ERNEST A. TOLIN
United States Attorney

BETTY MARSHALL GRAYDON
Assistant United States Attorney
325 West "F" Street
San Diego 1, California
Telephone:  F 9-4101

Attorneys for Plaintiff



# FILED

MAY 1 - 1951

EDMUND L. SMITH, Clerk

By ........................................
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CIVIL NO. 1247 |
| ) | |
| Plaintiff, ) | RESPONSE OF UNITED STATES |
| ) | |
| v. ) | TO |
| ) | |
| FALLBROOK PUBLIC UTILITY DISTRICT, a ) | MOTION FOR MORE DEFINITE STATEMENT |
| public service corporation of the ) | OR FOR BILL OF PARTICULARS; |
| State of California; ) | |
| ET AL.; ) | MOTION TO STRIKE |
| ) | |
| JAMES OVIATT; ) | MOTION FOR A MORE DEFINITE STATEMENT |
| ) | |
| SANTA MARGARITA MUTUAL WATER COMPANY, ) | MOTION TO DISMISS, MOTION TO STRIKE, |
| a public service corporation of the ) | AND FOR AN ORDER DIRECTING PLAINTIFF |
| State of California, ) | TO FILE A MORE DEFINITE STATEMENT |
| ) | |
| Defendants. ) | |

PRELIMINARY STATEMENT

To be noted is the fact that there is before this Court but a single

motion to dismiss.  That has been filed by the Santa Margarita Mutual Water

Company.  Motions for a more definite statement have been filed by that Company

and by the other defendants named above.  A paragraph-by-paragraph response

has been made to the several items referred to in those motions for a more

definite statement.  Better to clarify the information submitted exhibits

in the form of maps and letters with full descriptions of the lands have been

prepared and incorporated into this memorandum.  Thus, it is believed that this

Court will find that all of the information desired by the defendants has been

supplied to them.

Important is the fact that counsel for the Fallbrook Public Utility

- i -

129

1   District has answered for one of the named defendants, though he makes numerous

2   requests on behalf of other defendants.  For that reason it is difficult to

3   perceive why this matter should be further delayed and the Court is respectfully

4   requested to require the defendants here named to answer.

5        Motions to strike have likewise been filed.  They are responded to

6   paragraph by paragraph.  It will be observed that the data which the movants

7   seek to strike would eliminate from the complaint allegations respecting the

8   military uses to which the rights to the use of water here involved are of

9   utmost importance and it is believed do not prejudice the movants in any way.

10  Accordingly, this Court is requested to deny those motions to strike.

11       Extended comment from the standpoint of the law is made to the motion

12  to dismiss and it is believed those authorities will reveal that the motion

13  should be denied.

### SYNOPSIS OF MEMORANDUM

Constitutional Law:

1.  The United States of America is a sovereign of delegated

    powers.  Within its sphere of delegated powers it

    exercises supreme authority                    pages 1 - 4

2.  The Congress has the power to provide for the

    common defense and to declare war.  For those

    purposes the properties here involved were acquired

    and are now maintained                         pages 4 - 5

3.  The authority residing in Congress to administer the

    properties of the United States is without

    limitation                                     pages 5 - 8

4.  Exclusive jurisdiction over the military establish-

    ments here involved resides in the United States.

    Thus Congress alone insofar as this case is concerned

    has legislative powers over the properties      pages 8 - 15

Character of Relief Sought by the United States:

1.  Rules of Civil Procedure require a simple statement

    of fact and prayer for relief                   pages 15 - 16

2. In an action to quiet title the petitioner is not
called upon in his complaint to deraign his title
or to allege the character of the adverse claim
asserted by the defendant                    pages 17 - 21
3. Inconsistencies in position assumed by the Fallbrook
Public Utilities District, et al.                    page 21

Response

1. To motion for more definite statement and
authorities of Fallbrook Public Utility District,
et al.                                      pages 21 - 35
2. To motion to strike of Fallbrook Public Utility
District, et al.                            pages 35 - 39
3. To motion for a more definite statement -
James Oviatt                                pages 39 - 43
4. To motion to dismiss, motion to strike, for
a more definite statement and supplemental
authorities - Santa Margarita Mutual Water
Company                                     pages 42 - end

Exhibits -

A  Letter of January 12, 1943, ceding jurisdiction to certain lands.
B  Letter of September 8, 1943, ceding jurisdiction to certain lands.
C  Letter of February 18, 1944, ceding jurisdiction to certain lands.
D  Letter dated January 24, 1950, from James Don Keller, District Attorney
   and County Counsel to the Superintendent of Schools of San Diego, Cal.
E  Map of underground basin.
F  Letter dated July 22, 1949, from Phil D. Swing, Attorney for
   Fallbrook Public Utility District, to Bureau of Yards and Docks,
   Department of the Navy.
G  Vicinity map showing watershed of the Santa Margarita River.
H  Map classifying lands riparian to the Santa Margarita River.

**M E M O R A N D U M**

Manifest from the motions and authorities to which this memorandum makes response is one paramount fact:

Movants fail to accept the unequivocal allegations of the complaint that the United States of America acquired, now uses, and in the foreseeable future will use for <u>military purposes</u> all of the rights to the use of water in the Santa Margarita River which were owned by the Rancho Santa Margarita y las Flores.

Those rights were acquired and are now used by the United States of America for military purposes. Measure of those rights is commensurate with the rights of the Rancho Santa Margarita at the time they were acquired by the United States of America, plus whatever increment may have accrued by reason of that ownership through the years.

Patent from the motions here involved, the requests for more definite statements, and the authorities cited, is a need for clarification of the status occupied by the United States of America in regard to its rights to the use of water in the Santa Margarita River. Thus, at the outset there will be reviewed the character of the sovereignty of the United States of America, the pertinent provisions of the Constitution of the United States, and the decisions interpreting those provisions.

<u>The United States is a sovereign of delegated
powers - within the sphere of its delegated powers it
exercised supreme authority.</u>

Any consideration of the constitutional powers of the United States of America entails a discussion of the nature of the National Government. On the subject this statement has been made: "The government of the United States is one of enumerated powers; the national Constitution being the instrument which specifies them, and in which authority should be found for the exercise of any power which the national government assumes to possess." [1/]

---

[1/] Cooley's Constitutional Limitations, 8th ed., Carrington, vol. 1, Chap II, p.11.

- 1 -

132

1  A correlative principle of constitutional law, equally important as the tenet
2  enunciated in regard to the character of the powers of the United States,
3  is that the Constitution "and the laws of the United States which shall be made
4  in Pursuance thereof; and all Treaties made, or which shall be made, under
5  the Authority of the United States, shall be the supreme Law of the Land;
6  and the Judges in every State shall be bound thereby, any Thing in the
7  Constitution or Laws of any State to the Contrary notwithstanding." [2]
8  By that provision it is manifest that the framers of the Constitution intended
9  to establish a government sovereign in its sphere of delegated authority. [3]
10  Moreover, in the performance of its delegated authority it matters not whether
11  the United States is assisting in the development of the arid West, acting in
12  furtherance of commerce between the States, or, as here, endeavoring to
13  prevent aggression, its acts are all of equal dignity.  That conclusion is
14  premised upon the decision of the Supreme Court of the United States in which
15  it declared: "The federal government is one of delegated powers, and from that
16  it necessarily follows that any constitutional exercise of its delegated powers
17  is governmental." [4]
18       Respecting the powers conferred upon the National Government,
19  Chief Justice Marshall, in the formative years of our Nation, declared:
20  "If any one proposition could command the universal assent of mankind, we
21  might expect it would be this — that the government of the Union, though
22  limited in its powers, is supreme within its sphere of action." [5]  Specifically
23  in regard to the cited clause of the Constitution, Justice Marshall continued:
24  "It is of the very essence of supremacy, to remove all obstacles to its action
25  within its own sphere, and so to modify every power vested in subordinate
26  governments, as to exempt its own operations from their own influence.  This
27  effect need not be stated in terms.  It is so involved in the declaration  of

---

29  [2]   Article VI, Clause 2, Constitution of the United States.
30  [3]   United States v. California, 332 U. S. 19 (1946).
31  [4]   Federal Land Bank v. Bismarck Co., 314 U. S. 95, 102 (1941).
32  [5]   McCulloch v. Maryland, 17 U. S. 315, 405 (1819).

1   supremacy, so necessarily implied in it, that the expression of it could not

2   make it more certain." [6/]   He further stated: "No trace is to be found in

3   the constitution of an intention to create a dependence of the government of

4   the Union on those of the states, for the execution of the great powers assigned

5   to it.  Its means are adequate to its ends; and on those means alone was it

6   expected to rely for the accomplishment of its ends." [7/]   Moreover, the Federal

7   Government is not only supreme in fulfilling its delegated responsibility,

8   it is free to accomplish the ends for which it was established, without

9   interference from the States.  Speaking with reference to that immunity of the

10  National Government, the Supreme Court of the United States, in connection

11  with a case much in point on the subject being discussed, said this:

12  "[Arizona's] statutes prohibit the construction of any dam whatsoever until

13  written approval of plans and specifications shall have been obtained from

14  the State Engineer * * *.  The United States has not secured such approval;

15  nor has any application been made by Wilbur, who is proceeding to construct said

16  dam in complete disregard of this law of Arizona.

17      "The United States may perform its functions without conforming to

18  the police regulations of a State.  * * * Wilbur is under no obligation to

19  submit the plans and specifications to the State Engineer for approval." [8/]

20  In denying the right of a State to require truck drivers for the Post Office

21  to secure licenses to drive within its jurisdiction the Court observed: "It

22  seems to us that the immunity of the instruments of the United States from

23  state control in the performance of their duties extends to a requirement that

24  they desist from performance until they satisfy a state officer upon examination

25  that they are competent for a necessary part of them and pay a fee for

26  permission to go on." [9/]

27      In words of infinite clarity Chief Justice Marshall expressed the

29  6/   McCulloch v. Maryland, 17 U. S. 315, 427 (1819).

30  7/   McCulloch v. Maryland, 17 U. S. 315, 424 (1819).

31  8/   Arizona v. California, 283 U. S. 423, 451 (1930).

32  9/   Johnson v. Maryland, 254 U. S. 51, 57 (1920).

- 3 -

134

1  reason for imparting to the National Government the attributes of sovereignty

2  which have been discussed, and the reason for investing it with freedom from

3  restraint within its sphere of authority: "To impose on it /‾the United States‾/

4  the necessity of resorting to means which it cannot control, which another

5  government may furnish or withhold, would render its course precarious, the

6  result of its measures uncertain, and create a dependence on other governments,

7  which might disappoint its most important designs, and is incompatible with

8  the language of the constitution." 10/

9      Abundantly clear from the cited authorities is the fact that the

10  United States of America has been vested with power commensurate with the

11  responsibilities which devolve upon it by reason of the Constitution.  From

12  that general resume of the powers of the National Government, consideration

13  now will be given to the pertinent provisions of the Constitution which are

14  here applicable.

15      "The Congress shall have Power To * * * provide for
    the common Defense * * *." 11/

16      "The Congress shall have power * * * To declare
    War, * * *." 12/

17

18      Exercising the power to provide for the common defense and exercising

19  the power to wage war against the Axis powers, the United States of America

20  during World War II acquired the land comprising Camp Joseph H. Pendleton,

21  the United States Naval Hospital and the United States Naval Ammunition Depot.

22  As alleged in the complaint, that land is traversed by the Santa Margarita River.

23  Fee simple title to that land and appurtenant rights to the use of water now

24  resides in the United States of America.

25      Pursuant to those constitutional powers there were constructed on

26  these sites military establishments vital to the Nation's defense – to its

27  successful prosecution of the present conflict in Korea.  Pursuant to those

28  powers the military installations are maintained.

29

30  10/  McCulloch v. Maryland, 17 U. S. 315, 424 (1819).

31  11/  Article I, section 8, clause 1, Constitution of the United States.

32  12/  Article I, section 8, clause 11, Constitution of the United States.

- 4 -

135

1   all of the properties were acquired and are now used for military

2   purposes.

3         Invaluable rights to the use of water from the Santa Margarita River

4   are owned and exercised by the United States.  Those rights were essential

5   to the prosecution of World War II.  They are essential to the successful

6   prosecution of the present Korean conflict.  They will be essential for the

7   "common Defence."

8         Seldom, previous to this case, has there been challenged the authority

9   of the United States of America to utilize water essential to the National

10  defense.  Where, however, the question has been presented, the courts have

11  uniformly adhered to the same principles which govern other property rights

12  held for National defense purposes.  Obviously, there could be no other

13  course which in logic could be pursued.  A different rule would nullify every

14  National defense effort for without water Camp Pendleton or any other military

15  installation could not be maintained. [13]

16         "The Congress shall have Power to dispose of and
       make all needful Rules and Regulations respecting the
17     Territory or other Property belonging to the United
       States; * * *." [14]
18

19         There can be no doubt that rights to the use of water are, in the

20  contemplation of the law, interests in real property and come within the

21  purview of the provisions of the Constitution of the United States above quoted.

22  In that regard the Supreme Court of the State of California has made several

23  pronouncements.  In a relatively recent case that court has declared that a right

24  to the use of water is a corporeal hereditament constituting an interest in real

25  estate. [15]   The right to the use of water is a natural right in the nature of

26  an interest in real property. [16]   Relative to the proposition the following

27  _____

28  [13]  For authorities in regard to the use of water for purposes of National
        defense please refer to Ashwander v. Tennessee Valley Authority, 297 U.S.
29      288, 326, 327 (1935); Tennessee Electric Power Co. v. Tennessee Valley Authority,
        21 F. Supp. 947, 958; affirmed 306 U.S. 118 (1938).

30  [14]  Article IV, section 3, Clause 2, Constitution of the United States.

31  [15]  Wright v. Best, 19 Cal. 2d 368, 121 P.2d 702 (1942).

32  [16]  Kinney, Irrigation and Water Rights, 2d ed., vol. 2, sec. 769, p. 1328 and
        cases cited.

                                                                        136

1   comment has been made: "This usufructuary right, or 'water right,' is the
2   substantial right with regard to flowing waters; is the right which is almost
3   invariably the subject matter over which irrigation or water power or similar
4   contracts are made and litigation arises; and is real property.  It is as
5   fundamental under the law of riparian rights as under the law of appropriation."[17]
6   That principle is recognized by one of the defendants in the authorities now
7   before this Court.[18]

8          Having established that rights to the use of water are interests
9   in real property, there will be examined the full purport of the clause of
10  the Constitution set forth above and which pertains to the power of Congress
11  over property.  That power, as the authorities in the succeeding paragraphs
12  will reveal, is without limitation.  Worthy of note at the outset is the fact
13  that the United States has been invested with power adequately to protect its
14  own property without regard to the States.  For, as the highest Court has
15  observed: "A different rule would place the public domain of the United States
16  completely at the mercy of the state legislature."[19]

17         Consonant with the principle that the United States may act to protect
18  the property which it holds in the several States the highest Court recognized
19  the power of the National Government to establish forest reserves on the public
20  land[20] and to make needful regulations for the administration of those
21  reserves.[21]

22         When deer were killed at the instance of the Secretary of Agriculture
23  in violation of State game laws to prevent overgrazing in a national forest and
24  the forestry official was threatened with arrest, the highest Court stated:
25  "the power of the United States to thus protect its lands and property does
26

---

27  17/  Wiel, Water Rights in the Western States, 3d ed., vol. 1, sec. 18, p. 20.

28  18/  Supplemental Points and Authorities of Defendant Santa Margarita Mutual
29       Water Company in Support of its Motions to Dismiss, to Strike and to
         Make More Certain, pages 7 and 8.

30  19/  Camfield v. United States, 167 U. S. 518, 526 (1896).

31  20/  Light v. United States, 220 U. S. 523, 536 (1911).

32  21/  United States v. Grimaud, 220 U. S. 506, 521 (1911).

137

1  not admit of doubt * * * the game laws or any other statute of the state to
2  the contrary notwithstanding." [22/]

3       More recently the highest Court had occasion to consider the purport
4  of an act of Congress granting certain lands and rights-of-way in Yosemite
5  National Park and Stanislaus National Forest, both in the State of California. [23/]
6  In declaring valid the conditions upon which a right-of-way was granted, the
7  Court first referred to the Property Clause of the Constitution, then stated:
8  "The power over the public land thus entrusted to Congress is without limitations.
9  'And it is not for the courts to say how that trust shall be administered.  That
10  is for Congress to determine.'  Thus, Congress may constitutionally limit the
11  disposition of the public domain to a manner consistent with its views of public
12  policy.  And the policy to govern disposal of rights to develop hydroelectric
13  power in such public lands may, if Congress chooses, be one designed to avoid
14  monopoly and to bring about a wide-spread distribution of benefits." [24/]  Few
15  cases better exemplify the breadth of application of the power conferred upon
16  the United States by the Constitutional clause in question.

17       Too clear for question, therefore, is the fact that Congress and
18  Congress alone is empowered to administer the properties of the United States.
19  Equally clear is the fact that in the absence of Congressional authorization
20  there may be no disposition of property by acts of the agents of the United States.
21  For, recently declared by the highest Court: "The Government, which holds its
22  interests here as elsewhere in trust for all the people, is not to be deprived
23  of those interests by the ordinary court rules designed particularly for private
24  disputes over individually owned pieces of property; and officers who have no
25  authority at all to dispose of Government property cannot by their conduct cause
26  the Government to lose its valuable rights by their acquiescence, laches, or
27  failure to act." [25/]

28

29  22/  Hunt v. United States, 278 U. S. 96, 100 (1928).
30  23/  United States v. San Francisco, 310 U. S. 16 (1939).
31  24/  United States v. San Francisco, 310 U. S. 16, 29, 30 (1939).
32  25/  United States v. California, 332 U. S. 19, 40  (1946).

- 7 -

1        Reiterating the precept that "The power over the public land thus

2    entrusted to Congress is without limitations," consideration will next be

3    directed to the fact that exclusive jurisdiction resides in the United States

4    over the properties involved in this litigation.

5               "The Congress shall have power * * * To exercise
           exclusive legislation in all Cases whatsoever, * * * over

6               all Places purchased by the Consent of the Legislature of
           the State in which the same shall be, for the Erection of

7               Forts, Magazines, Arsenals, dock-Yards, and other needful
           Buildings; * * *." 26/

8

9        Exclusive jurisdiction over Camp Joseph H. Pendleton and the United

10   States Naval Ammunition Depot and the United States Naval Hospital resides in

11   the United States of America, subject to exceptions not here important.  That

12   cession of jurisdiction was effectuated pursuant to the applicable Federal

13   and State laws. 27/

14

_____

15   26/  Article I, section 8, clause 17, Constitution of the United States.

16   27/  Act of October 9, 1940, Public No. 825, 76th Congress, 3d Session,
17       Ch. 793, 54 Stat. 1083, 1084 – "* * * Notwithstanding any other provision
    of law, the obtaining of exclusive jurisdiction in the United States over
18   lands or interests therein which have been or shall hereafter be acquired
    by it shall not be required; but the head or other authorized officer of
19   any department or independent establishment or agency of the Government
    may, in such cases and at such times as he may deem desirable, accept or
20   secure from the State in which any lands or interests therein under his
    immediate jurisdiction, custody, or control are situated, consent to or
21   cession of such jurisdiction, exclusive or partial, not theretofore ob-
    tained, over any such lands or interests as he may deem desirable and
22   indicate acceptance of such jurisdiction on behalf of the United States
    by filing a notice of such acceptance with the Governor of such State or
23   in such other manner as may be prescribed by the laws of the State where
    such lands are situated.  Unless and until the United States has accepted
24   jurisdiction over lands hereafter to be acquired as aforesaid, it shall be
    conclusively presumed that no such jurisdiction has been accepted."

25       Political Code of California, Section 34 as amended by Chapter
26   710 of the 1939 Statutes and Amendments to the Codes: "The Legislature
    consents to the purchase or condemnation by the United States of any
27   tract of land within this State for the purpose of erecting forts,
    magazines, arsenals, dockyards, and other needful buildings, upon the
28   express condition that all civil process issued from the courts of this
    State, and such criminal process as may issue under the authority of this
29   State, against any person charged with crime, may be served and executed
    thereon in the same mode and manner and by the same officers as if the
30   purchase or condemnation had not been made and upon the further express
    condition that the State reserves its entire power of taxation with
31   respect to such tracts of land and may levy and collect all taxes now or
    hereafter imposed in the same manner and to the same extent as if this
32   consent had not been granted."

139

1       Governor Earl Warren of the State of California has acknowledged

2  that exclusive jurisdiction resides in the United States. [28/]  Due to the

3  immense importance of the cession of jurisdiction by the State of California

4  to the United States of America over Camp Pendleton, the United States Naval

5  Hospital and the United States Naval Ammunition Depot, brief reference is

6  warranted to the historical background of the last above-quoted provision

7  of the Constitution of the United States.

8       Of particular interest is the change made in the draft of the

9  Constitution before the Convention which first adopted our organic law.  As

10  originally presented to the Convention the clause in question provided that

11  the National Government would exercise "exclusive legislation" over the now

12  District of Columbia.  Similarly, it provided that "like authority /‾would

13  be exercised_7 over all places purchased for the erection of forts, magazines,

14  arsenals, dock-yards, and other needful buildings."  Mr. Elbridge Gerry of

15  Massachusetts objected that the power in question could be exercised as a

16  means "of awing the state into an undue obedience to the general government." [29/]

17  To alleviate the concern expressed by the opponents of the Constitution, it was

18  proposed, and the amendment was adopted, to interpolate following the word

19  "purchased" this clause: "by the consent of the legislature of the state." [30/]

20  Respecting the proviso and the amendment to it, Mr. James Madison succinctly

21

22  28/  Letter of January 12, 1943, from James Forrestal, Acting Secretary
23      of the Navy, to Earl Warren, Governor of the State of California,
   respecting the lands acquired by the United States in a condemnation
24  proceeding designated United States of America v. 9,147.55 acres of land,
   more or less, in San Diego, San Diego County, California, Rancho Santa
25  Margarita, a corporation, et al., No. 139, acknowledged by Governor Warren
   January 18, 1943;
26       Letter of September 8, 1943, from James Forrestal, Acting Secretary
   of the Navy, to Earl Warren, Governor of California, respecting lands acquired
27  by the United States in proceedings designated United States of America v.
   123,620 acres of land in San Diego and Orange Counties, California, Maud Lee
28  Flood, et al., Civil No. 197-SD, acknowledged by Governor Warren September 13,
   1943;
29       Letter of February 18, 1944, from A. L. Gates, Acting Secretary of
   the Navy, to Earl Warren, Governor of California, respecting lands acquired
30  by the United States in proceedings designated United States of America v.
   1,676.58 acres of land in San Diego County, California, George Henry Hutson, et
31  al., Civil No. 321-SD, acknowledged by Governor Warren February 23, 1944;
        Attached to this memorandum and marked Exhibits A, B and C are true
32  copies of the letters in question together with the description of the lands
   involved.

29/  Elliot's Debates on the Federal Constitution, vol. 5, page 511.     140
30/  Elliot's Debates on the Federal Constitution, vol. 5, page 511.

- 9 -

1  commented as follows: "The necessity of a like authority /as that exercised

2  over the seat of the National Government_7 over forts, magazines, etc.,

3  established by the general government, is not less evident.  The public money

4  expended on such places, and the public property deposited in them, requires

5  that they should be exempt from the authority of the particular State.  Nor

6  would it be proper for the places on which the security of the entire Union

7  may depend, to be in any degree dependent on a particular member of it.  All

8  objections and scruples are here also obviated, by requiring the concurrence

9  of the States concerned, in every such establishment." [31]/

10      Of innumerable cases involving the status of lands, held as here

11  under the exclusive jurisdiction of the National Government, space will allow

12  the consideration of but a few.  Those authorities will, however, constitute a

13  background for the ultimate trial of the issues of this case.  In that regard

14  reference is first made to an important State case.  There are recognized the

15  principles that the United States, where jurisdiction has been ceded to it,

16  is free from any restraints by State law. [32]/   That case arose with respect to

17  fencing of a right-of-way as required by local law.  Disregarding that law the

18  Secretary of War forbade the fencing of certain tracks which traversed Fort

19  Robinson Military Reservation.  The Supreme Court of Nebraska in that case

20  declared that refusal of the Secretary of War to permit the erection of fences

21  along the right-of-way constituted a defense to an action against the railroad

22  company for the killing of cattle, although a statute of the State, if it had

23  governed the case, would have made the company liable because of the failure

24  to enclose its tracks.  In another important decision the Supreme Court of the

25  United States stated that when the United States acquires title to lands, which

26  are purchased by the consent of the legislature of the State within which they

27  are situated "for the erection of forts, magazines, arsenals, dockyards and

28  other needful buildings," the Federal jurisdiction is exclusive of all State

29  authority. [33]/   That view is consistent with the principles enunciated in

31  [31]/  The Federalist, vol. 1, 1914, p. 295.

32  [32]/  Anderson v. Chicago & Northwestern RR., 102 Neb. 578, 168 N.W. 196 (1918).

[33]/  United States v. Unzeuta, 281 U. S. 138 (1929).

1  regard to the jurisdiction in question. [34/]   There it was stated in substance
2  that lands purchased by the United States with the consent of California, upon
3  which a custom house and other buildings had been erected, were under the
4  exclusive jurisdiction of the United States.  Again, on the subject, the Supreme
5  Court stated this: "The question is not an open one.  It long has been settled
6  that where lands for such a purpose are purchased by the United States with
7  the consent of the state legislature the jurisdiction theretofore residing in
8  the state passes, in virtue of the constitutional provision, /Article I, Sec. 8,
9  Clause 17 of the Constitution of the United States 7 to the United States, thereby
10  making the jurisdiction of the latter the sole jurisdiction." [35/]

11      In a highly important decision the Supreme Court of the United States
12  has before it for consideration the question of whether the state law respecting
13  oleomargarine controlled in an area set aside as a national home for volunteer
14  soldiers.  Having reviewed the action of Congress in providing funds for the
15  purchase of food for the soldiers in the home in question the Supreme Court
16  made this comment: "In making provision for so feeding the inmates, the
17  governor, under the direction of the board of managers and with the assent and
18  approval of Congress, is engaged in the internal administration of a Federal
19  institution, and we think a state legislature has no constitutional power to
20  interfere with such management as is provided by Congress." [36/]  Continuing, the
21  Court stated: "Whatever jurisdiction the state may have over the place or
22  ground where the institution is located, it can have none to interfere with
23  the provision made by Congress for furnishing food to the inmates of the home,
24  nor has it power to prohibit or regulate the furnishing of any article of food
25  which is approved by the officers of the home, by the board of managers and
26  by Congress.  Under such circumstances the police power of the State has no
27  application.

28      "We mean by this statement to say that Federal officers who are

29

30  34/  Sharon v. Hill, 24 Fed. 726 (C.C.A. Calif., 1885).
31  35/  Surplus Trading Company v. Cook, 281 U. S. 647, 652 (1929).
32  36/  Ohio v. Thomas, 173 U. S. 276, 282, 283 (1898).

142

discharging their duties in a State and who are engaged as this appellee was
engaged in superintending the internal government and management of a Federal
institution, under the lawful direction of its board of managers and with the
approval of Congress, are not subject to the jurisdiction of the State in
regard to those very matters of administration which are thus approved by
Federal authority."

On several occasions cases involving the respective jurisdiction of
the State of California and the United States have arisen. One of these cases
involves the sale of oil within an area long held and occupied by the United
States for military purposes. That area was the Presidio of San Francisco.
There the plaintiff delivered gasoline and the State of California undertook
to collect from the plaintiff the taxes levied upon that commodity. Having
recognized the fact that this was a military establishment over which
jurisdiction had been ceded by the State of California, the Supreme Court of
the United States made this succinct statement: "In three recent cases * * * we
have pointed out the consequences of cession by a State to the United States of
jurisdiction over lands held by the latter for military purposes. Considering
these opinions, it seems plain that by the Act of 1897 California surrendered
every possible claim of right to exercise legislative authority within the
Presidio - put that area beyond the field of operation of her laws. Accordingly,
her Legislature could not lay a tax upon transactions begun and concluded
therein. * * *

"The principle approved in these cases applies here. A State cannot
legislate effectively concerning matters beyond her jurisdiction, and within
territory subject only to control by the United States." [37/]

Again, the Supreme Court, in a case involving a jurisdictional
dispute between the State of California and the United States, had before it
the question of that State's control over the sale and distribution of milk.
It appears that the Department of Agriculture of the State of California
endeavored to revoke the license of a distributor of milk who sold to

---

37/  Standard Oil Co. v. California, 291 U. S. 242, 244 (1934).

- 12 -

143

1    Moffett Field, a base purchased by the United States.  There the appellant

2    sought a writ of mandamus to restrain the Department of Agriculture from

3    proceeding to hear and act upon the pending complaint.  Of importance is the

4    fact that Moffett Field was acquired by the United States under an act of

5    Congress and it is conceded by the State of California that the United States

6    has always had exclusive jurisdiction.

7         In contending the State of California was empowered to control the

8    appellant in the sale and distribution of milk even though the contract was

9    entered into and sales made on property within the exclusive jurisdiction of

10   the United States, it was urged by the State that the regulation of business in

11   the manner outlined was a valid exercise of police power.  Denial of the

12   validity of that contention by the highest Court was in these terms: "The

13   exclusive character of the jurisdiction of the United States on Moffett Field

14   is conceded.  Article I, Section 8, Clause 17 of the Constitution of the

15   United States declares that Congress shall have power 'To exercise exclusive

16   Legislation in all Cases whatsoever, over' the District of Columbia, 'and to

17   exercise like Authority over all Places purchased by the consent of the

18   Legislature of the State in which the Same shall be, for the Erection of Forts,

19   Magazines, Arsenals, dock-Yards, and other needful Buildings; * * *.'"  Having

20   declared that the State statutes were inoperative insofar as Moffett Field was

21   concerned, the highest Court stated: "To hold otherwise would be to affirm that

22   California may ignore the Constitutional provision that 'This Constitution, and

23   the Laws of the United States which shall be made in Pursuance thereof; * * *

24   shall be the supreme Law of the Land; * * *.'  It would be a denial of the

25   federal power 'to exercise exclusive Legislation.'  As respects such federal

26   territory Congress has the combined powers of a general and a state government."[38]

27         Another important case before the Supreme Court of the United States

28   involving jurisdiction arose in connection with the sale of intoxicating liquors

29   in the Yosemite National Park. [39]  There exclusive jurisdiction had been ceded to

30   _____

31   [38]  Pacific Coast Dairy v. Dept. of Agriculture of California, 318 U. S. 285,
          294 (1943).

32   [39]  Collins v. Yosemite Park Company, 304 U. S. 518, 530 (1937).

- 13 -

144

1    the United States subject to the right to tax persons and corporations on the

2    lands included in the park.  It was contended by the State of California that

3    the Alcoholic Beverage Control Act applied within Yosemite Park and that

4    appellee was obliged to apply for permits for importation and sale of liquor.

5    It was likewise contended that the appellee was subject to the provisions of

6    the act prohibiting the issuance of importer's licenses to persons holding

7    on-sale retail licenses.  Having reviewed the facts of the case with particular

8    reference being given to the exclusive jurisdiction ceded to the United States,

9    the Supreme Court made this comment: "* * * jurisdiction less than exclusive

10   may be granted the United States.  The jurisdiction over the Yosemite National

11   Park is exclusively in the United States except as reserved to California, e. g.,

12   right to tax, by the Act of April 15, 1919.  As there is no reservation of the

13   right to control the sale or use of alcoholic beverages, such regulatory

14   provisions as are found in the act under consideration are unenforceable in the

15   Park."

16          Worthy of attention is the opinion of the Honorable James Don Keller,

17   District Counsel and County Counsel, dated January 24, 1950. [40/]  There that

18   official discusses at length certain of the implications attendant upon the

19   fact that exclusive jurisdiction over the properties in question resides in the

20   United States.

21          To proceed further with this analysis would lend nothing to what has

22   been stated.  From the authorities reviewed it is abundantly manifest that the

23   laws of the State of California may in no way regulate the property of the United

24   States or impede the utilization of it for the purpose for which it was acquired.

25   Obviously, therefore, the contention is without merit that the United States may

26   not utilize the water of the Santa Margarita River for the purposes for which

27   it was acquired.  To assert, as has been done, that the United States is subject

28   to the laws of the State of California respecting the use of its property is

29   erroneous.  Moreover, it is contrary to the express provisions of the Constitution

30   and to repeated pronouncements of the highest Court.

31

32   40/  Exhibit D of this memorandum.

- 14 -

145

## CHARACTER OF RELIEF SOUGHT BY THE UNITED STATES IN THIS PROCEEDING

To this point in the memorandum the fundamental questions involving Constitutional law have dominated. Clearly, those all-pervading tenets of the law constitute the most salient aspects of this case. It is respectfully submitted that they will control the ultimate disposition of it. Against the background of Constitutional law the innumerable objections raised by movants must be considered.

Those objections are of such character as to require consideration of certain rudimentary factors of pleading. At the outset it is to be emphasized that under the Rules of Civil Procedure the distinction between law and equity which previously existed has been eliminated. 41/   Moreover it is provided in those rules that there shall be but one form of action known as a "civil action." It is likewise provided by those same rules that in pleading the petitioner must state a claim for relief which shall be (1) a short and plain assertion of the grounds upon which the court's jurisdiction depends; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for judgment for the relief to which he deems himself entitled. 42/

In regard to the sufficiency of the statement of the claim which will entitle the court to take jurisdiction, this pertinent statement has been made: "There is no justification for dismissing a complaint for insufficiency of statement, except where it appears to a certainty that the plaintiff would not be entitled to relief under any state of facts which could be proved in support of the claim." 43/   Again, this authoritative statement has been made on the subject: "Our duty * * * is to consider whether in the light most favorable to the plaintiff, with every intendment regarded in his favor, the complaint is sufficient to constitute a valid claim." 44/   It is likewise a precept adhered to by the courts that: "Pleadings are to be liberally

41/ Rules of Civil Procedure for the District Courts of the United States, Rule 2.
42/ Rules of Civil Procedure for the District Courts of the United States, Rule 8.
43/ Continental Collieries v. Shober, 130 F.2d 631, 635 (C.A. 3, 1942).
44/ Tahir Erk v. Glenn L. Martin Co., 116 F.2c 865, 869 (C.A. 4, 1941).

146

construed." [45/]   This summarization in regard to pleadings under the new rules
is especially pertinent: "A motion to dismiss is limited to the allegations of
the complaint, and, being the equivalent of a demurrer, the court is called
upon to interpret the allegations of such complaint, and to accept all such
allegations as being true, and to determine whether such complaint presents
a cause of action.   In weighing the validity of a motion to dismiss a complaint
for insufficiency the duty of the court is not to test the final merit of the
claim in order to determine which party is to prevail.   But in ruling on the
motion, the court must proceed in the light of the present principles as to
liberal interpretation of pleadings.   On a motion to dismiss the plaintiff is
entitled to the most favorable intendments to be drawn from the facts pleaded.
As it has been expressed, the question presented by a motion to dismiss a
complaint is whether the complaint, construed in the light most favorable to
the plaintiff and with all doubts resolved in favor of its sufficiency, states
a claim upon which relief could be granted.   * * * to warrant dismissal of a
complaint for insufficiency, it should appear that a claim for relief does
not exist, rather than that a claim has been defectively stated." [46/]   Thus
it will be observed that the minutiae of the vast majority of objections raised
by the movants are not only contrary to the present rules of civil procedure,
but are very largely without merit.

Turning now to the question of the sufficiency of the complaint to
state a claim in a proceeding such as this to quiet title, reference will be
made to decisions of both the highest court of the United States and the
highest court of the State of California.   One of the leading authorities on
the subject is an early decision of the Supreme Court of the State of California.
That case is especially in point under the circumstances.   There the petitioner
alleged ownership of certain real properties; that the defendant claimed an
adverse interest; that such claim was without right; and that the defendant

---

45/   Moore's Federal Practice, 2d ed., 12.08,   Motion to Dismiss for Failure
       to State Claim, pp. 2244, 2245.

46/   Cyc. Fed. Proc., sec. 1601, p. 267.

1  had no right or title or interest whatever in the property.  The prayer was
2  that the defendant be required to set forth the nature of his claim, that it
3  be adjudged to be void and that the defendant be enjoined from asserting it. 47/
4  In declaring the sufficiency of the complaint, the court stated: "* * * the
5  proceeding is for the purpose of stopping the mouth of a person who has
6  asserted or is asserting a claim to the plaintiff's property, whether such
7  claim be founded upon evidence or utterly baseless.  It is not aimed at a
8  particular piece of evidence, but at the pretensions of an individual."
9  Continuing, the court stated: "* * * the action may be maintained by the owner
10  of property to determine any adverse claim whatever.  For if the defendant by
11  his answer disclaims all interest whatever, judgment may, nevertheless, be
12  entered against him, though in such case it must be without costs. * * *
13        "The plaintiff, therefore, is not required to set forth the nature of
14  the defendant's claim. * * * The pleading is very simple.  And it is well
15  settled that the allegations above mentioned are sufficient."
16        Again, California's highest court has declared: "An action to quiet
17  title may be maintained by the owner to determine any adverse claim of the
18  defendant, and the plaintiff in such action is not required to set forth the
19  nature of the defendant's claim." 48/   In a very recent case California's
20  Supreme Court reiterated the principle in these terms: "One who alleges that he
21  is the owner of certain described real property, that defendants claim an
22  interest therein adversely to him, that such claim is without right, and that
23  the defendants have no estate, title or interest whatever in said premises
24  or any part thereof pleads all that the law requires in an action to quiet
25  title and, in such an action, the complaint need not particularly state the
26  facts in regard to the asserted invalidity nor attack the instrument which is
27  claimed to be a cloud against the title of the plaintiff." 49/

29  47/  Castro v. Barry, 79 Cal. 443, 446, 447, 21 Pac. 946 (1889).
30  48/  Thompson, et al., v. Moore, et al., 8 Cal.2d 367, 69 P.2d 800, 803.
31  49/  Ephraim v. Metropolitan Trust Co., 28 Cal.2d 824, 172 P.2d 501 (1946).

1      Identically the same principles have been stated by the Supreme
2  Court of the United States.  In regard to the sufficiency of a complaint in a
3  proceeding to quiet title, as here before the Court, the highest Court of the
4  United States has stated: "An allegation, in ordinary and concise terms, of
5  the ultimate fact that the plaintiff is the owner in fee is sufficient, without
6  setting out matters of evidence, or what have been sometimes called probative
7  facts, which go to establish that ultimate fact; <u>and an allegation that the</u>
8  <u>defendant claims an adverse estate or interest is sufficient, without further</u>
9  <u>defining it, to put him to a disclaimer, or to allegation and proof of the</u>
10 <u>estate or interest which he claims, the nature of which must be known to him,</u>
11 <u>and may not be known to the plaintiff."</u> [50/]   (Underscoring supplied.)   That
12 often-cited case is authority for the proposition that where, as here, the
13 United States has alleged its fee simple title to the property it is not
14 called upon to deraign its title.  It is likewise authority for the proposition
15 that it need not plead evidentiary factors necessarily involved in defining
16 the character of the adverse claim of the defendant.  Obviously, the defendant
17 is in a better position to know the character of the claim which he has, if
18 any.
19      It is to be observed that the United States, in the complaint filed
20 in this case, has complied fully with the principles enunciated by the courts
21 in question.  Worthy of note at this point is the fact that the Supreme Court
22 of the State of California has held that the same principles relating to
23 proceedings to quiet title to land as such, will be applied to an action to
24 quiet title to rights to the use of water.  That principle was adhered to in
25 an instance where the right was inchoate. [51/]
26      By reason of the inquiries of movants concerning the existence of
27 a genuine controversy, it is necessary to consider the authorities relating to
28 the adjudication of rights to the use of water in suits for declaratory judgments.

---

30 50/  Ely v. New Mexico & Arizona RR. Co., 129 U. S. 291, 293 (1889).

31 51/  Inyo Consolidated Water Company, appellant, v. Stoddard Jess, et al.,
        respondents, 161 Cal. 516, 521, 119 Pac. 934 (1911).

149

1    That review will be undertaken to avoid further delay.  On the subject reference is

2    first made to the fact that an action seeking declaratory relief with respect to

3    rights to the use of water in the State of California is no innovation.  That

4    fact has long been recognized for, as stated authoritatively: "A decree may be

5    rendered refusing injunction, but declaring a right in plaintiff.  This cannot

6    be in rem, except by statute, but will be phrased in personam, enjoining

7    defendant from claiming any right hostile to that declared in plaintiff; in

8    effect a decree quieting title."  $\underline{52/}$  The same authority further states:

9    "* * * there is a tendency to protect such future use (where no present use is

10   made, and hence no actual present damage) by a declaratory decree, protecting

11   the complaining proprietor's right of future use, * * *."  $\underline{53/}$  A case on the

12   subject involved the rights to the use of water of the City of Los Angeles.

13   There the city, having originally instituted a proceeding injunctive in

14   character, amended to the end that the relief which it sought was purely

15   declaratory.  The court entered a decree which, among other things, sustained

16   the contention of the City of Los Angeles and retained jurisdiction for

17   purposes of administration.  In sustaining the lower court on that point,

18   the Supreme Court of the State of California said: "The retention of jurisdiction

19   to meet future problems is regarded as an appropriate exercise of equitable

20   jurisdiction in litigation over water rights, particularly when the adjustment

21   of substantial public interests is involved.  * * * In giving declaratory relief

22   a court has the powers of a court of equity."  $\underline{54/}$

23        In a leading case involving rights to the use of water of the City of

24   San Diego, the Supreme Court of the State of California had this to say:

25   "This * * * is an action purely declaratory in character and is one wherein the

26   plaintiff has neither pleaded nor attempted to prove any facts which would entitle

27   it to any further or affirmative relief beyond that of having its prior and

29   52/  Wiel, Water Rights in the Western States, 3d ed., vol. 1, sec. 654, p. 728.

30   53/  Wiel, Water Rights in the Western States, 3d ed., vol. 1, sec. 802.

31   54/  City of Los Angeles v. City of Glendale, 23 Cal.2d 68, 142 P.2d
32        289 (1943).

150

16-29995-1          GPO 0-878913

1   paramount right to the use of the water of the San Diego River established." [55/]

2   This authoritative statement is particularly of interest from the standpoint

3   of declaratory judgments: "A declaratory action with respect to water rights

4   is appropriate for the adjudication of questions respecting the same.  This is

5   particularly true in the arid sections of the western states where water

6   applied to land is regarded as realty.  A declaratory action will lie to

7   determine the rights, title, interests, and legal relations of the parties

8   in and to water.  * * * declaratory action may be resorted to to determine the

9   riparian rights of parties to waters of a stream or a lake." [56/]

10          As to the criterion which governs in considering the sufficiency of a

11  complaint for declaratory relief, the highest Court of the United States has

12  made this statement: "A 'controversy' * * * must be one that is appropriate for

13  judicial determination.  * * * The controversy must be definite and concrete,

14  touching the legal relations of parties having adverse legal interests.  * * *

15  It must be a real and substantial controversy admitting of specific relief

16  through a decree of a conclusive character, as distinguished from an opinion

17  advising what the law would be upon a hypothetical state of facts.  * * * Where

18  there is such a concrete case admitting of an immediate and definitive deter-

19  mination of the legal rights of the parties in an adversary proceeding upon the

20  facts alleged, the judicial function may be appropriately exercised although the

21  adjudication of the rights of the litigants may not require the award of process

22  or the payment of damages." [57/]

23          From the authorities which have been cited it is manifest that the

24  United States has filed with this Court a complaint entitling it to relief.

25  Certainly the movants have failed to offer any authorities to sustain their

26  objections.  In the absence of authorities to the contrary nothing will be

27  gained by further laboring the proposition.

28          Having thus concluded the general aspects of the matter, consideration

29

---

30  55/  San Diego v. Cuyamaca Water Co., 209 Cal. 105, 287 Pac. 475, 496 (1930).

31  56/  Anderson, Declaratory Judgments, p. 737, sec. 311.

32  57/  Aetna Life Ins. Co. v. Haworth, 300 U. S. 227 (1937).

1   will next be directed to the specific points which have been raised.  These

2   salient factors should, however, be noted prior to that consideration.

3          1.  Counsel for the Fallbrook Public Utility District has moved

4   to strike innumerable provisions of the complaint; he has moved on behalf of

5   several defendants he represents for a more definite statement and a bill of

6   particulars.  Nevertheless, the same counsel on behalf of Austin H. Buckley

7   and others, answers each and every allegation in the complaint.

8          2.  Counsel for the Fallbrook Public Utility District moves on the

9   one hand to strike, as stated, many of the allegations of the complaint;

10  nevertheless, on the other hand, he asks for a more definite statement in regard

11  to many of those provisions which he seeks to strike.

12         3.  Counsel for the Fallbrook Public Utility District has sought to

13  raise on motion for a more definite statement, issues which, if proper, could

14  only be raised on a motion to dismiss.

15         There is open to the United States under the circumstances no

16  alternative but to make a paragraph by paragraph response to the pending motions

17  to the end that the true purport of this litigation may be revealed.

18  RESPONSE TO MOTION FOR MORE DEFINITE STATEMENT OR FOR BILL OF PARTICULARS

19         Fallbrook Public Utility District;
       Ernest Louis Barbey;
20       Essie Beulah Barbey;
       Ruth Wentworth;
21       A. F. Borel;
       Felix R. Garnsey;
22       H. McC. Hossein;
       M. N. Lloyd and E. M. Lloyd
23
                        I.

24         Defendants, having first charged that the United States is trying to

25  create a controversy by commencing this action, request that the United States

26  make a statement of facts showing that an actual controversy exists. [58]  In a

27  manner repetitious the defendants later in the motion request that the United

28  States declare the acts of encroachment complained of, the times, places, extent,

29  and character of those acts and by whom committed; and whether or not the

30  encroachments were by a common design. [59]

31  ─────────────────────────────────────────────────────────────────

32  [58]  Motion for more definite statement or for bill of particulars, par. 1, page 2.

   [59]  Motion for more definite statement or for bill of particulars, par. 7 (b).

1        Simply stated, the named defendants are on a "fishing expedition."

2        A cursory review of the authorities cited above in regard to quiet

3 title suits reveals that where, as here, the plaintiff has charged "that the

4 defendant claims an adverse estate or interest $\lceil$it$\rceil$ is sufficient, without

5 further defining it, to put him to a disclaimer, or to allegation and proof

6 of the estate or interest which he claims." [60/]   Manifestly, the movants would

7 have the United States plead evidence – evidence which of necessity is possessed

8 by the defendants and which in the normal course of a trial the defendants are

9 required to produce  or have judgment entered against them.  Moreover, as the

10 Supreme Court of the United States has declared and as reiterated by the Supreme

11 Court of the State of California, if the defendant has no claim he is then put

12 to a disclaimer.  Believing, however, that it would be of some aid to the

13 Court and would facilitate an early trial of the issues, the United States

14 gladly informs the named defendants the basis upon which it demands that they

15 come forward and set up their claims, or that judgment be entered against them.

16       1.  Specifically, the Fallbrook Public Utility District [61/] in direct

17 violation of the rights to the use of water of the United States in the Santa

18 Margarita River, has installed in that stream and is now maintaining a pump.

19 With that pump that District is now and has been pumping large quantities of

20 water to which the United States is entitled and to the great damage of the

21 United States.  That activity has been carried on irrespective of the rights

22 of the United States and irrespective of the fact that the defendant, Fallbrook

23 Public Utility District, has been served in this case.  Respecting the diversion

24 in question the defendant, Fallbrook Public Utility District, asserts rights

25 under permit No. 7033, Department of Public Works, Division of water Resources,

26 State Engineer, State of California.

27       2.  Specifically, the Fallbrook Public Utility District has filed

28 applications for permits to appropriate water, with the Department of Public

29 Works, Division of water Resources, State Engineer, State of California.

30

31 60/  Ely v. New Mexico & Arizona RR. Co., 129 U. S. 291, 293 (1889).

32 61/  Fallbrook Public Utility District, et al., motion for more definite
       statement or for bill of particulars, par. 1, page 2.

1   Those applications, it is understood, are numbered 12178, for 10,000 acre-feet

2   of water from Rainbow Creek; 12179 for 10,000 acre-feet of water from Sandia

3   Creek; and 11578 for 10,000 acre-feet of water from the Santa Margarita River.

4   They are in addition to the direct flow rights now claimed by the Fallbrook

5   Public Utility District under permit No. 7033.  Those claims in themselves are

6   adverse to the claims of the United States against which the United States is

7   entitled to a decree quieting title.

8         3.  Specifically, counsel for the Fallbrook Public Utility District,

9   in a letter dated July 22, 1949, to the Bureau of Yards and Docks, Department

10  of the Navy, Washington, D. C., [62/] declared that the United States has no

11  right to store water although that right is specifically provided for in

12  the Stipulated Judgment, Exhibit A of the complaint.

13        The foregoing assertions are not to be construed as in any way

14  limiting the adverse claims of the named defendants nor to vary in any way

15  the demand contained in the complaint that the defendants set up fully their

16  claims to water from the Santa Margarita River.

17        4.  Specifically, in regard to Ernest Louis Barbey and Essie Beulah

18  Barbey:  Those named defendants are plaintiffs in the case Ernest Louis Barbey,

19  and Essie Beulah Barbey v. James Oviatt, et al.; Cross-complainants Mary Vail

20  Wilkinson, Mahlon Vail, Edward N. Vail, Margaret Vail Wise, and Nita M. Vail,

21  Trustees, in the Superior Court of the State of California in and for the

22  County of San Diego, No. 154140.  Involved in that litigation are rights to the

23  use of water claimed by the parties plaintiff to which reference has been made.

24  If those plaintiffs claim no interest in and to the rights to the use of water

25  in the Santa Margarita River and its tributaries, they could not, of course,

26  be in conflict with the interests of the United States.  If, however, they are

27  asserting correlative rights in the stream, they are called upon to come forward

28  and assert their rights in this proceeding or, as the Supreme Court has suggested,

29  enter a disclaimer of any right.  The institution of such a suit in itself

30  clouds the title of the United States requiring relief of the character prayed.

31

32

---

62/  Exhibit E of this memorandum.

As counsel for these named defendants, it is understood, represents them in the Barbey litigation, it is impossible to view the request for a more definite statement as being other than somewhat anomalous.

5. Specifically, in regard to Ruth Wentworth, defendant and movant here, the United States alleges that the defendant in question is a party to the proceeding instituted by Ernest Louis Barbey and Essie Beulah Barbey, and it is understood is asserting interests in and to rights to the use of water of the Santa Margarita River and its tributaries. Worthy of note in regard to this request is the fact that counsel represents Austin H. Buckley, executor of the estate of John Wentworth, deceased. It will be revealed whether Ruth Wentworth has an interest in the estate of John Wentworth. Irrespective of that fact, if the aforesaid Ruth Wentworth has no claim or interest in and to the waters in question, it is her responsibility to make a disclaimer.

6. Specifically, in regard to A. F. Borel, defendant: that defendant has filed an application to appropriate water from the Santa Margarita River and its tributaries, application No. 13577. Whether that claimant is asserting rights in addition to those referred to, he is called upon to make proof. Moreover, the claim which he has filed is obviously against the interests of the United States.

7. Specifically, in regard to Felix Garnsey, defendant; that claimant has filed with the Department of Public Works, Division of Water Resources, State Engineer, State of California, filing No. 13505, asserting claims adverse to the interests of the United States and was for that reason named in this suit. If that defendant claims water, he is required, in accordance with the complaint of the United States, to answer and set up fully the claims which he asserts. If he makes no assertion to rights to the use of water, he should enter a disclaimer.

8. Specifically, H. McC. Hossein, M. N. Lloyd and E. M. Lloyd, defendants, are claimants to rights to the use of water in the Santa Margarita River or its tributaries and as such are asserting correlative rights in and to the use of the waters of the stream in question. In accordance with the prayer of the complaint those defendants should be required to answer the complaint

1    and to set up fully the character of their interests.  If they have no interests,

2    disclaimer should accordingly be entered by counsel.

3                                   II.

4         The defendants in the motion here under consideration make two
                    63/
5    inquiries:

6         (1) Whether the United States claims title and ownership of the rights

7    to the use of water in the Santa Margarita River, the subject matter of this suit.

8    Response to that inquiry is in the affirmative.  Such an inquiry, of course, is
                                                                          64/
9    unnecessary in view of the express statements throughout the complaint.

10        (2) The source of the title claimed by the United States.  This Court

11   will, of course, take judicial notice of its own records which will reveal that

12   the United States did condemn these rights for the military purposes for which

13   they are presently being used.  It is again observed in passing that the

14   United States is not called upon to plead for, as stated by the Supreme Court

15   of the United States: "An allegation, in ordinary and concise terms, of the

16   ultimate fact that the plaintiff is the owner in fee is sufficient, without

17   setting out matters of evidence, or what have been sometimes called probative
                                                                   65/
18   facts, which go to establish that ultimate fact; * * *."

19                                  III.
                                                        66/
20        Defendants request a more definite statement      as to what acts or

21   statutes vest in the United States exclusive jurisdiction over the properties

22   here involved.  Response to that inquiry has already been made in the review of

23   the law in the preceding paragraphs, commencing on page 5 through page 14.

24   Attached to this memorandum and made a part of it are Exhibits A, B, and C,

25   pursuant to which cession of exclusive jurisdiction in compliance with the laws

26   of the State of California was accomplished.

27   _____

28   63/  Fallbrook Public Utility District, et al., motion for more definite
          statement or for bill of particulars, par. 2, page 2.
29

30   64/  Complaint, paragraphs I, II, VI, and throughout the complaint.

31   65/  Ely v. New Mexico & Arizona RR. Co., 129 U. S. 291, 293 (1889).

32   66/  Fallbrook Public Utility District, et al., motion for more definite
          statement or for bill of particulars, par. 3, page 2.

1    Due to the confused character of the inquiry, full response to the
2  remainder of this paragraph is extremely difficult.  The inquiry is made as to
3  whether water rights were acquired by the United States by reason of the cession
4  of jurisdiction.  Continuing in the same vein, reference is made to the paramount
5  right to 35,000 acre-feet of water which the United States asserts.  Manifestly,
6  a cession of exclusive jurisdiction could not constitute a conveyance.  Neither
7  is the paramount right asserted by the United States premised upon that cession
8  of jurisdiction.  It is abundantly clear, however, that the fact that exclusive
9  jurisdiction resides in the United States casts the claims and rights of the
10  United States in a different perspective than those of the ordinary water user.
11                        IV.
12    Inquiry is made by the defendants in regard to the underground basin
13  alluded to in the complaint. 67/   In accord with their request, there is attached
14  to this memorandum, marked Exhibit B, a map of the underground basin to which the
15  United States alludes in its complaint.  For purposes of identification three
16  areas have been designated as separate basins.  They are interconnected, it will
17  be noted, and physically they are a single basin and one of the principal sources
18  of the supply of water of the United States for the military establishments.
19                        V.
20    Next, the defendants request that the United States give a more
21  definite statement as to which of the defendants in the present action were
22  parties to the suit upon which the Stipulated Judgment, Exhibit A of the complaint,
23  was predicated. 68/   They likewise request that, if plaintiff concedes that
24  some of the defendants in the present action were not parties or privy in
25  estate to the parties in the former action, it state how such defendants became
26  bound by the Stipulated Judgment.  A careful review of the complaint reveals
27  no assertion on the part of the United States that anyone who was not a party
28  to the action upon which the Stipulated Judgment in question was premised

---

67/  Fallbrook Public Utility District, et al., motion for more definite
     statement or for bill of particulars, par. 4, page 3.

68/  Fallbrook Public Utility District, et al., motion for more definite
     statement or for bill of particulars, par. 5, page 3.

157

- 26 -

1  is bound by that judgment.  Manifestly, it would be impossible under the law to

2  bind anyone not a party or a privy to the judgment.  If the defendants were not

3  parties to the cause, their recourse is to answer and set up the character of

4  their claims.

5                                    VI.

6         An incongruous situation is created by the defendants in their
            69/
7  motions.       It will be observed that in one motion the defendants request

8  that there be stricken from the complaint a large part of the particular

9  paragraph.  Nevertheless, in regard to that same allegation which the defendants

10  are desirous of having stricken, they move for a more definite statement in

11  another pleading.  An appropriate course would be to demand that defendants

12  elect either to strike or to request a more definite statement.  However, in an

13  effort to expedite a trial of the issues, the United States will make response

14  to the inquiries presented.

15         1.  Does the United States claim that the military purposes are
                                       70/
16  riparian or appropriative?       The United States declares that the rights to

17  the use of water were acquired from the Rancho Santa Margarita.  Those rights

18  are presently used for military purposes.  The measure of the rights are those

19  owned by the Rancho Santa Margarita at the time of the acquisition plus such

20  rights as may have been acquired through use – an element which must remain

21  undetermined until the evidence has been evaluated.  Those facts will present

22  the fundamental question of whether the State law under the circumstances will

23  control.  Response to that question, it is respectfully submitted, will be in the

24  negative for exclusive jurisdiction of the properties resides in the United
                                                                              71/
25  States and Congress alone is the law-making body respecting those properties.

26

27  69/  Fallbrook Public Utility District, et al., motion for more definite
           statement or for bill of particulars, par. 6, page 4; Fallbrook Public
28  Utility District, et al., motion to strike, paragraph V.

29  70/  Fallbrook Public Utility District, et al., motion for more definite
           statement or for bill of particulars, par. 6 (a), page 4.
30

31  71/  Ohio v. Thomas, 173 U. S. 276 (1898).

32

                                    - 27 -

1       2.  The second inquiry,[72/] correlative with the first, raises the proposi-

2   tion of whether all the military establishments are upon the 38,739 acres found

3   by the court to be riparian to the Santa Margarita River.  For the reasons

4   expressed above, it is immaterial from the standpoint of the United States

5   whether the water in question is utilized by the United States on riparian

6   or nonriparian land.

7       3.  The next inquiry presented by the defendants[73/] is whether since

8   the commencement of the military establishments the United States has pumped

9   from its wells and exported water out of the watershed.  It is repeated that

10  the measure of the rights exercised by the United States are those rights

11  acquired from the Rancho Santa Margarita plus such increment of rights as would

12  arise from use through the years.  The uses to which those rights are applied

13  are subject solely to the jurisdiction of the United States and the laws

14  enacted by the Congress.

15                          VII.

16      Alluding again to paragraph IV of the complaint,[74/] the defendants

17  inquire if the United States, by reason of the acquisition of the rights to

18  the use of water here involved for military purposes, has a superior and paramount

19  right to the riparian and overlying land owners upstream from the Rancho Santa

20  Margarita, so that the United States could enjoin such riparian and overlying

21  land owners from diverting and using the water upon said lands.  That inquiry,

22  of course, relates solely to a question of law and being hypothetical in nature

23  is wholly improper under the circumstances.  However, assuming that the

24  defendants named are able to prove riparian rights, it is sufficient to state that

25  the United States fully recognizes those riparian rights.  It is, of course,

26  necessary for those owners, in accordance with the request in the complaint,

27  to answer and come forward and fully prove their interests.  Worthy of note

---

29  72/  Fallbrook Public Utility District, et al., motion for more definite
30       statement or for bill of particulars, par. 6 (b), page 4.

31  73/  Fallbrook Public Utility District, et al., motion for more definite
         statement or for bill of particulars, par. 6 (c), page 5.

32  74/  Fallbrook Public Utility District, et al., motion for more definite
         statement or for bill of particulars, par. 7 (a), page 5.

159

1    is the fact that diverters of the character of Fallbrook Public Utility

2    District are appropriators and come within a separate and distinct category

3    from those alluded to in the paragraph in question.

VIII.

5         In a manner repetitious the defendants request that the United States

6    be directed to state the basis upon which it claims the quantity of water

7    alluded to in the complaint. [75/]   To reiterate, the United States asserts the

8    rights to the use of water to which it succeeded from the Rancho Santa Margarita

9    plus whatever rights may have accrued by reason of use.  Response, therefore,

10   is not required to the variety of questions presented by defendants as to the

11   character and manner in which rights to the use of water may be acquired and

12   held.  Moreover, in the words of the Supreme Court of the United States

13   previously quoted, the assertion of ownership is sufficient without setting

14   out probative facts respecting title which are evidentiary in character. [76/]

IX.

16        In view of the reply appearing in the paragraphs immediately preceding,

17   no useful purpose would be served by responding to the next inquiry of the

18   defendants. [77/]

X.

20        Creating the same anomalous situation to which reference has [78/]

21   previously been made, the defendants request a more definite statement

22   in regard to matters which they seek to strike from the complaint.  Again, in

23   the interest of an expeditious trial of this matter, the defendants will not be

24   called upon to elect as to the relief which they seek to obtain.  Rather, the

25   United States responds that it has utilized water beneficially and consumptively

26   for military purposes through the years pleaded in the complaint.  Of course,

---

75/  Fallbrook Public Utility District, et al., motion for more definite
     statement or for bill of particulars, par. 8 (a), (b), (c), (d), (e) and (f),
     pages 6 and 7.

76/  Ely v. New Mexico and Arizona RR. Co., 129 U. S. 291 (1889).

77/  Fallbrook Public Utility District, et al., motion for more definite
     statement or for bill of particulars, par. 9, page 7.

78/  Fallbrook Public Utility District, et al., motion for more definite
     statement or for bill of particulars, par. 10, page 7.

1  the United States is claiming the maximum needs for an emergency, and will

2  adduce evidence in that regard.  The military demands must be calculated on

3  that basis.  Again, however, it is a matter of proof concerning which in the

4  course of the trial the United States will produce full and complete evidence.

XI.

6  Alluding to the claim of the United States to a specified quantity

7  of water from the Santa Margarita River, the defendants refer to the uses

8  to which the water is applied when not needed for military demands. 79/  Inquiry

9  is then made as to what is meant by "other needs" as used by the United States

10  in the complaint.  Simply stated, that reference is to domestic uses.

11  Again, the United States, in regard to the remainder of the question,

12  is not called upon to explain the uses to which the water is applied when the

13  military establishments are not making full demand.  It is reiterated that

14  the primary and principal demand is military and that all other uses are

15  subordinate to that demand.  In a time of crisis the full quantities claimed

16  and which will be proved by the United States are what the Department of the

17  Navy and the Marine Corps believe to be their needs to protect the Nation.

XII.

19  Another anomaly is presented where the defendants request first

20  that a particular clause of the complaint be stricken and then ask for a more

21  definite statement in regard to it.  Irrespective of that fact, the United

22  States responds to the inquiry presented. 80/  That sentence from the complaint

23  is as follows: "For the purposes of this cause the United States of America,

24  adopting the findings of the Supreme Court of the State of California, considers

25  and accordingly claims that the surface stream and subterranean basin constitutes

26  a single source of supply of water."  Stripping the sentence quoted from its

27  context, defendants, for dilatory reasons, make much of it.  Manifestly, that

---

29  79/  Fallbrook Public Utility District, et al., motion for more definite
          statement or for bill of particulars, par. 11, page 8.

31  80/  Fallbrook Public Utility District, et al., motion for more definite
          statement or for bill of particulars, par. 12 (a), (b) and (c), pages
   8 and 9.

1   allegation applied only to the context and efforts in some manner to pervert

2   its meaning add nothing to the position of defendants.

3           In response to (a) of the paragraph in question, the United States

4   denies that the declaration by the Supreme Court that there were less than

5   38,739 acres of riparian land is adopted by the United States.  To the contrary,

6   it will be noted that the United States asserts that 38,739 acres of land are

7   riparian as found by the trial court. 81/   Worthy of note in that regard is

8   the fact that counsel for the Fallbrook Public Utility District alludes to the

9   38,739 acres of land as being riparian. 82/

10          Inquiry is next made as to whether the United States adopts the

11  finding of the Supreme Court to the effect that no riparian user is entitled

12  to the full flow of the stream.  While that can scarcely be termed a finding of

13  fact, rather it is a conclusion of law, the United States is not claiming all

14  of the water in the Santa Margarita River.

15          Inquiry is then made as to whether the United States adopts the

16  finding of the Supreme Court of California to the effect that there exists more

17  than one underground basin.  That statement is undoubtedly correct, but as

18  previously pointed out, the large underground basin upon which the United States

19  relies, and as depicted in Exhibit E of this memorandum, is actually a single

20  large basin comprised of three portions.  Nevertheless, as emphasized, those

21  three areas are directly connected with each other and in fact constitute one

22  large underground source for military uses.  In regard to the Temecula basin

23  and the other underground basins, the United States has not in any way pleaded.

24

25          In responding to the motion for a more definite statement, the

26  United States has made available to the defendants information far above and

27  beyond that which the law requires.  Nevertheless, to avoid the possibility

28  of delay emanating from a refusal to provide that data, the United States has

29  acceded to the unreasonable requests of movants.  Now it is necessary to turn

30  briefly to the authorities cited by the defendants.

31  ────────────────────────

32  81/  Complaint, paragraph V.

    82/  See Exhibit F attached to this memorandum.

162

1        1.   It is asserted that the United States has created an actual

2  controversy by instituting the action.   The absurdity of that contention is

3  manifest from a consideration of the facts set forth in response to paragraph 1

4  of the motion for a more definite statement.

5        2.   In the second paragraph of the authorities cited by defendants

6  it is alleged that they are uncertain as to the meaning of "a paramount right."

7  By way of evidencing their inability to understand, reference is made by them

8  to a recent Supreme Court decision involving the off-shore oil properties. [83/]

9  Quoting from that case, the defendants point out that the terms "paramount

10  right" and "full dominion" had been utilized by the Supreme Court of the United

11  States.   Defendants then declare that they are entitled to a more definite

12  statement as to whether the United States by its claim of "paramount rights"

13  intends to claim "full dominion" over the waters of the Santa Margarita River.

14  In passing it is observed that defendants will have the customary difficulty

15  which is encountered when one undertakes to mix oil and water.

16        At the outset reference will be made to the derivation of the word

17  "paramount" as used in this litigation.   From a highly important decision of the

18  Supreme Court of the State of California this excerpt is taken: "The preferential

19  and paramount rights of the riparian owner, the owner of an underground and

20  percolating water right, and the prior appropriator are entitled to the

21  protection of the courts at law or in equity." [84/]   Again, the Supreme Court

22  of the State of California, in regard to the rights to the use of water of the

23  City of San Diego, commented: "This * * * is an action purely declaratory in

24  character and is one wherein the plaintiff has neither pleaded nor attempted

25  to prove any facts which would entitle it to any further or affirmative relief

26  beyond that of having its prior and paramount rights to the use of water * * *

27  established." [85/]   It will be observed that the term "paramount rights" has been

28  used generally by the Supreme Court of the State of California in describing the

29

---

30  83/   United States v. California, 332 U. S. 19 (1947).

31  84/   Peabody v. Vallejo, 2 Cal.2d 351, 40 P.2d 486, 494 (1935).

32  85/   San Diego v. Cuyamaca Water Company, 209 Cal. 105, 287 Pac. 475 (1930).

rights of a riparian user.  It has likewise been used in connection with pueblo rights.  In utilizing the term in this proceeding the United States seeks to attribute to it no other meaning than that which has frequently been used by the Supreme Court of the State of California.  To that statement, however, it is essential to add the fact that the United States holds the rights to the use of water in question as a sovereign having exclusive jurisdiction over its properties.  Thus, to the term "paramount" as used there must be attributed the additional connotation of a sovereign acting in the capacity in which the United States is acting in maintaining the military establishments in question for the defense of the Nation.

3.  The movants cite authorities in connection with exclusive jurisdiction.[86]  Clearly, the United States has exclusive jurisdiction over the properties and the authorities cited by the defendants are without meaning under the circumstances.

4.  Defendants allude again to the question of underlying basins.[87] It is respectfully submitted that the matter is answered in full by the previous statements contained in this memorandum and by the exhibit disclosing the basin underlying Camp Pendleton.

5.  The authorities cited by the defendants in connection with the Stipulated Judgment have no bearing on the proposition.[88]  Clearly, the United States is not asserting that anyone not a party to the proceedings upon which the Stipulated Judgment is premised, or in privity with those parties, could be bound by it.  Further comment is unnecessary.

---

[86]  Fallbrook Public Utility District, et al., points and authorities on motions for a more definite statement and to strike out portions of complaint, par. 3, page 2.

[87]  Fallbrook Public Utility District, et al., points and authorities on motions for a more definite statement and to strike out portions of complaint, par. 4, page 3.

[88]  Fallbrook Public Utility District, et al., points and authorities on motions for a more definite statement and to strike out portions of complaint, par. 5, page 4.

6. Defendants continue to allude to the question of whether the military uses are riparian uses. [89/] Clearly, the matter has been answered by the comments set forth above.

7. Again the defendants raise the question of the rights of the United States to proceed against them, requesting that defendants each be advised as to the acts of which they are being charged with doing. [90/] In the preceding paragraphs the charges against the defendants have been specified and the Court is respectfully requested to require that the defendants answer and set up such rights as they have.

8. Repeating, the defendants demand the basis upon which the United States is claiming its rights to the use of water. [91/] As previously stated, the United States has based its claim upon the rights to which it succeeded from the Rancho Santa Margarita and by reason of its use on the river. It is difficult to perceive why counsel for the defendants could answer in regard to one defendant and is unable to answer in regard to others.

9. Inquiry is made as to whether the United States claims its rights on more than one basis. [92/] It is respectfully submitted that the United States has repeated throughout that it succeeded to the rights of the Rancho Santa Margarita and that it has been applying the rights to a beneficial use over a long period of years. That suffices and there is no question but that the defendants should be able to answer.

10. Defendants request a statement of fact as to the quantities of water which have been applied to a beneficial use. [93/] The United States has stated when acquiring water for military uses it must look to the time of

89/ Fallbrook Public Utility District, et al., points and authorities on motions for a more definite statement &c., par. 6 (a), (b) and (c), pp. 4, 5.

90/ Fallbrook Public Utility District, et al., points and authorities on motions for a more definite statement &c., par. 7 (a) and (b), pp. 5, 6.

91/ Fallbrook Public Utility District, et al., points and authorities on motions for a more definite statement &c., par. 8, page 6.

92/ Fallbrook Public Utility District, et al., points and authorities on motions for a more definite statement &c., par. 9, page 6.

93/ Fallbrook Public Utility District, et al., points and authorities on motions for a more definite statement &c., par. 10, page 6.

165

1  maximum demand during an emergency.  That is the purpose for which those

2  rights were acquired.  If defendants wish to contest the rights of the United

3  States to hold these waters for military purposes, they should proceed in the

4  normal manner of raising it in their answer and having the dispute settled before

5  the Court rather than by means of numerous questions of the character here

6  presented.

7         11.  No response is required to defendants' paragraph numbered 11.

8         12.  The defendants allude to the question of riparian acreages. [94/]

9  Attached to this memorandum is a map disclosing the watershed of the Santa

10  Margarita River as it relates to the military establishments in question. [95/]

11  The defendants have likewise made inquiry as to what lands are riparian.

12  Attached to this memorandum is a map utilized in the suit upon which the

13  Stipulated Judgment is predicated.  That map reveals the location of riparian

14  acreages. [96/]     Very clearly, those acreages together with a description of the

15  lands accompanying the statements involving exclusive jurisdiction should suffice

16  to give to the defendants all of the data, and more, to which they are entitled.

17  Inquiry is likewise made by the defendants as to what the United States is

18  bound in regard to the findings with respect to the rights of a riparian user.

19  As stated, that is a conclusion of law rather than a finding of fact.

20  Nevertheless, the United States admits the existence of the precept to which

21  the defendants refer.  The United States declares that there is one basin

22  underlying Camp Joseph H. Pendleton. [97/]

23              RESPONSE TO MOTION TO STRIKE

24         Fallbrook Public Utility District;
        Ernest Louis Barbey;
25         Essie Beulah Barbey;
        Ruth Wentworth;
26         A. F. Borel;
        Felix R. Garnsey;
27         H. McC. Hossein;
        M. M. Lloyd and E. M. Lloyd
28

29  94/  Fallbrook Public Utility District, et al., points and authorities on
        motions for a more definite statement &c., par. 12 (a), (b), (c), page 7.
30

31  95/  See Exhibit G attached to this memorandum.

   96/  See Exhibit H attached to this memorandum.
32

   97/  See Exhibit E attached to this memorandum.

166

1    In considering the motion for a more definite statement reference
2  was made to the fact that movants have requested to strike in many instances
3  the same data concerning which the plaintiff is called upon to make a more
4  definite statement.  Under those circumstances it is respectfully submitted
5  that each and every paragraph of the motion to strike should be denied.
6  Manifestly, the points which are requested to be stricken are those dealing
7  directly with the fundamental proposition that the rights in question were
8  purchased and used by the United States for military purposes, are presently
9  used in connection with the Korean crisis, and that the facilities are of
10  extreme importance in connection with the world situation as it exists today.
11  With that background, each of the following items of the motion to strike will
12  be separately considered.

I.

14    Defendants would have stricken that portion of the complaint relating
15  to the unique characteristics giving rise to the establishment of Camp Joseph H.
16  Pendleton. [98/]  It is respectfully submitted that the very fact that the
17  physical elements comprising the camp make it such a desirable location for
18  training men to defend our Nation that the allegation is essential to give this
19  Court a true perspective of the eminently important elements of the trial.

II.

21    The defendants likewise would have stricken the additional allegation
22  that there is no other site on the West Coast as suitable as Camp Pendleton for
23  training purposes. [99/]   For the reasons expressed above, that proviso in the
24  complaint should not be deleted.

III.

26    In describing the Santa Margarita River as a source of supply of
27  water for Camp Pendleton the statement is made that the river traverses some
28  21 miles of the camp. [100/]   Defendants would strike that provision.  It is to
29

---

30  98/  Fallbrook Public Utility District, et al., motion to strike, paragraph I.
31  99/  Fallbrook Public Utility District, et al., motion to strike, par. II.
32  100/ Fallbrook Public Utility District, et al., motion to strike, par. III.

167

1   be observed, however, that as the last user on the stream the United States

2   will be in a position to impound and therefore more effectively utilize the

3   rights to the use of water which it has acquired.  Thus, it is highly significant

4   and the Court is respectfully requested to deny that phase of the motion.

5                                         IV.

6          Movants would have stricken from the complaint the assertion that the

7   trial upon which the Stipulated Judgment was predicated involved 444 court

8   days.  ___101/___  As the trial in this case progresses the importance of the earlier

9   trial upon which the Stipulated Judgment is predicated will become increasingly

10  important.  Thus the fact that the issues were thoroughly tried is a matter

11  which the record should disclose.

12                                        V.

13         Similarly the defendants would have stricken the reference that the

14  matter of the trial of the rights to the use of water in the Santa Margarita

15  River had been on appeal before the Supreme Court of the State of California. ___102/___

16  There again the reference simply gives additional background to salient

17  allegations upon which the United States will rely in the trial of the facts.

18  How defendants could be injured by it is difficult to perceive.  Clearly, the

19  trial court and the Supreme Court had an opportunity to review and closely

20  consider all of the elements which went into the Stipulated Judgment which

21  is Exhibit A to the complaint.  As stated, that allegation, which is not

22  controverted, lends credence to the assertion by the United States that the

23  rights at one time were thoroughly adjudicated, a factor which no doubt will

24  bear weight with this Court in giving consideration to the issues here.

25                                        VI.

26         To strike from the complaint, as defendants request, the allegation

27  that the Marines who are trained at Camp Pendleton are assigned to combat in

28  the Far East in order that the warfare may be successfully prosecuted would be

29

30  101/  Fallbrook Public Utility District, et al., motion to strike, par. IV.

31  102/  Fallbrook Public Utility District, et al., motion to strike, par. V.

32

1  to strip from the complaint an extremely important factor. [103]  Water is

2  essential for the maintenance of the camp.  The defendants have encroached upon

3  those rights and are presently exercising rights which are in contravention to

4  the interests of the United States.  The urgency of the situation, the critical

5  situation, is emphasized by the allegation that the United States is in conflict

6  in the Far East and that the destruction of Camp Joseph H. Pendleton for want of

7  water would constitute a National catastrophe.  Again the Court is respectfully

8  requested to deny the motion to strike that essential allegation to which

9  reference has been made.

10                          VII.

11          Similarly, defendants would have stricken the allegations that the

12  rights to the use of water involved in this litigation are utilized for the

13  United States Naval Hospital and for the United States Naval Ammunition Depot. [104]

14  As both of those military installations are vital in the Nation's defense and in

15  the present conflict, it is strange indeed that it would be urged that those

16  allegations should be deleted.  Clearly, they are essential in view of the fact

17  that the United States is claiming and asserting its rights for military purposes.

18  Accordingly, that phase of the motion should be denied.

19                          VIII.

20          Though the defendants have repeatedly requested a more definite

21  statement in regard to the provision that the United States has adopted the

22  findings of the Supreme Court of the State of California in regard to the basin

23  underlying Camp Joseph H. Pendleton, the defendants nevertheless move to strike. [105]

24  As stated, the allegation is important as again it gives this Court background in

25  regard to the earlier trial of the issues.  For that reason that phase of the

26  motion should be denied.

_____

[103]/  Fallbrook Public Utility District, et al., motion to strike, par. VI.

[104]/  Fallbrook Public Utility District, et al., motion to strike, par. VII.

[105]/  Fallbrook Public Utility District, et al., motion to strike, par. VIII.

                                                    169

16—29903-1                    GPO O · 878812

IX.

Defendants likewise move to have that phase of the complaint stricken relating to the threatened destruction of the military installations.[106/] It is respectfully submitted that under the circumstances, the issues being what they are, it would be error to strike from the complaint that all-important factor. To be noted, in addition, the defendants are unable to cite any authorities in support of their motion to strike. Accordingly, the entire motion should be denied.

### MOTION FOR A MORE DEFINITE STATEMENT

James Oviatt

In responding to the several paragraphs in the motion for a more definite statement by James Oviatt the Court is respectfully requested to consider the principles of law previously alluded to, particularly in regard to the factors involved in suits to quiet title and for declaratory judgments. In making this response, moreover, the United States will cross-reference its replies with similar points previously raised.

I.

It is urged by defendant James Oviatt [107/] that he is unable to ascertain if the alleged controversy existed between the United States and the defendants prior to the filing of the complaint. Manifestly, the only interest which James Oviatt has in the pleadings relates solely to his status in the matter. That the United States has alleged a claim for relief to quiet its title against his adverse claims is manifest from the citation of authorities above.[108/] As likewise pointed out above, the same principle of law adheres in the State of California.[109/] Irrespective of the fact, however, that the United States need not allege the character of the adverse claim of James Oviatt, reference is made to litigation presently pending to which James Oviatt is a party.[110/]

---

106/  Fallbrook Public Utility District, et al., motion to strike, par. IX.

107/  James Oviatt, motion for a more definite statement, par. 1 (a).

108/  Ely v. New Mexico & Arizona RR. Co., 129 U. S. 291, 293 (1889).

109/  Castro v. Barry, 79 Cal. 443, 21 Pac. 946 (1889).

110/  Ernest Louis Barbey, and Essie Beulah Barbey v. James Oviatt, et al.; Mary Vail Wilkinson, et al., cross-complainants, No. 15440.

170

1  In that litigation defendant James Oviatt is claiming rights to the use of

2  water within the watershed of the Santa Margarita River which of necessity

3  are adverse to those of the United States.  Moreover, the pendency of the State

4  court litigation to which Oviatt is a party is in itself sufficient cause to

5  proceed against him. [111/]   If, of course, James Oviatt asserts no rights, it

6  is appropriate that he should file a disclaimer in accordance with the

7  established principles of law which have been reviewed above.

8                                    II.

9        It is asserted by defendant James Oviatt that he cannot ascertain

10 whether it is claimed by the United States that the Stipulated Judgment,

11 Exhibit A of the complaint, is binding upon any parties to the action who were

12 not parties to the judgment or successors in interest to parties subject to

13 that judgment. [112/]   For reasons expressed above, if defendant James Oviatt

14 is in no way a party or privy to that Stipulated Judgment he is, of course,

15 not subject to it.  In view of the response made in the sentences immediately

16 preceding, the remainder of the paragraph of the motion in question does not

17 require response.

18                                   III.

19        It is next alleged by defendant James Oviatt [113/] that he cannot

20 ascertain whether the United States claims any rights in and to the waters of

21 the Santa Margarita River and its tributaries other than the rights allegedly

22 vested in it as successor in interest to the properties acquired from the

23 Rancho Santa Margarita.  Responding to that question, the United States refers

24 to earlier comments in regard to its rights.  The measure of the rights asserted

25 in this case by the United States are the rights to which it succeeded from the

26 Rancho Santa Margarita plus whatever other rights might accrue to it by reason

27 of user.  The exact extent of the rights is, of course, a matter of proof

28

29 111/  Colquitt v. Roxanna Pet. Corp., et al., 49 F.2d 1025 (C.A. 5, 1925);
          cert. denied 284 U.S. 669 (1926).

30

31 112/  James Oviatt, motion for a more definite statement, par. 2 (a).

32 113/  James Oviatt, motion for a more definite statement, par. 3 (a).

1  concerning which evidence must be adduced.

2  Respecting the inquiry relative to a paramount right to 35,000 acre-
3  feet, [114/]  it is asserted by the United States that it succeeded to 38,739 acres
4  of riparian land.  It is likewise asserted that that acreage is entitled to a
5  reasonable share of the waters of the Santa Margarita River.  Again, the term
6  "paramount" is alluded to.  As pointed out previously, [115/]  the term "paramount"
7  is frequently used by the Supreme Court of the State of California in defining
8  riparian rights and likewise in defining pueblo rights.  The term "paramount"
9  here carries with it no connotation other than that attributed to it by the
10  Supreme Court of the State of California.  It must, of course, be borne in mind
11  that the United States occupies the position of a sovereign having exclusive
12  jurisdiction over the properties.  The connotation of that fact is far-reaching
13  and it is believed will be controlling in this proceeding.

14  Finally, in the paragraph in question, inquiry is made as to whether
15  it is the claim of the United States that the waters of the Santa Margarita River,
16  title to which is not vested in the plaintiff as successor in interest of the
17  Rancho Santa Margarita, can be taken by the United States from other water users
18  except through condemnation proceedings. [116/]  Reply to that inquiry is in the
19  negative.  It is the position of the United States in this proceeding that there
20  is no claim to rights to the use of water above and beyond those mentioned.  It
21  is not here seeking to deprive any water user of vested rights to the use of water.
22  Rather, it is seeking to have those rights adjudicated and defined.  It is
23  essential to have claimants to rights to the use of water assert their rights
24  in this proceeding to the end that the United States may know with a certitude
25  the extent of the rights which it may exercise on the Santa Margarita River in
26  connection with the military purposes so essential to our Nation's defense.

27                              IV.
28  To a very large extent repetitious of preceding paragraphs in his

30  114/  James Oviatt, motion for a more definite statement, par. 3 (c).
31  115/  See page 32 supra.
32  116/  James Oviatt, motion for a more definite statement, par. 3 (d).

172

1   motion, defendant James Oviatt asserts that he cannot ascertain whether the

2   alleged diversions by the defendants from the Santa Margarita River upstream

3   from Camp Pendleton were made by all of the defendants or only by a part of

4   them.  117/   Manifestly, defendant James Oviatt's concern is solely that of

5   his own diversions.  It has been alleged that he has diverted water to which

6   the United States is entitled.  Defendant Oviatt is claiming adversely to other

7   users on the stream.  Presumably his claim is adverse to that of the United

8   States.  He is, therefore, called upon to answer and set up his claim, or if

9   he does not wish to assert a claim, to make a disclaimer.

10          Continuing the repetition, defendant Oviatt declares that he cannot

11   ascertain when and where the diversions attributed to him took place.  Manifestly,

12   he is the one best acquainted with his activities in regard to the waters of

13   the Santa Margarita River and he should, therefore, either disclaim or answer

14   and set up the rights which he asserts.

15          Departing entirely from the subject matter of the paragraph in

16   question, in the final subparagraph  118/   defendant Oviatt says it cannot be

17   ascertained if the needs of the United States for military purposes vest any

18   rights in the plaintiff in and to the waters not vested in the plaintiff as

19   successor in interest of the Rancho Santa Margarita.  That inquiry is not only

20   foreign to the subject matter of the paragraph but is highly repetitious.  As

21   alleged above, the United States is asserting only rights to which it succeeded

22   from the Rancho Santa Margarita and to such other rights as may have accrued

23   by reason of the use of the waters over the many years since the date of

24   acquisition.

25                              V.

26          Finally, it is alleged  119/   that defendant Oviatt cannot ascertain how

27   his rights became subject and subordinate to the rights of the United States.

28   That, of course, is evidentiary in character and it is rather elementary

29   until the evidence is adduced, that fact cannot be made a matter of judgment.

30   _____

31   117/   James Oviatt, motion for a more definite statement, par. 4 (a),(b),(c),(d).

32   118/   James Oviatt, motion for a more definite statement, par. 4 (e).

     119/   James Oviatt, motion for a more definite statement, par. 5 (a).

1    Nevertheless, the United States has made the assertion that such is the fact
2    and it is the responsibility of defendant James Oviatt to come forward and prove
3    the character of his rights.

4                              RESPONSE TO AUTHORITIES

5            Consideration has been given to the authorities cited by defendant
6    James Oviatt.  In view of the fact that the United States has supplied the
7    information desired by the defendant irrespective of the fact that it is
8    believed he is not entitled to it, there is no basis for considering the cited
9    authorities, nor would a consideration of those authorities be of any assistance
10   to this Court.

11           RESPONSE TO MOTION TO DISMISS, MOTION TO STRIKE, AND FOR AN
             ORDER DIRECTING PLAINTIFF TO FILE A MORE DEFINITE STATEMENT
12
13           Santa Margarita Mutual Water Company

14           Consideration will first be given to the motion of defendant that
15   the action should be dismissed because it fails to state a claim against the
16   Santa Margarita Mutual Water Company.  The authorities which precede, the
17   manifest contentious situation now existing on the Santa Margarita River, all
18   of which is alleged in the complaint of the United States, constitute a complete
19   response to the motion in question.  Abundantly manifest from them is the
20   fact that the United States does state a claim against the defendant and
21   accordingly the motion should be denied.  However, for such aid as it may be to
22   the Court, in addition to the authorities cited previously, there will be brief
23   consideration of the elements presented by defendant's motion.

24           The first of those principles relates to the criterion which guides
25   the courts in considering motions to dismiss.  On the subject it has been
26   authoritatively stated: "A motion to dismiss is limited to the allegations of
27   the complaint, and, being the equivalent of a demurrer, the court is called
28   upon to interpret the allegations of such complaint, and to accept all such
29   allegations as being true, and to determine whether such complaint presents a
30   cause of action.  In weighing the validity of a motion to dismiss a complaint
31   for insufficiency the duty of the court is not to test the final merit of the
32   claim in order to determine which party is to prevail.  But in ruling on the

                                    - 43 -
                                   GPO O- 879813

                                                              174

1   motion, the court must proceed in the light of the present principles as to
2   liberal interpretation of pleadings.  On a motion to dismiss the plaintiff is
3   entitled to the most favorable intendments to be drawn from the facts pleaded.
4   As it has been expressed, the question presented by a motion to dismiss a
5   complaint is whether the complaint, construed in the light most favorable to
6   the plaintiff and with all doubts resolved in favor of its sufficiency, states
7   a claim upon which relief could be granted." 120/

8        Movant neither cites authority to the contrary nor alludes to elements
9   in the complaint which it considers to be insufficient.  To the contrary, the
10  authorities which are cited reveal that pleadings, the gravamen of which is
11  considered to be far less serious, have been sustained.  More particularly,
12  movant cites the decision of the Supreme Court of the State of California
13  involving the rights to the use of water here involved, and to which the
14  United States succeeded. 121/     It will be observed that California's highest
15  court described that litigation as an action "to secure a declaration of its
16  riparian rights in the waters of the Temecula-Santa Margarita River and its
17  tributaries, and for an injunction * * *." 122/     Here the United States seeks
18  relief of the same character, with the additional factors which attach to a
19  proceeding by a sovereign vested with exclusive jurisdiction of rights concerning
20  which the relief is sought.  Under the circumstances it is, therefore, difficult
21  to perceive the basis upon which the motion to dismiss is premised.  In that
22  regard reference is made to the requirements of the Federal Rules of Civil
23  Procedure which specify, among other things, that applications for orders of
24  the nature here involved must "state with particularity the grounds therefor." 123/
25  By reason of the nature of the motion and the absence of authorities to

26  _____

27  120/  Cyc. Fed. Proc. 2d ed., vol. 5, sec. 1601, pp. 266-267; Please consider
28         also the numerous decisions Cyc. Fed. Proc., 2d ed., 1950 cumulative
       supplement at the same reference.

29  121/  Rancho Santa Margarita v. Vail, et al., 11 Cal. 2d 501; 81 P.2d 533
30         (1938).

31  122/  11 Cal. 2d 501, 508.

32  123/  Rule 7 (b) (1) Federal Rules of Civil Procedure.

1  support it, it appears that there has not been compliance by the movant with

2  the rule last cited.

3      Extended comment is not necessary on the subject.  Relief of the

4  character for which the United States petitions this Court has been granted in
                                                           124/

5  numerous instances both by the courts of the State of California ——— and in
                    125/

6  the Federal courts. ———      For the reasons stated above, this Court is

7  respectfully requested to deny the motion of defendant Santa Margarita Mutual

8  Water Company to dismiss this cause for failure to state a claim.

9              Response to Motion to Strike and for an Order to File a

10                          More Definite Statement

11      In that phase of this consideration relative to the motion of

12  Santa Margarita Mutual Water Company to dismiss it was emphasized that movant's

13  authorities did not support the motion.  To the contrary, those authorities

14  revealed that California's highest court has entertained many cases similar in

15  character to this case.  Reexamination of those authorities reveals that they

16  either tend to support the position of the United States or are entirely

17  inapplicable to the situation presented.

18      Here the United States is seeking to have quieted its title against

19  adverse claimants and to enjoin encroachment upon its rights to the use of

20  water from the Santa Margarita River.  Those rights, as averred in the complaint,

21  were acquired by the United States from the Rancho Santa Margarita.  Those

22  rights are required for purposes of National defense.  They were acquired for

23  that purpose.  They are now exercised for that purpose.  They are now defended

24  for that purpose.

25      As emphasized throughout, exclusive jurisdiction over Camp Pendleton, the

26  United States Naval Hospital and the United States Naval Ammunition Depot has

27

28  124/  San Diego v. Cuyamaca Water Co., 209 Cal. 105, 287 Pac. 475, 496 (1930);
           City of Los Angeles v. City of Glendale, 23 Cal.2d 68, 142 P.2d 289 (1943);

29  Anaheim Union Water Co. v. Fuller, 150 Cal. 327, 88 Pac. 978 (1907).

30  125/  United States v. Humboldt Lovelock Irr. Light & Power Co., 97 F.2d 38
           (C.A. 9, 1938), cert. denied 305 U. S. 630; Ramshorn Ditch Co. v. United

31  States, 269 Fed. 80 (C.A. 8, 1920); Brooks v. United States, 119 F.2d 636
           (C.A. 9, 1941), cert. denied 313 U. S. 594; Ide v. United States, 263 U. S.

32  497 (1923).

176

1    been ceded by the State of California to the United States.  This Court may well

2    attribute to that fact far-reaching legal effect.  Certainly it is a matter of

3    primary concern to the United States for, as revealed above, that cession

4    establishes the relationship which here exists between the Nation and the State.

5    Nevertheless the movant Santa Margarita Mutual Water Company requests that

6    clause be stricken from the complaint. 126/

7          Described in detail in the complaint are the rights to the use of

8    water acquired by the United States from the Rancho Santa Margarita. 127/

9    Asserted by the United States is a claim that it succeeded to the rights, title

10   and interest of the Rancho Santa Margarita. 128/   Defendant, however, seeks an

11   order requiring the United States to describe with greater particularity

12   the lands, riparian acreage and quantities of water. 129/   Yet in its motion

13   accompanying the application for the order in question the defendant asks this

14   Court to strike from the complaint the description of the land, the riparian

15   acreage and the quantities of water set forth in those paragraphs as being

16   redundant, immaterial, and impertinent. 130/   Similarly this Court is requested

17   to strike the aggregate quantity of water, the uses to which the water is

18   applied, and practices of the United States to avoid waste during periods

19   when not confronted with maximum demands for military purposes. 131/   Defendant's

20   motion to strike would leave intact a sentence which refers to paragraphs

21   which movant earlier requested to be stricken. 132/   Disregarding the motion to

22   strike, the movant requests a more definite statement of the factors which

23   this Court is petitioned to eliminate. 133/

24

25   126/  Santa Margarita Mutual Water Company, motion to dismiss &c, par. D, page 2.

26   127/  Complaint, paragraph V.

27   128/  Complaint, paragraph VI.

28   129/  Santa Margarita Mutual Water Company, motion to dismiss &c, par. A,B,C, p. 3.

29   130/  Santa Margarita Mutual Water Company, motion to dismiss &c, page 2.

30   131/  Complaint, paragraphs VII and VIII.

31   132/  Santa Margarita Mutual Water Company, motion to dismiss &c, page 2, re-
32         ferring to par. VIII of complaint, which has reference to par. II and VII.

     133/  Santa Margarita Mutual Water Company, motion to dismiss &c. par. E,F,G,H,
           page 4.

1    These conclusions, it is respectfully submitted, seem necessarily

2  to follow – defendant by its motions would confuse rather than clarify, would

3  delay rather than expedite, professes difficulty to comprehend where none

4  should exist.  Here the United States acquired vast areas of land for military

5  purposes.  Reasons for the selection of the sites are declared with much

6  detail in the complaint.  Averred, among other things, are the unique

7  qualities for military purposes of which that area is possessed.  Among

8  the primary reasons, from the military standpoint, was the availability of

9  water from the Santa Margarita River.  Rights to the use of water from that

10  stream were appurtenant to that land.  Those rights had been settled after

11  long and contentious litigation between two principal claimants who owned

12  by far the greatest share of riparian lands.  The Supreme Court of California

13  reviewed the findings and pronounced in its decision a basis of settlement.

14  Those rights were defined as being riparian in character and acreages and

15  quantities were meticulously defined.  By a Stipulated Judgment, premised on

16  the trial court's findings and the law as pronounced by California's highest

17  court, the rights were settled.  To approximately two-thirds of those rights

18  the United States succeeded.  Those rights were purchased for military purposes.

19  They are now and in the future will be used for those purposes.  To strike

20  from the complaint references to those rights and the other salient factors

21  attacked by movant would be a denial of the right of the United States to be

22  heard in this case.  A succinct and authoritative statement is particularly

23  applicable under the circumstances: "A motion to strike immaterial matter

24  should be denied where granting such motion would strike out allegations

25  without which the complaint would be meaningless.  And, certainly, matter

26  which under a proper theory has a legitimate place in the pleading should

27  not be stricken." 134/   This suit is to protect those military rights.   It is

28  not contended that anyone not a party to or a successor in interest to the

29  rights determined by the above-mentioned litigation could be bound by the

30  judgment, Exhibit A of the complaint.  The need for this suit stems primarily

31  from the fact that the claimant here named is not bound by that judgment.

32

---

134/  Cyc. Fed. Proc., Vol. 5, sec. 1776, p. 429.

1          To avoid possible contentions by the defendant that additional

2     information is required, reference is made to the following exhibits which

3     are a part of this memorandum:

4          Reply to defendant's request for a more definite description

5     of the land: See Exhibits A, B, C, in which are described the

6     lands over which exclusive jurisdiction is held by the United

7     States and to which are appurtenant the rights to the use of

8     water here involved.  See also Exhibit G, a map of the area

9     which defines the limits of the drainage area of the Santa

10    Margarita River and its tributaries.

11         Reply to defendant's request for a definite description of

12    the riparian land and the acreages:  Having moved to strike that

13    portion of the complaint defining the acreages, the propriety of

14    this request is at least suspect.  Nevertheless the requested

15     information is set forth in paragraph V of the complaint.

16    Though the United States is not called upon to provide an exact

17    description of the 38,739 acres of land, reference is nevertheless

18    made to Exhibit H, which is a map classifying lands riparian to

19    the Santa Margarita River.

20         Reply to the inquiry whether the United States is claiming

21    rights as a riparian owner:  As repeated throughout, the United

22    States succeeded to the rights of the Rancho Santa Margarita.

23    Those rights are riparian.  In addition the United States is

24    entitled to such other rights to the use of water as may have

25    accrued to it by user.

26          Response to Supplemental Points and Authorities of Defendant
27            Santa Margarita Mutual Water Company in Support of
                    its Motions to Dismiss, to Strike and to
                              Make More Certain
28                                    I.

29         It is asserted by the defendant that the United States does not allege

30    the basis upon which it is claiming its rights, whether they are riparian,

31    appropriative, or premised upon prescription.  As stated and reiterated above,

32    the United States is claiming its rights premised upon those which it acquired

- 48 -

1   as successor in interest to the Rancho Santa Margarita together with such other

2   rights as may accrue to it by reason of user. 135/  The assumption of defendant

3   that the United States is basing its right solely upon the artificial needs

4   created by the military establishments referred to in the complaint is,

5   therefore, in error.

6                                   II.

7          It is alleged by the defendant that the United States has not

8   described the properties involved. 136/   That question was asked in the earlier

9   filings by this defendant and response has been made to it.

10                                  III.

11         It is next alleged by the defendant that there is no allegation

12  that the water which the United States is using for military purposes is

13  being used on lands riparian to the Santa Margarita River or that it is a

14  riparian use. 137/   As stated throughout this memorandum, the United States

15  acquired these rights to the use of water for military purposes.  For a long

16  period of years those rights have been exercised for those purposes.  Moreover,

17  the United States holds exclusive jurisdiction over the properties and Congress,

18  and Congress alone, is the body which can enact laws in regard to the use of

19  those rights.  Thus, it becomes a question of law to be decided by this Court

20  as to whether the United States must use these rights upon riparian lands.

21                                  IV.

22         Next it is asserted that there is no allegation that the United States

23  has filed any notice of appropriation or received any permit from the Division

24  of Water Resources of the State of California as required by the Water Code of

25  the State of California. 138/   The United States acquired the rights in question

26  by purchase.  Manifestly, it is not required to initiate an appropriation with

27  the State of California.  Moreover, the United States is not subject to the

28

---

29  135/  Santa Margarita Mutual Water Company, supplemental points &c, unnumbered
30        paragraph, page 1.

31  136/  Santa Margarita Mutual Water Company, supplemental points &c, par. A, page 2.

32  137/  Santa Margarita Mutual Water Company, supplemental points &c, par. C, page 2.

    138/  Santa Margarita Mutual Water Company, supplemental points &c, par. D, page 2.

1  police regulations of the State of California and for that reason it is not

2  obliged to comply with those regulations enacted by the State of California

3  in connection with the administration of rights to the use of water.[139/]

4                                   V.

5        It is next alleged that the United States has not asserted title by

6  prescription or otherwise to the use of the waters of the Santa Margarita River.

7  For reasons inexplicable, it is stated that a more careful inspection of the

8  allegations of plaintiff's complaint discloses the reason for the lack of such

9  an allegation.[140/]   In view of the fact that the United States is asserting

10  its rights as successor in interest of the Rancho Santa Margarita and by reason

11  of its use of the water down through the many years since title vested in it,

12  there certainly is no reason for making further allegations.  Moreover, as

13  pointed out, it is not essential in a suit to quiet title that the United States

14  set out the evidence of its title but rather it is sufficient to allege, as the

15  United States has alleged, that fee simple title to the properties involved

16  resides in it.[141/]

17                                  VI.

18        It is next alleged that the United States acquired the property at

19  different times and consequently in different parcels.  That fact is admitted.[142/]

20                                  VII.

21        The defendant next reviews in some detail certain paragraphs of the

22  complaint but makes no comment regarding them.[143/]   Admittedly, those allegations

23  are contained in the complaint, but the significance of the assertion by the

24  defendant is not understood.  Accordingly, no response can be made to it.

25

26  139/  See comments in regard to the immunity of the United States from control by
27        the States through the exercise of the State's police power, pages 1 et seq.

28  140/  Santa Margarita Mutual Water Company, supplemental points &c, par. E, page 3.

29  141/  See discussion above in regard to the sufficiency of complaints in suits
        to quiet title, pages 17 et seq.

30  142/  Santa Margarita Mutual Water Company, supplemental points &c, par. F, page 3.

31  143/  Santa Margarita Mutual Water Company, supplemental points &c, par. G, page 4.

32

### VIII.

It is next alleged that the United States does not claim a military
use is a riparian use. [144/]   That is admitted.  As previously emphasized, the
problem is one of law for this Court to decide as to whether, having purchased
and used those rights for military purposes, the United States may be deprived
of them.

### IX.

Finally, it is stated that there is no allegation by the United States
describing or defining its rights. [145/]   That, of course, is incorrect.  In that
regard see paragraphs V and VI in particular of the complaint filed by the United
States.  It is also asserted in this paragraph that there is no allegation of a
controversy existing between the United States and the defendant.  That is again
an error.  In that regard, reference is made to paragraph I and to paragraph IX
of the complaint now before the Court.

### ARGUMENT

Santa Margarita Mutual Water Company

### I.

The first assertion under the heading of "Argument" relates to the
character of the description of the property involved in a proceeding to quiet
title.  In view of the full description which has been supplied to defendant in
the attached exhibits to which reference has been previously made, there is no
need for further comment.

### II.

It is next alleged that the owner of lands which are riparian to the
river does not have the right to use the water upon non-riparian land.  Irrespective
of what the rule may be in regard to a private individual, here the United States
acquired a vast tract of riparian land for military purposes.  Appurtenant to that
land are highly valuable rights to the use of water from the Santa Margarita
River essential to the maintenance of the military establishments in question.
As repeatedly stated, however, the matter is a question of law to be decided
by the Court.

---

144/   Santa Margarita Mutual Water Company, supplemental points &c, par. H, page 4.

145/   Santa Margarita Mutual Water Company, supplemental points &c, unnumbered
        paragraph, page 5.

182

III.

Defendant next sets forth the elements constituting riparian lands. There is no question as to defendant's correctness in the matter. The pertinency of the propositions under the circumstances, however, is questioned.

IV.

It is next asserted that a pleading must allege the nature of the water right and the amount of water which the party may put to a beneficial use. It is respectfully submitted that the United States has made those allegations. Worthy of note, however, is that the defendant has moved to strike the allegations which he says are essential in a complaint. Defendant next alludes to certain principles in regard to res adjudicata. Again the United States raises no objection in regard to those principles, although it is respectfully submitted they have no application here. Defendant then alleges that a riparian owner has no right to any mathematical or specific amount of water in a stream. Again with that proposition the United States has no dispute. The significance of it here, however, is a question of law which must be determined by this Court.

V.

Finally, at considerable length the defendant sets forth the pertinent statutes of the State of California in regard to the appropriation and administration of rights to the use of water. For reasons expressed above, it is respectfully submitted that those laws have no application to the United States.

Under the heading "Synopsis of Memorandum" is a resume of this memorandum.

A. DEVITT VANECH,
Assistant Attorney General

ERNEST A. TOLIN,
United States Attorney

BETTY MARSHALL GRAYDON,
Assistant United States Attorney

WILLIAM H. VEEDER,
Special Assistant to the Attorney General

WHV

183

ND11/N1-13
5-9
F-5-7/RFM:bl                        NAVY DEPARTMENT                    EXHIBIT  A

                                      WASHINGTON

                                                        January 12, 1943

Sir:

     An Act of Congress approved October 9, 1940 (54 Stat.
1083), provides that in any case where a state cedes juris-
diction over lands within its borders to the United States,
the head or authorized officer of any department of inde-
pendent establishment or agency of the Government having
custody of such lands, shall, if such jurisdiction be ac-
cepted on behalf of the United States, file a notice of such
acceptance with the Governor of the State ceding such juris-
diction.

     Pursuant to a Declaration of Taking filed January 21,
1942, in the District Court of the United States for the
Southern District of California, the United States acquired
fee simple title to certain land in the case of the United
States of America v. 9,147.55 acres of land, more or less,
in San Diego, San Diego County, California, Rancho Santa Mar-
garita, a corporation, et al., Civil No. 139.  This land was
acquired by the United States under the authority of an Act
of Congress approved March 23, 1941 (Public Law 21, 77th
Congress), for the establishment of a Naval Supply Depot at
San Diego, San Diego County, California.

     Pursuant to the provisions of the aforesaid act of October
9, 1940, jurisdiction is hereby accepted on behalf of the United
States in the manner and form granted by an Act of California
Legislature approved March 12, 1872 (Section 34 of the Political
Code of California, 1937), over the aforementioned land which
is more particularly described as follows:

        That portion of the Rancho Santa Margarita y Las Flores,
        in the County of San Diego, State of California, as
        described in the Patent thereof from the United States
        of America to Pio Pico and Andres Pico, dated March 28,
        1879, and recorded in Book 7, Page 18, of Patents,
        records of said County, included within the southwest
        quarter of Section 13, and Sections 14, 15, 21, 22, 23,
        24, 25, 26, 27, 28, 33, 34, 35, and 36 in Township 9
        South, Range 4 West, and Sections 2, 3, and 4 in Town-
        ship 10 South, Range 4 West, according to the extension
        of the United States Government rectangular System of
        Public Land Surveys based on the San Bernardino Base
        and Meridian over said Rancho, and shown on Record of
        Survey Map No. 794, filed in the Office of the County
        Recorder of said San Diego County, January 17, 1940;

EXCEPTING therefrom those portions of Sections 14, 15, 21, 22 and 28 in said Township 9 South, Range 4 West, lying north and west of the center line of Santa Margarita River;

ALSO EXCEPTING THEREFROM that portion of Section 14 in said Township 9 South, Range 4 West, lying south and east of the center line of Santa Margarita River within the northeast one-quarter of said Section 14;

ALSO EXCEPTING therefrom those portions of Sections 13, 24 and 25, as described in the deed from the Rancho Santa Margarita, a California corporation, to the Union Title Insurance and Trust Company, a corporation, recorded June 24, 1940 in Book 1039, page 325, of Official Records, in the Office of the County Recorder of said San Diego County, described as follows:

All that portion of Rancho Santa Margarita y Las Flores, as delineated upon the map in Book 7, page 39 of Patents, and as shown by Record of Survey Map No. 794 in the Office of the County Recorder of said San Diego County, described as follows:

Beginning at a point on the easterly boundary line of said Rancho Santa Margarita y Las Flores, distant thereon S. 7 degrees 4 minutes 52.98 seconds W. 1603.81 feet from Corner No. 1 of said Rancho, said point being the closing corner on the north line of Section 13, Township 9 South, Range 4 West, San Bernardino Base and Meridian, and marked with a 1-1/2 inch iron pipe having a brass cap stamped "C C Sec 12-Sec 13"; thence along said easterly boundary line S. 7 degrees 4 minutes 52.98 seconds W. 12,278.70 feet to a point in the northwesterly right of way line of the Atchison, Topeka and Santa Fe Railway, Fallbrook Branch; thence along said right of way line S. 33 degrees 39 minutes 30 seconds W. 104.35 feet to the beginning of a tangent curve concave northwesterly; thence southwesterly along said curve, radius 1860.08 feet, central angle 4 degrees 8 minutes 45 seconds an arc distance of 134.59 feet to a 1-1/2 inch iron pipe having a brass cap marked R.S.M.; thence following the location of the present old fence, N. 6 degrees 52 minutes 50 seconds E. 5156.55 feet; thence N. 6 degrees 44 minutes 12 seconds E. 1997.35 feet to a point in the north line of section 24 of said Township and Range; thence N. 6 degrees 56 minutes 21 seconds E. 1344.03 feet; thence N. 6 degrees 51 minutes 55 seconds E. 2835.04 feet; thence N. 10 degrees 18 minutes 5 seconds E. 1149.32 feet to a point in the north line of Section 13 of said Township and Range

marked by a 1-1/2 inch iron pipe having a brass
cap marked "Sec 12-Section 13"; thence along said
north line of said Section 13," South 89 degrees 2
minutes 13.5 seconds E. 91.29 feet to the point of
beginning.

AND ALSO EXCEPTING all that portion of Rancho Santa
Margarita y Las Flores as per said maps, described
in said deed to Union Title Insurance and Trust Com-
pany as follows:

Beginning at a point on the easterly boundary line
of said Rancho, distant thereon S. 7 degrees 4 min-
utes 52.98 seconds W. 17,619.14 feet from Corner No.
1 of said Rancho, said point being in the south line
of Section 25, Township 9 South, Range 4 West, San
Bernardino Meridian, and marked by a 1-1/2 inch iron
pipe having a brass cap stamped "C. C Sec. 25-Sec.
26"; thence along said easterly boundary line N. 7
degrees 4 minutes 52.98 seconds E. 3517.89 feet to a
point in the southeasterly right of way line of the
Atchison, Topeka and Santa Fe Railway, Fallbrook
Branch, said point being on a curve concave to the
northwest, a line through said point radial to said
curve having a bearing of N. 53 degrees 40 minutes
21 seconds W.; thence southwesterly along said right
of way line along said curve, radius 1960.08 feet,
central angle 6 degrees 3 minutes 21 seconds an arc
distance of 207.17 feet to a point marked by a 1-1/2
inch iron pipe having a brass cap marked "R.S.M.";
thence following the location of the present old
fence S. 6 degrees 42 minutes 1 second W. 3352.49
feet to a 2-inch iron pipe in the south line of Sec-
tion 25, said Township and Range; thence along said
last mentioned line S. 89 degrees 7 minutes 30 sec-
onds E. 88.78 feet to the point of beginning.

## PARCEL 2

Lots 1, 2 and 3 in Section 35, Township 9 South,
Range 4 West, San Bernardino Meridian, in the Coun-
ty of San Diego, State of California, according to
United States Government Survey approved June 11, 1880;

Also Section 36, Township 9 South, Range 4 West, San
Bernardino Meridian, in the County of San Diego, State
of California, according to United States Government
Survey thereof approved June 11, 1880, EXCEPTING there-
from that portion thereof lying northeast and easterly
of the southwest and westerly line of the present ex-
isting California State Highway from Bonsall to Fall-
brook, as shown on Licensed Surveyor's Map No. 501,

186

filed in the Office of the County Recorder of said
San Diego County.

### Parcel 3

The southwest quarter of the northeast quarter; the
west half of the southeast quarter and the west half
of Section 1, and Lots 1, 2, 3, 4 in Section 2,
Township 10 South, Range 4 West, San Bernardino
Meridian, in the County of San Diego, State of Cali-
fornia, according to the United States Government
Survey approved April 5, 1881.

There are enclosed two carbon copies of this letter of
acceptance. Their return in the enclosed franked envelope
with your endorsement thereon of the time of the receipt of
the acceptance will be appreciated. One copy will be for-
warded to the Attorney General of the United States and the
other retained in the files of the Navy Department.

Very truly yours,

James Forrestal

The Honorable,
Earl Warren
The Governor of the State of California
Sacramento, California

Enclosures (2)

CC: COM11                          Original of this letter received
U.S. Atty Gen.                     on the 18th day of January 1943.

GOVERNOR  /s/ Earl Warren

187

56

ND11/N1-13
F-5-7/RFM/oaw
C5-40-SD-2

EXHIBIT  B

September 8, 1943

Honorable Earl Warren,
Governor of California,
Sacramento, California.

Sir:

The United States of America became vested with a valid
title to certain land in San Diego County, California on
December 31, 1942 pursuant to a declaration of taking filed
on that date in the United States District Court for the
Southern District of California in the case of United States of
America v. 123,620 acres of land in San Diego and Orange
Counties, California, Maud Lee Flood, et al, Civil No. 197-SD.
This land which is more fully and particularly described in
the attached Exhibit "A" was acquired for the establishment
of Camp Joseph H. Pendleton, a Marine Corp Training Area at
Oceanside, California.

In accordance with the provisions of the Act of Congress
approved October 9, 1940 (54 Stat., 1083), jurisdiction
over the aforementioned land is hereby accepted by the
Navy Department on behalf of the United States of America
in the manner and form granted and ceded by an Act of the
California Legislature approved March 12, 1872, as amended
by Chapter 710 of the Statutes of 1939 (Sec. 34 of the
Political Code of California, 1939).

There are enclosed two carbon copies of this letter of
acceptance.  Their return in the enclosed franked envelope
with your endorsement thereon of the time of the receipt of
this acceptance will be appreciated.  One copy will be
forwarded to the Attorney General of the United States and
the other retained in the files of the Navy Department.

Very truly yours,

James Forrestal  Acting

Original of this letter received:

Date: __September 13, 1943__

Encl.
1. HW 5 carbon copies
   of 1 tr

/s/  Earl Warren
Governor

CC:  Atty Gen
     COM11
     Comdt USMC
     Commanding General, FMFTC,
        Camp Elliott, San Diego, Calif.

188

57

EXHIBIT "A"

DESCRIPTION OF 123,620 ACRES, MORE OR LESS, LYING IN
ORANGE AND SAN DIEGO COUNTIES, CALIFORNIA.  (MARINE
CORPS TRAINING AREA, RANCHO SANTA MARGARITA).

PARCEL "A"

Those portions of Rancho Santa Margarita y las Flores,
in San Diego County, California, as shown on Record of Survey
Map No. 794, filed in the office of the County Recorder of
said San Diego County, January 17, 1940, and of Rancho Mis-
sion Viejo in Orange County, State of California, as shown
on Record of Survey Map filed 2/18/42 in Book 12, Page 5,
in the office of the County Recorder of Orange County,
bounded and described as follows:

Beginning at the intersection of the Westerly boundary
line of said Rancho Santa Margarita y las Flores, (being
also the line between San Diego County and Orange County),
and the Mean High Tide line of the Pacific Ocean, as shown
on said Record of Survey Map No. 794; thence N. 13*13'42.69"
E. along said Westerly boundary line, a distance of 24,838.34
feet, more or less, to Intersection Corner, as shown on said
Record of Survey Map No. 794; thence leaving said line be-
tween Orange and San Diego Counties, and running in a general
Northeasterly direction along the line delineated on said Re-
cord of Survey Map of a portion of Rancho Mission Viejo, the
following courses and distances:

```
S. 87*01'11" E. a distance of 517.38 feet;
N. 46*33'01" E. a distance of 136.71 feet;
N. 27*52'31" E. a distance of 211.40 feet;
N. 58*52'31" E. a distance of 361.10 feet;
S. 80*45'54" E. a distance of 1493.74 feet;
N. 60*32'36" E. a distance of 439.52 feet;
N. 37*14'36" E. a distance of 137.77 feet;
N. 67*37'45" E. a distance of 439.85 feet;
N. 13*39'00" E. a distance of 254.95 feet;
N. 58*25'25" E. a distance of 3811.06 feet;
N. 79*35'28.7" E. a distance of 7611.23 feet;
N. 49*26'12" E. a distance of 2601.41 feet;
N. 36*54'06" E. a distance of 806.89 feet;
N. 51*52'15" E. a distance of 1242.20 feet;
N. 21*12'21" E. a distance of 360.75 feet;
N. 67*24'44" E. a distance of 100.37 feet;
S. 74*40'49" E. a distance of 153.78 feet;
N. 59*25'43" E. a distance of 229.26 feet;
N. 88*35'10" E. a distance of 288.78 feet;
N. 32*05'37" E. a distance of 485.65 feet;
N. 52*17'37" E. a distance of 206.85 feet;
S. 37*34'23" E. a distance of 139.70 feet;
N. 15*42'27" E. a distance of 95.96 feet;
N. 76*31'17" E. a distance of 649.02 feet;
N.  3*24'07" E. a distance of 427.29 feet;
N. 61*25'47" E. a distance of 308.61 feet;
N. 25*33'27" E. a distance of 204.84 feet;
N. 24*15'53" W. a distance of 196.39 feet;
N.  3*34'43" W. a distance of 360.70 feet;
N. 25*35'57" E. a distance of 290.09 feet;
S. 62*47'03" E. a distance of 181.03 feet;
N. 80*39'37" E. a distance of 119.26 feet;
N. 30*17'47" E. a distance of 238.18 feet;
N. 68*47'07" E. a distance of 210.69 feet;
N. 28*45'57" E. a distance of 555.16 feet;
N. 67*52'47" E. a distance of 116.77 feet to a
```

point on the San Diego County-Orange County line as shown on
said Record of Survey Map of a portion of Rancho Mission
Viejo, said point being a Corner of the Rancho Santa Margarita
y las Flores bearing N. 0*03'48.5 E. a distance of 4999.52
feet from Mission Viejo Corner No. 7, as shown on said Record
of Survey Map No. 794; thence N. 43*25'58" E. along the bound-
ary line of said Rancho Santa Margarita, a distance of 9720.87
feet to Rancho Santa Margarita Corner No. 44 as shown on said
Record of Survey Map No. 794; thence S. 38*23'33" E. a dis-
tance of 7393.16 feet to Rancho Santa Margarita Corner No. 45,
as shown on said Record of Survey Map No. 794; thence S.
10*11'15.8" W. a distance of 6290.58 feet to Rancho Santa
Margarita Corner No. 46, as shown on said Record of Survey
Map No. 794; thence S. 89*34'40" E. a distance of 1574.50
feet to a point; thence N. 39*43'20" E. a distance of 1055.56
feet to a point; thence N. 63*51'20" E. a distance of 615.97
feet to a point; thence N. 8*00'10" W. a distance of 792.76
feet to a point; thence N. 14*41'50" E. a distance of 500.12
feet to a point; thence S. 75*48'40" E. a distance of 1088.65
feet to Rancho Santa Margarita Corner No. 52 as shown on said
Record of Survey Map No. 794; thence S. 70*02'22.37" E. a
distance of 17,684.98 feet to Rancho Santa Margarita Corner
No. 53, as shown on said Record of Survey No. 794; thence S.
53*37'05" E. a distance of 2981.02 feet to Rancho Santa
Margarita Corner No. 54, as shown on said Record of Survey
Map No. 794; thence S. 13*18'00.04" E. a distance of 5102.00
feet to Rancho Santa Margarita Corner No. 55 as shown on said
Record of Survey Map No. 794; thence S. 17*43'13.46" E. a
distance of 1623.13 feet to Rancho Santa Margarita Corner No.
56, as shown on said Record of Survey Map No. 794; thence S.
31*49'30.6" E. a distance of 5275.61 feet to Rancho Santa
Margarita Corner No. 57 as shown on said Record of Survey
Map No. 794; thence S. 50*16'00.32" E. a distance of 5227.04
feet to an intersection with the partition line as shown on
Record of Survey Map No. 983, filed February 14, 1942 in the
office of the Country Recorder of San Diego County; thence
in a general Southwesterly direction along said partition
line the following courses and distances:

```
S. 33*44'41" W. a distance of 2456.19 feet;
S. 43*21'07" W. a distance of 1464.78 feet;
N. 79*00'26" W. a distance of 1319.19 feet;
S. 53*36'55" W. a distance of  449.48 feet;
S. 68*25'10" W. a distance of  323.74 feet;
S. 38*44'10" W. a distance of  520.05 feet;
S. 63*19'40" W. a distance of  230.43 feet;
S. 75*43'42" W. a distance of  366.85 feet;
S. 36*44'10" W. a distance of  366.59 feet;
S. 72*07'10" W. a distance of  712.53 feet;
S. 62*36'26" W. a distance of  894.95 feet;
S. 48*48'47" W. a distance of 3427.49 feet;
S. 73*13'12" W. a distance of  610.33 feet;
N. 67*43'10" W. a distance of  444.54 feet;
N. 52*46'50" W. a distance of  265.03 feet;
N. 12*27'20" W. a distance of  433.89 feet;
N. 65*45'41" W. a distance of  988.94 feet;
S. 82*39'00" W. a distance of  220.76 feet;
N. 80*23'58" W. a distance of 1322.88 feet;
S. 54*20'16" W. a distance of  367.09 feet;
S.  0*11'36" E. a distance of  757.20 feet;
S. 19*00'09" W. a distance of  725.06 feet;
S. 62*53'39" W. a distance of 1042.55 feet;
S. 11*12'54" W. a distance of  858.53 feet;
S.  5*14'21" E. a distance of  291.90 feet;
S. 31*26'21" E. a distance of  365.80 feet;
S.  5*14'41" E. a distance of  910.92 feet;
```

- 2 -

190

```
S. 12°53'10" W. a distance of  530.57 feet;
S. 44°01'30" W. a distance of  525.93 feet;
S. 56°29'20" W. a distance of  601.94 feet;
S. 72°06'50" W. a distance of  417.18 feet;
S. 54°54'30" W. a distance of  137.08 feet;
S. 52°07'00" W. a distance of  180.35 feet;
S. 62°34'50" W. a distance of  389.48 feet;
S.  5°43'10" W. a distance of  445.09 feet;
S. 15°38'50" E. a distance of  248.81 feet;
S. 25°51'50" W. a distance of  291.18 feet;
S. 29°58'01" W. a distance of  549.55 feet;
S. 64°20'35" W. a distance of 1483.03 feet;
S. 49°33'33" W. a distance of 1376.37 feet;
N. 89°28'35" W. a distance of  465.07 feet;
N. 76°38'09" W. a distance of  766.63 feet;
S. 83°20'41" W. a distance of 1588.66 feet;
N. 79°42'50" W. a distance of  910.01 feet;
N. 52°18'09" W. a distance of  152.09 feet;
N. 74°09'23" W. a distance of  987.53 feet;
S. 81°40'41" W. a distance of  416.14 feet;
S. 31°22'20" W. a distance of  212.90 feet;
S. 12°27'31" W. a distance of  214.62 feet;
S. 58°59'13" W. a distance of  983.78 feet;
S. 48°02'04" W. a distance of 2896.87 feet;
S. 58°32'37" W. a distance of 3757.47 feet;
N. 82°08'01" W. a distance of 1879.19 feet;
S. 85°24'54" W. a distance of 3441.05 feet;
S.  2°22'58" E. a distance of 1444.65 feet;
S. 58°42'00" W. a distance of  281.86 feet;
S.  5°35'00" W. a distance of  305.26 feet;
S. 12°41'10" E. a distance of  272.17 feet;
S. 26°07'25" E. a distance of  691.82 feet;
S. 15°54'37" W. a distance of  823.19 feet;
S.  1°11'05" W. a distance of 1227.02 feet;
S. 29°49'40" W. a distance of  933.63 feet;
S.  9°15'00" W. a distance of 1740.69 feet;
S. 20°25'55" E. a distance of  679.69 feet;
S.  1°11'40" E. a distance of  826.09 feet;
S. 54°18'03" W. a distance of 1633.33 feet;
S. 46°30'03" W. a distance of   26.68 feet;
S. 43°59'57" E. a distance of   73.07 feet; to
```

the beginning of a curve concave to the Northeast; thence
Southeasterly along said curve, having a radius of 1450 feet,
through a central angle of 8°30'49", a distance of 215.45
feet; thence S. 52°30'46" E. tangent to said curve, a dis-
tance of 266.43 feet; thence S. 37°29'14" W. a distance of
76.65 feet; thence S. 36°31'33" E. a distance of 1346.15
feet; thence S. 13°27'13" W. a distance of 3430.20 feet
more or less to the Mean High Tide Line of the Pacific Ocean,
being the Westerly boundary line of said Rancho Santa Margarita
y las Flores; thence Northwesterly along the Mean High Tide
Line of the Pacific Ocean as shown on said Record of Survey
Map No. 794, to the point of beginning.  Containing an area of
52,420 acres more or less.

### PARCEL "B"

That portion of the Rancho Santa Margarita y las Flores,
in the County of San Diego, State of California, as shown on
Record of Survey Map No. 794 filed in the office of the County
Recorder of said San Diego County January 17, 1940, bounded
and described as follows:

Beginning at the intersection of the Southeasterly bound-
ary line of said Rancho Santa Margarita y las Flores, and the
Mean High Tide Line of the Pacific Ocean, as shown on said

- 3 -

191

Record of Survey No. 794; thence along said Southeasterly
boundary line, N. 43°04'44.69" E. a distance of 51,482.82 feet
more or less to Corner of No. 2 of said Rancho Santa Margarita
y las Flores as shown on said Record of Survey No. 794; thence
N. 7°04'52.98" E. along the Easterly boundary line of said
Rancho Santa Margarita y las Flores, as shown on said Record
of Survey No. 794, a distance of 10,645.78 feet to a point on
the Southerly line of Section 2, Township 10 South, Range 4
West, as shown on said Record of Survey No. 794; thence N.
89°16'29" W. a distance of 14,661.52 feet along the Southerly
lines of said Section 2, and Sections 3 and 4, Township 10
South, Range 4 West, to the Southwesterly corner of said Sec-
tion 4, as shown on said Record of Survey No. 794; thence N.
0°47'11.05" E. along the Easterly line of said Section 4,
Township 10 South, Range 4 West, and Sections 33 and 28, Town-
ship 9 South, Range 4 West, to the centerline of the Santa
Margarita River; thence in a general Northeasterly direction
along said centerline of the Santa Margarita River, being
also the Northwesterly and Northerly boundary line of the
Naval Ammunition Dump, Fallbrook, through Sections 28, 21,
22, 15 and 14, Township 9 South, Range 4 West, as shown on
said Record of Survey Map No. 794, to an intersection with
the South line of the Northeast quarter of said Section 14;
thence Easterly along the Southerly line of said Northeast
quarter of Section 14 to a point on the Easterly line of said
Section 14, as shown on said Record of Survey Map No..794;
thence Easterly along the Southerly line of the North half
of Section 13, Township 9 South, Range 4 West, to an inter-
section with the Easterly boundary of the Rancho Santa
Margarita y las Flores, as shown on said Record of Survey
Map No. 794; thence N. 7°04'52.98" E. along said Easterly
boundary to Corner No. 1 of said Rancho Santa Margarita y
las Flores as shown on said Record of Survey Map No. 794;
thence S. 89°29'24" W. a distance of 1946.09 feet to Corner
No. 63 of said Rancho Santa Margarita y las Flores, as shown
on said Record of Survey Map No. 794; thence N. 84°08'07.65"
W. a distance of 3886.55 feet to Corner No. 62 of said Rancho
Santa Margarita y las Flores, as shown on said Record of Sur-
vey Map No. 794; thence N. 58°49'13.46" W. a distance of
7488.95 feet to Corner No. 61 of said Rancho Santa Margarita
y las Flores, as shown on Record of Survey No. 794; thence
S. 57°18'15.84" W. a distance of 12,065.32 feet to Corner No.
60 of said Rancho Santa Margarita y las Flores, as shown on
said Record of Survey Map No. 794; thence S. 89°27'46.73" W.
a distance of 7991.79 feet to Corner No. 59, of said Rancho
Santa Margarita y las Flores, as shown on said Record of Sur-
vey 794; thence N. 30°57'40.93" W. a distance of 4575.19 feet
to Corner No. 58, of said Rancho Santa Margarita y las Flores,
as shown on said Record of Survey Map No. 794; thence N.
50°16'00.32" W. along the line between Corner No. 58 and Cor-
ner No. 57, of said Rancho Santa Margarita y las Flores, as
shown on said Record of Survey Map No. 794, a distance of
3861.76 feet to an intersection with the partition line as
shown on Record of Survey Map No. 983, filed in the office
of the County Recorder of San Diego County; thence in a
generally Southwesterly direction through the Rancho Santa
Margarita y las Flores along said partition line, the follow-
ing courses and distances:

S. 33°44'41" W., 2456.19 feet; S. 43°21'07" W.
1464.78 feet; N. 79°00'26" W. 1319.19 feet;
S. 53°36'55" W. 449.48 feet; S 68°25'10" W.
323.74 feet; S. 38°44'10" W. 520.05 feet; S.
63°19'40" W. 230.43 feet; S. 75°43'42" W. 366.85
feet; S. 36°44'10" W. 366.59 feet; S. 72°07'
10" W. 712.53 feet; S. 62°36'26" W. 894.95 feet

- 4 -

192

S. 48°48'47" W. 3427.49 feet; S. 73°13'12" W.
610.33 feet; N. 67°43'10" W. 444.54 feet; N.
52°46'50" W. 265.03 feet; N. 12°27'20" W. 433.89
feet; N. 65°45'41" W. 988.94 feet; S. 82°39'00"
W. 220.76 feet; N. 80°23'58" W. 1322.88 feet;
S. 54°20'16" W. 367.09 feet; S. 0°11'36" E.
757.20 feet; S. 19°00'09" W. 725.06 feet; S.
62°53'39" W. 1042.55 feet; S 11°12'54" W.
858.53 feet; S. 5°14'21" E. 291.90 feet; S.
31°26'21" E. 365.80 feet; S. 5°14'41" E. 910.92
feet; S. 12°53'10" W. 530.57 feet; S. 44°01'30" W.
525.93 feet; S. 56°29'20" W. 601.94 feet; S.
72°06'50" W. 417.18 feet; S. 54°54'30" W. 137.08
feet; S. 52°07'00" W. 180.35 feet; S. 62°34'50"
W. 389.48 feet; S. 5°43'10" W. 445.09 feet; S.
15°38'50" E. 248.81 feet; S. 25°51'50" W. 291.18
feet; S. 29°58'01" W. 549.55 feet; S. 64°20'35"
W. 1483.03 feet; S. 49°33'33" W. 1376.37 feet;
N. 89°28'35" W. 465.07 feet; N. 76°38'09" W.
766.63 feet; S. 83°20'41" W. 1588.66 feet; N.
79°42'50" W. 910.01 feet; N. 52°18'09" W. 152.09
feet; N. 74°09'23" W. 987.53 feet; S. 81°40'41"
W. 416.14 feet; S. 31°22'20" W. 212.90 Feet;
S. 12°27'31" W. 214.62 feet; S. 58°59'13" W.
981.78 feet; S. 48°02'04" W. 2896.87 feet; S.
58°32'37" W. 3757.47 feet; N. 82°08'01" W.
1879.19 feet; S. 85°24'54" W. 3441.05 feet; S.
2°22'58" E. 1444.65 feet; S. 58°42'00" W. 281.86
feet; S. 5°35'00" W. 305.26 feet; S. 12°41'10"
E. 272.17 feet; S. 26°07'25" E. 691.82 feet; S.
15°54'37" W. 823.19 feet; S. 1°11'05" W. 1227.02
feet; S. 29°49'40" W. 933.63 feet; S. 9°15'00"
W. 1740.69 feet; S. 20°25'55" E. 679.69 feet; S.
1°11'40" E. 826.09 feet; S. 54°18'03" W. 1633.33
feet; S. 46°30'03" W. 26.68 feet; S. 43°59'57" E.
73.07 feet to the beginning of a tangent curve
concave to the Northeast; thence Southeasterly along said
curve, having a radius of 1450 feet, through a central angle
of 8°30'49" a distance of 215.45 feet; thence S. 52°30'46" E.
tangent to said curve, a distance of 266.43 feet; thence S.
37°29'14" W. a distance of 76.65 feet; thence S. 36°31'33"
E. a distance of 1346.15 feet; thence S. 13°27'13" W. a dis-
tance of 3430.20 feet more or less to the Mean High Tide Line
of the Pacific Ocean, being the Westerly boundary line of said
Rancho Santa Margarita y Las Flores; thence Southeasterly
along said Mean High Tide Line of the Pacific Ocean, as shown
on said Record of Survey Map No. 794, to the point of begin-
ning.

Containing an area of 71,200 acres more or less.

62

BUDOCKS
ND11-N1-13
F-5-7A/RFM/acl                NAVY DEPARTMENT                                   EXHIBIT  C
C5-40-SD-6

                                  Washington

                              18 February 1944


Honorable Earl Warren,
Governor of California,
Sacramento, California.

Sir:

The United States of America became vested with a valid title to
approximately 1,676.58 acres of land in San Diego County, California,
on December 22, 1943, pursuant to a declaration of taking filed on
that date in the United States District Court for the Southern District
of California, Southern Division, in the case entitled United States
of America v. 1,676.58 acres of land in San Diego County, California;
George Henry Hutson, et al., Civil No. 321-SD.  This land which is more
fully and particularly described in the attached Exhibit "A" was ac-
quired for the expansion of Camp Joseph H. Pendleton, a Marine Corps
Training Area at Oceanside, California.

In accordance with the provisions of the Act of Congress approved
October 9, 1940 (54 Stat. 1083), jurisdiction over the aforementioned
land is hereby accepted by the Navy Department on behalf of the United
States of America in the manner and form granted and ceded by an Act
of the California Legislature approved March 12, 1872, as amended by
Chapter 710 of the Statutes of 1939 (Sec. 34 of the Political Code of
California, 1939).

There are enclosed two carbon copies of this letter of acceptance.
Their return in the enclosed franked envelope with your endorsement
thereon of the time of the receipt of this acceptance will be appreciated.
One copy will be forwarded to the Attorney General of the United States
and the other retained in the files of the Navy Department.

                              Very truly yours,

                              A. L. Gates
                              Acting Secretary of the Navy

                              Original of this letter received:

Encl:  HW:                    Date:   February 23, 1944
1. 5 Carbon Copies of ltr.

                                      /s/  Earl Warren
                                                  Governor


CC: Atty Gen
     Com11
     Comdt. USMC
     Commanding General, FMFTC,
              Camp Elliott, San Diego, Calif.


                                                                    194

                                  63

EXHIBIT "A"

All that land lying and being situate in the County of San Diego,
State of California, particularly described as follows:

Parcel 2:   The SE 1/4 of the NW 1/4 of Section 6, Township 9 South,
Range 4 West, S. B. M.

Parcel 3:   Lot 6 (the NW 1/4 of the SW 1/4) and the NE 1/4 of the
SW 1/4 of Section 6, Township 9 South, Range 4 West, S.B.M.

Parcel 4:   Lot 7 (the SW 1/4 of the SW 1/4) and the SE 1/4 of the
SW 1/4 of Section 6, Township 9 South, Range 4 West, S.B.M.

Parcel 5:   Lot 1 (the NW 1/4 of the NW 1/4 and the NE 1/4 of the NW 1/4
of Section 7, Township 9 South, Range 4 West, S. B. M.

Parcel 7:   Lot 3 (the NW 1/4 of the SW 1/4), Lot 4 (SW 1/4 of the SW 1/4),
and the SE 1/4 of the SW 1/4 of Section 7, Township 9 South,
Range 4 West, S.B.M.

Parcel 8:   Lot 1 (the NE 1/4 of the SE 1/4), Lot 2 (the SW 1/4 of the
SE 1/4), Lot 3 (the SE 1/4 of the SW 1/4), and the SW 1/4
of the SW 1/4, the W 1/2 of the NE 1/4, and the NW 1/4 of
the SE 1/4 of Section 8, Township 9 South, Range 4 West, S.B.M.

Parcel 9:   Lots 1 and 2 (the fractional N. 1/2 of the NW 1/4) of Section
17, Township 9 South, Range 4 West, S.B.M.

Parcel 10:  Lots 1, 2, 3 and 4 (the N 1/2 of the NW 1/4 and the N 1/2 of
the NE 1/4) of Section 18, Township 9 South, Range 4 West, S.B.M.

Parcel 13:  The S 1/2 of the NE 1/4 and the NE 1/4 of the SE 1/4 of
Section 2, Township 9 South, Range 5 West, S.B.M.

Parcel 14:  The SE 1/4 of the SE 1/4 of Section 2, Township 9 South,
Range 5 West, S.B.M.

Parcel 16:  The SW 1/4 of the NW 1/4 of Section 1, Township 9 South,
Range 5 West, S.B.M.

Parcel 17:  The W 1/2 of the SW 1/4 and the SE 1/4 of the SW 1/4 of Section
1, Township 9 South, Range 5 West, S. B. M.

Parcel 18:  The NE 1/4 of the SW 1/4 of Section 1, Township 9 South, Range
5 West, S. B. M.

Parcel 19:  The SW 1/4 of the SE 1/4 of Section 1, Township 9 South, Range
5 West, S. B. M.

Parcel 21:  Lot 1 (the SW 1/4 of the NW 1/4), the N 1/2 of the NW 1/4
and the SE 1/4 of the NW 1/4 of Section 12, Township 9 South,
Range 5 West, S.B.M.

195

64

Parcel 22:  Lot 2 (the fractional N. 1/2 of the SW 1/4), Lot 3
(the SW 1/4 of the SE 1/4) and the NW 1/4 of the SE 1/4
of Section 12, Township 9 South, Range 5 West, S. B. M.

Parcel 24:  The NW 1/4 of the NE 1/4 and all of the SW 1/4 of the NE 1/4
except the S. 330' thereof, of Section 12, Township 9 South
Range 5 West, S. B. M.

Parcel 25:  The S. 330' of the SW 1/4 of the NW 1/4 of Section 12, Town-
ship 9 South, Range 5 West, S.B.M.

Parcel 26:  The E 1/2 of the NE 1/4 of Section 12, Township 9 South, Range
5 West, S.B.M., excepting from the NE 1/4 of the NE 1/4 of said
Section 12 the following described portion: BEGINNING at a
point on the E. line of the NW 1/4 of the NE 1/4 of said
Section 12, distant 1093.1' S. from the NE corner of said
NW 1/4 of the NE 1/4 of said Section, thence N. 51° 20'
E. 211'; thence N. 42° 13' W. 255.7', more or less, to the said
E. line of said NW 1/4 of the NE 1/4; thence S. along said
East line to the point of beginning.

Parcel 27:  All that portion of the NE 1/4 of Section 12, Section 12,
Township 9 South, Range 5 West, S. B. M., described as
follows: BEGINNING at a point on the N. line of the NW 1/4
of the NE 1/4 of said Section 12, distant 1093.1' S. from
the NE corner of said NW 1/4 of the NE 1/4 of said Section;
thence N. 51° 20' N. 221'; thence N. 42° 13' W. 255.7', more
or less, to the said E. line of said NW 1/4 of the NE 1/4;
thence S. along said East line to the point of beginning.

Parcel 28:  The NE 1/4 of the SE 1/4 of Section 12, Township 9 South,
Range 5 West, S.B.M.

Parcel 29:  The SE 1/4 of the SE 1/4 of Section 12, Township 9 South,
Range 5 West, S.B.M.

Parcel 30:  Lot 1 (the NE 1/4 of the NE 1/4)of Section 13, Township 9
South, Range 5 West, S. B. M.

- 2 -

196

6,

COPY aw

EXHIBIT  D

January 24, 1950

Dr. John S. Carroll
Superintendent of Schools
209 Civic Center
San Diego, California

Dear Sir:

You have inquired of this office as follows:

"In your letter dated October 10, 1949, addressed to the Fall-
brook Union Elementary School District, you state as follows
(the underlining is ours):

"Had not the Federal Government taken exclusive juris-
diction over the land, it is our opinion that Section
2621 of the Education Code above set out would be appli-
cable.  However, since the United States has taken ex-
clusive jurisdiction over the land within the boundaries
of Camp Pendleton as provided by law and no reservations
were made by the State relative to schools it is our
opinion that said land can no longer be considered within
the boundaries of the various school districts and the
school districts have no jurisdiction within the boundaries
of said Camp Pendleton.'

"The letter from the Attorney General dated November 15,
1949, addressed to your office, stated in part as follows:

"'Section 2621 of the Education Code is effective for
some purposes, however.  We think this section means that
should children residing in the Camp Pendleton area desire
to attend the schools of the school district in which Camp
Pendleton is located they would have a right to attend the
public schools.  In such event, the school district would
collect average daily attendance from the State, but, of
course, no taxes could be levied upon the persons or
property in Camp Pendleton.'

"We would like to have answers to the following questions:

"1.   There appears to be a conflict between the two
underlined statements.  Do you concur in the Attorney
General's opinion?

"2.   Did the State of California grant exclusive
jurisdiction over the territory included in Camp Pendleton
when this area was turned over to the United States Govern-
ment?

197

COPY/aw

Dr. John S. Carroll
Supt. of Schools                    -2-                January 24, 1950

"3.  May either personal property or real property
be taxed within the boundaries of the Camp Pendleton
reservation?  (i.e.-cattle, leased land, equipment, etc.)

"4.  Are the school district boundaries which existed
within the Camp Pendleton area before this area became a
United States Government reservation still existing school
district boundaries for either attendance or taxation or
any other purpose?

"We shall appreciate your help on these specific, enum-
erated questions as a means of clarifying problems relating
to our official responsibilities, particularly because of
budget planning now in process for the coming school year."

Apparently the two opinions referred to, that of our office
and the Attorney General opinion, were released without the custom-
ary clarification as to whether or not this office concurs in the
Attorney General opinion.

We regret the confusion resulting and welcome the opportunity
to review the two opinions in the light of the questions you have
raised.

Our opinion holds that the United States, having accepted ex-
clusive jurisdiction of Camp Pendleton reservation as of September
8, 1943, pursuant to law the territory of the reservation is no
longer to be considered as within the boundaries of the various
school districts involved for school purposes.

The Attorney General agrees in the main with this view but
qualified our opinion to observe that the reservation territory
still is within the respective school district boundaries by vir-
tue of section 2621 of the Education Code for certain school
purposes, namely, the right of the reservation resident pupils to
attend the public schools of the districts involved if they so de-
sire and the right of the districts to collect from the state aver-
age daily attendance apportionments for such pupils so attending.

Perhaps the discrepancy in the two opinions stems from the mis-
apprehension of just what is meant by the words "Exclusive juris-
diction."

Under the law as it existed at the time jurisdiction over the
reservation was accepted by the United States, namely, on September
8, 1943, the State of California could not if it wanted to have
ceded jurisdiction to the Federal Government without reserving to
the State the power to serve and execute civil and criminal process
on the reservation as well as the entire power to tax.

198

67

COPY/aw

Dr. John S. Carroll
Supt. of Schools                    -3-            January 24, 1950

(See sections 110, 111, 113, 114, 116, 117, and 120 of the
Government Code, effective August 4, 1943, prior to this accept-
ance).

Therefore, when we stated that "exclusive jurisdiction" was
assumed and accepted over the reservation by the United States we
of course meant "exclusive" within the limits prescribed by law,
which limits were as before stated subject to the power reserved
in the state to serve process and to tax.

That such is true is demonstrated by the facts.  It is a fact
that ever since the acquisition of Camp Pendleton by the Federal
Government, the County Assessor has continued to go on the reser-
vation annually during the assessment period and assess the re-
maining taxable property there, which assessments have consisted
largely of personal property of residents of the reservation, for
example, such as belongs to farm tenants occupying certain portions
of the reservation lands under lease from the Federal Government.
Of course the property real and personal owned by the Federal Gov-
ernment on the reservation is exempt from taxation because of its
Federal ownership.

Therefore it may truthfully be said there is a remaining tax
base on Camp Pendleton subject to local county taxes and the County
Assessor has been exercising his authority to levy assessments
thereon and such tax base has been paying county taxes ever since
Camp Pendleton was federally acquired.

The power to tax on Pendleton having thus been retained by
the State and having been exercised as above stated by the State
through its political subdivision the County, it follows that the
residents of Pendleton who desire to send their children to the
public schools of the state which are maintained in the school dis-
tricts of the area within which the reservation is situated are
entitled to do so on demand, since the county taxes levied against
Pendleton residents include school taxes.  To deny this right is to
tax without representation or benefit.

Accordingly this office concurs in that portion of the Attorney
General's opinion holding that residents of Pendleton may properly
demand admittance to the appropriately located public school of
this state for their children residing on the reservation, and the
school district admitting such pupils is entitled to collect from the
state the average daily attendance therefor.  Anything to the contrary
in our former opinion must be deemed overruled.

We do not, however, concur with that portion of the Attorney
General's opinion which states, "but, of course, no taxes could be

199

68

COPY/aw

Dr. John S. Carroll
Supt. of Schools              - 5 -              January 24, 1950

in this state. Such is one of the incidents of exclusive Federal
jurisdiction assumed over the area. This loss of franchise ap-
plies to school district elections as well as any other election
held in the state. See our opinion to the Board of Supervisors,
dated October 21, 1948.

    As to the right of the state school authorities to go upon
Camp Pendleton and enforce the compulsory education law of Cali-
fornia, such right no longer exists, in our opinion. Again, the
surrender of this right is one of the incidents of Federally as-
sumed exclusive jurisdiction. Pendleton residents may demand that
the neighboring California public schools receive their school age
children, but the public schools cannot compel such attendance on
pain of violation of the criminal laws of the state. Jurisdiction
to prosecute for crimes committed on the reservation now rests
solely with the United States and its federal courts by virtue of
the assumption of exclusive jurisdiction (Peo. v. Mouse, 203 Cal.
782, certiorari denied 278 U.S. 614, 73 L. Ed. 538;  United States
v. Watkins, 22 F. (2d) 437).  The right to serve civil and criminal
process on the reservation for offenses committed off the reservation
on state territory is to be distinguished from criminal jurisdic-
tion over the reservation.  There would appear to be little
question but that the criminal offense of failing to educate his
child would be committed by the Pendleton parent at his place of
residence, which in this case would be on the reservation, and not
at the public school, which is off the reservation.

                              Yours very truly,


                              JAMES DON KELLER, District Attorney
                                  and County Counsel


                              BY   Carroll H. Smith
                                   Chief Trial Deputy

CHS:ig
F. T. D.
APPROVED:  1/25/50



ANNEX "A"

70

201



SANTA MARGARITA RIVER
SUBTERRANEAN BASIN
UNDERLYING CAMP PENDLETON

202

C O P Y

SWING, SCHARNIKOW & STANIFORTH
Attorneys at Law
604 San Diego Trust and Savings Building
San Diego 1, California

July 22, 1949

Bureau of Yards and Docks
Department of the Navy
Washington, 25, D. C.

Re:   ND11-N1-13
      C5-40-Sd-2
      B-412.1/am

EXHIBIT F

Attention:  J. F. Jelley, Captain, (CEC) U.S.N.

Gentlemen:

In reply to your letter to me of June 10, 1949, I am glad to report
that we have successfully concluded our negotiations with the Vail
Company and are herewith enclosing the draft of letter prepared by
your Bureau and submitted to me for the purpose of having it executed
by the Vail Company.  This has been done.

I enclose also the letter of transmittal by the Vail Company in which
you will note that they say that they understand that the waters
which are to be impounded by the De Luz Dam are the same waters
referred to in Section Thirteenth of the Judgment entered in the case
of Rancho Santa Margarita v. Vail, et al., which section reads as
follows:

"Section Thirteenth:  Each of the parties hereto shall have
the right to construct dams or reservoirs on its or their
respective lands or elsewhere, for the purpose of intercepting
or impounding or conserving such party's share of the flood
waters of said river and its tributaries; provided, however,
in the event any such dam or reservoir is hereafter constructed
by defendants for such purpose, the rights of defendants to
abstract and divert Storage Water pursuant to Section Tenth
hereof shall cease and terminate.

"Defendants shall not make, during any irrigation season,
any surface diversions of the waters of said river at the
Bridge Pumping Plant, the Cantarini Pumping Plant or the Tule
Pumping Plant referred to in the Findings herein, or any other
point on said Temecula-Santa Margarita River below the point
of Rising Water as shown on said Exhibit No. 265."

Of course, our whole emphasis has been laid on the importance of
keeping our project within the terms of the decree and this under-
standing of Mr. Vail's is, I am sure, in harmony with the under-
standing of all of us who sat in on the negotiations in Washington
in May.

Encl. 2

203

The further reference is to your pending application before the Division of Water Resources which, I believe, is also a part of our plan.  Under the laws of the State of California, a riparian, as such, has no right to store water and must get this right by an appropriation which appropriative rights are not inconsistent with his rights as a riparian (Rindge v. Crags Land Co., 56 Cal. App., 247). Also since only a portion of the lands of the Rancho Santa Margarita, to wit, 38,739 out of 133,440 acres are riparian (Rancho Santa Margarita v. Vail, 11 Cal. (2d), 501, 518), it is necessary to make an appropriation in order to put the waters of the river to use on your non-riparian lands.

We hope and expect to cooperate closely with you in making the District's pending application and the Navy's pending application harmonize to carry out the project as we are proposing it to Congress.

As to the laws of return water, I think this is unsubstantial in amount and one which can be easily adjusted between the Fallbrook Public Utility District and the Navy.

I am hoping sincerely that Congressman McKinnon can promptly intro-duce the bill and get the same referred to your Department and bureau while the people who know what it is all about are still there.

Sincerely,

/s/ Phil D. Swing
Attorney for Fallbrook Public
Utility District

PDS:ec
encs.

P.S.  I will be in Washington the 15th of August and for some time thereafter, but hope this matter can be got going without delay.

204

