# SANTA MARGARITA WATER RIGHTS CONTROVERSY, CALIFORNIA

---

**MONDAY, AUGUST 13, 1951**

House of Representatives,
Special Subcommittee on Irrigation and Reclamation
of the Committee on Interior and Insular Affairs,
*Fallbrook, Calif.*

Chairman Engle. The subcommittee will be in order.

Ladies and gentlemen, this is an official subcommittee of your House of Representatives from Washington, D. C. It is the Subcommittee on Irrigation and Reclamation of the House of Representatives which has jurisdiction of all irrigation and reclamation matters in which the United States Government is involved. The Subcommittee on Irrigation and Reclamation, in addition to being the committee which authorizes all irrigation and reclamation projects throughout the United States, is also the legislative committee of the House dealing with the problems of water and water law and reclamation law throughout the entire West. This subcommittee also has jurisdiction of all interstate compacts between States relating to the distribution of water throughout the United States by interstate compact.

We are here today at the request of numerous local citizens and local organizations. I wish, in the beginning, to introduce the members of my subcommittee by name and a little later I will call on them for a brief expression, prior to the time the testimony is started, but to identify this subcommittee for you, my name is Clair Engle. I live at Red Bluff, Calif. I am Congressman from the Second District in this State and I am chairman of the House Subcommittee on Irrigation and Reclamation.

On my left I have Congressman Sam Yorty of Los Angeles, who is also a member of this subcommittee, a member of the full Committee on Interior and Insular Affairs, and one of the most active Members of Congress on water rights problems.

On my right I have another gentleman from Los Angeles who is also one of the leading spokesmen in the field of water legislation in the United States, Mr. Norris Poulson.

Further on my right, the second man to my right, is from Pennsylvania, Mr. John P. Saylor, who, notwithstanding the fact that he comes from an area where they try to get rid of water, rather than to conserve it, has taken an intense interest in the water problems of the Far West.

A little later we will have with us Congressman Walter S. Baring of Nevada, from our neighboring State. He came in a little late this morning on an airplane, but he will be here in a few minutes.

1

491

In addition, too, we have with us Mr. James K. Carr, who sits second to my left. He is the technical consultant, and civil engineer for the Subcommittee on Irrigation and Reclamation of the House.

Now, we are honored today to have with us a number of State legislators who have appeared here because of the public interest in this hearing and because, sooner or later, the joint water problems committee of the State Legislature may be involved in it.

Senator Williams is here, at the other end of the table—the third from my left. He is chairman—you correct me, Senator, if I do not give your title correctly—of the joint water problems committee of the State legislature.

Sitting immediately beyond him, and to the end of the table, is Senator Ben Hulse. Senator Hulse, as I understand, is a member of that same committee.

Now, over on the end of the table, at the far end, we have Senator Dilworth, who, I believe, also, if I am correct, is a member of that committee. Is that correct, Senator?

Senator DILWORTH. I am from Riverside County, but I am not a member of the committee.

Chairman ENGLE. We are glad to have you here in your capacity as a member of the State legislature.

Have I covered all the senators?

Now, let me go through the assemblymen. We have Assemblyman Harold K. Levering of the Sixtieth Los Angeles assembly district. I am going to ask all these gentlemen to sit with the committee. Mr. Levering is the third gentleman from my right.

Assemblyman John B. Cooke, a member of the assembly from the thirty-eighth district. He is at the end of the table.

Assemblyman William S. Grant of the seventeenth assembly district of Long Beach.

Assemblyman Ralph R. Cloyed of the twenty-third assembly district. This, by the way, is his district and we are very happy to have you here.

Assemblyman Carley V. Porter of the Sixty-ninth assembly district from Compton, Calif.

Now, have I recognized all of the members of the State legislature who are here? Are there any others? If there are I wish you would please come forward. You are invited to sit with the committee at this hearing.

Now, ladies and gentlemen, I think it would be proper in the beginning to define for you, to some extent, at least, the function of this committee.

This is a legislative committee of the Congress of the United States. It is not our intention to try to decide the lawsuit which is pending in connection with this particular matter in the Federal court. We intend by this proceeding no interference with the judicial process. We assume that the Federal court will make its decision on what it determines to be the facts and the law without reference to this hearing or anything which is determined particularly at this hearing. As you know, the Constitution of the United States very carefully separates the judicial, the legislative, and the executive functions.

492

It is not our intention in coming here to seek to interfere with or to influence the decision of the court one way or the other. We intend, under proper provisions of the Constitution, to respect the separation, and the independence, and integrity of the judicial branch of the Government. On the other hand, the same Constitution which separates the powers of the judicial, the legislative, and the executive, guarantees to the people of this country the right of petition to their Congress and the pendency of litigation in a Federal court in no way abridges the right of the people of the United States to petition the appropriate committees of the Congress of the United States. We are here in response to the petition of the people of this area.

Within the function which the legislative branch of the Government is entitled to carry out we intend to do what we can to be of assistance in this problem. There are several things that we can do. We can make findings of fact which have bearing upon the actions taken by the various executive agencies including, I hope, the office of the Attorney General. We can implement those findings of fact with specific recommendations which it has been the policy and practice of the executive branch over a period of years to recognize and, on most occasions, respect.

In addition to that, should our findings of fact and our recommendations be overlooked or ignored, we have the right to implement and the power to implement those findings of fact and those recommendations by appropriate legislation.

Now, as one member of this committee, and as the chairman of it, perhaps I should tell you what I am interested in finding out in this hearing from the local people so that you can appropriately orient your testimony. In a few minutes I will recognize the other gentlemen on my subcommittee so they can give you their ideas on the same subject matter.

But, I am interested in, particularly, two matters. In the first place I would like to find out, if I can, on what basis the Federal Government asserts the right which it asserts in this area to water. I want to find out whether or not the Federal Government is claiming some right by reason of its sovereignty; by reason of its capacity as a water owner or an owner of water rights in a different capacity than an individual would hold those same rights provided that he had acquired the same purchase documents. I might say, relevant to that particular proposition, that it has always been the view of the Congress of the United States that the Federal Government owns no water rights other than as any other property owner would own water rights; that the Government, by reason of its sovereignty owns or exerts no greater right than an individual would exert in navigable streams of these United States, although the Federal Government, under the commerce clause of the Constitution, is given the power to regulate navigation on those streams. It does not, by reason of that constitutional provision, acquire any rights to the water in those streams. This subcommittee, throughout the years, has jealously guarded the rights of the State to dispose of the waters of nonnavigable streams of this country. And so, if there is some assertion of title here which is different than or covers more ground than has been previously known or acknowledged in Federal legislation, we want to know about it so that we can correct that situation. We do not want the Federal Government moving into the western part of the United

**4**      SANTA MARGARITA WATER RIGHTS CONTROVERSY

States and asserting title to the streams of the Western States. So, as a general proposition, we are interested in just what the Federal Government is asserting here and on what basis. That is number one.

Number two, I am interested in knowing why this litigation is necessary at all, and I assert that if it is necessary for an owner of the legal title to water to sue ten or twelve or sixteen thousand defendants in order to establish a water right then, so far as the average water owner is concerned, he is without legal remedy in the establishment of his rights in the streams of this country. And, if that condition exists, then all of us who assert any right on the streams of the far West, unless we have the resources and the attorneys that the Federal Government can carry on the payroll year after year, are helpless to assert and to prove the water rights on these streams because the average landowner simply cannot afford legislation of this magnitude.

If that is the case then I say that the water laws of this State and of this Nation need some serious revamping, and because that may be in issue here I am very, very glad that Senator Williams has brought to this hearing, and this meeting, the official committee of the State legislature because it may have some problems bearing upon the same subject matter.

Now, our time is very short. We are going to be here today, this evening, and tomorrow morning. This subcommittee has been on the road for something like 2 weeks. We came through the Central Valley celebration. We have made numerous inspections from Redding south to Bakersfield and over to Santa Maria and Santa Barbara, and now we are here at what will be the concluding session of this subcommittee. Because our time is short I am in hopes that we can devote as much of it as possible to hearing what the local people have to say. The representative of the attorney general's office is here, and I believe others are here from various interested agencies, but our particular purpose in this hearing is to listen to the local people of this area with reference to your problems and we will devote ourselves to that exclusively, or at least as far as we can.

We are here in the district of our good friend, a very popular and able legislator, Clint McKinnon. I am sorry that he can't be here. He called me the other day to tell me that his legislation relating to the second barrel of the aqueduct into San Diego is up for hearing before the Armed Services Committee today and as a consequence of that he felt it very necessary for him to remain in Washington and to present the evidence in support of that proposition to the Armed Services Committee. But Mr. Heald, I think, has a letter from Congressman McKinnon; I would like to have Mr. Heald read that now, if he will, so that it may be a part of the record and so that this committee and the people here can be informed of Congressman McKinnon's viewpoint. Mr. Heald.

Mr. O. P. HEALD. Gentlemen of the United States Congress, members of the California State Interim Committee, and ladies and gentlemen, this is a letter dated August 10, 1951, from Congressman McKinnon to the people of Fallbrook and the Santa Margarita watershed:

I deeply regret my inability to be with you today for I have looked forward to a congressional hearing in Fallbrook for many weeks. But as you testify

before this committee in your community, I shall be appearing before another congressional committee in Washington to secure the second barrel to our aqueduct. May we both be successful in our endeavors.

I am sincerely grateful to the Honorable Clair Engle and the members of his Subcommittee on Irrigation and Reclamation. This is one of the great committees of the Congress and there is no committee more versed in water problems nor more sympathetic to the needs of water users than the one that is visiting your community today. They are all distinguished Members of the House of Representatives and their willingness to take time from a busy legislative program indicates their interest in justice and their determination to guarantee one of our fundamental rights: that of the people to redress the Government with their grievances. Because it is impractical to take Fallbrook to the Nation's capital, they are bringing the Government to the people. Congressman Engle is particularly well versed with your problem and as you get to know him today, you will find a strong and sincere friend.

This meeting will afford the good citizens of this area an opportunity to fully discuss their grievances and their problems. This is your opportunity to fully discuss their grievances and their problems. This is your opportunity to blow off steam. But I hope the meeting does not stop with that. I hope that your testimony will convince this great committee that we need more than a just division of the scant amount of water we now have in the Santa Margarita. Our problem is deeper and broader than that. We need a progressive and courageous conservation and development program that will build adequate dams in our streams and create more water for the further enrichment of your acres.

This is our basic challenge, and I fervently hope your testimony will inspire this committee to work with us, and for us, in attaining the goal.

Cordially yours,

CLINTON D. MCKINNON.

Chairman ENGLE. Thank you very much, Mr. Heald. We very much appreciate that statement from our colleague, Clint McKinnon, and we are all wishing him good luck and good success in the advancement of the very necessary project on which he is today appearing before the House Armed Services Committee.

The Chair wishes to acknowledge the presence and the interest here of Senator Hugh P. Donnelly of Turlock. Senator, will you come forward and sit with our committee, please. We are very glad to have you here, Senator Donnelly.

And now, in accord with my previous announcement, the Chair is going to recognize each one of the members of this subcommittee for a brief statement. Gentlemen, we are proceeding under the 5-minute rule which I will expect you to strictly observe. The first gentleman I will introduce, ladies and gentlemen, for a brief statement, so that you may orient yourselves to what his views of this situation are, is Congressman Norris Poulson whom I have previously introduced.

Congressman Poulson, for a number of years, has been a member of the House Subcommitte on Irrigation and Reclamation as well as a member of the House Committee on Interior and Insular Affairs. He has taken a most active interest in water matters because of the controversy that has raged for a number of years on the Colorado River. He has taken an intensive interest in this particular matter and it is a pleasure to introduce to you at this time my friend and colleague from Los Angeles, Congressman Norris Poulson.

[Applause.]

Congressman NORRIS POULSON (Los Angeles). Mr. Chairman and fellow Californians, we came out here to listen to you folks rather than to do the talking, but I do think that there are a few things that we ought to clear up. First of all, I think that we publicly should

give due credit to our chairman, Clair Engle, for the fact that we got this committee out here.

Now probably some of you do not realize the problems which we had. First of all, the Justice Department is a very powerful department and some of these problems came under the jurisdiction of the Judiciary Committee and so, therefore, Clair Engle and the other members of the California delegation had to diplomatically get the full cooperation of the Judiciary Committee to turn this problem over to this Subcommittee on Irrigation and Reclamation. While the subject of irrigation and reclamation of water rights positively comes under this committee, there were a few problems involved which came under the Judiciary Committee. For instance, the Government was using the same technique that it used when it went and took over the tidelands, and therefore the Judiciary Committee had an interest. So to you, Clair, and the rest of the California delegation, we think that there is a certain amount of credit due you.

Now there is something else we might just as well clear up right now. Naturally, when people begin to fight and they find they are in a tough spot they always try to throw up a lot of other issues, and the Justice Department has tried to bring up that this committee, and the newspapers which were publicizing it, were doing it to protect certain large landowners. Well, now, this committee took a trip over this area and we certainly found that by far and large it was comprised mostly of the small landowners in whom we are interested. Remember, the big landowners can take care of themselves through litigation. It is the small landowner and home owner in whom we are interested. Just bear this in mind, and this is something for the Justice Department to take into consideration, injustice is injustice whether it be against a big man or a little man. [Applause.]

Now, since they started it, I want to say, first of all, we want to pay tribute to the newspaper fraternity because we, in Congress, would not have known a thing about this unless they had called it to our attention through the columns of their papers. [Applause.] And it might be interesting to know how this started. This started by one of your own residents writing to, I believe, the Los Angeles Times, and it was placed in the Monday morning paper—you know where they have letters from the readers—and I think Ed Ainsworth and others became interested as well as people in this district, who followed up that letter, and that started the whole exposure. Now it has gotten so big that the Justice Department is trying to divert it by bringing up such propaganda as that this is another issue than the main issue of the intrusion upon our individual rights.

Now there are, of course, many problems which we are going to have you bring up, and I think one thing that they haven't mentioned is the availability of water from the aqueduct. With the new aqueduct the metropolitan water district will be able to supply Camp Pendleton with water not taken out of San Diego's portion or any other portion, but just the same as they are supplying it to other Army bases. So I think the purpose of this is clear and we will get down to the facts and forget the smoke screen which has been thrown up by the Justice Department. [Applause.]

Chairman ENGLE. The next gentleman I will call on for a statement, also under the 5-minute rule, is also a gentleman from Los Angeles. He is a newer member of our committee, having joined us this last

session, but has been a very able and a very active member and one who has taken an intense interest in this particular controversy as well as the Colorado River controversy with which he is completely conversant. He has, I belive, expressed himself from time to time in respect to this particular matter in the public press and on the floor of the House and in the Congressional Record. He will have, I believe, some observations which will be beneficial to you in presenting to this congressional committee your views as to what your testimony should cover. It is a great pleasure to introduce to you Congressman Sam Yorty of Los Angeles.

Congressman Sam Yorty (Los Angeles). Mr. Chairman and ladies and gentlemen, I will only take a minute because, as our chairman has said, we are here to listen to your story and not to tell you what we think about this particular controversy. As the chairman suggested, I have made my views fairly clear and I can hardly be considered an impartial judge in this matter because I am completely unconvinced that this suit is necessary or, if necessary at all, I am convinced that the scope of it is far too broad. It seems to me that when a government summons in as many people as they have here it is a very good thing that you can petition Congress. There was a time when I think we would have looked to the courts to protect you, but as a result of the tidelands decision in which California was the guinea pig, it appears to me that the courts are being used as an instrumentality of the Federal Government to acquire things without paying for them. I do not believe there is any precedent for the sort of thing that is happening here. It is necessary this time that we act before you lose all of your water rights and we lose the right to control water under State law in the State of California.

Now we are particularly fortunate in having as chairman of our subcommittee with us as the ranking member of the committee, Mr. Engle, who is recognized by everyone in Congress as an authority on water law and certainly one of our ablest Members. It is very fortunate for California that we have kept him there long enough so that his seniority makes him the ranking member and, by virtue of that, the chairman of this committee. I am glad that we have a Californian sitting here as chairman, and I am sure you all feel the same way about it.

We are anxious to find out exactly what is happening to you people here. We want to find out what the Federal Government thinks it acquires when we give them exclusive jurisdiction over an area in good faith believing they will respect that concession on our part, respect it and limit it to the things for which it was intended, and I can assure you, on behalf of my former colleagues in the State legislature that when exclusive jurisdiction was given to Camp Pendleton they did not intend to surrender our right to govern waters under our State law or to have our State authority decide how water should be distributed in accordance with our law. I think that exclusive jurisdiction as it has been brought into this case by the Attorney General is an extremely dangerous doctrine, and when you consider that the Federal Government owns installations on many streams throughout the West you can understand that what is involved here is certainly much more than just the Fallbrook area and the Santa Margarita watershed. This is of interest to the whole United States and particularly to the

Western States.  To me it is just one more step in what looks like a plan of encroachment, against the water rights in the West.

This complaint, read in connection with the tidelands decision and the references to the needs of the Federal Government for national defense; references to the sovereignty of the United States and the sovereign rights, all of that read in connection with the Government's brief in the case of *Nebraska v. Wyoming*, in which they assert that the Federal Government owns all of the unappropriated water on the nonnavigable streams in the West—a doctrine which was not decided in that case but which was certainly strenuously urged by the United States—when you read this complaint in connection with these things which have happened before you cannot help but be convinced that it is a mighty fine thing for a lot of citizens to meet here in Fallbrook to try and protect your water rights from seizure by a Government that apparently is getting too big for itself, getting too headstrong.  In making this fight on behalf of yourselves you are fighting for all of the people on all of the streams in the West and we are out here to try and help you.  [Applause.]

Chairman ENGLE. The next gentleman I would like to introduce will be the one previously introduced to you as the gentleman from far-away Pennsylvania who, as I say, is out here getting a lesson in water problems in reverse.  But he has shown an intense interest in California water problems as well as the water problems of the entire arid western part of the United States.  This is the second trip he has made in the last year to California.  He is one of the most popular—I beg your pardon, it is the third trip he has been here—he is one of the most popular and able Representatives on the Republican side of our committee.  It is always a pleasure to introduce Congressman John Saylor of Pennsylvania.

Congressman JOHN P. SAYLOR (Pennsylvania). Chairman Engle, members of the committee, distinguished members of the legislature and citizens of California, I am not interested in your politics or your religion.  I am only interested in the fact that you are American citizens and have a big problem out here.

Now, while this may have been my third trip out here I want to tell you I have been in this area before and I was the only member of the committee that came through this morning that ever had been on the military reservation over the hill here in Pendleton.  I know something about that camp first-hand.

One of the things I want to check up on while I am out here is whether or not they have used the marines to serve these papers on the defendants and I don't care if you have some of the boys here in civilian uniform or civilian clothes—I want to find out about it.  I was one of those that stanchly came to the defense of the great Marine Corps when a certain person wrote a letter and said that they were Navy policemen.  Now, if they are being used to serve papers on the citizens of this great community maybe he was not far wrong and maybe I will have to admit I was wrong.

True, I came out here to meet with this committee for the dedication of the central California project.  The only reason that I agreed to come along with the committee and stay away from Washington, as an easterner for this period of time, was on account of the hearing which we are going to have here today and tomorrow, because from an east-

erner's viewpoint, if the newspaper accounts which we have been privileged to read in the East of this suit are correct, and the Justice Department is declaring that the United States Government has certain paramount rights because it is the United States Government, then the whole historic pattern of these United States has changed because the planners of our Constitution and those great historic gentlemen who wrote that great document that only those rights which were given to the Federal Government by the Constitution were taken away from the States and all other rights were retained by the States themselves.

While this suit involves many of your people here today individually the implications go far beyond California. There is no telling when they may move into the coal fields of Pennsylvania; there is no telling when they may move into the oil fields of Michigan; there is no telling when they may move down into the great central part of our country and claim all the various ores that we find down there. So I am happy to be here and happy to be able to listen to those citizens who are vitally affected by this what might be one of the greatest lawsuits that has taken place in the history of our country. [Applause.]

Chairman ENGLE. Congressman Baring has not arrived as yet, but when he does the Chair will introduce him.

Those in attendance here might assume, from the preliminary statements which have been made here, that this commmittee has its mind pretty well made up. I haven't any doubt at all that most of us on this committee—I won't say all of us—have certain ideas about this entire problem, but from what has been said here I think you can conclude that we are conscious of the great power of the Federal Government. We are conscious of the fact that the exercise of that power against the citizen may be extremely hard, although our courts are supposed to give equal justice under our law. People do not necessarily go into court equal by any means, and we intend to restrict, if we can, the disparity of power between the Federal Government and the individual citizen.

Now I want to introduce Mr. Raymond Wayman who is going to make an introductory statement and then we will call the first witness. Now, Mr. Wayman, you can be seated or you may stand, as you choose. If you desire to be seated I would suggest that you try to face over toward the reporter because we want him to get the record straight.

## STATEMENT OF RAYMOND WAYMAN

Mr. RAYMOND WAYMAN (Fallbrook). Chairman Engle, members of the congressional committee, members of the California Joint Interim Committee, honored visitors, gentlemen of the press, and you who are being sued, you who have come here today to give us the moral support we so badly need, in the name of the Fallbrook Chamber of Commerce we welcome you.

In this unincorporated district the chamber of commerce acts for all the people. It is our town hall. The witnesses we have arranged for come from all parts of the watershed, from Oak Grove to the Camp Pendleton line. We have urged them to come and tell you, freely and openly, the story that they have that has so harrassed them.

Now I have a very great pleasure and that is in introducing one of my very best friends, one of the best friends that Fallbrook ever had,

our senior citizen who has been here all of his life and whose father came here and pioneered this community. Without further adieu I would like to present my very good friend and our friend, Victor B. Westfall.

CHAIRMAN. ENGLE. Mr. Westfall, this subcommittee will be very glad to have your statement and, as in the case with Mr. Wayman, you may stand here or you can be seated, as you choose.

Mr. WESTFALL. I would rather be seated, if you don't mind, as I am just out of bed.

Chairman ENGLE. You may proceed.

### STATEMENT OF VICTOR B. WESTFALL, SR.

Mr. VICTOR B. WESTFALL, Sr. (Fallbrook). When the first papers were served, and the word spread, the first reaction was of surprise, and then the people were sort of stunned. They just couldn't believe that their Government would do such a thing. For more than 60 years they have been using water given the lands by the State of California, and in these early days of this century they were real pioneers developing their homes under most adverse conditions. Wells were dug by hand and the water lifted in buckets, and many of the first lemon and orange orchards were watered from small tanks hauled on horse-drawn wagons. Markets were poor and money hard to get. Then as Fallbrook grew schools were built and windmills did the first pumping into private reservoirs and families felt secure owning their land, water and pumping plants.

It was hard going in those early days and Fallbrook merchants like Fallis Brothers, E. C. Reeder, Clarence Lamb and my own father before me, often carried the farmer for supplies the year round and often longer, and wholesale firms like the International Harvester Co. made this possible by extending their credit to these merchants, and though sometimes slow, obligations were taken seriously.

I would like to speak briefly of the origin of the Fallbrook district. It was started only shortly after gold was discovered in California. These pioneers started an economy that was based on that which they could raise and use within the community.

Not too many years went by until they found that if Fallbrook, if northern San Diego and the southern part of Riverside County were to come into their full development, some other source of water must be found. Not the small streams that then flowed through this area.

One of the first attempts was the Fallbrook Water & Power Co., which was organized and which sold stock in the early eighties for the purpose of bringing water and power to these early people. The reason for its failure is lost in the past. The original hand and horse-dug ditch lines is still visible. We do have one stock certificate, which I would like to have the Congressional committee examine.

Undaunted by one failure, our forefathers again attempted to solve their water problem through the newly enacted California irrigation district law. The constitutionality of this law was questioned, and the people of Fallbrook fought it through to the Supreme Court of the United States. But while winning their case before the Supreme Court, they found they had lost. They were unable to finance the project and it was doomed to failure.

The following years were ones of slow growth throughout this entire area. We, however, lived in neighborly fashion between two of the biggest ranches in the State—the Vail holdings to the north, known as the Pauba Ranch, and the Rancho Santa Margarita, which was then owned and operated by Jerome O'Neill. It was a common practice that whenever the community celebrated a major event, such as the opening of a new road or the completion of a new school, that one or the other of these ranches was always more than willing to slaughter a steer for the barbecue that inevitably followed.

In 1924, Fallbrook again decided the time had come when it must obtain an outside supply of water. A second Fallbrook irrigation district was formed, and the directors elected to go to the Santa Margarita River and erect a dam to bring water into this area. At that time, a large part of the Fallbrook irrigation district was composed of a part of the Rancho Santa Margarita, which is now Camp Pendleton. The cooperation between that ranch and its owner, Jerome O'Neill, and the Fallbrook people, was always excellent, and it was surely the thought of Jerome O'Neill that Fallbrook would naturally share in the flood waters of the Santa Margarita River.

After many years and the expenditure of what was to us a tremendous amount of money, it was found that we had not yet grown to a point where we were able to finance a dam on the Santa Margarita River. It was with a deep sense of regret that in 1936 Fallbrook found that it must temporarily lay aside its plans for the development of the Santa Margarita and turn to another source of water supply. This we did when we turned the assets and liabilities of the old irrigation district over to our present Fallbrook Public Utility District and brought from the San Luis Rey River a supply of water that we knew would eventually have to be augmented by additional water from the Santa Margarita River. This was accomplished in 1939. In the years prior to this time, the Fallbrook Public Utility District, with the full consent of the Rancho Santa Margarita, had started pumping water from the Santa Margarita River for domestic and irrigation purposes in and around the town of Fallbrook.

When the Marines purchased Camp Pendleton, this friendly relationship continued, and continues today. Fallbrook has no fight, no difference of opinion, with either Camp Pendleton or the Eleventh Naval District. We have always been proud of our relationship with them, always ready to help them put on such celebrations as Armed Forces Day—during the war we were glad to supply the naval depot with our water—and in return, we have received every courtesy from Camp Pendleton that could possibly be expected. They have always been willing to provide band music for us and any other facility that we might ask.

So when the shock wore off the Fallbrook people decided to fight with all the strength they could muster. We know of your interest by your being here and we want to express our thanks and appreciation. [Applause.]

Chairman ENGLE. Mr. Westfall, I wonder if you would mind answering a question or two from members of the committee.

Mr. WESTFALL. If I can.

Chairman ENGLE. We know you got out of a sick bed to come here.

Mr. WESTFALL. It is all right.

Chairman ENGLE. We will make our questions very brief so it will be as little hardship on you as possible.

Mr. Poulson has indicated an interest in asking you a question.

Mr. POULSON. Now, how much has this area developed from 1936? That is, how much more water have you been using, say, from 1942 to date, the date that Camp Pendleton went into business?

Mr. WESTFALL. I am afraid for that I would have to go to the records. Mr. Yackey may have that.

Mr. POULSON. Then I will ask you this question. This is an irrigation district which was formulated on the good old American principle of people did it themselves. They didn't call on the Federal Government to do it.

Mr. WESTFALL. That is right.

Mr. POULSON. Well, do you think that there could be a veiled threat there just because it is operating that way, that you are not going to get the cooperation you would if it was a Government project?

Mr. WESTFALL. Well, from the serving of these people with papers it looks like we are not going to get much help from the Government.

Mr. SAYLOR. I would like to ask you, Mr. Westfall, did the oldest district comprise substantially the same territory that is now included in the new district?

Mr. WESTFALL. Yes, sir, with the exception of seven hundred some-odd acres that was originally the Fallbrook Public Utility District. The two districts were entirely separate up to the time the Fallbrook irrigation district sold its assets.

Mr. SAYLOR. And this stock certificate which you have presented here indicates that that corporation was formed in 1887, is that correct?

Mr. WESTFALL. Yes, sir. It is really before my time and is just one of the old records of Fallbrook's efforts to get water.

Mr. SAYLOR. And it was incorporated in the State of California in 1887?

Mr. WESTFALL. Yes, sir.

Mr. SAYLOR. Thank you.

Chairman ENGLE. Is that all?

Mr. SAYLOR. That is all.

Chairman ENGLE. Thank you very much, Mr. Westfall. We very much appreciate your appearance here and we are conscious of the fact that you came at some physical sacrifice to be here.

Now we have with us Congressman Walter Baring, of Nevada, who has just arrived, having come here from Reno to attend this hearing. Congressman Baring is the only Congressman from Nevada having the unique distinction of being one Congressman in the State with two Senators. Nevada has always been regarded as a sister State of California and one with which we have a very close community of interest.

Mr. Baring, I would appreciate if you would stand up and let the people see you. They are very glad to know that you are here.

Now, Mr. Wayman, have you completed your statement?

Mr. WAYMAN. I believe I have.

Chairman ENGLE. Now we can proceed, then, with the list of witnesses as presented on this agenda, and the first witness I have is an old, old friend and one I have known a long time, Mr. Hewes, president of the Imperial irrigation district. Mr. Hewes, it is good to see you again.

502

Case 3:51-cv-01247-JO-SBC   Document 853   Filed 12/03/51   PageID.2193   Page 13 of 54

## STATEMENT OF EVAN HEWES

Mr. Evan Hewes (president, Imperial irrigation district). Mr. Chairman, members of the Irrigation and Reclamation Committee of the Congress of the United States, members of the State Legislature of the State of California, my friends and neighbors of Fallbrook Public Utility District and of the Santa Margarita watershed as a whole.

Mr. Chairman, on entering the building today I had somewhat the same feeling that I had some 2 months ago one night when I journeyed to Fallbrook to attend a meeting that was held by the good people of Fallbrook for the purpose of discussing what, in their mind, was a near catastrophe that had descended upon their community, speaking of this lawsuit.

I had the feeling of a little boy with a very small voice that was, maybe, going to try to put forth a message in the wilderness. Mr. Chairman, I am awfully happy to sit here before this microphone now and, with the greatest humility, apologize to you and the other members of this committee for ever letting such a thought cross my mind with the advance notice that I had of the many battles that you and your committee have fought for the principles that the people in my district are fighting for and have stood for. It is a shame to me, Mr. Chairman, knowing that other members of your committee have fought just as hard in maintaining those same principles and, therefore, many of the things that I anticipated saying here today have already been said by yourself and members of this committee.

However, Mr. Chairman, the citizens of the United States, and more particularly that part of the western part of the United States, are concerned and disturbed and we are without that peace of mind that the people of our country fought wars for and strove so many years to try to attain. Our faith in our form of government is unwavering, but in the late years things have come to pass, in putting various incidents together, and in trying to evaluate them, and many of us have arrived at the conclusion that the action of agents of the people, working for the Federal Government, are slowly but surely developing into a definite pattern and that definite pattern now, in our opinion, is directed toward depriving the citizens of the western part of the United States of the rights that our Constitution guarantees to them.

Mr. Chairman, the Fallbrook suit might be an accident. The tideland suit might have been an accident. Litigation pending in the Central Valley in the State of California also might be an accident; litigation recently undertaken in the State of Nebraska might also be an accident; the over-all and comprehensive and conclusive acquisition of property and rights of every citizen in the entire Colorado River Basin, under the subterfuge of the Mexican Water Treaty, might also be an accident. But, Mr. Chairman, and gentlemen, we believe that when you put them all together, even although some of those actions may have been fostered and nourished by different branches of the Cabinet of our Government, or, I would say, individuals in those branches of Cabinet, the results of any one of those actions establishes a precedent that would have a direct influence upon, if not prejudice, the rights of people of the entire United States, and, at least, specifically, to the western United States.

**14**    SANTA MARGARITA WATER RIGHTS CONTROVERSY

We do not believe, Mr. Chairman, that they were accidents at all. We believe that these various actions that have been directed toward the people of these various communities was just as well thought out and just as thoroughly predetermined as the reconnaissance trips the Army sends out. The reconnaissance trips feel out the opposing force's weaknesses. We all know that old military strategy, as old as the beginning of time. Probing parties test the opposite forces to find the weakness in their armor and then to send masses to break through. We believe that the people of the United States are having their rights probed for a weakness in the Constitution, and if they find a weakness, whether it be in the tideland suit or whether it be in the Santa Margarita water case; if it had been, and it was in the Mexican Water Treaty—it was full of it—it overflowed; it overflowed to such an extent that even the sponsors of the treaty themselves contended on the floor of the Senate of the United States until it had 11 reservations attached to it protecting the rights of the people of the Colorado Basin under the domestic law of the United States when there was no reason or no justification to deprive them of any of their rights to enact that treaty with a nation knowing that that nation had no rights or interests; it was none of their concern, about the domestic rights of the citizens of the United States.

So, therefore, we feel that in any of these lawsuits, if their probing was successful, and they were able to break down what at the present time and always has been considered, our constitutional rights, it would spread just like a prairie fire spreading in prairie grass. It would be used as a precedent to deprive us of rights that we have.

Down on the Colorado River, as an example, we have great works constructed by the Federal Government, as your committee knows, and connected with those works in minor ways we also have military establishments needing the use of the water of the Colorado River. Some of the establishments have been made on public lands and others are there by the good graces of organizations such as the people that I represent in Imperial Valley leasing those acres of land for a dollar, and we pay the dollar. But what are we doing, Mr. Chairman? Are we laying a foundation for some later date to have a legal question raised as to the paramount rights that the Federal Government has acquired because of land or property that the people of our community have donated to them to use in cooperation, and to help defend our country? Certainly it behooves every citizen of the United States to do his utmost to protect the United States against foreign invaders, but in doing so we want to be assured, Mr. Chairman, that agents representing departments of our own Federal Government will not use some technicality or some smart practice of law to try to deprive us of our rights as citizens.

Mr. Chairman, I was raised to think of our Federal Government as being beyond reproach as far as its actions were concerned. My opinion was rather broad. As far as the acts of our Government are concerned, with checks and balances, as you have so well described today, the executive, judicial, and legislative, one a watchdog to the other with the responsibility and obligation of each one of those departments of Government, however, to protect the people of this Government, and as far as that line of thinking is concerned I think it was correct. We have overlooked the thought, however, that some-

times that trustee, regardless of whether they are trustees in Government or whether they are trustees in private enterprise, do not always see eye to eye with the people that have trusted them to represent them and they get far afield.

That is the point that I am trying to call to your attention, and the district that I represent, as you men know—I think every member of this committee has attended hearings and you are just as familiar with the contract of the Imperial irrigation district with the Interior Department of December 1932 as I am myself, so I will not test your patience and impose on your generosity by reviewing any part of it. We wish to take this opportunity, however, to point out, because the people of the United States as a whole have been raised and trained in their thinking to think of the United States as being above reproach as far as its actions are concerned, that there is one thing for the Congress of the United States to watch and guard most conclusively, and that is to protect the United States interests against ourselves. Members of Congress, you and we have so religiously sought to attain and preserve that status that we have created a condition that has made it difficult, if not next to impossible, where we have agents of the Government who are exceeding their authority to do anything about it but just take a beating.

I was glad to hear you, Mr. Chairman, as well as other members of your committee, state that one of the things that you were interested in, and you sincerely hoped might be brought about in these hearings, was anything of a legislative nature whereby this committee, by exercising its influence and exerting its efforts to do something that, in your wisdom, you decided was necessary, to give people, give the citizens of these western United States, greater protection than what they might enjoy at the present time. If the Fallbrook suit develops there probably will be instances develop that will either convince you of the necessity of doing something, even more so than you might be today, or your minds will be completely put at ease as to whether we, the citizens of the United States, need any additional protection.

In closing that is my prayer, Mr. Chairman; that is my prayer to the members of your committee, to give full and thorough consideration, without in any way, shape, or form impairing the rights and the protection of the people of the United States as a whole, but to give the citizens of the community of Fallbrook, the Central Valley of California, Nebraska, and Imperial Valley, Calif., the States that are vitally affected by the tidelands, to see if there cannot be some legislation developed by the authority of you and your fellow legislators, who are able lawyers, to help us meet the situations such as the people in Fallbrook are confronted with and are facing, which you and I know both, if it has to run its course, will be ruined. Thank you, Mr. Chairman, and members of the committee.

Chairman ENGLE. Thank you very much, Mr. Hewes. I think you put your finger on the essential purpose of this hearing. We are here to determine the needs of the people and to what extent the people of this area will require protection from excessive exercise of authority by Federal agencies. One of the biggest problems Congress has is trying to keep a bit in the mouth of Federal agencies which have a tendency to broaden their power and to assert jurisdiction in violation

505

of the rights of individuals.  That is precisely what we are here for and I hope, as this hearing goes forward, we will get a demonstration of what these people regard as their needs in the premises.

Now, are there any questions?  May I suggest, with reference to questions, that we make them as brief as possible because we have a very heavy schedule.

Mr. POULSON. Have you not found out, Mr. Hewes, in your activities with the Imperial irrigation district, that the Federal agencies are continuously referring to precedent, something that has happened in an isolated case, and they use that and develop that to try and prove their point and use that as their evidence on some of the larger cases? Is that not true?

Mr. HEWES. For 20 years I have been feasted and fasted on that word.

Mr. POULSON. All right.  Now, taking this particular problem right here in Fallbrook, we know that any of the large landowners can afford—I will correct that—they can't afford, but they are able to litigate for years and years, which they would have to do in a case where the Justice Department has armies of attorneys.  But the poor little landowner and home owner, who has just a lot or at the most, oh, an acre or two, he would have to give in immediately and by the mere fact that he has given in the Justice Department and the Federal agency would start using that as a precedent and as a basis for many of their contentions.  Isn't that the way you proceed?

Mr. HEWES. Yes.  Regardless of how a precedent is established, whether it is established by default or actual loss in trial, I have never seen the boys hesitate to use the word "precedent" to the fullest extent.

Mr. SAYLOR. Mr. Hewes, for the record, as president of the Imperial Valley irrigation district, you entered into a contract in 1932 with the Interior Department and upon completion of the All-American Canal it would be turned over to you, to your district; is that not correct?

Mr. HEWES. The little catch is that the Secretary of Interior had to make the determination as to its completion.  It wasn't a question of whether it was physically completed.  The language that was in the contract was that the Secretary of the Interior would determine it was completed, and that is a point that I am trying to make, that as far as we know, Mr. Congressman, there never has been any legal process that was available to the Imperial irrigation district to make him make that determination, and that determination has not been made as of today.  However, as far as this Nation is concerned, there have been a million and a quarter barrels of oil that have been burned to generate power that has been purchased at a value of a billion dollars because of that determination not being made 10 years ago.

Mr. SAYLOR. How long has that canal been in operation?

Mr. HEWES. In part since 1941 and in total since February 1942.

Mr. SAYLOR. And from 1942 until just the other day, the representatives of the Interior Department and yourself came to an agreement which will be submitted to the Secretary of the Interior for his final determination; is that correct?

Mr. HEWES. That is correct.

Mr. SAYLOR. And even though you have been using it since 1942, a period of approximately 10 years, they haven't determined that it has been completed?

Mr. HEWES. That is correct.

Mr. SAYLOR. And you do represent one of the larger irrigation districts in the United States?

Mr. HEWES. Yes, sir.

Mr. SAYLOR. And with that as a background that might happen to some of these small owners here who have one lot or an acre or two here in the Santa Margarita Valley?

Mr. HEWES. No small district—there are no small individuals—who could have stood up under the financial beating that the Imperial irrigation district has had to take during that 10 years as a result of using subterfuge and technicalities in not carrying out the contract. If that had existed between two private organizations of any kind, whichever one violated that contract to the extent that we considered that that contract has been violated with our district, would have been dragged into court and they would have been forced to abide by the terms of the contract.

Mr. SAYLOR. Thank you.

Chairman ENGLE. Thank you very much, Mr. Hewes. We are glad to have your statement. We had you before our committee before and we recognize you as one of the most competent men in this whole water field. We are glad to have you here and have your statement. Thank you very much. [Applause.]

The next witness is O. P. Heald, president of the Fallbrook Public Utility District, and a member of its board of directors. Mr. Heald.

## STATEMENT OF O. P. HEALD

Mr. O. P. HEALD (president, Fallbrook Public Utility District). Mr. Chairman, gentlemen of the United States Congress, you have done and are doing a very great service for the people of Fallbrook and the United States by your presence here today to hear testimony from the folks who live in the area, and who pay their just proportion of taxes.

For many years Fallbrook community has been aggressively striving to develop its natural water resources. These water resources are chiefly from local rivers and wells. Six years ago, on behalf of the people of Fallbrook, the Fallbrook Public Utility District requested the office of the Bureau of Reclamation to aid us in our development program. The Bureau of Reclamation sent into the field engineers making geological surveys, land surveys for reservoir sites and dam sites, and economic surveys that would support the conservation program on the Santa Margarita River. Every acre in this district was examined in this survey at Government expense. That was in 1945. During the period of 6 years negotiations with the Bureau of Reclamation and subsequently the Navy Department and other Government agencies were carried on, and the Army engineers were in on it and our relations were all very friendly and very equitable. Consideration was given to everybody's viewpoint. At no time during these negotiations, during these surveys, was there any question about State rights and State water laws. Everyone dealing with the problem of water conservation in the river adhered strictly to what was considered the jurisdiction of the State of California.

We have operated in the district throughout our entire experience and our records are quite complete. I have known them for 12 years and I have known them intimately for 6 years. We have made appli-

cations for water out of the river from time to time and other agencies have made, and other individuals have made, applications for water permits. The Navy Department itself made an application for a permit to store and use floodwaters of the Santa Margarita River within the last 3 years. This procedure, at the local level, satisfies us that everyone has recognized California State water laws. This was our conclusion until January of 1951, when the Justice Department came forward with a suit in which—the terms of which I will leave to our legal counsel to better explain which was very hard for local individuals and farmers and storekeepers and ordinary citizens to understand.

After all of the time that has been consumed in the last 6 years trying to develop water storage, develop complete use of the water, and the Santa Margarita River current expenses of surveys, studies by both local, State, and Federal agencies, the Justice Department comes forward with ways and means to further delay the development of the district and this portion of the State of California and are trying to stop and are attempting to stop the right to use the waters that we have considered our inherent right over the years. We, the people of Fallbrook and the State of California, feel that the United States Congress can very well intervene in this proceeding and find ways and means to stop the shotgun lawsuits by the Department of Justice and have a determination, if it is necessary, of water rights in the Santa Margarita or any other river in the State of California, be made under the jurisdiction of the State water laws.

I wish to introduce our managing engineer who will further amplify these statements, but I will accept your questions, if I can answer them.

Chairman ENGLE. Before you do that, I would like to say to you, Mr. Heald, that those of us on this committee have always thought that we made it plain enough, time and again, that State law controls the distribution of water from navigable streams of this country. Even as recent as this last month I helped prepare an amendment to the bill on the tidelands which made it perfectly plain that the Federal Government acquired no title to the water resources and that the water resources were subject to distribution and control by State law. That amendment was accepted without dissent on the floor of the House during the consideration of the tideland legislation. I wasn't there, but I helped draft the amendment before it was offered. I took it to Mr. Walters, who is the author of the tideland bill, and he accepted it. But it was simply a reiteration of what we had always believed to be the law. In fact, it was a summary of section 8 of the reclamation law of 1902, and that was reiterated in the Flood Control Act of 1944. Time and again we have made it perfectly plain that as far as we were concerned we regarded the distribution of water under State law and were a little amazed, frankly, that any other assertion would be made. If more legislation is necessary I dare say we can get it.

Now, Mr. Yorty, you wanted to ask a question?

Mr. YORTY. Mr. Heald, you mentioned some negotiations. Who was taking part in those negotiations?

Mr. HEALD. The negotiations that were attempted with the Bureau of Reclamation, our first contacts were with agents in their Vista office at the time they were completing the surveys on the first barrel

of the metropolitan water district in San Diego County.   I am sorry I don't have these dates right before me.   As a result of that first contact Mr. Nielson, planning engineer for the Bureau of Reclamation, came to visit us in Fallbrook.   At that time I took him on a survey of the entire district; that was just a horseback survey of the entire district, to give him an idea of the physical set-up.

He showed keen interest, sufficiently to encourage us to further negotiate for the proposition of getting these geological surveys and land surveys and economic surveys which later developed.   Mr. Moritz of Boulder City—I think he is the managing engineer at Boulder City for the Bureau of Reclamation, Western Division—Mr. Moritz joined us on these negotiations.

Mr. YORTY. Let me ask you, Mr. Heald: At what point did the Navy Department come into the negotiations about the water for Camp Pendleton?

Mr. HEALD. About 1946, the latter part of 1946.

Mr. YORTY. Now, did you yourself take part in the negotiations with the Navy?

Mr. HEALD. Yes.

Mr. YORTY. Along with other people in this district?

Mr. NIELSON. Yes.   It was on an open book, on top of the table, with all departments.

Mr. YORTY. And who represented the Navy in those negotiations?

Mr. HEALD. I can get those names and the date of that.

Mr. YORTY. You were present, were you, at some of the negotiations?

Mr. HEALD. I was present at all of them.

Mr. YORTY. And was there ever any threat of a lawsuit of this type being filed by the Federal Government if an agreement was not reached?

Mr. HEALD. Never was even suggested by either party.

Mr. YORTY. Was Mr. Veeder of the Department of Justice ever present during any of these negotiations?

Mr. HEALD. Not until sometime in 1949.   We know he was at that one.

Mr. YORTY. When were you first threatened with this type of lawsuit if an agreement could not be reached?

Mr. HEALD. Well, actually we didn't recognize it as a lawsuit until the suit itself landed in our laps.   We didn't think of it in terms that such a thing could be possible until the actual surveys or the actual public notice came out in January of 1951.

Mr. YORTY. Well, were you ever told at any meeting by the Department of Justice, or any other representative of the Federal Government, that if you do not do thus and so we are going to sue everybody in this whole watershed?

Mr. HEALD. No; not that I recall.

Mr. YORTY. Did they ever make any specific demand on you, telling you exactly what you could do or would have to do, otherwise they would bring the suit?

Mr. HEALD. No, nothing that I recall that was a demand, that would invoke, let us say, a suit.

Mr. YORTY. Now, during these negotiations did they at any time claim paramount right to all of the water in the watershed?

Mr. HEALD. Never a word was said of that nature.

Mr. YORTY. That is all.

Chairman ENGLE. Mr. Heald, you were going to introduce Mr. Yackey, were you?

Mr. HEALD. Yes, if I may.  Mr. Yackey is our managing engineer, a gentleman who will carry this point of the utility district testimony before this commitee.

Chariman ENGLE. Thank you very much.

Mr. POULSON. One question.  Outside of the surveys that have been made has the Government ever contributed any money to this irrigation project?

Mr. HEALD. None whatsoever.

Chairman ENGLE. Thank you, Mr. Heald, for your statement. We appreciate it very much.  [Applause.]

The next witness is Mr. George F. Yackey, general manager of the Fallbrook Public Utility District.  Mr. Yackey, we are very glad to have you here and hear your statement.  You may proceed.

## STATEMENT OF GEORGE F. YACKEY

Mr. GEORGE F. YACKEY (General Manager, Fallbrook Public Utility District).  Congressman Engle, members of the congressional committee, of the California Joint Interim Committee, honored visitors, gentlemen of the press and other friends:

The Fallbrook Public Utility District is a quasi-municipal corporation and an agency of the State of California.  It accordingly, sincerely tries to recognize, respect and abide implicitly by all State laws.

The Fallbrook Public Utility District is a beautiful land of rolling hilltops covering approximately 8,000 acres of the best land for avocado culture in the country.  Its most critical need is water which, in addition to local ground sources, now practically gone, consist of supplies from three rivers—the Santa Margarita in the immediate north, the San Luis Rey on the south and the Colorado, which is piped to the district.

Fallbrook Public Utility District's current supply consists of: 77.1 percent Santa Margarita (permit), 16.4 percent San Luis Rey (permit), 6.5 imported Colorado (entitlement).

Future possible supplies from these sources amount to 82 percent Santa Margarita (application) which includes application on permit water, 13 percent San Luis Rey River, 5 percent Colorado (with second barrel).

These figures show why the Santa Margarita River means so much to the Fallbrook Public Utility District.

Chairman ENGLE. You are taking into consideration the pumping that is attributed to each one of these sources?

Mr. YACKEY. Yes and no.  I have taken into consideration our current supply, in other words, where our supplies are in sight.  In other words, the waters which today Fallbrook has State rights to take or to plan to take in the future.  Pumping of the Fallbrook Public Utility District water is a must, with the exception of the Colorado supply.  All the waters in Fallbrook are pumped from six to eight hundred feet, from the river bed.

Chairman ENGLE. I understand.

Mr. YACKEY. The Colorado River water comes in higher.

Chairman ENGLE. Thank you very much.

Mr. YACKEY. Today Fallbrook Public Utility is using 31 percent of the water which ultimately will be required by present district area commitments. Due to delay in approval of cooperative plans for water development on the Santa Margarita, Fallbrook is 2 to 3 years behind in water development and is in critical condition. Realizing this and forced ahead by extreme drought conditions, our district is going ahead with a storage project which could possibly have been avoided if the cooperative plans between the Government camp and the Fallbrook Public Utility District had not been interrupted by the Department of Justice. The Department of Justice has not only stymied approval of agreements and enabling legislation for a cooperative solution at DeLuz, but by the present suit has cast suspicion and question upon Fallbrook's water rights to where we are advised it would be practically impossible to sell bonds to construct our storage project. Without this storage project or immediate construction of some means of getting additional Colorado water from San Jacinto Reservoir—miles to our north, Fallbrook faces disastrous shortage a year from now. Retraction of the present suit today would permit Fallbrook to issue and sell bonds to start to build storage which next year might be far enough along in construction to carry the district through.

The Department of Justice says Camp Pendleton and the naval ammunition depot are critically short of water. We know Fallbrook is in dire need of relief. The Government camp and Fallbrook problems as regards present and future shortages are common and could be remedied in sufficient time only by construction of a temporary pipeline to the metropolitan water district's adequate Colorado River supply at San Jacinto. This temporary line which has been investigated by the Government agencies could serve until construction of the second barrel large enough to take care of all needs was completed and then could be removed with very little loss. Fallbrook would pay its share of the cost of the project in order to get water for its needs. The water is available at the metropolitan water district; the Government has investigated the possibility of getting it, and the cost to all concerned would be far less than the cost of this suit.

The El Toro Marine Base near Santa Ana originally pumped local waters, but finally due to pressure of Santa Ana farmers went to the Colorado supply. March Field and Camp Hahn had likewise intended to use local waters, and equipment was installed to do so, but finally turned to the Colorado for their water. There should be no compunction on the part of the Government to do the same in San Diego County, especially as it would clear up the awful mess between the Government and the people, and would save everyone concerned money seriously needed otherwise.

America was settled by oppressed people who came here to work out their individual salvations without oppression. The Boston Tea Party for many years was a warning to overbearing people in governments. The war between our States was over individual rights. Since then we have had prohibition come and go because basically individual rights cannot be legislated. The United States is festering today—thank God in only a small way—with gangsters, preying on our weaker people and children with narcotics, illicit trade and gambling; mili-

tary draft and income tax evaders are evidences to our youth that some laws are being circumvented. Sex criminals are worrying parents of the Nation over the safety of our children; so it is only natural that we cry out for the help of our fellow citizens and the representatives we sent to make our laws when a branch of the Government so powerful as the Justice Department takes a stand which is affecting the whole Nation.

The Fallbrook Public Utility District has always followed existing laws and accepted these laws. In its development since 1922, when it was formed under the State act, it has always conscientiously followed the laws of the State and has endeavored to work cooperatively with other State agencies, public utilities and neighbors. During the many years before the Government bought Rancho Santa Margarita, Fallbrook planned and grew with the knowledge and good will of the owners of Rancho Santa Margarita who recognized the community's value and future possibilities for they aided and abetted the plans for water developments in the area. The ranch never used much water and would probably have gone on indefinitely as they had. Such a heritage the Government bought and that was about the situation when Fallbrook in 1946 searching for a needed water storage project went to the United States Army Corps of Engineers and the Bureau of Reclamation for advice and assistance. The Fallbrook Public Utility Board further in a spirit of openness and sincerity went to Camp Pendleton officials with the district's plans. The district talked California water laws, the application permit and right system and told how and why the district had just made filings on the river waters. The district even sent back complete sets of records of their activities to Camp Pendleton officials. The Government itself shortly thereafter applied to the State for a permit based on their past and future expected use, which was considerably greater than former ranch needs.

At one time it was said that the Government only wanted what the rancho was entitled to. Some time later the application was amended to apply for a vastly increased amount. History of the negotiations for cooperative action will be covered by our attorney. It is only my purpose to show that the Government bought a ranch which has always recognized State water laws and that the Government up to the time the Department of Justice became involved accepted and abided by these State laws.

Since 1946 the district has continued its work to develop water. Each step has been with the fullest knowledge and approval of the California Division of Water Resources. The 2½ cubic feet per second of stream flow granted by permit 7033, 2–18–48 and later the 10,000 acre-feet under permit 8511 issued April 23, 1951, were only after publication and procedure set by California law and the knowledge of everyone interested. Full development of these permits will provide no more water than the present district consumers will require for the maintenance of the orchards and croplands already committed to be served. The application still on file with the State it is expected will augment present allotments and will only provide for normal development which from past experience is bound to occur.

Development of the permits now possessed by the district has been delayed by the Justice Department, in refusing to approve previous agreements, by the current suit, which is holding back construction causing real hardship to exist now and calamity to face the district next summer if drastic action is not taken immediately to eliminate this suit and publicly give assurance of continued recognition and acceptance of State water laws. As I mentioned before, this situation is due to the cloud thrown upon us, and if we can't get that cloud removed in time to get the money to build these projects, we will be in bad shape.

The catastrophe in Europe puts millions of dollars there for protection. Floods in the Midwest appeal to everyone's sympathy and generosity. Today respect and adherence to State law and censuring of overeager young men in the Justice Department may present disastrous action here and elsewhere.

The answer is so simple; so easy; so economical:

1. Drop this suit.
2. Bring Colorado water here for the Government agencies.
3. Continue to recognize and respect State laws.   [Applause.]

Chairman ENGLE. Mr. Yackey, that was an excellent statement, concise and very clear. We appreciate it very much. Now, are there any questions from the committee?

Mr. POULSON. I would like to ask a question. Has the Government farmed any additional land in the Camp Pendleton area other than what was farmed when it was held by the original owners?

Mr. YACKEY. Sir, that is one question that I can't answer for various obvious reasons. There is military security on the base any anything I quoted you would be hearsay. We are not permitted to trespass or are we very cordially invited to inspect such facilities. Our aerial photographs show a considerable amount of planting in the area and I believe that would have to be up to somebody else besides me, because my testimony would not be direct.

Mr. POULSON. We drove through there today, and we certainly saw a great deal of land under cultivation and some of it was fallow, which had been cultivated, and they had some new areas. In other words, it looked like quite extensive farming activities. Now, if they do that now, when prior to that it was a cattle ranch——

Mr. YACKEY. Sir, maybe I can answer that in a little different way and do it right. Like Will Rogers, all I can do is repeat. At the hearing in San Diego in May, if I recollect the hearing, it was said by Government attorneys that it was the intention of the Government to acquire all the water that would ever be needed on Camp Pendleton for the military forces they would need; they would use that in wartime, and in peacetime they would use it for agriculture on the base. I think that covers the intention.

Mr. POULSON. Now, if this police action we are in now is going to develop to such an extent that Camp Pendleton is going to be one of the larger bases, certainly the Government could go out and take some of the water which California is entitled to, and which is now going down the Colorado River, and use it for such purposes because this is for the benefit of the entire country, and why should they come in here and take the water away from these few individuals? That is the question I would like to have answered.

Mr. YACKEY. Mr. Poulson, that is the question that bothers me a great deal. [Applause.]  The Federal Government has a vast interest in the Colorado right at its source.  Today it is worrying about allocation of some of that water.  It seems to me, where we all contribute to the military strength, we all contribute soldiers and men to the Armed Forces; likewise, we all, in the United States, contribute Colorado River water to the military establishments in California—in Orange County and in Riverside County that has been done—it seems only fair that San Diego, with its vast percentage of area controlled by the Government agencies, the Colorado could be brought in here to handle all of these military installations.  It would be something those people, I think, would want to share in.

Mr. POULSON. From your experiences now in the full development of this case, this is really the result of certain individuals in the Justice Department who have the theory that the Government supersedes every State law.  That is all it looks like; is that not true?

Mr. YACKEY. Yes, sir.  All I can say is that again, in quoting testimony in April, the Government stated that they were coming to California to prove that the Federal Government was supreme and sovereign to State rights and would prove that State rights were secondary to the Government's wishes.

Chairman ENGLE. Mr. Yackey, can you give us the dates on which the Navy filed applications with the State for a permit?  If you can't get it, will you supply it for the record, please?

Mr. YACKEY. I can supply it later, exactly.  I have it in my office.

Chairman ENGLE. Thank you very much.  We would like to have the record also show the application number, if you have it.

Mr. YACKEY. I will be glad to do that, sir.

(The following data was furnished by Mr. Yackey to be inserted in the record at this point:)

*Applications to State for water*

| Date filed | By— | Application No. | Amount | From— |
|---|---|---|---|---|
| Oct. 11, 1946...... | Fallbrook Public Utility District. | 11586 | 2½ cubic feet per second (1,800 acre-feet). | Santa Margarita. |
| Do........... | .....do................. | 11587 | 10,000 acre-feet........... | Do. |
| Nov. 28, 1947... | .....do................. | 11589 | .....do.................... | Santa Margarita (Sandia tributary). |
| Do........... | .....do................. | 12179 | .....do.................... | Santa Margarita (Rainbow tributary). |
| June 30, 1948..... | Navy................. | 12576 | {12,540 acre-feet [1]........ {165,000 acre-feet [2]........ | |

[1] Jan. 10, 1949.
[2] Amended July 26, 1949.

Public notice was made Aug. 19, 1949, of the cooperative project at De Luz by the Corps of Engineers of the U. S. Army.

Chairman ENGLE. Mr. Yorty, do you desire to ask a question?  May I again suggest that we keep our questions as brief as we can.

Mr. YORTY. Mr. Yackey, did you personally take part in the negotiations with the Navy?

Mr. YACKEY. I believe I was in practically all of them except what occurred in Washington, D. C., that our attorney attended.

Mr. YORTY. Now, who sat in those negotiations?

Mr. YACKEY. I have memoranda of the hearings, and I can get that either from the Bureau of Reclamation office, from the Navy office, or from my own records. In those the Corps of Engineers, the Bureau of Reclamation, the Marine Corps, the Navy, some of their attorneys, our public-utility district people and the State division of water resources were in some of them, but not in all of them.

Mr. YORTY. Did the Government at any time during negotiations which you attended claim a paramount right to all of the water in the watershed?

Mr. YACKEY. No; they did not, and when you were asking Mr. Heald a few questions, Mr. Yorty, I want to mention a few things on that matter. All of our original negotiations were predicated on all water rights on this combined project being pooled, and the water rights referred to were State rights, primarily all State rights. It was agreed that we would all do that. Later in negotiations it was decided that it would be necessary to have an adjudication of water rights to make sure that they were all clear. Incidentally, the Bureau of Reclamation, if I understand it correctly, can only go in for a public agency, and they were, therefore, working for and through the Fallbrook Public Utility District. I will be glad to stand corrected if that is not true, but that is my opinion: they can only act through a public agency. Their statement to me was that they would assume that all water rights would be furnished the Bureau of Reclamation, and it was accepted knowledge that we would have some kind of adjudication of water rights before we got through, but it was assumed that that adjudication would be under the State, because all of our negotiations were under the State and all of our original early negotiations were in the presence of State engineers.

Mr. YORTY. Was there any discussion of this type of suit, perhaps in a State court, but with everybody in the watershed made defendant?

Mr. YACKEY. It would be my assumption that such a suit could have been included, whether it was spoken of directly or not. However, this type of suit was never mentioned and it was always assumed that the adjudication suit would be one of those suits like we have in California on watersheds and that is usually handled with the State division of water resources making all the determinations.

Mr. YORTY. What was the maximum claim that the Navy ever made in these negotiations to water rights on this river?

Mr. YACKEY. Well, the Navy's strong point, as I have always gotten it, was that they claimed two-thirds of the rights on the river because of a stipulated judgment that they inherited from the O'Neill ranch, which was beween the O'Neill ranch and the Vail ranch. That stipulated judgment, however, to the best of my knowledge and engineering and legal ability, was like two men having a partnership and deciding that they had to have a split of that partnership and they wanted to know and have a division of their rights, and their moneys being established in the Bank of America and they had a lawsuit and they decided that they would divide it two-thirds to one and one-third to the other; that meant that two-thirds of their bank account and one-third of the bank account belonged to these two people, but not two-thirds of all the money in the Bank of America went to that one man, and that is the situation on the Santa Margarita. [Applause.]

Mr. YORTY. Did they ever assert in these negotiations that they were entitled to two-thirds of the water in the watershed as against everyone else?

Mr. YACKEY. Oh, very definitely. That was the substance that we have fought and fought and fought.

Chairman ENGLE. Let's have that repeated to be sure we understand it.

Mr. YACKEY. Yes, that two-thirds of the watershed they figured they were entitled to, and one-third that they figured the Vails were entitled to. That philosophy was presented right along until just very recently. I haven't heard any direct contradition to that, but I have noticed a weakening in their testimony in regard to it.

Chairman ENGLE. Do I understand you to say that the Vails and the O'Neills claimed they owned 100 percent of the river?

Mr. YACKEY. No, I did not say that. I said that the Government Department of Justice said that as heirs to the O'Neills, they were entitled to two-thirds. The Vails had never made such a statement.

Mr. YORTY. I was not asking what the Department of Justice claimed. I was asking you what the Navy claimed in these negotiations. Were you ever faced in these negotiations with a claim by the Navy that they were entitled to two-thirds of the water in the river as against all other users on the river?

Mr. YACKEY. The Navy claimed nothing specific. They made a lot of figures, but those figures varied and were fluctuating. For instance, in one of the agreements that we discussed they held 12,500 acre-feet as the minimum they could get along with. However that, in my estimation, did not involve a claim or involve a right. They maintained that they were entitled to two-thirds of all the waters of the river. That is the only statement they have ever made.

Mr. YORTY. Now, it is the Navy that I am talking about. We will get to the Department of Justice in a minute.

Mr. YACKEY. Well, the Navy—yes; the Navy never came out with a flat statement, nor the Marine Corps. The officials at Camp Pendleton and the Eleventh Naval District have been very reasonable in this whole transaction. We had the agreement consummated until they went to Washington. Until that time we had no trouble.

Mr. YORTY. In the agreement you had consummated, how much water was to go to Camp Pendleton?

Mr. YACKEY. 12,500 acre-feet going to the Navy at Camp Pendleton and 7,500 going to Fallbrook. That was merely a sort of side agreement.

Mr. YORTY. Were the officials of the Federal Government satisfied with that arrangement?

Mr. YACKEY. Yes; they were.

Mr. YORTY. Who were they? Who were the officials?

Mr. YACKEY. That final agreement came out in December 1949, in San Diego, as a result of a series of meetings in Washington that our attorney attended at various times, and our Congressman represented us in them, and time after time we would get up to a point——

Mr. YORTY. Now, were you present?

Mr. YACKEY. No, sir. Mr. Swing was there. He is coming on in a minute.

Mr. YORTY. Don't answer any questions about any meeting you did not attend. If you know about the agreement——

Mr. YACKEY. So, they finally, after that meeting, or those meetings, it was finally decided to have an on-the-job hearing and that all of the intellects were to get together, and all of the engineers, to go right out here, and decide right then and there what was what, and get a final approved plan and send it back to Washington for final approval.

At that hearing, held in the Eleventh Naval District office in San Diego, were the Marine Corps, Navy, Bureau of Reclamation, Corps of Engineers, Fallbrook Public Utility District, and the Department of Justice, including two Department of Justice men present now.

Mr. YORTY. Who were they, the Department of Justice men?

Mr. YACKEY. Mr. Veeder and Mr. Agnew. Other Marine top-ranking officers from Washington were here. They all sat around a large table and discussed and brought out these various points and finally arrived at what is termed "a memorandum of agreement." The lawyers present wrote that memorandum of agreement based on the points that were agreed to by the committee as a whole. The memorandum of agreement, a copy, was mimeographed and sent to us the next day with the request for our board to approve it. I hate to take this away from our attorney, who is going into it in some detail, but at that hearing this division of water was made by this memorandum agreement.

Now, since that time—at that time Fallbrook only had a permit to assert water on the river, and they had applications for more water—since that time Fallbrook, seeing that we couldn't get anywhere, has gone ahead and spent the money and has prosecuted one of its applications and has secured a State permit for an additional amount of water which we are now going to use in back of this project that we are getting together on and building ourselves.

Mr. YORTY. During those negotiations was there any contention or was it assumed by everyone that you could get together and settle this in a friendly way?

Mr. YACKEY. That was the definite purpose of having all of these people come out. We estimated it must have cost over $500 a day to hold that meeting.

Chairman ENGLE. When did this thing blow up, and this lawsuit come on; after you had amicably gone ahead with all these negotiations?

Mr. YACKEY. Congressman, after this memorandum agreement was approved by all bodies, such as ours, and went back to Washington, it seemed to disappear someplace in the files. We had our Congressman seek it and push it. Finally it was discovered that it was being held up in a top Navy office, the Secretary of Navy's office. And then we finally found out it was being held up by the Department of Justice. Mr. Swing is very capable about explaining all that; but, as a result of that, after months and months and months of delay, with our distribution, by the way, getting larger and larger and larger, requiring more water, this thing blew up and the suit was filed.

Mr. YORTY. Now, was it your understanding that Mr. Veeder had agreed to this memorandum agreement?

Mr. YACKEY. Mr. Veeder was present at that meeting and everyone agreed, and Captain Johnson, of the Eleventh Naval District headquarters, his statement, in that letter of transmittal, he stated that that was arrived at in agreement with all present.

Mr. YORTY. And by that agreement Camp Pendleton was to get 12,500?

Mr. YACKEY. And Fallbrook was to get 7,500.

Mr. SAYLOR. Will you gentlemen yield right there?

Mr. YORTY. Just one step further. The Government and all of its agencies that dealt with you at that time never claimed all of the water in the river?

Mr. YACKEY. No, and there were several that were willing that we should participate.

Mr. YORTY. Now, then, there are just a couple of little points that I think the record should show. The Government has led many people to believe that there are a lot of great big people out here that are involved in this situation as far as property owners are concerned. Do you have all of the records with regard to the owners of the 8,000 acres of land in this district?

Mr. YACKEY. Yes, sir, I certainly do.

Mr. YORTY. How many are there over 160 acres?

Mr. YACKEY. None, sir.

Mr. YORTY. And 160 acres is the so-called farm which is agreed to by the Bureau of Reclamation?

Mr. YACKEY. The largest acreage today in the Fallbrook Public Utility District entitled to water is 112 acres, the Red Mountain Ranch, and they have some more land when it is paid up and then they will be entitled to water, but that is the largest ranch. Then there are several a little smaller and then they drop down very, very rapidly. I would say that between 85 and 90 percent of our people are under 10 acres and we can say that 90 percent of our meters are what we call domestic meters, 1 inch or smaller.

Chairman ENGLE. Thank you very much. The committee will stand in recess for 10 minutes.

(Short recess.)

Chairman ENGLE. The subcommittee will please be in order.

There had been submitted a statement dated August 13, 1951, signed by W. R. Martin, president of the Long Beach Board of Harbor Commissioners. Without objection the statement will be made a part of the record at this point.

DEAR CONGRESSMAN ENGLE: It would be appreciated if you would read this statement into the record of your subcommittee's hearings on the Federal lawsuit to take over the water rights of private property owners in the Fallbrook, Calif., area.

This is more than just a dispute over local water rights. It is an effort by Federal officials to establish a new principle of law that would destroy the constitutional right to hold private property. If not stopped, it will result in the nationalization of vital resources throughout the United States.

Bluntly, the Federal Government is saying that since it needs this water for national defense it has a paramount power and can confiscate these private water rights. It does not propose to pay these land owners for their property rights despite the constitutional guaranty that private property shall not be taken for public use "without just compensation."

This idea of the Government having paramount power to confiscate private property was given substance in 1947 when the United States Supreme Court held that the Federal Government could seize California's tidelands. There the Court held that since tideland oil might be the subject of a war and since national defense was a "paramount responsibility" of the Federal Government, the Government had a paramount power over the tidelands and could take over the oil and any other resources of value that might be discovered.

Since then Texas and Louisiana have been told by the Supreme Court that they must give up their tidelands to this claimed paramount power of the Federal Government. And now this doctrine is being extended to the water rights of private property owners in the Fallbrook, Calif., area.

Where will it stop? If tideland oil and Fallbrook water are essential to national defense and can be confiscated, what about other vital resources in other States? Coal in Pennsylvania and uranium ores in Nevada are just as essential to national defense. If the Government has the paramount power it claims here, that power applies to those resources and to vital resources in all States.

I cannot stress too strongly that this is a national issue affecting every citizen of the United States. At stake is a freedom that is the foundation of our free-enterprise system—the constitutional right to hold private property free from Government confiscation.

I urge you to compare closely the language of the Supreme Court's tidelands decision against California with the language in the Government's complaint against these Fallbrook property owners. You will find that the "paramount right" the Government claims here originated in that tidelands section.

The Long Beach Harbor Commission is interested in this matter because much of our harbor is built on reclaimed tidelands. Our port is also one of the largest producers of tideland oil. Proper development of our facilities has been seriously hindered by this Federal grab for power.

I hope your subcommittee will alert the American people and the Congress to this real danger and that you will vigorously recommend action by Congress to reverse this trend toward nationalization.

Sincerely,

W. R. MARTIN,
*President, Long Beach Board of Harbor Commissioners.*

Chairman ENGLE. The Chair is very glad to recognize at this time one of our former colleagues in the House of Representatives; one of the most renowned water lawyers and legislators in California's history. It is a pleasure to have you here, Phil Swing. We would be glad to hear your statement at this time. I understand that you are appearing for the Fallbrook Public Utility District.

## STATEMENT OF PHIL D. SWING

Mr. PHIL D. SWING (attorney for Fallbrook Public Utility District). Chairman Engle, members of this committee who have traveled so far and under a good many trials and tribulations to get here to afford us the opportunity of presenting our testimony and showing you, on the ground, what the problem is that confronts these people.

The statement has been bandied about that Fallbrook has no rights in the Santa Margarita River and that it is trying to take water out of the watershed. We are at this minute conducting the hearing within the Santa Margarita watershed, and one of its principal tributaries runs just beyond the schoolgrounds, between here and the Santa Fe depot. It runs through the town of Fallbrook and on down and finally reaches the Santa Margarita. We have assumed that being in the watershed, under generally recognized laws and equity, that we had a right to a reasonable share of the waters of the watershed for beneficial use upon the lands within the watershed.

Santa Margarita has been, from the beginning of Fallbrook, one of the objects and intended sources of supply of water for this community. The Fallbrook irrigation district, the history of which was given by one of the pioneers before I arrived here, had elaborate plans to build a dam in the Santa Margarita at approximately where the Fallbrook Public Utility District now plans to build a dam, and the Fallbrook Public Utility District is the successor in interest of the

rights of the old Fallbrook irrigation district. It made a filing in 1924 and later this Fallbrook Utility District installed a pumping plant in the river about 1933, and since which time has been continuously using Santa Margarita water along with water from other sources as one of its principal sources of supply. This practice was legalized under the laws of the State of California February 18, 1948, when the State division of water resources granted the Fallbrook Public Utility District's application made October 4, 1946, for the right to divert 2½ cubic feet per second from the Santa Margarita River.

The Fallbrook Public Utility District has made other applications which are pending, and the Navy has also made an application under State law to appropriate waters of the Santa Margarita River.

The Fallbrook Public Utility District has three pending applications, each for 10,000 acre-feet of water per annum, or a total of 30,000 acre-feet, the first one made October 11, 1946, application No. 11587, which is on the main stream of the Santa Margarita River; one made November 28, 1947, application No. 12178, on the Rainbow, and an application made November 28, 1947, application No. 12197, on the Sandia Creek.

I want to call your attention to the fact that the State has granted the permit to Fallbrook for 10,000 acre-feet a year under application No. 11587, which permit was issued April 23, 1951.

The Navy's application No. 12576 was made June 30, 1948, for 165,000 acre-feet per annum, to be impounded at the Santa Margarita Dam, which we locally call the DeLuz dam site, from which they expect a net safe yield of 12,700 acre-feet per annum. The difference in the figure of 165,000 acre-feet application was to cover the storage capacity of the dam intended to be built. That application was, of course, nearly 2 years junior to the Fallbrook Public Utility District application for 10,000, which the State granted this year.

The negotiations which have already been referred to were underway at the time the State noticed the Navy's application for hearing, and we, at that time, being in continuous, you might say, negoiations with representatives of the Navy and the Reclamation Bureau for the development of a multiple-purpose joint project, it became necessary, to keep the record clear, for the Fallbrook Public Utility District to file a protest. But on the back of the protest, in a place prepared on the State form, the district entered this explanation of its protest:

> An agreement has been reached, or is in process of being negotiated, for the construction of a multiple-purpose dam at the DeLuz site where the Navy Department proposes, under this application, to store its water if its application is granted. By said project and by said agreement the waters of the Santa Margarita River above said DeLuz Dam, to which the United States Navy and Fallbrook Public Utility District may be entitled, are to be divided and apportioned under the basis of 12,500 acre-feet to the Navy Department and 7,500 acre-feet to the district, it being the understanding and agreement that these parties will cooperate to present to Congress the proposal to authorize a multiple-purpose project in accordance with said understanding and agreement. No further steps should be taken with application No. 12576—

that is the Navy application—

> until this project can be presented to Congress in accordance with said agreement.

520

Case 3:51-cv-01247-JO-SBC   Document 853   Filed 12/03/51   PageID.2211   Page 31 of 54

I sent copies of that not only to the Eleventh Naval District headquarters at Pendleton, but also to Washington, and got back a letter on the official heading of the Navy Department, Washington 25, D. C., addressed to Swing, Scharnikow & Staniforth, attention Phil D. Swing, signed by J. A. Dominy, by direction of the Chief of the Bureau of Yards and Docks. It is interesting to note in his last paragraph he says——

Mr. YORTY. What is the date of that letter, Counsel?

Mr. SWING. March 29, 1949. After acknowledging receipt of the copy of our protest with its endorsement on the back, he said—

The cooperation and interest of the Fallbrook Public Utility District in furthering the cause of the proposed multiple-purpose dam is appreciated, and it is sincerely hoped that the project will receive the early approval of Congress.

Chairman ENGLE. The purpose of that, as I understand it, was to authorize a multiple-purpose project to be built by the Bureau of Reclamation? Is that what you are talking about?

Mr. SWING. The plan, which I will come to in a minute——

Chairman ENGLE. Will you proceed according to your regular order that you had in mind, Mr. Swing? I don't want to divert you. Go right ahead.

Mr. SWING. I brought that in because it was the filing.

The Navy Department application is pending and is in full force and effect, except as I pointed out, it is 2 years junior to one of the applications of the Fallbrook Public Utility District for 10,000 acre-feet which has now been granted and approved by the State and a permit to Fallbrook issued on it.

Negotiations to adjust these conflicting interests and rights or claims in the Santa Margarita River have been under way with the Navy and representatives of the Government for a considerable length of time. I attended the first of those joint conferences on November 17, 1948, held in the office of the Bureau of Reclamation at Escondido. Mr. Yackey kept a memorandum and furnished me a copy. It shows the following were present: E. G. Nielson, R. E. Burnett——

Mr. YORTY. Would you mind saying who they represent?

Mr. SWING. I will start again. The Bureau of Reclamation, E. G. Nielson, R. E. Burnett, D. K. Johnson; Corps of Army Engineers, Los Angeles, J. G. Jobes, F. F. Friend; United States Navy, Eleventh Naval District, R. E. Muench, J. E. Samson; Camp Pendleton, Col. L. S. Swindler, M. H. Aubey, F. H. Cannon. I think the latter two are engineers.

Mr. YORTY. What is the last name?

Mr. SWING. Cannon. The State division of water resources was present with Mr. Edmonston, P. H. Van Etten, H. M. Crooker; the Fallbrook Public Utility District represented by F. R. Sachse, president, E. J. Schmitz, vice president, Robert T. Gray, director, V. B. Westfall, director, George F. Yackey, general manager, and Phil D. Swing, attorney.

That was a preliminary, what we would call in law a trial shot, and it was rather encouraging, though, that the Navy, the Army engineers and the Reclamation Bureau, all thought from the investigations they had theretofore and were then conducting, that this was a good project which could develop the amount of water which Camp Pendle-

ton and its associated establishments required, and also have 7,500 acre-feet of water available for Fallbrook.

The Navy very carefully insisted that the pooling of the water rights should be from the dam up, and they reserved to themselves, and it was agreed to, that they should have the entire underground basin below the dam as a special reserve supply at any time the reservoir did not give them their full requirements. It was estimated that there was a considerable supply in this—you may call it an over-all one basin or three joints basins.

The studies were continued and as a result I got a letter from Assistant Secretary of the Interior William E. Warne, dated January 13, 1949, in which he said—

That little project for the development of Santa Margarita in the interest of Fallbrook and Camp Pendleton is just about ready to gel. I took Ed Neilson and N. B. Bennett, of the Bureau of Reclamation, down to Congressman McKinnon's office Tuesday morning and we outlined an agreement that had been worked out between the Marines and Reclamation which Neilson will explain to you and the Fallbrook people in 10 days or so. I think this project is now ready for formal report and it should command and receive the approval of all interested agencies and the Congress.

Chairman ENGLE. Give us the date of that letter.

Mr. SWING. January 13, 1949. Now the forecast appearance of Mr. Neilson, who is the project director for this area from Boulder City, came on in Fallbrook and on January 27, 1949, another conference of the interested parties was held in this community in an all-day session which resulted in an agreement, a tentative agreement, and Mr. Neilson sat at a table with me, after the conference adjourned, and between the two of us we wrote this resolution which was demanded of the Fallbrook Public Utility District.

Chairman ENGLE. Mr. Swing, with reference to the people who were there at this meeting, if you don't have them will you make that a part of the record?

Mr. SWING. Virtually the same people that were at the one in Escondido. I have it some place in my files.

Chairman ENGLE. At least the same——

Mr. SWING. The Army engineers, the marines from Pendleton, representatives from the Eleventh Naval Headquarters in San Diego, the Reclamation Bureau, of course, and the Fallbrook board of directors, engineer and myself.

Chairman ENGLE. Without being specific about the names at this time would you prepare a list of the names of those present at that meeting so that it can be inserted at this point in the record as a part of your testimony?

Mr. SWING. I will do so.

Congressman ENGLE. And without objection it may be so inserted.

E. G. Neilson, Bureau of Reclamation, Boulder City. R. E. Burnett, Bureau of Reclamation, Escondido office. Dick Aten, attorney for Bureau of Reclamation, Los Angeles office. J. G. Jobes, Corps of Engineers, Los Angeles office. Col. Leland Swindler, commander M. H. Aubrey, Frank Cannon, Camp Pendleton, Oceanside. H. M. Crooker, State division of water resources, San Diego office. Phil D. Swing, attorney for Fallbrook Public Utility District. George F. Yackey, general manager for Fallbrook Public Utility District. Franz R. Sachse, president, board of directors, Fallbrook Public Utility District.

Mr. SWING. The board of directors of the Fallbrook Public Utility District, at its regular meeting on January 31, 1949, adopted, unani-

mously, one director being absent, the resolution which had been drafted to represent the result of the conference at that meeting.

Whereas, at a conference held at Fallbrook, Calif., January 27, 1949, attended by representatives of the United States Navy Department, the United States Marine Corps, the United States Corps of Army Engineers, the Reclamation Bureau, the State division of water resources, and the Fallbrook Public Utility District, a tentative agreement was reached for the cooperative endeavor of the parties represented to build a multiple-purpose dam on the Santa Margarita River at the De Luz site and share the costs and benefits therefrom equitably, subject to the approval and authorization of Congress; and

Whereas the Fallbrook Public Utility District desires to express its approval of the conclusions arrived at by said conference and its willingness to carry out the tentative agreement there reached: Now, therefore, be it

*Resolved by the board of directors of the Fallbrook Public Utility District:*

1. That the Fallbrook Public Utility District is ready, and willing, to participate jointly with the United States, acting through its proper agencies thereunto duly authorized, in the building of a multiple-purpose dam at the De Luz site on the Santa Margarita River, Calif.

2. That the Fallbrook Public Utility District will promptly take the proper and necessary steps to legally obligate itself to pay to the extent of its ability its fair share of the cost of said dam and reservoir and the cost of the necessary and proper irrigation pumping and distribution system.

3. That if the Fallbrook Public Utility District's share of said costs is financed through or under the Federal reclamation law, the acreage limitations expressed therein will be observed and agreed to by the district.

4. That the proposed expansion of the district and the annexation of new lands shall be limited to such lands as have a prospective productivity substantially similar to the lands now within said Fallbrook Public Utility District and shall not exceed in total acreage within the district the safe water supply of the said district including the supply proposed to be received from the De Luz development and the United States shall have the right to pass on the amount of the new lands to be annexed, the type and the area within which they shall be located.

5. The Fallbrook Public Utility District is willing to paricipate in the said proposed multiple-purpose dam and reservoir (having a net safe yield of approximately 20,000 acre-feet per year) on the understanding and agreement that all present water claims and rights of the United States and the Fallbrook Public Utility District on the Santa Margarita River above the De Luz site shall be pooled and that the total water of said river available to said parties above said dam site shall be apportioned in the ratio of 7,500 acre-feet per year to the Fallbrook Public Utility District and 12,500 acre-feet per year to the United States respectively.

Passed and adopted by the board of directors of Fallbrook Public Utility District at a special meeting of the board duly and regularly called and held January 31, 1949, by the following vote, to wit:

Ayes: Sachse, Gray, Heald, and Westfall.   Noes: None.   Absent: E. J. Schmitz.

FRANZ R. SACHSE,
*President, Board of Directors,*
*Fallbrook Public Utility District.*

It was assumed that Mr. McKinnon would introduce a bill, present it to his colleagues, and ask their authorization of this multiple-purpose joint project for the benefit of the Navy and the Fallbrook Public Utility District.

May I say in passing, that at that time the Navy was most solicitous that Fallbrook and Congressman McKinnon carry the ball as they informed us that while they had a dam at DeLuz on their list of projects it had such a low priority that they had no hopes of getting to it for a number of years, but they thought that if we would carry the ball for them, with their support, that the thing might be gotten through Congress.  Now, we then received——

Mr. YORTY. Mr. Swing, give me an answer, as you are an expert—would you not know just how to get a dam authorized in Congress?

Chairman ENGLE. That will be stipulated to.

Mr. SWING. That is a rhetorical question. I received from Lieutenant Commander Aubey, public works officer at Pendleton, a little time afterward, a letter—I and the Navy were exchanging communications and information, cooperating in good faith each with the other, to carry out what both at that time desired as a meritorious, worthwhile project—so he wrote me on March 15, 1949, from Pendleton, saying:

I have in hand a personal letter from a friend of mine in the Bureau and thought perhaps the information contained therein might bring you more fully up to date. Please bear in mind, however, that this information is strictly informal and was passed on to me personally and should not be construed as being absolutely accurate. The following excerpts from the letter appear pertinent and are quoted:

"Attached hereto is a copy of our first agreement to draft a bill covering the construction of the DeLuz Dam as well as distribution systems both for the Navy and the Bureau of Reclamation. You will note that this is written up as a separate bill rather than an item in the Navy public works bill. It is not definite yet that this course of action will be taken, but indications are that the project is insufficient in priority to stand any chance of getting before Congress this year as an item of the public works authorization. This is not yet definitely settled, but it is the best guess that our budget people can make at this time.

"It is generally agreed by all concerned here"—

apparently from Washington—

"that any separate bill would have a better chance of getting through Congress than would a rather complicated item in our public works appropriation which, in all probability, wouldn't get before Congress until next year. At any rate, we are going along on this basis for the time being.

"Mr. Bennett of the Bureau of Reclamation has sent a copy of his proposed bill to his man Nielson, I believe in your general area. He is asking that Neilson take it up with Mr. Phil Swing who is representing the Fallbrook Public Utility District to make sure that we will have no opposition from that direction. This being the case, I thought it would be well if you had a copy, too, in case the matter should come up for discussion. Undoubtedly this draft will be modified and as a matter of fact we don't know exactly where we will go from here. However, the present plan is to append this proposed bill to a memorandum of agreement to be presented to the heads of the three interested bureaus and agencies, namely the Commissioner of Reclamation, Chief of Engineers, as well as the Chief of Bureau of Yards and Docks."

Mr. YORTY. Can you give us the name of this man?

Mr. SWING. Aubey. I did not give the name of the other man because the man is not mentioned, who wrote the letter from Washington; a personal friend. That is the information.

Chairman ENGLE. That is what we are asking for, will you make the name a part of the record or would you rather reserve that?

Mr. SWING. I would rather reserve it.

Chairman ENGLE. Very well.

Mr. SWING. Now, the bill was prepared and I went to Washington for the purpose of sitting in on the final agreement as to the wording of the bill, to give the O. K. to Congressman McKinnon to introduce it. I got there—I believe I will give you the date in just a minute—and went into conference in the office of the Bureau of Reclamation, at which was present Navy representatives from the Bureau of Yards and Docks, the Real Estate Division, a representative of the Army engineers, Washington. This first meeting, I believe, was held on May 4, 1949. It may have been May 5. And Mr. Veeder—it was thought

at the last minute that it might be well to call in a representative of the Department of Justice, as they, by law, are the legal advisers of the Navy Department—and Mr. Veeder was about the only dissenting voice among those present. Everybody else was in general accord and some rather energetic language was exchanged between some of the Bureau attorneys who thought they knew water law and Mr. Veeder who thought he knew water law.

Chairman ENGLE. Would you care to say, Mr. Swing, on what basis Mr. Veeder dissented?

Mr. SWING. Yes. It was finally boiled down to the stipulated judgment which had been entered as between, we are saying here, the O'Neills and the Vails as we knew them locally, or the Santa Margarita Rancho and the Vail interests. That suit, as you perhaps know from history, was one of the most long-drawn-out suits to be participated in by a plaintiff and a defendant, lasting 3 years in the trial court and I don't know how many more in the appellate court. The O'Neills won in the local court—their land was in San Diego County—and the Vail's was in Riverside County, but the Vails won in the Supreme Court and the two litigants, after having settled the bills, which the report is totaled a million dollars, said, "One more such victory for either one of us and we will both be in the poorhouse. Let's shake the lawyers and get in a room and make a decision, one way or another, on this matter."

The Santa Margarita Rancho was claiming 75 percent and the Vails probably were claiming 60 percent—I have forgotten the exact figures—anyway, they shook hands and made it $66\frac{2}{3}$ and $33\frac{1}{3}$.

Mr. POULSON. I would like to ask a question at that point. Mr. Swing, with your knowledge of government and concepts of what it should be, don't you think it is a basic principle that if the agencies which have direct charge, like the Department of Interior, the Bureau of Reclamation and the Army and the Navy and the State water resources are favorable, that they should be able to arrive at an amicable agreement which would take care of all interests for the welfare of the community and of the country as a whole? Isn't that your idea?

Mr. SWING. I have lots of confidence in those two departments which you have mentioned.

Mr. POULSON. Isn't that the idea of agency government?

Mr. SWING. I think so.

Mr. POULSON. I think that Mr. McGrath has some eager beavers in his department like Veeder and some of the others who either like to show their great legal ability or else to install their philosophy of more and greater power and a super-wise government. [Applause.]

Chairman ENGLE. That was not a question——

Mr. POULSON. Going back to that—this is all a part of it, just the same——

Chairman ENGLE. Let's let the witness proceed.

Mr. POULSON. I want to ask—this is right to the point, Mr. Chairman—now, when you come right up to that, when you say that the Navy questioned the possibility of being able to get through that legislation right away, could this be an opportunity for one of these smart boys to say, "I know how to get it without going to that trouble"?

Mr. SWING. I don't know.

Chairman ENGLE. The Chairman will state that that is not a question. Let the witness proceed, who has an orderly statement and when he gets through we can ask general questions.

Mr. SWING. Let me say that I think Mr. Veeder is very conscientious and a very earnest official, and feels he has a very important duty to perform. In this instance he raised a question as to whether or not, in view of the stipulated judgment that Vail would be let out if the rancho and the United States, who is its successor in the rancho, delivered water to Fallbrook which, under the stipulated judgment, belonged for use upon the Rancho Santa Margarita. And I am coming now to that important point which I concede that Mr. Veeder correctly raised, and the next day Congressman McKinnon and myself met with Mr. Veeder and his immediate superior, Mr. Mulroney—I believe his name was—and we undertook to work out a satisfactory settlement.

The agreement reached was that we were to secure—we of Fallbrook—were to secure from the Vail interests a written waiver and consent that the Government might deliver from the DeLuz Dam, and from their share of the water, 7,500 acre-feet of water to Fallbrook and that Vail would never at any time claim that that was a violation of the stipulated judgment.

I asked the Department of Justice to write the kind of a waiver they wanted and they brushed me off and said, "Why, that is a very simple thing to do. You write it."

The next morning Mr. McKinnon and I arrived at 11 o'clock and presented a form of a waiver which I thought would be adequate and Mr. Veeder and Mr. Robert E. Mulroney took it and said they would give us some consideration and I would hear from them shortly.

After some time—after that I flew home to San Diego. The Department of Justice and the Navy went into a huddle over how this should be worded and I then received from A. Devitt Vanech, Assistant Attorney General, and the boss over both Mr. Veeder and Mr. Mulroney, a letter dated May 17, 1949, in which he said:

DEAR MR. SWING: This will refer to recent conversation which Representative McKinnon and you had with representatives of this Department in connection with certain rights to the use of water from the Santa Margarita River. This matter has been discussed with officials of the Navy Department and there were delivered to them copies of the letter suggested by you from the Vail interests to the Fallbrook Public Utility District and their comments have been requested. Under the circumstances it is anticipated that a form of letter acceptable to the Department of the Navy will be forwarded to you on or about May 25, 1949.

And Mr. Veeder and Mr. Mulroney both assured Mr. McKinnon and myself that if we got this release duly signed by the Vail interests all objections would be out of the way and the blue-green light would be given to the project.

After some delay and some wiring back and forth, and not getting it, on June 9, 1949, I received a copy of a letter written by Mr. A. Devitt Vanech, Assistant Attorney General, to the Bureau of Yards and Docks, Navy Department. "This will refer to Mr. Jelley's letter"—of course, he was captain at that time and he is now admiral in charge of the Bureau of Yards and Docks—"and accompanying that letter"—referring to this Vail letter—"was a proposed draft of a letter from the representative of the Vail interests. The letter

Case 3:51-cv-01247-JO-SBC   Document 853   Filed 12/03/51   PageID.2217   Page 37 of 54

of transmittal"—no, this is about the letter which had been drafted by the Navy and sent over to them for approval.

Mr. YORTY. Sent over to whom?

Mr. SWING. The Department of Justice. Mr. A. Devitt Vanech says: "Consideration has been given to the proposed communication"—that is the letter which Vail was to sign to the Navy giving full release and consent and agreeing not to raise any objection that it was in violation of the stipulated judgment—"Consideration has been given to the proposed communication and it appears adequate to cover the proposition discussed between representatives of your department and representatives of this department." That is the Vail waiver.

It did arrive and was sent out and was duly signed and sent back. Vail made one bobble in dealing with the Government. He wrote a letter of transmittal with this letter and they objected to that and they required him to write another letter and withdraw the letter of transmittal which contained some language in it that they objected to. He then did withdrew his letter of transmittal and Mr. McKinnon was informed that everything was satisfactory.

Mr. YORTY. Now excuse me, Mr. Chairman, but Congressman McKinnon was informed by whom?

Mr. SWING. Let me see if I can get that. I have the letter of Congressman McKinnon—a telegram from Congressman McKinnon to myself dated June 16, 1949:

Proposed draft for Vail has been approved by Justice in letter to Navy.

That is under date of June 16, 1949.

Now I went by one of these, a memo on the conference had in Washington—a memo to Admiral Manning dated August 2, 1949, written by Willis R. Dudley who is listed among the conferees at Congressman McKinnon's office on July 29, 1949, as being in the Real Estate Branch of the Bureau of Yards and Docks, and present at that conference in McKinnon's office was N. B. Bennett of the Bureau of Reclamation, Attorney Richard Witmer of the Bureau of Reclamation, Mr. Veeder, Department of Justice; Admiral Manning, Chief of Bureau of Yards and Docks, Col. A. E. Dubber and W. R. Dudley.

The subject dam—

now we are talking about the DeLuz Dam—

The subject dam would be constructed to fulfill needs of the Navy Department, Marine Corps and those of the Fallbrook Water Utility District. Originally the Navy contemplated the construction of the dam to meet Marine Corps needs at Camp Pendleton. It subsequently developed that the surrounding agricultural communities to Fallbrook contemplated generally similar action through means of the Fallbrook Public Utility District. Conferences were held by the Bureau of Reclamation, Department of Interior (which agency would be responsible for Federal sponsorship and regulation of a public dam project for Fallbrook), the Navy Department and the Army engineers looking to the possibilities of a combined or multipurpose dam. Engineering and hydrographic studies with respect to feasibility and water resources were conducted and the practicability of such a dam was determined. The Navy Department has relied on the stipulated judgment entered into in the suit between Rancho Santa Margarita et al, Plaintiff, and Vail, Defendant, 42850, as the basis for the title to its share of the water of the Santa Margarita River. This stipulation adjudicates title to two-thirds of all such waters in the Rancho Santa Margarita (to which the United States Government is successor in title) and title to one-third of all such waters in the Vail interests.

527

**38**     SANTA MARGARITA WATER RIGHTS CONTROVERSY

The Fallbrook Public Utility District has received a permit from the California Water Commission No. 7633 dated February 18, 1948, for 2½ cubic feet of water per second to be withdrawn from the Santa Margarita River and has pending before the State water commission three applications totaling 30,000 acre-feet per year. These applications are No. 12178 for 10,000 acre-feet from Rainbow Creek, No. 12179 for 10,000 acre-feet from Sandia Creek, both of said creeks being tributaries of Santa Margarita River and No. 11578 for 10,000 acre-feet from the Santa Margarita River. No dates are presently available for applications Nos. 12178 and 12179. Application No. 11578 is dated October 4, 1946. The Marine Corps Headquarters at Camp Pendleton has entered application No. 12576 for 12,540 acre-feet of water under date of June 30, 1948, apparently considering that such application to the State water commission was necessary.

Now they go on to a conference that was held in the office of Congressman McKinnon preliminary to the introduction of Congressman McKinnon's bill for the construction of a dam. In that conference it was determined that the Navy Department and the Department of Justice, the latter as legal adviser to the Navy, would prepare a letter for the execution of the Vail interests. This letter, copies of which are attached, was prepared by the Navy, Department of Justice, and forwarded by the Navy to Phil Swing.

Then they raised the question that I have already mentioned, that they objected to some language in the letter of transmittal and sent it back to have that withdrawn. But it goes on—this is the question that you are asking, whether anybody claimed all the water—this is the Navy talking to the Navy—Paragraph 6:

The Department of Justice representative—

and the only one that I ever saw at any of these meetings was Mr. Veeder—his name is not mentioned—

The Department of Justice representative made it very clear that as legal adviser to the Navy Department he was obliged to state that in his opinion the stipulated judgment apportioned all of the waters of the Santa Margarita River, both normal flow and flood waters, between the Vail Co. and Rancho Santa Margarita, and that the United States Government as successor in interest to Rancho Santa Margarita owned two-thirds of all such waters; that any act or admission to the contrary was detrimental to the Government's interests and that while it was no concern of the Department of Justice as to how the Navy Department disposed of Government-owned water, he felt restrained to advise that any act outside the stipulated judgment could result in a loss of property rights in such water.

Mr. SAYLOR. Mr. Swing, I think that is of such importance to have you reread those last two paragraphs, wherein he says that the representatives of the Department stipulated——

Chairman ENGLE. I don't think that is necessary now.

Mr. SWING. I will bow to the chairman.

Chairman ENGLE. I think, Mr. Swing, you can summarize it, but is that the first time, so far as you are aware, that any spokesman of the Government or any agency of the Government had taken the position that the judgment between the Vails and the O'Neills was, in effect, a division of 100 percent of the waters both natural and flood waters of the Santa Margarita?

Mr. SWING. To my recollection that is the first time I ever heard of it and it was astounding to me that two men could meet in a room, the O'Neills and the Vails, and divide up water which they now say 14,000 defendants have a legal interest in, and must, therefore, be necessary parties in this suit. [Applause.]

Chairman ENGLE. Just one further point. Did it also startle you to find out that two individuals could bind everybody else in the watershed by an agreement they had made with respect to what they considered their mutual rights on a river?

528

Mr. SWING. It reminds me of the time that Columbus, having landed on an island he didn't know the name of, or where it was, waded out knee deep into the Caribbean waters and said "In the name of the King I claim all the lands, the shores of which these water wash."

Mr. POULSON. Could you also go further by saying, in addition to the fact that the two men could claim to divide it up, that one agency or one man in an agency could conceive the idea that the Government could take it away from all of them then?

Mr. YORTY. May I ask a question about that now?  Who was it that prepared that memorandum that you have quoted from?

Mr. SWING. I have at the bottom only a typewritten signature, "Willis R. Dudley," and holding it up to see the watermark, I recall that all United States paper is marked with the United States watermark, and this is, so it is on official paper.  I don't know who wrote it, except that the signature is Willis R. Dudley in a memo to Admiral Manning, proposed legislation re construction of a mulitpurpose dam on the Santa Margarita River, Camp Pendleton, San Diego County, Calif.

Mr. YORTY. Who is Mr. Dudley?

Mr. SWING. He lists himself in the conference, "Mr. W. R. Dudley, Real Estate Branch, Bureau of Yards and Docks."

Chairman ENGLE. Do you have any objection to that document being made a part of the record?

Mr. SWING. Not at all.

Chairman ENGLE. Would you submit a copy for the record, please, and without objection it will be made a part of the record at this point.

AUGUST 2, 1949.

Memorandum to Admiral Manning.
Subject: Proposed legislation re construction of a multipurpose dam on the Santa Margarita River, Camp Pendleton, San Diego County, Calif.

Background.  1. The subject dam would be constructed to fulfill needs of the Navy Department (Marine Corps) and those of the Fallbrook Water Utility District.  Originally the Navy contemplated the construction of the dam to meet Marine Corps needs at Camp Pendleton.  It subsequently developed that the surrounding agricultural communities to Fallbrook contemplated generally similar action through means of the Fallbrook Public Utility District.  Conferences were held by the Bureau of Reclamation, Department of Interior (which agency would be responsible for Federal sponsorship and regulation of a public dam project for Fallbrook), the Navy Department and the Army engineers looking to the possibilities of a combined or multipurpose dam.  Engineering and hydrographic studies with respect to feasibility and water resources were conducted and the practicability of such a dam was determined.

The Navy Department has relied on the stipulated judgment entered into in the suit between Rancho Santa Margarita et al, plaintiff, and Vail, defendant, 42850, as the basis for the title to its share of the water of the Santa Margarita River.  This stipulation adjudicates title to two-thirds of all such waters in the Rancho Santa Margarita (to which the United States Government is successor in title) and title to one-third of all such waters in the Vail interests.  The Fallbrook Public Utility District has received a permit from the California Water Commission No. 7033 dated February 18, 1948, for 2½ cubic feet of water per second to be withdrawn from the Santa Margarita River and has pending before the State Water Commission three applications totaling 30,000 acre-feet per year.  These applications are No. 12,178 for 10,000 acre-feet from Rainbow Creek, No. 12,179 for 10,000 acre-feet from Sandia Creek, both of said creeks being tributaries of Santa Margarita River, and No. 11,578 for 10,030 acre-feet from the Santa Margarita River.  No dates are presently available for application Nos. 12,178 and 12,179.  Application No. 11,578 is dated October 4, 1946.  The Marine Corps Headquarters at Camp Pendleton has entered application No. 12,576 for 12,540 acre-feet of water under date of June 30, 1948, apparently considering that such application to the State water commission was necessary.

Case 3:51-cv-01247-JO-SBC   Document 853   Filed 12/03/51   PageID.2220   Page 40 of 54

2. During the first week in June 1949 discussions between representatives of the Navy Department, Department of Justice, and Bureau of Reclamation centered around the legal problems involved in the disposition, collection, and diversion of waters which would be impounded in the proposed dam.   A conference was held in the office of Congressman McKinnon of California preliminary to his introduction of a congressional bill providing for construction of the dam.   At that conference it was determined that the Navy Department and the Department of Justice, the latter as legal adviser to the Navy Department, would prepare a letter for execution by the Vail interests, of which letter would indicate the assent of Vail to the diversion of 7,500 acre-feet of water to the Fallbrook Public Utility District, such water to be taken exclusively from the Navy's two-third share of all Santa Margarita River waters allocated under the above-mentioned stipulated judgment.   This letter, copy of which is attached as enclosure 1, was prepared by the Navy and Justice Departments and forwarded by Navy to Mr. Phil Swing, who is counsel for the Fallbrook Public Utility District and is also a member of the California State Water Commission advisory board, on June 10, 1949.

3. Conference in Congressman McKinnon's office, July 29, 1949.

Present and representing:

Bureau of Reclamation: Mr. N. B. Bennett, Jr., Assistant Director, Bureau of Planning.   Mr. Richard Witmer, office of chief counsel

Department of Justice: Mr. W. H. Veeder.

Navy Department: Rear Adm. J. J. Manning (CEC), USN, Chief of the Bureau of Yards and Docks.   Lt. Col. A. E. Dubber, USMC.   Mr. W. R. Dudley, Real Estate Branch, Bureau of Yards and Docks.

At this meeting it was disclosed that Mr. Phil Swing had forwarded to the Navy Department the prepared draft of letter mentioned above duly executed before notary by Mahlon Vail, managing trustee for the Vail Co., dated July 21.   However, by separate letter also dated July 21, Mr. Vail qualified this letter as follows:

"We enclose herewith, executed in duplicate, a letter regarding the construction of a multipurpose dam designed to impound certain waters of the Santa Margarita River and to make available to the Fallbrook public utility district not more than 7,500 acre-feet of water per annum.   Since the letter was not prepared by us and certain language therein appears to us to be somewhat vague, a further explanation of our understanding thereof appears to be in order.

"It is our understanding that the waters referred to in said letter to be impounded and the waters to be made available to Fallbrook public utility district are from the share of the United States of America, as successor in interest of the Rancho Santa Margarita, of the flood waters of said river and its tributaries, referred to in section 13 of the judgment dated December 26, 1940, referred to in said letter.   Said waters are to be appropriated by the United States of America under and pursuant to a permit to appropriate water for which the United States of America has filed an application with the Division of Water Resources of the State of California.

"It is also our understanding that said letter will not be construed as a waiver of any credit to which we may be entitled under said judgment for return water lost by reason of delivery of water to said Fallbrook public utility district.

"Any use you may make of the enclosed letter will be in accordance with this understanding."

4. It is believed that the figure "7,5000" is a typographical error and that 7,500 acre-feet of water per annum was intended.   The letter from Mr. Phil Swing forwarding the Vail letters was dated July 22, and gave Mr. Swing's interpretation of these qualifications.   A copy of Mr. Swing's letter is attached as enclosure 2.

5. The consensus of the Navy and Justice Department representatives was that these qualifications, together with Mr. Swing's construction thereof, were such that any diversion of water to Fallbrook could be interpreted as being wholly or partially without the terms of the stipulated judgment in the Rancho Santa Margarita Vail case, and could conceivably be interpreted as passing jurisdiction to the State water commission.

6. The Department of Justice representative made it very clear that as legal adviser to the Navy Department he was obliged to state that in his opinion the stipulated judgment apportioned all of the waters of the Santa Margarita River, both normal flow and flood waters, between the Vail Co. and Rancho

Santa Margarita, and that the United States Government as successor in interest to Rancho Santa Margarita owned two-thirds of all such waters; that any act or admission to the contrary was detrimental to the Government's interests and that while it was no concern of the Department of Justice as to how the Navy Department disposed of Government-owned water, he felt restrained to advise that any act outside the stipulated judgment could result in a loss of property rights in such water. It was then considered by the Justice and Navy representatives that further action in the form of clarification or revision in communications from the Vail Co. was necessary in order to safeguard the Government's interests in the subject waters. It was agreed that, on the basis of informal legal comments from the Department of Justice representatives, Congressman McKinnon would attempt to obtain from the Vail Co., elimination of all qualifications; also that if such was obtained, there should follow a legally binding agreement between the Government and Fallbrook which would unequivocably provide that the maximum of 7,500 acre-feet per year ultimately contemplated for withdrawal from the impounded waters by Fallbrook Public Utility District would constitute all of the Santa Margarita waters which would be withdrawn by that district and would be in lieu of all permits from the California Water Commission, both existing and pending.

7.   The Bureau of Reclamation representatives advised that something in the nature of a firm commitment on the part of the Navy as to the amount of water Fallbrook could withdraw was essential to permit Federal financing of Fallbrook's portion of the dam costs. The Navy representatives stated that while enlarging the proposed dam to care for Fallbrook's needs was desirable for the Navy from an economic standpoint, it was not essential to Navy interests. Consequently, such enlargement would represent the Navy's desire to adhere to its policy of being a good neighbor to adjacent communities, recognizing their needs and cooperating in the fulfillment of such needs. However Navy representatives (including Marine Corps) took the position that the Navy could not guarantee water to Fallbrook to a point where lack of water would become detrimental to Navy requirements. Reclamation representatives indicated that the Bureau of Reclamation would be willing to compromise a firm 7,500 acre-feet diversion to Fallbrook in conformity with a reasonable fixed formula which would recognize Navy requirements, perhaps on a Camp Pendleton population basis. It was considered that if the necessary commitments from Vail and Fallbrook are forthcoming such formula should be negotiated to the satisfaction of all interested parties.

8. Bureau of Reclamation representatives advised that hydrological studies have been made both by the Corps of Engineers and the Bureau of Reclamation and that the results arrived at in these independent studies are so nearly in agreement that it is believed that the estimates are as reliable as such studies can be on the basis of stream-flow records for the period for which such records are available.   (It is understood that these figures cover a 30-year period.)

9. Congressman McKinnon requested the assistance of Mr. Veeder, of the Department of Justice, in connection with the next step, which is that of clarifying the Vail letters and is to be undertaken by the Congressman. Mr. Veeder has furnished the Congressman with an informal memorandum in this connection, copy of which is included herewith as enclosure 3. This memorandum represents Mr. Veeder's personal assistance to the Congressman and is not an official memorandum of law from the Office of the Attorney General.

WILLIS R. DUDLEY.

Mr. YORTY. Is the method by which that came into your possession, Mr. Swing, a confidential matter or could you tell us where it came from?

Mr. SWING. To be perfectly frank I don't don't at this minute recall, but the Navy and the Fallbrook representatives and Congressman McKinnon and all the Government officials except Mr. Veeder were all in a confidential relationship with each other, considering ourselves all on the same side of the table, and we exchanged, freely, information with each other regarding what we considered a common project to which we had already agreed.

Mr. SAYLOR. And, Mr. Swing, even after you received that letter you had never heard of any contention by anybody that you had dealt

with, including Mr. Veeder, that the United States claimed all of the water in the river by virtue of their purchase of the Santa Margarita Rancho?

Mr. SWING. Well, I am trying to think now.  I may have heard him say that in his opinion the United States was the owner of two-thirds of all the water of the Santa Margarita River and all of its tributaries, both surface and subsurface, but I thought he was kidding as I never could think of a lawyer in his right mind making such a statement that 14,000 people who were not parties to the lawsuit would be bound by a judgment of which they had no notice and no opportunity to be heard.  And I never took it seriously until I found it written out in the language on a piece of Government official paper. I am taking more time than I intended, but I think I am trying to lead up to an important point.

Chairman ENGLE. This is a very complete and interesting statement, Mr. Swing.  We would be glad to have you proceed.  Do you desire a brief rest?

Mr. SWING. I would appreciate it.

Chairman ENGLE. The subcommittee will stand in recess for 5 minutes.

(Short recess.)

Chairman ENGLE. The subcommittee will please be in order. While we are giving Mr. Swing a little respite from his testimony, we have a lady here, Mrs. Mary Hubbard, who lives 1 mile northwest of Fallbrook and who has 10 acres, I believe, of property, on which there is located a dry well.  She has lived on that property for over 10 years.  Mrs. Mary Hubbard is 90 years of age, and in order to hear her, and because of her age, we will interrupt Mr. Swing's testimony at this time to hear from Mary Hubbard.

Mrs. Hubbard is now at the witness stand.  Mrs. Hubbard, we will be very happy to hear your statement at this time. You will have to speak a little louder because we want the court reporter to hear what you have to say so it will appear in the record.  I understand that you have to have your water hauled to you; is that right, Mrs. Hubbard?

Mrs. HUBBARD. Yes, I do.   She has to haul it to me.

## STATEMENT OF MRS. MARY HUBBARD

By Mr. CARROLL HUSCHER:

Mr. HUSCHER. Why does she haul it to you?

Mrs. HUBBARD. Because I have no convenience.  I have no automobile or no horse.

Mr. HUSCHER. How long have you lived on that piece of ground?

Mrs. HUBBARD. Since 1908.

Mr. HUSCHER. How long has it been in the family?

Mrs. HUBBARD. Oh, my brother owned it before me.

Mr. HUSCHER. Quite sometime back?

Mrs. HUBBARD. Yes; 1928.

Mr. HUSCHER. Do you have a well?

Mrs. HUBBARD. I have a well but it is dry.  It is down to blue granite now and I have been told there is no use going any deeper.

Mr. HUSCHER. In other words, you could have gone into the utility district with your property but you did not have funds to do so?

Mrs. HUBBARD. Yes.

Mr. HUSCHER. Have you been served yet with a summons? Have you been served yet with a summons?

Mrs. HUBBARD. Yes; I have.

Mr. HUSCHER. What have you done about it?

Mrs. HUBBARD. I don't know. I turned it over—I referred it to my grandson. I don't remember what he did.

Mr. HUSCHER. How old are you, Mrs. Hubbard?

Mrs. HUBBARD. I am 90 years.

Chairman ENGLE. Thank you very much, Mrs. Hubbard. We are very glad to have your testimony.

Will the gentleman who asked the questions give his name?

Mr. HUSCHER. Carroll Huscher.

Chairman ENGLE. The record will show that the questions were asked by Mr. Carroll Huscher. Thank you very much, Mrs. Mary Hubbard. We hope that we can help you out.

Mr. SAYLOR. Will you ask this good woman whether she is related in any way to the Vails who were a party to this lawsuit which is here in question?

The WITNESS. No, I am not.

Mr. SAYLOR. Do you have any relatives living other than your grandson?

The WITNESS. No. My grandson lives in San Francisco. I have two grandsons in San Francisco.

(Witness excused.)

Chairman ENGLE. Mr. Yackey has provided, for the record, a list of applications to the State for water, the date filed and by whom filed and the application number and so forth. This memorandum will be made a part of the record at the appropriate point, Mr. Reporter, in his testimony and without objection will be made a part of the record.

(This memorandum will be found on p. 56.)

Chairman ENGLE. Now, Mr. Swing, are you ready to proceed?

Mr. SWING. With your permission.

## STATEMENT OF PHIL D. SWING—Continued

Mr. SWING. Just before we took a 5-minute recess I was saying that there was a little bobble in the Vail waiver due to the fact that he said something in the letter of transmittal and he thereupon was asked to, and did, withdraw his letter of transmittal and reaffirmed the Vail letter as written, either by the Department of Justice or certainly approved by the Department of Justice, as I have already indicated by the letter to which I have referred.

Thereafter, on September 29, 1949, Congressman McKinnon wrote the director of the public utility district:

> I find that the second Vail letter has overcome the original objections. Consequently, I am asking Admiral Manning at the Navy and Mr. Bennett at the Bureau of Reclamation to double check with the higher echelon to be sure that the present wording of the bill is agreeable to all and as soon as they agree to the bill I will introduce it in the House.

But before that was done we were notified that there would be one more conference, and a plane load of representatives from the Reclamation Bureau, the Army, and the Navy were flown out and a series of conferences were held, by them first among themselves at Camp

Pendleton, and afterward with the Fallbrook Public Utility District in the office of Captain Johnson, public works officer, Eleventh Naval District, at San Diego. After 2 days of work a drafting committee was appointed to reduce to form the unanimous agreement of those present. Mr. David W. Agnew acted as chairman and did most of the formulating of the understanding, as it was called. After the committee reported back to the bigger body of some 15 or 20, it was read over and everyone present was asked whether they had any objections to it or whether it was agreeable. There were no objections, and the only question remained was how soon could they get it to Washington and get it signed up. I thought they ought to be able to get it signed up in a couple of weeks, but the general understanding was that it would take a little longer than that.

The Fallbrook Public Utility District was asked to be the first one to sign it and then forward the copies.

Captain Johnson, who was acting as host, and presided originally at the conference in the Public Works office, Eleventh Naval District, wrote Mr. Franz Sachse, president of the Fallbrook Utility District, under date of December 22, 1949:

As a result of conferences held at Camp Joseph H. Pendleton and the district public works office on December 12, 13, and 14, 1949, in connection with the proposed De Luz Dam on the Santa Margarita River, the enclosed memorandum of understanding was approved by all interested parties. Ten copies of the memorandum are forwarded herewith.

It is requested that the Fallbrook Public Utility District signify by resolution that the memorandum of understanding is satisfactory and that five copies of the memorandum be executed and returned to this office, together with five certified copies of the resolution author'zing the approval. The approved copies of the memorandum will be forwarded to the Navy Department in Washington for signature of the Navy Department and the other interests that are a party thereto.

A copy of the proposed bill authorizing the construction of the dam is attached to the memorandum of understanding. It was suggested in the conferences that the portion of the bill providing that the Secretary of the Interior shall transfer to the Secretary of the Navy funds received by him from the operator, be rewritten in order to assure that funds so transferred will not revert to the Miscellaneous Receipts of the Treasury, and will be available for expenses arising out of the operation of the reservoir.

A copy of the memorandum of understanding has been delivered by hand to Mr. Phil D. Swing, attorney for the Fallbrook Public Utility District.

Very truly yours,

C. R. JOHNSON,
*Captain, CEC, USN, Public Works Officer.*

MEMORANDUM OF UNDERSTANDING BETWEEN THE DEPARTMENT OF THE NAVY, THE FALLBROOK PUBLIC UTILITY DISTRICT, DEPARTMENT OF THE ARMY, AND THE DEPARTMENT OF THE INTERIOR

The parties named in the title of this memorandum all being conversant with the terms and provisions of the attached bill for an act to authorize the Secretary of the Navy to construct, maintain, and operate a dam and reservoir on the Santa Margarita River in the State of California and for other purposes, have reached the following understanding relating to the operation of said proposed dam and reservoir when authorized and construction thereof is completed.

1. Best obtainable hydrologic data, which are accepted by the parties as the basis for this understanding, show that a dam built at the De Luz site to a height sufficient to create a reservoir of 188,000 acre-feet active conservation

capacity will create a reservoir having a firm yield during its initial filling as indicated by the figures below:

| Active reservoir content, Mar. 1 | Subsequent firm yield |
|---|---|
| Acre-feet | Acre-feet |
| 0 | 3, 400 |
| 44, 000 | 8, 600 |
| 54, 000 | 9, 000 |
| 63, 000 | 9, 800 |
| 74, 000 | 10, 800 |
| 83, 000 | 11, 600 |
| 94, 000 | 12, 500 |
| 98, 000 | 12, 800 |
| 115, 000 | 14, 300 |
| 139, 000 | 16, 300 |
| 160, 000 | 18, 000 |
| 176, 000 | 19, 300 |
| 188, 000 | 20, 000 |

Subsequent to the reservoir filling to 188,000 acre-feet, the firm annual yield is estimated to be 20,000 acre-feet at any stage of the reservoir.

2. As between the naval reservations and the Fallbrook Public Utility District, division of the waters of the Santa Margarita River and of the De Luz Reservoir shall conform to the following:

(a) Until such time, immediately following construction of De Luz Dam, as the reservoir attains an active content of 63,000 acre-feet naval reservations will satisfy their basic requirements but not exceed a draft upon the reservoir of 8,000 acre-feet in any year except in the case of a national emergency involving mobilization; Fallbrook would satisfy its requirements to the extent possible without exceeding a draft upon the river or reservoir of 1,800 acre-feet.

(b) After the reservoir has attained an active content of 63,000 acre-feet and until an active content of 98,000 acre-feet has been attained, the naval reservations will satisfy their basic requirements but not exceed a draft upon the reservoir of 8,000 acre-feet in any year except in case of a national emergency involving mobilization; Fallbrook would divert from the river or reservoir the difference between the firm yield indicated in the table above, and the naval reservations 8,000 acre-feet.

(c) When an active reservoir content of 98,000 acre-feet is reached, the 12,800 acre-feet yield of the reservoir will have been divided, following the rule of (b), 8,000 acre-feet to the naval reservations except in case of a national emergency involving mobilization, 4,800 acre-feet to Fallbrook. These quantities represent 62.5 percent and 37.5 percent of the whole. Thereafter, and until the reservoir fills, the firm yield of the reservoir as indicated by the table above shall be divided in that proportion.

(d) After the reservoir fills, and except in the case of a national emergency involving mobilization, the 20,000 acre-feet firm yield would be divided: 12,500 acre-feet to the naval reservations, 7,500 acre-feet to Fallbrook. Water unused by either party after the reservoir fills initially would accrue to the credit of that party. Credit to United States and to Fallbrook shall not exceed 62.5 percent and 37.5 percent respectively of that part of the conservation capacity that would be unoccupied if no credits existed to either party. When the reservoir refills to its full conservation capacity, namely, 188,000 acre-feet, all credits to either party shall become null and void.

3. Water losses from De Luz Reservoir, including but not limited to evaporation losses, shall be charged against water in storage to the credit of the naval reservations, Fallbrook Public Utility District, or both, and against that water which would be De Luz Reservoir if no credits to either party existed in the ratio that each segment of the reservoir content bears to the total content.

4. All claims of the Fallbrook Public Utility District in and to rights to use of waters from the Santa Margarita River will be transferred to the reservoir created by the proposed dam, and after it is in operation, be forever satisfied from the quantities of water accorded to that district pursuant to this Memorandum of Understanding.

88455—51—ser. 7——4

46      SANTA MARGARITA WATER RIGHTS CONTROVERSY

5. It is understood and agreed that the top 23,000 acre-feet of De Luz Reservoir shall be used exclusively for the control of floods of the Santa Margarita River, under rules prescribed by the Secretary of the Army through the Chief of Engineers.

6. In the case the Secretary of the Interior shall, as provided in the proposed bill, transfer to the contracting body or bodies the operation of the works provided for in section 2 of the proposed bill, the Secretary of the Navy will make available to such body or bodies free and unrestricted access to these works as may be necessary for the proper operation of the works and facilities, subject only to the requirements of the National Defense.

7. It is understood that nothing contained in this Memorandum of Understanding is intended to affect the right, title and interest of the United States of America to the use of water from the Santa Margarita River, as provided for in the judgment entered in the case entitled *"Rancho Santa Margarita, a corporation, v. N. R. Vail, et al.,* No. 42850 in the Superior Court of the State of California, in the County of San Diego."

8. It is understood that the Department of the Navy will initiate a request of the Department of Justice that appropriate action be taken by the United States to protect the rights to the use of water as proposed in this Memorandum of Understanding whenever and wherever the same may be attacked.

It is understood that the Secretary of the Navy and the Secretary of the Interior will request the Attorney General of the United States to advise them of the best means to safeguard and protect the use of water by the United States as herein proposed and against any encroachment thereof.

10. It is understood that the provisions of this Memorandum of Understanding are subject to approval by the Department of the Navy, Fallbrook Public Utility District, Department of the Interior and the Department of the Army, and that it shall not be effective unless approved by all of the parties.

On January 11, 1950, Mr. Yackey wrote to Captain Johnson:

DEAR CAPTAIN JOHNSON: Your letter of December 22, 1949, addressed to Mr. Franz Sachse, president of the board of directors of the Fallbrook Public Utility District, was acted upon at the next regular meeting of the board January 9, 1950.

Enclosed are five copies of the Memorandum of Understanding, executed by Franz R. Sachse, president of the board; together with five certified copies of our Resolution No. 333 approving the Memorandum of Understanding between the Department of the Navy, the Fallbrook Public Utility District, the Department of the Army and the Department of the Interior.

We trust that approval of all agencies will be executed without delay and that nothing further will stand in the way of satisfactory completion of details holding progress on the De Luz Canyon Dam.

Yours very truly,

GEORGE F. YACKEY,
*General Manager.*

Chairman ENGLE. May we have a copy of that for the record?

Mr. SWING. Yes.

(The above quote is the complete letter.)

Mr. SWING. The memorandum went to Washington and delay after delay followed. I was, of course, in touch with Congressman McKinnon who was doing all he could. On January 24, 1950, he wired me—

San Diego Agreement scheduled to be signed without change by Admiral Jelley tomorrow. Will advise upon performance.

Then there was a lapse of time until March 20, 1950, with more inquiries of me of the Congressman and finally I got a telegram of that date, March 20, 1950, from McKinnon:

Agreement approved today by Chief of Naval Operations. Assistant Secretary must now approve and then Secretary Navy. Shouldn't be long.

On March 27 he wrote:

I feel sure we will have the San Diego agreement ratified by Secretary of Navy before the week is out and the Secretary of the Interior is all set to go as soon as we get the document over from the Navy.

And then, gentlemen, the iron curtain was pulled down. [Applause.] Who killed Cock Robin? I made some effort to find out but it is only rumor. I learned that the Navy had sent over to the Department of Justice some legal questions for the Department of Justice to report on. As I say, at all times then, and now, in Congress, in court, here, the only representative of the Department of Justice who stood out in front, made all the assertions and answered all questions was Mr. William H. Veeder. Rumor says that in due time Mr. Veeder reported back to the Navy the Department's opinion of the questions. I have never been able to learn either what the questions were or what Mr. Veeder's answers were. It is sufficient to say that the next thing I heard of Mr. Veeder was that his name appeared at the bottom of this very tremendously important document called Complaint, United States of America versus Fallbrook and Fourteen Thousand Other Defendants, as I understand there are to be.

Mr. YORTY. Mr. Swing, will you permit me, do you mean to say that you were never notified that there were some new objections to this agreement which was ratified and you were never given an opportunity to make any additional changes that might be required?

Mr. SWING. I want to answer your question directly and honestly, and I am assuming that Congressman McKinnon will not object to what I am about to say, because he deals frankly and openly with his colleagues. Time running on, the baby had been born and whether it had died, or when it died, or was a live and healthy and growing into manhood I was eager to know, because it was a tremendously important problem out here. I was bombarding Congressman McKinnon until I think he was very much irritated. I asked him whether there was any basis for the report that a set of questions had been put up to the Department of Justice and that they had been answered. He finally wrote me that he had got in touch with Mr. Veeder and Mr. Veeder confirmed the fact that these new questions had been raised by somebody and that he had written out the answers, but that he would not give Mr. McKinnon a copy of this communication because he was afraid it would fall into my hands and inform me of his position. Now that is all I know and that, of course, is only hearsay.

Now, gentlemen, we are down to the $64 question. I have been in a good many water cases. I have never known of a single water litigation that ever increased the amount of water available for use. The only product of water litigation is terrific expense and loss. In this case it has upset one entire community and has tentacles which are so far-reaching that they have disturbed many, many serious thinking people in the West.

After we have been through this litigation, and it is not my intention to discuss the merits of this lawsuit as I shall present those to the court which I conceive to be the proper forum, but after this suit is through, what is the status quo? Mr. Veeder and the Department of Justice has found out what 14,000 riparian owners have a right to— he concedes they have rights, I believe, now—he still says he has not

**48**     SANTA MARGARITA WATER RIGHTS CONTROVERSY

enough water for the Navy. This suit, at the end of its long tortuous course will then be followed by another lawsuit. That is my prediction. The lawsuit will not have given to the Rancho Santa Margarita, if they stand on their riparian rights alone, as they have assured the Committee on the Judiciary they intend to stand—and this is one of the most startling assertions from eminent water lawyers I have ever heard—a man goes down on the creek just before it runs into the ocean, and by using the water that has passed every other landowner for 60 miles upstream, beginning at Mt. Palomar and which, so far as Veeder is concerned is water they don't need and can't use—waste water—the Government, or the Rancho Margarita water that has passed the property of everybody else, that they gain a prescriptive right, which he asserted that the Government was going to claim in court, is a new principle of law that sets me back on my heels after 35 years of practice in the water field.

But they must have water, he says, and testifying before the Senate committee on Mr. Watkins' bill to give the State courts some opportunity to hear these controversies, at page 21 he refers to the Santa Margarita case and in opposing Watkins' bill he says:

Some of the rights were not proven up on in the Santa Margarita River case and the United States is going to have to go in and condemn rights which at one time it owned.

It owned, them, of course, when it owned the public domain, but having parted with all of the public domain except possibly a few rocky mountaintops, it has parted with the water that goes with the land. "If it does not condemn them it won't have them. That is all there is to it."

So, gentlemen, we are notified by the department representative in charge of this suit that having harassed this community, having set by the ears 14,000 people demanding to know the precise amount in gallons per hour that they can use, he is then threatening to follow this with a condemnation suit to condemn such rights as he thinks the Navy needs.

Now they are already at work on the De Luz Dam. The Korean War, having suddenly made the Public Treasury available to the Navy in unlimited quantities for any purpose in the name of national defense, they decided that they did not want to be bothered with a little partner like Fallbrook, or even large partners like the Bureau of Reclamation—and we are all brushed out of the picture—they went to Congress, the Appropriations Committee, and presented their claim for $1,011,000 to start the De Luz Dam and they give as their authority Public Law 910, Eighty-first Congress, second session, an act to authorize certain construction of military and naval installations and for other purposes, and here is what covers, I am told, the Navy building the De Luz Dam by itself for itself, period. And it is repudiating all the gentlemen's agreements that we have heretofore referred to.

Title II, section 201—

The Secretary of the Navy, under the direction of the Secretary of Defense, is authorized to establish or develop naval installations and facilities by the construction and conversion, installation of equipment of temporary or permanent public works, including building facilities appurtenances and utilities as follows:

and then there is in lump sums, to the fleet so much, aviation facilities, Marine facilities so much, and in that lump some place is the De Luz Dam. For the justification they say that the work described herein is based on the dam recommended by the Los Angeles district engineer, Corps of Engineers, United States Army, in his report dated March 15, 1949, except that it is proposed to use the entire annual yield for the requirement of Camp Pendleton, naval hospital, and Fallbrook Ammunition Depot.

The Army engineers recommended, and their report will so show, a multiple-purpose project in which Fallbrook was to be accorded its just share, equitable share of the water in accordance with the agreements which we have been heretofore discussing, and the Navy was to get its 12,500 acre-feet a year. But they brushed that off and they go on to say that this is urgent and that in order to protect the water rights of the Government on the Santa Margarita by the construction of the dam. They want to get ahead of Fallbrook.

Fallbrook is therefore challenged by the Government, this little community that it is, and it is forced to go to the expense and has started its project upstream at what we call the Libbencott Sully, a dam for the benefit of the people of this town, under the laws of the State of California to appropriate its share of the floodwaters. So that the race is on to build two dams instead of one, with evaporation from two reservoirs instead of one, meaning a tremendous additional expense to the taxpayers of the country, and little Fallbrook will pay its share of the De Luz Dam; and a greater loss of the water resources of the river through increased evaporation.

In conjunction with this I would like to make a part of the record a letter from Admiral Jelley to Mr. McKinnon and the project description which was included.

MAY 29, 1950.

MY DEAR MR. MCKINNON: In compliance with your telephone request, there is forwarded herewith the project description for the construction of the dam at the junction of Santa Margarita River and De Luz Creek, Camp Pendleton, Oceanside, Calif.

There are also included herewith copies of Public Law 910, Eighty-first Congress, which authorized this project, and Public Law 911, Eighty-first Congress, under which funds were appropriated.

The project is included in Public Law 910, on page 2, under "Title II, continental United States, Marine Corps facilities, $30,055,000."

The appropriation is included in Public Law 911, on page 10, under "Chapter VII, Department of the Navy, public works (new), $303,378,000."

With kindest regards.

Sincerely yours,

J. F. JELLEY,
*Rear Admiral, CEC, USN, Chief of Bureau.*

CORRECTION OF DEFICIENCIES IN RAW WATER SUPPLY MB, CAMP PENDLETON, OCEANSIDE, CALIF., PROJECT NO. N681-2

Authorization 1951, $17,380,000; Second supplemental, 1951, $1,011,000

*Project description*

(*a*) This project is the first increment of the construction of an earth-fill dam at the junction of the Santa Margarita River and De Luz Creek, using materials in the vicinity, to insure an adequate water supply by conserving runoff waters and for flood control. The dam is to be located at the junction of the Santa Margarita River and De Luz Creek. The total estimated cost is $22,904,000.

(*b*) Principal features of the proposed dam are: Height above stream bed, 224 feet; capacity (top of spillway gates); 211,000 acre-feet; storage allocation, water conservation and sediment (sediment storage reservation, 14,000 acre-feet

for 50-year period), flood control, 23,000 acre-feet; annual yield, 20,000 acre-feet.

(c) The project further proposes the construction of a purification plant and installation of new mains from the dam site to the existing camp lines.

(d) The work described herein is based on the dam recommended by the Los Angeles district engineer, Corps of Engineers, United States Army, in his report dated March 15, 1949, except that it is proposed to use the entire annual yield for the requirements of Camp Pendleton, the naval hospital, and the Fallbrook ammunition depot.

*Basis of requirement*

(a) In addition to its training mission, which will be augmented because of Korean operations, Camp Pendleton is to be used as a staging area for troops en route to combat missions in the Pacific. These troops are not included in the figures given on the previous page.

(b) The entire planning and development of Camp Pendleton is predicated on the eventual construction of the dam described herein.

(c) The controlling factor in any extensive development in the arid areas along the southern California coast is the availability of a dependable water supply. Camp Pendleton, therefore must be assured of ample water if it is to carry out its mission of training troops successfully. The urgency of developing the existing potential water resources and protecting the riparian rights now accruing to the land cannot be overemphasized. Failure of the Marine Corps to take such action will undoubtedly result in the loss of this potential water supply to outside interests, leaving the camp without sufficient water to support the development of the permanent camp and to carry out its assigned mission.

(d) This fact is borne out by the encroachment of the Fallbrook utilities district on the waters of the Santa Margarita River. This interest has recently started pumping from the river although it is well known that a surplus of water does not exist. The above action was taken with full knowledge and sanction of the California Division of Water Resources. Camp Pendleton has requested an injunction restraining the Fallbrook district but to date action has not been evident.

(e) Unless immediate action be taken, consideration should be given to moving the activities now at Camp Pendleton to some other location where natural resources are more plentiful, even though it would mean abandoning an investment of approximately $75 million in existing buildings and facilities. The construction of a dam on the Santa Margarita River to impound flash flood waters to be held over for use during dry periods is considered the best method to assure an adequate supply of water for Camp Pendleton. By such means, the United States Naval Hospital, Santa Margarita Ranch, and the naval ammunition depot, Fallbrook, also will be assured of an adequate supply. These activities are not included in the troop strengths given previously.

(f) The only positive assurance against loss of potential resources to others is the early development of these resources by the Marine Corps.

(g) Stipulated judgment, Docket No. 42850, rendered by the Superior Court of the State of California, San Diego County, established the riparian rights of Rancho Santa Margarita on the basis of the water crop of the free flowing river and its tributaries, but it, however, contemplated the probable construction of dams at some later date to impound storm water now lost by flowing into the sea.

(h) The Fallbrook public utility district, serving the community of Fallbrook which adjoins Camp Pendleton, realizing that during times of flood large quantities of water are lost at sea, has filed application with the State of California for the right to impound by a dam and use such waters as a supplement to their present supply. While approval of such an application would jeopardize the riparian rights of Camp Pendleton as established by the stipulated judgment—stipulated judgment, Docket No. 42850, rendered by the Superior Court of the State of California, San Diego County—such action would fall within the provisions of the State water code which provides for such an allocation whenever waters are not being put to beneficial use. In fact, the California State Division of Water Resources has granted the Fallbrook district 2.5 cubic feet per second from the normal flow, if not interfering with existing vested rights. Therefore, if immediate steps are not taken to protect Marine Corps interests in the Santa Margarita River, there is little doubt but that this irreplaceable source of water will be transferred to other parties by the State; and once lost, its return would be impossible because of the prescriptive rights

that would have been established by the use of the water by others. The protection of the water rights by the construction of the dam by this project in addition to assuring an adequate supply of water for military use during times of war or emergency, would allow for its beneficial use in times of peace, by irrigation of additional acreage of valuable agricultural lands which form part of the post.

(*i*) Additional advantages of the proposed construction would be:

(1) Flood control to prevent damage to land and camp facilities.

(2) Development of highly productive farm lands.

(3) The lake formed by the dam would be an important morale factor in this isolated location.

(*j*) The only known alternate source of water supply would be the Metropolitan Aqueduct which furnishes Colorado River water to this area. Due to its length, it is subject to possible sabotage during wartime and should be considered as the sole supply for a military training base. That source might better be developed for civilian use, leaving to the Marine Corps the purely local supply from the Santa Margarita River.

(*k*) Application to impound the waters of the Santa Margarita River has been filed with the Division of Water Resources, State of California. The application was filed to impound 165,000 acre-feet.

(*l*) The reservoir formed by the dam would make possible the storage of several years' water supply to be applied later to beneficial use during droughts and periods of lean flow of the river. This quantity can be assured only through the construction of a dam of adequate size. The dam would eliminate the danger of flooding military and agricultural installations that now exist in the river basin, and would permit full utilization of the lands in and adjacent to the river bed.

(*m*) On August 19, 1949, the division engineers, South Pacific Division, Oakland Army Base, promulgated a public notice relative to Santa Margarita River and tributaries, California, stating in part that the report authorized by the act of Congress, Public Law 765, Seventy-fifth Congress, approved June 28, 1938, has been made a part thereof and the division engineers are favorable to the construction of a reservoir for flood control and water conservation in the De Luz site, Santa Margarita River at river line 12.

*Basis of estimates*

Construction of 211,000 acre-feet dam and reservoir; water treatment and connections as required to NAD Fallbrook, Naval hospital and Camp Pendleton systems; delivery to agricultural irrigation system on Navy property; diversion works for possible transfer of water off the reservation. Total estimated cost is $22,904,000.

First increment to cover land acquisitions, rights of way, and architectural and engineering services, $1,011,000.

I say to you, gentlemen, that somewhere somebody has gone off the reservation; some place somebody has jumped the track on what was an honest, fair, square, gentleman's agreement, which was constructive; which was in the interest of the Government; which was in the interest of the people of the Government.

What have we done? With the De Luz Dam built it may take 10 years to fill. The second barrel of the aqueduct can be built, we were told in the First World War, the first barrel could be built in 18 months. It wasn't, but it could have been. The second barrel of the tunnels has already been dug and certainly it could be put through very shortly.

I want to refer in that connection to the President's Committee, and I am now referring to a committee appointed by Franklin D. Roosevelt to consider the water shortage in the San Diego County area, of which William E. Warne, Assistant Commissioner for the Bureau of Reclamation, was Chairman, Vice Adm. Ben Moreel, Bureau of Yards and Docks, represented the Navy; Maj. Gen. Eugene Ribald, Chief of the Army Engineers, Baird Snyder, Assistant Administrator,

Federal Works Agency, and the President honored me by appointing me on the Committee to represent San Diego.

Mr. Warne, in transmitting this to the White House said:

> Mr. President, in behalf of your Committee, and in response to the assignment made in your letter of October 3, 1944, to me, I submit the attached report on the San Diego, Calif., area water-supply problem. The report finds that an emergency impends in San Diego and already exists in the Santa Margarita section. The report also makes recommendations in accordance with the assignment given.
>
> Sincerely yours,
>
> WILLIAM E. WARNE,
> *Assistant Commissioner and Chairman of the Committee.*

That report was dated October 21, 1944. At that time the idea was that Pendleton would get a supplemental supply through this aqueduct which connects with the Metropolitan Water District, and which brings Colorado River water into this county.

Finding No. 1 of the President's Committee—which was unanimous—reads:

> An emergency impends in the water supply of the city of San Diego and surrounding communities, and an emergency exists in the water supply of Camp Pendleton and other military installations in the Santa Margarita vicinity of San Diego County. These situations demand relief at the earliest practicable time.

And then on the next page:

> In addition, Camp Pendleton and other naval installations in the Santa Margarita vicinity have an anticipated maximum requirement of about 5 million gallons per day.

Then it goes on to discuss droughts—

> Such droughts occur frequently in the area as disclosed by the 60-year record that is available. An extended drought may begin at any time.

Now, of course, the war ended with the Hiroshima bomb and the Navy rushed to close up all activities. They were no longer interested in this aqueduct. They started to notify the contractors to cease work immediately; they would pay for the work that they had done and then the San Diego community rushed in and said:

> We are willing to guarantee the Government all its payments. Do not cancel these contracts. We think it is urgent that they should be completed.

The city of San Diego signed a contract on behalf of the communities here, and the aqueduct was continued and the Navy said they weren't interested in it, although they were on notice that they needed at that time, and ever since, a supplementary supply of water from the Colorado River. And they are now, on this day, appearing before the defense committee, the defense subcommittee, testifying in favor of the urgent need of a second barrel of water, and I trust that at this time they will be farsighted enough to provide themselves a spigot in that second barrel whereby they can get water for an emergency. That would be temporary.

In the meantime the record shows that there is enough floods and runoffs in the Santa Margarita every 5 years that a dam of the size which the Navy is proposing to build, equating these 1-in-5-year floods, will result in a net safe yield of 20,000 acre-feet a year and the Navy, in their own application to the State stated its needs at 12,500, which is approximately the same figure. So here we are. Can we

do something constructive? Can this committee furnish the leadership which the citizens of this country, of the State of California, of Nevada, the Western States of the whole United States require? Can we preserve local autonomy?

I read with great interest the speech of Daniel Webster, as a boy, "An indestructible Union of sovereign States." But the trend has been to sap their rights, undermine their laws, until we are shrinking back into what I fear may be mere provinces. How all overpowering can one's government be? We are only learning one at a time. I believe that you would set a splendid example if you would reauthorize the De Luz Dam and make the water rights into the waters conserved thereby subject to the laws of the State in which the project is constructed and in which it is operated.

There are rivers in every State. There are expanding Government activities in the nature of war defense and otherwise; the atomic activities in Nevada may take a million acres for the purpose of exploding atomic bombs, withdrawn from the sovereignty of the State to the exclusive sovereignty of the United States, and all water necessary to carry on the Government's activities may be asserted as they are asserted here, as paramount.

Mr. Veeder and Mr. Vanech have assured the Judiciary Committee that the gun isn't loaded, but a lot of good men have been killed by unloaded guns. Here is the gun that says that the United States, as against 14,000 riparian owners, owns the riparian rights. And then he stands before the Judiciary Committee and says, "Well, Swing did it; he filed an answer." I distinguish between riparian rights in my answer. I said my riparian rights were correlative with the Government's riparian rights; my prescriptive rights which I asserted were paramount, and the appropriative rights were junior to the Government's riparian rights.

Now, that is the way anybody would plead a case, but he asserts that the Government's right to 35,000 acre-feet of water a year, which is more water than there is in the river, on the average, that the Government has the paramount right to it. Gentlemen, I must stop. I have trespassed on your time. I will yield. You have been very indulgent with me. I appreciate your kindness and your consideration of this most urgent problem to not only these local people here but to everyone in the West. [Applause.]

Chairman ENGLE. Mr. Swing, you made an excellent statement, and in giving us the splendid description of what has occurred you have given us an affirmative approach to the matter which I am sure that you might want to consider.

If it is not going to be too much of a burden on you, I think the committee would like to ask you a couple of questions.

Mr. SWING. I will be very happy.

Chairman ENGLE. In the first place, I would like to ask you a couple of questions and then I will recognize these gentlemen who have expressed some interest here in asking questions.

You spoke of reauthorizing the project on the Santa Margarita. Was that a slip of the tongue or has it been previously authorized?

Mr. SWING. It has been authorized only in the language that I read, Public Law 910 of the Eighty-first Congress, which is simply authorizing the Secretary of the Navy to construct whatever facilities

or utilities may be required for national defense. You know, under the rules of the House—and I doubt if they have changed so much—once a project has been started, once Congress appropriated money for it—and they have appropriated a million dollars for this one—it is considered to be authorized, even though there was no actual legislative committee action on it. It is authorized by silent consent. I think you are perfectly familiar with the reauthorization bill, which did a very remarkable piece of work in the interest of the public and the Government both, I would say, and I think I probably had that in mind when I used the word "reauthorize."

Chairman ENGLE. I understand what you mean now. I have that very clear. I might say that I haven't very much respect for these blunderbuss authorizations. It is a most dangerous way to legislate, and in national emergencies sometimes we have to do it, but it has been the program of the Armed Services Committee to screen all of those. I don't know whether they screened this one or not, but that is the reason I asked you about reauthorization.

There are just one or two other points. You have indicated pretty generally the basis on which the Government asserts its position here, but I am not clear as to whether the Government is standing on what it contends to be the effect of the purchase documents on the Santa Margarita or whether, in addition to whatever they acquired when they acquired the Santa Margarita ranch, they contend that because of the sovereignty of the Government they have some preferential and higher right on the stream than you or I would have had we acquired the same purchase documents. Now, may I have your comments as to what the Government is asserting, if anything, over and above what you and I would acquire had we acquired the same purchase documents? I don't want to lead you into a long dissertation, but perhaps you can summarize it.

Mr. SWING. We undertook, by motion, to make more definite the complaint and have them state what the basis of the Government's complaint was. The court did not see fit to direct them to do that, but Mr. Veeder filed what he called a response to our motion, and in that response of 52 pages he states definitely that the Government is not in the position of an ordinary water user; that it is a sovereign, and that it has rights in addition to those of a mere proprietor. I think he used similar language when he was testifying before Mr. Watkins' committee. "The Government," he says, "isn't in a business. The national defense is a Government activity and a constitutional activity" which I take it, means a sovereign activity.

Chairman ENGLE. I asked him about that at the hearing before the Judiciary Committee. He made the statement then, I believe, that the Government asserted its sovereignty for the purpose of preventing the running of a prescriptive right against the Government, but not for the purpose of enlarging the title to the Government water itself. Now, is that your understanding of it?

Mr. SWING. That is my understanding of his understanding?

Chairman ENGLE. No; is that your understanding of the position taken by the Government? I assume you saw the record of the hearing?

Mr. SWING. Yes; I read it. The record is very soothing and is sweet music to me. I was gratified to read it, but I am still confronted