with the pleading, which has all the portent, all the possibilities of the oil-land case, because he refused in court to amend his pleading to only claim as against riparian rights, and when Mr. Veeder is through trying the case some other attorney general may have the case on appeal and will say: "The United States cannot lose any title to property which it may have merely because Mr. Veeder has made such-and-such a statement, either in court or out of court."

Chairman ENGLE. Is it a fair statement, then, to say that, so far as the defendants in this litigation are concerned, they are confronted with the Federal Government's asserting rights by reason of the sovereignty of the Government over and above any rights that the Government might acquire through its purchase documents?

Mr. SWING. In all written documents filed in this case in court, that is exactly the Government's position. Orally in court, or orally before congressional committees, they state that they are claiming only the rights as the owners of the Rancho Santa Margarita, but I can't carry that oral statement out of court into court as evidence or as a stipulation.

Chairman ENGLE. Now we have the record, I think, very clear on that point. Now, one other point and I will yield. Let me get this second point and then I won't ask any more questions. I am concerned about the fact that this litigation involves 14,000 defendants, and I would like to ask you, as probably the most renowned water lawyer and legislator in this State, whether or not you think the condition of our water laws is in such shape that it would be necessary for a fellow out here owning 10 acres of land, if he wanted to establish his right on a basis equivalent to that now undertaken by the Federal Government, to institute a suit of that magnitude to determine what his right is? Is it necessary to go through all this business of suing 14,000 people?

Mr. SWING. If there is anything to be gained by a technical adjudication of everyone's rights, probably the only way that an encyclopedic definition of water rights on the Santa Margarita could be made would be by doing that, but for all practical purposes it is absolutely unnecessary. As I said to Mr. Veeder in the last conference I had with him—and I did not hear him dissent from it—90 percent of these defendants use less than 10 percent of the water of the Santa Margarita. Ten percent is the estimated loss, anyway, in transportation in ordinary water activities, and 10 percent are users of 90 percent of the water; the Vails, the Rancho Santa Margarita, or the Government, and probably Fallbrook and one or two others, and that by confining themselves to 10 percent they could have got a practical adjudication of everything that they ever could enforce. There is no possibility of policing this stream, or they are going to have to have marines from now to doomsday ride this river to see how much water a man is pumping.

When the court has accorded him 5 gallons per minute from his well for domestic purposes, who is going to enforce such an order? It is purely theoretical. It has no practical force or effect whatsoever. The only purpose of this action, as I said before, is the threat to file, follow this one up with another of condemnation of the lower users' rights in order to get the Navy some more water.

Chairman ENGLE. In other words, is this a fair summary of your answer: that if you wanted a wholly technical and encyclopedic definition of the water rights on the Santa Margarita and of the Santa Margarita Ranch, you could possibly get it by suing everybody in the watershed; but, for all practical purposes, since there is transperation and evaporation, and since it is impractical to police the whole river, a determination of the Government rights under the purchase documents, whatever they are, could be had in a suit involving a handful of defendants?

Mr. SWING. Absolutely.   There has never been, in the history of litigation that I have ever read about, any suit to compare with this suit making 14,000 defendants parties to the suit.   I never heard of one compared to it.

Mr. SAYLOR. Mr. Swing, from your dealing with various agencies of the Government in handling this matter through a series of meetings wherein you thought the entire thing was negotiated, until you described the iron curtain falling, and then this unnecessary lawsuit on account of its magnitude, does that not indicate to you—not just as one of the leading lawyers, as described by Mr. Engle on water rights on the west coast, but to somebody who comes from the East, who has heard about Phil Swing and recognizes him as the leading water lawyer in the country—does that not indicate to you a lack of good faith on behalf of the people in the Department of Justice in dealing with citizens of this community?

Mr. SWING. I don't believe that is a question that I should answer.
[Applause.]

Mr. POULSON. Did you not say that there was a practical answer or constructive solution to this in the reauthorization of the dam and the pushing of the second barrel of the aqueduct with provisions for getting the necessary water?

Mr. SWING. Absolutely.

Mr. POULSON. Now, since that is the solution, I mean since that can be done that way, couldn't your own California Secretary of the Navy, Mr. Kimball, use or show some strength and work to that end? I mean, after all, this is something that surely he, as a member of the Cabinet, can overrule in the interest of the country, some subordinates, these eager beaver attorneys?

Mr. SWING. Well, your opinion of the California Secretary of the Navy is probably better than mine.   I have never met him.

Mr. POULSON. I mean hasn't he, as a member of the Cabinet, enough influence to accomplish something like that?

Mr. SWING. I don't know.   I believe the law provides that the Department of Justice is the legal adviser for other departments when they go into court.

Mr. POULSON. Does it have to go to court?

Mr. SWING. No.

Mr. YORTY. Mr. Swing, did you ever have a client that didn't take your advice?

Mr. SAYLOR. One question, Mr. Swing: Do you know of any other case wherein the Government has claimed more water for themselves than exists in the stream?   As I understand your figures, there are about 20,000 acre-feet in floodwaters——

Mr. SWING. About 26,000.

Case 3:51-cv-01247-JO-SBC   Document 853-1   Filed 12/03/51   PageID.2099   Page 3 of 84

Mr. SAYLOR. 26,000, and the Government suit indicates that they only want the good Lord to send down 35,000 acre-feet. That is typical of some of these people down there. They expect to do what the good Lord does not do around here. [Applause.]

Mr. YORTY. Mr. Swing, I am wondering if you wouldn't like to sit down? You have been standing up for 2 hours.

Mr. SWING. It takes me back to the time when I stood, occasionally, in the aisles of the House.

Mr. YORTY. If you can stand it, all right. I am going to ask a few questions. I am interested in this question of exclusive jurisdiction, and I suppose that the question answers itself, that if the Federal Government hadn't purchased this ranch the question of exclusive jurisdiction would not have arisen. I believe that is correct; isn't it?

Mr. SWING. That is right.

Mr. YORTY. And these rights to water on this stream would all have been governed by State law and by the people on the stream without any interference by the Federal Government?

Mr. SWING. Absolutely.

Mr. YORTY. And, therefore, in granting exclusive jurisdiction to the use of this military establishment, it appears that the Government's position is that we have done something more than surrender the right to police the establishment, or the other rights of police power. Would that be your interpretation of their position?

Mr. SWING. Well, one day I think that is true and then I read Mr. Veeder's statement before the Subcommittee of the Judiciary in which he said that the cessation of jurisdiction with the State of California and the United States would not give them any more water rights than what they would have had without it. That is, as I recall, his testimony. But he put half of his 52 pages of response to our motion to make more definite to what he explained, or in which he explained, what cessation of jurisdiction meant. It meant the exclusion of State laws with reference to the property involved, and the only property involved was the water in the Santa Margarita River.

Mr. YORTY. And it would be impossible—would it not?—to assert Federal jurisdiction over part of the stream without affecting the whole of the stream.

Mr. SWING. Yes. It would be silly to say that all they claimed was exclusive jurisdiction of what water crossed their boundary lines. In other words, to have any water at all they have to have—they have to appeal, I think, to the State law to go up that stream to land which is all private property, and which has water rights, which they admit it has, and start telling people up there, "You have got to let your water down to me because of some rights of mine."

Now, what rights are they? Are they riparian or are they based on a suit in jurisdiction? I am confused by reading everything that Mr. Veeder says.

Mr. YORTY. And of course this complaint stresses the needs for national defense very much, does it not?

Mr. SWING. Why, it claims that this water is needed not only for the soldiers who are being trained to go to war, but for washing when they come back, and in the hospital, and to grow gladiolus on these leased farms in order to put them on their graves when they die.

Mr. YORTY. Now, in the normal course, in the normal course of the reasonable division of the waters of this stream, among all the people on this stream, of course you never would have considered that a reasonable division would contemplate one party taking all the water it needed for a huge national defense establishment?

Mr. SWING. Well, certainly not, because their riparian uses are limited to riparian lands. As a matter of fact, they are claiming the right to use the water all over the 135,000 acres, the big majority of which is nonriparian.

Mr. YORTY. That is inherent in what they are doing as distinguished from what they are saying. Inherent in what they are doing is an enlargement of the water rights of that ranch by virtue of its sale to the Federal Government, is that not right?

Mr. SWING. That is the effect of their contention, although they orally disavow it.

Mr. YORTY. Well, now, I don't have to tell you, Mr. Swing, that what they orally disavow and what they do are two different things. Before the Judiciary Committee the representative of the Department of Justice stated that the defendants in this case would not have to come in and answer, and when his testimony was sent to him for revision, which means for grammatical errors and not substantive changes, he said they would not have to come into the court and prove their rights, just answer, which is an entirely different matter.

Now, you made some reference to the testimony of Mr. Veeder before the subcommittee headed by Senator Watkins, and I was very much interested, too, in the statement that you made quoting Mr. Veeder, and I suppose he will find some way to worm out of this one, too. But he stated that they had not proved up on their rights, and that they would have to come in and condemn in order to get sufficient rights. Now, my interpretation of that statement was different than yours. You felt that that meant that after the present suit they would come in and condemn. I feel that he at that time, was conceding that they did not have sufficient water rights on this stream for that establishment and they were planning on the necessity of condemning. But I feel, also, that at some later time they must have taken another good long look at the cases and the doctrine of sovereign paramount powers, and decided that they could take the water rights on the stream without paying, by the present suit. I have had other lawyer members of the Judiciary Subcommittee look at this complaint. They feel that it is worded like a complaint in condemnation except does not offer to pay anything. Do you have any comment on that?

Mr. SWING. Well, my comment on that is it is not condemnation unless you pay a just price which the property is worth. I agree that this complaint, as drawn, is drawn so that it would be entirely possible to enter a judgment for the Government to the same extent as it entered a judgment in favor of the Government on the oil-land case. The language is broad enough to permit that.

Chairman ENGLE. On the right to exappropriate?

Mr. SWING. That is the precise word. I am going to apologize to some of these people who are expecting to be witnesses. I have taken more time than I should.

Case 3:51-cv-01247-JO-SBC   Document 853-1   Filed 12/03/51   PageID.2101   Page 5 of 84

Chairman ENGLE. You haven't. You have contributed substantially to this hearing and we may have to crowd some other witnesses on account of it, but we are milking you for all we can get out of you in the way of information, both legalistic and otherwise.

Mr. YORTY informs me that he has some further questions to ask that may take a little while, and in view of the arrangements which have been made I think we ought to recess and continue, if you are going to be back here at 8 o'clock, Mr. Swing, or a few minutes after.

Mr. SWING. I am enlisted for the duration of the war.

Chairman ENGLE. The subcommittee will now stand in recess until 8 o'clock sharp.

(Thereupon, at 6 p. m. a recess was taken until 8 p. m. of the same date.)

### AFTER RECESS

Chairman ENGLE. The subcommittee will be in order.

When we recessed Mr. Swing had completed his statement and had, I believe, been questioned by all the committee except Mr. Yorty and Mr. Baring. Mr. Yorty expressed a desire to ask Mr. Swing some more questions. Mr. Swing, if we can inflict ouselves upon you a little further, the Chair will recognize Mr. Yorty for some additional questions.

Mr. YORTY. At the time of the recess we were discussing this matter of exclusive jurisdiction which I am sure is bothering you, and is certainly bothering me, because the complaint seems to rely so heavily upon that fact. I noticed that in his testimony before the Watkins committee Mr. Veeder made this statement—this was on April 25, in Washington—he said:

The next point I have here involves the question of national defense which we have facing us today down at Camp Pendleton in particular, and on the Colorado River in a general way in regard to shale-oil rights. We are in litigation right now in San Diego, Calif., where we are going down on May 9 and start to litigate the question of whether the State laws for administration of water rights in the State of California supersede the constitutional law of the Government in regard to exclusive jurisdiction.

Now, as I interpret that, Mr. Swing, it is an assertion that this exclusive jurisdiction is to be used as a wedge to contend that the State law is superseded, the State water law is superseded and that the Government intends to base its claim certainly on other than our State water law. Is that the way you interpret that statement, and also the action that has been filed?

Mr. SWING. Well, it is pretty hard for me to interpret what a witness has in his mind testifying in Washington, before a Senate committee. Mr. Veeder has stated to me in conversation that the State law doesn't apply to Government in its water claim.

Mr. YORTY. Well, then, that gets back to the point that I think is very vital here, that any State which henceforth permits the Federal Government to come in and buy any property is taking a chance of having its whole State water law superseded, and all of the rights on the stream upset. Wouldn't that necessarily follow?

Mr. SWING. That is the very dangerous threat because we have a blanket State law which automatically accedes to the Federal Government its exclusive jurisdiction, with one or two minor exceptions, wherever the Government buys land or asquires it by condemnation for

those purposes specified in the act. Now the widespreading activity of the Government under this claim asserted here of national defense, which I referred to, possibly a million acres, might govern not only the land but the rivers, and I think you are right that either the Federal Government or the State Government is going to have to revise the question of cessation of sovereignty over the vast areas which the Government seems to need to acquire for national defense and other purposes so as to safeguard the State laws in a better way than they are now. You can't do it by blanket law. You are going to have to screen these cases and give it cessation to the extent to which it may be deemed wise.

Mr. SAYLOR. Mr. Swing, if the Government's contention is correct in this case, and they are successful in this case, do you not see also a threat, not just to water rights in this State, but to national resources of whatever kind any other State may have?

Mr. SWING. I think there is a sound basis for that observation of yours. If the national defense is the basis and the necessity for it, not only may they take water, they may take other national resources that they may find necessary if that theory is pushed to it logical conclusion.

Mr. YORTY. That is what Justice Frankfurter said in the California Tidelands case, that the doctrine asserted there could be extended most anywhere.

I was anxious to stress this point as to the exclusive jurisdiction because we do have our State legislative committee here, and I think it is important for them to have the testimony and to realize that they have got a job to do as well as our Congress in connection with this matter which has occurred down here.

Mr. SWING. Well, what are you going to do in a case in which the papers filed in the case, and in the court, they assert that the cessation of sovereignty applies in most State law, and yet when he appears before a congressional committee, like he did before the Judiciary Committee, he says something that appears to me to be the opposite?

Mr. YORTY. Well, I think without laboring the point, it is obvious that inherent in this suit, no matter what they say, is the theory of superseding our State law. They are asserting that if they ever owned any rights they can only be divested of them by an act of Congress; and, that the State has lost jurisdiction.

Chairman ENGLE. Gentlemen, an important point which was directed to my attention sometime ago—my district runs from the Oregon line to Death Valley, and includes Yosemite National Park. I was very much astounded to learn that by the cessation of sovereignty of the park area, although including some private land, that the supreme court of our State now held that the cessation of sovereignty gave to the park superintendent jurisdiction over the issuance of liquor licenses and that they were not under the police powers of the State. We have run across that problem from time to time in connection with police jurisdiction in military reservations, I think that it is a subject matter which should be given attention, because of implications that can be drawn from it, such as mentioned by my good friend and colleague from Los Angeles, Mr. Yorty.

Mr. YORTY. Now at this same committee hearing the representative of the United States attorney's office also said:

> The additional factor that I would like to raise in that regard is that the State law as written is not adequate to give the United States the kind of relief to which it is entitled and which it frequently needs.

That was his statement, which of course to me—I don't know how you can interpret it any other way—means that they are dissatisfied with the State law and they are going to try and avoid State law which gets back to the point that: here you had a river which unquestionably would have had all rights adjudicated under State law in State courts, but because the Federal Government simply purchased property, where they should have only succeeded to the rights of a private person, instead of that, because it happens to be the sovereign, they are asserting an entirely different doctrine which, as you have said, is unprecedented in your opinion, and you are one of the most eminent water lawyers in the Nation.

Now, I was wondering, and the statement was made here, that even the Navy had applied to the State for water rights on the stream to appropriate water, but wasn't it the contention of the United States in *Nebraska* v. *Wyoming* that even where they had historically complied with State law that they were prepared now to assert that they weren't bound to, that they had only done it as a matter of comity?

Mr. SWING. The brief filed in *Nebraska* v. *Wyoming* (325 U. S. 589-672) by Mr. Burgess of the Solicitor's Office of the Department of the Interior, on behalf of, I presume, the Bureau of Reclamation, asserted the contention that you state here, that under the treaty the United States had acquired, as sovereign by the treaty, the land and water rights which formerly belonged to Mexico so far as the Western States were concerned, and France so far as Nebraska was concerned, and they owned at least the unappropriated water. I think, however, Mr. Veeder and Mr. Vanech, the Assistant Attorney General, in their testimony before the Judiciary Committee said orally that they did not intend to urge that claim in this case.

Mr. YORTY. Of course you know, Mr. Swing, that in the Tidelands case the Secretary of the Interior, the same one who changed his mind and wanted to file suit against the State of California, that same Secretary of the Interior had written a letter to several applicants who wanted to file on California's tidelands, as we call them—actually they are the submerged lands off the coast—saying that they would have to apply to the State of California, that those lands were owned by the State of California, but he was not bound by that. He later changed his mind and sued us and they have been successful in establishing their title in the Supreme Court, so I think we would be very foolish to rely too much on what the representatives of the Federal Government say at any one time. Do you not feel that is correct?

Mr. SWING. Well, I do not think the United States is bound at all by what any assistant to the Attorney General or even the Assistant Attorney General says. They are mere employees and their negotiations, their ignorance or their misstatements in nowise divest the United States of any title which they may claim. That is the fear, whether this gun is loaded or not—Mr. Veeder and Mr. Vanech say the gun is not loaded—but some other assistant attorney General

88455—51—ser. 7——5

may insist that paramount means exactly what the English language says it means, and it could be pulled on us.

In the Supreme Court of the United States, in the Wyoming-Nebraska case, they did hold that where they had applied to the State they had thereby subjected themselves voluntarily to the State law, and that they could not afterward claim that the State law did not apply to them. In this case here it seems to me that the Navy, and I believe wisely and legally, did apply to the State division of water resources for water in order that they might store it, because the only right they had before that is a riparian right, and Mr. Veeder and Mr. Vanech now, before the Judiciary Committee, stated they are only claiming as land owners, and that would mean riparian rights. One with riparian rights has no right to store the water for future use. He only can take it out of the stream as it goes by his property and he has no right to use it off of the riparian land. Only 35,000 acres of this ranch, out of 135,000, are riparian, and yet they want to use this water all over the entire 135,000 and claim a right to do so, which cannot be because of riparian rights; it must be for some other reason, some other law or some other right that they claim that I don't know of.

Mr. YORTY. Of course I don't know either, and that is what I am trying to get at here. I view this complaint—with reference, and getting back to the *Nebraska* v. *Wyoming* case, in which, as you say, they asserted that they owned all the unappropriated water in the nonnavigable streams, if that assertion can be made here—I assume that it can be made here—and since it was not decided in that case there isn't any reason to believe that they have changed their minds in the Department of Justice.

Now, in that connection I was thinking that if they could come on our river here, the Santa Margarita, which creates their interest in it, then, if their doctrine should be upheld because of their very interest in the river, they might assert that the State could not allow any appropriations at all on that river because they own all unappropriated water, and without the Federal consent it couldn't be done. Isn't that right?

Mr. SWING. Well, as you state it; yes. Of course, we lawyers who try to follow water law have accepted that since 1866, and in the act of Congress of 1877 the law was an expression of Congress giving its consent to the State to administer the water law and the disposition of the water to all appropriators who came into that State for the purpose of putting it to a beneficial use. Now the Santa Margarita is very much overappropriated, if I might use that expression. If all the water that the United States Government is in a position to claim is the unappropriated water I don't know what good that will do them to get a decree saying that they are the owners of the unappropriated water when there isn't any unappropriated water left.

Mr. YORTY. I was thinking that, as against the Government, after it came on the stream—you have received some allotments, I believe, from the State—they might, under that theory start to attack them. Of course, they are attacking them in the suit by claiming all the water in the river, but they might urge this further ground, and I point this out merely because I don't know. You can not take a complaint like this and just read it and get all the implications without

going back to the previous positions of this Department and what they have asserted in some of the other cases.

Now, there were one or two other matters that I wanted to ask you about. The Department of Justice also testified, "We need an inventory of water rights in all the streams in the West." I think you are thoroughly familiar with that, Mr. Swing, because they say that the Indians have rights; that the Department of Forestry has rights, and now national defense has rights, and to me that is a growing theory of theirs that they, as the sovereign have these rights, which although people may have assumed for years that the water they are using is theirs, the Federal Government, not being bound by the doctrine of laches, could very well come in at any time and upset water all over these western streams.

Mr. Swing. I do not know what Mr. Veeder had in mind when he used the expression "inventory of the streams." In probate cases we say an inventory and appraisement. Maybe he meant to have every one of these streams litigated in the same manner that he is litigating the Santa Margarita and bring in every landowner and mortgagee, and if a plasterer has a laborer's lien and records it he would have to be a party defendant also.

Chairman Engle. That would be a nice thing for us lawyers, wouldn't it, Mr. Swing?

Mr. Swing. I think not. My theory of the expectancy of life does not run to the point where I look forward with any pleasure to any cessation or lack of success of lawsuits.

Mr. Yorty. Did you know of any reservation between the parties made at the time of the stipulated judgment between the O'Neills and the Vails that that was not to affect the reasonable uses of other people already on the stream?

Mr. Swing. I never saw anything of that in the stipulation. Of course the judgment was entered automatically following the wording of the stipulation. The court exercised no judicial discretion at all. It was required to enter exactly the judgment which the two parties had stipulated to and I never knew anything about that at all.

Mr. Yorty. Is there any theory you know of in water law by which the court could get jurisdiction of the res, as we use it in dealing with other things, and determine the rights of use of all that water as against persons who are not parties to the action?

Mr. Swing. Well, the res, as you use the expression, of water is a word which would correspond to the corpus, if I remember my Blackstone at all, and he listed those things which were not capable of ownership—air, sunshine, running water, wild animals, and so forth—unless and until reduced to possession, and what the plaintiff in this case wants is the use of rights, what he is trying to get the court to give him is the right to claim that he has the right to use so much water so that he can go up the stream and tap the farmer on the shoulder and say, "You can't pump any more from your well. You have got as much as you are entitled to." Now the corpus of the water, of course, once it passes into the boundaries of the Rancho Santa Margarita, the corpus can be done with as they please, but the corpus of water arriving inside of the Government's possession is one thing and the use of the right to go clear up the full length of the 60 miles of the stream and control uses upstream is an entirely different thing.

**64**      SANTA MARGARITA WATER RIGHTS CONTROVERSY

Mr. YORTY. Now, as I understand the geological structure here, it is considered that there is more than one basin underlying this area, is that right?  It is not one basin?

Mr. SWING. I think it is admitted that there are three basins on the Rancho Santa Margarita; it is called the lower, the middle, and the upper basin, and there are other basins upstream in the Temecula area and the Murietta Creek area, and both, as I understand it, have basins.

Mr. YORTY. Well, now, in their complaint in paragraph 9, with which you certainly are thoroughly familiar, they say:

> In direct violation of the rights of the United States of America, and in complete disregard of the need of the water in question for national defense, the defendants, by reason of their diversions from the Santa Margarita River upstream from Camp Pendleton have caused the intrusion of salt water from the Pacific Ocean, as described above, to irreparable damage of the United States.

Now, I noticed in the report of our own State engineer, made December 6, 1950, he says:

> Excessive pumping along the seaward margins of Pajaro, Salinas, San Luis Rey, and Santa Margarita Valleys has lowered ground-water level below sea level and has reversed the seaward hydraulic gradient resulting in intrusion of ocean water.  Continued pumping at present rates will allow further encroachment into these basins.

Now, where are these wells that are doing this pumping and allowing this salt-water intrusion?

Mr. SWING. Well, now, you are extending me beyond my legal scope as an attorney.  I have been through the Rancho Santa Margarita and I am not qualified to pass upon the question of their operation of their several basins as to whether they pump too heavily out of the lower basin nearest to the ocean.  That all would develop, no doubt, on the trial of the case.

Mr. SAYLOR. Mr. Swing, if at any time—while you have been a most cooperative witness—there are any questions which bring you within the realm of disclosing any defense which you may have, and may not wish to show to the representatives of the Department of Justice, this committee does not want to infringe in any way on those rights.

Mr. SWING. Thank you.  I do not want to undertake to try the case here before the committee, and the committee does not want me to do that.  I have been trying to answer questions and I have no fear of disclosing to the opposite attorneys any of the facts.  I only wish they knew more of the facts of the case than they do.  [Applause.]

Mr. YORTY. I mention this to you, Mr. Swing, because I have had some discussions with representatives of the Department of Justice myself, and while I believe a private litigant is probably justified in going in with a shotgun complaint and trying to claim everything and do everything, which is not too unusual in practice in private litigation.  I think when the United States Government starts to sue 14,000 of its citizens it is an entirely different proposition.  I think they ought to be very careful to claim only exactly that to which they can prove they are entitled, and not to make shotgun allegations, putting everybody in an adversary position, even though they verbally admit the people have some rights.  This struck me as a rather unusual allegation as against people clear up on the top of this water-

shed, to claim that by pumping under their own property they were causing the salt intrusion in a basin way down at the mouth of the Santa Margarita.  It just seems to me to be a typical example of what we have in this lawsuit which should not be there.

Mr. SWING. I have one client on the top of Palomar Mountain with one spring upon 160 acres, and they are threatening to enjoin him from using his spring.

Chairman ENGLE. Mr. Yorty yields back the floor to Mr. Poulson.

Mr. POULSON. Since you have intimated the fact that you want to be very ethical in your procedure, would you call it ethical on the part of the Justice Department to use verbal threats of sending out marine officers to question the people and serve the papers?

Mr. SWING. Well, my clients, of course, who are country folks with simple, honest lives, have been a little alarmed and astonished, as they have telephoned me, at seeing men drive up in jeeps with "United States Marines" on the side, and start interrogating them.  I say again we have nothing to hide from the Government.  We only wish that they would grant us the same privileges which they proceed to take with reference to our clients' property and their land, in running over them and taking pictures and making investigations.

Mr. POULSON. Well, now, if they can use this sort of a smoke screen of defense in order to run roughshod over people, that is, by claiming these rights, couldn't they likewise use other excuses, after they have established this precedent?

Mr. SWING. Well, your conclusion on that would be as good as mine.

Chairman ENGLE. Thank you very much, Mr. Swing.  You have been patient and even long-suffering in your effort to inform this committee.

Mr. SWING. Your committee has been very courteous and very patient.

Chairman ENGLE. I want you to know that we certainly appreciate it.  [Applause.]

## STATEMENT OF RAY GIRD PETERS

The Chair would like to call attention to, and have it appear in the record at this point, the fact of the appearance of B. Abbott Goldberg, assistant attorney general, who is here representing the State attorney general, and who, I understand, has filed an appearance as an interpleader in this action.  Perhaps later on we will have an opportunity to hear from Mr. Goldberg, but at this time we will proceed to the list of witnesses given me relating to individual instances of hardship which result from the nature and the magnitude of this suit.

The first witness whose name appears here is Mr. Ray Gird Peters. Is Mr. Peters here?  Will you come forward, Mr. Peters, please.  You may be seated, if you desire, Mr. Peters.  I understand you live on homestead and patented land on the Santa Margarita River, consisting of 80 acres of lemons and avocados, and that you secure your water from the river; that you have operated the place all of your adult life, having been born on the property and inherited the same from your parents.  Would you care to describe to this committee how this litigation has affected you?  State first whether or not you have been served.

Mr. Peters. Yes; I have been served.

Chairman Engle. And how far up the river do you live from here?

Mr. Peters. About 6 miles above the Santa Margarita ranch line.

Chairman Engle. Now, do you desire to make any statement with reference to what your situation is on the river in connection with this litigation?

Mr. Peters. Well, I have just gone through two rather severe freezes which has cut me out of my crops for the last 2 years and has left me in a bad way financially, and then this suit coming on has just added to it.

Chairman Engle. You anticipate the necessity of employing counsel, I assume?

Mr. Peters. I have already got a counsel; yes.

Chairman Engle. To protect your rights?

Mr. Peters. Yes, sir.

Chairman Engle. Do you use water from the river now?

Mr. Peters. Yes, I do.

Chairman Engle. You do claim a riparian right on the river?

Mr. Peters. I most certainly do.

Chairman Engle. And how long has that right gone back?

Mr. Peters. It has gone back all of my life and my mother bought the place in 1889 and water had been used previous to that.

Chairman Engle. Are all of your 80 acres riparian to the river?

Mr. Peters. I don't have 80 acres at the present time. I sold some of it last year. I have about 22 acres.

Chairman Engle. Is your position very much different than those of your neighbors who likewise have been made defendants in this action?

Mr. Peters. No; I don't think it is any different.

Chairman Engle. Have all of them been required to employ counsel and have employed counsel?

Mr. Peters. All that have been served; yes. There are a number who have not been served yet.

Chairman Engle. I suppose they are waiting in happy anticipation.

Mr. Peters. They all hope to be away from home the day the man who serves the papers comes down. He has served the ones that he found at home.

Chairman Engle. Do you have any further statement to add to what has already been stated?

Mr. Peters. Well, there has been marines on my place several times, or at least I think they are marines. I heard the marines were in the canyon. They come mostly when I wasn't home.

Chairman Engle. Were they in uniform?

Mr. Peters. I didn't see them but once. At that time they went by the house and went on down and found my driveway and I did not see them. I couldn't see them from the house. Later I saw their tracks where they had gone down to my pump.

Chairman Engle. Did a marine serve the papers on you?

Mr. Peters. No; it was the United States marshal who served the papers.

Chairman Engle. Are there any questions by the committee?

Mr. Saylor. I would like to ask Mr. Peters, this land which you own, or which you have sold, and which you have described here,

was that ever owned by the O'Neill family who owned the Santa Margarita Ranch?

Mr. PETERS. No, sir.

Mr. SAYLOR. Was it ever owned by anybody by the name of Vail in connection with the Vail interests?

Mr. PETERS. No.

Mr. SAYLOR. As far as you know was there ever any litigation with regard to your family in the waters of the Santa Margarita River?

Mr. PETERS. No; there was no litigation. I acted as a witness on both sides when that case was on.

Mr. SAYLOR. But you were not a party to that suit?

Mr. PETERS. I was not a party to the litigation.

Chairman ENGLE. That is a tribute, I would say, to your integrity, that both sides were willing to be bound by your testimony.

Mr. YORTY. Mr. Peters, did I understand you to say that you were a witness in the *O'Neill* v. *Vail* matter?

Mr. PETERS. Yes, sir.

Mr. YORTY. Now, when that suit was tried was there any feeling among the people in this watershed that all of their rights were at issue? Did you feel that your own water rights were at issue in that case?

Mr. PETERS. No, I did not.

Mr. YORTY. That is all.

Mr. PETERS. They were around with their attorneys and engineers and they asked me a few questions about the size of my pump and how much water I used, but they made no comment.

Chairman ENGLE. You did not have the impression, then, that you were attending an inquest on the riparian rights which you and your predecessors and your family had exercised for at least a generation, did you?

Mr. PETERS. No; I did not.

Chairman ENGLE. And if you had you would probably have been in the suit rather than as a witness in it, is that right?

Mr. PETERS. I think very likely. I might say that there was one or two interveners in that suit, and I also acted as a witness for them.

Mr. POULSON. Is that your business?

Mr. PETERS. No.

Chairman ENGLE. That, as I said before, is a remarkable tribute to you, that both sides and all sides in the litigation have been willing to call you as a witness and be bound by your testimony, as it is the party who calls you who is bound by your testimony. Thank you very much. And, by the way, I might add, also, that it substantially adds to the character of the testimony you have given here and it will be so considered. Thank you very much. [Applause.]

Now I have a series of witnesses here from the upper basin area. Mr. H. H. Bergman, are you present?

Mr. Bergman, will you come forward, please?

## STATEMENT OF H. H. BERGMAN

Chairman ENGLE. Now, Mr. Bergman, my memorandum shows that your family settled in this area in 1856; that this is one of the oldest settled districts in southern California and that your grandfather went, presumably from this area, to the Civil War?

68        SANTA MARGARITA WATER RIGHTS CONTROVERSY

Mr. Bergman. Yes, sir.

Chairman Engle. After his discharge he returned to this area and purchased more land and lived here during the rest of his life and raised a family and developed the property. I presume you are a grandson?

Mr. Bergman. Yes, sir. I might testify that my granddad was an immigrant from Europe and he walked across the United States seeking freedom from Bismarck's oppression, and he thought he found it when he got clear back on the headwaters of the Santa Margarita River.

Chairman Engle. He did not stop at the Alleghenies, but kept on coming, is that right?

Mr. Bergman. He kept right on. He was located here at the time of the Civil War and he walked back across the country, making a second trip, and then he walked back with a cane, making a third trip, always seeking the headwaters of the Santa Margarita River. He was a Yankee, and sorry to say, he went down to Atlanta and went through Georgia. He always considered that that was a discredit to him.

Chairman Engle. Now, how much land do you now own?

Mr. Bergman. I own, personally, about a thousand acres.

Chairman Engle. Is that the ancestral homestead up there?

Mr. Bergman. No. This land that I personally own is not part of the old ancestral home. That land fell to my brother and his offspring who were farming it at the time and I leased it, with my nephews and my sister-in-law, and no doubt he had riparian rights on it. But he had rights there that I think preceded the riparian rights inasmuch as it was Mexican land and had been operated and farmed by the Mexicans prior to the advent of the white man in this country, and without doubt had been farmed and operated by the Indians prior to the advent of the Mexicans, so that riparian right goes back quite a ways. Now, he settled here in 1856 and he took out water and operated it and it has been in operation ever since, and that makes it just right close to a hundred years we have been located up in that one locality, so we are still on the old home place. When I say "we" I refer to the family. I personally have not been served with papers because—well, I guess I saw them before they saw me.

Chairman Engle. I do hope, Mr. Bergman, that there is not one of them here with a summons, because as far as I know you haven't any immunity.

Now, is it fair to say that your people, you and your family, have asserted riparian rights in that area since 1856?

Mr. Bergman. Since 1856; that is true.

Chairman Engle. You were asserting and using water from the river at the time of the Vail-O'Neill suit?

Mr. Bergman. Oh, yes.

Chairman Engle. And were you apprised of the fact that those two parties had got together and divided up the river?

Mr. Bergman. We were assured that all of those with riparian rights on the headwaters of the river were safe and in no way affected by their decisions.

Chairman Engle. Now, did you testify for either or both sides in this litigation?

Mr. BERGMAN. No, I did not.  My father did but I didn't.

Chairman ENGLE. The family was there?

Mr. BERGMAN. Yes.

Chairman ENGLE. You say you were assured that riparian rights subject to use were not affected by this litigation.  Who assured you, who gave you that assurance?

Mr. BERGMAN. My father, when he came back from the hearing, he assured us that we were in no way affected by the decision, and that our riparian rights stood as they were before.  We had, at that time, three places along the river where we were using the water.  Later we sold those places and one of those places we sold to a man who is now here, Mr. Barbee, and he has continued to use the water as we did at the time we sold it to him, and for many years prior to that.

Mr. YORTY. I just want to ask one question.  Do you have any feeling that in exercising your historic rights to this water are interfering with the national defense of the United States, as alleged in this complaint?

Mr. BERGMAN. I don't see how it could possibly be so, inasmuch as it has been proven in this new well that has been drilled up here, that the water level runs down to 2,100 feet, and what water we take out, what water we use, is not taken from the drainage.  It runs right back into the old stream bed and I can't see—what little loss there would be would be through evaporation, is all—that it could materially affect the Marine base, and, furthermore, I have seen enough water go by our place that if the Marine base had been there it would have been down in the Pacific Ocean.

Chairman ENGLE. Mr. Poulson?

Mr. POULSON. No.

Chairman ENGLE. Mr. Saylor?

Mr. SAYLOR. No.

Chairman ENGLE. Thank you very much for your testimony, Mr. Bergman.  We are very happy to have you here and are glad to know that California has the kind of settlers you and your grandfather are and were.

Mr. SAYLOR. Mr. Bergman, have other people up in the vicinity where you live, in the headwaters, been served?

Mr. BERGMAN. Yes, and I am sorry to say that one in particular, who was very anxious to be here tonight, is feeling pretty ill and couldn't be here, but we are in hopes that she will be here tomorrow.

Chairman ENGLE. Who is that?

Mr. BERGMAN. Mrs. Wentworth, a widow woman with two children.

Mr. SAYLOR. Mr. Bergman, do the other people, from your own knowledge, who lived up there throughout your lifetime, did they and their predecessors in title exercise water rights on this river?

Mr. BERGMAN. Yes.

Mr. SAYLOR. Similar to those of your family?

Mr. BERGMAN. Yes, and there are some of them yet who have never been——

Mr. SAYLOR. Who have never been served?

Mr. BERGMAN. Yes, and one is Dr. Thurber, a bone specialist in Los Angeles, and we couldn't get ahold of him.

Mr. SAYLOR. And none of the predecessors in title to that land up there were related to either the O'Neills or the Vails?

Mr. BERGMAN. No.

Mr. SAYLOR. And none of them were parties to this suit we have been referring to here?

Mr. BERGMAN. No; in no way.

Mr. SAYLOR. But some of them have been served now?

Mr. BERGMAN. Yes.

Mr. SAYLOR. And are among these 14,000?

Mr. BERGMAN. So I am told.

Chairman ENGLE. Were you a little surprised that the United States is trying to shake you loose from your ancient rights up there?

Mr. BERGMAN. Well, I guess I am involved, and I will let it go at that.

Chairman ENGLE. We always thought that those at the top of the mountain, at the start of the river, had pretty good rights.

Mr. BERGMAN. I think so, and furthermore, I think that there are, south of the border, a lot of people down there, and my old granddad came back looking for freedom and he lived a good old life.

Chairman ENGLE. Now we have Mr. Gibbons. Is Mr. Gibbons here? Mr. F. A. Green? Mr. Tyler? Some of these folks are well up the river, and as I understand they may be in again tomorrow. They had to go home to take care of their chores.

Mr. E. L. Barbee? Do you care to come forward?

## STATEMENT OF E. L. BARBEE

Chairman ENGLE. Mr. Barbee, the memorandum handed to me indicates that you had a permit to this river in 1886?

Mr. BARBEE. That is right.

Chairman ENGLE. And one in 1890, for 200 inches?

Mr. BARBEE. That is right.

Chairman ENGLE. And you own property 1½ miles of riparian land on the river above Oak Grove?

Mr. BARBEE. This side of Oak Grove; below Oak Grove.

Chairman ENGLE. How far is that north of here, or up the river from here?

Mr. BARBEE. Well, by road it is about 30 miles, going around through the Vail Ranch, the way you have to go on 395 and 71.

Chairman ENGLE. Speak a little closer to the mike.

Mr. BARBEE. It is about 30 miles from here going on 395 and 71 and up 71 and 79, and I am just inside San Diego County.

Chairman ENGLE. You don't look like you have been around since 1886.

Mr. BARBEE. Well, just part of the time.

Chairman ENGLE. But you have some predecessors in interest, your family, members of your family on that property or——

Mr. BARBEE. No.

Chairman ENGLE. People from whom you acquired it?

Mr. BARBEE. This is a portion of the property that the Bergman family owned.

Chairman ENGLE. That is the gentleman who preceded you on the witness stand, Mr. H. H. Bergman?

Mr. BARBEE. Yes, sir.

Chairman ENGLE. Now this permit, did that relate to riparian or appropriative rights?

Mr. BARBEE. Well, it is filed rights. There was a right filed in 1886 for all the water in the creek, except during floodtime and in 1890 it was refiled for 200 inches. I think there was a chink in the law that you had to specify a little more definite how much water you were taking and the point of diversion and where it was to be used. I presume there was a reason for the refiling. I don't really know.

Chairman ENGLE. Have you been served in this action?

Mr. BARBEE. Yes, sir.

Chairman ENGLE. I take it you found it necessary to employ counsel?

Mr. BARBEE. Yes, sir.

Chairman ENGLE. Any questions by the committee?

Mr. YORTY. Were you here, Mr. Barbee, at the time of this O'Neill-Vail suit?

Mr. BARBEE. No, I was not. I beg your pardon on the other—I am also a riparian for about a mile and a quarter or a mile and a half.

Chairman ENGLE. You are speaking now——

Mr. BARBEE. In addition to the filed rights.

Chairman ENGLE. When you are speaking of that you are speaking of the Santa Margarita?

Mr. BARBEE. No. It is called the Temecula Creek at that point.

Chairman ENGLE. Temecula Creek, and that is spelled T-e-m-e-c-u-l-a?

Mr. BARBEE. Yes, a tributary to the Santa Margarita.

Mr. POULSON. Who were you served by?

Mr. BARBEE. That I don't know. I wasn't served. They served my wife.

Chairman ENGLE. Thank you very much, Mr. Barbee. Is there anything you care to add to what you have stated already? We are personally interested in this, as is the rest of the committee.

Mr. BARBEE. I think the whole thing is ridiculous. [Applause.]

Chairman ENGLE. You might add, also, that it is expensive, Mr. Barbee.

Mr. Joe Hayes.

## STATEMENT OF JOE HAYES

Chairman ENGLE. Mr. Hayes, my memorandum shows that you live a mile and a half north on the Santa Margarita River?

Mr. HAYES. No, we are about a mile north of the river.

Chairman ENGLE. You are north of the river?

Mr. HAYES. Yes, north.

Chairman ENGLE. And you own 158 acres?

Mr. HAYES. That is right.

Chairman ENGLE. Lemon and avocado and general farming?

Mr. HAYES. We only have about 5 acres planted to lemon and avocados.

Chairman ENGLE. How long have you been on the river?

Mr. HAYES. Well, we have been there since 1946 when I got out of the Army. We moved out on our place then.

Chairman ENGLE. And how long was your predecessor in interest there, do you know?

Mr. HAYES. Well, it dates back to 1890 when it was homesteaded by one of the residents' grandfather who is still living in the neighborhood.

Chairman ENGLE. What kind of water rights do you have?

Mr. HAYES. Well, we get our water from a well. Originally I think they got water from the spring that was not on the property, but that right has now been lost from nonuse, so we get all our water from the well.

Chairman ENGLE. Have you been served in this action?

Mr. HAYES. My wife has been served but I was not home at the time.

Chairman ENGLE. Since they served your wife you are a party too, aren't you?

Mr. HAYES. Well, that is the way I figured it. I figure we both of us are.

Mr. SAYLOR. Who served you?

Mr. HAYES. Well, it was the United States marshal. I don't know who it was.

Mr. SAYLOR. Do you know whether it was the marshal or whether he was a deputized marshal?

Mr. HAYES. Well, just what the wife told me; she said that he introduced himself as the United States marshal and handed her the papers.

Chairman ENGLE. How does your use of water from that well interfere with the Santa Margarita River?

Mr. HAYES. Well, it is not going to interfere at all until it rains and fills up my little basin and it runs over and finally gets down to the river. If there is any water leaking out of my place now it is very, very small, the way I see it.

Chairman ENGLE. How deep is your well?

Mr. HAYES. Well, it is 42 feet deep. We pump about 20 gallons a minute.

Chairman ENGLE. That doesn't irrigate very much ground, does it?

Mr. HAYES. No; 5 inches is all we have to pump now, as they are young trees.

Chairman ENGLE. Any further questions?

Mr. POULSON. Since you state that you are quite sure there is no water that they would be able to utilize, why this action of the Justice Department? How much do you estimate it is going to cost you personally when they not only couldn't get any water out of you, or to defend——

Mr. HAYES. How much would it cost me to prove that they couldn't get water?

Mr. POULSON. I mean to defend what rights, if any, you have.

Mr. HAYES. Well, gosh, I have got no way of figuring that out.

Mr. POULSON. You haven't got your bill from your lawyer?

Mr. HAYES. I know how much it has cost me up to now, and I would say I can't go too much further along that line.

Mr. POULSON. I don't want you to be specific—I am not being an attorney—I just want to develop the fact that it is costing you a lot of money for which there will be absolutely no value taken by the Government, or anybody else.

Mr. HAYES. That is absolutely right.

Mr. SAYLOR. Mr. Hayes, the questions I am going to ask you now I think are in point, because you are the first one that I know of that has come up here to testify that said he was a serviceman. Now, when you got out of the service did you negotiate a loan to buy your property through what is known as the GI loan bill?

Mr. HAYES. No, sir. It took my wife and I 8 years to buy that place out there. We started to buy it in 1943 and we finished in 1950. We did not have any loan and we didn't inherit anything or nothing. We just got it the hard way.

Mr. SAYLOR. Have you talked at all to, or do you know the people who owned that property for some period before you bought it?

Mr. HAYES. Well, my neighbor, Mr. King, it is his grandfather who homesteaded it, and there has only been about five owners since that date.

Mr. SAYLOR. Do you know whether or not the Kings were related in any way to the O'Neills and the Vail family?

Mr. HAYES. Not to my knowledge, no.

Mr. SAYLOR. And as far as you know the predecessors in title, King and the other people that sold that property were never parties to the lawsuit involving the O'Neills and the Vails?

Mr. HAYES. Not to my knowledge, no, sir.

Mr. YORTY. Do you have any idea why you have been sued by the United States of America?

Mr. HAYES. Well, no, I haven't.

Mr. YORTY. Do you feel guilty of doing anything, any of the things that the complaint says you have done?

Mr. HAYES. Not in the least. I don't feel guilty and I figure this way, if the Government needs my land for the defense of the country, or for the public benefit I am willing to let them have it but I expect to be paid for it, if that is not asking too much.

Mr. YORTY. You did not see anything in this complaint about money being paid for the use of this water?

Mr. HAYES. No, sir, I did not. I didn't notice anything of that sort.

Mr. YORTY. This may not be exactly relevant, but since the service of that complaint upon you, has that changed your opinion of the Government of the United States?

Mr. HAYES. Well, no, because to me the Government of the United States is you and I, I mean the real Government, and it is just a matter of getting on the ball and seeing to it that we get our property rights. That is the way I feel about it. [Applause.]

Chairman ENGLE. Thank you very much, Mr. Hayes.

Mr. HAYES. Somebody evidently wanted this question asked. It says, "How far is the bottom of your well above the Santa Margarita River?" Well, my well is at the 700-foot elevation, and it is 42 feet deep, so you can figure from that. That is a long way above the river. There is a lot of hard rock between here and there.

Chairman ENGLE. Thank you very much, Mr. Hayes, for that statement. I am glad Mr. Hayes appeared because it demonstrates, I think to a lot of people, that these boys who came back from overseas came back awfully good Americans and they do have their grip on the fundamentals of how we ought to run a democracy. [Applause.]

The next witness is Mrs. William Lattimer.

561

**74**     SANTA MARGARITA WATER RIGHTS CONTROVERSY

### STATEMENT OF MRS. WILLIAM LATTIMER

Chairman Engle. Mrs. Lattimore, I see you are a mile and a half south of the river?

Mrs. Lattimer. Yes.

Chairman Engle. And 4 miles east of Fallbrook?

Mrs. Lattimer. Yes.

Chairman Engle. You have 38 acres?

Mrs. Lattimer. Yes.

Chairman Engle. You operate a well?

Mrs. Lattimer. Yes.

Chairman Engle. Have you also been served in this action?

Mrs. Lattimer. No, not as yet. I hope we won't get one.

Chairman Engle. How long have you been on that property?

Mrs. Lattimer. Well, my father bought it in 1945 and died this last year and my brother and I have inherited the property and we just have one little old tree, a crabapple tree. Our well is only 11 feet deep and it is near a spring where we have water running the year round which, if it was developed, which we hope to do some day, our future hope is to go ahead and plant avocados and citrus. The way things look, unless there is some change, it will be a little difficult.

Chairman Engle. Your father lived on the property?

Mrs. Lattimer. Yes.

Chairman Engle. For a number of years?

Mrs. Lattimer. Just since 1945.

Chairman Engle. Your father bought it in 1945?

Mrs. Lattimer. Yes.

Chairman Engle. Do you know anything about the property?

Mrs. Lattimer. No, I really don't. Mr. Anderson may have sold it before we got it—we bought it from him and I don't know how long he owned the property.

Chairman Engle. In any event, this 11-foot well you have is nibbling on the water. That is not taking very much?

Mrs. Lattimer. Really, we only pump once a week and our tank holds 500 gallons, and we have to wash dishes, you know, and scrub the floors with it; the bare necessities.

Mr. Saylor. Just for domestic consumption?

Mrs. Lattimer. Yes. It goes right back in the ground and reaches the river finally.

Chairman Engle. Your interest in this matter is the fact that you anticipate you might be the recipient of a bundle of papers in which the United States Government sends you greetings?

Mrs. Lattimer. Evidently.

Chairman Engle. You have been named as a defendant but you have not been served yet?

Mrs. Lattimer. Yes; that is it.

Chairman Engle. Then you are right in the middle of this.

Mrs. Lattimer. Oh, yes, almost.

Mr. Saylor. You mean they haven't caught up with you?

Mrs. Lattimer. That is right.

Chairman Engle. It is amazing what the Government interests itself in. I am surprised to find out that the marshal hasn't been around here serving papers. Maybe we ought to clarify the record: This is Mrs. William Ardyth Lattimer?

Mrs. LATTIMER. Yes, that is right.

Chairman ENGLE. Are there any further questions? Thank you very much. We appreciate your appearance and your testimony.

Mr. Felix Carnsey.

## STATEMENT OF FELIX CARNSEY

Chairman ENGLE. Mr. Carnsey, my memorandum shows here that you are an appropriator, I assume, of the Santa Margarita; is that correct?

Mr. CARNSEY. No, I am over in DeLuz; that is 11 miles from here over the hills and the DeLuz Creek comes into the Santa Margarita just above the proposed location of the DeLuz Dam.

Chairman ENGLE. In other words, the DeLuz is a tributary feeding the Santa Margarita?

Mr. CARNSEY. That is right.

Chairman ENGLE. And are you a defendant or have you been served in this action?

Mr. CARNSEY. I have been served twice, the first time by a United States marshal and the second time by a fellow in a new Chrysler 1951. I am quite sure that he was a deputy of some sort and he was lost. He had a whole stack of summons in the back of his car, and we have a sign on the front of our place, so I guess he was looking down his list and he finally saw one name he could find. In those hills he was kind of lost and I didn't give him too much information about where he could find my neighbors. But the thing that kind of griped me on that point was that they keep talking about having efficiency in Government and here they have a fellow in a new car who has probably gotten three or four hundred John Does with names on them, and they send him out to DeLuz. They don't give him a list of the people that live in DeLuz and how the devil is he going to find them? It just isn't sense. I don't know what they pay him or what they give him, but if it is piecework maybe they are doing all right. If he gets paid by the day he was not earning anything that day.

Chairman ENGLE. Especially when they gave you a double shot. They want to be sure, I assume, that they got you in court.

Mr. CARNSEY. They haven't given my wife one yet, but they are going to put her name in it, in filing her answer.

Chairman ENGLE. You might as well get the whole family in there. Tell me, how much water do you use?

Mr. CARNSEY. Oh, all I can get now.

Chairman ENGLE. What does the permit call for?

Mr. CARNSEY. Well, I have two of them. The first one was taken out in 1939 and after we had done considerable water development, and that was permit No. 5505; it called for 200 acre-feet on Cottonwood Creek, and Cottonwood Creek is a tributary to the west branch of the DeLuz Creek. There is an east and a west branch and they join and eventually wind up in the Santa Margarita. I am on a tributary of a tributary, quite a long ways away, I thought, anyway, from anything that would be bothering Camp Pendleton.

Chairman ENGLE. I notice here that this property is one that has been in the family for a great many years. Is that right?

Mr. CARNSEY. Yes; both of my grandparents bought relinquishments from the original homesteaders in the 1880's. I think they

**76**      SANTA MARGARITA WATER RIGHTS CONTROVERSY

actually bought the relinquishment before it was officially surveyed and subsequently I bought 80 acres, an 80-acre plot from my aunt. She and my uncle had purchased 80 acres; they purchased about 200 acres and I bought 80 acres of that space in between the upper 160 and the lower 160 which my grandfather owned.

Chairman ENGLE. In other words, you and your ancestors, your parents and your grandparents, three generations of you, have been on this property or substantially——

Mr. CARNSEY. That is correct.

Chairman ENGLE. Substantially the same property and all of that time you have used a certain amount of water?

Mr. CARNSEY. There might be one correction on that. Since probably 1883 or 1884 we have owned 360—320 acres, and then in the intervening 80 acres, that has only been in our family since—I have forgotten now.

Chairman ENGLE. That was too far back?

Mr. CARNSEY. It was about 30 years.

Chairman ENGLE. At least that was before this litigation had come along?

Mr. CARNSEY. Oh, yes, considerably.

Mr. SAYLOR. Before the Navy came into Camp Pendleton?

Mr. CARNSEY. Yes. I am interested in your comment on this water suit between the Vails and Santa Margarita Ranch. I did not testify for either side but I was putting in a busy day fishing on the O'Neill Lake, as they call it, and I thought, really, they were going to take me. About 15 cars came out in old Pierce Arrows and what-not—I guess they brought the whole court out that day to look at some of the property—and there were "no fishing" signs all over the place.

Chairman ENGLE. In any event, it never occurred to you, I suppose, at that time that the Santa Margarita Ranch and the Vails were dividing up the river and all of the tributaries and all the watershed?

Mr. CARNSEY. No. It hadn't occurred to me at that time. Along about, well, along around 1939, when I made my original filing on the water, I got to thinking that before I went into it too far it might be a good idea to file on it and I did. And you go through the record procedure of posting notices, and of course the department of water resources notifies everyone below you that you have filed on this water. I guess probably a week or 10 days after it was filed a representative from the Santa Margarita Ranch did come up and look the situation over, but they did not file a protest on it and never at any time since have they.

Chairman ENGLE. When was that?

Mr. CARNSEY. Well, that would be in 1939.

Chairman ENGLE. Are there any questions?

Mr. SAYLOR. Yes; I would like to ask one. Mr. Carnsey, was any member of your family a defendant in this suit between the O'Neills and the Vails?

Mr. CARNSEY. No.

Mr. SAYLOR. As near as you know when this suit was decided it was never considered by your grandfather or your parents, who owned this property, that it was in any way affected by any decision that happened in that case?

Mr. CARNSEY. No. There was never any question about it. After all it was on the Santa Margarita that they were having the arguments and we were over on the De Luz.

I would like to go a step further, though, on this. In 1949 I built an earth-fill dam. I had been talking about building it and the local Soil Conservation Service came out and checked it all over and felt that it would be worth while so we built it. And at that time I asked them if they thought that it would be necessary for me to file on the water.

They said, "Well, you have already filed on it, haven't you?"

I said, "Yes."

"Well, that ought to be all there is to it." He said, "Nobody else filed on the water and you might as well build a dam. They are building all around here, so why shouldn't you?"

So I built my dam and then I applied for an additional intake on my gravity line since the first filing, and my dam was built below the inlet on our first filing—it was the only suitable place for a basin so I could get the gravity flow down to the reservoir where we use it, and from there on down I have to pump it in with a little booster engine. After I built the dam and notified the department of water resources—I sort of kicked myself because I think that is why I wound up being one of the first named defendants—I got appropriator's rights and they were the first ones to be named on this, I gather. The department of water resources said:

Well, you can't do this on your original appropriation. You are trying to store water here and that will call for a new appropriation.

So they sent me along a big manila envelope about as large as that large one there, and it was full of forms to fill out. And I filled them out and sent them in and they corrected them and sent them back. I would fill them out and send them back. We did that three or four times until I finally got them filled out to their satisfaction. Of course, the minute that was done Camp Pendleton was notified of this filing and an investigation was made immediately and a jeep drove in and they wanted to see our original reservoir. They went up and looked at our dam and everything that we had and wanted to know why—wanted to know whether I was worried or not. I was. I was thinking of 13,999 guys helping us on that deal, and I figured that if Uncle Sam wanted to stop me it would be me against Uncle Sam all alone. They didn't file any protest, though, and it went along until August 1950, and the division of water resources gave Camp Pendleton a second opportunity to file and again nothing was done about it. So I was thinking that that would indicate that the proper officials down there, after investigating and everything, felt that at that time I wasn't bothering them at all.

The whole thing boils down to this: That if this suit is right, and it winds up that you are going to be at the whim of an official—if you happen to have some good ones down there, fine, maybe we can use that water—but you can't develop this country that way, when it takes 5 years to have an avocado tree or any other kind of a tree growing, and then just have one time when there comes a dry cycle and you are beat. Furthermore, they allege that it is the pumping of all these people that is causing the difficulty, and possibly they are

right in a sense, but over in De Luz you have a situation which would have some bearing on it.  We have wet cycles, and then we have water going down there and sometimes we are rained in for 2 weeks when we can't get into Fallbrook, and the same streams that were impassable for 2 weeks at a time haven't a drop of water in them at all, hardly, now, not even when it is raining.  And I believe that the officials down at Pendleton would verify the statement that they haven't had any water from the De Luz Creek even join the Santa Margarita during the flood, and that is in spite of some of our hills being burned off by fires that originated down there.  It looks like it is ridiculous for them to push this thing like they are doing.

Chairman Engle. Are there any questions?

Mr. Yorty. Just one question, Mr. Carnsey.  You pointed up a very important point in this controversy.  If that ranch had still been owned by the O'Neills and they had their opportunity to protest and didn't do it you would be safe, but you say the situation here, where the Federal Government refuses to be bound by the acts of its agents—they acted without the scope of their authority—they contend they had no authority to give anything away that belongs to the Government, and therefore if they can succeed in asserting that they own this property, even though you went to the State and notified them and did everything that would appear to a normal person reasonable, nevertheless they would still try to upset your rights and would not be estopped, as we call it in law, as would a private party, so that again I think for the benefit of our State legislators it shows the danger involved when these kind of people interpret the law and act upon it.  The kind we have in the Department of Justice.  It shows the danger of permitting the United States to buy on your stream without being very careful to safeguard the fact that your State water laws are not to be affected.

Mr. Carnsey. I don't think there is a person here except Mr. Veeder who wouldn't like to see the State laws safeguarded.  One thing I am wondering, though, how are you going to reconcile the situation where one Federal agency, the Soil Conservation, in this case, helps you build a dam and the Department of Agriculture, the Bureau of Production and Marketing even helps contribute to the cost of it—$750 is the maximum that was allowable that year—and then subsequently they turn around and tell you that you can't use it.  The whole set-up cost about $7,000.  If one  of them tells you to go ahead and build and gives you every encouragement and then another agency comes along and tells you not to use it, well what is the sense of it?

Mr. Saylor. Well, the attorneys representing the Department of Agriculture didn't happen to talk to the attorneys who represented the Department of Justice.  We have just had a couple of lawyers disagreeing.

Mr. Poulson. That is just another sample of bureaucracy in action?

Chairman Engle. At this point we will take a short recess.

(Short recess.)

Chairman Engle. The subcommittee will please come to  order.  At the recess Mr. Carnsey was testifying in answer to some questions asked by the subcommittee.  The Chair didn't have any desire to cut the members off at all.  The Chair just wanted to give the court reporter a chance to rest his fingers, which I had been trying to do for 15 minutes.  Now the Chair will recognize Mr. Poulson or Mr. Saylor.

Mr. Poulson. I think I answered my own question by saying that was another example of bureaucracy in action.

Chairman Engle. The chairman will recognize Mr. Saylor.

Mr. Saylor. No further questions.

Mr. Yorty. Mr. Carnsey, you asked me a question and if the chairman will permit me I can answer it best by asking Mr. R. J. Marks to stand up, if he is here. Mr. Marks I might state, showed me one of the most interesting letters I have had about this controversy in which he explained to me that he received a loan from the Federal Government to develop water on his property which the Federal Government alleges he does not own. Is that correct?

Mr. Marks. Yes.

Mr. Yorty. That was the answer to your question.

Chairman Engle. Are there any further questions? Thank you very much, Mr. Carnsey. We appreciate your statement and we hope you get to some safe land.

Mr. Carnsey. I think all of us appreciate what you fellows are doing for us here with your problem of getting out here and going through all this hectic rush and all.

Chairman Engle. Now, Mr. Art King? Mr. Charles Stubblefield?

Mr. Stubblefield. Yes, sir.

## STATEMENT OF CHARLES STUBBLEFIELD

Chairman Engle. Mr. Stubblefield, I observe that your home is in Rainbow Valley?

Mr. Stubblefield. That is right.

Chairman Engle. You have about 160 acres, is that correct?

Mr. Stubblefield. That is correct.

Chairman Engle. General farming, with a pump?

Mr. Stubblefield. Yes.

Chairman Engle. Your property was homesteaded about 1890?

Mr. Stubblefield. Yes, sir.

Chairman Engle. Formerly occupied by your parents?

Mr. Stubblefield. Not my parents, my wife's parents.

Chairman Engle. All in the family?

Mr. Stubblefield. Yes.

Chairman Engle. Now, has there ever been any question about your use, your right to use water?

Mr. Stubblefield. None whatever.

Chairman Engle. Are you a defendant or have you been served in this action?

Mr. Stubblefield. I wasn't served but my wife was served, but they got her name wrong, but then we went ahead and answered it, anyhow.

Chairman Engle. Will you state to the committee your relationship, the relationship of your property to the Santa Margarita River and the Santa Margarita watershed?

Mr. Stubblefield. Well, we are on the Rainbow Creek that enters the Santa Margarita River. It is a tributary of the Santa Margarita River. It is about 8 miles from here on 395, the new 395 as it runs back of Red Mountain Ranch down into the Santa Margarita Creek.

Chairman Engle. I take it you are not a direct diverter from the stream but develop your property by use of wells?

567

Mr. STUBBLEFIELD. We have wells; yes, sir.  I have five wells on the place.

Chairman ENGLE. Has water been used on this particular property since 1890?

Mr. STUBBLEFIELD. Oh, yes.  It was not used a great deal until 1920.  When my wife's father started homesteading, he died and mother finished up in 1891 and got the patent permit in 1900, and then she sold it and got all mixed up in the title.  She sold it on a kind of a contract and the fellow never paid anything but interest, hardly.  It got all mixed up and I said, "Let me handle it and I will straighten it out and take the place," so we did that.  There wasn't much water used before then.  Then we put down the wells and have about 30 acres a well, and the water came from the wells.

Chairman ENGLE. You have been more or less a continuous user since 1920?

Mr. STUBBLEFIELD. Well, until we knocked out most of the lemons, and then my son came back from the Pacific and he took it over and he raised some winter summer squash and then raised a couple of crops of watermelons and different things of that kind; garden truck.  But this year he didn't do any because the water had gotten so low from this drought.  He landed down at San Luis Rey where they had plenty of water this year and he is living in hope that it will rain this year and he can come back on the place next year and use the water.

Mr. YORTY. Just one question.  Were you here at the time of the O'Neill-Vail suit?

Mr. STUBBLEFIELD. Yes.

Mr. YORTY. Did you have any reason to believe that any of your rights were affected by the litigation between those two people?

Mr. STUBBLEFIELD. No, sir. I had no intimation of that and I never had heard of their interfering with the wells, anyhow, wells that shallow, only a few feet down into hard rock.  It would take a geologist to estimate how many years it would take for that water to percolate through that hard rock and go down through to the O'Neill property.  I think it would take a lifetime.

Mr. YORTY. You don't feel that you are guilty of the things you are accused of in that complaint?

Mr. STUBBLEFIELD. I don't feel a bit guilty.  My conscience is perfectly clear.

Mr. SAYLOR. Did you ever think, Mr. Stubblefield, that because of the fact that you owned the ranch on this river that you were interfering in any way with national defense?

Mr. STUBBLEFIELD. It never entered my mind until I read that complaint and then I did feel kind of bad.  I read it over and I couldn't hardly believe it, so I am not worried about it.

Mr. SAYLOR. In other words, you personally feel that there is nothing that you have done in the conduct of farming on your property which your people have cut out of the brush out here, and homesteaded and have done it in the good old-fashioned American way— you have done nothing but help and be a good American citizen?

Mr. STUBBLEFIELD. That is all.  I furnished a son for the Army, too.

Mr. SAYLOR. You furnished a son for the Army?

Mr. STUBBLEFIELD. He was in it from Guadalcanal to Korea.

568

Mr. SAYLOR. And there is nothing that any of the neighbors around there have ever pointed a finger at you, or anybody that lived up there, and said that because you were doing the thing in a good old-fashioned American way that you weren't a good American citizen?

Mr. STUBBLEFIELD. Well, if they pointed a finger at me I didn't see them.

Mr. POULSON. You have told us how you feel. How would you feel if they take the water away from you?

Mr. STUBBLEFIELD. Well, I tell you, I don't believe I could stay here. I don't believe it would be my home any more. I feel it would be a a tragedy because they say in the complaint—I suppose you gentlemen are familiar with it—they say that the Government would be magnanimous—I don't think they use that word—but they would leave use enough for domestic use and for stock watering. So I suppose they still think what they were saying back there when I was a little kid, that everything was just stock and it wasn't necessary to have the water on a creek; maybe a little bit of a garden, and just some stock grazers. I have an idea that that is what a lot of those folks in the East think it is yet. I don't know. I was just saying, telling my wife today, that we had a school teacher out from Ohio 3 or 4 years ago and we took her on just an excursion trip up around the Indian reservation. She couldn't believe her eyes. Several of the Indians came up to us and spoke and shook hands and talked very friendly, just as friendly as anybody and she said, "Well, we have just got to change our textbooks back there because we are still teaching that Indians live in tepees and wear feathers and are painted, and here you talk to them." So I believe that is the way a lot of those people are back there, about our property.

Chairman ENGLE. You had to employ an attorney, did you?

Mr. STUBBLEFIELD. Yes. Yes, we have. Anyhow, we thought it the safer thing, because I have quite a little property around. I also have 40 acres down here on the river. I signed away or relinquished part of my riparian rights to the Fallbrook Water Co. here in 1930, I think it was, so they could get enough riparian rights to come up here. Several of us did it.

Chairman ENGLE. You are sued on both ends?

Mr. STUBBLEFIELD. It seems like I am kind of in bad, although they served my wife under the wrong name, but we saw the attorney and he said we could put in an answer and set it up that way.

Chairman ENGLE. Thank you very much, Mr. Stubblefield. We appreciate your appearance and testimony.

Mr. STUBBLEFIELD. We are glad to have you out here. We feel that you are our friends and we sure need friends now. [Applause.]

Chairman ENGLE. Mr. Sam Roper.

## STATEMENT OF SAM ROPER

Chairman ENGLE. I observe that you are a landowner and your source of water has been utility district water entirely, is that correct?

Mr. ROPER. Yes.

Chairman ENGLE. You are a resident 1 mile north of town and own three-quarters of an acre?

Mr. ROPER. That is right.

82       SANTA MARGARITA WATER RIGHTS CONTROVERSY

Chairman ENGLE. You and your parents have been in Fallbrook for over 30 years?

Mr. ROPER. Yes, sir.

Chairman ENGLE. Are you a defendant in this action or have you been served?

Mr. ROPER. Yes, sir; I have been served.

Chairman ENGLE. You are both named and served?

Mr. ROPER. Yes, sir. I would like to make a brief statement here as some of the boys thought I should testify.

Chairman ENGLE. I would be glad to hear you.

Mr. ROPER. Before I do that I would like to say the whole area is grateful to you gentlemen for coming out. We know how busy you are and know it was a sacrifice. Mr. Vanech and Mr. Veeder have made many statements that I don't agree with. I read one statement where I believe it was before the Judiciary Committee of Congress, if I remember correctly, they said something to the effect that this suit would be tried in spite of hell and high water and no bunch of would-be lawyers in Congress would stop it. Now, frankly, you are a pretty slick looking bunch to me. I think you are a pretty nice looking bunch of fellows. The way a couple of you made eyes at the young lady up here reminded me that I have an eligible daughter, so if you do happen to be bachelors—— [laughter.]

Chairman ENGLE. We will discuss that off the record.

Mr. ROPER. Really, gentlemen, I came here to represent the Fallbrook Methodist Church of which I am a trustee. It is a small church.

Chairman ENGLE. You mean to tell me that the church has been sued?

Mr. ROPER. That is true. The church has been served.

Chairman ENGLE. Now, how do they sue a church? I would like to find out about that.

Mr. ROPER. Well, they served it on the preacher and I don't know from there where it was taken, but the point is that we have a small church there of about 100 people. The church is 65 years old. I am quite sure every person in this house will agree that during that 65 years that church has never done anything but tried to serve the people of this community. We haven't been sued before and we go along minding our own affairs.

I was talking to one of the oldest couples in the church yesterday, and I asked her to come to testify. She is 84 and her husband is 85. They homesteaded land. I saw a homestead deed in which it said that they were deeded this property and all the water and mineral rights under the land. They certainly thought that was a good deed because it was signed by the President of the United States. I believe it is good today.

Chairman ENGLE. It also said, did it not, that carried with it water used and acquired according to the local custom and uses?

Mr. ROPER. Yes.

Mr. SAYLOR. You mean to say, Mr. Roper, that the church has been charged with the same heinous crimes that all the other members of this community were charged with?

Mr. ROPER. Yes.

Mr. SAYLOR. The church does not grow any avocados, does it?

Mr. ROPER. No, sir. We only give water to a few Sunday school children in the morning. We tried to start a lawn and some of the

folks objected to the $2 a month that it cost us to water the lawn, so about all the water we use is just for the Sunday school children on Sunday morning.

Mr. Poulson. Well, the Baptist Church uses more water than you do, don't they?

Mr. Roper. Yes. We are thinking of suggesting that they be served. It happens that my father plowed these hills here with a team of horses and dug a well with a pick and shovel, the hard way. He did it because he didn't have any money to pay anybody else to do it. And there are many, many of these pioneers that have gotten their water exactly in the same way.

Mr. Yorty. You are talking about your own property now, not the church's property?

Mr. Roper. Yes. But we can go back to the church for just a minute, because we have a young minister here, and this is his first charge. I believe I can say that every denomination in town respects him because of his intelligence and his integrity. He was preaching about three Sundays ago on the question of whether a thing can be immoral, even though legal, and I thought he made a very good point to this effect:

Passing a law doesn't create morality. Laws are simply reflections of the judgment of humanity upon universal truths.

This matter of morality being greater than law has a direct application to the suit being filed against people of Fallbrook for water rights. The suit is being filed in a very legal manner. It may be that the Government will win its case—if it does it will be a very legal decision handed down by a very legal court. But let me ask, "Does the fact that it may be proven legal thereby mean that it is moral?"

The Fallbrook Methodist Church has been accused by the United States Government of stealing. According to the suit, all of us, because we have put water in our flower baskets and washed dishes in our new sink, and watered our lawns, have been stealing water from the Government. We, according to this suit, have broken the Eighth Commandment. We are put in the same class as a man who breaks into a bank and opens the safe and steals the money. It may be legal for the Government to do this, but is it moral?

Is it moral for the Government to confiscate our water which, in Fallbrook, amounts to the same thing as confiscating land without payment? The fifth amendment to the Constitution clearly states "nor shall private property be taken for public use without just compensation."

Is it moral for Government to deny our right of water which has been recognized for almost 100 years and in doing so, destroy our farms and homes and churches and futures and invested savings?

Is it moral for Government to say it needs water for Camp Pendleton when the commanding general at the camp and high Navy officials have stated in writing that they didn't need it because future needs would be met from water through the metropolitan water district from the Colorado?

Is it moral for an Assistant Attorney General to say before a House Judiciary subcommittee that most water users would not be required to answer the suit and then, after penciling in changes in his testimony, send letters saying that they would have to answer, causing inestimable confusion and expense and trouble?

As I say, it may be legal. But is it moral? Government as well as individuals should not consider itself to be beyond morality. Certainly the overwhelming majority of Government officials are thoroughly upstanding, fine, and morally conscientious. And yet there are evidently some who have lost their sensitivity to moral requirements—who believe you can do whatever you want to do, providing you make it legal, and who have substituted minimum legality for morality to the extent that 16,000 small landowners have their property, their homes, their savings and their futures put in jeopardy.

Gentlemen, that was said by a boy 25 years old, a mighty good American, and we up here really respect him.

Chairman ENGLE. He would make a good lawyer as well as a good preacher.

Mr. ROPER. We recently raised his salary and I made the same statement at the meeting, that had this boy studied law he would probably make $10,000 or $15,000 a year, and we pay him $250 a month.

Mr. YORTY. What is his name?

Mr. ROPER. Rev. Marshall Ketchum. This was published in the Fallbrook Enterprise on July 27.

There are a few points I would like to have you consider. Now, of course, that is the main point. The lawyers know all about the legal technicalities. I took it upon myself to turn my office, my wife and my secretary over the people of this community to answer these complaints free of charge. The answer form was approved by an attorney, and I wish Mr. Vanech and Mr. Veeder could be in my office when these old people, these old homesteaders, come in with tears in their eyes and say, "What is it all about? We have lived here 50 years. We haven't bothered anybody. We have sons in the Army. We have tried to be good citizens. We have a few hundred dollars in the bank and we have got to hire a lawyer and dissipate our life savings."

Now these are good people. The people of Fallbrook are the best people in the whole world. There are no rich people around this community, and in our little church there is not one single rich person. There is not one person in that church who can afford to hire a lawyer, including myself.

Now I point out to you that the Navy, when they bought Camp Pendleton, knew—they must have known to spend a hundred million dollars, to invest a hundred million dollars over there—that there had been times when the O'Neill Ranch, and when these hills were covered with cattle who starved to death and perished for lack of water in times like these, these drought seasons. They knew that. They knew many other things. They knew this stream was intermittent and they planned to provide for that and there is a way to provide for it. The committee that you heard quoted said that they should get the water from the Colorado River. These people, as I say, are peace-loving people around here. We had no troubles here with the Navy allocating the water. We gave and we took and we had a very friendly time. We had a plan to settle this whole thing. We can get along with anybody without the intervention of Mr. Veeder. About the only people in the world that the Falbrook Public Utility District couldn't make a deal with tomorrow are Vanech, Veeder, and Stalin. Thank you.

Chairman ENGLE. Thank you very much, Mr. Roper. I might state that the condition and the manifest hardship upon thousands of small people, the people who can't afford to hire lawyers, is one of the reasons, one of the major reasons why this subcommittee is here to see what they can do about it.

The next witness is Mary Golden. Is Mary Golden here?

## STATEMENT OF MARY GOLDEN

Chairman ENGLE. I take it that it is Mrs. Golden?

Miss GOLDEN. Miss Golden.

Chairman ENGLE. Miss Golden, the memorandum I have says that you live a mile southeast of Fallbrook and own 2½ acres and have

some avocados there as well as a residence. You depend upon the Fallbrook Public Utility District and you are a retired school teacher?

Miss GOLDEN. Yes.

Chairman ENGLE. And I see a list here of various churches, the Baptist, the Methodist, the Episcopal, the Assembly of God—the Adventists—do you represent all of them?

Mr. ROPER. She can't belong to all of them.

Chairman ENGLE. I beg your pardon. I thought maybe you were representing all these churches.

Miss Golden, we would be glad to hear your story about this suit.

Miss GOLDEN. Well, coming after Sam Roper is an anticlimax for you, but our case is like a good many of the humbler, smaller ranchers here, that is, ranches with a small acreage. We bought our land in 1937 and it was just a hilltop covered with cactus and sagebrush, and we started from scratch and worked it. We went in there when we didn't know anything about that work, but we developed it into a very nice place.

Chairman ENGLE. You refer to "we." I notice here——

Miss GOLDEN. That is another friend who is right here.

Chairman ENGLE. Charlotta Root? You are speaking for both of you?

Miss GOLDEN. Yes. And of course we had water trouble all along. We still have, but it is more and bigger now, though we get along.

Chairman ENGLE. What kind of a water supply do you have?

Miss GOLDEN. We belong to the utility district.

Chairman ENGLE. What you do is to have the district provide the water.

Miss GOLDEN. Yes. We couldn't have developed this farm, this ranch, if we would have had to sink a well, because we couldn't afford it. We put all our savings into it as it was.

Chairman ENGLE. And it boils down to this, doesn't it? If the public utility loses its water, you lose your ranch?

Miss GOLDEN. Yes; we lose too. But it hurts me plenty, here we are, encouraged to develop land, and then we get the subpena slapped at us. I don't know why my voice is going like this. It doesn't usually.

Chairman ENGLE. Well, don't worry about it.

Miss GOLDEN. Here we are, all these little ranches and we have small homes, but we haven't unlimited means.

Chairman ENGLE. Have you hired an attorney?

Miss GOLDEN. No; I haven't.

Chairman ENGLE. Have you been served with one of these pieces of paper?

Miss GOLDEN. I was served twice. I was served as an individual and I was served as a member of the board of trustees of the school, so we got it twice and we answered, but here we are with small means and the Government has unlimited means that we have paid for with our taxes. I think it is a vicious circle, myself.

Chairman ENGLE. Any questions?

Mr. POULSON. Miss Golden, when you were teaching school did you not teach your children that our Government was a fair and just Government?

Miss GOLDEN. Very, very much so, because I believed it myself.

Mr. POULSON. You believed it yourself?

573

Miss GOLDEN. You bet.

Mr. POULSON. And this is certainly not an example of that which you had faith in, and which your taught your children?

Miss GOLDEN. No, not when we were served.  We had heard about it, but we couldn't believe it because it was ridiculous to think of such a thing.

Mr. POULSON. And as the chairman said, you women have given your lives to helping the children whom you have taught, but you have put all of your earnings into this home of yours?

Miss GOLDEN. Yes.

Mr. POULSON. And if they are successful in the lawsuit, because they have these thousands of attorneys on our tax rolls, which we are all supporting, if they defeat you in this water suit, and one of the reasons may be because you haven't the means to fight them over the years, then you will be back——

Miss GOLDEN. Where we were.

Mr. POULSON. You will be back on the rolls of the rest of the country because of the fact that you have no home?

Miss GOLDEN. Yes.

Mr. POULSON. That is the vicious circle.

Miss GOLDEN. The only thing is we should live so long to finish that suit.

Mr. YORTY. Miss Golden, why haven't you hired a lawyer?  You know that you will have to answer.

Miss GOLDEN. Well, I will tell you, we are in the utility district.

Mr. YORTY. I see.

Miss GOLDEN. And we thought, all together, that we could take care of it.  I suppose if it had not been so, that we would have.

Mr. YORTY. Well, I am sure the utility district is looking out for your interests.

Miss GOLDEN. Well, they are a good utility district.  I can tell you that.

Mr. YORTY. I will go down the line with you and tell you that, too.  Could we ask Mr. Swing a question on that?

Mr. SAYLOR. You say you have been served not only as an individual but as a trustee of the local school district?

Miss GOLDEN. Yes, of the high school, the Fallbrook Union High School.

Mr. SAYLOR. And you trustees, who are doing nothing more than providing the members of this community—educating your children—providing them with the facilities which this community is best able to provide, are guilty of that heinous crime of stealing water?

Miss GOLDEN. It sounds queer, doesn't it?

Mr. SAYLOR. You haven't noticed anything different between the boys and girls that went to your school and the boys that you have seen wearing the uniform down here at Camp Pendleton, have you?

Miss GOLDEN. No; they are just fine youngsters.

Mr. SAYLOR. And it certainly seems strange, as Mr. Poulson brought out, contrary to everything that you ever taught to your children, everything that you and the people in this community have been brought up to believe, that by trying to be good citizens and provide your community with the necessities of life to enable them to go out

and make their way, that the Government, which they have been supporting so vigorously, and which you have been advocating, and we have all been advocating all our lives, to suddenly come along and now accuse you of being a criminal?

Miss GOLDEN. Yes; that is true.  Again that is queer.

Mr. SAYLOR. We never can tell how these things will go.

Chairman ENGLE. Miss Golden, we hope that you will not lose confidence in the Government.  There are five, at least, that are going to stick with you and help you out. [Applause.]  So you might find some justification for the things you taught those school kids for many years.  It is nice to be here, and we appreciate your coming up and testifying.  Thank you very much.

Miss GOLDEN. Well, I think it is fine that you folks are here.  It is certainly wonderful for us.

Chairman ENGLE. Mr. Yorty wants to ask a question of Mr. Swing at this point.  We will interrupt the procedure to do that, if our former colleague will yield for a question.

Mr. YORTY. I thought, as a matter of safety, that I would ask this question because when it came up I made a note of it.  I want to make sure that the answer would apply to all these people in the district.  I did not want to see them misled into thinking they may not have to employ counsel, unless you are answering for all of them.

Mr. SWING. No.  I am only retained by the Fallbrook Public Utility District to answer for the Fallbrook Public Utility District.  I have told these people at public meetings that each and every one of them must, without fail, answer the Government charges or else subject themselves to the danger of having the Government enter a default.  According to a letter I have seen which has been sent out by the Department of Justice they have until November 1 in which to do that.  If they do not answer by November 1 they will then be subject to having a default judgment entered against them which would enable the plaintiff to have the court issue any or all of the relief prayed for in the complaint.  Each defendant has a separate state of physical facts which that person has to set up, as I understand this type of litigation, in order to have their claims recognized by the court and entered in the final decree.

I am sorry that anybody would be misled, because I think that it is the individual defendant's responsibility.  The Fallbrook Public Utility District is doing everything it can to be helpful and Mr. Roper, as he testified, has had some printed forms which he has distributed, which were supposed to have been approved by some attorney.  That, as least, will prevent the entry of a default.  But they must, as I understand it, each one set up his own claim, as the complaint demands, that each defendant set up his individual claim on behalf of himself.

Mr. YORTY. I have a note, Mr. Swing, that Miss Golden has signed one of these short forms.

Mr. SWING. In propria personum.  This, of course, will prevent a default, but it will have to be followed up by an amended answer in which they affirmatively set up what amount of water they claim and on what they base it.

Chairman ENGLE. This is a fair example of the unusual hardship to which this multitude of people have been subjected by this type of proceeding.

Mr. SWING. Yes, it is. As I said before, never in the history of litigation that I have ever read or have ever heard tell about, has there ever been anything like this. And the plaintiff is now proposing that all of these defendants be made not only adverse to the Government but adverse to each other. Well, if each person should then undertake to sue each other, and that, as I understand it, is Mr. Veeder's idea of how to arrive at an adjudication so that each person would know just precisely what amount of water he was entitled to as against everybody else, then no single attorney could represent more than one single defendant, because every defendant being adverse to each other then one could not represent two conflicting claims. The result would be that instead of some 20 or 30 lawyers, as are presently in the case, there would, of necessity, according to ethics, have to be as many separate attorneys appearing for each separate defendant as there are defendants. And with this figure of 14,000 that has been mentioned, should everybody be a party, there wouldn't be enough attorneys in California and we would have to import some from Pennsylvania.

Mr. SAYLOR. I might say, Mr. Swing, that the attorneys of Pennsylvania are busy with their own problems back there battling the Department of Justice, too. They don't need to come out here.

Chairman ENGLE. Gentlemen, we have arrived at 10 o'clock. I observe that the memorandum here shows that each of those various churches, including the Methodist—I believe Mr. Roper answered for the Methodist—an answer must be made for each one of these church groups. Now we will recess at this time until 10 o'clock in the morning. The subcommittee will stand in recess at this time.

(Adjournment at 10 p. m. until 10 a. m., August 14, 1951.)

# SANTA MARGARITA WATER RIGHTS CONTROVERSY, CALIFORNIA

---

### TUESDAY, AUGUST 14, 1951

House of Representatives,
Special Subcommittee on Irrigation and Reclamation,
of the Committee on Interior and Insular Affairs,
*Fallbrook, Calif., Tuesday, August 14, 1951.*

Chairman Engle. The subcommittee will be in order.

The first witness this morning will be Mr. Franz Sachse, of the Fallbrook Chamber of Commerce. Mr. Sachse.

### STATEMENT OF FRANZ SACHSE

Mr. Franz Sachse (Fallbrook Chamber of Commerce). Chairman Engle, members of the committee, guests and friends of Fallbrook, I have been asked by the chamber of commerce to try in my statement today to pick up any loose ends that may remain after yesterday's testimony, and to again point out to you what we feel to be the basic and fundamental problems in this litigation. Before attempting to do this, I would like to introduce myself to you and, so to speak, "qualify" myself as a witness.

My parents bought land in Fallbrook in 1935. From that date on my father and I were both interested in Fallbrook's water problems and did what we could to assist in solving them. I was the attorney for the old irrigation district in the proceedings that dissolved it and created our present public utility district, and thereafter was active in Fallbrook's efforts to obtain its first water right on the San Luis Rey River. After my separation from the service in 1946 my wife and I moved to Fallbrook and took over the family grove. I was elected a director of the public utility district in 1946, and thereafter became its president, and served in that capacity until I was recalled to active duty in the United States Air Force in October of last year. I am here today on 2 days' leave from my station.

My wife and I make our living from our Fallbrook grove, and Mr. Saylor may be interested to know that it is one of the larger groves of the district—35 acres. It is a good and productive grove, and an asset to this community. Our local tax bill last year was just under $1,300. About 80 percent of our water supply comes from the Fallbrook Public Utility District pipes; the balance from our own well. Our land lies wholly within the watershed of the San Luis Rey River, not the Santa Margarita, yet we are named as defendants in this lawsuit and my wife has been served with summons and complaint. Without the water supplied us by the Fallbrook Public Utility District our property would literally dry up and blow away, because

89

there is absolutely no possibility of operating it on the water produced from our own well.

Mr. Engle yesterday opened this meeting by stating that he was primarily interested in two things: Whether or not this litigation was necessary, and whether or not the Federal Government was asserting rights over and above those that could be asserted by a private citizen in the same circumstances. I would like to take some of your time to speak specifically on those questions.

First, I will state flatly that this lawsuit is absolutely unnecessary. Mr. Swing has reviewed for you the conferences that led up to our memorandum of understanding in 1949. That memorandum was complete; it was based on the best engineering data obtainable, and was in accord with the recommendations of the Bureau of Reclamation, the United States Corps of Engineers, and the State division of water resources. It provided a sane and intelligent means of pooling the rights of the Navy and Fallbrook in the river; of supplementing those rights by further allocation of floodwaters from the State; and would have resulted in the utilization of all the waters of the river, plus a large flood-control factor, without the necessity of protracted and expensive litigation. Had that memorandum been put into effect, the De Luz Dam would today be rising for the benefit not only of the Navy but of all of this area, as a joint project with Fallbrook bearing its just share of the cost of construction and operation. This would have been accomplished through a democratic process of discussion around a conference table, without the necessity of intervention by the courts.

But we were not permitted to settle our differences in this fashion. Somewhere along the line after December 14, 1949, the Navy Department was told that it could not enter into this agreement. We were told, in effect, that we didn't know what was good for us, and that some omnipotent individual in the Department of Justice would prescribe how we should run our affairs, even though his prescription was contrary to that of the Bureau of Reclamation, the United States Corps of Engineers, and the State division of water resources.

I believe this sort of dictation is not only un-American but bad business as well. Every attorney knows that a bad settlement is better than a good lawsuit. Certainly every Congressman has enough controversy in his daily work without trying to drum up more. From the standpoint of the farmers and property owners here in this area every dollar spent in litigation, lobbying, or controversy is wasted, and we don't like to be compelled to waste our dollars.

I do not believe that it is a part of the job of the Justice Department to create lawsuits, particularly when no need for disagreement or controversy exists. We have more important things to do in America today than indulge in lawsuits for the fun of litigating.

The second point I wish to make, and perhaps even more fundamental, is to point out once more the threat that is implied to all of this country by this lawsuit.

Following adjournment last night, Mr. Veeder repeatedly stated to citizens here that he was not asserting any rights over and above those acquired by the United States when it bought the Santa Margarita ranch from the O'Neills. I submit that this statement is untrue and can be demonstrated as such very easily. All we have to

do is consider the rights that could have been exercised by O'Neill, and compare them with the rights now asserted by Mr. Veeder.

The O'Neills were riparians, and as such had a right to use the waters of the river on their riparian lands for proper riparian uses. They had no right to store floodwaters, such waters being the property of the State of California, and subject to appropriation by any person who could put them to beneficial use. They had no right to use the waters on their nonriparian lands. If they became involved in litigation over these water rights they sued or were sued in the State courts and the case was decided by State law.

What about Mr. Veeder's claims? First, he sues in the Federal courts. Second, he asserts a riparian right to the waters of the stream for all of the uses of Camp Pendleton, yet many thousands of the troops stationed on that reservation are not located in the Santa Margarita basin and the land to which water will be provided by the Navy is not now and never was riparian to that river. Mr. O'Neill could not have diverted Santa Margarita water to buildings in the San Luis Rey watershed. He could not have used it to irrigate bean fields in the watershed of San Mateo Creek. The United States asserts both of those rights, as I understand their complaint.

But the greatest difference between the rights asserted by the Federal Government in this case and those which you or I or Jerome O'Neill could have asserted is this: Our western water law is based upon a doctrine of appropriation. For over 150 years we in the semiarid West have recognized the essential wisdom of putting our limited water resources to work. We have not permitted a mere property owner, because of his riparian situation, to monopolize our waters. We have always held that surplus waters, floodwaters, were public domain, to be allocated to him who can first and best put them to beneficial use. Since the settlement of the West we have irrigated our farms and groves, worked our mines and industries and generated our electric power on the basis of appropriative permits granted by the State.

The Santa Margarita is a small stream. It is not a navigable stream by any stretch of the imagination. Surely its waters would have been allotted and adjudicated by the State except for the fact that Uncle Sam is today the owner of the Santa Margarita ranch. Because of this fact he now proposes a dam, with some 200,000-odd acre-feet of storage, to trap the winter floods. He does not propose that the State consider the correctness or the wisdom of his decision or have anything to say about how it is put into effect or who will derive the benefits from the project. I do not believe that the Federal Government has ever before asserted a prior right to the surplus floodwaters of a purely intrastate stream.

If the theory of this complaint should become the law of the land the whole concept of water law upon which we have developed the West will cease to exist. Literally thousands of irrigation projects, large and small throughout the West will have their water rights jeopardized. Let me emphasize again what Mr. Swing pointed out so clearly yesterday: the assertion of this right by the Federal Government does not end at the boundary of Camp Pendleton. It runs to the top of Palomar Mountain and the interior of Riverside County. You heard yesterday from landowners 30 miles away who are being sued.

If the mere ownership of riparian land by the United States results in a paramount sovereign right in the Federal Government to all the surplus waters of a stream, then I submit that there is no stream in the West to which the Government could not lay claim tomorrow.

There is an Indian reservation on the San Luis Rey River to the south. Does the Federal ownership of that land permit the attack in Federal courts of every water right above and below it? There are several military installations on the San Joaquin River. Can their needs now be asserted to destroy the rights granted by the State 100 years ago? If this is the law, gentlemen, you had better put everything else aside and change it, fast.

One last word as to the hardship. Mr. Veeder has stated that the practical effect of this suit is that every defendant is in effect suing every other property owner. Multiply 14,000 by 14,000 and you will arrive at a figure of 3,960,000 lawsuits. Multiply this by $200 each, a minimum attorney fee, and we have a figure of about $792,-000,000—a fair-sized sum even to Congressmen used to astronomical budget figures.

That is not all it has cost this area. Every landowner named as a defendant has suffered an immediate decline in the value of his land—how many millions that may represent I couldn't guess.

There remains the question of what can be done. First, there is the solution suggested by Mr. Swing: Let the Congress follow the recommendation of other governmental agencies, of the Bureau of Reclamation, the Corps of Engineers and the State division of water resources and proceed with the construction of a multipurpose dam on the river, for the benefit of all. And at the same time provide for the immediate emergency as well as future possible emergencies by providing Colorado River water through the metropolitan aqueduct.

Second and most important, let the Congress clearly and unequivocally state that the intrastate waters of any State are subject to its exclusive control, and that when the Federal Government happens to be a landowner or water user its rights are no greater and no less than those of any private citizen of the State. In the last analysis, the United States has always the protection of its power of eminent domain. I do not believe we need also allow it the power of expropriation.

May I thank you gentlemen in behalf of all of Fallbrook for coming here. Surely you must again have been impressed with the value and importance of such meetings as this. Obviously Fallbrook could never have told its story in Washington with the same effect that we can tell it here. We have you to thank for giving us the opportunity. [Applause.]

Chairman ENGLE. Mr. Sachse, that was a splendid summarization.

Mr. SACHSE. Thank you, sir.

Chairman ENGLE. We very much appreciate it. Are there any questions? Mr. Poulson?

Mr. POULSON. I was very much interested in what you stated, that you not only question the right of the taking of the riparian rights, but also the matter of this floodwater. Now that is an additional trespassing, according to your opinion, is it not?

Mr. SACHSE. Mr. Poulson, the law of California has always recognized winter floods as the public domain of the State subject to be

allocated by the division of water resources to him who can first trap them and put them to beneficial use. The mere ownership of land through which the flood may flow has never given the property owner that right.

Mr. POULSON. You made a very fine statement.

Mr. YORTY. Mr. Sachse, has the State ever authorized the DeLuz Dam?

Mr. SACHSE. The State has not. At an earlier date the Navy Department did file an application but that application is dead, and from things I have heard from the counsel for the Navy, the present counsel for the Navy, I think they are a little embarrassed that the application was ever filed.

Mr. YORTY. Are you familiar with the salt water intrusion?

Mr. SACHSE. Only as a layman and by hearsay. I wouldn't want to express my opinion on it.

Mr. YORTY. That is all.

Chairman ENGLE. Thank you very much, Mr. Sachse.

Mr. SAYLOR. Mr. Sachse, I want to make this observation with regard to your comment about the number of lawyers. After I talked to Mr. Swing last night, when he was interrogated last, just as we were leaving, I had the thought as to where we might get them, and not from Pennsylvania. We could just go down to the Justice Department and get all the excess lawyers they have got down there and take them off the Federal payrolls and try to give them a decent job where they can go out and make a living. [Applause.]

Mr. Sachse, one other thing. As a layman I would like to ask you this question. The complaint, as I understand it, alleges the immediate need for this water at Camp Pendleton. Is that not correct?

Mr. SACHSE. That is my understanding, sir.

Mr. SAYLOR. It is the theory of lawsuits, those which we have known, that lawsuits always take time, and therefore the biggest lawsuit that has ever been started is going to take at least an unusual length of time, is that not correct?

Mr. SACHSE. Unquestionably.

Mr. SAYLOR. Therefore, the statement itself must be untrue because if they need water that urgently why have they not taken what all of the Federal agencies agreed is the immediate solution to that problem of getting water, and that is the metropolitan aqueduct which they say will take no more than 6 months?

Mr. SACHSE. I hope you will take that thought back to your colleagues, Mr. Saylor. I think you hit the nail right on the head.

Mr. YORTY. Mr. Sachse, have you seen this so-called short form that some of the people in this area are filing in the court?

Mr. SACHSE. I have.

Mr. YORTY. Of course, I think it is obvious that what Mr. Swing said yesterday is correct, that this does not set up the rights of the various persons who are using it and it would be totally inadequate to protect their rights if this thing should ever get to the point of going to trial.

Mr. SACHSE. I think the only useful purpose it served, and that was a very useful purpose, was to put these people who filed it beyond the possibility of an immediate default, but, beyond any doubt, an amended answer will have to be filer should this case go to issue.

Mr. YORTY. I think sometimes people don't understand that when a lawyer undertakes to appear in an action on behalf of a client, and files their answer for them and signs it, that he is not in a position to simply get out of the suit, even though he might have to put in a year's time in that suit, and for that reason it is impossible for him to take a small fee that might be the proper fee for just the filing of a formal answer, because he has to consider that he is in a lawsuit that may last 2 years and he cannot withdraw without the consent of the court, even though the client does not pay him. Of course, no lawyer can afford to put in 2 years free of charge, no matter how great the hardship is on his client, so the lawyers in the community have a very serious responsibility here and I suppose, for that reason, it has created a problem with people who are unable to afford counsel and who have resorted to this short form. I think we would be making a mistake if we did not point out that if this lawsuit is permitted to go on, as the United States attorney would like to carry it on, all of these people are eventually going to have to file amended answers and when they do that it is going to have to be a more formal answer and they are going to have to have counsel and it is going to be expensive. The hardship has just been postponed unless we are able to stop this suit.

Mr. SACHSE. That is absolutely correct.

Chairman ENGLE. Thank you again, Mr. Sachse.

Now we will hear from Mr. Harry H. Smelser who, I think, will speak for the Odd Fellows. Is Mr. Smelser here? I understand this is Judge Smelser, although my notes do not indicate that.

## STATEMENT OF JUDGE HARRY H. SMELSER

Chairman ENGLE. Judge, we are glad to have you here.

Judge SMELSER. I am pleased to be here.

Chairman ENGLE. I take it you are representing the Odd Fellows?

Judge SMELSER. Yes, sir.

Chairman ENGLE. And I understand the Odd Fellows run one of Fallbrook's oldest cemeteries?

Judge SMELSER. Since about 1880.

Chairman ENGLE. And has this diligent attorney general's office located somebody out there that ought to be served?

Judge SMELSER. Not as yet, but I understand they have located some who live in housing projects that don't own property, and they are serving them already.

Chairman ENGLE. Have they served the cemetery as an association or as a district?

Judge SMELSER. No, they are just serving the lodge.

Chairman ENGLE. Just serving the lodge because you use water in connection with your operations, I suppose?

Judge SMELSER. A very little water.

Chairman ENGLE. You water some lawns?

Judge SMELSER. No, we don't have any lawns.

Chairman ENGLE. In other words the lodge, as a fraternal organization, has been sued, is that right?

Judge SMELSER. Yes.

Chairman ENGLE. And served?

Judge SMELSER. Yes, sir.

Chairman ENGLE. Now, what water does the Odd Fellows Lodge use?

Judge SMELSER. Oh, about, maybe, one or two hundred gallons a month in our hall, and that is all.

Chairman ENGLE. Just drinking water?

Judge SMELSER. That is all.

Mr. SAYLOR. They haven't accused the dead of using any water, have they?

Judge SMELSER. Not that I know of.

Mr. SAYLOR. I don't doubt, from what they are doing, that they will probably accuse even those who are dead of some crime under this process.

Chairman ENGLE. As I understand it, the lodge has been receiving water since 1880?

Judge SMELSER. Yes, sir.

Chairman ENGLE. And do you understand that the right of the lodge to use that water is being put in issue by this complaint?

Judge SMELSER. I would judge so.

Chairman ENGLE. And that you are required to defend it?

Judge SMELSER. Yes, sir.

Chairman ENGLE. Just by using it for purely drinking purposes?

Judge SMELSER. Yes, sir.

Chairman ENGLE. Which has occurred since 1880. Have you gone to the expense and trouble of employing counsel?

Judge SMELSER. Not as yet. We are waiting to see what the results will be due to the fact that the Federal judge has given us until the 1st of November to file an answer, without being in default. We are just holding up for the present.

Chairman ENGLE. You think that perhaps the attorney general's office may have sense enough to dismiss this action as far as the Odd Fellows Lodge is concerned?

Judge SMELSER. Not only as to the Odd Fellows Lodge, but for all of Fallbrook.

Chairman ENGLE. Well, I hope so, but especially with reference to all of these very, very small users, such as is indicated in this instance. Are there any further questions?

Mr. SAYLOR. Judge, I would like to ask you, were any of the members of the O'Neill family or the Vail family members of the Odd Fellows Lodge here in this community when they were involved in this lawsuit that we have heard referred to here?

Judge SMELSER. No, sir, they never have been.

Mr. SAYLOR. And the Vail family, or the O'Neill family have never owned a plot of ground upon which the Odd Fellows have their home or their cemetery?

Judge SMELSER. No, sir.

Mr. SAYLOR. And you were not a party in this suit in the State courts between the O'Neills and the Vails?

Judge SMELSER. No, not directly. Mr. Vail came over—I was president of the chamber of commerce at the time—and he informed me if we would keep quiet and keep out of the suit he would try and build a dam up above here and furnish us water by gravity. We accepted him at face value.

Mr. SAYLOR. That is all. Thank you.

Chairman ENGLE. Thank you very much, Judge.

Judge Smelser: I would like to ask one question, not for myself, but I have had a lot of people come to me and they say that this suit is simply a trial balloon and they have heard indirectly—and I know it can be true—that the Government figures on buying a few acres down at New Orleans and taking over the Mississippi Valley.   I just want to be able to answer them truthfully.

Mr. SAYLOR. Judge, if the theory of the Department of Justice in this case is true, they can buy a couple of acres down in New Orleans and take the waters of the Mississippi, and the first thing you know they will be back buying a couple of acres down on the Susquehanna and it won't be surprising for them to go in and be claiming all of its waters in Pennsylvania.

Chairman ENGLE. According to their theory, Judge—I think we might as well be frank about it—they could join all the millions of people in the watershed of the great Mississippi and all of its tributaries.   They could have the whole United States in one colossal lawsuit.   Now that is the consequence of this type of logic, and since you asked the question that is the answer we give you.   We think, though, that democratic processes are capable of preventing the Nation being completely embroiled in red tape and lawsuits.   At least if we can't there is something wrong with our parliamentary system under which we operate and we better start changing it.

Judge SMELSER. If they start with that it will be worse than the H-bomb.

Chairman ENGLE. Thank you, Judge.   We appreciate your statement.

Is Mrs. Wentworth here?   Evidently not.

Mr. Lawrence Lenfers.

## STATEMENT OF LAWRENCE LENFERS

Chairman ENGLE. You hold a patent signed by Franklin D. Roosevelt; do you?

Mr. LENFERS. Yes, sir.

Chairman ENGLE. Do you have it with you?

Mr. LENFERS. Yes, sir.

Chairman ENGLE. Would you mind handing it to the committee for its inspection?

Gentlemen of the committee, I have here before me patent Los Angeles No. 046987, being the United States of America and Lawrence A. Lenfers, particularly describing—not by metes and bounds— by sections, property containing 633.53 acres, and I will read the granting part of the patent.   The patent bears the signature of Franklin D. Roosevelt by the recorder of the General Land Office.

Know ye that there is therefore granted to you by the United States the tract of land above described, to have and to hold said tract of land with the appurtenances thereof and to the said claimant and to his heirs and assigns and to the heirs and assigns of said claimant forever, subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights as may be recognized and acknowledged by the local customs, laws, and decisions of the courts.   There is reserved from the land hereby granted a right-of-way thereon for ditches or canals constructed by the authority of the United States, excepting and reserving, however, to the United States all of the gold and other minerals in the land so entered and patented, together with the right of protection for mining and removing same pursuant to the provisions and limitations of the Act of December 29, 1916, Thirty-ninth Statute.

This deed, if I can find the date—it bears the date of the 8th day of December 1936. I think that is a significant statement and emphasizes the part of it referring to the acknowledgment of all local customs, laws, and decisions of the courts pertaining to water rights.

Mr. SAYLOR. Mr. Chairman, is that properly enrolled and recorded?

Chairman ENGLE. It shows its recordation. It is rather thin here, and I suppose I could get it if I studied it long enough, but it was recorded in the county of Los Angeles.

Mr. Lenfers, I assume from reading that patent that you figure local law controls with reference to water rights on your property and that you have the highest sort of acknowledgment from the President of the United States in your patent?

Mr. LENFERS. That is what I can't understand: why the Government of the United States will turn around and give you that and then, after having it and living there all your life, you turn around and find out you are being sued. Why are you being subpenaed in such a case after the Government gives you the rights for that?

Chairman ENGLE. That is exactly what this committee is trying to find out.

Mr. LENFERS. I know, on the other hand, they are always hollering about the charges for their water, but I heard a boy make a complaint last night that he was rationed in Camp Pendleton to 5 quarts of water a day. Now, it looks kind of bad for them to go to rationing water for the boys that have to go over to Korea to do their fighting and they turn around and feed and water their sheep. They water their golf courses and they water their flowers, but they turn around and ration that water which goes to the boys who go to Korea. They are rationed for their water.

Mr. POULSON. Are these golf courses for the officers?

Mr. LENFERS. Well, I understand they are because the boys that go to Korea very seldom ever get on the golf courses over in Camp Pendleton.

Mr. SAYLOR. Do you know whether or not the O'Neills ever had golf courses down there when they owned the ranch?

Mr. LENFERS. The only golf course they ever had was 26,000 head of cattle. They never tried to raise a lot of flowers and all that stuff down there; and since it got to be a military camp, why, they are trying to take the agriculture away from the farmers. In other words, they are hollering about their salt forming, but they put so many wells down there it is just like if you pull the cork out of a sink; your water is gone. Whenever you pump the water out of the sink then the salt water is going to come back to its lowest level, because the level is lower than the ocean out there. That is the reason they are getting their salt water. I have developed lots of wells in this country, and I have heard of water so much that I have taken to fishing on the ocean, and there is a lot of water out there, and I don't have to worry much about the water around here.

Mr. YORTY. Mr. Lenfers, the State engineer has said that excessive pumping along the seaward margins of the Santa Margarita Valley has lowered the ground-water level below sea level and has reversed the seaward hydraulic gradient, resulting in intrusion of ocean water. Is that what you are talking about?

Mr. LENFERS. Yes. Whenever water is lowered in the inside lower than the ocean, it is bound to come back from the other direction.

98        SANTA MARGARITA WATER RIGHTS CONTROVERSY

Mr. YORTY. Well, you feel that the excessive pumping right down in Camp Pendleton, nearest the ocean, is what is causing the salt-water intrusion?

Mr. LENFERS. Yes, sir.

Mr. YORTY. But the complaint served on you accused you and everyone——

Mr. LENFERS. That I was doing it.

Mr. YORTY (continuing). In the watershed of causing that salt-water intrusion?

Mr. LENFERS. That is right.

Mr. YORTY. Now, I was wondering—you said "golf courses." Do you mean they have more than one golf course there?

Mr. LENFERS. Well, I only know of one, and I know of them getting out at 4 and 5 o'clock in the morning and watering them down so they can have nice little grass to knock the golf ball around on while the other boys over there in the camp are hollering for a little more than a canteen of water.

Mr. YORTY. Now, how big a golf course is it?

Mr. LENFERS. Eighteen holes, I understand.

Mr. YORTY. What else are they using the water for down there?

Mr. LENFERS. For flowers up and down the coast and for around 4,000 head of sheep. If they come to figure—I am a kind of stock raiser myself—if they come to the figure of taking 3 to 5 gallons of water to water a sheep a day, if you have got 4,000 sheep over there, that will make you 16,000 gallons of water that goes to these sheep. Well, now, then, if they will take and give that 16,000 gallons of water to the boys in place of the quart, as I understand they are making it now, then they would take care of around 16,000 or 18,000 boys with a gallon of water apiece. So, it would help out a little, because they give it to the sheep or to the flowers or to the golf course and places like that, and make the boys do without it.

Mr. YORTY. If this ranch had remained in private hands, there never could have been the burden put on this stream that is being put on it by Camp Pendleton?

Mr. LENFERS. The cattle wouldn't have used up the water as much as the flowers and the other stuff would. And I understand that the way that this here agricultural deal is that the Government is not in the agricultural business, and the money is not going into the Government Treasury, but it is going in to make more flowers and stuff like that for the Government farm.

Mr. YORTY. On what are you basing that information?

Mr. LENFERS. On the information that has just been told around, where they say that this here is all going into the officers' fund for this area, to have better times.

Chairman ENGLE. You mean the Navy officers out there are slushing around in the water while the boys who are going to have to get shot at over in Korea are begging for an extra canteen?

Mr. LENFERS. That is what one told me last night, in Fallbrook.

Chairman ENGLE. And then after they have the flowers and they raise their agricultural production, whatever they have there, that money goes back to create more golf courses and more flowers?

Mr. LENFERS. It goes to the officers' funds, and maybe they are buying a few quarts of Taylor or something like that. I don't know.

Chairman ENGLE. Your information on this subject matter is what you have heard from talking to some of the boys?

Mr. LENFERS. Yes, and I am pretty well acquainted with lots of them. I was a trail blazer over there for Camp Pendleton, and I hauled the first load of stuff that went to the administration building. I know every foot of it. I have run Corwin shovels and Northwest shovels and drag lines for Cap 2, and rock crushers down in there, and I have had a couple of the boys that slip in there and kill duck on the pond that we have dredged out of rock and it has formed a little water hole and the ducks come in and then they take over. In fact, I cleaned some of them with hot water off my shovel and then they take them down to the officers.

Chairman ENGLE. Thank you very much, Mr. Lenfers. We appreciate your statement. [Applause.]

The next witness is Mr. Harry Held.

## STATEMENT OF HARRY HELD

Chairman ENGLE. I am informed that you live about a mile and a half from the river on the De Luz Road?

Mr. HELD. That is correct.

Chairman ENGLE. You have 12 acres of land?

Mr. HELD. That is correct.

Chairman ENGLE. I understand that the Government, through the water facilities, has loaned you some money to pay up the Fallbrook Public Utility District, which, I assume, is on the water bill; is that right?

Mr. HELD. Yes, sir.

Chairman ENGLE. Now, you mean that we have this rather odd inconsistency: the Government loaned you some money to pay the water bill to the Fallbrook Public Utility District which is now being sued to take the water away?

Mr. HELD. Well, that is the way I thought when I went from one floor, after filing my complaint, up to the next floor and down the hall a few doors to see another part of the Government about a loan.

Chairman ENGLE. You thought maybe the gentleman got mixed up, and one hand of the Government didn't know what the other hand was doing?

Mr. HELD. One hand was putting it in my pocket and the other was taking it out.

Chairman ENGLE. You are getting sued?

Mr. HELD. Yes, sir. They tried to serve my wife twice. When they come back looking for me, they wanted to give her another one.

Chairman ENGLE. From what I can observe, if there is anybody around who has not been sued, they should feel neglected?

Mr. HELD. I believe they should.

Chairman ENGLE. Are there any questions?

Mr. SAYLOR. You were served, Mr. Held, by an Army officer?

Mr. HELD. No, sir; I was served by a marshal.

Mr. SAYLOR. Now, Mr. Held, if the Government is successful in its suit and takes the water rights which you have away from that 12 acres, you are going to take it out of your pocket a lot faster than you are putting it in?

Mr. HELD. You are not joking there.

Mr. SAYLOR. In other words, your land will be absolutely worthless?

Mr. HELD. It will be absolutely worthless.

Mr. SAYLOR. Unles you have this water?

Mr. HELD. Unless I have this water. I am losing trees right now for lack of water, and unless I get it from the district I might as well throw up the sponge.

Mr. SAYLOR. Mr. Held, were you related to the O'Neills and the Vail family?

Mr. HELD. Not to my knowledge.

Mr. SAYLOR. And were your predecessors in title to the land that you own related to the O'Neills or the Vails in any way?

Mr. HELD. No, sir.

Mr. SAYLOR. And, as near as you know, the 12 acres of land which you have was never involved in any lawsuit respecting its water rights before this time?

Mr. HELD. No, sir.

Mr. SAYLOR. That is all.

Mr. HELD. The old-timers I have talked to, they tell me that.

Chairman ENGLE. Thank you very much, Mr. Held. We appreciate your testimony. [Applause.]

I believe that Mr. Deuel, who represents the Farm Bureau, as attorney for the Farm Bureau, is going to make a statement for Mr. R. C. Faulkner; is that right?

Mr. DEUEL. Mr. Faulkner is here. I have a statement in connection with his case that I do want to make.

Chairman ENGLE. Mr. Faulkner, will you come forward, please, if you are here?

## STATEMENT OF R. C. FAULKNER

Chairman ENGLE. Your name is R. C. Faulkner, and you live a half a mile northeast on old 395?

Mr. FAULKNER. That is right.

Chairman ENGLE. You have 10 acres of almonds, lemons, and——

Mr. FAULKNER. Avocados and geese; a few lemons and a few oranges, but mostly avocados.

Chairman ENGLE. What are these geese for?

Mr. FAULKNER. Well, I keep them to keep the grove clean, the Bermuda grass.

Chairman ENGLE. You use them for lawn mowers?

Mr. FAULKNER. Yes.

Chairman ENGLE. You get water from the public utility district at Fallbrook?

Mr. FAULKNER. Yes, sir.

Chairman ENGLE. Now, I understand that the Farm Bureau has filed some kind of a test case for you; is that right?

Mr. FAULKNER. I believe so; yes.

Chairman ENGLE. Will you describe the general nature of it, and then we will have Mr. Deuel describe it more in detail?

Mr. FAULKNER. Well, I have six wells, and only one of which produces enough water to pay for pumping, and these are adult wells, and here sometime ago I had to join the utility district. I had to hook up with the utility for water because the wells no longer—the

water level was going down—and they no longer produce enough water to take care of 10 acres. There was a time in the older days when the same well had water enough to water 40 acres, but the water level is down all over now, and there is no relief from wells. I have a good well site, and I have other well sites on the place, but it won't pay me to go down for the water because the water level is too low. There is no relief from wells; so we have to have this utility water.

Chairman ENGLE. Have you been made a member of the lawsuit in Fallbrook?

Mr. FAULKNER. Yes.

Chairman ENGLE. You have joined up for the duration in this lawsuit, have you?

Mr. FAULKNER. Yes.

Chairman ENGLE. You have been involuntarily drafted, I take it?

Mr. FAULKNER. Yes; and they have brought my wife in.

Chairman ENGLE. Your attorney has fixed that up for you?

Mr. FAULKNER. Yes.

Chairman ENGLE. Have you employed counsel?

Mr. FAULKNER. Have I what?

Chairman ENGLE. Have you employed counsel, an attorney?

Mr. FAULKNER. No; I have not.

Chairman ENGLE. Have you used the short form of answer which has been provided here by Mr. Roper, I believe?

Mr. FAULKNER. That is right, I have; yes.

Chairman ENGLE. Are there any questions?

Mr. YORTY. Do you understand that if this lawsuit continues you will have to file an amended answer and have an attorney do it for you?

Mr. FAULKNER. Yes, sir.

Mr. YORTY. Have you been told that?

Mr. FAULKNER. That will be taken care of. I understand that the Farm Bureau will coach me on anything that I need in that regard.

Mr. YORTY. Well, I will tell you and everybody else who has filed these short forms that I wouldn't rely on them. You have got too much at stake. You better be very certain, if this thing goes on, that you have the right kind of an answer on file.

Mr. SAYLOR. Mr. Faulkner, when you say the Farm Bureau, you mean the United States Farm Bureau?

Mr. FAULKNER. Well, yes; this is the State farm.

Mr. SAYLOR. The United States Farm Bureau of the Department of Agriculture is going to help you in this suit?

Mr. FAULKNER. I think so; yes. They are going to help all of us having gone into this thing. That is what they are in business for. They take care of the interests of the farmers.

Chairman ENGLE. Mr. Saylor, this is the California State Farm Bureau Federation, which is affiliated, I believe with the National Farm Bureau Federation which, as you know, is a national farmers' organization.

Mr. SAYLOR. I thought you were referring to the Farm Bureau when you were referring to that, which is a part of the Department of Agriculture.

Mr. FAULKNER. No.

589

Mr. SAYLOR. I wondered how foolish this thing could get if you were going to have a part of Uncle Sam out here helping you defend this suit against another department of Uncle Sam.

Mr. FAULKNER. No.  This is just a farmers' organization and association.

Mr. SAYLOR. Now, Mr. Faulkner, are you related to the O'Neills or the Vails?

Mr. FAULKNER. No.

Mr. SAYLOR. The piece of ground that you own was never owned by either the O'Neills or the Vails?

Mr. FAULKNER. No.

Mr. SAYLOR. And as far as you know, from living in this community and knowing about your property, it has never been involved in a lawsuit or affected in any way by the case which was decided here in the State courts between the O'Neills and the Vails regarding the water of the Santa Margarita River?

Mr. FAULKNER. That is right.

Chairman ENGLE. Any further questions?  I thank you very much, Mr. Faulkner, and we will now hear from Mr. J. J. Deuel, who represents the California Farm Federation and I believe is its counsel.

## STATEMENT OF J. J. DEUEL

Mr. J. J. DEUEL. (director, public utilities and water problems departments, California Farm Bureau Federation). No, Mr. Chairman, I want to correct that.  I am a farmer.  The Farm Bureau in California retains farmers to boss their legal department and their engineers and the balance of the staff because we want them to do the work the way farmers want them to work.

Chairman ENGLE. Now, let's get this record straight.  You are the boss of the lawyers?

Mr. DEUEL. That is right.

Chairman ENGLE. You are not a lawyer?

Mr. DEUEL. I am the director of the public utilities department and I am the director of the water problems department of the biggest farm organization in the State of California.

Chairman ENGLE. Mr. Deuel, I did not intend any disrespect to you when I introduced you as an attorney, but perhaps you may have been associating with these lawyers so long that you sort of act like one and I misunderstood.  But, with the appropriate apology, we are very glad to have you here and you may proceed.

Mr. DEUEL. Thank you.  I would like, first, Mr. Chairman, to make a statement in behalf of the California Farm Bureau Federation and then show our interest in the witness who has just preceded me, and what we are trying to do to help out in this case, and because of the questions recently asked I think I better read the first page as well as the last, too.  I did not intend to because this was just from the farm bureau.

Mr. Chairman and members of the committee, my name is J. J. Deuel.  I have owned and operated a farm in Kern County, Calif., ever since 1903.  I have been director of the public utilities department of the California Farm Bureau Federation ever since the department was formed in 1921, and the water problems department

since its organization 3 years ago. I am here representing the members of that organization generally, and particularly those members who are affected by the action in question, and we have about 200 members in the Fallbrook district.

For record purposes, the California Farm Bureau Federation is a nonprofit organization representing the voluntary association of county farm bureau organizations in 54 of the 58 counties of the State of California. These county farm bureaus have an aggregate voluntary membership on an annual renewal basis of over 60,000 farm families. The farms operated by these families are big, little, and in between. The California Farm Bureau Federation was organized and is maintained for the purpose, among other things, of representing, protecting, and advancing the social and economic interests of its members, their members and farmers generally in the State of California. The public utilities and water problems departments, of which I am the director, are service departments maintained by the federation for the achievement of those objectives.

The water problems department is specifically charged with the consideration and solution of problems arising in connection with the conservation, distribution, and use of water.

In our judgment, this action entitled "*United States of America, Plaintiff*, v. *Fallbrook Public Utility District et al., Defendants,*" constitutes one of the most serious threats owners of water rights in California have ever been confronted with and creates a problem of such magnitude as to justify intervention by the Congress on behalf of the multitude of citizens whose property rights have been placed in jeopardy by this action.

Your efforts on behalf of the water users here are greatly appreciated and we sincerely hope that you will not abate them until the Department of Justice has amended its pleadings to correspond with the representations which it has made and the oral stipulation made in court by Special Assistant Veeder. In Federal court on May 9 Mr. Veeder made an oral stipulation corresponding to what the press indicates the Department of Justice has told this subcommmittee. However, he absolutely refused to amend his complaint to limit the Government's claims in accordance with his stipulation, on the plea that the amendment would take too much time. This claim had no real foundation in fact because virtually all of the parties already served had counsel in court and service of additional defendants could easily have awaited amended complaint.

This committee can appreciate the necessity of getting some hard and fast change in the pleadings when you realize that Mr. Veeder insisted to the court in San Diego that "paramount" and "correlative" were synonomous. Furthermore, attention is called to the fact that if all the Government claims is the water accorded it by the so-called Santa Margarita decision, it is gaining little by filing another lawsuit unless it claims that a lot of the upstream users are taking more than they are entitled to under the facts. However, there is no allegation in the complaint that any water user is exceeding his correlative right.

The formal complaint filed in the United States district court in this case, and not the statements of representatives of the Department of Justice, is what counts legally and practically and every other way.

The complaint demands the water rights of a vast number of small farmers for national defense.  It demands them on the basis of a paramount right of the Federal Government.  It demands that the court enjoin these defendants from encroaching or infringing upon the rights of the United States of America.  If the complaint means what it says, the United States Attorney General is attempting to seize private property of the defendants without payment of just compensation in defiance of the Constitution.

The shotgun method adopted by the Department of Justice in this case is unjust and unreasonable and deserves the closest scrutiny and remedial action at the hands of this committee because it will require at least hundreds and possibly thousands of small landowners to spend their financial resources employing counsel and paying court and other costs of litigation to defend rights which were acquired many years ago under honest, recognized procedures.

Failure of the United States to submit to the jurisdiction of State courts or administrative agencies of the State to determine the rights of the United States on a river system jeopardizes such State administration.  Because the United States by bringing an action as plaintiff in a Federal court in effect substitutes that court for a State court and State control, which places an undue burden on defendants and when, as in this case, the claim is made on sovereign or paramount rights in the Federal Government the action is not only unfair but unjust and unreasonable.

We sincerely appreciate the interest the committee has shown in this case and are hopeful that through your influence justice may be done.

Mr. Chairman, when Mr. Able, one of my lawyers, whom I believe some of you at least know, returned from the hearing in San Diego and repeated to me what took place I was greatly concerned and asked the California Farm Bureau Federation directors to authorize me to spend the necessary money to hire an attorney because the California Farm Bureau Federation could not become a party to the suit as such.  So we have undertaken to employ and to finance from the beginning to the end of this case, a lawyer to protect the rights of Mr. Faulkner, who appeared here before you.  I was led to do that because I saw in this the same injustice that we have been confronted with by the same Justice Department on the river up in your neck of the woods, Mr. Chairman, and on the San Joaquin River, and now here, and this is the worst of the three.  This one just went a little bit further, and when I saw a letter addressed to Mr. Faulkner by the Department of Justice, which I would like to have made a part of this record, if you please, advising him to go to the United States attorney for his advice, I thought it was time that he might well be served by somebody who had the interest of the farmers of the whole State of California at heart.  We have undertaken and we have filed an answer for Mr. Faulkner to meet the 20-day limit, which is not exactly the short form, Mr. Yorty, but it is short and will have to be amended because we did not have the necessary facts to file a complete answer at the time, but we are going all the way and the State farm bureau is going to furnish the money that is necessary to go just as far as Mr. Swing goes for the public utility district.

We know that this thing must be stopped. Now we hope that we won't have to do that, to the ultimate end, because we don't think that is the answer. We think that Congress should find the answer. We believe that maybe our State legislature might have to help some in finding the answer, too, but whatever the outcome is, so far as Mr. Faulkner is concerned, he has the word of the California Farm Bureau Federation, authorized by its board of directors, that he has able counsel as long as this case is in the United States courts.

Chairman ENGLE. Without objection, the letter addressed to Mr. Faulkner, under date of July 13, 1951, signed by Mr. Veeder, will be made a part of the record at the conclusion of the testimony given by Mr. Deuel.

Now, Mr. Deuel, I did want to call your attention to one thing. I noticed you say here that the Justice Department has said time and again that they only expect to get what the Santa Margarita was entitled to under the decision. Now, I suspect, and you suggest here, that the pleadings should be so amended. I suspect that the Justice Department can make that statement in absolute good faith in view of their idea of what the Santa Margarita litigation means. I suspect that they mean, they believe, or at least they will contend, that this Santa Margarita litigation actually divided up the whole pie, that there isn't anything left for anybody else and that two-thirds of it belongs to the Federal Government as the successor in interest to the Santa Margarita ranch. In short, the Federal Government may be taking a position here as to the legal interpretation of the Santa Margarita judgment, which is wholly different than that which was thought to be the result of it by either of the parties who originally participated in it.

I ask you, isn't that a possibility?

Mr. DEUEL. That is right, and that is the reason that we thought it was so desirable that we would become counsel for one of the parties who had been sued and was served in this case. We don't feel that we can represent more than one because, as Mr. Swing told you last night, we can't represent people who might have different interests later on. We have got one here. We don't believe that the interpretation of the Department of Justice is the correct interpretation and we want to begin on the ground floor to be able to state what we think the proper interpretation of that situation is.

Chairman ENGLE. That is a sound position and the action taken by the farm bureau is certainly a very salutary one and one which, I am sure, will be applauded by all of your membership throughout the whole State.

Do you have a question, Mr. Poulson?

Mr. POULSON. No.

Mr. YORTY. Mr. Deuel, I want to comment on your statement that you want to go by what the pleadings in the case say and not by what the representatives of the Government say orally when they are not bound and at other times like here, in court and out of court. Now, the complaint in this case, which has been served on all you good people here, the prayer of that complaint in paragraph 3 says or asks the court—

that this court declare and determine that all of the rights of the United States of America and paramount and superior to those of the named defendants by virtue of the riparian character of the land above-mentioned, and the ownership of them by the United States.

**106**   SANTA MARGARITA WATER RIGHTS CONTROVERSY

Now it is obvious to everyone that that, and the ownership of them by the United States, carries more inferences than just what appear on the surface. If they are only trying to acquire the same rights, irrespective of the fact that the United States happens to own those rights, that wouldn't make any difference, would it?

Mr. DEUEL. That is right.

Mr. YORTY. They would be the same rights?

Mr. DEUEL. That is right.

Mr. YORTY. But this paramount sovereign theory creeps in here even in phrases like that, and I am glad that you are not being deceived by statements made out of court.

Now it goes on to say—

And by reason of its acquisition of the above-mentioned rights to the use of water and the application of those rights for military purposes.

Now, the O'Neill people could never have put this water to military purposes, could they?

Mr. DEUEL. That is right.

Mr. YORTY (reading).

This court is likewise requested to declare as against the named defendants, that by reason of the nature of the rights of the United States and by reason of its application of those rights to a beneficial use, and the great need for water to meet the military demands above described, the United States is entitled to take, use and enjoy without interference by the defendants all of said water which it claims for the military needs above described, for agricultural purposes, and generally for the purposes which have been stated.

Now it seems to me that you are absolutely right in contending that what they are asking there is certainly not what the O'Neill people would have been able to claim under the widest stretches of the imagination.

Mr. DEUEL. There is no question about that. Unfortunately, we have had too many sad experiences in the promises of the word of these people in the past 4 or 5 years in other places, on the San Joaquin River more particularly speaking, and up in northern California, and we no longer care to take the word of one of these individuals who cannot bind the United States Government for anything that doesn't appear in the pleadings in the court, because the court, and particularly on appeal, will be bound by the pleadings, and not by something that was said or what somebody might have said out of the court.

Mr. YORTY. Now the court said, here on page 9 about amending the complaint, the court said—

It is also my understanding that the Government wishes to avoid, if possible, amending the complaint because of the resultant expense of serving many defendants already served and because of delay incident thereto. The court recognizes, as I am sure that counsel ought to recognize, we are in a time of emergency.

Now, to me, to try and hurry this lawsuit—it can be settled—but to try and hurry counsel for the defendants and to try and talk about saving the Government the expense of amending, if his complaint ought to be amended from a legal standpoint, is absolutely absurd when they have spent the sum already spent to bring all these people in court.

Mr. DEUEL. That is the way the matter appealed to me when Mr. Able returned and made his report. He is one of the attorneys for

my department that I sent down there that day to take part in the proceedings.

Mr. YORTY. I can guarantee you and your federation that some of us are going to take a great interest in the budget of the Department of Justice to find out where they get the money to finance lawsuits like this one.   (Applause.)

Mr. DEUEL. Mr. Chairman, I have a very short statement from the San Diego County Farm Bureau, which is the farm bureau to which these individuals belong, that I would like to present.

Chairman ENGLE. Do you want to read it?

Mr. DEUEL. It is less than a page, and I will read it.   I think it will be a little better.

Chairman ENGLE. You may proceed.

Mr. DEUEL. This is to the Honorable Clair Engle, chairman, House Irrigation and Reclamation Subcommittee, Fallbrook, Calif.:

DEAR CONGRESSMAN ENGLE: The attached copy of an official resolution represents the viewpoint of the San Diego County Farm Bureau and the California Farm Bureau Federation.

The San Diego Farm Bureau seriously protests the actions now being taken by the Justice Department for the following reasons:

(1) It is a violation of the Constitution in that an attempt is being made to seize water rights without compensation.

(2) It apparently is a trend toward socialistic practices which destroys confidence in our Democartic form of Federal Government.

(3) The statement made by the Justice Department that the suit is in the interest of national defense is a misstatement of facts.  If national defense was involved, the citizens of California would be the first to rise in support of the problem.  We have harbors, ports of embarkation and other defense establishments which vitally affect the security of the Nation.  Certainly the confiscation of the water rights of private individuals is not in the interest of national defense or national unity.

(4) The water problems of Camp Pendleton and the residents of the Santa Margarita River watershed have in the past and in the future can be solved by mutual agreement.  This is not only the most effective way but the most democratic way.  That the Justice Department would ignore these agreements clearly indicates that their actions are not in the interest of solving Camp Pendleton's water problems.

(5) If the same amount of taxpayers' money and the time and effort of our Federal representatives were devoted to a solving of the acute water problems in the entire Southern California area, which could very easily affect national defense and the Nation's security, Camp Pendleton's water requirement would be solved in a far better way.  Involved in this solution for example is the Second Barrel.

The San Diego County Farm Bureau, feeling that the suit is neither in the interest of national defense nor the common good respectfully asks your committee to use its influence in seeing that the suit is abandoned or modified so as to only establish the legality of Camp Pendleton's existing water rights.

Respectfully yours,

MILTON B. PARFET,
*President of San Diego County Farm Bureau.*

Attached to that, Mr. Engle, is the resolution passed by the organization.

Chairman ENGLE. Thank you very much, Mr. Deuel.  The letter submitted by the San Diego County Farm Bureau will, of course, be a part of the record, and following it, without objection, will appear the resolution passed by the same organization.

RESOLUTION

The following resolution was passed by the Fallbrook Farm Bureau Center, the San Diego County Farm Bureau, and the California Farm Bureau Federation:

**108**     SANTA MARGARITA WATER RIGHTS CONTROVERSY

"Whereas the suit which has been filed by the United States against the Fallbrook Public Utility District, et al., Civil Code, Second Division, Part I, Title I, Section 658 and 660, is of vital interest to everyone owning land adjacent to or using water from the Santa Margarita River; and

"Whereas the basis for the suit is of vital interest to every resident of the State of California; and

"Whereas this suit attempts to cancel the riparian rights of the State of California guaranteed under the Constitution, and if successful, could adversely affect agriculture throughout the entire United States; and

"Whereas a precedent would be established for furnishing water for Federal Government leased lands for agriculture in preference to privately owned agricultural lands; and

"Whereas we feel the Federal Government should attempt to develop sources of water that do not abrogate State's rights and those of agriculture, especially since agriculture is a vital part of the defense program: Therefore, be it

"*Resolved*, (1) That the Fallbrook center of the San Diego County Farm Bureau go on record as protesting this action by the Federal Government; (2) that the office of the San Diego County Farm Bureau be requested to endorse this resolution and forward to the California Farm Bureau Federation together with a request that it vigorously cooperate with the Attorney General in studying the action filed by the United States in the United States District Court for the Southern District of California, Southern Division, entitled '*United States of America* v. *Fallbrook Public Utility District et al.* (Civil file No. 1247, Civ.),' to determine whether or not the rights and interests of the State of California are involved therein and, if he so finds, to take whatever action he may deem necessary or desirable to protect the rights and interests of the State and its citizens; be it further

"*Resolved*, That the American Farm Bureau Federation be notified of the implications of this suit, so that proper action may be taken on a national level to protect the interests of Farm Bureau members and agriculture generally throughout the United States."

No, I am not sure whether everybody got a chance to question Mr. Deuel.

Mr. SAYLOR. Mr. Deuel, is your organization also going to take care of the case against Mrs. Faulkner?

Mr. DEUEL. Yes.

Mr. SAYLOR. We don't want to leave the Molly Pitchers out of this. Back East they made a great deal of Molly because she went along and fought alongside her husband. I am glad to see the wives going right along because Uncle Sam is taking them by force.

Mr. DEUEL. We didn't feel that we could get into any legal difficulty representing a man and his wife, that we might if we tried to represent different people.

Mr. YORTY. Mr. Deuel, would you mind answering one more question? In a memorandum I have here of August 2, 1949, to Admiral Manning, signed by Willis R. Dudley, of the Real Estate Division, Bureau of Yards and Docks, Navy Department, Mr. Dudley reports as follows about a conference. He says that—

the Department of Justice representative made it very clear that as legal advisor to the Navy Department he was obliged to state that in his opinion the stipulated judgment apportioned all of the waters of the Santa Margarita River, both normal flow and flood waters between the Vail Co. and the Rancho Santa Margarita, and that the United States Government, as successor in interest to Rancho Santa Margarita, owned two-thirds of all such water and that any act or omission to the contrary was detrimental to the Government's interests—

and so forth.

Now, did you ever hear of a water suit in this State, in your experience, where two persons could sit down and stipulate to divide all of the waters in a stream as against all other people who weren't even parties to the suit?

Mr. DEUEL. I never heard of such a thing, and not only that, from my many years of experience in sitting in the office with these three attorneys which I have for my use, I am convinced that such a thing is utterly impossible.   It can't be done.

Chairman ENGLE. Thank you very much, Mr. Deuel.   We very much appreciate your statement.

UNITED STATES DEPARTMENT OF JUSTICE,
*Washington, D. C., July 13, 1951.*

Mr. RAYMOND C. FAULKNER,
*Fallbrook, Calif.*

DEAR SIR: This will refer to the action entitled "*United States of America, Plaintiff, v. Fallbrook Public Utility District, et al., Defendants,*" No. 1247 in the District Court of the United States for the Southern District of California, Southern Division. You have been served with a summons and complaint in the above-entitled action.

An effort will be made by the United States of America to secure a ruling by the court upon the fundamental questions of law in certain selected cases. Under those circumstances proof of the rights of each of the respective parties will not be required until after that matter has been disposed of by the court. If you are asserting rights to the use of water in the Santa Margarita River watershed it will be necessary for you to answer the complaint, although default judgments will not be sought at this time.

If you have no claim to rights to the use of water in the Santa Margarita River watershed or if you wish additional information on the subject, the matter may be referred to Mrs. Betty Marshall Graydon, Assistant United States Attorney, 325 F Street, San Diego 1, Calif., Telephone F 9-4101. Mrs. Graydon, upon receipt of the question presented, will advise you in regard to a time for meeting and discussing the problems which you have.

Sincerely,

ASSISTANT ATTORNEY GENERAL IN
CHARGE OF LANDS DIVISION,
By WILLIAM H. VEEDER,
*Special Assistant to the Attorney General.*

Chairman ENGLE. Is Ruth Lillie here?

## STATEMENT OF RUTH LILLIE

Chairman ENGLE. Mrs. Lillie, I observe here that you live in a Federal housing project which is, presumably, supplied water by the Fallbrook Public Utility District; that you have no property and never have had any in this entire area. Now, do you understand that you are a member of this family which is being litigated here?

Mrs. LILLIE. Well, I was served with a summons, like everyone else, and I own no property in the State of California.

Chairman ENGLE. The fact that you got a summons convinced you that probably you were in a lawsuit, is that it?

Mrs. LILLIE. I sure am.

Chairman ENGLE. And you own no water and claim no water? You claim no property?

Mrs. LILLIE. No.

Chairman ENGLE. Do you have any idea how you happened to come to the attention of the very diligent fellows in the Attorney General's office?

Mrs. LILLIE. No, not unless I take baths in it and drink it. That is the only reason why I would know.

Mr. POULSON. Mr. Chairman, I think that we better become conscious of the fact that we are in danger of being subpenaed because

110    SANTA MARGARITA WATER RIGHTS CONTROVERSY

they have been putting water up here on the table for us to drink. [Applause.]

Chairman ENGLE. At any rate, the point of the matter is that you are not a property owner and you have never been?

Mrs. LILLIE. No.

Chairman ENGLE. And except for the water which you use as a resident of this Federal Housing project you haven't trespassed at all?

Mrs. LILLIE. No.

Chairman ENGLE. Upon whatever claims may be made by the Federal Government and Camp Pendleton, is that right?

Mrs. LILLIE. That is right.

Chairman ENGLE. Any other questions?

Mr. SAYLOR. Mrs. Lillie, as near as you know the complaint that was served on you was identical in form to the complaint served on everybody else?

Mrs. LILLIE. Yes.

Mr. SAYLOR. You have been accused of all these crimes of stealing water from the Marine Corps?

Mrs. LILLIE. I sure don't like it, either.

Mr. SAYLOR. And you are not related to the O'Neills or the Vails?

Mrs. LILLIE. No.

Mr. SAYLOR. And your family is not related to them in any way that you know of, the O'Neills or the Vails?

Mrs. LILLIE. I don't think so.

Mr. SAYLOR. And you certainly were not a party to the suit that was filed here in the State court between the O'Neills and the Vails?

Mrs. LILLIE. No.

Mr. POULSON. Have you legal counsel?

Mrs. LILLIE. I don't think so.   I will get one if I need it.

Chairman ENGLE. Well, thank you very much, Mrs. Lillie.   We are glad to have your testimony.

Mr. POULSON. This makes it more ridiculous than ever.

Mrs. LILLIE. I think so too.

Chairman ENGLE. Is Mrs. Etta Hamilton in the audience?

## STATEMENT OF MRS. ETTA HAMILTON

Chairman ENGLE. Mrs. Etta Hamilton, as I understand it, you live 2 miles east of Fallbrook and you have about 40 acres in general farming?

Mrs. HAMILTON. That is right.

Chairman ENGLE. You have been here about 20 years; is that right?

Mrs. HAMILTON. Twenty-two years.

Chairman ENGLE. Now, have you been joined as a defendant or served as a defendant in this matter?

Mrs. HAMILTON. I have.

Chairman ENGLE. Will you explain to the committee what your water use and rights are, what brings you into this litigation?

Mrs. HAMILTON. I have only 2 acres of the 40 in the Santa Margarita watershed.   My supply of water for the rest of my ranch is from two wells, and of course, I am in the utility district, which I have

exercised as a sort of form of insurance against the depletion of my wells. That is why I suppose I am here.

Chairman ENGLE. How large or significant is the use on these 2 acres? Is that irrigated by the Fallbrook district?

Mrs. HAMILTON. No. There is nothing on these two acres which are immediately adjacent to the highest spot in our district.

Chairman ENGLE. You have been served, I take it?

Mrs. HAMILTON. Yes, sir, of course.

Chairman ENGLE. You have employed counsel?

Mrs. HAMILTON. I tried to employ counsel at Vista as our attorneys here are very busy, so I thought I was being very smart and I went down there to an attorney that I had been told was a very splendid man, but he refused to take my case so I used one of the forms, knowing that I had until November to get counsel.

Mr. POULSON. Now, as I understand it, you pump your water out of this area which is not in the Santa Margarita watershed?

Mrs. HAMILTON. That is right.

Mr. POULSON. And after you pump this water out of another shed, which is up on the high point, then the water runs off on two acres and it might run over into the Santa Margarita watershed?

Mrs. HAMILTON. At the present time I am not pumping not even close to the 2 acres.

Mr. POULSON. But, anyway, it could run over?

Mrs. HAMILTON. Yes.

Mr. POULSON. So, in other words, that is running uphill. You see, they have introduced a new theory of law, and maybe they are wanting to introduce a new law of physics that water can run uphill and therefore, because it runs uphill that you are guilty.

Mrs. HAMILTON. I am guilty of something. I don't know what it is. I am trying to find out.

Mr. POULSON. And therefore you have absolutely no use of water out of the Santa Margarita watershed?

Mrs. HAMILTON. Only the water that might be supplied by the utility district.

Mr. POULSON. You have been sued as a member of the utility district, then?

Mrs. HAMILTON. Yes; perhaps I am. At this present time I am not even using that. I am not even hooked up. We put a big line through—gum tree, if you are familiar—one of our new lines, and at that time we had to have the meter moved and it wasn't necessary for my planting, as it is very light at the present time, but knowing that if and when I needed additional water, then I could get it. I haven't even bothered having it hooked up, hoping that my little contribution might help in the conservation of our water to people that need it more.

Mr. POULSON. In other words, they are suing you here even if you had it in your mind?

Mrs. HAMILTON. That is right.

Mr. POULSON. That you might use water?

Mrs. HAMILTON. That is right.

Mr. POULSON. That is about as bad as the girl in the Federal housing project.

Mr. SAYLOR. Mrs. Hamilton, as near as you know are you related to the O'Neills or the Vails?

Mrs. HAMILTON. I am afraid not.

Mr. SAYLOR. And your land, your ranch, was not a part of the O'Neill or the Vail holdings?

Mrs. HAMILTON. No.

Mr. SAYLOR. As near as you know you or your predecessors in title have never been involved in any water disputes with regard to your land?

Mrs. HAMILTON. That is right.

Chairman ENGLE. Thank you very much, Mrs. Hamilton. The committee will stand at recess for 5 minutes.

(Short recess.)

Chairman ENGLE. The committee will be in order. The next witness will be Mr. G. E. Arnold who represents, I believe—Mr. Arnold, will you announce the capacity in which you are appearing?

Mr. ARNOLD. Yes, sir. My name is G. E. Arnold and I am chairman of the California section of the American Waterworks Association. I also appear here on behalf of the irrigation district associations and the municipal utility district, with their consent and knowledge.

## STATEMENT OF G. E. ARNOLD

Chairman ENGLE. You may proceed.

Mr. ARNOLD. I wish to bring to the attention of the committee the matter of domestic water. The discussion thus far has been largely in connection with agricultural or irrigation uses of water. According to the State law of California the highest and best use to which water can be put is that of domestic consumption. The people who live here depend on the water supply of this area for domestic use, and that is the most important phase of water use in this area. In order to understand the water situation in this vicinity it is necessary to know something of the hydrology of this part of the country. We live in a semiarid region where rainfall is scarce. Occasionally we get a wet year which results in large runoff and refills the reservoirs, but the majority of the years there is practically no runoff and we therefore must store water from one year to another in order to have water to tide us over these long dry periods.

This area is currently in the tenth year of a prolonged drought cycle. Not since 1941 has there been a normal runoff in the streams on the west slope of San Diego County. That is the reason that water is so critical in this area at this time and it particularly points up the necessity of long-range planning and preparation in order to meet the requirements of the area as the years roll along and the population continues to increase.

The American Waterworks Association is the representative of all of the water systems in the United States who serve water to people who live in the cities and urban communities. We represent about 85 percent of the total population of the country. Within San Diego County all of the water systems serving communities and areas of that type are members and are affiliated with the American Waterworks Association and our prime concern is that of domestic water.

As has been pointed out to you here domestic water is essential to the people that live in this area. They have been using this water

over a period of many years and they must not be deprived of that water which is rightfully and justfully theirs. Thank you.

Chairman ENGLE. Thank you very much, Mr. Arnold.

Mr. SAYLOR. Mr. Arnold, am I correct in that your understanding of this complaint is that if the Government is successful that even the individual property owners will be deprived of the use of any water for domestic consumption?

Mr. ARNOLD. Those who depend upon the Santa Margarita River for domestic water will be deprived of that water, as I understand it, yes.

Mr. SAYLOR. And many of the people here have claimed the use for domestic purposes. Is that not the highest priority for use to which water can be put?

Mr. ARNOLD. That is correct.

Mr. SAYLOR. And many of the people here have claimed the use of that water through their own families for periods of upward of a hundred years?

Mr. ARNOLD. That is correct: yes, sir.

Chairman ENGLE. Are there any further questions? Thank you very much, Mr. Arnold. We appreciate your statement and your appearance here. [Applause.]

Chairman ENGLE. Mr. R. D. Elliott, of the Long Beach Harbor Commission, filed a brief yesterday, and I believe he desires to make a brief statement.

## STATEMENT OF R. D. ELLIOTT

Mr. ELLIOTT. I feel that I can contribute a little bit to this hearing because we have a little different approach to this problem. We probably can throw a little light on what we believe is the actuating motive in this and a number of other Government actions having to do with the title to property.

Long Beach Harbor has been interested in the Fallbrook water suit not only because of the hardship that is imposed on small-property owners here, but we believe that this suit was instituted—that it was not instituted to obtain more or cheaper water, but it was definitely instituted to extend and strengthen the theory of paramount rights on inland resources.

This theory of paramount rights was first promulgated in 1947 in a Supreme Court decision. That Supreme Court held that the Federal Government holds paramount rights—and that is a bad word—paramount rights in coastal submerged lands in California, and in the interest of national defense. Later Supreme Court decisions have held in a like manner bearing on coastal submerged lands of Texas and Louisiana.

The California tideland decision, among other things, held—this is in the decision of the majority—it was a split decision of the court:

The crucial question on the merits is not merely who owns the bare legal title to the lands under the marginal sea. The United States here asserts rights in two capacities transcending those of a mere property owner.

Again it says:

The State is not equipped in our constitutional system with the powers or the facilities for exercising the responsibilities which would be concomitant with the dominion which it seeks.

The general sense of it, as I get this part of the decision, is that the Federal Government has no right to defend any property unless it owns it. That is contrary to common sense and contrary to the entire history of our country.

We would like to submit for the record a few exhibits here which I hope you will have the time to read. One of the exhibits, which I will label "A", is entitled "Every State Has Submerged Lands." Without objection I will submit it to your stenotypist.

Chairman ENGLE. Just a minute. Let me look at it. Without objection the document submitted will be made a part of the file but not a part of the record.

Mr. ELLIOTT. I would like also to read from a statement which we prepared in connection with the ownership of the tidelands.

From its inception the United States Government recognized that title to the tidelands belonged to the United States. Whenever the Government wished to construct installations on or over those lands it first acquired title to the land from the State concerned. For over 150 years the States have been granting title and other rights in these lands to municipalities, individuals, corporations or other business, educational, charitable and like entities. Over 50 decisions of the Supreme Court of the United States, and 244 decisions of Federal and State Courts, 31 rulings of Secretaries of the Interior and 49 opinions of Attorneys General, upheld the ownership of the various States to their tidelands.

I am taking it in this order because this appears to us to be a program of spending on the theory of paramount rights vested in the Federal Government. When it started in Long Beach, where the Supreme Court held that the Federal Government held paramount rights to the submerged lands adjoining the city, within the city boundaries.

In 1948 North Carolina was told by the United States Supreme Court that it could regulate fishing in its marginal seas only in absence of conflicting Federal claim. This was based on the Federal Government's paramount power created in the California tidelands case.

In 1950 Texas and Louisiana were told by the United States Supreme Court that the Federal Government could take over their coastal submerged lands and resources again because of paramount power.

In 1951 we come up to Fallbrook and over 600 farmers and ranchers in Fallbrook area of California are being sued for their water rights which the Federal Government says it can confiscate—I don't like the word "condemn"—because it is confiscation—because, in the interest of national defense it has paramount powers.

I would like to have the committee think of this as only one part of a great big picture here of confiscation by the Federal Government of things that it wants. We have the snowball and it is well started on its way. There is no logical point at which this snowball can be effectively stopped. It cannot only include oil under the ocean but it can include minerals under the soil. It apparently, as far as we can see here, can include fresh water. In fact, there is no logical point to which we can limit it.

There is one other statement I would like to read.

The tidelands problem is simply the problem of whether the Federal Government can, without paying for them, take over operation from Washington and dispose of as it sees fit, all of the tidelands, whether or not heretofore developed by and at the expense of the State and cities who are grantees of the State, and private parties working under such grants.

So I feel that there is a responsibility upon your federation, and all agencies that are interested in the title of property are interested in the Fallbrook suit, in the tideland cases in Texas, Louisiana, and California, otherwise we are headed for a point where anything that is desirable in the way of real property is subject to confiscation by the Federal Government.

One other approach I would like to make to this by way of changing a little bit of emphasis. Present today is the special prosecutor, Mr. Veeder, who I have no doubt is a very cultured, capable gentleman, and a very capable attorney. He is taking the brunt of the rather pent-up feelings of the people who are here. We in Long Beach are not quite so close to the situation. We are regarding him, and we are bound to regard him, merely as the tool, the mouthpiece of an all-powerful Attorney General's office who is hoping to carry forward this program of confiscation and broadening its effect in the Fallbrook area.

Chairman ENGLE. Mr. Elliott, if you want to submit this information which deals specifically with the tideland issue, we will be glad to have it as a part of the clerk's file which will be included with this hearing. The Chair didn't want to put it in the transcript because the Chair wants to keep this transcript to moderate size and relating specifically to the particular problems which we are dealing with here so when people pick it up they will be on the Fallbrook issue and nothing else. As you know, we have about 10 million words on the tidelands in the records back there now, but for the purpose of clarifying and giving continuity to what you have had to say, if you want to submit this information it may be included with the file.

Mr. ELLIOTT. I would like to submit some more pieces of this, if I may.

Chairman ENGLE. Without objection that will be so ordered.

(See exhibits A, B, C, and D, attached to file.)

Chairman ENGLE. Are there any questions?

Mr. YORTY. Mr. Elliott, you hit on something that I have felt was very important in this case. It seems to me that this new theory of a sovereign right which transcends ownership is being extended inland on nonnavigable waters in this case, and it was the theory developed as the result of another California case, United States against California. I feel in his oral statement the representative of the Government has backed down somewhat on that, and I believe it is the result of the publicity that the suit has received and the attention it is getting from people here and all over the United States, now. But as originally filed and as stated in this complaint, it certainly reads like the attempt of a sovereign to expropriate property without payment, and I was particularly concerned because the gentleman who drafted this complaint, in testifying before the Senate committee on April 25, 1951, in answering a question used this phrase, "But the matter transcends the ownership." That phrase struck me as indicating that he very well understands this new theory developed in the tidelands case, and might have intentionally included some of these phrases in this complaint which could very well, in spite of what he says, be construed as giving the United States some right that is superior to what they call the mere ownership by these people who depend on the water to make a living. I commend your board in Long Beach

for seeing the real underlying basis of this lawsuit and for taking the trouble to call it to the attention of other people.

Mr. ELLIOTT. We see a lot of that is taken out of the tideland decision; a lot of the words.

Chairman ENGLE. Thank you very much, Mr. Elliott. We appreciate your being here and appreciate the interest of the Long Beach Harbor Commission. I hope one of these days we have a chance to get over to that area and to take a closer look at your tideland problems. [Applause.]

The State chamber of commerce is represented here by Mr. Charles H. Wilding, who is the head of their southern division, public relations. He has submitted a statement for the record in which he says that the State chamber of commerce is desirous of supporting the efforts of the Fallbrook people to protect themselves against what appears to be a Federal encroachment on individual property rights. In addition he refers to the cooperation which the California delegation has had from Mr. C. J. S. Williamson, their Washington representative, and I am sure that those members of the California delegation here can testify to that. He concludes his statement by wishing to assure this body, as well as the Fallbrook interests, of the desire of the State chamber of commerce to be of all possible assistance in working out a fair and equitable solution to the Santa Margarita water problem.

The statement will be made a part of the record at this time.

STATEMENT OF CHARLES H. WILDING

My name is Charles H. Wilding. I am director of public relations for the southern California district of the California State Chamber of Commerce. I have been instructed by my organization to attend this hearing today to observe your proceedings because of our tremendous interest in this case.

I do not have a formal statement to present but inasmuch as you have called upon me I should like to have you know that our organization always seeks to resist any infringement of the basic rights of California citizens. In this instance we are desirous of supporting efforts of the Fallbrook people to protect themselves against what appears to be a Federal encroachment on individual property rights.

On June 22 Mr. C. J. S. Williamson, Washington representative of the State chamber, requested the Subcommittee No. 1 of the House Committee on the Judiciary studying this problem to give favorable consideration to the five-point program recommended to Attorney General Howard McGrath by the membership of the California congressional delegation.

We feel that the program suggested by the California delegation is a fair one and will prevent individual suits that will cost thousands of small property owners very heavy expense. Further, we agree most wholeheartedly with the California delegation that not only individual property rights, but also our State water rights, should be protected.

We wish to assure this body, as well as the Fallbrook interests, of our desire to be of all possible assistance in working out a fair and equitable solution to the Santa Margarita water problem.

Chairman ENGLE. The next witness will be Mr. Arnold Klaus, the assistant manager of the San Diego Chamber of Commerce.

## STATEMENT OF ARNOLD KLAUS

Mr. KLAUS. Mr. Chairman, and gentlemen of the committee, it was very heartening to us to be asked to appear here in this session today because of the deep interest that the community, the urban community of San Diego, has in the problem of this neighbor of ours.

Case 3:51-cv-01247-JO-SBC   Document 853-1   Filed 12/03/51   PageID.2159   Page 63 of 84

Our interests in this case began when we first heard of these suits being filed against the people of Fallbrook by the Federal Government. The economic area of San Diego is interested in it not only because they are friends and neighbors, but for years we have studied the water problems of this area. In appearing here before you today, as a representative of the San Diego Chamber of Commerce, which I am, I am sure that I can only express the feelings of the economic interests of the West, the business interests, not only of the West but of the United States.

In a carefully prepared statement which I have to enter into the record, I want to say that it includes the thinking of the United States Chamber of Commerce and some of its policy statements which I have in written form, and it also includes the thinking of the people not only of our urban area, but of our rural area. It is as follows:

The citizens of this section, and of the State as a whole, deeply resent the proceedings instituted by the Attorney General in the case of the United States of America versus the Fallbrook Public Utility District et al. This resentment is against an action in eminent domain clothed in what the Attorney General chooses to call a quiet title action.

In the complaint filed in this suit, the United States Government alleges paramount rights in the Santa Margarita River because of its sovereignty, which exactly parallels the principle enunciated in the so-called Tidelands case.

The people of this State are alarmed because in this action the Government is seeking to establish sovereign rights greater than those established in our California State courts at the time the Vail interests and the Rancho Santa Margarita's rights were determined. Therefore, the rights which the Government is seeking to acquire in this condemnation action exceeds those which were held by the private land holders when the Government acquired this property.

It is the belief of the citizens of this State that the exercise of sovereignty over equitable portions of the river flow of the State should be controlled by it according to State laws and our courts, and such powers of the State should not be abridged, modified or superseded by the Federal courts, laws, or agencies.

Congress should recognize the interests and rights of the States and its people in water utilization, and control. It should preserve and protect to the fullest lawful extent established and potential uses for all purposes. It should limit the authorization and construction of improvements to those, the operation of which will be consistent with the fullest use of the waters of such rivers for purposes in the public interests.

The Congress should not encroach upon water uses as established by the State. This principle should be applied by act of Congress to all, other than nonnavigation uses, such as domestic, municipal, agricultural, industrial, and reclamation uses of water in connection with all Federal projects.

It should be of interest to the members of this committee to know that this great ranch, acquired by the Government in time of war for training purposes, has been taken from the tax rolls of our country just as have hundreds of thousands of other acres in this county; and that in Government ownership it pays no part of the cost of providing health, safety, fire and police protection, and the countless other services of local government which the personnel and relatives of this establishment enjoy; and it should further be of interest to you to know that while enjoying these services of local government, the military, not finding full utilization of the property for the purposes for which it was obtained, subleases hundreds of acres for the production of agricultural commodities, and thus the Government as a landlord to tenant farmers is in direct competition with the 10,000 citizens of the Fallbrook area from whom they propose to confiscate water, historically used by those in the Santa Margarita watershed.

It is our prayer that this committee will return to Congress after hearing the plea of our neighbors, and attempt legislation to rectify the wrong that is being done by an administrative branch of the Federal Government which is ignoring the rights and laws of our State.

And finally, we want to impress upon you that the additional water now being sought by the Government in this suit is for the use of share croppers working Government land who do not pay any San Diego County taxes and who compete

with the resident taxpaying farmers from whom the water is being taken, and not exclusively for the use of the military as set forth in the Government's complaint.

It was heartening to be here yesterday and see these appeals. I could not help but be particularly impressed with that fine young ex-service man not resorting to GI loans, but by the work of himself and his wife acquiring a piece of property, and then when he was asked if he had changed his mind about this Federal Government of ours he comes up with "No." What did he mean? He meant just like all the rest of the people in this room mean. We are the Government. It is a challenge to you men behind the desk here to go back in Washington to reinsure the faith of the people in this room that we are the Government. [Applause.]

Mr. SWING. If the chairman will permit, I would like to add something about Mr. Arnold Klaus, and that is he is an ex-service man who gave his services to his country during the Second World War.

Chairman ENGLE. Thank you very much, former Congressman Phil Swing, and thank you, Mr. Klaus. I am sure that you spoke the feelings of this committee and of this audience in reference to the statements made yesterday.

Now, one of the crucial interests in this matter is whether or not the true traditional concept of water rights throughout the western part of the United States is to be followed or whether or not some new concept is going to be taken over by the Federal Government. As I told you when this hearing started, those of us in Congress have always believed the control and disposition of water in the navigable streams of the West is subject to the jurisdiction of State law. We have always believed that. We think that the law still so provides. I am amazed to find that any other contention is being made. Because this committee, over a period of years, has tried to protect State sovereignty in the field of water rights, and water distribution, especially in the 17 arid States of the West, this problem is one which is of vital concern to your State legislators.

If a different concept of Federal jurisdiction on these streams is accepted and put into operation it very materially affects the attitude and the work of the State legislature.

Our State legislature has recognized for a period of years the importance of the water problems of California establishing a joint water problems committee. We have been favored, and this committee has, I want to assure you, been delighted to have sitting with us, not only the chairman of that joint water problems committee, but a considerable number—I think six altogether—of his committee, as well as other State legislators from the southern part of California.

So at this time I would like to introduce Senator J. Howard Williams, chairman of the joint water problems committee of the State legislature who will certainly have something, I believe, to say and will, I am sure, be concerned with this problem along with congressional committees which have jurisdiction of it.

Senator Williams, we appreciate the fact that you have come here to sit with this committee and your interest in this problem and we want to assure you that it is our desire to cooperate with the very important committee of the State legislature of which you are the chairman.

## STATEMENT OF SENATOR J. HOWARD WILLIAMS

Senator WILLIAMS. Thank you very much, Mr. Chairman, and members of the congressional committee. The joint interim committee on water problems had this matter mentioned to them back during the session of the legislature just completed last June. It was mentioned to me by the author of a resolution forming the committee by Assemblyman Ralph Cloyd, who is the assemblyman here from San Diego County. Ralph, would you care to stand up so your people will know who you are. [Applause.]

I might say, for the benefit of the people here in this district, that Assemblyman Cloyd is the vice chairman of this committee. I think it is also worth noting the fact that an invitation was received by me from your chamber of commerce here in Fallbrook and from your committee of the chamber of commerce, and I think they should be complimented on the fine presentation made here at this hearing. [Applause.]

I might state for the benefit of the congressional committee that I am not related in any way to the Vails or the O'Neills. Nor to the Hatfields or the Coys, either.

When I first arrived here one gentleman told me that all this area needed was water, and contented people. I was reminded that that is all hell needs. But I would like to say to you people here today that it has always been my concept that the laws of California, as they deal with water, were enacted on the basis that the State controlled the water and it was rather astounding to me to hear the claim that possibly the United States controls the water of our State of California.

Mr. Chairman, I would like to say on behalf of the water committee, and the people of this State, that we are very appreciative of you and your committee taking your time, and I am also happy to note that three members of your committee are Californians and one member is from our sister State of Nevada and that one member comes from the State of Pennsylvania, and I hope that he will convey back to his people the possibility, as he sees from this hearing, of what might happen to the water of his State, which I understand is very plentiful.

This morning I was in the company of one of the members of this community, Mr. Anthony, and he took me over part of the area and particularly his ranch. With me was Mr. George Murphy, who sits over at my right here at the end of the table, who was loaned to the committee as legal counsel from the legislative counsel's office in Sacramento. I am sure that Mr. Anthony's problem is the same as the other people of this district. He started here with practically nothing and built a very fine ranch and raises excellent avocados, and what he wants is water and then he wants to be left alone. I think that is the feeling of a lot of these people. They pioneered this country and I was pleased yesterday to hear the testimony of so many people that had been connected with the soil for so many years gone by. I lived in San Diego in the years of 1907 to 1927 and I know something about the county and the rural area of San Diego. It is rather surprising to me that in the course of serving so many people in regard to this lawsuit they did not happen to serve two or three tourists that came through the area at the same time.

120      SANTA MARGARITA WATER RIGHTS CONTROVERSY

But I can tell the committee and I am pleased to tell the committee, that the committee on water problems of your legislature is definitely interested and we are happy to be here and sit in on this hearing and to hear this important testimony. I think proof of that statement is in the fact that 7 of the 10 members have sat in on most of the hearings yesterday and today and I can also assure the committee and the people of this State that we will cooperate fully with your congressional committee and with the Federal Congress and with all departments of our State and Federal Government involved, and I feel, too, that this is a question of State's rights. I feel that unless this suit is stopped or modified in some manner that we will eventually get into the problem of where the people of this Nation will be ruled by men and not by laws. Then I think we will cease to be a nation of free men. Mr. Chairman, I appreciate this opportunity to speak to you, and I thank you. [Applause.]

Chairman ENGLE. Senator Williams, we are glad to have you here and we appreciate your appearance and your statement. We have many mutual problems throughout California and we will be working together, I assume, on those problems from almost, literally, the Oregon line to the Mexican border. I think there is not very much difference in our viewpoint in regard to how those water problems should be handled, notwithstanding that this is a Federal legislative committee and you represent a State legislative committee.

Now there is one gentleman here I want to call to ask a question of, just one question, Mr. Lawrence M. Wright. Is Mr. Wright here?

Mr. WRIGHT, I understand that you are the attorney for the Vail interests; is that correct?

Mr. WRIGHT. One of the attorneys. That is correct.

Chairman ENGLE. One of the attorneys for the Vail interests. Now, without trespassing at all on the confidential relationship which exists between you and your clients, I wonder if you would be willing to say whether or not you, as one of the attorneys for the Vail interests, have ever regarded the Santa Margarita judgment as wiping out all of the other rights on the river.

Mr. WRIGHT. I have repeatedly stated that the judgment is binding only on those parties to the judgment and I don't believe there has ever been any difference of opinion among the Vails in that respect.

Chairman ENGLE. Thank you very much. That is a significant addition to this record. [Applause.]

Now, there is some tidying up, but before I do that, I want to ask our local assemblyman: Do you desire to make a statement at this time?

Mr. CLOYD. Mr. Chairman and members of the committee, I know that you have been told many times that the people around Fallbrook and the Santa Margarita area appreciate your coming out here. I would like to also tell you that I appreciate your coming out here because I represent this district in the State assembly. The problems of the people in this district are my problems and I want to also thank Senator Williams for bringing the water problems committee down here and I think the testimony that has been presented here has impressed you people with the sincerity and the individual type of people who represent this type of people. My only sorrow is that I will no longer represent this district due to the reapportionment

and that you will have to elect a new assemblyman from this territory up here.   But I am sure——

Chairman ENGLE. They will also have to elect a new Congressman, won't they?

Mr. CLOYED. That is right.   But I am sure that the people will select the person that will represent us with the type of people that are represented here today.   It is a pleasure to be down here and listen to the testimony.

Chairman ENGLE. Thank you very much, Assemblyman Cloyd.

Now, as I said, there is some tidying up that we have to do here on the record.   Mr. Swing read from several documents.   I am wondering, Mr. Swing, if we could get those documents, or excerpts from them, sufficient to indicate the general continuity of your thought?

Mr. SWING. I have made an appointment with your official reporter to sit down with him and take such extent of time as he wants and go through the documents to which I referred and he will copy them in whole or in part as the context of the testimony and the questions of the Members of Congress are desired.

Chairman ENGLE. I think that we can trust the judgment of our former colleague, Mr. Swing, to get us a sufficient coverage of the context in the record to give clarity to the testimony, and in each instance to specify the source of the material.   Without objection such additions as may be necessary to the record, from the matters referred to by Mr. Swing in his testimony, will be made a part of the record at the appropriate place.

Now I am going to make a few comments with reference to what has been said here and I will ask each of my colleagues if they desire to review, briefly, at the close of this hearing, their thoughts.

I would like to tell you that we have not called witnesses from any Federal agency because we did not see any sense in traveling 3,000 miles to put on the witness stand people we can get a hold of within 3 blocks from where we operate in Washington, and at a later time we intend to secure the appearances of proper representation from the Attorney General's office.   I am not concerned too particularly with Mr. Veeder.   I think perhaps we ought to start with the Attorney General and with the Secretary of the Navy.   [Applause.]

Now this has been a remarkable hearing.   I suspect that none of these legislators, and they are all legislators of experience, Mr. Baring and Mr. Yorty both served in their State legislatures, and Mr. Poulson and I both served in the State legislature, and Mr. Saylor has been in Congress—this is his second term—I doubt if any of us have seen a hearing like this.   It results from the fact that we have a lawsuit here which is remarkable, not only in size but absurdity.

We had some conception of what was going on from what we had heard back in Washington, but they always say that one look is worth a thousand words, and this hearing here has been very, very revealing to me.

You may wonder why a presumably responsible Federal agency would enter upon an enterprise of the sort that is in progress in this area.   There are a great many things that perplex us in Government.   We have had some perplexing things happen in recent years that there is no apparent, no reasonable answer to.   You can't understand why reasonable men would undertake any sort of a proceedings such as this.

I think that you all should know that the Attorney General's office operates under considerable hardship. The Attorney General's deputies and assistants and assistant deputies and deputy assistants are all underpaid. They don't get enough money and as a consequence you have two kinds of lawyers working for the United States Attorney General's office. You have what I call the professional derelict; they are the worn-out, drunk-out, and drug-out. They seek haven in those jobs and they are not top-flight lawyers. If they were they wouldn't be in the jobs they hold because they could go out and make, after their years of legal experience, at least 3 or 4 or perhaps 5 times as much money. Then you have the other class in the Attorney General's office. You have the bright young men who want to sharpen their professional claws while drawing a small salary from Uncle Sam, and often they are men of real promise and ablity, but since they haven't had any experience their judgment is very, very poor indeed. They haven't any sensibility at all to the terrific impact which the exercise of the massive power of the Federal Government can bring against the people of this community, people who are a real part of the Federal Government.

Occasionally those young fellows will go in there, as I say, just to sharpen their professional claws while they learn the legal business in the hopes later of getting out and getting into something else. They get married and raise families and they find out they can't get out for economic reasons and they are locked in by circumstances which creates what I call professional frustration. Then you get these legal sadists who want to swing a legal bullwhip over people to compensate for the personality losses under which they are suffering. From that comes these kind of wholly unreasonable and incomprehensible actions by Federal agencies. When you understand those things you understand why high Government officials turn Communist and why Government scientists turn Communist and professors of colleges turn Communist. It is a quirk in their minds and you get the same thing among lawyers who become frustrated and have to exercise their power in some way or other. We have to watch for that in Government and to corral it as best we can.

Now I am not characterizing anybody in connection with this procedure and I haven't by anything I have said given any indication that I regarded anybody here, and especially the gentleman who has been regarded as the evil genius of this whole business, in either one category or the other. I am just saying that we do get those incomprehensible things which occur, and it is our job to take care of them as best we can.

Now, when the executive branch of the Government, within the framework of law, abuses its discretion by an arbitrary and unreasonable exercise of power, there are only one or two ways that the people can protect themselves. They can protect themselves by political action of one kind or another; call on their legislators, and try to exercise political power directly by calling upon the United States Attorney General, Mr. McGrath, to ask him to change the type of procedure that he is following. Mr. Yorty referred to another type where we go on the floor of the House and hack at the appropriations which hire these people who abuse the authority and the power which is vested under the law in the executive branch of the Government.

And then the other way, of course, is to change the framework of the law inside of which the executive branch is working, so it will no longer be possible for them to swing their bullwhips quite so wide and to strike as many people.

These are the remedies that are open to people in Fallbrook, and I suggest that you use all of them.

As far as this subcommittee is concerned, there are at least two things that we can do.

The first is, that we intend to take care of what we have regarded as the traditional position of the Federal Government on these navigable streams, namely, to rewrite again and again and again into the law, if we have to, the proposition that the control and jurisdiction and distribution of water from these streams is subject to State law. I might say that I have used the words "navigable streams" because, if the Federal Government has any hold at all it has it on navigable streams under the commerce clause of the Constitution. It has no control whatever and no vestige of power or right over nonnavigable streams, as far as I know.

In any event, as little as 3 weeks ago we thought we had reiterated State control of water, and I suppose we are going to have to go back and do it again, but we will do it again. So that is No. 1 that I expect to propose to this committee.

No. 2 is that I expect to make a proposal, in order to get a specific remedy for this area, that this subcommittee report to and recommend to our full Committee on Interior and Insular Affairs, that it report out legislation implementing the agreements which were arrived at after weeks and months of negotiation between these local people and all of the Federal agencies involved, and to which all of the Federal agencies directly involved agreed, save and except, so far as I know, the Attorney General's office.

Mr. POULSON. Mr. Chairman, now is the time to act. I so move that this committee go on record at this time.

Mr. SAYLOR. I second the motion.

Chairman ENGLE. My colleague is right up on the bit, I see. I hadn't got this quite down into shape yet; I am explaining precisely what I mean so that if the gentleman wants to move it he can do it now. What I was going to propose to the subcommittee is that when we file our report on this hearing to the full committee that we report and recommend that this agreement, which was reduced to writing and agreed to by everybody, be implemented by legislation, and I mean that we intend to include in that language which will protect the rights and the utilization of the waters for this area and limit the rights and utilization of the Federal Government. [Applause.]

Chairman ENGLE. My colleague has moved it and the gentleman from Pennsylvania has seconded. All in favor say "aye."

The subcommittee has voted unanimously on the motion. [Applause.]

I will ask Mr. Carr, the consulting engineer of our subcommittee, to get in touch with Mr. Phil Swing and other proper people here in the area so that he can get the form of those agreements and the proper form of recommended legislation.

Now, I didn't intend to talk so long or get so much done. I should say I didn't expect to get so much done so fast. The Chair recognizes Mr. Poulson.

Mr. POULSON. I think I have expressed my opinion throughout these hearings, but I can say one thing, that seeing and hearing is certainly believing. I had no idea, when I came to Fallbrook, of the extent to which this ridiculousness went. I never realized the depth that it went as far as the principles were involved. I think our chairman very ably described these sadists. I heard and read, as all of you have, of what they call the attempts in proletarian countries to invoke their controls, and we need proper control. We have an example of it today when this lady testified that just because she lived in a Federal housing that she was subject to the suit, and she was also being subpenaed before the court; and then the other lady who thought that maybe in the future she might use the water was also called into court just because she thought about it. So I think that after all, while this is rather humorous, it is really very serious.

Chairman ENGLE. Now, Mr. Yorty.

Mr. YORTY. Mr. Chairman, ladies and gentlemen, I have very little to say now. I came here along with the other members of the committee to get the facts and, believe it or not, it is hard for a Congressman to get the facts from these Federal agencies in a matter of this kind when they are unwilling to disclose all of the transactions which have led up to their various decisions.

I asked the Navy a month ago for the draft to which Congressman Swing referred in his testimony, of the proposed draft of the bill. I asked them for a copy of the proposed memorandum of agreement, and up until this time I am still unable to get it, and this committee, I believe, would not get it short of a subpena and maybe not even then, if it were not in the possession of Mr. Swing. So you can see that even Congress is handicapped. We have small staffs and we have small facilities, all too small for the job that we are now called upon to do. I don't want to make a summarization of the testimony here after listening to what I considered the brilliant statement of our distinguished chairman, Mr. Engle. [Applause.] I agree with him that there is a great danger that our Government is getting away from the people. We have got to be on guard against it.

As we transfer these transactions back to Washington in these complex bureaus, Government tends to get away from us and the people in these bureaus tend to identify themselves with some third character called Uncle Sam, who is separate and apart from the people. They don't seem to understand that the people all over the United States, right down to the grass roots, are the people that officials are supposed to be representing, and not some mythical, powerful character who is separate from the people, a dictator and a tyrant over them, and who possesses some sovereign power that transcends any power that the people may have.

Now, I think I can safely say that Congress is probably closer to the people than any other agency of Government. That is why we are out here. We are the agency coming to you. We want to bring the Government right back down to where you can talk to us and we can get the facts. And perhaps with the facts our judgment in this matter will be better than the judgment of some of those in the

other agencies who have gotten away from the people and who don't really seem to fundamentally understand our form of government.

I personally was very much impressed with the sermon by the Methodist minister who said that this might all be legal and still be immoral or not moral, as he put it. I think that is exactly right. It isn't within the proper province of the Federal Government to go out and use legal technicalities to seize property or to acquire property or to exert sovereign dominion over property of its citizens even though technically, in a legal sense, by a very careful construction of some of the past decisions they might legally succeed. Still, when they come down to suing people who have relied on the good faith of their Government, relied on the judgment of Government officials, people who, in good faith, have tried to be good citizens, who have done nothing an ordinary citizen wouldn't do in the course of his lifetime, it just seems to me that even though they may be able to win the lawsuit in the Federal court, still it is an immoral thing to do and it is wrong. I am sure that all members of this committee have indicated the feeling that even though the Government might make some pretension of legal correctness which, of course, as yet has not been sustained, nevertheless it is already apparent, without trying the lawsuit, that their action is very immoral, should never have been started and certainly should be stopped at this point. [Applause.]

The minister, in his next sermon, if he talks about people getting drunk might also say that there are many ways to get drunk and sometimes people get drunk just with power. That is the sort of thing that worries me when I see it happen in Washington, when they get this power complex identified with Uncle Sam. It is a very dangerous trend.

Now the Government at Washington is not entirely at fault for this situation. In recent years people from all over the country have taken it upon themselves to run back to Washington for everything they want and they seem to lose the ability to go on and solve their own problems in their own way without asking for some kind of Federal financing to get the Federal Government into their problems, then, after getting them in, they wished they had gone on their own way and had kept them out. Many of the projects with which we deal are eventually paid for in the area served anyway—paid for by the people there, and so it is only a matter of temporary use of the Federal money, but in taking that temporary use of the Federal money, and in going there and asking for it, you get the bureaucrats in Washington involved in your affairs, even though you pay off the entire cost of the project. You are never able to get them out again, so the people, in the States, can reverse that trend somewhat by taking back to themselves the initiative in doing some of these things for themselves. Now you will recognize what I am saying applies somewhat to the situation here with the second barrel of your aqueduct. I am very sorry that as Californians we didn't just go ahead and do this thing ourselves and leave the Federal Government out of it. If we had done that we would have been better off. [Applause.]

Chairman ENGLE. Mr. Saylor, the gentleman from Pennsylvania.

Mr. SAYLOR. Mr. Engle, I want to say to you and the members of our committee, to our hosts here in Fallbrook, the citizens of Fall-

brook, that I sincerely appreciate the opportunity of being out here and participating in these hearings. I am going to go one step further than our chairman. When we get back to Washington I am going to get a brand new resolution—I am worried about the form, and I am thinking about it right now, as to how I am going to prepare the wording to the Attorney General and all of the people that work for him, that this suit be withdrawn against all fourteen-thousand-odd defendants. [Applause.]

Now, I don't want to impose upon the lawyers out here, and I don't want anybody to walk out of this hearing and say that there is a fellow from Pennsylvania that is practicing law out here, because that is not what I am doing. I could tell you, maybe, what the law was in Pennsylvania if Uncle Sam was not involved in it, but I sincerely believe that I am not far wrong when I tell you, the citizens, that if this suit is withdrawn that it will not be necessary for you to file any other suits to quiet the title to your land, and if this suit is withdrawn that you will then be able to continue just as good American citizens that you have been in the past.

Now, I don't know whether you folks from Fallbrook really appreciate what you are, because you are Americans. You are, as Mr. Yorty said, the Government, and if the Government gets away from anybody, the only people that it can get away from is you, and while it may seem a long time from election day to election day, the executive department and all the bureaucrats in Washington, and anywhere else, are awfully cognizant of John Q. Public on election day. While I may not like, and you may not like, some people that get elected to office, I am awfully well satisfied that if the American people will get out and vote and put into office what a majority of you want, and if they don't do what they tell you they will do the next time they come up, be they Congressmen, be they assemblymen, be they Senators, be they governors, be they Presidents, vote them out. That is your American privilege. [Applause.]

Don't forget that you are not living in the days of our ancestors when it was a long time from the east coast to the west coast. News is out here on the west coast at the same time that it is on the east coast. You know, over national hook-ups, the people who live in New York City and Maine hear the same voice at the same time that you hear it here in Fallbrook and on the west coast. This, I hope, is a means of awakening the people out here in the West, because to me it is just another example of what happens when the Government tends to get away from the people and they tend to put in positions of trust and power people who think they can plan your lives, your children's lives and your community's life better than you can, and as far as I am concerned, there has never been anybody in Washington, there has never been anyone in these United States, that can plan any better for Fallbrook, Calif., than the citizens of Fallbrook. [Applause.]

If they get away with this case it is just another little homeopathic dose, you may think, but don't forget the homeopath gave it to you in small doses and the allopaths gave it in little heavier doses, but you got the same results. If they get through with this you have just lost a little more of your rights. They have just taken a little more away to the Great White Father, that mythical man that Sam talked about,

because he does not exist. It is just you giving away part of yourselves, and when you give away part of yourselves, remember that the first thing you know you have given away everything, and then you have got yourselves, as they have got in England, a nice socialistic state, and don't ever let anybody tell you different. The only difference between socialism and communism is just a little shade. They are both red, and one is a little redder than the other. I hope, as the result of this hearing, that the people out here in southern California will realize that they are Americans and that they have a great interest in this country and that they will exercise those rights which you fought for and which your ancestors fought for, and when you people came out here, resurrected and saved this soil and carved out a little niche for yourselves, will just make it a better place so that when the day comes that you will pass on, and are ready to lay down, you will be able to look at your children and say, "My grandfather fought for something and gave it to me, and so did my dad, but I fought a little, too, and I have got something just a little better to hand on to you." Thank you. [Applause.]

Chairman ENGLE. Mr. Baring?

Mr. BARING. Mr. Chairman, I have been traveling for the better part of 2 weeks from the Shasta Dam down to Fallbrook, and I do want to remark about the wonderful hospitality of the California people. They have treated us wonderfully in every city we have stopped.

I want to say in regard to the present meeting that my philosophy has always been one of State rights, and I have heard the word "immoral" used today in connection with the bureaucrats whom I don't get along with. I think we ought to change that for the record because of the very meaning of the word "immoral" to "unmoral."

I have listened to testimony for 2 days. I haven't asked any questions because I didn't think it was necessary. The great people of this city have given honest and sincere testimony and I have just listened with the greatest of interest and I assure you all I am going back to Washington and do my very best to alter this case. Thank you very much. [Applause.]

Chairman ENGLE. I would like to close this meeting by saying that this subcommittee appreciates the presentation that has been made here by the people of this area. The Fallbrook Chamber of Commerce, the subcommittee on water litigation, the Fallbrook Utility District, and all those individuals who have come here to add their part to these proceedings have been helpful and instrumental toward solving the problem which you people face. I want to add that in adopting the motion which was adopted here we have just taken formal action which will be followed up later, vigorously. We intend to follow it up vigorously and in the event that it is necessary we may ask some representatives of this area to appear in support of the report this subcommittee will make to the full Committee on Interior and Insular Affairs, which has the power to take the action that has been suggested.

Now, with that, and with thanks to all of you, it has been a great pleasure to be here and this subcommittee will now stand adjourned.

(Following the hearings held August 13 and 14, at Fallbrook, Calif., relative to the Santa Margarita water rights controversy, the Honorable Clair Engle of California, Chairman of the Special

**128**     SANTA MARGARITA WATER RIGHTS CONTROVERSY

Subcommittee on Irrigation and Reclamation, submitted to Hon. John R. Murdock, Chairman of the Committee on Interior and Insular Affairs, the following report and recommendations: )

REPORT OF THE SPECIAL SUBCOMMITTEE ON IRRIGATION AND RECLAMATION

SEPTEMBER 18, 1951.

Hon. JOHN R. MURDOCK,
  *Chairman Committee on Interior and Insular Affairs,*
    *House of Representatives, Washington 25, D. C.*

MY DEAR MR. CHAIRMAN: This letter will serve as a report on the hearings of our Special Subcommittee on Irrigation and Reclamation, which held hearings at Fallbrook, San Diego County, Calif., on August 13 and 14 regarding the controversy between the local people and the Federal Government over the waters of the Santa Margarita River. These hearings at Fallbrook were the last assignment of the special subcommittee which attended the Central Valley project celebrations and also conducted other inspection trips while in California as requested in your letter of July 19, 1951.

Brief reports on other assignments of the subcommittee in the Central Valley of California and in Santa Barbara County will be covered separately.

The subcommittee for the hearings at Fallbrook, San Diego County, Calif., consisted of the following members:

Representative Clair Engle, chairman
Representative Walter S. Baring
Representative Samuel W. Yorty
Representative Norris Poulson
Representative John P. Saylor

Representative Reva Beck Bosone was a member of the special subcommittee also, but she was unable to attend the hearings at Fallbrook. However, she attended earlier meetings in the northern part of the State.

Mr. James K. Carr, civil engineer and consultant on irrigation and reclamation for the committee, also participated in the hearings and served as clerk at Fallbrook for the special subcommittee.

Our colleague, Congressman Clinton D. McKinnon, was unable to be at the hearings in Fallbrook, which is located in his congressional district. He had to be in Washington, D. C., to appear before another congressional committee on behalf of the people of his district to urge construction of the "second barrel" of the San Diego aqueduct, a water project that is extremely vital to the San Diego area. Mr. O. P. Heald read a statement from Congressman McKinnon in which he said:

"I deeply regret my inability to be with you today for I have looked forward to a congressional hearing at Fallbrook for many weeks."

INTEREST OF STATE OFFICIALS

The hearings were considered of such importance to the people of California that several members of the joint legislative committee on water problems of the State legislature were present and sat with us during the hearings. Also several local and metropolitan newspapers as well as the press associations and bureaus assigned special representatives to report the progress and outcome of the hearings. The members of the State legislature who were present included—

Senator J. Howard Williams, chairman, joint legislative committee on water problems.
Senator Ben Hulse
Senator Nelson Dilworth
Senator Hugh P. Donnelly
Assemblyman Ralph R. Cloyed, vice chairman
Assemblyman John B. Cooke
Assemblyman Harold K. Levering
Assemblyman William S. Grant
Assemblyman Carley V. Porter

The hearings were begun at 2 p. m. on August 13 in the auditorium of the Fallbrook High School, and lasted until 10 p. m. on the 13th, except for a 2-hour break for supper. On August 14 the hearings were resumed at 10 a. m. and were concluded at 1 p. m. The 9 hours of hearings were equivalent to 4½ days of hearings had they been held in the usual manner in Washington where we can conveniently take only 2 hours a day for hearings.

The manner in which arrangements for the hearings were made was outstanding and the local committee in charge deserves high praise for its assistance to the subcommittee. The steering committee for the local people consisted of—

George F. Yackey
Ed Berg
Raymond (Jim) Wayman
George Roesch
Carroll Huscher

Many other local people too numerous to mention made an "all-out" effort to help the subcommittee conduct the hearings with all possible ease and speed. Local organizations also assisted, notably the women's groups of the Methodist Church, the Catholic Church, and the Eastern Star.

You will want a brief report, we are sure, on the interest shown in the hearings which you authorized. The large auditorium of the Fallbrook High School was completely filled most of the time, and because even standing room was not available for everyone, loud speakers were set up on the outside of the building so that the people who could not get into the auditorium were able to listen to the proceedings. The crowds of people coming to Fallbrook were so large that emergency lunch and dining rooms were set up by local church and lodge groups.

### INSPECTION OF AREA

A short inspection tour of the area to see the difference between land with water and without water was sufficient to understand the "life or death atmosphere" which pervaded the hearings so far as the local people were concerned. We will not attempt to reiterate the testimony here, but you will be interested, we are sure, in the transcript of testimony which shows these small landowners were very pleased that a congressional subcommittee would come to California to hear their views. As the chairman said at the conclusion of the hearings, we feel that some inexperienced attorneys in the Justice Department do not fully realize the terrific impact that can be brought to bear when the Federal Government brings suit against an ordinary citizen.

### EXPLANATION OF COMMITTEE'S FUNCTION

At the outset of the hearings the chairman made it clear that the function of the subcommittee was to learn first from the local people the position taken by the Federal Government with respect to their individual water rights and problems, and, second, why it is necessary to serve some 14,000 people, or whatever the figure may be, to settle the water rights of the Santa Margarita River.

At the beginning of the hearings I also made it clear that the committee did not intend to interfere in any way with the court proceedings. In this respect the chairman pointed out the constitutional separation of powers between the executive, legislative, and judicial departments of our Government. He also mentioned, however, that the people had the constitutional right of petition when actions of the Government were unreasonable or burdensome.

With that introduction the chairman explained that we would make recommendations to the Committee on Interior and Insular Affairs, and if the full committee agreed with the recommendations of the subcommittee, then these recommendations would be submitted to the executive departments. He also explained that in the final analysis the Congress could take legislative action which would be binding on the executive department. No executive department witnesses were called because we wished to devote all the time possible to the hearing of the local witnesses.

**130**      SANTA MARGARITA WATER RIGHTS CONTROVERSY

### LOCAL WITNESSES

The subcommittee heard testimony from 29 witnesses, including 22 local land-owners. Approximately 15 other witnesses were scheduled to testify, but time did not permit them to be heard. The witnesses who testified were as follows:

G. E. Arnold, San Diego
E. L. Barbee, Fallbrook
H. H. Bergman, Fallbrook
Felix Carnsey, Fallbrook
J. J. Deuel, Berkley
R. D. Elliott, Long Beach
R. C. Faulkner, Fallbrook
Mary Golden, Fallbrook
Mrs. Etta Hamilton, Fallbrook
Joe Hayes, Fallbrook
O. P. Heald, Fallbrook
Harry Held, Fallbrook
Evan Hewes, Imperial Valley
Mrs. Mary Hubbard, Fallbrook
Arnold Klause, San Diego

Mrs. William Lattimer, Fallbrook
Lawrence Lenfers, Fallbrook
Ruth Lillie, Fallbrook
Ray Gird Peters, Fallbrook
Sam Roper, Fallbrook
Franz R. Sachse, Fallbrook
Judge Harry H. Smelser, Fallbrook
Phil D. Swing, San Diego
Charles Stubblefield, Fallbrook
Raymond Wayman, Fallbrook
Victor B. Westfall, Sr., Fallbrook
Charles H. Wilding, Fallbrook
Senator J. Howard Williams, Porterville
George F. Yackey, Fallbrook

The selection of witnesses by the local committee was done in such a way that our subcommittee obtained representative testimony in a short period of time. Introductory remarks were made by Mr. Raymond Wayman and Mr. O. P. Heald. Mr. Victor B. Westfall, Sr., a merchant and long-time resident of the area, outlined the Fallbrook area history for the members of the subcommittee. Mr. Evan Hewes, president of the Imperial irrigation district, spoke as a representative for all affected parties. The Fallbrook utility district was ably represented by Mr. George F. Yackey, chief engineer and general manager, and Mr. Phil D. Swing, attorney for the district. Mr. Swing's testimony was of particular value to the subcommittee and I shall report further on it in subsequent paragraphs.

### WATER USERS REPRESENTED

Local landowners were called representing various categories substantially as outlined below:
(a) Riparian owners on the Santa Margarita River.
(b) People of the upper basin area.
(c) Riparian owners using off-the-river wells with no other source of supply.
(d) Appropriators using water under permit.
(e) Owners of patented land.
(f) Users who have no other source than the Fallbrook public utility district.
(g) Utility district landowners who depend entirely on well water.
(h) Utility district landowner who can use district services but depends entirely on local ground water services.
(i) "Shotgun" action people who were served although they own no land in the Santa Margarita watershed or who don't own any land at all.
(j) Owners who own land in the Santa Margarita River watershed but use water from the watershed of the San Luis Rey.

Other witnesses were representing various organizations. Among these witnesses were Franz R. Sachse, former president of the Fallbrook utility district and former deputy director of public works for the State of California; J. J. Deuel, California Farm Bureau representative; and Arnold Klause, assistant manager of the San Diego Chamber of Commerce.

It was a pleasure to also have the statements of Senator J. Howard Williams, chairman, and Assemblyman Ralph R. Cloyed, vice chairman, of the State legislative committee on water problems.

### HISTORY OF NEGOTIATIONS

We referred earlier to the testimony of Mr. Phil D. Swing, former Member of Congress and attorney for the Fallbrook public utility district. Mr. Swing's testimony is especially valuable to the subcommittee because it documents the events that led up to the action of the Justice Department which precipitated

the present controversy over the waters of the Santa Margarita River. From Mr. Swing's testimony the important documents and actions can be listed generally as follows:

1924: Fallbrook irrigation district (predecessor in interest of the Fallbrook public utility district) made a filing on waters in the Santa Margarita River.

1943: Fallbrook public utility district installed a pump in the Santa Margarita River and began continuous use of water from the river.

October 4, 1943: Fallbrook public utility district made application to divert 2½ cubic feet per second from Santa Margarita River.

October 11, 1943: Fallbrook public utility district filed application No. 11587 for 10,000 acre-feet per annum from the Santa Margarita River (permit granted April 23, 1951).

November 28, 1947: Fallbrook public utility district filed application No. 12178 for 10,000 acre-feet per annum from the Rainbow River, tributary to the Santa Margarita River.

November 28, 1947: Fallbrook public utility district filed application No. 12197 for 10,000 acre-feet per annum from Sandia Creek, a tributary of the Santa Margarita River.

February 18, 1948: State of California granted the application of the Fallbrook public utility district for the right to divert 2½ cubic feet per second from the Santa Margarita River.

June 30, 1948: United States Navy filed application No. 12576 for 165,000 acre-feet per annum to be impounded behind the proposed DeLuz Dam from which a safe yield of 12,700 acre-feet per annum was expected.

1948: (Negotiations were underway for a memorandum of understanding between the Fallbrook Public Utility District and the Departments of the Federal Government that were involved when the Navy's application for hearing was noticed. Mr. Swing attended his first conference regarding negotiations on November 17, 1948).

January 13, 1949: Assistant Secretary of the Interior William E. Warne informed Mr. Phil D. Swing by letter that some agreement on the project for the Santa Margarita River was expected momentarily.

January 27, 1949: An all-day conference of interested parties was held which resulted in a tentative agreement and drafting of a resolution.

January 31, 1949: The board of directors of the Fallbrook Public Utility District unanimously adopted the resolution which had been drafted to represent the consensus of the conference.

March 1949: Fallbrook Public Utility District entered a protest against Navy application No. 12576.

March 15, 1949: Mr. Phil D. Swing received information in a personal letter indicating a bill had been drafted so the matter could be handled separately from the public works authorization.

March 29, 1949: The Navy acknowledged the protest and said "the cooperation and interest of the Fallbrook Public Utility District in furthering the cause of the proposed multiple-purpose dam is appreciated, and it is sincerely hoped that the project will receive the early approval of Congress."

May 4, 1949: Mr. Phil D. Swing, representing the Fallbrook Public Utility District, met with interested parties in Washington, D. C., to reach an agreement on the draft of the legislation.

May 5, 1949: Mr. Swing and Congressman McKinnon met with Mr. Veeder and agreement was reached that the Fallbrook Public Utility District would "secure from the Vail interests a written waiver and consent that the Government might deliver from the DeLuz Dam, and from their share of the water, 7,500 acre-feet of water to Fallbrook and that Vail would never at any time claim that was a violation of the stipulated agreement."

May 6, 1949: Mr. Swing and Congressman McKinnon presented a form of waiver to the Justice Department representatives and were informed the Justice Department would consider it and inform Messrs. Swing and McKinnon shortly of the Department's views.

May 17, 1949: Mr. A. Devitt Vanech, representing the Justice Department, wrote a letter to Mr. Swing saying the matter had been discussed with the Navy Department and copies of the form of waiver had been forwarded to the Navy and Mr. Swing could expect to receive an acceptable form of waiver about May 25, 1949.

June 9, 1949: Mr. A. Devitt Vanech, representing the Justice Department, informed Mr. Swing that "consideration has been given to the proposed communication [the form of waiver] and it appears adequate to cover the proposition discussed between representatives of your Department and representatives of this Department."

July 16, 1949: Congressman McKinnon informed Mr. Swing by telegram that the proposed form of waiver for Vail had been approved by the Justice Department in a letter of the Navy Department.

August 2, 1949: Memorandum to Admiral Manning by Willis R. Dudley regarding a conference of July 29, 1949, which mentions for the first time, in Mr. Swing's opinion, that the stipulated judgment between the O'Neills (Santa Margarita Rancho) and the Vails divided up all the water in the Santa Margarita River. (See transcript of testimony for details.)

September 29, 1949: Congressman McKinnon reported that the objections raised with respect to the transmittal of the form of waiver for the Vails had been overcome and Mr. McKinnon said he would introduce the necessary legislation for the multiple-purpose project as soon as the Navy Department and Interior Department had approved the draft of it.

December 12, 13, and 14, 1949: Conferences were held at Camp Pendleton and as a result a memorandum of understanding was drawn up by the representatives of the interested parties who were present.

December 22, 1949: Memorandum of understanding was transmitted by Captain Johnson to the Fallbrook Public Utility District.

January 9, 1950: The Fallbrook Public Utility District approved and executed the memorandum of understanding between the Department of the Navy, the Fallbrook Public Utility District, the Department of the Army, and the Department of the Interior.

January 11, 1950: Executed documents were transmitted to Captain Johnson.

January 24, 1950: Congressman McKinnon wired Mr. Swing that the "San Diego agreement scheduled to be signed without change by Admiral Jelley tomorrow."

March 20, 1950: Congressman McKinnon reported after several delays and inquiries—

"Agreement approved today by Chief of Naval Operations. Assistant Secretary must now approve and then Secretary Navy shouldn't be long."

March 27, 1950: Congressman McKinnon informed Mr. Swing by letter:

"I feel sure we will have the San Diego agreement ratified by Secretary of Navy before week is out and the Secretary of the Interior is all set to go as soon as we get the document over from the Navy."

Mr. Swing's testimony indicated that following March 27, 1950, there were no communications or written documents stating the memorandum of understanding would not be approved by the Navy or the Justice Department until the complaint was filed on July 18, 1951, in the case of the *United States of America v. the Fallbrook Public Utility District et al.*

#### TWO BASIC QUESTIONS

At the opening of the hearing, the Chairman stated two basic questions which he hoped the hearings would answer.

The first was the reason and the necessity for a suit of this magnitude involving as it did between 10,000 and 14,000 defendants. Nothing which developed in the hearings indicated the necessity or any good reason for bringing a suit involving thousands of small defendants with trifling or nonexistent water claims. Ninety percent of the water in the Santa Margarita River is used by less than 10 percent of the users. Consequently, it would be possible to get a practical definition of the water rights on the river by suing the 10 percent using 90 percent of the water. Suing the thousands of small defendants as the Government has done in this instance may give a technical and encyclopedic definition of the water rights. But, such a definition is of no practical value for the reason that not more than 90 percent of the flow in the watershed can be controlled anyway. The losses in a stream from transpiration, evaporation, and casual and insignificant diversions ordinarily amount to more than 10

percent. Therefore, no useful purpose is served by securing a legal and encyclopedic definition of water rights down to the last bucketful. It can be concluded, then, that the legal theorists in the Attorney General's Office have unnecessarily put the Federal taxpayers to great expense and the local people to great provocation and legal expense for no practical reason whatever.

The second question stated by the chairman at the commencement of the hearing is whether or not the Federal Government asserts some right or claim in its sovereign capacity which could not be asserted by a private holder of the same purchase documents. It appears from the testimony that the Government is standing on its purchase documents, plus the stipulated judgment between the Vails and the O'Neills. The pleadings filed by the Government are subject to the interpretation that it asserts some claims in its sovereign capacity and for defense purposes, although this has been denied by the Government's attorneys. The Government apparently takes the position that the stipulated judgment between the Vails and the O'Neills divided the river and that the judgment was binding on everyone on the watershed even though other users on the river were not parties to the litigation. This is a novel legal theory, to say the least, but it would seem to indicate that the Federal Government is not asserting a higher position than a private holder of the same purchase documents could assert. However, it might be well to point out that in the testimony before the judiciary subcommittee of the House, the representatives of the Attorney General's Office indicated that they would assert the Federal Government's sovereignty against any claim of prescriptive use of water which might impair the Government's rights under its purchase documents. If this position is sustained by the court, a Federal agency on any stream in California will to that extent become a preferential user of water with preferential rights not subject to impairment by prescriptive use of water by others.

### NAVY MANEUVERS

It is apparent from the testimony that the Navy does not come into the court of public opinion with entirely clean hands. The Navy had participated in the original negotiations with the Fallbrook Public Utility District, which culminated in the memorandum of understanding approved on December 14, 1949. From the negotiations it was apparent that the Navy was not only willing but anxious that the Army engineers, the Bureau of Reclamation, and the Fallbrook Public Utility District jointly undertake the necessary steps to build the reservoir contemplated at the DeLuz site. It was obvious that the Navy saw no chance of building the project itself at that time, and hoped to gain by the sponsorship of the project by the Bureau of Reclamation, the Army engineers, and the Fallbrook Public Utility District. After the passage of the omnibus defense public works bill, which in effect authorized the Defense Department to build anything it wanted to provided the construction was connected with a defense installation, the situation was quite different. The Navy saw the chance to build the project itself and to exclusively own and operate it. Thereupon, the Navy took advantage of the technical machinations of the legalists in the Attorney General's Office as a convenient method of escape from an agreement mutually and openly arrived at. This was nothing more or less than Federal interagency power politics in the raw.

### CONSTRUCTIVE APPROACH REQUIRED

As we developed the testimony during the hearings it became apparent that not enough water could be available to meet all of the requirements of the Federal Government and the needs of the rapidly growing local area unless the floodwaters of the Santa Margarita River could be controlled and put to beneficial use. Therefore, we endeavored to take a constructive approach to the problem, bearing in mind that litigation over limited water supplies doesn't make new water available. During the hearings we also kept in mind a major issue in the hearings which dealt with the right of the Federal Government to take water for its use without regard to the laws of the State which pertain to water rights.

**134**     SANTA MARGARITA WATER RIGHTS CONTROVERSY

### RECOMMENDATIONS

Two major recommendations were made and unanimously approved by the subcommittee as a result of this approach to the problem. The recommendations to the Committee on Interior and Insular Affairs are as follows:

(1) That the committee approve legislation implementing the memorandum of understanding, which was first approved by the Fallbrook utility district on December 14, 1949, and which had the approval of the local representatives of the Department of the Navy, Department of the Interior, and Department of the Army. This memorandum of understanding suggested a distribution of the waters that would be stored behind the DeLuz Dam, which is to be constructed on the Santa Margarita River by the Department of the Navy. Already funds have been appropriated to prepare plans and specifications for construction of the dam. These funds were authorized by title 2, section 201, and title 4, section 401, of the act of Congress of January 6, 1951 (title 1212, Public Law 910).

(2) The subcommittee recommends to the Interior and Insular Affairs Committee that legislation be approved which will make it unmistakably clear that the control, jurisdiction, and distribution of water from the streams such as the Santa Margarita River are subject to State law and that the Federal Government has no control whatever and no vestige of power or right over the waters of these nonnavigable streams.

The form of legislation necessary to accomplish these objectives can be developed in the meeting of the Committee on Interior and Insular Affairs. We are informed that Representative Clinton D. McKinnon, who represents the area covered by the Fallbrook public utility district, is drafting legislation in consultation with the local people which he believes will carry out the recommendations of the subcommittee. We will bring a copy of this legislation to your attention as soon as it has been introduced.

A copy of the memorandum of understanding between the Fallbrook utility district representatives and the local representatives of the Federal Government is attached, together with a letter of December 22, 1949, from Capt. C. R. Johnson, United States Navy, to Mr. Franz R. Sachse, president of the Fallbrook public utility district.

CLAIR ENGLE, <i>Chairman.</i>
WALTER S. BARING.
SAMUEL W. YORTY.
NORRIS POULSON.
JOHN P. SAYLOR.

---

PUBLIC WORKS OFFICE,
ELEVENTH NAVAL DISTRICT,
<i>San Diego, Calif., December 22, 1949.</i>

Mr. FRANZ SACHSE,
   *President, Fallbrook Public Utility District,*
      *Fallbrook, Calif.*

DEAR SIR: As a result of conferences held at Camp Joseph H. Pendleton and the district public works office on December 12, 13, and 14, 1949, in connection with the proposed DeLuz Canyon Dam on the Santa Margarita River, the enclosed memorandum of understanding was approved by all interested parties. Ten copies of the memorandum are forwarded herewith.

It is requested that the Fallbrook public utility district signify by resolution that the memorandum of understanding is satisfactory and that 5 copies of the memorandum be executed and returned to this office, together with 5 certified copies of the resolution authorizing the approval. The approved copies of the memorandum will be forwarded to the Navy Department in Washington for signature of the Navy Department and the other interests that are a party thereto.

A copy of the proposed bill authorizing the construction of the dam is attached to the memorandum of understanding. It was suggested in the conferences that the portion of the bill providing that the Secretary of the Interior shall transfer to the Secretary of the Navy funds received by him from the operator be rewritten in order to assure that funds so transferred will not revert to the mis-

cellaneous receipts of the Treasury, and will be available for expenses arising out of the operation of the reservoir.

A copy of the memorandum of understanding has been delivered by hand to Mr. Phil D. Swing, attorney for the Fallbrook public utility district.

Very truly yours,

C. R. JOHNSON,
*Captain, CEC, USN, Public Works Officer.*

MEMORANDUM OF UNDERSTANDING BETWEEN THE DEPARTMENT OF THE NAVY, THE FALLBROOK PUBLIC UTILITY DISTRICT, DEPARTMENT OF THE ARMY, AND THE DEPARTMENT OF THE INTERIOR

The parties named in the title of this memorandum all being conversant with the terms and provisions of the attached bill for an act to authorize the Secretary of the Navy to construct, maintain, and operate a dam and reservoir on the Santa Margarita River in the State of California and for other purposes, have reached the following understanding relating to the operation of said proposed dam and reservoir when authorized and construction thereof is completed:

1. Best obtainable hydrologic data, which are accepted by the parties as the basis for this understanding show that a dam built at the DeLuz site to a height sufficient to create a reservoir of 188,000 acre-feet active conversation capacity will create a reservoir having a firm yield during its initial filling as indicated by the figures below:

| Active reservoir content Mar. 1 (acre-feet) | Subsequent firm yield (acre-feet) |
|---|---|
| 0 | 3, 400 |
| 44, 000 | 8, 000 |
| 54, 000 | 9, 000 |
| 63, 000 | 9, 800 |
| 74, 000 | 10, 800 |
| 83, 000 | 11, 600 |
| 94, 000 | 12, 500 |
| 98, 000 | 12, 800 |
| 115, 000 | 14, 300 |
| 139, 000 | 16, 300 |
| 160, 000 | 18, 000 |
| 176, 000 | 19, 300 |
| 188, 000 | 20, 600 |

Subsequent to the reservoir filling to 188,000 acre-feet, the firm annual yield is estimated to be 20,000 acre-feet at any stage of the reservoir.

2. As between the naval reservations and the Fallbrook public utility district, division of the waters of the Santa Margarita River and of the DeLuz Reservoir shall conform to the following:

(*a*) Until such time, immediately following construction of DeLuz Dam, as the reservoir attains an active content of 63,000 acre-feet, Naval Reservations will satisfy their basic requirements but not exceed a draft upon the reservoir of 8,000 acre-feet in any year except in the case of a national emergency involving mobilization; Fallbrook would satisfy its requirements to the extent possible without exceeding a draft upon the river or reservoir of 1,800 acre-feet.

(*b*) After the reservoir has attained an active content of 63,000 acre-feet and until an active content of 98,000 acre-feet has been attained, the Naval Reservations will satisfy their basic requirements but not exceed a draft upon the reservoir of 8,000 acre-feet in any year except in case of a national emergency involving mobilization; Fallbrook would divert from the river or reservoir the difference between the firm yield indicated in the table above, and the Naval Reservations 8,000 acre-feet.

(*c*) When an active reservoir content of 98,000 acre-feet is reached, the 12,800 acre-feet yield of the reservoir will have been divided, following the rule of (*b*), 8,000 acre-feet to the Naval Reservations except in case of a national emergency involving mobilization, 4,800 acre-feet of Fallbrook. These quantities represent 62.5 percent and 37.5 percent of the whole. Thereafter, and until the reservoir

fills, the firm yield of the reservoir as indicated by the table above shall be divided in that proportion.

(d) After the reservoir fills, and except in the case of national emergency involving mobilization, the 20,000 acre-feet firm yield would be divided: 12,500 acre-feet to the Naval Reservations, 7,500 acre-feet to Fallbrook. Water unused by either party after the reservoir fills initially would accrue to the credit of that party. Credit to the United States and to Fallbrook shall not exceed 62.5 percent and 37.5 percent respectively of that part of the conservation capacity that would be unoccupied if no credits existed to either party. When the reservoir refills to its full conservation capacity, namely, 188,000 acre-feet, all credits to either party shall become null and void.

3. Water losses from DeLuz Reservoir, including but not limited to evaporation losses, shall be charged against water in storage to the credit of the Naval Reservations, Fallbrook Public Utility District, or both, and against that water which would be in DeLuz Reservoir if no credits to either party existed in the ratio that each segment of the reservoir content bears to the total content.

4. All claims of the Fallbrook Public Utility District in and to rights to the use of waters from the Santa Margarita River will be transferred to the reservoir created by the proposed dam, and after it is in operation, be forever satisfied from the quantities of water accorded to that District pursuant to this memorandum of understanding.

5. It is understood and agreed that the top 23,000 acre-feet of DeLuz Reservoir shall be used exclusively for the control of floods of the Santa Margarita River, under rules prescribed by the Secretary of the Army through the Chief of Engineers.

6. In case the Secretary of the Interior shall, as provided in the proposed bill, transfer to the contracting body or bodies the operation of the works provided for in section 2 of the proposed bill, the Secretary of the Navy will make available to such body or bodies free and unrestricted access to those works as may be necessary for the proper operation of the works and facilities, subject only to the requirements of the national defense.

7. It is understood that nothing contained in this memorandum of understanding is intended to affect the right, title, and interest of the United States of America to the right to the use of water from the Santa Margarita River, as provided for in the judgment entered in the case entitled: *"Rancho Santa Margarita, a corporation v. N. R. Vail et al.*, No. 42850, in the Superior Court of the State of California, in the County of San Diego."

8. It is understood that the Department of the Navy will initiate a request of the Department of Justice that appropriate action by taken by the United States to protect the rights to the use of water as proposed in this memorandum of understanding whenever and wherever the same may be attacked.

9. It is understood that the Secretary of the Navy and the Secretary of the Interior will request the Attorney General of the United States to advise them of the best means to safeguard and protect the use of water by the United States as herein proposed and against any encroachment thereof.

10. It is understood that the provisions of this memorandum of understanding are subject to approval by the Department of the Navy, Fallbrook Public Utility District, Department of the Interior, and the Department of the Army, and that it shall not be effective unless approved by all of the parties.

| | |
|---|---|
| ------------------------------ | ------------------------------ |
| | *Department of the Navy.* |
| ------------------------------ | ------------------------------ |
| | *Fallbrook Public Utility District.* |
| ------------------------------ | ------------------------------ |
| | *Department of the Army.* |
| ------------------------------ | ------------------------------ |
| | *Department of the Interior.* |

(The following bill introduced by the Honorable Clinton D. McKinnon, of California, would carry out the two recommendations of the special subcommittee, which are shown on page 134 of this hearing.)

[H. R. 5368, 82d Cong., 1st sess.]

A BILL To authorize the Secretary of the Interior to construct, operate, and maintain certain facilities to provide water for irrigation and domestic use from the Santa Margarita River, California, and the joint utilization of a dam and reservoir and other waterwork facilities by the Department of the Interior and the Department of the Navy, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Interior, through the Bureau of Reclamation acting pursuant to the Federal reclamation laws (Act of June 17, 1902, 32 Stat. 388, and Acts amendatory thereof or supplementary thereto) as far as those laws are not inconsistent with the provisions of this Act, is hereby authorized to construct, operate, and maintain such facilities as may be required to make available to Fallbrook Public Utility District for irrigation, municipal, and domestic use, seven thousand and five hundred acre-feet of water per annum from the De Luz Reservoir hereinafter described: *Provided,* That the Secretary of the Interior shall allocate to irrigation, municipal, and domestic use an appropriate share of the cost of the De Luz Dam and Reservoir and shall enter into a contract or contracts with the Fallbrook Public Utility District for the delivery of seven thousand and five hundred acre-feet per annum of water from said reservoir on terms and conditions prescribed by the Secretary of the Interior which contract or contracts shall, among other things provide for payment to the United States, upon such terms and conditions and for such period as the Secretary of the Interior shall deem proper, of charges which take into account (1) an appropriate portion of the cost of operating and maintaining the works, including the dam and reservoir and (2) an appropriate portion of the capital cost of such works (including, but without limitation, that share of the cost of the De Luz Dam and Reservoir which the Secretary of the Interior finds properly allocable to irrigation, municipal, and domestic use and such costs of rehabilitation, replacement, and betterment as are required from time to time and as the Secretary of the Interior finds to be beyond the ability of the water users to pay as an ordinary operation and maintenance charge) which contract or contracts shall be renewable, under such reasonable terms and conditions as the Secretary of the Interior shall specify, at the option of the contracting body or bodies: *Provided further,* That the contracting authority herein granted shall be alternative to, and not exclusive of, such authority provided in the Federal reclamation laws and if, in lieu of contracting as hereinbefore provided, a repayment contract is entered into under section 9 (d) of the Reclamation Project Act of 1939, the general repayment obligation shall be spread in annual installments, which need not be equal, in number and amounts satisfactory to the Secretary of the Interior, over a period not exceeding fifty years, exclusive of any development period: *Provided further,* That the Secretary of the Navy shall operate the dam and reservoir for the storage and delivery of water to the Navy reservations located on the Rancho Santa Margarita in San Diego County known as Camp Pendleton and to Fallbrook Public Utility District pursuant to this section in accordance with regulations to be agreed upon between the Secretary of the Navy and the Secretary of the Interior, which regulations shall conform to and be in harmony with the hereinafter-mentioned memorandum of understanding; and the Secretary of the Interior shall transfer to the Secretary of the Navy from the payments made by the contracting body or bodies, funds equal to an appropriate portion of the operating, maintenance, rehabilitation, replacement, and betterment costs of the dam and reservoir, such appropriate portion to be agreed upon between the Secretary of the Navy and the Secretary of the Interior and the contracting body or bodies: *Provided further,* That the Secretary of the Interior may transfer to any body or bodies contracting under this section the care, operation, and maintenance of the facilities constructed by the Secretary of the Interior, under conditions satisfactory to the Secretary of the Interior, and the said body or bodies, and, with respect to such of the facilities as are located in the naval reservations, satisfactory also to the Secretary of the Navy.

There are hereby authorized to be appropriated, out of any moneys in the Treasury of the United States not otherwise appropriated, such sums as may be required to carry out the purposes of this section.

**138**      SANTA MARGARITA WATER RIGHTS CONTROVERSY

SEC. 2. That upon the completion of the construction of the dam and reservoir at the junction of the Santa Margarita River and De Luz Creek in the county of San Diego, State of California, authorized by title II, section 201, and title IV, section 401, of the Act of Congress of January 6, 1951 (ch. 1212, Public Law 910), the joint utilization thereof is hereby authorized by the naval reservations located on Rancho Santa Margarita in the county of San Diego, State of California, and by the Fallbrook Public Utility District, a public agency of the State of California, for flood control, conservation, and storage of water for irrigation, municipal, and domestic purposes, for the use and benefit of said naval reservations and said Fallbrook Public Utility District on a basis of twelve thousand five hundred acre-feet per annum to the Navy and seven thousand five hundred acre-feet per annum to Fallbrook Public Utility District, all in accordance with that certain memorandum of understanding between the Department of the Navy, the Fallbrook Public Utility District, Department of the Army, and the Department of the Interior, agreed to by representatives of said agencies of San Diego, California, December 14, 1949, so far as the same is not inconsistent with the provisions of this Act and as further hereinafter provided.

SEC. 3. The Secretary of the Army through the Chief of Engineers, acting in accordance with section 7 of the Flood Control Act of December 22, 1944 (Public Law 534, Seventy-eighth Congress), is authorized to utilize for purposes of flood control such portion of the storage capacity of the dam and reservoir as may be available.

SEC. 4. All Federal officers in carrying out this and laws relating to water-resources development and utilization, including the furnishing of water to national-defense installations, in States or Territories lying wholly or partly west of the ninety-eighth meridian, shall proceed in conformity with the laws of such States or Territories with regard to the control, appropriation, use, or distribution of water and shall not interfere with or acquire any vested right except upon specific authorization and upon due compensation being paid therefor. The provisions of this Act shall not be construed as affecting or intended to affect in any manner whatsoever the provisions of section 8, Reclamation Act, 1902.

×

626