UNITED STATES OF AMERICA
v.
FALLBROOK PUBLIC UTILITY DISTRICT
ET AL. 1247
CIVIL NO. 1274-SD

FILED

SEP 19 1952

EDMUND L. SMITH, Clerk
By
Deputy Clerk

1310

**FILED**

SEP 19 1952

EDMUND L. SMITH, Clerk

By........................
                    Deputy Clerk

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>       v.<br><br>FALLBROOK PUBLIC UTILITY DISTRICT,<br>  a public service corporation<br>  of the State of California;<br><br>SANTA MARGARITA MUTUAL WATER COMPANY,<br>  a public service corporation of<br>  the State of California; et al.;<br><br>        Defendants;<br><br>STATE OF CALIFORNIA,<br><br>        Defendant in<br>        Intervention. | CIVIL NO. 1247-SD |

BRIEF IN REGARD TO QUESTIONS PROPOUNDED

TO COURT IN ADVANCE OF TRIAL

1311

# I N D E X

|  |  | Page |
|---|---|---|
| I. | RIPARIAN RIGHTS OF THE UNITED STATES OF AMERICA AND THE STIPULATED JUDGMENT WITH THE VAIL ESTATE | 1 |
| II. | APPROPRIATIVE RIGHTS ASSERTED BY THE SANTA MARGARITA MUTUAL WATER COMPANY AND THE FALLBROOK PUBLIC UTILITY DISTRICT | 4 |
| III. | UNDER THE LAWS OF THE STATE OF CALIFORNIA VESTED RIPARIAN RIGHTS ARE PRIOR AND PARAMOUNT TO SUBSEQUENTLY INITIATED APPROPRIATIVE RIGHTS | 7 |
| IV. | CONSIDERATION OF DEFENDANTS' QUESTIONS WHICH RELATE TO THE FIRST TWO QUESTIONS OF THE UNITED STATES OF AMERICA | 15 |
|  | (1) The Riparian Rights of the United States of America in the Santa Margarita River are held correlatively with all Riparian Owners on the Stream | 16 |
|  | (2) "Water can be Demanded under a Riparian Right only for use on Riparian Land." | 17 |
|  | (3) Riparian Rights may be exercised by a Riparian Owner for any Beneficial Use - a Military use is a Beneficial use | 18 |
|  | (4) Riparian Rights Owned by the United States have historically been used for agricultural purposes - when not needed for Military Uses they are still Exercised for that purpose - Defendants may not invade those rights | 22 |
|  | (5) There Resides with the Defendants the Burden of going forward with the Evidence to prove there is a surplus of water in the Santa Margarita River available for appropriation | 25 |
| V. | PRESCRIPTIVE RIGHTS UNDER CALIFORNIA LAW- THEIR ACQUISITION | 27 |
| VI. | MEASURE OF RIPARIAN RIGHTS OF THE UNITED STATES OF AMERICA | 33 |
| VII. | THE POLICE POWER OF THE STATE OF CALIFORNIA DOES NOT CONTROL THE ACTIVITIES OF THE UNITED STATES IN CONNECTION WITH THE MANAGEMENT AND ADMINISTRATION OF THE RIGHTS TO THE USE OF WATER FROM THE SANTA MARGARITA RIVER WITHIN THE BOUNDARIES OF CAMP JOSEPH H. PENDLETON, THE UNITED STATES NAVAL HOSPITAL AND THE UNITED STATES NAVAL AMMUNITION DEPOT. | 34 |

1312

PRELIMINARY STATEMENT

It is respectfully submitted that the admissions
and the express stipulations of the Santa Margarita Mutual
Water Company and the Fallbrook Public Utility District contained
in the Pre-trial Order, Appendix C of this memorandum, entitle
the United States of America at this phase of the proceedings
to have its riparian rights in the Santa Margarita River
declared prior and paramount to the asserted appropriative
rights of the named defendants.  It was in contemplation of
such a declaration that the United States propounded the four
questions to this Court, Appendix A of this memorandum, and
it is with that objective in the foreground that the accompanying
Brief was prepared.  Should the Court declare that the
riparian rights of the United States of America are prior and
paramount to the asserted appropriative rights of the defendants
the measure of the riparian rights remains to be determined.
Due to the known extensive riparian rights of the United
States and other claimants from the Santa Margarita River, the
defendants Santa Margarita Mutual Water Company and the Fallbrook
Public Utility District are confronted with the responsibility
of determining the propriety of engaging in costly and protracted
litigation respecting their rights.  The burden in that regard
is severe for they admit that the earliest appropriative right
which the Santa Margarita Mutual Water Company could possibly
have adjudicated to it is October 4, 1946; the Fallbrook Public
Utility District, that of October 11, 1946.

1313

SYNOPSIS OF MEMORANDUM

Fee simple title to lands riparian to the Santa
Margarita River resides in the United States of America.
The defendants Santa Margarita Mutual Water Company and
the Fallbrook Public Utility District admitted that fact
at the pre-trial hearing; stipulated to it in the Pre-
trial Order.

Riparian rights to the use of water, under
the laws of the State of California, are prior and
paramount to subsequently initiated appropriative rights.
Defendants Santa Margarita Mutual Water Company and the
Fallbrook Public Utility District agree in the Pre-trial
Order that (1) the riparian rights of the United States
of America were acquired in 1942; (2) those rights were
long vested in the Rancho Santa Margarita prior to the
time of their acquisition by the United States; (3) the
earliest priority date claimed by the Santa Margarita
Mutual Water Company is October 4, 1946, the Fallbrook
Public Utility District October 11, 1946.

By reason of the admissions and express stipula-
tions of the defendants the riparian rights to the use of
water of the United States of America are, under the
California law, prior and paramount to the asserted appro-
priative rights of the Santa Margarita Mutual Water Company
and the Fallbrook Public Utility District.

Riparian rights to the use of water are part
and parcel of the land, inseparably annexed to it; they
are not acquired by use nor are they lost by disuse.

1314

Those rights to the use of water are protected
against encroachment by subsequent appropriators
both for the present use for which the riparian
rights are exercised or for any use for which the
riparian lands may be reasonably adapted.

Under the laws of California if a riparian
right is invaded or injured by a subsequent appropriator
the owner of the riparian right is entitled to just
compensation even though the remedy of injunction may
not be available to him.

Riparian rights to the use of water may be
exercised for any beneficial use - a military use is
a beneficial use.  If there were merit to defendants '
contention that a military use is not a riparian use,
which there is not, it does not follow that the United
States is stripped of its riparian rights and that the
water is available to appropriation by late claimants
of the character of defendants.  A non-riparian use
does not deprive a riparianist of his riparian rights.

Prescriptive rights to the use of water from
the Santa Margarita River have been acquired by the
predecessors in interest of the United States and by
the United States through actual, open, notorious, hostile,
continuous and uninterrupted use by them for a period far
exceeding the five-year statutory period.

The prescriptive rights of the United States
of America in the Santa Margarita River are prior and
paramount to the asserted appropriative rights of the

- v -

1315

1     Santa Margarita Mutual Water Company and the

2     Fallbrook Public Utility District.

3

4         Both the asserted claims of the Santa Margarita

5     Mutual Water Company and the Fallbrook Public Utility

6     District are subject to vested rights.  Their asserted

7     claims are subject to the riparian rights of the Vail

8     Estate and the United States.  The Supreme Court of the

9     State of California has recognized the Santa Margarita

10    River will not yield sufficient water to meet the

11    riparian needs of either.  Defendants' rights are subject

12    to every other riparian, prior appropriative, and prior

13    prescriptive claimants on the stream.

14

15        There resides with the named defendants the

16    burden of adducing evidence that there is surplus water

17    above and beyond all prior claims of any character in the

18    Santa Margarita River before they may be accorded their

19    asserted right to appropriate and divert water from the

20    watershed of the Santa Margarita River.

21

22        The police power of the State of California

23    does not control the administration of rights to the

24    use of water within Camp Pendleton and the other military

25    establishments in view of the cession by the State of

26    California to the United States of America of exclusive

27    jurisdiction.  That legal tenet does not increase the

28    rights of the United States in the Santa Margarita

29    River nor permit the invasion of rights of other riparian

30    owners who hold their rights correlatively with those

31    of the United States of America.

32

_B_R_I_E_F_

1       Pursuant to the direction of this Honorable Court there
2  were submitted by the United States of America for determination in
3  advance of trial four questions of law. [1]   Questions were likewise
4  submitted by the defendants in this separate trial. [2]   For such aid
5  as it may be to this Court the accompanying memorandum sets forth
6  the authorities which, it is respectfully submitted, will entitle the
7  United States of America to judgment in this separate trial against
8  the defendants whose interests are at issue.

9       In substance the first two questions presented are whether
10 the United States of America is entitled to have its riparian rights
11 in the Santa Margarita River declared, under the laws of the State
12 of California, prior and paramount to the asserted appropriative
13 rights of the Santa Margarita Mutual Water Company and the Fallbrook
14 Public Utility District.

15      Affirmative response to that inquiry, it is respectfully
16 submitted, necessarily follows from the admissions by defendants at
17 the pre-trial hearing and those contained in the pre-trial order. [3]

18                                I.

19          RIPARIAN RIGHTS OF THE UNITED STATES OF
20          AMERICA AND THE STIPULATED JUDGMENT WITH
            THE VAIL ESTATE
21      These salient facts are admitted and agreed to by the
22 defendants:

23          Fee simple title resides in the United States of
24      America to 135,000 acres of land which is situated
25      largely in San Diego County, California. [4]
26          Those lands were acquired by the United States
27      of America in the year 1942. [5]

28
29 [1]  Appendix A of this memorandum.
30 [2]  Appendix B of this memorandum.
31 [3]  Appendix C of this memorandum.
32 [4]  Pre-trial order, Agreed Facts, page 11, par. E 1.
   [5]  Pre-trial order, Agreed Facts, page 11, par. E 1.

- 1 -

1317

1   They constitute the site for the following

2   military establishments:  Camp Joseph H. Pendleton,

3   the United States Naval Ammunition Depot, and the

4   United States Naval Hospital. 6/

5   Exclusive jurisdiction over those lands has

6   been ceded to the United States of America by the

7   State of California. 7/

8   The Santa Margarita River in its course

9   traverses virtually the length of the military

10  establishments in question. 8/  Thus, for its last

11  twenty-one miles* before entering the Pacific Ocean

12  the Santa Margarita River flows upon and across

13  lands owned by the United States of America.

14  For that distance the United States of America

15  owns both banks of the stream.  There are no water

16  users or landowners on the Santa Margarita River

17  below the lands of the United States of America.*

18  The Santa Margarita River is an intermittent

19  stream in its course across the lands comprising

20  the military establishments in question and

21  throughout its length. 9/

22  Underlying that stream as it traverses those

23  military establishments is an alluvial basin.

24  Numerous wells are maintained in that basin by

25  the United States of America. 10/

---

27  6/  Pre-trial order, Agreed Facts, pages 12, 13, par. E 3.

28  7/  Pre-trial order, Agreed Facts, page 12, par. E 2.

29  8/  Pre-trial order, Agreed Facts, page 13, par. E 5.

30  9/  Pre-trial order, Agreed Facts, page 5, par. A 1; page 7, par. A 9.

31  10/ Pre-trial order, Agreed Facts, page 9, par. C.

32      * With the possible exception of a right-of-way which
        the Atchison, Topeka, and Santa Fe Railroad may own.

1318

1         Lands _riparian_ to the Santa Margarita River

2   are owned in fee simple by the United States of

3   America and comprise part of the military establish-

4   ments in question.  That fact is agreed to [11] by

5   the defendants and is expressly stipulated to by

6   them. [12]

7         Lands riparian to the Santa Margarita River

8   are owned by the defendant Vail Estate.  That

9   fact is expressly stipulated to by the defendants. [13]

10        By a stipulated judgment, Exhibit A of the

11  complaint, the respective rights in the Santa

12  Margarita River of the United States of America

13  and the Vail Estate, insofar as this litigation is

14  concerned, have been established. [14]

15  Likewise of importance are these matters:

16        Approximately 38,000 acres of the 135,000

17  acres owned by the United States of America, it

18  is contended, are riparian to the stream in

19  question.  Of that total riparian acreage,

20  approximately 18,700 acres, it is contended, are

21  susceptible of practicable and profitable irrigation. [15]

22  At variance with that figure is the assertion by

23  defendants that less than 12,000 acres of the lands

24  of the United States within the watershed of the

25  Santa Margarita River are susceptible of practical

26  irrigation. [16]

---

[11] Pre-trial order, Agreed Facts, page 14, par. E 6.

[12] Pre-trial order, General Stipulations, page 68, par. 2.

[13] Pre-trial order, General Stipulations, page 68, par. 2.

[14] Pre-trial order, Agreed Facts, page 14, par. E 7.

[15] Pre-trial order, Contentions of the U.S., page 26, par. 16 and 17.

[16] Pre-trial order, Contentions of the Santa Margarita Mutual Water Company, page 51, par. 31.

1319

1    Relative to the riparian rights in the Santa Margarita

2   River of the Rancho Santa Margarita, predecessor in interest of the

3   United States of America[17] and the Vail Estate, California's

4   highest court made this statement: "The trial court also found,

5   and this finding is admittedly supported by the evidence, that the

6   normal flow of the Temecula-Santa Margarita River is not sufficient

7   to supply all the riparian needs of all of the riparian lands of

8   either respondent or appellants * * *.  This was practically

9   stipulated to by the parties, and was one of the basic facts upon

10   which the action was tried."[18]

11                                II.

12                 APPROPRIATIVE RIGHTS ASSERTED BY THE
                   SANTA MARGARITA MUTUAL WATER COMPANY
13                 AND THE FALLBROOK PUBLIC UTILITY DISTRICT

14       Turning from the riparian rights of the United States of

15   America, consideration will be directed to the asserted claims to

16   appropriative rights by the Santa Margarita Mutual Water Company

17   and the Fallbrook Public Utility District.  As the claimed appro-

18   priative rights of the Santa Margarita Mutual Water Company are

19   prior to the Fallbrook Public Utility District, they will be con-

20   sidered first.  Relative to the asserted rights of each of the

21   named defendants, it is respectfully submitted, these all-important,

22   controlling facts in regard to the questions before this Court are

23   emphasized:

24                 In the year 1942 the United States of

25             America acquired the lands comprising Camp Joseph

26             H. Pendleton and the other military establishments,

27             which it owns and which are riparian to the Santa

28             Margarita River.

29                 It was not until October 4, 1946, that the

30

─────────────────────────────────────────

31   17/  Pre-trial order, Agreed Facts, page 11, par. E 1; page 14,
         par. E 6 and 7.
32   18/  Rancho Santa Margarita v. Vail, 11 C2d 501, 516, 517; 81 P.2d
         533 (1938).

                                                    1320

1    Santa Margarita Mutual Water Company, and

2    October 11, 1946, that the Fallbrook Public

3    Utility District took steps to initiate claims

4    to rights to the use of water in the Santa

5    Margarita River.[19]

6  Admitted by the Santa MargaritaMutual Water Company is the important

7  fact that it has no diversion works and had never diverted any

8  water.[20]   Moreover, the Santa Margarita Mutual Water Company was not

9  organized until the year 1947, five years after the United States

10  acquired the riparian rights which are the immediate subject of

11  inquiry.[21]

12    Consideration will next be given to the claimed appro-

13  priative rights of the Fallbrook Public Utility District.   Those

14  alleged rights, like the alleged rights of the Santa Margarita Mutual

15  Water Company, are largely paper in character, incipient, inchoate

16  and unexercised.   More important, the priority claimed by the Santa

17  Margarita Mutual Water Company is senior to that of the Fallbrook

18  Public Utility District.   Admitted by the Fallbrook Public Utility

19  District is the fact that it did not file any claim to water from

20  the Santa Margarita River until October 11, 1946.[22]   Moreover, when

21  the filing was made the Fallbrook Public Utility District was

22  receiving an infinitely small quantity of water pursuant to a

23  gratuitous and revocable permit from the United States of America.[23]

24  An examination of the report of the Fallbrook Public Utility

25

26  19/   Pre-trial order, Contentions of Santa Margarita Mutual Water Co.
      page 51, par. 37; Contentions of Fallbrook Public Utility Dist.
27  page 33, par 3 (1).

28  20/   Transcript of pre-trial hearing, July 9, 1952, page 109, lines
      21-23; page 119, lines 12-15.
29

30  21/   Transcript of pre-trial hearing July 9, 1952, page 137, line 7.

31  22/   Pre-trial order, page 33, par. 3 (1).

32  23/   Exhibit B of reply of United States to Answer of Fallbrook Public
      Utility District.

- 5 -

1321

1  District's alleged diversions from the Santa Margarita River is
2  highly informative. [24/]

3        It was the revocable license mentioned above and the
4  implications of it that gave rise to the third question by the
5  United States of America now before this Court of "Whether the
6  defendant Fallbrook Public Utility District could initiate rights
7  to the use of water in the Santa Margarita River adverse to those of
8  the United States of America while that /¯Fallbrook Public Utility_7
9  District was being permitted to receive water from the Santa
10 Margarita River pursuant to a gratuitous and revocable license from
11 the United States of America."

12        A permit was issued by the State of California to the
13 Fallbrook Public Utility District in connection with the application
14 dated October 11, 1946, for a direct flow right of 2 1/2 c.f.s.
15 That permit specified that the quantity of water claimed could be
16 beneficially used "from about April 1 to November 1 of each year and
17 through the remainder of the year as required for domestic and
18 municipal uses."  Too great emphasis may not be placed upon the fact
19 that the permit last mentioned and the one subsequently issued by
20 the State in connection with the storage right of 10,000 acre-feet
21 claimed by the Fallbrook Public Utility District [25/] are both:
22 "Subject to Vested Rights."  Thus the issuance of the permits could
23 not in any way encroach upon the riparian rights of the United
24 States of America.  As agreed by the parties, those rights were
25 acquired in the year 1942.

26        In addition to the filings made by the two defendants in
27 the month of October of 1946, they each filed claims in November of
28 1947.  Again the Santa Margarita Mutual Water Company claims the

─────────────────────────────

30 24/  Appendix D, Fallbrook Public Utility District Exhibit No. I ;
          Pre-trial order, contentions of Fallbrook Public Utility Dist.
31 page 38, par. 8.

32 25/  Pre-trial order, page 33, par. 3 (2).

1322

1   earlier right for 60,000 acre-feet with a priority date of

2   November 12, 1947; [26/]   the Fallbrook Public Utility District claiming

3   rights in the Santa Margarita River and two tributaries for 20,000

4   acre-feet with a priority of November 28, 1947. [27/]   Thus the

5   Fallbrook Public Utility District claims appropriative rights from

6   the Santa Margarita River for 31,800 acre-feet of water - the Santa

7   Margarita Mutual Water Company for an indeterminate amount exceeding

8   65,000 acre-feet: it is reiterated, those alleged rights are, with

9   a very minor exception, incipient, inchoate and unexercised.

10          Having reviewed in detail the facts relating to the

11  riparian rights of the United States of America and the appropriative

12  claims of the Santa Margarita Mutual Water Company and the Fallbrook

13  Public Utility District, consideration will be given to their

14  respective positions in the contemplation of the law.

15                          III.

16          UNDER THE LAWS OF THE STATE OF CALIFORNIA
        VESTED RIPARIAN RIGHTS ARE PRIOR AND PARAMOUNT

17          TO SUBSEQUENTLY INITIATED APPROPRIATIVE RIGHTS

18          It is on a background of riparian rights long vested and

19  acquired by the United States of America in the year 1942, with the

20  alleged appropriative rights of the defendants in question not having

21  been initiated until October of 1946, that the precepts of the law

22  here involved must be considered.

23          Express constitutional and statutory provisions of the

24  laws of the State of California recognize and secure against encroach-

25  ment by appropriators the vested riparian right.  Reference in that

26  regard is first made to the provisions of the law relating to waters

27  of the State in question which are available for appropriation.

28  There it is specifically declared that "All water flowing in any

29

30  26/  Pre-trial order, contentions of Santa Margarita Mutual Water Co.
          page 52, par. 38.

31

32  27/  Pre-trial order, contentions of Fallbrook Public Utility Dist.
          pages 33-34, par. 3 (3) and (4).

1323

1  natural channel, <u>excepting so far as it has been or is being applied</u>

2  <u>to useful and beneficial purposes upon, or in so far as it is or may</u>

3  <u>be reasonably needed for useful and beneficial purposes upon lands</u>

4  <u>riparian thereto</u>, or otherwise appropriated," is subject to appro-

5  priation. [28/]   (Emphasis added.)

6         Consonant with the proviso last cited is the declaration

7  that, "Riparian rights in a stream or watercourse attach to, but to

8  no more than so much of the flow thereof as may be required or used

9  consistently with this and the next succeeding section, for the

10  purposes for which such lands <u>are, or may be made adaptable</u>, in view

11  of such reasonable and beneficial uses; provided, however, that

12  nothing in this or the next preceding section <u>shall be construed as</u>

13  <u>depriving any riparian owner of the reasonable use of water of the</u>

14  <u>stream to which his land is riparian under reasonable methods of</u>

15  <u>diversion and use</u>, * * *." [29/]   (Emphasis added.)

16         When the State of California wisely acted to effectively use

17  and conserve the water resources of the State through constitutional

18  revisions, great care was taken to preserve the rights of riparians.

19  This significant clause is contained in the law: "Riparian rights

20  in a stream or watercourse attach to, but to no more than so much

21  of the flow thereof as may be required or used consistently with

22  this section, for the purposes for which such lands <u>are, or may be</u>

23  <u>made adaptable</u>, in view of such reasonable and beneficial uses;

24  <u>provided, however</u>, that nothing herein contained shall be construed

25  as depriving any riparian owner of the reasonable use of water of the

26  stream to which his land is riparian under reasonable methods of

27  diversion and use, * * *." [30/]   (Emphasis in part added.)

28  _____

29  <u>28/</u>  Deering's California Codes, Water, Sec. 1201.

30  <u>29/</u>  Deering's California Codes, Water, Sec. 101.

31  <u>30/</u>  Constitution of the State of California, Art. XIV, Sec. 3.

32

1324

1          Having reviewed the constitutional and statutory pro-

2     visions preserving vested riparian rights against encroachment by

3     subsequent appropriators, it is desirable at this point to discuss

4     briefly the nature of riparian rights.   In that regard reference is

5     made to this authoritative statement:

6              "The ⎣riparian_⎦ right to the flow of water

7          is inseparably annexed to the soil, and passes

8          with it, not as an easement or appurtenant, but

9          as a parcel." [31]

10    Again California's highest court declared: "The riparian right is a

11    usufructuary one in the stream, a part and parcel of the land

12    itself." [32]   Many years later that tenet of California's law was

13    reiterated in these terms:  "A riparian right has been well defined,

14    and such right is a part and parcel of the land." [33]   Not only is a

15    riparian right annexed to the realty - parcel of it - but

16    "A riparian right is neither gained by use nor lost by disuse." [34]

17    In the case last quoted California's highest court was simply

18    reiterating what it had said very much earlier when it declared:

19    "Use does not create ⎣the riparian right_⎦, and disuse cannot destroy

20    or suspend it." [35]   Further, in regard to the riparian right, this

21    authoritative declaration has been made: "Unlike an appropriation,

22    riparian rights need no act of the owner to acquire them; they

23    attach to the land bordering on the stream of their own accord." [36]

24    This statement from a well known authority is illustrative of the

25    meaning of the term that a riparian right is part and parcel of the

26

27    [31]  Lux v. Haggin, 69 Cal. 255, 391, 10 Pac. 674 (1886).

28    [32]  Collier v. Merced Irrigation Dist., 213 Cal. 554, 566.

29    [33]  Carlsbad Mutual Water Co. v. San Luis Rey Dev. Co., 78 C.A.2d
            900, 911; 178 P.2d 844 (1947).

30
31    [34]  Duckworth v. Watsonville Water and Light Co., 150 Cal. 520, 531;
            89 Pac. 338 (1907).

32    [35]  Lux v. Haggin, supra, 69 Cal. 255, 391.

      [36]  Wiel, Water Rights in the Western States, 3d ed., vol. 1, Sec.
            711, p. 777.

1325

1    land:  A "riparian estate is made up of many elements, not alone the

2    actual soil * * *.  Pure air, the right of support, benefits from

3    flowing water, all such intangible ingredients, mixing together with

4    the soil itself, join to form the value or quality of the estate

5    owing to its natural position; their preservation maintains the use

6    of the land."  Thus "The riparian right is inherent in the riparian

7    land and part and parcel of it; an inherent result of the relative

8    position of the land to the stream as a natural resource." 37/

9        These succinct statements further evidence the nature of the

10   riparian rights which defendants agree the United States of America

11   has in the Santa Margarita River: "These property rights ⌐riparian

12   rights⌐ are a part and parcel of the freehold of which no man, in

13   whom the title to the same has vested, can be disseized but by a

14   lawful judgment of his peers, by due process of law, and upon just

15   compensation." 38/

16        Again, this statement has been made: "The exercise of a

17   riparian right, * * * is not necessary to hold it superior to

18   appropriations on private lands, in the absence of prescriptive

19   rights acquired against it; and future use may be insured against

20   the vesting of prescriptive rights by the securing of a declaratory

21   judgment." 39/

22        In view of the relief sought in this case the last quoted

23   excerpt is particularly significant.  Here the United States of

24   America is, among other things, seeking to have, under the laws of

25   the State of California, its riparian rights declared prior and

26   paramount to those of the defendants in the separate trial.

27

---

28   37/  Water Rights in the Western States, Wiel, 3d ed., vol. 1,

29           Sec. 709, p. 774; Sec. 711, p. 777.

30   38/  Kinney on Irrigation and Water Rights, 2d ed., vol. 1,
            Sec. 456, p. 773.

31   39/  Misc. Pub. No. 418, G.P.O., Selected Problems in the Law of

32           Water Rights in the West, page 33.

It is respectfully submitted that the alleged rights of the
defendants to appropriate water may not be exercised without
violating the riparian rights to which the United States of America
succeeded when it acquired the Rancho Santa Margarita.  Under the
California law the riparian rights are paramount to the subsequent
appropriative rights.  On the subject this statement has been made:

> "It $\underline{/}$ the opinion of Lux v. Haggin $\underline{7}$ declared
> that the rights of the riparian owners to the
> use of the waters of the abutting stream were
> <u>paramount</u> to the rights of any other persons
> thereto; that such rights were parcel of the
> land * * *." [40]/  (Emphasis added.)

Riparian rights are today, as in 1886, protected against
encroachment by appropriators.  That rule adheres irrespective of
the constitutional amendment modifying to some extent the esoteric
precepts of the strict common law doctrine of riparian rights.
Reaffirmance under the law of the State of California that riparian
rights under the circumstances which here prevail, are paramount to
those of the appropriator has been frequent and emphatic.  Of that
character is this statement from a milepost decision: "The prefer-
ential and paramount rights of the riparian owner, the owner of an
underground and percolating water right, and the prior appropriator
are entitled to the protection * * *.  If the exercise of the appro-
priative right cause a substantial diminution of the supply the
owner is entitled to compensation for the resulting damage to his
lands. * * * the appropriator may use the stream surface or under-
ground or percolating water, so long as the land having the paramount
right is not materially damaged.  Any use by an appropriator which
causes substantial damage thereto, taking into consideration all of
the <u>present</u> and <u>reasonably prospective recognized uses</u>, is an

---

[40]/  Development of Law of Waters in the West, 189 Cal. 779, 791
(1922).

1327

1  impairment of the right for which compensation must be made either
2  in money or in kind, and in the event public use has not attached
3  the owner of the paramount right is entitled to injunctive relief." 41/
42/
4          From the leading decision on riparian rights in California
5  this pertinent statement is taken - a statement which counsel for the
6  defendants must give gravest consideration before pressing their
7  claims:

8              "The question being, Can a private corporation
9          divert the waters of a watercourse, and thereby de-
10         prive the riparian proprietors of all use of the
11         same, without compensation made or tendered to such
12         proprietor?  held -
13             "1.  The owners of land by or through which a
14                  watercourse naturally and usually flows
15                  have a right of property in the waters
16                  of the stream.
17             "2.  This property may be taken for a public
18                  use, just compensation being first made,
19                  or paid into court."

20         Our Nation's highest court has very recently recognized
21  the paramount character of the vested riparian right over that of
22  the subsequent appropriative rights.  43/   Having referred to the
23  decisions of the Supreme Court of the State of California which
24  upheld the common law riparian doctrine in that jurisdiction,
25  Justice Jackson for the Court declared:

26             "The Court held that the doctrine of riparian
27          rights still prevailed in California, that such

---

28

29  41/   Peabody v. Vallejo, 2 C.2d 351, 374-375; 40 P.2d 486 (1935).

30  42/   Lux v. Haggin, 69 Cal. 255, 264; 10 Pac. 674 (1886).

31  43/   United States v. Gerlach Live Stock Company, 339 U, S. 725
32         (1949).

1329

right attached to riparian land as soon as it
became private property and, while subject to
appropriations made prior to that time, it is
free from all hostile appropriations thereafter."[44]

To labor further the proposition would lend nothing to that
which has been said.  Clearly, the owner of riparian rights is
protected against encroachment by subsequent claimants of appropria-
tive rights.  That conclusion, it is respectfully submitted, is
manifest by the cited constitutional provisions, the statutory
enactments, decisions of California's highest court and by the
Supreme Court of the United States of America.

Premised upon the tenets of the law reviewed above, this
statement is respectfully made and a question presented to
defendants:

When the United States of America constructed
Friant Dam[45] on the San Joaquin River in the Central
Valley of California, the Court found that there had
been a partial taking of rights of the riparian
owners on that stream.  Both the Santa Margarita
Mutual Water Company and the Fallbrook Public Utility
District contemplate the construction of dams and
diversion systems which will export from the watershed
of the Santa Margarita River large quantities of water.
Thus, without considering the anomaly of a quasi-
municipal corporation taking property of the Federal
Government, if either defendant asserts rights to
appropriate water which will encroach upon the vested
riparian rights of the United States of America, then
the latter, under the rule of the Gerlach case, is

---

[44]   United States v. Gerlach Live Stock Company, 339 U. S. 725, 749.

[45]   United States v. Gerlach Live Stock Company, supra.

- 13 -

1329

1   entitled to just compensation; as neither defendant
2   could exercise its alleged inchoate, incipient rights
3   without reducing the quantities of water to which
4   the riparian lands of the United States are legally
5   entitled.
6          The striking parallel with the Gerlach case
7   is best evidenced by the assertion that the Fallbrook
8   Public Utility District is seeking to initiate appro-
9   priative rights for the water users of its service
10  area,  46/  and this statement from the Supreme Court
11  in the case last cited: "The waters of which claimants
12  are deprived are taken for resale largely to other
13  private land owners not riparian to the river and to
14  some located in a different water shed. * * * No
15  reason appears why those who get the waters should
16  be spared from making whole those from whom they
17  are taken."  47/  If defendants' theories are sustained,
18  the United States must of necessity be deprived of
19  water to which it is entitled under its vested
20  riparian rights for no project of the type con-
21  templated by defendants could be economically or
22  physically constructed without impounding and
23  diverting riparian water.  As each defendant claims
24  far more water than the stream will yield on the
25  average, that conclusion must necessarily follow.  48/
26
27  46/  Pre-trial order, Agreed Facts, page 19, par. G 8.
28  47/  United States v. Gerlach Live Stock Co., 339 U. S. 725, 752-3.
29  48/  Pre-trial order, Agreed Facts, Exhibit D, United States
         Geological stream records; Contentions of Fallbrook Public
30  Utility District, pp. 33-34; Contentions of Santa Margarita Mutual
    Mutual Water Company, p. 51, par. 37 and exhibit, par. 38 and
31  exhibit.
32

- 14 -

1330

1    Before engaging in a long and costly trial,
2    counsel for the defendants are requested to state
3    whether, in the light of the principles enunciated
4    above, in their opinion the claimed appropriative
5    rights of their clients could be exercised without
6    encroaching upon the vested riparian rights of the
7    United States, the existence of which they have
8    admitted?
9    From the authorities cited and the tenets of the law re-
10   viewed, the character of the riparian rights of the United States in
11   the Santa Margarita River has been defined.  Those riparian rights
12   are inseparably annexed to the soil, they are parcel of it.  They
13   passed to the United States when it acquired the fee to the land
14   involved.  Being part of the soil, being annexed to it, having
15   vested in the United States of America years prior to the steps
16   taken by the defendants to initiate their alleged claims, it is
17   respectfully submitted, predicated upon the laws of the State of
18   California, that:

19    The riparian rights of the United States of America
20    in the Santa Margarita River are prior and paramount
21    to the alleged appropriative rights of the Santa
22    Margarita Mutual Water Company and the Fallbrook
23    Public Utility District; and the first two questions
24    propounded by the United States of America should
25    be answered in the affirmative.

26
27    IV.

28    CONSIDERATION OF DEFENDANTS' QUESTIONS
      WHICH RELATE TO THE FIRST TWO QUESTIONS
29    OF THE UNITED STATES OF AMERICA

30   There has been tendered for this Court's consideration
31   the principles which, it is respectfully submitted, will constitute
32   the basis for ruling upon the first two questions presented by the

- 15 -

United States of America.  Consideration is next directed to those
statements presented by the defendants for rulings by this Court and [49/]
which are related to the first two questions of the United States.

       (1)  The Riparian Rights of the United States
            of America in the Santa Margarita River
            are held correlatively with all Riparian
            Owners on the Stream. *

      Frequently California's courts have referred to the
correlative rights of riparian owners as evidencing the "common right"
of those owners in a stream.  Descriptive of the nature of riparian
rights in a stream is this statement: "A riparian proprietor on whose
land a stream rises has no greater right than other riparian proprie-
tors.  Nor has one who first used the water.  The rights of the
riparian proprietors are correlative, as contrasted with the exclusive
right obtained by appropriation."[50/]  Recently this statement on the
subject was made: "All riparian owners of a water course have a
common right therein, each being entitled to sever his share for use

---

49/      1.  Water rights of riparians inter se are correlative.
        2.  Water can be demanded under a riparian right only
for use on riparian land.
        3.  Water can be demanded under a riparian right only
for proper riparian uses and purposes.
           (a) Storage of water is not a proper riparian use.
           (b) Military use is not a proper riparian use.

        6.  An appropriator can take and use any water belonging
to riparians, but not currently used by them.

50/  Wiel, Water Rights in the Western States, 3d ed., vol. 1,
    sec. 739, p. 793.

---

* The matter is largely academic because the alleged claims of
the two defendants are inchoate, incipient and largely unexercised.
Should they be exercised they would be appropriative in character
with the very late priorities of October 1946.
    The meager claims of the Fallbrook Public Utility
District to riparian rights must be viewed only as a desperate
afterthought.

1332

on his or her riparian land. * * * Such riparian owner, by reason of the situation of his land on the stream, has the right to make <u>any</u> reasonable and beneficial use to himself on the riparian land. * * * <u>With respect to subsurface flow, all riparian owners share correlatively just as in the surface flow."</u> [51] (Emphasis added.) Again it has been authoritatively declared that: "All the riparian owners, through or by the side of whose land a stream naturally flows, may enjoy the privilege of using it. Hence it follows that rights * * * cannot be absolute as to any particular right, but must be relative or correlative as to all the owners on the stream." [52]

Under the circumstances nothing would be gained by further laboring the proposition. Of interest, however, in an ancillary way is the fact that: "One riparian owner cannot, by grant or otherwise, extinguish or diminish the riparian rights attached to the lands of other nonconsenting riparian owners." [53]

To conclude:  The United States of America recognizes that the riparian rights in the Santa Margarita River to which it succeeded when it purchased the Rancho Santa Margarita are held on a correlative basis with all other riparians on the stream.

(2) "Water can be Demanded under a Riparian
Right only for use on Riparian land."

Defendants would have been more exact in their statement had they declared: "Water can be demanded 'successfully' under a riparian right only for use on riparian land." Manifestly, when riparian rights are held correlatively with all other riparians there would be no basis for claiming a right to use water on non-riparian land. That statement in regard to the rights here involved

---

[51]/ Carlsbad Mutual Water Co. v. San Luis Rey Development Co.,
78 C.A.2d 900, 911; 178 P.2d 844 (1947).

[52]/ Kinney on Irrigation and Water Rights, vol. 1, 2d ed., sec. 455,
p. 770.

[53]/ Carlsbad Mutual Water Co. v. San Luis Rey Development Co.,
78 C.A.2d 900, 911; 178 P.2d 844 (1947).

1  must, of course, be qualified by reason of the stipulated judgment

2  between the United States of America and the Vail Estate which

3  specifically provides that the water covered by that judgment could

4  be used on lands which are not riparian.  The effect of the stipulated

5  judgment upon rights of users not parties to it is not at this time

6  to be passed upon.

7         (3)  Riparian Rights may be Exercised by a
           Riparian Owner for any Beneficial Use -

8             A Military Use is a Beneficial Use

9       By way of introduction to consideration of the third

10  principle propounded by the defendants it is essential briefly to

11  review the tenets of the law set forth above.  Most important of

12  those tenets enunciated in regard to riparian rights are these:

13         (1) the riparian right to the use of water

14            is part and parcel of the land;

15         (2) the riparian right is inseparably annexed

16            to it;

17         (3) use does not create the riparian right

18            and disuse does not destroy it.

19  Manifestly, therefore, the riparian right is vested in the land

20  irrespective of the use to which the water is placed.  Repeatedly the

21  defendants have made the erroneous assertion that a military use is

22  not a riparian use.  They have presumed that if their contention is

23  correct the United States of America is divested of its riparian

24  rights, and they could then appropriate that riparian water to their

25  own use.  This excerpt is the complete answer to the erroneous con-

26  tention that a riparian could be divested of his rights by reason of

27  a non-riparian use: "The rights of a riparian proprietor as such

28  are not to be tested by the use or uses to which he puts the

29  riparian waters, or whether he uses them at all or not.  If one's

30  lands are riparian to a stream of water, the owner of the lands

31  cannot be divested of his rights as a riparianist merely because he

32  may either put the waters flowing in such stream to other than a

- 18 -

1  riparian use or not use them for any purpose at all." [54]

2          There is no authority to support defendants' erroneous

3  contention that a military use is a non-riparian use - all of the

4  authorities are to the effect that the character of the use is

5  unimportant.  Reasonableness of the use is the sole criterion - that

6  is a question of fact.  In that regard it has been authoritatively

7  declared: "The purpose for which riparian land is used is generally

8  held to be immaterial, so far as concerns the existence and enjoyment

9  of riparian rights incident thereto.  There is no distinction in this

10 respect between a farm and a summer residence.  So, one who uses such

11 land for the purpose of pleasure, recreation, and health is not

12 deprived of any of the rights attaching to the land." [55]  That state-

13 ment conforms with Kent's observation made many years ago to the

14 effect that,"Every proprietor of lands on the banks of a river, has

15 naturally an equal right to the use of the water which flows in the

16 stream adjacent to his land * * *." [56]  The sole limitation respecting

17 the use of riparian water, that author declared, is that the user

18 apply it in "a reasonable manner."

19         Wiel has stated that riparian water may be used for domestic

20 needs of all kinds and then lists what he refers to as artificial

21 uses.  "These include fishing, bathing, boating, floatage, diversion

22 for irrigation, the running of machinery and all the many other

23 varied purposes for which water can be used." [57]

24         The statutes of the State of California and its constitu-

25 tion protect the riparian rights to water not only for present but

26 future uses.  Thus, riparian rights must be viewed from the standpoint

27

28 [54]  Porters Bar Dredging Co. v. Beaudry, 15 Cal.App. 751, 764 (1911).

29 [55]  56 Am. Jur., Waters, Sec. 281, p. 734.

30 [56]  Kent, Commentaries, vol. 3, 7th ed., page 536 et seq.

31 [57]  Wiel, Water Rights in the Western States, 3d ed., vol. 1,
        sec. 743, p. 803.

32

1335

of present use of the water and "for the purposes for which such lands are, or may be made adaptable." [58/] Accordingly, if there were any basis to support the contention that a military use is not a riparian use, that fact in itself does not deprive the United States of America of its riparian rights. To the contrary, if the alleged appropriative claims are exercised in a manner which infringes upon the riparian rights the United States of America is entitled to the full protection which the Supreme Court of the United States recently afforded other riparian owners. [59/]

In the absence of any authority to the contrary, this Court is respectfully requested to adhere to the firmly established precept of the law that the riparian landowner may make any reasonable use of the water- including military use - and to deny the fallacious declaration of the defendants that the United States of America may not utilize riparian water for National Defense.

Response has been made to two aspects of the third proposition advanced by defendants. [60/] Concluding this phase of the matter it is emphasized: (1) the United States has always recognized the correlative rights of other riparian claimants; (2) the United States denies that the defendants could deprive the United States of its vested riparian rights under the fallacious assertion that a military use is a non-riparian use. As emphasized above, if there were merit to that contention, it does not *ipso facto* strip the United States of its riparian rights and make that water available for appropriation by defendants.

---

58/   Article XIV, Sec. 3, Constitution of the State of California.

59/   United States v. Gerlach Live Stock Co., 339 U. S. 725.

60/       3.  Water can be demanded under a riparian right only for proper riparian uses and purposes.
                  * * *
              (b) Miliary use is not a proper riparian use.

- 20 -

1336

1    Finally, it has been asserted by defendants that "(a)
2    Storage of water is not a proper riparian use." The complete answer
3    to that statement is that the "storage" of water is not a use.  Few
4    precepts of the law are more firmly established than the principle that
5    the mere storage of water or the mere diversion of water without an
6    application to beneficial use has no legal significance.  Perhaps
7    what the defendants had in mind but did not state, is that the
8    United States of America may not store riparian water.  If that was
9    intended, the statement is clearly in error.  For, as between the Vail
10   Estate and the United States of America, each a riparian owner, the
11   stipulated judgment, Exhibit A of the complaint, specifically provides
12   that the waters may be impounded. [61]  Undoubtedly that proviso was
13   written into the stipulated judgment by reason of the statements of
14   California's highest court in the decision in the historical case of
15   Rancho Santa Margarita v. Vail. [62]  Whether the waters delivered by
16   the Vail Estate under the stipulated judgment as against the defend-
17   ants may be stored necessarily entails propositions raised in
18   defendants' statement No. 8 to which, by reason of directions from
19   this Court, no response is to be made.

20   Moreover, there cannot be agreement with the categorical
21   statement that riparian water may not be stored.  That is far too
22   inclusive.  It would be contrary to the principle that riparian
23   water may be impounded in reservoirs for purposes of power generation
24   - a recognized riparian use though the period of detention for that
25   use appears limited. [63]  Manifestly, the rule against long-term
26   storage of riparian water does not preclude the United States from
27   taking measures to regulate the riparian water and thus insure
28   recharging of the basin underlying Camp Pendleton.

29   _____

30   [61]  Stipulated Judgment, Exhibit A of Complaint, Section 13.
31   [62]  11 C.2d 501, 559, 560.
32   [63]  Seneca Consolidated Gold Mines Co. v. Great Western Power Co.,
          209 Cal. 206, 287 Pac. 93 (1930).

(4)  Riparian Rights Owned by the United States
Have Historically been used for Agricultural
Purposes - When not Needed for Military Uses
They are still Exercised for that Purpose -
Defendants May Not Invade Those Rights

In the paragraphs which precede, the character of the
riparian rights in the Santa Margarita River with which the United
States of America is invested has been reviewed.  They are part and
parcel of the soil - inseparably annexed to it.  Predicated upon
that background it becomes important to determine the waters of a
stream to which a riparian right pertains.  Fortunately, the Supreme
Court of the State of California has given very careful consideration
to that precise question in regard to the same rights which are
presently before this Court.  64/  This succinct and highly important
statement was there made:

> "The rule is that, as between riparians each party
>
> must make a reasonable use of all of the water of
>
> the stream, * * * that includes both surface and
>
> subsurface flow, and likewise includes water in
>
> the underground basins."

Thus, it is essential in the trial of the case to determine
(1) Whether the riparian rights of the United States attaching to
the surface flow of the Santa Margarita River will be injured by the
proposed impounding and diversion by the defendants of the waters
to which they assert rights; (2) Whether the riparian rights of the
United States attaching to the subsurface flow will be injured by the
proposed impounding and diversion by the defendants of the waters to
which they assert rights; (3) Whether the riparian rights of the
United States attaching to the waters of the underground basin
situated within the boundaries of Camp Joseph H. Pendleton will be
injured by the proposed impounding and diversion by the defendants
of the waters to which they assert rights.  In regard to the riparian

---

64/  Rancho Santa Margarita v. Vail, 11 C.2d 501, 556; 81 P.2d 533
(1938).

- 22 -

1338

1  rights of an owner of land overlying a groundwater basin, as the

2  United States is situated, it is possible to again turn to the

3  Supreme Court of the State of California for guidance in determining

4  the appropriate course to adopt in the present case.  65/   There, as

5  here, an appropriator sought to take from the watershed large

6  quantities of water.  In rendering its opinion the court stated:

7  "Defendant /appropriator - exporter from watershed_7 concedes that

8  plaintiffs' rights are paramount to its right of diversion and

9  exportation of water, but contends that the amount of water claimed

10 by plaintiffs and allowed them is exorbitant."  Important here in

11 regard to the evidence defendants must adduce, the Supreme Court

12 continued: "Defendant /appropriator - exporter from watershed_7 did

13 not conclusively show that there were any areas which would not be

14 affected by its pumping operations through pressure shock or

15 mineralization * * *."  Thereafter, the court reviewed at some length

16 the protection which an owner whose source of water is an underground

17 basin is entitled to as against an appropriator-exporter.  Emphasized

18 there and highly important in the light of the contentions of defend-

19 ants is this principle: "* * * the constitutional enjoinder against

20 waste does not mean that the riparian owner must either clear all

21 water consuming native growth from his land or else permit a

22 lowering of the underlying water table below the roots even if such

23 lowering is otherwise inadvisable. * * * It should be assumed that he

24 /the riparian owner_7 has made utility the primary consideration

25 in farming his land and he is entitled to sufficient water for such

26 crops as may normally be raised under conditions of noninfringement

27 of his water supply."  66/   Thus, part of the paramount right of the

28 riparian owner is to have the water table under his land maintained

29

30  65/  Allen v. California Water and Tel. Co., 29 C.2d 466; 176
31        P.2d 8 (1946).

32  66/  29 C.2d 482, 483.

1339

1  "under conditions of noninfringement of his water supply," by the

2  appropriator-exporter.  In the case now before the Court the

3  continuance of the water table at a level to maintain the forage which

4  the overlying lands of the basin have historically yielded, and now

5  yield, is a right of great value which a riparian owner is entitled

6  to have preserved as against encroaching appropriators.

7          For the next facet of the riparian rights of the United

8  States which will be protected from encroachment by subsequent appro-

9  priators it is necessary to turn to a previously referred to decision

10 of the Supreme Court of the United States. [67/]  There the plaintiff

11 riparian owner, as here the United States of America riparian owner,

12 asserted as part of its riparian right the benefit accruing to

13 natural forage from overflow from the San Joaquin River during periods

14 when the usually meager supply rises to a point where it naturally

15 irrigated the forage and enriched the soil. [68/]  That element of the

16 riparian right is recognized and interference by subsequent appro-

17 priators with it entitles the riparian owner to just compensation.

18 For, as stated by the highest Court: "We recognize that the right to

19 inundation asserted here is unique in the history of riparian claims.

20 Where the thirst of the land is supplied by rainfall, floods are

21 detriments if not disasters, and to abate overflows could rarely if

22 ever cause damage.  But as we have pointed out, uncommon local

23 conditions have given rise to the singular rule of California.  The

24 same scarcity which makes it advantageous to take these waters gives

25 them value in the extraordinary circumstances in which the California

26 courts have recognized a private right to have no interception of

27 their flow except upon compensation." [69/]  (Emphasis added.)

28

29 67/  United States v. Gerlach Live Stock Company, 339 U. S. 725,754

30      (1949).

31 68/  Pre-trial order, Contentions of United States, pages 25-26,
        paragraphs 12, 13, 14, 15.

32 69/  339 U. S. 754, 755.

1340

From the preceding resume it is manifest that neither the Santa Margarita Mutual Water Company nor the Fallbrook Public Utility District may exercise their alleged appropriative rights without encroaching upon the vested riparian rights of the United States of America.

Viewed in the light of the tenets of the law set forth above, consideration will be directed to the next related statement presented to the Court by the defendants.[70]

(5)  There Resides with the Defendants the Burden of Going Forward with the Evidence to Prove there is a Surplus of Water in the Santa Margarita River Available for Appropriation

It has been respectfully urged to this Court that the United States of America owns riparian rights to the use of water in the Santa Margarita River. It is likewise emphasized that use has no bearing upon the ownership of those rights; that the claims of the Santa Margarita Mutual Water Company and the Fallbrook Public Utility District must of necessity invade those rights if exercised. Repeatedly it has been declared that the riparian right, being part and parcel of the soil, is prior and paramount to any rights of a subsequent appropriator. In apparent recognition of that fact defendants contend that: "An appropriator can take and use any water belonging to riparians, but not currently used by them." Cognizant of the great need for the highest use of water in the semiarid region here involved, no one would deny the propriety of junior claimants utilizing water not immediately needed by riparian proprietors. However, the defendants are here confronted with a fact recognized by California's highest Court, that the yield of the Santa Margarita River is not "sufficient to supply all the riparian needs of all of the riparian lands of either * * * ⌈the Rancho Santa Margarita, predecessor of the United States of America⌋ or * * * ⌈the Vail Estate⌋."[71] Premised upon those factors the proposition

---

[70]  Appendix B, No. 6 "An appropriator can take and use any water belonging to riparians, but not currently used by them."

[71]  Rancho Santa Margarita v. Vail, 11 Cal.2d 516, 517.

- 25 -

1341

1   advanced by defendants and here under consideration is very largely
2   academic.  Moreover, proof that there is surplus available for use
3   by junior claimants is a responsibility they must assume.  On the
4   subject the Supreme Court of the State of California has declared:
5   "The plaintiffs contend for the rule stated in Miller v. Bay Cities
6   Water Co., 157 Cal. 256, 272 (107 Pac. 115 * * *), as follows:
7   'If the accustomed flow is more than necessary to supply the under-
8   ground stratum, the burden of proof is upon the appropriator seeking
9   to appropriate the surplus to show that there is a surplus.  In the
10  case at bar the burden of proof was upon the defendants setting up
11  a claim to an alleged portion or surplus of flood waters upon the
12  ground that such waters were waste or lost waters to prove the fact.'

13        "The general rule in this state as to the burden of proof
14  is laid down in section 1981 of the Code of Civil Procedure as
15  follows: 'The party holding the affirmative of the issue must produce
16  the evidence to prove it; therefore, the burden of proof lies on
17  the party who would be defeated if no evidence was given on either
18  side.'  However, when one enters a field of water supply and seeks
19  by appropriation to take water from such supply on the claim that
20  there is more than sufficient for all reasonable beneficial uses by
21  those who have the prior and preferential right, it would seem to
22  comport with the principles of fairness and justice that the appro-
23  priator, in whatever way the issue may arise, should have the burden
24  of proving that such excess exists.  We therefore reaffirm the rule
25  to that effect in the Miller case." 72/

26        Though the anachronism of burden of proof, as this Court
27  has emphasized, has largely been dissipated in modern jurisprudence,
28  particularly in a case of this character, there does reside with the
29  defendants the obligation of proving that there is a surplus of water
30  available for exportation.  That surplus must be proved to exist

31  ─────────────────────────────────────────────
32  72/   Peabody v. Vallejo, 2 C.2d 351, 381 (1935); Miller v. Bay Cities
        Water Co., 157 Cal. 270, 107 Pac. 115 (1910).

1  in the light not only of the claims of the United States of America
2  but of the numerous other claimants to riparian water in the Santa
3  Margarita River watershed.  In the light of that burden it is
4  difficult to perceive that defendants can seriously contend that they
5  are capable of proving the existence of a surplus available for
6  exportation from the watershed.

V.

PRESCRIPTIVE RIGHTS UNDER CALIFORNIA LAW –
THEIR ACQUISITION

10        The third question presented by the United States of
11  America to this Court was whether the Fallbrook Public Utility
12  District could initiate rights to the use of water in the Santa
13   Margarita River adverse to the United States at the time the
14  Fallbrook Public Utility District was receiving water pursuant to a
15  gratuitous and revocable license from the Federal Government.  Related
16  to that question are certain legal propositions advanced by the
17  defendants.  Those propositions will be reviewed in this considera-
18  tion in connection with pertinent aspects of the pre-trial order,
19  thus eliminating the academic elements which they otherwise present.
20        Relative to these matters reference is first made to the
21  claim by the Fallbrook Public Utility District that it has acquired
22  prescriptive rights in the stream in question.  That contention is
23  denied by the United States by reason of the laws of the State of
24  California.  For, as appears in the record in this case, the defendant
25  Fallbrook Public Utility District received water from the Santa
26  Margarita River until July 31, 1948, pursuant to a revocable and
27  gratuitous permit.  73/    Under those circumstances there could be no
28  adverse claim against the United States which could ripen into a
29  prescriptive right.  On the subject the courts of the State of
30  California have repeatedly declared that: "To perfect a claim based

73/  Pre-trial order, Plaintiff's Exhibita, U.S.A. Plaintiff's Exhibit
     No. 34.

1343

upon prescription there must, of course, be conduct which
constitutes an actual invasion of the former owner's rights so as
to entitle him to bring an action." [74]   As to the elements requisite
to give rise to a prescriptive right this declaration has been made:
"It is the law that in order to acquire by prescription a permanent
right to realty or to water developed on the land of another the
enjoyment thereof must have been adverse, continuous, open, and
uninterrupted for not less than five years." [75]   The authority last
cited is very much in point as it is there emphasized that a written
document allowing the use of the water claimed will destroy the
adverse element essential to give rise to the prescriptive right.
To labor the matter further would not be of assistance to the Court.
Suffice to state as a California court has declared: "The facts or
elements which are necessary to the existence of a prescriptive water
right have been set forth in a veritable forest of cases.  To perfect
such right, the use of the water must be: (1) actual, (2) open and
notorious, (3) hostile and adverse to the original owner's title,
(4) continuous and uninterrupted for the statutory period, and
(5) under a claim of title in the claimant, and not by virtue of
another right." [76]

At this point, therefore, it may be stated that the
Fallbrook Public Utility District did not and could not have acquired
a prescriptive right to the use of water from the Santa Margarita
River - it cannot prove a single element in that regard.  Moreover,
as the Santa Margarita Mutual Water Company does not divert any water
or have the means to accomplish diversion of water, no comment is
required in regard to its claim.  Thus, defendants' assertion that
"A prescriptive right is paramount to a riparian right against which
it arises" is purely academic.

[74]  City of Pasadena v. City of Alhambra, 33 c.2d 908, 927; 207 P.2d
17 (1949).

[75]  Fryer v. Fryer, 63 C.A.2d 343, 346; 147 P.2d 76 (1944).

[76]  Peck v. Howard, 73 C.A.2d 308, 325; 167 P.2d 753; cited favorably
O'Banion v. Barba, 32 C.2d 145 (1946); 195 P.2d 10 (1948).

1344

1          Consideration is next directed to defendants' assertion
2  that: "One cannot obtain a prescriptive right as against users
3  upstream from him."  In regard to both the claims of the Santa
4  Margarita Mutual Water Company and the Fallbrook Public Utility
5  District, it is again emphasized that their claims are very largely
6  inchoate, incipient and unexercised.  Thus, the assertion that a
7  downstream user may not gain a prescriptive right against an upstream
8  "user" is not reflective of the facts.  The Santa Margarita Mutual
9  Water Company, as stated, is not a user.  The Fallbrook Public Utility
10  District, a very meager user.  Thus, the situation is not one where
11  the upstream user has permitted water to flow to the lower water user
12  thus preventing an adverse use by the lower user.

13          The situation which does prevail is succinctly this:

14             The United States of America acquired riparian
15          lands in 1942.  Historically the predecessors in
16          interest of the United States diverted Santa Margarita
17          River water from the watershed and used it upon non-
18          riparian land.

19             Since 1942 and to date, a period of ten years,
20          twice the statutory period - the United States of
21          America has continued that practice and has enlarged
22          it. [77]

23             Both the Santa Margarita Mutual Water Company
24          and the Fallbrook Public Utility District assert
25          their first claims to water in October 1946.

26          Under the factual situation outlined, the United States of
27  America has acquired prescriptive rights in the Santa Margarita River
28  good against the defendants - against the world.  Evidence must be
29  adduced to prove the extent of those rights.  So substantial, however,
30  are those rights that the defendants, or either of them, could not

31
32  [77]  Civil Code, 1007; Code of Civil Procedure, 321.

1  exercise their claims without invading the rights in question of
2  the United States.

3      In a case very much in point the plaintiffs had for many
4  years diverted water from a stream.  Thereafter the defendant built
5  structures to divert water from the stream, taking from the plaintiffs
6  water which had previously flowed down to them.  Predicated on that
7  factual situation, California's highest court declared: "The evidence
8  shows that plaintiffs' use of this ditch for conveying the water from
9  the stream was open, notorious and under a claim of right to all of
10  said water.  They thus acquired not only a right to maintain their
11  ditch, but also to the waters flowing therein." [78/]  Again, it has
12  been declared by a California court that: "An owner of land adjacent
13  to a stream may acquire prescriptive title to waters therefrom
14  distinct from or even in addition to his normal riparian rights." [79/]

15      Again it has been held: "Appropriative * * * rights to
16  ground water, as well as the rights of an overlying owner, are subject
17  to loss by adverse user.  This is in accord with the rule announced
18  in cases dealing with water in a surface stream." [80/]  Very recently
19  the Supreme Court of California declared: "Water rights are a species
20  of real property capable of acquisition by adverse user." [81/]

21      It is respectfully submitted that the evidence which the
22  United States of America will adduce will prove extensive rights to
23  the use of water have been acquired by it through use by its predeces-
24  sor in interest and through its own use.  Those rights are as free
25  from encroachment by defendants as are the riparian rights of the
26  United States. [82/]

27

28  78/  Larsen v. Apollonio, 5 C.2d 440, 443; 55 P.2d 196 (1936).

29  79/  Dykzeul v. Mansur, 65 C.A.2d 503, 507; 150 P.2d 958 (1944).

30  80/  City of Pasadena v. City of Alhambra, 33 C.2d 908, 927; 207 P.2d
31      17 (1949).

32  81/  Locke v. Yorba Irr.  Co., 35 C.2d 205, 211; 217 P.2d 425 (1950).

    82/  From the cited authorities it is evident that defendants'
        proposition No. 7 is incorrect.

1348

- 30 -

1    Regarding the character of the title to rights to the use
2  of water acquired by prescription this authoritative statement has
3  been made: "Where the title by which water rights are held is based
4  upon prescription * * * it is absolute and perfect, as much so as if
5  the title had been secured by conveyance or otherwise. * * *   The
6  holder of the prescriptive title may, to the same extent as a person
7  who has acquired title in another mode, prevent an interference with
8  his use of the water by persons <u>above</u> him on the stream, or elsewhere.
9  Once the title vests, not even the original owner can recover it, [83]
10 except by adverse user himself for the prescriptive period * * *."

11    Further comment would not aid the Court on the proposition
12 that the United States of America has acquired by prescription
13 against the defendants rights to the use of water in the Santa
14 Margarita River.  It is respectfully submitted that the proposition
15 is too well established for question that rights to the use of water
16 in the State of California may be acquired in that manner.  That
17 conclusion is supported by a recent careful digest of the important
18 cases on the subject. [84]

19    It is observed in passing that the conclusion respecting
20 the acquisition by the United States of America of rights by
21 prescription refutes entirely the proposition advanced by defendants
22 that: "One cannot, since the effective date of the Water Commission
23 Act in 1914, obtain a water right by use alone."  From the last
24 cited authority, which is directed towards the precise statement of
25 the defendants, this excerpt is taken:  "On principle, the approach
26 of the California courts /‾that the Water Commission Act does not
27 relate to rights acquired by prescription_7 is the correct one.  As
28 prescription of land has been excepted from the recording acts, so the
29 prescription of rights of water should be outside the analogous laws." [85]

30
31   [83]   25 Cal. Jur., p. 1150, sec. 165.
32   [84]   39 Cal. Law Rev. 369-376, 525-527.

     [85]   39 Cal. Law Rev. 376.

                                                      1347

To summarize the prescriptive aspects of the questions
presented:

Respecting the claim of the Fallbrook Public
Utility District of a prescriptive right, it is
evident that as against the United States of America
the Utility District was a licensee until July 31,
1948.  Thus the quality of adverseness, without which
a prescriptive right may not be gained, is absent.
On the subject this succinct statement has been made:
"A user can never be adverse if it is by permission
of the owner, for he cannot have any right of action
for acts which he expressly sanctions." [86/]  Moreover,
since the date last mentioned the five-year period
has not elapsed.  Thus the basis of the prescriptive
claim of the Fallbrook Public Utility District is
wholly lacking.  Under the circumstances it is
unnecessary to advance the principle that prescription
may not arise against the sovereign. [87/]

A totally different situation prevails in
regard to the United States of America.  Both it
and its predecessor in interest have, for many
years exceeding the five-year prescriptive period,
diverted large quantities of water for use on non-
riparian land.  Evidence must be adduced to disclose
the full extent of those prescriptive rights.  Nevertheless
from the cited authorities it is manifest that the
United States of America, against the Santa Margarita
Mutual Water Company and the Fallbrook Public Utility
District has acquired prescriptive rights under the
laws of the State of California.

---

86/  56 Am. Jur., Waters, page 768, sec. 328.

87/  56 Am. Jur., Waters, page 772, sec. 336.

1348

# VI.

## MEASURE OF RIPARIAN RIGHTS OF THE
## UNITED STATES OF AMERICA

There has been reviewed at length the nature of the riparian rights of the United States of America in the Santa Margarita River.  Emphasized was the fact that the sole criterion in regard to the exercise of the riparian right is whether it is beneficially applied.  That a military use is a beneficial use is so obvious that extended comment was unnecessary.  There remains, therefore, but to consider the measure of the rights which the United States of America holds in the stream in question.  On the subject this statement has been made:

> "It should be noted that as the riparian right
> is not affected by the amount of water the owner uses
> or does not use; the amount of land belonging to each
> party, rather than the amount of land already under
> cultivation, should be properly made a controlling
> element in adjusting their respective rights.  And it
> may be further noted that in apportioning the use of
> water between the parties in accord with their rights
> as riparian owners, it is the reasonable use or the
> possibility of such use for beneficial purposes that
> alone should be considered." [88]

Numerous authorities sustain the well founded principle enunciated in the preceding quotation.  Moreover, as emphasized above, that doctrine is written into the Constitution and statutes of the State of California.  In that regard reference is made to the specific provisions of the law which preserve from appropriation the riparian water which has been "or in so far as it is or may be reasonably needed for useful and beneficial purposes upon" riparian lands. [89]

---

[88]   25 Cal. Jur. 1144, 1145, sec. 158.

[89]   Deering's California Codes, Water, Sec. 1201.

1349

1  Similarly, the Constitution of the State of California protects the
2  use of riparian rights against encroachment by appropriators in so
3  far as the riparian lands "are, or may be made adaptable" to the
4  beneficial use of the water.  Thus the defendants are precluded from
5  encroaching upon the riparian rights of the United States of America
6  in the Santa Margarita River on the basis of the use to which the
7  waters are presently applied or for which the riparian lands "may be
8  made adaptable."  That conclusion stems from the fact, as emphasized
9  above, that the riparian right is part and parcel of the land; that
10  the riparian right does not arise from use and is not destroyed by
11  disuse; that the future use of the right is as much protected as the
12  present use.

13                              VII.

14          THE POLICE POWER OF THE STATE OF CALIFORNIA
            DOES NOT CONTROL THE ACTIVITIES OF THE UNITED
15          STATES IN CONNECTION WITH THE MANAGEMENT AND
            ADMINISTRATION OF THE RIGHTS TO THE USE OF
16          WATER FROM THE SANTA MARGARITA RIVER WITHIN
            THE BOUNDARIES OF CAMP JOSEPH H. PENDLETON,
17          THE UNITED STATES NAVAL HOSPITAL AND THE
            UNITED STATES NAVAL AMMUNITION DEPOT.

18

19          Under this heading let it be emphasized that the United
20  States of America does not claim any greater rights than those to
21  which it succeeded from the Rancho Santa Margarita plus such other
22  rights as may have accrued by use or prescription.  It does assert,
23  however, that in the administration of those rights to the use of
24  water - fully recognizing the rights of other riparians and other
25  claimants and avoiding encroachment upon those rights - that the
26  State Engineer of the State of California does not have jurisdiction
27  within the boundaries of the military establishments in question.[90]
28          At the outset of this phase of the matter reference is made
29  to the contention which has been advanced by defendants that the
30

31  [90]  This highly important factor refutes the contention of the
          defendants that: "9.   The cession by the State to the United
32  States of exclusive jurisdiction over Camp Pendleton is immaterial
    to any issue in the case."

                              - 34 -                    1350

16—29985-1                    GPO O—819913

1  cession of exclusive jurisdiction by the State of California does

2  not relate to lands within the boundaries of Camp Joseph H. Pendleton

3  used for farming purposes.  Squarely against that contention is a

4  decision of the Supreme Court of the United States.  In that case

5  a murder had been committed on lands over which the State of Kansas

6  had ceded to the United States exclusive jurisdiction.  From the

7  decision this salient excerpt is taken: "It is contended by appellant's

8  counsel * * * jurisdiction passed to the general government only over

9  such portions of the reserve as are actually used for military

10  purposes, and that the particular part of the reserve on which the

11  crime charged was committed was used solely for farming purposes.

12  But in matters of that kind the court follows the action of the

13  political department of the government.  The entire tract had been

14  legally reserved for military purposes.  The character and purposes

15  of its occupation having been officially and legally established by

16  that branch of the government which has control over such matters,

17  it is not open to the courts, on a question of jurisdiction, to

18  inquire what may be the actual uses to which any portion of the

19  reserve is temporarily put." 91/

20        There are innumerable other cases involving the status of

21  lands held, as here, under the exclusive jurisdiction of the National

22  Government.  Space will allow the consideration of but a few.  Those

23  authorities will, however, constitute a background for the ultimate

24  trial of the issues of this case.  In that regard reference is first

25  made to an important State case.  There are recognized the principles

26  that the United States, where jurisdiction has been ceded to it, is

27  free from any restraints by State law. 92/  That case arose with

28  respect to fencing of a right-of-way as required by local law.

29  Disregarding that law the Secretary of War forbade the fencing of

---

91/  Benson v. United States, 146 U. S. 325, 331 (1892).

92/  Anderson v. Chicago & Northwestern RR., 102 Neb. 578, 168 N.W.
     196 (1918).

certain tracks which traversed Fort Robinson Military Reservation.
The Supreme Court of Nebraska in that case declared that refusal of
the Secretary of War to permit the erection of fences along the
right-of-way constituted a defense to an action against the railroad
company for the killing of cattle, although a statute of the State,
if it had governed the case, would have made the company liable
because of the failure to enclose its tracks.  In another important
decision the Supreme Court of the United States stated that when the
United States acquires title to lands, which are purchased by the
consent of the legislature of the State within which they are situated
"for the erection of forts, magazines, arsenals, dockyards and other
needful buildings," the Federal jurisdiction is exclusive of all
State authority. 93/    That view is consistent with the principles
enunciated in regard to the jurisdiction in question. 94/    There it
was stated in substance that lands purchased by the United States
with the consent of California, upon which a custom house and other
buildings had been erected, were under the exclusive jurisdiction
of the United States.  Again, on the subject, the Supreme Court
stated this: "The question is not an open one.  It long has been
settled that where lands for such a purpose are purchased by the
United States with the consent of the state legislature the jurisdic-
tion theretofore residing in the state passes, in virtue of the
constitutional provision, /¯ Article I, Sec. 8, Clause 17 of the
Constitution of the United States_7 to the United States, thereby
making the jurisdiction of the latter the sole jurisdiction." 95/

In a highly important decision the Supreme Court of the
United States had before it for consideration the question of whether
the State law respecting oleomargarine controlled in an area set

93/   United States v. Unzeuta, 281 U. S. 138 (1929).

94/   Sharon v. Hill, 24 Fed. 726 (C.C.A. Calif., 1885).

95/   Surplus Trading Company v. Cook, 281 U. S. 647, 652 (1929).

aside as a national home for volunteer soldiers.  Having reviewed
the action of Congress in providing funds for the purchase of food
for the soldiers in the home in question the Supreme Court made this
comment:  "In making provision for so feeding the inmates, the
governor, under the direction of the board of managers and with the
assent and approval of Congress, is engaged in the internal adminis-
tration of a Federal institution, and we think a state legislature
has no constitutional power to interfere with such management as is
provided by Congress." [96]   Continuing, the Court stated: "Whatever
jurisdiction the State may have over the place or ground where the
institution is located, it can have none to interfere with the
provision made by Congress for furnishing food to the inmates of the
home, nor has it power to prohibit or regulate the furnishing of any
article of food which is approved by the officers of the home, by
the board of managers and by Congress.  Under such circumstances the
police power of the State has no application.

"We mean by this statement to say that Federal officers who
are discharging their duties in a State and who are engaged as this
appellee was engaged in superintending the internal government and
management of a Federal institution, under the lawful direction of
its board of managers and with the approval of Congress, are not
subject to the jurisdiction of the State in regard to those very
matters of administration which are thus approved by Federal
authority."

On several occasions cases involving the respective juris-
diction of the State of California and the United States have arisen.
One of these cases involves the sale of oil within an area long held
and occupied by the United States for military purposes.  That area was
the Presidio of San Francisco.  There the plaintiff delivered
gasoline and the State of California undertook to collect from the

---

96/  Ohio v. Thomas, 173 U. S. 276, 282, 283 (1898).

1 plaintiff the taxes levied upon that commodity.  Having recognized
2 the fact that this was a military establishment over which jurisdic-
3 tion had been ceded by the State of California, the Supreme Court of
4 the United States made this succinct statement:  "In three recent
5 cases * * * we have pointed out the consequences of cession by a
6 State to the United States of jurisdiction over lands held by the
7 latter for military purposes.  Considering these opinions, it seems
8 plain that by the Act of 1897 California surrendered every possible
9 claim of right to exercise legislative authority within the
10 Presidio - put that area beyond the field of operation of her laws.
11 Accordingly, her legislature could not lay a tax upon transactions
12 begun and concluded therein. * * *

13   "The principle approved in these cases applies here.  A
14 State cannot legislate effectively concerning matters beyond her
15 jurisdiction, and within territory subject only to control by the
16 United States." [97]

17   Again, the Supreme Court, in a case involving a jurisdic-
18 tional dispute between the State of California and the United States,
19 had before it the question of that State's control over the sale and
20 distribution of milk.  It appears that the Department of Agriculture
21 of the State of California endeavored to revoke the license of a
22 distributor of milk who sold to Moffett Field, a base purchased by
23 the United States.  There the appellant sought a writ of mandamus
24 to restrain the Department of Agriculture from proceeding to hear
25 and act upon the pending complaint.  Of importance is the fact that
26 Moffett Field was acquired by the United States under an act of
27 Congress and it is conceded by the State of Californiathat the United
28 States has always had exclusive jurisdiction.

29   In contending the State of California was empowered to
30 control the appellant in the sale and distribution of milk even though
31

32 [97] Standard Oil Co. v. California, 291 U. S. 242, 244 (1934).

16—29988-1  GPO.O · 578612

1  the contract was entered into and sales made on property within the
2  exclusive jurisdiction of the United States, it was urged by the
3  State that the regulation of business in the manner outlined was a
4  valid exercise of police power.  Denial of the validity of that
5  contention by the highest Court was in these terms:  "The exclusive
6  character of the jurisdiction of the United States on Moffett Field
7  is conceded.  Article I, Section 8, Clause 17 of the Constitution of
8  the United States declares that Congress shall have power 'To
9  exercise exclusive legislation in all Cases whatsoever, over' the
10  District of Columbia, 'and to exercise like Authority over all Places
11  purchased by the consent of the Legislature of the State in which the
12  Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-
13  Yards, and other needful Buildings; * * *.'"  Having declared that
14  the State statutes were inoperative insofar as Moffett Field was
15  concerned, the highest Court stated:  "To hold otherwise would be to
16  affirm that California may ignore the Constitutional provision that
17  'This Constitution, and the Laws of the United States which shall
18  be made in Pursuance thereof; * * * shall be the supreme Law of the
19  Land; * * *.'  It would be a denial of the federal power 'to exercise
20  exclusive Legislation.'  As respects such federal territory Congress
21  has the combined powers of a general and a state government."[98]

22       Another important case before the Supreme Court of the
23  United States involving jurisdiction arose in connection with the
24  sale of intoxicating liquors in the Yosemite National Park.[99]  There
25  exclusive jurisdiction had been ceded to the United States subject to
26  the right to tax persons and corporations on the lands included in
27  the park.  It was contended by the State of California that the
28  Alcoholic Beverage Control Act applied within Yosemite Park and that
29  appellee was obliged to apply for permits for importation and sale of

---

31  [98]   Pacific Coast Dairy v. Dept. of Agriculture of California, 318
32         U. S. 285, 294 (1943).

       [99]   Collins v. Yosemite Park Company, 304 U. S. 518, 530 (1937).

liquor.  It was likewise contended that the appellee was subject to
the provisions of the act prohibiting the issuance of importer's
licenses to persons holding on-sale retail licenses.  Having reviewed
the facts of the case with particular reference being given to the
exclusive jurisdiction ceded to the United States, the Supreme Court
made this comment: "* * * jurisdiction less than exclusive may be
granted the United States.  The jurisdiction over the Yosemite
National Park is exclusively in the United States except as reserved
to California, e.g., right to tax, by the Act of April 15, 1919.  As
there is no reservation of the right to control the sale or use of
alcoholic beverages, such regulatory provisions as are found in the
act under consideration are unenforceable in the Park."

To proceed further with this analysis would lend nothing
to what has been stated.  From the authorities reviewed it is
abundantly manifest that the laws of the State of California may in
no way regulate the property of the United States or impede the
utilization of it for the purpose for which it was acquired.  A
different construction would remove from the Federal Government the
ultimate control of the military establishments vital to our Nation's
defense.

Dated: *September 19, 1952*

Signed: *David N. Agnew*

*attorney, Department
of the Navy*

*A copy of this brief served on
me, personally the 19th day of
September 1952 by David N. Agnew*

*Nm Lewis*

*attorney for Santa Margarita
Mutual Water Company*

*Phil D. Swing*

*attorney for
Fallbrook Public Utility District*

- 40 -

GPO O—879913

A 356

APPENDIX   A

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>    v.<br><br>FALLBROOK PUBLIC UTILITY DISTRICT,<br>  a public service corporation of<br>  the State of California;<br>SANTA MARGARITA MUTUAL WATER COMPANY,<br>  a public service corporation of<br>  the State of California; et al.;<br><br>           Defendants,<br><br>STATE OF CALIFORNIA,<br><br>           Defendant in<br>           Intervention. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. 1247-SD |

QUESTIONS OF LAW REQUESTED TO BE DETERMINED
IN ADVANCE OF PRE-TRIAL OF THE ABOVE NAMED DEFENDANTS

COMES NOW the UNITED STATES OF AMERICA, Plaintiff in the above-entitled

action, pursuant to direction by this Court and predicated upon admissions and

facts agreed upon by the defendants and petitions this Honorable Court to

consider and rule upon in advance of trial the following legal questions:

1.  Whether the riparian rights in the Santa Margarita River system

of the United States of America, Plaintiff, are prior and paramount under the

laws of the State of California to the appropriative rights claimed by the

defendant Santa Margarita Mutual Water Company in that stream in view of the

admission by that Company that the earliest date of priority which it is

357

16—29998-1                         GPO O - 878813

1  asserting is October 4, 1946.

2      2.  Whether the riparian rights in the Santa Margarita River system
3  of the United States of America, Plaintiff, are prior and paramount under the
4  laws of the State of California to the appropriative rights claimed by the
5  defendant Fallbrook Public Utility District in that stream in view of the
6  admission by that District that the earliest date of priority which it is
7  asserting is October 11, 1946.

8      3.  Whether the defendant Fallbrook Public Utility District could
9  initiate rights to the use of water in the Santa Margarita River adverse to those
10  of the United States of America while that District was being permitted to
11  receive water from the Santa Margarita River pursuant to a gratuitous and
12  revocable license from the United States of America.

13      4.  Whether the police power of the State of California respecting
14  the management, control and administration of rights to the use of water is
15  operative within the boundaries of Camp Joseph H. Pendleton, United States Naval
16  Hospital and the United States Naval Ammunition Depot in view of the fact that
17  exclusive jurisdiction resides in the United States of America over those
18  military establishments.

19      WHEREFORE, the UNITED STATES OF AMERICA, Plaintiff, respectfully
20  petitions this Court to consider the questions presented and to order the
21  filing of briefs in connection with them and to declare the legal principles
22  which will govern in connection with the legal propositions raised by those
23  questions.

24

25

26  Dated:   Aug. 20, 1952              /s/ William H. Veeder
                                        William H. Veeder
27                                      Special Assistant to the
                                           Attorney General
28

29                                      /s/ David W. Agnew
                                        David W. Agnew
30                                      Attorney
                                        Department of the Navy
31

32

-2-

APPENDIX  B

LIST OF QUESTIONS FOR LEGAL
ARGUMENT IN UNITED STATES v.
FALLBROOK PUBLIC UTILITY
DISTRICT, ET AL.

Defendants in the separate trial to be held October 21st, 1952, submit the following list of legal principles which they advance as applicable law and consider should be briefed and ruled on prior to the trial:

1. Water rights of riparians inter se are correlative.

2. Water can be demanded under a riparian right only for use on riparian land.

3. Water can be demanded under a riparian right only for proper riparian uses and purposes.

(a) Storage of water is not a proper riparian use.

(b) Military use is not a proper riparian use.

4. A prescriptive right is paramount to a riparian right against which it arises.

5. One cannot obtain a prescriptive right as against users upstream from him.

6. An appropriator can take and use any water belonging to riparians, but not currently used by them.

7. One cannot, since the effective date of the Water Commission Act in 1914, obtain a water right by use alone.

8. The stipulated judgment between Rancho Santa Margarita, Inc. and the Vails has no force or effect except as between the parties to that case and those in privity with them, and consequently is not admissible in evidence as against the present defendants.

9. The cession by the State to the United States of exclusive jurisdiction over Camp Pendleton is immaterial to any issue in the case.

1359

16—99985-1                                    GPO O · 878011

APPENDIX  C

# S U B J E C T   I N D E X

|  |  | Page |
|---|---|---|
| Order On Pre-Trial Hearing |  |  |
| Pre-Trial Order |  |  |
| Findings: Jurisdiction; Existence of Controversy; Request for Action; Separate Trials |  | 2-3 |
| Agreed Facts |  |  |
| A. | Description of the Santa Margarita River and Its Drainage Area | 3-5 |
| B. | Tributaries of the Santa Margarita River | 5-7 |
| C. | Subterranean Basins Underlying Santa Margarita River | 7-8 |
| D. | United States Geological Survey Records | 8-9 |
| E. | Acquisition by the United States of America of Sites for Camp Joseph H. Pendleton, the United States Naval Hospital, and the United States Naval Ammunition Depot – General Statement | 9-14 |
| F. | Santa Margarita Mutual Water Company | 14-15 |
| G. | Fallbrook Public Utility District | 15-16 |
| H. | State of California Stipulation with State of California | 17-18 |
| Contentions of the United States of America |  | 1-11 |
| Response of the United States of America To Contentions of the Fallbrook Public Utility District, Santa Margarita Mutual Water Company and the State of California |  | 11 |
| Contentions of Fallbrook Public Utility District |  | 1-14 |
| Contentions of the Santa Margarita Mutual Water Company |  | 1-8 |
| Contentions of the State of California |  | 1-2 |
| Facts Disputed By The United States of America |  | 1-5 |
| List of Exhibits of The United States of America |  | 1-5 |
| List of Exhibits of Fallbrook Public Utility District |  | 1 |
| List of Exhibits of Santa Margarita Mutual Water Company |  | 1 |
| General Stipulations |  | 1-2 |
| Definitions |  | 2-3 |
| Signatures |  | 3 |

* * * * * * * * * *

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

FALLBROOK PUBLIC UTILITY DISTRICT,
   a public service corporation of
   the State of California;
SANTA MARGARITA MUTUAL WATER COMPANY,
   a public service corporation of
   the State of California; et al.;

                Defendants,

STATE OF CALIFORNIA,

                Defendant in
                Intervention.

Civil No. 1247-SD

ORDER ON PRE-TRIAL HEARING

       Separate trials in the above-entitled action having been ordered March 31, 1952 by this Court as between the United States of America and Fallbrook Public Utility District, Defendant; Santa Margarita Mutual Water Company, Defendant and the State of California, Defendant in Intervention, having been made a party to the separate trials on July 11, 1952; a pre-trial conference having been duly held by this Court July 8, 1952 through July 11, 1952, the parties being represented by their respective counsel, who after extended conferences have approved as among themselves in regard to this cause the agreed facts and having severally set out certain contentions of the parties and disputed facts; all as evidenced by the attached document designated "Pre-Trial Order" signed by the respective counsel and which is incorporated herein;

1

1361

1  questions of law for determination in advance of trial having been separately

2  tendered by the respective parties; this Court finds that it has jurisdiction

3  of the proceedings and that there is in existence an actual controversy between

4  the parties.

5      The Court finds that it is for the best interest of the parties hereto

6  and for the public interest that all rights to the use of water in the Santa

7  Margarita River system of all parties to this action be determined as against

8  the others and the filing of cross pleadings is dispensed with as unnecessary

9  and inconvenient.  Provided that the Order setting this cause for separate trials

10  is not affected hereby.

11      The issues in this cause are hereby defined and limited in conformity

12  with the statements contained in the Stipulation between the State of California

13  and the United States of America, dated November 29, 1951, a copy of which is embraced

14  in Paragraph H 1 of the attached Pre-Trial Order.

15      IT IS THEREFORE ORDERED that the attached Pre-Trial Order is adopted

16  by this Court; that the Court reserves the right to amend it by consent of the

17  parties or in the furtherance of justice; that upon trial of this cause no proof

18  shall be required as to matters of fact specifically agreed upon in the Pre-Trial

19  Order.

20      Dated at Los Angeles, California, this ___25th___ day of ___August___,

21  19 .

27                  /s/ Leon R. Yankwich

                 Chief Judge Leon R. Yankwich

-2-

1362

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                  Plaintiff,

      v.

FALLBROOK PUBLIC UTILITY DISTRICT,
  a public service corporation of
  the State of California;
SANTA MARGARITA MUTUAL WATER COMPANY,
  a public service corporation of
  the State of California; et al;

                  Defendants,

STATE OF CALIFORNIA,

                  Defendant in
                  Intervention.

Civil No. 1247-SD

PRE-TRIAL ORDER

    A pre-trial conference having been held commencing on July 8, 1952, at
San Diego, California, Honorable Chief Judge Leon R. Yankwich presiding, the
UNITED STATES OF AMERICA, Plaintiff, appearing by its counsel William H. Veeder,
Esquire, Special Assistant to the Attorney General, Department of Justice, and
David W. Agnew, Esquire, Attorney, Department of the Navy; Fallbrook Public
Utility District, Defendant, appearing by its counsel Phil D. Swing, Esquire;
Santa Margarita Mutual Water Company, Defendant, appearing by its counsel
W. B. Dennis, Esquire; the State of California, Defendant in Intervention,
appearing by its counsel Arvin B. Shaw, Jr., Esquire, Assistant Attorney General
of California;

3

THE COURT MAKES THE FOLLOWING ORDER ON PRE-TRIAL:

Jurisdiction:

This Court has jurisdiction of the above-entitled action by reason of the express declaration by Congress that the United States District Court "* * * shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, * * *." [1]/

Existence of Controversy:

This Court finds that an actual controversy exists over the respective claims of rights to the use of water of the Santa Margarita River System among the United States of America, Plaintiff; Fallbrook Public Utility District, Defendant; Santa Margarita Mutual Water Company, Defendant; and the State of California, Defendant in Intervention and other defendants. [2]/

Request for Action:

At the request of the Department of the Navy this action was instituted by the Attorney General of the United States of America. [3]/

Separate Trials:

This Court on March 31, 1952, entered an order granting separate trials against the named defendants.  That order is as follows: [*]

"The plaintiff having moved the Court for an order directing a separate trial of the issues herein as to each of the defendants Santa Margarita Mutual Water Company and Fallbrook Public Utility District, and

"It appearing that because of the large number of defendants involved in this action it will not be practicable to try the issues as to all of the defendants in one trial, and

"It further appearing that each of the defendants above named claims an appropriative right to divert large quantities

---

[1]/ 28 U.S.C. 1345.

[2]/ Transcript of pre-trial proceedings, pages 38, 78, 81.

[3]/ Plaintiff's Exhibit No. 1 – Letter, dated November 14, 1950, from Dan A. Kimball, then Acting Secretary of the Navy, requesting the Attorney General to bring action to protect the rights of the United States of America in the Santa Margarita River.

[*] This order was entered over the objections of the defendants here involved.

-2-

of water from the watershed of the Santa Margarita River,
and that the plaintiff contends that proof of its rights and
those of defendants Mary Vail Wilkinson, Mahlon Vail,
Edward N. Vail, Margaret Vail Wise and Rita M. Vail, trustees,
will show that no water of said river is surplus for appro-
priation by defendants Santa Margarita Mutual Water Company
and Fallbrook Public Utility District, and

"It further appearing that the issues presented with
reference to each of the defendants Santa Margarita Mutual
Water Company and Fallbrook Public Utility District may be
tried in separate trials without prejudice to the rights of
such defendants and without prejudice to the rights of any
other defendant, and

"It further appearing that a separate trial as to each
of said last named defendants will facilitate the disposition
of the issues as to many of the other defendants, and good
cause appearing therefor,

"IT IS ORDERED that a separate trial be had as to the
issues with reference to the defendant Santa Margarita
Mutual Water Company and that a separate trial be had as to
the issues with reference to the defendant Fallbrook Public
Utility District."

On July 11, 1952, the scope of the separate trials was broadened to
include the State of California, Defendant in Intervention. [b/]

AGREED FACTS [5/]

A.  Description of the Santa Margarita River System and Its Drainage Area

1.  The Santa Margarita River is a non-navigable intermittent stream
having a drainage area of 740 square miles, 192 square miles of which are situated
in San Diego County, California, and 548 square miles in Riverside County,

---

b/  Transcript of pre-trial proceedings, page 385, lines 4-16.

5/  Relief map from the office of Major General Oliver P. Smith will be used
throughout for location and general reference.  This map is entitled "Photo
Surfaced Terrain Model 15-53, U.S. Marine Corps Reservation, Camp Joseph H.
Pendleton, Oceanside, California" as prepared January 1951 by U.S. Navy Special
Devices Center, Port Washington, Long Island, N. Y.

1365

California. [6]    The Santa Margarita River watershed is semi-arid. [7]

2.  Temecula Creek and Murrieta Creek have their junction at the head of Temecula Gorge and there form the Santa Margarita River. [8]

3.  Rising on the eastern slope of the Coastal Range in San Diego County, near the present site of the Palomar Observatory, Temecula Creek proceeds in a northerly and westerly direction a distance of approximately fourteen miles where it enters the Pauba Grant of the Vail Estate. [9]   After entering the Pauba Grant it flows northwesterly through a portion of the grant known as Nigger Valley, for a distance of a little more than three miles. It then enters a narrow canyon on the Pauba Grant known as Nigger Canyon. In a state of nature Temecula Creek flowed through Nigger Canyon for a distance of approximately two miles. Situated across the channel of Temecula Creek at the upper end of Nigger Canyon on the Pauba Grant, in the Northwest Quarter of the Northwest Quarter, Section 10, Township 8 South, Range 1 West, is the Vail Dam, creating a reservoir with a capacity of approximately 50,000 acre-feet. [10]

4.  Below the Vail Dam, Temecula Creek traverses Pauba Grant for a distance of approximately eleven miles.

---

6/  Plaintiff's Exhibit No. 2 - Map of the drainage area of the Santa Margarita River, disclosing the Santa Margarita River, Murrieta Creek, Temecula Creek and other affluents of the stream; the location of the military establishments involved in the litigation and the location of the Vail properties. Defendants are not to be bound by any data or information superimposed on the map other than that information which delineates the watershed; the extent of the Vail holdings and the location of Camp Pendleton, Naval Ammunition Depot and the United States Naval Hospital and the location of the Santa Margarita River, Temecula River and their tributaries.

7/  Plaintiff's Exhibit No. 3 - Climatological Data, California Section, U. S. Department of Commerce, Weather Bureau.

8/  Plaintiff's Exhibit No. 2

9/  Plaintiff's Exhibit No. 2

10/  Plaintiff's Exhibit No. 2; Plaintiff's Exhibit No. 4 - Application of the Vail Company to appropriate waters of Temecula Creek, Application No. 11518 and the permit granted, and Permit No. 7052 granting the application for the construction of the dam for the Vail Reservoir; Plaintiff's Exhibit No. 5 - Capacity and area curve for Nigger Canyon (Vail) reservoir; Plaintiff's Exhibit No. 6 - Vail Dam and Reservoir data; elevation, capacity and related information; Plaintiff's Exhibit No. 7 - Tabulation respecting the acre feet in Vail Lake from December 1948 to and including April, 1952.

6

-4-

5. Leaving the Pauba Grant of the Vail Estate, Temecula Creek continues its westerly course across the Little Temecula Grant of the Vail Estate for a distance of approximately one and a half miles. That stream then enters the Temecula Grant of the Vail Estate, flowing a distance of approximately two miles. [11]

6. Immediately before leaving the Temecula Grant of the Vail Estate, Temecula Creek has its confluence with Murrieta Creek and below that point is known as the Santa Margarita River.

7. The Santa Margarita River then enters Temecula Gorge, a narrow canyon through which it flows southerly and westerly for a distance of approximately nine miles. Though Temecula Creek, prior to its junction with Murrieta Creek, flows alternately as a surface and subsurface stream, the Santa Margarita River throughout Temecula Gorge in the state of nature is a surface stream. [12]

8. Shortly after leaving Temecula Gorge, the Santa Margarita River enters Camp Joseph H. Pendleton, the Marine Corps Training Base. It then flows in a generally southwesterly direction through Camp Pendleton---Naval Ammunition Depot---United States Naval Hospital lands for a distance of about twenty-one miles to the Pacific Ocean. For the full twenty-one miles the course of the river lies entirely within the property of the United States of America. [13] *

9. The Santa Margarita River within the boundaries of the above-mentioned military establishments is an intermittent stream.

B. Tributaries of the Santa Margarita River

There are several tributaries of the Santa Margarita River from tidewater to its head waters:

1. DeLuz Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate, proceeds in a westerly and southerly direction to its confluence with the Santa Margarita River several miles within the boundary lines of Camp Pendleton. [14]

---

11/  Plaintiff's Exhibit No. 2 - Map of drainage    of Santa Margarita River.

12/  Plaintiff's Exhibit No. 2

13/  Plaintiff's Exhibit No. 2

14/  Plaintiff's Exhibit No. 2

* Except for such acquisition and lands of the Atchison, Topeka and Santa Fe Railroad Company and others.

2.  Fallbrook Creek, an intermittent stream, rises east and south of the Santa Margarita River. Most of its length is within the boundaries of Camp Pendleton and the United States Naval Ammunition Depot and it has its present terminus in Lake O'Neill, an artificial reservoir which lies within the Camp Pendleton area.[15] In the state of nature, Fallbrook Creek flowed into the Santa Margarita River.

3.  Sandia Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate, proceeds in a southerly direction to its confluence with the Santa Margarita River at a point a short distance above the easterly boundary of Camp Pendleton.[16]

4.  Rainbow Creek is an intermittent stream which rises east and south of the main channel of the Santa Margarita River and proceeds in a northerly and westerly direction to its confluence with that river a short distance above Sandia Creek.[17]

5.  Murrieta Creek, an intermittent stream, has its source north of the Temecula Grant of the Vail Estate and traverses the lands of that grant before it joins Temecula Creek to form the Santa Margarita River. Junction of the streams takes place at a point about a half mile east of the westerly boundary of Temecula Grant of the Vail Estate and a short distance east of Temecula Gorge. It has several tributaries, most important of which is Cottonwood Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate. Santa Gertrudis Creek, a tributary of Murrieta Creek, is an intermittent stream rising on the Pauba Grant of the Vail Estate, traversing lands in other ownership before crossing a portion of the Temecula Grant prior to its confluence with Murrieta Creek. Warm Springs Creek, an intermittent stream, rises east of Murrieta Creek and flows into that stream just below the town of Murrieta.[18]

6.  Penjango Creek, an intermittent stream, is tributary to Temecula

---

15/   Plaintiff's Exhibit No. 2 - Map of drainage area of Santa Margarita River.

16/   Plaintiff's Exhibit No. 2

17/   Plaintiff's Exhibit No. 2

18/   Plaintiff's Exhibit No. 2

8

1368

1  Creek, rising south of that stream and joining it a short distance upstream from

2  the junction of the stream last mentioned with Murrieta Creek.  From its source

3  to confluence Penjango Creek traverses a portion of the Little Temecula Grant,

4  and then flows across the Temecula Grant of the Vail Estate, the property upon

5  which its junction with Temecula Creek takes place. [19]

6      Other affluents of Temecula Creek are Lancaster Creek and Arroyo Seco,

7  both of which are intermittent in character, flowing only during periods of high

8  precipitation and entering Temecula Creek above Nigger Canyon. [20]

9      C.  Subterranean Basins Underlying Santa Margarita River

10     From its head waters to the Pacific Ocean, the watershed of the Santa

11 Margarita River System is underlaid with numerous subterranean basins.  They differ

12 greatly in size and capacity. [21]

13     Underlying the military establishments in question within the Santa

14 Margarita River watershed are one or more underground basins or segments of basins,

15 commonly known as:

16         1.  Upper or O'Neill Basin or Segment,

17         2.  Chappo or Home Ranch Basin or Segment,

18         3.  Ysidora Basin or Segment.

19     Agreement in regard to the alluvial basins will not preclude defendants

20

21

22  [19]  Plaintiff's Exhibit No. 2 - Map of drainage area of Santa Margarita River.

23  [20]  Plaintiff's Exhibit No. 2

24  [21]  Plaintiff's Exhibit No. 8 - Map disclosing the geology of the Santa Margarita-

25     Temecula River watershed, dated January 1952, Office of Ground Water Resources,

26  Camp Pendleton, California; Plaintiff's Exhibit No. 9 - Profile of the Santa

27  Margarita River, disclosing elevation and location of principal basins beneath

28  Temecula Creek and Santa Margarita River, entitled "Geologic Cross Section A-A'

29  along the Santa Margarita-Temecula River," dated 10 July 1952, Office of Ground

30  Water Resources, Camp Pendleton, California.

31

32

-7-

1  from contending that the named segments or basins are independent basins.  Neither

2  will it preclude the United States from contending that those segments or basins

3  are geologically and hydrologically connected and constitute one basin.

4  The United States does not assert that there are any other basins within

5  the watershed of the Santa Margarita River underlying Camp Joseph H. Pendleton,

6  including the United States Naval Ammunition Depot, than those to which reference

7  has been made.

8  Throughout the ground-water basin or basins within the watershed of the

9  Santa Margarita River underlying Camp Pendleton are numerous wells of varying

10  depths in the alluvium.  The surface and subsurface area and the character and

11  type of the deposits penetrated by the wells, so far as the same are known to the

12  United States of America, have been analyzed. [22]

13  Defendants reserve the right to question the accuracy of these analyses and

14  present contradictory evidence.  This does not entail a questioning of the

15  identification of the exhibits to which reference is made.

16  D.  United States Geological Survey Records

17  The United States Geological Survey has maintained and published records

18  of the following principal gauging stations within the watershed of the Santa

19  Margarita River:

20
| Stream | Station | Period of record |
|---|---|---|
21 | Santa Margarita River | Ysidora | From February 19, 1923, to date |
22 | Santa Margarita River | Fallbrook | "   November 25, 1924, to date |
23 | Temecula Creek | Temecula (Railroad) Canyon | "   January 30, 1923, to date |
25 | Temecula Creek | Nigger Canyon | "   January 30, 1923, to date |
26 | Murrieta Creek | Temecula | "   October 1, 1930, to date |

27

28  [22]  Plaintiff's Exhibit No. 12 - Isopach map of alluvial deposits of a portion of

29  the Santa Margarita River within Camp Joseph H. Pendleton, San Diego County,
California, Office of Ground Water Resources, Camp Pendleton, dated March 20, 19??.

30  Plaintiff's Exhibit No. 13 - Bar graph disclosing specific yield of materials of
wells within the basin underlying Camp Joseph H. Pendleton by Office of Ground

31  Water Resources, Camp Pendleton, dated March 1952.

32

-9-

10

1  In addition measurements have been taken for diversions at O'Neill Ditch and at

2  other places on the Santa Margarita River system. 23/

3          E.  Acquisition by the United States of America of Sites for
              Camp Joseph H. Pendleton, the United States Naval Hospital,

4                and the United States Naval Ammunition Depot - General Statement

5          1.  The United States of America acquired fee simple title to 9,147.55

6  acres (the present United States Naval Ammunition Depot) of land, more or less,

7  in San Diego County, State of California, by a declaration of taking filed

8  January 21, 1942, in the United States District Court for the Southern District

9  of California. 24/  It likewise acquired fee simple title to 123,620 acres of

10  land, more or less, in San Diego County, California, by a declaration of taking

11  filed December 31, 1942, in the United States District Court for the Southern

12  District of California.  These two tracts of land thus acquired by the United

13  States of America had historically comprised part of the Rancho Santa Margarita. 25/

14  Fee simple title was likewise acquired by the United States of America to

15  1,676.50 acres of land, more or less, in the County of San Diego, State of

16  California, by a declaration of taking filed December 22, 1943, in the United

17  States District Court for the Southern District of California.  By deed dated

18  February 8, 1949, approximately 112.11 acres of land situated in Orange County,

19  California, were conveyed to the United States of America.  In addition to the

20  above parcels of land, approximately 1574.61 acres of the Public Domain Lands

21  situated in San Diego County, California, were transferred to Camp Pendleton by

22  Public Land Order #293, dated August 8, 1945. 26/

23

---

24  23/  Plaintiff's Exhibit No. 14 - U.S.G.S. records, Water Supply Papers for the

25        Santa Margarita River System.

26  24/  Plaintiff's Exhibit No. 15 - Certified copies of certain documents involved
      in the acquisition of the 9,147.55 acres of land more or less comprising the

27  United States Naval Ammunition Depot.

28  25/  Plaintiff's Exhibit No. 16 - Certified copies of certain documents involved
      in the acquisition of the 123,620 acres of land more or less comprising

29  Camp Joseph H. Pendleton Marine Corps Training Base and United States Naval
      Hospital.

30  26/  Plaintiff's Exhibit No. 17 - Certified copies of certain documents involved
      in the acquisition of the 1,676.50 acres of land more or less, 112.11 acres

31  of land and 1574.61 acres of the public domain lands comprising part of Camp

32  Joseph H. Pendleton.

1      2.  Notices of acceptance by the United States of America of the

2  cession of exclusive jurisdiction over each of the parcels of land referred to

3  above, except the lands in Orange County and the lands described in Public Land

4  Order No. 293, were forwarded to the Honorable Earl Warren, Governor of the

5  State of California.  27/   The legal effect of the notices given by the

6  representative of the United States of America is a question to be resolved by

7  the Court in this proceeding.

8      3.  The approximately 135,000 acres of land are presently utilized for

9  the following purposes; among others:

10 Camp Joseph H. Pendleton:

11      It is the function of Camp Joseph H. Pendleton to provide housing and

12 training facilities for units of the Armed Forces, to conduct training of units

13 of the Armed Forces in amphibious warfare and experimental work with landing

14 craft, landing vehicles, tracked and affiliated equipment and the development

15 thereof; to conduct combat training of the various units of the United States

16 Marine Corps, including air-ground support coordination, and use of artillery,

17 tanks and other equipment used in the conduct of modern amphibious and land

18 warfare.  In addition to the aforementioned activities, it is the function of

19 Camp Pendleton to provide logistic support for units of the United States Marine

20 Corps together with material maintenance and storage facilities, for supplies and

21 equipment and to house and train replacements for subsequent assignment to

22 various operating units of the United States Marine Corps.

23 United States Naval Hospital:

24      The United States Naval Hospital, with a capacity of approximately

25

26 27/  Plaintiff's Exhibit No. 18 - Letter of January 12, 1943 from James Forrestal,

27      Acting Secretary of the Navy, to Governor Earl Warren accepting the cession
   of exclusive jurisdiction over the United States Naval Ammunition Depot; Plaintiff's

28 Exhibit No. 19 - Letter of September 8, 1943 from James Forrestal, Acting
   Secretary of the Navy, to Governor Earl Warren accepting the cession of exclusive

29 jurisdiction over Camp Joseph H. Pendleton and the United States Naval Hospital;
   Plaintiff's Exhibit No. 20 - Letter of February 18, 1944 from A. L. Cates,

30 Acting Secretary of the Navy, to Governor Earl Warren accepting the cession of
   exclusive jurisdiction over 1676.58 acres of land in connection with Camp Joseph

31 H. Pendleton.

32

-10-

12   2372

1,550 beds, established at Camp Joseph H. Pendleton, provides medical and hospital
services to personnel of the Armed Forces, their dependents and other authorized
personnel at 83 Naval shore activities located in the Southern California area and
provides medical and hospital care to personnel of units of the United States
Fleet.

United States Naval Ammunition Depot:

The United States Naval Ammunition Depot, Fallbrook, California,
provides facilities for the storage, segregation, reconditioning and issuing of
ammunition for operating units of the United States Fleet and the United States
Marine Corps and maintains ammunition stocks for shore establishments of the
United States Navy located in the Southern California area. In addition, this
Naval Ammunition Depot stores and ships ammunition for use by combat elements
of the United States Navy and United States Marine Corps.

Agreement as to the use of the properties above mentioned neither
constitutes an admission respecting the utilization of the entire area for
military purposes nor does it constitute an admission respecting the extent or
effect of the exclusive jurisdiction of the United States of America over the
property in question.

h. The installations referred to in the preceding paragraphs are
disclosed on the accompanying map. [28]

5. The Santa Margarita River in its course traverses virtually the
length of Camp Pendleton—Naval Ammunition Depot—United States Naval Hospital
lands from east to west for a distance of approximately 21 miles. There are no
users below Camp Pendleton on the Santa Margarita River for the United States of
America owns the lands on both banks of that stream from the point where the
Santa Margarita River enters upon the military establishments above mentioned to
the point of confluence of the river with the Pacific Ocean, except for such
properties and lands as the Atchison, Topeka and Santa Fe Railroad Company may own.

[28] Plaintiff's Exhibit No. 21 — Uncontrolled Mosaic, Camp Pendleton, Calif.
Photographed by Patrol Squadron 61, 1951. Plaintiff's Exhibit No. 22 —
Map disclosing location of all structures — United States Navy Hydrographic
Office, map of Camp Joseph H. Pendleton, 1st Edition, March 1952.

[29] Plaintiff's Exhibit No. 21 — Uncontrolled Mosaic, Camp Pendleton, Calif.

-11-

6. A portion of the approximately 135,000 acres of lands owned by the United States of America comprising the military establishments in question is riparian to the Santa Margarita River. [30]

7. By a stipulated judgment, Exhibit A of the complaint in this case, a defendant in this action, the Vail Estate, and the Rancho Santa Margarita, a corporation, predecessor in interest of the United States of America, concluded protracted litigation between themselves over their respective rights in the Santa Margarita River. By an order of this Court there was filed July 8, 1952 the following stipulation between the United States of America and the Vail Estate:

"Whereas, on December 27, 1940, a judgment was entered in that action entitled Rancho Santa Margarita, a corporation, Plaintiff, v. N. R. Vail, et al., Defendants, in the Superior Court of the State of California in and for the County of San Diego, case No. 42850; and

"Whereas, the United States of America, during the years 1941-1943 acquired all the lands and rights to the use of water in the Temecula-Santa Margarita River which had been owned by the Rancho Santa Margarita, Plaintiff in the action referred to in the preceding paragraph. By that acquisition the United States of America succeeded to all the rights, title, and interest of the Rancho Santa Margarita in the Temecula-Santa Margarita River; and

"Whereas, on January 25, 1951, the United States of America instituted the above-entitled action, incorporating in the complaint filed therein, a copy of said judgment of December 27, 1940, as Exhibit A to its complaint. To the end that a full declaration of Plaintiff's rights in and to the waters of said River as against all other users thereof and

---

[30] Plaintiff's Exhibit No. 23 - Land classification map of the Santa Margarita watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp Pendleton; Plaintiff's Exhibit No. 24 - Land utilization map of Santa Margarita watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp Pendleton.

14 1374

- 12 -

claimants thereto might be obtained in this action, Plaintiff
named among many other Defendants, Mary Vail Wilkinson, Mahlon
Vail, Edward N. Vail, Margaret Vail Wise, and Rita M. Vail,
Trustees herein collectively referred to as the Vails.
Notwithstanding the naming of the Vails as parties defendant
in the present action the United States of America and the
Vails are mutually in agreement that as between themselves
the said judgment of December 27, 1940, is and shall continue
to be binding upon them and each of them.

"Accordingly, it is hereby stipulated and agreed by and
between the United States of America, Plaintiff herein, and
the Vails Defendants herein, through their respective counsel,
as follows:

"1. That the rights and duties of Plaintiff, United
States of America, and the Vails, in and to the waters of the
Temecula-Santa Margarita River as between Plaintiff and said
Vails, are those fixed, determined, and declared in that
certain judgment entered on December 27, 1940, in the case of
Rancho Santa Margarita, a corporation, Plaintiff, v. N. R.
Vail, et al., Defendants, in the Superior Court of the State
of California in and for the County of San Diego, case No. 42850.

"2. That neither Plaintiff herein nor said Vails claim
or will claim, in the within action, any rights or duties as
against the other, other than or different from, those fixed,
determined and declared in said judgment of December 27, 1940.

"3. That no issue is or will be raised in this litiga-
tion as to the operations of the parties under said judgment,
it being understood that neither party will claim in this
litigation that the other has failed in any way to comply with
said judgment of December 27, 1940.

"4. The introduction of a properly certified copy of the
said judgment of December 27, 1940 in the record in this case

15

1375

-13-

1   will constitute proof of the rights and duties of the respective

2   parties hereto as against each other as specified in said judgment.

3       "Signed this 23rd day of Oct. 1951."

4       By agreeing to the facts set forth in Paragraph 7, the defendants do

5   not admit the admissibility of the judgment or stipulation in this action

6   which has arisen between the United States of America and the defendants named

7   herein or waive any rights to have said stipulated judgment or stipulation

8   deleted from the records in the proceeding.

9       8.   That the predecessors in interest of the United States in ownership

10  of Camp Pendleton and the Naval Ammunition Depot did not prior to the effective

11  date of the State Water Commission Act of 1913 post, file or record any notices

12  of appropriation of the waters of the Santa Margarita River system.

13      9.   That Plaintiff owns approximately 6,869.6 acres of land which lie

14  within the watershed of DeLuz Creek and is the owner in fee of approximately

15  3,798.9 acres of land lying within the watershed of Fallbrook Creek.

16      10.  The Plaintiff is the owner in fee of approximately 7,258.9 acres

17  of land lying within the watershed of Pilgrim Creek and the owner in fee of

18  approximately 1942.1 acres of land lying within the watershed of Windmill Creek.

19  That said Windmill Creek and said Pilgrim Creek drain into and are part of the

20  watershed of the San Luis Rey River.

21      F.   Santa Margarita Mutual Water Company

22      1.   The Santa Margarita Mutual Water Company is a mutual water company

23  organized and existing under and pursuant to the laws of the State of California

24  and is currently in good standing. [31]

25      2.   Application No. 11578[*] to appropriate water was filed October 4,

26  1946, by the Santa Margarita Mutual Water Company with the State of California,

27  Department of Public Works, Division of Water Resources, State Engineer.   The

28  application was for sixty (60) cubic feet of water per second from the Santa

29  Margarita River.

30

---

31  [31]   Defendant Santa Margarita Mutual Water Company Exhibit No.   A   , organiza-
        tional documents, including State of California certified document as to
32      current standing.

[*]   The period each year during which the applicant seeks to divert or impound
      the water described in and claimed in the accompanying application.

16

1376

1    In addition to the direct flow right above mentioned, the application

2 in question is for a storage right of 5,000 acre-feet of water from Temecula

3 Creek at the approximate site of the Vail Dam and Reservoir. 32/

4    3. Application No. 12152* to appropriate water was filed November 12,

5 1947, by the Santa Margarita Mutual Water Company with the State of California,

6 Department of Public Works, Division of Water Resources, State Engineer.  The

7 application was for 60,000 acre-feet of water from the Santa Margarita River for

8 storage. 33/

9    C. Fallbrook Public Utility District

10    1. The Fallbrook Public Utility District is a public agency of the

11 State of California, organized and existing under and pursuant to the Public

12 Utility District Act of the State of California, and is currently in good

13 standing. 34/

14    2. Application No. 11586* to appropriate water was filed October 11,

15 1946, by the Fallbrook Public Utility District with the State of California,

16 Department of Public Works, Division of Water Resources, State Engineer.  The

17 application was for 2-1/2 (two and one-half) cubic feet of water per second from

18 the Santa Margarita River. 35/

19    3. Pursuant to said last-mentioned application, there was issued on

20 February 18, 1948, to the Fallbrook Public Utility District permit No. 7033.  That

21 permit was approved subject to vested rights.  The quantity of water to be

22 diverted pursuant to it was not to exceed 2.5 cubic feet per second from April 1

23 to about November 1st of each year and throughout the remainder of the year as

24

25    32/  Defendant Santa Margarita Mutual Water Company Exhibit No.  B  , application
26         No. 11573 to appropriate water.

27    33/  Defendant Santa Margarita Mutual Water Company Exhibit No.  C  , application
28         No. 12152 to appropriate water.

28    34/  Defendant Fallbrook Public Utility District Exhibit No.  A  , organizational
29         documents, including state of California certified statement as to current
         standing.

30    35/  Defendant Fallbrook Public Utility District Exhibit No.  B  , application
31         No. 11586 to appropriate water.

32    *  The period each year during which the applicant seeks to divert or impound
         the water described is contained in each above-given application.

17

1377

1  required for domestic and municipal uses. 36/

2  4.  Application No. 11587* to appropriate water was filed October 11,

3  1946, by the Fallbrook Public Utility District with the State of California,

4  Department of Public Works, Division of Water Resources, State Engineer.  The

5  application was for 10,000 acre-feet of water for storage from the Santa Margarita

6  River. 37/

7  5.  Pursuant to said last-mentioned application, there was issued on

8  April 23, 1951, to the Fallbrook Public Utility District permit No. 8511.  That

9  permit was approved subject to vested rights.  The quantity of water to be

10  impounded pursuant to it was not to exceed 10,000 acre-feet for storage to be

11  collected from January 1 to December 31 of each year. 38/

12  6.  Application No. 12178* to appropriate water was filed November 28,

13  1947, by the Fallbrook Utility District with the State of California,

14  Department of Public Works, Division of Water Resources, State Engineer.  The

15  application is for storage of 10,000 acre-feet of water per annum, 500 acre feet

16  from Rainbow Creek and 9,500 acre feet from Santa Margarita River.  Said

17  application is now under consideration by the State of California, Department of

18  Public Works, Division of Water Resources, State Engineer, and notice of the

19  application is now being published. 39/

20  7.  Application No. 12179* to appropriate water was filed November 28,

21  1947, by the Fallbrook Public Utility District with the State of California,

22  Department of Public Works, Division of Water Resources, State Engineer.  The

23  application is for storage of 10,000 acre-feet of water per annum, 1,500 acre

24  feet from Sandia Creek and 8,500 acre feet from Santa Margarita River.  Said

25

---

26  36/  Defendant Fallbrook Public Utility District Exhibit No. C , Permit No.
27      7033 signed by Edward Hyatt, State Engineer on February 18, 1948.

28  37/  Defendant Fallbrook Public Utility District Exhibit No. D , application
      No. 11587 to appropriate water.

29  38/  Defendant Fallbrook Public Utility District Exhibit No. E , Permit No.
30      8511 signed by A. D. Edmonston, State Engineer on April 23, 1951.

31  39/  Defendant Fallbrook Public Utility District Exhibit No. F , application
      No. 12178 to appropriate water.

32

The period each year during which the applicant seeks to divert or impound
the water described is contained in the accompanying application.

18_378

-16-

application is now under consideration by the State of California, Department
of Public Works, Division of Water Resources, State Engineer, and notice of the
application is now being published. 40/

8. The legal title to whatever rights Fallbrook Public Utility District
may have acquired or may hereafter acquire to the waters of the Santa Margarita
River system by virtue of its said applications to and permits from the State of
California or otherwise, are vested in the District in trust for the uses and
purposes set forth in the Public Utility District Act of the State of California
and the beneficiaries of the trust are the landowners and water users in the District.

H. State of California

1. The State of California, defendant in intervention, has entered into
the following stipulation with the United States of America:

> "On the 15th day of August, 1951, the People of the State
> of California, in accordance with invitation of the United
> States of America, petitioned this Court to intervene in this
> litigation. On that date an Order was allowed and entered by
> this Court granting the Petition.

> "For the clarification of the issues in this litigation,
> and for the benefit of all of the parties to this cause, it is
> hereby stipulated:

> "I

> "That in Paragraphs VIII and IX of plaintiff's Complaint
> herein, and in Paragraphs 2 and 3 of the Prayer of said Complaint,
> the word 'paramount' is used in the same sense in which that word
> is used in the second paragraph, on page 374 of the opinion of
> the Supreme Court of California in the case of Peabody v. Vallejo,
> 2 Cal. 2d 351 (fourth paragraph on page 494, 40 Pac. 2d 486.)

> "II

> "That in this cause, the United States of America claims
> only such rights to the use of water as it acquired when it
> purchased the Rancho Santa Margarita, together with any rights
> to the use of water which it may have gained by prescription or
> use, or both, since its acquisition of the Rancho Santa Margarita.

> "III

> "That the United States of America claims by reason of its
> sovereign status no right to the use of a greater quantity of

---

40/ Defendant Fallbrook Public Utility District Exhibit No. G, application
No. 12179 to appropriate water.

19   1379

-17-

water than is stated in Paragraph II, hereof.

"IV

"That the rights of the United States of America to the use
of water herein are to be measured in accordance with the laws
of the State of California.

"V

"That the parties to this Stipulation will request the
entry of a Pretrial Order by this Court defining the issues
in this cause, in conformity with the statements contained
in this Stipulation.

"VI

"That there will be a full, complete and mutual exchange
of data and information as to the subject matter of this cause
collected by the respective parties to this Stipulation,
including data respecting the issuance of any permits or
licenses issued by the State of California in connection
with the rights to the use of water of the Santa Margarita
River. Such exchange of information by the United States,
will be subject to clearance by the Commanding Officer, Camp
Joseph H. Pendleton, in respect to military security, as
determined by said Officer.

"Dated: November 29, 1951."

2.  That stipulation has been approved by the Court and ordered filed.

3.  Counsel for the State of California are presently informed that the
State of California owns no lands and has no liens on lands within the Santa
Margarita River system watershed.  They reserve the right, however, should further
investigation disclose any such interest to amend their answer and prove such
ownerships.

-16-

20
1380

CONTENTIONS OF THE UNITED STATES OF AMERICA

1. In addition to the physical features of the Santa Margarita River system contained in the Agreed Facts, the United States contends that:

a. Below the Vail Dam, Temecula Creek traverses a highly porous area where that stream, except during periods of high runoff, disappears into the Temecula Basin. In a state of nature Temecula Creek customarily again becomes a surface stream at a distance of about three miles from the present site of the Vail Dam. Presently, however, due to the control of the stream arising from the mentioned dam and the draft upon Temecula Basin by the Vail Estate, Temecula Creek reappears as a surface stream at a greater distance from the mouth of Nigger Canyon dependent upon the draft and the period elapsing between releases from Vail Reservoir.

b. Within Camp Pendleton the Santa Margarita River does not flow as a continuous surface stream but during the dry season of the year the stream customarily and ordinarily sinks into the highly porous ground water basin underlying Camp Pendleton and the other military establishments. When that basin has been filled, the Santa Margarita River ordinarily comes to the surface some two or three miles from tidewater. In a state of nature it continues then to the Pacific Ocean as a stream of diminishing volume.

c. From its head waters to the Pacific Ocean the Santa Margarita River passes over and through numerous ground water basins. The water in those basins is contained by bedrock or other impervious material. The basins are filled with alluvial deposits of varying degrees of porosity. The basins differ greatly in size and in capacity. The waters of the Santa Margarita River in its course through the valley penetrate and fill the voids of the porous alluvium. When the water of the stream sinks to bedrock or the other impervious material comprising the beds of the basins, in which the detrital material lies, it spreads out laterally filling the basins. When completely charged, the waters of the basins support the surface stream and progress slowly

-1-

downstream through the permeable material.

Ground water basins of the character described underlie Temecula Creek in portions of Oak Grove Valley, and Lancaster Creek in Lancaster Valley. Temecula Basin, one of the largest in the entire watershed of the Santa Margarita River, is located on the property of the Vail Estate. This large T-shaped alluvial deposit area has the stem of the T along the main channel of Temecula Creek for a distance of approximately eight miles, varying in width from two-thirds of a mile to a mile and a half. 1/ That area of the Temecula Basin immediately below the present site of Vail Dam is comprised of coarse, highly porous material and is known as the "out wash." Into that "out wash" except in periods of extremely heavy precipitation, Temecula Creek sinks. About three miles below the "out wash" the Temecula Basin becomes an artesian area from which Temecula Creek again emerges as a surface stream.

The right arm of the T-shaped alluvial basin extends northward underlying Murrieta Creek for a short distance above that stream's confluence with Temecula Creek. The left arm of the T-shaped Temecula alluvial basin extends southward beneath Penjungo Creek. 2/

Underlying Murrieta Creek and separated from the Temecula Basin is another large alluvial basin known as the Murrieta Basin. That is comprised of valley fill similar to that found in the other basins.

Due to the existence of granitic rock immediately underlying the stream from approximately the point of confluence of Temecula Creek with Murrieta Creek to the mouth of the Temecula Gorge, the Santa Margarita River in the state of nature is a surface stream. That granitic underlay

1/ Plaintiff's Exhibit No. 8 - Map disclosing the geology of the Santa Margarita-Temecula River watershed, dated January 1952, Office of Ground Water Resources, Camp Pendleton, California; Plaintiff's Exhibit No. 9 - Profile of the Santa Margarita River, disclosing elevation and location of principal basins beneath Temecula Creek and Santa Margarita River, entitled "Geologic Cross Section A-A' along the Santa Margarita-Temecula River," dated 10 July 1952, Office of Ground Water Resources, Camp Pendleton, California.

2/ Plaintiff's Exhibit No. 8 - Map disclosing the geology of the Santa Margarita-Temecula River watershed.

-2-

1382   22

1    of the stream continues from the point mentioned across the boundary of

2    Camp Pendleton to a point approximately one and one-half miles below the

3    confluence of DeLuz Creek with the Santa Margarita River.  At that

4    point the stream opens out into a rather broad alluvial flood plain.

5    That alluvial area extends from the point last mentioned to tidewater,

6    constituting a large ground-water basin.  That ground-water basin is

7    comprised of a relatively coarse and loose porous valley fill at the

8    upstream end comparable to the "out wash" area of the Temecula Basin

9    above described. 3/  Approaching the ocean the character of the alluvium

10   becomes increasingly fine and tight.

11      The alluvial ground-water basin underlying the Santa Margarita

12   River within Camp Pendleton and the other military establishments is

13   geologically and hydrologically interconnected, comprised, however, of

14   three separate segments which lend themselves readily to arbitrary

15   subdivisions.  They are

16      1.  Upper or O'Neill Basin Component,
         2.  Chappo or Home Ranch Basin Component,
17      3.  Ysidora Basin Component.

18      2.  Exclusive jurisdiction over the approximately 135,000 acres of land

19   constituting Camp Joseph H. Pendleton, United States Naval Hospital and the United

20   States Naval Ammunition Depot resides in the United States of America.  By reason

21   of exclusive jurisdiction, with an exception having no bearing here, the police

22   power of the State of California has no application and is without force and

23   effect in regard to the lands, buildings, or any of the components constituting

24   the installations or the rights to the use of water claimed by the United States

25   of America.

26      3.  Construction of the military installations in question commenced

27   immediately upon the acquisition by the United States of America of the lands

28   to which reference has been made.  Those installations since that date and all

29

30   3/  Plaintiff's Exhibit No. 10 - Map of lower Santa Margarita River Valley, Camp

31      Joseph H. Pendleton, California, showing groundwater storage units, general
         geology, and location of wells and screen gaging stations, compiled November

32   1951 by U.S.G.S.  Plaintiff's Exhibit No. 11 - Geologic section A-A' through
     the lower Santa Margarita River Valley, showing unconsolidated deposits and
     water-level profiles, United States Geological Survey.

-138323-

-3-

1  of the approximately 135,000 acres of land have been continuously utilized for

2  military purposes.

3    b. A water system was constructed and is now operated to serve the

4  military installations. [4/]

5    5. Water has been delivered through the distribution system to the

6  military installations since the properties were acquired by the United States

7  of America. [5/]   Since that date water has likewise been delivered to

8  agricultural lands when the lands and water were not required for military

9  purposes.

10    6. All of the land and rights to the use of water acquired from the

11  Rancho Santa Margarita and all of the water acquired through prescription or use

12  or both, are primarily for military purposes.  To avoid possible waste of water

13  entails the utilization of it for agricultural purposes when the water is not

14  immediately needed for military purposes.

15    7. Water has been continuously diverted from the Santa Margarita

16  River and from the ground-water basin underlying the military establishments in

17  question by the United States of America for military purposes [6/]  and

18  agricultural purposes [7/]  since the acquisition of the lands in question.  The

19  surface stream and the ground-water basin underlying those military establishments

20  constitute a single source of supply.

21    8. For both military and agricultural purposes the United States of

22  America has historically utilized its rights to the use of water both within

23  and outside of the watershed of the Santa Margarita River.  Thirty days prior

24  to trial there will be delivered to the defendants named in this separate trial

25  the quantities of water from the Santa Margarita River historically utilized

26

27  4/  Plaintiff's Exhibit No. 22 - Map disclosing location of all structures -

28    United States Navy Hydrographic Office, map of Camp Joseph H. Pendleton,
  1st Edition, March 1952.

29  5/  Plaintiff's Exhibit No. 22 - Map disclosing location of all structures.

30  6/  Plaintiff's Exhibit No. 26 - Tabulation in acre feet of water pumped at

31    Camp Pendleton, entitled "Camp Pendleton Water Pumps, Camp Pendleton Records
  Diversions."

  7/  Plaintiff's Exhibit No. 27 - Tabulation in acre feet of water pumped from
32    Ysidora area for agricultural purposes, entitled "Ysidora Area Pumps, Camp
  Pendleton Records Diversions."

1384

1   both within and without the watershed.

2       9.  Based on the troop load which will be attained by the end of Fiscal

3   Year 1954, the annual demand for water from the Santa Margarita River for use by

4   the United States of America at Camp Pendleton and the other military establishment

5   will increase to approximately 23,000 acre-feet. Full mobilization of the Nation

6   for war would increase the demand to the full extent of the relief prayed in the

7   complaint in this case, 35,000 acre feet of water annually.

8       10.  Long prior to the acquisition by the United States in the year 1884,

9   its predecessors in interest had diverted for agricultural purposes and had im- [8/]

10  pounded large quantities of water from the Santa Margarita River in Lake O'Neill.

11  For a similar period the predecessors in interest of the United States had diverted

12  from the surface flow or pumped from the underground basin underlying the river,

13  large quantities of water of the Santa Margarita River out of the watershed of

14  that stream for agricultural uses. Thirty days prior to trial, the Plaintiff will

15  furnish Defendants a statement of the quantities of water used by the United States

16  and its predecessors in interest outside the watershed of the Santa Margarita River

17  the several places of use; periods of time used and purposes of use, so far as that

18  information is available. Moreover, the supply available from the Santa Margarita

19  River system has been historically insufficient to meet the demands of the

20  predecessors in interest of the United States of America and of the United States.

21      11.  Historically the waters from the Santa Margarita River were diverted

22  from the stream by the predecessors in interest of the United States of America

23  and utilized upon the riparian lands for agricultural purposes. Large quantities

24  of the water were likewise pumped from the ground-water basin underlying those

25  riparian lands and were likewise used for agricultural purposes.

26      12.  Large quantities of both the surface stream of the Santa Margarita

27  River and of the ground-water basin underlying that stream were historically

28  used by the predecessors in interest of the United States of America for stock

29  watering and domestic purposes.

30      13.  The high water table of the ground-water basin above described

31  subirrigated the entire surface area of the basin, greatly enhancing the

32

8/  Plaintiff's Exhibit No. 29 - Tabulation Lake O'Neill Reservoir storage records.
    Plaintiff's Exhibit No. 30 - Area and capacity curve of Lake O'Neill, Camp
Joseph H. Pendleton, Public Works Office, P W drawing #11870F.

1  production of natural forage, thus increasing the carrying capacity for livestock

2  of the lands with the attendant increment in the value of the lands.  That

3  natural subirrigation from the ground-water basin above described since the

4  acquisition of the lands in question by the United States of America has

5  continued to subirrigate the natural forage, providing feed for livestock and

6  maintaining a coverage of the surface area necessary for the present military

7  use.

8  14.  Though the Santa Margarita River is an intermittent stream, it has

9  historically for brief periods raised to higher levels within the natural high

10  water channel of the stream, overflowing lands which during the long dry periods

11  receive only subirrigation from the ground-water basin underlying the area.

12  That overflow watered, enriched, and fertilized the lands resulting in increased

13  productivity of the land and enhancement of its value.

14  15.  The United States of America as owner of the lands is invested

15  with title to rights to the use of water in the Santa Margarita River for the

16  subirrigation and the overflow above mentioned in addition to the other rights

17  to the use of water above described and subsequently to be described.  Obstruction

18  or diversion of the natural flow of the Santa Margarita River upstream from

19  properties owned by the United States of America constitutes an invasion of

20  any and all of the rights of the United States of America to the use of water to

21  the irreparable damage of the United States of America.

22  16.  There are 37,944* acres of land riparian to the Santa Margarita

23  River within the boundaries of Camp Joseph H. Pendleton, the United States

24  Naval Ammunition Depot and the United States Naval Hospital.9/

25  17.  Of those 37,944 acres of land riparian to the Santa Margarita

26  River 18,701.1* acres are irrigable and are susceptible of practicable and

27  profitable irrigation,10/ of which 4,601.9 irrigable acres are within the United

28  States Naval Ammunition Depot.

29  9/  Plaintiff's Exhibit No. 24 - Land Utilization map of Santa Margarita water-

30  shed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp
Pendleton.

31  10/  Plaintiff's Exhibit No. 23 - Land classification map of the Santa Margarita

32  Watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources,
Camp Pendleton; Plaintiff's Exhibit No. 24 - Land Utilization map of Santa
Margarita watershed; Plaintiff's Exhibit No. 25 - Soil survey field sheets, soil
survey legend, of Camp Joseph H. Pendleton, dated June 1952.

*  This figure is subject to slight modification dependent upon the ultimate
determination of the crest of the watershed in certain disputed areas.

26

18. The irrigation requirements for practicable and profitable irrigation for those lands is 69,237.1* acre feet a year. [11]

19. In addition to the riparian and irrigable lands within the watershed as above described, there are lands lying outside of the watershed which have historically been irrigated from the ground-water basin underlying the military establishments in question. Those lands are situated within the area known as the Stuart Mesa, lying north of the Santa Margarita River, and South Coast Mesa, lying south of the stream. Thirty days prior to trial there will be delivered to the defendants the exact acreage as determined by the United States lying outside of the watershed in regard to the land in question; the duty of water and the maximum demand upon the Santa Margarita River which the United States is asserting in connection with those properties.

20. The principal source of water from the Santa Margarita River for use on the lands now comprising the military establishments in question is the ground-water basin which has been described. Future demands will be principally met by pumping from the basin. The ground-water storage capacity of the three components of the subterranean basin underlying the Santa Margarita River within Camp Joseph H. Pendleton, the United States Naval Hospital and the United States Naval Ammunition Depot are as follows:

| | |
|---|---|
| Upper Basin (O'Neill) Component | 12,500 acre feet |
| Chappo Basin (Home Ranch) Component | 27,000 " " |
| Ysidora Basin Component | 8,600 " " |
| | 48,100 acre feet |

21. To provide a fresh water barrier for the prevention of salt water intrusion, which has presently destroyed two wells, it is requisite that there be maintained a fresh water barrier in the Ysidora Basin Component. Thus the maximum usable capacity of the ground-water basin is 40,000 acre feet.

[11] Plaintiff's Exhibit No. 23 — Land classification map of the Santa Margarita watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp Pendleton; Plaintiff's Exhibit No. 24 — Land utilization map of Santa Margarita watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp Pendleton; Plaintiff's Exhibit No. 25 — Soil survey field sheets, soil survey legend, of Camp Joseph H. Pendleton, dated June 1952.

* This figure is subject to slight modification dependent upon the ultimate determination of the crest of the watershed in certain disputed areas.

-7-

1387

To accomplish the maximum utilization of the storage capacity of the ground-water basin and the rights to the use of water, the United States will pump largely from the Upper and Chappo Basins-Components, thus permitting the water in the Ysidora Basin-Component to remain at a level which will effectively prevent the intrusion of salt water into the basin.

22. In a state of nature, the process of recharging the under-ground basin resulted in Santa Margarita River water occasionally reaching tidewater. Plans now being effected, however, in regard to the pumping from the ground-water basin underlying Camp Pendleton and the other military establishments, together with the regulation of surface stream flow, will eliminate or greatly reduce the amount of Santa Margarita River water from reaching tidewater.

23. It is estimated, premised upon the available data respecting the annual runoff of the Santa Margarita River system and upon known demands for water from that stream system within its watershed, that the maximum quantity of water which would be available to Camp Pendleton and the other military establishments is 12,500 acre feet per annum.[12/] Only by adherence to the strictest conservation practices and the use and re-use of water will it be possible to meet the demands for water of Camp Pendleton and the other military establishments.

24. The Vail Estate has title to 29,000 acres of riparian land which is susceptible of practicable and profitable irrigation from the Santa Margarita River and its tributaries. Of that acreage, due to the insufficient supply of water in the river and its tributaries, the Vail Estate presently irrigates only 4,200 acres of land. The annual water duty for those lands is presently three acre feet per acre. The other riparian lands susceptible of irrigation, if the water was available for them, would likewise utilize three acre feet per acre per year.[13/]

12/  Plaintiff's Exhibit No. 14 - U.S.G.S. records, Water Supply Papers for the Santa Margarita River System.

13/  Plaintiff's Exhibit No. 31 - Map of Pauba Ranch and vicinity, Riverside County, California; Plaintiff's Exhibit No. 32 - Map of soil and climatic surveys of the Pauba Ranch, Riverside County, California; Plaintiff's Exhibit No. 33 - Tabulation and ......... as to crop adaptation of parts of Pauba, Temecula, Little Temecula ... Santa Rosa Ranchos.  (& Temecula Creek)

-6-

25. The Vail Estate is presently expanding its operation upon its riparian land and has adopted a program better to use the available supply of water through the construction of small impounding reservoirs and water spreading devices.

26. The Vail Estate, in addition to its riparian rights in the stream in question which are above described, is the owner of an appropriative right to impound in Nigger Canyon Reservoir and utilize for purposes of irrigation 50,000 acre feet of water. All of the water yielded by the riparian rights and the appropriative rights of the Vail Estate are beneficially applied to practicable and profitable irrigation of crops commonly grown in the area in which the property is located.

27. Pursuant to the Stipulated Judgment, Exhibit A of the Complaint in this case, the Vail Estate during the irrigation season of each year is required to maintain a constant flow of water of not less than three cubic feet per second at the Temecula gauging station at the head of Temecula Gorge. That water is delivered to the United States of America in accordance with the provisions of the Stipulated Judgment and is not open to appropriation under the laws of the State of California. Moreover, that three second feet of water which would not be in the stream were it not for the Stipulated Judgment is not available for use and diversion by the defendants, Fallbrook Public Utility District and Santa Margarita Mutual Water Company, or the State of California.

28. All of the water to which the United States is entitled by reason of the rights to the use of water under the Stipulated Judgment and as against the defendants in this litigation may be used outside of the watershed of the Santa Margarita River or may be impounded in the discretion of the United States by reason of the express provisions of the Stipulated Judgment.

29. The United States of America declares that Permit No. 7033 and Permit No. 8511, issued by the Department of Public Works, Division of Water Resources, State Engineer, State of California, to the Fallbrook Public Utility District are null and void and of no force and effect. It likewise denies that the Fallbrook Public Utility District acquired any rights in and to the use of water of the Santa Margarita River by any of its filings of applications

1389

-9-

1  with the Division of Water Resources.

2      30.  The United States of America likewise denies that the Santa

3  Margarita Mutual Water Company has any rights to the use of water in the Santa

4  MargaritaRiver by reason of the applications which it filed with the Department

5  of Public Works, Division of Water Resources, State Engineer, State of California.

6      31.  The United States of America asserts that within the watershed of

7  the Santa Margarita River system there are 35,000 acres of land above Nigger

8  Canyon and 19,000 acres of land within the watershed of Murrieta Creek and 6,000

9  acres of land between Camp Pendleton and the head of Temecula Gorge susceptible

10  of irrigation and entitled to water from the Santa Margarita River and that those

11  rights, together with the rights of the Vail Estate and the United States, far

12  exceed the quantitiesof water available in the Santa Margarita River.  The

13  United Statesof America likewise denies that there is any water available for

14  appropriation or exportation from the watershed of the Santa Margarita River.

15      32.  The defendant Fallbrook Public Utility District in direct

16  violation of the rights to the use of water of the United States in the Santa

17  Margarita River has illegally andin violation of the rights of the United States

18  installed in the channel of that stream a dam and pump and with intake structures

19  is impounding and diverting water to which the United States is legally entitled.

20      33.  The validity of Permit No. 8511, in addition to the other reasons

21  expressed above, is denied by reason of the fact that it was issued with full

22  knowledge of the pendency of the action subsequent to the date that this cause

23  was instituted.

24      34.  Similarly no rights could be invested in the Fallbrook Public

25  Utility District or the Santa Margarita Mutual Water Company by reason of action

26  taken by the State in regard to pending applications.

27      35.  The water diverted from the watershed at the present time for

28  military uses is largely re-diverted to the watershed in the form of sewage

29  effluent which is returned to the basin for recharging the basin and for reuse.

30      36.  The Fallbrook Public Utility District could not initiate rights to

31  the use of water in the Santa Margarita River when it made its filings with the

32  State of California by reason of the fact that it was at the time receiving water

1    in small quantities from that river pursuant to a revocable license from the

2    United States of America. [14]/

3        37. All of the acts of the Fallbrook Public Utility District and of

4    the Santa Margarita Mutual Water Company complained of in this litigation by

5    the United States were taken with full knowledge of the dependency of the United

6    States of America upon the Santa Margarita River as a source of supply for the

7    military establishments in question.

8        38. The diversions of the Fallbrook Public Utility District are the

9    direct and immediate cause of salt water intrusion, described in the Complaint,

10    which has resulted in the contamination by salt water of two of the wells

11    maintained on Camp Joseph H. Pendleton.

12        39. Due to the diversions of the Fallbrook Public Utility District,

13    none of the waters of the Santa Margarita River are now reaching Camp Joseph H.

14    Pendleton or the United States Naval Ammunition Depot. By reason of that

15    diversion, the United States Naval Ammunition Depot is without a supply of water

16    causing the United States to suffer irreparable damage and it will continue

17    suffering irreparable damage as long as the Fallbrook Public Utility District

18    continues to maintain its dam across the Santa Margarita River and continues

19    to pump water from that stream.

20

21      RESPONSE OF THE UNITED STATES OF AMERICA TO CONTENTIONS OF THE
        FALLBROOK PUBLIC UTILITY DISTRICT, SANTA MARGARITA MUTUAL WATER COMPANY
22                     AND THE STATE OF CALIFORNIA

23        1. The United States of America denies the contentions of the Fallbrook

24    Public Utility District, the Santa Margarita Mutual Water Company and the State of

25    California pointing to the fact that the contentions in question are largely

26    conclusions of law to be determined by this Court.

27        2. The United States of America objects and renews its objection

28    previously made to the amendment by the State of California, Defendant in

29    Intervention, to its answer.

30

31    14/   Plaintiff's Exhibit No. 34 — Certified copy of Revocable License and Permit

32        to use water from the Santa Margarita River from Rancho Santa Margarita
        to the Fallbrook Public Utility District; Letter of May 24, 1948 revoking it.

1391

CONTENTIONS OF FALLBROOK PUBLIC UTILITY DISTRICT.

1. Fallbrook Public Utility District denies that plaintiff is making, or that it has made since the acquisition of Rancho Santa Margarita, any riparian uses, or in the future will make any riparian uses of the waters of the Santa Margarita River for the reason that this defendant contends that the military uses to which plaintiff has put and is putting such waters are not riparian uses; and that the water heretofore and now being applied by plaintiff to irrigation and agricultural purposes has not been and is not now being used on lands located within the Santa Margarita watershed.

2. Fallbrook Public Utility District denies that Plaintiff, or its predecessor in interest, acquired or could have acquired, as against this defendant, by use,[*] or that plaintiff now owns the right to demand that water of the Santa Margarita River be allowed to pass this defendant's diversion point to enable plaintiff to use said water

(a) on lands outside the Santa Margarita River watershed;

(b) for supplying plaintiff's military requirements, including the sanitary, culinary and drinking requirements of its armed forces, and the civilian personnel employed in connection therewith, stationed from time to time at Camp Joseph H. Pendleton, the Naval Ammunition Depot and the United States Naval Hospital;

(c) for storage for future use.

It is the contention of this defendant that neither plaintiff nor its predecessors in interest ever made any appropriation of the water of the Santa Margarita River, under or pursuant to the laws of the State of California (other than the application No. 12576 made by the Navy Department June 30, 1948, to which reference is hereinafter made) and that Plaintiff and its predecessors in interest did not and could not have acquired, as against this defendant any prescriptive rights for the reason that all of Plaintiff's diversions and those of its predecessors in interest were and are down stream from the diversions of this defendant and the lands on which this defendant puts the waters of the Santa Margarita River to use.

3. Fallbrook Public Utility District has made the following applications

32

[*] or prescription

to the State of California to appropriate water of the Santa Margarita River and the Sandia and Rainbow Creeks, tributaries of Santa Margarita River, and pursuant to the water laws of the State of California:

> (1) Application No. 11586, filed October 11, 1946, to appropriate 2½ cubic feet per second from the Santa Margarita River, which application was approved and permit issued on February 18, 1948, to appropriate and divert from said river for beneficial use not exceeding 2.5 cu. ft. per second, "from about April 1 to November 1 of each year and through the remainder of the year as required for domestic and municipal uses. In case of rotation the equivalent of such continuous allowance for any thirty day period may be diverted in a shorter time if there is no interference with other vested rights."

Thereafter this defendant has exercised its rights under said permit and has now diverted and put to beneficial use the full amount granted under said permit and has acquired the right to continue to so use said full amount.

> (2) Application No. 11587 filed October 11, 1946, to appropriate 10,000 acre-feet per annum from the Santa Margarita River, which application was approved and permit issued on April 23rd, 1951, to store for beneficial use within the Fallbrook Public Utility District not to exceed "10,000 acre-feet per annum to be collected between January 1st and December 31st of each year."

Thereafter this defendant has been and now is actively engaged in the acquisition of lands for the dam and reservoir in which to store said water and in the preparation of plans and specifications for the building of said dam.

> (3) Application No. 12178 filed November 28, 1947 to appropriate 10,000 acre-feet per annum for storage and beneficial use in the Fallbrook Public Utility District, 500 acre-feet per from Rainbow Creek and 9,500 acre-feet from the Santa Margarita River.

-2-

1     That said application is in due form and order, in full force and effect

2     and now pending before and under consideration by the State Engineer

3     and Division of Water Resources, Department of Public Works, State of

4     California and notice of said application is now being published as

5     required by law, and the District is entitled to the issuance of a

6     permit thereon.

7     (4) Application No. 12179, filed November 28, 1947, to appropriate

8     10,000 acre-feet of water per annum for storage and beneficial use

9     within the alltrook Public Utility District, 1500 acre-feet per

10     annum from Sandia Creek, 8,500 acre-feet per annum from Santa

11     Margarita River.

12     That said application is in due form and order, in full force and effect

13     and now pending before and under consideration by the State Engineer and

14     Division of Water Resources, Department of Public Works, State of

15     California and notice of said application is now being published as

16     required by law, and the District is entitled to the issuance of a

17     permit thereon.

18     4. The United States of America, acting by and through the United States

19 Navy Department also filed an application with the State of California on June

20 30, 1949, being

21     Application No. 12576 to appropriate 165,000 acre-feet of water

22     per annum from the Temecula Creek-Santa Margarita River for

23     storage at a dam to be built on Camp Pendleton for municipal or

24     military, irrigation and domestic uses

25 but that said application was filed subsequent to all of the applications of this

26 defendant and is junior in right to the applications and rights of this defendant.

27 A copy of said application is attached hereto and made a part hereof. 1/

28     5. There exists in said Santa Margarita River excess and surplus waters

29 over and above the actual reasonable requirements of the riparian land owners and

30 those having rights prior to those of this defendant, which excess and surplus

31

32 1/ Defendant Fallbrook Public Utility District Exhibit No. 11, Application No.
   12576 of United States of America to appropriate water.

1   waters are subject to appropriation, diversion and use by this defendant.

2           6.  While Fallbrook Public Utility District is primarily an appropriator

3   of water, distributing same to land owners and water users within the boundaries

4   of the District, it is also the owner in fee simple, or is in the process of

5   acquiring title in fee simple, to the hereinafter described tracts of land which

6   are situated within the watershed of the Santa Margarita River and said District

7   claims water rights therefor, in the several amounts hereinafter set out, either

8   as being riparian to the Santa Margarita River and its tributaries, or, as being

9   rights to the underground water percolating beneath said tracts of land.

10          The District is the owner in fee of the following tracts of land situated

11  in the County of San Diego, State of California, and more particularly described

12  as follows:

13  PARCEL 1.   The South 248.09 feet of that portion of the North 480 feet of the

14              Northwest Quarter of the Northeast Quarter of Section 25, Township 9

15              South, Range 4 West, San Bernardino Meridian, lying and being West of

16              the center line of the County Highway as described in Decree of Con-

17              demnation in Superior Court of San Diego County, Case No. 17550, a

18              certified copy of which was recorded May 20, 1912, in Book 500, page 89

19              of Deeds, containing 4 acres, more or less, with a right to water for

20              use thereon up to 12 acre-feet per annum.

21  PARCEL 2.   The East One Hundred Thirty (130) feet of the West Eleven Hundred

22              Fifty-two (1152) feet of the Northwest Quarter of the Northwest

23              Quarter of Section 7, Township Nine South, Range 3 West, San

24              Bernardino Meridian, containing 3.94 acres more or less, with a right

25              to water for use thereon up to 12 acre-feet per annum.

26  PARCEL 3.   The North one-half of Block "S" of Bartlett's Addition to West Fallbrook

27              No. 1, according to Map thereof No. 470, filed in the office of the

28              Recorder of said San Diego County, January 4th, 1888, containing .38

29              acres more or less, with a right to water for use thereon up to one

30              acre-foot per annum.

31  PARCEL 4.   All that portion of Lot 2, being the Northwest Quarter of the Southwest

32              Quarter of Section 18, Township 9 South, Range 3 West, S.B.M. described

as follows:  Commencing at a point on the West line of said Section 18
distant thereon 215 feet Northerly from the Southwest corner of said Lot
2, thence at right angles Easterly, 185 feet to the true point of begin-
ning, thence at right angles Northerly, being along a line parallel with
said West line of said Section, 200 feet, thence at right angles Easterly,
217.8 feet, thence at right angles Southerly, being along a line parallel
with said West line of said Section, 200 feet, thence at right angles
Westerly, 217.8 feet to the true point of beginning.  ALSO an easement
and right of way, 16 feet wide, connecting the South line of the above
described property with the South line of said Lot 2, the West line of
said 16 foot strip being the Southerly prolongation of the West line of
the above described property, containing one acre more or less, with a
right to water for use thereon up to 3 acre-feet per annum.

PARCEL 5.  All that portion Section 17, Township 9 South, Range 3 West, S.B.M.
described as follows:  Commencing at a point in the South line of said
Section 17, distant N 89° 56' 30" E. 159.84 feet from the SW corner of
the SE¼ of said Section 17;  Thence at right angles to said South line of
said Section 17, N. 0° 03' 30" West 873.15 feet to a point;  Thence N.
89° 56' 30" E 210 feet to a point;  Thence S. 0° 03' 30" E. 210 feet to a
point;  Thence S 89° 56' 30" W 194 feet to a point;  Thence S 0° 03' 30"
E 663.15 feet to a point in the South Line of said Section 17;  Thence S
89° 56' 30" W 16 feet along the South line of said Section 17 to the
point of beginning, containing 1.25 acres more or less, with a right to
water for use thereon up to 4 acre feet per annum.

PARCEL 6.  All that portion of the SW¼ of the SE¼ of Section 24, Township 9 South,
Range 4 West, S.B.M. described as follows:  Commencing at a point which
is South 88° 56' East 670 feet and North 0° 31' East 344.60 feet from
the South Quarter corner of Section 24, Twp. 9 South, Range 4 West;
Thence North 0° 31' East 75 feet;  Thence South 89° 15' East 275 feet;
Thence South 0° 31' West 74.64 feet;  Thence North 89° 17' West 275 feet
to point of commencement, containing .47 acres more or less, with a
right to water for use thereon up to 1.5 acre-feet per annum.

36      1396

Fallbrook Public Utility District has heretofore commenced an action in the Superior Court of the State of California in and for the County of San Diego, to condemn sixty-five (65) parcels of land for dam and reservoir sites for storing waters of the Santa Margarita River, which said action is now pending and in which action this defendant has taken possession of three of said tracts, hereinafter described, under an order of court after depositing with the Clerk of said court the amounts of money specified in said order as adequate to secure to the owner of each of said tracts payment of just compensation for such taking and any damages incident thereto. The tracts of land for which compensation has been paid into court and possession thereof taken by this defendant are all located in San Diego County, State of California, and are more particularly described as follows:

PARCEL 1.  The Northeast Quarter of the Northeast Quarter of Section 12, in Township 9 South, Range 4 West, San Bernardino Meridian, according to United States Government Survey approved January 15, 1892, containing 40 acres more or less with a water right to water for use thereon up to 120 acre-feet per annum.

PARCEL 2.  Portions of the Northwest Quarter of the Northeast Quarter of Section 12, and the Southeast Quarter of the Northeast Quarter of Section 12, in Township 9 South, Range 4 West, San Bernardino Meridian, according to United States Government Survey approved January 15, 1892, containing 77 acres more or less with a water right to water for use thereon up to 230 acre-feet per annum.

PARCEL 3.  The West 1022 feet of Lot 1, (Northwest Quarter of the Northwest Quarter) Section 7, and the Southwest Quarter of the Northwest Quarter, Section 7, Township 9 South, Range 3 West, San Bernardino Meridian, according to United States Government Survey thereof, containing 77 acres more or less with a water right to water for use thereon up to 230 acre-feet per annum.

This defendant intends to prosecute said action in condemnation to final judgment and acquire title in fee simple to all of said 65 tracts of land, together with the water rights belonging thereto.

7.  Fallbrook Public Utility District was not, nor was any of its

predecessors in interest, a party to the action entitled: Rancho Santa Margarita vs Vail No. 42850 in the Superior Court of the State of California in and for the County of San Diego, and Fallbrook Public Utility District is not bound by nor are any of its rights or interests restricted, limited or affected by the Stipulated Judgment entered in said action, copy of which is attached to and made a part of Plaintiff's complaint as Exhibit "A". That as against Fallbrook Public Utility District said Stipulated Judgment and the stipulation between plaintiff and the Vail interests signed October 23rd, 1951 and filed on October 24th, 1951, are inadmissable as evidence.

8. Fallbrook Public Utility District, pursuant to the Court's direction, proffered for inclusion in the "Agreed Facts" a statement and tabulation of the District's records of diversions made by it from the Santa Margarita River, but Plaintiff declined to allow them to be included herein under the heading of "Agreed Facts" although plaintiff made no objection to the accuracy of the figures. Therefore in order to comply with the Court's direction, said data is inserted at this point under this defendant's contentions and said statement attached as an exhibit of defendant Fallbrook Public Utility District. 2/

9. Fallbrook Public Utility District has distributed the water diverted by it from the Santa Margarita River primarily for use on lands situated within that portion of the District which lies within the Santa Margarita River watershed. The area of the Fallbrook Public Utility District which lies within the Santa Margarita River watershed consists of approximately 1800 acres. The quantities of water so diverted from the Santa Margarita River were found to be inadequate to meet the requirements of the lands and water users within said area and Fallbrook Public Utility District has continuously imported large quantities of "foreign water" for distribution and use in said area. Since 1938 the District has diverted from the San Luis Rey river for use within the district, the quantities set out in Defendant's Exhibit No. ___, attached hereto and made a part hereof. 3/ Since 1947 this defendant has purchased Colorado river water for

2/ Defendant Fallbrook Public Utility District Exhibit No. ___, statement of Records of Diversions of Water from Santa Margarita River.

3/ Defendant Fallbrook Public Utility District Exhibit No. ___, statement of Records of Diversions at Water from the San Luis Rey river.

-7-

398

1   use within the District in the quantities set out in Defendant's Exhibit No. K
2   attached hereto and made a part hereof. [h/]   The said "foreign waters" imported
3   into and distributed by the District for use upon lands within the Santa Margarita
4   watershed were in such quantities that the return flow therefrom, together with
5   the return flow from the Santa Margarita River water likewise distributed by
6   the District for use upon land within said watershed were at least equal to the
7   amounts diverted by this defendant from the Santa Margarita River so that its
8   flow on and under the plaintiff's property was not and are not diminished by
9   this defendant's diversions from the Santa Margarita River.

10      10.   The Fallbrook Public Utility District began its diversions of
11   water from the Santa Margarita River with the full knowledge of plaintiff's
12   predecessor in interest. At all times since the diversion of said water by this
13   Defendant commenced, the same has been used by said District not only for
14   domestic purposes and uses but also for the irrigation of lands within the District.
15   That the water requirements of the district have steadily increased with the growth
16   and development of the Fallbrook and surrounding area and its diversions from the
17   Santa Margarita River have increased proportionately. That said increase in
18   water requirements represents both the growth of the orchards from young plantings
19   to maturity and other plantings of new orchards on lands not previously planted
20   as well as the increase in population of the community. The said District has
21   expended large sums of money in purchasing a site on the Santa Margarita River
22   for construction and installation of its pumping plant, for the purchase and
23   installation of said pumping plant, for expansions and additions to said pumping
24   plant in order to increase its capacity, for the purchase of a reservoir site
25   and for the construction of said reservoir, for the construction and installation
26   of a pipe line connecting said pumping plant and said reservoir, and for the
27   construction and installation of a distribution system from said reservoir to the
28   several land owners and water users within the district located within the Santa
29   Margarita River watershed. That all of the lands within the Fallbrook Public
30   Utility District and particularly the 1800 acres thereof within the Santa
31
32

h/   Defendant Fallbrook Public Utility District Exhibit No. K, copies of
     records of San Diego County Water Authority of Colorado River water sold
to Fallbrook Public Utility District.

30

1399

1 Margarita watershed (except the small portion thereof occupied by the town of
2 Fallbrook) are planted to permanent orchards of citrus, avocados and other
3 varieties of fruit trees which require regular and continuous irrigation for the
4 reason that all of the Fallbrook Public Utility District lies within a semi-arid
5 region where the rainfall alone is insufficient to produce crops. Plaintiff, and
6 its predecessor in interest, at all times had knowledge of the diversions made by
7 the District from the Santa Margarita River and that the water so diverted was
8 at all times being used extensively for irrigation as well as for domestic purposes.
9 The area served by the Fallbrook Public Utility District is approximately 8,000
10 acres. The population of the District dependent wholly or in large part upon the
11 water distributed by the District is approximately 5,000. The aggregate assessed
12 valuation (primarily small farms and homes) is $4,396,690.00.

13        That the Fallbrook community, together with orchards and crops growing
14 upon the lands within the Fallbrook Public Utility District are dependent upon
15 the Santa Margarita River as one of their primary sources of supply of water and
16 would suffer great and irreparable damage, injury and loss if that supply were
17 cut off. All of the foregoing facts and matters are and have been common knowledge
18 and public records and at all times known to the plaintiff and its predecessor
19 in interest and plaintiff is now estopped and barred from objecting to the con-
20 tinued diversion and use of said water for said public purposes, or from com-
21 plaining that such diversions and uses are, or have been, without right or from
22 asking that said diversions be now enjoined.

23        11. Fallbrook Public Utility District contends that plaintiff's
24 predecessor in interest conveyed in fee simple to and that the Atchison Topeka
25 & Santa Fe Railway Company now owns title in fee simple to a strip of land running
26 northerly and southerly through and across the Rancho Santa Margarita, underlying
27 and occupied by the main line of said Company running from Los Angeles to San
28 Diego and also said plaintiff's predecessor in interest conveyed in fee simple
29 to and the Atchison Topeka and Santa Fe Railway Company now owns title in fee
30 simple to a strip of land beginning at a point on said main line commonly known
31 as Fallbrook Junction running thence easterly and northeasterly through and
32 across said Rancho Santa Margarita to Fallbrook, California and underlying and

-9-

1   occupied by said Fallbrook branch line. That said transfer and conveyance by

2   plaintiff's predecessor in interest to said Atchison, Topeka & Santa Fe Railway

3   Company of said strips of land constituted a severance of a large portion of said

4   Rancho Santa Margarita from the Santa Margarita River so that the portion thereof

5   lying southerly and easterly of said Fallbrook branch line was and is no longer

6   in contact with the Santa Margarita River and does not have riparian rights in

7   and to the waters of said river and the portion westerly of said main line was

8   and is no longer in contact with that portion easterly thereof and is not entitled

9   to water produced on said easterly portion.

10      12. Fallbrook Public Utility District contends that any shortage of

11  water which may have been experienced or suffered by plaintiff in the supply to

12  which it may have been entitled from the Santa Margarita River was not caused by

13  diversions made by this defendant but was the result of plaintiff's own excessive

14  and unreasonable use of the waters of the said river and its mismanagement and

15  misuse of its wells and the underground basins in which the same are located.

16      13. This defendant contends that its rights to the waters of the Santa

17  Margarita River under its applications to, and permits from, the State of

18  California are prior to plaintiff's rights

19      (a)  to use any of said waters outside the watershed of the Santa

20           Margarita River

21      (b)  to store any of said water for future use

22      (c)  to use any of said waters for military purposes, to-wit:

23           to supply the domestic, municipal and quasi-municipal requirements

24           of its armed forces, and the civilian personnel performing duties

25           in connection with said armed forces, and for supplying water for

26           radiators of automobiles, tanks and other self-propelled machines

27           requiring water for their mechanical operation or maintenance.

28      14. Fallbrook Public Utility District contends that the lands of

29  plaintiff lying within the watershed of DeLuz Creek and Fallbrook Creek respectively,

30  cannot be taken into consideration in determining the amounts of water of the main

31  stream of the Santa Margarita River to which plaintiff may be entitled to have

32  pass the diversion points of this defendant in order to meet plaintiff's riparian

-10-

41    1401

requirements.

15. Fallbrook Public Utility District contends that the State of California has not ceded exclusive jurisdiction over the entire Rancho Santa Margarita to the United States but only to that portion thereof actually occupied and used for military establishments and contends that plaintiff does not have exclusive jurisdiction over several thousand acres which have been continuously leased out by plaintiff to farmers for growing commercial agricultural crops thereon.

16. This defendant contends that plaintiff's rights, as owner of Rancho Santa Margarita, are no greater than those which a private owner of the same property would have and that plaintiff's right to the use of the waters of the Santa Margarita River system are not increased by virtue of plaintiff's sovereignty military necessity, or by reason of cession of jurisdiction by the State of California over all or any part of said Rancho Santa Margarita.

17. This defendant contends that plaintiff's rights, as owner of riparian lands, are correlative with the rights of all other riparian land owners on the Santa Margarita River system and are limited and restricted to an equitable share only of the flow of the river which may actually be available from day to day, week to week and month to month.

18. This defendant contends that where several parcels of land have been acquired separately and at different times as was the case when plaintiff purchased the Rancho Santa Margarita, each parcel of land must be considered as a separate unit in determining its water rights and that water produced on one parcel of land cannot be transferred or used on another parcel of land to the injury of the rights of third persons, nor can water be demanded for such use and purpose.

19. This defendant contends that the Stipulated Judgment did not give plaintiff's predecessor in interest, nor does it give plaintiff, as against this defendant, any right, title or interest in or to the waters stored and impounded or which may be stored or impounded in the Vail reservoir constructed by the Vail interests in Nigger Canyon and plaintiff does not now own any right, title or interest in or to waters stored or to be stored in said reservoir or in or to waters released therefrom, other than such rights as plaintiff may have as the

42   1402

-11-

1  owner of riparian lands; that said Stipulated Judgment did not and does not, as
2  against this defendant, increase in any way plaintiff's rights in and to the
3  waters of the Santa Margarita River system or its control over the same beyond
4  and above what plaintiff would have if said Stipulated Judgment had never been
5  made and entered.

6      20.  This defendant desires to supplement and add to its Number 10
7  contention hereinbefore set forth and state these additional facts:  During the
8  year 1941 the United States Navy Department with full knowledge of the fact that
9  Fallbrook Public Utility District was diverting water from the Santa Margarita
10  River as set out in said Contention No. 10, negotiated and executed a Contract
11  with the Fallbrook Public Utility District (San Diego Contract N244s-39380)
12  requiring this district to furnish water service to the Naval Ammunition Depot
13  located on the Rancho Santa Margarita, and pursuant to said Contract, the District,
14  at its own expense, installed, constructed and maintained the necessary water
15  facilities for performing said contract, including the necessary diversion works
16  in the Santa Margarita River, pumps, pipelines, service connection line and
17  meter to enable the District to supply the additional quantities of water which
18  it had obligated itself to furnish.  Said contract remained in full force and
19  effect until by letter of February 26, 1947 its cancellation was requested
20  effective February 21st, 1947.  Also with full knowledge of Fallbrook Public
21  Utility District's diversion from the Santa Margarita River, plaintiff requested
22  deliveries of such water, accepted said deliveries and paid for the water
23  furnished to the Federal Housing Unit at Fallbrook, California.  That plaintiff
24  is now estopped and barred from objecting to the diversions by this defendant
25  from the Santa Margarita River or from complaining thereof or for asking that
26  said diversions be now enjoined.

27      21.  Fallbrook Public Utility District contends that plaintiff is not
28  entitled to raise, as it has attempted to do, the question of the validity of the
29  District's application to appropriate water from the Santa Margarita River or of
30  the permits issued by the State of California therefor since all such permits are
   and because of Plaintiff's stipulation that the rights of the United States are to be
31  measured in accordance with the laws of the State of California.
   issued subject to vested rights.  If it should be held that plaintiff is entitled
32  to attack the validity of District's applications and permits and to raise the

# That as late as April and May, 1952, Plaintiff requested deliveries from Fallbrook
Public Utility District and received from it substantial quantities of water for
use at the U. S. Naval Ammunition Depot which it knew or could have known as being
diverted from the Santa Margarita River by the District under claim of right.

13  1403

1    question of due diligence, and if it should be held for any reason that said

2    applications and permits are not valid, then this defendant contends that

3    plaintiff's Application No. 12576, filed June 30th, 1948 is not valid and that

4    plaintiff has failed to exercise due diligence in the prosecution of its said

5    application for 165,000 acre-feet of water per annum from the Santa Margarita

6    River.

7            22.  This defendant has not yet been accorded the privilege or

8    opportunity of having its experts examine, investigate and study the physical

9    and geological formation of the basins or basin underlying that portion of the

10   Rancho Santa Margarita lying within the watershed of the Santa Margarita River.

11   Accordingly, until Fallbrook Public Utility District is otherwise advised by

12   its experts, contends that there exists three separate basins within the Santa

13   Margarita watershed on plaintiff's property.  That said basins have other

14   separate sources of water replenishment other and independent of the main stream

15   of the Santa Margarita River which passes this defendant's points of diversion.

16           23.  Fallbrook Public Utility District contends that the principal use

17   by plaintiff of Santa Margarita River water from the time plaintiff first acquired

18   the Rancho Santa Margarita has been for supplying the domestic, sanitary, culinary

19   and drinking requirements of the armed forces and civilian personnel used in

20   connection therewith stationed from time to time at Camp Joseph H. Pendleton,

21   Naval Ammunition Depot and the United States Naval Hospital.  The numbers of said

22   armed forces and civilian personnel vary from time to time substantially in the

23   manner set out in Defendant's Exhibit No.  L  , supplied to it by plaintiff and

24   attached hereto and made a part hereof.  5/

25           24.  Fallbrook Public Utility District disputes the contentions of the

26   United States of America hereinbefore set forth except so far as the same are

27   expressly admitted in the Statement of "Agreed Facts" contained in this order.

28           25.  By consenting to the inclusion of references to plaintiff's exhibits

29   in the Statement of "Agreed Facts" Fallbrook Public Utility District does not

30   agree to the truth, accuracy or correctness of any of the figures, statements or

31

32   5/   Defendant Fallbrook Public Utility District Exhibit No.  L   - Population
         tabulation.

"non-riparian uses and purposes, to-wit:

                                            44   1404

-17-

1  representations therein contained or set out, for the reason that this defendant

2  has not been accorded the privilege of seeing, examining or studying the same

3  and accordingly reserves the right to criticize and refute the truth, accuracy

4  and correctness of any of the figures, statements or representations contained

5  in plaintiff's said exhibits.

6       26.  Fallbrook Public Utility District has heretofore objected to the

7  trial of its issues in this action and the determinations of its rights separate

8  from and independent of the trial and determination of the rights of the other

9  defendants in and to the waters of the Santa Margarita River and does not waive

10  its rights to reassert that objection at all proper times and places by

11  participating in this pre-trial conference and in the separate trial under this

12  order.

13       27.  This defendant contends that no further proceedings should be had

14  or taken in this action during the current fiscal year as to do so is and will

15  be in violation of the intentions of Congress and the express prohibition

16  contained in Public Law 495 Chapter 651, 82nd Congress, 2nd Session, Section

17  208(d) of H.R. 7289 approved by the President of the United States July 10, 1952.

18       28.  This defendant may have other contentions and reserves the right

19  to present additional contentions later and as the trial progresses and the

20  occasion arises justifying the same or shows the necessity therefor.

21       29.  Fallbrook Public Utility District contends that it has acquired a

22  prescriptive right to divert from the Santa Margarita River the quantities of

23  water which it has heretofore diverted from said river in the amounts shown on

24  its Exhibit No. I, being a copy of its record of diversions commencing in 1925. [6/]

6/ Defendant Fallbrook Public Utility District exhibit No. 1, Statement of
Records of Diversions of water from Santa Margarita River.

411405

CONTENTIONS OF THE SANTA MARGARITA MUTUAL WATER COMPANY

1. That Plaintiff and its predecessors in interest have not and could not acquire any rights to the use of water of the Santa Margarita River System by prescription or adverse possession as against any defendant or defendants in the above entitled action. That all water which has been extracted or diverted from the Santa Margarita River System by Plaintiff has been diverted, extracted and used downstream from the lands and the point of extraction and diversion of water by all defendants.

2. That the Plaintiff and its predecessors in interest could not acquire any rights to the use of water or to the waters of the Santa Margarita River System by appropriation without complying with the local rules, regulations, customs and the laws of the State of California relative to and governing the appropriation of water then in effect at the time said appropriation was made and perfected.

3. That this action is an action by the Plaintiff to quiet its title to the use of water or waters of the Santa Margarita River System and to have its rights declared and adjudicated by the court and that the Plaintiff must recover upon the strength of its own title and cannot recover on the weakness or weaknesses of the Defendant's title.

4. That the plaintiff has not and could not acquire any greater right to the use of water than that possessed by a private proprietor under the laws of the State of California and that the Plaintiff does not have any rights by virtue of sovereignty, exclusive jurisdiction, or by reason of the cession of jurisdiction by the State of California to use waters of the Santa Margarita River System for non-riparian purposes or on non-riparian lands and that Plaintiff is limited to the place of use of said waters and the quantities of said waters to the same extent as a private land owner.

5. In an action to quiet title to the waters on a non-navigable stream the question of exclusive jurisdiction or sovereignty can neither enlarge or curtail the rights of the United States and that any and all statements contained in the Complaint relative to exclusive jurisdiction should be stricken and should not be considered by the court.

-1-

46   1406

6. That the safe yield of the basin or basins lying within the watershed of the Santa Margarita River and within the boundaries of Camp Joseph H. Pendleton, the U. S. Naval Ammunition Depot, and of the U. S. Naval Hospital has always exceeded the quantities of water put to beneficial use by the Plaintiff and its predecessors in interest on the lands overlying said basins and on the lands lying within the watershed of the Santa Margarita River.

7. That the Plaintiff has no right as against a riparian owner or a prior appropriator to extract water from the basin or basins referred to as the Upper or O'Neill Basin, the Chappo or Home Ranch Basin, or Ysidora Basin for beneficial use on lands which do not overlie said basins.

8. That the underground basin or basins located within the watershed of the Santa Margarita River and within the boundaries of Camp Joseph H. Pendleton, the U. S. Naval Ammunition Depot and the U. S. Naval Hospital are not supported by the surface or sub-surface flow of the Santa Margarita River.

9. That the lands lying within the watershed of DeLuz Creek and Fallbrook Creek do not constitute and are not a portion or part of the watershed of the Santa Margarita River in considering the riparian requirements of Camp Joseph H. Pendleton, the U. S. Naval Ammunition Depot and the U. S. Naval Hospital, and the correlative rights and the needs of upstream owners and appropriators diverting upstream from the junction of said tributaries of the Santa Margarita River.

10. That at all times the flow of the Santa Margarita River in the state of nature is and has been sufficient to supply all waters required by the Plaintiff for beneficial use on its riparian lands.

11. That the Plaintiff and its predecessors in interest have not acquired by prescription or appropriation the right to divert from the Santa Margarita River waters for storage either underground or surface, and has not acquired the right to store waters in Lake O'Neill, an artificial reservoir.

12. That the Plaintiff is not entitled to any greater quantity of water by virtue of ownership of land which it has dedicated to and is using exclusively for Military purposes than it can put to beneficial use of those lands for Military purposes and the fact that because lands might be used for agricultural purposes cannot increase or decrease the quantity of water to which Plaintiff is

-2-

entitled by reason of the ownership of said lands so long as those lands are used exclusively for Military purposes.

13. Quantities of water to which Plaintiff is entitled by virtue of its riparian ownership on any parcel of land for which it has no present beneficial use on said parcel cannot be used to supplement the needs of Plaintiff on any other parcel of land which it may own.

14. Plaintiff as a riparian owner only has a correlative right to the use of waters of the Santa Margarita River System and the quantity of waters which Plaintiff is entitled to use varies from day to day, from week to week, from month to month, and from year to year.

15. That Plaintiff does not have by virtue of its riparian ownership of lands which are riparian to the Santa Margarita River System the right to divert, impound, and store, the surface flow or the subsurface flow of the Santa Margarita River and that it has not acquired any rights by prescription, adverse possession, or appropriation to divert, store, or impound the waters of the Santa Margarita River System.

16. That the court in this proceeding cannot determine or adjudicate the legality or sufficiency of any application filed with the State of California, Department of Public Works, Division of Water Resources, State Engineer, to appropriate water of the Santa Margarita River System or determine the sufficiency or regularity of any proceedings pursuant thereto, but that this court is limited to determining whether there are waters of the Santa Margarita River System subject to and which could be used under and pursuant to any permit or license which might be issued or granted by the State of California and the priority of any and all permits and licenses which have been or might be issued by the State of California pursuant to existing applications to appropriate waters of the Santa Margarita River System.

17. That the stipulated judgment entered into by the Plaintiff's Predecessor in Interest and the Vail Interests which is attached to Plaintiff's Complaint as Exhibit A and the stipulation heretofore, by order of the Court filed on July 8, 1952 and which is set forth in the agreed statement of facts is incompetent, irrelevant, and immaterial and cannot tend to prove or disprove any

48

1408

of the issues between the Plaintiff and the Defendant, Santa Margarita Mutual
Water Company and that the controversy between the Defendant, Santa Margarita
Mutual Water Company, and the Plaintiff must be determined and adjudicated as
though said stipulated judgment and said stipulation had never been executed.

18. That Plaintiff cannot acquire any right, title or interest, claim,
lien, or demand in or to any of the waters in the Santa Margarita River which
may be stored, impounded, or collected in the Nigger Canyon Reservoir by the
Vail Defendants as against the Defendant Santa Margarita Mutual Water Company.

19. That Plaintiff has no right by virtue of the terms of the
stipulated judgment attached to Plaintiff's Complaint as Exhibit A or by reason
of the stipulation entered into by the Defendant Vails and the Plaintiff and
approved by an order of this court of July 8, 1952 to use water of the Santa
Margarita River System outside the watershed of the Santa Margarita River.

20. That the acreage which can be irrigated by the Vails, Defendants,
is not limited by the amount of water available to said Defendants but is limited
and controlled by the terms of an agreement entered into between the Plaintiff's
predecessors in interest and said Vail Defendants and which is attached to
Plaintiff's Complaint as Exhibit A.

21. That any and all rights which the Vail Defendants may have to
impound, divert, and store water of the Santa Margarita River System and their
rights to use said water and the lands upon which said water may be used are
controlled by the terms of the permit issued by the State of California, Department
of Public Works, Division of Water Resources, State Engineer. And that neither
said Vail Defendants or the Plaintiff in this action has acquired any rights to
store, divert, or impound any waters of the Santa Margarita River System at the
Nigger Canyon Reservoir site for use or to use any of the water so stored or
impounded on or for the benefit of Camp Joseph H. Pendleton, U. S. Naval
Ammunition Depot, or the U. S. Naval Hospital.

22. From time immemorial large quantities of the surface and subsurface
flow of the Santa Margarita River have been discharged into the Pacific Ocean and
thereby lost resulting in an economic loss of water of the Santa Margarita River.

23. That the principal sources of water of the Santa Margarita River

—4—

49 1409

System available to the Plaintiff during the dry season of the year is obtained from the underground water basins herein referred to as the Upper or O'Neill Basin, the Chappo or Home Ranch Basin and the Ysidora Basin. That no waters are available or can be diverted during the dry seasons from either the surface or subsurface flow of the Santa Margarita River other than those flood waters of the Santa Margarita River which Plaintiff has diverted and stored in Lake O'Neill, an artificial reservoir.

24. The Plaintiff cannot and has not put to beneficial use more than 1200 acre feet per year on lands lying within the watershed of the Santa Margarita River.

25. That in the controversy between the United States of America and the Defendant Santa Margarita Mutual Water Company, the Fallbrook Public Utility District, and the State of California in determining whether there is a surplus available for appropriation that the acreage of riparian land owned by the Vail Defendants and the quantity of water which can be put to beneficial use on said land is immaterial, incompetent, and irrelevant because the quantities of water available to said Vail Defendants and which can be put to use by them is limited by the terms of the stipulated judgment attached to Plaintiff's Complaint as Exhibit A.

26. That the flood waters of the Santa Margarita River which cannot be put to beneficial use by the riparian owners without cyclic storage are available for appropriation under the laws of the State of California.

27. That a military use is not a riparian use and that waters used for military purposes on Camp Joseph H. Pendleton and U. S. Naval Ammunition Depot are not used by virtue of the riparian ownership of the lands owned by Plaintiff and that if the court should decide that a military use is a riparian use then a use for military purposes is junior and subsequent to the use of water of said river for agricultural, domestic, and livestock purposes.

28. That no portion of the lands being occupied by the U. S. Naval Ammunition Depot are used for agricultural purposes.

29. That no portion of the lands located within the watershed of the Santa Margarita River and within the boundaries of Camp Joseph H. Pendleton are

-5-

50  1410

used or devoted to agricultural purposes.

30. That the lands located within the area of Camp Joseph R. Pendleton and within the watershed of the Santa Margarita River do not derive any substantial benefit from sub-irrigation or from being overflowed by flood waters during periods of high precipitation.

31. That there are less than 12,000 acres of land lying within the watershed of the Santa Margarita River and within the boundaries of Camp Joseph H. Pendleton, the U. S. Naval Ammunition Depot and the U. S. Naval Hospital which are susceptible of practical and profitable irrigation.

32. That the lands within the watershed of Windmill Creek and Palm Canyon are within the watershed of the San Luis Rey River and not within the watershed of the Santa Margarita River.

33. That the reasonable requirements per man per day for personnel within Camp Joseph H. Pendleton, the U. S. Naval Ammunition Depot is 75 gallons of water per day.

34. Insofar as any contentions of the United States of America conflict with the terms of the Stipulation entered into between the State of California and the United States of America, the United States is precluded from introducing any evidence or raising any legal contentions that would be at variance with that Stipulation.

35. Santa Margarita Mutual Water Company adopts by reference Contentions No. 1 to 8, inclusive, of the State of California and the following Contentions of the Fallbrook Public Utility District: Nos. 1, 2, 4, 5, 7, 8, 11, 12, 13, 14, 15, 16, 17, 18, 19, 21, 22, 24, 25 and 26.

36. The United States of America filed a protest to the applications to appropriate water filed by the Santa Margarita Mutual Water Company, a corporation, with the State of California, Department of Public Works, Division of Water Resources, State Engineer, which protest has never been withdrawn or dismissed and is still pending.

37. On October 4, 1946, the defendant Santa Margarita Mutual Water Company, a corporation, filed a bona fide application with the Division of Water Resources, Department of Public Works of the State of California, being

-5-

51

1411

1  Application No. 11578, and that said company was not and has never been notified
2  by the Division of Water Resources of any defect in said application and that said
3  company within the time as extended by the Division of Water Resources completed
4  said application. That said application is now pending before the Division of
5  Water Resources of the State of California, is in good standing and has never
6  been withdrawn, revoked or dismissed.

7          38.  On November 12, 1947, the defendant Santa Margarita Mutual Water
8  Company, a corporation, filed a bona fide application with the Division of Water
9  Resources, Department of Public Works of the State of California, being
10  Application No. 12152, and that said company was not and has never been notified
11  by the Division of Water Resources of any defect in said application and that said
12  company within the time as extended by the Division of Water Resources completed
13  said application and that notice of said application was duly and regularly
14  published pursuant to the rules and regulations of the Division of Water Resources
15  of the State of California.  1/   That said application is now pending before the
16  Division of Water Resources of the State of California, is in good standing and
17  has never been withdrawn, revoked or dismissed.

18          39.  That a notice to appropriate water filed with the State of
19  California, Department of Public Works, Division of Water Resources, State
20  Engineer, creates a property right under the laws of the State of California and
21  under the laws of the United States of America sufficient to justify the
22  applicant to institute and maintain a quiet title suit to the waters of a river
23  against a riparian owner and appropriator or a person who has gained the right
24  to use the waters of a stream by virtue of prescription or adverse possession.

25          40.  That an appropriator or a riparian owner or a user who has
26  acquired rights by adverse possession or prescription is not in a position and
27  cannot attack the validity of an application filed with the Division of Water
28  Resources of the State of California prior to the issuance of a permit and then
29  only if they have filed a protest to the granting of said application within the

30

31  1/  Defendant Santa Margarita Mutual Water Company Exhibit No. D, Affidavit of
32      publication of notice of application by the Fallbrook Enterprise; Defendant
    Santa Margarita Mutual Water Company Exhibit No. E, Notice of application and
    affidavit of publication in the Elsinore Valley Sun.

-7-

1  period of time designated by the Division of Water Resources and that prior to the
2  issuance of said permit, no attack can be made on the feasibility of the project,
3  the economic soundness of the project or the place of use of the water or the
4  quantity of water which can be put to beneficial use.

5      41. The Congress of the United States of America has expressly
6  subjected itself in respect to the use of waters on property belonging to the
7  United States of America to the local rules, regulations and laws of the State of
8  California.

9      42. That the protests filed with the Division of Water Resources by
10  the United States of America protesting granting of a permit or permits to the
11  Santa Margarita Mutual Water Company were not filed within the time specified
12  by the Division of Water Resources of the State of California.

-8-

### CONTENTIONS OF THE STATE OF CALIFORNIA

1. The United States has only such a limited jurisdiction over the military reservations in controversy as has been ceded to the United States under the laws of the State of California.

2. The fact that the United States has been ceded certain limited jurisdiction over the military reservations in controversy does not entitle the United States to use the water of the Santa Margarita River system which it has the right to use, in any other manner, on any other place, or for any other purpose than that to which a private individual or corporation would be entitled, if it owned the same land and water rights as the United States does own, or than the United States would have had in the absence of such cession.

3. Specifically, the fact of such cession of a limited jurisdiction does not entitle the United States to use water, which it is entitled to use as a riparian, upon non-riparian lands.

4. The fact of such cession of limited jurisdiction is immaterial to any issue in the cause.

5. As provided in Section 102 of the Water Code of California, intervenor State of California is the absolute owner of all water within the State, provided that the right to use water may be acquired in any manner recognized by the law of California. Intervenor is also the owner of the right of use of all water within the State to which other rights of use do not exist. Intervenor is also owner of the right of reversion of any rights of use of such water which may be forfeited or otherwise terminated for non-use or otherwise.

6. The public interests and welfare require that in the decree herein the Court define and declare each and every water right involved herein as against each and every other water right herein involved.

7. Under the law of California, among other things;

    (a) Water rights of riparians inter se are correlative.

    (b) Water can be demanded under a riparian right only for use on riparian land.

    (c) Water can be demanded under a riparian right only for proper riparian uses and purposes.

-1-

(1)  Storage of water is not a proper riparian use.

(2)  Military use is not a proper riparian use.

(d)  One cannot obtain a prescriptive right as against users
upstream from him.

(e)  An appropriator can take and use any water belonging to
riparians, but not currently used by them.

(f)  One cannot, since the effective date of the Water Commission
Act in 1914, obtain a water right by use alone.

(g)  The stipulated judgment between Rancho Santa Margarita, Inc.
and the Vails has no force or effect except as between the
parties to that case and those in privity with them, and
consequently is not admissible in evidence as against the
present defendants.

8.  The issues in this case are defined and limited in conformity with
the statements contained in the stipulation made between the State of California
and the United States of America, dated November 29, 1951.

9.  If it develops from the evidence that a "physical solution" which
will reasonably and fairly protect the water supply to which plaintiff is
entitled as a riparian, or otherwise in priority to defendants, can be found
and practicably effected at the expense of defendant appropriators, then
plaintiff is not entitled to an injunction against such defendant appropriators
restraining them from using, to the extent of their lawful appropriative rights,
waters surplus to plaintiff's riparian or other prior rights.  The term "physical
solution", as used in this paragraph has the meaning in which it is used in the
decisions in water cases of the Supreme Court of California since the year 1928.

-2-

FACTS DISPUTED BY THE UNITED STATES OF AMERICA

The United States of America denies:

1. That there is water in the Santa Margarita River available for appropriation or exportation from the watershed of the Santa Margarita River system by the defendants Santa Margarita Mutual Water Company or the Fallbrook Public Utility District.

2. That the Santa Margarita River is or ever has been one of the principal sources of supply of water for the lands within the Fallbrook Public Utility District and for the people residing within that district.

3. That the Fallbrook Public Utility District has since the year 1922 supplied irrigation and domestic water from the Santa Margarita River or from any other source to the lands located within its boundaries and to the people living therein but rather that it was not until the year 1943 that the Fallbrook Public Utility District delivered any water from the Santa Margarita River and that water was diverted pursuant to a gratuitous and revocable license for 10 miner's inches solely for domestic purposes from the United States of America.

4. That the Fallbrook Public Utility District can exercise any of its alleged rights in the Santa Margarita River without encroaching upon the vested rights to the use of water of the United States in that stream.

5. That the Fallbrook Public Utility District can divert during the irrigation season from the normal flow of the Santa Margarita River without encroaching upon the vested rights to the use of water of the United States of America including but not limited to the three cubic feet per second of water that the Vail Estate is obligated to deliver

**(Continued)  THE UNITED STATES DENIES:**

1  to the United States pursuant to and by reason of the

2  Stipulated Judgment, Exhibit A of the complaint.

3  6.  That the Fallbrook Public Utility District has diverted

4  1,800 acre feet of water per annum from the Santa Margarita

5  River and asserts that such quantities of water as were

6  diverted by that district were those which would have

7  descended to the United States were it not for the

8  diversion of it by the Fallbrook Public Utility District.

9  7.  That the Fallbrook Public Utility District has exercised

10  due diligence in the prosecution of its alleged claim of

11  right to impound 10,000 acre feet of the Santa Margarita

12  River pursuant to Permit No. 8511, the validity of which

13  is denied by the United States.

14  8.  That the Fallbrook Public Utility District has exercised

15  due diligence in the prosecution of its alleged claim of

16  right to impound 10,000 acre feet of the Santa Margarita

17  River and Rainbow Creek pursuant to Application No. 12178,

18  the validity of which is denied by the United States.

19  9.  That the Fallbrook Public Utility District has exercised

20  due diligence in the prosecution of its alleged claim of

21  right to impound 10,000 acre feet of the Santa Margarita

22  River and Sandia Creek pursuant to Application No. 12179,

23  the validity of which is denied by the United States.

24  10.  That the Fallbrook Public Utility District could exercise

25  the alleged right to divert from the Santa Margarita River

26  2-1/2 second feet of water or could construct the dam which

27  it allegedly proposes to construct to impound 10,000 acre

28  feet of water or exercise the alleged rights described in

29  its Applications No. 12178 and No. 12179 without:

30  a.  Encroaching upon the riparian rights of the United

31  States, including the rights historically enjoyed

32  by the United States and its predecessors in interest

-2-

57      1417

(Continued)  THE UNITED STATES DENIES:

of having the surface area of the basin under-
lying Camp Pendleton and the other military
establishments naturally irrigated by overflow
from the Santa Margarita River and subirrigated
by the high water table of the basin last
mentioned;

b.  Encroaching upon the right of the United States
to have recharged the basin underlying the
military establishments in question;

c.  Encroaching upon the right to the use of water
provided for in the Stipulated Judgment, in-
cluding but not limited to the three second
feet which the Vail Estate delivers pursuant
to that document; and

d.  Encroaching upon the rights to divert water from
the watershed of the Santa Margarita River which
have been historically exercised by the United
States of America and its predecessors in
interest.

11.  That the Santa Margarita Mutual Water Company could divert
water in accordance with its alleged plans without
encroaching upon the vested rights to the use of water
of the United States mentioned above in connection with
the encroachments and threatened encroachments by the
Fallbrook Public Utility District.

12.  That the Santa Margarita Mutual Water Company could
practically or economically carry out what counsel for the
Fallbrook Public Utility District has referred to as the
Mutual Company's "cuckoo bird theory" of seeking to
appropriate water out of the Vail Reservoir and the
allegedly proposed dam of the Fallbrook Public Utility
District.

-3-

1418

**(continued)**   THE UNITED STATES DENIES:

13. That the Santa Margarita Mutual Water Company is any more than a paper corporation claiming paper rights to the use of water, devoid of any structures or physical assets essential to effectuate the alleged plans.

14. That the defendants have facilities with which to divert from the Santa Margarita River or apply to a beneficial use the water for which they are claiming rights.

15. That either the Santa Margarita Mutual Water Company or the Fallbrook Public Utility District have or are able to raise the funds requisite to construct the facilities which would be required to impound, divert, distribute or utilize the quantities of water for which they are asserting rights in the Santa Margarita River.

16. That the lands within the alleged service areas of the Santa Margarita Mutual Water Company or the Fallbrook Public Utility District are susceptible of practicable or profitable irrigation.

17. That either the Santa Margarita Mutual Water Company or the Fallbrook Public Utility District have plans for the impounding, diversion, distribution or utilization of water from the Santa Margarita River which are physically or economically feasible.

18. That either the Santa Margarita Mutual Water Company or the Fallbrook Public Utility District can impound, divert, distribute or utilize water from the Santa Margarita River without encroaching upon or impairing the rights to the use of water owned by the United States of America and the subject matter of this litigation.

19. That the Fallbrook Public Utility District or the Santa Margarita Mutual Water Company could construct or operate a system for impounding, diverting or distributing the water for which they are claiming rights from the Santa

**(Continued)** THE UNITED STATES DENIES:

Margarita River without financing from the Federal Government and asserts that no such funds are available.

20. That either the Santa Margarita Mutual Water Company or Fallbrook Public Utility District have in connection with any claims for which they are asserting rights to the use of water prosecuted the construction of their alleged projects with due diligence.

21. That there are 1,800 acres of land or any other acreage within the boundaries of the Fallbrook Public Utility District which are within the watershed of the Santa Margarita River or that any of the waters used by that District enter the watershed of the Santa Margarita River.

22. That the State of California has a property interest of any kind or character in the Santa Margarita River which is subject to determination or adjudication in this proceeding.

23. That the Santa Margarita Mutual Water Company has an established service area and the United States of America alleges that the service area which it claims conflicts with the service area of another corporation which claims the authority to serve the same area or a part of the same area claimed by the defendant in question and further alleges that the defendant in question has yet to determine the area which it proposes to serve or the source of water upon which it will rely.

60

E X H I B I T S

U.S.A. - Plaintiff's Exhibit No. 1

Letter, dated November 14, 1950, from Dan A. Kimball, then Acting Secretary of the Navy, requesting the Attorney General to take action to protect the rights of the United States of America in the Santa Margarita River.

U.S.A. - Plaintiff's Exhibit No. 2

Map of the drainage area of the Santa Margarita River, disclosing the Santa Margarita River, Murrieta Creek, Temecula Creek and other affluents of the stream; the location of the military establishments involved in the litigation and the location of the Vail properties.

U.S.A. - Plaintiff's Exhibit No. 3

Climatological Data, California Section, U. S. Department of Commerce, Weather Bureau.

U.S.A. - Plaintiff's Exhibit No. 4

Application of the Vail Company to appropriate waters of Temecula Creek, Application No. 11518 and the permit granted, and Permit No. 7032 granting the application for the construction of the dam for the Vail Reservoir.

U.S.A. - Plaintiff's Exhibit No. 5

Capacity and area curve for Nigger Canyon (Vail) Reservoir.

U.S.A. - Plaintiff's Exhibit No. 6

Vail Dam and Reservoir data; elevation, capacity and related information.

U.S.A. - Plaintiff's Exhibit No. 7

Tabulation respecting the acre feet in Vail Lake from December 1948 to and including April, 1952.

-1-

U.S.A. -Plaintiff's Exhibit No. 8

> Map disclosing the geology of the Santa Margarita-Temecula River Watershed, dated January 1952, Office of Ground Water Resources, Camp Pendleton, California.

U.S.A. -Plaintiff's Exhibit No. 9

> Profile of the Santa Margarita River, disclosing elevation and location of principal basins beneath Temecula Creek and Santa Margarita River, entitled "Geologic Cross Section A-A' along the Santa Margarita-Temecula River," dated 10 July 1952, Office of Ground Water Resources, Camp Pendleton, California.

U.S.A. -Plaintiff's Exhibit No. 10

> Map of lower Santa Margarita River Valley, Camp Joseph H. Pendleton, California, showing ground-water storage units, general geology, and location of wells and stream-gaging stations, compiled November 1951 by U.S.G.S.

U.S.A. -Plaintiff's Exhibit No. 11

> Geologic Section A-A' through the lower Santa Margarita River Valley, showing unconsolidated deposits and water-level profiles, United States Geologic Survey.

U.S.A. -Plaintiff's Exhibit No. 12

> Isopach map of alluvial deposits of a portion of the Santa Margarita River within Camp Joseph H. Pendleton, San Diego County, California, Office of Ground Water Resources, Camp Pendleton, dated March 20, 1952.

U.S.A. -Plaintiff's Exhibit No. 13

> Bar graph disclosing specific yield of materials of wells within the basin underlying Camp Joseph H. Pendleton by Office of Ground Water Resources, Camp Pendleton, dated March 1952.

U.S.A. -Plaintiff's Exhibit No. 14

> U.S.G.S. records, Water Supply Papers for the Santa Margarita River System.

-2-

U.S.A. - Plaintiff's Exhibit No. 15

Certified copies of certain documents involved in the acquisition of the 9,147.55 acres of land more or less comprising the United States Naval Ammunition Depot.

U.S.A. - Plaintiff's Exhibit No. 16

Certified copies of certain documents involved in the acquisition of the 123,620 acres of land more or less comprising Camp Joseph H. Pendleton Marine Corps Training Base and United States Naval Hospital.

U.S.A. - Plaintiff's Exhibit No. 17

Certified copies of certain documents involved in the acquisition of the 1,676.58 acres of land more or less; 119.11 acres of land and 1574.61 acres of the public domain lands comprising part of Camp Joseph H. Pendleton.

U.S.A. - Plaintiff's Exhibit No. 18

Letter of January 12, 1943 from James Forrestal, Acting Secretary of the Navy, to Governor Earl Warren, accepting the cession of exclusive jurisdiction over the United States Naval Ammunition Depot.

U.S.A. - Plaintiff's Exhibit No. 19

Letter of September 8, 1943 from James Forrestal, Acting Secretary of the Navy, to Governor Earl Warren accepting the cession of exclusive jurisdiction over Camp Joseph H. Pendleton and the United States Naval Hospital.

U.S.A. - Plaintiff's Exhibit No. 20

Letter of February 18, 1944 from A. L. Gates, Acting Secretary of the Navy, to Governor Earl Warren accepting the cession of exclusive jurisdiction over 1676.58 acres of land in connection with Camp Joseph H. Pendleton.

U.S.A. - Plaintiff's Exhibit No. 21

Uncontrolled Mosaic, Camp Pendleton, Calif. Photographed by Patrol Squadron 61 - 1951.

U.S.A. - Plaintiff's Exhibit No. 22

Map disclosing location of all structures - United States Navy Hydrographic Office, map of Camp Joseph H. Pendleton, 1st Edition, March 1952.

-3-

63
423

U.S.A. - Plaintiff's Exhibit No. 23

Land classification map of the Santa Margarita watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp Pendleton.

U.S.A. - Plaintiff's Exhibit No. 24

Land utilization map of Santa Margarita watershed within Camp Joseph H. Pendleton, Office of Ground Water Resources, Camp Pendleton.

U.S.A. - Plaintiff's Exhibit No. 25

Soil survey field sheets, soil survey legend, of Camp Joseph H. Pendleton, dated June 1952.

U.S.A. - Plaintiff's Exhibit No. 26

Tabulation in acre feet of water pumped at Camp Pendleton, entitled "Camp Pendleton Total Pumps, Camp Pendleton Records Diversions."

U.S.A. - Plaintiff's Exhibit No. 27

Tabulation in acre feet of water pumped from Ysidora area for agricultural purposes, entitled "Ysidora Mesa Pumps, Camp Pendleton Records Diversions."

U.S.A. - Plaintiff's Exhibit No. 28

Tabulation of monthly acre feet use of water for irrigation - Vail Ranch, entitled "Use of water for irrigation - Vail Ranch - from ranch records by H. M. Hall."

U.S.A. - Plaintiff's Exhibit No. 29

Tabulation Lake O'Neill Reservoir storage records.

U.S.A. - Plaintiff's Exhibit No. 30

Area and capacity curve of Lake O'Neill, Camp Joseph H. Pendleton, Public Works Office, P W drawing # 1167CP.

U.S.A. - Plaintiff's Exhibit No. 31

Map of Pauba Ranch and vicinity, Riverside County, California.

64

1424

U.S.A. -Plaintiff's Exhibit No. 32

    Map of soil and climatic surveys of the Pauba Ranch,
Riverside County, California.

U.S.A. -Plaintiff's Exhibit No. 33

    Tabulation and analysis in re crop adaptation of parts
of Pauba, Temecula, Little Temecula and Santa Rosa
Ranches.

U.S.A. -Plaintiff's Exhibit No. 34

    Certified copy of Revocable License and Permit to use
water from the Santa Margarita River from Rancho
Santa Margarita to the Fallbrook Public Utility
District; Letter of May 24, 1948 revoking it.

U.S.A. -Plaintiff's Exhibit No. 35

    Relief map from the office of Major General Oliver P.
Smith will be used throughout for location and general
reference.  This map is entitled "Photo Surfaced Terrain
Model 16 DP3, U.S. Marine Corps Reservation, Camp Joseph H.
Pendleton, Oceanside, Calif." and was prepared January 1951
by U.S. Navy Special Devices Center, Port Washington, L.I.,
N. Y.

# EXHIBITS

## FALLBROOK PUBLIC UTILITY DISTRICT

Exhibit No. A — Organizational documents, including State
of California certified statement as to
current standing.

Exhibit No. B — Application No. 11586 to appropriate water.

Exhibit No. C — Permit No. 7033 signed by Edward Hyatt,
State Engineer on February 18, 1948.

Exhibit No. D — Application No. 11587 to appropriate water.

Exhibit No. E — Permit No. 8511 signed by A. D. Edmonston,
State Engineer on April 23, 1951.

Exhibit No. F — Application No. 12178 to appropriate water.

Exhibit No. G — Application No. 12179 to appropriate water.

Exhibit No. H — Application No. 12576 of United States of
America to appropriate water.

Exhibit No. I — Statement of Records of Diversions of Water
from Santa Margarita River.

Exhibit No. J — Statement of Records of Diversions of Water
from the San Luis Rey River.

Exhibit No. K — Copies of records of San Diego County Water
Authority of Colorado River Water sold to
Fallbrook Public Utility District.

Exhibit No. L — Population tabulation.

-1-

66

# E X H I B I T S

## SANTA MARGARITA MUTUAL WATER COMPANY

Exhibit No. A - Organizational documents, including State of California certified statement as to current standing.

Exhibit No. B - Application No. 11578 to appropriate water.

Exhibit No. C - Application No. 12152 to appropriate water.

Exhibit No. D - Affidavit of publication of notice of application by the Fallbrook Enterprise.

Exhibit No. E - Notice of application and affidavit of publication in the Elsinore Valley Sun.

-1-

67

1427

1
2
3
4
5
6
7
8
9

## GENERAL STIPULATIONS

10        1.  It is understood and agreed that the defendants or any of them,
11  shall have the right to present other contentions in addition to those contained
12  in this Order and to present responses to the contentions of the other party,
13  if such be deemed desirable by that party.  The same privilege will be accorded
14  the United States.

15        2.  It is understood and agreed between counsel for the Fallbrook Public
16  Utility District, the Santa Margarita Mutual Water Company, the State of California
17  and the United States of America that the United States of America has fee simple
18  title to the lands comprising the military establishments (Camp Pendleton, United
19  States Naval Ammunition Depot, United States Naval Hospital) and that a portion
20  of the land are riparian in character but counsel for the defendants and the
21  defendant in intervention do not agree in regard to the total or location of the
22  riparian acreage claimed by the United States.  It is likewise understood and
23  agreed between counsel for the Fallbrook Public Utility District, the Santa
24  Margarita Mutual Water Company, the State of California and the United States of
25  America that the Vail Estate is the owner in fee simple title of lands located
26  in the watershed of the Santa Margarita River some of which is riparian to that
27  river but counsel for the defendants and the defendant in intervention do not
28  agree in regard to the total or location of that riparian acreage.

29        3.  Thirty days prior to trial, the Plaintiff will furnish the Defendants
30  with a statement of the quantities of water which have been used by the United
31  States of America and its predecessors in interest outside the watershed of the
32  Santa Margarita River; the several places of use; the periods of time during which

-1-

68

1428

said water was so used and the purposes for which said water was used.

4. It is understood and agreed by and between the parties hereto that since all the exhibits have not yet been delivered to the respective parties, that as to each exhibit delivered, and to be delivered hereunder, when delivered, the party receiving it reserves the right to object to the admissibility of the exhibit. Each of the parties shall have the right to dispute or question the truth, accuracy or correctness of any of the exhibits of another party or any of the figures, statements or representations therein contained and shall have the right to present evidence and exhibits to prove facts to the contrary to those contained in said exhibits or in addition thereto. Any party hereto shall have the right to demand the production in court of the person or persons who prepared any exhibits for cross-examination by giving the opposite party written notice within thirty days after receiving the exhibit.

5. The defendants by agreeing that the Court has jurisdiction of the above entitled action by reason of the express declaration of Congress do not concede that this Court has jurisdiction to pass on or adjudicate the legality or validity of any permit or license which may be issued by the Division of Water Resources of the State of California pursuant to the applications filed with said Division by the defendants either prior to or subsequent to the issuance of such permits or licenses. The United States asserts that this Court has jurisdiction to adjudicate the questions referred to in the preceding sentence.

- - - - - - - - -

## DEFINITIONS

- - - - - - - - -

1. The phrase "intermittent stream" as used herein is defined to mean a stream, the flow of which in the state of nature is interrupted either from time to time during the year or at various places along its course, or both.

2. The phrase "in the state of nature" as used herein with respect to natural streams or basins is defined to refer to a period of time before such streams or basins were affected by the activities of man.

3. The term "historically", as used herein, is defined to mean "at

69
1429

-2-

1    some time or times in the past."

2

3    DATED this _____25_____ day of __August__, 19 52.

4

5

6                                        UNITED STATES OF AMERICA

7

8                                        /s/ William H. Veeder
                                         William H. Veeder
9                                        Special Assistant to the Attorney General

10

11                                       /s/ David W. Agnew
                                         David W. Agnew
12                                       Attorney, Department of the Navy

13

14                                       FALLBROOK PUBLIC UTILITY DISTRICT

15

16                                       /s/ Phil D. Swing
                                         Phil D. Swing, Attorney for Fallbrook
17                                          Public Utility District

18                                       SANTA MARGARITA MUTUAL WATER COMPANY

19

20                                       /s/ W. B. Dennis
                                         W. B. Dennis, Attorney for Santa
21                                          Margarita Mutual Water Company

22                                       STATE OF CALIFORNIA

23

24                                       /s/ Arvin B. Shaw, Jr.
                                         Arvin B. Shaw, Jr., Assistant Attorney
25                                       General, for the State of California,
                                         Defendant in Intervention

26

27

28

29
                                                              AUG 25 1952
30                                              A TRUE COPY.
                                                ATTEST, ETC.
31                                              Edmund L. Smith, Clerk U. S. District Court
                                                   Southern District of California
32
                                                By _____ Deputy

                            -3-

                                                            70
                                                              1430

APPENDIX  D

## FALLBROOK PUBLIC UTILITY DISTRICT

### WATER DIVERSIONS FROM SANTA MARGARITA WATER SHED

1891   Official water diversions started by a district organization under the Wright Act.  Privately owned wells supplied unrecorded amounts of water. Plans were initiated to develop water from the Santa Margarita River, but were not completed.

1922   Fallbrook Public Utility District formed.  Private wells in the water shed supplied the water, augmented by the leased wells used by the District, which supplied unknown amounts.

1924   Fallbrook Irrigation District planned to divert water from the Santa Margarita River by reclamation project.  Amounts actually diverted unknown.

1932   In addition to water use from private wells, a diversion plant was installed on the Santa Margarita River capable of diverting water at the rate of 144 acre feet per year.

1937   Fallbrook Public Utility District acquired the assets of the Fallbrook Irrigation District.

1943   In addition to water being used from private wells, the Santa Margarita River Diversion Plant capacity was increased to 272.4 acre feet per year.

1946   Santa Margarita Diversion capacity increased to 324 acre feet per year.

1949   Santa Margarita Diversion  capacity increased to 800 acre feet per year.

1951   Santa Margarita Diversion capacity increased to 1,800 acre feet per year.


The above is a true and correct copy of
information in the official files of the
Fallbrook Public Utility District.

GFY
7/52

/s/ Katherine Enigenburg
    Clerk of the Fallbrook Public Utility District

## AMOUNTS DIVERTED FROM THE SANTA MARGARITA RIVER

### IN ADDITION TO UNKNOWN AMOUNTS FROM PRIVATE WELLS

| Year | Acre Feet | | Year | Acre Feet |
|------|-----------|--|------|-----------|
| 1925 | 2.3  | | 1937 | 79.0  |
| 1926 | 11.3 | | 1938 | 94.5  |
| 1927 | 12.2 | | 1939 | 107.0 |
| 1928 | 15.3 | | 1940 | 141.0 |
| 1929 | 21.7 | | 1941 | 126.5 |
| 1930 | 21.3 | | 1942 | 183.5 |
| 1931 | 21.6 | | 1943 | 208.9 |
| 1932 | 24.6 | | 1944 | 139.0 |
| 1933 | 45.2 | | 1945 | 157.0 |
| 1934 | 70.5 | | 1946 | 63.0  |
| 1935 | 59.0 | | 1947 | 94.0  |
| 1936 | 84.5 | | | |

## WATER PUMPED from SANTA MARGARITA RIVER by FALLBROOK PUBLIC UTILITY DISTRICT

| | 1948 | 1949 | 1950 | 1951 | 1952 |
|------|------|------|------|------|------|
| Jan.  | .0   | 10.4 | 0    | 19.0  | 27.8  |
| Feb.  | .5   | 7.6  | 0    | 11.1  | 35.6  |
| Mar.  | .4   | 9.6  | 0    | 26.4  | 59.4  |
| Apr.  | .25  | 0    | 2.0  | 90.0  | 0     |
| May   | .25  | 9.1  | 35.4 | 39.3  | 25.5  |
| June  | .25  | .2   | 50.3 | 88.8  | 249.6 |
| July  | .25  | 1.0  | 72.2 | 79.7  |       |
| Aug.  | 7.6  | 5.0  | 51.0 | 60.2  |       |
| Sept. | 8.7  | 31.0 | 37.9 | 86.5  |       |
| Oct.  | 14.0 | 48.0 | 27.2 | 125.0 |       |
| Nov.  | 13.0 | 71.0 | 38.9 | 140.0 |       |
| Dec.  | 12.8 | 15.3 | 28.7 | 92.2  |       |
| Total | 58.0 | 208.2 | 343.6 | 858.2 | |

The above is a true and correct copy of information in the official files of the Fallbrook Public Utility District.

/s/Katherine Enigenburg
Clerk of the
Fallbrook Public Utility District

GFY
7/52