(SPACE BELOW FOR FILING STAMP ONLY)

**FILED**

OCT 15 1952

EDMUND L. SMITH, Clerk
By _Charles Nokit_
Deputy Clerk

1  SWING, SCHARNIKOW & STANIFORTH
   ATTORNEYS AT LAW
2  SAN DIEGO TRUST & SAVINGS BUILDING
   SAN DIEGO I, CALIFORNIA
3  FRANKLIN 9-1131

4

5  Attorneys for Defendant FALLBROOK PUBLIC UTILITY DISTRICT

6

7

8          IN THE UNITED STATES DISTRICT COURT

9       IN AND FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10                    SOUTHERN DIVISION

11  UNITED STATES OF AMERICA,

12                    Plaintiff,

13          vs.

14  FALLBROOK PUBLIC UTILITY DISTRICT,          CIVIL NO. 1247-SD
    a public service corporation of the
15  State of California;

16  SANTA MARGARITA MUTUAL WATER COMPANY,
    a public service corporation of the
17  State of California; et al.

18                    Defendants;

19  PEOPLE OF THE STATE OF CALIFORNIA,

20                    Defendants in
                      Intervention.
21



**FILED**

OCT 15 1952

EDMUND L. SMITH, Clerk
By _____
          Deputy Clerk

22

23

24      BRIEF OF DEFENDANT FALLBROOK PUBLIC UTILITY DISTRICT

25        IN REGARD TO QUESTIONS PROPOUNDED TO COURT

26                IN ADVANCE OF TRIAL

27

28

29

30

31

32

No Copy

1545

TOPICAL INDEX

|  | Page |
|---|---|
| PRELIMINARY STATEMENT | 1 |
| Riparian Right of the United States | 3 |
| Right of Fallbrook Public Utility District | 4 |
| MILITARY USE IS NOT A PROPER RIPARIAN USE | 6 |
| STATEMENT OF FACTS | 6 |
| Supplying Military Camps and Housing Units, like Cities, is not a riparian use | 7 |
| Riparian rights are Private Rights, Military Rights are not | 13 |
| Riparian Rights are Natural Rights Military Rights are not | 15 |
| Supplying Military Camp is an unreasonable Use | 17 |
| Military Uses Compared to Railroad Uses | 18 |
| ANSWERS TO MISCELLANEOUS CONTENTIONS | 22 |

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

1546

PRELIMINARY STATEMENT

The brief of the defendants for convenience in drafting has been divided into three parts or sections, one to be written by the State of California, one by the Santa Margarita Mutual Water Company and one by Fallbrook Public Utility District. This division was necessary, also, for the reason that certain questions were directed specifically to the defendant Fallbrook Public Utility District and to the defendant Santa Margarita Mutual Water Company respectively. The particular proposition "Military Use is not a Riparian Use" was assigned to Phil D. Swing for preparation and presentation and will be presented later in this Brief. We, accordingly, adopt the Brief of the State of California and Brief of the Santa Margarita Mutual Water Company insofar as they uphold the contentions and the position of this defendant in the issues involved. From there, Fallbrook Public Utility District carries forward the argument on additional and supplemental matters involved in the questions which are particularly addressed to this defendant.

For convenience in this brief, defendant FALLBROOK PUBLIC UTILITY DISTRICT will be referred to as "Fallbrook", the UNITED STATES OF AMERICA as "Plaintiff", the STATE OF CALIFORNIA, as "State" and defendant SANTA MARGARITA MUTUAL WATER COMPANY as "Company.

Introductory to the discussion of specific questions, a few general observations may serve to clear the record as to possible confusion in the discussions to follow.

The fact that the plaintiff is the last landowner on the Santa Margarita River and that there are no intervening riparians or users before the stream enters the ocean is a false or misleading factor and one immaterial to the legal issues involved in this controversy. Such geographical and physical location of plaintiff's lands does not in anywise increase its riparian rights

-1-

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

547

which are _usufruct_ rights. Such location is important only with
reference to what plaintiff can do with the _corpus_ of the water
which reaches its property after passing all other users and
points of diversion on the river.

It must be kept in mind at all times, the distinction
between rights relating to the corpus of the water of the stream
and rights relating to the usufruct use thereof. Once the _corpus_
of any particular segment of water has entered Rancho Santa
Margarita and has been reduced to the possession and control of
plaintiff, plaintiff may do with it as it pleases without fear of
objection from any other user on the river _because as to all_
_other users, this particular water is "waste water" which has_
_passed below all of their points of diversion and beyond any_
_possibility of their using it._  On the other hand, however, the
usufruct right which the plaintiff can enforce against upstream
users to compel them to let down water to plaintiff is entirely
dependent upon plaintiff asserting and being able to prove that
it intends to and will use such water so claimed under its ripar-
ian rights _only on riparian lands and for riparian purposes._

The right to make a change in the character of the use
of water is generally recognized by the courts where the rights
of third parties are not adversely affected thereby but for the
new use to have the continued priority of the old use, the new
use must be a riparian right and of the same class and priority
as the old one. The use, of course, must be confined to ripar-
ian lands. Numerous authorities are set out in State's brief at
pages 8-10.

It seems clear that an appropriator under California
laws has superior rights to a riparian owner seeking to make non-
riparian uses of the water. A riparian may not change the char-
acter of his use from riparian to non-riparian uses to the injury
of the rights of any third person. That is, the riparian may not

-2-

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
404 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO I, CALIFORNIA

1   compel upstream riparians and prior appropriators to let down
2   water to him for non-riparian uses.  To allow him to do would be
3   to permit him to lift himself by his shoe straps and to expand
4   and enlarge his riparian rights, at will, beyond the legal defin-
5   ition and limits thereof.

7                    B R I E F
8                        I
9       Question No. 2 propounded by the Plaintiff is:
10      "Whether the riparian rights in the Santa
11      Margarita River system of the United States of America,
12      Plaintiff, are prior and paramount under the laws of
13      the State of California to the appropriative rights
14      claimed by the defendant Fallbrook Public Utility
15      District in that stream in view of the admission by
16      that District that the earliest date of priority
17      which it is asserting is October 11, 1946."
18      Fallbrook readily concedes that under the laws of the
19  State of California the general proposition is true that, riparian
20  rights are prior and paramount to appropriative rights.  This much
21  was conceded in Fallbrook's answer on file herein.  But this leaves
22  the bulk of the controversy between plaintiff and Fallbrook still
23  untouched, as Fallbrook has pleaded and will offer evidence to
24  prove prescriptive rights against plaintiff's predecessor and
25  estoppel against the plaintiff.  These are questions of fact which
26  can only be determined at the trial.  Also untouched is the
27  determination to be made at the trial of the number of acres of
28  plaintiff's holdings which are actually riparian and the determin-
29  ation of the nature and extent of plaintiff's riparian rights, but
30  for the present we will turn to the legal questions not settled
31  by our answer to the above question to-wit:  Prescriptive rights
32  and estoppel, the discussion of which is a necessary part of
    plaintiff's Question No. 3.

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

1549

## II

The plaintiff's question No. 3 is:

" Whether the defendant Fallbrook Public Utility
District could initiate rights to the use of water
in the  Santa Margarita River adverse to those of
the United States of America while that District
was being permitted to receive water from the
Santa Margarita River pursuant to a gratuitous
and revocable license from the United States of
America."

Plaintiff seeks to build up the so-called revocable per-
mits into legal proportions and significance far beyond any effect
they could possibly have had. (Plaintiff's brief pages 5-6 and 27)
Owners of Rancho SantaMargarita (neither alone or in partnership
with the Vail interests) did not own the River or the running
water therein- least of all, EXCESS and SURPLUS running water
which they did not want and apparently could not use. This, under
the laws, belonged to the State.  As riparians on the River,
neither Vails (to whom this water was waste water because passed
and was below their diversions) nor owners of Rancho Santa Mar-
garita could legally transfer by grant any of their riparian
rights to third parties for exportation and use out of the water-
shed. They merely estopped themselves from complaining if their
riparian rights were invaded. (Spring Valley Water  Co. v. County
of Alameda 88 C.A. 157, 167)

In 2 C.J. 124 Section 210 of the Article "Adverse Pos-
session" under the heading "Necessity of Possession, Hostile in
its Inception", the text declares:

"While there are a number of decisions in which it is
either held that possession, in order to ripen into
title must be hostile in its inception, the great
weight of authority is to the effect that, although
the original entry, upon lands is made in subor-

-4-

1550

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

<u>dination to the title of the real owner, possession</u>
<u>may become adverse.</u>  The occupant's intention at
the time he took possession is not necessarily a
controling factor."  (Emphasis added)

    The text is supported by numerous authorities given in
the foot note.  What was there said regarding land is likewise true
of water.  In this case the revocable permits (Plaintiff's Exhibit
34) show that the consent was expressly limited and restricted in
amount, type of use to which it could be put and the point of
diversion.  It is Fallbrook's contention set forth in the pretrial
order (Contention No. 10 at page 39) that water was taken by Fall-
brook Public Utility District in excess of the amount specified
and for "irrigation" purposes as well as for domestic use as plain-
tiff and its predecessor well knew.  This was in violation of the
permit and adverse to its terms. The violation of the revocable
permit was actionable but plaintiff's predecessor did not invoke
any of its remedies.  This all involves mixed questions of law and
facts which can be finally decided only on the trial of the case.

    Also Fallbrook had a right to initiate an appropriative
right by applying for a permit from the State of California as it
cannot be conceded or even claimed as against this defendant and
the State of California that plaintiff and its predecessor, toge-
ther with the Vail interests owned <u>all</u> the waters of the river.
A consent given by Rancho Santa Margarita for the taking of ten
miners inches of water for domestic use did not preclude Fallbrook
from appropriating two and one-half cubic inches per second of the
<u>unappropriated</u> waters in the river which it did under its applica-
tion No. 11586, nor from appropriating 10,000 acre-feet of winter
flood waters for storage, as it did under its application No.11587
provided there existed in the river any excess and surplus water.
This, of course, again, is a question of fact which can be deter-
mined only at the trial.

-5-

### III

DEFENDANTS' PROPOSITION NO. 3(b) IS:

"MILITARY USE IS NOT A PROPER RIPARIAN USE"

Perhaps a more accurate statement of the legal proposition which we urge would be: "The manner in which the water is being used at Camp Pendleton for military purposes is an unreasonable exercise of the Government's riparian rights". We earnestly contend that under the admitted facts and under the laws of California and the recognized principles applicable to this case, the uses now being made of Santa Margarita River water by plaintiff are not covered by its riparian rights.

STATEMENT OF FACTS: The military uses as practiced by the Government since its acquisition of Camp Pendleton are primarily supplying water to its military forces and civilian personnel incident thereto quartered and housed in several large camps, housing units, institutions and establishments located on Rancho Santa Margarita, for drinking, culinary and sanitary purposes of the personnel, for quasi-municipal purposes of sprinkling streets, fire protection etc., and for supplyong water for filling radiators and washing automobiles, trucks, tanks and other self-propelled military equipment. The strength of the personnel making up these military forces varies according to military orders from headquarters in Washington and fluctuates according to the extingency and necessity of national defense ranging from a few thousand up to approximately 50,000, its present population.  See this defendant's Exhibit "L", Population Tabulation supplied by plaintiff.Also see Del Mar Housing Project shown on both sides of Railroad and State Highway on plaintiff's map U.S.G.S. Oceanside Quadrangle.  In Fallbrook Public Utility District's Exhibit "H", being Application No. 12576 of the United States to appropriate water, plaintiff declares its intention of maintaining a military force of approximately 72,000 men at its combined establishments

-6-

1552

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
104 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

on Rancho Santa Margarita.  The members of the forces are enlisted
and drafted from communities scattered all over the United States
and are brought to the various camps and establishments scattered
over the Rancho, for training for combat duty and then sent else-
where, as military necessity or strategy dictates.  Their presence
at Rancho Santa Margarita is solely for military purposes.  Their
business is fighting.  They are not brought there for any purposes,
and their uses of water are not, in connection with any employment
related to the use or enjoyment of the soil either for the purpose
of agricultural, animal industry or otherwise.  The numerous
families of the officers and non-commissioned officers and civilian
personnel live in the several large Housing Units built and located
at designated points on the Rancho laid out and arranged after the
manner of residential sections of any of our cities.

> A.  Plaintiff's primary requirements on Rancho Santa
>     Margarita for supplying water to large camps and
>     housing units compare closely to supplying water
>     to cities and municipalities.  Cities, however,
>     even when located upon the banks of rivers or
>     overlying underground basins do not have rights
>     permitting them to divert and use the water for
>     supplying their inhabitants, either as riparians
>     or as overlying land owners.

Text book writers and courts list riparian rights as
including (1) domestic requirements, (2) irrigation, (3) mining and
manufacturing (25 Corpus Juris 1116-1123)  For the purposes of this
brief we can omit the latter two classifications as not being
involved in this controversy.  That leaves "domestic requirements"
and the question of whether military uses are "domestic" require-
ments as that term is used by the courts in discussing riparian
rights.   Admittedly, the supplying of water to soldiers and

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

1553

marines for drinking, culinary and sanitary purposes has some of
the characteristics of domestic use. But so does the supplying of
water to the inhabitants of a city possess these same character-
istics, but such uses have been declared not to be riparian.
26 Cal Jur 1009 states a city, as such, has no riparian rights.
Riparian rights "are not of a political nature but are private
rights."

All of the City of San Bernardino overlies the basin
involved in the protracted litigation between San Bernardino and
Riverside commencing with the famous case of Katz vs. Walkinshaw
141 Cal. 116 followed by Barton vs. Riverside Water Company, 155
Cal. 609 and the  City of San Bernardino vs. City of Riverside,
186 Cal. 7. However, the court, at page 24 in the latter case,
held the City did not have the right of an overlying owner but
that its rights were those of an appropriator. The court held at
page 25 that the action of a city in supplying water to its in-
habitants is a public use or governmental right. That riparian
rights and overlying land owners' rights are private rights. In
the present case United States' use of water at Camp Pendleton is
primarily a governmental or public use of water in aid of national
defense not the use of water by a private owner in connection
with the land itself of which it is part and parcel.

This same principle was also declared in Antioch vs.
Williams Irrigation District 188 Cal. 451, 456, where the Califor-
nia Supreme Court said "the fact that the City is situated upon
the San Joaquin River is wholly immaterial in the consideration
of its rights in this case", stating that riparian rights of an
abutting land owner "are wholly of a private nature," that a city's
right is that of an appropriator. We repeat that in the present
case the Government's primary claim for water is not for a private
use but for a public quasi-municipal and governmental use and
therefore cannot be asserted as a riparian right but only as an

-8-

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

1554

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
101 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

1  appropriative right.

2  In the City of Lodi v. East Bay Municipal Utility District

3  7 Cal(2) 316, the facts set forth in the opinion disclose that the

4  City of Lodi is situated over an underground basin into which basin

5  the City sunk wells within the city limits and from which basin by

6  means of said wells it secures its municipal water supply (page

7  321); that the source of supply for this underground basin is the

8  Mokelumme River (page 326 and 329) but notwithstanding the fore-

9  going findings the California Supreme Court held that the City

10  rights were those of an appropriator.(page 335).

11  In Eden Township Water District v. City of Hayward 218 C

12  634, 640, the defendant city was situated about one-half overlying

13  the underground basin from which its water supply was drawn to

14  supply all of its inhabitants. The court declared this fact

15  immaterial. "This act of the city is that of a genuine appropriator"

16  In the last important water case decided by the California

17  Supreme Court, City of Pasadena v. City of Alhambra 33 Cal (2)

18  908, 927, that court recognized the principle that we are contend-

19  ing for here to-wit:  That water for municipal or quasi municipal

20  purposes is an appropriative right not a riparian right. It said:

21  "The principal takers of water however are public utility

22  corporations and municipalities which have either ex-

23  ported water or have used it within the Western Unit for

24  municipal purposes or for sale to the public and their

25  taking when commenced was entirely appropriative. (City

26  of San Bernardino vs. City of Riverside 186 Cal.7,29 Edon

27  Township County Water District v Hayward 218 Cal 634,640)".

28  (Emphasis added)

29  The general rule is set out in 25 Cal.Jur. 1093 Waters, Sec-

30  tion 102, where it is said:

31  "Municipalities.-- The fact that a city is situated on

32  a natural watercourse does not give it any right in its

-9-

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

1  capacity to use the water.  A City as such, aside from
2  its private ownership of riparian lands, has no rights
3  in a stream arising out of its position thereon, <u>for</u>
4  <u>the reason that riparian rights are private, rather</u>
5  <u>than public, in nature</u>.  Such rights are confined exclusively
6  to owners of abutting lands, <u>hence any water rights in a</u>
7  <u>city as such must exist by virtue of the doctrine of</u>
8  <u>appropriation</u>." (Emphasis added)

9      In 67 Corpus Juris 1118-1120 under heading of PUBLIC AND
10 MUNICIPAL WATER SUPPLY, the text reads:
11     " - - - <u>the use of the waters of a stream to supply the</u>
12 <u>inhabitants of a municipality with water for domestic</u>
13 <u>purposes is not a riparian right</u>." (Emphasis added)

14      In 141 A.L.R. 640 it is said:
15     "Although there is authority to the contrary, the weight
16 of authority sustains the view that a municipality, as a
17 riparian owner merely, has no right to divert or abstract
18 the waters of a stream for the purposes of public water
19 supply."

20 One of the cases cited in the annotations in 141 A.L.R. in support
21 of the above rule was <u>City of New Whatcomb vs. Fairhaven Land Co.</u>
22 (Wash.) 64 Pac. 735, 737, where the facts are stated to be:
23     "The City of New Whatcomb is situated on both sides of
24 the creek, the full length of the creek from its source,
25 taking in a part of Lake Whatcomb and its outlet. Streets
26 and alleys are located on, run across, parallel to and
27 upon the banks and bed of the creek and the City of New
28 Whatcomb is the owner of property on the shores of the
29 lake and in the bed of the creek at its source and is a
30 riparian owner on the Lake and Creek."

31 Notwithstanding the foregoing facts, the Court enjoined the City
32 from diverting water from the lake or the creek for supplying the

-10-

municipal requirements of itself and the domestic needs of its inhabitants.  The Washington Supreme Court seemed influenced by the fact that the use to which the water was put was a municipal and public use as distinguished from a riparian use which is a private right and use and quoted, at page 740, extensively from City of Emporia v. Soden (25 Kansas 588; 37 Am.Rep. 265.) which holds that a city can have no riparian rights for supplying water to its inhabitants, which latter case is hereinafter discussed by us.

In the case of Pernell v. City of Henderson (North Carolina) 16 S.E. 2nd, 449, 451 the court s aid regarding the claim of riparian rights of a municipality:

"It has been held with practical unanimity that a muni-
cipal corporation, in its construction and operation of a
water supply system, by which it impounds the water of a
private stream and distributes such water to its inhab-
itants, receiving compensation therefor, is not in the
exercise of the traditional right of a riparian owner to
make a reasonable domestic use of the water without
accountability to other riparian owners who may be injured
by its diversion or diminution. 'The use of the waters of
a stream to supply the inhabitants of a municipality with
water for domestic purposes is not a riparian right'.
67 C.J.1120.

The precise question raised by defendant is dealt
with by a leading authority, as follows: 'The rule giv-
ing an individual the right to consume water for his
domestic needs is founded upon the needs of the single
individual and the possible effect which his use will
have on the rights of others, and cannot be expanded
so as to render a collection of persons numbering
thousands, and perhaps hundred of thousands, organized
into a political unit, a riparian owner, and give this

-11-

1557

1   unit the rights of the natural unit.  The rule, therefore,

2   is firmly established that a municipal corporation can

3   not, as riparian owner, claim the right to supply the

4   needs of its inhabitants from the stream.' Farnham, Water

5   and Water Rights, Vol.1 p.611."

6   The last case cited and quoted in _Town of Purcellville_

7   _v. Pots_ (Va1942) 19 SE (2) 700,703, to the effect: "The use of

8   waters of a stream to supply the inhabitants of a municipality

9   with water for a domestic purpose is not a riparian right."

10   In _City of Emporia v. Soden_ (25 Kan. 588) 37 Am Rep. 265,

11   268, the  Supreme Court of Kansas declared:

12   "The City cannot be considered a riparian owner within

13   the scope of the exception named.  The amount of water

14   which an individual living on the banks of a stream

15   will use for domestic purposes, is comparatively trifling.

16   Such use may be tolerated upon the principle _de minimis_

17   _non curat lex._  It is a use which must always be anti-

18   cipated, and may reasonably be considered as one of the

19   benefits of the ownership of the banks of a natural

20   stream - - - - -.  But _the taking of water for the supply_

21   _of a populous and growing city, stands upon an entirely_

22   _different basis._  No man can forsee this. - -The city as

23   a corporation may own land on the banks, and thus in a

24   sense be a riparian owner.  But this does not make each

25   citizen a riparian owner.  _And the corporation is not_

26   _taking the water for its own domestic purposes; it is_

27   _not an individual; it has no natural wants; it is not taken_

28   _for its own use but to supply a multitude of individuals._"

29   (Emphasis added)

30   In California Administrative Code, Title 23, Chapter 2

31   governing appropriations of water, Section 664 reads as follows:

32   "_Municipal Use._-Municipal use includes all those uses

-12-

1558

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

common to the municipal water supply of a city, town <u>or</u>
<u>other similar population group</u>." (Emphasis added)
This would appear to cover the Housing Units and Army Camps on
the Rancho Santa Margarita and to call for appropriations to
supply their requirements.

This rule or principle of law, the plaintiff has itself
recognized by filing an application with the State Division of
Water Resources to appropriate 165,000 acre-feet per annum of
waters of the Santa Margarita River for "military" purposes. (See
Defendant Fallbrook Public Utility District's Pretrial Exhibit No.
"H", Application No. 12576 of the United States to appropriate
Water.)

<u>B.   Riparian rights are private rights and do not</u>
<u>extend to or include the right of a government</u>
<u>agency to supply water to governmental institu-</u>
<u>tions such as military camps or cantonments</u>
<u>established and maintained primarily for military</u>
<u>purposes embracing personnel running into great</u>
<u>numbers even though located on lands riparian to</u>
<u>a stream.</u>

In 1 Wiel (3d ed) Water Rights in Western States, Sec.
743, page 804, a situation existed similar to that prevailing at
Rancho Santa Margarita, and the author says:

"The State owning riparian land cannot as riparian
proprietor take water for thirteen hundred people in
a penitentiary and insane asylum a quarter of a mile
from the stream, a case in which the test of 'natural
uses' must give way on the facts because unreasonable."

In support of the text, Wiel cites <u>Salem Mills Co. v.</u>
<u>Lord et al</u> 42 Oregon 82 (69 Pac.1033). This action was brought
against the governor of the State of Oregon (Lord) and other state

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

-13-

1559

officers acting as the  Board of Control for the State Insane
Asylum and penitentiary located on a tract of land traversed by
a creek.  The plaintiffs had a right to use the waters below the
penitentiary and asylum for hydraulic power development.  The
State of Oregon purchased the tract "containing 147 acres, the
lower portion of which is intersected by the middle channel of
Mill  Creek" and erected on the south portion thereof a peniten-
tiary and incidental buildings to maintain such an institution,
enclosing the institution, with stockade embracing five acres with-
in the confines of which flowed one channel of Mill Creek.  Later
the State erected an insane asylum on the north portion of  the
same tract of land.  The penitentiary was supplied with water for
irrigation, cooking, living, sanitation and other purposes as were
required and to the asylum for like purposes.

At page 98 (42 Oreg.82), the Oregon Supreme Court
declared:

"Riparian rights do not extend so far as to authorize
the state to supply with waters from the stream a suf-
ficient amount to accommodate and meet the necessities
of irrigation, cooking, laundry, sanitation etc. for
such institutions as the State penitentiary and Asylum
for the insane,,where from 1300 to 1500 persons are
kept in constant confinement, the latter institution
being located one-fourth to one-third of a mile from
the course of the stream.  It is analagous to many cases
to be found in the books where individuals have claimed
the right by reason of their riparian ownership to supply
towns and cities with water and where towns and cities
adjacent to some part of a stream have claimed a suf-
ficient quantity to supply the remote portions thereof
but without avail. (City of Emporia vs Soden 25 Kansas
533, 37 Am.Rep. 265; Stein v. Burden 24 Ala 130;

-14-

SWING, SCHARNIKOW & STANFORTH
ATTORNEYS AT LAW
104 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

1   60 Am.Rep. 453; Harding v. Stanford Water Co. Conn. 81;

2   Company of Proprietors of Medway vs. Romney 9 CBNS 575;

3   Lord vs. Meadville Water Co. 135 Ia St. 133, 19 Atl 1007;

4   20 Am St. Rep 864."

5        It has been repeatedly declared that riparian rights are

6   private rights and are such as may be shared and enjoyed in com-

7   mon by any or all land owners abutting on the stream. (25 C.J.1093)

8        Under such a definition riparian rights could not in-

9   clude the supplying of water to the army or the Marine forces of

10  the United States.  The plaintiff's military uses of the water of

11  the Santa Margarita River at Camp Pendleton are uses entirely

12  different in character from the uses which any other riparian

13  land owner on the stream could or would be entitled to make and

14  are such that can be exercised and enjoyed solely and exclusively

15  by the United States of America.  This is so because the United

16  States alone can maintain an army and it alone can wage war.  It

17  has these rights and powers because it is a sovereign nation and

18  national defense is an attribute of and incidental to that

19  sovereignty.  In maintaining an army  and in training marines at

20  Camp Pendleton and supplying their requirements for water, the

21  plaintiff is acting in its political, not in its land owner capa-

22  city; in its public, not in its private capacity; in its sovereign

23  and governmental, not in its proprietary capacity.  It follows

24  therefore that its military uses cannot be riparian uses since the

25  latter are, by their nature, private rights.

26

27       C. Riparian Rights have long been called Natural Rights

28          and supplying an army or military camp does not fall

29          within those rights.

30       In 1 Wiel Water  Rights 773 the author quotes Judge

31  Baker in Indianapolis Water Co. vs. American etc. Co. 52 Fed.770:

32       "It has been well said that the rights of a riparian

-15-

1   proprietor so far as they relate to any natural stream,

2   exist *jure naturae*, because his land has by nature the

3   advantage of being washed by the stream."

4   Wiel also quotes <u>Duckworth vs. Watsonville etc.</u>, 150 Cal. 120,

5   declaring:

6   "The (riparian) right exists because a stream runs <u>by</u>

7   <u>the land</u> and thus gives the natural advantages result-

8   ing from the <u>relative situation.</u>"

9   On page 775 Mr. Wiel quotes Mr. Justice Shaw in <u>Turner vs. James</u>

10  <u>Canal Co.</u> 155 Cal. 82,87 to the effect:

11  "It (riparian rights) comes from <u>the situation of the</u>

12  <u>land with respect to the water</u>, the opportunity afforded

13  thereby to divert and use the water upon the land, <u>the</u>

14  <u>natural advantages and benefits resulting from the rela-</u>

15  <u>tive positions</u> and the presumptions that the owner of

16  the land acquired it with a view to the use and enjoy-

17  ment of <u>these</u> opportunities, advantages and benefits."

18  (Emphasis added)

19      Since riparian rights are natural rights and are those

20  which arise from the natural advantages which the land has by

21  virtue of its adjacency or juxtaposition to the stream, they are

22  measured and limited by the opportunities which nature makes pos-

23  sible.  If nature has been generous in supplying the land with

24  fertile and arable soil or with water power possibilities, these

25  natural advantages increase the uses to which the riparian owner

26  may put the water.  If, however, nature has been niggardly in her

27  gifts, the uses are restricted.  But it is the <u>natural advantages</u>

28  which determine the uses which may be made of the water.  On the

29  other hand, military uses are increased or restricted <u>not according</u>

30  <u>to the natural advantages of the land but according to the military</u>

31  <u>necessities of the nation</u> and by the will and decree of the Com-

32  mandant of the United States Marines, the Secretary of the Navy or

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
404 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

1562

The Secretary of Defense in Washington. Military uses may go down to just a little water for the needs of only a handful of men or such uses may go up to great quantities of water for the needs of 50,000 men or any unlimited greater number that Washington may decide to place there in camp.   Such uses do not depend on the natural advantages of the land or have any direct relation thereto but rather depend on the military necessities of the nation.  To say that a riparian can arbitrarily expand or contract his riparian rights, at his own will in this manner is contrary to the long standing concept of the nature and fundamental characteristics of riparian rights as recognized and declared in our decisions.

   D.   The exercise of riparian rights has been restricted by the Constitution and laws of the State of California to reasonable uses and military uses as practiced by Plaintiff constitute an unreasonable use.

It is hornbook law that no riparian owner can transport his share of riparian waters off of his property to supply the domestic needs of a great number of people whether such service is for a city, resort or camp.  Logic would seem to prohibit the riparian owner accomplishing by indirection the thing which he is forbidden by law doing directly, namely to transport and transfer the city or camp onto his property and to there satisfy their domestic, sanitary and culinary requirements by supplying them with his riparian share of the waters of a stream.  This would appear to make such use an unreasonable use and therefore not within his riparian rights.

In McCord v. Big Bro. Movement (N.J.1936) 185 A 480,482 where the owner of riparian lands invited the defendant to use his property for a summer camp for boys.  There the Court went so far as to say:

1563

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

"The defendant is not selling the water it transports from the stream but is giving it away or granting its use daily for eight or more weeks to seventy boys who are strangers to defendant's riparian lands and who of their own right have no privilege to the use of the stream water. <u>Riparian</u> rights can be claimed <u>only</u> by the owner thereof and they include the use of the waters of a stream for <u>ordinary</u> and reasonable bathing privileges which extend to the owner, his family and inmates and guests of his household. <u>The transfer to a large number of invitees of the bathing use of transported waters exceeds the reasonable use to which the riparian owner is entitled.</u> (Harvey Realty Co. v. Wallingford (Conn. 150 A 60)" (Emphasis added)

So here we believe that the Court should declare that the transfer of 50,000 persons to Rancho Santa Margarita and the establishing thereon of extensive military camps and large housing projects calls for an unreasonable use of water in order to supply them with water.

E. <u>Plaintiff's military uses as practiced at Camp Pendleton are as unreasonable as it would be for a Railway Company owning riparian lands over which it was operating trains to divert the waters of the stream to supply its steam engines and passangers.</u>

In <u>Attorney-General vs. Great Western Ry. Co.</u> 23 LAW TIMES (N. S.) pages 344, 345 affirmed in LR 6 Ch 572 and in <u>McCartney vs. Londonderry Ry Co.</u> (1904) LR App. Cas.301 House of Lords it was held that this could not be done.

In the first case, the facts were that the Railway owned a strip of land crossing the   River Cam over which they operated their trains.  The railway constructed a water tight cistern on

-18-

1   their strip and connected it by pipe with the river by means of

2   which the railway took water for supplying its steam engines and

3   other trade purposes of that company. Lord Romilly said:

4      "With regard to the second point, as to riparian

5      proprietors, there is no question, I think, about the

6      law upon the subject, and, in fact, the cases which were

7      cited by Mr. Jessell all establish the same thing - that

8      a riparian proprietor has a paramount right to take what

9      water he likes from the river for <u>usual</u> domestic purposes.

10     I do not say how widely the term "domestic purposes" may

11     extend. Unquestionably it would extend to culinary pur-

12     poses, to the purposes of cleaning and washing, feeding

13     and supplying the <u>ordinary</u> quantity of cattle, and so on.

14     But that is not what the railway company want. I wholly

15     dissent from the argument that, assuming they might have

16     taken so many gallons a day for domestic purposes if they

17     had wanted it, as they do not want it for such purposes,

18     they may take it for another purpose which is of a dif-

19     ferent character. That, I am of opinion, is not the law

20     of the court. Therefore the case resolves itself solely

21     into the question whether the <u>extraordinary</u> supply

22     required by the railway company is injurious to the nav-

23     igation of the river. (His Lordship examined the evi-

24     dence at great length, stated that the result of the

25     evidence was that the quantity of water (100,000 gallons

26     per day) required by the company could not in dry weather

27     be taken without impeding navigation, and continued)

28     I am, therefore, of opinion that it is an extraordinary

29     use of the water not justified by any rule or principle

30     of law, and that it does seriously affect the navigation

31     of the river. I am of opinion, therefore, that the plain-

32     tiffs are entitled to the injunction which they ask for,

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

1565

1   and that the costs must follow the event." (Emphasis

2   added)

3   In the second case, Earl Halsbury, at page 304, said:

4       "My Lords, if the question were the reasonableness in

5       respect of quantity, I should think it a most unreason-

6       able thing that the use of a stream passing through a

7       very small area of riparian land should be made to

8       extend to 40 miles of country or wherever else the

9       exigencies of railroad service might require.  Speaking

10      of it simply in respect to quantity, I think it more

11      unreasonable than supplying drinking water to an asylum

12      built on the banks, which has been held to be unlawful."

13      (Emphasis added)

14          It is to be noted that the case of Attorney-General v.

15  Great Eastern Ry.  Co. is cited by Calif. Sup.Ct. in support of

16  its decision in Cowell v. Armstrong 210 C 218, 225.

17          In Clark vs. Pennsylvania Railroad Company, 145 Penn.

18  State,438 (27 Am.St.Rep.710) the plaintiff were the owners of a

19  tract of land through which ran a small stream of water.  The

20  defendant Railroad Company was the owner of a tract of land situ-

21  ated on the stream above the land of plaintiffs.  The Defendant

22  Company was diverting the water of this stream for operational

23  purposes of its railroad supplying its locomotives with water. The

24  Court held that was an unreasonable use of the water and said:

25      "The rule of law is uniform and undoubted, that every

26      riparian owner is entitled, as an incident to his land,

27      to the natural flow of the water of a stream running

28      through it, undiminished in quantity and unimpaired in

29      quality, subject to the reasonable use of the water by

30      those similarly entitled, for the ordinary purposes of

31      life; and any sensible or essential interference there-

32      with, if wrongful, whether attended with actual damage

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
601 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

-20-

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

1  or not, is actionable: (cites cases)" - - - -

2  "Every riparian owner," says our brother Paxon in

3  <u>Pennsylvania R.R. Co. v. Miller</u>, 112 Pa. St. 41,"has

4  the right to use the water of the stream passing over

5  his land, for ordinary domestic purposes; and of the

6  stream be so small that his cattle drink it all up,

7  while it may be a loss to the lower riparian owner,

8  it is <u>damnum absque injuria</u>. But where the upper ripar-

9  ian owner diverts or uses the water, <u>not for ordinary</u>

10  <u>domestic purposes, such as are inseparable to and</u>

11  <u>necessary for the use of his land, but for manufactur-</u>

12  <u>ing or other purposes, having no necessary relation to</u>

13  <u>his use of his land</u>, it is different";

14  "The stream in question, although steady, was small;

15  and it is alleged that the six-inch pipe so impoverished

16  the flow of water as to destroy its utility as a water-

17  power. <u>The defendant company, as a riparian owner merely,</u>

18  <u>had no right to divert the water from its natural chan-</u>

19  <u>nel, to the prejudice of the rights of others below it</u>

20  <u>on the stream. If the amount of water required to supply</u>

21  <u>its locomotives at this point, and diverted by it from the</u>

22  <u>channel of the stream, sensibly or materially diminished</u>

23  <u>the flow,</u> it was <u>bound to buy it, or subject itself to</u>

24  <u>an action for an excessive use or diversion of the water.</u>

25  No matter what were the necessities of the defendant's

26  business, it had no right to convey the water out of its

27  course, to the prejudice of the plaintiffs' rights:

28  <u>Haupt's Appeal, 125 Pa St. 211.</u>" (Emphasis Added)

29  In the pending case, the defendant Atchison Topeka and

30  SantaFe Railway Company is claiming riparian rights based on its

31  ownership in fee simple of the strip of land over which it operates

32  its trains. The Santa Fe Railway  Company could claim water from

-21-

1587

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

1  the Santa Margarita River for running its steam engines and sup-

2  plying its passengers on the trains operating over its main line

3  from Los Angeles to San Diego and its branch line from Fallbrook

4  Junction on the basis of being a riparian, if the Government is

5  justified in claiming as a riparian the right to supply an army

6  with water because it is camping on riparian lands.

7      For the same reasons that the claims of Railway

8  Companies have been denied, so in this case the claim of the

9  Government to a riparian right to supply armies camping on ripar-

10  ian lands must be denied as an unreasonable use.

12                          IV

13      ANSWERS TO MISCELLANEOUS CONTENTIONS OF PLAINTIFF

14      1.  Referring to plaintiff's brief, page 1, lines 23 and 24:

15  Plaintiff claims "Fee simple title resides in the United States

16  of America to 135,000 acres of land", which was not agreed to by

17  Fallbrook and on page 2 of its brief, plaintiff concedes such

18  statement is subject to the exception of such right of way as

19  Atchison, Topeka and SantaFe Railroad may own in fee across its

20  lands.

21      2.  On page 3, lines 10-14 plaintiff claims that the res-

22  pective rights of plaintiff and the Vail Estate have been estab-

23  lished by the Stipulated Judgment.  But this is true only as bet-

24  ween themselves.

25      3.  On page 4, lines 4-10 plaintiff places great reliance

26  on its quotation from Rancho Santa Margarita vs. Vail (11 C (2)

27  501,516, declaring "That the normal flow of the Temecula-Santa

28  Margarita River is not sufficient to supply all the riparian needs

29  of all of the riparian lands of either respondent or appellants".

30  Plaintiff ignores the fact that the statement referred only to the

31  normal flow.  On page 560 the Court referred to "winter waters

32  that now go to waste" and further on the same page said, "that

1569

during periods of heavy rainfall large amounts of water run into
the sea, and that such waters as now flow and have heretofore
flowed into the Pacific Ocean are largely, but not entirely,
capable of being impounded on the lands of the plaintiff".  Such
"winter waters" that go to waste and the "large amounts of water
(which) flow into the sea", are capable of being impounded not
only on the lands of plaintiff but are also capable of being ap-
propriated by Fallbrook and impounded in a reservoir on lands of
Fallbrook which it is proposing to build under its several State
applications and permits.  The fact that the plaintiff itself has
an application pending (junior to the application of Fallbrook,
Application No. 12576 for 165,000 acre-feet of water per annum)
indicates that plaintiff itself believes there is excess and sur-
plus water in the river available for appropriation.

In connection with Fallbrook's plans to build a dam under its
State applications and permits, we call the Court's attention to
the declaration of the California Supreme Court in Peabody v City
of Vallejo 2 C(2) 351,373:

> "The decisions of this State have long since encouraged
> the impounding and distribution of unused and storm and
> and flood waters (San Joaquin etc.Co. vs. Fresno Flume
> & Irr. Co.158 C 626). The fundamental law of the state
> now commands it when it can be done without substantial
> damage to the existing rights of others. This command
> is enjoined upon trial courts as well as upon the review-
> ing courts, and the former cannot avoid the responsibility
> of weighing the evidence in conformity with constitutional
> requirements and framing their decrees accordingly."

Further illustrating the point as to how riparians and appropria-
tors should get along, the same Court said: (at page 376)

> "The correct rule is stated with its appropriate limit-
> ations in the italicised words in the following language

-23-

1569

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
621 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

of the District Court of Appeal in <u>Waterford Irr. Dist. v.</u>
<u>Turlock Irr. Dist.</u> 50 Cal. App. 213 at page 221:

"The mere inconvenience, or even the matter of extra
expense, <u>within limits which are not unreasonable</u>, to
which a prior user may be subjected, will not avail
to prevent a subsequent appropriator from utilizing
his right."

4. The foregoing answers plaintiff's query at the top of
page 15 of its brief requesting counsel for defendants to give
their opinion whether the appropriative rights of the defendants
could be exercised without encroaching upon the vested riparian
rights of the United States. That answer is emphatically YES.

5. Fallbrook concurs in plaintiff's statement at the bottom
of page 18 that if the court holds that a military use is not a
riparian use such decision would not "divest" the United States of
its riparian rights. It would merely restrict plaintiff in its
exercise of such riparian rights to a reasonable use thereof for
recognized riparian purposes.

6. Plaintiff, at the bottom of page 18 quotes an excerpt
from <u>Porter's Bar Dredging Co. vs. Beaudry</u> 15 Cal Ap 751,762 which
might seem to imply that riparian waters could be put to non-
riparian use but such is not the holding of the case since the
language must be applied and confined to the facts of that case in
which it was shown that plaintiff had both riparian and appropria-
tive rights.

The decision goes no further than what we have conceded the
law to be in the preceding paragraph, to-wit: that an owner cannot
be penalized for his mis-use of his riparian right to the extent
of forfeiting his rights. The case merely declares that the
owner cannot be divested of his rights merely because he may have
made a wrongful use of them. Anyway since that decision in 1911
the whole theory of riparian rights has been modified. These

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
404 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

1570

1    rights have been substantially curtailed by the 1928 Constitutional

2    Amendment.  Also the decisions rendered subsequent to that amend-

3    ment have virtually wiped out distinctions previously existing

4    between riparian owners, overlying land owners and appropriators

5    whereby now all users are to be bound by the rule of reasonable

6    use.  (Peabody vs. City of Vallejo 2 Cal(2) 351,367,383)

7         Other points not touched on by us herein, have been

8    adequately covered,we believe, in the briefs filed by the State

9    and by the  Company, to which we refer, rather than extend this

10   brief with further discussion of our own.

11        Dated October 14th, 1952.

13                              SWING, SCHARNIKOW & STANIFORTH

14                              BY _____

15                              Attorneys for Defendant FALLBROOK
16                              PUBLIC UTILITY DISTRICT

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA

-25-

1571

being by me first duly sworn, deposes and says: that ____ he ____ is the ____

____

in the above entitled action: that ____ he ____ has ____ read the foregoing ____

____

and knows the contents thereof; and that the same is true of ____ own knowledge, except as to the matters which are

therein stated upon ____ information or belief, and as to those matters that ____ he ____ believes it to be true.

____

Subscribed and sworn to before me this ____

____ day of ____ 19____

____ Notary Public in and for the County of Los Angeles
____ State of California

(SEAL)

Received copy of the within ____ this ____ day of ____ 19____

Attorney ____ for ____

____ ceived copy of the within ____ this ____ day of ____ 19____

Attorney ____ for ____

(AFFIDAVIT OF SERVICE BY MAIL—1013a, C.C.P.)

STATE OF CALIFORNIA, } ss.
COUNTY OF ~~LOS ANGELES~~ }
SAN DIEGO
MARIAN W. ALLEN ____ being first duly sworn, says: That affiant is a citizen of the
United States and a resident of the county of ____ San Diego ____; that affiant is over the age of eighteen years and is not a party to the
within above entitled action: that affiant's ~~residence~~ business address is ____ 604 San Diego Trust & Savings Bldg.

SAN DIEGO, CALIFORNIA

that on the ____ 11th day ____ of ____ October ____ 19 52 ____ affiant served

the within ____ BRIEF

on the ____ Plaintiff ____ in said action, by placing a true copy thereof in an envelope

addressed to the attorney ____ of record for said ____ Plaintiff ____ at the

~~~~ office ____ address of said attorney ____ as follows: ____ Mr. David W. Agnew
Room 111-A Fox Theatre Bldg.
720 "B" St., San Diego, California
and by then sealing said envelope and depositing the same, with postage thereon fully prepaid, in the United States Post Office at
~~San~~ Diego ~~~~ California, where is located the office of the attorney ____ for the person ____ by and for whom said service was made.
~~~~ that there is delivery service by United States mail at the place so addressed or ** there is a regular communication by mail
between the place of mailing and the place so addressed.

Subscribed and sworn to before me this ____ 11th

day of ____ October ____ 19 52

____ Notary Public in and for the County of ~~Los Angeles~~ San Diego California.
(SEAL)
* Here "quote" from envelope name and address of addressee.
** When the letter is addressed to a post office other than "Los Angeles" strike out "and" when "addressed to "Los Angel