IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

HONORABLE LEON R. YANKWICH, JUDGE

UNITED STATES OF AMERICA,

                              Plaintiff,

             vs

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

                              Defendants,

THE PEOPLE OF THE STATE OF CALIFORNIA,

             Defendant in Intervention

No. 1247-SD

OPINION ON

PRE TRIAL QUESTIONS

**FILED**

OCT 22 1952

EDMUND L. SMITH, Clerk

By John A. Childress

Deputy Clerk

APPEARANCES:

For the Plaintiff:
DAVID W. AGNEW, Esq.
Attorney for U.S. Navy Department
Special Assistant to the Attorney General
            and
RAYMOND deS. SHRYOCK
Commander, U.S. Navy
Attorney for U.S. Navy Department

For the Defendant
Fallbrook Public
Utility District:
SWING, SCHARNIKOW & STANIFORTH, by
PHIL D. SWING, Esq.
San Diego, California

For the Defendant
Santa Margarita Mutual
Water Company:
W. B. DENNIS, Esq.
Fallbrook
California

For the Defendant in
in Intervention,
People of State of
California:
EDMUND G. BROWN, Esq.
Attorney General of the State of
California, by
ARVIN B. SHAW, JR., Esq.
Assistant Attorney General

For Division of Water
Resources of the State
of California:
GAVIN M. CRAIG, Esq.
Los Angeles, California

1587

YANKWICH, Chief Judge:

On January 25, 1951, the Government of the United States began an action to declare its rights to the water of the Santa Margarita River, which it acquired when it purchased, in 1942, certain lands from the Rancho Santa Margarita.

The complaint in the action has been fully summarized and analyzed by the writer in a previous opinion. (1)

Following pre-trial conference, a Pre-Trial Order was entered on August 25, 1952, defining the issues as they affect two of the defendants, Fallbrook Public Utilities District and Santa Margarita Mutual Water Company, public service corporations of the State of C lifornia, and the State of California, which is a defendant in intervention.  We shall refer to Fallbrook Public Utilities District as "Fallbrook", and to Santa Margarita Mutual Water Company as "Santa Margarita".

The Pre-Trial Order contains the following finding:

"  The Court finds that it is for the best interest of the parties hereto and for the public interest that all rights to the use of water in the Santa Margarita River system of all parties to this action be determined as against the others and the filing of cross pleadings is dispensed with as unnecessary and inconvenient.  Provided that the Order setting this cause for separate trials is not affected hereby.

"  The issues in this cause are hereby defined and limited in conformity with the statements contained

1588

in the Stipulation between the State of California

and the United States of America, dated November

29, 1951, a copy of which is embraced in Paragraph

H-1 of the attached Pre-Trial Order."

The stipulation to which reference is made, and which was adopted

by the Court, contained the following agreements:

"I

That in Paragraphs VIII and IX of plaintiff's

Complaint herein, and in Paragraphs 2 and 3 of

the Prayer of said Complaint, the word 'paramount'

is used in the same sense in which that word is

used in the second paragraph, on page 374 of the

opinion of the Supreme Court of California in the

case of Peabody v. Vallejo, 2 Cal. 2d, 351 (fourth

paragraph on page 494, 40 Pac. 2d 486)

II

That in this cause, the United States of America

claims only such rights to the use of water as it

acquired when it purchased the Rancho Santa Mar-

garita, together with any rights to the use of

water which it may have gained by prescription

or use, or both, since its acquisition of the

Rancho Santa Margarita.

III

That the United States of America claims by

-2-

1589

reason of its sovereign states no right to
the use of a greater quantity of water than
is stated in Paragraph II, hereof.

IV

That the rights of the United States of
America to the use of water herein are to be
measured in accordance with the laws of the
State of California."

With the issues thus delimited, the cause is now set for
trial for October 29, 1952, as to the three named defendants.
The pre-trial hearings made it apparent that certain questions of
law could, with great propriety, be argued and determined in
advance of trial.  The parties are of the view that a legal
determination of these questions might be a guide to counsel in
the presentation of the case and reduce the trial time materially.

These questions, propounded by the respective counsel and
approved by the court, have been briefed, and the object of this
opinion is to state the Court's conclusions upon them.

The following facts bearing on the legal questions involved
need be adverted to.

Fee simple title resides in the United States of America
to 135,000 acres of land, which is situated largely in San Diego
County, California.

The lands were acquired by the United States of America
in the year 1942.

Lands riparian to the Santa Margarita River are owned in

-3-

in fee simple by the United States of America and comprise part of the military establishment in question.

Lands riparian to the Santa Margarita River are owned by the defendant Vail Estate.

By a stipulated judgment, Exhibit A of the Complaint, the respective rights in the Santa Margarita River of the United States of America and the Vail Estate, insofar as this litigation is concerned, have been established.

It is contended by the United States that approximately 38,000 acres of the 135,000 acres owned by the United States of America, are riparian to the stream in question. Of that total riparian acreage, approximately 18,700 acres, it is contended, are susceptible of practicable and profitable irrigation. At variance with that figure is the assertion by the defendants that less than 12,000 acres of the lands of the United States within the watershed of the Santa Margarita River are susceptible of practical irrigation.

Fallbrook has been a public utility district since 1922, and has engaged in supplying irrigation and domestic water to the lands within its boundaries and to the people living thereon.

It has installed in the channel of the Santa Margarita River a dam impounding water to which the United States claims to be entitled. It has also installed a pump in the channel of that stream. With that pump the defendant Fallbrook is now, and has been for the past two years, pumping and extracting approximately 1,800 acre-feet of water from the Santa Margarita River to

-4-

which the United States claims to be entitled.

The diversion by Fallbrook is made pursuant to Permit No. 7033, issued by the Department of Public Works, Division of Water Resources, State Engineer, State of California.

Fallbrook, pursuant to Permit No. 8511, issued by the Department of Public Works, Division of Water Resources, State Engineer, State of California, asserts a right to construct a dam on the Santa Margarita River with a capacity of 32,000 acre-feet, and to divert from the Santa Margarita River 10,000 acre-feet of water annually.

On October 4, 1946, there was filed an application with the State of California Department of Public Works, Division of Water Resources, on behalf of Santa Margarita.

Pursuant to this application, Santa Margarita claims to have the right to divert not to exceed 60 cubic feet per second from the stream flow of the Santa Margarita River and its tributaries, and to store 5,000 acre-feet of the waters of the Santa Margarita River under and pursuant to any permit which may hereafter be issued by the State of California pursuant to the application mentioned.  On the 12th day of November, 1947, Santa Margarita filed its application with the Division of Water Resources of the State of California for permission to store 60,000 acre-feet of the waters of the Santa Margarita River under and pursuant to any permit which may be issued by said Division of Water Resources.

On the 30th day of June, 1948, the plaintiff, the United States of America, filed its application with the Division of

-5-

Water Resources of the State of California, wherein the plaintiff requested the issuance of a permit authorizing it to store 165,000 feet of water of the Santa Margarita River. All said applications are still pending before the Division of Water Resources. And no diversion of water has been made by Santa Margarita.

## II

### RIPARIAN RIGHTS AND APPROPRIATION

So far as the defendants Fallbrook and Santa Margarita are concerned, the issue turns upon the familiar one which has always characterized water litigation in California, - that is, the rights of riparian owners against appropriators. The State of California is interested merely in seeing that the integrity of its law be respected.

In the prior opinion, the history of the development of riparian rights in California and their modification by constitutional revision was gone into.(2) We need not review that history. But it is well to begin this discussion by referring to the constitutional amendment of November 6, 1928, which limits the rights of both riparian owners and appropriators of water in California to beneficial use. (3)

The Water Code, which carried into effect this constitutional provision, reasserts the principle that it is the policy of the State to insure the fullest beneficial use of its water resources.(4) The rights of riparian owners are recognized in both the constitutional amendment and in the Code. But the amendment limits them

-6-

1593

to so much of the flow of a stream as may be

> "required or used consistently with this
> section, for the purposes for which such
> lands are, or may be made adaptable, in
> view of such reasonable and beneficial
> uses." (5)

The Water Code redefines the right in identical language.(6)
It also declares all water within the State to be

> "the property of the people of the State,"

subject to the right to use of water by appropriation, and with
full recognition of riparian rights. (7)

> The Supreme Court of California has stated that the object
of the Water Commission Act, later codified in the Water Code, was

> " To provide an orderly method for the
> appropriation of the unappropriated waters
> of the state and, to that end, a state water
> commission was created and was vested with
> certain powers.  We find nothing in the act
> which purported to enlarge the rights of
> riparian owners as such or to curtail the
> rights of appropriators.  On the contrary,
> the language employed in the act shows an
> intention to declare the waters of the
> state to be subject to appropriation in
> so far as that can be done without inter-

-7-

fering with vested rights.  As we read
the exception found in the above-quoted
portion of section 11 of the act, in the
light of all other provisions of this act,
it constitutes no more than an affirmation of
the existing rights of riparian owners in and
to the natural flow and it may not be construed
as enlarging the rights of riparian owners so
as to give them in effect riparian rights in
foreign water as well as in the natural flow."(8)

In this respect, the right does not rise above the limita-
tion imposed by the constitutional amendment of 1928.  The Supreme
Court of California has said:

"  Under this provision, whenever water in a
natural stream or watercourse * * * is not
reasonably required for beneficial use by the
owners of paramount rights, whether the water
is foreign or part of the natural flow, such
owners cannot prevent use of the waters by
other persons, and the water must be regarded
as surplus water subject to appropriation by
those who can beneficially use it." (9)

The water rights of a riparian owner stem from his owner-
ship of the land and are appurtenant to it.  The right of an ap-
propriator depends upon the actual taking of the water. And, in
California law, the term is used

-8-

1595

"to refer to any taking of water for other

than riparian or overlying uses." (10)

Other than the limitation to place the water to beneficial use,

the right of the riparian owner is limited by the rights of other

riparian owners.  As to this, the Supreme Court of California

has said:

" A riparian owner has no right to any

mathematical or specific amount of the

water of a stream as against other like

owners.  He has only a right in common

with the owners to take a proprotional share

from the stream - a correlative right which

he shares reciprocally with the other riparian

owners.  No mathematical rule has been formulated

to determine such a right, for what is a reason-

able amount varies not only with the circumstance

of each case but also varies from year to year

and season to season." (11)

## II

### BENEFICIAL USE, PRESENT AND PROSPECTIVE

In impressing the limitation of beneficial use to the

riparian water rights, California law does not limit the owner to

present use.  To the contrary, giving, in this respect, effect

to the constitutional enactment, it envisages uses to which

lands may not be put at the time, but to which they may be made

"adaptable". (12)

1596

The California Supreme Court, in applying this section, has stressed the prospective reasonable beneficial uses which the law has in mind.  In one of the first leading cases involving the interpretation of the new constitutional amendment, the Court said:

" The new doctrine not only protects the actual reasonable beneficial uses of the riparian but also the prospective reasonable beneficial uses of the riparian. As to such future or prospective reasonable beneficial uses, it is quite obvious that the quantity of water so required for such uses cannot be fixed in amount until the need for such use arises.  Therefore, as to such uses, the trial court, in its findings and judgment, should declare such prospective uses paramount to any right of the appropriator."

" By such declaratory judgment, the rights of the riparian will be fully protected against the appropriative use ripening into a right by prescription, but, until the riparian needs the water, the appropriator may use it, thus, at all times, putting all of the available water to beneficial uses."(Emphasis added) (13)

This feature has been reasserted in later cases. (14) Indeed, these and other cases declare it to be the function of courts, whenever an action is instituted for the determination of water rights, to ascertain the preferential and paramount rights of the riparian owner and to enjoin the assertion of an adverse use which might mature into a prescriptive right. (15)

## III

## NATURE OF BENEFICIAL USE

Ever since the recognition of riparian rights in California, the courts have laid down very broad rules relating to what constitutes beneficial use. Among those which have received recognition are household and domestic needs, (16) irrigation and other agricultural needs,(17) power for mills and factories , (18) and for mining. (19) The early and the leading cases adopt a realistic attitude by holding that many uses which might not have been recognized at common law are proper beneficial uses at the present time. (20) In this respect, the concept has been broadening as the need to have water for diversified uses has gained recognition.(21) While these cases hold that seasonal storage of water is not permitted, they recognize that where, in the development of land and the use of power to carry on the various beneficial activities, it is necessary to store water temporarily, either in its own or in other channels, such incidental storage is permissible.

Illustrative of the realistic approach is a recent case in which the use of riparian water for the purpose of furnishing water to guests at a resort was held within the scope of domestic

-12-

use.  The Court used very broad and significant language:

"  Without question the authorities approve
the use of water for domestic purposes as
first entitled to preference. That use
includes consumption for the sustenance of
human beings, for household conveniences,
and for the care of livestock. The fact
that human beings are occupants of hotels,
apartment houses, auto camps, or resorts,
such as those conducted by the parties to
this action does not necessarily exclude
them from the preferential class.(Frederick
v. Bogner Water Co., 78 L.J. Ch. 40; 21 Mews'
Digest of English Case Law, p. 738.) But it
may well be that the commercial character of
the proprietor's business in serving his guests
may be so extensive that a lower riparian whose
domestic use, whether or not commercialized,
would be prejudiced by the business activities
of the upper riparian and to such an extent as
to require the interposition of a court of
equity to safeguard his rights. This would
especially be true where swimming pools,
ornamental pools, boating, and the like are
furnished as a part of the service to the
guests (see, Wiel, supra, pp. 803-807), which

-12-

uses, in themselves, have been held to
be not domestic. (Bernard Castle Urban
Council v. Wilson, 71 L.J. Ch. 825, 21
Mews' Digest of English Case Law, p. 742.)
<u>The question is whether under all the cir-
cumstances of the case the use of water by
the one is reasonable and consistent with
the corresponding enjoyment of the right
by the other.</u>  (Dumont v. Kellogg (1874)
29 Mich. 420 (18 Am. Rep. 102)  What con-
stitutes reasonable use is, in the first
instance, a question for the trier of
facts." (22) (Emphasis added)

This portion of the opinion is more or less expository.
It is not our intention to draw definite conclusions until we
reach the end. However, while professing that

"the interest of the People of the State
of California in this proceeding is primarily
to preserve and protect the integrity of
State water law",

the brief filed by the State of California joins the corporate
defendants in insisting, with much emphasis, that the use of
water for military purposes is not a riparian use.

Surprisingly, the State of California, in all seriousness,
would limit the right of the Government to the stationing of a
few soldiers to guard the stream and to supplying them with water.

-13-

Indeed, the State's brief uses a term which seems to have been coined for the occasion, "urban service", - as representing the type of service which the Government has established and which the State insists should be supplied in another manner. We quote from the brief:

"Obviously, the stationing of a few soldiers as sentries on the Rancho Santa Margarita, and their being supplied with water from the stream for domestic purposes, would not raise any serious question of reasonableness. On the other hand, when the United States brings on the Ranch many thousand, (50,000 or more) of men, and further sets up housing developments for the families of officers and non-commissioned personnel, and for civilian employees, the resulting effect is that of an urbanized municipal water service. Urban service of this extended character, which under our law has always been carried on under appropriations, not under riparian claims, is so exaggerated, that the question whether it can be deemed reasonable must be given serious consideration."

While the courts have held that furnishing water by a municipality to its inhabitants is not a riparian use, we know of no California case which has limited the number of beings who

-14-

can be supplied with domestic water per acre of ground. We be-
lieve that a military population of 50,000 on 130,000 acres of
ground would not be considered "urban" concentration. We know
of no rule which states that "urban" concentration must be sup-
plied through appropriation when riparian waters are available.
To the contrary, the cases heretofore referred to do not exclude
a military use of the type under consideration.

For, if a riparian owner may develop power for use on
his riparian lands or transport the power elsewhere, if he may
operate a mill or mining establishment, if he may use the water
to satisfy cattle and humans and may use water to satisfy the
needs of paying guests, in hotels located on the premises, cer-
tainly the United States Government could house soldiers on a
huge ranch which it purchased, and use the water for the purpose
of training and housing of military and allied personnel, and
for conducting hospital facilities, and also carry on, either
directly or indirectly, such incidental, temporary agricultural
activities as it does, and of the type which admittedly is being
conducted by the Government at Camp Pendleton.

California has many military establishments. We are quite
certain that if the interpretation of the defendants concurred in
by the State were adopted, and the Government were to announce
that it intends to abandon Camp Pendleton, many persons would
protest the removal from the State of the economic value of 50,000
soldiers and the purchasing power which their maintenance entails.
California is one of the states which sanctions what is known as

-15-

"exploitation funds", - money raised by taxation by counties, which is turned over to various groups, such as the Chamber of Commerce, All-Year Clubs and similar organizations, with the idea of exploiting the availability of California for the establishment of industry and other facilities.

California has competed in the Congress with other states to secure such military establishments. If it had been known that California would insist that a military use of waters is not riparian, I am quite certain that the Congress and the military authorities who have brought to California so many military establishments, might have hesitated to purchase land for military establishments elsewhere than in incorporated areas having an assured water supply.  The State's contention is surprising in view of California's efforts, made over the course of years, and continued to date, to increase its population, and the constant endeavor to diversify the types of establishments which it attracts.  Of course, the State is free to join the corporate defendants in making such assertions.  But to us, it seems a departure from the impartiality which the State claims in this litigation.

What precedes expresses our conclusion that, while the question of reasonableness of the particular use is a question of fact, the contention that a military use is not per se a reasonable riparian use, must be rejected.

-16-

1603

IV

## PRESCRIPTIVE RIGHTS

Ever since the inception of water law in California, the Courts have held that because water is a species of property, title by prescription could be acquired by adverse use for the five-year period prescribed by the California Code for acquiring title by adverse possession. (23)  There has been no deviation from this principle.  Whether the courts are dealing with right to surface or underground water, or whether they are dealing with assertions between appropriators and riparian owners, or one or the other, (24) all that is required is that the ordinary elements of adverse possession be present, - i.e., (1) actual use, (2) open and notorious, (3) hostile and adverse to the original owner's title, (4) continuous and uninterrupted use for a statutory period, and (5) a claim of title. (25)

The most important element is that the taking of the water invades the rights of another.  For this reason, a right
to/water acquired by permission or license from another can
never ripen into a title. (26)  But if the inception of the right be adverse, it may ripen into prescriptive title so far as a riparian owner is concerned, whether it relates to the quantity of water or the non-riparian use. (27)

The bearing of these principles upon the facts, as they are disclosed by the pleadings and the pre-trial order, is this:

1.  Granting that the Government and its predecessor in interest may have put the water to non-riparian use, whether by

-17-

using it in other watershes or not, the Government will have
the right to establish that they and their predecessors have
acquired a prescriptive right to such use.

2.  Under the same principles, Fallbrook cannot
assert any prescriptive rights during the period when it received
water under a revocable license received on July 20, 1932, from
the predecessor in interest of the United States, which was revoked
by the United States on July 31, 1948, and pursuant to which
Fallbrook was permitted to divert, for domestic use only, ten
miners inches of water (1/5 of a cubic foot of water per second
of time).

## V

## APPROPRIATION

Santa Margarits is not a riparian owner. Fall-
brook claims only ownership of a possible 400 acres as riparian.
Fallbrook has used some of the water which it secured under a
revocable license of the United States Government for distri-
bution among its patrons for domestic and agricultural purposes.
Its first appropriation of the law of California is dated
October 11, 1946.  The first application for appropriation by
Santa Margarita was October 4, 1946.

The Supreme Court of California has found that the
normal flow of water in the Santa Margarita River is insufficient
to satisfy the needs of the riparian owners.(28) Leaving aside,
for the moment, the question whether this judgment is binding
as to persons who are not parties to it, we are confronted with
the fact that as of the date of the decision, July 12, 1938,
there is a finding that at normal flow, the Santa Margarita River
does not have enough water to satisfy the needs of riparian owners

This being so, and assuming that Fallbrook and Santa Margarita may appropriate surplus waters under the laws of the State of California, which are not being put to beneficial use by the riparian owners (29), the burden is on Fallbrook and Santa Margarita to prove the existence of such surplus (30). This principle applies whether the dispute is between two appropriators (31), or between an appropriator and a riparian owner who seeks the unused surplus of a riparian owner.(32)

This rule <u>does not</u>, however, relieve the riparian owner of proving the amount of water required for beneficial use. Both facets of this problem have been succinctly stated by the Supreme Court of California:

"This rule, placing the burden on the appropriator who seeks to take water from a particular water field to show that there is a surplus, does not relieve the riparians and appropriators, who are already in the field, from the burden of proving the quantity of water that they have been using, and that such amount is necessary for their reasonable beneficial purposes. The rule throws on the new appropriator the burden of proving the existence of a surplus from which it can extract the quantity it desires from either the surface or subterranean flow without injury to the uses and requirements of those who have

1606

prior rights.  In the present case, while
it is true the burden was on appellant to
prove the existence of a surplus, that
burden did not come into existence until after
the respondent riparians first proved the
amount required by them for reasonable
beneficial purposes."  (33)

VI

THE RIGHTS OF LOWER RIPARIAN OWNERS

All three defendants argue the proposition that a
lower riparian owner cannot, ordinarily, acquire any adverse
rights to the same stream against an upper owner.

Admittedly, this is a correct general statement of the
law of California, although there have been deviations in the
cases. (34)  The Supreme Court of California has stated the
principle, the reasons behind it, and the conditions which
control its application in this language:

"A right can be gained by prescription only
by acts which operate as an invasion of the
rights of the person against whom the right
is sought and which afford a ground of action
by such party against such claimant and it is a
rule of law so well settled by decision in this
and other states as to scarcely need any citation
to support it, that a lower use, since it inter-

-20-

feres in no way with the flow above, constitutes
no invasion of the upper riparian owner's right
and cannot, therefore, afford any basis for a
prescriptive right. * * * In the absence of a
showing that the upper owner is using the water
under a claim of prescriptive right the lower
owner has the right to presume that such owner
is only taking that to which he is entitled as a
riparian owner by virtue of his riparian right.
(Skelly v. Cowell, 37 Cal. App. 215 (173 Pac. 609);
Oliver v. Robnett, ante, p. 51 (210 Pac. 408).)
Such use was not hostile unless there was an
actual clash between the rights of the respective
owners.  While there was sufficient water flowing
down the stream to supply the wants of all parties,
its use by one was not an ivasion of the rights
of the other." (35) (Emphasis added)

It is to be noted that the inference that, ordinarily,
the use of the upper riparian owner is not hostile is based upon
the assumption that  there was an adequate supply of water for all.
This may be overcome by a showing that there was an adverse use,
(a) either because of insufficiency of the water flow, or (2) for
other reasons showing hostile use.  If there is water enough for
all, under the doctrine of correlation, the benefit goes to the
lower riparian owners.  The appropriator cannot benefit by the
situation unless, after the correlative needs of all riparian

1608

owners have been satisfied, there is a surplus capable of appropriation.

So, here, again, the rights of the two corporate defendants depend uponthe existecne of a surplus as to which their right of appropriation could attach.

## VII

### CONTROL, FEDERAL OR STATE

In view of what precedes, the question of control by the United States within the boundary of the ranch which it acquired by purchase and on which it is conducting a military establishment, does not seem of great importance. For if, as we hold, the use of water for a military reservation is a beneficial use, then the question of such use in correlation with the other riparian uses (36) does not concern these defendants.

As to the other large riparian user,-the Vail interest,-the matter is covered by a stipulation which makes the stipulated judgment in the case between the Vails and the Government's predecessor the measure of their rights. Even the right to impound water temporarily (37) as between the Government and the other chief riparian owner is governed by the same stipulation.

This stipulation recognizes, as do the cases just cited, the right to store water temporarily with a view of putting the water to better use for whatever operations may be conducted by the Government. The Government concedes that it gives full recognition to the rights of other riparian owners. Indeed, its brief states:

-22-

1609

" Under this heading let it be emphasized
that the United States of America does not claim
any greater rights than those to which it succeeded
from the Rancho Santa Margarita plus such other
rights as may have accrued by use or prescription.
It does assert, however, that in the administration
of those rights to the use of water - fully recog-
nizing the rights of other riparians and other
claimants and avoiding encroachment upon those
rights - that the State Engineer of the State of
California does not have jurisdiction within the
boundaries of the military establishment in
question."

What the Government is contesting is the possible con-
tention that the cession of exclusive jurisdiction by the State
of California to the United States Government over these and
kindred lands acquired by it does not extend to land not used
for military purposes.  It is accepted law that any act of
cession by a state gives the United States exclusive jurisdiction
regardless of the use to which a portion of the land might be
put.  The contention to the contrary is answered in the very
succinct language of Mr. Justice Brewer:

" It is contended by appellant's counsel that,
within the scope of those decisions, jurisdiction
passed to the general government only over such
portions of the reserve as are actually used for
military purposes, and that the particular part

-23-

of the reserve on which the crime charged
was committed was used solely for farming
purposes.  But in matters of that kind the
courts follow the action of the political
department of the government.  <u>The entire
tract had been legally reserved for military
purposes.</u>   United States v. Stone, 2 Wall.
525, 537.  <u>The character and purposes of its
occupation having been officially and legally
established by that branch of the government
which has control over such matters, it is not
open to the courts, on a question of jurisdiction,
to inquire what may be the actual uses to which
any portion of the reserve is temporarily put.</u>"(38)

(Emphasis added)

This carries into effect the constitutional mandate which gives
the Congress the power to "exercise exclusive legislation" over
such lands within a State as may

"by Cession of particular States, and the
Acceptance of Congress, become the Seat of the
Government of the United States, and to exer-
cise like Authority over all Places purchased
by the Consent of the Legislature of the State
in which the S me shall be, for the Erection
of Forts, Magazines, Arsenals, dock-Yards, and
other needful Buildings; * * *" (39)

--24--

Writing for a unanimous court, half a century after Mr.
Justice Brewer used the language just quoted, Mr. Justice Black
asserted the need for exclusive legislative power as of the
essence of sovereignty:

> "The realty of petitioner has been conveyed to
> and used by the United States for the essential
> governmental activities which authorized the
> exercise of its exclusive legislative juris-
> diction. <u>Exclusive legislative power is in
> essence complete sovereignty.</u>" (40) (Emphasis added)

There has been no deviation from this principle either
in cases which preceded or those which followed the cases just
cited. (41)

The only exception exists in those instances wherein,
either by general law, or by a special cession statute, certain
laws are allowed to co-exist with the federal law, - there being
no inconsistency between the two. (42)

The variety of cases in which these principles have been
applied, ranging from attempts to tax persons within government
reservations, or to collect taxes on goods, down to the fencing
of a railroad right-of-way, which ran through a military enclave,
(43) attest to the rigor with which the courts, except in cases
where rights were specifically reserved, have sustained the norm
that the acquisition of land by the Government for military pur-
poses with the consent, expressed or implied, of a State, gives
the Government <u>exclusive</u> jurisdiction, whether the land is used

1612

for the purpose of the acquisition or not.

Granted that, in certain instances, federal and state legislation might be exercised without conflict, it is inconceivable that, under the demands of national security, the Government should tolerate interference by State water authorities, upon a showing that a portion of the land is used for agricultural purposes. Granted that it is, it is outside the purview of State regulation or control.

## VIII

### CONCLUSIONS

In what precedes, we have discussed the main legal questions involved which, in the opinion of the Court, can be determined in advance of trial.

Supplemental problems are referred to in the notes to the text. Others discussed in the briefs are not touched on at all because they should not, in the opinion of the Court, be decided until a record of all the facts is before the Court. Because the defendants have filed three separate briefs, it has not been easy to ascertain their true position as to all issues. At times, they drew different conclusions from identical principles or authorities.

The following conclusions may, however, be stated in answer to some of the contentions made in this case:

1.  In this case, the Government, by reason of its sovereign status, claims no right to the use of a greater quantity of water than it acquired when it purchased the Rancho Santa Margarita, together with any rights

1613

prescription or use, or both, since its acquisition of Rancho Santa Margarita in 1942.

2.  The riparian rights of the Government acquired through the purchase of the Rancho Santa Margarita are correlative as to other riparian owners, and are to be measured according to the law of the State of California.

3.  The riparian rights of the Government are paramount to those of appropriators like the two corporate defendants, in the sense in which the word "paramount" is used in the water law of the State of California.

4.  The extent of the rights of the Government is to be determined on the basis of the beneficial use to which the water in the Santa Margarita River has been put by the Government or its predecessor, or may in the future be put by the Government.

5.  A military use is a riparian, beneficial use under the law of the State of California.

6.  Prescriptive rights to water may be acquired under California law. Neither the Water Commission Act of 1914 (44), nor the constitutional amendment of 1928 (45), have changed the law in this respect. Such prescriptive rights, being extra-legal, are not dependent for their inception upon application, or their fruition upon any administrative action by the Department of Water Resources of the State of California. (46)

7.  The Department of Water Resources of California has

no jurisdiction over the enclave of the United States
Government in Camp Pendleton.

8.  The United States Government is, however, required
to respect the rights of other riparian owners or ap-
priators who, according to the law of California, may
have acquired rights, permanent or temporary, to any sur-
plus water in the Santa Margarita River.

9.  It will be incumbent upon the Government, at the trial,
to prove the beneficial use of water, and the extent of
such use for present or prospective installations.

10.  If the Government or its predecessor in interest have
put the water of the Santa Margarita River to non-riparian
use, whether by using it in another watershed or not, the
Government will have the burden of proving that such use
was hostile to others and has resulted in a prescriptive
right.

11.  Fallbrook cannot assert any prescriptive rights dur-
ing the period when it received water from the Government
and its predecessor in interest under the revocable permit
dated July 20, 1932, which was terminated on July 31, 1948.

12.  The decree of the Court shall determine the rights
of the Government and the corporate defendants to the
waters of the Santa Margarita River, and apportion the flow.

13.  The decree shall also determine the overlying rights
as to any subterranean waters, as between riparian owners
and appropriators.

14.  The foregoing does not exclude other inferences or

1615

collateral conclusions which may be deduced from the legal

principles declared in this opinion.

15.  Other deductions, dependent on proof of specific

facts, even when the legal principles are not in dispute,

are not to be made until after all the relevant facts

have been presented, and the Court's conclusion thereon

announced.

DATED this _____22nd_____ day of October, 1952.


LEON R. YANKWICH
Chief U.S. District Judge

1616

<u>N O T E S   T O   T E X T</u>

1.    United States v. Fallbrook Public Utilities District, 1951,
      D.C. Cal., 101 F. Supp. 298.

2.    United States v. Fallbrook Public Utilities District, supra,
      pp. 302-305.

3.    Constitution of California, Art. XIV, Sec. 3.

4.    California Water Code, Sec. 100.

5.    Constitution of California, Art. XIV, Sec. 3.

6.    California Water Code, Sec. 101.

7.    California Water Code, Sec. 102.

8.    Bloss v. Rahilly, 1940, 16 Cal. (2) 70, 75-76.

9.    Stevinson Water District v. Roduner, 1950, 36 Cal. (2) 264, 270.

> "If, * * * defendants do not have sufficient
> water for domestic and irrigation purposes,
> there is open to them the same right which any
> other nonriparian owner has to make application
> to the Division of Water Resources for a permit
> to appropriate water, and if that state agency
> finds that water is available, a permit may be
> granted.  (Bloss v. Rahilly, 16 Cal. 2d 70
> (104 P. 2d 1049). )  Of course, before the
> plaintiff could invoke the power of a court
> of equity to restrain the diversion of water
> above its lands, it would be necessary for it
> to show first, that <u>there was a wrongful diversion
> of water above its lands,</u> and second, <u>that the
> amount wrongfully diverted would be rightfully</u>

> used by plaintiff and that the water is being
> used or would be used for reasonable and
> beneficial purposes." (Carlsbad Mutual Water Co.
> v. San Luis Rey Development Co., 1947, 78 Cal.
> App. (2) 900, 914)  (Emphasis added)

10.   City of Pasadena v. City of Alhambra, 1949, 33 Cal.(2) 908, 925.

11.   Prather v. Hoberg, 1944, 24 Cal.(2) 549, 560.  This is but a
recent reiteration of what the courts of California have said
before:

> "  The rights of riparian proprietors on the
> same stream, with respect to each other,
> are mutual and reciprocal.  Neither has a
> right to the whole stream as against the
> rights of the others.  Each is entitled only
> to his reasonable share thereof, considering
> the rights and needs of the others, and such
> rights must be exercised and the use must be
> made only on the parcel to which the rights
> attach." (Parker v. Swett, 1922, 188 Cal. 474, 475)
> (Emphasis added)

In a later case, City of Pasadena v. City of Alhambra, supra,
the same principle is expressed and contrasted with the lack
of such correlation as to appropriators:

> "  As between overlying owners, the rights,
> like those of riparians, are correlative and
> are referred to as belonging to all in common;
> each may use only his reasonable share when water

-N2-

1618

is insufficient to meet the needs of all.
(Katz v. Walkinshaw, 141 Cal. 116 (70 Pac.
663, 74 Pac. 766, 99 Am.St. Rep. 35, 64
L. R.A. 236); see 26 Cal. Jur. 269-273;
cf., 25 Cal. Jur. 1063-1067.)  As between
appropriators, however, <u>the one first in</u>
<u>time is the first in right, and a prior</u>
<u>appropriator is entitled to all the water</u>
<u>he needs, up to the amount that he has taken</u>
<u>in the past,  before a subsequent appropriator</u>
<u>may take any.</u>"  (City of Pasadena v. City
of Alhambra, supra, p. 926)

12.   Constitution of California, Art. XIV, Sec. 3.  And see, Porters
      Bar Dredging Co. v. Beaudry, 1911, 15 Cal. App. 751, 764;
      Carlsbad Mutual Water Co. v.San Luis Rey Development Co., 1947,
      78 Cal. App. (2) 900, 911-912.

13.   Tulare Irrigation District v. Lindsay-Strathmore Irrigation
      District, 1935, 3 Cal. (2) 489, 525.

14.   Meridian, Ltd. v. San Francisco, 1939, 13 Cal. (2) 424, 445.

15.   San Bernardino v. Riverside, 1921, 186 Cal. 7, 19-20; Peabody
      v. City of Vallejo, 1935, 2 Cal. (2) 351, 374.

16.   Half Moon Land Co. v.Cowell, 1916, 173 Cal. 543, 550.

17.   Holmes v. Nay, 1921, 186 Cal. 231; Antioch v.Williams Irrigation
      District, 1922, 188 Cal. 451, 467-468.  The Water Code declares:

-N3-

" It is hereby declared to be the established
policy of this State that the use of water for
domestic purposes is the highest use of water
and that the next highest use is for irrigation."
(California Water Code, Sec. 106)

18. Mentone Irrigation Co. v. Redlands etc. Co., 1909, 155 Cal. 323;
Fall River Valley Irrigation District v. Mt. Shasta Power Corp.,
1927, 202 Cal. 56, 69-70; Seneca Consolidated Gold Mines Co. v.
Great Western Power Co., 1930, 209 Cal. 206, 215-216; Colorado
Power Co. v. Pacific Gas and Electric Co., 1933, 218 Cal. 559,
565.

19. Bear River etc Water and Mining Co. v. New York Mining Co.,
1857, 8 Cal., 327, 332-333.

20. Mentone Irrigation District v. Redlands, 1909, 155 Cal. 323,
327-328.

21. Moore v.Cal.Oregon Power Co., 1943, 22 Cal.(2) 725,730.

22. Prather v. Hoberg, 1944, 24 Cal. (2) 549, 562. Cases such as
Katz v. Walkinshaw, 1903, 141 Cal. 116; Barton v. Riverside,
1909, 155 Cal. 509; San Bernardino v. Riverside, 1921, 186 Cal.
7; Antioch v. Williams Irrigation District, 1922, 188 Cal. 451;
Eden Township Water District v.City of Hayward, 1933, 218 Cal.
634; Lodi v.East Bay Municipal Utility District, 1936, 7 Cal. (2)
316; City of Pasadena v. City of Alhambra, 1949, 33 Cal. (2) 908;
and others which hold that the use of the water of a stream to
supply the inhabitants of a municipality with water for domestic
purposes is not a riparian right, do not help. The military
establishment conducted by the Government is not a municipality,

-N4-

620

even though it may have a population comparable to that of some municipalities. The use to which it is being put is more akin to that of an owner of a large piece of property who establishes habitations, hotels or resorts, and uses the water to supply the needs of the guests, - as was the case in Prather v. Hoberg, supra.  The latter case modified the doctrine declared by the Supreme Court in Cowell v. Armstrong, 1930, 210 Cal. 218, 225, and which seemed to adopt the distinction established by the English cases, especially by Attorney General v. Great Eastern Ry. Co., 23 L.T.(N.S.) 344, affirmed in L.R. 6 Ch. 572, - and by some text writers between natural and artificial uses in the law of riparian rights.  Counsel for Fallbrook not only would adopt the bare distinction to which the California courts alluded, but would make the entire law of the English case the law of California. They cite extensively from the opinions of the various Justices which indicate a narrow limitation of beneficial use to the common law concept.  The trend in modern water law is away from such strict definition.  The water needs of an arid state like California have become so diversified that it would be tragic to confine the use of riparian water to the restricted limits of English common law. It was bad enough for California to adopt the doctrine of riparian rights, so unsuited to the desert country.  It would be catastrophic if, today, after the modification introduced into the doctrine of riparian rights not only by the California constitutional amendment of 1928, but also by the changed attitude of our higher courts, we were to engraft upon the California law of riparian rights the rigid limitations of the common law as to use. This, evidently,

explains why the Supreme Court, - speaking through Mr. Justice
Shenk, who, perhaps, more than any other living member of that
court, is responsible for the more modern approach to the
problem of water rights, - while referring to the distinction
between natural and commercial use, sanctioned a commercial use
which would not have the approval of the English court in the
case referred to.  So Prather v. Hoberg, supra, stands as a
modification of the rigid distinction between natural and
artificial uses which earlier cases may have sanctioned.  The
application of its rationale to the facts in this case so as to
include military use as a beneficial use is commanded not only
by the language which the Court used, but also by the new
approach which the case represents.

23.   California Code of Civil Procedure, Sec. 318; California Civil
      Code, Sec. 1007; Yankee Jim's Union Water Co. v. Crary, 1864
      25 Cal. 504, 509.

24.   Katz v. Walkinshaw, 1903, 141 Cal. 116, 135; California etc Co.
      v. Madera etc Irr. Co., 1914, 167 Cal. 78, 85-86; Northern
      California Power Co. v.Flood, 1921, 186 Cal. 301, 304; Pabst
      v. Finmand, 1922, 190 Cal. 124; Lee v. Pacific Gas & Electric
      Co.,1936, 7 Cal. (2) 114, 120; Albaugh v. Mt. Shasta Power
      Corp., 1937, 9 Cal. (2) 751, 765-766; Moore v.Cal. Oregon Power
      Co., 1943, 22 Cal. (2) 725, 735; Carlsbad etc Co. v.San Luis
      Rey Development Co., 1947, 78 Cal. App. (2) 900, 913; Locke v.
      Yorba Irrigation Co., 1950, 35 Cal.(2) 205, 211; City of
      Pasadena v. City of Alhambra, 1949, 33 Cal. (2) 908, 926-927;

Prescriptive rights are rights of property in California. What
the owner loses by limitation, the adverse possessor acquires
by prescription. California Civil Code, Sec. 1007. Montecito
Valley Water Co. v. Santa Barbara, 1904, 144 Cal. 578, 593; Pabst
v. Finmand, 1922, 190 Cal. 124, 128-129; San Diego v. Cuyamaca Water
Co., 1930, 209 Cal. 105, 132-134. Prescriptive rights to water or
any property are extra-legal. And I am of the view that neither
the Water Commission Act of 1914 (Cal. Stats., 1913, Ch. 586,
Cal. Water Code, Secs. 1000-4360) nor the constitutional amendment
of 1928, could, or did affect the prescriptive rights to water and
the manner of their acquisition. See Note, Waterlaw: Mutually
Prescriptive Interest in Underground Water, 1949, 37 Cal. Law Rev.
713; Edward F. Treadwell, Developing a New Philosophy of Water
Rights, 1950, 38 Cal. Law Rev. 572, 579-580; Russell R. Kletzing,
Prescriptive Water Rights in California, 1951, 39 Cal. Law Rev. 369;
Delger Trowbridge, Prescriptive Water Rights in California: An
Addendum, 1951, 39 Cal. Law Rev. 525.

25. Crain v. Hoefling, 1942, 56 Cal. App. (2) 396, 401-402; Fryer v.
Fryer, 1944, 63 Cal. App. (2) 343, 346-347; Peck v. Howard, 1946
73 Cal. App. (2) 308, 325-326.

26. Thomas v. England, 1886, 71 Cal. 456, 458-460; Abbott v. Pond, 1904
142 Cal. 393, 397-398; Fryer v. Fryer, supra, 346. This is also
the general rule elsewhere. 56 Am. Jur., Waters, Secs. 328-329.

27. Duckworth v. Watsonville etc. Co. 1907, 150 Cal. 520, 531; Logan
v. Guichard, 1911, 159 Cal. 592, 597; Albaugh v. Mt. Shasta Power
Corp., supra, 765-766; Larsen v. Apollonio, 1936, 5 Cal. (2) 440.

28. Rancho Santa Margarita v. Vail, 1938, 11 Cal. (2) 501, 516-517.

29. California Water Code, Secs. 1201, 1240.

30. Lodi v. East Bay Utility Dist. 1936, 7 Cal. (2) 316, 339; Allen v. California Water & Tel. Co., 1946, 29 Cal. (2) 466, 481.

31. Lodi v. East Bay Utility Dist. supra, 339; Peabody v.City of Vallejo, 1935, 2 Cal.(2) 351, 381; Tulare Irrig. Dist. v. Lindsay-Strathmore Dist., 1935, 3 Cal. (2) 489, 535.

32. Allen v. California Water & Tel. Co., 1946, 29 Cal.(2) 466, 481.

33. Tulare Irr.Dist. v. Lindsay-Strathmore Dist., supra, 535.

34. Half Moon Bay Land Co. v.Cowell, 1916, 173 Cal. 543, 549-550; Holmes v. Nay, 1921, 186 Cal. 231, 234; Pyramid Land etc.Co. v. Scott, 1921, 51 Cal. App. 634, 637; Williams v. Costa, 1921, 52 Cal. App. 396, 403-404; Cory v. Smith, 1929, 206 Cal. 508, 511.  For a deviation from this principle, see, Larsen v. Apollonio, 1936, 5 Cal.(2) 440.

35. Pabst v. Finmand, 1922, 190 Cal. 124, 128-129; but see, Oliver v. Robnett, 1922, 190 Cal. 51, 55, in which it is stated:

> "The use of water by an upper riparian owner adverse to the rights of the lower riparian owner only when it con-stitutes such an interference with the rights of the lower owner/would justify an action to restrain such interference."
> as
>                                         (Emphasis added)

36. Carlsbad Mutual Water Co. v. San Luis Rey Development Co., 1947, 78 Cal. App. (2) 900, 911.

37. Seneca Consolidated Gold Mines Co. v. Great Western Power Co., 1930, 209 Cal. 206, 215-217; Moore v.Cal. Oregon Power Co., 1943, 22 Cal. (2) 725, 731-732.

-N8-

1624

38.   Benson v. United States, 1892, 146 U.S. 325, 331.

39.   United States Constitution, Article 1, Sec. 8, Cl. 16.

40.   S.R.A., Inc. v. Minnesota, 1946, 327 U.S. 558, 562. Mr. Jus-
      tice Story was as explicit in 1819.  See, United States v.
      Cornell, 1819, Cases No. 14,867, 14,868, 25 Fed.Cas. pp.
      647, 651, wherein he said:

> "The constitution of the United States de-
> clares that congress shall have power to exer-
> cise 'exclusive legislation' in all 'cases
> whatsoever' over all places purchased by the
> consent of the legislature of the state in
> which the same shall be, for the erection of
> forts, magazines, arsenals, dockyards and other
> needful buildings. When therefore a purchase of
> land for any of these purposes is made by the
> national Government, and the state legislature
> has given its consent to the purchase, the land
> so purchased by the very terms of the constitution
> ipso facto falls within the exclusive legislation
> of congress, and the state jurisdiction is com-
> pletely ousted. This is the necessary result,
> for exclusive jurisdiction is the attendant upon
> exclusive legislation; and the consent of the
> state legislature is by the very terms of the
> constitution, by which all the states are bound,
> and to which all are parties, a virtual surrender
> and cession of its sovereignty over the place."
> (p. 648) (Emphasis added)

1625

41.    Fort Leavensworth R.R. Co. v. Lowe, 1885, 114 U.S. 525, 532,

where the principle is summed up in this pithy sentence:

"When the title is acquired by purchase by
consent of the Legislatures of the States,
the federal jurisdiction is exclusive of all
State authority." (Emphasis added)

See, Ohio v. Thomas, 1899, 173 U.S. 276, 283-284; United
States v. Unzeuta, 1930, 281 U.S. 138, 142; Surplus Trading
Co. v.Cook, 1930, 281 U.S. 647, 652-656; Standard Oil Co. v.
California, 1934, 291 U.S. 242; Pacific Coast Dairy, Inc.
v. Dept. of Agriculture, 1943, 318 U.S. 285, 294-295.  Cases
such as United States v.Fox, 1876, 94 U.S. 315, 320; Reading
Co. v. United States, 1925, 268 U.S· 186, 188; Los Angeles
& Salt Lake R. Co. v. United States, 1944, 9th Cir., 140
F. (2) 436, 437, cert. denied 1944, 322 U.S. 757; United
States v. Williams, 1947, 5th Cir., 164 F. (2) 989, 991;
United States v. Burnison, 1949, 339 U.S. 87, 90; United
States v. Nebo Oil Co., 1951, 5th Cir., 190 F. (2) 1003,
1010, referred to in the briefs, do not teach a different
doctrine. They merely state the general proposition that,
ordinarily, property, especially personal property, acquired
by the Government, retains the characteristics which it had
under State law.

42.    Collins v. Yosemite Park & Curry Co., 1938, 304 U.S. 518,
527-530; Stewart & Co. v.Sadrakula, 1940, 309 U.S. 94,
99-101.                              -N10-

1626

43.     **Anderson v. Chicago & N.W. Ry. Co.**, 1918, 102 Neb. 578,
        168 N.W. 196.

44.     Cal. Stats., 1913, Ch. 586; Cal. Water Code, Secs. 1000-
        4360.

45.     Constitution of California, Art. XIV, Sec. 3.

46.     See cases and authorities cited in Note 24.

1627