IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
~~SOUTHERN~~ DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

Defendants,

THE PEOPLE OF THE STATE OF CALIFORNIA,

Defendants in Intervention.

No. 1247-SD

OPINION ON THE
MERITS AS TO
CERTAIN PARTIES

# FILED

DEC - 9 1952

EDMUND L. SMITH, Clerk

By ~~John A. Childress~~

Deputy Clerk

APPEARANCES:

For the Plaintiff:

RAYMOND deS. SHRYOCK
Commander, U.S. Navy
Attorney for U.S. Navy Department
and
DAVID W. AGNEW
Attorney for U.S. Navy Department
Special Assistant to Attorney
General

For the Defendant Santa
Margarita Mutual Water
Company:

W. B. DENNIS
Fallbrook, California

For ~~Division of Water
Resources of~~ the State
of California:

EDMUND G. BROWN
ATTORNEY GENERAL OF THE STATE
OF CALIFORNIA, by

GEORGE G. GROVER,
Deputy Attorney General of
the State of California

1662   143

YANKWICH, Chief Judge:

This litigation has been the subject of two prior opinions.(1)
The first opinion dealt with the development of the law on riparian
rights in California and the contentions of the parties as disclosed
by the pleadings. The second one dealt with certain questions of
law, which, following a pre-trial order, filed August 25, 1952,
the Government and the defendants Fallbrook Public Utilities District
(to be herein referred to as Fallbrook) and the Santa Margarita
Mutual Water Company (to be referred to as Santa Margarita) and the
State of California, as intervenor, have briefed and requested
the Court's opinion thereon as a means of simplifying the issues
and reducing the time for preparation for trial.

Following the filing of the second opinion and the re-
fusal of the Court to grant a continuance requested by Fallbrook,
it secured an order from the Court of Appeals for the Ninth Cir-
cuit staying the proceedings as to it, until that Court heard an
Order to Show Cause which questioned the right of the writer to
hold the separate trial as to some defendants at Los Angeles in
the Central Division, because the courtroom facilities in the
Southern Division at San Diego were occupied with other trials.
So the writer, with the acquiescence and approval of Santa Margarita
and the State of California, proceeded to try the issues as to this
defendant and intervenor who were not made parties to the proceed-
ing before the Court of Appeals.

Due to the extensive pre-trial order and the cooperation
of counsel, the presentation of testimony and the arguments were
completed in record time. And the writer expresses publicly his

1663

thanks to counsel in the case for demonstrating that even a water case can be tried expeditiously in California, if there is cooperation between Court and counsel.

The prior opinions stated in detail the Court's attitude on the major questions of law involved in this case. So this opinion will deal chiefly with facts.  A fundamental factor adverted to in the second opinion (2) is that the Government of the United States, by reason of its acquisition of lands through purchase, after the institution of condemnation proceedings, and through actual letters of cession (3), insists on absolute control of the lands so acquired against the exercise of any of the police powers of the State. Nonetheless, by stipulation between the Government and the State of California, dated November 29, 1951, and by the Order of this Court, embodied in the pre-trial order, <u>the rights to the use of water which the Government seeks to determine by this lawsuit are to be measured in accordance with the law of California.</u>

And in assaying the facts, <u>the criteria to be used are those applied by the higher courts of California.</u>

I

<u>THE BENEFICIAL TEST USE</u>

One of the difficulties one encounters in a case of this character is that where a State has developed a body of law on a subject, the tendency is to consider it as a whole.  However, the water law of California, so far as it relates to riparian rights, <u>cannot be so considered</u>.  For, as the first opinion on the subject and as the decision of the Supreme Court of the United States

-2-

dealing with the subject indicate (4), the people of California,
in 1928, adopted an amendment to the Constitution of the State
which modified the riparian rights as they had been previously
declared by the courts of California. So when trying a case of
this character, it is important to re-examine and reject every
decision ante-dating 1928 which goes counter to the philosophy
of water rights embodied in the 1928 amendment. The chief
change the amendment brought into the water law of California
consisted of engrafting upon every water right and every mode of
diversion the doctrine of beneficial use.

    In one of the first cases dealing with the effect of
the amendment, the Supreme Court of California summed up its
effect in this language:

    "   The limitations and prohibitions of the
    constitutional amendment now apply to every
    water right and every method of diversion.
    Epitomized, the amendment declares:
    1.  The right to the use of water is limited
    to such water as shall be reasonably required
    for the beneficial use to be served.
    2.  Such right does not extend to the waste
    of water.
    3.  Such right does not extend to unreasonable
    use or unreasonable method of diversion of
    water.
    4.  Riparian rights attach to, but to no more
    than so much of the flow as may be required

1665   112

or used consistently with this section of
the Constitution.

" The foregoing mandates are plain, they are
positive, and admit of no exception. They
apply to the use of all water, under what-
ever right the use may be enjoyed. The
problem is to apply these rules in the vary-
ing circumstances of cases as they arise." (5)

Similar declarations have been made repeatedly since.(6)
And the doctrine has been applied to an underground stream.(7)

Subject to this limitation, the riparian owner is en-
titled to the flow of the stream, as limited by the correlative
rights of other owners.  The riparian owner may acquire prescrip-
tive rights in addition to his riparian rights. (8)

In one of the cases already referred to, the Supreme
Court of California, after analyzing the cases decided since the
1928 amendment, has stated the scope of its limitation on riparian
rights and the rights to surplus and waste waters in this manner:

" In the cases referred to it was established
that by the changes in the law the right to
use the waters of rivers and streams of the
state has been limited to a reasonable bene-
ficial use; that the riparian owner has a
prior and paramount right to this use and if
necessary is entitled to the full natural
flow of the stream or its equivalent undiminished
in quantity and unimpaired in quality. /The

-4-

riparian owner is safeguarded in this right by the constitutional amendment. But the amendment also provides that 'riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section . . . '. This provision clearly means that when the law has guaranteed to the riparian owner the use of the waters of the stream to the full extent to which he may put the same for all present and prospective use-ful and beneficial purposes, and has made available to him the means of protecting the rights so guaranteed, he has received the full measure of benefit and protection to which he is entitled, and can claim no more.

" There are waters in the river and streams of the state to which the riparian right first attaches. The rights of other lawful users on the stream also rightfully attach. In addition there are in many of the rivers and streams of the state great volumes of water which pass on unused to the sea or to an in-land drainage basin. In a real sense this excess water is a great natural resource

-5-

available for the benefit of this and
future generations, as the occasion for
its use may arise.  These excess waters
constitute the public waters of the state to
be used, regulated and controlled by the
state, or under its direction." (9)

In the case involving the former owners of the Ranch
which the Government acquired by purchase, the nature of the
usufructory rights of the riparian owners is stated in this
manner:

"  The riparian does not 'own' the water of
a stream - he 'owns' a usofructory right -
the right of reasonable use of the water
on his riparian land when he needs it.
(Gould v.Eaton, 117 Cal. 539 (49 Pac. 577,
38 L.R.A. 181)  If one riparian has no pre-
sent need for water the others may use it
all.  The lower riparian cannot secure an
injunction against the upper riparian un-
less the upper owner is using an excessive
portion of the waters of the stream result-
ing in actual damage to the lower proprietor.
* * * The same principles apply to underground
waters. * * *  Moreover, it is also well estab-
lished that the underground and surface portions
of the stream constitute one common supply." (10)

Santa Margarita has not diverted any water. So we need
not concern ourselves with the academic problem whether a lower

riparian owner is entitled to enjoin an upper appropriator.(11)
Rather do we direct our attention to the problem of what the
Government by riparian ownership and adverse use has shown itself
to be entitled to under the cases just announced which, summed up,
state the law to be that Santa Margarita as an appropriator is
entitled only to any surplus or waste waters which exist in the
stream. If there is no surplus water, after the Government is
allowed the full measure of its riparian rights to which its
riparian lands can be put, then any diversion by Santa Margarita
under its appropriation would, of necessity, damage the Government.
For it is quite evident from the experience of the failure of the
water system at the ammunition depot and the intrusion of salt
water into some of the wells, that an additional diversion would
harm the Government. And, while it is the rule that the injunctive
process is not used to allay one's fears, the Government is entitled,
at least, to a declaration that diversion would result in injury.

II

THE CHARACTER OF THE SANTA MARGARITA AND ITS BASIN

In the pre-trial order the character of the Santa Margarita
River System and its drainage areas was agreed to, and the following
facts are gathered from it.

A  The Santa Margarita River System and Its Drainage Area

The Santa Margarita is a non-navigable intermittent
stream having a drainage area of 740 square miles, 192 square
miles of which are situated in San Diego County, California, and

-7-

1669

548 square miles in Riverside County, California. The Santa
Margarita watershed is semi-arid.

Temecula Creek and Murrieta Creek have their junction
at the head of Temecula Gorge and there form the Santa Margarita
River.

Rising on the eastern slope of the Coastal Range in
San Diego County, near the present site of the Palomar Observatory,
Temecula Creek proceeds in a northerly and westerly direction a
distance of approximately fourteen miles where it enters the Pauba
Grant of the Vail Estate. After entering the Pauba Grant, it flows
northwesterly through a portion of the grant known as Nigger
Valley, for a distance of a little more than three miles. It
then enters a narrow canyon on the Pauba Grant known as Nigger
Canyon. In a state of nature, Temecula Creek flowed through
Nigger Canyon for a distance of approximately two miles. Situated
across the channel of Temecula Creek at the upper end of Nigger
Canyon on the Pauba Grant, in the Northwest Quarter of the North-
west Quarter, Section 10, Township 8 South, Range 1 West, is the
Vail Dam, creating a reservoir with a capacity of approximately
50,000 acre-feet.

Below the Vail Dam, the Temecula Creek traverses Pauba Grant
for a distance of approximately eleven miles.

Leaving the Pauba Grant of the Vail Estate, Temecula
Creek continues its westerly course across the Little Temecula
Grant of the Vail Estate for a distance of approximately one and
a half miles. That stream then enters the Temecula Grant of the
Vail Estate, flowing a distance of approximately two miles.

-8-

Immediately before leaving the Temecula Grant of the Vail Estate, Temecula Creek has its confluence with Murrietta Creek and below that point is known as the Santa Margarita River.

The Santa Margarita River then enters Temecula Gorge, a narrow canyon through which it flows southerly and westerly for a distance of approximately nine miles. Though Temecula Creek, prior to its junction with Murrietta Creek, flows alternately as a surface and sub-surface stream, the Santa Margarita River throughout Temecula Gorge in the state of nature is a surface stream.

Shortly after leaving Temecula Gorge, the Santa Margarita River enters Camp Joseph H. Pendleton, the Marine Corps Training Base.  It then flows in a generally southwesterly direction through Camp Pendleton - Naval Ammunition Depot - United States Naval Hospital lands for a distance of about twenty-one miles to the Pacific Ocean. For the full twenty-one miles the courseof the river lies entirely within the property of the United States of America.

The Santa Margarita River within the boundaries of the above-mentioned military establishments is an intermittent stream.

B.   Tributaries of the Santa Margarita River

There are several tributaries of the Santa Margarita River from tidewater to its head waters.

De Luz Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate, proceeds in a westerly and southerly direction to its confluence with the Santa Margarita

-9-

1671

River several miles within the boundary lines of Camp Pendleton.

Fallbrook Creek, an intermittent stream, rises east and south of the Santa Margarita River.  Most of its length is within the boundaries of Camp Pendleton and the United States Naval Ammunition Depot and it has its present terminus in Lake O'Neill, an artificial reservoir which lies within the Camp Pendleton area. In the state of nature, Fallbrook Creek flowed into the Santa Margarita River.

Sandia Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate, proceeds in a southerly direction to its confluence with the Santa Margarita River at a point a short distance above the easterly boundary of Camp Pendleton.

Rainbow Creek is an intermitten stream which rises east and south of the main channel of the Santa Margarita River and proceeds in a northerly and westerly direction to its confluence with that river a short distance above Sandia Creek.

Murrieta Creek, an intermittent stream, has its source north of the Temecula Grant of the Vail Estate and traverses the lands of that grant before it joins Temecula Creek to form the Santa Margarita River.  Junction of the streams take place at a point about a half mile east of the westerly boundary of Temecula Grant of the Vail Estate and a short distance east of Temecula Gorge.  It has several tributaries, most important of which is Cottonwood Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate. Santa Gertrudis Creek, a tributary of Murrieta Creek, is an intermitten stream

-10-

rising on the Pauba Grant of the Vail Esate, traversing lands in other ownership before crossing a portion of the Temecula Grant prior to its confluence with Murrieta Creek. Warm Springs Creek, an intermittent stream, rises east of Murrieta Creek and flows into that stream just below the town of Murrieta.

Penjango Creek, an intermittent stream, is tributary to Temecula Creek, rising south of that stream and joining it a short distance upstream from the junction of the stream last mentioned with Murrieta Creek. From its source to confluence Penjango Creek traverses a portion of the Little Temecula Grant, and then flows across the Temecula Grant of the Vail Estate, the property upon which its junction with Temecula Creek takes place.

Other affluents of Temecula Creek are Lancaster Creek and Arroyo Seco, both of which are intermittent in character, flowing only during periods of high precipitation and entering Temecula Creek above Nigger Canyon.

C.  Subterranean Basins Underlying Santa Margarita River.

From its head waters to the Pacific Ocean, the watershed of the Santa Margarita River System is underlaid with numerous subterranean basins. They differ greatly in size and capacity.

Underlying the military establishments in question within the Santa Margarita River watershed are one or more underground basins or segments of basins, commonly known as:

1.  Upper or O'Neill Basin or Segment;

2.  Chappo or Home Ranch Basin or Segment;

3.  Ysidora Basin or Segment.

-11-

Throughout the ground-water basin or basins within the watershed of the Santa Margarita River underlying Camp Pendleton are numerous wells or varying depths in the alluvium.  The surface and sub-surface area and the character and type of the deposits penetrated by the wells, so far as the same are known to the United States of America, have been analyzed.

D.  United States Geological Survey Records.

The United States Geological Survey has maintained and published records of the following principal gauging stations within the watershed of the Santa Margarita River:

| Stream | Station | Period of record |
|---|---|---|
| Santa Margarita River | Ysidora | From February 19, 1923, to date |
| Santa Margarita River | Fallbrook | " November 25, 1924, to date |
| Temecula Creek | Temecula (Railroad) Canyon | " January 30, 1923, to date |
| Temecula Creek | Nigger Canyon | " January 30, 1923, to date |
| Murrieta Creek | Temecula | " October 1, 1930, to date |

In addition, measurements have been taken for diversions at O'Neill Ditch and at other places on the Santa Margarita River System.

E.  Additional Features.

In addition to the facts just referred to, the following additional facts are established by the evidence.

Below the Vail Dam, Temecula Creek traverses a highly porous area where that stream, except during periods of high run-off, disappears into the Temecula Basin.  In a state of nature, Temecula Creek customarily again becomes a surface stream at a distance of about three miles from the present site of the

-12-

Vail Dam.  Presently, however, due to the control of the stream arising from the mentioned dam and the draft upon Temecula Basin by the Vail Estate, Temecula Creek reappears as a surface stream at a great distance from the mouth of Nigger Canyon dependent upon the draft and the period elapsing between releases from Vail Reservoir.

Within Camp Pendleton the Santa Margarita River does not flow as a continuous surface stream, but, during the dry season of the year, the stream customarily and ordinarily sinks into the highly porous ground water basin underlying Camp Pendleton and other military establishments. When that basin has been filled, the Santa Margarita River ordinarily comes to the surface some two or three miles from tidewater.  In a state of nature it continues then to the Pacific Ocean as a stream of diminishing volume.

From its head waters to the Pacific Ocean, the Santa Margarita River passes over and through numerous ground basins. The water in those basins is contained by bedrock or other impervious material.  The basins are filled with alluvial deposits of varying degrees of porosity. The basins differ greatly in size and in capacity. The waters of the Santa Margarita River, in its course through the valley, penetrate and fill the voids of the porous alluvium. When the water of the stream sinks to bedrock or the other impervious material comprising the beds of the basins, in which the detrital material lies, it spreads out laterally filling the basins. When completely charged, the waters of the basins support the surface stream and progress

-13-

slowly downstream through the permeable material.

Ground water basins of the character described underlies Temecula Creek in portions of Oak Grove Valley; and Lancaster Creek in Lancaster Valley.  Temecula Basin, one of the largest in the entire watershed of the Santa Margarita River, is located on the property of the Vail Estate. This large T-shaped alluvial deposit area has the stem of the T along the main channel of Temecula Creek for a distance of approximately eight miles, varying in width from two-thirds of a mile to a mile and a half. That area of the Temecula Basin immediately below the present site of Vail Dam is comprised of coarse, highly porous material and is known as the "out wash".  Into that "out wash", except in periods of extremely heavy precitipitation, Temecula Creek sinks. About three miles below the "out wash", the Temecula Basin becomes an artesian area from which Temecula Creek again emerges as a surface stream.

The right arm of the T-shaped alluvial basin extends northward underlying Murrieta Creek for a short distance above that stream's confluence with Temecula Creek. The left arm of the T-shaped Temecula alluvial basin extends southward beneath Penjango Creek.

Underlying Murrieta Creek and separated from the Temecula Basin is another large alluvial basin known as the Murrieta Basin. That is comprised of valley-fill similar to that found in the other basins.

Due to the existence of granitic rock immediately underlying the stream from approximately the point of confluence

-14-

of Temecula Creek with Murrieta Creek to the mouth of the
Temecula Gorge, the Santa Margarita River in the state of
nature is a surface stream.  That granitic underlay of the
stream continues from the point mentioned across the boundary
of Camp Pendleton to a point approximately one and one-half
miles below the confluence of DeLuz Creek with the Santa Mar-
garita River.  At that point the stream opens out into a rather
broad alluvial flood plain.  That alluvial area extends from
the point last mentioned to tidewater, constituting a large
ground-water basin. That ground-water basin is comprised of
a relatively coarse and loose porous valley-fill at the  upstream
end comparable to the "out wash" area of the Temecula Basin
above described.  Approaching the ocean the character of the
alluvium becomes increasingly fine and tight.

The alluvial ground-water basin underlying the Santa
Margarita River within Camp Pendleton and the other military
establishments is geologically and hydrologically interconnected,
comprised, however, of three separate segments which lend them-
selves readily to arbitrary subdivisions.  Their designation
as three separate components already appears.

<h2 style="text-align:center">III</h2>

<h3 style="text-align:center">THE MILITARY ESTABLISHMENT</h3>

A brief description of the military establishments
may be given. This, also, is taken from the Agreed Facts in
the Pre-trial Order.

**A.  Camp Joseph H. Pendleton.**

It is the function of Camp Joseph H. Pendleton to pro-

-15-

1577

vide housing and training facilities for units of the Armed
Forces, to conduct training of units of the Armed Forces in am-
phibious warfare and experimental work with landing craft,
landing vehicles, tracked and affiliated equipment and the
development thereof;  to conduct combat training of the various
units of the United States Marine Corps, including airground
support coordination, and use of artillery, tanks and other
equipment used in the conduct of modern amphibious and land
warfare.  In addition to the aforementioned activities, it is
the function of Camp Pendleton to provide logistic support for
units of the United States Marine Corps together with material
maintenance and storage facilities, for supplies and equipment
and to house and train replacements for subsequent assignment
to various operating units of the United States Marine Corps.

B.   United States Naval Hospital.

The United States Naval Hospital, with a capacity of
approximately 1550 beds, established at Camp Joseph H. Pendle-
ton, provides medical and hospital services to personnel of
the Armed Forces, their dependents and other authorized personnel
at 83 Naval shore activities located in the Southern California
area and provides medical and hospital care to personnel of
units of the United States Fleet.

C.   United States Naval Ammunition Depot.

The United States Naval Ammunition Depot, Fallbrook,
California, provides facilities for the storage, segregation,
reconditioning and issuing of ammunition for operating units
of the United States Fleet and the United States Marine Corps
and maintains ammunition stocks for shore establishments of the

United States Navy located in the Southern California area.
In addition, this Naval Ammunition Depot stores and ships
ammunition for use by combat elements of the United States
Navy and the United States Marine Corps.

The Santa Margarita River, in its course, traverses
virtually the length of Camp Pendleton - Naval Ammunition Depot-
United States Naval Hospital lands from east to west for a
distance of approximately 21 miles. There are no users below
Camp Pendleton on the Santa Margarita River for the United
States of America owns the lands on both banks of that stream
from the point where the Santa Margarita River enters upon the
military establishments just mentioned to the point of con-
fluence of the river with the Pacific Ocean, except for the
easement for right of way which the Atchison, Topeka and Santa
Fe Railroad owns.

VI

PRESENT AND PROSPECTIVE WATER NEEDS

This brings us to a consideration of the water supply of
the Santa Margarita River. Excepting a small riparian acreage
owned by Fallbrook, the two chief riparian owners on the Santa
Margarita River are the Vails and the Government. As between
them, the measure of their rights is the stipulated judgment
dated December 27, 1940, as agreed to by stipulation entered
into in this case July 8, 1952.

The court in the case between the Government's pre-
decessor in interest and the Vails (12) has stated that the nor-
mal flow of the river is not sufficient to supply the full needs

-17-

of the riparians. As the rights between riparians are correlative, the stipulated judgment determines the division of the water between them.  And if, after such division of water, there is no surplus, the appropriators, whether they are bound by the judgment or not, (13) simply have nothing to appropriate.

The evidence shows that the Vails claimed more water than the stipulated judgment gave them.  In this respect, the case follows the usual pattern in judgments of this character where the court, finding that the supply is inadequate, makes a division which curtails each side to some extent. Here, the parties, after the first judgment was reversed, agreed on the division. So the Government's predecessor in interest benefitted by the stipulated judgment, and the Government will continue to benefit as the expanding needs of the Vails unfold.

The acquisition of the lands by the Government was through two condemnation proceedings.  The first acquisition in point of time was a tract of land consisting of 9147.55 acres. The decree on the declaration of taking was entered in the Southern Division of this court on January 21, 1942. This land is the place upon which the Ammunition Depot is located. The next acquisition was 122,202.72 acres.  The decree in that case was dated December 31, 1942.

A small parcel of 1676.58 acres was acquired in another proceeding by a decree dated December 23, 1943.  Another parcel of 1574.61 acres, which was in the public domain, was transferred to the Navy on August 8, 1945. A small parcel consisting of 112.11 acres located in Orange County was acquired by deed

-18-

dated February 8, 1949.

The Santa Margarita River flows through the large parcel. The river enters the area at the northeasterly corner of Camp Pendleton, and from there it meets the boundary of the Naval Ammunition Depot to the south and forms the boundary of the Naval Ammunition property and Camp PEndleton property and continues to flow in a southwesterly direction along the boundary of the Naval Ammunition Depot into Camp Pendleton and from there on through the Camp into the Pacific Ocean. From the point at which it leaves the boundary of the Naval Ammunition Depot, the lands embrace the river on each bank until it reaches the ocean. The stipulated judgment states, as does the pre-trial order, that for the full twenty-one miles the course of the river lies entirely within the property of the United States of America.

This land is subject to an easement to a 100-foot right of way granted by the Government's predecessor to the Santa Fe Railroad which does not affect the riparian rights of the Government.

Of this acreage, some 37,882.2 acres lie in the watershed of the Santa Margarita River and are riparian to the river, i.e., they are contiguous to the stream and have not been separated by separation of interest or change of ownership of lands lying between or upstream from the thread of the stream.(14)

Of the Government's riparian acreage in the watershed, 18,648.3 acres can be irrigated profitably according to the standards recognized by the Soil Conservation Service of the United States Department of Agriculture. The riparian acreage

of the Vails is 40,575, of which 29,410 acres can be profitably
irrigated.  These lands are within the watershed of the stream
and drain into it.  They have access to the stream and constitute
one continuous piece, no part of which has ever been severed from
its riparian rights.

At the present time, the Vails have only 4500 acres
under irrigation, but their engineers are working on plans for
the development of the irrigation system.  On the basis of an
irrigable acreage of 29,410, it was the opinion of the expert,
H. M. Hall, who had worked for the Vails over a long period of
years, that the duty of water of the Vail lands would be

"79,514 acre-feet which could be profitably
applied to the irrigable land on the ranch
if that much water were available."

On the same basis, the same and other Government experts com-
puted that the 18,648.3 acres of irrigable land of the Govern-
ment in the watershed would call for a duty of water of 69,237
acre-feet of water per year.  In this we agree.

Under California law, subject to the correlative
rights of other riparians, the rights of the riparian owner
are paramount as to the water he puts to actual reasonable
beneficial use, but his rights against appropriators are para-
mount also as to his prospective reasonable beneficial use.
The latter envisages future uses to which the lands may be
adapted.  (15)  While a court might make a declaration as to such
maximum use, until there has been actual use, any water which
remains above the present actual use may temporarily be sub-

-20-

ject to appropriation. So it becomes important to determine the present actual use of water by the Government in its military establishment.

In so doing, we repeat that a military use being considered a substitute use, the Government is entitled to the maximum actual use being made at the present time. In determining the amount, the Government would be entitled to the equivalent for present military use of the maximum potential future agricultural use. And assuming, as it has been stated, that when the maximum population of the military establishment reaches 105,000, the Government might need 20,500 or more acre-feet per year, this would still be less than the maximum potential of its irrigable lands, and as to that quantity of water, its rights are paramount, although the unused portion may, in the meantime, be subject to appropriation if it can be captured and impounded.

Nevertheless, as of today, the Government is only entitled to the undisturbed flow of the water which it can use for the present population of its military establishments.

V

THE GOVERNMENT'S USE

We consider the evidence in the record relating to the extent of the basic water supply and the use of the water by the military establishment at Camp PEndleton.

A.  "Normal" Flow.

Attention has been called to the fact that the Supreme Court in the litigation between the Government's predecessor

1883

in inaerest and the Vails had stated that the normal flow of
the river is not adequate for the two main riparian owners.

I think the word "normal", in cases of this character,
is used in its dictionary sense implying the usual, the ordinary,
as distinguished from the extraordinary. (16) It is defined in
the dictionary as

> "The ordinary, usual condition, degree,
> quantity or the like; average, mean." (17)

When you are dealing with elements which operate
periodically, normality implies an average over a particular
number of years.  Thus, the dictionary defines "normal" from a
"meteorological" point of view in this manner:

> "Of a meteorologicalelement average over
> many years at a particular place and for a
> definite time, a certain day or some other
> specified period." (18)

The legal definitions accord with these. (19)  Thus, where the
court had before it a contract which related to the "normal
high water line", it held that the word was used in the dictionary
sense as meaning the normal or average height the water reached
at the highest stage during the year.  The Court said:

> "The use of the word normal may not be ig-
> nored and applying it to the word 'high',
> we must conclude the contract did not mean
> the highest level to which water naturally
> raised prior to 1924, for a sufficient length
> of time to make a mark, but the normal or

-22-

average height the water reached at
the highest stages during the years.
The evidence merely as to the highest
line the water may have reached, did
not thus establish the 'normal high
line.' " (20)

This accords with the ordinary speech habits of men,
and also with the pattern in arid states.  When we speak of
"normal" rainfall, we speak of the average usual rainfall
established by meteorological data over a course of years.
In actual practice  we all know that, at times, the normal is
not reached for a period of years, and, on the contrary, periodic-
ally, we have high precipitation. And as we are dealing with a
stream in a dry country, and a channel through which the flow
varies from dry years to flood years, and varies greatly
during what is known as the rainy season from the normally dry
season, it must be quite evident that when the court spoke of
normal flow, it referred to the ordinary flow in the channel
over a period of years, considering the fact that the Santa
Margarita River is a flash flood stream, without a control
structure.

B.   The Water Used.

Accurate measurements exist to show the actual use
of water by the Government's establishment from the year 1943
to date. The yearly use is shown in the following chart:

-23-

"QUANTITIES OF WATER FROM
THE SANTA MARGARITA RIVER HISTORICALLY
UTILIZED BOTH WITHIN AND WITHOUT
THE WATERSHED BY THE UNITED
STATES OF AMERICA

| Year | Within Ac. Ft. | Without Ac. Ft. | Total Ac. Ft. |
|------|------|------|------|
| 1943 | 5389 | 1591 | 6,980 |
| 1944 | 5298 | 1785 | 7,083 |
| 1945 | 6396 | 4332 | 10,728 |
| 1946 | 6160 | 3729 | 9,889 |
| 1947 | 6374 | 4350 | 10,724 |
| 1948 | 6894 | 4417 | 11,311 |
| 1949 | 6637 | 5008 | 11,645 |
| 1950 | 6407 | 4402 | 10,809 |
| 1951 | 6275 | 3983 | 10,258 |

This gives an average per year of 9,934 acre-feet. The needed
average, on a present-day basis, is 11,000 acre-feet per year.

The testimony in the record warrants the conclusion
that the use is reasonable; that, in fact, it is, in some
respects, below what military authorities believe to be the
actual needs of the three military establishments. One of the
witnesses, a high ranking Marine Officer, testified that, in
his opinion, the equipment and machinery at Pendleton is
"filthy", because of lack of adequate water supply. It is a
fair inference that the average use of military personnel in
an establishment of this character should be at least 150
gallons per man per day. This minimum is not used, and the
average at Pendleton is lower than the experts have declared

-24-

to be reasonable for well-built suburban areas.

We are satisfied that the military authorities have husbanded the water resources well.  They have limited strictly the use of water on their agricultural land.  They have treated sewage and the affluent from the sewage treatments has been discharged into a lake where, after its being temporarily used for recreational purposes, it is released into the river basin in order to recharge it and thus increase the underground supply. No water is taken by the Government from the stream itself. All the water is from underground pumping through various wells located in the area. Of the water used by the Government, some has historically been used on irrigated lands lying outside the watershed.  The maximum demand upon the Santa Margarita River which the Government is asserting as to them is indicated by the following table:

| LOCATION | AREAS (ACRES) | WATER DUTY (Ac. Ft./Yr.) |
|---|---|---|
| Stuart Mesa | 964.0 | 3770.0 |
| South Coast Mesa | 259.0 | 1036.0 |
| Total | 1223.0 | 4806.0 |

The pre-trial opinion discussed fully the question of acquisition of prescriptive rights by a non-riparian diversion such as one outside the watershed. We refer in the margin to some of the most recent assertions of this doctrine. (21)

The undisputed record is that the use of water outside the basin began in 1938 by the Government's predecessor in interest, after a finding in the case which later resulted

in a stipulated judgment, (22) that there was not water enough
at normal flow to satisfy both riparian owners. In the circum-
stances, it matters not whether the use is by the lower
riparian owner or an upper riparian owner. For the lower
riparian owner, having put some of the water to non-riparian
use, he has put the water to a hostile use against anyone,
including appropriators who might have been entitled to it
as surplus water. (23)

C. The Water Available.

    The geological and hydrographic description of the
Santa Margarita River and the basin has already been given.
And reference has also been made to geological and other data
available in Government and other official publications.
Having set forth the use of water and the possible use by the
two chief riparian owners, it becomes necessary to consider
the supply available.

    The Government's experts have presented charts and
computations showing the water available in the basin from
1923 to 1952. In referring to quantitites, the measure used
is acre-feet. And an acre foot is defined by water and soil
experts as that amount of water which would cover one acre-
one foot deep. The amount is 43,560 cubic feet per second, or
second feet or 326,000 gallons. A cubic foot per second is
a cubic foot each second. That amounts to a flow of two
acre-feet in a twenty-four hour period. The acre-foot is
volume, and the second foot is rate.

    In attempting to reconstruct the flow of the stream,

-26-

the Government experts have measured diversion through pumping and surface diversion.  This for the reason that a subterranean basin as well defined as this basin is a part of a stream and an integral part of the water supply.  The exhibits which embody the conclusion are rather lengthy.  But a summary of them may be given by paraphrasing the language of one of the Government's experts, Paul F. Henderson.

In the first year, 1924-1925, the month of June shows that the reconstructed stream flow was approximately 1,000 acre-feet.

In the water-supply year 1925-1926, there was a fairly large flow occurring during the month of April, the reconstructed flow being approximately 14,500 acre-feet.

The next year 1926-1927 was one of the very heavy run-off years. The flood occurred in February, the total reconstructed flow being 81,700 acre-feet.

The years 1927-1928, 1928-1929, 1929-1930, 1930-1931 are all what might be termed minimum flow years with the average monthly flows in the river varying between 1,000 and 2,500 acre-feet per month.

In 1931-1932, in the month of February a small flood occurred with the reconstructed flow amounting to 31,680 acre-feet.

The years 1932-1933, 1933-1934, 1934-1935 were again low run-off years.

For the year 1935-1936, the reconstructed run-off for would be approximately 7,500 acre-feet.

-27-

On of the largest run-off years occurred in 1936-1937, with a reconstructed flow of 56,030 acre-feet in February and 36,000 acre-feet in March.

This was followed by one of the largest single month run-offs, which occurred in March of the water supply year of 1937-1938, with a recorded or reconstructed flow of 106,400 acre-feet.

The years 1938-1939 and 1939-1940 had comparatively low flood flows in February.

The 1940-1941 year was another year of heavy flood flows. It showed a reconstructed flow of 53,570 acre-feet in March and 37,750 acre-feet in April.

The year 1941-1942 was a low flow. There was another full water supply year in 1942-1943, with floods occurring in the month of January, fairly heavy flow in February, and another heavy flow in March.

The drought period then became progressively worse with average flows during the year running from 1,000 to 1500 acre-feet.

From this study of the recorded diversions for a period of twenty-eight years, the conclusion is reached that

"the safe annual water supply at Camp Pendleton from the Santa Margarita River, with full usage of the subterranean basin, is 12,500 acre-feet annually."

Even that figure could not be safely relied upon without the construction of a small equalizing reservoir at the DeLuz site.

-28-

Such reservoir would not be used for storage, but would be installed to spread the flood flows out for such a period of time as the water could be introduced into the subterranean basin underlying the Camp Pendleton site.

During the period of extreme flow, there would be considerable spill from an equalizing reservoir allowing the water to spread out over the pumping area.

There is no such structure on the basin at the present time. The only dam structure is the Vail dam. The stipulated judgment between the Vails and the Government's predecessor in interest insures a minimum quantity of three second feet at the Temecula Gorge, which, flowing for twenty-four hours, would amount to six acre-feet per day. It was the opinion of the expert that, but for the requirement for this minimum flow at Temecula Gorge, very little, if any, water would reach Camp Pendleton during the summer season, with the exception of the heavy flood flows.

In order to prevent damage to the basin through intrusion of sea water, it is necessary to maintain a fresh-water barrier at the lower end of the pumping basin, which is estimated as 8000 acre-feet.

A glaring fact which stands out in the history of the water supply in this basin is that, at high flood time, large quantitites of water run off in a very short period of time. Thus, in the year 1926-1927, of the 81,600 acre-feet for the month of February, 67,000 went through in one day. This type of flood occurred during the measured period some six or seven

times.  Thus, in 1932 and 1933, of the total run-off of 40,600
acre-feet, 31,200 was in the month of February.  And of this
amount, 12,000 acre-feet in one day, - February 16th. In
1936 and 1937, there was a run-off of 117,200 acre-feet,  of which
92,000 ran off in two months, February and March.  On February
7th, 22,000 ran off in one day.  Of the 36,000 feet in March
of that year, 10,000 occurred in one day, --March 16th.  The
water year of 1942-1943 showed a run-off of 74,270 acre-feet of
which there were 32,700 acre-feet in January, with 19,000 acre-
feet in one day, - January 23rd.

These facts are very significant. For the defendant's
water expert has included these extraordinary run-offs in order
to formulate the indefensible conclusion that they can be con-
sidered a part of the "normal" flow so as to show a greater water
supply than testified to by the experts of the Government.
This expert, Mr. Harold Conkling, by including the uncontrolled
flood waters and making them a part of the available supply,
and by postulating two reservoirs not yet built, in addition
to the Vail reservoir, and by assuming their existence and
function over the entire twenty-eight year period, reached the
conclusion that, after deducting all the diversions of the
riparians, there would have been brought up in the underground
a surplus of some 9620 acre-feet.

In summing up this conclusion, the expert makes the
following observations in one of his exhibits:

"This is the discharge into the ocean that
would occur in a period of average precipi-
tation with Camp Pendleton using water as in

-30-

1692

1952 and after Vail and Fallbrook Reservoirs
were fully operating.

"a.  This diversion assumes Fallbrook Reservoir
retains all water arriving at any time of year
up to its capacity so that the only water pass-
ing are the spills when the supply exceeds
capacity.  If, however, the summer flows which
would surely percolate in the Pendleton basins
if not dissipated enroute were padded through
the Fallbrook Reservoir, the average annual
diversion would be about 10,500 acre-feet in-
stead of 12,460 and safe yield of Fallbrook
Reservoir would be about 7000 acre-feet in-
stead of 10,000.  Discharge past Ysidora would
be about 2000 acre-feet more, giving an annual
average of about 11,600 instead of 9620.

"b.  Diversion minus sewage return to basins."

I believe the conclusion is fanciful.  It postulates
the possibility that the court under its power to indicate an
alternative solution could order the riparians to spend millions
of dollars in constructing dams.  There is no warrant in law
for such action.  The value of the opinion is further vitiated
by the fact that the construction of these dams would not, of
themselves, assure an increase in present water supply.  They
are a water expert's speculations as to what might have happened
if, during a period of twenty-eight years, the flood waters had
been stored and been used to replenish the underground.  But as

-31-

both Santa Margarita and the State contend that both cyclical and seasonal storage of riparian water is illegal (24), this clearly represents a case of wishful thinking. For the court, in seeking another solution of the problem, cannot suggest a solution which is impossible because incompatible with the water law of the State, <u>which we are bound to apply</u>. The Government's experts have rejected as impractical a dam of the type envisaged by Mr. Conkling.  The only type of dam or reservoir that they consider feasible on this stream which would assure a more uniform supply is an equalizing reservoir that would not be used for storage but merely for the purpose of spreading the flood flows out for such period of time as the water could be introduced into the subterranean basin underlying the Camp Pendleton area.  In this we agree.  And, assuming that appropriators might construct such dam, we should not jeopard the rights of the riparians in the vain hope that a generous appropriator might, after many years, achieve an adequate supply from an unnamed source.

Judgment and declaration quieting the title of the Government will be entered, in accordance with the views here expressed and the order embodying specific findings filed with this opinion.

Dated this __9th__ day of ___December___, 19_52_.

_____

Chief U. S. District Judge

1694

# N O T E S   T O   T E X T

1. United States v. Fallbrook Public Utility District, et al., 1951
   D.C. Cal., 101 F. Supp. 298; United States v. Fallbrook Public
   Utility District, et al., 1952, D.C. Cal., 107 F. Supp. _____

2. United States v. Fallbrook Public Utility District, et al.,
   1952, D.C. Cal., 107 F. Supp. _____, Part VII.

3. United States Constitution, Art. I, Sec. 8, Cl. 17.

4. United States v. Gerlach Live Stock Co., 1950, 339 U.S. 725.

5. Peabody v. City of Vallejo, 1935, 2 C(2) 351, 367-368.

6. Gin S. Chow v. City of Santa Barbara, 1933, 217 C. 673, 699-704;
   Tulare Irrig. Dist. v. Lindsay-Strathmore Irrig. Dist., 1935,
   3 C(2) 489, 525; City of Lodi v. East Bay Mun. Utility Dist., 1936,
   7 C(2) 316, 338-339; Carlsbad Mut. Water Co. v. San Luis Rey
   Dev. Co., 1947, 78 C.A.(2) 900, 911; Stevinson Water Dist. v.
   Roduner, 1950, 36 C(2) 264, 270.

7. Meridian, Ltd. v. City of San Francisco, 1939, 13 C(2) 424, 445;
   Rancho Santa Margarita v. Vail, 1938, 11 C(2) 501, 555; City
   of Pasadena v. City of Alhambra, 1949, 33 C(2) 908, 926-927.

8. Tulare Irrig. Dist. v. Lindsay-Strathmore Irrig. Dist., 1935,
   3 C(2) 489, 565; Meridian, Ltd. v. City of San Francisco, 1939,
   13 C(2) 424, 445; Dykzeul v. Mansur, 1944, 65 C.A.(2) 503, 507;
   Larsen v. Apollonio, 1936, 5 C(2) 440, 444; City of Pasadena v.
   City of Alhambra, 1949, 33 C(2) 908, 926-927.

9.   Meridian, Ltd. v. City of San Francisco, 1939, 13 C(2) 424, 445.

10.  Rancho Santa Margarita v. Vail, 1938, 11 C(2) 501, 555.

11.  See, Oliver v. Robnett, 1922, 190 C. 51, 55; Carlsbad Mut. Water
     Co. v. San Luis Rey Dev. Co., 1947, 78 C(2) 900, 914.

12.  Rancho Santa Margarita v. Vail, supra, pp. 534, 556.

13.  Los Angeles v. Hunter, 1909, 156 C. 603; City of Los Angeles v.
     City of Glendale, 1943, 23 C(2) 68, 80.

14.  Constitution of California, Art. XIV, Sec. 3; California Water
     Code, Sec. 101; Carlsbad Mutual Water Co. v. San Luis Rey Dev.
     Co., 1947, 78 C.A.(2) 900, 911.

15.  The extent of lands having riparian status is determined by three
     criteria:

          "1.  The land in question must be contiguous to or
          about on the stream, except in certain cases not now
          involved.  The length of frontage is an immaterial factor.
          Thus in Joerger v. Mt. Shasta Power Corp., 214 Cal. 630
          (7 Pac. (2d) 706), a 40-acre tract with but a 250-foot
          contact with the stream. * * * *  (See, also, Omnes v.
          Crawford, 202 Cal. 766, 767 (262 Pac. 722).)  Clearly
          under these cases, and others that could be cited, it
          is access to the stream, and not whether all surface
          drainage from the area in question drains directly into
          the stream at the point of access, that determines the
          riparian status of the land. These cases clearly refute

the so-called 'surface drainage theory'. * * * *

2.  The riparian right extends only to the smallest tract held under one title in the chain of title leading to the present owner. (Boehmer v. Big Rock Irr. Dist., 117 Cal. 19 (48 Pac. 908). ) * * * *

3.  The land, in order to be riparian, must be within the watershed of the stream. (Anaheim Union Water Co. v. Fuller, 150 Cal. 327 (88 Pac. 978, 11 L.R.A. (N.S.) 1062 ). ) "   (Rancho Santa Margarita v. Vail, supra, pp. 528-529)(Emphasis added)

16.  Rancho Santa Margarita v. Vail, supra, p. 534, 556-568; Gin S. Chow v. City of Santa Barbara, 1939, 217 C. 673, 683-686.

17.  Webster's New International Dictionary, 2 Ed., 1937, p. 1664.

18.  Webster's New International Dictionary, 2 Ed., 1937, p. 1665.

19.  See, Restatement, Torts, Sec. 302d, 443b; Sterling Cider Co., Inc. v. Hassett, 1943, 1 Cir., 133 F(2) 590, 591-592.

20.  Payette Lakes Protective Ass'n. v. Lake Reservoir Co., 1948, 68 Ida. 111, 125, 189 P(2) 1009, 1017.  See, Hilbert v. City of Vallejo, 1927, 19 F(2) 510, 511-512.

21.  Larsen v. Apollonio, 1936, 5 C(2) 440; Crane v. Hoefling, 1942, 56 C.A.(2) 396, 402; Moore v.Calif.-Oregon Power Co., 1943, 22 C(2) 725, 734; Dykzeul v. Mansur, 1944, 65 C.A.(2) 503, 507; Orchard v. Cecil F. White Ranches, Inc., 1950, 97 C.A.(2) 35, 43-44.

22.  Rancho Santa Margarita v. Vail, supra, Note 15.

23.  Larsen v. Apollonio, 1936, 5 C(2) 440.

24.  See, Part III of Pre-trial Opinion in United States v. Fallbrook
     Public Utility District, 1952, D.C.Cal., 107 F. Supp._____.

1698