DAVID W. AGNEW
Special Assistant to the
Attorney General

RAYMOND deS. SHRYOCK
Attorney for the Department
of the Navy
Room 411-A, Fox Theater Building
720 "B" Street
San Diego, California

LODGED

FEB 10 1953
3:40 P.M.
EDMUND L. SMITH, Clerk
By John A. Childress
Deputy Clerk

FILED

FEB 24 1953
EDMUND L. SMITH, Clerk
By Simmons
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE SOUTHERN DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff

      v.

FALLBROOK PUBLIC UTILITY DISTRICT,
  et al.,

          Defendants,

THE PEOPLE OF THE STATE OF CALIFORNIA,

    Defendant in Intervention.

No. 1247-SD

FINDINGS OF FACT

CONCLUSIONS OF LAW

- 1 -

1913

1  This court having jurisdiction over the above proceedings and

2  the parties thereto, and the cause having come on to be tried as

3  to the defendant Santa Margarita Mutual Water Company, and the

4  defendant in intervention the State of California, having been

5  argued and submitted, and the Court having filed its opinion and

6  its order, both dated December 9, 1952, now makes the following:

7                          FINDINGS OF FACT

8      I.  Title to Lands Involved in Controversy

9          A.  Title to Parcels

10  1.  The United States of America, in condemnation proceedings,

11  acquired fee simple title to a tract of land of 9,147.55 acres in

12  San Diego County, California, by a declaration of taking, and

13  decree entered thereon, filed January 21, 1942, in this Court.  1

14  2.  This tract of land is that portion of the military reservation

15  sometimes referred to as the "U. S. Naval Ammunition Depot" and

16  "Fallbrook Naval Reservation". 2

17  3.  The United States of America, in condemnation proceedings,

18  acquired fee simple title to a tract of land of 122,202.72 acres

19  in San Diego County, California, by a declaration of taking, and

20  decree entered thereon, filed December 31, 1942, in this Court. 3

21  4.  This tract, which is the main portion of the Camp Pendleton

22  Marine Corps Training Base, includes the site of the U. S. Naval

23  Hospital, Oceanside, California. 4

24  5.  The United States of America, in condemnation proceedings,

25  acquired fee simple title to a tract of land of 1,676.58 acres in

26  San Diego County, California, by a declaration of taking, and decree

27  entered thereon, filed December 23, 1943. 5

28  ───────────────────────────────────────────────

29      1.  Exh. 15

30      2.  Exh. 22 (Fallbrook sheet) and Exh. A.

31      3.  Exh. 16

32      4.  Exh. 22 (Fallbrook sheet) and Exh. A.

        5.  Exh. 17

1914

1.   GPO O - 878953

6.  The United States of America, by intragovernmental transfer of land in the public domain, included in the Camp Pendleton military reservation a tract of land of 1,574.61 acres in San Diego County, California, by Public Land Order No. 293 dated August 8, 1945. [6]

7.  The United States of America likewise acquired fee simple title to a tract of land of 112.11 acres in Orange County, California, contiguous to the above lands acquired by the United States of America in San Diego County, California, by deed dated February 8, 1949. [7]

B.  Rights of way

8.  The tracts of land described in Findings 1 and 3 hereof were acquired subject to easements for railroad rights of way in favor of the Atchison, Topeka and Santa Fe Railroad Company. [8]

C.  Location of Camp Pendleton

9.  The Santa Margarita river traverses the above property of the United States of America for a distance of some 21 miles from the point at which it enters the easterly boundary of that property to the Pacific Ocean.  The five parcels described above are component parts of the single military reservation of the United States of America generally known and referred to as "Camp Joseph H. Pendleton" or "Camp Pendleton", Oceanside, California, which reservation includes those military activities known as the U. S. Naval Ammunition Depot and the U. S. Naval Hospital. [9]

10.  Camp Pendleton military reservation comprises some 135,000 acres located principally in San Diego County, California, bordering on the Pacific Ocean for approximately 17 miles between the cities of Oceanside and San Clemente, California, and having an area of approximately 211 square miles.  U. S. Highway No. 101 traverses the westerly portion of the reservation in an approximate north-south

6.   Exh. 17
7.   Exh. 17
8.   Exhs. 15 and 16
9.   Exhs. 22 and A

1915

2.

1  direction, close to the Pacific Ocean.  The entire reservation lies
2  west of U. S. Highway No. 395. [10]
3      II.  Cession of Exclusive Jurisdiction
4  11.  Letters of acceptance dated January 12 and September 8, 1943,
5  and February 18, 1944, were duly transmitted from the Acting
6  Secretary of the Navy to the Governor of the State of California,
7  which recited and accepted the cession by the State of California
8  to the United States of America of exclusive jurisdiction over the
9  tracts of land acquired by condemnation proceedings as described in
10  Findings 1, 3 and 5 hereof. [11]
11      III.  Present Military Use of Lands
12          A.  Primary Military Use
13  12.  It is the function of Camp Joseph H. Pendleton to provide
14  housing and training facilities for units of the Armed Forces, to
15  conduct training of units of the Armed Forces in amphibious warfare
16  and experimental work with landing craft, landing vehicles, tracked
17  and affiliated equipment and the development thereof; to conduct
18  combat training of the various units of the United States Marine
19  Corps, including air-ground support coordination, and use of artil-
20  lery, tanks and other equipment used in the conduct of modern
21  amphibious and land warfare.  In addition to the aforementioned
22  activities, it is the function of Camp Pendleton to provide logistic
23  support for units of the United States Marine Corps together with
24  material maintenance and storage facilities, for supplies and equip-
25  ment and to house and train replacements for subsequent assignment
26  to various operating units of the United States Marine Corps. [12]
27  13.  Camp Pendleton, both at present and prospectively, is the
28  largest and most complete military base in the world for training
29  in amphibious warfare. [13]

30   10.  Exhs. 22 and A
31   11.  Exhs. 18, 19 and 20
32   12.  PTO p. 12 (Note: "PTO" as used in these footnotes means the
     Pre-Trial Order dated August 25, 1952, which provided (p. 2) that
     "Upon trial of this cause no proof shall be required as to matters
     of fact specifically agreed upon in the Pre-Trial Order".) 1916
      13.  E. B. Robertson, Vol. 6, p. 653, line 15

3.

14.  The United States Naval Hospital, with a capacity of approximately 1,550 beds, established at Camp Joseph. H. Pendleton, provides medical and hospital services to personnel of the Armed Forces, their dependants and other authorized personnel at 83 Naval shore activities located in the Southern California area and provides medical and hospital care to personnel of units of the United States Fleet. [14]

15.  The United States Naval Ammunition Depot, Fallbrook, California, provides facilities for the storage, segregation, reconditioning and issuing of ammunition for operating units of the United States Fleet and the United States Marine Corps and maintains ammunition stocks for shore establishments of the United States Navy located in the Southern California area.  In addition, this Naval Ammunition Depot stores and ships ammunition for use by combat elements of the United States Navy and the United States Marine Corps. [15]

B.  Agricultural Use

16.  The United States of America uses such parts of these lands, as are not immediately required for military activities, for agricultural purposes. [16]

17.  The United States of America now leases or has issued permits for use of approximately 5,500 acres of Camp Pendleton, and has leased as much as 6,000 acres.  In addition, some 15,000 to 20,000 sheep and 1,000 head of cattle are grazed on the military reservation, and are largely dependent on the Santa Margarita River for their watering needs. [17]

---

14.  PTO pp. 12-13

15.  PTO p. 13

16.  W. D. Taylor, Vol. 5, p. 590, line 4.

17.  W. D. Taylor, Vol. 5, p. 590, line 15 ff.

1917

1517

18.  A considerable acreage of Camp Pendleton, adaptable to cultivation or irrigation, and not immediately required for military use, is not leased or put to agricultural use due to insufficiency of water. [18]

IV.  Description of Santa Margarita River System

A.  General Location and Features

19.  The Santa Margarita River is a non-navigable intermittent stream having a drainage area of 740 square miles, 192 square miles of which are situated in San Diego County, California, and 548 square miles in Riverside County, California.  The Santa Margarita watershed is semi-arid. [19]

20.  Temecula Creek and Murrieta Creek have their junction at the head of Temecula Gorge and there form the Santa Margarita River. [20]

21.  Rising on the eastern slope of the Coastal Range in San Diego County, near the present site of the Palomar Observatory, Temecula Creek  proceeds in a northerly and westerly direction a distance of approximately fourteen miles where it enters the Pauba Grant of the Vail Estate.  After entering the Pauba Grant, it flows northwesterly through a portion of the grant known as Nigger Valley, for a distance of a little more than three miles.  It then enters a narrow canyon on the Pauba Grant known as Nigger Canyon for a distance of approximately two miles.  Situated across the channel of Temecula Creek at the upper end of Nigger Canyon on the Pauba Grant, in the Northwest Quarter, Section 10, Township 8 South, Range 1 West, is the Vail Dam, creating a reservoir with a capacity of approximately 50,000 acre-feet. [21]

22.  Below the Vail Dam, the Temecula Creek traverses Pauba Grant for a distance of approximately eleven miles. [22]

18.  W. D. Taylor, Vol. 5, p. 595, line 1

19.  PTO p. 5

20.  PTO p. 6

21.  PTO p. 6

22.  PTO p. 6

1918

188

23.  Leaving the Pauba Grant of the Vail Estate, Temecula Creek
continues its westerly course across the Little Temecula Grant of
the Vail Estate for a distance of approximately one and a half
miles.  That stream then enters the Temecula Grant of the Vail
Estate, flowing a distance of approximately two miles. [23]

24.  Immediately before leaving the Temecula Grant of the Vail
Estate, Temecula Creek has its confluence with Murrieta Creek and
below that point is known as the Santa Margarita River. [24]

25.  The Santa Margarita River then enters Temecula Gorge, a narrow
canyon through which it flows southerly and westerly for a distance
of approximately nine miles.  Though Temecula Creek prior to its
junction with Murrieta Creek, flows alternately as a surface and
subsurface stream, the Santa Margarita River throughout Temecula
Gorge in the state of nature is a surface stream. [25]

26.  Shortly after leaving Temecula Gorge, the Santa Margarita
River enters Camp Joseph H. Pendleton, the Marine Corps Training
Base.  It then flows in a generally southwesterly direction through
Camp Pendleton - Naval Ammunition Depot- United States Naval
Hospital lands for a distance of about twenty-one miles to the
Pacific Ocean.  For the full twenty-one miles the course of the
river lies entirely within the property of the United States of
America. [26]

27.  The Santa Margarita River within the boundaries of the above-
mentioned military establishments is an intermittent stream. [27]

        B.  Principal Tributaries

28.  There are several tributaries of the Santa Margarita River from
tidewater to its head waters. [28]

---

23.  PTO p. 7
24.  PTO p. 7
25.  PTO p. 7
26.  PTO p. 7
27.  PTO p. 7
28.  PTO p. 7

1913

6.

29.  De Luz Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate, proceeds in a westerly and southerly direction to its confluence with the Santa Margarita River several miles within the boundary lines of Camp Pendleton. 29

30.  Fallbrook Creek, an intermittent stream, rises east and south of the Santa Margarita River.  Most of its length is within the boundaries of Camp Pendleton and the United States Naval Ammunition Depot and it has its present terminus in Lake O'Neill, an artificial reservoir which lies within the Camp Pendleton area.  In the state of nature, Fallbrook Creek flowed into the Santa Margarita River. 30

31.  Sandia Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate, proceeds in a southerly direction to its confluence with the Santa Margarita River at a point a short distance above the easterly boundary of Camp Pendleton. 31

32.  Rainbow Creek is an intermittent stream which rises east and south of the main channel of the Santa Margarita River and proceeds in a northerly and westerly direction to its confluence with that river a short distance above Sandia Creek. 32

33.  Murrieta Creek, an intermittent stream, has its source north of the Temecula Grant of the Vail Estate and traverses the lands of the grant before it joins Temecula Creek to form the Santa Margarita River.  Junction of the streams takes place at a point about a half mile east of the westerly boundary of Temecula Grant of the Vail Estate and a short distance east of Temecula Gorge.  It has several tributaries, most important of which is Cottonwood Creek,

29.  PTO p. 7

30.  PTO p. 7

31.  PTO p. 8

32.  PTO p. 8

1920

1  an intermittent stream which rises on the Santa Rosa Grant of the

2  Vail Estate.  Santa Gertrudis Creek, a tributary of Murrieta Creek,

3  is an intermittent stream rising on the Pauba Grant of the Vail

4  Estate, traversing lands in other ownership before crossing a por-

5  tion of the Temecula Grant prior to its confluence with Murrieta

6  Creek.  Warm Springs Creek, an intermittent stream, rises east of

7  Murrieta Creek and flows into that stream just below the town of

8  Murrieta. 33

9  34.  Penjango Creek, an intermittent stream, is tributary to

10  Temecula Creek, rising south of that stream and joining it a short

11  distance upstream from the junction of the stream last mentioned

12  with Murrieta Creek.  From its source to confluence Penjango Creek

13  traverses a portion of the Little Temecula Grant, and then flows

14  across the Temecula Grant of the Vail Estate, the property upon

15  which its junction with the Temecula Creek takes place. 34

16  35.  Other affluents of Temecula Creek are Lancaster Creek and

17  Arroyo Seco, both of which are intermittent in character, flowing

18  only during periods of high precipitation and entering Temecula

19  Creek above Nigger Canyon. 35

20          C.  Underground Basins

21  36.  From its head waters to the Pacific Ocean, the watershed of

22  the Santa Margarita River System is underlaid with numerous sub-

23  terranean basins.  They differ greatly in size and capacity. 36

24  37.  Underlying the military establishments in question within the

25  Santa Margarita River watershed is an underground basin, with seg-

26  ments of the basin commonly knowns as:

27  ─────────────────────────────

28  33.PTO p. 8

29  34.PTO p. 8

30  35.PTO pp. 8-9

31  36.PTO p. 9

32

1.   Upper or O'Neill Basin or Segment;

2.   Chappo or Home Ranch Basin or Segment;

3.   Ysidora or Lower Basin or Segment.

Those segments comprising a single basin are geologically and hydrologically inter-connected. [37]

38.   Throughout the ground-water basin within the watershed of the Santa Margarita River underlying Camp Pendleton are numerous wells of varying depths in the alluvium.   The surface and sub-surface area and the character and type of the deposits penetrated by the wells have been analyzed. [38]

39.   Below the Vail Dam, Temecula Creek traverses a highly porous area where that stream, except during periods of high run-off, disappears into the Temecula Basin.   In a state of nature, Temecula Creek customarily again becomes a surface stream at a distance of about three miles from the present site of the Vail Dam.   The Temecula River (Creek) is now, as a result of the construction of the Vail Dam, a stream completely controlled by that structure, and any water from that source entering the Temecula Basin or Temecula Canyon is derived from the waters impounded by that structure. [39]

40.   Within Camp Pendleton the Santa Margarita River does not flow as a continuous surface stream, but, during the dry season of the year, the stream customarily and ordinarily sinks into the highly porous ground water basin underlying Camp Pendleton.   When that basin has been filled, the Santa Margarita River ordinarily comes to the surface some two or three miles from tidewater.   In a state of nature it continues then to the Pacific Ocean as a stream of diminishing volume. [40]

---

37.   PTO p. 9; G. F. Worts, Jr., Vol. 3, pp. 240-247

38.   PTO p. 9

39.   H. M. Hall, Vol. 1, p. 84, Vol. 2, pp. 115, 126, 127

40.   G. F. Worts, Jr., Vol. 3, pp. 240-247

1922

41.  The water in the underground basins is contained by bedrock or other impervious material.  The basins are filled with alluvial deposits of varying degrees of porosity.  The waters of the Santa Margarita River, in its course through the valley, penetrate and fill the voids of the porous alluvium.  When the water of the stream sinks to bedrock or the other impervious material comprising the beds of the basins, in which the detrital material lies, it spreads out laterally filling the basins.  When completely charged, the waters of the basins support the surface stream and progress slowly downstream through the permeable material. 41

42.  Ground water basins of the character described underly Temecula Creek in portions of Oak Grove Valley; and Lancaster Creek in Lancaster Valley.  Temecula Basin, one of the largest in the entire watershed of the Santa Margarita River, is located on the property of the Vail Estate.  This large T-shaped alluvial deposit area has the stem of the T along the main channel of Temecula Creek for a distance of approximately eight miles, varying in width from two-thirds of a mile to a mile and a half.  That area of the Temecula Basin immediately below the present site of Vail Dam is comprised of coarse, highly porous material and is known as the "out wash".  Into that "out wash", except in periods of extremely heavy precipitation, Temecula Creek, in a state of nature, sinks.  About three miles below the "out wash", the Temecula Basin becomes an artesian area from which Temecula Creek again emerges as a surface stream.  42

43.  The right arm of the T-shaped alluvial basin extends northward underlying Murrieta Creek for a short distance above the stream's confluence with Temecula Creek.  The left arm of the T-shaped Temecula alluvial basin extends southward beneath Penjango Creek. 43

41.  G. F. Worts, Jr., Vol. 3, pp. 270-271; Exhs. 9-12

42.  H. M. Hall, Vols. 1 and 2, pp. 84 and 152; Exhs. 8, 32 & 36

43.  H. M. Hall, Vols. 1 and 2, pp. 84 and 152; Exhs. 8, 32 & 36

1923

10.

44.  Underlying Murrieta Creek and separated from the Temecula Basin is another large alluvial basin known as the Murrieta Basin. That is comprised of valley-fill similar to that found in the other basin.  Drafts on this basin and the other underground basins above Temecula Canyon, for agricultural, domestic and other uses, necessitates re-charging of the basins, thus reducing the quantities of water available to downstream users. [44]

45.  Due to the existence of granitic rock immediately underlying the stream from approximately the point of confluence of Temecula Creek to the mouth of the Temecula Gorge, the Santa Margarita River in the state of nature is a surface stream.  That granitic underlay of the stream continues from the point mentioned across the boundary of Camp Pendleton to a point approximately one and one-half miles below the confluence of DeLuz Creek with the Santa Margarita River. At that point the stream opens out into a rather broad alluvial flood plain.  That alluvial area extends from the point last mentioned to tidewater, constituting a large groundwater basin.  That ground-water basin is comprised of a relatively coarse and loose porous valley-fill at the upstream and comparable to the "out wash" area of the Temecula Basin above described. [45]

46.  Approaching the ocean the character of the alluvium becomes increasingly fine and tight. [46]

          D.  Elsinore Fault

47.  The Elsinore Fault is one of the major geological features of California.  That part of it which is of interest in the present case lies across the entire watershed in a general southeasterly to north-westerly direction, shortly west of the communities of Murrieta and Temecula. [47]

44.  H. M. Hall, Vols. 1 and 2, pp. 84 and 152; Exhs. 8, 32 & 36

45.  W. R. Muehlberger, Vol. 2, p. 205; Exhs. 9-12

46.  Exhs. 9-12

47.  W. R. Muehlberger, Vol. 2, p. 203, line 23 ff.; Exh. No. 8

1924

11.

48. The Elsinore Fault constitutes an impenetrable barrier between the northeasterly or upper part of the watershed and the south-westerly or lower part, preventing the movement of water from one part to the other except as permitted on the surface at the point where the river enters the upper end of the Temecula Gorge or Canyon, the so-called "lip of the fault". Thus the only source of ground-water passing into the lower valley from the upper valley is that which flows through Temecula Gorge (also known as Temecula Canyon and Railroad Canyon) past the Temecula gauging station of the United States Geological Survey. [48]

V. United States Geological Survey Records

A. Location of Gauging Stations

49. The United States Geological Survey has maintained and published records of the following principal gauging stations within the watershed of the Santa Margarita River:

| Stream | Station | Period of record |
|---|---|---|
| Santa Margarita River | Ysidora | From February 19, 1923, to date |
| Santa Margarita River | Fallbrook | " November 25, 1924, to date |
| Temecula Creek | Temecula (Railroad) Canyon | " January 30, 1923, to date |
| Temecula Creek | Nigger Canyon | " January 30, 1923, to date |
| Murrieta Creek | Temecula | " October 1, 1930, to date |

In addition, measurements have been taken for diversions at O'Neill Ditch and at other places on the Santa Margarita River System. [49]

VI. Geological Aspects of Camp Pendleton Basin

50. The water in the Camp Pendleton underground basin is an integral part of the waters of the Santa Margarita River system in the course of their movement through the watershed to the Pacific Ocean. [50]

---

48. W. R. Muehlberger, Vol. 2, p. 204, line 13 ff.; H. M. Hall Vol. 1, p. 79, lines 4-25

49. PTO pp. 10-11; G. F. Worts, Vol. 3, p. 250, line 10

50. G. F. Worts, Jr., Vol. 3, p. 262, line 25 ff.

1925

51.  The basin underlying Camp Pendleton extends from approximately the proposed DeLuz damsite (for location, see Exhibit 10, for example), which is some 11.7 miles from the Pacific Ocean, downstream to a point in the Ysidora Narrows near the ocean.  It extends laterally in varying widths of from one-half mile to two miles, and underlies the bed of the Santa Margarita River at all points. [51]

52.  The underground basin lies entirely within the watershed. [52]

53.  The underground basin is filled with alluvial material, the significant feature of which is its water-bearing quality. [53]

54.  The water-storage unit of the underground basin has a depth of approximately 100 feet.  The storage capacity of the basin is 48,000 acre feet, of which some 40,000 acre feet may be considered a potential source of supply.  In a state of nature, with all segments of the underground basin filled, the ground water gradient, being in a coastward direction, prevented intrusion of salt water from the ocean into the underground basin.  Historically, upstream surface use and pumping from the basin permitted actual salt water intrusion.  Constant re-charging of the basin is required to prevent such intrusion. [54]

---

51.  G. F. Worts, Jr., Vol. 3, pp. 241-7

52.  G. F. Worts, Jr., Vol. 3, p. 247, line 4

53.  G. F. Worts, Jr., Vol. 3, pp. 247-298 passim; Detailed description of the alluvial fill, as well as the geological structure which embraces or forms the basin, is contained in the geological exhibits introduced by the United States of America; Exhs. Nos. 9, 10, 11, 12 and 13

54.  G. F. Worts, Jr., Vol. 3, p. 253, line 9 ff.; pp. 257-8, Exhs. Nos. 11 and 12

55.  The surface area of the land overlying the Camp Pendleton
basin in the alluvial plain is 4,535.3 acres.  The natural forage
in this area is dependent upon the supply of water in the under-
ground basin.  Appreciable lowering of the water table in that
basin results in destruction of that forage.[55]

56.  The flow of the waters of the Santa Margarita River system
constitutes the only source of supply of the water in the under-
ground basin, and the surface flow and the waters of the underground
basin constitute a single source of supply.[56]

57.  The lower end of the underground basin terminates at an alluvial
tongue lying between the basin and the Pacific Ocean.  The tongue of
alluvium is approximately 800 feet wide, encased in a geological
formation known as the San Onofre Breccia which is relatively imper-
vious.  Either sea water or fresh water moves through the alluvial
tongue, depending on the relationship of the head of the fresh water to
the head of the sea water in the alluvial tongue.  Sea water has moved
through the alluvial tongue to intrude into the fresh water basin.[57]

VII.  Historical Use of Water by Rancho Santa Margarita and
      Camp Pendleton - Vail Estate

    A.  General Statement as to Rancho Santa Margarita

58.  The Camp Pendleton military reservation of some 135,000 acres
is the property which was formerly known as Rancho Santa Margarita
y Las Flores, or Rancho Santa Margarita.  It was devoted to the
growth and production of horticultural and agricultural crops, and
the raising and grazing of thousands of head of cattle.[58]

    B.  Lake O'Neill

59.  Lake O'Neill is an off-channel, earth fill reservoir, located
at the O'Neill or upper segment of the underground basin, having a

55.  A. C. Bowen, Vol. 7, p. 828, line 4; W. R. Taylor, Vol. 5,
p. 599, line 19.

56.  G. F. Worts, Jr., Vol. 3, p. 266, line 19 ff.

57.  G. F. Worts, Jr., Vol. 3, p. 261, line 8 to p. 263, line 2

58.  H. W. Witman, Vol. 5, pp. 575 ff.; Rancho Santa Margarita v.
Vail (1938), 11 Cal. 2d 501, 81 P. 2d 533, 542.

1  capacity of some 1260 acre-feet.  Since at least 1920, the United

2  States and its predecessors in interest used Lake O'Neill for

3  agricultural and domestic purposes, during the irrigation season, by

4  filling and refilling the reservoir, such beneficial use having been

5  actual, open, notorious, hostile and adverse to all other claimants

6  on the river, and having been continuous and uninterrupted for the

7  statutory period, and under a claim of right. [59]

8  60.  During a five-year period since 1920, 21,502 acre-feet of water

9  have been diverted at the O'Neill Ditch, giving an average of 4,300

10  acre-feet per year during this five-year period. [60]

11          C.  Agricultural Use Outside of the Watershed

12  61.  Stuart Mesa, a part of the property of the United States,

13  borders the Pacific Ocean and lies immediately north of the Santa

14  Margarita River, partly within and partly without the watershed

15  of that river.  South Coast Mesa, also a part of the property of the

16  United States, borders the Pacific Ocean and lies immediately south of

17  the Santa Margarita River, partly within and partly without the

18  water shed of that river. [61]

19  62.  Stuart Mesa comprises some 1200 acres of which 964 acres lie

20  outside of the watershed; South Coast Mesa comprises some 600 acres,

21  of which some 269 acres lie outside of the watershed. [62]

22  63.  All of Stuart Mesa outside of the watershed was placed under

23  irrigation by a pipeline system in 1938, and all of South Coast Mesa

24  outside of the watershed was placed under irrigation by a pipeline

25  system in 1939.  The irrigation of both areas has been open, adverse,

26  continuous, and hostile, made under a claim of right, and instituted

27  after the Supreme Court of California had declared that there was

---

29  59.  H. W. Witman, Vol. 5, p. 576; Exhs. 14 and 44; A. C. Bowen,
30  Vol. 3, p. 399 ff.

31  60.  Exh. 14

32  61.  Exh. 22

     62.  Exh. 41

insufficient water in the Santa Margarita River for either of the
major riparian owners. [63]

64.   All of the water used in the irrigation systems supplying the
two Mesa areas is and has been pumped from the underground basin
underlying Camp Pendleton.  The duty of water for the 1223 acres so
irrigated is 4806 acre-feet per year.   Cropping on the Mesas is
carried on throughout the year. [64]

D.   Military Use

65.  Water has been delivered through the water distribution system
of Camp Pendleton since the property acquired by the United States
was put in operation as a military installation in 1942.   The
distribution system at the present time is substantially the same as
that put into use in 1942.  All of the water distributed by the
system is pumped from the underground basin underlying Camp
Pendleton. [65]

66.   In addition to the water distributed for agricultural (irrigation
purposes on Stuart Mesa and South Coast Mesa outside of the water-
shed, practically all of the water delivered for military use by the
distribution system is delivered outside of the watershed, including
Areas 11, 12, 13, 14, 15, 16 and 17, as well as Camp Del Mar. [66]

67.   The actual use of water by Camp Pendleton from the year 1943 to
date is shown in the following table:

(See next page)

---

63.  H. W. Witman, Vol. 5, pp. 579 ff.; Rancho Santa Margarita v.
Vail, supra.

64.  H. W. Witman, Vol. 5, pp. 581, 583; Exh. 41.

65.  J. R. McNearny, Vol. 5, pp. 615-616.

66.  J. R. McNearny, Vol. 5, p. 616.

16.

QUANTITIES OF WATER FROM
THE SANTA MARGARITA RIVER HISTORICALLY
UTILIZED BOTH WITHIN AND WITHOUT
THE WATERSHED BY THE UNITED
STATES OF AMERICA

| Year | Within - Ac. Ft. | Without - Ac. Ft. | Total - Ac. Ft. |
|------|------------------|-------------------|-----------------|
| 1943 | 5389 | 1591 | 6,980 |
| 1944 | 5298 | 1785 | 7,083 |
| 1945 | 6396 | 4332 | 10,728 |
| 1946 | 6160 | 3729 | 9,889 |
| 1947 | 6374 | 4350 | 10,724 |
| 1948 | 6894 | 4417 | 11,311 |
| 1949 | 6637 | 5008 | 11,645 |
| 1950 | 6407 | 4402 | 10,809 |
| 1951 | 6275 | 3983 | 10,258 |

This gives an average per year of 9,934 acre-feet.  The needed [67]
average, on a present-day basis, is 11,000 acre-feet per year.

68.  The washing of military vehicles and equipment following
immersion in sea water is a major item of water use in the United [68]
States Marine Corps.

69.  The water requirements of the personnel attached to Camp
Pendleton are 200 gallons per person per day. [69]

70.  The population of Camp Pendleton on October 30, 1952, was
49,123, and this population is constantly increasing. [70]

71.  The planned peace time population of Camp Pendleton, based on
planning for the fiscal year 1954, is 105,000 persons.   The average [71]
annual demand for water from the Santa Margarita River for military
purposes premised upon that population figure is approximately
23,500 acre-feet.

E.   Natural Surface Irrigation Above Underground Basin

72.  Though the Santa Margarita River is an intermittent stream,
it has historically for brief periods raised to higher levels within
the natural high-water channel of the stream, overflowing lands in

67.  Exh. 40
68.  E. B. Robertson, Vol. 6, p. 692.
69.  E. B. Robertson, Vol. 5, p. 663.
70.  E. B. Robertson, Vol. 5, pp. 677, 678.
71.  E. B. Robertson, Vol. 5, p. 662, 668.

1930

1    Camp Pendleton which during the long dry periods receive only sub-

2    irrigation from the underground basin.  That overflow watered, en-

3    riched and fertilized the lands, resulting in increased productivity

4    of the land and enhancement of its value.[72]

5       F.  Historical Use of Water by Vail Estate

6    73. The Vail Estate is the only major owner of riparian lands on the

7    Santa Margarita River other than the United States.  It holds fee

8    simple title to 40,575 acres of riparian lands of which 29,410 acres

9    can be practicably and profitably irrigated.  If available, 79,510

10    acre-feet of water from the Santa Margarita River could be applied

11    profitably to those lands.  At the present time, due to the shortage

12    of water, only 4,500 acres of lands of the Vail Estate are being

13    irrigated.  The Vail Estate is now building an extension of its irri-

14    gation system for the purpose of increasing substantially the number

15    of acres it will irrigate.[73]

16    74.  Pursuant to Permit No. 7032 issued by the Department of Public

17    Works of the State of California, dated February 18, 1948, the Vail

18    Estate completed the construction of the Vail Dam at the head of

19    Nigger Canyon, on the Temecula River, and closed the gates in Novem-

20    ber, 1948.  The storage capacity of this dam is some 50,000 acre feet.[74]

21    Further development of Vail lands is actively under way.

22    75.  The Vail method of operation is control of the stream by means

23    of the dam, and storage of water in the Temecula basin, from which

24    the pumps on the Vail lands riparian to the Santa Margarita-Temecula

25    River extract water for domestic and farm use.[75]

26       G.  Litigation between Rancho Santa Margarita and Vail Estate

27    76.  On August 22, 1924, the Rancho Santa Margarita, a corporation

28    (in effect the predecessor in interest of the United States of

29    America) instituted action to determine its rights to the waters

30    72.  W. D. Taylor, Vol. 5, p. 599.

31    73.  Exh. 33; H. M. Hall, Vol. 2, p. 114.

32    74.  Exh. 4; H. M. Hall, Vol. 2, p. 116.

      75.  H. M. Hall, Vol. 2, p. 151.

**1931**

18.

of the Santa Margarita as against the Vail interest.  A legal

determination of those rights was expounded by the Supreme Court of

California in the case of Rancho Santa Margarita v. Vail, et al.,

11 Cal. 2d 501, 81 P 2d 533, dated August 11, 1938.  Pursuant to

that decision the parties, rather than resort to a new trial as was

ordered (since the original trial had been conducted over a period

of three years consuming 444 actual court days), entered into a

stipulated judgment which is an exhibit admitted in this proceeding.

In that stipulated judgment, which has been adopted by the United

States in a stipulation filed in this Court on July 8, 1952, the

respective rights of the Rancho Santa Margarita and the Vail Estate

were specified.[76]

VIII.   Soil Classification of Camp Pendleton Property

      A.   Riparian Land Susceptible of Practicable and
         Profitable Irrigation

77.  The Camp Pendleton property of the United States includes

18,648.3 acres of land riparian to and lying within the watershed

of the Santa Margarita River, susceptible of practicable and

profitable irrigation, having a duty of water of 69,237 acre feet

per year.[77]

      B.   Non-Riparian Lands Susceptible of Practicable
         and Profitable Irrigation

78.  The Camp Pendleton property of the United States includes

1,223 acres lying outside the watershed but irrigated practicably

and profitably by water derived from the watershed.[78]

      C.   Total Acreage Susceptible of Practicable and
         Profitable Irrigation

79.  The total acreage susceptible of practicable and profitable

---

76.  Case cited; Exh. 37.

77.  A. C. Bowen, Vol. 3, p. 351, line 11; Exh. 38

78.  Exh. 41

**1932**

irrigation, within the watershed of the Santa Margarita River, and without the watershed but irrigated by waters derived therefrom, is 19,861.3.[79]

### D. Duty of Water

80.   The total duty of water for this acreage is 74,042.5 acre-feet per year.[80]

### E.   Classification of Lands

81.   A detailed study of the Camp Pendleton lands within the watershed has been compiled according to standards prescribed by the United States Soil Conservation Service.[81]

#### 1.   Class I Lands

##### a.   Characteristics

82.   Class I lands are:  very good land with little or no limitation on use.  It is nearly level, deep and commonly without erosion.[82]

##### b.   Acreage

83.   There are 3172.7 acres of Class I lands in the 18,648.3 acres described above.[83]

#### 2.   Class II Lands

##### a.   Characteristics

84.   Class II lands are:  good land with minor physical limitations, as gentle slopes, less deep soils or slight erosion.  Choice in crops is reduced or special practices as water management, contour operations, cover cropping or longer rotations are needed.[84]

##### b.   Acreage

85.   There are 1380.7 acres of Class II land in the 18,648.3 acres

---

79.   Notes 69 and 70.

80.   Exhs. 38 and 41

81.   A. C. Bowen, Vol. 3, p. 357 ff.

82.   Exh. 25-B

83.   Exh. 25-E

84.   Exh. 25-B

1933

203

1 described above.[85]

2       3.  Class III Lands

3         a.  Characteristics

4 86.  Class III lands are:  moderately good land with major physical

5 limitations, as relatively steep slopes, shallow soils or severe

6 erosion.  Choice in crops is further reduced and more protective

7 measures are required as terracing, strip cropping and careful,

8 water management.[86]

9         b.  Acreage

10 87.  There are 3147.8 acres of Class III land in the 18,648.3 acres

11 described above.[87]

12       4.  Class IV Lands

13         a.  Characteristics

14 88.  Class IV lands are:  fairly good land that is best suited to

15 pasture and hay but can be cultivated occasionally – usually not

16 for more than 1 year in 6.  When plowed, careful erosion practices

17 must be used.[88]

18         b.  Acreage

19 89.  There are 4308.2 acres of Class IV land in the 18,648.3 acres

20 described above.[89]

21       5.  Class V Lands

22         a.  Characteristics

23 90.  Class V lands are:  land very good for grazing or forestry.

24 It has slight or no physical limitations and needs only good manage-

25 ment.[90]

26

27     85.  Exh. 25-B.

28     86.  Exh. 25-B.

29     87.  Exh. 25-B.

30     88.  Exh. 25-B

31     89.  Exh. 25-B

32     90.  Exh. 25-B

**1934**

GPO O - 678013

204

b.  Acreage

91.  There is no Class V land in the 18,648.3 acres described
91
above.

6.  Class VI Lands

a.  Characteristics

92.  Class VI lands are:  land good for grazing or forestry.  It
has minor physical limitations and needs some protective measures. 92

a.  Acreage

93.  There are 6638.9 acres of Class VI lands in the 18,648.3 acres
93
described above.

7.  Class VII Lands

a.  Characteristics

94.  Class VII lands are:  land moderately good for grazing or
forestry.  It has major physical limitations and needs extreme
care to prevent erosion or destructive burning, or to overcome
other hazards.  94

b.  Acreage

95.  There are 8449.9 acres of Class VII land in the Santa
Margarita River watershed area of Camp Pendleton.  Class VII land
95
is not considered irrigable.

8.  Class VIII Lands

a.  Characteristics

96.  Class VIII lands are:  suited only for wildlife or recreation.
This land is usually steep, rough, stony, sandy, wet or highly
96
erodable.

---

91.  Exh. 25-B

92.  Exh. 25-B

93.  Exh. 25-B

94.  Exh. 25-B

95.  Exh. 25-B

96.  Exh. 25-B

1935

b.   Acreage

97.   There are 10,663.7 acres of Class VIII land in the ~~18,648.3~~ *Santa Margarita* 97

~~watershed area of Camp Pendleton.~~  ~~acres described above.~~   Class VIII land is not considered irrigable.

IX.   Vail Lands

A.   Title

98.   The lands of the Vail Estate lying in the watershed of the Santa Margarita-Temecula River are owned by the Vail Estate in 98 fee simple.

B.   Riparian Lands Susceptible of Practicable and Profitable Irrigation.

99.   There are 29,410 acres of land susceptible of practicable and profitable irrigation owned by the Vail Estate in the watershed of 99 the Santa Margarita-Temecula River and riparian to that stream.

C.   Duty of Water

100.   The duty of water upon the 29,410 acres above described is 100 79,514 acre-feet per year.

D.   Soil Classification

1.   Class A Lands

a.   Characteristics

101.   Class A lands are:  Lands which by reason of soils, air drainage, elevations, topography and assumed temperatures are suitable for such crops as oranges, lemons, any varieties of avocados and cherimoyas, assuming that the average number of hours in any one year of temperatures below $30°$ F would not be greater than twenty-five, and where minimum temperatures of $20°$ F do not occur with greater frequency than once in 10 years; and where maximum temperature of $110°$ F before July 15 or $115°$ F after July 15

97.   Exh. 25-E

98.   PTO p. 68

99.   H. M. Hall, Vol. 2, pp. 106, 114

100.   H. M. Hall, Vol. 2, p. 114

1  with concurrent humidities lower than 20% do not occur oftener than

2  once in five years.

3          b.  Acreage

4  102.  There are 10,991.7 acres of Class A lands in the 29,410 acres

5  described above.

6          c.  Duty of Water

7  103.  The duty of water on these Class A lands is 25,830 acre feet

8  per year.

9        2.  Class B Lands

10          a.  Characteristics

11  104.  Class B lands are:  lands which by reason of their soils, air

12  drainage, elevations, topography and exposures and temperatures are

13  on the average suitable for such crops as oranges, hardy avocados,

14  sapotes and guavas, assuming the average number of hours in any one

15  winter of temperatures below $30^\circ$ F would not be greater than 100

16  and where minimum temperatures of $20^\circ$ F do not occur with greater

17  frequency than once in ten years; and where maximum temperatures of

18  $110^\circ$ F before July 15 and $115^\circ$ F after July 15, with concurrent

19  humidities lower than 20% do not occur oftener than once in five

20  years.

21          b.  Acreage

22  105.  There are 7,210.3 acres of Class B lands in the 29,410 acres

23  described above.

24          c.  Duty of Water

25  106.  The duty of water on these Class B lands is 16,944 acre feet

26  per year.

27

28     101.  Exh. 33

29     102.  Exh. 33

30     103.  H. M. Hall, Vol. 2, p. 114

31     104.  Exh. 33

32     105.  Exh. 33

   106.  H. M. Hall, Vol. 2, p. 114

1937

3.   Class C Lands

    a.   Characteristics

107.   Class C lands are:  lands which by reason of their soils, air drainage, elevations, topography, slopes, exposures and temperatures are suitable for alfalfa, truck crops such as tomatoes, melons and squash; also deciduous fruits, walnuts, almonds, grapes, olives, figs, loquats, and oriental persimmons; assuming serious injury to blossom or young fruit by late frosts occurring after May 1st or to unharvested mature olives by early fall frosts previous to December 1st, are not of greater frequency than once in five years. [107]

    b.   Acreage

108.   There are 5,393.7 acres of Class C land in the 29,410 acres described above. [108]

    c.   Duty of Water

109.   The duty of water on these Class C lands is 13,484 acre feet per year. [109]

4.   Class D.Lands

    a.   Characteristics

110.   Class D lands are:  lands which by reason of their soils, air drainage, topography, slopes, exposures and temperatures are suitable for the growth of such crops as alfalfa, annual summer crops, such as potatoes, lettuce, onions, melons, Indian corn, sorghums, etc., assuming summer temperatures between May 1st and October 1st, do not fall below $30^\circ$ F or rise above $110^\circ$ F oftener than once in five years. [110]

    b.  Acreage

111.   There are 5,814.2 acres of Class D lands in the 29,410 acres

---

    107.   Exh. 33

    108.   Exh. 33

    109.   H. M. Hall, Vol. 2, p. 114

    110.   Exh. 33

1 described above. [111]

2         c.  Duty of Water

3 112.  The duty of water on these Class D lands is 23,256 acre-feet

4 per year. [112]

5   X.  Water Available to United States of America at Camp Pendleton

6 113.  The quantity of water available to the United States of

7 America at Camp Pendleton from the Santa Margarita River, including

8 rights of all types and characters, is 12,500 acre feet per year. [113]

9 114.  The United States has husbanded its water well, as evidenced

10 by the practice, in addition to other conservation measures, of

11 returning sewage effluent to the supply of the underground basin. [114]

12 115.  There is no surplus water at the present time available for

13 appropriation from the Santa Margarita River system; there was no

14 surplus so available in the year 1946; there was no surplus so

15 available when Camp Pendleton was placed in operation as a military

16 installation in 1942. [115]

17   XI.  Irrigable Land in Watershed

18 116.  There are some 127,000 acres of land, including the Vail lands,

19 in the watershed of the Santa Margarita River, above the Camp

20 Pendleton property of the United States, which are susceptible of

21 practicable and profitable irrigation. [116]

22   XII.  View by Court of Lands in Controversy

23 117.  The Trial Judge has viewed the lands involved in the present

24 controversy. [117]

25

---

26   111.  Exh. 33

27   112.  H. M. Hall, Vol. 2, p. 114

28   113.  P. F. Henderson, Vol. 5, p. 530; Exhs. 14 and 44; H. M. Hall, Vol. 2, pp. 101-111.

29   114.  A. C. Bowen, Vol. 4, pp. 465-466.

30   115.  Exhs. 14, 44, Y; H. M. Hall, Vol. 2, pp. 101-111;
31 P. F. Henderson, Vol. 5, p. 530.

  116.  H. M. Hall, Vol. 2, p. 110.

32   117.  Court, Vol. 2, pp. 116-117.

1939

290

XIII.   Additional Facts

118.   Pursuant to the provisions of the Stipulated Judgment, Exhibit A of the Complaint, the Vail Estate is required to maintain for the designated period a flow of water of three cubic feet per second at the Temecula Canyon Gauging Station on the Santa Margarita River which would not be present except for the provisions of the Stipulated Judgment. 118

119.   The State of California, defendant in intervention, has entered into the following stipulation with the United States of America which has been approved by this Court and filed in this case:

"On the 15th day of August, 1951, the People of the State of California, in accordance with invitation of the United States of America, petitioned this Court to intervene in this litigation.  On that date an Order was allowed and entered by this Court granting the Petition.

"For the clarification of the issues in this litigation, and for the benefit of all of the parties to this cause, it is hereby stipulated:

"I

"That in Paragraphs VIII and IX of plaintiff's Complaint herein, and in Paragraphs 2 and 3 of the Prayer of said Complaint, the word 'paramount' is used in the same sense in which that word is used in the second paragraph, on page 374 of the opinion of the Supreme Court of California

---

118.   H. M. Hall, Vol. 2, p. 184; Exh. 37.

in the case of Peabody v. Vallejo, 2 Cal.

2d 351 (fourth paragraph on page 494,

40 Pac. 2d 486.)

"II

"That in this cause, the United States

of America claims only such rights to the

use of water as it acquired when it purchased

the Rancho Santa Margarita, together with

any rights to the use of water which it may

have gained by prescription or use, or both,

since its acquisition of the Rancho Santa

Margarita.

"III

"That the United States of America claims

by reason of its sovereign status no right

to the use of a greater quantity of water

than is stated in Paragraph II, hereof.

"IV

"That the rights of the United States of

America to the use of water herein are to

be measured in accordance with the laws of

the State of California.

"V

"That the parties to this Stipulation

will request the entry of a Pretrial Order

by this Court defining the issues in this

cause, in conformity with the statements

contained in this Stipulation.

"VI

"That there will be a full, complete

and mutual exchange of data and information

as to the subject matter of this cause

1941

28.

1   collected by the respective parties to this Stipulation,

2   including data respecting the issuance of any permits or

3   licenses issued by the State of California in connection

4   with the rights to the use of water of the Santa Margarita

5   River.  Such exchange of information by the United States,

6   will be subject to clearance by the Commanding Officer,

7   Camp Joseph H. Pendleton, in respect to military security,

8   as determined by said Officer.
                                                    119
9           "Dated: November 29, 1951."

10  120.  Application No. 11578 to appropriate water from the Santa Mar-

11  garita River was filed October 4, 1946, by the Santa Margarita Mutual

12  Water Company with the State of California, Department of Public

13  Works, Division of Water Resources, State Engineer.  The application

14  was for sixty (60) cubic feet of water per second from the Santa

15  Margarita River.  In addition to the direct flow right above men-

16  tioned, the application in question is for a storage right of 5,000

17  acre-feet of water from Temecula Creek at the approximate site of the
                                          120
18  Vail Dam and Reservoir.

19  121.  Application No. 12152 to appropriate water from the Santa Mar-

20  garita River was filed November 12, 1947, by the Santa Margarita Mutual

21  Water Company with the State of California, Department of Public Works,

22  Division of Water Resources, State Engineer.  The application was for
                                                              121
23  60,000 acre-feet of water from the Santa  Margarita River for storage.

24  122.  The Santa Margarita Mutual Water Company has diverted no water

25  and has no facilities with which to divert or utilize water.

26  However, the plans of that Company if carried out would result in the

27  diversion of large quantities of Santa Margarita River water from

28  the watershed of that stream.

29

30      119.  PTO pp. 19-20

31      120.  PTO p. 16

32      121.  PTO p. 17

1942

CONCLUSIONS OF LAW

1.   Jurisdiction to entertain this action was conferred upon this Court by express congressional enactment.  (28 U.S.C. 1345).

2.   The United States of America, as any other owner of property, is entitled to have its rights in that property adjudicated by a court of competent jurisdiction.  (U. S. v. Fallbrook Public Utility District, et al., 101 F. Supp. 298, 301 (U.S.D.C. S.D., 1951)).

3.   There was ceded to the United States of America by the State of California the exclusive jurisdiction of the approximately 135,000 acres of land comprising Camp Pendleton, the United States Naval Hospital and the United States Naval Ammunition Depot.

4.   The State of California has properly intervened in this proceeding.  It does not, however, seek to have adjudicated here any substantive rights.

5.   The Santa Margarita Mutual Water Company is a public corporation in good standing, organized and existing pursuant to the laws of the State of California.

6.   Fee simple title to approximately 135,000 acres of land and to all appurtenant rights to the use of water, both riparian and prescriptive, all as set forth in the preceding findings of this Court, resides in the United States of America, subject, however, to the easement for a railroad right of way of the Atchison, Topeka and Santa Fe Railroad.  That land constitutes the site of the Marine Corps Training Base known as Camp Pendleton, the United States Naval Ammunition Depot and the United States Naval Hospital.

7.   The Santa Margarita River is a natural, non-navigable, intermittent, intra-state stream.  In its course it traverses virtually the entire length of the military establishment in question.  For its last 21 miles before entering the Pacific Ocean, the Santa Margarita River flows upon and across lands owned by the

1943

243

United States.  For that distance, those properties of the United
States abut upon both banks of the stream.  There are no water users
or landowners on the Santa Margarita River below the lands of the
United States.

8.  There are 37,882.2 acres of the 135,000 acres of land
to which the United States holds fee simple title, riparian to the
Santa Margarita River.  Of that total, there are 18,648.3 acres
that are susceptible of practicable and profitable irrigation.

9.  The Vail Estate holds fee simple title to approxi-
mately 40,575 acres of land riparian to the Santa Margarita River.
Of that total riparian acreage, the Vail Estate holds fee simple
title to 29,410 acres of land which are susceptible of practicable
and profitable irrigation.

10.  The Vail Estate has constructed and now maintains
a concrete dam across the Santa Margarita River /_sometimes referred
to in the particular reach of the river here under consideration as
Temecula Creek_/.  Large quantities of water have been impounded
behind that concrete structure and those waters have been diverted
and applied to a beneficial use.  That structure is known as the
Vail Dam and Reservoir and has a potential storage capacity of
50,000 acre feet.  To the extent that water has been actually
impounded and applied to beneficial use, there resides in the
Vail Estate an exercised and completed appropriative right; to
the extent of the potential storage capacity of the Vail Reservoir,
there is an incipient, inchoate and unexercised right to the use
of water in the Santa Margarita River which shall ripen into a
vested appropriative right to that extent or to any lesser quantity
which is actually impounded, diverted and applied to beneficial use.

11.  The Vail Estate has proceeded to acquire the
exercised and completed appropriative right mentioned in the pre-
ceding paragraph in conformity with the laws of the State of
California.  It similarly holds the incipient and inchoate rights

1    to which reference has been made.   It has a priority for those

2    rights of August 16, 1946, subject to all vested prior rights.

3         12.  The riparian rights of the United States of America

4    and the Vail Estate entitle them to a reasonable use of their

5    correlative share of all of the water of the Santa Margarita River,

6    including the surface flows /which embraces the flow which has

7    historically enriched, fertilized and watered the surface area of

8    the alluvium underground basin underlying Camp Pendleton_7 and the

9    subsurface flow of that stream which sub-irrigates the lands

10   adjacent to the stream.  Those riparian rights of the United States

11   of America likewise entitle it to make a reasonable use of the

12   waters of the underground basin situated within the confines of

13   Camp Pendleton, all of which are more particularly described in

14   the preceding findings.  Moreover, the subsurface flow and the

15   underground basin comprise a single source of supply to meet the

16   needs of Camp Pendleton, the United States Naval Hospital and the

17   United States Naval Ammunition Depot.  It likewise constitutes the

18   source of water supply for the agricultural uses, including the

19   watering of livestock, all as described in the preceding findings.

20        13.  The flow of the Santa Margarita River is not

21   sufficient to supply all of the riparian needs of the riparian lands

22   of the United States of America.  Similarly, the flow of the Santa

23   Margarita River is insufficient to supply all of the riparian needs

24   of all of the riparian lands of the Vail Estate.  Thus the average

25   annual yield of the Santa Margarita River is insufficient to meet

26   all of the riparian demands of either the United States of America

27   or the Vail Estate.  By a stipulated judgment, Exhibit A of the

28   Complaint, the respective rights of the United States of America

29   and the Vail Estate, insofar as this litigation is concerned, have

30   been established.

31        14.  The riparian rights of the United States of America

32   in the Santa Margarita River are held by it correlatively and

GPO O - 679013

16—29995-1

1945

reciprocally with all other riparian owners on the stream.  The
riparian rights to the use of water to which the United States holds
title, like all other riparian rights, are part and parcel of the
land.  It acquired those rights from the Rancho Santa Margarita.
They are inseparably annexed to the land; they were not acquired by
use nor are they lost by disuse.

15.  Riparian rights, like other property rights, are
protected against encroachment by the Constitution and laws of the
United States of America and the Constitution and laws of the State
of California.

16.  Riparian rights to the use of water may be exercised
for any beneficial purpose.  Moreover, the riparian owner is
protected in his riparian rights not only for present actual bene-
ficial uses but likewise for all prospective reasonable beneficial
uses.

17.  Riparian rights for present actual beneficial uses
and for future prospective beneficial uses are, under the laws of
the State of California, accorded a paramount and preferential
status to the right of any subsequent appropriator.

18.  A military use is a beneficial use for which
riparian rights may be exercised.

19.  The past and present diversion of water by the
United States of America from the Santa Margarita River, as disclosed
in the preceding findings, has been a reasonable exercise under the
laws of the State of California of its riparian rights.  There
resides in the United States of America, as against the Santa
Margarita Mutual Water Company a right to divert annually from the
Santa Margarita River for military use, which use, in the light of
evidence adduced, would be a reasonable exercise by the United
States of America of its riparian rights in the Santa Margarita
River, a quantity of water equivalent to the maximum demands set
forth in the findings for agricultural purposes. However, as disclosed
by the findings, predicated upon the average annual yield of the

1946 216

1   Santa Margarita River and the known entitlements to water of the

2   other riparians and appropriators with rights prior to the Santa

3   Margarita Mutual Water Company, there is available to the United

4   States of America for use at Camp Pendleton, the United States

5   Naval Ammunition Depot and the United States Naval Hospital a

6   quantity of water not exceeding 12,500 acre feet a year. Only by

7   the most careful use and re-use of the waters and protection of the

8   underground basin for peak demand during periods of emergency will

9   the United States be in a position to meet the demands of total

10  mobilization.

11          20.   There resides in the United States of America in

12  connection with those riparian lands susceptible of practicable and

13  profitable irrigation described in the preceding findings, as

14  against the Santa Margarita Mutual Water Company, the right to

15  divert for agricultural purposes the number of acre feet of water

16  annually, as disclosed by those findings. As recognized above,

17  however, the reasonable irrigation demands for the riparian lands

18  susceptible of practicable and profitable irrigation far exceed the

19  annual yield of the Santa Margarita River.

20          21.   Under the laws of the State of California, rights

21  to the use of water being a species of real property, may be

22  acquired by adverse use for the five-year period prescribed by

23  State statute. That principle applies to the surface flow, sub-

24  surface flow and the waters diverted from the underground basin.

25  Since prior to 1920, the United States of America and its predecessor

26  in interest have impounded water in Lake O'Neill described in the

27  preceding findings and have applied that water to beneficial use.

28  That diversion, as revealed by the findings of fact, has been

29  actual, open, notorious, hostile and adverse to all claims of right,

30  continuous and uninterrupted for the statutory period and made under

31  claim of right. There was, by reason of that fact, acquired a

32  prescriptive right in connection with the structure in question to

- 34 -

the quantities of water set forth in the findings of fact.  Moreover, all of the elements for acquisition of prescriptive rights have been found to exist respecting the use of water from the Santa Margarita River upon those areas known as the South Coast Mesa and the Stuart Mesa.  There resides in the United States of America a prescriptive right to the use annually of the quantities of water set forth in the findings of fact in connection with the area referred to in the preceding sentence.

22.   There rested with the Stanta Margarita Mutual Water Company, which asserts inchoate and unexercised appropriative claims from the Santa Margarita River with priority dates of October 4, 1946, and November 12, 1947, the burden of proving that there exists in the stream in question a surplus of water in excess of reasonable beneficial uses by those who, at the time the Company sought to initiate its appropriative rights, had prior and preferential rights in that stream.  The Santa Margarita Mutual Water Company failed to sustain that burden of proof.  To the contrary, as revealed by the findings and evidence, the average annual yield of the Santa Margarita River when the Santa Margarita Mutual Water Company sought to initiate its rights was far short of the demands of the vested rights to the use of water of the riparian, appropriative and prescriptive claims to water from the Santa Margarita River.

23.   Each and every right to the use of water of the United States of America in the Santa  Margarita River, including but not limited to the rights contained in the Stipulated Judgment, Exhibit A of the Complaint, are prior and paramount to the rights claimed in that stream by the Santa Margarita Mutual Water Company.

24.   Predicated upon the decision of this Court entered December 9, 1952, (United States of America v. Fallbrook Public

1948
218

1   Public Utility District, 108 F. Supp. 72 (U. S. D. C. S. D. Cal,

2   C. D. 1952)); the findings of fact and these conclusions of law, the

3   United States of America is entitled to judgment in this action

4   adjudging and declaring that it is the owner of the rights to the

5   use of water which were the subject matter of this cause and quieting

6   its title against the adverse claims asserted by the defendant

7   Santa Margarita Mutual Water Company.

Dated: February 24, 1953

LEON R. YANKWICH,
Chief Judge

- 36 -

1949