# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PEOPLE OF THE STATE OF CALIFORNIA,

*Appellant,*

vs.

UNITED STATES OF AMERICA,

*Appellee.*

No. 14,049

Mar. 30, 1956

SANTA MARGARITA MUTUAL WATER COMPANY,

*Appellant,*

vs.

UNITED STATES OF AMERICA,

*Appellee.*

Upon Appeals from the United States District Court
for the Southern District of California
Southern Division

Before: STEPHENS, ORR and FEE, Circuit Judges

JAMES ALGER FEE, Circuit Judge:

The United States brought an action against some three thousand (3,000) defendants to quiet title to water rights claimed to be appurtenant to lands acquired in 1941-1943 and used for various purposes of the army and navy and which, collectively, with additions from the public domain, will be referred to as "Pendleton."

The history of this litigation appears in United States vs. Fallbrook, 101 F.Supp. 298, 108 F.Supp. 72, 109 F.Supp. 28 and 110 F.Supp. 767.

The State of California was served as a defendant and appeared as intervenor.

2144

2          *People of the State of California vs.*

On motion of the government, separate trial was held as to Santa Margarita[1] and People of the State of California. Thereafter, the trial court entered a judgment in favor of the government and against these two, the appellants, Santa Margarita and the State alone, from which these appeals are taken.

The judgment which was rendered contained recitals of certain declarations purporting to be based upon findings of fact, and adjudged that the Santa Margarita Mutual Water Company and the State of California, and each of them, ''are forever barred from any and all claim, right, title or interest in those rights to the use of water''[2] which the court found vested in the United States. The judgment was made final July 1, 1953.

During the years 1941, 1942 and 1943, the United States, by three separate transactions, acquired by condemnation and purchase most of the Rancho Santa Margarita[3] and by executive order added thereto from the adjoining public domain 1574.61 acres more and established thereon the United States Naval Ammunition Depot at Fallbrook, the United States Naval Hospital and Camp Joseph H. Pendleton. All of this land, with the exception of the lands added from the public domain, had been in private ownership long before California joined the Union. This military reservation as a whole has an area of 135,000 acres. The Santa Margarita River is a coastal stream which drains a watershed in San Diego and Riverside Counties and flows through Pendleton for 21 miles and thereupon enters the ocean.

The United States brought into the trial court all of the other claimants of the river system, praying that its title to water right as the landowner at the mouth be quieted against each and all. By final judgment, the District Court is empowered to grant complete relief as to all claimants and the United States, adjudicate the water rights, set up control systems and require physical

---

[1]Santa Margarita Mutual Water Company, herein referred to as ''Santa Margarita.''

[2]Declaration of Judgment No. 16, 110 F.Supp. 767, 788.

[3]Rancho Santa Margarita was the private landowner from which the United States acquired most of these lands, and this title was used as descriptive of the lands so acquired. In either connection, this opinion uses ''Rancho'' as the designation.



solutions of specific problems, equitably charging the expense thereof to the claimant of surplus so created.[4]

The cardinal fact in the case is that in 1941 the State of California ceded to the United States general sovereignty over the territory land and water embraced in the enclave.

Among the factors extraneous to the merits, which seem to have affected the trial of this case, was the standing and good faith of Santa Margarita and its supporters. This Court has spoken as to the efforts of interested parties to prevent the trial of this case by the able District Judge.[5] There also was improper interference legislatively to prevent a hearing in one of the courts of the nation. The trial court found that Santa Margarita had "not made any diversion" and the State had issued no permits for diversion or storage. In other words, here was a paper application.

It can apparently be gleaned from the record that this stream and its tributaries are upon lands over which the United States did not have sovereignty before the cession by the State of California. None of these creeks are navigable. There is no problem of the use of these waters for power or navigation. Flood control is necessary only to conserve water and create a surplus. There are thus no complicating factors. Before the acquisition by the government, the problem was one of settlement of rights of individual landowners under California law.

The law of California, by stipulation here and by the federal Constitution, controls the water rights within its boundaries. The most strict application of the doctrine of riparian rights adapted from the common law between proprietors on a stream, both as to normal flow and flood waters, was enforced by the courts of the state. Even the constitutional amendment[6] of the funda-

---

[4] 43 U.S.C.A. § 666.

[5] See Fallbrook Public Utility District vs. United States District Court, Southern District of California, Southern Division, 9 Cir., 202 F.2d 942.

[6] "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters

mental law of the state, although limiting the scope of applicability of the established doctrine by the concept of beneficial use, is given close scrutiny in order not to interfere with vested rights.

Here the United States "claims only such rights to the use of water as it acquired when it purchased Rancho Santa Margarita, together with any rights which it may have gained by prescription or use or both since" that time. Inasmuch as the rights at the date of acquisition depend upon the law of the state, this Court defers to the interpretation of the able trial judge, himself a lawyer of the state of long standing, acquainted with the imponderables and implications inherent in the pronouncement of the courts of the state. This Court will not reject any such interpretation unless convinced that it be manifestly contrary to the holdings of the local tribunals.[7]

On the other hand, decision of problems of national law and process and procedure of federal courts are familiar ground to the judges of this Court. It is incumbent upon federal appellate judges also to maintain the delicate balance between the sharers

---

is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of depriving any appropriator of water to which he is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained." Constitution of the State of California, Article XIV, Sec. 3.

[7]Primarily, the concepts of "state ownership" of water and "prior appropriation" on privately owned lands, as applied in strictly desert land states, are entirely alien. The history and interpretation of the California water law show the riparian doctrine accepted there has been much more strict than at common law.

2147

of dual sovereignty in this area, the United States of America and
the State of California. The problem has intriguing scholastic
aspects. But it is earthily practical. These are therein deep
rooted implications of the structure of government.

If the partial judgment in this case had only gone to the
extent of declaring under the laws of California one who has
filed an application for appropriation of water, which had not
been acted upon by the state authorities and under which no
diversion had been made, acquired no privileges which should
conflict with the vested real property rights of riparian owners
and established appropriators, no appeal would probably have
been taken. But this judgment, above summarized, apparently
cuts off (a) the right of the State of California, as sovereign over
the landowners and appropriators on the watershed, other than
the federal government, to resolve the water rights outside the
enclave between such parties and also the rights of the State of
California, as landowner and proprietor of water rights on parcels
in the watershed above the enclave; (b) the right of Santa
Margarita, by perfecting its application, to rank ahead of sub-
sequent applicants for appropriations, including the Navy, and
to utilize surplus water, if any, which developed now or in the
future. And finally (c) in a suit where there are many other
parties, the partial judgment attempts to fix positive rights of
ownership of water in the government ''by prescription'' or ''use''
which rights would not only be valid against the State of Cali-
fornia and Santa Margarita, but against all the other litigants
and the world.

The government apparently desired to try Santa Margarita
because it was obviously in the weakest position of any prospec-
tive user on the stream. This was, of course, perfectly proper,
and this Court has affirmed the trial judge in the exercise of his
discretion.[8] But no license was accorded thereby to enter judg-
ment in such sweeping terms. It is demonstrable that some of
the declarations, conclusions and findings are improper as to each,
Santa Margarita and the State of California. If Santa Mar-
garita had any right, even inchoate, under the laws of California,

---

[8]Fallbrook Public Utility District vs. United States District Court,
Southern District of California, Southern Division, supra.

*People of the State of California vs.*

then that right, whatever its value, must be protected.  The State of California should not be denied the power of granting a permit to Santa Margarita valid against all private landowners. It would, of course, only be valid for surplus waters, if any, now or in the future.  Diversion of water not surplus by an appropriator is a trespass.  While there might be a final judgment in this case declaring the future needs and settlements of the United States, such a judgment should not cut off rights to use the water which is presently surplus, if any.

These errors in the breadth of the partial judgment may have been caused by a misconception of (a) "military necessity," (b) "sovereign rights" of the United States, or (c) the effect of a judgment[9] in the state court between Rancho and Vail[10] and a stipulation between the government attorneys and Vail.

One factor is handled only to be immediately discarded.  The government brief blares out like a trumpet the "military necessity" in the use of Pendleton against the "aggressors."  "It was on the postulate that the United States of America could utilize water in the State of California successfully to wage war that the case was tried."  This reasoning seems to have had effect on the findings of the trial court.  The crisis existing when this land was acquired still exists.  It may exist beyond the lives of any now living.  New developments may require the taking of

[9]Upon the reversal and remand for new trial of the cause entitled Rancho Santa Margarita vs. Margaret R. Vail, 11 California 2d 501, a stipulated judgment dated December 26, 1940, was entered in the "Superior Court of the State of California in and for the County of San Diego" between the parties thereto. The judgment purported to declare the rights of the parties thereto "in and to the waters of the Temecula-Santa Margarita River and its tributaries." It specifically set up an elaborate system for the measurement of the flow of the stream, and provided for pumping privileges and the release to the Rancho during "irrigation season of each year, to wit, May 1 to October 31" of "a constant flow of water not less than three (3) cubic feet per second" at a gauging station at the upper end of Temecula Gorge, immediately downstream from the confluence of Murrieta Creek.

[10]The Vail estate, owner of 40,575 acres of upper riparian land, a party to litigation noted above in Footnote 9 and a defendant in this suit but not a party to the trial, see Declarations of Judgment Nos. 4, 5, 6, 9 and 12, 110 F.Supp. 787, 788. The estate and the individual Vails will be herein referred to as "Vail," "the Vails" and "Vail Estate."

more land. For that, the government will pay just compensation. If more water rights than those presently appurtenant to the holdings are necessary, the government can acquire these also by paying just compensation. But the principles of property law should not be warped in order to provide for contingencies yet to come. The stipulation above quoted measures the right of the government. The theory of the government agents seems to be that, if a military post be established upon the mouth of a stream and the State voluntarily cedes sovereignty of the area, on the ground of military purposes and future military necessities, the government obtains the right to use all of the water which in the state of nature flowed there, even if the land and water is located in a state where the United States had no sovereignty except by the admission of the state to the Union. It is true, the decision here does not approach the limits of the theory proposed, but the findings and declaration seem to have been influenced thereby.

As noted, the United States had no original sovereignty over the territory included in the present boundaries of the State of California. This is a unique situation, although not entirely unprecedented. No sovereign rights over this land existed in the United States except as provided by the dual system until the State of California ceded exclusive jurisdiction over the tracts of land acquired by condemnation. By federal law, thereafter, United States held paramount and exclusive control and jurisdiction over the land and water which at any time is upon the land within the limits of this enclave. The process of the state courts could not run therein unless by consent. The executive and administrative bodies and regulations had no control therein. State law, substantive and procedural, had no force over persons or objects within the boundaries.

The question of "sovereign rights" of the United States pervades this entire case and has done so from the beginning. Not only that, but the steady beating of the war drums in the government's brief by references to "military necessity" tends to deflect full consideration from the property rights of ordinary citizens.

It is true enough that, at the time of the establishment of Camp Pendleton in 1942, military necessity was a prime consider-

2150

ation. There are elaborate disclaimers by the government attorneys of any appeal to the doctrine of sovereignty in settling this case. These appear likewise in the opinions and findings of the trial court. On the surface, it is agreed by all that the law of the State of California should be applied. For all that, the sovereign rights of the United States seem to have had a controlling effect upon the findings and judgment.

Now it must be conceded by all parties that the United States had sovereign rights in the enclave. The rules governing the use of that property were properly set by the Executive under the Constitution. Its rights within the borders were sovereign, paramount and supreme. This principle applied to the use of water appurtenant to the land. The United States could store the water which came to the land or use it on a different watershed than that of the Santa Margarita without interference from anyone. The Water Master of the State of California had no authority in the enclave and could not object. Santa Margarita could not object or prevent the United States from using the water which came onto the land in any way its officers chose. This sovereign authority was essential and was granted by the Constitution.

But the physical possession of the corpus of the water after it enters the enclave and the ability and legal right then to use it for whatever purposes are not evidentiary of a water right, for the right to use water is a property right and is appurtenant to particular parcels of land. We must not fall into the fallacy of believing that, because the United States, by its sovereignty, made use of the corpus of water which entered the enclave as it chose, it thereby acquired property rights in the flow against upper riparians or appropriators under municipal law.

This principle has important effects. The findings of the trial court that there was no surplus either now or in the future were vitally affected. Since neither appropriators, riparians nor anyone else could object or prevent such use of water by the United States in the enclave, such use was not adverse to their interests.

These parties could not be estopped by "use" of the corpus of the water with which none of them by any possibility could interfere. To hold that the "use" of the corpus of the water coming onto the enclave for any purposes the government agents

required, whether beneficial or not, and that the "needs", present and future, claimed by government attorneys were the measure of vested property rights, would be to adjudge that California not only ceded the sovereignty over the enclave, but thereby bargained, sold and delivered a vested water right adverse to all other claimants in all the flow of the stream at that time. But California did not own such a water right and could not grant it.

The government, as regards all claimants to water outside the enclave, is not in the position of sovereign, but in the position of a lower riparian which is compelled to make beneficial use within the watershed and for other than proper riparian uses must show an appropriation according to law.

This case must be remanded because of the apparent misconceptions of the law of the enclave by the trial court and the application of the theory of sovereignty to the subversion of vested and inchoate private rights.

Declarations, findings and conclusions, hereinafter criticized, eventually may be found in substance to be well founded upon the entry of final judgment in the action. In remanding, this Court is not attempting to find fact or express any opinion as to fact situation, but rather to indicate that many of the declarations, findings and conclusions are not well founded on the present record, are premature and may tend, if allowed to stand, to be given undue weight in the final judgment, owing to the erroneous influence of factors herein considered.

The two declarations of the judgment are manifestly erroneous:

"12. If the correlative rights of the two chief riparian owners (the United States of America and the Vail Estate) are considered, there was not at the time of the filing of the appropriation notices by the Santa Margarita Mutual Water Company in 1946 and 1947, any surplus water supply to appropriate.

"13. There is no surplus water supply at the present time subject to appropriation."

as is Finding 115:

"There is no surplus water at the present time available for appropriation from the Santa Margarita River System; there

2152

was no surplus so available in the year 1946; there was no
surplus so available when Camp Pendleton was placed in
operation as a military installation in 1942."

If these are findings of fact, they are clearly erroneous; and, if
conclusions of law, they are wrong.

There are no facts found by the court anywhere which justify
this declaration. In essence, it appears to be based upon prior
litigation between the Vails and predecessor of the United States
and the acceptance by the latter of that decree as a basis in this
case. Also, the agreements and stipulations between the United
States and Vail seem to have been given weight. None of these
considerations was proper, since Vail was not a party to this
present judgment and the rights of Santa Margarita against it
were reserved. Similarly, the State of California had other lands
in the watershed which it excepts specifically because this dec-
laration eliminates consideration of the water rights of these lands
by a spurious merger of the rights of Vail and the United States.
This merger was an attempt to tie the landowner uppermost on
the watershed to the lowermost owner, which could not be done
against those having intervening rights on the stream except by
the application of the principles of sovereignty.

Appellants make the point in the assignments of error that the
Vail Estate is not a party to the instant judgment. The trial
court specifically said, as a ground for entering the partial judg-
ment against appellants, that the rights of Santa Margarita
against Vail and all other defendants in the main suit would be
reserved. There had been a lawsuit wherein the water rights of
Rancho Santa Margarita, a private owner, predecessor of the
government, on a part of this land against the Vails were de-
termined. But this stipulated judgment between two litigants
is contractual in character between the principals to the agree-
ment and is not binding upon the Water District or the State.
Thus the correlative rights between the Vail Estate and the gov-
ernment have been settled by agreement. Such a correlation does
not bind appellants. But a key declaration is based upon the
assumption that it does. There is connected therewith another
finding which comes within the same assignment of error. The
court found the United States was entitled to 3 cubic feet of

2153

water per second at the upper end of Temecula gorge, which was released to it by the Vail Estate as against the Santa Margarita.

The stipulation that it is necessary for Vail to release these 3 cubic feet was and is, of course, binding upon the parties thereto. But the release at that point is obviously not a delivery to the United States. It only means that Vail was not entitled to any use of water unless and until there had been such a quantity released. It must be assumed that the rights of the intervening landowners and appropriators between the point of release and the boundary of the Rancho must have been considered. In any event, neither the state court nor Rancho and Vail had power to bind such parties or the State of California. This feature must be considered since it was given so much weight by the trial court in determining there was no surplus.

If the Vail Estate could not use this water above the filling of the Water Company, there would be a question of fact between them as to whether Vail could sell this water to the United States. Furthermore, the question concerns all other riparians and appropriators between Vail and Camp Pendleton.

None of these factors could be considered in making a decree that, on account of them, there was no surplus in the Santa Margarita watershed.

All the findings of fact relating to the Vail Estate and the litigation with the previous owner of the lands now held by the government would be pertinent in litigation between Vail and the government, but neither that nor the adoption of the decree by the government helps it against either the Santa Margarita or the State of California.

As will be hereafter noted, the trial court distinctly states this is not a final judgment as to Santa Margarita, but its rights in connection with the other defendants (including Vail) must be hereafter determined. The court was therefore in error in using the supposed rights of Vail as against Santa Margarita.

The declaration (No. 13) that there is no surplus at the present time is invalid. Here the misconception is apparent. If the corpus of the water coming onto the land in a dry year be considered, there might not be sufficient to satisfy the legitimate

2154

needs of the United States upon riparian land in that particular year. But that circumstance would not diminish its "water right" appurtenant to the land. Nor would it increase the incorporeal water right. In a future flood year, the United States would have the right to insist that only such water enter the reservation which a private owner could have used beneficially upon riparian land. It is improper to average the use, demand or supply of water over a series of years in the attempt to determine whether or not there is a present surplus.

The defects made manifest in the discussion of paragraph 12 enter into this consideration also and likewise vitiate this declaration.

The declaration that "there is no surplus water supply at the present time subject to appropriation" is clearly erroneous. This "finding" is in truth a conclusion. As such, there is a begging of the question at issue. The trial court assumes that "the demands of the United States of America of 15,300 acre-feet a year as recognized by the Trial Court" are valid and established. But that is the very point at issue. Instead of reasoning back from postulated "demands" of the government to find whether a present surplus exists, the trial court should have found in second feet or some other appropriate measure what water was at the designated time applied beneficially and not prodigally to riparian lands. The conclusion involves many facets of conflict. First, do the sovereign rights of the United States within the enclave change its relative position in respect to other private riparian owners and appropriators? Second, are the correlative rights of the two chief appropriators, the Vail Estate and the United States of America, which have been settled by agreement between them and which depend upon the final adjudication binding upon intervening riparians and appropriators to claimed surplus water?

Finding No. 115, that there was no surplus water at the time the United States acquired the lands is a pure deduction related back from the finding that there is no surplus at present time. No precise finding as to the amount of water used on each tract beneficially at that time has been made in this proceeding. This finding has no basis in the testimony or record. It is shown

clearly erroneous by the fact that other findings show that flood water wastes into the ocean in various years when the land was in private ownership.

We are not therefore prepared to say, upon the bases of the findings of the trial court and the record in this case, that the uses to which the water was put by the United States were valid as compared with the inchoate appropriative right of Santa Margarita. Every water right in private ownership in California and each use or diversion thereof as appurtenant to land is subject to the limitations and prohibitions of the Constitutional amendment. Peabody vs. Vallejo, 2 California 2d 351, 367. It is certain from the evidence in the case that in some years there is surplus water which flows clear through the watershed and wastes into the sea. No attempt is made by this Court to determine here what rights Santa Margarita might receive under a permit with relation to the United States and other riparians and other appropriators. But it was error for the trial court to enter a final judgment as regards Santa Margarita without determining these questions.

Finally, the trial court found that there were 4535.3 acres of lands in the lower basin and that "the natural forage in this area is dependent upon the supply of water in the underground basin." There were no definite findings as to how much water had been used at any time for that purpose. There was no finding that allowing the floodwaters to plunge over these lands was a reasonable method of application and use. There was no finding that no physical solution could be found for the problem, charging the cost to those claiming the surplus thereby created. There was no finding that the water stored in Lake O'Neill could not have been applied to this agricultural use, besides delighting the eye of the beholder. There was no finding that the Rancho and the government agents were not depleting this basin themselves by pumping water outside the watershed. If the latter were true, it might be possibly claimed as a "substituted use," but surely the other parties above would not be required to allow water to flow down for the original use and for the substituted use in addition thereto. Yet this is within the scope of the declaratory judgment.

2156

The adequacy of the findings, conclusions and declarations as to surplus which have just been discussed directly bear upon the rights of the State of California and Santa Margarita. There are pronouncements as to purported rights of the government not riparian in character, which enter into the declaration as to present surplus and also affect these litigants, but, since these are stated as vested property rights acquired by prescription and use, positively affect all the other parties in the main case filed in the name of the United States and all the world.

These pronouncements are summarized in the margin.[11]

[11]An adverse right to an **average** of 4300 acre-feet per year for diversion into Lake O'Neill was found to have been acquired by the United States and its predecessors in interest during "a five-year period since 1920." United States vs. Fallbrook Public Utility District, 110 F.Supp. 767, Findings of Fact Nos. 59, 60 (page 777).

An adverse right to the use of 4806 acre-feet per year was found to have been acquired for the irrigation of portions of Stuart Mesa and South Coast Mesa outside the watershed. The open, continuous and adverse use was said to have begun on Stuart Mesa in 1938, and on South Coast Mesa in 1939, after the Supreme Court of California had declared that the water of the Santa Margarita was insufficient in a suit between the Rancho and the Vails. Distribution of water to these areas through the government's distribution system was found to have commenced in 1942, along with practically all of the water used for military purposes, such uses also occurring off the watershed. Findings of Fact Nos. 61-66 (page 778).

The yearly **average** actual use by the military reservation was found as 9,934 acre-feet, but the **needed average** on a "present-day basis," was found to be 11,000 acre-feet per year. Finding of Fact No. 67 (page 778).

The quantity of water available to the government was found to be 12,500 acre-feet per year. Finding of Fact No. 113 (page 783).

As a conclusion of law, it was held that an adverse right to impound water in Lake O'Neill was vested in the government, and moreover "all of the elements for acquisition of prescriptive rights have been found to exist respecting the use of water from the Santa Margarita River" upon South Coast Mesa and Stuart Mesa. Conclusion of Law No. 21 (page 786).

It was then adjudged that the present **average** need was 11,000 acre-feet per year, which included 4806 acre-feet used on irrigated lands outside the watershed. Additionally, the government was possessed of a prescriptive right to impound annually 4,300 acre-feet of water in Lake O'Neill. It was then concluded that, inasmuch as there was "not more than 12,500 acre-feet annually" available to the government, no sur-

We now take up a consideration of the supposed positive rights of the government declared in this suit to exist by prescription and use as the foundation of a partial judgment in an action brought against all the owners in a watershed: (1) Storage of water in equalizing reservoirs or in Lake O'Neill; (2) uses of water outside the watershed; (3) military uses and the use of water in townsites or barracks not riparian. Such uses may indeed be beneficial.

Suffice it to say, the findings do not support the existence of any water right in Rancho or the government by either of these methods of acquisition. Although the question was argued, this Court does not presently decide whether a lower owner in California can acquire title to water rights by prescription or use against upper riparians or appropriators. "Use" of water can mean nothing more than appropriation and application to some purpose. Since no estoppel could be raised against other landowners and appropriators, the phrase used in the stipulation must mean "prescription" or "appropriation." Because of this, the theory underlying the judgment, however, is that Rancho acquired a water right for such purposes above enumerated by "prescription or use."

Apparently, under the law of California since 1913, a valid water right by appropriation can be acquired only by filing an application with the state authorities and pursuing it through the steps required by law.[12] There is no finding that Rancho or the government agents made or pursued such an application.

---

plus water supply existed, after consideration of the correlative rights of the chief riparian owners (the government and the Vails). Declarations of Judgment Nos. 10-13 (page 788).

[12] "No right to appropriate or use water subject to appropriation shall be initiated or acquired except upon compliance with the provisions of this division." California Water Code, § 1225.

A prescriptive right can be gained only by the open, continuous, hostile and adverse user of water under claim of right, to which another has a claim that can be protected by injunction or other legal process. Hence "prescriptive rights" are not acquired "by the taking of surplus or excess water." City of Pasadena vs. City of Alhambra, 33 California 2d 908, 926.

At a late date after the filing of Santa Margarita, the agents of the government have made a filing, ostensibly for the Navy, upon the stream. If its lawyers and agents had obeyed the injunction of the reclamation statute when Camp Pendleton was first acquired and had filed for the surplus waters of the stream, another question would have arisen. But because they were not foresighted enough to do that is no reason to allow them to act as if they had. The Santa Margarita rights, if these have any value, may be purchased. If these have no value, they may be disregarded. In no event can they be appropriated by fiat.

Appropriated water must be appurtenant to a particular parcel of land and a particular beneficial use, and the initiation must be fixed at a positive date. Title to a water right by prescription must be founded on like essentials, and it must be further found that the use of a specified quantity on a given parcel continued through the period. There is no prescriptive right in gross. There can be no acquisition of such a right for a purpose not beneficial. But findings to support the acquisition of a title by either method in Rancho are conspicuously absent. The trial court seems also to have laid emphasis upon the proposition that the use by Rancho was adverse because in violation of the Vail decree. It would seem that, if thus adverse, it was only adverse as to Vail, and, if in violation of the terms of judgment, it could not be "under claim of right."[13] We do not pass upon this point, but designate the inadequacy of the findings.

The findings were not sufficient to support any prescriptive water right either in Rancho or the government. In order to be valid, such findings must specify a particular period not less than five years, during all of which a quantity of water (miners' inches, cubic feet per second, acre feet) was continuously applied to a particular beneficial use, under claim of right, hostile and adverse to the property rights of all others interested.

There is also an attempt in the findings, conclusions and declarations to cure this defect and to cumulate the time when Rancho made use of water for purposes not riparian with that time when agents of the government made nonriparian uses of a

---

[13]Declaration of Judgment No. 9, 110 F.Supp. 767, 787.

different character and different purposes.[14] This attempt is fallacious. As soon as the United States took sovereignty of the enclave, as we have heretofore noted, its agents had the right to use the corpus of any water on any part of the area for any purpose. The State of California could not object or interfere. Its officers and agents could not even enter Pendleton without permission. The Bureau of Water Resources had no power or authority within these limits, as above noted. The trial court so held, and the holding is correct. The private landowners and appropriators could not object to any use of water by the government agents. Indeed, the former might well have been kept in complete ignorance of what was going on. In any event, no one could resist by self-help the use by the agents of the government in whatever use they wished to make. An action for damages or for injunction by landowners or appropriators above would necessarily have been dismissed.

Since no one had the right to interfere, the government could not acquire originally or by tacking onto some previous use so as to create a property right in waters which had not yet come onto the land. The use of water in the enclave by the government was of sovereign right and was not and could not be adverse to any other holder or claimant above. The doctrine of prescription envisions a party whose rights are being openly and notoriously violated by another having the power to intervene and prevent the violation from becoming an adverse property right by self-help or by bringing an action or obtaining an injunction before the period of prescription runs. But, when the United States was in possession as sovereign, the water which came into the enclave could be used without let or hinderance in any way which the agents of the government chose.

The implication apparently is that upper riparians or future appropriators must during the period have dammed up the water and prevented the flow of floodwaters from reaching the enclave and wasting into the ocean. There is no foundation for this assumption. For it is paradoxical to say the government agents had the right to use the corpus as they did and still say such use of

---

[14]Findings of Fact Nos. 59, 60, 63, 65; Conclusion of Law No. 21; Declaration of Judgment No. 10. 110 F.Supp. 767, 777, 778, 786, 788.



waters, admittedly surplus at the time, founded right not only against an upper riparian such as the State of California, but against the world, to have all surplus water flow in perpetuity until it reached the boundaries of the enclave. But, if sufficient findings were not made to support the judgment in this respect, the declarations and findings as to the existence of a present surplus fail also.

The implication that the government agents had the right to use water outside the watershed is another apparent application and extension of the right of sovereignty outside the boundaries of the enclave to the prejudice of owners of vested and inchoate rights under the laws of the State of California.

There is no finding sufficient to support an existing property right at the time of acquisition by the government to use water off the watershed. Insofar as there is a claim for pumping privileges, the law limits the use of water so obtained to the watershed and the rights of the overlying owners must be equaled with those of other riparians and established appropriators.[15] There is no uncontrolled right to use pumped water wastefully or in another watershed. There are no findings of an appropriation by the agents of the government or any previous owner of pumped water which developed into a perfected water right. Neither do the findings show a specific completed prescriptive right.

The findings to establish either an appropriative or a prescriptive right or a right to use water off the watershed are entirely inadequate.

The key question in this case is who had the right to store these floodwaters for future disposition, Vail, Santa Margarita, Fallbrook or the United States, or perhaps some other owner intermediate on the stream? Or perhaps some physical solution by or control under court decree could permit participation by all in the conservation of all flow of the watershed for beneficial use so that no drop would waste uselessly into the Pacific?

The findings, declarations and conclusions are not sufficient to establish the right to the nonriparian use of the flow of floodwater by storage in any of the three participants to this partial

---

[15]Peabody vs. Vallejo, 2 California 2d 351.



judgment. The trial court at no place defines the rights which an applicant for a permit to appropriate for storage acquires under California law in relation to other owners and users. There are no adequate findings as to the right of the owners previous to the government to hold water in Lake O'Neill. There are no findings upon which use of an "equalizing reservoir" or any other reservoir for riparian or nonriparian land had been acquired by the predecessors of the government.

As to "military use" and particularly the use of water in barracks and quarters of service personnel off the watershed, as a substitute use for portions of the flow previously used off the watershed for agricultural purposes, the difficulties have been suggested above. Certainly, the findings are inadequate to show that part of the water now used or vaguely intended to be so used in the future is not presently surplus. Surely the uses are not riparian to the lands in the watershed. The use in barracks is analogous to municipal use. Undoubtedly, the agents of the government could use for such purpose any water lawfully coming onto the enclave by virtue of a water right owned by Rancho. But the findings do not show Rancho owned such a property right.

It will be noted that this Court has carefully avoided suggesting that Santa Margarita has any rights or even inchoate privileges, either as a matter of fact or law. It may well be that a state administrative board might never grant a permit. If a permit were granted and Santa Margarita diverted water not at that time surplus, a trespass would have been committed by the diversion upon the owner of the water right, whether the United States or another. Further, this Court does not attempt to say whether there is a present surplus in the watershed.

It is here directly decided that entry of a partial judgment in declaratory form containing an absolute pronouncement that neither Santa Margarita nor the State of California had any rights against the agents of the government in the flow in this watershed was premature. The attorneys for the government had brought all the parties into court and final judgment could include physical solutions and a supervisory system of control, if that be deemed advisable.

The only proper method of adjudicating the rights on a stream, whether riparian or appropriative or mixed, is to have all owners of lands on the watershed and all appropriators who use water from the stream involved in another watershed in court at the same time.

The trial court violated this principle by issuing a declaratory judgment as to the right of the United States as against one claimant whose rights were junior, which had the effect of preventing a trial of the other water rights involved without giving a hearing as to the individual owners.



Under the rule of waters adopted, the State originally was strictly riparian and must be recognized as such. Herminghaus vs. Southern C. E. Co., 200 California 81. The Constitutional amendment has been noted as a limitation on that right, which is strictly construed, as the trial court correctly notes. But everyone must admit that the purpose of the constitutional amendment was to vest with a public interest the use of all the waters of the state, so that no part of the precious supply should flow uselessly into the sea or otherwise go to waste. This characterization applies to flood waters as well as the normal flow. But there is no right to an unreasonable use or unreasonable method of use. United States vs. Gerlach Livestock Co., 339 U.S. 725. In providing for the United States, the trial court apparently held that the flood waters must be permitted to flow into the sea in order to protect the lower land of its holding from intrusion of salt water. There is no express finding that this is a beneficial use. But it is clear from the facts found that in certain years tremendous quantities of water do flow uselessly into the ocean. It is entirely improper for the government to show that, on the average of a series of years, it would not obtain its quota. The right to floodwater, in order to be claimed as appurtenant to the land, must be used in the year when it occurs.

As a result of the considerations which have been suggested above, we are of opinion this case must be reversed due to the entry of the partial judgment in this cause. The assignment of no damage by the entry of such a judgment was an abuse of discretion. It is, in fact, somewhat shocking in litigation where a whole stream system with various types of ownership of land and use of water, appurtenant and in gross, vested and inchoate,

overlying, riparian by appropriation and by permit, that the court should attempt to adjudicate matters which affect the whole collection of rights and all the defendants in a proceeding which directly involves three litigants only. Most prominent in this adjudication is the finding and declaration that the government has certain water rights by prescription. A right by prescription is binding upon all the world, not only upon the water district, but upon all owners and possessors of rights on the stream system. But these parties, although defendants in the suit, cannot appeal from this decision. It may be said that this finding or declaration is not binding upon them.[16] If allowed to stand, however, the determination will have effect upon the other defendants because it is a finding of a right against all the world in a suit in which they are parties.

The court ostensibly reserved the right of trial to Santa Margarita as to other owners, but it has been seen that the presumed rights of the Vail Estate and its agreements with the United States were used adversely to Santa Margarita.

The State of California has other property in the watershed. It has been specifically assigned as error that the rights of these properties were not adjudicated as against the United States in this case. The judgment "purports to adjudicate all of the State's rights" in the river.

Santa Margarita Mutual Water Company has appealed from the granting of a certificate by the court, to the effect that there was no just reason for delay in the entry of a final judgment against it and the State of California.

After a review of the record, the outstanding fact is that all of the riparians and appropriators on the watershed are vitally

[16]The defendants, not joined to the trial, are neither "parties" nor "privies" to the findings and judgment entered therein because: " 'Under the term **parties**, in this connection, the law includes all who are directly interested in the subject matter and had a right to make defense or to control the proceedings and to appeal from the judgment * * * Persons not having these rights are regarded as strangers to the cause * * * privity denotes mutual or successive relationship to the same rights of property.' " Litchfield vs. Crane, 123 U.S. 549, 550-551. Cf. Brotherhood of Locomotive Firemen and Engineers vs. United States, 5 Cir., 183 F.2d 65, 66.

2164

interested in certain of the findings and most of the declarations of the judgment. Since this action includes the entire watershed, it is in the nature of a plenary suit to settle the correlative right of everyone interested in the waters. The standard course in such a proceeding is to enter a decree setting up all the rights as of the same date. The State of California did not represent all of these private rights. Besides the damage to Santa Margarita of considering the rights of other persons' drawing water from the stream and, particularly, the Vail Estate, which is not a party to this specific trial, the rights of the others interested in the flow of the stream were prejudged before they had been tried, by sweeping declarations of the judgment in favor of the contentions of agents and attorneys for the government. This was an abuse of discretion.

The cause is therefore reversed and remanded with directions to take further proceedings in accordance with this opinion and enter no judgment until the entire suit can be disposed of at the same date.

Reversed and remanded.

(Endorsed:)   Opinion.   Filed Mar. 30, 1956.
          Paul P. O'Brien, Clerk.

PERNAU-WALSH PRINTING CO., SAN FRANCISCO   4-2-56—200

2165