SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-1131

SACHSE & PRICE
FALLBROOK, CALIFORNIA

Attorneys for Fallbrook Public Utility District

**FILED**

MAY 1 1957

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  vs<br><br>FALLBROOK PUBLIC UTILITY DISTRICT,<br>et al.,<br><br>    Defendants. | NO. 1247-SD-C<br><br>MEMORANDUM ON PRINCIPLES AND ISSUES DETERMINED AND LEFT OPEN BY THE DECISION OF U. S. COURT OF APPEALS 235 Fed (2) 647. |

## Historical Background

This action was commenced January 1951 after several years of negotiations between Federal agencies and State agencies, including Fallbrook Public Utility District, had resulted in an apparent solution of the problem embodied in the so-called 1941 Memorandum of Understanding calling for the joint use of a dam to be built by the United States at the De Luz site, and dividing the waters according to an agreed ratio.

A disturbing reaction to the suit spread across the Country evidencing itself in newspapers and magazine articles, and even in one motion picture, "The Fallbrook Story". Congressional committee investigations followed and for a time a Congressional ban was put on the use of any of its appropriations to prosecute the action.

After Fallbrook Public Utility District and many

-1-

2116

1   individual Defendants had been served in this action the  Attorney

2   General of the State of California intervened, at the request of

3   the Legislature of this State (Transcript of Record, p.541) and

4   in accordance with the invitation of the United States of America,

5   filed an Answer. (Appendix "B" and "D" of Amicus Curiae Brief).

6   Thereafter on Plaintiff's Motion the court directed a separate

7   trial of the issues as to Defendants Santa Margarita Mutual Water

8   Company, Fallbrook Public Utility District and Intervenor, the

9   State of California.  The court having been restrained from

10   proceeding with the trial against Fallbrook Public Utility Dis-

11   trict the trial did go ahead as against the other two.

12          The actual trial in the District Court had occupied

13   nearly a month (October 29,1952 to November 28,1952) the record

14   of which (with certain omissions) filled 775 pages of the printed

15   Transcript of Record, all of which was the testimony given by

16   Plaintiff's witnesses, except only 92 pages. The Government

17   introduced 43 exhibits, and the Defendants 26 exhibits,"A" to "Z".

18          At the conclusion of the trial, Judge Yankwich entered

19   a judgment in favor of the United States on practically all its

20   contentions.  An appeal was taken therefrom by the State of Cali-

21   fornia and the  Santa Margarita Mutual Water Company.  Fallbrook

22   Public Utility District was  granted leave to file its briefs in

23   support of the position of the Appellants and in opposition to

24   the contentions of Appellee.  On March 30, 1956, the United States

25   Court of Appeals for the Ninth Circuit rendered its decision

26   (235 F (2) 647) reversing the judgment and remanding the cause

27   "with directions".

28          The Opinion, as it appears in the published reports,

29   covers some thirteen pages and deals with the numerous contentions

30   made by the parties.  To summarize the pronouncements of the court

31   in passing on the issues presented and the contentions urged by

32   the parties, the editorial staff of West Publishing Company.

2117

1   formulated thirty-four head notes for the opinion.

2          Since no appeal or Writ of Error was taken from the

3   decision of the Ninth Circuit Court of Appeals, it has become

4   "the law of the case.".

5

6                    The Doctrine of the Law of the Case

7          It should be pointed out at the beginning, we believe,

8   that the law of the case doctrine while similar to, is not iden-

9   tical with, the doctrine of res judicata or stare decisis.

10  (5 C J S 1275 Appeal and Error, Sec. 1822). The law of the case

11  doctrine is set out in 5 Corpus Juris Secundum, 1499, Appeal and

12  Error, Section 1964 as follows:

13         "      The decision of a reviewing court becomes the

14         law of the case as to all matters properly within the

15         scope thereof and controls in all subsequent trials

16         or proceedings.

17              It is the general rule that the decision of an

18         appellate court is the law of the case in further

19         proceedings in the cause in the trial court and in

20         all subsequent stages of the action or proceeding, as

21         in a subsequent suit for the same cause of action, or

22         on a subsequent appeal in accordance with the rule

23         laid down supra in §§ 1821-1834.  The rule is especially

24         applicable where the appellate court has remanded the

25         cause with specific directions as to the steps to be

26         taken by the lower court, or on further proceedings

27         after answer to certified questions; and such rule

28         holds good regardless of whether the decision of the

29         appellate court is right or wrong, it being said that

30         it is only where the decision is deemed erroneous that

31         the doctrine of "the law of the case" becomes at all

32         important.

-3-

2118

1      "    The lower court cannot rehear or reconsider the

2      matters decided by the appellate court, and it is the

3      duty of the lower court to follow the decision of the

4      appellate court, its action being deemed erroneous

5      when at variance with the decision, and not erroneous

6      in this respect when in accord therewith.  Stated in

7      another way, the rule is that matters once determined

8      by the appellate court cannot, after remand, be again

9      raised and relitigated in the lower court."

10          It is the well established doctrine of the federal

11   courts that on a second writ of error or appeal, questions of law

12   or fact decided upon the first hearing are not re-considered pro-

13   vided the evidence is substantially the same upon both trials.

14          Northern Pacific Railroad Company vs. Van Dewson

15          Harrington Co., 60 Fed.(2) 394, 397.

16          Clairborn-Reno Co. v. E.I. DuPont, 77 Fed. (2) 565,566

17          State of Kansas v. Occidental Life Insurance Co.

18          95 Fed (2d) 935,936.

19          Midland Valley Railroad Co. v. Jones, 115 Fed.(2d)

20          503,509.

21          Mr. Justice Holmes in Messinger v. Anderson 225 U.S.

22   436,444, said:

23          "In the absence  of statute, the phrase 'law of the

24          case' as applied to the effect of previous orders on

25          the later action of the court rendering them in the same

26          case, merely expresses the practice of courts generally

27          to refuse to re-open what has been decided."

28          In Chesapeake & Ohio R.R.  v. Means, 70 Fed.(2d) 490,

29   491, the court said:

30          "    Per curiam.  This is the second appeal in this

31          case (See 64 F.(2) 291.  All of the questions now pres-

32          ented were dealt with in the opinion on the former appeal,

-4-                              2119

1    which is the law of the case. Dodd v. Union Indemnity Co.
2    32 Fed (2d) 512 and cases there cited.  For the reasons
3    stated in that opinion the judgment appealed from must
4    be affirmed."
5  In Chamberlain Co. v. Allis-Chalmers Mfg. Co., 74 Cal. App 2d
6  941, 942, the court said:
7          "          Preliminarily, in discussion of the points
8          urged for reversal of the judgment by defendant, it should
9          be borne in mind that the rule is established in Califor-
10         nia, that where an appellate court, in reversing a
11         case and in ordering further proceedings, lays down
12         a proposition of law presented on the appeal though
13         not essential to the decision of the case but impor-
14         tant for the purposes of a new trial, such ruling
15         becomes the law of the case and without regard to the
16         correctness of such legal principle is binding upon
17         the trial court and the appellate courts in subsequent
18         stages of the action. (Steelduct Co. v. Henger-Steltzer
19         Co., 26 Cal.2d 634,643; Estate of Baird, 193 Cal.225,
20         239; Wallace v. Sisson,114 Cal.42,43; Porter v. Muller,
21         112 Cal.355,366 et seq; Gwinn v. Hamilton, 75 Cal.
22         265,266; Olney v. Sawyer, 54 Cal. 379,385; Table Moun-
23         tain Tunnel Co. v. Stranahan, 21 Cal.548,551; People's
24         Lumber Co. v. Gillard 5 Cal. App.435,438; c.f. Code
25         Civ.Proc.§ 53.  See, also Cal.Jur.(1921) §562,p.958)."
26  In Woodworkers Tool Works v. Byrne,202 Fed 2d 530, the U. S. Court
27  of Appeals for the Ninth Circuit had before it the matter of
28  construing a former decision rendered by it in the same case on
29  a former appeal (191 Fed 2d 667,673).  Involved was the question
30  of the sufficiency of the evidence to prove Defendant, a foreign
31  corporation, had made one Preuer its agent for the purpose of
32  being served with process in California.  On the first appeal the

-5-

2120

1   court held that the affidavits before the trial court was insuf-

2   ficient to show service of Summons on Defendant but that there was

3   oral testimony at the trial tending to prove Preuer had been act-

4   ing as the Defendant's agent.  The lower court having denied the

5   Defendant's motion to dismiss the action or quash the summons, an

6   appeal was taken.  On the first appeal the Appellate Court con-

7   sidered that the evidence in the record "might be a basis to sus-

8   tain a conclusion that Woodworkers Tool Works had made Preuer its

9   agent" (191 Fed 2d p.673)  The Appellate Court therefore decided:

10   "We vacate the judgment and remand the cause with the direction

11   to the court below to proceed to determine the issue". (p.677)

12       On the second appeal Defendant again urged the insuf-

13   ficiency of the evidence to prove Preuer its agent.  The court,

14   after reciting the foregoing facts, said:

15       "   Is the point now open to inquiry?  We think not.

16       The court's original decision constitutes the law of

17       the case.  It clearly implied that on the evidence in

18       the record the issue was one of fact for the trial court's

19       determination, not one of law for ourselves.  Had we

20       deemed the evidence insufficient as a matter of law to

21       support a finding of jurisdiction, it would have been

22       worse than an impertinance to remand the case for a

23       finding.  We would have been obliged to reverse the

24       judgment outright.  Nor, if we were in doubt whether on

25       that evidence a finding of jurisdiction could be sus-

26       tained by us, would we have thought it proper to under-

27       take at that juncture the very considerable and perhaps

28       wholly futile task of passing on the merits.  Taking

29       the opinion by its four corners we construe it as holding

30       that the trial courts' finding of fact was to be accepted

31       as conclusive of the question of the validity of the

32       service.  True the rule we apply here is not a compulsive

-6-

<u>principle akin to res judicata</u>.  The phrase "law of the
case" expresses rather the general practice of courts
to decline to re-open what they have already decided.
<u>Messinger v. Anderson</u>,225 U.S. 436,444; cf. <u>People of
State of Illinois ex rel Hunt v. Ill. Central Ry Co.</u>,
184 U.S. 77,91.   The rule is grounded in large part
on the policy of ending litigation". (p.531).

(Emphasis added)

The Ninth Circuit Court of Appeals in a later case,
<u>Federal Service Finance Corporation vs. Bishop National Bank of
Hawaii</u>, 205 Fed 2d 11, again had occasion to evaluate the binding
effect of a decision of a court of appeals on subsequent proceed-
ings in the same case and reaffirmed its views expressed in the
Woodworkers Tool Works case.  On a second appeal the court
declared:

"      What we have to say now can be understood only
in the light of the opinion handed down on the former
appeal and this should be consulted for a fuller under-
standing of the facts and the views we entertained as
regards their significance---." (P.11-12)  "

Someone may contend that the judgment in this case
could have been reversed on the sole ground that the District Court
in the first trial was without legal authority to conduct "separate"
trials of the issues as to the Santa Margarita Mutual Water Com-
pany and the State of California, and therefore all of the rest
of the decision is obiter dictum.  Such, however, is not the law.

Where there are two or more grounds upon any of which
an appellate court may rest its decision and it adopts all of those
grounds, it cannot be said that one ground was more important than
another and that rulings based on the other points are obiter dictum;
each is the judgment of the court and of equal validity

-7-

2122

with the others.

United States vs. Title Insurance and Trust Co.

265 U.S. 472,485;

Richmond Screw Anchor Co. vs. United States,

275 U.S. 331,340;

Union Pacific Railroad Co. vs. Mason City and

Ft. Dodge Railroad Company 199 US 160,165-166

In Woods vs. Interstate Realty Co.,337 U.S. 535,537,
the court said:

"   Where a  decision rests on two or more grounds,
none can be relegated to the category of obiter dictum.
United States vs. Title Insurance and Trust Co. 265 U.S.
472,486; Massachusetts v. United States, 333 U. S. 611,623".

In 21 C.J.S. 314,315, Courts, Section 190, it is said:
"   An adjudication on any point within the issues
presented by the case cannot be considered a dictum;
and this rule applies as to all pertinent questions,
although only incidentally involved, which are presented
and decided in the regular course of the consideration
of the case, and lead up to the final conclusion, and
to any statement in the opinion as to  a matter on which
the decision is predicated. "


If this Honorable Court is willing to adopt for its
guidance the method of construing the Appellate Court Opinion in
this case,which the Ninth Circuit Court of Appeals adopted for its
own guidance in the Woodworkers Tool Works and the Federal Service
Finance Corporation cases, supra, it will take that document "by
its four corners" and read and interpret it in the light of the
issues and contentions which the parties presented to and pressed
upon the court for decision.  We are convinced that it was the
intent and purpose of the Appellate Court by its Opinion

-8-

1  in this case to supply this court with the answers to the ques-
2  tions of law and fact raised on appeal by the briefs of the res-
3  pective parties and thereby eliminate them as issues on the
4  retrial.  If that were not true, why, as that court said in
5  Woodworkers Tool Works case, supra, "would we have thought it
6  proper to undertake at that juncture the very considerable and
7  perhaps wholly futile task of passing on the merit?"  Or, why,
8  after reversing the judgment did the Appellate Court remand the
9  cause "with directions to take further proceedings in <u>accordance</u>
10 <u>with this opinion</u>"?

13        Principles and Issues Determined by The Circuit
14        Court Decision and Those Left Open.

16        The opinion rendered by the Court of Appeals, after
17 taking up point by point and criticizing the principal findings
18 and conclusions of law as set out in the decision of Judge
19 Yankwich, reversed the judgment and remanded the case, "with
20 directions to take further proceedings in accordance with this
21 opinion."
22        Based upon the principles of law heretofore referred to
23 and particularly those of our own Circuit Court, we are convinced
24 the opinion of the Appellate Court in this case should be inter-
25 preted and construed like any other document for the purpose of
26 determining the true intent and purpose of its authors and, having
27 ascertained it, thereafter conduct the further proceedings in
28 accordance with said true intent and purpose as nearly as can
29 reasonably be done.  This, we believe, will dispose of practically
30 all the issues of law and fact which disturbed the former trial
31 and will also greatly shorten the retrial.
32        Accordingly, we herewith list what we believe was

-9-

2124

determined by the said Circuit Court decision.

    1.  The United States claimed some kind of special rights to the use of Santa Margarita River water "as an essential water supply for the military establishments - - - vital to our National Defense" (Appellee's Brief, p.8) and charged Appellants' claims "would jeopardize the continuance of the existance of military establishments vital to our Nation's defense (Appellee's Brief p. 58-59). This claim of a National Defense right, whether called sovereign rights or paramount rights, was protested as having no support in our State law (Amicus Curiae Brief pages 32-33).

    The Decision definitely determined that Plaintiff had no such rights and held that the admitted "sovereignty" of the United States over the lands within Camp Pendleton, called "the enclave", did not give the Federal Government any greater rights against upper riparians and appropriators to the waters of the Santa Margarita River than a private land owner would have had. The exclusive jurisdiction of the United States stopped at the boundary lines of Camp Pendleton and while, after it got "the physical possession of the corpus of the water" it could then "use it for whatever purposes" and wherever on Camp Pendleton it chose, this was not evidence of enforcible "property rights in the flow against upper riparians and appropriators".

    The Appellate Court pointed out:

    "   The law of California, by stipulation here and by the Federal Constitution, controls the water rights within its boundaries" (i.e. the boundaries of State of California) (p.653)

    "   The Government, as regards all claimants to water outside the enclave, is not in the position of sovereign, but in the position of a lower riparian which is compelled to make beneficial use within the watershed, and for other than proper riparian uses must show an appropri-

-10-

2125

ation according to law. (i.e. the law of California)

" This case must be remanded because of the apparent
misconceptions of the law of the enclave by the trial
court and the application of the theory of sovereignty
to the subversion of vested and inchoate private rights."
(P.656).

2. The United States claimed prescriptive rights.
(Appellee's Brief, pages 66 to 93). Appellants vigorously denied
that the Government had acquired prescriptive rights or that its
non-riparian uses had been adverse (Appellee's Opening Brief,
p.45-61) also the United States claimed appropriative rights.
(Appellee's Brief, p.85-88) Appellants pointedly denied that the
Government had any prescriptive or appropriative rights. (Appel-
lants' Reply Brief, p.20-31)

The Decision expressly reversed the judgment because
it awarded to the United States water rights based on claimed
prescriptive and appropriative rights which never existed. The
Appellate Court, referring to Paragraph II of the Stipulation
made by the State of California with the United States herein,
said:

" Here the United States claims only such rights
to the use of water as it acquired when it purchased
Rancho Santa Margarita, <u>together with any rights which
it may have gained by prescription or use or both.</u>"
(P. 653) (Emphasis added)

" 'Use' of water can mean nothing more than appropri-
ation and application to some purpose. Since no estoppel
could be raised against other land owners and appropri-
ators, the phrase used in the stipulation must mean
'prescription' or 'appropriation'. " (p.660)

" The findings were not sufficient to support any

1    prescriptive water right either in Rancho or the govern-

2    ment.- - -

3    "   The doctrine of prescription envisions a party whose

4    rights are being openly and notoriously violated by another

5    having the power to intervene and prevent the violation

6    from becoming an adverse property right by self-help or

7    by bringing an action or obtaining an injunction before

8    the period of prescription runs.  But, when the United

9    States was in possession as sovereign, the water which came

10   into the enclave could be used without let or hindrance

11   in any way which the agents of the government chose.- --.

12   "    It is paradoxical to say the government agents

13   had the right to use the corpus as they did and still

14   say such use of waters, admittedly surplus at the time,

15   founded right not only as against an upper riparian as

16   the State of California,but against the world, to have

17   all surplus water flow in perpetuity until it reached

18   the boundaries of the enclave. (p.661) 1/

19

20   As to appropriative rights, the Decision declares:

21   "   The findings to establish either an appropriative or

22   a prescriptive right or a right to use water off the water-

23   shed are entirely inadequate." (p.662)

24   "   Apparently, under the law of California since 1913,a

25   valid water right by appropriation can be acquired only

26   by filing an application with the State authorities and

27   pursuing it through the steps required by law. There is

28   no finding that Rancho or the Government agents made or

29   pursued such an application. - - -

30   "    At a late date after the filing of Santa Margarita

31   ─────────────────────────────────────────────────
     1/ Decision at page 661 "that the use by Rancho was adverse
32   because in violation of the Vail decree - -if thus adverse,
     it was only adverse to Vail--we do not pass upon this point."

Mutual Water Company, [1] the Agents of the Government
have made a filing ostensibly for the Navy, upon the
stream.  If the lawyers and agents had obeyed the
injunction of the reclamation statute when Camp
Pendleton was first acquired and had filed for the
surplus waters of the stream, another question would
have arisen.  But because they were not foresighted
enough to do that is no reason to allow them to act
as if they had - - - -.  In no event can they be
appropriated by fiat."  (p. 666)

Since the claimed prescriptive, appropriate and use
rights all had to be based happenings prior to the former trial,
there is no possibility of the evidence on retrial being any
different from that presented at the first trial.

3.  The United States contended "There is no surplus
water available for appropriation in the Santa Margarita River,"
(Appellee's Brief,p.53) while, on the other hand, Appellants
made the existence of a surplus subject to appropriation a primary
issue.  (Appellant's Opening Brief,p.14-15;  See also Amicus Curiae
Brief,p.48-50).

The Decision reversed the case because the judgment
declared there was no surplus water subject to appropriation.

The Trial Court's Finding 13 was: "There is no surplus
water supply at the present time subject to appropriation."
Trial Court's Finding 115 was "There is no surplus water at the
present time available for appropriation from the Santa Margarita
River system; there was no surplus so available in the year 1946;
there was no surplus so available when Camp Pendleton was placed
in operation as a military installation in 1942." (p. 657)

---

[1] The Government's filing was junior and subsequent to
all the filings of Fallbrook Public Utility District.

-13-

The decision of the Appellate Court declares:

"    If these are findings of fact, they are clearly erroneous; and, if conclusions of law, they are wrong. (p.657)

"    The declaration (No. 13) that there is no surplus at the present time is invalid . - - - -

"    Finding No. 115 that there was no surplus at the time[1] the United States acquired the lands is a pure deduction related back from the finding that there is no surplus at the present time. - - -This finding has no basis in the testimony of record.  It is shown clearly erroneous by the fact that other findings show that flood water wastes into the ocean in various years when the land was in private ownership. - - " (p.658)

"    It is certain from the evidence in the case that in some years there is surplus water which flows clear through the watershed and wastes into the ocean."(p.659)

"    But everyone must admit that the purpose of the constitutional amendment was to vest with a public interest the use of all the waters of the State so that no part of the precious supply should flow uselessly into the sea or otherwise go to waste.  This characterization applies to flood waters as well as the normal flow----" (p.663) (Emphasis added)

4.  The United States contended that the Stipulated Judgment between its predecessor and the Vail Estate (Exhibit "A" of Plaintiff's Complaint) gave the United States, along with other

---

1 / Decision at page 662 that "this Court does not attempt to say whether there is a present  surplus in the watershed," merely recognizes existence of current drought.

-14-

2129

special rights, a guaranteed three (3) cubic feet per second of
Santa Margarita River water.(Appellee's Brief, pages 17,18, and 19)
This claim was protested by Appellants (Appellants' Reply Brief,
p. 10; Amicus Curiae's Brief, p.29-31).

The Decision reversed the judgment because of misin-
terpretation and misapplication by the Trial Court of the Stip-
ulated Judgment. The Appellate Court said:

"- - - -it /the Finding of no surplus water/ appears to
be based upon prior litigation between Vails and the
predecessors of the United States and the acceptance  by
the latter of that decree as a basis in this case.
Also, the agreements and stipulations between the
United States and Vail seem to have been given weight.
None of these considerations was proper, since Vail was
not a party to this present judgment - - -. But this
stipulated judgment between two litigents is contractual
in character between the principals to the agreement and
is not binding upon the Water District or the State.
Thus the correlative rights between the Vail Estate and
the government have been settled by agreement.
Such correlation does not bind appellants.  But a key
declaration is based upon the assumption that it does." 
(p.657)

Ownership of three cubic feet of water per second: The
stipulation in Rancho Santa Margarita-Vail Judgment required Vail
to maintain a 3 cubic foot per second flow of water at the upper
end of Temecula gorge.  The Government claimed this water belonged
to them which was denied by Fallbrook Public Utility District.
The Appellate Court declared:

"   The /trial/ court found that the United States
was entitled to three cubic feet of water per second
at the upper end of Temecula gorge, which was released

-15-

2130

to it by the Vail Estate as against the Santa
Margarita.

"   The stipulation that it is not necessary for Vail
to release these three cubic feet was and is, of course,
binding upon the parties thereto.  But the release at
that point is obviously not a delivery to the United
States.  It only means that Vail was not entitled to
any use of water unless and until there had been such
a quantity released.  It must be assumed that the rights
of the intervening landowners and appropriators between
the point of release and the boundary of the Rancho
must have been considered.  In any event, neither the
state court nor Rancho and Vail had power to bind such
parties or the State of California.  This feature must
be considered since it was given so much weight by the
trial court in determining there was no surplus."

"   - - -this declaration eliminates consideration of
the water rights of these lands by a spurious merger
of the rights of Vail and the United States.  This merger
was an attempt to tie the landowner uppermost on the
watershed to the lowermost owner, which could not be
done against those having intervening rights on the
stream except by the application of the principles of
sovereignty."

5.  The United States' contention "that a military
use - - - was a beneficial use for which riparian rights- - -
could be exercised" (Appellee's Brief p.23) was vigorously denied.
(Appellants' Brief p.38-40; Amicus Curiae Brief,p.10-20)
                                                    riparian
The Decision held that "Military use" is not per se /
but akin to a municipal use.   The Appellate Court stated:
"   We now take up a consideration of the supposed

-16-

2131

1    positive rights of the government declared in this suit

2    to exist by prescription and use as the foundation of

3    a partial judgment in an action brought against all the

4    owners in a watershed: (1) Storage of water in equal-

5    izing reservoirs or in Lake O'Neill; (2) uses of water

6    outside the watershed; (3) military uses and the use

7    of water in townsites or  barracks not riparian. Such

8    uses may indeed  be beneficial." (P.660)

9    The Court then added: (p.662)

10    "  As to 'military use' and particularly the use of

11    water in barracks and quarters of service personnel

12    off the watershed, as a substitute use for portions of

13    the flow previously used off the watershed for agri-

14    cultural purposes, the difficulties have been suggested

15    above.  Certainly, the findings are inadequate to show

16    that part of the water now used or vaguely intended to be

17    so used in the future is not presently surplus.  Surely

18    the uses are not riparian to the lands in the watershed.

19    The use in barracks is analogous to municipal use.

20    Undoubtedly, the agents of the government could use for

21    such purpose any water lawfully coming onto the enclave

22    by virtue of a water right owned by Rancho.  But the

23    findings do not show Rancho owned such a property right."

24    In making the above statements, the Court had in mind

25    the cases cited to it which hold that  municipal uses are appro-

26    priative in character even when the city abuts on the stream sup-

27    plying the water.

28    City of San Bernardino v. City of Riverside,

29    186 Cal. 7, 24; 198 Pac.874 (1921);

30    Antioch v. Williams Irrigation District,

31    188 Cal. 451,456; 205 Pac. 688;

32

-17-

2132

<u>Antioch v. Williams Irrigation District</u>,

188 Cal. 451, 456; 205 Pac. 688.

<u>Eden Township Water District v City of Hayward</u>

218 Cal. 634, 640; 24 P2d 492 (1933);

<u>City of Pasadena c. City of Alhambra</u>, 33 Cal.2d

908, 927; 207 Pac/17 (1949)

<u>City of New Whitcomb v. Fairhaven Land Co.</u>,

64 Pac. 735,737 (1921, Wash.);

<u>Pernell v. City of Henderson</u>, 16 S.E. 2d 449,

451 (North Carolina);

<u>Town of Purcellvile v. Pots</u>, 19 S.E. 2d 700,

703 (Virginia)

<u>City of Emporia v. Soden</u>, 25 Kan. 588, 37 Am.

Rep.265, 268;

25 Cal. Jur. 1093, Water, Sec. 102

Also cited and  quoted to the Appellate Court was the case of

<u>Salem Flouring Mills Co. v. Lord</u> 42 Ore. 82, 98; 69 Pac.1033 (1902)

which case and others to like effect prompted  Wiel in 1 Wiel

Water Rights in Western States,(3rd Edition) at page 804 to say:

"    The State owning riparian land cannot as rip-

arian proprietor take water for thirteen hundred

people in a penitentiary and insane asylum a quarter

of a mile from the stream, a case in which the test

of 'natural uses' must give way on the facts because

unreasonable."

The Oregon case seemingly presented a stronger basis

for a claim of riparian rights than do the facts in our present

case because the Oregon institutions were located within the water-

shed and the use  was on a riparian tract of land.  Here, the

principal military uses of the water were found by the trial court

to be outside the watershed and on non-riparian land.

-18-

2133

6.   The United States, on whose motion the former
trial was ordered, contended that it had a right to try
"selected" defendants separately.  This was denied by Defendants
Santa Margarita Mutual Water Company and Fallbrook Public Utility
District.

The Decision of the Court of Appeals was that in an action
of this kind, separate trials were not proper.  In the Decision
the Court said:

"   It is here directly decided that entry of a
partial judgment in declaratory form containing an
absolute pronouncement that neither Santa Margarita
nor the State of California had any rights against
the agents of the government in the flow in this
watershed was premature.- - - - - - - - - -(p.662)
"   The only proper method of adjudicating the
rights on a stream, whether riparian or appropriative
or mixed, is to have all owners of lands on the water-
shed and all appropriators, who use water from the
stream involved in another watershed, in court at the
same time."   (Emphasis added) (p.663)

Thus, the issue of separate trials had been definitely
decided against the Government's contention.

7.   The United States contended that "the average
annual yield of the Santa Margarita River is insufficient to meet
all the riparian demands of either the United States or the Vail
Estate"(Emphasis added) (See Appellee's Brief, page 16) but the
Appellants insisted that the "average" flow of a river was not the
legal basis for determining the riparian rights of the Government,
nor were its needs and requirements the measure of its rights;
that the riparian rights of the United States were limited to its
share of the flow of the river as it existed from time to time in

-19-

2134

1  a state of nature. (Appellants' Opening Brief, pages 15 and 28;
2  Amicus Curiae Brief, pages 43-45)
3  　　　　In passing upon this important issue the Court of
4  Appeals in its Decision rules against the Government, declaring:
5  　　"　　The declaration (No. 13) that there is no surplus
6  　　at the present time is invalid.  Here the misconcep-
7  　　tion is apparent.  If the corpus of the water coming
8  　　onto the land in a dry year be considered, there
9  　　might not be sufficient to satisfy the legitimate needs
10 　　of the United States upon riparian land in that parti-
11 　　cular year.  But that circumstance would not diminish
12 　　its 'water right' appurtenant to the land.  Nor would
13 　　it increase the incorporeal water right.  <u>In a future</u>
14 　　<u>flood year, the United States would have the right to</u>
15 　　<u>insist that only such water enter the reservation which</u>
16 　　<u>a private owner could have used beneficially upon</u>
17 　　<u>riparian land.  It is improper to average the use,</u>
18 　　<u>demand or supply of water over a series of years</u> in the
19 　　attempt to determine whether or not there is a present
20 　　surplus." - - - - - - - - - - - - - - - - - - - - - -
21 　　"　　The declaration that 'there is no surplus water
22 　　supply at the present time subject to appropriation'
23 　　is clearly erroneous.  This 'finding' is in truth a
24 　　conclusion.  As such, there is a begging of the ques-
25 　　tion at issue.  The trial court assumes that 'the demands
26 　　of the United States of America of 15,300 acre-feet a
27 　　year as recognized by the Trial Court' are valid and
28 　　established.  But that is the very point at issue.
29 　　Instead of reasoning back from postulated 'demands' of
30 　　the government to find whether a present surplus exists,
31 　　the trial court should have found in second feet or
32 　　some other appropriate measure <u>what water was at the</u>

-20-

2135

1      <u>designated time</u> applied beneficially, and not prodigally,
2      to riparian lands". (Emphasis added) (235 Fed 2d 658)
3 The Court concluded its decision on this point by declaring:
4      "    It is clear from the facts found that in certain
5      years tremendous quantities of water do flow uselessly
6      into the ocean. <u>It is entirely improper</u> for the
7      government to show that, <u>on the average of a series</u>
8      <u>of years,</u> it would not obtain its quota". (235 Fed 2d 663)
9      (Emphasis added)

11      8. <u>Substitute use theory.</u>  The United States
12 contended that the Government had the right, after first deter-
13 mining "the maximum potential future agricultural use" of Santa
14 Margarita River water attached to its 38,000 acres of riparian
15 lands to then convert, on "a substitute use" theory, that rip-
16 arian right into some other kind of a water right more useful
17 for the governments particular purpose (Appellee's Reply Brief
18 to Amicus Curiae, p.28)  This "substitute use" theory was
19 denounced by Appellants as without any legal support in Califor-
20 nia law. (Appellant's Opening Brief, pages 37-41)
21      The Appellate Court in its Decision, disapproved
22 the Government's contentions that it could turn its riparian land
23 water rights into military uses, "as a substitute use" for portions
24 of the flow of the river previously used for agricultural purposes.
25 (235 Fed 2d 647, 662)

-21-

2136

PRINCIPLES AND ISSUES NOT DETERMINED

BY APPELLATE COURT

1. The Appellate Court Decision did not Determine
who were Necessary Parties Defendant.

The United States has been considering bringing in
new parties and adding new names as defendants to this action in
order to have before this court all owners of lands within the
watershed, supposedly because it was so required by the Decision
of the Appellate Court. Such action, in our opinion, is neither
necessary or desirable nor was it directed by the Appellate Court.
What the Appellate Court said was:

" The only proper method of adjudicating the
rights on a stream whether riparian or appropriative or
mixed, is to have all owners of lands on the watershed
and all appropriators who use water from the stream
involved in another watershed in court at the same time".
(Emphasis added) (p. 663)

This action was brought by the United States of
America seeking to have its rights to the use of water in the
Santa Margarita River and its tributaries determined as against
the defendants. (Plaintiff's Complaint, Paragraph I, Transcript of
Record, Volume 1, page 4) The Complaint closes with: "United
States of America prays: 1. That all the defendants named in
this action be required to answer this complaint and set up fully
their claims to the use of water from the Santa Margarita River"
(Transcript of Record page 13) The Appellate Court fully under-
stood the nature of the proceedings and that it was limited to
the waters of the Santa Margarita River system, and declared in
its decision: "The United States brought into the trial court
all of the other claimants of the river system." (P.652) (Emphasis
added) Again:

-22-

2137

1   "To hold that the 'needs', present and future, claimed

2   by government attorneys were the measure of vested

3   property rights, would be to adjudge that California

4   not only ceded the sovereignty over the enclave, but

5   thereby bargained, sold and delivered a vested water

6   right adverse to all other <u>claimants in all the flow</u>

7   <u>of the stream at that time</u>." ( P.656) (Emphasis added)

8 The Appellate Court then quoted Finding 115:

9   "        There is no surplus water at the present time

10   available for appropriation from the Santa Margarita

11   River system; - - - -(P.657)

12 Again the Court said:

13   "The judgment purports to adjudicate all of the State's

14   <u>rights in the river</u>." (P.664) (Emphasis added)

15 And again the court said:

16   "     Besides the damage to Santa Margarita of con-

17   sidering the rights of other persons <u>drawing water</u>

18   <u>from the stream</u>-the rights of the others interested

19   <u>in the flow of the stream</u> were prejudged before they

20   had been tried - - - -" (P.664) (Emphasis added)

21        In <u>Rancho Santa Margarita v. Vail</u>, (11 Cal (2d) 501,

22 529, 81 Pac.2d 533) the California Supreme Court declared that in

23 order for land to have riparian rights, in addition to being with-

24 in the watershed, the land must be contiguous to or abut on the

25 stream and "the riparian right extends only to the smallest tract

26 held under one title in the chain of title leading to the present

27 owner".

28        Only a small part of the 3,600 named defendants have

29 or claim to have riparian, appropriative or prescriptive rights.

30 As Plaintiff well knows, most of them supply their needs from

31 water found in the soil of the land they own, water which is not

32 a part of any defined stream or underground basin.  They may

-23-

2138

exercise this right freely, subject only to the maxim: "Sic utere tuo ut alienum non laedas". We are convinced that only claimants to riparian, appropriative or prescriptive rights are necessary parties, and respectfully request this court to so find and declare, and urge the Government attorneys to carefully re-examine this subject in the public interest and not only refrain from adding more defendants but to dismiss as many as possible of those now named whom Plaintiff finds are not necessary to an adjudication of the waters of the Santa Margarita River system.

2.   A Physical Solution was Not Directed by The Decision but Strongly Suggested it Should be Sought.

While the Court of Appeals has not directed that "a physical solution" be found, the Decision declares: "By final judgment the District Court is empowered to grant complete relief as to all claimants and the United States adjudicate the water rights, set up control systems and require physical solutions of specific problems charging the expense thereof to the claimant of surplus so created". (652-653) (Emphasis added)

It is significant, we believe, that among the errors of omission in the trial court's findings criticized by the Decision, was: "There was no finding that no physical solution could be found for the problem, charging the cost to those claiming the surplus thereby created. (659)

Further on the Appellate Court declared:
"     The key question in this case is who has the right
       to store these flood waters for future disposition,
       Vail, Santa Margarita, Fallbrook or the United States?
       Or, perhaps some physical solution by or control under
       court decree could permit participation by all in the
       conservation of all flow of the watershed for beneficial
       use, so that no drop would waste uselessly into the
       Pacific?" (P.662)

-24-

2139

1    The Decision reiterated its suggestion again for the

2 finding of a physical solution when the court said: "The attorneys

3 for the government had brought all the parties into court and

4 final judgment could include physical solutions and a supervi-

5 sory system of control if that be deemed advisable". (p.662-663)

6    We suggest therefore that this court direct the

7 parties,between May 6 and the formal pretrial hearing,to formulate

8 and propose for the consideration of the court one or more

9 "physical solutions" to the problem here involved for the purpose

10 of settling this litigation, as was suggested by the Court of

11 Appeals.

12

13    We apologize to the court for the length to which this

14 memorandum has been extended.  Our intent and purpose has been to

15 assist the court in arriving at a proper evaluation of the very

16 important decision of the Ninth Circuit Court of Appeals.  It is

17 our earnest hope that a full examination and discussion now

18 may save time for both the court, the counsel and the parties

19 later on.

20

21                    Respectfully Submitted,

22                    SWING, SCHARNIKOW & STANIFORTH

23                    BY

24                    SACHSE & PRICE

25                    BY

26                    Attorneys for Defendant FALLBROOK
                      PUBLIC UTILITY DISTRICT.
27

28

29

30

31

32

                            -25-

                                              2140