SWING, SCHARNIKOW & STANIFORTH
604 San Diego Trust & Savings Bldg.
San Diego 1, California
   BElmont 9-1131

SACHSE & PRICE
Fallbrook, California
   RAndolph 8-1154

Attorneys for Fallbrook Public Utility District

FILED

AUG 9 - 1957

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
                    Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
|              Plaintiff, ) | NO. 1247-SD-C |
|         ) | MEMORANDUM ON ISSUES LISTED IN |
|       vs. ) | COURT'S ORDER OF MAY 8, 1957. |
| FALLBROOK PUBLIC UTILITY ) | |
| DISTRICT, et al., ) | |
|           Defendants. ) | |

Counsel for Defendant FALLBROOK PUBLIC UTILITY DISTRICT herewith

present their views on, and discussion of, the issues listed in Paragraph 8 of the

Court's Order dated May 8, 1957:

"A. THE EFFECT OF THE CIRCUIT COURT DECISION REPORTED IN 235 F.

2d 647, AND SPECIFICALLY WHETHER OR NOT THE VARIOUS PRO-

NOUNCEMENTS OF THE CIRCUIT OR ANY OF THEM ARE THE LAW

OF THE CASE AND BINDING ON A SUBSEQUENT TRIAL, OR WHETHER

THE EFFECT OF THE CIRCUIT COURT DECISION IS TO BE LIMITED

TO ITS HOLDING THAT THERE WAS ERROR IN CONDUCTING A

SEPARATE TRIAL AND ENTERING A SEPARATE JUDGMENT INVOLV-

ING SOME AND NOT ALL OF THE PARTIES IN THE ACTION."

1. There is no legal ground or justification for the Suggestion Made by the

-1-

2290

Government's Attorneys that the Circuit Court Decision is to be
Limited to its Single Holding that There was Error in Conducting
a Separate Trial and Entering a Separate Judgment.

True, the Circuit Court did so declare and so decided.  But that declaration,
ruling and pronouncement was only one of several declarations, rulings and pronounce-
ments made in its decision, any one of which would have necessitated a reversal of
the judgment.

Where there are two or more grounds upon any of which an appellate court may
rest its decision, and it adopts all of those grounds, it cannot be said that one ground
was more important than another and that the rulings based on the other points are
obiter dictum.  Each is the judgment of the court and of equal validity with the others.

Union Pacific Railroad Co. vs. Mason City and Ft. Dodge Railroad Company,
199 U. S. 160, 165-166;

United States vs. Title Insurance and Trust Co. , 265 U. S. 472, 486;

Richmond Screw Anchor Co. vs. United States, 275 U. S. 331, 340;

Massachusetts v. United States, 323 U. S. 611, 623.

In Woods vs. Interstate Realty Co. , 337 U. S. 535, 537 the court said:

"Where a decision rests on two or more grounds, none can be relegated
to the category of obiter dictum.

United States vs. Title Insurance and Trust Co. , 265 U.S. 472, 486

Massachusetts v. United States, 333 U.S. 611, 623."


2. We think that the Decision Constitutes the Law of the Case and is
Binding on the Subsequent re-trial.

But whether or not it is technically "the law of the case", it is significant that after
pointing out numerous errors of law and findings of fact unsupported by the evidence,
the Circuit Court concludes its decision with this specific declaration:

"The cause is therefore reversed and remanded with directions to take
further proceedings IN ACCORDANCE WITH THIS OPINION and enter
no judgment until the suit can be disposed of at the same date. "

(Emphasis added)

The decision fills some 12 pages of discussion of, and pronouncements upon, the

-2-

2291

errors and deficiencies of the findings of fact and conclusions of law before it finally reversed the judgment and remanded the case "with directions".  The pronouncements and rulings were sufficient to cause West Publishing Company to formulate 34 head-notes as summarizing the decision.

The position and holdings of the Ninth Circuit Court under similar situations are set forth clearly and forcibly in two recent cases where it had occasion to review and construe the force and effect of its former decisions on a second appeal.

In Woodworkers Tool Works vs. Byrne, 202 Fed. 2d 530, 531, the court said:

"The court's original decision constitutes the law of the case.  It clearly implied that on the evidence in the record the issue was one of fact for the trial court's determination, not one of law for ourselves.  Had we deemed the evidence insufficient as a matter of law to support a finding of jurisdiction, it would have been worse than an impertinance to remand the case for a finding.  We would have been obliged to reverse the judgment outright.  Nor, if we were in doubt whether, on that evidence, a finding of jurisdiction could be sustained by us, would we have thought it proper to undertake at that juncture the very considerable and perhaps wholly futile task of passing on the merits.  Taking the opinion by its four corners we construe it as holding that the trial courts' finding of fact was to be accepted as conclusive of the question of the validity of the service. True the rule we apply here is not a compulsive principle akin to res judicata.  The phrase 'law of the case' expresses rather the general practice of courts to decline to re-open what they have already decided. Messinger v. Anderson, 225 U.S. 436, 444; Cf. People of State of Illinois ex rel Hun v. Ill. Central Ry. Co., 184 U.S. 77, 94.  The rule is grounded in large part on the policy of ending litigation." (Emphasis added)

The Ninth Circuit Court of Appeals in a later case, Federal Service Finance Corporation vs. Bishop National Bank of Hawaii, 205 Fed. 2d 11, again had occasion to evaluate the binding effect of a decision of a court of appeals on subsequent proceedings in the same case and reaffirmed its views expressed in the Woodworkers Tool Works case.  On a second appeal the court declared:

-3-

2292

"What we have to say now can be understood only in the light of the opinion handed down on the former appeal and this should be consulted for a fuller understanding of the facts and the views we entertained as regards their significance - - - - -." (P. 11-12)

Accordingly, we believe it makes little difference whether the various pronouncements of the Circuit Court constitute, technically, the law of the case or not.   They were made for the assistance and guidance of the District Court on the retrial and we believe that they should be observed and honored in the spirit and for the purpose for which they were made.

### B. THE EXTENT OF THE RIGHTS OF THE UNITED STATES OF AMERICA AS A RIPARIAN OWNER TO USE WATER OUTSIDE THE WATERSHED.

We assert that no one as a riparian owner can claim a riparian right to use Santa Margarita River water on lands outside the watershed.   In this case the United States has only the same riparian right as a private landowner.   We believe the United States no longer claims the right to use riparian water out of the watershed. (See Reporter's Transcript of proceddings for Monday, May 6, 1957, page 128, line 19 to page 129 line 2).

### C. THE EXTENT OF RIGHTS OF THE UNTED STATES AS RIPARIAN OWNER TO USE WATER WITHIN THE WATERSHED.

This question is necessarily directed at those rights which the United States can enforce against the numerous defendants in this action.   The riparian rights here involved are those of a private landowner not those of the "sovereign".   It is not necessary for present purposes, we believe, to list seriatim the rights of riparian landowners generally or the well recognized limitations thereon.   Such a discussion can be found in any standard text book.

1. Even before the Adoption of the 1928 Contitutional Amendment It was held that, as between Riparian Owners the use and exercise of

-4-

2293

riparian rights must be reasonable under all the facts and circum-
stances of the case.


Lux v. Haggin, 69 Cal. 255, 401

Heilbron v. Land & Water Co., 80 Cal. 189, 193

Harris v. Harrison, 93 Cal. 676, 681

Southern California Investment Co. v. Wilshire, 144 Cal. 68, 71

Turner v. The James Canal Co., 155 Cal. 82, 95

Miller & Lux v. Madera Canal Co., 155 Cal. 59, 64

   1 Wiel on Water Rights, § 745, page 807, § 748, pages 812-815.

   The decision in Herminghous vs. Southern California Edison Co., 200 Cal. 81,
produced the great revolt resulting in the adoption of the 1928 Constitutional amend-
ment. At pages 104 and 105 the court held that the riparian, as against the appropri-
ator, could under claim of riparian rights use the flood overflow of the San Joaquin
River to leach out the alkali of his land in order to reclaim it for growing natural
grasses.

   The majority's extreme views prompted Judge Shenk to write the dissenting
opinion which in substance became the law of the state through the adoption of the 1928
Amendment. He declared at page 128: "A more extravagant or wasteful use of water
cannot well be imagined"; and again, at page 130 Judge Shenk said: "that the appellant
as an appropriator of water has the right of storage and should have its reasonable
exercise of that right balanced only against the reasonable exercise by plaintiff of
their riparian rights".


   2. Since the adoption of the Constitutional Amendment, the limitation
      of reasonable use and the prevention of waste has been applied to
      all classes of users, appropriators, as well as riparians.


   Gin S. Chow v. City of Santa Barbara, 217 Cal. 673, 700.

   Peabody v. City of Vallejo, 2 Cal. 2d 351, 367.

   Tulare District v. Lindsay-Strathmore District, 3 Cal. 2d 489, 524.

-5-

2294

3. Applying the Doctrine of Reasonable Use and the Constitutional

Command for the prevention of Waste to the Facts of our Case,

We Contend that the Government's Claim of Right to Spread the

Waters of the Santa Margarita River for the purpose of irrigating

the Native Vegetative covering (Rep. Tr. of proceedings May 7,

page 150) is not within its Riparian Rights.

By that process the Plaintiff causes the water so spread to seep down into the basin with the object of conserving that water for future utilization. Mr. Veeder claims as a part of the Government's riparian rights, it "can control the water when it comes down for the purpose of making a greater utilization of it-----a temporary control, a storage, if you please, during the period when the riparian water is available". (Rep. Tr. of Proceedings May 6, 1957, pages 113-114.)

Query: In a semiarid region and on a stream of intermittent surface flow and of only occasional heavy run-off, is the United States entitled to demand that the Defendants let water come down so it can irrigate cover crops and other agricultural products and store water for future use. We assert that such a requirement would not be a reasonable use of riparian waters under all the existing circumstances.

The Plaintiff by its complaint declared in Paragraph II thereof:"Sites for those military installations acquired by the United States - - - - - - to the end that those properties could be utilized for the military purposes for which they were acquired".

In Paragraph III Plaintiff bases its claim of exclusive jurisdiction "over all of the properties constituting the military establishments - - - - by reason of cessions to it by the State of California". That cession by the State is to be found in California's Government Code Section 126 (a) giving the State's "Consent to the acquisition by the United States of land within the State-----(a) The acquisition must be for the erection of forts, magazines, arsenals, dockyards and other needful buildings."

Nowhere is there to be found any cession provisions or consent for the United States to acquire lands for growing agricultural crops or cover crops to feed cattle and livestock.

4. This Same Property and Same Riparian Rights Were Heretofore

-6-

2295

Passes on by the California Supreme Court in Rancho Santa

Margarita vs. Vail, 11 Cal. 2d 501.

At pages 556-558 that Court expressed a doubt that the predecessor of the United States could compel water to be let down to it to fill the underground basin so that water would stand in pools to supply drinking water for the cattle which they owned.  Here the Government claims water to grow cover crops overlying the underground basin to feed lessees' cattle.  The question is whether the United States, operating a military base and training camp using only mechanized equipment, has any real occasion or bona fide justification for growing pasture or cover crops and whether such claimed right and proposed exercise thereof is a reasonable use of riparian water under all the circumstances.  It would appear that the irrigation of a "cover crop" is more likely a "cover up" to the real intention and purpose of the plaintiff to store in its underground basin water for future use which would constitute a seasonal, and perhaps cyclic, storage, admittedly not within the Government's riparian rights.

The spreading of water over land for the purpose of causing it to seep into the underground for storage is, under California law, an appropriative right.  Water Code Sec. 1242.  The United States has never made any application for, and does not now possess, or claim to possess, any such appropriative rights.

D. WHETHER THE USE BY THE UNITED STATES OF WATER FOR
   MILITARY PURPOSES IS A BENEFIAL USE.

E. WHETHER THE USE BY THE UNITED STATES OF WATER FOR
   MILITARY PURPOSES ON ITS RIPARIAN LAND IS A PROPER
   RIPARIAN USE.

We will discuss these two questions together.  There can be no doubt but that the use of water for military purposes by the United States is a beneficial use.  But that leaves the principal question unanswered, to wit:

-7-

2296

WHETHER THE USE OF WATER BY THE UNITED STATES FOR
MILITARY PURPOSES ON ITS RIPARIAN LANDS IS A RIPARIAN
USE, OR WHETHER IT IS AN APPROPRIATIVE USE.

1. Statement of Facts.

The military uses as practiced by the Government since its acquisition of Camp
Pendleton are primarily for supplying water to large military forces stationed at  Camp
Pendleton, U. S. Naval Ammunition Depot located on Rancho Santa Margarita, for
drinking, culinary and sanitary purposes of the personnel and for supplying water for
filling radiators and washing automobiles, trucks, tanks and other self-propelled
military equipment.  While the Government's military establishments may be assumed
to be permanent, the personnel making up the military forces comes and goes accord-
ing to military orders from headquarters in Washington, and the number occupying
the Rancho, according to the testimony of Col. Robertson in the former trial, fluctu-
ates from time to time according to the exigency and necessity of national defense
ranging between the lowest year of 11,080 in 1946, and an estimated 105,000 in 1954.
(Transcript of Record on Appeal, pages 590-591).  The members of the forces are
enlisted and drafted from communities scattered all over the United States and the
individual, once in the military services, has little choice or volition of his own as to
where he will go, what he will do or how long he will stay at any one place.  Large
units of the military forces concentrated in various camps and establishments scat-
tered over the Rancho are being continuously trained for combat duty and when their
training is completed they are sent elsewhere, as military necessity or strategy
dictates.  Their presence at Rancho Santa Margarita is solely for military training
purposes.  Their business if fighting.  They are not brought there for the purpose of
cultivating the land, and their uses of water are not in connection with any employment
related to the use of the soil either for the purpose of agriculture, animal industry or
otherwise.

2. Riparian rights do not extend to or include water supplied by a
   government agency to inmates or personnel of governmental
   institutions established and operated primarily without reference

-8-

2297

1         <u>to the use of the soil even though located on lands riparian to a stream.</u>

2

3     In <u>Wiel (3d Ed) Water Rights in Western States</u>, Sec. 743, page 804, discussing

4 a situation similar to that prevailing at Rancho Santa Margarita, it is said:

5         "The State owning a riparian land cannot as riparian proprietor take

6         water for thirteen hundred people in a penitentiary and insane asylum a

7         quarter of a mile from the stream, a case in which the test of 'natural

8         uses' must give way on the facts because unreasonable.  Likewise the

9         watering of large bands of cattle will not be allowed to the exclusion of

10         other proprietors under the plea that the watering of cattle is a 'natural

11         use'."

12     (a) Under the first proposition Wiel first cites the case of <u>Salem Mills Co. vs.</u>

13 <u>Lord, et al</u>, 42 Oregon /69 Pac. 1033/.  This action was brought against the governor

14 of the State of Oregon (Lord) and other state officers acting as the Board of Control

15 for the State Insane Asylum and penitentiary located on a tract of land traversed by a

16 creek.  The plaintiffs had a right to use the waters below the penitentiary and asylum

17 for hydraulic power development.  The State of Oregon purchased the tract "containing

18 147 acres, the lower portion of which is intersected by the middle channel of Mill

19 Creek" and erected on the south portion thereof a penitentiary and incidental buildings

20 to maintain such an institution, enclosing the institution with stockade embracing five

21 acres within the confines of which flowed one channel of Mill Creek.  Later the State

22 erected an insane asylum on the north portion of the same tract of land.  The peniten-

23 tiary was supplied with water for irrigation, cooking, living, sanitation and other

24 purposes as were required and to the asylum for like purposes.

25     At page 98, (Pacific Page 1039) the Oregon Supreme Court declared:

26         "Riparian rights do not extend so far as to authorize the state to supply

27         with waters from the stream a sufficient amount to accommodate and meet

28         the necessities of irrigation, cooking, laundry, sanitation etc. for such

29         institutions as the State penitentiary and Asylum for the insane, where

30         from 1300 to 1500 persons are kept in constant confinement, the latter

31         institution being located a quarter to a third of a mile from the course

32         of the stream.  It is analogous to many cases to be found in the books

2298

1   where individuals have claimed the right by reason of their riparian ownership to

2   supply towns and cities with water or where towns and cities adjacent to some part of

3   a stream have claimed a sufficient quantity to supply the remote parts or portions

4   thereof, but without avail.  (City of Emporia vs. Soden, 25 Kansas 588, 37 Am. Rep.

5   265; Stein v. Burden, 24 Ala. 130, 60 Am. Rep. 453; Harding v. Stanford Water Co.,

6   41 Conn. 87; Company of Proprietors of Navigation of River Medway vs. Romney,

7   9 CB(NS) 575; Lord vs. Meadville Water Co, 135 Pac. St. 113, 19 Atl. 1007, 20 Am.

8   St. Rep. 864. "

9       Clearly the uses and purposes to which Plaintiff declares to put its riparian

10   waters are not connected with or incident to the use and enjoyment of the soil of which

11   those rights are "part and parcel".

12       (b).  Under the second proposition Wiel cites Lux vs. Haggin, 69 Cal. 255.  At

13   pages 406 and 407 of that important decision the Court discusses "natural" and "arti-

14   ficial" uses and "ordinary" and "extraordinary" purposes for which water may be used.

15   The Court said:

16           "The distinction between natural and artificial 'wants' seems to be derived

17           from a distinction previously recognized and which has sometimes been

18           designated as a difference between the use of water for 'ordinary' and

19           'extraordinary' purposes.  Thus Lord Kingsdown (in Minor v. Gilman,12 Moore

20           P. C. C. 156) said: 'By the general law applicable to riparian proprietors,

21           each has a right to what may be called the ordinary right of a use of water

22           flowing past his land; for instance, to the reasonable use of the water for

23           domestic purposes and for his cattle; and this without regard to the effect

24           that such use may have in case of deficiency upon the proprietors lower

25           down the stream.' * * * * * *

26           Lord Kingsdown's 'instances' indicate that he was using them as

27           illustrations of the relative importance of the uses by him mentioned.

28           It may perhaps be doubted whether an arbitrary classification can be

29           made which is applicable everywhere where the common law prevails.

30           Even the use of water of a stream for potation may not be of paramount

31           importance, when the stream is small, and the particular proprietor

32           is amply supplied with water for such purpose by living springs

-10-

2289

1    independent of the creed.  And it may happen, all the conditions being

2    considered, that the exhaustion of an entire stream by large bands of

3    cattle ought not to be permitted. "  (Emphasis added)

4        The distinction made in Lux v. Haggin  regarding riparian rights for water the

5    ordinary number of cattle which a land owner is accustomed to keep on his land, and

6    an unusual and extraordinary number of cattle placed thereon for trade or commercial

7    purposes is clearly developed and stated in Cowell vs. Armstrong, 210 Cal. Page 218.

8    In Cowell v. Armstrong it was held that the transfer of "about 2,000 head of beef

9    cattle" on to plaintiff's lands which were riparian to Putah Creek "did constitute a

10   use for artificial or extraordinary purposes" and not fall within his preferential

11   riparian rights.   The Court at pages 224-225 said:

12       "The evidence is that the Plaintiffs maintain on their lands about

13       2,000 head of cattle.   During the flood season the cattle are kept in

14       the mountain ranch, but in the summer-time they are driven down to

15       the pasture lands which have been flooded by the winter overflow and

16       which latter lands the court found are riparian to Putah Creek.   In

17       support of their contention that their right as riparian owners to water

18       their commercial herds from the stream is superior to the right of the

19       defendant to use the water for irrigation,  the plaintiffs rely on Alta Land

20       & Water Co. v. Hancock, 85 Cal. 219 /20 A. St. Rep. 217, 24 Pac. 654/;

21       Wiggins v. Muscupiabe L & W Co., 113 Cal. 182 /54 Am. St. Rep. 337,

22       32 L. R. A. 667, 45 Pac. 160/;  Smith v. Corbit, 116 Cal. 587 /48 Pac.

23       725/ and Filippini v. Hewett, 162 Cal. 111 /121 Pac. 376/. * * * * * *

24   In none of the cases relied upon do the facts disclose that any more than

25       the ordinary number of domestic animals are involved; and the statements

26       of the court in those cases in recognizing the distinction made by the

27       common law between the right to the ordinary use of the water for man's

28       natural wants, i. e. for domestic uses and for cattle, and the right to

29       its use for his extraordinary or artificial wants (Wiggins v. Muscupiabe

30       L & W Co. , 113 Cal.,p. 189) among which is its use for irrigation

31       (Alta Land & Water Co. v. Hancock, 85 Cal. p. 230), in the absence

32       of authority directly in point, must be applied to the facts to which they

                              -11-

1    "were obviously intended to apply, viz, for the use of stock and animals

2    ordinarily kept to sustain the domestic needs of man.  There is no indica-

3    tion in the cases relied upon that if the stock exceeded those necessary for

4    the ordinary domestic uses, and increased to the proportions of an industry

5    so that the primary object of the owner was to raise stock in large herds

6    for the market, the common-law rule of preference would still apply."

7        (Emphasis added)

8        What was said by the Court about the ordinary number of cattle usually kept on a

9    farm can be also applied to the ordinary number of people employed on a farm and

10   the extraordinary number of soldiers or marines stationed at Camp Pendleton.  Satis-

11   fying their requirements for water ceases to be riparian and becomes military or

12   quasi municipal uses.

13       3. Cities, Although located upon the banks of Rivers or Overlying Under-

14          ground basin do not thereby have rights permitting them to divert and

15          use the water for supplying their inhabitants, either as riparians or as

16          overlying land owners.

17   All of the City of San Bernardino overlies the basin involved in the protracted litigation

18   between San Bernardino and Riverside commencing with the famous case of Katz vs.

19   Walkinshaw 141 Cal. 116 followed by Barton vs. Riverside Water Company, 155 Cal.

20   609, and the City of San Bernardino vs. City of Riverside, 186 Cal. 7.  However, the

21   Court, at page 24, in the latter case held the City did not have the right of an overlying

22   owner but that its rights were those of an appropriator.  The Court held at page 25 that

23   the action of a city in supplying water to its inhabitants is a public use or governmental

24   right.  That riparian rights and overlying land owners' rights are private rights.  In

25   the present case United States' use of water at Camp Pendleton is primarily a govern-

26   mental or public use of water in aid of national defense not the use of water by a

27   private owner in connection with the land itself of which it is part and parcel.

28       This same principle was also declared in Antioch vs. Williams Irrigation

29   District 188 Cal. 451, 456, where the California Supreme Court said "the fact that the

30   City is situated upon the San Joaquin River is wholly immaterial in the consideration

31   of its rights in this case", stating that riparian rights of an abutting land owner "are

32   wholly of a private nature," that a city's right is that of an appropriator.  We repeat

-12-

2301

1    that in the present case the Government's primary claim for water is not for a private

2    use but for a public quasi municipal and governmental use and therefore cannot be as-

3    serted as a riparian right but only as an appropriative right.

4        In the City of Lodi v. East Bay Municipal Utility District 7 Cal. 2d 316, the facts

5    set forth in the opinion disclose that the City of Lodi is situated over an underground

6    basin into which basin the City sunk wells within the city limits and from which basin by

7    means of said wells it secures its municipal water supply (page 321); that the source

8    of supply for this underground basin is the Mokelumne River (page 326 and 329) but

9    notwithstanding the foregoing findings the California Supreme Court held that the City

10   rights were those of an appropriator.  (page 335).

11       It seems clear that a municipality having no riparian rights for such public or

12   governmental use would also have to recognize and respect the rights of prior appro-

13   priators as well as riparians.

14       In 141 A. L. R. 640, it is said:

15           "Although there is authority to the contrary the weight of authority

16           sustains the view that a municipality, as a riparian owner merely,

17           has no right to divert or abstract the waters of a stream for the

18           purposes of public water supply."

19   One of the cases cited in the annotations in 141 A. L. R. in support of the above rule

20   was City of New Whatcomb vs. Fairhaven Land Co. (Wash.) 64 Pac. 735, 737, where

21   the facts are stated to be:

22           "The City of New Whatcomb is situated on both sides of the creek,

23           the full length of the creek from its source, taking in a part of

24           Lake Whatcomb and its outlet.  Streets and alleys are located on,

25           run across, parallel to and upon the banks and bed of the creek

26           and the City of New Whatcomb is the owner of property on the

27           shores of the lake and in the bed of the creek at its source and

28           is a riparian owner on the Lake and Creek."

29   Notwithstanding the foregoing facts, the Court enjoined the City from diverting water

30   from the lake or the creek for supplying the municipal requirements of itself and the

31   domestic needs of its inhabitants.  The Washington Supreme Court seemed influenced

32   by the fact that the use to which the water was put was a municipal and public use as

-13-

2302

distinguished from a riparian use which is a private right and use and quoted, at page 740, extensively from City of Emporia vs. Soden which holds that a city can have no riparian rights for supplying water to its inhabitants, which latter case is hereinafter discussed by us.

In the case of Pernell v. City of Henderson (North Caroline) 16 S. E. 2d 449, 451, the court said regarding the claim of riparian rights of a municipality:

"It has been held with practical unanimity that a municipal corporation, in its construction and operation of a water supply system, by which it impounds the water of a private stream and distributes such water to its inhabitants, receiving compensation therefor, is not in the exercise of the traditional right of a riparian owner to make a reasonable domestic use of the water without accountability to other riparian owners who may be injured by its diversion or diminuition. 'The use of the waters of a stream to supply the inhabitants of a municipality with water for domestic purposes is not a riparian right'. 67 C. J. 1120.

The precise question raised by defendant is dealt with by a leading authority as follows: 'The rule giving an individual the right to consume water for his domestic needs is founded upon the needs of the single individual and the possible effect which his use will have on the rights of others, and cannot be expanded so as to render a collection of persons numbering thousands, and perhaps hundreds of thousands, organized into a political unit, a riparian owner, and give this unit the rights of the natural unit. The rule, therefore, is firmly established that a municipal corporation can not, as riparian owner, claim the right to supply the needs of its inhabitants from the stream'. Farnham, Water and Water Rights, Vol 1, p. 611."

One of the cases cited by the Oregon Supreme Court in Salem Mills Co. v. Lord supra, was City of Emporia, vs. Soden (25 Kan. 588) 37 Am. Rep. 265, 268, where the Supreme Court of Kansas declared:

"The City cannot be considered a riparian owner within the scope

-14-

2303

"of the exception named.  The amount of water which an individual
living on the banks of a stream will use for domestic purposes, is
comparatively trifling.  Such use may be tolerated upon the principle
de minimis non curat lex.  It is a use which must always be antici-
pated, and may reasonably be considered as one of the benefits of
the ownership of the banks of a natural stream * * *.  But the taking
of water for the supply of a populous and growing city, stands upon
an entirely different basis.  No man can forsee this. * * *  The city
as a corporation may own land on the banks, and thus in a sense
be a riparian owner.  But this does not make each citizen a riparian
owner.  And the corporation is not taking the water for its own
domestic purposes; it is not an individual; it has no natural wants;
it is not taken for its own use but to supply a multitude of individuals. "
(Emphasis added)

4.  It is hornbook law that no riparian owner can transport his share
    of riparian waters off of his property to supply a great number
    of people whether such service is for a city, resort or camp.
    Logic would seem to prohibit the riparian owner accomplishing
    by indirection the thing which he is forbidden by law doing di-
    rectly, namely to transport great numbers of people from distant
    communities and cities on to his property to there satisfy their
    domestic, sanitary and culinary requirements by using and consuming
    his riparian share of the waters of a stream.  This would appear
    to be an unreasonable use of his riparian rights.

This was the state of facts in McCord v. Big Bro. Movement (N. J. 1936)
185 A 480, 482 where the owner of riparian lands invited the defendant to use his
property for a summer camp for boys.  The Court there said:

"The defendant is not selling the water it transports from the stream
but is giving it away or granting its use daily for eight or more weeks
to seventy boys who are strangers to defendant's riparian lands and
who of their own right have no privilege to the use of the stream water.
Riparian rights can be claimed only by the owner thereof and they

-15-

2304

"include the use of the waters of a stream for ordinary and reasonable bathing privileges which extend to the owner, his family and inmates and guests of his household.  The transfer to a large number of invitees of the bathing use of transported waters exceeds the reasonable use to which the riparian owner is entitled.  (Harvey Realty Co. v. Wallingford (Conn. 150 A. 60)" (Emphasis added)

It is true that the California Supreme Court in Prather v. Hoberg 24 Cal. 2d 549 seems to approve the use of riparian waters for supplying summer guests of two resort owners but it should be noted in that connection that the plaintiff and defendant together own all the riparian lands within the watershed of the creek, the rights to which water were to be adjudicated and apportioned.  The Court, at page 557 said:

"- - - - In a case such as this, where the parties litigant own all of the land bordering on the stream, there being no other riparian owners, a trial court may not properly make an apportionment of water and award damages without taking all of the lands into consideration - - -" (Emphasis added)

In that case both parties were doing the same thing and making a similar use of the waters, to wit:  for supplying their paying guests at their respective summer resorts; hence as between these two parties so far as the uses in question were concerned, the necessity for a strict definition of riparian rights did not exist, the court merely considered the relative reasonableness of the uses being made of the water by the respective parties.  Since both litigants were making the same use, the necessity did not arise for determining whether the commercial uses in question were strictly riparian and if so, whether they were reasonable uses.

The Supreme Court, in that case, at page 560, cited without criticism the trial judge's views distinguishing between "natural" and "artificial" uses and holding that "a use for resort purposes was an artificial commercial use contributing to the land owner's profit in a business enterprise, a use not within the purview of a "natural use by a riparian owner arising out of the necessities of life on the riparian land, such as a household and drinking use and the watering of stock, and that here, so far as any purely domestic need or natural use is concerned, the issue may be eliminated as each party has a sufficient water supply for such purpose distinct from the supply

-16-

2305

in controversy. (Emphasis added)

The case was reversed because the trial court failed to determine the number of acres in defendant's Parcel Two which was riparian to the creek in question and which was useful for agricultural purposes.  The Court did say, at page 562:

"The fact that human beings are occupants of hotels, apartment houses, boarding houses, auto camps, or resorts such as those conducted by the parties to this action does not necessarily exclude them from the preferential class.  But it may well be that the commercial character of the proprietor's business in serving his guests may be so extensive that a lower riparian whose domestic use, whether or not commercialized, would be prejudiced by the business activites of the upper riparian and to such an extent as to require the interposition of a court of equity to safeguard his rights. - - - - - The question is whether, under all the circumstances of the case, the use of water by the one is reasonable and consistent with the corresponding enjoyment of the right by the other.  What constitutes reasonable use is, in the first instance, a question for the trier of facts. "  (Emphasis added)

It should also be noted that Prather v. Hoberg was decided without the court taking any notice of the prior decision of Cowell v. Armstrong, 210 Cal. 218 (and the numerous cases therein cited) in which it was held that the transfer of "about 2000 head of beef cattle" on the Plaintiff's lands which were riparian to Putah Creek "did constitute a use for artificial or extraordinary purposes" and did not fall within the meaning of domestic uses so as to entitle him to preferential riparian rights.

We are strongly of the opinion that the use by the Plaintiff of Santa Margarita River water to supply the requirements of unlimited numbers of the thousands of men in the military forces of the government is not within its riparian rights.

5. The Government, in this case, is claiming, under its riparian rights, water for purposes as alien to the use of the soil, as the Santa Fe Railway Company would be if it claimed riparian rights to water from the Santa Margarita River for running its its steam engines and supplying its passengers on trains

2306

*operating over its main line from Los Angeles to San Diego*

*and its branch line from Fallbrook Junction based on owner-*

*ship in fee of the strip of land underlying its railroad bed.*

Such use by a railroad has been held a non-riparian use. Attorney-General vs. Great Western Ry Co. 23 LAW TIMES (N. S. ) pages 344, 345 affirmed in LR 6 Ch 572 McCartney vs. Londonderry Ry. Co. (1904) LR App. Cas. 301 (House of Lords).

In the first case, the facts were that the Railway owned a strip of land crossing the River Cam over which they operated their trains. The railway constructed a water tight cistern on their strip and connected it by pipe with the river by means of which the railway took water for supplying its steam engines and other trade purposes of that company. Lord Romilly said:

"With regard to the second point, as to riparian proprietors, there is no question, I think, about the law upon the subject, and, in fact, the cases which were cited by Mr. Jessell all establish the same thing – that a riparian proprietor has a paramount right to take what water he likes from the river for usual domestic purposes. I do not say how widely the term 'domestic purposes' may extend. Unquestionably it would extend to culinary purposes, to the purposes of cleaning and washing, feeding and supplying the ordinary quantity of cattle, and so on. But that is not what the railway company want. I wholly dissent from the argument that, assuming they might have taken so many gallons a day for domestic purposes if they had wanted it, as they do not want it for such purposes, they may take it for another purpose which is of a different character. That, I am of the opinion, is not the law of the court. Therefore the case resolves itself solely into the question whether the extraordinary supply required by the railway company is injurious to the navigation of the river. (His Lordship examined the evidence at great length, stated that the result of the evidence was that the quantity of water (100,000 gallons per day) required by the company could not in dry weather be taken without impeding navigation, and continued:) I am,

-18-

2307

"therefore, of opinion that it is an <u>extraordinary use of the water</u>
not justified by any rule or principle of law, and that it does
seriously affect the navigation of the river. I am of opinion,
therefore, that the plaintiffs are entitled to the injunction which
they ask for, and that the costs must follow the event." (Emphasis
added)

In the second case, Earl Halsbury, at page 304, said:

"My Lords, if the question were the reasonableness in respect
of quantity, I should think it a most unreasonable thing that the use
of a stream passing through a very small area of riparian land
should be made to extend to 40 miles of country or wherever else
<u>the exigencies</u> of railroad service might require. Speaking of it
simply in respect of quantity, I think it more unreasonable than
<u>supplying drinking water to an asylum built on the banks</u>, which
has been held to be unlawful." (Emphasis added)

We think the holding that the supplying of "an asylum built on the banks" of a
stream with water therefrom is "unlawful" and non-riparian, covers also the situa-
tion of the cantonments and military camps built and operated by the government at
Camp Pendleton in the present case.

It is to be noted that the case of <u>Attorney-General v. Great Eastern Ry. Co.</u>
is cited by the California Supreme Court in support of its decision in <u>Cowell v.
Armstrong</u>, 210 Cal. 218, 225.

6. <u>It is not true that the State of California has failed to make any
provision for recognizing or processing applications to appro-
priate water for military uses.</u>

(1) Mr. Veeder asserted the contrary during the proceedings of May 6, 1957.
(See Reporter's Transcript of Proceedings of that day, page 61). The government
attorneys seem to believe that because there can be found no language in California's
Laws, Rules and Regulations relating to appropriations, expressly naming "Military
Uses", it would necessarily follow that there was no requirement for the United
States to make such an application for such uses in order to enjoy appropriative

-19-

rights.   The Ninth Circuit Court decision thought it apparent that "since 1913 a valid water right by appropriation can be acquired only by filing an application with the State Authorities."

We assert that the existing provision of California Rules and Regulations governing applications to appropriate water do     provide for and cover applications to appropriate water for military uses. · That part of California Administrative Code applicable to the appropriation of water is found in Section 669, Paragraph 3, which is:

> "The uses or purposes for which the water is to be appropriated
> shall be stated - - - - Municipal use includes all those uses common
> to the municipal water supply of a city, town, or other similar
> population group." (Emphasis added)

(2) The United States itself has recognized the existence of such rules and regulations and conformed thereto when on June 30, 1948, the United States Navy Department filed its Application 12576 to appropriate 165,000 acre-feet of water per annum from the Temecula Creek-Santa Margarita River for storage at what is commonly known as the DeLuz site on Camp Pendleton.  This application, together with three Navy letters amending the same were introduced into evidence during the prior trial of this action as Defendant Santa Margarita Mutual Water Company's Exhibit "K". (See Transcript of Record on Appeal, page 852).  One of the letters of that exhibit was letter of September 13, 1948, addressed to "State of California, Dept. of Public Works, Division of Water Resources, Sacramento, California," signed by "Maj. Gen. G. B. Erskine, U S M C, commanding Camp Pendleton", making amendments in its original application, a part of which letter stated:

> "The paragraph numbers refer to similar numbers on the application. - -
> 3.  It is probable that the use of appropriated water by the Military
> does not occur often enough to justify its inclusion as a separate
> category in the Rules and Regulations.  As a result of the discussions
> with Mr. Gleason, it appeared that the use to which the proposed
> water was to be put was more nearly municipal than any of the other
> categories.  Inasmuch as jurisdiction of the Camp, which embraces
> approximately 200 square miles, has been ceded by the State to the

-20-

2309

1       "Federal Government, including all services, police powers, fire

2       protection, etc., <u>it is necessary that the Camp operate as an in-</u>

3       <u>dependent community including all of the facilities commonly found</u>

4       <u>in connection with a municipality with a population of approximately</u>

5       <u>75,000 people.</u>  Water requirements as listed on the application are

6       principally those for personnel subsistence, although recreation

7       and irrigation use was also described. - - - - -

8          <u>It is proposed to change the use of water as listed in the appli-</u>

9       <u>cation, paragraph 3, from 'Military, Irrigation and Domestic'</u>

10      <u>to 'Municipal (Military)'.</u>"  (Emphasis added)

11    The above application has never been withdrawn and is still pending before the

12  new State Water Rights Board and has been set down for hearing before, and action

13  by, said Board August 12, 1957.  The Fallbrook Public Utility District also has two

14  pending applications, Nos. 12178 and 12179 to each of which the Department of

15  Justice, acting through David W. Agnew at the request of the Department of Navy,

16  has filed protests, which applications and protests will also come on for hearing

17  and decision August 12, 1957.

18

19    (3) Doubtless, with the foregoing law and facts in mind, the United States Court

20  of Appeals for the Ninth Circuit on March 30, 1956 (235 Fed 2d 647) stated, among

21  other things pertinent to this question:

22       "As to 'Military Use' - - - the use in barracks is analagous

23       to municipal use."

24    Thus the Court's declaration concurred with the Navy's own opinion officially

25  expressed in its amended Application 12576.  We fully agree with the Navy's views

26  expressed in 1948, and the views of the Circuit Court expressed in 1956.

27    In connection with the Navy's statement that Camp Pendleton was operated

28  "as an independent community, including all the facilities commonly found in con-

29  nection with a municipality", this Court will find an informative statement of facts

30  confirming the foregoing in the recent decision of the California Supreme Court,

31  Deluz Homes, Inc. vs. County of San Diego, and Wire Mountain Homes, Inc. v.

32  County of San Diego, 45 Cal. 2d 546, involving the County's right to tax two Housing

-21-

2310

1  projects constructed and operated on Camp Pendleton. Deluz Homes, Inc. took a

2  75 year lease from the United States on 95.22 acres terminatable in event of default

3  or at the end of 50 years.  Under said lease, Deluz Homes Inc. constructed a 562

4  unit housing project under the Wherry Act at a cost in excess of $4,500,000 which it

5  financed by borrowing from the First National Bank of Boston, payable in annual in-

6  stallments, including interest, of $248,388.  The Wire Mountain Homes, Inc. #1 and

7  Wire Mountain Homes Inc. #2 built similar housing units under like conditions.  The

8  California Supreme Court upheld the County's right to tax the possessory interest of

9  the Housing Corporations.  We believe the facts set forth in that case support the ex-

10  istence of a quasi municipality on Camp Pendleton to which the Navy is supplying

11  water under its alleged claim of riparian rights.

12  Accordingly, as we have already pointed out, municipal uses, not being riparian

13  but appropriative rights and "military Use' being quasi-municipal or analagous to

14  municipal use, Plaintiff is not entitled to claim that military uses are riparian rights

15  even when exercised upon its riparian lands and within the watershed.

16

17  F. THE RIGHT OF THE UNITED STATES TO TEMPORARILY IMPOUND,

18  REGULATE AND SPREAD ITS RIPARIAN WATER FOR THE PUR-

19  POSE OF IRRIGATING THE VEGETATIVE COVER AND ENRICHING

20  THE SOIL OF THE ALLUVIAL BASIN SITUATED WITHIN CAMP

21  PENDLETON AND THEREBY, IN THE PROCESS OF IRRIGATING

22  THE VEGATIVE COVER, RECHARGE THE ALLUVIAL BASIN.

23  We will discuss separately the several elements which appear to be embraced

24  in the above question:

25  1.  "The right of the United States", here referred to, of course, means an

26  enforcible right against some or all of the up-stream defendants, not merely the

27  "right" to use the corpus of water which may arrive physically on plaintiff's property

28  after passing unused all other possible upstream diverters.  The importance of this

29  distinction was made clear in the decision of the Circuit Court.

30  2.  The right of the United States to "temporarily impound", as propounded

31  in the question necessarily must refer to and take cognizance of the admitted physical

32  facts in this case.

Mr. Veeder presented the Government's position on this question saying:
"We have never claimed that we could carry water from season to season under our riparian right. - - - - - - On the other hand, there are cases that support our position that there can be a temporary control, a storage, if you please, during the period when the riparian water is available, and that is the extent of the claim we have made there." (Reporter's Transcript of Proceedings May 6, 1957, page 114).

"We do not, however, assert that we have the right to impound the water and carry it over for any extensive period, in violation of the principles of riparian law as recognized in the State." (Reporter's Transcript of Proceedings May 6, 1957, page 151)

We readily concede that "to temporarily impound" riparian waters, may be justifiable under special and limited circumstances.  In Seneca C. H. M. Co. v. Great Western Pacific Co., 209 Cal. 206, while appropriative and prescriptive claims were involved, the Court had before it the issue of riparian rights.  On the question of the right of storage by a riparian proprietor operating a dam for power purposes, the court at page 216, asked:

"May a riparian owner, when the stream carries more water
than is necessary for the propulsion of his mill or power plant,
store such surplus water until he shall be able to use it in a
contemplated dry season to follow? - - - - -'Every owner of
land, through which a natural stream flows, has a usufruct in
the water of the stream as it passes along, and has an equal
right with those above and below him to the natural flow of the
water in its accustomed channel, at its usual level, without
unreasonable detention - - - -'

"The use of the hydraulic effect of the stream for the genera-
tion of electric current is, of course, a legitimate exercise of
the riparian right; (citing cases)

"But to what extent may such owner detain, store or impound
the waters before the right ceases to be a riparian one and be-
comes an adverse or appropriative right which may ripen into a
prescriptive one, is the question".  (Emphasis added)

-23-

The court then reviewed a number of authorities on this question quoting therefrom, at pages 216-217, to sustain its conclusion that a riparian cannot impound or regulate the waters of a stream "in a manner that will unreasonably detain the water" - - - quoting from Rhodes v. Whitehead 27 Tex. 304 (84 Am. Dec. 631, 634).  Again the Court quoted from 40 Cyc., page 606:

> "A riparian owner has a right to erect a dam across the
> stream on his land, and to detain the water for such reasonable
> time as may be necessary to raise the requisite head. - - - but
> he cannot - - - - detain such surplus water of the stream as he
> may not require for his present use until it may be wanted by
> him in a dry season . . . . . .'"

The Court then quoted from Clinton v. Myers, 46 N.Y. 511 (7 Am. Rep. 373):

> "He /a riparian proprietor 7 may use the water while it
> flows over his land as an incident thereto, but he cannot
> unreasonably detain it, - - - - - - - - - Nor has he a right
> to create a reservoir and detain and store the water therein
> for future use in a dry season.'"  (Emphasis added)

The Court next quoted from Still v. Palouse Irr. & Power Co., 64 Wash. 606 (117 Pac. 466, 567):

> "Water may not thus be gathered into reservoirs for
> future use, when it may best suit the convenience and use
> of one riparian owner, and thus deprive other riparian
> owners of their use and service of the stream in its natural
> condition, unless such right is exercised under a valid prior
> appropriation".  (Emphasis added)

The California Supreme Court concluded from the authorities discussed that it was plain that the use of its dam by Defendant "for the purpose of storing in the reservoir created thereby such water - - - as was not at the time required for the operation of the defendant's said power house" and later discharging such water when needed, (page 213) was not within its riparian rights (page 217).

The proposal of the Government's attorneys here falls within the above limitations and restrictions.  Clearly the spreading of the water over the alluvial soil

-24-

1  to irrigate native cover vegetation is a minor and purely incidental purpose while

2  the recharging of the underground basin is the real and principal intended purpose,

3  for which it has neither appropriative nor prescriptive rights.

4          The Seneca case is published in 70 A. L. R. 210 and is followed by full and

5  informative annotations and discussion.  At page 227 under subheading "Obstruction

6  for several days" the annotation lists a number of cases supporting the statement:

7  "In general the complete obstruction of a stream for several days at a time is deemed

8  unreasonable".  At page 235 under subheading, "Storage, generally", the annotation

9  says:  "the right temporarily to detain water for power or other reasonable purposes

10  does not justify the storage of it for use in time of scarcity."  The Seneca case was

11  approved by the California Supreme Court in Colorado Power Co. vs. Pac. Gas. &

12  Elect. Co. 218 Cal. 559, 564.

13          In the recent decision of the California Supreme Court, Moore vs. California

14  Oregon Power Co., 22 Cal. 2d 725, the Court had before it a state of facts resulting

15  in a ruling which narrowed the "temporarily detention" rights of a riparian to even

16  less than "periodical storage" which in turn was defined as being less than "seasonal

17  storage".  The facts in the Moore case involved "withholding substantial quantities

18  of water - - - - during the night time and on Sundays and holidays".  The court said,

19  at page 723:

20                  "As we have seen, it (the stored water) was released to

21          meet the convenience and needs of the defendant in the opera-

22          tion of its plant s".

23  and again at page 734:

24                  "Water may never be thus gathered in a reservoir for

25          future use when it may best suit the convenience and use of

26          one riparian owner, and thus deprive other riparian owners

27          of their use and service of the stream in its natural con-

28          dition, unless such right is exercised by a valid prior

29          appropriation."

30  And at page 735 the court said:

31                  "To hold that storage, which results on occasions when the

32          bed of the river is dry during the daytime, and prevents lower

-25-

2314

"riparian owners of any use of the waters during the night
time and on Sundays and holidays, is a proper riparian use
of the stream, while seasonal storage is not, seems both
illogical and unreasonable, and contrary to long established
principles of law governing the respective rights of owners
of water upon a stream." (Emphasis added)

In our case, the proposal is for the Government, under color of irrigating
native vegetation, to require upstream users, riparians and prior appropriators to
let down to it water to store in its underground basin to be subsequently withdrawn
therefrom on such occasions as may best suit its convenience and needs. Such a
proposal the California decisions hold is not a reasonable "exercise of its riparian
rights but calls for a valid prior appropriation." The Government does not have
any such appropriative right.

While it is true that most of the reported cases involving "unreasonable de-
tention" arose on the complaint of a lower riparian being injured thereby, the right
to detain, impound and store, if it is an enforcible right could operate to the injury
of upstream riparians and prior appropriators as well as downstream users.

The fact that there are no riparians or other users below Camp Pendleton to
complain of its actions, does not give the plaintiff in this case the usufruct right to
compel upstream riparians or upstream prior appropriators to let down water which
they would otherwise use, to enable the plaintiff to make this unreasonable "deten-
tion" and this non-riparian storage of the water.

3. "The right of the United States to - - - - - spread its riparian water for
the purpose of irrigating the vegetative cover and enriching the soil of the alluvial
basin."

This phase of the question we have already discussed under the heading "C".
THE EXTENT OF THE RIGHTS OF THE UNITED STATES AS RIPARIAN OWNER
TO USE WATER WITHIN THE WATERSHED", and there set forth our conclusion
that no matter what the rule formerly was, (Herminghouse vs. Sou. California
Edison Co. 200 Cal. 81), since the 1928 Constitutional amendment, such use of
riparian water for such a purpose by the United States on its military reservation
would not constitute under all the circumstances a reasonable use for the exercise

-26-

2315

of which Plaintiff could compel upstream prior appropriators, users and diverters, to deliver water to Camp Pendleton.

A demand for water must be to meet a present existing requirement of the riparian for a reasonable beneficial use. Obviously for a riparian land owner to demand water not actually needed by him would constitute a waste. The Government's acquisition of the Rancho Santa Margarita admittedly was for a permanent military camp for training the marines in the use of modern mechanized implements of war. Nowhere has there been suggested that the United States as one of its military activities needs water for agricultural purposes or itself requires pastures and the growing of cover vegetation.

4. "The right of the United States to temporarily impound, regulate and spread its riparian water for the purpose of - - - recharge the alluvial basin."

The basin or basins underlying Camp Pendleton are used and operated by Plaintiff as an underground reservoir, or at least that is what the Government here proposes and claims a right to do. On the authorities above cited, such a practice would not be within Plaintiff's riparian rights but would constitute an appropriative right calling for an application to and a permit from the State of California as provided for in the California Water Code Section 1242, to make it effective outside the "enclave" and against upstream appropriators and diverters.

### G. THE EXTENT OF PRESCRIPTIVE RIGHTS CLAIMED BY THE UNITED STATES.

1. As successor to the Rancho Santa Margarita, the United States could acquire no greater prescriptive rights than its predecessor had. What right its predecessor had was the subject of a famous and protracted lawsuit, Rancho Santa Margarita vs. Vail 11 Cal. 2d 501. The records of that case show that the Plaintiff claimed only riparian rights. Nowhere in the voluminous transcript of the proceedings is there anywhere to be found any claim advanced by the plaintiff in its pleading or evidence that it had, or claimed to have, either prescriptive or appropriative rights to the use of the waters of the Santa Margarita River. An owner is presumed to know what he owns. Judged by the colossal sums of money which the parties are reputed to have spent on the lawsuit and the unprecedented length of time it took to present

-27-

2316

the evidence to the court, the parties must have pushed their investigations, surveys, studies and research to embrace all known and ascertainable facts and by such efforts to have succeeded in uncovering every possible relevant and material fact. Plaintiff was represented by shrewd, able and experienced attorneys, well informed as to California water law,[1] who must be presumed to have produced in court every bit of evidence in support of every valid claim possessed by Plaintiff.  Plaintiff's counsel was staffed and aided by skilled and resourceful experts who could be counted on to suggest every legal claim, every factual basis and theory which could honorably be urged in support of the claims of their clients for the maximum amount of water. And yet, nowhere, at any time, throughout that protracted trial does there appear any allegation or pleading, or any statement of any witness or any expression of opinion or conclusion of any expert or any argument of any attorney that the plaintiff in that case had, or could have had, any prescriptive or appropriative rights, or any basis for a claim of such rights.

The fact that there is no record of any claim by Rancho Santa Margarite of any prescriptive or appropriative rights, is the best evidence that no basis for claiming any such right existed   It would follow therefor that, <u>as successor to the Rancho Santa Margarita</u>, the United States acquired no prescriptive rights.

If we can learn any lesson from that case, it would be to note that after battling each other to exhaustion, the parties finally adopted a physical solution to end their controversy in the form of a Stipulated Judgment which is Exhibit "A" attached to Plaintiff's Complaint.

2. <u>As to prescriptive rights acquired by the United States</u> by uses made by it after acquiring Camp Pendleton in 1942-1943 (Subdivision 2 to 5 Inc. of question) we adopt the reasoning and declarations of the decision of the Circuit Court at page 656:

"Now it must be conceded by all parties that the United States had sovereign rights in the enclave. - - -

"The United States could store the water which came to

_____

[1] Hunsaker, Britt and Cosgrove represented Rancho Santa Margarita, the Plaintiff in that action, Mr. Britt and Mr. Cosgrove both actively participating through the long trial.

2317

"the land or use it on a different watershed than that of the
Santa Margarita without interference from anyone.

"But the physical possession of the corpus of the water
after it enters the enclave and the ability and legal right then
to use it for whatever purposes are not evidentiary of a water
right, for the right to use water is a property right and is ap-
purtenant to particular parcels of land . - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - - - - - - - -

"Since neither appropriators, riparians nor anyone else
could object or prevent such use of water by the United States
in the enclave, such use was not adverse to their interests.

"These parties could not be estopped by 'use" of the
corpus of the water with which none of them by any possibility
could interfere. "

and at page 661:

"The doctrine of prescription envisions a party whose
rights are being openly and notoriously violated by another
having the power to intervene and prevent the violation
from becoming an adverse property right by self-help or
by bringing an action or obtaining an injunction before the
period of prescription runs.  But, when the United States
was in possession as sovereign, the water which came into
the enclave could be used without let or hindrance in any
way which the agents of the government chose. "

3. <u>Prescriptive Rights do not run upstream.</u>

Because upper owners have no cause of action against use of water which they
have allowed to pass off of their lands on to those below them, the Supreme Court of
California has squarely held, on numerous occasions that a downstream user cannot
acquire a prescriptive right:

<u>Morgan v. Walker</u>, 217 Cal. 607, 615, 20 P. 2d 600, 664 /1933/

<u>Cory v. Smith</u>, 206 Cal. 508, 511, 274 Pac. 969, 970-971 (1929);

<u>Pabst v. Finmand</u>, 190 Cal. 124, 128, 211 Pac. 11, 12-13 (1922);

-29-

2318

<u>San Joaquin & Kings River Canal & Irrigation Co. v. Worswick</u>,

187 Cal. 674, 683-685, 203 Pac. 999, 1003-1004 (1922);

<u>Holmes v. Nay</u>, 186 Cal. 231, 234, 1899 Pac. 324, 327 (1921);

<u>Peake v. Harris</u>, 48 Cal. App. 363, 382, 192 Pac. 310, 318 /‾1920 - Opinion

is by California Supreme Court on denial of hearing_7;

<u>Miller & Lux, Inc. v. Enterprise Canal & Land Co.</u>, 169 Cal. 415, 423,

147 Pac. 567, 570 /‾1915_7;

<u>Perry v. Calkins</u>, 159 Cal. 175, 177-178, 113 Pac. 136, 138. (1911);

<u>Hudson v. Dailey</u>, 156 Cal. 617, 627, 105 Pac. 748, 753 (1909);

<u>Walker v. Lillingston</u>, 137 Cal. 401, 404, 70 Pac. 282, 283-284 (1902);

<u>Cave v. Tyler</u>, 133 Cal. 566, 567-568, 65 Pac. 1089, 1090 (1901);

<u>Bathgate v. Irvine</u>, 126 Cal. 135, 140-141, 58 Pac. 442, 444 (1899);

<u>Hargrave v. Cook</u>, 108 Cal. 72, 77-79, 41 Pac. 18, 19-20 (1895)

<u>Lakeside Ditch Co. v. Crane</u>, 80 Cal. 181, 183-183, 22 Pac. 76, 77 (1889);

<u>Hanson v. McCue</u>, 42 Cal. 303, 310 /‾1871_7;

<u>Rank v. Krug</u>, 142 Fed. Supp. 1, 120 (1956).

H. THE EXTENT OF APPROPRIATIVE RIGHTS CLAIMED BY
   THE UNITED STATES IN CONNECTION WITH LAKE O'NEILL,
   STUART MESA, SOUTH COAST MESA, AND ALL OTHER
   USES FOR WHICH APPROPRIATIVE CLAIMS ARE ASSERTED
   BY IT; MUST THE UNITED STATES COMPLY WITH STATE
   PROCEDURES FOR THE ACQUISITION OF APPROPRIATIVE
   RIGHTS?

It would not help any for us to discuss "the extent of the appropriative rights
<u>claimed</u> by the United States and we will not do so. Such claims are beyond our
comprehension and without any factual or legal basis.

It is the contention of Fallbrook Public Utility District that the United States
must comply with State procedures for the acquisition of appropriative rights and
that since the only step taken by it to comply with such laws, rules and regulations
was initiated June 30, 1948, subsequent to the four prior applications of Fallbrook,

-30-

2319

1    the United States possesses no effective appropriative rights against Fallbrook.

2         The Government's position on this question seems equivocal.  Mr. Veeder

3    concedes that in this case the mere fact that the United States is a sovereign "could

4    not broaden our right by reason of our sovereignty" and while "within the enclave

5    we are not subject to police control that does not broaden our right to claim that

6    water must be delivered to us from upstream users."  (Transcript of Proceedings

7    May 6, 1947, page 118).  However, Mr. Veeder at the same time is reasserting the

8    very same position which he took in 1951 and which he urged all through the first

9    trial and unsuccessfully on the appeal, to-wit:  that the United States can have an ap-

10   propriative right to use water on Camp Pendleton lands outside the Santa Margarita

11   River watershed without complying with State laws.  (Reporter's Transcript page 118)

12        The Circuit Court decision (235 Fed. 2d 647, 660) declared:

13             "Apparently under the law of California since 1913 a valid

14        water right by appropriation can be acquired only by filing an

15        application with the State authorities and pursuing it through

16        the steps required by law",

17   citing in support thereof California Water Code 1225:

18             "No right to appropriate or use water subject to appropriation

19        shall be initiated or acquired except upon compliance with the

20        provisions of this Division."

21   The Decision then continues:

22             "At a later date after the filing of Santa Margarita (and we

23        will add, after the filings of Fallbrook Public Utility District)

24        the agents of the government have made a filing ostensibly

25        for the Navy upon the stream.  If its lawyers and agents had

26        obeyed the injunction of the reclamation statute when Camp

27        Pendleton was first acquired (and we add, followed the State

28        Statutes) and had filed for the surplus waters of the stream,

29        another question would have arisen.  But because they were

30        not foresighted enough to do that is no reason to allow them

31        to act as if they had."  (Page 660)

32        The law is settled in California that no right to appropriate water may be

-31-

2320

1  acquired, since the enactment of the Water Commission Act in 1913, without com-

2  pliance with its provisions concerning the issuance of permits.  (Crane vs. Stevenson

3  5 Cal. 2d 387, 398 (74 Pac. 2d 1100, 1105-1106) (1936).

4      Ivanhoe Irrigation District vs. All Parties, 47 Cal. 2d 597, 625, discussing

5  the State's control over the uses of water of the State declares:

6          "To avail themselves of the right thereto, individually,

7      collectively or in a corporate capacity, administrative pro-

8      cedures have been established and are set forth in the Water

9      Code and relating statutory provisions.  Compliance with

10     those provisions is necessary in order that the right to use

11     the water may be acquired. -- - - - - - - - - - - - - "

12     (Emphasis added)

13     The change affected by the Act of 1913 is succinctly set out in 26 Cal. Jur. 34,

14  Waters, Section 210, as follows:

15         " - - - - the code method was not exclusive and one could

16     appropriate water with or without notice until the Water Com-

17     mission Act of 1913, which entirely abolished this method of

18     appropriation.  Under the Commission Act the Legislature has

19     placed the regulation of appropriation procedure in the hands

20     of a Commission or its successor the Department of Public

21     Works." (Emphasis added.)

22     Since as we have already pointed out, the Plaintiff's predecessor Rancho Santa

23  Margarita neither made nor claimed any appropriative right, the United States in

24  acquiring the private property of that corporation succeeded to no then existing ap-

25  propriative rights.

26     Notwithstanding Mr. Veeder's assertion of some vague nonstatutory appro-

27  priative rights, the United States in making its State filing, Application No. 12576,

28  on June 30, 1948, wrote into its application in response to the question printed on

29  the application as to whether it had another water right, declared:

30         "The land to be irrigated has another water right or source

31     of water other than that here applied for; the nature and

32     amount of the additional supply referred to is riparian rights,

-32-

2321

"defined by the Sup. Court Judgment (Santa Margarita

vs. Vail)" (Emphasis added)

The failure of the United States at that time to assert any claim of prescriptive

or appropriative rights is pretty good evidence that none existed.


I.  "THE LAW OF PERCOLATING WATERS, THAT IS,

WATERS WHICH ARE NOT PART OF THE SANTA

MARGARITA RIVER OR ITS TRIBUTARIES OR

UNDERGROUND BASINS WHICH ARE A PART OF

SAID STREAM."


This question is important in connection with the proof which Plaintiff must

present in support of its charges against the numerous defendants that they are di-

verting water which the United States is entitled to receive and use at Camp Pendleton,

and whether the water so diverted and used by said Defendants actually falls within

the issues of this action.  The law governing percolating water also becomes important

if all defendants are retained as parties to this action and are each made adverse as

to each other.

1.  The answer to this question is, and we believe, must be, that the owner

of any lands in and through which are to be found percolating waters such as are

described in the question, has a recognized and established legal right to put the same

to a beneficial use on the lands beneath which the waters are found subject only to

the correlative rights of his neighbors whose lands may also overlie the same per-

colating waters.  Originally the rule was that the percolating waters, being part of

the soil in which they were found belonged absolutely to the owner to do with as he

pleased.  But this rule of "absolute ownership" was modified by the Doctrine of

Reasonable Use now generally recognized throughout California and most of the other

states.

In 26 Cal. Jur. pages 267-272, percolating waters are defined and the rights

of the landowners, in whose soil these waters are found, to use the same on their

lands are declared and set forth:

"§477.  Percolating Waters. -- Percolating waters may

-33-

2322

"consist of rain or drainage waters which are slowly infiltrating through the soil, or waters which have seeped out through the banks or bed of a stream and lost their character as part of the flow.  They have no general course or definite limits but are diffused in the soil. -- - - - - - - - -

" §478.  <u>Evidence as to Percolating Waters</u>. --  The question whether certain water is percolating water or is part of a stream is one of fact, as to which a decision of the trial court based upon conflicting evidence is conclusive.  As already seen, underground water is presumed to be percolating water in the absence of any proof that the supply is from a flowing stream, and the burden of proof is on one who asserts that the underground water constitutes a watercourse, - - - - - -.

" §480.  Doctrines of Absolute Ownership and Correlative User.  --  Prior to the decision of Katz v. Walkinshaw, in 1903, the California courts had repeatedly recognized that percolating waters were owned absolutely by the owner of the land in which they were found.  That case, which has since been uniformly followed, repudiated the theory of ownership and adopted instead the doctrine of correlative user, analogous to the doctrine of riparian rights, as being more suited to conditions in California. - - - - - -. "

" §481.  Reasons for Correlative User. --  The purpose of the doctrine of correlative user is to afford a better protection of property rights and to conduce to a fairer distribution of percolating waters than would obtain under a rule of absolute ownership which would in effect enable one land owner to drain the water from under the land of another and thus use up the entire common supply. - - --

" §482.  Who May Use Percolating Water. --  Percolating waters and the right to use the same are private property of the owners of overlying lands, since, as has been said, the

-34-

2323

1    "original grant of the land from the government carried the

2    water in it as part of the land and the water and water right

3    remain private property until taken from the owners or

4    devoted to a public use. - - - - - -

5    "  §483, 484.  Extent of Right. --  A land owner has a

6    natural right to the reasonable use of the water percolating

7    through his land, although it may be moving into the land of

8    his neighbor, and although his use may prevent it from so

9    doing.  Ownership of land carries with it all the natural

10    advantages of its situation, and the right to a reasonable use

11    of the land and everything it contains, limited only by the

12    operation of the maxim, sic utere tuo ut alienum non laedas.

13    - - - - - -"

14    2.  The Subject Matter of this Litigation is Limited to The Water of the

15  Santa Margarita River.

16    The "subject matter" of this litigation is the water of the Santa Margarita

17  River and its tributaries.  Water, not a part of that river system, is not a part of

18  this lawsuit.  Plaintiff, by its complaint had a right to and did fix, determine and

19  limit what was the subject of the controversy to be adjudicated in this action.

20    Plaintiff specified at the very outset in Paragraph I of its complaint: "An

21  actual controversy having arisen between the United States of America and the

22  defendants named herein, /Pltf./ seeks to have declared its rights to the use of

23  water in the Santa Margarita River and its tributaries". In Paragraph II it declares:

24  "---- Camp Joseph H. Pendleton--was selected by reason of the unique combination

25  of the availability of a supply of water from the Santa Margarita River. - - - -"

26  Also in Paragraph IV, it alleges: "Source of the all-important supply of water for

27  Camp Joseph H. Pendleton, the Naval Ammunition Depot and the United States Naval

28  Hospital, as indicated, is the Santa Margarita River." Again, in Paragraph IX,

29  the Plaintiff charges: "In direct violation of the rights of the United States of

30  America - - - the defendants by reason of their diversions from the Santa Margarita

31

32  1/  Emphasis to quotations from Plaintiff's Complaint are added.

-35-

River. "

Therefore assuming, as we must, from the above and foregoing, that the subject matter of this action is <u>the water of the Santa Margarita River and its tributaries</u>, the all-important question arises: What waters constitute the Santa Margarita River and its tributaries, and what waters are percolating waters and therefore not a part of the Santa Margarita River or its tributaries.

2325

3.  <u>What Waters Constitute the Santa Margarita River And Its Tributaries</u>.

In 25 Cal. Jur 1097-1103 natural streams and waters which are a part thereof are defined and rights thereto set forth as follows:

" §106.  <u>Natural Watercourses and Bodies of Water</u>.  - - - Riparian rights exist only in natural watercourses and natural bodies of water.  They extend, however, not only to the water in streams themselves, but also to water in the tributaries, - - - - - - -.

" §107.  <u>Waters available for Riparian Uses</u>. --- In general a riparian owner is entitled to his correlative share of all the waters in streams themselves, but also to water in the tributaries, - - - - .

" §108.  <u>Natural and Normal Flow as Gauging Rights</u>. ---- Clearly, a lower owner has no right to water that, under normal conditions, would not reach him, for one has no interest in the water until it reaches his land or unless it would reach it under natural and normal conditions.  And so one may not object to the taking of water from the underflow or subterranean stream where such flow would not ordinarily reach him. - - -

" §109.  <u>Underflow or Subsurface Flow</u>. --- A watercourse consists not only of the water on the surface but also of the sub-surface or underflow which supports the stream either by upward or lateral pressure or feeds it directly.  In some cases the surface flow may disappear entirely, and all the water may percolate in a more or less definite channel through the soil.

" §110.  <u>Right to Use Subsurface Flow</u>. --- It would seem that if the subsurface flow is in such immediate connection with the surface stream as to make it a part thereof, lands overlying such underflow may be considered as riparian to the stream.  Thus in discussing the rights of owners of land overlying an underground stream, it has been said that "<u>subterranean streams flowing through known and definite channels are governed by the same rules that apply to surface streams</u>.  (Emphasis added)

The leading California case on underground waters defining and differentiating

-36-

2326

underground waters in contact with the stream and so-called percolating waters

is <u>San Bernardino v. Riverside</u>, 186 Cal. 7, wherein our Supreme Court at pages

14-15 said:

"When a stream runs over porous material saturated with

water, and the underground waters support the stream,

either by upward or lateral pressure, or feed it directly,

persons having rights in the stream will be protected against

a depletion thereof by adverse diversions of such underground

waters, if they are injured thereby.  <u>There may be a point of</u>

<u>distance from the stream at which a diversion of such under-</u>

<u>ground water will have so little effect on the stream that it will</u>

<u>not be actionable.  It is ordinarily a question for the trial</u>

<u>court to determine whether or not this is true in the particular</u>

<u>case before it</u>.  (Emphasis added)  These matters are considered

as applied to differing conditions in <u>Los Angeles v. Pomeroy</u>,

124 Cal. 617, (57 Pac. 585), <u>Miller v. Bay Cities W. Co.</u>

157 Cal. 256 (107 Pac. 115), <u>Hudson v. Dailey</u>, 156 Cal. 626

(105 Pac. 748); <u>McClintock v. Hudson</u>, 141 Cal. 279 (74 Pac.

849) and other cases, and will be averted to herein in connection

with the rights of Riverside Water Company.

"The law of so-called 'percolating' waters presents the principal

questions in issue in this case.  These waters are almost in-

variably found in permeable material of more or less density,

such as sand, gravel and boulders intermixed, in which the water

will move readily by the force of gravity.  The original title to

such water was in the owner of the land in which it is found, under

the elementary rule that the title and ownership of land extends to

the center of the earth and includes everything within the cone

having the superficial boundaries of the land for the base and

the center of the earth for its vertex.  The transfer of the land by

the government to the individual passed this title and gave the

land owner the right to all the water therein.  Originally in this

1    "state it was assumed that this title was absolute, and that

2    each land owner could take out as much of such underground

3    water as he pleased, regardless of the effect thereof on

4    other lands, provided he took it on his own land and without

5    a malicious intent to injure others.  But the immediate effect

6    of such taking of water out of such land usually is to draw

7    out the water from the surrounding land into the void or de-

8    pression caused in the water plane in the land from which it

9    is taken, and this, if continued, lowers the subsurface water

10    plane in the vicinity thereof and eventually to a greater or

11    less extent throughout the basin in which the lands are situated.

12    If there is artesion pressure therein, this will reduce the

13    pressure.  In this manner the owner of one tract of land in such

14    basin could take such water from another tract without an

15    actual trespass thereon, and thus an injury could be done which

16    the owner of the other tract could not prevent by any physical

17    means, and a resort to the courts was necessary.  In cases

18    presenting these facts the original assumption of absolute owner-

19    ship in such water was held untenable under the conditions

20    existing in this state and the <u>doctrine that the respective rights</u>

21    <u>of owners of land in the waters percolating or lying beneath</u>

22    <u>the surface are reciprocal and correlative as to each other</u>

23    <u>was adopted</u>.  (<u>Katz v. Walkinshaw</u>, 141 Cal. 116, (99 Am. St.

24    Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766); <u>Newport</u>

25    <u>v. Temescal W. Co.</u> 149 Cal. 535 (6 L. R. A. (N. S.) 1098, 87

26    Pac. 372); <u>Burr v. Maclay etc. Water Co.</u>, 154 Cal. 428,

27    (98 Pac. 260); and other cases.)"  (Emphasis added)

28    To same effect see <u>Revis vs. I. S. Chapman & Co.</u> 130 C. A. 109, 112-113;

29  <u>Orchard v. Cecil F. White Ranches, Inc.</u> 97 C. A. (2) 35, 42-43.

30        4.  <u>Many Defendants can and should be eliminated from this action.</u>

31        In view of the foregoing and the fact that the law recognizes and classifies Per-

32  colating Waters as separate and distinct from waters which are a part of a river

-38-

2328

1   and its tributaries, and in view of the fact that the United States in this action has

2   limited this litigation to its rights to "water in the Santa Margarita River and its

3   tributaries", we seriously question any necessity for making 3600 landowners defendants

4   in this proceeding.

5        It would be ignoring the laws of nature, matters of common knowledge and

6   physical facts of which this court may take judicial notice, to say that the boundaries

7   of the Santa Margarita River and its tributaries are identical with the boundaries of

8   its watershed.  All maps show the Santa Margarita River system occupies only a very

9   small portion of the 740 square miles which constitute its watershed.  Therefore, it

10  cannot be said that all water which happens to be within the watershed is in the Santa

11  Margarita River or any of its tributaries.  Much of the precipitation which falls on

12  the area never reaches any recognized tributary of that river, even in a state of nature

13  and without any diversions by man, and most of it in normal years never reaches

14  Plaintiff's property.  Any claim to the contrary must of necessity rest on a highly

15  speculative and conjectural basis, ignoring the many intervening contingencies which

16  could prevent such rainfall from reaching any tributaries and ultimately arriving at

17  Camp Pendleton.

18        To support Plaintiff's thesis that every land owner in the watershed is a nec-

19  essary party defendant and that every diversion and use of water anywhere within the

20  watershed constitutes a diversion "from the Santa Margarita River" system and

21  diminishes the quantity of water arriving at Camp Pendleton, Plaintiff must claim a

22  right to and an interest in every drop of water that falls anywhere in the watershed,

23  even on the east slope of Palomar Mountain.  This is reducio ad absurdum for any

24  such claim.

25        5.  United States Not Affected by Diversions of Waters Upstream from

26  the Vail Properties.

27        It is our contention that the United  States is not justified in suing any land

28  owners over diversions of water made upstream from the Vail properties.  In the

29  Stipulated Judgment agreed to December 27, 1940 by the United States' predecessor

30  Rancho Santa Margarita (Exhibit "A" of Plaintiff's complaint herein) and by the

31  United States' own stipulation with the Vail estate filed herein with the approval of

32  this Court, July 8th, 1952, it was declared that "the United States of America and

-39-

2329

1   "the Vails are mutually in agreement that as between themselves the said judgment

2   of December 27, 1940, is, and shall continue to be, binding upon them and each of

3   them." (For Stipulation see 109 Fed. Supp. 28 at page 50).

4          It is true the Appellate Court declared that this Stipulated Judgment "is con-

5   tractual in character between the principals to the agreement" and is not binding upon

6   others not parties thereto, but the practical operating effect of the stipulations is to

7   make the United States look to the Vail Estate for getting its agreed share of the flow

8   of the River at the designated measuring points below the Vail lands (Sections Seventh,

9   Eighth, Ninth, Tenth, Eleventh, Twelfth and Thirteenth of the Stipulated Judgment).

10         <u>Binding on each other</u>, the Stipulated Judgment divided "the waters of the

11  Temecula-Santa Margarita River and all its tributaries which naturally, when not

12  artificially diverted or abstracted, flows and descends in the channel thereof at that

13  certain gaging station hereinafter in this judgment designated as Measuring Station

14  No. 6", two-thirds to the Rancho Santa Margarita and one-third to the Vails.

15  (Sections Second and Third).

16         Vails were given up to an additional 1500 acre-feet of water which they could

17  pump from their underground depending on the ground water elevation and the right

18  to "the spreading of flood waters which does not involve surface impoundment

19  (Section Ninth). However, when Vails built their surface dam, which they did in

20  1948-1949 in Nigger Canyon, the right to pump the extra 1500 acre-feet from the

21  underground ceased (Section Tenth). The whole stipulated judgment appears to have

22  been designed to bring into existence a "physical solution" or operating arrangement

23  effective between the two signatories fixing their respective rights to all the waters

24  of the Santa Margarita River and its tributaries without regard to what any other

25  diverter or user on the River might do. For ten years it so operated and had that

26  effect. For all practical purposes the Vails assumed the responsibility of delivering

27  into the River channel at the upper end of Temecula Gorge (Gaging Station No. 3)

28  the quantities of water called for by said Stipulated Judgment.

29         What any land owner lying <u>upstream</u> from the Vail properties might do in the

30  way of diversions of water from the Santa Margarita River or its tributaries might

31  well become a matter of interest and concern to the Vails by diminishing the quantity

32  of water reaching their lands and could constitute an invasion of their riparian or

1 appropriative rights.  It could not, however, reduce or diminish the quantity of

2 water which the Vails have agreed, by the Stipulated Judgment, to maintain in the

3 channel of the Santa Margarita River below their lands.  All that is necessary for the

4 United States to do to obtain the delivery of the quantities of water which the Vails

5 agreed they would maintain in the River Channel below their property at Gaging Station

6 No. 3 would be for Plaintiff to call upon the Vails to perform their part of the Stipu-

7 lated Judgment.  There is no necessity for the United States to look to the landowners

8 above or beyond the Vails.  By the Stipulated Judgment Vails have obligated themselves

9 to maintain in the river channel below their lands the quantitites of water specified in

10 that judgment.

11

12                    6.    S U M M A R Y

13          The question propounded, itself recognizes that there is a sound basis in

14 physical and hydrological facts for dividing the waters found existing within the Santa

15 Margarita watershed into at least two general classes: (1)  those in contact with and

16 a part of the river and its tributaries, and (2) other waters not so in contact with the

17 river system.  The division and classification of surface flow and the law applicable

18 thereto, usually presents little difficulty, but the division and classification of the

19 underground waters, because of their hidden location is more difficult.  In case of

20 any doubt as to where to draw the line between "free percolating underground water",

21 and water in contact with and a part of a definite stream or recognized water course,

22 the authorities hold that the trial court can pass upon that issue as a question of fact

23 and its decision on the conflicting evidence will be final and conclusive.

24          1.  We assert that the overwhelming weight of the authorities support the rule

25 that every person who finds percolating water in or under his land, not in contact with

26 any stream or recognized water course, has a right to apply such water to all bene-

27 ficial uses on his land on which it is produced, subject only to a correlative right in

28 each of his neighbors to make a like use of the same percolating waters found in

29 their lands.

30          2.  The corollary to the foregoing is that all waters which are a part of the

31 Santa Margarita River or its tributaries or the ground water basins which are a part

32 of said stream are all subject to the well known law of riparian rights -- and this

-41-

2331

1  applies both to the surface and the subsurface flow of the river and its tributaries.

2  However, for lands to have riparian rights they must have all three of the following

3  requirements: (1) be contiguous to or abut on the stream; (2) be within the watershed

4  of the stream, and (3) the land for which water can be claimed is the smallest tract

5  which has been continuously held under one chain of title leading to the present owner

6  (Rancho Santa Margarita v. Vail, 11 Cal. 2d 501, 528-529).

7      3.  The United States, by the allegations of its complaint, has limited its claims

8  in this action to its proportionate share of the waters of the Santa Margarita River and

9  its tributaries.  This greatly restricts and limits the numbers of landowners who are

10  necessary and proper parties defendant, and especially eliminates users of perco-

11  lating water.  The rights of users of percolating waters found within the watershed but

12  which are not in contact with the Santa Margarita River or its tributaries are not

13  necessarily involved in this litigation and should not be kept in the action as parties

14  defendant.

15      4.  If due force and effect is given to the Stipulated Judgment (Exhibit A of

16  plaintiff's complaint) agreed to by plaintiff's predecessor and by its own stipulation

17  made with the Vails and entered in this proceeding, we must realize that the size and

18  scope of this litigation has again been cut down by eliminating, for all practical

19  purposes, all landowners and water users who are situated above the Vail properties--

20  and this without regard to whether their diversions are direct from the Santa Marga-

21  rita system or are from percolating waters not in contact with any of its tributaries.

22      5.  None of the foregoing desirable results are or will be true if every de-

23  fendant in this action is held to be adverse to every other defendant.  We hope and

24  trust that this Court can hold that it is not necessary to a proper adjudication of the

25  plaintiff's claims to compel every defendant to engage in a "Battle Royal" with each

26  and all of the other three thousand six hundred (3,600) defendants.  We request the

27  Court to so rule and declare.

28

29

30

31

32

2332

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

Respectfully Submitted,

SWING, SCHARNIKOW & STANIFORTH,

BY _____
PHIL D. SWING

SACHSE & PRICE

BY _____
FRANZ SACHSE

ATTORNEYS FOR DEFENDANT FALLBROOK

PUBLIC UTILITY DISTRICT

-43-

2333

1            AFFIDAVIT OF SERVICE BY MAIL

2               (C.C.P.1013a)

3 STATE OF CALIFORNIA )
                      ) ss

4 COUNTYOF SAN DIEGO )

5      MARIAN W. ALLEN, being duly sworn, says, that affiant is a

6 citizen of the United States, over 18 years of age, a resident of,

7 or employed in, San Diego County, and not a party to the within

8 action.

9      That affiant's business address is 604 San Diego Trust and

10 Savings Building, San Diego, California.

11      That affiant served the attached MEMORANDUM ON ISSUES LISTED

12 IN COURT'S ORDER OF MAY 8, 1957, by placing a true copy thereof

13 in an envelope addressed to the attorneys of record whose names

14 and addresses are set forth on the list of said attorneys hereto

15 attached at their respective addresses, which envelopes were then

16 sealed and postage fully prepaid thereon, and thereafter were on

17 August 9th, 1957 deposited in the United States Mail at San Diego,

18 California.

19      That there is delivery service by the United States mail at

20 the place so addressed, or regular communication by United States

21 mail between the place of mailing and the place so addressed.

22      ALSO Twenty-five (25) copies of said MEMORANDUM were on said

23 day delivered to the Clerk of the District Court at San Diego,

24 California.

25

26                           *Marian W. Allen*

27

28 Subscribed and sworn to before me

29 this 9th day of August, 1957.

30

31 Notary Public in and for the County

32 of San Diego, State of California.

                                                2334

LIST OF DEFENDANTS & ATTORNEYS CASE NO. 1247-SD-C
U.S.A. vs FALLBROOK PUBLIC UTILITY DISTRICT

| ATTORNEY: | CLIENTS: |
|---|---|
| Bert Buzzini,<br>2223 Fulton St.,<br>Berkeley 4, Calif. | FAULKNER, Charlotte Flor &<br>FAULKNER, Raymond C. |
| Allard, Brownsberger<br>Shelton & O'Conner,<br>313 1st National Bldg<br>Pomona, Calif. | ERWIN, Ada Lee |
| Florence A. Anderson,<br>918 C.C. Chapman Bldg<br>756 S. Broadway<br>Los Angeles, Calif. | ROBINSON, Julienne Vaasa |
| Henry Ashton, Esq.,<br>408 E. Central Ave.<br>Balboa, Calif. | RICHARDSON, A. S.<br>RICHARDSON, Eileen |
| Best, Best, & Kireger<br>Evans, Bldg,<br>Riverside, Calif. | HARTMAN, Walter K. & Carol<br>HARTMAN, Georgia Lewis,<br>WILKS, (No first name shown) |
| A. A. Bianchi<br>901 Kohl Bldg<br>400 Montgomery St.<br>San Francisco, Calif. | Bayle, Verlie L. |
| Edmund G. Brown, Att'y Gen'l,<br>By Walter C. Rountree and<br>Adolphus Moskovitz,<br>Library & Courts Bldg,<br>Sacramento, Calif. | STATE OF CALIFORNIA. |
| Major A. C. Bowen<br>Office of Ground Water Resources<br>Camp Pendleton, Calif. | U.S.M.C. |
| Thomas J. Burke<br>504 Granger Bldg,<br>San Diego, 1, Calif. | MASSENGILL, J. D. |
| Mabel Clausen,<br>320 - 1st Trust Bldg<br>Pasadena, Calif. | EASTON  Ruby Lee<br>PATTEN, J. C.<br>POORE, Mildred C. & Paul R. |
| George G. Grover, Owen Strange,<br>Messrs Clayson, Stark & Rothrock<br>First National Bldg,<br>Corona, Calif. | REUTER, Arthur G.<br>GIBBON, Katherine C.<br>REUTER, Phila<br>COTTLE, William W. |
| Gerald A. Coxe<br>Alessandro Hotel Bldg,<br>Hemet, Calif. | PARKS, Myrtle E. |
| Howard E. Crandall<br>127 W. Anaheim Bldg,<br>Wilmington, Calif. | DENNI, Joseph A.<br>DENNI, Grace H. |
| Wm J. Cusack, Esq.,<br>Rm 814 Merritt Bldg,<br>307 W. 8th St.,<br>Los Angeles, Calif. | HECKER, F.H. |

2335

LIST OF DEFENDANTS & ATTORNEYS IN CASE NO. 1247-SD-C
U.S.A. vs FALLBROOK PUBLIC UTILITY DISTRICT
-2-

ATTORNEY:
W. B. Dennis,
365 Broadway,
Vista, Calif.

CLIENTS:
BULLOCK, D. H.
BULLOCK, Glenn C.
BULLOCK, Westa
CREGO, Dora M.
COBB, Chas. Raymond
COBB, Winifred Cherry
CREGO, Thos. H.
DURKAN, Ed. J.
DURKAN, Edna M.
FIELD, Harry O.
FIELD, Mabel B.
FREEMAN, Frank A.
FREEMAN, Norma J.
FREEMAN Robert L.
FREESE, Addie J.
FREESE, Frederick W.
GALLACHER, Margaret Laurette
GALLACHER, Mark
HANES, Bertie B.
HANES, C. C.
HANES Viva
HANEY, W. B.
HANES, William F.

CLIENTS:
(continued)
HAYES, Joseph H.
HAYES, Lydia C.
HELMS, Edward G.
HELMS, Lottie L.
HOFFMAN, Lincoln J.J.
HOFFMAN, Evelyn R.
JENNINGS, Janice B.
JENNINGS, Theodore F.
LUDGATE, Leon P.
LUDGATE, Tacy W.
LYTHNER, Caroline
MARTIN, Eulilla
MARTIN, K. I.
MORTZ, Paul D.
MORTZ, Olive M.
OLSEN, Carl W.
OLSEN, Christina Marie
PANKONIEN, Alma C.
PANKONIEN, Herman C.
PETERS, Gladys P.
PETERS, Ray Gird
SANTA MARGARITA MUTUAL WATER CO.
TRAYLOR, Laura Howell
WARREN, Iris D.
WARREN, Roscoe L.
WEAVER, Charles A.
WEAVER, Zela P.
YAKES, Daisy P.
YAKES, Paul P.

Devor & Dorfman
924 Van Nuys Bldg,
Los Angeles, 14, Calif.

VRUWINK, Dolores Costello

Leonard J. Difani,
200 Loring Bldg,
Riverside, Calif.

CANTARINI, John A.
CANTARINI, Beatrice

J. A. Donnelley &
Richard P. MacNulty
1403 Bank of America Bldg, 26 53 461 L.A.
San Diego, 1, Calif.

HARTLEY, Yolanda
BONE, Lucille Holcomb

Lawrence E. Drumm,
458 S. Spring, Suite 820,
Los Angeles, 14, Calif.

BRADFORD, Ione

Ray C. Eberhard,
Rm 1231 Bartlette Bldg,
215 W. 7th St. .
Los Angeles, 14, Calif.

WILSON, Samuel M.
WILSON, Hazel A.

Estudillo & Bucciarelli,
3900 Market St.,
Riverside, Calif.

DI PRIMA, Benney
DI PRIMA, Lillian J.

Fendler, Weber & Lerner
333 S. Beverly Drive,
Beverly Hills, Calif.

FENDLER, Harold A.
FENDLER, Miriam O.

Daniel W. Gage,
740 Rowan Bldg,
458 S. Spring St.
Los Angeles, 13, Calif.

IPPOLITO, Domenick
IPPOLITO, John A.
IPPOLITO, Theresa

Arthur M. Gediman
119 S. Main St.
Elsinore, Calif.

SIMONELLI, Bartolomeo
SIMONELLI, Clara H.

2336

-3-

LIST OF DEFENDANTS & ATTORNEYS IN CASE NO. 1247-SD-C
U.S.A. vs FALLBROOK PUBLIC UTILITY DISTRICT

| ATTORNEYS: | CLIENTS: |
|---|---|
| Abraham Gottfried,<br>424 S. Beverly Dr.,<br>Beverly Hills, Calif. | GELTMAN, Myron V.<br>GELTMAN, Pauline C. |
| Frank E. Gray<br>202 S. Hamilton Drive,<br>Beverly Hills, Calif. | MURCELL, Betty B. |
| Hahn, Ross & Saunders<br>Suite 611, 608 S. Hill St.<br>Los Angeles, 14, Calif. | MAUZEY, Sr., Bill E.<br>MAUZEY, Ona Faye |
| Tom Halde,<br>417 S. Hill St., Suite 520,<br>Los Angeles, 13, Calif. | HALDE, Carl N.<br>HALDE, Hester M. |
| Frank S. Hamburger<br>1031 Mills Tower,<br>San Francisco, Calif. | HUBBARD, Mary H. aka<br>HUBBARD, Mary E. |
| Leslie B. Hanson<br>4412 York Blvd,<br>Los Angeles, Calif. | ANDERSON, Olga O. |
| James Don Keller, &<br>Robert G. Berrey<br>302 Civic Center<br>San Diego, 1, Calif. | DE LUZ SCHOOL DISTRICT<br>FALLBROOK UNION SCHOOL DISTRICT<br>FALLBROOK UNION HIGH SCHOOL DIST.<br>SAN DIEGO, COUNTY OF<br>VALLECITOS SCHOOL DISTRICT |
| Courtney Lacey<br>408 E. Florida Ave.<br>Hemet, Calif. | BARTON, Irene |
| Launder, Chaffee & Launer<br>Bank of America Bldg,<br>Fullerton, Calif. | HENDERSON, Max M.<br>HENDERSON, Aurelia S. |
| Walter Gould Lincoln<br>Suite 1113, 742 S. Hill St.,<br>Los Angeles, 14, Calif. | SCHLOSS, Murray (Estate Of) |
| Lindley, Lazar & Scales,<br>825 Bank of America Bldg,<br>San Diego, 1, Calif. | FALLBROOK CITRUS ASSOCIATION<br>MILLER, Madeline G. |
| Luce, Forward, Kunzel & Scripps<br>1220 San Diego Trust & Svgs Bldg<br>San Diego, 1, Calif. | SAN DIEGO GAS & ELECTRIC CO. |
| William O. Mackey and<br>Wilburn J. Murry &<br>James H. Angell,<br>Court House,<br>Riverside, Calif. | RIVERSIDE, COUNTY OF |
| Richard M. Marsh<br>45-262 Jackson St.,<br>Indio, Calif. | EASLEY, James I.<br>EASLEY, Marguerite B. |
| J. U. Memmi,<br>220 N. Nevada St.,<br>Oceanside, Calif. | BURDICK, Paul<br>BURDICK, Lucy J. |
| Lt. David W. Miller, USN,<br>Office of Ground Water Resources<br>Marine Corps Base,<br>Camp Pendleton, Calif. | U. S. MARINE CORPS |
| John Neblett,<br>500 Mission Inn Rotunda,<br>Riverside, Calif. | HARMER, Carl A.<br>HARMER, Sarah |

2337

LIST OF DEFENDANTS & ATTORNEYS IN CASE NO. 1247-SD-C
U.S.A. vs FALLBROOK PUBLIC UTILITY DISTRICT
-4-

| ATTORNEYS: | CLIENTS: |
|---|---|
| A. J. O'Connor,<br>639 S. Spring St.,<br>Los Angeles, 14, Calif. | SCOTT, Leslie<br>SCOTT, Beatrice<br>SCOTT, Willard R. |
| Henry M. Moffatt,<br>121 E. 6th St.,<br>Los Angeles, 14, Calif. | A. T. & S. F. Ry |
| O'Melveny & Myers, & Geo. Stahlman,<br>433 S. Spring St.,<br>Los Angeles, 13, Calif. | VAIL, Nita M.<br>VAIL, Mahlon<br>VAIL, Edward N.<br>CALIFORNIA INSTITUTE OF TECHNOLOGY<br>WILKINSON, Mary Vail<br>WISE, Margaret Vail |
| Benjamin S. Parks,<br>Room 916, 219 W. 7th St.,<br>Los Angeles, 14, Calif. | SILL, Charles F.<br>SILL, Pauline H. |
| George M. Pierson,<br>816 Continental Bldg,<br>Los Angeles, 13, Calif. | CARTER, Lawrence R.<br>CARTER, Paula Gillette |
| J. Lee Rankin, Esq.,<br>Assistant Attorney General<br>Department of Justice,<br>Washington, D. C. | UNITED STATES OF AMERICA |
| Sarau Adams, Neblett & Sarau,<br>Suite 500, Mission Inn Rotunda,<br>Riverside, Calif. | CUMMINS, George<br>CUMMINS, Meta Lee |
| Shatford & Shatford,<br>5920 Temple City Blvd,<br>Temple City, Calif. | CRALEGO, Joseph A.<br>CRALEGO, Lola M. |
| W. E. Starke,<br>1130 Bank of America Bldg,<br>San Diego, 1, Calif. | BRETZ, Georgia - formerly<br>RECEK, Georgia<br>MICHIGAN MORTGAGE CO.<br>STARKE, William E.<br>STARKE, Cecilia G. |
| J. D. Skeen,<br>802 Utah Oil Bldg,<br>Salt Lake City, Utah. | HOLDAWAY, E. Maria<br>GILES, Mary L.<br>CALDWELL, Vilate<br>HUNT, Pearl |
| Hugo A. Steinmyer &<br>Winfield Jones,<br>650 S. Spring St.,<br>Los Angeles, 14, Calif. | BANK OF AMERICA NATIONAL TRUST<br>& Savings Association |
| William Stinehart,<br>5045 Wilshire Blvd,<br>Los Angeles, 36, Calif. | ALBERS BROS. MILLING CO. |
| Swing, Scharnikow & Staniforth,<br>Phil D. Swing,<br>Suite 604, 530 Broadway,<br>San Diego, 1, Calif. | (Clients, continued:)<br>BRUCKLEY, Elizabeth M.<br>CAPRA, Frank R.<br>CAPRA, Lucille W.<br>CAREY, Arthur W. |

CLIENTS:
ALDRICH, James C.
ALDRICH, Mary E.
AUBERT, Ernest
BARBEY, Ernest Louis
BARBEY, Essie Beulah
BOHLEN, John H.
BOHLEN, Grace M.
BOHLEN, Nan
BRADSHAW, Paul D.
BRADSHAW, Margaret
BUCKLEY, Austin H.

CAREY, Inez
DERBY, William V.
DERBY, Harriet T.
EDWARDS, Marie E.
EDWARDS, William Donald
ENSLEY, Oliver P.
Ensley, Katherine F.
FALLBROOK PUBLIC UTILITY DIST.
FORSYTH, Edward L.
FORSYTH, Eunice E.
GARNER, Jack

2338

LIST OF DEFENDANTS & ATTORNEYS IN CASE NO. 1247-SD-C
U.S.A. vs FALLBROOK PUBLIC UTILITY DISTRICT
-5-

| ATTORNEYS: | CLIENTS: |
|---|---|
| Swing, Scharnikow, & Staniforth (continued:) | Swing, Scharnikow & Staniforth (continued:) |
| CLIENTS: (continued from p. 4:) | McCARTNEY, Platt, |
| GARNER, Cosette S. | McCARTNEY, Orris |
| GARNSEY, Felix R. | * HOSSEIN, Harriett McCartney |
| GARNSEY, Theodora L. | - NICOLAS, Joseph M. |
| GILLILAND, Grace L. | NICOLAS, Seraphina |
| GILLILAND, Wm T. | OWENS, John T. |
| GOODWIN, Mary Alice | OWENS, Elta C. |
| GOODWIN, Ewart W. | PITTAM, Frank Will |
| GRAY, Robert T. | PITTAM, Hazel Eunice |
| GRAY, Jane P. | PORTER, Don C. |
| H. & L. OIL CO. | PRATT, H. S. |
| *HAMILTON, Rhina | PRATT MUTUAL WATER CO. |
| JONES  Haley F. | RAWSON, Tommy |
| JONES  Ruth B. | SAWDAY, Charles F. |
| LINCOLN, Earnest M. | SAWDAY, Ruth |
| LINCOLN, Julia | SEATON, Nan F. |
|  aka WIEKE, Julia | SEATON, Stephen A. |
| LLOYD, M. M. | SEATON, Stephen A., Jr. |
| LLOYD, E. M. | SMYTH, Daniel K. |
| LOOP, Rex L. | SMYTH, Lucy R. |
| LOOP, Lois E. | SWIMM, Eleanor Forsyth |
| MERICKLE, Arthur R | SWIMM, Ross D. |
| MERICKLE, Georgie I. | WENTWORTH, John (Estate of) |
| MITCHELL, Mary Bernice | WENTWORTH, Ruth |
| MITCHELL, Wm A. | WIEKE, Julia, aka (Lincoln) |
| MONETT, John James | WILLIAMS, Elizabeth H. |
| MONETT, Margaret May | Yackey, George F. |
|  | Yackey, Alma H. |
| Tanner, Thornton & Myers | |
| 215 W. 7th St., | BUTLER, Wm Lawrence |
| Los Angeles, 14, Calif. | BUTLER, Mary |
| Thompson & Colgate | SEARL BROS. viz: |
| 405 Citizens Bank Bldg, | SEARL, Edgar L, - Harry O., - |
| Riverside, Calif. | Floyd L.- Gerald E. & Lorena G. |
|  | a partnership. |
| *J. Lee Rankin, Solicitor General* | |
| William H. Veeder, | UNITED STATES OF AMERICA |
| Special Assistant to | |
| the Attorney General, | |
| Department of Justice, | |
| Washington, D. C. | |
| Wm E. Burby, | UNITED STATES OF AMERICA |
| Cornelius T. Waldo, | CALLAWAY, Richard W. |
| 10742 Nassau Ave., | CALLAWAY, Mildred C. |
|  Sunland, Calif. | |
| Robert W. Walker, | THE ATCHISON, TOPEKA & SANTA FE |
| Henry M. Moffat, |  RAILWAY |
| Robert S. Curtiss, | |
| 448 Santa Fe Bldg, | |
| Los Angeles, 14, Calif. | |
| David R. Warner, | UNITED STATES OF AMERICA |
| Department of Justice, | |
| Washington, 25, D. C. | |
| G. V. Weikert, | OVIATT, James |
| 918 Oviatt Bldg, | |
| Los Angeles, 14, Calif. | |

2339

LIST OF DEFENDANTS & ATTORNEYS IN CASE NO. 1247-SD-C
U.S.A. vs FALLBROOK PUBLIC UTILITY DISTRICT
-6-

ATTORNEYS:
P. W. Willett, Esq.,
P.O. Box 103,
Fallbrook, Calif.
     AND
William H. Macomber,
1114 San Diego Trust & Svgs Bldg,
San Diego, 1, Calif.
   CLIENTS:
   BUCK, Leora M.
   CRABTREE, Gertrude E.
   CULPEPPER, Roberta L.
   DONATH, Curtis A.
   DONATH, Dorothea
   DONATH & PIERCE, INC.
   GRAFFIN, Luetta M.
   HOSTETTER, Annie
   KNIGHT, Thomas Gale
   KNIGHT, Marshall W.
   KNIGHT, W. E. (deceased)
   BAKER, Raymond F.
   BAKER, Ardelle C.
   BAKER, Elvin C.
   BAKER, Barbara A.
 * BAKER, Sylva Blanche
   MARTIN, Ben U.
   MARTIN, Blanche
   MARTIN, Milton P.
   MARTIN, Maggie E.

Dennett Withington
1317 E. St.
San Bernardino, Calif.

CLIENTS:
   P.W. Willett, Esq., et al.
   clints, continued:
PERRY, Emma Bateman
PIERCE, Patricia
REYNOLDS, G. R.
REYNOLDS, Jean M.
RIGGLE, O. Lester
RIGGLE, Maude A.
ROBINSON, Howard W.
ROBINSON, Alla M.
SMELSER, Emelia C.
SMELSER, Harry H.
SMELSER, Mary
SOMACAL, Geno L.
SOMACAL, Louise R.
SONES, Lester E.
SONES, Lois M.
SPEED, Catherine
STRYSON, Harland L.
STRYSON, Doris G.
STUBBLEFIELD, Charles
STUBBLEFIELD, Dora A.
SUTTON, Sylva Blanche
SUTTON, James H.
THOMPSON, Mattie S.
LATTIMER, Ardyth Louise
SWEARINGEN, Eugene Neal
*BAKER, James H. Sutton

COBURN, Ida M.

2340