```
 1   EDMUND G. BROWN, Attorney General
        of the State of California
 2   ADOLPHUS MOSKOVITZ, Deputy Attorney General
     Library and Courts Building
 3   Sacramento, California
     Telephone:  GIlbert 2-4711, Ext. 4574
 4
     Attorneys for Defendants in Intervention
 5
```

# FILED

AUG 14 1957

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By *William M____*
Deputy Clerk

```
 6
 7
 8              IN THE UNITED STATES DISTRICT COURT
 9                 SOUTHERN DISTRICT OF CALIFORNIA
10                        SOUTHERN DIVISION
11
12   UNITED STATES OF AMERICA,          )
13                    Plaintiff,        )    No. 1247-SD-C
14              v.                      )
15   FALLBROOK PUBLIC UTILITY DISTRICT, )    EFFECT OF CIRCUIT
     a public service corporation of the)    COURT DECISION RE-
16   State of California; et al.,       )    PORTED IN 235 F.2d
                                        )    647 - WHICH PRO-
17                    Defendants,       )    NOUNCEMENTS ARE THE
                                        )    LAW OF THE CASE?
18   PEOPLE OF THE STATE OF CALIFORNIA, )
                                        )
19                    Defendants in     )
                      Intervention.     )
20
```

```
21
22           This memorandum discusses the issue set forth in
23   paragraph 8(a) of the Court's order dated May 8, 1957.
24   That issue is:
25           "The effect of the Circuit Court decision
             reported in 235 F.2d 647, and specifically whether
26           or not the various pronouncements of the Circuit
             or any of them are the law of the case and binding
27           on a subsequent trial, or whether the effect of the
             Circuit Court decision is limited to its holding
28           that there was error in conducting a separate
             trial and entering a separate judgment involving
29           some and not all of the parties in the action."
30   In accordance with paragraph 5(a) of the Court's order of
31   May 8, 1957, this issue is being covered in a separate
```

2341

memorandum from each of the other issues ordered discussed.

The doctrine of the law of the case, i.e., "the familiar doctrine that a lower court is bound to respect the mandate of an appellate tribunal and cannot reconsider questions which the mandate has laid at rest . . . is indisputable . . ." (Federal Comm'n. v. Broadcasting Co. (1940), 309 U.S. 134, 140). The United States Supreme Court opinion just quoted referred to an earlier Supreme Court decision for an explanation of this doctrine. In re Sanford Fork & Tool Co. (1895), 160 U.S. 247, 255, explained the doctrine as follows:

> "When a case has been once decided by this court on appeal, and remanded to the Circuit Court, whatever was before this court and disposed of by its decree, is considered as finally settled. The Circuit Court is bound by the decree as the law of the case; and must carry it into execution, according to its mandate. That court cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it for apparent error, upon any matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded. /Cases cited. 7 If the Circuit Court mistakes or misconstrues the decree of this court, and does not give full effect to the mandate, its actions may be controlled, either upon a new appeal (if involving a sufficient amount) or by a writ of mandate of the court. /Cases cited. 7 But the Circuit Court may consider and decide any matter left open by the mandate of this court; and its decision of such matters can be reviewed by a new appeal only. /Cases cited. 7 The opinion delivered by this court, at the time of rendering its decree, may be consulted to ascertain what was intended by its mandate; and, either upon an application for a writ of mandamus, or upon a new appeal, it is for this court to construe its own mandate and to act accordingly. /Cases cited. 7"

The Supreme Court has emphasized that the lower Court is

> "bound to follow the decision of the Circuit Court of Appeals . . . /and 7 'if error was committed it is not for . . . /the lower court 7 to pass upon that question. The . . . /lower court 7 could not do otherwise than carry out the mandate of the Circuit Court of Appeals and

2342

could not refuse to do so on the ground of want of jurisdiction in itself or in the appellate court'" (Metropolitan Co. v. Kaw Valley District (1912), 223 U.S. 519, 522-523).

Establishment of the rule still leaves us the task of ascertaining what issues were in fact disposed of by the Circuit Court decision (Federal Comm'n. v. Broadcasting Co. (1940), 309 U.S. 134, 140; Sprague v. Ticonic Bank (1939), 307 U.S. 161. 168).

The mandate of the Circuit Court of Appeals in the instant case was as follows:

"The cause is therefore reversed and remanded with directions to take further proceedings in accordance with this opinion and enter no judgment until the entire suit can be disposed of at the same date." (235 F.2d at 664.)

It will be noted that after reversing the trial court judgment, the Circuit Court of Appeals made two directives in this mandate:  First, that further proceedings should be taken "in accordance with this opinion"; and second, that no judgment should be entered "until the entire suit can be disposed of at the same time".  This clearly indicates that the effect of the Circuit Court decision cannot be limited to its holding that there was error in entering a separate judgment involving some and not all of the parties in the action.  For if that was all the Circuit Court meant to do, the second directive would have been sufficient.  By also ordering further proceedings in accordance with its opinion, the Court obviously must have intended that the trial court do more than merely withhold  judgment until the entire suit could be decided at once.  It must have intended also that in a retrial the trial court should be governed by the rules of law declared in the opinion to be controlling, so that a subsequent judg-

2343

1  ment would not be invalidated by the errors which tainted

2  the first judgment.

3          The opinion itself must, therefore, be examined

4  to ascertain the issues which the Circuit Court intended

5  to settle for the guidance of the trial court, especially

6  since the Circuit Court expressly referred to the opinion

7  in its mandate (Metropolitan Co. v. Kaw Valley District

8  (1912), 223 U.S. 519, 523; Gulf Refining Co. v. U. S.

9  (1925), 269 U.S. 125, 135).  We have heretofore set forth

10  in a memorandum to this Court, dated May 1, 1957, the

11  main principles and issues which in the opinion of the

12  State of California were determined by the Circuit Court

13  decision.  For the convenience of the Court, those prin-

14  ciples and issues, together with the appropriate references

15  to the Circuit Court opinion, are repeated here:

16          "1.  After exclusive jurisdiction over the
     portions of the military reservation at Camp Pendle-
17   ton purchased by the United States was ceded by
     the State of California to the United States in
18   1941, the United States acquired paramount and
     exclusive control and jurisdiction over the land,
19   and the water which at any time is upon the land,
     within the limits of this military enclave.  As a
20   result, the process of state courts cannot run therein
     unless by consent, state executive and administra-
21   tive bodies have no control therein,
     and state law, substantive and procedural, have no
22   force over persons or objects therein (235 F.2d at
     655).
23
         "2.  There is a distinction between (1) the
24   physical possession by the United States of the
     corpus of water after it enters the military en-
25   clave and the ability and legal right of the
     United States then to use the water therein for
26   whatever purposes officers of the United States
     choose and (2) a property or water right in the
27   flow of the water as against upper riparians or
     appropriators under municipal law; the United States
28   has (1) but this does not give it (2) (235 F.2d at
     656).
29
         "3.  The use by the United States on the
30   military enclave of water which flows onto the
     military enclave is of sovereign right, and there-
31   fore is not and cannot be adverse to the interests

2344

-4-

of any other holder or claimant above the enclave because no one can object or prevent such use by the United States; hence, the United States could not acquire a prescriptive right by uses on the military enclave (235 F.2d at 656, 661).

"4.   The United States, as regards all claimants to water outside the enclave, is not in the position of sovereign, but in the position of a lower riparian land owner which is compelled to make beneficial use within the watershed of the water which it claims under riparian right, and for other than proper riparian uses must show an appropriation according to law (235 F.2d at 656).

"5.   It is improper in this litigation to use the prior judgment between the Vail Interests and Rancho Santa Margarita, the predecessor in interest of the United States, or any stipulation or agreement between the Vail Interests and the United States, against any other litigant (235 F.2d at 657).

"6.   The fact that the Vail Interests have agreed with the United States to release three cubic feet per second of flow from the Vail Dam down the river does not give the United States a right to that flow over intervening water claimants on the stream; thus, this agreement could not be used as a basis for determining that there is no surplus water in the stream (235 F.2d at 657-658).

"7.   The purported findings of fact and conclusions of law that there is no unappropriated water in the Santa Margarita River, made by the trial court on the first trial, are invalid (235 F.2d at 658).

"8.   It is improper to average the use, demand, or supply of water over a series of years in an attempt to determine whether or not there is a present surplus of water (235 F.2d at 658, 663).

"9.   It is certain from the evidence received in the first trial of this case that in some years there is surplus water which flows clear through the watershed and wastes into the sea (235 F.2d at 659, 663).

"10.   The United States and the State of California prior to the first trial of this case entered into a stipulation on November 29, 1951, in which, among other things, the United States stated that it 'claims only such rights to the use of water as it acquired when it purchased Rancho Santa Margarita, together with any rights which it may have gained by prescription or use or both since' that time.   In this stipulation

2345

the phrase 'prescription or use' means 'pres-
cription or appropriation' since the word 'use'
can mean nothing more than appropriation and
application to some purpose (235 F.2d at 660).

"11.  In order to acquire an appropriative
right in California since 1913, it is necessary
for the prospective appropriator, whether the
United States or anyone else, to file an appli-
cation to appropriate with state authorities and
pursue it through the steps required by law
(235 F.2d at 660).

"12.  To support acquisition of a prescrip-
tive right by any one, including the United States,
there must be findings specifying a particular
period not less than five years during all of
which a designated quantity of water was continu-
ously applied to a particular beneficial use under
claim of right, hostile and adverse to the property
rights of all others interested (235 F.2d at 661).
A prescriptive right is binding upon all the world
including all owners and possessors of rights on
the stream system (235 F.2d at 663).

"13.  Storage of water is a non-riparian
use (235 F.2d at 662).

"14.  The use of water in barracks is
analogous to municipal use (235 F.2d at 662).

"15.  The court has jurisdiction in this
case to enter a final judgment imposing a physical
solution and a supervisory system of control on
all parties, including the United States (235
F.2d at 652-653, 662-663).

"16.  The only proper method of adjudicating
the rights on a stream, whether riparian, appro-
priative or mixed, is to have all owners of land
on the watershed, and all appropriators who use
water from the stream involved in another water-
shed, in court at the same time (235 F.2d at 663).
Thus, no judgment should be entered by the trial
court until the entire suit can be disposed of
at the same date (235 F.2d at 664)."

Admittedly, the Circuit Court could have reversed

the trial court judgment, without deciding the principles

and issues listed above, by relying solely on the error

committed in entering a judgment before the claims of all the

parties were adjudicated.  But this does not make these

pronouncements of the Circuit Court mere dicta.  They

2346

constituted an alternative ground of decision.   The Court

expressly declared that:

> "This case must be remanded because of the apparent misconceptions of the law of the enclave by the trial court and the application of the theory of sovereignty to the subversion of vested and inchoate private rights."  (235 F.2d at 656.)

As stated by the California Supreme Court, "A decision

on a matter properly presented on a prior appeal becomes

the law of the case even though it may not have been ab-

solutely necessary to the determination of the question

whether the judgment appealed from should be reversed"

(Steelduct Co. v. Henger-Seltzer Co. (1945) 26 Cal.2d

634, 643, 160 P.2d 804, 809).

Even regarded as dicta, the Circuit Court's

conclusions as to the controlling law must be respected

as the law of the case.   An apt statement of what we

believe to be the proper rule is found in Brummitt Tire

Co. v. Sinclair Refining Co. (Tenn. Appeals, 1934),

75 S.W.2d 1022, 1030, where in a petition for rehearing

the court was asked to strike from its opinion a discussion

on the law which the petitioners believed to be dictum.

The court stated:

> "The Court's holding was not obiter dictum, for it was a considered holding, supported by cited authorities, and if it did not cover a point in issue, then it is judicial dictum.  The holding was made as a direction to the lower court to prevent unnecessary consumption of time and expense in trying this issue in another suit."

In the case of In re Fanoni (1914), 152 N.Y.S. 218, 221,

the rule was stated as follows:

> "Where in the court of last resort the rule governing the case decided is accompanied by an equally express statement of an alternative rule not essential to the decision, but closely re- lated to the subject discussed, the latter statement, even though made aside from the point of adjudication, may well constrain the judgment

2347

-7-

of a trial court.  A dictum doubtless becomes a
dictate when it is explicitly declared to be the
guide for future conduct."

See also Table Mountain Tunnel Co. v. Stranahan
(1863), 21 Cal. 548, 551-552.

The doctrine of the law of the case applies as
to the parties who participated in the first trial and
appeal, those in privity with them, and any parties who
may later voluntarily intervene (State of Kansas v.
Occidental Life Ins. Co. (10th Cir. 1938), 95 F.2d 935,
936).  However, only the plaintiff and two of the more than
three thousand defendants sued by the plaintiff in this
case participated in the first trial and appeal.  To the
extent that those who did not participate may dispute the
rules of law laid down by the Circuit Court, it would seem
improper for them to be bound under the doctrine of the law
of the case.  Their claims were not in issue in the first
trial and they had no opportunity to present their views
on the law.  Hence, if they choose to urge principles of
law different from the rules adopted by the Circuit Court,
the Court should be free to reconsider and alter those
rules if it believes they are incorrect.  On the other
hand, if the defendants who did not participate are
satisfied with the rules laid down by the Circuit Court,
there would be no occasion for the Court to do other than
accept and apply them in compliance with the doctrine of
the law of the case.

Dated:  August 13, 1957.

EDMUND G. BROWN, Attorney General
of the State of California
ADOLPHUS MOSKOVITZ
Deputy Attorney General

By ADOLPHUS MOSKOVITZ

Attorneys for Defendants in
Intervention.

2348

-8-

EDMUND G. BROWN, Attorney General
   of the State of California
ADOLPHUS MOSKOVITZ, Deputy Attorney General
Library and Courts Building
Sacramento, California
Telephone:  GIlbert 2-4711, Ext. 4574

Attorneys for Defendants in Intervention


IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>FALLBROOK PUBLIC UTILITY DISTRICT,<br>a public service corporation of the<br>State of California; et al.,<br><br>    Defendants,<br><br>PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Defendants in<br>    Intervention. | No. 1247-SD-C<br><br>THE EXTENT OF THE<br>RIGHTS OF THE<br>UNITED STATES AS A<br>RIPARIAN OWNER TO<br>USE WATER OUTSIDE<br>THE WATERSHED |


   This memorandum discusses the issue set forth in
paragraph 8(b) of the Court's order dated May 8, 1957.  That
issue is:

   "The extent of the rights of the United States
  of America as a riparian owner to use water outside
  the watershed."

In accordance with paragraph 5(a) of the Court's order of
May 8, 1957, this issue is being covered in a separate
memorandum from each of the other issues ordered discussed.

   The law of California is crystal clear on this
issue.  Diversion of water to and use on non-riparian land

1   constitute an appropriation of water and are not within the

2   riparian right (Montecito Valley Water Co. v. City of

3   Santa Barbara (1907), 151 Cal. 377, 378, 90 Pac. 935, 936;

4   Duckworth v. Watsonville Water and Light Co. (1907), 150

5   Cal. 520, 526, 532, 89 Pac. 338, 341, 343; Bathgate v.

6   Irvine (1899), 126 Cal. 135, 141-144, 58 Pac. 442, 444-445;

7   Boehmer v. Big Rock Irrig. Dist. (1897), 117 Cal. 19, 26-27,

8   48 Pac. 908, 910; Chauvet v. Hill (1892), 93 Cal. 407, 410,

9   28 Pac. 1066, 1067; Gould v. Stafford (1888), 77 Cal. 66,

10  68, 18 Pac. 879, 880).  Land outside the watershed of the

11  stream from which the diversion is made is non-riparian

12  land (Rancho Santa Margarita v. Vail (1938), 11 Cal. 2d 501,

13  529, 81 P.2d 533, 547; Anaheim Union Water Co. v. Fuller

14  (1907), 150 Cal. 327, 330, 88 Pac. 978).

15       The Circuit Court of Appeals set this issue at

16  rest for this case in its opinion on the first appeal:

17       "The government, as regards all claimants to
    water outside the enclave, is . . . in the position
18  of a lower riparian which is compelled to make bene-
    ficial use within the watershed and for other than
19  proper riparian uses must show  an appropriation
    according to law."  (235 F.2d at 656.)
20

21       Apparently there is no longer any dispute among

22  the parties on this issue.  Mr. Veeder, speaking for the

23  United States, stated at the hearing on May 6, 1957, that

24  the United States never has and does not now claim the right

25  to use water outside the watershed under its riparian rights

26  (Tr. May 6, 1957, pp. 112-113).

27       Dated:  August 13, 1957.

28                        EDMUND G. BROWN, Attorney General
                             of the State of California
29                        ADOLPHUS MOSKOVITZ
                          Deputy Attorney General
30

31                        By  *Adolphus Moskovitz*
                              ADOLPHUS MOSKOVITZ

                          Attorneys for Defendants in
                          Intervention.

                                            2350

                          2.

EDMUND G. BROWN, Attorney General
  of the State of California
ADOLPHUS MOSKOVITZ, Deputy Attorney General
Library and Courts Building
Sacramento, California
Telephone:  GIlbert 2-4711, Ext. 4574

Attorneys for Defendants in Intervention

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|         Plaintiff, | ) | No. 1247-SD-C |
| v. | ) | |
| FALLBROOK PUBLIC UTILITY DISTRICT, a public service corporation of the State of California; et al., | ) ) ) | THE EXTENT OF THE RIGHTS OF THE UNITED STATES AS A RIPARIAN OWNER TO USE WATER WITHIN THE WATERSHED |
|         Defendants, | ) | |
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | |
|         Defendants in Intervention. | ) ) | |

This memorandum discusses the issues set forth in paragraph 8 (c), (d), (e), and (f) of the Court's order dated May 8, 1957.  Those issues are:

"(c)  The extent of the rights of the United States as a riparian owner to use water within the watershed;

"d)  Whether the use by the United States of water for military purposes is a beneficial use;

"(e)  Whether the use by the United States of water for military purposes on its riparian land is a proper riparian use;

"(f)  The right of the United States to

1.

temporarily impound, regulate and spread its
riparian water for the purpose of irrigating
the vegetative cover and enriching the soil
of the alluvial basin situated within
Camp Pendleton and thereby, in the process
of irrigating the vegetative cover, recharge
the alluvial basin."

Paragraph 5 (a) of the Court's order of
May 8, 1957, states that, "Each issue shall be covered in
separate briefs . . . ."  However, we are covering all the
issues quoted above in this one memorandum because we
believe the issues set forth in subparagraphs (d), (e) and
(f) are merely facets of the main issue set forth in para-
graph 8 (c) concerning the extent of the rights of the
United States as a riparian owner to use water within the
watershed.

The underlying premise of this memorandum, as
well as the other memoranda being filed by the State of
California concurrently with this one, is that the extent
of the water rights of the United States in this case is
determined by California law.  At the beginning of this
litigation, the United States stipulated with the State of
California that this indeed was the controlling principle,
that "the rights of the United States of America to the use
of water herein are to be measured in accordance with the
laws of the State of California".  This stipulation was
merely a recognition of what is well-established law --
that when the United States contracts or acquires property
within a state, the law of that state controls what rights
in the United States arise therefrom (United States v.
Burnison (1950), 339 U.S. 87, 90; Reading Co. v. U.S. (1925),
268 U.S. 186, 188; United States v. Fox (1876), 94 U.S. 315,
320; United States v. Nebo Oil Co. (5th Cir. 1951), 190 F.2d
1003, 1010; United States v. Williams (5th Cir. 1947),

2.

2352

164 F. 2d 989, 993; <u>Los Angeles & Salt Lake R. Co. v.</u>
<u>United States</u> (9th Cir. 1944), 140 F.2d 436, 437, cert. den.
(1944), 322 U.S. 757; <u>Werner v. United States</u> (D.C.S.D.
Calif. 1950), 10 F.R.D. 245, 247).

I.   The Riparian Right -- Basic Principles

Before discussing the particular issues concern-
ing the extent of the riparian rights of the United States,
a few basic principles concerning the riparian right under
California law should be reviewed.

1.   The riparian proprietor does not own the
water of a stream; he owns only a usufructuary right, which
is the right in common with all the other riparians on the
stream of reasonable use of water on his riparian land
when he needs it (<u>Prather v. Hoberg</u> (1944), 24 Cal. 2d 549,
560, 150 P.2d 405, 411; <u>Rancho Santa Margarita v. Vail</u>
(1938), 11 Cal.2d 501, 555, 81 P.2d 533, 560; <u>Anaheim</u>
<u>Union Water Co. v. Fuller</u> (1907), 150 Cal. 327, 335,
88 Pac. 978, 982).

2.   The riparian right extends to "all the water
of the stream and . . . that includes both surface and sub-
surface flow, and likewise includes water in the underground
basins" (<u>Rancho Santa Margarita v. Vail</u> (1938), 11 Cal.2d
501, 556, 81 P. 2d 533, 561), but only as such water flows
or is present naturally (<u>Seneca C. G. M. Co. v. Gt. Western</u>
<u>Power Co.</u> (1930), 209 Cal. 206, 215, 287 Pac. 93, 96).

3.   All rights to the use of water, including the
riparian right, are limited to such water as is reasonably
required for the beneficial use to be served; they do not
extend to the waste, unreasonable use, or unreasonable
method of diversion of water (Calif. Const. Art. XIV,
sec. 3; <u>Peabody v. City of Vallejo</u> (1935), 2 Cal.2d 351,

3.

2353

367-368, 40 P.2d 486, 491).

4. Subject to the limitations of the preceding paragraph, the riparian right is prior and superior to rights based on appropriation, and a riparian owner is entitled to an injunction against an appropriator's interference with present riparian uses (Peabody v. City of Vallejo (1935), 2 Cal.2d 351, 367-368, 40 P.2d 486, 491; Meridian, Ltd. v. City and County of San Francisco (1939), 13 Cal.2d 424, 445, 90 P.2d 537, 547).

5. The riparian right is not based on use and is not lost by non-use; however, to the extent that water is not presently being used by riparian proprietors under their riparian right it is subject to appropriation and beneficial use by others, the riparian owners being entitled to a declaration of their superior right to make reasonable beneficial use of the water in the future but not entitled to enjoin storage or use of water by an appropriator which does not conflict with their own present reasonable beneficial use (Meridian, Ltd. v. City and County of San Francisco (1939), 13 Cal.2d 424, 445, 447, 458, 90 P.2d 537, 547, 548, 554; Gin S. Chow v. City of Santa Barbara (1933), 217 Cal. 673, 683-691, 22 P.2d 5, 9-12).

II. Military Use of Water by the United States-- Is it a Proper Beneficial Use under the Riparian Right?

The State of California does not contest that military use of water by the United States, when made on riparian land owned by the United States, may be a beneficial use within the riparian right. The real question is the reasonableness of the amount of military use as related to uses made by the other riparian landowners on the stream who have correlative rights to the same source.

4.

2354

It is our position that the United States should not be permitted to obtain for military use an unreasonably disproportionate share of the water resources of the Santa Margarita River available to riparian proprietors. Since some uses of land call for more water than others, the riparian right is a flexible one. That is, the quantity of water it entitles the owner of a particular parcel to consume depends on the use he makes of that parcel. If the military use of land were to involve consumption of water substantially in excess of the amount involved in private use of land, other riparian water users might be called upon to give up to the Government water which would otherwise be theirs. It seems unfair and without precedent to push the flexibility of the riparian right that far. But, to the extent that military use does not surcharge the normal riparian right we do not believe the nature of the use should disqualify it if it otherwise meets the test of proper riparian use (cf. Salem Flouring Mills Company v. Lord (Oregon, 1902), 69 Pac. 1033, 1039).

III.   Artificial Storage of Water, Whether on the Surface or Underground, for Future Use is Not a Proper Exercise of the Riparian Right

The issue for discussion posed in paragraph 8(f) of the Court's order dated May 8, 1957, asks whether the United States has a right "to temporarily impound, regulate and spread its riparian water for the purpose of irrigating the vegetative cover and enriching the soil of the alluvial basin situated within Camp Pendleton and thereby, in this process of irrigating the vegetative cover, recharge the alluvial basin". This issue involves two

related problems:  First, whether a riparian landowner may,
under his riparian right, demand that water be permitted to
flow down to him which he cannot presently use but desires
to "temporarily impound" or "regulate" in surface reser-
voirs for later use; and second, whether the artificial
spreading of water for storage underground and later use is
a proper exercise of the riparian right.

One of the fundamental characteristics of the
riparian right is that it is a right to use water as the
water is naturally available; thus it is established beyond
dispute by California cases that storage of water for future
use, whether cyclic or seasonal, is not a proper exercise
of the riparian right, but instead constitutes an appropria-
tion of water (Moore v. California Oregon Power Co. (1943),
22 Cal.2d 725, 731, 140 P.2d 798, 802; City of Lodi v.
East Bay Municipal Utility Dist. (1936), 7 Cal.2d 316, 335,
60 P.2d 439, 447; Colorado Power Co. v. Pacific Gas &
Electric Co. (1933), 218 Cal. 559, 564, 24 P.2d 495, 497
(1933); Seneca C. G. M. Co. v. Gt. Western Power Co. (1930),
209 Cal. 206, 216, 287 Pac. 93, 97; Herminghaus v. Southern
California Edison Co. (1926), 200 Cal. 81, 109-111, 252 Pac.
607, 618-619), which "may be exercised only pursuant to
appropriations lawfully made" (Meridian, Ltd. v. City and
County of San Francisco (1939), 13 Cal.2d 424, 450, 90 P.2d
537, 549).

Temporary impoundment of water for the purpose of
providing a head for generation of power is permitted under
the riparian right, but this is wholly distinct from an
impoundment of surplus water during a wet period for
consumption during a subsequent dry period, which is
prohibited (Seneca C. G. M. Co. v. Gt. Western Power Co.

1  (1930), 209 Cal. 206, 219, 287 Pac. 93, 97). The only
2  type of "temporary impoundment" or "regulation" which would
3  assist in irrigating the vegetative cover of Camp Pendleton,
4  assuming that this is the real objective of the United
5  States in advancing the claim of right to "temporarily
6  impound" and "regulate" water, would be a storage of the
7  water when the soil is wet and the vegetative cover does
8  not need irrigation, and its release when the soil dries
9  out and the vegetative cover requires irrigation. This
10 would, of course, clearly be outside the riparian right
11 and constitute an appropriation under California law.
12        On the other hand, if the United States proposes
13 to release the water after "temporary impoundment" of a
14 few days while the soil is still wet and the vegetation
15 does not need irrigation, the water would obviously be
16 wasted and for this reason, if for no other, such use
17 would not be a proper exercise of the riparian right.
18 Nor could the spreading of the water be transformed into
19 a proper beneficial use under the riparian right by justi-
20 fying it as a means of recharging the underground basin.
21 For, even assuming that recharge could be accomplished
22 without surface detention of the water from a wet to a dry
23 period, such action to press more water into the ground-
24 water basin than would seep naturally would constitute the
25 artificial storage of water underground for later use,
26 and hence no less an appropriation of water than storage
27 in a surface reservoir. This is clearly recognized by
28 Water Code section 1242, which provides:

29        "The storing of water underground, including the
          diversion of streams and the flowing of water on
30        lands necessary to the accomplishment of such
          storage, constitutes a beneficial use of water
31        if the water so stored is thereafter applied

7.

2357

1  to the beneficial purposes <u>for which the</u>
2  <u>appropriation for storage was made</u>."
   (Emphasis added.)

3      It is our view, therefore, that, irrespective
4  of the words used to describe the process, the artificial
5  holding of water, either on the surface or underground,
6  from a period when it is in excess of current needs to a
7  period when it can be consumed is not proper under the
8  riparian right.

9      Dated:  August 13, 1957.

11          EDMUND G. BROWN, Attorney General
                of the State of California
12          ADOLPHUS MOSKOVITZ, Deputy
                Attorney General

14      By   *Adolphus Moskovitz*
15          ADOLPHUS MOSKOVITZ

16          Attorneys for Defendants
            in Intervention

8.

2358

EDMUND G. BROWN, Attorney General
   of the State of California
ADOLPHUS MOSKOVITZ, Deputy Attorney General
Library and Courts Building
Sacramento, California
Telephone:  GIlbert 2-4711, Ext. 4574

Attorneys for Defendants in Intervention

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

FALLBROOK PUBLIC UTILITY DISTRICT,
a public service corporation of the
State of California; et al.,

                    Defendants,

PEOPLE OF THE STATE OF CALIFORNIA,

                    Defendants in
                    Intervention.

No. 1247-SD-C

THE EXTENT OF THE
PRESCRIPTIVE RIGHTS
OF THE UNITED
STATES

          This memorandum discusses the issue set forth

in paragraph 8(g) of the Court's order dated May 8, 1957.

That issue was stated as:

          "The extent of prescriptive rights claimed by
     the United States:

          "(1)  As successor to the Rancho Santa Mar-
     garita;
          "(2)  Resulting from its uses after 1942;
          "(3)  Resulting from a combination of uses
     by its predecessor before 1942 and the United
     States thereafter;
          "(4)  Prescriptive rights claimed by the
     United States outside the Santa Margarita River
     watershed;
          "(5)  Prescriptive rights to the use of water
     claimed by the United States in connection with
     Lake O'Neill."

2359

1    In accordance with paragraph 5(a) of the Court's
2  order of May 8, 1957, this issue is being covered in a
3  separate memorandum from each of the other issues ordered
4  discussed.

5    We believe the application to this case of two
6  fundamental rules of law respecting prescription is fatal
7  to every claim of the United States that it has prescrip-
8  tive rights, no matter what the basis of the claim.  These
9  two rules of law are:

10    1.  A prescriptive right to use water cannot be
11  acquired by the lowermost diverter on a stream because
12  his diversion and use of water which has been permitted
13  to flow down to him is not adverse to anyone else.

14    2.  The use by the United States on the Camp
15  Pendleton military enclave of water which has come down
16  onto the land of the enclave is of sovereign right, and
17  therefore is not and cannot be adverse to the interests
18  of any other holder or claimant upstream because no one
19  can object to or prevent such use; hence it is impossible
20  for the United States to acquire a prescriptive right by
21  uses on the enclave.

22    I.  Prescriptive Rights May Not Be Acquired
23        by the Lowermost Diverter on a Stream

24    Adverse use is, of course, one of the prerequisites
25  to the establishment of a prescriptive right.  As stated in
26  City of San Diego v. Cuyamaca Water Co. (1930), 209 Cal.
27  105, 132, 287 Pac. 475, 488:

28    "The nature of the right claimed to have been
29    acquired in the waters of a flowing stream by
     prescription rests as a prime essential upon an
30    adverse use thereof by the claimant which has,
     to the extent thereof and for the required
31    number of years, been acquiesced in by the person
     or persons otherwise entitled to the ownership and

-2-

2360

enjoyment of the waters thus adversely ab-
stracted from such stream and to enforce these
rights by appropriate action."  (Emphasis supplied.)

In the absence of adverse use, the only kind of right that

could be gained by use would be an appropriative right.

Whether an appropriative right to use water of the Santa

Margarita River could have been acquired since 1914 by

use alone is discussed in the memorandum covering the

extent of the appropriative rights of the United States

which is being submitted concurrently with this memorandum.

An avalanche of California cases supports the

proposition that, by its very nature, use of water by the

lowermost user on a stream cannot possibly be adverse to

anyone else.

"A right can be gained by prescription only
by acts which operate as an invasion of the rights
of the person against whom the right is sought
and which afford a ground of action by such party
against such claimant, and it is a rule of law
so well settled by decisions in this and other
states as to scarcely need any citation to support
it that a lower use, since it interferes in no way
with the flow above, constitutes no invasion of
the upper riparian owner's right, and cannot,
therefore, afford any basis for a prescriptive
right."  (Pabst v. Finmand (1922), 190 Cal. 124,
128, 211 Pac. 11, 12.)

In accord are the following decisions:  Cory v. Smith

(1929), 206 Cal. 508, 511, 274 Pac. 969; San Joaquin & Kings

River Canal & Irrigation Co. v. Worswick (1922), 187 Cal.

674, 683-685, 203 Pac. 999, 1003-1004; Holmes v. Nay (1921),

186 Cal. 231, 234, 199 Pac. 325, 327; Perry v. Calkins

(1911), 159 Cal. 175, 177-178, 113 Pac. 136, 138; Hudson

v. Dailey (1909), 156 Cal. 617, 627, 105 Pac. 748, 753;

Walker v. Lillingston (1902), 137 Cal. 401, 404, 70 Pac.

282, 283-284; Cave v. Tyler (1901), 133 Cal. 566, 567-568,

65 Pac. 1089, 1090; Bathgate v. Irvine (1899), 126 Cal.

135, 140-141, 58 Pac. 442, 444; Hargrave v. Cook (1895),

2361

108 Cal. 72, 77-79, 41 Pac. 18, 19-20.

The cases cited above are all directly in point because they involved the diversion of water downstream from the owner of the prior right against which the prescriptive claim was asserted.  Likewise, Camp Pendleton, where the diversions or extractions of water assertedly have been made, is downstream from any other claimant to the water.

Heretofore, the United States has predicated its argument that its use of water has, nevertheless, been hostile and adverse on the authority of one California case, Larsen v. Apollonio (1936), 5 Cal.2d 440, 55 P.2d 196.  In that case, a prescriptive right in the plaintiffs was upheld, although the statement of facts described the plaintiffs' diversion as downstream from the defendant's land.  On the face of the decision, therefore, it appears to be a holding that a downstream use may be adverse to and result in a prescriptive right against upstream rights. However, on analysis it becomes obvious that this is not so.

The opinion did not state any such rule and contained no intimation of disapproval of the numerous California cases, cited above, which have squarely held that a downstream user cannot gain prescriptive rights.

The only case cited in the Larsen case  by the Supreme Court in support of the prescriptive claim was Smith v. Gaylord (1918), 179 Cal. 106, 108-109, 175 Pac. 449, 450.  In that case the prescriptive claim was upheld because the claimant had trespassed upon the land of the owner of the prior right and made his diversion there. This diversion of water constituted an invasion of the

2362

-4-

1  rights of the landowner for which he had a cause of
2  action.  For this reason the use truly was adverse and
3  ripened into a prescriptive right.

4        The record in Larsen v. Apollonio on file in
5  the California Supreme Court (Sac. No. 4911) shows that
6  the situation in that case at the time the prescriptive
7  right was acquired was identical to the situation in Smith
8  v. Gaylord.  That is, at the time the adverse diversion was
9  instituted and during the entire prescriptive period, the
10 land where the diversion was made was part of a larger
11 tract held in one ownership which included the upstream
12 land against which the Larsen case held the prescriptive
13 right had accrued.  After the prescriptive period had
14 elapsed, but before the Larsen case was brought, this up-
15 stream portion of the tract was conveyed to the defendant
16 in the case.  Such conveyance, of course, could not cut
17 off the prescriptive right which had already arisen by
18 reason of the trespass.

19       Hence, Larsen v. Apollonio is merely another
20 example of the rule that the element of hostility may
21 result from trespass and diversion on the land of the owner
22 of the prior right as well as from upstream interference
23 with his flow.  The case is of no relevance in a situation
24 where the diversion occurs downstream from any other
25 claimant.  In that situation, as we have shown, no cause
26 of action could exist in upstream claimants to halt the
27 use of water which they have permitted to flow down, and
28 consequently no prescriptive right could result from
29 passage of any period of limitation.

30       Under this controlling doctrine that prescription
31 does not run upstream, it is obvious that the Rancho Santa

2363

Margarita never could have acquired prescriptive rights by uses on the ranch, and thus had neither vested prescriptive rights to convey to the United States nor incipient prescriptive rights to which the United States could tack uses of its own.  It follows also that uses since 1942 by the United States itself, as the lowermost owner, have similarly lacked the quality of hostility or adversity necessary to create a prescriptive right.  And this is true whether what is asserted is the right to store water in Lake O'Neill for later use within the watershed or the right to make direct diversions or extractions for use outside the watershed of the Santa Margarita River.

II.   <u>Prescriptive Rights Cannot Be Acquired by Use of Water Found on the Camp Pendleton Military Enclave.</u>

In its decision reversing the judgment after the first trial in this case, the Circuit Court of Appeals declined to rule on whether the lowermost user on a stream can acquire a prescriptive right under California law (235 F.2d at 660).  But it held squarely that, irrespective of the ability of a lowermost user other than the United States to do so, the United States could not, because of its sovereignty over the military enclave.  The Circuit Court reasoned that the same element of adversity, which the California cases point out is lacking in downstream use generally, is lacking when the United States uses water which has found its way onto the military enclave:

"The doctrine of prescription envisions a party whose rights are being openly and notoriously violated by another having the power to intervene and prevent the violation from becoming an adverse property right by self-help or by bringing an action or obtaining an injunction before the period of prescription runs.  But, when the United

2364

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

States was in possession as sovereign, the water which came into the enclave could be used without let or hindrance in any way which the agents of the government chose" (235 F.2d at 661).

Thus, by the law of this case the United States could not have acquired any prescriptive rights to store water or use water outside the watershed by its own uses within the Camp Pendleton military enclave since 1942.

Dated:   August 13, 1957.

EDMUND G. BROWN, Attorney General
   of the State of California
ADOLPHUS MOSKOVITZ
   Deputy Attorney General


By _Adolphus Moskovitz_
   ADOLPHUS MOSKOVITZ

Attorneys for Defendants in Intervention.

2365

1   EDMUND G. BROWN, Attorney General
     of the State of California
2   ADOLPHUS MOSKOVITZ, Deputy Attorney General
  Library and Courts Building
3   Sacramento, California
  Telephone: GIlbert 2-4711, Ext. 4574
4
  Attorneys for Defendants in Intervention
5

6

7

8             IN THE UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10               SOUTHERN DIVISION

11

12   UNITED STATES OF AMERICA,    )

13            Plaintiff,   )   No. 1247-SD-C

14       v.            )   THE EXTENT OF THE
                       )   APPROPRIATIVE RIGHTS
15   FALLBROOK PUBLIC UTILITY DISTRICT,  )   OF THE UNITED STATES
  a public service corporation of the  )   - MUST THE UNITED
16   State of California; et al.,    )   STATES COMPLY WITH
                       )   STATE PROCEDURES IN
17            Defendants,   )   ORDER TO ACQUIRE
                       )   VALID APPROPRIATIVE
18   PEOPLE OF THE STATE OF CALIFORNIA,  )   RIGHTS?

19           Defendants in  )
          Intervention.   )
20

21

22        This memorandum discusses the issue set forth

23   in paragraph 8(h) of the Court's order dated May 8, 1957.

24   That issue is:

25        "The extent of the appropriative rights
      claimed by the United States in connection with
26       Lake O'Neill, Stuart Mesa, South Coast Mesa,
      and all other uses for which appropriative
27       claims are asserted by it; must the United States
      comply with State procedures for the acquisition
28       of appropriative rights."

29   In accordance with paragraph 5(a) of the Court's order of

30   May 8, 1957, this issue is being covered in a separate

31   memorandum from each of the other issues ordered discussed.

                                     2366

1       Under California law, water which is not presently

2  being used by riparian or overlying proprietors under

3  their superior rights is subject to appropriation and

4  beneficial use by others (<u>Peabody v. City of Vallejo</u> (1935),

5  2 Cal.2d 351, 374, 40 P.2d 486, 495). Riparian and over-

6  lying landowners themselves may become appropriators when

7  they desire to use water in a manner or place which is not

8  proper under their riparian or overlying rights (<u>Healy v.</u>

9  <u>Woodruff</u> (1893), 97 Cal. 464, 466-467, 32 Pac. 528, 529;

10  <u>Rindge v. Crags Land Co.</u> (1922), 56 Cal.App. 247, 252,

11  205 Pac. 36, 38).

12       There are two systems in California for the

13  acquisition of appropriative rights to use unappropriated

14  water. Since December 19, 1914, the effective date of the

15  <u>Water Commission Act</u> (Calif. Stats. 1913, c. 586, p. 1012),

16  appropriative rights to surface water and water in "sub-

17  terranean streams flowing through known and definite

18  channels" (Water Code sec. 1200) may be acquired only pur-

19  suant to that act, as codified in Division 2 of the Water

20  Code (Water Code secs. 1200-1801). Thus, as to such water,

21  to perfect a valid appropriative right it is necessary

22  to file an application and pursue it to permit and license.

23  The exclusiveness of this method results from Water Code

24  section 1225, which provides that:

25       "No right to appropriate or use water subject
26     to appropriation shall be initiated or acquired
       except upon compliance with the provisions of
27     this division."

28  That the method is exclusive by virtue of this code sec-

29  tion has been recognized by the California Supreme Court

30  (<u>Crane v. Stevinson</u> (1936), 5 Cal.2d 387, 398, 54 P.2d

31  1100, 1105-1106) and by the Circuit Court of Appeals

-2-

2367

1   on this very case (235 P.2d at 600).

2         On the other hand, percolating groundwater

3   which is not part of the flow of a stream within the mean-

4   ing of Water Code section 1225 is excluded from the

5   statutory appropriation procedure of the Water Commission

6   Act (City of Pasadena v. City of Alhambra (1949), 33 Cal.2d

7   908, 933-934, 207 P.2d 17, 33).  As to such water, under

8   California law appropriative rights are developed simply

9   by taking the water and applying it to beneficial use.

10         "The principles which, before the adoption

11   of the Civil Code, were applied to protect appro-
priations and possessory rights in visible streams

12   will, in general, be found applicable to such appro-
priations of percolating waters, either for public

13   or private use, on distant lands, and will suffice
for their protection as against other appropriators.

14   Such rights are usufructuary only, and the first
taker who with diligence puts the water in use

15   will have the better right."  (Katz v. Walkinshaw
(1903), 141 Cal. 116, 135, 74 Pac. 766, 772.)

16         Hence, whether under California law the United

17   States could acquire valid appropriative rights to store

18   water or use water outside the watershed without following

19   the filing procedure set forth in the Water Commission Act

20   depends on whether the water to which it claims appropriative

21   rights is part of the flow of a stream, surface or under-

22   ground.  There is no problem respecting the surface flow

23   of the Santa Margarita River.  It is clearly subject to

24   the Water Commission Act.  Underground water, however, may

25   or may not be covered depending upon its character.

26         The distinction between water in subterranean

27   streams flowing through known and definite channels,

28   which is subject to the Water Commission Act, and percola-

29   ting water not part of the flow of a stream, which is not,

30   was developed by California decisions well before the

31   enactment of that act.  The distinction was important then

2368

because prior to the landmark decision of Katz v. Walkinshaw
(1903), 141 Cal. 116, 70 Pac. 663, 74 Pac. 766, a land-
owner had absolute ownership over any percolating ground-
water found under his land which was not part of the flow
of a stream (Vineland Irr. Dist. v. Azusa Irr. Co. (1899),
126 Cal. 486, 494, 58 Pac. 1057, 1059), whereas if the
water was part of an underground stream the landowner had
only correlative rights with other landowners similarly
situated with respect to the stream, just as in the case
of surface streams (Los Angeles v. Pomeroy (1899), 124 Cal.
597, 632, 57 Pac. 585, 598; Hanson v. McCue (1871), 42 Cal.
303, 308).

The opinion in Vineland Irr. Dist. v. Azusa
Irr. Co. (1899), 126 Cal. 486, 494-495, 58 Pac. 1057, 1059,
explained the difference as follows:

"It is essential to the nature of percolating
waters that they do not form part of the body or
flow, surface or subterranean, of any stream. They
may either be rain waters that are slowly infil-
trating through the soil, or they may be waters
seeping through the banks or bed of a stream which
have so far left the bed and other waters as to
have lost their character as part of the flow.
If these waters which the court describes were
in fact percolating waters, then plaintiff had
the unquestioned right to take them by its tunnel,
and even if injury resulted to other appropriators
or riparian owners upon the stream, they could
not be heard to complain. Yet the court grants
these defendants an injunction against plaintiff
to restrain it from taking such waters. The
findings, therefore, must be construed--and they
are fairly susceptible of this construction-- to
mean that plaintiff was drawing its waters from
within the bed and channel of the stream and from
its subsurface flow . . . The existence of a well-
defined subsurface flow within the bed and banks
of streams such as this is well-recognized. Says
Kinney (Kinney on Irrigation, sec. 44): 'At cer-
tain periods of the year water flows on the surface
in a well-defined course, and there is at all
times what is known as the underflow. This is
the broad and deep subterranean volume of water
which slowly flows through the sand and gravel
underlying the most, if not all, the streams
which traverse the country adjacent to the mountain

2369

-4-

systems of the arid region.  These underground
streams are probably much greater in volume in
some cases than the water upon the surface, and
are, as far as rights of appropriation or riparian
rights are concerned, but a valuable portion of
the well-defined surface stream.'"

In City of Los Angeles v. Pomeroy (1899), 124
Cal. 597, 57 Pac. 585, the California Supreme Court held
that instructions of the trial court concerning the proper
definition of a subterranean stream "contain a sound and
correct statement of the law as it applies and ought to
apply to streams of the character of the Los Angeles river"
(124 Cal. at 635, 57 Pac. at 599).  The instructions so
approved included the following:

"XIV.  The Los Angeles River is composed of
its main stream and any branches it may have,
whether surface or subterranean.

"XV.  While a watercourse must have a bed and
banks or sides, yet such bed may consist of any
material which keeps the waters from penetrating
below a certain depth, and such banks or sides may
consist of any material which has the effect of
confining the waters within circumscribed limits.

"XVI.  It does not always follow that water
which does not flow on the surface in a visible
stream is for that reason not a watercourse, or
not a part of the water of a stream which does
at some place run on the surface; nor need it
flow in a defined channel underground as a solid
body of moving water of any particular dimensions
in order to constitute a watercourse.

"If you find from the evidence that there is
a bed or a river bottom filled to a considerable
depth with sand, gravel, or other porous material,
meandering over which a stream runs on the surface,
and through and in which the water moves underground,
enough of it rising to the surface to supply the
surface stream, and the other portions of the
underground water moving with a much less velocity
than the surface stream, and through a wider or
larger space in and through the interstices
of the porous material, but in the same general
direction as the surface stream and in connection
with it, and in a course and within a space
reasonably well defined, the conditions being such
that the existence and general direction of the
body of water moving underground can be determined
with a reasonable accuracy, then that portion of
the water thus moving underground should be

2370

-5-

considered as a part of the watercourse as well
as that part which flows over the surface.

"If such watercourse exists, it is immaterial,
so far as the watercourse is concerned, from or
through what lands the waters flow in reaching
the channel, or whether they reach the same by
percolation or by clearly defined streams."
(124 Cal. at 623-624, 57 Pac. at 594.)

"XXI.  A stream which flows along and in a
natural channel, at some places flowing on the
surface and at some places sinking in porous
material which has been deposited in and has
filled the channel, and there passing down along
in the same channel underground and again rising
to the surface and flowing as a surface stream,
is no less a stream or watercourse at the points
where it flows under the surface than at the
places where it runs on the surface.  And if part
of the water remains moving underground at the
places where the surface stream flows, all of
the water, both above and below the surface, con-
stitutes the stream.  And if at places the channel
widens very much and is filled with gravel, sand,
or other porous material in which the water spreads
so as to fill the voids of the porous material,
forming the semblance of an underground lake or
reservoir with no water appearing on the surface
therein, but with the water passing on beneath
the ground down the widening channel and afterward
reappearing below as a surface stream, then the
water would be as much a part of the stream while
it was contained in such underground lake or
widened channel as while it was flowing on the
surface.

"And, on the other hand, water which has not
formed part of such stream and is not moving in
such underground channel, but comes from surface
water or from rains and floods sinking into
the ground and passing through the soil by
gravitation, having no general direction, although
it may eventually find its way into some stream
or watercourse and materially add to the water
thereof, yet while so passing through the ground
it is not a stream or watercourse, but is part
of the soil and is the property of the owner
thereof."  (124 Cal. at 628-629, 57 Pac. at 596.)

The water which is the subject matter of this

litigation is, according to the complaint, "the Santa

Margarita River and its tributaries" (Comp. par. I),

which is the "source of the all-important supply of water

for Camp Joseph H. Pendleton, the Naval Ammunition Depot

and the United States Naval Hospital" (Comp. par. IV).

2371

The complaint describes the Santa Margarita River as follows:

> "The Santa Margarita River is an intermittent stream. It does not flow as a continuous surface stream, but in the dry seasons of the year the surface stream customarily and ordinarily disappears, when not artificially interfered with, at a point on the lands of the United States of America at approximately eight miles from the Ocean, sinking into the sand and gravel of its bed and channel. Later it reappears as a surface stream two or three miles below, thence flowing as a surface stream but diminishing in volume to its confluence with tidewater.

> "Underlying the river and its tributaries is a vast underground basin. That basin is composed of pervious material, sands, gravel, boulders and other fluvial deposits to the depth of several hundred feet. The basin as a whole creates a large underground reservoir into which a high proportion of the Santa Margarita River sinks. In the dry seasons the river entirely disappears into the basin, reappearing on the surface across the artesian area." (Comp. par. IV.)

* * * * * *

> "That quantity of water /¯the quantity to which the United States claims paramount rights_7 must be derived not only from the surface flow which, as indicated, is intermittent, but must likewise be pumped from the great subterranean basin described in some detail in the earlier paragraphs. For the purpose of this cause the United States of America, adopting the findings of the Supreme Court of the State of California, considers and accordingly claims that the surface stream and subterranean basin constitute a single source of supply of water." (Comp. par. VIII.)

These allegations of the complaint show that the water to which the United States asserts appropriative rights in this case is surface water of the Santa Margarita and underground water which is part of the flow of the Santa Margarita River under the definitions laid down in the cases quoted above. Hence, this water is all within the coverage of the Water Commission Act. As we have already explained, compliance with that act is a prerequisite to the perfecting of valid appropriative rights

2372

to any water subject to its control (Water Code sec. 1225).

The United States has admittedly failed to secure permits or licenses in accordance with the Water Commission Act for the uses of water to which it asserts appropriative rights.  Its position apparently is that, irrespective of the effect of the Water Commission Act on other appropriators, the United States may perfect valid appropriative rights to water simply by diverting and using it.  As we understand it, this position is based on two premises:  (1)  The requirements of the Water Commission Act are police regulations which are not applicable to the United States as sovereign.  (2)  That the State of California has ceded exclusive jurisdiction over the Camp Pendleton military enclave to the United States, thereby ousting the State from any control over it.

We do not dispute the correctness of the premises, but we deny the correctness of the conclusion which the United States has drawn from them.

What the United States is asserting is a property right, that is, the right to compel persons upstream from the military enclave to release water down to the enclave. The conceded sovereignty of the federal government within the military enclave and the State's lack of power to control how water which may reach the enclave is used within its boundaries is not the equivalent of a property right enforceable against persons outside the enclave with respect to water outside the enclave.

A property right to appropriate the water involved in this case enforceable against other appropriators outside the enclave cannot arise except upon compliance with the law of California where the water is located.  At

-8-

2373

1   the beginning of this litigation the United States ex-
2   pressly agreed with the State that this is the correct
3   rule.  The Government stipulated:

> "That the rights of the United States of
> America to the use of water herein are to be measured
> in accordance with the laws of the State of Cali-
> fornia" (United States v. Fallbrook Public Utility
> District (1952), 109 F. Supp. 28, 52-54).

7   Indeed, it could not be otherwise.  The United States can
8   point to no other source of title to this water than the
9   State of California nor to any system of law other than
10  California law which regulates the acquisition of rights
11  to appropriate water from a non-navigable stream located
12  wholly within the boundaries of this State.  We are frankly
13  at a loss to understand how the Government's present
14  position can be reconciled with its solemn stipulation.
15  There was a time when, under California law, appropriative
16  rights could be acquired by the mere diversion and bene-
17  ficial use of water (Lower Tule etc. Co. v. Angiola etc.
18  Co. (1906), 149 Cal. 496, 499, 86 Pac. 1081, 1082).  But
19  this was superseded when the Water Commission Act went into
20  effect (Crane v. Stevinson (1936), 5 Cal.2d 387, 398, 54 P.2d
21  1100, 1105-1106), many years before the United States bought
22  the Rancho Santa Margarita and was ceded exclusive juris-
23  diction to it by the State.  That old method is no more
24  effective today to create an appropriative right than a
25  private oral announcement, without action, of a desire to
26  appropriate water.

27          We do not believe any further discussion of this
28  issue is required.  The Circuit Court of Appeals settled
29  it for this case in its opinion reversing the judgment
30  after the first trial:

31          "But the physical possession of the corpus

2374

-9-

of the water after it enters the enclave and the
ability and legal right then to use it for whatever
purposes are not evidentiary of a water right, for
the right to use water is a <u>property right</u> and is
appurtenant to particular parcels of land.  We
must not fall into the fallacy of believing that,
because the United States, by its sovereignty, made
use of the corpus of water which entered the en-
clave as it chose, it thereby acquired <u>property
rights</u> in the flow against upper riparians or
appropriators under municipal law.

* * * * * *

"The Government, as regards all claimants to
water outside the enclave, is not in the position
of sovereign, but in the position of a lower
riparian which is compelled to make beneficial
use within the watershed <u>and for other than proper
riparian uses must show an appropriation according
to law."</u>  (235 F.2d at 656.  Emphasis added.)

Dated:  August 13, 1957.

EDMUND G. BROWN, Attorney General
   of the State of California
ADOLPHUS MOSKOVITZ
   Deputy Attorney General

By _____Adolphus Moskovitz_____
         ADOLPHUS MOSKOVITZ

Attorneys for Defendants in
Intervention.

-10-

2375

1   EDMUND G. BROWN, Attorney General
       of the State of California
2   ADOLPHUS MOSKOVITZ, Deputy Attorney General
    Library and Courts Building
3   Sacramento, California
    Telephone: GIlbert 2-4711, Ext. 4574
4
    Attorneys for Defendants in Intervention
5
6
7
8              IN THE UNITED STATES DISTRICT COURT
9               SOUTHERN DISTRICT OF CALIFORNIA
10                    SOUTHERN DIVISION
11
12   UNITED STATES OF AMERICA,            )
13                   Plaintiff,           )   No. 1247-SD-C
14          v.                            )   MEMORANDUM ON THE
                                          )   LAW OF PERCOLATING
15   FALLBROOK PUBLIC UTILITY DISTRICT,   )   WATERS, i.e., WATERS
     a public service corporation of the  )   WHICH ARE NOT PART
16   State of California; et al.,         )   OF THE SANTA
                                          )   MARGARITA RIVER OR
17                   Defendants,          )   ITS TRIBUTARIES OR
                                          )   UNDERGROUND BASINS
18   PEOPLE OF THE STATE OF CALIFORNIA,   )   WHICH ARE A PART
                                          )   OF SAID STREAM.
19                   Defendants in        )
                     Intervention.        )
20
21
22          This memorandum discusses the issue set forth in
23   paragraph 8 (i) of the Court's order dated May 8, 1957.
24   That issue is:
25          "The law of percolating waters, that is
              waters which are not part of the Santa Margarita
26            River or its tributaries or underground basins
              which are a part of said stream."
27
28   In accordance with paragraph 5 (a) of the Court's order of
29   May 8, 1957, this issue is being covered in a separate
30   memorandum from each of the other issues ordered discussed.
31          In our memorandum on the extent of the

                                              2376

1   appropriative rights of the United States, being submitted

2   concurrently with this memorandum, we have discussed the

3   distinctions which California decisions have drawn between

4   percolating groundwater not part of the flow of a stream

5   and underground water which is part of the flow of a

6   stream. We will not repeat that discussion here.

7       Most of the rules of law governing percolating

8   waters not part of the flow of a stream are summarized in

9   the case of City of Pasadena v. City of Alhambra (1949),

10  33 Cal.2d 908, 207 P.2d 17. We do not believe we can

11  improve upon the succinctness and clarity of the Supreme

12  Court's summary and therefore set it forth verbatim

13  (33 Cal.2d at 925-927, 207 P.2d at 28-29):

14      "Rights in water in an underground basin, so far
        as pertinent here, are classified as overlying,
15      appropriative, and prescriptive. Generally
        speaking, an overlying right, analogous to that
16      of a riparian owner in a surface stream, is the
        right of the owner of the land to take water from
17      the ground underneath for use on his land within
        the basin or watershed; the right is based on
18      ownership of the land and is appurtenant thereto.
        (See Hillside Water Co. v. Los Angeles, 10 Cal.2d
19      677, 686 /76 P.2d 681/; Miller v. Bay Cities
        Water Co., 157 Cal. 256, 279-280 /107 P. 115,
20      27 L.R.A.N.S. 772/; 26 Cal. Jur. 271-277; 2 Wiel,
        Water Rights /3d ed., 1911/, secs. 1100-1105, pp.
21      1040-1045.) The right of an appropriator depends
        upon an actual taking of water. (See 26 Cal.Jur.
22      277.) The term 'appropriation' is said by some
        authorities to be properly used only with reference
23      to the taking of water from a surface stream on
        public land for non-riparian purposes. (See
24      Wiel, Water Rights /3d ed., 1911/ secs. 228, 1107,
        1158, 1159, and sec. 231 in the 'reprint ed.'
25      of the 3d ed.; Farnham, Waters and Water Rights
        /1904/ sec. 672a; 56 Am.Jur. 599.) The California
26      courts, however, use the term to refer to any
        taking of water for other than riparian or over-
27      lying uses. (City of San Bernardino v. City of
        Riverside, 186 Cal. 7, 13-14 /198 P. 784/; Burr
28      v. Maclay Rancho Water Co., 154 Cal. 428, 436
        /98 P. 260/; Katz v. Walkinshaw, 141 Cal. 116,
29      135, /70 P. 663, 74 P. 766, 99 Am.St.Rep. 35,
        64 L.R.A. 236/; see 26 Cal. Jur. 273-274.) Where
30      a taking is wrongful, it may ripen into a prescrip-
31      tive right.

2377

-2-

"Although the law at one time was otherwise, it is now clear that an overlying owner or any other person having a legal right to surface or ground water may take only such amount as he reasonably needs for beneficial purposes. (Katz v. Walkinshaw, 141 Cal. 116 /70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236/; Peabody v. City of Vallejo, 2 Cal.2d 351 /40 P.2d 486/; Cal. Const., art. XIV, sec. 3.) Public interest requires that there be the greatest number of beneficial uses which the supply can yield, and water may be appropriated for beneficial uses subject to the rights of those who have a lawful priority. (Peabody v. City of Vallejo, 2 Cal.2d 351, 368 /40 P.2d 486/.) Any water not needed for the reasonable beneficial uses of those having prior rights is excess or surplus water. In California surplus water may rightfully be appropriated on privately owned land for nonoverlying uses, such as devotion to a public use or exportation beyond the basin or watershed. (Peabody v. City of Vallejo, 2 Cal.2d 351, 368-369 /40 P.2d 486/; City of San Bernardino v. City of Riverside, 186 Cal. 7, 29, 30 /198 P. 784/; Burr v. Maclay Rancho Water Co., 154 Cal. 428, 436 /98 P. 260/; Katz v. Walkinshaw, 141 Cal. 116, 135 /70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236/; see 26 Cal.Jur. 32 et seq., 273-274.)

"It is the policy of the state to foster the beneficial use of water and discourage waste, and when there is a surplus, whether of surface or ground water, the holder of prior rights may not enjoin its appropriation. (Peabody v. City of Vallejo, 2 Cal.2d 351, 368-369, 372 /40 P.2d 486/; see 26 Cal.Jur. 277.) Proper overlying use, however, is paramount, and the right of an appropriator, being limited to the amount of the surplus, must yield to that of the overlying owner in the event of a shortage, unless the appropriator has gained prescriptive rights through the taking of nonsurplus waters. As between overlying owners, the rights, like those of riparians, are correlative and are referred to as belonging to all in common; each may use only his reasonable share when water is insufficient to meet the needs of all. (Katz v. Walkinshaw, 141 Cal. 116 /70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236/; see 26 Cal.Jur. 269-273; cf., 25 Cal.Jur. 1063-1067.) As between appropriators, however, the one first in time is the first in right, and a prior appropriator is entitled to all the water he needs, up to the amount that he has taken in the past, before a subsequent appropriator may take any. (City of San Bernardino v. City of Riverside, 186 Cal. 7, 26-28 /198 P. 784/; cf., Civ. Code, sec. 1414.)

"Prescriptive rights are not acquired by the taking of surplus or excess water, since no injunction may issue against the taking and the

appropriator may take the surplus without
giving compensation; however, both overlying
owners and appropriators are entitled to the
protection of the courts against any substantial
infringement of their rights in water which they
reasonably and beneficially need. (Peabody v.
City of Vallejo, 2 Cal.2d 351, 368-369, 374
/40 P.2d 486/.)  Accordingly, an appropriative
taking of water which is not surplus is wrongful
and may ripen into a prescriptive right where
the use is actual, open and notorious, hostile
and adverse to the original owner, continuous and
uninterrupted for the statutory period of five
years, and under claim of right.  (City of San
Bernardino v. City of Riverside, 186 Cal. 7, 22-23
/198 P. 784/; Katz v. Walkinshaw, 141 Cal. 116,
135 /70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64
L.R.A. 236/; 25 Cal.Jur. 1178, 1157-1158; 1 Cal.
Jur. 585; 26 Cal.Jur. 278-279; cf. Wutchumna Water
Co. v. Ragle, 148 Cal. 759, 764-765 /84 P. 162/)
To perfect a claim based upon prescription there
must, of course, be conduct which constitutes an
actual invasion of the former owner's rights so as to
entitle him to bring an action.  (City of Los
Angeles v. City of Glendale, 23 Cal.2d 68, 79
/142 P.2d 289/.)  Appropriative and prescriptive
rights to ground water, as well as the rights of
an overlying owner, are subject to loss by adverse
user.  This is in accord with the rule announced
in cases dealing with water in a surface stream.
(See Yankee Jim's Union Water Co. v. Crary, 25
Cal. 504, 508-509 /85 Am.Dec. 145/; Big Rock
M. W. Co. v. Valyermo Ranch Co., 78 Cal.App. 266,
273 /248 P. 264/; Peabody v. City of Vallejo, 2 Cal.2d
351, 374 /40 P.2d 486/; Duckworth v. Watsonville
etc. Co., 150 Cal. 520, 529-532 /89 P. 338/;
Davis v. Gale, 32 Cal. 26, 35 /91 Am.Dec. 554/;
3 Farnham, Waters and Water Rights (1904), sec.
680a, p. 2106; 1 Wiel, Water Rights /3d ed., 1911/,
sec. 580, pp. 625-626; 56 Am.Jur. 773.)"

In the actual decision in City of Pasadena v.

City of Alhambra, the Supreme Court held that when a parti-

cular groundwater basin is being overdrawn by reason of the

extraction of more water than is replenished under natural

conditions, both overlying owners and appropriators who

participate in such overdraft by pumping for the prescrip-

tive period acquire prescriptive rights as against each other.

The result is that all have rights of the same priority and

all must accept the same pro rata reduction in pumping in

order to halt the overdraft (33 Cal.2d at 927-933, 207 P.2d

at 29-33).

2379

It has been recognized by California decisions that a percolating groundwater supply, although not part of the flow of a stream, may nevertheless be hydrologically connected with it, with the result that the extraction of water from either source diminishes the amount of water in the other (City of Lodi v. East Bay Mun. Utility Dist. (1936), 7 Cal.2d 316, 334, 60 P.2d 439, 447; Hudson v. Dailey (1909), 156 Cal. 617, 627-628; 105 Pac. 748, 753; Cohen v. La Canada Land etc. Co. (1904), 142 Cal. 437, 438-439; 76 Pac. 47, 48; McClintock v. Hudson (1903), 141 Cal. 275, 280, 74 Pac. 849, 850). In such a situation, the percolating groundwater and the stream are regarded as one common water supply (Hudson v. Dailey (1909), 156 Cal. 617, 628, 105 Pac. 748, 753); and in considering the respective rights of those who secure water from the two interconnected sources, it is "immaterial whether the /underground7 waters . . . were or were not part of an underground stream, provided the fact be established that this extraction from the ground diminished to that extent, or to some substantial extent, the water flowing in the stream" (McClintock v. Hudson (1903), 141 Cal. 275, 281, 74 Pac. 849, 851). The rights are correlated just as they would be from any other common source, with riparians and overlying owners having "coequal, except as to quantity, and correlative" rights to use their reasonable share of the water on their riparian or overlying land (Hudson v. Dailey (1909), 156 Cal. 617, 628, 105 Pac. 748, 753) and appropriators having the right to use any remaining surplus in the order of their priority (City of Lodi v. East Bay Mun. Utility Dist. (1936), 7 Cal.2d 316, 333-339, 60 P.2d 439, 447-449).

2380

"The cumulative effect of the court de-
cisions rendered since the adoption of the correlative
doctrine, with respect to the waters of physically
connected supplies, is to consider all such inter-
connected waters as part of a common supply and to
correlate the respective rights of use accordingly.
Thus the waters of a watercourse, both surface and
underflow, the ground waters that feed the stream
whether in definite channels or percolating and the
ground waters that escape from the stream either in
definite channels or as percolations, all constitute
such a common supply; and the rights to all parts
of this common supply are correlated on a basis of
reasonable beneficial use." (Hutchins, The Cali-
fornia Law of Water Rights (1956), p. 514.)

Dated:  August 13, 1957.

EDMUND G. BROWN, Attorney General
of the State of California
ADOLPHUS MOSKOVITZ
Deputy Attorney General


By _Adolphus Moskovitz_____
ADOLPHUS MOSKOVITZ

Attorneys for Defendants in
Intervention.

-6-

## AFFIDAVIT OF SERVICE BY MAIL

STATE OF CALIFORNIA     )
                         ) ss.
COUNTY OF SACRAMENTO )

       CHARLOTTE MORGAN, being duly sworn, deposes and says:

       That affiant is a citizen of the United States, over the age of 18 years, and not a party to the within action; that affiant's place of employment and business address is Library and Courts Building, Sacramento 14, California; that on the 13th day of August 1957, affiant enclosed a true copy of the following memoranda, all dated August 13, 1957:

             Memorandum on the Effect of Circuit Court Decision Reported in 235 F.2d 647--Which Pronouncements Are the Law of the Case?

             Memorandum on the Extent of the Rights of the United States as a Riparian to Use Water Outside the Watershed.

             Memorandum on the Extent of the Rights of the United States as a Riparian Owner to Use Water Within the Watershed.

             Memorandum on the Extent of the Prescriptive Rights of the United States.

             Memorandum on the Extent of the Appropriative Rights of the United States--Must the United States Comply with State Procedures in Order to Acquire Valid Appropriative Rights?

             Memorandum on the Law of Percolating Water, i.e., Waters not Part of the Santa Margarita River or its Tributaries or Underground Basins Which are a Part of Said Stream.

in an envelope for each of the persons named below, addressed to each of them at the address set out immediately below each respective name, sealed said envelope, and deposited the same in the United States Mail at the City of Sacramento, State of California, with postage thereon fully prepaid; that there is delivery service by United States Mail at each of the places so addressed, or there is regular communication by mail between the said place of mailing and each of the places so addressed:

2381

Bert Buzzini
2223 Fulton Street
Berkeley 4, California

Allard, Brownsberger, Shelton &
  O'Connor
313 First National Building
Pomona, California

Florence A. Anderson
918 C. C. Chapman Building
756 South Broadway
Los Angeles, California

Henry Ashton, Esq.
408 East Central Avenue
Balboa, California

Best, Best & Kireger
Evans Building
Riverside, California

A. A. Bianchi
901 Kohl Building
400 Montgomery Street
San Francisco, California

Thomas J. Burke
504 Granger Building
San Diego 1, California

Mabel Clausen
320 First Trust Building
Pasadena, California

Clayson, Stark & Rothrock
First National Building
Corona, California
Attention:  George G. Grover

Howard E. Crandall
127 West Anaheim Building
Wilmington, California

Wm. J. Cusack, Esq.
Room 814 Merritt Building
307 West 8th Street
Los Angeles, California

W. B. Dennis
365 Broadway
Vista, California

Devor & Dorfman
924 Van Nuys Building
Los Angeles 14, California

Leonard J. Difani
200 Loring Building
Riverside, California

J. A. Donnelley & Richard P.
  MacNulty
2655 - 4th Avenue
San Diego 1, California

2382

Lawrence E. Drumm
458 South Spring Street
Suite 820
Los Angeles 14, California

Ray C. Eberhard
Room 1231 Bartlette Building
215 West 7th Street
Los Angeles 14, California

Estudillo & Bucciarelli
3900 Market Street
Riverside, California

Fendler, Weber & Lerner
333 South Beverly Drive
Beverly Hills, California

Daniel W. Gage
740 Rowan Building
458 South Spring Street
Los Angeles 13, California

Arthur M. Gediman
119 South Main Street
Elsinore, California

Abraham Gottfried
424 South Beverly Drive
Beverly Hills, California

Frank E. Gray
202 South Hamilton Drive
Beverly Hills, California

Hahn, Ross & Saunders
Suite 611, 608 South Hill Street
Los Angeles 14, California

Tom Halde
417 South Hill Street, Suite 520
Los Angeles 13, California

Frank S. Hamburger
1031 Mills Tower
San Francisco, California

Leslie B. Hanson
4412 York Boulevard
Los Angeles, California

James Don Keller & Robert G.
  Berrey
302 Civic Center
San Diego 1, California

Courtney Lacey
408 East Florida Avenue
Hemet, California

Launder, Chaffee & Launer
Bank of America Building
Fullerton, California

Walter Gould Lincoln
Suite 1113
742 South Hill Street
Los Angeles 14, California

2383

Lindley, Lazar & Scales
825 Bank of America Building
San Diego 1, California

Luce, Forward, Kunzel & Scripps
1220 San Diego Trust & Savings Building
San Diego 1, California

William O. Mackey, Wilburn J.
   Murray and James H. Angell
County of Riverside
Courthouse
Riverside, California

Richard M. Marsh
45-262 Jackson Street
Indio, California

J. U. Memmi
220 North Nevada Street
Oceanside, California

Lt. David W. Miller, USN
Office of Ground Water Resources
Marine Corps Base
Camp Pendleton, California

John Neblett
500 Mission Inn Rotunda
Riverside, California

A. J. O'Connor
639 South Spring Street
Los Angeles 14, California

Henry M. Moffatt
121 East 6th Street
Los Angeles 14, California

O'Melveny & Myers
433 South Spring Street
Los Angeles 13, California
Attention:  George Stahlman

Benjamin S. Parks
Room 916
210 West 7th Street
Los Angeles 14, California

George M. Pierson
816 Continental Building
Los Angeles 13, California

J. Lee Rankin
Solicitor General
Department of Justice
Washington, D. C.

Sarau, Adams, Neblett & Sarau
Suite 500, Mission Inn Rotunda
Riverside, California

Shatford & Shatford
5920 Temple City Boulevard
Temple City, California

W. E. Starke
1130 Bank of America Building
San Diego 1, California

2384

-4-

J. D. Skeen
802 Utah Oil Building
Salt Lake City, Utah

Hugo A. Steinmyer & Winfield Jones
650 South Spring Street
Los Angeles 14, California

William Stinehart
5045 Wilshire Boulevard
Los Angeles 36, California

Swing, Scharnikow & Staniforth
Suite 604
530 Broadway
San Diego 1, California
Attention:  Phil D. Swing

Tanner, Thornton & Myers
215 West 7th Street
Los Angeles 14, California

Thompson & Colgate
405 Citizens Bank Building
Riverside, California

William H. Veeder
Special Assistant to the Attorney General
Department of Justice
Washington, D. C.

William E. Burby
12120 Travis Street
Los Angeles 49, California

Cornelius T. Waldo
10742 Nassau Avenue
Sunland, California

Robert W. Walker, Henry M. Moffat,
   Robert S. Curtiss
448 Santa Fe Building
Los Angeles 14, California

G. V. Weikert
918 Oviatt Building
Los Angeles 14, California

P. W. Willett
P. O. Box 103
Fallbrook, California

William H. Macomber
1114 San Diego Trust & Savings Building
San Diego 1, California

Dennett Withington
1317 E. Street
San Bernardino, California

*Charlotte Morgan*
CHARLOTTE MORGAN

Subscribed and sworn to before
me this 13th day of August, 1957.

*Laura R. Middleton*
Notary Public in and for the County of
Sacramento, State of California.

2385

-5-