J. Lee Rankin
Solicitor General
Department of Justice
Washington, D. C.

Attorney for United States of America

**FILED**

AUG 2 1 1957

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
                    Plaintiff,  )
                                )       No. 1247-SD-C
          v.                    )
                                )
FALLBROOK PUBLIC UTILITY        )
    DISTRICT, et al,            )
                                )
                    Defendants. )

MEMORANDUM
OF THE UNITED STATES OF AMERICA
IN REGARD TO
NOTICE TO ALL DEFENDANTS
AND COURT ORDER RE PROCEDURE
PARAGRAPH 8 (a) THROUGH (i)

COMES NOW THE UNITED STATES OF AMERICA pursuant to the

Order of May 8, 1957, entered by this Honorable Court, and tenders

its memoranda pertaining to the issues set forth in Paragraph 8

(a) through (i) of that Order.  In accordance with the Order of

May 8, 1957, Paragraph 5a, to the extent possible each issue

has been separately briefed.

                    THE UNITED STATES OF AMERICA


                    _____
                    J. Lee Rankin
                    Solicitor General

                    _____
                    William H. Veeder
                    Attorney,
                    Department of Justice

                    _____
                    William E. Burby
Dated   August 18, 1957     Attorney
                    Department of Justice

2386

GPO 16—80092-1

1   J. Lee Rankin
    Solicitor General
2   Department of Justice
    Washington, D. C.
3
    Attorney for United States of America
4

5

6

7

8           IN THE UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10                   SOUTHERN DIVISION

11  UNITED STATES OF AMERICA,        )
                                     )
12                     Plaintiff,    )
                                     )        No. 1247-SD-C
13        v.                         )
                                     )
14  FALLBROOK PUBLIC UTILITY         )
        DISTRICT, et al.,            )
15                                   )
                       Defendants.   )
16

17                       MEMORANDUM
                OF THE UNITED STATES OF AMERICA
18                     IN REGARD TO
                 NOTICE TO ALL DEFENDANTS
19              AND COURT ORDER RE PROCEDURE
         PAGE 4, PARAGRAPH 8 (a), (b), (c), (d), (e) and (f).
20

21

22        (a)  The effect of the Circuit Court decision reported in

23  235 F. 2d 647, and specifically whether or not the various pronounce-

24  ments of the Circuit or any of them are law of the case and binding

25  on a subsequent trial, or whether the effect of the Circuit Court

26  decision is to be limited to its holding that there was error in

27  conducting a separate trial and entering a separate judgment involv-

28  ing some and not all of the parties in the action;

29        (b)  The extent of the rights of the United States of

30  America as a riparian owner to use water outside the watershed;

31        (c)  The extent of the rights of the United States as a

32

                              -1-
                                              2387

GPO  16-80005-1

riparian owner to use water within the watershed;

(d)  Whether the use by the United States of water for military purposes is a beneficial use;

(e) Whether the use by the United States of water for military purposes on its riparian land is a proper riparian use;

(f) The right of the United States to temporarily impound, regulate and spread its riparian water for the purpose of irrigating the vegetative cover and enriching the soil of the alluvial basin situated within Camp Pendleton and thereby, in the process of irrigating the vegetative cover, recharge the alluvial basin.

2388

1        This Honorable Court on May 8, 1957, ordered that separate

2    briefs be filed in regard to several issues set-forth in that order.

3    This memorandum is submitted pursuant to that order.  Reference is

4    first made to the following issue which is set-forth in the order

5    at Page 4, Paragraph 8(a):

6          "The effect of the Circuit Court decision reported in

7          235 F. 2d 647, and specifically whether or not the
           various pronouncements of the Circuit or any of them

8          are the law of the case and binding on a subsequent
           trial, or whether the effect of the Circuit Court

9          decision is to be limited to its holding that there
           was error in conducting a separate trial and enter-

10         ing a separate judgment involving some and not all
           of the parties in the action."

11       The United States of America reaffirms its position that the

12   only issue decided, or intended to be decided, by the Circuit Court

13   pertained to the entry of a separate judgment at a time when in-

14   dispensable parties were not before the trial court.  That is the

15   only issue that it was necessary for the Court to decide.  Accord-

16   ingly, it is the only point that can be considered as "the law of

17   the case."

18       A Memorandum on this point was filed by the United States

19   of America on May 2, 1957.  At the time the present Order was made

20   the court indicated that an additional memorandum on this point

21   would not be necessary.

22       Page 4, Paragraph 8(b) -- <u>The extent of the rights of the

23   United States of America as a riparian owner to use water outside

24   the watershed.</u>

25       There is no claim made by the United States of America as

26   a riparian owner to use water outside of the watershed.  Indeed,

27   the whole concept of the law of California respecting riparian

28   rights is foreign to such a claim.  That statement stems from the

29   characteristics of the riparian right which by law is constituted

30   part and parcel of the land itself.  California's Highest Court

31   has declared:

32

                                 2389

GPO  16—80069-1

"The (riparian) right to the flow of water is inseparably annexed to the soil, and passes with it, not as an easement or appurtenant, but as a parcel." 1/  Again California's highest Court declared:  "The riparian right is a usufructuary one in the stream, a part and parcel of the land itself." 2/  Many years later that tenet of California's law was reiterated in these terms:  "A riparian right has been well defined, and such right is a part and parcel of the land." 3/  Not only is a riparian right annexed to the realty - a parcel of it - but "A riparian right is neither gained by use nor lost by disuse* * *." 4/  In the case last quoted California's highest Court was simply reiterating what it had said very much earlier when it declared:  "Use does not create (the riparian right), and disuse cannot destroy or suspend it." 5/ Further, in regard to the riparian right, this authoritative de- claration has been made:  "Unlike an appropriation, riparian rights need no act of the owner to acquire them; they attach to the land bordering on the stream of their own accord." 6/

Illustrative of the nature of a riparian right is this statement:  A "riparian estate is made up of many elements, not alone the actual soil* * *.  Pure air, the right of support, bene- fits from flowing water, all such intangible ingredients, mixing together with the soil itself, join to form the value or quality of the estate owing to its natural position; their preservation

---

1/  Lux v. Haggin, 69 Cal. 255; 10 Pac. 674, 754 (1886).

2/  Collier v. Merced Irrigation Dist., 213 Cal. 554; 2 P. 2d 790, 794 (1931).

3/  Carlsbad Mutual Water Co. v. San Luis Rey Dev. Co., 78 C.A. 2d 900; 178 P. 2d 844, 851 (1947).

4/  Duckworth v. Watsonville Water and Light Co., 150 Cal. 520; 89 Pac. 338, 343 (1907).

5/  Lux v. Haggin, 69 Cal. 255; 10 Pac. 674, 754 (1886).

6/  Wiel, Water Rights in the Western States, 3d ed., Vol. 1, Sec. 711, p. 777.

2390

GPO  16—20995-4

maintains _the use of the land_." Thus "The riparian right is in-
herent in the riparian land and part and parcel of it; an inherent
result of the relative position of the land to the stream as a
natural resource." _7/_ Moreover, "These property rights (riparian
rights) are a part and parcel of the freehold of which no man, in
whom the title to the same has vested, can be disseized but by a
lawful judgment of his peers, by due process of law, and upon just
compensation." _8/_ Thus a claim to use riparian water upon non-
riparian land would be contrary to the law respecting rights of
that nature.

Page 4, Paragraph 8(c) -- _The extent of the rights of the_
_United States of America as a riparian owner to use water within_
_the watershed_.

The United States of America based upon its asserted riparian
agricultural acreage claims a right to use 69,237 acre feet
annually from the Santa Margarita River. Measure of that claimed
right is pursuant to the California Constitution, Article XIV,
Section 3, which having decreed an end to waste inherent in the
common-law as applied to riparian rights, nevertheless protected
both present and potential uses.

Riparian rights decreed the Constitution may be exercised:
"for the purposes for which such lands are, or may be made adapt-
able* * *. Nothing herein contained shall be construed as de-
priving any riparian owner of the reasonable use of water of the
stream to which his land is riparian under reasonable methods of
diversion and use* * *." _9/_

---

7/  Wiel, Water Rights in the Western States, 3d ed., Vol. 1,
    Sec. 709, p. 744; Sec. 711, p. 777.

8/  Kinney on Irrigation and Water Rights, 2d ed., Vol. 1, Sec.
    456, p. 773.

9/  Constitution of the State of California, Art. XIV, Sec. 3.
    See in connection with this provision Derring's California
    Codes, Water, Sections 101 and 1201.

2391

GPO  16-80098-1

Though the figure set forth above is the maximum potential demand which may be made for agricultural uses, it far exceeds the supply of water of the stream in question. Moreover, the maximum military demand is approximately 23,000 acre feet. Nevertheless, the larger sum is the basis upon which the United States of America as a riparian owner asserts it is entitled to participate in the meager supply of water from the Santa Margarita River.

Page 4, Paragraph 8 (d) - <u>Whether the use by the United States of water for military purposes is a beneficial use;</u>

Page 4, Paragraph 8 (e) - <u>Whether the use by the United States of water for military purposes on its riparian land is a proper riparian use.</u>

As the two issues presented are interrelated, they will be considered together. Reference will first be made to the basis upon which riparian claimants participate in the available supply of water.

By way of introduction to this phase of the matter, it is essential briefly to review the tenets of the law set forth above. Most important of those tenets enunciated in regard to riparian rights are these:

      (1)   the riparian right to the use of water is part and parcel of the land;

      (2)   the riparian right is inseparably annexed to it;

      (3)   use does not create the riparian right and disuse does not destroy it.

Manifestly, therefore, the riparian right is vested in the land irrespective of the use to which the water is placed. This quoted excerpt is the complete answer to the issues here involved. "The rights of a riparian proprietor as such are not to be tested by the use or uses to which he puts the riparian waters, or whether he uses them at all or not. If one's lands are riparian to a stream of water,

-6-

2392

the owner of the lands cannot be divested of his rights as a
riparianist merely because he may either put the waters flowing in
such stream to other than a riparian use or not use them for any
purpose at all."10/

Reasonableness of the use is the sole criterion - that is a
question of fact.  In that regard it has been authoritatively declared:
"The purpose for which riparian land is used is generally held to
be immaterial, so far as concerns the existence and enjoyment of
riparian rights incident thereto.  There is no distinction in this
respect between a farm and a summer residence.  So, one who uses such
land for the purpose of pleasure, recreation, and health is not
deprived of any of the rights attaching to the land."11/ That state-
ment conforms with Kent's observation made many years ago to the
effect that, "Every proprietor of lands on the banks of a river, has
naturally an equal right to the use of the water which flows in the
stream adjacent to his land * * *."12/   The sole limitation respect-
ing the use of riparian water, that author declared, is that the user
apply it in a "reasonable manner."

Wiel has stated that riparian water may be used for domestic
needs of all kinds and then lists what he refers to as artificial
uses.  "These include fishing, bathing, boating, floatage, diversion
for irrigation, the running of machinery and all the many other
varied purposes for which water can be used." 13/

The statutes of the State of California and its constitution
protect the riparian rights to water not only for present but future
uses.  Thus, riparian rights must be viewed from the standpoint

---

10/     Porters Bar Dredging Co. v. Beaudry, 15 Cal. App. 751, 764 (1911)

11/     56 Am Jur. Waters, Sec. 281, p. 734.

12/     Kent, Commentaries, vol. 3, 7th ed., page 536 et seq.

13/     Wiel, Water Rights in the Western States, 3d., vol. 1,
        sec. 743, p. 803.

2393

of present use of the water and "for the purposes for which such lands are, or may be made adaptable."[14]   Accordingly, if there were any basis to support the contention that a military use is not a riparian use, that fact in itself does not deprive the United States of America of its riparian rights.  To the contrary, if the alleged appropriative claims are exercised in a manner which infringes upon the riparian rights the United States of America is entitled to the full protection which the Supreme Court of the United States recently afforded other riparian owners.[15]

In the absence of any authority to the contrary, this Court is respectfully requested to adhere to the firmly established precept of the law that the riparian landowner may make any reasonable use of the water - including military use - and to deny the fallacious declaration that the United States of America may not utilize riparian water for National Defense.

It is difficult to perceive a higher beneficial use of water than a military use.  It would, of course, be impossible to maintain National Defense in the time of peace or successfully prosecute war without using water.  That there has been found no precise ruling on the question is simply indicative of the unusual challenge which has been made -- namely -- that a military use is not a beneficial use.  This Court will, of course, take judicial notice of the fact that water was probably first applied to a military use by those who settled California and without such use it would, of course, have been impossible to prosecute the claims of our national defense.

---

14/   Article XIV, Sec. 3, Constitution of the State of California.

15/   United States v. Gerlach Live Stock Co., 339 U.S. 725.

16/     3.  Water can be demanded under a riparian right only
      for proper riparian uses and purposes.
              * * *
            (b)  Military use is not a proper riparian use.

GPO  16—92008-1

Page 4, Paragraph 8 (f) - <u>The rights of the United States</u>
<u>temporarily to impound, regulate and spread its riparian water for</u>
<u>the purpose of irrigating the vegetative cover and enriching the</u>
<u>soil of the alluvial basin situated within Camp Pendleton and</u>
<u>thereby, in the process of irrigating the vegetative cover, recharge</u>
<u>the alluvial basin.</u>

An abstract consideration of law in regard to this phase of the matter is extremely difficult.  For crux of the question, it is respectfully submitted, involves facts, if a true perspective is to be obtained.  By way of example of these difficulties, reference is made to Lake O'Neill.  Respecting that body of water, the Supreme Court of California declared:

"The main diversion on respondent's (Rancho Santa Margarita) property is at Lake O'Neill reservoir. * * * By means of a temporary earthen dam constructed in the river the surface flow is diverted during the dry season into this reservoir.  Since 1886 it has been the custom of respondent not to construct this dam until about the middle of March of each year after the spring rains."<u>17</u>/

Waters from the Santa Margarita River were undoubtedly appropriated by diversion into and storage in Lake O'Neill.  Proof regarding that appropriation will require evidence.  Yet the claim is not limited to appropriation for, in part at least, the waters diverted into and regulated by Lake O'Neill were utilized, the United States of America asserts, pursuant to its riparian rights. Please refer in that connection to Fisher Feige 137 Cal. 39, 69 P. 618 (1902).

It appears not to be even doubtful under any of the California cases that in the exercise of the riparian right, water may be diverted, regulated and economically applied to lands for a

---

<u>17</u>/   Rancho Santa Margarita v. Vail, 11 Cal. 2d 501; 81 P. 2d
553, 540 (1938)

beneficial purpose. That has been the historical practice on the
lands now constituting Camp Pendleton.

Exercise of a right to store water from one season to another
as a riparianist is neither contemplated nor is such a right
claimed by the United States of America. Regulation, better to
enjoy the yield of its riparian rights, is contemplated; a regulation,
it is respectfully submitted, in keeping with the law relative to
riparian rights. Again, however, the controls which will be invoked
respecting the larger riparian run-offs is a factual matter concern-
ing which evidence will be adduced. Precise size of the structure
or structures to attain the requisite regulation need not be
reviewed. Suffice to state, however, that such regulation will
not violate any basic principles governing the exercise of riparian
rights.

Contrary to assertions frequently and erroneously made,
the California courts long have recognized the fundamental right
to impound temporarily and detain waters constituting the yield
from riparian rights.[18] An example is the generation of electricity.
Thus the riparian right comprehends the detention of water in
reservoirs for a limited period - not seasonal - the better to
efficiently use and conserve the meager water supply.

Through regulating and spreading waters over lands riparian
in character, the United States of America will irrigate them, thus
maintaining a vegetative covering essential to full utilization of
the military establishments here involved. In the process, the
subterranean basin will be recharged and protected against salt
intrusion from the Pacific Ocean.

---

18/   Seneca Consolidated Gold Mines v. Great Western Power Co.
      209 Cal. 206, 287 Pac. 93 (1930)

GPO   16—29090-1

J. Lee Rankin
Solicitor General
Department of Justice
Washington, D. C.

Attorney for United States of America

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )       No. 1247-SD-C
                                )
        v.                      )
                                )
FALLBROOK PUBLIC UTILITY        )
    DISTRICT, et al.,           )
                                )
                Defendants.     )

MEMORANDUM
OF THE UNITED STATES OF AMERICA
IN REGARD TO
NOTICE TO ALL DEFENDANTS
AND COURT ORDER RE PROCEDURE
PAGE 4, PARAGRAPH 8 (g)

        (g)   The extent of prescriptive rights claimed by the
United States:

                (1)   As successor to the Rancho Santa Margarita;

                (2)   Resulting from its uses after 1942;

                (3)   Resulting from a combination of uses by its
predecessor before 1942 and the United States thereafter;

                (4)   Prescriptive rights claimed by the United
States outside of the Santa Margarita River watershed.

                (5)   Prescriptive rights to the use of water
claimed by the United States in connection with Lake O'Neill.

2397

GPO   16-90090-1

PRELIMINARY STATEMENT BY
THE UNITED STATES OF AMERICA
RESPECTING
PRESCRIPTIVE AND APPROPRIATIVE
RIGHTS WHICH IT CLAIMS
FROM THE SANTA MARGARITA RIVER

Because the extent of the claims of the United States of America to prescriptive and appropriative rights are identical - though not cumulative - the specific quantities claimed will only be set forth with the law pertaining to prescriptive rights. That phase of the response to the issue now being reviewed will be incorporated by reference into the review of the federal government respecting the appropriative rights in the Santa Margarita River.

Preliminarily, likewise, is this brief reference to the fact that a violation by the Fallbrook Public Utility District of a gratuitous, revocable license first granted to it by the predecessor in interest of the United States of America, was a major factor giving rise to the subject case.[1] That license is set forth:

"REVOCABLE LICENSE AND PERMIT
TO USE WATER
FROM THE SANTA MARGARITA RIVER

" THIS AGREEMENT made and entered into this 20th day of July, 1932, by and between RANCHO SANTA MARGARITA, a corporation, First Party, and FALLBROOK PUBLIC UTILITY DISTRICT, a municipal corporation, Second Party:

" WITNESSETH:

" WHEREAS, Rancho Santa Margarita is a corporation organized and existing under the laws of the State of California, and is the owner of that certain tract of land commonly known as the Santa Margarita Ranch,

---

[1] Please refer to Reply filed with this Court on or about Dec. 22, 1951 by United States of America to Answer of Fallbrook Public Utility District.

2398

-2-

situated in the County of San Diego, State of California; and

"WHEREAS, the lands comprising the said Santa Margarita Ranch are riparian to that certain stream of water in said county known as the Santa Margarita River, and said Rancho Santa Margarita is the owner of and exercising riparian rights in and to the waters of said River; and

"WHEREAS, Fallbrook Public Utility District is a municipal corporation organized under the laws of the State of California embracing territory located within the County of San Diego, all as shown on that certain map attached hereto, marked Exhibit A, and

"WHEREAS, said public utility district has been organized and is functioning for the purpose of supplying the inhabitants of said district with public utility service including the furnishing and supplying of its inhabitants with water for domestic purposes; and

"WHEREAS, said district is in need of an additional supply of water for the purpose of furnishing water for domestic purposes to the inhabitants of said district, and is desirous of securing said additional supply of water from said Santa Margarita River;

"NOW, THEREFORE, in consideration of the mutual covenants and agreements of the parties hereto as hereinafter expressed, and the fulfillment of said obligations by said respective parties,

"IT IS HEREBY COVENANTED AND AGREED as follows:

"1. Rancho Santa Margarita grants to Fallbrook Public Utility District a revocable license or permit to divert and take from the Santa Margarita River ten

-3-

2399

miner's inches of water continuous flow for the sole
and exclusive purpose of supplying the inhabitants of
said Fallbrook Public Utility District with water for
domestic uses.

"Such revocable license or permit is granted upon
the following express terms and conditions:

"(a)   This revocable license or permit shall con-
tinue in effect until expressly revoked in writing by
Rancho  Santa Margarita, its successors or assigns.   In
the event of revocation of this license or permit, a
notice of revocation in writing shall be served on said
district by delivering to the President or Secretary of
said Fallbrook Public Utility District at the office of
said district a copy of said written notice or by mailing
a copy thereof, postage prepaid, to said President or
Secretary and addressed to said President or Secretary,
General Delivery, Fallbrook, California, at least sixty
(60) days before the date expressed in said notice when
said revocation shall become legally effective.

"(b)   Water taken and used under this revocable
license or permit shall be diverted from Section (7),
in Township Nine (9) South Range Three (3) West, S.B.M.,
or at such other point on said river as may be selected
and agreed upon by the parties hereto.

"(c)   If at any time said Rancho Santa Margarita
shall construct a dam and reservoir at any point on
said river and by reason thereof, flood or otherwise
require or use those portions of the watershed of said
river in Section Seven (7), Township Nine (9) Range
Three (3) West, S.B.M., or any part thereof, which may
be occupied or used or owned or controlled by said

-4-

2400

GPO  16—92065-1

Fallbrook Public Utility District, then and in that
event, said District hereby and herein expressly
undertakes and agrees to permit the said Rancho Santa
Margarita to flood or other wise use or occupy the said
lands, or any part thereof, in said Section Seven (7),
Township Nine (9) South, Range Three (3) West, S.B.M.,
notwithstanding the fact that said district may be
using and occupying or intending to use and occupy said
lands for diversion and pumping purposes, PROVIDED HOW-
EVER, that in event said Rancho Santa Margarita shall
flood or otherwise occupy said lands of the Fallbrook
Public Utility District, then said District, under this
revocable license and permit, shall have the right
thereafter to take and divert said ten (10) miner's
inches of water from said river by pumping said water
from the reservoir, and the waters impounded therein,
so constructed and maintained by said Rancho Santa
Margarita or its successors in interest.

"(d)  As a condition precedent to the effective-
ness of the revocable license and permit herein provided
for, the approval of the same by the Vail Company, an
association of persons transacting business under that
common name, Margaret R. Vail, N. R. Vail, Mary Vail
Wilkinson, Mahlon Vail and Wm. Banning Vail, as Trustees
of said Vail Company, Margaret R. Vail, N. R. Vail, Mary
Vail Wilkinson, Mahlon Vail, Wm. Banning Vail, Edward
N. Vail, Margaret Russell Vail and Samuel Stiles shall
be obtained upon the form attached hereto, entitled
"Revocable Consent by Vail Company', the same being made
a part hereof as though in this paragraph fully set
forth.

-5-

2401

1    "IN WITNESS WHEREOF, the parties hereto have caused

2    this agreement to be duly executed by their respective

3    officers thereunto dual authorized on the day and

4    year hereinabove, first written."

5                       "RANCHO SANTA MARGARITA

6                       By  Farrell W. McCuerney, Vice-
                                President
7
                       By  Darrel W. Daly, Secretary
8
                           First Party
9
                       FALLBROOK PUBLIC UTILITY
10                          DISTRICT

11                     By  C. E. Lamb, President

12                     By  M. D. Einsel

13                     By  Gilbert F. Maze

14                     Members of the Board of Directors
                               Second Party"
15

16

17   "ATTEST:

18    John H. Chase

19    Clerk and Secretary

20    (SEAL) "

21       When the Fallbrook Public Utility District, which had no

22   rights in the Santa Margarita River, sought to initiate the claims

23   it now asserts by making filings with the State of California and

24   to otherwise invade the rights of the United States of America,

25   the quoted license was revoked.  That revocation took place on

26   July 31, 1948.

27       As a consequence, we have as a background to view the

28   prescriptive claims of the United States of America the fact that

29   the Fallbrook Public Utility District was without right, title or

30   interest in the stream in question at the time and for years

31   subsequent to assertions by it to rights which it now claims.

32

                              -6-

                                                2402

GPO  16—20898-1

Similarly tenuous are the claims of the Santa Margarita Mutual Water Company, which having neither means of diverting water nor facilities to distribute it is now and always has been a paper corporation claiming paper rights.

Too great emphasis may not, moreover, be placed upon this factor; neither the Fallbrook Public Utility District nor the Santa Margarita Mutual Water Company claimed any rights in the Santa Margarita River until approximately four years after the United States of America acquired lands for which it is now asserting rights to be adjudicated in this cause.

Page 5, Paragraph 8 (g) - The extent of prescriptive rights claimed by the United States:

(1)  As successor to the Rancho Santa Margarita;

The United States of America, respecting the issue last quoted, claims and will undertake to prove a right of the character mentioned to approximately 9,100 acre feet of water annually from the Santa Margarita River;

Page 5, Paragraph 8 (g) - The extent of prescriptive rights claimed by the United States:

(2)  Resulting from its uses after 1942;

The United States of America, respecting the issue last quoted, claims and will undertake to prove a right of the character mentioned to approximately 3,200 acre feet of water annually from the Santa Margarita River;

Page 5, Paragraph 8 (g) - The extent of prescriptive rights claimed by the United States:

(3)  Resulting from a combination of uses by its predecessor before 1942 and the United States thereafter;

The United States of America, respecting the issue last quoted, claims and will undertake to prove a right of the character mentioned to approximately 12,300 acre feet of water annually

-7-

2403

from the Santa Margarita River;

Page 5, Paragraph 8 (g) - <u>The extent of prescriptive rights claimed by the United States:</u>

(4)   <u>Prescriptive rights claimed by the United States outside of the Santa Margarita River watershed;</u>

The United States of America, respecting the issue last quoted, claims and will undertake to prove a right of the character mentioned to approximately 8,000 acre feet of water annually from the Santa Margarita River;

Page 5, Paragraph 8 (g) - <u>The extent of prescriptive rights claimed by the United States:</u>

(5)   <u>Prescriptive rights to the use of water claimed by the United States in connection with Lake O'Neill;</u>

The United States of America, respecting the issue last quoted, claims and will undertake to prove a right of the character mentioned to approximately 4,300 acre feet of water annually from the Santa Margarita River.

### CALIFORNIA LAW RESPECTING ACQUISITION OF PRESCRIPTIVE RIGHTS

The Supreme Court of California recently declared:  "<u>Water rights are a species of real property capable of acquisition by adverse user.</u>"  [2/]  (Emphasis supplied.)   Regarding the character of the title to rights to the use of water acquired by prescription, this statement has been made:  "Where the title by which water rights are held is based upon prescription * * * it is absolute and perfect, as much so as if the title had been secured by convey- ance or otherwise. * * *  The holder of the prescriptive title may, to the same extent as a person who has acquired title in another mode, prevent an interference with his use of the water by persons above him on the stream, or elsewhere.  Once the title vests, not

---

2 /   **Locke** v. Yorba Irr. Co., 35 Cal. 2d 205, 211; 217 P. 2d 425, 429 (1950).

2404

gpo  16—29065-1

even the original owner can recover it, except by adverse user himself for the prescriptive period * * *." 3/

Recently the State of California 4/ filed an amicus curiae brief attacking a decree quieting title to prescriptive rights to the use of water "contending that there is no evidence * * * that defendant complied with the statutory procedures concerning the appropriation of water, Water Code, Sections 1200 - 1801, and that without such compliance no prescriptive rights to the use of water may be acquired in this state." Summarily dismissing California's contention, the highest court of that state declared, "The parties have not raised this issue * * * and the judgment quieting title in defendants prejudices no right of the state of California, for neither it nor the Department of Public Works was a party to this action."

As a consequence of the cited authority, it is not even doubtful that prescriptive rights to the use of water may be acquired in the State of California.  Proof of those rights will be adduced by the United States of America.

Relative to the prescriptive right, this authoritative statement has been made: "The title once acquired is as complete as any other." 5/

All doubt having been removed by the cited authorities that prescriptive rights to the use of water may be acquired in the state of California, there remains to be considered the question of whether the United States of America may acquire rights of that nature by reason of the fact that it is the last user on the stream.  That a downstream claimant may acquire rights

---

3/  25 Cal. Jur., p. 1150, sec. 165.

4/  Hudson v. West, __ Cal. ___, 306 P.(2) 807, 808 (1957)

5/  Wiel, Water Rights in the Western States, 3d ed., vol. 1,
     p. 626, Sec. 580.

2405

of that character is equally free from doubt as has been announced
by the California Supreme Court.[6/]

Final disposition of the question necessarily turns,
however, upon the facts of the case.

---

6/   Larsen v. Appallorio 5 Cal. (2d) 440; 44 P.(2d) 196 (1936);
Dykzeul v. Mansur, 65 CA (2d) 503; 150 P.(2d) 958 (1944).

-10-

2406

J. Lee Rankin
Solicitor General
Department of Justice
Washington, D. C.

Attorney for United States of America

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
                    Plaintiff, )
                               )        No. 1247-SD-C
        v.                     )
                               )
FALLBROOK PUBLIC UTILITY       )
    DISTRICT, et al,           )
                               )
                    Defendants.)

MEMORANDUM
OF THE UNITED STATES OF AMERICA
IN REGARD TO
NOTICE TO ALL DEFENDANTS
AND COURT ORDER RE PROCEDURE
PAGE 5, PARAGRAPH 8 (h)

(h)  The extent of the appropriative rights claimed by
the United States in connection with Lake O'Neill, Stuart Mesa,
South Coast Mesa, and all other uses for which appropriative claims
are asserted by it; must the United States comply with State
procedures for the acquisition of appropriative rights?

2407

GPO  16—99905-1

### PAGE 5, PARAGRAPH 8 (h)

The Extent of the Appropriative Rights Claimed
By the United States in Connection with Lake
O'Neill, Stuart Mesa, South Coast Mesa, and all
Other Uses for which Appropriative Claims are
Asserted by it; Must the United States comply
with State Procedures for the Acquisition of
Appropriative Rights?

In that phase of this review relating to prescriptive rights, there is set forth the measure of those rights.[1/] That phase of the prescriptive memorandum is incorporated here by reference. Appropriative claims for identical quantities of water are made, though as emphasized, those claims are not cumulative with the ones predicated upon adverse possession.

Reference will now be made to this phase of the issue here under consideration:

" * * * Must the United States comply with State
procedures for the acquisition of appropriative
rights? "

Every act requisite for the appropriation of rights to the use of water in connection with the appropriative claims of the United States has been accomplished. However, reference in that connection is made to the original congressional act pertaining to the appropriation of rights to the use of water which in specific language declared: "Whenever by <u>priority of possession</u> rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; * * * " [2/]

---

1/   Memorandum of the United States of America in Regard to Notice
     to All Defendants and Court Order Re Procedure, Page 4, Para-
     graph 8 (g) pgs. 7-8.

2/   43 U.S.C. 661.  See also 43 U.S.C. 321, The Desert Land Act.

-2-

2408

GPO   16—99093-1

Reference is made in regard to that statute to an important decision concerning it.[3/] There, the Court declared that: "The rights of plaintiff (in that case) do not, therefore, rest upon the laws of Wyoming, but upon the laws of Congress. The legis-lative enactment of Wyoming was only a condition which brought the laws of Congress into force." That case is favorably cited by the Supreme Court in a leading decision;[4/] its rationale was recently adopted by the highest court.[5/]

This statement by California's Supreme Court, with ref-erence to the statute last quoted, is very pertinent: "To constitute a valid appropriation of water, three elements must always exist: (1) An intent to apply it to some existing or contemplated beneficial use; (2) an actual diversion from the natural channel by some mode sufficient for the purpose; and (3) an application of the water within a reasonable time to some beneficial use." [6/]   Continuing, the Court declared that: " * * * if diversion is actually made with <u>intent</u> to use the water for such (beneficial) purposes, the appropriation is then complete in the sense that the rights of the appropriator cannot be defeated by acts done or appropriations attempted to be made by others * * *." From that same source this statement is taken: "Actual diversion (the taking of possession) creates the right; actual use (the amount in possession) measures the right."

That conclusion has been repeated on numerous occasions by the California courts. Relying on those decisions, this

---

3/ Howell v. Johnson 89 Feb. 556, 558 (cc Mont. 1898)

4/ California Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142 (1934)

5/ Federal Power Commission v. State of Oregon, 349 U.S. 435 (1954)

6/ Simons v. Inyo Cerro Gordo Mining & Power Co., et al., 48 Cal. App. 524, 537; 192 P. 144, 150, 151 (1920).

-3-

2409

authoritative statement has been made: "* * * one may, by a
prior, actual, and complete appropriation and use, without
proceeding under the statute, acquire a right to the water
actually beneficially used which will be superior and para-
mount to the title of one making an appropriation * * * sub-
sequent to the actual use of the water by the prior appro-
priator." _7/

As the United States of America has diverted and applied
waters to a beneficial use and will undertake to prove the
quantities of water thus diverted and used, there arises the
question of whether it must make filings with California
before it may continue to exercise those claimed rights.
Similarly, the question is presented as to whether claims based
upon filings made subsequent to the diversion and use of
water by the United States of America may deprive it of water
it is presently using; may vitiate its claimed vested rights.

Before proceeding further, however, let this fact be
emphasized:  The United States of America does not seek to
assert any claimed appropriative right ahead of other rights
vested prior to the time it diverted and utilized water pursuant
to the claimed rights it is now asserting in the present phase
of this memorandum.

Predicated upon those introductory comments, considera-
tion will next be directed to the nature of the "State's
procedures for the acquisition of appropriative rights *"

At the outset reference is made to the source of authority
of the States when they exercise control of the rights of
private individuals to the use of water.  This authoritative
comment is pertinent:  "Subject to constitutional guaranties

---

7/  Kinney on Irrigation and Water Rights, 2d ed., vol. 2,
     Sec. 730, p. 1261.

241.0

for the protection of property rights, the public authority, under
the police power, may enact and enforce reasonable regulations
with respect to the use of water for irrigation."[8]   That conclu-
sion is in conformity with an enunciation by the Supreme Court
of the State of California on the subject. [9]   Regarding the source
of authority pursuant to which the statutory procedure was estab-
lished for the adjudication of rights to the use of water in the
State of Colorado, this statement has been made:   "They $\int$ statutes
establishing the procedure $\_7$ are in the nature of police regula-
tions to secure the orderly distribution of water for irrigation
purposes, and to this end they provide a system of procedure for
determining the priority of rights as between the carriers." [10]
From another decision from the State in question this succinct
comment is taken:   "We believe this regulation $\int$ for administra-
tion of rights to the use of water $\_7$ is fairly within the police
power of the State; * * *. " [11]   Thus it is eminently clear
that the authority pursuant to which rights to the use of water
are initiated, declared and administered stems from an exercise
by the States of their police power.

Pertinent also in this phase of the discussion is the
nature of rights to the use of water.   In that regard the Supreme
Court of the State of California has made several pronouncements.
In a relatively recent case that court has declared that a right
to the use of water is a corporeal hereditament constituting an

---

8/  30 Am. Jur., Irrigation, Sec. 4

9/  Fall River Valley Irrigation District v. Mt. Shasta Power
    Corporation, 202 Cal. 56, 259 Pac. 444 (1927).

10/  Farmers High Line Canal & Res. Co., et al. v. Southworth,
     13 Colo. 111, 134, 21 Pac. 1028 (1889).

11/  Farmers Independent Ditch Co. v. Agricultural Ditch Co., 22
     Colo. 513, 45 Pac. 447 (1896); See Wiel, Water Rights in
     the Western States, Vol. 2, 3d ed., page 1090.

-5-

2411

GPO  16—39065-1

interest in real estate.[12/]   The right to the use of water is
a natural right in the nature of an interest in real property. [13/]
Relative to the proposition the following comment has been made:
"This usufructuary right, or 'water right,' is the substantial
right with regard to flowing waters; is the right which is almost
invariably the subject matter over which irrigation or water power
or similar contracts are made and litigation arises; and is real
property.   It is as fundamental under the law of riparian rights
as under the law of appropriation." [14/]   Moreover, it has been
stated that a suit to adjudicate water rights is in the nature of
an action to quiet title to realty. [15/]   Thus, it is evident that
the procedure adopted by the State of California in connection
with rights to the use of water is in substance a police regulation
respecting the real property.

Pursuant to that power, the State in question has declared
that no right to appropriate or use water shall be initiated or
acquired except upon compliance with the provisions of the law.[16/]

As a consequence of the principles reviewed above, the
question is whether rights being exercised by the United States
of America may be taken from it by reason of the police regulations
alluded to above.

A negative response is respectfully made to that query.
Reasons for that response are contained in the paragraphs which
succeed.

---

12/   Wright v. Best, 19 Cal. 2d 368, 121 P. 2d 702 (1942).

13/   Kinney, Irrigation and Water Rights, 2d ed., vol. 2, sec.
      769, p. 1328 and cases cited.

14/   Wiel, Water Rights in the Western States, 3d ed., vol. 1
      Sec. 18, p. 20.

15/   Sherlock v. Greaves, 106 Mont. 206, 76 P. 2d 87 (1938).

16/   Deering's California Code, Water, Ch. 1, Art. 4, sec. 1225.

GPO   16-59090-1

Too great importance may not be predicated upon this fact
regarding California's police regulations respecting the appropria-
tion of rights to the use of water:

> They do not provide for the acquisition
> of rights for military purposes !

Thus, the logical sequitur to the erroneous contentions
that the United States of America must comply with those police
regulations is the anomaly that the national government may not
maintain military forces in the State of California as military
uses are not within the embrace of the appropriative laws of that
state.  That result is not forthcoming, however, in view of the
express ruling of the Supreme Court of California summarily deny-
ing the State's contention that rights to the use of water could
not be acquired absent compliance with the state police regula-
tions, now being considered. 17/

To declare that the State of California could by its laws
preclude the use of water by the United States of America in the
fulfillment of the latter's obligation to maintain its military
establishments is to deny the organic law of our nation.

Clearly, the United States of America, in the conduct of
the national defenses, for which the establishments in question
were acquired and the rights in the Santa Margarita utilized and
developed, was acting within the sphere of its delegated powers.
Certainly the military purposes for which the rights to the use
of water from the Santa Margarita River were acquired are within
the sole power of the United States to be administered and exercised
free from and without restraint of State law.

With what might well be regarded as anticipation of the
present dispute over the rights in question, Chief Justice Marshall,
when this Nation was passing through its formative years, made

---

17/  Hudson v. West __Cal (2d)___; 306 P(2d) 807 (1957)

-7-

2413

GPO  16—90999-1

this sage observation:  "If any one proposition could command the universal assent of mankind, we might expect it would be this - that the government of the Union, though limited in its powers, is supreme within its sphere of action." 18/  As authority for that declaration Chief Justice Marshall referred to the organic law of this country which provides that:  "This Constitution, and the laws of the United States which shall be made in pursuance thereof; * * * shall be the supreme law of the land; * * * " 19/  Commenting in regard to that clause this statement was made:  "It is of the very essence of supremacy, to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence.  This effect need not be stated in terms. It is so involved in the declaration of supremacy, sonecessarily implied in it, that the expression of it could not make it more certain." 20/

Respecting the position occupied by the State in connection with the performance by the general government of the responsibilities conferred upon it, this pertinent excerpt from the decision in question is taken:  "The sovereignty of a state extends to everything which exists by its own authority, or is introduced by its permission; but does it extend to those means which are employed by congress to carry into execution powers conferred on that body by the people of the United States?  We think it demonstrable, that it does not.  Those powers are not given by the people of a single state.  They are given by the people of the United States, to a government whose laws, made in pursuance of

---

18/   McCulloch v. Maryland, 17 U.S. 315, 405 (1819)

19/   Constitution of the United States, Art. VI, sec. 2.

20/   McCulloch v. Maryland, 17 U.S. 315, 427 (1819).

-8-

2414

the constitution, are declared to be supreme.  Consequently, the
people of a single state cannot confer a sovereignty which will
extend over them." 21/    Supremacy of the United States within the
scope of its delegated power is, therefore, free from doubt.
Applying the cited principles to the present factual situation it
is obvious that the law of the State of California could not operate
to prevent the use of water acquired by the United States for
military purposes.  Neither could it operate to prevent the United
States from storing the water the better to use it.

Again from the eminent authority:  "No trace is to be found
in the constitution, or an intention to create a dependence of the
government of the Union on those of the states, for the execution
of the great powers assigned to it.  Its means are adequate to its
ends; and on those means alone was it expected to rely for the
accomplishment of its ends.  To impose on it the necessity of
resorting to means which it cannot control, which another govern-
ment may furnish or withhold, would render its course precarious,
the result of its measures uncertain, and create a dependence on
other governments, which might disappoint its most important
designs, and is incompatible with the language of the constitution." 22/

Adherence to the contention that the laws of the State of
California govern the rights to the use of water acquired by the
United States would be contrary to the fundamental precepts con-
tained in the last quoted excerpt.  It would "create a dependence
of the government of the Union" regarding national defense on the
State of California.  Moreover, the end result of adopting the
principles suggested respecting the acquisition and use of rights
to the use of water by the United States would "impose on it the

21/  McCulloch v. Maryland, 17 U.S. 315, 429.

22/  McCulloch, v. Maryland, 17 U.S. 315, 424.

-9-

2415

necessity of resorting to means which it cannot control," which the State of California "may furnish or withhold," rendering precarious and uncertain the course which the United States must adopt in administering Camp Pendleton.

By that paraphrasing of certain of the tenets enunciated by Chief Justice Marshall, there is disclosed the fallacy of the assertion that the water supply which was acquired for Camp Pendleton is controlled by the laws of the State and must be enjoyed in conformity with the laws prescribed by that jurisdiction. Few precepts of law are more firmly established than those declared by Chief Justice Marshall respecting the relationship of the national government with the component states. While it is limited in the number of its activities, it is nevertheless, so far as its sovereignty extends, supreme. 23/

### THE UNITED STATES IS NOT SUBJECT TO THE POLICE POWER OF THE STATES

At this point it is desirable to refer again to the fact that the rights to the use of water acquired by the United States to supply Camp Pendleton are appurtenant to the lands involved. Those rights, as has been emphasized, are interests in real property. Thus the administration and control of them are embraced in the purview of this Constitutional provision: "The Congress shall have power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; * * *." 24/ Pursuant to that authority Congress is invested with exclusive power over the lands and property of the United States. "Its power in this respect is without limitation, * * *. The congressional power and authority over the public domain

---

23/  Tennessee v. Davis, 100 U.S. 257, 263 (1880).

24/  Article IV, Section 3, Clause 2.

GPO  16—30008-1

includes the right to regulate and control, directly or by dele-
gation of power, the use and diversion of waters on such lands
and the construction of necessary ways and works therefor, includ-
ing the disposal of the land and water thereon together or sepa-
rately, * * *." 25/    Further, "The power of Congress over the
public domain cannot be interfered with by any state legislation;
* * *." 26/

Speaking with reference to the immunity of the National
Government to the State police power, the Supreme Court of the
United States, in connection with a case much in point on the
subject being discussed, said this: " [ Arizona's ] statutes
prohibit the construction of any dam whatsoever until written
approval of plans and specifications shall have been obtained
from the State Engineer * * *.  The United States has not secured
such approval; nor has any application been made by Wilbur, who
is proceeding to construct said dam in complete disregard of this
law of Arizona.

"The United States may perform its functions without conform-
ing to the police regulations of a State.* * * Wilbur is under
no obligation to submit the plans and specifications to the State
Engineer for approval. 27/   Equally clear is the fact that the
State Law respecting estoppel would have no application for as
the Supreme Court recently stated:  "The Government, which holds
its interests here as elsewhere in trust for all the people, * * *
and officers who have no authority at all to dispose of Government
property cannot by their conduct cause the Government to lose its
valuable rights by their acquiescence, laches, or failure to act." 28/

25/ 42 Am.Jur., Public Lands, sec. 10, p. 792.
26/ 42 Am.Jur., Public Lands, sec. 11, p. 792.

27/ Arizona v. California, 283 U.S. 423, 451 (1930).

28/ United States v. California, 332 U.S. 19, 40 (1946).

-11-

2417

GPO   16—89995-1

When deer were killed at the instance of the Secretary of Agriculture, in violation of State game laws, to prevent over-grazing in a national forest and the forestry official was threatened with arrest, the highest Court stated: "the power of the United States to thus protect its lands and property does not admit of doubt * * * the game laws or any other statute of the state to the contrary notwithstanding." 29/

Most recently the Supreme Court of the United States of America declared unequivocally that police regulations of the nature here involved did not - it is believed could not - restrain the national government in the exercise of authority vested in it. 30/

In the light of the principles reviewed, it is respectfully submitted that the United States of America is not subject to the control of the police powers of the State of California in a manner which would divest it of long exercised and vested rights to the use of water from the Santa Margarita River.

29/  Hunt v. United States, 278 U.S. 96, 100 (1928).

30/  Fed. Power Comm. v. Oregon, 349 U.S. 435 (1954).

-12-

2418

1 | J. Lee Rankin
2 | Solicitor General
Department of Justice
3 | Washington, D. C.

4 | Attorney for United States of America

5

6

7

8 | IN THE UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | SOUTHERN DIVISION

11 | UNITED STATES OF AMERICA,        )

12 |                 Plaintiff,      )        No. 1247-SD-C

13 |         v.                      )

14 | FALLBROOK PUBLIC                 )
    | UTILITY DISTRICT, et al         )
15 |                                 )

16 |                 Defendants.     )

17

18 | MEMORANDUM
    | OF THE UNITED STATES OF AMERICA
19 | IN REGARD TO
    | NOTICE TO ALL DEFENDANTS
20 | AND COURT ORDER RE PROCEDURE
    | PAGE 5, PARAGRAPH 8 (i)

21

22 |         (i)  The law of percolating waters, that is waters

23 | which are not part of the Santa Margarita River or its tributaries

24 | or underground basins which are a part of said stream.

2419

Page 5, Paragraph 8 (i) -

The Law of Percolating Waters, That is
Waters which are not part of the Santa Mar-
garita River or its tributaries or Underground
Basins which are a part of said stream

This litigation pertains only to the rights to the use of waters constituting part of the stream system of the Santa Margarita River. As a consequence, it would seem logically to follow that the only rights to be adjudicated would fall within the categories of (1) surface waters of the Santa Margarita River, (2) its tributaries, (3) underground basins which are a part of that river or its tributaries. It would also seem logical to conclude that there would be excluded from the litigation "* * * percolating waters, that is waters which are not part of the Santa Margarita River or its tributaries." If those predicates are correct, the matter is purely academic and needs no further consideration.

In view of the nature of the proposition contained in the issue here being considered, facts become of transcendent importance. For if it is found that percolating waters in some area of the watershed do in fact feed the stream, then interference with those percolating waters presents matters to be resolved in the cause. 1/

The case last cited which directly involved the Santa Margarita River, discloses the importance of water bearing strata upon the yield of the stream. Whether waters of that character are within the embrace of the issue here being reviewed is not known. However, the United States of America respectfully requests the right to submit additional authorities if the question of percolating waters becomes important in this cause.

---

1 / Please refer in that connection to Rancho Santa Margarita v. Vail, 11 Cal.(2d) 501; 81 Pac. (2d) 533 (1938)

2420

-2-

oPo   10-88008-1