OF THE UNITED STATES
WASHINGTON 25, D. C.

Attorney for the UNITED STATES OF AMERICA

**FILED**

OCT 7 - 1957

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

FALLBROOK PUBLIC UTILITY DISTRICT,
    et al.,

        Defendants,

STATE OF CALIFORNIA,

        Intervening Defendant.

NO. 1247-SD-C

MEMORANDUM OF PROPOSAL FOR SETTLEMENT

OF SUBJECT CASE

BY

UNITED STATES OF AMERICA

Honorable James M. Carter

Presiding Judge

2429

1  J. LEE RANKIN
   SOLICITOR GENERAL
2    OF THE UNITED STATES
   WASHINGTON 25, D. C.
3
   Attorney for the UNITED STATES OF AMERICA
4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9               SOUTHERN DISTRICT OF CALIFORNIA

10                    SOUTHERN DIVISION

11

12  UNITED STATES OF AMERICA,                )
                                             )
13                     Plaintiff,            )
                                             )
14          v.                               )     NO. 1247-SD-C
                                             )
15  FALLBROOK PUBLIC UTILITY DISTRICT,       )
      et al.,                                )
16                                           )
                       Defendants,           )
17                                           )
   STATE OF CALIFORNIA,                      )
18                                           )
                  Intervening Defendant.     )
19

20

21            MEMORANDUM OF PROPOSAL FOR SETTLEMENT

22                    OF SUBJECT CASE

23                          BY

24               UNITED STATES OF AMERICA

25

26

27

28

29
                              Honorable James M. Carter
30
                                      Presiding Judge.
31

32

                                      2430

GPO 16—22025-0

U.S. MARINE CORPS
OFFICE OF GROUND WATER RESOURCES
Camp Pendleton, California
SANTA MARGARITA RIVER
WATERSHED

Drawing Number W-1a
Scale 1:250,000   Date: September '57

LEGEND

Watershed Boundary
Intermittent Streams
Perennial Streams
(August Flow)

SUBJECT INDEX

Page

REVIEW OF FACTUAL BACKGROUND ............................. 1

    Character of Action and Rights Involved .............. 1

    Proceedings Before Honorable James M. Carter,
    Presiding Judge ..................................... 1

        i.  Predicate for Memorandum of Proposal for
            Settlement ................................... 2

        ii.  Fallbrook's Request for Conditions ........... 2

CONDITION NUMBER 1 OF PROPOSAL ........................... 2

    Recognition of the Riparian Rights of the United
    States of America in the Santa Margarita River All
    in Accordance with the Established Tenets of the Law
    and in Accordance with the Spirit and Intendment of
    the Will of Congress as Expressed in the Provisions
    of Public Law 547 ................................... 2

        Public Law 547 An Act "To Authorize the Secretary
        of the Interior to construct facilities to provide
        water for irrigation, municipal, domestic, military,
        and other uses from the Santa Margarita River,
        California, and for other purposes" Offered by
        the United States of America as Basis of Proposal
        for Settlement ................................... 2

        a.  Riparian Rights ............................ 3

            i.  They are Parcel to the Land Itself ..... 4

            ii.  Use Does Not Create Them ............... 4

        b.  "Flood waters" in the contemplation of
            the Law of California Respecting Riparian
            Rights ..................................... 7

        c.  Riparian Rights Established Among the
            United States of America, the Vail Estate and
            Others by the "Stipulated Judgment" ....... 10

        d.  Surface and Subsurface Flow of the Santa
            Margarita River are Part of the Riparian
            Rights of the United States of America .... 11

        e.  The Extent of the Riparian Rights Claimed
            by the United States of America ........... 12

        f.  Rights of Other Riparians When the United
            States of America Does Not Exercise Its
            Full Entitlement .......................... 13

- i -

Subject Index - Continued                                          Page

CONDITION NUMBER 2 OF PROPOSAL                                        16

    Recognition That Military Uses on the 38,000 Acres
      of Riparian Land are Proper Riparian Uses; That Those
      Rights May be Exercised for Agricultural Purposes
      When Not Required to Meet Military Needs                    16

        i.  A Military Use Under California Law
           Is a Proper Riparian Use                            16

        ii.  When Not Required for the Prime Military
           Purpose for Which They were Acquired the
           Riparian Rights Here Involved may be
           Exercised for Agricultural Purposes                 17

CONDITION NO. 3 OF PROPOSAL                                           18

    Recognition of the Appropriative and Prescriptive
      Rights, or Both, of the United States of America
      in the Santa Margarita River, All in Accordance
      with the Established Tenets of the Law and in
      Accordance with the Spirit and Intendment of the
      Will of Congress as Expressed in the Provisions
      of Public Law 547                                          18

CONDITION NO. 4 OF PROPOSAL                                           20

    Physical Phenomena, Principally Runoff of the
      Santa Margarita River Watershed Available to the
      Military Enclave Here Involved, Constitute a
      Prime Element in this Proposal                             20

    TEMECULA-SANTA MARGARITA RIVER

      Measured Annual Runoff in Acre-feet
      in the Water Years 1924-1956                               21

CONDITION NO. 5 OF PROPOSAL                                           22

    Due to the Runoff Characteristics of the Santa Margarita
      River and the Conflicting Claims Respecting the Rights
      to the Use of That Water, The United States of America
      Cannot Make a Proposal of a Firm Supply of Water to
      the Fallbrook Public Utility District as Distinguished
      from the Percentage Proposal Subsequently set forth        22

PROPOSAL                                                             23

TO WHOM THIS PROPOSAL SHALL APPLY                                   25

2433

GPO 16-83005-4

**CITATIONS**

Page

Cases:

Carlsbad Mutual Water Co. v. San Luis Rey Dev. Co.,
  78 C.A.2d 900; 178 P.2d 844          4, 16

Collier v. Merced Irrigation District,
  213 Cal. 554; 2 P.2d 790          4

Duckworth v. Watsonville Water and Light Co.,
  150 Cal. 520; 89 Pac. 338          4, 15

Half Moon Bay Land Co. v. Cowell,
  173 Cal. 543; 160 Pac. 675          14

Lux v. Haggin,
  69 Cal. 255, 10 Pac. 674          4

Peabody v. City of Vallejo,
  2 Cal. 2d 351; 40 P.2d 486          7

Prather v. Hoberg,
  24 Cal.2d 549; 150 P.2d 405          6

Rancho Santa Margarita v. Vail,
  11 Cal.2d 501; 81 P.2d 533      5, 10, 11, 12, 19

United States v. California
  332 U. S. 19          16

Miscellaneous:

20 A.L.R.2d 664          8

56 Am. Jur., Waters, Sec. 281          16

25 Cal. Jur., Waters      12, 13, 17, 19

Constitution of California, Article XIV          4, 6

Public Law 547, 68 Stat. 575, July 28, 1954      1, 2, 3, 10, 23

Water Code, Sec. 1200          4

Wiel, Water Rights in the Western States, 3d ed., Vol. 1          4, 16

Exhibits:

Location Map - Santa Margarita River Watershed          1

Exhibit A - Copy of Court Order of May 8, 1957          1

Exhibit B - "Utt Act", Public Law 547, 68 Stat. 575      1, 2, 3, 10, 23

Exhibit C - Revocable License and Permit to Use Water
            from the Santa Margarita River          18

Exhibit D - A tabulation - De Luz Dam Authorized by Public
            Law 547 (188,000 acre-feet conservation capacity)          22

- iii -

2434

GPO 16—99996-4

REVIEW OF FACTUAL BACKGROUND

Character of Action and Rights Involved:

      This action was initiated by the United States of America to have quieted its title to invaluable and long-exercised rights to the use of water in the Santa Margarita River [1] against all adverse claimants. Those rights were acquired by the National Government in connection with the Marine Corps Base, Camp Pendleton, Oceanside, California, and the Naval Ammunition Depot, Fallbrook, California. Those vital military installations embrace approximately 135,000 acres of land.

      Rising on the eastern slope of the Coastal Range in San Diego County, California, near the site of the Palomar Observatory, the Santa Margarita courses through a semiarid region of approximately 740 square miles, finally to empty into the Pacific north a short distance from the City of Oceanside, California. Important here is the fact that the lands comprising those military establishments include the last twenty-one miles of the stream. Underlying a substantial portion of that reach of the river is a subterranean basin fed by its intermittent flow. From that basin the Marines and the Navy secure the water for the maintenance of the above-described military installations.

Proceedings Before Honorable James M. Carter,
   Presiding Judge:

      Honorable James M. Carter, Presiding Judge, by his Order of May 8, 1957, [2] directed the parties to explore the possibilities of settlement of the subject case. To that end Judge Carter ordered conferences, at which he would not be present, to be held on July 15, 1957, and August 12, 1957. Judge Carter, moreover, directed that at those two conferences counsel for the State of California would preside. A final pre-trial conference to be held September 4, 1957, Judge Carter further ruled would be in his presence. At that conference the results of the two earlier proceedings would be reviewed. In addition, at the September 4, 1957, pre-trial hearing, Judge Carter ordered, there would be reviewed certain basic tenets of the law having bearing upon the case, concerning which briefs were to be filed by August 12, 1957.

---

[1]/ Location Map of Santa Margarita River Watershed.
[2]/ Copy of Court Order of May 8, 1957, attached and marked Exhibit A.

- 1 -

2435

GPO 16—62695-d

On September 4 and 5, 1957, after comprehensive discussions respecting the possibility of settlement, Judge Carter ordered the United States to tender, within thirty days, a proposal of settlement.  In accordance with that order this proposal is tendered.

    i.  Predicate for Memorandum of Proposal for Settlement:

        Judge Carter's direction as to the type of proposal to be tendered relates to the division between the United States of America and the Fallbrook Public Utility District of the

> "* * * flood waters, waters that come down ⌐the Santa
>
> Margarita River⌐ at exceptional times, a few days during
>
> the year, particularly in a wet year * * *."

That division to be in contemplation of the percentage basis prescribed in the subsequently to be discussed "Utt Act"; hereafter referred to as Public Law 547.[3]/

    ii.  Fallbrook's Request For Conditions:

        Mr. Franz Sachse, counsel for the Fallbrook Public Utility District, has requested the United States of America to tender with its proposal the conditions which it will consider essential in connection with the operation by Fallbrook of any dam which might be constructed by reason of this proposal.

        Essential to compliance with Mr. Sachse's request, if this proposal is to be meaningful, is a review of the historical background, physical phenomena, and principles of law giving rise to those conditions.

CONDITION NUMBER 1 OF PROPOSAL

> Recognition of the Riparian Rights of the United States of America in the Santa Margarita River All in Accordance with the Established Tenets of the Law and in Accordance with the Spirit and Intendment of the Will of Congress as Expressed in the Provisions of Public Law 547

Public Law 547 - An Act "To Authorize the Secretary of the Interior to construct facilities to provide water for Irrigation, municipal, domestic, military, and other uses from the Santa Margarita River, California, and for other purposes" Offered by the United States of America as Basis of Proposal for Settlement:

        Congress in adopting Public Law 547 prescribed the safeguards and declared with specificity the procedures requisite for resolving this

---

3/  "Utt Act", Public Law 547, 68 Stat. 575, Exhibit B attached.

- 2 -

Condition No. 1

2436

1  controversy over the claimed rights of Fallbrook and those asserted by the United

2  States of America. By the case in question the National Government seeks to have

3  declared and defined its rights in the Santa Margarita River as they relate to

4  Fallbrook and all others on the stream. Congress in that connection by Public

5  Law 547 [4/] authorized the construction of the De Luz Dam across the Santa Margarita

6  River upon lands of the United States of America within Camp Pendleton to impound

7  the meager waters of that stream. Among the several conditions naturally inci-

8  dent to this type of authorization Congress required Fallbrook to enter into a

9  repayment contract; Fallbrook to agree not to assert against the United States of

10  America any prior rights in excess of the quantities provided for in the Act;

11  60 percent of the water impounded by De Luz Dam being allotted to the United

12  States of America, 40 percent to Fallbrook.

13       Warranting particular reference are these provisos written in con-

14  templation of Fallbrook's desire to impound and divert waters from the Santa

15  Margarita River: "* * * nothing in this Act shall be construed as a grant or a

16  relinquishment by the United States of America of any of its rights to the use

17  of water * * *." [5/] With reference to the protection of the rights of the United

18  States of America Public Law 547 declares: "* * * DeLuz Dam as herein provided

19  shall at all times be operated in a manner which will permit the free passage of

20  all of the water to the use of which the United States of America is entitled***. [6/]

21  In prescribing that safeguard Congress has before it information respecting the

22  very substantial rights of the United States of America which included those

23  riparian in character, prescriptive in character, and appropriative in character.

24  By adopting that course the will of Congress leaves no doubt that any proposal

25  advanced by the United States of America must come within the spirit and in-

26  tendment of Public Law 547.

27  a. Riparian Rights:

28       Earlier reference was made to the fact that for the last twenty-one

29  miles the Santa Margarita River has its course through the lands now

30  comprising Camp Pendleton and the Naval Ammunition Depot. Attendant upon that

31  circumstance are far-reaching implications involving the rights of the National

32  Government in that stream. For, though materially modified by police

4/  Exhibit B.
5/  Exhibit B, Section 3 (c).
6/  Exhibit B, Section 3 (d).                    - 3 -                    Condition No. 1
                                                                         2437

OFO 16—67005-1

regulations [7] directed to the conservation of water, the State of California, differing from many far Western States, recognizes the common law doctrine of riparian rights.  Brief reference to the characteristics of the riparian right is warranted for it will shed light upon the problems inherent in this litigation and the factors attendant upon Judge Carter's direction to the United States of America that it tender this proposal.

Reference in that connection is made to these fundamental aspects of the law of riparian rights:

(i) They are Parcel to the Land Itself:

"The /̄ riparian ̄/ right to the flow of water is inseparably annexed to the soil, and passes with it, not as an easement or appurtenant, but as a parcel." [8]

"The riparian right is a usufructuary one in the stream, a part and parcel of the land itself." [9]

"A riparian right has been well defined, and such right is a part and parcel of the land." [10]

(ii) Use Does Not Create Them:

"A riparian right is neither gained by use nor lost by disuse * * *." [11]

"Use does not create /̄ the riparian right ̄/, and disuse cannot destroy or suspend it." [12]

"Unlike an appropriation, riparian rights need no act of the owner to acquire them; they attach to the land bordering on the stream of their own accord." [13]

7/  Constitution of California, Article XIV, Sec. 3; Water Code, Sec. 1200 et seq.

8/  Lux v. Haggin, 69 Cal. 255; 10 Pac. 674, 754 (1886).

9/  Collier v. Merced Irrigation Dist., 213 Cal. 554; 2 P.2d 790, 794 (1931).

10/  Carlsbad Mutual Water Co. v. San Luis Rey Dev. Co., 78 C.A. 2d 900; 178 P.2d 844, 851 (1947).

11/  Duckworth v. Watsonville Water and Light Co., 150 Cal. 520; 89 Pac. 338, 343 (1907).

12/  Lux v. Haggin, 69 Cal. 255; 10 Pac. 674, 754 (1886).

13/  Wiel, Water Rights in the Western States, 3d ed., Vol. 1, Sec. 711, p. 777.

- 4 -

Condition No. 1

2438

Measure of the riparian right from the standpoint of this proposal is equally important by reason of two governing physical phenomena:

1. So meager is the water supply of the Santa Margarita River that it is insufficient to meet the needs of either of two major claimants from that source.  In the words of California's Highest Court on the subject: "The trial court also found, and this finding is admittedly supported by the evidence, that the normal flow of the * * * Santa Margarita river is not sufficient to supply all the riparian needs of all of the riparian lands of either respondent /Rancho Santa Margarita predecessor in interest of the United States of America_7 or appellants /Vail Estate_7. and that there is only enough water available for the irrigation of a portion of their riparian lands and for the uses thereon which are most valuable and profitable.  This was practically stipulated to by the parties, and was one of the basic facts upon which the action was tried." [14/]  (Emphasis supplied)

2. The Santa Margarita River is an intermittent stream given to great variances in runoff from season to season; from year to year.

What then is the guide in fixing the yield to which the riparianist is entitled; with whom must he participate in that yield?  Response to those underlying questions will be found in these succinct and basic statements of California law:

"A riparian owner has no right to any mathematical or specific amount of the water of a stream as against other like owners.  He has only a right in common with the owners to take a proportional share from the stream - a correlative right which he shares reciprocally with the other riparian owners.  No mathematical rule has been formulated to determine

---

14/   Rancho Santa Margarita v. Vail, 11 Cal.2d 501, 516, 517; 81 P.2d 533, 541 (1938).

- 5 -                                        Condition No. 1

2439

such a right, for what is a reasonable amount varies
not only with the circumstance of each case but also
varies from year to year and season to season."[15]   (Emphasis supplied)
Thus the participation by the United States of America in Santa Margarita's
meager yield must be enjoyed correlatively - a variant which is not subject
to mathematical delineation, rather, differing from year to year.

Accordingly there are involved imponderables which are governed by
land use, water use, precipitation, temperature, periods when water is available
and the innumerable elements which fix the aggregate of the yearly runoff.

As California's population explodes and population pressures increase -
pressures let it be observed the impact of which carry to the furthermost
reaches of the Santa Margarita River above Camp Pendleton - another constituent
of the riparian right takes on ever-increasing importance.  Generally it is
expressed in these terms in California's Constitution [16] that a riparian
owner may exercise his rights in the stream

"for the purposes for which such lands are, or may
be made adaptable * * *."  (Emphasis supplied)

Moreover

"* * * nothing herein contained shall be construed as
depriving any riparian owner of the reasonable use of
water of the stream to which his land is riparian under
reasonable methods of diversion and use * * *."

Thus California's organic law guarantees the riparianist of the right not only
to his present reasonable beneficial use but more important here, his potential
demands.  Essential to determining the measure of the yield of the Santa
Margarita River available to the United States of America by reason of its
riparian rights the guide is far from limited to the present uses of all
riparian claimants.  It is rather governed by the maximum potential uses of
those riparian owners or more likely their successors in interest who,

---

15/   Prather v. Hoberg, 24 Cal.2d 549, 560, 150 P.2d 405, 411 (1944).

16/   California Constitution, Article XIV, Sec. 3.

2440

1  as California's population expands, will increasingly demand the fullest extent

2  of their rights, limited only by the short supply of water from the stream

3  in question. Aggravating that circumstance are the advancements rapidly being

4  made in means pursuant to which waters are utilized, as a consequence of which

5  lands hitherto viewed as nonirrigable are now being brought into production

6  with an increment in demand for water. Industrial and municipal uses are

7  similarly on the upgrade in the area with the attendant increased burden on the

8  stream.

9         It is on the background of an ever-increasing demand for water that

10  the crux of this proposal is now directed - namely the Order of Judge Carter

11  that the United States of America tender a proposal for the division of the

12  "flood waters" of the Santa Margarita River.

13  b. "Flood waters" in the contemplation of the
       Law of California Respecting Riparian
14     Rights:

15         In keeping with the concept of modern law that beneficial use is

16  $\underline{/}$ a $\underline{/}$ the basis, $\underline{/}$ b $\underline{/}$ the measure, and $\underline{/}$ c $\underline{/}$ the limit of the right to use

17  water, the principles governing the riparianist's rights to flood water have

18  been materially revised in recent times. Indeed, "* * * $\underline{/}$ the $\underline{/}$ distinctions

19  heretofore made between the unusual or extraordinary and usual or ordinary

20  flood and freshet waters of a stream are no longer applicable" under California

21  law. $\underline{17/}$    Rather the law on the subject as it prevails today has been

22  authoritatively summarized as follows:

23         "Accordingly, it has become well settled that where

24         overflow waters of a stream, although in a sense high or

25         'flood' waters, are nevertheless a part of the regular

26         and usual flow of the stream for a considerable part of

27         each year, being in a rational sense, periodic or seasonal,

28         and are used or applied to a reasonable extent and in a

29         reasonable manner, commensurate with the needs of the

30         riparian proprietor in producing the maximum benefits

31  _____

32  17/  Peabody v. City of Vallejo, 2 Cal.2d 351; 40 P.2d 486, 492 (1935).

GPO 16—99995-3

1    from his land, or such waters are necessary for the

2    maintenance of the required water in subterranean strata

3    from which overlying owners are entitled to take it,

4    there is no right of appropriation for nonriparian uses

5    which would be substantially detrimental; * * *." [18]

6        Application of the principles thus enunciated entails a consideration

7    of the physical phenomena reviewed above and the inevitable increased demands

8    upon the stream, which as the shadow follows the substance, will most surely

9    have attendant upon them a reduction in the flood runoff in the future.  Very

10   much in point is the Vail Reservoir which came into operation in the year 1948.

11   A sharp reduction in the yield of the stream below that structure has been the

12   result.  New wells throughout the watershed have had the same result.  What

13   the future may hold is only subject to ascertainment by the changes which

14   have already transpired within the Santa Margarita River watershed, and those

15   in other watersheds similarly situated.  Looking directly to the south into the

16   San Luis Rey reveals an expansion of land and water use which no one could

17   have reasonably foreseen.  New wells in the already overtaxed alluvial basins

18   of that stream are a daily occurrence.  Recourse to the courts is frequent and

19   the contests bitter in which established rights are constantly being invaded

20   by those who seek to bring additional lands into production.  Fallbrook,

21   defendant, seeking in that watershed as in the Santa Margarita, to initiate

22   rights, was recently enjoined.

23       Lake Henshaw situated in an area near, and not far different from,

24   the Santa Margarita valley constitutes a grim and dry reminder of over-optimism

25   in regard to anticipated runoff.  Throughout Southern California - indeed

26   throughout the West - will be seen the impact of land and water development upon

27   the yields of streams which formerly appeared to produce quantities of water

28   in excess of those of the present time.

[18] 20 A.L.R. 2d 664, 665.  Note:  The remainder of the quoted provision is as
follows: "* * * but if, on the other hand, it can be shown that the whole
of such waters is not necessary to the exercise of such rights by a
riparian proprietor, an appropriator may make use of the excess."

- 8 -                    Condition No. 1

2442

Turning directly to the runoff of the Santa Margarita River in the last thirteen years, the drastic shortage is evidenced by the stream-flow records at the two principal gauging stations on the stream here involved so far as the United States of America is concerned:

ANNUAL RUNOFF U.S.G.S. RECORDS IN ACRE-FEET

| Year | Fallbrook Gauging Station | Ysidora Gauging Station |
|---|---|---|
| 1944-45 | 15,560 | 20,270 |
| 1945-46 | 11,150 | 11,680 |
| 1946-47 | 8,700 | 6,930 |
| 1947-48 | 6,640 | 562 |
| 1948-49 | 5,880 | 479 |
| 1949-50 | 3,910 | 0 |
| 1950-51 | 2,750 | 0 |
| 1951-52 | 47,010 | 47,640 |
| 1952-53 | 3,970 | 1,040 |
| 1953-54 | 7,540 | 7,740 |
| 1954-55 | 3,420 | 0 |
| 1955-56 | 1,821 | 0 |
| 1956-57 | -- | 0 * |

\* Not yet officially reported

For only a single water year - 1951-1952 - do these records disclose any quantity of water, when the large and all-important demands of the military establishments are considered.

Would that lone year in thirteen be considered to have yielded flood water in the sense that the United States of America received no benefit from the runoff? What proportion, if any, of that runoff could be considered in the contemplation of the law as being in excess of the riparian rights which under Public Law 547 are to be guaranteed and must remain inviolable? Could Camp Pendleton and the Ammunition Depot concur in the impoundment of all of that water when they are faced with the imperative necessity of recharging the subterranean basin which is their primary source of supply? In view of the effect of Vail's dam, wells and other structures upon the stream, will there be a recurrent pattern of runoff? Will there be a respite from the drought or are conditions more normal than is pleasant to comprehend? These are elements inextricably part of this proposal to the Fallbrook Public Utility District. Statistically they defy exact measurement, yet they are nonetheless very real, looming large in the minds of the men responsible to their country for the integrity of the military establishments, the utility of which in the overall plan of national defense is geared to a readily available firm and adequate supply of water from the Santa Margarita River.

- 9 -                                    Condition No. 1

2443

c.  Riparian Rights Established Among the United
      States of America, the Vail Estate and Others
      by the "Stipulated Judgment":

Stemming from the "Million Dollar Lawsuit" which entailed a trial "over a period of 3 years, and actually consumed 444 court days" [19] is a "Stipulated Judgment", [20] fixing the respective rights of the Rancho Santa Margarita, predecessor in interest of the United States of America, the Vail Estate and others.  Prior to reviewing those rights, reference again is warranted to Public Law 547 which provides, among other things, as follows: "nothing in this Act shall be construed as a grant or a relinquishment by the United States of America of any of its rights to the use of water which it acquired according to the laws of the State of California either

as a result of its acquisition of the lands comprising Camp

Joseph H. Pendleton and adjoining naval installations, and

the rights to the use of water as a part of said acquisition,

or through actual use or prescription or both since the date

of that acquisition, if any, or to create any legal obligation

to store any water in De Luz Reservoir, to the use of which it

has such rights, or to require the division under this Act of

water to which it has such rights." [21]

Similarly provision is made that in the operation of De Luz Dam the yield of the rights above described would be permitted to flow through that structure for the use of the National Government free from Fallbrook interference. [22]

Judge Carter was express in his declaration that there would be excluded from this proposal the rights of the United States of America as they relate to those of the Vail Estate.  That Order takes cognizance not only of the fundamental guarantees of Public Law 547 but, as will be reviewed in subsequent paragraphs, those inherent in the law respecting riparian rights to which the "Stipulated Judgment" relates.

Turning first to the provisions of that "Stipulated Judgment" reference is made to the fact that among themselves the parties to it and their successors have allocated the yield of their respective riparian rights as follows:

[19]  Rancho Santa Margarita v. Vail, 11 Cal.2d 501, 81 P 2d, 533, 536 (1938).
[20]  Exhibit A of the Complaint in this cause.
[21]  Exhibit B, Section 3 (c).
[22]  Exhibit B, Section 3 (d)

2444

SPO 16-99905-1

1    Rancho Santa Margarita, the interest
      to which the United States of
2      America succeeded . . . . . . . . . . . . . . sixty-six and two-thirds
     (Small interveners' interests          percent (66 2/3%) of the
3      included)                           waters of the Santa
                                      Margarita River and its
4                                         tributaries

5    Vail Estate . . . . . . . . . . . . . . . . . . . thirty-three and one-third
                                    percent (33 1/3%) of the
6                                       waters of the Santa
                                      Margarita River and its
7                                       tributaries

8 Moreover, the Vail Estate guarantees to the United States of America by that

9 Judgment that: "During the irrigation season of each year, to wit, May 1 to

10 October 31, inclusive, * * * defendants /Vail Estate_7 shall cause to be main-

11 tained at Gaging Station No. Three (3) /located upstream from the military en-

12 clave_7 a constant flow of water of not less than three (3) cubic feet per second

13 one (1) cubic foot per second being the equivalent of fifty (50) miner's inches)." [23]

14      All that has been reviewed above respecting the riparian rights of

15 the United States of America independent of the Stipulated Judgment is equally

16 applicable to its entitlement under the Stipulated Judgment.

17      Too great emphasis may not be placed upon the fact that the Vail

18 Estate has in effect contracted with the United States of America for large

19 quantities of water; they were acquired as appurtenant to the lands comprising

20 the military establishments here involved; that Public Law 547 specifically

21 provides for the preservation of rights to the use of water passing to the

22 United States of America when it acquired "the lands comprising Camp Joseph H.

23 Pendleton and adjoining naval installations * * *" and the rights it has acquired

24 since that date by prescription or use or both.

25 d.   Surface and Subsurface Flow of the Santa
      Margarita River Are Part of the Riparian
26      Rights of the United States of America:

27      Respecting the precise rights here under consideration California's

28 Highest Court has declared: "* * * it is also well established that the

29 underground and surface portions of the stream constitute one common supply." [24]

30

31 [23]   Stipulated Judgment, Exhibit A of the Complaint, Section Eleventh, Part 1.

32 [24]   Rancho Santa Margarita v. Vail, 11 Cal.2d 501; 81 P.2d 533, 560 (1938).

                      - 11 -              Condition No. 1

1  That proposition was decided many years ago in California. [25/]  The waters

2  in the immensely valuable subterranean basin discussed above are part of

3  the entitlement of the riparian rights to which the United States of America

4  succeeded when it acquired the Rancho Santa Margarita.  Accordingly, they are

5  within the embrace of Public Law 547 and must be protected.

6

7  e.  The Extent of the Riparian Rights Claimed by the
       United States of America:

8      There are 37,944 acres of land, title to which is in the United

9  States of America, which are riparian to the Santa Margarita River.  Of that

10 total it has been determined that:

11      18,701 acres are irrigable and are susceptible of

12      practicable and profitable irrigation;

13      69,237 acre-feet annually are required for the

14      practicable and profitable irrigation of those

15      irrigable lands.

16 Pertinent at this juncture is a reference to the statement of California's

17 Supreme Court regarding the great disparity between the riparian claims for

18 the lands in question and the availability of water.  From that source this

19 statement is taken:  "In determining the riparian status of land the same

20 rules of law apply regardless of the size of the tract, the extent of the

21 watershed or the amount of the run off." [26/]   Continuing in regard to the

22 subject, that Court stated: "Respondent also seeks to support its contention

23 by a reference to the admitted fact that there is not sufficient water for

24 the riparian needs of either party.  The amount of water in the stream has no

25 bearing whatever in determining whether a particular tract is riparian. * * *

26 We are here discussing the status of land, not the quantity of water available."

27      As a consequence of the facts and law reviewed the United States of

28 America is entitled to participate in the meager supply of the Santa Margarita

29 River on the basis of approximately 70,000 acre-feet annually.  It is readily

30 _____

31 25/  25 Cal. Jur., Waters, Sec. 110, page 1102.

32 26/  Rancho Santa Margarita v. Vail, 11 Cal.2d 501; 81 P.2d 533, 550 (1938).

2446

1  recognized that the quantity of water mentioned is not available, yet for the
2  reasons expressed the present and potential demands for the lands in question
3  constitute a sound basis upon which to predicate its claims.  Likewise recognized
4  is the fact that the military demands for the enclave are 23,000 acre-feet
5  annually.

6  f.  Rights of Other Riparians When the United
       States of America Does Not Exercise Its
7      Full Entitlement:

8          There have been reviewed at length the characteristics of the
9  riparian rights under California law.  Here it is important again to emphasize
10 that "Unlike an appropriator, an owner of riparian land has no right to a
11 definite amount of water.  All ⌐riparian⌐ owners on a watercourse have a
12 common correlative and reciprocal interest therein, and the rights of each
13 must be exercised with due regard to the rights of others, and with the least
14 possible harm to them."  —27/  Further, lending complexity to this proposal
15 is the fact that: "No rules have been laid down by the courts for determining
16 the relative and proportional rights of riparian proprietors to the use of
17 water for irrigation or other proper uses.  And it is impossible to formulate
18 any mathematical rule to determine such rights. * * * It is obvious that what
19 is a reasonable amount ⌐of water⌐ varies not only with the circumstances of
20 each particular case but also varies from year to year, for the amount which
21 might be reasonable in a season of plenty might be manifestly unreasonable
22 in a season of drought."  —28/

23         As a consequence it is too clear for question that the United States
24 of America has no knowledge and no way of knowing from year to year or season
25 to season its entitlement by reason of its riparian rights.  Neither does it
26 know and it has no way of knowing what its reciprocal or correlative share of the
27 runoff will be nor the extent of its demands at any given time, for who knows
28 the moment of mobilization.  Further, in these years of drought, every available
29 acre-foot of water has potential benefit in recharging the ground water basins upon
30 which the vast military establishments are reliant.

31 _____
32 27/  25 Cal. Jur., Waters, Sec. 147, page 1135.

    28/  25 Cal. Jur., Waters, Sec. 154, pages 1140 et seq.

                                          - 13 -                  Condition No. 1
                                                                       2447

1    When the United States of America is not itself utilizing all of the

2    waters to which it is entitled by reason of its riparian rights, then the

3    surplus, if any, becomes available for use by other riparians.  Relative to the

4    matter this statement by California's court is controlling: "Each /riparian_7

5    owner has the right to use the whole or any part of the water on his

6    own riparian land at any time when such use does not interfere with the actual

7    use by the other owners of their due shares.  If any such owner is not using

8    the water himself, he has no right to object to the use of it by another

9    riparian owner on riparian land." 29/

10   Flowing from that precept of the law respecting riparian rights are

11   consequences which not only the United States of America must correctly assess

12   but similarly Fallbrook.  For it is manifest that to the extent the "flood

13   waters" are impressed with the character of riparian water, then to that

14   extent they are enjoyed only correlatively with all other riparians on the

15   stream.  If those "flood waters" were surplus to the momentary needs of the

16   United States of America they would inure first to the riparian claimants

17   who could use the surplus riparian waters not required by the United States

18   of America.  Let it be emphasized however, the preceding sentence is

19   theoretical in the extreme for: The great military enclave here involved

20   has needed all of the waters which have reached it since its establishment.

21   Such periods when waters in the Santa Margarita River exceed immediate

22   consumptive needs, they result in great benefits in recharging the subterranean

23   basins; aid in repelling salt water intrusion from the Pacific Ocean;

24   irrigate the dry and parched areas within the enclave; and otherwise

25   are beneficially used.

26   It becomes abundantly manifest, in the light of the preceding review,

27   that there is no sound basis upon which the United States of America could

28   make a proposal to Fallbrook for any firm supply of water.  Equally clear is

29   the fact that any proposal to Fallbrook directly and immediately entails the

30   good faith of the United States of America as to all other riparian owners

31   _____

32   29/  Half Moon Bay Land Co. v. Cowell, 173 Cal. 543, 160 Pac. 675, 678 (1916).

- 14 -                    Condition No. 1

2448

on the stream.  Under no circumstances, wholly aside from the limitations
1   contained in Public Law 547 against the relinquishment by the United States
2   of America of any rights to Fallbrook, should the United States of America
3   compromise its riparian rights to "flood waters" truly beneficial to it,
4   by agreeing that such waters in any way could be impounded and diverted by
5   Fallbrook.  For, as stated above, whenever the United States of America has no
6   need for its full riparian entitlement, other riparians have the legal right
7   to the water.  Clearly a late claimant to an appropriative right such as Fallbrook
8   may not be accorded the privilege of taking waters to which others have a
9   legal right.  Indeed, California law precludes an undertaking of that nature.
10  Long established precedents in that State deny a riparian owner the power to
11  contract with regard to the use of water to which he is entitled if other
12  riparians have a claim to it.[30/]   On the subject California's Supreme Court
13  stated: "* * * his riparian right is limited to his riparian land.  It gave
14  no right to use any of the water of the stream for any purpose, upon land
15  not riparian, nor upon any riparian land other than his own.  No one can
16  sell or convey to another that which he does not himself own.  Grimmer
17  could not, by a transfer of his riparian rights, sell to the plaintiff,
18  as against third persons having interests in the water, the right to use
19  the water upon any land, riparian or non-riparian, except his own, to which
20  it originally attached.  His deed operated to prevent him from complaining
21  of a diversion, but it did not affect other parties."  In effect, at most
22  the United States of America could extinguish its riparian rights to the
23  extent they are affected by the proposal, but could not guarantee Fallbrook
24  with a supply of water.  Rather, in all probability and in most years and in
25  regard to most of the waters called "flood waters" this anomalous circumstance
26  would prevail: The United States of America would give away its rights to
27  Fallbrook, yet the result would be the extinguishment of those rights with the
28  benefit inuring to other riparians.  Simply stated, by reason of the reciprocal
29

30   30/   Duckworth v. Watsonville Water and Light Co., 150 Cal. 520, 526;
31           89 Pac. 339, 341 (1907).
32
                                    - 15 -              Condition No. 1

                                                          2449

and correlative nature of riparian rights under California's law: "One riparian

owner cannot, by grant or otherwise, extinguish or diminish the riparian rights

attached to the lands of other nonconsenting riparian owners." [31/]

Moreover, Congress and Congress alone could authorize an extinguishment

of the invaluable riparian rights or any part of them to which the United States of

America is entitled. [32/] Congress has not granted such authorization. To the

contrary, it has by Public Law 547 expressly declared an intention to preserve

those rights.

### CONDITION NUMBER 2 OF PROPOSAL

Recognition That Military Uses on the 38,000 Acres of Riparian
Land Are Proper Riparian Uses; That Those Rights May be Exercised
for Agricultural Purposes When Not Required to Meet Military Needs

Although Fallbrook has challenged the right of the United States of

America to use the yield of its riparian rights to meet military demands, the State

of California in its brief dated August 13, 1957, states that it "does not contest

that military use of water by the United States, when made on riparian land owned

by the United States, may be a beneficial use within the riparian right." Similarly

challenges by Fallbrook have been directed to the use of the waters of the Santa

Margarita River for agircultural purposes when not required for military purposes.

i. A Military Use Under California Law Is a Proper Riparian Use:

Totally without basis in law are the assertions that a military use

is not a riparian use. Fundamental tenets of the law, long recognized, belie

that contention. Wiel, having specified certain uses, has declared that the

riparian owner may exercise his rights for "all the many other varied purposes

for which water can be used." [33/] Likewise it has been stated relative to the

use for which riparian rights may be exercised, that: "There is no distinction

in this respect between a farm and a summer residence. So, one who uses such

land for the purpose of pleasure, recreation, and health is not deprived of any of

the rights attaching to the /riparian 7 land." [34/] Again, this statement has

been made: "In general every owner of lands through or past which a water

31/  Carlsbad Mutual Water Company v. San Luis Rey Development Company, 78 C.A.2d
     900; 178 P.2d 844, 851 (1947).
32/  United States v. California, 332 U.S. 19 (1946).
33/  Wiel, Water Rights in the Western States, 3d ed., vol. 1, sec. 743, page 803.
34/  56 Am. Jur., Waters, Sec. 281, page 734.

2450

GPO 16—99905-d

course flows has the right to a reasonable use of the waters on his lands
for any and every use which does not interfere with the equal right of or injure
the lands of other riparian proprietors along the stream.  What is a reasonable
use depends upon all the facts and circumstances of the case, and is a
question of fact for the trial court." 35/

Each of the authorities cited above predicated its conclusions upon
numerous California decisions in support of the proposition that: Riparian
rights may be exercised for any beneficial purpose, reasonableness being the
sole limitation.  A military use is, of course, a beneficial use.  It is
elementary that the numerous military bases in the State of California could
not be operated without water.

ii.  When Not Required for the Prime Military Purpose
     for Which They Were Acquired the Riparian Rights
     Here Involved may be Exercised for Agricultural Purposes:

California's vast agricultural empire had its genesis in Southern
California in the area here involved.  Water from the Santa Margarita River has
long been used in that connection.  Indeed, the lands now primarily used for
military purposes have been highly productive for many years, contributing to
California's wealth.  No sound reason has been advanced for not using those lands
for agriculture when not required for the military.  To give that water to
Fallbrook would be taking it from lands historically irrigated from the Santa
Margarita River by farmers who have been on the land many years prior to the
time the properties were acquired and to relinquish it for use upon lands within
Fallbrook which had never been irrigated from that source, if at all, for use by
farmers who had never used it, would, of course, be the rankest discrimination.
For although the farmers now using the water do so subject to being deprived of
it for military purposes, they nevertheless receive great benefits from it as
does the United States of America.

---

35/  25 Cal. Jur., Waters, Sec. 120, p. 1114.

- 17 -                    Condition No. 2

2451

GPO 16—69996-4

CONDITION NO. 3 OF PROPOSAL

Recognition of the Appropriative and Prescriptive Rights, or
Both, of the United States of America in the Santa Margarita
River, All in Accordance with the Established Tenets of the
law and in Accordance with the Spirit and Intendment of the Will
of Congress as Expressed in the Provisions of Public Law 547

Vital to the United States of America are its appropriative and pre-
scriptive rights to the use of water to which it succeeded when it acquired the
lands constituting the military enclave and those appropriative and prescriptive
rights which it has acquired since the date when title to the lands constituting
the enclave passed to it.  Those are the rights long exercised:

a.  At Lake O'Neill:

b.  Outside of the watershed of the Santa Margarita River.
Absent those rights, large segments of the military establishment in question would
be without a water supply.  Any reduction in them would cause irreparable damage.

All of the appropriative and prescriptive rights, or both, to which ref-
erence is here made were initiated <u>prior</u> to the time Fallbrook asserted any rights
to the use of water in the Santa Margarita River.  Indeed, they were all being
exercised when Fallbrook, recognizing that it had no rights in the Santa Margarita
River, was, pursuant to a gratuitous[36/] and revocable license, diverting from the
source in question an infinitely small quantity of water for domestic purposes.

Lake O'Neill located <u>within</u> the watershed, is used both for storage
of water and the regulation of direct flow.  Relative to that reservoir the
Supreme Court of the State of California has declared: "South of that $\lceil$Santa
Margarita$\rceil$ river is Fallbrook creek, which flows through the Santa Margarita
ranch in a westerly direction for almost all of its length.  This tributary, as
well as the others above described, flows mainly in the rainy season.  Near
where this creek joins the Temecula-Santa Margarita river on respondent's
property, respondent has constructed a dam and created an artificial lake known
as Lake O'Neill reservoir, used for irrigation purposes.  This reservoir is
used to store not only some of the waters of Fallbrook creek, but also some of
the waters of the main river where a diversion dam and ditch have been constructed.

" * * * * *

36/  Exhibit C - Revocable License and Permit to Use Water from the Santa
      Margarita River

- 18 -                              Condition No. 3

2452

GPO 16—62995-1

"The main diversion on respondent's property is at Lake O'Neill reservoir. * * * By means of a temporary earthen dam constructed in the river the surface flow is diverted during the dry season into this reservoir.  Since 1886 it has been the custom of respondent not to construct this dam until about the middle of March of each year after the spring rains.  The dam remains in the river until washed out during the next heavy rainy season." [37/]

Historically that structure has been used and is now used to impound waters under a claim of appropriative and prescriptive right; it has been used and is now used as part of a system to divert and apply to beneficial uses a part of the riparian rights of the National Government above described.

Outside of the watershed the United States of America today, as did its predecessor in interest, the Rancho Santa Margarita, uses large quantities of water, pumped from the basin which is fed by the Santa Margarita River, under claim of appropriative and prescriptive rights.  Those rights are essential to Camp Pendleton.  For long before Fallbrook made claim to any rights to the use of water from the Santa Margarita River - while it was still diverting water from that stream pursuant to the above-mentioned gratuitous and revocable license - a very large segment of the barracks and other structures constituting Camp Pendleton were built outside of the watershed.  Riparian rights may not be exercised in connection with uses outside of the watershed, for

"Water / which is the yield of riparian rights / may not be taken from a stream for use on lands beyond the watershed, as such lands are nonriparian.  This is true even where such land is part of a tract abutting on a stream." [38/]

Thus they may not be used in substitution of the appropriative and prescriptive rights claimed by the United States of America.  As the existence of Camp Pendleton turns upon those rights any reduction would necessitate the procurement of an equivalent quantity of water through initiating new appropriations from the

37/  Rancho Santa Margarita v. Vail, 11 Cal.2d 501; 81 P.2d 533, 539, 540 (1938).

38/  25 Cal. Jur., Waters, Sec. 137, 138; Page 1127.

- 19 -                    Condition No. 3

2453

Santa Margarita River, which could have no other effect than the loss of
1   invaluable priorities so long exercised by the Central Government.

2            The United States of America claims an aggregate of 12,300 acre-feet
3   of water annually from the Santa Margarita River by reason of its appropriative
4   and prescriptive rights to the use of water which have been discussed in the
5   paragraphs immediately preceding.

6

7                            CONDITION NUMBER 4 OF PROPOSAL
8                Physical Phenomena, Principally Runoff of the Santa
                 Margarita River Watershed Available to the Military Enclave
9                Here Involved, Constitute a Prime Element in this Proposal

10            Dangerously erroneous conclusions have been expressed in regard to
11   the yield of the Santa Margarita River.  Principal among them has been to forecast
12   runoff of that stream based upon relatively meager data and on an extremely
13   short period during which stream flow records have been kept.  To prognosticate
14   yields on the basis of a single average of runoff during the period of record
15   is the prime fallacy of most analyses purporting to disclose a surplus of
16   water available for appropriation.  Reference in that regard is made to the
17   table appearing on page 9 of this memorandum.  There it will be observed that
18   at the Ysidora gauging station for five out of the last thirteen years the
19   runoff at that point is zero (0); ten of the thirteen years the runoff was
20   below 7,800 acre-feet - average for the thirteen years being 7,410 acre-feet.
21   Only one of the years could be denominated a year of relatively high runoff.
22   However, it followed six years of drought of which the two years immediately
23   preceding were years of zero (0) runoff; two other years each under six hundred
24   (600) acre-feet.  Could it be said the runoff of one relatively large year in
25   thirteen was all available for appropriation?  A negative response is manifest.
26   For during the protracted period of drought the National establishments had
27   existed by pumping from the subterranean basin.  Any waters reaching the enclave
28   benefited the United States of America through recharging the basin, filling
29   Lake O'Neill and by irrigating the lands.

30

31

32                           - 20 -                    Condition No. 4


GPO 16—20995-1

2454

Historically runoff of the Santa Margarita River discloses a
pattern so erratic in nature; so variant from year to year that the United
States of America cannot accept the assertion that the river's yield is
29,000 acre-feet annually as a sound criterion for future planning.  Noteworthy
is the fact that twenty-seven (27) out of the thirty-four (34) years of
record fall far below the average runoff; seven (7) out of those thirty-four
years scattered without pattern throughout the years of record, raise the
average to a wholly unrealistic high which, if relied upon, would be disastrous
to the United States of America were it to tender a proposal based upon it.
Long-term calculations based upon runoff records and correlations with watersheds
similar to that of the Santa Margarita River disclose that fifty-five (55) years
out of sixty-four (64) years in the Santa Margarita River watershed are years
of short supply.  That only nine (9) years out of sixty-four (64) years could
be considered in excess of demands for each of those individual years.

Moreover, an analysis of the detailed runoff records of the stream,
published by the United States Geological Survey, in the years of comparatively
high flows, discloses that there are but very few periods when the stream could
be considered as being at such stage, then only for a most brief interval.  Far
more realistic than any average based upon the period of record is the following
table revealing statistically the great disparity between the average and the
median flow, the latter being reflective of the waters which may be reasonably
expected to be available throughout the years:

TEMECULA-SANTA MARGARITA RIVER

Measured Annual Runoff in Acre-feet
in the Water Years 1924-1956

|                | Fallbrook | Ysidora |
|----------------|-----------|---------|
| Average        | 21,583    | 24,801  |
| Upper Quartile | 20,350    | 25,300  |
| Median         | 8,230     | 7,740   |
| Lower Quartile | 4,895     | 1,200   |

- 21 -                    Condition No. 4

2455

CONDITION NO. 5 OF PROPOSAL

1  ·Due to the Runoff Characteristics of the Santa Margarita
2  River and the Conflicting Claims Respecting the Rights to
   the Use of That Water, The United States of America Cannot
   Make a Proposal of a Firm Supply of Water to the Fallbrook
3  Public Utility District as Distinguished from the Percentage
   Proposal Subsequently set forth.
4

5      Judge Carter's direction that the United States of America tender a

6  proposal respecting the division of the

7          "* * * flood waters, waters that come down /the Santa

8      Margarita River_/ at exceptional times, a few days during

9      the year, particularly in a wet year * * *"

10  is tantamount to taking judicial notice of the intermittent, periodic and sporadic

11  runoff of the Santa Margarita River, which characterizes all of the streams in

12  Southern California.  Those vagaries are apparent from a consideration of the

13  records and the analyses of them made a part of this proposal.  Any proposal

14  which would assure Fallbrook a definite quantity of water, in the light of the

15  known factors - both legal and physical - would be clearly violative of these

16  express statements by the Congress, contained in Public Law 547:

17          a.  there must be no relinquishment of any rights in the

18      Santa Margarita River by the United States of America;

19          b.  the dam would be operated in a manner which would

20      permit free passage to the United States of America of its

21      full entitlement in the Santa Margarita River.

22      Physical factors precluding the United States of America from granting

23  to Fallbrook a firm water supply are reflected in accompanying Exhibit D. 39/

24  There based upon data supplied by the State of California, defendant in inter-

25  vention, in part from its Bulletin 57 and in part from its unpublished data,

26  it becomes abundantly manifest that the yield of the Santa Margarita River,

27  presently and in the future, falls far short of insuring a firm surface water

28  supply to long-established rights.  Only by reliance upon the subterranean

29  basin within the enclave as a source of water is it possible to maintain the

30  military establishments here involved.  Destroy that basin through the diversion

31

32  39/   Exhibit D, A Tabulation - De Luz Dam Authorized by Public Law 547
             (188,000 acre-feet conservation capacity).

GPO 16—69905-1

or impounding of the fluctuating and intermittent surface flows of the Santa Margarita River which recharge it and the military establishments which Public Law 547 seeks to protect could no longer be maintained.

Accordingly, upon the background of the preceding review the United States of America tenders its proposal.

PROPOSAL

Subject to all of the rights of the United States of America alluded to in Public Law 547; [40/] to the requirements that any dam Fallbrook might build or cooperate in building will be operated in a manner which will permit free passage of all of the waters of the Santa Margarita River to which the United States of America is entitled and that any dam which may be constructed "will not be administered or operated in any way which will impair or deplete the quantities of water" to which the United States is entitled, all as provided by Public Law 547; to all riparian rights on the stream and all appropriative and prescriptive or any other rights having priorities ahead of Fallbrook's; to the condition that nothing in this proposal "shall be construed as a grant or a relinquishment by the United States of America of any of its rights to the use of water which it acquired according to the laws of the State of California either as a result of its acquisition of the lands comprising Camp Joseph H. Pendleton and adjoining naval installations, and the rights to the use of water as a part of said acquisition, or through actual use or prescription or both since the date of that acquisition;

IT PROPOSES THAT:

At any time the United States of America is receiving all of the water "to the use of which the United States of America is entitled according to the laws of the State of California either as a result of its acquisition of the lands comprising Camp Joseph H. Pendleton and adjoining naval installations, and the rights to the use of water as a part of said acquisitions, or through actual use or prescription or both since the date of that acquisition", provided no adverse claims are then asserted against the United States of America, the Fallbrook Public Utility District may impound, at the De Luz site on Camp

40/   Exhibit B.

- 23 -                    Proposal

2457

Pendleton, waters momentarily in excess of the needs of the United States of America, subject nevertheless to the provisions of Public Law 547 that the waters thus impounded shall be divided on the basis of sixty percent (60%) of the water impounded by De Luz Dam to be allotted to the United States of America and forty percent (40%) of the water impounded by De Luz Dam to be allotted to the Fallbrook Public Utility District.

Fallbrook will, moreover, enter into the agreements and otherwise conform to the provisions of Public Law 547.

Should Fallbrook seek to construct a dam at the Lippincott site it will agree:

a.  To the apportionment specified in Public Law 547 that the United States of America will participate on the basis of sixty percent (60%) of the impounded water and Fallbrook will participate on the basis of forty percent (40%) of it;

b.  That it will not assert or seek to exercise any rights in the Santa Margarita River adverse to those of the United States of America;

c.  That this proposal or any arrangement effectuating it does not constitute a relinquishment by the United States of America of any of its rights in the Santa Margarita River;

d.  That it will operate any dam on the Santa Margarita River in which it may have an interest in such a manner as to permit free passage to the United States of America of all of the waters which it claims or to which it may be legally entitled, that determination to be made prior to the acceptance of this proposal unless Fallbrook agrees to recognize the claims of the United States of America;

e.  That it will adhere strictly to the provisions respecting the division of the waters impounded pursuant to this proposal.

- 24 -                    Proposal

2458

1    In the event that the dam at the Lippincott site is constructed

2  Congressional approval will be required of the provisions of this proposal

3  set forth in "a" through "e" above.

4    Respecting the construction and operation of any dam within the

5  contemplation of this proposal, the Secretary of the Navy shall be considered

6  to have invested in him the power, authority and responsibility conferred

7  upon him by Congress in Public Law 547.  All determinations made by the

8  Secretary of the Navy in effectuating this proposal, Public Law 547, or any

9  other applicable Act of Congress, shall be considered final.

10    This entire proposal is made subject to, and without prejudice to,

11  the rights of the United States of America and of the Indians and Indian tribes

12  concerned to use the waters of the Santa Margarita River on the Indian Reserva-

13  tions to which those waters are appurtenant.

14                    TO WHOM THIS PROPOSAL SHALL APPLY

15    Due to the present conflict over rights to the use of water in the

16  Santa Margarita River among the Fallbrook Public Utility District, the Santa

17  Margarita Mutual Water Company, the Vail Estate, and numerous small users on

18  the stream, this proposal is directed to the Fallbrook Public Utility District

19  and to any other claimant that the Court before which this cause is pending

20  shall determine may be entitled to the benefits of it.

21                              UNITED STATES OF AMERICA

22

23

24                              J. LEE RANKIN,
25  Dated: October 4, 1957          Solicitor General

26

27

28

29

30

31

32

                    - 25 -                    Proposal

                                              2459

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

FALLBROOK PUBLIC UTILITY
    DISTRICT, et al.,

              Defendants.

NO. 1247-SD-C

NOTICE TO ALL DEFENDANTS
AND COURT ORDER RE PRO-
CEDURE

     You are advised that on April 18, 1957, the court
made its order calling a conference of all attorneys who had
appeared in the matter, for May 6, 1957, at 10:00 A.M. in court-
room No. 2, Federal Building, San Diego, California.  The
purpose of the conference was to generally consider matters which
would lead to pretrial hearings and to work out procedures for
proceeding with the eventual trial of the case.

     On April 18, 1957, the court made an order that the
clerk enter no defaults as to parties defendant until further order
of this court.  In order to protect the rights of small landowners
whose holdings do not justify the employment of counsel to parti-
cipate throughout the entire trial, procedures are being worked
out to provide for methods of trial to accommodate pro per defendants
and for defaults only upon further written notice to defendants who
have been served and have not answered.

     You are further notified that at the conference on
May 6, 1957, the attorneys for the major defendants were present,
and in addition many other attorneys.  There was a full discussion
of issues, problems and procedures.  Following the hearing the
court made further orders as to procedure.

- 1 -

EXHIBIT A

2460

1   No decisions were made on any matter of substance or

2   on any of the contentions of the parties.

3   The above matters having been discussed at the hearing

4   on May 6, 1957, and good cause appearing,

5   IT IS ORDERED:

6   1.  That the plaintiff, the United States of America,

7   mimeograph and mail to all defendants who have appeared by counsel

8   or in pro per a copy of this notice and order;

9   2.  The United States will make available to the landowners

10  or their authorized representatives such of its engineering data

11  and facilities as are available and which relate to defendants'

12  properties.  Those data when available will be at its office in

13  Rainbow, located at the San Diego and Riverside County line adja-

14  cent to the old Highway 395, approximately one city block from the

15  new Highway 395, next to Hampton's Store.  The telephone number is

16  RAndolph 8-1943.  The office hours will be from 12 o'clock noon

17  to 4:00 P.M. Monday through Friday, and special appointments may

18  be made by telephoning the office.  Nothing contained herein shall

19  indicate that the defendants shall accept or be content with the

20  engineering and factual material available at the government office.

21  It is the purpose of this order to advise defendants that the

22  United States has made such an offer of cooperation to the extent

23  that the data are available;

24  3.  That counsel for the government prepare, serve upon

25  all counsel of record, and file with the clerk by May 22, 1957, a

26  chronological list of rulings heretofore made by the trial judges

27  of this case;

28  4.  That counsel for the major parties, the United States

29  of America, Fallbrook Public Utility District, Santa Margarita

30  Mutual Water Company, State of California, the Vail Company, shall serve and

31  file by July 8, 1957, and all other counsel appearing in the case and defend-

32  ants appearing pro per may serve and file by July 8, 1957, a memorandum

7—1404

U. S. GOVERNMENT PRINTING OFFICE

- 2 -                    EXHIBIT A

2461

suggesting methods of trial of this action by areas, classifications,
segments or other methods looking towards an expeditious trial of
the action, and taking into account the problems of the small
landowners resident in different areas involved;

5. That the following procedure shall govern on the service
of memoranda and briefs:

(a) Each issue shall be covered in separate briefs and they
shall be served upon all counsel appearing in the case;

(b) Extra copies in the amount of 25 shall be deposited
with the clerk of the court and may be obtained by the parties to
the cause by applying to the clerk of this court;

(c) The clerk is directed to mimeograph and mail to
all counsel of record a list of all counsel who have appeared in
this case to date. From time to time the clerk shall prepare and
mail to all counsel of record supplemental lists of counsel
appearing.

6. On July 15, 1957, at 10:00 A.M. in the court room
No. 2 Federal Building, 325 West F Street, San Diego, California,
without the presence of the court, a meeting will be held by all
counsel who have appeared in the case, and all other interested
parties defendant who care to appear, to discuss the possibilities
of a physical solution or settlement of the case. Counsel for all
major parties are expected to be present and the court suggests
that counsel for the State of California act as Chairman of the
meeting. Counsel for the State of California is designated for
the reason that the State of California has only minor land inter-
ests consisting of tax deeded land, etc., in the area and is in a
more neutral position than any other counsel in the case. The
meeting shall be continued from day to day or time to time, until
in the opinion of the majority of counsel appearing for the major
defendants of the case, no further progress can be made.

It is suggested that at the conclusion of the first

EXHIBIT A

2462

7—1404

U. S. GOVERNMENT PRINTING OFFICE

1    meeting, it be adjourned by the parties and counsel for further

2    study and consideration of the objects for which it was called,

3    and that a further meeting be held without the presence of the

4    court on the 12th day of August, 1957, in the Grand Jury Room,

5    Federal Building, San Diego, California, for further discussion of

6    the problem.

7        7.  That further pretrial hearing be held in the action

8    on the 4th day of September, 1957, at 10:00 A.M., court room No. 2.

9    Counsel for all major parties are requested to be present, and

10   all other interested parties defendant may appear.

11       8.  That at the further pretrial hearing heretofore set

12   there will be discussed the following issues:

13           (a)  The effect of the Circuit Court decision reported

14   in 235 F.2d 647, and specifically whether or not the various

15   pronouncements of the Circuit or any of them are the law of the

16   case and binding on a subsequent trial, or whether the effect of

17   the Circuit Court decision is to be limited to its holding that

18   there was error in conducting a separate trial and entering a

19   separate judgment involving some and not all of the parties in the

20   action;

21           (b)  The extent of the rights of the United States of

22   America as a riparian owner to use water outside the watershed;

23           (c)  The extent of the rights of the United States as

24   a riparian owner to use water within the watershed;

25           (d)  Whether the use by the United States of water for

26   military purposes is a beneficial use;

27           (e)  Whether the use by the United States of water for

28   military purposes on its riparian land is a proper riparian use;

29           (f)  The right of the United States to temporarily

30   impound, regulate and spread its riparian water for the purpose of

31   irrigating the vegetative cover and enriching the soil of the

32

- 4 -                   EXHIBIT A

7—1404

2463

1   alluvial basin situated within Camp Pendleton and thereby, in

2   the process of irrigating the vegetative cover, recharge the

3   alluvial basin.

4           (g)  The extent of prescriptive rights claimed by the

5   United States:

6                   (1)  As successor to the Rancho Santa Margarita;

7                   (2)  Resulting from its uses after 1942;

8                   (3)  Resulting from a combination of uses by its

9   predecessor before 1942 and the United States thereafter;

10                   (4)  Prescriptive rights claimed by the United

11   States outside of the Santa Margarita River watershed;

12                   (5)  Prescriptive rights to the use of water

13   claimed by the United States in connection with Lake O'Neill.

14           (h)  The extent of the appropriative rights claimed

15   by the United States in connection with Lake O'Neill, Stuart Mesa,

16   South Coast Mesa, and all other uses for which appropriative

17   claims are asserted by it; must the United States comply with

18   State procedures for the acquisition of appropriative rights?

19                   (i)  The law of percolating waters, that is waters

20   which are not part of the Santa Margarita River or its tributaries

21   or underground basins which are a part of said stream.

22       9.  Counsel for all major defendants shall file and serve

23   memoranda on the above issues by August 15, 1957, and counsel for

24   all other defendants and defendants appearing pro per may serve and file

25   memoranda by such date.

26       10.  Local Rule No. 9 does not have application to the

27   pretrial conferences in this case insofar as this order is con-

28   cerned.

29

30   May 8, 1957

                                       JAMES M. CARTER
                            United States District Judge

31

32                                      - 5 -                    EXHIBIT A

7—3404

U. S. GOVERNMENT PRINTING OFFICE

2464

Introduced by Congressman James B. Utt, San Diego County, California

1                         AN ACT

2          To authorize the Secretary of the Interior to construct
3             facilities to provide water for irrigation, municipal,
            domestic, military, and other uses from the Santa
4             Margarita River, California, and for other purposes.

5       Be it enacted by the Senate and House of Representatives of

6 the United States of America in Congress assembled,  That the Secretary

7 of the Interior, acting pursuant to the Federal reclamation laws (Act of

8 June 17, 1902, 32 Stat. 388), and Acts amendatory thereof or supplementary

9 thereto, as far as those laws are not inconsistent with the provisions of

10 this Act, is authorized to construct, operate, and maintain such dam and

11 other facilities as may be required to make available for irrigation,

12 municipal, domestic, military, and other uses the yield of the reservoir

13 created by De Luz Dam to be located immediately below the confluence of

14 De Luz Creek with Santa Margarita River on Camp Joseph H. Pendleton,

15 San Diego County, California, for the Fallbrook Public Utility District

16 and such other users as herein provided.  The authority of the Secretary

17 to construct said facilities is contingent upon a determination by him

18 that --

19            (a)  the Fallbrook Public Utility District shall have

20            entered into a contract under subsection (d), section 9, of

21            the Reclamation Project Act of 1939 undertaking to repay to the

22            United States of America appropriate portions, as determined

23            by the Secretary, of the actual costs of constructing,

24            operating, and maintaining such dam and other facilities,

25            together with interest as hereinafter provided; and under

26            no circumstances shall the Department of the Navy be

27            subject to any charges or costs except on the basis of

28            its proportional use, if any, of such dam and other

29            facilities, as determined pursuant to section 2 (b) of

30            this Act;

31            (b)  the officer or agency of the State of California

32                               - 1 -               EXHIBIT B

GPO 16—30006-1

2465

authorized by law to grant permits for the appropriation

of water shall have granted such permits to the United

States of America and shall have granted permits to the

Fallbrook Public Utility District for rights to the use

of water for storage and diversion as provided in this Act;

including, as to the Fallbrook Public Utility District,

approval of all requisite changes in points of diversion

and storage, and purposes and places of use;

(c)  the Fallbrook Public Utility District shall have

agreed that it will not assert against the United States

of America any prior appropriative right it may have to

water in excess of that quantity deliverable to it under

the provisions of this Act, and will share in the use of

the waters impounded by the De Luz Dam on the basis of

equal priority and in accordance with the ratio prescribed

in section 3 (a) of this Act; this agreement and waiver

and the changes in points of diversion and storage,

required by the preceding paragraph, shall become

effective and binding only when the dam and other

facilities herein provided for shall have been completed

and put into operation: Provided, however, That the enact-

ment of this legislation does not constitute a recognition

of, or an admission that, the Fallbrook Public Utility

District has any rights to the use of water in the

Santa Margarita River, which rights, if any, exist only

by virtue of the laws of the State of California; and

(d)  the De Luz Dam and other facilities herein

authorized have economic and engineering feasibility.

Sec. 2.  (a)  In the interest of comity between the United

States of America and the State of California and consistent with the

historic policy of the United States of America of Federal noninterference

- 2 -

EXHIBIT B

2466

GPO 16-22906-1

1   with State water law, the Secretary of the Navy shall promptly comply

2   with the procedures for the acquisition of appropriative water rights

3   required under the laws of the State of California as soon as he is

4   satisfied, with the advice of the Attorney General of the United States,

5   that such action will not adversely affect the rights of the United

6   States of America under the laws of the State of California.

7   (b)  The Department of the Navy will not be subject to any

8   charges or costs in connection with the De Luz Dam or its facilities,

9   except upon completion and then shall be charged in reasonable

10  proportion to its use of the facilities under regulations agreed upon

11  by the Secretary of the Navy and Secretary of the Interior.

12  Sec. 3.  (a)  The operation of the dam and other facilities

13  herein provided shall be by the Secretary of the Interior, under regula-

14  tions satisfactory to the Secretary of the Navy with respect to the

15  Navy's share of the impounded water and national security.  In that

16  operation, 60 per centum of the water impounded by De Luz Dam is hereby

17  allotted to the Secretary of the Navy; 40 per centum of the water

18  impounded by De Luz Dam is hereby allotted to the Fallbrook Public

19  Utility District.  The Department of the Navy and the Fallbrook Public

20  Utility District will participate in the water impounded by De Luz Dam

21  on the basis of equal priority and in accordance with the ratio prescribed

22  in the preceding sentence: Provided, however, That at any time the

23  Secretary of the Navy certifies that he does not have immediate need for

24  any portion of the aforesaid 60  per centum of the water, the official

25  agreed upon to administer the dam and facilities is empowered to enter

26  into temporary contracts for the delivery of water subject, however,

27  to the first right of the Secretary of the Navy to demand that water

28  without charge and without obligation on the part of the United States

29  upon thirty days' notice as set forth in any such contract with the

30  approval of the Secretary of the Navy; Provided, further, That all

31  moneys paid in to the United States of America under any such contract

32

- 3 -                         EXHIBIT B

2467

1  shall be covered into the general fund of the Treasury, and shall not be

2  applied against the indebtedness of the Fallbrook Public Utility

3  District to the United States of America.  In making any such temporary

4  contracts for water not immediately needed by the Navy, the first right

5  thereto, if otherwise consistent with the laws of the State of California,

6  shall be given the Fallbrook Public Utility District.

7  (b)  The general repayment obligation of the Fallbrook Public

8  Utility District (which shall include interest on the unamortized balance

9  of construction costs of the project allocated to municipal and domestic

10  waters at a rate equal to the average rate, which rate shall be certified

11  by the Secretary of the Treasury, on the long-term loans of the United

12  States outstanding on the date of this Act) to be undertaken pursuant

13  to section 1 of this Act shall be spread in annual installments, which

14  need not be equal, over a period of not more than fifty-six years,

15  exclusive of a development period, or as near thereto as is consistent

16  with the operation of a formula, mutually agreeable to the parties,

17  under which the payments are varied in the light of factors pertinent

18  to the irrigators' ability to pay.  The development period shall begin

19  in the year in which water for use by the district is first available,

20  as announced by the Secretary, and shall end in the year in which the

21  conservation storage space in De Luz Reservoir first fills but shall,

22  in no event, exceed seventeen years.  During the development period water

23  shall be delivered to the district under annual water rental notices

24  at rates fixed by the Secretary and payable in advance, and any moneys

25  collected in excess of operation and maintenance costs shall be credited

26  to repayment of the capital costs chargeable to the district and the

27  repayment period fixed herein shall be reduced proportionately.  The

28  Secretary may transfer to the district the care, operation, and

29  maintenance of the facilities constructed by him under conditions

30  satisfactory to him and to the district and, with respect to such of

31  the facilities as are located within the boundaries of Camp Pendleton,

32  - 4 -                    EXHIBIT B

2468

GPO 16—29995-1

1    satisfactory also to the Secretary of the Navy.

2         (c) For the purposes of this Act the basis, measure, and limit of

3    all rights of the United States of America pertaining to the use of water

4    shall be the laws of the State of California: Provided, That nothing in

5    this Act shall be construed as a grant or a relinquishment by the United

6    States of America of any of its rights to the use of water which it

7    acquired according to the laws of the State of California either as a

8    result of its acquisition of the lands comprising Camp Joseph H. Pendleton

9    and adjoining naval installations, and the rights to the use of water as

10   a part of said acquisition, or through actual use or prescription or both

11   since the date of that acquisition, if any, or to create any legal

12   obligation to store any water in De Luz Reservoir, to the use of which it

13   has such rights, or to require the division under this Act of water to

14   which it has such rights.

15        (d) Unless otherwise agreed by the Secretary of the Navy, De

16   Luz Dam as herein provided shall at all times be operated in a manner which

17   will permit the free passage of all of the water to the use of which the

18   United States of America is entitled according to the laws of the State

19   of California either as a result of its acquisition of the lands

20   comprising Camp Joseph H. Pendleton and adjoining naval installations,

21   and the rights to the use of water as a part of said acquisitions, or

22   through actual use or prescription or both since the date of that

23   acquisition, if any, and will not be administered or operated in any

24   way which will impair or deplete the quantities of water to the use

25   of which the United States of America would be entitled under the

26   laws of the State of California had that structure not been built.

27        Sec. 4.  After the construction of the De Luz Dam, the

28   official operating the reservoir shall deliver water to the Fallbrook

29   Public Utility District, pursuant to regulations issued by the Secretary

30   of the Interior, as follows:

31        (1)  One thousand eight hundred acre-feet in any year until

32

                          - 5 -                    EXHIBIT B

                                                        2469

the reservoir attains an active content of sixty-three thousand acre-feet;

(2)  Not in excess of four thousand eight hundred acre-feet in any year after the reservoir attains an active content of sixty-three thousand acre-feet and until said reservoir attains an active content of ninety-eight thousand acre-feet; and

(3)  Not in excess of eight thousand acre-feet in any year after the reservoir attains an active content of ninety-eight thousand acre-feet and until the conservation storage space of the reservoir has been filled.

Sec. 5.  The Secretary of the Army through the Chief of Engineers, acting in accordance with section 7 of the Flood Control Act of 1944 (58 Stat. 887) is authorized to utilize for purposes of flood control such portion of the capacity of De Luz Reservoir as may be available therefor.

Sec. 6.  There are hereby authorized to be appropriated, out of any money in the Treasury of the United States not otherwise appropriated, $22,636,000, the current estimated construction cost of the Santa Margarita River project, plus or minus such amounts as may be indicated by the engineering cost indices for this type of construction, and, in addition thereto, such sums as may be required to operate and maintain the said project.

Sec. 7.  From time to time the Attorney General, the Secretary of the Interior, and the Secretary of the Navy shall report to the Congress concerning the conditions specified in section 1 of this Act, and the first report thereon shall be submitted to the Congress no later than one year from the date of enactment of this Act.

Approved July 28, 1954.

(68 Stat. 575, Public Law, 547, Chapter 593, July 28, 1954)

- 6 -                    EXHIBIT B

2470

### REVOCABLE LICENSE AND PERMIT TO USE WATER
### FROM THE SANTA MARGARITA RIVER

THIS AGREEMENT made and entered into this 20th day of July, 1932,
by and between RANCHO SANTA MARGARITA, a corporation, First Party, and
FALLBROOK PUBLIC UTILITY DISTRICT, a municipal corporation, Second Party:

WITNESSETH:

WHEREAS, Rancho Santa Margarita is a corporation organized and
existing under the laws of the State of California, and is the owner of that
certain tract of land commonly known as the Santa Margarita Ranch, situated
in the County of San Diego, State of California; and

WHEREAS, the lands comprising the said Santa Margarita Ranch are
riparian to that certain stream of water in said county known as the Santa
Margarita River, and said Rancho Santa Margarita is the owner of and exer-
cising riparian rights in and to the waters of said River; and

WHEREAS, Fallbrook Public Utility District is a municipal
corporation organized under the laws of the State of California embracing
territory located within the County of San Diego, all as shown on that
certain map attached hereto, marked Exhibit A; and

WHEREAS, said public utility district has been organized and is
functioning for the purpose of supplying the inhabitants of said district
with public utility service including the furnishing and supplying of its
inhabitants with water for domestic purposes; and

WHEREAS, said district is in need of an additional supply of
water for the purpose of furnishing water for domestic purposes to the
inhabitants of said district, and is desirous of securing said additional
supply of water from said Santa Margarita River;

NOW, THEREFORE, in consideration of the mutual covenants and
agreements of the parties hereto as hereinafter expressed, and the
fulfillment of said obligations by said respective parties,

IT IS HEREBY COVENANTED AND AGREED as follows:

- 1 -                         EXHIBIT C

2471

1. Rancho Santa Margarita grants to Fallbrook Public Utility District a revocable license or permit to divert and take from the Santa Margarita River ten miner's inches of water continuous flow for the sole and exclusive purpose of supplying the inhabitants of said Fallbrook Public Utility District with water for domestic uses.

Such revocable license or permit is granted upon the following express terms and conditions:

(a)  This revocable license or permit shall continue in effect until expressly revoked in writing by Rancho Santa Margarita, its successors or assigns.  In the event of revocation of this license or permit, a notice of revocation in writing shall be served on said district by delivering to the President or Secretary of said Fallbrook Public Utility District at the office of said district a copy of said written notice or by mailing a copy thereof, postage prepaid, to said President or Secretary and addressed to said President or Secretary, General Delivery, Fallbrook, California, at least sixty (60) days before the date expressed in said notice when said revocation shall become legally effective.

(b)  Water taken and used under this revocable license or permit shall be diverted from Section (7), in Township Nine (9) South Range Three (3) West, S.B.M., or at such other point on said river as may be selected and agreed upon by the parties hereto.

(c)  If at any time said Rancho Santa Margarita shall construct a dam and reservoir at any point on said river and, by reason thereof, flood or otherwise require or use those portions of the watershed of said river in Section Seven (7), Township Nine (9) Range Three (3) West, S.B.M., or any part thereof, which may be occupied or used or owned or controlled by said Fallbrook Public Utility District, then and in that event, said District hereby and herein expressly undertakes and agrees to permit the said Rancho Santa Margarita to flood or other wise use or occupy the said lands, or any part thereof, in said Section Seven (7), Township Nine (9) South, Range Three (3) West, S.B.M., notwithstanding the fact that said

- 2 -            EXHIBIT C

2472

1   district may be using and occupying or intending to use and occupy said

2   lands for diversion and pumping purposes, Provided However, that in event

3   said Rancho Santa Margarita shall flood or otherwise occupy said lands

4   of the Fallbrook Public Utility District, then said District, under this

5   revocable license and permit, shall have the right thereafter to take

6   and divert said ten (10) miner's inches of water from said river by

7   pumping said water from the reservoir, and the waters impounded therein,

8   so constructed and maintained by said Rancho Santa Margarita or its

9   successors in interest.

10          (d)  As a condition precedent to the effectiveness of the

11   revocable license and permit herein provided for, the approval of the

12   same by the Vail Company, an association of persons transacting business

13   under that common name, Margaret R. Vail, N. R. Vail, Mary Vail

14   Wilkinson, Mahlon Vail and Wm. Banning Vail, as Trustees of said Vail

15   Company, Margaret R. Vail, N. R. Vail, Mary Vail Wilkinson, Mahlon Vail,

16   Wm. Banning Vail, Edward N. Vail, Margaret Russell Vail and Samuel

17   Stiles shall be obtained upon the form attached hereto, entitled

18   "Revocable Consent by Vail Company", the same being made a part hereof

19   as though in this paragraph fully set forth.

20          IN WITNESS WHEREOF, the parties hereto have caused this

21   agreement to be duly executed by their respective officers thereunto

22   dual authorized on the day and year hereinabove first written.

23                              RANCHO SANTA MARGARITA

24                              By Farrel W. McCuerney, Vice-President

25                              By Darrel W. Daly, Secretary

26                                  First Party

27                              FALLBROOK PUBLIC UTILITY DISTRICT

28                              By C. E. Lamb, President
                                By M. D. Einsel
29                              By Gilbert F. Maze
                                Members of the Board of Directors
30   ATTEST:
        John H. Chase                     Second Party
31          Clerk and Secretary
     (SEAL)
32                              - 3 -                      EXHIBIT O

2473

GPO 16—22925-q

### REVOCABLE CONSENT BY VAIL COMPANY

WHEREAS, Rancho Santa Margarita, a corporation, referred to in the foregoing agreement, and the undersigned, are now and heretofore have been litigating their respective rights as riparian owners to the waters of said Santa Margarita River; and

WHEREAS, Rancho Santa Margarita, a corporation, and the undersigned are willing to consent to the diversion of water from the Santa Margarita River by said Fallbrook Public Utility District for the purposes and under the terms and conditions set forth in the foregoing revocable license and permit, and in this revocable consent;

NOW, THEREFORE, the undersigned hereby consent to the granting of said revocable license and permit, but subject to and upon the following reservations and conditions, to-wit:

(1) The undersigned, and each of them, specifically reserve the right to revoke this consent at any time.

(2) The undersigned, and each of them, specifically reserve all their rights in and to the waters of the Santa Margarita River, including the Temecula River and all tributaries to and branches of said Santa Margarita River and said Temecula River.

(3) It is specifically agreed that the diversion of waters by said Fallbrook Public Utility District, pursuant to the terms of the foregoing revocable license and permit and this consent thereto, shall not be considered either by said Rancho Santa Margarita or by the undersigned as any modification or limitation of the rights of said Rancho Santa Margarita or the undersigned as against one another in and to the waters, and the use of the waters, of said Santa Margarita River but, on the contrary, in any judicial proceeding involving the rights of the undersigned and said Rancho Santa Margarita to the waters of said river and the use thereof, any diversions made by said Fallbrook Utility District under the terms of the foregoing revocable license and permit and this consent thereto shall be treated, and shall have the same legal force and effect, as

- 4 -                    EXHIBIT C

2474

1   between said parties and their successors in interest, as though made

2   by said Rancho Santa Margarita and by it used upon its lands riparian to

3   said stream.

4       (4)  It is expressly understood and agreed between the parties

5   hereto now owning and exercising riparian rights in and to said river

6   that all abstractions of water from said river by Fallbrook Public Utility

7   District under said revocable license shall be from the share of water

8   of the lower riparian owner or owners and in no case shall ever come from

9   or be taken from the share of the undersigned.

10      (5)  Water shall never be diverted under said revocable license

11  from said rivers, or any of them or any of their tributaries, at any

12  point upon the lands of the undersigned, or any of them, or at any point

13  above or upstream from the lands of the undersigned, or any of them.

14      The approval and consent herein expressed shall continue in

15  effect until expressly revoked in writing by Vail Company, its successors

16  or assigns.  This consent and approval may be revoked by serving a written

17  notice of revocation on said Fallbrook Public Utility District.  Such

18  notice may be served by delivering a copy thereof to the president or

19  secretary of said district at the district office, or by mailing a copy

20  thereof, postage prepaid, to said president or secretary and addressed

21  to said president or Secretary, General Delivery, Fallbrook, California,

22  at least sixty (60) days before the date expressed in said notice when

23  said revocation shall become effective.

24                      VAIL COMPANY

25                      By N. R. Vail, Managing Trustee

26                          N. R. Vail
27                          Margaret R. Vail
                            Margaret Vail Wilkinson
28                          W. B. Vail
                            Mahlon Vail
29                              Trustees of Vail Company

30

31

32                  - 5 -                    EXHIBIT C

                                                    2475

Exhibit D

## DELUZ DAM AUTHORIZED BY P.L. 547 (188,000 A.F. Cons. Cap.)

### All Values in A.F.

| Water Year Ending 30 Sep | Measured runoff of gaging station near Fallbrook (Publ. by U.S.G.S.) | Runoff of Fallbrook adjusted to 1953 conditions (Table 1-2, Bull. 57) | Reduction in Vail Spill under future development[1] | Reduction in Murrieta Creek under future development (From State) | Runoff at Fallbrook gage adjusted for future development | Runoff from De Luz Creek Area (Table 1-2, Bull. 57)[1,2] | Inflow to DeLuz Reservoir under future development | Net evaporation loss | U.S. Navy requirements | Water in storage of year end | Waste |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1925 | | | | | | | | | | 120,000[b] | 0 |
| 1926 | 12,500 | 11,500 | | 2000 | 9500 | 5800 | 15,300 | 5300 | 23,000 | 107,000 | 0 |
| 1927 | 85,100 | 71,500 | 16,800 | 9000 | 45,700 | 23,300 | 69,000 | 4700 | 23,000 | 148,300 | 0 |
| 1928 | 5480 | 5500 | | 2400 | 3100 | 1500 | 4600 | 6000 | 23,000 | 123,900 | 0 |
| 1929 | 4830 | 4800 | | 1400 | 3400 | 500 | 3900 | 5400 | 23,000 | 99,400 | 0 |
| 1930 | 8680 | 7900 | | 1600 | 6300 | 2600 | 8900 | 4500 | 23,000 | 80,800 | 0 |
| 1931 | 4920 | 4700 | | 570 | 4100 | 1600 | 5700 | 3900 | 23,000 | 59,600 | 0 |
| 1932 | 36,900 | 27,600 | | 5300 | 22,500 | 12,100 | 34,600 | 3100 | 23,000 | 68,100 | 0 |
| 1933 | 6940 | 6600 | | 600 | 6000 | 1900 | 7900 | 3400 | 23,000 | 49,600 | 0 |
| 1934 | 4870 | 4900 | | 80 | 4800 | 2200 | 7000 | 2800 | 23,000 | 30,800 | 0 |
| 1935 | 7780 | 7600 | | 1600 | 6000 | 5700 | 11,700 | 2200 | 23,000 | 17,300 | 0 |
| 1936 | 7070 | 6600 | | 1400 | 5200 | 4200 | 9400 | 1500 | 23,000 | 2200 | 0 |
| 1937 | 78,310 | 50,200 | | 10,000 | 40,200 | 37,400 | 77,600 | 300 | 23,000 | 56,500 | 0 |
| 1938 | 91,090 | 84,800 | 14,900 | 6900 | 63,000 | 32,900 | 95,900 | 3000 | 23,000 | 126,400 | 0 |
| 1939 | 18,850 | 16,300 | 700 | 3600 | 12,000 | 8000 | 20,000 | 5400 | 23,000 | 118,000 | 0 |
| 1940 | 16,720 | 15,700 | | 3000 | 12,700 | 8200 | 20,900 | 5100 | 23,000 | 110,800 | 0 |
| 1941 | 83,100 | 73,300 | 6500 | 15,600 | 51,200 | 36,200 | 87,400 | 4800 | 23,000 | 170,400 | 0 |
| 1942 | 15,760 | 15,300 | 3700 | 500 | 11,100 | 5100 | 16,200 | 6600 | 23,000 | 157,000 | 0 |
| 1943 | 57,890 | 53,200 | 3800 | 9600 | 39,800 | 18,100 | 57,900 | 6400 | 23,000 | 185,500 | 0 |
| 1944 | 21,850 | 18,100 | | 4500 | 13,600 | 9300 | 22,900 | 6800 | 23,000 | 178,600 | 0 |
| 1945 | 15,560 | 14,000 | | 3200 | 10,800 | 7600 | 18,400 | 6600 | 23,000 | 167,400 | 0 |
| 1946 | 11,150 | 9700 | | 1800 | 7900 | 3600 | 11,500 | 6400 | 23,000 | 149,500 | 0 |
| 1947 | 8700 | 8300 | | 480 | 7800 | 2600 | 10,400 | 6000 | 23,000 | 130,900 | 0 |
| 1948 | 6640 | 6600 | | 100 | 6500 | 1800 | 8300 | 5500 | 23,000 | 110,700 | 0 |
| 1949 | 5880 | 6000 | | 40 | 6000 | 1600 | 7600 | 4800 | 23,000 | 90,500 | 0 |
| 1950 | 3910 | 4300 | | 0 | 4300 | 800 | 5100 | 4400 | 23,000 | 68,200 | 0 |
| 1951 | 2750 | 3300 | | 0 | 3300 | 300 | 3600 | 3400 | 23,000 | 45,400 | 0 |
| 1952 | 47,010 | 48,200 | | 7500 | 40,700 | 14,600 | 55,300 | 2800 | 23,000 | 74,900 | 0 |
| 1953 | 3970 | 5200 | | 560 | 4600 | 1800 | 6400 | 3700 | 23,000 | 54,600 | 0 |
| 1954 | 7540 | 8600[a] | | 2400[a] | 6200 | 5900[a] | 12,100 | 3000 | 23,000 | 40,700 | 0 |
| 1955 | 3420 | 4300[a] | | 500[a] | 3800 | 200[a] | 4000 | 2600 | 23,000 | 19,100 | 0 |
| 1956 | 1750 | 3600[a] | | 50[a] | 3600 | 1400[a] | 5000 | 1600 | 23,000 | Dry | 0 |

[1] Based on State's estimate of spill under 1953 conditions; reduced by State's estimate of future upstream development as it affects average annual spill.
[1] Includes all drainage area between Fallbrook gage and DeLuz Damsite.
[2] Future development studies of DeLuz Creek Area and other areas of inflow below Fallbrook gage have not been completed. These figures would accordingly reduce.
[a] Extension of State's tabulation.
[b] From long term reservoir studies by U.S. Corps of Engineers and U.S. Bureau of Reclamation.

2476

EXPLANATION OF COLUMN HEADINGS IN EXHIBIT D

Column

1   Water year is accepted in essentially all hydrologic studies.

2   Gaged runoff; Also contained in Table I-2 (page I-8) of State
    Bulletin 57 extended from water year 1953 through water year 1956.

3   Gaged runoff (Column 2) less depleted flow due to upstream conditions
    of development in 1953, including Vail dam operation, plus
    diversions by Fallbrook Public Utility District and others.

4   State's estimate of spill under 1953 conditions was obtained from
    Max Bookman and does not appear in their report (Bulletin 57).
    State's estimate of depleted flow due to future upstream
    development above Vail averages 2,000 acre-feet per year.  Average
    annual spill from Vail dam, based on State's figures, is 3,100
    acre-feet per year.  Therefore, spill was reduced by ratio of
    20 to 31, which are the figures shown in this column.

5   Reduction in Murrieta Creek runoff under future development considers
    the depletion in runoff due to fully developed ground-water
    supply.  Yearly figures obtained from State but do not appear in
    Bulletin 57.  Bulletin 57 states that average annual reduction
    in stream flow would be 3,600 acre-feet.

6   Adjusted runoff at Fallbrook is obtained by subtracting the sum
    of columns 4 and 5 from column 3.

7   De Luz Creek area runoff as estimated by State.  Includes 60 square
    mile area of watershed downstream from Fallbrook gage draining
    to the De Luz site.  No estimate of stream depletion due to
    development in the De Luz Creek area has been made.  Any
    consequential depletion would be the result of operation of
    surface structures.

8   Inflow to De Luz reservoir, sum of columns 6 and 7.  Doesn't
    consider development on stream system below Temecula gage.

9   Net evaporation loss based on average area in acres of water
    in storage during each year times 3 feet.

10  United States Navy requirement is 23,000 acre-feet per year;
    requirement is computed on official personnel forecasts
    of Headquarters, United States Marine Corps.

11  Water remaining in storage at year's end obtained by adding
    amount in storage in previous year to the inflow (column 8)
    minus the sum of columns 9 and 10.  Started with 120,000
    acre-feet in storage in 1925 based on long-term reservoir
    studies, extending back to 1888, by United States Corps of
    Engineers and United States Bureau of Reclamation.

12  Waste:  This amount would flow over spillway and would be
    available for a 60-40 split in accordance with Public Law 547

- 2 -                              EXHIBIT  D