

# FILED

NOV 12 1957

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _William M. Lusk_
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | NO. 1247-SD-C |
| v. | ) | |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) | MEMORANDUM |
| Defendants. | ) | OF POINTS AND AUTHORITIES SUBMITTED BY THE UNITED STATES OF AMERICA PURSUANT TO THIS COURT'S DIRECTION OF OCTOBER 21, 1957 |

26113

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | NO. 1247-SD-C |
| | ) | |
| v. | ) | |
| | ) | |
| FALLBROOK PUBLIC UTILITY | ) | |
| DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Comes now the United States of America and submits the Memorandum of Points and Authorities as directed by this Honorable Court on October 21, 1957.

UNITED STATES OF AMERICA

_____
J. LEE RANKIN
Solicitor General

_William H. Veeder_
WILLIAM H. VEEDER, Attorney,
Department of Justice

_____
WILLIAM B. BURBY, Attorney
Department of Justice

2614

# SUBJECT INDEX

|  | Page |
|---|---|
| MEMORANDUM OF POINTS AND AUTHORITIES SUBMITTED BY THE UNITED STATES OF AMERICA PURSUANT TO THIS COURT'S DIRECTION OF OCTOBER 21, 1957 | 1 |
| AN ANALYSIS | 2 |
|    Resume of Facts | 2 |
|    Question Presented | 5 |
| ARGUMENT | 5 |
|   A.  Having Acquired the Rancho Santa Margarita and Appurtenant Rights to the Use of Water, those Rights are Free from Interference by the State of California or Anyone Claiming It. | 8 |
|   B.  The State of California May not Interfere with the Power of the United States to Acquire Rights to the Use of Water through Eminent Domain as was accomplished in this Court. | 8 |
|   C.  To the Extent Rights have been Exercised by the United States of America in the Santa Margarita River in Excess of those Condemned by It in this Court, It has likewise Acquired those Rights through Its Powers of Eminent Domain, Congress having Authorized the Construction of Camp Pendleton and the Diversion of Water to Serve that Part of the Camp located outside of the Watershed and Has Ratified all Acts in Connection with those Diversions. | 11 |
| POLICE REGULATIONS OF THE STATE OF CALIFORNIA GOVERN THE ACQUISITION AND USE OF RIGHTS TO THE USE OF WATER AMONG WATER USERS UNDER STATE JURISDICTION -- THOSE POLICE REGULATIONS HAVE NO APPLICATION TO THE UNITED STATES OF AMERICA. | 13 |
|    California's Claim to Unappropriated Waters is Made not in a Proprietary Sense of the Term; Rather it is for Purposes of Regulation. | 13 |
|    Genesis of Title to Rights to the Use of Water in the State of California has been and is now the Diversion and Application of Water to a Beneficial Use coupled with the Intention to Appropriate Rights and not Compliance with State Statutory Procedure. | 19 |
|    If the State of California is the Owner as a Proprietor of the Waters within the State, which is denied, the United States of America nevertheless Acquired Title to those Waters through Eminent Domain. | 24 |
|    When, as here, the United States of America Diverts Unappropriated Water for its own Use, it is Exercising a Usufructuary Right presently Residing in it; Vested Rights of Others May Not, however, Be Invaded. | 26 |
| RIGHTS OF A MUNICIPALITY TO EXERCISE RIGHTS TO THE USE OF WATER. | 30 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

2615

14—29905-1                      GPO O - 819013

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )          NO. 1247-SD-C
                                    )
         v.                         )
                                    )
FALLBROOK PUBLIC UTILITY            )
    DISTRICT, et al.,               )
                                    )
                    Defendants.     )

MEMORANDUM

OF POINTS AND AUTHORITIES SUBMITTED
BY THE UNITED STATES OF AMERICA PURSUANT
TO THIS COURT'S DIRECTION OF OCTOBER 21, 1957

This Honorable Court, on October 21, 1957, propounded several
propositions of law ordering the presentation of authorities relative to
those subjects.  In conformity with that direction the United States of
America respectfully submits its conclusions regarding them and the tenets
of the law supporting those conclusions.

The first of the propositions to be considered is whether the United
States of America has acquired through the exercise of its power of eminent
domain all of the rights to the use of water which it now claims.  Response
to that inquiry is in the affirmative.  Throughout, the United States of
America has claimed "only such rights to the use of water as it required when
it (a) purchased the Rancho Santa Margarita, together with any rights to the
use of the water which it may have gained; (b) by prescription; or (c) use,
or both, since its acquisition of the Rancho Santa Margarita."  As the
authorities reviewed in this Memorandum reveal, the United States of America

2616

1   has by (a) direct condemnation and (b) by inverse condemnation through "use"

2   acquired all of the rights which it claims in this proceeding.  Those rights

3   may not be invaded as the authorities disclose by the State of California or

4   anyone claiming under it.  In making this assertion the United States of

5   America does not in any way abandon its claim that its rights may likewise

6   be predicated upon the principles pursuant to which prescriptive and appropri-

7   ative rights may be acquired.

8                               AN ANALYSIS

9           Essential to any response to the question presented for consider-

10  ation is an analysis of the basic facts and the underlying principles of law

11  which are involved.

12                            Resume of Facts

13  The United States of America:

14          (i)  In the years 1942-43, acquired approximately 135,000 acres of

15              land as a part of its program for national defense and constructed

16              on those lands, Camp Pendleton and a Naval Hospital near Oceanside,

17              California.  It likewise constructed on those lands a Naval

18              Ammunition Depot near Fallbrook, California, spending millions

19              of dollars in connection with those establishments; the last

20              twenty-one (21) miles of the Santa Margarita River traverse those

21              lands;

22          (ii)  Built a large proportion of Camp Pendleton outside of the

23              watershed of the Santa Margarita River;

24
25          (iii) Diverted for a period of fifteen (15) years, and now diverts

26              from the Santa Margarita River large quantities of water required

27              by Marines occupying barracks situated outside of the watershed

28              of that stream, and for other military purposes;

29          (iv)  Has not made filings with the State of California for the pur-

30              pose of appropriating rights to the use of water for the military

31              purposes in question;

32          (v)  Exercise of all of the claimed rights in the Santa Margarita

                                        -2-                        2617

both within and outside the watershed of that stream has been
authorized by Congress.

The Fallbrook Public Utility District:

(i) Made no claim to rights to the use of water from the Santa
Margarita River in 1942-1943, at the time the United States of
America commenced to divert and use the waters of the Santa
Margarita River in the manner described above;

(ii) Rather, Fallbrook diverted a very small quantity of water from
the source mentioned, pursuant to a gratuitous and revocable
license from the United States of America;

(iii) Violated that gratuitous and revocable license by asserting an
adverse claim to the rights of the United States of America
resulting in the termination of the gratuitous license in July
of 1948;

(iv) Though fully cognizant of the vast expenditures made by the
United States of America to construct Camp Pendleton, undertook
to make claims against and encroach upon the rights of the United
States of America;

(v) Aware that for years the United States of America and its
predecessor in interest had diverted and was continuing to
divert large quantities of water from the watershed of the Santa
Margarita River, sought to challenge those rights by initiating
rights through filings with the State of California;

(vi) Made no claim whatever from the Santa Margarita River until
October 1946, approximately four (4) years subsequent to the
time the United States of America had expended huge sums of
money in constructing Camp Pendleton and the Naval Ammunition
Depot, all as described above;

(vii) Filed with California in October 1946 and in the year 1947
claims from the Santa Margarita River totaling 30,000 acre-feet
of water, a quantity which far exceeds the entire flow of the
stream;

-3-

2618

(viii)  Constructed a pumping unit immediately above Camp Pendleton and diverts from the Santa Margarita River at that point quantities of water alleged to total 1,800 acre-feet;

(ix)  Irreparably damages the United States of America by the diversion of water as described, and claims its title to the invaluable and indispensable rights claimed by the United States of America to divert water for use both within and outside the watershed as it has during the last fifteen (15) years.

The Santa Margarita Mutual Water Company:

(i)  Like Fallbrook, claimed no rights in the Santa Margarita River until years after the United States of America and its predecessor in interest commenced diverting and using water from the Santa Margarita River both within and outside the watershed of that stream;

(ii)  Is a paper corporation asserting rights which ante-date the paper claims of Fallbrook;

(iii)  Clouds the title of the rights to the use of water of the United States of America in the Santa Margarita River.

The State of California:

(a)  Having ceded exclusive jurisdiction over Camp Pendleton and the Naval Ammunition Depot to the United States of America;

(b)  Aware that the United States of America has constructed at great costs those military establishments;

(c)  Fully cognizant that the United States of America is using and has been using the waters of the Santa Margarita River for approximately fifteen (15) years for military purposes;

(d)  Apprised that neither the Mutual Water Company nor the Utility District claimed any rights in the Santa Margarita River until October 1946, years after the United States of America and its predecessor in interest commenced diverting and utilizing water both within and outside of the watershed from that source,

-4-

2619

nevertheless joins with the Santa Margarita Mutual Water Company and the
Fallbrook Public Utility District in asserting that:

    (a) The United States of America may not divert and use water out-
        side of the watershed without first having permission from the
        State of California;

    (b) The United States of America may be limited in its riparian use
        of water within the watershed.

### Question Presented

Whether the United States of America:

    (a) Exercising its constitutional power to wage war and to maintain
        its armed forces;

    (b) Congress having authorized the acquisition of land and rights
        to the use of water for the construction, operation and maintenance
        of Camp Pendleton, the Naval Hospital, and the Naval Ammunition
        Depot;

    (c) Having diverted and applied and now diverts and applies water
        from the Santa Margarita River for military purposes for a period
        of fifteen (15) years,

may be deprived of those rights to the use of water or any part of them by
(a) the Santa Margarita Mutual Water Company, (b) the Fallbrook Public Utility
District, and (c) the State of California.

### ARGUMENT

CONSTITUTIONAL POWERS EXERCISED BY THE UNITED STATES OF AMERICA
THROUGH CONGRESSIONAL AUTHORIZATION, COUPLED WITH EXECUTIVE
ACTION, RIGHTS TO THE USE OF WATER IN THE SANTA MARGARITA RIVER
HAVE BEEN ACQUIRED BY IT THROUGH DIRECT CONDEMNATION IN THIS
COURT AND THROUGH INVERSE CONDEMNATION FOR USE BOTH (a) WITHIN
AND (b) OUTSIDE THE WATERSHED OF THE SANTA MARGARITA RIVER.

Our National Government has invested in it the power:

2620

GPO 16—80008-4

(a)  "To declare war ***** " 1 /

(b)  "To raise and support armies ***** "

(c)  "To provide and maintain a navy ***** "

Similarly, Congress has the power:

> "To make all laws which shall be necessary and proper for carrying
> into execution the foregoing power, and all other powers vested
> by this Constitution in the government of the United States, or
> in any department or officer thereof."

Congress has this further investiture of constitutional power:

> "To dispose of and make all needful rules and regulations respect-
> ing the territory or the property belonging to the United
> States ***** " 2 /

Relating to those powers, so essential to national survival, the founders of
this country added the following clause:

> "This Constitution, and the laws of the United States which shall
> be made in pursuance thereof; ***** shall be the supreme law of
> the land; ***** " 3 /

Chief Justice Marshall, on the background of those fundamental provisions of
our Constitution, declared:

> "No trace is to be found in the Constitution, or an intention to
> create a dependence of the Government of the Union on those of
> the States, for the execution of the great powers assigned to
> it." 4 /

Accordingly, it is free from doubt in the light of the provisions of the
Constitution that have been quoted, that our National Government is fully
empowered to (a) acquire the lands constituting the site of Camp Pendleton,
the Naval Ammunition Depot, and the Naval Hospital, (b) to construct those
military establishments, (c) to operate and maintain them, and (d) to provide
for them a full and firm supply of water.

---

1 / Constitution of the United States of America, Art. I, Sec. 8.
2 / Constitution of the United States of America, Art. IV, Sec. 3, Cl. 2.
3 / Constitution of the United States of America, Art. VI, Cl. 2.
4 / McCulloch v. Maryland, 17 U.S. 315, 429 (1819).

2621

Equally free from doubt are these indisputable facts:  5 /

(a)  Congress authorized the acquisition, which was accomplished in the year 1942-1943, of the Rancho Santa Margarita, totaling approximately 135,000 acres of land;

(b)  Congress authorized the construction on those approximately 135,000 acres of land, Camp Pendleton, the Marine Corps Base, the Naval Ammunition Depot, and a Naval Hospital at a cost exceeding $100,000,000;

(c)  Congress has authorized the operation and maintenance of those three great military establishments;

(d)  Congress has authorized the expenditure of large sums of money for the construction of a system for diverting and using the waters of the Santa Margarita River to supply the thousands of Marines who are stationed at Camp Pendleton, for the Naval Ammunition Depot, and the Naval Hospital, and to supply other military purposes;

(e)  Congress has authorized and ratified the use of the waters of the Santa Margarita River by the Marine Corps both within the watershed of that stream and outside of it.

As a consequence, it may be stated that:

Every act, every diversion of water, every building which has been constructed, every use made of water within the watershed and outside of the watershed of the Santa Margarita River have been accomplished with the full authorization, knowledge and intention of Congress. The history of the "Utt Act", and the Act itself, reveals that Congress has a full and precise knowledge of the uses which have been and are now being made of the waters which are now diverted and utilized at the great military establishments here under consideration.

---

5 / Please refer to: Pre-trial Order United States of America v. Fallbrook Public Utility District, 109 F. Supp. 28, 48-49 (U.S.D.C, S.D. Cal. 1952) - where parties agree respecting the acquisition of the properties here involved.

2622

A. **Having Acquired the Rancho Santa Margarita and Appurtenant Rights to the Use of Water, those Rights are free from Interference by the State of California or Anyone Claiming it.**

By express stipulation:

(a) The State of California, (b) the Fallbrook Public Utility District, and (c) the Santa Margarita Mutual Water Company have agreed that the United States of America acquired by condemnation in this Honorable Court, the lands comprising Camp Pendleton, the Naval Ammunition and the Naval Hospital. **6 /**

Similarly, the State of California, the Fallbrook Public Utility District, and the Santa Margarita Mutual Water Company agree that the Santa Margarita River "flows in a generally southwesterly direction through Camp Pendleton -- Naval Ammunition Depot -- United States Hospital lands for a distance of abouve twenty-one (21) miles to the Pacific Ocean. For the full twenty-one (21) miles the course of the river lies entirely within the property of the United States of America. **7 /**

Unchallenged is the fact that at the time the United States of America acquired the Rancho Santa Margarita the Rancho was diverting water outside the watershed of the Santa Margarita River and applying it to lands in areas known as Stewart Mesa and South Mesa.

Evidence will, of course, be required to prove the extent of those rights thus acquired by condemnation in this Court by the United States of America. It seeks in this Court to have quieted those rights to the use of water against adverse claimants.

B. **The State of California May Not Interfere with the Power of the United States to Acquire Rights to the Use of Water through Eminent Domain as Was Accomplished in this Court.**

There are numerous instances where states have undertaken to legislate regarding the titles of the United States of America to its property. This rule, it appears, has been invariably applied:

"State laws cannot affect titles in the United States." **8 /**

---

**6 /** 109 F. Supp. 28, 48-49
**7 /** 109 F. Supp. 28, 46
**8 /** United States v. Utah, 283 U.S. 64, 75 (1930).

-8-

2623

Again the Supreme Court citing Article IV, Section 3, Clause 2 of the Constitution, states "The power over the public lands thus entrusted to Congress is without limitation." 9 /

Here it is desirable to refer to the nature and characteristics of the rights to the use of water which the United States of America claims in this proceeding. Reference in that regard is made to the fact that few tenets of Western water law are more firmly established than that which recognizes a right to the use of water as an interest in real property. "This usufructuary right, or 'water-right,' *** is real property. It is as fundamental under the law of riparian rights as under the law of appropriation." 10 /   The right to the flow and use of water, being a right in a natural resource, is real estate. **** The right to have water flow from a river into a ditch is real property. A wrongful diversion of water is an injury to real property. The right to take water from a river and conduct it to a tract of land is realty. *** An action to quiet title as for real property is proper. And an action to settle rights is one to quiet title to realty." Moreover, a right to the use of water has "all the dignity of and is an estate of fee simple, or a free-hold." 11 /   "As has been held in numerous cases, a water right is real property." 12 /

Thus it is respectfully emphasized that:

The United States of America acquired a usufructuary right in the Santa Margarita River to the extent of its claims when it (a) condemned in this Court the Rancho Santa Margarita and the rights appurtenant to it; (b) diverted and used water, if any, in excess of the waters diverted by the Rancho;

Likewise emphasized is this fact:

All of the rights asserted by the United States of America against the Fallbrook Public Utility District and the Santa Margarita Mutual Water Company were exercised and waters diverted to the maximum

---

9 / United States v. San Francisco, 310 U.S. 16, 29 (1939)
10 / Wiel, Water Rights in the Western States, 3d ed., vol. 1, sec. 18, pp. 20, 21.
11 / Wiel, Sec. 283, pp. 298-300; Sec. 285, p. 301.
12 / 19 Rocky Mountain Law Review, 63

2624

extent of its claim outside of the watershed prior to the time
either made any claims in the Santa Margarita River.

Here the United States of America seeks to protect its usufructuary
rights in the Santa Margarita River which are interests in real property.
Those usufructuary rights entitle it to have flow to it all of the waters it
claims for use both within and outside the watershed of the Santa Margarita
River.

It is, of course, a well established principle that properly authorized
federal agencies may use and regulate the lands of the United States as well
as its water and resources without regard to state regulatory laws.  13 /
For indeed, if that were not the rule, the properties of the United States,
particularly in the semi-arid West, would be "completely at the mercies of
state legislation."  14 /

As a consequence, when the United States of America condemned the land
and the rights to the use of water of the Rancho, it acquired all of the
rights of its predecessor to divert and use water from the Santa Margarita
River.  Those rights thus acquired are the primary rights the title to which
the United States of America seeks in this proceeding to quiet.  It is not even
doubtful that the United States of America has the power thus to condemn lands
and rights to the use of water.  On the subject this statement by our Highest
Court has been made:

"The right of the United States to exercise the power of eminent
domain is 'complete in itself', and can neither be enlarged nor
diminished by a state.'"  15 /

In a case very much in point respecting federal and state relationship
in regard to a development as clearly within the sphere of authority of the

13 / See in particular Federal Power Commission v. Oregon, 349 U.S. 435;  also
     Camfield v. United States, 167 U.S. 518, 526; Light v. United States, 220
     U.S. 523; Utah Power & Light Co. v. United States, 243 U.S. 389; Hunt v.
     United States, 278 U.S. 96, 100;  Arizona v. California, 283 U.S.423,
     451-2; United States v. Rio Grande Irrigation Co., 174 U.S. 690, 703;
     Gibson v. Chouteau, 13 Wall. 92; United States v. Oregon, 295 U.S.1, 27-29.
14 / Camfield v. United States, Supra
15 / United States v. Powelson, 319 U.S. 266,279 (1942)

-10-

2625

National Government as that pursuant to which it undertook the establishment
of Camp Pendleton and the other military establishments, the Supreme Court
declared:

>  "Since the construction of this dam and reservoir is a valid
>  exercise by Congress of its commerce power, there is no inter-
>  ference with the sovereignty of the state ****.
>  **** The fact that land is owned by a state is no barrier to its
>  condemnation by the United States. ****
>  'Whenever the constitutional powers of the Federal Government
>  and those of the state come into conflict the latter must
>  yield. ****' "   16 /

This general statement, predicated upon numerous authorities, sets forth
it is respectfully submitted, the rule which governs here:

>  "The power of eminent domain in the Federal Government extends to
>  all territory within the limits of the United States, ***.   It
>  extends to lands within the states and is in no wise dependent
>  on state authority.  The state cannot condition its exercise in
>  any degree."   17 /

To be observed is the fact that a leading case respecting the acquisition
of rights to the use of water by our National Government through the exercise
of eminent domain arose in the State of California.   18 /

It is thus respectfully submitted that the rights to the use of water
acquired by the United States through condemnation are not subject to the
control of California or anyone claiming under it.

C.   To the Extent Rights have been Exercised by the United States of
America in the Santa Margarita River in Excess of those Condemned
by It in this Court It has likewise Acquired those Rights through
Its Powers of Eminent Domain, Congress having Authorized the
Construction of Camp Pendleton and the Diversion of Water to serve
that part of the Camp located outside of the Watershed and has
Ratified all Acts in connection with those Diversions.

Congress fifteen (15) years ago authorized the construction of Camp

---

16 /   Oklahoma v. Atkinson, 313 U.S. 508, 534 (1940)
17 /   18 Am. Jur. Eminent Domain, Sec. 18, p. 644.
18 /   United States v. Gerlach Live Stock Company, 339 U.S. 725, 739 (1949)

2626

Pendleton, a large portion of which is located outside of the watershed.
Numerous reports have been made to Congress respecting that development. In
particular, Congress has been apprised of the fact that water was being diverted
and used outside of the watershed. 19 / Moreover, and let this fact be
respectfully emphasized, those diversions were made to the maximum extent,
outside of the watershed, of the claims asserted by the National Government
prior to the time that the Fallbrook Public Utility District or the Santa
Margarita Water Company made any claim for rights in the Santa Margarita River.
In fact, as emphasized above, Fallbrook had disclaimed any rights by joining
in a revokable license to secure a small quantity of water from the source in
question from the predecessor in interest of the United States of America and
later enjoyed that privilege at sufferance by the National Government.

Admittedly the matter is rendered academic by reason of the fact that
the claimants in question had no rights when the United States of America com-
menced using the waters of the Santa Margarita River both within and outside
of the watershed. Had they rights -- which is denied -- the rights exercised
by the United States of America pursuant to Congressional authorization would
have resulted in the "taking" of them through the power of eminent domain.
Based on that taking, the United States of America has asserted under
Congressional authorization usufructuary rights in the Santa Margarita River.
Those usufructuary rights are, as stated above, interests in real property.
Interference with them would be and is an invasion of rights in real property
that the United States of America claims and exercises. If in exercising those
rights it invades the title of another, then there may arise a claim for just
compensation. Surely, however, the United States of America may not be deprived
of those rights, it has so long exercised, by claimants who asserted no claim
in the river when the United States of America began to divert and apply the
waters to beneficial uses.

19/ Note: There have been annual appropriations by Congress for Camp Pendleton
and the other military establishments. Full reports have been made to it
respecting the developments. Further exhaustive hearings have been held
on the precise question of where and how much water is diverted and the
rights claimed in connection with those diversions for Camp Pendleton.
These numerous citations and reports will be supplied if the statements
made are challenged or if this Honorable Court so desires.

2627

As pointed out above, it is, of course, inherent in the sovereign power of the United States of America to acquire by eminent domain whatever property rights are essential to the fulfillment of its responsibilities. 20 / That power may be exercised when the authority for the acquisition of the property has been either expressly or impliedly granted by Congress. 21/ If an officer under the direction of Congress took steps, as in this case, to utilize under a claim of title, properties of the nature here being considered, title to those properties passes to the United States of America through its power of eminent domain. 22 / Acquisition of rights to the use of water through inverse condemnation is, as pointed out above, a procedure fully recognized by our Highest Court. 23 /

POLICE REGULATIONS OF THE STATE OF CALIFORNIA GOVERN THE ACQUISITION AND USE OF RIGHTS TO THE USE OF WATER AMONG WATER USERS UNDER STATE JURISDICTION -- THOSE POLICE REGULATIONS HAVE NO APPLICATION TO THE UNITED STATES OF AMERICA.

California's Claim to Unappropriated Waters is made not in a Proprietary Sense of the Term; Rather it is for purposes of Regulation.

Referring to California's law regulating rights to the use of water, that state's Highest Court declared:

"The main purpose of said Act was to provide an orderly method for the appropriation of the unappropriated waters of the state and, to that end, a State Water Commission was created and vested with certain powers." 24 /

That case last referred to, and another, 25/ have been cited as authority that the California law respecting the appropriation of rights to the use of water being "permissive" in character is not the exclusive means of appropriating rights to the use of water. Thus a right may be acquired in California either by diversion and application of water to a beneficial use or by complying with the state statutory procedure. 26 /

20 / Hanson Lumber Co. v. United States, 261 U.S. 581, 587 (1923)
21 / 18 Am. Jur. Eminent Domain, Sec. 17 et. req.; Mitchell v. United States, 267, U.S. 341 (1925); Hooe v. United States, 218 U.S. 322, 334,335 (1910)
22 / United States v. Lynch, 188 U.S. 445, 465, 467 (1903)
23 / 339 United States 725, 739 (1949)
24 / Bloss v. Rahilly, 16 Cal.(2d) 70, 104 Pac.(2d) 1049, 1051 (1940)
25 / Carlsbad Mutual Water Co. v. San Luis Rey Development Co., 78 Cal. App.(2d) 900, 178 P(2d) 844 (1947)
26 / 93 C.J.S. Waters, Sec. 180.

-13-

2628

On that background, consideration is directed to the assertion that:
All waters flowing in any river, stream, canyon, ravine, or other natural channel, not applied to useful and beneficial purposes upon riparian lands or reasonably needed therefor or otherwise appropriated, are declared to be public waters of the State of California subject to appropriation. 27 /

Implementing that declaration of policy is Section 1225 of the California Water Code referred to by this Honorable Court on October 21, 1957. That section is as follows: "No right to appropriate or use water subject to appropriation shall be initiated or acquired except upon compliance" with the laws of California.

For a searching analysis as to the source of the power exercised by a state reference is made to a decision by the United States Court of Appeals for the Ninth Circuit. 28 /   That decision and the authorities cited remove any doubt but that California and other Western states are merely regulating rights to the use of water among the citizens and those subject to their jurisdiction in enacting laws of the nature now under consideration.

Statutes similar to that quoted above from the State of California have been described by the Supreme Court of the State of Utah as follows:

"The statutory declaration that 'The water of all streams and other sources in this State *** is hereby declared to be the property of the public' does not vest in the state title or ownership of the water as a proprietor. It is a community right available to all upon compliance with the law by which that which was once common to all may be brought within the domain of private right to use, or under certain circumstances private and exclusive possession and ownership."   29/ In the light of that decision, legislation enacted in connection with rights to the use of water in the State of Utah is predicated upon an exercise of what is sometimes referred to as "governmental power" as distinguished from an exercise of proprietary rights.

---

27 /   Please refer to California Water Code, Sec. 102.
28 /   California-Oregon Power Co. v. Beaver-Portland Cement Co. 73F(2d) 555, 562, 567 (CA 9, 1934; affirmed upon other grounds, 295 U.S. 142 (1934)
29 /   Wrathall v. Johnson, 86 Utah 50; 40 p.2d 755, 777 (1935.

-14-

2629

Another analysis on the subject here under consideration was made in a case directly involving the power of the State of Utah to undertake the regulation of rights to the use of water. Challenged there was the authority of the legislature to enact comprehensive legislation governing the adjudication of rights to the use of water. In upholding the constitutionality of the original legislation pursuant to which the State Engineer of Utah acts, the Supreme Court of that state reviewed the status occupied by Utah in fulfilling its responsibility relative to rights to the use of water. Recognized there, as indeed is universally recognized that regulation of rights to the use of water is essential. Yet no reference to proprietary ownership is made. Rather, the Court ruled:

> "The State, therefore, in its <u>governmental capacity</u>, has a right
> to regulate, within reasonable bounds the use of water although
> the right to the use may have been adjudicated. No doubt, in
> administering the law for the protection of all and for the
> public good, some inconvenience will result. Such incon-
> veniences, however, cannot be avoided and must be tolerated
> for the public good." 30/

Continuing, the Court then declared the genesis of the power pursuant to which the state legislature acted in adopting the law in question:

> "Laws similar indeed, laws which in substance and effect are identical
> with the act in question, have been fully considered by the courts
> and held unassailable in the following, among other cases: *** 31/

A review of those cases discloses the full acceptance of the proposition that the claim of ownership by the states is for regulation only.

---

30 / Eden Irr. Co. v. District Court of Weber County, 61 Utah 103, 113, 114; 211 Pac. 957, 961 (1922).
31 / Cases cited in quote: Vineyard L. & S. Co. v. District Court, 42 Nev. 1, 171 Pac. 166; Pacific Livestock Co. v. Lewis (D.C.) 217 Fed. 95; Id. 241 U.S. 440, 36 Sup. Ct. 637, 60 L. Ed. 1084; Farm Inv. Co. v. Carpenter, 9 Wyo. 110, 61 Pac. 258, 50 L.R.A. 747, 87 A. St. Rep. 918; Enterprise Irr. Dist. v. Tri-State Land Co., 92 Neb. 121, 138 N.W. 171; Pitt v. Scrugham 44 Nev. 418, 195 Pac. 1101; In re: Willow Creek, 74 Or. 592, 144 Pac. 507, 146 Pac. 475.

2630

1    The universal acceptance of the basic proposition that the source of

2  legislative authority is the state police power is evidenced by the following

3  references:

4    (1)  The Nevada Supreme Court quoted this excerpt from a decision of the

5  Supreme Court of the United States:

6    " 'To accelerate the development of the state, to promote peace

7    and good order, to minimize the danger of vexatious controversies

8    wherein the shovel was often used as an instrument of warfare,

9    and to provide a convenient way for the adjustment and recording

10   of the rights of the various claimants to the use of water of a

11   stream or other source of supply at a reasonable expense, the

12   state enacted the law of 1909, <u>thereby to a limited extent</u>

13   <u>calling into requisition its police power. *** '"</u>

15  Adding that:

16   "*** we do not concede that, if the proceeding were not a quasi

17   public one, calling into requisition the police power of the

18   state, a statute providing for such a proceeding would be un-

19   constitutional."  <u>33</u> /

21    (2)  The Supreme Court of the United States adopted the conclusion of

22  the Supreme Court of the State of Oregon which declared the comprehensive pro-

23  ceedings for adjudication and administration of rights to the use of water were

24  based upon the police powers of the states.  <u>34</u> /

25    (3)  Frequently cited on the subject is a decision of the Supreme Court

26  of the State of Wyoming.  There the Court stated:

27   "A similar proceeding in Colorado has been held to be based

28   upon, or to grow out of, the police power of the state."  <u>35</u> /

29    (4)  Adhering to the same view, Nebraska's highest Court stated:

30   "On the point that the action of the board in adjudicating

31    priorities does not constitute due process of law for the

<u>33</u> / Vineyard Land & Stock Co. v. District Court Fourth Judicial District of
    Nevada; 42 Nev. 1; 171 Pac. 166, 173, 174 (1918)
<u>34</u> / Pacific Live Stock Company v. Lewis, 241 U.S. 440, 448, 449 (1915)
<u>35</u> / Farm Investment Co. v. Carpenter, 9 Wyo. 110; 61 Pac. 258, 260 (1900)

2631

reason that the statute does not specifically provide for notice

to the parties,

> we are of opinion that, where a statute under
>
> the police power of the state

authorizes a proceeding affecting the property rights of any

person and does not expressly provide for notice to be given,

the right to notice is implied ****." 36 /

(5) Previously mentioned was the statement by Oregon's highest Court,

quoted by the Supreme Court of the United States, that the laws in question

involved a "requisition" of police powers.  The reasoning behind that judicial

declaration was there stated to be:

> "Water rights, like all other rights, are subject to
>
> such reasonable regulations as are essential to the general
>
> welfare, peace, and good order of the citizens of the state ***. " 37 /

(6) Frequently cited on the subject are cases from the State of

Colorado.  A leading Colorado decision concludes:

> "This court has repeatedly held that statutes like the one under
>
> consideration may be enacted in the exercise of the police power
>
> of the state." 38 /

Again the Colorado Court stated:

> "They (the statutes relative to adjudication) are in the
>
> nature of police regulations to secure the orderly distri-
>
> bution of water for irrigation purposes, and to this end they
>
> provide a system of procedure for determining the priority
>
> of rights as between the carriers." 39 /

(7) In a comprehensive review of the law in regard to the utilization

of rights to the use of water, this statement has been made:

> "Like other property, however, riparian rights are subject

---

36 / Enterprise Irr. Dist. v. Tri-State Land Co., 92 Neb. 121; 138 N.W. 171,
    179 (1912).
37 / In re Willow Creek, 74 Ore. 592, 144 Pac. 505, 513, 514 (1914).
38 / Farmers Independent Ditch Co. v. Agricultural Ditch Co., 22 Colo. 513;
    45 Pac. 444, 449 (1896).
39 / Farmers' High Line Canal & Reservoir Co., et al., v. Southworth,
    13 Colo. 111, 134; 21 Pac. 1028, 1031 (1889).

2632

to the police power of the state and within reasonable limits
may be modified by legislation passed in the interest of the
general welfare."

From that same source, this comment was added:

"To argue, as plaintiff does, that riparian rights are real
property rights which attach to the land, does not put such
rights beyond the reach of the police power."  40/

(8)  This authoritative comment is from a leading text:

"The power of a state legislature to enact laws for state
control and for the government of the waters flowing within
its boundaries and the regulation of their use is unquestioned.
This comes strictly within the police power of the state,
which is a most comprehensive branch of sovereignty, extending
as it does to every person, every public and private right ***."

From that same source, this statement is taken:

"*** legislation by a state in relation to the waters flowing
within its boundaries directly affects the public welfare, and
the right to legislate in regard to its use, regulation, and
conservation is referable to the police power of the State."  41/

(9)  Relative to the legislation, it has been stated that:

"Concerning the general effect of this legislation it has been
usually attributed to the police power of the State."  42/

(10)  Adding to the authorities, this comment has been made:

"Subject to constitutional guaranties for the protection of
property rights, the public authority, under the police power,
may enact and enforce reasonable regulations with respect to
the use of water for irrigation."  43 /

---

40 / California-Oregon Power Co. v. Beaver Portland Cement Co., 73 P(2d) 555,
562, 567 (C.A.9, 1934); affirmed U.S. 142 (1934)                    2429.
41 / Kinney on Irrigation and Water Rights, 2d Ed., Vol. 3, Sec. 1341, pp. 2428,
42 / Wiel, Water Rights in the Western States, 3d Ed., Vol. 2, Sec. 1184, p.1097
43 / 30 Am. Jur., Irrigation, Sec. 4, p. 599.  For an almost identical statement,
see 56 Am. Jur., Waters, Sec. 295, p. 745.

-18-

2633

<u>Genesis of Title to Rights to the Use of Water in the State of California has been and is now the Diversion and Application of Water to a Beneficial Use coupled with the Intention to Appropriate Rights and not Compliance with State Statutory Procedure.</u>

Compliance with the statutory procedure for acquiring rights to the use of water is not a condition precedent to the acquisition of rights of that nature in the State of California.  That proposition is proved beyond doubt by the fact that rights may be acquired in California by prescription.  Reference is made in that connection to a very recent case previously alluded to in an earlier brief. <u>44</u> /  There, California's Department of Public Works, Division of Water Resources: "attack the judgment (in the cited case) contending that there is no evidence in this case that defendants complied with the statutory procedures concerning the appropriation of water ***," unsuccessfully asserting that "<u>without such compliance</u> no prescriptive right to the use of water may be acquired in this state."

In summarily dismissing that contention, California's Highest Court declared:

"The judgment quieting title in defendants prejudices no right of the State of California, for neither it nor the Department of Public Works was a party to this action." <u>45</u> /

Two things are abundantly manifest from the last-cited decision:

(1)  Compliance with the police regulation of the State of California for acquisition of rights to the use of water is not a condition precedent to securing a title to rights to the use of water which the Highest Court of California will recognize and protect;

(2)  There is nothing basically or inherently wrong in diverting water without compliance with State law or surely California's Highest Court would not have thrown a mantle of protection about the rights involved in this case.

Here let this fact be respectfully emphasized:

No case has been found, where, as here: (1) a water user having diverted

<u>44</u> / Hudson v. West, Cal. 306 P(2), 807, 810 (1957)
<u>45</u> / 306 P(2), 807, 808.

-19-

2634

and applied water to a beneficial use under a claim of right, as in this case
the United States of America, though having failed to file with the State, (2)
has been deprived of the rights thus claimed, (3) by a claimant who, subsequent
to the time that the water user had diverted and applied the water to a
beneficial use, has made a filing with the State in an effort to comply with
state regulations respecting the appropriation of rights to the use of water.

A case heavily relied upon by defendants 46 / to support their contention
that a present water user may be deprived by one who subsequently files with
the state, when examined, reveals that it is not authority for that proposition.
There the Court declared: "The burden was upon appellant, to establish by suf-
ficient evidence the fact of appropriation by him, and the quantity of water
appropriated and applied by him to beneficial use upon his land.  On this issue
plaintiff's evidence is defective and incomplete."  Simply stated, plaintiff
failed to prove his claim.  All else in the case is obiter dictum.  Even the
obiter, however, does not declare that a filing with the state is mandatory
to securing title to rights to the use of water.

California's Highest Court has consistently declared that its code
respecting the acquisition of rights to the use of water "**** was to provide
an orderly method for the appropriation of the unappropriated waters of the
state ****"; 47 / that "The present law was not enacted to abolish the right
of appropriation (as it existed prior to the Water Commision Act of 1913).
No attributes are added to constitute the right.  The new legislation is
designed "merely to regulate and administer this privilege." 48/

It has been  authoritatively declared that: "to constitute a valid
appropriation of water there must be (1) a bona fide intent to apply it to
some beneficial use, existing at the time or contemplated in the future;
(2) followed by a diversion from the natural channel ****; and (3) also an
active application of the water, within a reasonable time, to a beneficial use."

---

46 /   Crane v. Stevenson, 5 Cal. (2d) 387, 54 Pac. (2d) 1100, 1105 (1936)
47 /   Bloss v. Rahilly, 16 Cal. (2d) 170, 104 P(2d) 1049, 1051 (1940)
48 /   Yuba River Power Co. v. Nevada Irr. Dist., et al., 207 Cal. 521, 279 Pac.
          128, 130 (1929).

2635

GPO 16—60008-4

1  strictly a part of the act of appropriation; the appropriation is

2  completed when the ditch or conduit is constructed and the water is

3  diverted there through and applied to a beneficial use." 53/  In

4  substance those cases recognize the fundamental proposition that the

5  appropriation is accomplished by the diversion of water and its

6  application to beneficial use.  That an appropriation of water may

7  be accomplished by the actual diversion and application to a bene-

8  ficial use without conforming with the statutory procedure has long

9  been recognized by other jurisdictions. 54/  The filing of the map

10  and statement with the state engineer as provided by statute consti-

11  tutes only evidence of intention to appropriate. 55/  Compliance

12  with those requirements as stated above, is neither essential to a

13  valid appropriation nor a condition to the vesting of a right to

14  divert and utilize water. 56/

15  A thorough analysis of the law fails to reveal any basis for

16  concluding that California's asserted claims to the waters of the state

17  are made on a basis other than for the purpose of regulation, identical in

18  every regard with all Western States.  Simply stated, California does not

19  claim ownership in a proprietary sense to the unappropriated waters of the

20  state.

21  Again it is reiterated:  No authority has been found where, among

22  adverse claimants, a present water user was deprived of water presently being

23  used, to his irreparable damage, by a claimant who, with full knowledge made

24  an effort to deprive him of that water by complying with the state law.

25  It is respectfully submitted that the United States of America may

26  not be thus deprived of the waters it is now using by the claims of Fallbrook

27  and the Santa Margarita Water Company filed so many years after the rights of

28  the use by the United States of America were first exercised.

29

30  53 / Archuleta v. Boulder & Weld County Ditch Co., 118 Colo. 89, 192 P.2d 891,
    895, 896 (1948; Schluter, et al. v. Burlington Ditch, Reservoir & Land
    Co., 117 Colo. 384, 188 P.2d 253 (1947); San Luis Roller Mills v. San
31  Luis Power & Water Co., 102 Colo. 119, 77 P.2d 128 (1938).
    54 / Kinney on Irrigation & Water Rights, 2d Ed., vol. 2, sec. 730, pp.1260-1263.
32  55/  Colo. Stat. Ann., 1935, ch. 90, sec. 32.
    56 / DeHaas v. Benesch, 116 Colo. 344, 181 P.2d 453 (1947).

-22-

2637

GPO 16-80006-4

1    A review of the basic tenets of and the historical developments of

2 water law bear out the basic conclusion expressed here that:

3       The diversion and application of water to a beneficial use

4       coupled with an intention to appropriate rights to the use

5       of water will invest a water user with title to those rights

6       which will be protected against a junior appropriator who

7       has complied with state police regulations. 57 /

8       The United States of America is not subject to police regulations

9 of the state respecting the acquisition of title to rights to the use of

10 water.  California's police regulations have no application to the United States

11 of America.  Speaking with reference to the immunity of the National Government

12 to the state police power, the Supreme Court of the United States, in connection

13 with a case much in point on the subject being discussed, said this:

14       "(Arizona's) statutes prohibit the construction of any dam whatso-

15       ever until written approval of plans and specifications shall have

16       been obtained from the state engineer ***.  The United States has

17       not secured such approval; nor has any application been made by

18       Wilbur, who is proceeding to construct said dam in complete

19       disregard of this law of Arizona.

20        "The United States may perform its functions without con-

21       forming to the police regulations of a state.****  Wilbur is

22       under no obligation to submit the plans and specifications to

23       the state engineer for approval." 58 /

24       When deer were killed at the instance of the Secretary of Agriculture

25 in violation of state game laws to prevent over-grazing in a national forest

26 and the forestry official was threatened with arrest, the highest Court stated:

27 "the power of the United States to thus protect its lands and property does not

28 admit of doubt **** the game laws or any other statute of the state to the

29 contrary notwithstanding." 59 /  In denying the right of a state to require

30 _____

57 /  22 Cal. Law, Rev. 333; 10 Cal. Law, Rev. 443.

31   58 /  Arizona v. California, 283 U.S. 423, 451 (1930).

32   59 /  Hunt v. United States, 278 U.S. 96, 100 (1928).

-23-                    2638

oeo 16-82008-6

truck drivers for the Post Office to secure licenses to drive within its juris-
diction the Court observed:  "It seems to us that the immunity of the instruments
of the United States from state control in the performance of their duties
extends to a requirement that they desist from performance until they satisfy
a state officer upon examination that they are competent for a necessary part
of them and pay a fee for permission to go on."  60/

Holding that the admission of a state into the Union did not deprive
the United States of the power adequately to protect its own property, the same
Court concluded:  "A different rule would place the public domain of the United
States completely at the mercy of the state legislature." 61 /

Further comment on the subject would lend nothing to what has already
been said by the Supreme Court.  Obviously neither the United States nor its
rights to the use of water are subject to the police power of the State of
California.  A different conclusion would do violence to the whole concept of
government as recognized in this Nation.

Certainly the State of California may not adopt police regulations
which would deprive the United States of America of the invaluable rights to
the use of water which it claims for the military establishments which are
here involved.

If the State of California is the Owner as a Proprietor of the Waters
within the State, which is denied, the United States of America
nevertheless acquired title to those waters through Eminent Domain.

It matters little who was the owner of the rights to the use of
water when the United States of America commenced, in this Court, the action to
condemn the Rancho Santa Margarita and its appurtenant rights to the use of
water.  When the decree was entered in that proceeding there vested in the
United States of America title to all of the rights which the Rancho held --
riparian, prescriptive, appropriative; the right to use water both within and
outside the watershed.  Moreover, the combined use of that water pursuant to
Congressional authorization constituted the acquisition of what other and

60 / Johnson v. Maryland, 254 U.S. 51, 57 (1920).
61 / Camfield v. United States, 167 U.S. 518, 526 (1896).

-24-

2639

1    additional rights the United States of America required outside of the water-

2    shed.  Reviewed in detail above are the tenets of the law supporting that

3    proposition.

4          A query may be interposed as to whether the power of eminent domain

5    may be exercised against California, assuming it had title to the rights in

6    question -- which is denied.  In that regard it is established beyond doubt

7    that state property, the same as other property, may be taken when needed by

8    the National Government to fulfill its mission -- a mission, let this fact be

9    emphasized, which is to represent all of the people and all of the states when

10   it undertook to construct, operate and maintain the military establishments

11   here being considered.  Authorities on that proposition are unequivocal and

12   free from doubt.  Our Supreme Court has stated:

13         "The fact that land is owned by a state is no barrier to its con-

14   demnation by the United States." 62 /  Similarly, the Court of Appeals for

15   the Eighth Circuit declared:

16         "Neither the fact that the State owns the lands nor the fact that

17   the taking of them will interfere with the State's program for the use and

18   development of the area can prevent the United States of America from acquiring

19   the lands.****  There is no interference with the State's sovereignty by the

20   United States in the taking if the land represents a valid exercise of

21   Congressional power." 63 /

22         Condemnation of state property by the National Government has been

23   recognized by the Court of Appeals for the Ninth Circuit. 64 /  There the

24   United States of America condemned state school lands.  Denying the state's

25   contention to the contrary, the Court of Appeals for the Ninth Circuit held"

26   "State ownership of the lands sought does not prevent condemnation."

27         In general, this statement has been made on the subject:

28         "*** in case of conflict, the Federal powers being supreme, land

29         necessary for the performance of its proper functions can be

30   _____

31   62/   Oklahoma v. Atkinson 313 U.S. 508 (1940).
     63/   State of Minnesota v. United States, 125 Fed.(2) 636, 640 (CA 8, 1942)
32   64/   United States v. State of Montana, 134 F(2) 194, 196, (CA 9, 1943) Cert.
            Denied 319 U.S. 772 (1942).

                                    -25-

                                                    2640

taken by the United States, no matter how it was used by a state." 65/

Thus assuming California owned the rights to the use of water here under con-
sideration, the rights to that extent have been taken.

When as here, the United States of America diverts Unappropriated Water
for its own Use, it is Exercising a Usufructuary Right presently Residing
in it; Vested Rights of Others May Not, however, be Invaded.

Reviewed above are the principles of law declaring that the
usufructuary right to divert water from a stream is an interest in real property;
that it has all of the dignity of a freehold estate. One who has title to an
appropriative right to use water is possessed of an interest which may and
frequently does exist independently of the land. As a consequence, the fact
that unappropriated water flows over privately owned land does not preclude
the acquisition of a right -- a freehold interest -- to divert and use that
unappropriated water. 66 /  Indeed, the whole concept of Western Water Law
is based upon that unassailable propositon of law. For as our Supreme Court
declared: "As the owner of the public domain, the Government possessed the
power to dispose of the land and water thereon together or dispose of them
separately." 67/

Alluding then to the Desert Land Act and related cases, 68/
the Court continued: "The fair construction of the provision now under review
is that Congress intended to establish the rule that for the future the land
should be patented separately; and that all non-navigable waters thereon
should be reserved for the use of the public under the laws of the states and
territories named."

Accordingly, it is not infrequent that rights to the use of un-
appropriated waters are acquired for use on lands far removed from the stream
many years after the property abutting upon the stream have passed into private
ownership. California has, of course, long recognized that principle;  a

---

65/ 18 A. Jur. Eminent Domain, Sec. 18, p. 649
66/ 56 Am. Jur. Waters, Sec. 241, p. 699; Sec. 242, p. 700, and cited cases.
67/ California-Oregon Power Co. v. Beaver-Portland Cement Co. 295 U.S. 142,
       162 (1934)
68/ 43 U.S.C. 321; 43 U.S.C. 661.

-26-

2641

principle given Constitutional approval when, in 1928, California amended its

basic law. 69 /

Before proceeding further, however, let this fact be respectfully
emphasized:

Any vested rights to the use of water must be recognized and

protected.  Thus prior appropriations and rights of

riparians may not be infringed upon through the appropri-

ation of unappropriated rights to the use of water in

any streams.

In the cited case of California Oregon Power Company v. Beaver-
Portland Cement Company, the Supreme Court favorably cites the case of Howell
v. Johnson, 70 / in support of its decision.  That opinion declares: "The
water in an innavigable stream flowing over the public domain is a part thereof,
and the national government can sell or grant the same, or the use thereof,
separate from the rest of the estate, under such conditions as may seem to it
proper. ****  It is urged that in some way the State of Montana has some right
in these waters in Sage creek or some control over the same.  It never purchased
them.  It never owned them."

The Supreme Court of the United States, in reaching its last-cited
decision relies heavily upon a leading case from the State of Oregon. 71/
There, the Oregon Court -- in concluding that the Congress by the Desert Land
Act of 1877, as the owner of the public domain, could sever the land from the
unappropriated rights to the use of water and prescribe the means pursuant to
which title to each could be acquired -- compared that Act with the provisions
respecting the mineral lands of the National Government.  It pointed out that one
who acquires a homestead "takes such land subject to the exception that he does
not acquire title to the minerals ***."  Proceeding with that comparison of the
acts of Congress respecting minerals and rights to the use of water, the court

---

69 / Constitution of California, Art. XIV, Sec. 3
70 / 89 Fed. 556 (C.C.D. Mont.)
71 /Hough v. Porter, 51 Ore. 318, 98 Pac. 1083, 1092 (1909)

-27-

2642

declared:  "It was in the exercise of a similar prerogative on the part of the
government that there was by the Act of 1877 given to the public, or to any
individual thereof, the right to appropriate and apply to a beneficial use the
waters flowing through its public domain. ****  This unquestioned power of the
owner over the public domain was exercised, ****; the import thereof being
that this right incident to the soil was reserved by the government, to be held
in trust for the public, and that he who first applies the water to a beneficial
use shall become the owner of the right thereto ****." (Emphasis added.)  As
did the Court, the Oregon Court relied heavily on the decision of Howell v.
Johnson.

In another frequently cited case, 72 / the Court declared: "****
the government can deal with its lands as other land proprietors can deal with
theirs.  In the Pacific Coast states Congress has recognized the privilege of
private citizens to acquire usufructuary interests in the waters of public
streams, independent of riparian ownership.  This is but one way, however, of
disposing of the public domain."  Continuing, the Court stated:

"It may be predicated of the waters of nonnavigable streams
upon the public domain, that are not appropriated by the
methods cognizant to law, that they are as much the property
of the government as the lands through which they flow. ****
the waters of non-navigable streams are part of such public
domain, and hence the property of the government, which may
lay hold of and use them, without taking any of the steps
made necessary to obtain an usufructuary interest therein
by private individuals.

It is also most significant that the Court of Appeals for the
Ninth Circuit, in its decisions in recent years, has repeatedly supported the
view that the United States has retained title to the unappropriated rights
to the use of water. 73/

72/ Nevada Ditch Co. v. Bennet, 30 Ore. 59, 45 Pac. 472, 485 (1896)
73/ United States v. McIntire, 101 F. 2d 650, 654 (C.A. 9); United States
   v. Walker River Irr. Dist., 104 F. 2d, 334, 336-337 (C.A. 9)

-28-

2643

GPO 16—89006 4

Kinney, based on an impressive body of decisions, 74/ likewise concludes that title to the unappropriated rights to the use of water resides in the United States:

> "The Government is still the owner of the surplus of the waters
> flowing upon the public domain, or rather the owner of all the
> waters flowing thereon remaining after deducting the rights to
> the use of the same which have vested in and accrued in some
> legal way to individuals and companies. **** It therefore
> follows, as the result of the ownership by the United States
> of the waters flowing upon the public domain, that any
> dedication by a State of all the waters flowing within its
> boundaries to the State or to the public amounts to but
> little, in the face of any claim which may be made by the
> Government, at least to all the surplus or unused waters
> within such State." (Emphasis added.)

The conclusions expressed above comport fully with the principle long recognized by the California Courts that the source of title for rights to the use of water is the National Government. 75/ Lux v. Haggin, a leading California decision, makes that declaration without question or equivocation. 76/ As the United States of America has not conveyed away the rights to the unappropriated waters, to the extent that they exist, title to them continues to reside in the Central Government.

Fully supporting this view are the tenets of the law recently enunciated by the Supreme Court in the Pelton Case. 77/ It is again emphasized, however, that when the United States of America commences to exercise previously unexercised, unappropriated rights it must not proceed in a manner which invades prior vested rights. Should that occur, as discussed at length above, it would be required to pay "just compensation" to the users.

---

74/ Kinney on Irrigation and Water Rights, Vol. 1, 2d. ed., sec. 411, pp. 692-3.
75/ 1 Weil, Water Rights in the Western States, 3d. Ed., Sec. 152, p. 174.
76/ 69 Cal. 255, 336, 10 Pac. 674 (1886).
77/ 349 U.S. 435 (1954).

-29-

2644

RIGHTS OF A MUNICIPALITY TO EXERCISE
RIGHTS TO THE USE OF WATER

This Honorable Court requested authorities as to the rights of
a municipality to exercise riparian rights.  Respecting that proposition,
this statement has been made:

> "A municipal corporation under the common law may also be
> a riparian owner upon a stream or other body of water, but
> only as to the lands actually owned by it.  Riparian rights
> are strictly limited to the land or lots which front on
> the water.  If these are owned by the city, the city has
> the riparian rights incident to the lots; **** if a city
> is the owner of riparian rights, it has the right to
> exercise the use of them, having due regard to the cor-
> relative rights of the other riparian owners upon the
> stream." 78/

Like any other user, the last-cited authority emphasizes the
municipal corporation may not claim riparian rights for lands which do not
abut upon the stream or to supply private individuals whose lands are similarly
served.  To the same effect is this statement:

> "**** a municipality, like any other corporation, is invested
> with riparian rights only in respect of such lands as it holds in a proprietary
> capacity, contiguous to a stream, and that the riparian rights of the inhabit-
> ants thereof are likewise limited to such lots or tracts as are actually con-
> tiguous to the stream." 79/

Those authorities and the cited cases bear out the proposition
advanced by the United States of America throughout this case that:

> A riparian right may be exercised for any beneficial use,
> be it military, municipal or agricultural -- limits are:
> the rights must be exercised upon riparian lands; must be
> reasonably exercised in regard to other riparian areas.

---

78/ Kinney on Irrigation and Water Rights, 2d Ed., Sec. 482, pp. 816-817.
79/ 56 Am. Jur., Waters, Sec. 283, p. 736.

2645

1          In the brief filed August 12, 1957, there was reviewed at length
2   the character of the riparian right pointing out that, assuming the use is
3   beneficial, the limiting aspect is reasonableness, based upon fact.  Observed
4   in passing: In the light of the authorities cited above, assuming a military
5   use is a municipal use, as defendants so stoutly urge, it must necessarily
6   follow that the United States of America could use the waters of the Santa
7   Margarita River for military, i.e., municipal purposes -- throughout all of
8   the vast riparian area which it presently owns.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

2646