# FILED

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-1131

NOV 2 7 1957

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
Deputy Clerk

SACHSE & PRICE
Attorneys at Law
Fallbrook,California
Attorneys for Drfendant FALLBROOK PUBLIC UTILITY DISTRICT

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) NO. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) |
| Defendants. | ) |

REPLY BRIEF

OF FALLBROOK PUBLIC UTILITY DISTRICT
TO PLAINTIFF'S MEMORANDUM OF POINTS
AND AUTHORITIES ACCORDING TO ORDER OF
COURT OCTOBER 21, 1957.

I.

ANALYSIS OF MR. VEEDER'S CLAIM THAT THERE IS VESTED IN
THE UNITED STATES THE RIGHT TO USE ALL THE WATERS OF
SANTA MARGARITA RIVER WHICH ITS MILITARY ESTABLISHMENTS
ON CAMP PENDLETON NEED BOTH INSIDE AND OUTSIDE THE WATER-
SHED BY VIRTUE OF THE EXERCISE OF ITS POWERS OF EMINENT
DOMAIN "BY (a) DIRECT CONDEMNATION AND (b) BY INVERSE CON-
demnation through use". (Pages 1 and 2).

(a) As to direct condemnation, there are only three cases
of record where the United States has "directly" or actually
exercised its power of eminent domain on behalf of Camp Pendleton.

2674

In all three of those cases its complaint was to condemn and take land and therefor condemned and took only the water rights of the Defendants named in those three actions which water rights were appurtenant to or part and parcel of the lands so condemned and taken.

(b)  As to inverse condemnation, Mr. Veeder asserts that if the actions of the United States taken by it in the courts did not entitle it to all the water it claimed, then, the actions which it took in the field at Camp Pendleton did.  He claims that by the act of Marine Corps taking physical possession of the waters of the Santa Margarita River on Camp Pendleton and applying same to meet all their military needs and requirements inside and outside the watershed, the United States acquired thereby, the right to continue to do so, and the lawful owners of the right to use these waters upstream, be they riparian or appropriators, were now remanded to an action for damages for their lost water rights under the doctrine of inverse condemnation.

(c)  But, says Mr. Veeder, if neither proposition (a) nor proposition (b) are found to have any justifiable basis in law or fact, the United States must not be penalized for his having advanced them on behalf of the government since he "does not in any way abandon its claim" that the United States' right to use Santa Margarita River water out of the watershed is "predicated upon the principles" of "prescriptive and appropriative rights".

Our reaction to the foregoing is that Mr. Veeder is either uncertain as to what the applicable law is, or he is uncertain as to what the Government's position is in the case, or he desires to claim on behalf of his client all possible positions in the hope that some one of them may be found valid.

However, let us now analyze his proposals:

-2-

2675

A.   REPLY TO THE FIRST PROPOSITION:   "THE UNITED
STATES OF AMERICA HAS ACQUIRED THROUGH DIRECT
CONDEMNATION AND THE EXERCISE OF ITS POWER OF
EMINENT DOMAIN ALL OF THE RIGHTS TO THE USE
OF WATER WHICH IT NOW CLAIMS."

Conceding, what everyone knows, that the Federal Govern-
ment does have the power of eminent domain to acquire all the
water rights its military establishments on Camp Pendleton may
need, we emphatically deny that the United States at any time has
initiated any action by which it "has acquired through the exer-
cise of its power of eminent domain all the rights to the use of
waters which it now claims".

Since this Court, from the beginning, has had jurisdiction
over the land and water which, necessarily would have been in-
volved, its own Clerk's office would hold the record of any proceed-
ings initiated by the United States for that purpose.  We have
searched the records of that office.  The only actions in eminent
domain ever brought by the United States of America, so far as
acquiring Rancho Santa Margarita is concerned, are: Civil No. 139
S.D. for 9,147.55 acres of land for the Naval Ammunition Depot;
Civil No. 197 S.D. for 122,202.72 acres of land for Camp Pendleton
and Civil No. 321 S.D. for 1,675.58 acres of land for the Artil-
lery Firing Range.

In none of the complaints filed by Plaintiff in said
actions could we find any reference to or allegation that the
United States was condemning or taking any water rights.  They do
allege: "That the estate or interest in said lands hereinbefore
described which plaintiff, by this action, intends to take, acquire,
condemn, hold and own is the fee simple title thereto".  That, of
course, was sufficient to give the United States, by the judgment
entered therein, whatever water rights were then appurtenant to or
part and parcel of the lands so condemned and taken.  A condemnor,

-3-

2676

1  however, cannot acquire by his action more or greater rights
2  than the allegations of his complaint warrant or what defendants
3  or condemnees themselves possessed.

4      If Mr. Veeder is here claiming <u>additional rights</u> in and to
5  the waters of the Santa Margarita River over and above those ac-
6  quired by it from the defendants and condemnees in the above three
7  actions, he leaves us entirely in the dark as to precisely whose
8  water and water rights he claims the government has taken. In
9  eminent domain proceedings the plaintiff does not condemn his own
10 property rights. He already has them. The purpose of his action
11 would be to condemn and take rights of others. The asserted claim
12 that the government has acquired <u>by eminent domain</u> all the water
13 and water rights which it now needs is an assertion of a right in
14 rem and against the world and, if valid, takes water and water
15 rights from all up-stream owners, riparians, as well as appropria-
16 tors. When, where and how did this condemnation take place? Can
17 a person's rights be invaded and his property taken or damaged
18 without his having any notice or knowledge of it? American judi-
19 cial procedure neither contemplates nor sanctions any such process
20 for the administration of justice.

21     Mr. Veeder, himself, places so little confidence in his
22 proposition that the United States has by the exercise of its
23 powers of eminent domain acquired title to all the water it needs
24 that he closes this part of his argument with this striking reser-
25 vation:

26     "In making this assertion /that the United States of
27     America has acquired the right to the use of the water
28     which it now claims by eminent domain 7 <u>the United States</u>
29     <u>of America does not in any way abandon its claim that its</u>
30     <u>rights may likewise be predicated upon the principles</u>
31     <u>pursuant to which prescriptive and appropriative rights</u>
32     <u>may be acquired.</u>" (Emphasis added.)

2677

1    The two propositions are contradictory.  One says that
2  the United States already had prescriptive and appropriative
3  rights to all the water it is now using.  If that is true, then
4  an action in eminent domain to condemn and take the water it
5  now needs would be impossible.  The United States cannot condemn
6  rights which it already had acquired.  The other proposition
7  admits the United States did not have prescriptive or appropriative
8  rights for use of water outside the watershed and had to acquire
9  that right by an action in eminent domain.  We ask Mr. Veeder to
10  stop straddling the fence and to tell us and the Court what the
11  position of the government actually is in this matter.

12

13    B. REPLY TO THE SECOND PROPOSITION: "BY INVERSE CON-
14         DEMNATION THE UNITED STATES ACQUIRED THROUGH USE,
15         ALL OF THE RIGHTS TO THE WATER WHICH IT NOW CLAIMS."
16    At page 13 of his Brief, lines 6-10, Mr. Veeder explains
17  his theory of how the United States acquired its claimed rights by
18  inverse condemnation through use, as follows: "If an officer under
19  the direction of Congress took steps, as in this case, to utilize
20  under a claim of title, properties of the nature here being con-
21  sidered, title to those properties passes to the United States of
22  America through its power of eminent domain".  He says on page 12,
23  lines 16-18, "---the rights exercised by the United States of
24  America pursuant to Congressional authorization would have resulted
25  in the 'taking' of them through the power of eminent domain".
26  Then, in lines 23-25 of the same page, he makes this under-state-
27  ment:  "If, in exercising these rights it /The United States7
28  invades the title of another, then there may arise a claim for
29  just compensation".  We note that Mr. Veeder's explanation of his
30  theory is rightly prefaced with an "IF".  No where can there be
31  found any authorization by Congress for the use of the waters of
32  the Santa Margarita River outside its watershed and Mr. Veeder's

-5-

2678

statement to that effect in sub-paragraph (e) page 7 is simply not true. It is preposterous to say that Congress authorized the Marine Corps or its officers to "invade" the rights or titles to water belonging to American citizens on the Santa Margarita River. And without an invasion of their rights there could not possibly exist any legal basis for Mr. Veeder invoking the doctrine of inverse condemnation.

The fact that Congress authorized the acquisition of the Rancho Santa Margarita lands and appropriated money for the construction and maintenance of the military establishments thereon does not mean that Congress authorized the Marine Corps to "take" other people's water as we will show later. And contrary to Mr. Veeder's assertion in subparagraph (e) of page 7, Congress strongly and repeatedly expressed its disapproval of that kind of action by the Department of Justice and the Navy Department.

As a matter of fact, there was no actual invasion of the upstream users' rights by the Marine Corp diverting out of the watershed Santa Margarita River water <u>after it physically arrived within their enclave.</u> There was just the irritating, exasperating threat resulting from the filing of Plaintiff's Complaint herein against some 3,600 defendants charging them with <u>invading the Government water rights</u> and "taking" water which the complaint alleged belonged to Camp Pendleton. This newest change of position by the Government's attorneys makes startling news because as has been said: "When a dog bites a man, that is not news: but if a man bites a dog, that is news."

We repeat: There has been no invasion by the Government of the rights of the upstream users for this simple reason--- by the time the water has reached the lands of the United States it has already passed beyond the lands of all possible upstream users and as to them it is waste water which being physically on the enclave, the United States could do with it as it pleased. (Calif. vs. U.S.A. 235 Fed(2) 647, 661).

-6-

2679

1  Mr. Veeder concedes the fact, of which this court takes judicial

2  knowledge, that Camp Pendleton is located at the mouth of the

3  Santa Margarita River and is the last possible user of its waters

4  before the river discharges into the Pacific Ocean (page 2 lines

5  20-22).

6               II.

7         REPLYING TO THAT PORTION OF GOVERNMENT'S

8         ARGUMENT THAT PLAINTIFF'S RIGHTS TO THE USE OF

9         WATER FROM THE SANTA MARGARITA RIVER BOTH WITHIN

10        AND WITHOUT THE WATERSHED WAS ACQUIRED "THROUGH

11        CONGRESSIONAL AUTHORIZATION"

12

13        Skipping, for the moment, the recital of assumed facts

14  set out in Government's Brief at pages 2 to 5, to which we have

15  several sharp and pointed objections, we will here analyze the

16  thesis engrafted into its principal heading on page 5 and its sub-

17  heading "C" on page 11 that Congress authorized Plaintiff to ex-

18  ceed its riparian rights and use water outside the watershed.  The

19  Government's proposition is clearly set out in sub-paragraphs (a)

20  to (e) inclusive, on page 7 of its Brief, Paragraph (e) being as

21  follows:

22      "(e)  Congress has authorized and ratified the use of the

23          waters of the Santa Margarita River by the Marine

24          Corps both within the watershed of that stream and outside

25          of it."

26        At the bottom of page 12 of its Brief is set forth a

27  footnote as follows:

28      "19/ Note:  There have been annual appropriations by Congress

29         for Camp Pendleton and the other military establishments.

30         Full reports have been made to it respecting the develop-

31         ments. Further exhaustive hearings have been held on the

32         precise question of where and how much water is diverted

and the rights claimed in connection with those diver-
sions for Camp Pendleton.  Those numerous citations and
reports will be supplied if the statements made are
challenged or if this Honorable Court so desires."

It is true that Congress knew what was going on at Camp
Pendleton, but it is not true that Congress ratified it, or that
the taking of water for military purposes outside the watershed
or the claiming of rights in excess of those acquired from its
predecessor, when the United States purchased Rancho Santa Mar-
garita, was the "intention of Congress".  It is true, as said in
Footnote 19, page 12, that "hearings have been held on the precise
question of where and how much water is diverted and the rights
claimed in connection with those diversions for Camp Pendleton."
(Emphasis added).  The result was that Congress repeatedly ex-
pressed its disapproval of "the rights claimed in connection with
those diversions for Camp Pendleton".

On July 10, 1952, the Department of Justice Appropriation
Act for 1953 was approved, Section 208 (d) of which Act prohibited
the use of the appropriated funds in the preparation or the prose-
cution of the pending action, "UNITED STATES OF AMERICA vs. FALL-
BROOK PUBLIC UTILITY DISTRICT, ET AL."  Section 208 (d) was as
follows:

"None of the funds appropriated by this title may be
used in the preparation or prosecution of the suit in the
United States District Court for the Southern District of
California, Southern Division, by the United States of
America against Fallbrook Public Utility District, a
public service corporation of the State of California,
and others."

The Department of Justice however, circumvented the
Congressional prohibition by appointing an attorney in the Navy
Department, without pay, Special Deputy Attorney General to go

-8-

2681

1   ahead with the lawsuit.  The next year, however, Congress expressed
2   its disapproval of that procedure by putting the same restrictive
3   rider, not only in the Department of Justice Appropriation Act
4   for 1954, but also in the Department of Defense Appropriation
5   Act as well.
6        Hearings were held in the year 1954 on the Appropriation
7   Bills for the year 1955.  Renewed efforts were made by the De-
8   partment of Justice and the Navy to prevent the reenactment of
9   the prohibition against the prosecution of this lawsuit against
10  the landowners in the area of Fallbrook.  Talk of compromise was
11  in the air represented by the Bill H.R. 5731 introduced by Mr.
12  Utt in the House which was different from that subsequently
13  passed by the Senate.  The result was that the prohibition was
14  reenacted by Congress, but to be effective only until H.R. 5731
15  was enacted into law.  The prohibition is found in Section 734 of
16  the Department of Defense Appropriation Bill for 1955 and is as
17  follows:
18       "   Sec. 734. None of the funds appropriated by this Act
19       may be used in the preparation or prosecution of the
20       pending suit in the United States District Court for
21       the Southern District of California, Southern Division,
22       by the United States of America against Fallbrook Public
23       Utility District, a public service corporation of the
24       State of California, and others: Provided, That this
25       section shall have no force or effect after the effec-
26       tive date of H.R. 5731, Eighty-third Congress, as finally
27       enacted into law."
28       If the foregoing unprecedented action by Congress con-
29  stitutes ratification and approval of the actions and claims of
30  the Plaintiff in this case, as claimed, then Mr. Veeder is in-
31  capable of recognizing the difference between approval and dis-
32  approval.

-9-

Nor can Mr. Veeder find in the Utt Bill (Public Law 547, 83d Congress Chapter 593 2nd Session) support for what he is claiming, to wit: the "Exercise of all the claimed rights in the Santa Margarita River both within and outside the watershed of that stream has been authorized by Congress" (page 2 Subsection(v).

Section 2(a) of that Act States:

"    SEC.2.(a)  In the interest of comity between the United States of America and the State of California and consistent with the historic policy of the United States of America of Federal noninterference with State water law, the Secretary of the Navy shall promptly comply with the procedures for the acquisition of appropriative water rights required under the laws of the State of California as soon as he is satisfied, with the advice of the Attorney General of the United States, that such action will not adversely affect the rights of the United States of America under the laws of the State of California." (Emphasis added)

Section 3(c) of the Act further declares:

"    SEC. 3.(c)  For the purposes of this Act the basis, measure,and limit of all rights of the United States of America pertaining to the use of water shall be the laws of the State of California: Provided, That nothing in this Act shall be construed as a grant or a relinquishment by the United States of America of any of its rights to the use of water which it acquired according to the laws of the State of California either as a result of its acquisition of the lands comprising Camp Joseph H. Pendleton and adjoining naval installations, and the rights to the use of water as a part of said acquisition, or through actual use or prescription or both since the date of that acquisition, if any, or to

-10-

create any legal obligation to store any water in
De Luz Reservoir, to the use of which it has such
rights, or to require the division under this Act of
water to which it has such rights." (Emphasis added)

The language quoted from the above two sections of the
Utt Bill cannot possibly be construed to vest the United States
at Camp Pendleton with the extraordinary rights and powers claimed
for it by Mr. Veeder in his brief. Certainly Congress did not
thereby authorize the Marine Corps to "take" water belonging to
others or to invade the rights of others or to brush aside State
water laws as mere "police regulations" non-applicable to the
United States. On the contrary any reasonable interpretation of
the language used above would seem to clearly indicate that Con-
gress intended that the Navy and the Attorney General should pro-
ceed in conformity with State laws and that the rights of the
United States pertaining to the use of water should be governed
by the laws of the State of California.

III.

REPLYING TO THAT PORTION OF GOVERNMENT'S
ARGUMENT THAT ITS WATER RIGHTS ARE BASED ON
THE CONSTITUTIONAL WAR MAKING POWERS OF THE
UNITED STATES AND DENYING THAT THE UNITED STATES
IS SUBJECT TO OR CONTROLLED BY THE WATER LAWS OF
THE STATE OF CALIFORNIA.

The Government's attorneys assert in their Brief
the sovereign rights of the United States as the basis of their
non-riparian claims :

"Our national government has invested in it the power:
"(a) to declare war **** (b) to raise and support armies***
(c) to provide and maintain a navy***"(Page 5,Line 32 to
Page 6, line 3)

1    And again:

2    "Accordingly, it is free from doubt in the light of the

3    provisions of the Constitution that have been quoted,

4    that our National Government is fully empowered to (a)

5    acquire the lands constituting the site of Camp Pendle-

6    ton, the Naval Ammunition Depot, and the Naval Hospital,

7    (b) to construct those military establishments, (c) to

8    operate and maintain them, and (d) to provide for them

9    a full and firm supply of water." (Emphasis added)

10   (Page 6, lines 24-29).

11   In its heading: "A. Having Acquired the Rancho Santa

12   Margarita and Appurtenant Rights to the Use of Water, those Rights

13   are free from Interference by the State of California or Anyone

14   Claiming it."   (page 8 Lines 1 - 3 )

15   And in its next heading: "B. The State of California

16   May Not Interfere with the Power of the United States to Acquire

17   Rights to the Use of Water through Eminent Domain as Was Accom-

18   plished in this Court." (Page 8, lines 25-26)

19   Again the Brief invokes the sovereign power of the United

20   States, when at page 13, lines 1- 4 it declares:

21   "As pointed out above, it is, of course, inherent in the

22   sovereign power of the United States of America to acquire

23   by eminent domain whatever property rights are essential

24   to the fulfillment of its responsibilities."

25   Likewise, on the same page, lines 13 to 15, the Brief

26   refers to California water laws as police regulations and declares:

27   " POLICE REGULATIONS OF THE STATE OF CALIFORNIA GOVERN THE

28   ACQUISITION AND USE OF RIGHTS TO THE USE OF WATER AMONG

29   WATER USERS UNDER STATE JURISDICTION--THOSE POLICE REGULA-

30   TIONS HAVE NO APPLICATION TO THE UNITED STATES OF AMERICA."

31   And again, at page 24, lines 26 to 30, the Brief declares:

32   " When the decree was entered in that proceeding there

-12-

2225

1    vested in the United States of America title to all

2    the rights which the Rancho held --- riparian,

3    prescriptive, appropriative; the right to use water

4    both within and without the watershed. Moreover,

5    the combined use of that water pursuant to con-

6    gressional authorization constituted the acquisition

7    of what other and additional rights the United States

8    of America required outside of the watershed."

9    (Emphasis Added)  (Page 24, line 26 to Page 25, Line 2)

10

11    From the foregoing quotations from the government's

12    brief (and others could be added) it is clear that the government

13    attorneys who wrote the Brief are strongly relying upon the Con-

14    stitutional powers of the United States as a sovereign, and that

15    because of its sovereign powers the water rights claimed by it

16    in the Santa Margarita River are exempt from and free of the

17    regulatory laws of the State of California applicable to private

18    landowners.

19    This new position now taken before this Court, is at

20    variance with and contrary to that which the very same attorneys

21    and their predecessors have heretofore repeatedly declared

22    before other federal forums was the true and  correct position of

23    the United States in this case.

24

25    A.  Assistant Attorney General A. Devitt Vanech and  Mr.

26    William H. Veeder, on June 25, 1951, Assured the House

27    Judiciary Committee That in this Action The United

28    States Was Seeking to Establish Only the Rights It

29

30

31    -13-

32

Purchased from Rancho Santa Margarita; That is,

Not Claiming any rights because It is the United

States Government; And That the State Law Governs

its Rights Upon the Santa Margarita River.

1/
Mr. Vanech:******In this particular case the Government of
the United States was requested by the Navy to determine what
rights the Navy Department has by reason of its purchase of the
Rancho Santa Margarita, which was acquired between 1941 and 1943.
There are about 21 miles of riparian rights on the river there,
and over 135,000 acres of land.

This particular complaint which has been filed is to deter-
mine what the United States acquired by purchase and not because
it is the United States Government. 2/ As the Government, we are
only asking to have determined what it purchased.

* * * * * * * * * * * * *

If there is not sufficient water there to take care of all
the needs on that stream, that is something else. Of course, if
the Federal Government needs more water than it purchased it would
have to pay for it.

The only thing this complaint and suit is designed for is to
determine just what rights were secured when the Government pur-
chased, the same as anyone here would do who made a purchase on
that stream.

* * * * * * * * * * * * *

Mr. Gossett:  Of course these people are not so concerned
with what you say your contentions are. I am sure they would not
be alarmed by a simple determination of what you bought, but they
are alarmed with your assertion of paramount power, to go further
than that.

1 / These excerpts are from an Extension of Remarks appearing in
   the Congressional Record of July 9, 1951, pp.A4371-A4372.

2 / All emphasis added unless otherwise stated.

1    Mr. Walter:  That, plus the fact that they are disturbed
2   that you do not utilize the usual facilities in order to determine
3   what you did acquire, and that by the bringing of this suit it in-
4   dicates to them not that the United States wants only what it
5   acquired, but that it wants what it feels it needs and is entitled
6   to because of a paramount and supreme power.
7    Mr. Vanech:  That is not true, Mr. Chairman.
8               * * * * * * * * * * * *
9   Mr. Fellows:  You are seeking to establish only what rights your
10  grantor had?
11   Mr. Vanech:  That is correct, Mr. Congressman.
12              * * * * * * * * * * * * * *
13   Mr. Vanech:  That is all right.  May I call Mr. Veeder, Mr.
14  Chairman?  Mr. Veeder is one of the Special Assistants to the
15  Attorney General and our water lawyer in the Department, and, I
16  might add, one of the best informed water lawyers in the United
17  States.
18   Mr. Walter:  Very well.
19              * * * * * * * * * * * * *
20   Mr. Walter:  Let me see if I can get this thing through my
21  mind.  Are you contending that the United States purchased what
22  its grantor had or that it purchased a sufficient amount of water
23  to meet the maximum needs. determined by the number of men that
24  the Marines decided to have at Camp Pendleton?
25   Mr. Veeder:  We claim that the measure of our rights are the
26  rights to which we succeeded from Rancho Santa Margarita.
27   Mr. Walter:  And nothing more; and without regard to the
28  needs of the Marine Corps at Pendleton?
29   Mr. Veeder:  That is correct, sir.
30              * * * * * * * * * * * * *
31   Mr. Fellows:  Here is your complaint.  I am now reading from
32  paragraph 3:

-15-                2688

1    !   That this Court declare and determine that all of
2    the rights of the United States of America are para-
3    mount and superior to those of the named defendants
4    by virtue of the riparian character of the lands above-
5    mentioned and the ownership of them by the United
6    States. * * * * * *'

7 That is what I have in mind. Do you claim only that the state law
8 applies?

9    Mr. Veeder: Yes,sir. The measure of our rights, the
10 measure of the state law governs entirely our demand upon the
11 Santa Margarita River. In other words, we certainly cannot claim
12 more than we acquired from the Rancho Santa Margarita.

13    Mr. Fellows: And you claim no more?

14    Mr. Veeder: That is correct.

15

16    B.  Extracts from Decision of Judge Yankwich Given in this
17        Case and Reported in 101 Fed. Supp.298 Which held
18        That under the Complaint Herein, The United States
19        Claims Nothing Because it is the Government of the
20        United States but merely as owner of the Santa Mar-
21        garita Rancho and that its rights are Governed by
22        State Laws.

23    On the occasion of the Motion of the State of California
24 for leave to intervene and file an Answer in the instant proceed-
25 ing, Mrs. Betty Graydon, Deputy U. S. Attorney, presented to
26 Judge Yankwich, presiding judge, an order permitting the inter-
27 vention of the State of California  which intervention had been
28 invited by and consented to by the United States Department of
29 Justice, evidenced by a letter written by A. Devitt Vanech, Assis-
30 tant Attorney General, attorney of record for the United States
31 in this case, addressed to the Honorable Norris Poulson, House of
32 Representatives (Now Mayor of the City of Los Angeles), from a

2689

copy of which letter Mrs. Graydon read, in part, the following:

"The United States has invited the intervention of the State of California in this proceeding. <u>That step is taken with the idea in view of laying to rest any concern that the United States in some way might seek in this proceeding a greater right than that which it has acquired.</u>" (Emphasis added) (p.299)

Judge Yankwich then proceeded with the following analysis of the issues involved:

"In the complaint filed here on January 25, 1951, the Government asserts that, <u>as successor in interest of the former owners of Santa Margarita Ranch</u> (emphasis by Court), it acquired certain rights when it purchased that ranch. In Paragraph VI of the complaint it is said: 'As successor in interest of the Rancho Santa Margarita, a party to the above-mentioned adjudication proceeding and to the stipulated judgment, the United States of America is entitled to, and claims all rights, titles, interests and privileges of said Rancho Santa Margarita.'

"Reference is made to a judgment of a state court which had adjudicated certain rights.

"Incidental to the ownership, the Government claims the riparian rights, that is, the right of an owner in California to the undiminished flow of the river through the lands" (p.300).

* * * * * * * * * * * * * * * * * *

"The prayer of the complaint before us is for a declaration of the rights of the parties. It merely seeks this: 'That this Court declare and determine that all of the rights of the United States of America are paramount and superior to those of the named defendants by virtue of the riparian character of the lands above mentioned and the ownership of them by the United States, and by reason of its acquisition of the abovementioned rights to military purposes.'" (P. 301)

* * * * * * * * * * * * * * * * * *

-17-

2690

1    "The complaint asserts that there is a dispute between

2    the parties.  The Government asserts certain rights to the whole

3    flow of the river by reason of riparian ownership, and it comes

4    into court and asks for their adjudication.

5    "Without getting into any controversy and because the fil-

6    ing of this answer verifies it, I desire to refer to testimony

7    given before Subcommittee No. 1 of the House Committee on the

8    Judiciary on June 25, 1951.

9    "On that occasion Mr. A. Devitt Vanech, Assistant Attorney

10   of the United States, now Deputy Attorney General, was asked con-

11   cerning this litigation and he stated that the lawsuit is intended

12   to achieve what I have just said appears to me from the pleadings

13   on file."

14            * * * * * * * * * * * * * * * * * * * *

15   "The Government of the United States concedes that ripar-

16   ian rights exist, that they attach to lands and are governed by

17   the laws of the particular States " (p.302)  (Emphasis added)

18            * * * * * * * * * * * * * * * * * * * *

19   "I find nothing in this complaint which asserts any right

20   to this water in the United States because it is the Government of

21   the United States  (Emphasis by the Court.) It is asserting its

22   right merely as owner of the Santa Margarita Rancho. And the only

23   reason why it is using the word 'paramount' is because that word

24   has been accepted as expressing the superiority of the rights of

25   the riparian owner over the rights of others" (p.306).

26            * * * * * * * * * * * * * * * * * * * *

27   "We are concerned only with the assertion of the Govern-

28   ment, which, like any other litigant, comes into court and says in

29   effect, 'I bought a ranch.  It has certain appurtenant water rights.

30   I am the owner of the water rights.  I am putting the water to ben-

31   eficial use.  Other persons are disputing my rights.  So I desire

32   the court to determine these rights.'* * * *  But insofar as the

                              -18-

                                        2691

1  issues as disclosed by the pleadings are concerned, I think the
2  matter should be set straight.  This is merely a suit to declare
3  the rights of the Government as owner of property under the ripar-
4  ian law of the State of California".  (P.307).

5

6          C.    The Testimony of A. Devitt Vanech given September
7                22, 1951 before the Senate Judiciary Committee at
8                Hearings Held on his Nomination to be Deputy At-
9                torney General Assured them that the United States
10               in this Action was claiming no greater Rights to
11               the Waters of the Santa Margarita River Than that
12               Which was had by the Owner from whom it Purchased
13               Rancho Santa Margarita and that its Rights are
14               Governed by State Law.

15      The following excerpts from the record of the hearings
16  on the nomination of A. Devitt Vanech to be Deputy Attorney General
17  of the United States, held before the Committee on the Judiciary
18  of the United States Senate on September 22, 1951, are believed
19  pertinent to the discussion of the Stipulation herein between the
20  State of California and the United States of America.

21                 * * * * * * * * * * *

22      "The Chairman:  Now Mr. Vanech, the subject matter has
23  been opened up to you pretty thoroughly.  We will be glad to hear
24  from you.

25      Mr. Vanech:  Mr. Chairman and Senators, * * * * * * * * *
26                 * * * * * * * * * * * * * * * *

27      "About a year ago the Navy Department came to the Depart-
28  ment of Justice and advised us that the water was being taken from
29  the river and that they were being placed on a very dangerous posi-
30  tion.  They wanted to know what relief could be had.

31      Now, we acquired what rights the Rancho Santa Margarita had,
32  no more or less.   (Emphasis added)

2692

1    "So, if any man around this table purchased the Rancho

2    Santa Margarita, instead of the United States Government, he was

3    entitled to so many acre-feet of water, and the mere fact that the

4    United States Government purchased does not entitle the United

5    States to one more acre-foot.

6        But, by the same token they can't take any less.

7                *   *   *   *   *   *   *   *   *   *   *   *

8        Mr. Veeder, when he testified before the court when he

9    was handling the case in San Diego, made the statement in open

10   court of record, that the Government would be very glad to stip-

11   ulate so as to clarify what is meant by 'paramount rights,' and I

12   have so told the State of California.

13       We are claiming under California law.  We have no sleeper

14   in here that is trying to in any way change the water law of the

15   West.  This is just a suit on one little river, and that is all we

16   are interested in.

17               *   *   *   *   *   *   *   *   *   *   *   *

18       Senator Nixon: * * * What does the term 'Sovereignity'

19   mean?  In other words, what did it mean in the complaint? That

20   is what we want to know.

21       Mr. Vanech:  Senator, in this complaint it has nothing to

22   do with having our rights adjudicated as to what we are entitled to.

23   We are only claiming what any other person would claim if you or

24   I had purchased the same property. * * *

25       When you buy a piece of property in California, under

26   California law you are entitled to so much water.  What we want is

27   what we bought and paid for, and that is all.  We want no more.

28               *   *   *   *   *   *   *   *   *   *   *   *

29       The Chairman:  All right, now, Mr. Vanech, if you will

30   stand by that, you will get away from a lot of trouble, but it is

31   your departure from that by your pleadings and by other assertions

32   that troubles us.  You say that you will take no more than the

-20-

1　previous owner whose title you acquired?

2　　　Mr. Vanech: That is correct, sir. 1/

3　　　　　*　*　*　*　*　*　*　*　*　*　*　*

4　　　The Chairman: If you then assert a paramount right

5　against them, you are doing a dangerous thing, in our view. I am

6　speaking now for the arid West.

7　　　Mr. Vanech: Mr. Chairman, in answer to that, I said that

8　we claim no greater burden when we acquired the land than was held

9　by a previous purchaser or owner.

10　　　Senator Watkins: May I pursue that just a little further,

11　Mr. Chairman. The previous purchaser subjects himself to State

12　law. Now are you going to accept that same limitation?

13　　　Mr. Vanech: We are governed by the State law, Senator.

14　I mean that we make our claims under State law, the same as we are

15　doing in this case here.

16　　　　　*　*　*　*　*　*　*　*　*　*　*　*　*

17　　　Mr. Vanech: We are claiming no more than that.

18　　　The Chairman: I am glad to hear you repeat that, because

19　that is exactly what has been bothering us.

20　　　Senator Watkins: Now, is that official?

21　　　Mr. Vanech: I said it was official.

22　　　Mr. Sourwine: Now, Mr. Vanech, if the Senator is through,

23　I would like to go back to these last tow sentences, if I may

24　read them. They are as follows:

25　　　　　'To that statement, however, it is essential to add

26　　　　　the fact that the United States holds the rights to

27　　　　　the use of water in question as a sovereign having

28　　　　　exclusive jurisdiction over its properties. Thus, to

29　　　　　the term 'Paramount' as used, there must be at-

30　　　　　tributed the additional connotation of a sovereign

31　　　　　acting in the capacity in which the United States is

32　_/Emphasis added unless otherwise stated

2694

1          acting in maintaining the military establishments in

2          question for the defense of the Nation.'

3    Now,I would like to rephrase my question, Mr. Vanech. Will the

4    Stipulation which you have said you are willing to enter into be

5    controlling as against any possible construction of this language

6    to the contrary; that is, contrary to the stipulation?

7          Mr. Vanech: Yes it would.

8          Mr. Sourwine:  In other words, you are willing to stipulate

9    flatly that you are seeking no greater right than that which was

10   had by the owner or owners from whom you purchased the fee simple

11   to the Rancho Santa Margarita?

12         Mr. Vanech: Absolutely.

13               *   *   *   *   *   *   *   *   *   *   "

14

15         D.   In the Following Excerpts from the Congressional

16              Record January 28, 1952, pages 549-551, wherein

17              was published Mr. William H. Veeder's letters to

18              the Saturday Evening Post and Readers Digest re-

19              garding the case of the United States v. Fallbrook

20              Public Utility District et al., he declared that

21              "At no Time has the United States Claimed Greater

22              Right by Reason of its Sovereignity than it purchased

23              and Paid For."

24

25   "                          January 11, 1952

26   Mr. Ben Hibbs

27   Editor, Saturday Evening Post, the Curtis Publishing Co.

28   Philadelphia, Pa.

29   Dear Mr. Hibbs:

30         This will refer to the article appearing in the

31   January 5, 1952 issue of the Saturday Evening Post relat-

32   ing to the case entitled United States of America v.

                              -22-

                                        2695

1    Fallbrook Public Utility District   et al. * * *

2    "Here let it be said that the rights asserted by the

3    United States in this litigation are no greater than those

4    which it purchased.

5           *    *    *    *    *    *    *    *    *

6    "On August 15, 1951, Judge Yankwixh, again for the

7    record stated: * * * *It is merely a suit to declare the

8    rights of the Government under the riparian law of the

9    State of California.'"

10          *    *    *    *    *    *    *    *    *

11   "Continuing in the same incorrect vein, your article

12   states: '* * * *If the Federal Government can, by

13   sovereign authority, take California water, then it might

14   by the same reasoning and authority, take anything anywhere.'

15   "That specious statement is likewise refuted by Judge

16   Yankwich:  'I find nothing in this Complaint which as-

17   serts any right to the water in the United States because

18   it is the Government of the United States.  It is assert-

19   ing its right merely as owner of the Santa Margarita Rancho.'

20   * **

21   "At no time has the United States claimed greater right

22   by reason of its sovereignity than it purchased and paid

23   for."

24          *    *    *    *    *    *    *    *    *

25   "Finally, in regard to the words 'sovereign' and 'para-

26   mount' the United States and the State of California have

27   stipulated --a stipulation now before the Court embodying

28   an offer made by the United States in May of 1951:

29       " ' In this cause, the United States of America

30       claims only such rights to the use of water as it

31       acquired when it purchased the Rancho Santa Mar-

32       garita * * * *

                         -23-

                                        2696

1         "'  The United States of America claims by reason

2         of its sovereign status no right to the use of a

3         greater quantity of water than/that stated above7

4         * * * *

5         " Those two provisions were introduced in the

6   stipulation by this clause:  'The word "paramount" is used

7   in the same sense in which the word is used in the * * * *

8   opinion of the Supreme Court of California in the case of

9   Peabody v. Vallejo * * *'

10       *    *    *    *    *    *    *    *    *    *

11   "    From the court record this statement is taken: 'We

12   claim exclusive jurisdiction * * * the  Congress of the

13   United States alone has authority to enact laws re-

14   lating to it /the rights involved7. That doesn't give us

15   any water above and beyond that which we purchased and

16   we claim none* * *'

17       *   *   *   *   *   *   *   *   *   *   *   *   *   *

18   "    That action has been thus described by Judge Yank-

19   wich:'** *I think the matter should be set straight, and

20   that is that it is merely a suit to declare the rights

21   of the Government under the riparian law of the State of

22   California.'

23       *    *    *    *    *    *    *    *    *    *

24   "    Your spurious article has caused widespread concern

25   among the citizens of this country.  If your article were

26   true, every American would be justifiably alarmed.  In

27   fairness to the public, which is entitled to the truth in

28   this matter, you are obliged to publish this letter.

29                Sincerely,,

30                    WILLIAM H. VEEDER

31             Special Assistant to the Attorney General."

32

2697

1    B.  The Statement of David W. Agnew, Attorney for

2        Bureau of Yards and Docks Department of the Navy

3        and One of the Attorneys of Record for Plaintiff

4        in this Case who signed the Complaint herein,

5        Given July 1 and 2, 1952 to the Senate Committee

6        on Interior and Insular Affairs on HR 5368 and

7        S2809 Limited the Rights of the United States

8        Claimed in this Action to the Rights it Acquired

9        From the Rancho Santa Margarita.

10

11   " Mr. Agnew:  My name is David W. Agnew.  I am an attorney in the

12   Bureau of Yards and Docks, the Department of the Navy. (P.92)

13        The suit was instituted to quiet the Government's title

14   to such right as it acquired at the time it acquired the Rancho

15   Santa Margarita.

16        We do not assert and never have that because those rights

17   are owned by the United States that we are entitled to any

18   greater rights in the use of water from that stream than our

19   predecessor in title.(pp. 93-94)   (Emphasis Added)

20              *    *    *    *    *    *

21   "       I do not think--I am positive-- that we have never asser-

22   ted any claim to any quantity of water from that stream over and

23   above the amount we acquired when we acquired the Rancho Santa

24   Santa Margarita (p. 94)

25              *    *    *    *    *    *    *    *    *    *

26   "   I am not contending, Mr. Engle, that we own a bit more water

27   than we acquired when we purchased the Rancho Santa Margarita

28   (p.97)         * * * * * * * * * * * *

29

30   "     Representative McKinnon:  Will you yield right there?

31   I think the record proves that at one time back in 1948 the Navy

32   did admit that there were flood waters because they made appli-

-25-

2698

" cation to the State Water Resources Board for an allocation
of 100,000 acre-feet. They got that application, and that ap-
plication is still pending, but they have not processed it or
have not tried to get it acted upon. * * * *

"        Mr. Agnee:  They have filed an application, yes,sir;
I fo not think that has ever been denied.

        Representative Poulson:  Will the gentlemen yield?  If
you claim waters, on what basis are you going to claim your
rights if you do not rely upon the State--

        Mr. Agnew:  We rely on the State law in this case, Mr.
Poulson. entirely.  I think the record in the suit is clear(p.98)
(Emphasis added)

        *    *    *    *    *    *    *    *    *    *

    Mr. Agnew:  Mr. Engle, we have said that as to the
quantity of water to which the Government may be entitled, we
come in strictly under the California law (p.99). "

NOTE:  Although hearing was before Senate Committee, its Chairman
        permitted House members to question the witnesses.

    F.  Attorney General Brownell on May 15, 1953 Assured
        Senate Committee that this case would be tried on
        the Theory that the United States possessed no more
        Water Rights at Camp Pendleton than an Individual
        Landowner would have and that the Rights of the
        United States would be governed by the laws of
        the State of California.

    On Friday, May 15, 1953 a hearing was held before the
Subcommittee of the Senate Committee on Appropriations for the
Department of Justice, at which appeared Honorable Herbert
Brownell,Jr., Attorney General of the United States, accompanied

-26-

2699

by J. Lee Rankin, Assistant Attorney General of the United

States, and on page 1 of the printed hearings, Mr. Brownell

said:

" I want to confine my remarks to the so-called Fallbrook

amendment that was put in the Department of Justice Bill by the

House. Some of you will remember--I know Senator Knowland will--

that it was put in there last year and when I came into office

this winter I found that was included in our current budget ap-

propriation bill. It provides specifically that the Department

of Justice shall not use any of the funds appropriated for the

defense  of the United States in the case of United States

against Fallbrook and others, which is now pending in the Feder-

al District Court of the Southern District of California, South-

ern Division."

          *     *     *     *     *     *     *

"At page 16 an exchange of views between Attorney General

Brownell and Senator Knowland is set forth as follows:

"Attorney General Brownell:  I would like to point out to

the committee also that the United States has entered into a

stipulation with the other parties here that its rights will be

no greater than the rights of a private individual if they held

this same land.     (Emphasis added)

          *     *     *     *     *     *     *     *

"The stipulation between the parties also provides that

the laws of the State of California shall govern in this case."

On page 19, Attorney General Brownell and Senator Hill of

Alabama have the following colloquy:

"Senator Hill.  I have great sympathy with what the

Senator from California has in mind.  As I understand it now,

you are asking for no more rights than what a private owner of

that property would have.

"Attorney General Brownell:  That is correct.  "

(Emphasis added)

-27-

2700

and on page 20 of the printed hearings, Senator Ellender ques-
tioned Attorney General Brownell, as follows:

" Senator Ellender: I have have misunderstood the facts
in this case, but it goes beyond asking for the Government's share
in this water?

" Attorney General Brownell:  That is not correct, in my
opinion, Senator.

"Senator Ellender:  What about the paramount rights theory
you spoke of, Senator Knowland?

"Senator Knowland:  I think it does go beyond the mere
settlement of water rights.

"Senator Ellender:  It is an agreement in which the Govern-
ment took part, and the owners of property in the locality who
were entitled to the water, got an agreement with the Government
for the water to be divided a certain way.  Now the Government
comes in and says:  'No, we are going to do away with that agree-
ment;because of our paramount rights we are going to take it all.'

"Attorney General Brownell:  <u>That is a misunderstanding.</u>
I can say that without referring further than to the stipulation
which has been entered into.

            *    *    *    *    *    *    *

"Let me read two sentences which state our position.  This
is the stipulation, into which all the parties have entered, in-
cluding the Attorney General and the State of California: That in
this clause the United States of America claims only such rights
to the use of water as it acquired when it purchased the ranch,
together with any rights to the use of water which it may have
gained by prescription or use by both since its acquisition.

        ' (3)   That the United States of America claims, by
                reason of its sovereign status, no rights to the
                use of a greater quantity of water than is stated in
                paragraph 2.'

                            -28-                    2701

1     " That is binding on the United States and we claim no other or

2     further rights.  The stipulation goes on to say:

3         'That the rights of the United States to the use of

4          water herein are to be measured in accordance with

5         the laws of the State of California."

6    "This is the only way by which we can settle the rights of the

7    United States to water, under the laws of California. And 'par-

8    amount rights' as used in real estate law in the State of Cal-

9    ifornia, is a term of art.  It is a kind of water right that you

10    have there, and the only way you can establish it under the laws

11    of California is to use that language.

12          *      *      *      *      *

13       " Senator Knowland:  There seems to be some substantial

14    dispute on that point, I might say, among the people out there.

15       "Attorney General Brownell:  Let me say it this way,

16    Senator, in order to clear up any doubt in your mind: It is the

17    theory under which the present Department of Justice will operate

18    in the case."

2702

IV.

FALLBROOK PUBLIC UTILITY DISTRICT TAKES EXCEPTION
TO THE "RESUME OF FACTS" SET OUT IN THE GOVERNMENT'S
MEMORANDUM AS THESE RECITALS PRESENT AN INACCURATE
AND INCOMPLETE PICTURE, AND ARE, IN PART, UNTRUE.

These recitals of assumed facts are inaccurate and in-
complete as a whole and untrue in part so as to give an erroneous
and unfair picture of the background against which the pertinent
questions of law must be weighed and considered.  Accordingly, we
point out the following errors and omissions:

1.  As to Subparagraphs (i) to (iii) inclusive, we say:

While emphasizing, as the Government Brief does, the
importance of the military establishments at Camp Pendleton and
the claimed exercise of the Constitutional war-making powers of
the United States in their behalf, to "take" from others, by in-
verse condemnation, water the Government claimed necessary to meet
the requirements of National Defense, the Government attorneys
should not cover up the fact that the Marine Corps was, during all
of that time, delivering large quantities of Santa Margarita River
water for non-military uses on thousands of acres of land outside
the watershed for growing commercial crops of flowers, fruits and
vegetables by the civilian tenant farmers of the government.

We also point out that Wherry Housing projects[1] have been
constructed on Camp Pendleton for some 2,550 dependents of the
military personnel which civilian population the government has and
is also supplying with water from Santa Margarita River. Details of
the transactions for the construction and operation of these
Housing Projects are set forth in the recent case of DeLuz Inc. v.
County of San Diego, 45 C.(2) 546, upholding the County's right to
tax the possessory interests of the corporations operating the
projects.

[1] Note Printed Transcript of Record on Appeal in California v.
    United States pages 605, 665.

-30-

2703

2.   The statement in Subparagraph (iv) on page 2 is not true.  The United States Navy Department on June 30, 1948 filed Application No. 12576 with the Division of Water Resources of the State of California to appropriate 165,000 acre-feet annually from the Temecula Creek-Santa Margarita River, specifying on page 1 of its said application:  "The use to which the water is to be applied is Military, Irrigation and Domestic purposes." Attached to the printed application as a part thereof are two typewritten pages containing additional statements as Supplements No. 1, No. 2, No. 3 and No. 4.  Supplement No. 3 is as follows:

"SUPPLEMENT NO. 3

"(A)   The need for an additional water supply for
military and domestic use at Camp Joseph H. Pendleton
has been created by the fact that the Camp has been
designated as a permanent base for Marine Corps
activities on the West Coast.  The present planning
figures used in computing water requirements are as
follows:

| | |
|---|---:|
| One Peace Time Division | 23479 |
| Signal School Students | 1000 |
| Tracked Vehicle Students | 350 |
| Civ.Serv.Housing 218 Units at 3.5 | 763 |
| Officer & NCO housing 13,000 at 3.5 | 44500 |
| Fallbrook NAD Total Personnel | 2000 |
| | 72092 at 100 GPF = |
| | 7,209,200 GPD |
| U. S. Naval Hospital 2000 at 150 GPD | 300,000  " |
| | 7,509,200 GPD  " |

(Emphasis added)

The Application was signed:

"U.S. NAVY DEPARTMENT
By Jack E. Cochrane
By Direction of Chief of
The Bureau of Yards and Docks,
Acting under the direction of
the Secretary of the Navy. "

-31-

2704

3.  As to Subdivision (v) beginning at page 2, we believe we have already shown at pages 7 to 10 ante, that it is not true that the "Exercise of all the claimed rights in the Santa Margarita, both within and outside the watershed of that stream has been authorized by Congress."  (Emphasis added)

4.  Fallbrook denies the statement appearing under (ii) page 3, that Fallbrook made diversions from the river under a "--- gratuitous and revocable license from the United States of America." That statement as quoted is untrue.  Fallbrook has never diverted any water from the Santa Margarita River under any license from the United States. The license to which Mr. Veeder doubtless refers is the one quoted in full in his own Memorandum in regard to its claimed prescriptive and appropriative rights presented to this Court August 18, 1957.  It is a license and permit granted by the Rancho Santa Margarita, and has no bearing whatsoever on the issues in this proceeding.

5.  Fallbrook denies the statement appearing under (iii), page 3, that it "violated" that license.  Examination of that license (See Preliminary Statement by the United States of America respecting prescriptive and appropriative rights pages 2-6) will disclose that it contains no covenants or agreements of any kind or character on the part of the Fallbrook Public Utility District.

6.  Fallbrook denies the statements appearing under (iv) and (v), page 3, that it undertook to "encroach" upon or "challenge" the rights of the United States.  The Pre-trial order of Judge Yankwich will disclose that in 1946 and 1947 Fallbrook proceeded under the laws of California to apply to the State for a Permit to divert surplus waters of the Santa Margarita River.  In the case of Application Number 11586 the State determined that surplus water was available and on February 18, 1948 issued its Permit Number 7033 authorizing diversion of $2\frac{1}{2}$cfs from the stream.  The Navy appeared at the Hearing on said application and was advised in

-32-

2705

writing on February 18, 1948 of the issuance of that Permit.  No
attempt was ever made by the Navy to appeal from or question that
finding of the State of California until it filed the present
action nearly three years thereafter.  The two other Fallbrook
applications are now pending.

       7.  Fallbrook denies the statement in Subparagraph (vii),
page 3, that its applications to the State to appropriate 30,000
acre-feet of water from the Santa Margarita River is "a quantity
which far exceeds the entire flow of the stream."  The fact is
that in the water year of 1951-1952 alone, 47,640 acre-feet of
water passed Ysidora gaging station and was measured by the U. S.
G.S. as it wasted into the ocean.  Judge Yankwich listed in his
decision (109 Fed.Supp. 28,40-41) some of the large run-offs of
the Santa Margarita River such as 106,400 acre-feet in the single
month of March 1938, 56,030 acre-feet in the month of February
1937 and 36,000 acre-feet in March 1937, 31,200 acre-feet in Feb-
ruary 1933 and 81,700 acre-feet in February 1927.  U. S. Geological
reports show many years of excess and surplus run-off exceeding
30,000 acre-feet.

       8.  Fallbrook denies the statement appearing under (ix)
on page 4, that its acts are "irreparably" damaging the United
States.  To ask this Honorable Court to accept such a statement as
a fact is to pre-try the entire controversy. Camp Pendleton has
never been without water to supply all its riparian rights and
has never been without water to supply all its military needs.

-33-

2700

V.

BECAUSE OF PLAINTIFF'S ERRONEOUS ASSUMPTION OF
FACTS, AUTHORITIES CITED AND QUOTED IN GOVERNMENT'S
BRIEF ARE INAPPLICABLE TO OUR CASE.

We do not propose to study, analyze and distinguish all
the decisions from various State and Federal courts cited and
quoted in the Government's Brief. We take it for granted that
the rules of law laid down and the holdings announced therein
were appropriate and applicable to the facts of each case in which
the particular decision was announced. However, we believe that
we have already shown that the Government's attorneys in this
case have made many erroneous assumptions of fact. It would ne-
cessary follow therefore that the decisions which would be appli-
cable to a state of facts assumed in Plaintiff's Brief to exist
in this case, would not be applicable where the true facts were
substantially different from those erroneously assumed by Plain-
tiff. We will undertake to point out further controlling factors
in the present case which we believe distinguish it from most of
the cases cited by the Government.

Furthermore, we are proceeding on the theory that this
Court will apply California law as interpreted by the decisions
of its highest courts, all as stipulated by the parties in the
pending action. Therefore, we believe the decisions of the
courts of other states should have little weight in deciding the
pending issues.

A.  The Fact that the United States owns a Substantial
Amount of Public Lands Upstream on the Santa Mar-
garita River, is not a Factor in Determining the
Quantity of Water to which Camp Pendleton is
Entitled.

As we read the Government's Brief and the cases cited

-34-

and quoted therein, we find in almost every page continued refer-
ences to the rights of the Government "as the owner of the public
domain" and its rights "to the water in a non-navigable stream
flowing upon and through the public domain."

1. The "History of San Diego County Ranchos" sponsored
by the San Diego Historical Society and published by the Union
Title Insurance and Trust Company of San Diego, declares at page
34:

"Rancho Santa Margarita Y Las Flores (Sp.,St.Margaret and
the Flowers), a grant of 133,440.78 acres, covers the northwestern
corner of San Diego County.  It was the largest grant and remains
the largest ranch within the present county limits.  Its lands
extend along the coast from the northern boundary of the City of
Oceanside to the Orange County line near San Clemente, and inland
from the ocean as far as the Township of Fallbrook. - - - - - -

"The original grant, specified as "Rancho San Oonofre y
Santa Margarita" and consisting of 89,742 acres, was made to
Andres and Pio Pico on May 10, 1841, by Governor Juan Bautista
Alvarado.  To this was added the Las Flores property which the
Picos acquired from the Indians in 1844.  Their claims before the
land commission were based on the Alvarado grant and on the assign-
ment made by the Indians.  These were confirmed by the District
Court April 24, 1855, and the patent was issued to them March 28,
1879."

Thus, we must start with the historical fact that the
lands which the United States acquired from Rancho Santa Margarita
were never at any time a part of the public domain of the United
States but were private property when the territory of California
was acquired from Mexico February 2, 1848 by the treaty of
Guadalupe Hidalgo, Article VII of which declared:

" Mexicans now established in territories previously
belonging to Mexico and which remain for the future

-35-

0700

"within the limits of the United States as defined by
the present treaty shall be free to continue where
they now reside, retaining the property they now
possess in said territory or disposing thereof - - -

In the said territory's property of every kind
now belonging to Mexicans not established there, .
shall be inviolably respected.  The present owners,
heirs of these, and all Mexicans who hereafter
acquire said property by contract, shall enjoy with
respect to it, guarantees equally ample as if the
same belonged to citizens of the United States."

2.  David W. Agnew, one of the attorneys of record for the
Plaintiff in this case, and a witness for the Plaintiff, [1]/ after
testifying that the Naval Ammunition Depot consisting of 9,147.55
acres was acquired from the Rancho Santa Margarita by the condem-
nation action Civil 139 SD; and that Camp Pendleton consisting og
122,207.72 acres was acquired from the Rancho Santa Margarita by
the condemnation action Civil 197-SD; and the Artillery Firing
Range consisting of 1675.58 acres was acquired from numerous
private land owners by condemnation action Civil 321 SD, then
declared that the only public lands in anywise involved were " a
small acreage which was all government owned and was transferred
to the Navy by the Department of the Interior under a public land
order-----I am not sure how much it was.  It was relatively small.
I would say less than 1000 acres."

The public lands so transferred to the Navy were not
riparian to the Santa Margarita River.

---

1 /   Printed Transcript of Record on Appeal to U. S.Court of
Appeals for the Ninth Circuit, People of the State of
California vs. U.S.A. #14049, pages 627-643.

-36-

2709

3. __The Public Domain owned by the United States in San__
__Diego County and within the Watershed of the Santa Margarita River__
__does not give Plaintiff any greater water rights for Camp Pendle-__
__ton.__

It is true that there still exists in San Diego County
vast areas of the Public Domain, title to the lands and water of
which remain in the United States but it does not follow from that
fact that the water supply or the water rights of the lands which
the United States purchased from Rancho Santa Margarita are there-
by increased even if a substantial amount of the public domain is
within the watershed of the Santa Margarita River.

We might point out that there is also a great quantity
of the public domain in the watershed of San Diego River. The long
established Naval Training Station and Marine Base at San Diego
are within the watershed of that river. Can the United States
now claim that because the acquisition by the government of the
lands on which those military establishments are located was
earlier in time than San Diego City's appropriation of San Diego
River water, the United States is entitled to receive at its mil-
itary establishments in San Diego the water falling on and running
off its public lands, free of the claim or charge of the City of
San Diego. To validate this claim of the Government, the Courts
would have to adopt a "substitute use" theory, or a right of
transfer of water belonging to the public lands within the public
domain to the lands acquired by the United States from the private
owner, Rancho Santa Margarita. We know of no authority which would
support such a "substitute use" theory, or transfer right in this
case.

-37-

2710

B. **By its New Claims, Based on Ownership of the**
**Public Domain, Government Attorneys Now Seek to**
**Revive and Inject Again Into this Case the Issue**
**of the Sovereign Rights of the United States**
**Which already have Been Excluded.**

There can be no question but that however indirectly the
assertion is phrased in their Brief, the Government attorneys are
re-asserting now their old claim of "sovereignty" and that the
United States, because it is the Government, has paramount rights
which an individual land owner would not have.  The idea of
sovereignty thrives in Washington among Bureau officials, and is
vigorously advanced by them on every possible occasion.  That is
the very reason why we belabored the subject in the preceding
pages 13 to 29 quoting the repeated abnegation and denial on the
part of every Justice Department official having anything to do
with this case, including Mr. Veeder, that the Plaintiff would not
in this case claim sovereign rights or deny the effectiveness of
State water laws to measure and govern the rights of the United
States to the use of water on Camp Pendleton.  Yet here the
"Ghost walks again".

A claim to water rights based upon the ownership of the
public domain is obviously a claim based upon the sovereignty of
the United States, since the public domain can be held and owned
only by the United States in its governmental capacity.  By now
asserting a claim to the un-appropriated waters of the Santa Mar-
garita River based upon its ownership of the public domain, the
United States is certainly asserting a claim to more water
rights and to a different kind of water rights than its predeces-
sor, the Rancho Santa Margarita could possible have claimed.
Therefore, the United States is now asserting that by acquiring
the Camp Pendleton lands for <u>military purposes and constructing</u>

-38-                    2711

and maintaining military establishments thereon it is entitled
to water and water rights which neither its predecessor nor any
other private land owner could possibly have. This claim neces-
sarily is based upon the sovereignty of the United States. This
claim as we have heretofore pointed out has been excluded as a
factor or issue in this case.

The Stipulation by which the sovereignty of the United
States was eliminated from being a factor in this case was drafted
by Mr. Veeder and agreed to by Attorney General Brown of
California. It was made a determining factor in this case by
being presented to and approved by Judge Yankwich (109 Fed.Supp
28,53). While the Stipulation may have been uncertain in some
aspects, Mr. Veeder put his own construction on what it was meant
to mean, to wit:  to make State laws the measure of the United
States water rights and to eliminate all claims of sovereignty
from this case. His superiors who were in the Department of  Jus-
tice under the Democratic Administration (Deputy Attorney General
Mr. Vanech, ante pp. 13-16; 19-22) as well as those under the
Republican Administration ( Attorney General Brownell, ante pp 26-
29), approved and accepted his interpretation and joined him in
presenting it to the Congressional Committee as the official govern-
ment interpretation and construction of the Stipulation. The Com-
mittees also gave it their approval. Mr. Veeder's interpretation
was likewise adopted by Judge Yankwich (ante pp.16-19).

The question is:  Can Mr. Veeder today repudiate his
stipulation of yesterday?

2712

C. <u>Replying to Cases Cited and Relied on by
Plaintiff in Government's Brief, We Find them
Distinguishable From Our Pending Case.</u>

As we have already said, a detailed analysis of each
case and authority cited in the Government's Brief would require
an unwarranted amount of space in our already too extended Reply.
Accordingly, we will limit our comments to a few, as examples of
the whole.

1.  The case of <u>United States vs. Utah,</u> 283 U.S. 64,
cited in footnote 8, page 8, is inapplicable because it involved
laws of the State of Utah which declared certain rivers in that
state to be navigable.  The decision simply holds that the state
statutes could not determine the factual question of whether or
not the streams were navigable.

2.  <u>United States vs. San Francisco,</u> 310 U.S. 16, cited
in footnote 9, page 9 is also inapplicable.  The case involves an
injunction proceeding against San Francisco to prevent the City
from disposing of Hetch-Hetchy power to the Pacific Gas and Elec-
tric Company.  The Act of Congress making Hetch-Hetchy stream
water available for development by San Francisco (it was in the
Yosemite National Park) expressly provided that the power there-
from must be disposed of by public agencies.  The decision simply
holds that Congressional power to impose such a limitation was
absolute.

3.  <u>Federal Power Commission vs. Oregon,</u> 349 U. S. 435,
(Pelton Dam case) cited in footnote 13, page 10, is not applicable.
It involved a Federal Power Commission license for the construc-
tion of a power dam entirely on the public domain of the United
States.  The State of Oregon sought to impose restrictions regard-
ing fish ladders and other like provisions authorized by its State
laws.  The decision simply held that the State had no authority

2713

1    to interfere where the entire project was on the public domain of

2    the United States on lands reserved for Indian and power purposes.

3    As we have already pointed out (ante p. 34-36) Camp Pendleton lands

4    never were a part of the public domain.  Also it is important to

5    note that in the Oregon case there was not, as there is in our

6    case, a stipulation "That the rights of the United States to the

7    use of waters herein are to be measured in accordance with the

8    laws of the State of California."

9          4.  United States v. Gerlach Live Stock Company, 339 U.S.

10   725 is inapplicable because the state of facts therein is entirely

11   different from our case.  The Gerlach case is cited at pages 11

12   and 13 of its Brief to support its claim that the United States

13   by the exercise of its power of eminent domain has taken the water

14   it needed and acquired title thereto by inverse condemnation.  An

15   inverse condemnation involves a taking for public purposes by

16   other means than judicial action.  The essence is that there be a

17   taking of the property rights of another.  In the Gerlach case,

18   the act complained of was the construction of a dam and impounding

19   of waters upstream from the plaintiff, thereby depriving him of

20   water to which he had a right.  In the Gerlach case there was a

21   clear invasion  of the lower land owners right and a clear taking

22   of a property right which he had previously enjoyed.  In our case

23   the acts relied on as constituting an inverse condemnation took

24   place downstream from all other possible users and invaded nobody's

25   rights since the United States was the last possible user on the

26   stream.  We must therefore conclude that while the Gerlach case

27   was rightly decided under the facts of that case, it is inappli-

28   cable under the admitted facts in our case.

29        5.  The cases cited in footnotes 24-25 on page 13 are inappli-
                                                    is
30   cable.  Neither case holds that there/today alternative methods of

31   appropriating water in California.  However, the reference to

32   93 C.J.S. 931, Waters, Section 180 cited in footnote 26 is correct

1 since the text there does state that alternative methods of ap-

2 propriation still exist in California.  The statement, however,

3 is not supported by the two California cases cited by it which

4 are the same two cases cited by Plaintiff in its Brief.

5     In the first case, <u>Bloss v. Rahilly</u>, 16 Cal(2d) 70, the

6 facts are recited at page 73:

7     "   On March 21, 1927, plaintiff made application to

8     the Division of Water Rights to appropriate twenty

9     second feet of said water for use upon his lands.  A

10     permit was thereafter issued to him on July 27, 1927,

11     and the final license was issued to him on March 5,

12     1935. Since making the original application, plaintiff

13     has beneficially used all of said water available to

14     him up to twenty second feet."

15     At page 75, the court, after quoting the wording from

16 Section 11 of the Water Commission Act of 1913 to the effect that

17 "all waters flowing in any river, stream-- - - - - - excepting so

18 far as such waters have been or are being applied to useful and

19 beneficial purposes - - - - - - - -are hereby declared to be

20 public waters of the State of California and subject to appropri-

21 ation <u>in accordance with the provisions of this act</u>" (Emphasis

22 added), the decision then declares:

23     "The main purpose of said act was to provide an orderly

24     method for the appropriation of the unappropriated waters

25     of the state",

26 That is a far cry from the statement of Corpus Juris Secundum

27 that an appropriator may proceed contrary to the "provisions of

28 this Act" since it is apparent that to do so would destroy "the

29 main purpose of said act" which was "to provide an orderly method"

30 for making appropriations.

31     In the second case, <u>Carlsbad etc. Co. vs. San Luis Rey</u>

32 <u>etc. Co.</u> 78 Cal App (2d) 900, the principal question was the

-42-

2715

effect of a 1906 deed to Charles Foreman granting him the grantor's
riparian water rights (so far as that could be done) to be stored
back of the Henshaw Dam, reserving to Gird, the grantor, the right
to develop and use on his own lands San Luis Rey water.  The Court,
at page 914, then expressed its opinion of the proper legal pro-
cedure for acquiring California appropriative water rights:

> "If, under the reservation clause, defendants do not
> have sufficient water for domestic and irrigation
> purposes, there is open to them the same roght which
> any other non-riparian owner has to make application to
> the Division of Water Resources for a permit to appro-
> priate water, and if that state agency finds that water
> is available, a permit may be granted. (<u>Bloss v. Rahilly</u>
> 16 Cal.2d.70, /104 P.2s10497)"

In <u>Ivanhoe Irrigation District vs All Parties</u>, 47 Cal.2d
597,625, the most recent California Supreme Court declaration on
the State's control over appropriations and uses of water within
its boundaries, it said:

> "    To avail themselves of the right thereto, in-
> dividually, collectively or in a corporate capacity,
> administrative procedures have been established and
> are set forth in the Water Code and related statutory
> provisions. <u>Compliance with those provisions is neces-</u>
> <u>sary in order that the right to use the water may be</u>
> <u>acquired.</u> - - - - - - - - -"(Emphasis added)

True, this case is now on appeal before the United States
Supreme Court.  But the appeal was taken by the State of California
through its Attorney General.  However, the above quoted ruling
is not involved in the appeal since the Attorney General in his
briefs before the State Supreme Court has already conceded that
the State Engineer controlled and regulated appropriative rights.
At page 21-22 of the "Joint Reply Brief of Appellants" the State

-43-

of California and the Ivanhoe Irrigation District" the Attorney-
General says:

> "- - - - - -Whenever one person diverts water for the
> use of others, the diverter and user acting in concert
> must acquire from the state the privilege to take and
> use the water;  this is the 'appropriative right' and
> the administrative control of its acquisition is in
> the State Engineer."

And again at pages 23-24 the Attorney General said:  "In the
simple case of a farmer who desires, wholly through his own efforts,
to take unappropriated waters from a nearby stream for irrigation
and domestic use on his non-riparian lands. water rights are in-
volved only in the primarily generally-understood sense of the
term. That is, the farmer must secure from the State the basic
right to divert and use the unappropriated water he needs.  This
is accomplished by applying for and receiving from the State
Engineer a permit to appropriate, constructing the necessary stor-
age and diversion works and actually using the water beneficially.
The license from the State confers the right thus acquired."
(Emphasis added)

The appeal involves the validity of the 160 acre limita-
tion put in the contracts drafted by the Reclamation Bureau.  If a
reversal results from the appeal it will be on that issue. Hence
the holding of the California Supreme Court that a valid appro-
priation can be made only in "compliance with those provisions"
establishing the administrative procedure for filing an applica-
tion to and receiving a permit from the State will be unaffected
by the decision of the United States Supreme Court in the
Ivanhoe case.

6.  California-Oregon Power Co. vs. Beaver-Portland Cement
Co. first decided by the Ninth Circuit Court of Appeals, 73 Fed.

2717

2nd, 555,[1] and on certiorari by the United States Supreme Court, 295 U. S. 142,[2] is a case on which we rely as upholding the power and right of the State to control and regulate the appropriations and uses of water outside the enclave of Camp Pendleton.  As the Ninth Circuit Court, at page 567 of that decision, said:

> " Under the common law, the right of the riparian owner
> is to the usufruct of the water and not to the water
> itself.  Legislation limiting the right to its use is
> in itself no more objectionable than legislation for-
> bidding the use of real property for certain purposes.
> To argue, as plaintiff does, that riparian rights are
> real property which attach to the land, does not put such
> rights beyond the reach of the police powers".

But the Supreme Court went even farther and expressed itself even stronger.  The government brief quoted only the first sentence of that court's most important declaration:

> "   As the owner of the public domain, the government
> possessed the power to dispose of land and water thereon
> together or to dispose of them separately. Howell v.
> Johnson, 89 F 556,558.  The fair construction of the
> provisions now under review /Acts of 1866, 1870 and 1877/
> is that Congress intended to establish the rule that, for
> the future, the land should be patented separately; and
> that ALL non-navigable waters thereon should be RESERVED
> for the use of the public UNDER THE LAWS OF THE STATES
> and territories named.  The words that the water of all
> sources of water supply upon the public lands and not
> navigable "shall remain and be held free for the appro-
> priation and use of the public" are not susceptible  of
> any other construction. (Emphasis added)

---

1 /     Cited in Government Brief, footnote 28, page 14; and
footnote 40, page 18.

2/      Cited im Government Brief in Footnote 67, page 26

2718

The only exception made is that in favor of <u>existing</u>
<u>rights</u>; (Emphasis by the Court) and the only rule
spoken of is that of <u>appropriation</u> (Emphasis by the
Court) - - - - - If it be conceded that in the absence
of federal legislation the State would be powerless to
effect the riparian rights of the United States or its
grantees, still, <u>the authority of Congress to vest</u>
<u>such power in the state and that it has done so by the</u>
<u>legislation to which we have referred, cannot be</u>
<u>doubted.</u>"  (Emphasis added)  (295 U.S. 142,162)

   7.  The case of <u>Crane vs. Stevinson</u> 5 Cal.(2) 387, is cited
by the United States at page 20 of its Brief, footnote 46.  The
quotation from page 398 is only a half statement of the Court's
holding.  The ruling is expressed not in that quotation alone
but also in the language found just two sentences farther on the
same page and paragraph, as follows:

   "   Since the effective date of the Water Commission
   Act, an intending appropriator has been required to
   file his application with the Water Commission ( now
   the Division of Water Resources)<u>1/</u>.  <u>This the plaintiff</u>
   <u>did not do.  To sustain his claim the appropriation made by</u>
   <u>him must have been actually complete at some time prior to</u>
   <u>said 1913 date, and even that is not sufficient if the</u>
   <u>evidence shows a subsequent failure to maintain the</u>
   <u>benefit use for the period of time prescribed by the</u>
   <u>statute.</u>"  (Emphasis added)

---

1/ Since 1956: State Water Rights Board.

-46-

2719

## VI

REPLYING TO PLAINTIFF'S STATEMENT ON RIGHTS
OF A MUNICIPALITY TO EXERCISE RIGHTS TO THE
USE OF WATER.

The discussion of the above heading on pages 30 and 31
of the Memorandum of Points and Authorities submitted by the
United States is entirely inapplicable and does not answer the
question raised by the Court.  The Reporters Transcript of pro-
ceedings of October 21, 1957, pages 360-361, reads as follows:

"MR. VEEDER: (Line 15)  In regard to municipal use, I
think the question that has been raised by Mr. Sachse
and the cases that he cites are not in point.  I believe
it would be entirely possible for a city or municipality,
if it owned all the land upon which the city or munici-
pality was situated, to be permitted to use water for
municipal purposes.

The question and the point that invariably comes up
in these municipality cases is this:  that the lands for
which the municipality is claiming water had been severed
from the stream and are no longer abutting upon it, and
that's the whole proposition, I believe.  It is not
pertinent here, because that situation doesn't prevail.
But the municipal cases where they have been permitted
to use water for municipal purposes, a part bordered upon
a stream and they could use the water for municipal pur-
poses - - - - - - - - -

THE COURT: Well, your authority for that is Veeder On
Water Rights, or do you have some cases that make that
statement?

MR. VEEDER: Well, it might be.  I'll be glad to submit
some cases to your Honor.  I have some cases.  This Antioch
case- - - - - - - -" (Emphasis added)

-47-

1    We respectfully point out that the United States has
2  submitted no authorities on the question asked by the court.  The
3  entire discussion in the Memorandum simply states that a <u>munici-</u>
4  <u>pality can be a riparian owner</u>. This, of course, has never been
5  denied.  As such riparian owner it can use its riparian water <u>for</u>
6  <u>all riparian purposes</u>.  But the question of the right of a mun-
7  icipality to use its riparian water for municipal purposes is com-
8  pletely ignored by Mr. Veeder.  He fails to meet the challenge
9  made by Counsel for Fallbrook and by the Court.  He has submitted
10  no authorities on that issue.
11    This matter was fully briefed in the Memorandum heretofore
12  submitted by the Fallbrook Public Utility District on August 9,
13  1957 at pages 8-22, but we will nevertheless briefly repeat some
14  of those citations.
15    <u>Antioch vs. Williams Irrigation District</u>,188 Cal.451,456,
16  the very case referred to by Mr. Veeder in the above quotation
17  from the Transcript of Proceedings, holds that "- - - the fact that
18  the City is situated upon the San Joaquin River is wholly immater-
19  ial in the consideration of the case.- - - -" stating that riparian
20  rights of a landowner abutting a stream "- - - are wholly of a
21  private nature - - - -", while a city's rights are those of an
22  appropriator.
23    141 A.L.R. 640 states:  "Although there is authority to
24  the contrary, the weight of authority sustains the view that a
25  municipality, <u>as a riparian owner merely, has no right to divert</u>
26  <u>or abstract the waters of a stream for the purposes of public</u>
27  <u>water supply</u>."   (Emphasis added)
28    In <u>City of New Whatcomb vs. Fairhaven Land Co</u>.(Washington)
29  64 Pac. 735, the Court enjoined the City from diverting waters of
30  a lake or creek for supplying municipal requirements, notwith-
31  standing that the city was situated on both sides of the creek;
32  that streets and alleys owned by the city ran across, parallel to

-48-

2721

and upon the banks and bed of the creek; and that the City owned other property on the shores of Lake Whatcomb and in the bed of its outlet stream.  The decision was based upon the fact that the use to which the water was put was municipal and public, whereas proper riparian use is a private use.

In 94 C.J.S. 7, the rule is stated as follows:  "The use of waters of a stream to supply the inhabitants of a municipality with water for domestic purposes is not a riparian right.". (Citing cases).

In Pernell vs. City of Henderson (North Carolina) 16 S.E 2d 449, 451, the court said:

"    It has been held with practical unanimity that a
municipal corporation, in its construction and operation
of a water supply system, by which it impounds the water
of a private stream and distributes the same to its
inhabitants, receiving compensation therefor, is not in
the exercise of the traditional right of a riparian owner
▼ . . . .". (Citing Authorities).(Emphasis added)

In City of Emporia vs. Soden (Kansas) 25 Kan.588; 37 A.Rep. 265, the Court affirmed the same rule in the following language:

"    But the taking of water for the supply of a
populous and growing city stands upon an entirely dif-
ferent basis. . . . .The city as a corporation may own
land on the banks, and thus in a sense be a riparian
owner.  But this does not make each citizen a riparian
owner.  And the corporation is not taking the water
for its own domestic purposes; it is not an individual;
It has no natural wants; it is not taken for its own
use but to supply a multitude of individuals. "
(Emphasis added)

There can be no doubt that the uses and purposes  to which

-49-

2722

1   water is put by the United States on Camp Pendleton are identical
2   to the uses to which water is put by any municipality of like
3   size.  The Plaintiff supplies Santa Margarita water to several
4   Wherry Housing Projects for the needs of some 2500 people.  The
5   Marines drink, wash and cook. They water lawns and flower gardens.
6   The "municipality" of Camp Pendleton operates a sewer system and
7   provides fire protection. Schools, apartments, hospitals, theatres,
8   playgrounds, swimming pools and a golf course are maintained
9   thereon and supplied with water.  It even has what might be
10  termed "industrial" uses in its shops and warehouses.  There is no
11  sound reason, in fact or in law, for applying any different rule
12  to its water use than would  be applied to a municipality of like
13  size.

14

15

16          The length of this Reply Brief has greatly exceeded
17  our own intentions and desires.  We trust that it has not
18  exceeded the patience of the Court.  However, it did seem worth-
19  while and important to demolish once and for all some of the
20  erroneous ideas of law and fact, which appear deeply embedded in
21  the minds of the attorneys for the Government.  If we have succeeded,
22  even in part, in doing so, our efforts herein have not been in
23  vain.
24          DATED:  November 27, 1957.
25
26                  Respectfully Submitted,
27                  SACHSE & PRICE
28                  SWING, SCHARNIKOW & STANFORTH
29                  BY
30                  Attorneys for Defendant FALLBROOK
                    PUBLIC UTILITY DISTRICT
31
32

                            -50-

                                    2723

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA
BELMONT 9-1131

SACHSE & PRICE
Attorneys at Law
217 North Main Street
Fallbrook, California
Attorneys for   Defendant FALLBROOK PUBLIC UTILITY DISTRICT


IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | NO. 1247-SD-C |
| vs. | AFFIDAVIT OF SERVICE BY MAIL |
| FALLBROOK PUNLIC UTILITY DISTRICT, et al., | (C.C.P. 1013a) |
| Defendants | |

STATE OF CALIFORNIA )
) ss
COUNTY OF SAN DIEGO )

MARIAN W. ALLEN being first duly sworn, says, that affiant is a citizen of the United States, over the age of 18 years of age, a resident of, or employed in, San Diego County and not a party to the within action.

That affiant's business address is 604 San Diego Trust & Savings Building, San Diego 1, California.

That affiant served the attached "REPLY BRIEF OF FALLBROOK PUBLIC UTILITY DISTRICT TO PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ACCORDING TO ORDER OF COURT OCTOBER 21, 1957" by placing a true copy thereof in an envelope addressed to

J. LEE RANKIN, Solicitor General

WILLIAM H. VEEDER, Special Assistant
to the Attorney General

WILLIAM E. BURBY, Specia; Assistant
to the Attorney General

-1-

2724

1   at their office address, which is

2                    DEPARTMENT OF JUSTICE BUILDING

3                    WASHINGTON, D. C.

4   and by placing a true copy thereof in an envelope addressed to:

5                    MR. ADOLPHUS MOSKOVITZ
                     Deputy Attorney General
6                    State Department of Justice
                     Sacramento, California
7

8   and by placing a true copy thereof in an envelope addressed to:

9                    O'MELVENY & MYERS
                            AND
10                   GEORGE STAHLMAN
                     Route 1, Box 235
11                   Fallbrook, California

12  which envelopes  were then sealed and postage prepaid thereon,

13  and thereafter were on November 27, 1957, deposited in the United

14  States Mail at San Diego, California.  That there is delivery  by

15  the United States mail at the place so addressed, or regular com-

16  munication by United States mail between the place of mailing and

17  the place so addressed.

18                         *Marian M Allen*

19

20  Subscribed and sworn to before me

21  November 27, 1957

22  *signature*

23  Notary Public in and for said
       County and State.

24

25

26

27

28

29

30

31

32

                                        2725