ORIGINAL

FILED

DEC 16 1957

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
                    Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

FALLBROOK PUBLIC UTILITY DISTRICT,
a public service corporation of the
State of California; et al.,

        Defendants,

PEOPLE OF THE STATE OF CALIFORNIA,

        Defendants in
        Intervention.

No. 1247-SD-C

ANSWERING MEMORANDUM OF
THE STATE OF CALIFORNIA
TO THE MEMORANDUM OF
POINTS AND AUTHORITIES
SUBMITTED BY THE UNITED
STATES PURSUANT TO THIS
COURT'S DIRECTION OF
OCTOBER 21, 1957

EDMUND G. BROWN, Attorney General
  of the State of California

ADOLPHUS MOSKOVITZ, Deputy Attorney
  General

Attorneys for Defendants in
Intervention.

ORIGINAL

2758

## TOPICAL INDEX

|  | Page |
|---|---|
| INTRODUCTION | 1 |

ARGUMENT

I. Under California Law, Since December 19, 1914, No Right to Appropriate or Use Unappropriated Water of the Santa Margarita River Can Be Acquired Except on Compliance with the Provisions of the Water Commission Act (Water Code Secs. 1200-1801).      4

II. The United States Is Not Exempt from the Obligation of Complying with California's Statutory Appropriation Procedure on the Ground that Police Regulation Cannot Restrict its Activities.      10

III. Ownership of the Public Domain Is No Source of Right in the United States To Use Water of the Santa Margarita River on Portions of Camp Pendleton Outside the Watershed.      12

IV. The United States Has Not Acquired Appropriative Rights to Use Santa Margarita River Water Outside the Watershed Through Exercise of the Power of Eminent Domain.      17

    A.   Direct Condemnation      17

    B.   Inverse Condemnation      18

2759

1  EDMUND G. BROWN, Attorney General
   of the State of California
2  ADOLPHUS MOSKOVITZ, Deputy Attorney General
   Library and Courts Building
3  Sacramento, California
   Telephone:  HI 5-4711, Ext. 4574
4
   Attorneys for Defendants in Intervention
5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10                    SOUTHERN DIVISION

11

12  UNITED STATES OF AMERICA,

13              Plaintiff,                    No. 1247-SD-C

14        v.
                                             ANSWERING MEMORANDUM OF
15  FALLBROOK PUBLIC UTILITY DISTRICT,       THE STATE OF CALIFORNIA
    a public service corporation of the      TO THE MEMORANDUM OF
16  State of California; et al.,              POINTS AND AUTHORITIES
                                             SUBMITTED BY THE UNITED
17              Defendants,                   STATES PURSUANT TO THIS
                                             COURT'S DIRECTION OF
18  PEOPLE OF THE STATE OF CALIFORNIA,        OCTOBER 21, 1957
19              Defendants in
                Intervention.
20

21                    INTRODUCTION

22        This memorandum by the State of California is in answer

23  to the "Memorandum of Points and Authorities Submitted by the

24  United States of America Pursuant to This Court's Direction of

25  October 21, 1957".  Specifically, the State contests the claim of

26  the United States in that memorandum that it presently has vested

27  property rights to use water of the Santa Margarita River on por-

28  tions of the Camp Pendleton military enclave* located outside

29  * In this memorandum, when we use the term "Camp Pendleton" we
    mean the entire contiguous military enclave consisting of Camp
30  Pendleton, the Naval Hospital, and the Naval Ammunition
    Depot.
31

                                                              2760

1   the watershed of the Santa Margarita River.

2          Although the legal theories of the United States in

3   support of this claim of water rights are not clearly defined or

4   distinguished in its memorandum, the United States seems to have

5   made four distinct and independent arguments:

6          1.  That by merely diverting the water and putting it to

7   beneficial use outside the watershed of the Santa Margarita River,

8   the United States has acquired valid appropriative rights under

9   California law, on the theory that diversion and application of

10  water to a beneficial use coupled with the intent to appropriate are

11  sufficient under California law to create an appropriative right

12  in any water user even if he has failed to comply with the appli-

13  cation and permit procedures required by state statutes (U.S.

14  Mem. pp. 13, 19-23).

15         2.  That California's statutory application and permit

16  procedures for the acquisition of an appropriative water right are

17  police regulations which are inapplicable to the United States,

18  with the result that, even if all other water users must comply with

19  such procedures in order to acquire a valid appropriative right,

20  the United States can obtain the right merely by taking and using

21  the water (U.S. Mem. pp. 14-18, 23-24).

22         3.  That even before it first diverted and used the water

23  on Camp Pendleton, the United States possessed the right to do so,

24  by virtue of its ownership of the public domain; hence, when it

25  began diverting and using the water the United States merely

26  exercised a right already residing in it (U.S. Mem. pp. 26-29).

27         4.  That if the United States did not acquire the right

28  to use the water outside the watershed under any of the theories

29  summarized above, it obtained the right through the exercise of the

30  power of eminent domain either (a) by its direct condemnation of

31  the Rancho Santa Margarita or (b) by subsequent inverse condemnation

-2-

2761

1   assertedly resulting from its use of the water outside the

2   watershed (U.S. Mem. pp. 1-2, 5-13, 24-26).

3          It is immediately apparent that only the first argument

4   and the portion of the fourth argument relating to the rights

5   believed acquired in the direct condemnation of Camp Pendleton

6   are consistent with the stipulation between the United States and

7   the State of California which was entered into at the outset of

8   this litigation, or with the repeated assurances concerning the

9   objective of this litigation made by responsible officials of the

10  Navy and the United States Department of Justice to various

11  Committees of Congress.  The stipulation, signed by Mr. Veeder

12  for the United States and approved and ordered filed by this Court,

13  provides in pertinent part as follows:

14      "For the clarification of the issues in this liti-
        gation and for the benefit of all of the parties to
15      this cause, it is hereby stipulated:

16                          "I

17          "  *   *   *

18                          "II

19      "That in this cause, the United States of America
        claims only such rights to the use of water as it
20      acquired when it purchased the Rancho Santa Margarita,
        together with any rights to the use of water which it
21      may have gained by prescription or use, or both, since
        its acquisition of the Rancho Santa Margarita.

22

23                          "III

24      "That the United States of America claims by
        reason of its sovereign status no right to the use of
25      a greater quantity of water than is stated in Paragraph
        II, hereof.

26                          "IV

27      "That the rights of the United States of America
        to the use of water herein are to be measured in accor-
28      dance with the laws of the State of California.

29                      *   *   *"

30  (United States v. Fallbrook Public Utility District (1952),

31  109 F.Supp. 28, 52.)

1   It is not necessary to repeat in this memorandum the copious

2   excerpts from hearings of Congressional committees which are con-

3   tained in the brief of the Fallbrook Public Utility District,

4   dated November 27, 1957, in reply to the United States memorandum

5   (Fallbrook Mem. pp. 13-29).  Those excerpts show that it was

6   stated over and over again by spokesmen for the Government that

7   in this litigation the United States was not claiming any more

8   than a private owner could assert under California law.

9         We believe that counsel for the United States owes this

10  Court and the other parties to the case an explanation of how its

11  present contentions can be reconciled with the stipulation and

12  statements which the United States so solemnly made that the water

13  rights claimed by it in this litigation are governed by the same

14  law of California as would apply to any private water user.

15        Nevertheless, since the United States has made these

16  novel arguments we will meet them head-on.  On their merits, it

17  is our position that none of them is sound and that the United

18  States has yet to take the necessary steps to obtain enforceable

19  rights to use water of the Santa Margarita River outside the water-

20  shed.

21                    ARGUMENT

22  I.  Under California Law, Since December 19, 1914, No Right to
        Appropriate or Use Unappropriated Water of the Santa Margarita
23      River Can Be Acquired Except on Compliance with the Provisions
        of the Water Commission Act (Water Code Secs. 1200-1801).
24

25        The United States has persisted in its erroneous argument

26  that under California law compliance with the statutory procedure

27  for acquiring appropriative rights provided in the Water Code is

28  not a condition precedent to the acquisition of such rights.  The

29  statute is plain and unambiguous.  Water Code section 1225 pro-

30  vides:

31        "No right to appropriate or use water subject to

-4-

1   appropriation shall be initiated or acquired except
2   upon compliance with the provisions of this division."

3      Crane v. Stevinson (1936), 5 Cal.2d 387, 54 P.2d 1100,
4   the one California case which has considered whether, by reason
5   of this section, compliance with the statutory procedure is a con-
6   dition precedent to the acquisition of a right to appropriate un-
7   appropriated water of a stream in California, has a direct holding
8   in the affirmative.  In the Crane case, the plaintiff contended
9   that he had acquired prior appropriative rights over the defendant
10  to certain foreign waters flowing in Bear Creek by taking and using
11  the water.  The California Supreme Court held that the burden was
12  upon the plaintiff to establish the fact of appropriation and
13  the quantity appropriated and that his evidence was defective and
14  incomplete.  Three reasons were given by the Court for its con-
15  clusion that the plaintiff's evidence was defective and incomplete
16  (5 Cal.2d at 398, 54 P.2d at 1105-1106).  First, the Court said:

17      "It fails to show the quantity of water diverted
18  by plaintiff from Bear Creek, or how much, if any, of
    the water taken by him from the main canal of East
19  Side Canal Company was water derived from Bear Creek."

20  Second, the Court stated:

21      "It fails to show how much, if any, of the water
    taken by him out of Bear Creek was taken as an appro-
22  priator and not in the exercise of his rights as a
    riparian owner,"

23  Third, the Court explained:

24      "Since the effective date (year 1913) of the Water
    Commission Act, an intending appropriator has been re-
25  quired to file his application with the water commission
    (now the division of water resources).  This the plaintiff
26  did not do.  To sustain his claim, the appropriation made
    by him must have been actually complete at some time prior
27  to said 1913 date, and even that is not sufficient if the
    evidence shows a subsequent failure to maintain the
28  beneficial use for the period of time prescribed by the
    statute, or for the period of time, five years, required
29  under decisions prior to the statute.  /Authorities cited.7"

30  The Court then closed the discussion of the evidence by saying:

31      "We conclude that the findings on this issue are
    sustained by the evidence."

2764

1    From these quotations it is obvious that the discussion

2  of the necessity of filing an application to appropriate was not

3  mere _obiter_ _dictum_, as argued by the United States (U.S. Mem. p.

4  20).  It was one of the alternative holdings from which the Court

5  concluded that the plaintiff's evidence was defective and incomplet

6    The other California cases cited in the United States

7  memorandum with respect to this issue are irrelevant.  _Hudson_ _v._

8  _West_ (1957), 47 Cal.2d 823, 306 P.2d 807 (U.S. Mem. p. 19) con-

9  cerned prescriptive rights rather than appropriative rights.

10  Further, the California Supreme Court simply declined to pass on

11  the question of the necessity of complying with statutory appro-

12  priation procedures in order to acquire a prescriptive right, for

13  the reasons that:

14    "The parties have not raised this issue, however,
      and the judgment quieting title in defendants prejudices

15    no right of the state of California, for neither it nor
      the Department of Public Works was a party to this action."

16    (47 Cal.2d at 827, 306 P.2d at 808.)

17  Neither _Bloss_ _v._ _Rahilly_ (1940), 16 Cal.2d 170, 104 P.2d 1049,

18  _Yuba_ _River_ _Power_ _Co._ _v._ _Nevada_ _Irr._ _Dist._ (1929), 207 Cal. 521,

19  279 Pac. 128, nor _Carlsbad_ _Mutual_ _Water_ _Co._ _v._ _San_ _Luis_ _Rey_ _De-_

20  _velopment_ _Co._ (1947), 78 Cal.App.2d 900, 178 P.2d 844, also cited

21  by the United States (U.S. Mem. pp. 13, 20), even remotely con-

22  cerned the question of the necessity of complying with statutory

23  procedures to obtain an appropriative right.

24    The discussion on this issue in the United States mem-

25  orandum (U.S. Mem. pp. 22-23) would lead one to believe that the

26  universal rule in other western jurisdictions is that compliance

27  with statutory appropriation procedures is unnecessary in perfect-

28  ing valid appropriative rights.  Nothing could be farther from the

29  truth.  In at least five other western states, besides California,

30  namely Arizona, Montana, Utah, Wyoming and New Mexico, it has been

31  squarely held by the highest court of the state that statutes

-6-

2765

1  like Water Code section 1225 mean what they say--that appropriative

2  water rights do not arise from the mere diversion and beneficial

3  use of water without compliance with the statutory procedures.

4       In the Arizona case of <u>In re Determination of Relative</u>

5  <u>Rights, etc.</u> (Ariz. 1935), 41 P.2d 228, 235-236, the Court declared

6       "In 1919 the new Water Code went into effect.  After
that time, it was no longer possible to appropriate

7  water under the law of Arizona for the purpose of irri-
gation by its mere beneficial user for that purpose upon

8  land.  Certain formalities were required to initiate and
perfect the right.  It does not appear from the record

9  that these formalities were ever complied with so far
as the Monthan land was concerned.  We are therefore of

10  the opinion that no right to the use of water for that
land has ever been legally acquired by anyone."

11

12       The Montana Supreme Court held similarly in the case of

13  <u>Anaconda Nat. Bank v. Johnson</u> (Mont. 1926), 244 Pac. 141, 144:

14       "Unquestionably the Legislature of 1921 intended that
an appropriation of the waters of an adjudicated stream

15  should not be made thereafter without a substantial com-
pliance with the requirements of the statute then enacted.

16  The method prescribed must be held to be exclusive."

17       In its memorandum, the United States twice emphasized

18  (U.S. Mem. pp. 19-20, 22) that no case had been found wherein a

19  water user who had actually diverted and beneficially used water

20  without complying with the statutory filing procedure was deprived

21  of his claimed appropriative rights by a subsequent claimant who,

22  after the time the first water user had diverted and beneficially

23  used the water, filed an application with the state in accordance

24  with the statutory procedure.  Counsel for the United States

25  apparently did not look far enough.  Just such a decision was

26  rendered by the Utah Supreme Court upholding the priority of the

27  subsequent claimant.

28       In <u>Deseret Live Stock Co. v. Hoopiania</u> (Utah, 1925),

29  239 Pac. 479, the dispute was between the plaintiff company, which

30  had filed an application to appropriate with the state engineer's

31  office on April 25, 1918, and the defendant Hooplania who filed

-7-

2766

1   on May 3 and May 22, 1918, after the plaintiff, but had for many

2   years prior to the plaintiff's filing date actually diverted the

3   water in dispute and applied it to beneficial use on his lands.

4   The Court stated the issue as follows:

5        "The question is therefore clearly presented
whether the actual diversion of water prior to the

6      making an application to the state engineer gives to
the party making the diversion a right superior to

7      another who first files his application in the state
engineer's office" (239 Pac. at 482).

8

9        The Court quoted, and discussed the origin and purpose of

10  the controlling Utah statute, which provided that:

11       "Rights to the use of unappropriated public water
in the state may be acquired by appropriation, in the

12     manner hereinafter provided, and not otherwise" (239
Pac. at 482).

13  Then, after comparing this provision with statutes of other western

14  states, the Court concluded:

15       "We are of the opinion, and so hold, that the
legislature of Utah, by the act of 1903, intended to

16     limit the method of acquiring any right to the un-
appropriated public waters of the state to the method

17     or means prescribed in that act.  The rights attempted
to be acquired by respondent Hoopiania by actually

18     diverting the water and applying it to beneficial use
must therefore be held to be subject to the right

19     of appellant who will acquire the first right by
completing its appropriation initiated by its appli-

20     cation filed in the state engineer's office on April 25,
1918" (239 Pac. at 483).

21

22       In a later 3-2 decision (Wrathall v. Johnson (Utah

23  1935), 40 P.2d 755, 786) the Utah Supreme Court purported to

24  overrule this holding by a dictum (Hanson v. Salt Lake City

25  (Utah 1949), 205 P.2d 255, 260).  However, the Utah Legislature

26  immediately enacted an amendment clarifying the exclusiveness of

27  the statutory appropriation procedure (Laws of Utah 1935, C. 105,

28  sec. 1, now codified in Utah Code Ann.(1953), sec. 73-3-1).

29  Since then it has been repeatedly held by the Utah Supreme Court

30  that the Hoopiania decision reflects the law of Utah and the

31  Wrathall case has been treated as erroneous (Adams v. Portage

-8-

1   Irr., Reservoir & Power Co. (Utah 1937), 72 P.2d 648, 654;

2   Riordan v. Westwood (Utah 1949), 203 P.2d 922, 927; Hanson v.

3   Salt Lake City (Utah 1949), 205 P.2d 255, 259-260; Bullock v.

4   Tracy (Utah 1956), 294 P.2d 707, 709.  For example, in the most

5   recent decision, Bullock v. Tracy, supra, the Court, citing the

6   Hoopiania case, among others, as authority, stated:

7           "It is now well established that since 1903,
        the right to the use of the unappropriated public
8       waters of this state can only be acquired by first
        filing an application therefor with the State En-
9       gineer's Office" (294 P.2d at 709).

10          Similar decisions have been reached in Wyoming (Wyoming

11  Hereford Ranch v. Hammond Packing Co. (Wyo. 1925), 236 Pac. 764,

12  768-771; Laramie Rivers Co. v. Le Vasseur (Wyo. 1949), 202 P.2d

13  680, 686) and in New Mexico (State v. Dority (N.M. 1950), 225

14  P.2d 1007, 1011, appeal to U.S. Sup. Ct. dismissed 341 U.S. 924).

15          We have cited these decisions in other states not because

16  they control the interpretation of the California statute, Water

17  Code section 1225, but to show that the plain meaning of the Cali-

18  fornia statute as recognized by the California Supreme Court in

19  Crane v. Stevinson is not at all unique in the western states.  Nor

20  have we cited these decisions as authority that a later applicant

21  to appropriate must necessarily lose to an earlier applicant.

22  Under the California appropriation statute, the State Water Rights

23  Board may "reject an application when in its judgment the proposed

24  appropriation would not best conserve the public interest" (Water

25  Code sec. 1255).  If considerations of public interest make it

26  advisable to reject an earlier application, a later applicant may

27  find himself with the best right.  Long use and reliance by a

28  later applicant on water which he has filed for are among the

29  factors which the Water Rights Board could consider in determining

30  whether granting a permit to an earlier applicant would best con-

31  serve the public interest.  Clearly, however, the failure of

-9-

2768

1   the earlier user to file an application would make it impossible

2   for the Water Rights Board even to consider the issue, and

3   without an application the earlier user could never perfect a

4   valid appropriative right under California law.

5   II.   The United States Is Not Exempt from the Obligation of Com-
plying with California's Statutory Appropriation Procedure
6   on the Ground that Police Regulation Cannot Restrict its
Activities.
7

8           In its memorandum, the United States has argued again

9   that Water Code section 1225 does not apply to the United States,

10   on the theory that the statutory appropriation requirements are

11   in the nature of police regulations which have no application to

12   the United States.  What this argument really means is that because

13   it is the sovereign, the United States may acquire proprietary

14   rights in the Santa Margarita River greater and different than

15   those which a private water user could obtain in similar circum-

16   stances.  We have already pointed out in the introductory section

17   of this memorandum that such a contention is patently in violation

18   of the stipulation of the United States that "the rights of the

19   United States of America to the use of water herein are to be

20   measured in accordance with the laws of California" (109 F.Supp.

21   28, 53).

22           Even assuming that the argument has been properly ad-

23   vanced by the United States despite the stipulation, the argument

24   does not stand up under analysis any better now than when it was

25   first made in the United States' answering brief in the appeal

26   after the first trial.  The real question is not whether the

27   United States must comply with police regulations in its activi-

28   ties on Camp Pendleton.  Of course it need not.  As the Circuit

29   Court of Appeals stated in this case:

30           "Now it must be conceded by all parties that the
United States had sovereign rights in the enclave.  The
31           rules governing the use of that property were properly

-10-

2769

1    set by the Executive, under the Constitution.  Its
2    rights within the borders were sovereign, paramount
       and supreme.  This principle applied to the use of
3    water appurtenant to the land.  The United States
       could store the water which came to the land or use
4    it on a different watershed than that of the Santa
       Margarita without interference from anyone.  The
5    Water Master of the State of California had no authority
       in the enclave and could not object.  Santa Margarita
6    could not object or prevent the United States from
       using the water which came onto the land in any way
7    its officers chose.  This sovereign authority was
       essential and was granted by the Constitution."  (235
8    F.2d 647, 656.)

9        The real question is whether the United States has

10  acquired an appropriative water right, a property right to insist

11  that those upstream, who have obtained appropriative rights under

12  state law, must release to it water of the Santa Margarita River

13  for use on portions of Camp Pendleton outside the watershed.

14  Unless the United States had a pre-existing right to use the

15  water or acquired the right by eminent domain, questions which we

16  will discuss in succeeding sections of this memorandum, it must

17  establish the acquisition of that right in accordance with Cali-

18  fornia law, for there is no other law on the subject.  The un-

19  appropriated waters in the streams of California constitute "the

20  public waters of the state to be used, regulated and controlled

21  by the state or under its direction" (Meridian, Ltd. v. San

22  Francisco (1939), 13 Cal.2d 424, 445, 90 P.2d 537, 547).

23        There is only one method provided by state law whereby

24  appropriative rights to use this unappropriated water may be

25  perfected.  This method requires the filing of an application and

26  the obtaining of a permit from the State Water Rights Board.

27  Absent condemnation by an authority superior to the State, there

28  is no other way to get a proprietary right in this public re-

29  source.  This is so whether the assertion of ownership by the State

30  in the unappropriated water of the State (Water Code secs. 102,

31  1201) and, generally, in all property which has no other owner

2770

1 (Gov. Code sec. 180-182) is in a governmental or proprietary

2 capacity. The point is that unless the United States has pre-

3 existing rights to the water, or has taken the necessary steps

4 to acquire the appropriative rights it wants by eminent domain,

5 it must obtain those rights in a fashion which is recognized by

6 the State as being effective to accomplish that objective. The

7 mere diversion and use of unappropriated water ceased to be a

8 means of securing an appropriative right in this State many years

9 ago. To describe the procedure which is now required as police

10 regulations does not mean that they are any the less applicable

11 if the United States wishes to acquire the rights which can

12 come only from the State.

13        The authorities cited by the United States (U.S. Mem.

14 pp. 23-24) are examples of the fundamental, undeniable principle

15 of our system of government that the United States may perform

16 its functions without conforming to State police regulations.

17 But none of these authorities even suggest that this freedom from

18 State control in performing functions empowers the United States,

19 except for the exercise of the power of eminent domain, to acquire

20 property rights in property under State control in a manner in-

21 consistent with State requirements.

22        Again, we must remember that the real issue here is not

23 whether the United States is exempt from State control in carrying

24 on its activities or in utilizing its property rights, as sugges-

25 ted by the United States (U.S. Mem. p. 24), but rather whether

26 it possesses the property rights it claims. On that issue, the

27 fact that the United States is not subject to State police regu-

28 lation in performing authorized federal functions is irrelevant.

29 III.   Ownership of the Public Domain Is No Source of Right in the
         United States To Use Water of the Santa Margarita River on
30       Portions of Camp Pendleton Outside the Watershed.

31        In oral argument before this Court on October 21, 1957,

-12-

1   counsel for the United States for the first time in this long

2   litigation made a new, far-reaching argument concerning the

3   source of its claimed appropriative rights.  That argument was that

4   at the time the United States first diverted the water of the

5   Santa Margarita River in Camp Pendleton for use outside the water-

6   shed, the United States exercised rights which it already owned,

7   by reason of the fact that since the Treaty of Guadalupe Hidalgo

8   the United States has been the owner of public lands, now held as

9   national forest lands, in the upper portion of the Santa Margarita

10  River watershed, and hence the owner also of the rights to all

11  the unappropriated water arising from such lands (Tr. October 21,

12  1957, pp. 271, 279-280, 282, 284, 287-288, 290).  This argument

13  is developed in the United States memorandum (U.S. Mem. pp. 26-29).

14       Of course, if this theory is sound, the United States

15  has wasted a lot of time in the past arguing variously (1) that

16  it could use the quantity of water, to which it might be entitled

17  as a riparian landowner, anywhere on Camp Pendleton; (2) that it

18  has acquired prescriptive rights under California law to use water

19  outside the watershed; (3) that any water user can secure a valid

20  appropriative right under California law by merely diverting and

21  using unappropriated water; and (4) that the California statutory

22  requirements of filing an application and receiving a permit to

23  appropriate are police regulations inapplicable to the United

24  States even if they are prerequisites to the acquisition of valid

25  appropriative rights by others.  For under this new argument, the

26  United States owned the rights it claims long before it attempted

27  to exercise those rights.  Therefore, it would make no difference

28  whether the United States is a riparian landowner, or what its

29  rights are as a riparian, or whether as a downstream diverter it

30  may acquire prescriptive rights under California law, or whether

31  it took proper steps to obtain an appropriative right under

-13-

2772

1    California law or otherwise.

2        The novelty of this argument, the fact that it makes

3    irrelevant so many other arguments of the United States urged

4    throughout this long litigation, the fact that it was first

5    mentioned in oral argument nearly seven years after this case was

6    filed and after the case had once been tried and appealed, all

7    indicate that it is an ill-considered, irresponsible afterthought,

8    an argument of desperation tossed in because more orthodox argu-

9    ments have apparently failed.

10        Does it, nevertheless, have any merit?  Its predicate

11   is that, as owner of the public domain, the United States has been

12   and remains the owner of the rights to water flowing over such

13   land.  Whether this is so, or whether the United States has

14   divested itself of any such water rights which it may have had

15   (see California-Oregon Power Co. v. Beaver Portland Cement Co.

16   (1935), 295 U.S. 142, 162-164), is a question which need not be

17   determined here.  For purposes of this case, we can assume that

18   to the extent that vested rights have not been acquired by others

19   in the water flowing over the public lands located in the upper

20   portion of the Santa Margarita River watershed, certain rights

21   to such water are still possessed by the United States as owner

22   of the land.

23        But what is the nature of such rights?  We submit that

24   they are riparian rights.  As a consequence, while the United

25   States may use the water within the watershed of the public land

26   through which the water flows, it may not rely upon these rights

27   as the source of the appropriative right to divert water for use

28   on lands of Camp Pendleton which were never public lands and which

29   are outside the watershed.

30        That the right is a riparian right is recognized in

31   many cases, both federal and state.  For example, in California-

-14-

2773

1  Oregon Power Co. v. Beaver Portland Cement Co. (1935), 295 U.S.

2  142, 162, the Court stated:

3          "If it be conceded that in the absence of federal
        legislation the state would be powerless to affect
4      the riparian rights of the United States or its
        grantees, still the authority of Congress to vest
5      such power in the state, and that it has done so by
        the legislation to which we have referred, cannot be
6      doubted."  (Emphasis added.)

7  In U.S. v. Gerlach Live Stock Co. (1950), 339 U.S. 725, 746-747,

8  the United States Supreme Court had occasion to discuss an early

9  California case in which, as between two squatters on public land

10  with conflicting claims to waters of a stream flowing through

11  such land, the California Supreme Court had held that priority

12  of appropriation established the better right.  The United States

13  Supreme Court continued the discussion of that case, as follows

14  (339 U.S. at 747):

15          "But the /California Supreme7 court gave warning
        that this appropriative right might not prevail against
16      a downstream riparian proprietor who claimed by virtue
        of proprietorship.  Irvin v. Phillips, 5 Cal. 140
17      (1855).

18          "The United States, as owner of the public domain,
        was such a proprietor, and the decision made appropria-
19      tions vulnerable to its challenge."  (Emphasis added.)

20          In People of the State of California v. United States

21  (9th Cir. 1950), 180 F.2d 596, 598, 604, both the majority and

22  the dissent indicate that the claim of the United States in that

23  case as an owner of public lands for water for forest and other

24  purposes on such lands was as a "riparian" landowner.

25          In the famous case of Lux v. Haggin (1886), 69 Cal. 255,

26  10 Pac. 674, the California Supreme Court also referred to the

27  United States in its capacity as the owner of public lands as a

28  "riparian proprietor" (69 Cal. at 338, 339, 10 Pac. at 721) and a

29  "riparian owner" (69 Cal. at 340, 10 Pac. at 722).  In Holmes v.

30  Nay (1921), 186 Cal. 231, 234, 199 Pac. 325, 327, the Court spoke

31  of the "government's rights as a riparian owner" of public lands

-15-

2774

1  and explained the purpose of the Act of Congress of July 26, 1866,

2  as "intended simply to validate such appropriations and diversions

3  as constituted an invasion of the government's rights as a riparian

4  owner" (186 Cal. at 234, 199 Pac. 327). (Emphasis added.)  In

5  Canal & Irrigation Co. v. Worswick (1922), 187 Cal. 674, 685-686,

6  203 Pac. 999, 1004, the California Supreme Court analyzed why the

7  appropriative right of a diverter on public land is superior to

8  the riparian rights of a subsequent purchaser of public land from

9  the United States lying above the point of diversion.  The Court

10 said (187 Cal. at 686, 203 Pac. at 1004):

11         "The opinions in these cases decide the question
       but do not state fully the reasons for the conclusion.
12     It is apparent, however, that they must be based on the
       hypothesis that the reservation provided for by section
13     17 of the Act of 1870 in favor of accrued and vested
       rights runs to the appropriator of water upon land of
14     the United States and creates in him a right superior to
       that of the riparian right of the United States per-
15     taining to the land it then owns situated above the place
       of diversion, so that a subsequent purchaser of such
16     upper lands takes subject to the lower appropriation."
       (Emphasis added.)
17

18         As a riparian landowner, the United States' right to use

19 the water is clearly limited to the riparian land.  Once the water

20 leaves that land and flows onto land that never was public land,

21 because it was in private ownership when California was ceded by

22 Mexico to the United States, the riparian right of the United States

23 is of no consequence whatever.  To obtain an appropriative right

24 to use the water on such land the United States must look else-

25 where than to its status as a riparian landowner upstream.

26         No case cited in the United States memorandum, and no

27 other case that we know about, holds that the ownership of public

28 land or reserved land gives the United States a superior claim to

29 use water, that may have flowed through such land, on other land

30 that never was in the public domain, and in fact is outside the

31 watershed of the stream.  On the contrary, to the extent that the

-16-

2775

1  ownership of public or reserved land has been regarded as a

2  source of right by the United States to use water, it has been

3  carefully restricted to use on that land.  In United States v.

4  Rio Grande Irrigation Co. (1899), 174 U.S. 690, 703, the United

5  States Supreme Court said:

6         "Although this power of changing the common law
       rule as to streams within its dominion undoubtedly
7      belongs to each State, yet two limitations must be
       recognized:  First, that in the absence of specific
8      authority from Congress a State cannot by its legis-
       lation destroy the right of the United States, as the
9      owner of lands bordering on a stream, to the continued
       flow of the waters, so far at least as may be necessary
10     for the beneficial uses of the governmental property."
       (Emphasis added.)

11 Similarly, in United States v. McIntire (9th Cir. 1939), 101 F.2d

12

13 650, and United States v. Walker Irr. Dist. (9th Cir. 1939), 104

14 F.2d 334, both cited by the United States (U.S. Mem. p. 28), the

15 reservation of water flowing over public land reserved for Indian

16 reservations was held to be for use on such reserved land.

17         Therefore, it is our position that even if the United

18 States has the right, as an owner of public land in the upper

19 portion of the Santa Margarita River watershed, to use water

20 flowing thereon upon the portions of such land that are riparian

21 to the various tributary streams, once the water has flowed out

22 of the public land, the United States has no special claim to it.

23 The water, to the extent it is in excess of riparian needs and

24 vested appropriative rights, becomes part of the "public waters

25 of the state to be used, regulated and controlled by the state

26 or under its direction" (Meridian, Ltd. v. San Francisco (1939),

27 13 Cal.2d 424, 445, 90 P.2d 537, 547).

28 IV.  The United States Has Not Acquired Appropriative Rights to
        Use Santa Margarita River Water Outside the Watershed Through
29      Exercise of the Power of Eminent Domain.

30     A.  Direct Condemnation.

31         The State of California does not contest that the

-17-

2776

1 United States acquired all the water rights owned by the Rancho

2 Santa Margarita when it condemned the land and appurtenances

3 belonging to the Rancho.  However, this does not help the United

4 States  in its claim of appropriative rights unless the Rancho

5 itself possessed appropriative rights to use Santa Margarita River

6 water outside the watershed.  We understand that it is conceded by

7 the United States that the Rancho never filed an application or

8 obtained a permit pursuant to state procedures to appropriate water

9 of the Santa Margarita River for use outside the watershed.  Hence,

10 unless the Rancho perfected an appropriative right prior to 1914,

11 the effective date of the Water Commission Act, by diverting and

12 using the water outside the watershed prior to that date (Crane v.

13 Stevinson (1936), 5 Cal.2d 387, 398, 54 P.2d 1100, 1106), the

14 United States cannot rely for its claimed appropriative rights

15 on the rights to which it succeeded when it bought the Rancho

16 Santa Margarita.  Whether such an appropriative right was per-

17 fected before 1914 is, of course, in part a question of fact.

18 But, it is significant that no evidence on this point was even

19 offered by the United States at the first trial.

20     B.  Inverse Condemnation.

21     Like the argument that the United States may base its

22 appropriative claims on ownership of the public domain, this final

23 contention of the United States, that appropriative rights have in

24 any event been obtained by inverse condemnation, was advanced for

25 the first time in oral argument on October 21, 1957.  If the

26 contention is sound, it, too, would conclude the issue and make

27 unnecessary all the other theories which the United States has

28 urged in this case to justify its claim of right to demand water

29 for use outside the watershed.  One naturally wonders, therefore,

30 why the United States has waited so long to make it.  We submit

31 that the explanation is the same as for the tardy reliance upon

-18-

2777

1   the ownership of public domain--the contention is a desperate
2   afterthought which the United States hopes will succeed where its
3   more responsible arguments have apparently failed.

4        Let us examine this new contention.  It is that the
5   diversion on Camp Pendleton of unappropriated Santa Margarita
6   River water and its use on portions of the enclave lying outside
7   the watershed constituted a "taking" in inverse condemnation of
8   an appropriative right to demand continuance of such flows for
9   such use.  The United States argues that the result is as though
10  an action in direct condemnation for such rights had been pro-
11  secuted to judgment.

12       There is no question, of course, that the United States
13  has the power to obtain by direct condemnation any property rights
14  which it needs to accomplish its constitutional function of
15  providing for the national defense.  A procedure for such acqui-
16  sition is contained in Title 10 of the United States Code, section
17  2663 (70A Stat. 148, (1956)):

18       "(a)  The Secretary of a military department may
19       have proceedings brought in the name of the United States,
         in a court of proper jurisdiction, to acquire by con-
20       demnation any interest in land, including temporary use,
         needed for . . .

21       "(1) the site, construction, or operation of
22       fortifications, coast defenses, or military training
         camps."

23       We assume this authority is adequate to enable the
24  Secretary of the Navy to bring an action in court to condemn what-
25  ever water rights he needs to operate Camp Pendleton and believes
26  he cannot get by other methods.  But, aside from the condemnation
27  of the Rancho Santa Margarita, the Secretary of the Navy has
28  brought no such direct condemnation proceeding here.

29       Neither do we doubt that, when authorized, a federal
30  official may engage in activities on behalf of the United States
31  which so interfere with the property rights of another that in

-19-

2778

1   effect there is a "taking" by the United States of such property

2   rights through "inverse condemnation"; in such event, it has

3   been held that the owner of the property has a right under the

4   Tucker Act (24 Stat. 505 (1887), 28 U.S.C. secs. 1346(a)(2),

5   1491) to damages for the taking (U.S. v. Gerlach Live Stock Co.

6   (1950), 339 U.S. 725, 730; United States v. Dickinson (1947),

7   331 U.S. 745; United States v. Causby (1946), 328 U.S. 256;

8   Hurley v. Kincaid (1932), 285 U.S. 95, 103; Portsmouth Co. v.

9   United States (1922), 260 U.S. 327; United States v. Cress (1917),

10  243 U.S. 316, 328-329; United States v. Lynah (1903), 188 U.S.

11  445, 468-469; Pumpelly v. Green Bay Company (1871), 80 U.S. (13

12  Wall.) 166, 177). We submit, however, that no "taking" of

13  appropriative rights in inverse condemnation could have resulted

14  from the action of the United States in diverting and using water

15  which it found on the Camp Pendleton enclave.

16        In a leading United States Supreme Court case on inverse

17  condemnation, the distinguishing feature of a "taking" was

18  explained:

19        "Property is taken in the constitutional sense
20     when inroads are made upon an owner's use of it to an
        extent that, as between private parties, a servitude
21     has been acquired either by agreement or in course
        of time" (United States v. Dickinson (1947), 331 U.S.
22     745, 748).

23        That feature is entirely lacking in our case. The water

24  which the United States diverted and used was surplus to the needs

25  of everyone else in the watershed; otherwise it would not have

26  reached Camp Pendleton. If not used by the United States it would

27  have wasted into the ocean. No one had the right to object to

28  such use; hence no servitude could have been acquired. The reason

29  was explained by the Circuit Court of Appeals in its decision on

30  the appeal after the first trial of this case (235 Fed.2d 647,

31  655):

1      "No sovereign rights over this land existed
      in the United States except as provided by the dual
2     system until the State of California ceded exclusive
      jurisdiction over the tracts of land acquired by
3     condemnation.  By federal law, thereafter, the United
      States held paramount and exclusive control and juris-
4     diction over the land and water which at any time is
      upon the land within the limits of this enclave.  The
5     process of the state courts could not run therein
      unless by consent.  The executive and administrative
6     bodies and regulations had no control therein.  State
      law, substantive and procedural, had no force over
7     persons or objects within the boundaries."

8          The Circuit Court explained further (235 F.2d at 656):

9          "But the physical possession of the corpus of the
      water after it enters the enclave and the ability and
10    legal right then to use it for whatever purpose are not
      evidentiary of a water right, for the right to use water
11    is a property right and is appurtenant to particular
      parcel of land.  We must not fall into the fallacy of
12    believing that, because the United States, by its
      sovereignty, made use of the corpus of water which
13    entered the enclave as it chose, it thereby acquired
      property rights in the flow against upper riparians
14    or appropriators under municipal law.

15         ". . . Since neither appropriators, riparians nor
      anyone else could object or prevent such use of water
16    by the United States in the enclave, such use was not
      adverse to their interests."
17

18         An analysis of some of the decisions of the United

19    States Supreme Court which recognize a taking of property in

20    inverse condemnation by the United States illustrates how

21    different those situations are from our case.

22         In U.S. v. Gerlach Live Stock Co. (1950), 339 U.S. 725,

23    730, Friant Dam of the federal Central Valley Project stored,

24    and diverted to other lands, flows of water which the plaintiffs

25    had long used on their downstream riparian land.  As the Court

26    described the situation:

27         "Except at rare intervals there will be no spill
      over Friant Dam, the bed of the San Joaquin along
28    claimants' lands will be parched and their grass
      lands will be barren" (339 U.S. at 725).
29

30    There has been no such deprivation of water here by the activities

31    of the United States on Camp Pendleton.

-21-

1       In United States v. Causby (1946), 328 U.S. 256, the

2  noise and glare resulting from the use of airspace directly over

3  the plaintiff's chicken ranch for airplane take-offs and landings

4  at a Government airbase made the ranch unusable for raising

5  poultry.  The Court held that this constituted a taking of an

6  easement over the plaintiff's land.  In Portsmouth Co. v. United

7  States (1922), 260 U.S. 327, the Court held in a somewhat similar

8  situation that an easement could have been taken by the firing

9  of large guns of the United States over the plaintiff's land

10  because the land might be rendered valueless as a summer resort.

11  In our case, there has been no such interference with the use

12  and enjoyment of property belonging to others by the activities

13  of the United States on Camp Pendleton.

14       In United States v. Dickinson (1947), 331 U.S. 745, a

15  federal flood control dam raised the level of a river to the

16  extent that certain land belonging to the plaintiff was flooded.

17  Similar problems of flooding of land resulting from navigation

18  improvements were involved in United States v. Cress (1917),

19  243 U.S. 316, 328-329; United States v. Lynah (1903), 188 U.S.

20  445, 468, 469; and Pumpelly v. Green Bay Company (1871), 80 U.S.

21  (13 Wall.) 166, 177).  Here, by contrast, there has been no

22  invasion of anyone's land or other property rights by the United

23  States' diversion of the corpus of surplus water which found its

24  way onto Camp Pendleton.

25       It is obvious that until this theory of inverse con-

26  demnation was pulled out of the hat less than two months ago, none

27  of the officials of the United States responsible for the operation

28  of Camp Pendleton or the conduct of this litigation had any idea

29  that the United States had taken water rights by inverse con-

30  demnation some sixteen years ago.  Certainly if they had any such

31  belief, they kept it very secret.  Indeed, they denied time and

-22-

2781

1   again, when testifying before committees of Congress, that the

2   United States claimed anything more than what any other water user

3   would have acquired by purchasing the Rancho Santa Margarita.

4   If they did not realize that a taking had occurred, how could

5   anyone else?

6       In United States v. Dickinson (1947), 331 U.S. 745, 747-

7   748, the United States Supreme Court contrasted direct condemna-

8   tion with inverse condemnation in a flooding situation.  The

9   Court stated:

10          "The Government could, of course, have taken
            appropriate proceedings to condemn as early as it
11          chose both land and flowage easements.  By such pro-
            ceedings it could have fixed the time when the property
12          was 'taken'.  The Government chose not to do so.  It
            left the taking to physical events, thereby putting
13          on the owner the onus of determining the decisive
            moment in the process of acquisition by the United
14          States when the fact of taking could no longer be in
            controversy."
15

16      Surely, if the United States really made a choice in

17  the past not to condemn directly the appropriate rights it claims

18  and instead to leave the taking to physical events, thereby

19  putting the onus on the owner to determine when the taking

20  occurred, there must be physical events which convey that fact

21  to the owner.  We submit that there never have been any such

22  physical events in our case.

23      Dated:  December 12, 1957.

24

25                          EDMUND G. BROWN, Attorney General
                                of the State of California
26                          ADOLPHUS MOSKOVITZ, Deputy Attorney
                                General
27

28                          By  Adolphus Moskovitz
                                ADOLPHUS MOSKOVITZ
29

30                          Attorneys for Defendants in
                            Intervention.
31

-23-

2792

## AFFIDAVIT OF SERVICE BY MAIL

STATE OF CALIFORNIA )
                    ) ss.
COUNTY OF SACRAMENTO )

CHARLOTTE MORGAN, being duly sworn, deposes and says:

That affiant is a citizen of the United States, over the age of 18 years, and not a party to the within action; that affiant's place of employment and business address is Library and Courts Building, Sacramento 14, California; that on the 12th day of December, 1957, affiant enclosed a true copy of the following memorandum, dated December 12, 1957:

Answering Memorandum of the State of California
to the Memorandum of Points and Authorities
Submitted by the United States Pursuant to This
Court's Direction of October 21, 1957.

in an envelope for each of the persons named below, addressed to each of them at the address set out immediately below each respective name, sealed said envelope, and deposited the same in the United States Mail at the City of Sacramento, State of California, with postage thereon fully prepaid; that there is delivery service by United States Mail at each of the places so addressed, or there is regular communication by mail between the said place of mailing and each of the places so addressed:

Bert Buzzini
2223 Fulton Street
Berkeley 4, California

Allard, Brownsberger, Shelton &
  O'Connor
313 First National Building
Pomona, California

Florence A. Anderson
918 C. C. Chapman Building
756 South Broadway
Los Angeles, California

Henry Ashton, Esq.
408 East Central Avenue
Balboa, California

Best, Best & Kireger
Evans Building
Riverside, California

A. A. Bianchi
901 Kohl Building
400 Montgomery Street
San Francisco, California

Thomas J. Burke
504 Granger Building
San Diego 1, California

Mabel Clausen
320 First Trust Building
Pasadena, California

Clayson, Stark & Rothrock
First National Building
Corona, California
Attention:  George G. Grover

Howard E. Crandall
127 West Anaheim Building
Wilmington, California

Wm. J. Cusack, Esq.
Room 814 Merritt Building
307 West 8th Street
Los Angeles, California

W. B. Dennis
365 Broadway
Vista, California

Devor & Dorfman
924 Van Nuys Building
Los Angeles 14, California

Leonard J. Difani
200 Loring Building
Riverside, California

J. A. Donnelley & Richard P.
 MacNulty
2655 - 4th Avenue
San Diego 1, California

Lawrence E. Drumm
458 South Spring Street
Suite 820
Los Angeles 14, California

Ray C. Eberhard
Room 1231 Bartlette Building
215 West 7th Street
Los Angeles 14, California

Estudillo & Bucciarelli
3900 Market Street
Riverside, California

Fendler, Weber & Lerner
333 South Beverly Drive
Beverly Hills, California

Daniel W. Gage
740 Rowan Building
458 South Spring Street
Los Angeles 13, California

Abraham Gottfried
424 South Beverly Drive
Beverly Hills, California

Arthur Gediman
119 South Main Street
Elsinore, California

2784

Frank E. Gray
202 South Hamilton Drive
Beverly Hills, California

Hahn, Ross & Saunders
Suite 611
608 South Hill Street
Los Angeles 14, California

Tom Halde
417 South Hill Street
Suite 520
Los Angeles 13, California

Frank S. Hamburger
1031 Mills Tower
San Francisco, California

Leslie B. Hanson
4412 York Boulevard
Los Angeles, California

James Don Keller & Robert G.
 Berrey
302 Civic Center
San Diego 1, California

Courtney Lacey
408 East Florida Avenue
Hemet, California

Launder, Chaffee & Launer
Bank of America Building
Fullerton, California

Walter Gould Lincoln
Suite 1113
742 South Hill Street
Los Angeles 14, California

Lindley, Lazar & Scales
825 Bank of America Building
San Diego 1, California

Luce, Forward, Kunzel & Scripps
1220 San Diego Trust & Savings Building
San Diego 1, California

William O. Mackey, Wilburn J.
 Murray and James H. Angell
County of Riverside
Courthouse
Riverside, California

Richard M. Marsh
45-262 Jackson Street
Indio, California

J. U. Memmi
220 North Nevada Street
Oceanside, California

Lt. David W. Miller, USN
Office of Ground Water Resources
Marine Corps Base
Camp Pendleton, California

-3-

2785

John Neblett
500 Mission Inn Rotunda
Riverside, California

A. J. O'Connor
639 South Spring Street
Los Angeles 14, California

Henry M. Moffatt
121 East 6th Street
Los Angeles 14, California

O'Melveny & Myers
433 South Spring Street
Los Angeles 13, California

George Stahlman
Route 1, Box 235
Fallbrook, California

Benjamin S. Parks
Room 916
210 West 7th Street
Los Angeles 14, California

George M. Pierson
816 Continental Building
Los Angeles 13, California

J. Lee Rankin
Solicitor General
Department of Justice
Washington, D. C.

Sarau, Adams, Neblett & Sarau
Suite 500, Mission Inn Rotunda
Riverside, California

Shatford & Shatford
5920 Temple City Boulevard
Temple City, California

W. E. Starke
1130 Bank of America Building
San Diego 1, California

J. D. Skeen
802 Utah Oil Building
Salt Lake City, Utah

Hugo A. Steinmyer & Winfield Jones
650 South Spring Street
Los Angeles 14, California

William Stinehart
5045 Wilshire Boulevard
Los Angeles 36, California

Swing, Scharnikow & Staniforth
Suite 604
530 Broadway
San Diego 1, California
Attention:  Phil D. Swing

Sachse & Price
217 North Main Street
Fallbrook, California
Attention:  Franz Sachse

2786

Tanner, Thornton & Myers
215 West 7th Street
Los Angeles 14, California

Thompson & Colgate
405 Citizens Bank Building
Riverside, California

William H. Veeder
Special Assistant to the Attorney
  General
Department of Justice
Washington, D. C.

William E. Burby
12120 Travis Street
Los Angeles 49, California

Cornelius T. Waldo
10742 Nassau Avenue
Sunland, California

Robert W. Walker, Henry M. Moffat,
 Robert S. Curtiss
448 Santa Fe Building
Los Angeles 14, California

G. V. Weikert
918 Oviatt Building
Los Angeles 14, California

P. W. Willett
P. O. Box 103
Fallbrook, California

William H. Macomber
1114 San Diego Trust & Savings Building
San Diego 1, California

Dennett Withington
1317 E. Street
San Bernardino, California


_Charlotte Morgan_
CHARLOTTE MORGAN


Subscribed and sworn to before
me this 12th day of December , 1957.

_Laura M. Middleton_
Notary Public in and for the County of
Sacramento, State of California.

2787

-5-