F I L E D

DEC 3 0 1957

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY CLERK

J. LEE RANKIN
SOLICITOR GENERAL
OF THE UNITED STATES
WASHINGTON 25, D.C.

Attorney for the UNITED STATES OF AMERICA

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

FALLBROOK PUBLIC UTILITY DISTRICT,
  a public service corporation of
  the State of California;
SANTA MARGARITA MUTUAL WATER COMPANY,
  a public service corporation of
  the State of California; et al.;

                    Defendants,

STATE OF CALIFORNIA,

                    Defendant in
                    Intervention.

Civil No. 1247-SD

M O T I O N
FOR RULINGS OF LAW RESPECTING CALIFORNIA'S
STIPULATION OF NOVEMBER 29, 1951, WITH THE
UNITED STATES OF AMERICA

MEMORANDUM
IN SUPPORT OF
MOTION FOR RULING IN ADVANCE OF TRIAL

MEMORANDUM
IN RESPONSE TO REPLY BRIEFS
OF CALIFORNIA AND THE
FALLBROOK PUBLIC UTILITY DISTRICT

Honorable James M. Carter

Presiding Judge.

2793

PRELIMINARY STATEMENT

Fallbrook and California have by their memoranda questioned the basis upon which the United States is proceeding in this cause. That matter was determined finally and completely by the stipulation of November 29, 1951, between California and the National Government. Accordingly, the United States of America moves this Court to declare the binding character of that stipulation. Such a declaration will constitute virtually a complete response to Fallbrook's memorandum.

A basic error by both Fallbrook and California pervades their memoranda. They fail to recognize that when, as here, the United States of America diverts and applies water to a beneficial use under a claim of right there vests in it an incorporeal hereditament in the stream, if the right was not in fact already vested in it. They have moreover confused the right to water with the corpus of the water.

Error is likewise to be found in the claims of both parties in their failure to recognize that every act of the National Government is in fact in full conformity with the laws of California.

These factors are fully reviewed in the motion and the accompanying memoranda.

- 1 -

2794

S U B J E C T   I N D E X

| | Page |
|---|---|
| Preliminary Statement | 1 |
| Motion For Rulings of Law Respecting California's Stipulation of November 29, 1951, With the United States of America | |
|    Stipulation | |
| Memorandum In Support of Motion for Ruling in Advance of Trial | 1 |
|    The Import of the Stipulation of November 29, 1951 | 1 |
|    California's Stipulation is Reflective of the "Sovereign Status" of the National Government and the Powers Exercised by the Latter in Acquiring the Rights here Involved | 3 |
|      a.  Our National Government May Only Exercise Powers Conferred Upon It By The Constitution | 3 |
|      b.  California Recognized in Its Stipulation That The United States of America Was Acting As a Sovereign - Indeed It Could Act In no Other Way When it Acquired the Rights Here Involved | 4 |
|    Conceded by All Parties Including California Is The Fact That the United States of America Acquired by Direct Condemnation Those Lands Comprising the Rancho Santa Margarita Together with Rights to the Use of Water Appurtenant to Those Lands | 6 |
|    California Stipulated With the National Government: "That the Rights of the United States of America to the Use of Water Herein Are to be Measured in Accordance with the Laws of the State of California" | 7 |
|    California's Law Fully Recognizes the Power of the United States of America to Acquire Property by /a/ Direct, /b/ Inverse Condemnation | 9 |
|    Acquired in the Exercise of Its "Sovereign Status"; Measured by Beneficial Use; This Court has Before it For Determination, Based Upon Law and Facts, Extent of the Rights to the Use of Water in the Santa Margarita River Acquired by the United States of America from the Rancho Santa Margarita and Those Which It May Have Gained Since That Acquisition by Prescription or Use or Both | 11 |
|    Conclusion | 12 |

*    *    *    *    *    *    *    *    *    *    *    *

| | Page |
|---|---|
| Memorandum In Response to Reply Briefs of California and the Fallbrook Public Utility District | 1 |
|    Preliminary Statement | 1 |

2795

| (Memorandum In Response to Reply Briefs of California and the Fallbrook Public Utility District - continued) | Page |
|---|---|

It Is Essential That There be Defined in This Cause the Meaning to be Ascribed to The Term "Right to the Use of Water" ... 2

    Erroneous Concepts of Fallbrook and California Respecting Rights to the Use of Water ... 2

Title To Rights to the Use of Water Vests in the Owner the Right to Demand Against Upstream Claimants or Water Users that They Refrain From Interfering With the Flow of the Water Co-extensive With the Right ... 4

California's Law - The California Doctrine - Recognizes The National Government as the Source of All Titles to Appropriative Rights to the Use of Water ... 9

Those Appropriative Rights to the Use of Water in the Santa Margarita River Which the United States of America is Exercising, if Any, in Excess of Those Which it Acquired From the Rancho Were Vested in It at That Time and May Be Enjoyed Without Regard to State Law ... 10

On the Background of Facts and Law - For Ultimate Resolution This Question is Presented: Will the Law Countenance Destruction of Large Areas of Camp Pendleton or Require Acquisition of New Rights for That Military Establishment After Sixteen Years of Use of Those Rights the United States of America Now Claims and Exercises? ... 11

Summary Respecting Fallbrook's and California's Memoranda ... 13

    A.  The Law Will Not Deprive a Water User of Rights He Is Using and Give Them to a Junior Claimant Who Files with the State ... 13

    B.  The "California Doctrine", Announced by California's Courts, that the United States of America is the Owner of the Unappropriated Rights to the Use of Water is Unrefuted by California's Brief ... 14

    C.  Fallbrook and California Both Err If They Are Asserting That Appropriative Rights To The Use of Water May Only Be Acquired Through Invasion of Upstream Property ... 17

    D.  California's Error Respecting the Acquisition by the United States of America of Rights by Direct and Inverse Condemnation is Set Forth in the Memorandum Supporting the Accompanying Motion ... 18

    E.  California Has Failed to Recognize That by Its Own Laws the United States of America is Fully Empowered to Acquire Property by Either Inverse or Direct Condemnation ... 20

    F.  Rights To The Use of Water Were Acquired by the United States of America When It Condemned the Rancho Santa Margarita; It Is Believed Those Rights Are Sufficient to Meet all the Demands of the United States of America. Congress Has Been So Advised. Congress Has Also Been Fully Advised of California's Stipulation of November 29, 1951 ... 20

2796

J. LEE RANKIN
SOLICITOR GENERAL
  OF THE UNITED STATES
WASHINGTON 25, D. C.

Attorney for the UNITED STATES OF AMERICA

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 1247-SD |
| | ) |
| FALLBROOK PUBLIC UTILITY DISTRICT, a public service corporation of the State of California; SANTA MARGARITA MUTUAL WATER COMPANY, a public service corporation of the State of California; et al.; | ) |
| Defendants. | ) |
| | ) |
| STATE OF CALIFORNIA, | ) |
| Defendant in Intervention. | ) |

M O T I O N

FOR RULINGS OF LAW RESPECTING CALIFORNIA'S
STIPULATION OF NOVEMBER 29, 1951, WITH THE
UNITED STATES OF AMERICA

Comes now the UNITED STATES OF AMERICA acting by and through J. Lee Rankin, Solicitor General, William H. Veeder and William E. Burby, Attorneys, Department of Justice, and alleges that

I

In the course of the present proceedings doubt has been cast upon the binding effect upon the State of California, the United States of America, and the Fallbrook Public Utility District, of the stipulation of November 29, 1951, a copy of which is hereto attached and by reference made a part of this motion;

- 1 -

2797

## II

Similarly in the course of those proceedings questions have been raised as to the meaning of the terms contained in that stipulation with special reference to Paragraphs II, III, and IV;

WHEREFORE the UNITED STATES OF AMERICA respectfully moves this Honorable Court to declare in advance of trial that the parties mentioned are bound by the stipulation;

The UNITED STATES OF AMERICA further moves this Honorable Court to declare that the stipulation have ascribed to it the usual meaning of the terms set forth in it.

UNITED STATES OF AMERICA

J. LEE RANKIN,
Solicitor General

WILLIAM H. VEEDER,
Attorney, Department of Justice

WILLIAM E. BURBY
Attorney, Department of Justice

- 2 -

2798

BETTY MARSHALL GRAYDON
Assistant United States Attorney
1405 Fifth Avenue
San Diego 1, California
Telephone: F 9-4101
EDMUND G. BROWN, Attorney General of the State of California
B. ABBOTT GOLDBERG, Deputy Attorney General
600 State Building
San Francisco 2, California
Telephone: UN 1-8700
ARVIN B. SHAW, JR., Assistant Attorney General
835 Rowan Building
Los Angeles, California
Telephone: MAdison 6-0161

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

FALLBROOK PUBLIC UTILITY DISTRICT, a
public service corporation of the
State of California, et al.,

        Defendants,

PEOPLE OF THE STATE OF CALIFORNIA,

        Defendants in Intervention.

Civil No. 1247

STIPULATION

On the 15th day of August, 1951, the People of the
State of California, in accordance with invitation of the
United States of America, petitioned this Court to intervene
in this litigation.  On that date an Order was allowed and
entered by this Court granting the Petition.

For the clarification of the issues in this
litigation, and for the benefit of all of the parties to this
cause, it is hereby stipulated:

I

That in Paragraphs VIII and IX of plaintiff's
Complaint herein, and in Paragraphs 2 and 3 of the Prayer of
said Complaint, the word "paramount" is used in the same

1.

2799

M E M O R A N D U M
In Support of
MOTION FOR RULING IN ADVANCE OF TRIAL

———

THE IMPORT OF THE STIPULATION OF NOVEMBER 29, 1951

California formulated;[1]

Fallbrook agreed to;[2] the

United States of America abides by

the stipulation of November 29, 1951, which contains this express

proviso:

"III

" * * * the United States of America claims by

reason of its sovereign status no right to the

use of a greater quantity of water than is stated

in Paragraph II, hereof." (Emphasis supplied)

Substance of that quoted paragraph is expressed in these terms

in the brief of the United States of America filed on or about May 1, 1951:

"The measure of the rights are those owned by the

Rancho Santa Margarita at the time of the acquisition

plus such rights as may have been acquired through use -

an element which must remain undetermined until the

evidence has been evaluated.[3]

* * * * * *

"The next inquiry presented by the defendants is

whether since the commencement of the military establishments

———

[1] United States of America v. Fallbrook Public Utility District, et al., 109 F. Supp. 28, 52-53 (U.S.D.C.S.D. Cal. S.D. 1952).
Note: California and Fallbrook on December 3, 1957, again agreed to the stipulation in question by approving "Agreed Facts" containing that stipulation.

[2] United States of America v. Fallbrook Public Utility District, et al., 109 F. Supp. 28, 52-53 (U.S.D.C.S.D. Cal. S.D. 1952).
Note: California and Fallbrook on December 3, 1957, again agreed to the stipulation in question by approving "Agreed Facts" containing that stipulation.

[3] Page 27, lines 18-21.

- 1 -

2800

sense in which that word is used in the second paragraph,
on page 374 of the opinion of the Supreme Court of California
in the case of Peabody v. Vallejo, 2 Cal. 2d 351 (fourth
paragraph on page 494, 40 Pac. 2d 486.)

II

That in this cause, the United States of America
claims only such rights to the use of water as it acquired
when it purchased the Rancho Santa Margarita, together with
any rights to the use of water which it may have gained by
prescription or use, or both, since its acquisition of the
Rancho Santa Margarita.

III

That the United States of America claims by reason
of its sovereign status no right to the use of a greater
quantity of water than is stated in Paragraph II, hereof.

IV

That the rights of the United States of America to
the use of water herein are to be measured in accordance with
the laws of the State of California.

V

That the parties to this Stipulation will request
the entry of a Pretrial Order by this Court defining the issues
in this cause, in conformity with the statements contained
in this Stipulation.

VI

That there will be a full, complete and mutual
exchange of data and information as to the subject matter of
this cause collected by the respective parties to this
Stipulation, including data respecting the issuance of any
permits or licenses issued by the State of California in
connection with the rights to the use of water of the

2801

1  Santa Margarita River.  Such exchange of information by the

2  United States, will be subject to clearance by the Commanding

3  Officer, Camp Joseph H. Pendleton, in respect to military

4  security, as determined by said Officer.

5          Dated:   November 29, 1951.

6

7

8  ERNEST A. TOLIN,                    EDMUND G. BROWN
   United States Attorney              EDMUND G. BROWN, Attorney General
   BETTY MARSHALL GRAYDON,             of the State of California
9  Assistant United
   States Attorney
10 WILLIAM H. VEEDER,                  ARVIN B. SHAW, JR.
   Special Assistant to                ARVIN B. SHAW, JR.
11 the Attorney General                Assistant Attorney General
   of the United States
12                                     B. ABBOTT GOLDBERG
   By                                  B. ABBOTT GOLDBERG,
13                                     Deputy Attorney General
14 WILLIAM H. VEEDER
   WILLIAM H. VEEDER                   Attorneys for the People of the
15                                     State of California

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

                           3.

MEMORANDUM
In Support of
MOTION FOR RULING IN ADVANCE OF TRIAL

THE IMPORT OF THE STIPULATION OF NOVEMBER 29, 1951

California formulated;[1]

Fallbrook agreed to;[2]   the

United States of America abides by

the stipulation of November 29, 1951, which contains this express

proviso:

"III

" * * * the United States of America claims by

reason of its sovereign status no right to the

use of a greater quantity of water than is stated

in Paragraph II, hereof." (Emphasis supplied)

Substance of that quoted paragraph is expressed in these terms

in the brief of the United States of America filed on or about May 1, 1951:

"The measure of the rights are those owned by the

Rancho Santa Margarita at the time of the acquisition

plus such rights as may have been acquired through use -

an element which must remain undetermined until the

evidence has been evaluated.[3]

* * * * * *

"The next inquiry presented by the defendants is

whether since the commencement of the military establishments

---

[1] United States of America v. Fallbrook Public Utility District, et al., 109
F. Supp. 28, 52-53 (U.S.D.C.S.D. Cal. S.D. 1952).
Note: California and Fallbrook on December 3, 1957, again agreed to the
stipulation in question by approving "Agreed Facts" containing that
stipulation.

[2] United States of America v. Fallbrook Public Utility District, et al., 109
F. Supp. 28, 52-53 (U.S.D.C.S.D. Cal. S.D. 1952).
Note: California and Fallbrook on December 3, 1957, again agreed to the
stipulation in question by approving "Agreed Facts" containing that
stipulation.

[3] Page 27, lines 18-21.

- 1 -

2803

1   the United States has pumped from its wells and exported water

2   out of the watershed.  It is repeated that the measure of the

3   rights exercised by the United States are those rights acquired

4   from the Rancho Santa Margarita plus such increment of rights as

5   would arise from use through the years.  The uses to which those

6   rights are applied are subject solely to the jurisdiction of the

7   United States and the laws enacted by the Congress." 4/

8       Former Attorney General Brownell testifying before Congress declared:

9       "* * * This is the stipulation / November 29, 1951/, into
10  which all the parties have entered, including the Attorney General
    and the State of California:

11      "That in this cause the United States of America claims
12  only such rights to the use of water as it acquired when it purchased
    the ranch, together with any rights to the use of water which it may
13  have gained by prescription or use by (sic) both since its acquisition.
        "(3) That the United States of America claims, by reason
14  of its sovereign status, no rights to the use of a greater quantity
    of water than is stated in paragraph 2.

15  "That is binding on the United States and we claim no other or
16  further rights.

17      "The stipulation goes on to say:

18      "That the rights of the United States to the use of water
    herein are to be measured in accordance with the laws of the State
19  of California." 5/

20      Congress has been fully apprised of it; has made numerous references

21  to it; at no time acted to refute it or deny the binding effect of it.

22      To what provision of the stipulation does this clause of that

23  document have application:  "The United States of America claims by reason

24  of its sovereign status, no right to the use of a

25      greater quantity of water than is stated in Paragraph II"?

26  Response to that query is set forth in the quotation which follows:

27                      "II

28      "That in this cause, the United States of America

29      claims only such rights to the use of water as it

30      acquired when it purchased the Rancho Santa Margarita,

31

32  4/  Page 28, lines 7-14.
    5/  Supplemental Hearing on State, Justice, and Commerce Appropriations
        for 1954, Friday May 15, 1953, page 20.

                        - 2 -

1    together with any rights to the use of water which

2    it may have gained by

3        [ a ] prescription or

4        [ b ] use,

5        [ c ] or both".

6  This statement was made in the brief of the United States of America

7  written in connection with this Court's determination to make rulings

8  in advance of trial.  There it was stated:

9        "* * * let it be emphasized that the United States

10       of America does not claim any greater rights than

11       those to which it succeeded from the Rancho Santa

12       Margarita plus such other rights as may have accrued

13       by use or prescription." [6/]

14  It is thus eminently clear that the United States of America and the

15  State of California - indeed this Court - have all recognized the breadth

16  of the claim of the United States and the basis upon which it is

17  predicated.  It is essential to consider the factors upon which the clause

18  is based that the United States of America "in its sovereign status"

19  claims only the rights spelled out in the second paragraph of the

20  stipulation.

21        CALIFORNIA'S STIPULATION IS REFLECTIVE OF THE
         "SOVEREIGN STATUS" OF THE NATIONAL GOVERNMENT
22       AND THE POWERS EXERCISED BY THE LATTER IN AC-
         QUIRING THE RIGHTS HERE INVOLVED
23

24  a.  Our National Government May Only Exercise
        Powers Conferred Upon It By The Constitution:

25        Seemingly elementary - yet very much involved - is the question

26  of the powers of the National Government and the manner in which it functions.

27  At the time that the stipulation was executed it was recognized by all

28  concerned that the United States of America could act only as a sovereign;

29  that in its "sovereign status" it acquired whatever rights to the use of

30  water which it was exercising, whether those rights passed to it by

31

32  6/  United States of America v. Fallbrook Public Utility District, 108
        F. Supp. 72, 85 (U.S.D.C.S.D. Cal. S.D. 1952).

2805

1   earliest decent ...

2   characteristics ...

3   Supreme Court ...

4   derives its authority ...

5   Constitution,

6          its every action must ... that ... power

7          is governmental ... and ... is made

8          the sole judge of what power within the constitution's

9          grant are to be exercised, all definition of government

10         constitutionally exhibited by Congress must depend on

11         a parity * * * [7/]

12   Consistent with this principle is the ... that: "Congress

13   and the President, like the courts, possess no power not derived

14   from the Constitution." [8/]   Similarly it has been stated that "The

15   federal government is one of delegated powers, and from that it

16   necessarily follows that any constitutional exercise of its delegated

17   powers is governmental." [9/]   Otherwise stated, the federal government

18   may act only as a sovereign and within the purview of the organic law.

19   b.   California Recognizes in Its Complaint That
20        The United States of America has a
         Sovereign – United States Act in the Very
21        Way When It Acquired all Rights Here
         Involved:

22          Respecting the power of eminent domain the Highest Court holds:

23   "Such an authority is essential to the independent existence and

24   perpetuity. * * * the powers vested by the Constitution in the general

25   government demand for their exercise the acquisition of lands in all the

26   States." [10/]

27          California in stipulating that the United States of America has

28   acquired through its "sovereign status" the rights to the use of water

29   which it is exercising in the Santa Margarita River, thus reiterating a

30   ———————————————

31   7/  Graves v. New York ex rel. O'Keefe, 306 U.S. 466, 477 (1939).
     8/  Ex parte Smith, 517 U.S. 1, 25 (1942).
32   9/  Federal Land Bank v. Bismarck Co., 314 U.S. 95, 102 (1941).
     10/ Kohl et al., v. United States, 91 U.S. 367, 1 (1875).

truism which existed without the formalization contained in the document.
For "The power of eminent domain does not depend for its existence
on a specific grant in the Constitution. * * * It is founded on
necessity." [11]   A "necessity" of such magnitude as to be described as
"essential to independent existence / on the part of the National
Government / and perpetuity." [12]

So fundamental is the power of eminent domain that our Highest
Court has declared unequivocally that

"All private property is held subject to the necessities
of government. The right of eminent domain underlies
all such rights of property." [13]

California in acknowledging the "sovereign status" of the
National Government in establishing means of survival - i.e. creating
a great training camp; an arsenal; a hospital - was no doubt fully
cognizant that the precepts which have been reviewed regarding eminent
domain apply equally to it. For the Supreme Court has repeatedly
determined that:

"The fact that land is owned by a state is no barrier
to its condemnation by the United States." [14]

California's formulation of its relationship with the National Government
as evinced by the stipulation may thus be summarized:

California acknowledges that the National Government
could - indeed did - acquire in "its sovereign status"
those rights which passed to it "when it purchased the
Rancho Santa Margarita"; those rights which it subse-
quently acquired "by prescription or use, or both,"
since acquisition of the Rancho.

11/   18 Am. Jur., Eminent Domain, Sec. 7, page 635.
12/   18 Am. Jur., Eminent Domain, Sec. 17, page 644.
13/   United States v. Lynah, 188 U S. 445, 465 (1902).
14/   Oklahoma v. Atkinson, 313 U. S. 508, 534 (1940).

- 5 -

What then were the rights to which the National Government succeeded; what are those which passed to it by prescription; what are those that passed by use; <u>since</u> its acquisition of the Rancho? A trial of the facts on the merits is the only means of responding to those questions.

<u>CONCEDED BY ALL PARTIES INCLUDING CALIFORNIA
IS THE FACT THAT THE UNITED STATES OF AMERICA
ACQUIRED BY DIRECT CONDEMNATION THOSE LANDS
COMPRISING THE RANCHO SANTA MARGARITA TOGETHER
WITH RIGHTS TO THE USE OF WATER APPURTENANT TO
THOSE LANDS</u>

Alluding to the proceedings pursuant to which the Rancho and its appurtenant rights were acquired, the brief filed by Fallbrook contains this statement:

"* * * everyone knows, that the Federal Government does
have the power of eminent domain to acquire all the
water rights its military establishments on Camp
Pendleton may need * * *." 15/

Denial, emphatic in character, was then enunciated in Fallbrook's brief that the United States of America had acquired by eminent domain: "All the rights to the use of water which it now claims." Called for then by that denial is a determination of the rights to the use of water in the Santa Margarita River which the United States of America did in fact acquire through direct condemnation. That, of course, has been and now is the prime issue since Fallbrook, violating its gratuitous and revocable permit, undertook to assert adverse claims against the vested and long-exercised rights of the United States of America. When Fallbrook joined in the "Agreed Facts", in effect stipulated that the United States of America was claiming "by reason of its sovereign status" the rights which it had acquired from the Rancho together with those which it had acquired by prescription or use or both, it tacitly agreed that the ultimate determination of the extent of those rights must await the trial

15/   Reply Brief of Fallbrook, page 3, lines 5 and 6.

2808

1   of the issues in this cause.  Efforts to resolve those complex factors

2   by legal argument in advance of trial are futile by reason of the

3   numerous issues of fact in which the parties are presently joined.

4

5   CALIFORNIA STIPULATED WITH THE NATIONAL GOVERNMENT:
    "THAT THE RIGHTS OF THE UNITED STATES OF AMERICA
    TO THE USE OF WATER HEREIN ARE TO BE MEASURED IN

6   ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA"

7       Only vaguely have California or Fallbrook made reference to the

8   quoted and salient clause in the stipulation of November 29, 1951.  The

9   term "measure" with regard to rights to the use of water is a word of

10  art in litigation pertaining to those rights.  It can have but a single

11  meaning - beneficial use!  Our National Government subscribes to and

12  abides by the strictest interpretation applicable to the term "beneficial

13  use."  In the brief history of the law relating to Western rights to the

14  use of water there has been an all-pervasive precept which has guided the

15  courts:

16      "Beneficial use is the basis, the measure, and the

17      limit of the right."

18  It is, of course, a basic tenet of the National Reclamation Act.[16/]

19      California's law declares:

20      "In general it may be said that an appropriator

21      acquires the right only to such water as he actually,

22      reasonably and necessarily puts to a beneficial use."[17/]

23  Similarly this statement has been made:

24      "A riparian owner, no more than an appropriator or

25      prescriptive user, may not divert water as against

26      other riparian owners, except for a beneficial use."[18/]

27      Those broad, general and unchallengeable tenets have been wisely

28  written into the organic law of California in these terms:

29

30  16/  32 Stat. 390.
31  17/  26 Cal. Jur., Sec. 286.
    18/  25 Cal. Jur., Sec. 122.

32

- 7 -                              2809

"It is hereby declared that because of the conditions
prevailing in this State the general welfare requires
that the water resources of the State be put to a
beneficial use to the fullest extent * * *." [19] (Emphasis
supplied)

"* * * waste or unreasonable use or unreasonable method of use of water"
California's law further declares must be prevented and that the waters
of the State are to be enjoyed

"with a view to the reasonable and beneficial
use thereof in the interest of the people and for
the public welfare."

Sharply delimiting the basis upon which riparian rights were measured
under the common law, the California Constitution was likewise revised
to read in part as follows:

"Riparian rights in a stream or water course attach
to, but to no more than so much of the flow thereof as
may be required * * * for the purposes for which such
lands are, or may be made adaptable, in view of such
reasonable and beneficial uses * * *." [20]

In summary, reference is made to this comment by the Supreme
Court:  "Under this doctrine [ of appropriation ], diversion and applica-
tion of water to a beneficial use constitute an appropriation, and entitle
the appropriator to a continuing right to use the water, to the extent
of the appropriation, but not beyond that reasonably required and actually
used." [21]

Similarly it has been stated, based on an abundance of sound
authority, that "* * * one can make a valid appropriation of water only

---

19/  California Constitution, Article XIV, Sec. 3.

20/  California Constitution, Article XIV, Sec. 3.

21/  Arizona v. California, 298 U. S. 558, 566 (1935).

- 8 -

2810

so far as he applies it to a beneficial use * * *." [22/]   At all times the
United States of America has husbanded the waters which it diverts and uses
in the exercise of the rights which it here seeks to defend.  Beneficial
use - as recognized by both the Nation and the State - constitutes the
"measure" of the right; the rights of the United States of America will
as a consequence "be measured in accordance with the laws of the State of
California", all as provided by the stipulation here being considered.

### CALIFORNIA'S LAW FULLY RECOGNIZES THE POWER OF THE UNITED STATES OF AMERICA TO ACQUIRE PROPERTY BY / a / DIRECT, / b / INVERSE CONDEMNATION

California's law provides: "Subject to the provisions of this title,
the right of eminent domain may be exercised in behalf of the following public
uses:

> "Fortifications, magazines, arsenals, Navy yards, Navy
> and Army stations, lighthouses, range and beacon lights,
> coast surveys, and all other public uses authorized by
> the Government of the United States." [23/]

It is impossible to perceive broader recognition by California of the right of
the United States of America to condemn property in that State, than that
expressed in the quoted excerpt, albeit, as pointed out, the National Govern-
ment has that power independent of the State.  Contained in the same statute
is authorization for condemnation by municipalities and irrigation districts
pursuant to which those entities have full power to acquire the rights which
they need to fulfill their responsibilities.

It is not even doubtful, therefore, that the United States of
America may condemn whatever rights to the use of water it needs in connection
with the great military establishments involved in this litigation.  That fact
is conceded by both California and Fallbrook.  Remaining to be considered is
whether the United States of America "may have gained by * * * use" through
its power of inverse condemnation any rights to the use of water from the
Santa Margarita River -- how extensive those rights, if any, may be is a
factual question to be resolved by this Honorable Court.

22/  56 Am. Jur., Waters, Sec. 300, page 748,
23/  Civil Procedure and Probate Codes of California, Sec. 1238,

2811

- 9 -

A leading case on the subject sustaining the power of the National
Government to acquire rights to the use of water in California by inverse
condemnation has been decided by the Supreme Court. [24/]   There though no
direct proceedings were initiated that Court stated regarding the rights
exercised by the United States of America:

> "We conclude that * * * Congress elected to recognize
> any state-created rights and to take them under its
> power of eminent domain."

The Supreme Court in making its decision relied upon several California
cases some of which will be referred to in the following paragraph.

When an effort was made to enjoin the City of Los Angeles
regarding the exercise of claimed rights to the use of water California's
Highest Court declared:

> "When public use has attached for any recognized
> reason, reverse condemnation proceedings may be
> invoked and applied." [25/]

Again California's Court declared respecting acquisition of rights to the
use of water:

> "The intervention of a public use * * * does not bar
> suit by the owner of a water right; it merely limits
> his remedy to damages in place of an injunction. * * *
> The acquisition by the municipality of the water right,
> for which the holder of the right receives only damages,
> is 'inverse condemnation' * * *." [26/]

Many other California cases have adopted that principle of the law. [27/]

California in its stipulation of November 29, 1951, simply

---

24/   United States v. Gerlach Live Stock Co., 339 U. S. 725, 739 (1949).
25/   Hillside Water Co. v. City of Los Angeles, 10 Cal.2d 677, 76 P.2d
      681, 687 (1938).
26/   City of Los Angeles v. Glendale, 23 Cal.2d 68, 152 P.2d 289,
      296 (1943).
27/   Peabody v. Vallejo, 2 Cal.2d 351, 40 P.2d 486 (1935);
      Meridian v. San Francisco, 13 Cal.2d 424, 90 P.2d 537 (1939);
      Collier v. Merced Irr. Dist., 213 Cal. 554; 2 P.2d 790 (1931).

2812

declared that the United States of America regarding the properties

comprising Camp Pendleton would assert rights to the use of water which

it acquired by

    (a)  direct condemnation, a fact agreed to by both California

        and Fallbrook, all as recognized by the quoted California

        statute;

    (b)  inverse condemnation through "use" under a claim of right.

Certainly the Gerlach Decision reviewed above and the California decisions

which have been similarly set forth recognize that under the law of

California there may be acquired by inverse condemnation rights to the use

of water.  In those cited California cases the important factor which

caused the doctrine of inverse condemnation to be invoked was the "use"

under a claim of right by an entity with power of eminent domain pursuant

to the law of California.  Seemingly the State and Fallbrook will not

concede the United States of America a power recognized to exist --

apparently without question - in municipal and quasi-municipal corporations.

That position, it is respectfully submitted, must necessarily fail in the

light of the law of California.

    Not to be overlooked is the fact that the Constitution of the

United States of America and the laws enacted pursuant to it are part of

the laws of California. [28] As a consequence any doubts as to the powers of

the National Government to acquire the rights it needs are wholly dissipated.

ACQUIRED IN THE EXERCISE OF ITS "SOVEREIGN STATUS";
MEASURED BY BENEFICIAL USE; THIS COURT HAS BEFORE
IT FOR DETERMINATION, BASED UPON LAW AND FACTS,
EXTENT OF THE RIGHTS TO THE USE OF WATER IN THE
SANTA MARGARITA RIVER ACQUIRED BY THE UNITED STATES
OF AMERICA FROM THE RANCHO SANTA MARGARITA AND THOSE
WHICH IT MAY HAVE GAINED SINCE THAT ACQUISITION BY
PRESCRIPTION OR USE OR BOTH

    There has been reviewed at length in the briefs of the United States

of America the basis upon which it asserts its claimed rights to the use of

water in the Santa Margarita River. [29] It is further reviewed in the

---

[28] 11 Am. Jur., Constitutional Law, Sec. 40 et seq.
[29] See Memorandum of Points and Authorities filed pursuant to the
    direction of this Court on October 21, 1957.

- 11 -

2813

1  responses made to California and Fallbrook.  As a consequence those
2  memoranda are by reference made a part of this statement in support of the
3  motion which it accompanies.  Ultimate determination of the issues as to the
4  extent of its rights in the Santa Margarita River must of necessity await
5  until the rights of the parties are adjudged by this Honorable Court based
6  upon findings supported by the evidence in the light of the applicable
7  precepts of the law.

9                         CONCLUSION
10      The United States of America respectfully petitions this Honorable
11 Court in accordance with California's stipulation with it of November 29,
12 1951, to declare that:
13          a.  The United States of America acquired in
14      its sovereign status rights to the use of water by
15      acquiring the rights appurtenant to the Rancho Santa
16      Margarita and such rights as it may have gained by
17      prescription or use or both.
18          b.  Beneficial use, in accordance with California
19      law constitutes the measure of those rights.

21      Respectfully submitted on behalf of the UNITED STATES OF AMERICA

24                                  _____
                                    J. LEE RANKIN,
25                                  Solicitor General

27                                  _____
                                    WILLIAM H. VEEDER,
28                                  Attorney, Department of Justice

30 Dated:  _____          _____
                                    WILLIAM E. BURBY,
31                                  Attorney, Department of Justice

J. LEE RANKIN
SOLICITOR GENERAL
    OF THE UNITED STATES
WASHINGTON 25, D. C.

Attorney for the UNITED STATES OF AMERICA

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
        v.                     )        Civil No. 1247-SD
                               )
FALLBROOK PUBLIC UTILITY DISTRICT,  )
    a public service corporation of )
    the State of California;   )
SANTA MARGARITA MUTUAL WATER COMPANY, )
    a public service corporation of )
    the State of California; et al.; )
                               )
                Defendants.    )
                               )
STATE OF CALIFORNIA,           )
                               )
                Defendant in   )
                Intervention.  )

M E M O R A N D U M
IN RESPONSE TO
REPLY BRIEFS
OF CALIFORNIA AND THE
FALLBROOK PUBLIC UTILITY DISTRICT

Preliminary Statement

        Concern over the seeming departure by California and the Fallbrook
Public Utility District from the express and solemn stipulation of November 29,
1951, caused the United States of America to move this Honorable Court to
declare binding that stipulation upon the parties; to construe it in the
light of its express terms as of the time it was written.  Disposition of that
motion will necessarily have far-reaching effect upon the issues here under
consideration.  On the background of that pending motion and the memorandum
in support of it response will be made to California's and Fallbrook's

- 1 -

2815

1  contentions in regard to the matters set forth in the memorandum filed

2  by the United States of America in accordance with the direction by this

3  Honorable Court of October 21, 1957.

    IT IS ESSENTIAL THAT THERE BE DEFINED IN
4   THIS CAUSE THE MEANING TO BE ASCRIBED TO
5   THE TERM "RIGHT TO THE USE OF WATER"

6

7  Erroneous Concepts of Fallbrook and California
    Respecting Rights to the Use of Water:

8       Failure on the part of California and Fallbrook to recognize the

9  meaning of the term "right to the use of water" has resulted in considerable

10 confusion throughout their respective briefs.  Fallbrook, for example, with

11 reference to the claimed rights of the United States of America, declares

12 with emphasis:

13      "We repeat:  There has been no invasion by the Government of the

14 rights of the upstream users for this simple reason - - - by the time the

15 water has reached the lands of the United States it has already passed

16 beyond the lands of all possible upstream users and as to them it is waste

17 water which being physically on the enclave, the United States could do with

18 it as it pleased." [1]

19      Tenor of California's pleadings reflects the same erroneous

20 concept of the issues when it avers that it is the "absolute owner of the

21 corpus of the water to be used in the watershed of the Santa Margarita

22 River stream system." [2]  Paraphrasing in its brief, in terms almost

23 identical with the quoted statement made by Fallbrook, California declares:

24 "there has been no invasion of anyone's land or other property rights by

25 the United States' diversion of the corpus of surplus water which found its

26 way onto Camp Pendleton." [3]

27      California's and Fallbrook's confusion stems in part from

28 [a] their failure to distinguish the corpus of the water from the right

29 to use water or the usufruct as it is on occasion termed; [b] their failure

30

31 [1]  Reply of Fallbrook, page 6, lines 27 et seq.
32 [2]  See Third Defense of Amendment to Intervenor's Answer accompanying Notice
     of Hearing on Motion for Leave to Amend Intervenor's Answer filed June 23, 1952.
     [3]  Reply of California, page 22, line 21.

                                    2816

                          - 2 -

1  to recognize that the United States of America does not divert the vagrant

2  flow of the Santa Margarita River, rather, all of the waters used outside

3  of the watershed -- the right to which is the prime issue - are pumped from

4  a subterranean basin by the United States of America under a claim of right

5  to have that basin recharged.  At this juncture the points and authorities

6  to be reviewed relate to Fallbrook's and California's failure to

7  differentiate between "water" and the "right to its use".  In the paragraphs

8  which succeed that basic - indeed controlling - distinction will be emphasized.

9         On the subject in question this statement respecting California

10  law has been made: "The right of an appropriator is usufructuary only;

11  there is no ownership of the corpus of the stream or of the water while

12  running therein.  Strictly speaking, one making an appropriation from a

13  stream acquires no title to the water, but only a right to take his share

14  for beneficial use.  * * * he does acquire a special property in water

15  appropriated, and the sole and exclusive right to use it for the purposes

16  for which it was appropriated, * * *." $\frac{4}{}$   This authoritative statement

17  respecting the law of the jurisdiction in question is likewise important:

18  "The riparian right is a usufructuary right, one of user only, there being

19  no ownership in the corpus of the water itself, * * *." $\frac{5}{}$

20         Wiel, speaking with reference to rights to the use of water in

21  general, declares: "* * * the corpus of naturally running water is * * *

22  not the subject of private ownership * * * the law recognizes nevertheless

23  a very substantial right in its flow and use, - the right to have the

24  liquid flow and to use it, which the law calls the 'usufructuary right,'

25  or the 'water right.'" $\frac{6}{}$   From the same source this statement is taken:

26  "The law distinguishes between the corpus or particles of liquid, and the

27  usufructuary right with respect to it.  * * *  The California court says:

28  'This court has never departed from the doctrine that running water, so

29  long as it continues to flow in its natural course, is not, and cannot be

30  made, the subject of private ownership.'" $\frac{7}{}$

31

32
<hr>
4/  26 Cal. Jur., Waters, Sec. 231, page 49.
5/  25 Cal. Jur., Waters, Sec. 64, page 1065.
6/  Wiel, Water Rights in the Western States, 3d ed., Vol. 1, Sec. 15, page 14.
7/  Ibid., Sec. 687, page 752.

2817

1    It is again emphasized:  The United States of America seeks here
2  to quiet its title to its rights to the use of water in the Santa Margarita
3  River, interests in real property. [8]    There is not at issue the matter of
4  the ownership of the corpus of the water.  Elementary though these state-
5  ments may appear to this Honorable Court there appeared to be no other
6  course to pursue in view of the all-pervasive errors appearing in every
7  phase of the briefs of both Fallbrook and California as to the subject matter
8  of this cause and the relief prayed for from this Court.

9
10           TITLE TO RIGHTS TO THE USE OF WATER VESTS IN THE
             OWNER THE RIGHT TO DEMAND AGAINST UPSTREAM CLAIMANTS
11           OR WATER USERS THAT THEY REFRAIN FROM INTERFERING WITH
             THE FLOW OF THE WATER CO-EXTENSIVE WITH THE RIGHT

12    Equally elementary in the field of law relating to rights to the
13  use of water, as the distinction between the corpus of water and the
14  usufruct is this principle:

15           The owner of a right to the use of water "has such
16           an interest in the stream from his point of diversion
17           to its source that he is entitled to the natural
18           flow of the stream to the extent of his appropriation
19           undiminished in quantity, and undeteriorated in
20           quality." [9]

21    It has also been declared that the owner of a right to the use of
22  water "acquires a most important legal and equitable property right in and
23  to such water and the right to have the same flow down, * * * as it flowed
24  at the time of the inception of his appropriation * * *." [10]  Continuing,
25  that same authority declares concerning the owner of rights to the use of
26  water:  "He has also the right to insist on this flow /_natural flow_7
27  and that no change be made in it by later comers to his material injury." [11]

28

8/  Please refer to opening memorandum of United States of America,
        page 9.
9/  2 Kinney on Irrigation and Water Rights, 2d ed. Sec. 782, page 1362.
10/  Ibid., Sec. 801, page 1397.
11/  Ibid., Sec. 801, page 1398.

2818

1  Logically, therefore, the question is presented as to the character of the

2  interest in a stream which entitles the owner of a right to the use of

3  water to demand that water commensurate with his right flow to his headgate.

4  Quite aside from the vast riparian acreage owned by the United States of

5  America, what is the predicate for the assertion that it has a non-riparian

6  right to divert water from the watershed of the Santa Margarita River for

7  use upon non-riparian land?

8       Answer to that query is fundamental and is contained in this

9  statement:

10      "A water-right of appropriation is real estate,

11      independent of the ditch for carrying the water, and

12      independent of ownership or possession of any land and

13      independent of place of use or mode of enjoyment,

14      whereby the appropriator is granted by the government

15      the exclusive use of the water anywhere so long as

16      he applies it to any beneficial purpose; and it is an

17      incorporeal hereditament, solely usufructuary, not

18      conferring ownership in the corpus of the water or

19      in the channel of the stream." [12/]

20  California's law fully supports that definition for it has been declared:

21  "The right of plaintiff, as stated in its complaint, to have the water flow

22  in the river to the head of its ditch,

23      is an incorporeal hereditament, appertaining to

24      its watercourse.

25  Granting that plaintiff does not own the corpus of the water until it shall

26  enter its ditch, yet the right to have it flow into the ditch appertains to

27  the ditch." [13/]  That California decision has been favorably cited by the

28  Court of Appeals for the Ninth Circuit. [14/]

29

30  12/  1 Wiel, Water Rights in the Western States, Sec. 288, Page 304.
31  13/  The Lower Kings River Water Ditch Co. v. The Kings River and
         Fresno Canal Co., 60 Cal. 408, 410, ___ Pac. ___ (1882).
32  14/  Rickey Land & Cattle Co. v. Miller & Lux, 152 Fed. 11, 13-14
         (C.A.9, 1907).  See also 2 Kinney on Irrigation and Water Rights,
         2d ed., page 1333 et seq.

2819

Tiffany states: "What he [the appropriator] acquires is the right to appropriate water from the stream to an extent measured by his original appropriation, and this right is entirely independent of his ownership of land. It answers to the incorporeal hereditament of the common law." [15]

Consonant with the principles enunciated above, Thompson states: "Water rights are considered real property. This rule applies to appropriators. * * * A water right is an incorporeal hereditament in the flow and use of the stream as a natural resource." [16] (Emphasis supplied)

Full import of the term "incorporeal hereditament" as it relates to rights to the use of water in non-navigable streams becomes apparent when consideration is given to the principles enunciated by our Highest Court respecting those rights: [17]

"As the owner of the public domain, the government possessed the power to dispose of land and water thereon together, or to dispose of them separately. Howell v. Johnson, 89 Fed. 556, 558. The fair construction of the provision now under review is that Congress intended to establish the rule that for the future the land should be patented separately * * *."

To be observed from the quoted excerpt and as authority for the quote - is Howell v. Johnson. Set forth on the cited page of the decision is virtually identical language as that adopted by the Highest Court. Especially pertinent regarding the term "incorporeal hereditament" are these statements: "The water in an innavigable stream flowing over the public domain is a part thereof, and the national government can sell or grant the same, or the use thereof, separate from the rest of the estate, under such conditions as may seem to it proper." [18] Congress did in fact prescribe a means of acquiring rights to the use of water independent from the soil, that the States could establish the conditions which would

15/ Tiffany Real Property, 3d ed., Sec. 738, pp. 149-150.
16/ Thompson on Real Property, Per. Ed., Sec. 74, page 83.
17/ California Oregon Power Co. v. Beaver Portland Cement Co. 295 U.S. 142,162.
18/ Howell v. Johnson, 89 Fed. 556, 558.

- 6 -

2820

invest title to rights to the use of water.  Significantly in that regard the case relied upon by the Supreme Court held that the investiture of title did not rest upon the laws of the State "but upon the laws of Congress.

"The legislative enactment of Wyoming was only a condition which brought the law of Congress into force."

What transpired when the United States of America severed from the bundle of rights constituting full title to its lands, those which pertained to the use of water, is a proposition of immense importance here for that severance permitting the appropriation of the rights to water separate from the land constitutes the crux of this case.  True import of that proposition is embraced in this reiteration of the language of our Highest Court in the California Oregon Power Company case:

"As the owner of the public domain, the government possessed the power to dispose of land and water thereon together, or to dispose of them separately. * * * The fair construction of * * * ⎡ the Desert Land Act of 1877 and related Acts ⎤ is that Congress intended to establish the rule that for the future the land should be patented separately; and that all non-navigable waters thereon should be reserved for the use of the public under the laws of the states and territories named." 19/

Otherwise stated:

⎡ a ⎤ Title to land subject to appropriative rights to water could be obtained by patent from the United States;

⎡ b ⎤ Title to appropriative rights to the use of water - incorporeal hereditaments - could be acquired from the United States of America in the words of Howell v. Johnson by compliance with State laws which effectuate the passage of the title from the National Government.

19/ California Oregon Power Company v. Beaver Portland Cement Company, 295 U. S. 142, 162-164 (1934).

- 7 -

2821

1    _[c]_  In California and other States pursuing the

2        hybrid system of water law, there passed to

3        patentees of the land the residue of riparian

4        rights, which are parcel to the land, subject

5        to existing appropriative rights acquired in

6        the stream prior to patent.

7  Thus the user - in this case the National Government itself - may exercise

8  non-riparian rights to the use of water which are independent of the land - an

9  incorporeal hereditament in the Santa Margarita River.  In the words of Wiel:

10        "A water-right by appropriation is not only real estate,

11        but has all the dignity of and is an estate of fee simple,

12        or a freehold."

13        It is not within the term "'land'.  * * * Being

14        but a usufruct, or privilege of flow and use, it is

15        incorporeal." 20/

16  While vested riparian rights may not be affected by subsequent appropriative

17  rights, there may, of course, be appropriated usufructuary rights irrespective

18  of the fact that title to all lands has passed from the National Government.

19  Indeed were that not true how could the Vail Estate assert a 1946 appropriative

20  claim for its Nigger Canyon Dam; or upon what basis could Fallbrook and the

21  Santa Margarita Mutual Water Company assert their paper claims?  Simply stated,

22  the severance of the right to the waters by the National Government, when it

23  owned all the land and all the water, * made it possible to acquire a right

24  in the stream - an incorporeal hereditament - if that term may once again

25  be reiterated - independent of the land.

26        In the paragraphs which succeed that basic tenet will be further

27  analyzed from the standpoint of the genesis of the title to appropriative

28  rights to the use of water.

29

30  20/  1 Wiel Water Rights in the Western States, 3d ed., Sections 285, 287.

31     * Note:  As here used the term "water" has the connotation ascribed to
             it by the Supreme Court in 295 U.S. 142, 162-164, supra; as

32             Vattel states when a Nation takes possession of a country
             that possession includes everything, land, lakes and rivers.
             Vattel Law of Nations, page 120; 30 Am. Jur., International Law,
             Sec. 28.

- 8 -

CALIFORNIA'S LAW - THE CALIFORNIA DOCTRINE - RECOGNIZES
THE NATIONAL GOVERNMENT AS THE SOURCE OF ALL TITLES
TO APPROPRIATIVE RIGHTS TO THE USE OF WATER

California's courts formulated, enunciated, and abide by the

precept of the law that:

> "Since, if not before the admission of California into
>
> the Union, the United States has been the owner of all
>
> innavigable streams on the public lands of the United
>
> States, within our borders, and of their banks and
>
> beds." [21]/

That historical concept of the source of the title to rights to the use of

water known as the California Doctrine, underlies the whole concept of

water law in the jurisdiction in question.  From the same source as the

last quoted excerpt, this statement is taken: "Recognizing the United States

as the owner of the lands and waters, and as therefore authorized to permit

the occupation or diversion of the waters as distinct from the lands, the

state courts have treated the prior appropriator of water on the public

lands of the United States as having a better right than a subsequent appro-

priator, on the theory that the appropriation was allowed or licensed by

the United States. It has never been held that the right to appropriate

waters on the public lands of the United States was derived directly from

the state of California as the owner of innavigable streams and their beds;

and, since the act of congress granting or recognizing a property in the

waters actually diverted and usefully applied on the public lands of the

United States, such rights have always been claimed to be deraigned by

private persons under the act of congress, from the recognition accorded by

the act, or from the acquiescence of the general government in previous

appropriations made with its presumed sanction and approval." [22]/   (Emphasis

supplied)

---

21/  Lux v. Haggin, 69 Cal. 255, 10 Pac. 674, 721 (1886).
22/  Lux v. Haggin, 69 Cal. 255, 338; 10 Pac. 674, 721 (1886).

THOSE APPROPRIATIVE RIGHTS TO THE USE OF WATER IN
THE SANTA MARGARITA RIVER WHICH THE UNITED STATES
OF AMERICA IS EXERCISING, IF ANY, IN EXCESS OF
THOSE WHICH IT ACQUIRED FROM THE RANCHO WERE VESTED
IN IT AT THAT TIME AND MAY BE ENJOYED WITHOUT REGARD
TO STATE LAW

A military reservation was established in Montana, and like Camp Pendleton - presumably all other military establishments - it required water.  Officers in charge of that military establishment diverted water for military purposes.  Respecting that use Montana's Supreme Court stated: "When the government established the reservation, it owned both the land included therein, and all the water running in the various near-by streams to which it had not yielded title.

It was therefore unnecessary for the government to 'appropriate' the water.  It owned it already.  All it had to do was to take it and use it." [23/]   (Emphasis supplied)

Oregon's Supreme Court in terms equally explicit as those last quoted, declared as follows: "It may be predicated of the waters of non-navigable streams upon the public domain, not appropriated by the methods cognizant to law, that they are as much the property of the government as the lands through which they flow.

* * * the waters of nonnavigable streams are part of such public domain, and hence the property of the government, which may lay hold of and use them, without taking any of the steps made necessary to obtain a usufructuary interest therein by private individuals." [24/]
(Emphasis supplied)

Our Highest Court has declared that upon reserved lands the State laws have no application in regard to the diversion and application of water to a beneficial use. [25/]   There the Court alluded to the fact that the Desert Land Act and related Acts pertain only to lands "subject to sale and

23/  Story, et al., v. Woolverton, et al., 31 Mont. 346, 78 Pac. 589, 590 (1904).
24/  Nevada Ditch Co. v. Bennett, 30 Ore. 59, 45 Pac. 472, 484-485 (1896).
25/  Federal Power Commission v. Oregon, 349 U. S. 435, 448 (1954).

- 10 -

2824

1  disposition."  Further it referred to the license to construct and

2  operate a power plant on the Deschutes River to be situated upon lands

3  reserved by the United States.  Under those circumstances the Court

4  declared: "these Acts do not apply to this license, which relates only to

5  the use of waters on reservations of the United States." [26/] (Emphasis supplied)

6       Thus the Supreme Court has specifically declared that in regard to

7  non-navigable streams traversing reserved lands of the United States of

8  America rights to the use of water may be acquired by licensees without

9  compliance with the State police regulations.  If a licensee may thus

10 acquire rights in the unappropriated waters of a stream, it follows a

11 fortiori that the National Government need not comply with State law in its

12 use of waters the rights to which are unappropriated at the time the waters

13 are diverted and used by it.  Applying that principle the United States of

14 America by its diversion and use of Santa Margarita River water outside of

15 the watershed of that stream has in effect asserted its rights to the

16 quantity of unappropriated water that it needed for the purpose in question,

17 if for any reason the rights it acquired from the Rancho prove insufficient.

18      Legal rights thus to use the water without interference by

19 Fallbrook or California are presently vested in it, all as reviewed in

20 detail in the memorandum supporting the accompanying motion, the opening

21 memorandum and this memorandum in response.

22      ON THE BACKGROUND OF FACTS AND LAW - FOR ULTIMATE RESOLUTION
23 THIS QUESTION IS PRESENTED:    WILL THE LAW COUNTENANCE
   DESTRUCTION OF LARGE AREAS OF CAMP PENDLETON OR REQUIRE
24 ACQUISITION OF NEW RIGHTS FOR THAT MILITARY ESTABLISHMENT
   AFTER SIXTEEN YEARS OF USE OF THOSE RIGHTS THE UNITED
25 STATES OF AMERICA NOW CLAIMS AND EXERCISES?

26      Bringing to focus the issues of law as they relate to facts the

27 accompanying aerial photograph discloses a large part of the vast area of

28 Camp Pendleton situated outside of the watershed of the Santa Margarita River

29 which is dependent upon water diverted from that source.

30 _____

31 26/  Note this caveat:
          Here again the United States of America is referring to the title
32    to rights to the use of water - the right which accords to the downstream
      user a quantity of water co-extensive with his appropriation.  It does
      not relate to the corpus as Fallbrook and California have misconceived.

- 11 -

Case 3:51-cv-01247-JO-SBC   Document 4588   Filed 12/23/21   PageID.com?   Page 34 of 48



AERIAL PHOTOGRAPH OF PART OF CAMP PENDLETON LYING OUTSIDE OF THE
WATERSHED OF THE SANTA MARGARITA RIVER

- 12 -



2826

Since the construction of the Camp approximately sixteen (16) years ago waters from the Santa Margarita River have been delivered to the area photographically shown. Fallbrook and California are equally well aware of that fact. Similarly known by those parties to this cause is the fact **that** historically water has been diverted out of the watershed for use on **other** large and important areas. Known likewise by them is the fact that the Rancho Santa Margarita diverted and used water out of the watershed. It moreover, as stated above, diverted and used large quantities of water within the watershed. Proof will reveal the full extent of the **appropriative** rights to the use of water owned by the Rancho at the time the property **was** acquired by the United States of America. Only when that proof has **been** adduced will the true meaning be known of these quoted excerpts from California's stipulation of November 29, 1951:

"II

"That in this cause, the United States of America claims only such rights to the use of water as it acquired when it purchased the Rancho Santa Margarita, together with any rights to the use of water which it may have gained by prescription or use, or both, since its acquisition of the Rancho Santa Margarita.

"III

"That the United States of America claims by reason of its sovereign status no right to the use of a greater quantity of water than is stated in Paragraph II, hereof."

SUMMARY RESPECTING FALLBROOK'S AND CALIFORNIA'S MEMORANDA

A. The Law Will Not Deprive a Water User of Rights He is Using and Give Them to a Junior Claimant Who Files With the State.

There are no cases cited by California which hold that a **water user** who has diverted and applied water to a beneficial use will be **deprived of that** water by a junior claimant who, as here, files with the State. **Every case** cited by California has been read and considered. Simply stated, **they are**

- 13 -

2827

1  not in point. [27/]   Indeed, the cases cited by California, if anything, bear

2  out the position of the United States of America rather than defeat it.

3  Fallbrook's citations are similarly inapplicable.

4        The cases reviewed by the United States are squarely in point and

5  bear out the basic, legal and equitable proposition that a mere filing will

6  not be permitted to deprive a water user of his rights. [28/]

7     B.  The "California Doctrine", Announced by California's Courts, that
           the United States of America is the Owner of the Unappropriated
8          Rights to the Use of Water is Unrefuted by California's Brief

9        California in substance seeks without success to avoid this funda-

10  mental doctrine alluded to as the "California Doctrine".  That doctrine which

11  underlies all of California water law declares without question or equivocation

12  that the source of all titles to rights to the use of water is the United

13  States of America.  From Wiel this statement is taken:

14        "California Doctrine Based upon the Federal Title.-- * * *

15        This custom of appropriating Federal property had to be upheld

16        by the State courts because the settlement of the whole State

17        depended upon it, and it settled upon the theory of grant to the

18        appropriator from the United States, deraigning the appro-

19        priator's title in the same way as mining titles, and upon

20        an equal footing with any later patentee." [29/]

21  Numerous California cases cited there support the conclusion thus expressed.

22  That statement is made in the opening memorandum of the United States of

23  America. [30/]   The United States of America has never conveyed away the title

24  to the unappropriated rights to the use of water; that title remains in it today

25        The "California Doctrine" so firmly established respecting Federal

26  ownership of the unappropriated rights to the use of water and the State's

27  present position create this anomaly:

28        1.  California's courts declare the United States of America

29             owns the unappropriated rights to the use of water.

30  _____

31  27/  See California's Brief, pages 5-10.
    28/  See Memorandum of United States, pages 21 et seq.
32  29/  1 Wiel Water Rights in the Western States, 3d ed., Sec. 154, page 177.
    30/  Please refer to page 29 of Opening Memorandum.

2828

2. California stipulates that in this case the United States
of America in its "sovereign status" may assert rights
to the use of water which it acquired (a) from the Rancho,
(b) through prescription, (c) through use.

3. California's stipulation recognizes that the United States
of America "may have gained" some additional rights over
and above those purchased from the Rancho - a question of
fact which only proof at the trial will resolve.

4. California anomalously now asserts that although its
courts recognize title is presently in the United States of
America to the unappropriated rights to the use of water
nevertheless the National Government must ask the State to
"use" water to maintain a great military establishment.

5. California takes that position in paragraph 4 even
though it stipulated that the United States of America
could claim rights to the use of water in this case by
reason of "use".

6. As California recognizes the United States owns the
rights to the use of the unappropriated water, when the
United States of America applied that water to a bene-
ficial use, to that extent the rights available for appro-
priation were reduced and could no longer be appropriated
by anyone else.

Our Highest Court has disposed of California's present position -
a position contrary to its own laws - in these succinct terms:

"State laws cannot affect titles in the United States." [31/]

The thought is unavoidable, in passing, as to the course which would
be taken if Fallbrook for example - assuming it had any rights, which is
denied - had used water for sixteen years and the State of California advised
it that it had no rights - must initiate new ones with the attendant loss of
priority and irreparable damage. The United States, it should be observed,

31/  United States v. Utah, 283 U. S. 64, 75 (1930).

- 15 -

2829

1  quite differently from California, already owned the rights when it used them

2  and it was thereafter impossible for anyone to initiate appropriations to

3  the extent of the use by the United States.

4      Dilemmas create strange reasoning as exemplified by California's

5  statements that the National Government has but riparian rights.  Cited for

6  example is the Rio Grande case [32/] which arose in New Mexico. [33/]  As New Mexico

7  repudiated the riparian doctrine in toto one would have difficulty applying the

8  reasoning thus advanced.  That State's Highest Court declared: "The common-law

9  doctrine of riparian right was not suited to an arid region, and was never

10  recognized by the people of this jurisdiction." [34/]  Full extent of the dilemma

11  now confronting California is well defined when consideration is directed to its

12  reliance upon the California Oregon Power Company case. [35/]  That decision as re-

13  viewed above, declared [1] the United States of America owned all of the land

14  and all of the water, [2] it severed the water from the land. (See Note page 8

15  supra).  Manifestly a severance of rights to the use of water from the land is

16  wholly repugnant to the riparian rights concept.  Owning all of the land prior to

17  its acquisition by the citizens of the country leaves no doubt that at one time

18  all of the public land was riparian to the streams which they abutted upon as

19  Lux v. Haggin, a California decision, recognizes.  That circumstance - and

20  California's cited cases - lend no credence to the strange assertion that the

21  United States of America is in some manner limited to using the waters the rights

22  to which it owns, on riparian land.  In that connection reference is made to the

23  Montana and Oregon cases cited above. [36/]

24      California's final assertion that the ownership by the United States of

25  America of the unappropriated "waters" (See 10 Pac. 721) is limited to reserved

26  land is in keeping with its present dilemma.  The lands which comprise Camp

27  Pendleton are reserved - rest assured they are not in the category of those open

28  to sale or disposition. [37/]  Simply stated, on the reserved lands in question the

32/  174 U. S. 690, 703 (1899).
33/  California's Brief, page 17.
34/  Snow v. Abalos, 18 N. Mex. 681; 140 Pac. 1044, 1048 (1914).
35/  California's Brief, page 14.
36/  Supra, page 10.
37/  See Federal Power Commission v. Oregon, 349 U. S. 435, 448 (1954)

- 16 -

2830

1    usufruct in the Santa Margarita River was exercised, to the extent, if any,

2    that the National Government needed water in excess of that which it purchased

3    from the Rancho. By exercising the rights to the use of the waters it owns

4    those rights were no longer available for appropriation in an amount co-extensive

5    with the use.

6        C.   Fallbrook and California Both Err If They Are Asserting
           That Appropriative Rights To The Use of Water May Only
7            Be Acquired Through Invasion of Upstream Property 38/

8       Throughout Fallbrook's brief and in California's brief are statements

9    indicating a concept that there must be an invasion of lands or property rights

10    of others before rights to the use of water may be acquired. California

11    asserts all that the United States of America is doing is diverting "the corpus

12    of surplus water which found its way onto Camp Pendleton." That is wholly in

13    error. Claims are asserted by the United States of America not to the corpus

14    of the water but rather to title to rights to the use of water. Those rights

15    which it claims are interests in real property, exercised for the purpose of

16    maintaining the subterranean basin from which is pumped the water used outside

17    of the watershed.

18       The usufruct - the incorporeal hereditament - pertains to a title to

19    a right in the stream itself. Here for sixteen (16) years the United States

20    of America has exercised that title which California and Fallbrook assert may be

21    destroyed by the simple filing of a paper with the State. A review of the basic

22    tenets of law set forth above reveals the errors of the named defendants. 39/

23    It is emphasized, however, that the United States believes in regard to this

24    claim that it violates no prior vested rights to the use of water. Pertinent

25    in that connection is the fact that Fallbrook claimed no rights in the Santa

26    Margarita River when the United States of America commenced the exercise

27    of the claims which it asserts in this cause. Long after the construction of

28    Camp Pendleton and with knowledge of the uses being made by the National

29    Government, Fallbrook asserted its first claim to any rights in the Santa

30    Margarita River.

31

32    38/   California's Brief, page 22; Fallbrook's Brief, page 6.
     39/   See above, pages 1 through 16 of this Memorandum.

In the succeeding phase of this memorandum the question of the claims by the United States of America on rights by inverse condemnation will be reviewed.

D.  California's Error Respecting the Acquisition by the United States of America of Rights by Direct and Inverse Condemnation is Set Forth in the Memorandum Supporting the Accompanying Motion 40/

It is conceded by Fallbrook and California that

(a)  Congress authorized the construction of Camp Pendleton outside of the watershed;

(b)  The Marine Corps diverts water out of the watershed.

Here reference is made to the aerial photograph at page 12 above. There in great detail is disclosed the extent of the development of Camp Pendleton - construction let it be emphasized with funds appropriated by Congress - which is now and for sixteen years past has been maintained through funds appropriated by Congress.  These are the indisputable facts:

1.  The pattern of Camp Pendleton, its layout and design, have been unchanged since its inception; the use of water from the Santa Margarita River outside of the watershed was part of that pattern.

2.  The vast development shown on the aerial photograph was initiated and completed between the years 1942 and 1944.

3.  The water system was completed during that time; and water has at all times been pumped from the watershed to serve that immense area.

4.  Annually for the entire history of Camp Pendleton Naval and Marine Corps Officers have appeared before Congress to secure the funds requisite for the maintenance

40/  See page 9 of Memorandum in Support of Motion for Ruling in Advance of Trial.

- 18 -

2832

of the Camp at its present site.

5. Colonel E. F. Robertson of the Marine Corps can and will testify that members of the Armed Services Committees have been expressly informed of the actual use of water outside of the watershed; have been expressly and officially informed of the location of the vast development outside of the watershed; informed of the significance of the use of the water outside of the watershed in this litigation. Colonel Robertson can and will prove the history of the development and all of the acts which resulted in the Congress having full and complete information on the subject.

6. On repeated occasions at hearings in regard to the Utt Bill and the legislation antecedent to it, regarding this litigation, Congress was informed that water was being diverted and used in large quantities outside of the watershed. Congress was informed of that fact not alone by the United States of America, it was informed of that fact by the representatives of Fallbrook.

Predicated upon the facts thus reviewed it is the position of the United States of America that proof will sustain the proposition that Congress has at all times known of the developments in question outside of the watershed. However, whether Congress knew at the time when construction was undertaken is not essential fully to support the position of the United States of America. For it is unquestionable and true that for years Congress [1] has known of the diversion and use of water outside of the watershed; [2] after being thus precisely informed, the United States of America has continued to make the diversions and use of the water; has benefited from it; has received great value from it. Under those circumstances the Congress has fully and completely ratified the acts of those who have been, as Fallbrook concedes, diverting and using the water outside of the watershed. Ratification of that character

- 19 -

2833

1 has been frequent and upheld by our Supreme Court and have finally an effective

2 to pass title to the United States of America as an original authorization to

3 exercise the power of eminent domain."

4          It is again to remember and to look at the time the United States of

5 America commenced this was its use of water claimed no rights in the Santa

6 Margarita River.  As a consequence there is no basis for asserting that there has

7 been a taking of Fallbrook's rights, if indeed it ever had any, which is denied.

8 Factually it is reasonable to assume that the rights claimed by the United States

9 of America will not conflict with any claimed rights of others, thus eliminating

10 the necessity of asserting that rights have been acquired by inverse condemnation.

11 That circumstance stems from the fact that it is very largely the winter flows

12 which recharge the basin from which is pumped the waters used outside of the

13 watershed.  Those waters are present in the stream at a time, it is believed,

14 when they would be in excess of the needs of any user other than the United

15 States at the present time.  However, if on the trial of the case it is found

16 that to supply the demands of the United States of America it must claim a

17 usufruct in the stream conflicting with vested rights of present or potential

18 users then to that extent for the reasons expressed, the United States of America

19 has by inverse condemnation acquired the rights to the extent of the conflict.

20          E.   California Has Failed to Recognize That by Its Own Laws
              the United States of America is Fully Empowered to Ac-
21              quire Property by Either Inverse or Direct Condemnation

22          In the brief in support of the accompanying motion the law of

23 California recognizing the authority of the United States of America to

24 acquire property is reviewed. 42/

25          F.   Rights To The Use of Water Were Acquired by the
              United States of America When It Condemned the Rancho
26              Santa Margarita;  It Is Believed Those Rights Are
              Sufficient to Meet all the Demands of the United States
27              of America.  Congress Has Been So Advised.  Congress
              Has Also Been Fully Advised of California's Stipulation
28              of November 29, 1951

29          Congress was advised that the representatives of the United States of

30 America believed that the rights it acquired from the Rancho Santa Margarita

---

31 41/   Shoshone Tribe v. United States, 299 U.S. 476, 496 (1936);
32       Crozier v. Krugg, 224 U. S. 290, 305 (1912);
        United States v. Creek Nation, 295 U. S. 103, 110 (1934).

42/   Supra, page 9 of Memorandum in Support of Motion for Ruling in Advance of Trial

- 29 -

1   were adequate for its purposes.  When the case is ultimately proved it is

2   believed that assumption will be sustained.  However, when the United States of

3   America undertook to stipulate as to its claimed rights in this proceeding, it

4   necessarily included not only the rights of the Rancho Santa Margarita which it

5   had acquired but also any other rights it "may have gained by prescription or use,

6   or both."  Congress was fully advised of that stipulation. [43/]

7           In fact, the Act introduced by Congressman Utt is a direction to all who

8   are concerned with the case that Congress desires to have measured the rights of

9   the National Government in accordance with the stipulation and it specifically

10  provides for that in the Act last mentioned in these terms:

11          " * * * nothing in this Act shall be construed as a grant or a

12          relinquishment by the United States of America of any of its

13          rights [ acquired from the Rancho ] * * * or through actual use

14          or prescription or both since the date of that acquisition, * * *." [44/]

15          It is respectfully submitted that the disposition of the motion which

16  this memorandum accompanies and supports will resolve any issues respecting the

17  claims of the United States of America relevant to this Court.  Basically the

18  question is whether the parties are bound by the stipulation to which that motion

19  is directed.

20          Respectfully submitted by the UNITED STATES OF AMERICA

21

22

23          J. LEE RANKIN,
            Solicitor General

24

25

26          WILLIAM H. VEEDER,
            Attorney, Department of Justice

27

28  Dated: Dec 27 1957

29          WILLIAM E. BURBY,
            Attorney, Department of Justice

30

31  43/  See Congressional Record, March 5, 1952, page 1905; Congressional
         Record May 27, 1954, page 7261.

32  44/  68 Stat. 779.

- 21 -

2835

IN THE DISTRICT COURT OF THE UNITED STATES IN AND FOR THE

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

**F I L E D**

DEC 18 1957

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY CLERK

UNITED STATES OF AMERICA,

        Plaintiff,

  vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
a public service corporation of
the State of California, et al.,

        Defendants.

No. 1247-SD Civil

AFFIDAVIT OF SERVICE BY MAIL

STATE OF CALIFORNIA   )
               ) ss.
COUNTY OF SAN DIEGO   )

     MARGARET B. TOOKER, being first duly sworn, deposes and says:

That she is a citizen of the United States and a resident of San Diego

County, California; that her business address is Office of Ground Water

Resources, Marine Corps Base, Camp Pendleton, California; that she is

over the age of eighteen years and is not a party to the above entitled

action.

     That, in the above entitled action, on December 13, 1957,

she deposited in the United States mail at Oceanside, California, a

copy of

        LETTER ADDRESSED TO HONORABLE JAMES M. CARTER,
        UNITED STATES DISTRICT JUDGE, DATED DECEMBER 10,
        1957, FROM HONORABLE J. LEE RANKIN, SOLICITOR
        GENERAL OF THE UNITED STATES,

2788

11ND-GEN-191 (8/56)           -1-          NPS, SAN DIEGO

1  addressed, to the last known addresses of the persons listed in Exhibit A,

2  attached hereto and made a part hereof, in envelopes bearing the requisite

3  postage and at which places there is a delivery service by United States

4  mails from said post offices.

5

6

7                                        _Margaret B. Looker_

8  Subscribed and sworn to before me
   this  _16_  day of December, 1957.

9

10

11 _____
   Notary Public in and for said
12       County and State.

13 My Commission Expires Feb. 28, 1958

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

1  Allard, Brownsberger, Shelton & O'Connor, 313 First National Building,
      Pomona, California
2
   Florence A. Anderson, 918 C. C. Chapman Building, 756 South Broadway, Los
3      Angeles, California

4  Henry Ashton, 408 E. Central Avenue, Balboa, California

5  Office of the Attorney General, Library and Courts Building, Sacramento,
      California; Attention:  Adolphus Moskovits, Deputy Attorney General
6
   Best, Best & Krieger, Evans Building, Riverside, California
7
   A. A. Bianchi, 901 Kohl Building, 400 Montgomery Street, San Francisco, California
8
   Thomas J. Burke, 504 Granger Building, San Diego 1, California
9
   Bert Buzzini, 2233 Fulton Street, Berkeley 4, California
10
   Mabel Clausen, 320 First Trust Building, Pasadena, California
11
   Clayson, Stark & Rothrock, Citizens Bank Building, Corona, California,
12      Attention:  George G. Grover & Owen Strange

13 Howard E. Crandall, 127 W. Anaheim Boulevard, Wilmington, California

14 William J. Cusack, Room 814 Merritt Building, 307 West 8th Street,
      Los Angeles, California
15
   Charles B. DeLong, 507 Harbor Insurance Building, San Diego 1, California
16
   W. B. Dennis, 365 Broadway, Vista, California
17
   Leonard J. Difani, 220 Loring Building, Riverside, California
18
   Emmett E. Doherty, General Petroleum Building, 612 Flower Street, Los Angeles,
19      California

20 J. A. Donnelley & Richard P. MacNulty, 2655 4th Ave, San Diego, California

21 Devor & Dorfman, 924 Van Nuys Building, Los Angeles 14, California

22 Lawrence E. Drumm, 458 So Spring Street, Suite 820, Los Angeles 14, California

23 Ray C. Eberhard, Room 1231 Bartlett Building, 215 West 7th Street, Los Angeles
      14, California
24
   Estudillo & Bucciarelli, 3900 Market Street, Riverside, California
25
   Oliver P. Ensley, Attorney at Law, Hemet, California
26
   Fendler, Weber & Lerner, 330 So Beverly Drive, Beverly Hills, California
27
   Daniel W. Gage, 740 Rowan Building, 458 So Spring Street, Los Angeles 13,
28      California

29 Arthur M. Gediman, 119 So Main Street, Elsinore, California

-1-

Exhibit A

2790

1   Abraham Gottfried, 424 So Beverly Drive, Beverly Hills, California

2   Frank E. Gray, 202 So Hamilton Drive, Beverly Hills, California

3   Samuel A. Greenburg, 1014 West Valley Boulevard, Alhambra, California

4   Hahn, Ross & Saunders, Suite 611, 608 So Hill Street, Los Angeles 14, California

5   Crider, Tilson & Ruppe, 548 So Spring Street, Los Angeles 13, California,
        Attention: Tom Halde

6

7   Frank S. Hamburger, 1031 Mills Tower, San Francisco, California

8   Halverson & Halverson, Suite 611, 704 So Spring Street, Los Angeles 14, California

9   Leslie B. Hanson, 4412 York Boulevard, Los Angeles, California

10  J. U. Hemmi, 220 No. Nevada Street, Oceanside, California

11  Office of San Diego County District Attorney, 302 Civic Center, San Diego 1, Cal-
        ifornia; Attention: Robert G. Berrey, Deputy District Attorney

12  James H. Kindel, Jr., Suite 405, Rowan Building, Los Angeles 13, California

13  Courtney Lacey, 408 E. Florida Avenue, Hemet, California

14  Launer, Chaffee & Launer, Bank of America Building, Fullerton, California

15  Walter Gould Lincoln, Suite 1113, 742 So Hill Street, Los Angeles 14, California

16  Lindley, Lazar & Scales, 825 Bank of America Building, San Diego 1, California

17  Luce, Forward, Kunsel & Scripps, 1220 San Diego Trust & Savings Building,
        San Diego 1, California

18

19  Office of Riverside County Counsel, County Court House, Riverside, California;
        Attention: Wilburn J. Murry, Deputy and James H. Angell, Deputy

20  William H. Macomber, 1114 San Diego Trust & Savings Building, San Diego 1,
        California

21

22  Richard M. Marsh, 54-262 Jackson Street, Indio, California

23  Henry M. Moffatt, 121 East 6th Street, Los Angeles 14, California

24  O'Melveny & Myers, & George Stahlman, 433 So Spring Street, Los Angeles 13,
        California

25  Neblett, Walker & Sullivan, 3742 10th Street, Riverside, California
        Attention: John Neblett

26

27  A. J. O'Connor, 639 So Spring Street, Los Angeles 14, California

28  Benjamin S. Parks, Room 916, 210 West 7th Street, Los Angeles 14, California

29  George M. Pierson, 816 Continental Building, Los Angeles 13, California

-2-

2791

1   Richardson & Henderson, 174 North Palm Canyon Drive, Palm Springs, California

2   Sachse & Price, 217 North Main Street, Fallbrook, California

3   Sarau, Adams, Neblett & Sarau, Suite 308 Lewis Building, 3972 Main Street,
    Riverside, California

4
5   Gary W. Sawtelle, Suite 612, 621 So Spring Street, Los Angeles 14, California

6   Shatford & Shatford, 5920 Temple City Boulevard, Temple City, California

7   J. D. Skeen, 802 Utah Oil Building, Salt Lake City, Utah

8   George Stahlman, Route 1, Box 235, Fallbrook, California

9   W. E. Starke, 1130 Bank of America Building, San Diego 1, California

10  Hugo A. Steinmyer & Winfield Jones, 650 So Spring Street, Los Angeles 14,
    California

11  William Stienhart, 5045 Wilshire Boulevard, Los Angeles 36, California

12  Swing & Swing, Attorneys at Law, 313 Central Building, San Bernardino,
    California

13
14  Swing, Scharnikow & Staniforth, Suite 604, 530 Broadway, San Diego 1, California;
    Attention:  Phil D. Swing

15  Tanner, Thorton & Myers, 215 West 7th Street, Los Angeles 14, California

16  Teschke, Rohe & Cramer, 359 No Cannon Drive, Beverly Hills, California

17  Thompson & Colgate, 405 Citizens Bank Building, Riverside, California

18  Trihey & Mirich, 565 West 5th Street, San Pedro, California

19  Cornelius T. Waldo, 10742 Nassau Avenue, Sunland, California

20  Robert W. Walker, Henry M. Moffatt & Robert S. Curtiss, 448 Santa Fe Building,
    Los Angeles 14, California

21
22  G. V. Weikert, 918 Oviatt Building, Los Angeles 14, California

23  P. W. Willett, P. O. Box 103, Fallbrook, California

24  Dennett Withington, 1317 "E" Street, San Bernardino, California

25
26
27
28
29

-3-