1 | J. LEE RANKIN
2 | SOLICITOR GENERAL OF THE
   | UNITED STATES OF AMERICA
3 | WASHINGTON, D. C.

4 | Attorney for the UNITED STATES OF AMERICA

8 | IN THE UNITED STATES DISTRICT COURT
  | SOUTHERN DISTRICT OF CALIFORNIA
9 | SOUTHERN DIVISION

11 | UNITED STATES OF AMERICA,

12 |        Plaintiff,

13 |     v.                        NO. 1247-SD-C

14 | FALLBROOK PUBLIC UTILITY DISTRICT,    NOTICE OF MOTIONS
   | ET AL.,                      RESPECTING ORDER OF FEBRUARY 11, 1958

15 |

16 |               Defendants.

17 |       PLEASE TAKE NOTICE that the United States of America will bring

18 | the accompanying Motions Respecting Order of February 11, 1958, on for

19 | hearing before this Court on the 21st day of May, 1958, in the Reche School

20 | House, near Live Oak Road, about two and one-half miles east of Fallbrook,

21 | California, at 10:00 o'clock in the forenoon of that day, or as soon thereafter

22 | as counsel can be heard.

23 |       Dated: May 9, 1958

24 |                           UNITED STATES OF AMERICA

26 |                           J. Lee Rankin

27 |                           J. LEE RANKIN
   |                           Solicitor General

29 |                           William H. Veeder

30 |                           WILLIAM H. VEEDER
   |                           Attorney, Department of Justice

                          WILLIAM E. BURBY
                          Attorney, Department of Justice

3327

J. LEE RANKIN
SOLICITOR GENERAL OF THE
    UNITED STATES OF AMERICA
WASHINGTON, D. C.

Attorney for the UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 1247-SD-C |
| Plaintiff, | MOTION |
| | RELATIVE TO THE INTRODUCTION OF EVIDENCE |
| v. | THROUGH ORAL TESTIMONY REGARDING ORDER |
| | OF FEBRUARY 11, 1958, RESPECTING BINDING |
| FALLBROOK PUBLIC UTILITY DISTRICT, | EFFECT AND MEANING OF STIPULATION DATED |
| ET AL., | NOVEMBER 29, 1951, ORIGINALLY ENTERED |
| | BETWEEN THE UNITED STATES AND THE STATE |
| Defendants. | OF CALIFORNIA |

Comes now the UNITED STATES OF AMERICA acting by and through

J. Lee Rankin, Solicitor General, William H. Veeder, Attorney, Department of

Justice, and William E. Burby, Attorney, Department of Justice, and alleges

and avers as follows:

I

This Honorable Court entered on the 11th day of February, 1958, an

order entitled "Order Respecting Binding Effect and Meaning of Stipulation

Dated November 29, 1951, Originally Entered Between the United States and

the State of California."

II

Respecting the order referred to in the paragraph which immediately

precedes the United States of America filed the accompanying motion dated

May 9, 1958, for the purpose of having this Court amend the above-mentioned

order of February 11, 1958, to conform with the intentions of the parties

who signed the stipulation, based upon the affidavit dated May 9, 1958, of

Inez M. Miller respecting statements of B. Abbott Goldberg, Deputy Attorney

- 1 -

3328

1  General for the State of California and the memorandum in support of the

2  motion. That affidavit and memorandum in support of the motion are by reference

3  made a part of this motion and incorporated into it as completely as though

4  fully set forth in this motion.

### III

6  The United States of America believes and therefore avers that

7  to the ends justice will be served, there must be a full, complete and true

8  disclosure respecting the circumstances, facts, and intentions of the parties

9  at the time that the United States of America and the State of California

10  entered into the stipulation of November 29, 1951.

### IV

12  Mr. Goldberg, Deputy Attorney General for the State of California,

13  who signed the stipulation of November 29, 1951, mentioned in paragraph II

14  above has, as the affidavit incorporated in this motion discloses, stated

15  that the intentions of the parties, the objectives to be attained by the

16  stipulation of November 29, 1951, and the meaning to be ascribed to the

17  stipulation in general and as to the specific terms used in that document,

18  are wholly and entirely different from those ascribed to it by California's

19  present representative in the case, Adolphus Moskovitz.

### V

21  By reason of the above prejudice to and the adverse effect upon the

22  United States of America stemming from the wholly erroneous and incorrect

23  interpretation presently urged by California respecting the stipulation of

24  November 29, 1951, it is essential that the testimony of Messrs. Goldberg

25  and Moskovitz be made a part of the record of this case, thus permitting this

26  Honorable Court and the Special Master fully to consider the proper interpreta-

27  tion to be placed upon the stipulation of November 29, 1951, and otherwise to

28  adopt a course to be pursued in the trial of the issues in this case, all

29  in keeping with the true intendment of the parties to the stipulation of

30  November 29, 1951.

31  WHEREFORE, based upon the statements set forth above and the

3329

1  documents incorporated in this motion by reference, the United States of America
2  respectfully moves this Honorable Court for leave to call Messrs. Goldberg
3  and Moskovitz for the purpose of eliciting their testimony in regard to the
4  proper interpretation to be placed upon the stipulation dated November 29,
5  1951, between the United States of America and the State of California.  It
6  is observed in regard to Mr. Goldberg's testimony that it will not be limited
7  entirely to the phase of the case last mentioned.

UNITED STATES OF AMERICA

J. LEE RANKIN,
Solicitor General

WILLIAM H. VEEDER
Attorney, Department of Justice

Dated: May 9, 1958

WILLIAM E. BURBY
Attorney, Department of Justice

- 3 -

3330

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,

      v.

FALLBROOK PUBLIC UTILITY DISTRICT,
ET AL.,

             Defendants.

NO. 1247-SD-C

MOTION

RESPECTING ORDER OF FEBRUARY 11, 1958

      Comes now the UNITED STATES OF AMERICA acting by and through J. Lee Rankin, Solicitor General, William H. Veeder, Attorney, Department of Justice, and William E. Burby, Attorney, Department of Justice, and alleges and avers as follows:

I

      Mr. B. Abbott Goldberg, Deputy Attorney General, Office of the Attorney General, State of California, joined in the formulation and execution of the stipulation of November 29, 1951, a copy of which is hereto attached. 1/

II

      Mr. Goldberg having participated in the formulation and execution of the stipulation of November 29, 1951, is fully acquainted with and knows the facts and surrounding circumstances respecting its objectives, tenor and meaning.

1/  See Attached Exhibit A, with accompanying Motion for Rulings of Law Respecting California's Stipulation of November 29, 1951, with the United States of America   Memorandum in Support of Motion for Ruling in Advance of Trial   Memorandum in Response to Reply Briefs of California and the Fallbrook Public Utility District, in which is set forth the stipulation of November 29, 1951.

- 1 -

3331

### III

Mr. Goldberg has been called as a witness by the United States of America to testify in regard to the uses of water by the United States of America at and prior to the time that the State of California intervened in the case, the place of use of that water and generally in regard to the historical aspects of this case and California's intervention. Although Mr. Goldberg's testimony at the trial is highly relevant to this phase of the case regarding the matters mentioned, it will disclose, among other things, that certain vital terms in the stipulation of November 29, 1951, have had ascribed by the parties to it, two or more wholly different meanings.

### IV

Attached, marked Exhibit A, and by reference made a part of this motion is the Affidavit of Mrs. Inez M. Miller who has reported at length from transcribed notes, some of which were dictated by Mr. Goldberg, the statements of Mr. Goldberg respecting the circumstances under which the stipulation was formulated and executed.

### V

As shown by the accompanying Affidavit, all parties knew that the United States of America, as the Rancho Santa Margarita had done before it, was diverting large quantities of water out of the watershed without compliance with the laws of California respecting the appropriation of rights to the use of water. Moreover, as Mr. Goldberg has stated, the representative of the United States of America at the time the stipulation was executed, steadfastly refused to agree that the United States of America was required to make the filings to divert the water out of the watershed. Thus it was not, and could not have been, the intention of the parties to ascribe to the term "measured" as used in paragraph IV of the stipulation a meaning which would require the United States to comply with the laws of California and its procedures respecting the acquisition or appropriation of rights to the use of water for diversion outside of the watershed of the Santa Margarita River. Yet, contrary to Mr. Goldberg's statements, California has urged that interpretation and tendered to this Honorable Court for execution an order signed by it that provides:

"C.  Paragraph IV of the stipulation means that the measure of the rights claimed by the United

3332

- 2 -

1  States in this action is all the laws of the State
2  of California pertaining to water rights. * * * including
3  the method and procedure established by California law
4  for the acquisition of appropriative rights."

### VI

6  Similarly it is presently urged by California and contrary to the
7  circumstances under which the stipulation of November 29, 1951, was executed,
8  that the United States of America had in effect stipulated away its "sovereign
9  status" [2/] insofar as the rights are concerned which "it acquired when it
10  purchased the Rancho Santa Margarita, together with any rights to the use of
11  water which it may have gained by prescription or use, or both, since its
12  acquisition of the Rancho Santa Margarita." Again referring to the Affidavit,
13  Exhibit A of this motion, it is evident that at the time of the execution
14  of the stipulation the State of California well knew that the representative
15  of the United States of America, did not, indeed could not, stipulate away the
16  "sovereign status" of the United States.

### VII

18  The United States of America respectfully asserts, as revealed by
19  Mr. Goldberg's statements set out in Exhibit A, that the representative of
20  the United States of America did not, in fact was without power to stipulate
21  in a manner which would require the United States of America to comply with
22  California's laws respecting the appropriation of rights to the use of water,
23  with all of the implications attendant upon such compliance. Moreover, as
24  similarly shown by Mr. Goldberg's statements set out in Exhibit A, the
25  representative of the United States of America did not, indeed could not
26  stipulate away the sovereign status of the National Government.

### VIII

28  The United States of America further respectfully submits that the
29  testimony of Mr. Goldberg, all as evidenced by the accompanying Affidavit,
30  is highly relevant, warranting full consideration by this Honorable Court and

---

32  2/ See paragraphs II and III of stipulation, set out in Motion and Memoranda
     accompanying Exhibit A attached.

3333

1  the Special Master as part of the record in this case.

IX

3       The United States of America further urges this Honorable Court to
4  reconsider its order of February 11, 1958, in the light of the accompanying
5  Affidavit and the evidence to be offered by the United States of America through
6  the oral testimony of Mr. Goldberg relative to the objectives to be attained
7  by and the meaning to be ascribed to the stipulation of November 29, 1951.

9       WHEREFORE, the UNITED STATES OF AMERICA respectfully moves this
10  Honorable Court to reconsider its order of February 11, 1958, interpreting
11  the stipulation of November 29, 1958, between the United States of America and
12  the State of California based upon the accompanying Affidavit and the testimony
13  of Mr. Goldberg, and to reverse that order to the end that the stipulation will
14  be made operative in accordance with the intentions of the parties at the time
15  of its execution.

16       In the accompanying memorandum the United States of America offers
17  points and authorities in support of this motion.

UNITED STATES OF AMERICA

J. LEE RANKIN,
Solicitor General

WILLIAM H. VEEDER,
Attorney, Department of Justice

Dated: *May 9 1958*

WILLIAM E. BURBY,
Attorney, Department of Justice

- 4 -

3334

1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF CALIFORNIA
9                    SOUTHERN DIVISION

10
11   UNITED STATES OF AMERICA,           )
12                 Plaintiff,            )      NO. 1247-SD-C
13            v.                         )    MEMORANDUM OF POINTS AND AUTHORITIES
                                         )             IN SUPPORT OF
14   FALLBROOK PUBLIC UTILITY DISTRICT,  )              MOTION
     ET AL.,                             )    RESPECTING ORDER OF FEBRUARY 11, 1958
15                                       )
                 Defendants.            )
16
17
18          INTERPRETATION OF STIPULATION OF NOVEMBER 29, 1951,
         BETWEEN THE UNITED STATES OF AMERICA AND THE STATE OF CALIFORNIA
19                           STATEMENT
20          Key provision of the Stipulation of November 29, 1951, is paragraph IV
21   which is as follows:
22          "the rights of the United States of America to the use
23          of water herein are to be measured in accordance with
24          the laws of the State of California."
25   "Measured" as there used is the term the meaning of which must be determined.
26   As Mr. Goldberg, Deputy Attorney General for the State of California, has
27   pointed out in his statements set forth in the Affidavit accompanying this
28   motion and this supporting memorandum, the main objective of the stipulation
29   was to establish the quantity of water the United States of America was
30   diverting and could divert pursuant to its claimed rights in the Santa Margarita
31   River.  To accomplish that end the United States of America stipulated with
32   California as follows:

                              - 1 -                      3335

1.  That the word "paramount" as used in the complaint would have the same meaning as that ascribed to it by the California court in the case of Peabody v. Vallejo.

2.  The United States limited its claims to the rights "it acquired when it purchased the Rancho" together with whatever rights it may have gained by prescription or use or both.

3.  Again as to the quantity of water the United States of America claimed, it agreed that it claimed by "reason of its sovereign status" no right to the use of a greater quantity of water than that which it acquired from the Rancho Santa Margarita, together with that which it may have gained by prescription or use or both.

4.  Finally, in regard to the quantity of water that the United States of America would be entitled to divert by reason of its rights in the Santa Margarita River, the United States of America stipulated that its rights would "be measured in accordance with the laws of the State of California."

Those provisions of the Stipulation must be viewed on this background and these circumstances under which they were written:

1.  At - the - time, - as - Mr. Goldberg's - statements reveal, - the - United States of America - was - diverting and - using - large - quantities - of - water - outside of - the - watershed;

2.  Its - predecessor - in - interest - the - Rancho Santa Margarita - at - the - time - of - the - purchase - of the - Rancho - was - diverting - and - using - large quantities - of - water - outside - of - the - watershed;

3.  Neither - the - Rancho - nor - the - United States of America - had - complied - with - the - laws - of - the State of California - for - the - appropriation - of - rights to - the - use - of - water - and - diversion - of - water out - of - the - watershed.

3336

GPO 16—69098-1

1         In the accompanying brief attached to the Affidavit, Exhibit A

2    of the motion, there is set forth an aerial photograph.[1/]   That aerial

3    proves beyond a doubt that the United States of America constructed and now

4    maintains a vast part of Camp Pendleton outside of the watershed of the Santa

5    Margarita River.  It proves equally beyond question that the United States of

6    America has been diverting and is now applying to a beneficial use large

7    quantities of water outside of the watershed of the Santa Margarita River.

8    Those large, permanent installations were built in 1942-1943, long before the

9    Fallbrook Public Utility District had even filed a piece of paper asserting

10   a claim to its alleged rights in the Santa Margarita River.  Squarely presented

11   is this question:

12        Whether it is reasonable to construe the provisions

13       of the Stipulation that the "rights of the United States of

14       America * * * are to be measured in accordance with the laws

15       of the State of California" to mean that the United States

16       in regard to water it was then using under a claim of right

17       and which it had thus used for many years previous, would

18       stipulate that it would then comply with the law and pro-

19       cedures of California respecting the appropriation of rights

20       to the use of water "including the method and procedure

21       established by California law for the acquisition of appro-

22       priative rights" with all of the implications attendant

23       upon such compliance?

24        Mr. Goldberg, a representative of the State of California shows

25   conclusively that the United States of America had at all times denied during

26   the negotiations that it had to comply with State law.  Yet California now

27   urges an interpretation and tendered to this Honorable Court an order which

28   was signed February 11, 1958, containing, among other things, this clause:

29       "C.  Paragraph IV of the stipulation means that

30       the measure of the rights claimed by the United States

31       in this action is all the laws of the State of California

32       pertaining to water rights. * * * including the method

---

[1/]  Memorandum In Response To Reply Briefs of California and The Fallbrook
Public Utility District, page 12.

3337

1    and procedure established by California law for the

2    acquisition of appropriative rights."

3  When read in the light of Mr. Goldberg's statements it is clear that the parties

4  did not intend to have the document thus construed.  Rather all parties knew

5  the situation which existed respecting the use of water at Camp Pendleton

6  and no one viewed the stipulation as an agreement to change in any way the

7  status then existing.  That fact brings the stipulation squarely within this

8  sound tenet of the law:

9        "A stipulation must be construed in the light of the

10       circumstances surrounding the parties and in view of the

11       result which they were attempting to accomplish.  In

12       seeking the intent of the parties the language used will

13       not be so construed as to give it the effect of an admission

14       of fact obviously intended to be controverted, or the

15       waiver of a right not plainly intended to be relinquished." 2/

16  Certainly California's then representatives and the representative of the

17  United States of America did not, indeed could not legally, stipulate in the

18  manner California now asserts.  Obviously the result may be most prejudicial

19  to the rights and interests which the United States of America was then and

20  is now seeking to defend.  Thus to construe the stipulation as set forth in

21  the order of February 11, 1958, can have no other effect than to strike it

22  down - a result to which the United States of America is most vigorously opposed.

23

24          TWO OR MORE MEANINGS ARE ASCRIBED TO THE TERM "MEASURED"
               AS USED IN THE STIPULATION OF NOVEMBER 29, 1951

25

26       It is abundantly manifest from the present status of the record

26  that the representative of the State of California who signed the stipulation

27  construes that document in a manner wholly different and diametrically opposed

28  to the meaning ascribed to that stipulation by the present representative of the

29  State of California.  Obviously the United States of America construes the

30  stipulation in a manner contrary to that presently adopted by California.

31  _____

32  2/  50 Am. Jur., Stipulations, Sec. 8, page 609.

- 4 -

3338

That position moreover is wholly consistent with the position taken throughout the trial of this case which is entirely in keeping with the preservation of the rights it was exercising at the time the stipulation was executed.

Pertinent in regard to the consistent course of conduct adhered to by the United States of America is this statement from California's brief before the Court of Appeals:

"* * * the State of California feels called upon to advise this Honorable Court that the United States has faithfully adhered to the stipulation.

We disagree with the United States as to just what California law provides, but there can be no doubt of the sincerity of the United States in recognizing that the Courts should apply California law to this litigation."

Significantly that statement followed a pre-trial order containing this statement:

"8.  For both military and agricultural purposes the United States of America has historically utilized its rights to the use of water both within and outside of the watershed of the Santa Margarita River.  Thirty days prior to trial there will be delivered to the defendants named in this separate trial the quantities of water from the Santa Margarita River historically utilized both within and without the watershed." [3]

Further, the trial court found that:

" * * * practically all of the water delivered for military use by the distribution system is <u>delivered outside of the watershed</u>, including areas 11, 12, 13, 14, 15, 16 and 17, as well as Camp Del Mar." [4]

---

[3] Pre-trial Order, paragraph 8; United States v. Fallbrook Public Utility District, et al., 109 F. Supp. 28, 55 (U.S.D.C.S.D. Cal. S.D. 1952).

[4] United States v. Fallbrook Public Utility District, et al., 110 F. Supp. 767, 778 (U.S.D.C.S.D. Cal. S.D. 1953).

3339

1  Again it is emphasized:  California specifically declared to the Court of
2  Appeals that
3         "the United States has faithfully adhered to the
4         stipulation."
5  In the light of those facts it is impossible to accept the present position
6  of California that the United States of America, when it executed the stipula-
7  tion, agreed that using the term "measured" as it related to its rights to the
8  use of water, meant that it would be bound by California law "including the
9  method and procedure established by California law for the acquisition of
10 appropriative rights."
11        It was then and is now impossible to comply with the law of
12 California respecting "the method and procedure established by California
13 law for the acquisition of appropriative rights" without severe prejudice
14 to its long-exercised rights.
15        Turning directly to the question of the meaning of the word
16 "measured" reference is made to the accompanying brief of the United States of
17 America as to the meaning of that term relating to rights to the use of water.
18 Wiel has summarized its meaning in these terms:
19        "Actual use * * * has become the sole measure of right.
20        * * * Water codes usually contain the provision 'beneficial
21        use shall be the basis, the measure and the limit of the
22        right.'" 5/
23 From California's brief this statement is quoted: "The verb 'measure' in the
24 context of the stipulation means 'to ascertain the extent, degree, quantity,
25 dimensions or capacity of, by a standard.'" 6/   That definition is quite in
26 keeping with the connotation of the term adopted by the United States.  How
27 then can California distort the meaning of "measure of rights to the use of
28 water" to include an obligation on the part of the United States of America

29 ────────────────────────────────

30 5/  1 Wiel Water Rights in the Western State, 3d ed., pages 503, 504.

31 6/  Response and Memorandum of Points and Authorities of the State of
       California to Proposed Motion of the United States for Rulings of
32     Law respecting the Stipulation of November 29, 1951, Between the
       United States and the State of California, page 2.

3340

1  to be bound by "the method and procedure established by California law for

2  the acquisition of appropriative rights."  Manifestly it did not and could not

3  have meant such a limitation.  Readily it agrees and has always agreed that

4  the yield of riparian rights may not be diverted from the watershed; may not

5  be cyclically impounded.  Each example relates to the "measure" of the right.

6  It is denied, however, that the term "measured" subjected the rights of the

7  United States to the police powers or procedures "established by California

8  law for the acquisition of appropriative rights."

9

                    EVIDENCE MAY BE INTRODUCED TO PROVE THE CIRCUM-
10                STANCES SURROUNDING THE EXECUTION OF THE STIPULATION

11           Evaluating the stipulation in the light of Mr. Goldberg's statements

12  and the matters reviewed above, it is apparent that the term "measured" in the

13  stipulation is open to various interpretations -

14                (1)  that ascribed to it by the representative of

15           California who participated in the negotiations for the

16           stipulation;

17                (2)  that ascribed to it by the present representative

18           of the State of California;

19                (3)  that ascribed to it by the United States of America.

20  California has codified the law applicable to the situation thus presented

21  in these terms:

22                "For the proper construction of an instrument,

23           the circumstances under which it was made, including

24           the situation of the subject of the instrument, and

25           of the parties to it, may also be shown, so that the

26           judge is placed in the position of those whose language

27           he is to interpret." 7/

28           Recently California's Supreme Court reiterated with approval this

29  rule on the subject as expressed in an earlier decision:

30  _____

31  7/  Deering's California Code of Civil Procedure, Evidence, Sec. 1860.

32

                              - 7 -

                                                    3341

GPO 16—60008-1

1  "It is a settled rule that, when the language employed

2  is fairly susceptible of either one of two constructions

3  contended for without doing violence to its usual and

4  ordinary import an ambiguity arises where extrinsic

5  evidence may be resorted to for the purpose of explaining

6  the intention of the parties, and that for this purpose

7  conversations between and declarations of the parties

8  during the negotiations at and before the execution

9  of the contract may be shown." [8]/

10 From that case this further statement is taken:

11  "When the language used is fairly susceptible to one

12  of two constructions, extrinsic evidence may be considered,

13  not to vary or modify the terms of the agreement but to aid

14  the court in ascertaining the true intent of the parties

15  * * * not to show that 'the parties meant something

16  other than what they said' but to show 'what they meant

17  by what they said.'" [9]/

18 That principle is clearly applicable in this case.  Quite obviously Mr. Goldberg's

19 testimony would go far in casting in a true light that which was in the minds

20 of the parties when the word "measured" was inserted into paragraph IV of the

21 stipulation.

22  More recently a California court stated: "Where any doubt exists

23 as to the purport of the parties' dealings as expressed in the wording of

24 their contract, the court may look to the circumstances surrounding its

25 execution - including the object, nature and subject matter of the agreement

26 * * *." [10]/

27

28

29 [8]/ Beneficial Fire and Casualty Insurance Co. v. Kurt Hitke & Co.,
   46 C.2d 517; 297 P.2d 428, 432 (1956).

30 [9]/ Ibid., 297 P.2d 428, 431 (1956).

31 [10]/ Goodman v. Jonas, 142 C.A. 2d 775; 299 P.2d 424, 435  (1956).

32

3342

GPO 16—69025-2

1        Black's dictionary defines an unambiguous word as being "Susceptible

2  of one meaning." From the above-cited California decision it is apparent

3  that they have adopted virtually the same meaning of the term.  It is not even

4  doubtful that the word "measured" is "susceptible of either one of two

5  constructions." As a consequence it is respectfully submitted the declaration

6  in the order that "The stipulation is unambiguous" should be re-examined in

7  the light of the clear conflict among representatives of the State of California

8  as to the meaning of the stipulation and the terms which it contains.  That

9  the National and State Governments have applied different meanings to the

10  word "measure" discloses beyond question that it is a term "susceptible of either

11  one of two constructions." That both sides viewed the stipulation as

12  unambiguous but each urged diametrically opposed constructions, removes all

13  question it would seem as to the ambiguous nature of the term "measured" as

14  used in the stipulation.

15        As a consequence the parol evidence is admissible - indeed, it would

16  seem imperative - if the record in this case is to be reflective of all of the

17  facts.  It is basic law, that "Extrinsic evidence may be admitted to prove the

18  circumstances under which a contract was made, wherever, without the aid of

19  such evidence, it cannot be applied to its proper subject matter." [11/]   Justice

20  can only be done in this case by a consideration of the circumstances to prove

21  what was in the contemplation of the parties when the stipulation was signed.

22  That none of those who participated in the preparation of that document even

23  remotely perceived that the United States of America agreed its rights would

24  be limited, as declared in the order, to "the method and procedure established

25  * * * for the acquisition of appropriative rights" is proved by the above-

26  mentioned pre-trial order and the findings of the court in the first trial

27  all as quoted above.

28

29

30  11/  20 Am. Jur., Evidence, Section 1159, page 1013.

31

32

- 9 -

1  ". * * * IT IS FIRMLY ESTABLISHED THAT A
2  BINDING STIPULATION MAY NOT BE MADE AS
   TO QUESTIONS OF LAW." 12/

3  A stipulation pertaining to facts was entered into between the

4  United States of America and the State of California. By California's

5  radical change in position as evinced by Mr. Goldberg's words California seeks

6  to convert it into a stipulation in regard to the law. Reference in that

7  connection is directed to the term "use" as set forth in paragraph numbered

8  II of the stipulation. To everyone's knowledge the United States of America

9  was diverting water from the watershed of the Santa Margarita River. Did it

10  acquire a right by reason of that "use"? Strictly a question of law. Seizing

11  again upon the word "measured" as contained in the stipulation the State of

12  California purely as an afterthought urges in substance, and tendered to the

13  Court, this terminology:

14  "c. Because the word 'use' is a very broad term,

15  the rights gained by 'use', which the United States may

16  claim under this Paragraph II, include rights by 'appropriation'

17  as well as other kinds of rights that may arise by use,

18  limited, however, because of Paragraph IV of the stipulation,

19  to such rights by use as may be acquired under the laws of

20  the State of California. Excluded, therefore, are claims

21  by the United States of rights acquired by inverse con-

22  demnation, since the law by which such rights would be

23  measured is federal law as set forth in decisions of

24  federal courts involving inverse condemnation by the

25  United States and not California law."

26  Obviously the meaning of the term "use" is a matter of law. It is strictly

27  a matter for this Honorable Court to determine predicated upon the facts

28  adduced at the trial. To declare that when the parties used the word

29  "measured" they limited the meaning of the word "use" to the State law is a

30  simple exemplification of the strained construction which California's present

31  _____

32  12/ 23 Cal. Jur., Stipulations, Sec. 5, page 814.

3344

- 10 -

representative is now asserting. Certainly the term "use" is broad as
California admits. But its meaning based upon proved facts is for this
Honorable Court to decide. As our Highest Court has said: "The construction and
effect of a written instrument is a question of law. * * * If the stipulation
is to be treated as an agreement concerning the legal effect of admitted facts,
it is obviously inoperative; since the court cannot be controlled by agreement
of counsel on a subsidiary question of law." [13]

More recently the Supreme Court refused to be bound by a stipulation
that a given plan was fair and equitable because "a stipulation does not
foreclose legal questions." [14]    As a consequence proof of the facts in this
case will call forth a legal opinion as to the meaning of the word "use" free
from any alleged interpretation among the parties.

Where counsel for the United States attempted to construe the meaning
of a word in a statute the Court declared that the law "cannot be left merely
to the stipulation of the parties." [15]

In a frequently cited case the attorney had stipulated, among other
things, that if one entity held its property under the same circumstances as
another the property "would be entirely exempt from taxation." [16]    This
principle was declared: "Decisions of questions of law must rest upon the
judgment of the court, uninfluenced by stipulations of the parties or counsel
* * * as to the existence of a law, as to its validity, * * * as to the legal
conclusion from a given state of facts, as to the legal effect of a contract."
* * *

"In other words, 'the people of the state are entitled to know what
is the law on public questions, rather than what we find it to be upon agreement
of parties.'"

---

[13]  Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 289 (1916).

[14]  Case v. Los Angeles Lumber Co., 308 U.S. 106, 114 (1939).

[15]  Young v. United States, 315 U. S. 257, 259 (1941).

[16]  North Platte Lodge v. Board of Equalization, 125 Neb. 841; 252 NW 313 (1934).

- 11 -

3345

1    That stated principle is reiterated in these terms:  "The propriety of
2  enforcing the rule against stipulations of law is regarded as especially clear
3  where the case wherein the stipulation is made is one which concerns the
4  public." 17/

5    California's Supreme Court leaves no doubt as to the law of that
6  jurisdiction respecting the subject matter of this memorandum:

7    "Counsel * * * may agree as to the facts, but they
8    cannot control this court by stipulation as to the
9    sole or any question of law to be determined under them.
10   When a particular legal conclusion follows from a given
11   state of facts, no stipulation of counsel can prevent
12   the court from so declaring it." 18/

13   From the unvarying line of authorities where, as here, a matter of
14  great public concern is involved, it is apparent that the National Government
15  and California could not stipulate in the manner the latter now contends.
16  Accordingly the parties could not deprive, and the parties to the stipulation
17  did not intend to deprive, this Honorable Court of the power of determining
18  the legal question, both State and Federal, of the effect of the diversion
19  and "use" of water by the National Government.  Let this fact, however, be
20  emphasized: The United States of America does not and has never claimed a right
21  to divert and use more water than that which it could apply beneficially;
22  the United States of America acquired the Rancho with its appurtenant rights; it
23  exercises those rights; it claims those rights together with the rights it may
24  have gained by prescription or use or both, all of which were claimed and exercised
25  before Fallbrook ever undertook to initiate a claim in the Santa Margarita River.

26   Thus in the exercise of its riparian rights it exercises them the
27  same as any other owner of that character.  Elements of that character clearly
28  relate to matters of title.  It did not - indeed it could not - agree to be
29  controlled by the State police regulations respecting "the method and procedure
30  established by California law for the acquisition of appropriative rights."

31

32

17/  92 A. L. R. 666.

18/  San Francisco Lumber Co. v. Bibb, 139 Cal. 325; 73 Pac. 864, 865 (1903).

3346

GPO 16—62899-1

1    Long ago the matter here involved was thus decided:

2           "This Constitution, and the Laws of the United

3    States which shall be made in Pursuance thereof; * * *

4    shall be the supreme Law of the Land; and the Judges in

5    every State shall be bound thereby, any Thing in the

6    Constitution or Laws of any State to the Contrary

7    notwithstanding." [19]

8    Respecting that basic precept in regard to control by the State of matters

9    of the nature here under consideration Justice Brandeis observed:

10           "[Arizona's] statutes prohibit the construction of

11    any dam whatsoever until written approval of plans

12    and specifications shall have been obtained from the

13    State engineer; and the statutes declare in terms that

14    this provision applies to dams to be erected by the

15    United States. * * * The United States has not secured

16    such approval; nor has any application been made by

17    Wilbur, who is proceeding to construct said dam in

18    complete disregard of this law of Arizona.

19           "The United States may perform its functions

20    without conforming to the police regulations of a State." [20]

21        To adopt California's contention that the United States of America

22    could submit itself by stipulation to California police regulations does

23    violence to the elementary facets of Constitutional Law relative to Federal-

24    State relationship.  Clearly the stipulation does not attempt that impossibility,

25    all as Mr. Goldberg's statements so clearly prove.

26                      CONCLUSION

27        This Honorable Court is respectfully petitioned to grant the

28

29    [19]  Constitution of the United States, Article VI, Cl. 2.

30    [20]  Arizona v. California, 283 U. S. 423, 451 (1931).

31

32

- 13 -

3347

1  motion of which this memorandum is in support, and to revise all phases of

2  the order of February 11, 1958, contrary to the true intendment of the parties

3  and the law.

4                                          UNITED STATES OF AMERICA

5

6                                          J. Lee Rankin

7                                          J. LEE RANKIN
                                           Solicitor General

8

9                                          William H. Veeder

10                                         WILLIAM H. VEEDER
                                           Attorney, Department of Justice

11

12  Dated:  May 9, 1958

13                                         WILLIAM E. BURBY
                                           Attorney, Department of Justice

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

3348

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

FALLBROOK PUBLIC UTILITY DISTRICT,
ET AL.,

        Defendants.

NO. 1247-SD-C

AFFIDAVIT

I, INEZ M. MILLER, being first duly sworn, upon my oath depose and say:

### Telephone conversation of February 21, 1958

1. That on February 21, 1958, I transcribed, in part, a telephone conversation which was initiated by Mr. B. Abbott Goldberg, Deputy Attorney General for the State of California, who called Mr. William H. Veeder in regard to the case of Rank v. Krug;

2. During the course of the conversation reference was made to the participation by the State of California in the case entitled United States of America v. Fallbrook Public Utility District, et al., in the United States District Court for the Southern District of California, Southern Division, No. 1247-SD-C.

3. Mr. Goldberg stated emphatically that he did not agree with the position of the State of California in the case and that it was error for California to be in the case, adding, "I say that although I myself signed the petition to intervene."

3349

- 1 -

EXHIBIT A

4. Mr. Veeder then asked Mr. Goldberg: "Have you read the brief of the United States in regard to the interpretation to be placed upon the stipulation which you signed between the United States and California?"

To that inquiry Mr. Goldberg answered: "Yes, I did and I agree with the position that you took there." Mr Goldberg then added, "There was only a single question involved in the formulation of the stipulation and that was the question of quantity - quantity-wise, how much water could the Government take."

5. Mr. Goldberg was asked, "Did you read Mr. Moskovitz's brief" filed in response to the brief of the United States? Mr. Goldberg answered: "Yes, I did." Mr. Veeder then asked, "Did you agree with Moskovitz's brief?" To which Mr. Goldberg said "No." Mr. Veeder asked "Would you sign that brief?" and Mr. Goldberg responded, "No. I would not."

6. Mr. Veeder asked Mr. Goldberg, "Do you remember the conversations at the conference when the stipulation was drafted in regard to the term 'sovereign status'?" Mr. Goldberg answered, "Well, it was at that conference I learned that the United States can act only as a sovereign."

7. "Did you discuss this with Moskovitz" Mr. Veeder asked Mr. Goldberg, to which he responded "Yes." Mr. Veeder then asked "Did Moskovitz know your position as to the meaning of the stipulation?" To which Mr. Goldberg responded "Yes."

<u>Conference of April 25, 1958, attended</u>
<u>by Mr. B. Abbott Goldberg, Deputy Attorney General</u>

8. That Mr. Goldberg to whose conversation of February 21, 1958, reference is made above, came to Mr. Veeder's office and after being served with a subpoena stated that he would appear as a witness at the hearing in the above-entitled case to commence May 21, 1958;

9. Mr. Goldberg stated he would appear as an adverse witness called by the United States; and if he were under oath would most certainly tell the truth;

10. Mr. Veeder asked him to express his thoughts concerning the "Fallbrook Case" and California's position in it. To that Mr. Goldberg stated:

GPO 16—62906-1

1   "That is the greatest fraud that ever stunk up to the nostrils of Heaven."

2       11.  Mr. Goldberg stated: "Life is too short and vanity too fleeting

3   for me not to tell the truth."  Mr. Goldberg stated he told his superior "I

4   disagreed with California's brief" and its position in court in regard to the

5   construction of the stipulation.

6       12.  Although Mr. Goldberg made other statements which he claimed were

7   privileged communications to his superior, he nevertheless stated that he told

8   him that he disagreed with Moskovitz's brief and his position in court because

9   "It did not seem to me /Mr. Goldberg_7 to be factual."

10      13.  Mr. Goldberg spoke at great length repeatedly stating that

11  California's position in regard to the stipulation was clearly in error.

12      14.  To Mr. Veeder's question on the objective of the stipulation

13  Mr. Goldberg stated: "The principal reason for the execution of the

14  stipulation arose out of Swing's assertions relative to your use of the

15  word "paramount."  He attributed to that use of the word "paramount" some

16  claim by the Government - some expansive claim by the Government the nature

17  of which was never clear to me, that the Government could do something nobody

18  else could do with regard to extinguishing vested rights upstream without

19  compensation.  It was never well defined to me.  He kept analogizing this to

20  the Tidelands Case."

21      "We were talking quantitywise - we were talking about quantity.  We

22  used the phrase, as I recall "burden on the stream."  We were concerned with

23  what would be the quantity and we well knew that the Government was taking

24  water out of the watershed without compliance with State law and the question

25  was whether the Government was placing a greater burden on the stream."

26      "We wrote in 'paramount' because there was so much discussion about

27  the Tidelands Case.  They said the Government was coming in with paramount

28  rights and they were taking all the water."

29      "To allay the fears of those who had been warned by Mr. Swing that

30  their vested rights would be somehow taken by the Government without proper

31  compensation."

32

- 3 -

3351

15.  Mr. Goldberg then considered each paragraph of the stipulation. Those paragraphs are set out and his comments in regard to them:

"I

"That in Paragraphs VIII and IX of plaintiff's Complaint herein, and in Paragraphs 2 and 3 of the Prayer of said Complaint, the word 'paramount' is used in the same sense in which that word is used in the second paragraph, on page 374 of the opinion of the Supreme Court of California in the case of Peabody v. Vallejo, 2 Cal. 2d 351 (fourth paragraph on page 494, 45 Pac. 2d 486.)"

Respecting the use of the term "paramount" Mr. Goldberg stated: "That was so you would use the word paramount in the same sense in which the word conventionally is used in California to describe the superior quality of the riparian right over the appropriative rights and to show that if anybody were setting out to draft a complaint to quiet title to riparian rights this is the way you would do it."

16.  Mr. Goldberg then referred to paragraph II of the stipulation which is as follows:

"II

"That in this cause, the United States of America claims only such rights to the use of water as it acquired when it purchased the Rancho Santa Margarita, together with any rights to the use of water which it may have gained by prescription or use, or both, since its acquisition of the Rancho Santa Margarita."

Regarding that paragraph of the stipulation Mr. Goldberg stated: "That's where we get to this quantity business.  You claimed that the quantity you were entitled to use - that quantity which the Rancho could have used as a riparian. And whatever rights you had acquired by prescription and use.  My recollection hinges about riparian rights."

"You didn't know whether you were using more than the Rancho and you put in those words "prescription or use or both" and you said the Government was not placing a greater burden on the stream" than that.  "I remember those words being put in there."

"I remember Shaw saying how could they acquire a prescriptive right because they were downstream and what his feeling was - I don't know what his feeling was."

- 4 -

3352

1       "I recall we put the word 'use' in."

2       "That's why we wrote in 'prescription or use or both.'"

3       17.  Mr. Goldberg then considered the paragraph numbered III of the

4 stipulation of November 29, 1951:

5               "III

6        "That the United States of America claims by reason

7       of its sovereign status no right to the use of a greater
quantity of water than is stated in paragraph II, hereof."

8 In regard to that paragraph Mr. Goldberg stated:  "Anything the United States

9 does or holds is held or done as a sovereign.  No greater rights in quantity."

10 "It didn't by virtue of its sovereign status have the right to take quantities

11 of water vested in other people without paying them."  "The United States claims

12 by reason of its sovereign status no right to the use of a greater quantity -

13 that is, the sovereign status did not enlarge the quantity, but of course by

14 the sovereign status it could use it any place it wanted, any area involved."

15       Mr. Veeder questioned:  "Was there any suggestion that the United States

16 had to comply with State law to use any of this water?"

17       Mr. Goldberg replied:  "Not that I recall.  We talked about sovereignty

18 and authority of the United States and that's where I guess I learned that the

19 United States officially can take whatever valid United States statute authorizes

20 regardless of what State law does or does not provide, so long as they pay for it."

21       "The United States by its sovereignty wasn't claiming any authority

22 or power to extinguish previously vested rights without compensation."

23       Mr. Veeder asked:  "But to the extent we had those rights we were

24 holding them as a sovereign?"

25       Mr. Goldberg stated:  "Yes."

26       18.  Mr. Goldberg then considered paragraph IV of the stipulation which

27 is as follows:

28               "IV

29        "That the rights of the United States of America to

30       the use of water herein are to be measured in accordance
with the laws of the State of California."

31 With reference to the meaning of that paragraph Mr. Goldberg stated:  "You

32 /Mr. Veeder_7 took me to Camp Pendleton and to the Office of Ground Water Resources

3353

1   where there were several lawyers and several engineers and I was briefed by

2   all of them in concerted action.  It was clear water was being taken out of

3   the watershed and without complying with State law.  You know that yourself.

4   It was made clear at the hearings at Fallbrook in August 1951 when Mr. Swing

5   made his reference to growing gladioluses.  We talked about it."

6          19.  Mr. Goldberg was asked: "What issues had arisen in regard to

7   the use of water the yield of which was derived from the exercise of riparian

8   rights?"  To that Mr. Goldberg responded: "Whether you could use that

9   riparian water outside the watershed and the proposals made to resolve those

10   issues."

11          "My recollection of that is as I said before, about the area of

12   riparian land, the uses which could be made on that area defining a quantity.

13   As far as we are concerned with riparian areas you ascertain the area of

14   riparian land, determine what uses could be made on that land which in turn

15   would measure a quantity of water and that was the quantity to which you were

16   entitled."

17          Mr. Veeder asked: "It had nothing to do with the initiation of rights

18   under the State law?"

19          Mr. Goldberg replied: "You were refusing to say that you had to file

20   an application."  "That idea was negated that the United States would make a

21   filing.  You represented the United States - refused that the United States had

22   to make a filing - you said it did not."  Mr. Veeder then asked: "Was there

23   ever an intimation among the parties when we said the measure of the rights

24   that we would go and make a filing with the State Engineer?"  Mr. Goldberg

25   replied: "No."

26          20.  Mr. Veeder again referred to the memorandum of the United States,

27   showing it to Mr. Goldberg, and that copy is attached to this affidavit, and

28   Mr. Veeder asked him if he agreed with that memorandum.  Mr. Goldberg stated:

29   "That's your memorandum.  I agree with the memorandum".

30          Mr. Veeder then asked Mr. Goldberg other questions relating to the at-

31   tached memorandum; his discussions with his superior and the present representative

3354

1   of California, and related matters, to which Mr. Goldberg stated he would have

2   to claim privilege or simply stated he could not respond.

3          Dated the _____9th_____ day of _____May_____ , 1958.

                                    _Inez M. Miller_
                                    Inez N. Miller

8   Subscribed and sworn to before me this _9th_ day of _May_ , 1958.

10     (SEAL)

                                    _Emily McC. Ireland_
                                    Notary Public, D. C.

12  My commission expires:
13      Feb. 28, 1959.

3355