J. LEE RANKIN
SOLICITOR GENERAL OF THE
 UNITED STATES OF AMERICA
WASHINGTON, D. C.

Attorney for the UNITED STATES OF AMERICA

FILED

JUN 6 - 1958

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
                    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,         )
                                  )
              Plaintiff,          )   NO. 1247-SD-C
                                  )
        v.                        )   MEMORANDUM
                                  )
FALLBROOK PUBLIC UTILITY DISTRICT,)   RESPECTING RIGHTS TO THE USE OF
ET AL.,                           )   WATER IN CONNECTION WITH RESERVED
                                  )   LANDS OF THE UNITED STATES OF
              Defendants.         )   AMERICA

RIGHTS TO THE USE OF WATER UPON RESERVED LANDS
OF THE UNITED STATES OF AMERICA IN THE WATERSHED
OF THE SANTA MARGARITA RIVER

This Honorable Court has stated that it desires an expression by the United States of America as to the nature of the rights to the use of water claimed by it in connection with the Indian Reservations, the National Forests, and the lands administered by the Bureau of Land Management. To that end this memorandum is directed.

### Rights To The Use Of Water To Which The United States Of America Succeeded Pursuant To The Treaty Of Guadalupe Hidalgo (1848)

This review relates to those reserved lands of the United States of America title to which has remained in it since it passed to the National Government pursuant to the Treaty of Guadalupe Hidalgo in the year 1848. As Vattel states:

> "When a Nation takes possession of a country with the intent to settle there, its jurisdiction extends over all that is included within the territory -- lands, lakes, rivers, etc. * * *" [1]

---

[1] Vattel, The Law of Nations or the Principles of Natural Law, Vol. III, Text of 1758, Translation p. 102.

3644

- 1 -

      Our Highest Court in a leading case on the subject has recognized the nature of the ownership of the public domain, as reflected in the quoted tenet of international law, and has declared:

> "As the owner of the public domain, the government possessed the power to dispose of land and water thereon together, or to dispose of them separately." [2]

Cited in support of that conclusion by the Supreme Court is a case which declares:

> "Being the owner of these lands, it has the power to sell or dispose of any estate therein or any part thereof. The water in an innavigable stream flowing over the public domain is a part thereof, and the national government can sell or grant the same, or the use thereof, separate from the rest of the estate, under such conditions as may seem to it proper." [3]

      Here it is essential to refer to the fact that the authority of the National Government to administer these lands "springs from the Property Clause -- 'The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States * * *.' Art. IV, § 3." [4] Our Supreme Court has interpreted the quoted clause of our organic law as follows:

> "The power over the public land thus entrusted to Congress is without limitations." [5]

It is pursuant to that all-embracing power that the Congress has, down through our Country's history, made available for acquisition by the Nation's citizens the lands and rights to the use of water.

---

[2]  California Oregon Power Company v. Beaver Portland Cement Co., 295 U. S. 142, 162 (1934).

[3]  Howell v. Johnson, 89 Fed. 556, 558 (C.C.D. Mont. 1898).

[4]  Federal Power Commission v. State of Oregon, 349 U.S. 435, 443 (1954).

[5]  United States v. San Francisco, 310 U.S. 16, 29 (1939).

### Rights To The Use Of Water On The Public Lands Made Available For Acquisition Under State Law

The Congress by the Acts of 1866 and 1870 [6/] accorded recognition to and sanctioned the possessory rights on public lands asserted under local customs and laws. [7/] Thus it protected those early pioneers who had gone upon the vast semiarid areas owned by the United States of America and applied water to a beneficial use in accordance with local laws and customs.

Later Congress enacted the Desert Land Act of 1877 [8/] which provides among other things, that:

> "* * * all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the <u>public lands</u> and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation * * *."

Interpreting that statute the Supreme Court states: "The fair construction of the provision now under review is that Congress intended to establish the rule that for the future the land should be patented separately; and that all non-navigable waters thereon should be reserved for the use of the public under the laws of the states and territories named." [9/]

To be observed is the fact that the Act last cited and those antecedent to it related to <u>public lands</u> which is a term of art in the field of law respecting lands and rights to the use of water. Reference in that regard is made to this recent comment by the Highest Court: "The Desert Land Act covers 'sources of water supply upon the public lands * * *'. The lands before us in this case are not 'public lands' but 'reservations.'" Continuing to differentiate between public and reserved lands the Court quoted from an earlier decision: "'It is a familiar principle of public land law that

---

[6/] 43 U. S. C. 661.

[7/] Federal Power Commission v. State of Oregon, 349 U. S. 435, 448 (1954).

[8/] 43 U. S. C. 321.

[9/] California Oregon Power Company v. Beaver Portland Cement Co., 295 U. S. 142, 162 (1934).

3646

statutes providing generally for disposal of the public domain are inapplicable to lands which are not unqualifiedly subject to sale and disposition because they have been appropriated to some other purpose.'" [10]

It is abundantly clear that the application of the Desert Land Act of 1877 and related Acts has no bearing upon the lands here being considered. Especially pertinent in that regard is this excerpt from the last-cited decision: "The title to the lands upon which the eastern terminus of the dam is to rest has been in the United States since the cession by Great Britain of the area now comprising the State of Oregon. Even if formerly they may have been open to private appropriation as 'public lands,' they were withdrawn from such availability before any vested interests conflicting with the Pelton Project were acquired." [11] Evidence of claims of private individuals in the subject case will establish the basis for a determination of those rights as they relate to the withdrawn lands which are here involved.

### Rights To The Use Of Water Reserved For The Indian Lands

In a leading case on the subject of rights to the use of water being reserved for Indian lands the Supreme Court declared: "The lands were arid and, without irrigation, were practically valueless. And yet, it is contended, the means of irrigation were deliberately given up by the Indians and deliberately accepted by the Government." It was also contended in the case that any reservation of rights to the use of water "was repealed by the act of admission /for the State_/." To the contention in opposition to a claimed right to water for the arid Indian lands, the Court declared:

> "The power of the Government to reserve the waters and exempt them from appropriation under the state laws is not denied, and could not be. * * * That the Government did reserve them we have decided, and for a use which would be necessarily continued through years. * * * it would be extreme to believe that * * * Congress destroyed

---

[10] Federal Power Commission v. State of Oregon, 349 U. S. 435, 448 (1954).
[11] Ibid., 349 U. S. 435, 444 (1954).

- 4 -

3647

the reservation and took from the Indians the consideration of their grant, leaving them a barren waste -- took from them the means of continuing their old habits, yet did not leave them the power to change to new ones." [12]

The doctrine of implied reservation of rights to the use of water for Indian lands was first recognized by the Court of Appeals for the Ninth Circuit in the case last cited when it was before that Court, and on numerous occasions since. [13] This excerpt from a decision of the Court of Appeals is of particular interest:

> "Appellees seem to contend that Michel Pablo acquired by prior appropriation the rights in question by local statute or custom, and that the Act of July 26, 1866, 43 U.S.C.A. § 661, requires recognition of those rights. That statute, however, applies only to 'public' lands. Winters v. United States, 9 Cir., 143 F. 740, 747, affirmed 207 U. S. 564, 28 S.Ct. 207, 52 L.Ed. 340. Lands which are reserved are severed from the public domain. Leavenworth, etc., R. R. Co. v. United States, 92 U. S. 733, 745, 23 L.Ed. 634; United States v. Minnesota, 270 U.S. 181, 206, 46 S.Ct. 298, 70 L.Ed. 539. The statute mentioned, therefore, does not, we think, apply here. * * * the Montana statutes regarding water rights are not applicable, because Congress at no time has made such statutes controlling in the reservation. In fact, the Montana enabling act specifically provided that Indian lands, within the limits of the state, 'shall remain under the absolute jurisdiction and control of the Congress of the United States'. 25 Stat. 676, § 4." [14]

---

[12] Winters v. United States, 207 U.S. 564, 576, 577 (1907).
[13] Winters v. United States, 207 U.S. 564 (1907) affirming 143 Fed. 740; 148 Fed. 684. United States v. Powers, 305 U.S. 527 (1939), affirming 94 F.2d 783. United States v. Walker River Irrigation District, et al., 104 F.2d 334 (C.A.9, 1939). Conrad Investment Co. v. United States, 161 Fed. 829 (C.A.9, 1908). United States v. McIntire, 101 F.2d 650 (C.A.9, 1939). Skeem v. United States, 273 Fed. 93 (C.A.9, 1921). United States v. Ahtanum Irr. Dist. et al, 236 F.2d 321 (C.A.9, 1956); cert. denied 1956.
[14] United States v. McIntire, 101 F.2d 650, 654 (C.A.9, 1939).

3648

Very recently the Court of Appeals for the Ninth Circuit reaffirmed the doctrine of implied reservation of rights to the use of water for Indian lands. In considering the doctrine enunciated in the Winters Case, the Court declared:

> "This brings us to a discussion of the question of quantum of waters reserved [ for the Indians from the stream there involved ]. It is obvious that the quantum is not measured by the use being made at the time the treaty reservation was made. The reservation was not merely for present but for future use. Any other construction of the rule in the Winters case would be wholly unreasonable." [15]

Having thus ruled, the Court of Appeals emphasized that the time taken by the United States to apply the waters reserved was not subject to review, for: "It is not for us to say to the legislative branch of the Government that Congress did not move with sufficient speed to appropriate the funds necessary" [16] to apply all of the water to a beneficial use.

### Reserved Rights To The Use Of Water On National Forest Lands And Those Administered By The Bureau Of Land Management

There can be no question of the power of the United States of America to reserve for the benefit of the Nation as a whole portions of its public domain. Two examples of reservations of that character are the Cleveland and San Bernardino National Forests which are partly within the watershed of the Santa Margarita River and upon which are situated the principal headwaters of that stream. They were reserved and are administered pursuant to Acts of Congress dating back before the turn of the century. [17] It is significant here that the law as originally enacted provided, among other things, that "no national forest shall be established, except to improve and protect the forests within the boundaries,

---

[15] United States v. Ahtanum Irrigation District, et al., 236 F.2d 321, 326 (C.A.9, 1956); Cert. denied 352 U.S. 988 (1956).

[16] Ibid., 236 F. 2d 321, 328.

[17] 16 U. S. C. A. 471.

3649

or for the purpose of securing favorable conditions of water flows * * *." [18]

Indeed, it may be stated that the National Forests, to a marked degree, constitute a prime factor in our Nation's program of water conservation and utilization.

Early attacks upon our Country's efforts to preserve the forests and the watersheds of our streams were sharply turned back by the courts which interpreted the Constitution as fully empowering that program of conservation. On the subject it has been stated: "'Congress is the body to which is given the power to determine the conditions upon which the public lands shall be disposed of.' * * *

"The United States can prohibit absolutely or fix the terms on which its property may be used. As it can withhold or reserve the land it can do so indefinitely * * *." [19]

Moreover, Congress is empowered to invest the Secretary of Agriculture with authority to make all needful rules and regulations to protect and preserve our Nation's forests. [20]

Similarly it has been authoritatively stated that: "Congress, in the exercise of its control of the property of the United States, may establish public forest reservations on the public domain without the consent of the state where the land lies." [21] The propriety of that conclusion may scarcely be questioned for "A different rule would place the public domain of the United States completely at the mercy of state legislation." [22]

A leading case on the proposition here being considered arose in connection with the Cache National Forest in the State of Utah. [23] In that

---

[18] 16 U. S. C. A. 475.

[19] Light v. United States, 220 U. S. 523, 536 (1910).

[20] United States v. Grimaud, 220 U. S. 506 (1910).

[21] 42 Am. Jur., Public Lands, Sec. 11, p. 793.

[22] Camfield v. United States, 167 U. S. 518, 526 (1896).

[23] United States v. Utah Power & Light Co., 209 Fed. 554 (C.A.8, 1913).

3650

case, the Utah Power and Light Company operated a flume and reservoir situated entirely upon the lands of the United States. In the bill of complaint the United States alleged that the defendant power company was not granted authority to construct or maintain the mentioned structures. To that charge the defendant answered that its rights stemmed from the customs, laws and decisions of the State of Utah as recognized and conferred by the Act of 1866.[24/] Having considered in detail the Enabling Act to which reference had been made, and the Constitution of the State of Utah, the Court announced that: "* * * it is profitless to discuss further this asserted power of the state [of Utah] to dispose of interests in the public lands, * * * in view of the express stipulation that such lands shall remain at the sole and entire disposition of the United States."[25/] Following that declaration, the court alluded to the guiding principles of Constitutional law discussed above, and added: "We must conclude therefore that the power of Congress to dispose of and make all needful rules and regulations respecting the territory, or other property belonging to the United States, including rights of the nature here involved, is supreme; and, in conferring upon the Secretary of the Interior power to establish such rules and regulations as may be necessary to supplement its legislation, Congress acts within its constitutional power. * * * <u>The exertion by Congress of a power which is granted in express terms must supersede all legislation over the same subject by the states. * * *</u>"[26/] (Emphasis supplied)

Affirming the decision last cited, the highest Court declared: "From the earliest times Congress by its legislation, * * * has regulated in many particulars the use by others of the lands of the United States, * * * The States and the public have almost uniformly accepted this legislation as controlling, and in the instances where it has been questioned in this court its validity has been upheld and its supremacy over state enactments sustained. * * * And so we are of opinion that the inclusion within a state of lands of the

---

[24/] Act of July 26, 1866.

[25/] United States v. Utah Power & Light Co., 209 Fed. 554, 558 (C.A.8, 1913).

[26/] Ibid., 209 Fed. 554, 559 (C.A.8, 1913).

3651

- 8 -

United States does not take from Congress the power to control their occupancy and use, * * * 'A different rule * * * would place the public domain of the United States completely at the mercy of state legislation.'" [27]

Important here is the fact that there has been adherence to the doctrine of the cases last cited by State court decisions. [28] Further review of the extent and nature of the powers of the United States of America over its property would merely be cumulative. Suffice to state in the terms of Chief Justice Marshall: "The government of the United States, then, though limited in its powers, is supreme; and its laws, when made in pursuance of the constitution, form the supreme law of the land, 'anything in the constitution or laws of any state to the contrary notwithstanding.'

* * *

"* * * No trace is to be found in the constitution, of an intention to create a dependence of the government of the Union on those of the states, for the execution of the great powers assigned to it. Its means are adequate to its ends; and on those means alone was it expected to rely for the accomplishment of its ends. To impose on it the necessity of resorting to means which it cannot control, which another government may furnish or withhold, would render its course precarious, the result of its measures uncertain, and create a dependence on other governments, which might disappoint its most important designs, and is incompatible with the language of the constitution." [29]

Relative to the status of National Forest lands and the enjoyment of them, the Court of Appeals for the Ninth Circuit has declared: "* * * it would seem to follow that a permit or limited right of grazing granted by the service would not act to perfect any property right as against the sovereign." The court then added this pertinent declaration: "No grant of United States property may be made except by virtue of Congressional authorization (Art. 4, s. 3, Const.; Shannon v. United States, [160 F. 870 (C.A.9)] * * * ), and the mere

---

[27] Utah Power & Light Co. v. United States, 243 U.S. 389, 404, 405 (1916).

[28] Allen v. Bailey, 91 Colo. 260, 14 P.2d 1087 (1932); Ratcliff et al., v. Miller, 86 Colo. 202, 280 Pac. 486 (1929).

[29] McCulloch v. Maryland, 17 U.S. 315, 404, 422 (1819).

3652

authority given the forest service to make appropriate regulations carries with it no authority to alienate for any period of time any phase of government right over the full use of its lands or to make any agreement regarding them subject to the payment of compensation for its revocation.

"It is safe to say that it has always been the intention and policy of the government to regard the use of its public lands for stock grazing, either under the original tacit consent or, as to national forests, under regulation through the permit system, as a privilege which is withdrawable at any time for any use by the sovereign without the payment of compensation. Indeed concessions to individuals for the use of public property or the enjoyment of rights peculiar to the sovereign have been consistently construed with strictness against the concessionee and in favor of the sovereign." [30]

Wisely the Congress, as part of the legislation establishing the National Forests, has enacted laws allowing exceptions to the strict rules and regulations for the administration of them. For example, "The Secretary of Agriculture may permit, under regulations * * * the use of timber and stone found upon national forests, free of charge, by bona fide settlers, miners, residents, and prospectors for minerals, for firewood, fencing, buildings, mining, prospecting, and other domestic purposes, as may be needed by such persons for such purposes; such timber to be used within the State or Territory, respectively, where such national forests may be located." [31] Congress has provided for ingress or egress for actual settlers across forest lands; for prospecting, locating and developing the mineral resources, all subject to rules and regulations. [32] Moreover, "The settlers residing within the exterior boundaries of national forests, or in the vicinity thereof, may maintain schools and churches within such national forest, and for that purpose may occupy any part of the said national forest, * * *." [33]

---

[30]/ Osborne, et al. v. United States, 145 F.2d 892, 895-896 (C.A.9, 1944).
[31]/ 16 U. S. C. 477.
[32]/ 16 U. S. C. 478.
[33]/ 16 U. S. C. 479.

3653

Consonant with the spirit reflected by the acts of Congress last cited, provision is made that "All waters within the boundaries of national forests may be used for domestic, mining, milling, or irrigation purposes, under the laws of the State wherein such national forests are situated, or under the laws of the United States and the rules and regulations established thereunder." [34/] Thus, it is evident that Congress has provided for entry upon the forest reserves under prescribed circumstances; that stone and timber may be used by actual settlers; that prospecting and mining may be conducted within the reserves; that churches and schools may be built. Better to employ those advantages the beneficiaries may utilize the waters within the reserves either under State law, or under the laws of the United States and the rules and regulations established pursuant to those laws.

It is evident from the principles reviewed and the express statutory provisions that the lands and rights to the use of water within the National Forests are reserved for the Nation as a whole with the right of permittees under express authority from the Secretary of Agriculture to secure the privilege to use those properties but not to acquire vested rights in those properties. Different principles or policies would have no other effect than the acquisition by a few of the invaluable lands and waters to the exclusion of all others - a course diametrically opposed to the whole concept for which those National Forests were established.

More recently, pursuant to the Taylor Grazing Act [35/] the National Government took additional steps to protect our natural resources. Respecting that enactment the Supreme Court summarizes as follows:

"The Taylor Grazing Act seeks to provide the most beneficial use of the public range and to protect grazing rights in the districts it creates." [36/]

Key, of course, to the use of the lands for grazing purposes is the availability

---

34/   16 U. S. C. 481.

35/   43 U. S. C. A. 315.

36/   Hatahley v. United States, 351 U. S. 173, 177 (1955).

3654

of water for livestock and to the extent available, the maintenance of forage. Regulations have been promulgated and are now in force respecting land and water use in connection with the lands involved. [37]/ As to the status of permittees upon grazing lands administered under the acts in question, this statement has been made:

> "Unquestionably, the grazing permits were of value to the ranchers. They were an integral part of the ranching unit - indeed, the fee lands are practically worthless without them."
>
> * * * * *
>
> "The permit holders here are not unlike riparian owners on navigable streams who enjoy the preferential privileges incident to the use thereof; but have no compensable property right therein when the use is diminished or destroyed by the Government in the exercise of its powers over navigation. United States v. Chandler-Dunbar Co., 229 U. S. 53, 33 S. Ct. 667, 57 L.Ed. 1063; United States v. Willow River Power Co., supra. [ 324 U.S. 499, 65 S. Ct. 761, 89 L.Ed. 1101.] " [38]/

This statement is significant in determining the nature of the privileges accorded under the Taylor Grazing Act:

> "We think this case is apt because the right to hunt upon public waters bears a striking analogy to the right or privilege of grazing upon the public lands. Neither is an interest in the land itself, and both are subject to restriction or withdrawal, the one by game laws, and the other by laws in the interest of the protection of the public domain; yet both are of value to the persons possessing them." [39]/

---

37/ 43 U. S. C. A. 315 b; 43 C. F. R. 160 et seq.

38/ United States v. Cox, 190 F.2d 293, 295, 297 (C.A. 10, 1951); Cert denied 342 U.S. 867.

39/ Red Canyon Sheep Co. v. Ickes, 98 F.2d 308, 316 (C.A.D.C. 1938).

3655

From the authorities reviewed it is evident that these lands administered under the Taylor Grazing Act are held in trust for all of the people. True, individuals may temporarily use the lands and waters, but title to them under the circumstances here being reviewed cannot be acquired to the exclusion of the other permittees who are equally in need of access to those resources.

### Character Of The Rights To The Use Of Water In Connection With The Reserved Lands Of The United States of America

Whether the lands reserved are for the occupancy of the Indians, for National Forests or are lands administered by the Bureau of Land Management pursuant to the Taylor Grazing Act, their utility and value in the semiarid West turns on the availability of water. Subject to vested rights at the time of the withdrawal of the public lands for the establishment of the reserve, whatever its character may be, rights to the use of water were similarly withdrawn and their measure would normally be commensurate with the needs to be accomplished by the withdrawal of the lands, based, of course, upon the availability of the water. For example, the Supreme Court in the Winters Case has declared that the United States of America reserved for the Indians a quantity of water sufficient to make habitable the lands set aside for them. Similarly the United States of America asserts in this case that to the extent water is available it has been reserved as a means of attaining the objectives for which there were withdrawn the public lands for the National Forests and those administered by the Bureau of Land Management. There resides with the United States of America the burden of proof as to those needs and proof of that character in this cause will be adduced. Title to these rights to the use of water upon the reserved lands of the United States of America resides in it and has never been conveyed away.[40/] Those rights are part of the land[41/] and may be administered by the United States of America independent of the

---

[40/] Winters v. United States, 207 U. S. 564 (1907).

[41/] Howell v. Johnson, 89 Fed. 557, 558 (C.C.D. Mont. 1898).

- 13 -

3656

laws of the several States.[42/] They are in some regard similar to State recognized riparian rights as use does not create them and non-use does not cause their loss, yet to the extent they are required to meet the beneficial uses for which they were reserved they are not subject to diminution by appropriative or riparian rights which vested subsequent to the reservation. They differ from appropriative rights as they exist as parcel to the land and require no act on the part of the United States of America to initiate or maintain them.

UNITED STATES OF AMERICA

J. LEE RANKIN
Solicitor General

WILLIAM H. VEEDER
Attorney, Department of Justice

Dated: May 16, 1958

WILLIAM E. BURBY
Attorney, Department of Justice

---

[42/] Federal Power Commission v. State of Oregon, 349 U. S. 435 (1954).

- 14 -

3657