SWING, SCHARNIKOW & STANIFORTH
604 San Diego Trust & Savings Bldg.
San Diego 1, California
    BElmont 9-1131

SACHSE & PRICE
Fallbrook, California
    RAndolph 8-1154

Attorneys for Fallbrook Public Utility District

F I L E D

JUL 7 - 1958

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | NO. 1247-SD-C |
| Plaintiff, ) | |
| ) | FALLBROOK PUBLIC UTILITY DISTRICT'S |
| vs. ) | REPLY TO MEMORANDUM RESPECTING |
| ) | THE JURISDICTION, POWER AND RESPON- |
| FALLBROOK PUBLIC UTILITY ) | SIBILITY OF THIS COURT. |
| DISTRICT, et al., ) | |
| ) | |
| Defendants. ) | |

The Plaintiff's Memorandum opens with considerable discussion of its contention

that Fallbrook Public Utility District has and is attempting to act beyond its authorized

powers in seeking appropriative rights for irrigation purposes, and in attempting to con-

struct a project for irrigation purposes which it could not finance because both attempts

would be ultra vires.  Plaintiff cites In Re Bonds of Orosi Public Utility District, 196

Cal. 43.  That case involved the validity of an $18,000 bond issue which was attacked by

a tax payer on the ground that the act under which the District was formed was uncon-

stitutional.  The State Supreme Court found that the act was constitutional.  In discussing

the powers of the legislature to authorize under general laws the formation of public

corporations of this kind the court said: (P. 54)

"    Although in this state the legislature is required to provide

such agencies under general laws, it is authorized, under its

general power of legislation, to invest such corporations, when

created, with the same powers which, without such restriction,

it could itself have exercised; and in providing for such organizations

1    it need confer upon them only such powers as, in its judgment, are proper

2    to be exercised by them - - - - - Whether the districts to which such gen-

3    eral laws are applicable, or in which the people thereof may avail themselves

4    of the privilege conferred, be many or few, is immaterial. - - - - - -

5    Whenever a special district of the state requires special legislation there-

6    for, it is competent for the legislature, by general law, to authorize the

7    organization of such district into a public corporation, with such powers of

8    government as it may choose to confer upon it. "

9    The case goes on to say: (P. 55)

10    " In 1911 the constitution of California was amended to provide that 'any

11    municipal corporation may establish and operate public works for supplying

12    its inhabitants with light, water, power, heat, transportation, telephone

13    service, or other means of communication. - - - - - -' The amended

14    section is radically different from the one it replaced. In the statement

15    of legislative reasons for the adoption of the amendment, printed and trans-

16    mitted to the voters by the Secretary of State, it is stated that the conditions

17    which prevailed in this state with regard to the operation of public utilities

18    in cities at the time of the adoption of the new constitution of 1879 had

19    materially changed, and an entirely new situation existed regarding the

20    subject to which the section related. 'The proposed amendment,' the

21    statement continues, 'is designed to provide for conditions as they now

22    are, and as they will doubtless continue to be in the future.' - - - - -

23    The true remedy, so far as any substantial benefit to the people is

24    concerned,' the statement declares, 'is to encourage the furnishing

25    of these public necessities by municipal corporations themselves.' The

26    adoption of the amendment definitely settled and removed all doubt from

27    the question of the right of cities and towns to own and operate the kind of

28    public utilities designated by the constitution. In enacting the statute here

29    in question, the legislature has made provision whereby the inhabitants

30    of the state living outside the limits of cities and towns may serve their own

31    purposes through the operaton of the same kind of utilities, when organ-

32    ized for that purpose. "

1   Thus we see the Orosi case gives abundant support for the intention of the people of

2   California in adopting the 1911 Constitutional amendment to give the legislature the power

3   to pass general laws meeting the local requirements of the various areas of the state and

4   authorizing the organization of the public corporations to supply those needs whatever they

5   may be.  And this is exactly what the legislature has since done.  The Public Utility Act

6   has been radically amended from what it was in 1925 when the Orosi case was decided and

7   now expressly gives public utility districts authority to serve water for irrigation purposes.

8   We do not by any means concede that an amendment to the Public Utility District

9   Act was necessary to give public utility districts authority to furnish and distribute water

10  for irrigation purposes.  As a quasi-municipal corporation, Fallbrook Public Utility

11  District had the right to supply the requirements of all its residents and property holders

12  just the same as any city supplies the needs and requirements of its citizens and tax-

13  payers, whether domestic, industrial or for irrigation.  Witness for example the City of

14  Los Angeles furnishing water for San Fernando Valley farmers, the City of Riverside

15  furnishing water for the extensive orange groves within its city limits, and the City of

16  San Diego supplying irrigation water for the Tia Juana Valley, which it recently annexed.

17  Since the decision in the Orosi case, the legislature added Sections 16,407 and

18  16,409 to the Public Utility Code.  Section 16,407 declares:

19  "  A (public utility) district has the same powers with reference to

20  improvement districts as are conferred upon irrigation districts by

21  Division 11, Part 7 of the Water Code. "

22  Division 11, Part 7 of the Water Code starts off with Section 23600 which declares:

23  "  Land, which need not be contiguous, may be formed into an im-

24  provement district for one or more of the following:

25  (a)  irrigation or domestic water service by a system of pumps or

26  conduits or both. "

27  Section 16,409 declares:

28  "  For the purpose of obtaining and supplying water for domestic, irri-

29  gation, and fire protection purposes, a /̲public utility̲7 district may

30  cooperate and contract with the United States and borrow and procure money

31  from the United States in the same manner and under the same procedures as

32  irrigation districts under Division 11, Part 6, Chapter 2 of the Water Code. "

1  Division 11, Part 6, Chapter 2 of the Water Code sets forth the procedure for entering

2  into a cooperative contract with the United States for the acquisition and operation of

3  works for irrigation purposes.

4      Thus we see that public utility districts, like Fallbrook, have by express declara-

5  tion of our legislature had conferred upon them power and authority to obtain and supply

6  water for irrigation purposes (Public Utility Code 16409) and assume some of the powers

7  of irrigation districts.  Furthermore, the provision of the Public Utility Code regarding

8  annexation of territory continually refers not to people or inhabitants but to lands and

9  territory to be annexed, showing clearly the present shift to the benefits of districts

10  service to land rather than to people alone.

11      Section 17360 Public Utility Code even permits the annexation of an "irrigation

12  district".

13      Section 17,319 provides for the annexation of "territory (which territory is

14  unihabited)" with the consent of the owners of a majority of the assessed valuation of the

15  territory.

16      In view of these express statutory powers conferred upon Fallbrook Public Utility

17  District, how can the Government attorneys seriously talk ultra vires, or ask this Court

18  to accept the Orosi case as now restricting and limiting the powers of the Fallbrook

19  Public Utility District.

20      Plaintiff devotes the next several subdivisions of its Memorandum (See II, III, IV,

21  V, VI) to attacking in various manner the right and authority of the State agencies to

22  regulate and control the use of surplus or unappropriated water of non-navigable streams

23  within the boundaries of California.  We contend that this right has been one of the

24  longest established and least questioned of any of our water laws.  The Civil Code of

25  California in 1872 (Sections 1410-1421) prescribed the steps which must be followed to

26  acquire an appropriative right. In 1911 the State Legislature amended Section 1410 Civil

27  Code to expressly declare:  "All water or use of water within the State of California is

28  the property of the State of California, but the rights to the use of running water flowing

29  in a river or stream or down a canyon or ravine may be acquired by appropriation in

30  the manner provided by law." (Emphasis added)  There is no federal law prescribing any

31  federal procedure for making an appropriation on any non-navigable stream or river,

32  therefore the language of Section 1410 Civil Code can refer only to California laws.  In

-4-

1943 the substance of Civil Code 1410 as amended in 1911 was reenacted as Section 102
of the Water Code: "All water within the State is the property of the people of the State
but the right to the use of water may be acquired by appropriation in the manner provided
by law."

In <u>Meridian, Ltd. v. San Francisco</u>, 13 Cal (2d) 424, The State Supreme Court
considered and discussed the power of the State to regulate and control the waters of the
streams of the State which were in excess of the needs of the riparian owners and prior
appropriators and said:  (at page 444)

"     The question is presented for the first time since the adoption of the
constitutional amendment of 1928 as to who has the power of control over
the waters in the rivers and streams of the state which are in excess of
the present and future needs of riparian owners and prior appropriators."

And again at page 445:

"     There are waters in the rivers and streams of the state to which the
the riparian right first attaches.  The rights of other lawful users on the
stream also rightfully attach.  In addition there are in many of the rivers
and streams of the state great volumes of water which pass on unused to
the sea or to an inland drainage basin.  In a real sense this excess water
is a great natural resource available for the benefit of this and future
generations, as the occasion for its use may arise.  <u>These excess waters
constitute the public waters of the state to be used, regulated and controlled
by the state or under its direction.</u>"  (Emphasis added)

And again at page 448:

"     The paramount importance of the conservation of the water resources
of the state, including excess waters, has been recognized and emphasized
for decades culminating in the original Water Commission Act in 1913.  The
necessity for gathering and distributing flood or other waters not presently
under beneficial use in the streams of the state was accentuated."

And at page 450:

"     Right of storage must necessarily be subordinate to all beneficial uses
on the stream made in the exercise of riparian and prior appropriative
rights.  <u>And the right of storage may be exercised only pursuant to</u>

<u>appropriations lawfully made.</u> "  (Emphasis added)

At page 459, the Court again said:

   "   <u>That the excess waters of the river constitute a natural resource</u>

<u>subject to regulation by the state</u>; that the people of the state have by the

constitutional amendment of 1928 released such excess waters from the

former restrictions and limitations on the use thereof  and have made

them available for further beneficial uses as indicated herein:  that the

state by statute has also provided safeguards against the unreasonable,

or excessive, or unauthorized use of such excess waters; that until it

is made to appear that the use of such excess waters is required for

beneficial purposes by riparian owners or appropriators having a prior

right, the city has the preferential right to store and utilize such waters

to the extent of its enlarged storage facilities. "  (Emphasis added)

In <u>Temescal Water Co. vs. Department of Public Works</u>, 44 Cal. 2d. 90, the

contention was made by the petitioner that there was no water  available to meet the

appropriation for which a permit had been issued to the Riverside County Flood Control

and Water Conservation District and insisted the existence of unappropriated water was

a jurisdictional fact.  The Court there said at page 95:

   "   Authority for the Division of Water Resources of the Department of

Public Works to administer the appropriation and  use of unappropriated

water, now included in Divisions 1 and 2 of the Water Code, stems from

the Water Commission Act of 1913.

      The main purpose of that legislation was to provide an orderly

method for the appropriation of such waters (<u>Bloss v.  Rahilly</u>, 16 Cal. 2d

70, 75 $\int$ 104 P. 2d 1049 $\int$ ), and substantial changes were made in the

procedure by which an appropriation was initiated."

The court then discussed the decision in <u>Tulare Water Co. v. State Water Com.</u>

187 Cal. 533 $\int$ 202 P. 874 $\int$ and <u>Department of Public Works v. Superior Court</u> 197 Cal.

215 $\int$ 239 P.  1076 $\int$ and stated that the determination made by the Division of Water

Rights in those cases was of an administrative or ministerial character only and the

conclusions arrived at were merely for their own guidance in the administration of their

duties.  The court then goes on to point out that there have been several amendments to

-6-

4019

the section of the Act considered in the Tulare and the Department of Public Works

cases making the issuance of a permit no longer merely a ministerial one saying:

" It was the intention of the Legislature to create a proceeding which

essentially, is the administrative hearing contemplated by section 1094.5

of the Code of Civil Procedure, and that section should govern a review of

the department's determination. "

The court next pointed out that Section 15 of the Act was amended following the

Tulare decision "to require the commission to allow the appropriation of unappro-

priated water 'under such terms and conditions as in the judgment of the commission

will best develop, conserve and utilize in the public interest the water sought to be ap-

propriated . . . . . The Commission shall reject an application when in its judgment the

proposed appropriation would not best conserve the public interest. ' " (Page 99).

Again at page 100 the Court said:

" The cumulative effect of the statutory changes is to create a type of

proceeding greatly different from that which was authorized by the legis-

lation considered in the Tulare case. At that time, the commission had

no discretion to issue or deny a permit, but, depending upon the avail-

ability of unappropriated water and the sufficiency of an application, its

duty to grant or to deny a permit was mandatory. -------- In carrying

out its present duty, the department exercises a broad discretion in

determining whether the issuance of a permit will best serve the public

interest. That determination requires an administrative adjudication and,

in any case in which the issuance of a permit is protested, it may be made

only after a hearing. Ample provision is made for notifying anyone who

may have an interest in the rights claimed or to be considered upon the

hearing of such application.

" Section 1094.5 of the Code of Civil Procedure specifies the procedure

to be followed upon inquiry 'into the validity of any final administrative

order or decision made as the result of a proceeding in which by law a

"hearing is required to be given, evidence is required to be taken and

discretion in the determination of facts is vested in the interior tribunal. "

Again on page 101, the State Supreme Court said:

" The framers of section 1094.5 intended it to set forth 'the procedure by

"which judicial review can be had by the writ of mandate after a formal

adjudicatory decision by <u>any</u> administrative agency' (Emphasis by the

court). The decisive question is whether the agency exercises an adjudi-

catory function in considering facts presented in an administrative

hearing."

At page 103 the State Supreme Court declared:

"    What is unappropriated water is a constantly fluctuating question,

depending upon the seasonal flow of the stream, the annual rainfall, the

forfeiture of prior appropriations and default in the use of riparian rights.

To conclude the rights of would-be appropriators by the extrajudicial and

perhaps arbitrary action of a board of water commissioners would be to

deprive such applicant of a valuable property right without due process of

law.

"    Under the present procedure, the department's determination as to

the availability of unappropriated water concludes no right to a permit to

appropriate water but merely decides a fact upon which the department

bases the exercise of its discretion. <u>Necessarily, the department must</u>

<u>make that determination as a prerequisite to any exercise of its discretion</u>

<u>in the issuance of a permit.</u>" (Emphasis added)

Again at page 105 the State Supreme Court said:

"    The suggested 'practical' reasons advanced for requiring the issue

of the availability of unappropriated water to be decided in an independent

judicial proceeding, rather than after a hearing before the department, are

unconvincing. The appellants suggest that, in such a proceeding, instituted

according to the traditional uses of the writ of mandate, <u>a judicial deter-</u>

<u>mination of that issue could be made simply by comparing the aggregate</u>

<u>of existing rights with estimated supplies.</u> By that means, it is said,

the issue could be determined and the expenses of numerous hearings

upon applications for permits before the department avoided. The basis

for this position is the desirability of protecting the holders of prior rights

against the danger of subsequent appropriative claims beyond available

supplies. As the appellants state the problem, the state should not issue

-8-

4021

'more hunting licenses than there is game to satisfy the hunters.' (Emphasis added)

"    As stated in the Tulare case, however, 'what is unappropriated water is a constantly fluctuating question, depending upon the seasonal flow of the stream, the annual rainfall, the forfeiture of prior appropriations and default in the use of riparian rights'. A judicial determination as to existing appropriative and riparian rights rests upon then present uses which may be quite different at a later time, and a determination as to the future availability of water necessarily can be only an estimate. A permit itself confers no appropriative rights but fixes the priority of its recipient over subsequent appropriators; it expressly provides that its issuance is subject to vested rights."

This Temescal water decision carries another very important determination, to wit: Who is entitled to petition for a mandate under Section 1094.5 of the Code of Civil Procedure. The California Supreme Court at page 106-107 declared:

"    The proper remedy for reviewing the issuance of a permit despite protest upon the ground of the unavailability of unappropriated water is by writ of mandate pursuant to section 1094.5 of the Code of Civil Procedure. The respondents correctly contend that the petition for mandate does not state a cause of action under that section. 'Where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act.' (Abelleira v. District Court of Appeal, 1 Cal. 2d 280, 292 /‾109 P. 2d 942 ‾/). The petition for mandate does not allege that the appellants have in any manner participated in the proceeding upon the application, although in their brief they state that they appeared and objected to the issuance of a permit. - - - - - If upon amendment to their petition they show their participation as interested parties in that proceeding, they may establish as well their interest in a judicial proceeding to review the department's determination. (Bodinson Mfg. Co. v. California Emp. Com. 17 Cal. 2d 321, 330 /‾109 P. 2d 935 ‾/). " (Emphasis added)

However, the Government's attorneys have already conceded that they declined to

-9-

1    participate in the proceedings and hearings before the State Water Rights Board after

2    being notified of the time and place of the hearing, to wit:  August 12, 13 and 14, 1957.

3    The record of the State Water Rights Board shows that

4         "William Veeder, Special Assistant Attorney General of the United States

5         of America, having appeared at said hearing on behalf of the United States

6         for the special purpose of requesting that further action on all of the afore-

7         said applications be withheld until after final disposition of an action in the

8         United States District Court, Southern District of California, in which the

9         rights of the United States and others to the use of water of the Santa

10        Margarita River are involved (U. S. v. Fallbrook Public Utility District,

11        et al. ); counsel for the United States having specifically stated at said time

12        and place that the United States was not appearing in regard to any issue pre-

13        sented to this Board, either as an applicant or as a protestant in these pro-

14        ceedings; no good cause having been shown for withholding action and the

15        request therefor having been denied; no evidence having been presented by or

16        on behalf of applicant in support of Application 12576, and no cause having

17        been shown at said hearing or within five days thereafter for failure of appli-

18        cant to appear and present evidence;

19             Now, Therefore, it is ordered that Application 12576 be, and the same

20        is, hereby rejected and denied. "

21        Accordingly, it must be held, under the Temescal Water Company case, that the

22   Plaintiff's attorneys who refused of record to participate in the proceedings before the

23   State Water Rights Board have forfeited their rights now to have the decision of the

24   Board reviewed on a writ of mandate in the only place where it could be reviewed, to wit

25   in the state courts under section 1094. 5 of the Code of Civil Procedure.

26        Since the pending proceeding, United States of America vs. Fallbrook Public Utility

27   District et al. , is being tried according to California laws, the removal of the Writ of

28   Mandate filed by the Santa Margarita Mutual Water Company against the State Water

29   Rights Board must be remanded by this Honorable United States District Court to the

30   State Court where the proceeding was brought under section 1094. 5 of the Code of Civil

31   Procedure.

32        In Ivanhoe Irrigation District vs. All Parties, 47 Cal. 2nd 597, the California

-10-

1   Supreme Court expressed its views on the water laws of California and while the case

2   was reversed by the United States Supreme Court on the ground that it had erred in de-

3   claring that the 160 acre limitation in the Reclamation Bureau contracts (the Ivanhoe

4   Irrigation District and the State of California vs. McCracken et. al., decided June 23,

5   1958) the decision stands as the latest expression of the State Supreme Court.

6      On Page 623 the Court said:

7      "   It is apparent that the more recent changes in the constitutional and

8   decisional law of this state had the effect of making available for beneficial

9   uses by appropriation and other means great volumes of unappropriated

10   domestic waters of the state.   The nature of the title to the waters here

11   involved is further indicated by the statutory law of this state.   The title to

12   these waters was mentioned at an early date in the amendment of Section

13   1410 of the Civil Code in 1911 which provided that 'All water or the use of

14   water within the State of California is the property of the people of the State

15   of California' subject to appropriation and use in the manner prescribed by

16   law.   That provision   in effect was carried into section 11 of the Water

17   Commission Act of 1913 which provided that 'All waters flowing in any nat-

18   ural water course in the state excepting so far as such waters have been or

19   are being applied to useful or beneficial purposes, upon, or in so far as such

20   waters are or may be reasonably needed for useful, and beneficial purposes

21   upon lands riparian thereto, or otherwise appropriated, is and are hereby

22   declared to be public waters of the State of California and subject to appro-

23   priation in accordance with the provisions of this act'.   (Stats. 1913, p. 1018.)

24   The same provision was carried into the Water Code in 1943 as section 102.

25      Section   104 of that code provides:  'It is hereby declared that the people

26   of the state have a paramount interest in the use of the water of the  State,

27   and that the State shall determine what water of the State, surface and under-

28   ground, can be converted to public use or controlled for public protection.'

29   Section 105 of the same code provides that 'It is hereby declared that the

30   protection of the public interest in the development of the water resources

31   of the State is of vital concern to the people of the State and that the State

32   shall determine in what way the waters of the state, both surface and under-

-11-

4024

1  ground, should be developed for the greatest public benefit.'  Section 1052

2  of that code provides that the diversion or use of water other than as auth-

3  orized by the code is a trespass and the Department of Public Works, act-

4  ing through the State Engineer, may initiate actions in the superior court

5  to have the trespass enjoined. "

6  　　　We desire to call the Court's attention to an excellent discussion of this subject

7  found in 44 Cal Law Review, 833 et seq and 45 Cal Law Review 738 et seq - where

8  several well known legal experts on water rights set forth their views.

9  　　　In Hutchins "The California Law of Water Rights" (1956), a valuable text book by a

10  recognized authority on water laws in the Western states, it is said: (Page 97-98)

11  　　"　Exclusiveness of Water Code procedure. - The procedure in the Water

12  　　Commission Act (now Water Code) superseded both the procedure provided

13  　　in the Civil Code and the non-statutory method for appropriating stream

14  　　waters.   Consequently the Water Code procedure is the exclusive method

15  　　by which an appropriation of water of a watercourse can now be made in

16  　　the State.  (Emphasis added)

17  　　　The Water Code provides that:

18  　　　1225.  No right to appropriate or use water subject to appro-

19  　　　priation shall be initiated or acquired except upon compliance

20  　　　with the provisions of this division.  (Emphasis added)

21  The California Supreme Court stated in 1936 (Crane v. Stevinson, 5 Calif.

22  (2d) 387, 398) that:

23  　　'Since the effective date (year 1913) of the Water Commission

24  　　Act, an intending appropriator has been required to file his

25  　　application with the water commission (now the division of

26  　　water resources).  This the plaintiff did not do.  To sustain

27  　　his claim, the appropriation made by him must have been

28  　　actually complete at some time prior to said 1913 date, and

29  　　even that is not sufficient if the evidence shows a  subsequent

30  　　failure to maintain the beneficial use for the period of time,

31  　　five years, required under decisions prior to the statute. ***'

32  "It is also provided in the Water Code that:

-12-

4025

'1052. The diversion or use of water subject to the provisions of this division other than as authorized in this division is a trespass, and the department may institute in the superior court in and for any county wherein such diversion or use is attempted appropriate action to have such trespass enjoined'. "

And at page 98, it is said:

"Nature of powers of State administrative officials. - The State administrators have no judicial powers in issuing and refusing to issue permits to appropriate water. Their powers in respect to the issuing of permits are administrative only. In this connection, they formerly exercised only a supervisorial function. But the cumulative effect of statutory changes is to create a type of proceeding greatly different from that considered in the Tulare Water Co. decision, so that in carrying out its present duty the State Water Rights Board exercises a broad discretion in determining whether the issuance of a permit will best serve the public interest. That determination requires an administrative adjudication, which, in any case in which an application is protested, may be made only after a hearing. "

And at page 99, it is said:

"The view expressed by the supreme court in 1921 in the Tulare Water Co. case (Tulare Water Co. v. State Water Commission 187 Calif. 533, 536)--- that the positive right to a permit was granted by the Water Commission Act to any person who made application as provided in the act and the rules of of the commission---was held in the Temescal Water case in 1955 to be no longer in effect. (See Temescal Water Co. v. Department of Public Works, 44 Calif. (2d) 90, 99-100, 280 Pac. 2d 1(1955). In the opinion in the latter case the court observed that the commission formerly had no discretion to issue or deny a permit; that depending upon the availability of unappropriated water and the sufficiency of an application, its duty to grant or deny was mandatory. Now, however, the State Water Rights Board (successor of the State Water Commission) is directed to allow the appropriation of water for beneficial purposes 'under such terms and conditions as in its judgment will best develop, conserve, and utilize in the public interest the water

-13-

1    sought to be appropriated;' and to reject an application 'when in its judgment

2    the proposed appropriation would not best conserve the public interest'.

3    (Calif. Water Code secs. 1253 and 1255).  The department (now the board),

4    said the supreme court, now exercises a broad discretion in determining

5    whether the issuance of a permit will best serve the public interest. "

6        It should not be necessary to add that Plaintiff's attorneys have already stipulated

7    in this case "that the rights of the United States of America to the use of water herein

8    are to be measured in accordance with the laws of the State of California" which

9    stipulation has been already approved by the former judge who first tried this case (108

10   Fed. Sup. 72, 75) and by the Honorable Judge now presiding in the pending trial (Order

11   of February 11, 1958).

12       From the foregoing, it must be clear beyond question that the highest authority

13   within California, the legislature and its Supreme Court, have both declared that the

14   State and its agencies have the exclusive right and authority to regulate and prescribe

15   the procedure for the acquisition and use of any surplus waters.

16       Fallbrook Does Not Have Time to Reply to Contentions

17       of Plaintiff Which It Believes Are Incompetent, Irrelevant

18       and Immaterial.

19       Time will not permit us to take up and discuss every contention advanced by

20   Plaintiff's attorneys some of which are immaterial, some irrelevant and some incom-

21   petent.  For one or more of these reasons we are passing over pages 5 to 11 inclusive

22   of Plaintiff's Memorandum.

23       At pages 12 to 14 of the Memorandum, Plaintiff again reasserts the claim that

24   Fallbrook Public Utility District is attempting an ultra vires act when it seeks appro-

25   priative rights to the use of water "for purposes of irrigation" and the construction of a

26   dam in which to store water for that purpose.  This contention that Fallbrook Public

27   Utility District lacks legal authority to carry out its proposed project has, we believe,

28   been completely demolished by the facts and the law heretofore set forth by us at pages

29   1 to 5 of this Brief.  The Orosi case "heavily relied upon by the United States", as the

30   Memorandum declares, is no longer effective because of amendments to the Public

31   Utility Act since adopted by the Legislature and referred to at pages 3 to 5 of this

32   Brief.

-14-

4027

Answering Plaintiff's Contention That Fallbrook

Public Utility District Has No Power to Assess its

Lands for Irrigation Purposes and is Financially

Unable to Construct the Proposed Dam Project

(Plaintiff's Memorandum, Pages 15 - 16).


The first portion of the above proposition which is ultra vires, that is beyond the legal powers of the District to underline irrigate land has already been disposed of. The financial ability of the District to pay for the project was an issue in the State Court of San Diego County in Fallbrook Public Utility District vs. Martin, et al., which was decided against the District by Judge Sherry but upon appeal was reversed on several grounds. (151 Cal. App. 2d 84). In the trial of that case the Defendants raised the issue of the financial ability of the district to finance the dam and reservoir project, and the trial court after appointing its own expert on the subject found "that Plaintiff is able to finance the building of the proposed dam and reservoir project" (151 Cal. App. 2nd, 92, 95). It was estimated at the time of that trial that the costs of the project would be approximately $3,000,000.00. It may be assumed that construction costs have substantially increased since the date of that trial, but is also known that the assessed valuation of the District's lands have likewise increased, and the need or demand for water also has increased. The District is vested with authority to issue general obligation bonds which become a lien upon all real and personal property within the District. (Section 16,573 Public Utility Code: Pacific Gas & Electric Co. vs. Shasta Dam Area Public Utility District, 135 Cal. App. 2d 463). General obligation bonds may not exceed 20% of the assessed valuation of all property situated within the district. However, the 20% bonded debt limitation is not applicable and does not limit the District where it finances water-works by means of a bond issue and makes provisions to pay the indebtedness out of revenues. The Public Utility District Code expressly authorizes a district to issue bonds "for the purpose of acquiring or constructing any waterworks necessary or proper for carrying out the objects and purposes of the district, in like manner as other bonds are authorized to be issued under this division, and may pledge the revenue, income, receipts and profits from the operation of the waterworks to the payment of the principal of and

-15-

1   interest on the bonds. " (Section 16,575 Utility Code).

2       The legality of the District acquiring or constructing a project cannot be attacked

3   in court on the ground that at that particular time the utility district has not taken or

4   completed some essential step to carrying out and completing its project.   The order

5   or sequence in which essential steps vital to putting the public utility project into actual

6   operation for serving the public cannot be dictated by the courts, or the absence of one

7   such step made a bar to the district acquiring some other essential portions of the

8   project.   It makes no legal difference which comes first, the hen or the egg.

9       California Southern R. R. Co. vs. Kimball

10      61 Cal. 90.

11      Vallejo etc. R. R. Co. vs. Home Savings Bank

12      24 Cal. App. 166.

13      Tuolumne Water etc. Co. vs. Frederick

14      13 Cal. App. 498, 502-503.

15      Fallbrook Public Utility District vs. Martin

16      151 Cal. App. 2d 84, 93.

17      As was held in the last cited case (pp. 94-95) in the absence of fraud or bad

18  faith, which is not charged, the Directors of the Fallbrook Public Utility District are

19  vested by law with the authority and discretion to determine that the building of the

20  Fallbrook-Lippincott dam project is necessary or at least desirable and in the best

21  interest of the District.

22

23

24

25

26

27

28

29

30

31

32

<u>Answering Plaintiff's Contention That This</u>

<u>Court Has the Power to Determine the Respective</u>

<u>Priorities of the Applications to Appropriate</u>

<u>The Waters of the Santa Margarita River Made by</u>

<u>The United States of America, Fallbrook Public</u>

<u>Utility District, Santa Margarita Mutual Water</u>

<u>Company and Others.</u>

1.   First in time, first in right to jurisdiction.

The Memorandum, at page 18 et seq., bases its claim that this Court has jurisdiction to determine the priorities of the several applications to appropriate the waters of the Santa Margarita River on the principle "that the court first having jurisdiction may, indeed seems obligated, to the exclusion of all other courts, to proceed to a final adjudication." And Plaintiff's counsel insists that the principle is applicable "whether the second trial is before an administrative tribunal or before a court" (Page 20).

Assuming Plaintiff's test is the correct one, we point out facts set forth in the pretrial stipulation approved by this Court, May 8, 1958, where on page 14 it declares

(1)   That Fallbrook Public Utility District filed with the predecessor of the State Water Rights Board Fallbrook's Application No. 11586 to appropriate Santa Margarita River Water October 11, 1946, and on that application the State agency issued Fallbrook Permit No. 7030.

(2)   That Fallbrook Public Utility District filed with the predecessor of the State Water Rights Board its application No. 11587 October 11, 1946 to appropriate Santa Margarita River water on which a permit was subsequently issued.

(3)   That Fallbrook Public Utility District on November 28, 1947 filed with the predecessor of the State Water Rights Board applications Nos. 12178 and 12179 to appropriate waters of the Santa Margarita River.

Since the pending suit, United States of America v. Fallbrook Public Utility District

-17-

4030

et al, was not commenced until January 25, 1951, when the original complaint was

filed in this Court, did not the State agencies, the Division of Water Resources acting

through the State Engineer and now, its successor the State Water Rights Board, acquire

jurisdiction over the subject matter or _res_ at least three years before this Court was

called into the controversy?

However, we have heretofore cited and quoted from the highest California courts

(pages 4 to 9) that there is only one method of acquiring appropriative rights in Cali-

fornia since the enactment of the Water Commission Act in 1913 and that is by making

an application to the State Agency to appropriate.  The law is clearly stated by Hutchins

quoted by us at pages 12 to 14 of this brief, and it seems to us without any legal basis

to say that this Court can assume the functions of the State Water Rights Board.

It may be that Your Honor, while presiding over these proceedings, can do what

Plaintiff's attorneys say you can do, assume the functions of the State Water Rights

Board and make decisions as to the priority of all applications pending before that

Board to appropriate Santa Margarita River waters, but such would not be the orderly

procedure prescribed by the laws of California, and the administrative rules duly

adopted thereunder, governing the acquisition of appropriative rights to unappropriated

water in the non-navigable streams of this State.  We earnestly contend that the law and

the courts have long recognized an orderly procedure administered by special state

agencies for first determining the priority of claimants for surplus waters subject to

appropriation.  This right and responsibility of the State Agencies has already been

referred to at pages 5 and 6 and 10 to 14 of this Brief.

We have also heretofore at pages 6 to 10 of this Brief referred to the decisions

of the highest courts of this state which point out the legal procedure prescribed by

California's statute C. C. P. 1094.5 and holding that it is applicable to the decisions

of the State Water Rights Board which should be reviewed in the State Courts on a

Writ of Mandate.

We do not concede that the rule of "first in time gives first in jurisdictional

right" applies to administrative agencies and courts without discrimination or distinc-

tion, at least not in California.  Here there is an orderly procedure prescribed and

a logical as well as legal relationship between the administrative agency and the courts

established, each performing its own functions and duties within its assigned sphere,

-18-

1  like the solar system in which the satellites revolve around the planets.  Under the

2  established procedure in California, the law says the administrative agencies shall

3  first discharge their duties, hold their hearings, announce their findings and de-

4  cisions.  Thereafter their action may be reviewed in the State courts on a Writ of

5  Mandate as provided in C. C. P. 1094.5.  We submit that the orderly procedure

6  would be for this Court to send back to the State court for decision under C. C. P.

7  1094.5 the mandamus action brought by the Santa Margarita Mutual Water Company

8  which was removed to this Court on the motion of the Department of Justice attorneys,

9  as they said, to expedite action and simplify court proceedings.  We refer to and adopt

10  the Brief we have heretofore filed in support of the Motion to Remand to the State

11  Court the Writ of Mandate, and the authorities therein cited.

12      We respectfully submit that the orderly procedure would be to send the Removal

13  Case back to the state court where it belongs and let nature take its course.  The

14  Government attorneys have not indicated by their recent past actions that they are

15  especially concerned with simplifying the proceedings before this Court or speeding

16  the case to an early and final decision.

17      We do not at all question the long established rule that the court which first takes

18  cognizance of an action over which it has jurisdiction and power to afford complete

19  relief has the exclusive right to dispose of the controversy without interference from

20  other courts of concurrent jurisdiction.  We do not believe that is the exact situation

21  here now under consideration.  The limitation on the rule is that "in order that the

22  rule may be applicable - - - - - the second action should be between the same parties

23  seeking on the one hand and opposing on the other the same remedy and should relate

24  to the same question".  (21 C J S 751 Courts Sec. 492).  The subject matter before

25  the State Water Rights Board was only the surplus and unappropriated waters of the

26  Santa Margarita River and the rights or claims thereto of only four (4) parties.  The

27  proceeding before the State Board in no wise could be considered an "invasion of

28  this Court's jurisdiction".  The Judge of this Honorable Court on two occasions

29  himself sanctioned the proceedings before the State Board and thought their decision

30  on priorities could be of help to him in deciding the main issues.

31

32

-19-

4032

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

Respectfully Submitted,

SACHSE AND PRICE

SWING, SCHARNIKOW & STANIFORTH

By _____
        PHIL D. SWING

ATTORNEYS FOR DEFENDANT

FALLBROOK PUBLIC UTILITY DISTRICT

-20-

4033

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

SWING, SCHARNIKOW & STANIFORTH
ATTORNEYS AT LAW
604 SAN DIEGO TRUST & SAVINGS BUILDING
SAN DIEGO 1, CALIFORNIA
BELmont 9-1131

SACHSE & PRICE
Fallbrook, California

Attorneys for FALLBROOK PUBLIC UTILITY DISTRICT

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )        NO. 1247-SD-C
                Plaintiff,       )
                                 )    AFFIDAVIT OF SERVICE BY MAIL
        vs                       )        (C. C. P. 1013a)
                                 )
FALLBROOK PUBLIC UTILITY         )
DISTRICT, et al.,                )
                Defendants.      )
─────────────────────────────────

STATE OF CALIFORNIA    )
                       )  ss
COUNTY OF SAN DIEGO    )

        MARIAN W. ALLEN, being first duly sworn, says:

        That affiant is a citizen of the United States, over 18

years of age, a resident of San Diego County, and not a party to

the within action;

        That affiant's business address is 604 San Diego Trust&

Savings Bldg., San Diego, California;

        That affiant served the attached Reply of FALLBROOK PUB-

LIC UTILITY DISTRICT TO MEMORANDUM RESPECTING THE JURISDICTION,

POWER AND RESPONSIBILITY OF THIS COURT, by placing a true copy

thereof in envelopes as follows:

                        Honorable J. Lee Rankin
                        Solicitor General
                            and
                        Mr. William H. Veeder, Special Assistant
                            To the Attorney General
                        DEPARTMENT OF JUSTICE
                        WASHINGTON, D. C.

                                -1-

4034

Professor William E. Burby
Attorney at Law
12120 Travis Street
Los Angeles 49, California

Adolphus Moskovitz, Esq.
Deputy Attorney General
Library and Courts Bldg.
Sacramento, California.

John Cranston, Esq.
Special Master
1425 Bank of America Bldg.
San Diego, California

Bert Buzzini, Esq.
Attorney at Law
2223 Fulton Street
Berkeley 4, California

George G. Grover, Esq.
Attorney at Law
Security Bank Bldg.
Corona, California

Col. A.C. Bowen
Office of Ground Water Resources
Marine Corps Base
AND
Lt. David W. Miller, U.S.N.
Office of Ground Water Resources
Marine Corps Base
CAMP PENDLETON, California

W. B. Dennis, Esq.
365 Broadway
Vista, California

George Stahlman, Esq.
Attorney at Law
Box 235
Fallbrook, California

which envelopes were then sealed and postage fully prepaid thereon
and thereafter on July 7, 1958, were deposited in the United States
mail at San Diego, California; that there is delivery service by
the United States mail at the places so addressed.

*[signature]*

SUBSCRIBED AND SWORN TO
before me this 7th day of July, 1958.

*[signature]*
Notary Public in and for
said County and State.

-2-

4035