1  CLAYSON, STARK & ROTHROCK
   DONALD D. STARK
2  GEORGE G. GROVER
   Security Bank Building
3  Corona, California
   REdwood 7-1910
4
   OWEN W. STRANGE
5
   Attorneys for Defendants
6    Katharine C. Gibbon
     William W. Cottle
7



FILED

JUL 11 1958

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _William W. Luby_
                    DEPUTY CLERK

8              UNITED STATES DISTRICT COURT

9          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10                   SOUTHERN DIVISION

11

12  UNITED STATES OF AMERICA,        )
                                     )
13            Plaintiff,             )
                                     )
14       v.                          )     NO. 1247-SD-C.
                                     )
15  FALLBROOK PUBLIC UTILITY         )     MEMORANDUM
    DISTRICT et al.,                 )     RE PARTIES AND TRIAL
16                                   )
              Defendants.            )
17  _____)

18

19

20       This memorandum is submitted in accordance with the

21  direction given by the Court during hearings held in the week

22  of June 16, 1958.

23       No formal motion is here made, for the memorandum is

24  in large part exploratory and is designed to suggest courses

25  of action rather than to evoke immediate orders by the Court.

26  If the Court should be receptive to some of the suggestions made,

27  other briefs or memoranda might be in order, and suitable action

28  might ultimately be taken on the basis of motions to dismiss,

29  to strike, for judgment on the pleadings, for summary judgment,

30  or other relief.

31

32

                            -1-                        4109

# I

## SERVICE AND APPEARANCE

In a later portion of this memorandum, it will be argued that it is neither necessary nor desirable to adjudicate in this action all the water interests of the Santa Margarita stream system.  But if it be assumed, for the purposes of this part of the discussion, that all such interests must or should be determined, then it seems fundamental that the trial be postponed until all the affected land owners and water users have been served.  Those who are not parties, or in privity with parties, cannot be bound by the decree.  (Duckworth v. Watsonville etc. Co. [Duckworth v. McKinlay], 158 Cal. 206, 215, 110 Pac. 927; Pasadena v. Alhambra, 33 Cal. 2d 908, 920, 207 Pac. 2d 17.)  If there are persons who have water rights in this river and yet who are not served, then the judgment will lack that all-inclusive character which it is claimed it should have.

The trial itself has now been postponed to October 1, 1958, and there should be ample time to complete service by that date.  Nevertheless, if service is not then accomplished, it seems clear that the trial should be further postponed, or else it must be recognized that something less than a full adjudication will result.  It is respectfully submitted that no other approach is consistent with the requirements of due process.

By the same token, the defendants' obligation to appear should be made clear to them.  Although the summons expressly requires answer within 20 days, the Court, in recognition of the difficulties of this case, has publicly announced that defaults will not be taken for some time and that liberality will be shown in setting aside defaults and in permitting amendment of answers.  Again, however, it seems fundamental that some definite date must be fixed beyond which a particular defendant cannot expect to postpone his appearance.  If the decree is to bind a non-answering

1   defendant at all, then there must come a time when his rights may
2   be cut off.    That time may well be before trial rather than after,
3   for it may prove impossible to give a full hearing to such a
4   defendant after the trial has begun.
5        We do not mean to suggest that the Court is in error in
6   refusing to allow prompt entry of defaults.  On the contrary, we
7   concur fully in the Court's policy, and we urge that no default
8   be taken until it is too late to give consideration to the par-
9   ticular claim involved.  But there is a difference between taking
10  a default and having the right to take one.  The Court's state-
11  ments have tended to make it uncertain how long a particular
12  defendant may safely wait.  For example, the Court may not contem-
13  plate defaults in the Wilson Creek area until the hearing on that
14  particular tributary is held; and yet the reasonable time for
15  answering in the De Luz Creek area may already be about to expire,
16  for it might well be a hardship on other parties to permit a
17  defendant who has already been served to reopen the De Luz Creek
18  hearings several months hence.  We urge, therefore, that wide
19  publicity be given to a definite order regarding defaults, so that
20  each defendant will know how long he has a right to answer and
21  when that right will become a matter of the Court's discretion.

23                          (continued)

## II

### HEARING SCHEDULE

Closely related to the problem of defaults is the problem of when and where to hold hearings on each particular issue, for the appropriateness of defaulting a given defendant may depend upon the nature of his claim and upon the time and place he seeks to present it.

Any defendant's case will naturally be divided into: (1) a defense against the claims of plaintiff and against the claims of all the other defendants (particularly the defendants whose lands are located in his vicinity), and (2) a presentation of his own claims (which will vary with the party against whom they are asserted and also with the various parcels of land owned by such other party). From the conduct of the De Luz Creek hearings thus far, it is apparent that the presentation of plaintiff's claims will take a minimum of several weeks in each area. A proper defense against those claims can be made only if a defendant hears their presentation, and it is therefore unrealistic to assume that each defendant will be adequately protected if he merely presents evidence of his own water rights at some time during the proceedings conducted in his area. Clearly he should also attend throughout the presentation of plaintiff's case and throughout the presentation of the cases of at least those other defendants whose claims directly affect his. Hardship results from the fact that very few defendants have the time to attend so many weeks of hearings, and even fewer can afford to engage counsel to attend for them.

The division of the trial into areas and the holding of hearings in the localities concerned has resulted from a recognition of this hardship, and yet the problem is not thereby solved. The time and expense of daily commuting to San Diego have been eliminated, but not the time and expense of attending the lengthy

-4-

1  presentation of plaintiff's case and the cases of the various other
2  significant parties.  Elsewhere in this memorandum it is argued
3  that such hardship can be removed entirely, but for the moment it
4  will be assumed that all parties are to be kept in the litigation
5  and comment will be limited to suggesting means for making the
6  most of that situation.

7       In a given area only a few defendants, either personally
8  or by counsel, are likely to attend all the hearings or even a
9  substantial part of them; so far as these non-attending defendants
10 are concerned, plaintiff's case will be presented without objection,
11 without cross-examination, and without argument.  There will be,
12 however, objections, cross-examination, and argument by certain
13 of the defendants, and it is to be hoped that these activities
14 will provide some degree of protection for those who are absent.
15 It bears emphasis that that is not at all the same as active par-
16 ticipation by each defendant himself -- particularly in view of
17 the fact that every defendant is adverse to every other and that
18 the Vails, the Fallbrook Public Utility District, and the Santa
19 Margarita Mutual Water Company (who, with the State, are the only
20 regularly participating defendants) are all large appropriators
21 or prospective appropriators.  Nevertheless, the realities are such
22 that the average small defendant can expect no more than the defense
23 which thus "trickles down" from these larger parties, and it is
24 therefore important to take all possible action to increase the
25 benefits to be thus obtained.

26       We recommend that the various hearings in this case be so
27 arranged that a smaller, non-attending defendant can have the
28 benefit of the Court's tentative findings on plaintiff's case
29 before he is required to present his own claims.  From the memoranda
30 which have been sent to us, it is not clear just how the proposed
31 trial before the Court sitting in San Diego will differ from the
32 hearings before the Special Master; presumably, however, plaintiff

1  plans at that Court trial to present its case in full detail.

2  It would seem logical that the Court hold this hearing first and

3  then make tentative findings concerning plaintiff's case, so that

4  persons interested in the hearings before the Special Master can

5  review those findings and thereby determine what matters may re-

6  quire their presence and what matters appear to be properly disposed

7  of.  By such a procedure, a non-attending defendant would receive

8  the maximum possible benefit from the work of the participating

9  defendants, for he would be able to see how well those active

10 defendants have done before he loses all opportunity to counter

11 plaintiff's evidence.  He might even decide, with respect to

12 certain rights tentatively adjudged in favor of plaintiff or some

13 other major party, that enough is at stake to warrant the employ-

14 ment of counsel or expert witnesses.  And if he does engage an

15 attorney or engineer, the time which such persons would have to

16 spend in order to advise him might be materially less if tentative

17 findings are available for their review.

18      Such findings would also be of assistance to a defendant

19 in planning the presentation of his own claims.  They would give

20 him an idea of what rights he himself owns, and they might also

21 indicate to him the points of conflict between his rights and

22 those of other parties.

23      Finally, the procedure suggested would lead, we believe,

24 to more uniform action by the Court and the Special Master.  If

25 the Court is to hear the major testimony directly, then obviously

26 the Court's evaluation of it will prevail over that of the Master

27 (although the Court will undoubtedly consult the Master before

28 making findings).  The Master's function, as we understand it,

29 would not be to pass on these major questions presented to the

30 Court but rather to relate them to the claims of the smaller

31 owners whose evidence will not be heard directly by the Court.

32 It would be advantageous,  therefore, if the Court's views on the

-6-

4114

principal claims were known to the Master during the hearings in
the various tributary watersheds.  The chances either of duplica-
tion or of conflict between the Court and the Master would thus
be minimized.

     If such tentative findings are made, they should be subject
to revision upon a proper showing by any smaller defendant whose
case is later presented before the Master.  But of course they
should not be changed at the instance of those who have fully
participated at the Court hearing (except perhaps to prevent manifest
injustice), for otherwise the non-attending parties who rely on
such tentative findings might be seriously prejudiced.

                    (continued)

4115

III

PRETRIAL OPINION

Another way in which the Court could reduce the hardship upon the lesser defendants would be the filing of an opinion on legal issues in advance of trial. Not only might the opinion eliminate some issues entirely (and thus reduce time and expense), but on other issues it would clarify the objectives of the trial and greatly aid in the efficient and accurate disposition of the factual questions. The major parties have extensively briefed and argued many legal contentions, and a non-participating defendant can receive maximum benefit from that work if the Court's views are made known before he is required to act.

If the opinion were filed in the near future, all parties who have been inactive would have an opportunity to review it and to make suggestions for revision before the trial begins. They could then fairly be regarded as bound by the rulings, and there would be no necessity to afford them the right at a later date to argue the issues involved. None of the major parties would be prejudiced, for the Court has given them ample opportunity for briefing and argument.

No doubt the Court should reserve the right to alter the legal conclusions reached. But it is apparent that some of these questions could be argued indefinitely, and the orderly administration of justice would seem to require that, once the trial has begun, re-argument be permitted, and changes in the opinion be made, only to prevent manifest injustice.

We believe that at least the following issues should be covered by the pretrial opinion:

(1) The effect of the opinion of the Court of Appeals. Much careful briefing went into many of the questions passed upon by that Court, and it seems clear that the discussion of them in the opinion was deliberate. Indeed, the concluding paragraph

4116

contains the express statement that the cause is "remanded with
directions to take further proceedings in accordance with this
opinion . . . ."  The contention that the reversal is binding
only on the issue of partial final judgment is at odds with the
Court's directive, for there are two different orders in that
final paragraph:  (a) further proceedings in accordance with the
opinion, and (b) no judgment until the entire suit can be dis-
posed of at the same date.

(2) The applicability of California law.  This question
has been thoroughly argued, both in connection with the stipula-
tion between the United States and California and in other
respects.  Pending motions involve questions of what the stipula-
tion means and whether or not it is binding, but wholly aside
from the stipulation, there can be no doubt that the work of the
trial will be greatly facilitated if the parties can know in
advance what body of law is controlling.  Accordingly, even if
it is held that the stipulation does not render California law
applicable, the Court will perform an important service by
deciding, on other grounds, whether or not California law is to
be followed.

(3) Paramount rights.  So much heat has been generated on
the subject of sovereign rights that we hesitate to discuss it
without first affirming that we regard it as just another issue
in this suit.  If plaintiff's counsel believe that the United
States has such rights, they may certainly ask the Court to
recognize them; whatever we may personally think of the policy
considerations involved, our response to such claims in this
Court will be no less professional than for any other issue.
Moreover, we take it as settled that in plaintiff's original
complaint the word "paramount" was designed to allege only that
certain rights are "superior" or "better" than others and that
no sovereign element was intended.  The amended and supplemental

11117

1   portions of the complaint, however, seem squarely to raise a

2   question of sovereign rights -- rights of the character described

3   by the United States Supreme Court in United States v. California

4   as "paramount". Thus, plaintiff now suggests in substance that

5   its rights on the public domain are based on the law of nations,

6   that the property law of California does not and cannot control

7   plaintiff's rights there, and that all water titles in California

8   are derived from the national government. The Court has ruled

9   that the stipulation between plaintiff and California is not

10  applicable to the newly added upstream rights, and plaintiff may

11  therefore claim that those rights are "paramount" in a sense

12  other than that used in Peabody v. Vallejo. But if sovereign

13  rights are intended, they should be brought out into the open

14  where they can be properly evaluated and adjudicated. With all

15  respect, we do not feel we can agree with the statement made

16  on the first day of the Master's hearings to the effect that

17  plaintiff's stipulation with California has eliminated from this

18  litigation the sovereign rights issue. Of course, plaintiff can

19  disclaim such sovereign rights and can concede, as the Supreme

20  Court of California has declared, that the United States holds its

21  lands in California as "a riparian proprietor". (Palmer v. Railroad

22  Commission, 167 Cal. 163, 168, 138 Pac. 997.) Such a disclaimer

23  would be in accord with the views expressed by the Court of Appeals

24  in this case:

25          "The law of California, by stipulation here and
        by the federal Constitution, controls the water rights
26      within its boundaries." (235 Fed.2d at 653.)

27          "As noted, the United States had no original
        sovereignty over the territory included in the present
28      boundaries of the State of California. This is a unique
        situation, although not entirely unprecedented. No
29      sovereign rights over this land existed in the United
        States except as provided by the dual system until the
30      State of California ceded exclusive jurisdiction over
        the tracts of land acquired by condemnation." (235 Fed.2d
31      at 655.)

32  In the absence of such a disclaimer, there remains a sovereign

1 | rights question which ought to be decided before trial. Much
2 | time and energy may thereby be saved.

3 |     (4) <u>Plaintiff's alleged appropriative rights</u>. Closely
4 | related to questions of sovereign rights and the applicability
5 | of California law are plaintiff's appropriative claims involving
6 | use of water commencing after 1914. The effect of the Navy's
7 | application for a State water permit also involves similar con-
8 | siderations. These questions are the subject of briefing by the
9 | State and the United States and may just as readily be decided
10 | before trial as after. If, as a matter of law, plaintiff has
11 | no such appropriative rights, the trial will be greatly simplified.
12 | Plaintiff's alleged appropriative right based on "excessive"
13 | use within the watershed before 1914 should, we believe, be more
14 | thoroughly briefed before a legal ruling is made with respect to it.

15 |     (5) <u>Plaintiff's alleged prescriptive rights</u>. It seems
16 | unlikely that further argument could be helpful on the issue of
17 | whether or not a diverter of water may gain a prescriptive right
18 | against owners upstream from him. Here again, a decision may
19 | obviate much testimony at the trial.

20 |     (6) <u>Artificial underground storage</u>. As we understand it,
21 | plaintiff concedes that it is not entitled to cyclic storage by
22 | virtue of riparian right. Nevertheless, at the first trial
23 | plaintiff presented evidence regarding the so-called Henderson
24 | project for accomplishing underground storage by a dam which would
25 | slow the waters of the river and permit them to seep into Pendle-
26 | ton Basin, and that project, in our view, is one for cyclic
27 | storage and therefore outside the riparian right. Storage
28 | accomplished by artificial structures does not cease to be un-
29 | natural (and therefore nonriparian) merely because it involves
30 | an underground basin; if by a tunnel or ditch, river water were
31 | diverted into a large surface sink or depression (like Lake
32 | O'Neill), the process would be in essence the same. (The matter

1  is treated in Appellants' Opening Brief before the Court of
2  Appeals, pages 25-32.)  Of course, plaintiff may legally build
3  such a project and store thereby whatever waters reach the
4  enclave, but the vital point is that plaintiff may not, by virtue
5  of riparian right, demand water for the project.  If the water
6  which would thereby be conserved is water which plaintiff could
7  not use in a state of nature (that is, water which would other-
8  wise waste into the ocean), then it is surplus and available for
9  appropriation in accordance with the law of appropriation.  So
10 far as riparian rights are concerned, plaintiff can no more
11 demand water for such a project at Camp Pendleton than it can
12 demand water for surface storage or for use outside the watershed
13 or for waste.  Plaintiff can do all these things, for there are
14 no lower owners to complain, but the law will not compel owners
15 of upstream rights to release water to plaintiff for such pur-
16 poses; it is important to bear in mind that the impact of any
17 injunction which plaintiff may obtain will fall upstream, outside
18 the enclave.  We urge that the Court's pretrial opinion dispose
19 of plaintiff's claim that, pursuant to riparian right, it may
20 demand water for storage underground by means of artificial
21 structures; there will be no need to take testimony regarding
22 any such project if, as a matter of law, it is outside the
23 riparian right.

24      (7) Military use.  Comprehensive arguments have been pre-
25 sented to the Court on the issue whether or not military use is
26 within the riparian right.  That issue is a legal one and is of
27 great importance; in fact, the whole character of the suit may
28 be affected if, as the Court of Appeals has suggested, "the
29 use in barracks is analogous to municipal use".  (235 Fed.2d
30 at 662.)

31      To summarize:  a pretrial opinion will be helpful in at
32 least four major ways:  (1) It will aid the Master in conducting

-12-

4120

1   hearings throughout the watershed, for it will enable him to
2   make many legal rulings with the knowledge that they will be
3   acceptable to the Court.  (2) It will dispose of certain issues
4   and will save the time and expense which would be required to
5   present evidence concerning them.  (3) It will give assurance
6   to the smaller defendants regarding issues which are ruled upon
7   in their favor; they will know that they need not attend the
8   trial or other hearings in order to protect their rights with
9   respect to such matters.  (4) Most important of all, perhaps a
10  pretrial opinion could put an end to this whole difficult liti-
11  gation.  There are many critical questions which may well be
12  decided contrary to plaintiff's contentions, and if that should
13  prove to be the case, one would think that the United States
14  might thereby be led to an agonizing reappraisal of its position.
15  It plaintiff has no storage rights (surface or underground),
16  no rights to use water outside the watershed, no prescriptive
17  rights, no riparian rights for military purposes, and virtually
18  no appropriative rights, then very little else is left; surely
19  this massive litigation is not needed merely to determine Camp
20  Pendleton's riparian right for agricultural use inside the
21  watershed without storage.
22
23                              IV
24                            ANSWERS
25       At the time the United States was permitted to file its
26  supplemental and amended complaint, the Court directed that
27  answers be promptly served and suggested that, in lieu of ex-
28  tending the time to answer, the Court would exercise liberality
29  in permitting later amendment.  During that same week, the Court
30  also made its written order that cross-pleadings be dispensed
31  with and that "all rights to the use of water in the Santa
32  Margarita River system of all parties to this action shall be

1   determined as against the others".  From these and other
2   expressions of the Court, we understand that a minimum of
3   emphasis will be placed on the phraseology of the individual
4   answers and that the Court intends in a general way to recognize
5   whatever rights the various defendants' evidence establishes.
6   We thoroughly agree with such an approach.  Most of the defendants
7   have thus far spent little time in the preparation of their
8   cases, and it would be a burden to compel them to perfect all
9   their theories within a few days.  Moreover, the smaller defen-
10  dants can receive maximum benefit from the activities of the
11  larger ones if they are permitted to take advantage of theories
12  presented by the larger defendants, who have greater familiarity
13  with the case and the assistance of counsel and engineers.  In
14  addition, new ideas are bound to occur from time to time as
15  the case progresses, and justice may be served if some of them
16  are considered by the Court even when not technically within
17  the pleadings -- provided, of course, that no one is thereby
18  prejudiced.  (It appears, for example, that even some of plain-
19  tiff's theories have undergone considerable revision and
20  amplification during the past year.)  Finally, there is no
21  reason why all the smaller defendants should not be treated
22  alike.  One of them should not be adjudged to have a water
23  right (or a defense) which is denied the others simply because
24  he thought of it in time to plead it; if it is applicable to
25  other defendants in similar circumstances, and if it is con-
26  sidered and passed upon by the Court, then no one is injured by
27  giving those other defendants the full benefit of it.
28          Although concurring in what we believe to be the Court's
29  attitude regarding the pleadings, we should like to go one step
30  further and propose that a form answer be drafted under Court
31  auspices for use by defendants who have not yet appeared.
32  (In fact, it might well be made available also to defendants

-14-

4122

who desire to substitute it for pleadings already on file.)
Such an answer would provide a double benefit:  (1) It would
make it easy for defendants to prepare their answers and yet,
by Court order, would allow them full protection.  Frankly, we
suggest virtually a "claim everything, admit nothing" sort of
approach so far as responding to plaintiff's complaint is con-
cerned.  (This is, in essence, the theory which underlies the
Court's order dispensing with cross-pleadings among the various
defendants.)  There are so many facts alleged in the complaint
that a defendant should not be required to say immediately just
what is true and what he may wish to contest; moreover, some
of plaintiff's allegations are unclear; in several places it is
extremely difficult to phrase proper responses.  (2) Such a
form answer would facilitate and encourage the pleading of those
few matters which each defendant should be required to set forth
at this time, namely:  (a) land ownership, (b) actual water use,
(c) State water permits and licenses, and (d) water contracts, deeds
and judgments.  No defendant need be forced to plead at his
peril whether or not his land is riparian; if it is known what
land he claims, the question of its riparian character can,
without hardship on anyone, be deferred until trial, when the
nature of riparian ownership has been more fully explored.
The same is true of overlying rights.  Again, if his claimed
use of water is known, other parties can, without hardship,
assume that he may have a prescriptive right, and the various
other elements that may be involved can be left until trial.
Other illustrations could be given.  We believe that in the case
of most defendants, those four facts (land ownership, actual
water use, State permits and licenses, and contracts, deeds and judg-
ments) are all that are essential to put either plaintiff or
the other parties on notice as to the type of case which may
develop at the trial.

-15-

4123

1     Of course, in a few instances the Court might, for good

2  cause, direct a more extensive answer.  We are speaking here of

3  the average small defendant.

4     The facts agreed upon in the proposed pretrial order might

5  be circulated and a limited time allowed each defendant to contro-

6  vert them.  Other similar orders might be made before trial to

7  promote the efficient conduct of the case.  Our comments in this

8  subdivision of the memorandum are directed only to the pleadings

9  as such.

10     (In view of the rather strict pleading requirements

11  recently suggested in United States v. Ahtanum Irr. Dist. (1956),

12  236 Fed.2d 321, 339, this Court, if it decides to authorize a

13  form answer, should no doubt make an order which will protect

14  the defendants using it.  There have been published reports that

15  the United States already has available a form answer, and it

16  would therefore appear that plaintiff will cooperate in devising

17  a form which will meet legal requirements; perhaps plaintiff

18  would even stipulate to its sufficiency.)

19

20                    (continued)

21

22

23

24

25

26

27

28

29

30

31

32

4124

V

DISMISSAL

We turn now to the really challenging problem of how to dispose of this gigantic law suit without the great loss of time, money, and good will which is inevitable if the case progresses as a full adjudication.  We respectfully urge that a plenary adjudication should not have been attempted, that it is not too late to convert the suit into one which would more appropriately accomplish plaintiff's announced purposes, and that even without a change of heart on the part of the United States Attorney General, this Court has authority to limit the scope of the litigation.

A

Before considering just what limiting action the Court might take, we will review briefly our reasons for feeling that such action is called for.  In this connection, we hope to show, first, that a complete adjudication will accomplish virtually nothing for plaintiff, and, second, that the present action places an impossible burden upon the thousands of smaller defendants.

In Pasadena v. Alhambra (1949), 33 Cal.2d 908, 920, 207 Pac.2d 17, the California Supreme Court said:

> "The line must be drawn somewhere in order to bring the proceeding within practical bounds, and it would have been impossible to reach a solution of the problems involved and to render a valid judgment if jurisdiction to make an allocation depended upon the joinder of every person having some actual or potential right to the water in the basin and its sources of supply.  The persons not made parties are, of course, not bound by the judgment, nor are they injured by the injunction."

No court was ever more right.  Under the riparian doctrine which prevails in California, the amount of water to which each riparian owner is entitled is a vague, uncertain quantity which changes with the weather (that is, with water supply), with the use he decides to make of his land, and with the use which other

-17-

4125

owners make of their land; we understand that plaintiff claims
that the amount of entitlement also depends on the economic
feasibility of the various uses (and of course feasibility may
in turn depend on such remote factors as the potato crop in
Idaho, the demand for lemonade in New York City, or the cost of
shipping vegetables to Los Angeles). It is impossible to con-
sider all these many elements for more than one season at a
time; they are far too variable for permanent adjudication. A
decree apportioning a specific amount of water to each of the
thousands of parties herein would be out of date before it could
be reviewed on appeal. Every year the Court would have to re-
consider the constantly changing conditions and redetermine the
quantities allotted. Even a system of index wells or river
control points would not be adequate, for the interrelationships
of all the parties are too complicated.

For example: the cause of the lowering of the water level
of a particular well would have to be traced to the particular
persons responsible, for it would be unjust to assume arbitrarily
that it has resulted from the activities of all parties upstream,
or from the diversions of one particular party, or from the
diversions on one particular tributary, or from a decrease in
precipitation, either throughout the watershed or in a particular
area. In the end, the cause might prove to be a perfectly lawful
increase in riparian use by owners previously inactive, so that
the loss would have to be spread throughout the watershed and a
complete reapportionment ordered. Again, let us suppose that
the riparian uses on De Luz Creek greatly increase for two or
three years and that the supply to Camp Pendleton decreases
accordingly. That would not be a matter for adjustment on De Luz
Creek alone. The amount of water which the owners on Rainbow
Creek have been ordered to let down to Camp Pendleton will have
been based in part on Pendleton's supply from De Luz, and as the

-18-

1  latter decreases, plaintiff's equitable claim on Rainbow (and
2  all the other tributaries) may correspondingly increase.
3      One answer to this problem of changing entitlement is not
4  to issue a decree in terms of specific quantities at all
5  (quantative riparian apportionment is, in fact, rarely resorted
6  to).  But a non-quantitative judgment would also be virtually
7  useless to plaintiff.  Camp Pendleton's water needs cannot be
8  intelligently planned with the knowledge merely that, say, 2,687
9  upstream parties have a correlative right to use an unknown
10  quantity of water.
11      What plaintiff really needs (and what a judgment in this
12  suit will neither provide nor prevent) is an engineering appraisal
13  of the water uses of the other parties.  If, in the course of
14  making such an appraisal, plaintiff discovers specific users
15  which it believes are not acting lawfully, then suit against
16  such persons might well be instituted; indeed, plaintiff has
17  singled out certain such parties in this case.  But a quiet title
18  action against everyone merely complicates and prolongs the
19  litigation and adds nothing of practical value to the result.
20      Even in an action against appropriators (or prospective
21  appropriators) where plaintiff's claim may be that there is no
22  surplus available for appropriation, it is not necessary to join
23  all owners of prior rights.  "Surplus," like everything else,
24  is a variable thing.  It is beyond dispute that _if_ all the
25  riparian land in this watershed were fully developed, more water
26  would be required than exists in the stream; but there may
27  nevertheless be a surplus _pending_ development, and that develop-
28  ment may not take place for generations, or at all.  Whether or
29  not such a surplus exists depends on total riparian use, not
30  total riparian right.  As between plaintiff and the appropriator
31  concerned, such total riparian use is a fact question which can
32  just as easily be decided without the presence of the other

-19-

4127

riparian owners; such owners, even if joined, would merely say:
"Someday we _may_ use the water."  There might well be testimony
concerning the present and probable future use of such other
owners, but an actual _adjudication_ of their rights is not
necessary.  In the last analysis, plaintiff is entitled to an
injunction if such an appropriator takes water to which _plaintiff_
is entitled; interference with the rights of other parties is no
concern of plaintiff.  Especially is this true in this case, for
plaintiff is the last riparian owner on the stream; there are no
lower owners with a right to share in the water which reaches,
or should reach, Camp Pendleton.

A more important issue between plaintiff and such an
appropriator or prospective appropriator might be whether or not
the waters in controversy are within the riparian right.  If
(as we understand is true of Fallbrook Public Utility District,
for example) the appropriator claims the right to take surplus
flood waters which are not recoverable without artificial storage,
then it is perfectly possible to determine the presence or ab-
sence of such flood waters without having the other riparian
owners before the Court.

The fact of the matter is that plaintiff does not need to
sue everyone in sight in order to protect its rights.  Most
water users in this area, like most citizens everywhere, are
law-abiding.  In most instances, even those whose use is excessive
would restrict their diversions if suitable overtures were made
by the United States.  Litigation is justified only where
plaintiff perceives an actual wrong which is injuring the United
States and where a demand for correction has not been effective.
Such practical considerations are the reason why this type of
suit is so exceptional.  Almost no one (except the United States)
could afford it.  To private owners, the matter is a question of
dollars and cents -- the tremendous cost involved must be weighed

-20-

against the relatively slight benefits to be derived.  Thus
tested, such suits simply are not worth it.

A plenary suit is not only unnecessary to protect
plaintiff's rights, but it also creates extensive hardship on
the smaller parties.  To a small rancher or home owner, the cost
of retaining counsel to represent him daily throughout the trial
is simply prohibitive.  Wholly aside from questions of defense,
many owners do not actually know whether or not they have rights
which can properly be asserted against the United States.  The
complexity of the case is such that an attorney would be required
to spend several days analyzing issues and preparing a suitable
pleading.  The cost of such representation, at the pleading
stage alone, is a matter of major importance to these people.

Moreover, an engineering appraisal is also necessary,
for the difficulty of determining the factual questions involved
is enormous.

How, for example, does a small nonriparian owner who has
never drilled a well determine whether or not his property over-
lies an underground basin?  Or whether or not such a basin (if
it exists) is the same as that underlying the land of his
neighbors?  Or whether or not that basin is connected underground
with the Santa Margarita River?  How does he determine the water
duty of his land, or even what portion of it is irrigable?  How
does he evaluate the factual assertions of the many other parties?
It has even proved difficult in this case to determine whether
or not particular land is within the watershed.  All these matters
obviously can be determined only with the aid of expert hydro-
logical, geological, and agricultural advice.  If the questions
propounded in the Special Master's recent memorandum to counsel
are indicative, each party should also have the aid of an
economist.  Plaintiff's counsel have themselves made it plain,
in the hearings before the Master, that nothing short of expert

-21-

4129

1   testimony for each defendant can safely be regarded as adequate
2   for the presentation of claimed water rights.  (See Reporter's
3   Transcript, pages 1340-1348.)
4        As we have already pointed out, the task of defending
5   against the claims of the United States and all the other parties
6   presents to the small defendant a financial problem even more
7   formidable than that of putting on his own case.  The "trickle
8   down" theory suggested by plaintiff (see plaintiff's "Memorandum
9   Suggesting Methods of Trial etc.," dated July 5, 1957, page 15,
10  lines 16-22) does not give to the smaller parties that "day in
11  court" which has always been a hallmark of our jurisprudence.
12  It casually assumes that someone else's attorneys and engineers
13  can do the job of representing the smaller parties, indirectly.
14  It also ignores the fact that the position of the larger
15  defendants is quite different.  On any stream, the water interests
16  are extremely complex and interrelated.  There are owners who
17  have used water for many years, and others who have never used
18  water; there are those who desire district organization, some
19  who prefer mutual water companies, still others who feel best
20  served by a public utility, and finally a great many who act
21  entirely alone; there are irrigationists, stock ranchers,
22  domestic users, and various combinations; some owners want to
23  import water, while others insist upon utilization only of local
24  supplies; even the State (as disclosed by its answer) has unique
25  water interests, such as those connected with fire protection
26  activities.  It is unrealistic to suppose that, in responding
27  to plaintiff's case, three or four large appropriators can
28  adequately represent all these conflicting positions.
29       The problem is rendered still more difficult by the order
30  making all parties adverse to each other.  Thus, even parties
31  with similar interests or points of view (parties who would like
32  to join together in a common front or to reduce expense) must use

1  extreme care to avoid conflict between themselves.  Under the
2  Court's order, a man's closest neighbor may very possibly be his
3  most significant adversary.

4  The inevitable and regrettable result is that those parties
5  will get adequate representation who can afford to pay for it.
6  The others stand in real danger of being overwhelmed by the sheer
7  size of the litigation.

8  Of course, the Court and the Master will do what they can
9  to protect every party's rights; and the announced policy of
10  requiring plaintiff to prove its case against defaulting defen-
11  dants will also help. But the Court simply does not have the
12  time or resources to devise arguments or develop factual data for
13  the individual parties.  This is, after all, an adversary pro-
14  ceeding.  True justice demands effective representation for
15  each adversary.

16  We hasten to add that we are not contending that the
17  United States desires to inflict hardship upon the smaller
18  parties.  But the situation is no less hard because of that fact.

19                              B

20  Before arguing that the Court has authority to restrict
21  the number of parties, we should like to deal with the contention
22  that the Court of Appeals has commanded a plenary adjudication.
23  It is true that the opinion of that Court (235 Fed.2d 647)
24  emphasizes the importance of having a single judgment as to all
25  parties.  But the language of the opinion falls far short of
26  declaring that, in every water suit, all interests on the stream
27  must be joined.  Long before the case ever reached the Court of
28  Appeals, the United States decided to include everyone in the
29  watershed, and it was in the light of that fact that the Court of
30  Appeals made its ruling.  The Court did not order the joinder of
31  all possible parties, but merely recognized that such joinder had
32  been made by plaintiff.  The very first words of the opinion

                              -23-                          4131

(page 652) are:

> "The United States brought an action against
> some three thousand (3,000) defendants to quiet title
> to water rights . . . ."

On the same page the Court again says:

> "The United States brought into the trial court
> all of the other claimants of the river system . . . ."

And on page 662:

> "The attorneys for the government had brought all the
> parties into court . . . ."

Finally, on page 664:

> "Since this action includes the entire watershed, it
> is in the nature of a plenary suit to settle the
> correlative right of everyone interested in the waters.
> The standard course in such a proceeding is to enter a
> decree setting up all the rights as of the same date."
> (Emphasis added.)

In this last-quoted sentence, the Court is merely saying that if
there is to be a plenary suit, then there can be no partial final
judgment.  Nothing in the opinion states that the plaintiff is
required to sue all persons in the watershed or that it is now
too late to reduce the suit to manageable proportions.

Even the first sentence beginning on page 663 (which
plaintiff has made the subject of its Count No. XIV) does not
indicate anything to the contrary:

> "The only proper method of adjudicating the
> rights on a stream, whether riparian or appropriative
> or mixed, is to have all owners of lands on the water-
> shed and all appropriators who use water from the stream
> involved in another watershed in court at the same time."

This comment of the Court relates (as it says) to "the" rights
on a stream -- not "a" right or "some" rights but "the" rights.
"The" rights on a stream are, of course, all the rights.  This
language is merely another recognition in the opinion that the
United States had already decided to litigate all such rights,
and the purpose of the sentence is merely to point out the manner
in which such a suit should be conducted.

-24-

4132

1   The question whether or not the United States should
2   have sued so many parties was not presented to the Court of
3   Appeals, and the language of the decision does not justify the
4   claim that the Court passed upon that question. We respectfully
5   submit, therefore, that the assertion that the Court of Appeals
6   is responsible for the broad scope of this litigation is not
7   supported by that Court's opinion. The responsibility does not
8   lie in San Francisco but in Washington. If the Attorney General
9   of the United States truly desires to sue 6,000 defendants,
10   let him say so; if he does not, then the opinion of the Court of
11   Appeals need be no bar to now limiting the scope of the suit.

12                              C

13   A crank suit by "A" against "B" is one thing. A crank
14   suit by "A" against 6,000 defendants is something altogether
15   different. Because of its size, the latter type of suit injures
16   the public interest in a very real sense, and the proper adminis-
17   tration of justice obviously calls for some means of preventing
18   or controlling it before the time and expense of trial are wasted.
19   In the field of water litigation especially, the restraints
20   which might ordinarily deter a plaintiff from bringing a crank
21   suit against a large number of parties are not likely to be
22   present. Thus, in a water suit, a plaintiff has no difficulty
23   showing an injury or controversy, for he can easily induce
24   adverse claims by a little puffing of his own contentions (just
25   as plaintiff here has claimed 4.2 acre feet of water per acre
26   per year for all its forest and Indian lands). And such a
27   plaintiff has no difficulty demonstrating that thousands of
28   persons are in fact involved, for there is an admitted legal
29   connection among all property owners within a watershed.

30   Our purpose here, of course, is not to contend that this
31   is a crank suit. But if it were -- if some plaintiff did bring
32   such an action for malicious or frivolous reasons -- is there

4133

anything the Court could do about it?  We think there is.  We
believe that, on recognized general principles, a court may
refuse to entertain a plenary water adjudication suit which is
contrary to the public interest or which would result in unreason-
able hardship to the defendants.

In establishing a statutory procedure for general adjudi-
cation of an entire stream system, the California Legislature
has expressly required that, in such a case, it must first be
found that "the facts and conditions are such that the public
interest and necessity will be served by a determination of the
water rights involved".  (Water Code §2525.)  Although that
statutory procedure is not applicable to this Court, it would
be anomalous indeed if a plaintiff who is denied the statutory
method (because his action is contrary to the public interest)
could nevertheless invoke the jurisdiction of this Court to
accomplish the same purpose.

The answer lies, we believe, in the fact that the relief
plaintiff seeks, and must have, is in equity.  Equity does not
act contrary to the public interest.

It is one of the most fundamental of equitable maxims
that he who seeks equity must do equity.  Clearly it is not
"doing equity" if the action itself is contrary to the public
interest.  It is not "doing equity" if the inevitable effect of
the action is to overwhelm small land owners and water users by
the sheer complexity (factual and legal) of the issues involved --
issues on which they cannot hope to present adequate argument
or evidence.  It is not "doing equity" if the action is in fact
unnecessary to the reasonable protection of a plaintiff's rights.
It is not "doing equity" where a plaintiff alleges, simply to
plead himself into court, that "the defendants named in this
action assert adverse claims to the rights to the use of water"
of the plaintiff, "have clouded the title" of the plaintiff, and

-26

1    "are presently exercizing rights to the use of water in a
2    manner that invades or threatens to invade the rights to the
3    use of water" of the plaintiff -- when in actual fact countless
4    defendants do not even use water and only a few have even
5    approached an "invasion" of the plaintiff's rights in any real
6    sense.

7        It is another cardinal principle of equity that it will
8    not grant relief if such relief would result in an unreasonable
9    hardship.  The principle has for centuries found frequent
10   expression in contract cases where specific performance has
11   been denied even though the contract itself is valid and en-
12   forceable at law -- that is, even where the plaintiff has a
13   technical legal right.  (See 23 Cal.Jur.418.)  This principle
14   has many times been applied in the field of injunctions, where
15   it is sometimes referred to as the "balance of convenience"
16   doctrine.  (Protz v. Reynolds (1956), 146 Cal.App.2d 732, 735-
17   736, 304 Pac.2d 188; Frost v. City of Los Angeles (1919),
18   181 Cal. 22, 32, 183 Pac.342, 6 A.L.R. 468; 27 Cal.Jur.2d 163.)

19       In recent years the courts of California have laid great
20   stress upon the flexibility of equity powers in water cases
21   and have developed several new doctrines on this principle.
22   One is the rule of continuing jurisdiction, which has only
23   gradually come to be fully recognized.  Another is the doctrine
24   of physical solution, which is squarely based on the power of
25   equity courts to impose equitable conditions in their decrees.
26   Thus, in Tulare Irr. Dist. v. Lindsay - Strathmore Irr. Dist.
27   (1935), 3 Cal.2d 489, 574, 45 Pac.2d 972, the California
28   Supreme Court said:

29       "Moreover, the trial court should not lose sight of
30   the fact that this is an equity case.  The equity
     courts possess broad powers and should exercise them
     so as to do substantial justice.  Heretofore, the equity
31   courts, in water cases, apparently have not seen fit to
     work out physical solutions of the problems presented,
32   unless such solutions have been suggested by the parties.

-27-

1    But it should be kept in mind that the equity court
2    is not bound or limited by the suggestions or offers
     made by the parties to this or any similar, action.
3    For purposes of illustration, if the trial court, on
     the retrial, comes to the conclusion, based upon proper
4    evidence, that a substantial saving can be effected at
     a reasonable cost, by repairing or changing some of the
5    ditches, as above mentioned, it undoubtedly has the
     power regardless of whether the parties have suggested
6    the particular physical solution or not, to make its
     injunctive order subject to conditions which it may
7    suggest and to apportion the cost thereof as justice
     may require, keeping in mind the fact that respondents
8    have prior rights and cannot be required lawfully to
     incur any material expense in order to accomodate
9    appellant."

10    Our limited research has not disclosed a case in which

11   an equity court has actually refused jurisdiction in a plenary

12   water suit because of the hardship that would result, but the

13   principle of the Chancellor's discretion is the same whether

14   it is applied before or after trial.  There was no exact

15   precedent for Bushel's Case, in 1670, when the Court of Common

16   Pleas  established our modern concept of jury trial -- the

17   court acted on principle and in recognition of the difference

18   between good government and oppressive government.  Certainly

19   there was no precedent for Erie RR. v. Tompkins, where, on

20   principle, the United States Supreme Court overruled a line of

21   cases almost a century old.  Even Marbury v. Madison was decided

22   on principle.

23    The lack of exact precedent for the point under discussion

24   is not surprising.  Plenary adjudication suits, because of their

25   size and complexity, are rare.  They lend themselves best to

26   the establishment of appropriative priorities, for the issues

27   raised and evidence required are much simpler than in the case

28   of riparian claims, which necessarily involve complicated

29   hydrological, geological, and economic interrelationships.

30   (It was not until 1935 that California's statutory adjudication

31   procedure was amended to include riparian rights.)  In a few

32   cases, even a plenary suit covering riparian rights will be

-28-

1  justified; for example, in <u>United States</u> v. <u>Ahtanum Irr. Dist.</u>

2  (1956), 236 Fed.2d 321, the United States had a legitimate claim

3  (albeit ultimately denied) to all the water of the stream.

4      We do not contend, therefore, that no such suit may ever

5  be maintained, but rather that the true rule is one of discretion.

6  That discretion will only rarely be invoked, for the difficulties

7  involved will ordinarily cause the plaintiff, in his own self-

8  interest, to resort to a plenary action only when clearly justified.

9      Here, however, as has been seen, plaintiff has gone far

10  beyond what is necessary to protect the water rights of Camp

11  Pendleton, the announced purpose of the suit.  (The upstream

12  rights were added later <u>because</u> this is a plenary suit and not

13  because they are in danger.)  We respectfully submit, therefore,

14  that in light of the hardship which falls upon the smaller parties,

15  in light of the inequality between plaintiff and the smaller

16  defendants with respect to legal and financial resources ("equality

17  is equity"), in light of the fact that plaintiff has no real

18  quarrel with most of the smaller parties, in light of the avail-

19  ability of adequate relief through a more limited suit, and in

20  light of the fact that the public interest is not served, and

21  in fact is injured, by a plenary adjudication, this Court should

22  exercise its discretion to withhold relief until plaintiff dis-

23  misses the action against all but those individual parties whose

24  unlawful activities, or threatened unlawful activities, substan-

25  tially interfere with Camp Pendleton's rightful share of the

26  waters of the Santa Margarita River.

27

28                      (continued)

29

30

31

32

4137

# VI

## CROSS-PLEADINGS

The Court's order dispensing with cross-pleadings and making all defendants adverse to each other has proved to be one of the most serious hardships in the case. It means that countless controversies which have no bearing on plaintiff's rights must now be litigated. Plaintiff has no right to demand such litigation. If its own interests are recognized and protected, it cannot complain that other disputes in the watershed may still exist. Those controversies can be worked out over the years (by litigation or otherwise) within the framework of the decree which plaintiff obtains here.

The effect of the order is to multiply the already onerous burden of defense for each party. Estoppel, contract, prescription, priority of appropriation, and many other factors are different for different parties; a defendant will not necessarily have the same case against another defendant that he has against plaintiff.

Moreover, the order makes it extremely difficult for defendants to cooperate in meeting plaintiff's case, for the conflict among themselves is now legally interwoven into the issues affecting plaintiff.

Finally, the order prevents any real settlement with the United States. Such a settlement could not be effective to permit a party to retire from the case without the concurrence of all the other parties. It therefore imposes upon each defendant the hardship of defense even after plaintiff's rights are fully protected.

We recognize that in Pasadena v. Alhambra (1949), 33 Cal.2d 908, 919, 207 Pac.2d 17, the California Supreme Court upheld a similar order. But there are several material differences in the situation presented here: (1) that case involved only the

-30-

1  major users and therefore the number of complicated interrela-
2  tionships was much less than here; (2) the appellant there was
3  a major party and therefore less affected by the order; (3) the
4  Court emphasized that the rule is one of discretion and expressly
5  found that there was no basis for a claim of prejudice in that
6  case.
7      Here, we respectfully urge the Court to exercise its
8  discretion the other way.  Real prejudice does result, and no
9  substantial benefit to plaintiff can be perceived.  Those parties
10  who do desire to settle other disputes in this action will be
11  free to file appropriate cross-pleadings as in any other case.
12  Even if all the small defendants are to be kept in the case,
13  there is now reason to compel them to fight among themselves.

(continued)

4139

VII

ENGINEER

If the suit is to continue unchanged, there is neverthe-
less a very substantial aid which the Court can extend to the
smaller parties. Even if equity does not require a dismissal of
the suit against them, it does, at the very least, call for some
adjustment in the inequalities which characterize this type of
litigation. Nowhere are those inequalities more evident than in
the field of engineering. We have already alluded to the truly
complex hydrological, geological, and agricultural investigation
which will have to be made to present the facts to the Court, and
it is plain that few can afford the professional assistance
involved. Just as the United States, in the present posture of
the case, cannot be expected to agree to a reference to the State
Water Rights Board (see Water Code § 2075), so the defendants
cannot be expected to accept blindly the engineering advice offered
by plaintiff. We propose, therefore, that a neutral engineer be
appointed by the Court to make a study of the land, water supply,
and water use of any defendant desiring his services, and that
he be available for testimony if (but only if) requested by such
defendant. He would also make, of course, a study of the watershed
as a whole and would relate each defendant's circumstances to that
broader study.

Much could be accomplished by such an officer. Most
important, he would adequately protect the smaller owners. At
the same time, he might well be an effective link between such
parties and plaintiff in settlement negotiations. The Court and
Special Master would also be greatly aided by his contribution.
And his presence would greatly reduce the time involved in the
suit, for the defendants would tend to utilize his services instead
of many separate engineers whose functions and testimony would to
a large extent be duplicating.

-32-

1    The California Supreme Court has often stressed the
2  advantages of a statutory reference.  (See Pasadena v. Alhambra
3  [1949], 33 Cal.2d 908, 917, 207 Pac.2d 17; Hutchins, "The Cali-
4  fornia Law of Water Rights," p. 358.)  That procedure is now out
5  of the question here, but many of the same benefits would be
6  obtainable through the appointment we propose.
7    The principal problem, of course, is the financing of
8  such a program.  The statutory reference procedure calls for
9  "equitable" apportionment of the expense.  (Water Code §§ 2043,
10  2048.)  The statutory adjudication procedure (Water Code §§ 2852,
11  2859) has the same requirement.  Since those procedures are
12  similar to the functions of the court-appointed engineer, and
13  particularly since this is an equity action, equitable apportion-
14  ment should be the rule here.  If "equality is equity," then
15  plaintiff should be expected to pay a large share of this expense,
16  for the appointment will be designed in large part to prevent the
17  hardship occasioned by plaintiff's suit and to equalize the great
18  disparity in the parties' position before the Court.  We propose
19  that the same rule be followed which has already been adopted with
20  respect to the Master:  plaintiff should be required to make
21  payment during the suit, with an order at the conclusion of the
22  trial concerning possible reimbursement by certain of the defen-
23  dants.  Again as was ordered in the case of the Master, the smaller
24  parties should not be expected to share in the cost, except that
25  some consideration might be given to the fact that a particular
26  defendant has or has not made use of the services of the Court's
27  engineer.
28
29
30
31
32

-33-

CONCLUSION

We have been unable to make of this memorandum an exhaustive treatise on the matters discussed.  Its purpose is frankly to suggest to the Court principles and ideas which may be more fully briefed at another time.  Above all, and with respect both for this Court and for the United States Attorney General, we wish to emphasize the responsibility which accompanies participation in a case of this character.  Justice will be done, if at all, in the trial court, for it will be too late to discuss procedure on appeal.  We earnestly urge a continuing consideration of the difficult position of the smaller parties.

Respectfully submitted,

CLAYSON, STARK & ROTHROCK
DONALD D. STARK
GEORGE G. GROVER
OWEN W. STRANGE

Attorneys for Defendats Katharine
    C. Gibbon and William W. Cottle

By _George G. Grover_

CERTIFICATE OF SERVICE

I, George G. Grover, hereby certify that I am a member of the bar of the United States District Court for the Southern District of California, and that I served the foregoing Memorandum re Parties and Trial upon each of the following persons by sealing one copy thereof in an envelope and depositing the same in the United States mail at Corona, California, on July 11, 1958, with postage thereon fully prepaid, addressed as follows:

Hon. John M. Cranston
Special Master
Room 1410
Bank of America Building
San Diego 1, California

J. Lee Rankin, Solicitor General
Department of Justice
Washington 25, D. C.

William H. Veeder
William E. Burby
Room 332
325 West "F" Street
San Diego, California

Adolphus Moskovitz
Deputy Attorney General
Library & Courts Bldg.
Sacramento, California

George Stahlman
Attorney at Law
Box 235
Fallbrook, California

Sachse & Price
Attorneys at Law
217 No. Main Street
Fallbrook, California

Bert Buzzini
Attorney at Law
2223 Fulton Street
Berkeley 4, California

W. B. Dennis
Attorney at Law
365 Broadway
Vista, California

Phil D. Swing
Attorney at Law
Suite 604
530 Broadway
San Diego 1, California

Tom Halde
Attorney at Law
Room 530
548 So. Spring Street
Los Angeles, California

DATED:  July 11, 1958.

George G. Grover
George G. Grover