SACHSE and PRICE
Attorneys at Law
1092 South Main Street
Fallbrook, California
RAndolph 8-1154



FILED

JUL 21 1958

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
               Plaintiff,           )   No. 1247-SD-C
                                    )
       vs.                          )   MEMORANDUM CONCERNING
                                    )
FALLBROOK PUBLIC UTILITY DISTRICT,  )   FINDINGS OF THE SPECIAL
a public service corporation of     )
the State of California, et al.,    )   MASTER
                                    )
               Defendants.          )

This memorandum is submitted in response to the request of the Special Master dated July 3, 1958. In it, we will discuss the questions expressly raised by the Master, and also will express our views on the scope of the Findings in general.

I

LIMITATIONS ON THE FINDINGS

The Findings of the Special Master will be limited by the Order of Reference, the pleadings and the proof. There are no directions contained in the Order of Reference requiring any quantitative apportionment of water. The purpose of the Order seems to be to determine the "rights" of the parties in a legal rather than a quantitative sense.

Likewise, the pleadings do not seek any apportionment of water. No such request is found in the prayer, nor does the text of the complaint allege that such an apportionment is

- 1 -

necessary. The prayer asks that the rights of the parties be determined; that the rights of the plaintiff be declared paramount to all appropriative and prescriptive rights and correlative with all riparian rights; that plaintiff's title to its claimed rights be quieted; and for an injunction. All of this relief could be granted without any apportionment of the waters of the De Luz Creek watershed.

More important, however, are the limitations imposed on the Master's Findings by reason of deficiencies in the proof. Four different ownership situations exist in the watershed, and the proof offered differs as to each:

1. The United States as owner of Camp Pendleton has offered proof that it owns riparian lands; that *some* of said lands are irrigable (without specifying the acreage); and that it is making certain uses of water within and without the watershed.

2. The United States as owner of the National Forest and Public Domain lands has offered proof that some of said lands are riparian (See Parcel 81, Exhibit M-68) and some non-riparian (See Parcel 67, Exhibit M-68). It has put into evidence Exhibit M-84, delineating the Land Capabilities of the De Luz Creek watershed. No detailed engineering reports on such lands have been submitted.

3. The Vail Company owns approximately 1/3 of the area of the watershed, but has introduced no evidence whatsoever.

4. Some individual defendants have offered evidence as to ownership, riparian status, claimed prescriptive or appropriative rights and irrigable acreage. Engineering studies prepared by the United States have been offered on all such parcels. Others have offered no evidence whatsoever.

No evidence has been offered as to stream flow

- 2 -

except the U.S.G.S. reports on flow at the De Luz Creek Gauge since 1951. No upstream measurements are available. No calculations of subsurface flow have been made.

There is testimony that certain lands overlie alluvial basins. However, there is no testimony as to the area of such basins, their depth, their water-holding capacity, their safe yield or even whether the water level is rising or falling. In an article in the University of California Law Review, Vol. 45 at page 689, Wells Hutchins states the rule as to the rights of landowners overlying such basins to be:

> "(Such landowners may) abstract and use the ground waters on or in connection with...overlying lands to the full extent of their reasonable beneficial needs, <u>so long as the water supply is enough for all.</u>". (Emphasis added)

Similarly, no riparian can complain of acts of an upstream riparian or appropriator in the absence of some showing of injury. (<u>Meridian vs. San Francisco</u> 13 C. (2d) 424; <u>Peabody vs. Vallejo</u> 2 C. (2d) 351). So long as the water supply is adequate for the reasonable and beneficial needs of the parties, there is no occasion for any apportionment between them, and without some evidence as to the available supply, any intelligent apportionment is impossible.

II

THE QUESTIONS ASKED BY THE MASTER

All of the questions raised by the Special Master relate to the yardstick to be applied <u>in making an allocation of water.</u> Not only is no such apportionment required of the Master, but it is our belief that any factual determination of irrigable acreage or other yardsticks upon which such apportionment might be based would be positively harmful.

<u>As long as there is sufficient water for all, and as long as no actual injury is suffered, all parties have a right to continue with any reasonable and beneficial use.</u> At such

- 3 -

4178

time as a shortage occurs, the questions asked by the Master become vital, <u>but they must be answered in the light of conditions then existing.</u> Many more acres of land are "irrigable" since the advent of electric power and modern pumps than were "irrigable" by gravity diversions from a stream. More lands are "irrigable" with portable pipe and sprinklers than were "irrigable" by furrow. What lands may be susceptible of "practical and profitable irrigation" depends upon many factors including concentrations of population, demand for commodities, farming techniques, access to markets, availability of water, power and labor.

All of these matters will be discussed as the specific questions raised by the Master are answered in the following sections of this Memorandum. We wish to emphasize, however, that we believe <u>any findings as to irrigable acreage, water duty or water apportionment would be improper at this time.</u>

This is particularly true in a case such as this, since it is obvious that <u>all</u> riparians are not making full use of correlative shares at this time. As among riparian owners, one may make use of the entire stream unless and until the others have use for their proportionate shares. (<u>Joerger vs. Mt. Shasta Power Co.</u> 214 C. 630, 636; 7 P. (2d) 706, 1932).

Even as against an appropriator the riparian can only complain if the appropriation interferes with his <u>present</u> reasonable and beneficial use. (Hutchins, <u>The California Law of Water Rights</u> pages 226-234 and cases cited.) In the absence of such interference, he is entitled to a declaration as to his riparian status and a judgment that his <u>prospective</u> reasonable beneficial uses are paramount to any right of the appropriator. (<u>Tulare I.D. vs. Lindsay Strathmore I.D.</u> 3 C. (2d 489, 524-525, 529-530; <u>Peabody vs. Vallejo</u> 2 C. (2d) 351, 382-384).

The hazard involved in making any determination upon

- 4 -

4179

which a quantitative apportionment may later be based is clearly stated by the California Supreme Court in the case of *Prather vs. Hoberg*, 24 C. (2d) 549 at pages 559-560:

> "A riparian owner has no right to any mathematical or specific amount of the water of a stream as against other like owners. He has only a right in common with the owners to take a proportional share from the stream - a correlative right which he shares reciprocally with the other riparian owners. No mathematical rule has been formulated to determine such a right, <u>for what is a reasonable amount varies not only with the circumstances of each case, but also varies from year to year and season to season.</u> (Emphasis added).

In this same connection, see the concurring opinion in the case of *Los Angeles vs. Baldwin*, 53 Cal. 469 at pages 474-475, where the point is made that even the <u>proportionate</u> share to which a riparian owner is entitled varies from time to time as facts change.

We respectfully submit that the Special Master should not make any determination of irrigable acreage, but should limit his findings to those facts that determine the <u>legal</u> rights of the parties. Findings as to the streams within the watershed to which riparian rights attach; riparian and non-riparian lands within the watershed; appropriative rights and prescriptive rights are all that should be included. Anything more than that would be surplusage, not justified by either the pleadings or the proof. We will endeavor, however, to answer the specific questions proposed in the Master's Memorandum of July 3, 1958.

A. <u>In determining irrigable acreage should evidence as to economic feasibility be considered?</u>

The answer to this question depends upon whether or not an actual apportionment of water is to be made. The leading California case on the question is *Half Moon Bay Land Co. vs. Cowell*, 173 C.543; 160 Pac. 675, 1916. The following language (173 C. at pp. 549-550) states the rule:

- 5 -

4180

"In apportioning the waters of a stream among riparian owners, <u>where there is not sufficient for the needs of all</u>, many different facts are to be considered......So far as we are aware, no court has ever undertaken to lay down a comprehensive rule on the subject. We are satisfied that the court may also consider the practicability of irrigation of the lands of the respective parties, the expense thereof, the comparative profit of the different uses which could be made of the water on the land, <u>and that when the water is insufficient for all the land, or for all the uses to which it might be applied thereon, and there is enough only for that use which is most valuable and profitable, the shares may properly be limited to and measured by the quantity sufficient for that use....</u>" (Emphasis added).

The case continues to point out that a party taking under such a decree can of course put his share so determined <u>to whatever beneficial use he desires, and that no decree can prevent him from so doing</u>. But it should be noted that while the case clearly authorizes the use of an economic feasibility yardstick, it pre-supposes a finding of an insufficient supply for the <u>present demands</u> of the riparians. We have already pointed out that there is no evidence upon which such a finding could be based. While we concede that the <u>Half Moon Bay Case</u> represents the law, we do not believe any finding of irrigable acreage is justified. If such finding is made however, evidence of economic feasibility must be considered.

B. <u>Should the Master consider the amount of water that can reasonably be used</u>.

Assuming that an apportionment of water is to be made, the Master <u>must</u> consider the amount of water that can reasonably be used on each parcel in question. This duty is imposed by Article XIV, Section 3 of the California Constitution. The requirement of that Section, that all water rights are subject to the condition that the use be reasonable and beneficial, is to be applied in the settlement of all water controversies. (<u>Miller & Lux vs. San Joaquin L. & P. Co.</u>, 8 C. (2d) 427, 435; 65 P (2d) 1289, 1937).

If any proposed or prospective use is in fact <u>unreasonable</u>,

- 6 -

4181

no apportionment should be made to provide for it. This principle will be involved throughout the proceedings, particularly in connection with rights to the use of water or allocations of water for use on Federal lands. It was this principle that motivated the questioning of Lt. Col. Bowen by the undersigned regarding the limitations imposed by Statutes and Executive Orders on water uses in National Forests. (See Transcript pp 919-922 and particularly the Offer of Proof found on page 921). It would appear obvious that a use of water which is presently _illegal_ must of necessity be _unreasonable_ if there is in fact a water shortage.

The rule is stated in _Prather vs. Hoberg_, supra, at p 561 as follows:

> "....it is the _present_ reasonable beneficial uses to which the water may properly be put by the riparian owners, consideration being given of course to preferential uses, that determines an apportionment." (Emphasis added).

Accordingly, we believe that the Master must consider the uses to which water can _presently_ be put on the lands in question, and then determine whether such uses are in fact _reasonable_, before any allocation or apportionment can be made by him.

C. _In determining reasonable use, shall the water duty of VARIOUS CROPS BE CONSIDERED?_

This question is largely answered by the answers to the two preceding questions. Assuming that an apportionment of water between riparian owners is to be made, that apportionment must be based upon irrigable acreage. (_Wiggins vs. Muscupiabe L. & W. Co._ 113 C. 182, 195; 45 P. 160; _Half Moon Bay Land Co. vs. Cowell_, supra.)

However, _in determining what acreage is to be considered as irrigable, the court should consider water duty_. Applying the reasoning of the _Half Moon Bay Case_, supra, it is entirely possible that the water supply in a stream available to riparian

- 7 -

4182

owners is so small that its use for certain purposes would be utterly unreasonable, and therefore acreage usable only for certain less-profitable purposes might be considered as non-irrigable. But if there is found to be irrigable acreage, the share of each riparian owner shall be determined without regard to the crops he intends to grow or is able to grow on his land.

The question is further answered by the fact that allocations of water among riparians cannot be made upon the basis of any specific quantity of water. (Seneca Consol. Mines vs. Great Western Power Co, 209 C. 206, 219-221; 287 P. 93). In Prather vs. Hoberg, SUPRA, the court recommended apportionment on a percentage basis, but allocations have also been made by requiring riparian owners to use the waters of a stream intermittently or alternately. (Harris vs. Harrison, 93 C. 676, 680-682; 29 P. 325.). Assuming that an allocation is made either in terms of percentage or through an order requiring rotation in use, the landowner has a right to use his allocation for whatever purpose he desires and on any part of his riparian land. (Half Moon Bay Land Co. vs. Cowell, supra).

D. Is the decree subject to future modification?

We do not believe the Master's Findings should state that they are subject to modification. However, as we understand the law, the final decree adjudicating rights within the watershed is only binding so long as conditions remain the same. (Los Angeles vs. Baldwin, 53 Cal. 469, 470; Hutchins, supra, p 225.) The question of what land is or is not irrigable will be decided differently as irrigation methods change. The question of what is a "reasonable" use will be decided differently as the amount of available water and the demand for water change.

It has become more or less standard practice for courts to reserve continuing jurisdiction, particularly in cases that

- 8 -

4183

involve the rights of both riparians and appropriators, because of the fact that the amount of surplus presently available for appropriation changes as the water supply and the uses of riparians change. As against an appropriator, any riparian who is making no <u>present use</u> can ask no more than a judicial declaration of his right to protect against the running of the prescriptive period. Until he puts his right to actual beneficial use, the water is available for appropriation. (<u>Meridian vs San Francisco, supra</u>). Accordingly, it would be proper for the <u>final</u> judgment in the case to reserve continuing jurisdiction in the trial court, if the court so determines.

E. <u>Should the Master consider water uses other than for the purpose of irrigation?</u>

The answer is "Yes", and serves to point out one of the reasons for the Court retaining jurisdiction in such cases. A riparian owner has a right to the use of water upon his riparian land for reasonable and beneficial riparian purposes. The so-called "natural" uses of water, household use, drinking and watering domestic animals, have absolute preference, and a riparian owner can completely dry up a stream if necessary to satisfy such uses. (Hutchins, <u>The California Law of Water Rights</u>, pages 235-246).

However, commercial stock watering, like irrigation, is an "artificial" use. When there is not enough water for all, riparians must share the supply for such artificial uses. Assuming a parcel of riparian land that is absolutely non-irrigable, but can be used for raising poultry, there is no authority in California that would justify denying water to such land in order to permit irrigation of other lands on the stream. On the contrary, the doctrine set forth in the <u>Half</u>

- 9 -

4184

Moon Bay Case might be held to justify a <u>preference</u> for the poultry-watering use if in fact it was a more practical and profitable use than was irrigation. So far as we are able to determine, the question has never been squarely decided in California.

The case of <u>Cowell vs. Armstrong</u>, 210 C. 218, 290 P.1036, involved a dispute between an upstream riparian irrigator and a downstream riparian who sought to use the water for watering large commercial herds of cattle. The court refused to assign any priority to either use, stating, at 210 C. 226:

> "...each of the riparian owners on the stream is entitled to exercise his usufructary right in the waters of the stream in common with all of the other riparian owners so as to make the most beneficial use of his land, limited only by what is reasonable, having due regard to the common right of the other riparian owners. Under the circumstances of this case it must therefore necessarily be concluded that the plaintiffs and defendants all are entitled to a reasonable use of the waters of the stream for irrigation and for the raising of stock for commercial purposes.".

F. <u>Should evidence be taken as to the amount of water required for such purposes?</u>

Again, <u>assuming that an actual allocation of water is to be made</u>, such evidence would be necessary. However, as has been previously pointed out, we do not believe the Master should make any allocation or should make any findings as to irrigable acreage. He should determine the <u>nature of the rights to the use of water that exist in the watershed</u>. Having done that, reasonable and beneficial riparian uses by any riparian are protected. No specific apportionment is necessary unless and until a controversy arises.

A determination of the <u>rights</u> of the parties does not require an apportionment between them. (Hutchins, supra, p 222) A long line of California cases has determined the riparian status of lands, and that each owner has a right to a reasonable use of the waters of the stream, without making any

- 10 -

4185

specific allocation of the waters, in fact, specifically reserving such allocation for future determination. See for example <u>Omnes vs. Crawford</u>, 202 C. 766, 768-9; <u>Bigelow vs. Mertz</u>, 57 C.A. 613, 619; <u>Strong vs. Baldwin</u> 154 C. 150, 163.

The case of <u>Bigelow vs. Mertz</u>, supra, is particularly interesting in the light of the evidence before the Master. In that case, the prayer of the complaint <u>did seek an apportionment of the waters of the stream</u>. The court however refused to make any apportionment, stating in its findings:

> "The evidence introduced at the trial is insufficient to enable the court to determine the extent of the riparian rights of the parties......and the question of determining the proportions of water to which each party is entitled is left open......".

This action of the trial court was expressly approved by the District Court of Appeal, (re-hearing in the Supreme Court denied) in the following language:

> "In effect the court merely denied part of the relief sought, namely, a specific apportionment of the water, basing its denial upon lack of facts sufficient to enable it to make such apportionment. It found the issues in favor of the plaintiffs. Those issues were the ownership of land by each of the parties to the action riparian to a certain stream of water, and the necessity and convenience for each of them to use a reasonable portion of such water. If in the subsequent exercise by any of the parties of the rights confirmed or given by such a decree it should become necessary to seek a specific apportionment, the right to such relief would spring from riparian ownership.....Emphasis added).

We respectfully submit that on the present state of the proof the Special Master should make no findings of irrigable acreage and should make no apportionment.

### III

### THE PROPER SCOPE OF THE FINDINGS OF THE MASTER

There can be no question as to the motives of the Court in appointing a Special Master. Lengthy discussions with counsel for all major parties preceded the Order of Reference. The basic intent was to provide a more convenient forum for the small individual landowner to present the facts

- 11 -

4186

as to his water rights. It was never intended that <u>all</u> of the evidence relating to the De Luz Creek watershed would be introduced. The essential facts of ownership and riparian status of the private holdings in the watershed were to be established, and that is all. Specifically, we believe the Master's findings should be limited as follows:

    A. <u>A determination of the streams within the watershed to which riparian rights attach.</u>

Unquestionably the two forks of De Luz Creek, Camps Creek, Cottonwood Creek, Fern Creek and Roblar Creek are such streams. But the Government's own witness has described all the other "watercourses" as being ravines or canyons through which water flows only during and immediately after heavy rains. A serious question exists as to whether or not they are streams in the legal sense.

    B. <u>A determination of the lands riparian to those streams.</u>

This question should be fairly simple. By stipulation it is agreed that all holdings shown to be contiguous to a stream will be regarded as riparian in the absence of rebuttal evidence showing a severance or establishing that a portion of the holding is for some reason not riparian.

    C. <u>A determination of the lands that are not riparian, but instead enjoy the rights of overlying landowners.</u>

Having determined questions A and B, the answer to this question is automatic. <u>All</u> lands have <u>some</u> water right. The rule in California is specific that <u>it is presumed that underground waters are percolating, not a part of any stream or watercourse.</u> (Hutchins, supra, pages 27-8; <u>Los Angeles vs. Pomeroy</u>124 C. 597, 633-4; 57 P. 585.) The burden of proof is on the party who asserts the existence of the stream. The presumption is itself evidence under the California rule. (18 Cal. Jur (2d) 490-491) and if it is not controverted, the

- 12 -

4187

trier of fact is bound to find in accordance with the presumption.

D. <u>A determination of the appropriative rights that exist in the watershed.</u>

This determination includes a finding as to the priority date of the appropriation, its amount, place of use and terms and conditions, if any.

E. <u>A determination of the prescriptive rights that exist in the watershed.</u>

This question also involves findings as to the date of acquisition of the right, against whom it runs, its amount, and other limitations, if any.

Having determined these questions, the purpose of the reference has been accomplished. The small owner has been given an opportunity to prove his legal status under conditions of optimum convenience and minimum expense. In the words of the decision in <u>Bigelow vs. Mertz</u> cited above: "If in the subsequent exercise of the rights.....it should become necessary to seek an apportionment...." the Court by reserving jurisdiction can meet the problem when it arises.

IV

CONCLUSION

Perhaps most important in considering the scope of the Master's findings is the simple question of equity. We have here a proceeding instituted by the United States which has forced the 90-odd individual landowners of the DeLuz Creek watershed to the trouble and expense of proving their rights. The Court and the Master have frankly acknowledged that for convenience sake the plaintiff need only put on a "skin" case at this time. The practical result has been that the order of proof has been reversed, and that defendants who never asked to be brought before the Court are proving their case first,

- 13 -

without any real knowledge as to the extent of the plaintiff's claims.

For the Master to make a finding as to the irrigable acreage owned by defendant Garnsey for example, without making a finding as to the irrigable acreage of defendant Vail upstream and of the United States downstream, would be the grossest kind of injustice. The very questions propounded by the Master point out the complexity of such a determination. Are we to have this complex question in the case of X determined before one forum while Y's case is decided by another? Is a determination to be made in the case of a small individual defendant without giving him the opportunity of contradicting or rebutting the evidence to be offered by the plaintiff?

The one statement concerning which there seems to be no disagreement between the parties is that the respective rights of riparian owners are "correlative". Is it not absolutely imperative then that any finding that will determine the extent of such rights must include the lands at the head of the stream (Vail) and at the foot of the stream (Camp Pendleton)?

Finally, there are at least two rulings of the Master on the admissibility of evidence that the undersigned believes are clearly erroneous, and both of which have a direct and vital effect on the question of irrigable acreage and water supply. They are:

1. The examination found on pages 860-872 of the Transcript in which counsel sought to elicit from plaintiff's witness Lt. Col. Bowen testimony which would have established that at least 90% of thr run-off of De Luz Creek was not usable by any riparian. After constant interruptions and objections by counsel for the United States and the Vail Company the questions and answers were stricken. The Master's refusal to consider that evidence is not serious if his findings are

limited as herein suggested.  <u>But if findings are made that are to become the basis of any quantitative apportionment of water the failure to receive such proof appears to be clearly prejudicial since it strikes at the very heart of the question of what is to be apportioned.</u>

   2.  The ruling referred to earlier, found on pages 919-922 of the Transcript, in which the Master excluded evidence of legal limitations on the use of federally owned lands within the watershed.  Again, if no apportionment or finding on which apportionment can be based, is made by the Master, the ruling has done no great harm.  But clearly, if irrigable acreage is to be determined, the Master should at least <u>hear</u> testimony as to statutory limitations on the use of certain lands.  What weight he might choose to give to such evidence is for him to determine, but the evidence that <u>irrigation use on forest lands is presently illegal</u> is directly relevant and material to the question of <u>present</u> irrigable acreage or water needs.

   In both cases the rulings point out the fact that a single item of testimony <u>might</u> completely change the findings of fact.  Surely the litigants are at least entitled to have the same testimony considered in determining the findings as to all parties.  To determine the Vail irrigable acreage or the Pendleton irrigable acreage on different proof, by different witnesses and under different rulings than in the case of the other defendants is surely inequitable, if not actually contrary to law.

   If, however, the findings are limited as herein suggested, these objections do not apply.  The Master has before him evidence upon which he can make valid findings as to riparian and non-riparian lands within the watershed, and the existence of prescriptive or appropriative rights.  We

respectfully submit his findings should be limited to those points.

Dated: July 19, 1958.    SACHSE and PRICE

by _[signature]_
Attorneys for defendants
Rudolph C. Foss; Truman C. and Beatrix Rowley; Herbert E. and Joan Shaver; Richard F. and Rosabel Matthews; Gaius Ray and Stella C. Shaver; David E. Foss et al; John Kuhnis; Mart J. and Rosamond Le Vack; Robert B. Bleeker; Cora H. Myers; George W. and Rose G. Towne; William A. and Roberta L. Goodchap; Georgia F. Walling; Minna Jave; Mercy E. and Niler R. Anderson; Frank E. and Anna J. Couch; Nina B. Anderson; Edith H. King; Frank J. and Patricia Anne Chestmolowicz; Alfred and Helen E. Holsworth.

SWING, SCHARNIKOW & STANIFORTH
SACHSE and PRICE

by _[signature]_
Attorneys for defendants
Felix R. and Theodora L. Garnsey

- 16 -

```
STATE OF CALIFORNIA    )
                       ) SS.
County of San Diego,   )
```

FRANZ R. SACHSE being first duly sworn, says:

That affiant, whose address is 1092 South Main Street, Fallbrook, California is a resident of the county where the herein described mailing took place and a citizen of the United States; over the age of 18 years and not a party to the above entitled action. That affiant served the attached Memorandum Concerning Findings of the Special Master upon each of the following persons in said action by placing a true copy thereof in an envelope addressed as follows:

| | |
|---|---|
| J. Lee Rankin, Solicitor General<br>Department of Justice<br>Washington 25, D. C. | W. B. Dennis<br>Attorney at Law<br>365 Broadway<br>Vista, California |
| Adolphus Moskovitz<br>Deputy Attorney General<br>Library and Courts Building<br>Sacramento, California | George Stahlman<br>Attorney at Law<br>Box 235<br>Fallbrook, California |
| William E. Veeder<br>Office of Ground Water Resources<br>Camp Pendleton<br>Oceanside, California | Bert Buzzini<br>Attorney at Law<br>2223 Fulton Street<br>Berkeley 4, California |
| Phil D. Swing<br>Attorney at Law<br>Suite 604, 530 Broadway<br>San Diego 1, California | Ray C. Eberhard<br>Attorney at Law<br>215 West 7th Street<br>Los Angeles 14, Calif. |
| John B. Myers<br>Attorney at Law<br>215 West 7th Street<br>Los Angeles 14, California | |

sealed and deposited on the 19th day of July, 1958 in the United States Mail at Fallbrook, California with postage fully prepaid thereon, and that there is regular communication by mail between the place of mailing and the place so addressed.

Subscribed and sworn to before me
this 19th day of July, 1958

_____
Notary Public in and for said
County and State
My commission expires May 25, 1961

- 17 -