FILED

AUG 8 - 1958

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
DEPUTY CLERK

1
2       IN THE UNITED STATES DISTRICT COURT
3       SOUTHERN DISTRICT OF CALIFORNIA
        SOUTHERN DIVISION
4
5   UNITED STATES OF AMERICA,
6                   Plaintiff,
7                                           No. 1247-SD-C
8   FALLBROOK PUBLIC UTILITY DISTRICT       PRETRIAL RULINGS
    et al.,
9                   Defendants              RULINGS ON MOTIONS
10
11          Prior to the beginning of the trial in this action, now
12   set for October 1, 1958, extensive pretrial has been conducted;
13   various legal propositions and motions have been briefed and
14   argued. The court now proposes to rule on the motions, to
15   determine certain of the legal principles to be applied during
16   the trial and set forth its reasons and the applicable authori-
17   ties.
18          A pretrial stipulation as to the facts not in controversy
19   was executed by the major parties and approved by the court.
20   It does not of itself embrace all non-stipulation, but a procedure has been
21   devised so that in hearings before the court and the Master,
22   the facts contained in the stipulation and pretrial order will
23   be presented in summary form to the court. Any party may offer
24   evidence to controvert them.
25          Unless controverted and differently found, the court and the
26   Master propose to find in accordance with such facts in the pretrial
27   order.
28                                  II
29                 HISTORY OF THE LITIGATION
30          The history of the litigation, commenced in 1951, appears
31   in the following reported cases.
32      United States v. Fallbrook P.U.D., D.C. 1951, 109

-1-

4364

1  (Complaint states a cause of action; State of
2  California permitted to intervene)
3 United States v. Fallbrook P.U.D. [1952] 10? F.S. ?72
4  (Pretrial order and Rulings on legal proposition)
5 United States v. Fallbrook P.U.D. [1952] 10? F.S. 2?
6  (Decision after trial is to defendants, Santa Margarita
7  Mutual Water Co. & State of California)
8 United States v. Fallbrook P.U.D. [1953] 110 F.S. 7?7
9  (Findings, conclusions and judgment pursuant to
10  decision in 10? F.S. 28)?
11 Fallbrook P.U.D. v. U.S. District Court [? Cir. 1953] 202 F.2d.942
12  (Mandamus proceeding in Circuit)
13 People of State of California v. United States [9 Cir. 195?]
14  235 F. 2d ?47. (Reversal of partial judgment shown in
15  110 F.S. 7?7)
16
17                    II
              THE STIPULATION OF NOVEMBER 29, 1951
18  The following stipulation was entered into between the
19 United States and the State of California on November 2?, 195?.
20 Note that it is "for the benefit of all the parties to this
21 cause."
22
23
24
25
26
27
28
29
30
31
32

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | Civil No. 1247 |
| v. | ) | STIPULATION |
| FALLBROOK PUBLIC UTILITY DISTRICT, a | ) | |
| public service corporation of the | ) | |
| State of California, et al., | ) | |
| Defendants, | ) | |
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | |
| Defendants in Intervention. | ) | |

On the 15th day of August, 1951, the People of the State
of California, in accordance with invitation of the United
States of America, petitioned this Court to intervene in this
litigation.  On that date an Order was allowed and entered
by this Court granting the Petition.

For the clarification of the issues in this litigation,
and for the benefit of all of the parties to this cause, it
is hereby stipulated:

I

That in Paragraphs VIII and IX of plaintiff's Complaint
herein, and in Paragraphs 2 and 3 of the Prayer of said Com-
plaint, the word "paramount" is used in the same sense in
which that word is used in the second paragraph, on page 373
of the opinion of the Supreme Court of California in the case
of Peabody v. Vallejo, 2 Cal. 2d 351 (fourth paragraph on page
374, 40 Pac. 2d 486).

II

That in this cause, the United States of America claims
only such rights to the use of water as it acquired when it
purchased the Rancho Santa Margarita, together with any rights

4366

1   to the use of water which it may have gained by present use

2   or use, or both, since its acquisition of the Rancho Santa

3   Margarita.

4                   III

5       That the United States of America claims by reason of

6   its sovereign status no right to the use of a greater quantity

7   of water than is stated in Paragraph II, hereof.

8                   IV

9       That the rights of the United States of America to the

10   use of water herein are to be measured in accordance with the

11   laws of the State of California.

12                   V

13       That the parties to this Stipulation will request the

14   entry of a Pretrial Order by this Court defining the issues

15   in this cause, in conformity with the statements contained in

16   this Stipulation.

17                   VI

18       That there will be a full, complete and mutual exchange

19   of data and information as to the subject matter of this

20   cause collected by the respective parties to this Stipulation,

21   including data respecting the issuance of any permits or

22   licenses issued by the State of California in connection with

23   the rights to the use of water of the Santa Margarita River.

24   Such exchange of information by the United States will be

25   subject to clearance by the Commanding Officer, Camp Joseph

26   H. Pendleton, in respect to military security, as determined

27   by said officer.

28       Dated:  November 29, 1951.

29

30

31

32

1  ERNEST A. TOLIN,                EDMUND G. BROWN
   United States Attorney          EDMUND G. BROWN, Attorney General
2  BETTY MARSHALL GRAYDON          of the State of California
   Assistant United States
3  Attorney                        ARVIN B. SHAW, JR.
   WILLIAM H. VEEDER,              ARVIN B. SHAW, JR.
4  Special Assistant to the        Assistant Attorney General
   Attorney General of the
5  United States                   B. ABBOTT GOLDBERG
                                    B. ABBOTT GOLDBERG,
6  By                              Deputy Attorney General

7  WILLIAM H. VEEDER               Attorneys for the People of the
   WILLIAM H. VEEDER               State of California
8

9                          III.

10            THE COURT'S INTERPRETATION OF

11            THE STIPULATION OF 11/29/51

12        On January 1, 1958, during pretrial, the United States

13  brought on for hearing a motion for an order declaring the

14  stipulation binding as to the signatories, the United States

15  and State of California, and that the court declare the

16  "stipulation have ascribed to it its usual meaning of the

17  terms set forth in it."  Prior to decision of the motion, the

18  Fallbrook P.U.D. and the Santa Margarita Mutual Water Comp. y,

19  with the consent of the United States and the State of

20  California, joined into the stipulation.

21        The court granted the motion of the United States, de-

22  clared the stipulation binding and set forth the meaning of

23  the stipulation by written order dated February 11, 1958,

24  which follows:

25                  IN THE UNITED STATES DISTRICT COURT

26                  SOUTHERN DISTRICT OF CALIFORNIA

27                       SOUTHERN DIVISION

28  UNITED STATES OF AMERICA,            )  No. 1247-SD-C
                      Plaintiff,         )
29                  v.                   )
                                         )
30  FALLBROOK PUBLIC UTILITY DISTRICT,   )  ORDER RESPECTING BINDING
    a public service corporation of      )  EFFECT AND MEANING OF
31  the State of California; et al.,      )  STIPULATION DATED NOV. 29,
                      Defendants,        )  1951, ORIGINALLY
32                                        )  ENTERED BETWEEN THE UNITED
    PEOPLE OF THE STATE OF CALIFORNIA,   )  STATES AND THE STATE OF
                  Defendants in          )  CALIFORNIA
                  Intervention.          )

                                                              4368

The United States having made a motion on January 1,
1958, for an order of this Court declaring (1) that the stip-
ulation dated November 29, 1951, originally entered between
the United States and the State of California, a copy of which
is attached and by reference made a part of this order, is
binding upon the parties thereto, and (2) that the stipula-
tion should have ascribed to it the usual meaning of the terms
set forth in it; and

The Fallbrook Public Utility District and the Santa
Margarita Mutual Water Company having on January 6, 1958, de-
clared in open court their desire to be parties to the stip-
ulation, and the United States and the State of California
having on January 6, 1958, declared in open court their agree-
ment to the Fallbrook Public Utility District and the Santa
Margarita Mutual Water Company becoming parties thereto; and

The State of California, the Fallbrook Public Utility
District and the Santa Margarita Mutual Water Company having
on January 6, 1958, expressed in open court their support of
the motion of the United States, but having disagreed with
the United States as to what meaning should be ascribed to
the stipulation; and

This Court (1) having considered written points and
authorities and oral argument by the parties to the stipula-
tion regarding the meaning thereof; (2) having taken judicial
notice of the cases concerning the nature of the claims of
the United States in this action which existed when this
action was originally filed; and (3) having considered
testimony by the Attorney General of the United States to
Congressional committees after the stipulation was entered
into, stating his interpretation thereof;

NOW, THEREFORE, IT IS RULED AND ORDERED AS FOLLOWS:

-6-

4369

I.

The stipulation dated November 29, 1951, is binding upon the parties thereto, which are the United States, the State of California, the Fallbrook Public Utility District and the Santa Margarita Mutual Water Company.

II.

The stipulation is unambiguous.

III.

Paragraph I of the stipulation, the meaning of which is not in dispute among the parties, defines the word "paramount", as used in the complaint in this action, as being used in the same sense as in the opinion in the case of Peabody v. Vallejo, 2 Cal. 2d 351, 40 P.2d 486, and therefore as having no reference to the sovereign character of the United States.

IV.

Paragraphs II, III and IV of the stipulation must be read together and when so read have the following meaning:

A.  Paragraph II of the stipulation lists and restricts the rights claimed in this action by the United States to be as follows:

1.  The rights to the use of water which the United States acquired when it purchased the Rancho Santa Margarita.  Such rights are the same rights, no more and no less, than the Rancho had, and hence the United States acquired the same rights as any private party who might have purchased the Rancho.

2.  Any rights which the United States may have gained since its acquisition of the Rancho Santa Margarita by prescription or use or both.

a.  This excludes any claims to rights which the United States may believe it already acquired

-7-

prior to its acquisition of the Rancho,
such as rights which the United States has
asserted arise from its ownership of the
public domain.  Paragraphs III and IV of the
stipulation reinforce the conclusion that
claims of rights asserted to arise from the
ownership of the public domain are excluded,
since such claims would be based on the
sovereign character of the United States and
the laws of the United States rather than the
laws of the State of California.

b.  The rights gained by "prescription"
which the United States may claim under this
Paragraph II, are only such rights as might
have been acquired by acts adverse to rights
belonging to others.

c.  Because the word "use" is a very broad
term, the rights gained by "use" which the
United States may claim under this Paragraph
II, include rights by "appropriation" as well
as other kinds of rights that may arise by
use, limited, however, because of Paragraph
IV of the stipulation, to such rights by use
as may be acquired under the laws of the
State of California.  Excluded, therefore,
are claims by the United States of rights
acquired by inverse condemnation, since the
law by which such rights would be measured is
federal law as set forth in decisions of
federal courts involving inverse condemnation
by the United States and not California law.

B.   Paragraph III of the stipulation is a disclaimer by
the United States that by reason of its sovereign status,
it has rights to a greater quantity of water than a per-
son not a sovereign would have, standing in the position
of the United States.

C.   Paragraph IV of the stipulation means that the measure
of the rights claimed by the United States in this action
is all the laws of the State of California pertaining to
water rights.  Among them are the laws relating to ri-
parian rights, to prescriptive rights, and to appropria-
tive rights, including the method and procedure estab-
lished by California law for the acquisition of appro-
priative rights.

Dated:   Feb. 11, 1958

James M. Carter
James M. Carter
United States District Judge

At the hearing, William H. Veeler, attorney in the
Department of Justice, asserted the stipulation was not
ambiguous, and offered no evidence to explain it.  Nor did
any other party contend it was ambiguous.

The court therefore did not consider statements of
officials of the United States to the Congress made prior
to the date of the stipulation - but did consider similar
statements made after its execution.  Such statements demon-
strated that the Attorney General of the United States gave
the same meaning to the stipulation, as ascribed to it by
this court.  Former Attorney General Brownell testifying
before Congress in 1953 declared:

" ... . This is the stipulation [November 29, 1951] into
which all the parties have entered, including the Attorney
General and the State of California:

'That in this cause the United States of America claims
only such rights to the use of water as it acquired when it
purchased the ranch, together with any rights to the use of
water which it may have gained by prescription or use by (sic)
both since its acquisition.'

'(3) That the United States of America claims, by reason
of its sovereign status, no rights to the use of a greater
quantity of water than is stated in paragraph 2.'

"That is binding on the United States and we claim no
other or further rights.   The stipulation goes on to say:

'That the rights of the United States to the use of water
herein are to be measured in accordance with the laws of the
State of California.' "   (Supplemental Hearing on State,
Justice, and Commerce Appropriations for 1954, Friday, May
15, 1953, page 20.)

The foregoing quotation was set forth in the memorandum
of the United States in support of its motion.

David W. Agnew, Attorney for Bureau of Yards and Docks,
U. S. Navy and one of the attorneys who signed the original
complaint in this action, at a hearing before the Senate
Committee on Interior and Insular Affairs in HR 5368 and
S 2809 on July 1 and 2, 1952, stated:

"Mr. Agnew:  My name is David W. Agnew.   I am an attorney
in the Bureau of Yards and Docks, the Department of the Navy.
(p. 92)

The suit was instituted to quiet the Government's title
to such right as it acquired at the time it acquired the Rancho
Santa Margarita.

We do not assert and never have that because those rights

are owned by the United States that we are entitled to
greater rights in the use of water from that stream than our
predecessor in title.  (pp. 93-94) (Emphasis added)" . . .

"I am not contending, Mr. Engle, that we own a bit more
water than we acquired when we purchased the Rancho Santa
Margarita (p. 97" . . .

"Representative Poulson:  Will the gentlemen yield?  If
you claim waters, on what basis are you going to claim your
rights if you do not rely upon the State --

Mr. Agler:  We rely on the State law in this case,
Mr. Poulson, entirely.  I think the record in the suit is
clear (p. 98)  (Emphasis added)

"Mr. Agler:  Mr. Engle, we have said that as to the
quantity of water to which the Government may be entitled, it
came in strict compliance the California law (p. 108) . . ."

In the memorandum filled 10/25/57 (supra) Mr. Veeder
stated, construing the stipulation:

"Congress has been fully apprised of it; has made
numerous references to it; at no time acted to refute it or
deny the binding effect of it." . . . .

When the parties, after the execution of an agreement,
by their statements and conduct place a definite interpreta-
tion upon it, such interpretation binds them.

"A construction given the contract by the acts and con-
duct of the parties with knowledge of its terms, before any
controversy has arisen as to its meaning, is entitled to
great weight and will, when reasonable, be adopted and en-
forced by the court," Woodbine v. Van Horn, 29 Cal. 2d 95,
104; Barham v. Barham, (1949) 33 Cal. 2d 416, 423; Gillespie
v. City of Los Angeles, (1950) 36 Cal. 2d 553, 561.

4374

IV.

THE SUPPLEMENTAL ORDER OF APRIL 8, 1958.

Thereafter, the question was raised as to the scope of the stipulation and particularly whether it applied to the lands included for the first time in the government's amended complaint, - (1) the Indian reservations, (2) the National forests, and (3) the public domain.

The following supplemental order was made on April 8, 1958.

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 1247-SD-C |
| Plaintiff, | ) | |
| v. | ) | SUPPLEMENTAL ORDER RE- |
| | ) | SPECTING BINDING EFFECT |
| FALLBROOK PUBLIC UTILITY DISTRICT, | ) | AND MEANING OF STIPULA- |
| ET AL., | ) | TION DATED NOVEMBER 2, |
| Defendants, | ) | 1951, ENTERED INTO BETWEEN |
| | ) | THE UNITED STATES OF |
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | AMERICA AND THE STATE OF |
| | ) | CALIFORNIA. |
| Defendants in | ) | |
| Intervention. | ) | |

There was entered by this Court on the 11th day of February, 1958, an order respecting the effect and meaning of the stipulation of November 29, 1951, between the United States of America and the State of California.

Objections to that order and the interpretation of the stipulation contained in it were made and reserved by the United States of America. Moreover, a question having been raised as to the scope of the order referred to above, it is desirable to limit and define its application.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

(a) The stipulation of November 29, 1951, referred to in this order and the order of February 11, 1958, is strictly limited to the approximately 153,000 acres of land in San Diego

-12-

County, California, acquired by the United States of America from the Rancho Santa Margarita and which now constitute the sites for Camp Pendleton, the United States Naval Ammunition Depot and the United States Naval Hospital, and to the rights to the use of water acquired by the United States of America from the Rancho Santa Margarita, together with any rights to the use of water it may have gained by prescription or use or both since its acquisition of the Rancho Santa Margarita.

(b) No other lands or rights to the use of water claimed by the United States of America in this litigation will be subject to or bound by the stipulation of November 29, 1951, and insofar as lands other than those referred to in paragraph (a) above are concerned, this cause will be tried as though neither the stipulation of November 29, 1951, had been entered into nor the order of February 11, 1958, entered by this Court.

(c) The United States of America disclaims any right to augment its rights to the use of water claimed by it in connection with Camp Pendleton, the United States Naval Ammunition Depot and the United States Naval Hospital by reason of the rights to the use of water, claimed in connection with the other lands in the watershed of the Santa Margarita River.

(d) Prescriptive rights to the use of water claimed by the United States of America will be based upon, and be determined pursuant to the laws of the State of California. The term "prescriptive rights" as used in this paragraph relates to the acquisition of rights by adverse possession as distinguished from any other means of acquiring rights such as by inverse condemnation.

Dated: April 8, 1958

James M. Carter
James M. Carter
United States District Judge

-13-

4376

MOTION TO RECONSIDER COURT'S

RULING OF 2/11/58 ON MEANING

OF THE STIPULATION OF NOV. 29, 1951

By motion filed May 12, 1958, the United States moved
the court to reconsider its ruling of February 11, 1958, on
the stipulation and amend that order "to conform with the in-
tention of the parties" and averred, "there must be full, com-
plete and true disclosure respecting the circumstances, facts
and intentions of the parties" at the time of the execution of
the stipulation on November 29, 1951; and by a second motion
filed the same day that the court take the testimony of E.
Abbott Goldberg and Adolphus Moscovitz, Deputy Attorneys
General of the State of California and on the basis of such
testimony that the court reconsider its order of February 11th,
and revise the order to comply with the intentions of the
parties.

In the motions, although not particularly stressed by
Mr. Veeder in arguing the motion, was the following language:
". . . . it is evident that at the time of the execution
"of the stipulation the State of California well knew that the
"representatives of the United States did not, indeed could not
"stipulate away the 'sovereign status' of the United States" . . .
[Emphasis added] and "the United States respectfully asserts
"that as revealed by Goldberg's statements set out in Exhibit A, that
"the representatives of the United States did not, in fact was
"without power to stipulate in a manner which would require the
"United States of America to comply with California's laws re-
"specting the appropriation of rights to the use of water" . . .
[Emphasis added] and " . . . the representative of the United
"States of America did not, indeed could not stipulate away the
"sovereign status of the National government" . . . [Emphasis added]

-14-

FPI ATLANTA—4-18-58——5000—3563

4377

This prelim. we discuss later.

The motion was heard by the court on May 22, 1958. The original stipulation of November 29, 1951, was signed for the State of California by Edmund G. Brown, Attorney General, Arvin B. Shaw, Jr., Assistant Attorney General and B. Abbott Goldberg, Deputy Attorney General and for the United States by William H. Veeder.

(1) Evidence Presented on the Motion

Veeder and Goldberg were present in the court room; Shaw was dead; Veeder, who was referred to in the motions as a prospective witness, was also present. The government did not call Veeder as a witness to the stand; it called only Goldberg. The court heard the testimony; a summary of the testimony attached hereto as Appendix A.

At the hearing on the motion, it was stipulated that a transcript of a proceeding before the District Court in this case on December 5, 1951 would be part of the record.

(2) Transcript of the Court Hearing December 5, 1951

On December 5, 1951, 5 days after the stipulation of November 29, 1951 was executed, a hearing was held before the Honorable Jacob Weinberger, U. S. District Judge on plaintiff's motion for a separate trial as to issues in the case concerning Fallbrook and certain other of the major defendants. Present and participating were Mr. Veeder and Mr. Goldberg. Mr. Veeder's and Mr. Goldberg's statements at that time, as officers of the court, should be contrasted with the testimony of Mr. Goldberg and the position of Mr. Veeder on the motion.

From reading the transcript of December 5, 1951, it is apparent that all it was in the mind of Mr. Goldberg and Mr. Veeder five days after the stipulation was signed, was the question of what the United States might do with water which it reached the enclave, and whether the government's jurisdiction

-95-

FPI ATLANTA—4-15-55—250—3588

4378

tion over the enclave prevented the exercise of state regula-
tions within the enclave.  It is clear that California law
was to measure the rights to use of water claimed by the
United States.

Extracts from that hearing are attached hereto as
Appendix D.

(3) Statements to the Congress before the execution of
the Stipulation of November 29th, 1951.

At the time the court made its ruling of February 11, 1957,
interpreting the stipulation, the court did not take into
account statements by Assistant Attorney General A. Devitt
Vanesh and William H. Veeder, before the House Judiciary
Committee on June 25, 1951, [Cong. Record, July 9, 1951,
pp A-4371 to A-4372].  Emphasis has been added.

"MR. VANESH:  This particular complaint which has been
filed is to determine what the United States acquired by pur-
chase and not because it is the United States Government.  As
the Government, we are only asking to have determined what it
purchased.      * * * * * * * * * * *

"If there is not sufficient water there to take care of
all the needs on that stream, that is something else.  Of
course, if the Federal Government needs more water than it
purchased it would have to pay for it.

"The only thing this complaint and suit is designed for
is to determine just what rights were secured when the
Government purchased, the same as anyone here would do who
made a purchase on that stream." . . .

"MR. VEEDER:  We claim that the measure of our rights are
the rights to which we succeeded from Rancho Santa Margarita.

MR. WALTER:  And nothing more; and without regard to the
needs of the Marine Corps at Pendleton?"

-15-

MR. VEDDER:  That is correct sir."

"MR. FELLOWS:  Do you claim only that the state law applies?

MR. VEDDER:  Yes, sir.  The measure of our rights, the measure of the state law governs entirely our demand upon the Santa Margarita River.   In other words, we certainly can't claim more than we acquired from the Rancho Santa Margarita.

"MR. FELLOWS:  And you claim no more?

"MR. VEDDER:  That is correct."  . . .

Mr. Veinesh again testified before the Senate Judiciary Committee on September 22, 1951.

"MR. VANESH:  About a year ago the Navy Department came to the Department of Justice and advised us that the water was being taken from the river and that they were being placed on a very dangerous position.  They wanted to know what relief could be had.

"Now we acquired what rights the Rancho Santa Margarita had, no more or less." . . .

"MR. VANESH:  Mr. Veeden, when he testified before the court when he was handling the case in San Diego, made the statement in open court of record, that the Government would be very glad to stipulate so as to clarify what is meant by "paramount rights," and I have so told the State of California.

"We are claiming under California law.   We have no sleeper in here that is trying to in any way change the water law of the West.  This is just a suit on one little river, and that is all we are interested in." . . .

"Senator Nixon: What does the term "Sovereignity" mean? In other words, what did it mean in the complaint?  That is what we want to know.

"Mr. Vanesh:  Senator, in this complaint it has nothing to do with having our rights adjudicated as to what we are en-titled to.  We are only claiming what any other person would

claim if you or I had purchased the same property. * * *

"When you buy a piece of property in California, under California law you are entitled to so much water. What we want is what we bought and paid for, and that is all. We want no more." . . .

"SENATOR WATKINS: May I pursue that just a little further, Mr. Chairman. The previous purchaser subjects himself to State law. How are you going to accept the same limitation?

"MR. VEEDER: We are governed by the State law, Senator. I mean that we make our claims under State law, the same as we are doing in this case here." . . .

(4) Ruling on Motion to Reconsider

The court granted the motion to take testimony concerning the surrounding circumstances and the intentions of the parties at the time the stipulation of November 29, 1951 was entered into.

The court now denies the motion to reconsider its ruling of February 11, 1958, as amended by its order of April 5, 19[...] on the following grounds:

1. The stipulation is ambiguous, and no recourse to matters of discretion are necessary;

2. The stipulation is in line with the statements made to the Committees of the Congress by the Assistant Attorney General, and Mr. Veeder prior to the execution of the stipulation;

3. The stipulation is in line with the statements made by Mr. Veeder and Mr. Goldberg to open court on December 3, 1951, five days after the execution of the stipulation.

4. The stipulation is in line with the statements made to the Committees of the Congress of the United States by the Attorney General of the United States, after its execution.

5. The testimony of Mr. Goldberg standing alone and also

-18-

FPI ATLANTA—4-18-58—5M—3263

4381

1  as contrasted with his statements made on December 3, 1957, is
2  entirely unsatisfactory, and affords no basis for reconsideration
3  of the court's decision;
4      6.  The government's motion and in fact the government's
5  various contentions made from time to time since the case was
6  assigned to the particular judge now handling it, have been a
7  series of afterthoughts attempting to bolster the government's
8  position, as one contention after another has been held invalid.
9      One portion of the Order of February 11, 1958, concerning
10  the court's interpretation of the stipulation of November 29,
11  1951, gives concern.
12      In paragraph IV A, 2c of the Order of February 11, 1958,
13  which appears on page 4 thereof, there was an interpretation
14  of the word "use" and the following was stated by the court:
15      "Excluded, therefore, are claims by the United States of
16      rights acquired by inverse condemnation, since the law
17      by which such rights would be measured is federal law
18      as set forth in decisions of federal courts involving
19      inverse condemnation by the United States and not
20      California law."
21      As discussed elsewhere in this memorandum under the sub-
22  ject of Inverse Condemnation, it is apparent that California
23  law is in accord with federal law in recognizing inverse con-
24  demnation. Since the word "use" is a very broad word, and
25  since inverse condemnation could arise under the word "use",
26  the court is now of the opinion that if the United States
27  should be able to claim rights by inverse condemnation under
28  California law, they should be entitled to do so under the
29  provisions of the stipulation. The quoted language will be
30  stricken from the order of February 11, 1958.
31      The matter is utterly immaterial, since we hold elsewhere
32  in this memorandum, that the United States, as the last down-

-19-

4382

stream user was not legally able to effect a "taking" of
upstream rights sufficient to constitute inverse condemnation
under either state or federal law.

## VI

### MR. VEEDER HAD AUTHORITY TO
### ENTER INTO THE STIPULATION OF
### NOV. 29, 1951 AND THE GOVERN-
### MENT IS BOUND BY IT.

As previously noted, Mr. Veeder's motion to reconsider
raises the contention that he, as an attorney in the Depart-
ment of Justice, had no power to bind the government, or as
he puts it, to "stipulate away the sovereign status rights
of the United States." It is a general rule that an estoppel
will not run against the government, and also a general rule
that the authority of United States attorneys, attorneys in
the Department of Justice and other governmental officials
are limited and ordinarily they do not have authority to
bind the government in financial matters or to dispose of
government property.

A necessary exception to this general rule of limited
authority, is a stipulation made by an attorney for the
government in the course of handling an action. Law suits
involving the government could not operate if government
attorneys were not authorized to stipulate. They stipulate
as to a waiver of jury, as to the testimony of witnesses, who
cannot personally be called before the court, as to the facts
in pretrial stipulations and as to the issues and contentions
of the government for the purpose of pretrial.

Here, Mr. Veeder has not in any sense of the word,
transferred, abandoned or given away any rights of the govern-
ment, if it had any, in this particular situation. He has merely

-20-

4383

1  delineated the claim of the government in the nature of stipu-
2  lating to the issue to be tried.  He has further stipulated
3  that state law shall control.

4      When a government lawyer prepares a complaint, he delineates
5  the claim of the government.  Whether or not he may be per-
6  mitted to later amend and widen that claim, is not a matter of
7  right.  (Rule 15(a) F.R.C.P.), but depends on rules of law and
8  court action.

9      When a government lawyer participates in a pretrial hearing,
10 he delineates or limits the claim of the government by his
11 statements and by the pretrial stipulation executed and the
12 order thereon.  The government like any other litigant may only
13 be relieved by a showing of "manifest injustice" (Rule 16,
14 F.R.C.P.) and court determination.

15     There is no essential difference between what here
16 occurred and the situations above.  The government placed
17 limits on its claim.  It agreed California state law should
18 measure its rights.  The court has acted on the stipulation.
19 The United States is bound thereby.

20     Title 5, USCA, Sec. 310 - "Conduct of legal proceedings"
21 sets forth the authority of the Attorney General and officers
22 of the Department of Justice to conduct legal proceedings.
23 This authority must necessarily include litigation required
24 to establish the rights of the government.  Mr. Veeder is an
25 attorney in the Department of Justice.  The statements of the
26 Attorney General and Assistant Attorney General of the United
27 States referred to in this memorandum decision, clearly show
28 Veeder's acts were authorized and ratified.

29     The following cases bolster our position.
30 Tucker v. Alexander (1927) 2  L.Ed. 480
31 Ludson v. United States (2 Cir. 1953) 86 Fed. 277
32 Bntts El.... Corporation v. United States (D.C........

-21-

FPI ATLANTA—4-18-58—25M—2209

4384

1    4 Fed. Rules Dec. 372.

2    Finally, we believe that the stipulation accords with

3    the law in the matter (1) as to the rights claimed by the

4    United States and (2) that state law controls.  The stipula-

5    tion recognized well-established law - - that when the United

6    States contracts or acquires property within a state, the law

7    of that state controls what rights in the United States arise

8    therefrom (United States v. Burnison (1950), 339 U.S. 87,90;

9    Reading Co. v. U.S.   (1925), 268 U.S. 186, 188; United States

10   v. Fox  (1876), 94 U.S. 315, 320; United States v. Nebo Oil

11   Co. (5th Cir. 1951), 190 F2d 1003, 1010; United States v.

12   Williams (5th Cir. 1947), 164 F. 2d 902, 905; Los Angeles &

13   Salt Lake R. Co. v. United States (9th Cir. 1940), 140 F.2d

14   436, 437, cert. den. (1944), 322 U.S. 737; Werner v. United

15   States (D.C.S.D. Calif. 1950), 11 F.R.D. 305, 307).  All that

16   Mr. Veeder has done is to stipulate in accordance with

17   applicable law.

18

19                        VII

20                   PRETRIAL RULINGS

21   There were heretofore submitted to counsel for their con-

22   sideration and briefing, various propositions of law appli-

23   cable to the trial of this action.  The court heard argument,

24   announced some tentative rulings, but made no formal rulings,

25   since the pretrial stipulation of facts had not at that time,

26   been executed and approved.

27   As to these questions of law presented upon pretrial with

28   respect to which the parties seek an order in advance of

29   trial, the court will rule upon the trial, in the absence of

30   controlling precedents to the contrary, and subject to modifi-

31   cation at the trial to prevent manifest injustice, as set

32   forth hereafter; it being understood of course that none but

-22-

4385

the major parties to this action have participated in the

briefing and arguments, and that the court is open to all

litigants to contest the validity of these rulings.

VII-A

EFFECT OF THE CIRCUIT COURT DECISION IN

PEOPLE OF THE STATE OF CALIFORNIA V.

UNITED STATES, 235 F. 2d 647

The holding in that case is that it was error for the

trial court to enter a separate judgment in the case as to

less than all the defendants, and the case was remanded, with

directions to hear the case and to enter but one judgment

adjudicating the right of all dependants to the water of the

river. However, the language and reasoning of the decision

is persuasive, and was intended for the guidance of the trial

court, and in the absence of authority to the contrary, will

generally be followed by the court in its rulings at the trial.

The Circuit decision was rendered in an appeal from a

judgment below, in which the only parties were the United

States, the State of California and the Santa Margarita

Mutual Water Company.  The decision is obviously not binding,

or the law of the case, as to any of the parties except those

participating in that appeal.

VII-B

THE EXTENT OF THE RIGHTS OF THE

UNITED STATES OF AMERICA AS A

RIPARIAN OWNER TO USE WATER OUT-

SIDE THE WATER SHED

The United States in its memorandum, states: "There is

no claim made by the United States of America as a riparian

owner to use water outside of the water shed" and "a claim

to use riparian water upon non-riparian land would be con-

trary to the law respecting rights of that nature."

In view of the continually changing position of the govern-
ment, we are in no doubt as to the extent of the govern-
ment's disclaimer.  The United States may contend (1) that
it has rights to the use of water as a riparian owner,
(2) that when those waters arrive within the enclave, (3)
since the United States possesses exclusive jurisdiction
over the enclave, and (4) since there are no users downstream
from the United States, the United States may use the water
which it was entitled to have flow into the enclave by
reason of its riparian rights, anywhere within the enclave,
and outside of the water shed.

We think such a position foreclosed by California law and
we set forth the law of California on the issue of riparian
rights.

Diversion of water to, and use on, non-riparian land
constitute an appropriation of water and is not within the
riparian right, Lodi-Vista Valley Water Co. v. City of Santa
Barbara (1907), 151 Cal. 377, 376; Duckworth v. Watsonville
Water and Light Co. (1907) 150 Cal. 520, 1035-1032; Fudickar
v. Irvine (1911) 160 Cal. 135, 143-144; Moehler v. Big Inll
Irrig. Dist. (1897) 117 Cal. 19, 25-27; Chauvet v. Hill
(1892) 93 Cal. 407, 416; Gould v. Stafford (1888) 77 Cal.
61, 68. Land outside the watershed of the stream from which
the diversion is made is non-riparian land; Rancho Santa
Margarita v. Vail (1938) 11 Cal. 2d 501,529; Anaheim Union
Water Co. v. Fuller (1907) 150 Cal. 327,334.

The Circuit Court of Appeals so stated in its opinion
on the appeal in this case;

"The government, as regards its rights to water
outside the enclave is . . . in the position of a
lower riparian which is compelled to make beneficial
use within the water shed and for other than public

-24-

4387

riparian uses must show an appropriation accordi g
to law.   (255 F.2d at 650).

VII - C, D, and E.

RIPARIAN USES -

THE EXTENT OF THE RIGHTS OF THE

UNITED STATES AS A RIPARIAN OWNER

TO USE WATER WITHIN THE WATER SHED

The court posed the following issues of law:

"(c) The extent of the rights of the United States
as a riparian owner to use water within the water
shed;

(d) Whether the use by the United States of
water for military purposes is a beneficial use;

(e) Whether the use by the United States of water
for military purposes on its riparian land is a
proper riparian use."  They will be considered toget...

(c) BASIC PRINCIPLES

The memorandum of the State of California contains an
excellent analysis which we adopt.

1.  The riparian proprietor does not own the water of
a stream, he has only a usufructory right, which is the
right in common with all the other riparians on the stream
of reasonable use of water on his riparian land when his
needs require (Tulare v. Lindsay (1949), 33 C 2. 2d 549, 55 ;
Rancho Santa Margarita v. Vail (1938), 11 Cal. 2d 501, 528;
Anaheim Union Water Co. v. Fuller (1907), 150 Cal. 327, 375.

2.  The riparian right extends to "all the water of the
stream and . . . that includes both surface and sub-surface
flow, and likewise includes water in the underground basins"
(Rancho Santa Margarita v. Vail (1938, 11 Cal 2d 501, 55 '
but only as such water flows or is present naturally
(Seneca C.G.M. Co. v Gt. Western Power Co. (1930), 209 Cal.
206, 215).

-25-

FPI ATLANTA—4-18-58—25M—8283

4388

3.  All rights to the use of water, including the riparian right, are limited to such water as is reasonably required for the beneficial use to be served; they do not extend to the waste, unreasonable use, or unreasonable method of diversion of water (Calif. Const. Art. XIV, sec. 3; Peabody v. City of Vallejo (1935), 2 Cal. 2d 351, 367-368.)

4.  Subject to the limitations of the preceding paragraph, the riparian right is prior and superior to rights based on appropriation, and a riparian owner is entitled to an injunction against an appropriator's interference with present riparian uses (Peabody v. City of Vallejo (1935), 2 Cal.2d 351, 367-368; Meridian, Ltd. v. City and County of San Francisco (1939), 13 Cal.2d 424, 445).

5.  The riparian right is not based on use and is not lost by non-use; however, to the extent that water is not presently being used by riparian proprietors under their riparian right it is subject to appropriation and beneficial use by others, the riparian owners being entitled to a declaration of their superior right to make reasonable beneficial use of the water in the future but not entitled to enjoin storage or use of water by an appropriator which does not conflict with their own present reasonable beneficial use (Meridian, Ltd. v. City and County of San Francisco (1939), 13 Cal.2d 424, 445, 447, 458; Gin S. Chow v. City of Santa Barbara (1933), 217 Cal. 673, 683-691.)

FPI ATLANTA—4-18-58—888—8888

4389

## (2) MILITARY USE

The United States, the State of California and Fallbrook have briefed this issue and all agree that a military use is a beneficial use.  Fallbrook states -

"There can be no doubt that the use of water for military purposes by the United States is a beneficial use."  California states -

"The State of California does not contest that military use of water by the United States when made on riparian land owned by the United States may be a beneficial use within the riparian right."

The real question is the reasonableness of the use. This is a question of fact.  Whether the military use is reasonable depends on the circumstances of the case.  Tulare District v. Lindsay Strathmore District, 3 Cal 2d 489.  The court does not propose to rule on this issue until the trial of this case delineates through the evidence precisely what the military use consists of.

FPI ATLANTA—4-16-58—939—3365

4390

Certain principles of law will be pertinent to that decision.

Riparian rights may be exercised "for the purposes for which such lands <u>are</u>, or may be <u>made adaptable</u> - - - Nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use." Constitution of State of California, Article XIV Sec. 3 [Emphasis added].

Waste of water, unreasonable uses and unreasonable diversion are not protected. Peabody v. City of Vallejo (supra).

Taking a disproportionate share of the water to the detriment of other riparian owners would not be a reasonable use.

### VII-F
### IS ARTIFICIAL STORAGE OF WATER ON THE
### SURFACE OR UNDERGROUND FOR FUTURE USE
### A PROPER EXERCISE OF THE RIPARIAN RIGHT

The court posed the following issue of law: "The right of the United States to partially impound, regulate and spread its riparian water for the purpose of irrigating the vegetative cover and enriching the soil of the alluvial basin situate within Camp Pendleton and thereby in the process of irrigating the vegetative cover recharge the alluvial basin."

On reflection, the court regrets the form in which the issue was posed. It obviously combines the question of the right to irrigate and the right to store water.

### Irrigation

The right to use riparian water to irrigate lands riparian to the stream is clearly recognized. The question in this case will be whether the United States on a military reservation can claim this use.

-27-

4391

The purpose and manner of the irrigation contemplated
may be important.  For example, spreading water in a wet
period, under the guise of irrigation might well run afoul of
the Constitutional Amendment, Art. XIV Sec. 3.  If through
legitimate irrigation, water fed the underground basin, the
result might well be the reverse.

These questions must await the trial and the determination
of the facts.

## Storage of Water

The California memorandum succinctly states the law.  We
paraphrase briefly from it.

One of the fundamental characteristics of the riparian
right is that it is a right to use water as the water is
naturally available.  But the artificial storage of water for
future use, whether cyclic or seasonal, is not a proper exer-
cise of the riparian right, but instead constitutes an
appropriation of water (Moore v. California Oregon Power Co.
(1943), 22 Cal. 2d 725, 731; City of Lodi v. East Bay Municipal
Utility Dist. (1936), 7 Cal.2d 316, 339; Colorado Power Co. v.
Pacific Gas & Electric Co. (1933), 218 Cal. 559, 564, (1933);
Seneca C. & G. M. Co. v Gt. Western Power Co. (1930), 209 Cal.
206, 216; Herminghaus v. Southern California Edison Co. (1926),
200 Cal. 81; 109-111, which may be exercised only pursuant to
appropriations lawfully made", Meridian, Ltd. v. City and
County of San Francisco (1939), 13 Cal.2d 424, 450.

Temporary impoundment of water for the purpose of pro-
viding a head for generation of power is permitted under the
riparian right. Seneca C. G. M. Co. v. Gt. Western Power Co.
(1930), 209 Cal. 206, 216.

-28-

4392

<u>Recharging the Underground Basin - Intrusion of Salt Water</u>

This problem also is in the case. It has not been briefed and must await the trial.

Judge Hall in <u>**Rank** v. (Krug) United States</u> (D.C. So. Calif. 195[illegible]) 142 F.S. 1 at 10[illegible], states in footnote 5[illegible],

"Neither the Constitutional Amendment nor subsequent cases, have changed the doctrine that the full natural and ordinary flow of a river includes the seasonal and [illegible] flood flows. See <u>United States v. Gerlach Livestock Co.</u>, 339 US 725 and cases cited in footnote [illegible], p. 99" (Should read p. 96). In Note 50, Judge Hall cites various cases and in particular the following decided after the Constitutional Amendment of 1928:

<u>Collier v. Merced Irr. Dist.</u> (1931) 213 Cal 554, 558;

<u>Chowchilla Farms Inc. v Martin</u> (1933) 219 Cal 1, 33;

<u>Tulare Irr. Dist. v. Lindsay - Strathmore Irr. Dist. (1935)</u> 3 Cal 2d 489, 570-57[illegible].

Is there a distinction between a natural and an artificial recharging of the basin? Suppose the underground flow was largely responsible for recharging the basin? Suppose the basin was being depleted by an unreasonable and excessive use by the United States? Suppose that only a reasonable use was being made of the water by the United States and still the basin was being depleted?

These questions must await the trial and briefing by Counsel.



FPI ATLANTA—4-18-55—25M—3283

VII-G

THE CLAIMED PRESCRIPTIVE RIGHTS

OF THE UNITED STATES.   THE DOWNSTREAM

USER MAY NOT ACQUIRE PRESCRIPTIVE RIGHTS

AGAINST THE UPSTREAM USER.

Adverse user is, of course, one of the prerequisites to

the establishment of a prescriptive right.   As stated in

City of San Diego v. Cuyamaca Water Co. (1930) 209 Cal.

App. 132:

"The nature of the right claimed to have been acquired

in the waters of a flowing stream by prescription rests _____

_a_prime_essential_upon_an_adverse_use_thereof by the

claimant which has, to the extent thereof and for the re-

quired number of years, been acquiesced in by the person,

or persons otherwise entitled to the ownership and enjoyment

of the waters thus adversely abstracted from such stream and

to enforce these rights by appropriate action." [Emphasis

supplied]

In the absence of adverse use, the only kind of right that

could be gained by use would be an appropriative right.   We

discuss in VII-H the problem of acquiring rights by

appropriation.

An avalanche of California cases supports the proposi-

tion that, by its very nature, use of water by the lowermost

user on a stream cannot possibly be adverse to anyone else.

"A right can be gained by prescription only by acts

which operate as an invasion of the rights of the person

against whom the right is sought and which afford a ground

of action by such party against such claimant, and it is a

rule of law so well settled by decisions in this and other

states as to scarcely need any citation to support it that a

lower use, since it interferes in no way with the flow down

1  Substitutes an invasion of the upper riparian owner's right,
2  and cannot, therefore, afford any basis for a prescriptive
3  right, Pabst v. Finmand (1922) 190 Cal. 124, 128, Cal.
4  In accord are the following decisions: Cory v. Smith (1929)
5  206 Cal. 508, 511; San Joaquin & Kings River Canal & Irrigation
6  Co. v. Worswick (1922) 187 Cal. 674, 687-695; Holmes v.
7  (1921) 186 Cal. 250, 254; Perry v. Calkins (1914) 159 Cal.
8  175, 177-178; Hudson v. Dailey (1909) 156 Cal. 617, 627;
9  Walker v. Lillingston (1902) 137 Cal. 401, 404; Cave v. Tyler
10 (1901) 133 Cal. 566, 567-568; Bathgate v. Irvine (1899) 126
11 Cal. 135, 140-141; Hargrave v. Cook (1895) 108 Cal. 72, 77-79.

12      The cases cited above are all directly in point because
13 they involved the diversion of water downstream from the land
14 of the prior user against which the prescriptive claim was
15 asserted. Likewise, Camp Pendleton, where the diversions or
16 extractions of water assertedly have been made, is downstream
17 from any other claimant to the water.

18      The United States relies upon three cases. They are not
19 in point. In Hudson v. West (1957) 47 Cal. 2d 823, plaintiffs
20 claimed as riparian owners and failed to support their claim.
21 Our problem is not discussed. Larson v. Apollonio, (1931)
22 5 Cal. 2d 440, which is probably this point. The statement
23 of facts in the index, described the plaintiff's diversion
24 as downstream from defendant's land. The only case cited in
25 Larson in support of the prescriptive claim was Smith v.
26 Gaylord 4?? Cal. 103, 108-109. There the prescriptive claim
27 was held good because the claimant had trespassed on the land
28 of the owner of the prior right and made his diversion there.
29 The State of California has submitted excerpts from the briefs
30 in Larson v. Apollonio before the Supreme Court, and these
31 excerpts show that the situation in that case was identical
32 to the situation in the Smith v. Gaylord (supra) in that,

-31-

4385

the actual diversion was instituted, and during the next
prescriptive period was carried on from a diversion point
on part of a larger tract held in one ownership which in-
cluded the upstream land against which the Larson case of
the prescriptive right had accrued. After the end of the
prescriptive period, but before the Larson suit was insti-
tuted, the upstream portion of the tract was conveyed to
defendant. Obviously the conveyance could not cut off the
prescriptive right which had arisen by the trespass over the
land.

Dimmel v. Mansur, (1944) 65 Cal. App. 2d 505 is the
third case. Here the defendant user prevailed. The diver-
sion point was on plaintiff's upstream land and the ditch
ran through plaintiff's land. Accordingly the adverse user
of plaintiff's land for the purpose of the diversion, resulted
in the prescriptive right to a downstream user.

We conclude that the law in California is clear that a
downstream user may not ipso facto acquire prescriptive
rights against an upstream owner of water rights except in
those instances where the downstream user has acquired rights
over the other parties' land for the purpose of the diversion.

The United States claims a variety of prescriptive rights.

"(1) As successor to the Rancho Santa Margarita;

"(2) Resulting from its uses after 1940;

"(3) Resulting from a combination of uses by its
predecessor before 1942 and the United States
thereafter;

"(4) Prescriptive rights claimed by the United
States outside the Santa Margarita River watershed;

"(5) Prescriptive rights to the use of water claimed
by the United States in connection with Lake O'Neill."

Actually these claims break themselves naturally into the

categories,

(A) Prescriptive rights claimed to have been acquired by the Rancho and therefore passing to the United States on its acquisition of the Rancho, and

(B) Prescriptive rights claimed to have been acquired by the United States since 1942.

As to both classes of claims, since prescription does not run upstream, it is obvious that neither the Rancho Santa Margarita nor the United States could acquire prescriptive rights against upstream owners.

The Rancho, the last downstream user, never acquired prescriptive rights by uses on the Rancho, and thus had neither vested prescriptive rights to convey to the United States nor incipient prescriptive rights to which the United States could tack uses of its own. The uses of United States itself, as the downstream user since 1942, similarly lack the quality of hostility or adversity necessary to create a prescriptive right. And this is true whether what is asserted is the right to store water in Lake O'Neill for later use within the watershed or the right to make direct diversions or extractions for use outside the watershed of the Santa Margarita River. These rights could not arise by prescription.

As to the rights claimed to have been acquired by the United States itself since 1942, a second reason renders it impossible for the United States to have acquired prescriptive rights. Since the United States is immune from suit except by consent and since it had exclusive jurisdiction within its enclaves, there was no means by which a person adversely affected by the government's user downstream (assuming such impossible situation), could have taken any action by self help or through court suit, against the United

States to prevent such adverse use.

The Circuit in the prior appeal concluded that, irrespective of the ability of a lowermost user, other than the United States to acquire prescriptive rights, the United States could not acquire such rights, because of its sovereignty over the military enclave. The Circuit Court reasoned that the same element of adversity, which the California cases point out is lacking in downstream use generally, is lacking when the United States uses water which has found its way onto the military enclave:

"The doctrine of prescription envisions a party whose rights are being openly and notoriously violated by another having the power to intervene and prevent the violation from becoming an adverse property right by self-help or by bringing an action or obtaining an injunction before the period of prescription runs. But, when the United States was in possession as sovereign, the water which came into the enclave could be used without let or hindrance in any way which the agents of the government chose" (235 F.2d at 661).

The United States, for this additional reason, could not have acquired any prescriptive rights to store water or use water outside the watershed by its own uses within the Camp Pendleton military enclave since 1942.

VII-H

<u>APPROPRIATIVE RIGHTS.   MUST THE UNITED</u>

<u>STATES COMPLY WITH STATE PROCEDURES FOR</u>

<u>THE ACQUISITION OF APPROPRIATIVE RIGHTS?</u>

The court posed this issue:- The extent of the appropria-
tive rights claimed by the United States in connection with
Lake O'Neill, Stuart Mesa, South Coast Mesa, "and all other
uses for which appropriative claims are asserted by it; must
the United States comply with State procedures for the
acquisition of appropriative rights."

We do not here consider or pass upon the validity of
alleged appropriations of water, made by the Santa Margarita
Rancho prior to December 19, 1914, the date of the Water
Commission Act.  If the Rancho owned such rights they passed
to the United States.  The discussion and rulings which
follow are limited to matters arising after December 19, 1914.

1.

<u>THE CONTENTIONS OF THE UNITED STATES</u>

The government's contentions in this case have been
fascinating.  They have shifted from hearing to hearing, de-
pendent only upon the imagination and ingenuity of William
H. Veeder, representing the United States.  With reference
to <u>unappropriated water</u> they presently seem to be as follows:

(1) <u>The Self Help Theory</u>

That by merely diverting the water and putting it to
beneficial use outside the watershed of the Santa Margarita
River, the United States has acquired valid appropriative
rights under California law, on the theory that diversion and
application of water to a beneficial use coupled with the
intent to appropriate are sufficient under California law to
create an appropriative right in any water user even if he
has failed to comply with the application and permit

4399

procedures required by state statutes.

(2)  State Police Regulation Theory

That California's statutory application and permit pro-
cedures for the acquisition of an appropriative water right
are police regulations which are inapplicable to the United
States, with the result that, even if all other water users
must comply with such procedures in order to acquire a valid
appropriative right, the United States can obtain the right
merely by taking and using the water.

(3)  Government Ownership of Water Theory
Incorporeal hereditament:

That even before it first diverted and used the water
on Camp Pendleton, the United States possessed the right
to do so, by virtue of its ownership of the public domain;
hence, when it began diverting and using the water the United
States merely exercised a right already residing in it.

(4)  Reserved Land Theory

That the United States, in connection with reserved
lands, may use all the unappropriated water it needs; that
this right in some manner arises as soon as a reservation
(here Camp Pendleton) was created.

(5)  Priority in Time of Filing Theory

That priority in time of filing applications for
unappropriated water by the United States creates a right in
the United States; and that Fallbrook's applications have
been so changed and amended that they are now junior to
that of the United States; and that this court should
determine priorities accordingly.

(6)  Direct and Inverse Condemnation Theory

That the United States acquired rights to use the water
(within and outside the watershed) through the exercise of
the power of eminent domain either (a) by its direct condem-

-38-

4400

nation of the Rancho Santa Margarita or (b) by subsequent
inverse condemnation assertedly resulting from its use of the
water outside the watershed.

### (7) Bucket at the End of Stream Theory
#### Water from public lands upstream

On October 21, 1957, the government advanced a new con-
tention, namely that at the time the United States, in 1942,
began diverting water from the river for use in Camp Pendleton
and outside the watershed, the United States was exercising
its rights which it already owned; that since the Treaty of
Guadalupe Hidalgo, the United States had been the owner of the
public lands now held as public domain, National Forests, and
Indian Reservations, and hence the United States was the
owner of all rights to the unappropriated waters arising from
said lands; that the United States might require these waters
to flow to the enclave, and there take and use the water.
Hence the title given this theory by the court - "Bucket at
the end of the stream."

Obviously, the contention flies in the face of the stipu-
lation of November 29, 1951, that the government claims only
the rights it acquired when it purchased Santa Margarita
Rancho and such rights as it thereafter "gained" by "prescrip-
tion or use or both."

That the United States has rights pertaining to the
National Forests, the Public Domain Lands and the Indian Reser-
vations, as set forth in the amended complaint, we have no
doubt. But these rights are rights limited to the lands in
question and to express the matter in the vernacular sense,
the United States has no right to catch in a bucket at Camp
Pendleton, water which it claims a right to in connection with
the lands upstream above mentioned.

The United States has since disclaimed any right to augment

its water rights at Camp Pendleton by virtue of the three
types of public lands upstream, and this concession by the
government was incorporated by the court into its order of
April 8, 1958, referred to above, wherein it is stated, "The
United States disclaims any right to augment its rights to
the use of water claimed by it in connection with Camp
Pendleton, the United States Navy Ammunition Depot, and the
United States Naval Hospital by reason of its rights to use
of water claimed in connection with its other land in the
watershed and the Santa Margarita River."

Certain of the remaining theories and contentions are
within, and certain are without, the terms of the stipulation
of November 29, 1951. Within the terms of the stipulations
are (1) The self help theory, if California law permits
self-help since 1914. (5) Priority in time of filing theory,
if state law so provides; (discussed in Section VIII of this
memorandum). (6) Direct and Inverse condemnation theories.
(discussed in Sec. VII-J of this memorandum)

But clearly, (2) State Police Regulation theory, (3)
government ownership of water theory and (4) Reserved land
theory, are outside the terms of the stipulation of November
29, 1951. There the government clearly stated it was
claiming no rights by reason of its sovereignty as such,
but only those rights it acquired in the acquisition of the
Rancho and those it had gained thereafter by prescription or
use or both.

2.

THE SELF-HELP THEORY.  THE UNITED STATES
MUST COMPLY WITH STATE LAW
(1)  State Law and Procedure

Prior to December 19, 1914, "To constitute a valid
appropriation of water, - - - - three elements must always

-40-

4402

1   exist:  (1) an intent to apply it to some existing or contem-
2   plated beneficial use: (2) an actual diversion from the
3   natural channel by some mode sufficient for the purpose; and
4   (3) an application of the water within a reasonable time to
5   some beneficial use.  Intention to appropriate can be
6   measured only by all the circumstances in the case."  26 Cal.
7   Jur., Waters, Sec. 253; See also 56 Am. Jur., Waters, Sec.296.
8       The government claims that this is still California law,
9   and that all necessary elements to constitute an appropriative
10  right came into existence by its self help in the early 1940's,
11  prior to the time Fallbrook ever filed an application with
12  the Division of Water Resources, the predecessor of the State
13  Water Rights Board.  The government claims that it will show,
14      (1) intention to appropriate water for a beneficial use
15      (2) actual and open appropriation and diversion, and
16      (3) that the water has been put to a beneficial use
17      Prior to December 19, 1914, the effective date of the
18  Water Commission Act, (Stat. 1913 C. 586) such method for
19  appropriating water existed under California law and could
20  result in a vested appropriative right.  In 1913 the State of
21  California, by this statute, provided for a statutory proce-
22  dure to be followed in the appropriation of unappropriated
23  water.
24      If this procedure was not the exclusive method of appro-
25  priating water after 1914, it became so in 1923 when this
26  method of appropriation was made exclusive by amendment to
27  the Water Commission Act (Stat. 1923 c. 87).  Appropriation
28  by pre-emption or self help was thus terminated at least by
29  1923.
30      The present section of the California Water Code, having
31  its genesis in these statutes is Sec. 1225.
32      "Sec. 1225.  Compliance with division provisions.

-41-

4403

No right to appropriate or use water subject to appropria-
tion shall be initiated or acquired except upon compliance
with the provisions of this division."

The statutory machinery for this procedure has changed
through the years since 1914, from applications to the State
Water Commission, later a Division of Water Resources in
the Dept. of Public Works, until in 1956, these functions
were assigned to a State Water Rights Board.

The procedure was generally the same.

An application to appropriate unappropriated water
would be filed with the Water Commission or the Division of
Water Resources of the State of California, (since 1956 the
State Water Board) and this body, after hearings, could
grant permission and permit for the appropriation of the
water.  Later the permits ripened into licenses.

In 1956, the California Legislature (Stat. 1956 -
Budget Session C-57) abolished the Division of Water Re-
sources and the office of the Chief Engineer, but their
functions were preserved and divided between a newly
created Department of Water Resources (Calif. Water Code
Sec. 120-163) and an independent three-member Board, the
States Water Rights Board (Calif. Water Code 175-188).  The
major function of the new Board is the administration of
the statutory law relating to the appropriation of
unappropriated or unused water of the state.

Vested rights were unaffected.  All permits and licenses
issued by the statutory agency (now the State Water Board)
are declared therein to be "subject to vested rights,"
(Cal. State Water Board, "Rules, Regulations and Informa-
tion pertaining to Appropriation of Water in California"
(1956); see, Meridian Ltd. v. San Francisco, 13 Cal. 2d
424, 450; Rank v. King, 142 F.S. 1)

-42-

1    (2) Compliance with Statutory Procedures to

2    appropriate water, is required by State law.

3    Crane v. Stevinson (1936) 5 Cal.2d 387, holds com-

4    pliance with the statutory procedure is required.  Hudson

5    v. West (1957) 47 Cal. 2d 823, relied on by the United

6    States, is not contra.  It concerned prescriptive and not

7    appropriative rights.  The court refused to pass on the

8    necessity of compliance with statutory requirements, since

9    the Department of Public Works was not a party.

10    The courts of other western states, with similar

11    statutes, have reached a like result requiring compliance

12    with the state statutory procedure.

13    Arizona - In re Determination of Relative Rights (1935)

14    41 Pac. 2d 228, 235-36

15    Montana - Anaconda National Bank v. Johnson (1926) 244

16    Pac. 141, 144

17    Utah    - Desert Live Stock Co. v. Hoopiania (1925)

18    239 Pac. 479

19    Bullock v. Tracy (1956) 294 Pac. 707, 709

20    Wyoming - Wyoming Hereford Ranch v. Hammond Packing Co.

21    (1925) 236 Pac. 764, 768-71

22    Laramie River Co. v. LeVasseur (1949) 202 Pac.

23    2d 680, 686

24    New Mexico - State v. Dority (1950) 225 Pac. 2d 1007, 1011,

25    Appeal to United States Supreme Court, dism. 341

26    U. S. 924.

27    The stipulation of November 29, 1951, requires the

28    rights of the United States to be measured by State law.

29    There is no body of federal water law.  The California

30    Supreme Court has stated that the unappropriated waters in

31    the streams of California constitute "the public waters of

32    the state to be used, regulated and controlled by the state

1  or under its direction" (Meridian, Ltd. v. San Francisco

2  (1939) 13 Cal. 2d 424, 445.  California Water Code Sec. 102,

3  1201; See California Government Code Sec. 180-182.

4      In view of the stipulation of November 29, 1951 and the

5  matters hereinafter discussed, the United States must comply

6  with State law in seeking to appropriate water.  This dis-

7  poses of the "Self Help Theory".

8                          3.

9       THE UNITED STATES SOVEREIGNTY THEORIES

10              TO RIGHT TO WATER

11      The three theories outlined above.  (2) State Police

12  Regulation Theory, (3) Government ownership of water theory

13  and (4) Reserved land theory, will be considered together.

14      (1)  The Stipulation Forecloses Their Application

15      All such issues are outside the terms of the stipula-

16  tion of November 29, 1951 and hence we hold the government

17  can legally assert no rights to use of water under any of

18  them.  All are essentially based on government sovereignty.

19  None rest on California law and all are in contravention

20  of California law.  The stipulation forecloses claims so

21  based.

22      (2)  Apart from the stipulation the theories

23              and claims have no validity

24      These claims raise the basic questions in this case.

25  Does the State have the power to deal with applications to

26  appropriate water?  Does State law and procedure apply?

27  Must the United States, like any private party, comply with

28  State law and procedure?  There is thus presented a much

29  discussed problem - does State law control the appropriation

30  of the use of unappropriated water in the Western states?

31      Government Ownership Theory

32      Police Regulation Theory

The Government's ownership theory is in summary as follows:-

(1)  A water right is an incorporeal hereditament;

(2)  As the owner of the public domain the Government possessed the power to dispose of land and water theron, together, or to dispose of them separately;

(3)  That Congress intended by the Acts of 1866, 1870, and the Desert Land Act of 1877, to establish the rule that for the future the land should be patented separately from the water;

(4)  That, therefore, appropriative rights to water could be acquired from the United States, by compliance with State law to effectuate the passage of title from the National Government;

(5)  That under California law, (The California doctrine), appropriative rights have always been claimed to be deraigned by private persons under the Act of Congress or from the acquiescence of the Federal Government.

(6)  Therefore the Government owns the unappropriated water and may take it as and when it chooses, without regard to State law.

We have labeled this - Mr. Veeder's "metaphysical theory" since he has the water metaphysically separated from the land on the public domain since at least 1877.

If this were true, no riparian rights could ever have attached to land acquired by patent from the public domain. We know this is not true, because although the Desert Land Act of 1877 and related acts, permitted and recognized appropriative rights when good under local law and custom, the Supreme Court decisions declare that States could set up such systems of handling water rights as they might desire. In fact California and most of the Western States set up

1   dual systems, whereby both appropriative rights and ripar-
2   ian rights were recognized.  California thus permitted the
3   pantentee of government land to assert riparian rights,
4   limited to the extent that vested rights had been secured
5   by prior appropriation.

6        We think the correct view is that as appropriative
7   rights were obtained pursuant to local law and custom, there
8   was a pro tanto severence of land and water to the extent
9   of these rights.  Thus these appropriative rights were de-
10  raigned from the United States.

11       With the land, as it was patented, went the remaining
12  water rights and thus the Western States recognized this
13  land as having riparian rights, diminished to the extent
14  that valid appropriative rights had been secured.

15       If Mr. Veeder's "metaphysical theory" holds water, so
16  to speak, then no riparian rights exist in California, since
17  the water rights were severed in 1877 and, therefore, on a
18  patent to land from the public domain, no water rights passed
19  to the patentee.

20       What mischief and havoc such a theory would wreck in the
21  western states, need not be spelled out, - it need only be
22  suggested.

23       The Police Regulation theory, viz. that State police
24  regulations - - laws relating to appropriation of water - -
25  can have no effect under the United States Constitution, on
26  the rights of the United States to take unappropriated water,
27  is but an extension of the Government Ownership theory.

28       If the Government owns the unappropriated water the
29  principle is sound; if the Government does not own the water,
30  the theory has no application.

31       Thus we pass the Police Regulation theory as adding
32  nothing to the Government Ownership theory.

FPI ATLANTA—4-16-56—25M—3263

4408

## Reserved Land Theory

The government contends that the Santa Margarita Rancho on its acquisition by the United States, became a reservation - reserved land of the government. That under the Property clause of the Constitution (Art. IV. Sec. 3), the government can do as it pleases with unappropriated water in the streams on the reservation.

With the basic contention we have no quarrel. Within the enclave or reservation, the government can do as it pleases with the unappropriated water, so long as vested rights of other parties are not injured. Since there are no property rights downstream from the enclave, it is difficult to see how anyone can be hurt by the use by the government of such water as reaches the enclave. But the extensions of the contention give concern. The government claims the right to reach up stream and insist that certain waters, in addition to waters which it claims by riparian right, by prescription and by appropriation prior to 1914, flow into the reservation.

Analyzing this contention, it is apparent the government claims more than the right to use such water as it finds on or such as flows to the reservation. To the extent that the United States claims an appropriative right we have disposed of it above. The word is one of art in water law. We have discussed self help and state procedure.

Under the sovereignty theories, although the United States talks of appropriation, it is misusing the term. The United States is talking of alleged rights they already claim to own.

The problem brings into focus the conflict between rights under federal law asserted by the government on its reserva- tion and rights under state law asserted by upstream users - or generally the problem of Federal and State rights. True, the government disclaims it seeks the right to use any water

-47-

44409

to which there are vested rights, either riparian, prescrip-
tive, appropriative or otherwise.

The government simply is saying.  There is unappropriated
water in the River on the Governmnt reservation.  The govern-
ment may use it, take it, and prevent other upstream users
from interfering with the flow and assert valid rights
against all prospective upstream users, all of whom would
conceededly have to comply with state law and procedure to
make a valid appropriation.

The government's position as to reserved lands is most
succinctly and forceably set forth in an Indian Land case,
United States v. Walker River Irr. District, [9 Cir. 1939]
104 F.2d 334.  There the Walker Indian reservation was on the
lower 30 miles of the river, and the defendants upstream con-
structed dams and reservoirs interfering with the flow of the
river.  The question the court stated, was "whether the
waters of the stream were intended to be reserved for the use
of the Indians or whether the land only was reserved,"
(page 336):

" . . .(b) The power of the Government to reserve the
waters and thus exempt them from subsequent appropriation
by others is beyond debate.  Winters v. United States, supra,
207 U.S. page 577, 28 S.Ct. 207, 52 L.Ed. 340.  The question
is merely whether in this instance the power was exercised.
If it was, the appellees are in no position to claim para-
mount rights in the stream, since their appropriations were
all later than 1859.

"It is of course well settled that private rights in
the waters of non-navigable streams on the public domain are
measured by local customs, laws and judicial decisions.
California Oregon Power Co. v. Beaver Portland Cement Co.,
295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356.  The Act of July

-48-

441.0

26, 1866, 14 Stat. 251, 253, was no more than a formal con-
firmation of local law and usage which had theretofore met
with silent acquiescence on the part of the National govern-
ment. Broder v. Natoma Water Co., 101 U.S. 274, 276, 25 L.Ed.
790; California Oregon Power Co. v. Beaver Portland Cement
Co., supra, 295 U.S. Pages 154, 155, 55 S.Ct. 725, 79 L.Ed.
1336. But it does not follow that the Government may not,
independently of the formalities of an actual appropriation
reserve the waters of non-navigable streams on the public
domain if needed for governmental purposes.

"In United States v. Rio Grande Dam & Irrig. Co., 174
U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136, it was said that
although this power of changing the common law rule as to
streams within its borders undoubtedly belongs to each state,
yet two limitations must be recognized: first, that, in the
absence of specific authority from Congress, a state cannot
destroy the right of the United States, as the owner of lands
bordering on a stream, to the continued flow of its waters,
so far, at least, as may be necessary for the beneficial uses
of the government property;   second, that it is limited by
the superior power of the general government to secure the
uninterrupted navigability of all navigable streams within
the limits of the United States . . ." (Emphasis added)

Although the government relies basically for its
"sovereignty theories" on the three categories of cases,
(1) the power and reclamation cases, (2) the navigation
cases, and (3) the Indian reservation cases, only two re-
ported cases have been cited or can be found, where it is
argued by the United States that the government by the
creation of a Military reservation, has been accorded rights
claimed herein and analogous to the rights arising in the
three situations above.

-49-

4411

1     We discuss the two cases on which the United States

2   relies to justify its contentions in this case.

3     Nevada Ditch Co. v. Bennett (Ore. 1896) 45 Pac. 472,

4   484-485 concerned in part a transfer of an old military

5   post to private ownership and whether rights to the use of

6   water, exercised by the United States thereon, passed to the

7   patentee, to the detriment of a prior appropriator.  The

8   court held alternately that (1) when the reserve was thrown

9   open to and restored to the public domain, the United States

10   use of water was no longer appurtenant to the land and was

11   in fact "abandoned," and (2) that the patent to the patentee

12   was expressly "subject to any vested and accrued water rights

13   . . . recognized by the local customs, laws, and decisions

14   of courts"; that this was "an implied recognition of such

15   rights of prior appropriators . . . and a direct transfer

16   expressly subject to such rights" (p.485).

17     There is language from which the United States draws

18   solace, - "the waters of unnavigable streams are part of

19   such public domain and hence the property of the government,

20   which may lay hold of and use them, without taking any of

21   the steps made necessary to obtain a usufructuary interest

22   therein by private individuals."  Then appears the following,

23   "But, if it would prevent individuals from acquiring

24   interests by prior appropriation, it would seem that there

25   should be a reservation made of such water, either by act

26   of congress or some executive order" (p.485).  (Emphasis

27   added)

28     Story v. Woolverton (Montana 1904), 78 Pac. 589 is al-

29   most a Chinese copy of Nevada Ditch Co. (Supra).   The

30   United States had created a reservation and used water.

31   Later it abandoned the reservation and granted the land to

32   the State of Montana.  The State claimed a ditch used

FPI ATLANTA—4-15-58—85M—8285

previously to convey water to the reservation and water rights
in connection therewith.  The Court held that when the United
States owned the reservation and water running in the various
nearby streams it was unnecessary for the United States to
"appropriate" the water but only to "take it and use it;"
that when the United States abandoned the reservation, it
abandoned the use of the water which was thereafter subject
to appropriation.  Alternatively the Court held that the
grant to Montana did not expressly name water rights and
that they did not pass to Montana by the grant.

The cases are of only historical interest.  In each case
it appeared that in the past the United States had used
water running on a reservation or on public domain land nearby.
No controversy existed or or was decided as to such matters.
Nor in either case did the United States reach upstream and
contend that the flow of a stream not then running through
public domain, flow onto the reservations.  The cases did not
consider our problem and are not determinative of the issue.

We do not believe that the analogy to the three types of
cases referred to above can be carried over to a Military
reservation of the character of Camp Pendleton.

Each of such class of cases stand on its own set of facts
and the reason for the rule prohibiting state interference
logically follows.

### THE POWER CASES

As to waters within the scope of the Federal Power Act,
the Supreme court has decided cases which clearly limit or
negate the power of states to interfere with the federal pro-
ject.  These cases concern both navigable and non-navigable
streams.

In Federal Power Commission v. Oregon [1955] 349 U.S.
435 (The Pelton Dam Case), the holding was generally that the
Federal Power Commission had the power and right to issue a

1    license to a private hydro-electric project even though the

2    State of Oregon objected that, (1) the project would interfere

3    with fish and state regulations concerning them and (2) that

4    the Acts of July 26, 1866, July 9, 1870, and the Desert Land

5    Act of 1877, constitute an express congressional delegation

6    or conveyance to the state of the power to regulate the use

7    of the waters.

8        One end of the dam abutted on Indian lands, reserved as

9    such by the government since 1910 and 1913; and the other

10    abutted on land reserved to the United States for power pur-

11    poses since 1909.  The court, though not deciding any question

12    of interference with vested rights, says "The Commission

13    states that the project will be subject to all existing rights

14    to the use of the waters of the river, whether perfected or

15    not," (p. 440).  The federal Power Act, 41 Stat. 1077 (1920)

16    (16 USC 821), in Sec. 27 provided for protection of vested

17    rights.

18        The court disposes of Oregon contentions based on the

19    Desert Land act of 1877 and related acts by holding that they

20    pertain to public land - land open to appropriation and dis-

21    posal according to law, and not to reserved land of the United

22    States.

23        The court said at page 441: "1. <u>Applicability of the</u>

24    <u>Federal Power Act.</u>  "On its face, the Federal Power Act

25    applies to this license as specifically as it did to the

26    license in the First Iowa case.  There the jurisdiction of

27    the Commission turned almost entirely upon the navigability

28    of the waters of the United States to which the license

29    applied.  Here the jurisdiction (of the F.P.C.) turns upon

30    the ownership or control by the United States of the reserved

31    lands on which the licensed project is to be located.  The

32    authority to issue licenses in relation to navigable waters

4414

of the United States springs from the Commerce Clause of the
Constitution.   The authority to do so in relation to public
lands and reservations of the United States springs from the
Property Clause - 'The Congress shall have Power to dispose
of and make all needful Rules and Regulations respecting the
Territory or other Property belonging to the United States.
. .' Art. IV, §3. . ."

Wash. Dept. of Game v. F.P.C. [9 Cir. 1953] 207 F.2d
391, cert. den. 347 U.S. 936, upheld the authority of the
F.P.C. to license the City of Tacoma for a power project on
the Cowlitz River, including two dams, one of which would
inundate and destroy a state fish hatchery.

In City of Tacoma v. Tax Payers of Tacoma [6/23/58] 26
L.W. 4441, ____U.S.____, (further litigation growing out of
the Cowlitz River project, considered in Wash. Dept. of Game
v. F.P.C. (supra), the Supreme Court held the issues fore-
closed by that decision and the denial of certiorari therein
and expressly held that the City of Tacoma as licensee under
the Federal Power Commission had authority to in substance
take by indunation the fish hatchery of the State of Washing-
ton to be flooded by one of the dams, but upon payment of
just compensation.   The lack of state statutory authority to
the City of Tacoma to condemn or exercise such power was not
controlling.

The Supreme Court said, " . . . We come now to the core
of the controversy between the parties, namely, whether the
license issued by the Commission under the Federal Power Act
to the City of Tacoma gave it capacity to act under that
Federal license in constructing the project and delegated to
it federal eminent domain power to take, upon the payment of
just compensation, the State's fish hatchery - essential to
the construction of the project - in the absence of state
legislation specifically conferring such authority. . .

-53-

4415

"It is no longer open to question that the Federal Government under the Commerce Clause of the Constitution (Art. 1, §8, cl. 3) has dominion, to the exclusion of the States, over navigable waters of the United States.  Gibbons v. Ogden, 9 Wheat. 1, 196; New Jersey v. Sergent, 269 U.S. 328, 337; United States v. Appalachian Electric Power Co., 313 U.S. 377, 424; First Iowa Hydro-Electric Cooperative v. Federal Power Comm'n, 328 U.S. 152, 173; United States v. Twin City Power Co., 350 U.S. 222, 224-225.  Congress has elected to exercise this power under the detailed and comprehensive plan for development of the Nation's water resources, which it prescribed in the Federal Power Act, to be administered by the Federal Power Commission.  First Iowa Hydro-Electric Cooperative v. Federal Power Comm'n, supra; United States v. Appalachian Electric Power Co., supra," (Emphasis supplied)

It is our conclusion that as to the use of water for power projects, the Supreme Court has made it clear that Congress has acted to endow the projects with such a public interest that state action shall not be permitted to interfere with the functioning of the projects.

RECLAMATION PROJECT CASES

The recent decision in the Supreme Court, Ivanhoe Irrig. District, et al v. McCracken,  [June 23, 1958] _____ U.S. ____, makes it clear that in situations where reclamation projects are involved, even though the power element is absent, the same rule will be applied by the Supreme Court that the Federal government will not brook interference by the states.  The Reclamation Act of 1902, in Sec. 5 [43 USCA, Sec. 431] provided for a 160 acre limitation on the use of water from the reclamation district.  Sec. 8 of the same act, [43 USCA, Sec. 383] provided that nothing in the Act should be construed "to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use or distribution of water used in irrigation or any vested right acquired thereunder," and instructed the Secretary to proceed in conformity with such laws.  The Supreme Court of California invalidated contracts with the 160 acre limitation.  The United States/Court said, "as to the rights and duties of the United States under the contracts, these are

-54-

4416

matters of Federal law on which this court has final word,
Clearfield Trust Co. v. United States, 318 U.S. 363; and
"from the beginning of the Federal Reclamation program in
1902, the national policy as declared by the Congress has
been one requiring that the benefits therefrom be made
available to the greatest number of people, consistent, of
course to the public good," and "In developing these pro-
jects the United States is expending federal funds and ac-
quiring federal property for a valid public and national pur-
pose, the promotion of agriculture.  This power flows not
only from the General Welfare Clause of Art. I, §8, of the
Constitution, but also from Art. IV, §3, relating to the
management and disposal of federal property.  As this Court
said in United States v. San Francisco, 310 U.S. 16, 29-30
(1940), this 'power over the public land thus entrusted to
Congress is without limitations.  'And it is not for the
courts to say how that trust shall be administered.  That is
for Congress to determine.'"  See also United States v.
California, 332 U.S. 19, 27 (1947), and Alabama v. Texas,
347 U.S. 272, 273-274 (1954)." (Emphasis added).

We conclude that the public interest in the Reclamation
projects has been settled as conclusively as those in the
power projects; and that again this situation results from
Acts of the Congress of the United States.

THE NAVIGATION CASES

The power of the government under the Commerce clause to
prevent state action affecting water, where a navigable river
is involved is another instance in which the federal govern-
ment will brook no state interference.  United States v. Rio
Grande Dam Irrig. Co.  [1898] 174 U.S. 690; Gutierres v.
Albuquerque Land & Inv. Co.  [1903] 188 U.S. 545.

4417

In First Iowa Hydroelectric Corp. v. F.P.C. (1946) 328
U.S. 152, Sec. 9(b) of the Federal Power Act, 41 Stat. 1068
(16 USC 802) provided that each applicant should submit
satisfactory evidence "that the applicant has complied with
the requirements of the law of the state or states within
which the proposed project is to be located with respect to
. . . appropriation, division and use of water for power
purposes . . . ." The project divested nearly all the water of
Cedar creek, a navigable river about 20 miles above the entry
of that river into the Mississippi.  This was expressly
forbidden by Iowa law.

The Supreme Court held in substance that the state of
Iowa should have no veto power in connection with the federal
project.  The case rests both on the right of the United
States to control navigable waters (p. 173) and upon the com-
prehensive scope of the Federal Water Power Act (p. 180-181)
and "The detailed provisions of the Act providing for a
federal plan of regulation", leaving "No room or need for
conflicting state controls" (p.181).

The navigation cases are clearly distinguishable and
have no real application to the question at hand, but illus-
trate how power to resist state inference has come from Acts
of the Congress of the United States.

### THE INDIAN CASES

Winters v. U.S. (1908) 207 U.S. 564, holds that where
reservations have been created for Indians and lands re-
served for such purposes, there has been impliedly reserved
also, by the treaty or executive order, the right to the use
of all water reasonably necessary for the needs of the
Indians.  The case must be read with the 9th Circuit opinion
below (1906) 143 F.740, 148 F.684.

4418

1    Conrad Inv. Co. v. United States, (9 Cir.) 161 F. 829,

2    termed the Indians' right to water "a paramount right" and

3    the decree provided for modification to provide for future

4    needs.

5    U.S. v. Ahtanum Irrig. Dist. (9 Cir. 1956) 236 F.2d 321

6    is a recent affirmation of the Winters doctrine. Relying on

7    the Winters and Conrad cases, the court states that "the

8    paramount right of the Indians . . . extended to the ultimate

9    needs of the Indians as those needs and requirements should

10   grow to keep pace with the development of Indian agriculture

11   upon the reservation" (p. 327). The case states that the

12   rights of appropriators exist only in the water remaining

13   after the needs of the Indians have been satisfied. (p. 327).

14   "It is too clear to require exposition that the state

15   water right decree could have no effect upon the rights of

16   the United States. Rights reserved by treaties such as this,

17   are not subject to appropriation under State law. Nor has

18   the state power to dispose of them. Federal Power Commission

19   v. State of Oregon, 349 U.S. 435, 444, 75 S.Ct. 822, 99 L.Ed.

20   1215". (p. 328). (Emphasis added)

21   The Indian cases cited heretofore rest fundamentally on

22   the background of the dealings between the United States and

23   the Indians and the treaties and the Acts of Congress.

24   Throughout the cases there runs the theme that the Indians

25   have not been fairly treated; that at one time they occupied

26   such parts of the country as they desired and exercised rights

27   which they held from time immemorial, and that upon the

28   creation of reservations, rights were needed by the Indians

29   and that the government in return reserved to the Indians on

30   those reservations certain rights.

31   Again, the problem is one of a particular character, where

32   the courts have held that because of the background of dealings

-57-

4419

with the Indians, that the government in connection with
these Indian reservations, is entitled to reserve for the
Indians such water as they presently need or will reasonably
need in the foreseeable future.

To extend the analogies to say that every time the
government acquires land by purchase or condemnation, or sets
it aside from the public domain as a reserve, that the govern-
ment then acquires the right, state law notwithstanding, to
appropriate such water as it needs by self help in derogation
of the state statutes and procedure would greatly expand the
limited principles developed in the three categories of cases
heretofore mentioned.  Let us analyze the impact of the rule
if broadened in line with the government contention.

### Date of Acquisition or Creation
### of the Reserved Land

What is the significance of the date of the establishment
of the reservation?  In Federal Power Comm'n. v. Oregon,
349 U.S. 435 (1955) the Indian reservation on one side of the
dam had been reserved for power purposes since 1910 and 1913,
and the land on the other side of the dam was reserved for
power purposes since at least 1909.  Does it make any material
difference when the reservation was made?  As a matter of
logic, the reservation at Camp Pendleton, made by the acquisi-
tion of the lands in 1942, and following, should be as effec-
tive as though made in 1910.  The power of the government to
constitute the reservation stems from the Property Clause of
the U. S. Constitution, Art. IV, Sec. 3, Clause 2.

Federal Power Commission v. Oregon (1955) 349 U.S. 435;

Ivanhoe Irr. Dist. et al v. McCracken (     ) U.S. ____ 6/23/58.

1        If the government has the power, what difference does

2  it make whether the reservation is old or newly created,

3  where no vested rights are involved?  The power and right -

4  following up the government contention, is unlimited as to

5  time.   It would pertain to all existing reservations and all

6  new ones created.

7                  LOCATION OF WATER TAKEN

8     Assuming the United States has such power, its exercise

9  would be unlimited as to place.   In our case the stream runs

10  through the reservation.  But the power as contended for by

11  the government, would be equally as valid if the stream ran

12  through another watershed removed from the reservation.  Since

13  the government says "we are taking unappropriated water - we

14  are exercising a right to take and use water without complying

15  with the present state procedure", why can not the government

16  take unappropriated water anywhere in the state.  If this is

17  a right and power, the United States may exercise without

18  bowing to what the government calls the "police power of the

19  state," what obstacle exists?  It would logically follow that

20  the United States would have the right to take and use

21  unappropriated water existing in any stream of the state with-

22  out complying with state law or procedure.  Truly this right

23  would be unlimited as to place.

24     The Indian cases relied on by the government were cases

25  where the water was on the land reserved or bordering it but

26  the government has shown no indication in this case to limit

27  its claims, in fact it keeps continually broadening its claims.

28  We see no material distinction between situations where the

29  stream is on or borders the reservation or where it is 500

30  miles away, insofar as the government contention is concerned.

31     We pause merely to note what an impact such a rule would

32  have on state procedure or actions to allot or apportion,

FPI ATLANTA—4-16-55—250—3250

1   unappropriated water.  e.g.-A lengthy state hearing has been

2   completed and a decision is being prepared.  The government

3   condemns or buys land on the stream or elsewhere, or recalls

4   a reservation it already owns, which needs water.  It takes

5   the water and state procedures are nullified.

6        Should this power of the government be extended beyond

7   the specific instances above referred to?  We think not.  We

8   believe that such power by the United States should be limited

9   in those specific instances where Congress has spoken and the

10  courts have been able to perceive a clear authorization for

11  the use of that power.  We return to this problem later,

12  viewed in a slightly different aspect.

13       We think that Trelease, Professor of Law at the University

14  of Wyoming, in his article, "Government Ownership and Trustee-

15  ship of Water," 45 Cal. L.R. 638, is correct in his statement,

16  page 651, "By and large, the Supreme court has never used

17  property concepts in deciding water cases.  The interstate

18  suits have been based upon apportionment of water between

19  individual users who are represented by their states in the

20  controversy," (e.g. Nebraska v. Wyoming (1945) 325 U.S. 589

21                      Wyoming v. Colorado (1922) 259 U.S. 419)

22  "and while a sovereign interest in the prosperity of the

23  lands watered by the river has been recognized" (Kansas v.

24  Colorado, (1907) 206 U.S. 46) "the apportionment has been

25  to the states as representatives not as owners."

26       "In those cases in which state and federal interests -

27  or state-based and federally-based interests - have conflicted,

28  the Court has scrupulously based its decisions on the question

29  of the allocation of sovereign power among the units of a

30  federated government.  In United States v. Rio Grande Dam and

31  Irrigation Co., [174 U.S. 690 (1899) the holding was that the

32  federal government had superior power to protect the naviga-

-69-

4422

bility of a river from state-authorized action.  In Cali-
fornia Oregon Power Co. v. Beaver Portland Cement Co., [295
U.S. 142 (1935)] the Court construed the Desert Land Act as
a recognition of the desirability of state control over water
rights, as a local problem, and as a relinquishment to the
states of whatever federal power existed because of the owner-
ship of the public lands.  In Winters v. United States, [207
U.S. 564 (1908)] the question of the existence of a state
power to curtail the obligations of the United States under
a treaty with an Indian tribe was brushed aside.  In the
Pelton Dam case, [FPC v. Oregon, 349 U.S. 435 (1955)]  the
court held that a federally-licensed power project on a non-
navigable river, where the dam was situated on reserved
lands, could not be blocked by state attempts to regulate the
river in the interest of fish conservation."

The two latest water cases in the Supreme Court follow
the same pattern.  (1) The Supreme court in Ivanhoe Irr.
Dist. v. McCracken (supra) states, "At the outset we
set aside as not necessary to decision here the question of
title to or vested rights in unappropriated waters.  Cf.
Nebraska v. Wyoming, 325 U.S. 589, 611-616," and proceeded
to decide the case based on the character of the federal
project as set up by the Congress.  In the cited case
Nebraska v. Wyoming (1945), 325 U.S. 589, the court disposed
of the government claim to all the unappropriated waters of
the United States, (p.611-616) by saying the issue was
"largely academic so far as the narrow issues of this case
is concerned." (p.616).  (2) City of Tacoma v. The Tax-
payers of Tacoma, _____ U.S. _____, (6/23/58) is based on the
power of the government under the commerce clause, over
navigable waters and the action of Congress in formulating
a detailed and comprehensive plan for developing the power

4423

1  resources of the country.
2     Trelease further states, (idem p. 652), referring to
3  conflicts between State and Federal government created by
4  withdrawals or reservations from the public domain, "that
5  such conflicts when they arise as they surely will, will [not]
6  . . . be settled by concepts of 'ownership,' by examing the
7  title of the federal government and the states, by interpreting
8  the treaties, acts of Congress, executive orders withdrawing
9  lands, and state constitutions as if they were deeds in the
10  abstract of title to a farm. Rather, there are two other
11  questions here, one of the power of the Federal government
12  and one of the appropriateness of the exercise of that power.
13  (Emphasis added)
14     We pose a third question: - Who has authority to say
15  whether this power should be exercised, (a) Hon. J. Lee Rankin,
16  Solicitor General, (b) This Court or (c) the Congress of the
17  United States?
18     Let us follow through with Trelease's analysis.
19        (1) The Power of the Federal Government
20     There is absolutely no doubt as to the power of the
21  Federal government to take what it needs for its public uses;
22  if vested rights are involved, the government will obviously
23  be required to pay compensation. In Ivanhoe Irrigation District
24  v. McCracken, _____ U.S. _____, decided June 23, 1958, Justice
25  Clark, speaking for the majority, states:
26     ". . . At the outset we set aside as not necessary to
27  decision here the question of title to or vested rights in
28  unappropriated water. Cf. Nebraska v. Wyoming, 325 U. S. 589,
29  611-616. If the rights held by the United States are insuffi-
30  cient, then it must acquire those necessary to carry on the
31  project, United States v. Gerlach Live Stock Co., supra, at
32  739, paying just compensation therefor, either through condem-
nation or, if already taken, through action of the owners in

the courts. As we see it, the authority to impose the conditions of the contracts here comes from the power of the Congress to condition the use of federal funds, works, and projects on compliance with reasonable requirements. And, again, if the enforcement of those conditions impairs any compensable property rights, then recourse for just compensation is open in the courts. . ."

(2) Should the Power be Exercised

We come then to the next question, should the government, having in mind the relationship of the functions of the state and federal government as units in a federated system of government, exercise this right in derogation of the right of the state to control the allocation of unappropriated water. California-Oregon Power Co. v. Beaver Portland Cement Co. [1935] 295 U.S. 142, was limited in its effect to the land in the public domain. The court said, at page 155:

". . . . The effect of these acts" (referring to the Acts of 1866, 1870 and the Desert Land Act of 1877) "is not limited to rights acquired before 1866. They reach into the future as well, and approve and confirm the policy of appropriation for a beneficial use, as recognized by local rules and customs, and the legislation and judicial decisions of the arid-land states, as the test and measure of private rights in and to the non-navigable waters on the public domain. Jones v. Adams, 19 Nev. 78, 86; 6 Pac. 442; Jacob v. Lorenz, 98 Cal. 332, 335-336; 33 Pac. 119. . ." (Emphasis added)

And at page 163:

"Second. Nothing we have said is meant to suggest that the act," (Desert Land Act, Feb. 27, 1877) "as we construe it, has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest. . ."

-63-

4425

And at page 164:

". . . The Desert Land Act does not bind or purpurt
to bind the states to any policy.  It simply recognizes and
gives sanction, insofar as the United States and its future
grantees are concerned, to the state and local doctrine of
appropriation, and seeks to remove what otherwise might be
an impediment to its full and successful operation.  See
Wyoming v. Colorado, 259 U.S. 419, 465. . ." (emphasis
added)

Following the above quote, the court sets forth footnote
2.

"In this connection it is not without significance that
Congress, since the passage of the Desert Land Act, has re-
peatedly recognized the supremacy of state law in respect
of the acquisition of water for the reclamation of public
lands of the United States and lands of its Indian wards. .
." (citing two examples).

Additional examples could have been cited by the court
in 1935, and since then Congress has added many more.  There
is an almost unbroken line of statutes by which Congress has
deferred to state laws concerning water.  They are cited in
the margin [1] and begin with the Act of July 26, 1866, and
run through Section 7 of the Colorado Storage Project Act
of 1956, (70 Stat. 109).

Sub-section, 2(a) and 3(c) of the Act of July 28, 1954,
relating to the DeLuz Dam on the Santa Margarita River, (68
Stat. 577) is particularly significant, since it involves
the stream in this case and this controversy.

"Sec. 2. (a) In the interest of comity between the United
States of America and the State of California and consistent
with the historic policy of the United States of America of
Federal noninterference with State water law, the Secretary

-64-

of the Navy shall promptly comply with the procedures for the acquisition of appropriative water rights required under the laws of the State of California as soon as he is satisfied, with the advice of the Attorney General of the United States, that such action will not adversely affect the rights of the United States of America under the laws of the State of California."

"Sec. 3.(c) For the purposes of this Act the basis, measure, and limit of all rights of the United States of America pertaining to the use of water shall be the laws of the State of California: Provided, that nothing in this Act shall be construed as a grant or a relinquishment by the United States of America of any of its rights to the use of water which it acquired according to the laws of the State of California either as a result of its acquisition of the lands comprising Camp Joseph H. Pendleton and adjoining naval installations, and the rights to the use of water as a part of said acquisition, or through actual use or prescription or both since the date of that acquisition, if any, or to create any legal obligation to store any water in DeLuz Reservoir, for the use of which it has such rights, or to require the division under this Act of water to which it has such rights." (Emphasis added)

Also particularly pertinent is Act of July 10, 1952, Ch. 651, Title 2, Sec. 208, 66 Stat. 560, 43 USCA 666.

'(a) Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is

a necessary party to such suit.  The United States, when a
party to any such suit, shall (1) be deemed to have waived any
right to plead that the State laws are inapplicable or that
the United States is not amenable thereto by reason of its
sovereignty, and (2) shall be subject to the judgments,
orders and decrees of the court having jurisdiction, and may
obtain review thereof, in the same manner and to the same
extent as a private individual under like circumstances:
Provided, That no judgment for costs shall be entered against
the United States in any such suit.

'(b) Summons or other process in any such suit shall be
served upon the Attorney General or his designated represen-
tative.

'(c) Nothing in this section shall be construed as
authorizing the joinder of the United States in any suit or
controversy in the Supreme Court of the United States involv-
ing the right of States to the use of the water of any inter-
state stream. . ."

(3) Who determines if this power shall be exercised?

Assuming arguendo, that the government has the power
generally, to take unappropriated water which it finds useful
for a Military reservation, how is this power to be exercised?
Who makes the determination as to whether the government should
exercise the limits of its power?  Who decides on a basis of
comity, that the United States yield to the states as members
of a federated government, a right to control and apportion
unappropriated water?

The Constitution, in Art. IV, Sec. 3, c.2, states, "The
Congress shall have the Power to dispose of and make all need-
ful Rules and Regulations respecting the Territory or other
Property belonging to the United States. . ."  This is generally
referred to as the Property Clause of the Constitution and has

been relied upon in various of the Power cases, together with the Welfare clause, as a source of the power of the government to reserve lands for governmental use.

The government of the United States consists of three branches, the Executive, Legislative and the Judicial, and a delicate mechanics of checks and balances regulate the exercise of the respective powers of these three branches.

We submit the inquiry, does the Honorable J. Lee Rankin, Solicitor General of the United States, a member of the Executive branch of the government, have the power to make this determination? We think not. He may urge upon a court for consideration, the problem of whether a certain power under the Property Clause has been exercised by the United States, but we think that the Constitution makes it clear that the Congress has authority to deal with and dispose of the property of the United States and inferentially to therefore claim for the government the right to take or appropriate unappropriated water.

We think the function of the Judiciary is to determine whether or not Congress has so acted.

"The role of the judiciary in reviewing the legislative judgment is a narrow one in any case", United States v. Twin Power Co. (1956) 350 U.S. 222, 224.

There is pending in the Congress of the United States, the Barrett Bill, with two versions, both bearing No. S 863. See "Water Rights and Federalism - The Western Water Rights Settlement Bill of 1957" by Chas. E. Corker, 45 Cal.L.Rev. 604. This bill is directed at the identical problem which now faces this court. The position of the Honorable J. Lee Rankin at hearings on the Bill, to say the least, is extreme. In Water Rights and Federalism etc., supra, page 612, note 26, is set forth the questions asked by Senator Kuchel and answers by Mr. Rankin. The last question and answer is

4429

particularly pertinent.

SEN. KUCHEL:  "So, that in your opinion this Congress is powerless to require federal properties thereafter acquired to be subject to the laws of the state with respect to water?

MR. RANKIN:  I think that is true. . ."  (Hearings on S 863 before the Subcommittee on Irrigation and Reclamation of the Senate Committee on Interior and Insular Affairs, 84th Congress 2d Session, 248 [1956] at 266-267.)

Has the government of the United States through the Congress elected to exercise the power to take and/or appropriate unappropriated water, except in the specific fields heretofore discussed?

Congress has made it clear that when it desires to empower an executive branch of the government or some statutory agency or commission, to exercise the general power of the federal government, it has done so by express authority.

In the case of the use of water and reservations of land for power purposes, the Congress of the United States, by the Federal Power Act has expressly authorized such action by the Federal Power Commission, (Federal Power Act, Act of June 10, 1920, 41 Stat. 1063, Act of Aug. 26, 1935, 49 Stat. 838, as amended from time to time, [16 USCA, Sections 791a-825u]).  See particularly Sec. 797(e), Title 16 USCA, authorizing the Federal Power Commission to issue licenses for the use of streams and waters, and Sec. 818, Title 16 USCA, reserving United States lands from entry.

Further examples of Congressional intent with respect to the exercise of governmental powers are to be found in acts dealing with Public Lands.  43 USCA Section 141 (June 25, 1910 C. 421 Section 1, 36 Stat. 847) authorizes the President to withdraw and reserve lands for water power sites, irrigation and other purposes.  By Executive Order No. 10355 dated

-68-

4430

May 26, 1952, 17 F.R. 4831 the President delegated this
authority to the Secretary of the Interior. The Secretary
of the Interior has been charged with the responsibility of
reporting such withdrawals to Congress (43 USCA Section 143
June 25, 1910 C. 421 Sect. 3, 36Stat.848). The secretary
of the Interior "in his discretion" has also been authorized
to withdraw lands in Indian Reservations for power or reser-
voir sites. 43 USCA 148 (June 25, 1910 C. 431 Sect. 13,
36 Stat. 858).

In dealing with reclamation and irrigation of lands by
the Federal Government, Congress has been no less precise in
its intent to have the powers vested under their acts
exercised by specific agencies. The Secretary of the Interior
has been expressly authorized to "perform any and all acts
and to make such rules and regulations as may be necessary
and proper. . ." to carry out the Reclamation Acts, 43 USCA
373;(June 17, 1902 C.1093, Sect. 10,32 Stat. 390; Aug. 13,
1918 C 247 Sect. 15, C.247 Sect. 15, 38 Stat. 690.) Not only
did Congress give no express authority to the Secretary of the
Interior, but it instructed the Secretary to proceed in Con-
formity to State laws in carrying out the provisions of the
Act, 43 USCA 383 (June 17, 1902 C 1093 Sect. 8, 32 Stat.590)

In Title 16, U.S.C.A. Conservation, Chap. 36-Sec. 590 Y,
Congress authorized the Secretary of Agriculture to "construct
water conservation and utilization projects." Sec. 590z-1,
lists the prerequisites for the construction of such projects,
and provides no construction shall be undertaken "until (1)
. . . and (2) the Secretary has found (i) that water rights
adequate for the purposes of the project have been acquired.
. . or that such water rights have been initiated and in his
judgment can be perfected in conformity with state law . . .
and (ii) that such water rights can be utilized for the

-69-

1   purposes of the project in conformity with State law . . ."

2   [Emphasis added]

3       In the instance of the Indian reservations, they arose,

4   prior to 1871, by treaty between the government and the

5   Indian tribe, and such treaties were subject to ratification

6   by the Congress pursuant to the terms of the Constitution.

7   After 1871 reservations were created by acts of Congress or

8   by executive order pursuant to a statute of the Congress, or

9   by statute authorizing the Secretary of the Interior to set

10  aside the lands as reservations for the benefit of the Indians.

11      An inspection of Winters v. United States, [1908] 207

12  U.S. 564, shows that on April 15, 1874, by Act of Congress,

13  18 Stat. 28, a reservation was created.  Subsequently by Act

14  of May 1, 1888, Fort Belknap Reservation, having been by

15  treaty limited and defined (25 Stat. 124), the treaty was

16  confirmed (25 Stat. 133).  The Winters case held that there

17  was impliedly reserved to the Indians by the treaty, the use

18  of waters.

19      In 1871 the policy of the government that had existed

20  for nearly 100 years of using treaties with the Indians was

21  changed by the Act of March 3, 1871, c. 120, 16 Stat. 566.

22  (See Matter of Heff [1905] 197 U.S. 488).  The present section,

23  in identical language, is carried over into Section 71, Title

24  25, USCA and provides, "Future Treaties with Indian tribes.

25  No Indian nation or tribe within the territory of the United

26  States shall be acknowledged or recognized as an independent

27  nation, tribe or power with whom the United States may contract

28  by treaty; but no obligation of any treaty lawfully made and

29  ratified with any such Indian nation or tribe prior to March

30  3, 1871, shall be hereby invalidated or impaired. [R.S. 2079]."

31  Thereafter setting by of reservations, was handled by Act of

32  Congress or by the orders of an executive department, authorized

-70-

FPI ATLANTA—4-16-58—25M—3568

4432

to act by Congress.

Throughout Title 25 on "Indians", are various examples of Congressional authorization given the Secretary of the Interior. For example, Sec. 381 concerning the use of water on Indian lands; Sec. 382, "Irrigation Projects Under the Reclamation Act"- arrangements to be made by the Secretary of the Interior in connection with Indian lands; Sec. 465, authorizing the Secretary of the Interior to acquire through purchase, relinquishment, gift, exchange or assignment, any interest in lands or water rights within or without existing reservations for the use of the Indians; Sec. 467, authorizing the Secretary of the Interior to proclaim new Indian reservations on lands acquired.

In the field of condemnation, the Constitution impliedly gives the government the right to take private property, upon payment of just compensation, (Amend.V). The Congress, by various statutes, has provided that executive departments and statutory agencies and bodies may condemn private property for their necessary needs, and have laid out the procedure for so doing. e.g. Sections 171 and 172, Title 50, USCA; Sections 258(a)-258(e) Title 40, USCA; Section 71A, Rules of Civil Procedure, adopted pursuant to Congressional authority. For a list of various condemnation statutes, see Notes of Advisory Committee on Rules, following Rule 71A, Rules of Civil Procedure, 1957 pocket part, p. 273 at 278.

What has Congress done which could lead this court to conclude that some agency of the Executive Branch, (e.g. the United States Navy, or officials acting in its behalf) has been empowered to take and/or appropriate unappropriated waters in connection with the military reservation at Camp Pendleton?

4433

(1) The Congress has passed a series of statutes heretofore set forth in the foot note (supra) requiring in instance after instance, that the government yield to the states in problems concerning water.

(2) In the DeLuz Bill, concerning the proposed dam on the Santa Margarita River, the Congress expressly stated, limited of course, as to that project, "In the interests of comity between the United States and the State of California, and consistent with the historic policy of the United States of America of federal non interference with state water law, the Secretary of the Navy shall promptly comply with the procedures for the acquisition of appropriative water rights required under the laws of the state of California. . . "

(3) In the Act of July 10, 1952, an appropriation bill, the Congress prohibited the use of Department of Justice funds for the preparation or prosecution of this particular litigation, Act of July 10, 1952, Sec. 208(d), 66 Stat. 560. "Sec.(d) None of the funds appropriated by this title may be used in the preparation or prosecution of the suit in the United States District Court for the Southern District of California, Southern Division, by the United States of America against Fallbrook Public Utility District, a public service corporation of the State of California, and others.

This title may be cited as the 'Department of Justice Appropriation Act, 1953. .'"

(4) Where Congress has intended that the federal government or its agencies take or use water rights, it has spoken expressly - e.g. the power and reclamation projects, the matters of reserving Indian lands, etc.

Against this record we find that

(1) The Congress has appropriated money for the purchase and condemnation of the property which now constitutes Camp

Pendleton and the reservation involved.

(2) The Congress has, from time to time made additional appropriations for the Marine Corps at Camp Pendleton since the filing of this litigation.

(3) That no Act of Congress has specifically said that the United States, through an executive department, the United States Navy, might take or use unappropriated waters on a military reservation in derogation of State law.

In view of the foregoing matters, the contention of the United States that the government has elected to exercise this power, falls completely. We fail to see how Congress, by any of its actions, has so exercised the power vested in it under the Property Clause, to empower any Executive agency to use, take or appropriate, unappropriated waters for Military reservations.

Many things could have been done or said in the Bills appropriating money for the condemnation or acquisition of Military reservations. Congress could have stated that the government or an agency thereof, was authorized to also use, acquire, take or appropriate unappropriated waters for the use of the reservations. The Congress did not do so. To sustain the contention of the government on the record before us, assumes that the Congress, by some uncited or undiscovered Act, has delegated authority to, and expressed its intention that the United States Navy might exercise this vast power.

-73-

4435

VII-I

THE LAW OF PERCOLATING WATER, THAT IS WATERS
WHICH ARE NOT PART OF THE SANTA MARGARITA RIVER
OR ITS TRIBUTARIES OR UNDERGROUND BASINS WHICH
ARE A PART OF SAID STREAM

This question was also posed to our self. The government
responded as follows: "This litigation pertains only to the
use of waters constituting part of the stream system of the
Santa Margarita River. As a consequent, it would seem
logically to follow that the water rights to be adjudicated
would fall within the categories of (1) surface waters of
the Santa Margarita River, (2) its tributaries, (3) under-
ground basins which are a part of that river or its tributar-
ies. It would also seem logical to conclude that there would
be excluded from the litigation "* * * percolating waters,
that is water which are not part of the Santa Margarita
River or its tributaries. If those predicates are correct,
the matter is purely academic and needs no further considera-
tion." The government further asserted that the existence
of percolating waters was a question of fact.

The court concludes that all parties are agreed upon the
law on this problem, but summarizes herewith the general
rules of law applicable.

Initially in determining whether or not there is percolating
water, there arises the question of fact as to whether or not
the water is a part of the stream. Our inquiry propounded
to counsel, assumed that the water to which this inquiry was
directed, was not part of the River or its tributaries, and
not part of the underground basins connected with or a part
of the River. We are particularly concerned therefore with
this particular type of water before we have decided it

-74-

4436

1    and the water rights pertaining thereto.

2        This suit has been brought by the United States to quiet

3    title to its right to water which is part of the River.   It

4    claims no water rights and can claim none, except as they per-

5    tain to the River.

6        On the factual problem it has been recognized by Cali-

7    fornia decisions that a percolating groundwater supply, al-

8    though not part of the flow of a stream, may nevertheless be

9    hydrologically connected with it, with the result that the

10   extraction of water from either source diminishes the amount

11   of water in the other (City of Lodi v. East Bay Mun. Utility

12   Dist. (1936), 7 Cal.2d 316, 334; Hudson v. Dailey (1909), 156

13   Cal. 617, 627-628; Cohen v. LaCanada Land etc. Co. (1904),

14   142 Cal. 437, 438-439; McClintock v. Hudson   (1903), 141 Cal.

15   275, 280.  In such a situation, the percolating groundwater

16   and the stream are regarded as one common water supply

17   (Hudson v. Dailey (1909), 156 Cal. 617, 628;   and in consider-

18   ing the respective rights of those who secure water from the

19   two interconnected sources, it is "immaterial whether the

20   [underground] waters . . . were or were not part of an

21   underground stream, provided the fact be established that

22   this extraction from the ground diminished to that extent,'

23   or to some substantial extent, the water flowing in the

24   stream"  (McClintock v. Hudson   (1903), 141 Cal. 275, 281.

25   The rights are correlated just as they would be from any

26   other common source, with riparians and overlying owners

27   having "coequal, except as to quantity, and correlative"

28   rights to use their reasonable share of the water on their

29   riparian or overlying land (Hudson v. Dailey (1909), 156 Cal.

30   617, 628; and appropriators having the right to use any re-

31   maining surplus in the order of their priority (City of Lodi

32   v. East Bay Mun. Utility Dist. (1936), 7 Cal.2d 316, 333-339.

FPI ATLANTA—4-16-58—25M—8288

4437

For a quick summary as to the law of percolating waters and what constitutes streams there appears in 25 Cal. Juris pp 1097-1103, Waters, Sections 106-110, and 26 Cal. Juris pp 267-272, Sections 477-484, a general discussion of the problem.

Much of the rules of law governing percolating waters not part of the flow of a stream are summarized in the case of City of Pasadena v. City of Alhambra (1949), 33 Cal.2d 908, 207 P. 2d 17.  We do not believe we can improve upon the succinctness  and clarity of the Calif Supreme Court's summary and therefore set it forth verbatim (33 Cal.2d at 925-927:

"Rights in water in an underground basin, so far as pertinent here, are classified as overlying, appropriative, and prescriptive.  Generally speaking, an overlying right, analogous to that of a riparian owner in a surface stream, is the right of the owner of the land to take water from the ground underneath for use on his land within the basin or watershed; the right is based on ownership of the land and is appurtenant thereto.  (See Hillside Water Co. v. Los Angeles, 10 Cal.2d 677, 686 [76 P.2d 681]; Miller v. Bay Cities Water Co., 157 Cal. 256, 279-280 [107 P. 115, 27 L.R.A.N.S. 772]; 26 Cal. Jur. 271-277; 2 Wiel, Water Rights [3d ed., 1911], secs. 1100-1105, pp. 1040-1045)  The right of an appropriator depends upon an actual taking of water.  (See 26 Cal.Jur. 277.)  The term 'appropriation' is said by some authorities to be properly used only with reference to the taking of water from a surface stream on public land for non-riparian purposes.  (See Wiel, Water Rights [3d ed., 1911] secs. 228, 1107, 1158, 1159, and sec. 231 in the 'reprint ed.' of the 3d ed.; Farnham, Waters and Water Rights [1904] sec. 672a; 56 Am.Jur. 599)  The California courts, however, use the term to refer to any taking of water for other than riparian or overlying uses.

(City of San Bernardino v. City of Riverside, 186 Cal. 7, 13-
14[198 P. 784]; Burr v. Maclay Rancho Water Co., 154 Cal. 428
436 [98 P. 260]; Katz v. Walkinshaw, 141 Cal. 116, 135,
[70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236]; see
26 Cal. Jur. 273-274.)  Where a taking is wrongful, it may
ripen into a prescriptive right.

"Although the law at one time was otherwise, it is now
clear that an overlying owner or any other person having a
legal right to surface or ground water may take only such
amount as he reasonably needs for beneficial purposes.
(Katz v. Walkinshaw, 141 Cal. 116 [70 P. 663, 74 P. 766, 99
Am.St.Rep. 35, 64 L.R.A. 236]; Peabody v. City of Vallejo,
2 Cal.2d 351 [40 P.2d 486]; Cal. Const., art. XIV, sec. 3)
Public interest requires that there be the greatest number of
beneficial uses which the supply can yield, and water may be
appropriated for beneficial uses subject to the rights of
those who have a lawful priority.  (Peabody v. City of
Vallejo, 2 Cal.2d 351, 368 [40 P.2d 486].) Any water not
needed for the reasonable beneficial uses of those having
prior rights is excess or surplus water.  In California surplus
water may rightfully be appropriated on privately owned land
for nonoverlying uses, such as devotion to a public use or
exportation beyond the basin or watershed.  (Peabody v. City
of Vallejo, 2 Cal.2d 351, 368-369 [40 P.2d 486]; City of
San Bernardino v. City of Riverside, 186 Cal. 7, 29, 30 [198
P. 784]; Burr v. Maclay Rancho Water Co., 154 Cal. 428, 436
[98 P. 260]; Katz v. Walkinshaw, 141 Cal. 116, 135 [70 P. 663.
74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236]; see 26 Cal.Jur.
32 et seq., 273-274)

"It is the policy of the state to foster the beneficial
use of water and discourage waste, and when there is a surplus,
whether of surface or ground water, the holder of prior rights

1   may not enjoin its appropriation.  (Peabody v. City of

2   Vallejo, 2 Cal.2d 351, 368-369, 372 [40 P.2d 486]; see 26 Cal.

3   Jur. 277.)  Proper overlying use, however, is paramount, and

4   the right of an appropriator, being limited to the amount of

5   the surplus, must yield to that of the overlying owner in

6   the event of a shortage, unless the appropriator has gained

7   prescriptive rights through the taking of nonsurplus water.

8   As between overlying owners, the rights, like those of

9   riparians, are correlative and are referred to as belonging

10  to all in common; each may use only his reasonable share when

11  water is insufficient to meet the needs of all.   (Katz v.

12  Walkinshaw, 141 Cal. 116 [70 P. 663, 74 P. 766, 99 Am.St.Rep.

13  35, 64 L.R.A. 236]; see 26 Cal.Jur. 269-273; cf., 25 Cal.Jur.

14  1063-1067.)  As between appropriators, however, the one first

15  in time is the first in right, and a prior appropriator is

16  entitled to all the water he needs, up to the amount that he

17  has taken in the past, before a subsequent appropriator may

18  take any.  (City of San Bernardino v. City of Riverside, 186

19  Cal. 7, 26-28 [198 P. 784]; cf., Civ. Code, sec. 1414.)

20      "Prescriptive rights are not acquired by the taking of

21  surplus or excess water, since no injunction may issue

22  against the taking and the appropriator may take the surplus

23  without giving compensation; however, both overlying owners

24  and appropriators are entitled to the protection of the courts

25  against any substantial infringement of their rights in

26  water which they reasonably and beneficially need.  (Peabody

27  v. City of Vallejo, 2 Cal.2d 351, 368-369, 374 [40 P.2d 486].)

28  Accordingly, an appropriative taking of water which is not

29  surplus is wrongful and may ripen into a prescriptive right

30  where the use is actual, open and notorious, hostile and ad-

31  verse to the original owner, continuous and uninterrupted for

32  the statutory period of five years, and under claim of right.

FPI ATLANTA—4-18-58—55M—8398

4440

1  (City of San Bernardino v. City of Riverside, 186 Cal. 7, 22-
2  23 [198 P. 784]; Katz v. Walkinshaw, 141 Cal. 116, 135 [70 P.
3  663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236]; 25 Cal.Jur.
4  1178, 1157-1158; 1 Cal. Jur. 585; 26 Cal. Jur. 278-279; cf.
5  Wutchumna Water Co. v. Ragle, 148 Cal. 759, 764-765 [84 P.
6  162].) To perfect a claim based upon prescription there must,
7  of course, be conduct which constitutes an actual invasion
8  of the former owner's rights so as to entitle him to bring an
9  action. (City of Los Angeles v. City of Glendale, 23 Cal.2d,
10 68, 79 [142 P.2d 289].)  Appropriative and prescriptive
11 rights to ground water, as well as the rights of an overlying
12 owner, are subject to loss by adverse user.  This is in accord
13 with the rule announced in cases dealing with water in a
14 surface stream.  (See Yankee Jim's Union Water Co. v. Crary,
15 25 Cal. 504, 508-509 [85 Am.Dec. 145]; Big Rock M. W. Co. v.
16 Valyermo Rancho Co., 78 Cal. App. 266, 273 [248 P. 264];
17 Peabody v. City of Vallejo, 2 Cal.2d 351, 374 [40 P.2d 486];
18 Duckworth v. Watsonville etc. Co., 150 Cal. 520, 529-532
19 [89 P. 338]; Davis v. Gale, 32 Cal. 26, 35 [91 Am.Dec. 554];
20 3 Farnham, Waters and Water Rights (1904), sec. 680a, p.
21 2106; 1 Wiel, Water Rights [3d ed., 1911], sec. 580, pp.
22 625-626; 56 Am.Jur. 773.)"  (Emphasis added).
23      The holding in City of Pasadena v. City of Alhambra,
24 (supra) was to the effect that when a particular groundwater
25 basin is being overdrawn by reason of the extraction of more
26 water than is replenished under natural conditions, both
27 overlying owners and appropriators who participate in such
28 overdraft by pumping for the prescriptive period acquire
29 prescriptive rights as against each other.  The result is
30 that all have rights of the same priority and all must accept
31 the same pro rata reduction in pumping in order to halt the
32 overdraft (33 Cal.2d at 927-933.)

In *City of San Bernardino v. Riverside*, 186 Cal. 7, the California Supreme Court at pages 14-15 said:

"When a stream runs over porous material saturated with water, and the underground waters support the stream, either by upward or lateral pressure, or feed it directly, persons having rights in the stream will be protected against a deple- tion thereof by adverse diversions of such underground waters, if they are injured thereby.  There may be a point of distance from the stream at which a diversion of such underground water will have so little effect on the stream that it will not be actionable.  It is ordinarily a question for the trial court to determine whether or not this is true in the parti- cular case before it.  (Emphasis added)  These matters are considered as applied to differing conditions in *Los Angeles v. Pomeroy*, 124 Cal. 617, (57 Pac. 585), *Miller v. Bay Cities W. Co.*  157 Cal. 256 (107 Pac. 115), *Hudson v. Dailey*, 156 Cal. 626 (105 Pac. 748); *McClintock v. Hudson*, 141 Cal. 279 (74 Pac. 849) and other cases, and will be averted to herein in connection with the rights of Riverside Water Company.

"The law of so-called 'percolating' waters presents the principal questions in issue in this case.  These waters are almost invariably found in permeable material of more or less density, such as sand, gravel and boulders intermixed, in which the water will move readily by the force of gravity. The original title to such water was in the owner of the land in which it is found, under the elementary rule that the title and ownership of land extends to the center of the earth and includes everything within the cone having the superficial boundaries of the land for the base and the center of the earth for its vertex.  The transfer of the land by the government to the individual passed this title and gave the land owner the right to all the water therein.  Originally in this state

FPI ATLANTA—4-16-58—288—2288

4442

it was assumed that this title was absolute, and that each
land owner could take out as much of such underground water
as he pleased, regardless of the effect thereof on other lands,
provided he took it on his own land and without a malicious
intent to injure others.  But the immediate effect of such
taking of water out of such land usually is to draw out the
water from the surrounding land into the void or depression
caused in the water plane in the land from which it is taken,
and this, if continued, lowers the subsurface water plane in
the vicinity thereof and eventually to a greater or less
extent throughout the basin in which the lands are situated.
If there is artesion pressure therein, this will reduce the
pressure.  In this manner the owner of one tract of land in
such basin could take such water from another tract without
an actual trespass thereon, and thus an injury could be done
which the owner of the other tract could not prevent by any
physical means, and a resort to the courts was necessary.
In cases presenting these facts the original assumption of
absolute ownership in such water was held untenable under
the conditions existing in this state and the doctrine that
the respective rights of owners of land in the waters perco-
lating or lying beneath the surface are reciprocal and
correlative as to each other was adopted.  (Katz v. Walkin-
shaw, 141 Cal. 116, (99 Am.St. Rep.35, 64 L.R.A. 236, 70 Pac.
663, 74 Pac. 766); Newport v. Temescal W. Co. 149 Cal. 535
(6 L. R. A. (N.S.) 1098, 87 Pac. 372); Burr v. Maclay etc.
Water Co., 154 Cal. 428, (98 Pac. 260); and other cases.)"
(Emphasis added)

   To summarize water which is not a part of the Santa
Margarita, its tributaries or underlying basins, and fact-
ually not a part of the stream, or does affect the stream
is not the subject of the relief sought by the government

1  in this case.  The existence of such water when found by the

2  trier of fact will entitle the owner of the property on which

3  it is located to a decree that the water is not part of the

4  River.  Such owners will, under the cases cited above, have

5  correlative rights with adjoining owners in connection with

6  that water but it is not the purpose of this case to adjudi-

7  cate such correlative rights to water which is not part of

8  the stream.

4444

## VII-J

### RIGHTS CLAIMED BY CONDEMNATION -

### DIRECT AND INVERSE

The United States claims rights to the use of water by both direct and inverse condemnation.

#### (A) Direct Condemnation

It is conceded by all parties that the United States acquired by the condemnation and/or purchase of the Rancho Santa Margarita, all water rights then owned by the Rancho. These were (1) riparian rights, (2) claimed appropriative rights (which we not now pass upon), (3) claimed prescriptive rights (as to which our pretrial ruling elsewhere in this memorandum, may or may not be dispositive) and (4) rights under the Vail judgment (not here considered).

#### (B) Inverse Condemnation

This claim of the United States was first advanced on October 21, 1957.  The stipulation of November 29, 1951, provided that the United States claimed only rights from the purchase of the Rancho, together with any rights "gained by prescription or use or both," since the acquisition of the Rancho.  This claim of inverse condemnation can be said to have been "lurking" in the words "by use."

Since the rights of the United States are to be measured by California law under the stipulation of Nov. 29, 1951, it follows that its claims to rights through "use" based by inverse condemnation, must stand or fall by California law. Without the existence of the stipulation, we think the result would be  the same.

California Code of Civil Procedure, Sec. 1238 provides that the right of eminent domain may be exercised in behalf of the following public uses "Fortifications, magazines, arsenals, Navy yards, Navy and Army Stations. . . . and all

FPI ATLANTA—4-18-58—2SM—8283

4445

other public uses authorized by the government of the United States." California case law recognized inverse condemnation, occasionally referred to as "reverse" condemnation.  When public use has attached for any recognized reason reverse condemnation proceedings may be invoked and applied," Hillside Water Co. v. City of Los Angeles (1938) 10 Cal.2d 677 at 688 (Emphasis supplied).  "The acquisition by the municipality of the water right, for which the holder of the right receives only damages, is 'inverse condemnation'". City of Los Angeles v. Glendale, (1943) 23 Cal.2d 68 at 80. For the same principle, see, Peabody v. Vallejo, (1935) 2 Cal. 2d 351; Meridian v. San Francisco, (1939) 13 Cal. 2d 424; Collier v. Merced Irr. Dist., (1931) 213 Cal. 554.

In U.S. v. Gerlach Live Stock Co., (1950) 339 U.S. 729, the Supreme Court of the United States in holding that inverse condemnation entitled the owners of grass lands downstream from Friant Dam to damages, cited the California cases above and said, "We conclude that claimants' right to compensation has a sound basis in California law," (p.754), and "We think the awards of the Court of Claims" (awarding damages for inverse condemnation) "correctly applied the law of California as made applicable to those claims by Congress." (p. 755).

Thus, no problem exists as to the law of inverse condem-nation.  State and Federal rules are the same.  The sole question involved is whether the government has taken water rights by inverse condemnation.

The United States, through its agents may engage in or carry on activities on behalf of the United States which so interfere with the property rights of another than in effect there is a "taking" by the United States of such pro-perty rights.  This constitutes "inverse condemnation."  The owner of the property so "taken" has a right under the Tucker

-84-

4446

1    <u>Act</u> (24 Stat. 505 (1887), 28 U.S.C. secs. 1346(a)(2), 1491)

2    to damages for the taking (<u>U.S. v. Gerlach Live Stock Co.</u>

3    (1950) 339 U.S. 725, 730; <u>United States v. Dickinson</u> (1947),

4    331 U.S. 745; <u>United States v. Causby</u> (1946) 328 U.S. 256;

5    <u>Hurley v. Kincaid</u> (1932) 285 U.S. 95, 103; <u>Portsmouth Co. v.</u>

6    <u>United States</u> (1922) 260 U.S. 327; <u>United States v. Cress</u>

7    (1917), 243 U.S. 316, 328-329; <u>United States v. Lynah</u> (1903)

8    188 U.S. 445, 468-469; <u>Pumpelly v. Green Bay Company</u> (1871)

9    80 U.S. (13 Wall.) 166, 177).

10    Here the last downstream user, the United States, claimed

11    it acquired by reverse condemnation, an upstream right, i.e.

12    the right to have a certain flow of water come on to the

13    lands of the United States.  For inverse condemnation to apply,

14    there must have been a "taking" - i.e. an adverse user which

15    took away substantial rights or such an interference with

16    another's right that it amounted to a taking.

17    The leading United States Supreme Court case on inverse

18    condemnation notes the distinguishing features of the "taking":

19    "Property is taken in the constitutional sense when

20    inroads are made upon an owner's use of it to an extent that,

21    as between private parties, a servitude has been acquired

22    either by agreement or in course of time," <u>United States v.</u>

23    <u>Dickinson</u> (1947) 331 U.S. 745, 748.

24    That feature is entirely lacking in our case.  The water

25    which the United States diverted and used was surplus to the

26    needs of everyone else in the watershed; otherwise it would

27    not have reached Camp Pendleton.  If not used by the United

28    States it would have wasted into the ocean.  No one had the

29    right to object to such downstream use; no one was injured

30    by such use; hence no servitude could have been acquired.

31    The Circuit Court of Appeals in its last decision in this

32    case <u>Peoples of the State of Calif. v. United States</u> 235 Fed.

FPI ATLANTA—4-15-55—250—5100

4447

2d 647, stated at p. 656: "But the physical possession of the
corpus of the water after it enters the enclave and the
ability and legal right then to use it for whatever purpose
are not evidentiary of a water right, for the right to use
water is a property right and is appurtenant to particular
parcel of land.  We must not fall into the fallacy of believ-
ing that, because the United States, by its sovereignty,
made use of the corpus of water which entered the enclave
as it chose, it thereby acquired property rights in the flow
against upper riparians or appropriators under municipal law.
".. . Since neither appropriators, riparians nor anyone else
could object or prevent such use of water by the United
States in the enclave, such use was not adverse to their
interests."

In each of the cases cited above involving inverse con-
demnation, there was a "taking."  In <u>U. S. v. Gerlach Live
Stock Co.</u> (supra), Friant Dam of the federal Central Valley
Project stored, and diverted to other lands, flows of water
which the plaintiffs had long used on their downstream ripar-
ian land.  In <u>United States v. Causby</u> (1946) 328 U.S. 256,
the use of airspace directly over the plaintiff's chicken
ranch for airplane take-offs and landings at a Government
airbase, and the noise and glare therefrom made the ranch
unusable for raising poultry, and constituted a taking of an
easement over the plaintiff's land.  In <u>Portsmouth Co. v.
United States</u> (1922) 260 U.S. 327, the firing of large guns
of the United States over the plaintiff's land rendered the
land valueless as a summer resort.

In <u>United States v. Dickinson</u> (1947) 331 U.S. 745, a
federal dam raised the level of a river and flooded land be-
longing to the plaintiff.  Flooding of land, resulting from
navigation improvements, were involved in <u>United States v.
Cress</u> (1917) 243 U.S. 316, 328-329; <u>United States v. Lynah</u>

11448

1   (1903) 188 U.S. 445, 468, 469; and Pumpelly v. Green Bay
2   Company (1871) 80 U.S. 13 Wall), 166, 177.
3       No such situation is present in our case. No one has
4   been injured or interferred with in his property rights as
5   a result of the use of water on the government property or
6   the diversion of water by the government out of the watershed
7   but within the reservation confines.
8       We conclude that the United States has no water rights
9   based on inverse condemnation.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

-87-

FPI ATLANTA—4-10-58—25M—8589

4449

VIII

RULINGS ON MOTIONS

- - - -

DOES THIS COURT'S JURISDICTION OVER

THE "RES" REQUIRE DETERMINATION OF

PRIORITY OF APPLICATIONS, ETC. AND

DETERMINATION OF FALLBROOK'S LEGAL

AUTHORITY AND CAPACITY TO APPROPRIATE

WATER FOR IRRIGATION PURPOSES?

- - - -

A

UNITED STATES MOTION FOR SUMMARY JUDGMENT

The United States has moved for a summary judgment
against the Fallbrook Public Utility District, on the ground
that Fallbrook secured from Rancho Santa Margarita on July 20,
1932, a revocable license to divert from the river ten miner's
inches for the purpose of supplying the inhabitants of the
Fallbrook P.U.D. with water for domestic uses; that the
license was revoked by the United States on July 31, 1948;
that applications for municipal and domestic rights to the
use of water were applied for by Fallbrook in applications
#11586 and #11587, filed with the State of California on
October 11, 1946; that by its course of conduct, it is
evident that Fallbrook sought only water for municipal and
domestic purposes; that such activity was within the powers
conferred on it by Act of the California Legislature of 1921,
ch. 560; that claimed priorities or permits for the use of
water for the purpose of irrigation are null and void, being
ultra vires and beyond the power of the Fallbrook P.U.D.

A further ground for the motion seems to be the
contentions that the United States acquired the enclave
between January 1942 and January 1943, and secured exclusive

jurisdiction over the property; that direct flow rights from
the river have been exercised continuously since 1943 "with
the full power and authority by the Marine Corps officers;"
that large quantities of water have been diverted out of the
water shed by the United States; that the applications of
Fallbrook to the State of California for water rights were
made long after the diversions by the United States; that on
June 30, 1948, a right to appropriate water was filed by the
Navy with the State of California, application #12576; that
thereafter, on December 11, 1950, Fallbrook filed amended
application #11587 in which Fallbrook made application to
appropriate water "for Domestic, Municipal and Irrigation"
purposes; that no amendment has ever been made to application
#11586 to include irrigation uses, although an addition by
pen was made by a person unknown, inserting the word
"irrigation."

The motion further contends that domestic, municipal,
and irrigation uses are defined by California Administrative
Code, Title 23, sub-ch. 2, Art. 3, Sec. 664, 661 and 662,
respectively; that application #12178 filed November 28, 1947,
by Fallbrook concerning Rainbow Creek has been abandoned;
that application #12179 filed November 28, 1947, concerning
Sandia Creek has been abandoned; that Fallbrook, on July 28,
1952, amended or attempted to amend applications #12178 and
#12179, to seek water not only from the creeks named above
but from the river; that the attempted amendments and appli-
cations #12178 and #12179 have greatly enlarged the claims
of Fallbrook to the damage of the United States; that the
amendments constitute new applications and that their
priority is four years junior to the application #12576 filed
by the Navy.

A further ground for the motion is that Fallbrook

has not formulated plans for its alleged project, namely to
build a dam; that Fallbrook does not have the corporate
power to construct the dam or to operate and maintain a dis-
tribution system, is not authorized to finance and does not
have the financial capacity to undertake the dam.

The memorandum of the United States in support of
the motion relies upon California Public Utilities Code, Sec.
15701, providing that a public utility district may be
incorporated and managed in unincorporated territory, and
upon In Re Orosi Public Utility District, 196 Cal. 43, 55-56,
which referred to powers which might be exercised by entities
of the nature of Fallbrook, and enumerated them as "the
acquisition, construction and use of works for supplying the
inhabitants of the district with light, water, power, heat,
transportation, telephone service and other means of communi-
cation", and on the basis of State statutes and the case last
cited, the government contends that Fallbrook's acts in
seeking to appropriate water, are ultra vires.

It equates the legal status of Fallbrook to that of
a Municipality and relies on California Water Code, Sec. 1461
to the effect that "the application for or the granting of a
permit to any municipality to appropriate water does not
authorize the appropriation of any water for other than
municipal purposes."

In a memorandum filed June 30, 1958, it contends
that Fallbrook does not have the power to assess lands for
irrigation purposes, and that the financial feasibility of
the dam is a prime element in effecting an appropriation.

The government argues that upon filing of this quiet
title action in 1951, this court acquired jurisdiction over
the "res" which the government defines as "rights to the use
of water in the Santa Margarita river," and that therefore

4452

neither the State Water Rights Board or the Superior Court
may exercise any jurisdiction in connection with the res.

District courts have original jurisdiction of all
actions, suits or proceedings commenced by the United States,
28 USC Sec. 1345. There is no question of the power of this
court to adjudicate the vested rights on the river upon the
suit of the United States.

The government cites well recognized authorities
that full and complete relief in equity should be granted in
an action. It then contends that this court should (1)
determine the priority of rights to appropriate the unappro-
priated water of the river; (2) determine that Fallbrook's
applications, by reason of amendments, have become junior to
the application of the United States; (3) determine that
Fallbrook is acting ultra vires and does not have the power
or authority to appropriate water for irrigation purposes.

(1) Determining Priority Dates - Not
a Judicial Function.

The State Legislature has delegated to the State
Water Rights Board, an administrative agency of the State,
the quasi-legislative function of determining who shall be
permitted to acquire a right to appropriate unappropriated
water. This function in no way interfered with judicial
determination by a court of the vested rights that may exist
with respect to the rights of that water. The State Water
Rights Board, in its action, makes a determination subject to
existing vested rights.

The California cases are clear that determinations
on applications to appropriate unappropriated water do not
constitute a judicial function. In Tulare Water Co. v. State
Water Commission (1921) 187 Cal. 833, Chief Justice Shaw in
his concurring opinion, pointed out that the State Water

4453

Commission (a predecessor of the present State Water Rights
Board) could not constitutionally exercise judicial powers.
The Department of Public Works v. Superior Court, (1925)
197 Cal. 215, held that the Superior Court had no juris-
diction to entertain a petition for a review, in the nature
of certiorari, to review the action of the Department of
Public Works, acting through the State engineer, basing its
decision on the ground that the Department of Public Works
had no judicial power to exercise. (The Department of Public
Works and the State engineer, in the statutory set-up of the
state, succeeded the State Water Commission, and was likewise
the predecessor of the State Water Rights Board.)

This holding has been carried over into the follow-
ing cases:

Mojave River Irr. Dist. v. Superior Court (1927) 202
   Cal. 717;

Yuba River Power Co. v. Nevada Irr. Dist. (1929)  207
   Cal. 521;

Wood v. Pendola (1934) 1 Cal. 2d 435;

East Bay M. U. Dist. v. Dept. of Public Works (1934)
   1 Cal. 2d 476;

Fleming v. Bennett (1941) 18 Cal. 2d 518.

In Temescal Water Co. v. Department of Public Works
(1955) 44 Cal. 2d 90, The Supreme court of California
reviewed the cases and noted that in the Tulare Water Company
case (supra) the function of the State Water Commission was
described as "ministerial," and the East Bay case (supra),
where the court had treated the function of the Department
of Public Works, as "quasi legislative." The Temescal case
considered the statutory changes since Tulare and held that
the Department of Public Works in acting upon an application
to appropriate water, exercised discretionary functions in a

purely administrative capacity.  The Court said:

"In carrying out its present duty, the Department
exercises a broad discretion in determining whether
the issuance of a permit will best serve the public
interest. (Wat. Code, Sections 1253, 1255.)  That
determination requires an administrative adjudica-
tion, which, in any case in which the issuance of
a permit is protested, may be made only after a
hearing," (44 Cal. 2d at 100).

This District court exercises judicial power under
Art. 3, Sec. 2 of the United States Constitution.  It has no
power to perform quasi-legislative functions, the type of
function delegated by the State of California to the State
Water Rights Board.  The State legislature of California
possesses the power of determining how unappropriated waters
in the state shall be handled, and has delegated this part
of its legislative function to the State Water Rights Board.
It follows therefore, that taking into account the division
of the powers of the state and federal government in exer-
cising executive, legislative and judicial functions, that
the determination of whether to grant or deny an application
to appropriate unappropriated water under state law, is not
a judicial function, but a legislative and administrative
one.

(2)  A Judicial function is exercised in
reviewing the action of the Board

True, the State Water Rights Board may make an
incorrect decision, and thereafter judicial review by
mandamus may be available, but it does not follow that the
judicial function may be exercised before the State Water
Rights Board has exercised its quasi legislative function.
In the Temescal case, supra, (1955) 44 Cal. 2d at 106, the

court said:

". . . A judicial determination as to existing
appropriative and riparian rights rests upon the
present uses which may be quite different at a
later time, and a determination as to the future
availability of water necessarily can be only an
estimate.  A permit itself confers no appropriative
rights but fixes the priority of its recipient over
subsequent appropriators (Wat. Code, §§ 1450-1456);
it expressly provides that its issuance is subject
to vested rights.  If the department erroneously
concludes that unappropriated water is available
to supply an applicant when there is no reasonable
expectation of such a supply, the error may be
corrected upon a review of the determination.  But
a holding that such a danger is so imminent as to
justify an independent judicial proceeding to
determine the availability of unappropriated
water before the department considers an appli-
cation, would deprive the administrative proceeding
of all of its proper functions in the issuance of
a permit.  No such danger will be presumed."

The United States seems to argue that the Board, in
considering priority dates, and (after considering other factors)
arriving at a decision on an application, has exercised a
judicial function.  This is no more a binding judicial
determination of priorities than is the consideration of
vested rights, in finding whether unappropriated water
exists.

Until the application to appropriate is acted upon
by the State Water Rights Board favorably to the applicant,
and the issuance of a permit is directed, the applicant has

- 94 -

1   no property right of any kind as against the state.  He has

2   an inchoate, incipient, conditional right of procedural

3   priority over later applicants and before seeking judicial

4   relief, he must exhaust the administrative procedures

5   available before the State Water Rights Board.

6          (3)   Priority of filing is not the sole

7                factor required to be considered

8                by the Board

9          Even if we assume that the applicant had a

10  sufficient legal status prior to the issuance of a permit to

11  seek in a court, judicial determination as to the date of

12  his priority of filing, such a determination could not effect

13  the statutory discretion of the State Water Rights Board to

14  grant, deny or condition permits on applications pending

15  before it.  The priority of the application is only one

16  factor to be determined by the State Water Rights Board, and

17  it may exercise its discretion in determining whether a

18  permit will issue.  The Board's final determination in the

19  exercise of its quasi-legislative authority granted it by

20  the state, is not exercised solely on the basis of the date

21  of an application.

22          Moreover, the United States application has been

23  rejected and, under California law, rejected applications,

24  no matter how early their time priority, can be no basis for

25  an appropriative right (Calif. Water Code Sec. 1450).

26          The dates of the applications is but one of the

27  factors which the State Water Rights Board must consider in

28  deciding among competing applicants.  The law gives the

29  Board broad discretion to allow the appropriation of

30  unappropriated water "under such terms and conditions as in

31  its judgment will best develop, conserve, and utilize in the

32  public interest the water sought to be appropriated" (Calif.

Water Code sec. 1253) (emphasis added) and also "to reject
an application when in its judgment the proposed appropria-
tion would not best conserve the public interest" (Calif.
Water Code sec. 1255, (emphasis added).  See also Temescal
Water Co. v. Dept. of Public Works, (1955) 44 Cal. 2d 90,
99-100.  East Bay M. U. Dist. v. Dept. of Public Works, (1934),
1 Cal. 2d 476, 480-481, states: "Clearly, the manner in
        which the unappropriated waters of the streams of
        the state shall be distributed among the applicants
        therefor involves questions of policy, and the
        legislature, in the interest of the public
        welfare, may prescribe reasonable conditions
        and priorities in such distribution.  This is
        true even though the filing of an application
        would, under certain conditions, be a sufficient
        foundation for a justiciable issue as against
        some other claimant."

             (4)  Exhaustion of Administrative Requirement
                  before Judicial Review
             There has been no exhaustion of administrative
remedies until the State Water Rights Board proceedings have
been completed.  The requirement that administrative remedies
be exhausted before judicial review may be had, is firmly
entrenched in both State and Federal law, Yakus v. U. S.
(1944) 321 U. S. 414;  Temescal Water Co. v. Dept. of Public
Works, supra p. 106.  In the latter case the court cited and
quoted from Abelleira v. District Court of Appeal (1941),
17 Cal. 2d 280, 292, a leading California case, which in turn
contained numerous authorities in accord, from federal and
state cases.
             In Rank v. (Krug) United States (D.C., S.D.Cal.1956)
142 F.Supp. 1 at 179-181, Judge Hall reviewed the problem and

4458

concluded that, under the present California law, an appli-
cant to appropriate unappropriated water, was not entitled
to an independent judicial determination of priorities prior
to the ruling by the State Engineer (now the State Water
Rights Board), in granting or denying permits, and that the
administrative remedy must be exhausted before judicial
review of the decision might be had.

Should this court review the question of priority
dates and determine the relative dates of filing, and
determine that Fallbrook's amendments in substance consti-
tuted new applications, junior in time to the United States
applications, this would not be the end of the problem.  As
stated above the administrative procedures outlined by state
law, have not been pursued by the United States to their
conclusion, since the United States appeared specially at
the State Water Board hearing, questioned its jurisdiction
and in substance refused to participate or present any
evidence; and secondly, the finding of priority dates would
not prevent the State Water Rights Board from proceeding to
hear and rule on the applications, even though among the
factors to be considered was the time priorities of the
applications as found by this court under the assumption
above.

(5)   The Argument Re Jurisdiction over
the "Res" misses the mark.

True, this court has jurisdiction over the rights
on the River.  But that does not require that it undertake
a quasi-legislative function and create, as it were, or
allot new rights.  Until permit issues no such right exists.
When permits issue this court will then determine whether
there was surplus water, over and above the vested rights on
the River, against which the permit might be operative and

meaningful as constituting a "right."

This court is utterly without power to "issue permits" to appropriate water and any determination of priority dates would be an idle and useless act.

That there might be ostensible similarity between the proceedings in the district court to determine vested rights and the proceedings before the State Water Rights Board to determine who should be permitted to secure permits to appropriate unappropriated water, does not answer the problem. The two proceedings are essentially different, - different types of rights are involved.

The case of Pacific Live Stock v. Lewis, (1916) 241 U. S. 40, is pertinent to this problem. In that case there was pending in the district court two cases involving water rights. Subsequently, proceedings were initiated before the State Water Board of Oregon for the adjudication of the relative rights of claimants to the water. Under Oregon law, the Water Board dealt with both vested rights and applications to appropriate water. The plaintiffs in the actions pending in the district court sought to enjoin the state proceeding on the ground it invaded the jurisdiction of the United States courts. The district court dismissed the injunction suit and the United States Supreme court affirmed on the grounds that although there was a similarity between the court actions and the water board proceedings, in that they both concerned, in part, vested water rights, the objective and basic characters of the proceedings were different.

(6)  Collateral Attack Improper.

If the board has decided erroneously or without substantial evidence in approving Fallbrook's applications and rejecting that of the United States, judicial review is available to the United States upon exhaustion of its

administrative remedy and the filing of a petition for writ
of mandate under California Water Code section 1360 and
California Code of Civil Procedure section 1094.5, <u>Temescal</u>
<u>Water Co. v. Dept. of Public Works</u> (supra). But if the
board has acted within its jurisdiction, its decisions are
not subject to <u>collateral attack</u> as attempted here by the
United States, <u>Stockton v. Department of Employment</u> (1944),
25 Cal. 2d 264, 267-268.

   This District court does not intend to undertake a
quasi-legislative function and decide who is entitled to a
permit, or decide priority dates of applications to appro-
priate water, when a priority date is not determinative of
entitlement to a permit.

   (7) <u>Government's claim that Fallbrook is</u>
      <u>acting ultra vires is presently for</u>
      <u>State determination.</u>

   It follows from the foregoing discussion that the
question of whether Fallbrook P. U. D. has the power and
capacity to appropriate water and build the proposed dam is
presently a problem for state agencies. This question might
determine whether the permit should issue or the type and
extent of such permit, if issued. These issues have not
been determined by the State. Since the mandamus action to
review the Board's action means a trial de novo, State
action is not now final.

   If and when State action is final and Fallbrook
presents proof in this court of a permit to appropriate
water, then the problem of ultra vires may or may not be
appropriate for consideration by this court.

   It is presently no ground for summary judgment.

   The question of Fallbrook's financial ability to
build the dam, and the economical feasibility thereof

FPI LRO—11-3-56-25M-6737

4461

1   obviously present issues of fact which in any event cannot
2   be decided on the motion for summary judgment.
3          Many other questions of fact are presented by the
4   motion. The government's motion for summary judgment is
5   denied.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

VIII-B

<u>DEFENDANTS MOTIONS TO DISMISS AND TO</u>

<u>STRIKE CERTAIN COUNTS IN PLAINTIFF'S</u>

<u>AMENDED AND SUPPLEMENTAL COMPLAINT</u>

Various defendants have made motions to dismiss and/or
strike certain counts or portions of counts in the plaintiff's
amended and supplemental complaint.

Plaintiff's amended and supplemental complaint is
wierdly pleaded.  First the original complaint is set forth
at Count I in the new pleading.  Each additional count incor-
porates Count I and all succeeding counts and then purports
to allege new matter.

At the argument the court indicated there might be some
problem as to dismissing counts or striking paragraphs because
of the procedure of incorporating by reference outlined above.
However, on reflection the court concludes that if a particular
count contains nothing actionable in the way of a cause
except the incorporated material, the dismissal of the count
or the striking of it will not prejudice the United States,
since obviously the incorporated material appears in a previous
count.

Although various defendants have made motions directed to
various counts, all rulings made hereafter will be for the
benefit of all the parties.  If a count is dismissed or a
paragraph stricken on the motion of one party, it is out of
the complaint not only for the moving parties but all other
parties to this litigation.

4463

## COUNT II

The count alleges that in answering the original com-
plaint Fallbrook made no reference and no claims pursuant to
application #12178 and #12179 filed with the State of Cali-
fornia and the subject of the hearing and order before the
State Water Rights Board; and that by failing to assert
these claims in its answer they have been abandoned by Fall-
brook in this litigation and Fallbrook is precluded in this
case from asserting any rights based on those applications.

Fallbrook has moved to dismiss and to strike the count.

The motion to dismiss is granted for the reasons else-
where set forth in this memorandum, particularly in Part
VIII-A, when there was discussed the power and procedure of
the State Water Rights Board. See also the "Memorandum on
Remand" in Case #2147-SD-c.

## COUNT III

Count III alleges that when this action was filed in
1951, Fallbrook was making no claims to the use of water from
the main stream pursuant to applications #12178 and #12179;
that these applications were for use of water from Rainbow
Creek and Sandia Creek respectively; that since the filing
of this action Fallbrook on July 28, 1952, filed amended
application #12178.  Fallbrook now seeks 500 acre feet of
water annually from Rainbow and 9500 from Santa Margarita
River; and that by the amendment to application #12179 Fall-
brook seeks 1500 acre feet of water annually from Sandia and
8500 acre feet annually from the Santa Margarita River; that
Fallbrook has greatly and drastically increased its demand
from the Santa Margarita River.

Fallbrook has moved to dismiss and made a motion to
strike.  The motion to dismiss is granted for the reasons
set forth above in reference to Count II.

-102-

## COUNT IV

Count IV alleges that in connection with Fallbrook applications #12178 and #12179, Fallbrook has undertaken to condemn lands for a dam and reservoir in the Santa Margarita River upstream from Camp Pendleton, and to impound 32,000 acre feet of water annually; that this action has clouded the title of the United States to rights on the river and threatens to invade those rights.  Paragraph V of Count IV alleges that Fallbrook has abandoned applications #12178 and #12179 or if they have not been abandoned, that they have lost their priority to claims with a date earlier than July 28, 1952.

Fallbrook has moved to dismiss the count and to strike. The court grants the motion to strike paragraph V of Count IV, for the reason heretofore stated in connection with the motion to dismiss on Count II.  The motion to dismiss Count IV is denied, in that the issue allegations concerning a dam on the river is one which will raise issues for trial and the government obviously has rights on the river which would require protection in any decree from the operation of a dam upstream.

## COUNT V

Count V alleges that Fallbrook claimed no rights in the river at the time the United States acquired the Rancho or for many years after, but that Fallbrook held a revocable license dated July 20, 1932 from the Rancho as predecessor in interest of the United States, entitling it to receive a small amount of water; that four years after the acquisition by the United States of the Rancho, Fallbrook on October 11, 1946 filed application #11586 with the State of California to appropriate 2-1/2 cubic feet of water per second from the river; that the United States revoked the license on July 31, 1948 and that thereafter Fallbrook "greatly increased its

-103-

4465

diversion from the Santa Margarita River . . . diverting
waters which the United States of America is entitled . . . ."
The count further alleges in paragraph VI that defendant in
intervention, California, through the State Water Rights
Board on December 31, 1957, issued Fallbrook a license to
appropriate water, No. 4906 based upon application #11586;
and alleges in paragraph VII that California has undertaken
to change the status of the parties in this case by the
issuance of the license and has clouded the title of the
United States to the use of water in the river.

Fallbrook and the State of California have filed motions
to dismiss and Fallbrook has filed a motion to strike.

The motions to dismiss are denied because of the allega-
tion of diversion by Fallbrook of waters to which the United
States is entitled.  The motion to strike is granted as to
paragraphs VI and VII upon the same grounds as referred to in
the court's ruling on Count II herein.

<u>COUNT VI</u>

Count VI alleges that the defendant Santa Margarita
Mutual Water Company on August 3, 1951, after the institution
of this action amended its application #11578 and #12152;
that the said amendments envision an increase in the burden
on the river and change the applications as originally filed;
that the defendant Santa Margarita has clouded the title to
the rights of the United States to use the water and has lost
its originally claimed priority to appropriate water.

The State of California has moved to dismiss the count.
The motion to dismiss the count is granted upon the ground
set forth in the court's ruling on Count II above.

FPI ATLANTA—4-18-58—25M—3388

4466

## COUNT VII

Count VII alleges that Fallbrook and Santa Margarita
have failed to prosecute with due diligence their applications
to appropriate rights to the use of water and permits and
construction of their alleged projects and have lost their
claimed rights, through laches and are now estopped from
claiming such rights in this cause.

Fallbrook and the State of California made motions to
dismiss the count and Fallbrook has made a motion to strike.
The motions to dismiss are granted upon the grounds set forth
in the court's ruling on Count II.

## COUNT X

Count X alleges that California, through its State
Water Rights Board, held hearings over plaintiff's objections,
on Fallbrook's applications No. 12178 and 12179, and Santa
Margarita's applications No. 11578 and 12152, and the Board
submitted the matters; (the Board has since acted); that the
Board's determination as to whether surplus water exists,
puts in issue the right of every claimant on the River; and
that the Board has usurped this court's jurisdiction.

California and Fallbrook made motions to dismiss the
count and Fallbrook moved to strike it.

The motions to dismiss are granted on the same grounds
as stated heretofore as to Count II.

## COUNT XIII

Fallbrook has moved to strike Paragraph VI of the count
on the ground that the matter is redundant, immaterial and
impertinent.

The motion is granted.  Facts are not alleged.  The
paragraph is only argument.

## COUNT XIV

Fallbrook has moved to strike Count XIV on the ground that its contents are redundant, immaterial and impertinent.

The motion is granted. The court contains only a quotation from the circuit decision, (235 F 2d 647, 663).

## COUNT XXI

Count XXI alleges in Paragraph II that the United States and its predecessor in interest have exercised rights to the use of water in connection with the enclave, in excess of the prescriptive period and that the use and diversion of this water by the United States has been open, notorious, adverse, exclusive and under a claim of right against each and every defendant in this case.

In paragraph III of the count, the United States alleges diversion and use of water on Indian reservations, National Forests and Public Domain in excess of the prescriptive period and that such use and diversion has been of the character alleged in the preceding section.

Count XXI, therefore seeks in paragraph II to set up prescriptive rights at Camp Pendleton and in paragraph III prescriptive rights in connection with the upstream land of the United States consisting of public domain, National Forests and Indian land.

To this count, various parties, including the State of California and Fallbrook have filed motions to dismiss.

There is no express allegation that the United States or any one has ever <u>used the water on or connection with the said lands.</u>    Actual <u>use</u> of water for the prescriptive period in connection with specified lands is essential to the acquisition of a prescriptive water right.

<u>No. Calif. Power Co. v. Flood</u> (1921)

186 Cal. 301, 304

-106-

FPI ATLANTA—4-10-58—28M—3288

4468

<u>Moore v. Calif.-Oregon Power Co. (1943)</u>

22 Cal. 2d 725, 735-37.

However, in view of the incorporation by reference of the original complaint and each of the preceding counts, the allegation has undoubtedly been supplied and at least appears inferentially.  In any event if a cause of action is otherwise alleged and proved, the court will permit an amendment to conform to proof, after or during trial, as far as this **point** is concerned.

The motions to dismiss the count are denied for the reason that in paragraph III of the count, an upstream prescriptive use is alleged and this the government may be able to prove. The court on its own motion strikes paragraph II for the reasons set forth elsewhere in this memorandum in holding that a downstream user may not acquire prescriptive rights against an upstream owner.

Nothing in this ruling shall preclude the United States in attempting to prove, if it can, that some prescriptive right was acquired by the United States, in connection with waters released from the Vail Estate pursuant to the court decree. This matter has not been briefed or considered, and the pleadings are broad enough to permit the United States to claim this right, if by any chance it exists.

COUNT XXII

Count XXII deals with <u>appropriation</u> and alleges that the United States has since 1942 for beneficial purposes, in connection with the Military establishments in the enclave, appropriated and used under a claim of right, waters from the <u>surface and sub-surface flow of the River; that such use was</u> <u>an exercise of, and in excess of the exercise of, its riparian</u> <u>rights;</u> that certain water is used for Military and agricultural purposes both within and outside the watershed and the river.

4489

The United States further breaks down this claim as follows:

(a) A storage right for 4300 acre feet of water annually for Lake O'Neill, alleging that since 1883 the surface flow of the River has been and is diverted to fill and refill the lake.

(b) The right to divert from the surface or sub-surface flow of the River 4800 feet annually for use within and without the watershed with a priority of January 1, 1937; that the diversion and use of this water was commended by the Rancho (apparently on Jan. 1, 1937) and the United States has exercised the same use and rights since its acquisition of the enclave; that presently the waters are diverted by pumps from the basin underlying Camp Pendleton.

(c) A right to divert directly from the surface or sub-surface flow of the river 3200 acre feet of water annually; that since 1942 these waters have been diverted outside the watershed; that the predecessor in interest of the United States diverted and used within the watershed large quantities of water in excess of their riparian entitlement by means of pumping; that from the year 1910 the predecessor in interest of the United States diverted and used annually 3200 acre feet annually, if not more, and United States claims a right to that amount of water with a priority date of January 1, 1910.

Count XXII, various of the defendants, including California and Fallbrook, have filed motions to dismiss.

The count is not artfully drawn, in that it makes no segregation as to appropriative rights acquired under California law prior to Dec. 19, 1914 and rights alleged to have been acquired thereafter. In the previous portion of this memorandum, paragraph VII-H, where we discussed

-108-

4470

appropriative rights, we limited our discussion to alleged
appropriations occurring after December 19, 1914.  Our con-
clusions in that respect will not here be repeated.

<u>Alleged appropriative rights acquired</u>

<u>prior to December 19,1914</u>

(1) <u>Beneficial use</u>

It is contended by the defendants, Gibbon and Cattle
through their attorney, Geo. V. Grover, that "there is no
allegation that the waters claimed to have been diverted and
stored in Lake O'Neill were beneficially used or used at all
under appropriative procedure existing before 1914.  Actual
beneficial use was essential to the creation of an appropria-
tive right.  Mere storage is by no means the same thing,
<u>Bazet v. Nugget Bar Placers Inc.</u>, [1931] 211 Cal. 607-618."
We agree.  However, at the trial, the court will permit an
amendment to conform to proof if the government can show that
not only the waters were diverted and stored in Lake O'Neill
but were also beneficially used on specified land.

The contention that there is not an express allegation
that the <u>other uses</u> prior to 1914 in addition to the storage
right, were beneficial and were in fact used on specified
land will be treated by the court in the same manner and
amendment to conform to proof will be permitted if otherwise
proper.

(2) <u>Failure to allege - Continued use</u>

Fallbrook contends that there is not only no allegation
of the application of the water to a beneficial use but also
that there <u>is no allegation that the same use has continued</u>
<u>to the present time</u>, citing California Water Code, Sec. 1241
which provides, "<u>Reversion of unused water</u>.  When the person
entitled to the use of water fails to beneficially use all
or any part of the water. . . for the purpose for which it
was appropriated or adjudicated for a period of three years

4471

such unused water reverts to the public and shall be regarded as unappropriated public water."

The same rule was formerly stated in California Civil Code, Sec. 1411, and has been approved by case law, <u>Lindblom v. Round Valley Water Co.</u>, 178 Cal. 450; <u>Smith v. Hawkins</u>, 110 Cal. 122; <u>Akin v. Spencer</u>, 21 Cal. App. 2d 325; <u>Haight v. Costanich</u>, 184 Cal. 426.

The matter will be handled by amendment to conform to proof, if otherwise proper.

(3)  <u>Substituted Use of Water</u>

From paragraph III(c) of the count it appears the United States is claiming the right to substitute uses, alleging that from 1910 to 1942 the plaintiffs' predecessor diverted and used the water <u>within the watershed</u> and that since 1942 the plaintiff has diverted and used the water <u>outside the watershed.</u>

Fallbrook contends that if there was a valid appropriation existent from 1910 to 1942, the same has been forfeited and the water rights reverted to the public, by reason of the change in place and character of the use.

In this respect Fallbrook is in disagreement with the position of the State of California.  The State of California contends that if upon the acquisition of the Rancho the United States succeeded to a valid appropriative right which the Rancho had acquired by a non-statutory appropriation prior to 1914, United States may retain that right, even though the place of use and the purpose of use, were changed; that as long as there had not been a cessation of the use for the statutory period, as long as the same amounts of water continued to be diverted at the same times as originally, a change in the place of use or purpose of use would not result in a forfeiture or abandonment of the original right, citing

-110-

4472

California Water Code, Sec. 1706; that therefore if the appropriative right was acquired, by diversion and use of the water <u>within the watershed</u>, then the United States could change the place of use to a point <u>outside the watershed</u>. We are in accord with and hold with the contention of the State of California.

(4) <u>Appropriation versus Riparian Use</u>

Diversion and beneficial use by a riparian owner on his riparian land of even the entire flow of the stream to which his land is riparian during periods when the other riparians on the stream have no use for the water, are an exercise of his riparian right, <u>Rancho Santa Margarita v. Vail</u> (1938) 11 Cal. 2d 501, 555; <u>Joerger v. Mt. Shasta Power Corp.</u> (1932) 214 Cal. 630, 637; <u>Half Moon Bay Land Co. v. Cowell</u> (1916) 173 Cal. 543, 549, <u>Gould v. Eaton,</u> (1897) 117 Cal. 539, 543. That being so, such diversion and use cannot constitute the appropriation of water. While a riparian owner is not dis- qualified from being an appropriator also, the same use cannot be both an exercise of the riparian right and an appropriation.

This is essentially a question of fact to be determined at the time.

(5) <u>Use of Riparian Water</u>
<u>outside the Watershed</u>

In the sense that there is any assertion in Count XXII, of a right to use water outside the watershed by virtue of riparian rights, this matter has been disposed of by prior parts of this memorandum.

The motions to dismiss Count XXII are denied. At the trial the court will rule in accordance with this memorandum unless a contrary rule is required by controlling precedents

-111-

4473

## COUNT XXIV

Count XXIV alleges that June 30, 1948, application 12576 was filed with the State of California by one, Cochrane "United States Navy Department" describing the project for storing annually 165,000 acre feet of water; that the application was amended on December 13, 1948, seeking the annual use of 12,540 acre feet of water; that the application was amended on July 13, 1949 "For diversion to be stored temporarily and later applied to beneficial use, 165,000. . . acre feet per annum, to be collected between 1 October and 30 April of each season;" that the United States claims this storage right with priority of June 30, 1948, "to be exercised to the extent of its demands, not met by the other rights claimed by it . . ."  To this count the defendants Cottle and Halde have moved to dismiss.  The motion is granted for the same reason set forth under Count II.

Nothing in this ruling shall prejudice the United States to any rights arising under the Utt Bill, providing for a dam on the River.

## COUNT XXV

The count alleges that the claims of the United States exceed the supply of water in the River; that defendants assert adverse claims which cloud the title to the rights of the United States; that defendants invade and are threatening to invade the rights of the United States.

The balance of the counts, page 38 lines 15 to 24, allege that the State of California has asserted claims adverse to the United States; that the State of California has through its acts "drastically changed its status and the status of the parties since the institution of this action. . . ."

California has moved to dismiss. Lines 15 to 24 without

-112-

FPI ATLANTA—4-10-58—50M—8689

4474

1   question refer to the action of the State Water Rights Board.
2   We have held such matter is not here in issue.  The first part
3   of the count is typical of quiet title pleading and could well
4   have been set up in the first cause.
5        Accordingly the motion to dismiss is denied.  The court
6   sua sponte, strikes lines 15 to 24, page 38 from count XXV.

FPI ATLANTA—4-16-58—260—9268

4475

## FOOTNOTE ( 1 )

Act of July 26, 1866, Rev. Stat. §2339 (1875), 30 U.S.C.
§ 51 (1952); Act of July 9, 1870, Rev. Stat. §§2339, 2340
(1875), 43 U.S.C. §661 (1952); Desert Land Act of March 3,
1877, 19 Stat. 377, 43 U.S.C. §321 (1952); Section 18 of the
Act of March 3, 1891, 26 Stat. 1101, 43 U.S.C. §946 (1952);
Act of February 26, 1897, 29 Stat. 599, 43 U.S.C. §664 (1952);
Section 1 of the Act of June 4, 1897, 30 Stat. 36, 16 U.S.C.
§481 (1952); Section 8 of the Reclamation Act of June 17,
1902, 32 Stat. 390, 43 U.S.C. §§372, 383 (1952); Section 4
of the Act of February 1, 1905, 33 Stat. 628, 16 U.S.C. §524
(1952); Section 2 of the Act of February 21, 1911, 36 Stat.
926, 43 U.S.C. §524 (1952); Section 11 of the Act of December
19, 1913, 38 Stat. 242, 250; Sections 9(b), 41 Stat. 1068, 43
U.S.C. §802 (1952), and 27 of the Federal Power Act of June
10, 1920, 41 Stat. 1077, 16 U.S.C. §821 (1952); Section 18 of
the Boulder Canyon Project Act of December 21, 1928, 45 Stat.
1065, 43 U.S.C. §617q (1952); Section 14 of the Boulder
Canyon Project Adjustment Act, 54 Stat. 779 (1940), 43 U.S.C.
§618m (1952); Section 3 of the Taylor Grazing Act of June 28,
1934, 48 Stat. 1270, 43 U.S.C. §315b (1952); Water Conserva-
tion Act of 1939, 53 Stat. 1419, 16 U.S.C. §590z-1(b)(2)
(1952); Great Plains Water Conservation and Utilization Pro-
jects Act of October 14, 1940, 54 Stat. 1120, 16 U.S.C. §590z-
1(b)(2) (1952); Section 1 of the Flood Control Act of December
22, 1944, 58 Stat. 887, 33 U.S.C. §701-1 (1952); Reservation
(c) to the Mexican Water Treaty, U.S. Treaty Ser. No. 994, 59
Stat. 1219, 1265 (1945); National Parks Act of 1946, 60 Stat.
885, 16 U.S.C. §17j-2(g) (1952); Section 208 of the Act of
July 10, 1952, 66 Stat. 560, 43 U.S.C. §666 (1952); Subsection
3(e) of the Submerged Lands Act of May 22, 1953, 67 Stat. 30,
43 U.S.C. §1311(e) (Supp. IV, 1957); Subsection 3(c) of the

2476

Act of July 28, 1954, relating to the DeLuz Dam of the Santa
Margarita River, 68 Stat. 577; Section 4(b) of the Act of
July 23, 1955, 69 Stat. 368, 30 U.S.C. §612(b) (Supp.IV 1957);
Section 4 of the Act of July 2, 1956, relating to section 9,
subsection (d) and (e) of the Reclamation Act of 1939, 70
Stat. 483, 43 U.S.C. §485h-(4) (Supp. IV 1957); Section 7 of
the Colorado River Storage Project Act, 70 Stat. 109 (1956),
43 U.S.C. §620f (Supp.IV 1957).

Footnote Page -2-

4477

APPENDIX A

SUMMARY OF TESTIMONY OFFERED BY THE UNITED STATES AT
HEARING ON MAY 22, 1958, CONCERNING SURROUNDING CIRCUMSTANCES
AND INTENTIONS OF THE PARTIES AT THE TIME OF THE EXECUTION OF
THE STIPULATION OF NOVEMBER 29, 1951.

E. ABBOTT GOLDBERG, Deputy Attorney General, State of
California, testified as follows:  that his most recent water
case was the Ivanhoe case (Ivanhoe Irrigation District v.
McCracken, June 23, 1958, ___ U.S. ____), and that he was
associated in that case for the State of California with
Moscovitz.  That he had frequently seen Moscovitz since May,
1957.  He did not recall that they ever had an actual confer-
ence on the Fallbrook case, but in the course of a conversa-
tion with Moscovitz, he stated to Moscovitz that he disagreed
with the position Moscovitz was taking in the Fallbrook case.
That Goldberg brought to his superior's attention his views in
regard to California interpretation of the stipulation of
November 29, 1951; that he stated to Mr. Brown, Attorney
General, that in his opinion the stipulation was intended to
refer only to the quantity of water which the government was
entitled; and the question of the use of the word "paramount"
in the complaint.

The court at this point, (Mr. Luke) pointed out that so
far this testimony was only window dressing; that what the
witness subsequently told the Attorney General had no bearing
on the question of the situation at the time the stipulation
was entered.  Mr. Veeder agreed.  Mr. Goldberg was then ques-
tioned as to his recollection of the circumstances leading up
to the execution of the stipulation.  He thought he was at
Camp Pendleton once, in August of 1951 and viewed the proper-
ties.  Mr. Shaw was not present.  Some time in November Mr.
Shaw was put in charge of the Fallbrook case; that Goldberg

App. A-1

was aware of the use of water by the Marines at Camp Pendle-
ton." That there was discussion about the fact that the United
States was taking water out of the water shed and the State of
California was fully apprised of that fact (p. 1230) that he
does not recall whether, in the preparation of the pleadings
for the State of California, he raised the issue of the
necessity of the United States to comply with the laws of the
State of California. That there was a discussion as to whether
the United States had to make a filing with the State of
California before it diverted water out of the water shed.
which discussion took place in the office of the Attorney
General, Mr. Brown in Los Angeles; that Mr. Shaw and Mr. Brown
were present with Lawrence or Loren Wright representing the
Vail interests; that Mr. Veeder and Mr. Turnbull and Mr. Gold-
berg were present, "that there was a discussion as to the
meaning of the word 'sovereign'" and at this time the stipula-
tion of November 29th had not been drafted; that he has a
prior draft of the stipulation; that the discussion with
reference to the word "sovereign" came down to this, "that the
United States could act only in its sovereign capacity."
There was a discussion for the need of distinguishing between
the property interest of the United States on the one hand and
the right of the United States to deal with that interest once
it had acquired it." (p. 1236). That Mr. Veeder stated the
United States could acquire a property right similar to the
right a private person has, but once it deals with a property,
it acts only in a sovereign capacity. That the witness was
under the impression to start with, that the United States
could act either in a proprietary or a sovereign capacity
similar to the situation under State law. The meaning of
the parties who executed the stipulation was that the United
States could and did and does hold only as a sovereign in this

1   case. (p. 1237).   That there was no intimation by Mr. Veeder
2   that the United States would abandon any rights to the use of
3   water or that it would lose any rights to the use of water by
4   the execution of the stipulation of November 29, 1951; that it
5   was the position taken by Mr. Veeder that the United States
6   would not abandon its rights that resulted in the insertion of
7   the words "prescription and use"; that as to the matter of
8   compliance of the United States with State law in connection
9   with the diversion of water out of the water shed, the question
10  was left open as to whether the United States had a right to
11  take water out of the water shed.   That the United States did
12  not agree to file an application with the State of California
13  (p. 1230); that the use of the word "paramount" was important
14  in connection with placing a quantitative limit on what the
15  government was claiming.   There had been a sort of sinister
16  implication that the United States, by virtue of its sover-
17  eignty, was going to take the valid rights without paying for
18  them, so it became important to put a quantitative limit on
19  what the United States was claiming, and that was his under-
20  standing of what the purpose of the stipulation was. (p. 1237).
21      "We were aware that the United States was taking water
22  out of the water shed.   We were also under the impression at
23  that time -- I have been told that it has been changed since,
24  but we were under the impression at that time that the United
25  States was claiming only its riparian rights or the riparian
26  right that it had succeeded to when it acquired the Rancho,
27  and a question was, how are you going to put a quantitative
28  limit on those riparian rights?   That was my understanding of
29  the word 'measure,' that the riparian quantity would be
30  measured in accordance with the law of the State of California,
31  although the stipulation was not intended to settle the ques-
32  tion whether the United States had the right to take that

App. A-3

FPI ATLANTA—4-16-58—25M—8889

4480

1   riparian quantity out of the water shed or not. There were
2   two problems that were in our minds: (1) the effect of the
3   cession of jurisdiction, and (2) does anybody upstream have the
4   right to object to what the downstream riparian does within
5   the limits of the riparian quantity?  Those questions were
6   not intended to be precluded by the stipulation.

7        THE COURT:  In other words, then, the question of the
8   right of the Government to take the water after it got on the
9   enclave out of the watershed is not, in your opinion, fore-
10  closed or thereby foreclosed by the stipulation?

11       THE WITNESS:  That is right.  " . . .

12       "Q.  BY MR. VEEDER:  Now, Mr. Goldberg, in regard to the
13  question of the meaning of the word 'measure,' did you inter-
14  pret the word 'measured' to mean that even though the United
15  States was then diverting water outside of the water shed
16  that it would make a filing with the State of California and
17  thus initiate a right to appropriate water in accordance with
18  the laws and procedures of California?

19       A.  No.

20       MR. MOSKOVITZ:  I object to that question, your Honor.
21  The question was, 'Did you interpret...?'  I don't think his
22  interpretation is important.  I think that is certainly
23  irrelevant.

24       MR. VEEDER:  I certainly think the whole question of
25  calling Mr. Goldberg is to find what was the parties' inten-
26  tion and interpretation at the time that this matter was
27  signed.

28       THE COURT:  It is an immaterial matter.  That is not the
29  question you asked.  You asked the broad question how he in-
30  terpreted it.  You didn't say when and where.  If you want to
31  ask him prior to the time or at the time of the signing of
32  this what he thought the stipulation meant, what his intention

A-4

4481

1  was, why don't you ask him.  But as to these shotgun questions,

2  he may have given a dozen interpretations since the date that

3  this was signed.

4  　　　MR. VEEDER:  I will reframe it, your Honor.

5  　　　Q　When the word 'measured' was written into the stipu-

6  lation, Mr. Goldberg, was your understanding that it meant that

7  the United States of America, even though using water out of

8  the water shed, at that time would agree to make a filing with

9  the State of California so as to get a permit to divert that

10  water?

11  　　　MR. MOSKOVITZ:  Your Honor, I object again, and let me

12  explain a little more.  The unexpressed understandings of

13  parties to negotiations of an agreement have no relevance

14  whatsoever.

15  　　　THE COURT:  What was said, and what was done?

16  　　　MR. MOSKOVITZ:  What was said and what was done.  On that

17  basis I object to the question.

18  　　　THE COURT:  In other words, how would a man's secret in-

19  tention or secret interpretation have any bearing, unless he

20  did something to express it?

21  　　　MR. VEEDER:  Well, I think he did, but I will ask him

22  some more questions.

23  　　　Q　Mr. Goldberg, at the time of the execution of the

24  stipulation and the use of the word 'measure,' did you know

25  yourself that water was being diverted out of the water shed

26  of the Santa Margarita River by the United States of America?

27  　　　A　Yes.

28  　　　Q　Mr. Goldberg, did I ever at any time indicate that I

29  would recommend or that the United States of America would

30  make a filing in accordance with the laws of the State of

31  California to permit us to divert that water out of the water

32  shed?

App A-5

FPI ATLANTA—4-10-35—55M—3603

4482

1     A  No.

2     THE COURT:  In the same connection, let me ask now:

3  At that time, before the stipulation was signed, did you or

4  any officer of the State of California ever say to Mr. Veeder

5  that the Government had the absolute right to divert that

6  water out of the water shed without a filing?

7     THE WITNESS:  No.

8     THE COURT:  In other words, nothing was said either way

9  about it?

10    THE WITNESS:  That is right.  That is what I mean, your

11  Honor, when I say that those questions were not concluded by

12  this stipulation." . . .

13    Q BY MR. VEEDER:  Mr. Goldberg, on the date of the stipu-

14  lation, the day that the stipulation was entered into, and

15  prior to that date, do you recall any conversation with me in

16  regard to the necessity of making a filing with the State of

17  California?

18    A  Yes

19    Q  Before we could divert water out of the water shed?

20    A  Yes

21    Q  And would you state your recollection as to the state-

22  ments that I made on the day of the execution of the stipula-

23  tion and prior to that time, as to the question whether the

24  United States would make a filing with the State of California?

25    THE COURT:  Give us the foundation, first.  Where did the

26  conversation take place?  Who was present?" . . .

27    "Q BY MR. VEEDER:  On November 29, 1951, do you recall

28  the conversations in regard to the compliance with the State

29  law before water could be diverted out of the water shed?

30    A  I can't pinpoint to that day, Mr. Veeder.

31    THE COURT:  Do you recall any conversation where you can

32  tell us who was present and where it took place, where con-

App A-

1 thing was said about that, prior to the date of the signing.

2 THE WITNESS: Well, I had various conversations with

3 Mr. Veeder about that time -- I can't state with precision

4 whether it was prior to the date of the signing or shortly

5 after the signing, and the reason for my difficulty there is

6 that we had a hearing in San Diego on December 5, 1951, very

7 shortly after the stipulation was filed, and we discussed the

8 matter at that time and I can't disentangle in my mind whether

9 we talked about it then or talked about it before. But cer-

10 tainly the matter was discussed.

11 THE COURT: Do you remember who was present?

12 THE WITNESS: No.

13 THE COURT: What did you say and what did Mr. Veeder say?

14 THE WITNESS: I don't think I said much of anything.

15 Mr. Veeder said that he believed that the United States was

16 not required to file applications for permits to appropriate,

17 because the Water Code is a statute of a police character which

18 is not binding on the United States.

19 Q BY MR. VEEDER: In regard to the use of the word

20 'measured,' on the day that the stipulation was executed or at

21 the time immediately antecedent to that, do you recall that I

22 stated that when we used the word 'measured' it would mean that

23 we would make a filing with the State of California?" . . .

24 "THE WITNESS: The answer is no.

25 THE COURT: Did Mr. Veeder state, at that same time and

26 place, that he would not make a filing with the State of Califor-

27 nia?

28 THE WITNESS: He insisted on the right of the United

29 States to appropriate without a filing.

30 THE COURT: Did he say that he would not make a filing?

31 "THE WITNESS: Your Honor, I can't say that he used

32 those very words, but in substance it is, yes, that he said.

1   that the United States didn't have to file." . . .

2        THE COURT:  Who drafted this final stipulation?

3        THE WITNESS:  I think Mr. Shaw did, but again it was a

4   group effort.

5        THE COURT:  You mean that Mr. Veeder didn't?

6        THE WITNESS:  No, my recollection is that the principal

7   draftsman was Mr. Shaw." . . .

8        "THE COURT:  It was a joint effort; you all had a hand

9   in it?  Is that right?

10       THE WITNESS:  Yes, sir." . . .

11       "Q  BY MR. VEEDER:  Mr. Goldberg, at the time when the

12  stipulation was executed, was there any statement by Counsel

13  for the United States that it would stipulate to comply with

14  the laws of the State of California?

15       A  No.

16       Q  And was there ever a statement by anyone with whom

17  you dealt in connection with this stipulation and on the day

18  that the stipulation was executed that the United States would

19  comply with the laws of the State of California?

20       A  As I recall, Mr. Veeder -- this is based again on

21  this prior draft.  We had an initial version or an earlier

22  version -- I don't know whether it was the initial one, but

23  we had an earlier version that stated that such rights, that

24  is, the rights to which the United States was laying claim,

25  that such rights are defined and measured in accordance with

26  the law of the State of California, and at your insistence

27  the word 'defined' was stricken and we were left with the word

28  'measured' alone, which I think you related to the question of

29  beneficial use -- that you had acquired the rights that the

30  law of California grants to water right unless the water is

31  put to use beneficially, and that you were referring to the

32  law of California in that sense." . . .

App A-8

FPI ATLANTA—4-16-58—10M—8888

4485

CROSS EXAM

1
2  "Q. Can you explain what the word 'measure' referred to

3  with respect to the variety of rights that were being discussed

4  at that time?" . . .

5  "THE WITNESS:  Well, as far as we were aware what riparian

6  rights were, yes, the riparian rights and also the fact that

7  the water is being taken out of the watershed, the word

8  'measured,' I thought, was used to cover two situations; as to

9  the riparian rights, that the quantity necessary for those

10  riparian rights would be determined by determing the riparian

11  land which the Government had acquired and determining the

12  uses on those riparian lands; and with regard to other rights

13  that the quantity would be determined by the amounts that had

14  been applied to beneficial use.

15  Q  BY MR. MOSKOVITZ:  Was there discussion in connection

16  with the use of the word 'measured,' on riparian rights as to

17  where the quantity of water to which those riparian rights per-

18  tained would be used?" . . .

19  "A  Yes, there was discussion about it, and the stipula-

20  tion was intended to be drafted so that the question of the

21  Government's right to take the riparian water out of the water

22  shed was not concluded by the stipulation; that all the stip-

23  ulation did was define the quantity but did not relate to the

24  Government's right to deal with that quantity.

25  Q  Did the United States' representatives assert that a

26  claim of right to take that riparian water and use it outside

27  of the water shed?

28  A  Yes

29  "MR. MOSKOVITZ:  Now, let me see if I understand this.

30  When you gentlemen were sitting around the table before this

31  stipulation was signed, did you talk about the fact that

32  California law on the law of riparian rights would probably

App. A-9

4486

1    control this lawsuit?

2      THE WITNESS: We talked about the problem, your Honor,

3 of (1) defining the United States' property interest and (2)

4 what we thought to be a different problem. I find it necessary

5 to say that I'm not trying to argue the merits of this thing.

6 I'm simply trying to recall what we were talking about then.

7 We had in mind two different things: (1) the property which

8 the United States had acquired, the quantum -- that is to what

9 the stipulation referred, and (2) the United States' right to

10 deal with that quantity, take it out of the watershed, speci-

11 fically, and that is what the stipulation did not refer to --

12 that was the question that was left open.

13      THE COURT: In other words -- this may be an improper

14 question and nobody can object -- it is your recollection

15 that the purpose of the stipulation at its execution was not

16 to foreclose the United States on a contention that it might

17 still take this water out of the watershed?

18      THE WITNESS: That is right.

19      THE COURT: That was left open?

20      THE WITNESS: Yes

21      THE COURT: Did representatives of the State of Califor-

22 nia say that it was clear that the Government had a right to

23 take this water out of the water shed?

24      THE WITNESS: No, we didn't say it was clear that they

25 had a right to do it. That was a question.

26      THE COURT: In other words, it was just a problem?

27      THE WITNESS: Yes

28      THE COURT: And it was left open?

29      THE WITNESS: Yes

30      Your Honor, if I may, we have actually a contemporaneous

31 memorandum of what this was about in the hearing which was

32 held on December 3, 1951, and I asked the Clerk to bring that

App. A-10

1  transcript here.  I have gone through it this morning, and for

2  whatever it may be worth, there are statements in there as to

3  what this stipulation meant.

4       THE COURT:  Is the transcript here?

5       THE WITNESS:  Yes

6       (The clerk hands a document to the Court)

7       THE COURT:  Well, it is 97 pages.  It was a hearing held

8  on December 3, 1951.  Is there any objection, for what it is

9  worth, to having it in the record?

10       MR. VEEDER:  No, your Honor.

11       MR. MOSKOVITZ:  Not at all, your Honor.

12       THE COURT:  Nothing could be added to or detracted from

13 it now.

14       MR. VEEDER:  I'm in favor of it.  I hope that I argued

15 vehemently on the matter.

16       THE COURT:  Is this part of the files in this case now?

17       THE WITNESS:  I think it is.  I acquired it from the

18 Clerk.

19       THE CLERK:  Yes, it is on file downstairs, your Honor.

20       THE COURT:  Well, incorporate by reference the transcript

21 of proceedings held on December 3, 1951." . .

APPENDIX B

STATEMENT BY VEEDER AND GOLDBERG AT HEARING ON DECEMBER 3, 1951, FIVE DAYS AFTER THE EXECUTION OF THE STIPULATION OF NOVEMBER 29, 1951.

"MR. VEEDER:  We think that the question of exclusive jurisdiction is of extreme importance.  We stated to your Honor and agreed in our earlier arguments that we do not claim the cession of jurisdiction gave us any more water than we bought and paid for, with the Rancho Santa Margarita.  It is of extreme importance as to whether the State police power would regulate the place of use, means of use and similar questions.  Those have been resolved by the stipulation." . .

". . . they (the defendants) alone seek to take from the water shed of the Santa Margarita the waters which the United States asserts it bought and paid for" . . .

"MR. GOLDBERG:  As we understand the issue on the question of exclusive jurisdiction, it comes down to this.  We have two questions here:  1, the quantity of water and, 2, the right to use that water after it hits the military reservation.  By the stipulation the first question as to the quantity of water is settled.  The government will obtain that quantity measured in accordance with State law."

"The next question is that quantity which it avers is a riparian user is that limited to use on riparian lands and what is the effect of the cession of exclusive jurisdiction on that limitation which would otherwise exist."

"I am not prepared now to express an opinion on that question but, as I understand it, that is the question we will settle by a trial on the issue of exclusive jurisdiction."

. . .

"Mr. Ewing then commented on the stipulation and the word "consumed" in the presence of Mr. Veeder and Mr. Goldberg.

App B-41.

4489

"It (the stipulation) says measured.  It doesn't

to take a tape measure.  It means restricted, controlled,

denied, in accordance with the laws of the State of California,

if it means anything." . . . .

Mr. Veeder in rebuttal, made no comment on about the

word "measured".

"MR. VEEDER:  There is no question there but that the

Attorney General of the State of California and Arvin Shaw,

his chief assistant, agreed completely to this stipulation

and by which there was laid to rest every question with the

State of California but the question of the threat and the

effect of exclusive jurisdiction."

"The question as to why this is important to have the

question of exclusive jurisdiction tried out is to determine

the effect of a sovereign, the United States, having complete

exclusive control over the water once that it passes into the

boundaries of Camp Pendleton.

"THE COURT:  What do you mean by "control"?

"MR. VEEDER:  By that we mean the commandant of the

Marine Corps, who is running Camp Pendleton, is not subject

to control by the State Engineer.  We say that and it is

highly important.  The change of places of use must go on at

all times in the administration of the Camp.  (I should say

officially subject to the control of the State Engineer) (?)

It is a matter of great significance and it is the background

upon which we must consider the entire matter."

"THE COURT:  What does it have to do with the extent of

the water rights?"

"MR. VEEDER:  We say, your Honor, it has nothing to do

with the extent of the water rights but it is certainly true

App. E-2

449(

1   that in the administration of the water rights, and we are

2   seeking a decree here to delineate our powers, we must know

3   whether the State police power and State Engineer have control

4   over us. We state that the Fifth Amendment protects every

5   single water right user on that stream against an enlarged use.

6   We bought and paid for certain water rights in May and they

7   are those we bought and paid for.  How do we use them, is the

8   next thing.

9       "THE COURT:  How do you reconcile that situation with the

10   stipulation you entered into?"

11      "MR. VEEDER:  We entered into the stipulation which re-

12   flects only in so far as the question of the quantities of

13   water is concerned.  The measure of our rights is measured by

14   the laws of California.  Suppose we went out and bought forty

15   acres of land.  The characteristics of the rights we bought to

16   that land would be governed by the laws of the jurisdiction

17   in which that property was situated but I submit that in re-

18   gard to the use of that land the United States is free from

19   control.  We cannot put a greater burden on the stream or

20   take anything from any individual but we are not subject to

21   police control in the use of that water." . . .

22      Mr. Veeder then quotes Mr. Swing and proceeds with his

23   argument.  Mr. Swing had stated - -

24      "Once the corpus of the water passes into the boundaries

25   of the Rancho Santa Margarita, the corpus can be done with as

26   they please but the corpus arriving inside of the government's

27   possession is one thing and the use of the right to go 12

28   dirty miles down the stream is something entirely different."

29      MR. VEEDER:  "We agree.  But there is a proposition there

30   and it is highly important to us.  It is not that we can go

31   up the stream and make any demand above and beyond what we

32   bought and paid for but it is very important to us by the

App. B-3

4491

1    water can be used.  And we assert that the fact that there
2    has been a cession of exclusive jurisdiction in the use of
3    that water --" . . .
4         "MR. VEEDER:  The cession of exclusive jurisdiction
5    couldn't possibly convey to us any rights.  It does have the
6    effect of administering the water." . . .
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

App. B&H
FPI ATLANTA—4-18-58—158—8163

4492