J. LEE RANKIN
SOLICITOR GENERAL
OF THE UNITED STATES
Washington 25, D. C.

Attorney for the UNITED STATES OF AMERICA

*Nunc Pro Tunc*
*April 22, 1958*

**FILED**

AUG 2 1958

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _William W. Luddy_
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA, )
          Plaintiff, )
    v. )   NO. 1247-SD-C
FALLBROOK PUBLIC UTILITY DISTRICT, )   INTERROGATORIES
ET AL., )   TO BE ANSWERED BY
          Defendants. )   FALLBROOK PUBLIC UTILITY DISTRICT

    The United States of America, Plaintiff, requests that the Fallbrook Public Utility District answer under oath, in accordance with the Federal Rules of Civil Procedure, Rule 33, the following interrogatories:

    1. What is the date when the Fallbrook Public Utility District proposes to undertake construction of the dam it allegedly intends to build? Hereafter reference to the "dam" will relate to the dam the Fallbrook Public Utility District purportedly intends to build at the point on the Santa Margarita River referred to as the Fallbrook Lippincott site.

    2. What provisions have been made to bypass the quantities of water to which the United States of America is entitled to have flow to it from the main channel of the Santa Margarita River?

    In that regard describe in detail the plans for the releases of water to the United States of America:

        a. During the period from April 1 to October 1 of each year?

        b. During the period from October 1 to April 1 of each year?

In responding to this interrogatory please provide the desired information

- 1 -

4527

as to (a) surface flow; (b) sub-surface flow.

3. What, in precise terms, are the dimensions of the structures to be built in connection with the dam, to deliver the surface flow of the Santa Margarita River to these downstream military establishments of the United States of America:

    a. Camp Pendleton?
    b. United States Naval Ammunition Depot?
    c. United States Naval Hospital?

Please answer the same question in regard to agricultural uses?

4. Please provide the same information requested in Interrogatory No. 3 above with regard to the sub-surface flow of the Santa Margarita River?

5. What is the maximum carrying capacity in cubic feet per second of each of the structures referred to in Interrogatories Nos. 3 and 4 above to be utilized to deliver surface and sub-surface flow to the United States of America?

6. In determining the dimensions of the structures for bypassing water to the military establishments in question, what were the maximum demands allowed for:

    a. Camp Pendleton?
    b. United States Naval Ammunition Depot?
    c. United States Naval Hospital?
    d. Agricultural uses?

7. In planning the alleged dam what were the maximum annual quantities of water in acre-feet that the Fallbrook Public Utility District determined the United States of America is entitled to receive from the Santa Margarita River? What were the criteria used in making that determination?

8. What, in precise terms, are the design of and method for the operation of the controls for releasing to the United States of America the waters to which it is entitled in the Santa Margarita River?

9. How will water be delivered to the military establishments during the period of construction of the alleged dam?

1  10. What quantities of water will be delivered to the military
2  establishments of the United States of America referred to in Interrogatory
3  No. 6 above during construction of the alleged dam:
4      a. For the period from April 1 to October 1 of each year?
5      b. For the period from October 1 to April 1 of each year?
6  11. What were the criteria used by the Fallbrook Public Utility
7  District in determining the quantities of water to be delivered during the
8  period of construction of the alleged dam to the military establishments
9  referred to in Interrogatory No. 6 above?
10  12. Has the Fallbrook Public Utility District a permit to construct
11  the alleged dam?
12      a. If so, when did it receive the permit?
13  Please submit a certified copy of the permit.
14      b. If not, why not, and what steps have been taken
15  to secure a permit to construct? When is its issuance
16  anticipated?
17  13. What is the alleged dam to cost?
18  14. How is the alleged dam to be financed?
19  15. a. What will it cost the Fallbrook Public Utility District to
20  deliver an acre-foot of water from the dam into its delivery system?
21      b. To the farthest point of delivery within the Utility District?
22      c. What is the average cost annually to deliver an acre-foot
23  of water to the water users within the service area of the Fallbrook Public
24  Utility District?
25  16. State in specific terms the methods used in determining the
26  net safe yield of the alleged dam?
27      a. Set forth the actual computations in acre-feet which
28  were utilized in arriving at the annual net safe yield of
29  the alleged reservoir?
30      b. State the area taken into consideration within
31  the watershed of the Santa Margarita River in arriving at
32  the annual net safe yield of the alleged reservoir?

4529

- 3 -

  c. State specifically each and every major factor relied upon in reaching that determination?

17. In responding to Interrogatory No. 15 please specify the:

  a. Annual cost per acre-foot of net safe yield to amortize the capital cost for construction of the alleged dam and reservoir?

  b. Annual costs per acre-foot of the operation and maintenance of the alleged dam and reservoir?

  c. Cost per acre-foot to pump the water out of the alleged reservoir or the bed of the Santa Margarita River whichever is the point at which the water is to be diverted?

  d. Annual costs per acre-foot to amortize the construction costs of the delivery system, and the annual costs for operation and maintenance of that system?

18. What would be the annual cost per acre-foot delivered to users from the alleged reservoir, assuming that the quantity of water available for use in the alleged reservoir were:

  a. 90% of the estimated annual net safe yield?

  b. 75% of the estimated annual net safe yield?

  c. 50% of the estimated annual net safe yield?

  d. 25% of the estimated annual net safe yield?

19. Will the cost to the water users of the Fallbrook Public Utility District be the same as the actual cost to the District to impound in the alleged dam and pump from it?

20.  a. Did the calculations of the Fallbrook Public Utility District respecting annual net safe yield take into consideration that "under optimum operating conditions the reservoir may at times be emptied * * *"?

  b. (i) If so, what is the frequency of years when the alleged reservoir "may * * * be emptied"?

   (ii) What then is the annual cost per acre-foot of water delivered at the place of use?

- 4 -

4530

21. What is the general bonding capacity of the Fallbrook Public Utility District?

22. Have bonds been authorized by the qualified voters of the Fallbrook Public Utility District to construct the alleged dam? If so, when? If not, when is such an election to be held?

If an election is to be held to secure authorization to issue bonds what is the total sum of the bonded indebtedness for which authorization is to be sought?

23. If financing in whole or in part is to be based upon revenue bonds, state the sum of the funds from that source to be utilized?

24.   a.   When did the Stone and Youngberg investment company declare it would recommend buying the Fallbrook Public Utility District bonds and approving the bonds for purchase?

b. Did the investment company make its declaration in regard to general obligation bonds or revenue bonds?

c. Please submit the document or documents setting forth the declaration by the Stone and Youngberg investment company that it would recommend buying the Fallbrook Public Utility District bonds for purchase?

d. What information was submitted to the Stone and Youngberg investment company which gave rise to the investment company's statement that it would recommend buying the bonds of the Fallbrook Public Utility District?

In that regard:

i. What was the kind and type of irrigation system the Fallbrook Public Utility District described to the investment company of Stone and Youngberg?

ii. What were the sources of income to the Fallbrook Public Utility District:

(a) Revenue from the sale of water?
If so, what was the calculated revenue to be derived from that source?

    (b) Revenue from the collection of assessments against the lands within the Utility District? If so, what was the calculated revenue to be derived from that source?

25. Respecting the lands within the Utility District, what are the present outstanding assessments against each acre of land? For what were the assessments levied?

26. Assuming the alleged dam is to be constructed, what will be the total assessments levied against the lands presently within the Utility District and subject to assessments? How many acres may be assessed?

27. Over what term of years are the present assessments outstanding against the lands to be amortized?

28. Which, if any, of the assessments are perpetual in character? If there are assessments of that character, state the amount for each acre of land assessed?

29. From the standpoint of the ability of the lands economically to bear the added assessments, what studies have been conducted to determine the maximum assessments which may be levied? In responding to this Interrogatory please state the person or firm who made the investigation and provide the results of it?

30. What were the factors taken into consideration in determining that the lands subject to assessment could bear the costs of construction of the alleged dam, distribution system, operation and maintenance?

31. When the lands have been assessed to finance the alleged dam what will be the total assessment outstanding against each acre of assessable lands for costs of constructing:

  a. The alleged dam?

  b. The distribution system?

State the estimated assessments for operation and maintenance when the project is fully developed?

32. What are the restrictions upon the Fallbrook Public Utility District, if any, in regard to the issuance of revenue bonds?

4532

- 6 -

33. If revenue bonds are to be used, what sources of income will be used to discharge or amortize them?

(Succeeding questions contemplate issuance of revenue bonds)

34. What are the estimated revenues to the Utility District which will be available to discharge those bonds? How were those estimated revenues calculated? Who made the calculations? Please supply a copy of the study or report upon which the calculations were made?

35. What assessments or charges or both, collected during the fiscal year 1957-1958, are available to discharge revenue bonds issued for the purpose of constructing the alleged dam?

36. What will be the increase in assessments against each assessable acre within the District, or charges for water, or both, which must be made or levied to discharge the revenue bonds issued for the purpose of paying the construction costs of the alleged dam?

37. How was it determined that the majority of people situated in a 3,000-acre area north of the Utility District "desire annexation thereto"?

38. When is it planned to have the lands annexed to the Utility District?

39. What steps have been taken to annex the lands?

40. What are the names of the owners of the lands comprising the 3,000 acres, the total acreage of each, and how have they evinced their desire to have their lands annexed?

41. What will be the assessments levied per acre, based upon the general obligation bonding capacity of the Utility District, against the alleged three thousand acres of which the majority of the owners are desirous of annexation? In responding to that Interrogatory please refer to the studies or investigations which have been made, state who made them and under whose direction they were made? Please supply a copy of the studies or investigations?

42. What income to the Utility District will be derived from the delivery of water to the 3,000 acres of land referred to in the Interrogatories immediately preceding?

4533

- 7 -

43. Will revenue bonds be issued based upon income to the Utility District from the alleged 3,000 acres? If so, in what sum? How was it determined?

44. When will water from the alleged dam first be delivered to lands within the present service area of the Fallbrook Public Utility District? In what amount? How much water must be impounded before deliveries are made?

45. When will water first be delivered to the alleged 3,000 acres the majority of owners of which purportedly desire to have their lands annexed to the District?

46. What acreage within the service area of the Fallbrook Public Utility District is presently or will be planted to

    a. Avocados?   b. Citrus fruit?  and c. Other crops?

      i. Of those acreages what percentage is in mature trees which are now producing?

      ii. Of those acreages what percentage is in trees which are not yet producing?

      iii. What acreage is not yet planted but which will be planted?

Please answer separately to each type of trees and crops.

47. What acreage with mature trees within the Utility District receives no water from the Fallbrook Public Utility District? What is the source of water: Private wells? Other sources?

48. Answer the same questions set forth in Interrogatory No. 47, as to lands upon which trees are planted but not yet matured? Lands being prepared for planting?

49. What is the total acreage within the service area of the Fallbrook Public Utility District which is not in profitable production? Waste land; streets; highways; buildings, for which water is not required?

50. How many acres of land within the service area of the Fallbrook Public Utility District will actually receive water from the alleged dam?

51. Answer the questions set forth in Interrogatories Nos. 46, 47, 48 and 49 in regard to the 3,000 acres of land allegedly to be annexed?

4534

- 8 -

52. Has the Fallbrook Public Utility District contracted for the construction of the dam?

53. Who designed the dam? Are the plans and specifications available for examination? If so, where are they and when may they be examined?

54. Has the Fallbrook Public Utility District done any actual work of construction on the dam? If so, describe it in detail and the plans pursuant to which the work was done?

55. Describe in detail the type of work which the Fallbrook Public Utility District will commence "within a matter of days"? Where will this work be done, describing the land by the smallest legal subdivision?

56. Who has title to the land upon which the Utility District will commence construction within "a matter of days"?

57. How many yards of earth will be required to construct the proposed dam? From what source will it come?

Has access to it been obtained? If so, from whom?

What will the cost per yard be for the construction of the dam?

What is the total cost of the earth in place in the dam?

58. How many man hours will be required to construct the dam? What will be the aggregate cost for labor? Has the labor been hired to do the work?

59. What equipment will be used? What is the total cost for the equipment that will be used? Who will operate it?

60. Describe the impervious core of the alleged dam? What is the source of the material to be used? What type of material will be used? Has access been obtained for it? How many yards of impervious material will be used? What will it cost per yard in the dam?

61. Please give full statistical data in regard to the exact location of the impervious core in the bed of the Santa Margarita River?

62. What preparation will be required before the impervious core may be in place? How much material will be stripped? How much rock and loose material removed? What will be the cost of the preparatory work?

63. Describe in detail the kind and type of earth and rock which is now in place and must be removed before the dam may be built?

64. If an impervious core is not to be used, state in detail

    a. The plans;

    b. The precautions taken to prevent a flooding of the downstream military installations of the United States of America?

65. What material will be used on the upstream face of the dam? If it is to be riprapped describe the type of work which will be done?

What is the source of rock for the riprapping?

Has access to the riprapping rock been obtained?

What is the cost of the riprapping?

66. What are the means of compaction of the pervious and impervious sections of the dam? What is the cost of the compaction?

67. What is the carrying capacity of the spillway? Describe its design? What will it cost?

68. When in the year 1932 the Rancho Santa Margarita first accorded to the Fallbrook Public Utility District the privilege of diverting a small quantity of water from the Santa Margarita River, did the Utility District claim a legal right to the use of water in the stream?

69. What were the size of the pump and the carrying capacity of the pipe through which the Fallbrook Public Utility District first diverted water from the Santa Margarita River pursuant to the gratuitous and revocable license accorded to it by the Rancho Santa Margarita?

70. State by years the quantities of water diverted from the Santa Margarita River by the Fallbrook Public Utility District with the pump and pipe originally installed?

71. When did the Fallbrook Public Utility District first divert water in excess of the limitation of 10 miner's inches spelled out in the gratuitous and revocable license accorded to it by the Rancho Santa Margarita?

State by years the number of acre-feet diverted subsequent to the first year the Fallbrook Public Utility District diverted water from the

Santa Margarita River in excess of the 10 miner's inches prescribed in the gratuitous and revocable license accorded to the Fallbrook Public Utility District by the Rancho Santa Margarita?

72. What is the present size of the pump or pumps and the carrying capacity of the pipe through which the Fallbrook Public Utility District is now diverting water from the Santa Margarita River?

73. What are the quantities of water diverted annually by the Fallbrook Public Utility District from the Santa Margarita River since the United States of America revoked on July 30, 1948, the gratuitous and revocable license accorded the Utility District by the Rancho Santa Margarita.

74. What is the present entitlement of the Fallbrook Public Utility District to Colorado River water?

75. Is it possible for the Fallbrook Public Utility District to receive a supply of water from the Colorado River which will meet its needs? What steps have been taken in that regard?

76. What are the estimated costs per acre-foot to the Fallbrook Public Utility District of water:

    a. From the Colorado River?

    b. From the Santa Margarita River, taking into consideration the costs of construction, operation and maintenance of the project required to impound and divert that water?

77. How do the costs of delivering Colorado River water compare with the costs of delivering Santa Margarita River water from the alleged dam the Fallbrook Public Utility District asserts it intends to build?

The United States of America reserves the right to serve such further and additional interrogatories as it may deem essential, all as agreed among the parties.

UNITED STATES OF AMERICA

Dated: April 21, 1958

s/ J. Lee Rankin
J. LEE RANKIN,
Solicitor General

s/ William H Veeder
WILLIAM H. VEEDER,
Attorney, Department of Justice

- 11 -

4537