LAW OFFICES
SACHSE AND PRICE
1092 South Main Street
FALLBROOK, CALIFORNIA
RANDOLPH 8-1154

(SPACE BELOW FOR FILING STAMP ONLY)



F I L E D

JAN 13 1959

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
          Deputy Clerk

Attorneys for____Defendants_____

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA, )
         Plaintiff, )   No. 1247-SD-C
vs. ) MEMORANDUM AS TO PROPOSED
) FINDINGS ON GEOLOGY
FALLBROOK PUBLIC UTILITY DISTRICT, )
ET AL., )
         Defendants. )

There is submitted herewith Memorandum as to Proposed Findings on Geology. This Memorandum is based upon the present state of the record, and is subject to modification in the event additional evidence is offered.

1. <u>Definitions</u>.

    a. Permeability is the rate of flow of water through a deposit expressed in gallons per minute. It is distinct from the amount of water contained in a deposit. The permeability of a deposit in a vertical direction is usually different from its permeability in a horizontal direction.

    b. Transmissibility is the quantity of water that will be transmitted through a saturated thickness of aquifer one foot in width, expressed in gallons per day.

    c. Specific yield is the quantity of water that will drain by gravity from a unit volume of material. It is expressed as a percentage, for example, if one cubic foot of saturated

material drained by gravity yields 1/10 cubic foot of water, the specific yield of the material is 10%. It should be noted that the _rate_ at which the material drains is not a factor in specific yield.

   d. Specific capacity (of a well) is the quantity of water pumped per foot of draw-down. A well yielding 50 gallons per minute with a 10 foot draw-down has a specific capacity of 5.

   e. What is a basin or storage unit?

   For the purposes of these proceedings a basin or storage unit is an area of land overlying water bearing materials, the extraction of water from which results in a material effect on the surface run-off within the watershed in which the basin or storage unit is located.

 2. The major faults:

  a. Location:

   For the purposes of these proceedings, the only faults having any significance are the Wildomar Fault and the Elsinore (Willard) Fault, which lie respectively northeast and southwest of Murietta and Wolf Valleys. The other faults that have been referred to in the testimony to date have not as yet been shown to have any material effect upon surface or ground water movement.

  b. Their effect:

   Their effect is best described in the words of United States witness George F. Worts, Jr., found in his report on the Pauba Well (Fallbrook Exhibit AB) at page 9:

> "The Wildomar fault forms an effective barrier to ground water movement in the older continental deposits upstream in the Temecula River Basin.".

   All witnesses agree that the faults constitute a barrier to ground water movement; the only disagreement is as to the extent of the barrier effect. The barrier effect appears to be substantial. Specifically:

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

- 2 -

5037

(1) It is responsible for the phenomenon of rising water along the "spring line" on the northeasterly side of Murietta Valley.

(2) It effectively stops any sub-surface flow out of Pauba Valley downstream.

(3) Together with the confining effect of the less-permeable lenses in Pauba Valley, the faults result in an artesian area at the lower end of that valley.

3. The kinds of material in the watershed.

While the materials in the watershed can be broken down into many geological classifications (Plate 13B of Bulletin 57 has 20 classifications), for the purposes of these proceedings the breakdown used in the United States Exhibits 15, 67, 69 and 70 is adequate, namely:

 a. Younger alluvium.
 b. Older alluvium or older continental deposits.
 c. Residuum or weathered basement complex.
 d. Basement complex and volcanic rocks.

4. The areas where these materials are located.

The undersigned accepts the surface location of the materials as shown on U.S. Exhibits 15, 67, 69 and 70.

5. The permeability of these materials.

Permeability of and by itself is not the factor which should control determination of which ground waters are held to be a part of the Santa Margarita River system. However, based on the present record, the following generalities can be made:

 a. Basement complex and volcanic rocks are for all practical purposes impermeable and ground waters found within areas of basement complex shall not be considered a part of the Santa Margarita River system.

 b. Weathered basement complex or residuum has a degree of permeability. However, it is so slight that ground

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

- 3 -

5028

waters found within such areas shall not be considered a part of the Santa Margarita River system.

     c. Younger alluvium is permeable. Ground waters found within it, <u>or underlying surface deposits of younger alluvium</u> shall be held to be a part of the Santa Margarita River system.

     d. Older alluvium or older continental deposits are permeable, but the degree of permeability varies widely with the different materials that are found within this classification. There is not sufficient evidence before the Court at this time to justify a Finding that ground waters underlying <u>surface areas of older alluvium or older continental deposits</u> should be considered part of the Santa Margarita River system. It is conceded that on the present state of the record, ground waters found within areas of older alluvium or older continental deposits <u>which are overlain by younger alluvium</u> may be found to be a part of the Santa Margarita River system.

  6. <u>Characteristics of these materials in connection with storage of ground water.</u>

     a. Basement complex and volcanic rocks can be said to store no ground water.

     b. Younger alluvium is largely water-bearing.

     c. Older alluvium or older continental deposits are water-bearing <u>where saturated</u> (see Worts, Pauba Well Report, Fallbrook Exhibit AB, page 8).

     d. Residuum or weathered basement complex <u>may</u> be water-bearing, but its water-bearing properties are so slight that ground waters within such material shall not be considered a part of the Santa Margarita River system.

  7. <u>Basins or water storage units.</u>

     The undersigned accepts the basins delineated on Plates 11A and 11B, Bulletin 57, California Exhibit ____. As stated in

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

- 4 -

5039

paragraph 5, c and d above, the surface area of such basins should be held to be the <u>surface</u> contact between the older and the younger alluvium. There is no evidence presently before the Court to justify a finding that any <u>surface areas</u> of material other than younger alluvium should be included within the surface area of a basin or storage unit. Specifically:

    a. The surface area of Murietta Basin should be held to be the surface area of younger alluvium, <u>eliminating areas of older alluvium within its exterior boundaries</u>.

    b. United States ground water Storage Unit Number 4 should not be considered as a basin or water storage unit.

    c. Based upon the answer to question 4, since the United States delineates the area of French Basin as weathered basement complex, the surface area of that basin should be limited to the area of the younger alluvium within it.

    d. The same condition applies in the case of Los Alamos Basin.

    8. <u>The usable storage capacity of basins.</u>

    The usable storage capacity of a basin, taken by itself, is immaterial. The important factors for purposes of these proceedings are: (1) Rate of use; and (2) Rate of re-charge. Usable storage capacity is only important as a factor to be considered in determining safe annual yield or perennial yield of a basin. The only basins concerning which any such evidence has been offered are the so-called "Coastal Basins" (Upper, Chappo and Ysidora) and it is conceded that additional evidence on this question will be offered as to them. Accordingly, any tentative findings as to storage capacity would be immaterial and pre-mature.

    9. <u>Confined waters.</u>

    a. The evidence is undisputed that confined waters exist in the Pauba Valley and have existed in Santa Gertrudis Valley.

    b. The confinement is not absolute.

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RAndolph 8-1154

- 5 -

5040

    c.  The vertical movement of the confined waters is very slow and usually is only noticeable when a well is drilled into the confined zone, or when a lateral barrier, such as a fault, forces water to the surface.

    d.  Artesian wells are accounted for by the confining effect of horizontal and vertical lenticular structures and vertical structures such as faults, composed of confining materials that greatly restrict the movement of ground water.

    e.  Lenticular deposits referred to above are irregular and vary in depth and in thickness.

    f.  There is no complete "blanket" serving to confine such confined waters.

    g.  <u>Lateral confinement is at least as great as vertical confinement.</u>  If this were not true, areas of confined water would not exist, since the greater pressures in the areas of confinement would constantly force the ground water outward into areas of lesser confinement until pressure conditions were equalized.

    h.  The confined areas are re-charged as follows:

        (1) By slow downward percolation from the stream and from rainfall.

        (2) By the movement of ground water <u>down</u> the hydraulic gradient, <u>beneath</u> the confining lenses.  At some point upstream the confining effect of the lenticular structures ceases.  Ground water moving downstream from above that point moves <u>under</u> the confining lenses, creating the pressure effect.  (See Worts, Pauba Well Report, Fallbrook Exhibit AB, page 10).  Lateral re-charge, from the older continental deposits into the confined water zones, <u>is very minor</u>, since for any substantial movement to exist would pre-suppose greater pressures in the older continental deposits than exists in the zone of confined water.

    i.  <u>Effect of such confined areas.</u>

        The principal significance of the existence of such

areas of confined waters in these proceedings is two-fold:

    (1) The existence of such areas of confined waters necessarily indicates a full basin, since the confined water constantly moves upward to re-charge the overlying younger alluvium.

    (2) The existence of such areas of confined waters is conclusive evidence that movement of water into (or out of) such areas is very slow.

10. Governments Storage Unit Number Four.

There is no evidence presently before the Court sufficient to justify a finding that ground waters within Government's Storage Unit #4 are a part of the Santa Margarita River system, excepting those portions of Storage Unit #4 which are overlain on the surface by younger alluvium. As to such portions of Storage Unit 4, it is conceded that they may be regarded as a part of the Santa Margarita River system. Specifically:

    a. The fact that storage exists within Unit 4 does not make such area a part of the stream system. It is also conceded that some water is found within basement complex in cracks and fissures. The test is whether such ground waters materially contribute to the stream.

    b. The projection of basins downward into older alluvium is entirely logical since it is conceded that areas overlain by younger alluvium may be regarded as part of the stream system, regardless of the underlying material. Since such surface areas of younger alluvium are valleys, they necessarily receive the greater portion of run-off; they are more permeable and necessarily receive the greater proportion of percolation; and the ground waters underlying them are necessarily more rapidly recharged, even into underlying areas of less permeable older alluvium.

    c. For reasons heretofore discussed, the cutting off of a basin at the point of surface contact between older and

younger alluvium is the only logical method of determining the surface area of a basin.

        d. There is no evidence as to the rate of movement within Storage Unit 4. If we disregard those parts of Storage Unit 4 which are not overlain by younger alluvium, there is no evidence as to how rapidly water can be extracted from it.

        e. Under the analysis and the concessions made above, the Roripaugh Well which is drilled in a <u>surface area</u> of younger alluvium should be considered to be extracting waters that are a part of the Santa Margarita River system.

        f. Ground water contours are signficant as indicating the <u>direction of movement</u> of ground water, and the elevation of the <u>water table</u>. They do not indicate the <u>rate</u> of movement, nor do they indicate the productivity of wells. Their value as evidence of water levels and direction of movement varies in direct proportion with the number of measurements upon which they are based. In the case of Storage Unit 4, the wells upon which the ground water contours have been based are so few and so scattered that it is obvious that the contours on U.S. Exhibit 15-A might curve drastically east or west, north or south, between any two reference points. In the present proceedings the ground water contours drawn upon U.S. Exhibit 15-A do not justify a finding that ground waters within Water Storage Unit 4 are a part of the Santa Margarita River system.

11. <u>Gradient of basement complex beneath Storage Unit 4</u>.

        a. It is generally conceded that the gradient of the basement complex underlying Storage Unit 4 must be northeast to southwest: that is, the older continental deposits are shallowest to the east and north and deepest to the west and south.

        b. The undersigned is unable to express any conclusion as to the value or reliability of seismographic tests within Storage Unit 4.

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

5043

c. For the reasons heretofore set forth, Storage Unit 4 cannot be considered a part of the River system, <u>excepting</u> those portions thereof that are overlain on the surface by younger alluvium. The depth of aquifer is therefore immaterial at this time.

d. The same answer applies to this question as to c. An assumed depth of aquifer of 100 feet within Storage Unit 4 may be reasonable. However, if the ground waters within the Unit are not a part of the stream system, it is immaterial.

12. <u>Movement of water within Unit Number 4.</u>

a. It is conceded that the movement of water within Unit 4 is generally from northeast to southwest, and that the movement is interrupted when the ground waters reach the Wildomar Fault. Relatively little water passes <u>through</u> the Fault. The majority of the water is forced upward by the Fault and appears as rising water on the surface.

b. There is no evidence as to the amount of water moving through Unit 4.

c. There is no evidence as to the speed of ground water movement through Unit 4.

d. The water level contours indicated on U.S. Exhibit 15-A are not reliable for the reasons heretofore discussed.

e. The fact that the wells within Storage Unit 4 may be hydrologically connected is of no significance unless the <u>degree of connection</u> is known. Movement of a few drops in a decade constitutes hydrologic connection, but obviously is so slight that such waters could not be considered part of the stream system. Without pumping tests to show direct relationships between extractions from one well and water levels in other wells, no hydrologic connection sufficient to make the ground waters underlying Unit 4 part of the stream system can be assumed.

13. <u>Depletion of basins in areas of confined water.</u>

a. Recharge of such basins is principally from seepage downward beneath the confining lenses at a point upstream from the area of confinement. (Worts, Pauba Well Report, Fallbrook Exhibit AB, bottom of page 11).

b. Some very minor recharge may reach Pauba and Santa Gertrudis Basins from the older continental deposits on either side of those basins. However, as heretofore pointed out, the pressure conditions existing within the areas of confined water in those basins would tend to force ground water outward into older continental deposits if the materials had any substantial permeability.

c. In Murietta and Wolf valleys the confining effect of the faults is such that there is little or no ground water recharge from the older continental deposits.

14. Salt water intrusion in the Coastal (Ysidora) Basin.

a. Unquestionably salt water intrusion into Ysidora basin has existed in the past. The evidence indicates that it no longer exists, reductions in pumping having restored the hydraulic gradient to a seaward direction. However, salt water contamination from past intrusions still exists.

b. Future salt water intrusion can best be prevented by reduction or elimination of pumping from Ysidora Basin. This, coupled with the re-charge of the basin by natural percolation and sweage effluent return, will create a fresh water barrier to future salt water intrusion.

c. The undisputed evidence is that the salt water intrusion was caused by excessive pumping of the basin by the United States and by export of the water extracted outside the watershed. Accordingly, any damage resulting from salt water intrusion cannot be charged to any up-stream user, but is caused solely by the acts of the plaintiff. This is particularly significant in the light of the findings of the U.S. Geological

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

5045

Survey (Worts, Pauba Well Report, Fallbrook Exhibit AB, end of page 6), that the needs of Camp Pendleton could be supplied by pumping from Chappo and Upper Basins.

15. <u>Areas within which the Court should find that ground waters are not a part of the Santa Margarita River system.</u>

Based upon the present state of the record, there are very large areas within the watershed within which ground waters must be held to be not a part of the stream system. Landowners within those areas are entitled to affirmative findings that their <u>ground water rights</u> are not involved in these proceedings. It is conceded that many such landowners may also have riparian rights to surface flow, which rights must be herein adjudicated. The undersigned contends that the following areas, as delineated on US Exhibits 15, 67, 69, and 70 should be eliminated <u>as far as ground waters are concerned:</u>

    a. All surface areas shown as basement complex.

    b. All surface areas shown as weathered basement complex or residuum.

    c. All surface areas shown as volcanic rocks.

    d. As to surface areas of older alluvium or older continental deposits, there is insufficient evidence for a finding that ground waters beneath such areas are a part of the stream system. However, the converse is also true, there is insufficient evidence to support a finding that such waters <u>are not</u> a part of the stream system. Accordingly, such areas are <u>not</u> presently entitled to a <u>res judicata finding</u> that they are outside the present litigation, but probably are entitled to a <u>dismissal</u> from these proceedings on the present state of the record.

    e. It follows that only the following water rights should be adjudicated:

        (1) Rights to surface waters anywhere in the watershed.

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

- 11 -

5046

(2) Rights to ground waters in those areas which are overlain on the surface by younger alluvium, as shown on U. S. Exhibits 15, 67, 69 and 70.

Exhibit A, attached, portrays graphically these proposed Findings.

Respectfully submitted.

SACHSE and PRICE

Dated:  12 January 1959.

by /s/ Franz R. Sachse
Franz R. Sachse
Attorneys for Fallbrook Public
Utility District and certain
individual defendants.

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

- 12 -

5047



Landowner A remains in the litigation. However he would be entitled to a res judicata judgment that the ground waters underlying his lands shown as "bc" are vagrant, local, percolating waters not a part of the Santa Margarita River system. No findings would be made as to his lands shown as "Qtoal", but the Court would retain jurisdiction.

Landowner B remains in the litigation and the ground waters underlying his lands would be held to be part of the Santa Margarita River system.

Landowner C would be entitled to a <u>dismissal</u> (not a res judicata judgment) since there is insufficient evidence for any finding as to the ground waters underlying his lands.

Landowner D would be eliminated from the proceedings with a res judicata judgment that the ground waters underlying his lands are vagrant, local, percolating ground waters not a part of the Santa Margarita River system.

EXHIBIT "A"

5048

(PROOF OF SERVICE BY MAIL — 1013a. and 2015.5 C.C.P.)

STATE OF CALIFORNIA,
County of __San Diego__ } ss.     1247 SD C

I, the undersigned, say: I am and was at all times herein mentioned, a citizen of the United States and a resident of the County of __San Diego__, over the age of eighteen years and not a party to the within action or proceeding; that my business address is __1092 South Main Street, Fallbrook, California__

that on __January 12__, 19__59__, I served the within __Memorandum as to Proposed Findings on Geology__

on the __Plaintiff__ in said action or proceeding by personally delivering a true copy thereof to:

1. Mr. William H. Veeder           2. Mr. George Stahlman
3. Mr. Adolphus Moskovitz          4. Mr. James H. Krieger

I certify (or declare) under penalty of perjury that the foregoing is true and correct.

Executed on __January 12__ at __Fallbrook__, California
           (date)                 (place)
                                  (Signature)

¹If deposited in the United States Post Office, cross out appropriate words and insert "in the United States Post Office". ²Here quote from envelope name and address of addressee.

PROOF OF SERVICE—ANY PAPER BY MAIL—WOLCOTTS FORM 146—REVISED 5-58                    66991 5046A