1  GEORGE STAHLMAN, Attorney at law
   Rt. 1, Box 235
2  Fallbrook, California
   Telephone: RAndolph 8-2310
3
   Attorney for defendant, Vail Company
4



FILED
JAN 27 1959
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | No. 1247-SD-C |
| vs. | ) | TENTATIVE VIEWS OF VAIL |
| FALLBROOK PUBLIC UTILITY DISTRICT, a public service corporation of the State of California; et al., | ) | COMPANY RESPECTING PROPOSED TENTATIVE FINDINGS |
| Defendants, | ) | |
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | |
| Defendants in Intervention. | ) | |

PREFACE

In extending the views herein of the Vail Company to the court at this stage of the proceedings, we desire to express that the views herein contained are subject to revision by reason of subsequent evidence and may be affected by legal presumptions, by legal decisions and other factual matter which may influence present conclusions in relation to matters which affect the rights of this defendant. Although the court has indicated that the answers to the 15 points requested in open court on December 19, 1958, were to be in the nature of a proposed or tentative findings, we feel that there are some matters related to the geological and hydrological evidence thus far presented that may merit some comment herein so as to better effect basic findings upon which conclusions of law affecting the rights of this defendant, may be legally and logically drawn.

1.   Definitions

The following definitions which we feel are justified by the evidence in

which the determination of legal rights could be made.

    (a) <u>Permeability</u>:

Quality or state of being permeable. The basic descriptive term "permeate"; quality of being permeated, passable, penetrate; to spread or diffuse itself through, especially fluids that pass through substance of loose texture; to spread and diffuse itself through; to pervade. (Webster's new International Dictionary)

<u>NOTE</u>: The practical application of the term thus far in this case is its application and relation to permeabilities of geological materials in contact each with the other.

    (b) <u>Transmissibility</u>:

Capable of being transmitted in any sense. Transmit; to send or transfer from one place to another; to pass or be conveyed through space or a medium; to admit the passage of. (Webster's new Internation dictionary)

<u>NOTE</u>: We have eliminated the technical laboratory definitions as given by the experts as we feel that the evidence thus far warrants consideration only of the practical application of these terms to the issues thus far created. As it concerns this defendant, the transmissibility of water through the materials comprising the younger and older alluvium is whether or not the older alluvium is sufficiently permeable to receive, to any practical degree, charge from the younger alluvium to the older alluvium and the degree by which the older alluvium would transmit water to the younger alluvium. This will be commented on further hereafter.

    (c) <u>Specific Yield</u>:

Is the quantity of water abstracted from a unit volume aquifer by gravity drainage or by pumping" When added to the <u>Specific Retention</u> 100% of the water in the unit volume is determined.

    (d) <u>Specific Capacity of a Well</u>:

is measured by the yield of gallons per minute, per foot of drawdown. It depends upon two factors; the permeability of the aquifer and the frictional resistance at the entrance to the well.

-2-

5071

(e) <u>Groundwater Basin or Storage Unit:</u>

All basins are storage units but not all storage units are basins. A basin is a geological structural feature in which water is held under some degree of confinement and in which the limits are in some degree determinable. The exact threshold between basin and storage unit cannot be determined with precision but is a matter of judgment. In this case we are confronted with the problem in some instances as to whether water which may be in storage in certain areas are or are not a part of the Santa Margarita stream system.

2. <u>The major faults</u>

There is general agreement as to both location and effect. The predominant factor is the effect of the Wildomar fault which acts as a effective barrier at the western end of the Pauba Basin and it also acts as a partial barrier of unknown degree which causes the rise of water along its fault line to the east throughout a large part of the Murieta basin. It also is a major consideration in determining the boundary of the Murieta basin. There was also testimony and was indicated on government's exhibit No. 15 a fault in the vicinity of Vail Dam. At this stage of the proceedings there has been no evidence concerning any matters affected by this fault. However, the existence of such a fault is doubted by this defendant by reason of the fact that prior to the construction of the Vail Dam, numerous geologists, including Dr. Buwalda, a noted geologist, and several other geologists made an extensive study of the geological features of this area to determine its practical and feasible features concerning the construction of a dam at this location and there was unanimous agreement that the type and character of the geological formations at this point were admirably suited for safe and practical dam construction and the discovery of any fault in this area was not manifest by any of these geologists.

3. <u>The kinds of material in the watershed:</u>

We are in agreement with the court that for the purpose of this litigation, classification of material as:

(a) The younger alluvium

-3-

5072

(b) The older alluvium

(c) The residuum or the weathered complex

(d) The basement complex is sufficient

4. <u>Area where the materials are located.</u>

Generally speaking, materials are located as indicated on government's Exhibit No. 15 which shows the disbursement of the material, the depth, however, in many areas is an unknown quantity.

5. <u>The Permeability of these materials</u>:

(a) Basin complex for practical purposes has no permeability, such waters as may be located in basin complex is in faults, fissures, and breaks.

(b) In the residuum there is some permeability; the degree depending upon factors as it affects areas and locations of specific watered material.

(c) Younger alluvium permeability is generally good. The older alluvium is less permeable. The degree of permeability of the older alluvium has been designated only by such general terms as would make it difficult for the court to make logical or effective findings in respect to these matters at this state of the evidence.

6. <u>Capacity of the materials and characteristics in connection with the storage of ground water.</u>

We are in general agreement with the characteristics of the material as designated by the court in paragraph 6. However, the characteristics of these materials as disclosed by the evidence is composed of lenses and materials of various density which would have effect upon the ingredient water in different areas of the same general material.

7. <u>Basins and water storage units at Murieta basin</u>

In this area a conflict as to the aerial extent of the basin exists between the government and the state of California. The effect of the differences although not great, probably stems from the different methods that were used by the two parties in their calculations. We agree with the court that the natural basin there is probably defined by the fault lines rather than taking contact by the younger and older alluvium. As to the other enumerated basins we believe

the court has logically analyzed the evidence under the subdivisions of paragraph 7. In this respect we feel that insofar as the so-called minor basins are concerned that when evidence is received by the court regarding the extractions of water in these areas, that further information may be available from which the extent of these minor basins may be determined. The major dispute concerns ground water unit No. 4 and in all probability the greatest impact affecting basic principles of law involving the determination of the character of rights of the defendant in this area (unit No. 4) and the character of the relationship of the waters in unit No. 4 in relation to the basins which border thereon. This poses some legal problems. It appears that findings must first be made as to what constitutes the stream system, and without reaching findings of fact, it may be well to bear in mind some of the legal principles which have a direct bearing upon our situation. The words "course" or "stream system" consists of banks and water. That we have a water course and stream system here is quite evident, however, the extent to which some of the storage units are a part of this stream system has not been established. To find ground waters in areas adjacent to the stream or even to well define storage units beneath the surface of streams is not unusual. However, the question involved in these proceedings is what waters adjacent to known basins, even in storage units, are or are not part of the stream system.

      The question of the existence of percolating water in land is merely a question of fact, "C. Hooker vs. Los Angeles @ 314" but if it is known that ground water exists but not known if they are flowing in a defined channel, the presumption is they are not part of a stream or water course, nor flowing in a definite channel. "Los Angeles v. Pomeroy, 124 Cal. @ 597". Thus, the burden of proof that ground waters are part of a stream, is on the party who asserts such ground waters are part of the stream. It is essential to the nature of percolating waters that they do not form part of the body or flow, surface or subterranean of any stream. They may either be rain waters which are slowly infiltrating through the soil or they may be waters seeping through the banks or bed of a stream which have so far left the bed and other waters as to have lost their character as part of the flow. "Vineland Irr. Dist. Azusa Co. 126 Cal. 486 @ 494."

To point up the character of proof which would be necessary to establish such continuity between the younger and older alluvium, by which a determination could be made that the older alluvium receives charge from the stream system, we believe it may be of value to consider the proven facts in the cases wherein a similar situations have occurred; referring to the case of the "City of Lodi v. Municipal Utility Dist. 7 Cal. (2d) 316 p. 322.

"The soil through which the Mokelumne flows between Clements and the Delta is the ordinary sedimentary soil of the San Juacin Valley possessing a high degree of porocity." As the result Mokelumne loses a portion of its flow by percolation into the surrounding territory." In this case the pumps of the city of Lodi were located approximately a mile from the bed of the stream. To demonstrate the evidence in addition to what evidence we have in the present case by which the court could make the finding of charge affecting the older alluvium. In the city of Lodi, it is stated:

> "the court found that as the Mokelumne flows from the foothills toward the sea it loses a portion of its flow into and underneath its banks; that the underground percolating waters flow in a general southwesterly direction across the Lodi basin; that the quantity of water percolating into the underground strata of the Lodi area (found to be 34,000 acres), under natural conditions varies from year to year with the quantity and head of water flowing in the stream; that the temperature of the water affects the rate of percolation; that warm water percolates more rapidly than cold; that the maximum rate of percolation occurs when the flow is maintained between 400 and 600 second-feet; that under natural conditions there percolates on the average into the strata underlying the 34,000 acres in the Lodi area about 50,000 acre-feet."

The legal important implication in connection with the necessity of establishing the degree of transmissibility between the older and the younger alluvium becomes apparent. Since the decision of the McClintock v. Hudson, 141 Cal. 275 of 281 wherein the court stated, "that the right to use of percolating waters tributary to a water course were corrolated with riparian rights to the water in a stream."
 Similar corrolations have been made in other cases thereafter, "Cohen v. Canada Land & Water Co. 142 Cal. 437."

CONFINING WATERS OR CONFINED WATERS:

We feel that a better understanding of this subject can be had after certain evidence which will demonstrate practical experience in relation to the extraction of water over a long period of time. However, we are in substantial agreement with many of the conclusions advanced by the court and feel

matters of degree. From the evidence thus far, it is evident that use of the word "confined" should be preceded by the word partially; in other words "partial confinement." Many of the matters referred to in No. 9 may prove to be of academic interest only.

10. <u>Government's unit No. 4</u>

Having heretofore expressed some views, pertaining to matters in paragraph 10 of the court's inquiry, we believe the major questions to be under and the court asked the $64.00 question under (d) "how rapidly the water moves, how rapidly water could be extracted from it." Again we must say that by reason of the absence of evidence which could demonstrate the rate and quantity of charge into unit #4 if unit #4 in fact could receive charge from the stream system, this poses many questions. By reason of the fact that most productive wells in the older alluvium are in the vicinity of flowing streams and many wells of poor production exist in the older alluvium.

Query - Does the distance of wells in relation to the source of charge have a bearing upon their productivity? There has been no evidence in this case as to the rate of percolation in any of the water bearing materials. It would appear that the rate of percolation in the older alluvium would be of some significance. It may be that wells of a close proximity to the streams, especially gravel packed wells, may more readily respond to charge from the stream system and that wells more distant from the older alluvium would receive little or no waters.

It would appear that it is as important to determine the balance of the various storage units as it would be to determine their usable capacity. Courts have made determination as they did in the "city of Pasadena v. Alhambra" as to when the basin is inbalance. This is the factor which would govern and determine the extent to which water could be extracted from basins as it would bear a relationship between the charge of the basin to the extractions that could be ma de before the basin would reach the point of danger. It would appear to be essential or possibly more necessary to know the safe yield of an underground storage unit than it would in a surface storage unit. There is no evidence in the record of these matters.

11. <u>What Is The Gadiant or Slope of the Basement Complex?</u>

This, we feel, cannot be determined by the evidence thus far presented. In this connection it may be of concern to what extent the waters underlying the older alluvium are the result of rainfall and percolation into the area and run-off from the Basement Complex and residual, and to what extent the extraction of water in this area will affect the ability of the older alluvium to continue supplying water.

12. <u>Movement of water in Unit No. 4</u>

The direction is not always the same and is not in a defined channel and not controlled by the direction of flow of surface channels; therefore, it would appear that unit No. 4 on the evidence in the record is not part of the stream system. However, it would appear by reason of the fact that there is rising water on some of the streams in unit No. 4 and some surface stream flow through the dry season, that the waters in storage unit No. 4 help, to some extent, to feed the surface streams and that depletion of water from this storage will decrease stream flow. As to the matters enquired of No. 12(b) amount, (c) speed of amount, (d) water level contours, (e) hydraulic connection of wells, All of these qualities vary with the location, season, and even if vital to the determination of water supply, could never be determined with accuracy except for one set of conditions.

13. <u>Depletion of confined water</u>.

The depletion is a comparative term. Depletion for shallow, small pumps would not be depletion for deep well turbines. The cost of raising the water with depletion could increase to such an extent that depletion could be claimed on an economic basis. Quality of water is an important factor in determining depletion. A natural sub-irrigated pasture might be considered depleted when the water table is drawn down below the root zone. Use, therefore, sometimes may be the factor which determines depletion.

14. <u>Salt water intrusion</u> does exist in many places along ocean front lands, such as the Ysidora basin. Under natural conditions the supply of fresh water acted to keep the hydraulic slope toward the ocean, thus preventing salt water intrusion. To maintain this condition, however, limits the use of this basin as a source of usable water, and any limitation of use of a basin at least partly destroys the value of one of California's most valuable natural features. To

obtain the natural equalizing effect of a basin on stream flow, they must be used, pumped down when water is scarce, and allowed to fill at times of fuller flow as nature intended. Depletion of steam flow from any cause always aggravates this condition.

14 (con.)  Methods of combatting this condition seem to be limited to two:

    A. Stop all use of the basin that lowers the water table below the ocean.

    B. Construct an underground barrier to hold back the salt water.

Method A has two possible factors:-

    1 Stop pumping sufficiently to hold the water table above sea level, or

    2 Preserve as far as possible a maximum supply of fresh water which with proper spreading would keep the basin in its natural condition and still allow a reasonable beneficial use.

The highest and best use of the basins in this stream system is a feature to be preserved if at all possible. The lack of complete agreement as to the rights of a riparian to restore a depleted basin to its natural condition should be determined.

15.  <u>Area or Sections to be taken out of the case.</u>

We are in agreement with the court's heretofore expressed opinions that those persons who are not a part of the stream and whose land overlies basement complex or other materials which it has been agreed that no water retention qualities should be relieved, as defendant in the case feels inasmuch as they have been made parties defendant, a decree would probably be proper method by which they could be relieved from defense of the case.

IN CONCLUSION:

Our laws pertaining to water have developed in progress since the early history of this State, and changed conditions, to social and economic developments have brought about corresponding changes in the progress of our courts' decisions to keep up with and meet these developments. The matter of the use of physical solutions to better alleviate the inequities of certain situations is becoming in more common use. We believe there are situations in the instant

case where the court may desire to resort to physical solutions *such* as the matter of salt water intrusion. That as to conditions which may not be determined by reason of the available evidence at present experience, ~~and changed conditions~~ and further investigation of some of these matters may be ~~created~~ *determined* in the future as the court will undoubtedly retain a continuing jurisdiction of this case.

                                            Respectfully submitted,

                                            */s/ George Stahlman*
                                            George Stahlman, Attorney for defendant, Vail Company