J. LEE RANKIN
SOLICITOR GENERAL
Department of Justice
Washington, D. C.

Attorney for United States
of America

FILED

FEB 3 - 1959

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By [signature] DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA, Plaintiff,

v.

FALLBROOK PUBLIC UTILITY DISTRICT, et al., Defendants.

NO. 1247-SD-C

EXCEPTIONS OF THE UNITED STATES OF AMERICA TO PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN REGARD TO FALLBROOK CREEK

Comes now the United States of America and presents the following exceptions to the proposed findings of fact and conclusions of law of the Special Master in regard to the Fallbrook Creek watershed.

BACKGROUND OF EXCEPTIONS

I

Lake O'Neill, title to which is in the United States of America, is an on-channel reservoir across Fallbrook Creek at a point where in the state of nature that stream had its confluence with the Santa Margarita River. Since 1886 when the dam creating the Lake was built, water from Fallbrook Creek has entered that Lake.

It is the position of the United States of America that it succeeded to an appropriative right to the use of water in Fallbrook Creek for Lake O'Neill to the extent that water has flowed to that Lake throughout the long history that it has been in operation. There can be no interference with that right.

Similar to all of the streams in the watershed of the Santa Margarita River, including the main stem, except in a few reaches, Fallbrook Creek is

5144

GPO 16—69085-1

intermittent both as to time and place. However, it is the composite supply of water from these intermittent streams which yields to the Naval Enclave its all-important supply of water.

Wholly aside from the spurious claim of the Fallbrook Public Utility District, increased development throughout the watershed of the Santa Margarita River is now and has been reducing, and in the future will reduce the quantities of water reaching the Enclave in question. Net effect of that development will be to place an increasing burden upon DeLuz Creek and Fallbrook Creek which are located to an appreciable degree within the Enclave itself. Assurance that the yields of these streams are available, meager though they are in most years, is essential to the fulfillment of the mission for which Camp Pendleton was established.

Failure to adopt proper findings on Fallbrook Creek and other streams of similar character in the watershed of the Santa Margarita River is tantamount to a denial of the relief which the United States of America and all cross-complainants in the case have prayed.

EXCEPTIONS TO FINDINGS OF FACT AND CONCLUSIONS OF LAW

II

Generally it may be stated that the findings of fact as proposed are wholly inadequate, failing to describe in sufficient detail Fallbrook Creek, its sources and the area which it drains.

III

Finding No. II  Finding No. II contains the following statement: "* * * descriptions of said riparian parcels and the apparent owners of each such parcel are also set forth in Plaintiff's Exhibit F-2 introduced in evidence herein."

It is obvious that the finding is incomplete. Manifestly it is improper to go beyond the scope of it to find the matters to which it purports to relate.

Accordingly, Plaintiff's Exhibit F-2 should be incorporated into the findings by reference and made a part of them.

GPO 16—80083-1

IV

Finding No. III In Finding No. III it is declared that "certain defendants" have entered into agreements or stipulations with the United States of America. It is essential that the names of those defendants, together with a description of the property to which the stipulation pertains either be set forth in the findings or incorporated into them by reference to a list of them attached to the findings.

V

Finding No. IV Finding No. IV apparently was intended to relate to non-riparian lands and non-riparian rights. Reference in that connection is made to the fact that there apparently exist impounding reservoirs on Fallbrook Creek which undoubtedly affect the surface runoff of the stream. It is essential that reference be made to those parcels and to the waters which they impound; the basis upon which the water is thus impounded; whether it is prescriptive or appropriative; and fully to describe those facilities together with any others which may exist.

VI

Finding No. V Having reviewed the flow of Fallbrook Creek, the finding contains this statement: "it is unnecessary to make any further findings at this time with reference to the nature and character of any of said parcels, or the water uses and rights thereof."

Riparian lands are situated throughout the watershed of the stream in question. Development of those lands reduces and will reduce the quantities of water reaching Lake O'Neill, in particular, and the Naval Enclave in general.

Failure to (a) determine the water uses, (b) the nature and extent of the riparian lands, (c) the rights to the use of water, is contrary to sound practice and to the law.

It is observed in passing that impounding reservoirs, referred to above, now exist on Fallbrook Creek; they reduce the quantity of water reaching the Enclave. Future developments must necessarily be anticipated. As a consequence the measure of the rights must be known and the extent of their potential use be declared in this proceeding.

GPO 16—69903-1

VII

Finding No. VI Finding No. VI declares "No evidence has been introduced respecting any prescriptive rights or concerning any rights to appropriate water from Fallbrook Creek, or any tributary thereof." It is concluded as a matter of law:

"No prescriptive or appropriative rights with reference to the use in the Fallbrook Creek watershed of water constituting a portion of the surface or sub-surface flow of the Santa Margarita River, or its tributaries, have been perfected."

Absent evidence there can be no findings; absent findings, there can be no "conclusions of law thereon", all as provided by Rule 52 (a) of the Federal Rules of Civil Procedure. As a consequence the Conclusion of Law is wholly without basis and should be stricken.

VIII

Conclusion No. II Serious error is contained in Conclusion No. II. That error stems from the fact that the Conclusion goes far beyond the scope of the Order of Reference dated February 12, 1958. For example, the Conclusion declares: "Whenever a stipulation [between the United States of America and defendants] as defined in Finding III has been, or is hereafter, executed with reference to a parcel, or portion of a parcel, of property in the Fallbrook Creek watershed, said stipulation shall not be construed as, and the execution of such stipulation shall not constitute, any limitation upon, or determination of the rights of the owner of such parcel either to develop or to use water upon said parcel." There is not a scintilla of authority thus to construe the stipulations of the United States of America. Objection is similarly made to the balance of the Conclusion as being beyond the scope of the Order of Reference.

Respectfully submitted,

UNITED STATES OF AMERICA

J. LEE RANKIN,
Solicitor General

WILLIAM H. VEEDER,
Attorney, Department of Justice

Dated: Feb. 1, 1959

WILLIAM E. BURBY,
Attorney, Department of Justice

5147

GPO 16—

J. LEE RANKIN
SOLICITOR GENERAL
Department of Justice
Washington, D. C.

Attorney for United States of America

FILED
FEB 3 - 1959
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By M D [signature] DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,
Plaintiff,
v.
FALLBROOK PUBLIC UTILITY DISTRICT, et al.,
Defendants.

NO. 1247 - SD - C

SUGGESTIONS BASED UPON THE PRESENT STATE OF THE RECORD, RELATIVE TO QUESTIONS PRESENTED DECEMBER 19, 1958, REGARDING THE GENERAL GEOLOGY OF AND GROUND WATER BASINS IN THE WATERSHED OF THE SANTA MARGARITA RIVER

INTRODUCTION

Essential to any response to the Fifteen Inquiries presented December 19, 1958, by this Honorable Court, is a consideration of the objectives which guided the United States of America in proving its case in chief. Particular reference is made in that connection to the evidence which it adduced in regard

[1] to the general geology of the Santa Margarita River watershed;

[2] to the ground water storage units.

From that evidence there emanated the questions to which this consideration is directed.

Prime reason for the institution of the subject cause now in the process of trial is to insure to a vast military enclave that it receive its full entitlement of the waters of the Santa Margarita River which it may beneficially use. Only by a general adjudication proceeding in the nature of an action to quiet title may that requisite assurance be obtained.

5148

GPO 16—80800-1

Relative to the proper practice and procedure in actions of this character the Court of Appeals for the Ninth Circuit has declared:

> "The only proper method of adjudicating the rights on a stream, * * * is to have all owners of lands on the watershed and all appropriators who use water from the stream involved in another watershed in court at the same time." 1/

Continuing, the Court of Appeals then declared:

> "this action includes the entire watershed, it is in the nature of a plenary suit to settle the correlative right of everyone interested in the waters." 2/

There is thus a specific mandate that in this cause there shall be settled "the correlative right of everyone interested in the waters" of the Santa Margarita River. Involved, as a consequence of that very correct mandate, is for everyone claiming rights in the surface or sub-surface flow of the Santa Margarita River to

[1] appear,

[2] plead, and

[3] prove their claims.

Failure thus to appear and prove their claims in this cause could imperil the rights of any landowner who is now, or who may in the future seek to exercise a claimed right in the stream. For that reason an owner, for example, whose lands overlie a portion of Storage Unit No. 4, as depicted on United States of America Exhibit 17, should accord most grave consideration to the question of whether he should assert and undertake to prove claims to a correlative share of the waters of the Santa Margarita River. Absent an adjudication that he has rights and a declaration that he may exercise them in accordance with the decree of adjudication, could well constitute a barrier to future use by him of the waters underlying his lands. That fact stems from the evidence presently in the record that the waters within the Storage Unit in question are hydrologically interconnected with the surface and sub-surface flow of the Santa Margarita River.

1/ California v. United States, 235 F.2d 647, 663 (C.A.9, 1956).
2/ California v. United States, 235 F.2d 647, 664 (C.A.9, 1956).

5149

By introducing evidence respecting the basins of the Santa Margarita River the National Government did not seek to prove or disprove the rights of any individual. Indeed, it would have been improper for it to undertake a course of that nature. Yet it is imperative for the protection of both the United States of America and the other owners enjoying correlative rights in the Santa Margarita River to have established in the record scientific criteria directly bearing upon those rights.

In concluding this introduction:

> By delineating the ground water storage units the United States of America did not purport to prove that there are not rights to the use of ground water in the Santa Margarita River and its tributaries located outside of the units as defined. To the contrary, there are rights - invaluable rights - beyond those limits. It did, however, undertake to prove that which will be helpful in the disposition of this complex action in regard to the recharge and discharge of the ground water basins.

RESPONSE TO QUESTIONS IN THE ORDER OF THEIR PRESENTATION

1. Definitions

(a) Permeability: The hydraulic permeability of deposits, with respect to water, is their capacity for transmitting water under pressure. For some rocks and soils it is different in different directions. This capacity can be quantitatively defined as the rate of discharge of water through a unit cross-section area of the deposits at right angles to the direction of flow if the hydraulic gradient is unity.

(b) Transmissibility: The field coefficient of transmissibility may be defined as the number of gallons of water, at the prevailing water temperature, that will move in one day through a vertical strip of the aquifer 1 foot wide having a height equal to the full thickness of the aquifer under a hydraulic gradient of 100 percent (1 foot per foot), generally expressed as "gallons per day per foot."

GPO 16—60065-1

(c) Specific Yield: The specific yield of a deposit, with respect to water, is the ratio of (1) the volume of water which, after being saturated, it will yield by gravity to (2) its own volume. This ratio is stated as a percentage and may be expressed by the formula $Y = 100(\frac{y}{V})$, in which Y is the specific yield, y is the volume of gravity ground water in the rock or soil, and V is the volume of the rock or soil.

(d) Specific capacity of a well: Specific capacity of a well is the number of gallons per minute pumped by the well divided by the drawdown (difference between the static water level and the pumping level) in feet.

(e) Basin or storage unit: A ground-water basin and a ground-water storage unit are two different entities. They may or may not coincide with one another. The ground-water storage unit is a designated part of a ground-water basin.

(1) A ground-water basin may be defined as a three-dimensional segment of the earth's crust composed in part of saturated water-bearing materials having fairly well-defined boundaries such as basement complex, fault barriers, or other relatively impermeable materials.

(2) Storage unit: In this case the term, ground-water storage unit, is an arbitrarily selected segment of a ground-water basin. Its areal extent and thickness may correspond in part to a ground-water basin but generally its areal extent and thickness are less than the ground-water basin of which it is a part.

2. The major faults

(a) Their locations: The major faults and their locations are shown on United States of America Exhibits 15 and 15A.

(b) Their effects: There are two principal faults that are barriers to ground-water movement. The first is the Wildomar fault along the northeast side of Murrieta and Wolf Valleys. The second is south of Lancaster Valley along the north side of Aguanga Valley. These faults cause a displacement of water levels and result in a change in the direction of ground-water movement.

GPO 16—69003-1

3. Kinds of geologic materials in Santa Margarita River watershed:

Within the area below the confluence of Temecula Creek and Murrieta Creek:

(a) Younger alluvium and (b) terrace deposits yield water to wells. Coastward from Ysidora subbasin the younger alluvium contains poor quality water.

(c) San Mateo formation yields poor quality water to wells in the lagoon area.

(d) San Onofre breccia and La Jolla formation yield virtually no water to wells.

(e) Residuum yields some water to wells on the United States Naval Ammunition Depot.

(f) Basement complex yields virtually no water to wells, except for minor quantities in cracks and fractures.

Above the confluence of Temecula Creek and Murrieta Creek:

(a) Younger alluvium and (b) older continental deposits are the principal water-yielding deposits in the inland area.

It usually is impossible to differentiate the younger alluvium from the older continental deposits in drillers' logs of wells. However, based on observations of stream channels, road cuts, exposures, and on geologic principles the younger alluvium is relatively thin. On the other hand, the older continental deposits in many areas are more than 2,000 feet thick. The nonpumping water levels in many parts of the area where the younger alluvium is underlain by older continental deposits range from about 30 to more than 60 feet below land surface. Therefore, a large part of the younger alluvium is unsaturated and ground water is pumped principally from the older continental deposits.

(c) Residuum yields some water to wells.

(d) Basement complex yields virtually no water to wells except for minor amounts in cracks and fractures.

4. Areas in Santa Margarita River watershed where geologic materials are located:

The locations of materials described in item 3 above are shown on United States of America Exhibits 15, 15A, 67, 69 and 70.

5152

GPO 16—60003-1

5. Permeability of the various materials

Based upon an examination of drillers' logs, on the observed and reported yields of wells, and an examination of the rocks and deposits as they crop out at the surface, the relative permeabilities of the kinds of materials are as follows:

(a) Basement complex: The basement complex is virtually impermeable and any water transmitted is through joints, cracks, and fractures.

(b) The residuum is the least permeable of the water-bearing materials.

(c) The younger alluvium, on the average, probably is the most permeable of the water-bearing materials. However, the younger alluvium is lenticular in character and contains lenses of material of very low permeability.

(d) In general the older alluvium, on the average, probably is less permeable than the younger alluvium and more permeable than the residuum. Like the younger alluvium, the older alluvium is lenticular in character. There are materials within the older alluvium that are as permeable as the more permeable materials in the younger alluvium. In drillers' logs the younger and older alluviums are usually indistinguishable and together the younger and older alluvium contain a single body of ground water.

A high or low permeability of the water-bearing deposits is not the factor which determines whether a well will yield a large quantity of water and whether the water pumped is a part of the Santa Margarita River water system, rather it is the transmissibility of the deposits that controls the yields of wells. As shown by the Pauba and Roripaugh wells, there is no doubt that the transmissibility of the older alluvium exceeds that of the younger alluvium.

GPO 16—80085-1

5152-A

6. Capacities of geologic materials in Santa Margarita River watershed to store water

(a) Basement complex and volcanic rocks have very low specific yields and store virtually no ground water except for minor amounts in cracks and fractures.

(b) The younger alluvium has the highest specific yield, and the greatest ability to store water. In the coastal area virtually all the usable ground water is stored in the younger alluvium. In the inland area the younger alluvium is relatively thin and, therefore, stores only a relatively small quantity of ground water.

(c) Older alluvium because of its greater thickness and areal extent, stores many times the quantity of water stored in the younger alluvium.

(d) Residuum: The specific yield of the residuum has not been determined. However, it probably has a lower specific yield than the older alluvium. Also, the residuum is relatively thin and, therefore, it probably does not store large quantities of ground water; though in some areas it has considerable depth and constitutes a source of water, for example, in the Fallbrook area.

7. Areal extent of ground-water storage units and ground-water basins in the Santa Margarita River watershed

As stated under 1 (e) above, ground-water basins and ground-water storage units are two different entities. The ground-water basins and subbasins within Camp Pendleton are three-dimensional segments of the earth's crust composed in part of saturated water-bearing materials having fairly well-defined boundaries such as basement complex or other relatively impermeable materials.

The Santa Margarita River ground-water storage units as shown on United States of America Exhibits 17 and 18 are arbitrary segments of ground-water basins of that stream. The ground-water capacities of the ground-water storage units, as shown on United States of America Exhibits 17 and 18, being only portions of ground-water basins, are considerably less than the ground-water basins of which they are a part.

As the record discloses, the ground-water storage units do not delimit

5153

GPO 16—00000-1

the areas within the Santa Margarita River watershed in which ground water which is part of the Santa Margarita River water system is found.

8. Usable Storage Capacity of the ground-water basins of the Santa Margarita River watershed

Water is now being pumped in increasing quantities from the ground-water basins in the Santa Margarita River water system. Ultimately the depletion of ground water in those basins must result in a sharp decrease in the surface flow of the Santa Margarita River.

The usable storage capacity may be defined as that reservoir capacity that is economically capable of being dewatered and capable of being recharged from the surface stream of the Santa Margarita River system or natural precipitation. In estimating the ground-water storage capacity of the several basins the United States of America adopted a very conservative policy respecting that capacity.

9. Confined waters in ground-water basins of the Santa Margarita River watershed

All the water-bearing alluvial deposits in the Santa Margarita River watershed are lenticular in nature. They are not in any sense continuous confining beds. These lenses are all permeable to varying degrees. Any lens of relatively lower permeability has the effect of retarding free vertical movement of waters to or from the relatively more permeable material that occurs beneath it.

(a) Under ordinary circumstances any well drilled through the lenticular deposits will contain water under artesian head (that is, the water level in the well, under natural conditions, would rise above the level at which it was first encountered by a well). Where the artesian head occurs above land surface the well will flow. The limits of the area of artesian head in no way can be shown by the areal extent of flowing wells. Therefore, semiconfinement is not limited to Pauba and Santa Gertrudis Valleys because virtually all of the water-yielding beds may be said to contain ground water which is partly confined or semiconfined.

GPO 16—60000-1

(b) Horizontal permeabilities exceed vertical permeabilities. Therefore, with the same hydraulic gradient, ground-water movement is greatest in the horizontal direction.

(c) The extent of the semiconfining beds has no real bearing on the case. Withdrawal of water from the younger or older alluvium, regardless of whether the area is unconfined or semiconfined, reduces the ground water in storage, which must be recharged. That will result in a reduction in the quantity of water reaching users downstream.

10. Ground-water Storage Unit No. 4 as defined by the United States of America

(a) The Ground-water Storage Unit No. 4 established by the United States of America is a minimum area within which the extraction of ground water will have an effect on the Santa Margarita River. There are areas outside of Unit No. 4 which also affect the flow of the Santa Margarita River. The extent of these areas cannot be determined except by detailed parcel surveys. That detailed determination must be developed by evidence in the course of the trial.

(b) In those areas where the younger alluvium is underlain by older continental deposits, limiting the extent of a ground-water basin to the two-dimensional areal extent of the alluvial plain does not correspond in the third dimension with any relatively impermeable boundaries. Evidence of hydraulic continuity between the younger and older alluvium is conclusive. When a deep well drilled on the younger alluvial plain is pumped it draws the major part of its water supply from the older alluvial deposits, and the water pumped is in direct hydraulic continuity with and has a direct effect on the movement of ground water in the areas beyond or outside the areal limits of the younger alluvial plain.

(c) Basin boundaries must be considered in three dimensions and are relatively impermeable. Nowhere does the United States of America consider the arbitrary vertical boundaries along the two-dimensional areal extent of the younger alluvial plain to correspond to the boundaries of a ground-water basin which must be considered in three dimensions. Therefore, in Murrieta, Pauba, Pechanga, and Santa Gertrudis Valleys the areal extent of the younger

alluvial plain can only outline in two dimensions the areal extents of arbitrary ground-water storage units which have little bearing on the total amounts of ground water available in these areas. For other basins in the inland part of the watershed, the areal extent of the alluvial plain generally corresponds to the surface extent of the ground-water basin. The three dimensions of each basin must correspond to the underlying impermeable formations. The ground-water storage units on United States of America Exhibits 17 and 18 for the smaller upstream areas show only the approximate outline of an area for which storage was calculated. They do not outline basins nor does it follow that there is no storage outside of these boundaries or that pumping outside of these units will have no effect on the streamflow.

(d) The United States of America has made no estimates concerning the rate of ground-water movement through any of the water-bearing materials in the watershed. It does not consider it to be an important factor in the case.

(e) The Roripaugh well draws all of its water from the older continental deposits. The water body from which water is pumped at the well is in direct hydraulic continuity with, and indeed is the same water body as that in the older continental deposits that lie outside of the younger alluvial plain of Santa Gertrudis Valley.

(f) The water-level contours on United States of America Exhibits 15 and 15A show the movement of ground water in the alluvial deposits of the inland area. All ground water in the area is tributary to the Santa Margarita River, as shown by the contours. The younger and older alluvium are in hydraulic continuity. Therefore, all the area of Storage Unit 4 is part of a ground-water basin.

11. Gradient or slope of the basement complex beneath Ground-water Storage Unit No. 4

(a) There is insufficient evidence to determine the gradient, slope, or configuration of the basement complex beneath the land surface of ground-water Storage Unit No. 4. However, existing evidence indicates that the depth to basement complex increases from east to west.

(b) Based on experience in other areas underlain by alluvial materials,

GPO 16—60085-1

it is believed that seismic or other geophysical studies would be of little value to determine the configuration of the basement complex beneath Storage Unit No. 4 unless it were done in conjunction with an extensive test-drilling program.

(c) The hundred feet of aquifer beneath ground-water Storage Unit No. 4 is a minimum value. The thickness of the saturated deposits beneath the surface of Storage Unit No. 4 in most places is much greater than 100 feet.

(d) The estimates of storage capacity by the United States of America are minimum estimates. Experience in other areas has shown that estimates of this type, where verified by more precise determinations, are consistently on the low side.

12. Movement of water, Ground-water Storage Unit No. 4

(a) The direction, in general, is from northeast to southwest, as shown by the water-level contours on United States of America Exhibits 15 and 15A.

(b) It may be assumed that the amount of ground-water flow, under natural conditions, was nearly equal to the natural ground-water discharge from Santa Gertrudis, Temecula, Pechanga, Pauba, and Wolf Valleys upstream from Temecula canyon.

(c) No estimate has been made as to the speed of ground-water movement and it is not necessary because it has no bearing on the case.

(d) Water-level contours as shown on United States of America Exhibits 15 and 15A are accurate to the degree required in the case. There is hydraulic continuity between Ground-water Units 3 and 4 and between Ground-water Units 1 and 2. The Wildomar fault zone is an impediment to the movement of ground water. The exact degree is not known because the permeability of the barrier-producing material along the fault is unknown.

13. Depletion of basins in areas of confined water

As discussed under item 9, there is no truly confined ground water in the Santa Margarita River watershed. The source of all recharge in the Santa Margarita River system is from surface stream runoff and infiltration of rainfall. Depletion of ground water in storage must be reflected in a reduction of surface runoff.

5157



GPO 16—80865-1

14. Salt-water intrusion

(a) The evidence conclusively proves that salt-water intrusion has occurred into Ysidora subbasin of the lower Santa Margarita River Basin.

(b) The salt-water intrusion can be combatted by enjoining Fallbrook Public Utility District and others from encroaching upon the rights of the United States of America and depleting the waters reaching the basin. Sound conservation practices are presently being pursued by the United States of America to prevent further intrusion and to mitigate the grave damage already experienced. Various devices and methods are likewise being considered. However, upstream diversions are now and will continue to threaten even greater damage by salt-water intrusion unless they are sharply regulated and further encroachments enjoined.

(c) There is at present no substitute for a firm, continuing, uninterrupted supply of fresh water to maintain the basin at a level which will repel salt-water intrusion.

(d) Kind and type of finding and decision as to salt-water intrusion: Relief of this nature is, in the opinion of the United States of America, requisite:

(1) A declaration that part of the legal rights of the United States of America to the use of the waters of the Santa Margarita River include the right to sufficient quantities to repel salt-water intrusion;

(2) A determination of the level at which the basin within Camp Pendleton must be maintained to repel salt-water intrusion;

(3) An order restraining diversions which would interfere with the rights to water in quantities sufficient to repel salt-water intrusion.

15. Areas within the watershed of the Santa Margarita River where there is no appreciable ground water feeding or supplying the streams

Basically and fundamentally there resides with each landowner the right to assert in this litigation his claims respecting ground water. Every owner is guaranteed by the Constitution the right to come forward to prove

GPO 16—80863-1

whatever his claims may be. One of the prime reasons which caused this Court to proceed with hearings before the Special Master was to permit all owners who may claim rights to appear with a minimum expenditure of time and money and to have their rights adjudicated. Action by the major parties litigant should not result in a frustration of that plan.

When evidence is properly presented a decision should be made as to the parties who should be before the Court. If no claim is made by certain parties to the waters of the Santa Margarita River or its tributaries then they may be eliminated by disclaimer.

Any effort to drop areas without knowing the claims of the owners of the land can have no other result in the ultimate than an unnecessary prolongation of the trial.

Respectfully submitted,

UNITED STATES OF AMERICA

J. LEE RANKIN,
Solicitor General

William H Veeder
WILLIAM H. VEEDER,
Attorney, Department of Justice

Dated: Feb. 2, 1959

WILLIAM E. BURBY,
Attorney, Department of Justice