1  J. LEE RANKIN
   Solicitor General
2  Department of Justice
   Washington 25, D. C.
3
   Attorney for the
4  UNITED STATES OF AMERICA

FILED

SEP 21 1959

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By M. L. Loughran
                    DEPUTY CLERK

5

6

7           IN THE UNITED STATES DISTRICT COURT

8             SOUTHERN DISTRICT OF CALIFORNIA

9                  SOUTHERN DIVISION

10

11  UNITED STATES OF AMERICA,           )
12                  Plaintiff,           )          No. 1247-SD-C
13       v.                             )
                                        )    RESPONSE TO VAIL COMPANY MEMORANDUM
14  FALLBROOK PUBLIC UTILITY DISTRICT,  )       ATTACKING STIPULATED JUDGMENT
    VAIL COMPANY, et al.,               )
15                  Defendants.          )
16

17              PRELIMINARY STATEMENT

18       FAILURE, TOTAL AND COMPLETE, AS TO PROCEDURE BEING
         PURSUED AND GROUNDS UPON WHICH VAIL COMPANY SEEKS
19       TO AVOID THEIR RESPONSIBILITIES UNDER STIPULATED
         JUDGMENT ENTERED DECEMBER 27, 1940, IN THE SUPER-
20       IOR COURT OF THE STATE OF CALIFORNIA, IN AND FOR
                  THE COUNTY OF SAN DIEGO
21

22       It is impossible to ascertain the course being pursued or the grounds

23  upon which Vail Company seeks to have this Honorable Court—a federal tribunal—

24  declare "null and void" the Stipulated Judgment entered approximately twenty

25  years ago by the Superior Court of the State of California, in and for the

26  County of San Diego, No. 42850.

27       Reference in that regard is respectfully made to:

28       (a)  The answers of the Vail Company;

29       (b)  The two memoranda that have been filed by the Vail Company;

30  from which it will be observed that:

31       1.  There are neither appropriate averments;

32                                                       5433

                          - 1 -

2.  Enunciation of principles either of law or equity which

would permit an intrusion by this Federal Court upon the

jurisdiction of the Courts of the State of California.

Absent proper pleadings; absent facts in support of proper pleadings; absent authorities disclosing the basis of the attack upon the Judgment, it is respectfully submitted that this Honorable Court should deny the harsh and drastic relief prayed for by the Vail Company.

Too great stress may not be placed upon the fact that the Stipulated Judgment now being attacked by the Vail Company was declared, by resolution adopted by that Company when it co-sponsored that decree, to be:

" . . . for the best interests of Vail Company . . . and"

that " . . . the terms of the proposed compromise and

settlement as evidenced by the said 'Stipulated Judgment'

are fair and reasonable as to the Vail Company, its

beneficiaries and trustees."

Settlement of this case was accomplished on October 23, 1951, by stipulation with the then counsel for the Vail Company.  Basis of that settlement is the Stipulated Judgment, dated December 26, 1940, and entered in the Superior Court of the State of California, in and for the County of San Diego.  Having changed counsel, Vail Company requested and was relieved of the Settlement of October 23, 1951.

Vail Company now seeks to have abrogated that Stipulated Judgment, not by the court that entered it, but by this the United States District Court for the Southern District of California, Southern Division.  As emphasized, basis of the contention of the Vail Company that this Court may thus invade the sovereignty of the State of California is not clear; the largely erroneous factual recital and the authorities alluded to in the Vail Company brief purporting to support its contention that this Court could invade the jurisdiction of the Superior Court of the State of California In and For the County of San Diego, leave completely undefined the basis upon which its seeks relief.

- ii -

**STIPULATED JUDGMENT NOT OPERATIVE AS TO
THOSE NOT PARTIES TO IT**

Respecting the breadth of application of the Stipulated Judgment this Honorable Court has been respectfully advised:

The Superior Court of California which entered the Stipulated

Judgment had jurisdiction of the parties before it and

the subject matter of the cause;

All parties to the Stipulated Judgment by appropriate resolution and

personal acts approved the Judgment entered by the State court;

As to the parties thus joining in approving the Stipulated Judgment

they are bound by it;

No one, however, not a party to it could be bound by the

Stipulated Judgment;

In this complete adjudication the Stipulated Judgment will have

application only to the rights which this Court declares,

determines and adjudges reside in the Vail Company, the

United States of America, and the other parties to it.

EQUITY WILL NOT AID THE VAIL COMPANY

Good conscience precludes equitable aid to the Vail Company.  By its efforts to avoid the Stipulated Judgment Vail Company seeks to

(a)  Attain unjust enrichment;

(b)  Reap the benefits which it obtained through inducements to the

National Government predicated upon the Stipulated Judgment

while avoiding its obligations;

(c)  Avoid the principles of laches;

(d)  Flout good conscience which is the fountainhead of the maxim that

He Who Comes Into Equity Must Come In With Clean Hands.

The Stipulated Judgment is res judicata among the parties to it; collateral attack upon that Judgment may not be countenanced; this Federal tribunal is precluded from invading the jurisdiction of the Superior Court of San Diego County.

5435

GPO 16—29096-1

**UNJUST ENRICHMENT WOULD ENSUE IF VAIL COMPANY
COULD AVOID COMPLIANCE WITH THE STIPULATED JUDGMENT
- HE WHO SEEKS EQUITY MUST DO EQUITY -
HE WHO COMES INTO EQUITY MUST COME IN WITH CLEAN HANDS**

Vail Company Would Violate Its Covenant
   In Regard To Naval Well:
      $51,610 [1/] is but a single item of the unconscionable

and unjust enrichment sought by the Vail Company in its

maneuver to avoid its obligations to the United States of

America under the Stipulated Judgment entered in the Superior

Court of San Diego County, California; entered virtually twenty

years ago on the 27th day of December, 1940. [2/]

      Predicated upon the Stipulated Judgment, last mentioned,

in accordance with a solemn covenant with Vail Company, it

was agreed by the United States of America that a well would [3/]

be drilled to great depths upon the Vail Company properties.

Mahlon Vail, representing the defendant Company, on the 8th day of

March, 1951, having agreed to the drilling of the well in question, declared:

      "It is understood and agreed that the exploratory

water well, * * *

            shall be considered a 'water well' under

            that certain Stipulated Judgment in an

            adjudication suit entitled 'Rancho Santa

            Margarita, a Corporation, versus N. R. Vail,

            et al.,' No. 42850 in the Superior Court of

            the State of California in and for the County

            of San Diego, California dated December 26, 1940.

            "It is also understood and agreed that

            the right of access to Permitter's [ Vail Company ]

            land to make continuing tests to obtain water

            data, provided for under the said Stipulated

            Judgment, shall apply to the said exploratory

            water well."

_____

1/  Please refer to attached Exhibit A, letter of 3 March, 1952.
2/  Please refer to Exhibit A of Complaint and Supplementary and Amendatory
     Complaint.
3/  Please refer to attached Exhibit B, Revocable Permit Agreement Between
     Vail Company and the United States of America.                    5436

GPO 16—69005-1                        - 1 -

Unjust Enrichment For Vail Company
  If It Can Avoid Its Obligations:

Fruits of the Stipulated Judgment, the terms of which the Vail Company now seeks to avoid, are numerous and of immense value. Too great stress may not be placed on the fact that the Naval Well secured by the device above described is a major source of irrigation water for the vast Vail holdings. From it are pumped each year huge quantities of water for the irrigation of fields which yield to the Vail Company vast returns.

An analysis of the testimony of Mr. Wilkinson who now appears to have displaced Mahlon Vail as manager of the Vail Company Ranch, discloses the use to which the Naval Well is placed in the water distribution complex of that rich company. As to the location of the Naval Well reference is again made to Exhibit B of this response, a part of which is a map of a small part of the Vail holdings but which nevertheless locates that well. When viewed with the Vail Exhibits in this cause, the importance of that highly valuable source of water becomes apparent.

Observed in regard to the $51,610 expenditure upon the Vail properties for the drilling of the Naval Well is this important fact: In addition to the costs of construction there were very large costs of personnel, transportation and related items which are not included in the costs of construction - they, however, must be considered from the standpoint of the unjust enrichment of the Vail Company which would ensue if their plans of avoiding their obligations are permitted to materialize.

Although the Naval Well which yields an all-important supply of water to the Vail Company is but a single item of the unjust enrichment which the Vail Company now seeks against the National Government, it is representative of the totally inequitable and unconscionable course of conduct which is now being adopted by that Company after nineteen years of close cooperation with the United States of America under the Stipulated Judgment, which that Company now petitions this Honorable Court to declare null and void and of no force and effect.

When the equities are weighed in regard to the Vail Company's

5437

1  petition, this Honorable Court is requested to take into consideration these

2  all-important facts:

3      There is not a single well on the Vail Company property

4      remotely comparable to the Naval Well drilled and cased

5      by the United States of America at great cost almost a

6      decade ago.  It drilled that well believing, as it was

7      lulled into believing by the Vail Company, that the latter

8      would not seek unjust enrichment - would not violate the

9      solemn obligation embraced in the Stipulated Judgment.

10      As will be demonstrated in the progress of this review,

11      the other so-called deep wells are shallow in comparison; [4/]

12      so ancient - drilled upwards to sixty years ago - that

13      pumping from them would, it is understood, cause a collapse

14      of their casings.

15  **Historical Review of the Inducements and Circumstances**
16    **Attendant Upon the Drilling of the Naval Well:**

17      Immense value of the Naval Well to the Vail Company has been

18  discussed above.  As defendants invoke equity to escape their legal

19  responsibilities, circumstances surrounding the drilling and use of that

20  invaluable asset added to the Vail Company properties warrant review.  Similarly

21  warranting review are other related facts which in themselves constitute

22  barriers to the invocation of the conscience of this Court as a device of

23  fleeing responsibilities which were accepted by the Vail Company; more

24  accurately, which were invited by it.

25  **Pemberton Report - October 23, 1950:**

26      Negotiations respecting the drilling of the Naval Well were

27  conducted between the United States of America and representatives of the

28  Vail Company far in advance of making available to the Vail Company that

29  highly productive source of water.  Pertinent in that connection is the letter

30  dated October 21, 1950, to the above mentioned Mahlon Vail from

---

31
32  4/  Dairy Well, China Garden Well, Camp Well - of depth to five hundred feet -
      compared to approximately 2,500 feet of the Naval Well with excellent
      casing.

5438

1   J. R. Pemberton, Petroleum Geologist and Engineer.  There Mr. Pemberton refers

2   to the availability of artesian water underlying the Temecula Valley within

3   Vail's vast holdings.  Noteworthy is his recommendation that an expert oversee

4   the development because "The water resources are believed to be of sufficient

5   importance to warrant" it.  A fact borne out by the Naval Well which is so

6   fruitful to the Vail Company. [5/]    Related to Pemberton's statement is the fact

7   that George F. Worts, Jr., of the United States Geological Survey was invested

8   with the authority to go upon the Vail Rancho for the purpose of drilling the

9   well and logging it, all as fully proved in the record in this case. [6/]   Mr. Worts

10   testified in detail on the matter.

11        Warranted is a thorough consideration of the Pemberton Report dated

12   October 23, 1950, which accompanies this memorandum. [7/]   "The Pauba Ranch"

13   declares Pemberton in his opening sentence, "is well blessed with abundance of

14   water" - "well blessed" indeed when one considers the thousands upon thousands

15   of dollars of  taxpayers' money poured into the Naval Well and its immense

16   yield for that Company.

17        H. M. Hall, then engineer for the Vail Company, in a letter to

18   Colonel Dubber of the Marine Corps, submitted the above-mentioned Pemberton

19   Report.  That submittal was made by letter dated November 9, 1950, in which

20   Mr. Hall, expert witness in this trial, reviewed the operation under the

21   Stipulated Judgment, which had then governed the Vails for a decade. [8/]

22   <u>$50,000 At Least in Addition to the $51,610 Have been
23   Expended by the United States of America as Required
    by the Stipulated Judgment Which the Vail Company
24   Would Vitiate:</u>

25        $101,610 is a minimum figure of public funds actually expended by

26   the National Government reliant upon the inviolability of the Stipulated Judgment.

27   That expenditure is, of course, but a portion of the outlay of the taxpayers'

28   dollars - taxpayers' dollars paid out in the belief that the Vail Company

29   would accept the bounty stemming from those expenditures only if it would

30   assume the concomitant responsibilities attendant upon it by reason of the

31
32   5/  Please refer to accompanying Exhibit C.
    6/  Mr. Worts' report on the Naval Well is a matter of record in this cause.
    7/  Accompanying Exhibit D, Artesian Water Resources.
    8/  Please refer to accompanying Exhibit E.

5439

1  Stipulated Judgment.  It is difficult to perceive the Vail Company now seeking

2  the relief for which it prays for as this Honorable Court well knows, equity

3  flows from good conscience.

4  Care was taken in the Stipulated Judgment to provide for the

5  compliance with its provisions by scientific means - compliance let it be

6  emphasized which has inured greatly to the Vail Company's benefit, rendering

7  highly questionable the wisdom of their attempted deviation from the course

8  so long pursued.  Imperative terms spell out the means of enforcement of the

9  respective rights and obligations of the National Government and the Vail

10  Company under the Stipulated Judgment that has regulated their relationship

11  since 1942.  This quoted and emphasized excerpt from the Judgment in question

12  clearly removes any doubt of the close relationship of the parties:

13  "Section Seventh:  For the purpose of dividing among,

14  and allocating to, the parties of this action, the waters of

15  the Temecula-Santa Margarita River and its tributaries, at

16  the places and in the amounts specified in this judgment,

17  the plaintiff and the defendants immediately shall establish,

18  and thereafter maintain jointly  * * * stream-flow (automatically

19  registering) gaging stations at the following three locations

20  on the Temecula-Santa Margarita River:

21  "Station No. One (1):  The upper end of Nigger Canyon

22  at or near the present location of the Nigger Canyon gaging

23  station;

24  "Station No. Three (3):  The upper end of Temecula

25  Gorge, immediately downstream from the confluence of

26  Murrieta Creek, at or near the present location of the

27  Temecula Gorge gaging station;

28  "Station No. Six (6):  The Narrows, at or near the

29  present location of the Ysidora gaging station.

30  "And plaintiff and defendants shall establish and

31  maintain jointly * * * gaging stations for measuring (and

32  automatically registering) the surface flow of said stream,

- 5 -

5440

1  or any of its tributaries, at any point thereon where the plain-

2  tiff, the defendants, or the interveners, or any of them, here-

3  after may construct or maintain appliances for the diversions

4  of the surface flow of said stream, or any of its tributaries.

5  (The cost of establishing and maintaining joint gaging

6  stations as are required hereunder, including the taking

7  of measurements and observations thereof, shall be borne

8  equally by the plaintiff and the defendants.)" (Emphasis supplied)

9  $500 a month has been paid to a water master agreed to by the Vail Company and

10  the United States of America to carry out the provisions of the Stipulated Judg-

11  ment respecting water measurements.  $250 a month of that sum has been paid by

12  the United States of America; $250 a month by the Vail Company, acting upon a

13  mutual understanding and arrangement to the end that the quoted provisions of the

14  Stipulated Judgment would be effectuated as they have indeed been effectuated for

15  upwards to twenty years.

16       The records in this cause both as to surface and ground water are

17  derived to a large degree from the measurements taken and maintained by reason

18  of the Stipulated Judgment.  Without a doubt the key measurements are and have

19  been maintained pursuant to that document.

20  <u>Inducements by the Vail Company in the Form of Representations</u>
21  <u>That They Would Abide by the Stipulated Judgment, Which</u>
       <u>They Now Seek to Avoid, Caused the Withdrawal by the United</u>
22  <u>States of America of Its Protest to the Application to</u>
    <u>Appropriate Rights to the Use of Water by Vail Dam:</u>

23       Vail Dam drastically changes the regimen of the Santa Margarita River;

24  completely controls Temecula Creek, major tributary of the Santa Margarita River.

25  When the Vail Company filed its application with the State of California to appro-

26  priate rights to the use of water of Temecula Creek by means of impoundment behind

27  the dam in question, protest was made to it by the United States of America.  Thus

28  confronted, the Vail Company requested the withdrawal by the United States of

29  America of that protest.  There follows the express inducement made by Mahlon Vail

30  to procure the withdrawal of the protest mentioned, based upon the representation

31  that the Vail Company was bound and would abide by the Stipulated Judgment.

32

- 6 -

5441

COPY

# VAIL COMPANY

5658 Wilshire Blvd.
Los Angeles 36, California
Wyoming 2114

October 6, 1947

Commanding General
Marine Barracks
Camp Pendleton
Oceanside, California

Dear Sir:

Following a conference in the office of
Public Works Officer, 11th Naval District, we wish
to state that in the Superior Court Judgment now in
effect, apportioning the waters of the Santa Margarita
River between us, it is our understanding and belief
that the 1/3 and 2/3 division is of the total water
crop of the stream system, including flood water.
Any diversions that we may make by means of Vail Dam
and reservoir will not mature into an appropriative
right as against you, over and above or superseding the
proportion of water alloted to us by the Judgment.

It is our understanding that this state-
ment will enable you to withdraw your Protest of
August 14, to our Application No. 11518.  This will
enable us to proceed more promptly with the dam
construction, and the earlier impounding and bene-
ficial use of flood waters.

It is understood that a detailed method
of operation of Vail Dam and other measurements
necessary to the division of the stream in accordance
with Judgment will be the subject of a later agreement
between us.

Yours very truly,

VAIL COMPANY

By (Signed)  Mahlon Vail

Managing Trustee

MahlonVail
MM

5442

- 7 -

1    Reliant upon the letter set forth above, the protest was in fact
2    withdrawn by the United States of America, the hearing on the application
3    conducted without objection from the United States of America, and there was
4    issued to the Vail Company the permit to undertake the construction of the
5    dam in question.

6    Twelve years have elapsed since the inducement made by the Vail
7    Company to the United States of America to withdraw the protest; twelve years,
8    let it be emphasized, during which the Vail Company reaped rich rewards from
9    the representation of intention to abide by the Stipulated Judgment in return
10   for the agreement of the United States of America to withdraw its protest to
11   the application, allowing the issuance of the permit without which the dam
12   could not have been constructed.

13   Of more than passing interest is this unassailable fact:

14   At the time that the Vail Company induced the
15   United States of America to refrain from exercising
16   its right to protest the application by its assurance
17   that it would abide by the Judgment, every ground then
18   existed upon which that Company now purportedly relies
19   to avoid its just obligations under the Judgment.

20   Pertinent, moreover, are these facts:

21   (a)  Five full years had elapsed since the acquisition
22   by the United States of America of the properties comprising
23   the Rancho Santa Margarita;

24   (b)  Five full years of military use of the waters
25   of the Santa Margarita River by the United States of
26   America had transpired;

27   (c)  Five full years during which time the
28   Vail Company had recognized that it was bound by the
29   Judgment it now seeks to have set aside by reason of
30   non-existent but nevertheless asserted equities in
31   its favor.
32

5443

- 8 -

GPO 16—59096-4

1   Benefits Accepted by the Vail Company Under the
    <u>Stipulated Judgment Respecting the Use of Water -</u>
2       (i)  <u>Impoundment of Water in Vail Reservoir;</u>
       (ii)  <u>Use of Water on Non-riparian Lands</u>
3            <u>are but Examples:</u>

4       Vail Dam and Reservoir are a clear invasion of the riparian rights

5   of the United States of America; that impoundment in these times of drought must,

6   of course, cease, with rare exceptions, if the Stipulated Judgment is abrogated.

7   Obviously in this period of protracted drought the United States of America must

8   reexamine the full nature and extent of its rights and entitlements in the

9   Santa Margarita River as they relate to the Vail Company, disregarding the

10  proviso of the Stipulated Judgment permitting the impoundment of water by either
         9/
11  party.

12      Oddly the Vail Company seeks to avoid the Stipulated Judgment which

13  permits it to use waters upon non-riparian land.  Similarly, it complains about

14  that use by the United States of America.  Yet absent that Stipulated Judgment

15  the Vail Company could not presently irrigate non-riparian land as against the

16  United States of America whose riparian rights far exceed the water available
         10/
17  to it.

18      In no sense are these examples exhaustive of the benefits which the

19  Vail Company has avidly accepted to their great financial gain through the

20  Stipulated Judgment and their repeated assertions to the National Government

21  of their intention to be bound by it.

22  _____

23  9/      "Section Thirteenth:  Each of the parties hereto shall have the right
    to construct dams or reservoirs on its or their respective lands or elsewhere,
24  for the purpose of intercepting or impounding or conserving such party's share
    of the flood waters of said river and its tributaries; provided, however, in
25  the event any such dam or reservoir is hereafter constructed by defendants for
    such purpose, the rights of defendants to abstract and divert Storage Water
26  pursuant to Section Tenth hereof shall cease and terminate.
            "Defendants shall not make, during any irrigation season, any surface
27  diversions of the waters of said river at the Bridge Pumping Plant, the Cantarini
    Pumping Plant or the Tule Pumping Plant referred to in the findings herein, or
28  at any other point on said Temecula-Santa Margarita River below the point of
    Rising Water as shown on said Exhibit No. 265."
29
    10/  That acreage is referred to as the Vail Company "Govt Land."
30

31

32

5444

Recognition by Vail Company of the Binding
  Effect of Stipulated Judgment:

California's finest lawyers in the field of water litigation
drafted the Stipulated Judgment which the Vail Company co-sponsored with the
Rancho Santa Margarita.  Pertinent are the resolutions adopted by the Board of
Directors and the Vail Trustees approving the Judgment.  Copies of those
resolutions were submitted to this Honorable Court.  Noteworthy is the fact that
Mahlon Vail signed the resolutions in his official capacity and purportedly acted
for himself.

For upwards to twenty years the Vail Company prospered mightily
under the Stipulated Judgment which it so readily sponsored, but which now
it wishes to avoid.  Throughout that long period that Company, through its
Manager Mahlon Vail, enjoyed the fruits of their Judgment.

  (a)  Delivery of Water Pursuant To Stipulated Judgment:

Provision is made in the Stipulated Judgment that:

"During the irrigation season of each year,
to-wit, May 1 to October 31, inclusive, * * * /Vail Company_7
shall cause to be maintained at Gaging Station No. Three (3)
a constant flow of water of not less than three (3) cubic
feet per second (one (1) cubic foot per second being the
equivalent of fifty (50) miner's inches). 11/

When the flow at Temecula Gorge in which is located the above mentioned
Gaging Station No. 3, dropped below three cubic feet per second, the Commanding
General at Camp Pendleton wrote the then counsel for Vail Company advising of
its violation of the Stipulation, adding:

"Please treat this communication, therefore, as our
formal demand upon your client, the Vail Company, to take
necessary, immediate action to contribute the deficiencies
occasioned by the decreased surface flow, as it has
deviated from the provisions of the Stipulated Judgment,
* * *." 12/

---

11/  Section Eleventh: Part I.
12/  Accompanying Exhibit F, letter dated July 26, 1951, from Oliver P. Smith,
     Major General, USMC, Commanding, to O'Melveny & Myers;

5445

Replying to that demand, the Vail Company representatives declared:

"Our client, the Vail Company had anticipated the possibility of a low surface flow due to the unprecedented drouth conditions and as was disclosed in negotiations with you some time ago, planned the drilling of a deep well in the lower end of Pauba Valley and using it to pump water into the stream, if necessary, to maintain the minimum flow at Temecula Gorge.

\* \* \*

"We hope that the above information is sufficient to satisfy your formal demand.  If anything further is required, the Vail Company stands ready to do everything humanly possible to comply with the provisions of the stipulated judgment." [13]   (Emphasis supplied)

An examination of the stream flow records will reveal that the Vail Company has, with minor variances, delivered to the United States of America the three second feet at the mouth of Temecula Gorge during the period specified in the Stipulated Judgment.

Especially pertinent in regard to the delivery of water at Temecula Gorge by the Vail Company pursuant to its Stipulated Judgment is this fact, succinctly enunciated by the Supreme Court of the State of California in regard to the precise subject under consideration:

"The trial court also found, and this finding is admittedly supported by the evidence, that the normal flow of the Temecula-Santa Margarita river is not sufficient to supply all the riparian needs of all of the riparian lands of either respondent or appellants, and that there is only enough water available for the irrigation of a portion of their riparian lands and for the uses thereon which are most valuable and profitable. This was practically stipulated to by the parties, and was one of the basic facts upon which the action was tried." [14]

[13]  Accompanying Exhibit G, Letter August 2, 1951, to Oliver P. Smith, Major General, USMC, from O'Melveny & Myers - cc Mahlon Vail.
[14]  Rancho Santa Margarita v. Vail, 11 Cal.2d 501, 81 P.2d 533, 541 (1938).

5446

1    Not only has the Vail Company irrigable lands within Pauba Valley

2 upon which to use all of the flow of Temecula Creek, it has the diversion

3 structures with capacity which exceeds the supply of water normally available

4 during the irrigation season.

5    Indeed, Temecula Creek by reason of the Vail operations is an

6 intermittent stream below Vail Dam and Highway 395 both as to time and place.

7 Only by artificial means is the Vail Company able to deliver into Temecula

8 Gorge the three (3) cubic feet of water per second as the Stipulated Judgment

9 requires.  Mr. Wilkinson testifying for the Vail Company, has delineated

10 reaches of Temecula Creek near the Gorge above mentioned where the stream

11 is in fact dry.

12    Absent the Stipulated Judgment it is obvious that Vail Company has

13 the need and the means of drying up the Santa Margarita River at Temecula Gorge

14 but has been restrained from doing so beacuse of the provisions of the document

15 which are presently under consideration.  Warranted here is reference to the

16 fact that it was the act of the Vail Company of drying up the stream which

17 precipitated the 444 days of trial which was concluded by the Stipulated

18 Judgment.  Since the initiation of the trial in that case on October 18, 1926,

19 thirty-three years ago, Vail Company has delivered to the United States of

20 America and its predecessors, pursuant to an injunction and subsequently

21 pursuant to the Stipulated Judgment, the waters which flow to the lands now

22 comprising the Naval Enclave.

23    (b)  Settlement of this Cause Between the United
          States of America and the Vail Company by
24        the Stipulation of October 23, 1951;
          Abrogation by the Vail Company of that Settlement:
25

26    Vail Company agreed with the United States of America in regard to

27 this litigation as follows:

28    "1.  That the rights and duties of Plaintiff, United

29    States of America, and the Vails, in and to the waters of

30    the Temecula-Santa Margarita River as between Plaintiff and

31    said Vails, are those fixed, determined, and declared in

32    that certain judgment entered on December 27, 1940, in the

     case of Rancho Santa Margarita * * * v. * * * Vail * * *,

5447

1     in the Superior Court of the State of California in

2     and for the County of San Diego, case No. 42850.

3      * * *

4      "4.  The introduction of a properly certified copy of

5     the said judgment of December 27, 1940 in the record in this

6     case will constitute proof of the rights and duties of the

7     respective parties hereto as against each other as specified

8     in said judgment."

9      From October 23, 1951, until March 5, 1959, the United States of

10  America and Vail Company were bound by that stipulation in regard to this

11  trial.  At the request of Vail Company's present counsel the United States of

12  America agreed to the termination of the arrangement pursuant to which this

13  cause was settled between the two major water users on the Santa Margarita River.

14  Costly litigation has been the incubus of that deviation by the Vail Company.

15  <u>In Summary</u>:

16      Oddly and with great suddenness the Vail Company decided that the

17  Stipulated Judgment

18      (a)  Under which it has prospered;

19      (b)  Pursuant to which it has so long proceeded;

20      (c)  The fruits of which it so readily enjoyed;

21      (d)  The continuity of which it utilized as inducements

22           to have the United States of America withdraw its

23           protest to the application of the Vail Company to

24           build the dam above described;

25      (e)  In  reliance upon which the United States of America

26           undertook at great cost the drilling of the Naval Well

27           which is now an invaluable asset of the Vail Company;

28  should be abrogated, with attendant irreparable damage to the United States of

29  America; the unconscionable unjust enrichment of the Vail Company.  Equally odd

30  is the mistaken belief that it may invoke equity to accomplish this unseemly

31  departure from good conscience.  That it cannot call upon equity to attain the

32  iniquitous, will be the subject matter of the next phase of this consideration.

- 13 -

5448

FAILURE OF VAIL COMPANY TO
    (a) STATE CLEARLY THE RELIEF IT DESIRES OR
        BASIS UPON WHICH IT IS PROCEEDING;
    (b) ALLEGE OR PROVE FACTS WARRANTING RELIEF;
    (c) CITE PRECEDENTS ENTITLING IT TO BE RELIEVED
        FROM THE STIPULATED JUDGMENT IT CO-SPONSORED
        APPROXIMATELY 20 YEARS AGO AND FROM WHICH
        IT HAS RECEIVED GREAT BENEFITS

Error pervades the Vail Company's attack upon the Stipulated Judgment. That error stems in part from the failure of that Company to:

    (a) State the grounds upon which it is proceeding in

        a Federal court to abrogate a State court decree;

        or to refer to authorities disclosing this Court

        to have power, authority or jurisdiction to invade

        the province of the State court which entered

        the Stipulated Judgment;

    (b) Refer to any law pursuant to which a Stipulated

        Judgment co-sponsored by the Vail Company;

        relied upon by the Vail Company to gain great

        advantages; could be vitiated at this late date.

Stipulated Judgment is Res Judicata:

Our Highest Court has declared that a judgment of the nature here involved is res judicata to the same extent as a judgment or a decree entered by the court after a trial on the merits. [15]  That principle has universal acceptance both in the State and Federal courts. [16]

A recent analysis of the precise principles which, it is respectfully submitted, govern in this cause, involved an effort to avoid the effect of a compromise settlement. In summarily dismissing the effort to set aside the compromise, the Court of Appeals for the Second Circuit stated: "It would be unfair for it, after retaining these benefits, to attempt to repudiate such part of the settlement as fifteen years later it discovers was less favorable to it than was warranted by the facts and law." [17]

15/ Burgess v. Seligman, 107 U. S. 20 (1883).
16/ Moore v. Schneider, 196 Cal. 380; 238 Pac. 81 (1925).
17/ Juilliard & Co. v. Johnson, 259 F.2d 837, 843 (C.A.2, 1958).

5449

GPO 16-90006-4

California's Supreme Court has declared that absent fraud or
collusion, a decree entered by consent may not be set aside. [18/]   California's
law on the subject has been correctly summarized in these terms:

> "A stipulated or consent judgment is as conclusive
> of the matters in issue and determined by it as a judgment
> rendered after trial." [19/]

To be observed in that connection are these unassailable facts:

(a)  Competent counsel represented the Vail Company
when it co-sponsored the Stipulated Judgment
that it now seeks to avoid;

(b)  There is not a scintilla of evidence that there
was fraud or collusion, and the Vail Company
does not now assert that there was - indeed,
the whole background of the Stipulated Judgment
reveals a mutual desire of all concerned, after
a full and complete review of all of the facts,
to resolve their respective rights.

## Collateral Attack on Stipulated Judgment By Vail Company:

> Few tenets of the law are more firmly established than
> "* * * that a judgment is not subject to collateral
> attack where the court had jurisdiction of the
> subject matter and of the parties or, in pro-
> ceedings in rem, of the res." [20/]

Vail Company, it is respectfully submitted, has ignored the principle quoted
above; it ignores the fact that the Superior Court of San Diego, California,
is the only proper forum to test the questions which it seeks to present in
this, the Federal Court.  California's Supreme Court has defined a collateral
attack upon a judgment as "an attempt to impeach the judgment by matters dehors
the record * * *." [21/]

---

18/  Newport v. Hatton, 195 Cal. 132; 231 Pac. 987.
19/  29 Cal. Jur.2d, Judgments, Sec. 236, page 196.
20/  30 Am. Jur., Judgments, Sec. 844, page 762.
21/  Parsons v. Weis, 144 Cal. 410, 77 Pac. 1007, 1009 (1904).

5450

GPO 16-69806-1

1    Manifestly Vail Company's effort here does not and cannot constitute

2  a direct attack upon the Stipulated Judgment.  Rather, here that Company seeks

3  in a Federal Court a review of matters which could only properly be heard in the

4  Superior Court of San Diego County, in which many years ago the Vail Company

5  requested the entry of the Judgment, and since that time has enjoyed the

6  benefits of it.

7    An authoritative analysis of the law of California declares:

8    "Many decisions emphasize as a feature of collateral attack

9    its attempt to step outside the record of the former judgment;

10   the rule of such decisions is that any effort to impeach a

11   judgment in a prior action or proceeding is collateral when

12   it is based on allegations of facts not apparent on the face

13   of the record, but wholly dehors the record." 22/

14   Any doubt as to the collateral nature of the attack upon the

15  Stipulated Judgment is removed when the brief of the Vail Company is analyzed

16  in the light of the answers filed by that Company.  Not only does the Vail Company

17  request a complete adjudication of all rights, it now calls upon this Honorable

18  Court to enter a decree for a physical solution.

19   Clearly the Vail Company has ignored the fundamental concepts of the

20  law and the procedures requisite to have declared void the Stipulated Judgment.

21        "HE WHO SEEKS EQUITY MUST DO EQUITY * * *"
          VAIL COMPANY HAS NOT "OFFERED TO DO EQUITY"  23/
22

23   Referred to above is the long and well documented history of the

24  relationship between the Vail Company and the United States of America under the

25  Stipulated Judgment which that Company now seeks to have this Court declare void.

26   Unjust enrichment pervades the Vail Company's claim to relief.  It has

27  procured through inducements urged under the Stipulated Judgment the drilling at

28  great cost of the Naval Well; the withdrawal of protest to the construction

29  of Vail Dam.

30  _____

31  22/  1 Freeman on Judgments, 5th Ed. Sec. 306.

32  23/  Gregory v. Ford, 14 Cal. 138, 142.

5451

- 16 -

Here let this fact be respectfully emphasized:

There is not a single authority to support the
invocation by this Court of its equitable powers
to set aside or to enjoin the operation of the
Stipulated Judgment, entered upon agreement by
the parties, effective for twenty years, pursuant
to which there has inured to the Vail Company
great and invaluable benefits.

Our Supreme Court has repeatedly declared the principles barring re-
lief of the character here sought by the Vail Company. [24/]

Barring Vail Company's plea for equitable
    intervention are three maxims:

(a)  Whosoever would seek admission into a Court of
equity must come with clean hands;

(b)  Equity will never interfere in opposition to
conscience or good faith;

(c)  Equity will never be called into activity to
remedy the consequences of laches or neglect, or the
want of reasonable diligence. [25/]

Unjust enrichment to the Vail Company which would ensue if the Stip-
ulated Judgment was set aside; laches; ratification of the Stipulated Judgment
by the Vail Company precludes the invocation of equity to relieve them from it. [26/]

In the cited case, where as here a judgment was entered from which
complainant sought relief, the Highest Court declared:

"After this course of conduct, he addresses himself to a court
of equity, praying that court to undo all that he has voluntarily
and deliberately performed, and in n order to accomplish this end

---

24 / Pickford v. Talbott, 225 U.S. 651 (1911)
    Brown v. Buena Vista County, 95 U.S. 157 (1877)
25 / Creath v. Sims, 46 U.S. 192, 204 (1847)

26/ Creath v. Sims, 46 U.S. 192 (1847)

- 17 -

5452

he seeks to stamp his own acts with illegality from their inception.

> For such purposes he surely would have no standing and receive no countenance in a court of equity, upon any of its known principles." 27/

Barriers of the nature alluded to, against the invocation of equity, most assuredly arise when consideration is given to the known facts, that:

(a)  $51,600 was spent to drill the Naval Well upon Vail Company's property based upon the representation that the Stipulated Judgment was then binding and would remain in force and effect.

(b)  For twenty years both the Vail Company and the United States of America have complied with it.

(c)  Vail Company represented to the United States of America that the Stipulated Judgment was binding to induce the United States of America to withdraw its protest to the construction of Vail Dam.

In another decision of our highest court, equitable relief from a judgment was denied by reason of the ratification of the judgment by the petitioner. There the Court declared:

> " . . . this appellant must, by his conduct, be regarded as having waived all right of inquiry into that consideration, nay, rather as having repeatedly admitted its validity." 28/

Again the Supreme Court declared:

> "Nothing can call forth—a court of equity—into activity but good conscience, good faith and reasonable diligence.

---

27 /  46 U.S. 192, 208 (1847)

28 /  Sample v. Barnes, 55 U.S. 69, 75, 76 (1852)
    See 31 LRA 202n; 775; 32 LRA 323

- 18-

5453

GPO 16—29098-1

1        Where these are wanting the Court is passive, and does

2  nothing." 29/

3        Warranting observation at this juncture is the indisputable

4  fact:

5        Not a single authority has been found which remotely

6        resembles the unconscionable course of the Vail Company—

7        certainly that Company cites no authorities which sup-

8        ports its position.

9  **Laches Bar Vail Company From**
10 **Relief In Equity**

11       Laches, declares the Court of Appeals for the Ninth Circuit, constitutes

12 a barrier to equitable relief against a judgment. From an opinion of that Court

13 this statement is taken:

14       "A party who thus neglects to avail himself of the

15       remedies afforded in the state court is precluded from

16       resorting to a federal court to obtain relief against

17       the decree." 30/

18 Pertinent in that regard is the fact that rather than attacking the decree the

19 Vail Company informed the State Court that:

20       "the terms of the proposed compromise and settlement

21       as evidenced by the said 'Stipulated Judgment' are

22       fair and reasonable as to Vail Company, its beneficiaries

23       and trustees." 31/

24 Also from the last cited Ninth Circuit decision denying equitable relief from a

25 judgment this statement is quoted:

26       "Unnecessary delay is deemed a waiver of the right.

27       It is no excuse for such delay that the plaintiff is

28       without means and resides in a distant state." 32/

29

---

30 29/   Brown v. Buena Vista, 95 U.S. 157, 160 (1877)
        See also Pickford v. Talbott, 225 U.S. 65 (1911)

31 30/   Bower v. Stein, 177 Fed 673, 677 (CA 9, 1910)

32 31/   Resolution of Vail Company, dated Dec. 20, 1950
   32/   177 Fed 673, 678

5454

GPO 16—29095-1

1      Our Supreme Court presents the principles which bar relief to the

2  Vail Company in these terms: "Laches and neglect are always discountenanced,

3  and, therefore, from the beginning of this jurisdiction there was always a

4  limitation of suits in this Court." [33]/

5      On the subject here being reviewed, the Court of Appeals for the Eighth

6  Circuit quoted this statement from a Supreme Court decision:

7          " 'A court of equity' will never be called into

8          activity to remedy the consequences of laches or

9          neglect, or the want of reasonable diligence." [34]/

10  Observed is this fact:

11          Vail Company for twenty years has reaped benefits from the

12          Stipulated Judgment it co-sponsored.

13          California's courts have shown great restraint in granting equitable

14  relief particularly where as here the petitioner has failed to proceed with

15  diligence against the Judgment.  Reference in that connection is made to this

16  rule enunciated on the subject:

17          "/ Petitioner _/ waited over two years and three months

18          after their default had been entered . . . about a year

19          after the Judgment had been rendered . . . before

20          taking any steps whatsoever." [35]/

21  In the light of the one year delay the California Court declared:

22          "Where a judgment by default is obtained against a

23          party through his own neglect, it constitutes no

24          ground for equitable intervention that the adversary

25          obtained relief to which he may not have been entitled." [36]/

26  Generally it has been authoritatively stated:

27          "It is a well-settled principle that equitable relief

28          will not be extended to those seeking to avoid the effects

29

30  _____

31  [33]/  Brown v. Buena Vista, 95 U.S. 157,160 (1877)
   [34]/  Travelers' Protective v. Gilbert, 111 Fed 269 (CA 81 901)

32  [35]/  Rudy v. Slotwinsky, 73 Cal App, 459, 466; 238 Pac 783 (1925)
   [36]/  Rudy v. Soltwinsky, 73 Cal App, 459, 466; 238 Pac 783 (1925)

5455

of their own neglect or misconduct.  Consequently even
an inequitable judgment will not be set aside nor will
its enforcement be enjoined where it was the result of
the complaining party's fault or inexcusable neglect. [37/]

" . . . Not only must due diligence have been exercised
in preventing the judgment, but to entitle himself to
equitable relief after the time has expired for recovering
relief at law, a party must show he was not negligent in
failing to pursue such lawful remedies." [38/]

Laches based upon the cited authorities constitute an insuperable
barrier to the relief sought by the Vail Company.

<u>ESTOPPED BY THEIR OWN ACTS, VAIL COMPANY HAVING
RECEIVED GREAT BENEFITS UNDER THE STIPULATED
JUDGMENT MAY NOT NOW REPUDIATE</u>

It is reiterated that Vail Company has neither pleaded nor proved any
grounds recognized in equity pursuant to which it could be relieved from the
Stipulated Judgment.  Certain it is, moreover, that it has failed to define
the nature, from its view, of the Stipulated Judgment.

Irrespective of the vagaries of the situation, wholly apart from the
legal import of the document, these facts are unassailable:

1. Vail Company received benefits under the Stipulated
   Judgment for twenty years;

2. Vail Company induced the United States of America
   to change its position, to its irreparable damage if
   the Stipulated Judgment is now abrogated or its en-
   forcement enjoined;

3. Vail Company co-sponsored the Stipulated Judgment
   advising the State Court that the document was fair
   to that Company

---

[37/] ; 3 Freeman on Judgments, 5th Ed., Sec. 1204, p.2500

[38/]  3 Freeman on Judgments, 5th Ed., Sec. 1250, p.2505

- 21 -

GPO 16—29996-1

5456

4.  Vail Company elected to be bound by it.

Relative to consent judgments the Highest Court has declared:

"It is a judicial function and an exercise of the
judicial power to render judgment on consent.  A
judgment upon consent is "a judicial act' . . ." [39]

Viewed then as an arrangement to end litigation; to fix their respective rights
it is not even doubtful that the Vail Company and Rancho Santa Margarita were
empowered thus to conclude their differences and to have them sanctioned by
a judgment entered by the Court.  As reviewed above, a stipulated judgment of
the character under consideration is res judicata in precisely the same manner
as any other judgment. [40]

It has however an additional feature described in this authoritative
statement:

"A consent judgment is undoubtedly contractual in its
nature and should be construed as though it were a
contract . . . nevertheless . . . the judgment is obviously
something more than a contract being rather the result of
a contract and its embodiment in form which places it and
the matters covered by it beyond further controversy.(Em-
phasis added) [41]

Undoubtedly the Vail Company having requested the United States of
America to withdraw its protest to the construction of the Vail Dam, it, as a
consequence, bound itself irrevocably by the Stipulated Judgment.  Recently the
Court of Appeals for the Fifth Circuit considered a case where as here the United
States ;of America, based upon an agreement among the parties, withdrew its pro-
test to an application pending with a state agency to appropriate rights to the
use of water. [42]

[39] Pope v. United States, 323 U.S. 1, 12 (1944)

[40] 2 ALR (2d) 515 for full annotation as to effect of consent judgments

[41] 3 Freeman on Judgments, 5 Ed., Sec. 1350, p.2773-2774

[42] El Paso County Water Improvement District v. City of El Paso et al,
     243 F (2) 927, 933 (CA 5, 1956); Cert. Denied 355 U.S. 820 (1957)

5457

There the Court declared:

> "It is too well settled to require much citation of
> authority that a bona fide contest furnishes adequate
> consideration for a contract of settlement. . . . the
> City of El Paso recognized the contract of August 10,
> 1949, as binding on it and accepted the benefits con-
> ferred thereby."

Similarly, the Vail Company, relying upon the Stipulated Judgment, induced the United States of America to withdraw its protest to the construction of Vail Dam. These facts have been fully reviewed above. As a consequence it is abundantly manifest that the Vail Company has no basis whatever for being relieved of its obligations.

Great benefits similarly accrued to the Vail Company by reason of the Naval Well. Those benefits were similarly predicated upon the Stipulated Judgment. Under those circumstances there is no conceivable basis for permitting that Company to take the benefits of its inducements with the attendant irreparable damage to the United States of America which necessarily follow through granting that Company the relief for which it prays. Basic concepts of contract law sustain that proposition. 43/

Certain it is, moreover, that equity will not grant relief from a decree entered by the consent of the parties where as here benefits have been enjoyed based upon it, ratification of it having been evidenced by a twenty year history of mutual acceptance. 44/

On the background of the action by the Vail Company's act of co-sponsoring the Stipulated Judgment and having reaped great benefits from it, the succint statement of the law will reveal the fundamental reason for non-intervention of a court of equity relieving that company of the Judgment. 45/

---

43/  3 Williston on Contracts, Fifth Ed. Sec. 687, p.1980
44/  Nashville etc. Railroad v. U.S.,113 U.S. 261 (1885)
     Wilson v. Haber, 275 Fed 346 (CA 2, 1921)
45/  In Re Innis, 140 F (2) 479, 481 (CA 4 1944)  Cert. Den 322 U.S. 736

- 23 -

5458

GPO 16—69905-1

1    "A court of equity treats all proceedings at law as valid

2    and grants relief against the consequences thereof only

3    because the rights acquired thereby can not be retained

4    in good conscience. Freeman on Judgments, Fifth Edition,

5    p.2443, and cases there cited. To afford relief a plaintiff

6    must show fraud, duress, coercion or other ground for re-

7    lief in equity. Idem (p.2464). A court of equity does

8    not interfere on the ground that injustice has been done,

9    that a judgment is wrong in fact or law or that its en-

10   forcement will work a great hardship, unless the complain-

11   ing party was, without his fault, deprived of his opportunity

12   to present his defense on the merits. Rather, the rule per-

13   mitting parties to appeal to equity against a judgment is

14   of 'great strictness and inflexibility,' for, otherwise,

15   the jurisdiction of that court would soon supplant all

16   other tribunals. Chancery will intervene, therefore,

17   only when the complainant was prevented from presenting

18   a meritorious defense by the inequitable conduct of his

19   adversary unmixed with negligence or fault on his own

20   part; he must abide the consequences of his own neglect.

21   Idem pp.2516, 2517, 2518 and 2519 and cases cited."

22   Contained in that quoted excerpt are the tenets of the law, which it is re-

23   spectfully submitted govern in this case and the reasons why relief in equity

24   should not be invoked.

25                    HE WHO SEEKS EQUITY MUST DO EQUITY
26                    VAIL COMPANY MUST MAKE RESTITUTION
                          IF RELIEF IS GRANTED
27

28           It is fundamental that equity will not grant relief from a judgment

     unless the party seeking relief himself does equity.[46/]

29

30   _____

31   [46/]  2 Pomeroy Equity, 5th Ed.  393C, citing California cases.

32

                              - 24 -

                                                      5459

In summary it has been authoritatively declared that:   "Proceedings for equitable relief from judgments are, like other suits in equity, subject to the rule that an applicant for relief must come into court with 'clean hands' and 'he who seeks equity must do equity'." [47/]

Manifestly the Vail Company must  offer restitution to the United States of America for the great outlay of federal funds which have been made by the National Government to the immense benefit of the Company in question . It is not even doubtful that equitable tenet is applicable here.

### VAIL COMPANY MUST PLEAD AND PROVE
### IRREPARABLE DAMAGE

Elementary but nevertheless very important in this case is the failure of the Vail Company to plead—much less prove irreparable damage. On the subject the Court of Appeals for the First Circuit declared:

> "It is settled that a federal court may not grant the extraordinary equitable remedy of an injunction if the complaining party has a plain, adequate and complete remedy at law.  And if the complaining party seeks to enjoin the threatened prosecution of a legal action the same rule applies.  An injunction will not be granted if it appears that the party will have an adequate oppor- tunity in the legal action itself to interpose by way of defense and fully to avail himself of the grounds upon which he seeks to enjoin the prosecution of the action. Moreover the federal courts are particularly cautious not to intervene by injunction, except upon a clear showing of irreparable injury, . . ." [48/]

Our Highest Court in a case where relief in the form of restraint against the

---

47/   30A Am. Jur. Judgments, Sec 816, page 744 and cited cases

48/   Porto Rico Tel. Co. v. Puerto Rico Com. Auth., 189 F(2) 39, 41 (CA 1, 1951)
           Cert. Den. 342 U.S. 840

- 25 -

5460

GPO 16—29000-1

state commission was sought declared:

> "Unless necessary to protect rights against injuries other-
> wise irremediable injunction should not be granted. [49/]

### RIPARIAN OWNERS AS AMONG THEMSELVES MAY AGREE TO EXERCISE THEIR RIGHTS AS PRO-VIDED IN THE STIPULATED JUDGMENT

As between the Rancho Santa Margarita and the Vail Company it is not even doubtful that they could agree to use the yield of their riparian rights upon non-riparian lands. [50/]

Worthy of observation in that regard is the fact that much of the Central Valley of California has been irrigated by means of the severance or violation of riparian rights thus permitting use of water upon large areas of non-riparian land. [51/]

Indeed, California's great agricultural growth to a marked degree can be attributed to the violation of riparian rights by agreement, severance or encroachment.

Wiel quoting from one of the California cases above cited set forth this principle: "As against himself (a riparian) or his grantee he may contract for the diversion of the water to non-riparian lands, but the right of the inferior proprietor will not be affected by such contract." [52/]

It has been repeatedly declared that:

> " . . . so long as the rights of the lower proprietor are
> not infringed, the riparian may contract for the diversion
> of water to non-riparian lands as against himself and his
> grantees; . . ." [53/]

---

49/  State Corp. Comm. v. Wichita Gas Co., 290 U.S. 551, 568 (1933)

50/  Gould v. Eaton, 117 Cal 539, 543; 47 Pac 577; Spring Valley Water Co. v. Alameda Co., 88 Cal. App. 157, 167-168; 263 Pac. 318 (1927)

51/  United States v. Gerlach Livestock Co., 339 U.S. 725 (1950)

52/  1 Wiel, Water Rights In the Western States, 3rd Ed. Sec. 844, p.906

53/  The Cal. Law of Water Rights, Hutchins, page 253; see p.192

- 26 -

5491

As a consequence it is free from doubt that provision in the Stipulated Judgment
for the use of water outside the watershed does not violate the California
law.  In that connection inquiry necessarily arises on these propositions:

    Does the Vail Company intend to cease irrigating its non-

      riparian lands;

    Cease to impound waters behind Vail Dam

which acts are to a marked degree in contravention of the riparian rights of
the United States of America and could not be countenanced absent the Stipulated
Judgment?

    It is, of course, elementary that if Vail Company is freed from the
Stipulated Judgment, so is the United States of America.

MILITARY USE WITHIN STIPULATED JUDGMENT
AND RIPARIAN RIGHT:
ESTOPPEL AGAINST VAIL COMPANY

    It is urged that in some manner the use of water by the United States
of America for military purposes has caused the Stipulated Judgment to be
abrogated.  Nevertheless these facts are unassailable:

    1.  The Stipulated Judgment does not limit the use of

      water to agricultural purposes.

    2.  Long after the United States of America began to

      use the water for military purposes Vail Company

      (i) Induced the United States of America to withdraw

        its protest to Vail's application to construct

        Vail Dam;

      (ii)  Accepted the benefits of the Naval Well.

    Based on the equitable principles reviewed above Vail Company may not
now successfully urge the invalidity of the Stipulated Judgment.

    It is of course elementary that riparian rights may be exercised for
any beneficial use.  As a consequence the use of water for military purposes
is entirely appropriate. [54/]

---

[54/] Lux v. Haggin, 69 Cal 225, 391; 4 Pac 919 (1884)

5462

1
2

## THERE IS NO BASIS FOR VAIL COMPANY'S REQUEST THAT THIS FEDERAL COURT ENJOIN A STATE COURT JUDGMENT

3      A careful review of the law has failed to reveal any authority

4  which would justify this Court's invasion of the jurisdiction of the Superior

5  Court of the State of California, in and for the County of San Diego.  In

6  those rare instances in which a Federal Court has enjoined a State Court

7  judgment, there was overwhelming proof of the need for that action.  In the

8  case now under consideration, there are neither averments nor evidence which

9  warrant the intrusion of this Court into the jurisdiction of the courts of

10  California.  Indeed, the unquestionable proof now before this Court is that

11  it would be totally inequitable for a tribunal of the United States of America

12  to take that requested action.

13      Although no cases have been found which would support a request for

14  relief against the Stipulated Judgment, the general principles on the subject

15  will be found in the citations referred to below. 55/

16

17                           CONCLUSION

18

19      Vail Company has failed to disclose a basis for relief.  Vail Company

20  has moreover failed properly to plead and as a result it is impossible for

21  issue to be joined.  Under the circumstances it appears essential that appro-

22  priate pleadings be filed specifying the grounds upon which it is proceeding.

23                              Respectfully submitted,

24                              UNITED STATES OF AMERICA

25

26                              _____
                               J. Lee Rankin, Solicitor General

27

28                              _____
                               William H. Veeder, Attorney
29  Dated:  September 21, 1959        Department of Justice

30

31  _____

32  55/   30 "A" Am. Jur., Judgments, Sec. 756; 3 Freeman on Judgments, 5th Ed,
        p.2451, Sec. 1182

                                                           5463

GPO 16—22085-1

COPY

EXHIBIT  A

C-250.01/ej
NOy-27008

3 Mar 1952

From:   Chief, Bureau of Yards and Docks
To:     Quartermaster General of the Marine Corps

Subj:   Completion of project, Camp Pendleton, Oceanside, California

1.    The following is a report on a completed project which was
financed from appropriation 1711106.11, MCTMF, 1951, and on which
the work was accomplished by Contract NOy-27088.  The unexpended
balance is returned hereby to the Marine Corps for credit to the
appropriation:

Project:  Survey of water resources on Vail Property (Pauba test well).
Allocation to BUDOCKS under QM Authority No.6386      $51,718.00
Expenditure as shown by voucher                        51,610.55
Unexpended balance                                  $    107.45

Copy to:
OICC, 11ND

George W. Higgs, Jr.
By direction of Chief of Bureau

5464

COPY

### REVOCABLE PERMIT AGREEMENT

between

VAIL COMPANY

and

THE UNITED STATES OF AMERICA

For and in consideration of the mutual benefits to be derived therefrom the Vail Company, which has its principal place of business at 5658 Wilshire Boulevard, Los Angeles, California, hereinafter referred to as the "Permitter", does hereby grant to the United States of America, represented by the Chief of the Bureau of Yards and Docks, acting under the direction of the Secretary of the Navy, its authorized rperesentatives and contractors, hereinafter referred to as the "Government", permission to drill an exploratory water well on a parcel of land owned by Permitter, together with the right of ingress thereto and egress therefrom, situated in Pauba Valley, Riverside County, California, the location of which is shown in red on a map entitled "Map of Portion of Pauba Valley Showing Location of Exploratory Water Well to be drilled by United States of America", marked Exhibit "A", attached hereto, and by this reference made a part thereof.

This permit is granted subject to the following provisions and conditions:

1. This permit shall become effective as of the date of acceptance by the Government, and shall continue until the exploratory water well authorized to be drilled hereunder is completed; PROVIDED, however, that if drilling operations are not commenced by the Government within forty-five (45) days from the effective

5465

date hereof, this permit shall become null and void.

2.  The specifications to be used in drilling the exploratory water well shall be approved by both parties hereto prior to the commencement of drilling operations.

3.  During drilling operations, the Government shall have the right to make such inspections and such tests as it may consider necessary to obtain flowage and other water data as the Government may require.

4.  It is understood and agreed that the exploratory water well, when completed, shall belong to and be wholly under the control of the Permitter, and shall be considered a "water well" under that certain Stipulated Judgment in an adjudication suit entitled "Rancho Santa Margarita, a Corporation, versus N. R. Vail, et al.," No. 42850 in the Superior Court of the State of California in and for the County of San Diego, California, dated December 26, 1940.

It is also understood and agreed that the right of access to Permitter's land to make continuing tests to obtain water data, provided for under the said Stipulated Judgment, shall apply to the said exploratory water well.

5.  This permit shall not be assignable or transferable except upon the written consent of the Permitter.

6.  The Government shall not be considered as acquiring hereunder any interest whatever in the property of the Permitter.

7.  The Government assumes and agrees to indemnify and save harmless the Permitter against all claims, demands, action or causes of action arising or growing out of loss or damage to property or injury to or death of persons resulting in any manner from the drilling of the exploratory water well, occasioned in whole or in part by the acts or omissions of any of the officers, agents

2

5468

or employees of the Government insofar as it may legally do so, pursuant to the provisions of an Act of Congress approved June 25, 1948 (62 Stat. 869,982, Title 28, U. S. Code, Sections 2671-2680) or any other law now existing or hereafter enacted.

8. The Public Works Officer, Eleventh Naval District, San Diego, California, is hereby authorized and empowered to act as the local representative of the Government.

9. No member of or delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this permit, or to any benefit that may arise therefrom; but this provision shall not be construed to extend to this permit if made with a corporation for its general benefit.

IN WITNESS WHEREOF, this permit is executed on behalf of the Vail Company, this  8th  day of  March,  1951.

VAIL COMPANY

In presence of:

(s)  H. M. Hall                    By  (s)  Mahlon Vail

(s)  David York

THIS PERMIT is also executed on behalf of the United States of America this     27     day of     March     , 1951,  in acknowledgment and acceptance of the terms and conditions herein set forth.

UNITED STATES OF AMERICA

By  /s/   Jack E. Cochrane
By direction of the Chief of the
Bureau of Yards and Docks, acting
under the direction of the Secretary of the Navy.

3

5467

COPY

EXHIBIT C

J. R. PEMBERTON
Petroleum Geologist and Engineer
714 West Olympic Boulevard
Los Angeles 15, California

October 21, 1950

Mr. Mahlon Vail,
Vail Company,
5658 Wilshire Blvd.,
Los Angeles, Calif.

Dear Sir:-

Herewith please find my report covering the essential
details of the factors bearing on the probable location
and depth of heretofore undeveloped artesian water resources
of the Pauba Ranch at Temecula, California. This in response
to your request that I give you my opinion covering the above
subject.

My opinion is that there is a very large supply of deep
artesian water in the lower temecula Valley which is as yet
unexploited.

Recommendations are made as to the manner in which I
believe the best results can be obtained in any development
program contemplated. The water resources are believed to be
of sufficient importance as to warrant the supervision of the
work by an expert rather than that it be placed in the hands
of the conventional water well driller.

I will be pleased to discuss the entire project at any
time with you or your associates.

Very truly yours,

/s/  J. R. Pemberton

5469

COPY                                                    EXHIBIT D

J. R. PEMBERTON
Petroleum Geologist and Engineer
714 West Olympic Boulevard
Los Angeles 15, California

ARTESIAN WATER RESOURCES

Of the

PAUBA RANCH

## INTRODUCTION

The Pauba Ranch, situated in the extreme southwestern corner
of Riverside County, California, and surrounding the small town
of Temecula, is well blessed with an abaundance of water.  The
Temecula River runs south of west through the Ranch, and is a
perennial stream.  The elsinore Valley, a long straight depres-
sion of over 25 miles length, passes south-eastward through the
Ranch.  Drainage from the small hamlet of Wildomar is southeast-
ward along this Valley to a point a few miles southeast of Teme-
cula where the stream, known as Murrieta Creek, joins the Temecula
River and passes southwestward through the mountains via Temecula
Canyon into the Santa Margarita River and thence toward the ocean.

Many wells have been drilled for both domestic and irriga-
tion water along the length of the Elsinore Valley, along the
Temecula River Valley and in the small lateral valleys on the
northeast side of the Elsinore Valley.  It may be said with
slight chance of error that no well has ever failed to produce
water unless it was located in the granite areas surrounding
the entire valley.

## GEOLOGY OF THE AREA

Published geological reports covering the area are two in
number.  United States Geological Survey Water Supply Paper No.
429, 1919, by Gerald A. Waring entitled "Ground Water in the
San Jacinto and Temecula Basins, California"; and Division of
Oil and Gas, State of California, "Geological Map of California",
1938.  Both of these reports show the regional geology while
Waring's report deals with the ground waters in details.

The geology of the area in so far as it affects the ground
waters is simple.  Regionally the basement complex of the area
consists of an extensively exposed mass of granite which is a
part of the great Hemet-Perris-San Gabriel basement.  This is
an old mass reduced by erosion to a semi-peneplain of well
rounded surfaces and with no sharp youthful type topographic
exposed forms.  In addition metamorphic schists, slates and
gneises greatly fractured and distorted are exposed in several
locations such as along certain portions of the southwest side
of the Elsinore Valley and in Nigger Canyon on the Pauba Ranch.
These metamorphics are of supposed Triassic age and the Granite

5470

COPY

ARTESIAN WATER RESOURCES - PAUBA RANCH                                          2.

has been intruded into them and is of Jurassic age.  Volcanic
basalts of probable Miocene age cover certain isolated areas
of the old peneplain, notably in the Santa Rosa Ranch area
southwest of the Pauba Ranch.

There are no known marine sediments within the area.  Sedi-
mentary strata consist of three types.  The first consist of
sandstones, sandy shales and shales of probable Tertiary (Mio-
cene or Pliocene?) age of continental or fresh water origin.
Exposures of these beds, usually tilted or faulted, occur in
widely separated localities.  These strata are insufficiently
exposed to enable one to make a paleogeographic map of their
extent or thickness.  The exposures occur close to the hills
composed of basement complex and near the western perimeter of
the later and undisturbed sediments and where erosion has
uncovered them.

The vast expanse of continental or fresh water sediments
which occupy the area below 1500 feet elevation in the Pauba
Ranch area and which extend from Aguanga far up the Temecula
River Valley to Corona along the great Elsinore Rift comprise
the main sedimentary series and at the same time form a
reservoir for a great volume of water.  Exposed sections of
the uppermost part of this series, which is of later Pliocene
age or in part earliest Pleistocene, indicate a high percent-
age of sands and sandy shales with a minimum of shale.  The
logs of drilled wells in every part of the expanse of these
strata show alternating sands, gravels, sandy shales and a
minor amount of clay and clay shale.  With the possible excep-
tion of outlying wells around the perimeter of the area covered
by these strata, no well has been drilled for water to the
bottom of this series, but in so far as drilling has progressed
the proportion of gravel and coarse sand increased with depth.
Within the Pauba Ranch these sediments cover more than 35 square
miles and doubtless the volume of gravels suitable for carrying
water would exceed half a billion cubic yards.  It is in these
gravels that the ground water resources of the Pauba Ranch exist.

GEOLOGIC STRUCTURE

A consideration of the ground water resources of the Pauba
Ranch involves an understanding of the geological structure of
the area in order to guide the possible development program if
and when any further development is considered.

The Elsinore Valley lies along a graben or depressed wedge
between two faults.  In the Pauba Ranch area the location of
the Elsinore fault lies along the face of the steep cliffs on
the southwest side of the Elsinore Valley.  The land mass to
the west has been uplifted.  The eastern fault is known as the
Wildomar fault, named after the hamlet of Wildomar some seven
miles southeast of Elsinore.  The surface trace of this fault

5471

ARTESIAN WATER RESOURCES - PAUBA RANCH                                    3.

is recognized by a long line of fresh water springs traceable
from Elsinore to the Temecula River.  The Elsinore Valley is
an erosional feature and lower than the hills of either side
and occupies the depressed block or "graben" lying between the
two faults.

The Elsinore fault is one of the so-called "Master Faults"
of Southern California and has, with the other "Master Faults",
been well described in R. T. Hill's book on "Southern California
Geology and Los Angeles Earthquakes", 1928.  This fault extends
from the region of Pomona southeastward for 150 miles within the
United States and then may be traced 50 miles further in Mexico
before its trace is lost in concealing overburden.

The age of this fault cannot be determined other than that
it is younger than the Jurassic strata which are disturbed by
the fault.  The faulting is responsible for the formation of the
graben between it and the companion Wildomar fault.  Doubtless
movements along this fault system have occurred many times in the
past, but the area has been stable since the latter part of the
Pliocene and during the Pleistocene.  The elevation of the bot-
tom of the Elsinore rift valley at the beginning of the stable
era was low and permitted filling of the valley with erosional
and detrital material being washed down from the surrounding
hills and mountains.

FORMATION OF THE WATER BEARING SEDIMENTARY STRATA

The sedimentary material, amounting to many cubic miles in
volume, was worn off the surrounding hills and transported into
a large depression.  Rainfall during that period was far greater
than that known in historic time; erosion was far faster than
now, and transportation and filling of the lake progressed
rapidly.

During the early stages of the filling of this vast lake
the streams flowed down quite steep slopes and the material
carried along was the coarse material.  In the later stages,
such as we now witness during floods, material transported is
sand and mud, the stones and rocks being left at the mouths
of the small canyons.  Thus as the lake filled the sediments
consisted of finer grained material with more muds and less
gravel.

As the lake filled, gravels would be found around the
perimeter of the lake even though some of these might not ex-
tend far out over the floor.  Filling took place in direct
proportion to runoff during periods of excessive rainfall and
doubtless there were periods of scanty rain between floods and
the subsequent deposition of finer sedimentary material would

5472

ARTESIAN WATER RESOURCES - PAUBA RANCH                          4.

cover the gravels and coarse sandy layers.  It seems probable
that all gravels found in the drilling of wells must be connected
to gravels touching the original sides of the lake which were of
granite or metamorphic rock.

It is, to continue the theory of the filling of this lake,
thus assumed that the deepest part of the lake was first filled
with gravels from the immediate vicinity surrounding the deepest
part of the depression.  Succeeding deposits covered the first
and continued until the lake was filled to about 1500 foot level.

At this time the upper surface of the water in the lake
found an outlet at what is now Temecula Canyon and probably with
great rapidity a notch was cut by the water through the barrier
hills to the southwest and the lake was drained to the point
where only a small lake remained, the present Lake Elsinore.
During this, and subsequent time, erosion of the material former-
ly filling the lake took place until the surface of the area as
we now find it was sculptured.  Erosion still occurs in periods
of heavy rainfall when such streams as Temecula River, Long
Valley and Santa Gertrudis Creeks carry some muds down into the
lower levels.

WATER DEVELOPMENT

A great many wells have been drilled for water.  In general
it is noticed that there is a slight slope southwestward toward
the Elsinore valley of the sediments.  Study of well logs fails
to develop any strata which may be recognized from well to well
to enable any correlations of strata to be made.  Most wells
have been drilled to depths around 100 feet or even up to 200
feet and the water used for domestic purposes.  On the Pauba
Ranch and in the near vicinity only have wells been carried to
such depths as 500 or more feet.  These deep wells resulted in
good flowing wells of high capacity in comparison with the shal-
low wells which were all smaller pumping wells.  Also the water
was recognizably different in chemical content.

Waring, in his Water Supply Paper No. 429, presented a map
covering the entire area considered in his report.  A portion
of that map is herein reproduced.  That part where the granites
and metamorphic rocks are exposed at the surface has been colored
red; the areas in which the sedimentary beds were deposited in
the old lake are colored brown or are cross hatched; and the
present lowest levels in which alluvium of recent origin occurs
are colored yellow.  In red ink is shown the surface trace of
the Elsinore fault and the Wildomar fault is shown in green ink.
The green spots show the springs from which water flows to the
surface.  In red ink are shown the locations of the principal

5473

COPY

ARTESIAN WATER RESOURCES - PAUBA RANCH                                    5.

wells, those which are artesian and flow are shown in solid
red and the pumping wells in red circles.  On Waring's original
map the shaded area indicates the artesian belt.  Waring at the
same time of writing his report did not have available the data
pertaining to the two large faults nor the existence of the gra-
ben between them and likewise he did not recognize the existing
barrier in the Wildomar fault which forms the lower barrier of
the artesian area.  The artesian area is vastly larger than
Waring indicated.

## WATER ANALYSES

Remarkable agreement exists between the chemical content of
the wells which produce water in the deep artesian zone and the
chemical content of these wells differs radically from that of
the shallow wells.  The high head existing in the artesian wells
indicates geological separation from the gravels furnishing the
shallow water and the chemical differences confirm the fact that
the source of the water is different.

Typical chemical content differences between the deep and
shallow wells in the Temecula Valley are as follows:

Average parts per million

| | Ca | Mg | Na | SO4 | Other | Total | Percent of Na |
|---|---|---|---|---|---|---|---|
| Shallow Wells | 75 | 25 | 125 | 185 | 365 | 775 | 50 |
| Deep Wells | 10 | 1 | 115 | 20 | 254 | 400 | 95 |

Thus the deep artesian water is decidedly preferable for
domestic use while the shallow water is best for irrigation.

The change in chemical content indicates a reduction of
mineral content of the water with depth.  This is undoubtedly
due to the far greater purity of the run off water during the
early geological stages of the filling of the old lake with
sediment.  During the later stages, as flow was reduced, greater
opportunity existed for the accumulation of salts on the surface
through evaporation and a consequent greater enrichment with
soluble salts in the run-off at that time.  Surface water at
present contains far greater mineral content than the waters from
the shallow wells.  The conclusion from the above would indicate
that greater purity of water would occur in wells if drilling
were to be carried deeper than heretofore.

## CONCLUSIONS

You have asked me for my opinion as to where drilling on
the Pauba Ranch can best be conducted with the object of getting
the most water for the least amount of drilling.  My conclusions

ARTESIAN WATER RESOURCES - PAUBA RANCH                                6.

are set forth as follows:

1. Based on every known fact there can be no question whatever as to the existence of a considerable area which is underlain by high head water. In order to take advantage of the head, the location of a well should be as low as possible and this limits the area within which drilling should be done to the Temecula valley and only in that part up stream from the Wildomar fault. The waters feeding this area come down the Temecula River drainage area. Below the Wildomar fault the source of water is in the Penjango Creek hydrographic basin which is of minor importance in comparison with the large area of the Temecula River basin.

2. No well has as yet penetrated the entire thickness of sediments in the lower Temecula valley. It is recommended that at least one deep well be drilled to thoroughly test the water potentialities of the entire sedimentary section.

3. Based upon all known data the slope of the old granite surface to the north and east of the Temecula valley can be projected to a depth of from 1000 to 1200 feet in the vicinity of the Wildomar fault at the lower end of the Temecula valley. Irregularities in the old topography will alter this depth depending on individual well locations and the exact depth at any point cannot be ascertained ahead of drilling.

4. It is recommended that the well be drilled with rotary tools and an electric log be run after basement is reached. This log will definitely indicate where water occurs and the zones of porous strata and those which are shales and not porous.

5. It is recommended that a competent engineer be engaged to watch the drilling of the well, to take drilling samples, and to make the log of the well rather than the drillers. The engineer will also make his recommendations as to the manner of completion of the well in every particular. Only in this way will the total potentialities of the water bearing strata be developed. The best man for this work is Mr. Roy Darke, 2004 Truxton Avenue, Bakersfield, California.

6. It is predicted that with depth beyond the 500 foot level to which wells have already been drilled that gravels should be more frequent and also thicker with a probable large size of individual rocks. The head will also be greater to some extent and the water of purer quality. The size of the hole

COPY                                           5475

ARTESIAN WATER RESOURCES - PAUBA RANCH                    7.

need not be greater than convenient to drill.  Once an extremely
prolific gravel strata is encountered the size of subsequent
wells can be changed if conditions warrant.

                              Respectfully submitted,

                        /s/  J. R. Pemberton

Los Angeles, California                    October 23, 1950

5478

COPY

COPY                                                    EXHIBIT E

H. M. HALL
Consulting Engineer
411 South Wall Street
Los Angeles 13

November 9, 1950

Colonel A. H. Dubber
Headquarters, U. S. Marine Corps
Office of Quartermaster General
Washington 25, D. C.

Dear Col. Dubber:

Enclosed herewith is the report from J. R. Pemberton, geologist, as to the probability of the existence of a large supply of water that can be pumped from the Pauba Valley on the Vail Ranch.

The terms of the stipulated judgment of the California Courts, under which the camp is now sharing the waters of the Santa Margarita River with the Vail Ranch, hold that all water pumped from this basin shall be considered as part of the stream flow, which is divided between the two properties, giving the Camp two thirds of the total crop available for such use. Therefore water pumped under the Pemberton Plan will increase this total water crop and in reality is to the advantage of Camp Pendleton. However, under the terms of the judgment, we are entitled to use an amount of water equal to half of the total use of the Camp, plus all the flood water we have captured at Vail Dam.

At present we have no pipe line from the dam to our distributing system so plan on turning it loose at the dam and recapturing it below, as stated in our original application. Since in pumping from the underground there is no way of differentiating between shallow sources and the deep artesian waters, the total pumping from the valley will of necessity all be in one classification. This pumped water can be used by us during periods when it seems wise to hold our stored flood water, or during an exceptionally dry season when, by the terms of the judgment, we are obliged to maintain a minimum stream flow at the Temecula Canyon Measuring Station.

We therefore feel that we should consider this deep stored water as "money in the savings bank" and that it should be held principally for the above mentioned uses.

5477

Colonel A. H. Dubber (contd)      - 2 -                November 9, 1950

That there is a large available supply in the deeper
gravels can not be doubted.  There are four wells in the
main Pauba Valley drilled nearly 50 years ago to a depth
of just over 500 feet, all showing artesian pressures and
having a free flow over the casing top of some 600 gallons
per minute when last measured.  These wells as far as we know
have never been pumped, and we doubt the wisdom of pumping
them now as the casing is light and badly corroded, but a
new and deeper well by all known indications, should yield
a large supply of water.

As a yardstick for the likely production of wells drilled
in the known artesian belt at a depth of 500 ft. we think it
is safe to use two wells that are located just off the ranch
property, which are both producing in excess of 100 miner's
inches at low lifts.  One of them just recently tested is
producing 115 miner's inches with only a 6 ft. drawdown.  We
believe that a number of wells properly spaced just above
the fault on the ranch should be equally productive even though
not drilled to the deepest gravels referred to in Mr. Pember-
ton's report.

We of course realize how important it is for the Camp
Pendleton to be able to meet any immediate demand for water.
In case the situation should become critical in the near
future, we feel sure that a plan can be worked out that will
assure a supply adequate to meet any emergency.

Sincerely yours,

/s/  H. M. Hall

HMH:em
Encl.

5478

1  <u>COPY</u>

2                          MARINE BARRACKS
3                     CAMP JOSEPH H. PENDLETON
                      OCEANSIDE, CALIFORNIA

4                                                   29054
5                                              26  July 1951

6    O'Melveny & Myers
7    433 South Spring Street
     Los Angeles, California

8    Attention:  Mr. Lauren M. Wright

9    Dear Sir:

10       It has come to the attention of this command, as the result
11   of the analyses of the stream flow readings collected by Mr.
     F. E. Green, which we understand are made available to your
12   client, the Vail Company, as in Section Seventh provided in the
     Stipulated Judgment entitled, "Rancho Santa Margarita, a corpor-
13   ation, versus N. R. Vail, et al," in the Superior Court of the
     State of California in and for the County of San Diego, recorded
14   on 26 December 1940, that, contrary to certain stipulations in
     Section Eleventh provided in the aforementioned Stipulated
15   Judgment, the surface flow at Gaging Station Number Three (3)
     located at the upper end of Temecula Gorge, immediately down-
16   stream from the confluence of Murrieta Creek, has been per-
     mitted to fall below three (3) cubic feet per second for a
17   continuous period in excess of ten (10) days, to wit:  from 3
     July 1951 through 22 July 1951, inclusive.

18       Please treat this communication, therefore, as our formal demand
19   upon your client, the Vail Company, to take necessary, immediate
     action to contribute the deficiencies occasioned by the de-
20   creased surface flow, as it has deviated from the provisions
     of the Stipulated Judgment, supra.

21                                     Very truly yours,

22

23

24                                     OLIVER P. SMITH
                                       Major General, USMC
25                                     Commanding

26   Copy to:
     BUDOCKS
27   QMG, MC
     11th NavDist
28   Mr. Wm. H. Veeder,
         Dept of Justice

29

30

31

32

                                                      5479

gpo 16-80005-1

EXHIBIT   G

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

O'MELVENY & MYERS
433 South Spring Street
Los Angeles
13

COPY

August
2nd
1 9 5 1

7430-a

Oliver P. Smith
Major General, USMC
Commanding
Marine Barracks
Camp Joseph H. Pendleton
Oceanside, California

Re Your No. 29054

Dear Sir:

We are in receipt of your letter of July 26, 1951 relative to the surface flow at Gaging Station Number Three (3), located at the upper end of Temecula Gorge.  Our client, the Vail Company had anticipated the possibility of a low surface flow due to the unprecedented drouth conditions and as was disclosed in negotiations with you some time ago, planned the drilling of a deep well in the lower end of Pauba Valley and using it to pump water into the stream, if necessary, to maintain the minimum flow at Temecula Gorge.

The program of drilling and developing this well was taken over by you and through unforseen circumstances its completion has been delayed long beyond the anticipated date.  If this delay had not occurred, the well would have been in production prior to the period mentioned in your letter and the deficinecies occasioned by the decreased surface flow would not have occurred.

We understand that a test pump has been installed in the well and the well is in the process of being tested.  As you know, until the draw-down curve of the well has been established it is difficult to obtain the proper pumping equipment.  The Vail Company made advance preparation with the power company and with the pump company so that there will be no delay in installing the new equipment as soon as the driller's test is finished.  There is no other readily available well from which water can be obtained to increase the stream flow at the Gorge.  The artesian flow from the well that is now going into the stream has raised the flow at the Gorge above the minimum requirement. We understand that the water produced during the testing of the well will more than make up the deficiency occasioned by the decreased surface flow within a matter of a day or two.  We understand that the deficiency is approximately  33 acre feet.

5480

OPO 16—59565-1