1    GEORGE STAHLMAN
2    Attorney at Law
     Route #1, Box 235
3    Fallbrook, California

4    Telephone:  RAndolph 8-2310

5    Attorney for defendant VAIL CO.

FILED

OCT 22 1959

CLERK, U.S. DISTRICT
SOUTHERN DISTRICT OF CALIF.
By _____
                        DEPUTY

6

7

8              IN THE UNITED STATES DISTRICT COURT

9                SOUTHERN DISTRICT OF CALIFORNIA

10                       SOUTHERN DIVISION

11

12   UNITED STATES OF AMERICA,      )
13                    Plaintiff     )      NO:  1247-SD-C
     -vs-                           )
14                                  )    NOTICE OF MOTION TO ADMIT
                                    )           EVIDENCE
15   FALLBROOK PUBLIC UTILITY       )
     DISTRICT,                      )
16                    Defendants    )

17

18   TO:   THE UNITED STATES OF AMERICA:

19         You will please take notice that VAIL COMPANY defendants, will

20   bring the accompanying Motion for the Admission of testimony of one BYRON

21   R. BRUNER for hearing before this Court in Courtroom No: #2, United

22   States District Court, 325 West "F" Street, San Diego 1, California, on the

23   3rd day of November, 1959, at 10:00 o'clock in the forenoon of that day, or

24   as soon thereafter as counsel can be heard.

25         DATED the 21 day of October, 1959

26

27

28                        _George Stahlman_

29                        GEORGE STAHLMAN
                          Attorney for defendant VAIL COMPANY

30

31

32                                              5515

ROBERT B. WALWICK
ATTORNEY AT LAW
22 NORTH NEVADA
OCEANSIDE, CALIF.
TELEPHONE
GA 2-4222

1  GEORGE STAHLMAN
   Attorney at Law
2  Route #1, Box 235
   Fallbrook, California
3
   Telephone: RAndolph 8-2310
4
5  Attorney for defendant VAIL CO.
6
7
8          IN THE UNITED STATES DISTRICT COURT
9          SOUTHERN DISTRICT OF CALIFORNIA
10                SOUTHERN DIVISION
11
12  UNITED STATES OF AMERICA,      )
                                   )    NO: 1247-SD-C
13                      Plaintiff  )
    -vs-                           )    MOTION TO ADMIT EVIDENCE
14                                 )
                                   )
15  FALLBROOK PUBLIC UTILITY       )
    DISTRICT,  et al.              )
16                      Defendants )
17  _____

18          Comes now VAIL COMPANY, one of the defendant's in the above

19  entitled action, acting by and through their attorney, GEORGE STAHLMAN,

20  and respectfully moves this Honorable Court that the sworn testimony of one

21  BYRON R. BRUNER, heretofore given in another proceeding, be admitted

22  as evidence in behalf of VAIL COMPANY in the present proceeding:

23                              I

24          One BYRON R. BRUNER was a witness in the Superior Court of the

25  State of California in and for the County of San Diego, in an action entitled

26  Rancho Santa Margarita vs. Vail et al.   That during the course of the trial

27  of said action, during the year 1927, for a period of several days, the witness

28  BRYON R. BRUNER, after being duly sworn, testified before the Honorable

29  L. D. Jennings, Judge of the Superior Court  for San Diego County presiding at

30  said trial.

31                              II

32          BYRON R. BRUNER is an essential and necessary witness in the present

ROBERT G. WALWICK
ATTORNEY AT LAW
322 NORTH NEVADA
OCEANSIDE, CALIF.
TELEPHONE
SARATOGA 2-4222

- 1 -

5516

1   proceedings before the Honorable James M. Carter, that he is presently
2   unavailable; that he is an employee of the United States Government presently
3   located on Okinawa Island in the South Pacific.

III

5   That the parties in the present trial are privies of those in the action
6   in which the witness Byron R. Bruner has previously testified.  That the
7   issues in the present trial are the same as those in the first action in which
8   the witness testified; that there was opportunity for cross-examination, and in
9   fact there was cross-examination of the witness in the first trial.   That the
10  witness Byron R. Bruner is legally unavailable.

IV

12  That portions of the testimony of the witness Bruner given in the former
13  proceedings is to be found in the transcript of that case, title "Rancho Santa
14  Margarita, a corporation, plaintiff vs. Margaret R. Vail et al." a  superior
15  Court action in the State of California in the County of San Diego., No: 42850,
16  during the trial of said case in Department #3 of said Court, and being the
17  testimony in the offical transcript of said action.   That portion of the testimony
18  which Vail Company moves to be admitted into the record of this case is con-
19  tained in the following pages, and on the dates herein designated:

20      1)  Testimony given by Byron R. Bruner, Monday March 28th, 1927,
21  Volume LXXXV, Pages 9655 to 9670 inclusive.

22      2)  Testimony given on Thursday, May 5th, 1927, Volume CXII,
23  Pages 12959 to 12964 inclusive.

24      3)   Testimony given on Monday, May 9th, 1927, Volume CXIV,
25  Pages 13260 to 13264 inclusive.

26      4)   One page of testimony of the record of Thursday May 12th, 1927,
27  Volume CXVII, Page 13686.  The latter on Page 13686 is explanatory of the
28  Exhibit to which the witness Bruner had testified, Exhibit "Z9" formerly
29  Exhibit "O-9-B".

V

31  The defendant VAIL COMPANY is transmitting, together with this
32  Motion through the Court and to the United States Government, plaintiff's

ROBERT S. WARWICK
ATTORNEY AT LAW
373 NORTH NEVADA
OCEANSIDE, CALIF.
TELEPHONE
SARATOGA 2-4222

5517

- 2 -

1   photostatic copies of the pages of the said testimony of Bruner herein

2   enumerated, together with photographic reproductions of the Exhibit "L9"

3   and the Exhibit "Z9" to which the witnesses testimony appertains.

4          W H E R E F O R E ,  defendant VAIL COMPANY prays that this

5   Honorable Court grant the within motion to permit the testimony in the former

6   proceedings given by the witness BYRON R. BRUNER to be admitted for

7   all purposes in this present action.

8          DATEd this  21  day of October, 1959.

9

10                              Respectfully Submitted,

11

12

13                              _George Stahlman_

14                              GEORGE STAHLMAN
                               Attorney for VAIL COMPANY

15

16   Points and Authorities:

17   Edmund M. Morgan
     (Basic Problems of evidence, A. L. I. 1957)
18
     Werner vs. State Bar
19   24 Cal 2d 611

20   CCP 1870 (8)   142 A. L. R.   673

21   Smith vs. Schwartz
     35 Cal Ap 2d 659
22
     Central Heights Improvement Co. vs. Memorial Parks
23   4 Cal Ap 2d 591

24

25

26

27

28

29

30

31

32

ROBERT S. WALWICK
ATTORNEY AT LAW
232 NORTH NEVADA
OCEANSIDE, CALIF.
TELEPHONE
SARATOGA 2-4222

- 3 -

5519



SOIL SURVEY
MAP OF
THAT PART OF THE
SANTA MARGARITA RANCH
WITHIN THE
WATER SHED OF THE SANTA MARGARITA RIVER
SAN DIEGO COUNTY
CALIFORNIA

LEGEND

PACIFIC OCEAN

5520



5521

## I N D E X

NAME - - - - - - - - - - - - - - - - - - - - - - - - - - Direct  Cross
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BYRON R. BRUNER, . . . . . 9655

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


### EXHIBITS.

Defendants' Exhibit for Identification, C-5, . . . 9725
   "         "       "    "         "         D-5, . . . 9726
   "         "       "    "         "         E-5, . . . 9726
   "         "       "    "         "         F-5, . . . 9726
   "         "       "    "         "         G-5, . . . 9748

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

9526

apley
FRED A. BHAPLEY
OFFICIAL COURT REPORTER

<u>Monday, March 28, 1927, 10 A.M.</u>

BYRON R. BRUNER,

a witness called on behalf of the defendants, after being
sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HAAS:

Q    Mr. Bruner, where do you reside?

A    Permanently, in Riverside.

Q    What is your age?

A    Twenty-five.

Q    Where were you born, and when?

A    Akron, Ohio, July 24, 1901.

Q    Did you attend public schools there?

A    I did.

Q    Completed your Grammar school course?

A    Yes, sir.

Q    At Akron?  A  Yes, sir.

Q    And after completing your Grammar School course,
what was your next schooling?

A    Central High School, Akron, Ohio.

Q    Graduated from that school?  A  Yes, sir.

Q    In what year?  A  I graduated in June, 1916.

Q    And upon graduating there, what other institution
of learning did you attend?

A    University of Akron, Municipal.

5523

OFFICIAL COURT REPORTER

1    Q    How long were you at the University of Akron?

2    A    I was first there for two years, from the fall of

3    1916 till the spring of 1918.

4    Q    And while there during that period, what course

5    did you take?

6    A    I followed the course of Bachelor of Arts Degree,

7    Philosophy and Economics.

8    Q    Did that include the study of scientific matters?

9    A    They are not embraced in the course itself, but they

10   are always open to anyone who cares to take them as extra.

11   Q    Did you take them during that two years?

12   A    Not during those two years, no.

13   Q    And at the end of those two years where did you go?

14   A    Joined the Army.

15   Q    In what capacity?

16   A    I joined as a private.

17   Q    Did you go overseas?

18   A    Yes, sir.

19   Q    While overseas, what was your first appointment

20   in the Army?

21   A    I was with the First Corps Ammunition Train, Motor

22   Truck Company, 449, Motor Train 414.

23   Q    Did that involve any engineering?

24   A    The only engineering involved in that was reading

25   maps as to the location of the different batteries and other

26   units to which the ammunition was to be taken.

5524

FRED B. SHAPIRO
OFFICIAL COURT REPORTER

9657

1   Q   Your duty was to ascertain locations and see that

2   the ammunition was delivered there?

3   A   Yes, sir, in case I was in charge of the particular

4   train which was carrying the ammunition, or if I was merely

5   subordinate to the Lieutenant who was in charge, then it

6   was a case of checking up, first reading the map in order

7   to ascertain that we were on the correct roads and that

8   we were proceeding in the correct course.

9   Q   And were you elevated from private to a higher

10  rank?

11  A   Yes, sir, I was at that time a Sergeant, - Sergeant

12  Truck Master.

13  Q   And from that corps, did you go into another corps,

14  or employment in the Army?

15  A   After the Armistice we were transferred to the Third

16  Army Corps and sent with the Army of Occupation into Ger-

17  many, and from there I was taken on special detail with

18  five trucks in connection with the 310th Engineers, Company

19  E, and later was transferred to that outfit.

20  Q   And while in that Engineering Corps, what did you

21  do?

22  A   We were engaged in the reconstruction of roads in

23  the area used by the American forces.

24  Q   Did that involve any engineering work?

25  A   Nothing more than the depositing on the road of the

26  road material, which we took from the quarries.

5525

9658

1    Q    Did it require the reading of maps or anything of
2  that kind?

3    A    Nothing in particular, no, sir.

4    Q    When were you discharged from the Army?

5    A    In July, 1919.

6    Q    And coming back from Europe, what did you do in the
7  way of further education?

8    A    Went back to the University of Akron.

9    Q    Remaining there how long?

10    A    1920 completed my course.

11    Q    Graduating with what degree?

12    A    Bachelor of Arts, Philosophy, and Economics.

13    Q    Graduating from that institution, what vocation did
14  you follow then?

15    A    I was salesman for the Washburn-Crosby Company, Gold
16  Medal flour.

17    Q    That did not involve engineering?   A  No, sir.

18    Q    How long were you so engaged?

19    A    I was  with them for approximately a year, from ten
20  months to a year.

21    Q    Then when you completed that employment, what did
22  you do?

23    A    I went to work for the La Salle Extension University,
24  of Chicago, selling business educational courses.

25    Q    Remaining in that employment how long?

26    A    About fifteen months.

5526

9669

Q    Then where did you go and what did you do?

A    I came to California in July, 1922.

Q    Taking employment where?

A    With the Palos Verdes project, Redondo Beach.

Q    That is the Vanderlip properties?

A    Yes, sir.

Q    Consisting of how many acres?

A    The work at that time under contemplation by Mr.
E. G. Lewis proposed to develop the entire 16,000 acres of
the Palos Verdes estate.

Q    And what was the nature of your employment with that
concern?

A    I was employed on a triangulation party as flagman
and recorder.

Q    And under what engineer or engineers?

A    As I recall, Mr. Norman B. Sellew was consultant.

Q    And who was your chief of party?

A    Mr. W. W. Michaels, M-i-c-h-a-e-l-s, who was in-
structor at the California ~~School~~ of Technology, in Sur-
veying and Civil Engineering.

Q    Now, what was the first work you did in conjunction
with Mr. Michaels?

MR. COSGROVE:   He stated he was flagman on triangu ation
first.

MR. HAAS:   He also said recorder.   I don't know which he
did first.

5527

9660

FRED A. SHIRLEY
OFFICIAL COURT REPORTER

1    A    The first work was as flagman.

2    Q    How long were you employed as flagman?

3    A    I alternated as flagman and recorder, after the

4    first couple of weeks, for the entire six months in which

5    I was connected with that party.

6    Q    There were how many in the party?

7    A    Five men.

8    Q    Was that plane table work, or what was it?

9    A    No, sir, it consisted of turning the angles of the

10   triangulation system, according to the points spotted on

11   the ground from the topographic map.

12   Q    The topographic map having been previously made?

13   A    Yes, sir, there was a topographic map of the coun-

14   try made by ~~Kopig and Kopig~~ *Koebig and Koebig* in 1914.

15   Q    Had the stations been established, the triangula-

16   tion points?

17   A    No, sir.  We of that particular party established

18   our own triangulation points in the convenient spots.

19

20

21

22

23

24

25

26

5528

FRED H. ROBINSON, REPORTER

1  Q  And before that was done, were the points established

2  before you did the surveying work, or subsequently?

3  A  The points were established before any angles were

4  turned to them.

5  Q  That is what I mean.

6  A  Yes, sir.

7  Q  Then, while recorder, you took down the distances,

8  as observed, and called to you by the topographer?

9  A  Of the angles.

10  Q  Of the angles, I mean, not the distance, - the angles,

11  I should say.

12  A  The angles are turned by the transit man.

13  Q  And were you required, in that connection, to make

14  any computations?

15  A  Yes, sir.

16  Q  What were they?

17  A  The transit man would, in the first place, turn the

18  angle and read it, and read it off to me, and I would record

19  it in the book, then he would turn six angles, turn an

20  additional five, and read the sixth to me, which would be

21  the sum of the six angles turned, and inverting his instru-

22  ment he would read the first angle again with the instrument

23  inverted, and read the sixth to me, then it was a question

24  of finding the MEAN OF THE original six angles turned, that the mean

25  of the six equaled or approximated the first angle which

26  he had given to me off of the plate, and after doing that,

5529

D H. ROBINSON, Reporter

9662

1   in both places checking the mean of the two sets of angles

2   as turned; if they didn't check, the angles were re-turned

3   and a new mean was figured.

4       Q  And you were employed in that work how long?

5       A  Six months.

6       Q  At the end of that field work, what did you do?

7       A  I was checking in the office of the Palos Verdes

8   engineering project.

9       Q  And you did what, while there?

10      A  I did various things.

11      Q  I mean  in an engineering way?

12      A  Computations--

13      Q  (Interrupting)  Computations involving what?

14      A  The first computation I did was in connection with the

15  triangulation system. As we turned the angles in the fields

16  the original closure of the triangulation system was, as

17  I recall it, a trifle over a foot in error in thirty-five

18  miles of triangulation traverses, and in order that we

19  might eliminate that error, the triangulation system was

20  adjusted on the Merriman System of least squares, as used

21  by the United States Government, I understand, and any

22  errors in the triangles were taken up by the formulas of

23  that system.

24      Q  Did that also involve the computation of the length

25  of the sides in the triangulation system?

26      A  Yes, sir, the Merriman System of least squares takes

5530

care of the varying weights of the angles  in relation
to the weights of the side.

THE REPORTER:  Is that word "weights" ?

THE WITNESS:  Weights, the measure of value.

Q  By the weights, you mean the same as I have used
here the words "value of angles" to determine the degrees,
minutes and seconds?

A  They are to determine the relationship between the
sides in certain triangulation figures which are turned,
in their relation, as they relate to the angles of the
figure.  If the angles of a figure-- if you have one
triangle and there are sixty degrees on each side, it
is simple,  if you have a triangle where two angles are
thirty degrees, and one is 120, and your error is on the
long side of the triangle, it is likely to be large, in
case there is any error in the corresponding angle, because
of the fact of the divergence of a less angle carries you
much further with a small error, and the Merriman System of
least squares reconciles the angles of the sides of the
triangulation figure.

MR. COSGROVE: May I interrupt, just there.  When you
say "corresponding angle", you mean an opposite angle?

THE WITNESS:  Yes, sir, the angle which controls the
length of the side.

Q  Did you do any drafting in connection with the tri-
angulation work?

5531

D H. ROBINSON, REPORTER

9664

A  Yes, sir.

Q  Platting them on sheets, and ultimatly tracing them?

A  Yes, sir.

Q  What other work did you do while in the office?

A  From the original Koebig & Koebig survey, from that original survey, a design would be made up, and was made up for the subdivision which it was proposed to produce, and a road line, the angular points of the roads would be taken from that map upon which had been placed the rectangular coordinate grip, and from that preliminary angular traverse which we would compute in the office, the field man would establish the points on the ground. Then to establish those points, he would either run cross sections of that land at intervals of 25 or 50 feet, according to the kind of country it was, and take the elevations for 100 feet on each side, 75 to 100 feet on each side, depending upon the necessity of taking the longer shots, and in some cases that work was done by plane table, but in a great many instances it was done with a transit and stadia, and hand level, and after the cross section had been taken in the field, the notes would be brought into the office, they would be platted up on a sheet corresponding to the road as proposed on the ground, and the contours would be platted on that sheet.

Q  Did you do that platting?

A  Yes, sir.

5532

H. ROBINSON, REPORTER

9665

1   Q   And the computing?

2   A   Yes, sir.

3   Q   These cross sections had about what number of shots

4   or points of observation?

5   A   Well, I would say they varied from five to a dozen,

6   usually in a country where it was not necessary to take

7   many shots, they would take one at the center, and two

8   on each side, they took them at the breaks of grade.

9   Q   Wherever that occurred?

10   A   Yes, sir.

11   Q   How did you plat the roadways on the map, from

12   those maps and plane table sheets?

13   A   Yes, sir, it would be a case of taking the roadway

14   as shown, and figuring the cuts and fills on that road,

15   and in case there was any great discrepancy between the

16   amount of cuts and fills, then it was perhaps a case of

17   shifting the road in order to eliminate that, and at

18   the same time not destroy the designer's idea of what

19   his subdivision should look like.

20   Q   That is a hilly country, is it not?

21   A   Yes, sir.

22   Q   To a large extent?

23   A   Yes, sir.

24   Q   What other work did you do, if any, connected with

25   that project?

26   A   I adjusted the net works, on the traverse over the

5533

H. ROBINSON, REPORTER

entire 3,000 acres-- or perhaps I should say 2500 acres,
I think, as I was not there the entire time, but I was
acquainted with the entire 3,000 acres.  That consisted
of taking the traverses as run in the field and adjusting
all errors which occurred in those traverses, finding them
wherever possible, and having them checked up in the
field, and in other cases, where they were too small to
be ~~computed~~ ,to adjust them in, so that the final traverse
which we accepted had no appreciable errors in it, what-
soever.

Q  That involved computations, did it?

A  Yes, sir, entirely.

Q  As well as drafting and so forth?

A  Yes, sir.

Q  And that was done by you?

A  Yes, sir.

Q  And you completed your work with the Palos Verdes
project, when?

A  In July, 1924.

Q  What was the next work you did?

A  I worked for the Bell Corporation, at Bel Air
west of Los Angeles.

Q  And that consisted of what?

A  Mapping, subdivisions, and computations.

Q  Flat work, or topographic, or both?

A  Both, the work was laid out in the same manner as

5534

1    the Palos Verde project, from a topographic map.

2        Q   That Bel Air  area is in rolling hills west of

3    Los Angeles?

4        A   Yes, sir, very much so.

5        Q   You were connected with that work, how long?

6        A   Until February, 1925.

7    MR. COSGROVE:   From when?

8    THE WITNESS:   From August, 1924.

9        Q   Did that involve computing as well as drafting?

10       A   Yes, sir.

11       Q   After you got through with that work, what did you do?

12       A   I went back East, to Ohio.

13       Q   To Akron?

14       A   Yes, sir.

15       Q   And did you engage in professional work there?

16       A   Yes, sir, in connection with the City Engineer, Mr.

17   Archie E. Runney, of Cahawba, which is a suburb of Akron.

18       Q   What was the character of your work there?

19       A   He had a private job in view consisting of 112 acres

20   of very valuable land  on the western side of the city

21   of Akron, and there were 36 signers on the map, I don't

22   know how many were actual owners of the land themselves,

23   but it was necessary to get the lines all adjusted, so that

24   each one was satisfied with the particular part allotted

25   to him.  That was done by means of making a survey of the

26   land as shown on the ground, and then making a map showing

5535

H. ROBINSON, REPORTER

what you could find according to the deeds, as shown
in the Recorder's Office; in getting all of the owners
together, and agreeing they would accept a mean line, or
whatever should be done in connection with the adjusting
of that line.

Q   It was a re-alignment?

A   Yes, sir.

Q   You were engaged in that work how long?

A   Three months, up to its completion.

Q   Did you do field work as well as office work?

A   Yes, sir.

Q   Using any instruments?

A   Yes, sir.

Q   What instruments?

A   Transit.

Q   And in the office work, did you do any drafting?

A   Yes, sir, I drafted the maps.

Q   When you got through with that work, where did you go?

A   I came back to California.

Q   Arriving here when?

A   Let's see-- June 18th, 1925.

Q   And you went to work then, for whom?

A   For Davidson & Fulmor, went to work for them on the
22nd of June, I believe.

Q   1925?

A   Yes, sir.

5536

1   Q   And you have been working for them ever since?

2   A   Yes, sir.

3   Q   In connection with their work, what was the general

4   character of work that you did, field, or office work?

5   A   Office work.

6   Q   Consisting of what?

7   A   The first job I did--

8   Q   (Interrupting)  I did not mean to have you detail

9   all the jobs, but generally, what was the office work,

10  computation, or drafting, or both?

11  A   Computation and drafting, yes, sir.

12  Q   Did you do any work in connection with the Vail lands

13  in Riverside County in connection with the Santa Margarita

14  Ranch, or that part of it in the Santa Margarita water

15  shed?

16  A   I did.

17  Q   On which of those ranches did you do the first work,

18  the Vail lands, or the Santa Margarita?

19  A   Well, I applied for the job, computing on the Pauba

20  Ranch, the triangulation system; I was only there for

21  half a day or so, and they sent me down to Oceanside to

22  work on the Santa Margarita.

23  Q   Then your actual work, outside of that half a day

24  or so, started on the Santa Margarita, did it?

25  A   Yes, sir.

26  Q   With your headquarters, when you started on that

H. ROBINSON, REPORTER

1  work, you say, at Oceanside?

2     A  Yes, sir.

3     Q  What was the first work you did in the Santa Mar-

4  garita survey?

5     A  I platted the stadia traverse of the water shed

6  lines-- no, that is not right,  I recomputed the triangles

7  which had been computed before I came there, and checked

8  them, and computed the rest of the triangulation system.

9     Q  On the Santa Margarita?

10    A  Yes, sir.

11    MR. COSGROVE:  Just a moment;  will the reporter read

12  that last answer of the witness, after he said, "No, that

13  is not right".

14    (Reporter reads as requested.)

15    Q  And what did you do in the recomputation of the

16  triangulation system?

17    A  I took my own computation from the field notes as

18  shown, and after arriving at my own conclusion, checking it

19  against the conclusions which had ~~gone~~ been by the man who

20  first computed them, and in case of any error, finding

21  out whether his work was right, or whether my work was right.

22    Q  In your computation, what did you do, is what I am

23  trying to get at.

24    A  I took the field notes, and first added the angles

25  in the triangles, to see that they approximated 180 degrees;

26  in case there were angles turned around, completely around

BYRON R. BRUNER

(Recalled)

MR. HAAS:  Gentlemen, we are about to go into another subject, so you may be informed, and that is to lay the foundation for our soil survey by Dr. Coit.

DIRECT EXAMINATION

BY MR. HAAS:

Q  Mr. Bruner, I call your attention to a map on the board, which for identification I will mark "L-9",  and will ask you if you had anything to do with the preparation of the map in question?

A  I did.

( L-9 is later designated as "L-9-a)

Q  From what base is the map made, what base map?

A  The base map of the Santa Margarita Rancho.

Q  The same as the Exhibit V-4 ?

A  Yes, sir, with the exception of the omission of the lines of the triangulation system.

Q  But the boundary lines, crest lines, and area sub-divisions, and so forth, that were shown on Exhibit V-4, are all on the document I have marked L-9 --- let us put that over on the other board here, it will be more convenient I think.

A  The topographic features which are shown on V-4, Mr. Haas, are identical with the ones shown on the map

5533

D H. ROBINSON, REPORTER

1  on the board, which is now known as "L-9".

2     Q  And what additions, if any, did you place upon

3  the map/marked L-9 that were not shown on Exhibit V-4 ---

4  I am asking you what you put on there?

5     A  I put certain lines on it, dividing it into parcels

6  of land, placing those lines on the map in such a position

7  that I felt the man who was out in the field would be

8  able, from the topographic features shown on the map, to

9  locate the lines which I drew on the map, to locate them

10  on the ground.

11     Q  Will you indicate to Court and counsel which those

12  lines are-- may I ask your Honor to step here just a

13  moment.

14     A  For instance, in this case, I drew a line from the

15  fence corner just below the number "17", to a point in

16  conjunction with the two stream lines, which would be

17  readily recognizable on the ground, that I considered the

18  division line between lots Numbers 17 and 22.

19     Q  The purpose being simply to fix areas which anyone

20  taking the map could employ in looking over the ground?

21     A  That is correct, yes, sir.

22     Q  And you followed the same course throughout the

23  map, did you, using topographic features and tying them

24  together by lines, so as to divide it into blocks or lots?

25     A  There may be an instance or two where the line

26  would not be very clear, but that was the general idea.

5540

D H. ROBINSON, REPORTER

Q  The plan being simply to divide it in some arbitrary way into lots and blocks which could be readily recognized on the ground?

A  Yes, sir.

Q  And for that purpose you employed topographical features?

A  Yes, sir.

Q  Did you put any lettering or numbering on the map?

A  I put the acreage on the map that I determined by planimeter.

Q  Using what areas for planimetering?

A  The areas of the individual lots.

Q  As fixed by you?

A  Yes, sir.

Q  And in what manner are those areas indicated on the map?

A  Indicated in black figures in the lots to which they belong.

Q  For instance, the figures here 87-8, means what?

A  That is the acreage included within the lines of the topographic features within the lines that I drew from the junction of the stream-- to the beginning of the stream.

MR. COSGROVE:  Parcel 21.

Q  Indicating acres?

A  Yes, sir.

Q  And have you given the various parcels numbers by

5541

which they can be identified in tabulation, or otherwise
referring to them?

A   The numbering was not done by me.

Q   But are they so numbered?

A   They are.

Q   And you adopted the same course with regard to each
lot?

A   Yes, sir.

Q   Now, in the subdivision of the lots, were not includ-
ed any part of the areas indicated in white on this map
now marked L-9 ?

A   No, sir.

Q   You used only the areas that are now colored in some
color other than white?

A   Yes, sir, that is correct.

Q   And did you have anything to do with the coloring of
the map?

A   Yes, sir.

Q   What significance is attached to the yellow color?

A   The yellow color indicates the irrigable land.

Q   That is, those that are intended to be classified
as irrigable?

A   Yes, sir.

Q   And what is the significance of the greenish color?

A   The green indicates land which is irrigated, or has
been irrigated, is capable of irrigation from the facilities

5542

12963

at hand.

Q   From the systems at hand?

A   Yes, sir.

Q   And what is intended by the areas colored in pink?

A   Brown.

Q   Is that brown?  I am color-blind, I guess.

A   The brown indicates the brush lands on the river, which are subject to overflow.

Q   And what is intended by the blue color?

A   That is the wash land of the river itself, the lowest land.

Q   And in classifying this what data did you  employ for the application of your color scheme?

A   The sheets which have been prepared in the field by the field men, the plane table sheets.

Q   Including the segregation sheets, testified to by Mr. Dauchy and Mr. Evans?

A   Yes, sir, included all of the sheets of the Santa Margarita Rancho.

Q   And determining the lands that you classified as irrigable, what did you employ in the determination of which lands you were so classifying?

A   The determination which had been made on the field sheets by the field men themselves.

Q   And that have been offered here?

A   Yes, sir.

5543

Q   And are they marked on these sheets as "irrigable"?

A   Yes, sir, they are.

Q   They are the plane table sheets we have been using in court here, and numbered as heretofore identified?

A   Yes, sir.

Q   You did not then, act on your own initiative, in regard to any of the classifications?

A   Not at all.

Q   There is a legend attached to this map, indicating what these colors mean, is there not?

A   Yes, sir.

Q   Now what is the pencil memoranda on the map?

A   My tabulation of the various features which I drew from the individual lots.

Q   Will you-- does the tabulation correctly express the result of your labor?

A   It does.

Q   Will you kindly state what it is, lot for lot?

A   The first notation is "Acres in stream below tide, 97 acres."

Q   Below what?

A   Below tide, in that case I referred to the crest line which has been referred to here previously as 'salt water crest line'.

Q   And being indicated on Exhibit V-4?

A   Yes, sir.

5544

RED H. ROBINSON, Reporter

BYRON R. BRUNER

(recalled)

DIRECT EXAMINATION

BY MR. HAAS:

Q  Mr. Bruner, I call your attention to a brown print marked by me "Sheet O-9-A", as I understand the next exhibit would be O-9, and I will ask you if you had anything to do with the preparation of that sheet?

A  Yes, sir, I did.

Q  What did you do on the sheet O-9-A ?

A  I took the thin paper tracing as it came from the blue printers, with the background, with the flat map, up on it.

Q  The background is made from what map?

A  From the original tracing, "Twining No. 1", as I understand it, and of that I drew lines in orange ink dividing the different sections up into parcels of ground which I felt would be recognizable upon the ground, that is, the limits of them would be recognizable, and those areas I planimetered and recorded the results of the plainimetering upon the map.

MR. HAAS:  Will your Honor kindly step here for a moment, the yellow lines cannot be seen very well at any distance.

Q  Indicate where the lines are that you stated you put on?

5545

ED H. ROBINSON, Reporter

13361

1      A  These lines in the yellow, running from the triangula-

2  tion point to the junction of the streams, and so on,

3  and the fence line, and the road.

4      Q  In other words, you arbitrarily divided the area

5  something after the same plan that you divided the area

6  on the Santa Margarita, to which you testified the other

7  day?

8      A  Yes, sir.

9      Q  Taking natural objects, as nearly as you could,

10  to indicate where the divisions were?

11      A  Yes, sir.

12      Q  And these divisions are shown by the yellow lines,

13  are they, on this sheet O-9-A ?

14      A  Yes, sir, they are.

15      Q  Now, did you put on the brown lines, the brown lines

16  and red lines, I guess they are?

17      A  Yes, sir, I believe that I did.

18      Q  What are they intended to show?

19      A  They merely cut the entire piece of land into

20  different blocks.

21      Q  And then those blocks--

22      A  Are given identifying numerals.

23      Q  Being the numerals in the larger figures on the

24  board, such as "13", "14", "16", "8", and similar large-

25  sized figures?

26      A  Yes, sir.

5546

ED H. ROBINSON, REPORTER

13282

1    Q   And what was employed in giving numbers to the

2    lots within these blocks, in other words, does each block

3    have numbers running from "1" consecutively, odd numbers on

4    the lots?

5    A   Yes, sir, I believe so, the numbering of those lots,

6    I did not do.

7    Q   But you have looked at it, and can tell us?

8    A   Yes, that is the way it is run, the numbering is

9    from "1", consecutively, within the individual blocks.

10   Q   Are there any other features that you put on this

11   sheet O-9-A ?

12   A   No, sir, I believe that is all.

13   Q   Now before taking that down, I want to call your

14   attention to the sheet that I will mark "Sheet O-9-B", and

15   ask you if you had anything to do with that particular

16   sheet?

17   A   No, sir I believe I did not; it seems to me to be a

18   duplicate print of this other one insofar as  its divisions

19   of lots are concerned.

20   Q   But it is printed on a different basis?

21   A   Yes, sir.

22   Q   On the same as R-4 that was upon the easel, along

23   by the rail?

24   A   Yes, sir.

25   Q   You did not do this work?

26   A   No, sir, I did not.

5547

H. ROBINSON, REPORTER

13263

Q  Can you say generally whether the lots as shown there correspond with the divisions  as shown on your sheet?

A  I think the idea was to get them about the same.

Q  Well, I will introduce the party who did put those on.  Now if you will help me one minute with this one. We will take it down, and put this one over on this other easel for a minute.  Now I show you a sheet which I will mark "O-9 for Identification"  and ask that it be marked "O-9 for Identification", and I will ask if you had anything to do with the preparation of that map?

A  That is a print of the map O-9-A .

Q  That is, the sheet O-9-A ?

A  Yes, sir.

Q  And with other features placed upon it?

A  Yes, sir.

Q  You had nothing to do with the placing of the other features on it?

A  I did not.

Q  And does this base print contain the divisions of lots and blocks that were shown on this sheet O-9-A ?

A  Yes, sir, it does.

Q  And was made, was it, from that sheet?

A  Yes, sir.

Q  The block lines are colored in dark black, are they?

A  Yes, sir, that is a printed line.

THE COURT:  It may be marked for identification,

5548

13264

H. ROBINSON, REPORTER

"Defendants' Exhibit O-9."

MR. HAAS:  That is all.

CROSS  EXAMINATION

BY MR. COSGROVE:

Q  You recall, Mr. Bruner, having been interrogated regarding map R-6, and particularly with reference to the extending of the crest line shown thereon, dividing the Temecula and Murrieta Creeks?

A  Yes, sir, I recall that.

Q  We asked that Miss O'Neill, who stated that she colored these lines, if she would not color this line for us.  We are very anxious to have it done, and she has not done it, and I will ask you if you will do it at this time?

MR. HAAS:  The reason for that is, she was here twice to do it, and we had the map covered up.

MR. COSGROVE:  Well, let's have it done now.

(Witness marks on map R-6.)

Q  Thanks very much, Mr. Bruner.  The sheet which is on the easel now to your right, is the one that Mr. Haas called O-9-A ?

A  Yes, sir.

Q  And so far as the Pauba, Temecula, and Little Temecula sections are concerned, and the Government land, immediately adjacent, and Little Temecula, was it taken from the same base map as the sheet which has been received

13686

A    Well, these were, as I remember, checked up with the contour map.

Q    I see.  Now let us take lot 24.  What per cent of waste do you show?  I believe you read 15 per cent, didn't you?

A    15 per cent, yes.

Q    Well, you have got 92 acres.  15 per cent of that would be at least 14 acres, but you only show 10 acres waste. Same explanation of that?          A   Yes .

Q    Take lot 35.  I understood you to say that 10 per cent of that was waste according to Dr. Colt's notes?

A    Yes, that is what I have here.

Q    That is 10 per cent of 31 acres would be 3 acres, and it shows in the report one acre waste.

A    Yes.

Q    And lot 36, I understood you to say 20 per cent waste.

A    Yes, 20 per cent waste.

Q    20 per cent of 76 acres would be about 15 acres, and it shows in the report 5 acres waste.

A    These were all checked up with the contour map.

MR. COSGROVE: I think that is all.

MR. HAAS: That is all.  May we have the map that was referred to as sheet O-9-B, marked for identification by the next appropriate number?

THE CLERK: Z 9.

5550