GEORGE STAHLMAN
Attorney at Law
Route #1, Box 235
Fallbrook, California

Telephone:  RAndolph 8-2310

Attorney for defendant VAIL CO.



OCT 22 1959

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,
plaintiff
-vs-

FALLBROOK PUBLIC UTILITY
DISTRICT et al.
Defendants

)
)
)
)
)
)
)
)
)
)

NO:  1247-SD-C

MEMORANDUM OF TESTIMONY
RE: SOIL SURVEY OF VAIL'S
PROPERTIES

The Court, having on September 22nd, 1959, requested that VAIL
COMPANY go through the record and make its summary of Exhibits and
Testimony to support a showing of the amount of irrigable land and the uses
and water duties for the irrigated land, the following summary is prepared
in pursuant to the Court Order therein made.  (Transcript;  Volume 93, Page
10532).

On March 26th, 1959, JOHN ELLIOT COIT, called as a witness on
behalf of VAIL COMPANY defendants,  submitted the following proof.    The
witness was eminently qualified.    (Volume 80, starting at Page 9176) briefly:

He resides at 690, Oceanview Avenue, Vista;  is 79 years of age,
presently engaged in a business known as the "Coit Agricultural Service".
A graduate in agriculture at the North Carolina State College, and thereafter
attending Cornell University for four years in graduate work, receiving from
that college a Masters Degree and a Doctors Degree in horticulture.  (Page
9177.)

Came to California after being connected with the University of Arizona

- Page  One -

5551

1  and joined the University of California, stationed at Whittier, where he was

2  located at the Pathological Laboratory, which has since become combined

3  with the Citrus experiment station at Riverside.  Work was investigating of

4  citrus, walnuts, avocado and other sub-tropical fruits.  (Page 9177.)

5       Prior thereto, while connected with the University of Arizona for a

6  period of two and one half years, did research work and investigation principally

7  in citrus, olives, figs and dates.  (Page 9178.)

8       Remained with the Pathological Laboratory at Whittier for two or

9  three years, and was then transferred to the Riverside Branch of the University

10  as Superintendant of the citrus experiment station, remaining in this position

11  about a period of one year.  Thereafter, he was transferred to Berkeley where

12  he remained for six or seven years as head of the Division of Citriculture,

13  which was organized by the witness.  (Page 9178.)

14       While connected with the University of California at Berkeley, witness

15  organized a division and also taught citrus and sub-tropical horticulture, and

16  did experiment and research work on various problems connected with citrus

17  and avocado, dates and other sub-tropical fruits.   After resigning from the

18  University, witness taught night-school at the Junior College in Fullerton for

19  a year or so, and delivered lectures at Palomar College.  (Page 9179.)

20       Was the author of the book entitled "Citrus Fruits" published by

21  MacMillan and Company, and used in various countries of the world as a text.

22  Has written a great many articles for magazines and pamphlets in connection

23  with his work.  Has had general supervision of agricultural lands where

24  diversified crops were produced.  Has supervised the operation of many citrus

25  and avocado and walnut ranches, and has been engaged in general agricultural

26  management service since 1919.   Has had contact with diversified farming

27  where crops besides citrus and sub-tropical crops were grown, such as alfalfa,

28  row crops, etc.  Is familiar with methods of irrigation and water duties, soils

29  and plants in general in this part of the country.   Has continuously, since 1919,

30  been employed in this type of work, in connection with agriculture of a diver-

31  sified nature, and is presently so connected.  (Page 9181)

32       Is presently supervising large acreage of diversified farming and

5552

1 presently supervises DULIN RANCH of several thousand acres.  Has managed

2 and supervised other operations of the same character in various counties

3 from Santa Barbara to San Diego .  (Page 9182)

4 　　　　Made a study of the VAIL PROPERTIES which resulted in the

5 preparation of the Map, Vail's Exhibit "C" in evidence.  Study was started in

6 the summer of 1926, and was made in connection with the litigation referred to

7 as "Santa Margarita vs. Vale".  (Page 9182)

8 　　　　Study was began in the summer of 1926, and was completed and offered

9 in Court in the summer of 1927.  The work was extensive and required assistants.

10 The witness secured the service of one CARL NICHOLS, a graduate in his

11 department at Berkeley, and who had previously been employed by the witness

12 in the Coit Agricultural Service, and brought another man named GEORGE

13 HUTCHINSON, who was a graduate of the University of California at Berkeley.

14 In the course of examining the lands, of which there were many Blocks and

15 Lots, they at all times had the assistance of one of the Surveyors who did the

16 work and laid out the Block.  The Surveyor was always with the witness and his

17 assistants for the purpose of locating lands under study and pointing out the

18 corners and the boundaries, and to provide the number of the Lot that the

19 witness and his assistants were working on.  (Page 9183)

20 　　　　The witness worked with these two men, Nichols and Hutchinson in

21 the field sufficiently to satisfy himself that work was done acceptably, and

22 worked with them from time to time, and would check their work and compiled

23 figures from their note books in company with these men, and did a number of

24 Lots alone.  The two men, Nichols and Hutchinson, and the Surveyor who was

25 with them, worked under the supervision and control of the witness.  When

26 the Surveyor, accompanying the witness and his assistants, or assistant, had

27 located a Lot, and designated the corners, and in general the boundaries, they

28 would walk over it and examine the soil and the slopes.  They examined erosion

29 cuts, and in a good many cases bored auger holes and observed the temperature

30 which in their judgment applied to the Lots, or different parts of the Lots,

31 and the elevation above sea-level, and the character of vegetation on the Lots.

32 (Page 9185)

1    The survey of the Lots had previously been done.   The Surveyor

2    indicated the corners in a general way, so that when they went on the property

3    they knew where the corners were approximately.   Before the witness came

4    to the property, a Map was prepared that showed the Lots and Blocks.   The

5    witness assumed that the Surveyor had given the designations that were on

6    the Map to the various Lots.   (Page 9187)

7        Exhibit "C" now in evidence was referred to by the witness as a

8    "Classification Key".   (Page 9187 - lines 10 - 13)

9        The Classes referred to in Exhibit "D" such as Classes, A, B, C and

10   D, were designated by this witness with some collaboration by CARL NICHOLS,

11   one of the gentlemen working with him.   And the classification as designated

12   in said Exhibit had been determined by the witness to be a proper method of

13   classification of land, and suitability for the crops that could be grown on that

14   land.   (Page 9188)

15       When locating a Lot for the purpose of the study, the witness and his

16   assistants had a Map, referred to in the testimony as "the Map" in addition

17   to the Surveyor.   They would go over the Lot, make an examination of it,

18   recording the information in their Note Books.   They accepted the acreage

19   that the Surveyor designated, and the Map which indicated the elevation was

20   also accepted.   As they went over the land it was classified.   The witness

21   gives an example on Page 9189 - Line 19, to Page 9190 - Line 6, wherein

22   Lot 1 designated as fifty-one acres was classified as all "D" land, there was

23   no waste to the land, it was level valley with vigorous native vegetation.

24   By the designations which appear on the classification key, Exhibit "D", the

25   initials of the witness or either of his two assistants were placed upon the

26   land classification key.   A further example of Class "D" land,  Page 9190 -

27   lines 12 to 19,  "Class D" land is  "land which by reason of the soil, air,

28   drainage, topography, slopes, exposures and temperatures, are suitable

29   for the growth of such crops as alfalfa, annual summer crops, such as potatoes,

30   lettuce, onions, indian corn, sorghum etc.   Assuming the summer temper-

31   ature between May 1st and October 1st does not fall below 30° fahrenheit, or

32   rise above 110° fahrenheit more often than once in five years.

- Page Four -

It will be noted that Exhibit "D" contains a key as to the suitability of the lands for the various purposes in relation to the class or classes of land as designated in Exhibit "D" .  The witness had previously worked with Nichols and Hutchinson, sufficiently to be satisfied that what work they were doing was being done correctly as they had previously been instructed, and the witness went over their notes of lands which they had classified.  (Page 9191)

This same process was used on each and every one of the Lots as shown on the Map, Vails Exhibit "C".  (Page 9191)

After the field studies had been made in the evening, the witness and his assistants got together and went over the notes and checked them with the map and copied them in proper order and in permanent form.  (Page 9191 to 9192)

Taking any Lot and Block No. as shown on the Map Exhibit "C" and referring to the same Lot and Block No.  and designation on Exhibit "D" you would find the classification and the kind and character and suitability of the land in that particular Lot.  (Page 9192)

Studies were made of the Pauba and Temecula and the Little Temecula and some parts of the Santa Rosa.  The studies of the Pauba, Temecula and Little Temecula were made as the ranch existed at the time the studies were made.  (Page 9192)

When the witness went upon the land with the Surveyor, witness estim- ated the number of acres in the Lot, walked over it and if he was with one of the assistants, discussed it together, and after walking over it decided as near as could in his judgment, how many acres belonged in Class "A" and how many acres Class "B", and how many acres waste .  (Page 9197 - Line 1 to Line 16. )

The witness in his lifetime of farm work has had experience in this matter.  He could go out, look at a field and could pretty accurately estimate the number of acres in it.  Making this determination they were at times aided by stepping off across different directions to assist in determining the acres that were in the area.  (Page 9197 - Line 23 to Page 9198 - Line 8)

This would result in reasonable approximations based upon the judg-

5555

1 ment and experience of the witness.  (Page 9198 - Line 9 and 10)

2   NOTE:   Reference is hereby made to the question asked by Mr.

3 Sachse during the direct examination of the witness:

4   Question:   And then you, from your own visual observation decided

5 that 30% of that was Class "A", is that right?

6   Answer:   That is right.

7   Question:   So then you would take 30% of the figure 22 representing

8 Class "A" is that how you did it?

9   Answer:   Right.          (Page 9199 - Lines 6 to 11)

10   This is the question to which the Court made reference to as "digging

11 a hole into which the witness fell."  (Page 9199 - Lines 12 to 14)

12   It will be noted that during the entire testimony of the witness, when

13 making observations, surveys and conclusions, the witness had spoke in terms

14 of acreage, not percentage.     Particularly just preceding the question from

15 Page 9195 to 9198, wherein the witness gave explanation as to the method of

16 compiling, the total of the acreage, and the method of determining the classif-

17 ication of acreage in each Lot, he did, in meticulous detail, explain how this

18 was accomplished and in all instances referred to the compilations being made

19 on acreage basis.  Immediately after the Sachse question, the witness in

20 response to an enquiry by the Court as to whether the land was classified in

21 percentages or acres, readily answered "I estimated the number of acres in

22 the piece".  (Page 9199 - Lines 19 to 25)

23   The witness again emphasized that the study was not made on a

24 percentage basis, that he did not take a percentage of Class "A" or Class "B"

25 or Class "D" and this was not the way it was done.  (Page 9200 - Line 22 to

26 Page 9201 - line 1)

27   Attorney Sachse after this further explanation by the witness, mad

28 the following comment in the record, by Mr. Sachse:

29   "As far as I am concerned, I have no objection to the admissability

30 of this at all.  I think it has come out now clearly enough that what my objection

31 will be, if it is any, will be to the weight really, and it will be a question of

32 how reliable it is.  There is no object to Dr. Coit testifying on the basis of

the figures."  (Page 9203 - Lines 12 to 17)

The Court then commented "Of course, this is what every farmer has done for years, starting back in the days when you described a piece of ground as being from the white oak to the stump etc......... and a man who knows the soil can make pretty accurate estimations of amounts of ground. I haven't any doubt about that, it goes to the weight I think." (Page 9203 - Lines 18 to 24)

Dr. Ford A. Carpenter was a Weather Bureau Man as the witness knew him, now dead. His work was in the background of the witnesses mind, and was gone over after climatic conditions were determined on different Lots, and his work had a certain effect. It had no effect on the soil survey. The witness first made a determination for himself in classifying the land, and later checked some of the records of Dr. Carpenter. In some cases where there was a divergence the record of Dr. Carpenter was considered. (Page 9029- Line 16 to Page 9300 -Line 16)

In making the survey the witness and his assistants were furnished a Map. They had one of the engineers with them at all times to assist them in locating the corners and the boundaries, so that they could be sure that they were describing the same Lot that they were looking at on the Map. (Page 9302 - Lines 5 to 14.)

When they went out with the engineer, they had a Map, Exhibit "A". The Map had lines and boundaries and blocks, and the Lots. It was not a contour map. By inspecting a certain Lot and Block, they could say from an inspection on the ground what particular area was covered in a certain Lot and Block by walking over the Lot and examining it. The surveyor who was with them would point out the corners or locate them accurately, and indicate the lines and boundaries. They would walk over the lot, bore the necessary holes, would examine cuts, gullys, or any other way, to tell the type of soil. If one of the corners was over a ridge, they would walk on top of the ridge and look down and the engineer would point out that "the corner of this lot is approximately so and so", then they would write a description of the Lot. (Page 9303 - Lines 16 to 24)

The witness, in determining the irrigability, took into consideration

5557

the crops and the slope of the land, and the type of soil. The slope of the land was determined by walking over it. From the experience of the witness he could tell whether the land is too steep for economical irrigation. The depth of the soil was taken into consideration in every instance. This was determined by cuts and the excavations, and by boring holes with a soil auger where there was doubt. (Page 9306 - Line 13 to Page 9307 - Line 8)

The quantity of water that would be required to irrigate a particular piece of land was considered. (Page 9307 - Lines 12 to 14)

The assistants, Hutchinson and Nichols, who worked with Mr. Coit estimated the same as he did. (Page 9320 - Lines 9 to 12)

In connection with Block 7, Lot 10, a total of forty-three acres in the Lot, the witness determined that 27.4 acres were Class "A" land. That he made this determination by going over the land, examining it, and from his experience in experting lands over a long period of years, could determine that there were 27.4 acres of Class "A" land by visual examination. (Page 9338 - Lines 5 to 19)

And could decide from his experience about what the acreage was in these different classes in each case. (Page 9338 - Line 24 to Page 9339 - Line 2)

And took into consideration the high point of the land when it was determined the amount of irrigable acreage. (Page 9339 - Lines 5 to 8)

They would look over the ground and as a rule would estimate the waste first, as near as they could, and then the Class "B" land, the lower land which was still irrigable, and then by adding these two together, the rest of the land might be irregular, but if he had estimated the waste reasonably correctly, and the Class "B" land reasonably correctly, the two added together and subtracted from the total amount, would give the Class "A" land which he would then walk over and see if there was any of that too steep or otherwise unsuitable for irrigation. In locating the outer extremeties of the field, he would not have to run a contour or line as the surveyors were with them and showed them the extremities and corners. (Page 9340 - Lines 5 to 10.)

In determining the class of land of the same character, it would not

5558

1 necessarily be all in one contiguous tract, but sufficiently so to permit

2 irrigation economically.

3     If the land were broken up into many small pieces, it would be

4 more expensive to get pipeline to it, but if it were in sufficient areas to

5 warrant putting water on it, then it was irrigable.

6     J. F. DAVIDSON TESTIFIED AS FOLLOWS:

7     That he has been a Civil Engineer for 40 years, registered in the

8 State of California. (Page 10065 to - Lines 1 to 11)

9     That his place of business is located in Riverside, California. That

10 he conducts general engineering land surveying of all types. (Page 10065 -

11 Line 23 to Page 1066 - Line 4)

12     That he made different surveys of the Vale Ranch (Page 1066 - Lines

13 12 to 14).

14     That the Map now in evidence, Vale's Exhibit "AE" was prepared

15 by his office and that he is familiar with it. (Page 10068 - Lines 8 to 13)

16     That his office made the maps. That the various surveys that were

17 made for the purpose of obtaining the information by which the Map was

18 constructed was done by his office. (Page 10069 - Lines 5 to 11)

19     That the Map, Vale's Exhibit "AE" shows the triangulation system

20 which was developed by witness for the purpose of obtaining the contours and

21 the segregation of the properties ---- classes of soil. (Page 10069 - Lines 12

22 to 16)

23     After obtaining the triangulations, contour maps were prepared.

24 That the Map, Vale's Exhibit "AE" in the opinion of the witness, is a correct

25 map of the conditions that it portrays as a map. (Page 10072 - Lines 10 to 23)

26     That the directions and bearings were obtained by instruments, and

27 that the bearings and distances to the knowledge of the witness are accurate.

28 (Page 10072 - Line 23 to Page 10073 - Line 9)

29     That the base map upon which was used as a starter, was the original

30 maps of the area recorded in the Court house in San Diego, upon which were

31 a great many lines, or surveys the county had established, such as roads that

32 were tied into, and that all of the available data that was possible was used.

9559

1 This included a survey made by a Mr. Taylor and the benefit of that map was

2 utilized in the making of the Map Vail's Exhibit "AE". (Page 10073 - Line 16

3 to Page 10074 - Line 2).

4     That the map and the survey that was made by the witness, was his

5 own survey from start to finish. (Page 10074 - Lines 17 to 21).

6     In connection with the use of the Taylor map, the witness checked

7 the Taylor map against the then existing recorded maps in San Diego County.

8 (Page 10075 - Lines 5 to 7.)

9     That the map now in evidence as Vail's Exhibit "AG" was compiled

10 by the office of the witness. It was made after the triangulation map was

11 prepared and was for the purpose of showing the roughness of the soil, and

12 the area and terrain, and is referred to as a contour map. (Page 10076 - Line

13 20 to Page 1007 - Line 7).

14     This map, Vail's Exhibit "AG" was made under the supervision and

15 control of this witness. That in his opinion the Map is correct in portraying

16 the different conditions that the map purports to exhibit . (Page 10077 - Lines

17 16 to 23).

18     That the witness was familiar with the preparation of a Map referred

19 to as Vail's Exhibit "C" for identification, which map shows Lots and Blocks.

20 (Page 10077 - Line 24 to Page 10078 - Line 3).

21     NOTE:   This is the map which was utilized in the Coit Soil Survey.

22     During the time the survey was being made, the witness had in his

23 employ a man named BRUNER, he was the office man; and worked on the job.

24 (Page 10077 - Line 9 to 15)

25     That Vail's Exhibit "C" which shows Lots and Blocks the witness was

26 familiar with the preparation of that map. (Page 10077 - Line 24 to Page 10078

27 Line 2).

28     This Map was made by Mr. Bruner while he was in the employ of the

29 witness, and was made under his supervision and control . (Page 10078 - Line

30 4 to Line 15).

31     Bruner at this time had been in the employ of the witness for several

32 years. (Page 10078 - Lines 14 to 16).

5560

That Bruner was, in the opinion of the witness, a man capable of designating upon a map the areas and planimetering the areas and determining the acreage within the areas.  That Vail's Exhibit "C" was made on the same base as the contour map Vail's Exhibit "AG" (Page 10079 - Lines 6 to 8)..

In regard to the acreages as shown on the map Vail's Exhibit "C" this work was done by Mr. Bruner, who was a reliable engineer, and who had done a lot of work for the witness, and that they were as accurate as can be. (Page 10094 Line 2o to Page 10095 - Line 1).

That he assumed that the acreage was accurate and that the man who did it was a high-class man.  (Page 10096 Lines 16 to 21).

That the witness is acquainted with Dr. Coit.  That during the period of time that the Map was being prepared in relation to the soil study, which was made by Dr. Coit, an office was maintained in the vicinity of the Vail Ranch.  Mr. Bruner worked there at that time at which Dr. Coit also did his work there, although Dr. Coit was not working for the witness.  (Page 10108 Line 13 to Page 10109 - Line 1).

Dr. Coit was the expert on the soil, and he outlined the areas as shown on Map Vail's Exhibit "C", and that Mr. Bruner planimetered all the different areas and came up with the acreage.  That the material from Bruner was supplied to the office, and the map was made.  (Page 10109 - Line 4 to Line 14).

ALAN C. BOWEN, the Government's expert on land classification was called as a witness for the defendant VAIL COMPANY.  (Page 9204)

Col. Bowen testified that he had become familiar with studies that were made by Dr. Coit in connection with the soil classification of the Vail Ranch. (Page 9204 - Line 22 to Page 9205 - Line 1).

That he had checked the studies to determine the reasonable accuracy of them.  That he had gone upon the property in many instances in making the check.  That he had in his possession the key to the first study prior to the time the additions were made as shown on Exhibit "D".  Page 9205 - lines 2 to 12).

That the witness also had a map such as Exhibit "C". (Page 9205 - Lines 15 to 18).

5561

That he formed an opinion as to the reasonable accuracy of the acreages that Dr. Coit had determined in his study. (Page 9205 - Lines 21 to 25).

That in his opinion the results of the study made by Dr. Coit and his assistants on the Pauba Ranch are reasonable in that they show land which is reasonably susceptible of economic and profitable irrigation. (Page 9205 - Line 24 to Page 9206 - Line 4).

That he spot checked areas in the Lots as shown on Exhibit "C" to determine the accuracy of the estimations and surveys, and that he found it very easy to orient himself with the Map on the ground, the physical features, ridges, gulleys, roads, streams, systems, etc. and spot checked the areas of some of these lots and found them to be quite close, both the total area of the Block and the Lot. (Page 9206 - Line 5 to 15).

That he reached an opinion that the sum total of the area was also reasonably accurate for the crops designated by Dr. Coit, which included sub-tropical fruits, except in Dr. Coit's evaluation of the suitability for the growth and the production of sub-tropical fruits on the steeper site. (Page 9206 - Lines 16 to 22).

That in most instances he assumed that the acreages as set forth on Exhibit "C" were correct. He spot checked those by planimetering the Map in the office. He made no field surveys to determine the areas. (Page 9207 - Line 5 to Line 11).

That he made a spot check to see generally that the topography was generally all right. Both on the ground and by comparison with the areal photographs, the topography at the time of the study undoubtedly was made by triangulation methods, and that they did not use refinements of areal photography to get more exact topography in those days. That there are some differences between the actual topography and what it depicted in the topographic map, but there are not serious differences. Generally speaking the topography would be reasonably accurate. (Page 9208,- Line 21 to Page 9209 Line 11).

That he spot checked the areas shown in certain of the Lots to see

- Page Twelve -

5562

whether the acreage listed was a reasonable approximation of the acreage, and that checked out also. That as to the breakdown of the area within a lot between the various classifications, he found them generally acceptable, except as to the conclusions as to some of the sub-tropical fruits. (Page 9209 - Lines 18 to 22).

In other words, where the key as shown in Exhibit "D" would show in a certain lot, a certain number of acres in Class "A", high mesas and highslopes, the number of acres in that classification was reasonably accurate, but the difficulty came in agreeing with the conclusions that it was suitable for oranges, lemons, avocados and cheramoyas. That he had no temperature data which Dr. Coit ways was available to him when he made these decisions. (Page 9209 - Lines 23 to Page 9210 - Line 5).

That after the testimony of Col. Bowen on Page 9211 - Line 14 to 22, the Court stated:

"I think there is a reasonable foundation laid. He is not claiming that these are accurate to the last tenth of an acre, but the Colonel says that spot checking shows these were reasonably accurate estimations of the acreage, and that he had spot checked the topography and with minor exceptions, shown by the difference in working from areal surveys and from the old method of running lines, that the topography is reasonably accurate. It seems to me that is a reasonable foundation."

Colonel Bowen further stated that he checked on the Coit survey first in 1952, when they were preparing for the trial in the fall of 1952. That he spent a long weekend around the 4th of July out there making a study. On that weekend and others, that is the period of July to mid-July, he first made a rather detailed check on the ground of this report, and since then he has had occasion to spot check it from time to time. That this does not include the additional parcels shown on the map, but only the original survey. (Page 9211 - Line 21 to Page 9213 - Line 9).

That the purpose of the testimony of Dr. Coit was to establish proof of the amount of irrigable acreage contained on the Vail Ranch. If in the mind of the Court there is a reasonable probability that the facts asserted have been established, the quantum of proof has been met, and a prima facia case has been

5563

1    established, which would require the party opposing the contention to proceed

2    with rebuttal.

3         The testimony of the witness Coit, together with that of Davidson,

4    corroborated by the Government's soil expert, Colonel Bowen, establishes a

5    prima facia case of the irrigable acreage onthe Vail Ranch as shown on Exhibit

6    "C" and as compiled and totalled on Vail's Exhibit "D".

7         We feel that the records in this case and this matter does not warrant

8    the necessity of the testimony of the witness Bruner.   However, out of abundence

9    of precaution, a separate memorandum is being prepared in support of a Motion

10   for the admission of the testimony of the witness Bruner as suggested by the Court

11   on September 22nd, 1959.

12        It is difficult to understand the contentious attitude of the Government's

13   lawyer, especially when the Government in an earlier proceeding in this same

14   action, through an expert witness Mr. H. M. Hall in the United States District

15   Court, before the Honorable Leon R. Yankowitz on October 30th, 1952, testified

16   to the irrigable acreage on the Vail properties, in Reporters Transcript Volume

17   2, Page 106, Line 3, to Page 107, Line 3, he gave, he gave testimony showing

18   the total irrigable acreage of the three grants, to wit: Pauba, Temecula and Little

19   Temecula, to be 29,410 acres of irrigable land.  This is the identifical figure

20   established by the Coit survey as shown in Vail's Exhibit "D".  The Hall testimony

21   we believe to be competent evidence in the present proceedings, and although

22   we feel that the evidence of Coit, Davidson and Bowen are sufficient to establish

23   the irrigable acreage of the Vail properties in question, we will however, in view

24   of the attitude of the Government, summarize the Hall testimony in a separate

25   memorandum, and will prepare a motion for the admission of the testimony of

26   H. M. Hall previously given in this case, be considered by the Court, and we shall

27   prepare points and authorities in support of the competency of the transcript of

28   the Hall testimony being considered as evidence for Vail Company in this case.

29        In view of the fact that the Government proposes to make a survey

30   of the Vail Estate as announced in open Court by the Government's attorney, we

31   have difficulty in understanding the acrimonious and contentious attitude of the

32   Government's attorney in relation to the Coit survey.   On March 31st, 1959, the

- Page Fourteen -

1   Government's attorney announced in open Court that they proposed to make survey

2   of the Vail Estate.   On Page 9323 - Line 22 to 24, in response to a question

3   asked by the Court:

4           "Does the Government propose to make a survey of this Vail Estate?"

5   By Veeder, "Well for rebuttal we certainly are".

6           DATED:      October,   1959:

7

8

9                                       Respectfully submitted,

10

11

12

13                                      *(signature)*
                                        GEORGE STAHLMAN
14                                      Attorney for defendant VAIL COMPANY

15

16

17

---

**AFFIDAVIT OF SERVICE BY MAIL (C. C. P. 1013a)**
(Must be attached to original or a true copy of paper served)

COUNTY OF SAN DIEGO }
STATE OF CALIFORNIA } ss.

Case Number 1247-SD-C

Julia A. Whites ..............being duly sworn, says, that affiant is a citizen of the United States,
over 18 years of age, a resident of, or employed in, San Diego County and not a party to the within action

That affiant's ~~residence~~ business address is 322 North Nevada, Oceanside, California

That affiant served the attached Memorandum of Testimony Re: Soil Survey of Vail's Properties

by placing a true copy thereof in an envelope addressed to J. Lee Rankin - Solicitor General of the United

States - - - - - - - - - - - - - - - - - - - - - - - - - - -

at ~~his~~ ~~residence~~ office address, which is Department of Justice, Washington D. C.

which envelope was then sealed and postage fully prepaid thereon, and thereafter was on.....................................

21 October ....................., 195 9 , deposited in the United States Mail    at Oceanside, California

.......................................That there is delivery service by the United States mail at the place
so addressed, or regular communication by United States mail between the place of mailing and the place so addressed.

Subscribed and sworn to before me

21st   October ................., 195 9                     Julia A. Whites

*(signature)*                                              Julia A. Whites
Notary Public in and for the County of San Diego, State of California
(SEAL)
My Commission Expires January 21, 1962                    5565

**AFFIDAVIT OF SERVICE BY MAIL**                           Form 9A Co. Clk. 3-59 30M PP