GEORGE STAHLMAN
ROUTE # 1, Box 235
Fallbrook, California

Telephone: RAndolph 8-2310

and

EARLE K. STANTON
139 North Broadway
Los Angeles 12, California

Attorneys for defendant
Vail Company

FILED
DEC 11 1959
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,

    Defendants.

NO. 1247-SD-C

MEMORANDUM OF THE VAIL COMPANY IN
REPLY TO THE MEMORANDUM OF THE UNITED
STATES IN RE: THE ABROGATION OF THE
STIPULATED JUDGMENT

SUBMITTED BY VAIL COMPANY

5629

PRELIMINARY STATEMENT

Much of the memorandum filed by the United States and denying the Vails' contention that the stipulated judgment should be set aside and a completely new determination be made concerning all water rights, appears to be predicated upon the assertion that the Vail Company does not come into Court with clean hands, and therefore is not entitled to such relief.

The Vail Company certainly has no quarrel with this long established rule of equity, but on the contrary now invokes it as against the United States which, like its humble and harassed tax payers, is bound by the salutary principle.

It is an incontrobertible fact, however, that <u>the United States, not the Vail Company, inaugurated this present equitable proceeding</u> by seeking a declaratory judgment as to its water rights. And it is likewise true that it is not the Vails but good old Uncle Samuel who is now claiming unjust enrichment, estoppel, etc. and thus seeking the aid of Equity! Therefore, a brief survey of its own activities connected with this litigation is not out of place, and the question immediately arises whether the plaintiff's legal hands are spotless.

The adjustment of water rights is a particular subject of equity jurisdiction.

<u>Burr v. Maclay Rancho Water Co.</u>, 154 Cal. 428

<u>Rancho Santa Margarita v. Vail</u>, 11 Cal. 2d 501

The United States, therefore, seeking equity, is not entitled to the requested relief, unless it comes into Court with clean hands. The equitable maxim in question is necessarily a two-edged sword which applies to both parties alike, not merely to the defendant.

I

<u>THE UNITED STATES HAS NOT COME INTO THIS EQUITY COURT WITH CLEAN HANDS.</u>

The United States, by its pleadings has sought, an apparently is still seeking, the greatest possible amount of water from this river system, with little or no regard for the rights of other users. Many and diverse theories have from time to time been urged by the Government some of which have been

(1)

judicially discountenanced in pre-trial rulings and elsewhere. Sometimes the United States has relied upon the more favorable aspects of the stipulated judgment; it has claimed riparian, approriative, prescriptive rights; it has stressed the military use of Camp Pendleton; it has claimed paramount and sovereign rights to all the water. About every possible or impossible theory has been explored and presented. But whatever the theory may be, the general idea expressed is that the United States should receive a very large percentage, if anot all, of the available water, with almost no regard for the rights of the many ranchers and others who own lands above Camp Pendleton and depend for their very existence upon the waters of the river system.

It is respectfully submitted that this conduct is anything but equitble in nature. It ill behooves the plaintiff to talk about coming into equity with clean hands. So far as the United States is concerned, it would appear that an equitable and just apportionment of water between the various users, having due regard for their riparian rights and other legal and equitable considerations, is not at all what is sought.

On the contrary, the plaintiff has arbitrarily attempted to get water to which it is not equitably entitled, and to this end has ruthlessly put all these defendants, its citizens and taxpayers, to enormous wastex of time and money in defending this action over a period of some 8 years. Although possessed of its great right of eminent domain under which it could condemn, take and pay for whatever land and water it needs, it has apparently proceeded on the theory that if sufficiently harassed and persecuted, these upper land owners will objectly surrender and their great country will thus acquire these valuable water rights without paying for them. This, the defendant submits, is anything but equity.

II

IF AN EQUITABLE APPORTIONMENT OF WATER BEMADE AS TO ALL INTERESTED PARTIES, THE STIPULATED JUDGMENT CANNOT BE ALLOWED TO STAND.

The Vail Company, of course, joins in the plaintiff's assertion that the Stipulated Judgment is not operative as to those persons who are not parties to it. ( U.S. Memo. p. iii. ) This quite obvious statement, however,

entirely fails to meet the meritorious contention of the Vails that any equitable apportionment of water, protective of the water rights of the many upper land owners, must of necessity ignore and abrogate the division made in the Stipulated Judgment.

How, for example, is the Vail Company to obtain its one-third of the water of this river system when so much of the available water is abstracted by land owners above the Vail Ranch? Obviously, there is but one answer to this question;- under presently existing conditions, it is simply and mathematically impossible for Vail to obtain its one third. Yet, despite this absolute impossibility, the same Stipulated Judgment nevertheless requires them to furnish the United States with an arbitrary and specified amount of water! It requires no tedious argumention and no citation of authority to prove this contention. It is an undeniable fact which no one can gainsay.

The result of this is that the Stipulated Judgment simply does not take care of the matter under present conditions, and merely stands in the way of making an equitable water distribution. It is an established fact that the river system does not produce enough water to go around. Conditions within the watershed have become much more complicated and involved in the 20 years which have elapsed since that judgment was entered. Matters which were never within the contemplation of the parties have intervened during that period, with the result that the Stipulated Judgment has become, under presently existing conditions, an entirely unconscionable and completely inequitable determination. As demonstrated in the previous Vail Co. Memorandum, this Court has the power to set aside such a judgment, and to make a complete, equitable determination of all water rights in respect to all parties concerned including the Vail Co.

### III

### THERE HAS BEEN NO UNJUST ENRICHMENT OF THE VAIL COMPANY BY REASON OF THE STIPULATED JUDGMENT OR COMPLIANCE THEREWITH

This contention of the United States in its Memorandum, (pages 1-20) that the Vail Company has been unjustly enriched by the Stipulated Judgment, and that in two cases, namely the Naval Well, and the Vail Dam, the Vail

Company has induced the Government to act to its prejudice on representations that the Stipulated Judgment would be complied with, and hence should not now be permitted to abrogate such judgment, is predictaed upon an entirely erronrous conception of what took place in reference thereto. Only a distorted and partial view of the situation can lead to any such conclusion.

Actually, as will appear from documentary and oral evidence, a summary of which will be presented to the Court along with this Reply Memorandum. the United States was never induced by any representations of the Vail Company, to do anything at all to its prejudice, and that whatever steps were taken by the Government in respect to either the Naval Well or the Vail Dam, were undertaken by plaintiff voluntarily, with full knowledge of the facts, and for its own best interests.

Certainly, through the years which elapsed after the Stipulated Judgment, the parties, and certainly the Vails, made a bona fide and noble effort to comply with and work under the Stipulated Judgment despite its inequitable provisions. And they have thereby clearly demonstrated that it was impractical and impossible in respect to compliance and operatin. The Government, as well as the Vails, must by necessity, have long since discovered these undeniable facts, although the plaintiff, by reason of its downstream position, had little to complain of as compared with the Vail Company in its upstream location.

What is quite certain is that the Vail Company has never been guilty of any overreaching or other inequitable conduct which would bar or estop it from asking this Court to abrogate the Stipulated Judgment and make an equitable allocation of water.

IV

THE VAIL COMPANY HAS BREACHED NO COVENANT IN RESPECT TO THE NAVAL WELL, AND MERELY CONSENTED TO THE DRILLING OF THIS EXPLORATORY WELL.

Much of the Government's brief in reference to the so-called unjust enrichment of the Vail Company, estoppel, and so on, is concerned with the claim that the Government expended something like $51,610.00 in the drilling of Naval or Pauba Well on the Vail property in 1951, and that the Vail Company, acquiescing in the terms of the Stipulated Judgment, induced the United States to drill this

(4)

5833

well so that the Vail property might be benefited thereby, and that the Vail Company was thereafter unjustly enriched by the irrigation water, secured from such well

A more erroneous or misleading statement can hardly be imagined. The entire theory of this claim is in contradiction to the facts and to the history of the Naval Well which will shortly be placed in evidence, a summary of which will be furnished the Court herewith.

THE NAVAL WELL WAS NOT SOUGHT BY THE VAIL COMPANY BUT BY THE UNITED STATES.

Its primary purpose was not to furnish water but to explore the underlying strata to a greater depth than had theretofore been attempted. This exploratory well sought to solve the mystery of the underground water basin which has always been and still is an unknown qualtity. This was obviously of as great and vital interest to the United States as it was to the Vail Company.

It was the considered opinion of the experts (see Pemberton Report, U. S. Memo, Exhibit D) that such a deep, exploratory well should be drilled at the lower end of the Temecula Valley as the most likely spot designed to furnish the desired information. The chosen spot was near the confluence of the Murrieta and Temecula Rivers, and of course, happened to be on the Vail Ranch. In this connection it should be noted that neither of the parties knew what might be accomplished by the drilling of this well; it was purely an experimental venture upon which the United States was willing to embark. Naturally, the Vail Company approved of the project and gave its consent.

(B) THE "REVOCABLE PERMIT AGREEMENT", (Exhibit B, Plf. Responst to Vail Memorandum) MERELY EVIDENCES THE VAILS' CONSENT TO DRILLING OF THE NAVAL WELL

One has only to read this Revocable Permit Agreement, executed on March 27, 1951 by the United States and the Vail Company, to see that there is no inducement on the part of the Vail Company to have the Government drill the Naval Well. On the contract, the United States is merely given a revocable permit to enter upon the Vail Ranch, drill a well and make water tests. Nothing more.

(5)

5634

Naturally, the permit refers to the Stipulated Judgment and the provision therein permitting either party to drill water wells, and stipulating that the Naval Well shall be considered such a "water well". As hereinbefore mentioned, both parties were still attempting to work under the Stipulated Judgment, although in truth and in fact, that judgment was entirely unworkable, impractical and impossible to fulfill, inequitable and unconscionable in operation.

The permit, it is to be noted, was not absolute but "revocable", and it provided that the Government should "Indemnify and save harmless the Permitter (Vail Co.) against all claims", etc. arising out of the drilling of the well. This is certainly a far cry from any possible inducement to drill the Naval Well. It was a straight forward business arrangement between two parties who believed that the drilling of this well might solve some or all of the difficulties encountered in their attempt to work under the unconscionable Stipulated Agreement. To claim that this "Revocable Permit Agreement" was anything more than that, or that it can amount to anything like an estoppel, or that the drilling of the Naval Well under this permit was the cause of any unjust enrichment to the Vails, borders on the ridiculous. It meant exactly what it said, no more and no less.

Furthermore the Government did not disclose to Vail Co. prior to inducing the Vail Co. to sign the revocable permit to drill the Pauba well that that Vail Co. was to be a defendant in the Action U. S. vs. Fallbrook, indeed it was not until four days after Vail Co. had signed the Permit that the Government showed its real purpose for wanting to drill such a well on the Vail properties. The permit for drilling was signed on March 8th 1951. Vail Co. did not know it was a defendant in the Fallbrook case until service upon them of the complaint on March 12, 1951.

(C) THE DRILLING OF THE NAVAL WELL DID NOT ENRICH THE VAIL COMPANY, EITHER JUSTLY OR UNJUSTLY, NOR DID IT ACCOMPLISH EXPECTED RESULTS.

Established by abundant evidence is the fact that the expected results was not accomplished by the drilling of the Naval Well. It did not solve the mysteries of the underground water basin, nor did it furnish a solution

to the water problems which had harassed the parties for a quarter of a century. It was drilled to a great depth, namely some 2500 feet, but when finished the parties knew but little more than they did before concerning the subterranean conditions. The results were inconclusive.

Nor have the Vails been enriched by this well. The water which it produces, by no means extensive in amount, is of an entirely different chemical content, and to be used at all requires a commingling with other water. The contention that this well furnishes the Vail Company with tremendous and inexhaustible source of water which has greatly enriched it, is but a figment of the imagination, unsupported by any evidence whatsoever. The fact of the matter is that the situation remains much the same as it was before the drilling of the Naval Well, and the water situation is a long ways from being solved. The truth is that the Stipulated Judgment has impoverished all parties to it, and has benefitted no one.

Whether the Naval Well, upon which the Government so greatly depends, cost Fifty One Thousand Dollars or twice that amount, is, of course, entirely immaterial, and proves nothing. As hereinbefore mentioned, it was purely experimental and exploratory in purpuse, and the United States was quite willing to embark upon the undertaking in the hope, also entertained by the Vails, that the water problem might thus be solved. It was not solved, and that is that.

The Navy Well by reason of its location and poor specific capacity is of little or no economic benefit to the Vail Co. as will be established by proof in the trial of this case. A comparison of the Navy Well it efficient productivity and specific gravity as compared to a few other wells, will show that the Naval Well is of no great benefit to the Vail Company. We are attaching hereto, marked Exhibit "A" "Specific Capacity Comparison" between Naval Well and some other Wells which had been testified to previously.

V

THE VAIL COMPANY DID NOT INDUCE THE UNITED STATES TO WITHDRAW ITS PROTEST TO THE BUILDING OF THE VAIL DAM: NO ESTOPPEL, AND NO UNJUST ENRICHMENT RESULTED FROM THE VAILS' CONDUCT IN CONNECTION THEREWITH.

The history of the building of the Vail Dam, like the history of the

(7)

Naval Well previously mentioned, discloses nothing tending to create an estoppel on the part of the Vail Company, and certainly indicates no unjust enrichment.

In 1947 the Vail Company filed an application with the California Water Resources Division asking permission to build a dam at Nigger Canyon on the Temecula River and to impound waters of that stream for storage purposes. Formal protests were then filed by the United States, by the Fallbrook Public Utility District, San Diego County Water Authority, and by others.

The United States apparently bases its claim of estoppel upon a letter from the Vail Company, dated October 6, 1947, (U.S. Response to Vail Memo p. 7), which mentions the Stipulated Judgment as making a 1/3 and 2/3 division of the water, and goes on to state that "Any diversions that we may make by means of Vail Dam and reservoir will not mature into an appropriative right as against you" over and above said division.

Thereafter the Government did withdraw its formal protest, but notwithstanding such withdrawal, after receiving notice of the hearing before the California Water Resources Division, the Commandant of the Eleventh Naval District wrote to such Division on Dec. 9, 1947 stating that "<u>this letter is intended to be a notice of intended appearance at this hearing for the purpose of submitting testimony or evidence.</u>" And at the hearing on December 16, 1947, to determine whether the Vail permit should be granted, the writer of the above letter, Capt. A. K. Fogg, Public Works officer of said Eleventh Naval District, did actually appear as a witness and testified to factual matters in protest to an application by the Fallbrook Public Utility District to build a dam, which application was heard at the same time as that of the Vails Company, and which factual matters were in relation to the same subject matters to which they protested the application by Vail.

After a plenary hearing of the California Water Resources Division, the vail application was granted, and on February 18, 1948, written notice was mailed to all interested parties and protestants including the Eleventh Naval District, stating that a permit had been issued to the Vail Company "to appropriate 40,000 acre-feet per annum from the waters of Temecula Creek, to be accummulated between November 1 and April 30 of each season and sub-

(8)

sequently untilized for irrigation and domestic purposes". (This letter and other documents relating to this matter are now being offered in evidence.) It is interesting to note that at this hearing, according to an interdepartmental communication dated December 24, 1947, "<u>The Navy did not recede from its protest in any particular.</u>"

The above mentioned documents and other evidence to be introduced, completely refutes the Government's claim that the Vail Company "induced" it to withdraw its protest. On the contrary it establishes the fact that notwithstanding its original formal protest, and its later equally formal and apparently meaningless withdrawal of protest, the United States actually continued its protest, appeared, participated therein, and was never induced by the Vails or anyone else to "recede from its protest."

Moreover the evidence is quite convincing that whatever the protests the California Water Resources Division was convinced that the permit should be given, authorizing the Vail Company to impound the water by its dam. The Vail Company has, then, proceeded in the prescribed legal manner to build the Vail Dam, and nothing in the entire transaction can be seized upon to establish an estoppel, -much less to show any unjust enrichment. Moreover, it is quite evident that Camp Pendleton, as well as the Vail Ranch, receives benefit from this dam, since flood waters which would otherwise escape and be lost are captured and ultimately in large part descend to the lower users.

The contentions currently made by the Government are utterly without basis of any kind and are directly controverted by the record.

### LACHES

The defense of laches doe not rest entirely upon lapse of time, nor require any specific period of delay, as does the statute of lim.

<u>Verdugo Canyon Water Co. v. v. Verdigo.</u> 152 Cal. 655, 674.

<u>Neet v. Holmes,</u> 25 Cal. 2d 447

The fact that determination of a controversy involves an investigation of rights originating many years past does not render the claim stale.

<u>McGuire v. Hibernia Sav. & Loan Soc.</u>, 23 Cal. 2d 719.

Delay alone does not constitute laches unless it is accompanied by circumstances from which prejudice may result.

)9)

Allen v. Calif. Mut. Bldg. "Loan Ass'n", 22 Cal. 2d 474.

Beverage v. Canton Placer Min. Co. 43 Cal. 2d. 769

There must be something more than lapse of time; it must also appear that this equitable defense is available as applied to the facts.

Borden v. Boyvin, 55 Cal. App. 2d. 432.

Plea of laches must fail where no damages are proved to have been suffered by the pleader.

Los Angeles B. & C. Products Co. Los Angeles, 60 Cal. App. 2d, 478.

Harootenian Estate, 38 Cal. 2d 242

Laches in law is not mere delay but delay which works a disadvantage to another.

Long v. Long, 46 Cal. App. 2d 716.

Wilkerson v. Thomas, 121 Cal. App. 2d 479.

Doctrine of laches can only be invoked where a refusal would be to permit and unwarranted injustice.

Hiett v. Inland Finance Co., 210 Cal. 293

A delay in excusable where it was caused or contributed to by the conduct of the party claiming laches, in which case he is estopped to claim the defense.

Smetherham v. Laundry Workers Union, 44 Cal. App. 2d 131.

Adams v. Calif. Mutual Bldg. & L. Ass'n, 18 Cal. 2d 487.

DEC 1 0 1959

Respectfully submitted,

GEORGE STAHLMAN

EARLE K. STANTON

Attorneys for the Vail Company

(10)

5639

EXHIBIT "A"

SPECIFIC CAPACITY
COMPARISON

JK Well 8S 2W 12 K1

   150' 20" Casing. Gravel Pack.

| Date | GPM | D. D. | S. C. |
|---|---|---|---|
| 1/29/35 | 1722 | 13.23 | 117 |
| 6/26/36 | 1688 | 13.55 | 124 |
| 5/1/37 | 2080 | 15.22 | 137 |
| 5/17/39 | 2010 | 12.61 | 159 |
| 4/11/40 | 2420 | 17.13 | 141 |
| 10/17/41 | 2082 | 15.75 | 132 |
| 3/23/42 | 2335 | 16.49 | 126 |
| 5/11/43 | 2450 | 19.75 | 124 |
| 4/1/44 | 2310 | 18.44 | 125 |
| 5/2/45 | 2010 | 17.76 | 113 |
| 11.6.46 | 1890 | 17.06 | 111 |
| 4/19/47 | 2520 | 24.70 | 102 |

#40 Well. 8S 2W 11L 1
   252' 16" x1 12" Casing. Gravel Pack.

| Date | GMP | D. D. | S. C. |
|---|---|---|---|
| 6/18/52 | 1110 | 11 | 101 |
| | 1250 | 15 | 83 |
| | 1360 | 17 | 80 |
| | 1600 | 20 | 80 |
| | 1940 | 27 | 72 |

New #28 Well. 8S 2W 20 B4
   289' 16" Casing. Gravel Pack.

| Date | GMP | D. D. | S. C. |
|---|---|---|---|
| 1/4/54 | 1750 | 25 | 70 |

Wells for State Exhibit "Y" Upper Basin
10-S-4W 5-D-1
   80' 18" Casing drilled.

| Date | GMP | D. D. | S. C. |
|---|---|---|---|
| 12/43 | 1980 | 9 | 220 |

Chappo 10S 5W 24 H-1
   172' 24" Casing

| Date | GMP | D. D. | S. C. |
|---|---|---|---|
| 7/50 | 1600 | 13.2 | 121 |

Chappo 10-S 5W 23 J-1
   140' 24" Casing

| Date | GMP | D. D. | S. C. |
|---|---|---|---|
| 11/50 | 160 | 16.5 | 97 |

(11)

Navy (or Pauba) Well. 8S 2W 17 M1.
2150' 30", 16" 12" Casing. Gravel Pack.

| Date | GMP | D. D. | S. C. |
|---|---|---|---|
| 8/3/51 | 650 | 38.7 | 16.8 |
| | 833 | 49.4 | 16.9 |
| | 1230 | 66.8 | 18.1 |
| | 1879 | 96.5 | 19.5 |
| | 1980 | 101.8 | 19.5 |
| | 2326 | 114.9 | 20.2 |

(12)

5641