1  GEORGE STAHLMAN
   Route #1, Box 235
2  Fallbrook, California
   RAndolph 8-2310
3
   EARLE K. STANTON
4  139 North Broadway
   Los Angeles 12, California
5
   Attorneys for defendant,
6  Vail Company

7

**FILED**

DEC 11 1959

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
                    DEPUTY CLERK

8          IN THE UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10                  SOUTHERN DIVISION

11  UNITED STATES OF AMERICA,        )
                                     )
12                    Plaintiff,     )    NO. 1247-SD-C
                                     )
13          vs.                      )
                                     )
14  FALLBROOK PUBLIC UTILITY DISTRICT, )
    et al.,                          )
15                                   )
                      Defendants.    )
16  _____ )

17

18

19       OUTLINE OF PROOF AS TO SETTING ASIDE OF

20                STIPULATED JUDGMENT

21

22                     ---

23

24

25          SUBMITTED BY VAIL COMPANY

26

27

28

29

30

31

32

                    - 1 -

5659

OUTLINE OF MISTAKES UNDER WHICH STIPULATED
JUDGMENT WAS ENTERED

A.  As to geologic and hyrologic conditions.

    1.  Storage basin volumes as now considered compared to old finding (42850).

    2.  Streams flows, their changes and accuracy of measurement.

    3.  Geological conditions as now considered compared to old findings (42850).

B.  As to future development and scientific advancement.

    1.  Water requirements based on irrigable acres and water duty.

    2.  Additional (present and future) abstractions and diversions.

    3.  New methods of irrigation.

    4.  New methods of land preparation.

    5.  New crops and/or increase demand for crops.

C.  As to establishment of Camp Pendleton and its water use.

    1.  Water use depending on Military or Political situation.

    2.  Future enlargement or disbandonment.

    3.  No set pattern to water use.

    4.  Dam Construction at Pendleton.

D.  As to the rights of other users not parties to the judgment.

    1.  Intervinors - Schloss and Playtor.

    2.  Fallbrook diversions.

    3.  No consideration of use upstreams east of Vail lands.

    4.  Murrieta drainage - Intitlement to all by Vail Co.

    5.  Others not included in original action (42850).

    6.  Over use ? or just use ? of water by others based on reparian status and irrigable acres.

E.  As to difficulty and impossibility of carrying out the judgment.

    1.  Upon restored flow - "Not artifically diverted or

5660

abstracted."

    a. Necessity and impossibility of recording all abstractions in water shed.

    b. Divergence of opinion or results in any study of reconstructed flow.

2. Errors in stream measurement.

3. Inconsistent clauses in judgment.

4. Court ruling disallowing use outside the water shed (Sec. 12th).

5. Enforcement.

    a. Who can interpret?

    b. Based on "Findings of Fact" it would be contrary to the rights of others.

    c. Difficulty due to changes such as Vail Dam and abstractions by others (Fallbrook, Pechanga, Murrieta, areas to East.)

6. Additional pumage and diversions by others (than Vail) reducing summer flow at Temecula gage.

F. As to fact that Vail would never be able to get its 1/3.

    1. Based on restored flow (Sec. 8).

    2. Based on 1/3 - 2/3 abstractions (Sec. 12).

    3. Based on flood flows - 1/2 of Sta. 6 (Sec. 9).

UNCONSCIABLE NATURE OF STIPULATED JUDGMENT.

A. Ambiguity of provisions.

    1. Sec. 2nd.

    2. Sec. 8th.

    3. Sec. 9th.

    4. Sec. 11th.

    5. Sec. 12th.

B. Impracticability of performance.

    1. Sec. 8th.

5661

2. Sec. 11th.

3. Sec. 12th.

4. No time or period of duration mentioned.

C. Fails to consider the fact that other owners put into Vail share.

    1. Newly irrigated lands in Murietta.

    2. Potential (by soil surveys) in Murrieta creek drainage, Pechanga creek, area above Vail Dam.

    3. Abstractions by others not measured.

      a. Impossibility to determine restored flow.

      b. Reduction of flow at Sta. 3.

      c. Diversions and abstraction above Vail Dam.

D. Great change in conditions introducing new factors.

    1. Areas heretofore not considered economically practical to irrigate.

    2. Newly drilled wells.

    3. Governments geologic contentions.

    4. Unusual weather conditions.

E. Governments present contentions different from Santa Margarita.

F. Stipulated judgment failed to retain jurisdiction to modify.

G. Stipulated judgment failed to follow findings and opinion.

    The following Outline and Memorandum in respect to exhibits and proof already introduced and to be offered in evidence in this case in support of the contentions of the Vail Company in its Second Amended and Supplementary Answer, to the effect that the Stipulated Judgment should now be abrogated and that a new and complete adjudication of all water rights be made, is submitted pursuant to the request of the Judge Carter. Reference is duly made to pertinent exhibits and transcripts evidence.

    NOTE. The above outline is not intended as an index, in fact many of the items contained therein are subject to further evidence and proof.

Not used.

- 4 -

I

THE STIPULATED JUDGMENT WAS THE RESULT OF MISTAKE

This matter is fully covered, so far as the law is concerned, in this defendants' Memorandum of Points and Authorities in re Stipulated Judgment (Pages 16-20) heretofore filed in this cause, and to which reference is made.  That this Court is empowered to set aside the Stipulated Judgment on account of the mistake of the parties, cannot be doubted.  Furthermore, in view of the evidence already introduced and to be shortly introduced, there can be as little doubt that if an equitable adjustment of water rights as to all interested parties is to be made in this case, the Stipulated Judgment MUST be abrogated.  It seems clear that the Stipulated Judgment was entered into under a complete misapprehension of the parties as to material facts and the law involved, and in total disregard of the interests of other parties possessed of valuable water rights.  That these mistakes involved matters of great importance and materiality cannot be doubted.

A.  MISTAKES AS TO GEOLOGIC AND HYDROGRAPHIC CONDITIONS.

1.  Storage Basins and their volumes.

Throughout this present litigation, the existence and extent of natural storage basins underlying the lands in question has been the subject of much controversy.  The relation of such subterranean basins to the entire water situation and the available supply of water is obvious.  During the many years since the entry of the Stipulated Judgment, various parties have drilled wells at widely separated points and have obtained large quantities of water which may or may not tap these storage basins. Many of these wells, never contemplated by the parties to the Stipulated Judgment are located East and

5663

1  north of the Vail Ranch and, of course, materially reduce the water
2  available to the Vail Company.

3      The United States, in the hope of discovering more definite
4  data concerning such underground water basins, put down the deep
5  Naval or Pauba Well. Indeed, since the time of the Stipulated Judg-
6  ment, the entire area has become more or less honeycombed with wells
7  which almost completely change the water situation as it existed at
8  the time of said judgment. It is evident that the parties to that
9  judgment had virtually no knowledge of these geologic and hydrogra-
10 phic conditions, and that they were entirely mistaken as to these
11 most material facts.

12     The mutual understanding of the parties to the Stipulated
13 Judgment, namely plaintiff's predecessor, Rancho Santa Margarita,
14 and the Vails, as to these underground water basins, is clearly dis-
15 closed in the trial Court's findings in that case which preceded the
16 entry of the Stipulated Judgment, and upon the opinion of the Cali-
17 fornia Supreme Court on the appeal of that case which directed a new
18 trial upon certain issues and leaving undisturbed all other findings
19 by the lower Court. There was, of course, no retrial of the Santa
20 Margarita-Vail case, as these parties then agreed upon the entry of
21 the Stipulated Judgment.

22     In the present case, the United States in its original
23 complaint (par. 5 on page 6) has affirmed that the Stipulated Judg-
24 ment was "premised upon the findings of the Trial Court and upon the
25 decisions of California's Highest Court."

26     The findings of Fact in the Santa Margarita vs. Vail case,
27 in so far as they relate to the geologic and hydrographic conditions
28 in the Temecula Basin and underground water basins there located, are
29 already in evidence in the present case (Exhibit AB, Vail). Since it
30 must be reasonably assumed that the statements therein made repre-
31 sented the understanding and knowledge of the parties to the Stipu-
32 lated Judgment, and since such statements represent a false and

- 6 -

5664

1 mistaken idea of the actual facts as they have been since disclosed,
2 the pertinent portions of such findings are herein set forth and a
3 comparison of those findings with the present known geology and
4 hydrology of the areas concerned clearly show that the Court in the
5 present case must make findings completely contrary to those found
6 and in the previous case and upon which the stipulated Judgment was
7 predicated. (See Government Ex. 17 and 18 Testimony of witness
8 Kinkel.)
9          Findings of facts quoted from Vail Exhibit "AB".

10
11                         TEMECULA BASIN
12
13     ***"Said basin or valley was eroded by stream action out
14 of or into a very much larger area and into an ancient plain composed
15 of a closely compacted, indurated, unassorted and impervious forma-
16 tion of silts, sand, clay and disintegrated and decomposed rocks of
17 the basement complex, which ancient formation is hereafter in these
18 findings designated and termed "Mesa Silt".
19      Intersperced throughout said Mesa Silt formation, remote
20 one from another and entirely disconnected, of varying but compari-
21 tively small volume, of varying but lesser density than the general
22 Mesa Silt formation, and located at various depths below the surface
23 of said Mesa Silt, are lozenges or lenses of less compacted indurated
24 and impervious materials, in which small amounts of the water so
25 collecting may be withdrawn, naturally, and artifically, by erosions
26 or wells or driven into said lenses or lozenges. That the water
27 contained in said lenses and lozenges do not constitute an under-
28 ground water plane, and in these findings are not embraced in the
29 term "underground water plane", but in these findings such waters
30 contained in such lenses or lozenges are designated as "Suspended
31 water planes". Findings 11 P. 22- L 17-26.
32      *** and thus saturate the strata of such Outwash Area of

- 7 -

5665

1  said Temecula Alluvial basin to ancient, impervious material below,

2  and to the confining mesas of ancient impervious materials on

3  either side thereof, but not beyond, not into such confining mesas;

4  Findings 11 P. 24-L 13-18

5          Artesian Area where the deterital deposit above said indu-

6  rated and impervious ancient Mesa Silt formation is shallower, and

7  where the eroded channel is below the surface and arterian water

8  planes in the adjacent area of the porous fill of said modern valley,

9  and thence continuing to said Temecula canyon.

10  Findings 11 P. 26-L 20-24

11          It is not true that there is a common underground water

12  plane underlying the whole, or any portion, of said ancient Mesa

13  Silt formation; but it is true that in lozenges or lenses within

14  said ancient Mesa Silt formation occur suspended water planes as

15  herein found; but there is no common water plane substantially or at

16  all continuous throught said Mesa Silt formation.

17          The only underground water planes existing in said area

18  occupied by said ancient Mesa Silt formation lie within the porous

19  modern fills constituting the alluvial basins of the Temecula creek

20  or river and the Murrieta creek or river, and are bounded by and

21  are co-terminous with the fills of said modern valleys which have

22  been cut into said ancient formation of said Mesa Silt.  The limits

23  of these two underground water planes are co-terminous with the

24  edges or confines of said eroded valleys of the Temecula and Murrieta

25  creeks, and in no instance extend into the ancient Mesa Silt forma-

26  tion beyond or on either side thereof, and the limits of said under-

27  ground water planes found within said valleys are co-extensive and in

28  conformity with the boundaries of the eroded modern valleys, and are

29  confined, as herein found, to the Temecula Alluvial basis and the

30  Murrieta eroded valley.

31          There is no underground water plane underlying the

32  Temecula creek, the Murrieta creek, the Santa Gertrudis Creek and

- 8 -

5666

1 the intervening areas between, and there is no underground water

2 plane underlying the lands, or any of the lands, or the streams or

3 any of the streams upon the lands, of the defendants other than the

4 underground water plane of the Temecula Alluvial basin and the

5 underground water plane of the Murrieta eroded Valley, as herein else-

6 where as more specifically determined and defined.

7        That the only underground water plane lying beneath any

8 portion of the lands of the defendants, which underground water plane

9 is in contact with, or which is a part of, or which contributes to

10 or supports, or to which there are contributions from the surface

11 flow of said Temecula creek or river, is the underground water plane

12 of the Temecula Alluvial basin, as herein found and described.

13       *** that in addition thereto and wholly separate and apart

14 therefrom, and in no manner communicating therewith, is another and

15 very much smaller water plane, lying beneath portions of the lands

16 of the defendants and parcels of land belonging to other persons

17 not parties of record herein, which lands are within and constitute

18 the fill of the eroded valley of the Murrieta Creed.

19 Findings 23 P. 54-L 23-32. P. 55 L 1-32 P. 56 L-1-13

20       It is not true that the waters coming in the area of said

21 ancient Mesa Silt formation, or particularly through Nigger Canyon

22 are spread out or absorbed by the soils and saturate a wide mass of

23 subteranian material.

24       *****To bedrock below, of an unknown extent, or to any great

25 extent, or of any greater extent than the erroded channels and the

26 modern fills of the valleys of the Temecula, the Murrieta, the

27 Panjango, the Santa Gertrudis, and other lesser streams occupying

28 valleys erroded by water-action into said ancient Mesa Silt forma-

29 tion, as herein found.

30

31       <u>GEOLOGY</u>: To demonstrate the great misunderstanding and

32 mistaken idea that the parties had when entering the Stipulated

5667

1 Judgment as to the geological formation, of the most important part

2 of the stream system, that is East and North of where the Temecula,

3 the Murrieta and the Pajango tributaries merge, and being that

4 important geological feature of the stream system on the Vail Ranch

5 and in the Murrieta Valley, the area in which considerable develop-

6 ment has occurred.  The difference between the time in which the

7 Santa Margarita Vail case was tried, and the present testimony, it

8 is interesting to note the great and diametrically opposit conditions.

9 There was during the trial.  Placed on the black-board by the Witness

10 KUNKEL, a map, Exhibit "17" entitled "Santa Margarita River Water

11 Shed" showing ground water storage units.  This map was the same as

12 Exhibit #15, their geological map, but the difference between #15

13 and #17 was that the witness had added the boundary line showing as

14 heavy long dash and short dash, the outlines of the area within

15 which there is an appreciable thickness of water yielding deposits.

16 (Page 2548 - Lines 19 to 22).

17     The extent of the water yielding deposits was determined

18 by surface mapping and the inspection and analysis of well logs.

19 The well logs were those indicated on Exhibit #16.  (Page 2548 - Lines

20 25 to Page 2549 - Line 2).

21     Exhibit #15 was utilized in the preparation of Exhibit #17,

22 plus the information from analysis of well logs.  (Page 2549 - Lines

23 17 to 19.)

24     This map shows different ground water storage units desig-

25 nated by numbers, the largest of which was Unit No. #4, which was the

26 unit of Older Continental Deposits northeast of the fault zone that

27 parallels the northeast of Murrieta Valley, and it is the area south-

28 west of the boundary that crosses Long Valley (Page 2550 - Lines 9 to

29 12.)

30     Unit No. #4 appears on both sides of the Pauba Basin (Page

31 2550 - Lines 21 to 22.)

32     Unit No. #3 is a separate area that has been remarked,

- 10 -

5668

meaning the Pauba Valley.  (Page 2551 - Lines 6 and 7.)

The materials indicated by the Unit No. #3 as Pauba Valley are the younger alluvial deposits that overlie the older continental deposits.  The older continental deposits are exposed on both sides of Pauba Valley to the north and south of Pauba Valley, and wells drilled through the materials in Pauba Valley also encounter materials that are of the same character as found in Unit No. #4 where it is exposed on the land surface.  (Page 2551 - Lines 11 to 17.)

That these areas, to-wit:  units, are the equivalent of basins.  (Page 2552 - Line 21.)

That the area indicated as #4 and #3 are hydrologically one basin.  (Page 2553 - Lines 8 and 9.)

That a large part of the area within the area indicated by storage unit No. 1.  (NOTE NO. #1 is the area of Murrieta Valley Basin), is underlayed by alluvial deposits, but there is a very great thickness of older continental deposits which wells tapped, even though the well may start in the younger alluvial deposit, it is drilled through the younger alluvial into the older alluvial deposits, and draw water from the older alluvial deposits.  (Page 2553 - Lines 18 to 25.)

The area marked with Symbol #1 is a separate basin from the area marked #3 and #4.  (Page 2554 - Lines 14 and 15.)

The basin No. #2 is separate from #3 and #4.  The boundary between #1 and #2 is an arbitrary boundary and would not be effected if there were considerable pumping in the area.

Exhibit #18 is a table prepared by the witness and describes the twelve ground water storage units shown in Exhibit #17.  It lists the areal extent of each Unit in acres, the specific yield in percentage as calculated by the witness, and the ground water in storage in the fall of 1953, in the top one hundred feet of saturated materials for the areas shown (Page 2581 - Line 2 to 8.)

- 11 -

5969

1    We are herein concerned of course with the storage Unit No.

2  #4 and #3. It is interesting to note on Exhibit #18 that storage

3  Unit No. #4 has a capacity as estimated by this witness, and the

4  ground water in storage as of the fall of 1953 of 280,000 acre feet.

5    The material which the witness testified to as being older

6  alluvium, and the area which encompasses storage Unit No. #4 princi-

7  pally, was the same area referred to in the Santa Margarita vs.

8  Vail suit as Mesa Silt. This is shown by the language as used on

9  the findings in the previous case, herein above referred to, and

10  in the testimony in the present trial of Mr. H. M. Hall, found in

11  Volume 33 at Page 3308, where the witness testified as follows:

12    "In test of wells which the witness stated he had made

13  reference to, he said that they explored the extent of the water

14  plane, not only in Pauba Valley but as far as we thought necessary

15  in through the surrounding older alluvium which I will call Mesa

16  Silt because I have called it that for 25 years." Mesa Silt is the

17  older alluvium. Wherein the witness pointed to the geologic map

18  Exhibit #15 and pointed to the area where previously testified by

19  witness KINKEL. Further testified the orange colored part of

20  Exhibit #15 corresponds with my understanding of Mesa Silt. And

21  that the legends and the areas depicted in what has been designated

22  as younger alluvium and older continental deposits comport with

23  his understanding of the areas. (Page 3308 - Lines 9 to 25.). (Page

24  3309 - Line 9.)

25    The great misconception and mistaken opinion held by the

26  parties and the Court in the Santa Margarita case in relation to the

27  geological and hydrological characteristics of the Santa Margarita

28  stream system can be clearly ascertained by a comparison of the

29  partial findingshereinabove set forth and the following study made

30  from a comparison between the Government Exhibit (18) and excerpts

31  from State bulletin 57 in evidence.

32  Not used.

- 12 -

5670

COMPARISON FROM STATE EXHIBIT P

TO SHOW GROUND WATER BASINS OUTSIDE OF VAIL OWNERSHIP ABOVE

TEMECULA GORGE

| ITEM | LOCATION | PER U.S. Exh. 18 | PER STATE Bul. 57 |
|---|---|---|---|
| 1 | Diamond | (B) | 26800 |
| 2 | Domenigoni | (B) | 16700 |
| 3 | French | (B) | 6860 |
| 4 | Los Alamos | (B) | 7520 |
| 5 | Murrieta (A) | 8400 | 136000 |
| 6 | Santa Gertrudis | (B) | 6460 |
| 7 | Tycalota | (B) | 585 |
| 8 | Wildomar (A) | (B) | 13500 |
| 9 | Anza (Terwilliger) | (B) | 34100 |
| 10 | Upper & Lower Lancaster ) | | 8900 |
| 11 | Agunga ) | | 35200 |
| 12 | Nigger )75000 | | 8100 |
| 13 | Radec ) | | 555 |
| 14 | Dodge | (B) | 3220 |
| 15 | Lower Culp (Dameron) | (B) | 630 |
| 16 | Oakgrove | 7500 | 11200 |
| 17 | Older Alluvium | 280000 | |
| 18 | Pauba | 30000 | 28600 |
| 19 | Pechanga | 24000 | 28200 |
| | TOTAL | 500500 | 375922 |

Storage in Basins above Vail Dam
(Less 1/3 for Vail Ownership)
    (Items 9 thru 17)
27% of Total                                    101777

Storage in Wolf Valley (Pechanga Basin)
(Less 1/3 for Vail Ownership)
    (Item 20)
5% of Total                                      18800

- 13 -

5671

```
 1        Storage in "Murrieta Basins"
          (Less 20,000 for Vail Ownership)
 2        (Item 1 thru 18)
          52% of Total                                      194425
 3
 4  TOTAL % Outside of Vail Ownership - 84%
 5      (a)  U.S. consider Murrieta and Wildomar Basins as one Unit.
 6      (b)  No Estimate.
 7
 8                        MISTAKE AS TO FLOW
 9
10         Walter Hoffman, Government's witness on surface flows,
11  was recalled to the witness stand on January 20th, 1959 -- the
12  testimony reported in Volume 66 of the transcript.  The purpose in
13  recalling Mr. Hoffman was to correct errors which were found to exist
14  in Exhibit No. #21 which exhibit shows the figures from the U.S.G.S.
15  for stream flows at Temecula.  Reference is made to Exhibit No. #21
16  and the stream flow figures for 1958.  A corrected sheet was sub-
17  mitted to the Court and made a part of Exhibit 21.  (Page 7412 - Lines
18  8 to 18.)
19         The corrections were for the approximate three months of
20  February, March and April, and involved three to five days in each of
21  those months.  (Page 7413 - Lines 4 to 8.)
22         The witness then testified that the corrections were the
23  daily discharge from March 16th had been changed from 689 to 745, and
24  March 17th from 50 to 55, and March 22nd from 189 to 259, and from 38
25  to 41.  April 1st changed from 1410 to 1516, April 7th from 347 to
26  466, and April 3rd from 1240 to 1360, and April 4th from 191 to 252.
27  April 7th 876 to 944 and 170 has been changed to 208.  That the
28  monthly values had been changed, the runoff in acre feet changed in
29  February from 1700 to 1770, in March 2800 to 3130 and in April from
30  9460 to 10560.  These are all in acre feet.
31         The figures taken from the added page, which was added to
32  Exhibit No. #21 and shows the gross errors that occurred by reason
```

- 14 -

5672

of the mistakes which were made in checking the stream flow, and although the witness stated there was approximately 10% change, and that all of the figures changed were due to the same condition in the rating that was used in making computations was improperly shaped through the medium and high range. (Page 7416 - Lines 18 to 22.)

And in shaping and rating considerable differences can occur. (Page 7417 - Lines 22 and 23.)

The following interesting study comparing Hoffman Exhibit #21 original with the corrected sheet and the testimony of Hoffman demonstrates clearly the high errors that can occur by the type of measurement upon which the division of waters are made according to the Stipulated Judgment.

STUDY OF HOFFMAN AMENDING EXHIBIT 21
1958 Calculations (Vol. 66 - Trial Transcript)
Original Sheet in Record
Correct Sheet Added

|  |  |  |  |  |  | % Increase |
|---|---|---|---|---|---|---|
| February | 4 | from | 493 | to | 514 | 4 |
|  | 5 | " | 104 | " | 116 | 11 |
|  | 19 | " | 36 | " | 42 | 17 |
| March | 15 | " | 14 | " | 17 | 21 |
|  | 16 | " | 689 | " | 745 | 8 |
|  | 17 | " | 50 | " | 55 | 10 |
|  | 22 | " | 189 | " | 259 | 37 |
|  | 27 | " | 61 | " | 74 | 21 |
|  | 28 | " | 38 | " | 41 | 8 |
|  | 28 | " | 85 | " | 100 | 18 |
| April | 1 | " | 1400 | " | 1516 | 8 |
|  | 2 | " | 347 | " | 466 | 34 |
|  | 3 | " | 1240 | " | 1360 | 10 |
|  | 4 | " | 191 | " | 252 | 32 |
|  | 7 | " | 876 | " | 944 | 8 |

5673

STUDY OF HOFFMAN AMENDING EXHIBIT 21 Cont.

|        |      |       |     |       | % Increase |
|--------|------|-------|-----|-------|------------|
| April  | from | 170   | to  | 208   | 22         |
|        |      |       |     |       | (Avg. 16.8%) |

MONTHLY RUNOFF CHANGED

|          |      |       |     |       |       |
|----------|------|-------|-----|-------|-------|
| February | from | 1700  | to  | 1770  | 4.1%  |
| March    | "    | 2800  | "   | 3130  | 11.8  |
| April    | "    | 9460  | "   | 10560 | 11.6  |
|          |      | 13960 |     | 15460 | (Avg. 10.7%) |

It will be noted from the above study that there are errors
in the daily computations far in excess of 10%. The witness had
previously testified that all of the data collected by the U.S.G.S.
in their measurements of stream-flow are not considered official
until they have been checked and verified by Washington. The witness
testified that the rating current was made by one of the employees,
that he did not check it personally, another one checked it and that
it was then sent to Washington, checked there, that they were satis-
fied and that not until Friday of the week in which he had testified,
the previous week from the testimoney given at this time, to-wit:
January 20th, 1958, did he find out that this mistake had been made.
(Page 7419 - Lines 1 to 17).

The witness then stated the difference in the acre feet
computation is 10% between the ones originally presented and these,
and that he recalled to the Court that in his earlier testimony he
did not claim much greater accuracy for the stream flow records for
most of the gaging stations of the Santa Margarita River than that
of 10%. The physical characteristics of the gaging sites are such
that they do not lend themselves to the type of accurate determination
that you get by say counting the number of pennies in a jar or some-

- 16 -

5674

thing of that type.  That it was a matter of interpretation and
judgment, and the final answer for anyone of these records for any
year would be in the accuracy range of from 5% to 10%.  (Page 7420 -
Lines 24 to Page 7421 - Line 11.)

The witness further testified that he would say that for any
one station, or for any particular year, that the answer would be
in error by somewhere in the neighborhood of 5% to 10%.  (Page 7421 -
Lines 18 to 22.)

COMMENTS:  Here is one instance where an error or errors
such as occurred were finalized after being submitted and certified
as U.S. official documents by the Department of Interior in
Washington, D.C. and thereafter found to be in error to the extent
as is shown by the above study.  This would demonstrate the unrelia-
bility of dividing or making divisions of any water in relation to
the type of measurements of stream-flow as are attempted in this case
and under the Stipulated Judgment.

It is likewise quite apparent that, at the time of the
Stipulated Judgment, all parties were laboring under a complete
misapprehension in respect to the actual and possible water flow
available, - a matter of the utmost importance to all water users.
Indeed, it has been demonstrated that even the experts, (Hoffman
Amending Exhibit 21), have found it necessary to considerably correct
their calculations and estimates over those previously given, and,
as will be there noted, shows an average increase of 16.8%.

The fundamental mistake of the two parties to the Stipulated
Judgment in attempting to divide the flow of this river system between
themselves without regard to either fact or law, or the rights of
other land owners, is apparent at every point.  Indeed, nothing is
better established by the evidence in this present action than the
fact that Rancho Santa Margarita and Vail were simply attempting to
do the impossible.  The Stipulated Judgment was, in effect, nothing

5675

1   more than an ill-advised effort of two greatly worried litigants

2   who, considering themselves only, disregarded all principles of law

3   and equity and complicated the entire matter for themselves and all

4   other water users.

5        A striking example of the misapprehension under which these

6   parties agreed to the terms of the Stipulated Judgment is found in

7   the findings of the trial court which preceded that judgment.

8   (Findings 33, page 67, 68.)  It was there found that the Vails were

9   entitled to use, during the summer months all of the surface and

10  subsurface flow of Murrieta Creek, Santa Gertrudis Creek and Cotton-

11  wood Creek, for the reason that the flow was "insufficient in

12  volume, if attempted to be allocated among the parties thereto,

13  other than in its entirety to the defendants."  A copy of these

14  Findings are attached hereto as Exhibit (1).

15       These Findings must, of course, represent and reflect the

16  understanding of the parties when the Stipulated Judgment was agreed

17  upon.  The evidence in this present action shows that these ideas

18  were incorrect.

19       During the intervening years since the Stipulated Judgment

20  was entered, this very area has become the subject of great develop-

21  ment; many wells have been drilled and surface and subsurface water

22  has been found available for the irrigation and domestic uses of the

23  persons who have settled and developed the area in question.  All

24  of this, naturally, was entirely unknown to the parties or to anyone

25  at the time of the Stipulated Judgment.  Yet that judgment arbitra-

26  rily disposed of this water and considered it of such little value

27  that it was all given to the defendants.  The parties were entirely

28  mistaken as to the facts.

29       As illustrative of this fact and attached hereto and

30  marked Exhibit (2) are partial lists of irrigation wells drilled

31  after January 1, 1941 up to 1953 and 1954 as listed in State Bulletin

32  No. 57.  State Bulletin 57 shows nothing later than the year 1954,

- 18 -

5676

however, as further evidence regarding wells and the properties of
the defendants is forthcoming a more complete picture will evolve.
A survey of these figures in connection with the other documentary
and testimonial evidence will indicate how very mistaken all parties
were in respect to the water resources at the time of the Stipulated
Judgment.

One of the most colossal mistakes of all, and fundamental in
nature, was the idea clearly evidenced by the Stipulated Judgment,
that these two great ranches, Santa Margarita and Vail, were the only
ones vitally interested in this river system, and that any extractions
of water save their own were so negligible that they need not be con-
sidered.  With this entirely erroneous concept, these parties then and
there divided all the water between them, thus piling monumental
errors of law upon equally monumental factual mistakes.  The result,
naturally, was the monstrosity known to us as the Stipulated Judgment,
which the United States now seeks to make binding by court decree
not alone as to the parties signatory to that judgment but as to many
other water users in the area whose legal rights would be thereby
emasculated.  It is hard to imagine a more mistaken premise than that
entertained by the two parties to such judgment.

The Vail defendants, according to the Stipulated Judgment,
were entitled to take and use 33-1/3% "of the water of said Temecula-
Santa Margarita River and all of its tributaries which naturally,
when not artifidally diverted or abstracted, flows and descends in
the channel thereof at *** Measuring Station No. Six (6)". (St.
Judg. Sec. 3.)

In the Ninth Section of the Stipulated Judgment (quoted at
page 46 of the Amended Complaint) it is said that the defendants'
33-1/3% shall be deemed to be "an amount of water equal to one-half
(½) the surface flow at Station No. 6 or Station No. 3., wherever the
flow is greater (as provided in Section Eighth), pumped and/or
diverted from the subsurface and/or surface waters of said river at

- 19 -

5677

1 points upstream from said Station No. Three (3)". (Italics added.)

2 These provisions again point to the mistaken idea that any

3 diversions or abstractions by persons other than the contracting

4 parties would have so little effect on the flow that they need not be

5 considered. And, that is just the point, - they were not considered.

6 Yet, as the situation now exists, and this will be further illus-

7 trated by other evidence. There are now a great many abstractions

8 and diversions upstream which of necessity come out of the Vail's

9 33-1/3% share so that it does not receive, in fact never has and never

10 can receive the share so mistakenly allocated in the Stipulated

11 Judgment. This impossible situation, of course, relates not only to

12 the matter of Mistake, but likewise to the Unconscionable Nature of

13 the Stipulated Judgment, both of which grounds are being urged by

14 the Vail Company in asking that such judgment be set aside, the slate

15 wiped clean, and a new and equitable determination of water rights

16 be made.

17

18 UNCONSCIONABLE NATURE OF STIPULATED JUDGMENT

19

20 Even a superficial reading of the Stipulated Judgment dis-

21 closes the inequitable and unconscionable nature of its provisions

22 both in respect to the parties thereto and the many other water users

23 in the area. But the unreasonable situation created by this judg-

24 ment becomes all the more aggravated when its provisions are read

25 in the light of the present day developments. If it were not for the

26 disastrous conditions brought about through its attempted operation,

27 the terms of this judgment might well be deemed ludicrous. No

28 court should consider engrossing upon its records such an infamous

29 and unfair division of the waters so necessary to the enjoyment of

30 the arid properties.

31 Vail Company in the original suit did however by an answer

32 to amended complaint of defendants in Santa Margarita No. 42850

- 20 -

5678

which answer was filed September 16th, 1926 and prior to the trial of
that case request that other reparian water users on the stream
system be made a party to the action.  A certified copy of that
answer will be offered as evidence of this fact in the within action.

This matter was considered by the court and denied as shown
by the following language used by the court in its findings on page
1 of Vail's Exhibit (A.B.) and which reads as follows:  "Thereupon,
the defendants presented an oral motion for a continuance of the
trial of the action and an abatement thereof until such time as
certain persons not parties of record to the action, but mentioned
in the defendants' answer to the amendments to the amended complaint
herein, were brought in and made parties to said action by appro-
priate pleadings of the plaintiff, and until said parties were given
an opportunity to assert in said action such rights, if any, as each
might have.  That said motion was opposed by the plaintiff.  That,
following argument thereon and a consideration thereof by the Court
and an examination in the field by said Court of the properties
involved in said action and the properties of certain of said persons
mentioned in said pleadings of the defendants, said motion was denied".

Some of the names of persons requested to be made party to
the prior written action with a comparison with the present owners
are attached hereto and marked Exhibit (3).


A.  AMBIGUITY OF JUDGMENT PROVISIONS.

So ambiguous are some of the provisions of the Stipulated
Judgment that the rights of the respective parties thereto cannot be
adequately determined.  The understandable desire to end the previous
litigation led the parties to draft an instrument which fails to
clearly express or adequately define their respective rights.  Even
if it were equitable to other water users, which it is not, it is
so ambiguous in its terms and definitions as to become impossible
of operation.

- 21 -

5679

1    Under the preceding caption, relating to "Mistakes as to

2   Flow", are set out Sections Three and Nine of the Stipulated Judgment,

3   wherein the Vail Ranch is given 33-1/3 of the total stream flow

4   "when not artificially diverted or abstracted", (Sec. 3), defined in

5   Section 9 to be "one-half (½) the surface flow at Station 6 or Station

6   3, wherever the flow is greater (as provided in Section Eighth),

7   pumped and/or diverted from the subsurface and/or surface waters of

8   said river at points upstream from said Station No. Three (3)."

9    Section Eighth of the Stipulated Judgment (P.5) states that

10   "Whenever the total normal flow of said Temecula-Santa Margarita

11   River (when not artificially diverted or abstracted) measured at

12   Gaging Station No. Three (3) exceeds the total normal flow measured

13   at Gaging Station No. Six (6), then and in that instance the flow of

14   said stream at said Gaging Station No. Three (3) shall be considered

15   as the total flow of said stream", etc. (Italics added.)

16    Reading these three provisions together and attempting to

17   interpret the words and phrases according to their common and usual

18   significance, one is left with a hazy and confused idea as to the

19   exact meaning which the language is intended to convey.

20    Vail is given 33-1/3% of the total stream flow "when not

21   artificially diverted or abstracted".  Nothing whatsoever is said

22   as to who it is who is supposed to be artificially diverting or

23   abstracting water, or exactly what is to be done about it if this

24   happens.  What Vail is entitled to under this section, then, is one-

25   third of the total normal flow, which is apparently measured flow

26   plus abstractions, - or is it?  Obviously, if other persons abstract

27   water upstream, Vail is not going to get one-third of the total

28   stream flow, yet this does not seem to have been considered in the

29   judgment.  This is what actually happens now for there are many

30   diversions and abstractions above the Vail Ranch which render it

31   impossible for Vail to obtain its one-third.

32    And in Section Nine, Vail is given one-half the surface flow

- 22 -

5680

at Station 6 or Station 3, whichever is greater. According to the
Eighth Section, "whenever the total normal flow of said Temecula-
Santa Margarita River (when not artificially diverted or abstracted)
measured at Gaging Station No. Three (3) exceeds the total normal
flow measured at Gaging Station No. Six (6)", then the flow at
Station No. Three "shall be considered as the total flow of said
stream." And so may we say that according to this, Vail is entitled
to one-half, not one-third of this total normal flow when not arti-
ficially diverted? And in this same connection, the total normal
flow when not artifically diverted or abstracted, is always greater
at Station 6 than at Station 3.

For Example:

    A = net use above Sta. 3 (Inc. Vail).

    B = measured flow at Sta. 3.

    C = net use below Sta. 3 (Inc. Pendleton).

    D = measured flow at Sta. 6.

    Total normal flow is = measured flow plus all abstractions.

    A & C (See Sec. 8th Line 2).

    A ≠ B = normal flow at Sta. 3.

    A ≠ B ≠ C ≠ D = normal flow at Sta. 6.

It all seems very confusing, inconsistent, meaningless and impossible.

### OTHER UNCONSCIONABLE FEATURES

Furthermore, Section Eleven of the Stipulated Judgment makes
an absolute requirement that Vail furnish Santa Margarita a 3 sec.
ft. flow at Station 3, regardless of conditions. Why enforce such
a flow against Vail when the evidence shows that Fallbrook's pumping
plant takes up to 4 sec. ft. July, 1952? The unconscionable nature
of the Stipulated Judgment appears at every point.

5681

Reference has already been made to that certain unhappy phraseology employed in the drafting of the Stipulated Judgment with the result that the entire instrument is rendered ambiguous.  In place of finally determining the water rights of the parties, the entire matter is left so doubtful and uncertain that no reliance can be predicated thereon.

The Stipulated Judgment at its outset attempts to make a simple one-third and two-thirds water division (which, of course, ignored all other parties).  However, as the document continues, this apparently simple division becomes highly complicated by reason of the diversity of terms used, until by the time one reached its end, the reader is confused as to precisely what was intended.  This state of confusion is, of course, considerably increased by reason of the great change of conditions which has, as pointed out herein, made the entire judgment utterly unfitted to cope with presently existing facts.

Unfortunately, the contracting parties to the Stipulated Judgment did not always make use of the same terms, but employed words and phrases which are far from being synonymous.  For example, in Sections 2 and 3, dealing with the division of water, the judgment provides that the parties may "take and use" their respective portions.  Yet when the Ninth Section of the judgment is read, an entirely different phraseology is employed, and the defendants' one-third is deemed to be "one-half the surface flow" at Stations 6 or 3, whichever is greater," pumped and/or diverted from the subsurface and/or surface waters of said river at points upstream" from Station No. 3; - whatever that may mean!

Now, obviously, "take and use" does not mean the same as "pumped and/or diverted".  If the parties were talking about true or "net use", it is to be pointed out that return irrigation waters are recognized as deductible from "gross use", and that this return irrigation can be as great as 40%, (Col. Bowen's testimony, Vol. 97 P. 10930 L 12-22, 11/25/59.)  Yet the Stipulated Judgment throws no light

- 24 -

5682

whatsoever on this matter.  In this connection it may be noted that
the only advantage of this return of irrigation to the Vail Company
is in the maintenance of the required flow at Station 3, while Camp
Pendleton due to their favorite down stream location are in a posi-
tion to fully utilize return irrigation waters.

The difference in the phraseology employed in Sections 8 and
9 of the Stipulated Judgment should also be noted.  Section 8 makes
use of the term "total normal flow (when not artificially diverted
or abstracted)" of the river system.  But Section 9, immediately
following, departs from this language and uses the term "surface flow"
stating that defendants' share "shall be deemed an amount of water
equal to one-half (½) the <u>surface flow</u> at these same Stations 6 or 3,
whichever is greater.  "Total normal flow" is quite a different
matter from "surface flow".  Yet Section 9 expressly refers back to
Section 8, which mentions nothing whatsoever about "surface flow".

Now, since the flows at Station 6 are always greater than
at Station 3, does this not mean that the Vail Company is entitled
to one-half, and not merely one-third of this greater flow at Station
6, which is actually equivalent to one-half of the waters of the
river, - not one-third?

During the summer or dry period it is entirely possible that
by reason of excessive pumping and/or diversions in the future by
others than the Vail Company, the flow will not only drop below the
3 sec. ft. required in Section 2, but that the Vail Company will have
to pump or divert more than half the surface flow at Station 3 in
order to maintain this required 3 sec. ft. flow.  And where does this
leave the Vail Company?

During the winter months or flood season, the surface flows
at Station 6 are historically three times the flows at Nigger Canyon,
and 50% more than at Station 3.  So again, may we not say that the
Vail Company has the right to one-half and not one-third, and that it
has the right to "pump or divert" one-half of the amount of the flow

- 25 -

5683

1  at Station No. 6? But not even with the presently existing Vail Dam,

2  which had not been built at the time of the Stipulated Judgment,

3  would it be possible for the Vail Company to divert an amount equal

4  to one-half the flow at Station No. 6 which latter is more than three

5  times greater than the flow at the dam!

6          These rather horrible examples of the confusion engendered

7  by the ambiguous provisions of the Stipulated Judgment, and the

8  impossibil/trying to follow its incomprehensible and inconsistent
              ity of

9  provisions, speak for themselves.

10          Yet this is by no means a full roster of the uncertainties

11 found in the Stipulated Judgment.

12          In this same Section Ninth, just discussed, reference is

13 made to waters abstracted or diverted to which the defendants "are

14 entitled under this decree", the term "entitled" being twice used

15 in that paragraph.  In Section Twelfth of the judgment, the same word

16 is again employed and it is there provided that "defendants at all

17 times shall be entitled to divert from the Temecula-Santa Margarita

18 River and its tributaries, and to apply to beneficial use upon their

19 said lands, an amount of water equal to one-half of the amount which

20 the plaintiff is entitled to divert from said river and its tribu-

21 taries". For the purpose of illustrating this proposition we have

22 prepared and attached hereto Exhibit No. 5.

23          It is possible that during the dry summer months the flow

24 at Station 3 will approach or fall below the 3 sec. ft. flow which

25 must be furnished by Vail, and that at the very time the diversion

26 by Camp Pendleton will be more than twice that of the Vail Company.

27 Yet, as heretofore mentioned, under Section Twelfth Vail is entitled

28 to one-half the amount diverted by Pendleton.  How is Vail to get

29 this one-half?

30          Again, in reference to this same matter, the plaintiff

31 (Pendleton) may not actually use all of the water to which it is

32 entitled, yet Vail is entitled to half of what Pendleton is entitled.

- 26 -

5684

While the judgment is silent as to this matter, it seems apparent that Vail is entitled to use <u>one-half of the water that Pendleton is entitled to, - not merely one-half of the water actually used by Pendleton.</u>

Once more, may we refer to the flow of 3 sec. ft. at Station 3 which under the Stipulated Judgment, Vail must insure to Pendleton. This requirement has been rendered impractical through no fault of the Vails, since more than this amount of the summer flow is consumed by the Fallbrook Pumping Plant. This pumping not only reduces the amount which reaches Pendleton but under Section 12, it necessarily reduces the amount which the Vail Company may divert, based on one-half of the Pendleton diversion.

A further inconsistency between Sections 11 and 12 may be noted. Section 11 required Vail to maintain a surface flow at Station 3 of 3 sec. ft., and if such flow falls below that amount for a ten day period then Vail must contribute by pumping to make up for the deficiency. And under Section 12 the defendants are entitled to increase their diversions equal to one-half of plaintiff's diversions, and they may make this increase during that same season or the following season. Now, while either of these provisions might possibly make sense if standing alone; - together they lead to an absurdity. In reference thereto please note that even through Vail is allowed to make up a deficiency as aforesaid, they are still required to maintain a flow which, if pumping is increased to make up the deficit, will decrease the flow to a point where they will have to stop pumping!

Section 2 of the Stipulated Judgment entitled plaintiff to use 66-2/3% of the waters of the river system, "which naturally, when not artificially diverted or abstracted, flows and descends in the channel thereof at" Station No. 6. But the judgment makes no attempt to specify means or method of arriving at this reconstructed flow, and this quantity has never been determined. Actually, to determine this, all of the diversions and abstractions in the entire watershed

- 27 -

5685

1   would have to be recorded.  Without accurate measurements a recon-

2   structed flow cannot be made.

3        Obviously, much water available to Camp Pendleton is

4   wasted when it flows into the ocean.  One needs only to examine Vail

5   Exhibit AC, which shows an average flow at Station No. 6 into the

6   ocean of 24,613 ac.ft. per year during 1923-24 through 1957-58; or

7   Govt. Exhibit 62, "Estimated annual inflow - to the DeLuz dam site

8   for the period 1922-57", which shows an average flow of 27,970 ac.ft.

9   per year.  Although Pendleton is entitled to some of this water, it

10  has been wasted into the ocean.  Considering this fact, then, can

11  Vail's entitlement be based (Sec. 12) on or geared to Pendleton's

12  entitlement although part of it is wasted into the ocean?  These are

13  all matters of extreme puzzlement left unsolved by the Stipulated

14  Judgment.

15       The inelasticity of the judgment provisions coupled with a

16  complete failure to retain jurisdiction so that necessary readjust-

17  ments could be made to meet ever changing increased the frustrations

18  engendered by the Stipulated Judgment.  The simple and demonstrable

19  fact is that this judgment is but a stumbling block to a just and

20  equitable division of the available water.  Its provisions are either

21  so cryptic and ambiguous that they cannot be understood, or they are,

22  under the presently changed conditions, impossible of performance.

23       Some detailed reference has heretofore been made to the

24  changed conditions now existing in this area, and the fact that these

25  monumental changes render the judgment provisions inequitable and un-

26  conscionable.  As illustrating the profound nature of these changes

27  and their effect upon general water conditions, one has only to look

28  at the "Partial List of Irrigation Wells drilled after January 1, 1941",

29  (State Bulletin 57), marked Exhibit No. 2 herein - prepared for Hydro-

30  graphic Units 1, 2 and 3.  Although this is only a partial list cover-

31  ing the years down to 1953 and 1954, it lists no less than sixty (60)

32  new irrigation wells drilled by others than the Vail defendants during

- 28 -

that period. Most of these wells, the Bulletin shows were drilled
during the years 1948-1953. Similarly, total surface diversions
above Vail Dam for a 3 year average (1951-53) are shown by State
Bulletin to be 1933 ac.ft. per year, with 25 diversion points.
Exhibit No. 4 herein.

Under the Stipulated Judgment Vail and Santa Margarita were
each permitted to use their allotted water outside the watershed.
Yet by a pretrial ruling with which this Court is familiar, it has
been decided that there may be no use of water outside the watershed.
This ruling, of course, abrogates a most valuable feature of the
judgment, and reduces or limits the rights which Vail enjoyed under
Section 12.

The question then immediately arises as to whether there can
be such a partial dismantling of the Stipulated Judgment? The judg-
ment represents one complete and entire undertaking; - it cannot be
plucked apart, and a portion of its provisions discarded, for such
was not the intent of the parties. Since it is ambiguous, unfair and
clearly unconscionable in nature, the only thing which can be logi-
cally done is to disregard it in its entirety, and allocate the water
according to law and equity.

It is almost impossible to exaggerate the importance of the
changes which have taken place in this area since the entry of the
Stipulated Judgment. Even if that judgment could be deemed fair and
reasonable then, it cannot be so considered at the present time.
Some of these vital changes have already been mentioned, such as the
many upstream water users who now claim a portion of the water which
was divided by the two large ranches. Many new wells have been
drilled by various parties, and there are recent abstractions of
water not within the contemplations of the parties to the judgment.

Areas which were heretofore considered not economically
practical to irrigate, such as the Vail Company's new potato ground,
Fallbrook, are now found to be irrigable. There are likewise new

5687

1  methods of irrigation and of land preparation, the advent of land
2  moving apparatus, new crops and change in demand for old crops.
3  There are newly irrigated lands in Murietta, and various potentials
4  (by soil surveys) within the Murietta Creek drainage and the areas
5  above the Vail Dam.  All these matters are factors which render the
6  terms of the Stipulated Judgment inequitable and unconscionable.

7       Many matters in addition to those treated in the within
8  brief must by necessity await the development of further evidence,
9  however the trend of some of these important situations which will
10  effect the court's consideration in relation to the issues pertaining
11  to the Stipulated Judgment are only partially covered at the present
12  state of the proceedings.  To illustrate:  the master's findings in
13  relation to tributaries on which he has heard evidence are not all
14  before the court, this is also true of the Murrieta area and the
15  area east of Vail dam.  To show the trend since the Stipulated Judg-
16  ment has been in effect regarding the irrigable acres and water duty
17  which the court in the previous trial refused to consider we are
18  attaching hereto and marked Exhibit No. 7 a partial compilation of
19  some of the acreage and water duties which are before the court as
20  well as some figures taken from engineering reports which soon will
21  be placed in evidence.

22       It is not the purpose of this Memorandum to catalog each
23  and every instance where the Stipulated Judgment has been proven
24  inadequate, inequitable and impossible under present conditions, but
25  rather to furnish pertinent examples thereof, pointing to the inevita-
26  ble conclusion that equity requires its total abrogation and a rede-
27  termination of all water rights.

28       Other pertinent matters pointing in the same direction are
29  suggested in the Outline which precedes this Memorandum which, as
30  before indicated is not to be regarded as an index or a recapitula-
31  tion but rather as offering in abbreviated compass, practical sug-
32  gestions believed to be of value in a consideration of this matter.

- 30 -

5689

**NOTE:**   Attached hereto and marked Exhibit No. 8 is a photostatic copy of a map which was in evidence in the case of Santa Margarita vs. Vail and designated in that case as "Plaintiff's Exhibit No. 10" which demonstrated that the geological conformation of the area as designated as unit No. 4 by government Exhibit No. 17 and testified to by the witness KUNKLE, as older alluvium was the same material referred to in the previous trial as "Mesa Silt".

DEC 1 0 1959

Respectfully Submitted,

GEORGE STAHLMAN
Attorney for Vail Company

- 31 -

5689

EXHIBIT NO. 1

EXCERPTS FROM FINDINGS SANTA MARGARITA vs. VAIL FROM VAIL EXHIBIT A.B.

**** The defendants own and reasonably claim the right and
are entitled to take and use on their lands riparian to said stream
in said Vail ranch, one hundred (100) per cent of the water of said
Murrieta river or creek, and all its tributaries which naturally,
when not artifically diverted or abstracted, flows and descents in
the channel thereof to the mouth of said Murrieta river or creek and
to the present location of said Station No. Two (2).  Finding 3 P. 67
L 6, P. 32, P. 68 L. 28.

The irrigation of the lands of the defendants lying within
the watershed of said Murietta creek and riparian thereto, suscepti-
ble or practical and profitable irrigation therefrom, will require,
during the summer or irrigating season, but not during the winter
or rainy season of the year, the entire surface and subsurface flow
of said Murrieta creek and all its tributaries.  The surface and
subsurface flow of said Murrieta creek and its tributaries, during
the summer or irrigation season, but not during the winter or rainy
season of the year, is insufficient in volume, if attempted to be
allocated among the parties hereto, other than in its entirety to
the defendants, to be susceptible of practical apportionment or
division.

For irrigation and domestic uses, the watering of live-
stock and other useful and beneficial purposes on the lands of the
defendants lying within the watershed of said Santa Gertrudis creek,
and being riparian thereto, the defendants own and reasonably claim
the right, and are entitled to take and use on said lands riparian
to Santa Gertrudis creek for said purposes the entire surface and
subsurface flow of said creek flowing over or across the whole or
any portion of said riparian lands of the defendants herein found to

- 1 -

1  be owned by them at this time.

2      For irrigation and domestic uses, the watering of live-

3  stock, and other useful and beneficial purposes on the lands of the

4  defendants lying within the watershed of said Cottonwood creek and

5  being riparian thereto, the defendants own and reasonably claim the

6  right, and are entitled to take and use on said lands riparian to

7  Cottonwood creek for said purposes the entire surface and subsurface

8  flow of said creek flowing over or across the whole of any portion

9  of said riparian lands of the defendants herein found to be owned

10  by them at this time.

11      For irrigation and domestic uses, the watering of live-

12  stock, and other useful and beneficial purposes on the lands of the

13  defendants lying within the watering of other tributaries of said

14  Murrieta river or creek and being riparian thereto, the defendants

15  own and reasonably claim the right, and are entitled to take and use

16  on said lands riparian to said tributaries for said purposes the

17  entire surface and subsurface flow of said tributaries flowing over

18  or across the whole or any portion of said riparian lands of the

19  defendants herein found to be owned by them at this time.

20      Said surface and subsurface flow of said creeks on lands of

21  the defendants, when and as the same flow during the summer or irri-

22  gation season, but not during the witner or rainy season of the year,

23  is insufficient in volume, if attempted to be allocated among the

24  parties hereto, other than in its entirety to the defendants, to be

25  susceptible of practical apportionment or division.

26  Findings 33, Page 67, L 15 to Page 68, L 28.

27

28

29

30

31

32

EXHIBIT NO. 2

PARTIAL LIST OF IRRIGATION WELLS DRILLED AFTER JAN. 1, 1941 (a)

(In hydrographic unit #1 of State Bul. 57)

| Year Drilled | Owner | Number | Depth | Casing Diam. |
|---|---|---|---|---|
| 50 | Mohlenhoff, A.C. | 6S/1W 4J1 | 121 | 10 |
| 51 | Domenigoni, F. | 6S/2W 2J2 | 110 | 12 |
| 53 | " | 6S/2W 2P1 | | |
| 53 | Connell, E.W. | " 9J1 | 146 | 12 |
| 48 | Frick, K. | " 28G2 | 126 | 12 |
| 50 | Cummins, R.M. | " 31R1 | 81 | 10 |
| 50 | Pourroy, P. | " 32A1 | 199 | 10 |
| 52 | Withrow, C.B. | 6S/4W 35D1 | 202 | 12 |
| 53 | Wilks, T. | " 35Q2 | 80 | 10 |
| 51 | Creech, S.T. | 7S/1E 8D1 | 48 | 36 |
| 48 | Pittam, L.E. | 7S/1W 12G1 | 83 | 10 |
| 53 | Pittam, F.W. | " 12R1 | 48 | 12 |
| 51 | Nicolas, M.A. | 7S/2W 4K1 | 90 | |
| 53 | Bennett, E.W. | 7S/3W 6K1 | 300 | 9 |
| 53 | Thompson, W. | " 7N1 | 135 | 10 |
| 46 | Termini, S. | " 7R1 | 285 | 10 |
| 53 | Nielsen, W. | " 20H3 | 196 | 12 |
| 50 | Rios, L.P. | " 20L2 | 124 | 10 |
| 49 | Contreras, G. | " 20R3 | 106 | 10 |
| 48 | Prestwich, G. | " 21D2 | 101 | 10 |
| 51 | Lipking, W. | " 21F1 | 84 | 10 |
| 53 | Cain, C. | " 21K2 | 312 | 12 |
| 49 | Mays, F. | " 21M2 | 110 | 8 |
| 53 | Lipking, W. | " 21P4 | 94 | 12 |
| 51 | Klubnikin, J. | " 27M1 | 112 | 12 |
| 53 | Brellow, C.F. | " 27N1 | 303 | 14 |
| 51 | Lincoln, E.M. | " 27P1 | 232 | 14 |
| 50 | Mance, M. | " 28F1 | 150 | 12 |
| 45 | Mance, M. | " 28F3 | 70 | 12 |
| 50 | Sweezy & Roen | " 29A1 | 275 | 12 |
| 51 | Freeman, K. | 7S/4W 1E2 | 104 | 10 |
| 51 | Brown, R.J. | " 2G1 | 231 | 12 |
| 52 | Paule, G.E. | " 12B1 | 100 | 12 |
| 52 | Vail Co. | 8S/3W 1P2 | 822 | 16,12,10 |

(a) No wells listed after 1953.

   This is not a complete list as bulletin 57 does not cover
   all wells nor drilling dates for most listed.

PARTIAL LIST OF IRRIGATION WELLS DRILLED AFTER JAN. 1, 1941 (a)

(In hydrographic unit #2 of State Bul. 57)

| Year Drilled | Owner | Number | Depth | Casing Diam. |
|---|---|---|---|---|
| 50 | Ippolito, D. | 7S/1E 15E5 | 155 | 8 |

- 1 -

PARTIAL LIST OF IRRIGATION WELLS DRILLED AFTER JAN. 1, 1941 (a) Cont.

(In hydrographic unit #2 of State Bul. 57)

| Year Drilled | Owner | Number | Depth | Casing Diam. |
|---|---|---|---|---|
| 51 | Bader, C. | 7S/1E 17G3 | 75 | |
| 45 | Hepburn, G. | 7S/2E 13D1 | 144 | |
| 49 | Herring, E.G. | 7S/3E 4H1 | 135 | 8 |
| 50 | " | " 4H2 | 124 | 12 |
| 51 | Cartier, J.E. | " 4J1 | 91 | 12 |
| 51 | Hurd, A. | " 14R2 | 112 | 12 |
| 53 | Holcomb, B. | " 15N2 | 106 | 10 |
| 51 | Pursche, H.A. | " 20A1 | 583 | 48 |
| 54 | " | " 20C2 | 305 | 16 |
| 50 | " | " 20G2 | 158 | 14 |
| 50 | " | " 20J3 | 300 | 12 |
| 50 | Johnson, C.T. | " 21J2 | 232 | 12 |
| 52 | Hamilton, L.J. | " 21L3 | 117 | 12 |
| 53 | " | " 21P2 | 178 | 12 |
| 49 | " | " 21P1 | 191 | 12 |
| 51 | Herring, E.G. | " 22D1 | 101 | 12 |
| 50 | Oviatt, J. | 8S/1E 7Q1 | 236 | 8 |
| 48 | " | " 7P1 | 130 | 12 |

(a)  No wells are listed after 1953.

This is not a complete list as bulletin 57 does not cover all wells nor drilling dates for many listed.

PARTIAL LIST OF IRRIGATION WELLS DRILLED AFTER JAN. 1, 1941 (a)

(In hydrographic unit #3 of State Bul. 57)

| Year Drilled | Owner | Number | Depth | Casing Diam. |
|---|---|---|---|---|
| 52 | Gibbon, W.R. | 8S/1E 19Q2 | 87 | 12 |
| 52 | Trunnell, D.B. | " 33G1 | 260 | 12 |
| 54 | Knox, G.L. | 8S/1W 24B1 | 183 | 10 |
| 53 | Bergman, A. | 9S/2E 17K3 | 61 | 12 |
| 53 | Martin, D.L. | " 20A3 | 80 | 10 |
| 53 | Ward, B.E. | " 26L2 | 104 | 8 |
| 47 | Jackson, R.C. | 9S/3E 16A2 | 52 | 8 |
| 48 | Carr, H.B. | " 16B1 | 60 | 12 |

(a)  No Wells are listed after 1954.

This is not a complete list as bulletin 57 does not cover all wells nor drilling dates and use for many listed.

- 2 -

5693

EXHIBIT NO. 3

COMPARISON OF OWNERS IN RORIPUAGH ET AL EXH. B (AND SOME OTHER
PRESENT DEFENDANTS) WITH OWNERS REQUESTED BY VAIL CO. TO BE
INCLUDED IN THE ORIGINAL ACTION 42850.

| PRESENT OWNER | OLD OWNER |
|---|---|
| Barnett, R.O. | Barnett, A.B. |
| Shamel, J.B. | Barnett, M.E. |
| Waddell, M.M. | Gonzales, A. |
| Guenther, | Guenther, Hugo |
| Hall, G.T. | Hall, L.M. |
| Cantarini, D.E. | Hall, L.M. |
| Nicolas, S. | Nicolas, Jos. |
| Ceas, A.N. | Nicolas, Jos. |
| Dixon, Emile | Nicolas, Jos. |
| Hinkley, S.I. | Nicolas, Jos. |
| Roripaugh, L.E. | Plumb, P.B. |
| Roripaugh, L.E. | Roripaugh, J.E. & Roy |
| Roripaugh, L.E. | Sec. Trust & Svgs. Bnk. |
| Small, E.L. | Small, H.B. |
| Thompson, W.A. | Thompson, N.B., C.J., M.W. |
| Wilks, H.L. | Wilks, A.L. |
| Wilks, Richard | Wilks, A.L. |
| Wilks, Chas. | Wilks, A.L. |
| Wilks, T.H. | Wilks, A.L. |
| Swanguen, C.R. | Swanguen, C.R. |
| Lincoln, E.M. | Swanguen, C.R. |
| Querry, F.O. | Howard, Grant |
| Howell, A.S. | Lambert, J. & G.B. |
| Brown, D.S. | Brown, R.J. |
| Cain, C.L. | Hutchison, A.H. (& Brown) |
| Oviatt, J. | Bailey, Geo. W. |
| Wilks, T.E. & L.M. | Wilks, A.L. |
| Cottle, G.D. & W.W. | McCarrell, Lulu |
| Gibbon, W.R. | McCarrell, Lulu |
| Geltman, E.C., etc. | Bergman, H.F. & Jacobest Est. |
| Knox, F.S., G.L., H.G., W.L. | Tripp, D.J. |
| Bergman, A.D., etc. | Bergman, H.F. & Jacobest Est. |
| Roripaugh, J.E. | Roripaugh, J.E. |
| Bailey, H.F., etc. | Bailey, Geo. W. |
| Dubner, H.B. | Dubner, Mrs., H.B. |
| Escallier, A.J., etc. | Escallier, H. |
| Heard, Jim, L.L. | Heard, L.B. |
| Miller, John J.G., etc. | Miller, J.J.G. |
| McCarrell, Lulu | McCarrell, Lulu |
| Pfau, G.M., Z.J. | Pfau, J.G. |
| Robertson, A.C., L.G. | Robertson, M. M. |
| Simonelli, B., etc. | Howard, Grant |
| Tripp, A.D., etc. | Tripp, D.J. |
| Trunnell, D.B. | Bergman, H.F. & Jacobest Est. |
| Wentworth, J.A. | Wentworth, John |
| Buchnan, C.A., etc. | Buchnan, G.E., D.E. |
| Beaver, G.V. | Beaver, Grace |
| Burnham, F.A., V.E. | Burnham, A.S. |
| Garrison, V.A., etc. | Garrison, C.B., H.S. |
| Matz, Joe | Matz, L., A. |
| Pacific Clay Products Inc. | Pacific Clay Products Co. |
| Rail, C.H., etc. | Rail, O.R., Chas. |
| Sykes, A.J., etc. | Sykes, Amos J. |
| Tarwater, Urban K. | Tarwater, Urban |
| Tarwater, B.W. | Tarwater, B.W. |
| Torbett, E.M., H.G. | Torbett, H.G. |
| Wickerd, B.M., etc. | Wickerd, H. |

- 1 -

5694

# EXHIBIT NO. 4

## SURFACE DIVERSIONS ABOVE VAIL DAM
### (AS PER STATE BULLETIN)

| Description | | Owner | 51-53<br>3 Yr. Avg.<br>Ac.Ft. |
|---|---|---|---|
| 8S/1E-7R | Wilson Creek | Oviatt | 155 |
| 8S/1E-9Q | Wilson Creek (Star Dust) | Tyber | * 182 |
| 8S/1E-19M1 | Temecula Creek | Knox | * 222 |
| 8S/1E-29L | Temecula Creek | Gibbon & Cottle | 616 |
| 8S/1E-29Q | Temecula Creek | Barton | * 17 |
| 8S/1E-29R | Temecula Creek | Trunnell | a 8 |
| 8S/1E-35M | Temecula Creek | Bergman | 386 |
| 9X/1E-12H | Temecula Creek | Ward | * 65 |
| 9S/1E-29C | Temecula Creek | Webber and Lawler | 2 |
| 9S/2E-17F | Temecula Creek | Oviatt and Brinkerhoff | * 175 |
| 9S/2E-28R | Temecula Creek | Oviatt | 105 |

TOTAL DIVERSION ABOVE VAIL RESERVOIR - 3 Yr. Avg.          1933

TOTAL NUMBER OF DIVERSION POINTS - 25.

\* 2 Yr. Avg.

a 1 Yr.

- 1 -

5695

EXHIBIT 5

|  |  | CAMP PENDLETON |  |  |  |  |  | INTERVENERS |  |  |  |  | VAIL COMPANY. |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Military Purposes | 2 Irrigation Purposes | 3 Col. 1 Plus 2 | 4 Bul. 57 Pumped | 5 O'Neill Ditch | 6 Use Col. 3, Plus 5 | 7 Flow to Ocean | 8 Available Col. 7 Plus 6 | 9 Fallbrk. Extract. | 10 Use U.S. Naval Depot | 11 Pumped | 12 Lake Irrigat. | 13 (c) Evap. less Cons. use | 14 Use Col. 11 plus 12 & 13 | 15 Net Use Col. 14 less 30% Ret. Wat. |
|  | 1790 |  | 5559 | 1640 | 6999 | 15930 | 23929 | 170 | 133 | 3148 |  |  | 3148 | 2204 |
|  | 2360 |  | 5371 | 1160 | 6531 | 74270 | 82301 | 203 | 133 | 3096 |  |  | 3096 | 2167 |
|  | 1680 |  | 5362 | 4940 | 10410 | 27600 | 38240 | 155 | 110 | 2638 |  |  | 2638 | 1847 |
|  | 1560 |  | 5746 | 2280 | 7920 | 20270 | 28090 | 152 | 137 | 2694 |  |  | 2694 | 1885 |
|  | 5990 |  | 5282 | 3020 | 6910 | 11680 | 20590 | 152 | 140 | 3355 |  |  | 3234 | 2174 |
|  | 2160 |  | 5529 | 3240 | 7420 | 14420 | 20990 | 86 | 96 | 3035 |  |  | 3095 | 2166 |
|  | 2350 |  | 5562 | 4940 | 6930 | 6930 | 12122 | 40 | 90 | 2717 |  | 375 | 2717 | 1902 |
|  | 2800 |  | 6148 | 4340 | 10800 | 562 | 11279 | 96 | 113 | 1874 |  | 575 | 2249 | 1687 |
|  | 3320 |  | 5374 | 1910 | 8120 | 479 | 3120 | 90 | 68 | 2152 |  | 575 | 2727 | 2081 |
|  | 3800 |  | 5737 | 1470 | 6910 | 0 | 3120 | 113 | 68 | 2152 |  | 653 | 2940 | 2040 |
|  | 2250 |  | 6717 | 186 | 6006 | 47640 | 53646 | 382 | 74 | 2893 | 4065 | 1195 | 3462 | 2540 |
|  | 2270 |  | 6038 | 0 | 6390 | 7890 | 7890 | 68 | 66 | 2869 | 3687 | 1282 | 3764 | 2891 |
|  | 6210 |  | 6573 | 1980 | 8070 | 1040 | 15810 | 595 | 55 | 3937 | 4241 | 1020 | 9282 | 6802 |
|  | 5440 |  | 6765 | 2100 | 8730 | 7740 | 8730 | 1215 | 55 | 4483 | 677 |  | 9130 | 6739 |
|  | 1620 |  | 6530 | 335 | 7205 | 0 | 7205 | 1233 | 65 | 5597 | 940 | 677 | 10515 | 7564 |
|  | 3380 |  | 6379 | 655 | 7075 | 0 | 7075 | 894 | 65 | 6028 | 508 | 365 | 8821 | 6944 |
|  | 1750 |  |  |  |  |  |  | 1717 |  | 6028 |  | 266 | 6802 | 4941 |
|  | 1890 |  |  |  |  |  |  | 1017 |  |  |  |  |  |  |
|  | 1900 |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  | 1750 |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  | 1540 |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 39540 | (v) 31500 | 96420 | 96122 | 33096 | 129516 | 215341 | 344857 | 9228 | 1245 | 57120 | 13459 | 6406 | 76965 | 55796 |
| 4181 | 1956 | 6026 | 6007 | 2068 | 8095 | 13459 | 21553 | 577 | 89 | 3570 | 2688 | 712 | 4810 | 3487 |

Vail Co. records
1942 & 43 from Col. 4
Evaporation less consumptive use
based on U.S. exh. 129 and study
on page 135 Vol. 1 Bul. 57

(v)
(x)
(xx)

Col. 1 U.S. exh. 150
Col. 2 U.S. exh. 151
Col. 4 Bul. 57
Col. 5 See Bul. 57
Col. 6 Col. 3 Addition
Col. 5 Col. 4 Addition
Col. 6 U.S. exh. 57

Col. 7 U.S.G.S.
Col. 8 Addition
Col. 9 State Bul. 57
Col. 10 State exh. & Vail Co.
Col. 11 Bul. 57 & Vail Co.
Col. 12 Vail Co.

Col. 13 U.S. exh. 129 & bul. 57
Col. 14 Addition
Col. 15 Col. 14 less 30% or irrigation water.

EXHIBIT NO. 7

MURIETA

PARTIAL COMPILATION OF SOME OF THE ACREAGE ON RORIPAUGH "B" BASED
ON OFF. GRND. WAT. REC. ENGINEERING REPORTS.

PARCELS HAVING GROUND WATER STORAGE

| PCL. | | ACRES OWNED | IRRIGABLE ACRES | WATER DUTY |
|---|---|---|---|---|
| 30 | Barnett | 204 | 167.9 | 668.1 |
| 21 | Brown | 357.6 | 233.6 | 934.2 |
| 46 | Cain | 100 | 93.6 | 374.4 |
| 45 | Gwinn | 33.8 | 23.2 | 91.8 |
| 29 | Howell | 202.9 | 174.4 | 690.4 |
| 35 | Pearl | 80 | 69.1 | 276.4 |
| 31 | Shamel | 164.7 | 158.6 | 631.4 |
| 40 | Small | 41.7 | 37.6 | 148.1 |
| 41 | Thompson | 456.7 | 433.6 | 1715.7 |
| 4 | Waddell | 60.1 | 54.1 | 215.9 |
| 16 | Wilk, T.H. | 149.2 | 145.1 | 580.4 |
| 34 | Williams | 40.0 | 39.3 | 157.2 |
| 19 | Yoder, C.F. | 413.0 | 394.0 | 1539.2 |
| 27 | Nicolas | 1134.6 | 1171.8 | 4592.4 |

The following are included only to the extent where water
is considered available and are denoted as in court or
by aerial photo number.

| | | ACRES OWNED | IRRIGABLE ACRES | WATER DUTY |
|---|---|---|---|---|
| 6 | Ceas Pcl. 6B | 264.7 | 247.1 | 974.0 |
| 6 | Ceas Pcl 6C | 575.2 | 499.3 | 1969.7 |
| 15 | Lincoln Aerial 35 | 515.9 | 450.5 | 1787.2 |
| 12 | Roripaugh Aerial 34 | 213.6 | 183.2 | 727.5 |
| | Aerial 52 | 1161.4 | 11029 | 4363.2 |
| | Aerial 53 | 131.4 | 130.8 | 523.2 |
| | Aerial 67 | 120.1 | 109.1 | 429.1 |
| | Aerial 83 | 393.0 | 241.3 | 953.2 |
| 17 | Yoder, M. J. Aerial 51 | 330.3 | 295.3 | 1156.7 |
| | | 7143.9 | 6455.4 | 25499.4 |

- 1 -

5697

## ABOVE VAIL DAM

### EXHIBIT NO. 7 Cont.

PARTIAL COMPILATION OF SOME OF THE ACREAGE IN THE AREA ABOVE DAM
BASED ON OFF. GRND. WAT. REC. ENGINEERING REPORTS.
(PARCELS HAVING GROUND WATER STORAGE)

| | | | ACRES OWNED | IRRIGABLE ACRES | WATER DUTY |
|---|---|---|---|---|---|
| ERWIN OVIATT | Aerial | 30184 | 65.0<br>216.5 | 27.9<br>127.9 | 111.6<br>508.3 |
| | | 30185 | 77.6 | 19.3 | 75.0 |
| | | 30184 | 612.3 | 165.8 | 696.5 |
| | | 50104 | 20 | 12.5 | 50.0 |
| | | 30185 | 246.3 | 126.6 | 507.6 |
| | | 60019 | 309.8 | 96.6 | 377.5 |
| | | 60019 | 541.2 | 282.4 | 1117.7 |
| | | 50162 | 377.1 | 225.3 | 887.3 |
| | | 50162 & 50121 | 389.8 | 226.1 | 876.5 |
| | | 50161 | 548.3 | 479.3 | 1880.5 |
| | | 60019 & 60020 | 195.8 | 194.5 | 777.3 |
| | | 60019 | 155.3 | 140.0 | 555.0 |
| | | 60020 | 59.7 | 46.0 | 182.8 |
| | | 50160 | 338.0 | 234.5 | 910.6 |
| | | 50160 | 87.1 | 58.7 | 225.5 |
| | | 50074 | 200.0 | 132.2 | 507.5 |
| WUTZKE | | | 1340.0 | 865.1 | 3371.7 |
| | SUB TOTAL | | 5779.8 | 3460.7 | 13518.9 |
| BERGMAN )<br>COTTLE )<br>GELTMAN )<br>GIBBON )<br>KNOX )<br>TRUNNEL )<br>TYLER (?) ) | | NO INFORMATION AVAILABLE AT PRESENT. | | | |

5698

EXHIBIT NO. 7 Cont.

PECHANGA

PARTIAL COMPILATION OF THREE OWNERSHIPS IN PECHANGA, THEIR ACREAGE
BASED ON OFF. GRND. WAT. REC. ENGINEERING REPORTS.

(PARCELS HAVING GROUND WATER STORAGE)

| | ACRES OWNED | IRRIGABLE ACRES | WATER DUTY |
|---|---|---|---|
| QUERRY | 384.6 | 225.0 | 894.6 |
| GARDNER Pcl. 31 | 563.1 | 246.9 | 784.3 |
| BETHEL | 20.3 | 18.5 | 74.0 |
| | 968.0 | 490.4 | 1752.9 |

- 3 -

5699