

1   STANLEY MOSK, Attorney General
       of the State of California
2   F. G. GIRARD, Deputy Attorney General
    Library and Courts Building
3   Sacramento 14, California
    Telephone: HIckory 5-4711, Ext. 5448
4
    Attorneys for Defendant
5   STATE OF CALIFORNIA

6

7

8               IN THE UNITED STATES DISTRICT COURT

9               SOUTHERN DISTRICT OF CALIFORNIA

10                    SOUTHERN DIVISION

11

12   UNITED STATES OF AMERICA,        )        No. 1247-SD-C
                                      )
13                    Plaintiff,      )
                                      )
14           vs.                      )      MEMORANDUM RELATING
                                      )
15   FALLBROOK PUBLIC UTILITY         )       TO JUDGMENT AND
     DISTRICT, et al.,                )
16                                    )      STIPULATED JUDGMENT
                      Defendants.     )
17   ─────────────────────────────────

18

19           In response to the questions submitted to counsel

20   by the Court on December 18, 1959, the State of California

21   respectfully submits this memorandum.

22
     1.  Is That Part of the Old Judgment Which Was Not
23       Reversed By the California Supreme Court Still
         Effective as Against the Parties to that Case,
24       Or Did the Stipulated Judgment Succeed It?

25           We presume that the Court is concerned with that

26   part of the old findings and judgment which defined and

27   limited the ground water of the stream system to basically

28   the area underlying younger alluvium (Vail Exhibit AB

29   (Findings of Fact), pp. 22, 54-56; see, also, Judgment of

30   trial court which refers to the findings to delineate the

31   stream system).

                              1

                                              5792

First, as to the Stipulated Judgment's effect on
that part of the Judgment which limits the ground water of
the stream to the younger alluvium, it must be emphasized
that nowhere in the Stipulated Judgment is there a definition
as to what ground water is included within the stream
system.  In other words, there is no inconsistency between
the Judgment and the findings of fact and the Stipulated
Judgment.  One defined and limited the ground waters of the
stream, while the other was silent on that particular point.
While the Stipulated Judgment refers to the Temecula-Santa
Margarita River, it is not, as emphasized, defined therein,
and obviously the parties to that stipulation intended that
the stream system (surface and ground) was, as defined and
limited, in the prior Judgment and findings.  This is not a
case where the Stipulated Judgment varied or changed the
prior Judgment as to the ground water encompassed within the
stream.  There is no need to reconcile the provisions, for
there is no inconsistency.  Consequently, even if it be
conceded that the Stipulated Judgment could succeed the
Judgment (which is very doubtful), it did not attempt to here,
and, thus, insofar as defining what ground water is within
the stream, the Stipulated Judgment in no way limited or
changed the prior Judgment and findings of fact, and it had
no effect thereon.  In short, the Stipulated Judgment did
not succeed the Judgment on this point, even if it be
assumed that it could have.

Also, some of the parties to the Judgment were not
parties to the Stipulated Judgment and, of course, the
Stipulated Judgment could never (even if it were inconsistent)
succeed the prior Judgment as to them, and, therefore, there
can be no question that those provisions in the Judgment and

2

5793

findings of fact as to the extent of the stream have not been affected in one iota by the subsequent entry of the Stipulated Judgment.

The question, then, is the present legal effect of the prior Judgment and findings of fact which defined and limited the ground water of the stream to that underlying younger alluvium. Several points are emphasized:

First, no party to that Judgment on appeal questioned the propriety of the Judgment or findings of fact as to the definition and limitation of ground water comprising the stream.

Second, the Supreme Court's judgment on appeal was a limited reversal concerning injunctive relief and the issue of what land was riparian to a surface stream (Rancho Santa Margarita v. Vail, 11 Cal.2d 501, 565-566).

If there is a limited reversal and the appellate court directs that the new trial be limited to specific matters, that part of the trial court's judgment which is not affected by the limited reversal is not reversed and is in effect affirmed (Northern Calif. Power Co. v. Flood, 186 Cal. 301, 307; Morris v. Standard Oil Co., 188 Cal. 468, 473-474; Tulare Dist. v. Lindsay-Strathmore Dist., 3 Cal.2d 489, 583-584; American Enterprise Inc. v. Van Winkle, 39 Cal.2d 210).

Also, a reversal on appeal of a portion of a judgment from which an appeal was taken has no effect on those portions of the trial court's judgment which were not appealed (American Enterprise Inc. v. Van Winkle, supra, at pp. 216-217, and cases cited therein).

It must be concluded from the above cases that the Judgment and findings of fact which limited the ground

3

5794

water of the river to that underlying younger alluvium was
not affected by the limited reversal of the Supreme Court
on appeal, and that the trial court's judgment and findings
on that issue were affirmed.  As emphasized, that issue was
not appealed to the Supreme Court, and that Court's reversal
was specifically limited to another issue, and the new
trial was specifically directed and limited to that other
issue.

The question then presented is whether those
provisions of the judgment and findings are res judicata.

As to the parties of that suit (whether they
appealed or not), the judgment and findings defining and
limiting the ground water which was within the river are
res judicata (California Code of Civil Procedure, sec.
1908; Hunceker v. Lutz, 65 Cal. App. 649; Parker v. Sweet,
188 Cal. 474, 484; City of L. A. v. City of Glendale, 23
Cal.2d 68, 80; Albaugh v. Mt. Shasta Power Co., 9 Cal.2d
751, 765).

While the above-cited cases do not concern a
prior judgment defining and limiting the ground water of a
stream (no such case having been found), they do concern
prior adjudications of similar matters such as riparian
status, and in each case the prior adjudication was held
to be res judicata in the subsequent action.

Moreover, a person need not have been a party in
the prior adjudication where the findings and judgment
resulted in order to assert a plea of res judicata in a
subsequent action.  A plea of res judicata can be asserted
against a party if:

(a)  The issue decided in the prior action was
        identical to the issue presented in the

4

5795

1      subsequent action;

2    (b)  There was a final judgment on the merits; and

3    (c)  The party against whom the plea is asserted

4        was a party or privy with a party to the

5        prior adjudication (Bernhard v. Bank of

6        America, 19 Cal.2d 807).

7        The prior findings and judgment defined and

8 limited the extent of the ground water of the stream.  That

9 is the identical issue presented in the instant case.  There

10 was a final judgment on the merits.  The United States,

11 against whom the plea is asserted, was a privy to a party

12 of the prior adjudication.  Thus, any defendant in this

13 case can assert that on the basis of res judicata the

14 United States is conclusively bound by the findings and

15 judgment of the prior adjudication on the issue of what

16 ground water is included within the river.

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

5796

2. **Can a Judgment of a California Court Involving Riparian Rights be Res Judicata?**

At the onset it is felt that certain terms used in the above heading must be defined. By the term "Involving Riparian Rights" we do not mean an adjudication of such factors as to what land is riparian, or what water sources constitute the stream system available to satisfy the riparian right. What we mean by this term is the amount of water which by adjudication is decreed to a riparian owner at the time of the judgment. The method used in the judgment in determining the amount of water decreed to a riparian is immaterial. It is the amount of water allocated to a riparian which we are concerned with when we use the term "Involving Riparian Rights." The question, therefore, is whether a judgment allocating an amount of water to a riparian (regardless of the method of allocation used) is res judicata.

The second term in the above heading which it is felt needs some clarification is the phrase "Res Judicata."

By the term "Res Judicata" we mean a judgment which the California court which entered it would have no power or jurisdiction to modify, alter or change. A judgment under California law could be final, but subject to modification or change either by proper motion or under the continuing jurisdiction of the court, upon the establishment of a change in conditions. By the term "Res Judicata" we do not mean a final judgment which may be altered or modified upon a showing of change in conditions, but a judgment which cannot be altered, modified or changed, regardless of any change in conditions.

We submit that a judgment of a California court

6                                                        5797

allocating an amount of riparian water to a riparian is a
_final_ judgment which _can_ be altered, modified, changed or
set aside upon a _showing_ of a change of conditions or
circumstances.  In other words, a judgment under California
law allocating water on the basis of riparian rights _is not_
res judicata.

Since the constitutional amendment in 1928 the
right of a riparian to the use of water is limited to
reasonable and beneficial use (_Peabody_ v. _Vallejo_, 2 Cal.2d
351, 374-375).  This right is not dependent on use and, of
course, _disuse_ cannot suspend it (_Half Moon Bay Land Co._
v. _Cowell_, 173 Cal. 543, 551).  All riparian owners of a
water course have a common right therein and share
correlatively of the stream surface and subsurface flow
(_Carlsbad Co_. v. _San Luis Rey Co_., 78 Cal. App.2d 900, 911).
A suit in _equity_ is the procedural vehicle for apportioning
amongst riparians their correlative share of the waters of
the stream (_Carlsbad Co_. v. _San Luis Rey Co_., _supra_, p.
911).  As to the _actual allocation_ of water among riparians
each case is decided on its own circumstances, and there is
no absolute answer which can be made applicable to every
case (_Carlsbad Co_. v. _San Luis Rey Co_., _supra_, p. 911).

From the above _basic rules_ it is apparent that the
judgment which allocates water amongst riparians can never
be res judicata in the sense of prohibiting future change,
modification, alteration or revocation.  Under the consti-
tutional amendment of 1928 _no_ riparian is entitled to an
allocation of water unless he uses it reasonably and bene-
ficially.  However, if a riparian is not entitled to an
allocation of water because _at the time_ the allocation is
sought he cannot or does not desire to use it reasonably

5799

1    and beneficially, his riparian right is not affected.  His

2    right still exists.  If he subsequently satisfies the

3    constitutional conditions, i.e., reasonable and beneficial

4    use, he is then, for the first time, in a legal position

5    to assert the right and have water allocated to him.

6    Conversely, if a riparian at the time the judgment alloca-

7    tion is made is allocated an ascertainable amount of water

8    for reasonable and beneficial use on his riparian land and

9    that reasonable and beneficial use is subsequently

10   abandoned, he would not then be presently entitled to the

11   water previously allocated.  He would still have a riparian

12   right, but he would no longer be entitled to his water

13   allocated by the prior judgment.  Such changes in conditions

14   as increased irrigable land or, to put it in another way,

15   increased reasonable and beneficial use, could necessitate

16   a change in the previous judgment which fixed the proportion

17   of water allocated.  The same result would follow if there

18   were a decrease in irrigable  area, i.e., a reduction in

19   the reasonable and beneficial use of water.  As the

20   riparians' rights are correlative, any change in reasonable

21   and beneficial use by any riparian from that which existed

22   at the time of the judgment would necessitate a change in

23   the judgment allocation of water.  It would not be a ques-

24   tion of changing the riparian right.  The right is never

25   extinguished as long as the land remains riparian.  How-

26   ever, the privilege of using the water which is based on

27   the right is controlled by a constitutional dictate of

28   reasonable and beneficial use.

29        There are many other factual situations which

30   would necessitate a change in a judgment allocation of

31   water.  If a judgment allocated water to riparian land and

that land were subsequently severed from its riparian

status, the judgment allocation of water would have to be

modified, for the basic right under which the water alloca-

tion was made would be extinguished.  Methods of farming

and irrigation could change, making an old allocation

obsolete.  The above are just a few of the factual situ-

ations which would necessitate a change in a judgment

allocation of water.

Thus, it is clear that a judgment fixing propor-

tions in which water may be used by riparians is not con-

clusive in subsequent actions concerning the _same_ water,

since the circumstances which determine the relative rights

to water are by their very nature subject to constant

change.  This conclusion is supported by the California

cases.

In the case of _Los Angeles_ v. _Baldwin_, 53 Cal.

469, Los Angeles brought an action to quiet title to the

waters of the Los Angeles River.  The defendants set up

as a defense that in a former action between the parties

they had been adjudged riparians and that their diversions

of water were then held to be proper riparian uses.  The

factual situation _had not_ changed since the former judgment.

The trial court gave judgment to the defendants.  In

affirming the court stated:

"The conditions do not appear to be different

now from what they then were.  The diversion

by the defendants is the same now as then, _and_

_while these conditions continue unchanged_ the

judgment rendered in the former action operates

as a bar between the parties here."  (Emphasis

added.)

1    In a separate concurring opinion this result

2  was emphasized:

3      "In other words, where the parties claim merely

4      as riparian proprietors, the proportions to

5      which they may respectively be entitled may

6      vary from time to time, in accordance with the

7      facts existing at the respective times" (pp.

8      474-475).

9        Thus, in this 1879 decision of the California

10  Supreme Court it was recognized that a judgment allocating

11  water among riparians was _final as long_ as the facts upon

12  which it was founded remained unchanged, but the judgment

13  _was not res judicata_, for a _change_ in the facts from those

14  that previously existed would allow a change in the water

15  allocation from that formerly provided by the judgment.

16        Insofar as we have been able to ascertain,

17  _Los Angeles_ v. _Baldwin_, _supra_, is the only California case

18  that has _directly_ considered the question of whether a

19  judgment allocation of water amongst riparians can be set

20  aside in a subsequent proceeding upon a showing of a change

21  in conditions.

22        Other decisions, while not holdings, are in full

23  accord with the _Los Angeles_ v. _Baldwin_, _supra_, result.

24        In _Temescal Water Co._ v. _Dept. Public Works_,

25  44 Cal.2d 90, 106, the court was considering the propriety

26  of a permit issued by the state to a district to _appropriate_

27  water.  The petitioners argued that they were entitled to

28  an _independent_ judicial trial in the Superior Court, as

29  distinguished from the nonjudicial administrative procedure

30  provided by California law, on the question of whether

31  unappropriated water was available.  The petitioners argued

that for "practical reasons" an independent judicial trial
could determine once and for all, by considering all of the
existing rights and the estimated supply, whether unappro-
priated water was available or would ever be available.
This "practical" argument was rejected by the Supreme Court
on the basis that a judicial determination could not finally
determine what by its very nature was a fluctuating question.
As stated by the court:

> "As stated in the Tulare case, however, '(w)hat
> is unappropriated water is a constantly fluctuating
> question, depending upon the seasonal flow of the
> stream, the annual rainfall, the forfeiture of
> prior appropriations and default in the use of
> riparian rights.' (187 Cal. at 537.) A judicial
> determination as to existing appropriative and
> riparian rights rests upon then present uses
> which may be quite different at a later time,
> and a determination as to the future availability
> of water necessarily can be only an estimate."

(Emphasis added.)

In Pabst v. Finmand, 190 Cal. 124, 129, the court
considered an action to quiet title to the waters of a
creek.  There were both riparian and prescriptive rights
asserted.  In considering whether an upper riparian user
had used riparian water so as to obtain a prescriptive
right, the court had occasion to discuss what amount of
water a riparian is entitled to, as follows:

> "A riparian owner is entitled to a reasonable
> amount of water for use on his riparian lands.
> What is a reasonable amount varies with the
> circumstances of each particular case and also

11

5802

1   varies from year to year, for the amount which

2   might be reasonable in a season of plenty might

3   be manifestly unreasonable in a season of drought.

4   Nor is the question of reasonableness to be tested

5   solely by the needs of the upper riparian proprietor.

6   The rights of riparian proprietors are correlative

7   and the 'reasonable' amount to which any one

8   riparian owner is entitled is to be measured by

9   comparison with the needs of the other riparian

10   proprietors."  (Emphasis added.)

11        If, as pointed out above, the amount of water

12   which can be judicially allocated to a riparian ". . .

13   rests upon present uses which may be quite different at

14   a later time.. . ." (Temescal Water Co. v. Dept. Public

15   Works, supra) or ". . . varies from year to year . . ."

16   (Pabst v. Finmand, supra), it would seem obvious that any

17   judicial determination, i.e., judgment, which allocates

18   water amongst riparians could be modified or set aside if

19   and when the conditions change.

20        Another case which clearly shows that a judgment

21   allocating water to riparians is not res judicata is

22   Wiggins v. Muscupiabe L. & W. Co., 113 Cal. 182, 195.

23   Insofar as pertaining to the instant question, the trial

24   court in allocating water to riparians had based the allo-

25   cation on irrigable acreage.  The appellant contended the

26   allocation should have been made on the basis of land culti-

27   vated.  In holding the method of allocation used by the

28   trial court to be correct, the court stated:

29        "The amount of irrigable land belonging to each

30        party, rather than the amount of land already

31        under cultivation, would be properly made a

controlling element in adjusting their respective
rights to the flow of the stream; otherwise, a
readjustment would be necessary whenever either
party should cultivate a greater or less area."
(Emphasis added.)

While irrigable acreage would not fluctuate to the
degree that cultivated land would, it is obvious that what
land was considered irrigable in 1896 (the date of the
decision in the above case) might be more or less in 1960
or 1996.  The court recognized that constant "readjustment"
would be necessary whenever cultivation increased or les-
sened if that standard had been followed.  For that reason
an allocation based on irrigable acreage was preferred.
But by stating that readjustment would be necessary, the
court in effect negates any conclusion that a judgment
allocation of water could be res judicata, for if it were
there could never be readjustment, regardless of what
standard was used in determining the proper allocation.

In McFarland v. Superior Court, 194 Cal. 407,
424, the petitioner had been held in contempt for violation
of a prior judgment which allocated water.  One of his
defenses was that a change in conditions had occurred since
the prior judgment in that more water was now available and
that he could, therefore, violate the prior judgment allo-
cation.  This contention was, of course, rejected by the
Supreme Court on the basis that change in conditions was
immaterial in the contempt proceeding.  However, the Court
pointed out that if conditions had changed there was a
remedy to be relieved of the former judgment restriction:

"Moreover, petitioners could have recourse to an
action at law to determine any relative rights

1    that may have intervened subsequent to the grant-

2    ing of injunctive relief."

3         If the prior judgment were res judicata, no

4    remedy would have existed to accomplish a modification

5    resulting from subsequent intervening changes in condition.

6         It is emphasized also that since the constitu-

7    tional amendment, in actions concerning water allocation

8    the California courts have supported the result where the

9    trial court expressly keeps continuing jurisdiction over

10   the case so as to be in a position to promptly act on

11   changes in conditions which would affect the former

12   judgment.  See:  Tulare Dist. v. Lindsay-Strathmore Dist.,

13   3 Cal.2d 489, 525; Carlsbad Co. v. San Luis Rey Co., 78

14   Cal. App. 2d 900, 912.

15        If such a judgment were res judicata, is it

16   reasonable to assume that the court would maintain con-

17   tinuing jurisdiction for the purpose of expediting change

18   or modification of it in the event of a change in con-

19   ditions?  Obviously not, for if it were res judicata that

20   could not be done.

21        Aside from the above-cited cases, there is

22   uniformity by the recognized water law authorities that a

23   judgment allocating water amongst riparians is not res

24   judicata.

25        "The decree of apportionment of water among

26        riparian owners, then, is binding upon the parties

27        so long as it remains in effect; the decree remains

28        in effect so long as the conditions upon which

29        it is based remain substantially unchanged; but

30        the decree may be modified in a subsequent pro-

31        ceeding if the conditions have changed sufficiently

1    to warrant a new or modified apportionment."

2    (Hutchins, The California Law of Water Rights,

3    1956, p. 225.)

4    "It is obvious that what is a reasonable amount

5    varies not only with the circumstances of each

6    particular case but also varies from year to

7    year, for the amount which might be reasonable

8    in a season of plenty might be manifestly unrea-

9    sonable in a season of drought.  It follows that

10    a judgment fixing proportions in which water

11    may be taken is not necessarily conclusive in

12    subsequent actions concerning the same water,

13    since circumstances determining relative rights

14    may be different." (23 California Jurisprudence,

15    p. 1142.)

16        Perhaps the leading water law authority, and one

17  frequently cited by the California Supreme Court, is

18  Samuel C. Wiel.  Mr. Wiel states as follows:

19    "The apportionment decreed in equity is not a

20    severance of rights such as occurs in partition

21    between tenants in common, but is an equitable

22    expedient to enforce, under existing conditions,

23    the unseverable right of each to a reasonable use

24    of the riparian land.  The apportionment is merely

25    such as, 'under the circumstances and facts in

26    this case, would be a reasonable and equitable

27    division of the water.'

28        Consequently, not being a severance of right,

29    but an expedient of remedy in each case, an appor-

30    tionment made at one time is not necessarily

31    conclusive at a later point of time, when the

5806

circumstances on which it is based have changed.
The apportionment is decreed in equity to afford
equality on the facts existing at the time; on
the circumstances then existing.  When the circum-
stances change so that the decree no longer repre-
sents equality and reasonable division, then a
readjustment must be had under the new conditions.
A system of correlative rights accepting as its
ground principle the determination of what is
reasonable in each case, cannot in its nature
be a system of permanent fixedness, such as is
the system of exclusive rights by appropriation.
The apportionment is permanent only if the surround-
ing circumstances on which it was founded remain
unchanged, so that the equality of the apportion-
ment is not destroyed; and ceases to be permanent
when a subsequent change of circumstances has
destroyed the reasonableness of the adjustment.
For example, an apportionment based on the
quantity of water needed to irrigate certain
crops where both parties grow the same kind,
would work great injustice when one party changes
to crops requiring much less water, while the
other changes to crops needing more.  To make
them share in the same proportion as before would
work great injustice to one, simply to permit
waste by the other.

     There are many other changing conditions.
The soil requires more water at one time than
another; different crops require different
quantities of water, and these requirements vary

5807

at different stages of growth; humidity of seasons
varies, and with it vary both requirements and
supply; one kind of soil or crop returns more
water to the stream than others; the times of
applying the water will be different under changed
methods of cultivation; the area cultivated or
owned may change; the flow of streams constantly
changes; new parties may be involved in a subse-
quent controversy whom the former apportionment
had not considered because not parties to the
former suit, and whom the former decree cannot
bind.  All these things may produce changes sub-
sequent to an apportioning decree to such an extent
that the substantive right of each contestant to
the equal reasonable use of their respective lands
is no longer secured by the decree.  Thus equality
must depend upon circumstances, and the adjustment
must change when they change.  An equalized distri-
bution at one time may become very unequal at a
later point of time."  (Wiel on Water Rights,
Third Edition, p. 824, sec. 752.)

Based on the above, it is the state's conclusion
that under California law a judgment allocating water to
riparians is not res judicata, but can be modified, changed
or set aside should the facts and conditions change to a
degree where it can be concluded by the court that such a
result would accomplish equity under the specific factual
situation existing in the case.

### Additional Point

From the above it is noted that the State of
California contends that the provisions of the prior

17

5809

1  findings and Judgment which defined and limited the ground

2  waters of the stream to the area of younger alluvium are

3  res judicata, but that an actual allocation of water by

4  judgment amongst riparians is not.  We submit this is a

5  correct statement of the law in California.

6        However, this does not mean that this Court must

7  accept the prior findings and judgment defining and limiting

8  the ground water of the stream, while at the same time chang-

9  ing or enjoining the prior water allocation.  Such a result

10  would be gross injustice.  The United States would in effect

11  be deprived of the benefits conferred by the prior judgment,

12  and be saddled by what now appears are obvious detriments.

13        In certain circumstances a California judgment

14  which is res judicata can be set entirely aside.  We believe

15  that there is sound legal basis for doing so here.  If the

16  Court should so request, we will submit a memorandum on this

17  point.  We point this out here to emphasize that in approach-

18  ing the problems presented by the prior Judgment and

19  Stipulated Judgment, it is our opinion that they cannot be

20  isolated and disposed of by the legalistic doctrine of

21  whether a certain provision is res judicata.  If this Court

22  finds that because of the passage of time and change in

23  events and conditions the water allocation is inequitable to

24  Vail, it should also consider (and we submit properly) those

25  provisions of the prior judgment which are inequitable to the

26  United States.  Also, the inequities to parties other than

27  Vail and the United States must be weighed.  Then, if the

28  Court is so inclined, we feel there is a proper legal basis

29  for this Court to enjoin in its entirety the provisions of

30  the Judgment and Stipulated Judgment.

31  ---

3.  <u>What the Stipulated Judgment Provides.</u>

Set forth below is a brief summary of the provisions of the Stipulated Judgment.  Thereafter, there are set forth comments with respect to its various provisions, as considered in the light of present knowledge of the Santa Margarita (Temecula-Santa Margarita) River and its tributaries with their related ground water basins and in the light of nearly twenty years of operation under the Judgment.

A.  <u>Summary of Stipulated Judgment</u>

Section First:  Plaintiff, defendants and interveners have rights to the <u>waters</u> of the Santa Margarita River and its tributaries and to the <u>use</u> of such waters on their respective lands later described.

Section Second:  Plaintiff may use on <u>any</u> of its land in Rancho Santa Margarita two-thirds of the river water <u>naturally</u> flowing at gaging station six (see Section Seventh).

Section Third:  Defendants may use one-third of the river water <u>naturally</u> flowing at gaging station six on <u>any</u> of the following lands:  Pauba Grant; Lots A, B, C and D of Little Temecula Grant; approximately the southeastern one-half of Temecula Grant with some exceptions; Santa Rosa Grant; and Vail government lands.

Section Fourth:  Intervener Philip Playtor may use upon any of his <u>riparian</u> lands one miner's inch of river water.

Section Fifth:  Intervener executors under the will of Murray Schloss may use on twenty <u>irrigable riparian</u> acres all natural surface and subsurface flow of Stone Creek in the irrigation season and five miner's inches thereof in

19

5810

1    the winter.

2        Section Sixth:  The apportionment of waters to

3    interveners shall be deducted from the plaintiff's alloca-

4    tion.

5        Section Seventh:  Stream gaging stations are to be

6    established at Nigger Canyon (Temecula Creek), Station 1;

7    Temecula Gorge (Santa Margarita River), Station 3; and

8    Ysidora Narrows (Santa Margarita River), Station 6.  Also,

9    gaging stations are to be established on all surface water

10   diversions and meters placed on all wells other than

11   domestic and windmills.

12       Section Eighth:  Whenever the total normal flow at

13   Station 3 exceeds normal flow at Station 6, then the flow

14   at Station 3 is considered to be the total flow and allot-

15   ments shall be predicated on such flow.

16       Section Ninth:  For purposes of apportioning one-

17   third of the flow to defendants it is deemed that one-half

18   of the flow at Station 6 or Station 3, whichever is greater

19   (see Section Eighth), shall constitute one-third of the

20   waters of the stream.  Daily diversions need not exactly

21   equal the apportionments established, but any excess or

22   deficiency shall be compensated for by subsequent like

23   decrease or increase in diversions.

24       Section Tenth:  Allows defendants to take ground

25   water, called "storage water," from specified portions of

26   Pauba Basin in certain amounts in addition to the one-third

27   allotment, under certain conditions.

28       (Comment:  Under provisions of Section Thirteenth,

29   Section Tenth is now inoperative because of the construction

30   of Vail Dam).

31       Section Eleventh:  (1) Requires the defendants to

maintain a stream flow of at least three cubic feet per
second at Station 3 during the irrigation season, May 1--
October 31, except that the flow may decrease to two cubic
feet per second for not more than ten days and shall be
replaced by flow in excess of three cubic feet per second
from underground waters or otherwise.

(2)  Defendants may take ground water at a greater
rate than otherwise allowable for a period of not more than
eight consecutive days but shall make up such excess
diversions by reducing pumping within ten days.

Section Twelfth:  Defendants are _entitled_ to one-
half of the amount to which the plaintiff is _entitled_.  To
determine the amount which the defendants are entitled to
divert, computations of diversions by parties shall be made
monthly.  If the measurements indicate that the amount of
defendants' _entitlement_ is less than one-half the amount
being applied for use by the plaintiff, the defendants may
increase their diversions to equal one-half of the amount
diverted and applied by the defendant; provided that such
increased diversion shall be made in the same irrigation
season in which the right accrues, or in the next subsequent
season, and that such increased diversion shall be made from
ground water taken in a specified upper portion of Pauba
Basin.

Section Thirteenth:  Each of the parties has the
right to construct dams to intercept such party's share of
flood waters, but if the defendants construct such a dam
they cannot take "storage water" under Section Tenth.
Defendants shall not divert surface water below the point
of rising water as shown on "Exhibit 265."

(Comment:  This is presumably the point of rising

21

water on Temecula Creek in Pauba Valley.  Vail Company now
diverts no surface water except at Vail Dam.)

Section Fourteenth:  Plaintiff shall recover costs
from defendants.

B. Comments

1. <u>That the Stipulated Judgment Was Written</u>
<u>with Regard to the Two Parties Only.</u>

That the stipulated judgment was written for the
two parties only, without regard to the other water users in
the watershed, is indicated in two ways:

(a)  The requirement that riparians should
use riparian waters only on riparian lands was
disregarded when, apparently, each party simply
agreed to let the other use water on <u>any</u> of his
lands, riparian and otherwise.

(b)  There is no apparent recognition of
possible effects of use by others, except for the
two interveners in the Temecula Gorge area, in the
determination of <u>natural</u> flow at Stations 3 and 6
for purposes of allocating water between the
parties.  Other uses whose use of water would
have some effect on the flow at these stations,
and on the availability of water to the two
parties, are located (1) upstream from Vail
Reservoir, (2) in the Murrieta Creek watershed
above Vail lands, (3) upstream from the military
reservation on DeLuz Creek, and (4) between
Stations 3 and 6 along the Santa Margarita River.

2. <u>Ground Water Storage Changes Are Not</u>
<u>Taken Into Account in the Allocation.</u>

Although numerous references have been made in the

5813

1    stipulated judgment to _natural_ flow, no formula has been set

2    forth for such a determination other than in Section Ninth,

3    which implies that natural flow at Stations 3 or 6 can be

4    calculated by allowing for the measured Vail use.  If water

5    use by others and changes in ground water storage were not

6    involved, this would appear to be a reasonable method for

7    allocating flow at Station 3, since, if Vail use upstream

8    from Station 3 had accounted for one-third of the flow,

9    two-thirds would then remain at Station 3, and the one-

10   third, of course, is one-half of two-thirds.  However, such

11   logic does not appear to apply to Station 6, above which the

12   use by both parties would have occurred.

13         The above calculation for Station 3 apparently

14   assumes that the _natural_ flow at that station can be recon-

15   structed, if not on a daily basis (see language of Section

16   Ninth) at least on an eight- to ten-day basis (see language of

17   Section Eleventh).  This is believed to be an unreasonable

18   assumption because ground water storage changes are not

19   taken into account.  This is demonstrated by the fact that

20   while Vail pumping from Pauba Basin varies from month to

21   month and probably also from day to day, the rising water

22   from Temecula Creek in Pauba Valley, which constitutes nearly

23   all the flow at Station 3 during the irrigation season, is

24   relatively constant from day to day, varying only at a slow

25   rate.  For example, in the months of June, July and August,

26   1954, the mean daily flow at Station 3 averaged 4.1, 3.4 and

27   4.2 cubic feet per second, respectively, with ranges from

28   minimum mean daily to maximum mean daily of only 1.9, 1.0

29   and 1.8 cubic feet per second, respectively.  Total flow for

30   each of the three months was 247, 212 and 260 acre-feet,

31   respectively.  At the same time Murietta Creek at Temecula

1   had total flows of 33, 22 and 28 acre-feet, respectively.

2   The difference or the net flow arising from Pauba Valley

3   in Temecula Creek was therefore 214, 190 and 232 acre-feet

4   for the months of June, July and August, respectively.

5   During the same months the pumping from Pauba Valley by

6   Vail Company totaled 480, 782 and 468 acre-feet, respec-

7   tively.  If pumping from the ground water were directly

8   related to the surface flow at Station 3 on an approximately

9   daily basis the large variation in ground water pumping

10   would obviously have had a greater effect on the stream

11   flows than the measurements indicate.

12          Also, if it is attempted to reconstruct Station

13   3 measured flow to natural flow for July, 1954, for example,

14   by adding to the measured mean daily flow of 3.4 cubic feet

15   per second the monthly pumping of 782 acre-feet distributed

16   uniformly throughout the month, the resulting flow is 16

17   cubic feet per second.  This is considerably greater than

18   the available records at the location of Station 3 indicate

19   the rising water flow, as distinguished from storm flow,

20   to have been under conditions approaching natural prior to

21   the start of heavy pumping in the Pauba Basin about 1918.

22   It is obvious therefore that a considerable portion of the

23   pumped ground water came from ground water storage and did

24   not directly and immediately affect the stream flow as

25   assumed in the stipulated judgment.

26          It is pointed out also that present pumping by the

27   parties does not approximate the allotment which one obtains

28   by taking one-third and two-thirds of the measured stream

29   flows.  For example, in August, 1954, when flow at Station

30   6 was zero and flow at Station 3 was 4.2 cubic feet per

31   second, the Vail Company allotment, according to the

24

5815

1   Stipulated Judgment, would be one-half of 4.2 cubic feet
2   per second or 130 acre-feet for the month.  However, during
3   August the Vail Company actually pumped 468 acre-feet.
4   Pumping from ground water by Camp Pendleton for the same
5   month was 733 acre-feet.

6         3.   <u>Measurements at Station 6 are Inadequate</u>.

7         Measurements at Station 6 are now meaningless
8   during the summer since, with the present mode of operation,
9   that is with Camp Pendleton utilizing the ground water supply
10  of Santa Margarita Coastal Basin, the flow at Station 6 is
11  zero every summer.  Change in storage of ground water has
12  the same effect on flow measured at Station 6 as is
13  described above for Station 3.  Two effects on Station 6
14  flow may be noted.  First, the pumping by Camp Pendleton
15  from Santa Margarita Coastal Basin causes the summer rising
16  water at Station 6 to cease flowing because of the with-
17  drawal of water from ground water storage and the conse-
18  quent lowering of the ground water table below the stream
19  bed elevation.  Second, all of the winter runoff from
20  streams such as DeLuz Creek and Santa Margarita River which
21  contribute to the supply of the basin does not reach Station
22  6 and is therefore not measured there, since much of such
23  runoff seeps into the basin to recharge ground water storage
24  therein.

25        The inequity which can result from disregarding
26  the change in ground water storage may be illustrated by
27  considering the practical case of a storm in which, as often
28  happens, the contribution to Santa Margarita River stream-
29  flow by DeLuz Creek is substantial, but because of the
30  lowered ground water table in Santa Margarita Coastal Basin
31  most of the river flow percolates into the basin before

25

1    reaching Station 6 and the resulting measured flow at that

2    station is less than at Station 3.  In this case, according

3    to the Stipulated Judgment, the allocation between the two

4    parties would be made by dividing the flow at Station 3,

5    thus disregarding entirely the large contribution of water

6    from DeLuz Creek and the other tributaries below Station 3.

7            The construction of a surface storage reservoir

8    between stations 3 and 6 would further confuse the situation

9    with respect to the usefulness of Station 6 in allocations

10   of water, and would probably render it useless in winter as

11   well as summer.  If the reservoir were on Camp Pendleton,

12   as Section Thirteenth would allow, there is no definite

13   method stated in the Judgment for accounting for such

14   reservoir operation.  A question which arises is the allow-

15   ance for evaporation from the reservoir water surface.  If

16   the reservoir were not on Camp Pendleton, the use would be

17   by someone other than the parties or interveners, and no

18   provisions therefor have been made in the Stipulated

19   Judgment.  Storage in and use from such a reservoir would,

20   of course, further reduce the measured flow at Station 6,

21   and in accordance with the Stipulated Judgment Station 3

22   would be utilized more often for allocation with the conse-

23   quent additional disregard for runoff from tributaries of

24   Santa Margarita River below Station 3.

25        4.  Reuse of Ground Water Not Considered.

26            Reuse of ground water is apparently not considered

27   in the Stipulated Judgment, since pumping from ground water

28   is to be treated acre-foot for acre-foot in the same manner

29   as surface diversions, whether such pumping constitutes a

30   reuse or not.  This is stated in the words of Section Tenth

31   as follows:

26

5817

"Such abstractions by the defendants of the underground waters of the Temecula-Santa Margarita River are, and for all purposes of this judgment shall be (except as hereinafter provided) considered as diversions of the waters of the said river, . . ."

The exceptions noted are for pumping by windmills, for domestic use, and for water pumped to satisfy the three cubic feet per second requirement of Section Eleventh.

5. <u>Maintenance of Three Cubic Feet Per Second Now of Less Importance to the United States Than It Was to the Rancho Santa Margarita.</u>

The emphasis on the importance of maintaining three cubic feet per second at Station 3 appears to be somewhat unjustified now when nearly all use by the military is based on pumping of ground water in Santa Margarita Coastal Basin, wherein recharge is primarily by infrequent storm runoff, and that recharge resulting from the day to day summer Santa Margarita River flow in the gorge (Station 3), reduced by numerous uses between Station 3 and the military reservation, is minor. A probable reason for this emphasis on the maintenance of summer flow was that at the time the Stipulated Judgment was entered watering of cattle was a dominant feature of the Rancho Santa Margarita cattle ranching operation.

27

5818

4. **Draft of Decree Affecting Area Assuming Judgment
   and Stipulated Judgment Remain in Effect.**

Frankly, this is impossible on the major issue of
this case. As pointed out previously, the prior findings
and Judgment limited the extent of the ground water of the
stream system to younger alluvium. However, the evidence in
this case goes a great deal further on this issue, and both
California's evidence and the United States' evidence
extended ground water basins which are part of the stream to
areas beyond younger alluvium. Those parties to this suit
who were not parties to the original Judgment are entitled
to have this issue decided on evidence submitted in this
case, not on a Judgment to which they were not parties. How
can this Court enter a decree which determines the extent of
the ground water of the stream on the basis of the provisions
of the prior Judgment as to the defendants who were parties
to that prior adjudication, and at the same time enter a
decree on that issue based on the evidence in this case as
to those defendants who were not parties to the prior action?
It just cannot be done unless all of the parties to this
action assert by proper pleading the plea of res judicata
on that issue. Unless all of the defendants to this action
do so, this Court will be in a position of entering two
separate, conflicting provisions in its decree on the same
issue, if the Judgment remains in effect. However, we will
assume (although without justification) that every defendant
in this case who was not a party to the prior Judgment is
satisfied with that Judgment's provisions limiting ground
water to the areas of younger alluvium, and asserts the plea
of res judicata.

We will not set forth specific language, but

28

generally what the Decree should provide.

    A.  The Extent of the Stream Insofar As
          Ground Water Is Concerned

        The Decree should provide that specified and described lands are overlying a basin which is part of the stream.  These lands would be basically those areas of younger alluvium shown on United States Exhibit 15 and other appropriate exhibits.  The Decree should also provide that any water underlying any of the other lands in the watershed are vagrant and local waters in areas of confinement and do not contribute to, and are not a part of, the stream.  Perhaps an exhibit could be prepared which would be a map of the watershed, and would clearly deliniate the areas of younger alluvium and the remaining areas and could be incorporated in a finding or in the Decree, or both.

    B.  Riparian Lands

        The Decree would describe the lands which are riparian to any surface stream and specify the stream.

    C.  Correlative Rights

        As to the riparian lands and those lands overlying a ground water basin, which is part of the stream, the Decree should provide that the owners of said lands share correlatively of those waters for reasonable and beneficial use on their riparian and overlying land.  No quantitative allocation of water should be made.

    D.  Appropriations

        The decree should recognize the source and priority of the appropriation, i.e., the date of application of water to the land, or if subsequent to 1914, the date application was filed with the State Water Rights Board or its predecessor.  The Decree should state the status of the

29

5820

appropriation, i.e., application, permit, or license; should state the point of diversion, the amount of water appropriated, any limitation on the appropriation, and the place and type of use of the water appropriated.  The Decree should provide that the appropriator is subject to all California laws concerning appropriation..

E.  Prescriptive Rights

If there are any prescriptive rights found the Decree should state the amount of water, the place of diversion, and the date the right was effected.

F.  The Decree should provide that this Court keep continuing jurisdiction over all parties to this action who have overlying, riparian, prescriptive or appropriative rights on the stream.

G.  Stipulated Judgment

1.  Decree that its provisions are only applicable to Vail and the United States, and this Court should then incorporate into its Decree the provisions of the Stipulated Judgment.


CONCLUSION

It is clear to this writer that the major difficulties which are inherent in the Stipulated Judgment and Judgment are problems which do not directly appear at this stage of the litigation.  Aside from the provisions of the Judgment which limit the ground water of the stream to lands underlying younger alluvium, the major difficulties which will have to be faced will arise when and if an apportionment is sought.  At that time the provisions of the Stipulated Judgment will, in our view, have to be abrogated.

Without discussing in detail the many provisions

30

of the Stipulated Judgment it is sufficient to state that

basically that document apportioned the waters of the

stream as if only two interests had rights therein.  As a

matter of fact, others both below and above Vail have sub-

stantial rights.  Such provisions in the Stipulated

Judgment as allowing riparian water to be used on non-

riparian land, the division of the water on an assumption

that a right to 100% of the stream existed, and a guaranteed

minimum flow of 3 cfs., will have to be set aside if in the

future those provisions impair, as they must, the rights of

others.

Frankly, even though these problems are not acute

until an apportionment is sought, we feel that now is the

time to face up to them.  If the Stipulated Judgment will

impair this Court (as it will) in the future administration

of this stream, this Court should now abrogate that

Stipulated Judgment.

We do not agree that the Stipulated Judgment is

a "Covenant Not To Sue."  While it may be convenient or

easier in interpreting its provisions to approach it on

that basis, that is an erroneous premise.  The Stipulated

Judgment is a Court Decree which clearly adjudicates the

rights of two entities as if their rights were all that

need be considered.  If, as is the fact, others have rights,

that adjudication is, to that extent, erroneous.  Regardless

of what the parties or that Court knew or assumed, the

Stipulated Judgment itself leaves no doubt that the Court,

by decree, adjudicated water rights.  The Stipulated

Judgment is not "a Covenant Not To Sue";  it is a Decree

which apportioned water, and to the extent that it impairs

the rights of others, it must be abrogated.  All parties

31

1  to this litigation are entitled to a Decree which will

2  assure that this Court will be able to administer their

3  respective rights with a minimum of difficulty and

4  uncertainty in the future.

5          To recognize the Stipulated Judgment as controlling

6  the rights of the United States and Vail will do nothing

7  but create future problems for the other parties and this

8  Court.  This issue of the Stipulated Judgment and its

9  application to the waters of the stream should be decided

10  in this Decree.  If its provisions are such that the rights

11  of others are or will be impaired by their application, it

12  should be set aside now.  In addition, as pointed out

13  previously, the Stipulated Judgment itself is not a

14  realistic apportionment between Vail and the United States

15  when its provisions are examined in the light of present

16  uses and conditions existing on the stream.

17          Dated:  January 18, 1960.

18

19                    STANLEY MOSK
                       Attorney General
20
                       F. G. GIRARD
21                     Deputy Attorney General

22
                       By  F. G. Girard
23

24                     Attorneys for Defendant
                       STATE OF CALIFORNIA
25

26

27

28

29

30

31

                              32

                                        5823