

FILED

MAY 6 - 1960

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
        DEPUTY CLERK

URBAN K. TARWATER and ROSE C. TARWATER

Defendants in propria persona

MURRIETA, CALIFORNIA


IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIVIL NO. 1247 - SD - C |
| Plaintiff, | ANSWER OF DEFENDANTS |
| vs. | Supplemental to Documents Mailed May 12, 1958 |
| FALLBROOK PUBLIC UTILITY DISTRICT, ET AL, | URBAN K. TARWATER and ROSE C. TARWATER |
| Defendants, | |

The defendants,

each severing from their co-defendants and each for himself or

herself alone, in additional answer to the Complaint and Supple-

mentary and Amendatory Complaint on file herein, admit, deny,

and allege:

15660

Dear Judge Carter:

My wife informs me that she understood that you told the State Attorney to brief the states position in this case and that you gave the other litigants the same opportunity to express their position in a brief. I'm taking advantage of that opportunity to submit the following reasons for my position.

One thing not mentioned in my testimony hereto for given April 26, 1960 was that in the pretrial judgement which I believe partakes of the nature of a stipulation in which the [of November 29, 1951] major parties hereto agreed on page 57 of the judgement Lines 16 to 18 that quote "rights reserved by treaties such as this are not subject to appropriation under state law nor has the state power to dispose of them". This was a decision in the Conrad and Winters cases which I believe can be applied here.

I do not know all the implication of correlative rights under state law. I do know that under the Treaty law no one can use his water rights for the benefit of land not in the grant. Therefor I feel safer under Treaty provisions. I would not want one party or a group to be able to make a deal to sell water out of our grant for land other than that which the water right was set aside for. The water rights should be used only for the purpose for which the United States appropriated them. While the grantee under treaty right may use his water freely it must be exclusively as shown by his title. No good American wants to use his property in a manner that is injurious or obnoxious to his neighbors, but they do want to keep whatever liberty of property is granted them for their own free and exclusive use. The rights to our land were assigned to us by the treaty, the title and the patent and as citizens of the United States they became privileges and immunities of the citizen of the United States and as such are not subject to disposal by state law.

Refer to the 6th Art. of AND the 14th Amendment to the U.S. Constitution.

Refer also to the 1st Par. Page 5 of this letter.

2

15661

The book which I use, which I believe fully supports my
conclusions of the law is entitled "Constitution of the United States
of America Revised and Annotated in 1952 Authorized by Senate
Joint Resolution 69" to be issued to the members of the Senate
and the House for their guidance. The book seems to be mainly
quoted to a settlement of the law between the nation and the
states. From it I wish to quote Page XXl.of the Introduction.
" This was in the 1866-1867 term of Court. Sixteen years later,
in 1882, Justice Samuel Miller gave classic expression to the
principle of a "government of laws and not of men" in these words:
"No man is so high that he is above the law . . . All officers are
creatures of the law and are bound to obey it." Eight years later
this same great Judge queried whether the President's duty to take
care that the laws be faithfully executed is "limited to the
enforcement of acts of Congress or of treaties according to their
express terms," whether it did not also embrace "the rights,
duties, and obligation growing out of the Constitution itself . . .
and all the protection implied by the nature of the government under
the Constitution." Then in 1895, in the Debs Case, the Court
sustained unanimously the right of the National Executive to go into
the federal courts and secure an injuction against striking railway
employees who were interfering with interstate commerce, although
it was conceded that there was no statutory basis for such action.
The opinion of the Court extends the logic of the holding to any
widespread public interest."

I quoted the above with the idea that I might suggest to you
that acts of congress and treaties can interpreted according to
their express terms. If one rules according to express terms
blame cannot follow for what happens later. I myself want to al-
ways follow law. I wish you would pardon me if I have departed from
the original purpose of this brief. I am devoted to the liberty of
property which I believe is the predominating principle that has
made this national government better than any in existence.

15662

3

If a man feels that another is injuring him by the free exclusive use of his land and is causing injurious and obnoxious effects to distress him in his free and exclusive enjoyment of his land then there is cause for the courts to settle the claim. The man is innocent until proven guilty and the burden of the proof of guilt rests with the complaining party. This is the policy of the Federal law. The proposed state law or I believe the doctrine of correlative rights reverses that proceedure and makes the man with the free and exclusive rights, prove to his neighbors that he will not injure the happiness or comfort of those around him before he can use his property freely and then a powerful third party, the state, excereised control that should belong exclusively to grantee, by virtue of the treaty, the title and the patent. Therefor the two doctines conflict. Anyway the treaty distinctly expresses the fact. Quote, These grants preserve the legal values they may posses and the grantees may cause their legitimate titles to be acknowledged before American Tribunals.

In reguard to the question of the protocol: the protocol of the treaty was written to take the place of and explain the stricken provisions of the treaty, the protocol substitutes new provisions for the stricken provisions, therefor is part of the treaty, and was duly ratified as such. It was referred to as an amendment to the treaty ( refer to ratification). Even if it wasn't, the treaty preserves the title rights to Mexican citizens, then because of the U. S. patent issued to the Mexican, he was thereby legally empowered to transfer those rights to an American citizen. Those rights then became privileges and immunities of an American citizen. And as such according the Fourteenth Amendment to the Constitution of the United States are not subject to conflicting state law.

15663

4

In regard to the privileges and immunities of a citizen
of the United States, I want to quote from my book page 967,
quote "Privileges and Immunities of a Citizen of the United
States--Although the Court has expressed a reluctance to attempt
a definite enumeration of those privileges and immunities of
the United States citizens such as are protected against State
encroachment, it nevertheless felt obliged in the Slaughter-
House Cases "to suggest some which owe their existence to the
Federal Government, its National character, its Constitution, or
its laws." Among those then identified were the following:  right
of access to the seat of Government, and to the seaports, sub-
treasuries, land offices, and courts of justice in the several
States; right to demand protection of the Federal Government
on the high seas, or abroad; right of assembly and privilege
of the writ of habeas corpus; right to use the navigable waters
of the United States; and rights secured by treaty". Ibid. 79
citing Crandall v. Nevada, 6 Wall. 35 (1868). Decided before
ratification of the Fourteenth Amendment.

I also wish to quote from my book which cites on page 703
in regard to the powers of the state ---------"But a State
statute enacted subsequently to a federal grant cannot be given
effect to vest in the State rights which either remained in the
United States or passed to its grantee", reference to Van
Brocklin v. Tennessee, 117 U. S. 151 (1886) ; of Wilson v.
Cook, 327 U. S. 474 (1946).  Gibson v. Chouteau, 13 Wall 92,
99 (1872).  See also Irvine v. Marshall, 20 How. 558 (1858) ;
Emblem v. Lincoln Land Co., 184 U. S. 660, 664 (1902);
Wilcox v. Jackson ex dem. M'Connel, 13 Pet. 498, 517 (1839).
Oklahoma v. Texas, 258 U. S. 574, 595 (1922).  United States v.
Oregon, 295 U. S. 1, 28 (1935).

15664

5

To brief the whole question in the shortest manner as
evidenced by the Documents in your possession, we in the
Temecula Rancho have the treaty, the original Mexican title
and the U. S. patent to rely on for our protection. The
Documents give us certain freedoms and exclusive use and control
of our land, which I believe runs counter to the policy of
state law as evidenced by correlative rights in the whole river.

The title to our land was made conformable to U. S. law by the
action of Congress when they issued the patent, signed by the Pres-
ident.   That completed the title as provided for in the treaty.
The treaty then provides that the grantee of the completed title
could cause his title to be acknowledged before American Tribunals.
This I pray you to do and I am sure that the others who claimed
treaty rights in their original answer want the same.

The present laws of California in Riverside County, state
law requires that a permit to drill or deepen a well must be
obtained from the County of Riverside, and one must report the
amount of water used to the state authorities if it is over a
certain amount.   This I believe, the state requirements are in
direct conflict with the title we hold preserved by treaty.   I
also would like to point out that Louis Vignes was the last
Mexican owner of the Temecula Ranch, who purchased from Valdez,
and it was to him the U. S. patent was issued, the last Mexican
owner and the first American owner, was Louis Vignes.

There is another matter to which I wish to direct your
attention.   In one of the documents which I left with you which
is a compilation of letters between the Mexican applicants for
the Temecula Rancho you will find a letter from Mexican citizens
Ortego and Stokes to the governor of Mexican upper California
Micheltoreno, Page 13 in which Orgeo and Stokes ask for the
Temecula Ranch in order they might irrigate cultivated crops.
This application which was prior to the one by Felez Valdez who
was the actual grantee was ordered by the Governor to be attached
to the application of Felez Valdez and thereby became a part of
his application.   When the Governor by this attachment, gave title

6

15665

to Valdez he therefor also expressly gave him the right to
irrigate freely and exclusively his cultivated crops.

I further wish to direct your attention to the fact that
the patent issued for the Temecula grant is dated 1860 and the
order of Congress directing these grants to be settled in
accordance with the Treaty of Guadalupe Hidalgo (in part) and
supreme court decisions (in part) was dated in 1851 and the
treaty itself is dated 1848, which dates are prior to dates of
the acts of Congress that the state relies on for its contention.
The congressional acts on which the state relies, were I believe
dated 1866, 1870 and 1877.

I ask you to ponder this proposition----How can a grantee in
following treaty law make any agreement with anyone outside the
grant for the use of any water right preserved to the grant?
According to treaty he doesnot have the power to legally do that.
The power of the treaty preserves to the grant the water right
values, not to the grantee. The grantee does not have that
power according to the treaty, he can only cause his ligitimate
title to be acknowledged. Then in my opinion any assignment
not in conformity to the treaty would be of no effect.

I do not know all of the implications in which I may
become involved in the future by stipulating for correlative
rights under state law. I am afraid of what might happen.
There may not be any body of federal law governing water rights
in California but we do have a federal law protecting water rights
in the Temecula Rancho. Its thread can be found running through
the original Mexican title to our land, in the treaty with Mexico,
and in the U. S. patent to our land. For over 100 years this law
has protected by keeping us free from harm, and we do not want to
do anything that will cause us to lose that protection. The law of
the treaty says quote "These grants preserved the legal values they
may posses and the grantees may cause their legitimate titles to be
acknowledged before American Tribunal. No matter what excursions in

7

in logic and law we may take, when we get back to the treaty
we are still confronted with the treaty provision that, quote
"The grantees may cause their legitimate titles to be acknow-
ledged before American Tribunals". That of course is my request.

I hope you will pardon me for the unacademic manner in
which I have presented my position. In order that I may cause
our legitimate title to be acknowledged before you according to
the treaty, I ask that this letter be read into the records of
the trial.

Very respectfully yours,

Urban K. Tarwater
Rose C. Tarwater

15667