STANLEY MOSK, Attorney General
   of the State of California
F. G. GIRARD, Deputy Attorney General
Library and Courts Building
Sacramento 14, California
Telephone: HIckory 5-4711, Ext. 5448

Attorneys for Defendant
State of California



FILED
MAY 26 1960
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,  )   No. 1247-SD-C
      Plaintiff,         )
  vs.                          )
FALLBROOK PUBLIC UTILITY     )
DISTRICT, et al.,            )
      Defendants.        )

MEMORANDUM REGARDING EXTENT OF WATER RIGHTS
ON LANDS ORIGINALLY CONVEYED BY MEXICAN GRANTS

      Pursuant to the request of this Honorable Court the State of California herein submits its memorandum of law pertaining to the extent of water rights on lands conveyed by Mexican land grants.

      In essence, certain individual defendants claim that because they are successors to land originally conveyed by Mexican land grants the extent of their water rights are not governed by California water law, but instead by Mexican water law as existing at the time the Treaty of Guadalupe Hidalgo was executed. While we will subsequently herein point out that the Treaty does not so provide, the problem is really only an

5917

academic one, for under Mexican law, assuming it does apply to water rights to land conveyed by Mexican grants, the various owners of land riparian to a stream shared correlatively of the water in the event of shortage. In other words, the Mexican law of water rights between riparians is identical to the present California law.

We quote from Hall's Mexican Law (The Laws of Mexico, A Compilation and Treatise, Frederic Hall, 1885, A. L. Bancroft and Company, pp. 412-413) the applicable Mexican provisions that author sets forth as determinative of water rights amongst riparians under Mexican law:

> "§ 1391. Water Running between Estates.--If running water passes between estates of different owners, each one of these can use it for the irrigation of his estate or for any other object, but not the whole of it, but only the part which corresponds to him, because both have equal rights, and the one can consequently oppose the use of it all by the other, or even a part considerably more than his own."

> "§ 1393. Canals and Cuts.--Since every riparian proprietor can use the water which passes by the border of his estate to irrigate it, it is clear that he can open cuts, canals, or gutters, and even construct a dam, flood-gate, or other work, in order to take it and carry it to his estate, provided that he does not make it flow back on the upper fields against the will of their owners, or inundate the lower ones, or to go down in a manner which shall cause ravages, nor detain it in such a manner that the neighbors shall be deprived of the accustomed irrigation: Law 13, title 32, partidas 3."

> "§ 1394. Constructions on the Estate of Another.--None of the riparian owners can construct works on the estate of the other without his consent, nor even support on it a dam or flood-gate to make the water enter more abundantly on his own; since all have the same rights, they must not make the works except in a manner that the water will be divided equally."

> "§ 1397. A Riparian Owner and Third Party.-- A riparian owner can not, without the consent of the other riparian owners interested, concede to a third party, to the injury of the former, the power to take water in the same current or on his estate; nor use himself the water to irrigate other lands which belong to him, but which are not situated on the same bank; although this

2

5918

right may be acquired by prescription. When one riparian estate is divided between co-owners or joint owners, so that the parts which are designed or adjudicated to some of them, and which form now so many other estates not bounded by the stream, both preserve notwithstanding their right to the water in the same form which they held it before the division, although nothing should have been stipulated on this matter."

"§ 1398. <u>Acquisition of Contiguous Estates.</u>--A proprietor who increases the extension of his riparian estate with the acquisition of contiguous lands, which he adds to it, can not take more water than before for his irrigation, in detriment to the others interested; since if he had such power, he could in time make the rights of the other riparian owners illusory."

Clearly, the basic riparian principle of correlative rights are encompassed within the above sections.

Moreover, it is recognized by other leading water authorities that the riparian right doctrine was a part of the Mexican civil law:

"The foundation of the Mexican Civil law was, as at common law, the law of riparian rights . . ." (Wiel, <u>Water Rights In The Western States, Third Edition, Vol. 1, p. 68</u>). (See, also, <u>Pomeroy On Riparian Rights</u>, 1887, West Publishing Company, sec. 114.)

In short, even if this Court were <u>required</u> to look to the Mexican law existing at the time of the treaty to determine the extent of the water right existing on riparian Mexican grant land, the basic correlative right doctrine would be mandatory, for, as pointed out above, the riparian doctrine was the foundation of the Mexican civil law.

However, aside from Mexican law, it has long been established by the California courts that lands bordering on a stream which were formerly included within Mexican grants are entitled to full riparian status.

<u>Pope</u> v. <u>Kinman</u>, 54 Cal. 3, was an action to quiet title of plaintiffs against the adverse claims of defendants

3

5919

to the right to use water of Lytle Creek, a nonnavigable natural stream which rises on government land and flows through the lands of plaintiffs and defendants. Plaintiffs' lands were formerly a portion of the Rancho Muscupiabe, a Mexican grant that was patented in 1872. Some of the lands of defendants were formerly portions of the aforesaid rancho and others were formerly portions of the Rancho San Bernardino. Other defendants owned lands that had formerly been a part of the public domain. Predecessors of defendants had commenced diverting water in 1856. It was held that because the patent to plaintiff's lands was issued in June, 1872, and this action was commenced in May, 1877, the statute of limitation had no application, and defendants could claim nothing by reason of lapse of time since their alleged appropriation. The court stated:

> "As being owners of the land, the plaintiffs have an interest in the living stream of water flowing over the land; their interest is that called the riparian right. It is not necessary, in this case, to define in detail the precise extent of the riparian right as existing in this country; it is enough to say that under settled principles, both of the civil and common law, the riparian proprietor has a usufruct in the stream as it passes over his land."

It was held that defendant had only such rights against plaintiffs as they "may have of like character with that of plaintiffs as being riparian proprietors of land bordering on said stream."

City of Los Angeles v. Pomeroy, 124 Cal. 597, was an action to condemn all interest of defendants in land through which the Los Angeles River flows. The defendants held their lands as successors to several Spanish and Mexican grantees, under patents from the United States based upon the original grants. Defendants claimed that, conceding the pueblo rights

4

of the city, they were entitled to the exercise of full riparian rights except so far as those rights had been impaired by the paramount pueblo rights. This claim was apparently not challenged and was assumed by the court to be just. The controversy revolved around the contention of defendants that the pueblo rights of the city could not exceed the rights of the pueblo as they existed before the change of flag. The court held that the pueblo rights of the city were not so limited but extended to future needs both within the original area of the pueblo and in areas subsequently annexed to the city.

In Frazee v. Railroad Commission, 185 Cal. 690, it was held that prior to its partition, the entire Rancho San Jacinto Viejo, a Mexican grant through which the San Jacinto River flows, was riparian to the stream. From this it followed that,

> "riparian rights in the stream attached to every part thereof, and that after said partition the proportional rights in the waters continued to be attached to the respective parcels of land set apart in severalty to the different owners. These water rights so attached to these several parcels of land were, in their nature, riparian rights after the partition the same as before. Such a partition 'did not change the character of the water right belonging to such land from a riparian right to a right appurtenant,' even if the particular tract did not abut upon the stream. The right to the water still remained a riparian right and 'parcel of the land itself.' The result would be that a subsequent conveyance of the land would carry with it the water right belonging to the particular tract conveyed."

Holmes v. Nay, 186 Cal. 231, was an action to enjoin diversion of water by defendant, the owner of two tracts of land upstream from plaintiffs' lands. The lands of defendant and the two plaintiffs had formerly been portions of "what is commonly known as a Spanish or Mexican grant; that is a tract granted to private owners by the government of California before California

5

was separated from Mexico." The court declared:

> "Coming now to the question of the defendant's rights as owner of the tract which was formerly a part of the Mexican grant, it is evident that, since the land is riparian to the stream, the defendant has the right to a reasonable use thereof of the water of the stream unless in some way the riparian rights, which are an incident of the ownership of the land, have been lost. . . ."

There is a long line of United States Supreme Court cases which squarely hold that the <u>extent</u> of the water right recognized on lands formerly included within Mexican grants is for the state court to determine, and that no federal questions are involved in that determination, the matter being purely a question of <u>local law not</u> involving a right, title, privilege, or immunity arising under statutes <u>or treaties</u> of the United States.

<u>Los Angeles Milling Co.</u> v. <u>Los Angeles</u>, 217 U. S. 217 (citing and discussing numerous Supreme Court cases)

<u>Devine</u> v. <u>Los Angeles</u>, 202 U. S. 313

<u>Los Angeles</u> v. <u>Hooker</u>, 188 U. S. 314

<u>Chrystal Springs Land & Water Co.</u> v. <u>Los Angeles</u>, 177 U. S. 169

In essence, the above-cited California cases hold that lands formerly included within Mexican grants and bordering (or overlying) a stream are entitled to full riparian status; and the United States Supreme Court decisions hold that this determination <u>by the California court</u> does not present a reviewable federal question under the treaties and laws of the United States. In other words, the <u>extent</u> of the water right existing on lands formerly conveyed by Mexican grants is a question of local, not federal law.

While the above-cited authorities and cases, we submit, dispose of the legal questions presented, we feel that the

following historical facts concerning Article X of the Treaty may be of interest to some of the parties. The Treaty of Guadalupe Hidalgo is codified in <u>Volume 9, United States Statutes</u>, 1845-1851, page 922. Insofar as pertinent Article X as executed by the respective plenipotentiaries provided:

> "All grants of land made by the Mexican government, or by competent authorities, in territories previously appertaining to Mexico, and remaining for the future within the limits of the United States, shall be respected as valid, to the same extent that the same grants would be valid if the said territories had remained within the limits of Mexico."

A Mr. Trist, who was the sole commissioner of the United States in negotiating the Treaty, was, <u>prior</u> to the execution of the Treaty, <u>recalled</u> by President Polk. As stated by President Polk in his February 22, 1848, letter to the Senate, transmitting the Treaty for Senate ratification:

> "I deem it to be my duty to state that the recall of Mr. Trist as commissioner of the United States, of which Congress was informed in my annual message, was dictated by a belief that his continued presence with the army could be productive of no good, but might do much harm by encouraging the delusive hopes and false impressions of the Mexicans; and that his recall would satisfy Mexico that the United States had no terms of peace more favorable to offer. Directions were given that any propositions for peace, which Mexico might make, should be received and transmitted by the commanding general of our forces, to the United States." (See Executive Documents, 1st Sess., 30th Congress, vol. VII, 1847 and 1848, Executive No. 52.)

In other words, Mr. Trist was recalled by President Polk because the President felt that he was too lenient or favorable to Mexico. However, Mr. Trist ignored the President's recall and negotiated the Treaty. As stated in the President's February 22, 1848, letter:

> "It was not expected that Mr. Trist would remain in Mexico, or continue in the exercise of the functions of the office of commissioner,

after he received his letter of recall. He has however done so, and the plenipotentiaries of the government of Mexico, with a knowledge of the fact, have concluded with him this treaty."

President Polk in his February 22, 1848, letter commented on the Treaty as follows:

"I have examined it with a full sense of the extraneous circumstances attending its conclusion and signature, which might be objected to; but, conforming, as it does substantially on the main questions of boundary and indemnity, to the terms which our commissioner, when he left the United States in April last, was authorized to offer, and animated, as I am, by the spirit which has governed all my official conduct towards Mexico, I have felt it my duty to submit it to the Senate for their consideration, with a view to its ratification."

However, President Polk in this letter to the Senate specifically requested that Article X be rejected:

"To the tenth article of the treaty there are serious objections, and no instructions given to Mr. Trist contemplated or authorized its insertion . . ."

The Senate on March 3, 1848, rejected Article X:

"After debate,

The question was stated 'Shall these words stand as part of the treaty?, to-wit:

'All grants of land made by the Mexican government, or by competent authorities, in territories previously appertaining to Mexico, and remaining for the future within the limits of the United States, shall be respected as valid, to the same extent that the same grants would be valid if the said territories had remained within the limits of Mexico.'

and it was determined in the negative     (Yeas 19
                                           (Nays 33."

(See Executive Documents, 1st Sess., 30th Congress, vol. VII, 1847 and 1848, Executive No. 52.)

---
---

In other words, the Treaty was negotiated and signed by Mr. Trist without authority to do so. Despite this fact, with the exception of Article X, President Polk and the Senate assented to it.

Dated: May 25, 1960.

STANLEY MOSK, Attorney General
F. G. GIRARD, Deputy Attorney General

By *[signature]*

Attorneys for Defendant
STATE OF CALIFORNIA