FILED

NOV 7 - 1960

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
by M. C. _____

1   STANLEY MOSK, Attorney General
        of the State of California
2   JOHN FOURT, Deputy Attorney General
    F. G. GIRARD, Deputy Attorney General
3   538 Library and Courts Building
    Sacramento 14, California
4   Telephone:  HIckory 5-4711, Ext. 3941

5   Attorneys for Defendant
    State of California

6

7

8        IN THE UNITED STATES DISTRICT COURT, SOUTHERN

9          DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

11   UNITED STATES OF AMERICA,           )
12                      Plaintiff,       )
13          vs.                          )        NO. 1247-SD-C
14   FALLBROOK PUBLIC UTILITY            )
     DISTRICT, et al.,                   )
15                                       )
                        Defendants.      )
16

17

18

19

20          MEMORANDUM RE JURISDICTIONAL STATUS OF

21             CAMP PENDLETON MARINE BASE,

22                COUNTY OF SAN DIEGO

23

24

25

26

27

28

29

30

31

Copy ____

6009

# TOPICAL INDEX

I.   IMPORTANCE OF THE ISSUE REGARDING THE
     JURISDICTIONAL STATUS OF THE CAMP PENDLETON
     MARINE BASE------------------------------------   1

II.  STATEMENT OF THE CASE--------------------------   2

III. STATEMENT OF THE FACTS-------------------------   5

IV.  CONTENTIONS OF THE DEFENDANT STATE OF
     CALIFORNIA------------------------------------   7

V.   CONTENTIONS OF THE PLAINTIFF-------------------   7

VI.  ARGUMENT---------------------------------------   8

     A.   INTRODUCTION------------------------------   8

     B.   UNITED STATES FAILED TO COMPLY WITH
          CONDITION PRECEDENT IN CALIFORNIA CESSION
          STATUTE-----------------------------------   9

     C.   1872 POLITICAL CODE SECTION 34 (GOVERNMENT
          CODE SECTION 111) DID NOT TENDER LEGISLA-
          TIVE JURISDICTION TO THE UNITED STATES-----  11

     D.   LETTERS OF ACCEPTANCE OF JURISDICTION
          FAILED TO COMPLY WITH EITHER FEDERAL OR
          STATE LAW---------------------------------  21

VII. CASE LAW---------------------------------------  23

     CONCLUSION-------------------------------------  28

     EXHIBIT A--------------------------------------  29

     EXHIBIT B--------------------------------------  30

     EXHIBIT C--------------------------------------  31

8010

STANLEY MOSK, Attorney General
  of the State of California
JOHN FOURT, Deputy Attorney General
538 Library and Courts Building
Sacramento 14, California
Telephone:  HIckory 5-4711, Ext. 3941

Attorneys for Defendant
State of California

IN THE UNITED STATES DISTRICT COURT, SOUTHERN

DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. 1247-SD-C |
| Plaintiff, ) | |
| vs. ) | MEMORANDUM RE JURISDIC-TIONAL STATUS OF CAMP |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., ) | PENDLETON MARINE BASE, COUNTY OF SAN DIEGO |
| Defendants. ) | |

I.  IMPORTANCE OF THE ISSUE REGARDING THE
    JURISDICTIONAL STATUS OF THE CAMP
    PENDLETON MARINE BASE.

     The primary issue before the Court in this

case is the determination of the water rights of the

United States in the Camp Pendleton Marine Base Military

Reservation.  However, the State of California has a

separate and important interest in the jurisdictional

status of this command.  The federal Departments of

Army, Navy, and Air Force utilize 3,901,386 acres on

280 military installations in California.  Inventory

Report, General Services Administration, November 10,

1959, page 34.  The importance of establishing California

sovereignty over these military bases, including the

Camp Pendleton Marine Base reservation, has been well

1

1  stated by United States Attorney General Homer Cummings in

2  the Brief for the United States filed in James v. Dravo Con-

3  tracting Co., United States Supreme Court, October Term,

4  1937, Nos. 3, 7 and 8, pages 83-84 (302 U.S. 134): "The

5  fundamental concept of our Union is that local matters are

6  better regulated by the States, while affairs of national

7  concern are committed to the United States.  In places where

8  there are civil inhabitants in an area purchased by the

9  United States, the local affairs of those inhabitants can

10  generally be more easily and desirably handled by the State

11  than by the United States.  Exclusive jurisdiction of the

12  United States over such areas results in a disenfranchisement

13  of the residents.  Sinks v. Reese, 19 Ohio St. 306; In re

14  Town of Highlands, 48 N.Y. 795; State v. Willett, 117 Tenn.

15  334 /but see Arapajolu v. McMenamin, 113 Cal. App. 2d 8247.

16  It deprives them of the right to send their children to

17  public schools, Opinion of the Justices, 42 Mass. (1 Metcalf)

18  580, of the right to benefit by the poor laws (ibid.), and

19  of the right to sue for divorce in state courts, Lowe v.

20  Lowe, 150 Md. 592."  The Report of the Interdepartmental

21  Committee for the Study of Jurisdiction Over Federal Areas

22  Within the States, Government Printing Office, Volume 2,

23  1957, at page 4, states:

24     "It has been generally held that residents of

25     such areas /of exclusive federal sovereignty7 are

26     not residents of the State, and hence not only

27     are not subject to the obligations of residents of

28     the State but also are not entitled to any of the

29     benefits and privileges conferred by the State

30     upon its residents.  Thus, residents of Federal

31     enclaves usually cannot vote, serve on juries, or

2

run for office.  They do not, as a matter of right, have access to State schools, hospitals, mental institutions, or similar establishments.  The acquisition of exclusive jurisdiction by the Federal Government renders unavailable to the residents of the affected areas the benefits of the laws and judicial and administrative processes of the State relating to adoption, the probate of wills and administration of estates, divorce, and many other matters.  Police, fire-fighting, notarial, coroner, and similar services performed by or under the authority of a State may not be rendered with legal sanction, in the usual case, in a Federal enclave."

Thus, the issue of the status of the Camp Pendleton Marine Base is important to California, and to the residents of such command.  Because of this importance, California respectfully asks that the Court examine the question of sovereignty at Camp Pendleton raised by the pleadings.

## II.   STATEMENT OF THE CASE.

An examination of the pleadings, exhibits, briefs and records in this case disclose, with reference to the issue of the legislative jurisdictional status of the Camp Pendleton Marine Base, the following facts.

2-A

6013

1   Paragraph III of the complaint of the United States

2   alleges that it exercises exclusive jurisdiction over

3   the Camp Pendleton Marine Base, County of San Diego.

4   This allegation is denied in paragraph III of the Answer

5   of the State of California.  The United States and the

6   State of California on November 29, 1951, filed with the

7   Court a stipulation that the rights of the United States

8   at Camp Pendleton are "to be measured in accordance with

9   the laws of the State of California."  By reason of this

10   stipulation, California took the position in prior pro-

11   ceedings herein that the jurisdictional status of Camp

12   Pendleton was irrelevant to the issues before the Court:

13   "In light of the law and the stipulation, the issue of

14   the cession of exclusive jurisdiction and the scope of

15   operation of the State's police power, which plaintiff

16   has attempted to inject herein, is wholly irrelevant.

17   If all rights of the United States are to be measured

18   in accordance with state law, it is immaterial to what

19   extent the State has lost jurisdiction over the place of

20   use."  Brief of the State of California dated October 13,

21   1952, page 28, on file herein.  For this reason Cali-

22   fornia has never adequately briefed or presented to the

23   Court its claim that California exercises sovereignty

24   over the Camp Pendleton military reservation, subject

25   of course to the qualification that the exercise of that

26   jurisdiction be consistent with federal functions.

27        The judgment previously entered in the cause,

28   United States v. Fallbrook Public Utility District,

29   110 Fed. Supp. 767, was remanded for further proceedings

30   after an unqualified reversal by the Court of Appeals.

31   People of the State of California v. United States,

32   235 Fed. 2d 647.

3

The opening brief filed in the Court of Appeals
by the State of California stated:  "As findings 1, 3,
5 and 11 (110 Fed. Supp. at 770-772) correctly indicate,
exclusive jurisdiction has been ceded as to most but not
all of the military reservation."  Appellant's Opening
Brief, dated April 12, 1954, People v. United States,
9 Cir. Court of Appeals, No. 14049, page 12.  This con-
cession of law by California accounts for the language
in 235 Fed. 2d 647 at 653:  "The cardinal fact in the
case is that in 1941 the State of California ceded to
the United States general sovereignty over the territory,
land and water embraced in the enclave."  And that
language stated, at page 656:  "Now it must be conceded
by all parties that the United States had sovereign
rights in  the enclave."

With respect to the effect of the Circuit Court
decision, 9 Cir., 235 Fed. 2d 647, this Court has held:

"The holding in that case is that it was error for
the trial court to enter a separate judgment in the
case as to less than all the defendants, and the
case was remanded with directions to hear the case
and to enter but one judgment adjudicating the
rights of all the defendants to the water of the
river.  However, the language and reasoning of the
decision is persuasive, and was intended for the
guidance of the trial court and in the absence
of authority to the contrary, will generally be
followed by the court in its rulings at the trial.

"The Circuit decision was rendered in an appeal
from a judgment below, in which the  only parties
were the United States, the State of California and

4

the Santa Margarita Mutual Water Company.  The deci-
sion is obviously not binding, or the law of the case,
as to any of the parties except those participating
in that appeal."  United States v. Fallbrook Public
Utility District, 165 F. Supp. 806, 823.

It follows that the Court is free to rule on the
legislative jurisdictional status of the Camp Pendleton
Marine Base.

III.   STATEMENT OF THE FACTS.

The parcels of land now constituting the Camp
Pendleton Marine Base were acquired by the United States
between January 21, 1942, to August 8, 1945, with the ex-
ception of one parcel of 112.11 acres which was acquired by
deed on February 8, 1949.  These acquisitions are shown in
the following table:

TABLE I

| Acreage | County of Location of Parcel | Date of Acquisition of Title | Document of Title Exhibit Number Herein |
|---|---|---|---|
| 9,147.55 | San Diego | Jan. 21, 1942 | Declaration of Taking Plaintiff's Exhibit #15* |
| 122,202.72 | San Diego | Dec. 31, 1942 | Declaration of Taking Plaintiff's Exhibit #16* |
| 1,676.58 | San Diego | Dec. 23, 1943 | Declaration of Taking Plaintiff's Exhibit #17* |
| 1,574.61 | San Diego | Aug.  8, 1945 | Withdrawal from public domain, Public Land Order No. 293 - Plaintiff's Exhibit #17* |
| 112.11 | Orange | Feb.  8, 1949 | Deed of Title - Plaintiff's Exhibit #17* |

*(Exhibit numbers taken from United States v. Fallbrook
Public Utility Dist., 109 F. Supp. 28, 48-49.  In the
present trial, these exhibits correspond to plaintiff's
exhibits #3, 6, 7, 8 and 9.)

Letters purporting to accept sovereignty over
the Camp Pendleton Marine Base pursuant to the federal Act

5

6019

of February 1, 1940, 54 Stat. 19, were filed by the United
States with the Governor of California on January 12, 1943,
September 8, 1943, and February 18, 1944.  The following
table gives the respective dates of the letters of accept-
ance and the land so accepted by each letter, together with
the exhibit number in this case.

TABLE II.

Letters of Acceptance of Sovereignty.

| Date of Letter | Tract Described in Letter | Exhibit Number in This Case |
|---|---|---|
| Jan. 12, 1943 | Acceptance of the 9,147.55-acre tract acquired January 21, 1942 | Plaintiff's Exhibit #18* |
| Sept. 8, 1943 | Acceptance of the 122,202.72-acre tract acquired December 31, 1942 | Plaintiff's Exhibit #19* |
| Feb. 18, 1944 | Acceptance of the 1,676.58-acre tract acquired December 23, 1943 | Plaintiff's Exhibit #20* |

*(Exhibit numbers taken from United States v. Fallbrook
 Public Utility Dist., 109 F. Supp. 28, 48-49.  In the
 present trial, these exhibits correspond to plaintiff's
 exhibits #3, 6, 7, 8 and 9.)

The record in this case fails to show that letters
of acceptance were filed with the California Governor cover-
ing the 1,574.61-acre tract, County of San Diego, withdrawn
from the public domain August 8, 1945 (Plf.'s Ex. 17) nor of
the 112.11-acre tract acquired by deed of title, February 8,
1949 (Plf.'s Ex. 17).

The United States has never filed a plat of
the reservation, nor metes and bounds description, of the
Camp Pendleton Marine Base military reservation pur-
suant to California Statutes of 1897, Chapter 56,
page 51, codified into section 114, Government Code, in
effect until repealed September 19, 1947, by California
Statutes of 1947, Chapter 1532, page 3163; Certificate
of Roger N. Howe, County Recorder, County of San Diego,

6

on file herein.  "Neither has the United States perfected
its application to the California State Lands Commission for
consent to acquire the land at the Camp Pendleton Marine
Base, nor has the said Commission given its consent to such
acquisition, pursuant to section 126, California Government
Code.  Calif. Stats. 1st Ex. Sess. 1946, Ch. 154, p. 199;
Certificate of Frank Porter, on file herein."

### IV.   CONTENTIONS OF THE DEFENDANT
### STATE OF CALIFORNIA.

The defendant State of California contends that
(1) the United States has never acquired sovereignty over
the Camp Pendleton Marine Base, since there has been no
compliance with the conditions precedent to such cession
in California Statutes of 1897, Chapter 56, page 51,[1]
the California cession statute, (2) 1872 Political Code
section 34 (Government Code section 111)[2] did not tender
legislative jurisdiction to the United States, and (3) the
notices of acceptance of sovereignty given by the United
States to the Governor of California were ineffective.

### V.   CONTENTIONS OF THE PLAINTIFF.

That 1872 Political Code section 34 (Government
Code section 111) tendered legislative jurisdiction to
the United States, which it accepted by virtue of its
notices of acceptance of jurisdiction given to the
Governor of California.

[1] California Statutes of 1897, Chapter 56,  page 51, and its
legislative history, is attached as Exhibit A hereto.
[2] California 1872 Political Code section 34, and its legis-
lative history, is attached as Exhibit B hereto.

6018

## VI.  ARGUMENT.

### A.  INTRODUCTION.

Sovereignty over the territory now comprising the State of California was ceded by Mexico to the United States by the 1848 Treaty of Guadulupe Hidalgo, Act of February 2, 1848, 9 Stat. 922, Standard Oil Co. v. Johnson, 10 Cal. 2d 758.  The United States thereafter, in 1850, ceded sovereignty over the area now comprising California to the State of California by enacting the Congressional Enabling Act of September 9, 1850, 9 Stat. 452, which admitted California to the Union, there being no reservation of jurisdiction in said Enabling Act.  United States v. Watkins, 22 Fed. 2d 437, 438, approved in Standard Oil Co. v. California,  291 U.S. 242, 244.

Notwithstanding this transfer of sovereignty, the United States remained the owner of vast tracts of land comprising the public domain.  Having once divested itself of jurisdiction, however, the United States did not reacquire sovereignty by simply retaining title to land within the state nor by subsequently acquiring title to land after the admission of a state to the Union. James v. Dravo Contracting Co., 302 U.S. 134; Mason Co. v. Tax Commission, 302 U.S. 186, 197.

To effect a transfer of sovereignty, there must be a tender of sovereignty by the granting  power and an express acceptance of that sovereignty by the receiving power.  As stated by the United States Solicitor General in a brief to the United States Supreme Court:  "The transfer of power and responsibility as vital as the right to exercise legislative authority over territory, must, in the nature of things, depend upon the concurrence not

8

6019

1   only of granting but also the receiving sovereignty.

2   This fundamental principle is, we believe, applicable as

3   well to grants of jurisdiction between the states and

4   the United States as to grants of jurisdiction between

5   wholly independent nations."  Brief for the United States,

6   Mason Co. v. Tax Commission, United States Supreme Court,

7   October Term, 1937, No. 7, 302 U.S. 186.

8   During the period January 21, 1942, the date

9   of the first acquisition of title at Camp Pendleton,

10  through September 19, 1947, the date of the repeal of

11  Statutes of 1897, Chapter 56, page 51, California made

12  a tender of concurrent sovereignty[3] to the United States

13  under the terms of Statutes of 1897, Chapter 56, page 51

14  (codified into Government Code section 114).

15

16  B.   UNITED STATES FAILED TO COMPLY WITH CONDITION

17       PRECEDENT IN CALIFORNIA CESSION STATUTE.

18  Statutes of 1897, Chapter 56,  page 51, tendered

19  concurrent jurisdiction to the United States of land

20  reserved for military purposes or conveyed to the United

21  States for military purposes "provided, that a sufficient

22  description by metes and bounds and a map or plat of such

23  land be filed in the proper office of record in the county

24  in which the same are situated."  The use of "provided"

25  in this statute imports  a  condition precedent and

26

27  [3]"Exclusive" jurisdiction less the reserved taxing author-
    ity of the state (Art. XIII, sec. 6; Calif. Pol. C. sec.
28  34; Int.  Business Machine Corp. v. Evans, 213 Ga. 333,
    99 S.E. 2d 220) and the reservation of the administration
29  of the criminal laws of California (Calif. Stats. 1891,
    Ch. 181, p. 262, Calif. Gov. C. sec. 113; Collins v.
30  Yosemite Park Co., 304 U.S. 518, 527; People v. Brown,
    69 Cal. App. 2d 602, 605).

31

1    carries out the legislative intent that the filing of a
2    metes and bounds description and a plat of the reservation
3    would constitute a condition precedent to the cession of
4    jurisdiction to the United States (United States v.
5    Watkins, 22 Fed. 2d 437, 439, approved in Standard Oil Co.
6    v. California, 291 U.S. 242, 244; Opinion, Army Judge
7    Advocate General, FPGR 45-9595; "provided" used in Cali-
8    fornia Code of Civil Procedure section 412 in California
9    Statutes 1905, Chapter 209, page 141, imports a condition
10   precedent, McPhail v. Nunes, 38 Cal. App. 557, 561). Fur-
11   ther indication that the California Legislature intended
12   that the filing requirement in the 1897 statute be a con-
13   dition precedent to the tender of cession of jurisdiction
14   is shown by the fact that when this statute was codified
15   into Government Code section 114 by Statutes of 1943,
16   Chapter 134, page 898, "provided" was changed to "shall
17   first be filed." These filing requirements in the cession
18   statutes of sister states have also been construed as
19   requiring the filing of a metes and bounds description
20   and a plat of the reservation involved to be a condition
21   precedent to the tender of cession of jurisdiction. See
22   Pothier v. Rodman, 291 Fed. 311, 320, construing laws of
23   Washington, 1917, page 2, section 20; Gill v. State, 141
24   Penn. 379, 210 S.W. 637; State v. Mendes, 57 Nev. 192,
25   61 Pac. 2d 300; Six Companies v. DiVinney, 2 Fed. Supp.
26   693. In Valley County v. Thomas, 109 Mont. 345, 97 Pac.
27   2d 345, at 360, the court stated: "We, therefore, hold
28   that the filing of the metes and bounds description and
29   of the map or plat is a condition precedent to transfer
30   jurisdiction under sections 24 and 25 /1935 Washington
31   Revised Codes7, for the dual purpose of evincing the

10

1  assumption of that jurisdiction by the federal government
2  and of giving record notice to all in the interests of
3  justice.  Any other rule would result in an intolerable
4  confusion and perhaps in  the abdication of state sovereign-
5  ty without a corresponding assumption of federal juris-
6  diction.  A ceding Act must not be so construed as to
7  make possible a no-man's land within the boundaries of
8  a state."

9         The Certificate of Roger N. Howe, County
10  Recorder, County of San Diego, shows that the United States
11  has never filed the metes and bounds description, and
12  plat, of the Camp Pendleton Marine Base Military Reserva-
13  tion pursuant to the 1897 cession statute and the United
14  States therefore can claim no legislative jurisdictional
15  rights  over the Camp Pendleton military command under
16  this statute.

17

18  C.  1872 POLITICAL CODE SECTION 34 (GOVERNMENT CODE
19      SECTION 111) DID NOT TENDER LEGISLATIVE JURISDICTION
20      TO THE UNITED STATES.

21         Plaintiff asserts that California 1872 Political
22  Code section 34 tendered cession of exclusive jurisdiction
23  to the federal government, and that by its letters of
24  acceptance to the Governor of California the United
25  States accepted cession of exclusive jurisdiction at the
26  Camp Pendleton Marine Base.  1872 Political Code section
27  34 provided:

28         "34.  The Legislature consents to the
29         purchase or condemnation by the United States
30         of any tract of land within this State for the
31         purpose of erecting forts, magazines, arsenals,

11

6022

1   dock-yards, and other needful buildings, upon

2   the express condition that all civil process

3   issued from the Courts of this State, and such

4   criminal process as may issue under the authority

5   of this State, against any person charged with

6   crime, may be served and executed thereon in

7   the same mode and manner and by the same officers

8   as if the purchase or condemnation had not been

9   made." (eff. March 12, 1872)

10   The wording of this enactment was taken from

11   the earlier California Statutes of 1852, Chapter 76,

12   page 149, which granted California legislative consent

13   "to the purchase by the Government of the United States

14   . . . of any tract, piece or parcel of land . . . for the

15   purpose of erecting thereon Armories, Arsenals, Forts,

16   Fortifications, Navy Yards, or Dock-Yards, Magazines,

17   Custom Houses, Light Houses, and other needful public

18   buildings or establishments whatsoever;".

19   The 1852 statute, which remained in effect

20   until repealed August 4, 1943, by Statutes 1942, Chapter

21   134, page 1009, and the 1872 statute, which remained in

22   effect until September 19, 1947, when repealed by Statutes

23   of 1947, Chapter 1532, page 3163, were enacted to comply

24   with the requirement in Article I, section 8, clause 17,

25   of the United States Constitution requiring state consent

26   to the acquisition by the United States of lands for mili-

27   tary purposes, and in order to comply with the several

28   federal statutes requiring state consent before a federal

29   agency could expend money to acquire land within a state.

30   Turning first to the provision in Article I,

31   section 8, clause 17 of the United States Constitution,

12

the court in <u>Fort Leavenworth R. R. Co.</u> v. <u>Lowie</u>, 114
U.S. 525, at 530, stated:  "It would seem to have been
the opinion of the framers of the Constitution that,
without the consent of the State, the new government
would not be able to acquire /military/ lands within
them;"  In the understanding of the import of this
statement, "A page of history is worth a volume of logic."
Mr. Justice Holmes, <u>New York Trust Co.</u> v. <u>Eisner</u>,
256 U.S. 345, 349.  The Articles of Confederation,
adopted by the Continental Congress on November 17,
1777, provided in Article II that "Each state retains
its sovereignty . . ."  Thus from the adoption of the
Articles of Confederation in 1777 to the ratification
of the Constitution in 1789, "Each of the thirteen states
were complete sovereigns." <u>Ware</u> v. <u>Hylton</u>, 3 Dallas 199,
224; <u>Gibbons</u> v. <u>Ogden</u>, 9 Wheat. 1, 187.  It follows that
when Great Britain divested itself of sovereignty over
its colonies in the new world by signing the Treaty of
Paris on September 3, 1783, the prerogatives of sovereignty
over the eastern seaboard passed from Great Britain to
each of the original thirteen states, and not to the
confederation of states.

Sovereignty remained in the original thirteen
colonies until the new Constitution went into operation
on March 3, 1789.  <u>Owings</u> v. <u>Speed</u>, 5 Wheat. 420, 423.
In contemplation of this transfer of sovereignty, the
Constitutional Convention two years before, in 1787,
made provision in the proposed constitution for a seat
of government for the new nation, and for the acquisition
of land for forts and arsenals.  The debates in the
Convention show that Article I, section 8, clause 17

13

of the Constitution was to embody two concepts:  (1) that
no cession of jurisdiction to the United States could
occur unless a state affirmatively ceded such jurisdiction
and (2) that the United States could not acquire land
within a state for military purposes without the consent
of the state.

The first mention in the Constitutional Con-
vention debates regarding the exercise of exclusive
jurisdiction over federal land appears on August 18, 1787,
when James Madison, delegate from Virginia, proposed that
Congress under the new Constitution have power to exercise
exclusive legislative authority over a district to be
acquired for the seat of government:  "The consent of the
legislature of the state or states, comprising the same,
being first obtained."  Debates on the Confederation and
Constitution, Elliott, Vol. 5, p. 439.  On the same day,
August 18, 1787, Madison also proposed that the President
have authority to procure for the United States property
"for the erection of forts, magazines and other necessary
buildings."  Debates, supra, Vol. 5, p. 440.

Madison's language, authorizing the exercise
of sovereignty in what is now the District of Columbia,
and the provision authorizing the purchase of land for
federal forts and arsenals were combined into one para-
graph by the Committee of Eleven, which proposed to the
Constitutional Convention on September 5, 1787, through
delegate David Brearly, of New Jersey, that Congress have
power

"to exercise exclusive legislation in all cases
whatsoever, over such district (not exceeding ten
miles square) as may, by cession of  particular

14

6025

states, and the acceptance of legislature, become
the seat of the government of the United States;
and to exercise like authority over all places pur-
chased for the erection of forts, magazines, arsenals,
dockyards, and other needful buildings." Debates,
_supra_, Vol. 5, pp. 510-511.

Under this language, the United States could
acquire sovereignty over the new seat of government and
over areas acquired for forts and arsenals where the
states made an affirmative cession thereof to the United
States.

However, Elbridge Geary, delegate from Massa-
chusetts, who disliked standing armies, and who finally
declined to sign the Constitution, raised objection to
granting the United States authority to purchase land for
forts and arsenals within a state, saying: ". . . this
power might be made use of to enslave any particular state
by buying up its territory, and that the strongholds pro-
posed would be means of awing the state into an undue
obedience to the general government." Debates, _supra_,
Vol. 5, p. 51..  In answer to Geary's fear that the
federal government might overawe a state through the
establishment of armed strongholds within its borders,
Rufus King, delegate from Massachusetts, moved that the
language of clause 17 be amended to read:

"The Congress shall have power . . .

"To exercise exclusive legislation in all
cases whatsoever, over such district (not exceed-
ing ten miles square) as may, by cession of par-
ticular States, and the acceptance of Congress,
become the seat of the government of the United

15

6026

States, and to exercise like authority over all places purchased by the consent of the Legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings; . . ." (language amending the proposal of September 5, 1787, emphasized).

Delegate King's amendment was adopted by the Convention and this language now appears in Article 1, section 8, clause 17 quoted above.  Thus the legislative history of Article 1, section 8, clause 17, fully supports the statement by the court in Fort Leavenworth R.R. Co. v. Lowie, 114 U.S. 525, 530, that the federal government must obtain prior state consent before purchasing land within a state for military purposes.

Of course, land can be acquired for nonmilitary purposes by the United States without state consent under the "supremacy clause," Article VI, clause 2, of the Constitution.  Kohl v. United States, 91 U.S. 367 (condemnation of land to be used as a courthouse and post office site).[4]

A second reason why California gave its consent to the purchase of land by the United States in the 1852 and 1872 statutes is the federal statutory requirement that such consent be given.  For example, Congress, in enacting the Act of April 2, 1794, 1 Stat. 352, required, as a condition precedent to the spending of federal moneys

[4]The states have enacted "consent" statutes so that the scope of this restriction is moot.  Calif. 1872 Pol. C. sec. 34; Calif. Gov. C. sec. 126.  See list of consent statutes set forth in the Brief for the United States, James v. Dravo Contracting Co., United States Supreme Court, October Term 1937, Nos. 3, 7 and 8, at pages 85 and 86.

16

6027

for arsenals, that "none of the said arsenals be erected until the purchase of the land necessary for their accommodation be made with the consent of the legislature of the State in which the same is intended to be erected."

In 1841 a dispute arose between the State of New York and Congress concerning title to a tract of land upon Staten Island upon which federal fortifications had been built. Because of this dispute, Congress by a joint resolution on September 11, 1841, 5 Stat. 468, resolved that "No public money shall be expended upon any site or land hereafter to be purchased by the United States for the purposes aforesaid /armories, arsenals, forts, and similar buildings7 until . . . the consent of the legislature of the state in which the land or site may be, shall be given to said purchaser." The resolution also required that the United States Attorney General give his certificate that good title could be conveyed to the United States before expenditure of federal funds was authorized. A search of the debates on the resolution shows that Congress was concerned with the United States' obtaining good title to the land upon which it expended money. The question of cession of sovereignty over such lands was not mentioned. Congressional Globe, 27th Congress, 1st Sess., pp. 421, 423, 440. This requirement that the federal Attorney General give prior approval to title, and that the States give prior consent to the acquisition, before a federal agency could expend moneys in purchasing land was enacted into law in section 355, 1875 Revised Statutes.

Contemporary federal statutes contain provisions requiring prior state consent. For example, the Weeks Forestry Act, 36 Stat. 963, provides in section 7:

17

"No deed . . . shall be accepted . . . under this act until
the legislature of the state in which the land lies shall
have consented to the acquisition of such land by the
United States."  California has given its consent to such
purchase in section 126(a), California Government Code.
Similarly, section 7 of the Migratory Bird Conservation
Act, 45 Stat. 1223, states that "No deed . . . should be
accepted by the Secretary of Agriculture under this act
unless the state in which the area lies shall have con-
sented by law to the acquisition by the United States of
land in that state."  Section 12 of the Weeks Forestry Act
and section 8 of the Migratory Bird Conservation Act
expressly provide that state jurisdiction continues over
such land notwithstanding their acquisition by the United
States.

Congress, since 1828, has authorized the Presi-
dent of the United States to procure the assent of the
legislature of a state to the purchase of land by the
United States for the erection of forts and arsenals.
Act of April 28, 1828, 4 Stat. 264; section 1838, 1875
Revised Statutes of the United States; section 103, Act
of July 30, 1947; 61 Stat. 641-644, 4 U.S.C. 103.

Summarizing the legislative history of
Article 1, section 8, clause 17, of the Constitution
shows that two entirely different concepts are involved.
First, before the United States may acquire land within
the states for military purposes, it must acquire consent
of the state and, secondly, before the United States may
acquire sovereignty over such land, there must be a
tender of cession of sovereignty from the state, and the
United States must expressly accept such sovereignty

18

before the transfer occurs.  See section 355, 1878 Revised
Statutes of the United States, as amended by the Act of
February 1, 1940, 54 Stat. 19.  There should be no con-
fusion between these two different legal concepts since
"cession" means a yielding up of sovereignty of territory
by one government to another.  Ortega v. Lora, 202 U.S. 339,
342; Standard Oil Co. v. Johnson, 10 Cal. 2d 758, 760.
On the other hand, "purchase" means the acquisition of
title to the land by means other than by inheritance.
Kohl v. United States, 91 U.S. 367, 374; Greer v. Blanchar,
40 Cal. 194, 197.

It was argued to the California Supreme Court
in Gilmer v. Point Lime, 18 Cal. 229, that the authority
to acquire property by condemnation in the California
courts given to the federal government by California
Statutes of 1859, Chapter 36, page 26, constituted a
surrender of state sovereignty over such acquired proper-
ties.  In answer the California Supreme Court expressed
doubt that a surrender of sovereignty occurred "without
the express cession of jurisdiction to the federal govern-
ment over the fort and grounds so taken" (18 Cal. 229, 259).
To the same effect is Standard Oil Co. v. Johnson, 10
Cal. 2d 758, 766-767, where the California Supreme Court
found that the state had not relinquished its jurisdiction
to impose gasoline taxes on gasoline sold within the
boundaries of Yosemite, Sequoia and General Grant National
Parks, saying: "But, since self-preservation is the first
law of nations and states, as well as of individuals, it
will not be presumed, in the absence of clearly expressed
intent, that the State has relinquished its sovereignty.
. . . So, in line with the applicable principle, the

19

1   reserved power must be construed most strongly in favor of

2   the state in order to preserve its jurisdiction as to

3   matters with which it is directly and immediately con-

4   cerned, and as to which jurisdiction has not been ceded

5   or granted to the federal government."  In Six Companies

6   v. DiVinney, 2 Fed. Supp. 693 (Federal District Court,

7   District of Nevada), the court states (page 697):

8   "Statutes relinquishing jurisdiction are strictly construed.

9   The controlling reason for such construction is that it

10  is a matter of the very greatest importance to both the

11  national and state governments affected" (citing Larson v.

12  South Dakota, 278 U.S. 429, 435).  In State v. Cline,

13  ____ Okla. ____, 322 Pac. 2d 208, 213, the court held:

14  "It is a well-established rule of construction that

15  statutes whereby a state relinquishes jurisdiction over

16  lands to the Federal Government are to be strictly con-

17  strued, and it will not be presumed, in the absence of a

18  clearly expressed intent, that the state has relinquished

19  its control of said lands.  /citation/  The rights of a

20  state will not be taken away by implication."

21        The application of the principle of strict

22  construction to statutes, such as 1872 Political Code

23  section 34, insures that the states will retain their

24  regulatory jurisdiction over the area within its boundaries,

25  except in those cases where the Legislature plainly pro-

26  vides for a divestiture of such jurisdiction.  This

27  result follows the report of President Eisenhower's Inter-

28  Departmental Committee for the Study of Jurisdiction Over

29  Federal Areas Within the States, which recommended:  "With

30  respect to the large bulk of federally—owned or operated

31  real property in the several states and outside of the

20

District of Columbia it is desirable that the federal government not receive, or retain, any measure whatever of legislative jurisdiction, but that it hold the installations and areas in a proprietorial interest status only, with legislative jurisdiction remaining in the several states" (Report of the Interdepartmental Committee for the Study of Jurisdiction Over Federal Areas Within the States submitted to President Eisenhower, Government Printing Office, Volume 1, 1956, page 70).

It follows that the California Legislature is giving the State's consent to the purchase by the United States of land within its borders (1872 Calif. Political Code, sec. 34) did not thereby make a tender of sovereignty to the United States. Section 34, Political Code (Calif. Gov. C. sec. 111) merely gave state consent to the federal purchase of land within California in order to meet the consent requirements of Article I, section 8, clause 17 of the Constitution, and of the Congressional Joint Resolution of September 11, 1841, 5 Stat. 468, which forbade the expenditure of federal moneys until such consent had been given.

D.   <u>LETTERS OF ACCEPTANCE OF JURISDICTION FAILED TO COMPLY WITH EITHER FEDERAL OR STATE LAW.</u>

The federal Act of February 1, 1940, 54 Stat. 19,[5] authorized the head of any federal department to give notice of the acceptance of exclusive or partial jurisdiction by the filing of a notice of acceptance "with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are

[5]The Act of Feb. 1, 1940, 54 Stat. 19, is attached as Exhibit C hereto.

21

situated.  Unless and until the United States has accepted
jurisdiction over lands hereafter to be acquired as afore-
said, it shall be conclusively presumed that no such juris-
diction has been accepted."  The five tracts at Camp
Pendleton Marine Base were successively acquired from
January 21, 1942 to February 8, 1949.  Letters of accept-
ance of jurisdiction  were given to the Governor of Cali-
fornia on January 12, 1943, September 8, 1943, and
February 18, 1943, covering the tracts acquired, respec-
tively, January 21, 1942, December 31, 1942, and December
23, 1943.  Thus the United States has not even attempted
to obtain sovereignty of the tract set aside from the public
domain August 8, 1945,[6] nor of the tract of 112.11 acres
acquired by deed of title on February 8, 1949.  The con-
clusive  presumption of state sovereignty in the Act of
February 1, 1940, 54 Stat. 19, would therefore be appli-
cable as to these two latter tracts.

As heretofore noted, there must be both a tender
of sovereignty by the granting power and an acceptance of
that sovereignty by the receiving power.  Brief for the
United States, Mason Co. v. Tax Commission, United States
Supreme Court, October Term 1937, No. 7, 302 U.S. 186.
See Davis v. Police Jury of Concordia, 9 How. 280, 292-293;
Oppenheim on International Law (2d Ed.), Vol. 1, pp. 286-
287.  Statutes of 1897, Chapter 56, page 51, the California
cession statute which was in effect on the dates when the
notices of acceptance of jurisdiction were given, provided

[6]Since the 1,574.61-acre tract set aside from the public
domain on  August 8, 1945, was never "purchased," section
34, California Political Code (Gov. C. sec. 111) could
have no application, even under plaintiff's theory.
Fort Leavenworth R.R. Co. v. Lowie, 114 U.S. 525.

22

6033

as a matter of California law, that no jurisdiction should
be granted to the United States unless a plat and a metes
and bounds description of the military reservation in
question be filed with the County Recorder of the county
wherein the military reservation was located. United
States v. Watkins, 22 Fed. 2d 437, 439, approved Standard
Oil Co. v. California, 291 U.S. 242, 244. No such metes
and bounds description, nor plat of the Camp Pendleton
Marine Base, were ever recorded in the Office of the
County Recorder, San Diego County. Certificate of Roger N.
Howe, San Diego County Recorder, on file herein. It
follows that the notices of acceptance of jurisdiction
given to the Governor of California did not comply with
California law, and California therefore never tendered
sovereignty to the United States of the Camp Pendleton
command.

In Adams v. United States, 319 U.S. 312, the
United States Supreme Court had before it for construction
a Louisiana cession statute which provided:

"2898. Jurisdiction over land expropriated by
United States.--The United States may enter upon and
occupy any land which may have been, or may be pur-
chased or condemned, or otherwise acquired, and
shall have the right of exclusive jurisdiction over
the property so acquired during the time that the
United States shall be or remain the owner thereof
for all purposes, except the administration of the
criminal laws of said state, and the service of
civil process of said state therein, and shall hold
the same exempt from all state, parochial, municipal
or other taxation. /Acts 1892, No. 12, § 2./"

23

6034

(1939, Dart's Louisiana General Statutes.) Also before the Court was the Act of February 1, 1940, 54 Stat. 19, as amended by the Act of October 9, 1940, 54 Stat. 1083, which provided that the United States might accept "cession of such jurisdiction, exclusive or partial, not theretofore obtained" over lands acquired by the United States "by filing a notice of acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated." 54 Stat. 1083, 1084. The statute further provided that state sovereignty is conclusively presumed unless jurisdiction had been accepted in the manner specified.

The appellants had been convicted of the crime of rape committed within Camp Claiborne, Louisiana, in the Federal District Court. At the time of the commission of the crime, the legislature of Louisiana had tendered "exclusive jurisdiction," less the "administration of the criminal laws" of Louisiana, by virtue of section 2898, 1939 Dart's Louisiana General Statutes, quoted above. However, the United States on the date of the crime had not accepted this tender of jurisdiction in the manner prescribed by the Act of October 9, 1940, 54 Stat. 1083. The United States first argued that since the Louisiana statute tendered "concurrent" jurisdiction to the United States (criminal jurisdiction being reserved), that the Act of October 9, 1940, 54 Stat. 1083, and its notice requirements, were inapplicable since the federal act referred to the acceptance of "exclusive or partial" jurisdiction but made no reference to the acceptance of "concurrent" jurisdiction. See section 7(3), of U.S.C. Title 18, giving the United States District Courts criminal jurisdiction over lands

23-A

within "concurrent" federal-state jurisdiction.  The
Solicitor General before the Supreme Court abandoned the
earlier view and conceded that concurrent jurisdiction could
be acquired only by the formal acceptance prescribed in the
Act of October 9, 1940.  The Supreme Court agreed, and
found that the federal district court had no jurisdiction
of the crime since the United States had never accepted
the jurisdiction tendered by the Louisiana legislature.

The Louisiana statute before the court in the
Adams case did not contain a requirement that a plat and
metes and bounds of the military reservation in question
be recorded in the county recorder's office in which the
land was located.  See Calif. Stats. 1897, Ch. 56, p. 51,
for such a proviso.  Had the Louisiana enactment contained
such a requirement, there can be but little question but
that the Supreme Court would have required compliance
before finding that a cession of sovereignty occurred.
See United States v. Watkins, 22 Fed. 2d 437, 439; Pothier
v. Rodman, 291 Fed. 311, 320; Gill v. State, 141 Penn. 379,
210 S.W. 637, 638; State v. Mendes, 57 Nev. 192, 61 Pac. 2d
300, 308; Six Companies v. DiVinney, 2 Fed. Supp. 693, 696;
Valley County v. Thomas, 109 Mont. 345, 97 Pac. 2d 345,
360.

Further, since these notices of acceptance of
sovereignty did not comply with the conditions "prescribed
by the laws of the State where such lands are situated,"
they did not comply with the requirements of the Act of
February 1, 1940, 54 Stat. 19, and were ineffective under
federal law.

23-B

6036

VII.  CASE LAW.

Nothing inconsistent with the views expressed above appears in the opinion of the Honorable Chief Judge Yankwich which appears in United States v. Fallbrook Public Utility District, 108 Fed. Supp. 72.  The opinion discloses that the question before the court was, assuming that California had ceded exclusive jurisdiction to the United States, did such exclusive jurisdiction extend to

23-C

6037

land not used for military purposes?  108 Fed. Supp. 72
at 85.  Assuming that exclusive jurisdiction did pass to
the United States, the answer is yes.  The issue raised
here, however, is whether the State of California ceded
any degree of sovereignty at all to the United States
over the Camp Pendleton Marine Base Military Reservation.
We note, though, that the court in footnotes 40 and 41
cites United States v. Cornell, 1819, 25 Fed. Cas.No.
14,867, and Fort Leavenworth R.R. Co. v. Lowie, 1885,
114 U.S. 525, for the proposition that a state cannot
make reservations of jurisdiction in its cession of
sovereignty to the United States. 108 F. Supp. 72, 86. /  These statements were
declared dicta and were expressly disapproved in James v.
Dravo Contracting Co., 302 U.S. 134, at 147.

It is fundamental that the language of any
opinion is to be understood in the light of the facts
and the issues then before the court.  Medaris Co. v.
Commissioner, 38 Fed. 2d 812, 813; Porter v. Bakersfield
and Kern Electric Railway Co., 36 Cal. 2d 582, 590;
Eatwell v. Beck, 41 Cal. 2d 128, 136.  Thus the cases
containing language to the effect that a state by con-
senting to the purchase of land tenders sovereignty
thereover to the United States should be read in the
light of the statute involved.  Thus, for example, the
court in Valley County v. Thomas, 109 Mont. 345, 97 Pac.
2d 345, 351, had before it section 25 of the 1935
Washington Revised Codes, which consented to the federal
purchase of land within the state for Article I, section
8, paragraph 17, United States Constitution purposes,
and further provided that "exclusive jurisdiction" be
ceded to the United States with respect to such lands.

24

6038

While the court spoke of a "consent" statute, it was
referring to a statute which both granted consent of the
state to the federal purchase of property within its
borders, and in addition which expressly ceded sovereignty
over such purchased area to the United States.

Again, Arkansas Acts of 1903, page 346, con-
sented to the purchase by the United States of sites
within the State for the erection of armories, arsenals,
and other needful buildings, and p rovided that the
jurisdiction of the State of Arkansas over the sites
thus purchased be ceded to the United States.  The Arkansas
Supreme Court, in Haynie v. Surplus Trading Co., 174 Ark.
507, 297 S.W. 822, reversed on other grounds Surplus Trad-
ing Co. v. Cook, 281 U.S. 647, and properly held that this
1903 Arkansas statute tendered jurisdiction over the
Camp Pike military reservation to the United States.
In United States v. Unzeuta, 281 U.S. 138, the court had
before it laws of Nebraska, 1887, page 628, which tendered
cession to the United States of "the jurisdiction of the
State of Nebraska in and over the military reservation
known as Fort Niobrara and Fort Robinson."  The Supreme
Court in Chicago and Pacific Railway Co. v. McGlinn, 114
U.S. 542, had before it Laws of Kansas, 1875, Chapter 66,
which provided "that exclusive jurisdiction be, and the
same is hereby, ceded to the United States over and within
all the territory owned by the United States, and included
within the limits of the United States Military Reserva-
tion, known as the Fort Leavenworth Reservation. . . ."
Again, in Arlington Hotel v. Fant, 278 U.S. 439, the
statute involved provided "That exclusive jurisdiction
over that p art of the Hot Springs Reservation known and

25

6039

described as a part of the Hot Springs Mountain . . . is hereby ceded and granted to the United States of America. . . ." Acts of Arkansas, 1903, at 30.

Arkansas Acts of 1903, page 346, considered in Surplus Trading Co. v. Cook, 281 U.S. 647, was both a consent and a cession statute.  1875 Laws of Kansas, page 95, considered in Fort Leavenworth Railroad v. Lowle, 114 U.S. 525, was a pure cession statute.  Acts of Rhode Island, March, 1794, page 11, considered in United States v. Cornell, 25 Fed. Cas. 646, granted legislative consent to the United States to purchase land within the state, gave consent for the City of Newport, Rhode Island, to convey title to the United States, and granted "all the right, title and claims of this state over such lands in the United States."  This latter language could only refer to the cession of jurisdiction since title to the land was in the City of Newport.  In each of these cases the statutes involved gave both the state consent to the federal purchase of the land involved, plus a tender of cession of sovereignty to the United States over the land so purchased.[7]

In sharp contrast, the United States Supreme Court has held that a consent statute which does not contain words of cession, does not make a tender of sovereignty to the United States.  Thus in Wilson v. Cook,

---

[7] In Commissioners of the Sinking Fund of the City of Louisville v. Howard (Ky.), 248 S.W. 2d 340, the parties stipulated that the Louisville Naval Ordnance Plant lay within exclusive federal sovereignty.  Thus neither the Kentucky courts nor the U. S. Supreme Court in Howard v. Commissioners, 344 U.S. 624, considered the problem of statutory construction here involved.  The holding of the court in Howard v. Commissioners, 344 U.S. 624, was that a municipal income tax validly applied to moneys earned by federal employees at the Ordnance Plant.

26

8040

327 U.S. 474, 486, the Supreme Court had before it Arkansas Acts of 1917, No. 148, page 797, which provided: "That the consent of the State of Arkansas be and is hereby given to the acquisition by the United States, by purchase . . ." of land within the state pursuant to the Weeks Forestry Act, 36 Stat. 961. In construing this language, the Court held: "It made no express grant or reservation of legis-lative power over the areas purchased. Hence the statute cannot be taken as having yielded or intended to surrender to the federal government the state's legislative juris-diction over the area in question, so far as exercise of that jurisdiction is consistent with federal functions." 327 U.S. 474, 486.

Summing up, then, consent statutes which contain express words of cession do tender cession of state sovereignty to the United States. See Calif. Statutes of 1861, Ch. 255, p. 259, which contained language consenting to acquisition and making tender of sovereignty. On the other hand, consent statutes which contain no words of cession do not tender legislative jurisdiction to the United States. It follows that California 1872 Political Code section 34, which contains no words of cession, did not tender cession of sovereignty to the United States. Thus no claim of sovereignty over the Camp Pendleton Marine Base can be based on this 1872 enactment.

8041

## CONCLUSION

For the reasons stated and upon the authorities cited, defendant State of California respectfully prays that the Court declare that the Camp Pendleton Marine Base Military Reservation, Counties of San Diego and Orange, be declared within the sovereignty of the State of California.

> STANLEY MOSK,
>    Attorney General of the
>    State of California
>
>
> JOHN FOURT,
>    Deputy Attorney General
>
> F. G. GIRARD,
>    Deputy Attorney General
>
>    Attorneys for Defendant
>    State of California

28

Statutes of 1897, Chapter 56, page 51

"An Act ceding to the United States of America jurisdiction
over all lands within this State which have been or may
hereafter be acquired by the United States for military
purposes.

/Approved March 2, 1897.7

"The People of the State of California, represented in
Senate and Assembly, do enact as follows:

"SECTION 1.  The State of California hereby cedes to
the United States of America exclusive jurisdiction over
all lands within this State now held, occupied, or reserved
by the Government of the United States for military purposes
or defense, or which may hereafter be ceded or conveyed to
said United States for such purposes; provided, that a
sufficient description by metes and bounds and a map or
plat of such lands be filed in the proper office of record
in the county in which the same are situated; and provided
further, that this State reserves the right to serve and
execute on said lands all civil process, not incompatible
with this cession, and such criminal process as may law-
fully issue under the authority of this State against any
person or persons charged with crimes committed without said
lands.

"SEC. 2.  This Act shall take effect immediately."

Stats. 1897, Ch. 56, p. 51, eff. March 2, 1897, codified
into Gov. C. sec. 114, eff. Aug. 4, 1943, by Stats. 1943,
Ch. 134, p. 898, until repealed eff. Sept. 19, 1947, by
Stats. 1947, Ch. 1532, p. 3163.

EXHIBIT A

29

6043

Section 34, Political Code, Enacted March 12, 1872:

"34.   The Legislature consents to the purchase or condemnation by the United States of any tract of land within this State for the purpose of erecting forts, magazines, arsenals, dock yards, and other needful buildings, upon the express condition that all civil process issued from the Courts of this State, and such criminal process as may issue under the authority of this State, against any person charged with crime, may be served and executed thereon in the same mode and manner and by the same officers as if the purchase or condemnation had not been made."

1872 Pol. C. sec. 34, eff. March 12, 1872, codified into Gov. C. sec. 111, eff. Aug. 4, 1943, by Stats. 1943, Ch. 134, p. 1009, until repealed eff. Sept. 19, 1947, by Stats. 1947, Ch. 1532, p. 3163.

EXHIBIT B

30

United States Statutes at Large, Vol. 54,
Part 1, 76th Cong., 2d and 3d Sess., 1939-1941,
Ch. 18, p. 19:

"AN ACT

"To amend section 355 of the Revised Statutes, as amended,
to make permissive the acquisition of legislative jurisdic-
tion over land or interests in land acquired by the United
States.

"Be it enacted by the Senate and House of Representa-
tives of the United States of America in Congress assembled,
That section 355 of the Revised Statutes of the United
States (U.S.C., title 33, sec. 733; title 34, sec. 520;
title 40, sec. 255; and title 50, sec. 175) be, and the
same is hereby, amended to read as follows:

"'Sec. 355.  No public money shall be expended upon
any site or land purchased by the United States for the
purposes of erecting thereon any armory, arsenal, fort,
fortification, navy yard, custom-house, lighthouse, or
other public building of any kind whatever, until the
written opinion of the Attorney General shall be had in
favor of the validity of the title.  The district attorneys
of the United States, upon  the application of the Attorney
General, shall furnish any assistance or information in
their power in relation to the titles of the public
property lying within their respective districts.  And
the secretaries of the departments, upon the application
of the Attorney General, shall procure any additional evi-
dence of title which he may deem necessary, and which may
not be in the possession of the officers of the Government,
and the expense of procuring it shall be paid out of the
appropriations made for the contingencies of the departments
respectively:  Provided, however, That in all cases of the

EXHIBIT C

31

6045

1   acquisition of land or any interest therein by the United
2   States for the purposes herein specified or for other pur-
3   poses, wherein the written opinion of the Attorney General
4   in favor of the validity of the title of such land is or
5   may be required or authorized by law, the Attorney General
6   may, in his discretion, base such opinion upon a certifi-
7   cate of title of a title company.  Notwithstanding any
8   other provision of law, the obtaining of exclusive juris-
9   diction in  the United States over lands or interests
10  therein which have been or shall hereafter be acquired by
11  it shall not be required; but the head or other authorized
12  officer of any department or independent establishment or
13  agency of the Government may, in such cases and at such
14  times as he may deem desirable, accept or secure from the
15  State in which any lands or interests therein under his
16  immediate jurisdiction, custody, or control are situated,
17  consent to or cession of such jurisdiction, exclusive or
18  partial, not theretofore obtained, over any such lands or
19  interests as he may deem desirable and indicate acceptance
20  of such jurisdiction on  behalf of the United States by
21  filing a notice of such acceptance with the Governor of
22  such State or in such other manner as may be prescribed
23  by the laws of the State where such lands are situated.
24  Unless and until the United States has accepted jurisdic-
25  tion over lands hereafter to be acquired as aforesaid,
26  it shall be conclusively presumed that no such jurisdiction
27  has been accepted.
28          "Approved, February 1, 1940."
29
30
31                              Exhibit C - page 2

                         32

                                              6046