CLAYSON, STARK, ROTHROCK & MANN
DONALD D. STARK
Security Bank Building
Corona, California
REdwood 7-1910

OWEN W. STRANGE

Attorneys for Defendants

  Katharine C. Gibbon and
  William W. Cottle



FILED
MAR 16 1961
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ Deputy Clerk

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>        Plaintiff,<br>    v.<br>FALLBROOK PUBLIC UTILITY<br>DISTRICT, et al.,<br>        Defendants. | Civil No. 1247-SD-C<br><br>MEMORANDUM RE APPROPRIATIVE AND<br>PRESCRIPTIVE RIGHTS OF DEFENDANTS<br>GIBBON AND COTTLE |

### LIMITED SCOPE OF MEMORANDUM

This memorandum is designed to assist in the discussion (scheduled for Wednesday, March 15, 1961) of claimed appropriative and prescriptive rights of certain riparian owners. It is, of course, directed toward the specific claims of Gibbon and Cottle on Temecula Creek near Radec, but it is believed that it will also be helpful in the consideration of other such claims, including those of the United States and Oviatt.

In several respects this memorandum falls short of a complete presentation of proposed findings for Gibbon and Cottle and of argument thereon:

    1. _The subject matter of this memorandum is limited_. Thus, no findings are here proposed on the riparian rights of Gibbon and Cottle,

1.

6320

since we understand that the principal question to be considered at the forthcoming hearing on March 15th is whether or not an admittedly riparian owner may also enjoy appropriative and prescriptive rights. Neither are there any findings concerning the geology of the area; we are informed that the problems of the underground character and interconnections of the upper Temecula region constitute a separate major subject of study and presumably will be scheduled for another date. Also excluded are proposed findings regarding the general lay-out and facilities of the Gibbon and Cottle properties since these matters are largely undisputed; counsel for the United States have already submitted to us a draft of findings thereon, and it is believed that they can be revised and agreed upon through informal conferences and without burdening the Court.

   2. <u>The proposed findings herein are not cast in final form</u>. They are general in nature, subject to being elaborated and exactly worded after the Court has indicated its views on the general questions involved. In this respect, the form of this memorandum resembles that heretofore filed in behalf of Defendant Oviatt.

   3. <u>The legal discussion herein is abbreviated</u>. It is believed that the citations here presented, and particularly the references to current authoritative texts, will indicate that our proposals are based on well-accepted principles of California water law. Should disagreement develop at the hearing on any particular legal question, a more detailed brief could be submitted within a few days.

OUTLINE OF MEMORANDUM

I. Introduction: Effect of Holding that a Riparian Owner Also Has Appropriative or Prescriptive Rights:

  A. Floor under Apportionment.

  B. Difference Between Appropriative and Prescriptive Rights.

II. Appropriative Rights of Gibbon and Cottle:

    A. A Riparian Owner May Also Acquire Appropriative Rights for his Riparian Land.

    B. The Gibbon-Cottle Appropriations.

III. Prescriptive Rights of Gibbon and Cottle:

    A. A Riparian Owner May Also Acquire Prescriptive Rights for his Riparian Land.

    B. Prescription by Gibbon and Cottle and Their Predecessors.

IV. Changes in Exercise of Appropriative and Prescriptive Rights:

    A. The Law.

    B. The Facts.

## ARGUMENT

### I.

#### INTRODUCTION: EFFECT OF HOLDING THAT A RIPARIAN OWNER ALSO HAS APPROPRIATIVE OR PRESCRIPTIVE RIGHTS

A. Regardless of the label attached to it, water is water. Farmers along the Santa Margarita stream system probably do not care whether they are irrigating with riparian, appropriative, prescriptive, or even pueblo rights so long as the crops are supplied. Moreover, since riparian rights are not limited to the amount historically used, and since an efficient farmer needs no more than what is reasonable and beneficial anyway, the riparian right is in many ways the most ideally suited to his needs. Why bother, then, to establish appropriative or prescriptive rights for riparian land?

The answer lies in the possibility that riparian rights may, in a given case, be restricted in their exercise by a decree of apportionment. We do not believe an apportionment is in order on the record here, but it may one day come. Against that eventuality, we seek a declaration of appropriative and prescriptive rights, which, by their very nature, are not subject to such apportionment; being based on prior use, they are cut back, in times of shortage, according to such priority and not on a correlative basis. These appropriative and prescriptive rights,

3.

6322

then, would serve as a _floor_ below which any future riparian apportionment would not be applicable to the Gibbon and Cottle land.

Viewed in this way, the mechanics of our proposal are extremely simple: the Court would, for now, permit full reasonable beneficial use of water on these riparian lands, but in the event of a future quantitative limitation upon riparians along this stream system, any riparian cut-back would not be applied, as against Gibbon or Cottle, below the quantity of their appropriative and prescriptive rights.

Although no more than the riparian rights of Gibbon and Cottle are now needed by them, they are obliged to assert appropriative and prescriptive rights in this proceeding in order to forestall any possible future claim, under the doctrine of res judicata, that the judgment to be entered herein has, by its silence on appropriative and prescriptive rights, adjudicated their non-existence.

B. Although both are based on prior use, appropriative and prescriptive rights vary in the details of their acquisition and effect. Prescriptive rights are gained by adverse use for the period of the statute of limitation; thus, they are valid only against those who might have sued during the statutory period, they accrue only after continuous use for such period, and they are not valid against upstream owners. Appropriative rights, on the other hand, are rooted in the development of the public domain during the last approximately 100 years and in the statutory consent of the United States, as against itself and its later patentees, to certain water practices on the public lands; accordingly, they do sometimes require, like prescription, what would otherwise be an "adverse" act on the part of the appropriator (for Congressional consent would not otherwise be needed), but such appropriative rights arise instantly, without waiting for the limitation period, and they are valid both upstream and down as against the public domain and later patents and withdrawals of it. (Of course, in later years, appropriations of surplus water, binding against private owners as well as the

4.

6323

United States and the State, have been recognized; but the Gibbon-Cottle appropriations are of the earlier type and, although not binding against lands in private ownership as of 1885, nevertheless they are not limited in their effect to surplus water.)

It will be necessary, therefore, to frame the decree herein to keep separate the appropriative and prescriptive rights. Each type will act as a floor under any riparian apportionment affecting Gibbon and Cottle, but the lands affected by each type will be somewhat different.

## II.
### APPROPRIATIVE RIGHTS OF GIBBON AND COTTLE

A.  A Riparian Owner May Acquire Appropriative Rights for his Riparian Land.

One difficulty in presenting the contention that a riparian owner may acquire, for use on his riparian land, an appropriative right stems from the fact that this Court has already tentatively ruled to the contrary. (165 Fed. Supp. 806, 863.) That conclusion was reached in connection with Count XXII of the complaint and it was stated that at the trial the Court would so rule "unless a contrary rule is required by controlling precedents." We respectfully urge that controlling precedents do require a contrary holding.

None of the cases cited in support of this Court's statement, referred to above, actually holds that an appropriative right may not be acquired by a riparian. Dictum originating in cases which do not involve that issue has crept into the opinions of the appellate courts, and, when taken out of context, such dictum gives the erroneous impression that the courts have so ruled. The theory behind the reliance upon such dictum is that a riparian owner has the "right" to use all of the water when other riparian owners do not have present use for it and that therefore his entire use is "riparian". The statements to this effect come from <u>injunction</u> cases. Obviously they are correct when restricted to their injunctive implications, for no riparian can obtain

5.

a decree forcing an upper owner to release water which will flow unused past the plaintiff's lands and on to the sea. That does not mean, however, that the lower riparian has no "right" to his share of the water. More to the point, it does not mean that the upper owner's use of all of the water is wholly within his riparian right as against other _riparians_. It may be correct to say that, as a riparian, he has the right, for beneficial use, to all of the water of the stream as against non-riparians (at least, this was true before 1928), but there again, dictum in cases involving non-riparians has erroneously been cited in cases between riparians. An example of this is this Court's own opinion above referred to. The case of Gould v. Eaton, 117 Cal. 539, 543, 49 P. 577, 38 L.R.A. 181, was there cited on this proposition but actually involved a diversion by the upper owner to non-riparian lands; the court in that case merely said that the lower riparian had a right to the flow of the entire stream if the upper owner did not in fact use any of the water. Certainly that holding does not mean that the upper riparian's diversion to non-riparian lands is not an appropriation.

The fact is that it has been squarely held in California that a riparian owner, for reasonable beneficial use on his riparian land, may go upon the public domain and "appropriate" additional water beyond that to which he would be entitled in the event of a riparian apportionment; other riparian owners along the stream, whose patents are subsequent to such appropriation, would no longer have a right, as riparians, to reduce such an appropriator's historical use. (Rindge v. Crags Land Co., 56 Cal. App. 247, 253, 205 P. 36.) In the Rindge case, the court said:

> "And thus it may happen that a riparian owner, being insufficiently supplied with water by the flow of a stream, and anticipating the attaching of other riparian claims when the government land above him may be transferred to private ownership, may, upon such government land, make an appropriation which will be good, although

> it may have the effect to rob entirely the upper property of any riparian right in the stream--this to be qualified only with the condition that the total water claimed under the combined rights does not amount to more than is reasonably necessary to satisfy the necessary uses to which it is designed to be put."

Even before the Rindge case, Samuel Wiel, a leading authority, had reached the same conclusion, by analysis of the principles involved. (1 Wiel on Western Water Rights, secs. 244, 322, 323, particularly pp. 346-347.) Current authorities indicate that the Rindge case is controlling. (See Hutchins on California Water Rights, pp. 208-209; 51 Cal. Jur.2d 754-755, sec. 294.)

B. The Gibbon-Cottle Appropriations.

The record is clear that a valid public land appropriation was made by the predecessors of Gibbon and Cottle and that it has since been maintained. All of the necessary elements of such a right have been proved.

Thus, there was a clear expression of <u>intent</u> to appropriate the full flow of the stream at the point of diversion of the upper ditch and limited only by the capacity of the ditch. (Exhibits Gibbon/Cottle "O" and "P"; testimony of Tripp, 13438-13441.) The diversion was made upon <u>Government land</u>. (Tripp, 13442.) <u>Diligence</u> was exercised to perfect the appropriation; constant work under the hardships of pioneer conditions, and in the face of the flood of 1891 and other disasters, resulted in the steady extension of the ditch system until the upper ditch was completed about 1897. (Tripp, 13471-13476.) All of the water in the creek, <u>up to the full capacity of the ditch</u>, was ultimately used for <u>irrigation and stock watering</u> in those early days. (Tripp, 13476-13484; Exhibit Gibbon/Cottle "P".) The ditch was <u>fully used</u> in <u>each</u> year after its completion in 1897. (Tripp, 13484-13490; Johannsen, 12333-12335, 12338-12342, 12357, 12360; McGaugh, 13661-13663, 13672; Gibbon, 12489-12490, 12501-12508, 12512; Spaniol, 12523-12530.) From the days of the completion of the ditch, it was the <u>same ditch</u>. (Tripp 13488.) During

7.

the irrigation season, <u>water has never been allowed to go to waste</u>; the full flow of the stream, up to the capacity of the ditch, has been taken for beneficial irrigation purposes. (Tripp, 13489-13490; Spaniol, 12545-12549.) Water from the upper ditch was also taken to the <u>lower ditch</u>, whenever there was a sufficient supply, for the irrigation of Fields I, J, and H. When there was water available, the lower ditch was also used for irrigation of those fields by means of diversions directly from the stream at the intake of the lower ditch.

Under the doctrine of relation, the priority date of this appropriation is February 11, 1885. (Exhibit Gibbon/Cottle "O".) Admittedly, there have been changes in the exercise of this right since 1885, but those changes have been lawful. They are discussed in detail in Part IV of this memorandum. At that point also, we will discuss the present quantitative measure of the right.

It was argued at the trial that the notice recorded by Samuel Tripp in 1885 may not conform to the requirements of the Civil Code then in effect. Without conceding that this criticism of the notice is sound, we are certain nevertheless that it is irrelevant. It is settled that failure to comply with the statutory provisions referred to is of significance only in connection with the doctrine of relation; that is to say, only a person who does comply with those provisions prior to the time that the appropriation is perfected may assert any rights based on the statute. (See Hutchins on California Water Rights, p. 114.) So far as we know, there is no person in this case who claims to have complied with those sections in the period between 1885 and the time the Tripp appropriation was perfected.

III.

## PRESCRIPTIVE RIGHTS OF GIBBON AND COTTLE

A. A Riparian Owner May Acquire Prescriptive Rights for his Riparian Land.

The claim that a riparian owner may not acquire a prescriptive right for reasonable beneficial use on his riparian land without storage is related to the claim that he may not acquire an appropriative right. Both claims appear to have originated, historically, in the dictum in some cases to the effect that the riparian has a "right" to the entire flow of the stream if other riparians are not using the water. We have already commented on the fact that such statements have originated either in injunction cases or in cases involving conflict between a riparian owner and persons claiming under non-riparian rights. Considered in the light of this background, they fall short of holding that one riparian has an absolute right to the full flow of the stream when other riparians are not using any water.

The alleged right of a riparian to the full flow when other riparians are not using the water has importance in connection with prescriptive rights in view of the basic theory of prescription under California law today. Although there was some uncertainty in former times regarding such theories of prescription as the "presumption" of a lost grant, it has now been settled that the real basis of prescription is the running of the statute of limitations. Indeed, one California case goes so far as to say that "prescription and limitation are convertible terms". (Alhambra Addition Water Co. v. Richardson, 72 Cal. 598, 600-601, 14 P. 379.) The current authoritative statement of this theory of prescriptive water rights in California is to be found in Pasadena v. Alhambra, 33 Cal.2d 908, 926, 207 P.2d 17. (See also Hutchins on California water rights, 299; 51 Cal.Jur.2d 653, sec. 195.) To give rise to a prescriptive right, there must be a cause of action in the person against whom prescription is claimed. Accordingly, the argument

9.

has been advanced that a riparian, since he has the "right" to use all of the water in the case supposed, cannot gain a prescriptive right.

Before considering the argument directly, it will be helpful to examine two results which would flow from it. <u>First</u>, it is inconsistent with the rule that use by a riparian on his <u>non-riparian</u> land will give rise to a prescriptive right against down stream owners whether or not they themselves then desire to use the water. In principle, it is impossible to distinguish such use by the riparian from his use of water on riparian land, where the latter is in excess of his equitable share. In both cases, the essence of his conduct is his use of water which others have the right to take. It is even more difficult to reconcile the argument now put forth with those cases which hold that a prescriptive right to <u>store</u> water may be gained by an upper riparian as against lower riparians, for in such a case the use is actually on riparian land. <u>Second</u>, if the argument now advanced were to be accepted, it would lead to the anomalous result that greater rights may be acquired by a non-riparian owner then by a riparian owner, even though the latter may have been just as diligent in developing the water resources. It seems inconceivable that the Western water doctrines which were formulated to encourage development of water resources may be relied upon by non-riparians only.

One other clarification should be made. A number of the dicta regarding the supposed right of the upper riparian to take all of the water when it does not damage lower riparians speak in terms of "actual" damage or "present" damage. The distinction must be clearly borne in mind between actual or present <u>damage</u> and actual or present <u>use</u>. These statements do not actually bear upon the question whether or not the lower riparian must be using the water. Obviously, there may be an actual and present <u>invasion</u> of the right to <u>future</u> use.

On analysis, it seems clear that an upper riparian who uses all of the water of a stream does "actually" and "presently" invade the

10.

6329

right of the lower riparians to receive their equitable share. The lower owners have an immediate right to sue. They can get damages, an injunction, or a protective declaration, depending upon the particular circumstances of each case. Mr. Wiel emphasizes that a taking by an upper riparian in excess of his reasonable share starts the running of the prescriptive period (1 Wiel on Water Rights in the Western States, 3d ed., 857-858, sec. 801):

> "****If the taking or use complained of is in excess of the share and due proportion which the proprietor, under the principle of equality, is entitled to take or use, then, conversely, he is taking the share belonging to other proprietors, and the damage to them may be excessive so far as it is a substantial deprivation of capacity to make future use of one's land though no actual damage to use exist at present, the complaining owner not himself using the water at present. True, the complaining owner suffers no present damage to use in such case, but present damage to use is not necessary. It is enough that it excessively deprives him of the natural advantages of his land, excessively diminishes the value of the riparian estate owing to the loss of the water for use on his land in the future, thereby causing a permanent depreciation of the value of his land. An excessive injury to capacity of use in the future, which would ripen into a prescriptive right, is equally a wrong. For example, if one riparian proprietor consumes the whole stream, though on his own riparian land, it is wrongful to a lower proprietor, though the lower proprietor makes no use of the water himself; for in a few years he would finally lose the whole stream by prescription." (Emphasis in original.)

(See also 1 Wiel 850-851, 857-860, secs. 795-797, 800-802. A related discussion, specifically concerning apportionment, appears in sec. 751 at pp. 820 et seq.)

In his more recent work, Mr. Hutchins also supports the principle that a riparian owner may obtain prescriptive rights for use on his riparian land:

> "The upstream user may likewise be found to be taking water for use on his own riparian land in excess of the use to which his riparian right entitles him. Such a taking, even though the use is made on the riparian land, is a nonriparian use of the water. As he is entitled to only a reasonable share of the water, the taking of the entire stream without returning the excess to the channel is obviously an excessive and therefore wrongful use." (P. 325.)

11.

6330

As the decision in Pasadena v. Alhambra, 33 Cal.2d 908, 207 P.2d 17, clearly shows, present _use_ by other riparian owners is irrelevant to the issue of a present _invasion_ of their rights. The court in that case laid down no requirement that the injured overlying owner be actually using the water during the prescriptive period; knowledge that his future ability to obtain water was being invaded by the conduct of the diverters was held sufficient to start the running of the statute of limitation. In the last analysis, what difference can it make that a lower owner has, for example, planted seed? The essence of prescription is not _agricultural_ inactivity during the critical period, but _legal_ inactivity. True, the lower owner may not get an _injunction_ without demonstrating a present use for the water, but he may meanwhile protect his rights by suit. The Pasadena case requires that he do so if he is to prevent the acquisition of prescriptive rights above him.

It is sometimes said that an upper riparian owner is "presumed" to be exercising his riparian rights, and therefore a given case may turn on whether or not lower riparian owners have had knowledge of the upper owner's diversion and of its non-riparian or excessive character. (See Hutchins, pp. 305-308.) On this point, it has been held that long-continued use, which is not secret, dispells the presumption. Hutchins says (pp. 305-306):

> "For example, where the adverse party uses all the water of the stream, the downstream claimant must be presumed to have known of the adverse claim. Again, the court might presume knowledge from a long-continued use of the water--in this case for more than 20 years--by parties who exercised the usual acts of ownership and diverted the water with the use of facilities that not only could be seen but actually were seen by representatives of the parties against whom the adverse right was claimed."

Again, in connection with the case of Morgan v. Walker, 217 Cal. 607, 20 P.2d 660, Hutchins says (p. 304):

> "But where the lower riparian owners for more than 34 years (during the last 20 years of which the upper riparian owners paid all taxes assessed against

12.

> the water) had actual knowledge but had stood by and without protest or objection had acquiesced in the use of practically the entire flow of the stream by the upper owners during the irrigation season, they were held to have lost any right to the waters of the stream inconsistent with the beneficial use to which the upper owners had put the water during that time."

It is also sometimes said that a riparian owner may acquire a prescriptive right but only for a use which is "appropriative" in nature. (See 51 Cal.Jur.2d 659, sec. 201.) However, as Hutchins points out (p. 325), use by a riparian of more than his equitable share is non-riparian. (See also Rindge v. Crags Land Co., 56 Cal.App. 247, 205 P. 35.)

In summary: There is no logical basis on which diversions by a riparian to his non-riparian land, storage by a riparian on riparian land, or pumping of an overdrawn basin by an overlying owner for use on overlying land can be distinguished from use by a riparian on his riparian land of more than his equitable share. In all these cases, actual present use by the owner of invaded rights is not essential to the running of the statute of limitation. Where the other elements of prescription are present (such as the open and notorious character of the diversion), prescriptive rights may be acquired.

B. Prescription by Gibbon and Cottle and Their Predecessors.

All of the elements of prescription were proved in this case.

The most important element is the <u>adverse or hostile</u> character of the use. As explained above (Point I-A, p. 3), <u>if</u> there is ever an apportionment which would allocate to Gibbon and Cottle less than their established use, then the element of adversity is necessarily present; Such an apportionment would indicate that their use has been more than their share and therefore an invasion of the shares of others. (And of course if there is never such an apportionment, then the prescriptive right here decreed for use on riparian land would never come into

13.

operation, for Gibbon and Cottle would have sufficient water under their riparian rights.) In that connection, the Court has already emphatically commented upon the fact that there is less water available than could be used on all the riparian land along this stream. (Tr. 12579.) The use by Gibbon and Cottle therefore may well be more than the share to which they would be entitled. This is so even though the status of total present development and uses may not require at this time an <u>injunction</u> to enforce delivery of the share due to each owner.

The use on the Gibbon and Cottle properties has continued for much longer than the <u>five years</u> necessary to perfection of the prescriptive right. Use was begun, and in fact the upper ditch was finished, before the turn of the century. Beginning in 1897, there has been full use of the capacity of both the upper and lower ditches to the extent water has been available. The use has been <u>continuous</u>, year after year since that time. (The specific evidence is referred to under Point II-B, above.) It has also been <u>uninterrupted</u>. No one has ever prevented the use, and whenever there has been damage from storms or other causes, the facilities have been reconstructed. (Tripp 13489; Johannsen 12347; McGaugh 13659-13662; Spaniol 12529.) The upper ditch has been cleaned every year. (Tripp 13488; Spaniol 12529.) Although the lower ditch is now in disuse, that is only because of the recent dry years (Cottle 12454-12455, 12473-12474); it can easily be returned to service when water is available.

The use has been <u>open and notorious</u>. The farm is in full view of the highway and all of the installations are easily visible. (Exhibits 29R, 229, 230, Gibbon/Cottle "A".) It has been regularly cultivated for three-quarters of a century. Moreover, the original notice of appropriative claim was recorded. (Exhibit Gibbon/Cottle "O".) Finally, the limited water supplies in this water shed, as well as the large potential demand for riparian agriculture, have been common knowledge at least since the litigation between Rancho Santa Margarita and the Vails, a generation

14.

6333

or more ago. Accordingly, under the authorities above cited, the alleged "presumption" that all use has been pursuant to riparian right is fully dispelled, and lower owners must be held to have had, long since, constructive knowledge of the fact that their equitable riparian share has been interfered with.

All uses (irrigation and stockwatering) have been <u>reasonable and beneficial</u>.

The <u>quantity</u> of the prescriptive right will be discussed below, under Point IV-B, but for now it may be pointed out that since 1897, Gibbon and Cottle and their predecessors have used the full flow of Temecula Creek, up to the capacity of the upper ditch, and without waste; the lower ditch has also been used for Fields I, J, and H, when water has been available.

The diversions to the Gibbon and Cottle properties have been under <u>claim of right</u> from the very beginning. (Exhibit Gibbon/Cottle "O".)

IV.

CHANGES IN EXERCISE OF APPROPRIATIVE AND PRESCRIPTIVE RIGHTS

A. The Law

It is elementary that an appropriative or prescriptive right need not be exercised exactly as originally perfected. The place of diversion, the means of diversion, the place of use, and the purpose of use may all be changed from time to time -- subject only to the one limitation that such changes work no injury to others having rights in the water. (Water Code sec. 1706; Hutchins on California Water Rights, pp. 175-178, 336-337; 51 Cal.Jur.2d 697, 787.) Permission of the State Water Rights Board is not necessary with respect to appropriations antedating the Water Commission Act, as ours does. (Water Code sec. 1706.)

We do not here discuss the right-of-way of Gibbon and Cottle over the land now owned by Mr. Schroeder for the purpose of maintaining their diversion structure and ditch. This is a case involving water

15.

6334

rights, and the issue of the right-of-way is outside the pleadings. It was proper for the Court to look into the claimed right of Gibbon and Cottle to divert water from Mr. Schroeder's land, for any water rights he may have would be affected. But the right-of-way, as such, is beyond the issues in this case.

The question here, then, is whether or not the changes that have been made in these appropriative and prescriptive rights have injured other owners of water rights.

### B. The Facts

The changes that have been made have been lawful and have not injured the water rights of others.

(1) The changes in the place of diversion of the upper ditch were occasioned by washouts, particularly in the area of the junction between Temecula Creek and Smith Mountain (Long) Creek. (Tripp 13460a.) Since the result has been to locate the diversion _above_ that junction, the changes have had only one possible effect on the amount of water diverted -- a _reduction_ due to the elimination from the upper ditch of the waters of Smith Mountain Creek. Obviously, no one else was injured.

(2) Changes in the upper ditch itself have not been substantial. Today it is still essentially the same as when originally completed in 1897. (Tripp 13439, 13488.)

(3) There have been some changes in the diversion structure from time to time. These have been designed primarily to prevent damage to the structure itself from flooding and to facilitate cleaning of the ditch. (Spaniol 12539-12540.) Of course, no water right was thereby injured. On one occasion, clay was placed beneath the dam in an effort to obtain more water. (Spaniol 12538-12539.) However, it is clear that no one else was injured thereby. In the first place, this action was merely a legitimate improvement in the structure in order to get the _same_ quantity of water that had been diverted in earlier years, namely,

the capacity of the ditch. If a dam were to be injured in a flood so that less water could be impounded, certainly it could be lawfully repaired and strengthened in order to get the original amount of water; the drought of recent years (merely a different type of weather phenomenon) has done the same thing here, and the owners have acted properly -- indeed, laudably -- in an effort to maintain their position as before. The subsurface flow is, after all, a part of the same stream and within the original claim of 1885. Mr. Spaniol testified that even after this change, they were still unable to divert as much water as before. (12542-12543.) Moreover, the subsurface water would never reach lower owners anyway. By reason of a rock ledge, such water rises on the Gibbon-Cottle properties above the intake of the lower ditch (Johannsen 12345, 12349, 12357) and formerly was diverted to Fields I, J, and H; but at the time when this change in the dam was made, that flow was so negligible that the lower ditch could not even be used. (Cottle 12454-12455.) Finally it will be recalled from the testimony of Dr. Mann that a high loss occurs in the stream between the upper intake and the lower intake by reason of water parasites; more than anything else, therefore, the strengthening of the dam was a desirable and wholly proper conservation measure which could only cut down on the loss going to such parasites, without reducing the flow below the ranch. In short, no one else was injured.

  (4) Changes in the place of use have been made, but the amount of water used has not thereby been increased. Here we come to the question of the quantitative amount of the right. It is true that more fields are irrigated now than in the past, but the amount diverted and put to beneficial use is the same. Formerly, the irrigation was done by flooding, which was reasonable for those times. (Tripp 13490.) Beginning as far back as 1929, water was pumped above the upper ditch and additional fields were brought under cultivation (Johannsen 12337); this was not possible on a continuous basis, however, and it was not until about 1951

17.

that the use of sprinklers made a permanent increase in acreage feasible -- without using more water. Mrs. Gibbon pointed out that with the <u>same</u> amount of water they were able to irrigate more acreage. (12513.) Col. Bowen was emphatic in his appraisal of the two methods: flooding is one of the most wasteful, and sprinklers one of the most efficient. (12576-12577.) Although we can make available a table showing the number of irrigated acres at various times, as brought out at the trial, it is apparent that that is not the controlling consideration in determining the extent of reasonable beneficial use, either in 1897 or now. The essential fact is that the full flow of the stream, up to the capacity of the upper ditch (plus the lower ditch for Fields I, J, and H) has been diverted and put to reasonable beneficial use every year since completion of the upper ditch in 1897, and with a priority date of 1885. The changes in the last decade in the means of utilization of the water and in the number of acres irrigated, far from injuring any other owner, have constituted commendable diligence in the development and improvement of water resources in time of drought. They have been wholly lawful and are entitled to the approval of this Court.

## CONCLUSION

The appropriative and prescriptive claims of Gibbon and Cottle have been established. They are entitled to recognition in the judgment in addition to the riparian rights which these owners hold.

Respectfully submitted,

CLAYSON, STARK, ROTHROCK & MANN
DONALD D. STARK
OWEN W. STRANGE

Attorneys for Defendants
  Katharine C. Gibbon and
  William W. Cottle
