IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

**F I L E D**

APR 5 - 1961

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
No.
Deputy Clerk

UNITED STATES OF AMERICA,          )

              Plaintiff,          )

        v          )          OPINION

FALLBROOK PUBLIC UTILITY DISTRICT, )
etc., et al.,          )

            Defendants.

APPEARANCES:

        LEE RANKIN, Solicitor General
        WILLIAM H. VEEDER
            Washington, D.C.

                    Attorneys for the United States

        STANLEY MOSK, Attorney General of the
            State of California, and
        F.G. GIRARD, Deputy Attorney General

            Library and Courts Building
            Sacramento, California

                    Attorneys for State of California

        FRANZ R. SACHSE and
        SACHSE and PRICE

            Attorneys at Law
            1092 So. Main Street
            Fallbrook, California

                    Attorneys for Fallbrook Public
                    Utility District

        GEORGE STAHLMAN
            Fallbrook, California

                    Attorney for VAIL COMPANY

        GEORGE C. GROVER,
            Corona, California

                    Attorney for Wm. W. Cottle and
                    Katherine C. Gibbon

1

6346

1  CARTER, JAMES M., District Judge

2          This opinion concerns only one problem in a long
and protracted water rights case, namely the effect of prior
judgments in the earlier State case wherein the Rancho Santa
Margarita, predecessor to the United States (hereafter the
Rancho), and the Vail interests (hereafter Vail) were the
principal parties.

7          This action was commenced January 25th, 1951, by
8  the United States of America to quiet to its rights to water
9  from the Santa Margarita River and its tributaries.  During
10 the years 1941, 1942 and 1943, the United States acquired,
11 either by condemnation or purchase, most of the Rancho Santa
12 Margarita.  This land is used principally by the United States
13 as a military reservation and includes Camp Joseph H. Pendleton,
14 a United States Naval Hospital, and a Naval Ammunition Depot.
15 The military reservation has a total area of approximately
16 135,000 acres and includes considerable land which is without
17 the drainage area of the Santa Margarita River.

18         The Santa Margarita River is a coastal stream which
drains a watershed in San Diego and Riverside counties and flows
through Camp Pendleton for approximately 21 miles and thereupon
enters the ocean.  The defendants in this suit include all
upstream claimants to the right to the use of the waters of said
River and number several thousand.

          This litigation has been a lengthy one and there are
several reported federal decisions concerning this case. (See,
United States v Fallbrook Public Utility District, 165 F.Supp.
806, 812-813, for a history of this litigation).

6347

The present trial in this case has consumed 134 trial days before this Court and numerous hearings before a Master who was appointed by this Court to hear factual data concerning areas within the watershed of a relatively minor, although not unimportant, nature.

As the trial is still in process, it is, of course, premature for any consideration to be given as to the final judgment which will be entered in this matter. However, during the litigation in this case there has arisen a question as to the effect of judgments which were entered in 1930 and 1940 in a case then pending in the San Diego County Superior Court. These judgments concern basically, the two major water users on the Santa Margarita River.[1] One of these is the plaintiff, United States of America, who is the successor of the Rancho Santa Margarita, and the other is the defendant, Vail Company, successor to the Vail interests.

Briefly, the facts of that State litigation are as follows:

In 1923 the Rancho commenced an action against Vail to secure a declaration of its riparian rights to the waters of the Santa Margarita River and its tributaries. In 1930, after a lengthy trial, the Superior Court of San Diego county entered judgment. Vail appealed from that judgment and in 1938 certain portions of that judgment were reversed by the California Supreme court and the case was remanded for a limited retrial, Rancho Margarita v Vail, 11 Cal. 2d 501.

Thereafter, in 1940, the Rancho and Vail agreed by stipulation to the entry of a judgment by the San Diego County

Superior Court.  This judgment in essence allocated to the respective riparians, the Rancho two-thirds (2/3) and Vail one-third (1/3) of the _entire_ waters of the Santa Margarita River and its tributaries.  That judgment provided certain methods for the parties to follow to determine their respective allocations, provided for a minimum surface stream flow, and insofar as the Rancho is concerned, provided that Rancho could use its two-thirds (2/3) of the waters of the river on any of its lands including lands _without_ the Santa Margarita River watershed.

In its amended complaint in the present action, the United States pleaded that it is the successor in interest of the Rancho and that it owns all the rights to the use of the water provided to the Rancho by the 1940 judgment of the San Diego County Superior Court.  The United States did not plead or rely on the 1930 judgment.  As will be seen hereafter, the United States, during the trial of the present action, seeks to avoid the holdings and effects of the 1930 judgment, while claiming the benefits of the 1940 judgment.

In the answer filed by Vail, Vail admitted that the United States owns all the rights to the use of water allotted to the Rancho by the 1940 judgment.  However, during the course of this litigation and after the introduction into evidence of considerable testimony and exhibits, Vail petitioned this court to file an amended supplemental answer, which in essence requested this court to set aside or enjoin the prior state court judgments.  The United States did not object to the filing of this amended supplemental answer, but did oppose the relief requested, and contends that the 1940 judgment was

4

MARIE C. ZELLNER, OFFICIAL REPORTER

6349

res judicata.

Considerable evidence, both oral and documentary, has been received on this issue and in fact almost all of the evidence received in this case is related directly or indirectly to this issue.  Both the United States and Vail have rested their case as to the evidence which will be introduced on this issue, and both parties have requested this Court to enter an interlocutory decree in regard to this issue prior to the final adjudication of this litigation, on its merits.

I

THE 1930 AND THE 1940 JUDGMENTS MUST BE TREATED
AS ONE JUDGMENT.

We first must determine the relationship and effect of the State judgments of 1930 and 1940.

A study of the (1) findings and judgment entered in 1930 in the Superior Court, (2) the decision on appeal, Rancho Santa Margarita v Vail, 11 Cal. 2d 501, and (3) the stipulated judgment entered in 1940, compels the conclusion that the stipulated judgment is a part of, and must be read with the original judgment.

This is true for various reasons:

(a)  The stipulated judgment, in referring to the 1930 judgment, recites that "Findings of fact, conclusions of law having been signed by the court . . . and filed and judgment on said findings and conclusions having been signed and entered; defendants and each of them thereupon appealed from the judgment and each part thereof, but said intervenors did not appeal from such judgment; the Supreme Court of the said

state of California upon said appeal, having reversed said
judgment and directed a new trial upon certain issues desig-
nated in the opinion of the court . . . and said plaintiff
and defendants having stipulated to the entry of the following
judgment,

NOW THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that
. . ."

Thus, the recitals in the stipulated judgment
clearly indicate it was entered to finally conclude the liti-
gation and dispose of the remaining issues in the case.

(b)  In the Vail case, supra, the Supreme Court said, at
page 561:

". . . a reversal of the judgment is necessary.
However, the new trial need not be a protracted one.
Appellants have not challenged many of the findings.
There is no need for a new trial on those issues.
It would appear that on the new trial it will be
necessary:

(1) To ascertain the extent of appellants' (Vail's)
riparian and irrigable acres as set forth in the
body of this opinion;

(2) To ascertain the extent of respondents'
(Rancho's) riparian and irrigable acres only insofar
as it involves the table land, discussed in the body
of this opinion, and

(3)  To ascertain whether an injunction should
be granted under the rules set forth in the body
of this opinion, and if so, what its terms should
be."

6

1   Thus, with the above exceptions, the 1930

2   judgment was affirmed.

3       It is apparent therefore, that the parties by the

4   Stipulated Judgment of 1940, cut through directions (1) and

5   (2) above by the provisions in the stipulated judgment that

6   water might be used within or without the water shed; and cut

7   through (3) above by the apportionment of water which obviated

    the consideration of the details of an injunction.

8       (c)  The findings supporting the 1930 judgment defined

9   the surface stream system of the Santa Margarita River and

10  certain ground water bodies found to be part of that stream

11  system.  The 1940 judgment did not.  The 1940 judgment contains

    only references to the 'Temecula Santa Margarita River and its

12  tributaries'.  As a judgment apportioning the surface and

13  ground waters, it is meaningless unless the extent of those

14  waters is defined.  It therefore becomes mandatory to refer

15  to the findings in the 1930 judgment which define the surface

16  and ground waters of the stream system in order to give meaning

17  to the words 'Temecula Santa Margarita River and its tribu-

18  taries' as used in the 1940 judgment.

19      (d)  In addition to references to various of the Exhibits

20  which were part of the record at the first trial, there is

    in the stipulated judgment of 1940 a further reference which

21  indicates that the stipulated judgment must be construed with

22  the findings and judgment of 1930.  At page 15 of the stipu-

23  lated judgment appears the provision prohibiting the defen-

24  dants, during any irrigation season, from making surface diver-

25  sions of the waters of the river "at the Bridge pumping plant,

7

6352

1    the Catarini pumping plant or the Tule pumping plant <u>referred</u>

2    <u>to in the findings herein.</u>"  There were <u>no findings</u> in con-

3    nection with the stipulated judgment of 1940.  The reference

4    is necessarily to the findings supporting the 1930 judgment.

5         Thus the 1940 judgment cannot be considered as

6    an isolated, separate document but is an integral part of the

7    over-all judicial determination which was made by the Cali-

     fornia courts in the <u>Santa Margarita v Vail</u>, supra, litigation.

8    The two judgments, read together, make a logical whole.  The

9    parts of the 1930 findings which were not overturned on

10    appeal support the unreversed part of the 1930 judgment and

11    support the 1940 judgment.

12         The Court can reach no other conclusion but that

13    the stipulated judgment of 1940 and the 1930 judgment must be

14    read as one unified judgment; that the 1940 judgment was

     grafted on to and became a part of the 1930 judgment.

15                     II

16    <u>AS JUDGMENTS APPORTIONING WATERS BETWEEN RIPARIANS</u>

17    <u>THEY ARE SUBJECT TO MODIFICATION ON A SHOWING OF</u>

18    <u>CHANGED CONDITIONS.</u>

19         Considering the 1930 and 1940 judgments, together

20    or separately, they were an allocation of waters amongst

     riparians.[2]  The question then presented is whether an

21    allocation to riparians under California law can ever be res

22    judicata or is it by its very nature such an allocation as is

23    subject to further change in the event of substantial changes

24    in conditions  It should also be pointed out at this stage

25    that pursuant to a written stipulation signed by the United

States [3] the Court must apply California law in determining

this question, and other questions concerning water law.

Even in the absence of such a stipulation, clearly
California law would apply, People of the State of California v
United States, (9th Cir., 1956) 235 F.2d 647 at p. 653. Since
the adoption of Section 3 of article XIV of the California
Constitution, in 1928, there can be no question that the right
of a riparian to the use of water is limited to reasonable and
beneficial use, Peabody v Vallejo, 2 Cal.2d 351, 374-375. This
right is not dependent upon use and, of course, non-use cannot
suspend it, Halfmoon Bay Land Company v Cowell, 173 Cal. 543,
551. All riparian owners of a water course have a common
right therein and share correlatively of the stream's surface
and subsurface flow, Carlsbad Co. v San Luis Rey, 78 Cal. App.
2d, 900, 911. In essence, a riparian has no right to an
allocation of water solely because he is a riparian unless he
can reasonably and beneficially use the water. However, if he
cannot use the water, his right is not destroyed but still
exists and if he subsequently satisfies the condition of
reasonable and beneficial use imposed by article XIV of the
California Constitution he is then in a legal position to assert
the right and have water allocated to him.

Conversely, if a riparian is by judgment allocated
water for reasonable and beneficial use on riparian land and
that reasonable and beneficial use is subsequently abandoned,
he would no longer have a right to the use of that water but
his basic riparian right would still exist. Further, if a
judgment were to allocate water to a riparian to be used on

9

his riparian land and such land were severed from its riparian status, the judgment allocation would be immediately ineffectual for it would be based on a riparian right which because of such severance would be extinguished.

As the riparian right is a correlative one to be shared proportionately with all other riparians on the stream, it is axiomatic that any increase or decrease in the reasonable and beneficial use of water by other riparians might necessitate a change in an allocation of water amongst riparians. This would not be a question of changing the riparian right for the right is never extinguished as long as the land remains riparian. However, the privilege of using the water which is based on the right is controlled by the constitutional dictate of reasonable and beneficial use.

Aside from reasonable and beneficial use, methods of irrigation and farming could change substantially over a period of years which would make a judgment allocation to riparians obsolete. For example, at the time of the judgment allocation amongst riparians the Court might conclude that a particular type of irrigation for a particular crop entitled the riparian to a specified amount of water as his correlative share. However, if that riparian were to change entirely his method of irrigation or the crop grown, so that the water demand would be lessened, or for that matter increased, he might under many circumstances be subject to a change in the water allocation.

Thus, in essence under the basic doctrine of riparian rights as determined by California law, it is clear that a

1  judgment allocating water amongst riparians cannot be res

2  judicata but is subject to change or modification upon a

3  showing of change in conditions.  California cases are in

4  accord with this conclusion.

5      In Los Angeles v Baldwin,(1879) 53 Cal. 469, Los

6  Angeles brought an action to quiet title to the waters of the

7  Los Angeles River.  The defendants set up as a defense that

8  in a former action between the parties they had been adjudged

9  riparians and that their diversions of water were then held

10  to be proper riparian uses.  The factual situation had not

11  changed since the former judgment.  The trial court gave

12  judgment to the defendants.  In affirming, the Court stated,

13  (p. 470):

14        "The conditions do not appear to be different

15        now from what they then were.  The diversion

16        by the defendants is the same now as then, and

17        while these conditions continue unchanged the

18        judgment rendered in the former action operates

19        as a bar between the parties here." (Emphasis added).

18  In a separate concurring opinion this result was emphasized,

19        "In other words, where the parties claim merely

20        as riparian proprietors, the proportions to

21        which they may respectively be entitled may

22        vary from time to time, in accordance with the

23        facts existing at the respective times." (pp.474-475).

24      Thus, in this 1879 decision of the California Supreme

25  Court, it was recognized that a judgment allocating water among

26  riparians was final as long as the facts upon which it was

1  founded remained unchanged, but the judgment was not res judicata

2  for a change in the facts from those that previously existed

3  would allow a change in the water allocation from that formerly

4  provided by the judgment.

5  In Temescal Water Co. v Dept. Public Works, (1955)

6  44 Cal.2d 90, the court was considering the propriety of a

7  permit issued by the state to a district to appropriate water.

8  The petitioners argued that they were entitled to an indepen-

9  dent judicial trial in the Superior Court, as distinguished

10  from the nonjudicial administrative procedure provided by

11  California law, on the question of whether unappropriated

12  water was available.  The petitioners argued that for "prac-

13  tical reasons" an independent judicial trial could determine

14  once and for all, by considering all of the existing rights

15  and the estimated supply, whether unappropriated water was

16  available or would ever be available.  This "practical"

17  argument was rejected by the California Supreme Court on the

18  basis that a judicial determination could not finally deter-

19  mine what by its very nature was a fluctuating question.  As

20  stated by the Court, (p. 106),

        "A judicial determination as to existing

        appropriative and riparian rights rests

        upon then present uses which may be quite

        different at a later time, and a determina-

        tion as to the future availability of water

        necessarily can be only an estimate."

24  In Pabst v Finmand, (1922) 190 Cal. 124, the court

25  considered an action to quiet title to the waters of a creek.

There were both riparian and prescriptive rights asserted.

12

MARIE G. ZELLNER, OFFICIAL REPORTER

6357

1 In considering whether an upper riparian user had used

2 riparian water so as to obtain a prescriptive right, the

3 Court had occasion to discuss what _amount_ of water a riparian

4 is entitled to, as follows, (p. 129),

> "A riparian owner is entitled to a reasonable
>
> amount of water for use on his riparian lands.
>
> What is a reasonable amount varies with the
>
> circumstances of each particular case and also
>
> varies from year to year, for the amount which
>
> might be reasonable in a season of plenty might
>
> be manifestly unreasonable in a season of drought.
>
> Nor is the question of reasonableness to be
>
> tested solely by the needs of the upper riparian
>
> proprietor. The rights of riparian proprietors
>
> are correlative and the 'reasonable' amount to
>
> which any one riparian owner is entitled is to
>
> be measured by comparison with the needs of the
>
> other riparian proprietors." (Emphasis added).

17 If, as pointed out above, the amount of water which

18 can be judicially allocated to a riparian ". . . rests upon

19 present uses which may be quite different at a later time

20 . . ." Temescal Water Co. v Dept. Public Works, supra, or

21 ". . . varies from year to year . . ." Pabst v Finmand, supra,

22 it would seem obvious that any judicial determination, i.e.,

23 judgment, which allocates water amongst riparians could be

24 modified or set aside if and when the conditions change.

25 Another case which clearly shows that a judgment

allocating water to riparians is not res judicata is Wiggins v

Muscupiabe L. & W. Co., (1896) 113 Cal. 182. Insofar as

13

pertaining to the instant question, the trial court in alloca-
ting water to riparians had based the allocation on irrigable
acreage.  The appellant contended the allocation should have
been made on the basis of land cultivated.  In holding the
method of allocation used by the trial court to be correct,
the court stated, (p. 195),

> "The amount of irrigable land belonging to
> each party, rather than the amount of land
> already under cultivation, would be properly
> made a controlling element in adjusting their
> respective rights to the flow of the stream;
> otherwise, a readjustment would be necessary
> whenever either party should cultivate a
> greater or less area."  (Emphasis added).

While irrigable acreage would not fluctuate to the
degree that cultivated land would, it is obvious that what
land was considered irrigable in 1896 (the date of the decision
in the above case) might be more or less in 1960 or 1996. The
Court recognized that constant "readjustment" would be neces-
sary whenever cultivation increased or lessened if that stan-
dard had been followed.  For that reason an allocation based
on irrigable acreage was preferred.  But by stating that
readjustment would be necessary, the court in effect negates
any conclusion that a judgment allocation of water could be
res judicata, for if it were, there could never be readjust-
ment, regardless of what standard was used in determining the
proper allocation.

14

In Hetterland v Superior Court, (1924) 19th Cal. 407,
the petitioner had been held in contempt for violation of a
prior judgment which allocated water. One of his defenses was
that a change in conditions had occurred since the prior
judgment in that more water was now available and that he
could, therefore, violate the prior judgment allocation. This
contention was, of course, rejected by the Supreme Court on
the basis that change in conditions was immaterial in the
contempt proceeding. However, the Court pointed out that if
conditions had changed there was a remedy to be relieved of
the former judgment restriction, (p. 424),

> "Moreover, petitioners could have recourse
> to an action at law to determine any relative
> rights that may have intervened subsequent to
> the granting of injunctive relief."

If the prior judgment were res judicata, no remedy
would have existed to accomplish a modification resulting from
subsequent intervening changes in condition.

Since the constitutional amendment, in actions
concerning water allocation the California courts have sup-
ported the proposition that the trial court expressly keep
continuing jurisdiction over the case so as to be in a position
to promptly act on changes in conditions which would affect
the former judgment. See Tulare Dist. v Lindsay-Strathmore
Dist.,(1935) 3 Cal. 2d 489, 525; Carlsbad Co. v San Luis Rey Co.,
(1947) 78 Cal. App. 2d 900, 912.

If such a judgment of allocation was res judicata,
there would be no reason or need that the court maintain

15

6360

continuing jurisdiction for the purpose of expediting change
or modification of it in the event of a change in conditions.[4]

We conclude that the judgments of 1930 and 1940,
read together, are an apportionment or allocation of the rights
to the use of riparian water and are therefore subject to
modification on a showing of changed conditions.

III

UNLESS WE CONSTRUE THIS 1940 JUDGMENT AS ONE
ALLOCATING WATER AND SUBJECT TO MODIFICATION
ON CHANGED CONDITIONS - THEN THE JUDGMENT
WOULD BE VOID.

Unless we construe the 1940 judgment as one alloca-
ting water to riparians, as we have done above, then a serious
question is presented as to whether the Superior Court of
San Diego County had jurisdiction to enter the specific 1940
judgment.  It is conceded that only four of the several
thousand riparians on the river were parties to that adjudica-
tion.  The United States concedes that other riparians who
were not parties cannot be bound by that judgment, a conces-
sion which is patently correct.

However, despite such concession, the 1940 judgment
specifically allocated 66-2/3% of the natural flow of the waters
of the Temecula-Santa Margarita River and all its tributaries
to the Rancho, and the remaining 33-1/3% of such natural flow
of that river to Vail. [5] What was left?  Clearly the Court
had no jurisdiction to allocate all the waters when others
not parties to the action had substantial rights thereto. Yet
the express language of that judgment did exactly that.

16
MARIE G. ZELLNER, OFFICIAL REPORTER

6361.

The United States does not contend that this language in the 1940 judgment was entered as a result of mistake or that it does not reflect the true judgment of the trial court, or that it was a clerical error.  The United States contends that this 1940 judgment can be sustained if it is construed as not to allocate to the parties the use of the waters of the Temecula-Santa Margarita River and all its tributaries in the specified percentages, but rather to construe it as allocating to the parties the stated percentages of whatever undetermined total right to those waters the parties are, under California law, legally entitled to.

This would be in effect an amendment by construction.  Under California law a judicial, as distinguished from a clerical, error, cannot be corrected by amendment even if clearly erroneous, Egleton v Superior Court, (1936) 5 Cal.2d 694, 696; Stevens v Superior Court, (1960) 160 Cal. App. 2d 264, 270, and the cases cited in 29 Cal. Jur. 2d, Judgments, Sec. 102, pp. 17-18.

This legally erroneous language cannot be attributed to clerical error but was in fact an erroneous decision.  Since this was a stipulated judgment, the error was substantially induced by the parties themselves.

A motion in the Superior Court where the judgment was entered will not lie to accomplish an amendment to this judicial error in the 1940 judgment, Barlow v City of Inglewood, 32 Cal.2d 688.  Can this Court accomplish the same result under the guise of construing the plain language to say that in fact it does not state?  In other words, can this Court

17

construe the 1940 stipulated judgment as a pooling of the
rights of the Rancho and Vail Co., and a division of those
rights?  We think not.

To the extent that the Court in the 1940 judgment
attempted to allocate the right to the use of the water of the
river beyond that vested in the parties to that proceeding,
it was without jurisdiction to do so and its judgment, if so
construed, is void.  Moreover, in such case, the void pro-
visions of the 1940 judgment could not be isolated from the
remainder of that judgment with the result that the remaining
provisions are effectual, for those void provisions would
have been the basic provisions of that judgment upon which the
other provisions rested.

IV

THE CHANGE IN CONDITIONS

Having concluded that under California law, a
judgment allocation of water amongst riparians is not res
judicata but subject to modification upon the showing of a
change in conditions, it must now be determined whether in
this case there has been a change in conditions in the 20 years
subsequent to the 1940 judgment of a sufficient degree to
warrant this Court to conclude that the 1940 judgment is in-
equitable, inoperative or otherwise ineffectual.  The evidence,
most of which is uncontradicted, dictates that this question
must be answered in the affirmative.

In 1940 when the judgment was entered, the land of
Rancho Santa Margarita was used primarily as a cattle ranch.
Following the acquisition of the Rancho's lands by the United
States, there has been a considerable change insofar as land

18

MARIE G. ZELLNER, OFFICIAL REPORTER

6363

1  use and water demands are concerned.  The use of **the water by**

2  the United States on its military reservation is **in essence a**

3  use synonymous with a municipal use.

4    Formerly it was necessary to maintain **surface flows**

5  of a sufficient degree for the cattle to drink and **also to**

6  have surface springs or stock watering reservoirs **for cattle**

   **because**
7  use.  Under today's conditions/of the nature of the **stream**

8  system itself, it would be impractical if not impossible for

9  the United States to satisfy its water requirements **from sur-**

10 face flow or springs or small stock reservoirs.  **The most**

11 satisfactory way that the United States can satisfy **its water**

12 needs is to use the ground water basins within its **reservation**

13 which are a part of the Santa Margarita River.  **This the United**

14 States has done.  They have drilled wells and **installed pumps**

15 to supply their military reservation needs.  There **can be no**

16 question that use of these ground waters by the **United States**

17 to satisfy its water needs is not only the most **economical**

18 method whereby such needs can be satisfied, but is **the only**

19 practical method whereby the United States could **acquire water**

20 from the river to meet its water requirements.

21    Thus we see that during the 20 year period **following**

22 1940 there has not only been a change in the type **of land use**

23 but also a substantial change in the method of **using the water**

24 of the river from that which previously existed.

25    Further, as a result of the pumping of **the ground**

   water basins within the military reservation to **satisfy the**

   United States water requirements, there has resulted a change

   in the factual situation at the Ysidora Narrows from **that which**

   **existed in 1940, which makes inoperative as a practical matter**

                19

1   one of the basic provisions of the 1940 judgment.

2           The 1940 judgment provided that the allocation of

3   the waters of the river to the Rancho and Vail would be deter-

4   mined basically by the amount of water in the river as measured

5   at Ysidora Narrows or at Temecula Gorge.  In other words, the

6   Rancho would be entitled to use on its lands an amount of

7   water equal to two-thirds (2/3) of the measured flow at

8   Ysidora Narrows or at Temecula Gorge, and Vail would be en-

9   titled to use on its land an amount of water equal to one-third

10  (1/3) of that measured flow.  Ysidora Narrows is located at a

11  point on the Santa Margarita River just upstream from the

12  river's mouth and downstream from the ground water basins

13  which are used by the United States to satisfy its water re-

14  quirements.  As a result of the pumping of those basins by

15  the United States, water which flows through Camp Pendleton

16  does not reach Ysidora Narrows as it did in 1940 but instead

17  recharges the ground water basins which have been used to

18  satisfy the United States water needs.

19          Therefore, as a practical matter, and especially

20  during the irrigation season, there is no surface flow at

21  Ysidora Narrows as was envisioned by the parties to the 1940

22  judgment.  Thus, as a result of the change from a ranch use

23  to essentially a domestic use with the necessary result of

24  ground water use as contrasted to surface flow use, one of

25  the basic provisions of the water allocation set forth in the

26  1940 judgment has been factually disrupted.

27          Another change in conditions from that which existed

28  in 1940 is that since 1940 substantial numbers of riparian

land owners have made riparian land productive by the use of
water from the river. These land owners have rights which,
of course, could not have been affected by the 1940 judgment
for they were not parties to that litigation. However, their
use of water have had an effect on the Santa Margarita River
which was not considered by the 1940 judgment, and in fact
was totally disregarded by it.

For example, the 1940 judgment allocated the entire
waters of the river to the Rancho and Vail who were only two
of numerous riparians on the river. No consideration was given
in that judgment as to the possibility of water uses by other
riparians. There can be no question that such uses by these
and other riparians have now reached the stage where they
substantially affect the river. In fact, the United States'
principal expert witness, Fred Kunkel, testified that such
uses in Murrieta Valley (one of the two major ground water
basins upstream from the military reservation) have lowered
the ground water table to such an extent that there has been
a reverse gradient in the ground water movement and that
ground water which formerly moved southerly and westerly
toward Camp Pendleton at certain times now moves in essentially
an opposite direction. While this witness did testify that
this was probably a temporary result and that upon recharge
of the ground waters in the Murrieta Basin the reverse gradient
would be corrected, it is evident from this testimony alone
that the uses of waters by others has substantially affected
not only the amounts of water available to the United States
and Vail, but also the very flow of the stream itself.

21
MARIE C. ZELLNER, OFFICIAL REPORTER

6366

1    We do not here decide whether these uses by other
2 riparians who were not considered in the 1940 judgment, are in
3 any way improper or excessive.  It would serve no useful pur-
4 pose to set forth all of the testimony given in this case
5 which shows the extensive increase in the use of the waters
6 of the river by others who were not parties to the 1940
7 judgment.  Suffice it to say that there has been voluminous
8 evidence by land owners within the watershed who are riparians
9 who testified that since 1940 they have increased their water
10 use for beneficial purposes from that which existed in 1940.
11    Thus, as outlined above, the record clearly estab-
12 lishes in this case a substantial change in the conditions
13 both as to land and water use from that which existed in 1940.
14 It is the Court's opinion that these changes in conditions
15 render inequitable and, in fact, inoperative, the water allo-
16 cation provided in the 1940 judgment.
17    This conclusion has been impliedly recognized by
18 both the United States and Vail for the uncontradicted evidence
19 establishes that since 1940 there have been various years
20 where one or the other diverted water from the river substan-
21 tially in excess of that provided by the allocation in the
22 1940 judgment.

V

THE CONTENTION OF THE UNITED STATES THAT THE
STIPULATED JUDGMENT IS A CONTRACT.

23    The United States contends that the 1940 stipulated
24 judgment is in any event and in actuality a contract.  It is
25 conceded by all that the 1940 judgment was signed by the

22

Court and entered pursuant to stipulation.

The position of the United States is that the Rancho and Vail entered into a contract giving Rancho the right to use 66-2/3% of all the waters of the River and Vail 33-1/2% of such waters; that the United States has succeeded to the interests of the Rancho; and that as to Vail and the intervenors the United States has a right by contract to use 66-2/3% of all the waters to which Vail and the United States would be collectively entitled to; but that as to all other defendants the ordinary rules as to the use of riparian waters would apply.

We note that in a prior appeal in the present case, People of the State of California v United States, (9 Cir. 1956) 235 F.2d 647, at p. 657, Judge Fee stated:

> "But this Stipulated Judgment between two litigants is contractual in character between the principles to the agreement, and is not binding upon the Water District or the state. Thus the correlative rights between the Vail estate and the government have been settled by agreement."

The statement was dicta. The question of whether the Stipulated Judgment was a contract had not been briefed or argued in the case before Judge Fee. We do not consider that the statement is binding on us in this decision.

We have examined the Consents to the Stipulated Judgment filed by the plaintiff and the defendants in the prior action (Ex. No. 217 in this action). If there existed

23

6369

a contract it arose from the agreement of the parties.  What
then did they agree to?  The Consents filed show a resolution
by the plaintiff Rancho, to the effect that their attorney
"be and he is authorized hereby to consent to the filing and
entry in said action" of the stipulated judgment.  The Con-
sent filed by Vails is entitled "Authorization for Entry of
Stipulated Judgment" and provides that their attorneys "are
hereby authorized and directed to consent to the making and
entering of said stipulated judgment by said court in said
action."

Thus, <u>the meeting of the minds or the agreement
of the parties was limited to an agreement that the court
make and enter a specified judgment.</u> The language is directed
entirely to court action.  There are no words or phrases
which indicate that the parties were making an agreement
between themselves in the language of the stipulated judgment.
The Consents clearly indicate that the parties contemplated
court action, to-wit, a judgment, and it is a reasonable
inference and is inherent in the actions taken by the parties,
that this judgment, to be made and entered by the Court, was
in lieu of a new trial on the issues specified in the decision
of the California Supreme Court.

The United States appears to contend that the
stipulated judgment of 1940 was an agreement whereby the Rancho
and Vail "pooled" their rights and then agreed to share them
on a 2/3 - 1/3 ratio.  Thus, the United States contends that
a decree can be drawn in this case fixing the water rights of
all entitled parties in the water shed and still give effect

to this "pooling" agreement.

If the parties had desired to enter into a contract
or such a "pooling" agreement as distinguished from securing
a judicial determination, it would have been a simple matter
for them to have done so. No court action would have been
necessary. The only conclusion that can be drawn from the
fact that they did not choose this latter course of action,
but sought a judicial decree, is that in 1940 it was the con-
clusion of all that an integrated, complete judicial deter-
mination of their respective rights to the waters of the river
was desirable. They chose the method of a water right decree,
and such a decree, insofar as it deals with use by riparians,
is subject to modification on showing of changed conditions.

Moreover and contrary to the contentions of the
United States, we cannot and do not interpret the stipulated
judgment and the Consents filed with the State court as an
agreement to "pool" their rights. [6]  Instead as riparians,
they were apportioning or allotting the entire water of the
Temecula-Santa Margarita River between themselves as if (with
the exception of two intervenors) no other riparian owners
or riparian land existed in the water shed.

In considering the 1940 judgment, we should note
that it is not and cannot be considered as an isolated document,
but is only a part of the over-all judicial determination which
was made by the California courts in the Rancho-Vail litigation.
The majority of the issues decided in that litigation were
made following an extensive trial on the merits lasting three
years (444 trial days), and those isolated matters which were

25

6370

provided for by stipulation in the 1940 judgment could not have the effect of changing a judicial determination into a mere contract.

A further difficulty is presented.  We have held that the two judgments of 1930 and 1940, must be read together. They become in substance, one judgment.  If the 1940 stipulated judgment is a contract, does it incorporate the provisions of the 1930 judgment as part of the contract?  Does it incorporate the findings of the 1930 judgment as part of the contract?  We find nothing to so indicate and we cannot so find.  Does the 1940 judgment as a contract, abrogate those portions of the 1930 findings and judgment which were not reversed on appeal and became final?  There is nothing to so indicate and we cannot so find.

Either result would be an incongruous situation which by all means should be avoided.  However, under California law a judgment entered into pursuant to stipulation is in all respects a judgment and has the same force and effect as a judgment entered following a trial on the merits.

Section 577 of the Code of Civil Procedure of California defines a judgment as the final judicial determination.  The case of Schwartz v California Claim Service, (1942) 52 C.A. 2d 47, affirms this statutory definition of a judgment, and the District Court of Appeals point out in that case that the judgment is the judicial determination but its origin may be in contract or quasi contract or on a liability imposed by statute.  But the judgment is a judicial act.

In the case of Guaranty Liquidating Corporation v Board of Supervisors, (1937) 22 C.A. 2d 68, the Court states:

26

MARIE G. ZELLNER, OFFICIAL REPORTER

6371

"The judgment of a court of competent
jurisdiction entered upon stipulation of the
parties has the same effect as if the action
had been tried on the merits." (p. 686).

United States v Swift & Co., (1932) 286 U.S. 106,
specifically considered the question.  The opinion was written
by Justice Cardozo.  In considering the power of the court to
set aside or to modify a decree which was entered pursuant to
a stipulation of the parties, Justice Cardozo states at p. 114:

"We are not doubtful of the power of a court
of equity to modify an injunction in adaptation
to changed conditions though it was entered by
consent.  The power is conceded by the Government,
and is challenged by the intervenors only.  We
do not go into the question whether the inter-
vention was so limited in scope and purpose as
to withdraw this ground of challenge, if other-
wise available.  Standing to make the objection
may be assumed, and the result will not be changed.
Power to modify the decree was reserved by its
very terms, and so from the beginning went hand
in hand with its restraints.  If the reservation
had been omitted, power there still would be by
force of principles inherent in the jurisdiction
of the chancery.  A continuing decree of injunction
directed to events to come is subject always to
adaptation as event may shape the need . . ."

27                    S372

The United States Supreme Court thus indicates that a judgment entered into by stipulation of the parties is not a contract, and that insofar as the court's power is concerned, the parties cannot by stipulation change the result, from that which would exist if the case were tried on the merits.

The United States cites only two _California_ cases in support of its position that the stipulated judgment is to be treated as a contract between the parties. Both cases, _Yarus v Yarus_, (1960) 178 C.A. 2d 190, and _In re Ferrigno_, (1937) 22 C.A. 2d 472, deal with the interpretation of stipulated judgments. They do not hold that such judgments are contracts for purposes other than interpretation of ambiguities.

When a court determines that a judgment is to be treated as if it were a contract between two or more parties, itdoes so by analogy. It is not necessarily intended that there is in literal effect a contract, _Becker v Becker_, (1950) 36 Cal. 2d 324, 328; 1 _Freeman on Judgments_, Ed., §6, pp. 10-11. As a result, it is possible for a court to treat a stipulated judgment as a contract for one purpose but not for another.

Our question is whether stipulated agreements are contracts which cannot be modified by the court action.

Since these are questions of State law, it is there the Court must seek its answer. A review of State cases is of little help. As expressed above, a stipulated agreement is a contract for purposes of interpretation. _Yarus v Yarus_, (supra); _In re Ferrigno_, (supra). A stipulation for child

support contained in an interlocutory decree of divorce is a
contract for purposes of enforcement, Becker v Becker, (supra).
However, as a judgment for child support it would be subject
to modification by court action.  A child support agreement
contained in a divorce decree is a contract enforcible against
a decedent's estate, Taylor v George, (1949) 34 Cal. 2d 552.
Judgments also are treated as contracts to the extent that
neither their security (Jones v Union Oil Co., (1933) 218 Cal.
775) nor enforcement (Scarborough v Dugan, (1858) 10 Cal. 305)
can be impaired by legislation.  And a judgment is a contract
for purposes of permitting it to be used as a counter-claim,
Miller v Murphy, (1921) 186 Cal. 344.   Nowhere are the ques-
tions before the Court at this time specifically answered.

There are a number of cases, however, holding that
judgments apportioning waters between riparians are subject
to modification on a showing of changed conditions.  See
part II, supra.  It is the opinion of this Court that such
decisions make imperative the conclusion that judgments shall
not be treated as contracts where questions of their continuing
effect or modification are posed.  Were we to hold otherwise,
parties to litigation involving water rights could by private
agreement, oust the courts of their traditional equitable
powers to adjust their decrees in accordance with changed
circumstances.

We do not doubt the power of this Court to exercise
it's continuing jurisdiction over water decrees though they
are entered by consent.  Nor do we believe the parties can, by
giving each other a consideration, purchase from a court of

MARIE G. ZELLNER, OFFICIAL REPORTER

1   equity a permanent allocation of riparian rights.  See <u>United</u>

2   <u>States v Swift & Co.</u>, (supra); <u>System Federation No. 91,</u>

3   <u>Railway Employees' Department, AFL-CIO v Wright</u>, (1961)  364

4   U.S. 642, 646.

5        Since these legal questions set forth above are all

6   connected with the continued validity of the stipulated judg-

7   ment and the legality of its modification, it is concluded

8   that they must be answered by reference to the law of judgments,

9   and not by analogy to the law of contracts.

                              VI

10       <u>IF THE 1940 JUDGMENT IS A CONTRACT, THE</u>

11       <u>UNITED STATES HAS BREACHED AND VAIL HAS</u>

12       <u>RESCINDED.</u>

13       Even if it be assumed that the 1940 judgment is not

14   a judgment but a contract, the United States, under the facts

     existing in this case, has breached the contract and Vail has

15   elected to treat such continuing breach as grounds for rescis-

16   sion.

17       The United States has commenced litigation and forced

18   Vail to defend whatever rights Vail has to the use of the waters

19   of the river.  Certainly there can be no question that one of

     the principal reasons which motivated the parties to dispose

20   of the litigation by the 1940 stipulated judgment following the

21   limited reversal by the California Supreme Court was to avoid

22   further expensive litigation.  Beyond doubt this purpose, as

23   far as Vail is concerned, has been thwarted, for by bringing

24   this instant action the United States has forced Vail to defend

25   the lawsuit which, to date, has consumed some 134 trial days

1    before this Court, not taking into account the numerous
2    hearings which have been held before this Court's appointed
3    master.

4       In addition, the United States has pleaded against
5    Vail in this case considerable rights to the use of waters
6    beyond those provided for by the 1940 stipulated judgment.
7    They have pleaded and offered proof as against all defendants
8    including Vail, of not only riparian rights but also presc-
9    riptive and appropriative rights and even rights which they
10   have designated by the term "paramount rights." [7]  If these
11   rights which are claimed by the United States were found to
12   be valid by this Court, the claimed "paramount" rights above,
13   would have given the United States first claim on all the
14   waters of the stream and there would have remained in fact
15   insufficient waters available in the watershed to satisfy
16   even a small part of the rights of Vail and other riparian
17   users.

18      In addition, the United States has offered consider-
19   able testimony directed to establishing a stream system
20   substantially in excess to that which predicated and was the
21   foundation upon which the 1940 stipulated judgment was entered.
22   If the United States prevails as to this contention, the United
23   States will have correlative rights to ground waters which,
24   pursuant to the prior California litigation, they did not have.

   Under these facts, if it be assumed that the 1940
Judgment is a contract, the conclusion is inescapable that
the United States has, by its conduct, breached that contract.
If that document be a contract, Vail was privileged to assume

31

6376

that the United States had repudiated it and that the United States did not intend to be bound by it and that Vail could act accordingly.

The Vail Company has tendered as an exhibit, and there has been received in evidence, a document asserting the continuing breach by the United States of the supposed contract, if one exists, and in such alternative, rescinding the contract.

While it is the conclusion of this Court that the 1940 Judgment is not a contract, even if it were, the inescapable result would be that the United States has, by its actions, violated the implied conditions of good faith and duty to act so that Vail would not be impaired in the receipt of its contractual benefits, Universal Sales Corp., v Calif. Press Mfg., (1942) 20 Cal. 2d 751, 771; 12 Cal. Jur. 2d, Contracts, Sec. 133, pp. 345-346.

Under such circumstances, if this be a contract, Vail is clearly privileged to rescind. Cal. Civil Code, Sec. 1689(4); Loop Building Co. v De Coo, 97 C.A. 354, 364.

VII

IN EQUITY THE UNITED STATES MAY NOT ENFORCE
THE 1940 STIPULATED JUDGMENT, STANDING ALONE
OR AS A PART OF THE 1930 JUDGMENT AND FINDINGS.

We next assume for purposes of discussion, that the prior judgments are not judgments allocating riparian water and therefore are not subject to modification. May the judgment or judgments be enforced by the United States in this proceeding?

In the present posture of this issue in the case,

32

6377

we have a quiet title action commenced by the United States.
It is hornbook law that the United States must do equity to
obtain relief.  Relief granted the United States must be equit-
able as to the defendants.

By an early order in the case, all parties were
made adverse to each other so that cross claim pleading could
be eliminated.  Thus, the filing of an answer was sufficient
under the order to cover the cross claim.  Each defendant
including Vail, must likewise do equity in seeking relief on
their claimed rights.  Relief granted to the defendants must
be equitable among themselves and equitable to the United
[7a]
States.

### THE INEQUITABLE POSITION OF THE PLAINTIFF

In its amended complaint, the United States asserted
rights to the use of these waters, based on the 1940 stipulated
judgment as against the Vail Company, and in addition asserted
against Vail rights of a riparian, prescriptive and approp-
riative nature as well as rights designated as paramount
rights.  But we have held that the 1930 and 1940 judgments
must be read together as one judgment.

(a)  GROUND WATER BODIES IN 1930 FINDINGS & JUDGMENT

The findings supporting the 1930 judgment expressly
provided, (Findings #23, p. 54, line 22; Ex Vail AB)

"It is not true that there is a common under-
ground water plane underlying the whole or any
portion of the said ancient Mesa Silt formation;
but it is true that in lozenges or lenses within
said ancient Mesa Silt formation occur suspended

33

6378

water planes as herein found; but there
is no common water plane substantially or
at all continuous throughout the said Mesa
Silt formation."

The Mesa Silt formation is the same formation
referred to in the present case as the "Older Alluvia."

The State court proceeded to find in 1930 that the
only underground water planes occurred in the younger alluvial
basins of Temecula and Murrieta Creeks, as they were bounded
by the formation of Mesa Silt.

The Court further found (p. 55, line 11; Ex Vail AB):
"There is no underground water plane underlying
the Temecula Creek, the Murrieta Creek, the
Santa Gertrudis Creek and the intervening areas
between, and there is no underground water
plane underlying the lands, or any of the lands
or the streams or any of the streams upon the
lands."

of defendants other than the underground water planes of the
Temecula and Murrieta valleys where the younger alluvia exists.

The Court further found (p.55,line 20;Ex. Vail AB):
"That the only underground water plane lying
beneath any portion of the lands of the defen-
dants, which underground water plane is in con-
tact with, or which is a part of, or which con-
tributes to or supports, or to which there are
contributions from the surface flow of said
Temecula River or Creek, is the underground
water plane of the Temecula alluvial basin,

34

6379

MARIE C. ZELLNER, OFFICIAL REPORTER

as herein found and described.  That in
addition thereto, and wholly separate and
apart therefrom, and in no manner communicating
therewith, is another and very much smaller
water plane. lying beneath portions of the lands
of the defendants and parcels of land belonging
to other persons not parties of record herein,
which lands are within and constitute the fill
of the eroded valley of the Murrieta Creek."

These findings were not disturbed on appeal, and
were not modified or affected by the stipulated judgment of
1940.

We note here that Vail owns the whole of the Temecula
alluvial Basin referred to above.  In the case at bar, it has
been named the Pauba Valley or Basin.  Vail also owns certain
lands overlying the basin or water plane in the Murrieta
Valley.  But most important. Vail owns large areas of land
in the "Mesa Silt" (as described in the 1930 findings) or
"older alluvia" (as the same material has been termed in the
present action).

This Mesa Silt or older alluvia on lands owned by
Vail lies on either side of the Temecula younger alluvia, lies
lies between the Temecula & Murrieta basins,
on the south westerly side of the younger alluvia of Santa
Gertrudis Creek and lies in places north easterly of the
Murrieta Basin.  There are at least 35 sections of such Mesa
Silt or older alluvia owned by Vail, as shown in United States
Ex. 15.

MARIE O. ZELLNER, OFFICIAL REPORTER

S380

Since the State court in 1930, found that there was
no underground water plane common to the areas of younger
alluvia in Murrieta, Santa Gertrudis and Temecula Creek or
in the intervening "mesa silt" (older alluvia) and that the
only underground water planes which contributed to or supported
the stream, were the water planes in the Temecula and Murrieta
alluvial basins, these findings clearly meant that the waters
underlying the "mesa silt" (older alluvia) was not part of the
stream system and were what are now termed in the present
action "local, vagrant, percolating waters, not part of the
stream system."

Under the 1930 and 1940 judgments, the rights to
this water belonged solely to Vail, (subject only to correlative
rights of adjoining owners).  It was not subject to use or
apportionment by others as riparian water.  It could not be the
subject of the government's quiet title suit <u>to rights in the
stream system</u>.

Thus, the 1930 findings and judgment expressly
defined and limited the <u>ground waters</u> of the Temecula-Santa
Margarita River to an extremely limited area.  However, in
this case the United States' evidence has been primarily
devoted to establishing that the ground waters of the river
are considerably larger than that determined by the 1930
judgment.  The evidence and contentions of the United States
demark an underground water unit in contact with, and part of
the stream system that embraces all the area of ancient mesa
silt as described in 1930 findings and here referred to as
"older alluvia."  The other parties' evidence is also of a

similar nature. The area of this ancient "mesa silt" in the 1930 proceedings and the area of "older alluvia" in the current proceedings, as shown by maps and testimony are practically identical.

The United States thus seeks to pull into the stream system the waters of the mesa silt (older alluvia) in contravention of the 1930 findings. Hence the insistence of the United States that it relies only on the 1940 stipulated judgment.

(b) MURRIETA SURFACE FLOW IN 1930 FINDINGS & JUDGMENT

The 1930 findings and judgment allocated 75 percent of the waters of the Temecula-Santa Margarita River to the Rancho and 25 percent of those waters to Vail. All of the waters of Murrieta Creek were allocated to Vail. While both the trial court and the California Supreme Court recognized that Murrieta Creek was in fact a tributary of the Santa Margarita River, it was by an express finding excluded from the term "Temecula-Santa Margarita River" as used in the findings supporting the 1930 judgment (Finding 8) and this fact was expressly recognized by the California Supreme Court (Rancho Santa Margarita v Vail, 11 Cal. 2d 501, 509-510).

The stipulated judgment of 1940 in Section First thereof lists the Rancho and Vail as having "rights in and to the waters of the Temecula-Santa Margarita River and its tributaries." The same wording is carried into Section Second, Third, Seventh, Tenth, Twelfth. Nowhere are the words defined or described in the 1940 stipulated judgment. We must look to the 1930 findings and judgment for their definition.

1   There the stream system is described in detail.

2          As to the surface flow, the 1940 judgment makes no

3   reference to Murrieta Creek.  It did allocate a specified

4   percentage of the Temecula-Santa Margarita River and all its

5   tributaries to the Rancho and Vail, respectively.  The 1940

6   judgment is silent as to what was intended to be included

7   within the phrase "Temecula-Santa Margarita River and all its

8   tributaries."  The 1930 judgment excludes Murrieta Creek from

9   the phrase "Temecula-Santa Margarita River" (Finding 8).

10  However, it is conceded by all that it is in fact a tributary

11  of the Santa Margarita River.

12          There is, to say the least, some ambiguity as to

13  whether the waters of Murrieta Creek were encompassed within

14  the 1940 judgment allocation.  Vail contends that as the 1940

15  judgment did not define what was meant by the term "Temecula-

16  Santa Margarita River," the meaning attributed to that term

17  in the 1930 judgment is conclusive and Murrieta Creek is there-

18  fore excluded.  With some logic Vail emphasizes that the 1930

19  judgment allocation of all the waters of Murrieta Creek to

20  Vail was not appealed from by any of the parties and was in

21  fact thereby affirmed by the California Supreme Court, and

22  that Vail, having accomplished a limited reversal of the 1930

23  judgment on the principal basis of substantial error in deter-

24  mining its riparian acreage, would not have stipulated to a

25  judgment which in essence was less favorable to it than the

26  one reversed by the California Supreme Court.

27          Vail also points out that if the parties to the 1940

28  judgment had intended to include Murrieta Creek within the

6383

1    term "Temecula-Santa Margarita River," it would have been

2    a simple matter, and in fact of compelling necessity, to have

3    expressly so stated.

4          The United States contends, also with logic, that

5    the phrase "and all its tributaries" enlarges upon the defin-

6    ition of the Temecula-Santa Margarita River as defined in

7    the 1930 judgment and that as Murrieta Creek is a tributary,

8    two-thirds of its waters are clearly allocated to it by the

     1940 judgment.

9          It is not necessary to resolve these contentions

10   for while the United States does assert in this case rights

11   to the surface flow of Murrieta Creek, which may or may not

12   be consistent with the 1940 judgment, they are vigorously

13   asserting rights to ground waters of a much more substantial

14   nature which are clearly beyond the terms of the 1930 and 1940

15   judgments and in fact are in direct conflict with the express

16   findings of the 1930 litigation and, if valid, would substan-

17   tially impair the benefits of Vail as provided by the California

     litigation.

18      (c)  VAIL MADE A PARTY DEFENDANT

19         The United States claims that as to Vail, its rights

20   and those of Vail were fixed by the stipulated judgment of

21   1940.  The conduct of the United States has been otherwise.

22         After the termination of lengthy and expensive

23   litigation by the stipulated judgment in 1940, the United

24   States made Vail a party defendant in this action.  True, the

25   Court of Appeals for the Ninth Circuit later held that all

     land owners in the watershed should be made parties defendant,

but even in this posture of the case, the United States could
have taken the position by a letter to Vail or document filed
in this proceeding, that "all our respective rights have been
settled by the stipulated judgment. There is no need for Vail
to defend this action as to the United States."

Instead, in the first complaint and all amendments
subsequent thereto, the United States not only made Vail a
party defendant, but claimed and asserted in the complaints
not only rights claimed under the 1940 stipulated judgment
but in addition thereto other rights such as that of down-
stream riparian, prescriptive and appropriative rights, and
rights to the water underlying Vail's land in the "mesa silt"
(older alluvia) belonging to Vail under the affirmed portion
of the 1930 findings and judgment.

Under California law in the exercise of its equit-
able jurisdiction, a court may grant appropriate relief from
judgments generally upon a showing of equitable grounds which
would justify such action, Parsons v Weis, (1904) 144 Cal. 410,
416-417. (See cases cited in 29 Cal. Jur. 2d, Judgments,
Sec. 157, p. 106). In the exercise of such equitable powers
the prior judgment does not constitute a bar to the equitable
relief since it is solely because such judgment is valid on
its face and collaterally unassailable that the equitable
jurisdiction exists and is necessary, Bacon v Bacon, (1907)
150 Cal. 477.

A proceeding for equitable relief concerning a judg-
ment is treated as a direct, as distinguished from a collateral
attack, and therefore the doctrine of res judicata does not

apply, <u>Caldwell v Taylor</u>, (1933) 218 Cal. 471, 475. Further,
there is no requirement that such a proceeding be tried in the
court which originally rendered the judgment, <u>Herd v Tuohy</u>,
(1901) 133 Cal. 55, and a Federal court has jurisdiction to
grant such equitable relief from State court judgments,
<u>McNeil v McNeil</u>, (1897) 78 Fed. 834, affirmed 170 Fed. 289.

While in the usual case a plaintiff would commence
a separate equitable action seeking relief from a judgment,
there would appear to be no reason why a defendant could not
avail himself of these equitable remedies when, as in this case,
the plaintiff asserts the benefits of a prior judgment. Moreover,
by order of the court in this case, all parties are adverse
claimants and cross-complaints have been eliminated and, there-
fore, each party is in substance a plaintiff seeking to quiet
title to its rights to the use of the water of the river.
Certainly since the 1940 judgment, relied upon by the United
States in its pleadings, affects Vail's water rights, Vail
would be privileged, as it is done, to seek the equitable powers
of the court and request equitable relief from that judgment.

Stated briefly, in a quiet title suit which is an
equitable suit, <u>Talbot v Gadia</u>, (1954) 123 C.A. 2d 712, the
party bringing the action must satisfy equitable claims inter-
posed by the defendants, <u>District Bond Co. v Pollack</u>, (1942)
19 Cal.2d 304. When an equitable defense in a quiet title suit
has been interposed and proved by a defendant the court should
grant such relief as is required from the facts and circumstances
of the case so that justice is accomplished. (See citations in
41 Cal. Jur. 2d, Quieting Title, Sec. 38, pp. 509-511 and

41

6386

1 Dreher v Rohrmoser, (1955) 134 Cal. App. 2d 196, 198).

2       It is an old axiom that a party may not "have his

3 cake and eat it too," but the United States, insisting that

4 only the stipulated judgment of 1940 should be considered by

5 the court, ignores the prior findings in the 1930 judgment and

6 has offered voluminous evidence and taken up many days of

7 court time in attempting to establish a stream system with

8 ground water units substantially in excess of the stream system

9 and ground water units as determined by the 1930 judgment,

supplemented by the 1940 stipulated judgment.

10       The United States even went so far as to allege and

11 assert paramount rights, and then ignoring the meaning of such

12 words in California Water law, asserted that the government by

13 reason of its sovereignty, had other rights adverse to Vail.[8]

14 Since that time Vail has been a party to this action and has

15 been required to appear by its attorneys in court, in 134 dif-

ferent court days and in many days of Master's hearings.

16       If the respective rights of the United States and

17 Vail were settled by the 1940 stipulated judgment, then to say

18 the least it is inequitable for the government to assert

19 additional and other rights against Vail.

20       The plaintiff, seeking equitable relief in this

21 quiet title action, obviously must do equity. It must come into

22 this court with clean hands and keep its hands clean during

the trial of this action.

23       We have then this factual situation:- a stipulated

24 judgment entered in 1940 at a time when under the prior 1930

25 findings and judgment, (which we now construe to be read with

the stipulated judgment),

42

1    (a) Vail had the entire use of the water of Murrieta;

2    (b) There existed the finding of the small ground water

3  bodies in the younger alluvial and the finding of the absence

4  of any ground water body, connected with the stream system,

5  in the mesa silt (older alluvial).  Large portions of the Vail

6  property overlie the mesa silt (or older alluvial).  Hence,

7  under the 1930 findings and judgment any water found under this

8  ground was not part of the stream system, but instead was
   available to Vail.

9        With this background, Vail agreed that the stipu-

10  lated judgment might be entered apportioning the waters of the

11  Temecula-Santa Margarita stream system between itself and the

12  Rancho on a basis of two-thirds to the Rancho and one-third

13  to Vail.

14        The United States now claims, and has proved, that

15  there are substantial ground waters in mesa silt (older allu-

16  vial) formations and that contrary to the prior findings of

17  fact in the California litigation, these ground waters are

18  part of the river.  As a riparian the United States asserts
   correlative rights to these ground waters. [9]

19        Can the government now assert that the stipulated

20  judgment is valid and binding and at the same time assert that

21  as a lower riparian, it is entitled to its reasonable share

22  of the surface and ground waters of the Murrieta and contend

23  that it is entitled to treat the mesa silt or older alluvial

24  as a ground water unit, and part of the stream system and

25  particularly the water in those parts of the mesa silt (older
   alluvial) contained in the Vail properties?

6388

1   If anything would seem inequitable, this would. The

2   government may not assert these contradictory claims, and since

3   it persists in its position that the larger ground water basin

4   exists, since it has offered proof to great length on this

5   issue, since it has forced Vail into a new law suit with

6   additional claims adverse to Vail, since it now asserts its

7   right as a riparian to ground waters in the Murrieta basin, it

8   obviously cannot be considered as acting in either good faith

9   or with clean hands.

10   For this Court to rule unconditionally that the

11   United States has correlative rights to such ground waters

12   would be grossly inequitable.  The United States would in fact

13   "have its cake and eat it too."  The clear equitable solution

14   which would accomplish justice to the United States and Vail,

15   and all other parties to this action, is to conclude that in

16   equity the United States may not enforce the 1940 judgment as

17   a single document or as an integral part of the unified judg-

18   ment entered in the California litigation, and that the United

19   States as a riparian has a correlative right to the ground waters

20   in the mesa silt (older alluvia) formations which are determined

21   to be a part of the river.

22   The court so concludes, and findings and interlocu-

23   tory judgment so providing will be subsequently entered. This

24   result not only accomplishes equitable justice as between the

25   United States and Vail, but also assures that this case will

be decided not on the basis of a judgment, which from present

knowledge was based on factual conclusions which were clearly

erroneous, but on the evidence introduced in this case, most

of which has been obtained subsequent to 1940, and is not in

44

1  substantial conflict.[10]

2                              VIII

3                            ESTOPPEL

4      (a)  Navy Well

5           It is the contention of the United States that
6  aside from the defense of res judicata hereinabove disposed of,
7  the Vail Company is estopped to assert that the 1940 judgment
8  be set aside, enjoined or not enforced.  One basis for the
9  asserted estoppel concerns the drilling by the United States
   of a well on Vail lands.

10          The evidence shows that in 1950 employees of the
11 United States contacted the Vail Company and requested permis-
12 sion to drill a well on Vail Company property.  The stated
13 reason for this request was that the United States desired to
14 obtain geologic information.  Vail Company gave its consent to
15 the drilling of the well and the United States expended some
16 $50,000 for this purpose.  The United States drilled the well
17 to the depth of 2469 feet and obtained the geologic information
   desired.

18          Counsel for the United States now contend that the
19 United States drilled this well in reliance on the 1940 judg-
20 ment and that Vail Company is now using the water made avail-
21 able by that well and that Vail would be unjustly enriched if
22 this Court were to enjoin or set aside the 1940 judgment.

23          The uncontradicted evidence establishes that this
24 well produces water of an inferior quality and limited amount
   and is of little benefit to the Vail Company.

25          However, aside from the failure of the United States

                              45

to prove enrichment, this contention of the United States must be rejected for there is not one scintilla of evidence that the United States drilled this well in reliance on the 1940 judgment.  The overwhelming evidence is that they drilled the well to get geologic information which they obtained.

In fact, it is interesting to note that after the United States filed this lawsuit, it was not until the well was completed and the geologic information obtained, that the United States served the summons and complaint upon Vail. The geologic information obtained from this well by the United States has been extensively used as evidence in this case to bolster its claim against all defendants, including Vail, to the use of the waters in the river.

It is also pertinent, that during the negotiations between Vail and the United States, when the United States was seeking Vail's consent to permit the well to be drilled, the United States did not advise Vail that they had a lawsuit on file nor did they intimate that Vail would be served with summons and complaint; and Vail, at the time it gave its consent to the drilling of the well on its property by the United States, was not aware of such litigation and had no knowledge that it would shortly be called upon to defend its rights to the use of water in this extensive litigation.

(b)  Vail Dam

The remaining basis for the estoppel contention by the United States concerns the construction of a dam by Vail Company.

In 1946, Vail Company filed an application with the

46

6391

predecessor of the California Water Rights Board for a permit
to appropriate by storage at Vail Dam, flood waters from
Temecula Creek, one of the two principal tributaries of the
Santa Margarita River.  The United States filed a protest with
the predecessor of the California Water Rights Board against
the application of Vail Company.  Subsequently, the United
States requested that its protest be withdrawn.  Following a
hearing and the taking of evidence, the application was granted
and a permit was issued to Vail Company to store the flood
waters.  Subsequently Vail Dam was constructed and since 1948
Vail has impounded flood waters at the dam, for subsequent
release and beneficial use.

Counsel for the United States contend that the
United States' protest was withdrawn upon a reliance by Vail
Company that any right to appropriate water at Vail Dam would
be subordinate to and consistent with the 1940 judgment, and
that Vail Company having been granted a permit by the Cali-
fornia State authorities to construct its dam and having
constructed its dam, cannot now seek to set aside or enjoin the
1940 judgment.

The answer to this contention is that the rights of
Vail Company to the storage of waters in Vail Dam are subor-
dinate to any right that the United States has to the use of
those waters.  The permit which Vail Company received from
the State of California expressly states that Vail Company's
rights to store water in Vail Dam are subject to all previously
vested rights.  Every right that the United States has to the
use of these waters would fall within this category, and as

47

1   this Court will maintain continuing jurisdiction over this
2   case, the United States will be privileged if it so desires in
3   the future to seek relief before this Court should it ever
4   conclude that Vail Company's storage of flood waters in Vail
5   Dam are adverse to any United States right to the use of the
6   waters of the river.

7        It is also relevant to note that Vail Company in
8   seeking an application to appropriate by storage flood waters
9   and subsequently constructing Vail Dam and impounding waters
10  therein was not acting inconsistently with the 1940 judgment
11  for that judgment expressly provides that the parties shall
    have the right to construct dams to impound flood waters.

12       In addition, even though the United States withdrew
13  its protest it did appear at the hearing before the predeces-
14  sor of the California Water Rights Board and did offer evidence
15  concerning the application of the Vail Company to appropriate
    flood waters in Vail Dam.  This fact is sufficient to justify
16  the conclusion that the United States' withdrawal of its pro-
17  test was, because of its own conduct, ineffectual.  However,
18  as pointed out, even if the United States had not appeared at
19  the hearing and had effectively withdrawn its protest, there
20  is not the slightest evidence that their rights were affected
    adversely, for Vail's rights to store water at Vail Dam are
21  expressly made junior to all rights possessed by the United
22  States.

23                          IX

24      EFFECT OF REFUSAL TO ENFORCE 1940 JUDGMENT

25       The refusal to enforce the 1940 judgment will not

                          48

1   impair the present use of the waters of the Santa Margarita

2   River and its tributaries by the United States.  As pointed

3   out above, the United States' use of these waters is almost

4   entirely from the basins of the river within the military

5   reservation.  The latest evidence [11] in this case shows that

    as of May 1958 those basins were full.

6        In addition, the basins within the United States

7   military reservation are in large part recharged from the run-

8   off downstream from Vail Company lands.  Without now so deci-

9   ding, it appears that there is a sufficient annual yield from

10  such downstream sources, to satisfy the present uses being

11  made by the United States on its military reservation.

12       The refusal to enforce the provisions of the 1940

13  judgment does not mean that Vail Company or any other defen-

14  dant would be entitled to dry up the surface or underground

    flow of the Santa Margarita River.  This Court will keep con-

15  tinuing jurisdiction of this case and should the United States

16  believe that any upstream use reaches such an extent that its

17  rights have been or might become endangered, the United States

18  can immediately apply to this Court for appropriate relief.

19       The United States in resisting the Vail Company con-

20  tention that the 1940 judgment be set aside or enjoined has

21  expressed apprehension as to its right, as provided in that

    judgment, to use the waters of the river _outside the watershed._

22       The 1940 judgment, in effect, provides that the

23  United States can use its allocated waters on any of its lands

24  including lands without the drainage area of the Santa Margarita

25  River.  In this case, the United States is the last water user

                        49                        6394

1  on the stream.  If it uses the waters of the river on its lands

2  outside the watershed no one is, or can be, harmed.  Such use

3  would not deprive other riparians of water for there are no

4  riparians (or for that matter any water users) down stream

5  from the United States' lands.  Hence the United States, under

6  these specific factual circumstances, is privileged to use the

7  water of the river which is available on its lands as it

8  chooses, and can if it desires export and use that water out-

9  side the Santa Margarita River watershed, and if it does so,

10 no one has a legal basis for objection.  No water right is

11 obtained thereby, but such use is permitted because no one is

in a position to complain.

12         Thus, as to the water which enters the government

13 reservation, the United States can in fact do what the 1940

14 judgment specifically authorized, and the apprehension of the

15 United States as to the propriety of its use of the water out-

16 side the watershed if the 1940 judgment is not enforced or set

aside or enjoined, is unfounded.

17         But assume the 1940 judgment was to be enforced in

18 line with the contentions of the United States.  In the event

19 the United States attempted to limit up stream water users to

20 permit water to flow down so it could be taken out of the water-

21 shed, every up stream water user except Vail and the inter-

22 venors could successfully resist such an attempt if the result

would interfere with their reasonable use of water.

23         As to any claim by the United States, that two-thirds

24 of the pooled rights to water of the United States and Vail should

25 flow down stream for use outside the watershed, all other

1  riparians could resist such a use as non-riparian and unreason-
2  able.  The claimed right of the United States would only be as
3  good as Vail's original right and could not prevail over injured
4  up stream users.

X.

## THE INTERLOCUTORY DECREE WILL NOT BE MADE APPEALABLE.

7          The United States has requested that the decree to
8  be entered in regard to this issue be made appealable as pro-
9  vided by Rule 54(b) of the Rules of Civil Procedure.  This
10 request is denied.  No satisfactory reason is apparent which
11 would justify this Court to permit the determination of this
12 case on a piece meal basis.

13         Moreover, the Court of Appeals for the Ninth Circuit
14 in remanding this case for retrial, expressly directed that no
15 judgment be entered ". . . . until the entire suit can be dis-
16 posed of at the same time," People of the State of California v
17 United States, 235 F. 2d 647, 664.  The term "judgment" would
18 include a decree only if an appeal therefrom would lie (Rules
19 of Civil Procedure, Rule 54(a)), and thus if this Court were
20 to provide that the decree be appealable it would be directly
21 contrary to the express directions of the Court of Appeals.

22         Findings of fact, conclusions of law and interlocu-
23 tory decree will be prepared by counsel for the State of Cali-
   fornia, served and entered in accordance with this memorandum
24 opinion.

25                                   51

<u>FOOTNOTES</u>

[1]   In addition to the two major water users, two other riparians (called interveners), Playtor and the Estate of Murray Schloss were parties to the State action.   Their successors in interest are parties to the present action. However, from a practical standpoint, their riparian lands are of such a minimal nature as to not warrant specific consideration and discussion in this opinion.

[2]   We consider later, the contention of the United States that the 1940 judgment is a contract.

[3]   On November 29, 1951, the stipulation was entered into between the United States and the State of California.   It recites it is for "the benefit of all the parties to this cause."   Paragraph IV reads,

> "That the rights of the United States of
> America to the use of water herein, are to be
> measured in accordance with the laws of the State
> of California."   (See 165 F.Supp. 806, 813-14, for
> full draft.)

[4]   Aside from the above-cited <u>cases</u>, there is <u>uniformity of opinion</u> by recognized water law authorities that a judgment allocating water amongst riparians <u>is not</u> res judicata.

> "The decree of apportionment of water among riparian
> owners, then, is binding upon the parties so long as

it remains in effect;  the decree remains in effect
so long as the conditions upon which it is based
remain substantially unchanged; but the decree may
be modified in a subsequent proceeding if the
conditions have changed sufficiently to warrant a
new or modified apportionment," Hutchins, The
California Law of Water Rights, 1956, p. 225.

"It is obvious that what is a reasonable
amount varies not only with the circumstances of
each particular case but also varies from year to
year, for the amount which might be reasonable in a
season of plenty might be manifestly unreasonable in
a season of drought.  It follows that a judgment
fixing proportions in which water may be taken is
not necessarily conclusive in subsequent actions
concerning the same water, since circumstances
determining relative rights may be different,"
23 California Jurisprudence, p. 1142.

Perhaps the leading water law authority, and one frequently
cited by the  California Supreme Court, is Samuel C. Wiel.
Mr. Wiel states as follows:

"The apportionment decreed in equity is not a
severance of rights such as occurs in partition
between tenants in common, but is an equitable
expedient to enforce, under existing conditions,
the unseverable right of each to a reasonable use
of the riparian land.  The apportionment is merely
such as, 'under the circumstances and facts in
this case, would be a reasonable and equitable

53

division of the water.'

"Consequently, not being a severance of right,
but an expedient of remedy in each case, an apportion-
ment made at one time is not necessarily conclusive
at a later point of time, when the circumstances on
which it is based have changed.  The apportionment
is decreed in equity to afford equality on the facts
existing at the time; on the circumstances then
existing.  When the circumstances change so that the
decree no longer represents equality and reasonable
division, then a readjustment must be had under the
new conditions.  A system of correlative rights
accepting as its ground principle the determination
of what is reasonable in each case, cannot in its
nature be a system of permanent fixedness, such as
is the system of exclusive rights by appropriation.
The apportionment is permanent only if the sur-
rounding circumstances on which it was founded
remained unchanged, so that the equality of the
apportionment is not destroyed; and ceases to be
permanent when a subsequent change of circumstances
has destroyed the reasonableness of the adjustment.
For example, an apportionment based on the quantity
of water needed to irrigate certain crops where
both parties grow the same kind, would work great
injustice when one party changes to crops requiring
much less water, while the other changes to crops
needing more.  To make them share in the same

54

6399

proportion as before would work great injustice
to one, simply to permit waste by the other.

"There are many other changing conditions.
The soil requires more water at one time than
another; different crops require different
quantities of water, and these requirements vary
at different stages of growth; humidity of seasons
varies, and with it vary both requirements and
supply; one kind of soil or crop returns more
water to the stream than others; the times of
applying the water will be different under changed
methods of cultivation; the area cultivated or
owned may change; the flow of streams constantly
changes; new parties may be involved in a subse-
quent controversy whom the former apportionment
had not considered because not parties to the
former suit, and whom the former decree cannot
bind.  All these things may produce changes sub-
sequent to an apportioning decree to such an
extent that the substantive right of each contestant
to the equal reasonable use of their respective
lands is not longer secured by the decree.  Thus
equality must depend upon circumstances, and the
adjustment must change when they change.  An
equalized distribution at one time may become very
unequal at a later point of time," Wiel on Water
Rights, Third Edition, p. 824, Sec. 752.

[5]    The small allocation of water to the two intervening riparian owners was to come out of the Rancho's two-thirds.

[6]    The United States relies on Section Twelfth of the 1940 judgment which provides generally that Vail is entitled to divert and use one-half of the amount which the Rancho is entitled to divert and use.  When this Section is read with the other parts of the judgment, we cannot and do not interpret it to mean that eternally the Rancho receives two-thirds of the whole which Vail and the Rancho would receive under any equitable apportionment which took into account the rights of other water users.

We call attention also to the use of the words "apportioned" in Section Sixth; "allocating" in Section Seventh; "apportionments and allotments" in Section Eighth; "apportioning" in Section Ninth; and "allotted" in Section Tenth.

[7]    The word "paramount" appears in the complaint and amended complaint.  Its use le d to an early outcry by newspapers and water users in the water shed that the United States was claiming rights by reason of its sovereignty, i.e., by the fact that it was the government.

"Paramount" is a word of art in California water law. It does not refer to rights from sovereignty.  Judge Yankwich in the first written opinion in the case, United States v. Fallbrook P. U. D., (1951) 101 F.Supp. 298, pointed out (p. 302-303) that a paramount water right is "superior to and

1  exclusive of" other claimed water rights, and rests on

2  California water law.

3          For a full report on the disclaimers made by the

   United States and its officials of any claimed rights arising
4
   through sovereignty see United States v. Fallbrook, (1958)
5  165 F.Supp. 806, 812-22.

6          Notwithstanding such disclaimers, the United States,

7  pressed upon the court during the trial of this action

8  various theories of rights to water based on sovereignty

9  (165 F.Supp. 806, supra, page 828 et seq. and page 832 et seq.)

10

11 [7a]   We have no doubt that these equitable issues are clearly

12 before us because of the nature of the quiet title action

   and the order on cross claims.  However, in addition, Vail
13
   by amended answer filed May 2, 1958, set up a Fourth affirma-
14
   tive defense to the effect that the 1940 judgment had created
15 inequities.  A Second Amended and Supplemental Answer was

16 filed by Vail on November 3, 1959, and adopted those parts

17 of the amended answer which are not inconsistent with the new

18 pleading.  In the Sixth affirmative defense set forth therein

19 Vail alleged again the inequitable character and operation of

   the judgment and that the United States was asserting
20
   additional rights to those provided for in the judgment.  In
21
   the same defense Vail alleged that the United States had
22 instituted the present action and had again subjected Vail to

23 expense in the new litigation.  The Ninth affirmative defense

24 alleged irreparable damage and the Tenth affirmative defense

25 was an offer to do equity.

57

1   [8]    See footnote 7.

2

3   [9]    The United States argues that as to Vail it relies only

4   on the 1940 stipulated judgment and that whatever its bundle

5   of rights may be, there has been fixed by contract (the 1940

    judgment) a division of the rights of Vail and the United

6   States in the stream system on a basis of two-thirds (2/3) to

7   the United States and one-third (1/3) to Vail.

8           But since the 1940 judgment, (even assuming the

9   government's position), only dealt with the stream system,

10  then the right  to underground water in Vail's 35 sections of

    Mesa Silt (older alluvia), does not pertain to the stream

11  system but belongs exclusively to Vail.

12

13          We believe but have been unable to convince government

    counsel that the rights flowing to the United States from our

14  ruling, (correlative riparian rights in an immense underground

15  water body, 35 sections of which underlie Vail land) are more

16  valuable to the United States than rights claimed under the

17  1940 judgment.

18

19  [10]   We are not basing our decision on mistake, although

    this was strenuously urged by Vail.  There can be no doubt

20  that the parties and the court in the State action were

21  actually mistaken as to the extent of the ground waters which

22  were part of the stream.  In 1930, it was not known that there

23  existed the large ground water body which is established by

24  the evidence in this case.  This fact was not known in 1940

25  at the time of the entry of the stipulated judgment.  It first

1  came to light with the preparation of the Pemberton report of
2  1950 (Exhibit        ) in which Pemberton, a well-known and
3  skilled geologist, outlined the existence of the ground water
4  body in the Mesa silt (the older alluvia).

5  [11]     Since the decision herein and the first draft of this
6  opinion, the United States has offered additional evidence of
7  the effect of the dry water years of 1958, 1959, and 1960
8  upon the basins within the government reservations.

9         There has been some slight lowering of water levels,
10 but there still remains a great amount of water in the basins.

11        The water year of 1960 has been one of the driest in
12 history.  Its impact on the basins cannot immediately be
13 determined.

59

6404