# FILED

AUG 4 - 1961

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____
                              Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,         )
                                  )
                Plaintiff,        )
                                  )
        v.                        )        No. 1247-SD-C
                                  )
FALLBROOK PUBLIC UTILITY          )
DISTRICT, et al.,                 )
                                  )
                Defendants.       )

RESPONSE

TO CALIFORNIA'S LETTER OF JULY 20, 1961

RESPECTING

THE MEMORANDUM OF THE UNITED STATES OF AMERICA

RELATIVE TO ITS APPROPRIATIVE RIGHTS IN THE

GROUND WATER BASIN UNDERLYING CAMP PENDLETON

-1-

6521

PRELIMINARY STATEMENT

There was filed with this Court on June 30, 1961, a memorandum supporting the claim of the United States of America to appropriative rights to the use of the percolating waters in the Basin which underlie Camp Pendleton. California, by a letter dated July 20, 1961, presented eight questions arising from the Memorandum. A copy of that letter is attached to this response to California's questions.

1. Pursuant to the laws of California an appropriative right to the use of percolating waters in a ground water basin may be acquired by the diversion and application of those waters to beneficial uses outside of the watershed of the Santa Margarita River or by making non-overlying uses. (See Page 7 et seq of Memorandum of June 30, 1961, and authorities.)

2. Percolating waters in the Basin underlying Camp Pendleton are those waters which have so far departed from the bed of the Santa Margarita River as to have lost their identity as part of the flow or sub-flow of that stream. (Katz v. Walkinshaw 141 Cal 116, 139; 74 Pac 766 (1903); The Cal. Law of Water Rights, Page 426-427; see Page 7 et seq of Memorandum of June 30, 1961.)

3. There is a presumption in the California law that percolating ground waters are " ' . . . not part of a stream or water course nor flowing in a definite channel.'  The burden of proving that ground waters are part of a definite underground stream, therefore, is on the party who asserts the existence of such a stream."  (The California Law of Water Rights, Pages 427-428; 2 Wiel, Water Rights in Western States 3rd Ed, Page 1011)

4. California's law does not require a filing of an application with the State to appropriate percolating ground waters as is required in connection with surface streams. (See Page 7 et seq of Memorandum of June 30, 1961.

7—1404

5. As against junior upstream appropriative rights, such as Vail
   Company's claim for Vail Dam and Reservoir and Fallbrook
   Public Utility District, the appropriative rights of the
   United States of America in the Basin are entitled to pro-
   tection to the extent they were exercised prior to the date
   the claim of Vail and Fallbrook were initiated.  (See Page 12,
   Response to California; Lodi v. East Bay Mun. Utility District;
   7 Cal(2) 316; 60 Pac(2) 439 (1936). )

6. Extent of the claimed appropriative rights of the United States
   of America in the Basin is measured by the quantities of
   water in any one year pumped from the basin, exported from
   the watershed and applied to beneficial uses prior to the
   time that the appropriative rights of junior claimants were
   initiated. (See Page 6, Response to California)

7. The fact that the United States of America re-uses Lake O'Neill
   water and the waters pumped from the Basin will not reduce
   its entitlement pursuant to those rights.  (See Page 8 thru
   12, Response to California)

8. The Stipulated Judgment between United States of America and
   Vail Company has no bearing upon the acquisition by them of
   appropriative rights valid against claimants who are not
   parties to that Judgment.  (See Page 17, Response to California)

   Response to California's questions have not been made in the
order in which they were presented.  Rather, the questions have been
grouped according to their subject matter to the end that greater con-
tinuiyt of thought could be attained.  Those questions have been sum-
marized.  However, the full text of the questions will be found in the
copy of the letter which accompanies this memorandum.

-i i i-

CALIFORNIA'S QUESTIONS

"First, is the ground water within the younger alluvium
percolating waters or part of the stream

All of the waters in the Basin underlying Camp Pendleton con-
cerning which the United States of America claims appropriative rights
are percolating waters.  They are waters which are not part of the flow
of the Santa Margarita River or sub-flow of that stream.  Rather, those
waters are found percolating throughout the lenticular deposits of the
alluvial fill which constitutes the Basin.  Nature of those lenses of
clay, silt, sand and gravel of which the Basin is comprised are graphi-
cally demonstrated in the record. [1]  Informative in regard to the per-
colating characteristic of the waters is the comprehensive and exact
soil survey of the United States Naval Reservation. [2]  From the aerial
photographs used in that survey, it is possible to ascertain with great
exactitude the course of the Santa Margarita River across the Naval
Enclave.  Especially pertinent in that regard is the very narrow area
of bed and banks of that stream across the broad alluvial plain consti-
tuting the surface of the Basin.  Percolating waters which are here in-
volved are those which have entered into the alluvial fill to the point
where they have lost their character as part of the surface flow or sub-
surface flow.  In the upper Sub-Basin the distance from the stream at
which those waters lose their identity with that flow does not exceed
ten feet.  Lower down the valley where the stream bed is less porous
the percolating ground waters lose there identity with the flow of the
stream in less than ten feet.

Typical of the California coastal basins, the alluvial fill
deposited by the Santa Margarita River is coarse at the point that stream

[1] / U.S.A.Pl's Ex. 38 and 38A; Testimony of G. F. Worts, Tr. Vol. 38,
Pages 3913 et seq.

[2] / U.S.A.Pl's Ex. 93 Series.

-1-

leaves the canyon and enters upon the broad plain described above. As
a consequence there are gravel and sand deposits from the surface to bed-
rock in much of the Upper Unit of the Basin. Nevertheless in that
segment of the Basin are found clay lenses interspersed throughout the
sand and gravel.

Finer textured sand and clay are found at the surface of the
Chappo and Ysidora Units. At relatively shallow depths in the Units
last mentioned are found lenses of clay and silty sand. Half way down
Chappo Unit at depths of approximately one Hundred (100) feet are found
cobbles and gravel. Farther down the valley are found areas of clay
and clay silt. Layers of clay of considerable thickness are in this
reach of the Basin. Likewise there are found in the Lower Ysidora area
marine deposits of fossil shells.

**Upper Member of Alluvium and Lower**
**Member of Alluvium in Santa Mar-**
**garita River Basin:**

Alluvial deposits in the Santa Margarita River Basin have been
classified as upper member and lower member. They have been thus
characterized in that manner because the upper member deposits were
finer than the lower. Those factors are of importance from the stand-
point of the receptive nature of the deposits to Santa Margarita River
water and the movement of that water in the alluvial fill. For example,
the interaction between deep and shallow wells in the same general areas
is largely controlled by the difference in the permeability and lenticu-
lar nature of the two strata of alluvium. There is a marked separation
between the ground waters in the upper and lower members of alluvium.

**Percolating Waters in the Santa**
**Margarita River Basin:**

Principal source of recharge for the water-bearing strata of the
Santa Margarita River Basin, as stated above, is the Santa Margarita
River. That stream, except during and immediately following heavy pre-
cipitation, is intermittent both as to time and place. Bed of the
stream is highly permeable with the result that the water carried in it

7—1404

U. S. GOVERNMENT PRINTING OFFICE

6525

1   readily enters the alluvial fill, spreading out in all directions from

2   the surface stream, recharging the alluvium which is dewatered either

3   through the natural forces of evaporation and evapotranspiration or by

4   the artificial means of pumping.  Rate of progression and the course

5   of the waters, once they enter the alluvium, are controlled by a variety

6   of factors.  Heterogeneous nature of the deposits is a prime factor in

7   that regard.  Speed of ground-water movement and its direction vary

8   with permeability of the clays, sands and gravel which it encounters.

9   For example, those elements enter into the rapidity with which it pro-

10  gresses laterally to recharge areas in Chappo Unit which contains al-

11  luvium at relatively great distances from the bed of the stream.  Verti-

12  cal direction of the waters, once they leave the Santa Margarita River

13  and enter the alluvial fill, is likewise involved.  Again the character-

14  istics of the deposits through which the waters must proceed govern the

15  rapidity with which recharge will enter the dewatered deeper aquifers.

16  In the lower reaches of the Basin ground-water movement is greatly re-

17  tarded by the low permeability of very extensive clay deposits which

18  are encountered.

19                   QUANTITIES OF PERCOLATING WATERS PUMPED
20                   FROM THE BASIN UNDERLYING CAMP PENDLETON
                        AND APPLIED TO BENEFICIAL USES
21
22          California's "Fifth" question, closely related to its "First"

23  question, is the next one logically to be considered.  Having declared

24  that one of the essential elements in establishing an appropriative

25  right is proof of the quantities of water actually applied to beneficial

26  uses, California declares:

27      "Fifth . . . the United States should clearly set forth in
         its memorandum (a) what amount of water it is claiming it
28       or its predecessor has actually beneficially used outside
         the watershed, and (b) the places where such water use
29       actually occured." 3/

30  LOCATION OF WATER USE OUTSIDE OF WATERSHED AREA

31          Response to the inquiry embraced in California's statement is

32  ───────────────────────────────────────

3/ Greater clarity is attained through responding to (b) prior to re-
        sponding to (a).

contained in the record. That record reveals a substantial part of Camp Pendleton is constructed outside of the watershed. For easy reference to ascertain the areas within and without the watershed there was introduced in evidence a composite map comprised of the pertinent United States Geological Survey Quadrangles upon which the watershed line is clearly identified. 4/

To meet all of the demands of the United States of America on both sides of the watershed line, percolating water is pumped from the Basin underlying Camp Pendleton. Through a complex system of conduits, reservoirs and related facilities, that water is first lifted to sufficient elevation, then delivered through miles of pipe to provide for the military needs which are involved. Evidence in the record depicts in great detail the "Camp Pendleton Water Distribution System." 5/ Concomitant, detailed exhibits locate, with great particularity every structure to which water pumped from the Basin is delivered. Reference in that connection is made to "Master Shore Station Development Plan . . . Areas 11 Thru 17 & 26 . . . Water Distribution and Sanitary Sewer System." 6/

Delineated with great care in the map last mentioned is the Santa Margarita River watershed line. Structures and facilities located north and west of that line are within the watershed of the stream in question; structures located south and east of that demarcation are in the sub-watershed of Pilgrim Creek in the San Luis Rey watershed. Correlated exhibits of the "Master Shore Station Development Plan" locate precisely all of the buildings and structures of Camp Pendleton in relation to the Santa Margarita River watershed line. 7/

---

4/ U.S.A.Pl's Ex. 89CG

5 / U.S.A.Pl's Ex. 101

6 / U.S.A.Pl's Ex. 112

7 / U.S.A.Pl's Ex. 100-117

7—1404

U. S. GOVERNMENT PRINTING OFFICE

-4-

1    Important in regard to the watershed line is the oral testi-

2    mony respecting it; how it was located on the maps and the precision

3    with which it was determined. [8/]

4        Similarly, the record is replete with proof of the location

5    of the lands irrigated from the Basin in question. [9/]  That irrigation

6    was commenced to the fullest extent in 1939. The system for irrigating

7    the lands and the methods used have been referred to above.  There was

8    a total of approximately seventeen hundred (1700) acres to which water

9    from the Basin was pumped. Twelve hundred (1200) acres were located

10   outside of the watershed of the Santa Margarita River and six hundred

11   (600) acres within that watershed. Reference to legal subdivisions

12   may assist in locating the lands outside of the watershed of the Santa

13   Margarita River upon which percolating waters from the Basin have been

14   and are now used:

15       Township Ten (10) South, Range Four (4) West, Sections 9, 16,
             17, 20, 21, 22
16

17       Township Eleven (11) South, Range Five (5) West, Sections 11,
             14, 15, 22
18
         Township Eleven (11) South, Range Five (5) West, Sections 4, 5,
19           8, 9.

20   QUANTITIES OF PERCOLATING WATERS USED OUTSIDE
     OF SANTA MARGARITA WATERSHED LINE

21       There has been proved by the United States of America the

22   quantities of water in acre feet used by it both inside and outside of

23   the watershed. That proof relates to military uses and agricultural

24   uses, set forth in Exhibits captioned as follows:

25       "Water Used For Military Purposes . . . Outside the Natural

26       Watershed Line " for period 1944-1960. [10/]

27       "Water Used For Irrigation Outside Watershed Line" for period

28       1942-1960. [11/]

29

30   [8]/ See Tr. 46, Pages 5161 et seq; Tr. 67, Pages 7590 et seq; Testimony
             of Frank H. Canon

31
     [9]/ U.S.A.Pl's Ex. 76 and 77; Testimony of Henry W. Whitman, Tr. 62,
32            Pages 6994 et seq.

     [10]/ U.S.A.Pl's Ex. 150A

7—1404
     [11]/ U.S.A. Pl's Ex. 151A
U. S. GOVERNMENT PRINTING OFFICE

6528

There follows a tabulation in acre feet of the "amount of water it (United States of America) is claiming it or its predecessor has actually beneficially used outside the watershed," of the aggregate of percolating water pumped from the Basin and used for military and agricultural uses:

| Year | Total In Acre Feet of Basin Water Used Outside Natural Watershed of Santa Margarita River by United States of America |
|------|------|
| 1942 | 1090 (amount of military use unknown) |
| 1943 | 1440 (amount of military use unknown) |
| 1944 | 2930 |
| 1945 | 2890 |
| 1946 | 3170 |
| 1947 | 3000 |
| 1948 | 3500 |
| 1949 | 3430 |
| 1950 | 3440 |
| 1951 | 2980 |
| 1952 | 3150 |
| 1953 | 3730 |
| 1954 | 3180 |
| 1955 | 3500 |
| 1956 | 3480 |
| 1957 | 3410 |
| 1958 | 3120 |
| 1959 | 3910 |
| 1960 | 3280 12/ |

On the background of the preceding facts, the United States

---

12/ The United States of America reserves the right to review these quantities set forth in the preceding tabulation when it offers its findings in the case.

7—1404

of America will consider the next question tendered by California. It is:

> "Sixth, under California Law an appropriator who does not use the water for a period of three years (or possibly five years) looses the appropriation right. (See Water Code, Section 1241)." The United States of America "must establish that . . . diversions outside the watershed have been continuous and that, therefore, there has been no non-use which would have resulted in the loss of the claimed appropriative right."

From the tabulation set forth above, in response to California's question "fifth," it is evident that there has been no non-use upon which it could be validly asserted that the National Government has lost its appropriative rights in the Basin.

Warranted in regard to the query is reference to certain principles which must necessarily be invoked if the matter of loss through non-use becomes an issue. Reference in that connection is made to a leading case on the subject which would be applicable here should the issue arise. [13] That case was reviewed at length in the memorandum of the United States of America of June 30, 1961, to which California's letter is addressed. [14] There was quoted the excerpt which declares that Water Code Section 1241 relating to the three year period for a statutory forfeiture of appropriative rights has no application to "Water in an underground basin . . ." [15] Rather states the Court in the cited authority, the forfeiture clause was intended to refer only to water which had been appropriated under a license or permit. Manifestly there is no basis for attempting to assert the applicability of the three year statutory forfeiture to the claims of the United States of America. Similarly, there is no basis for seeking to declare that the United States of America lost rights through a five year period of non-use. Supporting that conclusion is the fact that state forfeiture

---

[13] Pasadena v. Alhambra, 33 Cal(2) 980, 933-934; 207 Pac(2) 17 (1949)

[14] Page 8, et seq.

[15] 33 Cal(2) 908, 934; 207 P(2) 17(1949)

7—1404

U. S. GOVERNMENT PRINTING OFFICE

6530

1    statutes have no application to the United States of America. [16]

2    Simply stated, both the facts and the law refute any basis for contending

3    that there has been a loss of the appropriative rights asserted by the

4    United States of America in the Basin.

5    　　　　Closely related to California's question respecting the

6    quantities of water exported by the United States of America is this

7    inquiry:

8    　　　　Eighth . . . the amount of water diverted from the watershed
     has not been identical to the actual depletion of the ground

9    　　　　water basin, for a substantial amount of the water diverted
     has been returned thereto. Is . . . (the United States of

10   　　　　America) . . . contending that . . . (its) appropriative
     right is the total divertive figure without deducting there-

11   　　　　from the amount returned to the basin?

12   UNITED STATES OF AMERICA ENTITLED TO BENEFITS
     OF SALVAGED OR RECAPTURED WATER

13

14   　　　　California in this inquiry has reference to these facts:

15   a. Water is pumped from the Basin, exported from the water-

16   　　　　shed of the Santa Margarita River and there used benefi-

17   　　　　cially;

18   b. A substantial share of the water pumped from the Basin and

19   　　　　exported from the watershed is reclaimed and returned to

20   　　　　the Basin in the form of sewage effluent. A portion of

21   　　　　that salvaged water re-enters the Basin.

22   　　　　In substance this is the question presented:

23   Is the claimed appropriative right of the United States of

24   America to the percolating waters of the Basin reduced by

25   reason of its salvaging of water by means of its treating

26   the sewage and returning some of it to the Basin?

27   　　　　Answer to that question is in the negative. It is basic in

28   the law that when, as here, by artificial means water is salvaged, the

29   one who has performed the act of salvaging is entitled to benefit from it.

30   　　　　―――――――――

31   [16]  U.S. v Cal. 332 U.S. 19, 32

32

7―1404

-8-

There is clearly an analogy between the acts of the United States of
America in reclaiming sewage, to the acts of one who saves water which
would otherwise be wasted. [17]/

On the subject of waters artificially salvaged, it has been
declared: "One who, as the result of artificial work, saves water that
would be lost through seepage, percolation, and evaporation is held
entitled to the use of such water . . . " [18]/

Wiel in his works on Western Water Law clearly defines the
distinction between severed water which has been reduced to possession
and artifically developed waters, from the waters of a natural stream. [19]/
In essence he declares that the one who through his labor adds to or in-
creases his supply of water by artificial means is entitled to the
benefit of those labors.

In a leading case the Supreme Court of the United States of
America succinctly outlines the question California presents; response
to it: "The seepage producing the artificial flow is part of the water
which . . . (the United States of America) . . . conducts to the project
lands in the vicinity of the ravine (from which defendants seek to ap-
prorpiate) for use in their irrigation.

The defendants insist that when water is once used
under the appropriation it cannot be used again,—
that the right to use it is exhausted. But we per-
cieve no ground for thinking the appropriation is
thus restricted. According to the record it is in-
tended to cover, and does cover, the reclamation and
cultivation of all the lands within the project. A
second use in accomplishing that object is as much

---

17/  Wiggins v. Muscupiabe Land & Water Co., 113 Cal 182, 196;
45 Pac 160 (1896)

18/  The Cal. Law of Water Rights, Page 384 et seq.

19/  Wiel, Water Rights on Western States, 3rd Ed, Page 45 et seq.

7—1404

within the scope of the appropriation as a first

use is." [20]

Favorably quoted in the last cited decision of the Supreme Court is this

excerpt from a case relied upon:

"One who by the expenditure of money and labor diverts

appropriable water from a stream, and thus makes it

available for fruitful purposes, is entitled to its

exclusive control so long as he is able and willing

to apply it to beneficial uses, and such right extends

to what is commonly known as wastage . . . Considera-

tion of both public policy and national justice

strongly support such a rule. . . . So long as he

does not abandon it or forfeit it by failure to use,

he may assert his rights . . . . In short, the

right of an appropriator in these respects are not

affected by the fact that the water has once been

used." [21]

California's Supreme Court has relied upon the case of United States v.

Ide in an important decision:

"Once within the basin, en route to plaintiff's di-

version works, it was in effect within plaintiff's

reservoir. Moreover in United States v. Ide . . .

it was held that a reclamation district had the

right to retake seepage, even though the water had

left the boundaries of the district . . . where such

recapture had been planned . . ."

Then applying the principles of recapture, the California Court declared:

" . . . Plaintiff selected an area where it could

_____

[20] Ide v. United States 263 US 497, 505 (1923)

[21] 263 U.S. 497, 506 (123)

-10-

7—1404

U. S. GOVERNMENT PRINTING OFFICE

6533

1        recover as much water as possible from seepage,

2        and it should not be deprived of the benefit of

3        its foresight." [22]/

4    Having recovered the sewage which would otherwise have wasted; having

5    transported it back into the watershed of the Santa Margarita River,

6    there is no basis for reducing the original appropriative right to use

7    the Basin waters.  Rather as the Supreme Court of the United States of

8    America and of California have declared, the National Government

9        should not be deprived of the benefits of its labor

10        and of its foresight.

11        Beneficial use of the waters by the United States of America

12   has been proved and has not been challenged by California or any of

13   the defendants.  Accordingly, right of the United States of America to

14   use and re-use the waters should not be impaired by the facts presented.

15        Closely related to the right of the United States of America

16   to recapture and use without penalty the sewage effluent is the right

17   to use and re-use the waters in Lake O'Neill.

18        "Seventh, in recognizing the United States' right to store
19        water in Lake O'Neill, one of the beneficial purposes for
         which that appropriative right is permitted is, . . . to
20        recharge the ground water basins. . . . the United States
         has an appropriative right . . . to put water into the
21        ground for re-use.  It cannot now get another appropria-
         tive right to use those same ground waters."
22
23        Response to California in regard to Lake O'Neill involves the

24   basic concepts of the law which were alluded to above respecting the

25   recapture of sewage effluent.  This Court has found that the surface

26   waters diverted from the Santa Margarita River and stored in Lake O'Neill

27   are used beneficially while thus stored.  Having been there beneficially

28   used, those waters are then released into the Basin.  There they join

29   the mass of percolating waters.  They are then re-used by the United

30   ────────────────────────────────

31   [22]/  City of L.A. v. City of Glendale 23 C(2) 68, 78; 143 Pac (2) 289
             (1943)

32

7-1404

U. S. GOVERNMENT PRINTING OFFICE

-11-

6534

States of America.  Warranted as a consequence of that fact is a re-
iteration of the words of the Supreme Court:  "The defendants insist
that when water is once used under the appropriation it cannot be used
again,— that the right to use it is exhausted.  But we perceive no
ground for thinking the appropriation is thus restricted.  . . . A
second use in accomplishing that object is as much within the scope of
the appropriation as a first use is." [23/]  That principle is in keeping
with the basic tenet of Western Water Law requiring the highest and
best use of the water resources.

Further factors of importance arises from California's com-
ments on the re-use of Lake O'Neill water.  They relate to where and
how those waters are re-used.  Having been released into the Basin after
their initial beneficial uses in Lake O'Neill, the waters may be consumed
by the vegetative cover of the surface of the Basin, applied to needs
within the watershed or otherwise utilized.  It does not follow nor is
there any basis for declaring that the re-used Lake O'Neill water is ex-
ported outside of the watershed.  Assuming that they are exported, never-
theless, a substantial quantity

will be returned to the Basin for reuse as sewage

effluent.

Under the circumstances, there is no just cause for reducing
the quantities of percolating ground waters which the United States of
America may pump out of the watershed in the exercise of its claimed ap-
propriative rights in the Basin.

Consideration in the light of this review will now be directed
to this fundamental question tendered by California:

"The third point . . . admitting that an appropriator of
percolating waters need not file with the State to obtain
a right to the percolating waters, can he, without filing

23/  Ide v. U.S. 263 US 497, 505 (1923)

§535

1   with the State, reach upstream and make a demand upon
2   the surface waters which may recharge the ground waters
    from which his diversions are being made?"

3   Response to that inquiry by California is in the affirmative.

4   Manifestly the right to "reach upstream and make a demand upon the sur-

5   face waters" is subject to all rights vested at the time of the initi-

6   ation of appropriative claim to percolating waters through the pumping,

7   exportation and application of those waters to beneficial uses. Never-

8   theless, the very essence of an appropriative right contemplates reach-

9   ing up stream, and subject to prior vested rights demanding that waters

10  flow down to the appropriator without interference from junior claimants.

11  Absent that power, the appropriative right in the percolating waters

12  would be totally barren.

13  Full support for the affirmative response to California's

14  third question is contained in a leading decision of the State's Highest

15  Court.  24/  There the City of Lodi pumped percolating water from a ground

16  water basin fed by the Mokelumne River.  It claimed an appropriative

17  right against two defendants who had filed applications with California

18  to appropriate surface flow upstream from Lodi.  The trial court found,

19  among other things that:

20      " . . . by reason of said diversion and beneficial use
21      plaintiff (Lodi) has acquired an <u>appropriative right</u>
22      to take from the underground water bearing strata fed
23      by the Mokelumne River . . . a total of 3600 acre
24      feet annually."  25/

25  Comporting with that Finding, the trial court concluded as a matter of
26  law that the City of Lodi:

27      " . . . is entitled to a judgment and decree declaring

28

29  ─────────────────────────────────
30  24/  Lodi v. East Bay Municipal Utility District, 7 Cal (2) 316; 60 Pac (2)
         439

31  25/  Finding No. XI, San Diego County Library, Appendix to Brief of Ap-
         pellant-Def., East Bay Municipal Utility District, Lodi v.
32       East Mun. Dist., pages 94; 138; 144-45 et seq.

7—1404

U. S. GOVERNMENT PRINTING OFFICE

6536

that (it) the plaintiff, by virtue of its own prior

appropriation . . . is the owner of a right to appro-

priate, pump and divert . . . the waters percolating

through the water bearing strata which underlie said

Lodi area in the Lodi area in the Mokelumne Basin to

the extent of a maximum diversion of . . . 3600 acre

feet per year . . . such right of plaintiff (Lodi)

is prior in time and superior in right to any claim

of appropriation that the defendants or either of

them, have to the waters of the Mokelumne River . . ." 26/

Based upon these Findings and Conclusions the Trial Court decreed in

part as follows:

" . . . it is hereby ordered, adjudged and decreed;

First.  That plaintiff, City of Lodi, a municipal

corporation, by virtue of its own appropriation . . .

has a legal vested right to appropriate, pump and

divert the waters percolating through the water-

bearing strata which underlies said Mokelumne Basin

. . . which basin is fed by the waters of the

Mokelumne River to the extent of 3600 acre feet per

year; . . . such right of the plaintiff is prior

in time and superior in right to any claim of appro-

priation that the defendants . . . have to the waters

of the Mokelumne River . . . the title of plaintiff

(Lodi) to the appropriative right hereinabove adjudged

to be vested in it is hereby quieted against both de-

fendants herein . . ." 27/

---

26/  Conclusions of Law No. I, San Diego County Library, Appendix to
     Brief of Appellant-Def., East Bay Municipal Utility District;
     Lodi v. East Bay Mun. Dist.

27/  San Diego County Library, Appendix to Brief of Appellant-Def., East
     Bay Municipal Utility District; Lodi v. East Bay Mun. Dist.,
     Pages 94; 138; 144-45 et seq.

7-1404

U. S. GOVERNMENT PRINTING OFFICE

6537

Affirming the judgment of the trial court on the proposition here involved the Supreme Court of California declared:

> "The City of Lodi is an appropriator for municipal
> purposes from the underground waters supplied by the
> Mokelumne River, prior in time and right to any claim
> of the District . . . <u>The District is a subsequent
> appropriator upstream from Lodi.</u>" [28]

Stressed here is this fact:

> In the Lodi case, an appropriator of percolating ground
> water "reached" upstream and successfully made "a
> demand upon the surface waters" which recharged the
> basin from which it pumped.

That appropriative right was thus decreed and the decree approved by California's Supreme Court:

> a. although Lodi did not plead a filing with the State
> of an application to appropriate;
>
> b. there is no finding of a filing of an application to
> appropriate with the State; and
>
> c. upon those facts the trial court awarded the City of
> Lodi a prior appropriative right in the percolating
> waters against junior appropriators in the surface
> flow of the stream which recharges those percolating
> waters.

There is thus presented based upon unassailable California authority that an appropriator of percolating ground water is entitled to have its rights decreed prior and superior to upstream surface water junior appropriators. [29]

> An authorative analysis of the Lodi case buttresses the con-

---

[28] 7 Cal(2) 316, 335; 60 Pac(2) 439 (1936)

[29] 7 (Cal(2) 316,346-347; 60 P(2) 439 (1936)

U. S. GOVERNMENT PRINTING OFFICE

6538

clusion that an appropriative right in percolating ground water "reaches" upstream to the source of recharge—here the Santa Margarita River.[30] There it is stated: "The right of a prior appropriator of ground water to protection in a reasonable means of diversion as against a junior appropriator was declared by the supreme court in Lodi v. East Bay Utility Dist." Other cases in California recognize the general principle that owners of rights to ground waters are protected from invasion by junior appropriators.[31]

California's question immediately following the query of the right of the United States of America against upstream users is as follows:

"The fourth point . . . is . . . whether there is a surplus in the ground water basins within Camp Pendleton."

Antecedent to responding to that question, it is essential that certain facts be reviewed:

a. The United States of America owns the entire Basin underlying Camp Pendleton.

b. Recharge for that Basin is from the surface stream. Upon leaving the stream and entering the alluvial fill the waters lose their identity with the flow and become percolating ground waters not part of the stream.

As a consequence, the prime question is not whether there is a surplus in the Basin but whether at the time that the appropriative claim in the percolating water was initiated, there was a surplus in the Santa Margarita River sufficient to provide the requisite recharge for the Basin. Due to the climatic conditions the principal runoff of

---

30/ The California Law of Water Rights, Page 481

31/ See Analysis of Cases, 2 Wiel Water Rights in the Western States, 970, 997 et seq.

the Santa Margarita River is in the winter months from November through
March. Water used by riparian and overlying landowners is minimal—a
fact repeatedly found by this Court. Winter waters surplus to all
riparian and overlying needs upstream from Camp Pendleton flow down the
Santa Margarita River and recharge the alluvial fill constituting per-
colating ground waters underlying Camp Pendleton. Those surplus waters
which entered the Basin are transported by the United States of America
outside of the watershed and applied to beneficial uses. They are
surplus to all upstream riparian and overlying needs. When those ap-
propriative rights in the Basin were initiated, neither Vail Company
nor Fallbrook had made filings with the State to appropriate surplus
waters of the Santa Margarita River. Thus the United States of America
is entitled to have adjudicated to it a priority for an appropriative
right in the waters of the Basin underlying Camp Pendleton, senior to
Vail Company's priority, in an amount equal to the greatest quantity of
percolating ground waters diverted from the Basin and beneficially used
in any one year before Vail Company made their filing. Similarly, the
United States of America is entitled to a priority senior to Fallbrook
in an amount equal to the largest quantity of water pumped by the United
States of America and beneficially used outside of the watershed, ante-
cedent to the priority date or dates ultimately adjudged to that District.

California further presents this question:

"Second, the Stipulated Judgment clearly provides . . .
that . . . United States has a right to use any water
which was allocated to it on any of its land. . . .
Under the circumstances . . . there is at least the
probability that this use was merely a permissive use
with the result that the United States of America did
not acquire an appropriative right by its pumping, ex-
portation and beneficial use of the waters from the
Basin. . . ."

Prior to making response to California's inquiry, this question
must be presented by the United States of America:

Is it California's position that Vail Company could
not acquire an appropriative right for Vail Dam by

7—1404

U. S. GOVERNMENT PRINTING OFFICE

6540

reason of the Stipulated Judgment?

The error in California's question stems from its failure to distinguish between the acts requisite under State law to acquire a vested appropriative right and voluntary agreements between water users as to how they will exercise their rights. [32/] Certain it is that the Stipulated Judgment between the United States of America and Vail Company could not preclude them from asserting their appropriative rights against Fallbrook, not a party to and not bound by that Judgment.  As Wiel points out: "A reference to the cases at large will disclose contracts of all kinds made by the appropriators whereby the water is apportioned between them, sold or dealt with like other property."[33/] Thus when Vail Company and Rancho Santa Margarita entered into the Stipulated Judgment and had it confirmed by the Court they effectuated an arrangement satisfactory to themselves.  However, that arrangement could not be considered a substitute for—or an impediment against—fulfilling the requirements for the acquisition of appropriative rights.  A most thorough search of the law fails to reveal any basis for a conclusion to the contrary.

Greater clarity in this response to the question asked by California may be attained by reference to certain of California's comments regarding the proposition which it raised.  Alluding to Oviatt's claims on the Cleveland National Forest, California states:

" . . . (Oviatt's) use was merely a permissive use and this Court held upon the urging of the State and the United States that Oviatt did not obtain a water right." [34/]

Reference in that regard is made to the fact that Oviatt diverts water from the National Forest pursuant to an express license from the United

---

32/  Matters pertaining to the ownership of the rights to the unappropriated waters, or Federal-State relationships, are in no sense involved in this question.

33/ 2 Wiel, Water Rights in the Western States, 3rd Ed, Page 571

34/ California's Letter, Page 2

7—1404

U. S. GOVERNMENT PRINTING OFFICE

6541

State of America.  Contained in the arrangement thus to divert from the National Forest is a specific provision that no right to the use of water vests in the holder of the permit by reason of it.  Important in that regard is the fact that the waters used by Oviatt are diverted from Reserved Lands of the United States of America and those waters are not subject to appropriation. 35/

Necessarily, in view of the facts of the Oviatt case, it does not and could not constitute a precedent in regard to the claimed appropriative rights of the United States of America which are here being considered.

Continuing in its comments California then states:  "I believe also that Fallbrook Public Utility District has received permission from the United States' predecessor to use certain water.  I rather doubt that Fallbrook could be found to have obtained a water right when the use of the water was pursuant to permission."

As a general proposition, the United States of America agrees with California that Fallbrook could not acquire a valid appropriative right as against the United States of America.  Obviously, Fallbrook when it was diverting water pursuant to a license which recognizes the title of the United States of America, could not act in derogation of that title.  However, that is a proposition entirely foreign to the issue presented by the question now being reviewed.  Observed in regard to the foregoing is the fact that these observations relate only to the failure of California's analogy and have no bearing in regard to the conflict between the United States of America and Fallbrook and their respective rights.

Acting pursuant to California's law, Rancho Santa Margarita pumped water from the Basin underlying its property, it exported part

---

35/  Federal Power Comm. v. Ore., 349 US 435, 448 (1954)

7—1404

U. S. GOVERNMENT PRINTING OFFICE

6542

1   of that water from the watershed and applied it to a beneficial use.

2   Based upon the principles reviewed in the memorandum of the United

3   States of America to which California's letter is directed, the Rancho

4   by those acts acquired a vested appropriative right in those waters. 36/

5   Those rights were acquired by the United States of America.  It now ex-

6   ercises those rights, moreover, the United States of America increased

7   those diversions out of the watershed, used the waters beneficially

8   and under California's law became invested with additional appropriative

9   rights in that Basin.  That statement is fully in accord with Cali-

10  fornia's law and policy as ennunciated in the following quotation from a

11  leading case respecting the appropriation of percolating ground waters:

12      "The California courts, however, use the term (appro-

13      priation) to refer to any taking of water for other

14      than riparian or overlying uses. . . .

15      Public interest requires that there be the great-

16      est number of beneficial uses which the supply can

17      yield, and water may be appropriated for beneficial

18      uses subject to the rights of those who have a law-

19      ful priority. . . . In California surplus water may

20      rightfully be appropriated on privately owned land

21      for nonoverlying uses, such as devotion to a public

22      use or exportation beyond the basin or watershed.

23      It is the policy of the state to foster the

24      beneficial use of water . . ., and when there is a

25      surplus, whether surface or ground water, the holder

26      of prior rights may not enjoin its appropriation." 37/

27  Further comment on California's query number two (2) would not

28  aid the Court.  Seemingly, the United States of America, Vail Company

29

30  _____

31  36/ Memorandum of June 20, 1961, Page 7

32  37/ Pasadena v. Alhambra, 33 Cal(2) 908, 925; 207P(2) 17 (1949)

7—1404

U. S. GOVERNMENT PRINTING OFFICE

6543

1    and Fallbrook have equal interests in the proposition which California

2    has advanced.  If an agreement among water users as to how they will

3    exercise their respective claimed rights precludes the acquisition of

4    appropriative rights, then California should set forth the authorities

5    upon which it relies for that conclusion.  As stated, a search of the

6    law has failed to reveal authorities which would support California's

7    position.

8           California has not presented and consideration has not been

9    directed to the issue of the effect of this Court's ruling upon the

10   enforceability of the Stipulated Judgment as that ruling may relate

11   to the claimed appropriative rights of the United States of America and

12   Vail Company.

13                               UNITED STATES OF AMERICA

14

15                               _____

16                               RAMSEY CLARK,
                                 Assistant Attorney General
17

18   Dated:  August 3, 1961       WILLIAM H. VEEDER,
                                  Attorney, Department of Justice
19

20

21

22

23

24

25

26

27

28

29

30

31

32

STATE OF CALIFORNIA
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF JUSTICE
LIBRARY AND COURTS CUILDING, SACRAMENTO 14
July 20, 1961

Honorable James M. Carter
District Judge
United States District Court
Southern District of California
323 U. S. Customsand Courthouse
San Diego, California

Dear Judge Carter:

I have received a copy of a motion by Mr. Veeder wherein he has noticed for July 25, 1961, a motion to have declared that the United States has an appropriative right to export and use water outside the watershed. The jist of this motion is that the diversions are from ground waters which are percolating waters, and that it is not necessary to file with the State of California to obtain an appropriative right thereto.

While I generally agree that a right can be obtained to percolating water without filing with the State, the problem in this case is not that simple, and I find after reading the United States' memorandum that the questions I feel must be answered have not been considered therein. I would suggest that before this matter be argued before this court, the United States file a brief which considers the following questions. I emphasize that these questions are ones that I feel must be answered, and undoubtedly other counsel will have other points which they feel should be briefed. After the United States has filed its brief it is submitted that the defendents should have an opportunity to reply in writing.

7—1101
U. S. GOVERNMENT PRINTING OFFICE

6545

Honorable James M. Carter      -2-            July 20, 1961

First, is the ground water within the younger alluvium percolating waters or part of the stream?

Second, the STIPULATED JUDGMENT clearly provides that under the terms of that document the United States has a right to use any water which was allocated to it on any of its lands. Throughout this case, Mr. Veeder has continually stated that the United States exported water outside of the watershed, acting upon and pursuant to the provisions of the stipulated judgment. He stated in the record numerous times that this conduct on the part of the United States did not and could not have resulted in any detriment to those who were not parties to that stipulated judgment. In short, it has been the United States' position up to now that their use of water outside the watershed was by stipulation formalized into a judgment and not under a claim of any water right. Under such circumstances it appears to me there is at least the probability that this use of water by the United States is analogous to the situation which we encountered in such cases as Oviatt, where his use of water was permitted under a revocable license issued by the United States. It was the State's position so far as Oviatt is concerned, which position was concurred in by the United States, that his use was merely a permissive use and this court held upon the urging of the State and the United States that Oviatt did not obtain a water right. I believe also that Fallbrook Public Utility District has received permission from the United States' predecessor to use certain water. I rather doubt that Fallbrook could be found to have obtained a water right when the use of the water was pursuant to permission. The mere fact that in

Honorable James M. Carter        -3-          July 20, 1961

the United States case the permission to use water outside
the watershed was finalized by a judgment would not seem
to change the result that when water is used pursuant to
an agreement a water right is not obtained thereby.

The third point which I think should be
considered by the United States in their brief is whether,
admitting that an appropriator of percolating waters need
not file with the State to obtain a right to the
percolating waters, can he, without filing with the State,
reach upstream and make a demand upon the surface waters which
may recharge the ground water from which his diversions are
being made?

The fourth point which I think the United States
should consider in their brief is to face up to the
question as to whether there is a surplus in the ground
water basins within Camp Pendleton. As I remember the
arguments of Mr. Veeder in this case, he has continually
placed into the record statements that his ground water
basins are at a drastic water level. The claimed
appropriative right that he now asserts is to the ground
water of that basin. He cannot get an appropriative right
to the water of the Santa Margarita River without filing
with the State. The only way he can get an appropriative
right to the percolating ground water is to establish that
the overlying demands or uses of that basin are such that
a surplus to satisfy the appropriation physically exists.
If in fact there is not a surplus above that used for
overlying lands, he does not have an appropriative right.
Of course, in the usual basin case where there have been

U. S. GOVERNMENT PRINTING OFFICE

6547

Honorable James M. Carter        -4-        July 20, 1961

an appropriation from without the basin and no surplus
exists, the appropriator is found to have obtained a
prescriptive right. In this case, as prescription does
not run upstream and as the United States owns all the
land which overlies the basin and cannot obtain a
prescriptive right against itself, no claim for a
prescription can properly be made.

Fifth, nowhere in Mr. Veeder's brief do I find a
reference to what particular amount of water he is claim-
ing as an appropriative right. I am sure the court and
counsel recall the numerous instances where Mr. Veeder
has successfully contended that the defendants have not
proven an appropriative right because they have just not
established the _actual_ amount of water used. This has
also been the State's position; and, as I recall, both the
State and the United States advocated, for example, that
Gibbon and Cottle had not proved their appropriative right
because their evidence did not establish what actual
amount of water was used on the land. I submit that the
United States should clearly set forth in its memorandum
what amount of water it is claiming it or its predecessor
has actually beneficially used outside the watershed, and
the places where such water use actually occurred. I
emphasize that the State for one will contend that the
mere fact that certain land was irrigated in the past does
not establish an appropriative right to water unless
evidence is introduced which clearly shows the amount of
water which was placed upon that land and beneficially
used.

Honorable James M. Carter     -5-     July 20, 1961

Sixth, under California law an appropriator who does not use the water for a period of three years (or possibly five years) loses the appropriation right (see Water Code Section 1241). I think Mr. Veeder in his brief must establish that his diversions outside the watershed have been continuous and that, therefore, there has been no non-use which would have resulted in the loss of the claimed appropriative right.

Seventh, in recognizing the United States' right to store water in Lake O'Neill, one of the beneficial purposes for which that appropriative right is permitted is, as I understand it, to recharge the ground water basins. In short, one of the beneficial purposes for which Lake O'Neill appropriative water is permitted is to put water into the basins in Camp Pendleton for subsequent re-use. The United States has an appropriative right for that water stored at Lake O'Neill for this purpose and to the extent that the water claimed under their now-asserted appropriative right would be diverting water which had been placed into the watershed from Lake O'Neill they cannot get a new appropriative right for this water. In other words, the United States has an appropriative right to put water into the ground for re-use. It cannot now get another appropriative right to use those same ground waters.

Eighth, as I recall the evidence, the amount of water diverted from the watershed has not been identical to the actual depletion of the ground water basin, for a substantial amount of the water diverted has been returned

Honorable James M. Carter       -6-          July 20, 1961

thereto. Is Mr. Veeder contending that his appropriative

right is to the total divertive figure without deducting

therefrom the amount returned to the basin?

It is submitted from the above that the defendants

have a right to insist that the United States submit an

opening brief which discusses these points and which

clearly advises the defendants as to the United States'

position in regard to these points. As I mentioned

previously, other defendants may also have points which

they feel the United States must consider before any

argument on their claimed appropriative right comes before

this court for hearing. So far as the State is concerned,

I do not want to be in a position as has often occurred

in the past of having the United States assert a right by

motion and placing upon the defendants the burden of prov-

ing that the United States does not have the right. This

is a quiet title suit where everyone must prove his own

right, and it is not the duty of any defendant to disprove

what is merely claimed. In my view under the facts which

exist in this case, the defendants are entitled to a brief

from the United States which fully discusses all the various

legal questions which are pertinent to their claimed

appropriative right.

It is respectfully suggested that at the hearing

on July 25, the United States motion not be heard but that

counsel for the United States be directed to file a

memorandum considering the points raised herein and that

the defendants be given a reasonable opportunity to reply

thereto. Of particular importance I feel that the United

Honorable James M. Carter         -7-         July 20, 1961

States should fully discuss whether it can get an
appropriative right to water when, pursuant to the record
in this case, the United States has taken a continual and
constant position that the water use to which it now
claims an appropriative right was based on a permissive
agreement reached amongst the two major water users.

Copies of this letter have been sent to the
persons named below.

Very truly yours,

STANLEY MOSK
ATTORNEY GENERAL


F. G. Girard
Deputy Attorney General

FGG:ac

ccs:   Frank R. Sachse
George Stahlman
James H. Krieger
William Vedder (San Diego and Washington)

6551