GEORGE STAHLMAN
Attorney at Law
Route 1, Box 235
Fallbrook, California

Telephone: RAndolph 8-2310

Attorney for Vail Company

FILED

AUG 25 1961

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ........................

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,                )
                                         )
                 Plaintiff,              )     NO. 1247-SD-C
                                         )
vs.                                      )
                                         )
FALLBROOK PUBLIC UTILITY                 )
DISTRICT, et al,                         )
                 Defendants.             )

MEMORANDUM RESPECTING NOTICE OF HEARING
FILED BY THE UNITED STATES OF AMERICA, JUNE
30th, 1961, CLAIMING APPROPRIATIVE RIGHTS TO
WATERS IN THE SANTA MARGARITA RIVER.

PRELIMINARY STATEMENT

United States of America on June 30th, 1961, filed a Notice of Hearing together with a Memorandum Claiming Appropriative Rights to Waters of the Santa Margarita River, and on August 4th, 1961, filed a document entitled Response to a Letter of July 20th, 1961, respecting the memorandum of the United States of America relative to its appropriative rights in the ground water basins underlying Camp Pendleton.

The position taken by the United States as outlined in the response appears to be that they are claiming rights to the use of water heretofore used outside the watershed of the Santa Margarita River and extracted from the underground water basin by means of pumps which are located on Camp Pendleton claiming that the water so extracted and exported are waters which are not part of the flow of the Santa Margarita River or the sub-flow of that stream.

-1-

That said waters have been appropriated by being placed to beneficial use and that waters of this character do not require the filing of an application nor the obtaining of a permit as is required by California Water Law in relation to the appropriation of waters from a stream. It seems to be the position of the United States that to appropriate percolating waters which are not a part of a stream would not require conformity with the laws of appropriation of waters as is required by the California Statutes.

The Government concedes that if the waters are a part of the Santa Margarita River no appropriation could be made except as required by the laws of the State of California, to wit: The filing of an application to appropriate and the performance of the other legal requirements which have been so often discussed in this case.

We feel that both the Memorandum in regards to the Notice of Motion and the Government's response to California's letter of July 20th, 1961, clearly demonstrates that the United States has an erroneous and mistaken concept of both the physical characteristics of the Santa Margarita River as disclosed by their own evidence and the application of the California decision regarding percolating waters which apply thereto. This misconception stems from the Government's inability to differentiate between percolations tributary to a surface supply as distinguished from defused percolating waters.

### GOVERNMENT'S POSITION UNSOUND

The Government's position is a belated and hastily conceived theory unsupported by evidence or adequate research.

The opportunity to make the claim of an appropriative right as herein contended has existed since the year 1923 when the predecessors of the United States entered into litigation with Vail Company concerning the rights to the use of water on this same land.

1. No such claim was made during the litigation between the predecessors, Rancho Santa Margarita, throughout the many years of litigation concerning the water rights between them and Vail Company.

2. There was no such claim made in the original complaint or the amended and supplemental complaint filed by the Government in this case.

3. No such claim was made during the trial when the Government was

pursuing its claims against the Santa Margarita Mutual Water Company before Judge Yankwich.

4. The Government in protesting application to appropriate water by Fallbrook and by Vail Company made no such claim in their testimony before the State Water Rights Board nor in any of the voluminous documents, exerting claims and protesting claims which were heard in the aforesaid State Water Rights Board hearing.

5. When the Government filed with the State of California two applications to appropriate water from the Santa Margarita River which said applications were subsequently abandoned, there was no claim nor declaration in the many documents filed by the government to a claim for a prior appropriative right.

6. At no time during the pre-trial conferences which lasted over many months nor during the trial in the present action was any such claim mentioned or even hinted.

7. The Government's testimony has at all times been completly inconsistent with the position now taken that an appropriation to the use of water outside the watershed of the Santa Margarita River has been exercised by the Government from percolating waters which were not a part of the stream.

## GOVERNMENT'S PREVIOUS CONTENTION

The record is repleat with evidence that the position of the Government as now contended is of recent origin. On Page 2332, line 12, et seq., Vol. 25 the following occurred.

QUESTION: (By Veeder referring to U.S. Exhibit 15)
"What are the yellow areas that are depicted on that map?"

Answer: (By Kunkel)
"The yellow areas are the youngest alluvial deposits that occupy the flood plane of the present day stream channel and their tributaries."

This description of the younger alluvium as given by Mr. Kunkel characterizes the alluvial full throughout the Santa Margarita River and its tributaries and is consistent with all of the testimony in describing the stream system before the master and before this Court by Government witnesses including the geologist, Mr. Worts, Colonel Bowen, and other witnesses from Camp Pendleton. Mr. Worts testified: Vol. 38, Page 3953, as follows, to wit: Line 14, et seq.

-3-

QUESTION:

"You use the term "Terrace Deposit". Would you state the meaning and the connotation to be ascribed to it."

ANSWER:

"Terrace Deposit" in this case, let's take Chappo sub-basin and the Terrace Deposits that are shown in Section 13 and 14, 10 South 5 West. These are all old alluvial deposits, deposited in much the same manner as the younger allivium is now being deposited. The surface of the younger alluvium and underneath that surface is the terrace."

Worts further testified, Page 3957, line 23, et seq.

QUESTION:

"What is the next formation that you investigated Mr. Worts."

ANSWER:

"The next formation is the alluvium shown on the legend of the map symbol QAL on plaintiff's 37. It is the principal water bearing deposit in which or from which the camp and irrigation wells obtain."

QUESTION:

"That is Camp Pendleton."

ANSWER:

"Camp Pendleton and irrigation wells obtain their supply and is shown by the legend. These deposits yield water to wells at rates of up to 2000 gallons per minute."

QUESTION:

"Where are these generally located. Would you make reference."

ANSWER:

"As shown by the color yellow on Exhibit 37, they extend along the thread of the Santa Margarita River up at and in as far North on this map as Section 28 9 South 4 West, and in DeLuz Creek, Section 29 extended continuously Southward through what is called upper basin chappel, sub-basin, Ysidora sub-basin down to the coast.

Page 3958, line 25, et seq., Witness Worts testified:

QUESTION:

"Would you state whether the younger alluvium extends away from the stream bed into the area which you have depicted on there as the LaJolla formation."

ANSWER:

"The younger alluvium extends up the minor tributaries, and minor drainages, that drain off the LaJolla formation of the San Onofre Breccia of the San Mateo formation and off the basement complex in those places the deposits are fine grain, largely sand and silt, and clay intermixed and not a source of water compared to the quantities available out of the deposits laid down by the Santa Margarita River. Page 3958, line 25, page 3959, line 10.

Worts further testified: Page 3971, line 22, et seq., By Mr. Veeder:

QUESTION:

"Would you state what is the relationship between the upper chappo and Ysidora basins from the standpoint of hydrologic and geological inter-connection."

ANSWER:

"Hydrologically and geologically they are interconnected as is shown on plaintiff's 38. They extend as one continuous unit even from above the arbitrary upstream from the DeLuz dam sight and down stream below Ysidora narrows to the coast. Basic geological principals provide no other way for a deposit such as the alluvium to be inplaced there without there being a continuous unit through there. After all, you have had a through flowing stream since the time that the ancient Santa Margarita had cut down through the base of the alluvium. There is no way geologically that you could deposit the alluvium in the valley without having it laid down as one longitudinally continuous unit."

Again on page 3972, line 14:

QUESTION:

" Would you describe in the record the kind and type of container in which this alluvial deposit is presently residing."

ANSWER:

"The alluvial shown in yellow in Exhibit 37 is surrounded by these materials that I have previously testified to. These rocks, the consolidated rocks that form the sides and bottom of the water bearing unit very much like a generalized and badly bent bath tub. In otherwords, you have an elongated deposit down through here that is surrounded by these consolidated rocks from which, in testing them for their supply we could hardly get any water out of the wells so that it is more or less of a water tight, well you could hardly call it wholly water tight, but it is nearly water tight container."

QUESTION:

"From the standpoint of depth extending latterly,

-5-

6557

would you describe the charactertics of the younger alluvium."

ANSWER:

"I think we have an isopach map which shows the latteral extent of the alluvium. Now the surface as expressed in the map in the field as shown on Exhibit 37 <u>extends from the consolidated rocks along the sides from one side of the valley to the other.</u> We then showed the Exhibit 38 the maxium depth down through the valley and Exhibit 39 shows the latteral extent of the younger alluvium as viewed from above."

Again page 4006, line 8, et seq.

QUESTION:

"In regards to plaintiff's Exhibit 46 for identification will you state the title of Exhibit."

ANSWER:

" The title of the Exhibit is Hydrographs of paired shallow and deep wells in Ysidora sub-basin Camp Pendleton."

Thereafter on line 23, and furthering answering this question the witness stated:

"I will refer to Exhibit 37 to spot the location. We have here on Exhibit 46 wells 35-K-1, K, 4. In section 35, 10 South 5 West near the river to show how the shallow water on the West side of the basin near the river responds not only to re-charge from the river but also for pumping effects."

Again on page 4009, a portion of a long answer is as follows, line 8.

"If this were merely a pressure response in a confined aquifer the deep well would shoot, rise rapidly, and the shallow well would not. Now that condition is depicted on the East side of Ysidora sub-basin where the pressure affect of recharge from the river <u>on the East side is transmitted rapidly across the basin to the other side.</u>"

The above excerpts from the testimony of Government's Chief geologist amply demonstrates that all percolating waters contained within the basins located on Camp Pendleton are <u>percolating tributary to a surface supply.</u> The whole of Mr. Worts' testimony is completely consistent with this position

### GOVERNMENT'S POSITION IN FORMER TRIAL

At all times during the trial held before Judge Yankwich, the government produced evidence and the Court so found that all water within the deliniated boundaries of the three sub-basins within Camp Pendleton were part of the

-16-

Santa Margarita stream.

Mr. Worts then testified (transcript October 30 and 31, 1552, Vol. 2, page 215, et seq.) in support of his studies of the capacity of the basin and also supporting his claim of salt water intrusion, repeatedly demonstrated the interconnection between stream runoff extraction and underground waters.

The Court's attention is called to finding in the instant case. Lodged February 10, 1953, and filed herein February 24, 1953, page 8, et seq., wherein the Court found as follows, to wit:

### UNDERGROUND BASINS

36. From its head waters to the Pacific Ocean, the watershed of the Santa Margarita River System is underlaid with numerous subterranean basins. They differ greatly in size and capacity. 36. 37. Underlying the military establishments in question within the Santa Margarita River water shed in an underground basin, with segments of the basin commonly known as:

  1. Upper or O'Neill Basin or Segments;
  2. Chappo or Home Ranch Basin or Segment;
  3. Ysidora or Lower Basin or Segment.

Those segments comprising a <u>single basin are geologically and hydrologically inter-connected</u>. 37.

38. Throughout the ground-water basin within the watershed of the Santa Margarita River underlying Camp Pendleton are numerous wells or varying depths in the alluvium. The surface and sub-surface area and the character and type of deposits penetrated by the wells have been analyzed. 38.

40. Within Camp Pendleton the Santa Margarita River does not flow as a continuous surface stream, but, during the dry season of the year, the stream customarily and ordinarily sinks into the highly porous ground water basin underlying Camp Pendleton. When that basin has been filled, the Santa Margarita River ordinarily comes to the surface some two or three miles from tidewater. In a state of nature it continues then to the Pacific Ocean as a stream of diminishing volume. 40.

---

36. PTO p. 9
37. PTO p. 9; G. F. Worts, Jr., Vol. 3, pp. 240-247
38. PTO p. 9.
40. G. F. Worts, Jr., Vol. 3, pp. 240-247

6589

The water in the underground basins is contained by bedrock or other impervious material. The basins are filled with alluvial deposits of varying degrees of porosity. The waters of the Santa Margarita River, in its course through the valley penetrates and fills the voids of the porous alluvium. <u>When the water of the stream sinks to bedrock or the other impervious material comprising the beds of the basins, in which the detrital material lies, it spreads out laterally filling the basins. When completely charged, the waters of the basins support the surface stream and progress slowly downstream through the permeable material.</u>[41]

## PREDECESSORS MADE NO SUCH CLAIM

The claims of Rancho Santa Margarita, predecessor in interest of the Government were in opposition to the position now assumed by latest Government contentions.

The findings to the effect that underground waters and extractions therefrom were part of the Santa Margarita stream and that there was no surpluses, but on the contrary, a deficiency as found (Vail Exhibit A.B) as follows:

" That the flow of said stream, surface and sub-surface, and the movement of the underground percolating water in contact with, contributing to, and supporting said stream, is along the erroded surface storm water channel of said Temecula Santa Margarita River or stream: That above an upstream from the Temecula Gorge such underground percolating water is confine to the Temecula alluvial basin and the erroded valley of the Murietta Creek, and below said Temecula Gorge such underground <u>percolating water is confined to the alluvial valleys or basins of the Santa Margarita Ranch contiguous to said erroded surface storm water channel.</u> Finding No. 8, page 16, to line 13." Exhibit A.B. (Underscoring ours)

"That one or two, but not a majority of the wells and pumping plants on said Rancho Santa Margarita had fallen into dis-use and into a condition of lack of repair and are now, and for a long time heretofore have been unsuited for the pumping of water and no longer constitute operative pumping plants; but several well ordered and equipped pumping plants are now and for several years

---

41. G.F. Worts, Jr., Vol. 3, pp. 270-271; Exhs. 9-12

last past have been maintained and operated on said Rancho Santa Margarita and upon said lands of said Ranch riparian to said stream by means of which the <u>underground waters on said land lying in the valley of said Santa Margarita River have been pumped and withdrawn</u> and used for beneficial purposes upon said riparian land.  Finding 20, page 45, line 8 to 20." Exhibit Vail A.B. (Underscoring ours).

" That if all the waters of said Temecula Santa Margarita River and all its tributaries were impounded, conserved and distributed to the lands of the plaintiff and the defendants susceptible of practical and profitable irrigation lying within the watershed of said river and riparian thereto would not be sufficient water to irrigate all or nearly all of said lands; neither would there be excepting in years of excessive and abnormal runoffs sufficient water to irrigate the lands of the plaintiff lying within the watershed of said river riparian thereto and susceptible of practicable and profitable irrigation therefrom. Finding 21, page 52, line 12 to line 22."

## PERCOLATING WATERS

Percolating waters may be broadly classified as:

1. Percolations tributory to a surface supply.

2. Diffused percolating waters.

"The cases that arise group themselves into underground waters in or connected with some definite body of water, on the one hand and that which percolates diffused as "ground water" without any such connection.  The former is divided into four classes viz.:

(1) Definite known underground streams;

(2) The subflow of surface streams;

(3) Percolating tributory to water courses;

(4) Subterranian lakes or artesian belts;

Diffused percolating water unconnected with a stream or other definite body, stands separate from these."( Weil on Water Law 3rd Ed. p.1010 ¶1076).

As to whether underground waters fall into one or the other catagories of percolating water is of couse a question of fact.  In comparing physical

-9-

G601

characteristics as outlined in many California decisions. The characteristics of the Santa Margarita and its underground percolating waters as shown by the Governments own evidence in this case we find complete harmony with those decisions determining that the underground waters were connected with some definite body of waters.

Los Angeles v. Pomeroy 124 Cal. 597

Huffner v. Sawday 153 Cal. 86

Verdugo W. Co., v. Verdugo 152 Cal. 655.

Yarwood v. West Los Angeles Etc. Co. 132 Cal. 204.

Hudson v. Daily, 156 Cal. 617.

L.A. v. Hunter, 156 Cal. 603

Pomona W.C. vs. San Antonio W. Co., 152 Cal. 618.

McClintock v. Hudson, 141 Cal. 275.

L.A. v. Hunter, 156 Cal. 603

We believe that the most profound and exhaustive research on the pivital question raised by the Government herein is contained in the works of that well recognized authority on Western Water Law, McKinney on Irrigation and Water Rights Vol. 2, Second Edition P. 2106 ¶1161, et seq:

¶1161. <u>Known dependent subterranean water courses</u> - The underflow of surface streams. - The second class of "defined and known" subterranean or underground streams or water courses, under our classification,[1] are the known dependent subterranean water courses. These waters are dependent for their supply upon the surface stream, or are the "underflow" sub-surface flow", "Subflow," or "undercurrent," as they are at times called, of surface streams. These waters may be defined as those which slowly find their way through the soil, sand, and gravel constituting the beds of streams, or the lands under and adjacent to the surface stream, and are themselves a part of the surface stream.[2]

Those who are acquainted with the water courses in the arid portion of our country know that some of the most important and well-defined surface streams in that section become almost and sometimes entirely, dry during a portion of the year. All of them, nevertheless, have well-defined beds, channels, banks,

---

1. Sec. Sec 1152.
2. For rights to the water of these streams, see Secs. 1162, 1163.

and currents of water at least a portion of the year, and there is at all times what is known as the underflow, and they are in every respect natural water courses, to which legal rights may attach. At certain periods of the year water flows on the surface in a well-defined course, and there is at all times what is known as the underflow. This is the broad and deep subterranean volume of water which slowly flows through the sand and gravel underlying the most, if not all, of the streams which traverse the country adjacent to the mountain systems of the arid region. These underground streams are probably much greater in volume in some cases than the water upon the surface, and are, as far as rights of appropriation or riparian rights are concerned, but a valuable portion of the well-defined surface stream.[3] In fact, it is a common expression used in the West that during part of the season certain streams "flow upside down", that is to say, the rocks and gravel are on top and the water flowing underneath. There is considerable truth in this statement, for at times during the dry season the surfaces of many of them are entirely dry while underneath their dry surfaces may be found flowing the subterranean water.[4]

---

[3] Vineland Irr. Dist. v. Azusa Irr. Co., 126 Cal. 486, 59 Pac. Rep. 1057 46 L. R. A. 824; Platte Val. Irr. Co., Buckers Irr. Mill, & Imp Co., 44 Cal. 77, 53 Pac. Rep. 334; Whitmore v. Utah Fuel Co., 26 Utah 488 72 Pac. Rep. 764; Howcroft v. Union & Jordan Irr. Co., 25 Utah 311, 71 Pac. Rep 487; Wiel on Water Rights in the Western States, 3d Ed. page 1078, all citing Kinney on Irrigation 1st. Ed. Sec. 44.
   See, also, Gould v. Eaton 111 Cal. 639, 44 Pac. Rep. 319, 52 Am. St. Rep 201; id., 117 Cal; 539, 49 Pac. Rep. 577, 38 L. R. A. 181; Barker v. Gould, 122 Cal. 240, 54 Pac. Re. 845 McClintock v. Hudson, 141 Cal. 275, 74 Pac. Rep. 849; Arroye Ditch Co., v. Baldwin, 155 Cal. 280, 100 Pac. Rep. 874; Mentone Irr. Co., v. Redlands etc., Co., 155 Cal. 323, 100 Pac. Rep. 1082, 22 L. R. A., N. S. 382, 17 Am. & Eng. Ann Cas. 1222; Los Angeles v. Hunter 156 Cal. 603, 102 Pac. Rep. 755; Kansas v. Colorado, 206 U. S. 46, 51 L. Ed. 956, 27 Sup. Ct. Rep. 655; ld, 185 U. S. 125, 46 L. Ed. 838, 22 Sup. Ct. Rep. 552; Buckers etc., Co., v. Farmers' etc. Co., 31 Colo. 62, 72 Pac. Rep. 49; Petterson v. Payne, 43 Colo. 184, 95 Pac. Rep. 301; Perry v. Calkins, 159 Cal. 175, 113 Pac. Rep. 136.

4. See Los Angeles v. Pomeroy, 124 Cal. 597, 57 Pac. Rep. 585; McClelan v. Hurdle, 3 Colo. App. 434, 33 Pac. Rep. 280; McClintock v. Hudson, 141 Cal. 275, 74 Pac. Rep. 849; LaJara Creamery & Live Stock Assn. v. Hansen. 35 Colo. 105, 83 Pac. Rep. 644; Kansas v. Colorado, 206 U. S. 46, 51 L. Ed. 956, 27 Sup. Ct. 665; Id., 185 U. S. 125, 46 L. Ed. 838, 22 Sup. Ct. Rep. 552; Whitmore v. Utah, 26 Utah 488, 73 Pac. Rep. 764.
   "The existence of a well-defined subsurface flow within the bed and banks of streams such as this is well recognized." Vineland Irr. Co., v. Azusa Irr. Co., 126 Cal. 486, 58 Pac. Rep. 1057, 46 L. R. A. 820, citing Kinney on Irr. 1st Ed. Sec. 44.
   See, also, for scientific investigations made along this line, the Underflow of the South Platte Valley, by C. S. Schlicter and Henry C. Wolf, Water-Supply and Irr. Paper No. 184, 1906, U.S. Geol. Survey
   See, also, the Geology and Water Resources of many sections of the country, issued as Water-Supply Papers by the U. S. Geol. Survey.

As our name to this class of these waters-the underflow of surface streams- indicates, physically they constitute a part of the surface stream themselves, and are simply incidents thereto; and, also, they in the main depend upon the surface streams to which they are incident for the greater portion of their water supply; the test being that there can not be any abstraction of the water of the underflow, without abstracting a corresponding amount from the surface stream. This is so far the reason that the water from the surface stream must first necessarily fill the loose, porous material underneath to the point of complete saturation before there can be any surface flow, and by tapping and drawing off a quantity of water from the underflow, it draws on the surface flow to the same extent to fill the void.[5] Therefore, the river bed must continue to

---

[5] Montecito v. Santa Barbara, 144 Cal. 578, 77 Pac. Rep. 1113, where the Court held that it was not error to instruct that tunnels driven into the sub-flow created an artifical draft, first upon the saturated strata which supports the flow of the stream, and, exhausting that, or, in the process of exhausting that, to suck down and drain directly the waters flowing in the channel of the stream.

"It is true that there is evidence to the effect that during the summer months, when the stream is dry in the San Pasqual Valley, there is some water running at the defendant's point of diversion. It does not follow, however, that the taking of this water would not injure the respondents. There are long stretches of sandy bottom over the rocky bed above sinks into the sand which must become saturated before there can be a flow over its surface. To so fill this sand requires, as a witness testifies, several weeks. The Court was justified in drawing from this testimony the inference that an interruption to the flow of this water would prevent or diminish the saturation of the sandy bed underlying the stream and thereby materially postpone the time when a surface flow would come to plaintiff's lands. Such postponement would be a clear injury to the plaintiff, whose interest in the waters of the stream included the right to have the river bed continue to hold sufficient water to supply and support the surface stream in its natural state." Huffner v. Sawday, 153 Cal. 86, 94, Pac. Rep. 424.

The sub-surface supply of a stream, whether it comes from tributary swamps or runs in the sand or gravel constituting the bed of the stream, is held to be as much a part of the stream as the surface flow, and is governed by the same rules. Smith v. Duff, 39 Mont. 382, 102 Pac. Rep. 984, 113 Am. St. Rep. 587.

See cases, supra.

See, also, McClintock v. Hudson, 141 Cal. 275, 74 Pac. Rep. 849; Hale v. McLea, 53 Cal. 578; Vineland Dist. Azusa Dist. 126 Cal. 486, 58 Pac. Rep. 1057, 26 L.R.A. 820; Yarwood v. West L.A.W. Co., 132 Cal. 204, 64 Pac. Rep. 275; Verdugo Co., v. Verdugo, 152 Cal. 655, 93 Pac. Rep.

-12-

hold sufficient water to support the surface stream, as it were, for otherwise in drawing up the underground flow of the stream will draw upon the water flowing[6] upon the surface.

If the bed of a stream is not solid rock, but gravel or earth, through which water will percolate, or flow, undoubtedly water will be found sometimes many feet below the surface, and the lighter the soil the more easily will it find its way downward, and the more water will be discoverable by exploring the sub-surface. Undoubtedly, too, in many cases there may be corresponding to the flow on the surface a current underneath the surface, but the presence of such sub-surface water, even though in places of considerable amount and running in the same direction, <u>is something very different from an independent subsurface water course."  It is not properly denominated a second and subsurface stream.  It is rather to be regarded as merely the accumulation of the water which will always be found beneath the bed of any stream whose bottom is not solid rock... As sub-surface it percolates on either side as well as moves along the course of the river, and the more abundant the subsurface water, the further it will reach in its per-colatings on</u> ( Italics)

1021; Cohen v. LaCanada Co., 142 Cal. 437, 76 Pac. Rep. 47; Id., 150 Cal. 680, 91 Pac. Re. 584; Los Angeles v. Pomeroy, 124 Cal. 597, 57 Pac. Rep. 585; Howcroft v. Union & Jordan Irr. Co., 25 Utah 311, 71 Pac. Rep. 487; Whitmore v. Utah Fuel Co., 26 Utah 488, 73 Pac. Rep. 764.

"It must not be forgotten that the sub-surface supply of a stream, whether it comes from tributary swamps or runs in the sand and gravel constituting the bed of the stream is as much a part of the stream as is the surface flow and is governed by the same rules." Smith v. Duff, 39 Mont. 382, 102 Pac. Rep. 984, 133 Am. St. Rep. 587.

6 "It is obvious that the continued presence in the soil, sand, and gravel composing the bed of the canyon of a sufficient quantity of water to supply and support these surface streams in their natural state is essential to their existence and preservation, and that the parties have a clear right to have this quantity remain underground for that purpose as they have to the stream upon the surface. Neither party should be permitted to decrease this necessary quantity of underground water to the depletion of the surface stream and the injury of those to whom it has been assigned." Verdugo Canyon W. Co. v. Verdugo, 152 Cal. 655, 93 Pac. Rep. 1021.

See, also, Huffner v. Sawday, 153 Cal. 86, 94 Pac. Rep. 424; Grand Junction Canal Co. v. Shugar, L. R. 6. Ch. App. 483; Village of Delhi v. Youmans, 45 N.Y. 362, 6 Am. Rep. 100; affirming Id; 50 Barb. 316; English v. Metropolitan etc. Co., 1 K. B. 601.

either side, as well as more distinct will be its movement down the course of the stream."[7] (Italics) Again, as was held in the leading case in California upon this subject, where water passes through the voids of any loose, permeable material, filling or partially obstructing the channel of a stream, it is still a part of the stream. If it all sinks below the surface, the whole stream is subterranean. If a part sinks and the remainder is on the surface, that water which is invisible is as much a part of the stream as the surface flow.[8] Again, many of the streams of this Western country flow a portion of the way over the surface, there being at all times the underflow, and at certain intervals the surface portion of the flow sinks from sight and is carried down with the underflow until it strikes some less permeable ground, when a portion of the water may again rise to the surface. Streams of this character are termed intermittent streams, and both the surface flow and the underflow are treated as a single stream.[9] These waters, in order to constitute the underground flow of surface streams, must be connected with the stream and strictly confined to the river bottom and moving underground, as was stated in a California case, "in connection with it, and a course within a space reasonably well defined."[10] In other words, the water must be within the bed of the surface stream itself.[11] Otherwise such underground waters must be classified with percolating waters hereinafter discussed.[12]

---

[7] Kansas v. Colorado, 206 U.S. 46, 51 L. Ed. 956, 27 Sup. Ct. Rep. 665; Id., 185 U.S. 125, 46 L. Ed 838, 22 Sup. Ct. Rep. 552.
    For independent subterranean water courses, see, Secs. 1156-1160.
[8] Los Angeles v. Pomeroy, 124 Cal. 597, 57 Pac. Rep. 585.
[9] Los Angeles v. Pomeroy, 124 Cal. 597, 57 Pac. Rep. 585; Huffner v. Sawday, 153 Cal. 86, 94 Pac. Rep. 424; Verdugo W. Co., v. Verdugo, 152 Cal. 655, 93 Pac. Rep. 1021; Medano etc. Co. v. Adams, 29 Colo. 317, 68 Pac. Rep. 431; Yarwood v. West Los Angeles etc. Co., 132 Cal. 204, 64 Pac. Rep. 275; Hilger v. Sieber, 38 Mont. 93, 98 Pac. Rep. 881; Hudson v. Dailey, 156 Cal. 617, 105 Pac. Rep. 748; Kansas v. Colorado, 206 U.S. 46, 51, L. Ed. 956, 27 Sup. Ct. Rep. 655; Id., 185 U.S. 125, 46 L. Ed. 833, 22 Sup. Ct. Rep. 552.
[10] Los Angeles v. Pomeroy, 125 Cal. 597, 57 Pac. Rep. 585.
[11] McClintock v. Hudson, 141 Cal. 280, 74 Pac. Rep. 849; Vineland Irr. Dist. v. Azusa Irr. Co. 126 Cal. 486, 58 Pac. Rep. 1057, 46 L.R.A. 820.
[12] For percolating waters, see Secs. 1185-1211.
    See, also, Katz v. Walkinshaw, 141 Cal. 116, 70 Pac. Rep. 663, 74 Pac. Rep. 766, 64 L.R.A. 236, 99 Am. St. Rep. 35.

¶1162 THE UNDERFLOW DEPENDENT ON SURFACE STREAM-RIGHTS WHICH MAY BE ACQUIRED THEREIN- AT COMMON LAW.- The underflow of surface streams being dependent upon the surface streams for their water supply both at common law and under the Arid Region Doctrine of appropriation, are recognized as parts thereof and incidents thereto. Under both of these rules of law rights may be acquired therein, but these rights can be acquired only as a portion of the surface stream. This rule is by no means new to the Arid Region Doctrine of appropriation, but this dependent underflow of surface streams has been recognized at common law both by the English, the Eastern American, and also the Western authorities in those states which have both rules of law governing the waters flowing within their respective jurisdictions. Therefore, the general law upon the subject is that the underflow of surface streams, being portions of them, are governed by the same rules as the surface streams themselves.

## CONCLUSION

If as contended by Governments Counsel (Govt. Response filed Aug. 4, 1961 p. ii, line 11), that percolating waters in the basins underlying Camp Pendleton are diffused percolating waters, not part of the streams then all present uses of water both <u>within</u> as well as without the watershed are being supplied by surplus waters.

What purpose would the extensive, expensive and protracted litigation instituted by the Government accomplish at this time if so large of surplus exists in the basins underlying Camp Pendleton.

To support the Government's contention of appropriation would require the undoing of much which has been accomplished in this case. Findings, conclusions and introlocutory judgments heretofore signed and filed would have to be further reconsidered and rewritten.

All the other basins, both large and small within the watershed of the Santa Margarita stream system would have to be reconsidered and redetermined in the light of Government's present contentions. Also, would it not be incumbrant upon the Court to notify all parties litigant hereto and give them another opportunity to be heard in view of information and declarations which the Court has transmitted by letter and made in open Court?

If as the Government contends there exists surpluses of water to such an extent that they can supply most of the needs of Camp Pendleton from this source, why did they start this lawsuit in the first place?

The Court adhering to the consistent and overwhelming proof of the Geological and Hydrological factors bearing upon this issue as disclosed by the entire record of this case, we feel must find that the ground waters which underlye the younger alluvium in the ground water basins of Camp Pendleton are waters of the Santa Margarita Stream System, and that they add to and support the surface flow and recharge therefrom, and that the Government's request to have said waters declared to be diffused percolating waters found not true.

Respectfully Submitted,

GEORGE STAHLMAN
Attorney for Vail Company

-16-

6608