1

LAW OFFICES
SACHSE AND PRICE
1092 SOUTH MAIN STREET
FALLBROOK, CALIFORNIA
RANDOLPH 6-1154

2

(SPACE BELOW FOR FILING STAMP ONLY)

3

# FILED

4

AUG 25 1961

5

Attorneys for___Defendants_____

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _M.D. Treagsey_____

6

7

8             IN THE UNITED STATES DISTRICT COURT

9               SOUTHERN DISTRICT OF CALIFORNIA

10                   SOUTHERN DIVISION

11   UNITED STATES OF AMERICA,         )
                                       )
12                   Plaintiff,        )        No. 1247-SD-C
                                       )
13       vs.                           )   MEMORANDUM OF FALLBROOK
                                       )   PUBLIC UTILITY DISTRICT
14   FALLBROOK PUBLIC UTILITY DISTRICT,)
     a Public Service Corporation of   )   APPROPRIATIVE RIGHTS OF THE
15   the State of California, et al.,  )   UNITED STATES IN THE GROUND
                                       )   WATERS UNDERLYING CAMP
16                   Defendants.       )   PENDLETON
                                       )

17

18                         I

19                 PRELIMINARY STATEMENT

20          The assertions of the United States respecting its

21   claimed appropriative rights in what it terms "The Ground Water

22   Basin Underlying Camp Pendleton" depend initially upon a deter-

23   mination by the court that the ground waters found beneath surface

24   areas of younger alluvium on Camp Pendleton are not a part of the

25   sub-surface flow of the Santa Margarita River, but on the con-

26   trary, are "percolating" waters as defined in many California

27   cases.  The United States defines  "percolating waters" as

28   follows:  (U.S. Memorandum page ii line 14; page 1, line 18)

29          "Percolating waters in the basin underlying Camp
           Pendleton are those waters which have so far departed
30         from the bed of the Santa Margarita River as to have
           lost their identity as part of the flow or sub-flow
31         of that stream.".

32   The United States then makes the further assertion that this

                         - 1 -

                                              C5914

condition exists in the Pendleton Basin within a distance of ten
feet from the stream bank. (U.S. Memorandum page 1, line 21).

All parties are agreed that the question is one of fact.
It is the position of the undersigned that the record in these pro-
ceedings is such that the Court is compelled to make a finding
that all sub-surface waters found underlying surface areas of
younger alluvium anywhere in the Santa Margarita River watershed
are an integral part of the sub-surface flow of the Santa Margarita
River and its tributaries. It is the purpose of this Memorandum to
point out the testimony and other evidence found in the record
which supports this contention. However, before considering
the evidence, the applicable law will be reviewed.

II

## THE APPLICABLE LAW

The basic principles of California law on the subject of
underground waters are stated in 51 Cal. Jur. (2d) pages 856-864:

"Sec. 388. In General. The underground waters
of California are divided generally into three
classes: (1) the underground flow of surface streams;
(2) definite underground streams with defined channels,
beds and banks.....; (3) percolating waters, which
are those waters that move through the soil, do not
move in a stream, but generally are found in a basin
under the ground, and do not form a part of the body
or flow, surface or underground, of any stream.
Percolating waters may either be rain waters slowly
infiltrating the soil, or they may be waters seeping
from streams that have left a definite stream bed and
are no longer a part of the flow thereof.".

********

"Sec. 390. Underflow of Surface Streams. In
General. The underflow of a surface stream is that

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

- 2 -

6565

water in soil, sand and gravel composing the bed of
a stream, which supports the stream in its natural
state and is essential to its existence.  The under-
flow and the surface flow must be in contact with
each other and must flow in the same general direction
to be part of the same stream.".

******

"Sec. 395.  Percolating Waters.  In General.
(at p. 864)...The essential fact to be ascertained
in determining whether underground water is perco-
lating water is that it does not form a part of the
body or flow, surface or subterranean, of any stream.
Waters of an underground lake or reservoir, or
waters that form part of the body or flow of any
stream, surface or sub-surface, are not percolating
waters."  (Emphasis added).

These broad principles can only be applied by a careful
review of the cases, and of the factual situations involved.
Immediately following we will review those leading decisions.

Los Angeles vs Pomeroy 124 C. 597; 57 P. 585; error
dismissed, 188 U.S. 314.

This was a condemnation action, brought by the City of
Los Angeles.  The claim of the city was (57 P. at p. 587)"...that
the stream itself consists not only of the surface flow of the
river, but of the large subterranean flow slowly passing through
the bowlders, gravel and sand under and adjacent to the river.".
The area of dispute is the San Fernando Valley.  The court, in
describing this area, quoted from Kinney on Irrigation, as follows:
(57 P. at p. 598)

"In and near the mountains many streams have a bed which
was originally a rocky canyon, but has been filled up with
boulders and coarse gravel.  In this debris a large portion

LAW OFFICES
BACHSE AND PRICE
1082 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1184

- 3 -

C566

or all of the water sinks from sight, to reappear only when
some rocky reef crosses the channel and forces the water to
the surface."

The court held that the waters within the alluvium of
San Fernando Valley were a part of the stream.  It would be difficult
to find a more accurate picture of the geologic history of the Santa
Margarita River Valley within Camp Pendleton that that quoted above.

<u>Los Angeles vs Hunter</u>   156 C. 603; 105 P. 755.

This was a quiet title action brought by the City of
Los Angeles against landowners extracting underground waters of the
San Fernando Valley by means of wells.  The facts were (105 P. at
p. 756) that the "...wells were situated at an average distance of
about 1000 feet from the surface border of the Los Angeles River,
though in instances the distances of certain wells were two or
three miles.".  In quieting the city's title, the court held:
(105 P. at p. 757):

"San Fernando Valley may indeed be regarded as a great
lake filled with loose detritus, into which the drainage
from the neighboring mountains flows, and the outlet of
which is the Los Angeles River.  Impeded by these soils,
these waters, of course, move more slowly than they would
in an open lake; but unquestionably the general movement
of practically all is southeasterly to the Narrows, through
and out of which flows the Los Angeles River proper.  Un-
questionably also, a serious interruption or interference
with this supply would as certainly impair the volume of
water carried by the Los Angeles River as though the inter-
ference were with a surface flowing tributary thereof.  <u>The
waters of the San Fernando Valley therefore are not "perco-
lating waters" in the common-law sense of the term--vagrant
wandering drops moving by gravity in any and every direction
along the line of least resistance.</u>  These waters percolate,

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

6567

it is true, but only in the sense that they form a vast
mass of water confined in a basin filled with detritus,
always moving slowly downward to the outlet, in the effort,
in conformity with the physical law, to attain a uniform
level.....the abstraction of waters from this valley is as
clearly an interference with that right as it would be if
the valley, instead of being filled with detritus, were an
open lake from which the river drew its whole supply.".
(Emphasis added).

San Bernardino vs Riverside  186 C. 7; 198 P. 784.

This controversy involved the waters of the San Bernardino
basin.  The defendant city was exporting the waters outside of the
basin and the watershed.  Since there were cross-appeals, and the
cause was reversed, the entire decision must be read.  But it is of
importance to us in again prescribing the yardstick by which the
line of demarcation between waters of a stream and percolating
waters are to be measured.  The court stated the principle as
follows: (198 P. at p. 787, headnote 3).

"When a stream runs over porous material saturated
with water, and the underground waters support the stream,
either by upward or lateral pressure, or feed it directly,
persons having rights in the stream will be protected
against a depletion thereof by adverse diversions of such
underground waters....." (Emphasis added).

McClintock vs Hudson 141 C. 275; 74 P. 849.

This case was tried within a few days after the decision
in Los Angeles vs Pomeroy, supra.  The trail court rendered judgment
for the plaintiff, holding that the waters in dispute were in fact
percolating waters.  Judgment was reversed, the Supreme Court
pointing out that the rules set forth in the Pomeroy case had not
been applied, and again affirming the correctness of the principles
stated in the Pomeroy case.

LAW OFFICES
BACHEE AND PRICE
1008 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

- 5 -

0568

<u>__Miller & Lux vs Maderal Canal__</u>, 155 C 59; 99 P. 502.

Here the express question was whether flood waters which spread over vast expanses of level land in flood season and perco-lated into the underground, had ceased to be a part of the stream. The court expressly held that such waters do not cease to be a part of the river "....so long as they form with it one body of water eventually to be discharged through the proper channel.". (99 P. at p. 509)

Still seeking _factual_ situations analagous to our own, consider the case of <u>Verdugo Canyon Water Co. vs Verdugo</u>, 152 C655; 93 P. 1021.  This involved the waters of Verdugo Canyon, an area in which the Court presently trying this cause grew up.  Paraphrasing the Court's statement of facts (93 P. at p. 1023): Verdugo Canyon begins at the base of Sister Elsie Mountain; extends thence southerly, through a narrow gorge, and opens or expands into a wide plain.  The floor of the plain is comparitively level and varies in width from 700' to over 1800'.  It is supplied by run off appearing only during and immediately after heavy rains, during which time the stream flows on the surface.  All of the area drains into the Los Angeles River. The underground waters were held part of the stream.

<u>Peabody vs Vallejo</u> 2 C. (2d) 351; 40 P. (2d) 486.

This dispute involved Suisun Creek.  The Supreme Court pointed out that at the lower end of the stream "..Suisun Creek is not only a surface, but a sub-surface stream as well, the latter extending a considerable distance on either side of the trough through which the stream flows.".  (40 P. 2d) at p. 495.

<u>Orange County Water District vs. Riverside</u> 173 CA(2d) 137; 343 P. (2d) 450.

It should be noted at the outset that a second appeal of this same litigation is reported at 189 ACA 13; 10 Cal. Rptr. 899, however, the second appeal accepts the facts as set forth in the first decision.  This controversy involves the waters of the Santa

LAW OFFICES
SACHSE AND PRICE
1088 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1184

- 6 -

0569

1 Ana River.  The Court (343 P. (2d) at p. 457) describes the river
2 as flowing from the mountains to the coastal plain where it sinks
3 into the underground excepting at certain times of heavy run off.

4      "The surface lands in said basins are underlaid to
5      various depths with alluvial deposits composed of boulders,
6      gravel, clay, sand, silt and other fluvial and detrital
7      material of varying textures, all of which materials have
8      been laid down by said Santa Ana River and its tributaries.
9      In a state of nature said materials are saturated with
10      waters supplied by the Santa Ana River and its tributaries
11      which waters percolate and flow as a continuous body of
12      underground waters and which in turn supply, support and
13      contribute to the surface flow of the Santa Ana River.".
14 The Court later on the same page and on page 458 states that in its
15 discussion it treats the "river system" as "..the entire natural
16 flows of the Santa Ana River and its tributaries....whether above
17 or below the surface, together with all waters from time to time
18 impounded in surface lakes or known or ascertainable underground
19 storage basins..".

20     Rancho Santa Margarita vs Vail 11 C. (2d) 501; 81 P 2d)
21 533.  This litigation involved the identical stream here in dispute.
22 In the course of its decision (81 P. (2d) at pp 560-562, headnotes
23 30-37) the Supreme Court discusses the rights of the plaintiff in
24 the "subsurface flow" of the Santa Margarita River, and points out
25 that the trial court had apparently treated the sub-surface waters
26 as independent of the stream as a matter of law, and declared such
27 position to be erroneous.  The entire section of the opinion
28 referred to above is of interest in that it consistently treats
29 all waters, surface and subsurface, including the basins, as a
30 part of the stream. (81 P 2d) at p. 561):

31      "The rule is that, as between riparians, each party
32      party must make a reasonable use of all of the water of the

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

0570

1   stream, and as already pointed out, <u>that includes both</u>
2   <u>surface and sub-surface flow, and likewise water in the</u>
3   <u>underground basins.</u>".   (Emphasis added).

4   <u>Pasadena vs Alhambra</u> 33 C. (2d) 908; 207 P. (2d) 17.

5   This litigation involved what is known as the "Raymond
6   Basin".  Paraphrasing the lengthy description of this Basin, it is
7   a field of ground water, 40 square miles in extent, bounded on the
8   north by the San Gabriel Mountains and on the west by the San
9   Rafael Hills; the southern boundary of which is the Raymond Fault.
10  It is noted at once that it is <u>not</u> an enclosed area.  Its water
11  supply flows into it from all directions, but once within the area
12  of alluvium is practically stopped from further movement by the
13  Raymond Fault.  It has no specific outlet other than percolation
14  through the fault or spill over the fault.  It receives its water
15  supply from rainfall; from return flows; and from run off from the
16  San Gabriel Mountains and San Rafael Hills.

17  The Court rejected the theory that the waters within
18  this area were a part of an underground stream, and it seems obvious
19  from the facts that this was a logical conclusion.  The physical
20  contrast between Raymond Basin and the Santa Margarita Basins is
21  obvious.

22                              III

23                         <u>THE EVIDENCE</u>

24  We wish to emphasize at the very outset, that an
25  exhaustive review of the Transcript, Exhibits and entire record in
26  these proceedings <u>does not disclose a single item of evidence in</u>
27  <u>support of Mr. Veeder's contention that ground waters in the Camp</u>
28  <u>Pendleton basins have lost their identity as part of the sub-flow</u>
29  <u>of the stream within a distance of ten feet from the banks.</u>  On
30  the contrary, the entire record clearly discloses that since the
31  inception of the cause, the United States has contended that <u>all</u>
32  ground waters within the entire watershed were an integral part of

LAW OFFICES
BACHSE AND PRICE
1002 S. MAIN STREET
FALLBROOK. CALIF.
RANDOLPH 8-1154

- 8 -

1   the stream and should be included in the water supply available

2   to riparians and were subject to regulation to protect riparian

3   rights.

4           A.  <u>THE TESTIMONY</u>

5           Attached hereto and made a part hereof by reference

6   is Appendix A, in which has been quoted or extracted many items of

7   testimony relating to the question.  However, <u>in addition to those</u>

8   <u>contained in the Appendix</u>, the following are particularly pertinent:

9           1.  When the trial proper began on October 1, 1958, the

10  United States opened its case by calling Fred Kunkel as an expert

11  witness (geologist), and introducing into evidence by him U. S.

12  Exhibit 15, "Geologic and Hydrologic Map of the Santa Margarita

13  River Watershed."  In explaining that map for the record, the

14  following colloquy occured (Tr. vol. 25, page 2332):

15          Q.  (Veeder):  "What are the yellow areas that are

16          depicted on that map?

17          A.  (Kunkel)  The Yellow areas are the youngest alluvial

18          deposits <u>that occupy the flood plain of the present-day</u>

19          <u>stream channel and their tributaries.</u>".  (Emphasis added).

20          Mr. Kunkel was never cross-examined on this answer.

21  Neither counsel for the United States, or any of the defendants nor

22  the Court has ever suggested any undertainty as to its meaning or

23  any disagreement with the statement.  The Court accepted this

24  testimony and used Exhibit 15 to define the ground waters held to be

25  a part of the stream in Interlocutory Judgment 26, (Oviott).

26          2.  Thereafter, on October 24, 1958, Lt. Giles Walker

27  was called by the United States as an expert witness (geologist),

28  who had prepared exhibits relating to the area between the Narrows

29  and Camp Pendleton.  In explanation of U. S. Exhibit 68, "Cross

30  Section of De Luz Creek", we find the following (Tr. Vol. 37, pages

31  3814-3815):

32          Q.  (Veeder)  "Now, Lieutenant, would you refer to the

LAW OFFICES
SACHSE AND PRICE
1002 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

6572

1    area on Exhibit 68 of the United States, which you have

2    colored yellow, at the uppermost part, that is....., and

3    state what that depicts...?

4    A.   (Lt. Walker)   The area colored yellow represents the

5    alluvial material beneath the, along the stream channel.".

6    3.   Even before the testimony of Mr. Kunkel and Lt. Walker,

7 the United States had presented expert testimony on this question

8 before the Special Master.  On May 26, 1958, Lt. Col. Bowen testi-

9 fied on the geology within Camp Pendleton and particularly the

10 basins, as follows (Sp. Master Tr. Vol. III, p. 286):

11    Q.   (Veeder)   "Now, will you describe the subterranean

12    basin within the confines of the enclave, particularly

13    Camp Pendleton, stating the general surface area of

14    those basins?

15    A.   (Bowen)   The subterranean basin within Camp Pendleton

16    is a long, relatively narrow valley, originating at  about

17    the confluence of De Luz Creek and the Santa Margarita

18    River and continuing through the confluence of the

19    Santa Margarita River with the sea.  The entire unit is

20    geologically and hydraulically connected.  It is similar

21    to all other streams in this southern coast of California.

22    It is the result of erosion through the containing bedrock

23    subsequently filled by alluvium precipitated out owing to

24    the rising of the sea concurrent with the melting of the

25    ice cap.  So we have an alluvium filled valley which,

26    for the purpose of location, we define generally into

27    three segments.  I will reiterate that there is no break

28    in the hydraulic and geologic continuity.....".

29    4.   The witness Joseph McNearney was called by Mr. Veeder

30 to explain the operation of the water system for Camp Pendleton.

31 His description of the operation of the Camp wells found in Special

32 Master's Transcript Vol. IX, p. 1206, lines 12-12 is significant:

LAW OFFICES
BACHSE AND PRICE
1002 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

6573

1  A. (McNearney) "When the float switch drops to an
2  indicated area in the redwood tank that immediately will
3  call to the deep well <u>which is located, each one of them,</u>
4  <u>in the Margarita River.</u>". (Emphasis added).

5  5. That both Mr. Veeder and his witnesses at all times
6 have treated the entire Pendleton basin area as a part of the river
7 is even more clearly indicated by the following testimony taken from
8 Vol. VI, Special Masters' Transcript. Vol. VI, page 736, lines 9-25.
9 The testimony related to the consumptive use of natural  vegetation
10 growing on the surface of the Pendleton Basins, which Col. Bowen
11 had previously testified covered an area of 4500 acres.

12  Q. (By Veeder) "Now, would you state for the record,
13  the quantity of water which you, in your opinion, have
14  determined to be derived from the Santa Margarita River
15  and consumed by the natural forage...".

16  A. (Col. Bowen) "In my opinion....it is that 1.4 are
17  consumed by native vegetation....".

18  Q. Now would you state the aggregate, then, for the
19  record that is derived <u>from the Santa Margarita River</u>
20  and consumptively used by this native vegetation?"

21  A. "The aggregate therefore is the area in native
22  vegetation, 4500 times the draft on the ground water basin,
23  which is 1.4, which equals 6300 acre feet of water per
24  year which is the total draft of the native vegetation
25  on the ground water and storage in the basin.".

26  (Emphasis added).

27  B. <u>FINDINGS OF THE COURT AND MASTER</u>:

28  Both the Court and the Special Master have consis-
29 tently adopted the theory that all ground waters found underlying
30 surface areas of younger alluvium are an integral part of the sub-
31 surface flow of the stream. <u>In every Finding or proposed Finding</u>
32 <u>considered to date as to areas of younger alluvium, waters are held</u>

LAW OFFICES
BACHBE AND PRICE
1062 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1184

6574

1  to be part of the stream.

2         1.  De Luz Creek:

3              The Special Master has held that all ground waters

4  underlying younger alluvium are part of the stream.  The exact

5  language is as follows: (Sp. Master Findings XXVII)

6              "Large portions of this parcel overlie alluvial

7              ground water basins, which basins form part of the sub-

8              surface flow of De Luz Creek...".

9  Identical language is used in every parcel in the De Luz Creek water-

10  shed which overlies younger alluvium.

11             The parcel under discussion in Finding XXVII is that

12  of Felix Garsney, and is the same parcel referred to in Item 11,

13  Appendix A, hereunto attached.  Examination of United States

14  Exhibit 67 will disclose that the surface area of the "basin"

15  referred to in the Finding  extends more than 2000' from the

16  stream bank in places, and that a producing well, held to be

17  extracting stream water, is more than 500' from the stream bank.

18         2.  Rainbow Creek:

19             Examination of U. S. Exhibit 70 will disclose that

20  Rainbow "basin" extends in places much more than 4000' from the

21  stream bank, and in fact extends out of the Santa Margarita River

22  watershed and into the San Luis Rey River watershed.  Throughout

23  this area are small ownerships with producing wells.  These wells

24  are held to be extracting waters that are a part of Rainbow Creek.

25         3.  Sandia Creek:

26             Findings on Sandia Creek have not yet been entered.

27  However, after the undersigned submitted a proposed draft of such

28  Findings, the Court expressly directed that they be amended to

29  point out that waters within the younger alluvium were part of the

30  stream and that there was insufficient water contained therein to

31  irrigate all riparian lands.

32                         *******

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

6575

4. **Murietta Basin:**

Findings on Murietta Basin have not yet been lodged. However, at the request of the United States, this Court directed letters to hundreds of individual defendants whose lands overlie the younger alluvium of that area. Those letters are intended to advise the defendant of the Court's proposed Finding, and expressly state that in the absence of objection, the Court will find as follows:

> "....they overlie a ground water body sometimes referred to as Murietta Creek Basin, the waters of which are a part of the Santa Margarita River.".
> (Emphasis added)

A quick check of U. S. A. Exhibit 207-E shows over 100 consents filed by individual landowners, approving such findings.

5. **Upper Temecula Creek:**

Just as in the case of Murietta Basin, the Court has, at the request of the United States, addressed letters to various defendants indicating its proposed Findings as to their lands. These letters have been drafted by the United States. Without exception, when any part of the lands overlies younger alluvium the following language appears: "...they overlie in whole or in part ground waters of the Santa Margarita River.". U.S.A. Exhibit 207-E contains nearly 100 consents of individual landowners.

6. **Interlocutory Judgment 26 (Oviatt)**

In this Judgment, the Court holds: "....ground waters underlying those lands described in Finding I which overlie deposits of younger alluvium or older continental deposits as depicted on U. S. Exhibit 15, incorporated herein, are a part of the Santa Margarita River".

7. **Interlocutory Judgment 27, (Knox).**

In this judgment all ground waters are held a part of the Santa Margarita River, without reference to older or younger

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

6579

1  alluvium.

2      8.  Gibbon & Cottle Lands:

3          No interlocutory judgment has yet been lodged.

4  At the hearing August 8, counsel for Gibbon and Cottle submitted a

5  draft of Finding which would hold that extractions by their wells

6  in areas of younger alluvium were not extractions of stream water.

7  They suggested that this result could be upheld by the Court, since

8  there was specific testimony that the younger alluvium in this area

9  was cut up by faults.  The Court did not rule, but indicated that

10  it would continue to treat all ground waters in the Aguanga area as

11  a part of the stream.

12      C.  OTHER EVIDENCE:

13          In addition to the testimony already discussed, there

14  is a mass of Exhibits dealing with the question.  The most important

15  of these are tabulated in Appendix B, hereunto attached.  Their

16  significance is outlined below:

17          1.  Well Locations in the Camp Pendleton Basins.

18          U. S. Exhibit 40, "Ground Water Basins and Storage

19  Units within Camp Pendleton", has plotted on it the producing wells,

20  extractions of water from which are relied upon as establishing

21  the appropriative right in question.  Without exception these wells

22  are located on surface areas of younger alluvium.  The well farthest

23  removed from the stream channel as indicated on the Exhibit is about

24  4000' southerly from the stream.  This fact is of interest in the

25  light of the decision in Los Angeles vs. Hunter, supra, in which

26  case wells several miles removed from the stream channel of the Los

27  Angeles River were nevertheless held to be extracting the sub-surface

28  flow of that stream.

29          2.  Hydrographs. (See items 2, 3, 4, 5 and 6 Appendix B).

30          There are in evidence many hydrographs of wells

31  correlated with stream run-off data.  Their purpose and effect is

32  obvious: - to establish a direct inter-relation between stream

LAW OFFICES
SACHSE AND PRICE
1095 E. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

8577

run-off and the depth to water in the younger alluvium.  The United
States has urged such exhibits as a principle part of its case, and
by no possible stretch of the imagination can it be argued that
they lend support to the proposition that ground waters ten feet
removed from the stream bank have "....lost their identity as part
of the sub-flow of the stream".

      3.  <u>Analysis of Mineral Content of Wells</u>.  (See item 9
Appendix B.).

      The Exhibits referred to represent an attempt to
establish the close chemical similarity between stream waters and
well waters.

      4.  <u>Water Level Contours</u>.  (See items 7 & 8 Appendix B.).
      In connection with these exhibits it is well to
remember the testimony of Mr. Kunkel (Tr. Vol. 28, p. 2734) that
such water level contours are "....conclusive evidence..." of the
hydrologic continuity of the  waters in question.

      5.  <u>Disclaimers</u>: (See items 10, 11, 12, 13, 14, 15,
Appendix B.).

      The exhibits referred to are all official statements
of the United States reciting the water rights claimed in the Santa
Margarita River.  There is not a single instance in which the
rights now asserted are even mentioned.  Counsel for the United
States has suggested that such statements cannot be treated as
legal disclaimers, but there is certainly no reason why they should
not be treated as <u>evidence of  the intent</u> of the United States in
its activities on Camp Pendleton.  The first fundamental necessary
to the acquisition of any appropriative right is an intent to
appropriate.  Not only is such evidence utterly lacking, but the
exhibits referred to clearly indicate that no such intent ever
existed.

*****
*****

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

0578

## SUMMARY AND CONCLUSION

The evidence in this case clearly establishes:

1. The Santa Margarita River Valley in Camp Pendleton was originally a rocky canyon, but has been filled with boulders, sands and gravels into which the stream at certain times and places sinks out of sight. It is an area in which there is presently continuing the process of younger alluvium being deposited by stream action. (See the discussion of Los Angeles vs. Pomeroy and Orange Co. W.D. vs. Riverside, supra).

2. The valley may be regarded as a huge underground lake filled with loose detritus, the outlet of which is Ysidora Narrows. All of the underground waters within this area follow a similar and constant course down the hydraulic gradient through Ysidora Narrows and thence to the sea. (See the discussion found in Los Angeles vs. Hunter, supra.).

3. The waters found beneath the surface in this valley support the surface stream both by lateral and by upward pressure, and in those places where the stream rises to the surface, the underground waters feed it directly. (See the discussion found in San Bernardino vs. Riverside, supra.).

4. There is no evidence that the waters underlying the valley flow in different directions or that their movement down-gradient is interrupted by any fault or other barrier. (See discussion of Pasadena vs. Alhambra, supra.).

5. On the basis of the foregoing facts both the Court and the Special Master have heretofore consistently held that ground waters found within similar areas of younger alluvium are an integral part of the underground flow of the stream.

6. The rulings of the court and Special Master referred to above have been accepted as establishing the facts by all counsel and by many pro per defendants.

7. There is no difference between a wide space in a

LAW OFFICES
BACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

- 16 -

6579

1  small stream, as for example the areas of younger alluvium on

2  De Luz Creek, Wilson Creek or Murietta Creek, and a similar wide

3  place in a larger stream as for example the valley on Camp

4  Pendleton.  The only distinction is one of size.  The alluvial

5  areas are naturally and of necessity smaller in extent where the

6  stream carries less water;  they are larger in those areas where it

7  carries more water.

8         The evidence and the law, and the previous rulings of

9  the Court and Master compel a Finding that all ground waters

10  found underlying surface areas of younger alluvium anywhere within

11  the Santa Margarita River watershed and specifically on Camp

12  Pendleton are an integral part of the sub-surface flow of the

13  Santa Margarita River or its tributaries.

14         Respectfully submitted,

15  Dated: 24, August, 1961                SACHSE & PRICE

16

17                                 By

18                                    Attorneys for Fallbrook Public
                                      Utility District and other
                                      defendants.

19

20

21

22

23

24

25

26

27

28

29

30

31

32

LAW OFFICES
SACHSE AND PRICE
1008 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

- 17 -

9580

# APPENDIX A

## EXTRACTS FROM TRANSCRIPT

1. Vol. 25, page 2332, line 23, et seq (Discussing U.S. Exh. 15).

 Q. (By the Court). "What are the orange?".

 A. (Kunkel) "The orange are older continental deposits that are presently being dissected.".

 Q. (By Veeder) "When you say 'dissected', what do you mean?".

 A. (By Kunkel) "Are being eroded during periods of precipitation and run-off, as opposed to the yellow areas which generally are receiving alluvial deposits and are in the process of being built up or flooded at the present time.".

2. Vol. 27, page 2570.

 Statement by Kunkel, referring to the Wilson Creek-Lancaster Valley area;

 "The Ground water in places, as indicated in earlier testimony, rises to the surface and is surface flow, and the ground water under natural conditions returns to the surface flow which was previously ground water, again returns to ground water, may be forced to the surface at another point, flows a distance as surface flow, again enters the water body at a downstream basin, moves as underflow, may again rise as surface flow.".

3. Vol. 30, pages 2920-2921.

 Q. (By the Court) "Now go back to Hydrolic Continuity where water is in contact with water.  I understand then that it is your testimony that as to the yellow areas and the orange areas and the gray areas there is

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

6591

APP-A-1

1      hydrolic continuity of underground waters with the

2      water that would flow out through the Narrows into

3      the Santa Margarita River?".

4      A.   (By Kunkel)   "Yes.".

5

6  4.  Special Master Tr., Vol. III, page 279, line 21, et seq.

7      Q.   (By Veeder)   "Would you proceed with the des-

8      cription of Temecula Creek?".

9      A.   (By Lt. Col. Bowen) "The Temecula Creek extends

10     through a series of valleys such as Oak Grove Valley,

11     which is a valley characterized by alluvium fill, and

12     into which the creek may sink and flow as a sub-

13     surface stream, and into a rock defile below the

14     valley may become a surface stream for a distance.

15     <u>That characterizes the extent of Temecula Creek</u>

16     <u>through Dodge Valley, Radec, Aguanga Valley and the</u>

17     <u>Pauba Grant until it enters the ground about 14 miles</u>

18     <u>from its origin.</u>".   (Emphasis is Added)

19

20  5.  Special Master Tr., Vol. IX, page 1174, line 9 et seq.

21     Q.   (By Moskovitz)  Now are there any other diversions,

22     to your knowledge, which serve the military enclave

23     either within or without--either diversions which are

24     within Camp Pendleton or which are outside of Camp

25     Pendleton......?".

26     Mr. Veeder:   <u>From the Santa Margarita River?</u>

27     Mr. Moskovitz:  From the Santa Margarita River.

28     The Witness (Cannon): Diversions, as I understand them--

29     maybe you better define the word diversion before I

30     answer the question.

31     Mr. Moskovitz:  As I understand it, and as I intended to

32     convey it to you, a diversion is a <u>taking away from</u>

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

8592

APP-A-2

1    <u>the river....</u>".

2    A. Surface diversions or----

3    Q. Well, let's say all kinds of diversions, surface

4    or sub-surface.

5    A. Of course, in that case I presume you would call

6    all these wells diversions.". (Emphasis added)

7

8 6. Special Master Tr., Vol, IX, page 1191, line 1, et seq:

9 (Witness Cannon, in reply to a question from Veeder as to changes

10 in run-off of the river during his employment at Camp Pendleton):

11    A. (Cannon) "Well, on January 1, 1943, we had quite

12    a large flood that caused a lot of damage, a lot of

13    flood damage; washed out fords; <u>that changed the</u>

14    <u>course of the river</u>; washed out a trailer court and

15    flooded the construction barracks area, and it is the

16    greatest outflow of water since I have known the

17    area." (Emphasis added).

18 7. Special Master Tr., Vol. X, page 1218, lines 6-9. Witness

19 McNearney, in discussing the operation of the Camp Pendleton

20 system in the event of a sudden, heavy draft such as a fire, states:

21    A. ".....As that water is pumped from the redwood tank

22    up into the reservoir, the booster redwood tank, in

23    dropping, would immediately make a demand on the <u>well</u>

24    <u>down in the river bottom</u>.". (Emphasis added).

25 8. Special Master Tr., Vol X, page 1297, lines 19-22. Mr. Veeder

26 is questioning his witness, William D. Taylor, concerning the

27 agricultural and grazing use of water on the Pendleton reservation:

28    Q. (Veeder) "What would be the <u>aggregate burden</u>

29    <u>upon the stream?</u> What would be the diversion duty that

30    would be efficiently and beneficially used <u>from the</u>

31    <u>Santa Margarita</u> upon the lands concerning which you

32    have testified?" (Emphasis added).

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1184

6583
APP-A-3

1    9.  Special Master Tr. Vol. XII, page 1686, lines 7-10.  The

2    witness (Bowen) is discussing the Matthews property on De Luz Creek.

3            Q.  (By The Master):  "As I understand, Col. Bowen,

4               the stream does not actually cross the property, but

5               the well takes water from the flow of the stream?"

6            A.  Your understanding is correct, your Honor.".

7            (Emphasis added)

8    10. Special Master Tr. Vol. XII, page 1723, line 21 to page 1724,

9    line 1.  The witness (Bowen) is discussing the Couch property on

10    Camps Creek in the De Luz Creek watershed.

11            A.  ".....it also contains,--the northeast corner is

12               crossed by Camps Creek, with some alluvial fill

13               adjacent to the creek.  And in the instance of the

14               northeast 40 I would say that a portion of it is in

15               contact with the stream and that the waters contained

16               within it are part of the stream".  (Emphasis added).

17    11. Special Master Tr., Vol. XIV, page 1899, lines 1-9.  Witness

18    Bowen, testifying as to water sources on the Felix Garnsey property

19    located at the confluence of De Luz Creek and Cottonwood Creeks.

20            Q.  (Sachse)  "In so far as the alluvial material which

21               you have testified is the best source of water is con-

22               cerned, what water source do you believe supplies the

23               alluvial material?

24            A.  Well, that is part of De Luz stream.

25            Q.  In other words, you feel that the extractions from

26               the underground in effect are a part of both De Luz

27               Creek and Cottonwood Creek streams.  Is that right?

28            A.  Yes sir.  (Emphasis added)

29    12. Special Master Tr. Vol. 19, page 2437, lines 1-9.  Witness

30    Bowen, testifying as to water sources on the Gillette property in

31    De Luz Creek watershed, in response to question of the Master:

32            A.  (Bowen) "It would depend on the location of the well,

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

APP-A-4

6584

1    your Honor.  The alluvial material which adjoins the

2    East Fork of De Luz Creek and which adjoins the lower

3    portion of the intermittent stream tributary to the

4    East Fork of De Luz Creek contains water which in my

5    opinion is part of the stream system.  Wells drilled,

6    however, in the granitic materials occupying the

7    southerly and easterly portions of parcel 53 would only

8    tap water which would be vagrant and percolating, and

9    not a part of the stream system.

10    13. Special Master Tr., Vol. 27, page 2919, lines 19-24.  Witness

11    Bowen, testifying on cross-examination concerning ground waters in

12    Rainbow Valley.

13    Q.  (Sachse)  And if you will look at Exhibit MR-34

14    (U.S., Rainbow Creek Geology), would your testimony

15    again be the same, that the ground waters underlying

16    areas shown in blue and brown are vagrant, local

17    percolating, whereas ground waters under areas shown

18    in yellow would be a part of the stream system?

19    A.  That is correct. (Emphasis added).

20    14. Vol. 26, page 2479, discussing Murietta Valley:

21    Q.  (Veeder) "What is the relationship between the

22    ground water, rather the surface flow of Murietta

23    Creek, and the ground water which emanates from these

24    seven streams?

25    A.  (Kunkel)  The surface flow during the periods of

26    low water, and when there is no run off from pre-

27    cipitation, the flow of Murietta and Temecula Creeks

28    is from ground water arising from the alluvial deposits".

29    15. Vol. 28, page 2737.

30    A.  (Kunkel) "One gallon of water removed from the

31    bottom of the Pauba Well will induce a movement of

32    every other drop of water that is in hydraulic

LAW OFFICES
SACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1154

APP-A-5

1     continuity with that well.".

2  16. Vol. 29, page 2873.

3         A. (Kunkel)  "The entire area of Oak Grove Valley is

4     in hydraulic continuity.  All the water beneath the

5     water table is in hydraulic continuity with itself.

6     There is also hydraulic continuity of the water table

7     Up-gradient into Dodge Valley and down-gradient into

8     Dameron Valley.  There is a thickness of alluvial fill

9     beneath which, -within which, -there is actual movement

10    of ground water that would affect the flow of Temecula

11    River system if it were pumped.".  (Emphasis added).

12  17. Vol. 52, page 5888 (Cross examination of California witness

13  James.)

14         Q. (Veeder)  "I am showing you the younger alluvium

15    as depicted on Exhibit 15-A.  If I used the term

16    "basin" I should have said that it is the younger

17    alluvium through which the stream flows.".  (Emphasis

18    added).

19  18. Vol. 130, page 14731.  Discussing Diamond-Domenigoni Valleys.

20         A. (Kunkel)  "So far as I can determine from my own

21    observations there is a continuous progression of

22    ground water unbroken from the area in the vicinity of

23    Murietta Hot Springs along Warm Springs Creek up to

24    the watershed divide between San Jacinto and Diamond

25    Valley on the Searl property.".

26         Q. (Veeder)  "What is the course of that progression

27    of ground water from Diamond and Domenigoni Valley

28    down Warm Springs Creek?".

29         A. (Kunkel)  "The progression of ground water is from

30    Diamond Valley to Domenigoni Valley down eventually to

31    Murietta Valley and ultimately to the ocean, as des-

32    cribed in previous testimony.".  (Emphasis added).

LAW OFFICES
BACHSE AND PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1184

APP-A-6
8588

19. Vol. 114, page 12952, Discussing Stardust Ranch.

    Q.  (By the Court to Mr. Sachse):  "Parts of the ground in Sections 9, 10, 3 and 2 overlie the younger alluvium in Wilson Valley <u>and would be part of the stream system there</u>.  You concede that the artesian well is part of the stream system?"

    A.  (Sachse) "I concede that your Honor." (Emphasis added)

20. Tr. Vol. 153, page 17219:

    THE COURT:  (Addressing Mr. Veeder) "You see, you found that the ground waters of Weber Valley were a part of the River, and I think it would be logical to add here: 'the ground waters of Tucalota Ground Water Basin are a part of the River'.".

    A.  (Veeder)  I think in IV we cover it.  We say: Continuing in a southwesterly direction, Tucalota Creek proceeds across Tucalota Ground Water Basin, the ground waters of which are <u>a part of the Santa Margarita River</u>.". (Emphasis added)

21. Tr. Vol. 153, page 17183, similar statement re Aguanga area.

22. Tr. Vol. 153, page 17187, similar statement re Aguanga area.

23. Masters Transcript, Vol. 35, page 3195, similar statement re Coahuila Valley, by Bowen.

24. Tr., Vol. 26, page 2402, similar statement re Oak Grove Valley by Bowen.

LAW OFFICES
SACHSE AND PRICE
1082 S. MAIN STREET
FALLBROOK, CALIF.
RAndolph 8-1154

6597

APP-A-7

# APPENDIX B

## TABULATION OF EXHIBITS

1.  U.S.A. 40, Map, Ground Water Basins and Storage Units within Camp Pendleton.

2.  U.S.A. 51-B, Fluctuations of Water Level in Wells, lower Santa Margarita River Basin, with stream run-off pencilled in.

3.  U.S.A. 51, Fluctuations of Wells, Lower Santa Margarita River Basin.

4.  U.S.A. 15-I-1 and 2, Hydrograph of selected wells and run off in Pauba Basin.

5.  California AD, Hydrograph of Selected Wells and Run Off, Santa Margarita River Coastal Basin.

6.  California AC, Hydrographs of Selected Wells and Run Off in Pauba Basin.

7.  U.S.A. 15, 15-A, 15-E, 15-F, 15-G, Geologic Maps with Water Level Contours, Upper Santa Margarita River area.

8.  U.S.A. 44 and 45, Maps of Water Level Contours within Camp Pendleton.

9.  U.S.A. 54-A, Chemical Analysis of Water Samples, Santa Margarita River.

10. Fallbrook O, U. S. Navy Protest to Application 11578.

11. Fallbrook P, U.  S. Navy Protest to Application 11578.

12. Fallbrook Q, U. S. Navy Protest to Application 11586.

13. Fallbrook R, U. S. Navy Protest to Application 12178.

14. Vail AK-7, Navy Protest to Vail Application.

15. Vail AK-5, Navy Protest to Vail Application.

16. U.S.A. Exh. 207-E, Tabulations of Letters of Defendants Consenting to Proposed Findings.

LAW OFFICES
SACHSE and PRICE
1092 S. MAIN STREET
FALLBROOK, CALIF.
RANDOLPH 8-1184

6588

6582

STATE OF CALIFORNIA
COUNTY OF San Diego } ss. (PROOF OF SERVICE BY MAIL — 1013a, 2015.5 C. C. P.)

I am a citizen of the United States and a resident of the county aforesaid; I am over the age of eighteen years and not a party to the within entitled action; my business address is:

1092 So. Main St., Fallbrook, California

On the 21st Day of August , 19 61, I served the within  Memorandum of Fallbrook

Public Utility District

on the Plaintiff in said action, by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States post office mail box at Fallbrook, California addressed as follows:

Mr. William H. Veeder
325 W "F" Street
San Diego, California

I certify (or declare), under penalty of perjury, that the foregoing is true and correct.

Executed on August 21, 1961           at     Fallbrook, California, California
              (date)                                      (place)

                                         Dorothy Hois
                                            (Signature)

*The proof of service by mail form, being signed under penalty of perjury, does not require notarization.

Received copy of the within _____ this _____ day of _____ 19___

_____
Attorney ___ for _____

Stacek Form 23-P

(PROOF OF SERVICE BY MAIL — 1013a, 2015.5 C.C.P.)

STATE OF CALIFORNIA
COUNTY OF San Diego

I am a citizen of the United States and a resident of the county aforesaid; I am over the age of eighteen years and not a party to the within entitled action; my business address is: 1092 So. Main Street, Fallbrook, Calif.

On the 21st day of August, 1961, I served the within Memorandum of Fallbrook Public

Utility District

on the _____ in said action, by placing a true copy thereof enclosed in a sealed envelope

with postage thereon fully prepaid, in the United States post office mail box at Fallbrook, California
addressed as follows:

Mr. James H. Krieger
Best, Best & Krieger
Attorneys at Law
P.O. Box 1028
Riverside, California

I certify (or declare), under penalty of perjury, that the foregoing is true and correct.

Executed on August 21, 1961 at Fallbrook California
               (date)                              (place)

_____
            (Signature)

*The proof of service by mail form, being signed under penalty of perjury, does not require notarization.

Received copy of the within _____ this _____ day of _____ 19____.

_____
Attorney ___ for _____

Stuart Form 23-P

6590

**STATE OF CALIFORNIA**
**COUNTY OF San Diego**

(PROOF OF SERVICE BY MAIL — 1013a, 2015.5 C. C. P.)

I am a citizen of the United States and a resident of the county aforesaid; I am over the age of eighteen years and not a party to the within entitled action; my business address is:

1092 So. Main Street, Fallbrook, California

On the 21st day of August, 1961, I served the within Memorandum of Fallbrook Public

Utility District

on the _____ in said action, by placing a true copy thereof enclosed in a sealed envelope

with postage thereon fully prepaid, in the United States post office mail box at Fallbrook, California
addressed as follows:

Mr. Fred Girard
Deputy Attorney General
Library and Courts Building
Sacramento, California

I certify (or declare), under penalty of perjury, that the foregoing is true and correct.

Executed on August 21, 1961, at Fallbrook, California.
                    (date)                              (place)

Dorothy Holson
                                         (Signature)

* The proof of service by mail form, being signed under penalty of perjury, does not require notarization.

Received copy of the within _____ this _____ day of _____ 19___

Attorney _____ for _____

Stat. Form 23-F

6591

6592

(PROOF OF SERVICE BY MAIL — 1013a, 2015.5 C.C.P.)

STATE OF CALIFORNIA
COUNTY OF San Diego

I am a citizen of the United States and a resident of the county aforesaid; I am over the age of eighteen years and not a party to the within entitled action; my business address is:

1092 So. Main Street, Fallbrook, California

On the 21st day of August, 19 61, I served the within Memorandum of Fallbrook Public

Utility District

on the _____ in said action, by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States post office mail box at Fallbrook, Calif addressed as follows: Mr. George Stahlman
Route 1, Box 235
Fallbrook, California

I certify (or declare), under penalty of perjury,* that the foregoing is true and correct.

Executed on August 21, 1969       at       Fallbrook                    , California
                    (date)                                    (place)

                                        _Dorothy Gibson_
                                                (Signature)

*The proof of service by mail form, being signed under penalty of perjury, does not require notarization.

Received copy of the within _____ this _____ day of _____ 19 ____

                                        Attorney for _____

Stumli Form 23-P