STANLEY MOSK, Attorney General
  of the State of California
F. G. GIRARD, Deputy Attorney General
Library and Courts Building
Sacramento 14, California
HIckory 5-4711, Ext. 5448

Attorneys for Defendant
State of California

FILED

AUG 28 1961

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By M. A. _____

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

   vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

               Defendants.

No. 1247-SD-C

STATE'S MEMORANDUM
REGARDING GROUND WATERS
IN YOUNGER ALLUVIUM

     The basic question which this brief will consider is whether the ground waters in the younger alluvium are percolating waters or are part of the Santa Margarita River, or a tributary thereto.

     While the instant question is concerned only with the ground waters in the younger alluvium in Camp Pendleton, the issue is much broader for undoubtedly there would be no justification for concluding that ground waters in the younger alluvium in Camp Pendleton are percolating waters, and reach an opposite result as to other upstream areas. California Water Code, section 1200, defines ground waters which are part of the stream as those waters which flow through ". . .known and definite channels." Whether ground waters meet the test of

section 1200 does not depend on absolute knowledge of a "known and definite channel" but may be inferred by reasonable inference from the evidence (City of Los Angeles v. Pomeroy, 124 Cal. 597, 634). In the Pomeroy case the only evidence upon which the conclusion that ground waters were part of the stream was in essence that the ground waters were in contact with the surface waters and moving in the same direction, and that said ground waters were in alluvium which rested upon bedrock and filled a space between the hills on either side. The California Supreme Court squarely held that this evidence was sufficient to justify a finding that all the ground waters in the alluvium were in a known and definite channel and thus part of the stream. Fallbrook Public Utilities District in its Memorandum has cited and discussed other cases which are pertinent to the basic question presented here. In the interest of avoiding repetition we will not cite or discuss those cases. Moreover, it is the Pomeroy case which is directly in point on the question of what ~~evidence~~ evidence is required to establish that ground waters are in a known and definite channel. That, in our view, is the question now before this Court. The Pomeroy case has set the evidentiary standard. Let us now examine the instant record to see whether that evidentiary standard has been met in this case.

The uncontradicted evidence in this case establishes that the younger alluvium was deposited and is being deposited by the stream and that it is bedded upon and enclosed within either basement complex or the older continental deposits or a combination thereof. (See U.S. Exhibit 15, R.T. Vol. 25 p.2333). The uncontradicted evidence in this case establishes that movement of the ground waters (with the exception of certain limited areas such as Diamond and Domenigoni Valleys) within the younger alluvium is in the same direction as the surface stream and this

1   is of course evidenced physically by the numerous points of
2   rising water which appear throughout the watershed (RT, Vd.27
3   pp. 2544, 2551, 2567; See U.S. Exhibit 15F, 15G). The uncon-
4   contradicted evidence in this case establishes that the ground
5   waters in the younger alluvium are in contact with the surface
6   waters (R.T. Vol. 30, pp. 2918-2921; R.T. Vol. 27, pp. 2557,
7   2571). In short, the evidence in this case is almost identical
8   to that set forth in the Pomeroy case which the California
9   Supreme Court held was sufficient to justify a finding that
10  the ground waters were in a known and definite channel. In
11  addition to the above evidence, the record in this case abounds
12  with uncontradicted testimony where various witnesses state
13  that ground waters in the younger alluvium are part of the
14  stream:
15          "Q Now, Colonel, with particular reference to the
16  southeasterly portion of this parcel, which I believe you dis-
17  cussed on page 1 of your report under geology, would you be of
18  the opinion that water developed anywhere on the property would
19  be other than a part of the stream?
20          "A Well, inasmuch as the upland portion of this proper-
21  ty lying in the southeasterly corner is in close proximity to the
22  stream and to the alluvium over which the stream flows, it is
23  my opinion that that water moves through the soil mantle and
24  through the fractures in the bedrock into the alluvium, and
25  hence in this position would be a part of the stream.
26          "Q And it is your opinion that the best water source
27  for this property would be the water stored in the alluvial
28  deposits in or adjacent to the stream. Is that right?
29          "A Yes, sir."  (M.T. Vol. XII, p.1583)
30                          - - -
31                          - - -

"THE MASTER: As I understand, Col. Bowen, the stream does not actually cross the property, but the well takes water from the flow of the stream; is that correct?

"THE WITNESS: Your understanding is correct, your Honor." (M.T. Vol. XIII, p. 1686).

- - -

"A --40 of the Couch property, that contains a substantial area of more gently sloping lands, sloping down to a tributary of Camps Creek. It also contains-- the extreme northeasterly corner is crossed by Camps Creek, with some alluvial fill adjacent to the creek. And in the instance of the northeasterly 40 I would say that a portion of it is in contact with the stream, and that waters contained within it are part of the stream." (M.T. Vol.XIII, p. 1723).

- - -

"THE WITNESS: Your Honor, the source of water on Parcel No. 39 is the recent and older alluvium bordering De Luz Creek, and that water would be part of the stream of De Luz Creek." (M.T. Vol. XIII, p. 1774-1775).

- - -

"A Camps Creek drains through the center of that 40, and there is alluvium material deposited along the creek. It would be my opinion that waters developed in that sixteenth of a section would be part of the stream." (M.T. Vol.XIII, p.1851).

- - -

"The East Fork of the De Luz Creek traversing this property is bordered and contained within alluvial fill and water extracted from the alluvium is, in my opinion, part of the flow of the East Fork of De Luz Creek." (M.T. Vol.XIII, p. 1860).

- - -

- - -

4

1         "Referring to the soil survey contained in Plaintiff's
2   Exhibit M-58, it is noted that De Luz Creek, flowing through
3   Class VIII or the purple area from north to south is in contact
4   with alluvium which occupies the area colored purple in the
5   westerly 40 of the property and that alluvium will be the best
6   source of water for development of the property, and water taken
7   from the alluvium would be part of the stream flow of De Luz
8   Creek."  (M.T. Vol.XIII, p. 1869, ll. 5-12).
9                              - - -
10        "The waters extracted from the well in alluvium border-
11  ing De Luz Creek are part of the stream flow of De Luz Creek."
12  (M.T. Vol. XIII, p. 1880, ll. 14, 15).
13                             - - -
14        "THE MASTER:   I notice, Colonel, in their answer
15  Mr. and Mrs. Stinson state water for irrigation of this land is
16  available by pumping from De Luz Creek which runs through this
17  property.  You say you see no evidence that they have actually
18  so pumped?
19        "THE WITNESS:  As of 1956, your Honor, there was no
20  evidence.  However, that source of water on the property, your
21  Honor, referring to the soil survey map contained in Plaintiff's
22  Exhibit M-62, the Class VIII lands characteristic of the coarse
23  alluvial fill on De Luz Creek at this point, colored in purple
24  in the extreme easterly portion of the property, and the Class
25  II land colored yellow, representing alluvial terrace adjacent
26  to the creek, are the best sources of water for the property.
27  Any water pumped from those areas would be part of the stream
28  flow of De Luz Creek."  (M.T. Vol. XIII, p. 1884, ll. 7-16).
29                             - - --
30        "Q  In so far as this alluvial material which you have
31  testified is the best source of water is concerned, what water

1 source do you believe supplies the alluvial material?

2 "A Well, that is part of the De Luz stream.

3 "A In other words, you feel that the extractions from
4 the underground in effect are a part of both De Luz Creek and
5 Cottonwood Creek streams. Is that right?

6 "A Yes, sir." (M.T. Vol. XIV, p. 1899, ll. 2--8).

- - -

8 "Q And any water developed on the portion of the
9 property with the overlying alluvium would be part of the stream,
10 I presume?

11 "A Yes, sir." (M.T. Vol. XV, p. 2138, ll.5-8).

- - -

13 " . . . That stream also flows through and over allu-
14 vial material.

15 "Q Water developed in that area then would be part of
16 the flow of that stream?

17 "A Yes, sir." (M.T. Vol. XV, p. 2154, ll.6-10).

- - -

19 "Q Now, what about underground water, if any were
20 developed on this property?

21 "A The Class III land, your Honor, in the extreme
22 southerly tip of the property, is alluvial in nature, part of
23 the alluvium brought in by the East Fork of De Luz Creek. And
24 water taken from that source would be, in my opinion, part of the
25 East Fork of De Luz Creek. . . ." (M.T. Vol. XV, p.2156,
26 ll. 14-20).

- - -

28 " . . . The small portion of Class III land within
29 Parcel 35 is continuous with a portion of Class III land in con-
30 tact with the substantial alluvial deposit along De Luz Creek
31 within Parcel No. 36. And the waters taken from that portion

6

6614

of the property in my opinion are part of De Luz Creek. . . ."
(M.T. Vol. 15, p. 2159, l. 25; p.2160, ll. 1-4).

- - -

"Q  Well, in the alluvium along the creek, wouldn't it be your opinion there is substantial ground water storage there?

"A  Well, there is just a narrow band of alluvium there, and I wouldn't say there is a substantial storage. But whatever water is in that alluvial fill supports the surface stream, is part of the stream flow." (M.T. Vol.28, p.2949, l. 24, 25; p. 2950, ll. 1-4).

- - -

"Q  And I presume your testimony is the ground water in that area is a part of the stream system of Coahuila Creek.

"A  That is correct." (M.T. Vol.35, p. 3195, ll.12-14).

--- -

"Q  What would be the nature of the water underlying this Parcel 361, then?

"A  In my opinion, your Honor, it is part of the ground water body there contained in the recent alluvium, and hence is part of the stream system.

"Q  Now, would that be true of any ground water underlying any portion of the territory which is colored yellow, the same color on Exhibit MW-3?

"A  Yes, sir."  (M.T. Vol. 35, p. 3202, ll.6-14).

- - -

"Q  Would you consider that the water found by drilling into or tapping the alluvium along the stem of this unnamed intermittent stream is a part of the stream?

"A  In my opinion, yes, sir, it would be a part of the stream."  (M.T. XI, p. 1427, ll. 16-20).

7

      "Q   What are the yellow areas that are depicted on that map?

      "A   The yellow areas are the youngest alluvial deposits that occupy the flood plain of the present-day stream channel and their tributaries." (Concerning U.S.Exhibit 15). (R.T. Vol. 25, p. 2332, 11. 13-17).

- - -

      " . . . The stream  Wilson Creek is bounded on the-- the younger alluvial deposits of Wilson Creek are bounded on the east by rocks of the basement complex and on the west by older continental deposits." (R.T. Vol. 26, p. 2401, 11.18-21).

- - -

      "Q   What is the relationship between the ground water, rather, the surface flow of Murrieta Creek and the ground water which emanates from those seven streams to which you have made reference?  Is there a relationship between them?

      "A   Yes, sir, there is.  The surface flow during the periods of low water and when there is no runoff from precipitation, the flow of Murrieta and Temecula Creeks is from ground water rising from the alluvial deposits." (R.T. Vol. 26, p.2479-2480, 11. 24-25, and 11. 1-6).

- - -

      "A   The ground water in places, as indicated in earlier testimony, rises to the surface and is surface flow, and the ground water under natural conditions returns to the surface flow which was previously ground water, again returns to ground water, may be forced to the surface at another point, flows a distance as surface water, again enters the water body at a downstream basin, moves as underground flow, may again rise as surface flow.  So when I have been referring to the movement of ground water from one basin to the next, it has in places been

8

6616

rising ground water flowing over-- or, flowing on the surface. In addition, there is a quantity of underflow flowing through the alluvial deposits, in addition to the observed surface flow that has had its origin as rising ground water." (R.T. Vol.27, p. 2570, ll. 20-25 through p. 2571, ll. 1-7).

- - -

"Q (Veeder)  "Now, Lieutenant, would you refer to the area on Exhibit 68 of the United States, which you have colored yellow, at the uppermost part, that is......and state what that depicts...?

"A  (Lt. Walker)  The area colored yellow represents the alluvial material beneath the, along the stream channel." (R.T. Vol. 37, p. 3814-3815).

- - -

United States' witness, Joseph McNearney, in discussing the operation of wells in the alluvium on Camp Pendleton testified as follows:

"When the float switch drops to an indicated area in the redwood tank that immediately will call to the deep well which is located, each one of them, in the Margarita River." (Emphasis added).  (M.T. Vol. IX, p. 1206, ll. 12-13).

- - -

The undersigned does not represent that these are all the pertinent quotes in the record. There are many others of a similar nature which, to avoid repetition, we have not set forth. It is emphasized that nowhere in the record is there any testimony in conflict with the above evidence. It should be pointed out also that aside from the testimony counsel for the United States has periodically in the record clearly stated that he at least (despite his present contentions) considered ground waters in younger alluvium to be part of the River. Commencing

at page 1904 of the Master's Transcript in Volume 14, Mr. Veeder in considering an application to appropriate water, clearly indicated that as the application in question was a surface diversion it could not form the basis for an appropriative right to use ground waters in alluvium and further that in the absence of an appropriation pertaining to those ground waters, there was no right to those waters for there had not been compliance with State law. Thus in the arguments of Mr. Veeder at this early stage of the trial, it was clear that at that time at least he was operating on the assumption that ground waters in younger alluvium, insofar as appropriations are concerned, were subject to State filings before appropriative rights were acquired. Nowhere in the transcript was there any change in position indicated by the United States until the recent motion filed by counsel for the United States which, as is evident from the record, was made at a time when the taking of evidence is for all practical purposes concluded.

     In addition, this position of Mr. Veeder that the United States regards ground waters in alluvium as part of the stream was reiterated in Volume 29, R.T., p. 2914. There the Court made a flat statement that there was no doubt that the ground waters in the younger alluvium basins were a part of the stream. Mr. Veeder, and I quote directly, states as follows in regard to the Court's statement:

     "I think we will take judicial notice of that."
Further, in many places throughout the record, it is clear that Mr. Veeder and his witnesses at all times have treated ground waters in younger alluvium as part of the River.

- - -
- - -
- - -

10

6618

A typical example occurs on page 736, Vol. 6 of the Master's Transcript:

"Q (By Veeder) 'Now, would you state for the record the quantity of water which you, in your opinion, have determined to be derived from the Santa Margarita River and consumed by the natural forage...'

"A (By ColBowen) 'In my opinion...it is that 1.4 are consumed by native vegetation...'

"Q Now would you state the aggregate, then, for the record that is derived from the Santa Margarita River and consumptively used by this native vegetation?"

In addition to the above evidence and statements of counsel, certain exhibits flatly state that ground waters in younger alluvium are part of the stream. If this counsel's memory is correct (and in this instance I have not examined the exhibit at the time of writing this brief), the famous Pemberton Report treats the alluvium as part of the stream (See U.S. Exhibit 205). In addition to the above evidence which, as emphasized, is insofar as the undersigned has been able to ascertain uncontradicted, there have been numerous acts and conduct by all counsel and the Court which clearly indicate that it was assumed by everyone that ground waters, in younger alluvium at least, were a part of the River. The numerous letters prepared by Mr. Veeder for the Court's signature to various small landowners telling them what the Court intends to find, state in several hundred of those that the ground waters in the younger alluvium are part of the stream. Many of the findings in the interlocutory judgments which have already been entered so provide. The Master's Findings which will be before this Court for consideration on September 6, 1961, find that ground waters in younger alluvium are part of the stream. At no time has the United States ever offered a hint of objection to these findings. Also,

aside from this lack of objection, in many instances as evidenced by the letters to the small landowners, counsel for the United States specifically drafted the language which states that ground waters in younger alluvium are part of the stream.

As mentioned earlier in this brief, if this Court is to conclude that ground waters in younger alluvium are not part of the stream in Camp Pendleton, there is no justification for a different result in the other areas in the watershed. Thus, if the contention advanced by Mr. Veeder is accepted by the Court, it will be necessary to completely redo what has already been done insofar as the younger alluvium in the other areas of the watershed is concerned.

We submit that in the light of the extensive citations of evidence in this case as set forth in this brief and as set forth in Fallbrook's brief, this Court is compelled to conclude that ground waters of younger alluvium are part of the stream. We emphasize that the record establishes beyond question that this case was tried on this theory and that the evidence is more than ample to support a finding that the ground water in younger alluvium are a part of the stream; i.e., are in a known and definite channel. In fact, from the evidence as recited herein, this Court would not be privileged to reach a contrary result.

Dated:  August 25, 1961.

STANLEY MOSK, Attorney General
 of the State of California
F. G. GIRARD,
 Deputy Attorney General

By /s/ F. G. GIRARD
F. G. GIRARD