FILED

SEP 21 1961

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) |
| Defendants. | ) |

MEMORANDUM OF POINTS AND AUTHORITIES

RESPECTING

PERFECTED APPROPRIATIVE RIGHTS OF PERCOLATING

WATERS OF UNITED STATES OF AMERICA IN SANTA

MARGARITA COASTAL BASIN

SUMMARY

For approximately twenty-two years the United States of America and its predecessor in interest have pumped percolating waters from the Santa Margarita Coastal Basin. Those waters have been exported from the Santa Margarita River watershed and applied to beneficial uses. That exportation and use of the waters of the Santa Margarita Coastal Basin is prior in time to the claimed appropriative rights of Vail Company and the Fallbrook Public Utility District.

California has specifically provided by Rules and Regulations that:

- i -

6683

Copy read

"Underground water . . . such as water percolating through a ground
water basin, is not subject to the board's jurisdiction and applica-
tions to appropriate such water, regardless of the place of use, should
not be submitted." That regulation is fully in accord with the re-
peated decisions of California's highest court, its intermediate
Court of Appeal and its Superior Courts. Basis for the rule and
the decisions is Section 1200 of the California Water Code that
requires application to appropriate surface waters in streams, lakes
or other bodies of water and "subterranean streams flowing through
known and definite channels."

Santa Margarita Coastal Basin contains large quantities
of waters which percolate slowly through the clay, silts and other
sedimentary deposits. That water has departed from the flow of
the Santa Margarita River and its course is governed by the deposits
which is encounters. Ultimately that percolating water, if not
consumed, may pass through the Ysidora Narrows, the constricted
outlet of the Basin. California's courts have repeatedly ruled
that waters contained in underground basins are not flowing in
subterranean streams.

Based upon the facts, California authorities and regula-
tions which are reviewed in the attached memorandum, the United
States of America is entitled to have this Court declare and
adjudged that the United States of America has an appropriative
right in and to the percolating waters of the Santa Margarita
Coastal Basin prior in time to the upstream claimed appropriative
rights of Vail Company and the Fallbrook Public Utility District.

* * * * * * * * * * * * *

- ii -

6684

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES
RESPECTING PERFECTED APPROPRIATIVE RIGHTS OF THE
UNITED STATES OF AMERICA IN AND TO THE PERCOLATING
GROUND WATERS OF THE SANTA MARGARITA COASTAL BASIN

This Memorandum of Points and Authorities supplements the memorandum dated June 30, 1961, filed by the United States of America on the same subject and likewise supplements its "Response To California's Letter of July 20, 1961, Respecting The Memorandum of the United States of America Relative To Its Appropriative Rights In The Ground Water Basin Underlying Camp Pendleton", filed August 4, 1961, and the Affidavit dated August 25, 1961, and signed by Lt. Col. Allen C. Bowen, U. S. Marine Corps.

QUESTION PRESENTED

Is there invested in the United States of America a perfected appropriative right in and to the percolating waters of the Santa Margarita Coastal Basin by reason of the pumping by the United States of America and its predecessor in interest of those waters, and the beneficial use of them outside of the watershed for a period of in excess of twenty-three years?

RESUME OF FACTS RESPECTING SANTA MARGARITA
COASTAL BASIN

Underlying Camp Pendleton is the "Santa Margarita Coastal Basin," as officially designated by California.  That ground water basin is the source of all of the waters consumptively used by the United States of America for a very large proportion of Camp Pendleton and for the Naval Hospital.  These salient features are relevant here:

Areal Extent

Santa Margarita Coastal Basin in approximately eleven (11) miles long and its maximum width is two and one-half(2½) miles; its surface area is approximately 4,600 acres.

-1-

6685

## Storage Capacity of Coastal Basin

The total storage capacity of the Santa Margarita Coastal Basin is estimated to be approximately 50,000 acre feet; California has estimated that the useable storage capacity of the Basin is 24,000 acre feet; useable storage capacity of that Basin as calculated by the United States of America is 24,000 acre feet. It has been estimated that the firm supply of the Basin is 10,000 acre feet annually.

## Source of Recharge

Recharge of the Santa Margarita Coastal Basin is primarily from deep percolation of run-off from the Santa Margarita River which debouches from a canyon into the Basin area a short distance below the confluence of that stream with DeLuz Creek.

## Geological Features of Santa Margarita Coastal Basin

Lenticular alluvial deposits of clay, silt, sand and gravel fill the Santa Margarita Coastal Basin to a depth of up to two hundred (200) feet. Course of the ground waters which fill that ground water reservoir are controlled by those lenses of alluvium of varying degrees of permeability. There are two important geological features found throughout the Basin. They are:

    a. The upper alluvial member which covers much of the surface of the Basin. That upper member is composed of fine alluvial clay and silts; it is tight, its permeability reduced; its depth varies from seventy-five (75) feet to eighty-five (85) feet from land surface;

    b. The lower alluvial member is coarser material with depths in excess of one hundred (100) feet.

## Course of Percolating Ground Waters in Coastal Basin

At the eastern extremity of the Santa Margarita Coastal Basin the coarser materials are receptive to the waters of the Santa Margarita River. Those waters enter the alluvial fill and recharge that

6686

underground lake.  The waters shortly after leaving the river lose their
identity with the flow of the stream.  They percolate through the inter-
stices of clays and silts.  Their course in the ground water basin is
governed by the character of the lenticular deposits through which they
percolate.  (U.S.A.Pl's Exhibit 38 & 38A)

Narrows at Ysidora, Ground Water Outlet
For Santa Margarita Coastal Basin

One hundred (100) acre feet or less of ground water annually
pass out through the sharply constricted Ysidora Narrows which consti-
tutes the outlet of the Santa Margarita Coastal Basin.[1]  In the light
of the large storage capacity of that Basin that discharge is indeed
small.  However, the Ysidora Narrows is less than a quarter ($\frac{1}{4}$) mile in
width; from surface to approximately eight (80) feet it is composed
largely of clay, the permeability of which is low when compared  with
the sands in the channel.

PROHIBITION BY CALIFORNIA AGAINST FILING AP-

APPLICATIONS WITH STATE TO APPROPRIATE "WATER

PERCOLATING THROUGH A GROUND WATER BASIN"

"Underground water not flowing in a subterranean stream, such
as water percolating through a ground water basin, is not subject to the
board's jurisdiction and applications to appropriate such water, regard-
less of the place of use, should not be submitted." [2]  Predicate for those
rules and regulations issued by the agency charged with responsibility of
administering the waters within California is Section 1200 of West's An-
notated Code, Water.  That statute is now quoted:

"Whenever the terms stream, lake or other body of water,

or waters occurs in relation to the applications to ap-

propriate water or permits or licenses issued pursuant to

_____

[1]  U.S.A.Pl's Exhibit 49

[2]  State Water Rights Board, Rules, Regulations and Information
pertaining to application of water in California, 1961.

-3-

6687

such applications, <u>such term refers only to surface water, and</u> <u>to subterranean streams flowing through known and definite</u> <u>channels."</u>

Pertinent in regard to that statute—the waters to which it relates— is this authoritative statement:

"The Water Code (Section 1200 quoted above and related sections) does not use the term 'percolating water' in its provisions relating to the appropriation of water . . . but confines the operation of those provisions to surface water and to 'subterranean streams flowing through known and definite channels.' This effectively excludes all other ground waters. Therefore, because of the distinction made by the Courts between percolating waters and waters of definite underground streams, it necessarily excludes percolating waters." 3/

Bearing out the conclusion expressed in the preceding excerpt is California Section 2500, West's Annotated Code, Water, which is as follows:

"Stream system defined. As used in this chapter, 'stream system' includes stream, lake, or other body of water, and tributaries and contributory sources, but does not include an underground water supply other than a subterranean stream flowing through known and definite channel."

"Percolating water" in underground basins of the nature here involved is beyond the scope of the California law requiring the filing of applications with the State as the initial step in acquiring a vested and perfected right to the use of them. That conclusion is based upon the state statutes, regulations and judicial interpretations all as more fully reviewed in the paragraphs which succeed.

---

3/ Hutchins, The California Law of Water Rights, page 426

-4-

6688

RECENT STATE COURT OPINIONS THAT PERFECTED APPRO-
PRIATIVE RIGHTS TO THE USE OF PERCOLATING WATERS
IN GROUND WATER BASIN ARE ACQUIRED WITHOUT FILING
APPLICATIONS WITH CALIFORNIA

A recent case in the Superior Court of San Diego County has direct
and immediate bearing on the matter here being reviewed. [4/]  Honorable Richard
B. Ault, presiding, wrote a comprehensive Memorandum Opinion, dated August 3,
1959, attached as Exhibit A of this Memorandum and a Memorandum Opinion No. 2,
dated November 15, 1959, likewise attached and marked Exhibit B.  Issues of
the case were described as follows by Judge Ault:

"This action involves conflicting claims to the underground
water of the Mission Basin of the San Luis Rey River.  The
plaintiffs are several owners of land overlying the basin,
and the San Luis Rey Water Conservation District within the
boundaries of which the basin lies.  In effect the Conservation
District sues on behalf of the other overlying owners.  At the
time the suit was commenced, the defendant was the Carlsbad
Mutual Water Company.  Since 1914, that Company has  owned
and operated wells in the Mission Basin from which it has ex-
tracted water and exported it through its distribution system
outside the basin and the watershed for the domestic use of
its customers in the City of Carlsbad.  Prior to trial, the
City of Carlsbad purchased all the rights and assets of the
Carlsbad Mutual Water Company and was regularly substituted
in the case as the party defendant.

The complaint was filed November 3, 1953.  The plaintiffs
seek to enjoin the defendant from continuing to export water
from the basin.  They contend that the basin is, and for some
time prior to the filing of the complaint has been, overdrawn;
that no surplus of water exists therein, and that there is not
sufficient supply of water for the reasonable and beneficial

---

[4/]  San Luis Rey Water Assn. Dist., et al v. Carlsbad Mutual
Water Co., No. 184855.

6639

use of the overlying land.

Defendant admits that the basin is overdrawn, alleges that the overdraft has existed and continued for a period in excess of five years prior to the date the complaint was filed, and contends it has established a prescriptive right to extract and export water from the basin."

Crucial to Judge Ault's opinions are these propositions:

(a)  An appropriative right must first be exercised for the statutory period of five years, with all of the other essential elements being attendant upon that use, before a valid prescriptive right may be acquired.

(b)  It is California's position that a prescriptive right to surface water may not be acquired after 1914 without first having complied with the statutory procedure (Section 1200 and related sections) for the acquisition of an appropriative right to the use of surface water. [5]

(c)  Percolating waters in a ground water basin are not within the purview of Section 1200 and related sections.

(d)  An appropriative right in percolating waters in a ground water basin may be acquired by pumping, exportation from the watershed and beneficial use of the percolating water without a filing of an application with the State of California.

Judge Ault wrote in his first Opinion as follows:

" . . .It is the purpose of this Memorandum Opinion to consider only the issue of whether defendant has established a prescriptive right against the overlying owners.  . . . In the event prescription should be found, plaintiffs have reserved  the right to raise in argument the legal issue that a prescriptive right cannot be acquired without first obtaining an appropriative permit from the state." [6]

---

[5]  See Hutchins, The California Law of Water Rights, page 334

[6]  Exhibit A, page 1

8690

Facts strikingly similar to those respecting the Santa Margarita Coastal Basin are recited in the opinion in regard to the Mission Basin. From that Opinion this statement is taken:

"The Mission Basin is located in the northern coastal area of San Diego County. It is the largest and western most of several alluvium valleys which lie along the San Luis Rey River between Lake Henshaw and the Pacific Ocean. The basin is about 9 miles in length and averages approximately one mile in width. Elevations of the valley fill start at approximately 10 feet above sea level in the upper region of the San Luis Rey Canyon at the west and rise gradually to approximately 100 feet at the gaging station at the narrows below Bonsall at the east. The canyon at the west end is narrow and steep-walled. It constitutes the only outlet for surface drainage from the basin.

The evidence indicates that the alluvium which comprises the valley fill varies in depth along the axis of the basin from 167 to 215 feet. It consists of clays, silts, sands and gravels, partially carried down by the river in times past from the mountains to the east, and in part washed down from sedimentary marine formations which bound the basin on the north and south. The materials forming the alluvial are lenticular in nature with the fine and coarse materials interfingered. Well logs indicate a preponderance of finer materials in the western part of the basin."

Judge Ault in determining the question of whether the defendant had acquired a prescriptive right to the use of water in Mission Basin relied heavily upon the case of Pasadena v. Alhambra. [7] Citing that case he observes, "The principles of law applicable to underground water are well established in California." [8] Further alluding to Mission Basin the presiding Judge declared: "Appropriation of water which is not surplus is wrongful, constitutes an invasion of the overlying right, and consequently

---

[7] Pasadena v. Alhambra, 33 Cal(2) 908, 926; 207 P(2) 17 (1949). See U.S.A. Memo, June 30, 1961; August 4, 1961.
[8] Exhibit A, page 4

6691

may be enjoined by the overlying owner.  Such appropriative taking of water which is not surplus 'may ripen into a prescriptive right' . . ." [9] Warranting reference here are the following principles enunciated by California's Highest Court in Pasadena v. Alhambra:

> "The California Courts, . . . use the term (appropriation)
> to refer to any taking of water for other than riparian or
> overlying uses.  . . . The primary purpose of the Act (Section 1200 quoted above and related acts) was to create a
> system for issuing licenses and permits for appropriation
> of surplus water.  . . . Water in an underground basin is
> not embraced by the licensing system . . ." [10]

Judge Ault having concluded Mission Basin was overdrawn prior to November 3, 1948, states:

> "The taking of water by defendant from the overdrawn basin
> for a period in excess of five years prior to November 3,
> 1953, was wrongful since it was not an appropriation of
> surplus water.  Such appropriation however, would ripen into
> a prescriptive right only if the other elements of prescription were present."

He then concluded:

> "The question then remains, was the use actual, open and
> notorious, hostile and adverse to the overlying owners?" [11]

Responding to that question Judge Ault states:

> "The Court feels that knowledge and notice to the overlying
> owner has been sufficiently established to meet the requirements of prescription." [12]

That conclusion was predicated upon the fundamental proposition that an appropriative right to percolating ground water must be exercised for five (5) years in connection with non-surplus waters under the California law before there could be an investiture of a prescriptive right. [13]

---

9 / Exhibit A, page 5
10/ 33 Cal(2) 908,925, 933-934
11/ Exhibit A, page 11
12/ Exhibit A, page 12
13/ 33 C(2) 908, 934

-8-

6692

Memorandum Opinion No. 2 Relative to Appropriative
Rights Acquired in Mission Basin Without Filing an
Application For An Appropriative Right with the State. 14/

When Judge Ault ruled:

(a) That the defendant had exercised an appropriative right for
in excess of five years;

(b) had acquired a prescriptive right by reason of that exercise
of an appropriative right;

he then turned to this proposition urged by plaintiffs and set forth on
page one of his first Memorandum Opinion:

" . . . that a prescriptive right cannot be acquired without
first obtaining an appropriative permit from the State." 15/

On that background he wrote Opinion No. 2, Exhibit B, in which this question
is asked:

"Can the defendant acquire a prescriptive right to appro-
priate underground water from the Mission Basin without
first obtaining an appropriation permit from the State
pursuant to the provisions of the Water Commission Act
(Section 1200)."

At the outset of the consideration reference is made in Memo-
randum Opinion No. 2 to Section 1200 and related acts from which stem the
requirement that applications must be filed with the State to appropriate
rights to the use of surface water in (a) streams, lakes and other
bodies of water and (b) "subterranean streams flowing through known and
definite channels."

The Court then stated:

"The question arises whether the evidence in this case would
sustain a finding that the underground waters of the Mission
Basin come within this definition (of a subterranean stream
flowing through known and definite channels." 16/

---

14/   Exhibit B

15/   Exhibit A, page 1

16/   Exhibit B, page 3

6693

In responding to that query, Judge Ault alluded to the express holding in the Pasadena v. Alhambra case which declares that: "Water in an underground basin is not embraced by the licensing system (of which Section 1200 is a part)." 17/

The Court then concluded that " . . . the waters of the San Luis Rey River, both surface and subsurface, flow into the Mission Basin, where, except in times of flood, they sink underground and percolate downward and outward in all directions through the alluvium that comprises the valley fill, forming a typical underground water basin." 18/

Important here is this determination by Judge Ault: "It is true that the defendant, as well as the City of Oceanside, has applied for and received a permit to appropriate underground water from the Mission Basin. Under the circumstances here existing, defendants prescriptive right should not be limited by such permit, nor is it estopped to maintain that such permit is not essential to the establishment of its prescriptive right. If the Pasadena case, supra, and the Orange County case, supra are applicable,

> it follows that the Division of Water Resources, in considering and granting such permit, insofar as the same applies to underground water, exceeded the authority conferred upon it by the Legislature in passing the Water Commission Act.

For the reasons stated, the Court finds that an appropriative permit from the state is not required under the circumstances here involved, and that such permit is not a prerequisite to the establishment of a prescriptive right to underground water by the defendant." 19/

---

17/  Exhibit B, page 4

18/  Exhibit B, page 5

19/  Exhibit B, page 5

6694

There was thus concluded:

(a)   That Section 1200 and related sections have no appli-
cation to percolating waters in a ground-water basin;

(b)   that a valid appropriation, a prerequisite to a pre-
scriptive right, may be acquired under California law
simply by the pumping of percolating water from a
ground water basin, the exportation of that water out
of the watershed, and the application of it to a
beneficial use.

ACTION TAKEN BY STATE WATER RIGHTS BOARD
BASED UPON MEMORANDUM OPINION NO. 2 IN
REGARD TO FALLBROOK'S SAN LUIS REY RIVER
PERMITS 20/

Impact of Judge Ault's opinions—particularly that numbered
two (2)—has been far-reaching.  It has had a direct effect upon
claim in the San Luis Rey watershed by the Fallbrook Public Utility
District, a principal defendant in this case.  Fallbrook had filed
applications for appropriative rights to the use of water from the
San Luis Rey River.  Subsequent to Judge Ault's Opinion and arising
from it, this Memorandum with respect to Fallbrook's permits in the
San Luis Rey River was entered in the files of the State Water Rights
Board:

"STATE OF CALIFORNIA

STATE WATER RIGHTS BOARD

Staff Summary for Hearing of Permits 5227, 5228 and
5229 (Held by Fallbrook Public Utility District)

JURISDICTION OF BOARD

On November 18, 1959, after a trial in Case No. 184855
in the Superior Court of San Diego County entitled "San Luis
Rey Water Conservation District v. Carlsbad Mutual Water
Company 'involving conflicting claims to the use of ground
water from the Mission Basin, Judge Richard B. Ault issued
' Memorandum Opinion No. 2' wherein he concluded that

20/   Exhibit B

-11-

6695

ground water in Mission Basin does not constitute a
subterranean stream flowing through a known and definite
channel.  Inasmuch as the jurisdiction of the State Water
Rights Board does not extend to percolating ground water,
the granting of further extension of time under the sub-
ject permits or the issuance of licenses should be subject
to a showing by the permittees that the Board does in fact
have jurisdiction of the water involved.  This requirement
should apply not only to those permits to appropriate
from Mission Basin but also to Permit 5227 in Bonsall Basin.
Dated: April 19, 1961
Sacramento, California."

Following the hearing on the Fallbrook Permits referred to above,
respecting the San Luis Rey Basin, is this Memorandum in the files of the
State Water Rights Board:

### "STATE WATER RIGHTS BOARD
### MEMORANDUM

| To:    Files | Date:  May 25, 1961 |
|---|---|
| From:  L. W. Carter | Sub:   Hearing on Applica-<br>tions 8156, 8205 and 8418 |

On May 16, 1961, a hearing was held in San Diego in
connection with permits 5227, 5228 and 5229 (Applica-
tions 8156, 8205, and 8418 respectively).  The hearing was
conducted by Chairman Silverthorne and Board Members McGill
and Alexander, assisted by staff members Craig and Carter.
Fallbrook Public Utility District was represented by Curtis
K. Price, attorney at law, and Richard Smith, general
manager of the District.  City of Carlsbad was represented
by Barbara Lang Hays, City Attorney, and City of Oceanside
was represented by Leonard A. Diether, attorney at law, with
J. Q. Jewett as special witness.  Also in attendance were
Mr. Weese, Superintendent, Water and Sewer Department, City
of Oceanside, and Don McKillop of the Department of Water
Resources.

6696

Fallbrook Public Utility District presented a written statement contending that Opinion No. 2 of Judge Richard B. Ault does not include Bonsall Basin and that the District's diversion points are in the stream channel of the San Luis Rey River.

The representatives for the Cities of Carlsbad and Oceanside indicated that Permits 5228 and 5229 could be revoked on the basis that water is being pumped from an underground basin. However, the parties requested that the Board make findings to the effect that the water being pumped is not within the jurisdiction of the Board and that no permits will be issued by the Board in the future to divert from the underground water within Mission Basin.

The City of Carlsbad entered Volumes 1 and 6 of the transcript of the court proceedings entitled 'San Luis Water Conservation District v. Carlsbad Mutual Water Company,' together with maps showing the geology of the Mission Basin. The City of Oceanside introduced the testimony of Mr. Jewett, of the firm Leeds, Hill, and Jewett, consulting engineers, who testified that water in Mission Basin is percolating and not confined to a definite underground channel.

The matter was submitted with the understanding that the Board's decision would not be made until after the findings of the above mentioned court case became final.

A field inspection of Mission and Bonsall Basins and of the diversion points of Fallbrook Public Utility District under application 8156 was made by Messrs. Silverthorn, McGill, Alexander, Craig, Carter, and McKillop on

6697

1     the afternoon of May 16, 1961.

2     Signed

3     L. W. Carter   Senior Engineer."

4        From the foregoing it is clear that a state court considering

5 facts strikingly similar to those before this Court ruled that appro-

6 priative rights to the use of ground water may be acquired without a

7 filing with the state. Awaiting the final decree in the last cited

8 case, the State Water Rights Board is withholding action on Fallbrook's

9 pending permits.

10     WHETHER THE WATER IS PERCOLATING AT POINT OF DIVERSION

11     IS THE GOVERNING FACTOR IN DISPENSING WITH FILING OF

12     APPLICATION TO APPROPRIATE WITH STATE: WATERS IN SANTA

13     MARGARITA COASTAL BASIN ARE PERCOLATING

14        Subsequent and seemingly in contemplation of Judge Ault's de-

15 cision, California's State Water Rights Board has established the

16 criterion for determining whether there is a need to file an application

17 to acquire an appropriative right to ground water. That agency has made

18 the following ruling on the subject:

19     "In deciding whether the point of diversion named in

20     the application is located at and draws from an under-

21     ground stream, it is not sufficient that there be

22     evidence of the existence of an underground stream a

23     mile or more away. As Tolman points out, an underground

24     basin may terminate in an underground stream. It is for

25     the Board to decide the ground water status of the point

26     of diversion specified in Application 17666. [21]/

27 Determinative factor, declares the Water Rights Board, is whether the

28 water is percolating at the point where it is pumped from the basin.

29 With care, the Board in the cited decision, distinguishes between the

30 waters percolating in a ground water basin and those flowing in sub-

31

32

—————————————

[21]/ Exhibit C, page 5

terranean streams.  From that opinion these statements are taken: [22]

" ' At page 44 of Tolman, Ground Water, it is stated:
Percolation (Laminar flow) is slow movement of water
in interconnected pores of saturated granular material
under hydraulic gradients commonly developed under-
ground . . . Much steeper gradients are necessary to
force water through fine material than through coarse
material and velocity of percolation decreases in
fine material until it becomes inappreciable in fine
silt and clay.'

The following language of interest is also found at
page 384 of Tolman:

' . . . No natural ground water basin without dis-
charge exists.  The water-table is an inclined sur-
face which slopes toward the discharge area, and
pumps draw on water moving in the direction of
water-table slope. . . .'

How slow must ground water move for it to be consid-
ered as percolating, not flowing?  The cases are not
clear and consistent on this question.  That slowness
of movement is an element to be considered is indicated
by the following:

'Flow' is defined in part in Webster's New International
Dictionary, second edition, as follows:

'1.  To move with a continued change of place among
the particles or parts, as a fluid; to change place
or circulate, as a liquid; to stream; run; as, rivers
flow from springs and lakes; tears flow from eyes.'

The word 'percolate' is defined in part in the same
dictionary as follows:

'1. To pass through fine interstices; to filter; as,

[22] Exhibit C, page 4

-15-

6699

water percolates through porous stone.  2.  Hence, to
pass as if by filtering; to seep . . .' "

It is abundantly manifest  that the ground waters impounded in
the Santa Margarita Coastal Basin are percolating through the inter-
stices of clay, silt, sand and gravel.  Those percolating waters are
not flowing in the sense that the term is used in Section 1200.  Repeat-
edly in this case, California has referred to the percolating waters in
the Santa Margarita Coastal Basin. [23/]  There with exhaustive comments
California speaks of the storage of water in the Basins.  By exhibit
California compares the relationship between discharge of Santa Margar-
ita River and percolation in Santa Margarita Coastal Basin. [24/]  Exten-
sive oral testimony was introduced by California in which repeated
references were made to the availability of percolating waters which
were stored in the Santa Margarita Coastal Basin and available for
use by the United States of America. [25/]

Noteworthy is the fact that California's testimony and that
of the United States of America virtually coincide in regard to the
available storage capacity of the Santa Margarita Coastal Basin.  Under
the undisputed facts of the large storage of percolating ground waters
in the Santa Margarita Coastal Basin reference is again made to Cali-
fornia's rules on the subject:

"Underground water not flowing in a subterranean
stream, such as water percolating through a ground
water basin, is not subject to the board's juris-
diction and applications to appropriate such water,
regardless of place of use, should not be submitted.' [26/]

As a consequence, it is evident that California's State Water Rights

23/  See California's Exhibit L Appendix B-63

24/  California's Exhibit AG

25/  Transcript Vol. 77, page 8840 et seq.

26/  Rules and Regulations of State Water Rights Board, 1960.

6700

Board by decisions and regulations has declared that there is no need to file an application to appropriate the percolating waters in the Santa Margarita Coastal Basin.

PRESUMPTION THAT WATERS IN SANTA MARGARITA COASTAL

BASIN ARE PERCOLATING

It has been declared by the California Courts that:  "The burden of proving that waters moving in the ground are flowing in a natural watercourse or in a well defined channel, or are a part of a stream, is upon the plaintiff in this action.

"The presumption is that they are not part of a stream or watercourse nor flowing in a definite channel."[27]

It has been authoritatively declared:  "The burden of proving that ground waters are part of a definite underground stream, therefore, is on one party who asserts the existence of such a stream."[28]

Important here is the fact:  The proof is clear that the waters pumped from the Santa Margarita Coastal Basin are percolating.  Thus there is not only the presumption that the waters are percolating, there is proof of that fact in the record.

REPEATEDLY THE CALIFORNIA COURTS HAVE DECLARED THAT

RIGHTS TO WATER PERCOLATING IN A GROUND WATER BASIN

MAY BE APPROPRIATED WITHOUT FILING APPLICATION WITH

THE STATE

In a leading case the Supreme Court of the State of California specifically held that:

"As between appropriators (of percolating ground waters) . . . the one first in time

---

[27]/  City of Los Angeles v. Pomeroy, 124 Cal 597, 628; 57 Pac 585 (1899)

[28]/  Hutchins, The California Law of Water Rights, page 428

-17-

is the first in right, and a prior appropriator
is entitled to all the water he needs, up to
the amount that he has taken in the past, before
a subsequent appropriator may take any."[29/]

Turning to the specific question of whether a filing must be made to
initiate an appropriative right to waters percolating in a ground water
basin, the court in the last cited case declared:

". . . Water in an underground basin is not
embraced by the licensing system (provided
for by Section 1200 above and related sections)."[30/]

Recently that principle was reiterated in another leading decision.
In that case were involved claimed appropriative rights with priorities sub-
sequent to the year 1914 when the surface water law became operative.[31/]
On the subject the Court declared:

"For the most part this legislation relates
only to appropriation from the surface water
and subterranean <u>streams</u> and the use of the
water appropriated therefrom as distinguished
from underground lakes or basins (State Water
Code, Sec. 1200, 1201)."

In a subsequent decision in the same case the Court reiterated its de-
cision:

"All of the appropriations by the appellant
cities . . . are of percolating waters . . .
Accordingly there appears to be no legal impedi-
ment to their claiming the points of diversion

29/  Pasadena v. Alhambra, 33 C(2) 908, 926; 207 P(2) 17 (1949)

30/  33 Cal(2) 908, 926; 207 P(2) 17 (1949)

31/  Orange County Water District v. City of Riverside 171 CA(2)
     518, 524; 340 P(2) 1036 (1959)

-18-

at will provided no one else is injured

thereby . . . . The source of supply remains

the same -- the Santa Ana River system."[32]

Another leading case involved appropriative rights to percolating waters acquired without filing pursuant to Section 1200 and related sections. Involved were rights acquired subsequent to 1914.  In adjudging the appropriative right of the City of Lodi, Plaintiff, the Supreme Court declared:

". . . Lodi is an appropriator for municipal

purposes from the underground waters supplied

by the Mokelumne River, prior in time and right

to any claim of the District . . . . The District

is a subsequent appropriator upstream from

Lodi."[33]

All of these cases which have been cited have declared that there need be no filing with the State to acquire an appropriative right to the use of water in a ground water basin, have adopted this criteria:

What is the status of the waters at the point

at which they are pumped -- if they are percolat-

ing in a ground water basin as in that underlying

Camp Pendleton their status at the point of

diversion is the controlling factor.

As the State Water Rights Board declared:

"In deciding whether the point of diversion

named in the application is located at and

_____

[32]   Orange County Water District v. City of Riverside;
     173 CA(2) 137, 192; 343 P(2) 450 (1959)

[33]   City of Lodi v. East Bay Municipal Utility District
     7 Cal(2) 316, 335; 60 P(2) 439 (1936)

6703

and draws from an underground stream, it is not
sufficient that there be evidence of the exist-
ence of an underground stream a mile or more
away.  As Tolman points out, an underground
basin may terminate in an underground stream.
It is for the Board to decide the ground water
status of the point of diversion specified in
Application 17666." [34/]

ANALYSIS OF POMEROY AND HUNTER CASES:  SAN FERNANDO
BASIN IS NOT A SUBTERRANEAN STREAM [35/]

No cases have been cited which are contrary to the propo-
sition that appropriative rights to percolating waters in a ground
water basin may be acquired without filing with the State.  References,
however, have been made to the Pomeroy Case cited above.  It has been
urged that the case is authority for the proposition that the San
Fernando Basin is an underground stream.  That conclusion is in error.
In that case the lower court instructed the jury that, "Water moving
by force of gravity in a valley or basin . . . say twenty-four by
twelve miles (the size of the San Fernando Valley) through . . .
alluvial or other deposits . . . do not constitute a water course
. . ."

However, the Court instructed that in the "narrows" or
very constricted outlet of the San Fernando Valley could be
considered to be a subterranean stream.  Crucial to the

---

34/  Exhibit C, page 5

35/  City of Los Angeles v. Pomeroy 124 Cal 597; 57 Pac 585 (1899);
     Los Angeles v. Hunter 156 Cal 603; 105 Pac 755 (1909)

6704

decision is this quotation by the Court:

"The quotation made by counsel from instructions
Nos. 13, 14, 15, 16, 17, 18, and their criticisms
thereon, are all directed to the proposition that
the Court understood and intended the jury to
understand that nothing is essential to the con-
stitution of a subterranean stream except that
the general direction of the flow of the water is
discoverable.  That in this sense the whole San
Fernando valley is a subterranean stream, and
the jury might as well have been instructed in
terms to find that there was in this land no
percolating water, the property of the defendants.
We do not think the instructions referred to,
taken by themselves, necessarily bear this con-
struction, and certainly when considered in
connection with those numbered 19 and 20, and
others, it clearly appears that the Court was not
giving, or intending to give, a definition which
would make the whole San Fernando basin a sub-
terranean stream.  The instructions, taken alto-
gether, are applicable in their definition of a
subterranean stream exclusively to the comparatively
narrow outlet of the valley between the Cahuenga range
and the Verdugo hills, where all agree that the
entire rainfall of the valley passes out, partly
on and partly beneath the surface, between the
rocky and comparatively impervious mountain sides
on either hand." 36/

---

36/  124 Cal 597, 631-632; 57 Pac 585 (1899)

-21-

6705

Manifestly, the California Court did not hold that the San Fernando basin is a subterranean stream. Rather it held that the "narrows" or outlet might be considered such a stream. More important is this fact, in a later case the California Court described the San Fernando basin:

"Unquestionably the San Fernando Valley is the great natural reservoir and supply of the Los Angeles River . . . . San Fernando Valley may indeed be regarded as a great lake filled with loose detritus, into which the drainage from the neighboring mounts flows, and the outlet of which is the Los Angeles River." [37]

Hutchins, based upon a review of the Pomeroy and Hunter cases concludes that the San Fernando Valley overlies a subterranean basin not stream:

"Ground waters of the San Fernando Valley constitute the chief source of supply of the Los Angeles River, which flows out of the valley through a comparatively narrow outlet. These ground waters, while literally percola- ting, were held to be not percolating waters in the common-law sense of the term -- 'vagrant, wandering drops moving by gravity in any and every direction along the line of least resist- ance' -- but to form 'a vast mass of water confined in a basin filled with detritus, always slowly moving downward to the outlet.' This water situation was not likened to a definite under- ground stream. Rather, the court's view was that

_____

[37] Los Angeles v. Hunter 156 Cal 603, 607

6706

1        San Fernando Valley 'may indeed be regarded as

2        a great lake filled with loose detritus, into

3        which the drainage from the neighboring mountains

4        flows, and the outlet of which is the Los Angeles

5        River.'  The soil of valley under this view is

6        a 'great natural (underground) reservoir' supply-

7        ing the river."[38]

8    Emphasized here is the fact that numerous non-overlying uses are claimed

9    and exercised in the San Fernando basin but California does not require

10    a filing with it to acquire appropriative rights.

11        Identically the same circumstances exist in the Santa Margarita

12    Coastal Basin as exists in the San Fernando valley.  There a large basin

13    of percolating water ultimately passes through the "narrows."  The

14    waters in the Basin are percolating in character and California does

15    not require that filings be made to appropriate waters under the

16    circumstances.

17        PERCOLATING WATERS IN SANTA MARGARITA

18        COASTAL BASIN SUBJECT TO APPROPRIATION

19        WITHOUT FILING WITH THE STATE

20        It has been urged that the hills surrounding the Santa

21    Margarita Coastal Basin constitutes the banks of the Santa Margarita

22    River; bed of the stream, it is urged is the broad alluvial fill over-

23    lying that basin.  Those concepts are clearly contrary to the California

24    law.  A stream must have definite "bed, banks and channel."[39]  It has

25    been declared that, "The land lying between the banks that contain the

26    stream during its ordinary course and the bluffs that contain it

27    during flood or freshet times is not part of the bed or channel of

28    the stream . . . . . ."[40]   A most careful review of

29

30    [38]  Hutchins, The California Law of Water Rights, page 420

31    [39]  51 Cal Jur (2d) Sec. 5

32    [40]  51 Cal Jur (2d) Sec. 6

6707

the authorities refute entirely the statement that the bluffs

bordering on the Santa Margarita Coastal Basin, under any stretch

of principles which pertain, could be correctly referred to as

the banks of the Santa Margarita River. [41/]

Similarly, based upon the soundest authorities, it

is impossible correctly to refer to the surface of the Santa

Margarita Coastal Basin as the channel of the Santa Margarita

River. [42/]

It is implicit, as the last cited authority declares,

that there must be a "definite channel with bed and banks

or sides." The only bed, bank and channel which can be

identified as a watercourse across the Santa Margarita

Coastal Basin is the well known, fully recognized, and clearly

designated Santa Margarita River. Efforts to broaden that

stream to the surrounding hills are wholly without foundation

in fact or law. As is fully recognized by the Pomeroy and

Hunter cases, the Basin itself is not a subterranean stream.

Rather it is an underground lake; an underground reservoir. That

fact is indisputable and cannot be seriously challenged. As in

Pomeroy and Hunter, the underground lake or reservoir has an

outlet. That outlet of the Santa Margarita Coastal Basin is

called the "Ysidora Narrows." So small is that outlet that it

is estimated that of approximately 50,000 acre feet of storage

in the Basin only one hundred (100) acre feet a year passes

through that constriction.

Even more clear is the fact that the vast basin in

which the percolating waters pumped by the Marines are contained

is not the bed and banks of a subterranean stream. Pomeroy

and Hunter declare, waters thus contained are in a subterranean

---

41/  Wiel, Water Rights In Western States, 3rd Ed, page 352 et seq.

42/  Hutchins, The California Law of Water Rights, page 21 et seq.

6708

lake, reservoir or basin--not a stream.  Percolating water
has been defined as "a vast mass of water confined in a
basin filled with detritus, always slowly moving downward
to the outlet', or outlets." [43]/

Percolating waters has also been defined as, "waters
seeping through the banks or bed of a stream which have
so far left the bed and the other waters as to have lost
their character as part of the flow." [44]/

Thus the waters impounded and stored in the Santa
Margarita Coastal Basin are clearly within the definition
of percolating waters as declared by the California courts
and the California State Water Rights Board.  They are also
clearly within this California rule which is repeated:
"The jurisdiction of the board to issue permits and licenses
for appropriation of underground water is limited by Sec-
tion 1200 of the Water Code to 'subterranean streams flowing
through known and definite channels.'...

Underground water not flowing in a subterranean
stream, such as water percolating through a
ground water basin, is not subject to the
board's jurisdiction and applications to appro-
priate such water, regardless of the place of use,
should not be submitted." [45]/

It is free from doubt that there is invested in the
United States of America, under the laws of California, an appro-
priative right to the use of the percolating waters in the Santa
Margarita Coastal Basin.  That right dates back more than

---

43/ Hutchins, The California Law of Water Rights, page 426

44/ Hutchins, The California Law of Water Rights, page 426 and
   cited cases

45/ Rules and Regulations of State Water Rights Board, 1960

twenty years.  It is prior in time to the 1946 priority
of Vail Dam and the earliest Fallbrook claimed priority
of 1947.

It is respectfully submitted, based upon the
record in this case, that the United States of America
should be adjudged a priority date for approximately
3,000 acre feet annually with a priority prior to either
of the two last named defendants.


RAMSEY CLARK,
Assistant Attorney General


WILLIAM H. VEEDER
Attorney, Department of Justice

Dated: Sept. 21, 1961

6710

C

O

P

Y

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

SAN LUIS REY WATER CONSERVATION
DISTRICT, et al.,

                    Plaintiffs,

vs.

CARLSBAD MUTUAL WATER COMPANY,

                    Defendant.

No. 184855

MEMORANDUM OPINION

It should be pointed out at the outset that it is the purpose
of this Memorandum Opinion to consider only the issue of whether
the defendant has established a prescriptive right against the
overlying owners.  While several other issues are raised by the
pleadings and framed by the Pre-trial Order, they will not be
dealt with in this opinion.  The importance of the issue of pre-
scription and the controlling effect it will have upon the remainder
of the case has been recognized by counsel, and it is by their
agreement that this issue has been isolated from the others and
submitted to the court for decision at this time.

In the event prescription should be found, plaintiffs have
reserved the right to raise and argue the legal issue that a
prescriptive right cannot be acquired without first obtaining an
appropriative permit from the state.  This argument is, as noted by
counsel, an elaborate one and it has been agreed, that if necessary,
it may be made at a later date.

-1-

                                        EXHIBIT A      6711

1       This action involves conflicting claims to the underground

2   water of the Mission Basin of the San Luis Rey River.  The plain-

3   tiffs are several owners of land overlying the basin, and the San

4   Luis Rey Water Conservation District within the boundaries of

5   which the basin lies.  In effect the Conservation District sues

6   on behalf of the other overlying owners.  At the time the suit

7   was commenced, the defendant was the Carlsbad Mutual Water Company.

8   Since 1914, that Company has owned and operated wells in the

9   Mission Basin from which it has extracted water and exported it

10  through its distribution system outside the basin and the watershed

11  for the domestic use of its customers in the City of Carlsbad.

12  Prior to trial, the City of Carlsbad purchased all the rights and

13  assets of the Carlsbad Mutual Water Company and was regularly

14  substituted in the case as the party defendant.

15      The complaint was filed November 3, 1953.  The plaintiffs

16  seek to enjoin the defendant from continuing to export water

17  from the basin.  They contend that the basin is, and for some time

18  prior to the filing of the complaint has been, overdrawn; that no

19  surplus of water exists therein, and that there is not a sufficient

20  supply of water for the reasonable and beneficial use of the over-

21  lying land.

22      Defendant admits that the basin is overdrawn, alleges that

23  the overdraft has existed and continued for a period in excess of

24  five years prior to the date the complaint was filed, and contends

25  it has established a prescriptive right to extract and export

26  water from the basin.

27      The Mission Basin is located in the northern coastal area

28  of San Diego County.  It is the largest and westermost of several

29  alluvial valleys which lie along the San Luis Rey River between

30  Lake Henshaw and the Pacific Ocean.  The basin is about 9 miles in

31  length and averages approximately one mile in width.  Elevations

32  of the valley fill start at approximately 10 feet above sea level

33  in the upper region of the San Luis Rey Canyon at the west and

-2-

EXHIBIT A      8712

1  rise gradually to approximately 100 feet at the gaging station at

2  the narrows below Bonsall at the east.  The canyon at the west end

3  is narrow and steep-walled.  It constitutes the only outlet for

4  surface drainage from the basin.

5        The evidence indicates that the alluvium which comprises

6  the valley fill varies in depth along the axis of the basin from

7  165 to 215 feet.  It consists of clays, silts, sands and gravels,

8  partially carried down by the river in times past from the mountains

9  to the east, and in part washed down from sedimentary marine forma-

10  tions which bound the basin on the north and south.  The materials

11  forming the alluvium are lenticular in nature with the fine and

12  course materials interfingered.  Well logs indicate a preponderance

13  of finer materials in the western part of the basin.

14        Recent years of continued drought have created both quantity

15  and quality problems to the water supply of the Mission Basin.  As

16  indicated by hydrographs of typical wells, ground water levels in

17  the basin have dropped approximately 50 feet during the current

18  prolonged dry period.  As indicated by tests of various wells, the

19  chloride content of the water in the basin has increased to a

20  point where some wells have been abandoned, many are not fit for

21  agricultural use, and by 1958 the water quality of the basin as a

22  whole had reached a point where chlorides approached 300 parts per

23  million.  The evidence indicates that chlorides in excess of 300

24  parts per million render the water unfit for irrigation purposes.

25  It is apparent that under existing circumstances, the basin cannot

26  safely yield the draft that has been placed upon it.

27        The geology of the hills surrounding, and the formation

28  underlying, the basin has a significant effect upon the ground

29  water therein.  To the northeast, a relatively small part of the

30  basin is bordered by a granitic-type rock known as Bonsall

31  tonalite.  At the western end, near the canyon area, it is lined

32  on both its northern and southern banks by an impermeable formation

33  called the San Onofre Breccia.  Surrounding and underlying

-3-

EXHIBIT A

6713

1    the major portion of the basin, is the La Jolla formation, which

2    consists of marine Eocene sands and sandy shales.  These materials

3    are of low permeability and contain saline connate water, probably

4    introduced during the period when the land was submerged under

5    the ocean.

6        Wells sunk into the La Jolla formation produce water of

7    poor quality.  These waters have a chloride content ranging from

8    300 to 2300 parts per million.  The lower concentrations are

9    probably indicative of diluted slaine connate water, while the

10    higher concentrations more probably represent natural chloride

11    content of the water in the La Jolla formation.

12        The evidence established that the saline waters in the La

13    Jolla formation constitute a major source of the water deteriora-

14    tion in the Mission Basin.  As water levels in the basin have been

15    pulled down in the dry years, the hydraulic gradient from the La

16    Jolla formation to the basin has increased.  This has permitted

17    an increase in flow of saline waters from the La Jolla into the

18    basin, and as water levels in the basin have gone down, the

19    chloride content of wells has increased.  Except in the westernmost

20    part of the basin, where there has been some sea water intrusion,

21    the evidence indicates that it is the lateral migration of saline

22    water from the basin sides that is responsible for the deterioration

23    of water quality.

24        The principles of law applicable to underground water are

25    well established in California.  These principles are succinctly

26    reviewed by Chief Justice Gibson in City of Pasadena v. City of

27    Alhambra, 33 Cal. 2d 908.  Generally, the right of the overlying

28    owner is the same as that of the owner of land riparian to a

29    surface stream.  The overlying owner has the right to take such

30    water as he reasonably needs for the beneficial use of his over-

31    lying land.  The rights of overlying owners are correlative and

32    belong to all in common.  Water not needed for the reasonable

33    beneficial use of the overlying land is excess or surplus water,

-4-

EXHIBIT  A

6714

1   and surplus water may be appropriated from privately owned land

2   for non-overlying uses and may be exported and devoted to use

3   outside the watershed.

4           The right of overlying owners to such water as they

5   reasonably need for the beneficial use of their land is prior and

6   paramount to that of appropriators, but the overlying right is

7   not invaded by the appropriation of surplus waters.  So long as a

8   surplus exists in the underground, appropriations thereof are not

9   wrongful.  Appropriation of water which is not surplus is wrongful,

10  constitutes an invasion of the overlying right, and consequently

11  may be enjoined by the overlying owner.  Such appropriative taking

12  of water which is not surplus "may ripen into a prescriptive right

13  where the use is actual, open and notorious, hostile and adverse

14  to the original owner, continuous and uninterrupted for the

15  statutory period of 5 years, and under claim of right".  (Pasadena

16  v. Alhambra, supra, p. 926-927.)

17          As applied to underground water basins, the terms of

18  "overdrawn" and "overdraft" are used to indicate a condition of

19  shortage, a situation in which no surplus water exists.  Thus

20  appropriation of water from an overdrawn basin is wrongful and

21  constitutes an invasion of the overlying right.  It follows there-

22  from that the defendant, as an appropriator of water who seeks to

23  assert a prescriptive right as against the overlying owners, must

24  establish, among other things, that the basin was overdrawn prior

25  to November 3, 1948, five years before the complaint herein was

26  filed.  This issue is framed by the pleadings, recognized in the

27  Pre-trial Order, and the case was tried on that theory.

28          It seems to be recognized, hydrologically at least, that

29  there may be more than one kind of overdraft, and throughout the

30  trial reference has been made to a distinction between a "quantity

31  overdraft" and a "quality overdraft".  The pre-trial statement and

32  order in connection with overdraft reads as follows:

33          "(d)  Overdraft:  All parties contend that the Mission

-5-

1       Basin is 'overdrawn,' that is, that either:  (1) the rate of

2       diversion of water therefrom is greater than the basin can

3       continue to supply; or (2) the diversions therefrom have

4       caused intrusion of salt water into the basin and have thereby

5       rendered the waters of the basin unfit for beneficial use;

6       or (3) the diversions from the basin have rendered the pro-

7       duction of water therefrom for beneficial use prohibitively

8       expensive.  Defendant contends, and Plaintiffs deny, that

9       said overdraft commenced prior to November 3, 1948, and that

10       Defendant owns a prescriptive or mutually prescriptive right

11       to extract waters from the basin for use in its service area.

12       With respect to said claimed prescriptive or mutually pre-

13       scriptive right, Defendant has the burden of proof, including

14       the burden of proving that said overdraft commenced prior

15       to November 3, 1948."

16       It should be noted here that in the trial all parties have

17 agreed that the type of overdraft designated (3) in the pre-trial

18 order is not applicable to the Mission Basin.

19       In Pasadena vs. Alhambra, supra, at page 929, the court in

20 effect defined overdraft in its quantititive sense, when it stated:

21       "Where the quantity withdrawn exceeds the average annual

22       amount contributed by rainfall, it is manifest that the

23       underground store will be gradually depleted and eventually

24       exhausted, and, accordingly, in order to prevent such a

25       catastrophe, it has been held proper to limit the total use

26       by all consumers to an amount equal, as near as may be, to

27       the average supply and to enjoin takings in such quantities

28       or in such manner as would destroy or endanger the under-

29       ground source of water."

30       No cases have been cited or found in which a court has defined

31 overdraft in its qualitative sense.  However, all parties and their

32 experts have agreed that overdraft in either sense occurs when the

33 draft on the basin exceeds the safe yield.

-6-

EXHIBIT A     6719

1        Two definitions of safe yield, both of which comprehend the

2  quality and quantity problem, seemed acceptable to the parties.

3  The first by Harvey O. Banks, Director of the Department of Water

4  Resources, reads as follows:

5        "Safe yield may be defined as the average annual rate

6        of artificial extraction from a ground water basin which

7        will not:  A.  Exceed the difference between the average

8        annual supply to the waste water table as defined previously,

9        and the average annual disposal from the water table by

10       underflow, affluent, seepage, drainage, and direct consumptive

11       use;  B.  Lower the water table sufficiently to permit in-

12       trusion of sea water, or other water of undesirable quality

13       or to prevent sufficient flow through the basin to maintain

14       proper balance of dissolved salts;  C.  Lower the water

15       table beyond the economical limit for a cost of pumping,

16       or; . . ."

17  The second which appears in a book entitled "Hydrology Handbook,

18  American Society of Civil Engineers", dated 1949, reads:

19        "The safe yield of a ground water reservoir is the

20       amount of water which can be utilized from it annually

21       over an unlimited period of time without eventually

22       bringing about some undesired result."

23        With respect to the quantity overdraft, it is apparent that

24  where the annual total draft on the basin exceeds the average

25  annual supply thereto, the continuance of such a draft will deplete

26  and exhaust the water supply.  Overdraft, however, occurs not when

27  the supply is exhausted, but when the draft in the amount which

28  exceeds the average annual supply begins.  As stated in the

29  Pasadena case supra:

30        "The proper time to act in preserving the supply is when

31       the overdraft commences, and the aid of the courts would

32       come too late and be entirely inadequate if, as appellant

33       seems to suggest, those who possess water rights could not

EXHIBIT  A    6717

commence legal proceedings until the supply was so greatly
depleted that it actually became difficult or impossible to
obtain water."

Defendant contends that this type of overdraft has occurred
in the Mission Basin. It was to demonstrate this contention that
its chief expert, Mr. Dibble, undertook to make a comprehensive
hydrologic study of the basin. This study embraced a computation
of the water supply to the basin, including that derived from
the surface and sub-surface flow of the river, the rainfall on
the valley floor and the runoff from the surrounding hills; it
also embraced a computation of the demand on the basin, including
the consumptive use of natural vegetation and irrigated crops on
the overlying land, water exported for use to the surrounding hills,
and water appropriated and exported from the basin for the
domestic use of the cities of Carlsbad and Oceanside. This hydro-
logic study basically covered the 18 year period from 1937 to 1954,
which Mr. Dibble denoted as the "Average Period". The results of
this study, insofar as they apply to the question of prescription,
may be said to culminate in defendant's Exhibit X-X-X-X, which has
been labelled "Hydroligic Equation". Examination of that exhibit
reveals that Mr. Dibble computed the average annual supply to the
basin for the 18 year average period as 9,625 acre feet, and that
he computed the draft on the basin for each of those years to be
in excess of that amount. It was therefore his opinion that the
basin was overdrawn in a quantitative sense because in each of
these years the total demand upon the basin was in excess of the
average annual supply.

Defendant has not attempted to compute the safe yield of the
basin, but takes the position that because of the quality problems
involved, the safe yield must of necessity be less than the average
annual supply.

Plaintiffs contend that the basin has not been overdrawn in
a quantitative sense. They did not make a study or computation

-8-

EXHIBIT A     6718

1   of the supply and demand on the basin; they attacked the sources

2   of the data used by Mr. Dibble as being speculative and too in-

3   accurate to be relied upon.  Their expert, Mr. Rowe, disputed the

4   figures used by Mr. Dibble as the basis for many of his calcula-

5   tions.  He disagreed particularly with the factors used by him for

6   specific yield in determining the storage capacity of the basin,

7   and the factors and methods used in computing the consumptive use

8   of native vegetation and irrigated crops.  It is their contention

9   that there is not sufficient accurate basic data available to make

10   a proper analysis of the basin from the standpoint of supply and

11   demand.

12          Plaintiffs also contend that the average period selected by

13   Mr. Dibble for his study is misleading in that it does not take

14   into consideration the increased absorptive qualities of the

15   basin which will exist when the wet years come.  Their analysis

16   of the condition of the basin is based upon a study of water levels

17   as portrayed by wells in the basin.  From this and other hydrologic

18   data, Mr. Rowe concluded that the basin was not overdrawn in the

19   quantitative sense; that there was sufficient water in storage to

20   ride out the dry period, and that the basin would again refill with

21   the return of the wet cycle.  It was his opinion that the main

22   problem in the basin was one of quality and not of quantity.

23          Turning to the problem of water quality, it is conceded by

24   plaintiffs that the basin is overdrawn in that sense at the present

25   time, and that it was so overdrawn prior to November 3, 1953, the

26   date the complaint was filed.  It is apparent from the evidence

27   that there exists a direct relationship between increased chlorides

28   and water levels in the basin.  As previously stated, when water

29   levels in the basin have gone down, the chloride content of water

30   extracted from the wells had increased.  Thus the quality problem

31   cannot be divorced from the problem of water quantity.  It is the

32   shortage of water, together with other factors, that has led to the

33   deterioration of the water supply.

-9-

It is also apparent that the water quality problems of the basin, tied as they are to water levels, inevitably reduce its effective storage capacity and render it less capable of surviving periods of drought. It follows that the permissible annual draft on the basin must be governed, not by its total storage capacity, but rather by its capacity for storage between ground level and the depth below which continued extraction results in substantial water detrioration.

The evidence established that overdraft in the quality sense in fact took place prior to November 3, 1948. As was heretofore noted, a quantity overdraft occurs, not when the water is exhausted, but when a draft in the amount which exceeds the average annual supply begins. So likewise, it would seem, overdraft in the quality sense occurs, not when the water gets bad, but when a draft is placed upon the basin which in time will pull water levels down to the point where trouble will occur. This analogy follows from the definition of overdraft as given by all experts in this case and seems to fit without conflict the definitions set forth earlier in this opinion.

Thus the overdraft in the Mission Basin occurred not in 1948, 1949, 1950 or 1951, when well samples indicated actual water deterioration, but at an earlier date when an annual draft was placed upon the basin which, with the advent of the dry years, was certain to, and did, bring water levels down to a point where saline water from the sides invaded the basin.

From 1935 to 1945, this area experienced a period of wet years, and it was inevitable that a series of dry years would follow. The evidence establishes that water exports from the basin increased yearly from 3,289 acre feet in the water year 1936-37 to 6,600 acre feet in 1946-47, more than doubling in the face of dry years to come.

During the wet years, wells in the basin substantially maintained their levels, fluctuating only upon a seasonal basis. When

-10-

EXHIBIT A      6720

1   the dry period came, and replenishment did not occur, water levels

2   have steadily declined as a result of the draft upon the basin.

3   The evidence conclusively demonstrates that the established draft

4   on the basin prior to November 3, 1948, was in an amount calculated

5   to bring basin levels down to the point where saline waters from

6   the La Jolla formation invaded the basin in sufficient quantity

7   to bring about a substantial deterioration of the water supply.

8   Indeed this conclusion is sufficiently established by the evidence

9   that the final position taken by plaintiffs on this issue seems

10  to be to concede that from a quality standpoint, the basin was

11  overdrawn prior to November 3, 1948.

12          Having arrived at the above conclusion, it becomes unnecessary

13  to determine whether defendant has sufficiently demonstrated over-

14  draft in any other sense.  The taking of water by defendant from

15  the overdrawn basin for a period in excess of five years prior

16  to November 3, 1953, was wrongful since it was not an appropriation

17  of surplus water.  Such appropriation, however, would ripen into a

18  prescriptive right only if the other elements of prescription were

19  present.

20          The question then remains, was the use actual, open and

21  notorious, hostile and adverse to the overlying owners?  The

22  plaintiffs earnestly contend that this was not such a taking.

23  Basically their argument is that the overlying owners cannot be

24  charged with knowledge and understanding of the complicated

25  hydrology and geology of this basin and its surrounding formation.

26  It was not until 1958, when the State Department of Water Resources

27  published its report entitled "Investigation of the Water Quality

28  in Mission Basin", that the causes of water deterioration in the

29  basin became generally known.  Here, for the first time, was

30  developed and published the theory that it was the intrusion of

31  saline waters from the La Jolla formation that had caused the

32  deterioration of the water supply.  How, plaintiffs contend, can

33  they be charged with notice that their rights were being invaded

-11-

1  when it was not until 1958 that the La Jolla problem was first
2  recognized and understood?
3          Defendant contends in this respect that the law does not
4  require notice, or knowledge, or the bringing home of the invasion
5  to the overlying owners.  As between appropriator and overlying
6  owner, the contention is that the invasion of the right alone is
7  sufficient.  The overlying owner is in the position of a lower
8  riparian owner and the defendant, as an appropriator, is in the
9  position of an upper non-riparian user.  This analogy was made
10  by Justice Kincaid in his opinion in the District Court of Appeal
11  in Pasadena v. Alhambra, found in 180 P. 2d 699.  The analogy is
12  accepted by Justice Shinn in his concurring opinion.  It should be
13  noticed, however, that Justice Kincaid stated in his opinion:
14          "The riparian concept of upper and lower use, however,
15          has not been applied to percolating waters."
16  The Supreme Court, in the Pasadena case, was not required to
17  determine the point here raised.  Whether this is, or should be,
18  the law of this state need not be decided here.  The court feels
19  that knowledge and notice to the overlying owners has been
20  sufficiently established to meet the requirements of prescription.
21  Prior to 1947 every study that had been made of the area by govern-
22  mental agencies concluded that the basin was of limited capacity
23  and that disaster might occur if water levels were pulled down
24  below sea level.  These studies all indicated a safe yield for the
25  basin in an amount less than the 6,600 acre feet which constituted
26  the amount of water exported alone during the water year 1946-47.
27          At every hearing held by the state relative to the issuance
28  of permits to appropriate water from the San Luis Rey River,
29  warnings were sounded that if water levels in the basin were
30  permitted to be drawn down, sea water intrusion might occur.  In
31  1939, in the midst of a cycle of wet years, the overlying owners
32  in the Bonsall Basin of the San Luis Rey immediately to the east,
33  filed an action to protect their rights against appropriators.

-12-

EXHIBIT A

9722

1    In 1936, farther to the south, the overlying owners in the Tijuana

2 Basin of San Diego County filed their action and successfully en-

3 joined the appropriation of water from the Tijuana Basin. All of

4 these things were either known, or should have been known, to the

5 overlying owners in the Mission Basin. The very fact that the

6 state was concerned enough with the condition of the basin to

7 conduct studies and investigations constitutes some notice.

8        It is true that the danger warned against, that the limitations

9 on the basin made, were predicated upon the threat of sea water

10 intrusion. While sea water intrusion has not occurred, except to

11 a limited extent, it is a fact that when the water levels of the

12 basin receded to a point where sea water intrusion was predicted,

13 serious deterioration of water quality did occur. The warning

14 was sounded again and again that if the water levels in the basin

15 were allowed to go down to a given point, the water supply would

16 be ruined by intrusion of saline waters from the ocean. When

17 water levels were allowed to be drawn down to that point, the

18 saline waters came. The fact that they came from the La Jolla

19 formation surrounding the basin and not from the sea itself is,

20 in the opinion of the court, of no consequence insofar as the

21 question of notice is concerned.

22        It follows from what has been said that this court is of

23 the opinion that defendant has established its prescriptive right.

24 Though little has been said on the subject during the trial, this

25 case fits within the framework of the Raymond Basin case, and the

26 overlying owners, too, have established mutually prescriptive

27 rights against the defendant.

28        Dated:  August 3, 1959.

29

30                       RICHARD B. AULT
                          Judge of the Superior Court

31

32

33

-13-

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

SAN LUIS REY WATER CONSERVATION )
DISTRICT, et al.,                )    No. 184855
                Plaintiffs,      )
                                 )
    vs.                          )    MEMORANDUM OPINION NO. 2
                                 )
CARLSBAD MUTUAL WATER COMPANY,    )
                Defendant.        )
_____

        Two issues are presented to the Court at this time for

decision.  These will be stated and discussed separately.

        1.  Can the defendant acquire a prescriptive right to

appropriate underground water from the Mission Basin without

first obtaining an appropriative permit from the state pursuant

to the provisions of the Water Commission Act?

        Section 1200 of the Water Code of the State of California

(formerly part of the Water Commission Act) reads as follows:

        "Terms referring to surface water and subterranean

        streams.  Whenever the terms stream, lake or other body of

        water, or water occurs in relation to applications to ap-

        propriate water or permits or licenses issued pursuant to

        such applications, such term refers only to surface water,

        and to subterranean streams flowing through known and

        definite channels."

-1-

EXHIBIT B 6724

1   Section 1201 of the Water Code reads:

2   "Water declared public and subject to appropriation.

3   All water flowing in any natural channel, excepting so

4   far as it has been or is being applied to useful and

5   beneficial purposes upon, or in so far as it is or may

6   be reasonably needed for useful and beneficial purposes

7   upon lands riparian thereto, or otherwise appropriated,

8   is hereby declared to be public water of the State and

9   subject to appropriation in accordance with the provi-

10   sions of this code."

11   The precise question here presented has not heretofore been

12   decided by a court.  In Hudson vs. West, 47 Cal. 2d 823, which in-

13   volved the flowing water of Grub Ravine, it was touched upon in-

14   directly.  At page 827, the Court said:

15   "(1)  On appeal, counsel for the state Department of

16   Public Works, Division of Water Resources, filed an

17   amicus curiae brief in which they attack the judgment,

18   contending that there is no evidence in this case that

19   defendants complied with the statutory procedures con-

20   cerning the appropriation of water ( Wat. Code, § 1200-

21   1801) and that without such compliance no prescriptive

22   right to use water may be acquired in this state.  The

23   parties have not raised this issue, however, and the

24   judgment quieting title in defendants prejudices no

25   right of the state of California, for neither it nor the

26   Department of Public Works was a party to this action.

27   (See Wat. Code, § 1052.)"

28

29   While this may indicate an attitude by the Supreme Court

30   not to consider the issue, since it was not raised by any of the

31   parties to the action, it is interesting that the Court ended its

32   discussion of the problem with "(See Wat. Code Sec. 1052.)"  That

33   section reads:

-2-

EXHIBIT B

6725

1       "Unauthorized diversion or use a trespass:   Institution

2      of injunctive action.  The diversion or use of water sub-

3      ject to the provisions of this division other than as

4      authorized in this division is a trespass, and the de-

5      partment may institute in the superior court in and for

6      any county wherein such diversion or use is attempted

7      appropriate action to have such trespass enjoined."

8         The question here under consideration has attracted the

9  attention of authorities in the field of Water Law.  Three articles

10  appear in the California Law Review on the subject.  The first two

11  of these, "Prescriptive Water Rights in California:  Is Application

12  a Prerequisite?" by Russel R. Kletzing, 39 Cal. Law Rev., page 369,

13  and "Prescriptive Water Rights in California:  An Addendum", by

14  Delger Trowbridge, 39 Cal. Law Rev., p. 525, conclude that a pre-

15  scriptive right may be gained in California without applying to the

16  Division of Water Resources.  The third article entitled "Prescrip-

17  tive Water Rights in California and the Necessity for a Valid

18  Statutory Appropriation", by Gavin M. Craig, reaches the conclusion

19  that the statute must be complied with and that a permit from the

20  state is a prerequisite to the acquisition of a prescriptive right.

21      None of these authorities discuss the proposition of

22  whether the Water Commission Act has application to underground

23  water basins.  Mr. Craig, in his article, excludes percolating

24  ground water from the operation of the Act.

25      Applicability of the Act to the underground water of the

26  Mission Basin, if it is to be applied, must be predicated upon that

27  part of section 1200 which reads: ". . . and to subterranean

28  streams flowing through known and definite channels."  The question

29  arises whether the evidence in this case would sustain a finding

30  that the underground waters of the Mission Basin come within this

31  definition.

32      As to underground water basins in general, two cases are

33  helpful.  In Pasadena v. Alhambra, 33 Cal. 2d 908, at page 934,

-3-

the Court states:

"Water in an underground basin is not embraced by the
licensing system, because section 42 of the act provides
that the term 'water,' as used in sections of the act
relating to permits or licenses, 'shall be interpreted
to refer only to surface water, and to subterranean
streams flowing through known and definite channels.'
(Deering's Gen. Laws (1937), Act 9091, § 42.) There is
no claim that any of the rights to water involved in the
present case were obtained under such a permit or license,
and the ground water in the Raymond Basin Area does not
flow in known and definite channels within the meaning
of section 42."

In Orange County Water District v. City of Riverside, 173A.
C.A. 167, (hearing in the Supreme Court denied), Judge Haines stated
at page 224:

"(41)  Insofar as mututal water companies or any other
agencies appropriate water from underground basins their
appropriations are not made under the authority of sections
1200 and 1201 of the state Water Code."

It is argued that neither the Raymond Basin nor the San
Bernardino Basin is the Mission Basin, and that these cases should
not be controlling.  However, a reading of that portion of the two
cases which is descriptive of the geography, geology and the hydrol-
ogy of the basins involved, leaves little to distinguish them from
the Mission Basin.  The basins there considered are larger, the
tributary rivers there involved are greater, and the alluvial de-
posits are deeper, but in general, little but size distinguishes
the Mission Basin from the other two.

If the evidence in this case establishes the ground water of
the Mission Basin as a "subterranean stream flowing through known
and definite channels," then the entire basin must be regarded as
such a channel, for no more definite a location of "the flow" has

-4-

EXHIBIT B

6727

1   been established. Many of the wells which overlie the basin are

2   located a considerable distance from the present river channel. A

3   fair interpretation of the pleadings and the evidence compels the

4   conclusion that the waters of the San Luis Rey River, both surface

5   and subsurface, flow into the Mission Basin, where, except in times

6   of flood, they sink underground and percolate downward and outward

7   in all directions through the alluvium that comprises the valley

8   fill, forming a typical underground water basin.

9          It is true that the defendant, as well as the City of

10  Oceanside, has applied for and received a permit to appropriate

11  underground water from the Mission Basin. Under the circumstances

12  here existing, defendant's prescriptive right should not be limited

13  by such permit, nor is it estopped to maintain that such permit is

14  not essential to the establishment of its prescriptive right. If

15  the Pasadena case, _supra_, and the Orange County case, _supra_, are

16  applicable, it follows that the Division of Water Resources, in

17  considering and granting such permit, insofar as the same applies

18  to underground water, exceeded the authority conferred upon it by

19  the Legislature in passing the Water Commission Act.

20         For the reasons stated, the Court finds that an appropriative

21  permit from the state is not required under the circumstances here

22  involved, and that such permit is not a prerequisite to the

23  establishment of a prescriptive right to underground water by the

24  defendant.

25

26         2. Are Sections 1005.1 and 1005.2 of the Water Code of the

27  State of California unconstitutional?

28         These sections are made applicable to the eight southern

29  counties of the state only. (Santa Barbara, Ventura, Los Angeles,

30  Orange, San Diego, Imperial, Riverside and San Bernardino.) As

31  applied to this case, they provide that where an owner of a right

32  to extract ground water reduces his extraction thereof as the

33  result of the use of water from a non-tributary source such use,

for the purpose of establishing or maintaining any right to extract
ground water shall be construed to constitute a use of the ground
water itself.  No lapse, reduction or loss of any right in ground
water, shall occur under such conditions.

It is contended that the above statutes are in violation of
the equal protection clause of the Fourteenth Amendment of the
Constitution of the United States, and of similar provisions of
the Constitution of the State of California, in that the applica-
tion of the act confers special rights on a limited number of
persons, and that the applicability of the act to the eight southern
counties consitutes an unreasonable and arbitrary classification.

It should be noted that in passing these statutes the
Legislature specifically provided as follows:

"Sec. 3.  The legislature finds and declares that this
act is necessary to the solution of a problem arising out
of the following unique circumstances:

"The water supplies in the underground basins in the
arid southern part of this State are being rapidly depleted
by excessive pumping during a period of prolonged drought
conditions.  Because of the geological conditions peculiar
to this area, further excessive pumping is certain to
destroy the usefulness of these basins.

"This act is intended to save these water basins by
protecting users of water from the basins who cease or
reduce the extraction of water therefrom and use, in lieu
thereof, water from an alternate nontributary source,
thereby preventing further depletion of the water in the
basins."

And later in Section 5:

"Long-continued conditions of drouth and great increases
in demands for water to supply the people and lands have
depleted certain ground water basins in the southern part

-6-

EXHIBIT B

C729

1   of this State to such an extent as to threaten their

2   extinction as sources of usable water.  To restore and

3   replenish these basins, it is essential that immediate

4   steps be taken to reduce pumping in these areas and to

5   bring in water available to these basins from alternate

6   nontributary sources.  This act is immediately necessary

7   to promote and protect these activities by water-rights

8   owners in conserving and developing the water supplies

9   which are the lifeblood of this State."

10   The principles to be applied in this situation are well

11   established.  The equality guaranteed is an equality under like

12   conditions and among those who are similarly situated. (Watson v.

13   Division of Motor Vehicles, 212 Cal. 279, 284.)  The classification

14   made must not be arbitrary, but must be based upon a reasonable

15   distinction or difference found to exist, and have substantial

16   relationship to the legitimate object sought to be established.

17   It is not essential that the entire public be directly benefited

18   by the legislations, it may be deemed for the ultimate public good

19   althought a particular class may be more directly benefited.  (The

20   Housing Authority v. Dockweiler, 14 Cal. 2d 437.)  All presumptions

21   are in favor of the legislative determination , which determination

22   "cannot be avoided by the courts unless it is palpably arbitrary."

23   (County of Los Angeles v. Hurlbut, 44 Cal. App. 2d 88, 92.)

24   At the time this legislation was enacted (1951), the southern

25   part of the State of California was in the midst of a prolonged

26   drouth.  The evidence establishes that the Mission Basin was in

27   danger of depletion, and it is commonly known that other basins

28   in the southern part of the state were in a similar condition.

29   Unfortunately the condition has grown worse.

30   The purpose of these statutes to preserve the underground

31   water basins in the southern part of the state is a legitimate

32   object for legislation and such legislation is for the ultimate

33   good of the entire public, although it may more directly effect

-7-                    EXHIBIT B

6730

1   and benefit a smaller group.  Application of these provisions to

2   the eight southern counties of the state, where the drought con-

3   ditions are most severe, seems wholly logical and far from arbitrary.

4   It would certainly appear that the classification is one where the

5   legislative determination should not be nullified by a court.  The

6   contention that Sections 1005.1 and 1005.2 of the Water Code are

7   unconsitutuional cannot be sustained.

8        Dated:  November 18, 1959.

9

10                                    RICHARD B. AULT
                                      Judge of the Superior Court.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

-8-                    EXHIBIT B

6731

STATE OF CALIFORNIA
STATE WATER RIGHTS BOARD

In the Matter of Application 17666   )
of Mojave Public Utility District   )
to Appropriate from Underground   )       Decision No. 968
Stream Tributary to Cache Creek   )      A D O P T E D     JUN 30 '60
in Kern County   )
_____)

## DECISION DENYING JURISDICTION

Application 17666, filed June 20, 1957, proposes the appropriation of two cubic feet of water per second for municipal use from an "underground stream located in Kern County, tributary to Cache Creek." Pursuant to notice of the application, written protests against its approval were submitted by Monolith Portland Cement Company, R. A. Jacobsen, and J. C. Jacobsen, Jr.

The matter was set for public hearing under the provisions of the California Administrative Code, Title 23, Waters, before W. P. Rowe, Member, State Water Rights Board (hereinafter referred to as "the Board"), on Tuesday, May 12, 1959, in Tehachapi, California. The applicant, protestants, and other interested parties were duly notified of the hearing, and the following appearances were entered:

[end of page 1]

| Party | Representative |
|---|---|
| Mojave Public Utility District | Oran W. Palmer, Attorney<br>Stephen E. Wall, Attorney |
| Monolith Portland Cement Company | Joseph T. Enright, Attorney |
| City of Tehachapi )<br>R. E. Jacobsen, Jr. )<br>R. A. Jacobsen ) | Philip M. Wagy, Attorney |
| Tehachapi Valley Citizens Committee | Gale Ellis |

After one day of hearing the matter was continued and reconvened on Tuesday, August 25, 1959, for the sole purpose of receiving evidence

- 1 -     State Water Rights Board
Decision No. 968

EXHIBIT C

GPO 10—20909-1

6732

1   on whether the water in the source named in Application 17666 is water in a

2   subterranean stream flowing through a known and definite channel and subject

3   to the jurisdiction of the Board. The same parties appeared as at the

4   previous day of hearing. This decision is limited to a discussion of the

5   jurisdictional issue.

6   The point of diversion named in the subject application consists

7   of a well over 100 feet deep which has been in production for several years.

8   It is contended by applicant that the underground stream stated in the

9   application is an unnamed stream tributary to Cache Creek. The applicant

10  states that although there are channels of more pervious material beneath

11  the surface, the bed and banks of the underground stream consist of the same

12  impermeable material as the adjacent hills, extended underground at approxi-

13  mately the surface slope and containing alluvial detritus through which the

14  underground stream flows (R. T. May 12, 1959, pp. 35, 36. Mojave Exh. 1).

15  It is the contention of protestants that the

16  [end of page 2]

17  water at the point of diversion is percolating, not flowing, and that the

18  area where the well is located is a ground water basin, not an underground

19  stream.

20  The Board's jurisdiction over applications to appropriate under-

21  ground water is limited by Water Code Section 1200 "to subterranean streams

22  flowing through known and definite channels." This language involves several

23  interrelated problems of interpretation. When is a given area a stream,

24  and when is it an underground basin? Does the word "flowing" include water

25  that is moving very slowly? When a given area containing slowly moving water

26  has impermeable sides and bottom, must those impermeable sides and bottom

27  be construed as the bed and banks of a stream, or may they be the sides

28  and bottom of a ground water basin? And how solid must the underground

29  banks be to hold water in a known and definite channel within the statutory

30  definition?

31  51 Cal. Jur. 2d, Waters, S 388 states:

32

- 2 -

State Water Rights Board
Decision No. 968

6733

"The underground waters of California are divided generally into three classes: (1) the underflow of surface streams, (2) definite underground streams with defined channels, beds, and banks that may be undefined to human knowledge, but are subject to reasonable inference from geological and other sources of knowledge, and (3) percolating waters, which are those waters that move through the soil, do not move in a stream but generally are found in a basin under the ground, and do not form a part of the body or flow, surface or underground, of any stream. Percolating waters may either be rain waters slowly infiltrating the soil, or they may be waters seeping from streams that have left a definite stream bed and are no longer a part of the flow thereof."

Since the applicant does not contend the source to consist of the underflow of Cache Creek, the first category

[end of page 3]

may be disregarded, but it is necessary to examine more closely the other two categories of ground water, and further quotations will be made from sections of Volume 51 of Cal. Jur. 2d, Waters.

"C. UNDERGROUND STREAMS

"393. . . . In determining whether water is part of an underground stream or is percolating water, the fact that the water is under pressure is immaterial. The material fact is whether there is a flow in a defined channel, or whether it is part of a diffused body of water that is without definite bed and banks confining its flow, but it may be moving in a definite direction and still not be a stream. The channel of a subterranean stream is defined when it is confined by impervious sides and beds, and can be bounded by reasonable inference though it may be undefined to human knowledge with exactness. The fact that water is percolating through loose, permeable material filling such a bed does not change its nature as a subterranean stream ...."

"D. PERCOLATING WATERS.

"395. The common-law definition of percolating waters as vagrant, wandering drops moving by gravity in any and every direction along the line of least resistance has not been followed generally in this state. In 1903 the supreme court extended the definition of percolating waters to include an artesian basin several square miles in area, well-defined, filled with loose water-bearing detritus, fed from numerous canyons and ravines, and furnishing through wells a large flow of artesian water. While such a bed might not be filled with percolating waters as they were understood at common law, it is fed by percolation and is not a watercourse, and hence the law of percolating waters is applicable . . . .

"The courts have experienced great difficulty in fixing the line beyond which water ceases to be a part of stream flow, and the body of water that actively supports the stream, and becomes percolating water. Underground water is generally presumed to be percolating, and the burden of proof is on the party who asserts that underground water constitutes a part of a watercourse."

[end of page 4]

- 3 -

State Water Rights Board
Decision No. 968

C734

GPO 16—09999-1

1    At page 44 of Tolman, Ground Water, it is stated:

2    "Percolation (Laminar flow) is slow movement of water in
     interconnected pores of saturated granular material under
3    hydraulic gradients commonly developed underground . . . .
     Much steeper gradients are necessary to force water through
4    fine material than through coarse material and velocity of
     percolation decreases in fine material until it becomes inap-
5    preciable in fine silt and clay."

6    The following language of interest is also found at page 384
7    of Tolman:

8    ". . . No natural ground water basin without discharge exists.
     The water-table is an inclined surface which slopes toward
9    the discharge area, and pumps draw on water moving in the
     direction of water-table slope. . . . ."

10

11   How slow must ground water move for it to be considered as per-

12   colating, not flowing? The cases are not clear and consistent on this

13   question. That slowness of movement is an element to be considered is

14   indicated by the following:

15   "Flow" is defined in part in Webster's New International Dictionary,

16   second edition, as follows:

17   "1. To move with a continued change of place among the
     particles or parts, as a fluid; to change place or circulate,
     as a liquid; to stream; run; as, rivers flow from springs
18   and lakes; tears flow from eyes."

19   The word "percolate" is defined in part in the same dictionary as

20   follows:

21   "1. To pass through fine interstices; to filter; as, water
     percolates through porous stone.  2. Hence, to pass as if by
22   filtering; to seep . . ."

23   In the case of Katz v. Walkinshaw, 141 Cal. 116, 70 Pac. 663 (1902),

24   74 Pac. 766 (1903), the court was called upon to decide whether an area in some

25   respects comparable to Cache Creek contained an underground stream or a ground

26   [end of page 5]

27   water basin with percolating water. The area in question was a so-called

28   artesian belt containing alluvial material saturated with water. Testimony

29   was to the effect that the saturated land was fed by the underflow of numerous

30   canyons and ravines, and by rain and flood water absorbed into the soil. The

31   court stated:

32

                                          State Water Rights Board
                                          Decision No. 968
                         - 4 -

"it is evident that, if there is any flow to this underground body of water thus held under pressure, it is by percolation." (70 Pac. 663, 664.)

In deciding whether the point of diversion named in the application is located at and draws from an underground stream, it is not sufficient that there be evidence of the existence of an underground stream a mile or more away. As Tolman points out, an underground basin may terminate in an underground stream. It is for the Board to decide the ground water status of the point of diversion specified in Application 17666.

The point of diversion named in the application is located in a mountain canyon filled with alluvial detritus and consists of a well known as S-26 from which applicant has been producing water for several years. At this point, underground water is moving slowly in a southerly direction, corresponding in general to the direction of the intermittent surface flow of Cache Creek. Well S-26 is 162 feet deep. In June of 1959, the water table at this location was about 90 feet below the surface of the ground and extended in width about 1,000 feet from impermeable hills on the east to the northerly end of some hills on the west known as

[end of page 6]

the Knolls. Gaps to the north and south of the Knolls will be described further.

There is one place about a mile and a half to the south and east of well S-26 near Tehachapi Pass where the flow of underground water is concentrated and has the definite and visible characteristics of a small underground stream. At this point, the bedrock walls have constricted the alluvium-filled channel to the extent that surplus water at times has been forced to the surface as rising water.

Immediately upstream and to the northwest of this constricted area, the distance between bedrock walls gradually increases to about Proctor Gap, the outlet from Tehachapi Valley, just to the south of the Knolls. The undisputed evidence shows this reach of the Cache Creek channel is an artesian basin where flowing wells occurred before the water table was lowered by pumping. This "artesian body of water" is an underground water basin, known locally and in court decisions as "Monroe Meadows".

- 5 -

1        Above the artesian rim of Monroe Meadows, there is a typical intake

2   or forebay area in which flood waters of Cache Creek can be absorbed.  This

3   reach of the river is a typical mountain underground water basin offering

4   cyclic storage space for the absorbed water.  The basement complex hills

5   apparently form a well-defined left (east) bank the full length of the basin.

6        The right (west) bank of the basin is neither continuous nor

7   well defined due to the breaks at North Gap and

8   [end of page 7]

9   Proctor Gap where the water-bearing materials are contiguous to and in

10   contact with similar deposits in Tehachapi Valley.  These offer a means

11   for flow of ground water to or from Tehachapi Valley ground water basin

12   depending on the hydraulic gradient.

13        The following criteria indicate that there is an underground

14   basin along Cache Creek, at least from the junction of Sand, Horse, and

15   Oil Canyons in the northeast quarter of aforesaid Section 15 for a distance

16   of about four miles to the lower end of Monroe Meadows where there is, or

17   was, an underground stream.

18        1.  Cache Creek Valley below the confluence of Sand, Cache, and

19   Oil Canyons has widths on the surface between bedrock walls of at least

20   1,600 feet at the southernmost well of Mr. Jacobsen in Section 22 (well

21   S-20); at least 2,000 feet opposite the North Gap; and at least 3,000 feet

22   opposite Proctor Gap.  It has no defined width at either of the "Gaps".

23        2.  Monroe Meadows is "an artesian body of water" (Mojave Exh.

24   26A, p. 31.3) and the "outlet of said artesian body of water is narrow

25   and obstructed."  In other words, Monroe Meadows is a typical artesian water

26   basin (on a small scale) terminating in a small underground stream formed

27   by the constriction.

28        3.  The east bank of Cache Creek is shown as well defined (Mojave

29   Exh. 1, and Monolith's Exh. 5), but the west bank is not well defined

30   because of breaks in the banks at both the North and Proctor Gap.

31   [end of page 8]

32        Mr. Jacobsen testified that all 22 wells drilled on his property

State Water Rights Board
Decision No. 968

- 6 -

8737

abutting Cache Creek encountered water.  This includes a well in the southeast corner of Section 15 which he stated was on a side hill in the basement complex. This well was drilled in the side hill forming the left (east) bank of the geological feature and suggests that even this bank is not well defined as a boundary.  The 22 wells explored the basin for its full width of 1,600 feet on Mr. Jacobsen's land (Exh. J-1).

5.  Although the water table gradient is fairly steep in the area near well S-26 (Mojave Exh. 7), nevertheless, tests conducted indicate, and the Board finds, the rate of movement of the ground water in this area to be substantially less than 100 feet a day.  A possible textbook explanation of this slow rate of movement despite the slope of the water table is the passage from Tolman regarding percolating water:

"Much steeper gradients are necessary to force water through fine material than through coarse material ....."

The Board is mindful, not only of the above evidence and considerations but of the presumption that underground water is percolating, and finds that the applicant has not sustained the burden of proving that the source named in the application is an underground stream at the applicant's point of diversion.  It follows that the application must be denied for lack of jurisdiction without considering whether there is unappropriated water subject to appropriation by applicant.

[end of page 9]

ORDER

Application 17666 having been filed for the appropriation of unappropriated water from an "underground stream located in Kern County, tributary to Cache Creek," but the Board finding that the underground water is not an underground stream but is percolating ground water,

IT IS HEREBY ORDERED that Application 17666 be, and it is, denied for lack of jurisdiction.

Adopted as the decision and order of the State Water Rights Board at a meeting duly called and held at            , California, this       day of       , 1960.

Kent Silverthorne, Chairman

W. P. Rowe, Member

- 7 -  Ralph J. McGill, Member

State Water Rights Board - Decision No. 968

STATE OF CALIFORNIA - STATE WATER RIGHTS BOARD
1401 - 21st Street
P. O. Box 1592
Sacramento 7, California

| | |
|---|---|
| In the matter of Application 17666, ) | NOTICE OF HEARING |
| MOJAVE PUBLIC UTILITY DISTRICT, ) | |
| Applicant ) | |
| MONOLITH PORTLAND CEMENT CO. and J. E. ) JACOBSEN, Jr. and R. A. JACOBSEN ) | Source: Unnamed underground stream tributary to Cache Creek |
| Protestants ) | County: Kern |

NOTICE IS HEREBY GIVEN that a hearing of the above-entitled matter will be held Tuesday, May 12, 1959, at 9:30 a.m., in the Veterans Memorial Auditorium, 125 East F Street, Tehachapi, California.

This hearing is for the purpose of affording an opportunity to the applicant, protestants and other interested parties to present relevant oral testimony and written evidence, maps, charts and other material which may tend to establish whether or not there is unappropriated water to supply the applicant, whether the source as named in the application is an underground stream flowing in a known and definite channel, and whether said application should be approved.

The enclosed pamphlet contains information as to the procedure to be followed by the Board in conducting the hearing and allocation of the costs to be borne by the parties appearing.

Those desiring to be heard shall give the undersigned at least five days' notice of intended appearance at this hearing.

L. K. Hill
L. K. Hill
Executive Officer

Enc.
Dated: Sacramento, California
April 13, 1959

6739

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32

STATE OF CALIFORNIA

STATE WATER RIGHTS BOARD

*   *   *   *   *   *   *   *   *

STAFF REPORT

ON

APPLICATION 17666

AN UNNAMED UNDERGROUND STREAM

TRIBUTARY TO CACHE CREEK

KERN COUNTY

May 1, 1959

6740

OPC 16—20005-2

STATE OF CALIFORNIA
STATE WATER RIGHTS BOARD

STAFF REPORT
ON
APPLICATION 17666
AN UNNAMED UNDERGROUND STREAM
TRIBUTARY TO CACHE CREEK
KERN COUNTY

Purpose and Scope of Report

This report presents factual data and information regarding Application 17666 to appropriate water from an unnamed underground stream tributary to Cache Creek in Kern County. The application was filed by Mojave Public Utility District pursuant to Division 2 of the Water Code of California. Notice of the application was given as required by law and protests against approval of the application have been received. The parties have not been able to adjust their differences and a hearing is necessary to determine the action to be taken on the application.

The report, prepared from data contained in the files of the State Water Rights Board and from various published bulletins and other public records, is primarily for the purpose of acquainting the interested parties with the information already at hand. It contains a list of bulletins and reports believed to contain relevant information which will be offered into evidence by reference at the hearing and outlines certain important issues presented in the application and protests thereto upon which additional information should be provided by the parties at the hearing. Copies of the report will be furnished to the various

[end of page 1]

interested parties prior to the hearing and a copy will be offered into evidence at the hearing as an exhibit of the staff of the State Water Rights Board.

Substance of the Application

Application 17666 was filed on June 20, 1957, by Mojave Public Utility District for a permit to appropriate 2 cubic feet per second, year-round, from an unnamed underground stream tributary to Cache Creek for municipal purposes. The point of diversion is to be located within the

- 1 -

Staff Report on
Application 17666

8741

GPC 19-29098-1

1   SW 1/4 of NW 1/4 of Section 27, T32S, R34E, MDB&M.  Diversion of water is to be

2   made by pumping from a well through approximately 12 miles of pipe to the town

3   of Mojave located within Sections 8, 9, 16, and 17 of T11N, R12W, SBB&M.

4   The applicant estimates that the full amount of the proposed appropriation

5   will be put to beneficial use by 1980 serving the Mojave Public Utility

6   District and the U. S. Marine Base at Mojave.  The present population is

7   stated to be approximately 5500.  According to the application the applicant

8   has a lease with Charles I. and Elizabeth M. Powell for the land at the

9   proposed point of diversion, which lease contains an option to purchase.

10                          Protests

11          Application 17666 was protested by Monolith Portland Cement Company

12   and J. C. Jacobsen, Jr., and R. A. Jacobsen.

13          Monolith Portland Cement Company protests the application

14   on the basis of prior development and beneficial use of the water

15   sought to be appropriated, alleging that the proposed diversion and

16   [end of page 2]

17   exportation of water by the applicant would constitute a draft upon a sub-

18   stantially confined body of percolating water, commonly referred to as

19   Tehachapi Basin and its sub-basins, which would reduce ground water levels

20   in such basins from which protestant has historically obtained its water;

21   that there is no subterranean stream flowing under or through any known and

22   definite channel upon, under, or through the land upon which applicant's well

23   is located; that the State Water Rights Board has no jurisdiction, authority,

24   or power to grant said Application 17666; that litigation is now pending

25   and is being diligently prosecuted between the parties in Case No. 68837,

26   Kern County Superior Court, to determine judicially the right of Mojave

27   Public Utility District to produce water from the subject land and export it

28   to the nonoverlying town of Mojave; and that no unappropriated water exists.

29   The protestant claims that its predecessors drilled wells and commenced

30   using water in about 1910 for industrial and other purposes, primarily in

31   the operation of a cement manufacturing plant; that water has been pumped

32   from wells in the basin by the present protestant for the same purpose since

- 2 -

Staff Report on
Application 17666

6742

GPC 10-22098-2

1  the year 1920; and that the amounts beneficially used were 2,630 acre-feet in

2  1948; 2,670 acre-feet in 1949, and during the first 10 months of 1950,

3  2,900 acre-feet.  The protest states that the protestant's point of diversion

4  consists of numerous wells within the Tehachapi Basin but does not go into

5  any detail in describing the location of the wells.

6      J. C. Jacobsen, Jr., and R. A. Jacobsen protest approval

7  of Application 17666 on the basis of being overlying landowners

8  and use of underground water since 1942.  They claim injury will

9  [end of page 3]

10  result to them by the exporting of any water from the area which will deplete

11  the already seriously diminishing underground water supply; that they will

12  be forced to greatly reduce their irrigated acreage, with loss of crop

13  revenue, and that their land values will be seriously reduced.  It is indicated

14  in the protest that use was started in approximately 1942, and that the water

15  is used to irrigate potato and seed crops.  Their diversion of water consists

16  of several wells in Sections 15 and 22, T32S, R34E, MDB&M.  According to the

17  protest, it may be disregarded and dismissed if the water supply is restored

18  to the amount available in 1942.

19              Answers to Protests

20      In answer to the foregoing protests, Applicant Mojave Public Utility

21  District states that the proposed diversion and exportation of water by it

22  would not result in any detriment to the underground water level of the

23  Tehachapi Basin; that the well site proposed is situated over the underground

24  channel of Cache Creek on a definitely defined underground water course which

25  terminates in a fan-shaped delta over which land belonging to the Mojave Public

26  Utility District is situated; that the well site is situated in the mouth of

27  "Monroe Meadows" which is the historic source of water supply of the applicant;

28  that if water is not diverted at the point where the proposed well site is

29  situated such water will be lost to use unless taken further downstream in

30  the canyon through which the underground water course flows; that it appears

31  from exhibits and hydrologic studies introduced in the certain litigation

32  between Monolith Portland Cement Company and the applicant that

[end of page 4]

- 3 -

Staff Report on
Application 17666
6743

there is a definite underground barrier between the wells of Protestant Monolith
Portland Cement Company and the wells from which applicant seeks to obtain its
waters; that the wells and property of Protestants J. C. Jacobsen, Jr., and
R. A. Jacobsen are upstream from wells of the applicant; that water having
passed through their property can never be recovered; and that any water drawn
from the wells of the applicant would have no effect on the water levels of
Protestants Jacobsens' wells.  It is further alleged that an adjudication by
the court in the afore-mentioned action between Monolith Portland Cement
Company and the applicant establishes that the location where applicant's
wells are situated is not within a water basin but is on a watershed or
drainage system leading into the "Monroe Meadows" and down Cache Creek, and
finally that the use to which the applicant intends to put the water applied
for is the highest use to which water may be put, that is, domestic use by a
political subdivision.

### Summary of Downstream Rights

The water rights of record in the files of the State Water Rights
Board are limited to those initiated subsequent to December 19, 1914, the
effective date of the Water Commission Act.  Appropriative rights initiated
prior to that date and riparian and overlying rights are not of record.  As
of March 4, 1959, there were no other applications to appropriate from the
stream system downstream from the applicant's proposed point of diversion.
[end of page 5]

### Description of Watershed

According to USGS Mojave (1956) and Tehachapi (1943) quadrangles,
15-minute series, Cache Creek rises in the eastern portion of Section 20,
T31S, R35E, MDB&M, near Cache Peak at an elevation of approximately 6,600
feet and flows in a southwesterly direction approximately 8 miles and then
turns to the southeast and flows approximately 2.5 miles to a junction with
an unnamed stream at the upper end of Tehachapi Pass.  From the upper end of
Tehachapi Pass, Cache Creek (shown as Tehachapi Creek on Tehachapi Quanrangle)
flows generally eastward a distance of several miles and discharges into the
Mojave Desert.  The town of Tehachapi lies approximately 7 miles to the west

6744

Staff Report on
Application 17666

OPC 16-29006-2

1  of the proposed point of diversion, and the town of Mojave lies to the southeast

2  approximately 8 miles.

3  <u>Additional Information</u>

4    Applicant, Mojave Public Utility District, filed Application 13869

5  on July 27, 1950, for an appropriation of 3 cubic feet per second, year-round,

6  from an unnamed underground stream within Cache Creek watershed for municipal

7  purposes. The point of diversion under that application was to have been within

8  the SW 1/4 of SE 1/4 of Section 28, T32S, R34E, MDB&M. Following legal

9  proceedings brought by Protestant Monolith Portland Cement Company it was

10 determined that the point of diversion under said Application 13869

11 was within the Tehachapi Basin and that the pumping of water there-

12 from and exportation to the town of Mojave constituted a detriment

13 [end of page 6]

14 to the Monolith Portland Cement Company and other overlying users in the

15 Tehachapi Basin.

16   The trial court's judgment was sustained on appeal insofar as it

17 enjoined the Mojave Public Utility District from exporting water extracted in

18 said SW 1/4 of SE 1/4 of Section 28, T32S, R34E, MDB&M. Consistent therewith,

19 on February 14, 1958, Application 13869 was canceled on the records of the

20 State Water Rights Board. The appellate decision referred to above is reported

21 in 316 Pacific 2d 713.

22   Before termination of the above-described litigation, the Mojave

23 Public Utility District had apparently started exporting water from the separate

24 well in the Cache Creek area, which is now the proposed point of diversion in

25 Application 17666. This well is variously described in the above-described

26 litigation as Powell Well or Well S-26. The trial court's Judgment in pro-

27 hibiting the export of water produced in the Tehachapi Basin for use outside the

28 basin, had indicated the basin's easterly boundary to be at Proctor Gap. But

29 the trial court's Findings of Facts had indicated that Tehachapi Basin extended

30 southeasterly of Proctor Gap, through Monroe Meadows, to the upper end of

31 Tehachapi Pass. As a result there was uncertainty as to whether the injunction

32 applied to the well in the Cache Creek area known as Well S-26. The appellate

Staff Report on
Application 17666
6745

OFC 10-20005-1

court, in the published opinion cited above, stated that "the
findings, conclusions, and judgment should not be considered as res
judicata in another action, or actions, involving other wells in
the Cache Creek or Monroe Meadows area ...".   Kern County Superior

[end of page 7]

Court Case No. 68837 was filed for the specific purpose of enjoining the
applicant from exporting water taken from Well S-26 near Cache Creek.
It is understood that this action was filed in 1956 but has never been
brought to trial.

Chapter IX of Bulletin No. 1, State Water Resources Board, "Water
Resources of California", dated 1951, gives general information with regard
to streams and areas of drainage basins, precipitation, runoff, flood flows
and frequencies, and quality of water.

### Scope of the Hearing

The decision of the State Water Rights Board as to whether or not
a permit should be issued must be based upon the record developed at the
hearing.  Applicant and protestants should present at the hearing information
relating to those issues raised by the protests and the answers thereto insofar
as they relate to matters within the jurisdiction of the Board.  Particular con-
sideration should be given to the following items:

1. Whether the source as named in the application
is in reality an underground stream flowing in a known
and definite channel and thus subject to the jurisdiction
of the State Water Rights Board.

2. Existence of unappropriated water available to
supply the applicant as to amount and season of occurrence.

3. Anticipated injury to protestants and other
lawful users with specific data substantiating such
injury.

4. Need for the water sought by the applicant.

5. If the application is approved, what special
terms and conditions, if any, should be included in
the permit issued pursuant thereto.

[end of page 8]

6. The present status of Kern County Superior
Court Case No. 68837.

- 6 -

OPC 10—20095-1

<u>Documents to be Offered into Evidence by Reference</u>

The following public documents on file with the State Water Rights Board contain information which may be relevant to the matter to be heard and will be offered into evidence by reference at the hearing:

1. Staff Report of Application 17666 dated March 4, 1959.

2. Files of Applications 13869 and 17666.

3. Bulletin No. 1, State Water Resources Board, "Water Resources of California", dated 1951, with particular reference to Chapter IX - Lahontan Area.

4. United States Department of Interior, Geological Survey, Water Supply Papers, Part 10, "The Great Basin", with particular reference to stream flow records in the Mojave River Basin and Antelope Valley.

5. Topographic maps of the area under consideration published by the United States Geological Survey.

6. United States Weather Bureau, Monthly Summary, Climatological Data, California.

Dated:   Sacramento, California
         May 1, 1959

- 7 -

Staff Report on
Application 17666

6747

6748