GROUND WATERS - NAVAL ENCLAVE
March 6, 1962
WHV

FILED
MAR 5 - 1962
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By /s/ DEPUTY

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 1247-SD-C |
| Plaintiff, | ) | STATEMENT OF |
| v. | ) | UNITED STATES OF AMERICA |
| FALLBROOK PUBLIC UTILITY DISTRICT, ET AL., | ) | RESPECTING |
| | ) | GROUND WATERS WITHIN NAVAL ENCLAVE |
| Defendants. | ) | |

    This Honorable Court in the course of considering findings regarding the Naval Enclave has tentatively approved statements respecting the alluvial fill which underlies a large segment of Camp Pendleton and which is the source of a large preponderance of the waters consumptively used within the Naval Enclave.

    "* * * alluvial deposits * * * vary in width within the Naval Enclave and for the sake of convenience in this case * * * have been referred to as sub-basins or ground water storage units, and specifically in downstream order, the Upper and Chappo and Ysidora Sub-Basins or ground water storage units.

    * * *

    "Those segments of the Basin are geologically and hydrologically interconnected and interrelated.

    * * *

- 1 -

6790

"Areal extent of the Basin, all within Camp Pendleton, is approximately four thousand six hundred (4,600) acres. It varies in widths from a maximum of two (2) miles in the Chappo Unit, to its narrowest point of approximately one quarter (1/4) mile at the above described Ysidora Narrows. By units the Surface areas of the Basin are as follows:

| | |
|---|---|
| Upper Unit  - | 960 acres |
| Chappo Unit  - | 2,640 acres |
| Ysidora Unit  - | 1,080 acres |
| | 4,680 acres |

"The surface area of the Basin is approximately seven (7) square miles." [1]/

In the light of the proposed findings this Court evinced a willingness to review proposals by the United States of America respecting the nature, character and movement of the percolating waters in the Basin.[2]/ Relevant in that connection is this finding proposed by the United States of America the substance of which has been tentatively agreed upon:

"Capacity, Yield and Management of Basin:

"Unanimity prevails to a marked degree between the evidence California and the United States of America introduced respecting (a) nature, (b) characteristics, (c), storage capacity, and (d) usable storage capacity of the Basin. Based upon the evidence it is found as follows:

| | |
|---|---|
| Total storage capacity of the three sub-basins found above - Upper, Chappo, and Ysidora - is approximately | 48,000 acre-feet |

Usable storage capacity for each sub-basin is approximately as follows:

| | |
|---|---|
| Upper Basin | 10,000 acre-feet |
| Chappo Basin | 15,000 acre-feet |
| Ysidora Basin | 1,200 acre-feet |
| | 26,200 acre-feet." [3]/

---

[1]/ Judge Carter's Copy - Feb. 21, 1962, pages 22A, 22B.
[2]/ Tr. Vol. 187, pages 19,126 et seq.
[3]/ Judge Carter's Copy - Feb. 21, 1962, Finding 15, page 24.

6791

Another series of findings tentatively agreed upon are as follows:

"From the point where the Santa Margarita River debouches from the mouth of the canyon, to the Ysidora Narrows there is a steady increase in the depth of the sedimentary fill. See in that connection U. S. A. - plaintiff's Exhibit 38 and 38B, Santa Margarita River Watershed within Camp Pendleton. Near De Luz Dam site, at an elevation of one hundred twenty-five (125) feet above sea level, basement complex is reached at approximately fifty (50) feet below land surface. Proceeding coastwards the depth through the alluvium to bedrock increases. Two miles below the point last mentioned wells have been drilled in the fill to depths varying from one hundred twenty (120) feet to one hundred and forty-two (142) feet. Throughout the deeper areas of the Chappo Unit the alluvium is approximately one hundred sixty-five (165) to one hundred eighty (180) feet in depth, feathering out to shallow limits as the edge of the Basin is approached. Greatest total depth of approximately three hundred (300) feet is attained at the southern extremity of the Basin.

"Alluvial fill deposited in the above-described Basin is lenticular in nature. Finer Textured sand and clay are found at the surface of the Chappo and Ysidora Units. At relatively shallow depths in the Units last mentioned are found lenses of clay and silty sand. Half way down Chappo Unit at depths of approximately one hundred (100) feet are found cobbles and gravel. Farther down the valley are found areas of clay and clay silt. Layers of clay are of considerable thickness in this reach of the Basin.

"One of the principal physical features of the Basin is a marked differentiation between the alluvial deposits referred to as

       (a) Upper Member, and
       (b) Lower Member.

6792

"The Upper Member is relatively uniform throughout the Basin, varying from eighty-five (85) to seventy (70) feet in depth commencing a short distance below the De Luz Dam site; the depths of that Upper Member increase progressively across the lower portion of the Upper Subbasin, Chappo Subbasin and the Ysidora Subbasin.

"The Lower Member is similarly comprised of lenticular deposits. However, they consist of coarser-grained clastics."[4]

"Ground Water Contours in Basin:

"The ground water contours within the Basin on or about October 1957 are depicted on U.S.A.-Plaintiff's Exhibit 45, which is incorporated into this Finding by reference. At the point of confluence of DeLuz Creek with the main stem of the Santa Margarita River the ground-water elevation on the date last mentioned stood at one hundred and thirty-five (135) feet above sea level. The elevations of the ground water table as evidenced by said exhibit conforms generally with ground surface and follow an approximately even downward gradient for the entire length of said younger alluvial deposits to an elevation of approximately five (5) feet above mean sea level at that point where the Santa Margarita River enters the Ysidora Narrows.[5]

"Alluvial Fill Below Sea Level;
    Salt Water Intrusion;
    Control of Salt Water Intrusion:

"Approximately two-thirds (2/3) of the alluvial deposits are below sea level. As a consequence, to prevent salt water intrusion it has been found necessary by the United States of America to maintain the water levels in the Ysidora segment of the

---
[4] Judge Carter's Copy - Feb. 21, 1962, pages 28A, 28B.
[5] Judge Carter's Copy - Feb. 21, 1962, page 30.

- 4 -

6793

Basin at minimum elevation of five (5) feet above sea level in order to prevent the waters of the Pacific Ocean from entering into the deposits. Maintenance of that fresh water barrier against salt water intrusion constitutes a reasonable beneficial use of water by the United States of America." [6]

"Ground Water Discharge
at Ysidora Narrows

"In the state of nature, approximately one hundred (100) acre-feet of ground water a year passed from the Ysidora Subbasin through the alluvial fill in the Ysidora Narrows. Subsequent to the year 1956 when salt water intrusion was prevented as found above, the quantity of water passing from the Ysidora Subbasin was restored substantially to what it was in the state of nature." [7]

In the light of the findings which have been quoted above, reference is made to the request of the United States of America that this Honorable Court declare in substance as a matter of fact that:

    The Santa Margarita Coastal Basin, as designated by the State of California, is in effect an underground lake of percolating ground waters from which the United States of America and its predecessor in interest have pumped large quantities of water which have been applied to beneficial uses for a period in excess of twenty (20) years;

and to determine as a matter of law that:

    The only way in which rights to the use of percolating water can be appropriated in the State of California is by pumping the water and applying it to a beneficial use;

---

[6] Judge Carter's Copy - Feb. 21, 1962, Finding 13, page 36.
[7] Judge Carter's Copy - Feb. 21, 1962, Finding 20.

- 5 -

6794

that there is no statutory procedure in the State of
California for the appropriation of rights to the use
of percolating waters.

Based upon the findings of the diversion by the United
States of America and its predecessor in interest of the
percolating waters of the Santa Margarita Coastal Basin
there is vested in the United States of America an
appropriative right to the use of that percolating water
acquired in conformity with the laws of California in the
amount, for the purposes and with a priority date all as
more specifically set forth in the findings of this Court.

It is respectfully submitted that the findings tentatively approved
by this Court relative to the Santa Margarita Coastal Basin fully support
the findings of fact and conclusions of law which have been suggested.

In declaring a willingness to consider those findings and conclusions
the Court alluded to earlier factual statements proposed by the United States
of America concerning the Santa Margarita Coastal Basin. Accordingly, those
statements will be reviewed.

<u>Colonel Bowen's Affidavit</u>:

Based upon his personal knowledge Colonel Bowen stated, under oath,
in support of the position of the United States of America, that a large Basin
underlies Camp Pendleton, exactly the same facts as this Court has tentatively
found. In addition to those findings tentatively approved by the Court,
Colonel Bowen further affirmed that:

"I have made detailed investigation of the geological
and hydrological features of the Basin underlying Camp
Pendleton and have personal knowledge respecting those
physical phenomena.

\* \* \*

"The bed and banks of the Santa Margarita River in

- 6 -

6795

its course across the Basin constitute but a small fraction of the total surface area of the Basin. It is evident that the stream has frequently changed its course and that its present and most recent channel is, like its numerous former channels, subject to change. Porous materials are found along the bed and banks of the stream. They are shallow in character when compared with the finer textured Upper Member or that of the Lower Member above described.

\* \* \*

"During periods of heavy precipitation and immediately following those periods there is surface flow in the Santa Margarita River. During those times the surface waters readily enter the porous materials constituting the bed and banks of the channel. Within a short distance after thus entering those porous materials the water ceases to be a part of the surface flow or subflow of the Santa Margarita River. Rather it enters the lenses of clays and silts which comprise the Upper Member and there they lose their identification with the surface flow and subflow of the stream.

"When those waters have left the limited porous areas of the bed and banks comprising the channel of the Santa Margarita River they join the mass of percolating and vagrant ground waters contained in the Basin. Their course of direction is not then that of the Santa Margarita River or its subflow. Rather, the heterogeneous nature of the deposits is the controlling factor as to the course of those waters. Course of the percolating waters in the mass of clays and silts, the rapidity of their movement, either vertical or horizontal, are governed by the permeability of the particular types of deposits which they encounter or enter. Those percolating waters do not flow through any known or definite channels.

8796

> "It is from the percolating waters, which can no longer be identified with the surface or subsurface flow of the Santa Margarita River, that the United States of America has historically diverted the waters which it uses for military and agricultural purposes. The quantities thus pumped by the United States are set forth in U.S.A.-Plaintiff's Exhibits 150A and 151A."

Reference in that connection is made to the statement by Colonel Bowen that "During those times [of heavy precipitation] the surface waters readily enter the porous materials constituting the bed and banks of the channel. Within a short distance after thus entering those porous materials the water ceases to be a part of the surface flow or subflow of the Santa Margarita River." Colonel Bowen was there describing the means by which the Basin with its forty-eight thousand (48,000) acre-feet of storage is recharged. That great storage capacity - a subterranean lake comparable in size to the maximum storage capacity of Vail Lake - does not flow as a stream. Rather it percolates through the interstices of silt, clay, sand and gravel - course of its movement is largely governed by the lenses it encounters and by the forces of gravity.

Especially pertinent in that regard is the fact that California has offered evidence regarding the Santa Margarita Coastal Basin which fully supports Colonel Bowen's statement respecting the Basin; its storage capacity and related physical phenomena. In addition these statements were made by the United States of America:

Response to California's Questions:

> "*First*, is the ground water within the younger alluvium percolating waters or part of the stream?"

> "All of the waters in the Basin underlying Camp Pendleton concerning which the United States of America claims appropriative rights are percolating waters. They are waters which are not part of the flow of the Santa Margarita River or subflow of that stream. Rather, those waters are found percolating throughout the lenticular deposits of the

alluvial fill which constitutes the Basin. Nature of those lenses of clay, silt, sand and gravel of which the Basin is comprised are graphically demonstrated in the record.[8/] Informative in regard to the percolating characteristic of the waters is the comprehensive and exact soil survey of the United States Naval Reservation.[9/] From the aerial photographs used in that survey, it is possible to ascertain with great exactitude the course of the Santa Margarita River across the Naval Enclave. Especially pertinent in that regard is the very narrow area of bed and banks of that stream across the broad alluvial plain constituting the surface of the Basin. Percolating waters which are here involved are those which have entered into the alluvial fill to the point where they have lost their character as part of the surface flow or sub-surface flow. In the upper Sub-Basin the distance from the stream at which those waters lose their identity with that flow does not exceed ten feet. Lower down the valley where the stream bed is less porous the percolating ground waters lose their identity with the flow of the stream in less than ten feet.

"Typical of the California coastal basins, the alluvial fill deposited by the Santa Margarita River is coarse at the point that stream leaves the canyon and enters upon the broad plain described above. As a consequence there are gravel and sand deposits from the surface to bedrock in much of the Upper Unit of the Basin. Nevertheless in that segment of the Basin are found clay lenses interspersed throughout the sand and gravel.

"Finer textured sand and clay are found at the surface of the Chappo and Ysidora Units. At relatively shallow depths in the Units last mentioned are found lenses of clay

---

8/ U.S.A.-Pltf's Ex. 38 and 38A; Testimony of G.F.Worts, Tr. Vol. 38, pages 3913 et seq.
9/ U.S.A.-Pltf's Ex. 93 Series.

- 9 -

6798

and silty sand. Half way down Chappo Unit at depths of approximately one hundred (100) feet are found cobbles and gravel. Farther down the valley are found areas of clay and clay silt. Layers of clay of considerable thickness are in this reach of the Basin. Likewise there are found in the Lower Ysidora area marine deposits of fossil shells.

"Upper Member of Alluvium and Lower Member of Alluvium in Santa Margarita River Basin:

"Alluvial deposits in the Santa Margarita River Basin have been classified as upper member and lower member. They have been thus characterized in that manner because the upper member deposits were finer than the lower. Those factors are of importance from the standpoint of the receptive nature of the deposits to Santa Margarita River water and the movement of that water in the alluvial fill. For example, the interaction between deep and shallow wells in the same general areas is largely controlled by the difference in the permeability and lenticular nature of the two strata of alluvium. There is a marked separation between the ground waters in the upper and lower members of alluvium.

"Percolating Waters in the Santa Margarita River Basin:

"Principal source of recharge for the water-bearing strata of the Santa Margarita River Basin, as stated above, is the Santa Margarita River. That stream, except during and immediately following heavy precipitation, is intermittent both as to time and place. Bed of the stream is highly permeable with the result that the water carried in it readily enters the alluvial fill, spreading out in all directions from the surface stream, recharging the alluvium which is dewatered either through the natural forces of evaporation and evapotranspiration or by the artificial

6799

means of pumping. Rate of progression and the course of
the waters, once they enter the alluvium, are controlled by
a variety of factors. Heterogeneous nature of the deposits
is a prime factor in that regard. Speed of ground-water
movement and its direction vary with permeability of the
clays, sands and gravel which it encounters. For example,
those elements enter into the rapidity with which it progresses
laterally to recharge areas in Chappo Unit which contains
alluvium at relatively great distances from the bed of the
stream. Vertical direction of the waters, once they leave
the Santa Margarita River and enter the alluvial fill, is
likewise involved. Again the characteristics of the deposits
through which the waters must proceed govern the rapidity
with which recharge will enter the dewatered deeper aquifers.
In the lower reaches of the Basin ground-water movement is
greatly retarded by the low permeability of very extensive
clay deposits which are encountered."

Facts reviewed above are fully supported by the evidence in this
cause. It is manifest that the percolating waters which fill forty-eight
thousand (48,000) acre-feet of the storage capacity of the Santa Margarita
Coastal Basin constitute an immense underground lake or reservoir. Too great
stress may not be accorded to this indisputable fact:

More than two-thirds - sixty-six and two-thirds percent
(66 2/3%) - of the alluvial fill of the Santa Margarita
Coastal Basin is below sea level. Maintenance of a fresh
water barrier is a constant necessity to repel salt water
intrusion - a fresh water barrier is nothing more or less
than water stored in the alluvium for the purpose of
maintaining a hydrostatic head sufficient to prevent the
Pacific Ocean from entering the Santa Margarita Coastal
Basin.

Those fully proved facts in the record of this case gave rise to the following findings, among others, proposed by the United States of America, which it is respectfully submitted, based upon undisputed evidence, establish that the alluvial fill underlying Camp Pendleton - designated by California as the Santa Margarita Coastal Basin - is in fact a basin and which in the contemplation of the law is a basin with all the implications emanating from those facts:

"Finding No. 78

"Santa Margarita Coastal Basin
    Within Naval Enclave:

"Situated within the Naval Enclave is the California designated Santa Margarita Coastal Basin, source of recharge of which is the Santa Margarita River that flows through its narrow and well defined channel across the Basin for a distance of approximately eleven (11) miles.

"Finding No. 79

"The Santa Margarita Coastal Basin is located in northern San Diego County, California and has its eastern extremity approximately eleven (11) miles from the Pacific Ocean. Roughly that easternmost point is at the proposed De Luz Dam site in the Northwest Quarter (NW 1/4) of Section thirty-two (32), Township nine (9) South, Range Four (4) West. It extends westward to a point on the Santa Margarita River referred to as the Ysidora Narrows. Those Narrows are located in the southwestern corner of Section two (2), Township eleven (11) South, Range five (5) West, S.B.M.

* * *

"Finding No. 86

"The bed and banks of the Santa Margarita River in its course across the Santa Margarita Coastal Basin constitute but a small fraction of the total surface area of the Basin. It is evident that the stream has frequently changed its course and that its present and most recent channel is, like its numerous former channels, subject to change. Porous materials are found along the bed and banks of the stream. They are shallow in character when compared with the finer textured Upper Member or that of the Lower Member above described.

6801

Greatest depth of the porous material in the stream channel is found on the most eastwardly end of the Upper Subbasin. That porous material becomes progressively shallow as the channel proceeds coastward, where finer grained clastics are found. In the lower portion of Chappo Subbasin and the Ysidora Subbasin are found layers of clay which are upwards to fifty (50) feet in thickness. These fine clastics immediately underlie the channel of the stream.

"Finding No. 87

"During periods of heavy precipitation and immediately following those periods there is surface flow within the well defined channel of the Santa Margarita River across the surface of the Santa Margarita Coastal Basin, all as more particularly described above in findings 45 et seq. During those times the surface waters readily enter the porous materials constituting the bed and banks of the channel. Within a short distance after thus entering those porous materials the water ceases to be a part of the surface flow or subflow of the Santa Margarita River. Rather it enters the lenses of clays and silts which comprise the Upper Member and there they lose their identification with the surface flow and subflow of the stream.

"Finding No. 88

"When those waters have left the limited porous areas of the bed and banks comprising the channel of the Santa Margarita River they join the mass of percolating and vagrant ground waters contained in the Basin. Their course of direction is not then that of the Santa Margarita River or its subflow. Rather, the heterogeneous nature of the deposits is the controlling factor as to the course of those waters. Course of the percolating waters in the mass of clays and silts, the rapidity of their movement, either vertical or horizontal, are governed by the permeability of the particular types of deposits which they encounter or enter. Those percolating waters do not flow through any known or definite channels.

"Finding No. 89

"It is from the percolating waters, which can no longer be identified with the surface or subsurface flow of the Santa Margarita River, that the

United States of America has historically diverted the waters which it uses for military and agricultural purposes."

## CONCLUSION

It is respectfully submitted as stated above, that this Honorable Court should find as a fact that:

> The Santa Margarita Coastal Basin, as designated by the State of California, is in effect an underground lake of percolating ground waters from which the United States of America and its predecessor in interest have pumped large quantities of water which have been applied to beneficial uses for a period in excess of twenty (20) years;

and conclude as a matter of law that:

> The only way in which rights to the use of percolating water can be appropriated in the State of California is by pumping the water and applying it to a beneficial use; that there is no statutory procedure in the State of California for the appropriation of rights to the use of percolating waters.

> Based upon the findings of the diversion by the United States of America and its predecessor in interest of the percolating waters of the Santa Margarita Coastal Basin there is vested in the United States of America an appropriative right to the use of that percolating water acquired in conformity with the laws of California in the amount, for the purposes and with a priority date all as more specifically set forth in the findings of this Court.

UNITED STATES OF AMERICA

RAMSEY CLARK,
Assistant Attorney General

WILLIAM H. VEEDER,
Attorney, Department of Justice

Dated: March 3, 1962

- 14 -

6803