# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN CENTRAL DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

        Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:           San Diego, California

Date:           Monday, May 6, 1957
                Tuesday, May 7, 1957

Pages:           1 to 163

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
               DEPUTY

JOHN SWADER
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211 - EXT. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
                                   )
          vs.                      )     No. 1247-SD-C
                                   )
FALLBROOK PUBLIC UTILITY           )
DISTRICT, et al.,                  )
                                   )
                    Defendants.    )

- - -

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Monday, May 6, 1957

- - -

APPEARANCES:

          For the Plaintiff:          WILLIAM H. VEEDER, Esq.
                                      WILLIAM E. BURBY, Esq.
                                      Special Assistants to the
                                      Attorney General
                                      Department of Justice
                                      Washington, D.C.

```
1    APPEARANCES:   (Continued)

2         For Defendant Vail Co.          GEORGE E. STAHLMAN, Esq.

3         For Defendant Fallbrook         LINDLEY, LAZAR & SCALES
          Citrus Association:             By: F. E. LINDLEY, Esq.
4
          For Defendant Fallbrook         SWING, SCHARNIKOW &
5         Public Utility District:        STANIFORTH,
                                          By:  PHIL D. SWING, Esq.
6                                         and F. R. SACHSE, Esq.

7         For Defendant State of          EDMUND G. BROWN, Esq.
          California:                     Attorney General, by
8                                         ADOLPHUS MOSKOVITZ, Esq.
                                          Deputy Attorney General
9
          For Defendant Santa Mar-        W. B. DENNIS, Esq.
10        garita Mutual Water Co.:

11        For Defendants Fallbrook        JAMES DON KELLER, Esq.
          Union High School District,     County Counsel, by
12        Vallecito School District,      ROBERT G. BERREY, Esq.
          Fallbrook Union Elementary      Deputy County Counsel
13        School District, De Luz
          School District:
14
          For Defendants Searl           THOMPSON & COLEGATE, by
15        Brothers:                       By: HARRY M. DAUGHERTY, Esq.

16        For Defendants George           JOHN NEBLETT, Esq.
          Cummins and Meta Cummins,
17        Carl A. Harmer and Sarah
          Harmer:
18
          For Defendant County of         RAY T. KELVIN, Jr.,
19        Riverside:                      County Counsel, by
                                          LEO DEEGAN, Esq.,
20                                        Assistant County Counsel

21        For Defendants Atchison,        LUCE, FORWARD, KUNZEL &
          Topeka & Santa Fe Railway       SCRIPPS
22        Co. and San Deigo Gas &         By: LELAND C. NIELSEN, Esq.
          Electric Co.:
23
          For Defendants Charlotte        BERT BUZZINI, Esq.
24        Faulkner and Raymond C.
          Faulkner:
25
```

1    APPEARANCES:   (Continued)

2         For Defendants William         GEORGE G. GROVER, Esq.
          Cottle, Katherine Gibbon
3         and Arthur Reuter:

4         For Defendant Massengill:      THOMAS J. BURKE, Esq.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      SAN DIEGO, CALIFORNIA, MONDAY, MAY 6, 1957, 10:00 A. M.

2                  - - -

3      (Other matters.)

4      THE COURT:  No. 4.

5      THE CLERK:  No. 4, 1247-SD, United States vs. Fallbrook

6  Public Utility District, et al.

7      Counsel state their names for the record, please.

8      MR. VEEDER:  For the plaintiff United States of America,

9  William H. Veeder and William E. Burby.

10     MR. STAHLMAN:  George Stahlman for Vail Company.

11     MR. LINDLEY:  Fred E. Lindley for Fallbrook Citrus

12  Association.

13     MR. SWING:  Phil D. Swing, attorney for the Fallbrook

14  Public Utility District.

15     MR. SACHSE:  Francis R. Sachse, attorney for Fallbrook

16  Public Utility District.

17     MR. MOSKOVITZ:  Edmund G. Brown, Attorney General for

18  the State of California, by Adolphus Moskovitz, Deputy

19  Attorney General, for the defendant intervenor, the State

20  of California.

21     MR. DENNIS:  W. D. Dennis, for the defendant Santa

22  Margarita Mutual Water Company.

23     MR. BURKE:  Thomas J. Burke for defendant Massengill.

24     MR. BERREY:  James Don Keller, by Robert G. Berrey,

25  Deputy, for Fallbrook Union High School District, Vallecito

1  School District, Fallbrook Union Elementary School District,

2  De Luz School District.

3      MR. DAUGHERTY:  Harry M. Daugherty, of Thompson &

4  Colegate of Riverside, on behalf of defendant Searl Brothers.

5      MR. NEBLETT:  Mr. Neblett, of Riverside, for George

6  Cummins, Meta Cummins, and the defendants Carl A. Harmer

7  and Edith Sarah Harmer.

8      MR. DEEGAN:  Ray T. Kelvin, Jr., County Counsel of

9  Riverside, by Leo A. Deegan, Assistant County Counsel.

10      MR. NIELSEN:  Leland C. Nielsen of Luce, Forward,

11  Kunzel & Scripps, for the Atchison, Topeka & Santa Fe

12  Railway Company and San Diego Gas & Electric Company.

13      MR. BUZZINI:  Bert Buzzini, of Berkeley, for Charlotte

14  Faulkner and Raymond C. Faulkner, defendants.

15      MR. GROVER:  George G. Grover, of Corona, for defendants

16  William Cottle, Katherine Gibbon and Arthur Reuter.

17      THE COURT:  The purpose of this hearing this morning

18  is to explore as to how we should proceed in the matter.

19      I am reminded of the farmer who went out to plow the

20  field.  And he said, "Gee haw -- the whole field has to be

21  plowed anyhow."  We are in that position.

22      I will be glad to hear from various counsel as to

23  suggestions and thoughts they may have.

24      Preliminarily, however, I had a letter from Mr. Rankin,

25  on January 30, 1957, in which he said, "It is anticipated

1    that conclusions can be reached regarding the possibilities

2    of at least a partial settlement prior to April 15, 1957;"

3    and I would like to hear from the Government as to whether

4    those conclusions have been reached, and if so what they are.

5        Also, the clerk will hand to Mr. Burby a copy of the

6    letter from Mr. Drum, an extra copy for the Government

7    enclosed with my correspondence.  It has nothing to do with

8    Mr. Rankin's letter.

9        Mr. Burby?  Mr. Veeder?

10       MR. VEEDER:  The United States of America undertook

11   conversations with the Fallbrook Public Utility District for

12   the purpose of effectuating a settlement.  The conversations

13   commenced in August, as I remember, and at the time there

14   was, we thought, a suggested formula for settlement.  About

15   two weeks ago I came to San Diego and renewed the conversa-

16   tions with Mr. Swing, and Mr. Swing, I am sure, will bear me

17   out in this, stated that there was no possibility of settle-

18   ment along the line that we had discussed at that time.  I

19   reported to Mr. Rankin the outcome of the conversations with

20   Mr. Swing, pointing out to him that Mr. Swing had tentatively

21   suggested that there might be some other basis of settlement.

22   However, on further consideration, Mr. Rankin advised me to

23   advise your Honor that it appears now that there is no basis

24   for settlement, and we believe that the expeditious thing

25   to do is to proceed to trial at the earliest possible time.

1    That concludes my statement, your Honor.

2    I took the liberty, your Honor, of putting a map of the

3    watershed of the Santa Margarita River on the easel there,

4    and I ask leave that we be able to refer to it during the

5    course of this pretrial conference, if that is agreeable,

6    your Honor.

7    THE COURT:  It is satisfactory.  You may explain to me

8    generally what this factual situation is.

9    MR. VEEDER:  May I approach the map?

10    THE COURT: Yes, you may.

11    MR. VEEDER:  The object of this is strictly for purposes

12    of location.

13    THE COURT:  Do you have a pointer?

14    MR. VEEDER:  Yes.

15    We have simply prepared this for the purpose of location

16    and for no other purpose.

17    The mouth of the Santa Margarita River where it enters

18    the Pacific Ocean is located down in the corner, the south-

19    west corner of the map.  There will be observed from there

20    a dark, heavy line which delineates a large area.  There are

21    about 720 square miles in the area embraced within that line.

22    That is the watershed of the Santa Margarita River, the

23    area in litigation.

24    We have undertaken to locate the principal tributaries

25    which arise and flow down throughout the area -- the watershed.

1   Coming down is the Temecula River that comes down Temecula

2   Canyon.   It is joined by Murrieta Creek, and together they

3   comprise the Santa Margarita River, which flows from that

4   point approximately 30 to 35 miles to the ocean.

5       The areas that we have delineated in green are the

6   areas which were in cultivation at the time that the United

7   States of America acquired, in the years 1942 and 1943, the

8   lands which now comprise Camp Pendleton.   We have also

9   delinated with broken lines the areas which constitute the

10  Vail Estate.   Between the United States and the Vail Estate,

11  I think there is ownership of perhaps 85 percent of the

12  irrigable land in the whole area.   I am sure that counsel

13  contest that, other than the Vails.   But we have shown here

14  also the agricultural areas that were in production in 1942

15  and 1943, when the lands were purchased.

16      THE COURT:   Those were all owned by Vails?

17      MR. VEEDER:   Yes, your Honor.

18      THE COURT:   In the center of the map?

19      MR. VEEDER:   Is all the Vail Estate, your Honor -- it

20  comes down here and clear on over.   It is a very, very

21  extensive holding.

22      The factor of most importance to us, the United States

23  of America, in the litigation at this juncture, were the

24  areas which were in  cultivation at the time the United

25  States bought the land.   This area lying south of the dark

9

1   line is known locally as Stewart Mesa.  North of the dark

2   line is an area known as -- this (indicating) is South Mesa,

3   and north is Stewart Mesa.  Now, those two areas were

4   utilizing water at the time the United States purchased the

5   property.  They were using water outside of the watershed.

6      Located centrally on the map is also Lake O'Neill, which

7   is another use of water.  It is an artificial lake which has

8   been on that land historically.  It was utilized by the

9   Rancho Santa Margarita, predecessor in interest to the

10  United States.

11     By and large, the thing we wish to emphasize from this

12  map was the circumstances which prevailed when the National

13  Government acquired by condemnation the properties.

14     I think that also you will observe on the map the

15  location of the Fallbrook Public Utility District.

16     We were not sure of where the Santa Margarita Mutual

17  Water Company District's lines were.  They are not placed

18  here, but generally speaking I think their service area is

19  located near where we have delineated the land of the

20  Fallbrook Public Utility District.

21     THE COURT:  Which is the Fallbrook Public Utility

22  District?  I couldn't see.

23     MR. VEEDER:  Right here, your Honor, is the Fallbrook

24  Public Utility District.  You will see a line -- the line

25  is, roughly, delineated right here, part in the watershed

1    and part outside the watershed.  Did your Honor see?

2        THE COURT:  Well, you pointed to several places there.

3        MR. VEEDER:  Well, it is.  You see, the outer extremity

4    of the Fallbrook Public Utility District is this broken

5    line that runs around here.

6        THE COURT:  Well, you say this map shows all the culti-

7    vated land.  This watershed takes in an area up beyond

8    Temecula?

9        MR. VEEDER:  I should have made it more clear, your

10   Honor.  This is the cultivated land of the Vail Estate and

11   the United States of America, principally.  There are some

12   of the areas delineated along Fallbrook generally and out-

13   side of the watershed, but by and large these are the areas

14   that were in cultivation at the time the United States pur-

15   chased the property.

16       THE COURT:  By Vail and the United States?

17       MR. VEEDER:  Yes.

18       THE COURT:  Areas of cultivation by Vail and the United

19   States?

20       MR. VEEDER:  That is right.

21       THE COURT:  But there must be many other people in

22   ownership.

23       MR. VEEDER:  Oh, yes, there are, your Honor.

24       THE COURT:  Well, east of Temecula, that is cultivated

25   land?

1    MR. VEEDER:  That is correct.  The point that I wanted

2    to make, though, in that connection, is that these areas

3    up in here do not have -- the Barbees and the Oviatts and

4    the others, we were unable actually to determine the areas

5    precisely that were in irrigation at that time.  There

6    certainly are, and I am glad your Honor brought up the point.

7    There are areas all through here, and up through here, which

8    utilize water.  There are also areas in the Temecula Canyon,

9    on down to the eastern boundary of Camp Pendleton, which

10   also utilized some water.  Similarly, along the Murrieta

11   there are areas utilizing water.

12       That is just the general outline, your Honor.

13       Thank you very much.

14       THE COURT:  How do you suggest that we proceed?  I am

15   open to suggestion now from any of the parties interested.

16       MR. VEEDER:  I think Mr. Swing may want to respond to

17   what I said in regard to this.

18       MR. SWING:  No, your Honor.

19       I do not want to interrupt you.

20       MR. VEEDER:  I am through, Mr. Swing.

21       MR. SWING:  The court was asking for suggestions as to

22   how the court should proceed.  If you were going to finish

23   your statement --

24       MR. VEEDER:  Well, your Honor, I had deviated from --

25   I had reported to you what Mr. Rankin had stated, and I

1   thought it would be better, if Mr. Swing didn't agree with

2   what I reported, for him to clear up that circumstance now

3   and then we would be done with that one piece of business

4   about possibility of settlement.

5       MR. SWING:   I think we may assume that I disagree with

6   most of what you say, but I do not want to interrupt you

7   in your statement.

8       MR. VEEDER:   If I may proceed, then, your Honor.

9       I have this morning gone over the statements that have

10  been served upon us.  The Fallbrook Public Utility District

11  has filed with this court a statement in response to your

12  Honor's order of, I think it was, April 18th.  They state:

13          "Principally, of course, it is asserted by the

14      Fallbrook Public Utility District that the decision by

15      Judge Fee of the Court of Appeals has become the law

16      of the case."

17      And of course, in our memorandum prepared and submitted

18  to your Honor in accordance with your order, we take sharp

19  issue.  We believe, your Honor, that it is very clear that

20  Judge Fee made no determination on the merits.  Any doubt

21  of that, I believe, is removed by the statements that he

22  made most clearly, and they are set forth at page 14 of our

23  brief.  There Judge Fee made this opening declaration prior

24  to the review of the facts and the findings set forth in

25  Judge Yankwich's opinion, and here is what he said and here

1    is why we believe that there was one question, and one

2    question only, determined, namely, that before final judg-

3    ment could be entered there would have to be all parties

4    before the court -- here is what he said:

5         "Declarations, findings and conclusions hereafter

6         criticized eventually may be found in substance to be

7         well-founded upon the entry of the final judgment in

8         this action."

9    It is manifest from that, that Judge Fee  had but one

10   thought in mind.  He had this thought, that Judge Yankwich

11   erred when he made his final judgment in regard to the

12   Santa Margarita Mutual Water Company.

13        THE COURT:  Well, he could have written a lot shorter

14   opinion, if that is all he was deciding.

15        MR. VEEDER:  I concur with your Honor.  Nor do I want

16   to sound at all critical of Judge  Fee, for whom I have the

17   greatest respect.

18        THE COURT:  Well, my point is this.  Let us assume,

19   academically, that you are right that he decided only that

20   it was improper to try one part of the case.  Nevertheless,

21   he went to considerable pains to assist the trial court in

22   a retrial of the matter, setting forth certain principles

23   of law, and on a multiple court, if this case goes back to

24   the Circuit, whatever panel gets it will undoubtedly treat

25   with deference and accept the statements of law as laid out

14

1  by Judge Fee, and I would wager that that would be true in

2  any case except where it might be demonstrated that the

3  Judge was clearly wrong.  So as a practical matter we are

4  going to have to try the case in line with the things Judge

5  Fee said.

6      MR. VEEDER:  In that regard, your Honor, I am fully

7  aware of the very extensive statements that his Honor made.

8  But I believe that for every statement that Judge Fee set

9  forth in his opinion, he either before or after the declara-

10  tion of what he stated he thought the law should be put a

11  caveat that he was not ruling on the proposition.

12      I will give an example.  We have heard a great deal

13  about "prescription."  He says, "Although the question was

14  argued, this court does not presently decide whether a lower

15  owner in California can acquire title to water rights by

16  prescription or use against upper riparians or appropriators."

17  Your Honor, I respectfully submit that Judge Fee, himself,

18  has eliminated in its entirety all that he said in regard

19  to prescription, for when he made that declaration he did

20  so in the light of the fact, concerning which he was very

21  explicit, that there were numerous appropriators and

22  riparians who were not before the court.  Thus he said that

23  the declarations and findings may ultimately be in substance

24  correct.  He says that it may be, ultimately, that all

25  that Judge Yankwich has declared will be proper.  But he

15

1  says it can't be determined until all these parties are

2  before the court.  Then he says, "In remanding, this court

3  has not attempted to find facts or express any opinion as

4  to the fact situation, but rather to indicate that many of

5  the declarations, findings and conclusions are not well-

6  founded on the present record, are premature and may tend,

7  if allowed to stand, to be given undue weight in the final

8  judgment owing to the erroneous influences or factors

9  herein considered."

10  Now, in that connection, he had gone at great length

11  to point out that had there been appropriators and riparians

12  and the other users before the court, all that he said might

13  be correct.  I don't, truly, understand why Judge Fee  wrote

14  such an extensive opinion, but I do know --

15  THE COURT:  I think he wanted to assist the trial court

16  when the matter came again before the court.

17  MR. VEEDER:  Well, true, your Honor, I think he may

18  have had that in mind.  But in each instance he pointed out

19  that the only thing that he was determining was that, with

20  one single owner before the court, it was impossible for the

21  trial court to declare that the United States had acquired

22  a prescriptive right.

23  Moreover, and the only other proposition, in my view,

24  your Honor, that has bearing here at this time, related to

25  the matter of surplus, and here is what he says in regard

1    to that, exactly as he said in regard to prescription --

2    we are not ruling on prescription -- in regard to surplus,

3    he declared, "This court does not attempt to say whether

4    there is a present surplus in the watershed."

5        Now, the importance of those two elements, when taken

6    into consideration with the final mandate that his Honor

7    entered, makes it immensely clear that he was objecting to

8    one thing and one thing only, in our view; he was objecting

9    to the fact -- and he said this:  "Although the Santa

10   Margarita Mutual Water Company is in the weakest position

11   of any defendant, nevertheless they were entitled to be

12   heard along with all the other defendants."

13       Now, I think the principles of law that will support the

14   proposition that I am advancing turn upon the matters of

15   indispensable parties not being before the court, and if that

16   is the basis upon which he made his ruling it follows

17   a fortiori, in our opinion, that the appellate court was

18   itself without jurisdiction to enter any determination on

19   the merits.

20       Now, in the Fallbrook Public Utility District's

21   memorandum they referred at length to the Woodworkers Tool

22   Works vs. Byrne, 202 Fed.(2d) 530, and from that extensive

23   quotations are taken.  If your Honor will consider that case

24   at all, the distinguishing features and elements become

25   obvious.

1     There the matter was tried fully on the merits.  It was

2    tried as among all the parties to the cause, and the court

3    says that a verdict awarding damages was returned and a

4    judgment entered thereon.  This court, the Court of Appeals,

5    held with the appellee.  But a motion was then filed by the

6    appellant on the grounds that they desired to quash the

7    service of summons.  Then the Appellate Court said this --

8    and this, we believe, is the controlling factor:

9        "We noted, however, that during the course of the

10       trial substantial oral evidence had been received

11       tending to show that there was no merit in the motion

12       to quash service.  Under those circumstances," the

13       court declared, "the matter of the retrial turned on

14       the simple technical question of the validity of the

15       acceptance of service by an agent of the appellant."

16    Now, this factor, in my view, eliminates all of the

17    merits of the question of the rule of the case here:  Can it

18    be said that all the other defendants who were not parties

19    to the judgment entered against the Fallbrook Public Utility

20    District are bound by the decision of the Appellate Court?

21    THE COURT:  Well, certainly not.  You needn't argue

22    that.

23    MR. VEEDER:  Then, your Honor, if that be true, where

24    do we stand?  If that is the case, then where does the

25    United States as plaintiff in this case -- what position does

1    it occupy?  It occupies this position.  It must put in a

2    case in chief against every single one of these defendants.

3    That is our view.  We must, to fulfil our burden as plain-

4    tiff, prove our case against every defendant in addition to

5    the Santa Margarita Mutual Water Company, the only claimant

6    to water which is before the court.  We would have this most

7    unusual circumstance, your Honor, if that were not true.  We

8    would have the circumstance of a paper corporation with

9    paper rights -- and that is all the Santa Margarita Mutual

10   Water Company is today -- being assured of the benefits, if

11   there are any -- and I question that -- of Judge Fee's

12   opinion, whereas every other defendant, including the

13   Fallbrook Public Utility District, will have to proceed

14   de novo, in effect.  We are in this position.  We would have

15   the Santa Margarita Mutual Water Company case decided and

16   out of the way.

17        But that can't be, your Honor.  The reason it cannot

18   be, your Honor, is this.  Judge Fee has said that the way

19   to try these lawsuits is to try them every parcel against

20   every other parcel, and he, moreover, with great clarity

21   emphasized that he was not deciding one solitary thing in

22   regard to the Santa Margarita Mutual Water Company.

23        THE COURT:  All right, let's go on to something else,

24   for this reason:  Nothing can be decided at this meeting

25   today, because the notice of this hearing went out only to

1   the parties who had counsel.  It is preliminary discussion.

2   Before anything could be decided, every defendant, whether he

3   appeared by counsel or not, including those who appeared

4   pro per, particularly, should have a right to appear and be

5   heard.  All we can do is point up the issues.  Fallbrook has

6   briefed it, you have briefed it, and we know that that issue

7   is in the case.

8        MR. VEEDER:  Yes, your Honor.  I will proceed to the

9   other matter.

10       THE COURT:  All right.

11       MR. VEEDER:  The additional factors that were raised,

12  referring to paragraph 2 -- no before that there is one other

13  element:  What issue remains undecided?  And while this is

14  correlative to the matter I was just discussing, we feel

15  that as against every single defendant the present posture

16  of the case is exactly as it was when issue was first joined

17  as if nothing had been decided.  That is our position, in

18  regard to the second factor of your Honor's question number

19  one on page 2.

20       In regard to subparagraph 2, you request that we list

21  the paragraph numbers of the pretrial order of August 25,

22  1952.  That appears in 109 Fed. Supp. at page 28.  Now, our

23  view is that there is much in that pretrial order that will

24  be of benefit in this cause and which I think that many of

25  the parties will probably agree to accept.  There are,

however, --

THE COURT:  Let me ask right there.  That points up a very practical thing.  How are we going to get very far with a pretrial order where we have so many defendants who appeared in pro per?  We can't get pro per defendants to sign any kind of pretrial order.  Suppose a pretrial order were worked out between the major defendants in the case who have appeared by counsel, you would still have to at least put a skin case on with proper notice to the other defendants of the matters contained in the pretrial order. Is that right?

MR. VEEDER:  That is correct, your Honor.

THE COURT:  If, however, we had most of counsel signed up on a pretrial order, I take it that could be pretty much of a skin case if there was not objection.

MR. VEEDER:  I think that is true, your Honor, and I think there are authorities, particularly in the State of California, which recognize that there is a point beyond which it is impossible, in this type of litigation, to have everyone before the court at precisely the same time, and we think one of the principal difficulties in this type of case is the unwieldy character of these proceedings.

Now, I am not recommending that your Honor appoint a Master.  Frankly, we would like to try it before your Honor. But I do believe that there are instances where, if your

1   Honor could undertake to hear evidence in the area around

2   Fallbrook, or have pretrial conferences there, we might be

3   able to have the parties themselves appear.  We recently had

4   exactly the same circumstances in the Yakima Valley in the

5   State of Washington.  Judge Lindberg, presiding, did this.

6   He had notice sent to all parties.  He had the matter on

7   television, he had it on the radio.  He got an astounding

8   number of people to appear, and in that manner it was pos-

9   sible, without requiring them all to hire counsel.  I think

10   they are all going to be represented.  I don't think it is

11   going to be costly to them.  As here, there were many small

12   users.

13        But I think the modus operandi, if we can use that

14   term, would be to have principal counsel and principal

15   claimants proceed with a pretrial order much as we did in

16   the original separate trial, and in that manner we would at

17   least be in a position of formulating among the principal

18   parties litigant the issues as they see them and define, in

19   that manner, the issues so that the smaller users would be

20   advised of the course which is being taken.  Mr. Willett,

21   who represents 40 of those small users, approached me this

22   morning, and we are going to have conferences tomorrow with

23   him to the end that we can find out what his view will be

24   and what his clients' views will be in regard to a pretrial

25   conference and pretrial orders and all other proceedings.

1   We will report that back to your Honor.  I think it will be

2   one means of facilitating the meeting problem you have

3   raised.

4       THE COURT:  Well, to sum this up, we have the problem

5   of trying to get a pretrial order signed up with the signa-

6   tures of major defendants represented by counsel, plus the

7   probable necessity of having at least a prima facie case

8   put on as to the remaining defendants.

9       MR. VEEDER:  That is correct.

10      THE COURT:  Let me ask another question or two.  If I

11  sound astoundingly ignorant on some of these matters, don't

12  be alarmed.  I haven't studied water rights since I had a

13  course at U.S.C. -- and not from Professor Burby either.

14  Does a riparian owner have to have land bordering on a

15  stream?

16      MR. VEEDER:  Definitely, your Honor, in our view, there

17  can be no riparian rights without the land abutting upon the

18  stream, and it would be the smallest parcel, in our view,

19  within the single chain of title.  I think Judge Swing would

20  agree to that.

21      THE COURT:  Well now, let's take two hypothetical

22  situations.  Number one is a riparian owner on one of the

23  water courses that feed the Santa Margarita who has made

24  some reasonable use of the water in the past or has the

25  potential use for it in the future.  What rights does the

23

1    Government claim against this individual, whom we will call

2    A? You are not going to deprive him of the right to continue

3    to use the water, are you?

4        MR. VEEDER:  Your Honor, our view on that is this, that

5    we and all other riparians on the stream hold correlative

6    interests based upon our potential uses.  In other words, we

7    do not deny any riparian his right to the use of the water,

8    nor do we contest it, other than this, that we say we must

9    deduce evidence for the purpose of measuring at this time

10   the extent of the rights to the use of water claimed by that

11   riparian measured by his present and reasonable prospective

12   use, and we think that that is the criterion which will

13   govern among the small riparians.

14       THE COURT:  Well, let's take a little landowner of five

15   or ten acres.  Are you going to claim any rights against him,

16   or are you going to ask for a decree that his right to use

17   water be cut down on five or ten acres because of some use

18   below?

19       MR. VEEDER:  No, your Honor.  That presents this

20   question.  Here is a man irrigating five acres of land.  He

21   may be using in excess of his correlative share at this

22   moment by reason of the fact that other riparians in the

23   area are not exercising their riparian rights to the fullest

24   extent.  In other words, it is entirely conceivable, and the

25   United States occupies no different position than does the

1    Vail Estate, for instance, or the Barbees or the Oviatts or

2    anyone else.  It is every parcel of land against every other

3    parcel of land for the purpose of determining the extent of

4    their riparian acreage and the maximum potential use that they

5    are going to claim against the stream.  In other words, --

6         THE COURT:  Well, by riparian rights and use, do you

7    also include, we will say, pumping out of a watercourse?

8    Most of these watercourses, of course, don't carry water

9    most of the year, but I take it that there is water in the

10   sands below the watercourse.  Do you include pumping from the

11   sands below the watercourse?

12        MR. VEEDER:  Yes, your Honor, if there is a physical

13   relationship between the flowing stream and the subterranean

14   source.  We believe that there are throughout the Valley --

15   and there is disagreement on this, too -- throughout the

16   Valley there are subterranean basins which we believe are

17   part of the Santa Margarita River, the Temecula River, and

18   that pumping from those sources, the source being inter-

19   connected with the surface stream, is part of the stream

20   itself.

21        As an example, your Honor referred to the Vail Estate.

22   The Vail Estate has within its borders the Temecula Basin.

23   That basin, like the basin which underlies three or four

24   thousand acres on Camp Pendleton, is their primary source

25   of water, actually of their riparian water -- they pump from

1   that, and certainly the source of water from the Temecula

2   Basin is part of their riparian right.  That is the position

3   we are taking on that.

4       We take also the position that the water in the sub-

5   terranean diluvial basin that underlies Camp Pendleton is

6   also a part of the riparian supply of water the United States

7   of America purchased.

8       In other words, there is no question in my mind that

9   there is a direct relation between those two.

10      THE COURT:  Your answer, then, would lead to the con-

11  clusion that it will not be possible to eliminate a lot of

12  these small property owners out of this case.

13      MR. VEEDER:  I believe that is correct, your Honor, and

14  I believe Judge Fee  so held and in our view the only thing

15  he did hold.

16      THE COURT:  I don't mean eliminate them out of the case

17  for the purpose of dismissal, but I mean we can't even set

18  them aside and say that the Government makes no claim against

19  you, Mr. Doakes, who are using a little water on five acres.

20      MR. VEEDER:  No, your Honor.  I believe that is the

21  case.  I believe the United States asserts claims for the

22  purpose of having those rights adjudicated, and I daresay

23  that Mr. Dennis's and Mr. Swing's clients and all the other

24  water users within the area will cross-claim against all

25  other claimants.  I don't believe there could be an

1  adjudication otherwise.  I think that every parcel of land,

2  every use is in competition one against the other, and the

3  object will be the adjudication of those rights one as against

4  the other.

5  THE COURT:  Take the second example or hypothetical case,

6  A person with a small piece of ground who doesn't pump out

7  of a stream or stream bed but who has springs or a well

8  somewhere upland where he has what might be called percolating

9  waters or waters beneath the ground that aren't part of some

10  basin -- what about him?

11  MR. VEEDER:  Well, your Honor, there is a very definite

12  legal distinction between percolating waters as such and

13  water that is diffused in the soil.  The latter is usually

14  part and parcel of the soil.  However, the possibilities,

15  in many of these instances, are that those springs to which

16  you allude and those other sources are actually part of the

17  Santa Margarita River watershed and actually do contribute

18  to the surface supply and to the ground water supply of the

19  main stream.  However, in that connection, I believe that

20  where that circumstance exists and the claimant is able to

21  prove or to show or to raise by a pleading that his source

22  of water is not part of the overall resources of the Santa

23  Margarita River watershed, then we certainly do not state a

24  claim against him and he certainly should be dismissed from

25  the cause.  But we do not know, in this type of litigation,

the kind, type and character of the right a man is going to

claim till he pleads, and if he sets that up in the pleading

that his rights are percolating in character and not part

of the Santa Margarita watershed resources, and if he can

prove that, then he is out of the case.

And may I add, there, that we have, in many instances,

investigated the hydrology and geology of the area, and if

we find such a circumstance to prevail we would be the first

to stipulate a man out of the cause.  We have no desire,

certainly, to have anyone in the cause that coesn't claim

water from the Santa Margarita River as a source of supply.

THE COURT:  Well, on theory, at least, and maybe in

infinitesimal amounts, every bit of percolating water in this

watershed might eventually lend some waters to the Santa

Margarita.

MR. VEEDER:  I imagine there would be circumstances that

the possibility is so minimized to the point where it is not

important, and under those circumstances we would certainly

dismiss them.

But again, and here is the problem we are always con-

fronted with in this kind of litigation, the United States

of America doesn't plead, nor could it plead the kind and

character of the rights of the defendants.  They must estab-

lish their own rights.  But if they do, immediately a

pleading is received, we have a staff that immediately

28

1   checks out the waters involved, and if we find that those

2   percolating waters do not contribute to the source of supply

3   thereof, we have no interest in it.  That is a problem.

4        THE COURT:  Well, let me interrupt you again.  What

5   about the pro per defendant who comes in and doesn't artfully

6   draw a pleading -- doesn't state that his waters are merely

7   percolating, and doesn't state that they have no appreciable

8   impact on the waters of the Santa Margarita?  How is he

9   going to be advised of his right to make that claim?

10       MR. VEEDER:  Well, your Honor, I would undertake and

11  recommend that we, the United States of America, undertake

12  to advise that man as to what we believe his rights are.

13  Now, if he hasn't got counsel, I don't see why that would

14  be objectionable, and what we would do would be to move your

15  Honor, file a motion and point out these factors, and under

16  your direction we would undertake to contact these people.

17  I don't know how else we could do it.  There are a great

18  many of those that I believe will be of that character, and

19  if they can be eliminated certainly we desire to eliminate

20  them.  There are many of that kind of claim that will, before

21  the final judgment is entered, in my view, be eliminated,

22  and that is certainly the course of litigation of this kind,

23  whether it has been conducted under the auspices of the

24  State of California or under the jurisdiction of the courts.

25  There are many, many claims that are small that are not

1    burdens on the stream.

2        But first I think they have to be joined and considera-

3    tion be given as to whether they have rights or not.  Cer-

4    tainly it is not up to us to say, "We don't hink you have

5    any rights, and therefore you are not in this cause," be-

6    cause I think a landowner has a right to be notified that

7    the suit is up and if he desires to disclaim he may disclaim,

8    or if he desires to default he may default, or if he desires

9    to answer and plead that is the other course available to

10   him.  There are those three alternatives.

11       THE COURT:  In what part of this area, as to the area

12   shown on the map you have demonstrated, do you have defen-

13   dants who have been made parties so far?

14       MR. VEEDER:  Well, may I --

15       THE COURT:  Yes.

16       MR. VEEDER:  We have throughout the areas, for our own

17   administrative purposes, actually broken it down to what we

18   call the critical area.  That is the area which runs the

19   full length of the stream above Camp Pendleton.

20       THE COURT:  How far up?

21       MR. VEEDER:  It runs up to the Vail Estate, ten miles

22   up, and includes the Vail Estate.

23       THE COURT:  Which is over in the valley near Temecula?

24       MR. VEEDER:  That is right.  It includes all the lands

25   in the De Luz Creek area, it includes all the lands that are

1   down here along the branch of the stream Sandia Creek, it

2   includes the area of Rainbow Creek.  That is the critical

3   area.  We have served throughout there and it is blocked out

4   quite completely.

5        There is another area above the Vail Estate, the Vail

6   damsite here on the Temecula River, and this is where the

7   Barbee and Oviatt suit was initiated, and we have served

8   through that area.  We have served further up through what

9   is noted on here as Wilson Creek, we have served on through

10  Murrieta on up to the north, and on Warm Springs and on other

11  areas around the Vail Estate.  We are blocking those out and

12  our men are today, and have been since we were told that the

13  show was definitely on the road, checking it out for the

14  purpose of seeing how many we can eliminate on the basis of

15  physical circumstance.  Our directions were of this character.

16  For example, those who are acquainted with the lands in the

17  northern and eastern areas through here, it is a broken

18  desert country.  Quite obviously there are thousands of

19  acres, really, which could not physically utilize water.  We

20  will take what we call a calculated risk and eliminate as

21  many of those defendants as we can.

22       But where there is any prospect that a landowner will

23  claim rights to the use of water, we will serve him as a

24  defendant -- and I might add there, your Honor, that it is

25  quite a task, because every time there has been a transfer of

property it is necessary to bring in the new owner.  We have
not filed -- although we will, we have not filed a notice of
lis pendens.  It is our intention later on to do that.  But
there is a rather hectic history in this lawsuit, with which
your Honor may be acquainted, and we didn't.  We didn't feel
at the time that it was proper to file a notice of lis
pendens, but as soon as we have all the defendants named we
will proceed to do that.

But that is the general outline of what we will follow
in connection with the parties.

THE COURT:  You are serving papers from day to day,
then?

MR. VEEDER:  Well, we are going to renew and we are
going to serve papers down to the time where we feel that
all parties that are needful before the court.  At that time
we will file the notice of lis pendens and there will be no
further service.  But there is no further question but that
five years have elapsed since the last service and there
have been transfers and there have been changes.  We will,
naturally, bring those names to date and we will bring the
parties before the court.  That is not such a prodigious task
as it has been made out to be.  We don't think it will be
too great an undertaking and we believe it will be accom-
plished well in advance of any -- if your Honor should desire
to try the case in the fall, we certainly  would be in a

1    position to have all the parties here and well in advance of

2    the date of trial.  It is a mechanical undertaking, it is a

3    mechanical question -- that is, keeping these parties before

4    the court, all parties necessary.

5        Judge  Fee's opinion has had this to do with us.  We

6    have had to review every parcel of land in the area, we have

7    had to reconsider every defendant, because in that connection

8    we feel that his mandate is very clear.

9        I might add that the Fifth Circuit Court, on April 12,

10   adopted the same procedure on the Rio Grande and insisted

11   that everybody in that area be joined in the cases down

12   there, and on failure to join them the court dismissed.

13       THE COURT:  You are convinced, however, that you need

14   not join or may dismiss against various persons within this

15   watershed?

16       MR. VEEDER:  We are convinced that there are landowners

17   in there, your Honor, whose properties are so situated that

18   they cannot be reasonably expected to claim or to use water.

19   Now Colonel Robertson's staff is at the present time making

20   a complete review of the physical features of this matter,

21   under the direction of Major Bowen -- both of them are in

22   the courtroom, and they are reviewing this for the purpose

23   of telling us, the Department of Justice, the parties that

24   they think are going to be requisite from the engineering,

25   geological and geographical standpoint in this cause.

1    Now, I think that is the only procedure that can be

2    followed.  I think it is a physical matter.  I don't think

3    we can speculate as to whether a man is a riparian or not.

4    I think that is up to him to allege and prove, and that of

5    course is the procedure that we will follow.  It wouldn't be

6    proper pleading for us to say that Mr. Swing's clients,

7    however many there are, are all riparians.  That may not be

8    true.  That would not be good pleading.  Certainly we would

9    have no information upon which we could plead in that manner.

10    Is there anything more on that, your Honor?

11    THE COURT:  No.

12    MR. VEEDER:  In regard to the legal conclusions, referring

13    to paragraph 2 on page 2 of your Honor's order, there you

14    inquire as to what are the 15 legal conclusions we can accept.

15    I believe that they are satisfactory, with the exception that

16    we would like to have added -- and perhaps your Honor won't

17    adopt the course which Judge Yankwich pursued in this con-

18    nection, but we do believe that this question of appropriative

19    rights should be spelled out more clearly than it was in

20    those 15 conclusions.  In other words, the United States has,

21    since the inception of this case, claimed prescriptive rights

22    and also rights by use, and under those circumstances we

23    think that -- well, those 15 conclusions are satisfactory.

24    We would like to have some additional ones.  While they might

25    have been all right for that trial, this trial is much

34

1    broader in scope and there will probably be additional

2    questions which would either, in our view, be tried in ad-

3    vance, or written into the pretrial order questions of law

4    calling for resolution.

5         Then, finally, in regard to the pretrial order, it is

6    our view that a new pretrial order is requisite.  We would

7    tender this thought to your Honor, that once a pretrial order

8    has been agreed to among the principal parties litigant,

9    additional copies should be made available to those parties

10   who are not before the court by counsel so that they can see

11   the course being taken, and I think it is only fair to them.

12   I think that the pretrial order will be far more compre-

13   hensive than any pleadings, and certainly if they are to be

14   in any way influenced or bound by it they should have an

15   opportunity fully to review it.

16        Now, you inquire, on page 2 in paragraph 1, as to the

17   procedure on defaults.  As we stated in our memorandum, we

18   have no desire to ask for defaults at this time.

19        THE COURT:  I have noticed that, and that has been

20   served on all of these attorneys present?

21        MR. VEEDER:  Yes, your Honor.

22        THE COURT:  All right.

23        MR. VEEDER:  So that is our position on that.

24        THE COURT:  On the Master situation, what do you propose

25   a Master could do and how would he operate?

MR. VEEDER:  Well, the Master could, in our opinion --
although, as I said, I believe, many times, if the court
can try the questions it is a desirable course to pursue --
however, where we have found that it is absolutely essential
that a Master be appointed, and I believe that that is
requisite under the rules that the appointment of a Master
is an exception and not the rule, that we could have a Master
under an order of reference by your Honor spelling out with
specificity the kind and character of the matters to be
reviewed by him.  For example, the question of the small
users would be an excellent opportunity to utilize a
Master.  In other words, he has a flexibility that this
court does not have.  He could actually go into Fallbrook,
he could go into Temecula, he could go into Murrieta, and
there could be hearings in connection with those small
claimants.  It would be impossible, in our view, for these
smaller users to hire counsel to be here every day during
the trial.  Obviously, it would cost far in excess of the
value of their property, and the lawyer himself couldn't be
here every day to see that his client's interests were taken
care of without being paid for it.  We do believe that under
those circumstances a Master might be very helpful.  He
could undertake to determine matters in regard to facts:
For example, whether the land in his view, abutted upon the
stream; the areas, if any, in his view, he could pass upon

1    the question of law as to whether, in his view, they were

2    riparian in character or not -- in other words, the matter of

3    title could be tried by a Master in regard to the individual

4    parcels.  He could then determine the irrigable acreage and

5    the reasonable anticipated demand of this particular tract.

6    He could then determine the irrigated acreage, the duty of

7    water, the history of water use, and matters like that, and

8    it would lend to an informal procedure which would be time-

9    saving and saving from the standpoint of costs.

10        We believe that a Master could render a great deal of

11    assistance to your Honor, with the heavy docket that you have.

12        THE COURT:  Well, I can see how a Master could do the

13    things that you have suggested and probably save some of the

14    small property owners expense.  How can you protect a small

15    property owner who has no attorney, or has an attorney, against

16    the hazards of the trial, with appropriators trying to seek

17    the water out of the watershed?

18        MR. VEEDER:  I still believe that the procedure that we

19    adopted in the initial case is sound.  I think it is de-

20    sirable to have a separate trial against the Fallbrook Public

21    Utility District and the Santa Margarita Mutual Water Company.

22    We felt then, and we feel now, that their claims are unique.

23    They are come-lately claimants.  They are claimants without

24    any real history of water use from the Santa Margarita River.

25    They each initiated the first claims in October of 1946.

1    They differ very materially from the water users who have,

2    historically, used water within the watershed.

3         We believe, however, that separate trials are in order

4    not only in connection with the Santa Margarita Mutual Water

5    Company and the Fallbrook Public Utility District, but we

6    also believe that we could have separate trials in connection

7    with other areas.  For example, we think the area above the

8    Vail Estate on the Temecula is unique, it is of such

9    character that a separate trial could actually be held there,

10   and when everything is done your Honor would have the power

11   and authority, in our view, to enter an order embracing the

12   whole watershed and with due notice to all parties and the

13   opportunity to be heard and to file their objections, if they

14   so desired -- first, if your Honor had a Master, I think the

15   Master could file his report, the report to be served on all

16   parties, they would be notified and given an opportunity to

17   object and thereafter when your Honor had reviewed the

18   report of the Master he could prepare the findings of fact

19   and final judgment, if that be desired, and notice could

20   again be given so that everyone would be given an opportunity

21   to have due process and to be heard in connection with his

22   rights as you found them to be at the trial.

23        THE COURT:  Well, I'll take a short recess.  Before we

24   do, I will state to you that, as far as I am concerned, the

25   small property owner who owns five, ten or fifteen acres of

38

1   land has just as valuable rights as the Government of the

2   United States or the Vail Estate or the Fallbrook Public

3   Utility District, and you may expect, in decisions that I

4   render where I have any discretion or latitude, that the

5   rights of those property owners will be protected to the

6   extent that I can protect them.  It's the old story, you

7   fine one man a hundred dollars, he suffers a lot more than

8   the well-to-do defendant against whom ten thousand dollars

9   is assessed.  So that I will put you on notice now that the

10  little man who has a small piece of ground and claims a

11  water right, as far as I am concerned his water right is just

12  as valuable as is the water right which the Government claims

13  at Camp Pendleton.

14      MR. VEEDER:  We would agree with your Honor and we have

15  no desire other than to determine his rights.

16      THE COURT:  We will take a short recess.

17      (Recess.)

18      MR. VEEDER:  Do you desire me to proceed?

19      THE COURT:  Yes.

20      MR. VEEDER:  In regard to the question of the compen-

21  sation of the Master, we touched on that again in our

22  memorandum; but alluding to the small users, we believe that

23  it would be appropriate for the larger owners, not limited

24  to the United States, however, to assume the costs for the

25  Master.  In other words, these small claimants could be

1   saved considerable cost.  The real burden of the Master, in

2   the long run, will be measuring the rights of the National

3   Government and the Vails and the other large claimants as

4   they relate to all others on the stream, and I think your

5   Honor has certainly the power to apportion among the parties

6   the obligations of the costs stemming from the employment of

7   a Master, if your Honor does appoint one.

8        I have touched on what I think should be the duties,

9   mainly, the taking of the evidence.

10       There is a matter of pressing importance to the United

11   States at this time, your Honor, and in view of the fact that

12   the State of California is here we think it would be appro-

13   priate, if your Honor would permit, to ask him some questions

14   in regard to the course that the State of California is going

15   to take hereafter.  It becomes increasingly pertinent for

16   this reason -- an example:  The Sawday diversions above

17   Camp Pendleton that are being made today are a burden on the

18   stream and are burdening the rights of the National Govern-

19   ment at Camp Pendleton.  We have checked.  We find that they

20   have made no claim for appropriative rights.  We know no

21   basis whatever upon which they are making their diversion.

22   We believe that there is a direct and immediate conflict and

23   we would ask the State of California to advise us if the

24   State of California is going to enforce the law of Cali-

25   fornia in regard to diversions of that character, which, we

1    believe, are totally without authority.

2         THE COURT:  You call those the Sawday?

3         MR. VEEDER:  Yes, your Honor -- Sawday.

4         THE COURT:  That is the name of a party?

5         MR. VEEDER:  Yes, your Honor, and it is also the name

6    of a principal diverter, who, we believe, is violating the

7    law of California, and we are simply asking if California is

8    going to enforce its law.

9         THE COURT:  You don't represent the State of California?

10        MR. MOSKOVITZ:  I represent California, your Honor.

11        THE COURT:  I am referring to Mr. Swing.  What is your

12   name?

13        MR. MOSKOVITZ:  My name is Adolphus Moskovitz, your

14   Honor.

15        Your Honor, as Mr. Veeder knows and others know, I have

16   come into this case lately.  I have never heard of the

17   Sawday diversion, and until I know more about it I can't

18   answer the question.  I am sorry.

19        THE COURT:  Will you look into the matter and confer

20   with Mr. Veeder about it?

21        MR. MOSKOVITZ:  Yes, your Honor.

22        MR. VEEDER:  And I would like to add, in regard to

23   diversions, such as the Fallbrook Public Utility District's,

24   which, obviously, during the summertime at least, and I

25   believe at all times are invading our rights, whether the

1   State of California is going to enforce the law against them,

2   because whatever claims they have are certainly subject to

3   all vested rights, and if we can confer with Mr. Moskovitz

4   as your Honor directs I have no further statement.

5       THE COURT:  Do you want to be heard now, Mr. Swing?

6       MR. SWING:  If your Honor please, the State of Cali-

7   fornia, I may say, from my casual connection with them as

8   having served on the State Water Resources Board and on the

9   State Water Board but of course not on the State Water Rights

10  Board, the State has no policing powers like the United

11  States Government has in its vast Marine Corps to go out and

12  enforce the observance of the water rights or laws of the

13  State.

14      The State Division of Water Resources and the State

15  Water Rights Boards issue permits, all of which permits and

16  later license are all printed in capital letters at the top

17  of the permit "SUBJECT TO VESTED RIGHTS," and we are satis-

18  fied that the vested rights, as your Honor declared a

19  minute ago, will be protected, whether they are large or

20  small, and protected by the courts, and of course with their

21  marshals and sheriffs and their contempt proceedings they

22  have the means of enforcing them.  The United States Govern-

23  ment, of course, as shown in this proceeding ever since 1951,

24  has methods and mechanics and personnel with which to pro-

25  tect its rights.

1    Let me say at the beginning that the location of the
2    Fallbrook diversion and proposed diversion where we may have
3    appropriative rights, and we are asserting only appropriative
4    rights, is a short distance above the east boundary of the
5    Rancho Santa Margarita or Camp Pendleton.  Of the 3,600
6    named defendants in this suit brought by the United States
7    Government, only four or five of them are between Fallbrook's
8    proposed or present diversion and its proposed dam at Camp
9    Pendleton.  As to all of the 3,595 other defendants upstream
10   in the Temecula, Murrieta, Vail and above Vail, as to all of
11   those we, as an appropriator, fully recognize their rights
12   and never at any time have and do not expect at any time in
13   the future to sue those people or claim any of their riparian
14   rights.

15   The attitude of Fallbrook with reference to a proposed
16   appropriative diversion right at the Lippincott site is
17   going to be the same as the Vail interests were when they had
18   an appropriative right issued to them by the State, and they
19   have built the Vail Dam which has been in existence for some
20   time now.  They did not sue and have not sued the upper
21   riparians above them, but they let the riparians exercise
22   their riparian rights and took what came down to their
23   reservoir as surplus after it had passed all upper stream
24   users and proceeded to use that under their state permit,
25   and that is the position we propose to take with reference

to our appropriative rights at the site we have chose, which
is the Lippincott site, which is right to the north and
down the Santa Margarita River from the town of Fallbrook.

Now, of all of the rest upstream, they will be allowed
to use their rights as they see fit, as and when they can,
and we will take the water that comes down to us and we will
take care of the riparians who are below us, which includes
the United States Government and four or five individual
landowners at the most.

THE COURT:  How will you take care of them?

MR. SWING:  Take care of them below?  Well, your Honor,
in the construction of the dam which we propose to construct,
of course there would be constructed in the dam itself
appropriate outlets with appropriate valves and those valves
would be opened to release to the lower riparians the water
which they needed and which they were able to acquire and
needed to put to riparian purposes within the watershed.

THE COURT:  Well now, if I may interrupt you from time
to time --

MR. SWING:  You may, your Honor.  I will be glad to
have you.

THE COURT:  This matter of whether or not an appropria-
tion may be made is, in one sense, a decision for the State
of California, is it not?

MR. SWING:  Yes, your Honor.

1    THE COURT:  Hinging, I take it, upon a decision by this

2  court as to whether there is surplus water subject to

3  appropriation?

4    MR. SWING:  The State of California is called upon to

5  make the administrative determination in the first instance.

6  After they have made that determination, of course, it would

7  be subject to the court's review.  We now hold two permits

8  from the State for water which may be stored or diverted at

9  the Lippincott site, and we have two additional pending

10  applications in good standing which we hope will be heard in

11  the very near future, each for 10,000, which would make a

12  total of our appropriations, if these two additional ones

13  are granted, permits for 30,000 acre feet of surplus water

14  for storage at the Lippincott site.  We proposed to build a

15  dam of 35,000 acre feet capacity, 5,000 of which would be

16  reserved for silt deposit and it would leave 30,000 for

17  conservation, and as I say, through the dam when built will

18  be adequate outlets to let out the water.

19    THE COURT:  I am concerned about this review.  Does this

20  court have authority to review the action of the State

21  Department in any appropriation they made?

22    MR. SWING:  In an appropriate action accusing the

23  appropriator of invading the riparian rights, yes.  The

24  state courts, and I assume this court, on proper diversity

25  of citizenship or otherwise, would have a right.

1    THE COURT:  Here the jurisdiction rests on the fact that

2    the plaintiff is the Government of the United States.

3    MR. SWING:  No.

4    THE COURT:  I say the jurisdiction of this court rests

5    upon the ground that the plaintiff is the Government of the

6    United States.  That is an express grant of jurisdiction to

7    this court.

8    MR. SWING:  Outside of the enclave, as it is called in

9    this case, the state laws, both by stipulation and by

10   numerous decisions, are in force and effect, and we looked

11   to the State for our authority to appropriate water, which

12   will be determined, first, by the administrative agency that

13   there is surplus water and then we will build the dam in

14   accordance with that permit.

15   THE COURT:  Well, how does this work?  Does this court

16   wait until the State has approved or disapproved this

17   appropriation?  You have two permits in existence.  You have

18   application pending for a further permit.  Is the State

19   going to rule on this before this case is tried, or are

20   they going to wait until this case is tried?

21   MR. SWING:  I assume that the matter of the two pending

22   permits -- there are two pending; there are four altogether,

23   your Honor -- I am assuming that a hearing will be held on

24   those two permits before this case goes to trial, and that

25   the decision of the State Water Rights Board will be known

1  before this case goes to trial.  But Fallbrook would assume

2  the risk in building a dam that there was surplus water to

3  be stored by it under its permit, because those permits are

4  subject to vested rights.  That is declared on the face of

5  them.

6      With reference to the Master, your Honor, I don't know

7  whether your Honor can settle that today or whether your

8  Honor ought to, if I may presume to use that expression.  It

9  seems to me that the question of deciding whether your Honor

10  wants to appoint a Master to take testimony may better be

11  determined a little later on when your Honor has ruled in

12  the formal pretrial what the issues are and what your Honor

13  thinks the law is and counsel for the United States has

14  decided whether or not it is going to add additional de-

15  fendants and if so how many, and furthermore how many of

16  those existing as names in the Complaint are going to be

17  dismissed.  It is my belief and it is my hope that, based

18  upon the number of parcels of land which justify being called

19  riparian and the United States Government has made exhaustive

20  title search and had one made for it and ought to be able to

21  know from its title search and from its title report what

22  lands actually are riparian, and those of course would be

23  necessary parties whether they are on the mainstream or

24  whether they are on any of the tributaries.  Of course, he

25  can learn from the State who have claims of appropriation

1   upstream.  Vail's, of course, which we take as a matter of

2   course.  The Government takes Vail's appropriative rights

3   as a matter of course.  Fallbrook takes Vail's appropriative

4   rights as a matter of course.  There are a number of others

5   smaller, not of any particular consequence, but they should

6   be made parties defendant and necessary parties.

7       But when we get down to what is called percolating

8   water, not in contact with any stream, then of course we are

9   proceeding, if I might say, lazily and negligently, wishing

10   the burden of proof and the expense of proof upon all these

11   little landowners to come in and prove whether they are

12   getting their water supply from water which is in contact

13   with a watercourse, a stream, or whether it is water which

14   they find in the soil to which they have dug a well and

15   from which they are pumping what they can receive through

16   their well.

17       Under the extreme of the Government's contention, when

18   one drop of water or one flake of snow falls upon the

19   southeasterly slope of Palomar Mountain, it immediately be-

20   comes a possible source of supply for Camp Pendleton 50 to

21   60 miles away.  We say that such a claim is highly specu-

22   lative and there is no necessity, as has been done in this

23   case, of making the owner of a mountain home on the side of

24   Palomar a party defendant here on the ground that by going

25   up there on week ends and getting his drinking water from a

well which he has put down he is depriving the Marines and the United States Government of water which might by percolation through some period of time possibly reach Camp Pendleton.

It seems to me that, in fairness and in justice to all parties, the Government should, and I am glad to accept Mr. Veeder's statement that they will, make a real investigation of the so-called -- I call them percolating supplies, which have not yet become a part of any stream, diffused in the soil, moving according to the slope of the soil first one way and then another, but which are not a part of any stream and therefore under California law cannot be enjoined for having used it reasonably upon the land provided they do not do so to the injury of their immediate neighbors.

I therefore hope that the matter of appointing a Master, which I am reluctant to give my -- I don't know whether I can -- the question of consent, or whether I want to advocate. I think that could very well wait until we see whether we are going to have more or greatly fewer numbers. If this case can be cut down to the number of a few hundred, and it is my belief that the essential persons who are riparians or who overlie an underground basin with definite boundaries, of course, or which have appropriative rights, which is a matter of record and can be ascertained, or who claim prescriptive rights, in my opinion that could all be embraced within

1   three or four hundred defendants, and as Mr. Veeder himself

2   says we would much prefer to have the case tried by the

3   court and disposed of according to your Honor's rulings and

4   according to the record rather than have to do it twice, so

5   to speak, once before the Master and then again with excep-

6   tions here.  He proposes that it would serve copies of the

7   Master's report upon all parties, including those of course

8   who are represented in propria persona, of which there are

9   approximately 3,000, I assume, as of now, and I don't know

10   how these men appearing by themselves in the case are going

11   to get the benefit of filing exceptions to the Master's

12   report when the public wouldn't understand very much of it

13   as laymen.

14         So if a suggestion were in order I would suggest that

15   that --

16         THE COURT:  It will have to wait.  I don't intend to

17   make any orders today on any matters of that sort, except to

18   try to lay out for the future some work and activities and

19   dates for future hearing.

20         MR. SWING:  Let me say this.  We are not holding back

21   in any way in pressing this case forward and getting the

22   final pretrial order, your Honor.  We will meet with the

23   counsel for the other side and try to work up whatever data

24   your Honor needs.  We would like the opportunity to brief

25   some of the questions of law, so that when your Honor signs

1   his formal pretrial order and we go to trial we believe it

2   will shorten immensely the length of this trial and might

3   even result, if your Honor accepts the suggestion that we

4   attorneys be required to submit to your Honor, as the Ninth

5   Circuit Court of Appeals suggested not once but several

6   times, that there was an absence in the former trial of any

7   effort to find a physical solution, and I think your Honor

8   could very well at this time say to counsel present that it

9   desires them to submit, between now and certainly before the

10   pretrial order, at some date fixed by your Honor reasonable

11   enough in distance to allow us to confer together -- I would

12   like to see us all unite in presenting one physical solution;

13   but if counsel are unable to agree upon one physical solution,

14   then counsel should have the privilege of submitting to

15   your Honor such physical solution as the parties think would

16   be appropriate, reasonable, fair and just in the interests

17   of all parties.

18       THE COURT:  Well now, tell me about this matter of

19   physical solution.  Fallbrook proposes to build a dam, do

20   they, across the Santa Margarita?

21       MR. SWING:  Yes, your Honor.

22       THE COURT:  And pay for it themselves?

23       MR. SWING:  Yes, your Honor.

24       THE COURT:  What is the dam going to cost?

25       MR. SWING:  $3,000,000 -- will take a figure.

51

1          THE COURT:   And it will hold 35,000 acre feet of water?

2          MR. SWING:   It would be that gross capacity.   5,000

3   feet in the bottom would be reserved for silt deposits.

4          THE COURT:   I think the suggestion is a sensible one,

5   because ultimately all these matters have to be decided one

6   way or the other and a physical solution might eventually

7   have to be ordered by the court, even if it made some ad-

8   judication.   How you can adjudicate and protect rights of

9   various people on the watershed without either having the

10   case open jurisdictionally for settlement of innumerable

11   disputes from time to time thereafter or without the appoint-

12   ment of a Water Master or some other sort of physical solu-

13   tion I don't know.   You just can't write a decree and say

14   that this settles everything.   What is your suggestion on

15   a physical solution to this problem?

16          MR. SWING:   Well, your Honor, it takes considerable

17   churning to bring butter, particularly in a cool atmosphere.

18   For the past year there has been a rather cold atmosphere

19   blowing out of Washington.

20          THE COURT:   Was this the subject of your discussions

21   with Washington -- a physical solution?

22          MR. SWING:   Yes, your Honor, and I think there has been

23   some misconception by Mr. Veeder of what he referred to in

24   saying that he had reported that I had turned down here the

25   suggestion I had made there.   The discussion was on a

1    division of 60-40.  The part that was left open was the

2    division of 60-40 of what?

3         THE COURT:  Who wanted the 60?

4         MR. SWING:  The United States Government -- oh, yes.

5         MR. VEEDER:  I hope, your Honor, we can correct this

6    error later on.

7         THE COURT:  Fallbrook was going to take 40; is that it?

8         MR. SWING:  Fallbrook would take 40.  The original 1949

9    agreement, which was agreed to by all, negotiated here in

10   San Diego but afterward repudiated in Washington, was for a--

11        THE COURT:  Now wait, you go awful fast here.  There

12   was an agreement negotiated at one time?

13        MR. SWING:  Yes, your Honor, a physical solution --

14        THE COURT:  Between whom?

15        MR. SWING:  Between the Navy and the Marines on the

16   one side, the United States Bureau of Reclamation, the Army

17   Engineers and the State of California and Fallbrook, right

18   down here at Naval Headquarters.

19        THE COURT:  How far did it get?  Was it reduced to

20   writing?

21        MR. SWING:  Well, it was reduced to writing, it was

22   signed and agreed to by Fallbrook and sent to Washington,

23   and there it --

24        THE COURT:  It met a fate worse than death?

25        MR. SWING:  But what I started to say is this.  What was

1    discussed by Mr. Rankin and myself in Washington was 60-40.

2    What Mr. Veeder and I disagreed to at my office a few weeks

3    ago was what it was that was to be divided 60-40.  I went

4    back to the 1949 memorandum of agreement, in which all of

5    the water arriving at the De Luz Dam, all of the water,

6    including the Navy's riparian rights, which arrived at

7    De Luz Dam, were to be divided 60-40 between the United

8    States and --

9        THE COURT:  Well, how could you even insist that you

10   divide up any part of the Government's riparian right?

11       MR. SWING:  It would have taken an Act of Congress to

12   approve it.  I proposed to follow up this agreement by an

13   Act of Congress approving it and authorizing the construction

14   of the dam.  Congress can do anything, I assume.  They have

15   always said they could.  They can give away property.  They

16   can give away money.  I don't always approve of it, but that

17   is one of their supposed prerogatives.

18       THE COURT:  And if there was a physical solution, would

19   the Government pay part of the cost of this dam?

20       MR. SWING:  The Government would advance all of the

21   cost of the dam and Fallbrook would pay back on its 40

22   percent percentage of its interest in the dam.

23       THE COURT:  Over a period of time?

24       MR. SWING:  Over a period of time, yes, your Honor,

25   under the reclamation laws.

1    Mr. Veeder insisted that I had proposed that we divide

2    60-40 the surplus water to which we have prior filings of

3    appropriation, and I saw no reason why to recall or to

4    remember or to agree that we would divide that to which we

5    already had a prior claim, and I think Mr. Veeder has pro-

6    bably reported to Mr. Rankin that I had gone back on my

7    proposal to him, which I do not think I did.

8         Now, I don't know that there is anything more, unless

9    your Honor has some questions, except this. In your order,

10   you say at the close, "The parties represented by Attorney

11   Phil D. Swing who have not answered or appeared may have to

12   May 3rd, 1957 to file answers." Heretofore I have filed

13   answers for 30 or more defendants, but I have still four

14   whom I have not been able to give an answer to because of

15   the peculiarities of the particular four, which are going to

16   require a visit on the ground by me before I can draw their

17   answer. One of them is Tommy Ralston, southeast of Hemet,

18   10,000 acres. It is principally a game refuge where this

19   sort of hermit lives. He uses very little water, although he

20   has some cattle running over it. But I would have to go

21   over that before I could do justice to the filing of an

22   answer. I have always made that practice in water suits.

23        THE COURT:  How much time do you want?

24        MR. SWING:  I would like 30 days, your Honor, for the

25   four of them. I have to go on the grounds of each one of

1     them.  The plaintiff is still going to file --

2           THE COURT:  Well, I see no objection to giving them

3     that time.  Does anybody here object?

4           MR. SWING:  They will be there at that time.

5           MR. VEEDER:  Does that include all of Mr. Swing's de-

6     fendants?

7           MR. SWING:  Yes.

8           MR. VEEDER:  And you will have answered by then?

9           MR. SWING:  I intend to take no more cases.

10          THE COURT:  That will be to and including June 6th.

11          MR. SWING:  Thank you, your Honor.

12          THE COURT:  Before we hear from other counsel, let me

13    hear from you briefly on this physical solution, Mr. Veeder.

14    Why isn't the physical solution the answer to this problem?

15          MR. VEEDER:  Your Honor, I think history has answered

16    that question long ago.

17          THE COURT:  By that you mean they have not been able to

18    get together?

19          MR. VEEDER:  No, your Honor.  The Santa Margarita

20    hasn' yielded sufficient water to make it feasible.  You may

21    be very sure of this, that if down through history -- pro-

22    bably the Santa Margarita has as long a history as there is

23    in this part of the country -- had there been surplus water,

24    your Honor, water users along that area would have been

25    diverting it long ago.

1      THE COURT:  What about flood waters?

2      MR. VEEDER:  There simply is not sufficient flood

3  waters, your Honor.  We take this position.  We told Mr.

4  Swing a moment ago, "Go ahead and build your dam if you

5  choose, but you respect our rights;" and he was confronted

6  with exactly the same problem long before the Government

7  acquired the property:  They could not build a dam without

8  invading the rights of the Rancho Santa Margarita.  It's

9  true today.  There simply is not enough water, in our view.

10      In that connection, certainly the law is very clear

11  that if Mr. Swing so desired to go ahead and spend $3,000,000

12  and put in a dam, but when he puts in that dam he invades

13  the rights of the National Government, and had he put in a

14  dam in 1920 he would have invaded the rights of the Rancho

15  Santa Margarita.  It is that simple.  I call your Honor's

16  attention that down through history the Fallbrook Public

17  Utility District took a quantity of water under a working

18  arrangement between the Vails and the Rancho Santa Margarita.

19  Why was that?  Because the Vails and the Rancho Santa

20  Margarita had such rights, and we bought those righs from

21  the Rancho Santa Margarita.  We bought those rights, and

22  those are the same rights which prior to our acquisition

23  were such that people could not appropriate water without

24  invading them.  It is that simple, your Honor.  They can

25  build a dam, but they couldn't do it feasibly without

1  encroaching on our rights, and Mr. Swing was very frank when

2  he said that we would need an Act of Congress.  And why

3  would we need an Act of Congress?  For the very plain and

4  simple reason that there is no water in that stream which

5  would support the Fallbrook Public Utility District service

6  area absent an invasion of the rights of the National

7  Government.  We have no objection --

8      THE COURT:  Well, let me ask you this.  I understand

9  one of the issues in this case is where you can use the

10  water down toward Pendleton.  Is the camp and the barracks

11  located within the watershed?

12      MR. VEEDER:  There is a large percentage of the barracks

13  area outside the watershed area.

14      THE COURT:  Then you have a serious question as to

15  whether you may take water which would be ordinarily

16  available in the watershed and use it outside the watershed,

17  isn't there?

18      MR. VEEDER:  Your Honor, that is one of the leading

19  questions, and it is another question that I would ask the

20  State of California and I would like to have a response from

21  them.

22      Is it the purpose of the State of California that where

23  the United States of America and its predecessor in interest

24  was utilizing water at the time that the filings of these

25  pieces of paper by the Santa Margarita Mutual Water Company

58

1   and the Fallbrook Public Utility District were made, does

2   that fact of the piece of paper destroy rights to the use of

3   water which were being exercised by the United States of

4   America?  It is a good question, and it is a question that

5   we think needs resolution.  But we deny that the police

6   power of the State of California could prescribe that the

7   Santa Margarita Mutual Water Company could file a piece of

8   paper and in so doing dry up a lemon orchard that has been

9   there for 20 years, which is outside the watershed and which

10  was irrigated with water from the Santa Margarita at the

11  time the United States bought the property.  We take the

12  position that these regulations of the State of California

13  have nothing to do with title.  All that they are are

14  regulations for the acquisition of rights to the -- com-

15  pliance with the state police regulations, and we certainly

16  deny that under any kind of law with which we are acquainted

17  the State of California could say, "Well, you people knew

18  that those rights were exercised down there, but you have

19  come and filed with us a piece of paper and you take from

20  the National Government the rights it acquired and the

21  rights the Santa Margarita was exercising."  We would be

22  very glad to try that question out.

23      But in response to the physical feature, we say that

24  there is not sufficient water utilized outside the enclave

25  to justify, assuming that they are right and we deny it,

59

1    assuming that by some hocus pocus of California law we could

2    be deprived of those rights, we say there is still not

3    enough water that would justify a physical solution.   That

4    is our position.

5         And may I hasten to add, I would question whether the

6    Federal Court has the power to order a physical solution.

7    I doubt that very much.   I believe that --

8         THE COURT:   You are using "physical solution" in the

9    sense of ordering a dam built?

10        MR. VEEDER:   That is correct, your Honor.

11        THE COURT:   But that is not the only kind of physical

12   solution.   In streams that have a flow of water, a physical

13   solution can be the appointment of a Master who regulates

14   the flow.

15        MR. VEEDER:   Well, your Honor, you are using a very

16   broad term, and I agree certainly that this court can

17   appoint an arm to administer the stream as a Water Master

18   would.   I think what Mr. Swing has in mind is something

19   of the order of Peabody vs. Vallejo or some of those other

20   California cases, in which it declares that the court can

21   order a physical solution.   We take the position that under

22   the separation of powers --

23        THE COURT:   Well, I couldn't order Congress to appro-

24   priate money.   On the other hand, it might be possible to

25   make some concession waters.   I don't go into that.   There

60

1    are some if's and and's in it.  But certainly I can't order

2    Congress to build a dam.

3        MR. VEEDER:  We have that question, your Honor, before

4    the Ninth Circuit at the moment.

5        THE COURT:  What question?  Ordering Congress to build

6    a dam?

7        MR. VEEDER:  Yes, your Honor, whether the Honorable

8    Judge Peirson Hall -- and I am speaking fully respectfully --

9    can order the United States of America to build 14 dams on

10   the San Joaquin River.  Now I think that is the type of

11   physical solution to which I was alluding.

12       THE COURT:  Now here is another thing.  The decision

13   by Judge Fee intimates, to put it most softly, that barracks

14   are equivalent to municipal use, and the defendants cite

15   some California law to the effect that municipal use is,

16   I think, a proper use of water outside of a watershed.

17       MR. VEEDER:  Well, your Honor, in that connection --

18       THE COURT:  Well, let me finish.  So supposing it is

19   found that these barracks are the equivalent of municipal

20   use, you are in bad trouble, then, aren't you?

21       MR. VEEDER:  Oh, I think that (1) if there is any merit

22   to the other argument, we are in very bad trouble.  But I

23   say there is no merit.  Our position is this that (1) mili-

24   tary use is probably the oldest use of water in the State of

25   California.  I believe that is the case.  Secondly, it is a

1    beneficial use, and that is the only true question -- is it

2    a beneficial use?  Who will deny that a military use is a

3    beneficial use?  There are two phases and facets of that,

4    and this is an interesting problem.  There is no provision

5    under the California law to appropriate water for a military

6    use.  That's unique.  But that is the situation.  But we

7    deny -- well, we say no, that if a military use is not a

8    beneficial use, we had better close shop and let the Russians

9    take over.

10    THE COURT:  Of course, the fact that there is no pro-

11    vision in California law for appropriating water for a mili-

12    tary use would not be strange, in view of the fact that the

13    Constitution gave the Congress the power to make and wage

14    war.  No state has a right to have anything except a National

15    Guard, which is largely a police force for the state.

16    MR. VEEDER:  Well, your Honor is absolutely correct

17    there.  Of course, I was not taking issue with what you said.

18    There are very many uses which are authorized under state

19    law which -- for example, they attempt to authorize the

20    United States to build reclamation projects.  The United

21    States is the only one who is really in that business.  But

22    we take the position that these diversions and applications

23    of water for a beneficial use for military purposes outside

24    the watershed constitute a valid appropriation.  We believe,

25    moreover, that those waters have been used for the

1   prescriptive period.   Fortunately, Judge Fee said, "I am

2   not ruling on that question."  So we will have a shot at

3   that.  But the point we make is that certainly within the

4   watershed the military use is a beneficial use.  Fortunately,

5   the question is reasonableness and is not use within the

6   watershed.  Outside of the watershed we say we diverted and

7   applied it to a beneficial use for military purposes, and

8   that by so doing we precluded Santa Margarita and Fallbrook

9   from encroaching on those rights.  By the mere filing of a

10  slip of paper in the hope that some day -- and the "some

11  day" is a long shot -- they might get some water.

12          THE COURT:  Well, I have a sentence calendar at 2:00

13  o'clock that will take until about 2:20.  I will excuse you

14  until 2:20.  After lunch I would like to hear from any other

15  counsel who want to be heard, and I would like also to have

16  some concrete suggestions as to tasks that have been assigned,

17  issues that should be briefed, things that can be done in

18  the next 30, 60, 90 days, which I could set for hearing as

19  a further pretrial on my return from vacation about August

20  1st.

21          MR. VEEDER:  Did your Honor state "tasks" that should

22  be done?

23          THE COURT:  Tasks.  In other words, I intend to put you

24  to work on some of these problems.  Some of these I want

25  briefed.  I want suggestions of issues from all parties.

1    This is all looking toward some further hearings where,

2    upon proper notice, I may make some decisions as to points

3    of law and will eventually work toward the formulation of

4    the pretrial order involving those persons who have counsel,

5    and some procedure to permit the making of a prima facie

6    case for the benefit of those who do not have counsel.

7        So you can think about that until 2:30.  We will recess

8    until that time.

9        (Noon recess.)

1    SAN DIEGO, CALIFORNIA, MONDAY, MAY 6, 1957, 2:00 P. M.

2                          - - -

3         (Other matters.)

4         THE COURT:  Now, back to the Fallbrook case.  We can

5    conduct this hearing much like these religious meetings; if

6    the spirit moves someone to contribute something, we will be

7    glad to hear you.  These two people already moved by the

8    spirit, give your name to the reporter and you may proceed.

9         MR. LINDLEY:  Fred E. Lindley, appearing on behalf of

10   Fallbrook Citrus Association, a cooperative marketing

11   association.

12         I listened with a great deal of interest this morning.

13   I am only one of these very small -- perhaps not the smallest,

14   but only one of these very small clients.  The discussion

15   about the small owners was particularly interesting to me.

16         I understood from the notice that I got that the pur-

17   pose of this meeting was to try to work out some plans that

18   would facilitate and shorten the trial.  I didn't get much

19   along that line.  But I think that it is important, in pro-

20   ceeding along that line, to think about these so-called

21   small owners and the number of them.  I don't know just how

22   many defendants there are.  It is suggested that there were

23   3,600.  The question was asked this morning, as I got it,

24   in substance, over how wide an area were these defendants

25   served?  An illustration might be interesting to the court

1  and possibly helpful.  I have filed answers for three de-

2  fendants.  One of them lived on Mount Palomar in the San Luis

3  Rey watershed and the land was entirely outside the Temecula

4  and Santa Maria (sic) watershed.  I filed an answer setting

5  that up and referring to the United States geodetic survey

6  maps.  Sometime later I received notice that a dismissal

7  had been filed.  I filed an answer for another client who

8  advised me that his land straddled the dividing line between

9  this watershed and another one.  Those seem to indicate that

10  they went to the limit of the watershed in finding these

11  people and making them parties defendant.

12      In all the cases that I have had I have discussed with

13  my clients and advised them of the disproportionate expense

14  that it would be to small owners to defend the case.  Your

15  Honor said this morning that the small owner's right was

16  just as important, just as valuable to him as the big one's.

17  There is a corrolary to that.  The cost of defending that

18  right is very big in proportion sometimes to its value.

19      THE COURT:  That is why I want some suggestions.  If

20  you are not satisfied with some that were made this morning,

21  I would be happy to hear any suggestions from you as to how

22  we can make it possible for a little man to see that his

23  rights are protected in this proceeding.

24      MR. LINDLEY:  That is what I am going to direct my

25  remarks to.  Your Honor, I don't know whether they will work

1   or not, but I think they are worth trying, if everybody

2   wants to try them.

3        I have advised these clients of mine that they should

4   make an effort to get together a group of their neighbors

5   and other defendants, get them to put their joint interests

6   all in the hands of one attorney or firm of attorneys.  An

7   attorney, of course, for ethical reasons, can't go out and

8   institute that sort of thing.  So it does fall upon the

9   clients, if it is done.  However, I believe that it would be

10  entirely possible and entirely proper for the representatives

11  of the Government, when they are contacted, as they have been

12  and are from time to time, to make this suggestion to these

13  people.  Certainly the attorneys for the Government are not

14  in a position to give legal advice.  If they do that, they

15  are getting on both sides of the case.  But I can see no

16  reason why they could not advise them of the advantage and

17  the saving of expense and ultimate saving of a lot of time

18  in court if they would get together in groups, because their

19  interests are all practically the same and the work that

20  helps one helps another.

21       That is one suggestion I have to make, and I don't

22  know whether it can go further than that.  I don't know how

23  many of them there are that have appeared in propria persona.

24  But it would seem to me that all of them should be advised

25  of the fact that this is a complicated case, that they can't

67

1    hope to do much for themselves anyway, and that the way to

2    facilitate the trial and protect their interests economically

3    would be to organize in groups.

4        Mr. Veeder this morning was discussing these people.

5    At one time he said, in effect, that it was up to them to

6    come in and plead their rights.  I am not so sure about that.

7    I thought the plaintiff had the burden of proof.  The de-

8    fendants have the defense.

9        THE COURT:  Well, that is my impression of quiet title.

10   It has been the law for years that the plaintiff must prevail

11   on the strength of its title and not on the weakness of the

12   defendant's title, and the defendant in a quiet title action

13   can come into court even without asserting title and if it

14   can punch a hole in the plaintiff's case it may prevail.

15       If I am wrong in the law, Mr. Veeder, you straighten me

16   out on that.

17       MR. VEEDER:  I think that would be proper, your Honor.

18   I think there is a matter of semantics here, your Honor.  I

19   think I said in regard to the matter of pleading, certainly

20   we must win on the strength of our title.  But there is the

21   obligation -- and Judge Fee was very explicit on that --

22   that there is the obligation on the defendant pleading his

23   right.  We must prove a superior right, and that is all I

24   said.  Certainly we win on the strength of our title.

25       THE COURT:  I don't know that I go that far.  Now I

think it is going to be better practice to have these defendants assert what their rights are. But I am not unfamiliar with quiet title proceedings as far as land is concerned, and if you allege that you are the owner of Lot A I can come into the action and I can get served with a copy of the Complaint and I can deny that you are the owner of Lot A and without ever offering a lick of title in my behalf I can go to trial on whether you can show that you have title, and if you don't prove title then get a judgment that you are not the owner of Lot A. That may not help me any, because I may not have title as to the rest of the world, but as to you I have defeated your title.

Now I don't see that there is any difference between the quiet title to water and the quiet title to land, except that I think it would be desirable for orderly proceedings to have the defendants assert what their right is that they claim.

MR. LINDLEY:  I am not trying to argue the point, your Honor.  I think Mr. Veeder has affirmed what I thought he said this morning.  What I am trying to make is this:  These defendants who do not have help of counsel will not understand and they will not know a thing about it and if they come in and they are told that they must plead their rights they are lost.  In ordinary litigation among private parties it frequently results that somebody has defaulted.  Nobody

1    feels particularly sorry about that.  But when the Govern-

2    ment, with all of its strength and prestige, defaults a

3    private citizen, it doesn't sound good to us, it doesn't

4    feel good, and there may be some of them who will be de-

5    faulted here.  I don't think that should be.

6         Mr. Veeder also said, as I understood, that the Govern-

7    ment had done a lot of work in these areas trying to classify

8    these rights and they are still doing that kind of work.  I

9    believe that the Government should voluntarily dismiss one

10   of these cases where their investigation leads them to think

11   that they don't have a strong case, and that would simplify

12   the trial very much.  I can hardly conceive how one would

13   go about it to handle a trial even with 2,000 defendants

14   coming in.  It would just be an impossible thing and would

15   take so long it is hard to tell how to do it.  It seems to

16   me there must be some way found of simplifying this matter.

17   I don't know of any way to protect these small owners except

18   that the Government should go out of its way to be perfectly

19   fair; not try to represent them, but tell them what their

20   rights are or are not; and that everybody connected with the

21   case should do everything that he can to persuade them to

22   get representation by groups, so that the matter may be

23   shortened.

24        Something was said about a physical solution.  A

25   physical solution, as it was referred to, a compromise

agreement between the parties, can frequently be far better than a court can do, because all that a court can do, when it is fully advised by evidence and law, is to say this is yours and this is yours. But these compromise agreements can do much more than that, and there is one in this county that is the best example I ever knew of what can be done in that way. I will not try to analyze it or describe it, but it was a settlement made between the Escondido Mutual Water Company and the then owners of the Lake Henshaw water rights, and it was so advantageous to both sides that it was just wonderful. They went together and did the things they couldn't have done individually.

The falling out, if it was such, in this last attempted settlement, seems to be over the question: 60 percent and 40 percent of what? The remarks made by Mr. Veeder were to the effect that there is not enough water there, so we can't make that kind of settlement. There isn't enough water. It seems to me there is not enough water for everybody, and that is no doubt true, because that is true all over Southern California. But it doesn't preclude the possibility, if you assume for the moment that 60 and 40 are the proper figures, then we should recognize that the Government gets 60 percent, and they get 60 percent of what they claim and 60 percent of what Fallbrook claims; Fallbrook gets 40 percent of what the Government claims and 40 percent of what

it claims.  So there you have got it.  One of the big ad-
vantages of such a settlement, if they will make it, is that
they can build a dam and save the flood waters.  The flood
waters aren't enough to provide all of the water that every-
body wants, that is true, but there are years when a great
deal of water goes into the ocean and it could be saved for
the benefit of all the parties concerned.

I have just one other thought.  It doesn't exactly
relate to this matter of proceeding, and yet it is related to
it and has come up.  The question was, because of what
happened in the past, and that is the determination or
attempt to determine the water rights with only two or three
people before the court and the rest outside.  I like to
illustrate it something like this.  Suppose we have a barrel
of water here and everybody in the room except the court has
an interest in that barrel of water, but our interests are
all different.  Suppose a suit is brought and we are all
served.  Then three or four of us get together and come
before the court and settle this water suit.  What about the
people who were not in court?  That sort of thing, to me,
violates all of the principles of our Anglo-Saxon and
American theories of determining justice.  If those people
had never been made parties to the suit, their rights were
not affected.  But they were parties to the suit, and here
is the water all divided up without taking into consideration

1   your rights over there and your claims.

2   So it seems to me that when this case is tried, there

3   must be a recognition of the rights of everybody, and that,

4   to my mind, makes it very important that an effort be made

5   by the parties who are represented by counsel to see that

6   others are represented, too, and that none of those people

7   who are small owners have to give up and say, as one of my

8   clients has said recently, "We are just about to decide to

9   give up any defense of our case because it costs so much."

10  To many of them the costs would probably absorb the value of

11  their property, and from what we can foresee now just the time

12  of the attorneys sitting through the trial would be a tre-

13  mendous amount for these people with small ownerships.

14  So the suggestion I have made is the only one I have,

15  and it isn't in the hands of any one to put that into effect,

16  but probably all working together can probably accomplish a

17  good deal in that direction.

18  THE COURT:  Let me inquire about one matter.  When I

19  asked the Government about this physical solution, as I

20  understand your reply, Mr. Veeder, it was that it was an

21  impossibility because there was not enough water.  Is that

22  right?

23  MR. VEEDER:  That is our view, your Honor.

24  THE COURT:  Well, then, what did you spend a year

25  talking with Mr. Swing about?  This Circuit Court decision

came down in March 1956, and clear up to April 1957 some word was going to be given the court about the outcome of settlement talks.  If this was an impossibility from the beginning, what was the year spent for in negotiations?

MR. VEEDER:  Your Honor, I would be reluctant to try to respond to your inquiry, as Mr. Rankin handled the negotiations.  However, I don't believe that there was ever -- and Mr. Swing and I are in disagreement on this proposition -- I don't believe that the matter of a physical solution was ever discussed with Mr. Swing.  I will recite, as I did this morning, the basis of the conversations were mainly these: That a proposal, we understood --Mr. Swing says we are incorrect -- a proposal was made that the United States would accept 40 percent of the available supply of water to the Santa Margarita River.  If you gentlemen are confused about the 40 and 60, I am, too.  But this is how it came to me. Mr. Swing proposed 40 percent to the Federal Government, Fallbrook would take 60 percent and would take care of all the other water claimants in the area.  That sounded very good, because certainly if Fallbrook would do that there would be no reason for litigation.

Now Mr. Rankin pondered that, as did I and the rest of us, and said, "Well, if Mr. Swing can make that kind of offer, it is too good to turn down."

But from the standpoint of a physical solution, there

1    has never been a discussion of a physical solution that I

2    ever participated in.  I have always advised my superiors

3    that, in my view, there was insufficient water in the water-

4    shed for the rights which have historically used the water.

5    It is true that in 1916 you had a tremendous flood, it is

6    true that maybe in 1952 some water entered the Pacific Ocean;

7    but for the last ten years, I assure your Honor, that if we

8    had had a structure it would have been a monument from the

9    standpoint of engineering but there wouldn't have been water.

10   And that is the problem, and we might as well face it.

11       Mr. Swing touched upon the very basic proposition.  Only

12   by Congress giving away -- and I use his term -- giving

13   away some of the water that the National Government acquired

14   is there a possibility of a physical solution.  That is the

15   only conceivable way.  If it were different, as I attempted

16   to emphasize earlier, if the situation were such that there

17   was a surplus supply, rest assured that Santa Margarita would

18   have rushed in and built itself a structure and would be

19   using water today.  That is the basic, fundamental premise

20   we are confronted with here.  There is not enough water for

21   the Vails and the United States of America today.  Mr. Vail

22   has a million dollar structure, and at the present time I

23   understand there is something around a thousand acre feet

24   of water in it.

25       Now, we don't have to go beyond the watershed to

1    observe the error of these people who are asserting that

2    there is a surplus.  Here is Vail's dam.  They filed their

3    application in 1946.  I believe they completed construction

4    in 1948, and less than nine years later it is, for practical

5    purposes, of no value.  And that is exactly what would occur.

6        When we were first confronted with this problem, we

7    were advised that the National Government was to build a

8    dam which would impound 211,000 acre feet of water, and the

9    only question I had then, and the question I have now, is:

10   Where are you going to get the water?  And we haven't been

11   disabused in that thought at all, because right today we

12   are ready to put into evidence showing zero, zero, zero,

13   about eight zeros out of ten years at the Ysidora gauging

14   station.  Now there is not water, your Honor, and that is

15   our view, and we think the record will support us on that.

16       I would like to say, if I may, to Mr. Lindley and to

17   the others -- Colonel Robertson is in the courtroom, as is

18   Major Bowen -- that we have, in the past, accumulated a

19   great deal of data, a great deal of physical information,

20   which, I think, may be of some assistance to these small

21   users, and they are free to talk to Colonel Robertson and

22   Major Bowen strictly from the technical standpoint and if

23   the data is available we will certainly see that it is

24   released to them.  I think it will save them some money.

25       THE COURT:  All right.

1      MR. LINDLEY:  May I say a word?

2      His idea appears to be, as near as I can understand it,

3   that because there is not enough water for the Vails and for

4   Camp Pendleton, Camp Pendleton must take all there is.  And

5   talking about the Government giving away some on a compromise

6   settlement, the other fellow was giving the Government some,

7   too, if you make that kind of settlement.  That doesn't

8   sound to me like any argument.

9      Now we know there are dry years in Southern California,

10   and sometimes there are seven, eight or ten of them.  But it

11   is true that the railroad that was built down Temecula

12   Canyon was washed out three times before they abandoned it,

13   and it is true that there are years when a lot of water goes

14   down there and goes to waste, and that water is worth

15   saving.  It is gone forever, as far as use is concerned, if

16   you don't save it.

17      THE COURT:  All right.  Mr. Sachse.

18      MR. SACHSE:  I would like to take just a minute, your

19   Honor, and comment on the same remarks Mr. Lindley has made.

20      First, there is a suggestion in the Circuit Could of

21   Appeal's decision that every party in this proceeding is

22   necessarily adverse to every other one, and that therefore

23   this case is even more complicated, 3,000 defendants, but

24   it gets to be 3,000 to the three-thousandth power.

25      Now Fallbrook has absolutely no interest in any user

1  upstream from the Fallbrook damsite.  If there is anything

2  that Fallbrook can do to assist Mr. Veeder in getting rid

3  of those people, we will be very happy to take whatever

4  action is necessary.  The reason for that is quite obvious.

5  First of all, we can only get the sooner we build a dam

6  whatever water reaches us.  But more important, in large

7  capital letters at the top of our permit -- and since we are

8  an appropriator, the only water we will ever use will be

9  under a state permit -- in large capital letters at the top,

10 it states that this is all subject to vested rights.  So

11 we have no controversy with any upstream riparian, and as a

12 matter of fact we have no controversy with any downstream

13 riparian, except as to the type of use he asserts.  If it is

14 a proper riparian use, we concede very frankly that his

15 right is prior to our own.

16     So, for what it is worth, the Fallbrook Public Utility

17 District, as one of the major defendants here, has no in-

18 terest in any defendant here in this case other than the

19 United States, other appropriators on the stream and perhaps

20 five or six very small, so small that they could be dis-

21 regarded, owners in the Rocky Canyon between Fallbrook dam-

22 site and Camp Pendleton.

23     That is the first point I want to make.

24     The second one is on this quiet title action aspect of

25 the case which your Honor mentioned a moment ago.  I agree

78

1   that Judge Fee spelled out, right in the first paragraph of

2   his decision, that this is a quiet title proceeding, and he

3   said that if the Government seeks to establish its title

4   it will have to do so as against all other potential claimants

5   to the water.  But the fact that these other claimants were

6   not parties to the proceeding that resulted in Judge Fee's

7   decision, in my opinion, does not mean that that decision

8   is not the law of the case in so far as the United States is

9   concerned.  What the Circuit Court of Appeals did was to

10  tell the United States the rules under which it must establish

11  the nature and extent of the title it claims, and I think

12  those rules are binding on the United States regardless

13  whether the defendant is the Santa Margarita Mutual Water

14  Company, who was the adverse party, the Fallbrook Public

15  Utility District, or any individual riparian or appropriator

16  upstream.  I believe the  rules laid down by Judge Fee will

17  be restricted on the case of the United States, even though

18  they may not be restricted on the case of each of the other

19  individual defendants.

20      Finally, another word about this physical solution.  If

21  your Honor rendered a decision, after taking evidence in

22  this case, your decision would, of necessity, determine

23  either that there is or is not some surplus water.  If there

24  was no surplus water, Fallbrook as an appropriator would be

25  out.  If your decision determined that there is surplus

JOHN SWADER, OFFICIAL REPORTER

1    water, I am quite sure that it would not determine surplus

2    in acre feet or in percentage of the stream flow.  I am quite

3    sure that if there is any surplus, there is more surplus in

4    the months of November through May than there is in the

5    months of May through October.  Anybody who has lived in

6    Southern California knows that in the wet season there is

7    water available which cannot be used, either because it runs

8    down the stream so rapidly that it goes into the ocean or

9    because the irrigation season is not on and in order to use

10   it the water must be impounded and stored.  So if there is

11   any surplus at all in the stream, I think we will ultimately

12   find that the great bulk of that surplus is in the winter

13   months, and I am quite certain that you will find that there

14   is surplus in the winter months.

15        Now, I don't think Mr. Veeder will disagree when I say

16   that  under the law of California which will apply in this

17   case the right to store water seasonally is not a riparian

18   right.  It is not a right which the United States can assert

19   as an owner of Camp Pendleton.  The O'Neills did not have

20   a right before them, and the United States doesn't have it.

21   So to whatever extent there is water available in the Santa

22   Margarita that can only be utilized by trapping it and im-

23   pounding it and using it for later storage.  To that extent

24   it is water to which today the United States has no right.

25   It is water today which the State of California can allocate

80

1   in accordance with state laws to state claimants.

2       The point of all this is that there is room for a

3   physical solution in this controversy.  There are facts --

4   the Government's witnesses in the original proceeding

5   testified that an average, I believe, of 25,200 acre feet a

6   year have been wasted into the Pacific.  Well, if they have

7   been wasted into the Pacific, I submit, your Honor, that

8   they are surplus and there is room for a physical solution.

9       A physical solution need not entail a Water Master.

10  A physical solution might entail a seasonal apportionment

11  of water.  A physical solution is limited only by the in-

12  genuity of the people who put their brains to work on it.

13  And at the risk of overstepping the place of counsel, I

14  believe with all my heart that if the engineers and legal

15  talent that is represented in this case were asked by your

16  Honor to come forward with proposed physical solutions, I

17  believe with all my heart that somewhere in the bundle of

18  documents that would result we would come up with a workable

19  answer, with a solution which would accomplish what Mr.

20  Lindley said would stop the water wasting into the ocean

21  and at the same time take reasonable care, within the limits

22  of the river, of the prospective claims.

23      MR. STAHLMAN:  I don't know whether the spirit is moving

24  me, your Honor, but some of these remarks sound more in the

25  nature of closing arguments, so I presume I had better put

1    one in for the people I represent.

2         First, I think we have gone a little far afield from

3    the object your Honor had in mind, if we are going to

4    accomplish today what we are expected to, and that is to

5    determine what the procedure will be when the case goes to

6    trial, and I am very much concerned in that respect for a

7    number of clients -- the small people on the river, who have

8    the same problem as all the small people do in the case, and

9    also as far as part of the Vail interests are concerned.

10        Now, speaking on behalf of the small people on the

11   river, I would like to say this.  I think that some method

12   should be arrived at by which the court could try this case.

13   The physical circumstances that surround it lend themselves

14   to some natural divisions by which the court could approach

15   the matter.  I merely make these suggestions for your Honor's

16   consideration in determining how the matter would be tried.

17   It is a great expense for all of these people if a lawyer

18   would have to sit in during the course of the trial.  The

19   Master somewhat appeals to me, as far as the small people

20   are concerned, but yet I don't feel that other clients of

21   mind should pay the cost of that.  I think, in relation to

22   some of the small people, and some of them are here in court

23   today, they have activated themselves in relation to this

24   case in certain matters by which they can be very simply

25   determined by this court.

1    Speaking now for 30 small riparian owners on the river
2    between Camp Pendleton and the Vail Ranch, these people were
3    approached by the Government.  The Government has made
4    surveys upon their land.  I have the surveys here.  It in-
5    volves about 30 pieces of property.  There are not many
6    more pieces of riparian land in between there -- about twice
7    that many at least.  These surveys have directed themselves
8    toward two objectives that the court will have to reach in
9    this case.  One of them is the present usage of the water,
10   and the other is the ultimate usage -- in other words, the
11   kind and character of land and the amount of land that is
12   adaptable for irrigation and the amount of water which, under
13   common agricultural practices, can supply that particular
14   area.

15   Now, addressing myself for one moment to these small
16   people and some of the remarks Mr. Swing made regarding the
17   history of this thing.  I don't know whether your Honor is
18   familiar with the fact that a group of small owners at
19   Fallbrook have been in a hassle over this dam that Fallbrook
20   proposed to build.  We tried the case before Judge Sherry
21   here -- I think it was about six weeks or two months in
22   trial; Mr. Swing and myself -- and there were very elaborate
23   findings in that case in relation to the building of this
24   dam, and the court held, injunctively, that they could not
25   build the dam at this time.

83

So we have all these small people whose land was proposed to be taken by Fallbrook for this damsite, this physical solution that is talked about, and when they were talking about dividing up the water 60-40 or whatever it was, none of these people were consulted. Now, they have primary and paramount rights on that river with relation to appropriators and they haven't been consulted about any solution.

I don't think that the litigants in this case are going to get any practical solution to this problem. I think that it must be a legal solution, and then make the practical controls in order to enforce the rights of the various people.

The Fallbrook Public Utility District presented a good many figures regarding the flow of water on that river, and the court held it was impractical to build a dam at this time -- that there was no surplus in the river. And anybody that knows that river and has studied that river, and even Fallbrook's own exhibits in that case indicated that. And I merely mention this because I want the court not to be deceived by the history as presented by Mr. Swing, because it is not accurate. We argued that case last month before the Appellate Court for the Fourth Appellate District, and the decision will probably be down in a month or two.

Then on the part of these people, they are not in court all of the time, so, if I may, I would like to address my

remarks to your Honor with regard to some of the circum-
stances in the trial of this case.  If I may go to this map,
this watershed divides itself into three rather equal
portions -- that is, from the Vail Dam and canyon to the
north, and then what was known as the Lippincott site where
Fallbrook proposed to build this dam, and then the area down
through here.  The watershed in each of those areas is,
proprotionately, about a third of the watershed.

Now, along the river here you have the various riparian
owners.  They divide themselves into a natural kind and
character of legal right.  And there may be on this river --
I don't know the history of the river -- as we get into
trial, it may develop that there are some prescriptive users
who may have acquired their rights at different stages of
the development of our law in California, at different times
in the history of our law -- different methods and different
conditions were required to obtain those rights.  A great
difference occurred from the time the constitutional amend-
ment came into existence in 1928.

Then there are many overlying owners throughout all
this area, here, and I daresay that when it comes to deter-
mining the rights of many of those overlying landowners that
their right to the use of the water far exceeds any amount
of water that they will be able to extract from the wells
which they use in order to obtain their source.  So they

1   divide themselves up into a natural category.

2        Then we have the situation of the appropriators.   Here

3   is Fallbrook and Rainbow, and someplace during the course

4   of this trial there is going to be a head-on collision be-

5   tween Fallbrook and Rainbow as to who has the superior

6   rights, and I presume that was Judge Yankwich's idea in

7   getting rid of the appropriators first.

8        So the case does lend itself into certain natural sub-

9   divisions.   In addition to that, we must not lose sight of

10   the fact, as your Honor has indicated, that it is an action

11   to quiet title, and yet in the prayer of the action, with

12   what the Government is requesting, there are some things that

13   must be done.   The character and the kind of land must be

14   determined -- in other words, as to whether it is riparian,

15   whether it is overlying, there are various questions as to

16   whether certain land overlies basins that are part of the

17   stream and other natural basins not part of the stream, which

18   lends itself to a little different application of water rules

19   than percolating waters, and you have the various correlative

20   rights between the different types of ownerships where the

21   correlative rule applies.   So it does break itself down into

22   some certain natural subdivisions, and I feel some plan

23   should be worked out whereby all these people will not have

24   to be in court all at the same time.   Even on the part of

25   Vail's, I don't feel that we should be sitting here during

the entire trial of this case, because there are going to be days and days on which there will be matters in which we would have no interest.  I think some system should be set up whereby when matters that may affect some of these major defendants are to be heard, that we then be in court and be present at that time, of course having the right to be there at other times if they wish, and I think that is strictly in accordance with Judge Fee's decision -- he didn't mean that everybody has to be in court at one time. So I think if we give attention and develop some form of procedure during the course of this trial where, by breaking down these various types and kinds of rights, it may be that the Master can take care of a lot of these, such as those overlying rights in the watershed.

Now, as far as the rights of the riparians on the river here are concerned, whom I represent, I don't believe we would use much time to dispose of those people.  We already have studies made of the amount of acreage, the amount of acreage which is adaptable to economic development in farming, we have their present use, and from that their rights can be determined and the ultimate quantity of water they will use can be determined.

I think that is about all I have to say at this time, your Honor.

THE COURT:  All right, thank you.

1    Mr. Moskovitz.

2    MR. MOSKOVITZ:  Your Honor, I think before I express

3 what the position of the State is, I should explain a little

4 bit about the position I, myself, am taking.  I have come

5 into the case only lately.  Mr. Grover, who handled the case

6 during the first trial and then on appeal, is no longer with

7 the office but is in the room today and represents one of

8 the small users.  He was not the first attorney for the

9 State in this case.  Arvin Shaw handled it originally.  He

10 is deceased now.  So a long time has elapsed since the case

11 first started.  The Complaint was filed early in 1951.

12    Now, the position of the State from the very start has

13 been a consistent one.  The State has certain small pro-

14 prietary interests in the Santa Margarita watershed, and

15 may have some small water rights.  Those depend upon the

16 changing character of land ownerships of the State in this

17 area -- land that has escheated or tax-deeded land, etc.

18 But the principal purpose of the State's intervention in

19 this case has been, from the beginning, to attempt to help

20 the court and the parties reach a conclusion which would be

21 consistent with California water law and with the physical

22 facts.  The State entered the case at the request of the

23 State Legislature by resolution, and the State entered the

24 case at the request of the United States.

25    Now, it is because of our interest in seeing that the

1    water law of the State of California is correctly understood

2    and applied that the State joined in the appeal from the

3    judgment in the first trial, because that judgment erroneously

4    construed and applied California law.  That judgment adopted

5    the legal contentions that the United States advocated at

6    the beginning and, to my surprise, still advocates even after

7    the Ninth Circuit decision.

8        The State feels, also, that this is the kind of case

9    that is ripe for settlement.  We have heard a number of

10   people explain, and your Honor, yourself, has indicated the

11   difficulties of trying a case of this character.  Nobody

12   will gain anything, almost everybody will lose at least time

13   and some money in trying the case again.  We feel that the

14   legal principles which the Ninth Circuit set forth in ex-

15   plaining what California law is can form the legal basis for

16   settlement discussions.

17       The State of California, under an appropriation from the

18   Legislature, engaged in a rather extensive physical investi-

19   gation of the watershed and came out with a report last year.

20       THE COURT:  Is that the two-volume report?

21       MR. MOSKOVITCH:  That is the two-volume report, your

22   Honor.

23       Now, because the State has felt that this is the kind of

24   case  that should be settled, and because the State has felt

25   that the physical facts we learned in that investigation and

1    the legal principles set forth in the Circuit Court decision

2    could be helpful, Governor Knight instructed the Director

3    of the Department of Water Resources last summer to speak

4    with the appropriate officials of the United States Govern-

5    ment and to try to lay the groundwork for settlement dis-

6    cussions.  Accordingly, the Director of the Department,

7    Harvey O. Banks, went to Washington, D.C. and engaged in

8    conversations with Solicitor General Rankin.  My report of

9    the conversations comes from Mr. Banks -- and this was, I

10   believe, along about October of last year when the meeting

11   was held -- that it would take six weeks to two months or

12   so for the United States to consult with the agencies con-

13   cerned, the Navy Department and the Marine Corps, and

14   formulate what it proposed to secure from a settlement, and

15   that thereafter the United States would get in touch with

16   the State of California and ask the State to take the lead

17   on the local level to bring the local interests together.

18       Your Honor, I regret to say that, notwithstanding any

19   talks that may have been held with Mr. Swing, no state

20   official has been contacted by anybody on behalf of the

21   United States with respect to settlement to this date.  We

22   sincerely believe that a settlement can come about, if the

23   United States would be willing to sit down with the State

24   engineers, who have made the investigation, who have ideas

25   and facts which they feel can be useful and at least explore

1   the possibility, and at this time I would like to ask the

2   representatives of the United States if they are authorized

3   to agree to that sort of procedure before we go further into

4   the preparations for another trial.  If we can be successful,

5   it will save us all a lot of time and a lot of money.

6       The State, as I say, has only minor proprietary interests

7   of its own and it can act, in a sense, as a disinterested

8   person.  We have no brief for any claimants.  We are in-

9   terested in all those small owners who will have to go to

10  so much expense to defend themselves in court.  All we want

11  to see is that the physical facts as they exist be respected

12  and that California law, as it exists, be respected.

13      That brings me to the question of what is the effect of

14  the Ninth Circuit decision.  Certainly, the Ninth Circuit

15  believed it was improper to render final judgment against

16  any party before all the other parties involved had a chance

17  to present their evidence.  But as your Honor pointed out,

18  they could have done that in about three paragraphs.

19  Instead, the opinion, in the pamphlet edition, goes on for

20  22 pages.  It was obvious that the Ninth Circuit wanted to

21  guide the District Court on any retrial so that the same

22  error would not be made again, necessitating another appeal

23  and another reversal.

24      Mr. Veeder points to a couple of issues that the Ninth

25  Circuit expressly left undecided, and there are two issues

that I can think of now:  What are the facts?  How much
water is surplus, if any?  When does it flow?  Another issue
which they expressly left undecided was whether a downstream
diverter can acquire prescriptive rights against someone
upstream?  Those were expressly left undecided.  But all
the pronouncements as to what the status of the Government
is as an owner of an enclave as against those upstream, as
to the fact that because the Government is an owner as a
sovereign of land it cannot acquire prescriptive rights
against someone else because it cannot be adverse to others
and others cannot interfere with its use, the fact that as
a riparian the Government must make riparian uses within the
watershed or seek an appropriation according to law, the
fact that use outside the watershed is not a riparian use --
all those were unqualified as principles of law to be used
in a further trial, and it is surprising to me that the
Government persists in asserting the same erroneous legal
theories now in preparing for another trial as it did then.
Apparently nothing has been learned from this decision.

Now, the State has not given attention to the question
of the procedure in dealing with the small people if a new
trial is required.  We have confined our preparation to the
issues which you asked us to have briefed and our memorandum
does discuss those as to what principles were decided and
what were undecided by the Circuit Court and what facts were

1    stated in the pretrial order and what legal conclusions were

2    stated by Judge Yankwich can still be acceptable to us.  We

3    would want a further opportunity to comment on those issues,

4    if it appears necessary to go to trial.

5        One final point.  Mr. Veeder brought up the question

6    about why doesn't the State enforce its own law with respect

7    to appropriation.  As I pointed out, I was not aware of the

8    situation, and during the recess Mr. Veeder and I had con-

9    versation and I advised him that any such asserted violations

10   of law, that is, diversions or use of water without permit

11   by someone not entitled to it, should be called to the

12   attention of the State Water Rights Board, which is the

13   agency responsible for that sort of thing and then appropriate

14   action can be taken by that agency.

15       MR. VEEDER:  I thank Mr. Moskovitz for assuring us that

16   they will take  proper action, and I am sure efforts will

17   be made and I am sure California will proceed expeditiously

18   to take care of the matter.  I understand that you assure

19   us that you will.  Is that right?

20       MR. MOSKOVITZ:  I assure you that appropriate action

21   will be taken by the administrative agency.

22       MR. VEEDER:  Thank you very much.

23       Now that we have taken care of the Sawdays, I think we

24   have made some progress.

25       THE COURT:  Well now, before I hear from you again, I

1   want to see if some other people want to be heard.

2          MR. VEEDER:  I was just going to sit down, your Honor.

3          THE COURT:  Mr. Dennis?

4          MR. DENNIS:  I represent the Santa Margarita Mutual

5   Water Company.

6          In view of the court's remarks at the close of this

7   morning's session, we ought to look at the last paragraph of

8   the judgment rendered by the Circuit Court.  The court did

9   primarily three things:  It reversed and remanded the

10  judgment entered against the State of California and the

11  Santa Margarita Mutual Water Company; it also instructed the

12  trial court to take further proceedings in accordance with

13  the opinion, and also to enter no judgment against the

14  defendant Santa Margarita or the State of California until

15  the entire suit can be disposed of.  So I think that that

16  injunction of the Circuit Court that the trial court should

17  take further proceedings in accordance with the opinion is

18  the particular facet that we should be considering today.

19         I have read carefully the memorandums filed by the

20  attorneys representing the Fallbrook Public Utility District,

21  the State of California, the Vail interests, and without

22  exception they all agree that certain principles of law have

23  been established by the Circuit Court to guide the trial

24  court.  The memorandum filed by the Government seems to take

25  the position that the only matter that was disposed of by

1    the Circuit Court was that it was error to enter a final

2    judgment against the Santa Margarita and the State.

3         I believe that there are certain matters in the opinion

4    of the Circuit Court that answer some of the primarily legal

5    problems that confronted us in the trial of the first law-

6    suit, primarily questions of prescription, the relevancy of

7    the Vail judgment against the Santa Margarita or any de-

8    fendant other than those who were parties to that stipulated

9    judgment, the possibility of the United States acquiring

10   appropriative rights without complying with the laws of the

11   State  of California, and the question whether a military

12   use is a municipal use or akin to a municipal use and whether

13   it is a riparian use.  Also, there were a number of state-

14   ments in that decision defining the measure of the United

15   States' right to use water by virtue of the riparian owner-

16   ship of land.  As to those particular questions, there seems

17   to be disagreement between counsel for the plaintiff and

18   counsel for the defendant as to whether or not any matters

19   were decided by the Ninth Circuit Court.

20        It seems to me that before we proceed further we should

21   be in agreement and that the court should make some ruling

22   as to how far the defendants and the plaintiff in the trial

23   of this action are going to be bound by those statements of

24   the Circuit Court.

25        The Circuit Court also stated that there were a number

of findings, declarations and conclusions that were not

supported by the record, and that to justify the entry of a

judgment against an appropriator the trial court is going to

have to make certain findings which it did not make at the

time the final judgment was entered against Santa Margarita.

I think that those findings should be discussed, because they

are going to have a direct bearing upon the evidence that

is going to have to be introduced.

The settlement of those provisions of the pretrial order,

I think, should also be arrived at before we proceed much

further, because a great many of those provisions are

historical data provided by the Government.  We have no

reason to believe that they will attempt, on the retrial of

this action, to establish the facts historically relevant to

the flow of the river as to the amount of water which has

been used, as to the place of use, as to what the water

was used for, was different than specified in the pretrial

order.  I think those things should be decided as soon as

possible.

I assume, from the language of the Circuit Court, that

while they ruled that it was error to enter final judgment,

they did not say that it was error to try the matter

separately as to Santa Margarita.  They stated that that was

a matter within the discretion of the trial court to decide

whether there should be separate trials, as I read the

decision.  I assume that because of the difficulties which
have been presented to the court by counsel for the Govern-
ment and by counsel for some of the defendants, it is now
apparent that many of the reasons advanced by Fallbrook and
by Santa Margarita in objecting to a separate trial of the
action as against those two defendants are valid.  It would
also appear that, in the discretion of the trial court, that
Santa Margarita and the State of California are going to have
to be retried.  I hate to say that.  I wish we could avoid it,
but it seems to me that it is inescapable.

I want to make this statement before I close, because
it has been made before the trial court with a different
judge on numerous occasions, and that is that the Santa
Margarita Mutual Water Company is only attempting to acquire
the right to put surplus waters to beneficial use.  They
have no problem so far as any riparian owner is concerned
upstream, or as to any of the appropriators who are now
appropriating water.

THE COURT:  Upstream or down?

MR. DENNIS:  Either upstream or down.  We are only
attempting to secure surplus waters of the Santa Margarita
River that may be developed by the installation of the dam,
which will result in seasonal storage.

Naturally, we would object to any riparian owner or to
any appropriator who has not at the present time constructed

1   proceedings for the impounding of water to construct

2   facilities on the river above the proposed points of di-

3   version by Santa Margarita to impound water for cyclic or

4   for seasonal storage.

5       However, Judge Yankwich held -- it was one of the few

6   points in which he sustained the position of the defendants --

7   that the storage of water for seasonal or cyclic storage,

8   either underground or in surface reservoirs, is not a

9   riparian right.

10      So that, so far as Santa Margarita is concerned, the

11   various small users present no problem.

12      I think, as the Ninth Circuit Court said, that the key

13   question in the case is, who had the right to store flood

14   waters for future disposition?  Vail, Santa Margarita,

15   Fallbrook, or the United States?  I think that is primarily

16   the problem.  I don't think that the Government is going

17   to obtain any substantial quantity of water by reason of

18   making the upstream riparian owners parties to this action

19   or by proceeding in trial against them.  The only thing that

20   they can do is by invoking the correlative rights of various

21   riparian owners to cut down substantially the amount of

22   water which those riparian owners are entitled to use on

23   their lands, if there were sufficient water to take care of

24   all.  However, that quantity of water is going to be small,

25   because the court's attention has been called to the fact

1   that the Santa Margarita is a stream of more or less inter-

2   mittent flow.   There are years when there are tremendous

3   quantities of water that flow through the stream into the

4   ocean -- there are months in the year when tremendous quan-

5   tities flow through the stream into the ocean.   But at the

6   time that those waters are present there is no use within

7   the watershed for those particular waters, and the only way

8   they can be put to use is to be recaptured and held for

9   cyclic or for seasonal storage, which is not one of the items

10  of the riparian right.

11      I think that Mr. Veeder in some of his statements this

12  morning is confusing the difference between the right of the

13  Government to use the water once it comes within the Camp

14  and that of a property right to compel the appropriators or

15  riparian owners upstream to allow those waters to flow into

16  the Camp itself.   For that reason, I think it is important to

17  both the small riparian owners and to the appropriators that

18  before we proceed much further in this matter that we estab-

19  lish to what extent the trial court is going to be bound by

20  the decision or by the statements of the Ninth Circuit Court

21  of Appeals and to what extent the United States of America

22  and the principal defendants, at least, are willing to pro-

23  ceed under the pretrial order heretofore made in this court.

24      I think that Mr. Stahlman's suggestion also is an

25  excellent one, that if this area is divided into two or

1    three subdivisions the Government will rapidly become very

2    disinterested in certain particular areas, primarily those

3    areas above the Nigger Canyon Dam in view of the fact that

4    the Nigger Canyon Dam, under the evidence in the case, is

5    impounding all of the surface and subsurface flow of the

6    Temecula Creek at that point.  In view of the stipulation

7    that exists between the Government and the Vails, I don't see

8    how they can be too concerned with the people in that area.

9    Because of the geological formations the lands upstream on

10   the Cottonwood, the Murrieta and some of the other streams

11   are in exactly the same position.  The Vails and the Govern-

12   ment are primarily interested in the flow from De Luz Creek.

13   The only point or area that I can see that there might be

14   any substantial difference of opinion in would be that area

15   that exists between the northern or northeastern boundary

16   of Camp Pendleton and the southwesterly boundary of the

17   Vail holdings.

18       THE COURT:  Well, we can take a short recess to give

19   the reporter a break.

20       (Recess.)

21       MR. DENNIS:  In view of a couple of questions that

22   were asked by some of the counsel representing the smaller

23   owners, I make the statement for Santa Margarita relative

24   to their position as to riparian owners, that also included

25   any overlying landowners.

1    THE COURT:  Up or downstream?

2    MR. DENNIS:  Up or down the stream.

3    THE COURT:  Mr. Stahlman.

4    MR. STAHLMAN:  If the court please, may I have per-

5    mission to file this substitution or association?

6    THE COURT:  It may be filed.

7    MR. STAHLMAN:  Your Honor please, extending the remarks

8    made by Mr. Dennis relative to the area north of the Vail's,

9    there is a lawsuit pending at the present time.  The title

10   of it is Barbee vs. Oviatt.  That suit is in litigation in

11   the state court.  Although the Vail Ranch is in Riverside,

12   the county line to the east of the Vail Ranch in San Diego

13   County is in that area -- in other words, that land in that

14   area is in San Diego County.  Therefore, that suit is pending

15   there.  But we have a situation where there are two suits

16   really pending for the same cause.  If this matter goes to

17   trial in which that land up there is to be litigated, those

18   suits will probably be merged.  Mr. Swing knows something

19   about that.

20   THE COURT:  That is a contest between two sets of owners?

21   MR. STAHLMAN:  Yes, and they involve the Vail's also.

22   There have been studies made by the Water Resources Board

23   prior to their filing their study in the two volumes you

24   referred to.  They also made a study in this area up here

25   north, and there are several defendants in that area,

1 including the Vails, who are parties to that suit which is

2 now pending in the court in San Diego County.

3     The only other remark I have to make, I neglected to

4 point out to your Honor that the statements of the matter

5 that Government counsel called your Honor's attention to

6 relative to this Sawday pumping, there are other riparians

7 downstream that that pumping interferes with.  There is no

8 right there.  These people would have liked to have stopped

9 them, but to go into the state court requires a bond on the

10 part of an individual in injunctive proceedings and they are

11 not financially able to do it.  But there is water being

12 pumped out of that stream and it is not only interfering

13 with Camp Pendleton but it is interfering with some of the

14 small riparian owners on the river.

15     THE COURT:  Are the Sawdays parties to this suit?

16     MR. STAHLMAN:  Yes, I think they are.

17     THE COURT:  Have they appeared here by an attorney today?

18     MR. NIELSEN:  No, your Honor.

19     MR. STAHLMAN:  I think Mr. Swing represented them.

20     MR. SWING:  I do not.  I think Luce, Forward, Kunzel

21 & Scripps had a man here this morning.

22     MR. NIELSEN:  I am here.

23     MR. SWING:  Do you represent the Sawdays?

24     MR. NIELSEN:  Yes.

25     MR. SWING:  That answers your question.

1    MR. STAHLMAN:  That is the Goodwins, the Sawdays and

2  several other real estate people from San Diego that are

3  taking that water up there.

4    MR. GROVER:  Your Honor, I am George Grover, appearing

5  for defendants Gibbon, Cottle and Reuter.

6    THE COURT:  Do you have any conflict of interest in this

7  case?

8    MR. GROVER:  I believe not, your Honor.  If your Honor

9  would like, I would file a --

10    THE COURT:  Well, that is an inquiry for you to make

11  in the first instance and not for me to make.

12    MR. GROVER:  Yes, I believe it is understood by every-

13  one.  I will make a double check on it, if your Honor thinks

14  proper.

15    At the risk of repeating a little, I do think there are

16  some realistic approaches that can be suggested.  First of

17  all, everyone decries the position of the small user, but

18  no one, to my mind, has come up with any concrete suggestions

19  about what to do about it.  We are very encouraged about

20  your Honor's attitude, and I don't want to suggest that your

21  Honor will in any way prejudice them any more than Judge

22  Yankwich did, but at the same time I think that affirmative

23  action can be taken to do something about it.

24    In the first place, it seems to me that the lawsuit,

25  as it was brought, as a vast watershed litigation, was

1  absolutely wrong.  It was perfectly within the rights of the

2  United States to sue everyone in the watershed.  They could

3  sue everyone in the Mississippi Valley, if they wanted to.

4  But it seems to me absolutely absurd to initiate this kind

5  of litigation.  It is, legally, impossible to sue 3,600

6  or 4,000, as someone suggested, if they had to include

7  everyone.  But it is too burdensome.  I don't believe the

8  interests of the United States are advanced by including so

9  many defendants whose rights are simply not substantially

10  in conflict with those of the United States.

11      Now, the opinion of the Ninth Circuit is to the effect

12  that if you are going to have a watershed adjudication you

13  can't leave anyone out.  But there is nothing in the opinion

14  to suggest that you can't have a limited water suit among

15  certain important parties whose interests substantially take

16  care of the major controversy.  And it seems to me that one

17  thing that could be done here would be to have the United

18  States limit its action to certain definite parties, to dis-

19  miss as to the others, and not have a watershed adjudication

20  that involves thousands who cannot, economically, represent

21  their interests.

22      THE COURT:  Let me interrupt right there.  I heard Mr.

23  Veeder talk about dismissing as to certain people.  But as

24  long as the Complaint talks about the entire watershed, it

25  seems to me that the Government's action -- this is very

1    tentative -- will have to be limited both as to the physical

2    area they are talking about as well as the limitation of the

3    defendants.  You talk about the watershed, but you say that

4    we are not going to serve a bunch of people who live up in

5    this northeast corner of it.  Well, then eliminate, by

6    geographical limits that part from your suit.  That is some-

7    thing you have to give some consideration to.

8         MR. GROVER:  But after all, the water comes down to the

9    United States at a certain point on the stream, and if they

10   had a lawsuit against certain people upstream whose rights,

11   not necessarily even within the watershed -- there might be

12   prescriptive rights in taking out of the watershed --

13        (Mr. Grover conferring with Mr. Swing off the record.)

14        MR. GROVER:  Mr. Swing says the Complaint is limited to

15   the river and its tributaries, that is, to the stream.  The

16   fact that the stream      , has a watershed seems to be

17   incidental.  There is certain water coming down toward the

18   Government's reservation and certain people might or have

19   interfered with the Government's rights and the Government

20   can, by suing those people, determine their right to take

21   water from that stream, and it is not necessary to adjudicate

22   everyone's rights.

23        Now, the Government apparently is unwilling to do this,

24   and it seems to me that if your Honor should agree with me

25   that something like that, some sort of limitation on the

1   Government in the nature of its action and the quantity of

2   people served, something like that would be appropriate, that

3   your Honor could use your good offices to persuade the

4   Government to do something like that.

5        I imagine at this stage perhaps the Government was a

6   little aghast at Judge Fee's statement that more people

7   should be served.  I am not sure, but it impresses me that

8   they perhaps don't care for that.  But at the same time

9   they do appear to want everyone in it, and if we could per-

10  suade --

11       THE COURT:  Well, I have your point.

12       MR. GROVER:  Yes.

13       Now, the second point, your Honor, is that even if the

14  Government is satisfied to dismiss as to some of these

15  people, or even if we could, as the Government representative

16  has suggested, agree upon the water right of a particular

17  person, there is a ruling of Judge Yankwich which makes it

18  virtually meaningless to settle with the Government, and

19  that is his ruling announced several times that there are no

20  more pleadings in the case -- everyone is a defendant and

21  cross-defendant, plaintiff and cross-complainant against

22  everyone else.  In other words, if my three little people

23  settle with the Government, that is one down and 3,599 to

24  go, and I think your Honor could right at this stage serve

25  these little people if you would rescind Judge Yankwich's

1    ruling and limit the issues to the pleadings.  Those who

2    want to cross-complain, let them cross-complain; but those

3    whose only interest is to defend them against the Government,

4    allow the opportunity to get out of the case if they can

5    settle with the Government.  I think that would be a real

6    contribution.

7        As to the issues in the opinion that remain, I think

8    again we can be a little bit realistic.  In the first place,

9    I do not believe, with all due respect to Judge Yankwich,

10   that his pretrial opinion on the legal issues was suf-

11   ficiently specific, and there are several issues which, if

12   decided right now, would do a great deal to shorten the

13   lawsuit, because in realistic terms it would, I think,

14   settle the substantial controversy:

15       1.  May the Government, under claim of riparian right,

16   use water on nonriparian land?  I believe that it is

17   apparent, from Judge Fee's opinion, that the Government

18   cannot, and yet that was never specifically determined.

19   If your Honor would make a ruling on that that they cannot --

20   I don't think there is any question about it -- or if the

21   Government would concede that they cannot, I think then

22   these areas outside the watershed would be limited, of

23   course, to prescriptive or appropriative rights, and that

24   would be a substantial advance.

25       2.  May the Government store, under claim of riparian

right -- that is, hold water for a later period?  That was

one of the issues which I don't believe Judge Yankwich

settled clearly enough, but which I think is suggested as to

settlement in the opinion of Judge Fee, and if not then

whether it is the law of the case or not let us have an early

ruling on it so that we will know whether or not the Govern-

ment, under its riparian right, may build even a small dam

or, as it was proposed in the first trial, spread water

slowly into the basin through little check dams for storage

underground in the natural basin.  I think if we could do

that we would very materially aid the case.

3.  This is one Judge Fee did expressly reserve judg-

ment on, I want to point out:  May the Government, as a

downstream owner, gain prescriptive rights?  Now, although

the Ninth Circuit did not pass on it, I think the issues are

clearly before the court.  It wouldn't take any further

briefing to present that issue.  We cite ten cases in the

appellant's brief to that effect.  The Larsen case was cited

by the Government.  I don't think there is anything more to

be said on it.  But a ruling would be of inestimable value

at this time. If the Government, as a downstream owner,

cannot gain prescriptive rights, then of course its position

is just that much more clear; and if the Government, as

sovereign, as Judge Fee suggests, cannot gain prescriptive

rights because no one can sue them to prevent their taking

1   the water, then that would be of great benefit if that could

2   be settled now.

3       Finally, if the Government must file an appropriation

4   to become an appropriator, that should be determined, it

5   seems to me, at an early date.  The suggestion was made, for

6   the first time, I believe, on appeal, that the Government did

7   not have to comply with state appropriative procedure in

8   order to gain an appropriation.  If that could be settled,

9   that would greatly aid.

10      Now, the reason I suggest these issues is that I believe

11  from what came into the case before, that if the Government

12  cannot use on nonriparian land under riparian right, and if

13  the Government cannot store under riparian right, and if the

14  Government cannot gain a prescriptive right as a downstream

15  user and as a sovereign, and if the Government must file to

16  gain an appropriation then the Government is in such a bad

17  position by that time that they are not going to have enough

18  water without going to the State Water Rights Board and

19  pursuing their appropriative claims.

20      Now, that is the real heart of the Government's position.

21  That is the water that they need -- the water that they file

22  on, the water that they still seek to store; and if that be

23  so, then these little users, who are not involved in these

24  appropriations at all, will not be burdened by a trial on

25  all kinds of riparian claims that will not help the

1   Government at all because the Government will still need

2   more water.  And as a suggestion as to what we should do

3   right now, it seems to me that we might have those issues,

4   if necessary, briefed; if not, passed on by the court on the

5   record as it stands and we will know where we stand on

6   those, and the Government may, in the light of adverse

7   rulings on those issues, wish to deal with the prior

8   appropriators or to contest who is the holder of the best

9   appropriative right.

10      THE COURT:  Or they might be more interested in talking

11   about a physical solution.

12      MR. GROVER:  Yes, your Honor.  And of course, the court

13   does have the right to review, in a sense, any action by

14   the State Water Rights Board in that if the water right,

15   your Honor, in this case is adjudicating what the effect

16   of the various rights is, but the initial ruling on the

17   granting of a permit would be made by the State Water Rights

18   Board.

19      THE COURT:  Well, to carry your thought a step further,

20   there are the names, of course, on record of all the persons

21   who have appeared in pro per or otherwise and if a date of

22   hearing were fixed the Government could notify everyone that

23   on a certain date certain issues would be argued and that

24   the court might be ready then to decide these issues.  As a

25   result, everyone would have notice of the hearing and if a

1    decision was made as part of pretrial on some of these issues

2    I would assume many of these small people would stay away

3    from that kind of hearing on the ground that they couldn't

4    add much to it.

5        MR. GROVER:  Certainly.  That is exactly the type of

6    procedure that I think would get us started the quickest.

7        I have only one other point, your Honor.  In the order

8    that was sent out the other day it said that the major parties

9    should serve and file a memorandum.  I left the office before

10   the mail was in this morning.  I wonder if that meant to

11   serve upon themselves or upon all counsel of record or upon

12   all parties, and I wonder if in the future, your Honor, even

13   where such memoranda are limited to the major parties, would

14   provide that other counsel receive copies even if not all

15   of the 3,000 defendants receive copies.  That way we could

16   at a distance perhaps keep up with a little less expense

17   than by attending all of the hearings.

18       THE COURT:  Does someone else want to be heard before

19   we start to see if we can pull some things together?

20       MR. BERREY:  Your Honor pleases, I am Mr. Berrey,

21   representing several of the school districts, a couple of

22   small teaspoon users, incidentally.

23       Someplace along the line these myriad defendants are

24   going to have to learn whether or not they are really in

25   contest with the Federal Government or adverse to them, and

1  in that I refer to the physical factual situation that per-

2  tains to each of their properties.  For example, I represent

3  a school district which, I understand, is riparian, at least

4  in part, to Fallbrook Creek, which as a well with which they

5  irrigate some avocado trees.  I don't know whether there is

6  any argument between the United States and myself on the

7  facts.  They have advised me and I propose to contact Major

8  Bowen and ascertain what their position is and what investi-

9  gation they have made with respect to these properties and

10  see if there is a dispute.  It may well be that sometime

11  the Government is going to have to state its contention with

12  respect to each of the properties, state what their position

13  is, and perhaps it will be discovered that in a great many

14  instances there is no argument at all.

15      THE COURT:  Anyone else?

16      MR. VEEDER:  May I make one or two observations, if

17  no one else --

18      THE COURT:  Yes.

19      MR. VEEDER:  And then I will make a brief response.

20      I have grown a little wearied about the attack on the

21  United States, because there hasn't been --

22      THE COURT:  Well, let's skip that.  I don't care whether

23  you are weary or not.

24      MR. VEEDER:  The thing that is important, your Honor --

25      THE COURT:  I don't care whether you are weary or not.

III

1      If you have a point, make the point.

2           MR. VEEDER:  I have a point.

3           THE COURT:  All right.

4           MR. VEEDER:  The thing I would like to raise here is

5      that the United States opened an office up at Temecula.  We

6      tried in every way to afford opportunities to these small

7      users to come in and work out a settlement.  We have also

8      provided assistance wherever we could of engineering advice.

9      We continue to offer that service.

10          Now, I turn to these propositions --

11          THE COURT:  What notification has ever been given to

12     defendants and landowners throughout the area that you have

13     such an office open and that engineering information is

14     available?

15          MR. VEEDER:  We have repeatedly told anyone that was

16     interested that could be represented by counsel, we have

17     told innumerable people in the area --

18          THE COURT:  Well, just as you run onto them?  No notice

19     has ever been sent out?

20          MR. VEEDER:  No, your Honor, our people went out and

21     contacted the people in the area, went onto their land and

22     worked with the people.  That service is now available, and

23     I don't believe there is anybody in the valley that doesn't

24     know that.  I think that there is every opportunity to be

25     heard in that connection and I certainly feel that the

1    United States in this litigation has leaned over backwards

2    in that connection.

3        I wish to allude, however, at this point, to some of the

4    other factors that were raised in the arguments today in

5    regard to surplus.  I don't believe that there was ever a

6    case in water litigation where the matter of surplus needed

7    to be adjudicated.  I don't believe it is needed to be

8    adjudicated now.  They can chronicle the rights of all

9    parties in the normal procedure.  If there is any surplus,

10   by all means let the appropriators have it.  It's that simple.

11   So, so far as surplus is concerned, I believe it is an

12   academic question, your Honor.

13       In regard to the United States claiming the right to

14   use riparian water out of the watershed, to my complete

15   amazement, I have never heard it asserted by the National

16   Government that we could use water outside of the watershed.

17   We do not claim that we can.

18       THE COURT:  Well now, let's stop right there.  You

19   concede that you cannot use water outside the watershed by

20   virtue of your riparian rights?

21       MR. VEEDER:  Why, we have always said that, your Honor.

22   It has never been the contention.  I am surprised at Mr.

23   Grover's comment on it.

24       THE COURT:  Therefore, when you use water outside of the

25   watershed you contend that is water to which you have a

1    prescriptive right?

2          MR. VEEDER:  We have either appropriated it or we have

3    a prescriptive right to it.  We do not claim it.

4          THE COURT:  You claim it on no other basis?

5          MR. VEEDER:  Of course not, your Honor.  There are a

6    few things that are elementary in this business.

7          THE COURT:  Well, let's have that put down in writing

8    in the file in this case.

9          MR. VEEDER:  All right, we will put it down in writing.

10   It is in writing, your Honor, and it has always been agreed

11   to by us.  We have never claimed or asserted that we could

12   use riparian water off the riparian land.  It is impossible.

13   We know that.  We have never asserted that we could have

14   seasonal storage.  It is not part of the riparian right.  We

15   know that.  But it's something -- well, I won't say.

16         THE COURT:  Well, what were you going to say?

17         MR. VEEDER:  Well, your Honor said you didn't want to

18   hear me say that I was weary and I'm not going to --

19         THE COURT:  What is your claim as to your right to store

20   water?

21         MR. VEEDER:  We do claim that there can be regulation

22   in the utilization of that water, and we do claim that we

23   can control the water when it comes down for the purpose of

24   making a greater utilization of it.  Now we are perfectly

25   willing to litigate that.  We say that is part of the

1  riparian right.  But we have never claimed that we could

2  carry water from season to season, under our riparian right.

3  It has never been asserted.

4      THE COURT:  Then you contend that you can carry it

5  within the seasons of the year, is that it, but not from

6  one year to the next?

7      MR. VEEDER:  I am not going to be specific in the

8  periods, your Honor, because it is going to be governed,

9  to some extent, by physical facts.  But we do say that the

10  cyclic storage is not part of the riparian right and we

11  have always recognized that.  On the other hand, there are

12  cases that support our proposition that there can be a

13  temporary control, a storage, if you please, during the

14  period when the riparian water is available, and that is the

15  extent of the claim we have made there.

16      THE COURT:  If you do that, you still concede that you

17  may only put that to riparian uses within the watershed.

18      MR. VEEDER:  That is correct, your Honor.  It would be

19  impossible to claim it.  Otherwise, we have never made such

20  an assertion ever.  We do claim that we have a prescriptive

21  right to store water at Lake O'Neill.  We claim that, and

22  that is a storage right.

23      THE COURT:  To whom does Lake O'Neill belong?

24      MR. VEEDER:  To the United States of America, your

25  Honor.  It has been used by Rancho Santa Margarita and the

1   United States since 1886.  Now that is an appropriative right

2   in any sense of the word.  It is likewise, in our opinion,

3   a prescriptive right.

4   Similarly, in regard to the use of water outside the

5   watershed, we are saying that that is an appropriation.  We

6   say that moreover we have used it outside the watershed for

7   the prescriptive period adversely.  So we are making those

8   claims.

9   THE COURT:  You make that claim as a result of the use

10   of the United States since 1942, or do you make that claim

11   as a result of rights you acquired from the Rancho Santa

12   Margarita?

13   MR. VEEDER:  We make the claim that (1) Rancho Santa

14   Margarita was using this water outside the watershed at the

15   time we acquired it and we continued to use it outside the

16   watershed for far beyond the prescriptive period, and we

17   insist that we have that right to continue that use.

18   In connection with the references to parties, I believe

19   that Judge Fee was correct on the one point that we thought

20   he covered, and that is having everybody before the court.

21   We have followed the established procedure of naming all

22   parties in the watershed.  I know of no other way of trying

23   this lawsuit.  It is true that we will probably find, that

24   is, as a physical fact, that some of the landowners could

25   not, under any conceivable circumstance, utilize any

1   Santa Margarita water.  Under those circumstances, we are

2   perfectly willing not to include that land in the litigation,

3   and we believe that that comports fully with the rationale

4   of Judge Fee's opinion.  We don't believe that there is any

5   need, in certain instances, of joining certain parties,

6   although they are within the watershed.  On the other hand,

7   the watershed is of such character and the physical

8   phenomena are such that we have considered it essential to

9   have many of these parties joined who are called "tea cup"

10  users.  Well, if they don't claim any water against us, that

11  is all right.

12      But your Honor touched on a point that I think is ex-

13  tremely important, and I don't want anybody, when judgment

14  is entered against them, to feel that they have been imposed

15  upon.  Now, if they come in and simply claim a right but do

16  not set up their right and we proceed, as I think we can and

17  shall, to prove our affirmative case, then we are entitled

18  to judgment against them.  That is the reason why we think

19  it is essential to set up their rights.  If they don't want

20  to, that is up to them.  But the consequences can be very

21  severe if they didn't plead and set up their rights, because

22  they couldn't put in proof.  But again, that is a matter for

23  them to consider.

24      THE COURT:  Are you talking about pro per defendants

25  now?

1    MR. VEEDER:  Yes, or anyone else, your Honor.  The thing

2    that has concerned us, in that connection, and again in our

3    effort to assist and cut down the cost for these small users,

4    we have undertaken to investigate, to the fullest extent

5    possible, the kind and character of their rights.  But a

6    gentleman just asked me a few moments ago, would I agree as

7    to whether they had riparian or prescriptive rights or

8    whether they had percolating rights?  It is certainly not for

9    counsel for the Government to tell a man what kind of rights

10   he may or may not have.

11       THE COURT:  Well, after you told him, he might be con-

12   tent.  If you told him that the only kind of right we assert,

13   as far as we are concerned, that you have is a right to

14   percolating waters, he might then be content and say, "Well,

15   that is the right I will claim then."

16       MR. VEEDER:  Well, your Honor, so far as I am concerned,

17   I rather enjoy representing the United States, but I would

18   never undertake to tell another man what kind of rights he

19   has.

20       THE COURT:  You could be required to state what you

21   contend the rights are.

22       MR. VEEDER:  Yes, I could, and if your Honor were to

23   order us to do that I would.  But I think it would be very,

24   very bad for us to go and tell a man, "I think you have a

25   riparian right," when as a matter of fact he might find out

1    that he did not.  I think many times we can recommend to

2    them in regard to the physical situation, the acreages, as

3    we have done with many of the clients of -- well, I think,

4    of all these gentlemen -- we have advised them in regard to

5    the physical matters.  But when we come down to saying, "We

6    think legally these are your rights," I think that is a risk

7    we should not assume.

8        Now, in regard to propositions that I had asked Mr.

9    Moskovitz about, Mr. Grover touched upon them.  I think it is

10   a highly important legal question as to whether the United

11   States of America must make a filing to acquire an appropria-

12   tion.  We have asserted from the outset -- we asserted it,

13   I think, in the first pretrial conference held in 1951, that

14   the United States claims that it had acquired rights by use.

15   We don't believe we need to make a filing to acquire the righ

16   to use water outside the watershed.  We continue to take that

17   position.  If somebody wants to have a ruling in advance of

18   trial, that suits me very well.

19       In regard to the Government having rights as a sovereign

20   we again say that we could not broaden our rights by reason

21   of our sovereignty.  We have never asserted that at any time.

22   We have said that in the utilization of the waters within

23   the enclave we are not subject to police control, but that

24   does not broaden our right to claim that water must be

25   delivered to us from upstream users.  We have never made

1      such assertion, and we do not make it now.

2            Now, in regard to the question of the acquisition by

3      prescriptive rights, the matter was left, in our view,

4      entirely open by Judge Fee.  If, however, his statement that

5      the National Government cannot acquire a prescriptive right,

6      we will ask this court for leave to argue the proposition.

7      We do not believe that the law of the case is so binding,

8      even under those circumstances, and assuming that it is the

9      law, that we would be precluded from being heard on the

10     proposition.  We can show adequate authority to the contrary.

11     And again, if it is desired to have a ruling in advance of

12     trial on that, why that is fine with us.  We are very much

13     in favor, we are very sure of our position in these matters.

14     We are continuing to insist that the National Government

15     acquired rights and should be protected in them.

16           Now, in regard to the task that your Honor said that he

17     might request us to undertake, if there is briefing or

18     anything like that we will be glad to proceed on that basis

19     if there are to be any rulings in advance of trial.

20         THE COURT:  Mr. Burby.

21         MR. BURBY:  Your Honor, it is a surprise to me that so

22     many different views should arise from one single decision.

23     In a case of that kind, it seems to me there is either

24     something wrong with the decision or wrong with the people

25     who read it.  But it seems perfectly obvious to me that the

1   Circuit Court expressly repudiated any idea of deciding

2   facts.  It expressly states that criticism of the decision

3   might subsequently prove to be unjustified.  However, I do

4   agree with the gentleman, I believe representing the State,

5   and Mr. Dennis, that the court pictured the thing that is

6   taking place here today, and that is that new proceedings in

7   connection with this litigation and made an attempt to out-

8   line for the court and counsel some of the things that might

9   arise and help guide in determining those matters.

10      Now, as to the alleged settlement discussions, I was

11  present at the time of the discussion with Mr. Swing, and as

12  I understood his statement it was that the waters were to be

13  divided 60-40, 60 in favor of Fallbrook, and that he would

14  by agreement protect the United States Government with respect

15  to (1) riparian rights, (2) appropriation, (3) prescription

16  or use, and it was on that basis that there was some pro-

17  longation in connection with the discussions until it was

18  discovered that he had in mind, apparently, a division on

19  the basis of 60-40 of all water available.  So in that re-

20  spect I certainly agree with what Mr. Veeder has said; that

21  was the basis upon which the negotiations were conducted.

22      Mr. Veeder observed that the United States Government

23  never has contended that riparian use was proper in connec-

24  tion with water outside the watershed.  There is no doubt

25  about that.  They may, of course, by appropriative rights,

1    prescriptive rights, based upon use, and he made mention

2    particularly of Lake O'Neill, and while I do not know that I

3    am speaking for Mr. Veeder I, personally, feel that the

4    United States should reserve the right to argue the point

5    in connection with Lake O'Neill. Because of the long condi-

6    tion that has existed there, that Lake has taken on the

7    aspects of a natural condition, to which riparian rights

8    would attach. At least, that is a possibility. There are

9    cases in California definitely supporting that view, and I

10   feel that that point should at least be reserved for possible

11   argument.

12        In connection with the issues, as the court observed,

13   I think most of them have been mentioned. I believe there

14   should be some further discussion as to the prescriptive

15   problems. I think there should be discussion as to whether

16   or not the United States could acquire rights without filing

17   an application by appropriation and the extent to which

18   military use qualifies as a proper riparian use to the extent

19   that it is used on the watershed. The question of storage,

20   to which I have just referred in connection with Lake O'Neill

21   and as a matter of fact and in conclusion without burdening

22   the court further, it seems to me that the big problem in

23   the case is perhaps what is meant by "surplus." It seems to

24   me there may be differences of opinion on that and perhaps

25   briefs on that question might be of help to the court on that

          Thank you.

1    THE COURT:  Well, I am going to be away, as I think most

2  of you know, during June and July.  I had no vacation last

3  year and it has been four or five years since I have had my

4  30 days.  I am going to Europe and I am taking 60 days.  I

5  will be gone from the end of May to the 1st of August.  I

6  will be back here about the 1st of August.

7    I have in mind certain tasks or things I want done.  I

8  don't intend to decide anything today.  This hearing was not

9  noticed to the pro per defendants.  It is more of a conference

10  of persons who have appeared by attorneys to explore what we

11  could do, and I will try in the next 30 minutes to see what

12  we can shake down out of it.

13    First of all, see if we can get a list of those who might

14  be called the major parties:  the United States, Fallbrook

15  Public Utility District, Santa Margarita Water District,

16  State of California, the Vail interests.  Who else should be

17  added to that list?

18    MR. VEEDER:  The Oviatts are large claimants upstream.

19  I think the Barbees are substantial claimants.

20    THE COURT:  Are they here by counsel today?

21    MR. VEEDER:  I don't know.  I think the Barbees are

22  represented by Mr. Swing, are they not?

23    MR. SWING:  They are.

24    MR. VEEDER:  I don't know that counsel for the Oviatts

25  are present.

1          THE COURT:  Who else?

2          MR. VEEDER:  There are the Pankoniens.  There are very

3     many.

4          MR. STAHLMAN:  The Quarry property?

1    MR. VEEDER:   Yes.   Is that the name?

2    Your Honor, would it be permissible to do this?  We can

3    list and submit to you the claimants, as we see them, in what

4    we call the critical area and up and down the valley who are

5    in immediate conflict and who are very substantial users.

6    That might be of assistance to you.   I would hate to attempt

7    to name the parties, because I don't know.

8    THE COURT:   Well, I have a pretty good idea.   I was

9    thinking of a little different angle on it, but I will pass

10   that for the moment and start out this way:

11   Number one, I would like an order drawn up on the basis

12   of what we do here today and I would like it served on every-

13   body in this case, pro per and all.   When the form of it is

14   settled, you can mail it out to everybody.

15   Number two, in that document I would like the Government

16   to set forth -- in other words, it should be an order -- one

17   paragraph of this order should be that the Government is

18   directed to set forth the name and address of this office in

19   Temecula, what facilities are there, when the office is open --

20   what days of the week, what hours -- how to make appointments,

21   so that these small people, if they are interested in seeing

22   what you have, can come in and look over your material or

23   talk with someone on the Government's side of the case.

24   Number three, I would like the Government to prepare me

25   a summary of this case to date in chronological order,

125

1   eliminating all such things as the filing of answers and sub-

2   stitution of attorneys and all of that, but what has gone on.

3   I discover now for the first time, apparently, that Judge

4   Yankwich has made an order that all the pleadings in the case

5   are to be considered adverse one to the other, and what the

6   effect of that order is I don't know.  I therefore want some

7   summary of what orders and rulings have been made in this

8   case up to date.  I don't think it would be a big task.

9   There may not be very many of them, but that particular one

10  caused me to think that I want to know more about this.  Have

11  I been specific enough in that?  I am particularly interested

12  in what procedural things have gone on in this case that I

13  don't know about.  I don't intend immediately to go through

14  this long file to find out.  If I am later on interested in

15  some of them, I will check into them.  But I think that is a

16  task that the Government can well take on.  I want the rulings

17  that have been made -- in other words, what is the status of

18  this case as it comes to me?

19      Number four, this offer that was just made to supply the

20  court with a statement of the major parties and their interests

21  and some picture on that.

22      MR. VEEDER:  Your Honor, I am not sure that we can show

23  you the interests.  We can give you the names.  I would hesi-

24  tate to outline what I think their interests are.

25      THE COURT:  Well, eliminate the interests, but I thought

1   you told me you could advise, for instance, what streams they

2   are on.

3       MR. VEEDER:  We will undertake to do that, yes.

4       THE COURT:  With whom they are in conflict.

5       MR. VEEDER:  I wouldn't undertake to do that.  I

6   wouldn't know.

7       THE COURT:  What can you tell me about these parties?

8       MR. VEEDER:  We can give you the names of the parties,

9   and we can give you the points of diversion and, as nearly as

10  possible, the places of use, and we  would do that without

11  prejudice, I hope to ourselves.  But I would be reluctant to

12  undertake to point out to your Honor the interests of those

13  parties, because I think that is a matter to be determined.

14      THE COURT:  All right, for the time being, limit it to

15  what you have indicated.

16      It seems to me that the court could also direct that

17  certain of these major parties should meet and tentatively

18  frame some issues which I could incorporate in a subsequent

19  order and have you brief them and be ready to argue them

20  sometime late in August or September.  I am trying to think

21  how this could be done.  If I knew more about this case, then

22  I could, off the cuff here, state these issues for you, and

23  then notice could go out to everyone that they would be

24  briefed and they would have a chance to be heard on them.

25  Maybe I can decide some of these issues in August or

1  September, if we can formulate them before that time, notify

2  the people that they are going to be heard on a certain date,

3  and meanwhile let them be briefed by anybody who wants to

4  brief them, but particularly briefed by the major parties.

5  The major parties here I can direct to file some briefs.  I

6  am not going to require some of these small landowners to

7  file briefs, but they should have an opportunity to be heard,

8  if they want to be heard.

9      To get on with that, I can make the suggestion that

10  within the next week there be a meeting between the represen-

11  tatives of the United States and Fallbrook, Santa Margarita

12  Water District, State of California and the Vail interests,

13  at least, to see if they could frame certain issues which I

14  have in mind, which I will enumerate, at least in rough style,

15  and submit to me some kind of a proposed order which, if I

16  don't like, I will redraft myself, the gist of which would be

17  that the court was going to consider these issues at some

18  hearing date to be fixed late in August or September and that

19  meanwhile interested parties might file briefs.

20      We have the question as to who these briefs would be

21  served on.  For the time being, I will toss that into the

22  laps of the "Committee," as it were, to decide that, to make

23  some suggestion to me.  That is a major problem as to the

24  serving of briefs.  We can kick that around a minute now.

25  I visualize something like this.  Notice could be sent out

1    by the Government to everybody who has appeared in this case

2    that on a date in September, we will say, the court would hear

3    arguments on some of these problems:

4         The purported right of the Government as an appropriator

5    without complying with the state provisions on appropriation;

6         The purported right of the Government to certain pre-

7    scriptive rights in Lake O'Neill or elsewhere, for the purpose

8    of deciding whether or not the Government could acquire

9    prescriptive rights either for its own activities or claimed

10   prescriptive rights which had been acquired by some predeces-

11   sor in interest of the Government;

12        This claimed right of the Government to store -- the

13   Government disclaims on a carryover basis from year to year,

14   but to store and spread within a year's period, as nearly as

15   I can get your contention, Mr. Veeder, and when done that

16   feeds the riparian rights of the Government;

17        The right of the Government to use water  for its

18   military establishment as a claimed riparian right.

19        I take it that you concede that if it is used in an

20   establishment outside the water shed it is not a riparian use;

21   is that right?

22        MR. VEEDER:  Well, yes, your Honor.  We couldn't use the

23   water outside.

24        THE COURT:  If it is used within the water shed, you

25   contend that that is a riparian use?

1      MR. VEEDER:  Yes.  But outside, we don't claim that it

2   is a riparian use.

3      THE COURT:  There are four or five major issues that

4   underlie this whole case.  What I am thinking about is sending

5   out a notice to all parties who have been served in this

6   case that on a certain date, we will say in September, this

7   matter is going to be heard and argument is going to be had.

8   Query:  What can we do about briefs?  Do you have an sugges-

9   tions?

10      MR. NIELSEN:  I would suggest that briefs be sent only

11   to people who request them, attorneys or otherwise, with a

12   specific request being made by them in order for them to be

13   served with briefs.

14      THE COURT:  Well, you mean that the notice say that any

15   person who wants copies of briefs may write in and get them,

16   or something like that?  Is that what you are talking about?

17      MR. NIELSEN:  No, I didn't have in mind that fashion,

18   your Honor, but that some reference be made to the attorneys,

19   at least a notice be sent to all counsel representing parties

20   that briefs would be sent only to those counsel specifically

21   requesting them.

22      THE COURT:  We have not so much a problem with counsel

23   who have appeared.  That is bad enough.  I am thinking about,

24   what about a hearing where these other parties or defendants,

25   without giving them copies of briefs that you present to the

1    court -- does anybody have any suggestion on that?

2        MR. BURDETTE:  It might be a suggestion that each party

3    preparing and filing a brief be also required to deposit one

4    at this United States office in Fallbrook, where any in-

5    terested party could call and read it.  That would at least

6    be an opportunity for unrepresented defendants to read the

7    briefs.

8        MR. LINDLEY:  I can see the problem involved, but I

9    can't see, for the life of me, why a defendant who appears in

10   propria persona is not entitled to information as to all pro-

11   ceedings in the case just as much and just as fully as if he

12   appears by an attorney.

13       THE COURT:  That is the problem that is bothering me.

14   What can we do, as a practical matter, there?  If Mr. Stahlman

15   files a brief on an issue, does that have to go out to every

16   one of these 3,600 defendants?

17       MR. LINDLEY:  Maybe they would dismiss 200 defendants.

18       MR. MOSKOVITZ:  It seems to me that the suggestion of

19   the gentleman over there could well be used.  You are going

20   to be sending notices to the 3,600 defendants and you could

21   request them to notify the clerk by return mail or within a

22   reasonable time if they want to receive a copy of the briefs

23   that will be submitted.  You can expect that relatively few

24   would want that -- at least we would hope so, and that those

25   be served.

1    THE COURT:  Mr. Veeder, you, representing the plaintiff,

2  brought this lawsuit.  What do you suggest about this?

3    MR. VEEDER:  My only experience is that the average small

4  user in this kind of litigation is not interested in receiving

5  a long brief.  We encounter this.  It is nothing unusual.

6  The practice as it has been followed in cases such as the

7  Carson River in Nevada and elsewhere is that only counsel have

8  been served with copies of the briefs.  There has been no

9  attempt to get copies to all parties.  As a practical matter,

10  I don't believe it entails in any way a deprivation of due

11  process.  I believe that if someone shows up and desires to

12  have a copy of the briefs, by all means give it to them.  But

13  I think most of the important parties litigant will naturally

14  be served and they will receive copies of the briefs.

15    I think your idea of mailing out notices to all parties

16  is desirable, and I think in that notice we should state that

17  briefs will be prepared and copies will be available if the

18  people call for them at the clerk's office, or I think it

19  would be better to have them call at the clerk's office.  But

20  certainly we shouldn't undertake to serve all these parties

21  with copies of all the briefs.  Maybe Mr. Swing disagrees with

22  me -- he has a pained look on his face.  But if he wants to

23  serve all those parties, that is up to him.  But I don't

24  believe it is in derogation of their rights if we don't.  We

25  look at this litigation as a normal lawsuit, and there are

1    many times when the people would not be interested.  If they

2    are notified and given an opportunity to be here for the

3    arguments, and if they desire briefs at that time give it to

4    them.  But certainly not mail it to all of them.

5         MR. STAHLMAN:  I think that they should be notified that

6    the briefs are on file in the clerk's office and if they

7    want to come down and read them they may come down and read

8    them.

9         THE COURT:  Well, as of this date, if the clerk's count

10   is right, there have been 64 counsel who have appeared in this

11   case.  What do we do there?  Does Mr. Stahlman serve 64 copies

12   on all of the counsel who have appeared in this case?

13        MR. SWING:  It seems to me that the technical legal

14   rights of all parties are protected when they are notified

15   that on a certain day in September your Honor is going to hear

16   the arguments presented on the principal issues of the case

17   and the fact that written briefs have been handed to you

18   either at the time of the date of the hearing or in advance of

19   that time.  They will be present and they can hear the

20   arguments and at that time they should not be denied the right,

21   if they are capable of doing so, of presenting their views in

22   opposition to those that are presented by the five principal

23   parties.  I think that would take care of the technical legal

24   rights of anybody.

25        THE COURT:  Well, the Committee will take this over and

1   see what you can figure out.  It may be that you can provide

2   in this prospective order that the court will direct that all

3   the counsel filing briefs serve them upon all other counsel

4   in the case, but that the court directs that persons appearing

5   pro per need not be served.  However, that briefs may be

6   obtained upon request from the clerk's office.

7        And of course, the notice will provide that a hearing

8   will be held on a certain date, and if they can be present

9   they have a right to be heard, and see what we can work out

10  on that.

11       At any rate, you have the issues in mind which I think

12  should be listed for that hearing.

13       There should be listed the further issue of the effect

14  of the Circuit's decision -- there have been briefs filed

15  already on that; that goes hand in hand with these other pro-

16  blems -- the effect of the Circuit Court's decision on these

17  issues, and these issues themselves.  When I get around to

18  deciding them, we will have them before us.

19       . I will tell you, tentatively, that I probably will re-

20  decide many of these issues myself.  On the other hand, I will

21  find the Circuit Court's decision very persuasive in the de-

22  cision I make.  That is only a tentative suggestion and not a

23  ruling by me at this time.

24       Now, separate and apart from this meeting you are going

25  to have and this proposed order you are going to draw up for

1   me, I would direct all parties who have appeared here in the

2   case by counsel to make what suggestions they have in writing

3   as to this trial by sections or areas or classifications, and

4   I have in mind particularly and will require that all the

5   major parties make written suggestions in that respect.

6       Now, by analogy, in condemnation law -- and I am just

7   trying a condemnation case -- there was a condemnation case

8   in the books -- if you are interested in the citation I can

9   probably find it -- where the judge, in order to accommodate

10  some counsel, said A can be here the first week and B can put

11  his case on the second week and C the third week and you don't

12  have to appear at any other time.  Well, on appeal the question

13  arose that one day B, who had been told that he didn't have to

14  be there on the third week was not present and that week when

15  he was not present some matters came up that seriously affected

16  his rights and the case was reversed.  So in the present

17  condemnation case I am trying, which has taken now into the

18  fourth month, I have told counsel that you have got to be here,

19  as far as I am concerned, every day of the trial.  If you want

20  to absent yourself, do so at your peril.  However, you can

21  find out from your co-counsel what is going on in the case.

22  You will know generally where we are in the case and you can be

23  governed accordingly.  As a result, I have had four or five

24  lawyers who stick their heads in, stay a while and leave, in

25  and out.  As far as I am concerned, no lawyer has to be present

1    when the case is being tried.  I merely call this to your

2    attention that you have this particular problem if you try to

3    say, in segmentizing the case, that on certain days certain

4    people will not have to be present.  To the extent that we

5    can see and give notice that on certain dates certain issues

6    will be determined, then people can come or not as they choose

7    and these notices will probably have to go to everybody.  I

8    merely throw that out to you for your consideration, but I

9    want suggestions from the major parties and any other counsel

10   appearing in this case about this trial by area or classifi-

11   cation or segments, whatever you want to call it.  There

12   ought to be some way in which there could go out a notice

13   that during a certain week the court would hear matters about

14   a certain area or a certain classification or a certain pro-

15   blem.  Maybe they would want to appear and be heard, and if

16   they have notice that certain things will be heard on certain

17   dates maybe we avoid the problem, maybe we don't.  Maybe that

18   very week we are hearing about a certain segment and some

19   other problem comes up that adversely affects somebody and

20   then later on they complain that they weren't given a chance

21   to be heard.

22        I want some suggestions and memorandums on that particul

23   point.

24        THE COURT:  Am I clear about what I want on that?  Is

25   anybody in doubt?

1    MR. MOSKOVITZ:  May I ask, at what particular time do

2    you want these memoranda?

3        THE COURT:  I don't expect to do anything on this problem

4    until I come back.  I don't know whether it is a matter that

5    you should list as for hearing on some date, or whether I

6    should subsequently set a date on it.

7        MR. VEEDER:  Your Honor, I believe progress in drafting

8    the pretrial order will go a long way in meeting the matters

9    you have mentioned.  When we begin formulating the pretrial

10   order, I think the order of presentation can be reviewed and

11   discussed and worked out, because I think that basically --

12       THE COURT:  Well, then, let's say this is to be done in

13   60 days.  That will give you plenty of time to do it and have

14   them on file.  Later on we can make some order about some

15   hearing on some further pretrial.

16       MR. VEEDER:  I believe that the order of proof and the

17   method of proving the case of the Federal Government in this

18   new trial may have some effect upon some of these questions

19   of law that your Honor has raised, and I would like to be able

20   to present some comment to you in regard to that order of

21   proof and how we intend to prove this case as it may relate to

22   the ability to rule upon all of the questions of law that

23   have been presented.  I believe that our course is going to be

24   a great deal different from the way it was proved in the first

25   instance, your Honor, and I think it may have a very broad

1   effect upon the kind and type of ruling your Honor would make

2   in regard to some of these questions of law.  I am just

3   bringing that to your attention now.

4       MR. SWING:  Did your Honor indicate your departure date

5   from San Diego?

6       THE COURT:  The latter part of May, about the 28th of

7   May.

8       MR. SWING:  You designated the five principal parties to

9   confer --

10      THE COURT:  To confer next week.

11      MR. SWING:  Yes, good.

12      THE COURT:  And submit to me --

13      MR. SWING:  Agree upon issues.

14      THE COURT:  Yes, and submit to me something in the nature

15  of a proposed order which I could sign.  That can be submitted

16  to me, I would say, somewhere between about the 17th of May

17  and about the 22nd.

18      MR. SWING:  Thank you.

19      THE COURT:  Say submitted by the 22nd.

20      MR. STAHLMAN:  Is your Honor going to designate when we

21  should meet?

22      THE COURT:  How many of you are from San Diego?  Mr.

23  Stahlman is nearby.  Mr. Swing is from San Diego.  Mr. Lindley,

24  where are you from?

25      MR. LINDLEY:  San Diego.

138

THE COURT:  Mr. Dennis.

MR. DENNIS:  Fallbrook.

MR. SACHSE:  I am from Sacramento.  I have a pretty heavy schedule for the next couple of weeks.

MR. STAHLMAN:  I think we should have a definite date.

THE COURT:  What space is available to meet?

MR. STAHLMAN:  The grand jury room?

THE COURT:  You can use the grand jury room on any day except Thursday, and certain Thursdays.

THE CLERK:  The grand jury meets this coming Thursday, your Honor, every other Thursday.

THE COURT:  You can meet any day except Thursday of this week, or you could meet any day the following week in the grand jury room.

When would you want to meet?

MR. VEEDER:  Would it be possible to meet tomorrow?

THE COURT:  Can you stay over, Mr. Moskovitz?

MR. MOSKOVITZ:  Yes, I can stay over tomorrow.

THE COURT:  All right, then, we will fix the date of the meeting in the grand jury room tomorrow morning at 9:30.  I will be available here tomorrow after court or noontime to discuss with you some of these problems.

MR. STAHLMAN:  Will 10:00 o'clock be satisfactory?  We have quite a distance to commute.

THE COURT:  All right, 10:00 o'clock.

139

1   Let me finish up, then.

2   This suggested memorandum about trial by area, classi-

3   fication, segments, etc., which each counsel may file and

4   which the counsel for the major parties will file, is to be

5   filed within 60 days.

6   I haven't fixed any time limit yet on this order and

7   notice that the Government is getting out, but I can do that

8   later.

9   This Sawday matter -- it seems to me that everybody in

10  this case is adverse to the Sawdays, and it seems to me that

11  if anybody has little right or is at the bottom of the heap

12  it is the Sawdays, and I would suggest that there be some

13  conference between the counsel here tomorrow on that subject,

14  at which Mr. Nielsen can comment if he wants to, and that if

15  the appropriation is not terminated there are probably criminal

16  proceedings that can be brought -- I don't know what the

17  statute provides, but the Government of course has injunctive

18  relief available, and on setting that matter for hearing the

19  chances are that when the matter was called for trial all

20  counsel in this case would be arrayed on the side of Mr.

21  Veeder and Mr. Nielsen would be fighting the pack here.

22  MR. NIELSEN:  You must understand, your Honor, that this

23  is only a contention that has been made.  It has not been

24  proved.

25  THE COURT:  Oh, yes.

1      MR. NIELSEN:  They are riparian owners as well as a lot

2   of the other defendants in this action.

3      THE COURT:  I am talking only about water taken out of

4   the water shed.  It would seem to me that any diversion of

5   water out of the water shed which was Johnny come lately would

6   be pretty hard to justify.  You have no application on file,

7   you claim no prescriptive right, you are taking water out of

8   the water shed.  What answer do you have to that?

9      MR. NIELSEN:  That is only the contention that is being

10   made, your Honor.

11      THE COURT:  I am not going to issue any order today, but

12   I am merely suggesting that this is something that can be

13   brought on for hearing.  I could rule on that before I left

14   here later this month upon proper notice.  You can talk about

15   that, and you are invited to attend this meeting tomorrow,

16   Mr. Nielsen.

17      I think if Mr. Berry has time he ought to stick his head

18   in, too.

19      Also, I would like to provide in this order which the

20   Government is going to draw up this general order about

21   directions, etc., that there be conferences on physical

22   solution of this problem, that there be some of them while I

23   am gone, and if nothing is accomplished, after I rule on some

24   of these things I am going  to hear in  September, maybe

25   people will be in a more agreeable mood to talk about

1   physical solutions, because I am not so sure but that if the

2   ruling of this court follows a number of the suggestions made

3   by the Circuit, whether you want to say they are dicta by

4   Judge Fee or whether they are instructions to the trial court

5   or, as some of the defendants argue, that they are the law

6   of the case, if my rulings are in accord with some of the

7   rulings by Judge Fee I think the Government is in bad shape.

8   They are going to start talking about buying water rights or

9   talking about physical solutions.  I am not preguessing the

10   case, but you can read English language as I can and if you

11   can acquire no prescriptive right against upstream users, if

12   you can't use -- and you admit you cannot -- riparian water

13   for use outside the water shed, if there are limitations upon

14   your right of storage for riparian use, and if you can't

15   appropriate that through the procedures as set forth by the

16   State Water Law, then you and these other claimed appropriators

17   are merely trying to get your fist into the same bucket of

18   water, and they are prior in right, prior in time, as far as

19   their notices of appropriation are concerned.  It may well be

20   that you could give some consideration to this matter of

21   physical solution.

22       I would like this order that Mr. Veeder is going to draw

23   summarizing what we have done here today to specify the time

24   and place, or if you prefer, different times and places for

25   different of these classifications -- any way you think is

1    proper, I will look at your tentative order -- for a meeting

2    of the physical solution of the problem. I don't know whether

3    it would be desirable to say that there would be further

4    meeting after the court rules on some of these matters that

5    are to be briefed. It might be helpful, it might not.

6      Well, that is all the notes I have. Does anybody want

7    anything else included in this matter?

8      MR. MOSKOVITZ: I don't know whether any other counsel

9    are in the same predicament I am, but I must confess that I

10    don't have a complete list of all the parties nor even of all

11    counsel.

12      THE COURT: Mr. Clerk, do you have a list that could be

13    furnished him?

14      THE CLERK: The only thing we have is a card index of

15    all the pro per defendants.

16      THE COURT: They are not asking for pro per defendants.

17    They are asking for a list of counsel. What was this list

18    made from that you have here?

19      THE CLERK: I don't know. Mr. Engstrom made this list.

20      THE COURT: I will instruct the clerk to go over his list

21    that he has and to bring it up to date and any new appearances

22    by counsel and turn it over to the United States so that they

23    may mimeograph it or cut a stencil, which can be added to from

24    time to time as new counsel come in, and to serve a copy of

25    this list upon every counsel in this case so that they will

1    know who the attorneys are in the case.

2         Are there any further suggestions?

3         In other words -- I have tried to make myself clear,

4    although it has been a little difficult -- I am suggesting,

5    first, that there be some sort of document drawn up sum-

6    marizing the directions I have given, and that that go out to

7    every party who has appeared in this action, pro per or

8    otherwise; secondly, that there be a specific fixing, either

9    in this particular order or in a subsequent order that this

10   Committee work on, of a time and place for a hearing on

11   certain of these issues which I think underlie a big part of

12   this case and an opportunity to brief it and an opportunity

13   to be heard.

14        Do you have other suggestions that will get this on the

15   road?  If you have, I will be glad to hear them.

16        MR. DENNIS:  Your Honor please, I would like to ask Mr.

17   Veeder a question, because I am not sure whether I understood

18   him.

19        Did I understand you to say today that in the event that

20   a defendant has filed an answer that was just a general denial

21   and does not set up specifically what his rights are to the

22   waters in the Santa Margarita water shed that you feel he is

23   not going to be entitled to introduce proof in support of his

24   claim?

25        MR. VEEDER:  I say that there is a problem, certainly,

1    with which he is going to be confronted, if he sets up no

2    claim himself except a general denial, as the general denials

3    have been made.  I would think -- and I didn't say that that

4    was necessarily the law, but I said that I would think that

5    he ran the risk of running into the proposition that he

6    wouldn't be permitted to put on his evidence.

7       MR. DENNIS:  If there is any such chance, I would think

8    any notice that goes out to these people who appear for

9    themselves or have filed a general denial by an attorney

10   should be warned that there is such a risk, so they would be

11   entitled to amend their answer.

12      THE COURT:  We will not cross that bridge now.  I

13   thought about it.  What I thought about there is that when I

14   get this Item No. 3 from the Government as to what rulings

15   have been made in this case, I can find out where I am.   I

16   don't know what this ruling is that Judge Yankwich made.

17   Maybe that ruling takes care of it, maybe not.  Nobody is

18   going presently to be clipped off without some study and

19   hearing on that question.  Frankly, I am thinking about re-

20   quiring the Government to state what their contentions are as

21   to what the rights of these various defendants are all down

22   the line.  Mr. Veeder is situated to advise people what their

23   rights are.  But the court can require you to state what you

24   contend the Sawdays' rights are or are not, what you contend

25   Joe Doakes' rights are, who lives upon the rim of Palomar

1   Mountain.  It may be that after you make your contention Joe

2   Doakes who lives up on the rim of Palomar Mountain may say,

3   "I am content, if that is what the Government is contending."

4   MR. VEEDER:  An order of that character would make it

5   a great deal easier for counsel, if that should be your order.

6   THE COURT:  I am not going to order it now, but I am

7   thinking about that, because you have made this study -- by

8   that I mean the Government -- you, representing the plaintiff,

9   have brought this action, you have had investigation made.

10  You must know why these people are joined or you wouldn't

11  have joined them as defendants, and many of them are without

12  counsel.  Let's find out what you claim against them, what

13  you think their rights are.  Also, that would hasten you

14  along this route of eliminating various of these people who

15  come in and talk over their problem.  I think you would be

16  more inclined to take a liberal view in washing some of these

17  defendants out, if I took that position.  Don't you think you

18  would be?

19  MR. VEEDER:  Your Honor, I am most liberal in all

20  matters and I might be more inclined to say now that I am

21  interested in bringing the parties up to date rather than

22  dismissing any.  But we will see as things go along.  I wonder

23  if the reporter could write up this phase of it here in ad-

24  vance of the balance of the transcript so that we might have

25  it before us tomorrow.  I would be most helpful, I think, in

1    formulating the order.

2        THE COURT:  You mean when I started telling you all the

3    things I wanted done?

4        MR. VEEDER:  Yes, your Honor.

5        THE COURT:  You can do that, can't you, Mr. Reporter?

6        THE REPORTER:  Yes, your Honor.

7        THE COURT:  See the reporter afterward.  Presently you

8    want these directions I tried to give you for your assistance

9    at the meeting of this group tomorrow.

10       MR. VEEDER:  Yes, your Honor.

11       THE COURT:  All right.

12       (Adjournment at 5:30 P.M.)

1
IN THE UNITED STATES DISTRICT COURT

2
SOUTHERN DISTRICT OF CALIFORNIA

3
SOUTHERN DIVISION

4
- - -

5
HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6
- - -

7
UNITED STATES OF AMERICA,          )

8
                    Plaintiff, )

9
              vs.                  )          No. 1247-SD-C

10
FALLBROOK PUBLIC UTILITY           )
DISTRICT, et al.,                  )

11
                                   )

12
                    Defendants.)

12
- - -

13
REPORTER'S TRANSCRIPT OF PROCEEDINGS

14
San Diego, California

15
Tuesday, May 7, 1957

16
- - -

17

18
APPEARANCES:

19
    For the Plaintiff:              WILLIAM H. VEEDER, Esq.
                                    Special Assistant to the

20
                                    Attorney General
                                    Department of Justice

21
                                    Washington, D.C.

22

23

24

25

1    APPEARANCES:   (Continued)

2        For Defendant Fallbrook            SWING, SCHARNIKOW &
         Public Utility District:          STANIFORTH,
3                                           By:   PHIL D. SWING, Esq.
                                            and F. R. SACHSE, Esq.
4

5        For Defendant State of            EDMUND G. BROWN, Esq.
         California:                       Attorney General, by
6                                           ADOLPHUS MOSKOVITZ, Esq.
                                            Deputy Attorney General
7
         For Defendant Santa Mar-          W. B. DENNIS, Esq.
8        garita Mutual Water Co.:

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

149

1

1       SAN DIEGO, CALIFORNIA, TUESDAY, MAY 7, 1957, 1:45 P.M.

2                         - - -

3           (In Chambers.)

4           THE COURT:  Messrs. Dennis, Veeder and Captain Powers

5       are here.

6           Go ahead, Mr. Veeder.

7           MR. VEEDER:  Mr. Swing has raised a question, as has the

8       United States, in regard to what is designated in the order

9       your Honor has drafted, as we have listed here, paragraph

10      9 (f) -- as written it is this way:

11              "The rights of the Government to store or spread

12          water to aid and feed its rights as a riparian owner."

13      That, of course, has been a prevalent contention among the

14      parties that the United States had assumed the position that

15      it could store riparian water.  However, the United States

16      has not taken that position.  Therefore, it has been our

17      position, in the conversations this morning, that there was

18      no real issue presented in paragraph 9 (f).

19          Mr. Swing --

20          Maybe the Reporter had better read back to them what I

21      have said.

22          (Messrs. Swing, Sachse and Moskovitz make their

23      appearance.)

24          (The Reporter read the above remarks made by Mr. Veeder.

25          MR. VEEDER:  And I was at the moment going to say that

say that Mr. Swing was desirous of having the sentence as
written contained in the order.

Mr. Swing, am I right on that?

MR. SWING:  Are you talking about the order we spent --

MR. VEEDER:  Yes.

MR. SWING:  I think it is a correct inquiry for the
Court to ask to have us submit briefs on.

THE COURT:  Except that the Government disclaims any
intention to do that?

MR. VEEDER:  That is right, your Honor.

THE COURT:  What is it you claim about spreading water?
You talked about that yesterday.

MR. VEEDER:  Yes.  We take the position that the United
States, as riparian owner, can control and regulate the
riparian waters -- that is the only term we use here -- that
enters the enclave, for the purpose of better utilizing it.

THE COURT:  In the watershed.

MR. VEEDER:  Yes, your Honor, and the process is this.
The riparian water comes onto the properties of the United
States.  Sometimes it is diverted into Lake O'Neill and is
temporarily held there, then released and spread across the
grounds, with the effect of irrigating the vegetative
covering and, in the process, seeping down and into the basin.
The objective, of course, is the utilization of the water.
At the same time, it does conserve it.

5

1      We do not, however, assert that we have the right to

2  impound the water and to carry it over for any extensive

3  period, in violation of the principles of riparian law as

4  recognized in the State.  It would be, in our view, an in-

5  creased burden on the stream which we would not be entitled

6  to, under riparian law.

7      However -- and this is the point that I brought to your

8  Honor's attention -- that as paragraph 9 (f) is written, we

9  have no objection to it, but we don't think it is germane to

10  the case.  Now Mr. Swing thinks it is germane.  So far as I

11  am concerned, it can stand.

12      THE COURT:  I would rather have it more specifically on

13  the basis of your contention as you have stated it here.  I

14  think they ought to meet what your contentions are, and not

15  some statement which you say you are not  going to contend

16  for.

17      MR. VEEDER:  That is correct, your Honor.

18      MR. SWING:  The law of the State, of course, calls

19  water-spreading an appropriative right and not a riparian

20  right.  But this is no time or place to argue it.  I said to

21  Mr. Veeder that as to any of the questions that didn't satisfy

22  him if he would formulate a question of his own I would be

23  very glad to have it added as (a) or (b) to the question.

24  But I thought the question did present an important issue

25  which should be briefed.

4                                                                                                    152

1        THE COURT:  Well, if you brief it under the wording as

2   suggested by Mr. Veeder you will be briefing the same problem.

3   It is a more specific question, because he, himself, tells

4   you specifically what he means by this matter.  The language

5   I use is very general, and I think I would prefer to have the

6   more specific one included in there.  I will direct you to

7   frame the issue along the line you suggested here.

8        MR. VEEDER:  We will formulate the language, your Honor,

9   and do you desire that it be substituted in lieu of that?

10       THE COURT:  In lieu of that, and in your brief you can

11  cite the same law and authority you would if it were worded

12  the other way.  But I would rather have the issue stated as

13  the Government is contending.  They have the laboring oar

14  here.  They are making certain contentions.  Let's see what

15  those contentions are -- this is a very limited part of it,

16  of course -- see what their contentions are, and see what they

17  have to back it up.

18       MR. SWING:  All right.

19       THE COURT:  One thing I neglected to suggest to you on

20  this order.  Has Fallbrook and Santa Margarita Mutual Water

21  District ever put themselves on record in writing, as they

22  did yesterday, that they don't claim any rights in connection

23  with people above them on the stream?

24       MR. DENNIS:  Against riparians.

25       MR. VEEDER:  I don't believe you have put it in writing.

5

1     MR. DENNIS:  Never in writing.

2     THE COURT:  Have you ever put it in writing?

3     MR. MOSKOVITZ:  Do you have our Answer?

4     MR. SWING:  We have been confronted up to now with an

5  issue which hasn't been disposed of and which we do not think

6  we have time to dispose of now, and that is the question of

7  backing off of the fact that instead of a lawsuit involving

8  3,600 parties we have a number of lawsuits in which every

9  defendant is an adverse claimant to every other defendant,

10  which I think was unfortunate for everybody to have pushed

11  into the case, and I think with a little more thinking and

12  study we may come up with a suggestion, when you come to

13  your pre-trial order, of not requiring every defendant to be

14  the enemy of every other defendant.

15     THE COURT:  Well, if you make that disclaimer I think

16  you ought to be required to put it down in writing now and

17  get it out of the way.  I think both of you --

18     MR. DENNIS:  I have no objection, your Honor.

19     MR. SWING:  It was made by me yesterday individually,

20  as far as I am concerned, as a basis for a physical solution.
                                      we
21  If we can reach a physical solution,/would accept the

22  liability of what we call a calculated risk with reference

23  to all of the upper riparians and users or diverters upstream.

24     THE COURT:  Do I understand that you made it only

25  conditionally yesterday?

154

6

1    MR. SWING:  Well, your Honor, I am like Mr. Veeder.  If

2  there are property rights involved, he says he can't give th[e]

3  away without an act of Congress.  If there are property right[s]

4  involved, I can't give them away by an oral statement in cour[t]

5  without the approval of my board of directors.

6    THE COURT:  I will not put it in this order, but I want

7  you to be thinking about it, because this phase of the case

8  should be determined.  If you have that position, let us know

9  about it eventually.

10    MR. SWING:  Yes.

11    THE COURT:  And if you don't claim any rights as to uppe[r]

12  riparian owners, or if the Santa Margarita Mutual Water Compa[ny]

13  doesn't, we ought to have it set down in black and white.  Bu[t]

14  I will not require you to put it in this order.

15

16    MR. DENNIS:  It specifically sets forth that we are

17  already claiming such rights as might be granted us by any

18  permit issued by the Division of Water Resources, I believe,

19  and only the right to use the surplus water of the Santa

20  Margarita River --

21    THE COURT:  Do you have land which is riparian?

22    MR. DENNIS:  We have no land which is riparian.

23    THE COURT:  You are entirely out of the watershed.

24    MR. DENNIS:  We are partially within and partially with-

25  out the watershed; but we have no riparian land.

7

1      THE COURT:  What about Fallbrook?  You are in and out of

2  the watershed?

3      MR. SWING:  Yes, your Honor, both in and out.

4      THE COURT:  Do you have any land that is riparian?

5      MR. SWING:  Yes, your Honor, quite considerable.

6      MR. VEEDER:  Is that not in the service area -- doesn't

7  belong to you?

8      MR. SACHSE:  No, we have land we own.

9      MR. SWING:  We own extensive riparian lands.

10      MR. STAHLMAN:  On the previous trial you were enjoined

11  from making expenditures, and Mr. Swing was in Judge Sherry's

12  chambers when he made some comment on you people buying that

13  land.

14      MR. SACHSE:  We bought a lot of it before Judge Sherry

15  gave any opinion.

16      MR. SWING:  Let's try one lawsuit at a time.

17      THE COURT:  Well, I shouldn't have asked the question,

18  because we have the jury waiting to hear argument in the

19  Convair case.

20      I may go through and make some other changes in this

21  order.

22      On this question of the effect of the decision of the

23  Circuit Court, you have actually filed briefs.

24      MR. SWING:  Some of the people have.

25      THE COURT:  I won't require anyone who has to file

156

8

1    another one.  If they want to, they can file one on the basis

2    of what has been submitted.

3        Also, I think the order permitting the filing of briefs

4    should be broad enough to permit pro per's to file one, if

5    they want to.

6        MR. VEEDER:  We have added that, your Honor.

7        THE COURT:  A few little things like that.  Get me a

8    draft of it and I will go over it and get something out.

9        MR. VEEDER:  There is one inquiry I would like to present

10   here, and I think it is important from the standpoint of the

11   United States.  The rulings on the questions of law, as I

12   understand it, would be on an agreed statement of facts or

13   a stipulated presentation of facts, because just the cold

14   question, Does the United States have to comply with State

15   law in making an appropriation? we feel doesn't truly reflect

16   --

17       THE COURT:  I know what you are talking about, and I

18   thought about the same thing.  In other words, it can be

19   argued that we are getting the cart before the horse in that

20   we are briefing some of these points before we have settled

21   a pre-trial stipulation or have facts to go upon, and I

22   realize that inherent weakness in what we have done.  But my

23   main desire is to get this case started.

24       So I think what you can do is to state, as a preface to

25   your brief, the facts which you think will be shown, to give

9

1    us some tie-in to the facts for the purpose of discussion on

2    the point.

3        If the other side are not satisfied with the facts --

4    this won't be, in any sense, a stipulation of facts -- they

5    can point out what facts or additional facts should be the

6    basis of their contention.

7        I think we will make progress on it, even though it is

8    a little nebulous, because even if we settle some of these

9    principles of law abstractly it will later on assist us in

10   the application to the facts as they are eventually found.

11       That is what you are talking about.

12       MR. VEEDER:  Yes, your Honor, we are concerned with

13   that.

14       THE COURT:  I realize that.

15       MR. VEEDER:  I would rather you, gentlemen, bring up

16   yours on the question whether Local Rule 9 applies.

17       THE COURT:  Local Rule 9 applies to all cases, unless

18   the Court otherwise directs, and we are not yet at any stage

19   where you need worry about Local Rule 9.

20       MR. DENNIS:  We are setting a pre-trial hearing, are we

21   not?  What I was inquiring is, do we have to make our demands

22   for interrogatories and the question about submitting our

23   exhibits, etcetera, in accordance with it?

24       THE COURT:  No.

25       MR. DENNIS:  We are dispensing with it, as far as this

pre-trial now is concerned.

THE COURT:  Yes.  However, if you have interrogatories, you had better get started on them.

MR. DENNIS:  We have interrogatories which have been answered and the material has gone into evidence, as far as Santa Margarita Mutual Water Company is concerned.

THE COURT:  I think Local Rule 9 was drawn up in the hope that it could be used in the "barnyard" variety of case. I think when you get into a big case, you may have to depart from it.

MR. VEEDER:  We have written into the order, then, that suggested Local Rule 9 does not have application in the trial of this case.

THE COURT:  No, I am not going to say that right now. It doesn't have application so far as this order is concerned.

MR. VEEDER:  We will change it to this order.

MR. SWING:  This morning, Mr. Veeder, we discussed the Court's oral pronouncement yesterday directing you to prepare certain data, which I think is very important, regarding the location of tracts of land, of which you have record, on streams and tributaries, etc.  I wonder whether you still want that put in a separate order, or whether you are willing to put it in this order.

THE COURT:  I don't think I would require that now.  I

11

1    don't know about requiring the Government subsequently not

2    only where these lands are but what they contained as to eaol

3    of them.  But I think that could wait, for the reason that

4    they are still serving defendants.

5       MR. SWING:  Yes.

6

7       THE COURT:  And if they do that kind of job now, it has

8    to be changed again when they get through serving.

9       MR. SWING:  But we assumed in the courtroom and I would

10   ask your Honor to make an order that it be done by an oral

11   order, not in a written order, and that a reasonable length

12   of time, I think, was agreed upon between us.

13      What length of time, August --

14      MR. VEEDER:  August 15th we will attempt to have all

15   parties and everything done by then.

16      MR. SWING:  I was in hopes that we would have assurance

17   before your Honor that that would be done by that time,

18   because I think it will have a tremendous bearing upon the

19   case and the proper parties and --

20      THE COURT:  Can this be included in this direction, then,

21   if you can have it ready by August 15th?

22      MR. VEEDER:  We will undertake it, your Honor.  There is

23   one thing that worries me on the order, your Honor, and that

24   is that we might not be able to complete it.  But I have

25   assured Mr. Swing that by August 15th we would have the

12

1   parties and the lands well defined for the purposes of this
2   case.  I don't know what more I can do.  I do worry about an
3   order, your Honor, because if something should occur that we
4   didn't accomplish it we would be --
5       MR. SWING:  Well, it is in the courtroom, in the
6   presence of the Court, and that is our understanding on
7   which we are proceeding.
8       MR. VEEDER:  That is right.  I want it understood that
9   way.
10      THE COURT:  I realize that every task has physical
11  limits and if you haven't got it ready by August 15th you can
12  come in and make a showing and say that it will be August 30th
13  before you have it ready and I would probably give you until
14  the 30th.
15      You would, too, wouldn't you?
16      MR. SWING:  Yes, your Honor.
17      THE COURT:  You have to be reasonable about these things.
18  You fix deadlines and try to keep attorneys to the deadlines,
19  but I have never followed the practice of not giving
20  additional time when some showing is made.  There is a lot
21  of work laid  out for you this summer, gentlemen.
22      MR. VEEDER:  There is.
23      MR. SWING:  It might have some effect upon what we might
24
25  have to ask in the way of discovery, under the Rules.  I think

1    it would save a lot of trouble for you and for us if we did

2    get it.

3        MR. VEEDER:  I am not resisting it.  I am simply saying

4    we have already undertaken the work for our own benefit.  We

5    certainly have to tell parties who the parties are and where

6    the land is located before we go to trial.

7        THE COURT:  If, as part of that task, you set forth your

8    contentions as to what the rights of these parties are, we

9    might be able to go down the line with some of these people

10   and solve a lot of problems.

11       MR. VEEDER:  Well, that is a great undertaking for us,

12   your Honor.

13       THE COURT:  Eventually, before you can get a decree, you

14   are going to have to tell the Court what you think the rights

15   of the parties are.

16       MR. VEEDER:  There will be a day, I assume, on cross

17   examination, when it will come out.  But I dislike to antici-

18   pate the other man's case too much.  I think it could pre-

19   judice us very greatly.  I will do it, of course, if I am

20   ordered to.

21

22       THE COURT:  I am not going to direct you right now to

23   do it.  You have plenty to do.  Get the lineup of these

24   defendants in the areas they are in and the location of the

25   tracts of land and that sort of thing.

I have to go back into court.  If you want to talk more you are welcome to use the Grand Jury room.

MR. VEEDER:   Thank you, your Honor.

(Other matters.)

- - -

1

2

3

4

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

5  UNITED STATES OF AMERICA,          )
6                         Plaintiff,  )
7              vs.                     )        No. 1247-SD-C
8  FALLBROOK PUBLIC UTILITY           )
9  DISTRICT, et al.,                  )
10                        Defendants. )

- - -

11

12            C E R T I F I C A T E

13       I hereby certify that I am a duly appointed, qualified

14  and acting official court reporter of the United States

15  District Court for the Southern District of California.

16       I further certify that the foregoing is a true and

17  correct transcript of the proceedings had in the above en-

18  titled cause on the dates specified therein, and that said

19  transcript is a true and correct transcription of my steno-

20  graphic notes.

21       Dated at San Diego, California, this 7th day of June,

22  1957.

23                              John Swader
                                Official Reporter

24

25