ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN ~~CENTRAL~~ DIVISION

- - -

- - -

UNITED STATES OF AMERICA,

Plaintiff,

-vs-

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:          San Diego, California,

Date:           July 15, 1957, 10:00 A.M.

Pages:  1 - 126

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

MARTHA L. COLE
~~JOHN SWADER~~
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211 • EXT. 370

3

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,      No. 1247-SD-C

    -vs-

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

               Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS
HELD JULY 15, 1957, U. S. DISTRICT
COURT, CUSTOMS AND COURTHOUSE BUILDING
SAN DIEGO, CALIFORNIA, AT 10:00 A.M.

APPEARANCES:

| | |
|---|---|
| For Defendants<br>FAULKNER, Charlotte Flor<br>& Raymond C.: | BERT BUZZINI, ESQ.,<br>2223 Fulton Street<br>Berkeley 4, California. |
| For STATE OF CALIFORNIA: | EDMUND G. BROWN, Att'y Gen'l<br>BY: Adolphus Moskovitz,<br>Library & Courts Bldg.<br>Sacramento, Calif. |
| "    "    "<br>DEPARTMENT OF WATER<br>RESOURCES: | PORTER A. TOWNER, ESQ. |
| For Defendants COTTLE,<br>GIBBON AND REUTER: | GEORGE G. GROVER, ESQ.<br>Citizens Bank Building<br>Corona, California. |
| For SAN DIEGO COUNTY: | JAMES DON KELLER, Dist. Atty.<br>BY: Donald Clark, Deputy<br>      District Attorney. |
| For SANTA MARGARITA MUTUAL<br>WATER CO., et al.: | W. B. DENNIS, ESQ.<br>365 Broadway,<br>Vista, California. |

APPEARANCES CONTINUED:

For COUNTY OF RIVERSIDE:   LEO A. DEEGAN, ESQ.
Court House,
Riverside, California.

For CARL N. HALDE &amp;    TOM HALDE, ESQ.
HESTER M. HALDE:    548 S. Spring,
Los Angeles 13, California.

For SAN DIEGO GAS &amp;    LUCE, FORWARD, KUNZEL &amp;
ELECTRIC CO.:    SCRIPPS
BY:  Roger Ruffin, Esq.
1220 San Diego Trust &amp; Savings
San Diego 1, Calif.

For VAIL CO.:    GEORGE STAHLMAN, ESQ.,
433 S. Spring St.
Los Angeles 13, Calif.

For FALLBROOK PUBLIC    SWING, SCHARNIKOW &amp;
UTILITY DIST., et al.:    STANIFORTH,
BY:  Phil D. Swing, Esq., &amp;
F. R. Sachse, Esq.
Suite 604, 530 Broadway
San Diego 1, California.

For UNITED STATES OF    WILLIAM H. VEEDER, ESQ.,
AMERICA:    Special Assistant to
the Attorney General,
Department of Justice
Washington, D. C.

and

WALTER KIECHEL, JR., ESQ.
Department of Justice,
Washington 25, D. C.

MARTHA L. COLE, CSR,
Official Reporter.

SAN DIEGO, CALIFORNIA, MONDAY, JULY 15, 1957, 10:00 A.M.

MR. MOSKOVITZ:  Gentlemen, it is about six or seven after 10.  I think perhaps we can begin.  First of all, the reason why I am up here in front -- my name is Adolph Moskovitz, Deputy Attorney General of the State of California -- is because the Court in ordering this conference be held suggested that Counsel for the State of California act as Chairman.  However, I am here at your grace, and if the parties desire somebody else to preside, I will be happy to step down.

MR. VEEDER:  Mr. Moskovitz, the United States is very much in favor of you continuing to preside throughout the entire conference.

MR. DENNIS:  Santa Margarita is also.

MR. MOSKOVITZ:  By the way, the conference is being reported.  I imagine you can make your arrangements for transcripts at the conclusion.  For the convenience and assistance of the Reporter, it is requested that each person who is recognized to speak and makes any remark identify himself before doing so.

Perhaps after some time the Reporter will become familiar with everyone here, but for some indefinite period, let's have everyone identify himself first.

MR. DENNIS:  My name is W. B. Dennis.

MR. SWING:  Swing is my name.  Would the preliminary matter call for entering appearances?  I would suggest for the record not all the attorneys present may have occasion

to advance a proposition, yet they ought to be entered as appearing and participating by being here in the conference.

MR. MOSKOVITZ: I think that is a good suggestion. I was just about to request that all those who are present and appearing identify themselves, have the attorneys do so, and as they do so, I think it would be a good idea if they would introduce any engineers or other technical personnel who will be assisting them or making any presentation for their clients, so perhaps we can start here in the jury box with the first gentleman.

MR. DEEGAN: Leo A. Deegan, representing the County of Riverside.

MR. MOSKOVITZ: The next gentleman.

MR. VEEDER: Well, William H. Veeder, Walter Kiechel, William Burby, attorneys for the United States; Col. Robertson of the Marine Corps, principal engineer representing the United States; Major Bowen; Mr. Wertz (phonetic), United States Geological Survey; and Captain Hunter and Lieutenant Miller, Dave Miller of the Navy. That is everyone.

MR. MOSKOVITZ: Next.

MR. HALDE: I am one of the so-called "Tea-Cup" defendants. My name is Tom Halde. I represent C. N. Halde and H. M. Halde.

MR. RUFFIN: I am Roger Ruffin. I represent the Santa Fe Railway and San Diego Gas and Electric Company.

MR. CLARK: Donald L. Clark, Deputy District Attorney, San Diego County for James Don Keller, District Attorney, representing the Fallbrook Union High School District, Fallbrook Union Elementary School District, Vallecitos School

1    District and De Luz School District.

2         MR. MOSKOVITZ:  Perhaps we can go down to the left

3    side of the audience area, the gentleman in the first row,

4    are you appearing for someone?

5         REPORTER:  No, sir, I am a reporter, Union Tribune.

6         MR. MOSKOVITZ:  Let's go to the gentleman who just

     entered.  Are you appearing here today for some party?

7         (No reply.)

8              On the right-hand side, anyone in the audience

9    area who is appearing for anyone?

10        MR. PEPPLE:  I am G. G. Pepple, Chairman of the Willow

11   Glen Water Users' Protective Association, and I represent

     Dr. Henderson and Mr. Ray Peters.

12

13        MR. MOSKOVITZ:  Now, in the front row, just inside

     of the audience area.

14

15        MR. BUZZINI:  I am Bert Buzzini, appearing for Mr.

     and Mrs. Faulkner.

16        MR. TOWNER:  I am Porter Towner for the Department

17   of Water Resources.  Technically, I am with Mr. Moskovitz

18   today, and with us from the Department, we have Leland

19   Illingworth and Robert Edmonston.

20        MR. MOSKOVITZ:  Anybody along the wall?  Next, Mr. --

          MR. VAIL:  I am Mr. Vail of Vail Co.

21

22        MR. MOSKOVITZ:  Mr. Stahlman, do you want to introduce

     yourself?

23        MR. STAHLMAN:  Yes.  In addition to Mr. Vail, we have

24   Mr. Hall who is the engineer for the Vail Co.

25        MR. MOSKOVITZ:  And then yourself?

1    MR. STAHLMAN:  I gave my name and the information to

2    the young lady previously.

3    MR. DENNIS:  W. B. Dennis, Santa Margarita Mutual Water

4    Company and Harold Conkling, Engineer for the Mutual.

5    MR. MOSKOVITZ:  And, Mr. Swing, do you want to intro-

6    duce yourself and your colleague?

7    MR. SWING:  Phil D. Swing, 604 San Diego Trust and

8    Savings Building, attorney for Fallbrook Public Utility

8    District and miscellaneous other individual defendants and

9    Mr. Sachse.

10    MR. SACHSE:  She has my name already.

11    MR. SWING:  We have not brought along any engineers as

12    we will get the engineering data from the multitude of engi-

13    neers who are here present, I am sure.

14    MR. MOSKOVITZ:  That completes all the parties.

15    MR. VEEDER:  Mr. Chairman, I overlooked one; I'm sorry

16    that I did:  Commander Flynn of the Navy is also here.  I

17    would like to have his name added to those representing the

18    United States.

18    MR. MOSKOVITZ:  Now, a word about suggested procedure.

19    I think this ought to be, and is, according to the Court's

20    order, a conference for the parties.  That is, the parties

21    will decide how they want to proceed and what material they

22    want to consider in what order.

23    It seems to me that objective is to try to find out

24    if there is any area of agreement among the parties which

25    can be explored further and perhaps result in a settlement

26    based upon a possible physical solution, possibly not.

My own suggestion for the initiation of the conference is to have a basis of fact laid, that is, a discussion in a fairly brief form of the essential physical facts about the Santa Margarita water shed.

The State of California has expended a substantial sum in accordance with the direction of the California Legislature on an investigation of the Santa Margarita River water shed. That investigation culminated last -- about a year ago in June of 1956 in a report. Many of you perhaps have had copies of it and have read it. However, to make certain that we all begin with the same basic information, I am suggesting that at this time we have an explanation which will last perhaps in the neighborhood of an hour or so, which Mr. Edmonston of the Department of Water Resources will present, as to the facts that the State has ascertained and the proposals which the State has come up with for possible physical solution.

The State of California has very little of its own proprietary interest in the water shed, and in suggesting physical solutions, is doing so in the interest of all the water users involved.

It is the feeling of the State that an understanding of the basic physical facts, the limitations on development will be very helpful in deciding what kind of agreement can be worked out.

Mr. Edmonston will emphasize further, but I want to point out here that there is very little water involved, that the time it comes is highly speculative, that over a

1    long period you can count on some averages, but not knowing

2    when they will actually make their appearance, that the

3    expense of developing the water is fairly high, that there

4    are alternate sources of supply which can be brought in and

5    which must be brought in if the full development of the area

6    is to take place.

7         Now, Mr. Edmonston will go into those details

8    and into the physical facts for about an hour if the parties

9    are willing at this point. If you have any objection, I would

10   like to hear them, but if not, I would like to have him

11   do that.

12        Is there anyone who would like to comment on that

13   procedure?

14        Then, I suggest that he be permitted to give his

15   explanation without interruption, if at all possible, save

16   the questions that you may have and at the conclusion, if

17   there is any discussion or questions, we can have that.

18        Subsequently, I would suggest -- everything I

19   am suggesting, by the way, is open to the objection of

20   anyone here. I am just going to preside because I was

21   asked to do so. I would suggest that after that the parties

22   in any order which they wish would present whatever pro-

23   posals for settlement they may have and after that, after

24   they have been presented one by one and discussed one by one

25   to the extent the parties wish, then have some sort of

     attempt to sum up and compare and find areas of agreement

     if there are any.

          Now, would anyone like to make any comment on

1   this proposed procedure?

2          Well, if not, we will open with Mr. Edmonston from

3   the Department of Water Resources.

4      MR. EDMONSTON:  As Mr. Moskovitz indicates, we will

5   keep this to somewhat of a minimum, taking not over an hour.

6          The report Mr. Moskovitz referred to is Bulletin

7   57, Division of Water Resources, prepared during the period

8   1952 to 1956.  It was published just about one year ago,

9   and it was produced at a cost of $175,000.  It is compre-

10  hensive in scope, going into the subjects of water supply,

11  water use, present and future, and possible plans for the

12  development of the water supplies of the Santa Margarita

    River.

13         It also touches upon source of water supply from

14  foreign sources that could be made available to the Santa

15  Margarita River water shed to satisfy indicated future needs

    therein.

16         We have prepared here some diagrams, which we

17  hope will assist in my presentation here and an understanding

18  of what I am saying.  Largely, these are drawn from the

19  plates which appear in our Bulletin 57.  There are two or

20  three exceptions here, which I will call out at the proper

    time.

21         First of all, the Santa Margarita water shed,

22  about 740 some square miles of area lying in the south coastal

23  area of California -- and I think right here we ought to,

24  from a hydrologic standpoint, identify what that means.

25  The south coastal area of California is an arrid area; its

    water supply is cyclic in its occurrence.  By that I mean

with the records that are available to hydrologists and people who have studied the water supply of the south coastal area, it comes in this manner:

We have experienced series of years, one on top of the other, wherein we have water supply far in excess of the long time average; we have flood years, torrential floods, followed by series or a period of years where the water supply is substantially below the average, commonly known as drought years.

We are experiencing a drought here in California now, which has continued since 1944 with only one year which was somewhat above normal to break that drought.

Now, that, of course, from the standpoint of development of water supply and making it available for us, brings us into other fields and immediately you think of storage to carry water of wet years over to the periods of drought and make it available for use. We will touch more upon that later, but let it be emphasized that the water supply of the south coastal area, including the Santa Margarita River is erratic in its nature, varying from large floods to little or no floods.  That is characteristic of this river system.

This (indicating) is a map of the area showing a rather fan shaped arrangement with most of your land area in the water shed inland from the coast, narrowing down markedly to a point of discharge into the ocean near Oceanside.

For our purposes, and to aid in analysis of the water shed, it was roughly divided to an inland area roughly

1  inland from the Railroad Canyon area near Temecula, and the

2  coastal area. Those inland and coastal areas were further

3  subdivided. I don't believe that we need go into that.

4  The significance of this subdivision is this:

This mountain range that divides the area has a marked

5  effect on the water supply. Your storm masses move inland

6  from the coast. These mountains drain thoses masses

7  and a large percentage of your rain fall falls in this

8  area. This area here, unit rain fall wise gets less water

9  and there is a marked difference in the type of vegetation

10  you will find in there.

11  In other words, simply, this area is wetter than

this area, yet the land area is much greater up in here than

12  down here. Your potential for water use is much greater up

13  in here than down here, yet your greatest development has

14  occurred in this area here.

15  Going into the subject of water supply, I have

16  indicated that the water supply of this river, in common

17  with other streams of Southern California, is very erratic;

it varies areally as I have just indicated.

18

19  The runoff in this stream we have estimated over

a long-time mean period, some forty-eight years in length,

20  which is adopted as a base period, which we estimate is

21  equivalent to an exceedingly long period of years, and

22  would amount to about 35,000 acre feet per annum at this

23  point here at its full natural runoff prior to the time

24  that man did anything to impair the flow.

25  At the present time, as a result of man's activities,

we estimate, were there to be a repetition of that period, and let me qualify the word "present" as of 1953 conditions, which were the conditions adopted for study purposes in our Bulletin, there would be about 25,000 acre feet annually discharged to the ocean at that point, at its point of discharge to the ocean.

Now, those were average figures. Our records, records of runoff in this water shed indicate that this water is produced from as much as seven hundred percent of that average twenty-five, thirty-five, or something in between to as little as fifteen percent of the average, demonstrating the erratic nature of its occurrence.

In other words, from over two hundred thousand acre feet annually down to just a few thousand acre feet annually, but nevertheless, the average impaired runoff would be about 25,000 acre feet annually at Ysidora, the point of discharge to the ocean of Santa Margarita River.

Now, where does that water occur and how does it occur? Going up into the Inland Area, two principal tributaries, Murrieta Creek and Temecula Creek, each with many tributaries, in this entire area. Flow is concentrated at Railroad Canyon to form the Santa Margarita River proper, taking up two principal tributaries, Sandia Creek and De Luz Creek in its path to the ocean.

The manner of its occurrence, which during flood times, and those are very infrequent, has gone for a few days or weeks at the most.

These streams, tributary streams are live, that is,

1    they contain water throughout their respective reaches,

2    but during the summer months, even in most flood years, the

3    flow in these streams is intermittant. Now, that is

4    demonstrated on this chart (indicating). By intermittant,

5    it is dry throughout portions of its reach. The water

6    appears and alternately disappears in the ground water bodies,

7    the alluvial bodies that are found upstream above Railraad

8    Canyon, so there is no continuity of flow from the top of

9    the watershed down to the ocean. That is true today. It

10   has been true historically --

11       MR. MOSKOVITZ:  Do you have the differences indicated

12   in different colors?

13       MR. EDMONSTON:  Yes, orange would indicate that as of

14   the time of these measurements, which I believe were in

15   1952, that the stream was dry, the summer -- in the summer

16   of 1952.

17           For example, this is Murrieta Creek; it was dry

18   nearly down to Temecula and throughout its upper watershed

19   with the exception of one small area here.

20           This is the Temecula Creek drainage system. You

21   can see it. Water was flowing from out of storage in the

22   ground water at this point, this point here, but dry

23   throughout most of its area.

24           Below Railroad Canyon, down to the vicinity of

25   the Fallbrook Diversion, it was a live stream; below that

     point to the ocean, it was again dry. This is characteristic

     of the Santa Margarita River, and other streams in Southern

     California.

1      I think we will leave the water supply for a

2  moment and go into the matter of water use.

3      Our studies estimated that at the present time

4  only a small percentage of the lands that are capable

5  of using water by their position, soil, climate are presently

6  receiving water service.

7      This map demostrates that.  The green areas

8  are those lands presently receiving water service.  The red

9  are those lands which are potentially irrigable with water

10  provided to them.  You can see the preponderance of red as

11  against green, indicating the Santa Margarita River watershed

12  is only getting started on its potential for water use.

13  MR. MOSKOVITZ:  Let me interrupt a minute, Ed.  You

14  look warm, and I think others are also.  I think it is

15  permissible to take off your coat if you are more comfortable.

16  I have taken off my coat.  If anyone else wants to do so,

17  go right ahead.  We will try to keep it as informal as we

18  can in hopes it will expedite frank exchanges of views.

19  MR. EDMONSTON:  I want to emphasize one thing:  The

20  red areas delineated on this map have no relationship to

21  the availability of water.  It merely states that, for

22  example, any of this area above or below Railroad Canyon,

23  by virtue of its topography, soil, is capable of irrigation

24  -- being irrigated if water were made available to it.

25      The green, again, is that land now receiving water

26  service.  In terms of areas, these lands presently receiving

27  water service amount to between six and seven thousand

28  acres as of 1953 conditions.  The red and the green combined

1   amount to an excess of 100,000 acres.  The figure is about

2   107, as I recall.  It is in our report, so you can see that

3   only on the order of five percent of the lands that could

4   receive water service are presently being provided therewith

    at the present time.

5       As far as requirements, present use of water in

6   the watershed is in the order of 15,000 acre feet annually.

7   Were all the land shown in color in this map to receive

8   water service, these -- there would be in the order of

9   150,000 acre feet annually being utilized.

10      Now, let's explore first here -- pull the water

11  supply and the water requirements together for a moment and

    attempt to ascertain what is the reason there is limited

12  development at the present time and what possibly can be

13  done in the future locally to enhance the irrigated area,

14  the land receiving water service.

15      Here is a table indicating, with the values I

16  have just mentioned, the total area of these various units.

17  Unit 1, 2, 3 and 4 constitute the Inland Area; Units 5 and

18  6, the Coastal Area lying below Railroad Canyon, the present

19  irrigated areas totalling 6400 acres and the ultimate

    irrigable -- was wrong -- nearly 110,000 acres, of which

20  about 20,000 acres is in the Coastal area with the remainder

21  in the Inland Area.  Present water requirements:  16,000

22  acre feet annually; the ultimate water requirement: 150,000

23  acre feet annually.

24      Then, finally, a re-cap of the present waste to

25  the ocean:  25,000 acre feet annually, which I call your

    attention would compare with an ultimate requirement for

    water in the          JOHN SWADER, OFFICIAL REPORTER          water shed of about

of about 150,000 acre feet.  Again, 25,000 acre feet on the average escapes from the watershed to the ocean.  There is a potential for utilizing water in the watershed of 150,000 acre feet per annum.

Down below, we have three charts, and an explanation of which is to follow:  One, a Cumulative Departure from the Normal Curve of Santa Margarita River at Ysidora.  I believe most of you are familiar with these curves.  This shows the deviation from the mean and the occurrence of runoff in a given year.  A downward trend in this plot indicates a period that is below the average; an upward trend, above the average.  This serves to demonstrate the cyclic occurrence of the water supply of Santa Margarita River and also the extent of these wet and dry periods.

This is demonstrated in another manner here on this second chart, a bar graph wherein the ordinate indicates the magnitude of runoff in a given year.  Note the great variation in runoff from year to year.

The third chart shown here, which I will not at this time attempt to explain, shows the occurrence and disposition of the water supply in Santa Margarita Watershed under 1953 conditions.  It graphically demonstrates that, and by following this trhough, one can see how we end up here with the 25,000 acre foot annual discharge to the ocean on the average.

Now, like so many places in California, the occurrence of the water supply and availability of water is the limiting factor in the development of the area.  I think that is very

significant in the Santa Margarita River watershed. We have plotted here, and incidentally, this is one chart that does not appear in the report -- we do have copies of this and it can be made available to any who desire it -- on here we have plotted in yellow the runoff during the period 1936 to 1951. This approaches an average period and is used her for demonstrative purposes.

In green is the demand on -- average irrigation demand schedule for crops that are grown in the watershed. It is the amount of water that could be captured from the surface runoff that occurred during that period.

Now, you might ask why is the green so small compared to the yellow. In California, the demand for irrigation water comes in the summer; the runoff occurs in the wintertime, so when your greatest demand of -- for water occurs, you have the least water, so the surface runoff, and its occurrence would produce a safe demand, irrigation demand shown here, which is tabulated up here and is in the order of 2500 acre feet annually.

Now, to be somewhat realistic about this, we have assumed that irrigated land could take a deficiency and in the latter years of this drought period, we have assumed that the acreage that would prevail during here would only get about 1100 acre feet of water. Maybe that is going a little too far, but nevertheless it demonstrates the point that dependency on the surface supply only definitely limits the land that could be irrigated safely with some assurance that you were going to get a crop in there.

19

1        Now, here we have plotted the runoff again in

2   yellow and this demonstrates -- pertains to ground water,

3   which we will touch a little more on, but this is drawn

4   to demonstrate the utility of the Santa Margarita Coastal

5   ground water basin; runoff again in yellow.  In green, is

6   the safe demand from that basin were it to be utilized to

7   its maximum potential.

8        There is a little background on that.  We estimate

9   that there are about 24,000 acre feet of storage capacity

10  in the Santa Margarita Coastal Basin, which could be utilized.

11  Now, in order to utilize that storage capacity, there would

12  have to be a proper pattern of pumping imposed on the basin

13  so as not to draw the lower portion of the basin near the

14  coast down below sea level, but with a proper pattern of

15  pumping imposed on that basin, it is believed that 24,000

16  acre feet of storage capacity could be utilized to regulate

17  inflow thereto and that the safe yield from utilizing 24,000

18  acre feet of storage capacity would be about 11,000 acre

19  feet annually.  That is shown here in green.  You can see

20  the advantage of storage here immediately, and the necessity

21  for storage for enhancing the water supply.

22       In this beige color is plotted the actual use

23  from that basin during the indicated period.

24       The graph here indicates a composite of the way

25  it is estimated the water levels would react.  Actually,

this is plotted as to storage capacity and indicates the water

available in that 24,000 acre feet of storage capacity,

reducing to zero in 1951.

1    Now, to go back a moment, let's re-cap a little

2  bit of what we have said.  We have 25,000 acre feet of water

3  on the average discharged into the ocean.  We have about

4  15 or 16,000 acre feet of water being used as of 1953 annually.

5  The largest area of potential water use lies above Railroad

6  Canyon.  Most of the water is available down at the ocean,

7  which is true of any stream system.  It is even more true

   here from the standpoint of physical availability.

8    I would like to touch upon that.  Our investigation

9  of the watershed started up on top of the watershed, moved

10  toward the ocean in an attempt to determine where water

11  could be conserved, either by construction of surface

12  reservoirs or in the underground.  We found this:  That

13  above Railroad Canyon there were no feasible dam and reservoir

   sites.

14    I would like to qualify that; no dam and reservoir

15  sites, which, as we understand economics, could be constructed

16  that would produce amounts of water within the probability

17  to pay for such water, and then only small amounts could be

18  conserved, so we must focus our attention then below

19  Railroad Canyon to a point where we could actually construct

20  something that -- on the surface -- that would make water

   available to those who might need it.

21    Now, I think I have demonstrated the erratic nature

22  of the flow, and the need for storage to carry water produced

23  during the wet periods over to dry periods.  That is graphic-

24  ally demonstrated here.  This is entitled Storage Development

25  Curve for Santa Margarita River at Ysidora.  On the ordinate

we have the safe seasonal yield, not taking into account on the black curve evaporation. Across the abcissa, we have storage capacity in percent of mean seasonal runoff. On this curve we have developed the relationship between storage capacity required to produce a given amount of yield.

Let's start over at zero. As we move up the ordinate, we get up to about ten or eleven percent of the mean annual runoff, which would amount to maybe three, four thousand acre feet. I believe it is a little less actually. You will recall on the diagram "Safe Irrigation Demand," from the natural runoff, we discovered that about 2,000 to 3,000 acre feet annually could be produced from the surface supply, so it doesn't require any storage to get that water, so we haven't moved over on the abcissa yet.

Then, we continue to move up. We move -- we have two curves plotted on here. I will explain those. This represents the amount that could be obtained by utilizing ground water, which, as you know, does not suffer from evaporation. Then, we move up to about 30 percent of the full natural runoff, and we have a line across there, and that is entitled "Depletion by natural runoff by present development." This is the amount of runoff, full natural runoff that is presently being captured and utilized.

Now, going on up to a hundred percent, and moving over, we find that in order to capture all the water within the watershed, we would need some nine hundred plus percent of the mean annual runoff in storage capacity to do that.

Now, what that means is:  You need nearly 300,000

acre feet of storage capacity to make full control of the watershed.  Evaporation would take over ten percent of that, so plotted on here, we have the present waste to the ocean, representing this ordinate.  We say with full control put into effect, part of that would go to evaporation, leaving a net, which we call potential conservable waste, that is on the order of 20,000 acre feet annually, and in order to get that again, nearly nine hundred percent of the mean seasonal full natural runoff, or nearly 300,000 acre feet of storage capacity would be required to get that, and that would have to be constructed down at the vicinity of Ysidora or below De Luz Creek.

Now, as a result of these studies, it was possible for us to concentrate our efforts in attempting to determine where this storage capacity could be developed.

This is a very poor map, I think, for most of you to see, but suffice it to say again:  This storage capacity we found could only be constructed below Railroad Canyon. There were four dam sites that were given more than cursory examination, the Fallbrook Lippincott dam site, located just below the existing Fallbrook Diversion, the so-called Fallbrook Border site, located near the easterly border of Camp Pendleton -- I guess it would be northeasterly line there -- the De Luz site, located on Camp Pendleton, the upper De Luz site, located on De Luz Creek above its confluence with Santa Margarita River.

After preliminary examination, the upper De Luz site was eliminated from further consideration, and I will not discuss it further here.

1       The Department of Water Resources examined these
2  sites from a geographic, topographic and hydrologic stand-
3  point.  This was done on a preliminary basis and prior to
4  any adoption of size or plan, further engineering would have
5  to be done, drilling of dam site, testing of materials.
6       The degree of accuracy to which our studies were
7  carried were sufficient to develop the relative feasability
8  of the one site as against the other or various sizes at
9  one site.  These curves graphically demonstrate the results
10 of our studies of the cost and accomplishments of these
11 three sites, the Fallbrook Lippincott, the Fallbrook Border,
12 and De Luz dam sites.  This demonstrates the relationship
13 between reservoir storagecapacity and capital cost, cost
14 plotted this way and storage capacity this way.
15       It shows here that for any given capacity, De Luz
16 would -- or put it this way:  For any given cost, De Luz
17 will produce the most capacity at the least cost.  Here
18 we show relationship between the storage capacity at these
19 reservoirs and the net safe seasonaly yield.  Again De Luz
20 is superior from that standpoint, and finally, we show the
21 relationship between the net safe seasonaly yield and the
22 annual unit cost with cost plotted this way and yield this
23 way, reservoirs to the left having the least unit cost
24 per acre foot of yield produced.
25       Now, in addition to studying these reservoirs
   individually, they were studied in combination.  This is
   all reported in our Bulletin.  I will say this about all
   three sites:  The Border site was studied as a possible
   alternative to De Luz, where large amounts of storage

capacity can be developed.  It was found that De Luz was superior to the Fallbrook Border site.  The Fallbrook Lippincott site was studied as a possible alternative to smaller sizes of De Luz reservoir, and also as a possible combination plan, a small De Luz with a smaller small Fallbrook Lippincott.

As a result of these studies, we found that the reservoir that would produce the most water at the least unit cost would be De Luz at a 143,000 acre foot capacity. Now, that unit cost is at the reservoir and does not take into account the cost of conveying the water to where it is needed and, of course, that is of prime importance.

We found that in comparative cost, capital, and annual cost and in water produced that a 75,000 acre foot reservoir at the De Luz site, operated in combination with a 65,000 acre foot reservoir at the Lippincott site would produce water at the reservoirs at about the same unit cost and about the same amount of water.

Now, in considering where this water might be utilized from the standpoint of Camp Pendleton area, it would be cheaper to be delivered to a high point in the service area to construct a 143,000 acre foot De Luz reservoir.  From the standpoint of the Fallbrook area, it would be cheaper to construct the combination plant, that is, the 65,000 acre foot reservoir at the Lippincott site in combination with the 75,000 acre foot reservoir at De Luz.

In all plans they are very close, and when I say "cheaper," it is a matter of one or two dollars per acre foot.

Now, we believe as a result of our studies that these are the feasible possibilities. We do not say they are either economically or financially feasible at this time. That is a matter for local decision, and I would like to qualify the yield figures -- Incidentally, these plans that I have talked about would produce from 13 to 14,000 acre foot annually. That compares with this 20,000 acre foot of potential conservable waste that I mentioned. We feel that that is probably the maximum feasible that could be captured.

One general qualification on any Southern California reservoir: We are going back over a very brief period of record. There have no doubt been droughts in the past more severe than that for which we have records, and no doubt that they will occur again. Any constructor of a reservoir in Southern California should realize that, and treat the indicated yield accordingly.

Another factor: We are in the midst of a thirteen year drought. We don't know how long it will continue. Construction of a reservoir such as we are talking about here in 1944 would have been of little or no value to date, thirteen years. In other words, you would have your invest-ment tied up for thirteen years and have realized no return.

Our feeling is that the -- again the adoption of a plan or plans here is a matter for local decision, and over that the -- whether or not a local entity, the Federal Government or some other local entity would proceed with adoption of any one of these plans, they should take into account the qualifications I have just mentioned.

And one other fact: The availability of an altern-
ative source of supply. Before I go into possible alternatives
to this, there is one issue that has come up that I would
like to clarify, and that is the matter of the future effect
of the development of the Santa Margarita River watershed
on the indicated yields, that is, of these reservoirs.

From that standpoint, we do not feel that there
would be any appreciable impairment of the yields indicated
here by upstream development.

First of all, how could that occur? No doubt
there will be additional development upstream, but we do
not feel it will be appreciable. There are certain limi-
tations involved in getting wells sufficient -- producing
sufficient water for irrigation purposes. That has been
experienced by many owners in the past. Were there to be
extensive irrigation from local sources upstream, it would
require two things -- one of two things to affect the
indicated or estimated yield shown here. There would have
to be a substantial reduction in the reservoir inflow
during the critical period estimated here, the carry-over
period.

In other words, the time from -- from the time
the reservoir has filled until it ran dry and started to fill
again, there would have to be some substantial impairment
of that. Now, if you examine in our report, our yield
studies, you will find that there is very little inflow
anyway during the drought period, so that there is very
little impairment that can be effected.

26

The only other way the estimated yields could be at all affected, if there were so much development upstream that the flood waters, during the time of filling of this reservoir were so reduced that the reservoir in fact did not fill.

Now, let's examine that. Are either of these things possible? Possibly to a small degree. First of all, the facts are: In capturing more water upstream, the water -- no matter how much is taken out of the ground, the flood waters passing over the ground have to get into the ground. The opportunity for percolation in the many tributaries of Murrieta Creek, and because of the control effected by the Vail Reservoir, that is really all we are talking about, Murrieta Creek, there is very limited opportunity for percolation in there, regardless of the storage space developed underground. We have made studies of the opportunity for this and have concluded that it would be negligible.

Those, I believe, set forth the plans for local water supply development as the State Department of Water Resources sees it. We believe that to proceed on with such a plan for water supply development, the parties ought to be be aware of what they are buying in effect. I mean, what these plans are worth, waterwise, costwise, and that by one means or another, in order to adopt such a plan, there would have to be agreement as to division of waters under such a plan.

In conclusion, I would like to call everybody's

27

1   attention to something I think you are all aware of, but
2   pointed up here in this discussion. Sometime ago the
3   Metropolitan Water District of Southern California authorized
4   its Chief Engineer and General Manager to proceed with
5   plans and specifications and go to contract on another
6   accueduct in San Diego County. On Tuesday of last week,
7   the San Diego County Water Authority and constituents of
8   that authority passed a bond issue authorizing the authority
9   to issue bonds in the amount of $35,000,000 to finance the
10  lower portion of that acqueduct.

    It appears then that work will proceed immediately
11  to construct another acqueduct into San Diego County.
12  This acqueduct will pass through the Santa Margarita watershed
13  and, according to the announced intentions of the Metropoli-
14  tan District of Southern California, will be in canal section
15  largely through the upper Santa Margarita River watershed.
16  A storage reservoir, a regulating storage reservoir, is
17  planned on Tucalota Creek; All Valley Reservoir is its name.

    The availability of water from that acqueduct
18  should clear up much of the situation in the upper Santa
    and
19  Margarita watershed/with the availability of that water,
20  those lands could be developed, and as I indicated, it is
21  our feeling only through the availability of imported water
22  will those lands be satisfied and in fact the ultimate
23  solution of the water problem of Santa Margarita River
    watershed does lie in importing water.
24      MR. MOSKOVITZ: Could you cover just one more matter,
25  Bob? The effect that further development of the ground

water basin from lower Santa Margarita River would have
upon the yields you would expect from the reservoirs that
you have discussed?

MR. EDMONSTON:  I indicated to you here on a chart
the yield could be obtained, we estimate from full utiliza-
tion of the Santa Margarita Coastal Basin -- with the
utilization of 24,000 acre feet of storage capacity in that
basin, we estimate that about 11,000 acre feet annually,
the safe yield, could be produced.

There are about between five and six thousand
acre feet of water being produced from that basin now.  The
new water would amount to in the order of 5,000 acre feet
annually.  Were that to be done in lieu of a construction
of a surface reservoir, the unit cost of water produced
be any subsequent construction would be quite high.

Now, although that is true, 11,000 acre feet, or
5,000 feet of new water, is the maximum amount that could
be developed down there.

If 10,000 acre feet of new water, 12,000 acre feet
or 14,000 acre feet were desired, it would be far better to
construct the surface reservoir without planned operation
of that basin to yield 11,000 acre feet, since the unit cost
would be comparable and having the -- disregarding other
factors -- having that dam there is, of course, a surer way
of conserving water than depending on the vagaries of nature
to get the water underground.

Does that clear that up?  I think that is it, Adolph.

MR. MOSKOVITZ:  Thank you very much.  It is a little

after 11 o'clock. Would it be convenient to take a short recess of about ten minutes and then resume?

(Whereupon a short recess was taken, after which the following proceedings were had, to wit:)

MR. MOSKOVITZ: Gentlemen, shall we resume now?

I would like to make one announcement before we take up with this explanation of the physical facts.

A number of people have indicated that they would like to have copies of the charts, drawingsthat were used here, for example, the one that is now visible that were not in the report, and I am taking the liberty of having copies sent to all those who have appeared at this hearing.

If there are any of you who have not entered an appearance who want copies, then I suggest that you get in touch with Mr. Illingworth after this session is over.

Mr. Illingworth, will you raise your hand so we know who you are?

Before we have questions on what has been discussed, Mr. Edmonston would like to make one clarifying remark.

MR. EDMONSTON: On this chart, and also the ohher one that was referred to that showed the ground water utilization, these were worked up rather early in the investigation. Subsequent to the time they were prepared, there were modifications in the estimated runoff. A lot of this, of course, had to be estimate, so the values shown here and on the other chart for runoff do not agree precisely with what is in the report.

Now, we have estimated that maybe a -- there may

be a three percent difference, but I wanted everybody to
be aware of that, that you will find that there are
differences, although they are not significant and they
dont modify the conclusion here, what we were trying to
demonstrate, but I wanted to make it perfectly clear you
will find that difference there.

Now, there have been requests for this map here.
Although everything shown here does appear in the report,
it is, I believe on one or two plates there, and we have
been asked for this. We just are not equipped to make re-
productions of this. This was worked up by hand, so I am
afraid we will not be able to honor the requests for re-
productions of this.

MR. CONKLING: May I ask a question? You have the
base map though, the base is in the report too?

MR. SWING: What would be the mechanics to duplicate
this?

MR. MOSKOVITZ: May I remind you again to mention your
name before you speak so the Reporter can get it?

MR. EDMONSTON: Mr. Swing, what it would really take
to get something like in the report, there would have to be
overlays made of every color shown on here and sent to the
State Printing Office, which is quite a job.

MR. MOSKOVITZ: Now, at this time, I think anyone
who would like to discuss or ask questions about the
presentation should have that opportunity.

Well, apparently Mr. Edmonston has made a remark-
ably clear explanation.

MR. BUZZINI:  Mr. Edmonston, in your presentation, you indicated alternate sources of water outside of those set forth in the chart, and you did refer to the Metropolitan Water District.  My question is:  Are there other sources than -- other than the Metropolitan Water District?

MR. EDMONSTON:  Not at the present time, no, in the amount of water that I believe you would probably be referring to; the answer would be no.

MR. SWING:  Mr. Chairman --

MR. MOSKOVITZ:  Mr. Swing?

MR. SWING:  May I inquire whether or not this peaceful silence that has followed the invitation to cross examine Mr. Edmonston on his factual statement indicates general approval of the facts as set forth by him?  If there is -- if that is not true, I wish some person would give his name and indicate his dissent from the factual statement.

MR. VEEDER:  Well, Mr. Swing -- United States and Mr. Veeder speaking -- we, of course, -- and I am certain Mr. Edmonston doesn't expect us to have our silence indicate complete agreement in regard to the various physical phenomena that he described and hydrological aspects of this matter -- we think that Mr. Edmonston did an excellent job of presentation.  We think that he covered the matter very well.  We do not agree, of course, with his statement that 25,000 acre feet of water wastes into the ocean, and I don't think Mr. Edmonston expects us to so agree.

We think that what he presented was a general statement; he made no effort to delineate or define the rights to the use of the water.  He did nothing more, we

think, than an excellent engineering statement, so our
silence, Mr. Swing, doesn't indicate agreement or disagree-
ment, except on the particular matter to which I alluded,
the 25,000 acre feet wasted into the ocean, but from our
standpoint, we certainly cannot be bound by anything that
is said by anybody, and I am sure that Mr. Swing would not
be bound himself by anything that was said, if it was not
to the best interest of his clients.

MR. SWING: Would you yield for a question?

Since you have pinpointed a figure of objection
to 25,000 acre feet wasting into the ocean over a long
period of time, reproducing past historical rainfall, would
you be willing to indicate your thinking as to what amount
would waste into the ocean different from the 25,000 stated
by Mr. Edmonston?

MR. VEEDER: Mr. Swing, we would take the position --
this position in regard to that: That the word "waste,"
of course, is a legal term. We don't believe that it is
waste. We don't believe it is waste per se to have water
into the ocean. We look at it this way: That the law is
such in California that the 25,000 acre feet, assuming
that that is a correct figure, is not entirely wasted, nor
should it be viewed as such.

We think it is highly important though what Mr.
Edmonston said. He said, "Since 1944 there has been only
one year in which there have been --" what he called
"above normal runoff." The United States of America has
owned that land since 1942, so we are in this position:

That during the history of our ownership there certainly has not been an excess quantity of water. We think it was highly significant that Mr. Edmonston made this statement: That had a dam been constructed, it would have been completely useless for this fifteen-year period here involved.

We think that is a very strong indication of the positivity of a firm water supply in the area.

We believe that the 25,000 acre feet, to which he alludes, is an arithmetical figure, which is not reflective of the phenomena that exists in the Santa Margarita Valley.

MR. SWING: Well, do I understand your answer then to be that you are dissenting, not necessarily to the figure 25,000 over a long period of time, but to the use of the word "waste"?

Would you still dissent if, instead of using the word "waste," it would say that over a long period of time? Do you engineers agree that 25,000 acre feet on an average would reach the ocean?

MR. VEEDER: No, no. I won't say that, Mr. Swing. My nine year old boy could add up the column of figures and divide it by whatever number of years there are and come up with 25,000.

We don't believe that the 25,000 is reflective of the situation that exists. We really don't know. I dare say no one knows how much water actually would reach the sea under the existing circumstances, assuming that the Vail Reservoir, capable of impounding 50,000 acre feet of

water had been extant during the period of recorded runoff.

We think that the development that is going on up-stream -- Again, I wish to say in all deference to Mr. Edmonston, we don't accept the premise that he works upon, namely, that there is not going to be a great deal of development upstream.  To the contrary, I was over the whole watershed yesterday, and there is development going on up there now, and a great deal of it, so we -- we reiterate that we don't and can't accept the premise that there are 25,000 acre feet of water annually reach the ocean, or in the ocean, or waste, because we don't believe that the physical phenomena presently existing -- May I start that again?

We believe that the phenomena that presently exist might very well change that circumstance so markedly that you couldn't rely upon the 25,000.

That is our position.

MR. SWING:  Well, would you, in order to help us, all of us here, with an intelligent basis for negotiation, exploring as we are the agreement -- the area of differences and the area of agreement -- what is the thinking of your engineers as to what this amount of water, which in the future, under present conditions, is that would reach the ocean?

MR. VEEDER:  Well, I know I have no study made on that basis by our engineers.  I know of no such study. I don't believe that such a study has been made.  I am giving an example of what is transpiring now.  We are

working to manage our basin differently.  We believe

that good husbandry dictates that we manage our basin

differently than it has been historically.

We believe that that in itself is going to utilize

more efficiently the very excellent reservoir that we

already have.  We think we have the finest reservoir on

the West Coast, namely, our subterranean reservoir where

we don't have the losses that would arise in a surface

reservoir, but in regard to our position at this meeting,

I want it understood that we are not rejecting any proposal

of settlement.

We don't know that a proposal has been made.

We refer in this matter to Congressman Utt's Bill, which

we think is the official pronouncement by the Congress

of the United States as to the method of settlement which the

Congress has approved.

That bill, and I am going to offer to the Reporter

a copy, which I will give to you at the end of the

statement, and have it in the record for we believe --

MR. MOSKOVITZ:  Excuse me just for a minute, Mr.

Veeder.  Are you making your statement that you said

you would like to make at this point?

MR. VEEDER:  Yes, yes.

MR. MOSKOVITZ:  Let's make sure there are no more

questions upon the discussion.

MR. VEEDER:  Very well.

MR. MOSKOVITZ:  Is there anyone else that wants to

ask any questions?

MR. PEPPLE:  I would like to ask a question on the development.  When I moved there on my place, we had nothing to develop with.  There was a little vertical pump that produced about fifteen, twenty gallons a minute of water --

MR. MOSKOVITZ:  Where are you located?

MR. PEPPLE:  In Willow Glen.  Now, then with the development of the place, we are using more water.  At the present time we have an eighty gallon pump, and consequently, we must be taking more water as we go along.

Other people, it seems, in the Murrieta Valley are going deeper and drilling more wells all the time, so that would naturally, it seems to me like, stop and shorten the flow of the stream.

Thank you.

MR. HALDE:  I would like to make a statement if I may.

This is answer to Mr. Swing's statement or question as to whether or not our silence constitutes an assent to this report, and I would like to state this:  That I have not received a copy of the report.  I believe there are many people who have not, so our silence here neither assents to it nor dissents to anything he may have stated.

I think it was an excellent presentation, but other than that, I have -- I don't believe we would be in any position to comment on it, the authenticity of any of the statements made either as to volume or amounts or uses, or anything of that nature, so just let the record show that we take that position.

1          MR. STAHLMAN:  If it please, Mr. Chairman, Stahlman

2    speaking, I take somewhat the same position.  I think it

3    is a very excellent presentation of technical matters,

4    an outline of the area, and, of course, Mr. Swing, when

5    he took the meeting over and started asking for approval

6    of this -- I represent the Vail interests only in this

7    proceeding, and I am only concerned with the matter pertain-

8    ing to Vail.  I don't want to make any statement which

9    would in the future prevent any cross examination upon

10   matters if they did affect the Vail position.  At this

11   time I see none.

12        MR. MOSKOVITZ:  I would think for the benefit of

13   everyone here, so you don't find each person standing up on

14   guard, that we can all assume that discussion here is

15   informal, that we should not be deemed -- anyone be deemed

16   to be bound by what is said in case there is a trial,

17   and there is a possibility of cross examination.  However,

18   I think Mr. Swing's purpose is legitimate, and that is:

19   If this is going to be an attempt to settle the lawsuit,

20   there must be some basic agreements on facts from which

21   the discussion can go on, and I think it would be helpful

22   if any of the parties have views to the contrary on any

23   of the points that are really significant, for example,

24   how much water goes to the ocean that is not now being

25   consumed within the watershed -- I think that is certainly

     a significant figure, although it may not be, by itself,

     the only controlling figure, but I would hope that if

     they have different views on that particular point, that

they would bring them out at some point during the discussion.

MR. STAHLMAN: That is the very point I am making. I do have different views on that. However, I don't think they concern the Vail interest, and therefore, it is up to those who it does concern to raise it.

MR. MOSKOVITZ: Yes. I think that is a legitimate position to take.

Now, are there any other questions or comments on the physical facts?

Mr. Dennis?

MR. DENNIS: Dennis, representing Santa Margarita Mutual Water Company.

We have -- are willing, in substance, to accept the statements and views and findings of the State as set forth in Bulletin 57 and as Mr. Edmonston outlined here. Neither Mr. Conkling nor myself find anything substantially wrong with them. There may be a few minor differences. We feel that the findings of the State more or less bear out the testimony of Mr. Conkling, which was rejected by Judge Yankwich at the time the matter was tried before in Judge Yankwich's Court.

MR. MOSKOVITZ: Any more questions or comments on Mr. Edmonston's discussion?

All right, Mr. Veeder.

MR. VEEDER: I will resume where I left off:

That we feel that Congressman Utt has introduced legislation, that it became the law of the land, and that the basis upon which the Congressman proceeded, the basis

1    upon which the Congress enacted the law necessarily is

2    binding upon the United States of America.

3    We would be sanguine, indeed, if we thought we

4    could come up with a statement contrary to what the law is.

5    We believe that any solution necessarily would envision

6    the protection of the rights of the United States of America

     as provided in that Bill, and I will just read the excerpt:

7    Having authorized the dam, subject to limitations

8    contained in the Act, it is:

9    "Provided, That nothing in this Act shall

10   be construed as a grant or a relinquishment by the

11   United States of America of any of its rights to the

12   use of water which it acquired according to the laws

     of the State of California either as a result of

13   its acquisition of the lands comprising Camp Joseph

14   H. Pendleton and adjoining naval installations,

15   and the rights to the use of water as a part of said

16   acquisition, or through actual use or prescription or

17   both since the date of that acquisition, if any, or

18   to create any legal obligation to store any water in

19   De Luz Reservoir, to the use of which it has such

20   rights, or to require the division under this Act

     of water to which it has such rights."

21   Now, certainly, we believe that that envisions

22   the law of California, namely, that we, the United States

23   of America, should not be required to give up any rights

24   that are vested in it.  We don't believe that anyone

25   could reasonably ask us to.

We believe that if a physical solution can be arrived at, it comes within the four corners of the Utt Bill, we are certainly for it.

We are certainly, moreover, desirous of seeing the highest conservation and use of the water, and we, moreover, take the position that as one of the early users on the stream, in comparison with Santa Margarita Mutual and the Fallbrook Public Utility District, that they certainly would not expect us to reduce our rights, or to in any way impair those rights.

I think that that is the basis upon which necessarily this meeting must proceed, because certainly, Mr. Swing wouldn't feel that we could encroach upon his rights, whatever they may be, and if anyone makes a proposal, we hope it is within the four corners of Congressman Utt's Bill.

(The following is the text of the Bill presented to the Reporter by Mr. Veeder:)

"PUBLIC LAW 547 - 83d CONGRESS

CHAPTER 593 - 2d SESSION

H. R. 5731

A N   A C T

To authorize the Secretary of the Interior to construct facilities to provide water for irrigation, municipal, domestic, military, and other uses from the Santa Margarita River, California, and for other purposes.

Be it enacted by the Senate and House of

Representatives of the United States of America

in Congress assembled, That the Secretary of the

De Luz Dam, Calif. Construction, etc. 43 USC 371 note.

De Luz Interior, acting pursuant to the Federal reclamation

laws (Act of June 17, 1902, 32 Stat. 388), and

Acts amendatory thereof or supplementary thereto,

as far as those laws are not inconsistent with the

provisions of this Act, is authorized to construct,

operate, and maintain such dam and other facilities as

may be required to make available for irrigation,

municipal, domestic, military, and other uses

the yield of the reservoir created by De Luz Dam

68 Stat.575 to be located immediately below the confluence
68 Stat.576.

of De Luz Creek with Santa Margarita River on Camp

Joseph H. Pendleton, San Diego County, California,

for the Fallbrook Public Utility District and

such other uses as herein provided.  The authority

of the Secretary to construct said facilities is

contingent upon a determination by him that --

(a) the Fallbrook Public Utility District

Fallbrook Public Utility District repayment construct. 53 Stat. 1193. 43 USC 485h

shall have entered into a contract under subsection

(d), section 9, of the Reclamation Project Act

of 1939 undertaking to repay to the United States

of America appropriate portions, as determined by

the Secretary, of the actual costs of constructing,

operating, and maintaining such dam and other

facilities, together with interest as hereinafter
and under no circumstances shall the Department of Navy be
provided;/subject to any charges or costs except

on the basis of its proportional use, if any of

such dam and other facilities, as determined
pursuant to section 2 (b) of this Act;

(b) the officer or agency of the State of
California **California** authorized by law to grant permits for
**permits.** the appropriation of water shall have granted such
permits to the United States of America and
shall have granted permits to theFallbrook Public
Utility District for rights to the use of water
for storage and diversion as provided in this Act;
including, as to the Fallbrook Public Utility
District, approval of all requisite changes in
points of diversion and storage, and purposes
and places of use;

(c) the Fallbrook Public Utility District
**Claim again-** shall have agreed that it will not assert against
**st**
**U.S.** the United States of America any prior appropri-
ative right it may have to water in excess of that
**Equal**
**priority** quantity deliverable to it under the provisions
**in use of**
**waters.** of this Act, and will share in the use of the
waters impounded by the De Luz Dam on the basis
of equal priority and in accordance with the
rates prescribed in section 3 (a) of this Act;
this agreement and waiver and the changes
in points of diversion and storage, required by
the preceding paragraph, shall become effective
and binding only when the dam and other facilities
herein provided for shall have been completed and
put into operation: <u>Provided</u>, <u>however</u>, That the

enactment of this legislation does not constitute a recognition of, or an admission that, the Fallbrook Public Utility District has any rights to the use of water in the Santa Margarita River, which rights, if any, exist only by virtue of the laws of the State of California; and

**Feasibility.**

(d) the De Luz Dam and other facilities herein authorized have economic and engineering feasibility.

- 1 -

**Water Rights.**

SEC. 2. (a)  In the interest of comity between the United States of America and the State of California and consistent with the historic policy of the United States of America of Federal noninterference with State water law, the Secretary of the Navy shall promptly comply with the procedures for the acquisition of appropriative water rights required under the laws of the State of California as soon as he is satisfied, with the advice of the Attorney General of the United States, that such action will not adversely affect the right of the United States of America under the laws of the State of California.

**Navy Department Charges**

**68 Stat.576.**

(b)  The Department of the Navy will not be subject to any charges or costs in connection with the De Luz Dam or its facilities, except upon completion and then shall be charged in reasonable proportion to its use of the facilities under regulations agreed upon by the Secretary of the

Navy and Secretary of the Interior.

68 Stat.577.
Dam Opera-
tion, etc.

SEC. 3. (a)  The operation of the dam and
other facilities herein provided shall be by the
Secretary of the Interior, under regulations
satisfactory to the Secretary of the Navy with
respect to the Navy's share of the impounded water

Water
Allotment.

and national security.  In that operation, 60 per
centum of the water impounded by De Luz Dam is
hereby allotted to the Secretary of the Navy; 40
per centum of the water impounded by De Luz Dam
is hereby allotted to the Fallbrook Public Utility
District.  The Department of the Navy and the
Fallbrook Public Utility District will participate
in the water impounded by De Luz Dam on the basis
of equal priority and in accordance with the ratio
prescribed in the preceding sentence; _Provided,_

Temporary
Contracts.

_however_, That at any time the Secretary of the
Navy certifies that he does not have immediate
need for any portion of the aforesaid 60 per centum
of the water, the official agreed upon to adminis-
ter the dam and facilities is empowered to enter
into temporary contracts for the delivery of water
subject, however, to the first right of the Secre-
tary of the Navy:  _Provided, further,_ That all
the moneys paid in to the United States of America
under any such contract shall be covered into the
general fund of the Treasury, and shall not be
applied against the indebtedness of the Fallbrook

45

Public Utility District to the United States of
America.   In making any such temporary contracts
for water not immediately needed by the Navy,
the first right thereto, if otherwise consistent
with the laws of the State of California, shall
be given theFallbrook Public Utility District.

**Repayment obligation.**

(b)  The general repayment obligation of the
Fallbrook Public Utility District (which shall in-
clude interest on the unamortized balance of
construction costs of the project allocated to
municipal and domestic waters at a rate equal to
the average rate, which rate shall be certified by
the Secretary of the Treasury, on the long-term loans
of the United States outstanding on the date of
this Act) to be undertaken pursuant to section 1
of this Act shall be spread in annual installments,
which need not be equal, over a period of not more
than fifty-six years, exclusive of a development
period, or as near thereto as is consistent
with the operation of a formula, mutually agreeable
to the parties, under which the payments are
varied in the light of factors pertinent to the
irrigators' ability to pay.   The development
period shall begin in the year in which water for
use by the district is first available, as announced
by the Secretary, and shall end in the year in which
the conservation storage space in De Luz Reservoir
first fills but shall, in no event, exceed seven-
teen years.   During the development period water

46.

shall be delivered to the district under annual

water rental notices at rates fixed by the Secretary

and payable in advance, and any moneys collected

in excess of operation and maintenance

– 2 –

costs shall be credited to repayment of the

capital costs chargeable to the district and

the repayment period fixed herein shall be

reduced proportionately. The Secretary may

transfer to the district the care, operation, and

maintenance of the facilities constructed by him

under conditions satisfactory to him and to the

district, and, with respect to such of the

facilities as are located within the boundaries of

Camp Pendleton, satisfactory also to theSecretary

of the Navy.

U.S. rights        (c) For the purposes of this Act the basis,
under California
law.        measure, and limit of all rights of the United

68 Stat.577.States of America pertaining to the use of
68 Stat.578.
        water shall be the laws of the State of California:

Provided, That nothing in this Act shall be con-

strued as a grant or a relinquishment by the United

States of America of any of its rights to the use

of water which it acquired according to the laws

of the State of California either as a result of

its acquisition of the lands comprising Camp Joseph

H. P ndleton and adjoining naval installations,

or through actual use or prescription or both since

the date of that acquisition, if any, or to
create any legal obligation to store any water in
De Luz Reservoir, to the use of which it has such
rights, or to require the division under this Act
of water to which it has such rights.

(d) Unless otherwise agreed by the Secretary
of the Navy, De Luz Dam as herein provided shall
at all times be operated in a manner which will
permit the free passage of all of the water to
the use of which the United States of America is
entitled according to the laws of the State of
California either as a result of its acquisition
of the lands comprising Camp Joseph H. Pendleton
and adjoining naval installations, and the
rights to the use of water as a part of said
acquisitions, or through actual use or prescription
or both since the date of that acquisition, if
any, and will not be administered or operated
in any way which will impair or deplete the
quantities of water to the use of which the United
States of America would be entitled under the laws
of the State of California had that structure not
been built.

**Water delivery regulations.**  SEC. 4.  After the construction of the De Luz
Dam, the official operating the reservoir shall
deliver water to the Fallbrook Public Utility
District, pursuant to regulations issued by the
Secretary of the Interior, as follows:

48

(1)  One thousand eight hundred acre-feet in any year until the reservoir attains an active content of sixty-three thousand acre-feet;

(2) Not in excess of four thousand eight hundred acre-feet in any year after the reservoir attains an active content of sixty-three thousand acre-feet and until said reservoir attains an active content of ninety-eight thousand acre-feet; and

(3) Not in excess of eight thousand acre-feet in any year after the reservoir attains an active content of ninety-eight thousand acre-feet and until the conservation storage space of the reservoir has been filled.

Flood control. 33 USC 709.
SEC. 5.  The Secretary of the Army through the Chief of Engineers, acting in accordance with section 7 of the Flood Control Act of 1944 (58 Stat. 887) is authorized to utilize for purposes of flood control such portion of the capacity of De Luz Reservoir as may be available therefor.

Santa Margarita River Project, appropriation.
SEC. 6.  There are hereby authorized to be appropriated, out of any money in the Treasury of the United States not otherwise appropriated, $22,636,000, the current estimated construction cost of the Santa Margarita River project, plus or minus such amounts as may be indicated by the engineering cost indices for this type of construction, and, in addition thereto, such sums as may

be required to operate and maintain the said pro-
ject.

- 3 -

All 68 Stat. 578.

Sec. 7. From time to time the Attorney General,
the Secretary of the Interior, and the Secretary
Reports
to
Congress.  of the Navy shall report to theCongress concerning
the conditions specified in section 1 of this Act,
and the first report thereon shall be submitted
to the Congress no later than one year from the
date of enactment of this Act.

APPROVED JULY 28, 1954.

####"

- 4 -

MR. SWING:  Mr. Veeder, may I ask you in connection
with the police of the Act of Congress, which you have
just read (Reporter's Note:  See Page 39), stating pursuant
to laws of California your rights, do you recognize that
the pronouncement of the 9th U. S. Court of Appeals in
its decision of last year will largely shape the judgment
that will be entered in this case, and should we not, in
this negotiation for a physical solution, work on the
assumption of the pronouncements made in that decision?

MR. VEEDER:  In response to that, Mr. Swing, I think
we have made ourselves clear in the past in briefs that have
been filed, but you injected a factor that gives me a
great deal of concern.

It would be foolish for us to endeavor to anticipate

50

how the Court may dispose of these questions.

We -- it is our position, however, that the only matter that was or could have been decided by the 9th Circuit was the question that there were indispensable parties who were not before the Court.  We have expressed ourselves on that before, and I think Judge Carter answered your question very largely when he made this statement:  That he felt free to redecide any matter touched upon in that decision, so I think that the response has been made to your question by Judge Carter.  I think that is how we would have to leave it.

MR. SWING:  Do you recall the statement of Judge Carter in the transcript, which you have, of course, in your possession, on Page 140 and 141:

"I would like to provide in this order, which the Government is going to draw up, this general order about directions:  That there be a conference on physical solution of this problem, that there be some of them while I am gone, and if nothing is accomplished, after I rule on some of these things I am going to hear in September, maybe people will be more agreeable -- in a more agreeable mood to talk about physical solutions, because I am not so sure but that if the ruling of this Court follows a number of the suggestions made by the Circuit Court, whether you will want to say they are dicta by the Circuit, whether you will want to say that they are dicta by Judge Fee or whether they are instructions to the trial Court, or as some of the defendant's argue, that they are the law of the case, if my rulings are in accord with some of the rulings of Judge

Fee, I think the Government is in bad shape; they are going to start talking about buying water rights, or talking about physical solutions.  I am not prejudging the case, but you can read English language, as I can, and if you can acquire no prescriptive rights against upstream users, if you can't use, and you admit you cannot, riparian water for use outside the watershed, if there are limitations upon your right of storage for riparian use, and if you can't appropriate that through the procedures as set forth by the State water law, then you and these other claimed appropriators are merely tring to get your fist into the same bucket of water, and they are prior in right, prior in time, and as far astheir notice of appropriations are concerned, it may well be that you could give some consideration to this matter of physical solution."

You will recall his statement with reference to his indication that he intended, while making his own decision, he intended to be influenced and would in all likelihood be influenced by the pronouncements of the Circuit Court decision.

MR. MOSKOVITZ:  Gentlemen --

MR. VEEDER:  May I have -- make an inquiry?

I would like to have the Chairman rule as to whether this phase of the matter alluded to by Judge Swing comes within the purview of this meeting.

I didn't know that we were going to review the 9th Circuit decision and I ask you to rule upon the question whether it is properly discussable.

MR. MOSKOVITZ: I don't want to be put in a position
of ruling as to whether any of you gentlemen are in order
or not.

This is a conference of the parties. I would
like to make a comment: I think it is certainly proper
to explore the bases upon which any of the parties feel
free to engage in settlement discussions.

Once that is ascertained, I don't know that
any further discussion of that is really necessary.
That is, if the United States feels that they do not --
it does not wish to engage in settlement discussions on
the basis of the legal pronouncements of the Circuit Court
decision, I assume that the United States has that privilege
to decline to do so.

Once that fact is ascertained, and if that fact
is understood by all concerned, whether the United States
is well taken in that position or not, I think is not a
subject to be discussed here.

MR. VEEDER: I think you covered it very well, Mr.
Chairman. We don't feel that that decision would guide
us in regard to any proposed settlement.

MR. MOSKOVITZ: That doesn't mean other people might
not think it would not be a good idea, but settlement
discussions are a voluntary matter.

MR. VEEDER: I think you are right.

MR. MOSKOVITZ: I would like to ask a question at
this point. It is directed to all parties. It is raised
by a comment you made, Mr. Veeder:

53

1          You wouldn't feel the United States could

2     agree to any settlement which gave up rights the United

3     States owned or rights the United States feds it owned,

4     and you don't think any other party would feel free to

5     do likewise?  In other words, the only basis that parties

6     can settle on is if they got everything they are asking

7     for.

8          Now, it strikes me if everyone sticks to that

9     position, you have no basis for a settlement.  That is,

10    the claims certainly are contradictory of the chief

11    litigants involved here, and let me as you this:

12         Mr. Veeder, do you feel that the De Luz authoriza-

13    tion Act restricts you from agreeing to compromise or

14    a settlement which would leave the United States with

15    less than it has been asking for in the lawsuit, as a com-

16    promise, if at the same time there were departures and

17    concessions by the other litigants?

18         MR. VEEDER:  I think at this juncture that I would

19    rather not respond to that question.  If some one has

20    a proposal in regard to a settlement, why, let us hear

21    it, and I think that would be -- rather than go into the

22    ozone on this, I would rather very much, if somebody is

23    going to tender a proposal, to examine it and then we

24    will tell.  I think it probably has to be ruled on at the

25    highest position of the Department of Justice on that,

26    frankly, but our view is if -- we would like to hear any

27    offers of settlement there are.

28         We have outlined the basis upon which we are

guided.  If a good settlement is offered to us, why, of course, we will re-examine the whole matter.

MR. SWING:  May I ask Mr. Veeder a question along that line?

Is there any physical solution which you would recommend agreeing to, which would, in your opinion, be within the law and within the present rights of the Government?

MR. VEEDER:  Well, I -- again, the only response I can make to that, Mr. Swing, is that if you have an offer to make, we would certainly entertain it.  We would like to see it, and, indeed, Colonel Robertson wrote to Mr. Yackey and petitioned him to have Fallbrook submit to us a proposed physical solution for our consideration.

Am I right, Colonel Robertson, we haven't heard from that?

COLONEL ROBERTOSN:  Yes.

MR. SWING:  Mr. Veeder, would you, yourself, propose any physical solution?

MR. VEEDER:  Why, I am just a lawyer, Mr. Swing, and I am trying my best to represent my clients just like you are, and if a good physical solution would show up, and the consultants, the engineers, would say it is a good one, why I, of course, would consider it, and I am anxious to consider it, and I would want the record very explicit on this matter:  We are here with the idea and purpose of carrying out physical solution, an agreement if it is possible.

MR. SWING:  Do you think it is possible?

MR. VEEDER:  It depends on what you are going to offer.

Incidentally, has the Fallbrook Public Utility District completed its plan for a physical solution as Mr. Yackey said he would?

MR. SWING:  Mr. Veeder, I would, and, Mr. Chairman -- Pardon me -- I would be skeptical of any person who came in with a patented proposal, a bulk proposal.  We are here, as I understood the Court's order, to confer, one with the other and search out fairly and realize a physical solution, which, if such were going to be worked out, would be the contribution of all parties, including the United States Government, and I think there has got to be an open-minded approach to this, and a give and take attitude, and we have not come in with any prize package and say, "This is our proposal," because we are here to confer upon a proposal, and I expect you to make as big a contribution towards a physical solution which must be agreed to be all as Fallbrook would make a contribution.

Do you differ from that approach?

MR. VEEDER:  Well, no.  I am completely -- I don't mean no -- yes, I am in complete accord with what you said, Mr. Swing, and I think that a place to begin would be here:  What are the extent of the rights to the use of water claimed by the United States of America that you are willing to recognize as being vested in the United States at the present time?

MR. SWING:  Of course, we cheerfully, fully, unreservedly

recognize your riparian rights for use of the waters of the
Santa Margarita River on your riparian lands for riparian
uses and purposes, but a physical solution, in my under-
standing of the word, as used in California decisions,
is where the -- a substitute, you might say, for the
highly technical legal rights, and it is in one sense
of the word a compromise by which something just as good
as is put in the place of what technically the law might
require, so here it would seem to me that we were called
together, or asked to come together by Judge Carter for
the purpose of seeing what we could agree to, mutually,
as a physical solution, as a substitute for a long drawn
out, expensive trial and litigation.

MR. VEEDER:  We are here for the same purpose.  We
are anxious to have it done.

MR. MOSKOVITZ:  May I inject for a moment -- I think
the order that the Court issued with respect to this
subject was that discussions would revolve around settle-
ment or physical solution.  Now, I assume that the ob-
jective is to settle the case without litigation, without
the necessity of a trial.

In doing so, I assume the parties are free, as
they would otherwise be, to settle on the basis of a
physical solution, if they can agree to it, or without
a physical solution, if they feel they can reach agreement
that way, so that physical solution is one of the mechanics
by which agreement can be reached, but I wouldn't think
it is necessarily exclusive.

I wonder if at this time if Mr. Veeder has stated everything that you want to, if at this point whether we should not go on to other parties and hear what they have to say. It is practically 12 --

MR. VEEDER: I think it would be excellent to go on to other parties.

MR. MOSKOVITZ: It is nearly 12 o'clock. Would you like to recess at this point and pick up again in an hour or an hour and a half?

Are there any here who would like to make their statement at this point, because of their schedules?

MR. DENNIS: I don't know that it necessarily involves a schedule, but I think I will stick my neck out for Santa Margarita/and try to get the ball rolling oneway
                    Mutual
or the other.

It seems to me any physical solution or settlement of the case that is going to produce any water in accordance with the State's water plan is going to involve the erection of a large dam at the De Luz Site or a combination of a medium sized at De Luz Site and a medium sized at Lippincott Site, is going to involve the principal parties, the Fallbrook Utility, the United States of America and the Santa Margarita Mutual. I don't think that any other litigant has any real interest in this lawsuit so far as an erection -- the construction or erection of dams on either theDe Luz Site or the Lippincott Site.

Santa Margarita has made the statement before

that so far as the riparian owners are concerned, they
are not making any claim at all against riparian owners
or overlying owners as to what water they can put to
beneficial use on their riparian or overlying lands, so
that then any physical solution, as I see it, or any
settlement of the case involves the construction of either
the De Luz Dam or a dam at De Luz and a dam at the Lippin-
cott Site.  That is going to take the agreement of the
three principal parties, Fallbrook, the Government and
Santa Margarita.

Naturally, the United States' position in
regard to the quantity of water which it is entitled to
use by virtue of riparian ownership, by virtue of appropri-
ation, overlying lands, or prescription is different from
the position from that taken by Fallbrook and Santa
Margarita, but I think the position also of the Government
is different from that of Santa Margarita and to Fallbrook
as to what are surplus waters and what waters are subject
to appropriation.

If we are to have any settlement, it seems to me
that we are going to have to arrive at two things:

First of all, all three parties are going to
have to agree that they are willing to make some adjustments
in respect to their claims as to what water they are
legally entitled to and, second, they are going to have
to make some -- come to some agreement as to how they will
bear, or how the expense of conserving these additional
waters will be met.

Now, if the Government is not -- the United States of America is not interested in entering into negotiations on that basis, naturally, you are going to have to throw out the De Luz Dam Site and concentrate entirely upon the Fallbrook Water or the Lippincott Site.

I also think that so far as my client is concerned, they are willing to make concessions for water for the United States of America for use for military purposes within the reservation. The extent of the concessions which they would make -- and I am talking about water which they feel they are entitled to by virtue of their appropriative rights -- the extent to which they would make those concessions would depend upon the location of the dam and such aids as might be given in -- relative to the construction of facilities to conserve the water.

I think that what I have said is going to require an answer from Fallbrook as well as from the United States of America.

MR. PEPPLE: Mr. Chairman, I don't think that other people should be counted out in this, and have the three decide this, because there are other people interested, and I think any dam that is put on the river should be where it would conserve the most water, and it seems to me like it would do the least harm to the people -- the De Luz Site has already been selected by the Government, and, as Mr. Veeder points out, that is the arrangement that Congress has made, and any other dam on the river, I think would be a waste of the People's money, and also it

1   would harm the people that are vitally interested on

2   that river.  Thank you.

3       MR. MOSKOVITZ:  We can continue with discussion of

4   what Mr. Dennis has said at this point, if you like, or

5   keep that in mind and resume after lunch.

6       I suggest that we recess for lunch and perhaps

7   when we come back perhaps be prepared on these two

8   questions:

8       As far as the defendants are concerned, whether

9   they are willing to recognize anything -- in a settlement,

10  anything more than what the Government would be entitled,

11  in their opinion, to use, as a riparian landowner, that is;

12  are they willing to go further than that towards settlement,

13  to recognize some sort of rights, as Mr. Dennis pointed

14  out, which the Government may be asserting as an appropri-

15  ator, and conversely, whether the United States would

16  be willing to entertain a settlement on the basis that

17  there is water in the river, which can be conserved and

18  utilized by parties other than the Government, that is,

19  is there in the common, ordinary term, unappropriated water

20  which other people could acquire the right to and which

21  the Government will permit them to acquire the right to?

22      MR. VEEDER:  I can answer that right now.  The United

23  States of America readily recognizes that upstream are

24  innumerable riparian rights that are vested whbh we respect.

25  Mr. Pepple has brought up a point that I think should be

26  cleared up before we go to lunch.

27      The United States doesn't believe that there are

1   only three parties involved.  We truly believe that the

2   small riparian owner has just as much rights here as

3   anyone else.  Moreover, the United States is committed

4   to recognize there are upstream riparian rights,

5   and I don't believe any conversations can proceed if we

6   ignore those rights.

7       MR. MOSKOVITZ:  Yes.  Apparently all the three major

8   parties that have made statements thus far agree to that.

9       Now, the question is whether the United States

10  would agree to anything further than that in terms of --

11  to appropriative rights in the area downstream from

    Railroad Canyon.

12      I just leave those with you, because it seems

13  to me those are the key points, and perhaps they can be

14  taken up afterwards.

15      Is that all right, Mr. Veeder, or do you want

    to make a statement.

16      MR. VEEDER:  It is fine with me.  I want to say in

17  addition to Congressman Utt's Bill, I would like to also

18  enter into the record the statement by the President of the

19  United States, dated July 28, 1954, in which -- when the

20  bill was signed.

21      MR. MOSKOVITZ:  All right.  Let's adjourn then until

    1:30.

22

23      (The following is the text of the President's statement

    above-referred to:)

24      "IMMEDIATE RELEASE      COPY            JULY 28, 1954

25      JAMES C. HAGERTY, PRESS SECRETARY TO THE PRESIDENT

THE WHITE HOUSE

STATEMENT BY THE PRESIDENT

I have signed today H.R. 5731, a bill "To authorize the Secretary of the Interior to construct facilities to provide water for irrigation, municipal, domestic, military, and other uses from the Santa Margarita River, California, and for other purposes."

This legislation grows out of the long-standing controversy between the United States and the Fallbrook Public Utility District and other water users concerning rights to the use of the waters of the Santa Margarita River. The bill will provide authority for the Secretary of the Interior, after certain determinations have been made, to construct storage facilities to satisfy the needs of the Fallbrook District and also of the United States if its water rights would not be jeopardized. I believe this legislation will be helpful to all agencies and persons concerned and I congratulate all those who cooperated in obtaining its enactment.

It is to be noted that, unless otherwise agreed by the Secretary of the Navy, the facilities authorized by the bill, including the De Luz Dam, are to be operated in a manner which will permit the unobstructed passage of all of the water to which the United States is now entitled. It is likewise to be noted that the bill is not to be construed as a grant or a relinquishment of any of the rights in the Santa Margarita River

which the United States now owns.  That stream provides
the essential supply of water for Camp Pendleton,
a naval hospital and a naval ammunition depot.  Each
of those vital establishments is important for
purposes of national defense.

The bill authorized the Secretary of the Interior
to construct the dam and other facilities only after he
has determined that the project has economic and
engineering feasibility.  It is my understanding
that such a determination will not be made until he
has found that there will be ample water available
in the Santa Margarita River for storage at the De
Luz Dam, separate and apart from all rights to the
use of water of the United States (except any appro-
priative rights hereafter obtained) and of all
claimants on the stream.

In view of litigation now pending between the
United States and other claiments to water from the
Santa Margarita River, I shall expect theSecretary of
the Navy to obtain and be guided by the advise of the
Attorney General before taking any steps to acquire
additional water rights in the River on behalf of the
United States.  Furthermore, I expect that the Secretary
of the Navy will not agree to the impounding of any
water to the use of which the United States is entitled
without first consulting with the Attorney General
and obtaining from him advice that such impounding
will not be a grant or relinquishment of any of the

rights to the use of water which the UnitedStates

of America has acquired in accordance with the laws

of the State of California."

(Whereupon the proceedings were adjourned until

1:30 p.m., this date.)

AFTERNOON SESSION

(The meeting was resumed at 1:30 p.m., July 15, 1957, after which the following proceedings were had, to wit:)

MR. MOSKOVITZ: We closed after Mr. Dennis made a short statement on the position of the Santa Margarita Mutual Water Company, and at this time, before we hear any more statements, I think there should be an opportunity to discuss or ask questions about what Mr. Dennis said.

Mr. Veeder, did you have something you wanted to say to that?

MR. VEEDER: In regard to what Mr. Dennis has proposed?

MR. MOSKOVITZ: Yes.

MR. VEEDER: I would like to have it reread. Would you read it back, Miss Reporter, and as I understand it, he recognized all of our rights?

(The statement of Mr. Dennis was read by the Reporter.)

MR. MOSKOVITZ: Mr. Dennis said that he thought this would require a response from you and from Fallbrook, and I want to give you that opportunity.

MR. VEEDER: I quite agree, but the first matter I want to bring up in that regard -- you haven't responded to our proffer in regard to the Bill introduced by Congressman Utt. Would you consider a compromise on that basis?

MR. DENNIS: Well, as I understand, we are not talking about any real vital point when we refer to Mr. Utt's Bill. Certainly, your interpretations of what rights the United States has, either by virtue of its riparian owner-ship of lands or by virtue of rights which it may have

acquired by appropriations or by prescription is different
from that taken by Fallbrook or Santa Margarita or the
9th Circuit Court of Appeals, as I understand it, so that
-- which is not unusual in that it is seldom that
attorneys will agree even when they are on the same side
as to just exactly the extent of a water right, or whether
that water right exists.

Certainly in this particular problem, that is,
the Santa Margarita River, there is -- there has been
no adjudication of the rights of the United States of
America or of Fallbrook or of Santa Margarita Mutual or
of any other defendant, and there are a great many inter-
pretations as to the law, and what those rights are.

Under that set of circumstances, I think that
the United States is in a position, under the Utt Bill,
where they can say that we think that this is a fair --
if we get this and do this, and Santa Margarita and Fallbrook
get this and Fallbrook get this , we feel that is all we
are entitled to under the law.  I don't think I can say
with absolute certainty what the rights of my clients,
Santa Margarita, are.

I have my opinion.  With all due respect to the
Representative for the Government, I don't think they can
predict the outcome of this lawsuit or in detail what the
rights of the United States are.  I think that we have
a plateau here in which reasonable people could agree that
their rights are such and such, or maybe they are entitled
by virtue of their riparian ownership to maybe 2,000 acre

feet of water, in addition to what we'll say the appropriators would give them, but they might get 2,000 acre feet of appropriated water from the appropriators, which would balance it off, so I don't think we will -- really have to answer the Utt Bill, because I don't think anybody knows what the rights of the United States are at the present time.

You have your opinion, Mr. Swing has his, and the Court probably will have an entirely different opinion.

MR. VEEDER: Do I understand then you reject the idea of settlement on the basis of the Utt Bill?

MR. DENNIS: No.

MR. VEEDER: I truly didn't understand what you said, Mr. Dennis, then, because --

MR. DENNIS: I'm sorry.

MR. VEEDER: -- Because, as I understand, the Congress has spoken on this matter, and we take the position that certainly Mr. Swing readily concedes our riparian rights. Necessarily, we claim water outside of the watershed; we have a large number of structures out there, so I don't think you would desire to dry up those areas there, and that is really the substance of the Utt Bill, is the Riparian rights that are spelled out, which Mr. Swing and you both concede, plus the rights we are using outside the watershed.

Now, you know quite well what those rights are, and so I don't think there is anything vague about our proposition.

MR. DENNIS: Well, I hardly agree with you on that,

Mr. Veeder.  As I understand, you have contended consistently throughout these proceedings that by virture of your riparian rights you have the right to take water and use it for military purposes.

MR. VEEDER:  Right.

MR. DENNIS:  Mr. Swing has taken the position that by virtue of the laws of the State of California, you do not have the right to use water.

MR. VEEDER:  May I interrupt there?  Is that your position, Mr. Swing?

MR. SWING:  I will state my position when I get to it.

MR. VEEDER:  Normally you do, sir, and when Mr. Dennis began stating it --

MR. DENNIS:  Well, at least, that is the way I understood the brief and the statements he made before the trial court, --no at the time of trial, preliminary hearing -- for military purposes.  Certainly the 9th Circuit Court of Appeals casts some doubt upon your right to use water for military purposes by virtue of your riparian rights.  You recall that I have not taken any position one way or the other in that -- on that particular fact. There are other things that enter into how far you can go, as I recall, and I may be mistaken -- if I am, you can correct me, but it certainly was my impression that during the trial of the case, you stated that if you could use a certain quantity of water on riparian lands for agricultural purposes and for some reason you saw fit not to do so, you had the right to take and use an equivalent

amount of water and use it for military purposes, either in or outside the watershed.

MR. VEEDER:  Mr. Dennis, I can't let that statement go, because now our position is not well defined with what you just said.

MR. DENNIS:  Could we get it defined at this time then?

MR. VEEDER:  Of course.  We put it into the lawsuit. It is in there now.  We proved the waters that were used outside the watershed; we proved the waters that -- we proved our riparian rights.  I don't believe there is the slightest -- any vagaries at all in regard to our position, and the Utt Bill is nothing more or less than reflective of those rights; and this is the unique situation:  No one likes to apparently accept the proof that we put in as to the measure of our rights.

Now, there is the basis of our claims, and you well know them, better than anyone perhaps.

MR. DENNIS:  Wouldn't it be fairer to ask you at this time:  Are you at the present time claiming any right by virtue of the -- of your riparian ownership of lands to use water outside the watershed for military purposes?

MR. VEEDER:  That has been completely rejected in the Court.  It is in the records.  We have never claimed any right to use riparian water outside of the watershed.  We never have.

MR. DENNIS:  For any purpose?

MR. VEEDER:  I don't believe there is such a thing,

Mr. Dennis, as riparian water outside the watershed. I just don't believe that it exists.

MR. MOSKOVITZ: I think there is unaniminity on that point.

MR. VEEDER: I also add there certainly should be unaniminity on the basis of what we have said in our briefs and on our statements here that we claim no right to use riparian water outside the watershed.

Now, we have only been saying that since 1949, and I will continue to repeat it, so I think this, Mr. Dennis:

You have -- and I am not being captious in the slightest -- you have before you the measure of the rights of the National Government, what we are claiming. We have reflected in the Utt Bill those rights. We came here in utmost good faith, and I don't mean a pun, and said that under the Utt Bill we would be very glad to proceed to a physical solution, to a settlement, and up to this moment, we have had no takers.

MR. DENNIS: Well, as I understand then, any physical solution or any settlement which might be worked out in this case, under your interpretation of the Utt Bill, would involve that we would have to accept the Governments' position as to what their rights are under the laws of the State of California, and that there could be no compromise made in regard to the Government's position by its duly authorized representatives?

MR. VEEDER: I don't follow -- our view is this: That we have put in our claims and proved them, in our view, and if someone wants to settle on that basis, why, we will sit

down --

MR. DENNIS:  In other words, the settlement would have
to be on your views of the laws of the State of California?

MR. VEEDER:  No.  You come up -- we have made our
proposal, Mr. Dennis.  We have outlined to you what we are
claiming.  Now, what are your rights, and what offer or
counteroffer are you making?  Are you, for example -- are
you ready now to tell me, or tell the record or tell
all of us how and what your relationship is with The Fallbrook
Public Utility System?  What is that relationship at the
moment

MR. DENNIS:  You mean, is there any arrangement been
entered into between the Fallbrook Public Utility System
and Santa Margarita Mutual Water Company relative to their
respective rights?

MR. VEEDER:  Right.

MR. DENNIS:  There has never been any discussion so
far as I know -- formal discussion of the rights of Fallbrook
and Santa Margarita as between the two entities.

MR. VEEDER:  Now, as I understand it, you two are
sharing the same reservoir, are you not?  I mean --

MR. DENNIS:  Same location, right.

MR. VEEDER:  You are on the same location with Fallbrook?

MR. DENNIS:  Right.

MR. VEEDER:  How much water do you think you can
impound there?

MR. DENNIS:  Mr. Conkling's testimony, you had it
before you in the trial of the case, and he sees nothing

in '57 which would change his opinion materially.

MR. VEEDER:  Well, you have a direct flow right.  Certainly, you are not going to claim that is a right to store, are you?

MR. DENNIS:  That is correct.

MR. VEEDER:  You are not?  Well, how much water are you claiming under your direct flow right, which must be taken somewhere else than the Lippincott Site?

MR. DENNIS:  Not necessarily right.

MR. VEEDER:  Are you going to divert the fifty second feet or sixty second feet at the Lippincott Site; is that the plan?

MR. DENNIS:  That is what the application says.

There are applications on direct flow, Mr. Veeder, and one application for storage at the Lippincott Site and one application for storage at the Vail Site.

MR. VEEDER:  Well, I still -- see, we have given you the measure of our rights, and I am trying to find out the measure of yours.

MR. DENNIS:  I may be a little thick, but I am somewhat hazy in my own mind as to the -- what the Government's claim is at this particular time.  We say that there is at least between 15,000 and 20,000 acre feet of surplus waters that can be preserved by the erection of adequate surface storage facilities on the river.  We said that in the other case.  Now, I heard you this morning state that you didn't think that was correct, but I have heard no estimate as to whether the Government feels that there is

any surplus water in the river or not.

MR. VEEDER:  Well, I am going to say this, Mr. Dennis:

We don't think there is any surplus.  Indeed, we think the river is tremendously overappropriated.

MR. DENNIS:  In other words, your position at the present time is that there is no surplus water subject to appropriation in theriver?

MR. VEEDER:  May I hasten to say I, asan individual, truly believe that.  Whether or not there may be a momentary flash when there is some surplus, I don't -- I couldn't say.  Certainly, for the last fifteen years, we would say there has been no surplus, but that -- when I am saying that, I am not rejecting any offer, any suggested offer, counter offer.  Now, we have made our offer.  If you have -- if you care to delineate to us now your proposal of settlement, why, Mr. Dennis, we are off and running.  We don't quite understand how you and Fallbrook are going to occupy the Lippincott Site, truly, we don't.  Mr. Swing used the term "cookoo-birds nest".  I thought that was unkind, but it seemed -- it did seem not kind, but it also pointed up a very important fact, that when we started talking about settlement -- now how do we settle with you and Fallbrook on the same site for the same water, because you are both claiming the same water.

MR. MOSKOVITZ:  Mr. Veeder and Mr. Dennis, I might inject here:  It seems to me as a basis of settlement it can be said that there is so much water available for storage by somebody; who that somebody is will be determined

in the first instance by the California State Water Rights Board in passing upon conflicting applications for the same water at the same site.

As far as the United States is concerned, I suppose that as long as you are guaranteed a certain quantum that you think you are entitled to, anything over and above that could be developed by anyone else, as long as you were safeguarded in what you thought were your rights; wouldn't that be correct?

MR. VEEDER:  Oh, yes, oh, yes.  We told Mr. Swing a long time ago if there is this water and Mr. Dennis the same way, if the water is there, by all means, gentlemen, go and put in your structure, use it.  We favor that, highest and best use, highest conservation.

MR. MOSKOVITZ:  In other words, it doesn't really concern the United States which of those that would like to conserve the water actually gets the right to do so?

MR. VEEDER:  No.

MR. MOSKOVITZ:  So you don't have to have the resolution of any difference that may exist between the various appropriators?

MR. VEEDER:  Mr. Moskovitz, that is your statement; not mine.

MR. MOSKOVITZ:  I want to know if you agree.

MR. VEEDER:  The point of it is:  That we truly believe this, that when the rights are adjudicated, as they ultimately must be, that there probably won't be what has been referred to as a surplus.  We just don't believe

that in a river that is so terribly overappropriated that you can view a surplus in the sense -- as Mr. Dennis has said. We don't see how there can be a surplus, frankly, when there is full development, but that's -- we are not rejecting his plan at all.

All I am trying to do is to find out how Fallbrook and Santa Margarita Mutual are going to occupy the same spot at the same time, and that is a problem, Mr. Moskovitz, even though you folks are going to resolve these questions.

We view it this way: That the Legislation that is on the books might not be construed too favorably for Mr. Dennis, but we -- we are taking no position on that.

MR. MOSKOVITZ: May I ask another question? Would you feel the United States' rights were safeguarded if there was an assurance that the quantity of water, which the United States, let's say, this past year has used both inside and outside the watershed were recognized as being within the United States' rights, and that any water which was left over above that could be appropriated by others?

MR. VEEDER: What is your view, Mr. Moskovitz, of the law of the State of California in regard to riparian rights? Do you mean at the present moment is the measure of the right? Isn't there some reasonable potential development under riparian claims?

MR. MOSKOVITZ: Certainly there is, under California law. As I understand it, most of the development which

exists on Camp Pendleton is outside the watershed.  Am I correct, that is, most of the use is actually being made outside the watershed?

MR. VEEDER:  I wouldn't say that, Mr. Moskovitz.

MR. MOSKOVITZ:  No?  How about your plans for the future, having more -- if you expand your base, would those uses be within or outside of the watershed as far as you know the plans?

MR. VEEDER:  Well, I would assume they might be both in and out.  You see, the Kremlin has something to say about how big that camp is going to be, but by and large, we certainly would be exercising our presently existing vested rights in any future development.

MR. MOSKOVITZ:  Do you feel that you have presently vested rights to use more water than you are now using outside the watershed?

MR. VEEDER:  That is a difficult question.  I mean, it would be something that we would want to talk about when we get a little further along.  I still would like to have Mr. Dennis respond to my inquiry if he would, whether he is going to accept or reject the measure of our rights as claimed and as reflected in the Utt Bill?

MR. MOSKOVITZ:  Mr. Veeder, let me say one more word. You just admitted now the question of your present rights included the right to use or increase outside the watershed, that that is a tough question.  That means, to some extent, what the United States claims is still not definite.

MR. VEEDER:  Does it?

MR. MOSKOVITZ:  Well, doesn't it?

MR. VEEDER:  I would assume that is entirely -- I threw out the caveat the Kremlin could affect that a little bit if they decided to go to war.

MR. MOSKOVITZ:  Then, it is difficult for anybody to say whether they are willing to accept this basis or not if they are not sure what it is.

MR. VEEDER:  Well, I think they can view it as we presented it in the lawsuit, Mr. Moskovitz.  Have you ever looked at the transcript in that case?

MR. MOSKOVITZ:  Yes, I looked at the transcript.

MR. VEEDER:  Well, didn't you find in there proof in regard to the claim?

MR. MOSKOVITZ:  Well, it was proof which the Circuit Court found was not adequate.

MR. VEEDER:  Now, Mr. Moxkovitz, we don't accept your premise.

MR. MOSKOVITZ:  I'm sorry.

MR. DENNIS:  I will answer your question, Mr. Veeder, and that is this:  The Utt Bill, as I understand it, only goes to the rights of the United States under the laws of the State of California, and as to that, I would accept it; as to whether it goesto the claims of what rights the United States has under the laws of the State of California, then, I would not accept it, because I think that the claims of the United States and their rights are two entirely different matters.  I think that the 9th Circuit Court of Appeals acknowledged that fact in their decision.

MR. MOSKOVITZ:  Let me inject one other thought.
If I intrude too much, I would be happy to accept anybody's
remonstrance, but it seems to me it might be helpful as
we get into more detail in this for the United States to
set forth, and the other parties also, set forth in
quantitees or flows or some other appropriate measure
what their claims are.  I am not sure there is as much
understanding or as clear an understanding what each
claims are as some people assume.

MR. VEEDER:  All right, the riparian claims of the
United States -- and I reserve the right to change that,
because I am shooting from the hip -- the riparian rights
as proven in the 9th circuit, were 69,069 feet per acre
a year, riparian rights.  As I recall, the rights outside
the watershed, in the Stuart Mesa area (phonetic) and
South Mesa area was, I think, in the neighborhood of 4800
acre feet -- 4800 acre feet.  That is outside of the
watershed.  Lake O'Neill, as I remember, was 4400 acre feet
annually.  I believe that was the limit of it, wasn't it?

Oh, yes, and the --

MR. SWING:  Did you say 69,000 --

MR. VEEDER:  69,000 acre feet per year.

MR. DENNIS:  Mr. Veeder, did I understand you to
say those claims were proved by the 9th Circuit?

MR. VEEDER:  I didn't hear.

MR. DENNIS:  Did you say those amounts were proved
by the 9th Circuit Court of Appeals?

MR. VEEDER:  The only question, the only question

that was passed upon by the 9th Circuit was the fact that there was a lack of jurisdiction to enter a judgment by reason of the want of indispensable parties.

MR. MOSKOVITZ: Mr. Veeder, I note in the statement of the claims you come up with a total, I believe, which is far in excess of the actual flow that can -- the average flow over a long period. Actually, your rights wouldn't cover that much water, would they, because the water isn't there?

MR. VEEDER: Oh, Mr. Moskovitz, as far as we are concerned, the unhappy circumstance of not having enough water to meet the extent of our rights is just one of the things that occurs in any arrid region.

I think the Vails, for example, got 3 acre feet per acre, and the number of riparian acres that they have -- don't hold me to this, and I am certainly not trying to commit Mr. Hall or Mr. Vail to the proposition -- I think it would run 70,000 acre feet or something like that. Am I right, Mr. Hall?

MR. HALL: Approximately, yes.

MR. VEEDER: In other words, Mr. Moskovitz, you don't measure your rights by the quantity of water in the stream; you measure your rights by the legal rights to take the water.

MR. MOSKOVITZ: I mgith be naieve, but it seems to me to measure yourrights in terms of some theoretical quantity like that is not helpful.

MR. VEEDER: Well, if you were a riparian owner, it

would be this way:  We would have the basis upon which
we would participate in available supply --

MR. MOSKOVITZ:  Would it be possible to translate --
I don't mean right now -- translate for the assistance of
this conference, those numbers in terms of what supply is
actually available so you can talk about the amount that
you would claim that is actually in the watershed and in
the river?

MR. VEEDER:  You mean some -- as of today?

MR. MOSKOVITZ:  Well, whatever your current claims
are over a long period of time.

MR. VEEDER:  You see, one of the real difficulties in
this, Mr. Moskovitz, is this:  That if the United States
of America was not using and re-using its water, that is,
relying upon sewage affluent to survive down there, we --
our base would be gravely impaired.  I don't know what --
whether they would be destroyed or not, but certainly we
are using and re-using the water, and when you talk about
the shortage of water, we know.  We live with it, but we
are talking about nothing theoretical when we talk about
riparian rights to the use of water, and we have moreoever --
Moreover, in the last fifteen years, I think -- I think that
there were five, maybe six years when the record showed
zero, so we well realize -- we realize that we talk of the
measurement of our rights, but we can't talk about the
availability of water, because it is not there.

I don't know any other way of measuring rights,
Mr. Moskovitz.  How would you measure your rights?

MR. MOSKOVITZ:  It seems to me the way to measure
rights is to correlate the claim with the water that is
there, and say my right is to take so much of the water
that flows by.  If there is a flow of a hundred acre
feet, my entitlement is fifty acre feet; if there is a
flow of a thousand feet -- but you talk about a right to
50,000 when there is only 20,000 that ever flows in a
year.  Isn't that -- that isn't very helpful in attempting
to arrive at a settlement.

MR. VEEDER:  Now, perhaps, you can help us then.  You
tell us how much water is going to flow in the Santa Mar-
garita River every year henceforward, and we can start
talking that way.

Your problem is this, Mr. Moskovitz:  There
simply is a grave shortage of water in that stream, so
you cannot anticipate -- I would be fired summarily if
I were to say, well, we measure yourrights on the basis of
the quantity of water that flows in the stream.  That is
what you have asked, Mr. Moskovitz, and we can't do it.
We have to have a criterion and we believe in the California
law, and the California law says this is what you have
as riparian owner, not how much is in the stream.

MR. MOSKOVITZ:  Would it be possible to go back
threough a period of record, for example, the one that was
used as an average period in the report of the State of
California and indicate your criterion under those conditions,
what wouldbe -- would have been claimed by the United States,
and thereby indicate what might be left over?

MR. VEEDER:  Well, I think the California Supreme Court handled it very nicely, reported in 11 Cal 2d, I have forgotten the page:  It said, "It is conceded by everyone, it is a known fact, the Court takes judicial notice of the fact," in substance, it says, that there is not enough water in the river to meet the riparian claims of the Vails and the United States of America, or , I mean, of the Rancho Santa Margarita, so that has already been decided.  There is not enough water there for the two single -- for either of the two larger riparians.

Now, how would we go back through a stream flow and say, "Well, now, here is so much water and we assert our claims."  Why we live off of it -- here's how we live on this stream, Mr. Moskovitz, we live this way:  We don't get any water for quite some time, particularly since the pumping began immediately above us, so we are confronted with a very serious problem.  We have to wait until the water gets there to use it, so we have these zero years that we make up by the fortuitous circumstance of a little water reaching us.  That is our problem, so you couldn't possibly measure.  I don't believe your criterion would be valid for us to undertake to measure our rights on the basis of what happened to flow by a particular guaging station.  I don't believe that would be sound irrigation practice to begin with, nordo I think it would be the way you would measure your rights under the California law.

MR. MOSKOVITZ:  Do you care to make any further comments

on what Mr. Dennis said?

MR. VEEDER: I still haven't heard whether my offer is accepted or rejected.

MR. MOSKOVITZ: I think he said plainly --

MR. VEEDER: That he was rejecting it?

MR. MOSKOVITZ: I didn't understand it as that. You can put your own interpretation --

MR. DENNIS: I didn't think I said that.

MR. MOSKOVITZ: Mr. Swing, do you have any comments on what Mr. Dennis said or would you like to embark upon your own statement?

MR. SWING: I am sure among the several thousand words spoken in this brillian exchange between Mr. Veeder and Mr. Dennis there must have been a few grains of seed that ought to be sought out, and in an effort to do that, I would like to ask Mr. Veeder one or two summarizing questions on his comments.

Mr. Veeder, do you feel so bound by the Congressional act, portions of which you read this morning, that you could not agree to a physical solution other than the one in that Act proposed?

MR. VEEDER: Well, Mr. Swing, I have already answeredd that question. I have answered the question in this manner:

I said if there is a proposal tendered, we would review the proposal against the background of the Utt Bill. I wouldn't be -- I would be very foolish to say we will accept carte blanche any kind of an offer.

If you make a proposal, as we requested you to, sir,

we will be glad to see whether in our view and in our interpretation, it comes within the purview of the Act.

MR. SWING:  My question was -- may I repeat it to you:

As I understood you this morning, you said that you were bound by the declaration of policy of Congress as -- in the provision which you read into the record this morning, and I am asking you now whether you are -- feel unable to here agree to a physical solution other than that proposed in that Act?

MR. VEEDER:  And I said, Mr. Swing, that when a proposal is made, we will come to that question, and we will resolve it.

I have said, and I repeat, I would be very reluctant to say, absent the presence of an offer to us, that we would depart from the formula as prescribed by the Congress of the United States.  I said we would be reluctant.  I didn't say we would reject it.

MR. SWING:  You would be reluctant to vary from the declaration therein contained; is that a correct statement?

MR. VEEDER:  Depending a lot on the offer.  I would have to consult with the engineers on the offer, but I think if it came within -- reasonably within that, we could certainly make some adjustment.  We are not rejecting anything, Mr. Swing.

MR. SWING:  That Act could be amended if all parties agreed and asked Congress for it.

MR. VEEDER:  Right.  Oh, you are right.  I mean there is nothing invariable about that Act.

MR. SWING:  One more question:

Based upon what you said this morning, as I understood it, that is, it was your position that there is not in the Santa Margarita River, from time to time, any unappropriated water, which is subject to appropriation under State laws?

MR. VEEDER:  Had you not thrown in that "from time to time," I think we might have gone along.  I think that there is conceivable in 1916 there was surplus water.  I think Mr. Hall knows what occurred, and maybe you know. There was quite a lot of water there, and I dare say it was subject to appropriation if somebody had receptacle, but in my ten years on that river, and fifteen years the Marines have been on the river, we say there has been no surplus water, and I point to no one less than Mr. Edmonston, who said the same thing, so that is the situation, Mr. Swing; we know that an erratic stream on occasion will have more water than is needed, but we say also that under the California law, the mere fact that the water goes into the ocean on occasion doesn't mean that the water is wasted, doesn't mean that it is necessarily surplus.

MR. SWING:  Mr. Chairman, following up Mr. Dennis' statement before we adjourned, and in an effort to relieve the Federal Government of the fear of future upstream development by riparians and prior appropriators, I would like to say on behalf of Fallbrook that under its existing State permit for 10,000 acre feet of Santa Margarita River water, and the two pending applications

before the State Water Rights Board, hearings on which will be held here at San Diego on August the 12th for action and determination thereof, Fallbrook, as an appropriator claims only appropriative rights, which means that the rights we claim are subject to prior vested rights.

Accordingly, if a physical plan is worked out by which Fallbrook at the Lippincott Site would build a dam to avail itself of water subject to appropriation, we would, of course, be willing to and agree to accept the risk of all upstream prior appropriators and all riparian right uses, both as they exist today and as they will exist in the future, and that applies not only to the Temecula Creek, but also to the Murrieta Creek where there has been expressed by the Government/fear that there would be substantial development, which would use a larger amount of water than is now being used.

We, of course, not only are willing to assume the risk of future development by prior appropriators and prior vested rights upstream, but we will agree to take care of those existing between us and Rancho Santa Margarita here referred to as Camp Pendleton, whatever riparian rights there are there, provided, of course, we can work out with the Government a physical solution and to that extent, I hope that we can take the fear away from theGovernment that there is going to be such a substantial development upstream that you would not be able to get your share down below.

I think that we who are gathered here today will

1    have been grossly negligent in the discharge of our duties,

2    we will be remiss in the instructions given to us, not

3    only by Judge Carter, but mentioned three times in the

4    9th Circuit Court of Appeals decision, that they regret

5    there had been no physical solution discussed at the

6    former trial, and we are here under a mandate to see if

7    we cannot, in the interest -- best public interest sit

8    down as American citizens, as American taxpayers and not

9    adopt the rigid, hardfast rule, which is drilled into

10   Marine fighters, who, when they are retreating insist

11   that they are advancing only in a different direction.

12   I admire that in our fighters, but when it comes to

13   fighting the Reds and when it comes to fighting American

14   citizens and American taxpayers, I am in hopes that those

15   who are endowed with the vision and with the responsibility

16   of directing general policies, that it will not all be

17   on the basis of which we train the Marine fighting men.

18        Some place there must be a policy man, a policy

19   board, a policy decision which recognizes American

20   citizens and American communities as essential to National

21   defense, and there never will be another war in which

22   every American civilian is not, in his way, a fighter just

23   as much as the Marines.  It is going to be the whole

24   United States the next time we have a war, and so I entreat

25   my fine friends, and I respect the Marines and I respect

     the Navy on the committee of which I served many years --

     I had a grandson in the Marines, who went through -- served

     his purpose and came out honorably discharged; I am proud

     of him -- I entreat them overnight, or whatever lapse of

time we have from here until we meet again, that this thing be given serious, fair and reasonable thought with a view towards giving a little here and giving a little there as only a compromise can possibly be worked out. Every man standing upon his extreme claim will never resolve in the producing of a physical solution, or a fair compromise, which is just and reasonable to all parties concerned.

MR. PEPPLE: Mr. Chairman: May I speak?

Mr. Swing, the people of Willow Glen would be glad to be treated as human beings and fair. We have had this condemnation that you have been talking about your coo-koo nest against us since 1951. I am -- I have an honorable discharge from the Army. My son has an honorable discharge from the Army in time of war. Now, you personally attended this conference in Washington when you got this meeting up. Senator Kuchel said that you were back there when this Bill was formed, and you approved and we thought then we would have you and the rest of the people off of our neck then, there would be some decency from then on, but no, you turned it over. For why, I do not know. That was the physical solution to the problem, and we wouldn't have had all this trouble since then, and since that time we have been under this condemnation that you have imposed on us since 1951 contrary to the State laws, and why it is, I do not no.

Thank you.

MR. MOSKOVITZ: Are there any other comments or questions

1   upon what Mr. Swing has had to say?

2       MR. VEEDER:  Your Honor, we would like to --

3       MR. MOSKOVITZ:  Thank you very much.  I revel in that.

4       MR. VEEDER:  We would like to have entered into the

5   record and returned to us, Miss Reporter, the letter from

6   the Fallbrook Public Utility District, responding to

7   our request that they tender to us a physical solution

8   and the statement that they had not been able to get to us

9   the solution as yet.

10      (The following is the text of the letter above referred
    to:)

11                      "June 28, 1957

12                              Re:   CO-ava

13  Col. Eliott B. Robertson,

14  Director, Services Division, Supply Dept.,

15  Department of the Navy

16  Washington 25, D. C.

17  Dear Col. Robertson:

18      In response to your letter of June 24th, our

19  Board and staff are earnestly endeavoring to get out a

20  solution in time for the conference of counsel ordered

21  on July 15th by Judge Carter.

22      To date we have nothing in form that I could give you,
    but if it is ready in advance, I will be only too glad

23  to send you a copy.

24                      Very truly yours,

25  GFY:ke                  /s/ George P. Yackey
    cc: Franz R. Sachse     GEORGE P. YACKEY
        Phil D. Swing       General Manager."

90

MR. DENNIS:  Could we have that read so the other parties could hear it?

MR. VEEDER:  Mr. Chairman, would you read it?

MR. MOSKOVITZ:  This is a letter addressed to Colonel Robertson, signed by George Yackey, General Manager of the Fallbrook Public Utility District, dated June 28, 1957:  "In response to your letter of June 24th, our Board and staff are earnestly endeavoring to get out a solution in time for the conference of counsel ordered on July 15th by Judge Carter.  To date we have nothing in form that I could give you, but if it is ready in advance, I will be only too glad to send you a copy." "Very truly yours," signed, George Yackey.

MR. SWING:  Let me say that as much of a proposal as can be made is that we accept the proposal advanced by Colonel Robertson and his associates in the hearing before Judge Yankwich in which they stated that all they wanted was a 50 or 60,000 acre feet regulatory reservoir.

We think that the facts show that there is enough water in the river from time to time to justify the Fallbrook building a dam at the Fallbrook Lippincott Site of a height of -- for our purposes, and for our appropriations, of 35,000 acre feet, which would be 5,000 for silt storage, 30,000 for our appropriations, which would leave, according to the state report, and which I have my confidence in, enough water for a dam at the De Luz Site of 143,000 acre foot capacity.

Now, if that will be considered by you and treated

as a bona fide proposal, I entreat you to so consider
it. Your engineers and your Marines have never wanted
outsiders into Camp Pendleton for security reasons, and
I appreciate it. They didn't even want the Reclamation
Bureau in there, and under the Utt Act, as you call it,
the interior had the right to turn over to Fallbrook
the operation.

I am sure that your people have reasons, security
reasons, why they do not want that, and between the pro-
posal made at your former trial, under oath, by your
witnesses, there is an opportunity for you to have your
regulatory dam, which you said you wanted of whatever size
you want it for purposes of either storage or for reregulating
it down into your basin, and we will take our dam of
35,000 acre foot capacity to take care of our appropriative
rights of 30,000 acre feet of water.

MR. MOSKOVITZ: Are there any comments or questions
by anyone on the last statement?

Well, at this time, perhaps we can pass on to
other parties who may wish to make their own statements
in chief.

Mr. Stahlman, do you have anything you would
like to say on behalf of the Vail interests?

MR. STAHLMAN: Well, Mr. Chairman, in our representing
the Vail Company, our interest in this matter is naturally
limited to -- as prescribed by the problems in which we
are concerned with. I have a lot of personal opinions,
make good barber shop talk; I might express them in corridors

or on street corners, but, as I see it here, in the interest of representing my client, they have no purpose in this hearing, and would only add to the confusion, which I have observed already existing here, and I might state what our limited interests are.

In the first place, by reason of the stipulated judgment with the predecessors in interest of Camp Pendleton, we have an interest in the riparian water. By reason of our right of appropriation at the Vail Dam Site, we are naturally interested in that. We feel those rights, however, are established. We have a further interest in the filling of the Santa Margarita at the Vail Dam Site, and in view of the explanation made here this morning as to the character of the entire river system, why, it is readily ascertainable that the issues that are joined and are substantial in this case and serious are those which exist down below theRailroad Canyon, so we feel that with whatever opinions we have in relation to the river, they are not germane to the issues in which we are participating. I might liken it to a conspiracy. We are only interested in our particular interest. I think it would be presumption on our part if we would offer any suggestions in the nature of settlement between other persons. I think it would only confuse the matter and prolong this hearing, and accomplish very little.

Any matter that does approach our interest, why, I will be very readily available to comment.

MR. MOSKOVITZ: Do any of the other parties or their

representatives want to make any statement about physical

solution, any proposals, comments on what has come before?

MR. GROVER:  Mr. Moskovitz, I have only this to

say -- George Grover is my name -- It seems to me that

physical solution, as it applies to this case, is essentially

a matter between the appropriators and the United States

and possibly the Vails.  I don't know, the large riparianists,

it seems to me that it is essentially a condition for

injunctive relief, and that the situation which calls

for a physical solution is one where a riparian owner

has the right to a certain amount of water, but that his

right to take the water may involve a waste of water,

and as it applies to this case, if he has no right to store

the water, himself, in order to take the water, it may

require that water to go to the ocean that someone with the

right to store might be able to conserve, and in this case,

it seems to me that that situation applies as between

the appropriators and the United States and other major

riparians there, or, the United States, which has asked

for the injunction and that as a condition for the injunction,

the United States might be required to allow storage from

which its riparian take could be supplied, and also

from which others could supply appropriative rights, and

it seems to me that the others of us are not concerned

in that problem, and while I would like to see it

solved, I do have the feeling that these discussions about

physical solution deal with the appropriators and the United

States, and that there isn't much that the smaller owners

can contribute to the discussions, so long as there is
no agreement between those approppiators and the United
States.

MR. MOSKOVITZ:  Mr. Buzzini.

MR. BUZZINI:  I certainly concur in that.  I represent
a man and a wife, and while our interest personally may
go far beyond that, I think for the purposes of the
issues here, we are just at the point that the previous
speaker has made with regard to what we can contribute
from the standpoint of future efforts here; because of
that, I feel that it might be an appropriate time now
to discuss whether the United States of America intends
to offer a memorandum for trial procedure.  I recall that
I received a -- such a memorandum from Mr. Swing and
from Mr. Moskovitz; I hadn't received any from anybody
else, the major parties, I am speaking of now.

It would appear to me that if Mr. Swing, if
I understand him correctly, speaking for the Utility
District, recognizes upper riparian owners and appropriators
and recognizes the risks that there is there, if, as
Mr. Veeder says, the United States of America/recognizes
                                              certainly
these upper riparian owners and appropriators, that we
are at a point where we might seek a way of disposing of
the claim which is asserted againstthem and thereby reduce
the number of defendants in the case to conform with the
Circuit Court's opinion that that matter had to be dealt
with.

If this would be an appropriate time, I would

95

1   like to hear discussion with regard to trial procedure

2   or the memoranda that might be expected from the parties.

3       MR. VEEDER:  May I respond to that?

4       MR. MOSKOVITZ:  Yes, respond as to your memorandum.

5       MR. VEEDER:  The memorandum of the United States was

6   filed on -- I think it was the 8th day of July.  There

7   are copies there available now.  If you didn't receive

8   yours, I'm quite surprised, but here's a copy now, and

9   it might be of some value to you.  You thumb through it.

10  At least, we have outlined how we would like to see the

11  case tried.

12      MR. MOSKOVITZ:  I don't think at this time we ought

13  to go into any details about how the case might be tried

14  except insofar as that might assist in a settlement.

15          Now, are there any other comments people want

16  to make about settlement or plans of physical solution?

17      MR. HALDE:  Halde is my name.  May I ask a question?

18      MR. MOSKOVITZ:  Yes.

19      MR. HALDE:  Do the major parties agree with the statement

20  counsel just made that inso far as the small defendants

21  are concerned, their interest is not -- is so small that

22  they can't concern themselves with the settlement that

23  might be effected here today?  Can we have a statement from

24  the various major parties to either affirm or deny that?

25      MR. MOSKOVITZ:  Well, perhaps given the opportunity,

    going clockwise.  Mr. Veeder, do you have any comment you

    would like to make on that?

        MR. VEEDER:  Well, our view in regard to the small

owners and the methods of handling them are set forth in this memorandum.

Briefly, they are simply this: That so far as we are concerned, we are anxious to know the claims of the people upstream who will ultimately or presently cast a burden on it. We have to know what are -- the measure of our rights. We have to know what water is going to be available. We have a big installation to take care of. We have no desire to make it difficult at all for any small user.

I think we have outlined a procedure that will make it virtually painless, but we do think it is important. We think it is highly important that the question of up-stream rights be considered.

The people with whom I have been working, and I have complete confidence in, say there is a -- not only a possibility, a very, very real probability that the burden on the stream from the upstream claimers, in the aggregate, is going to be very high.

The State, for example, says that we can expect, if I can recall -- correct me if I am wrong -- that there will be an increase of 5600 acre feet a year consumptive use upstream from Camp Pendleton. If we are accepting the figures that have been tendered in regard to present demand, assuming that to be 16,000, whatever it is -- what-ever is being presently burned up in the stream, add another 5,000 to that -- the United States is in real trouble by reason of the shortage of water.

Now, we take that position because of men who we think are as highly qualified as there are in the nation have said it is reasonable to expect that there will be a sharp increase in demand upstream from the United States of America's contemplated -- that being true, we have never felt that it would be appropriate to do anything other thann Mr. Swing one time very dramatically put it, that from the -- I can't do it the way he did, but he pointed to Palomar and then he pointed to the ocean, and he said, "Everybody has to be joined."

Well, we don't go quite that far, but we do say that the 9th Circuit has declared; and I believe it is -- that declaration is the only law in the decision -- that everyone with a claim has to be before the Court.

In regard to your State of California, I have some experience in connection with the adjudication of the Feather River, for example. I don't know of anybody that was left out of that litigation. I know of no one who was left out of Shackleford Creek (phonetic) or Indian Creek or any of the other small creeks that were adjudicated by the State. Mr. Swing's Tijuana River case down here, there were quite a number. I don't know that this is the appropriate place to discuss parties, but if the case goes to trial in the light of the rule of law established by the 9th Circuit decision, it is necessary that people having claims come forward and assert them.

We no of no other way of trying the lawsuit.

We certainly don't want to burden the riparian claimants
any more than we have to, but I think, sir, if you will
read through the memorandum/we have attempted in every
you will see
way we know how to limit the burden to the principal
claimants, and we sincerely hope that the methods outlined
and the procedures suggested and the services attendant
in the event this matter proceeds to trial will do
just exactly what we say they will, keep the cost to a
minimum, keep the obligations to the minimum, keep the
number of clients who have to employ lawyers to a minimum,
but we have no other alternative.

The gentleman makes a very good point. He has
got a small riparian claimant. He has no desire to put
his client to any burden, but if they are claiming rights,
if they are claiming rights, I suggest that the safe thing
to do at this juncture is to claim them, and prove them
to the end that when this physical solution or whatever
proposal is accomplished, that there won't be --
they won't be finding themselves limited in their riparian
development by reason of downstream claims.

I think that is the real reason we are in no
different position than the small claimant. We would like
to know what our rights are as they relate to everyone else
on the stream. There is no other purpose.

We claim nothing more than the law entitles
us to, but we do feel that when you talk physical solution,
you necessarily speak of Mr. Swing's clients, the Barbours,
the Oviatts (phonetic), the people who are above "Nigger"

Canyon. We were up there yesterday. There is development going on there right at the moment. We saw catchment dams there that were full. We saw them putting an increasing burden on the stream, and our experience on rivers from the Rio Grande and elsewhere is that when you find the kind of development, a small user impounding water upstream, ultimately he reduced the yield of that stream.

I think that is one thing we are overlooking here, Mr. Chairman. I think we are overlooking the fact that we have an explosion of population in this part of the country, and that the area is rapidly growing up. Anyone that has been looking at the area where Mr. Pepple's properties are, as well as elsewhere, can only say it is obvious that each year -- each year there are new and broader demands being made.

I think we have to look at that when we talk about the physical solution.

MR. SWING: I must contest the obvious the obvious misquotation. I never at any time said, "From the top of Palomar to the ocean they had to be made parties." What I said was: "They have been made parties."

Our physical solution that we have proposed is that with the knowledge of a dam, 35,000 acre foot capacity, at the Lippincott Site, we will assume the risk of all upstream riparian and Vail appropriations and riparian rights of all upstream users, and relieve you of the worry and responsibility and the expense of the taxpayers' money of running out a suit against 3,600 and X additional

ones. If you find that you want to get an encyclopedic adjudication of every Tea-Cup owner, I say it is a waste of money. We won't talk about water wasting into the ocean, but it is a waste of money and it is wholly unnecessary, highly undesirable, if we can work out a physical solution, which I am saying that Fallbrook is willing to take this tremendous risk of what you state of the increase of 60 somewhat acre feet a year increased use.

Isn't it true that 5100 of that is the expected Fallbrook use at the Lippincott Fallbrook site, so you are cutting the amount down to where it is relatively a small amount.

Now, while I am on my feet, let me say this for Mr. Veeder's information: His complaint asks an adjudication of claimed rights in the Santa Margarita River and its tributaries. There are vast areas in which there is nothing but percolating water. A stream and its tributaries are water which is flowing in contact with the river, or with the stream called its tributaries, and, Mr. Veeder, quite wisely, and quite properly limited the issues of this case to claims in and to the waters of the Santa Margarita River and its tributaries. There are vast areas of underground water, percolating water, it is called, and Judge Carter has specifically requested that we brief that, and I am in the act of briefing it, and I am surprised to find what a difference there is in the law of riparian rights to the riparian waters of a stream or -- our riparian comes from a Latin word, however

you spell it, meaning bank -- it is those that are in contact

with the banks of a stream, underground or surface, so

it is going to be possible to dismiss many thousand, I

hope, of these defendants who are being worried and put

to expense over their so-called water rights where they

are not riparians at law, they are not claiming water in

the Santa Margarita River or any of its tributaries, but

are claiming only underground percolating water, and I

am satisfied when Mr. Veeder gets ready to write

that portion of his brief, which Judge Carter has requested,

he will find that much of the landowners are drawing their

water from wells which get their supply from percolating

water and not riparian water at all.

MR. MOSKOVITZ: Yes, sir?

MR. HALDE: Apparently my question touched off quite

a lengthy discussion here, and I didn't intend it to be

that at all. I appreciate both Mr. Veeder's and Mr. Swing's

declarations and their statements here, but my question

simply was -- I will put it another way: Supposing

these small Tea-Cup defendants, as they are called,

approaches either the Government or any of the other

major defendants here, Fallbrook Utility District or

any of these other major defendants and says we will state

our position to be thus. Can we come to a physical

solution? Are any of the defendants, the major defendants

in a position to accept such a proffer, if it is made,

in view of the present controversy among them as to the

rights under riparian use or appropriation or otherwise?

Could you, Mr. Veeder, say to anyone defendant who would come to you and say this is what we would like to do, this is what we would like to settle, say yes, I am in a position to accept that, but with the view that there are -- there is a present controversy existing between the other defendants, could you accept?

MR. VEEDER: In that regard, have you seen our memorandum?

MR. HALDE: No, I have not.

MR. VEEDER: I wish -- I am just terribly sorry you don't have it, because if you would stop by the Clerk's Office, however, there is a supply in there for everyone that wants them, and we have set up there in very great detail just the proposition you have touched upon.

If a riparian owner comes to Major Bowen's office, which is maintained in Rainbow community, we have men there who are fully capable and very anxious to consider the extent and the measure of your claims, and they are empowered to proceed on the bases of working out a sensible and a sane settlement with each individual user who comes.

Am I right on that, Major?

MAJOR BOWEN: Yes, I think so.

MR. MOSKOVITZ: I received an SOS from the reporter. She is getting tired. Maybe we can close this part of the discussion and not continue on --

MR. VEEDER: May I hasten on: I will get some more of those memorandums and spread them around.

MR. HALDE: I appreciate that, Mr. Veeder, and I

1    appreciate what you have said.  In fact, Mr. Miller and

2    I have had a discussion regarding this problem before,

3    and I will get one of your copies, but that still doesn't

4    answer the solution so far as the small defendants present

     in this courtroom today and how many more appearances

5    we may have to make before this case goes to trial.

6            Insofar as a physical solution is concerned,

7    there are any number of defendants sitting out here, who

8    have, I imagine, no idea of the vastness of the particular

9    map that has been discussed today and how it affects them.

     They won't be in a position to state what they could offer,

10   based on the information that you have -- that has been

11   presented here today or the information available to you,

12   so the point is this:

13           You are asking now that these individual small

14   users come to you and offer a settlement, and you will

15   consider it, but you haven't yet said what your position

16   will be with regard to the other defendants who contest

17   possibly the United States' right to the amount of

18   water that may be available to all parties concerned, so

19   my point is this:  I feel that all of the small Tea-Cup

     defendants have absolutely no position here.  They have

20   no -- there is no point to their being here to discuss

21   a physical solution on something that is so vast that it

22   can't -- they haven't a consideration, in any event, so

23   my problem is this:  What, if any of these defendants

24   came to you and offered these solutions, would you at that

25   time be in a position to accept or reject them?

MR. MOSKOVITZ:  I hate to cut in.  I think the reporter is going to miss some of what you are going to say.  She is a little tired.  Let's keep this in mind and resume in about ten minutes.

(Whereupon a short recess was taken, after which the following proceedings were had, to wit:)

MR. MOSKOVITZ:  Gentlemen, let's sit down and see if we can wind this thing up and get some conclusions.

I don't want to cut off any discussion, which anyone still wants to make at this point, however, it seems to me there has been, for the present at least, probably as thorough a discussion as will be fruitful.

I think we have come to a point where, to me, at least, it seems plain that the major dispute and the major area where settlement can be engaged in, settlement discussions can be engaged in is with respect to the conflicting claims of the United States and the two chief prospective appropriators, that is, the Fallbrook Public Utility District and the Santa Margarita Mutual Water Company.  Both of these prospective appropriators have said that as far as they are concerned, they are willing to assume the risk of upstream development and the risk of satisfying the rights of those upstream from the point where they would propose to store water.

Therefore, it seems to me that the next step is to determine what quantities of water the United States on the one hand would require and what will be -- quantities of water the two appropriators would feel they would be

willing to release to satisfy the rights of the United
States, that is, every -- anything left over, over and
above that amount would be available for storage appropriation
by these appropriators.

The discussion thus far has been in general terms.
It has not been reduced to quantities in anyway, except that
mentioned of 5,000 odd acre feet, which the State of
California estimates on the average wastes into the ocean.

It seems to me that the -- it might be helpful
before we meet again, if these three major parites,
the United States, the Fallbrook District and the Santa
Margarita Mutual Water Company would make a specific
proposal in quantitative terms of releases that would be
deemed adequate to satisfy what they each conceive to be
the rights of the United States, and see how far apart the
parties actually are.

Now, in theory, there seems to be considerable
difference, but perhaps reduced to quantitative terms,
it might not be so big it cannot be bridged. This is a
proposal that may have merit or not, but otherwise, I
am not sure to see where next to go, and it seems to me
it might be a waste of time merely to adjourn to meet
again unless something new is brought by the parties with
them.

Now, does that have any merit, and does anyone
want to discuss that possibility?

MR. DENNIS: I think probably that would be well
if we followed that procedure, and it certainly would

be most helpful if the United States could furnish us
with a report showing the amount of water that they have
used sinceethe time of trial. Up to the time of the trial,
we had rather adequate records as to the amount of water
the Vails and the United States had used in various
locations. Since the matter went to trial as against
Santa Margarita, we are in complete ignorance as to the
amount of water the United States has used for military
purposes or for agricultural purposes or a total amount of
water they have used or net consumptive use. That is, we
have no records of the amount of sewage water put back
into the basin. If we could have those records to help
Santa Margarita in formulating the plans they have in
mind, of course, we could get those by asking for written
interrogatories, but I assume the Government would be
glad to furnish us with that information without going
to that trouble.

MR. VEEDER: Just the telephone. Have you asked
before?

MR. SWING: Supplementing Mr. Dennis' request, I
think the consumptive use or live use, and the information
should so state water within Santa Margarita watershed
and the quantities of water used outside of the shed.

MR. VEEDER: Would you supply us with the same
information, Mr. Swing? Mr. Dennis isn't confronted with
the problem. Would you supply us with the information
as to the quantities of Santa Margarita River water that
you have pumped, the quantity that is used inside of the

watershed --

MR. SWING:  It is a matter of public record.

MR. VEEDER:  -- and the quantity used outside of the watershed?

MR. SWING:  Yes, yes.  Mr. Sachse, you do that.

MR. MOSKOVITZ:  Well, apparently the parties feel this sort of information would be helpful in combining the proposal for releases.  Now, Mr. Veeder, you haven't commented.  Maybe Mr. Swing hadn't finished as to whether you think such a procedure of setting forth the amount of water which the United States should receive through any storage facilities constructed upstream, whether that would expedite finding out whether there is a basis for solution or not.

MR. VEEDER:  I am a little worried about your premise now.  I hasten to add that it probably would be important information, and it probably would be most helpful.  I am somewhat worried about your premise, Mr. Chairman, in regard to theories of the law respecting rights to the use of water for this reason:  I think that we must look, not only to today's use, but to the measure of our legal right.  I don't want the meeting to adjourn with any thought that we should not proceed on the basis of legal rights.

You tender a thought in regard to the corpus of the water.  I am simply casting out this caveat to the end that it will be understood that necessarily settlements are on the basis of the law, and not on the basis of the

whims or nature of the quantity of water which may show up
in the stream on any particular day.

MR. MOSKOVITZ: What I am suggesting is that you reduce
to quantitative terms --

MR. VEEDER: Right. I understand that.

MR. MOSKOVITZ: -- what you believe your legal
rights entitle you to in terms of the amount of water that
actually flows, so that there can be some comparison
among the parties as to what their respective claims come
to and what the conflicts are.

MR. VEEDER: Right. I see what you are saying, and I
simply -- we will work on that and we will follow the
suggestion.

MR. MOSKOVITZ: Now, I understand that --

MR. DENNIS: Just one question: As I understand, I
can get that information from Major Bowen's Office in
Rainbow?

MR. VEEDER: I don't know where the Major has got it.

MR. DENNIS: I just want to know where to go to get
the information. Would that be correct?

MAJOR BOWEN: Call me at Pendleton.

MR. DENNIS: Oh, at Pendleton?

MR. SWING: Is there an unanswered question by the
gentleman who represents himself and his family? I thought
it involved the question of the Government's ability to
stipulate with an individual where the parties at the
present moment are held to be adverse to everybody.

MR. HALDE: If you are directing that question to

me, Mr. Swing, I had a discussion with several gentlemen in the hall.  I think my question was answered there.

MR. SWING:  That is all right.

MR. MOSKOVITZ:  Well, if the major parties -- not meaning Vail is not a major party -- but the major parties interested in a physical solution in the area downstream from Railroad Canyon feel it would be helpful to come up with that sort of proposal for comparison purposes, perhaps we can adjourn this meeting and resume again sometime in August with that information and go on from there.

Now, the Court's order suggested that this meeting go on from day to day, or time to time until the majority of the major parties feel that there is no benefit to be gained in further consecutive meetings.

We have had just one day.  Do I take it that the major parties, Vail, the Fallbrook Utility District, Santa Margarita and the United States feel that at this point there is no benefit to be gained by meeting tomorrow and continuing to do so?

Do you want to express yourselves on that or do I understand the sense of the group?

MR. SWING:  I enjoy the atmosphere.

MR. VEEDER:  I always like to be with Mr. Swing.  I mean, if you want to be here tomorrow --

MR. MOSKOVITZ:  Do you want -- we will meet tomorrow morning; do you want to do that, Gentlemen?   Do you have anything further you want to say tomorrow morning?

MR. SWING:  I have nothing further to say.

MR. STAHLMAN: I don't think anything can bee accomplished by a meeting tomorrow. I don't think there can be anything more accomplished by any further meetings. I wish there could be, but I have listened here to matters that dealt back into the past and nothing can be done in relation to what the Judge indicated should be done here. I have heard all of Mr. Swing's speeches before. I enjoy them each time, but on a hot day, it gets a little worrisome, so I would just as soon as put it over on the 12th.

MR. MOSKOVITZ: The Court order is that it be put over on the 12th after considering what happened at the first meeting.

Does anyone feel that there would be anything to be gained by continuing this meeting beyond today?

I assume there is no feeling that it should be.

The date suggested by the Court for meeting again was the 12th of August. I s there any objection to that?

I understand, Mr. Swing, that you have another matter on that very day.

MR. SWING: Don't worry about that. Justice will prevail.

MR. MOSKOVITZ: Well, then, the date of the 12th is agreeable as suggested?

MR. STAHLMAN: That is the date of the water rights meeting,sthe 12th. You can't be both places.

MR. VEEDER: However, the Court entered an order specifying August 12th, and we have set up our summer

schedule on that basis, and anything that transpired

subsequent to that time, I am not -- maybe I could make

the adjustments that would be necessary, and I will

endeavor to do so, because I want to accomodate them if I

can, but that was the date that was specified on May 8.

MR. MOSKOVITZ:  It is in the order of the Court.  I

will read the language:

         that

   "It is suggested/at the conclusion of the first

  meeting it be adjourned by the parties and counsel

  for further study and consideration of the objects

  for which it was called, and that a further meeting

  be held without the presence of the Court on the

  12th day of August, 1957, in the Grand Jury Room,

  Federal Building, San Diego, California, for further

  discussion of the problem."

   Now, for the meeting to be held, I suppose

all those who have a primary interest should be there.

It is up toethe parties what they want done, but I do

think there is something to be gained by meeting again

before we come together with the Court in September.

MR. VEEDER:  I think you are absolutely right.  I

think we should have the meeting on the 12th, and I

will attempt to adjust to whatever time --

MR. SWING:  May I -- in order to have these two

gentlemen who are indivisible in some manner, could we

hold our meeting at 9:30 and receive the Government's

encouragement that they have agreed to our physical solution,

which doubtless could be done with a short word or two,"

1   and, if not, we could adjourn to a 1:30 meeting, and

2   so comply with Judge Carter's order.

3      MR. MOSKOVITZ:  What is the time of your hearing; is

4   it 10 o'clock?

5      MR. STAHLMAN:  10 o'clock.

6      MR. SWING:  10 o'clock.  We don't know where it is

7   going to be though.

8      MR. SACHSE:  They haven't announced the place.  It is

    in San Diego.

9      MR. SWING:  Probably the Chamber of Commerce.

10      MR. MOSKOVITZ:  That is not far from here, is it?

11      MR. SWING:  It is right here (indicating).

12      MR. MOSKOVITZ:  Could we meet at 9 o'clock, so

13   there would be an hour?  I think half an hour might be

    too short to get started; 9 o'clock on the 12th of August

14   and at that time the Fallbrook District, Santa Margarita

15   and United States would bring with them this proposal

16   that I have suggested or do you want to send it out before?

17      MR. DENNIS:  Send it out beforehand.

18      MR. MOSKOVITZ:  Would you be ready to do so, send

19   it out beforehand to the other major parties?

20      MR. DENNIS:  I think Santa Margarita would be ready.

21      MR. MOSKOVITZ:  Mr. Veeder, would you be ready?

22      MR. VEEDER:  You are asking would we have the data

    available for exchange prior to the meeting?

23      MR. MOSKOVITZ:  Yes.

24      MR. VEEDER:  We will certainly undertake to do so.

25      MR. MOSKOVITZ:  Shall we set any particular deadline?

MR. SWING:  Five days before, sir?

MR. VEEDER:  Five will be fine.

MR. MOSKOVITZ: That is August the 7th. Now, should these proposals be sent to anyone other than the so-called major parties, or would that involve too much difficulty?

MR. DENNIS:  I don't see what would be gained by sending them to anybody but the major parties that are here today, let's say.

MR. VEEDER:  I can't ascribe to that, Mr. Chairman. I think -- I may be wrong, but I think the small users are just as vitally interested in their small rights as the larger claimants and I think they are entitled to participate.

I think they are entitled to be fully informed, and I think the spirit and the temper of all that has been done by Judge Carter contemplated a full exchange of information for everyone and with everyone.

MR. MOSKOVITZ:  Would this be an agreeable suggestion: That all those who have appeared here today should receive copies of the proposal on the assumption that those who appeared are those who are interested, and that there be some extra copies brought with the parties on the 12th so that if there are people present who have not received copies in the mail, they can pick them up?  Is that agreeable?

MR. VEEDER:  It is all right with us.  We feel that there are -- we feel that everyone who has a claim in Santa Maegarita is interested in anything that transpires in litigation, and we are very interested in the small users

personally.

MR. MOSKOVITZ:  Is it your feeling that copies go to everyone of the parties?

MR. VEEDER:  We would feel that certainly to all those that have counsel, at least.  We have been mailing it to them, and I see no reason why we should be restrictive on this matter.  We don't own the river.  There are a lot of people on the river that are interested.

MR. MOSKOVITZ:  This proposal would involve the three parties, the three main parties here, Fallbrook, Santa Margarita and the United States.

MR. VEEDER:  We will proceed as you suggested.  It suits me.

MR. DENNIS:  Mr. Veeder, Santa Margarita is not claiming any rights whatsoever against anybody who is upstream from their point of diversion, and as far as erection of a dam or any type of structure that would impound water, the only people that could possibly be affected would be the Government of the United States of America, with two or three exceptions, and I think that Santa Margarita has gone on record that sufficient water would be released to take care of their legal needs, and so I can't see why we should go to the expense -- have to go to the expense of having these things mimeographed and additional mailing expense to a lot of people whose rights can't possibly be affected by erection of a dam at the proposed point by either Fallbrook or Santa Margarita.

MR. MOSKOVITZ:  I assume proposals of both Fallbrook

1    and Santa Margarita would include the assumption of the

2    risk of those upstream.

3          MR. DENNIS:  That is the State law.

4          MR. MOSKOVITZ:  True, so that the others would not

5    be affected.  Well, unless --

6          MR. SACHSE:  Could we ask then if we are going to

7    have to mail this out?  It hasn't been decided yet.

     We would like to ask to get a copy of these appearances.

8    Have you authority to have this stuff mailed to us by

9    the Clerk or do we have to come here and get them, or what?

10         MR. MOSKOVITZ:  Well, the Clerk has a record of all

11   the appearances.  I assume you can get copies of the

12   transcript, and then you will have the appearances, and

     you can compare the names with those on your list of

13   Counsel and get the addresses.

14         MR. DENNIS:  The addresses will probably be -- is

15   everybody here on that list of Counsel?

16         MR. SACHSE:  I have not --

17         MR. GROVER:  I have a correction there:  Citizens

18   Bank Building instead of First National Bank.

19         MR. MOSKOVITZ:  Is there anything else that should

20   come up now?

21         MR. SACHSE:  I am still not quite clear what we

22   are supposed to submit on the 5th.  This is a proposal

     we are supposed to cross submit, United States to Fallbrook

23   and Rainbow, and so on, proposals for a quantitative

24   division of the water; is that it?

25         MR. MOSKOVITZ:  What I had in mind to compare how

far apart the parties are that they indicate how much water
from time to time, whether it is daily or weekly or monthly,
depending on what the flow is, how much would be released
down to below the point of the storage facilities that
you are proposing, and that the United States indicate what
the quantity would be that it would feel would be needed
to satisfy its rights, and have that related to the physical
situation, as it has existed in the past.  You can't
predict what the flow will be in the future, but of the --
have it tied to what the conditions have been in the past.

MR. SACHSE:  I would like to point out that if
quantitative means in second feet or in acre feet, that
is very difficult.  If quantitative means in a percentage,
that is not too hard to accomplish.  That could be done.

MR. MOSKOVITZ:  Well, I think the parties should be
left to do this the way they best can, but I would like
to hear from an engineer, maybe Mr. Edmonston, as to
what manner of setting this forth would be helpful and
feasible to do within the time between now and the 5th of
August.

Do you have any ideas on that?

MR. EDMONSTON:  Well, you would have to take them
one by one here.  Mr. Swing is the only one that has come
up with a proposal -- proposed that the Fallbrook District
would go ahead with this 35,000 acre foot reservoir.  You
could take a period representing the period of average
water supply -- I don't think at this point you would
want to overly complicate the thing -- and I might suggest

that you just put down a schedule of releases, the inflow
to the reservoir and disposition of it, so much to the
Fallbrook District and so much to Camp Pendleton.  That
could be done here.  There is a limitation of time.  I
don't know how much work the Fallbrook District has done
in the past, but if they have done anything at all, they
would have some such idea and set that forth.  Similarly,
Mr. Dennis' client, in their consideration, whatever it
may be, would do the same thing, and I might suggest on
an annual basis.  Then, as far as the United States, they
have made certain claims as enumerated by Mr. Veeder,
and regardless of the legal right, when you get down
to brass tacks, you are not going to get any more water
than physically occurs in that system in that same period,
if you could decide on a period.

Then, under his legal right, how much water
would be available to them under that right, and he
would request that of the other two principals in the case.

MR. MOSKOVITZ:  What period was used in the Report?

MR. EDMONSTON:  Well, it is a rather ancient period.
I think that for the purpose which you are trying to
achieve here that a more recent period possibly than was --
I think as a starting point I might suggest the period
from 1936 to date or 1936 to 1951 would be sufficient
for developing the procedure in a start for the negotiations.

MR. SACHSE:  Mr. Moskovitz, I certainly don't want
to argue with Mr. Edmonston; he is an engineer and I am
not.  That is what I am getting at when I say I think this

quantitative division, if it is expressed in percentages, will make a lot more sense to everybody. Then, Mr. Veeder could take a percentage of the runoff at Fallbrook or Ysidora, and he can apply it to any one cycle of years, dry or wet, and he would know what that would mean to us, and we can do likewise.

MR. MOSKOVITZ: I don't think it is realistic, because if you use percentage, it would amount to a tremendous amount of water. For example, in a year when there was an outflow of 216,000 acre feet, don't forget in a year like that, Fallbrook has to let it go by anyway, because we are only talking about a 35,000 acre foot dam.

MR. VEEDER: Well, Mr. Chairman, we have -- our offer of settlement is on a percentage basis, of course. Congressman Utt's Act put it on a 60-40 basis, so I think you have a precedent there. Ours was the first offer, and I am not taking issue with Mr. Edmonston, not partially at all; we have made the offer, and it is on the basis of 60-40 of the surplus, so I think that the idea of percentage shouldn't be too bad.

MR. EDMONSTON: Adolph, if I am not out of order, I think 60-40 of the surplus -- I think that is exactly what has pervaded this whole discussion today, that no one can agree as to what the surplus is. I mean, that there has to be a definition of what the releases would have to be in order to determine how much could be stored and there be divided on a 60-40 basis.

MR. VEEDER: Isn't that, Mr. Edmonston, what we are

1    talking about?  We are going to have an exchange of

2    data and information and the criterion will be 60-40.

3         MR. SACHSE:  Mr. Veeder, I would like to make myself

4    clear.  When I say percentage, I am talking about a

5    percentage of the flow of the river, recorded flow of the

6    river at a given point, and I presume that in the case

7    of Fallbrook's offer, it will be at the Fallbrook Dam Site,

8    not of surplus, or not of percentage of the total flow

9    of the river.  Now, that is the only kind of an offer

10   we can make.  I don't know what surplus is.  You and I

11   don't agree.

12        MR. MOSKOVITZ:  Gentlemen, it doesn't seem to me that

13   you are going to have anything comparable or meaningful

14   if you talk merely in terms of percentage.

15        It seems to me that for the purposes of really

16   getting anywhere, you should reduce it to acre feet or

17   second feet.

18        MR. EDMONSTON:  Adolph, if I might make this suggestion:

19   Fall in with this 60-40 basis, but at least take a

20   period, if nothing more than one year, and show how it

21   works.  You are still talking in generalities unless

22   you apply it to a specific example, and so you come up

23   with acre feet and everybody has a meeting of the minds

24   and there can be no misunderstanding.

25        MR. MOSKOVITZ:  The period you suggested was 1936 to

     1951?

          MR. EDMONSTON:  1936 to 1951, which I won't stand

     behind this, but it approximates an average period.  You

have a series of wet years; you have a series of dry years.
It will possibly be a little heavy on the wet side, but
it is illustrative.  It would be for the purpose of getting
started.

MR. VEEDER:  Can't we pick the years and the quantities,
and I think we are all capable of coming up with a
suggestion, exchange of data in contemplation of August
the 12th.

Mr. Moskovitz, we have the problem of sitting
down with the engineers and being instructed on these
matters.  I think each of us has to be guided by his
own expert as to whether it is second feet or acre feet
or percentages.

MR. MOSKOVITZ:  My objective is to try to get
something that can be compared.  If one person uses
one period and another party uses another period, and
they use different bases of stating their offers,
there will be nothing you can really put next to each
other to see how far apart the parties are.

It seems to me it would be helpful if you can
pick the same period and use the same basis of measurement
and then you can see where you are.

MR. SWING:  Mr. Chairman, I thought when you started
out this morning you said the purpose of this conference
was to explore the areas of agreement and the areas of
disagreement, and so I thought this was bringing the thing
nicely to a conclusion; you were asking to see how far apart
we were.  I thought you were asking the Marines on

Pendleton what their minimum requirements were, there

actual uses, and that you were asking Fallbrook to determine

what its minimum requirements were, what they were to get

by and live on, and that that way we would determine how

far apart they were on their minimum requirements in order

to meet their actual needs.  Now, I find out 60-40,

which is a pure arbitrary figure, has nothing -- no factual

basis for requirements or need or anything else -- it

was passed -- a thing that was forced through Congress

on a compromise basis, and now these people are talking

about percentages.  Mr. Sachse is proposing an offer

of compromise by dividing the water that flows past the

site of the Fallbrook Lippincott Dam.

It seems to me there are three different ideas

and none of them in touch with each other.

What Fallbrook wants is 5,100 acre feet net

at the Fallbrook Lippincott Site.  That is the minimum on

which it can live.  Now, we know that already.  It doesn't

make a darn bit of difference how many figures you look

at.  That is our minimum for Fallbrook to live.  Now,

you have got your minimum, which you say you have got to

have so much water out of the Santa Margarita River, its

basin or some other method down to you on a -- on which

you can operate your Camp Pendleton.  Isn't that true?

Now, then you will have to develop how far apart you are.

MR. VEEDER:  I think that Mr. Swing summarized very

nicely the exchange of information that should be undertaken

and why not proceed just the way Mr. Swing just summarized?

1   MR. MOSKOVITZ: Mr. Swing, do you feel that this

2   will be helpful unless you pick a period of record and

3   apply these needs to that period, so you can see how it

4   would actually work out?

5   MR. SWING: Here's their period: 1946 'till now. They

6   know how much they have actually taken, and used, and where

    they have put it, to what use they have put it.

7   We will do the same thing. We want to know

8   where we are taking the water and where we are putting it.

9   They want to know how much is inside the watershed, how

10  much is outside the watershed. We can give that to you with-

11  in a short percentage, five or ten percent; it would be

12  an immaterial difference -- on how much is outside, but

13  we do have a division, or three divisions. One of them

    is within the watershed; two divisions are without.

14  MR. VEEDER: Well, your summarization of just a

15  moment ago, Mr. Swing, coincided completely to my under-

16  standing of the data which was to be exchanged five

17  days before August 12th. I don't see why we go any further

18  than that.

19  MR. MOSKOVITZ: Now, Mr. Dennis, do you understand

20  what is to be exchanged? I am not sure I do, but if Mr.

    Dennis does and Mr. Veeder does and Mr. Swing does --

21  MR. SWING: Mr. Dennis can write his up; it will be

22  zero.

23  MR. MOSKOVITZ: Mr. Swing, maybe that indicates where

24  I don't understand this: It is not what water has been

25  used in the past, but what water you people feel you can

1   settle on for the future to be coming on to the United

2   States.

3       MR. VEEDER:  Which part of that zero is used inside

4   and outside of the watershed?

5       MR. MOSKOVITZ:  I really don't think, Gentlemen,

6   although I may be mistaken or missing the point entirely,

7   that you are going to anything to help you.

8       MR. SACHSE:  I agree with you.  I don't understand

9   this.  I thought we were talking about how we are going

10  to divide the water of the river, not how we have divided

11  it in the past or where we put it, but how we are talking

12  about dividing it in the future.

13      MR. MOSKOVITZ:  My proposal is that you indicate

14  how it would be divided in the future by taking a past

15  period as an example, the suggested period of 1936 through

16  1951, indicate how the flows would be part stored and

17  part released and you can compare and see how far apart

18  the parties are as to how much would be stored and how

19  much would be released.

20      MR. VEEDER:  Couldn't we bring it down to August 1,

21  1957?

22      MR. MOSKOVITZ:  If the records are available, but

23  are the records available to all parties to do that?

24      MR. VEEDER:  Yes.

25      MR. MOSKOVITZ:  Of course, any suggestion has to

    be acceptable to the parties.  Would that be acceptable

    to you, Mr. Swing, 1936 to 1957?

        MR. SWING:  I have now delegated a very able assistant,

1      Mr. Sachse.

2          MR. MOSKOVITZ:  All right.

3      MR. SWING:  Mr. Sachse, you are inquired if everything

4   is hocus-pocus.  Do you understand what is going on, or
    are you in favor of it?

5          MR. SACHSE:  I am sorry.  I didn't hear the last.

6          MR. MOSKOVITZ:  The last proposal would be the period

7   you would apply your suggestions to would be 1936, I guess

8   that would be water years, 1936, beginning October 1st, through

9   -- what was it, August 1957.

10         MR. SACHSE:  My only objection to that is I haven't

11  got the figures.  I don't think Dennis does either.  The

    only figures we can use were the ones -- the only figures

12  we have readily available to us are the runoff figures

13  contained in the second volume of Bulletin 57.  I don't

14  know where I can get the figures.

15         MR. MOSKOVITZ:  Couldn't we limit it to some period

16  in that report so it would be readily available?

17         MR. VEEDER:  In that report?

18         MR. MOSKOVITZ:  Yes, the report of the state, which

    has runoff figures.

19         MR. VEEDER:  My own view is that reality is more

20  reflected by bringing it down to '57 by reason of the

21  short years, but I don't care; we will take the '53 figure.

22         MR. MOSKOVITZ:  From '36 to '53?  Is that all right

23  then?

24         MR. VEEDER:  We will put a caveat under it and say,

25  "This isn't reflective of reality."

1 MR. MOSKOVITZ:  Of the last few years?

2 MR. VEEDER:  Right.

3 MR. SACHSE:  I would like to point out also, after

4 checking with Mr. Illingworth, that again the figures we

5 will have to use, and this applies to Dennis too, that

table is broken down with runoff, it says, near Fallbrook.

6 MR. ILLINGWORTH:  That is a geological survey station.

7 MR. SACHSE:  "Near" Fallbrook.  In other words, we

8 will have to use a column of figures, year by year by

9 year that are indicated by that as being "near" Fallbrook.

10 I don't know if it is exactly what would exist at the dam

11 site.  He says he doesn't think it is.  It is as close

as we can get to it.

12 MR. MOSKOVITZ:  Close enough for comparison purposes.

13  Now, do all the parties understand now what

14 they are to do?

15 MR. VEEDER:  Yes.

16 MR. MOSKOVITZ:  All right.  Then, we will meet again

17 in the Grand Jury Room on the 12th of August.

18 MR. DENNIS:  There is one thing I am not completely

19 sure I understand, however, is Mr. Veeder's last statement.

I took it to mean he introduced the Utt Bill as a physical

20 solution on the part of the Government as to our problem.

21 MR. VEEDER:  Yes.  Didn't I make that clear?

22 MR. DENNIS:  Not until your last statement.

23 MR. VEEDER:  I am terribly sorry.  I didn't know that.

24 MR. DENNIS:  I didn't know he was introducing it for

25 the purpose of saying this is the physical solution the

Government is offering.

MR. VEEDER: Mr. Dennis, yes, it is in there for all purposes.

MR. GROVER: Are these to be sent to all persons who were here today?

MR. VEEDER: The United States wishes to thank you, Mr. Chairman State of California for your help today, and we think you have done a very fine job.

MR. SWING: I think the record should show that the meeting met pursuant to the suggestion of Judge Carter, conducted in the friendliest and most amicable spirit, and much was suggested and very much remains to be determined.

MR. VEEDER: That is, from Palomar to the ocean.

MR. MOSKOVITZ: So we meet again at 9 o'clock on the 12th of August in the Grand Jury room.

- - -