# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### CENTRAL DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

              Plaintiff,

vs.

                              No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT, et al,

              Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    September 4 & 5, 1957

        Pages:  153 to 194

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTE

JOHN SWADER
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211 • EXT. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
vs.                            )
                               )        No. 1247-SD-C
                               )
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al,               )
                               )
                Defendants.    )

- - -

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

September 4 & 5, 1957.

- - -

APPEARANCES:

    For the Plaintiff:        WILLIAM H. VEEDER, Esq.
                              WILLIAM E. FURBY, Esq.
                              Special Assistants to the
                              Attorney-General
                              Department of Justice
                              Washington, D. C.

134

APPEARANCES (continued):

| | |
|---|---|
| For Defendant Vail Company: | GEORGE E. STAHLMAN, Esq. |
| For U. S. Marine Corps: | LT. DAVID MILLER |
| For Defendant Fallbrook Public Utility District: | SWING, SCHARNIKOW & STANIFORTH, by:<br>PHIL D. SWING, Esq. and<br>F. R. SACHSE, Esq. |
| For Defendant State of California: | EDMUND G. BROWN, Esq.<br>Attorney-General, by:<br>ADOLPHUS MOSKOVITZ, Esq.<br>Deputy Attorney General |
| For Defendant Santa Margarita Mutual Water Company: | W. B. DENNIS, Esq. |
| For Defendants Fallbrook Union High School District, Vallecito School District, Fallbrook Union Elementary School District, De Luz School District: | JAMES DON KELLER, Esq.<br>County Counsel, by:<br>DON CLARK, Esq.<br>Deputy County Counsel |
| For Defendants Atchison, Topeka & Santa Fe Railway Co. and San Diego Gas & Electric Company: | LUCE, FORWARD, KUNZEL & SCRIPPS, by:<br>ROGER S. RUFFIN, Jr., Esq. |
| For Defendants Cottle, Gibbon and Reuter: | CLAYSON, STARK & ROTHROCK,<br>By: GEORGE G. GROVER, Esq. |
| For Defendants Halde: | TOM HALDE, Esq., by:<br>GEORGE G. GROVER, Esq. |

- - -

1   MR. SWING:  Your Honor, since Mr. Utt, whom I concede

2   to be friendly to the general Fallbrook side of the case, I

3   feel that I should say that I have had no communication from

4   him of any kind or nature relative to the news releases which

5   appeared in the local newspapers, the Union and, I believe,

6   the Tribune, first announcing as coming from him that the

7   Department of Justice was preparing a consent decree.  Of

8   course, the word "consent" involves two parties or more, and

9   having received no communications from the Department of

10  Justice, having had no suggestion as to what the plan referred

11  to in the newspapers involved, we did not take it as anything

12  except a newspaper story.

13       Subsequently, there appeared in a later edition a

14  statement that Mr. Utt proposed to work for an appropriation

15  for the building of the De Luz dam in accordance with the

16  Bill.  The only time the Utt Bill had been discussed was in

17  our informal conferences, and Mr. Veeder had said that that

18  was his idea of a physical solution.  I believe that that was

19  the substance of his statement, that he thought that the

20  Government was controlled by the direction of Congress and

21  that they would have to operate within the legislative

22  enactment in discussing a proposed physical solution.

23       So outside of that, neither myself nor Mr. Sachse

24  have ever received any communication from Mr. Utt or from

25  anybody in the Department of Justice as to the newspaper story

1    regarding a plan to be proposed by the Department of Justice.

2              THE COURT:  Mr. Veeder.

3              MR. VEEDER:  I concur with what Mr. Swing said, that

4    the United States made an offer in accordance with the Utt

5    Bill to settle the litigation within the purview of that Bill.

6              THE COURT:  Made an offer to whom?

7              MR. VEEDER:  To Mr. Swing.

8              THE COURT:  At the conference.

9              MR. VEEDER:  At the conference.

10             The matter was discussed again on several occasions,

11   but that is the extent of my knowledge on the matter, your

12   Honor.  I returned to Washington in time to receive the

13   newspaper clippings.  I read them and I was somewhat sur-

14   prised, because no one had discussed the matter with me.  I

15   checked throughout the Department and found that no one there

16   had made the release -- at least no one admitted that he

17   made the release.  So that is the circumstances under which

18   we are here today.

19             THE COURT:  Well, Mr. Utt quoted some high-

20   ranking Officer of the Marine Corps, did he not?

21             MR. VEEDER:  Your Honor, I don't recall that on the

22   proposition of settlement he did quote him.  I think there

23   was a statement that a high-ranking Marine Corps officer

24   had pointed out that difficulty had been encountered in

25   securing funds for Camp Pendleton by reason of the litigation

1  but I know of no statement by the Marine Corps -- the fact is,

2  I understand no statement was made other than the one to which

3  I just made reference.  No statements in regard to settlement

4  were released by the Marine Corps.

5       THE COURT:  Mr. Stahlman.

6       MR. STAHLMAN:  Your Honor, to inform the Court maybe

7  on matters of background, there was an editorial in the

8  Fallbrook paper, as well as an article a week or two prior to

9  the release of this article from Washington, which showed

10  that somebody in Fallbrook was aware of the fact that Mr. Utt

11  was calling upon the White House, that he had gone back to see

12  President Eisenhower, and some reference was made to the fact

13  that it had been referred to Sherman Adams, with whom Mr.

14  Utt was to confer in relation to the settlement.  So there

15  undoubtedly was something going on back there that reached

16  our local papers, and it was editorialized as being a great

17  beneficial thing for the community of Fallbrook.  Now that

18  appeared in our paper.  I merely give that to the Court as

19  background.

20       THE COURT:  Of course, if this were an election year

21  you might view some of these things a little differently.  But

22  there is no campaign on.  Mr. Utt is a reputable, experienced

23  member of Congress.  In fact, he belongs to your political

24  party, Mr. Swing.  I understood that you and he were pretty

25  good friends.

1        MR. SWING:   I have always considered, and do now

2   consider, that Congressman Utt is a competent, capable and

3   responsible officer of the Federal Government, and I think

4   he feels that he has certain responsibilities, perhaps he

5   feels he has certain rights, in connection with his responsi-

6   bilities.

7        As far as the visits to the White House are concerned,

8   I know of them by reading in the newspapers, and I do not dis-

9   approve of them at all; but he was acting within his own

10  official capacity and on his own responsibility in doing what

11  he thought was for the best interests of his District, no

12  doubt.

13       THE COURT:   Well, my only concern is this.   If there

14  is something going on that we don't know about -- I accept

15  your statement, Mr. Swing, and I accept Mr. Veeder's state-

16  ment that he knows nothing about this -- if there is some-

17  thing going on that would dispose of this litigation, we

18  ought to know about it.   We shouldn't be kept in the dark.   If

19  there are some plans afoot that might lead to a disposition

20  of this litigation, it is silly to waste a lot of time on it.

21  That is my only concern about the matter.

22       Nobody knows anything about it, then, except what

23  you read in the paper?

24       MR. MOSKOVITZ:   Just for the purpose of the record,

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, SEPTEMBER 4, 1957, 10:00 A.M.

2                              - - -

3

4             (Other Matters.)

5             THE COURT:  Call number 2 on the calendar, Mr. Clerk.

6             THE CLERK:  Number 2:  1247-SD-C, United States

7    versus Fallbrook Public Utility District, et al.

8             For pre-trial hearing.

9             THE COURT:  Is there a correction to be made in this

10   transcript?

11            MR. MOSKOVITZ:  Yes, your Honor, I have a correction.

12            THE COURT:  On page 143?

13            MR. MOSKOVITZ:  Yes, your Honor, on page 143 of the

14   transcript for August 15, 1957, on line 2, "VEEDER" should be

15   stricken and the name MOSKOVITZ inserted.

16            THE COURT:  The correction will be made.

17            MR. MOSKOVITZ:  And the same on line 5.

18            THE COURT:  The correction will be made.

19            Well, I got back to California here and I read the

20   newspaper stories that this matter is all settled now and

21   disposed of.  Mr. Utt quotes the Marine Corps and says that

22   the matter is completely disposed of.  So I didn't do any work

23   on the matter.  I didn't hear from any of you gentlemen.  I

24   assumed that you knew I would read the newspapers.  What is

25   the story on this?

1    your Honor, that is my position.

2         MR. VEEDER:  There is a Marine Corps representative

3    in the courtroom, your Honor -- Colonel Robertson, and I

4    undertook to speak for the Marines.  It may be desirable to

5    inquire from Colonel Robertson on the subject.

6         THE COURT:  Have you had any communication, Colonel

7    Robertson, about this matter?

8         COLONEL ROBERTSON:  Well, sir, the Marine Corps do

9    not make press releases of the type that has been described.

10   I talked to the Officer quoted therein, and a careful reading

11   of the article would show that he was not talking about or

12   quoted, at least, about a settlement.  He was talking about

13   benefits to Camp Pendleton if a settlement could be accomplished.

14   He did not announce a settlement.

15        THE COURT:  Well, what is your suggestion as to our

16   work this morning?

17        MR. VEEDER:  Your Honor, I would like to inquire, if

18   I may, as to the views of Fallbrook in regard to a settlement

19   on the basis of the Utt Bill, because Congress has spoken

20   there and has delineated and defined --

21        THE COURT:  When was this Bill passed?

22        MR. VEEDER:  The Bill was passed in 1954, your

23   Honor.  I will give your Honor the citation.  It is Public

24   Law 547, passed in 1954, to authorize the Secretary of the

25   Interior to construct facilities to provide water for

1   irrigation, municipal, domestic, military and other uses from

2   the Santa Margarita River, and for other purposes.

3        THE COURT:  Well, I just came back from a very

4   profitable seminar at New York University on the trial of long,

5   protracted cases, and I came back with a head full of ideas.

6   It was very profitable.  This seminar was directed particular-

7   ly toward anti-trust cases, the long case, the big case that

8   might take anywhere from a year to two years to try; but it is

9   also applicable to almost any kind of case.

10        One of the suggestions made was that when there was

11   to be discussed the broad outlines of some possible settle-

12   ment, far more progress was made if this was done without the

13   presence of a reporter, informally, where people would speak

14   a little more freely and not have their words thrown back to

15   them at some later date that you said so and so; understand-

16   ing, of course, that at some subsequent time some record

17   would have to be made of the specific terms of a settlement.

18   But to explore these possibilities, it was the concensus of

19   some very experienced judges, including Judge Prettyman, who

20   was chairman of the committee that wrote the Prettyman

21   Report on long cases, that far more progress could be made

22   by informal discussions.

23        Now, if we are going to go into this and discuss it

24   a little bit, that might be desirable.  There are people in

25   the courtroom who are interested in the matter.  There is no

1    thought of the Court to hold any star chamber.  We could sit

2    around the table down here and talk about it, or we could have

3    Counsel come into chambers and talk about it.

4         I definitely have not given up the idea that this

5    case is subject to settlement, and I know of no case which

6    cannot be settled, if the parties will face up to facts and

7    principles of law and proceed intelligently.  It may be, of

8    course, that some rulings on some fundamental questions may

9    further pave the way to a settlement.  I have no views yet on

10   these principles involved.  But as a suppositious example, and

11   used only to illustrate what I mean as to how a determination

12   of an issue can lead to a settlement, if the Court held, for

13   instance, that a barracks use was not a proper use of the

14   water and backed it up with authority, or if the Court found

15   that by some rule of law Fallbrook's claims were completely

16   out the window -- I'm just using suppositious cases -- things

17   like that might do one of two things:  they might lead

18   certainly to an appeal, or they might lead to some disposition

19   of issues.

20        Do you want to discuss this informally?  Do you want

21   to discuss it with the reporter present?

22        Mr. Sachse.

23        MR. SACHSE:  As far as Fallbrook is concerned, your

24   Honor, we would be very happy to discuss it informally.  But

25   I would like on the record one thing first, and that is that

1    in response to your Honor's direction, on the 15th of August

2    Fallbrook submitted in writing its proposals for a physical

3    solution.   To the best of my knowledge, there have been no

4    other proposals submitted.

5         Mr. Veeder has stated that he will be bound -- and I

6    hope that I am paraphrasing correctly, but correct me if I am

7    wrong -- that he will be bound in any settlement by the terms

8    of the Utt Bill; that Congress has spoken, and that that would

9    have to be the basis of a settlement.   But he has not pro-

10   posed how the Utt Bill settles this litigation.   Does the Utt

11   Bill result in a dismissal of this case?   The Utt Bill affects

12   only Fallbrook and the Government.   The Utt Bill doesn't

13   affect Vail.   The Utt Bill doesn't affect/the users upstream.
                                          all

14   Where do they come into this thing?   And I don't presume that

15   the Utt Bill, taken in its four corners, the naked Utt Bill,

16   can be a settlement of this case.   The Utt Bill can be a

17   basis for settlement, yes, but it can't be a settlement.   And

18   there has been no proposal of any kind made by any agency

19   other than Fallbrook for a settlement.

20        THE COURT:   Who wants to be heard here?   Mr. Veeder?

21        MR. VEEDER:   Well, we haven't responded to your

22   Honor's inquiry.   The United States would be very pleased to

23   go off the record and have informal discussions, if you

24   desire.

25        But I would like to add that in regard to a

1   proposed physical solution as tendered by Fallbrook Public

2   Utility District, the United States has considered it and we

3   are ready to talk about it.  We do feel, however, that the

4   Utt Bill has within its four corners every element of a

5   settlement that the Fallbrook Public Utility District has

6   tendered.  There is no effort on the part of the Fallbrook

7   Public Utility District, indeed it hasn't the power, to

8   settle this litigation with anybody else or on behalf of

9   anybody else.

10          So we are at that point now where I feel that the

11  United States has made a tender, a genuine, valid proffer of

12  settlement.

13          THE COURT:  Well, you didn't make one in writing,

14  but it is your contention that you felt that a settlement

15  could be arrived at, shall we say, based on the Utt Bill or

16  using the Utt Bill as a basis and then going forward in such

17  other ways as were necessary.

18          MR. VEEDER:  That is right, your Honor, precisely.

19          MR. MOSKOVITZ:  Your Honor --

20          THE COURT:  Mr. Moskovitz.

21          MR. MOSKOVITZ:  First of all, in direct response to

22  your question whether we should go off the record, the State

23  of California has felt all along that that was the most

24  profitable way to discuss settlement, and when we were

25  planning for the very first meeting that you ordered in July

1    I wrote to the United States suggesting that no transcript be

2    kept, but that instead someone take minutes of what occurred,

3    and as I recall it, it was Mr. Veeder's desire at that time

4    that there be a reporter and he arranged for a reporter and

5    thereafter both meetings were reported.

6         Secondly, on the question of the Utt Bill, I think

7    this point should be brought out.  The Utt Bill authorized

8    construction of the dam and reservoir at De Luz and provided

9    for a certain percentage division of the waters impounded --

10   60 per cent to the Navy and 40 per cent to the Fallbrook Public

11   Utility District.  But it also said -- and I will quote from

12   the Bill, because this is important, if you want to consider

13   how significant the Bill is as a basis for settlement -- it

14   also stated, and I am quoting now from Section 3, Subsection

15   (c), in part:

16        "Provided that nothing in this Act shall be

17         construed as a grant or a relinquishment by the

18         United States of any of its rights to the use

19         of waters which it acquired according to the laws

20         of the State of California, either as a result of

21         its acquisition of the lands comprising Camp

22         Joseph H. Pendleton and adjoining Naval

23         installations, or through actual use or pre-

24         scription, or both, since the date of that

25         acquisition, if any, or to create any legal

1          obligation to store any water  in the De Luz

2          reservoir to the use of which it has such rights,

3          or to require the division under this Act of

4          water to which it had such rights."

5          In other words, the question as to what rights the

6      United States has is still left wide open.  So that must first

7      be settled somehow before you can say that you have a basis

8      for settlement.

9          MR. STAHLMAN:  Your Honor, --

10          THE COURT:  Mr. Stahlman.

11          MR. STAHLMAN:  I would like to address myself to the

12      Court, in relation to the inquiry the Court made, on behalf of

13      a lot of the small owners on the River.  These people's

14      property has been under condemnation by the Fallbrook Public

15      Utility District.  If the Utt Bill would be the basis of

16      settlement, there would be no necessity for building a dam

17      at --

18          THE COURT:  Just a minute.  Let me follow you.

19      Fallbrook, as a public utility district, has been proposing

20      to, or has been condemning the land upon which to build

21      another dam.

22          MR. STAHLMAN:  Last week they went into court and

23      made a motion for immediate possession of land.  The matter

24      is put over to the 12th of this month.  Now the interests of

25      these people on the River are small, but they are great to

1   them and they are very important to them.  They don't know
2   whether they are sitting on a home that they are going to have
3   to give up, and a lot of them have just given up hope and
4   have sold out their property, not realizing what the property
5   was worth.  But the condemnation has been on there now for a
6   period of six years.  They have had that property under con-
7   demnation.  One suit was filed in 1951.

8         Now, as a part of this plan and scheme to build the
9   Lippincott dam, or the dam on the Lippincott site, there have
10  also been activities on the part of the Fallbrook District
11  to take in an additional 3,000 acres of land.  Now we find
12  that this land is owned by people who have an interest in
13  pushing the condemnation.  There are some of the most start-
14  ling and amazing things that have occurred in this case, all
15  to the detriment of and without any consideration of the
16  interests of the small people on the River.  They've been
17  booted, they've been kicked, they've been abused.  Previous
18  possession of some of the property has been taken.

19        THE COURT:  Is this 3,000 acres within the watershed
20  or outside?

21        MR. STAHLMAN:  It is within the watershed, but it is
22  not within the Fallbrook District at this time.  They made
23  application to annex it to the District through the San Diego
24  Water Authority.  There has been a tentative approval on it.
25        Now here is an amazing t ing.  In 1951 one of the

1  owners, Mr. Dickey, of the property at the exact point where

2  the dam was to be built receives a letter from the Goodwin

3  Company, which I have here, attempting to purchase his

4  property.  Within just a few weeks after that, a condemnation

5  is filed, and the Goodwin Company buys 500 acres of land --

6  that's the Sawday property which we talked about here --

7  Sawday, Goodwin and two other speculators from San Diego.

8       Now we find out that the writer of that letter, a

9  Mr. Peterson, when Fallbrook talked about generously going to

10 buy this property they put a negotiator in Fallbrook to

11 negotiate with these people down there, who gave them a price

12 take-it-or-leave-it, and we find out that Mr. Peterson is the

13 same man who wrote the letter prior to the condemnation.  In

14 other words, speculators and people who bought land up there

15 knew that this condemnation was going on that property there

16 before the people whose property was condemned knew anything

17 about it, and these people never found out until it was

18 necessary to make a loan and even the Government agencies

19 turned this loan down because this condemnation has been on

20 that property for this many years.

21      Now, the point I am making is, how can you settle a

22 case, how can they be sincere in their desire to settle this

23 case when they are having Water Rights Board hearings on the

24 same day on which your Honor has set the case for hearing,

25 when the directors are coming down trying to buy the property

1    from these people, when people have been threatened there that

2    if they didn't sell their property to them this and that will

3    be done?  I'm not talking through my hat.  These are actual

4    facts.  Some of them have been criticized by the Court who

5    tried the first phase of the condemnation and have been

6    criticized by the Grand Jury in San Diego County.  Now how can

7    there be a settlement where there is any interest as far as

8    the small people, many of whom are sitting in this courtroom,

9    are concerned, if, during the time we are negotiating a

10    settlement, we have a continuation of taking this property to

11    build this dam?  Now are they going to build the Lippincott

12    dam?  Is the De Luz bill out the window?  If it is, they should

13    say so and let's not waste time negotiating.

14            Now there was $50,000.00 spend by Fallbrook Public

15    Utility District in sending many people, people with political

16    pressure and otherwise, to go back to Washington to get the

17    Utt Bill passed, and the day it was passed there was great

18    jubilation in Fallbrook, and the very people whom afterward

19    within two or three weeks they kicked in the teeth and said

20    they didn't want the Utt Bill -- the very people who said that

21    said, at the time it was passed, what a great thing it was

22    going to be for Fallbrook.

23            Now I strongly suspect and I think if this evidence

24    is laced together -- and I've prosecuted for eleven years and

25    I think I know evidence -- that there is behind the movement

1   for this condemnation and this persistence in this Lippincott

2   dam, in face of the Utt Bill and in face of all these other

3   things, to annex a lot of land that will be of benefit to

4   some of these speculators.

5          And I might say this, and I dislike to but I feel

6   that on behalf of these people I am talking for I have to tell

7   the truth.  Mr. Holsinger, who was Chairman of this Water

8   Rights Board, received a letter in 1951 from Mr. Sachse that

9   he is interested in developing some of that land over there.

10   We find that there is a company called the Gavilan Develop-

11   ment Corporation, and Mr. Sachse was a director of that

12   corporation at its formation, and they spent over a hundred

13   thousand dollars over there on that land trying to develop

14   water and they are stuck with it unless they get into the

15   District.

16          Now if there is a sincere and honest desire to settle

17   this case, then I say all this monkey business that is going

18   on in between, this crowding and pushing of these people who

19   have their entire life's stake there, should be completely

20   terminated and cut out, because in the Ninth Circuit

21   decision the Court there said, on page 18:

22              "The key question in this case is,who had

23              the right to store these floodwaters for future

24              disposition?  Vail, Santa Margarita, Fallbrook,

25              or the United States, or perhaps some other

owner intermediate on the stream?  Or perhaps
some physical solution by or control under
court decree could permit participation by all
in the conservation of all flow of the watershed
for beneficial use so that no drop would waste
uselessly into the Pacific?"

So I think the Court there stated that the trier of
the facts in this case has the authority and the power to say
where a dam shall be built, how it shall be built, determined
upon the physical facts; and for them continually to go ahead
and push and crowd these people, in face of this, I think,
prevents getting together in any settlement, if we are going
to consider the small people on the River.

MR. SACHSE:  May I be heard briefly on this, your
Honor?

THE COURT:  Mr. Sachse.

MR. SACHSE:  In the first place, I think we are
getting a little far afield.  The condemnation case, Fallbrook
Public Utility District against ___Martin___ is now pending,
Mr. Stahlman is quite correct.  The District presently owns
more than 66 per cent of the lands required for the
reservoir site.  It is pending in the State courts.  There is
no federal angle involved whatsoever.  The case was fough
very bitterly by Mr. Stahlman.  He won below.  The trial court
refused to permit us to proceed with condemnation -- a rather

1   unusual decision, your Honor will agree, in the case of a

2   public agency.  They refused to permit us to condemn it.  The

3   case went on appeal to the District Court of Appeal.  The

4   District Court of Appeal held that the trial court was in

5   error and reversed it on all grounds.  Mr. Stahlman requested

6   a rehearing in the District Court of Appeal.  That was denied.

7   He requested a rehearing before the Supreme Court.  That was

8   denied.  A remittitur was sent back.  The State case is now

9   pending.

10       Why is it pending?  The Fallbrook Public Utility

11   District is a public agency in the State of California, with

12   a responsibility of attempting to serve domestic and irriga-

13   tion waters to its consumers.  It hasn't got the water.  We

14   don't have it.  We are taking every method we know of within

15   the law to attempt to provide the water supply that the

16   District needs.  We are attempting to condemn land for a dam

17   that we think is the best site for Fallbrook.  We are pro-

18   ceeding before the State Water Rights Board in the manner

19   that the laws provide for.  We are asking them to determine

20   if surplus water exists in that River.  If surplus water

21   exists, they will give us a permit.  We are resisting the

22   United States' claim that it owns all the water in the River.

23   We don't think it does.  We think beyond any question of a

24   doubt, and the Court of Appeals has given us great comfort

25   where it says that there is no question a surplus exists in

173

1    some years.  Further, there is some water in that River that

2    I believe we are going to get.  How much I don't know.

3    THE COURT:  This is the difficulty when you start to

4    take partisan positions.  The first thing we know, somebody won't

5    be speaking to somebody else.  Let's just stop some of this

6    now.

7    One thought occurs to me -- I don't know if the facts

8    justify it, but if we got into a situation where activities

9    carried on by parties to this litigation were hampering this

10   litigation, the thought goes through my mind that this is an

11   equity suit, the Court has jurisdiction over the parties who

12   have appeared here, and I am not so sure but that I might have

13   authority to say stop whatever you're doing and issue an

14   injunction pending the determination of this litigation.  Has

15   anybody ever explored that idea?

16   MR. VEEDER:  I have explored it.  I have spent

17   considerable time thinking about the curious situation in

18   which we find ourselves.  As I understand, the rule of law is

19   that once litigation is started the status quo is supposed

20   to be maintained; that if we seek pendente lite relief, the

21   Court will search back to the last non-contested moment and

22   preserve that as the status quo.

23   THE COURT:  The Court also has inherent power to

24   stop anything which is interfering with the orderly process

25   of litigation.

1    MR. VEEDER:  That is very true, your Honor.  I think

2    the prime example is what the court did to John L. Lewis in

3    the United Mine Workers case reported at 330 U.S.  I concur

4    with your Honor.  But I think that is the leading case, and

5    the ship case cited there is similarly a leading case, to

6    the effect that even when a court does not have jurisdiction

7    it does have jurisdiction to determine its jurisdiction, and

8    during that period the parties are required to maintain the

9    status quo.  And that is our position today.

10        We feel that there are two very serious matters

11   confronting us:  (1)  We feel that the proceedings before the

12   State Water Rights Board is a serious encroachment upon the

13   dignity of this court and upon our rights.  We truly believe

14   that this Court of equity is fully empowered suis spondi to

15   stop that litigation, because the State of California has

16   appeared here not as parens patriae entirely but as a

17   sovereign and in a proprietary capacity.  Now we feel that

18   those proceedings should cease and desist until this settlement

19   is accomplished, if it can be.

20        THE COURT:  Well, I am not going to pass on any of

21   these matters.  I am just exploring this thought in my mind.

22   Of course, there is the other rule that where the court

23   might hesitate to issue an order directed to a public body,

24   it may issue an order to litigants, and it is an example of

25   the adage that there is more than one way to skin a cat.  I

175

1   might not be able or I might not want to restrain a Superior

2   Court from doing something, but I could certainly restrain A

3   and B from appearing in that court, and the result would be

4   exactly the same.

5          MR. VEEDER:  Your Honor asked that we research that,

6   and that is precisely what the courts do.

7          THE COURT:  That's hornbook law.

8          MR. VEEDER:  That's right.  There is no question on

9   that.

10         THE COURT:  Well, shall we talk informally?  Is that

11  all right?

12         MR. SWING:  I would like to point out what your Honor

13  has in mind, briefly.

14         THE COURT:  I haven't anything in mind.  I have heard

15  a lot of charges made back and forth.  It has been running

16  through the back of my head the fact that we have serious

17  conflicts here.  If the Water Rights Board decides one thing,

18  apparently it is the same thing this court is going to have to

19  decide.  What are we going to do then?  Maybe the thing to do

20  is to explore this later on.  If this case goes to litigation,

21  we all know it is a complicated case.  We know it is going to

22  take time to get it in shape to try.  We know it is going to

23  create a problem with the small owners.  The Master situation

24  -- how are we going to handle that?  People's titles are

25  involved.  And of course a poor settlement, all lawyers know,

126

1   is better than a good lawsuit.  So let's see if there is any

2   possibility of settlement.  But if there is not, let's get

3   out the knife and see if we have to do any cutting.

4          Mr. Swing.

5          MR. SWING:  The cases cited by Mr. Veeder in the

6   discussion of the injunctive powers of this court are, of

7   course, recognized in connectio  with anything that interferes

8   with the litigation.  What we are discussing here today is a

9   compromise of the litigation, and it is true, I believe, as

10  Mr. Veeder says, and apparently your Honor thinks, that the

11  proceeding before the State Water Rights Board might affect

12  a compromise of the litigation.  But I doubt whether your

13  Honor has the legal power to issue an injunction merely on

14  the grounds that it would make more difficult a compromise

15  of the litigation, while I frankly admit that you have the

16  power to issue an injunction on anything that interferes with

17  the proper trial and adjudication of the issues by litigation

18  in the case.

19          Now the powers of the State Water Rights Board are

20  purely administrative.  They are not binding upon this court.

21  This court has a perfect right, under all of the decisions of

22  California, after the State Water Rights Board has rendered

23  its administrative decision, to render any decision this court

24  wants to render with reference to the water rights on the

25  River.

1      THE COURT:   Then what is the use of going ahead with

2  the Water Rights Board hearing?   If I am not --

3      MR. SWING:   It is a preliminary step which we have

4  to take, and the law requires Fallbrook to take it with due

5  diligence.   The law of California requires, to perfect

6  appropriative rights which Fallbrook has initiated by filing

7  applications, that it must prosecute those applications to a

8  conclusion with due diligence, and they have been delayed as

9  long as they can be delayed without impairing their legality.

10      THE COURT:   Well, now, let's get away from some of

11  these matters.   Mr. Stahlman has made a statement, Mr. Sachse

12  has made one, Mr. Veeder, Mr. Swing, Mr. Moskovitz.   The Court

13  stuck its oar in.   Let's forget about all these things and

14  spend a little time seeing where we are on a possible settle-

15  ment of this matter.

16      MR. MOSKOVITZ:   If I may have just a little more

17  time, your Honor.   As attorney for the State of California, I

18  want to make it plain now that the State does not believe

19  there is any interference with your jurisdiction in this case

20  by the proceeding before the State Water Rights Board.   We

21  have researched this problem very thoroughly, as you probably

22  know, in connection with the case of Rank versus Krug

23  and if and when you want us to argue the question we are

24  prepared to do it orally and in writing.   We feel that the

25  issues are different in the two proceedings, and that actually

1    a decision in the State Water Rights proceeding will enhance

2    the possibility of the ease of solution of your case rather

3    than interfere with it.  I don't want to make an argument on

4    the points now, in deference to your wishes.

5           THE COURT:  I have your position.

6           MR. STAHLMAN:  I have just one more statement.  It

7    seems peculiar to me -- you see, this argument interferes

8    with the talk of settlement -- these applications were filed

9    over ten years ago, they have continued them because of this

10   litigation, I presume, and then suddenly when we are talking

11   settlement up comes this sudden desire to hear these cases

12   right away.  There is something mysterious about it.

13          THE COURT:  Well, let's not worry about it.  I don't

14   think the Water Rights Board can preempt the power of this

15   Court to make a decision on an issue that is properly before

16   this Court.  Mr. Moskovitz may be right; it might facilitate

17   the decision, it might impede it.  I don't know.  But let's

18   not worry about it.  I think this litigation goes back far

19   enough that many things have happened subsequent to its

20   institution.  It is going to have to defer eventually to the

21   decision of this Court.

22          Now do you want to talk settlement in front of the

23   spectators, or do you want to talk in my chambers?  The

24   courtroom is a public courtroom.  There are no secrets about

25   this thing.  We might proceed better in chambers, we might

179

1  not.  These people came to hear what was going on, but they

2  must know by now that the Court is interested in seeing if we

3  can explore some ground of settlement, and if we do hold this

4  in chambers I trust that those of you who are here will know

5  that this is being done with an idea to looking toward

6  settlement of the case and those of you who want it settled

7  and disposed of are certainly having your interests looked

8  after.  It might be pleasant to be present and hear a dis-

9  cussion, but I think we would probably progress better in

10  chambers.

11        MR. VEEDER:  The United States wants to do whatever

12  your Honor desires, and I am fully in accord with the idea

13  that we should.

14        THE COURT:  This is in line with the idea of having

15  an informal discussion; no reporter present, people can speak

16  more freely, and see where we are.  And we are all going to

17  be friends now.  All these things where one fellow wants to

18  fight the other, those are going to be reserved for later

19  rounds.  This is going to be a friendly little discussion.

20        Well, let's do that.  I'll see you in chambers in

21  about five minutes.

22        (Recess.)

23

24

25

1        (In Chambers, at 4:20 p.m. of said day:)

2        THE COURT:  I would like to summarize, if I can, and

3   anybody interrupt me on it -- probably a half-dozen of you can

4   do a better job than I can.

5        We adjourned, without the reporter, to have a frank

6   discussion as to any possibilities of settlement, and most of

7   the parties -- big parties were present, and some of the

8   representatives of the smaller landowners upstream.  We tried

9   to keep the discussion on the basis of principle, to see

10  whether we could reach some common ground.

11       The status of the negotiations was that Fallbrook had

12  made a written proposal -- which I will try to summarize, since

13  everybody has a copy of it -- a written proposal which

14  involved the construction of a dam at the Lippincott site,

15  about a 35,000-acre-foot dam, and the gist of Fallbrook's

16  proposal was that because of their legal position they had

17  prior rights as an appropriator.  The proposal, in substance,

18  gave Fallbrook the first crack at these runoff waters, and

19  the Navy below was to get what was left over.  The figures

20  showed that the percentage of stream flow available to Navy

21  would range from about 47 per cent to 94 per cent, depending

22  on the year in question.

23       Mr. Veeder had stated to the Court that the Govern-

24  ment was prepared to talk settlement on the basis of the Bill

25  creating the De Luz Dam, the Utt Act, and there were statements

1  made by Fallbrook of their desire to build a dam even if it

2  were necessary only to store water that they might get from

3  other sources, such as the Colorado River or San Diego, etc.

4  They pointed out the additional expense to Fallbrook if they

5  took water from the De Luz Dam that might be constructed under

6  that Act.

7       We then discussed, in principle, that if there were

8  some agreement reached as to how much water Fallbrook took

9  and how much the United States Government took, that neither

10  one nor the other would be concerned with what the other one

11  did with the water.  In other words, if the Government -- and

12  this was a big "if" -- was satisfied with how much water

13  Fallbrook took, it didn't make any difference to the Govern-

14  ment whether Fallbrook built a dam or not; and likewise, if

15  Fallbrook was satisfied with what the Government was to take,

16  it didn't interest Fallbrook whether the Government built a

17  dam, a big dam, a small dam, or spreading facilities or other

18  methods to use their water.

19       Incidentally, before we got through we got a state-

20  ment here from the Santa Margarita Mutual Water Company that

21  they were in about the same relative position as Fallbrook,

22  and that our discussions between Fallbrook and the Government

23  applied to them and that they would be content to abide by a

24  proportional division of the water and fight out with Fallbrook

25  whether Santa Margarita or Fallbrook was entitled to that

182

1     proportion.

2              We then went to the nut of the question, and that was

3     how much water we talked about as floodwaters, waters that

4     came down at exceptional times, a few days during the year,

5     particularly in a wet year -- how that water could be divided,

6     and the Fallbrook proposal I have already commented on, and

7     Mr. Veeder's attention was called to the fact that the

8     Government have indicated that they are willing to stand on

9     the Utt Bill involving the De Luz Dam, which had a proportional

10    provision in it, and Mr. Veeder was asked if he would submit

11    a counter-proposal to Fallbrook's based, at least in

12    principle, upon some proportional division of these waters,

13    necessarily excepting from the proposal many of the smaller

14    items that would have to be later on hammered out -- as, for

15    instance, the amount of the flow of the stream beneath the

16    surface that would be impeded by a dam at Fallbrook, and the

17    matter of the rights of the Government to waters from the

18    Vail estate, a right which the Government contend they have

19    to continuous flow in the River, matters of that sort.

20             There was further explored the possibility of some

21    stay of the various other proceedings that are going on if

22    we made some progress toward settlement in principle, matters

23    pending hearing before the Water Rights Board which have

24    been concluded except for the filing of briefs and decision

25    by the Board.  It was agreed that probably a continuance

4

1  could be obtained for the filing of those briefs without the

2  necessity of asking the Water-Rights Board to postpone or

3  continue its date of decision.

4      It was pointed out also that there is pending a

5  condemnation suit which Fallbrook is bringing to acquire

6  additional lands for the building of their dam, and the fact

7  that there are hearings coming up on applications for immediate

8  possession.  It was likewise agreed that these could be con-

9  tinued for some long period of time if some progress toward

10  settlement in principle was arrived at.

11      Those were the only things that are pending

12  presently, I think.  That is the only two we discussed; is

13  that so?

14      MR. SACHSE:  There is nothing else pending that I

15  know of, your Honor.

16      THE COURT:  The discussion was about 30 days' stay.

17      Mr. Swing pointed out why, under the particular

18  facts of the Fallbrook situation, 30 days' stay would be more

19  a problem than it would be ordinarily because of the program

20  of testing that has to be carried on in a dry season and the

21  tentative program for work on the dam.

22      Mr. Veeder was requested to propose a counter-

23  proposition, and he thought he would need at least 45 days

24  and he asked to be able to think the matter over and discuss

25  it this evening and come back here tomorrow at one o'clock

p.m., at which time any party interested may be present, and Messrs. Sachse, Stahlman and Moskovitz will be present, along with Mr. Veeder and maybe Mr. Burby, and at that time inform us whether we can shorten that 45 day period and propose, in principle, some particular items.  He is hopeful that it can be done in less than 45 days.

MR. VEEDER:  I have an inquiry, your Honor --

This is off the record.

THE COURT:  All right.

(Discussion off the record.)

THE COURT:  Another point we talked about is that if there is a stay agreed to of 30 or 45 days, whatever we arrive at, that it is going to be understood by all the parties here that no one is going to claim that any estoppel arose during that period.  That period is excepted from any estoppel that might possibly run, and no estoppel can originate in that period.

It was contemplated, Mr. Veeder pointed out, that probably Congress would have to act with reference to rights or alleged rights which it might be giving up on some settlement.  Of course, Congress would have to act on any appropriation for a dam, if a dam was to be built.  And it was our contemplation that we were not trying to pre-empt the rights of the State, and that the State would have to take certain action within its prerogative even if a settlement

1  was agreed upon; but we were hopeful that if the major parties

2  agreed on something, state action might follow along those

3  lines and go further and decide other disputes, such as the

4  dispute between Santa Margarita and Fallbrook.

5        Is that a thumb-nail sketch of what has happened?

6        MR. DENNIS:  Just one thing, your Honor, so that

7  there will be no misunderstanding as far as Santa Margarita

8  is concerned.  We said we were perfectly willing to go on a

9  percentage basis and fight out with Fallbrook as to who was

10  entitled to the water.  However, we feel that the De Luz dam

11  site, if possible, has many advantages over a dam constructed

12  at the Lippincott site, and if possible the large dam should be

13  constructed at the De Luz site.  Also, we feel that the small

14  dam at the Lippincott site is a mistake, and that a larger or

15  medium-sized dam should be built at that location. .

16        THE COURT:  Of course, your problems are largely

17  academic, because when you and Fallbrook go at it and have

18  your battle, you may be on the sidelines.  On the other hand,

19  if you succeed you won't be concerned with their dam site at

20  Lippincott.

21        MR. DENNIS:  That is correct.  But so there would be

22  no misunderstanding.

23        MR. MOSKOVITZ:  Am I correct that the proposal that

24  the United States is asked to prepare would be prepared in the

25  form of an acre-foot compilation for the period covered by the

1   proposal submitted by Fallbrook?

2          THE COURT:  No.  They were asked, in addition to their

3   proposal, to try to work out some chart using the years 1935

4   to 1953 to give us some idea of what would happen.

5          MR. VEEDER:  We would like, in that connection, to

6   bring the matter down to 1957, if we may, your Honor.

7          THE COURT:  It's all right.

8          MR. VEEDER:  I think it is more reflective of the

9   true picture.

10          THE COURT:  And if you can use the feet of flow that

11  Mr. Sachse used, of course, it would make the charts comparable;

12  and even if you do that with a footnote saying "We don't

13  concede the amount of flow," if you are in disagreement, at

14  least for illustrative purposes you might run a comparison or

15  you might make a second chart on the figures as you saw them to

16  be.

17          MR. SACHSE:  I understand that Mr. Veeder's proposal

18  would include what terms and conditions he feels would be

19  necessary in any permit we might receive from the State to

20  protect their rights.  That last items is very important to

21  me.

22          THE COURT:  That is important, if you can give it

23  some thought.

24          MR. SACHSE:  As to what type of specific terms and

25  conditions you would require on it.  It would be of great

important to us.

MR. VEEDER:  Yes.  As far as we are concerned, the 45-day period was asked to the end that when we got through with this it wouldn't be every source stream that would be required, but it  would suffice that we would know where we stood in regard to the Vail's and where we stood in regard to the other parties.

THE COURT:  Mr. Sachse, I would like you to think over before tomorrow at one o'clock whether or not you will not be content with some longer period of stay, in view of the fact that you can go ahead on your own ground and do what you please and we are holding you up on only a couple of parcels where you are seeking immediate possession.  I think we are all agreed on the State proceedings.  But you were particularly concerned about the stay on this exploratory work.  The Court suggested that further negotiations for purchase on this likewise be suspended.  Can you go along with that?

MR. SACHSE:  I can go along.

THE COURT:  Finally, I want to thank you all who participated for submerging your personalities and also staying away from your firm legal positions, which I know all of you have.  I am trying to look at this thing from the standpoint of what might possibly be done to solve it.  You know, a suit like this, you don't think of in days or years.

9

1  You think of it in terms of a lifetime.  I sort of wonder if

2  I will live long enough to see the end of it.  And so I am

3  deeply appreciative of the fact that everybody has kept their

4  temper and also kept their magazine loaded and unexploded on

5  their legal positions on most of these matters.

6  MR. VEEDER:  We desire to thank your Honor for the

7  leadership you have given us.  It has been very helpful.

8  THE COURT:  Is there anything else anybody wants to

9  add to this summary?

10  MR. GROVER:  I just want to say, your Honor, that it

11  is apparent that these small users, who are not concerned with

12  these appropriations, are really not involved in these

13  settlement discussions, and since expense is the big thing

14  for us we just won't act.

15  THE COURT:  I think the small owners would be well

16  advised to forget about this for the time being.

17  MR. GROVER:  That is what I was going to suggest.

18  THE COURT:  You can't be hurt by what goes on in

19  this phase of the discussion.  It may be that we can get rid

20  of you some day.

21  MR. GROVER:  Fine, and I am encouraged, except that

22  could we leave it that the Court or the Clerk will advise us

23  at an appropriate time when we might be involved in some

24  hearings that will come up?

25

10

1          THE COURT:  We will try to do that, and you can

2   inquire of co-counsel or the Court or anybody else you want

3   of what is going on.  I am not going to undertake to write

4   you a personal letter if I think you are involved.  I have

5   been trying to look out for the small owners by the orders I

6   have already made -- you are familiar with the order about

7   defaults.  So that the small owner can sit tight for the time

8   being.  If they don't have a lawyer, they don't need to get

9   one.  If they have one, there is nothing for the lawyer to do

10  presently.

11          (ADJOURNMENT.)

12                              - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SAN DIEGO, CALIFORNIA, THURSDAY, September 5, 1957, 2:00 P.M.

2                          - - -

3              (In Chambers, after discussions since 1:00 P.M.)

4              THE COURT:  Let's see if I can summarize this.

5              This meeting was continued from yesterday until 1:00

6    p.m., and all counsel for the major parties are here again

7    today, with other people present.

8              There was discussed this question of time for the

9    Government to submit a proposition in principle that concerned

10   the floodwaters, under the definition we talked about yester-

11   day, and although the Government asked for 45 days the Court

12   suggested and the Government conceded --

13             MR. VEEDER:  We agreed.

14             THE COURT:  -- that they would submit it within the

15   30 days.  That would bring us to October 5th.  Fallbrook and

16   the other parties would have a week to look this over.  The

17   5th falls on a Friday.

18             MR. VEEDER:  Would it be possible to have that 30

19   days start this coming Monday?

20             THE COURT:  Monday the 9th.

21             MR. SACHSE:  All right.

22             THE COURT:  That will take us to, say, Monday,

23   October 7th to submit it, and then we would set a further

24   hearing on October 14th at 2:00 in the afternoon to talk

25   about it.  Is that all right?

12

191

1    MR. VEEDER:  I have a proceeding, but I will be here

2    the 14th.

3    THE COURT:  You can do that all right?

4    MR. VEEDER:  I will make arrangements.  If the 14th

5    is satisfactory to you, I will adjust to that.

6    MR. SACHSE:  Satisfactory to me.

7    THE COURT:  Satisfactory to me.

8    As part of this proposal, Mr. Sachse has agreed to

9    stipulate with Mr. Stahlman that applications for orders of

10   possession and the condemnation suit be put over to the 14th,

11   and counsel for Santa Margarita, Mr. Dennis, and Mr. Sachse

12   for Fallbrook have agreed that they will stipulate that the

13   opening brief in that hearing is to be filed sometime after

14   October 16th and that the other briefs will follow them in

15   the same relative order, whatever the time limits were

16   thereafter.  It is represented, and nobody disagrees, that

17   there are no other pending State matters.  I will take that

18   back.  Escrows now in progress are to be completed.

19   One of you state this stipulation as to further

20   negotiations.

21   MR. SACHSE:  That I will instruct the Board of

22   Directors for the Fallbrook Public Utility District to enter

23   into no other negotiations for further purchases, and if they

24   are approached by any landowner to inform the landowner that

25   they will deal only through his attorney, I will phrase that,

1    because there are some representative attorneys other than Mr.

2    Stahlman.

3              THE COURT:  That is fair enough.

4              Mr. Veeder also stated that the Government has serious

5    questions concerning upstream claims, and Mr. Sachse made his

6    position clear that --

7              You had better state it.

8              MR. SACHSE:  Fallbrook asserts only an appropriative

9    right.

10             THE COURT:  Either already appropriated or to be

11   appropriated.

12             MR. SACHSE:  Either already existing appropriative

13   right or to be consummated, and therefore must, of necessity,

14   take subject to all vested rights upstream or downstream,

15   either one.

16             MR. VEEDER:  Including possible Indian rights.

17             MR. SACHSE:  Including any rights.  Indian rights

18   would be vested, yes, definitely.

19             THE COURT:  Mr. Veeder points out that there is a

20   serious problem that the Government refers to as upstream

21   appropriations or uses, and particularly involving an Indian

22   reservation and ground therein, and you merely wanted to

23   mention this so that nobody would think there was a "sleeper"

24   in this problem.

25             It was further agreed by Mr. Moskovitz that he would

1   advise the engineering group for the State to make available

2   to the United States Engineers all basic data which would be

3   useful to them, and particularly the data on which they based

4   Bulletin No. 57.

5          You are to set that up, Mr. Moskovitz, so that the

6   engineers themselves can get together and work it out.

7          MR. MOSKOVITZ:  I will instruct them to meet with you

8   at your mutual convenience, and you will arrange the dates.

9          MR. STAHLMAN:  Off the record --

10          (Discussion off the record about Sawday.)

11          THE COURT:  Does that summarize what we have done here

12   today?

13          MR. SACHSE:  As far as I am concerned, it is very

14   accurate.

15          MR. VEEDER:  Yes.

16          THE COURT:  Mr. Veeder is to submit with his proposal

17   some charts for an apple-by-apple comparison, if possible.

18          MR. VEEDER:  They will be schedules.

19          THE COURT:  Schedules or charts, whatever you want to

20   call them.  He also suggested that he preferred a 24-year

21   period from 1933 to 1957, and Mr. Sachse had no objection.

22          Let me suggest this.  Your full 30 days may be needed

23   and maybe no.  If you can get this in earlier, all right.

24   Also, this chart matter, which is only a matter of figures,

25   you might be able to work out pretty quick.

15

1        MR. VEEDER:  I am hopeful of starting this afternoon.

2        THE COURT:  If you will, make that available to Mr.

3   Sachse, so he can do his work even long before this proposal

4   comes in..

5        MR. SACHSE:  I would really appreciate it.  If you

6   will tell me that you are going to run from October 1, 1934,

7   or whatever year you are going to start, tell me that, and

8   tell me whether you are going to start with a full or an empty

9   reservoir, I will go ahead.

10       THE COURT:  Also, if you would like to have this

11  using the State figures which Mr. Sachse used, and if you

12  want to use some others advise Mr. Sachse what other figures

13  you are going to use or where they are, so that he can make a

14  run on that.  In other words, let's do a little cooperating

15  on the basis you are going to start with.  Nobody has any

16  secrets on that, I suppose.  If you have any figures, they

17  are all in a publication.

18       MR. VEEDER:  We want to be sure that we have the

19  State material before we waste a lot of time on it.

20       THE COURT:  All right.

21       (ADJOURNMENT.)

22

                        - - -

23

24

25