# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

~~CENTRAL~~ DIVISION
SOUTHERN

- - -

UNITED STATES OF AMERICA,

            Plaintiff,

      vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

         Defendants.

No. 1247-SD-C

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:   San Diego, California

Date:   October 15, 1957

Pages:   193 to 246

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRIC OF CALIFORNIA
By _____ DEPUTY

JOHN SWADER
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211 • EXT. 370

193

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,       )
                                )
                    Plaintiff,  )
                                )
    vs                          )        No. 1247-SD-C
                                )
                                )
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al,                )
                                )
                    Defendants. )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

October 15, 1957


APPEARANCES:

            For the Plaintiff:          WILLIAM H. VEEDER, Esq.
                                        WILLIAM E. BURBY, Esq.
                                        Special Assistants to the
                                        Attorney-General
                                        Department of Justice
                                        Washington, D. C.

APPEARANCES (Continued):

|   |   |
|---|---|
| For Defendant Vail Company | GEORGE E. STAHLMAN, Esq. |
| For U. S. Marine Corps: | LT. DAVID MILLER |
| For Defendant Fallbrook Public Utility District | SWING, SCHARNIKOW & STANIFORTH, by: PHIL D. SWING, Esq. and F. R. SACHSE, Esq. |
| For Defendant State of California: | EDMUND G. BROWN, Esq., Attorney-General, by: ADOLPHUS MOSKOVITZ, Esq. Deputy Attorney General. |
| For Defendant Santa Margarita Mutual Water Company: | W. B. DENNIS, Esq. |
| For the Defendants Faulkner: | BERT BUZZINI, Esq. |

1    SAN DIEGO, CALIFORNIA, TUESDAY, OCTOBER 15, 1957, 10:00 A.M.

2                              - - -

3              THE COURT:  Mr. Clerk, you don*t have the Fallbrook

4    case listed on the calendar.

5              THE CLERK:  No, I don*t, your Honor.  I didn*t know

6    know it was to be on.

7              THE COURT:  An order was made on September 5th that

8    it would be set for hearing on the 14th, and then I continued

9    it until this afternoon.

10              United States versus Fallbrook, et al, No. 1247.

11              Apparently all interested Counsel are present.

12              I am very much disturbed, Mr. Veeder, about this

13    so-called offer of compromise.  I have read it a time or two.

14    I have read Mr. Sachse*s letter to you upon receipt of it.  I

15    have tried to understand what you might be trying to do.

16              If this is an offer where you are hedging against

17    making further concessions, in other words, where you have not

18    gone all the way that you propose to go in an offer, then I

19    suppose it falls in the same category of the Fallbrook offer,

20    which was a proposal but which did not close the door to

21    further negotiations.  But if this is intended as any kind of

22    offer that could be accepted, then I lose you completely, and

23    I am disturbed at the contents of it.

24              I don*t know whether I have made myself clear or

25    not.

196

1          To make my thinking clear, just take one example.   I

2    am talking about settling the case.   I am not talking about

3    adjudicating the contentions of the parties.   Fallbrook has

4    made it clear all along that their only claim was their right

5    to appropriate surplus water from the River.   Now, if there is

6    a settlement whereby there is an agreement between Fallbrook

7    and the military as to how much of these surplus waters each

8    side is going to take, then I utterly fail to see why there

9    should be anything like Condition Number 3, requiring Fall-

10   brook to recognize the appropriative and prescriptive rights

11   of the United States.   There may be prescriptive rights, but

12   if it is a compromise you are settling on a certain amount of

13   water out of the surplus and naturally you are yielding some-

14   thing and the other side is yielding something.   Fallbrook has

15   been contending that they have a right to appropriate more

16   water than would be involved in this proceeding.   The Govern-

17   ment is contending that they have certain prescriptive rights

18   and that they have certain rights to appropriate.   If you are

19   going to have a settlement, naturally you yield these claims

20   of the right to appropriate and the settlement that you arrive

21   at takes the place of the claims you have heretofore made to

22   appropriate water.

23          Now, am I silly, or does that make sense?

24          MR. VEEDER:   Your Honor, in response to your question,

25   Condition Number 3, from our point of view, is important.   We

197

1    take the view, in regard to the appropriative and prescriptive

2    rights, that those are exercised and enjoyed by the Marines

3    outside the watershed.  The buildings that are outside the

4    watershed and the structures there must be maintained.  We

5    have no alternative in regard to the measure of our rights

6    respecting those interests.  If we were to, in any way,

7    relinquish or give up those appropriative and prescriptive

8    rights, we would necessarily reduce the size of the military

9    operations outside of the watershed.

10            THE COURT:  As I understand it, you as yet have made

11   no appropriations.

12            MR. VEEDER:  We take the position, your Honor, that

13   we have, from the standpoint of all the elements required for

14   an appropriation.

15            THE COURT:  You have not made an application and

16   had it acted on by the State of California to appropriate

17   water, have you?

18            MR. VEEDER:  No, your Honor, we haven't.

19            THE COURT:  Then why should you insist, on a settle-

20   ment, that Fallbrook recognize the fact that you might have

21   a right to appropriate, any more than Fallbrook would have a

22   right to say, "Well, we will settle with you, but you have got

23   to recognize that we have a right to possibly appropriate

24   water."  How can you have a settlement if one side or the

25   other says, "Now, we are going to settle, but you have to

1    recognize that we would have a right to go to the State and

2    appropriate water"?

3         That is what you are doing.  It doesn't make sense

4    to me.  If you can point out the error of my thinking, I will

5    be glad to listen to you.

6         MR. VEEDER:  Your Honor, I have stated that, from

7    the standpoint of the Marines, any reduction in the appropria-

8    tive rights of the use of water and the prescriptive rights

9    as claimed has applicztion to buildings and structures

10   presently in existence and presently using water.

11        THE COURT:  Then you never intended that this case

12   could be settled.  If you intend to reserve all rights to

13   appropriate water, then this case can't be settled and you

14   were not fair and honest with the Court when there was a

15   suggestion made that maybe this case could be settled on the

16   formula of the Utt Bill.

17        MR. VEEDER:  Your Honor, with all respect to your

18   Honor, I have always been fair and honorable with any court.

19   I want you to know, sir, that I would not appear before you

20   without being honorable with you.  But I also have an obliga-

21   tion and a responsibility.  We have told Fallbrook repeatedly,

22   your Honor, that if they desire to go ahead and build this

23   structure they may do so.  They can if they choose.  But

24   I was very pleased at the letter that we received, for it is

25   for the first time since 1949 that the true intendment of

1    Fallbrook is disclosed.  Fallbrook advises us that it will not

2    recognize that a riparian right to the use of water may be

3    exercised for military purposes.  It is not for me to

4    question --

5            THE COURT:  Let's not get off what I am talking

6    about.  I may have something to say about that later.  But I

7    am talking about this alleged proposal now.  How can you

8    submit or talk about submitting a proposal based upon the

9    formula of the Utt Bill and proposing a 60-40 division of the

10   floodwaters and at the same time require that Fallbrook

11   recognize a right for the Government to appropriate further

12   waters from the River?

13           MR. VEEDER:  Your Honor, we are not asking that

14   Fallbrook recognize any further appropriations by the United

15   States -- none at all.

16           THE COURT:  Well, then you have misused the word

17   "appropriation."  By "appropriation" do you mean the waters

18   you have already purported to take?

19           MR. VEEDER:  That is correct, your Honor.  We have

20   already appropriated waters --

21           THE COURT:  Waters that you appropriated by some

22   method of self-help without complying with the water laws of

23   California.

24           MR. VEEDER:  That is correct.  It is our position

25   that it is a question of law to be resolved, we admit; but we

200

1    believe the cases will support us in the proposition that the

2    diversion and application of water to beneficial use consti-

3    tutes an appropriation itself.  The measure of our rights is

4    the measure we are presently exercising.  We claim no right

5    for additional appropriations as against Fallbrook or as

6    against any other appropriator as of the present time.

7        THE COURT:  Well, now, let's stop right there, so

8    that I will understand what you are now telling me, which you

9    didn't say in your document.

10       You are not requiring Fallbrook to recognize, as

11   part of a settlement, that you have any rights further to

12   appropriate water.

13       MR. VEEDER:  That is correct, your Honor.

14       THE COURT:  But you are talking about water that

15   you claim you have heretofore appropriated by self-help with-

16   out complying with the requirements of California water laws.

17       MR. VEEDER:  Precisely.

18       THE COURT:  Now is that also what you mean when you

19   talk about requiring Fallbrook to recognize your riparian

20   rights?  Are you talking about a recognition that you have

21   certain rights in the stream which are prior to any rights to

22   surplus water?  Is that what you are talking about?

23       MR. VEEDER:  Your Honor, I will say that in regard

24   to Fallbrook or anyone else we are claiming the full measure

25   of our riparian rights.  By the use of the term "surplus" I

1   am not quite sure what your Honor meant.  If there is surplus

2   above and beyond the needs of the National Government, that

3   water is, of course, available for appropriation by Fallbrook

4   or anyone else.

5         THE COURT:  Well, I think I understand your position

6   on that.  Your position is that you have riparian rights to

7   this surplus water.

8         MR. VEEDER:  Well, we have this --

9         THE COURT:  To what we call surplus, and that there-

10   fore there is no surplus.  Is that your position?

11         MR. VEEDER:  We have always taken the position, your

12   Honor, that for any practical purpose there is no surplus

13   water in the Santa Margarita River.

14         THE COURT:  Now let's be more specific.  Your position

15   is that the rights that you have as riparian rights impinge

16   upon and include, at least in part if not all, this water

17   which we have heretofore designated as floodwaters or surplus

18   waters.

19         MR. VEEDER:  It is our view, in that regard, your

20   Honor, that the riparian rights of the United States of

21   America entitle it to have water come to it for the purpose of

22   recharging its basin, and the question whether the water is

23   or is not surplus necessarily depends upon physical circum-

24   stances existing at the time when the water is available.  In

25   other words, we can have, as we have had, I think, in 1952, a

202

1      momentary surplus.   In the last thirteen years there was only

2      one period when there was a quantity of water which might be

3      called "surplus."  Our investigations and our considerations

4      reveal, however, that that water was greatly needed for us to

5      recharge our basins down within the enclave.  So when that

6      water reaches us, it is the only method and means of re-

7      charging the basin.  If Fallbrook were to put a structure

8      above us, we would be in a position of having lost to us the

9      only method available to us to recharge our principal source

10     of water.

11            And your Honor, if I may refer back for a moment,

12     you inquired as to our position in regard to the proposal we

13     have made.  The proposal that we have made here is, in our

14     view, squarely within the Utt Bill.  The Utt Bill specifically

15     places an impost upon us not to relinquish any of our vested

16     rights to the use of water.

17            THE COURT:  Well, I read the Utt Bill again before

18     I came out, and I don't follow your interpretation of that

19     Bill.  There is some general language in there.  But you

20     construe a bill by the four corners of it, and I don't think

21     the interpretation you put on it is a correct interpretation.

22     I will go into that in a minute.

23            MR. VEEDER:  I wanted to bring that to your atten-

24     tion, that we are in this position, and it is the interpreta-

25     tion that has been placed upon the Bill by the Department of

1    Justice that there is no basis for a relinquishment of any of

2    our rights.   Your Honor has referred to surplus waters.   We

3    don't know that there is any surplus water in that stream, and

4    during our ownership we don't believe there ever has been a

5    surplus of water.   It is true that water has gone into the

6    ocean on occasion, but that is not per se waste, nor is it

7    per se surplus.   We don't know what would have occurred if

8    that water had not reached the full length of the stream and

9    some of it entered the ocean.   We believe it probably required

10   every drop of water to conduct the quantities required for

11   our basin, and the complete good faith of the United States is

12   set forth in this proposal.   We have told Fallbrook through-

13   out the entire period of this long and protracted matter that

14   by all means if they want to build a dam and not invade our

15   rights to go ahead.   But I think that their proposal and their

16   letter in response to us indicates that they could not build

17   a dam and divert water absent an invasion of the vested

18   rights of the United States of America.

19            THE COURT:   Well, what do you make of the fact that

20   the Utt Bill had at the end of it Section 4?   What do you

21   make of Section 4?   If you have this all-inclusive right

22   where your so-called riparian right includes even flood-

23   waters, what do you think of Section 4 of the Utt Bill?

24            "After construction of the De Luz Dam,

25        the official operating the reservoir shall

1           deliver water to Fallbrook pursuant to

2           regulations, as follows: . . ."

3  so many acre feet until the reservoir contains 63,000 acre

4  feet, etc.

5           MR. VEEDER:   I think that inclusion in the Bill is

6  simply predicated upon the possibility that under a given set

7  of circumstances there might be a quantity of water impounded

8  that could be made available to Fallbrook.   I refer to an

9  additional fact, your Honor, that is extremely important here.

10  The Utt Bill provided for the construction upon the enclave

11  of the United States of a structure that would be capable of

12  impounding a large quantity of water.

13           THE COURT:   Well, Mr. Veeder, it is obvious to me

14  what the Congress intended.   The section that you are putting

15  weight upon is Section C of the Bill -- Section 3C.   It says:

16           "For the purposes of this Act, the

17           basis, measure and limit of the rights of the

18           United States pertaining to the use of water

19           shall be the laws of the State of California."

20  That is a far cry from your talk about your appropriation by

21  self-help.

22           "Provided, that nothing in this Act shall be

23           construed as a grant or relinquishment by the

24           United States of any of its rights to the use

25           of water which it acquired according to the

1    laws of the State of California . . ."

2  again referring to the laws of the State of California --

3    ".. . . either as a result of itz acquisition

4    of the land comprising Camp Pendleton and the

5    rights to the use of water as a part of said

6    acquisition, or through actual use or prescrip-

7    tion, or both, since the date of that acquisi-

8    tion."

9    Now it is true that they have deferred to not only

10 the rights you got when you bought the property, but what you

11 might have got through use or prescription.  Congress made no

12 finding that you had any water through use or prescription,

13 but this was broad enough to cover any that was found.

14    However, notwithstanding that general language, it

15 is clear that the intention of Congress in the Utt Bill, and I

16 think any court who looked at this Bill would say that the

17 intention was that the distribution of this water was to be

18 on a 40-60 basis and that it was not a finding that the

19 Government owned all this water by either a use or prescription

20 or appropriation.  The very fact that Section 4 specifies

21 certain amounts of water, relatively small amounts, in sub-

22 division 1 and two other subdivisions there, with no if's or

23 and's about it, that much water was provided by the Act to be

24 delivered to Fallbrook, and that read in connection with the

25 language in Section 3C makes it clear to me what Congress had

1   in mind.

2         MR. VEEDER:  Your Honor, may I refer to paragraph

3   3D.  There it says:

4            "Unless otherwise agreed by the Secretary

5           of the Navy, the De Luz Dam as herein provided

6           shall at all times be operated in a manner

7           which will permit the free passage of all the

8           waters to the use of which the United States

9           of America is entitled, according to the laws

10          of the State of California,, either as a result

11          of its acquisition of the lands comprising

12          Camp Pendleton . . ."

13  and proceeding on to the end.

14         THE COURT:  Well, it's the same language, and that

15  obviously referred to the free passage of the water that you

16  were entitled to under your riparian rights and possibly if

17  you had prescriptive rights.  Query as to these so-called

18  appropriative rights by self-help.

19         Now we're talking about settlement.  I understand

20  that your superior -- this is scuttlebut -- that your superior,

21  the Solicitor of the Department of the Interior, assured the

22  President of the United States that your Department would

23  discuss settlement of this litigation on the basis of the Utt

24  Bill.  Am I in error on that?

25         MR. VEEDER:  Your Honor referred to Mr. Rankin, the

1   Solicitor-General.

2   THE COURT:   The Solicitor-General.

3   MR. VEEDER:   I have no personal knowledge -- I have

4   none at all.   The last time that I discussed this matter with

5   Mr. Rankin was a month ago in his office.   I talked with him

6   on the telephone on three or four occasions, and our discuss-

7   ions have always been on the same basis of our discussions

8   during the pendency of the Utt Bill.

9   It was Mr. Rankin's understanding of the Utt Bill,

10  and mine, your Honor, that it was the intention of Congress to

11  protect the rights and interests of the United States against

12  invasion.   If there was a surplus, they had no objection to

13  building a dam on the enclave and impounding water -- if there

14  was a surplus.   But your Honor, the record is clear since the

15  acquisition of these properties by the United States that there

16  has not been a period, in our view, when Fallbrook could have

17  taken the water that she desired, without invading our rights.

18  THE COURT:   Why didn't you comply with my request

19  that you make a chart that could be compared with the chart

20  submitted by Fallbrook.   I thought that was very clear in the

21  record of the case.

22  MR. VEEDER:   Your Honor, --

23  THE COURT:   I have no way to make a comparison

24  between the chart that you made and the chart that Fallbrook

25  made.

MR. VEEDER: Your Honor, we truly thought that the chart Exhibit D would disclose the same data with greater clarity. I will say --

THE COURT: Well, now, regardless of what you thought, did you understand what I asked you to do? I repeated it time and again, and I told you that you could make alternate charts. Now I don't mind an attorney's having initiative, but I'm not a very smart judge, and when I want something I can see I would like to see it. Now if you want to do something else at any time, you go ahead and do it; but you do what I tell you to do.

MR. VEEDER: Yes, your Honor, I will.

THE COURT: Now did you understand that I wanted a chart that I could compare with the Fallbrook chart?

MR. VEEDER: Well, I will say this as to my understanding of what you told me. You advised me that it would not be necessary that I respond to the Fallbrook proposal. You suggested that a chart be prepared in a manner that would permit you to compare and to analyze the Fallbrook position as it relates to the United States of America. I assure your Honor that I will have in your hands the exact --

THE COURT: Don*t you recall that in our discussions it was expressly stated that you should make out the chart taking your figures but using the exact formula that Fallbrook had used, so that I could make a comparison, and I said that

209

1    if you want to make any other charts make them?  Now maybe

2    you can tell me how I can compare this chart, but it certainly

3    isn*t the kind of chart I asked for and it is not the kind of

4    chart that I think you understood that I wanted.

5           MR. VEEDER:  Your Honor, I will say this, that I

6    truly believed when we presented Exhibit D to your Honor that

7    it went far beyond and gave a much more complete indication of

8    the status of the available water.  Now I truly regret that

9    we did not put column for column, as your Honor suggested;

10   but we will do that.  We will get it column for column and

11   submit it to you.  There was no intention on my part in any

12   way to vaoid your direction, but I thought that this manner

13   of presentation would be more effective.

14           THE COURT:  Do we have a transcript of that?

15           MR. VEEDER:  I don't believe that was on the record,

16   your Honor.  I recall very distinctly, your Honor, that --

17           THE COURT:  Did I summarize it on the record?  Let

18   me see it.

19           MR. VEEDER:  Was it summarized on the record?  I

20   have forgotten.

21           THE COURT:  Does somebody have a page reference?

22           MR. MOSKOVITZ:  Page 186, your Honor.

23           THE COURT:  I summarized this somewhere.

24           MR. SACHSE:  Page 193, line 16, your Honor.

25           MR. VEEDER:  I think I recall your Honor*s

1  reference to that, and if I could refer to this Exhibit D I

2  will undertake to disclose how we view the comparison.  We did

3  take a longer period, and as I recall your Honor told me that

4  that would be permissible.  We then showed the factors that

5  are entailed in arriving at the conclusions disclosed here.

6  This is a chart prepared for the purpose of indicating the

7  burden  on the stream at full development, which is, in our

8  view, the only proper method of analyzing the problem here

9  presented.

10         If your Honor would refer to the first column and

11  the second column and on across, it will be observed that the

12  report is much more comprehensive; that we had started to use

13  the figures of Fallbrook, but that we went these additional

14  steps in our analysis to show the reduction in runoff by

15  upstream development.  We had the additional  elements to

16  take into consideration which Fallbrook did not take into

17  consideration:  the elements of reduction of Murietta Creek

18  and at other points, which yield the waters upon which we must

19  rely.

20         Now again, I apologize if it was not the way your

21  Honor desired it set up.  We did take the same figures as

22  Fallbrook, we gave you a longer period, but we show more

23  comprehensively the burden upon the stream.

24         THE COURT:  What column of figures is comparable?

25  What figures did you take that are the same as Fallbrook's?

211

1    MR. VEEDER:  The figures that are comparable, your

2  Honor -- if Your Honor will look at our column number 1 and

3  Fallbrook's columns 4 and 5, it will be observed that number 1

4  column is the composite of Fallbrook's columns 4 and 5, which

5  is, in our view, your Honor, the only --

6    THE COURT:  What do you mean, Fallbrook's 4 and 5?

7  Do you mean C and D?

8    MR. VEEDER:  Well, here you have Exhibit --

9    MR. SACHSE:  You're using the old one.

10    MR. VEEDER:  Which figures does your Honor have?

11    THE COURT:  I have only a set that was submitted to

12  me with the proposition of Fallbrook under date of September

13  30, 1957, two charts drawn in this manner, if you want to look

14  at them.  Apparently, you have taken some older chart of which

15  I don't have a copy.  Is this the chart?

16    MR. VEEDER:  I am looking at the original chart

17  that was given to us.  Now you can take the one of September

18  30th, if that is the one your Honor desires to look at; you

19  will find that Fallbrook's columns 1 and 2 --

20    THE COURT:  Can we use letters?  What do you mean,

21  1 and 2?  The first column says the year and March 31st.

22    MR. VEEDER:  If we will take Fallbrook's columns,

23  here, B and D, it will result in the composite figure which we

24  show in our column 1.

25    THE COURT:  In other words, in the year 1926, your

1  figure there is 12,500, and Fallbrook's is 9,143.  Is that the

2  comparison?  Or is it the addition of those two?

3        MR. VEEDER:  It would be the addition.  If you add

4  3400 to 26-27, it gives you 8100.

5        THE COURT:  8100?

6        MR. VEEDER:  I was referring to B and D, your Honor.

7        THE COURT:  B and D in the year 1926?

8        MR. VEEDER:  And the figure is 12,500 in our column

9  1, and the runoff has been reduced --

10        THE COURT:  Just a moment.  Are you referring to the

11  year 1925-26 on the Fallbrook chart?

12        MR. VEEDER:  I am referring to the year '25-26, your

13  Honor.

14        THE COURT:  Where it says "October-March Inflow" --

15        MR. VEEDER:  "October-March Inflow."

16        THE COURT:  Column B, 3,396.

17        MR. VEEDER:  That's right.

18        THE COURT:  And "April-September Inflow 9,143"?

19        MR. VEEDER:  I don't have that, your Honor.

20        MR. STAHLMAN:  They are two different sheets.

21        MR. VEEDER:  I'm having difficulty, your Honor, with

22  these figures that Fallbrook is using here.  If Mr. Sachse can

23  straighten it out, I'd appreciate it.

24        THE COURT:  I see the second chart here.

25        MR. SACHSE:  Your Honor, if I may, I will try to

213

1   help Mr. Veeder and your Honor.   The figures to which you are

2   referring were transmitted to Solicitor-General Rankin by me

3   under the letter dated September 16th, in which I stated that

4   at Mr. Veeder's request I modified my original proposal, which

5   had run only from '35 to '53 and was going back to '23.   I

6   submitted two charts, one using the figures contained in

7   Bulletin 57 of the State of California -- if you will look at

8   the heading you will see "Santa Margarita figures based on

9   Bulletin 57."   I submitted a second one, "Figures based on the

10  U.S.G.S. records submitted by the Marine Corps," which is the

11  set of figures they gave me.   They do not quite coincide.   The

12  figures that Mr. Veeder is talking about, your Honor, the

13  measured runoff for 1926, Column 1 in his Exhibit D, 12,500,

14  that is the total of column B on my Bulletin 57 chart and

15  column D on my Bulletin 57 chart.   So together they add up to

16  12,500.

17          MR. VEEDER:   That is correct.   May I inquire,

18  though, Mr. Sachse, you said a letter of September 16th?

19          MR. STAHLMAN:   30th.

20          MR. SACHSE:   September 30th.   On September 30th I

21  addressed the Honorable J. Lee Rankin and you as co-addressees.

22          MR. VEEDER:   We have that, your Honor.

23          MR. SACHSE:   And I submitted, as you will recall,

24  considerably earlier than that, this other proposal that you

25  have.

            MR. VEEDER:   That is correct.   I have them both.

214

1      The only point I wanted to bring to your Honor's

2   attention is that 12,500 is the composite of B and D.  We have

3   the adjusted figures taken from the State's report, which is

4   11,500, in the second column.

5      THE COURT:  Well, that doesn't follow either.

6   Actually, if you are comparing figures, the figures on Mr.

7   Sachse's Bulletin 57, taking B and D columns are the figures

8   in your column 2, because --

9      MR. VEEDER:  Because they are the adjusted figures.

10      THE COURT:  -- 3,400 added to 8,100 is 11,500; and

11   the next column, '26-27, 68,500 plus 3,000 is 71,500.  That's

12   the so-called adjusted figures.

13      All right, let's go across the chart, then.  What is

14   the next column?

15      MR. VEEDER:  The next column is "Reduction in Vail's

16   Fill on Future Development."  As I understand those figures --

17   and these are figures we obtained from the State of California

18   -- these figures are not final, but they are the only data

19   that we could obtain from the State.

20      To move on to the next one, "Reduction in Murietta

21   Creek --

22      THE COURT:  Before we go on, you say "future

23   development;" this is something that is going to happen in the

24   future.

25      MR. VEEDER:  That is correct.

1          THE COURT:   And why do you run them into past years?

2          MR. VEEDER:   Your Honor, the only way we can calcu-

3    late what will come in the future would be to take the full

4    history of the record runoff and see how they would be reduced

5    if, under full development, they were to recapitulate.

6          THE COURT:   I see why you put them in.

7          The next one?

8          MR. VEEDER:   On the next one -- are you at Murietta

9    Creek, your Honor?

10         THE COURT:   Yes.

11         MR. VEEDER:   There would be a 2,000 reduction there,

12   on the basis of full development.

13         THE COURT:   And the next one is Fallbrook with the

14   adjustment you have already mentioned; is that right?

15         MR. VEEDER:   That is correct, your Honor.

16         Now De Luz Creek enters the River within the

17   enclave.   That is an additional quantity of water that comes

18   in below the Fallbrook gauging station.

19         THE COURT:   Are those figures comparable to Mr.

20   Sachse's, too?

21         MR. VEEDER:   I don't know that Mr. Sachse included

22   those figures.

23         THE COURT:   Yes, he did, in F.

24         MR. VEEDER:   Yes, he did.   They are comparable --

25   5800.   They are the same.

216

1    THE COURT:   The next column speaks for itself,

2  "Evaporation Loss."

3    Then the next column is "Navy Requirements."

4    MR. VEEDER:   23,000.

5    Now we feel that the method, and the only method,

6  upon which these --

7    THE COURT:   How do you interpret this last column,

8  "Water in Storage at the Year End"?

9    MR. VEEDER:   That is on the basis of the structure

10  authorized by the Utt Act, with a full reservoir of 180,000

11  capacity, and based on our calculation there would be that

12  much water to start with in 1925.

13    THE COURT:   What is the comparable figure in the

14  Sachse chart?

15    MR. VEEDER:   B and D has an entirely different

16  calculation than we have, your Honor.

17    As I understand, Mr. Sachse, you are operating on a

18  35,000 acre foot storage; isn't that correct?

19    MR. SACHSE:   I was operating, as I think both our

20  proposals made very clear, on the assumption that we build a

21  reservoir at the so-called Lippincott site and not the De Luz

22  site, and that it had 35,000 acre feet capacity, and my charts

23  were intended to indicate how much would come in during

24  October-March, how much we would take out, how much would come

25  in April to September, how much would  spill, how much would

1   accrue to the stream below the dam, and how much would be

2   available to the Navy, and there is absolutely no figure on

3   your Exhibit D except in the stream flow totals that is in any

4   way comparable.    You're talking about a different reservoir,

5   a different site, with a different evaporation loss, and there

6   is no figure anywhere in yours for any withdrawals by Fall-'

7   brook, zero withdrawal by Fallbrook in Exhibit D.   We get

8   nothing.

9           MR. VEEDER:  Well, no, the --

10          THE COURT:  What site was your chart based on?   The

11   Lippincott site?

12          MR. SACHSE:  Fallbrook Lippincott site, your Honor,

13   35,000 acre feet, which is roughly outside our back door.

14          THE COURT:  And your chart is on the basis of the

15   De Luz site.

16          MR. VEEDER:  That is the only authorization we have,

17   your Honor.  We can run it on the Lippincott storage.  However,

18   from our standpoint, the 35,000 acre foot storage as contem-

19   plated by Fallbrook is written on a contemplated 6500 acre

20   foot firm supply to Fallbrook subsequent to the year 1926-27,

21   and we, of course -- I thought I had made it clear and I'm

22   sorry if I hadn't, that from our view there would never be a

23   circumstance where the United States could recognize a firm

24   right in Fallbrook without giving up water which the Marines

25   and the Navy say they absolutely must have.

1    THE COURT: All right, for the purpose of our dis-

2    cussions we have passed up the firm right in Fallbrook.   That

3    was left out.   The purpose of our discussions was settlement.

4    This was to be a counter-proposal on a percentage basis.   The

5    Fallbrook proposal was, true, one with a firm right, and this

6    was a counter-proposal, now, that was not going to talk about

7    firm right to Fallbrook but was going to talk about a per-

8    centage of the floodwaters.   That's the way I understood it.

9    MR. VEEDER: And that was precisely what the offer

10   which has been made contemplates.   We view it this way, that

11   certainly on a 35,000 acre foot storage situated at Lippincott

12   there could be nothing other than an invasion of the rights of

13   the United States, on any kind or type of calculation.

14   THE COURT: Well, have you made an offer or haven't

15   you?

16   MR. VEEDER: We have made this offer, that at any

17   time that there is a surplus Fallbrook may proceed to impound

18   the water, and our proposal was, and is, on the basis that if

19   there is a surplus above and beyond the needs of the National

20   Government Fallbrook would be permitted to impound the water,

21   and we, in return, would simply say, "Well, go ahead and build

22   your dam, if you choose to do it," and that is the only fair

23   and honest proposal, in our view, that can be made.

24   THE COURT: Who is going to make this determination

25   of the needs of the Government?

1      MR. VEEDER:  They have already been made, your

2  Honor.

3      THE COURT:  By whom?

4      MR. VEEDER:  By the United States Navy.

5      THE COURT:  Well, I mean, you are just suggesting

6  that, for settlement purposes, the figures made by the Navy

7  be accepted, and that anything over and above that Fallbrook

8  may impound; is that it?

9      MR. VEEDER:  We view it this way, your Honor, that

10  it is conceivable that there would be a period when there will

11  be a return to periods of higher flow.  Should those circum-

12  stances take place, there might be, in some years, floodwaters.

13      THE COURT:  I'm talking about your proposal of

14  settlement.  You say you have made a proposal.

15      MR. VEEDER:  Yes.

16      THE COURT:  And you say that you will share 60-40 with

17  Fallbrook any water over and above the needs of the Govern-

18  ment.

19      MR. VEEDER:  That is correct.

20      THE COURT:  And I ask you, for the purpose of

21  settlement, who is going to determine the needs of the

22  Government?

23      MR. VEEDER:  The Department of the Navy.

24      THE COURT:  That's a proposal of settlement?

25      MR. VEEDER:  Well, your Honor, from our view --

       THE COURT:  If you said that so many acre feet are

1   our needs, and we base this proposal upon these figures, you

2   might have something to work on.   But how can you call that an

3   offer of settlement?

4               MR. VEEDER:   I refer your Honor to Exhibit D again:

5   U. S. Navy requirements 23,000 acre feet -- that is the third

6   and last column, and those are the needs that have been

7   determined by the Marines and the Navy, they are the figures

8   that have been supplied to us, they are the figures upon which

9   we necessarily must proceed.   They are the figures and the

10  only figures that the military men say they can rely upon --

11  those periods of full mobilization.   I have no alternative, as

12  a lawyer, to do other than to proceed on the basis of the

13  demands concerning which we have been advised.

14              We take the position that the Marines bought this

15  area.   They knew what their demands would be.   Fallbrook had

16  no claim at the time they bought the property.   The result was,

17  and is, that a great military installation has been built

18  for the purpose of national defense and they know what their

19  needs are.   If there is a momentary surplus above those at any

20  time, we have no objection to Fallbrook impounding the water.

21  But we do say, your Honor, that the physical phenomena that

22  prevail in the Valley are such that for us to come here and

23  say to your Honor that a firm offer of settlement could be

24  made which would guarantee Fallbrook --

25              THE COURT:   Nobody asked you to submit a proposition

1    guaranteeing one drop of water to Fallbrook.  Our entire dis-

2    cussion was on the basis of a division of floodwaters.  Isn't

3    that right?

4            MR. VEEDER:  That is correct, your Honor.

5            THE COURT:  All right.  And I'm not asking you, in

6    this proposal, to guarantee one drop of water.  We were trying

7    to explore what could be done on division of floodwaters.  So

8    let's forget about any guarantee to Fallbrook right now.

9            MR. VEEDER:  All right.

10           THE COURT:  Your point is that you can't make a

11   proposition except one which says that you must accept the

12   need as determined by the Navy, and if there is water over and

13   above that need then we'll share that with you 60-40.  Is that

14   your proposal?

15           MR. VEEDER:  The 23,000 acre feet to which we make

16   reference is the quantity of water that the Navy claims from

17   the River and which it states that it needs.

18           THE COURT:  And your proposal is to share flood-

19   waters over and above the satisfaction of your need with

20   Fallbrook on a 60-40 basis.

21           MR. VEEDER:  Here is our position in that regard,

22   your Honor.  We feel, on the basis of these stream flow

23   studies -- and we have had the best men we could get to do

24   it -- that there is possibly a period in some years when there

25   might be a surplus; but in our view of the law, and predicated

1  upon the history of runoff in this River, it is our view that

2  there would never be a time -- maybe the 1916 flood that took

3  everything out may be an exception -- there is never a time

4  when there would/be some benefit accruing to the United States
          not

5  to have that water enter the enclave and recharge the basin,

6  and when we relinquish to Fallbrook what has been termed

7  floodwaters those are waters that, we truly believe, would be

8  beneficial to our property and that we are waiving a right to

9  have that water enter upon our enclave.

10         THE COURT:  How much of your 23,500 acre feet --

11  23,000 acre feet, which you say is your need, do you claim is

12  appurtenant to your riparian rights, how much to your alleged

13  prescriptive rights, and how much to your rights of appropria-

14  tion by self-help?

15         MR. VEEDER:  Our riparian rights, of course, would

16  take far beyond any water that is in the River.  We have

17  18,000 acres of riparian land, with a demand far, far in

18  excess of the yield of the stream.  Our total riparian rights,

19  your Honor, under the law of California, as we have calculated

20  it, runs to 69,000 acre feet, better than twice as much as

21  there is in the River.

22         When we take into consideration the Vail interests,

23  which are upstream, which are larger than ours, the quantity

24  of water to which riparian lands have an entitlement are

25  probably five or six times as much as the runoff.  That is a

1   phenomenon that is recognized by the Supreme Court of Califor-

2   nia.   There is no doubt that the riparian rights in the Santa

3   Margarita River of the Navy alone exceed all the waters in that

4   River.

5          Now, in regard to our appropriative and prescriptive

6   rights, I am reluctant to say exactly but I think that they

7   will run around 4500 acre feet for Lake O'Neal, I think that

8   they will run around that figure for water used outside the

9   watershed.   So, when all is said and done, our claims for

10  prescriptive and appropriative rights alone will run perhaps

11  ten or twelve thousand acre feet.

12          Now the position that we are in is that we are con-

13  fronted with a stream that will, under prevailing circumstanc-

14  es, supply the Navy with the water that they say they need.

15  But an invasion by Fallbrook, an impounding by Fallbrook of

16  the 35,000 acre feet to which it makes reference could have no

17  other effect than irreparable damage to us.   We cannot, and

18  we would be in grave error if we undertook to tell your Honor

19  that we can guarantee or that we could even suggest or that we

20  could even guess the number of acre feet which might be

21  available in any year or at any time.   The history of this

22  stream, if your Honor will observe our Exhibit D again, you

23  will see the violent fluctuations which defy calculation as to

24  what will be available.

25          THE COURT:   Well, it boils down to this -- and I

1 would have respected you better if you had been frank about

2 it, if in the preliminary conference when we were talking

3 about a division 40-60 of floodwaters you had said, "The

4 Government cannot makel  a good faith proposition to settle,

5 because we claim that we can prove that we have riparian

6 rights fully to satisfy our needs.  When our need is satis-

7 fied, there is no water left over for Fallbrook.  Fallbrook is

8 an appropriator, outside of a little bit of water that they

9 already have.  Therefore, we can't, in good faith, make an

10 offer."  Or if you had left the conference, with some thought

11 that you could submit an offer, if you had said that instead

12 of submitting a multi-page document called "A Proposal for

13 Settlement," which, when boiled down, says this:  "We need

14 23,000 acre feet.  We claim that our riparian rights are

15 69,000 acre feet.  Fallbrook is an appropriator, except for a

16 limited amount of water it is guaranteed.  Therefore, there is

17 no water for Fallbrook.  Therefore, we can submit no good-

18 faith proposition."

19            Now that's what you have told me, isn't it?

20            MR. VEEDER:  Your Honor, with all respect to your

21 Honor,I dare say you will find in the record before your

22 Honor    that we have said precisely what you have just got

23 through saying.  We have stated repeatedly to your Honor, and

24 we have stated repeatedly in this courtroom, what our demands

25 are today.  We set those up in memoranda.  They are on file

224

1   here.  They are distributed to everyone.  We have said it

2   repeatedly, your Honor, and when your Honor directed that some

3   offer of settlement be undertaken we undertook to do the best

4   we could.

5        THE COURT:  Well, I have never noticed you to be

6   afraid to speak up in court no matter how hard a court is on

7   you.  Couldn't you speak up to the Court and say, "We can't

8   make a proposal"?  And couldn't you have come in with a

9   document where you could have said in about three pages what

10  you have said here:  "We can't make a good-faith proposal,

11  because we claim 69,000 acre feet of riparian water.  We need

12  23,000 acre feet.  There is no water to be divided"?

13       MR. VEEDER:  I believe, your Honor, I have said that

14  into the record.  I have said it for ten years.

15       THE COURT:  Well, you may have said it to other

16  judges, but I'm not so sure that you ever said it to me, and

17  I don't intend to be charged with judicial notice of what you

18  may have said in other courtrooms.

19       MR. VEEDER:  Your Honor, I have no desire to argue

20  with you, of course.  But I believe that if I were to go

21  through this record, I believe I could go through memoranda

22  as of the moment and show precisely and exactly what I have

23  just finished saying to your Honor.  I filed a brief with

24  your Honor on August 17th, in which we said exactly what your

25  Honor just got through saying.

1          We set up, in that brief -- I think I have it

2     here --

3          THE COURT:  I don't dispute that you may have said

4     that in a brief.  But thereafter we had these talks of settle-

5     ment, and I supposed there was to be a good-faith offer of

6     settlement.  How can you make a good-faith offer of settle-

7     ment if, when you get all through, you're saying, "We can't

8     settle.  We have no basis on which to settle"?  So that the

9     talk about 40-60, and compliance with the formula of the Utt

10    Bill, is all a bunch of gobbledegook until one reads it over

11    and analyzes what you said.

12         MR. VEEDER:  The memorandum that I tendered to your

13    Honor, this proposal of the United States, embraces the exact

14    language of the Utt Bill; it says we are not to relinquish any

15    rights, but if a reservoir is constructed there will be parti-

16    cipation.

17         THE COURT:  Well, I'm in disagreement with you on

18    the Utt Bill.  We have already talked about that.  I don't

19    think that that strained interpretation is what is meant by

20    the Utt Bill.  It was an attempt by Congress to settle the

21    controversy by legislation, and I had understood that there

22    could be some attempt made to settle this controversy by using

23    the formula of the Utt Bill.   But I am apparently in error.

24         If you take the strained construction that you do

25    of the Utt Bill, and if you are right in your construction,

1  then there is no argument about your position.  I don't think

2  the Utt Bill is subject to that construction.  I don't think

3  Congress intended to "lay an egg" when they passed this

4  statute.  I don't think it said "We're going to let you build

5  a dam and give Fallbrook some water,"but because of a little

6  statement saying that nothing shall prejudice the rights of

7  the United States, etc. cut out with one sentence everything

8  else they said, including their Section 4 where certain

9  definite amounts of water were to be released.  If you tell

10  me that that is the way Congress operates -- if you can con-

11  vince me of that, then I might take your interpretation of the

12  Utt Bill.

13      But the Utt Bill isn't binding on this court.  The

14  Utt Bill was merely a handle, possibly a formula, that might

15  have been used if the Department of the Interior was, in good

16  faith, willing to settle on the formula of the Utt Bill --

17  let a dam be built somewhere else -- settle on the formula of

18  the Utt Bill.

19      But if you take that interpretation of the Utt Bill,

20  and I take another one, we're miles apart.

21      MR. VEEDER:  Your Honor, necessarily, as a lawyer,

22  I have to respond somewhat in regard to your Honor's statement

23  in regard to my  good faith.

24      I refer to the memorandum of August 18, 1957, in

25  which I set forth precisely the figures I just gave your

1    Honor.  I went into great detail in regard to quantities of

2    water claimed by the United States of America.  They are as I

3    just gave them to you.

4            Now in regard to my comments as to the quantities of

5    water required by the United States, I believe that they are

6    in the record, your Honor.

7            Now a good-faith offer of settlement by the United

8    States of America has been made.  We simply cannot, nor

9    should we, in propriety, be asked by Fallbrook simply to grace

10   them with a right while we deny other citizens equally en-

11   titled to participate in the available supply of water.  I

12   have always thought that it was a most anomalous circumstance

13   that Fallbrook should think that it should be so favored

14   above everyone else on the River.

15           Now I truly regret that --

16           THE COURT:  You may have a point.  But you're

17   presently in litigation with Fallbrook.  You settle cases

18   which are litigated.  You may have a point on what Fallbrook

19   thinks about its superior right to all the other persons on

20   the River.  But the inquiry today has been, Is there any

21   chance to settle this controversy?  A man may assert a claim

22   which you think is grossly overstated, but when you get down

23   to settlement you agree upon something.

24           MR. VEEDER:  I think Mr. Rankin, the Solicitor-

25   General, filed this with your Honor after a great deal of

1    consideration; that we certainly had no intention other than

2    to make a good-faith offer.

3         THE COURT:   Well, let's leave out the question of

4    good faith -- I don't want to accuse anybody of bad faith;

5    but it comes pretty near not being an offer at all, to be

6    frank, doesn't it?

7         MR. VEEDER:   Yes, I'll be very frank, your Honor.

8    I think this, that had not it been for the unconscionable acts

9    of Fallbrook, this circumstance would not exist today.   I

10   believe this, that by a course of political planning they have

11   created a circumstance that is completely outlandish.   I

12   believe that's true.

13        I don't believe that there can be an offer of

14   settlement honorably made which would say, "Fallbrook, you

15   get some water," because we don't believe there is that kind'

16   of water in the stream, and we would be very pleased to

17   demonstrate that if we have to go to court.

18        Our view is this, that at pistol point, virtually,

19   Fallbrook has gone after us to get some water.   If I may refer

20   to the letter from Fallbrook to us, it says, "The United

21   States doesn't intend to relinquish any water."   Of course

22   we don't.   Why should we relinquish something to Fallbrook any

23   more than to the Vail's, or any more than to Santa Margarita

24   Mutual?   We don't intend to relinquish any.

25        We say this.   We will settle the litigation upon the

1   basis of the intention, as we construe it, of the Utt Bill.

2   We have no intention to be intimidated by Fallbrook into

3   giving up something because it might be unpleasant for us

4   personally or as lawyers to fight.

5          THE COURT:   Unfortunately, we're not in the position

6   where we could get an adjuciation of the meaning of the Utt

7   Act.   If, by declaratory relief, we could get an interpreta-

8   tion of the Utt Act, this litigation might take an entirely

9   different aspect.   But we can't.   We are using the Utt Act

10  only by analogy, as a handle, to see if we could talk settle-

11  ment.   There is no way we could adjudicate the Utt Act.

12         But subject to later revising my opinion, I would

13  submit that your interpretation of the Utt Act is not

14  correct, Mr. Veeder.   However, that's neither here nor there.

15  If you insist upon your interpretation, and if your inter-

16  pretation is correct, then what you've said in this alleged

17  offer follows.   But if the Utt Act means what I think it

18  means, that there was a give and take done by Congressional

19  action, it is a fairly well drafted bill.   State rights are

20  recognized.   The United States is told to go in and make their

21  application, and there's a division of waters.   There's a

22  reservation to the United States, and I would think the

23  interpretation of that reservation would apply to your

24  riparian rights as contrasted with what would be called

25  floodwaters, and would apply also to a prescriptive right,

1   if you could prove it, and might apply to an appropriative

2   right by self-help if you can prove to me that there is that

3   kind of legal animal.  It was obviously the intention of

4   Congress that some of these floodwaters be divided, and they

5   fixed the proportion -- they even made allowance for a

6   definite assignment of a certain amount of water to Fallbrook,

7   small amounts it's  true, without any if's or and's, if there

8   was a certain amount of water in the reservoir.

9         Now, if you don't interpret that Act the way I do,

10   we're not even talking the same language.  If you say that

11   those if's and and's meant that you could claim your 69,000

12   acre feet of riparian rights and your 9,000 acre feet of

13   prescriptive and appropriative rights so-called, and if your

14   need and use is 23,000a acre feet, then of course Congress

15   laid an egg -- there wasn't anything to divide 60-40. Congress

16   just went through a silly performance -- passed a statute,

17   made a lot of people think they were solving their problem,

18   but did it all of the time knowing that the Government's

19   rights were so extensive that there wasn't anything to

20   divide.  I don't think that is what Congress did.

21         MR. VEEDER:  May I make an observation in that

22   regard?

23         THE COURT:  Yes.

24         MR. VEEDER:  I think the best evidence of the

25   correctness of our interpretation of the Utt Act is this.

1   Fallbrook bent every effort to get it on the books.  When it

2   sat down and read what it got on the books, it said, "We

3   can't live with that, because it doesn't invade the rights of

4   the National Government."  So they have had nothing to do with

5   it.  They said, "We don't want any part of the Utt Act,

6   because if we can't invade the National Government's rights

7   we can't go ahead."  We know that.  We've known it since 1949.

8   We've known it through a hectic, shameful period.

9          THE COURT:  Well, we're going to take a recess now,

10   and then I'll hear from these other gentlemen if they want to

11   be heard later.

12          Let me say this.  I'm perturbed, and maybe I've

13   cooled off a little bit, about this alleged offer.  Any

14   feeling I have toward you, either now or later, will have

15   nothing to do with how I decide this case.  You can rest

16   assured of that.  If you're right in your  position that

17   there is no water for Fallbrook, and I become convinced of it,

18   they will not get any water.  If, on the other hand, I'm

19   convinced that some of your positions are wrong, I intend to

20   rule that way, regardless of any personal feelings which

21   might exist or appear to exist between you and me.

22          Do you follow me on that?

23          MR. VEEDER:  I hasten to inquire, if your Honor has

24   any personal feelings against me, I truly regret it.

25          THE COURT:  Well, I came on this Bench a little hot

median

1  about this "offer."  I am withdrawing any talk, now, about

2  it's not being in good faith -- I don't want   to stigmatize

3  you in that fashion; but actually, it comes down to being an

4  offer of settlement which states, "There is no water to give

5  you, and we, therefore, make an offer that over and above

6  what we have to have and what our rights are we will divide

7  with you this nothing on the basis of 60-40.

8          MR. VEEDER:  I truly believe that, your Honor.

9          THE COURT:  Isn't that what it says?

10         MR. VEEDER:  I truly believe that there is zero to

11  be divided.  I truly believe it.

12         THE COURT:  Well, let's take a short recess, and

13  then I'll hear from Mr. Sachse and Mr. Swing.

14         (RECESS)

15         THE COURT:  Who wants to be heard in this matter?

16         MR. SACHSE:  Your Honor, in view of the lengthy

17  discussion with Mr. Veeder, unless your Honor has questions,

18  I don't believe there is very much point in Fallbrook's dis-

19  cussing the reasons why it cannot regard this Memorandum of

20  Proposal as an offer of any kind of settlement.  We feel, as

21  very aptly expressed by Mr. Veeder at the very conclusion

22  before the recess when he admitted that there is nothing for

23  Fallbrook, and that he is quite willing to give us 40 per cent

24  of that.

25         Now, I would like to make this request of your

1    Honor, though, and remind your Honor of the status of the

2    record in this case.   In the order signed by your Honor on

3    May 8th you directed that at further pre-trial hearings to be

4    held on the 4th of September 1957 at 10:00 a.m. Counsel for

5    all major parties are requested to be present and all interested

6    parties may appear, and that at this further   pre-trial

7    hearing there would be discussed nine issues, and you then

8    directed us to brief them.

9            Those briefs, as your Honor is aware, have been sub-

10   mitted, I believe.   Any discussion of the briefs was   post-

11   poned because of this assumed possibility of settlement.   In

12   view of the developments of the last thirty days, Fallbrook

13   will request that, as fast as your Honor's calendar would

14   permit, we go ahead with the pre-trial proceedings in the

15   action and try to get this show on the road and try to arrive

16   at an adjudication of these very controversial questions.

17           That is all we have at this time, unless your Honor

18   has questions.

19           THE COURT:   Well, I don't think there is much else

20   you could say, Mr. Sachse.

21           I'm going to find, for what it's worth, that there

22   is no intention on the part of the Department of the Interior

23   to settle this lawsuit.   There is no intention on the part of

24   Mr. Veeder, Mr. Rankin or any of the other officials of the

25   Department to settle it, because their proposal makes it

clear that the rights upon which they insist, without any "give," so far exceed the available amount of waters that, if that is their attitude, there is no intention to settle this lawsuit.   Now I will leave open the question of why that is their intention.   It is not their intention to settle because they, in good faith, feel that their rights are so superior and so extensive that there is no water for Fallbrook; and if that is the case, we might as well quit talking about settlement and proceed with the disposition of some of these issues.

When do you want to be heard?  I'll set this down for hearing on these motions that have been briefed, say, for the 28th of this month.   Is that satisfactory?

MR. SACHSE:  That is entirely satisfactory with us.

THE COURT:  Is that satisfactory, Mr. Veeder?

MR. VEEDER:  I have a trial on the 28th, your Honor. I would like, if possible, to have it in the middle of November, your Honor.

THE COURT:  I inquired of you how many fish you were frying around the United States.   You gave me an answer that there weren't very many and you could always be here. This is an important piece of litigation.   Where are you in trial on the 28th?

MR. VEEDER:  Before Judge Lindbergh's court.

THE COURT:  What kind of case?

MR. VEEDER:  Exactly the same as this, your Honor.

1          THE COURT:  Quiet title suit over water?

2          MR. VEEDER:  That's right; exactly the same.

3          THE COURT:  Are you in trial now, or in pre-trial,

4    or what?

5          MR. VEEDER:  We are in trial now before a Special

6    Master.  However, I will say this.  We go to trial on the

7    28th of October.  I think that there will be a two- or three-

8    week period there.  I would be very pleased, if your Honor

9    has time, to stay here and argue this now.  I'm prepared.

10         MR. SACHSE:  We're prepared at any time at your

11   Honor's convenience.

12         THE COURT:  Well, i'm not exactly an invalid, but

13   it just happens that I've been on the Bench all morning.  It's

14   now four o'clock.  Do you mean argue today?

15         MR. VEEDER:  I wouldn't want to impose on your

16   Honor.  I would be pleased to change my plans to return to

17   Washington and stay here and argue tomorrow.

18         THE COURT:  I have a jury trial set tomorrow.  What

19   about the 21st?  What about next Monday afternoon, the 21st,

20   at 2 o'clock?

21         MR. SACHSE:  It's all right, your Honor.

22         MR. MOSKOVITZ:  Your Honor, if it would be that one

23   day, I could make it that one day.  I could not remain more

24   than a day.

25         THE COURT:  That is not agreeable either?

237

1      MR. VEEDER:  The 21st?  Yes.

2      MR. STAHLMAN:  Fine.

3      THE COURT:  Let me explore some dates, here.

4      Is that date entirely satisfactory to everybody?

5      MR. VEEDER:  The 21st?

6      THE COURT:  Yes, at 2 o'clock.

7      MR. VEEDER:  Do you think it will run beyond one day,

8  your Honor?

9      THE COURT:  No.  No, I have your briefs.  I intend

10  to study them this week, and when I hear arguments on matters

11  which have been briefed I generally ask some questions.  I ask

12  you to enlarge upon matters about which I'm in doubt.  I ask

13  you to submit matters that you have included in your briefs.

14  I don't intend to have you argue the briefs that you have

15  filed.  It is largely a matter of testing out some tentative

16  views that I may have after studying your briefs.  I think we

17  can do it in an afternoon.

18      MR. VEEDER:  It's very good with me, your Honor.

19  I'll be here at 2 o'clock.

20      THE COURT:  Is that agreeable?

21      MR. MOSKOVITZ:  It is satisfactory to us, your

22  Honor.

23      THE COURT:  October 21st at 2 p.m.  I'll not

24  guarantee how long we may go.  Bring your lunch.  We may go on

25  into the evening, if we need additional time, and if you're

238

1    short of time and the next day is not available we can go out

2    and get something to eat and come back and hear it again that

3    evening.

4              MR. VEEDER:  I have a date on the 23rd.

5              MR. SACHSE:  I will be brief.

6              MR. STAHLMAN:  Your Honor, there is one other

7    matter I would like to call your Honor's attention to.  We

8    have these stipulations that we might, during the pendency of

9    the attempt to negotiate a settlement, and I believe they're

10   up on the 28th, and so far as these people on the River are

11   concerned that thing should remain in status quo during the

12   trial of this case.  I wonder if your Honor wants to hear us

13   on that.

14             THE COURT:  Well, we'll cross them when we get to

15   them.  Of course, some of these preliminary decisions may clear

16   the air.  I'm not going to prejudge this.  Fallbrook is pur-

17   porting to build a dam.  If the case progresses to the point

18   where it becomes apparent to the Court that a dam would inter-

19   fere with rights of the United States, the Court may entertain

20   a motion to enjoin the parties from proceeding with any

21   activities on the dam.  It would be an idle gesture to build

22   a dam in that respect.  On the other hand, the case may turn

23   off on some other angle.

24             Then we have the applications between Fallbrook and

25   Santa Margarita before the State of California.  Now that

239

1  particular litigation might well be permitted to go to its

2  conclusion, because it would determine that if there is water

3  that is subject to appropriation it might determine who was

4  entitled to appropriate.  That type of litigation might well

5  be permitted to continue.

6            But I serve notice now on all of you.  This is an

7  equity case.  Jurisdiction attached when this suit was filed,

8  and if it becomes necessary, upon proper application and show-

9  ing, I intend to restrain anybody and everybody who might

10 interfere with the disposition of this lawsuit.

11           MR. STAHLMAN:  Your Honor, about the 28th is the

12 date on which these stipulations are concluded.  They run

13 until that time, and application has been made for immediate

14 possession on property about which I am concerned.

15           THE COURT:  I don't know how we could ever get that

16 far along with the case by the 28th, Mr. Stahlman.

17           MR. STAHLMAN:  I don't either.  That's  why I think

18 it should remain in status quo.  If we have not concluded

19 this by the 28th, that either that stipulation should continue

20 in effect, or I am wondering whether it will be necessary for

21 me to petition the Court.

22           THE COURT:  All right. I'll have to leave that to

23 Counsel to discuss it.  I can't make an order on that at this

24 time.

25           How long will you be tied up in this case before

Judge Lindbergh?

MR. VEEDER:   I think by the middle of November, your Honor, it will be to the point where there will be no question as to interference with this suit.

THE COURT:   How long do you contemplate that we'll spend on pre-trial?   We haven't exhausted the subjects to be considered, in this first hearing.   There are about eight or nine points coming up, but that's certainly not the limit of the legal problems involved.   How long do you think we'll be on pre-trial before we get ready to go to trial on this case?

MR. VEEDER:   I might suggest, your Honor, in that regard, that Counsel could get together and develop a pre-trial order, without your Honor being present.

THE COURT:   Well, I'm willing to give some time on that.   But what is your rough estimate of how long we would be on pre-trial?   Can we set a target date on this?

MR. VEEDER:   I would think that we could.   When your Honor says "How much more pre-trial," are you thinking of having a day of pre-trial and then two weeks and then another day of pre-trial, or shall we go into pre-trial for a week's period?   I think the latter is the better way.

THE COURT:   I propose on pre-trial to dispose of as many legal issues as I can rule upon prior to trial.   I propose, also, to see that a pre-trial stipulation is prepared in which all agreed facts and facts that are not in dispute

1  will be disposed of.  I propose to take care of this question

2  of the Master and the little people on the River.  I propose

3  to have you file this list of dismissals on which you are

4  supposed to be working.

5          MR. VEEDER:  That is correct.  I would like to raise

6  a point in that regard, in connection with preparation for

7  going to trial.  It will be necessary that some additional

8  parties be joined, as we suggested to your Honor some time ago,

9  and that will entail some time.  But it certainly shouldn't

10  interfere with the pre-trial proceedings, nor, in my view, if

11  I may respectfully suggest it, should it preclude a pendente

12  lite proceeding, perhaps, which would take care of the status

13  quo until the final decree is entered.  We are just as concern-

14  ed as Mr. Stahlman about the present actions that are going

15  ahead above the enclave, and whether we ask your Honor for a

16  hearing, a pendente lite proceeding for a temporary restraining

17  order, I would think would have a great deal of effect upon the

18  time of trial.

19          In other words, it seems quite evident to me that

20  injunctive process is in order, and it might be that an

21  injunction suit could be brought and tried out and resolve

22  many of the questions that we have prior to the time that the

23  ultimate adjudication is accomplished.  We will certainly be

24  available for the trial.  There will be no delay on that

25  account.

THE COURT:  When do you propose to file these dismissals as to certain of these parties?

MR. VEEDER:  We are ready to let your Honor know the parties who are to be joined and the parties that we think can be dismissed.

THE COURT:  That work is all done.

MR. VEEDER:  Pretty largely.

THE COURT:  Don't you think any new parties ought to be brought in at the earliest moment?  They would be entitled to participate in pre-trial.

MR. VEEDER:  I think that's correct, your Honor. That's a matter that has concerned us very greatly.

THE COURT:  Are these large landowners, or are they small interests?

MR. VEEDER:  There is a variety.  The principal concern that we have, or at least one of the great concerns that we have, is the fact that in the 5-year period there has been a tremendous turnover in ownerships and there will have to be service upon those parties who now own land.  Notice of lis pendens was not filed, so we are in this circumstance, that we will have to bring in additional parties.

I would like, however, to make an additional report to your Honor on what has transpired.  I spent some time with Mr. Willett yesterday, who represents about forty small landowners.  I tendered to him a suggested disclaimer and

1  agreement and he is considering it now.  I delivered it to Mr.

2  Swing and Mr. Sachse and to others, with the suggestion that

3  they correspond withm me as to the acceptability of it.  I think

4  we are making progress along that line.

5          THE COURT:  Do you have the form of this disclaimer

6  that I might look at?

7          MR. VEEDER:  Yes, your Honor (passing document to

8  the Court).

9          THE COURT:  You would have difficulty noticing your

10  motion to join these parties by the 21st.

11          MR. VEEDER:  That is correct, your Honor.

12          THE COURT:  Or does that have to be done on notice

13  -- bringing in additional parties, under the Rules?  Can't

14  they be brought in ex parte and then let them move to --  what

15  do the Rules provide on additional parties?

16          MR. VEEDER:  Well, I think that they could be brought

17  in that way, but your Honor, we feel that we would like to

18  file a motion with you and bring to your attention the number

19  of parties to be brought in.  That's what Mr. Rankin has

20  directed me to do, and I'm going to see him on Thursday and

21  we'll resolve the whole thing after --

22          THE COURT:  Of course, your substitution of parties

23  will be covered by Rule 25(c):  the Court, on motion, may

24  direct a substitution.

25          MR. VEEDER:  There will be some substitutions, your

Honor.

1    THE COURT:  Now, are there new parties in addition

2  to the so-called substituted parties?

3    MR. VEEDER:  There are, your Honor, yes.

4    THE COURT:  What's the Rule number on that?

5    MR. VEEDER:  I don't have my Rules with me, your

6  Honor.

7    I may say, in that connection, that Mr. Rankin has

8  asked that I file a motion for the joinder of these parties,

9  and, as I say, I will consult with him about your Honor's

10  suggestion.

11    THE COURT:  Well, now, Mr. Rankin is not running

12  this lawsuit.

13    MR. VEEDER:  That's correct.

14    THE COURT:  If I direct that they brought in ex

15  parte, they will be brought in ex parte.

16    MR. VEEDER:  Yes, your Honor.

17    THE COURT:  I would be glad to hear what Mr.

18  Rankin's reasons are as to why he would like to do it a

19  certain way, and I might agree with him.

20    MR. VEEDER:  Yes, your Honor.

21    THE COURT:  There's a rule on this matter.

22    MR. VEEDER:  There is, I know, your Honor, and I've

23  checked on it and I've gone through it.  I have forgotten the

24  number of it, however.

25    THE COURT:  I find the rule on additional parties

245

1    to a counterclaim or crossclaim -- Rule 13(h), but that

2    doesn't fit our problem.

3           MR. VEEDER:  I have checked that through, your

4    Honor, and you can simply add parties by filing with the court

5    clerk; but bringing in new parties, I believe, has to be by

6    motion.

7           THE COURT:  Well, let's take that question up on the

8    21st also, and be prepared to advise me how you want to pro-

9    ceed and why.

10          MR. VEEDER:  Yes, your Honor.

11          THE COURT:  And if we decide to proceed ex parte,

12   be prepared to file an amendment necessary to bring in any of

13   these parties.

14          MR. VEEDER:  Yes, sir.

15          THE COURT:  Is there some thought that you wanted a

16   ruling on some of these issues before you brought in these

17   parties?

18          MR. VEEDER:  No.

19          THE COURT:  That has nothing to do with it?

20          MR. VEEDER:  That has nothing to do with it.  I

21   believe, your Honor, that -- I, myself, see no reason for

22   delaying it.

23          THE COURT:  Do Counsel contemplate that we can go to

24   trial in this case  early next year, if we can get our work

25   done by that time?

1    MR. SACHSE:   I certainly hope so -- before then.

2    MR. VEEDER:   We will be prepared.   When you say

3  early next year, do you mean the month of January?

4    THE COURT:   I'm thinking of January 1958.

5    I borrowed a transcript from somebody.

6    MR. SACHSE:   It's mine, your Honor.

7    THE COURT:   All right, see you on the 21st at 2:00

8  o'clock.

9                      -- --

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25