# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

        Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:  San Diego, California

Date:    October 21, 1957

Pages:  247 to 406

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

JOHN SWADER
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211 • EXT. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION


HONORABLE JAMES M. CARTER, JUDGE PRESIDING


UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
vs.                            )        No. 1247-SD-C
                               )
                               )
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.               )
                               )
                Defendants.    )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

October 21, 1957


APPEARANCES:

  For the Plaintiff:    WILLIAM H. VEEDER, Esq.,
                WILLIAM E. BURBY, Esq.
                Special Assistants to the
                Attorney-General
                Department of Justice
                Washington, D. C.

APPEARANCES (continued):

| | |
|---|---|
| For Defendant Vail Company: | GEORGE E. STAHLMAN, Esq. |
| For U. S. Marine Corps: | LT. DAVID MILLER |
| For Defendant Fallbrook Public Utility District: | SWING, SCHARNIKOW & STANIFORTH, by: PHIL D. SWING, Esq., and F. R. SACHSE, Esq. |
| For Defendant State of California: | EDMUND G. BROWN, Esq. Attorney-General, by: ADOLPHUS MOSKOVITZ, Esq. Deputy Attorney General. |
| For Defendant Santa Margarita Mutual Water Company: | W. B. DENNIS, Esq. |
| For Defendants Cottle, Gibbon and Reuter: | CLAYSON, STARK & ROTHROCK By: GEORGE G. GROVER, Esq. |
| For Defendants Halde: | TOM HALDE, Esq., by: GEORGE G. GROVER |
| For Defendants Faulkner: | BERT BUZZINI, Esq. |

1    SAN DIEGO, CALIFORNIA, MONDAY, OCTOBER 21, 1957, 2:00 P.M.

2                              - - -

3              (Other matters.)

4                              - - -

5              THE CLERK:  Number 10 on the calendar:  1247-SD-C,

6    United States of America v. Fallbrook, etc., et al.

7              Hearing on various matters raised in briefs.

8              THE COURT:  It was my intention, as I went through

9    these various items listed as 8(a) through 8(i), to indicate

10   who I thought had the laboring oar and let you speak on the

11   matter and test out some tentative conclusions I have arrived

12   at.  I spent all day yesterday reading briefs and reading

13   cases down here in the Federal Building.  There were no tele-

14   phones ringing and I had a chance to spend a good bit of time

15   on it.

16             On 8(a), the effect of the Circuit Court's decision,

17   I will follow my usual practice and tell you what I'm thinking

18   about, and then whomever the spirit moves may get up and talk

19   about it.  It is not a final conclusion, but it is a tentative

20   view as to which I will submit myself for the purpose of being

21   shook, if you can shake me on it.

22             It's my tentative view that the Circuit Court

23   decided only, as far as the law of the case is concerned, that

24   it was improper to enter the judgment against the parties

25   affected by that judgment and without disposing of the whole

1   case in one judgment.

2         I think secondly, however, that many of the prin-

3   ciples enunciated by the Circuit should be persuasive on the

4   Court in proceedings held hereafter; first, for the reason

5   that they were, undoubtedly, set forth for the help and

6   assistance of the trial court; and secondly, if this case goes

7   back to the Circuit, I apprehend that there will be a very

8   good possibility that it will be assigned to the same panel

9   that sat on it the first time, and if I were a betting man I

10   would probably bet money that Judge James Alger Fee --

11         Who were the other Judges on the panel?

12         MR. VEEDER:  Judge Stephens and Judge Orr.

13         THE COURT:  Judge Fee, Judge Stephens and Judge Orr.

14   I would apprehend that probably that same panel would hear the

15   case the second time.

16         So tentatively I would hold that as far as the law

17   is concerned the case holds that it was error to render the

18   judgment that was entered on the grounds that it was only a

19   partial disposition of the case, and the Mandate of the

20   Circuit is clear that this Court should hear the whole case

21   and enter one judgment.

22         But I think that the various pronouncements of the

23   Circuit should be very persuasive to the Court.

24         Does anyone feel badly aggrieved about that and want

25   to be heard?

1          Well, that will be the tentative order on that.

2          Now that raises a point that we will have to consider

3     from the standpoint of mechanics, and that is that at this

4     hearing today there are only certain people present and I have

5     serious doubt if all the parties litigant have had notice of

6     this hearing.  We're talking about pre-trial, we're talking

7     about some pre-trial stipulations and orders, and probably we

8     can get stipulations that will bind some of the major parties

9     to this litigation.  But we can't bind parties who don't

10    enter into the stipulations; nor can we bind parties on

11    rulings of law without their having a chance to be heard.

12          So it would seem to me that in drafting some order

13    eventually incorporating various rulings that I may make, we

14    may have to have some if's, and's and but's in it.  Tentative-

15    ly, I would think it would be something like this:  that in

16    the absence of convincing authority to the contrary, or upon

17    the presentation of different factual situations than the

18    court thought to exist, and subject to the right of any liti-

19    gant in open court to object and to be heard, the Court at the

20    trial of this case will rule as follows.  Maybe you could

21    frame something like that better than I can.  But my thought

22    would be that probably a proposed pre-trial order be sent out,

23    eventually served on everybody in some way to comply with due

24    process requirements, and then later on, after the service of

25    the proposed order and an opportunity for anyone else to be

1  heard who wanted to be heard.

2  What are your suggestions on that?  Mr. Veeder.

3  MR. VEEDER:  Your Honor, I think that is essential,

4  that the formulation and definition of the issues as presented

5  should be made available to all parties, particularly those

6  smaller users who have not employed counsel.

7  Your Honor, in that connection, I think that the

8  United States has outlined, in its suggested method of trial --

9  Has your Honor --

10  THE COURT:  I looked that over again yesterday also.

11  MR. VEEDER:  That is certainly our view there, and

12  we believe that that would be a method to pursue in regard to

13  pre-trial proceedings.

14  THE COURT:  And on any pre-trial stipulations of

15  facts, don't you apprehend that we can probably get a binding

16  stipulation involving the major parties, the parties repre-

17  sented by counsel, and follow the same procedure -- that any-

18  one else can be heard on the presentation of facts -- much the

19  same procedure that you suggest?

20  MR. VEEDER:  I think that would be absolutely right.

21  There is no question on that.  I think if we can get together

22  on the major facts, your Honor -- I don't think there is any

23  dispute.

24  THE COURT:  Does anyone else want to be heard on this

25  proposal?

1          (Another matter.)

2          THE COURT:   Paragraph 8(b) of the memorandum of the

3     United States states that it makes no claim as a riparian

4     owner to use water outside the watershed.

5          MR. VEEDER:   That is correct, your Honor.

6          THE COURT:   That should dispose of that point.   All

7     agreed?

8          Well, we'll pass 8(c), (d), (e) and (f) for the

9     moment.

10          Paragraph 8(g), the extent of prescriptive rights

11     claimed by the United States, either as successor to the

12     Rancho Santa Margarita, or resulting from its uses after 1942,

13     or resulting from a combination of uses by the Rancho before

14     1942 and the United States thereafter, prescriptive rights

15     claimed by the United States outside the Santa Margarita

16     watershed, prescriptive rights to the use of water in con-

17     nection with Lake O'Neill.

18          I have a preliminary question in that matter.   From

19     the maps submitted, Lake O'Neill lays below Fallbrook on the

20     stream, does it not?

21          MR. VEEDER:   That is correct, your Honor, it does.

22          THE COURT:   Well, what users are there below Lake

23     O'Neill?

24          MR. VEEDER:   The United States of America is the

25     last owner on the stream, your Honor.

1      THE COURT:  Below Lake O'Neill.

2      MR. VEEDER:  That is correct, your Honor.  Lake

3  O'Neill is within the enclave, on the property of the United

4  States.

5      THE COURT:  Well, my tentative conclusion on this

6  matter of prescriptive rights is that the United States has no

7  prescriptive rights.

8      Now the cases cited by Mr. Veeder, which I read, are

9  Larsen v. Appallorio, 5 Cal. (2nd) 440, Dykzeul v. Mansur,

10  65 CA (2nd) 503, and a reference to Hudson v. West, 306 P. (2nd)

11  807.  Does somebody have the California citation handy?

12      MR. VEEDER:  I don't know that that is reported in

13  California.  At least, I was not able to find it, your Honor.

14      THE COURT:  All right.  At any rate, as far as

15  Hudson v. West is concerned, I couldn't get anything out of

16  that to constitute a holding.

17      As far as the case of Dykzeul v. Mansur is concerned,

18  it was clear that the lower user prevailed on a theory of

19  prescription, but the diversion point was on plaintiff's land

20  upstream and the ditch ran through the plaintiff's land, and

21  so the decision is clearly understandable.  It was not the

22  gaining of a prescriptive right by lower use, but the gaining

23  of a prescriptive right by lower use plus diverting the water

24  at a diversion point upstream on the plaintiff's land, coupled

25  with a right to use the land for that purpose.

1   And the Larsen case stands upon the same ground,

2 particularly in view of the material submitted in the brief of

3 the State of California.  The State of California points out

4 that they have checked the record in the Supreme Court and that

5 the situation there was identical to that in Smith v. Gaylord,

6 which was relied upon by the Supreme Court in the Larsen case,

7 and in the case of Smith v. Gaylord there was trespass upon

8 land and a diversion point by virtue of the trespass.

9   So I would conclude that the three cases are similar

10 and stand upon the same set of facts and would not be in

11 necessary conflict with the general rule that the lower owner

12 does not gain a prescriptive right against an upper owner,

13 or a lower user against an upper user.

14   That would dispose of the matter prior to 1942.

15   After 1942, the situation is further complicated by

16 the exclusive right to possession and title of the United

17 States in the enclave, and the inability of anybody upstream

18 to do anything about the matter as far as a suit against the

19 United States is concerned.

20   Now if you want to be heard on that, Mr. Veeder, I

21 would suggest that you test out my tentative view.

22   MR. VEEDER:  Your Honor, there is a dovetailing,

23 here, of three different aspects of the case, namely, the

24 element of prescription and the element of appropriation, and

25 I think it would probably save time if we were to argue both

1   (g) and (h) at the same time, if that would be permissible.

2         THE COURT:  All right.

3         Paragraph (h) concerns appropriation, and the essen-

4   tial question is whether the United States, to acquire what

5   might be called appropriative rights, must comply with State

6   water procedure, and the Government spells out quite an

7   argument based upon the police power of the State and the

8   fact that the police power can't interfere with the Govern-

9   ment. I am in accord with the major and the minor premise,

10  but I don't think it has any application here.  My tentative

11  view on the matter is that appropriative rights -- depending

12  upon the date, of course, of the appropriation -- are con-

13  trolled by state law as it existed at the particular time,

14  and I think since the 1928 --

15        What was the year?

16        MR. VEEDER:  1913, your Honor.

17        THE COURT:  -- since 1913 I think appropriative

18  rights are controlled by state procedure.  My tentative view

19  is that the United States has no appropriative rights by

20  self-help.

21        Now I'll be glad to hear from you.

22        MR. VEEDER:  Your Honor, we would like to proceed,

23  if we may, on the basis of the locations of the use of water.

24        THE COURT:  Yes.

25        MR. VEEDER:  Would you pass that to his Honor?

257

1          That is a map showing the use of water outside the

2    watershed by the United States of America -- used there for

3    approximately fifteen years.

4          THE COURT:  Well, explain the map.  Where do you mean

5    used outside the watershed?

6          MR. VEEDER:  I have taken the liberty, your Honor,

7    to place a map here on the board which is identical with what

8    your Honor has.

9          THE COURT:  Except for the matters shown outside the

10   watershed.

11         MR. VEEDER:  Yes.  Now I have marked on the map that

12   your Honor has the areas outside the watershed.

13         THE COURT:  Oh, I see -- 2, 3 and 4.

14         MR. VEEDER:  That is correct, your Honor.

15         The area most vital to the United States of America

16   is the one which is marked 4 on your Honor's map.  That is the

17   area known -- in fact, the term "area" is used throughout --

18   it is  area 14, 15, 16 and 17, as I recall, where there are

19   located the barracks and large military installations, which

20   were built in the year 1942 and '43, antecedent to any time

21   that Fallbrook or the Santa Margarita Mutual Water Company

22   made any claim for water in the watershed.  Indeed, at the

23   very time when this construction was going on and for approxi-

24   mately five years afterward, Fallbrook was diverting water

25   pursuant to a gratuitous and a revocable license granted

258

1    to it by the Rancho Santa Margarita, concurred in by the Vail

2    estate, and it had no right at all -- it recognized that it had

3    no right, and it violated the revocable license, in our view,

4    when it proceeded to seek to acquire an appropriative right as

5    against the National Government.

6         Those matters are all set up in our brief, and I

7    need not belabor them now.

8         The area proceeding immediately toward the Pacific

9    Ocean, your Honor, on the map that you have there is known as

10   South Mesa, again an area of military use, an area of military

11   structures long used and used at the time that Fallbrook and

12   Santa Margarita each undertook to acquire rights to the use of

13   water in the Santa Margarita River in violation of those of

14   the National Government.

15        THE COURT:  That's 1 and 2.

16        MR. VEEDER:  That is correct, your Honor.

17        THE COURT:  And 4 was the Fallbrook ammunition

18   depot?

19        MR. VEEDER:  No, your Honor; the Fallbrook ammunition

20   depot is up higher.

21        THE COURT:  By what name do you characterize 4?

22        MR. VEEDER:  Your Honor, 4 is the areas 14, 15, 16

23   and 17, where the barracks are located -- the housing for the

24   Marines and offices and similar facilities.  Those are the

25   long-established plant installations of the Marines.

1           Similar construction, mostly housing however, is

2    down South Mesa.

3           There are military uses there on the <u>Stewart</u> Mesa,

4    which lies north of the enclave.

5           THE COURT:  Is that 3?

6           MR. VEEDER:  That would be 3 on your map, yes, your

7    Honor.

8           MR. VEEDER:  Those areas, I might state, are the

9    areas concerning which the Marines and the United States of

10   America cannot possibly relinquish any water without suffering

11   irreparable damage.  Those are areas which, for a period of

12   fifteen years, have been built and maintained and authorized

13   by the Congress of the United States.  Those areas are the

14   areas in which the most vital function, as vital as any

15   function for the military enclave, are located.

16          THE COURT:  Well, let me interrupt for just a

17   minute.  In the initial instance, I have to decide, as a

18   matter of law, whether you have any appropriative rights or

19   prescriptive rights or a right to use water in those areas.

20   But the Marines aren't without help.  The military establish-

21   ment need not, necessarily, fall apart.  I'd be the last man in

22   the world to want to do something to prevent our armed forces

23   from having the water they needed.  But the Government is

24   armed with the power of eminent domain.  If the Government

25   needs more water, they can condemn all the watershed of the

260

1    Santa Margarita.  If they need further water, they can go out

2    and condemn water elsewhere.  The Government has unlimited

3    power to acquire what they need for the military establishment.

4    The only requirement is that they pay just compensation for

5    what they take.

6         So I'm not shackling the Marine Corps.  They have a

7    weapon that no private party has, and only semi-public bodies

8    have a similar weapon -- the power of eminent domain.  If you

9    don't have a right to use water in those areas, you can go out

10   and condemn water.

11        MR. VEEDER:  I would like to inquire, if I may,

12   your Honor, because I am not certain of the position that your

13   Honor has taken.

14        It is my understanding, your Honor, that these rights

15   that the United States is exercising the title originally

16   stemmed from the State of California, or certainly they had

17   resided some place -- I'm not sure where.-- When the Marines

18   began diverting the water out of the watershed, as they did

19   for so many years before there was any adverse claim at all,

20   we take this position:  (1) that there was certainly an

21   appropriation.  We don't believe that the State of California

22   could enact a law that would preclude the United States of

23   America from diverting and applying water to a beneficial use

24   and thus acquiring a right.

25        THE COURT:  Well, that was an appropriation, at

1  least in the lay sense of the word.

2  MR. VEEDER:  That's right.

3  THE COURT:  Whether there was an appropriation deal-

4  ing with legal rights is another problem.

5  MR. VEEDER:  We take the position, of course, that

6  there was an appropriation and every element was fulfilled in

7  the acquisition of a right.  We believe that, basically and

8  fundamentally, an appropriation is a diversion and application

9  of water to beneficial use, and that in itself is sufficient to

10  vest in the National Government any title which it might

11  require.  We believe that that was enough.  We don't believe

12  that the state police regulations of California could either

13  give or take away from the National Government any rights.

14  But we take an additional step.

15  THE COURT:  Well, you seem to assume that because it

16  is the National Government it can do things and it doesn't

17  have to comply with rules that I, as a citizen, would have to

18  comply with.  Suppose I had put in a housing project in those

19  areas, could I have started to use water and secured an appro-

20  priation  right to water without complying with State

21  procedure?

22  MR. VEEDER:  I truly believe you could, your Honor.

23  And I believe this, that if, in the instance as in our instance

24  here, there were no intervening adverse claims of Fallbrook or

25  Santa Margarita Mutual and you came in here as an individual

1   and diverted the water and applied it to beneficial use I would

2   say that you acquired a right of priority ahead of Fallbrook.

3          The only difference, in our view, that compliance

4   with State law has is that you would not have enjoyed the

5   doctrine of relation back.  In other words, had you filed this

6   piece of paper that Fallbrook and Santa Margarita Mutual have

7   filed, you would have been entitled then to a priority as of

8   the date of filing.  But here, not having filed, you wouldn't

9   have enjoyed that priority.

10         But if you had diverted, as we did, and applied the

11  water to beneficial use, as we did;  and then Fallbrook and

12  Santa Margarita Mutual came along subsequently, as they did,

13  we say that your right would take precedence and be paramount

14  to the rights of Fallbrook and Santa Margarita Mutual.

15         We say that the effect of filing a piece of paper

16  with the State of California lends not one thing to your

17  right other than the right   to date your priority as of that

18  time.  If there are no intervening right, then your priority

19  attaches as of the date when you apply the water to a bene-

20  ficial use, as did the Marines.

21         THE COURT:  Well, of course, you have disclaimed any

22  right to use riparian in those areas.  Is that right?

23         MR. VEEDER:  That is   right, your Honor.  It has

24  to be appropriative or prescriptive.

25         THE COURT:  Well, now you're talking about what might

1    be surplus water, water over and above your riparian rights.

2         MR. VEEDER:  That's correct.

3         THE COURT:  And so now you make the claim, first, that

4    you can use this water outside the watershed as against an

5    upstream appropriator who wants to use it in the watershed.

6         MR. VEEDER:  May I state, your Honor, --

7         THE COURT:  Well, part of it in the watershed.

8         MR. VEEDER:  Well, I won't argue that.

9         THE COURT:  Well, I realize that to the extent that

10   they want to use part of it outside the watershed they're in

11   the same boat you are there.  But I understand that at least

12   part of it would be used in the watershed.

13        Secondly, you contend that you could acquire some

14   kind of right, and I take it that you have researched this

15   problem and the only cases you could find for me were the three

16   that stand upon this explainable basis of an appropriation

17   upstream over the land of someone else.  Those are the only

18   three cases you have cited me.

19        MR. VEEDER:  Your Honor, up to this point I have been

20   talking about appropriation as distinguished from prescription.

21        THE COURT:  Well, I'm talking about prescription.

22        MR. VEEDER:  Well, in regard to prescription I will

23   say this, that I believe the Larsen case supports us entirely.

24   I haven't had the advantage or disadvantage of going beyond the

25   four corners of that decision -- whether or not Mr. Moskovitz

1   has I don't know -- but my own view is that, from the statement

2   of facts in the Larsen case, it has declared that you could

3   acquire a downstream prescriptive right.

4          THE COURT:  That's what it seems to say.  When you

5   read Smith v. Gaylord, which it cites, plus the record, the

6   record shows that at the time adverse possession was institut-

7   ed and during the entire prescriptive period the land where

8   the diversion was made was part of a larger tract under one

9   ownership, and that subsequently the defendant got part of that

10  land.  Now if Mr. Moskovitz is right and this is shown to the

11  Supreme Court, plus their reliance on the case of Smith vs.

12  Gaylord, which was the same kind of case, then that is almost

13  open and shut that the Larsen case falls in line with the other

14  two cases.

15         MR. VEEDER:  Your Honor, as I say, I have never gone

16  outside a decision of the Supreme Court.  When the Supreme

17  Court of California comes down as clearly and explicitly as it

18  does in the Larsen case, I say that is the law of the case.

19         THE COURT:  I'll concede that when you read the case

20  that's what it says.  But when you look at Smith v. Gaylord,

21  and when you look at the record, which I suppose you could ask

22  the Supreme Court to do when they pass on this problem again --

23         MR. VEEDER:  I think that is correct .  I think that

24  it is, and I am certain that that may be the case, and I would

25  say that, by all means, we should have the record here.  I

1   would like to have the record in this court in the Larsen case,

2   because if the Larsen case is explainable then it is essential

3   that this Court have that data before it.  I can't, truly,

4   except to that.

5           THE COURT:  I think that is a good suggestion.  I

6   think that Mr. Moskovitz can probably get us a copy of that

7   record, and probably he can get us the briefs, too.  They have

8   a bound set.

9           Can we borrow that?

10          MR. MOSKOVITZ:  Yes, your Honor.  I will bring it to

11  court next time.

12          MR. VEEDER:  I think that it is essential, your

13  Honor.

14          THE COURT:  I think that is a good suggestion.

15          MR. VEEDER:  And I would like very much to have it

16  here, because if Larsen is not the law we should know it.

17          I might say, however, that in my own view, from the

18  standpoint of the acquisition of a prescriptive right, I see

19  no violence to the precepts of the acquisition of an adverse

20  claim to a right to the use of water, because here, though we

21  are downstream below these other users, there is every element

22  of hostile, adverse claims.

23          THE COURT:  How could they be adverse?  What could

24  the upstream owner have done?  Suppose Fallbrook, or Jones,

25  disapproved of this appropriation of water you made, what

1    could they have done?   Have you consented to be sued?   How

2    could they stop you?

3            MR. VEEDER:   Well, there are certainly opportunities

4    for them to sue us.

5            THE COURT:   How could they have sued you?   There

6    would be jurisdiction, of course.   There is jurisdiction in

7    the District Court any time anyone wants to sue the United

8    States for anything.   There is no doubt about that.   There's

9    no doubt about the jurisdiction over the United States.   But

10   where's the consent to be sued?

11           MR. VEEDER:   Well, I hate to invite litigation,

12   because I find myself in quite a bit.   They had no claims what-

13   ever when we first started in on a hostile claim or adverse

14   claim to the obvious use of the water, but yet they had full

15   knowledge of it and yet they made no claim.   But the important

16   thing, as we see it, is that if there was an invasion, if there

17   was something wrong that was being done, it was the act of an

18   individual and not of the National Government.   Now there can

19   be that kind of litigation.

20           THE COURT:   You're right on that.   In other words,

21   your point there is  that, without suing the United States,

22   there could have been a suit against A, B and C, who were

23   officials, and of course the Government would argue that that

24   was a suit against the United States, and the Court would

25   probably say, "No, this is a suit against individuals who are

1    alleged to have acted outside of their authority."

2         MR. VEEDER:  And I think there would be a sound claim

3    to that effect.  Although if I am confronted with the proposi-

4    tion, I must come up on the other side.  I feel this way,

5    really, your Honor, that that would be the complete answer to

6    these gentlemen and to his Honor, Judge Fee.

7         THE COURT:  Of course, your position is always to the

8    contrary.  When suit is brought against these officials, you

9    always contend that the suit is against the United States.

10        THE COURT:  Well, your Honor, that's what the tax-

11   payers pay me for.

12        But the fact does remain that they are not without

13   remedy, for if there was a use concerning which they could

14   complain this Court could certainly entertain a proceeding

15   against the individual.

16        THE COURT:  Well, now, that raises a very interesting

17   problem.  I'll have to think about that.  But the point is that

18   these prescriptive rights that you claim, and these appropria-

19   tive rights, are not claimed by these individuals.  They may

20   be the persons who did the wrongful acts -- we're just talking

21   academically, in a sense, in the use of the word "wrongfully"

22   but the title is claimed by the United States.

23        MR. VEEDER:  That is correct, your Honor.

24        THE COURT:  Query:  Can you restrain the official

25   from doing some act and, at the same time, not thereby

268

1   adjudicate the rights of the Government?

2           MR. VEEDER:  Well, we have, of course, a great many

3   cases on that proposition which say no, and in this instance

4   we believe -- and I have an additional bite out of the apple,

5   your Honor, that I am going to take in a moment in regard to

6   the propriety of the Marines going ahead under Congressional

7   authorization and doing what they have done -- we believe that

8   Congress fully authorized them to divert this water out of the

9   watershed.  We believe that they did so with every element

10  which would acquire for the United States a prescriptive

11  right, for truly we believe  that in an area, as the Larsen

12  case declares, where the stream is so terribly short as here,

13  the act of a downstream user can be adverse, and we believe

14  that Larsen is good law, until Mr. Moskovitz shows up with his

15  book, and I am not so sure that we won't say that it's still

16  good law because I have never heard of going outside the four

17  corners of a decision to refute it.

18          However, I would like to pass onto another proposi-

19  tion, if I may --

20          THE COURT:  All right.

21          MR. VEEDER:  -- which is certainly germane to what

22  your Honor has asked about the acts of the Marines.

23          We believe this, that when the United States of

24  America undertook to divert water out of the watershed with the

25  full authorization of Congress, and by men who were fully

1    empowered so to act, that if the State of California owned the

2    rights to the use of water those rights were, as of that

3    moment, condemned by inverse condemnation.

4         THE COURT:  You're throwing a lot of very novel

5    problems at me that you didn't even have in your brief.

6         MR. VEEDER:  Your Honor, on this proposition I went

7    back and checked our Complaint very carefully.

8         THE COURT:  I'll have to think about that one.  Now

9    if I were going to punch a hole in that argument, I would say,

10   first of all, that California doesn't, necessarily, claim --

11   maybe I'm wrong about this -- I was going to say that Califor-

12   nia doesn't necessarily claim title to this water.  If it does,

13   it's sort of a trustee for the benefit of the people.  Calif-

14   ornia claims the right to regulate the appropriation of water

15   for the benefit of the people who can use it.

16        MR. VEEDER:  That's right.

17        THE COURT:  And therefore can you condemn the rights

18   of all the beneficiaries by your inverse condemnation running

19   against the State of California?

20        MR. VEEDER:  Well, may I start again on our theory

21   in regard to this:

22        (1)  We don't believe that the State of California

23   owns the unappropriated waters at all.

24        We do believe that what California did is this --

25   and every other state in the Union has done it.  In the

1   exercise of the police power as among the individuals who are

2   subject to the State's jurisdiction -- and the National Govern-

3   ment is not -- they have passed police regulations to authorize

4   the acquisition of rights to the use of water under a given

5   set of circumstances.  California does not have title as a

6   proprietor at all, and its only interest is the interest that

7   it has in the regulation of a highway or the regulation of any

8   of the other innumerable aspects of our culture that come

9   under its jurisdiction.

10          THE COURT:  Well, under the constitutional amend-

11   ment, doesn't it have a sort of trustee's title to this

12   water for the people?

13          MR. VEEDER:  I would say, your Honor, in that regard,

14   that it has been called a trust.  Call it what you will, it is

15   not a proprietary title.

16          THE COURT:  You see, we're not dealing with a case

17   like those Supreme Court cases where you have land that was

18   acquired through a desert entry setup or like the case that

19   arose on the river where an attack was made on the dam

20   involving fish.  We have a case where this land has been

21   within the State of California, and this water originates in

22   this basin.  If you want to go back historically, California

23   is probably one of the few, if not the only state, where the

24   Federal Government never had any interest in California until

25   the moment the State became a member of the Union.  There was

1 no Territory here.   There was a Bear Flag Republic, and follow-

2 ing the Bear Flag Republic California was admitted to the

3 Union.   I suppose you would have to go back to the Treaty of

4 Guadalupe Hidalgo.   But it's a little different from most of

5 the states.

6       MR. VEEDER:  Well, your Honor, in that regard I

7 observed that statement by Judge Fee and I didn't agree with

8 him, because I think this:  that there resided in the National

9 Government, at Guadalupe Hidalgo, the ownership of every piece

10 of land and every drop. of water within the area conveyed to

11 it -- I believe that is the law, and I believe that, absent a

12 showing that title passed in some manner to the State of

13 California, the only title that would reside in California

14 would be that of a non-proprietary interest, and that is all

15 the cases have ever said.

16       THE COURT:  You would upset all the title,if you

17 postulate that the United States, by the Treaty of Guadalupe

18 Hidalgo, owned title to all the land in California.

19       MR. VEEDER:  All the public land, your Honor, and

20 also the drainage.  For example -- excuse me for interrupting,

21 but you touched on a point that is important.

22       THE COURT:  Yes.

23       MR. VEEDER:  From this area down -- I'm pointing now

24 from about the Vail estate on up here to Palomar, Mr. Swing's

25 location -- that is all National Forest where the water arises,

1   largely, and title has never been out of the National Govern-

2   ment for those properties since the Treaty of Guadalupe

3   Hidalgo -- never.

4           THE COURT:  That may be a very interesting point in

5   this case.  It may be that the Government's right to that X

6   quantity of water that came out of that land might stand upon

7   a different basis than in the case of some of the other land.

8           MR. VEEDER:  Well, in that connection, --

9           THE COURT:  You haven't gone into that, have you?

10          MR. VEEDER:  Oh, yes.  I look at it this way, your

11  Honor, that the right to the use of surplus water, if there be

12  any -- and we're just talking about the use; we're not talking

13  about the corpus at all -- it is our view that the unappro-

14  priated water that would be flowing through here, while subject

15  to the control of the State as among its citizens, it would

16  have no control over the National Government in regard to the

17  diversion of water.  But assuming that title were in the

18  State of California, and assuming that it resided there, it was

19  condemned by the United States the moment that it diverted the

20  water out of here and applied it to a beneficial use and title

21  now resides in the United o States one way or the other.

22          THE COURT:  All right, i've got your point, but this

23  is one I would have to think about and I'd have to have some

24  more briefing done on it.

25          MR. VEEDER:  I may be of some help to your Honor in

1   that regard.

2           Oklahoma v. Atkinson, 313 U. S. 508 (1940), is an

3   important case.

4           There is a Ninth Circuit decision involving the

5   State of Montana, where the question came up about the condemn-

6   ation.  I'm talking about the power of the National Government

7   to condemn state property.  That is the case of United States

8   v. State of Montana, 134 Fed. (2nd) 194, at CA 9 1943, and

9   "cert" denied at 319 U.S. 772 (1942).

10           There is an Eighth Circuit decision, State of

11   Minnesota v. United States, 125 Fed. (2nd) 636, at 640.

12           THE COURT:  These hold with reference to the power of

13   the United States to condemn state property.

14           MR. VEEDER:  That's right.

15           THE COURT:  By inverse condemnation, or just by

16   straight condemnation?

17           MR. VEEDER:  By straight condemnation or by inverse

18   condemnation; I don't think it makes any difference.

19           In the Oklahoma case --

20           THE COURT:  Well, there is not much dispute, is there,

21   about the power of the United States to condemn state property?

22           MR. VEEDER:  There never has been in my mind, your

23   Honor.

24           THE COURT:  Is there any question about that?

25           MR. MOSKOVITZ:  No, your Honor.

1    MR. VEEDER:  So we're down to the proposition --

2    THE COURT:  So these are not inverse condemnation

3    cases, but these are just on the power of the United States

4    to condemn state property.

5    MR. VEEDER:  I think, your Honor, in regard to the

6    case of Oklahoma v. Atkinson, that power is certainly recog-

7    nized.

8    The point that I make, however, is that it makes no

9    difference whether this is inverse condemnation or direct

10   condemnation.  No one has challenged, and I dare say no one

11   can challenge, the right of the Marines to establish the

12   camp here and to divert the water out of the watershed.

13   Certainly Congress knows they have done it.  Congress has

14   authorized the construction of the camp here.  The Marines

15   have been operating there for fifteen years, and I dare say

16   that if California owned the water rights, which we deny, they

17   were taken and are presently owned and exercised by the

18   National Government.

19   We don't have to rely, in our view, on eminent

20   domain, for the very reason that we expressed.  We don't

21   believe that the state procedures which were established, pur-

22   suant to which the rights could be acquired by the filing with

23   the state, would make any difference.

24   We think that this case of Hudson v. West, to which

25   your Honor made reference, is a fine example of refuting the

275

1   State's position.  The state there appeared and declared that

2   there was no right to the use of water -- a very recent case

3   (1957).  The state appeared, as it appears here, and says, "If

4   you don't go through this hocus-pocus, you get no right."  The

5   Supreme Court of the State of California brushed it off with

6   the statement, "Well, California hasn't shown that it has been

7   hurt.  It's not a party to the cause.  It has nothing to

8   complain about."  And we feel much the same here.

9           THE COURT:  They were in only as amicus curiae by

10   brief, weren't they?

11          MR. VEEDER:  That is correct.  But I have no view as

12   to what the State of California is here.  California is not

13   claiming, as I understand it -- although I'm not sure just what

14   it is claiming -- that it owns all  the water.

15          But assuming that it is, by its Answer, claiming that

16   it does own all of the water, it has lost it, in our view, by

17   inverse condemnation; although we believe that the rule in the

18   Hudson case shows that a right can be acquired without com-

19   pliance, without a filing, or without a permit from the state.

20          THE COURT:  How does talking about inverse condemna-

21   tion take us along the route to solution?  If property had

22   been taken by inverse condemnation, then there is a right, in

23   the Court of Claims, to get fair compensation --

24          MR. VEEDER:  I think California has --

25          THE COURT:  -- and if you went out today and brought

1  a suit in condemnation to acquire water you would have to pay

2  fair compensation.

3          MR. VEEDER:  That's right.

4          THE COURT:  Now if you need water and you don't have

5  a right to it, why don't you condemn water and pay for it?

6  Your argument implies that you would have to pay for it even-

7  tually in the Court of Claims, if you got it by inverse con-

8  demnation.

9          MR. VEEDER:  And here is the great difference.  At

10 the time the United States of America diverted and applied this

11 water to a beneficial use, there were no appropriators,

12 Fallbrook or Santa Margarita Mutual, with whom we could possibly

13 have been in conflict.  Indeed, for the reasons I have already

14 said, we already have an agreement by Fallbrook that she had

15 no rights at that time.  She didn't.  She says, "Please," with

16 her hat in her hand, "may we have some water from the Rancho

17 Santa Margarita," and we gave her a little water.  So she had

18 no rights in the Santa Margarita River at the time this

19 diversion was made.  Certainly we don't have to pay her com-

20 pensation.  The Santa Margarita Mutual Water Company was not

21 even a dream at that time, when we started this.  It was called

22 into being later and made a filing, upon which it has never

23 acted -- it has no system at all.  So as against those two,

24 certainly we don't owe them any money.

25          As against the State of California, assuming that the

1    State of California had title, which we deny, maybe they have a

2    claim for just compensation.   But for what?   For water that

3    the State has never used, and couldn't use?

4           We have no objection, your Honor, to somebody coming

5    along -- and indeed, I wouldn't mind defending a case in the

6    Court of Claims -- if they were to come along and say, "Well,

7    you condemned the water" -- Fallbrook comes in and says, "You

8    condemned the water.   You used it for six years, or five years,

9    or four years before we ever made a filing.   We want just com-

10   pensation."   That would be a good lawsuit.

11          THE COURT:   Well, I see your point, and I think you

12   would have some merit on that analysis.   I don't think Fall-

13   brook could show any right except after she had secured an

14   appropriative right from the State.   She might thereafter show

15   some right, but initially she couldn't show any.   I think there

16   is some merit to that.

17          But what distrubs me is your flat contention that the

18   State of California has no authority to determine who shall use

19   the surplus waters that might be appropriated, and just because

20   the United States Government is what it is you seem to feel

21   that the United States doesn't have to look to California law

22   at all.   That's your basic contention.

23          MR. VEEDER:   No, your Honor, I don't really take any

24   position that the National Government can override the State of

25   California.   I do take the position, in regard to the

1    appropriation of rights to water, that your Honor or anyone else

2    who went in and diverted water and applied it to a beneficial

3    use would the better right as against someone who subsequently

4    made a filing, as in this case.  I believe that that's the

5    case.

6            There are innumerable cases along that line in other

7    states, and much harsher states, from the standpoint of the

8    appropriative doctrine.  Now the State of Colorado is a good

9    example.  Colorado is a strict appropriation state.  And the

10   important thing there, your Honor -- if I may digress for just

11   a moment -- there are two theories of water law within the

12   United States.  One is what they call the "Colorado Doctrine."

13   The "Colorado Doctrine" is that the title to the rights to the

14   use of water stemmed from the State of Colorado.  That's their

15   position.

16           The California doctrine, on the other hand, first

17   enunciated by Lux v. Haggin, is that the source of all title

18   to the rightss to the use of water is from the National

19   Government, by reason of its ownership of the public domain.

20   That's what surprised me a little bit at the position of

21   California in this litigation, because historically California

22   has always adhered to the doctrine that the source of the title

23   of the rights to the use of water is the National Government.

24           THE COURT:  One of the Supreme Court cases referred

25   to that.  Which one was it -- 295 U.S?

279

1    MR. VEEDER:  Yes, 295 U.S., the case of California v.

2  Oregon Power Company, as I remember;and it recognizes the

3  difference.

4    THE COURT:  It recognized the difference, but it

5  seemed a little more tolerant to one view than to the other.

6    MR. VEEDER:  As I remember, Justice Sutherland came

7  down with that, and he was very express and very explicit in

8  declaring that all title to all lands and to all rights to the

9  use of water resided in the National Government, and he adopt-

10  ed in that case the principle of Huff v. Porter, which is the

11  Oregon case which says that all rights to the use of water

12  emanate from the National Government.

13    As I say, there is this distinguishing element.

14  California, Oregon, Washington have all adopted the same

15  premise, that when the National Government, as a sovereign,

16  acquired all the lands, by seizure, acquisition or conquest,

17  it owned everything.  Now that's the California law.  That's

18  the principle that California has always adhered to.  And our

19  position, in that connection, is that historically title then

20  was in the United States.

21    California certainly recognized that doctrine in

22  Lux v. Haggin, in 69 Cal., where it first recognized the

23  doctrine of riparian rights; but it said there, in unequivocal

24  terms, that the National Government owned all unappropriated

25  rights to the use of water.

1          So if we go back to that thesis, which I believe is

2   the law, the National Government, at the time when it diverted

3   this water, was the owner of those unappropriated rights to the

4   use of water, and therefore --

5          THE COURT:  Well, if your premise is right, your con-

6   clusion might follow.  In other words, if your premise is

7   correct that the Government owned all that water, then in 1913

8   when the Legislature of the State of California attempted to --

9          I don't know whether that was a constitutional amend-

10  ment.  It probably was a constitutional amendment, wasn't it?

11         MR. VEEDER:  It was a statute.

12         MR. MOSKOVITZ:  It was a statute in 1913, your Honor.

13         THE COURT:  When they passed that statute, if your

14  premise is right, the Legislature laid an egg.  It couldn't

15  affect the property rights of the United States by its statutory

16  proposals.

17         MR. VEEDER:  Your Honor, in that connection, I take

18  no issue at all with California's position.  I take the position,

19  in that connection, that what California did was to make a

20  statutory declaration that she would regulate the rights to the

21  use of water.

22         I think a very important case, in that connection,

23  and one frequently cited, although it's a Utah case of <u>Raffles</u>

24  v. Johnson, reported in 40 Pac. (2nd) 755, at 777, referring to

25  exactly the same kind of statute.

281

THE COURT:  If I get your position right, then, your position would be that the 1913 statute was valid as applied to private individuals but did not affect the rights of the United States.

MR. VEEDER:  That's right.

A quote from that Johnson case is extremely important.  It says:

> "The statutory declaration that the water
> of all streams and other sources in the state
> is hereby declared to be the property of the
> public does not vest in the state title or
> ownership of the water as proprietor.  It is
> a community right available to all upon com-
> pliance with the law."

Now that's our position.  We think it is entirely proper and appropriate for the states to adopt such statute and to declare that it owns -- it's like claiming that it owns all the ducks and geese and all the fish.  The states all make such declarations.  But the point is that those declarations of ownership of the wildlife are for the purposes of regulation only.

So when they adopted, in 1913, the regulatory procedures for the acquisition of rights to the use of water, they were simply saying, "We're going to get rid of this anarchy; we're going to regulate it," and with the passage of

1   time they became more complex, until now we have the applica-

2   tion, the permit and the license.

3          THE COURT:  Well now, then, let's follow your argu-

4   ment along.  If it is your argument that the Government owns

5   the use of this water --

6          MR. VEEDER:  It would own the right to the use of

7   unappropriated water that was here involved.  Certainly that is

8   our view.

9          THE COURT:  If the Government owned the right to the

10   use of unappropriated water, wouldn't it also own a right

11   underlying the riparian rights of individuals on the stream?

12          MR. VEEDER:  No, your Honor.

13          THE COURT:  Wouldn't the same logic carry through?

14          MR. VEEDER:  No, your Honor.

15          THE COURT:  How do you cut that off?

16          MR. VEEDER:  I'm glad your Honor brought that up,

17   because I heard the stage whisper back here that Colorado

18   didn't recognize riparian rights, which has nothing to do with

19   it.

20          The Acts of 1866, '70 and '77 provided as follows:

21   that they would recognize the state law in regard to rights to

22   the use of water in connection with public domain that passed

23   into private ownership, or any rights that were appropriated

24   on the public domain.  In other words, when California, by

25   Lux v. Haggin, recognized the riparian right, the National

1    Government recognized the riparian right, and when title to a

2    piece of land riparian to a stream passed to a private indivi-

3    dual it took with it all the riparian rights.   There's no

4    question about that.

5         THE COURT:   Well, let's take another step.   If you

6    except the riparian rights from your argument, but the Govern-

7    ment is the owner of the use of all unappropriated water, and

8    the state holds a hearing and appropriates water to Joe Doaks

9    and Bill Smith, the Government is not made a party to that

10   hearing.

11        MR. VEEDER:   No.

12        THE COURT:   The Government could come in later and

13   say, "That doesn't mean a thing.   We weren't served.   We own

14   the right to the use of all unappropriated water.   We'll just

15   upset that proceeding.   Now we claim the water."

16        MR. VEEDER:   No, your Honor.

17        THE COURT:   Tell me why that doesn't follow.

18        mr. veeder;   The Desert Land Act of 1877 provided for

19   the appropriation of rights to the use of water on the public

20   domain, and the Acts of 1866 and '70 provided that the National

21   Government would recognize the rights to the use of water

22   acquired pursuant to state law.   So if anyone diverts and

23   appropriates water in compliance with the state law, title

24   passes from the National Government and into this individual.

25        We cited in our brief the case of Howell v. Johnson,

1 which I think is a very succinct summarization of that prin-

2 ciple, namely, there the Court said that the impellant, pro-

3 pulsion -- whatever it is -- that causes the title to pass

4 into the individual is not the state law.  It is the national

5 law, which says that when a man has complied with state law,

6 title will vest in him.  Now Howell v. Johnson was cited in

7 the California-Oregon Power Company case as being good law,

8 and we believe that it is good law.

9   THE COURT:  All right.  Now you go back to these

10 Acts of 1866 and '70, the desert entry acts.  How much of the

11 land in this watershed was ever in the public domain?  I have

12 a hunch that a good bit of this came out of Spanish grants.

13   MR. VEEDER:  Yes.

14   THE COURT:  It was never in the public domain.

15   MR. VEEDER:  I think Pio Pico, the first Governor of

16 Mexico, owned the Rancho Santa Margarita, and I'm sure that

17 Mr. <u>Hall</u>, who is in the courtroom, and Mr. Vail can say who

18 originally owned the Vail Ranch.  There is no doubt that those

19 two large segments of land were --

20   THE COURT:  -- were never in the public domain.

21   MR. VEEDER:  That's correct.  The balance of the

22 area was certainly part of the public domain, and the use of

23 any unappropriated water, in our view, still resided in the

24 United States, because in this state and elsewhere the mere

25 fact that you don't own land doesn't mean that you can't

1   appropriate rights to the use of water -- assuming that there

2   are unappropriated rights.

3   THE COURT:  Well, then, do I understand that your

4   argument would have a two-barreled effect:  (1) the argument

5   that you have made heretofore would apply to that land which,

6   at one time, was in the public domain; but (2) as to that

7   land that came out of Spanish ranchos, title to which was

8   generally confirmed, as I recall, by the Treaty of Guadalupe

9   Hidalgo, that the United States could not claim any right to

10   the use of that water from that land; is that right?

11   MR. VEEDER:  That is right.

12   THE COURT:  Then under your theory we would have to

13   divide this up and apply one standard to one part of the

14   water and another standard to the other part.

15   MR. VEEDER:  I don't think so, your Honor, for this

16   reason:  the only water that could ever be  open to appropria-

17   tion would be the waters which were surplus to the Vail Estate

18   and to the Rancho Santa Margarita.  The best example, of course,

19   is that Fallbrook, here, is coming in and claiming the right

20   to appropriate what she alleges is surplus water.  The trouble

21   was that we beat her to it.  So the mere fact that there was

22   some of this land in private ownership at the time that juris-

23   diction passed to the National Government over all the

24   property and title to some of it, the mere fact that that

25   transpired does not mean, in our view, that the principles of

1    Howell v. Johnson or the doctrines enunciated by the supreme

2    court in the California-Oregon Power Company case are not

3    equally applicable.

4            THE COURT:  Well, now, you've lost me.  I followed

5    your argument -- not that I necessarily agree with you -- I

6    followed your argument as to that part of the land that was,

7    at one time, in the public domain, and I understand the effect

8    of Howell v. Johnson and your argument there.  Now I'm asking

9    you, what about this part of the land that came from the

10   Spanish ranchos?  The United States could claim no right to the

11   use of unappropriated water there.

12           MR. VEEDER:  Right.  If there were, for example, in

13   the Vail --

14           THE COURT:  What is your point?  That there is no

15   water subject to appropriation?

16           MR. VEEDER:  No, there is some water subject to

17   appropriation, because some of the water comes down here and

18   is actually diverted and used outside the watershed -- that's

19   our view, and to that extent that water was subject to appro-

20   priation and indeed, in our view, we either owned it or we

21   have appropriated it or we have condemned it.

22           THE COURT:  Water that came from land that was

23   originally in the public domain.

24           MR. VEEDER:  That's right.

25           THE COURT:  What about water that came from land

1    that was in the Spanish ranchos?

2         MR. VEEDER:  I don't know that there is any, your

3    Honor.   Here's water that comes down that enters the Vail

4    property and proceeds on down the River to the property of the

5    United States.  Certainly when it passes out of the jurisdic-

6    tion of Vail it comes down here and is available for appro-

7    priation.

8         Now our position is simply this.  We cannot contest,

9    nor will we contest, the vested rights of Vail.  We may not

10   agree entirely with Vail in regard to its appropriative rights,

11   but we do recognize that Vail succeeded to whatever title

12   their predecessor in interest had, which stemmed from a

13   Mexican grant, as I remember it.

14        So there could be no invasion there at all.  There

15   is no invasion of a riparian right that is vested.  There can

16   be no invasion of an appropriative right that is not vested.

17   Certainly we cannot contest, in our view, a right -- for

18   example, if Fallbrook had some rights.  It is our position

19   that in regard to this area here -- now I'm pointing to areas

20   14, 15, 16 and 17, the military area --

21        THE COURT:  Marked 4 on this map.

22        MR. VEEDER:  That is correct.

23        THE COURT:  We'll call this map Exhibit A for the

24   purpose of this hearing, to have some record here.

25        MR. VEEDER:  Now we could not, in our view, extend

1   our claims beyond those exercised in the maximum quantities

2   at the time that Fallbrook made its filing, because Fallbrook

3   -- and I'm not conceding this except for the argument -- had

4   not complied complied with the state law, acquired a right to

5   the use of water but a right junior to these rights exercised

6   outside the watershed.

7       Now if we were to -- and here is an important factor,

8   from our position -- if we were to extend area 4 and take in a

9   great deal more water, we would have to pay just compensation

10  to Fallbrook to release whatever water she might be entitled

11  to, because there would be an instance of an extension of our

12  rights on the River and invading a vested right, at least an

13  inchoate right.

14      Now that is what we mean when we say that we would

15  have to condemn -- for example, here is the Vail property up

16  here which has an appropriative right for its dam, 1946 appro-

17  priative right -- we couldn't invade that Vail damsite without

18  paying just compensation for it, because that right became

19  fixed and were we to extend our claims on the River in a manner

20  which would conflict we would have to pay them for it.

21      So that is the position that we are taking here, that

22  basically and fundamentally there has been a recognition of the

23  law of the State of California by the United States.  We will

24  accept Lux v. Haggin and its declarations that all title

25  remained in the United States; that the Desert Land Act, the

1    Acts of 1866 and 1877, provided for the acquisition by indivi-

2    duals of rights to the use of water, and when an individual has

3    acquired a right to the use of water he has just as much right

4    to the use of that water as if he had received a patent from

5    the National Government.  Nor can we invade that right without

6    paying just compensation.

7           Those are the **Gerlach** cases.  The **Gerlach** cases, if

8    your Honor will remember, were on the San Joaquin River.  We

9    went into those cases and my view at the trial of them was that

10   there was only one question, and that was the question of

11   value.   I believe that that is true; that when a man has

12   acquired a right to the use of water and the National Govern-

13   ment invades it, he is entitled to payment just as much as

14   anyone else.

15          But we take the additional step here that in regard

16   to Fallbrook and Santa Margarita Mutual they had no rights

17   when we exercised these, ergo they have no basis of complaint.

18   Nor could they, in our view, possibly dry up the Marine Corps

19   camp; nor are they entitled to a claim for compensation for

20   that water, for they had no interest in it at the time that we

21   exercised our rights in it or acquired the new right.  We say

22   that if there was an appropriator ahead of us and we are

23   invading his rights, we must pay for it.  But in regard to

24   these junior appropriators, they have no rights at all.

25          THE COURT:  But basically your proposition on appro-

priation is that you could appropriate by self-help because of the rights of the United States that stemmed from its owner-ship of the public domain; that they do not have to comply with state water rights procedures.

MR. VEEDER:  That's one aspect of it, your Honor. But I believe your Honor or anybody else here has exactly the same right, and I think that if they went out, as we did, and diverted and applied water to a beneficial use and Fallbrook came along subsequently and said "We want it.  We filed this little piece of paper up here in Sacramento.  We're going to take away from you the water that you are using," we believe that the law of California would deny that -- that this man could be dried up because Fallbrook, years subsequently, made a filing with the State.

Now I have looked and have searched very, very care-fully, and I started it many years ago in connection with the Gurlock cases.  The question there  has always been, What did the state do when it granted a permit?  Our view has always been that the state did not convey title.  It permitted a man, by compliance with the laws of California, to acquire a right to the unappropriated water, and that's all it did.  It didn't convey title.  California does not have that title.

So we don't have to go outside the four corners of the case upon which the State of California has primarily relied down through the years.  That case shows that in the

1   proof there was a complete failure of the alleged appropriator
2   who had not complied with state law.   I believe that the
3   decision would have been contrary had there been a diversion
4   and application of water to a beneficial use and proof of the
5   quantity of the water thus diverted, irrespective of the fact
6   that there had not been a compliance with the state rigamarole
7   in regard to acquiring a right.

8           Now I believe that if we go back historically we will
9   find that the word "appropriation" is a term of art in water
10  law.   I don't believe that California police regulations
11  changed that.   An appropriation has always meant, down through
12  the years it has always meant the diversion and application of
13  water to a beneficial use; and I deny, and I don't believe
14  that the courts of California would sustain the position, that
15  here a man has used water for five or six years, and Fallbrook
16  comes along and makes a filing and because he had failed to
17  make a filing he could be burned up because Fallbrook happened
18  to say the right words.   I don't believe it.   I believe that
19  that's too harsh.   I believe Hudson v. West and many other
20  cases, which say that you can acquire a right to the use of
21  water in the State of California without compliance with state
22  law, is good law.

23          It is true that in Hudson v. West they refer to a
24  prescriptive right.   But what is there, your Honor, that would
25  permit a man to acquire a prescriptive right and not an

1   appropriative right without compliance with state law?   The

2   only way in the world that you could get a prescriptive right

3   is to use it adversely.   Now if the state police power would

4   deny -- for instance, in that case -- the man any water because

5   he had failed to comply with the police regulation, there might

6   be something to it.   But we have yet to find a precise case

7   where a man has been burned up because a man subsequently came

8   along and with a junior claim said, "I want that water.   You

9   failed to comply with X statute and therefore you're out of

10  business."   We don't believe the law is that way.   We don't

11  believe the law is that foolish.

12          So we don't have to stand upon the tenets of the law

13  that the National Government is the owner of unappropriated

14  water, although I truly believe that the California courts

15  have always said that; but we do say that we have, indeed,

16  complied with the law of California, in our view.   The mere

17  fact that we didn't file with the State Engineer doesn't mean

18  that we can be burned out or that we must quit Camp Pendleton.

19  I can't get Sputnic out of my mind.

20          THE COURT:   This argument that you're making raises

21  a lot of other problems that haven't been briefed.   In other

22  words, let's assume that somebody is to decide on applications

23  for appropriation.   Fallbrook applies to appropriate water.

24  The Government comes in to some tribunal and says, "We've

25  already, actually, by self-help, appropriated this water,

1   although we didn't comply with the statute" and gives the

2   argument that you have given here.  The question arises, What

3   tribunal decides that?

4               MR. VEEDER:  I think your Honor has full jurisdiction.

5               THE COURT:  Well, I might have jurisdiction to

6   decide whether you had acquired a right by prescription, or I

7   might have jurisdiction to decide whether you had acquired a

8   right by self-help in regard to appropriation; but when it

9   came to balancing the equities and the facts to determine

10  whether one appropriator or another should have the water, in

11  the absence of some finding by me that probably is the state

12  water tribunal that decides that.

13              MR. VEEDER:  Well, on that, your Honor, I --

14              THE COURT:  In other words, if I decide that you

15  have no right, that you made no appropriation in any legal

16  fashion and that you haven't any rights, as you claim, coming

17  from this ownership of the public domain and you are then in

18  the position of a self-help appropriator and you have come

19  into conflict with Fallbrook, who also wants to use water

20  outside the watershed and who later, in their claim of use,

21  has complied with the statute, the niceties of that decision,

22  it would seem to me, would be made by the California Water

23  Board and not by the Federal Court.

24              MR. VEEDER:  On that, of course, I would say that

25  your Honor, sitting as a cout of equity, has the full power to

adjudicate every question presented here.  I think, moreover, that the National Government should, and does, look to its own tribunals for adjudication of its claimed rights.

THE COURT:  Well, I'm postulating a situation where I've found that you have no rights, except that you have used water by self-help.  Then on a hearing between Fallbrook and X or Y or the United States in there, as it claims, that wouldn't be my function, would it, to determine who should get this appropriative right?

MR. VEEDER:  Oh, yes.  Your Honor, the suit is one to quiet title.

THE COURT:  Well, I'm postulating that you've got no title.  You're seeking title to something, and, for the purpose of argument, I am assuming that you have no title.  Who decides, then, as to who gets the title to the use of this water as yet unappropriated?

MR. VEEDER:  I think that your Honor has full juris-diction, and I think that the decision of your Honor necessar-ily goes to every phase and facet of this litigation.  There are elements in addition to the question of title that have to be resolved, and I think that your Honor has jurisdiction to consider the whole, every phase of this litigation and every claim as against every other claimant.

For example, the third defense interposed by the State of California, is extremely important.  It claims not

1  the right to the use of water; it says as owner of the corpus

2  of the water, and it has submitted to jurisdiction for your

3  Honor to decide that question.  Moreover, it says -- and this

4  is California's pleading here, so I don't believe there is any

5  question about your Honor's power -- it alleges further that

6  "the public interest and welfare require that in the decree

7  herein the Court define and declare each and every water right

8  involved herein as against each and every other water right

9  herein involved."  Now that's the State of California asking

10  your Honor to make that determination.

11       THE COURT:  As to water rights.  But now just think

12  with me for a minute.  Suppose I would find -- I'm not saying

13  that I am going to find this -- but suppose I would find that

14  you have no rights by prescription -- I'm not talking about

15  riparian rights; I'm talking about prescriptive rights --

16  suppose I find that you have no prescriptive rights, and that I

17  find that you have no right by self-help appropriation, and

18  that there is water subject to appropriation.  I have defined

19  the rights that exist, if I go that far.  But here is water as

20  yet unappropriated.  Do you think that I should then take

21  upon myself the task of sitting as the state water authority

22  would and making an apportionment or determining the equities

23  of the various parties who sought this unappropriated water?

24       MR. VEEDER:  Well, I do that.  Certainly the

25  Federal Court has power to adjudicate rights to the use of

water.  Certainly it has the power to render a decree in a

294

1    general adjudicative proceeding like this one here. I don't

2    believe that that is doubted. Now, the question is, Does your

3    Honor have the right to decide as among the parties what their

4    respective rights are? Is that the question, your Honor?

5         THE COURT: No, I don't think you understand my

6    question. Suppose that I'm going to find -- let's leave out

7    riparian rights -- that you have no prescriptive rights, that

8    you have no rights by appropriative self-help, and that there

9    is unappropriated water, and that I find that Fallbrook has

10   made an application for it, that Santa Margarita has made an

11   application for it, and that although you have not come in

12   before the water board you present to me your claim, namely,

13   the claim that you have talked about here, which I have found

14   gives you no right but you set up an equitable set of circum-

15   stances -- money has been spent, buildings have been erected,

16   the water has been used long before Fallbrook came in -- and

17   having found that you have no right, ordinarily you would be

18   relegated to going into the California tribunal, the water

19   authority, and opposing the Fallbrook and the Santa Margarita

20   applications on the basis of the facts that you've set forth.

21   Now, do you propose that I would then take on the functions of

22   that board to hear that application, to decide whether I would

23   grant the Fallbrook application or the Santa Margarita

24   application, or because of equitable showing that you made to

25   decide that you should be allowed to appropriate water?

295

1    MR. VEEDER:  In this connection -- I see what your

2    Honor is inquiring -- there has been a great deal of confusion,

3    in my view, as to the functions of a court in an adjudicative

4    proceeding.  Our view has always been this, that your Honor

5    would determine the respective priorities of the parties and

6    would <u>carve</u> from them the first right, the riparian rights,

7    then the first appropriator, and on down.  If there were water

8    available for appropriation, the man at the bottom of the

9    totem pole would get some water.  Here we don't think there is.

10   But each man would have a priority based on his compliance

11   with the law of the State of California, and his priority

12   would be fixed by your Honor on that basis.  You would not, in

13   my view, undertake all the functions of the State of Califor-

14   nia at all.  You would simply quiet the title as among all the

15   parties as to their respective rights.  Certainly no one

16   could come here and file with your Honor an application to

17   appropriate water.  I don't think that you would have the

18   jurisdiction.

19         THE COURT:  You have filed with the State of Califor-

20   nia, have you not, an application to appropriate water?  I

21   mean, the United States has filed.

22         MR. VEEDER:  Well, there was a filing made, yes; but

23   we assert no claim under it.  The filing that was made -- I

24   hate to be critical -- but the filing that was made was made

25   junior to Fallbrook and to Santa Margarita Mutual.  It was

1   made for a municipal use, and certainly we don't believe that

2   the act of a subordinate in the Navy of filing an application

3   with the State of California could in any way jeopardize the

4   title presently residing in the United States.

5           THE COURT:  Well, I'd go along with you on that.

6   Estoppel wouldn't ordinarily run against the United States,

7   Judge Mathes to the contrary, for whom I have a great deal of

8   respect.

9           MR. VEEDER:  I don't believe that this unfortunate

10  act -- and that's all I can call it -- of filing this paper

11  could, in any way, imperil our rights or in any way affect us.

12          THE COURT:  All right, have you pretty well outlined

13  your position?  You've certainly suggested some arguments that

14  weren't in your brief.

15          MR. VEEDER:  I thought your Honor invited those.

16          THE COURT:  I did.  But being rather slow-minded and

17  dull-witted, I have to digest some of these things.

18          Shall we take a brief recess and then hear what some

19  of your opposing counsel have to say about these propositions.

20          MR. VEEDER:  I'm sure they'll all concur with me.

21          THE COURT:  Do you concur, Mr. Moskovitz and Mr.

22  Sachse?

23          MR. SACHSE:  Did you say you were going to take a

24  recess, your Honor.

25          THE COURT:  We'll take a short recess.

297

(RECESS)

MR. VEEDER:  Your Honor, we have an additional exhibit, Exhibit A for the purpose of this hearing, and I would like the record show that I hand one to the State of California, one to the Fallbrook Public Utility District and one to Mr. Stahlman, and we have some additional ones.

THE COURT:  All right, the Clerk will mark it Exhibit A for the purpose of this hearing, so that we will have a record of what we are talking about.

Who wants to be heard?  Mr. Moskovitz?  Mr. Sachse?

MR. MOSKOVITZ:  Your Honor, I would like to be heard now.

Your Honor was justifiably somewhat amazed at some of the legal theories upon which Mr. Veeder expounded in his argument, because among them are theories which have never before been uttered in this case.

I think it would be a good idea to review briefly something of the history of this litigation and the principles of law which the parties agreed that they would abide by, and I would start with the stipulation that the United States and the State of California executed early in the litigation, and this was for the purpose of attempting to establish, for the benefit of all parties and for the public, for the State of California, for the Legislature of the State, all of which were concerned about this case, just what the ground rules

1   would be.

2           This stipulation was executed on November 29, 1951,

3   and was filed in this case and was recited in the pre-trial

4   order of the first trial and was referred to in the Circuit

5   Court's decision.  The introduction states, "For the benefit

6   of all the parties to this cause, it is hereby stipulated,"

7   and paragraph 4 states:  "That the rights of the United States

8   of America to the use of water herein are to be heasured in

9   accordance with the law of the State of California."

10          Now we were under the impression that these were the

11  rules to govern the case, and we have briefed the issues on

12  that basis.

13          Let's go to prescription first.  Under the law of

14  California, as your Honor has pointed out, the cases are

15  uniform in holding that a downstream user or diverter of

16  water cannot possibly acquire a prescriptive right against

17  someone upstream.  And why?  Because the basic element of

18  adversity or hostility is necessarily absent.  It cannot exist

19  because those who permit water to flow downstream have no right

20  to object to someone below them using the water.  It's that

21  very simple element which makes it impossible for the United

22  States to acquire prescriptive rights.

23          Your Honor has pointed out that the cases which Mr.

24  Veeder has cited in his memorandum don't bear on this point,

25  because they all involve a diversion of water on the land of

1   the person against whom the prescriptive right was sought to

2   be acquired.

3        Mr. Veeder says that it is a good idea to bring in

4   the record in the Larsen case to make sure that these were

5   indeed the facts.  I just want to point out to you that there

6   has been ample opportunity for Mr. Veeder to check on this

7   point, because the Larsen case was analyzed in the pre-trial

8   briefs the first time around back in 1952 by the State and the

9   State pointed out all the facts that were in the brief sub-

10  mitted to your Honor this time as to what the record in the

11  Larsen case showed.  It seems to me that Mr. Veeder could have

12  checked up on that by now.  But I'll be happy to bring that in,

13  your Honor.

14       Now that takes care of prescription, under the law

15  of the State of California.

16       Let's go to appropriation.  First of all, I think it

17  is interesting to remember that the United States never argued

18  that an appropriative right had been acquired to use water

19  outside the watershed or in connection with the storage at

20  Lake O'Neil until the briefs were filed in the Circuit Court

21  of Appeals.  In the legal arguments which took place prior to

22  the first trial, that theory was never once enunciated.  It

23  came as a distinct surprise when, in the answering brief of

24  the United States, the appellee, this theory was announced.

25       The theory seems to be this -- it has been expanded

1    since -- the theory seems to be that, again apparently pro-

2    ceeding under California law because that is what the stipula-

3    tion says, it is possible for an appropriator or a diverter of

4    water to establish a valid appropriative right good as against

5    others merely by diverting and using the water.  A permit

6    need not be secured, no application need be filed -- the State

7    Water Rights Board can be ignored.

8           THE COURT:  Well, he limits that to -- I don't know

9    whether he does or not -- I was going to say that he limits

10   that to the United States.

11          MR. MOSKOVITZ:  Well, does he?

12          THE COURT:  No, he didn't, in his argument.

13          MR. MOSKOVITZ:  No, he didn't.  That, I might point

14   out, your Honor, is also new for the first time.

15          Apparently, the theory was previously, and maybe still

16   is, that somehow this didn't apply to the United States because

17   it was a police regulation.  It might apply to others, but not

18   to the United States.  Today Mr. Veeder argues that this is

19   true of your Honor and me and anyone else who wants to appro-

20   priate water; we can ignore the Water Rights Board.

21          Now Mr. Veeder has cited authorities in his brief

22   which he feels support that  position.  Now the first aurhority

23   which he cites -- and I refer, your Honor, to page 2 of the

24   memorandum of the United States on this subject of appropriation

25   -- he cites this Act of 1866 that he referred to also in his

391

1    oral argument, and he underlines --

2              THE COURT:  Is that 43 U.S. 661?

3              MR. MOSKOVITZ:  That is the one, as I understand it,

4    your Honor.

5              THE COURT:  That's the Act of 1866.

6              MR. MOSKOVITZ:  Yes.

7              THE COURT:  He underlines priority of possession.

8              MR. MOSKOVITZ:  -- priority of possession.  However,

9    if you read further, your Honor -- let me read the section --

10   it says:

11             "Whenever, by priority of possession, rights to the

12             use of water, agricultural, manufacturing or other

13             purposes have vested and accrued and the same are

14             recognized and acknowledged by the local customs,

15             laws and the decisions of courts, the possessors

16             and owners of such vested rights shall be main-

17             tained and protected in the same."

18             First of all, I want to point out that a condition

19   precedent, in addition to priority of possession, is that the

20   rights be recognized and acknowledged by the local customs,

21   laws and decisions of the courts.  So that referss to state

22   law, and you must have that recognition in order for this Act

23   to apply in the first place.

24             THE COURT:  Well, it must have also vested and

25   accrued.  Now "vested" is used, I take it, in contrast to the

302

1    word "inchoate" or "alleged." For instance, a right that had

2    become good by prescription would be a vested right. Prior to

3    the time the period of prescription ran it would be only an

4    inchoate right.

5         MR. MOSKOVITZ:  That's correct, your Honor.

6         Now the second point I want to make about this par-

7    ticular statute is that it had reference to the use of water

8    on Government land.  The Act of 1866 was a Congressional effort

9    to silence and calm the fears of those who felt that the United

10   States might some day object to the use of water by people who

11   had taken water from Government land and used water off

12   Government land but diverted it from Government land.  The

13   theory was that, to the extent that the Government was the

14   owner of public land, it had the rights of any riparian in

15   that land, and that if someone came and took water off that

16   land it was a violation of the rights of the Government as a

17   riparian landowner.  Now there had been much diversion and

18   appropriation of that sort by the miners of California and,

19   subsequently, by miners in other states as well, as well as

20   by agricultural and other types of users.  These people felt

21   that they had rights.  Insofar as they were concerned with

22   others in the area, they did have the better right.  The courts

23   of California recognized those rights.  The Act of 1866

24   granted the United States permission that those rights would

25   be good as against the United States in the role of a riparian

1    landowner.  It had reference to the diversion of water from

2    public land.

3           I want to go into this later again, your Honor, but

4    let us remember that the diversion of water here by the United

5    States was not on public land.  It was on land that had never

6    been in the public domain.  The only connection that Mr.

7    Veeder seems to have found is that certain portions of the

8    upper watershed are forest lands, and by that he seems to --

9           THE COURT:  And that certain of them may have been

10   in the public domain and not part of old ranchos.

11          MR. MOSKOVITZ:  That's right.  But clearly where the

12   diversion was made and the land on which it was used was never

13   public land.

14          Now the second group of authorities that Mr. Veeder

15   relies upon are one case in California and a quotation from a

16   textbook, and the case is cited on page 3 of his memorandum --

17   Simons v. Inyo Serra Gordo Mining & Power Company.

18          THE COURT:  Did that arise prior to the statute of

19   1913?

20          MR. MOSKOVITZ:  Yes, your Honor, that's just the

21   point.  If you read that case -- and it's reported at 48 CA

22   524 -- if you look at page 528 you see that the Court said

23   that the appropriation -- this was from a spring -- was

24   initiated in the fall of 1889, and what the Court was there

25   talking about when it indicated what the elements of

1   appropriation were under California law was the law of Califor-

2   nia that no longer exists.

3          A little history might bring us up to date.  Initial-

4   ly, there were no statues at all which controlled how appro-

5   priative rights could be acquired and it was held that diversion

6   of the water and beneficial use would vest the right.  There

7   was also a doctrine, which apparently existed in all the

8   states, that the priority of the right would relate back to

9   the time when work was first begun on diversion, because it

10  would be unfair it somebody started work and then someone else

11  came in and diverted and put the water to beneficial use

12  earlier.  It was felt that there should be some time at the

13  first instance when the first appropriator made efforts to

14  divert and use the water.

15         So the Civil Code statutes were adopted at that

16  time, and they provided, briefly, that a person could get a

17  priority date by filing a notice of application in the local

18  county recorder's office and posting a notice at the point of

19  diversion.  This was not exclusive, however.  This was just a

20  means -- as Mr. Veeder pointed out, but referring to the

21  present-day law -- this was a means in those days of securing

22  your date of priority as of the date of filing your applica-

23  tion.  If you didn't  want to take advantage of it, you didn't

24  have to.  You could merely divert and use it before, and upon

25  putting the water to beneficial use you would get a right.

But if someone else had filed and posted before you put the

1    water to beneficial use he was prior to you.

2          The law was changed in 1913, and in a statute

3    passed then, a statute which became effective in 1914 by

4    referendum, the so-called Water Commission Act, it was stated

5    expressly that no right to appropriate or use water could be

6    acquired without complying with the provisions of this Act,

7    and that appears now in the Water Code as Section 1225.

8          Now the same comment can be made about the quota-

9    tion from Kinney on Irrigation and Water Rights, which is

10    cited on page 4 of Mr. Veeder's memorandum on this subject.

11    He quotes from it to the effect that one may, by a prior

12    actual and complete appropriation and use, without proceeding

13    under the statute, acquire a right to the water actually

14    beneficially used whichwill be superior and paramount to the

15    title of one making an appropriation subsequent to the actual

16    use of the water by the prior appropriator.

17          Again, your Honor, the law which was referred to by

18    Mr. Kinney was the law prior to 1913.  And why?  Because the

19    edition of the book in which this is found is dated 1912.

20          THE COURT:  Has there been litigation under Section

21    1225 of the Water Code in which there has ever been brought up

22    this right of the Government to the use ofsurplus waters

23    originating on land originally in the public domain?  Has

24    that point ever been raised?

25         MR. MOSKOVITZ:  To my knowledge, no, your Honor,

1    not at all.   There is a case now in Nevada involving the

2    Naval Ammunition Depot at Hawthorne, in which the Government is

3    asserting that it need not comply with the ground water appro-

4    priations statute in Nevada, on the theory that the water is

5    extracted from land that is publicly owned, actually reserved

6    land of the United States.   But there, of course, the water

7    is -- this is, by the way, in the Federal District Court of

8    Nevada and I think the trial is to start shortly.   The question

9    has never been adjudicated there either, nor anywhere else,

10   as far as I know.   But that is the closest case I know of, on

11   these facts.

12            THE COURT:   All right.

13            MR. MOSKOVITZ:   Now there has been a case in Califor-

14   nia which construed the meaning of this Water Commission Act

15   code section that I cited to you, and Crane v. Stevenson said

16   this --

17            THE COURT:   You have it in your brief, don't you?

18            MR. MOSKOVITZ:   I don't know if I quoted from the

19   language, your Honor, but I did cite the case in the brief.

20            THE COURT:   All right, go ahead.

21            MR. MOSKOVITZ:   This is what the Supreme Court of

22   California said -- now this was 5 Cal. (2nd) 387, at page

23   394:

24            "Since the effective date, the year 1913 of

25            the Water Commission Act, an intending appro-

1          priator has been required to file his appli-

2          cation with the Water Commission."

3  Now the Division of Water Resources, might I interpolate, now

4  the State Water Rights Board.

5          "This the plaintiff did not do.  To sustain

6          his claim, the appropriation made by him must

7          have been actually complete at some time prior

8          to said 1913 date, and even that is not suffi-

9          cient if the evidence shows a subsequent

10          failure to maintain the beneficial use for the

11          period of time prescribed by statute or for the

12          period of time, five years, required under

13          decisions prior to the statute."

14      So we see, your Honor, that the law of California

15  today is not what Mr. Veeder said it was.  In California you

16  must file an application, you must secure a permit from the

17  State Water Rights Board, and this applies certainly to

18  private appropriators.  His advice to you to go out and

19  appropriate without getting a permit, I think, was bad legal

20  advice and I don't think anybody ought to rely upon it,

21  because they might find themselves out in the cold.

22      Now apparently Mr. Veeder realized that this theory

23  might have some flaws in it, and so today, for the first time

24  in this case, he has come up with the theory that it makes no

25  difference whether we owned or didn't own -- pardon me --

1   whether the state law permist the acquisition of an appropria-

2   tive right with or without filing; that in this case we owned

3   the water anyhow, therefore we don't have to file any applica-

4   tions or comply with any state law.

5            THE COURT:  Owned the use of the water.

6            MR. MOSKOVITZ:  Well, perhaps we can say that we

7   own the use of the water.  That might be more accurate.

8            THE COURT:  That's what he said.

9            MR. MOSKOVITZ:  Now the basis for this asserted

10  ownership is that the United States owns public land, forest

11  land, in the upper part of the watershed.  Of course, if that

12  is the source of the right to appropriate that the United

13  States asserts, it certainly doesn't conform with the stipula-

14  tion that the rights to the use of water that they claim are

15  measured by state law, because state law certainly doesn't

16  recognize that at all.

17           This is a theory that, apparently, as I say, is being

18  used elsewhere -- in the Hawthorne case and perhaps at other

19  places.  It is a theory that has been announced by the people

20  from the Department of Justice in other connections.  It is

21  something that we are not prepared at this time to argue fully

22  because it is a new one here.  By virtue of the fact that the

23  diversion and use is on land that never belonged to the

24  Government, we never felt that it had any business in this case

25  at all, even under the legal theories of the United States.

The most that we can say at this point, I think -- and I think this point should be briefed, if the United States is going to persist in making the argument -- is that here the use of the water, again, is not on land that was ever public. Now presumably the origin of the asserted right of the United States based upon ownership of public land is that with the land goes the water which is on it.  It's a riparian doctrine. Now we know, and Mr. Veeder has already conceded, that the right of the riparian/to use water on riparian land, and that
is
when he uses it on riparian land he relies upon an appropriation.

Now here, apparently, Mr. Veeder is asserting that by virtue of ownership of land up here  and water that goes with it, he can use the water down here.  Now this is not, certainly, within the riparian claim.  It's an appropriation.

Now I have yet to be cited any statute of the United States which establishes this as a method by the United States of appropriating water, even assuming that the United States has prior claim to it.

THE COURT:  Do you have any short summary of the relation of the statutes of the United States to Section 1225 of the Water Code -- what the historical background of that is?  Of course, this first statute of 1866, the Desert Land Act, as you pointed out, applied to water from Government lands; and there were some other statutes.  Did they have any effect upon or did they form any basis for Section 1225.

1      MR. MOSKOVITZ:  Well, those three Acts, the Acts of

2  1866, 1870 and 1877, all had reference to water which came from

3  public land.

4      THE COURT:  Well, spell out for me, if you can --

5  of course, this is new to you, as it was to me -- but spell out

6  to me now, if you can, the theory underlying the authority of

7  the Legislature of the State of California to pass Section

8  1225.  Have you ever thought about that?

9      MR. MOSKOVITZ:  Well, I have thought about it, your

10  Honor.  I think this is something that would, possibly, suffer

11  by an impromptu discussion.

12      THE COURT:  Well, let's make a note of it, to look

13  into that, too.  That would go a long ways toward solving our

14  problem.  If the Legislature had authority to pass that statute

15  and it was a Constitutional enactment, that is one thing.  On

16  the other hand, if it suffers from the defect of having taken

17  too broad a bite of the apple, that is something else again.

18      MR. MOSKOVITZ:  Now this is a very fundamental point,

19  as you can recognize, because it challenges the very basis of

20  the whole system of water rights adjudication and administra-

21  tion which exists not only in California but throughout the

22  West.  This is a system that has been in existence for eighty-

23  five to ninety, more than that, probably closer to a hundred

24  years all over the West.

25      THE COURT:  Well, now, in this connection -- I don't

1    know, maybe you have cited a case and maybe you haven't -- I

2    had occasion sometime back to look into the question of this

3    right to appropriate water under one of these Desert Land Acts

4    and I discovered that the Solicitor's office had prepared an

5    opinion that this right to appropriate water did not apply to

6    percolating waters in the ground but only to waters flowing in

7    streams, and as a result they set aside a bunch of applications

8    for desert land entries.  That opinion of the Solicitor was

9    based upon what they considered to be California law.  And a

10   similar thing had happened in the State of Arizona, where

11   Congress by statute had provided otherwise.  Now I may have

12   this a little mixed up.  But the significance of the matter was

13   that here was the Department of the Interior withdrawing from

14   desert entry desert lands where people could originate water

15   on the land itself by wells and saying that this did not come

16   within the Act and was not suitable for desert entry and for

17   the appropriation of water, because the water came from the

18   land itself and did not flow in streams, and they based this on

19   California law.

20          Are you familiar with this opinion about which I am

21   talking?

22          MR. VEEDER:  Yes, I am, your Honor.

23          THE COURT:  And there was a statute passed by

24   Congress to obviate a similar situation in the State of

25   Arizona.  Is that right?

1      MR. VEEDER:  That's right, your Honor.

2      THE COURT:  That opinion and that new statute would

3  be very interesting in this problem.

4      MR. VEEDER:  The appropriation applies only to

5  natural streams, and also --

6      THE COURT:  It was an opinion of your Department.  It

7  was based upon California law, as had been the opinion of your

8  Department, in Arizona, which based it on Arizona law.  Is that

9  right?

10      MR. VEEDER:  I want to check that through further,

11  your Honor, but your Honor is right in the general premise, and

12  that, of course, is the basis of the position of the Solicitor

13  of Interior, too.

14      THE COURT:  Can you make that opinion available for

15  us?

16      MR. VEEDER:  Yes.

17      THE COURT:  Can you get us the citation of this

18  statute that was passed that cured the situation in Arizona?

19      MR. VEEDER:  I will undertake that, yes, your Honor.

20      MR. MOSKOVITZ:  Now, I want to point out another

21  argument which Mr. Veeder made in his brief concerning appro-

22  priation.  He implies that if the United States were willing

23  to comply with state law and file application to appropriate,

24  that it could not, under state law, acquire a right to use

25  water for military purposes.  This is on page 7 of his

313

1    memorandum on this subject.

2           THE COURT:  I have your point there.  In other words,

3    you've cited the regulation which was broader than Mr. Veeder

4    thought it was.  Isn't that the situation?

5           MR. MOSKOVITZ:  That's right, your Honor.  And I

6    might also refer you to the Water Code sections, to which I

7    will refer, on the appropriation of water -- they're very

8    broad; any beneficial purpose is sufficient -- Water Code

9    Sections  1240  and 1252.5, which generally authorize the

10   United States to appropriate water, just as any other user can.

11          Therefore, I can't see any merit to Mr. Veeder's

12   saying that the State of California cannot pass statutes which

13   would forbid the United States from appropriating water.  The

14   State of California has not attempted to do so.  If the

15   United States will act just as any other user, it can get the

16   rights that it needs;and, as your Honor has pointed out, to

17   the extent that, for some reason, it cannot acquire the rights

18   that it needs by proceeding under state law, it always has the

19   power of eminent domain available to it to proceed and

20   condemn.

21          Mr. Veeder argued that in any event, even if the

22   United States doesn't own the rights to use water by virtue of

23   the    ownership of public land, and even if it hadn't pro-

24   ceeded properly to appropriate it by diversion and use, in any

25   event it has acquired those rights by inverse condemnation.

1        Of course, one of the elements of inverse condemna-
2   tion is that you interfere with the rights of somebody else.
3   Now here the diversion of water that they made was of water
4   that had passed through the watershed and was on the way to the
5   ocean.  Its diversion couldn't have interfered with anyone's
6   rights. The Circuit Court pointed that out very, very clearly;
7   that the use of water on the enclave was subject to the
8   objection of no one.  No one could interfere with it.

9        THE COURT:  Tell me what this "enclave" means.  I
10   think I know.  The Circuit Court kicked it around, and every-
11   body talks about the "enclave."  That's the area encompassed
12   by the Government's purchases and taking?

13        MR. VEEDER:  That's the area over which the State of
14   California ceded to the National Government exclusive juris-
15   diction.

16        MR. MOSKOVITZ:  That is my understanding, your Honor.
17   And over that territory nobody has the power to stop the United
18   States' activities, and therefore nobody could have come in
19   there and stopped what the Government was doing -- using water
20   that had theretofore been permitted to flow down.  I certainly
21   would feel that this was a better argument had the Camp been
22   located up here and interfered with the rights of somebody or
23   that someone else may have asserted.

24        This was the case, your Honor, in the Gurlock case.
25   There the storage of water was at Friant Dam above the points

1    of diversion of the people who were complaining.  Now as I

2    understand it, in the Gurlack case the downstream people who

3    had their flows interfered with were permitted to recover in

4    the Court of Claims.  This falls right in line with our estab-

5    lished law.

6            But here the diversion was downstream.

7            Mr. Veeder commented on Hudson v. West as being

8    authority in support of his position that it is not necessary,

9    under California law, to file an application to secure a per-

10   mit for an appropriative right.  Now I want to point out again

11   that that was a case that involved prescription, not appro-

12   priation; and the issue was whether the Department of Public

13   Works, at that time, could, as amicus curiae, raise the issue

14   for the first time on appeal before the Supreme Court as to

15   the necessity of filing an application and securing a permit,

16   and the Court said, "Well, the state is not a party here.  It

17   is not going to be hurt by this decision.  We will not go into

18   it at this point," and that and no more was held.

19           Your Honor, that covers my comments on the two

20   issues that you asked to have arguments on first -- the

21   question of prescription and the question of appropriation.

22           THE COURT:  All right.

23           Mr. Sachse, do you have anything to add?

24           MR. SACHSE:  I have nothing further, your Honor.

25           THE COURT:  Mr. Swing?

1        Mr. Stahlman?

2        Mr. Burby?

3        MR. GROVER:   Your Honor, --

4        THE COURT:   State your name for the record.

5        MR. GROVER:   George Grover.

6        Your Honor, I do have a couple of points.   I agree

7   with what Mr. Moskovitz has said, but I would like to emphasize

8   one or two things, because it seemed to me that there was a new

9   novel point on this doctrine of appropriation.

10        The suggestion seemed to be made, and I am not sure

11   that it was not, and if possible I would like to have the point

12   clarified here as to just what the United States contends --

13   there seems to be some suggestion that, by reason of the Treaty

14   of Guadalupe Hidalgo or the cession from Mexico or something,

15   the United States and not the State of California got some

16   paramount property rights to everything in California, to all

17   of the property in California.

18        Now your Honor adverted to the fact that there was

19   no territorial statues in California, but of course the Treaty

20   ceded the territory before California became a state.

21        Now there is a big difference between the United

22   States claiming an appropriative right, as it did on appeal

23   for the first time, by reason of the law of the West that use

24   gives you some sort of appropriative right -- it is quite a

25   different thing to say that the basis of this claim is some

1   paramount right of the United States, and it seemed to me that

2   Congress has settled that question a number of times.  Mr.

3   Moskovitz mentioned that there was concern, after the miners'

4   appropriations a hundred years ago, that the Government would

5   come in and claim rights that would upset the practices of the

6   miners, and that was a political battle which was settled by

7   Congress -- and Mr. Justice Jackson, in the Gurlack case,

8   discusses it -- settled by Congress in favor of these people

9   who had appropriated on public domain, and that is what the

10  statutes of 1866 and following were, the decision that the

11  Government would recognize these rights.

12          Well, there have been other political battles that

13  Congress has decided, and one of them in very recent history

14  is the tidelands battle, where again the question of the

15  Government's paramount rights came up.  Now there the Supreme

16  Court said that the Government did have paramount rights in the

17  offshore lands beyond low tide, and in settling that contro-

18  versy the question of water rights came up and Congress

19  definitely decided that the Submerged Lands Act, which assert-

20  ed certain Government rights in offshore lands, would not

21  upset this prior decision of Congress to recognize the

22  appropriative rights, and in the Submerged Lands Act Congress

23  says:

24          "Nothing in this Act shall be construed as

25          affecting or intended to affect or in any way

1 interfere with or modify the laws of the states

2 which lie wholly or in part westward of the

3 ninety-eighth meridian relating to the owner-

4 ship and control of ground and surface water,

5 and the control, appropriation, use and distribu-

6 tion of such water shall continue to be in

7 accordance with the law of such states."

8 THE COURT:  What is the citation of that statute?

9 MR. GROVER:  Public Law 31, 67 Statutes 29.

10 THE COURT:  Of what Congress?

11 MR. GROVER:  I don't have that citation here.  I'm

12 sorry.

13 THE COURT:  Well, I can get it.

14 Well, also, of course, in the Utt Bill that was

15 passed there is an express statement that California law will

16 be recognized as to its rights.  Of course, it has this tag

17 end, which Mr. Veeder interpreted the other day as reserving

18 everything, from the days of Columbus on down, to the United

19 States.  I don't read it that way.  But there is a reference

20 to state law in the Utt Bill.

21 All right, do you have another point, Mr. Grover?

22 MR. GROVER:  Yes.

23 Now, if it is not paramount rights of some sort,

24 then the Government's right to a different treatment than that

25 accorded other people under state lie must lie in the fact

that it owned riparian land under the Treaty of Guadalupe
Hidalgo.  Well, it did not own the ranchos -- that's clear;
they were private property, recognized by the Treaty.  And as
to the land it owned upstream, the public domain, as it gave
out patents on that land riparian rights thereon were recog-
nized, and again there is a control of that question in the
statutes of 1866, '70 and '77.  So that only as to public
lands not given out does the Government have still some type
of riparian right which it had under the Treaty of Guadalupe
Hidalgo, and as Mr. Moskovitz has pointed out there is no
diversion on that land being claimed -- at least, we don't
understand that that is the case.  Hence, it is not the
riparian rights of that land with which we are concerned.  In
any event, even assuming that they did have riparian rights
in that land, they could use it only on that land, and it must
be within the watershed to be riparian.

Now this was the doctrine of appropriation as it grew
up in California, namely, that as against everyone but the true
owner the Government, in most cases as the owner of riparian
lands in the public domain, most of the land in California --
as against everyone but the true owner, the state recognized
that a taking, literally, an appropriation gave the first
appropriator a good right recognized in law.  And in the
Gurlack case Mr. Justice Jackson points out that occasionally
the Government asserted its riparian rights, the true owner,

330

1    and mentions the case where President Lincoln issued a writ of

2    execution ejecting someone from the right which the Government

3    asserted.

4            THE COURT:  Were the Gerlach cases cited in these

5    briefs?

6            MR. VEEDER:  I think I cite those cases, yes,

7    your Honor.

8            MR. MOSKOVITZ:  The citation, your Honor, is 339

9    U.S. 725.

10           MR. GROVER:  It's very instructive, your Honor,

11   because it is a little analysis of the history of California

12   law on this subject.

13           THE COURT:  I don't recall that they were cited.

14           MR. GROVER:  I don't recall that it has been either,

15   your Honor.

16           MR. VEEDER:  I have cited it, your Honor.  Whether

17   it is in this brief or not I will check very rapidly.

18           THE COURT:  It's not in your brief on appropriation.

19           MR. GROVER:  When Lux v. Haggin spoke of rights

20   stemming from the National Government, it meant only that the

21   rights stemmed from the National Government as riparian owner

22   of most of the land of the state and not as some paramount

23   lord.

24           Now what the Water Commission Act in 1913 did --

25   Water Code 1225 now -- was to say, by legislative enactment,

1     that the state will no longer recognize this right of a taker

2     as against all but the true owner, unless that taker files

3     with the state.  Now that doesn't hurt the Government.  The

4     Government's rights all along have been that of a riparian

5     owner.

6              THE COURT:  In other words, that statute, Section

7     1225, was consistent in principle with the prior activities

8     of the state.

9              MR. GROVER:  Certainly.

10             THE COURT:  And which state law had controlled

11    appropriation.

12             MR. GROVER:  That's right.

13             Now I must say that there is some controversy today

14    on the claim of the state to town all of the water.  Mr.

15    Veeder mentioned the fact that the state claims the corpus of

16    all the water.

17             Now there are two statutes under which the state

18    claims title to all the water:  Water Code 102, I believe it

19    is, in which it literally does make that claim; and then there

20    is Government Code section -- I don't have it with me, but

21    it's either 182 or 189 -- I believe it's 182, in which the

22    state lays claim to all the property that nobody else owns.

23             Now if this water cannot be used under anyone's

24    right, then no one owns it, and the state, under this Govern-

25    ment Code section, would get a good title to it.

322

1          Now as Mr. Moskovitz says, this would have to be

2    briefed to be gone into very far, because a 4 to 3 decision in

3    the Ivanhoe case just a few weeks back raised it in California

4    and certiorari has been granted in that case.

5          THE COURT:  Ivanhoe case from the Supreme Court of

6    California?

7          MR. GROVER:  Yes; I understand just a week ago.

8          THE COURT:  What is the title of that case?

9          MR. GROVER:  Is it Ivanhoe Irrigation District v.

10   All Parties?

11         MR. VEEDER:  Ivanhoe Irrigation District v. All

12   Parties, 47 Cal. (2nd) 597.

13         MR. GROVER:  Now, what the majority says there is

14   that as to these unappropriated waters which nobody else owns,

15   by reason of these statutes the state owns them.

16         THE COURT:  That's what the majority says.

17         MR. GROVER:  Yes; and that you only get them from the

18   state on the terms that the state allows.

19         THE COURT:  Well, if the Supreme Court affirms that

20   decision, that solves our problem right there, doesn't it?

21         MR. GROVER:  Yes, but even if they reverse it, it

22   might not hurt, because the dissenting opinions don't object

23   to the title of the state, a kind of paramount lord type title

24   -- they don't object.  They just say that the trust, in which

25   Mr. Justice Shenk says it is held, is the new creature of the

1    majority -- in other words, the trust, the condition that

2    struck down the 160-acre limitation is what the defendant

3    objects to.  They say the state owns it, but there is no trust

4    that would prohibit the 160-acre limitation.

5            I raise this because the matter is in the United

6    States Supreme Court now and we just have to be very careful

7    in discussing it, your Honor, and your Honor would have to be

8    careful in --

9            THE COURT:  I'm learning a lot of things this after-

10   noon.  I had heard of the Ivanhoe case and the 160-acre pro-

11   vision, but I didn't realize that it involved these sections

12   in the Water Code and the Government Code.

13           MR. GROVER:  Well, it does discuss, in a different

14   way, this question of the state ownership of all the water

15   that nobody else owns.

16           Now I raise this because I think we ought to know

17   today whether the United States is claiming some sort of

18   paramount right to this unappropriated water or whether its

19   rights are --

20           THE COURT:  I don't think Mr. Veeder could state it

21   any more clearly; that the Government had a right to the use

22   of this water -- that's the way he put it -- without complying

23   with California law.

24           MR. VEEDER:  Your Honor, am I going to have an

25   opportunity to say just a few things in response?

1  THE COURT: Oh, yes.

2  MR. GROVER: No, I have one other point, and that

3 was the Larsen case. I think perhaps your Honor didn't mean

4 it quite the way you phrased it, but I understood you to say

5 that the Larsen case does hold that a downstream prescriptive

6 owner --

7  THE COURT: No, the facts are stated as if this

8 were solely a downstream owner.

9  MR. GROVER: That's right. The Court, of course,

10 doesn't discuss the many, many square holdings --

11  THE COURT: Well, does it cite the other cases?

12  MR. GROVER: The Judge who ruled on that case three

13 years before had quoted the rule in another case, and that is

14 mentioned in the appellate brief; and so his silence on it

15 certainly indicates that he didn't have any intent to over-

16 rule, and of course the record that Mr. Moskovitz will bring

17 in will make that clear.

18  Now in the Crane case, on the other hand, they did

19 squarely treat the point and hold that an application to

20 appropriate was necessary.

21  THE COURT: Thank you, Mr. Grover. Let's see,

22 you're with this firm in Riverside?

23  MR. GROVER: Corona, your Honor.

24  THE COURT: Stark --

25  MR. GROVER: Clayson, Stark & Rothrock.

1     MR. SWING:  May I say that Mr. Grover was the Deputy

2     State Attorney-General who wrote the very able brief for the

3     state on the appeal which resulted in the reversal of the

4     previous decision in this case in the Ninth Circuit Court of

5     Appeals.

6          MR. MOSKOVITZ:  Your Honor, I would like to say one

7     point before Mr. Veeder responds, if I may, to clarify a

8     matter.

9          THE COURT:  Yes.

10         MR. MOSKOVITZ:  The Ivanhoe case has been cited, and

11    I would like to make this observation.  In reading it, you may

12    note that my name is on the side of the losing party there.

13    I participated in requesting the Supreme Court of the United

14    States to review, and I certainly don't feel that there is

15    anything in the majority or dissent which actually bears on

16    this point.  Both of them agreed, or didn't disagree with

17    each other --

18         THE COURT:  What are you doing -- apologizing for

19    being on the losing side?

20         MR. MOSKOVITZ:  No, your Honor.  I just want to point

21    out that I didn't cite the case in my brief not because I lost

22    but because I didn't think it was relevant.

23         THE COURT:  All right.

24         Mr. Stahlman?

25         Mr. Burby?

1          Anyone else?

2          Mr. Veeder.

3          MR. VEEDER:  Your Honor, I would like just a few

4   moments, if I may, because I am always taken aback when I hear

5   something like I've just heard, that there is some significance

6   to the fact that the properties here involved are not public

7   lands and, therefore, the National Government couldn't appro-

8   priate rights to the use of water.

9          I refer, in that regard, to the case of the Federal

10  Power Commission v. State of Oregon, at 349 U. S. 435, and it

11  shows the fallacy of both the positions taken by Mr. Moskovitz

12  and Mr. Grover.  If what they say is true, then there can be

13  no question of the propriety of the National Government taking

14  the water as it is doing, for the Acts of 1866, 1870 and 1877

15  apply only to the lands within the term of "public lands,"

16  lands which are open for appropriation -- that is, open for

17  sale or disposition.  Following through to a logical sequitur

18  of these gentlemen's statement, if it can be relied upon, is

19  the fact that nothing can touch the rights to the use of water

20  there -- no state, no one -- because Congress acted only in

21  regard to lands open for homestead when it passed these laws of

22  1866, 1870 and 1877.

23          Now that is the case, and the Supreme Court on the

24  subject in regard to the lands there involved, in the Deschutes

25  River case -- and having written the brief on it I am quite

1   familiar with it -- the proposition there advanced was that, in

2   some manner, the State of Oregon could open for appropriation

3   the waters along theDeschutes River, which were lands which had

4   been withdrawn for public power purposes.  The question was also

5   advanced that the state law applied to those lands.  But the

6   Supreme Court said no, those lands were not public lands within

7   the contemplation or the purview of the Acts of 1866, 1870 and

8   1877; therefore, the state law had no application whatever.

9           THE COURT:  Well, weren't part of them Indian lands,

10  on one side?

11          MR. VEEDER:  Yes, on one side were Indian lands, on

12  the other side were lands that were withdrawn from  the public

13  domain or public lands for power purposes.

14          THE COURT:  Well, I don't follow your analogy, then.

15          MR. VEEDER:  Well, your Honor, the point is that the

16  lands on neither side of the River were public lands which were

17  open for homesteading, and therefore the Acts of 1866, 1870

18  and 1877 had no application.

19          THE COURT:  I get your first premise, but I don't

20  get your "therefore" conclusion that since the Desert Land Acts

21  of 1866, '70 and 77 don't apply then the United States has

22  some title to water.  In this particular case, this was water

23  flowing through an Indian reservation and through land which

24  the Government owned on the other side of the River.  When the

25  Government wanted to put up a dam they had made their peace with

328

the Indians.  The Indians consented to the construction of the

dam.  It's in the case.  I read it yesterday.  Do you dispute

me on that?

MR. VEEDER:  I don't dispute your Honor on it.  I

simply say that what it says is that the only lands to which

the Acts of 1866, 1870 and 1877 could have application are the

Indian lands, which were only on one side.  The point was

fully argued and fully briefed in regard to the applicability

of those Acts, and it says that it had no application what-

ever to the lands in question.

Therefore, the urging that the United States, within

an enclave over which exclusive jurisdiction has been ceded,

could not divert water within that enclave is --

THE COURT:  Nobody disputes the fact that after the

water gets down there you could divert it.  That's not what

we're talking about.  Nobody disputes that fact.

MR. VEEDER:  The additional fact, your Honor, then

-- if I may go ahead -- has been raised that the only assert-

ion of rights to the use of water of the United States is

that we have forest lands.  Now your Honor, I don't know

where that thought came from.  We simply say this:  that at

the time we diverted and applied this water to a beneficial

use there was water available for that purpose and we diverted

and applied it to a use.  Now, when we consider --

THE COURT:  Well, let me interrupt again.  Apropos

1     of what you said about the Oregon case, I'm interested in the

2     background of Section 1225, and it may be a very easy answer

3     because I've had the feeling all along that these three Acts

4     of 1866, '70 and '77 were applicable particularly to the

5     property that came under them -- the desert land entries,

6     homesteads, etc., and I don't think that those statutes in

7     themselves are the statutes which give the state the power to

8     deal with water.  I think it goes back either to some other

9     statutes or it goes back to the basic relationship between the

10    state and the United States.

11              But this hasn't been briefed.

12              MR. VEEDER:  I think your Honor cited the case that

13    would be controlling under the circumstances, and that is the

14    Oregon-California Power Company case, 295 U.S., because there

15    it recognizes that where the title originated and --

16              THE COURT:  Well, it is obviously going to have to

17    be briefed, so let's pass on to --

18              MR. VEEDER:  May I, then, cite --

19              THE COURT:  Yes.

20              MR. VEEDER:  I must take issue with Mr. Grover.  I

21    hope that he is not laying the groundwork for a propaganda

22    campaign against us when he talks about this "overlord."  I've

23    read the papers before and I think that he's starting on that.

24    I hope he doesn't.

25              MR. GROVER:  Your Honor, I ask your protection on

1    that.

2          THE COURT:   It means nothing to me.   I haven't heard

3    anything like that.   The overlord reference was to the State

4    of California.

5          MR. VEEDER:   If he restricts it to that, I'm happy.

6          THE COURT:   As far as any paramount title is con-

7    cerned, which I thought went out of the case with Judge

8    Yankwich's first decision in this matter, it seems again to be

9    asserted today that the Government has some/title to this

                                              paramount

10   water.

11         MR. VEEDER:   The only title that the United States

12   of America is asserting here, your Honor, is the title of the

13   ownership of the property that the sovereign has.   It doesn't

14   claim that it can take anything away from anybody who has a

15   vested right, nor has it ever claimed, nor will it ever claim.

16         THE COURT:   All right.

17         MR. VEEDER:   I would like to read from Lux v.

18   Haggin, 69 Cal. 255, which, to me, sets the tone and temper

19   of California law that has always been adhered to.   It says:

20              "Since, if not before, the admission of

21         California into the Union, the United States

22         has been the owner of all the navigable streams

23         in the public lands of the United States and

24         within our borders, and of the ownership of the

25         beds and banks.   It has never been held that the

1    right to appropriate water on the public lands

2    of the United States was derived directly from

3    the State of California."

4    Now that is the position that is taken here.   Assum-

5 ing that we have to turn to the ownership of the unappropriated

6 water, which I don't think is essential, there remains this

7 fact:   that the rights to the use of water, as distinguished

8 from the corpus of the water, are still there and they are

9 open to be exercised by anyone.

10    THE COURT:   Give me that page in Lux v. Haggin.

11 That is such a long case --

12    MR. VEEDER:   That is at 336, your Honor -- 69 Cal.

13 255, at 366.

14    That, of course, was the genesis of the California

15 doctrine, which has always been that the title to the rights

16 to the use of water was derived from the National Government.

17    Now in regard to the comments directed to my brief

18 in connection with the methods of appropriation, the only

19 reason that those were cited, your Honor -- and they were not

20 cited for the purpose of dates or times or whether they

21 related to 1913 or not -- we emphasized, however, that the

22 term "appropriation," in California and elsewhere in the

23 West, has always meant one thing; the diversion of it and the

24 application to a beneficial use.

25    If I may have just one more moment.

1    There are numerous cases now, and they have become

2    increasingly important.  In the State of Colorado and else-

3    where, this question is continually coming up:  Does a man

4    acquire a right to the use of water by reason of the diversion

5    of it and the application of it to a beneficial use?  And con-

6    sistently those states have held that that rule does apply --

7    that if a man has diverted the water he is entitled to it.

8        THE COURT:  Well, does Colorado have a similar

9    statute under Section 1225 of the Water Code?

10       MR. VEEDER:  Oh, yes, Colorado goes further.  When

11   Colorado came into the Union in 1879 it had, as part of its

12   constitution, as distinguished from California, the proviso

13   that the water belonged to the state, and that is the reason

14   for the difference between the Colorado and the California

15   doctrines to which I made reference.  California had always

16   recognized that the source, the genesis of the right was the

17   National Government.  Colorado never has.

18       But I think your Honor might be interested in the

19   case of De Haas v. Benesch, reported at 116 Colorado 344,

20   181 Pac. (2nd) 453, and 457 is the pertinent and probative

21   language.  The other cases which follow this same doctrine to

22   which I am alluding:  there is another case, Archuleta v.

23   Boulder and Weld County, 192 Pac. (2nd) 891, 895, 896.  There

24   is another case, 188 Pac. (2nd) 253, Schluter   v.

25   Burlington.

333

1          In those cases the Court held that the filing with the

2     state -- now there is a different procedure in the State of

3     Colorado; it differs as to procedure, but the same doctrine

4     applies, that is, the police regulations are the source of

5     that power -- but nevertheless, it said that even where they

6     didn't make the filing with the State Engineer, as required by

7     the Colorado law, if a man did divert and appropriate water

8     and apply it to a beneficial use he acquired the right, and it

9     said, "The only thing that this filing with the state accomp-

10    lishes is the provision of evidentiary material from which the

11    date of the priority may be established." Now that makes

12    sense, because --

13          THE COURT:  There would be nothing inconsistent for

14    Colorado to have that view and for California to have a differ-

15    ent view.

16          MR. VEEDER:  No, but I think that when the cases are

17    reviewed -- the Hudson v. West case, which is a good example;

18    it is true that it deals with prescription -- the fact

19    remains that a right was recognized where there was no com-

20    pliance with state law.

21          I have no further comment, your Honor.

22               (See next page)

23

24

25

1        THE COURT:  Well, obviously, you have raised a lot

2   of new problems which will have to be briefed.

3        MR. VEEDER:  Well, we hope that it doesn't delay our

4   getting to trial, your Honor.  We would like to go to trial,

5   as you suggested, in January, if possible.

6        THE COURT:  Now Mr. Veeder, you can't come in here

7   on October 21st and raise a new problem, one that I have never

8   heard about and which Counsel say they haven't heard about,

9   and then pass up the matter of briefing it.  I want the matter

10  briefed.

11       How long do you want?  You have the opening brief

12  on this point.

13        MR. VEEDER:  To brief the point I just raised?

14        THE COURT:  The point that you just raised about

15  those Colorado cases, and these new points that you have

16  raised here.

17       I take it that these new points are your contention

18  that the United States has some paramount right to the use of

19  water from land that was at one time in the public domain or

20  is now in the public ownership.

21       And connected with that and tied in with it is your

22  contention, apparently, that Section 1225 of the Water Code

23  goes further than it should have and delegates to the State

24  of California rights in the allocation and appropriation of

25  water, which you apparently contend the State hasn't got,

insofar as the Government is concerned.

1    MR. VEEDER:  Well, I would like to straighten that

2    out.  From the standpoint of the declaration of the State of

3    California that it owns the rights to the use of water, I

4    thought I had covered that.  It doesn't mean that California

5    has title at all.  I don't believe that California claims

6    title.  I think it says that it regulates the water by that

7    means.

8        Now in regard to the claim that we have brought up

9    here, in regard to condemnation, I will be very glad to brief

10   it.  I will brief each one of the points.

11       But I didn't realize that I brought up anything new

12   in regard to the claim that we acquired, assuming that

13   California had title, that by diversion and application of

14   water to beneficial use, I thought I had already briefed it.

15   But if you want me to cover it further, I will.  I thought we

16   briefed that, your Honor, but I will cover it again.

17       THE COURT:  There is so much of this I don't know

18   where you brief it.  The only thing you briefed, here, was

19   this prescriptive right, and you have briefed your alleged

20   appropriative right by self-help, by your citations on the

21   limited scope of the police power of the State of California.

22   Now you haven't briefed this point that you raised that you

23   have some paramount right to the use of this water because it

24   came from public domain land originally.

25       MR. VEEDER:  I am worried about your Honor's use of

the term "paramount," but I will be glad to --

1          THE COURT:  You may omit "paramount."

2          MR. VEEDER:  All right.

3          THE COURT:  That you have a right to the use of the

4     water.

5               And you haven't briefed anything on this inverse

6     condemnation, although I am not too much concerned about that.

7          MR. VEEDER:  I will brief that, your Honor.

8          THE COURT:  And I would like to have your inter-

9     pretation of the statutes of the United States and Section

10    1225 and just what rights you concede that the State has to

11    deal with water.  Apparently, you concede that it has some

12    rights, as far as individuals are concerned.

13         MR. VEEDER:  Yes.

14         THE COURT:  But you seem to think that the United

15    States is an exception to that, and I would like to have your

16    basis for that.

17         MR. VEEDER:  Well, I would like, your Honor, in

18    that connection -- this is the middle of the month, isn't it?

19         THE COURT:  The 21st of October.

20         MR. VEEDER:  What is your Honor's pleasure on that?

21         THE COURT:  You and I both want the case to go to

22    trial as soon as it can.  You name your time.  If it is

23    reasonable, I will give you that amount of time to get your

24    brief in.

25         MR. VEEDER:  Well, 21 days.

THE COURT:  Approximately when would that be?

MR. VEEDER:  That would throw us toward the last week of November, or middle of November.

THE COURT:  That would be the 11th or 12th of November.

MR. VEEDER:  12th of November.

THE COURT:  November 12th?

MR. VEEDER:  Yes.

THE COURT:  The other parties can be looking into it immediately, because you have a number of his citations here and you have his theory.  Ten days ought to be enough for the other parties.

Are you going to submit a brief, Mr. Moskovitz?

MR. MOSKOVITZ:  Yes.

THE COURT:  Mr. Sachse?

Mr. Swing?

MR. SWING:  All right.

MR. VEEDER:  Your Honor, in regard to the status quo, are we going to touch on that today?

THE COURT:  Oh, we've just started on this.

MR. SACHSE:  We haven't started on the legal points.

THE COURT:  On November 22nd your brief will be due. If the defendants want to get together on a joint brief, or join in with somebody else's brief, that is satisfactory.  I don't need any duplication of effort here.  But there will be

1    a response at least by Mr. Moskovitz by November 22nd.

2            MR. MOSKOVITZ:  Your Honor, I don't want to delay

3    things here, but this problem is very significant to the

4    State.   In order to do it justice and to make sure that it

5    represents the State's viewpoint it will take some coordina-

6    tion, and I will do my best to have it ready by that time.

7            THE COURT:  You have the advantage, of course, that

8    you can go to work with all the employees that the State of

9    California has immediately.   You know what the theory is.   You

10   say it's new to you.   I take it that the transcript will be

11   available here.   You can get to work.   You can get to work

12   even before the brief comes in.   Then when the brief comes in

13   all you have to do is to organize what you have prepared.   I

14   think ten days ought to be enough.

15           MR. MOSKOVITZ:  We will endeavor to do it, your

16   Honor.

17           THE COURT:  These problems, I think, are closely

18   enough related that this could all be put into one brief,

19   without breaking it down into various parts.   Don't you think

20   it all concerns this appropriative right?

21           MR. VEEDER:  Yes.

22           I wonder if the Reporter would be good enough to

23   run off these pages first in regard to these briefs, so that

24   there will be no doubt as to what your Honor desires.

25           THE COURT:  All right.

1          MR. GROVER:  Your Honor, might it not be more con-

2     venient if we just started from scratch again and briefed

3     points (g) and (h) and bring everything into one place?

4          THE COURT:  I haven't heard anything on point (g)

5     that bothers me -- this prescriptive right.

6          MR. GROVER:  I see.  Well, let's just put it this

7     way then:  that we just brief point (h) from scratch.

8          THE COURT:  Paragraph 8(h), yes -- well, I don't

9     know about doing it from scratch.  You can do what you want to

10    do.  I'm particularly interested in these new matters that

11    come up.

12         MR. GROVER:  But it might not hurt.  It would maybe

13    take a little repetition to include the pertinent parts that

14    were in the prior briefs, but at least we would have the

15    whole subject in the new brief.

16         THE COURT:  It's all right with me, if you would

17    like to do that.  I'd be happy to have your help, Mr. Grover.

18         All right, passing now to 8(i), in view of the

19    Government's statement, I take it that we can pass up that

20    one.

21         MR. VEEDER:  I think that's correct, your Honor.  If

22    the waters are not part of the Santa Margarita River or

23    tributaries to it, they're not in this litigation.

24         THE COURT:  The Government says, "It would also

25    seem logical to conclude that there would be excluded from the

1   litigation percolating waters, waters that are not part of

2   the Santa Margarita." That gets to be a factual question: of

3   whom can we dispose in the case who have a right to perco-

4   lating waters as contrasted to waters in the stream?

5       MR. VEEDER:  That's right, your Honor, if the issue

6   should arise.

7       THE COURT:  All right.

8       Now we come to (c), (d), (e) and (f).

9       Tentatively, it seems to me, as I read the cases,

10   that there is a difference between a beneficial use and a

11   reasonable use.  I may be wrong about that, but I don't think

12   they mean exactly the same thing.  In other words, the use

13   might be beneficial and yet it might be unreasonable in con-

14   nection with correlative rights of the various riparian

15   owners on the stream.  And incidentally, this provision talks

16   about riparian rights within the watershed.

17       Now again I say that the United States is not help-

18   less to protect itself.  I think that if they haven't the

19   rights they think they have, they have a right to condemn

20   water.  All they have to do is to pay fair compensation and

21   they can get all the water they want.  They can take all the

22   water out of the Santa Margarita basin, if they want to

23   buy the water rights.

24       But I have serious trouble following the Govern-

25   ment's contention that military use is a reasonable use, and

1    I notice that Judge Yankwich held that it was not ipso facto

2    an unreasonable use.  Of course, we have not before us yet a

3    factual record to make a firm decision.

4           But what bothers me is this.  Suppose that a man had

5    a farm on the stream downstream, a riparian owner, and he had

6    raised a dozen cattle for twenty years, using riparian water

7    to irrigate ground to raise these cattle, and people ustream

8    had, five, ten, twenty head of cattle.  So suddenly he moves

9    in two thousand head of cattle downstream and he says, "Now I

10   want to use my riparian rights to raise two thousand head of

11   cattle, and, in substance, I'm going to surcharge the water

12   on this stream with this additional number of cattle."  Is

13   that reasonable?  Do the upper riparian owners have to stand

14   still for the increased use?

15          Another example.  A man has a thousand acres, we'll

16   say, down around where Camp Pendleton is now located, and he

17   has irrigated and he has raised cattle and he has made reason-

18   able and beneficial use of the water, and upstream there are

19   agricultural and domestic uses of the water.  Suddenly he

20   decides to subdivide this thousand acres, and, as could happen

21   around San Diego -- witness Clairemont -- within a year's

22   time he has a hundred thousand people living on this piece of

23   ground.  Do you claim that that's a riparian use?  True, I

24   would think it would be beneficial, but is it a reasonable

25   use, taking into account the correlative rights that he has in

1   comparison with the other people on the River?

2          I'm inclined to think that the use of the water for

3   military barracks, in view of the various cases involving

4   insane asylums, municipalities and things of that sort, is not

5   the reasonable use contemplated;and I wind up by saying that

6   if the Government doesn't have the water they think they ought

7   to have it can go out and condemn it.

8          Now I take it that Mr. Veeder will want to respond

9   to that.  But as part of that, there are other facets of it.

10  I take it -- I don't know the facts yet -- that Santa

11  Margarita Rancho, before it sold to the Government, irrigated

12  a certain amount of land and grazed a certain number of

13  cattle.  Is that true?

14         MR. VEEDER:  That is true, your Honor.

15         THE COURT:  And used a certain amount for domestic

16  water.

17         Now query:  When the Government bought the rights of

18  Santa Margarita, or condemned them, is there anything wrong

19  with the Government converting what was a reasonable riparian

20  use, as that right would be measured in correlation to the

21  rights up the stream, to what is now (1) a military use,or

22  (2) a limited military use that didn't surcharge the stream,

23  or (3) to a combination of use of the water for irrigation

24  for cattle and for the military?  In other words, certainly it

25  would seem that the Government bought some rights and the

1   Government should be entitled to use those rights, and I

2   would think, offhand, that if the Government wanted to use

3   Camp Pendleton for raising cattle and irrigating land -- this

4   is in the abstract, of course -- that the mere fact that the

5   Government has acquired the land wouldn't keep it from doing

6   the same thing that had been done in the past, as long as its

7   use was a reasonable one.

8           Secondly, I wouldn't see any problem if the military

9   establishment was a limited one, which didn't, as it were,

10  put an extra burden on the stream.

11          Or thirdly, I wouldn't see any difficulty with

12  converting what had been its right to X amount of water for

13  grazing and for cattle and using the same relative amount for

14  military purposes.

15          But I don't think that it can build an establish-

16  ment of seventy-five thousand or a hundred thousand people

17  and then claim that all the water it needs for that establish-

18  ment is part of its riparian right.

19          That is my tentative thought on this matter, and

20  before I hear from you let's decide about how long we are

21  going to go here.  I take it that this will take some time.

22  Would you like to have a recess and get a bite of dinner and

23  come back, or would you like to go until six --

24          MR. VEEDER:  I would just as soon keep on going,

25  your Honor.

1    MR. MOSKOVITZ:  I would just as soon go on, in the

2 hope that we can get through by seven-thirty.  I have a plane

3 to catch.

4    MR. VEEDER:  However, whatever your Honor desires,

5 of course.  I really believe that in regard to this feature of

6 the riparian claims that it shouldn't take long.  Is this the

7 final question to be argued?

8    MR. SACHSE:  You have underground storage yet, Mr.

9 Veeder.

10    THE COURT:  Well, underground storage is connected

11 with this.  The matter of putting water in to keep the salt

12 out of the basin is connected with this.  I want some help on

13 that.  That's a rather bothersome problem.

14    First of all, they trimmed the air off in here, and

15 I think we had better find out if we can't get some air or

16 we'll suffocate.

17    MR. SACHSE:  They changed the temperature.

18    MR. VEEDER:  I'm not short of air, your Honor.

19    THE COURT:  You say you're not short of air?

20    MR. VEEDER:  Never.

21    THE COURT:  Let's take a recess and see if I can get

22 some air in here.  I don't know whether we can or not, but

23 this will get worse as the evening goes on, if we don't.  Then

24 we will go on at least to six, and we may take an adjournment

25 and come back later or we may try to finish up.

(RECESS)

THE COURT:  All right, Mr. Veeder.

MR. VEEDER:  It is my personal view, your Honor, on the basis of your comment that a military use is a proper riparian use limits, then, the matter to one of fact, and with that we completely agree.

The Marines have never asserted, and never have we asserted on behalf of the Marines that the United States of America, in the exercise of its riparian right, could claim more water than would be a reasonable use as that right relates to all other riparians on the stream.

In other words, we take this position:  that in regard to the Vail rights, which are large riparian rights, we share correlatively with them, and it is a factual question which will govern as to the quantity of waters we are entitled to receive.  That would be true with the other smaller riparian users who are present here.  We would prorate, we would participate in the available supply of water the same as anyone else.  The fact that we are using water for a military purpose makes no difference, in our view.  We believe that any beneficial use, and certainly a military use is a beneficial use, entitles us to use the water.  The extent and the measure of that right is a factual question, which we must enjoy reciprocally and correlatively with everyone else.

THE COURT:  You say that you need 23,000 acre feet now.

1          MR. VEEDER:  That is correct.

2          THE COURT:  What will your proof show as to the

3    amount of acre feet that Santa Margarita heretofore used?

4          MR. VEEDER:  I would be reluctant to say the amount,

5    because I am not sure, as to the amount of water that the

6    Rancho Santa Margarita used at the time of the acquisition of

7    the rights.  We believe, however, that the proof will show

8    that our riparian rights, ones that we have succeeded to,

9    would entitle us to 69,000 acre feet of water as an agricul-

10   tural user.  What was actually applied by the Rancho Santa

11   Margarita I would hesitate to say now.  But in our view, the

12   rights to which we succeeded from the Rancho Santa Margarita,

13   as an agricultural user, under the California amendment of

14   1928, would entitle us to 69,000 acre feet as a basis for

15   prorating, for enjoying that right as it relates to other

16   riparians -- that is the agricultural use, and certainly

17   that was the measure of the rights of the Rancho Santa

18   Margarita.

19         Now she could not have claimed, nor do we claim --

20   certainly there is not 69,000 acre feet of water, but it is

21   the basis upon which we are entitled to participate with other

22   riparians.  The Vail's, I think, have a higher entitlement

23   than that; I think it runs as high as 70,000.

24         MR. STAHLMAN:  79,510.

25         MR. VEEDER:  79,510 says Counsel for the Vail's.

1        So we have the circumstance where the measure of the

2    rights are established there.   Now those are the agricultural

3    rights.   Our 23,000 acre feet of water, of course, includes

4    our prescriptive and appropriative rights.

5        But here, as to us, is the all-important factor in

6    regard to Santa Margarita, in regard to Fallbrook, in regard

7    to the appropriators:   we don't believe that the rule of

8    reasonableness has application to junior appropriators.   We

9    think that the rule of reasonableness is limited -- I am

10   speaking about the right of the riparian; he is entitled to a

11   reasonable use as in regard to other riparians -- in regard to

12   a junior appropriator, in regard to an appropriator that rule

13   doesn't adhere.

14       Now I think the State of California, in its brief,

15   has agreed with us in the general proposition as I have stated

16   it.   They say, "Yes, a military use is a proper riparian use.

17   Is it reasonable?."

18       Now that, again, is not a point that the appropria-

19   tors can raise.   I think that the Vail estate can raise that

20   question.   If we were demanding more water than we are

21   entitled to on the correlative and reciprocal right, they

22   could object.

23       Your Honor raised several instances which we think

24   are of importance.   Suppose that a man had a small acreage of

25   forty acres of land which were riparian; he had five cows, and

1    he claimed a right to participate on the basis of five cows.

2    One day he moved in cattle that just consumed far, far above

3    any quantity hitherto enjoyed.  He could not, in our view,

4    increase his right above what was reasonable in regard to other

5    riparians.  In other words, for the additional stock -- now

6    I'm not talking about domestic rights at all; i'm talking

7    about where you have a large herd of cattle, which is not a

8    domestic use -- I think there he might have to appropriate

9    water over and above his riparian rights, if he were going to

10   water all the stock.

11            An example that I would tender would be where a man

12   has a thousand acres of land.  He has irrigated a hundred of

13   that.  That was a reasonable use as that one hundred acres

14   applied to other upstream riparians and other downstream

15   riparians.  Then he decided to break out all the land and have

16   a thousand acres under his riparian right.  We would say that

17   that would probably be unreasonable, dependent upon the facts,

18   and if it was unreasonable he would be limited to whatever the

19   court found to be reasonable as all the rights in the stream

20   related.

21            Now that is exactly our statement.  We, as a riparian

22   owner, have no right, as against other riparian owners, to a

23   quantity of water that would be unreasonable.  We think this,

24   that that is a question for this Court to decide in this case.

25   Suppose that the Vail estate or somebody else would come in

1   and say, "We deny that the United States has the right to

2   water for fifty thousand Marines by reason of its riparian

3   right." That may be true.  I don't think it is.  But I think

4   that if we got into that case it might be necessary, to broaden

5   our riparian right, actually to condemn some water.  We don't

6   think so.  But we do agree with your Honor's proposition that

7   if fifty thousand Marines is an unreasonable use, we are not

8   entitled to go that high.  We have a correlative right.

9           THE COURT:  Of course, the riparian right is not

10  measured entirely by the use you made of it.

11          MR. VEEDER:  We don't think the use makes any differ-

12  ence at all, your Honor.  We believe that as long as it is a

13  beneficial use, whether it is an apartment house, a motel --

14          THE COURT:  I mean the extent of the use.  In other

15  words, the man with the thousand acres, who had irrigated only

16  a hundred, that doesn't mean ipso facto that he could irrigate

17  the other nine hundred acres without argument.

18          MR. VEEDER:  That is right.

19          THE COURT:  But on the other hand, he is not

20  limited to irrigating his hundred acres merely because he never

21  irrigated more than a hundred.

22          MR. VEEDER:  That's right.

23          THE COURT:  But again it would be a question of how

24  much water there is -- who, and how many, and to what extent

25  are the other rights on the river; how would the increase of

1 his nine hundred acres, added to the burden on the stream,

2 affect the other people -- and you might wind up with any kind

3 of answer; you might get an additional hundred acres, or, in

4 certain instances, he might get the whole nine hundred.

5      MR. VEEDER:  It could be that, in a given year, when

6 there is a large runoff, he could get enough water for his

7 thousand acres; or it might be that somebody upstream took his

8 land out of cultivation and his correlative right would be

9 enlarged to that extent.

10      So it is a flexible claim that we are asserting here,

11 and the measure of our rights is as we have stated.

12      That's our position.

13      THE COURT:  I have your position.

14      Who wants to be heard on this?

15      MR. SACHSE:  I would like to take a crack at some of

16 this, your Honor.

17      First, I want to make it very clear that we do not

18 agree at all with Mr. Veeder's statement that the only test is

19 that the use be reasonable or that the use be beneficial --

20 that that is the only test of a proper riparian use.  That is

21 absolutely not so.  Any casual examination of what has been

22 held to be a proper or an improver exercise of a riparian right

23 will show that that is not true.

24      Now I don't think that anyone will quarrel, for

25 instance, that the storage of water, cyclically or seasonably,

1    is a reasonable and a beneficial thing to do.  But I don't

2    believe that anyone will quarrel, except possibly Mr. Veeder,

3    that in California the cyclic or seasonal storage of water is

4    not a proper exercise of the riparian right.  I don't care

5    how reasonable, I don't care how many thousands of acres of

6    riparian land he may own, the storage of water is not a proper

7    exercise of the riparian right.

8         Similarly, it has been settled in California very

9    clearly -- the cases are cited in our brief -- that the claim

10   to use riparian water for what our law terms "municipal

11   purposes" is not a riparian use.  I don't care how many acres

12   of land the City of Oceanside may own on the banks of the

13   San Luis Rey River, it has no riparian right to use that water

14   for the supply of its inhabitants.  It simply doesn't.

15        There are no cases that Mr. Veeder has been able to

16   cite, there is not a single case in the jurisdiction of the

17   State of California that has ever held that a municipality can

18   use, for municipal purposes, water under a riparian right.

19        THE COURT:  What's the history of the City of Los

20   Angeles?

21        MR. SACHSE:  Those are appropriative rights, or else

22   rights that they condemned.  A great many of Los Angeles'

23   rights are appropriations and --

24        Pueblo rights.  I thought you were talking about

25   Owens Valley water.  The original rights of the City are

     pueblo rights.

The water that they took up in the Owens Valley that they brought to Los Angeles was appropriated or condemned.

THE COURT:  I know.  I'm thinking about the tunnel that used to exist in the Narrows there by Elysian Park.

MR. SACHSE:  That was an old pueblo right.

But I don't think Mr. Veeder contends that there is a pueblo right in the Rancho Santa Margarita.  It is a special and specifically unique kind of right that does not exist here.

We have to stop and go away, away back, if we can, your Honor, on this argument as to riparian right.  The oldest English law, if you will remember, the original riparian law was that a use had to be "natural."  That was the word that they used.  It was a natural use or an unnatural use.

So whether or not a military use, if you want to call it that, is a proper riparian use is going to depend on an analysis of what a military use is.  There is no such thing as a military use, I will submit to Mr. Veeder.  The only two citations1 that I have ever been able to find anywhere are two citations in this very proceeding, one in Judge Yankwich's reported
/decision, and again in the reported decision of the Circuit Court where they say that the use appears to be analagous to a municipal use.  Those are the only two cases anywhere that have ever used the term "military use."

THE COURT:  Well, is it your contention that if the

1   Government acquired certain riparian rights from the Rancho

2   Santa Margarita to be used for irrigating land and for cattle

3   and for domestic uses, that when they ceased to use the water

4   for that purpose they lost those riparian rights and they

5   couldn't convert that X amount of water to military use?

6   MR. SACHSE:  You've asked me two questions, your

7   Honor.  They never lost the riparian rights, no -- the rights

8   are still there; but they can use them only for proper riparian

9   purposes, and if they don't use them for proper riparian

10   purposes they have nothing to which they can quiet title.

11   They are then just doing something to which they have no right.

12   They are doing it because they are downstream and they are

13   within the enclave and nobody can stop them.  But they have

14   nothing to which they can quiet title unless they are using it

15   properly under their riparian right.  That's all they can quiet

16   title to; not the power to use the water for anything they

17   want, but the right to force someone else to let it come down

18   to them.

19   If we try, as reasonable men, to consider what the

20   uses are on Camp Pendleton, I don't know how we can consider

21   them as anything but municipal uses.  "Military use" is not

22   a term of art; it is just a description that the lawyers and

23   the Court used in this very proceeding -- it's a description

24   for the various uses or purposes to which water is put on

25   Camp Pendleton.  We know what they are.  The military cook,

1   they drink, they bathe, they have a sewer system, they have

2   a fire department, they have parks, they have motion-picture

3   theatres, swimming pools, playgrounds, factories, laundries,

4   service stations, churches, vegetable gardens, lawns.  It's

5   exactly the same as any community of the same size.

6               THE COURT:  Are there farming activities carried on

7   at the Camp?

8               MR. SACHSE:  There are many farming activities on

9   the Camp.

10              THE COURT:  By the Government?

11              MR. SACHSE:  By lessees of the Government.

12              MR. VEEDER:  By lessees of the Government, your

13  Honor.

14              MR. SACHSE:  I submit that if we take the military

15  strength at Camp Pendleton at any tome -- and according to the

16  statement of the Government, it has ranged from eleven

17  thousand to over a hundred thousand -- you will find that the

18  actual uses to which the water is being put is exactly the

19  same uses to which it is put in a city of like size --

20  population of eleven thousand, the same as a city of eleven

21  thousand; population of a hundred thousand, the same as a city

22  of a hundred thousand; and a city, regardless of the number of

23  acres that it may own on the bed of the stream -- and again

24  I'll remind us, as Mr. Moskovitz so clearly pointed out, we

25  are operating not only under the basic principle, I think,

1   that this is California law that applies, but even under a

2   stipulation -- I would challenge Mr. Veeder to produce a

3   single California authority that will say that a municipality

4   can serve water for municipal purposes under a riparian right.

5   It simply can't do it.  The only time that cases have ever

6   come up, the decision has been expressly to the contrary.  I

7   might add that it is not unique in California -- it's not at

8   all unique.

9          There are other states that have adopted the same

10  rule, as our brief pointed out; there are Kansas cases,

11  Washington cases, Oregon cases, etc.

12          Well, so much for that.

13          The only thing I wanted to point out that Mr. Veeder

14  has mentioned, which I think is incorrect and cannot be per-

15  mitted to go unchallenged.  Mr. Veeder takes the position that

16  the riparian right of Camp Pendleton is 69,000 acre feet, and

17  apparently the way he calculates that right is that if there

18  was that much water that much water could be put to beneficial

19  use on the land.  Now that is not how a riparian right is

20  calculated.  I would like to quote from a recent Supreme Court

21  case in this state, Prather v. Hoberg -- I don't think it is

22  in our brief.  Yes, it is, but this quotation is not in it.

23          "The riparian owner has no right to any

24          mathematical or specific amount of water from

25          a stream.  No mathematical rule has been

1   formulated to determine such a right.  For

2   what is a reasonable amount varies not only

3   with the circumstances of the case but also

4   varies from year to year and season to season."

5   Now, in exercising a riparian right, any riparian is

6   limited by the water that is there.  Practically speaking, if

7   he attempts to build an economy on a given riparian right, he

8   is going to be limited to the amount of water that is there in

9   front of him -- not the maximum, but the minimum quantity, the

10  summer flow as distinct from the winter flow.  He has got to.

11  And again, we are here confronted with a case where

12  the United States is not -- well, the United States is not

13  being challenged; I should rather phrase it another way -- the

14  United States is seeking to assert a right upstream.  The

15  argument isn't what they do on Camp Pendleton.  The argument

16  is how much water can they force to come down to Camp Pendle-

17  ton quantity-wise.  The argument is, Can they force water to

18  come down to Camp Pendleton to supply a municipality?  Can they

19  force water to come down to Camp Pendleton to use out of the

20  watershed either under the appropriative or the prescriptive

21  claim?  That's what we're talking about.  Not the use that they

22  make in the Camp, but can they reach up beyond the enclave and

23  force someone to let it down?  That gives you, your Honor, a

24  right to which you can quiet title.  I say that they can't,

25  unless it is a proper riparian use.

1          Again, I respectfully challenge Counsel, and I would

2    be most happy if anybody here could show me a single California

3    authority that has ever stated that a municipality, for this

4    type of use -- drinking, bathing, eating, swimming, lawns,

5    gardens, sewer systems, fire departments, a city -- that that

6    type of use can be exercised under a riparian right.   It

7    simply cannot.   Now I believe the point is absolutely correct.

8    It's controlling.   If I am correct, I submit that they will

9    have to find a substituted use theory or something else.

10         Now your Honor asked a question about a substituted

11   use.   I don't believe that any riparian can substitute a non-

12   riparian use for a riparian use.   Just because I have the right

13   to use a thousand acree feet of water for irrigation does not

14   mean that I can use that same thousand acree feet of water to

15   put it in bottles and send it to the Sahara Desert.   I can't

16   do it.   I have to use it for a riparian purpose.   I can sub-

17   stitute one riparian use for another.

18         THE COURT:  Well, you can grow cotton or you can grow

19   wheat or alfalfa.

20         MR. SACHSE:   That's right; they are both riparian

21   uses.

22         THE COURT:  What about this?  Is it your contention

23   that the United States, because of its character and because

24   of this military base, may no longer use water for its lessees

25   to farm and raise stock on this base?

1      MR. SACHSE:  No, sir.

2      THE COURT:  You concede that.

3      MR. SACHSE:  Again, if it please your Honor, I want

4   to correct that.  What the United States can do with that

5   water is one thing.  What kind of decree you can give them to

6   go upstream is another.

7      THE COURT:  All right.  Let's talk about the decree

8   operating upstream.  Do you concede that the United States

9   should have a right to quiet its title to a reasonable amount

10   of water for riparian use in the farming operations of its

11   lessees and for its cattle?

12      MR. SACHSE:  For agricultural purposes.

13      THE COURT:  Yes.

14      MR. SACHSE:  Yes, sir.  The United States is a

15   riparian like anyone else.  Whether it is good business is a

16   question for Congress.  But the United States, like anyone

17   else, can exercise normal riparian use on that land.

18      THE COURT:  But they can't substitute that use --

19      MR. SACHSE:  For a non-riparian use.

20      THE COURT:  -- and bind upstream owners.

21      MR. SACHSE:  That's right.  As long as it's on the

22   land, they can do anything they want with it; but they cannot

23   assert a right which can reach upstream to take water from a

24   riparian use and put it to a non-riparian use.

25      That is our first premise.

1    Our second premise is that the use for municipal

2  purposes -- and we submit that these are municipal purposes;

3  there is no other way to describe it -- we say that it is a

4  municipal use, and that, as a municipal use, it is not a proper

5  exercise of the Government's riparian right.  I might add that

6  the United States itself described it that way in the letter

7  that accompanied or supplements the application for appropria-

8  tion that is now on file.  The Commanding General of the

9  Marine Corps Base described it as being analogous to a munici-

10  pal use.

11    THE COURT:  Mr. Moskovitz, do you have anything to

12  add?

13    MR. MOSKOVITZ:  No, your Honor, I think you summariz-

14  ed the position that we took in our brief, in your opening

15  statement on this question.  That is the position of the State

16  of California.

17    THE COURT:  You say that I took.

18    MR. MOSKOVITZ:  No.  You summarized the position that

19  we took when you opened the discussion of the subject.

20    THE COURT:  Well, do you think that the Government

21  may substitute a military use for an agricultural use?

22    MR. MOSKOVITZ:  We believe that any reasonable use

23  within the watershed of water as it flows naturally may be

24  within the riparian right, depending upon its reasonableness,

25  and the  quantity, on the question of reasonableness, is a

1   fact question.  We don't believe that any particular type of

2   use ought to be excluded.  On the question of municipal use,

3   it is true that the use of the Government is analogous to a

4   municipal use.  But of course so is the use of a resort, if it

5   is large enough.  We don't feel that the use for drinking, for

6   bathing, etc. is, in and of itself, disqualified from coming

7   under a riparian right.

8           THE COURT:  Mr. Grover?

9           MR. GROVER:  I have nothing to add, your Honor.

10          THE COURT:  Mr. Veeder.

11          MR. VEEDER:  I think the State and the United States,

12  Mr. Moskovitz and I, agree completely.  We don't believe that

13  the question of use has any bearing whatever on the question

14  of reasonableness.

15          In regard to municipal use, I think that the question

16  that has been raised by Mr. Sachse and the case that he cites

17  are not in point.  I believe that it would be entirely possible

18  for a city or a municipality, if it owned all the land upon

19  which the city or municipality was situated, to be permitted

20  to use the water for municipal purposes.

21          The question and the point that invariably comes up

22  in these municipality cases is this:  that the lands for which

23  the municipality is claiming water had been severed from the

24  stream and are no longer abutting upon it, and that's the

25  whole proposition, I believe.  It is not pertinent here,

1    because that situation doesn't prevail.  But the municipal

2    cases where they have been permitted to use water for municipal

3    purposes, a part bordered upon a stream and they could use the

4    water for municipal purposes.  If Joe Doaks bought the land

5    five miles away from the stream, obviously he has no riparian

6    right, and obviously the municipality could claim no riparian

7    right for it.

8         THE COURT:  Well, your authority for that is Veeder

9    On Water Rights, or do you have some cases that make that

10   statement?

11        MR. VEEDER:  Well, it might be.  I'll be glad to

12   submit some cases to your Honor.  I have some cases.  This

13   Antioch case --

14        THE COURT:  Well, it sounds logical, but I'd like

15   to --

16        MR. VEEDER:  This Antioch case, your Honor, is the

17   one I was reaching for -- 188 Cal. 451, at 456, 205 Pac. 688

18   (1922), and that is the law in California.

19        MR. SACHSE:  While you are citing 188 California,

20   Antioch v. Williams Irrigation District, in the same citation,

21   at the same page reference that Mr. Veeder has given you,

22   your Honor, the California Supreme Court said:

23        "The fact that the city is situated upon the

24        San Joaquin River is wholly immaterial in the

25        consideration of its rights in this case,"

1 stating that the riparian rights of an abutting landowner "are

2 wholly of a private nature, that a city's right is that of an

3 appropriator.

4          The point that I am making, your Honor, was that if

5 the abutting landowner were the municipality and it owned all

6 the land upon which the municipality were situated, I see no

7 reason why that couldn't be.  I don't believe that Mr. Sachse

8 and I are adverse at all in our views.

9          The distinguishing element, as Mr. Sachse just

10 pointed out, is the fact that there had been a severance and

11 they were no longer abutting upon the stream, and that made

12 the difference.

13          MR. SACHSE:  I have one more case, then, your Honor.

14 This is from the State of Washington.

15          "The City of New Whatcomb is situated on both

16          sides of the creek, the full length of the creek

17          from its source, taking in a part of Lake

18          Whatcomb and its outlet.  Streets and alleys

19          are located on, run across, parallel to and

20          upon the banks and bed of the creek and the

21          City of New Whatcomb is the owner of property

22          on the shores of the lake and in the bed of

23          the creek at its source and is a riparian owner

24          on the lake and creek."

25 Notwithstanding the foregoing facts, the Court enjoined the

1    City from diverting water from the lake or the creek for

2    supplying the municipal requirements of itself and the domestic

3    needs oof its inhabitants.   It is a municipal, public use and

4    must be taken care of by appropriation.

5            THE COURT:   What is the citation of that?

6            MR. SACHSE:   City of New Whatcomb v. Fair Haven Land

7    Company, State of Washington, 64 Pac. (2nd) 735, 737.

8            Now I concede, before somebody starts jumping up and

9    down, that this is not a riparian right that I am going to

10   talk about now, but I believe Mr. Veeder will agree that the

11   rule that applies as to correlative user is exactly the same

12   as between overlying owners and riparian owners in California,

13   the rights as between each other are identical, and the

14   Supreme Court of California, in a whole string of cases, ending

15   up with San Bernardino v. Riverside, has held that water for

16   municipal purposes can only be taken by an overlying land-

17   owner through the medium of appropriation.

18           MR. VEEDER:   May I make one other observation and

19   then I'll be through on the point.

20           I think this question is entirely moot.   I think a

21   military use, as Mr. Moskovitz has recognized and the State of

22   California recognizes, is a use which certainly is part of a

23   riparian right and limited only by reasonableness.

24           Now going back again to the question of the right

25   of a municipality to use riparian water, if they own riparian

1    land there is no reason why, and the cases indicate to me that

2    to the extent of a park bordering upon a riparian stream, the

3    city owning the right, they could certainly use it to the

4    extent but limited to that park or an area where title is in

5    the city.

6         THE COURT:  You were going to submit some additional

7    cases on this analysis that you made.

8         MR. VEEDER:  Yes, I will, your Honor.

9         THE COURT:  Will you do that within the time also?

10        MR. VEEDER:  I will include it in the brief.

11        THE COURT:  Put it in a separate brief.  I have these

12   files broken down by subject-matter.

13        MR. VEEDER:  It will be separate.

14        THE COURT:  It is hard enough to find what I'm

15   looking for now.

16        MR. VEEDER:  There is one concern.  We do not sub-

17   scribe to the argument that this is a municipal use.

18        But I will certainly cite those cases to your Honor.

19        THE COURT:  What about this point about temporary

20   impounding, regulating or spreading riparian water to irrigate

21   the cover, to enrich the soil and to recharge the alluvial

22   basin?

23        MR. VEEDER:  Do you want me to speak on that, your

24   Honor?

25        THE COURT:  I don't have any ideas on that, except

1    this:   What do you do with your sewage at Camp Pendleton?

2              MR. VEEDER:   We are using the sewage and re-using it.

3    We put the sewage affluent into Lake O'Neill, the sewage

4    affluent is turned underground in the subterranean basins, and

5    were it not for that use the irreparable damage we are exper-

6    iencing by Fallbrook's intrusion upon our rights would be

7    greater.

8              THE COURT:   You're not running it out into the ocean,

9    then.

10             MR. VEEDER:   No.   No, we're using it.   The sewage

11   that is used outside the watershed is brought back in.   We have

12   always used all the sewage affluent within the watershed and

13   it is now going underground.

14             I think that it is going to be an important matter in

15   this case, your Honor.   We view the use of the sewage affluent

16   as a supplement which is going to have an adverse and unfortu-

17   nate effect upon us.   There is a point beyond which we cannot

18   use sewage affluent without damaging our basin.   More than that,

19   I think that we are being penalized by husbanding this water.

20   It should not, in our view, delimit or restrict our riparian,

21   appropriative and prescriptive rights.

22             THE COURT:   Of course, it strikes me that if there is

23   a factual point that would be important, it is not existent

24   here.   That is, if you were pumping this sewage into the ocean,

25   there would be a big distinction, then, between the quasi-

1   municipal use where you were depleting your basin, pumping

2   your water out into the ocean.   The very fact that you are

3   putting your affluent, after a settling process, I take it --

4               MR. VEEDER:   That's right.

5               THE COURT:   -- back into the ground, would have some

6   impact on my thinking, at least.

7               MR. VEEDER:   We're trying to husband everything we

8   have there.

9               THE COURT:   Well, maybe I was tired when I read this

10   last one, but I couldn't get much out of this.   I get your

11   contentions, but as far as any law to help me out --

12               MR. VEEDER:   Which is that, your Honor?

13               THE COURT:   This point about putting the water back

14   into the ground to recharge the basin, etc.

15               In other words, what little thinking I could do on

16   that would be this:   Suppose you are overcharging the stream

17   by your alleged riparian use.   While you are overcharging the

18   stream, you are then also depleting your basin, and if you are

19   overcharging the stream then why should you be allowed to

20   replenish your basin?

21               If, on the other hand, your use is a reasonable one

22   and you are not overcharging the stream, but because of the dry

23   country we live in and the small amount of water even your

24   reasonable use results in a depletion of the basin, then you

25   get one color of horse.

1    But if you are overcharging the stream and by so

2  doing you are depleting your basin, then you get a horse of

3  another color.

4    MR. VEEDER:  Your Honor, there is a very important

5  element, if I may step to the map here, on that.

6    THE COURT:  Yes.

7    MR. VEEDER:  The basins from which we are claiming

8  water are entirely within the enclave and no one else parti-

9  cipates in those basins at all.  Those basins extend in no way

10  outside the land of the United States.  They extend up approxi-

11  mately to where De Luz Creek comes into the Santa Margarita

12  River, and then they extend from that point on down to the

13  ocean; and we believe that the case of Rancho Santa Margarita

14  v. Vail, in 11 Cal. (2nd), has established the law of Califor-

15  nia on the point that the ground water, the water in the basin

16  and the surface stream of the Santa Margarita River are one

17  and the same.  I believe that is the law.  Our use of the

18  surface stream and our use of the subterranean basin are

19  identical uses.

20    THE COURT:  All right.  But that sort of begs the

21  question.  There is no doubt but that the Government may do

22  what it wants to do with that water when it reaches you.  You

23  have a stream that may have some water and it may not.  You

24  have a basin underneath which is probably part of the stream.

25  You may do what you want with it.  You could pump it out into

1      the ocean.  But the question is, Can you make certain uses

2      of the water out of your basin, and then charge, as it were,

3      other riparian owners upstream and say that their uses must be

4      limited because of what you have done to your own basin?

5            MR. VEEDER:  Your Honor, in that regard, we believe

6      that the rule of reasonableness applies both to the surface

7      and to the subsurface, and we are limited in making our demands

8      of riparians upstream, whether it be for the surface or sub-

9      surface stream.  In other words, if our pumpage out of the

10     basin is unreasonable, we have no right to make demand up here

11     against other riparians.  So it makes no difference.  Our right

12     is reciprocal, it's correlative, it cannot be unreasonable,

13     whether it is from the ground water or from the surface water.

14     We have no right to make a demand to recharge the basin beyond

15     what is reasonable.

16            THE COURT:  Well, who wants to be heard on this?

17            MR. SACHSE:  Very briefly, your Honor.

18            At the risk of being repetitious, I am going to

19     repeat something I said a moment ago, and that is the very

20     great distinction between the right to use the water and the

21     right to reach upstream and demand that it come down.  Lest

22     you think I am beating this horse to death, that is of tremend-

23     ous importance, because the reach of the United States or that

24     which they can reach upstream and force to come down and if

25     their       rights on any given day do not cover all the water

1   of the river then there is water available above for appro-

2   priation.   That is why this is, constantly and repeatedly,

3   going to be so important, this whole question.

4            Now I want to address myself to Mr. Veeder's brief

5   and call your Honor's attention to an error.   Mr. Veeder cites

6   Seneca Gold Mines v. Great Western Power at page 10 of the

7   first section of his brief.   His language reads:

8            "Contrary to assertions frequently and

9            erroneously made, the California courts long

10           have recognized the fundamental right to impound

11           temporarily and detain waters constituting the

12           yield from riparian rights. . . ."

13  And he cites as his authority the Seneca Gold Mines case.

14           Well, the Seneca Gold Mines case is the leading

15  authority in the State of California that a riparian cannot

16  store water.   Now that's it.   That's what it is.   And Mr.

17  Veeder uses very loosely the words "reasonably," "for a short

18  period of time," "temporarily impound," "temporarily detain,"

19  and apparently by the use of the word "temporary" hopes to

20  take the curse off the Seneca case.

21           I would like to call your Honor's attention to

22  Moore v. California-Oregon Power --

23           THE COURT:   Well, do you claim that the water in

24  this underground basin is being impounded temporarily and

25  detained, etc?

1   MR. SACHSE:  I claim that it is being impounded for

2   long periods of time, seasonally.  But Mr. Veeder seems to

3   contend that this is only a temporary impound.  I certainly

4   want to point out to your Honor --

5   THE COURT:  Does that Seneca case concern a under-

6   ground basin, or does it concern a surface reservoir?

7   MR. SACHSE:  The Seneca case concerns surface

8   storage.  However, --

9   THE COURT:  Well, isn't the rule limited to surface

10  storage?

11  MR. SACHSE:  No, sir.

12  THE COURT:  If the underground basins are part of

13  the stream, we all know that if your underground basins are

14  depleted you have no stream.

15  MR. SACHSE:  "The right to store water, above ground

16  or under ground, is --

17  THE COURT:  Is that what the case says -- above or

18  under?

19  MR. SACHSE:  No, your Honor, I am not citing a

20  case.  I am citing the California Water Code.

21          "The right to store water, either above

22          ground or under ground, is a right to be exer-

23          cised by appropriation; and the right to impound

24          water, even for such a --

25  THE COURT:  If that is what the Code says, the word

1   "store" there must refer to situations where there was no

2   water before.  I don't think it could refer to the natural

3   underground basins under streams.

4            MR. SACHSE:  I think your Honor is mistaken.  I

5   believe that the right to the claim -- put it that way -- of

6   the United States, here, to enrich the basin, to irrigate the

7   native cover, etc., by allowing this water to flow across it,

8   and again I repeat, if they want to reach upstream and permit

9   us to let these what we call floodwaters come down -- we say

10  that they are floodwaters, subject to being trapped by anyone

11  who wants them for storage, surplus floodwaters to be stored

12  and put to beneficial use.  The United States says that they

13  are not surplus floodwaters; they are part of our riparian

14  rights, which we can reach upstream, force to come down, spread

15  over the basin, enrich the/soil and make the grass grow.  We

                                    sub

16  say that is foolishness.  That's not the purpose -- that is,

17  to impress this water into the soil underneath.  All they are

18  doing by doing it is increasing, perhaps, the otherwise normal

19  safe yield of an underground basin.  That underground basin,

20  with the water running down across it in the state of nature,

21  would give them a safe annual yield of so many acre feet.

22  How many acre feet I don't know.  The engineers can figure it

23  out.  But by demanding more and more water and spreading it

24  out over the top, they can take more water out.

25            We contend that they cannot reach upstream and

1    demand that this water come down for that purpose.  We contend

2    that that is an improper riparian use.  Back to the same

3    argument as this:  "The storage of water, whether above ground

4    or below ground, is an improper riparian use."

5            I would like to hear the State's comments on that.

6            MR. VEEDER:  I will be glad to concede, and I will

7    be glad to stipulate, that we have no right to seasonal

8    storage.

9            I think that what Mr. Sachse has touched upon, though,

10   in regard to our subterranean basins and the use to which we

11   are applying the water, is a factual question, which can only

12   be resolved by facts, and if we are truly storing water

13   seasonally, in the term that he has used, that is beyond the

14   scope of the riparian right.  So that I believe that it is a

15   question of fact, and we think that certainly -- and the cases,

16   we believe, will support us -- that you can divert the water

17   into ditches and into a reservoir and temporarily, very

18   temporarily store it.  You can't carry it from one season to

19   the next.

20           Now we have no quarrel, I don't believe.  It is a

21   factual question that has to be tried out factually, in regard

22   to our basins.

23           MR. MOSKOVITZ:  Your Honor, it seems to me that the

24   real question is, How do you store?  Is this storage natural,

25   or is it artificial?

             Now the rule is that artificial storage, whether it

1  is above ground or underground, is an appropriation.  Natural

2  storage is not.

3         Suppose you had a stream which widened out into a

4  large basin like a lake and the water was naturally stored

5  there -- as it flowed in it stayed there because there was

6  lots of room.  Now someone who lived along the banks of that

7  widened portion of the stream could certainly take the water

8  under his riparian right.  The fact that it was stored

9  naturally wouldn't affect it.  But if he puts a dam in front

10  of this lake to raise it, to the extent that he raises it

11  that's artificial storage and that's an appropriation.  If he

12  goes underground to get water that seeps in naturally under-

13  ground, this is not the exercise of an appropriative right.

14  But if measures are taken to spread it out where it wouldn't

15  go naturally so that more water sinks in, so that you have a

16  wider area where it would sink in or a place where the water

17  would not come naturally, that is the exercise of an appropria-

18  tion.

19         MR. VEEDER:  That is a question of fact.

20         THE COURT:  Well, suppose you have this twenty-two

21  miles that the Government has on the stream, and let's assume

22  that the water level has been a certain figure.  Let's assume,

23  for argument, that the Government makes a reasonable riparian

24  use of water, and in so doing, through a period of dry years,

25  the water level in this basin drops all the way along.  Why

1    wouldn't it be perfectly proper for the Government to have the

2    floodwaters flow over that twenty-two miles of gravel and sand

3    and replenish that underground basin to the level at which it

4    formerly was?

5        MR. MOSKOVITZ:  Your Honor, there would be nothing

6    wrong with it.  It would be within their riparian right, if it

7    were the way the water would flow naturally.  You see, if the

8    water, as it naturally flowed down, sank into the underground,

9    that would be perfectly all right.  What is not all right is

10   for the Government to take the water from the area where it

11   would flow naturally and seep naturally and spread it somewhere

12   else  where it wouldn't be natural, because that would be

13   artificial storage of water and that would be an appropriation.

14       THE COURT:  And this theory that you advance is

15   supported by the Code sections?

16       MR. MOSKOVITZ:  Yes, your Honor; Water Code Section,

17   I think it is, 1242.

18       MR. VEEDER:  Again, we concede that proposition,

19   your Honor.  We concede that.  We are not claiming anything --

20       THE COURT:  When you talk about spreading water,

21   you're not talking about spreading it somewhere besides the

22   bed of the stream?

23       MR. VEEDER:  Your Honor, in regard to the diversion

24   of water from the Santa Margarita River to irrigate the

25   vegetative cover within the enclave, that is certainly a

1    riparian use, and that is what we are claiming.

2            THE COURT:  You claim --

3            MR. VEEDER:  I don't follow this at all.

4            THE COURT:  You claim that therefore, in addition to

5    irrigating the land you are entitled to irrigate, the water

6    seeps down and replenishes the underground basin.

7            MR. VEEDER:  That's right.

8            THE COURT:  Are you also talking about spreading

9    water in the stream bed over your twenty-two miles of --

10           MR. VEEDER:  When we divert water out upon and

11   across the land, it's undoubtedly true that the water does go

12   underground; but in the process it is irrigating, which is

13   truly a riparian right, and waters are being controlled and

14   distributed in that manner.

15           THE COURT:  But you were talking, when we had our

16   discussion of settlement, about the floodwaters coming down,

17   running through this 22 miles of stream bed and replenishing

18   your underground stream, and that that was a riparian right

19   that you had.

20           MR. VEEDER:  It is.  But we're talking about two

21   different things.  We have what we call the O'Neill ditch.

22   We divert water from the surface of the Santa Margarita River

23   and we spread it out across the enclave, and that is certainly

24   a riparian right.  Certainly you can use water in this state

25   for irrigation purposes.

1 Now when the floodwaters come down, it is true that

2 we say that those waters spread out and seep underground.  But

3 there is certainly nothing wrong with using water in that

4 manner, always going back to the proposition that it is a

5 reasonable riparian use, and, as I say, that is a factual

6 question.

7  THE COURT:  How do you spread these floodwaters out?

8  MR. VEEDER:  Well, we have two means of doing that.

9 We have the irrigation system that passes through the Rancho

10 Santa Margarita, when we purchased the place, and water is

11 diverted and we claim a riparian right for that water to divert

12 it out of the River and out across the land.  It is true that

13 some of it flows to Lake O'Neill, but it is not stored

14 seasonally.

15  Then there is the period when there is a momentary

16 high runoff.  We see that that water spreads out and irrigates

17 the surface of the land, still a riparian right, and it's

18 true that it goes underground.  But it is still used as a

19 riparian right to irrigate and enrich the surface, and that is

20 the first use that is made of it.

21  THE COURT:  You use floodwaters for irrigation.  I

22 can't follow you on that.

23  MR. VEEDER:  Well, the water can be diverted out of

24 the stream.  The fact that it is a momentary high water does

25 not mean that it can't be used for irrigation the same as the

1     low water.

2          MR. SACHSE:  When the ground is soaked already with

3     rain.

4          THE COURT:  You mean that in the wintertime, when

5     you ordinarily have your floods, you're irrigating your ground

6     there at Pendleton?

7          MR. VEEDER:  It is a question of fact whether it is

8     a beneficial use, your Honor.  But we say this, let's try out

9     the facts and see.  I would be very reluctant to attempt, on

10    a question of law, to resolve it on the basis of statements

11    that are being made by Counsel.

12          I simply say that we are claiming that this is a

13    riparian use:  to spread the water, to enrich the land, to

14    irrigate the grass coverage, all coming within the riparian

15    right and the riparian demand.  It is true that it does go

16    underground, but I submit that it goes underground only after

17    it has been applied to a beneficial use.  And if the facts are

18    different when we try it out, why there you are.

19          MR. MOSKOVITZ:  Your Honor, I agree that, ultimately,

20    you have a factual question as to whether the spreading of the

21    water on the soil during the height of the flood is a reason-

22    able use of water under the riparian right.  If that is the

23    purpose, and if it is reasonable, then the consequence would

24    not be illegal.  It seems to me that, from the situation that

25    Mr. Veeder posed, during the winter season, the real purpose

1   would be to get the water underground and not to irrigate the

2   soil, and that would be an appropriation.

3          I want to comment briefly on an authority that Mr.

4   Veeder cited on page 9 of his brief on this subject -- the

5   case of Fisher v. Seide, 137 Cal. 139.  Apparently, this case

6   was cited as authority that the United States could store

7   water as a riparian.       I read the case, and the facts, I

8   don't think, help Mr. Veeder at all.   There a downstream

9   riparian was the plaintiff and sued the upstream riparian,

10  alleging that damage was being caused by certain activities by

11  the upstream landowner.   Those activities included the felling

12  of trees and leaving them in the stream, and also, apparently,

13  building some dams.   Now the court held that the downstream

14  owner hadn't proved that he had any cause of action, because

15  he hadn't proved that he had any damage.   That was all that

16  the case held:   no damage, therefore no cause of action.   And

17  of course, in that case there's no language, no holding, no

18  discussion at all about what the right of a riparian is to

19  store water when he is being challenged by somebody who wants

20  to appropriate it before he does.

21         So the one case that Mr. Veeder cited doesn't seem to

22  support the contention that storage of water is proper under

23  a riparian right.

24         MR. VEEDER:  I think that you will observe that I

25  didn't put that in the footnote.  I simply called your Honor's

1   attention to it in connection with that part of the discussion,

2   because I thought it would be a case of interest to your Honor.

3          We are simply saying, and we are repeating, there

4   has never been, and there is not now, that we can store water

5   cyclically.  I think I have stipulated to that innumerable

6   times, and I reiterate that it is not a proper riparian use to

7   store cyclically.  So what is the difficulty?  There is a

8   question of fact that we are talking about -- spreading the

9   water and getting it underground.  But I think that has to be

10  tried out.

11         THE COURT:  Mr. Grover.

12         MR. GROVER:  I have two points on this, briefly.  I

13  don't think anyone has mentioned that in the Moore case the

14  Court referred to what it called "periodic storage."  The

15  storage there was over less than a 24-hour period.  The case

16  is very instructive and it's very recent.  The Court pointed

17  out that, for hydroelectric power purposes, storage was

18  proper.  But it isn't really storage that the riparian is

19  undertaking to do there; it's impounding the water in order to

20  get a head for power.

21         THE COURT:  To what case are you referring?

22         MR. GROVER:  The Moore case cited by Mr. Sachse a

23  moment ago, in 22 Cal. (2nd).

24         MR. SACHSE:  Moore v. California-Oregon Power,

25  22 Cal. (2nd) 725.

1    MR. GROVER:  The Court conceded that, for hydro-

2  electric power purposes, the power company could store or

3  impound water in order to get enough head to generate power,

4  but to generate power immediately.  But the Court held that

5  they did not have a riparian right to hold it for even a few

6  hours to generate power at some later time; and the Court, in

7  discussing seasonal storage, said that this was "periodic

8  storage" and just as much within the ban.  In fact, they

9  pointed out that seasonal storage usually doesn't hurt other

10  people as much as periodic storage, because in the case of

11  seasonal storage you usually store it in the wet time of the

12  year, or cyclic storage when you are storing in the wet time

13  of year when you are trying to get water to use during the

14  dry time of year.  But here every day the power company was

15  storing, even in dry periods, for a few hours and then letting

16  it out a few hours later.

17      It seems to me that the time element is the essence

18  of it.  To store means to hold for another time.

19      Now the project which the Government proposed at

20  the first trial was an artificial dam -- Mr. Henderson's

21  project -- to hold the water back so that it would go into the

22  basin; and if my analysis is correct, it is not within the

23  riparian right because the water would not be in the basin for

24  use by the plaintiff at the time that they would have it under

25  the Henderson project.  Naturally, it would not have been there

1   at the same time.  It would have gone into the ocean.  It was

2   there, it passed over the lands at one moment, but it was not

3   there at a later time, later in the year, as it would have been

4   if they held the water back, drifted it slowly over the basin

5   so that it would be there at another time, much more than

6   hours.

7        So seasonal storage isn't the test.  It is periodic

8   storage for any later time that the Court emphasizes in the

9   Moore case.

10        Now as far as irrigating the vegetative cover of the

11  basin is concerned, it seems to me that the United States does,

12  in a period when it is not raining, anyway, have a right to

13  irrigate that, if there is water enough under its apportion-

14  ment of available riparian water, and if that's all their

15  demand is then the fact that they get an accidental benefit by

16  its sinking in and they are the only ones who have the benefit

17  of returned flow or retained flow in the ground at that time

18  that's just an advantage of their being last on the stream.

19  But if, over and above what it takes to irrigate the cover,

20  they want to have more sink in, then they want it solely to

21  use it at a later time; and the essence of the Moore case is

22  that that time element is what determines whether or not it is

23  permissible storage.

24        THE COURT:  Were you impressed by Mr. Moskovitz'

25  distinction between artificial and natural storage?

1      MR. GROVER: Yes. Well, --

2      THE COURT: I was.

3      MR. GROVER: I think that the riparian right is a

4  natural right.  It is the right you have as a riparian to the

5  natural advantage of your position on the stream or your

6  position over the basin.

7      THE COURT: Well, the stream lays over a basin, it

8  is part and parcel of the basin, and if the basin starts to

9  sink in water level and you get the intrusion of salts, etc.,

10  why isn't it the natural thing, rather than storage, to have

11  the basin built up to its natural level?

12      MR. GROVER: But it is not the natural level of the

13  basin, your Honor, if you do it artificially, and it seems to

14  me that the Moore case says that you are entitled to it at the

15  natural time -- at the natural time, not at another time.

16  If you can't use it when it is there naturally, then you're

17  not entitled to it at an unnatural time.

18      Now there was a company here, I believe, in San

19  Diego that used to buy reservoir sites as an investment, the

20  way some people buy diamonds.  They figure, "Well, some day

21  they are going to have to use that reservoir site as this

22  country develops."  It was the natural advantage of that piece

23  of ground that it could hold water if a dam were put over it.

24      A basin is the same thing.  It has a certain natural

25  amount of water that it gets.  It has an increased advantage

1   if you put a dam upstream and let the water trickle over

2   slowly; you get an unnatural benefit from the basin, just as

3   you get an unnatural benefit out of a surface reservoir when

4   you put a dam in front of it.

5          But it is the time element that is important -- the

6   unnatural timing.  That is the key, I think, to the Moorec

7   case.

8          MR. VEEDER:  How can we say more, your Honor, than

9   to say that we claim no riparian right beyond that recognized

10  by California law, and we will introduce facts to show how

11  we have managed the water, and that's all we are saying about

12  seasonal storage.

13         MR. GROVER:  I was merely addressing this to the

14  Henderson project.  It may be that the United States does not

15  plan to store it.  That was the project that Judge Yankwich

16  discussed in his findings.

17         MR. VEEDER:  I think it is interesting, but --

18         THE COURT:  All right, where do we go from here?

19  You'll have to file more briefs on some of these problems.  I

20  suppose I'll have to make some decision on some of these

21  matters, at least in principle.  When can we meet and see

22  what stipulations can be arrived at, what facts can be

23  -agreed, etc?

24         MR. SACHSE:  Your Honor, I would like to just offer

25  a suggestion.  Mr. Veeder and I discussed briefly, during one

1   of the recesses, and I think it offers a little hope, at

2   least for all of us represented here -- I don't know how it

3   will affect all the little parties.

4          The original pre-trial order of Judge Yankwich has

5   already been commented on, I believe, by all the so-called

6   major parties.  It's there.  It's a piece of paper that all

7   of us can look at and we'll all see exactly the same words

8   and it will be the same to all of us.  Possibly if we took

9   that as a starter, without even coming back and taking your

10  time, and checked with each other as to what amendments or

11  corrections have to be made, first of all by reason of the

12  lapse of time -- I know that in the case of Fallbrook there

13  are a great many things that have changed, even acreage etc.

14  has changed -- maybe we can make those notes.  Mr. Veeder and

15  I can agree to do it between ourselves.  Maybe all of us

16  could do it, and get this thing a little closer to a pre-trial

17  order the next time we meet with you.

18         MR. VEEDER:  I agree.  I think we have the frame-

19  work of a pre-trial  order already.  Mr. Sachse and I are

20  going to exchange statements as to factual changes concerning

21  which we might get stipulations.  I think that is a good idea.

22         THE COURT:  Mr. Moskovitz, can you work on that

23  basis?

24         MR. MOSKOVITZ:  Yes, that's agreeable, your Honor.

25         THE COURT:  Mr. Stahlman?

1    MR. STAHLMAN:  Yes, your Honor.

2    THE COURT:  Mr. Grover?

3    MR. GROVER:  Yes, your Honor.

4    THE COURT:  Can we fix some date to bring that in and

5 see what you've done with it and generally find out how much

6 work you've done and see what help the Court can be on problems

7 that come up?

8    MR. VEEDER:  That can proceed right along with the

9 briefs, can't it, your Honor?  There is no reason to wait for

10 ultimate rulings.  We can start now, can't we?

11    THE COURT:  Oh, you can proceed right now.  I'm

12 talking about a date to come back in here.

13    MR. VEEDER:  Oh, I see.

14    THE COURT:  I understand that you're going to be

15 trying another case for awhile.  When will you be available?

16    MR. VEEDER:  I'll be available, I think, any time in

17 the last part of November and all through December.

18    THE COURT:  How about December 3rd?

19    MR. VEEDER:  Excellent.

20    MR. MOSKOVITZ:  What day is that?

21    THE COURT:  Tuesday.

22    MR. MOSKOVITZ:  That's fine.

23    THE COURT:  Mr. Veeder, I'll give the Government the
                                    the
24 responsibility of contacting/various litigants who have

25 appeared by Counsel, the major parties, in connection with this

1    pre-trial stipulation.  Get their suggested changes in the

2    physical facts since the first one.  You'll be responsible

3    eventually for the preparation of the order.

4            MR. VEEDER:  We will undertake that, your Honor.

5            THE COURT:  You'll be the clearing house for all

6    this information.  Will you be prepared to have some sort of

7    draft for me on December 3rd?

8            MR. VEEDER:  Yes, your Honor.  Could we ask that all

9    Counsel, though, write to us as rapidly as possible their

10   suggestions, because it's quite a mechanical undertaking.

11           THE COURT:  Yes, it is.

12           MR. SACHSE:  Is there any reason why we have to

13   cross-serve these, if Mr. Veeder is the clearing house?  I

14   care very little, for instance, about the Vail property.

15           THE COURT:  I don't see why, in this work of getting

16   up a pre-trial order, everybody has to be served with that.

17   Eventually, we'll have to do something with the proposed

18   order.  But this would be like Counsel working in their

19   chambers -- any way that's convenient to get the facts to Mr.

20   Veeder's office or to Mr. Burby's and to ask for what you

21   need and to exchange your information.  I don't see any need

22   to serve that on all the parties, because when we finally get

23   up a draft of some kind it's still no different than asking

24   some counsel in a simple case, "Prepare a draft of a pre-trial

25   stipulation and we'll look it over," and then at the hearing

1    it's either settled or it's proposed and then mailed out to

2    everybody to shoot at.

3        MR. VEEDER:  I think that a preliminary draft should

4    be submitted to everyone for review.  But that preliminary

5    draft would be the December 3rd draft, as I see it.

6        THE COURT:  I think it should be submitted to every-

7    body sometime before December 3rd, if possible, so that when

8    we got here on December 3rd we'd know what we're talking

9    about.

10       MR. VEEDER:  I thought you were speaking of the

11    smaller parties, your Honor.

12       THE COURT:  Oh, no.

13       MR. VEEDER:  All right.

14       THE COURT:  I think what we send out to them will

15    have to happen after December 3rd.

16       MR. VEEDER:  That's the point I make, your Honor.

17    But we will exchange with everyone the points that have been

18    received and prepared.

19       Excuse me, Mr. Swing.

20       MR. SWING:  I was just trying to get a pre-date

21    ahead of December 3rd.  I understand that on December 3rd we

22    are to come in here with something pretty well charted and

23    pretty much definite on the situation, and those who have any

24    particular exceptions or those to which a majority have

25    already agreed would come here and thresh it out before your

388

1   Honor.  But I think at least ten days before the 3rd of

2   December there should be a draft of this submitted to the

3   "principal parties"-- may I use that expression -- so that

4   that could be agreed to ahead of time, if possible, as far as

5   the principal parties are concerned.

6            THE COURT:  Well, suppose we fix some dates.  Now

7   this is the 21st.  Suppose that we provide that by at least

8   November 8 everybody get their suggested material in to Mr.

9   Burby's office?

10            MR. VEEDER:  Well, you can send it to -- I would

11   think, your Honor, my own recommendation is, that it could

12   probably clear through Major Bowen's office at Camp Pendleton

13   as easily.  It suits me to have it go through Mr. Burby's

14   office, but I think Major Bowen's office is most centrally

15   located from the standpoint of reproducing this document, and

16   Colonel Robertson is in contact with me anyhow.

17            THE COURT:  All right, let's try this.  On November

18   8 you get your material to Major Bowen of changes, supplements,

19   additions, modifications, corrections, etc.  Then can we get a

20   draft out by two weeks later -- November 22?

21            MR. VEEDER:  That is possible, your Honor, yes.

22            THE COURT:  That's a Friday, November 22nd.  Now

23   let's have a draft by that date even if we have to apologize

24   for it.  Let's have something that we can start to look over

25   and tear apart.

1    MR. VEEDER:  That will be done.

2    THE COURT:  Or that we can agree to.  The Government

3  will duplicate it and send it out to all Counsel.  We don't

4  need to worry about the small people yet, because when we

5  finally get a proposal where you gentlemen can agree to some-

6  thing we will give other people a chance to shoot at it.

7    So a draft by the 22nd, and then a hearing at 10:00

8  o'clock on December 3rd.

9    MR. VEEDER:  That's fine.

10    THE COURT:  That will give me time to study further

11  these problems.  It will give me also a chance to see your

12  briefs on these new theories you've evolved here -- I don't

13  know when -- that you want to present.

14    MR. VEEDER:  At about ten o'clock this morning,

15  your Honor.

16    MR. SWING:  There is one other matter, which has

17  been hanging in suspended animation.  Mr. Warner, representing

18  the Attorney-General, appearing before Judge Yankwich at the

19  time that Judge Yankwich made the order transferring it here,

20  announced, just as Mr. Veeder announced here at the last

21  meeting, that the Government wanted to make a motion or wanted

22  to serve or wanted to bring in X number of new defendants in

23  this case.  That's quite a long while ago that the Department

24  announced that, and now Mr. Veeder has announced it.  There

25  has no time yet been suggested.  May I ask Mr. Veeder as to

1    when that will be ready. You are looking forward to a trial

2    being set in January sometime, if possible, to get this case

3    rolling.

4              What date have you in mind, Mr. Veeder for what I

5    assume you did before -- make a motion to the Court for the

6    bringing in of new defendants?

7              MR. VEEDER:   I think this, your Honor, that the

8    United States now has all the parties that it intends to bring

9    into the case itemized and listed.  We will file with your

10   Honor a motion for the purpose of having that accomplished

11   and proceed in accordance with Rule 21 of the Federal Rules of

12   Civil Procedure.  We feel that the joinder of these parties

13   is essential for the ultimate disposition of this matter, but

14   that from the standpoint of trying out the question of Fall-

15   brook's relationship and Santa Margarita Mutual's relationship

16   in the area where we have called it the critical area we can

17   have an injunction proceeding quite shortly for the purpose of

18   testing out their rights further to encroach upon ours.  Now

19   that would be a pendente lite proceeding.  We believe that the

20   ultimate decision in the quiet title suit will come later.  I

21   think that is the only way that it can be handled.

22             But in regard to these people who are presently

23   diverting water above us, we feel that we would like to try

24   those questions out as soon as we can against these appropria-

25   tors.

1    Now as to the ultimate disposition of it, I think

2 your Honor will agree that the procedure to follow would be

3 to get a temporary order regulating the River and the ultimate

4 disposition of all these, there'll probably be, three thousand

5 defendants, which would take more time than --

6        THE COURT:  Are you talking about three thousand more

7 defendants?

8        MR. VEEDER:  Well, your Honor, there are the whole

9 group that will be in this category.  There are about 1700

10 changes in names of the parties originally served.  Now those

11 parties are going to have to be dropped, because they have sold

12 their property, they've changed their interests.  We have to

13 bring in new parties who now have the interests that those

14 people had.  We will file motions for that purpose.

15        MR. SWING:  When?  That's what I'm trying to find

16 out.

17        MR. VEEDER:  When we get to it, Mr. Swing.

18        THE COURT:  Now that's 1700.  Then what?

19        MR. VEEDER:  Then when we get the final group

20 pullel  together -- and we have the list here, we will proceed

21 and file a motion with your Honor and we'll proceed to serve

22 those who need to be brought in.

23        THE COURT:  How many will that be?  Do you know yet?

24        MR. VEEDER:  It will be around 3,000, your Honor.

25        THE COURT:  Three thousand more?

1        MR. VEEDER:  Not more in addition to the 1700.  That

2   3600 or 3500, whatever it is, includes all the 1700 parties.

3        THE COURT:  These are in addition to the people you

4   have already served in this proceeding.

5        THE COURT:  No, your Honor, because 1700 of those

6   people have already transferred their interests and are out of

7   the case entirely.  The figure I gave you embraces every party

8   that it has been decided needs to be brought into the case.

9        THE COURT:  As to how many people are you going to

10  dismiss?

11       MR. VEEDER:  About 1700.

12       THE COURT:  Well, now, I don't mean dismissal as to

13  people who no longer own property.  I thought you were going

14  to dismiss as to some people who, say, are interested only in

15  percolating waters.

16       MR. VEEDER:  Now if that's the case, and we have

17  distributed these disclaimers to anyone who wants to get out

18  of the case.  We're certainly glad to see them go.

19       MR. SACHSE:  How about that?  You've never given me

20  a disclaimer yet.  You took it away.

21       MR. VEEDER:  I gave it to Mr. Swing and these other

22  gentlemen, and I haven't heard from them on it.  We will know

23  when we hear from them on it.

24       MR. SWING:  I think your Honor was honored with a

25  copy of this.  I looked at it and more is hidden under the

1    shell than a rubber pea.   There is a lot of stuff in that

2    so-called "disclaimer" that I would hesitate to ask a client

3    of mine to sign, one of your new defendants, and I do not

4    assume that the so-called "disclaimer" is the only way to get

5    these people out, Mr. Veeder.   Is there any other way?

6          MR. VEEDER:   My suggestion, at the time that I gave

7    you the form, Mr. Swing, is that if you don't like it by all

8    means submit me one that you do like.

9          THE COURT:   Well, aren't you in position, from the

10   investigation you've made and the facts that you have up at

11   this office, to determine if there are certain people  whose

12   rights are only to percolating water, where you can safely

13   dismiss against them?

14         MR. VEEDER:   No, your Honor, we are in this position

15   in that regard.   I have asked the engineers to go over the

16   whole area and to give us a list of names that can be dis-

17   missed.   In the whole group, there are about sixty who, they

18   have determined, could have no possible claim.   Those will be

19   dismissed.   And there is this 1700 where the changes have been

20   made.   The balance, based upon the decision of the Ninth

21   Circuit, we believe are essential parties to the cause.   Now

22   if someone will come along and say that these parties do not

23   need to be in and give us reasons, we will be glad to drop

24   them out.

25         I would like to point this out, though, your Honor.

1    It has always been our view in this kind and type of litiga-

2    tion that it is not for the National Government or for any

3    plaintiff to decide whether a man has a claim or not. If he

4    doesn't have a claim, he can say no. But I would be loathe

5    to say, "I don't believe you have any claim. Therefore, we

6    won't bring you into the litigation." It's a whole lot

7    better, in our view, to serve that man with the Complaint. If

8    he has no claim, let him say so. But the day that we decide

9    that this man has a claim and this one doesn't, then we're

10   in trouble. And I think Judge Fee's opinion is very explicit

11   on it; he says that the only way to try these cases is to

12   have everybody before the Court.

13        THE COURT:  Do you expect to be able to complete

14   these briefs, to work on this pre-trial stipulation, to bring

15   in these parties, and to take whatever proceedings are needed

16   to take care of these little people, maybe appoint a Master to

17   take testimony, all by the first of the year?

18        MR. VEEDER:  I don't believe we can by the first of

19   the year do all these things. But I meant that there is no

20   reason, in our view, even if all the details in regard to the

21   quiet title proceeding have not been completed, why we cannot

22   go ahead with the pendente lite proceeding and test out

23   Fallbrook's and Santa Margarita's rights.

24        THE COURT:  Well, have you decided whether you want

25   to proceed as to bringing in these new parties ex parte, under

     Rule 21?

1      MR. VEEDER:  I had a motion prepared under that

2  Rule, and that would be the one under which we proceed.

3      THE COURT:  Well, what do you do?  Do you move the

4  Court ex parte to add some parties?

5      MR. VEEDER:  That's right.

6      THE COURT:  You can do that at any time.

7      MR. VEEDER:  Yes.

8      THE COURT:  You can bring it into my office.

9      MR. VEEDER:  Yes, we intend to do that, your Honor.'

10  In fact, as of just this afternoon I received the full list

11  of names to be joined.

12      THE COURT:  Well, let's fix a date for that.  When

13  will you submit this ex parte motion to add parties?

14      MR. VEEDER:  Monday.

15      THE COURT:  You will submit that Monday.

16      MR. VEEDER:  Yes.

17      THE COURT:  I may be in Los Angeles or I may be

18  here.  But you will submit it, wherever I am.

19      MR. VEEDER:  I will have Mr. Burby get it to you.

20      THE COURT:  All right.

21      Now would you serve these people, these new

22  defendants with process at the same time that you serve some of

23  them with an order to show cause on an injunction pendente

24  lite?

25      MR. VEEDER:  My own view, your Honor, in regard to

1    the pendente lite proceeding, with minor exceptions those

2    people are already served and are already before this Court.

3           THE COURT:  When would you propose to make your

4    filings for that and to --

5           MR. VEEDER:  For the pendente lite proceeding?  We

6    would like very much to get that started in January or

7    February.

8           THE COURT:  Can't you do that earlier?

9           MR. VEEDER:  I doubt it, your Honor.

10           THE COURT:  You're the man who has been talking

11    about going to trial, here.

12           MR. VEEDER:  Well, as to the pendente lite pro-

13    ceeding, your Honor suggested January, and that made sense to

14    me.

15           THE COURT:  I didn't say -- for January?  I said

16    we would try to set some target date for the trial of this

17    case.

18           MR. VEEDER:  I think that at that pendente lite

19    proceeding, from the standpoint of the National Government,

20    we will put in our case in chief almost entirely.

21           THE COURT:  You mean you're going to bring a

22    proceeding pendente lite against Fallbrook and Santa Margarita

23    Mutual as well?

24           MR. VEEDER:  Well, I think this, your Honor, that

25    there is a crying need immediately above our enclave for a

397

1    proceeding to maintain the status quo until the overall case

2    is tried.

3          THE COURT:   I follow you on that.   But I don't follow

4    you if what you're talking about is to bring in pendente lite

5    on a proceeding for a temporary injunction Fallbrook and

6    Santa Margarita Mutual.   You talk as if you're going to try

7    your case in this injunction proceeding.

8          MR. VEEDER:   Well, I think that as against Fallbrook,

9    Santa Margarita Mutual, Sawday and a great many others that

10   when we get through with our pendente lite proceeding there

11   will be not much doubt as to their status in regard to our

12   enclave.

13         THE COURT:   Well, what good does that do you?   That's

14   an interlocutory thing.   Suppose you get that injunction.   It's

15   an interlocutory injunction pending the trial of this action.

16         MR. VEEDER:   I think it would be appealable, your

17   Honor.

18         THE COURT:   It might be appealable.   What would you

19   do then?

20         MR. VEEDER:   I would have no desire to appeal it,

21   your Honor -- I hope; only if we lost it, your Honor.

22         THE COURT:   Well, what are you trying to do --

23   shortcut a trial on the merits?

24         MR. VEEDER:   No, I'm not trying to shortcut a trial

25   on the merits.   But I do believe that there are conditions

1   growing up very rapidly above the enclave where we are being

2   irreparably damaged by Fallbrook's diversion, by Sawday's

3   diversion, by Quary's diversion, by many, many other diversions

4   that are taking place up there, and we believe that it is not

5   desirable to delay any longer in regard to those.  Now that

6   kind of proceeding **

7           THE COURT:  I follow you.  But I don't follow you on

8   this talk about the case being tried on this application for

9   a pendente lite injunction.

10          MR. VEEDER:  Only to the extent of irreparable

11  damage, of course, your Honor.  We couldn't get a quiet title

12  decree on that basis.  But as against these people who are

13  presently invading our rights, as distinguished from the

14  watershed as a whole where it will seek to quiet title against

15  everyone -- I think that is the main case, and I would assume

16  that your Honor would want a Master to hear that.  I don't

17  know.  But in regard to these twenty, maybe twenty-five

18  people that would be one kind and type of proceeding.

19          THE COURT:  That would be in this lower area.

20          MR. VEEDER:  That's correct, your Honor.  I can show

21  you from the map here.  We call this the critical area, your

22  Honor.  We start right through here, come around here.  This

23  area here, since we started the proceeding, has virtually

24  exploded from the standpoint of people diverting and using

25  water.  This area through here, while we believe are important

1    to us in an ultimate adjudication and resolution of the issues,

2    we see no immediate need for injunctive process.  We do feel

3    that there is an immediate need for injunctive process pendente

4    lite during the time when the main case is being tried, and on

5    that basis I think that this Court could proceed, and indeed

6    I think that is the usual procedure.

7         THE COURT:  Well, on this kind of proceeding, then,

8    you would contemplate that we would try out early next year

9    this injunctive proceeding, and undoubtedly it would be

10    appealed one way or the other, and therefore the case as to

11    the rest of this area would be tried out two or three years

12    from now after the Circuit had ruled on the injunction.

13         MR. VEEDER:  I certainly hope not.  But I do think

14    that there must be regulation up here during the period, when

15    this case is being tried out.

16         THE COURT:  Well, that may be.  But I'm concerned

17    about the extent to which these people's titles are tied up

18    with this litigation, and when you file a lis pendens, which

19    I take it you're going to do --

20         MR. VEEDER:  We will.

21         THE COURT:  -- that titles will be tied up further.

22         MR. VEEDER:  That's right.

23         THE COURT:  They'll be really tied up then.  But I

24    don't know any other way you can do in a quiet title suit

25    except to file a lis pendens.

1      MR. VEEDER:  You see, we have not previously filed a
2  lis pendens.  We will file a lis pendens now.  To this 1700
3  people we have been talking about it would have made no difference
4  if we had a lis pendens.  But if you recall, your Honor, there
5  was some turmoil about this litigation and I didn't feel justi-
6  fied at that time in filing a notice of lis pendens.  But I
7  think we should do it now.  And the procedure that I have just
8  outlined is the one that I would like to see adhered to.  The
9  matter of bringing in and serving these parties is a big one,
10  but we have to get it under way.

11      THE COURT:  Well, we'll have this on for discussion
12  on December 3rd.  I don't know that I can ask you to do much
13  more than what you're going to do, with the briefing, and with
14  the work on this pre-trial draft, etc.

15      MR. STAHLMAN:  One other thing, your Honor.  Concern-
16  ing the stipulation that was entered into with relation to
17  entering into immediate possession of these small properties,
18  this matter is up now, I think, on October 21, the last day of
19  this stipulation.  I feel that that matter should remain in
20  effect.  There is no water available to Fallbrook, there is
21  certainly no need for this dam, and there is no need to take
22  this property.

23      THE COURT:  Is Fallbrook willing to forego any further
24  proceedings on this dam?  It seems to me that you can't speed
25  things up by going ahead on that end of it.  You have to dispose

1    of this and find out if you have any water first.

2         MR. SACHSE:  With all due respect, your Honor, we are

3    not willing voluntarily to forego any further proceedings.  We

4    have voluntarily stopped proceedings in the Superior Court in

5    this County.  We voluntarily stipulated to the interruption in

6    the proceedings before the State Water Rights Board.  We did

7    so, not necessarily at your Honor's request, but because repre-

8    sentations from the United States were such that we believed,

9    in good faith, that there would be a proposition made of some

10   kind that might offer a way to wrap this case up without the

11   terrific expense, heartache, bitterness and everything else

12   that is involved in litigation.  There was no such offer.

13         I am directed by my board of directors to advise the

14   Court that, in accordance with your instructions and in accord-

15   ance with the laws of this State as we understand them to be,

16   we are going to proceed to self-help under the laws of

17   California.

18         THE COURT:  Proceed to what?

19         MR. SACHSE:  To self-help, under the laws of Califor-

20   nia.  We are going to go ahead and attempt to acquire the land

21   for this dam and reservoir and hope to get a permit from the

22   State of California to take the water.  We are going to go

23   ahead and try to borrow money to build the dam.  And if, after

24   all ends, your Honor's judgment is such that there is not a

25   single drop of water that is left behind, then it will be a

1    monument to the stupidity of the board.  But they are going to

2    try.  They are in desperate straits, and they are not volun-

3    tarily consenting to any further continuances.

4              THE COURT:  How can you borrow money, when your

5    whole right to water is in litigation?

6              MR. SACHSE:  I will submit that we have so far

7    succeeded in acquiring over seventy per cent of the property,

8    and we have money enough to get the rest.  We are doing it,

9    by our own bootstraps.  That's the way the District has man-

10   aged to operate.

11             Your Honor, I apologize, but I have absolutely no

12   authority to agree to any voluntary extensions in our pro-

13   ceedings in the state court.  Now if Mr. Stahlman wants to

14   bring a request for a temporary restraining order, he's at

15   liberty to do so and we will contest it.  But I have no

16   authority from my board voluntarily to agree.

17             THE COURT:  That's your answer, Mr. Stahlman.  He

18   has no authority voluntarily to stipulate.  If he has no

19   authority, he can't.  The door is open.  What I would do on an

20   application for an injunction, I can't say now.  I would have

21   to see what the showing was.

22             MR. STAHLMAN:  As long as that's their attitude,

23   I think it speaks for itself.  However, it does seem to me

24   that it would be idiotic, as Mr. Sachse explained, to go down

25   and take these people's land away, not knowing whether they are

1   going to have water or be able to finance a dam.  They are

2   down there on some of this land now with their equipment and

3   machinery.  To take the attitude that Mr. Sachse has taken

4   here and not be willing to talk about pressuring people, I

5   think --

6        THE COURT:  Well, I think you had better talk this

7   over with Mr. Stahlman, Mr. Sachse.  You have to concede that

8   the Government has some riparian rights if they have one head

9   of stock down there grazing.  If you build a dam, you're

10  interfering with the natural flow of the water, and certainly

11  the Government isn't going to have to accept your assurance

12  or the District's assurance that you are going to do this or

13  that with the water.  It seems to me that when you start to

14  build a dam you're leading with your chin, because you're

15  definitely interfering with the flow of the stream and the

16  rights which are now in litigation.

17        MR. SACHSE:  Your Honor, I simply want to point out

18  that what Mr. Stahlman is talking about and any interference

19  with the flow of the stream are two entirely different things.

20  Land acquisition has no conceivable effect on water flowing

21  up or down.  The only thing that Mr. Veeder is complaining

22  about, if I understand correctly, is our diversions, which

23  diversions are under color of right in the State of California

24  today.  Now whether we own another ten acres or five hundred

25  acres or all the acres for the dam, it really is not going to

affect the flow of the stream in the least.

1          THE COURT:  It is merely one step in your program to

2   build a dam and interfere with the flow of the stream.

3          MR. STAHLMAN:  It simply means that they are going to

4   try to use these people down there to try to get their foot on

5   that River.  Now as far as the Government's situation is con-

6   cerned, the reason that I am interested is this:  in behalf of

7   these people down there, their property is being taken to be

8   used as a weapon to get their foot on the River there.  They

9   have some silly idea that if they get a dam built across there

10  they're going to get some water in it.  That's talked all over

11  the town up there.  They feel that that's an advantage.  I

12  don't think that eventually it will be an advantage.  But they

13  think it is, and that's the motive which they have behind it.

14         THE COURT:  How could you build a dam until this

15  litigation was settled here, Mr. Sachse?

16         MR. SACHSE:  Your Honor, I do not concede that your

17  Honor or any District Court Judge could enjoin the building of

18  a dam, if we did not in any way interfere with the flow of the

19  River.

20         THE COURT:  You mean if you let the --

21         MR. SACHSE:  If we let it all go, to be ridiculous

22  -- and I realize that I am.  If we build a dam and stop nothing,

23  obviously we can build a dam if we want to.  If we build a dam

24  to impound behind it Colorado River water, we can do it.  If

25  we build a dam to impound behind it that infinitesmal amount

1   amount that Mr. Veeder discussed, that one year in thirteen,

2   we can do it.   How do I know that next year isn't going to be

3   this one year in thirteen when there is going to be 3000,000

4   acre feet of water rushing down that stream?

5           I don't believe your Honor has the authority to

6   enjoin us from building a dam.   You have the authority,

7   certainly, to enjoin us from interfering with the rights of

8   the United States, but not to enjoin us from building a dam.

9           MR. STAHLMAN:   You know why they want this land from

10  these people.   They are building roads up there now to take

11  real estate men across to show what they can do with that dry

12  land.

13          MR. SACHSE:   If you want to testify under oath as to

14  what we are doing up there, I'll be glad to have you; but I

15  resent your pronouncements.

16          THE COURT:   All right, anything further?

17          MR. SACHSE:   Nothing from me, your Honor.

18          THE COURT:   I'll see you on December 3rd at 10:00.

19          MR. GROVER:   I haven't any role in this forthcoming

20  pre-trial order.   I don't represent one of the major users.

21          THE COURT:   Whom do you represent?

22          MR. GROVER:   The Gibben's and the Cottle's.   They are

23  relatively small.   I have been trying to protect their rights

24  in this.   It's expensive, as I have said many times.   We just

25  really want to get out.

1          THE COURT:  You may confer on what you want.  You

2     will have to judge your time on the basis of that fee you want

3     to get.

4          MR. GROVER:  I just want the Court to understand that

5     I may not, at this time, do a great deal.

6          (ADJOURNMENT AT 7:00 P.M.)

7                                    - - -