# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### CENTRAL DIVISION

---

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

                          No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

               Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:        Tuesday, December 3, 1957

Pages:       406 to 530

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____ DEPUTY

JOHN SWADER
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-9211 • EXT. 370

IN THE UNITED STATES DISTRICT COURT

: SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION


HONORABLE JAMES M. CARTER, JUDGE PRESIDING


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) | |
| Defendants | ) | |


REPORTERS TRANSCRIPT OF PROCEEDINGS

San Diego, California

December 3, 1957


APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | WILLIAM H. VEEDER, Esq., WILLIAM E. BURBY, Esq. Special Assistants to the Attorney-General Department of Justice Washington, D. C. |

APPEARANCES  (continued) :

| | |
|---|---|
| For U. S. Marine Corps: | LT. DAVID MILLER |
| For Defendant Vail Company: | GEORGE E. STAHLMAN, Esq. |
| For Defendant Fallbrook Public Utility District: | SWING, SCHARNIKOW & STANIFORTH, by: PHIL D. SWING, Esq., and F. R. SACHSE, Esq. |
| For Defendant State of California: | EDMUND G. BROWN, Esq. Attorney-General, by ADOLPHUS MOSKOVITZ, Esq., Deputy Attorney General. |
| For Defendants Faulkner: | BERT BUZZINI, Esq. |

1   SAN DIEGO, CALIFORNIA, TUESDAY, DECEMBER 3, 1957, 10:00 A.M.

2                           - - -

3               (Other matters.)

4                           - - -

5               THE COURT:  Call number 2 on the calendar.

6               THE CLERK:  No. 1247-SD-C, United States of

7   America versus Fallbrook etc., et al.

8               THE COURT:  Mr. Clerk, there have been some papers

9   filed which you didn't get because they came in about the

10  time of the holidays.

11              Here are some "Suggested Revisions" by Fallbrook,

12  original and a copy, that I think I got on Friday, November

13  29th.  File those as of that date.

14              And the Government's Proposed Order on Pre-Trial.

15              Was that delivered to me?  As of what date is that

16  to be filed, Mr. Veeder?  The letter is dated November 18th.

17  I don't know how it didn't get to the Clerk.

18              MR. VEEDER:  Did your Honor say that it did not get

19  to the Clerk?

20              THE COURT:  No.  It wouldn't make any difference.

21  We can file it as of November 19th.

22              THE CLERK:  File it, or lodge it?

23              THE COURT:  Lodge it as of November 19th.

24              MR. VEEDER:  I would like, your Honor, if it is

25  appropriate, to offer to your Honor and to Counsel some

1    Suggested Revisions in the Proposed Pre-Trial Order, together

2    with the Contentions of the United States as presently pro-

3    posed.

4              THE COURT:  You have served copies, have you?

5              MR. VEEDER:  Yes, sir, copies will be served on

6    Counsel (handing documents to Counsel).

7              (Mr. Veeder handing document to the Court.)

8              THE COURT:  Do you have an extra copy for the Court?

9              MR. VEEDER:  Yes, your Honor (handing document to

10   the Court).

11             THE COURT:  It may be filed.

12             I will mark my copy, Mr. Clerk.

13             I take it that it will take some time to study this

14   document.

15             MR. VEEDER:  We received from Fallbrook, your Honor,

16   some suggested changes, and to the extent that they were

17   agreeable they were incorporated into the revised pages of the

18   proposed Agreed Facts, and those copies are submitted here.

19   If the parties will substitute those pages, then the Agreed

20   Facts will be proper, as far as we are concerned.

21             We undertook a revision of our Contentions as

22   originally proposed, and those also accompanied our letter

23   dated December 2nd.  There will undoubtedly be additional

24   contentions, but to the extent that the issues have now been

25   joined we have made our offer of contentions, although we

610

1    haven't received them from anyone else.

2         MR. SACHSE:  Your Honor, from a very hasty examina-

3    tion of this document, it appears that Fallbrook's suggestion

4    for clarification of the geological survey records by indicat-

5    ing the location of the gauging stations has been adopted by

6    Mr. Veeder, and it also appears that one other of our suggest-

7    ed revisions has been in part included in the Proposed Pre-

8    Trial Order -- that is, that the Fallbrook District has a

9    proceeding in eminent domain pending for the condemnation of

10   land for dam and reservoir site.  However, none of the other

11   suggested revisions appear to me to be included.

12        Am I correct, Mr. Veeder, in understanding that the

13   United States cannot or will not consent to any of our other

14   requested revisions?  You will expect proof on all of them?

15        MR. VEEDER:  We have, as I say, adopted, to the

16   extent possible, the tender of Fallbrook --

17        THE COURT:  Well, which parts did you adopt, looking

18   at their document called Suggested Revisions?

19        MR. SACHSE:  They adopted, on page 4 of our docu-

20   ment, your Honor, most of paragraph 8c; not in full, but I

21   think sufficient that I will have no quarrel with them there.

22        THE COURT:  What else?

23        MR. SACHSE:  And they have adopted the suggestion

24   that starts under number 8 on the same page and carries over

25   onto the next.

1    And that is all.

2    MR. VEEDER:  It may well be, Mr. Sachse and your

3  Honor, that -- I don't know whether it will be necessary to

4  ask for proof on all of these matters, but certainly they are

5  matters to which we cannot stipulate at this time.

6    THE COURT:  Well, let's take 7a proposed on here.

7  Why can't you stipulate to a thing like that?  What's wrong

8  with that?

9    MR. VEEDER:  Because we disagree with the mileage,

10  your Honor.

11    "7a.  Approximately 5 miles below Temecula Gorge,

12  in the Northwest Quarter . . ."

13    Our calculations are at variance with that figure.

14    THE COURT:  Well, what's your calculation?

15    MR. VEEDER:  That is set out in the Agreed Facts,

16  your Honor -- I mean we have tendered in our Agreed Facts

17  those distances.  I would hesitate to state specifically the

18  mileages at this time, because we calculate, from the stand-

19  point of river miles in this phase of the matter, from the

20  head of Temecula Canyon down through the point of confluence

21  of De Luz Creek.  Now our figures and the area to which we are

22  making reference differ materially from Fallbrook's method of

23  calculation.  It may be that we can work it out or our

24  engineers can work it out, but as of the present time our

25  technicians tell us that there would be no basis for making

412

1    that calculation that Fallbrook has undertaken.

2         MR. SACHSE:  Well, may I offer a suggestion.  I don't

3    care about the mileage.  My reason for these two specific

4    suggestions, 7a and 7b, was that the proposed Pre-Trial Order

5    of the United States, this Pre-Trial order is based upon the

6    order used in the Yankwich case, and I think it's a good one.

7    But in the Yankwich hearing Fallbrook was not a party.  Now

8    in his Contentions Mr. Veeder has references to our dam site,

9    references to our pumping and diversion works.  I just think

10   it's kind of silly not to say where they are.

11        THE COURT:  I do too.

12        MR. SACHSE:  You may use whatever mileage you want,

13   Mr. Veeder -- I don't care, but I do feel that your Pre-Trial

14   Order should specify that these diversion works of the

15   District to which you object in your Contentions are located

16   at such and such place, and similarly that immediately down-

17   stream from Sandia Creek and River is located our proposed

18   damsite.  I just feel that it makes the Contentions more

19   logical.  Now I don't care how you describe the locations.

20        THE COURT:  Do you agree with the legal description

21   -- Northwest Quarter of Section 7?

22        MR. SACHSE:  It is in that Section.

23        THE COURT:  It looks to me like we ought to get as

24   many of these facts about which there is no dispute included

25   here as we can.  You're making contentions about the damsite

1    and Fallbrook's proposed --

2           MR. SACHSE:  Your Honor, I'm perfectly willing to

3    skip it, to save your Honor's time, if Mr. Veeder wants to write

4    his own description of the location of our damsite -- that's

5    all I want in, and the location of our diversion works.

6           MR. VEEDER:  I will make this suggestion, then, your

7    Honor.  Now I've explained in regard to mileages, and it may

8    be that our technicians can straighten that out.  They've told

9    me that --

10          THE COURT:  Well, mileages aren't important, if we

11   just have the legal description and the location up or down

12   from this confluence.

13          MR. VEEDER:  There is this factor.  We, of course,

14   deny that there is a damsite there -- we don't believe that it

15   is a suitable damsite, but here's what we will say --

16          THE COURT:  Well, they say "what is known as."  You

17   can say "what has been denominated by Fallbrook as . . ."

18          MR. VEEDER:  Excellent, your Honor.  I think we can

19   certainly do that.

20          THE COURT:  You can    ? can certainly work these two

21   out.

22          MR. VEEDER:  Yes.  There's no problem there, using

23   your Honor's suggestion.

24          THE COURT:  All right, the two of you work out 7a and

25   7b on the proposed revisions by Fallbrook.

414

Now 8a.

MR. SACHSE:  The next concerns Fallbrook a little more.  They are perfectly susceptible of proof, but it appears to me that if we are going to try to simplify the issues and avoid cluttering up the files with any more exhibits than necessary -- it's a matter of public record.

THE COURT:  What's the objection to 8a?  I'm not talking now about the exact way it's worded, but the content of it.  What's wrong with that?  It recites facts which, apparently, aren't in dispute.

MR. VEEDER:  Well, your Honor, in that connection, we certainly think that proof is requisite on it.  I dislike agreeing to something that I think is extremely prejudicial to the position of the United States.  I certainly don't believe that anyone had the power to undertake to make a filing with the State of California, the result of which --

THE COURT:  Well, why don't you word it as it actually happened?  Some officer of some bureau of yards and docks or something -- I forget his name -- signed a document and it was filed with some state authority.

MR. VEEDER:  That's agreeable to me, your Honor.

THE COURT:  As to whether it was the action of the United States is, in a way, a legal conclusion.  There doesn't seem to be, offhand, much doubt in my mind about it.  But state the facts, what actually happened.

415

1    State the man's name, what his title was, when he did it.

2           MR. VEEDER:  What we would suggest, then, is that

3    there be added to it a statement that in making this con-

4    cession the United States is in no way bound by it.

5           MR. SACHSE:  That goes without saying.

6           THE COURT:  You can add that if you want to.

7           MR. SACHSE:  I think you will probably want to amend

8    your contention to indicate what you contend with regard to

9    this application of the United States.  But that's all right

10   with us.

11          THE COURT:  These facts that you admit are just

12   facts, and if you have any doubt at any time that some infer-

13   ence might be drawn from them and you don't want to be stipu-

14   lating to the inference, you can so state that this was not the

15   action of the United States.  But let's get the facts.

16          MR. VEEDER:  Very well, your Honor, we will.  I think

17   that's all right, as long as we --

18          THE COURT:  Now what about the one denominated 3,

19   at the bottom of the page?

20          MR. SACHSE:  Your Honor, I want to cooperate, here,

21   too, and I will concede that the last sentence of 3, at least,

22   I should not ask Mr. Veeder to stipulate to -- the last two

23   sentences, and I should not have included, and that will be a

24   contention.  But the rest of it, I think, is purely a

25   recital.

1      MR. VEEDER:  Where do you start, Mr. Sachse?  You

2  say "application was duly noticed . . ."

3      MR. SACHSE:  No, we're reading 3 on page 2.

4      THE COURT:   "Pursuant to the last mentioned

5  application . . ."

6      MR. SACHSE:  I consent to striking "thereafter" and

7  from there --

8      THE COURT:  On line 26.

9      MR. VEEDER:  All right.

10      MR. SACHSE:  But the rest, I think, is purely a

11  statement of the --

12      MR. VEEDER:  We will work out the --

13      THE COURT:  The first part of 3, therefore,

14  agreeable, Mr. Veeder?

15      MR. SACHSE:  Subject to Mr. Veeder's correction.

16      MR. VEEDER:  We will work that out, your Honor.

17      THE COURT:  All right.  By working it out you mean

18  that you're willing to stipulate to these facts, as long as

19  this other --

20      MR. VEEDER:  As long as the inferences are not

21  conceded.

22      THE COURT:  All right.

23      Paragraph 6.

24      MR. SACHSE:  Well, I believe that Mr. Veeder's only

25  quarrel could be with the last two sentences of that, but I

417

1   think they are the facts and ought to be stipulated to:  that

2   the application was noticed and a hearing was held.  That's

3   the facts.

4          THE COURT:  And the matter is now pending.

5          MR. SACHSE:  And is pending.

6          THE COURT:  I don't think there ought to be any

7   dispute about that.  You probably rejected this in line with

8   your -- I don't know why.

9          MR. VEEDER:  I didn't want to have any implications,

10   your Honor, attendant upon any agreed facts.  If we can put

11   the same caveat around this terminology, why, I see no

12   objection to it.

13          THE COURT:  Surely.  All right, that's easy.

14          MR. SACHSE:  The next, number 7, is exactly identi-

15   cal, except on the companion application.

16          THE COURT:  All right, do it the same way.

17          MR. SACHSE:  On the next one --

18          MR. VEEDER:  Are you speaking of 8a now?

19          THE COURT:  8a at the bottom of the page.

20          MR. SACHSE:  I will not ask Mr. Veeder to stipulate

21   to acreages and percentages, since I am not ready to give him

22   the exhibit on which we have drafted the  --

23          THE COURT:  This is 8a from page 14.

24          MR. SACHSE:  Yes, sir, it appears on page 3 of my

25   revisions and continues to the top of page 4.

1          I will withdraw the request that that be included.

2          THE COURT:  All right.

3          8b, on the top of page 4.

4          MR. SACHSE:  Well, there again I will --

5          THE COURT:  The same situation?

6          MR. SACHSE:  Yes, I'll withdraw the request to

7    include it.

8          THE COURT:  All right.

9          8c.

10          MR. SACHSE:  8c is taken care of.  We have that in.

11   He has that in sufficient to satisfy Fallbrook.

12          THE COURT:  All right.

13          MR. VEEDER:  You are withdrawing 8b.

14          MR. SACHSE:  I'll withdraw 8b.

15          That would appear to dispose of it.  With your Honor's

16   permission, I would like to run over this quickly to be sure

17   that Mr. Veeder and I understand each other.

18          As I understand it, now, --

19          THE COURT:  For the benefit of the Reporter, we're

20   talking about a document entitled "Suggested Revisions of

21   Proposed Pre-Trial Order," filed November 29, 1957, by

22   Fallbrook, and you actually have item numbers, don't you --

23   item 1, item 2?

24          MR. SACHSE:  Yes, sir, and paragraph references.

25          THE COURT:  All right.

419

1      THE COURT:  All right.

2      MR. SACHSE:  As I understand it, then, Mr. Veeder,

3  Item 1, paragraph 7a, you will redraft to indicate your under-

4  standing of the location of our diversion works.

5      MR. VEEDER:  That's right.

6      THE COURT:  All right.

7      MR. SACHSE:  Item 2 --

8      MR. VEEDER:  Just a moment, Mr. Sachse.  We have

9  gone through the United States Geological Survey quadrangles

10  and several other maps.  We find references to Temecula Canyon

11  as distinguished from Temecula Gorge.  It is not splitting

12  haris, on the basis of the geology that we have anyway, and we

13  would always prefer, if we may, to use "Temecula Canyon" rather

14  than "Temecula Gorge," because it's a different area that's

15  involved.

16      MR. SACHSE:  No objection at all.  In fact, you can

17  leave it out.  I think it might be written simply "in the

18  Northwest Quarter of Section 7 immediately upstream from the

19  confluence of Sandia Creek and Santa Margarita River" is the

20  pumping plant.

21      THE COURT:  I don't care what names you apply to

22  these canyons or creeks or gorges, as long as we all know that

23  we're talking about the same thing.  That's not important.

24      MR. SACHSE:  Then you will make a similar correction

25  in 7b, Mr. Veeder, is that correct?

1           THE COURT:  Item 2, 7b.

2           MR. VEEDER:  That's correct.

3           MR. SACHSE:  And Item 3 --

4           THE COURT:  Which is 8a.

5           MR. SACHSE:  -- 8a, you will draft language that will

6   be satisfactory to you describing the fact of the Government's

7   application and reserving all your objections.

8           THE COURT:  Well, describing the fact of the

9   application.

10          MR. SACHSE:  The application.

11          THE COURT:  Reserving the inference as to whether it

12  was a Government application.  That's his point.

13          Is that right?

14          MR. VEEDER:  That's correct.

15          THE COURT:  Item 4, which is this paragraph 3.

16          MR. SACHSE:  We have consented to the deletion of

17  the last 6 lines of that.

18          THE COURT:  From line 26 through line 31.

19          MR. VEEDER:  Starting with "thereafter."

20          MR. SACHSE:  Starting with "thereafter," yes.  We

21  will consent to the deletion of that.  If Mr. Veeder desires

22  to change any language in there, I don't think there will be

23  any dispute.

24          THE COURT:  Item 5 at the bottom of page 2 concerns

25  that paragraph numbered 6.

1        MR. VEEDER:  We have agreed to rewrite that that and

2  put in a caveat that we think is necessary for our protection.

3        THE COURT:  Okay.

4        The same will be true with Item 6, which involves

5  paragraph 7; is that correct?

6        MR. VEEDER:  That's right.

7        THE COURT:  Item 7, which involved a paragraph

8  called 8a --

9        MR. VEEDER:  He has withdrawn.

10       MR. SACHSE:  Fallbrook has withdrawn.

11       THE COURT:  -- is withdrawn.

12       And 8b.

13       MR. SACHSE:  Fallbrook will withdraw.

14       THE COURT:  Paragraph 8c has been substantially

15  taken care of already.

16       MR. SACHSE:  Yes, sir.

17       And so has the last Item 8.

18       THE COURT:  All right.

19       Does anyone else have any suggestions?  Let's see,

20  the State of California filed some, did they not?

21       MR. MOSKOVITZ:  Your Honor, we filed with the United

22  States, at the original deadline, our Suggestions for Changes

23  in the Original Pre-Trial Order.  I regret that I was ill

24  last week and I didn't get the United States' redraft until

25  Monday and I haven't had an opportunity to file anything.  But

1   certain of our suggestions were not accepted, and perhaps we

2   can take them up now, if the Court desires.

3          THE COURT:  All right.  Now has this document been

4   filed, or is it just handled as a letter exchange?

5          MR. MOSKOVITZ:  I sent it as a latter to Mr. Veeder

6   at the Office of Ground Water Resources, by letter dated

7   November 8, 1957, and I sent copies to Counsel.

8          THE COURT:  All right.  I have a copy of it.  I

9   suppose there is no need that it has to be of record.

10         MR. MOSKOVITZ:  I have no desire on that score.

11         THE COURT:  All right.

12         MR. MOSKOVITZ:  The first matter that was not includ-

13   ed by the United States in the redraft appears on page 3 of

14   the attachment to our letter, and it is denominated as number

15   8 at the bottom of that page.  We suggested that a sentence be

16   added to a paragraph in the pre-trial order that related to

17   the fact that the predecessor in interest of the United States

18   in ownership of Camp Pendleton did not acquire rights to

19   appropriate prior to 1913; and we suggested that there also

20   be added the following:

21          "That neither the predecessors in interest of

22          the United States in ownership of Camp Pendleton

23          and the Naval Ammunition Depot nor the United

24          States, since acquiring ownershkp thereof, have

25          acquired any permit from the State of California

to appropriate water of the Santa Margarita

River system pursuant to the State Water

Commission Act of 1913, now codified as

Water Code Section 1200-1801."

THE COURT:  Can't you accept that, Mr. Veeder, with a caveat, if you want it in there, that it is your contention that you don't have to have any permit?  This is a fact.  I have never heard anybody contend that anybody ever had any formal permit to appropriate water.

MR. VEEDER:  I will check that through, your Honor, and if we put in the kind and type of caveat that I think is required, why, I think we can agree to that.  However, I want to go through the whole matter.

THE COURT:  Well, it would seem to me that there is no dispute in fact that I know about, and with a caveat I can't see how you would be hurt.  But let's get that in there.

MR. VEEDER:  All right.

THE COURT:  What's the next one?

MR. MOSKOVITZ:  The next one appears on page 4 of that attachment to our letter -- it's number 3 on that page, and it's the second of the suggestions:

"At the end of the second sentence, add the

following:  60 cubic feet of water per second

for direct diversion from the Santa Margarita

River."

424

1  This is merely an additional matter that was covered by the

2  particular application of the Santa Margarita Mutual Water

3  Company, from our understanding of the records.

4         MR. VEEDER:  Is Mr. Dennis here?

5         MR. MOSKOVITZ:  No.

6         MR. VEEDER:  Who is representing Santa Margarita

7  Mutual Water Company?

8         THE COURT:  They haven't got any representation,

9  presently.

10        MR. VEEDER:  Well, on the agreed facts --

11        Is California represented?

12        MR. MOSKOVITZ:  Beg your pardon?  I'm not represent-

13  ing the Santa Margarita Mutual Water Company.  However, we

14 went over this pre-trial order carefully and tried to bring it

15 up to date.

16        THE COURT:  It doesn't make any difference.  Mr.

17 Moskovitz, as counsel in this case, would have a right to

18 suggest that the pre-trial stipulation state the facts which

19 aren't in dispute.  As I understand it, this was some

20 description of their application.

21        MR. MOSKOVITZ:  That's right.

22        THE COURT:  And to complete the description of their

23 application, you thought this sentence should be in there.

24        MR. MOSKOVITZ:  That's right.

25        THE COURT:  Based upon the actual application.

425

1    MR. MOSKOVITZ:  Yes, your Honor.

2    THE COURT:  It may.

3    MR. MOSKOVITZ:  I deliberately rechecked this when

4 I saw that you hadn't included it, on the ground that perhaps

5 we had made a mistake; but as we see it, this is what the

6 application provides.

7    THE COURT:  Do you have a copy of the application?

8    MR. MOSKOVITZ:  Not with me, your Honor.  I have with

9 me the summary of the applications that appear in the state

10 report 57.

11    MR. VEEDER:  I have no objection, if it is in the

12 application.  I don't have the application.

13    THE COURT:  All right, check on it and see if you

14 can get it in.

15    What's your next one, Mr. Moskovitz?

16    MR. MOSKOVITZ:  The next one I think perhaps has

17 been taken care of, but should be taken care of specifically

18 with respect to Santa Margarita applications.  It is the fact

19 that a hearing was held before the State Water Rights Board.

20 I think the changes that were agreed upon with Mr. Sachse

21 just now concern the Fallbrook applications.

22    MR. VEEDER:  Why don't we write in Santa Margarita

23 with Fallbrook.

24    THE COURT:  I don't care how you handle it, but

25 let's take care of that problem.

1    MR. MOSKOVITZ:  That is agreeable.

2    THE COURT:  In other words, there was a hearing held,

3  and the matter is pending and has not been decided.  I don't

4  see that you should have any dispute about that.

5    MR. VEEDER:  No.

6    THE COURT:  On what page of your document does that

7  appear?

8    MR. MOSKOVITZ:  In my document it appears on page 4,

9  the paragraph numbered 4 on that page.

10    THE COURT:  I see.  All right, work that in.

11    MR. VEEDER:  That will simply correspond, then, with

12  Fallbrook's.

13    THE COURT:  Similar sections as to Fallbrook there.

14    MR. MOSKOVITZ:  That's right, it can be either

15  combined in one or kept in two places, since there are two

16  different sections of the pre-trial order relating to Fallbrook

17  and Santa Margarita Mutual. Each one should have that reference.

18    MR. VEEDER:  In other words, if you refer to page 2,

19  paragraph 5, and on down to 6, we can put it together so that

20  they will be reflected in both the Fallbrook Public Utility --

21    THE COURT:  Well, that's only a matter of technique.

22  I don't care.

23    MR. MOSKOVITZ:  Any way you want to do it.

24    THE COURT:  Any way that's easiest.

25    MR. MOSKOVITZ:  Yes.

THE COURT:  What's your next one, Mr. Moskovitz?

MR. MOSKOVITZ:  The next one relates to some addition-
al facts that were put in the/pre-trial order by the United
proposed
States in its draft of November 18th.  Some of these were not
in the original pre-trial order and I have some proposed
corrections.  I don't know if you want to take the time now.
They relate to descriptions of the Coahuila Creek, and then a
description of other affluents of Temecula Creek, which have
to be altered in light of this new inclusion of the
description of the Coahuila Creek.  It appears on page 5 of
the proposed --

THE COURT:  Is this just a mechanical matter?

MR. MOSKOVITZ:  Well, it's a physical matter of
description, and perhaps we can get together on it at recess.

THE COURT:  Why don't you try to work it out
between you?

MR. VEEDER:  What page?

THE COURT:  What page are you talking about?

MR. MOSKOVITZ:  I'm now talking about page 5 of your
draft of proposed pre-trial order.

THE COURT:  It's not in this document.

MR. VEEDER:  It is not in your letter.

MR. MOSKOVITZ:  No, because --

THE COURT:  It's something that occurred after your
letter.

428

1      MR. MOSKOVITZ:   That's right.

2      THE COURT:   I see.   Is there anything else in your

3  letter?

4      MR. MOSKOVITZ:   Nothing else in the letter.

5      THE COURT:   All right. Maybe you had better take it up

6  first and see if you can work it out.   It will be easier than

7  doing it on the record.   If it results from some change in

8  description that Mr. Veeder made, probably you'll agree to these

9  minor suggestions.

10     MR. VEEDER:   Yes; it is a matter for the engineers

11 to go through.   I have no problem there.

12     THE COURT:   I see no insurmountable problem.

13     MR. MOSKOVITZ:   We can do it at the recess, then.

14     THE COURT:   Mr. Stahlman, did you have some suggest-

15 ions?

16     MR. STAHLMAN:   Yes, your Honor.   I have not filed

17 any agreement as yet.   However, we do agree -- I have pencilled

18 it out here -- we do agree to everything in the Government's --

19     THE COURT:   I didn't hear you.

20     MR. STAHLMAN:   We agree to all of the proposals by

21 the Government and the corrections that have been suggested --

22 we'll have no trouble with it, with the exception that I want

23 to reserve, for a short period of time, a matter that concerns

24 only the Vails and the Government, and that is in relation to

25 this stipulated judgment which appears on page 10 at line 28

429

to page 11 at line 24.  I want to discuss that matter with Mr.
Veeder further before I agree to the form in which it is to
be presented to the Court.

THE COURT:  You can take care of that between you.

MR. STAHLMAN:  Yes.

There is only one other thing, and that is in the
revision as suggested by Fallbrook on page 3, number 6; I
think, to reflect the entire picture there, we should have
noted therein that there was a protest filed by Vail.   In
other words, the Santa Margarita Mutual Water Company had
filed for 5,000 acre feet of water at the Vail Dam storage,
and there was a protest, and that matter is also before the
State Water Rights Board.  I think to reflect the entire
picture --

MR. SACHSE:  I don't think that ought to go in here,
because I am referring only to one application, to which you
did not protest.

MR. STAHLMAN:  No, we didn't protest that.

THE COURT:  Which application did you protest, if
you didn't protest application number 12178 or -179?

MR. STAHLMAN:  It's a different application.

MR. SACHSE:  He protested the Santa Margarita
Mutual application at the Vail site, which was heard at the
same time that ours were heard.

THE COURT:  But Vail appeared at the hearing.

1          MR. STAHLMAN:  We appeared.

2          MR. SACHSE:  He appeared, but not in protest to the

3     Fallbrook application.

4          MR. STAHLMAN:  That's correct.

5          THE COURT:  All right.  Do you object, Mr. Veeder, to

6     working something out?

7          MR. VEEDER:  Not at all.

8          THE COURT:  All right.  Mr. Stahlman will submit

9     something to you.

10         MR. STAHLMAN:  Very well.

11         That's all we have.

12         THE COURT:  Now, have all of you tried to pick up

13    the facts which are not in dispute and get as many of them as

14    you could into this stipulation?

15         MR. STAHLMAN:  I might say that the facts that were

16    contained in the Findings of Fact of Judge Yankwich's

17    decision, as it affected the Vails -- that is, the acreage,

18    and the water duty, and the quantity of irrigable land, and

19    those matters -- I think that we will go right down the line

20    on those as at that time.

21         THE COURT:  Has anybody checked to see whether you

22    have picked up most of the facts out of that previous pre-

23    trial stipulation that are applicable?

24         MR. SACHSE:  Fallbrook has taken the pre-trial

25    stipulation step by step, and I believe has gotten together --

431

1   I think Mr. Veeder has covered, in the pre-trial stipulation,

2   everything that is in the original pre-trial order.

3           THE COURT:  All right.

4           MR. SACHSE:  However, I have not gone down through

5   the findings in the Yankwich decision.  I have not made any

6   attempt to do that.

7           MR. STAHLMAN:  These matters that I speak of were

8   in the pre-trial order that carried over.

9           THE COURT:  That's what I'm talking about.

10          MR. STAHLMAN:  Yes, and I have previously filed a

11  memorandum agreeing to those things.  That was filed, here,

12  last Spring.

13          MR. VEEDER:  We undertook, at your direction, your

14  Honor, to follow through on the original pre-trial order and

15  included the findings, as near as possible, where we thought

16  there would be any reasonable grounds of agreement.

17          THE COURT:  In addition to the pre-trial stipulation

18  previously entered into, you went through the findings that

19  Judge Yankwich made to see whether any of those were accept-

20  able.  Did you do that?

21          MR. VEEDER:  Yes.  Where it was patent that there

22  would be disagreement, your Honor, we just didn't tender it.

23          THE COURT:  All right.

24          MR. SWING:  I am a little confused by Mr. Stahlman's

25  reference to Judge Yankwich's findings.  Now we have been

1   considering and discussing and amending the pre-trial order

2   and bringing it up to date, which is all very satisfactory;

3   but I do not want to have us agreeing to what might be con-

4   sidered an interpretation by Judge Yankwich in his separate

5   findings of what this stipulation between Vail and the

6   Government turned out to be.  They say that's only between

7   them.

8          THE COURT:   No.  No, I understand your concern, and

9   there's no problem here.

10          MR. STAHLMAN:   The point is this, your Honor, if I

11   may clear Mr. Swing up on this thing.  There were certain

12   agreements in the previous pre-trial stipulation entered into

13   in the previous pre-trial order issued by Judge Yankwich, and

14   insofar as those matters which Vail contended there was

15   testimony offered during the trial of the Santa Margarita.

16   However, that testimony was strictly in accordance with  those

17   previously agreed stipulations.  There is no variance in these

18   matters that I have spoken about.

19          MR. SWING:   I'm assuming, Mr. Stahlman, that this

20   Court will give its own interpretation to what the stipula-

21   tion between the Vails and the Government really means.

22          THE COURT:   Well, we are all thinking about the

23   same thing.  The only point was that Mr. Veeder -- I don't

24   know whether you caught this -- said he also went through the

25   findings made by Judge Yankwich to see if he could find

instances where there had been findings on facts about which
there was no dispute, but which had not been part of the pre-
trial stipulation.

That's what you did, isn't it, Mr. Veeder?

MR. VEEDER:  That's correct.

THE COURT:  All right.  Now this means another
revision draft, another revision or another draft.  This
practice of putting the date at the bottom of your page, for
the time being, would be helpful.  The date of your revision
on the bottom of the page would be helpful to us in shuffling
our pages around.

MR. VEEDER:  We thought it would be, your Honor.

THE COURT:  If you will, continue to do that.

Can we, at this time, explore and see if we can
arrive at some policy as to how we can use this pre-trial
stipulation entered into between major parties insofar as it
affects other parties who do not sign it?  Now that presents
a mechanical problem.  I would like to have your suggestions
on that.

MR. VEEDER:  Your Honor, the United States tenders a
thought in that regard.  There is going to be service on
other parties, and it appears to me that it might be possible,
to the extent possible, to serve copies of the pre-trial
order on all parties.  I think that due process requires that
every one have it.

434

1    THE COURT:  Well, yes, that's one step -- that
2  would help.  But how would we use it at the trial?  At the
3  trial, of course, it is binding on the parties who sign it.
4  It certainly doesn't bind X, who might participate at the
5  trial.

6    MR. VEEDER:  I don't think that we should ask X to
7  be bound by it, your Honor.  I don't think he could be.

8    THE COURT:  What do we do, then, put a "skin" case
9  on -- put a witness on who knows enough about this to testify
10  to these undisputed facts, give X his day in court in that
11  way?

12    MR. VEEDER:  Well, I think this -- I don't know
13  what disposition was ever made of our proposed method of trial.
14  I think it's still in a state of suspended animation, if
15  such a thing can be.  Anyhow, our proposal was, and we still
16  adhere to it, that the happy way of handling these small
17  users is for the Court to go to the people and try out the
18  three areas which we designated, giving full and complete
19  notice, if we can, to everyone, and to the fullest extent
20  possible getting into the hands of everyone of these small
21  users copies of the agreed facts and the contentions of the
22  parties.  They, of course, have to be served.  Our concern is
23  that very many of them wo have been served in the past have
24  not answered.  We don't want defaults, and at the same time we
25  think there must be an end to the litigation.

435

1          So the proposal that we make is that we get into the

2    hands of the parties copies of our proposed method of trial,

3    or whatever your Honor proposes as a method of trial as an

4    order, and then have the pre-trial order as ultimately

5    developed and get it into the hands of everyone who is a

6    party to the cause.

7          THE COURT:  Well, I follow you so far, and I can

8    also conceive a situation where X or Y might come in and say,

9    through their attorney or in pro per, "I've read the stipu-

10   lated facts and I'm in agreement with them.  You can put me

11   on the record as being in agreement with them."

12         But let's take a case where that isn't true.  How

13   do we effectively use this pre-trial order as to these other

14   people who are not a party to it?

15         MR. VEEDER:  Maybe Mr. Swing has a thought.

16         MR. SWING:  Well, I'm only concerned with the fact

17   that, primarily, every man is entitled to his day in court, and

18   your Honor, of course, is one of those who would be most

19   insistent upon that.  I am assuming that the Government will

20   do the honors of mimeographing the orders to which the

21   principal parties have agreed -- we have virtually agreed to

22   it, here, and that attached to that might be -- I'll not call

23   it an order to show cause but the effect of it would be an

24   order to show cause, fixing a day, like a summons, on which

25   anyone who has any objection to these settled facts could

436

appear in court and state what their objections were, and if
not then they have, by their silence, given their consent to
that statement of facts.

I think they have got to be noticed and a date
fixed when they can appear and make their objections known.
Now, as suggested, that's a technical matter.

THE COURT:  Well, I think that that procedure takes
us a little further along the road of due process, except
that ultimately what you're doing you're saying to these other
parties, "A, B, C and D have made an agreement as to certain
facts.  Unless you come in and protest on a certain date,
you're going to be bound by those stipulated facts."  Now
whether that's enough --

MR. SWING:  Well, what I'm saying is off the cuff.
I agree with your Honor that somebody might dig up some case
against us.  We are willing to give the matter some thought,
and I suggest that we do brief the point of what constitutes
due notice and what would bind them and be prepared to advise
your Honor of our views when we come back with a formal
hearing.

I want to proceed a step further with reference to
going to trial and the method of going to trial.

THE COURT:  May I interrupt you for a minute on
that --

437

MR. SWING:  Yes.

THE COURT:  -- and stay with this pre-trial order.

Why wouldn't this be a further technique that could be used to get the most use out of this pre-trial order?  At the day of trial, everybody would have notice of the trial date -- an easy matter to provice.  The trial starts.  Now I take it that the parties who are present at the trial have a right to enter into stipulations, and as to those who don't show up it's their hard luck if they aren't there.  Suppose that at the day of trial you called a witness, some expert in this crowd who knows all these facts that are in this stipulation, and you propose to call him as a witness to have him testify into the record these undisputed facts.  That's what you would be doing.  Whereupon, somebody says, "Well, let's save some time.  Rather than to have the witness sit here on the stand and read all these undisputed facts, let's agree that the undisputed facts that he would testify to are the things in this pre-trial stipulation."  Everybody agrees.

"All right, who wants to cross-examine?"  Cross-examination on the basis of his "canned" testimony, as it were.

Don't you think we would have it?

MR. VEEDER:  That would certainly complete it, because, if I understand what your Honor is saying there, you would enter an order binding on those of us before the Court

438

On the date of trial you would go in on the basis of process
requiring a man to be there.  There's no doubt about that.

THE COURT:  Then you would call a witness, and he
is available for cross examination, and we would agree that
this is his "canned" testimony -- in other words, that if he
were to testify, he would testify to all of the things in this
agreed statement of facts.

Now I don't think that we are stretching realities
when we say that there are people in this courtroom, as far
as that's concerned, who could testify to probably everyone
of these agreed facts.

MR. VEEDER:  That's right.

THE COURT:  And then it goes into the record.  There's
his testimony.  If anybody wants to cross-examine, there's
their opportunity.  If anybody wants to put on any evidence in
contradiction to any of that testimony, there's his opportun-
ity.  And in the absence thereof, the Court then finds, as
was agreed upon by some of the parties and as was testified
to.

Don't you think that would heal it up?

MR. MOSKOVITZ:  Your Honor, I think that is about
the best way and the fastest way to be assured that these
facts can go into the record and make a finding -- faster
than doing all this research to find out whether another way
would do it.

439

THE COURT:  Well, I'll think about it.

Now you have two suggestions:  Mr. Swing's sugges-
tion, and Mr. Veeder's suggestion of getting this into the
hands of everybody; Mr. Swing's suggestion of an order to
show cause to come in and have their day in court; and then a
technique of some kind when the trial starts.

I think we have it pretty well healed up.

MR. MOSKOVITZ:  Your Honor, I would like to bring up
another matter involving the pre-trial order that has been
mentioned to me by other Counsel, and that is still a sneaking
worry concerning whether everybody should be deemed to have
filed a counterclaim to everyone else's claim, and that is as
to the effect that it might have on dismissals.  I think Mr.
Grover particularly is concerned about that.  He still hopes
to get his client out and doesn't feel that it would be
practical to attempt to get a dismissal from all the other
parties to the action; and I would like to have the Court
consider including in the pre-trial order a statement to the
effect that nothing which has gone before shall be deemed to
have resulted in all parties being considered to have filed
counter-pleadings or cross-complaints or what-have-you to the
claims of all other parties.  In other words, that the record
is as it looks, so that if there is a desire for dismissal
the dismissal can be affected merely by the opposing party,
the plaintiff in the case of the defendants, agreeing to a

460

1    dismissal.

2         THE COURT:  Well, I haven't talked that out, Mr.

3    Moskovitz, but I did have a search of the file made by the

4    Government, and they have filed a document showing all the

5    orders that have heretofore been made in this case.  I wanted

6    to find what orders are now in existence that would, at least

7    until changed, bind me and bind the proceedings in this case,

8    and it seems to me that there was an order made by Judge

9    Yankwich.

10        MR. MOSKOVITZ:  It was actually included in the pre-

11   trial order, your Honor.

12        MR. VEEDER:  It was actually entered, and at the

13   instance of California.

14        MR. MOSKOVITZ:  That's right.

15        THE COURT:  That order is to the effect that every-

16   body's pleadings are adverse to everybody else's.

17        MR. MOSKOVITZ:  Well, it doesn't say quite that,

18   your Honor.  It is the inference that might be drawn from

19   what is said that has disturbed some.  What it said was this --

20        THE COURT:  Well, there's a further order made by

21   Judge Weinberger to some similar effect somewhere in the

22   record, as I recall.

23        MR. MOSKOVITZ:  The one that I'm aware of appears on

24   page 43 of 109 Fed. Sup., at the beginning of the pre-trial

25   order -- it's called "Order on Pre-Trial by Judge Yankwich,"

1    and in the second paragraph it says: "The Court finds that it

2    is to the best interests of the parties hereto and for the

3    public interest that all rights to the use of water in the

4    Santa Margarita River system of all parties to this action be

5    determined as against the others, and that the filing of cross-

6    pleadings is dispensed with as unnecessary and inconvenient."

7    Now it's that language that at least some feel might be --

8         THE COURT:   I see your point.   I think there were

9    similar orders -- it doesn't make much difference -- made by

10   Judge Weinberger.   I might be wrong.   I thought I saw one made

11   by him.

12        What about this?   Could these dismissals be made on

13   notice?   Then you get rid of this problem of stipulation.   If

14   everybody is adverse, here, technically you would have to have

15   a stipulation of everybody in the lawsuit to get anybody out

16   of it.   Now what about dismissals to be made on notice?   What

17   about the dismissals already made by the Government?

18        MR. VEEDER:   Your Honor, I think this.   I don't

19   believe there is any great problem here.   If there is some

20   party who wants to be dismissed --

21        May I start again.

22        I think it is absolutely essential that to dispense

23   with cross-pleadings that we proceed on the basis that every-

24   body is adverse to every other party.   Secondly, I don't

25                              real
     believe there is any/reason why, if a man has no interest,

1   he can't be dismissed by order of this Court, unless objection

2   is made within a specified time, and he is considered out of

3   the case.   I think your Honor has that power.   In a case of

4   this magnitude certainly you could establish a practice.

5           THE COURT:   To follow through on your suggestion,

6   wouldn't it have to be done on notice?   In other words, you

7   say that he would be dismissed unless somebody objects within

8   a specified time.   Wouldn't we maybe have to notice these

9   dismissals?

10          MR. VEEDER:   You mean notice all parties, your

11  Honor?

12          THE COURT:   Yes.

13          MR. VEEDER:   I truly hadn't thought through that far.

14  But it would be incredible to me that if a man has no claim

15  that he couldn't be dismissed out, and certainly as a man dies

16  he is dismissed out, and under the circumstances I don't see

17  any real problem.

18          THE COURT:   Your dismissals so far  have only been

19  people who died or who sold their property.

20          MR. VEEDER:   Or who have no interest in the lawsuit.

21  So I don't --

22          THE COURT:   Wait a minute.   People who died --

23          MR. VEEDER:   That's right.

24          THE COURT:   -- or people who sold their property?

25          MR. VEEDER:   Yes.

443

1          THE COURT:  Any other category?

2          MR. VEEDER:  There were some dismissals of parties

3   who, on investigation, we found were outside the watershed.

4          THE COURT:  Who were outside the watershed.

5          MR. VEEDER:  That's correct.  So there was no adverse

6   claim there.

7          THE COURT:  Then I think you have no problem on the

8   dismissals you have made to date.

9          MR. VEEDER:  That's right, your Honor.  The United

10  States is certainly willing now, if any party wants to get

11  dismissed out, we would certainly agree to it.

12         THE COURT:  Well, yes, there ought to be some easy

13  way to do it.  But again Mr. Moskovitz has put his finger on

14  what might be a touchy problem.

15         MR. VEEDER:  You have a rule that is specific on

16  the point, and I think it is true that in a case like this

17  dismissal, if there appears to be an adverse claim, should be

18  on notice, and I can/envision a circumstance where a person
                              not

19  with a claim would or could be dismissed from the case -- I

20  mean a claim of an existing right.

21         MR. SACHSE:  You say you cannot visualize?

22         MR. VEEDER:  Where there is an adverse claim.

23         MR. SACHSE:  I just didn't hear you.

24         MR. SWING:  This case, to me, has gotten out of hand

25  on this every defendant being adverse to every other, and there

1    being in excess of three thousand named defendants there are

2    hardly three thousand attorneys who are qualified to represent

3    three thousand claimants in a comprehensive irrigation or

4    water litigation.

5         The case started out, as I conceive it, to be an

6    action by the plaintiff to quiet title as against the three

7    thousand named defendants.  We had a smilar situation in the

8    Tijuana case before Judge Haynes, in which the California

9    Water & Telephone Company had filed a cross-complaint against

10   every person in the Tijuana Valley that had any interest in

11   land, just like the Government has done here; and in that case

12   each of the defendants appeared and asserted their water

13   rights as against the plaintiff.  In this case, I have con-

14   ceived, in representing some thirty, maybe more or less,

15   defendants, that each of them in their answers were asserting

16   that, as against the plaintiff, they had such and such water

17   rights.

18        I am now faced with not only the rule of the Court

19   but the ethics of my profession, according to which no attorney

20   can be on both sides of the table at the same time, and I

21   cannot represent Defendant A, who is --

22        THE COURT:  -- who is adverse to B.

23        MR. SWING:  I am going to immediately have to resign

24   and suggest substitution.  But where are they going to go to

25   find the three thousand attorneys to represent the three

445

1   thousand defendants?

2        THE COURT:   I agree with you; the case started out

3   with the Government seeking to quiet title to its rights. Now

4   this matter about all parties being adverse, which would mean

5   therefore a decree settling all the rights on the River, got

6   into the case probably from Judge Fee's decision, did it not?

7        MR. VEEDER:   Your Honor, in that regard, I think that

8   if you will examine California's answer, as amended, you will

9   find that California prays that that very thing be done.

10        THE COURT:   Well, there's a big difference between a

11   lawsuit that would settle the rights of the United States on

12   this River against all the parties and the judgment entered

13   thereon and one which would settle all the rights of all the

14   parties on the River one against the other.  Now I don't know

15   that we have to take on that burden.  There were no particular

16   problems on the River until the United States asserted its

17   right.  It might be to the social good to have a judgment that

18   settled all the water rights on the River, but it seems to me

19   that that's a colossal task compared with a decree that settled

20   the rights of the United States and the rights of any cross-

21   complainant who came in and specifically named other people

22   as to whom he wanted an adjudication.  I think we could go that

23   far.  We could say the rights of the United States as against

24   the people whom they have sued, and the rights of any cross-

25   complainant as to people whom they would join or name.

1      I've wondered about this, too.  If we go all the way

2  and follow Judge Bee's suggestion that we have to have a

3  decree settling all the rights on the River, Mr. Swing has put

4  his hand on a very interesting problem.  If he represents A, B,

5  C and D, and if they are all adverse to one another, he has a

6  problem, except that I understand that the rules of ethics are

7  that you can still represent adverse interests if they agree.

8      MR. VEEDER:  Your Honor, I don't believe that there

9  is a water lawsuit in the State of California, before the

10  California Water Board or any other board, where the thing to

11  which Mr. Swing makes reference isn't present.  I think that

12  every right, necessarily, in the ultimate, is adjudicated as

13  against every other right.  It never occurred to me, although

14  I have heard Mr. Swing, on some of his flights, suggest that

15  it might be unethical.  I see no reason whatever, with Mr.

16  Swing's 90-some clients, why there would be even a doubt

17  about it.  Here are people competing for water supply, and

18  certainly a decree in the Superior Court of the State of

19  California embodies the very same thing.  It is true that the

20  evidence may be taken in a different manner, but every claimant

21  on a stream is having his rights determined as against every

22  other claimant.

23      Am I right, Mr. Moskovitz?  Isn't that what occurs?

24      MR. MOSKOVITZ:  Well, before the State Water Rights

25  Board, you don't ordinarily have that sort of situation.  I

1   cannot say that I have the experience to tell you that this is

2   true in all other lawsuits.  Mr. Swing may have.

3          THE COURT:  Well, do you have such a problem if your

4   clients are informed that their rights are adverse one to the

5   other and they still want you to represent them -- do you have

6   any problem of ethics?

7          MR. SWING:  Obviously, your Honor, I have to have the

8   consent of the clients that I could represent in what, on its

9   face, appears to be an adverse claim; but I am in doubt that

10  even that clears me.  I am still embarrassed.  Everyone of the

11  answers which I filed says:  As against the plaintiff, we claim

12  so-and-so and so-and-so, and those answers were all on file

13  before we got around to this unfortunate cocklebur that was

14  stuck in the tail of the horse, that we were going to not have

15  a lawsuit by the plaintiff to quiet title to its rights but

16  we were going to have, by geometrical progression, or arith-

17  metical -- I don't know which one to take -- we're going to

18  multiply three thousand defendants by three thousand different

19  lawsuits.  I don't know how many separate lawsuits we have

20  bred here overnight by this one unfortunate declaration.

21         THE COURT:  Well, let's take a little recess and give

22  the Reporter a rest, and then come back in and hear you further

23  on this.

24         (RECESS)

25

448

THE COURT:  Anything further on this problem of the scope of this lawsuit?

I was just glancing over Judge Fee's decision.  He talks about it being plenary proceeding where the Court could set up controls and regulate the whole supply of water on the River.

MR. STAHLMAN:  I would like to throw in one suggestion, your Honor, just outlining the practical situation that exists.  For instance, everybody downstream should be concerned in relation to the quantity of water to which they are entitled.  There has been considerable development, and we've seen some of it, extracting waters north of the Vail Dam.  There is another litigation that has developed in the area up there in relation to some of the water rights, and all of those matters can be determined in this suit, and if you would have, as the United States Circuit Court suggested, plenary action and the rights were all determined, then everybody on the River knows where they stand and you would eliminate future lawsuits, which would be multitudinous if it is not done.

It never struck me as being any great tragedy to litigate a river.  As a matter of fact, I think the river is well off in the southern part of the state where we do have these great conflicts by reason of the shortage of water that the rights among people on those rivers be established.

449

On the San Luis Rey River, which is a river similar to the Santa Margarita, great development has occurred, with a lot of litigation.  The City of Carlsbad has started to litigate the entire River, and many of us in the Bonsall Basin have interests in that River and are on the boards of water companies there, and we rather welcome the suit to determine what the rights are on that River, so that, once and for all, those people who are entitled to the water will know where they stand.

This continual process, such as they have on the San Luis Rey River up around Rincon, with those conflicts developing between people, I can see that thing starting north of Vail.  As I say, there is already a suit in the Superior Court of San Diego County, and a number of the parties there have been drawn into it -- Vail is now into it.  So we have a multiplicity of lawsuits.

In the final analysis, when the matter has progressed to the point that this lawsuit has progressed, it would seem to me that a final determination of the rights of the properties within that watershed should be beneficial to all of the people in the area.

MR. VEEDER:  I would like to tender an additional thought -- Mr. Swing has raised this point.  In view of the fact that the large rights on the River are riparian in character, and being riparian in character they are all

1   correlative one to the other, it is absolutely impossible to

2   get a decree without exactly the determination that is to be

3   made.

4   THE COURT:  I thought of the same thing, certainly

5   as to riparian rights, and following your thought along

6   further, of course, we're going to have to determine who the

7   people are who have riparian rights on the River and establish

8   their correlative rights.  Then there would be another group

9   of people whom you would designate as having no riparian

10  rights and having rights only by appropriation or prescription

11  or what-not.  So in that sense creating categories would help

12  determine the final decree and settle a lot of matters.

13  The point that you make, though, that the riparian

14  rights are correlative certainly means that all the riparian

15  owners have to be included in the decree.

16  MR. VEEDER:  And they necessarily are competing one

17  against the other for the supply of water.

18  I may be entirely wrong.  I think that your Honor

19  will take the same amount of evidence for the quiet title by

20  the United States against each individual as your Honor would

21  take in regard to every right against the other.

22  THE COURT:  Mr. Swing, you were going to say something

23  about the trial of this action and I stopped you because I

24  wanted to explore that pre-trial stipulation further.

25  MR. SWING:  I was intending to say just a word with

451

1    reference to the order of trial.

2    I realize, of course, that your Honor at all times

3    has complete control over the order of the trial, and that

4    you will perhaps have to, from time to time, make some modi-

5    fication.  I am in hopes that your Honor would not commit

6    himself at this time to what the United States Government has

7    proposed, which appeared to me to be/somewhat arbitrary
                                         a

8    slicing the watershed into rather arbitrary areas.  I,

9    personally, feel that the parties and the witnesses would be

10   most convenienced by having the trial proceed along the line

11   of tributaries.  The neighbor or neighbors who are on the

12   tributary -- take the De Luz Creek or the Sandia Creek -- it

13   would seem to me that those people would know the most about

14   each other's land and as to how much of it was irrigable and

15   could be into court and would be most helpful to the Court and

16   perhaps helpful to themselves in having their cases presented

17   along at the same time, particularly if they are going to be

18   held to be adverse to each other they would be where they

19   could hear each other.

20   I am not pressing -- in fact, I am urging the

21   Court not, at this time, to commit itself to any rigid form,

22   knowing that your Honor at all times has the control of the

23   order of the presentation of the evidence and the witnesses.

24   THE COURT:  What other large property holdings are

25   involved other than the groups that have appeared here by

1    Counsel?  No one is here for Santa Margarita Mutual. What other

2    large interests are there?

3            MR. VEEDER:  The Oviatts, situated up in the area

4    above the Vail property, are very large.

5            THE COURT:  Have they appeared by counsel in this

6    case?

7            MR. VEEDER:  They appeared in the original case.

8            And scattered throughout the watershed are other

9    large holdings.

10           I don't know why Oviatt -- I'm sure that he was

11   served, and I know that he appeared.  There is just one

12   example.

13           How we are going to handle this matter, Mr. Swing's

14   reference to the arbitrary cutup that we have suggested falls

15   precisely in line, if your Honor has before him the proposed

16   Agreed Facts, the lines that we have drawn embrace De Luz

17   Creek, Sandia Creek and Rainbow Creek in the main stem.  I

18   don't see how there is any problem there.  That is exactly

19   what we are attempting here.  The Murietta Creek area, I

20   believe everyone there knows -- I don't know of any other

21   delineation that can be made, your Honor.

22           But I do think that at this juncture, unless Mr.

23   Swing has a specific recommendation, we would like to press

24   this matter a little bit further, because we think that what

25   we call the critical area in the lower Santa Margarita falls

1  into a very precise category, and if there is any way that we

2  can divide it up differently we want to do it.

3  THE COURT:  Well, I had been impressed, Mr. Swing,

4  with the fact that this division into three areas was very

5  logical.  Now that would not necessarily mean that you couldn't

6  have further segmentation.  In other words, here is this lower

7  Santa Margarita area, with De Luz, Sandia and Rainbow.  Now the

8  hearings on De Luz Creek could be held at one time, the hear-

9  ings on Sandia Creek at another time, and the hearings on

10  Rainbow.  I think that would be logical.  Those three together

11  seem to fit into a logical area.

12  Then when you go north of the narrows there up at

13  Temecula and you have this --

14  What's the name of that Creek?  Is it Murietta?

15  MR. STAHLMAN:  Yes, Murietta.

16  THE COURT:  Running down through Murietta, you have

17  a rather logical area there; and likewise on the other side,

18  the Temecula River, you have a logical area there, which in

19  turn might require some segmentation in the hearings.

20  So I think we probably could reconcile both your

21  views and Mr. Veeder's on that score.

22  Well, what is the present intention of the Govern-

23  ment on this injunction proceeding that you talked about?  Now

24  of course, if you bring an injunction proceeding, I take it

25  that that takes precedence over a trial of the action.  Are you

1    still contemplating that?

2        MR. VEEDER:   It depends somewhat upon the activities

3    of Fallbrook, your Honor.   But I think the ultimate trial of

4    this case will turn on a request for a temporary restraining

5    order.   That's the customary way, I believe, of trying them.

6    In other words, we want to maintain the status quo during the

7    period of the trial.

8        Now should there be this pendente lite request,

9    a petition for a pendente lite order, it would, in our view

10   as we now contemplate it and based on the investigations that

11   I have been making in the last few days, the lower Santa

12   Margarita area, the are to which you just made reference --

13   De Luz Creek, Sandia Creek and Rainbow Creek -- is the area

14   with which we are most concerned now, and -- I don't know --

15   it struck me that at the time that we undertake the trial of

16   this matter that many of the issues could be resolvedd in that

17   pendente lite case.

18       Or, I was talking to Mr. Sachse a moment ago and

19   the question came up in regard to the matter of ruling on

20   questions of law in advance of trial -- it might have the

21   same effect.

22       In any event, the matter of how your Honor is going

23   to hold on some of these legal issues, again Mr. Sachse made

24   the statement that he was reluctant to offer any contentions

25   until those rulings were made.

1          Now whether we take the full step into a trial on the

2     facts in advance of the ruling on the questions of law, whether

3     we go into pendente lite I think is going to govern a great

4     deal as to the method  of practice.

5          There are areas which are developing right ath the

6     present time throughout the whole watershed, but the most

7     critical area is the lower Santa Margarita area, and we think

8     there should be a resolution as soon as possible.

9          THE COURT:  I don't object to ruling prior to trial

10    on certain issues of law.  The only problem you have there is

11    that you should have formulated some factual basis to rule

12    upon.  Of course, this pre-trial stipulation will take us

13    along that route, but we generally have the problem of any

14    other defendant being bound by a ruling of law who hasn't had

15    a chance to be heard.  It makes a tentative ruling, I suppose,

16    and get the order to show cause out to everybody to come in

17    and be heard. why they shouldn't be bound by that ruling.

18         I may be able to, and probably will have to,

19    dovetail the pre-trial stipulation with that -- trying to

20    figure out how you would do it.  It would seem to me that the

21    parties who could agree to a pre-trial stipulation sign it

22    up, and then the Court would tentatively rule, in those

23    instances where there were sufficient facts in the stipulation

24    to base a ruling upon, make certain rulings as a matter of

25    law, and then see that everybody got a copy of the pre-trial

1  stipulation and the tentative rulings of the Court, issue an

2  order to show cause why they shouldn't be the rulings of the

3  Court -- give them their day in court to be heard on it.

4       MR. VEEDER:  Your Honor made reference to the

5  appointment of a master, too.

6       THE COURT:  Oh, yes, I'll talk about that in a

7  minute.

8       MR. VEEDER:  Excuse me, but I thought it was an

9  element that was certainly involved.

10       THE COURT:  Yes.  Also, this mention of Oviatt.  It

11  seems to me that some of these bigger landowners who have

12  appeared by counsel should be contacted when you get this pre-

13  trial stipulation further along, and if you get agreement on

14  most of these I wouldn't be surprised if most of them would

15  come in on this stipulation.

16       MR. SACHSE:  Your Honor, may I express a thought

17  here.

18       As far as riparians are concerned, the judgment is

19  going to be one of their correlative rights.  There isn't any

20  question about it.

21       As far as appropriators, either present appropriators

22  under present permit or simply applicants, are concerned, the

23  decision is necessarily going to revolve around the question

24  whether there exists, at the time of the judgment, any amount

25  of water surplus to the needs of the riparians available for

appropriation.  If they are vested existing appropriative

rights, they are subject to vested rights.  If they are a pend-

ing application, obviously they cannot expect an application

would be granted by the State unless there is water to appro-

priate.  Now there is more water in the River at Fallbrook --

more physical water -- than there is in the River at the

narrows or at the Vail Dam or at any place upstream.  It is

just a simple mechanical fact that there is more watershed

above it, that more water runs down it, that for all practical

purposes, let us say, the point at which the largest amount of

water would be available for appropriation would be somewhere

close to the boundary of Camp Pendleton, because below Camp

Pendleton it is all Government land -- you can't get in to take

it.  Above Camp Pendleton, the farther up the stream you go

the smaller the watershed and the smaller the runoff.

I think that if all we are trying to do is to dispose

of this case in the easiest and the simplest fashion for the

benefit of all concerned, the thing to do is to settle, by

pendente lite proceedings or otherwise, whether or not there

exists, at the Fallbrook site or thereabouts, a surplus of

water available for appropriation.  I presume that if the

United States brings a pendente lite proceeding attempting to

enjoin our present diversion and attempting to enjoin any

construction of a dam by Fallbrook, I presume that if your

Honor found that there was surplus you would deny the injunction.

1    Now that would, more than anything else, dispose of this thing.

2          THE COURT:  Yes, but before I could decide whether

3    there was any surplus at all we would have to know the

4    riparian rights and the riparian use up the River.

5          MR. SACHSE:  I beg your pardon, your Honor.  That is

6    not the way I understand it.  The question that will exist is,

7    Is there, at the proposed point of diversion by Fallbrook,

8    today water which it can take without injuring anybody?  Now

9    it isn't injuring anybody upstream by taking it, because the

10   water has already passed the people upstream.  If there is

11   water available for Fallbrook to take, the only person it can

12   injure is a person downstream.

13         THE COURT:  Well, now, wit.  If you get a judgment

14   that you're entitled to take a certain amount of water, with-

15   out taking into account the riparian rights upstream, then

16   you're in trouble, because the riparian rights upstream would

17   be very pertinent --

18         MR. SACHSE:  I have never assumed that your Honor

19   would give us --

20         THE COURT:  When any people upstream, who have a

21   riparian right to the use of water and who are not now using

22   it, go to use it, the so-called surplus might not exist

23   down where you are talking about.

24         MR. SACHSE:  Right.  But I have never assumed that

25   your Honor would give Fallbrook, for example, a judgment

1  saying, "You're entitled to so much water."  I don't think

2  you could.

3          THE COURT:  How could I say --

4          MR. SACHSE:  I think you could say that there exists

5  today a surplus of water above the needs of the riparians

6  downstream, and that insofar as that surplus exists Fallbrook

7  can proceed to act under the state statutes to put it to

8  beneficial use, and those state statutes provide that what-

9  ever right Fallbrook acquired is subject to vested rights.  If

10  at a later date upstream riparian uses increase so that less

11  water comes down, we get less water.  That's all.

12          Our case, Fallbrook's case revolves entirely around

13  the one question whether or not there exists in the River, at

14  our proposed point of diversion, a surplus of water for which

15  we can apply to the State of California.  Now that's our

16  whole case.

17          THE COURT:  How can you say that there is a surplus

18  until you know what the riparian rights are on the River

19  above you?

20          MR. SACHSE:  Because any State permit is subject to

21  vested rights.  It is put in capital letters on the permit --

22  it is in very large capital letters.

23          In the second place, an appropriator can only take

24  water that comes to him.  If a proper, legitimate riparian

25  use expands upstream, the result is that the appropriator

1    simply gets less water on the River.

2            Now if an improper use accrues upstream -- if some

3    person jumps in and takes it without right, then the appropria-

4    tor would enjoin the upstream user.

5            THE COURT:  I agree with all that, except your

6    original premise.  How could I say that there is any surplus

7    at Fallbrook until I know what the rights are above of Fall-

8    brook of a riparian character?

9            MR. SACHSE:  Because the surplus, your Honor, is

10   determined as of the use on the day that you make your order.

11   If there is water flowing, to use a strong word, "wasting"

12   into the ocean, let us say, then that water is not being used

13   by a riparian.  It isn't.  It's available to Fallbrook.

14           If, on the other hand, there's just enough water

15   reaches Fallbrook -- to take Mr. Veeder's side of the case, as

16   I understand it, as against Fallbrook -- if just enough water

17   comes to Fallbrook to supply the proper riparian needs of the

18   United States on Camp Pendleton, then there is nothing for

19   Fallbrook to appropriate.

20           But if more water flows in that stream past

21   Fallbrook than is necessary to supply the proper riparian

22   rights of the United States -- I shouldn't limit it even to

23   riparian -- all the rights of the United States --

24           MR. VEEDER:  I think you had better let me state my

25   case.

1    MR. MOSKOVITZ:  I'm trying to state my understanding

2  of the problem.

3         If enough water passes Fallbrook to more than meet

4  the requirements of the United States -- the rights of the

5  United States, then there is a surplus at Fallbrook available

6  for appropriation.

7         THE COURT:  But there, again, the rights of the

8  United States are correlative -- I'm talking now about

9  riparian rights, and the extent of their rights is going to be

10  determined by the amount of legitimate use and future use

11  upstream by riparian owners.  Therefore, we can't say what the

12  rights of the United States are until we know what the rights

13  are upstream.

14         MR. SACHSE:  Well, I can only refer your Honor to --

15         THE COURT:  And of course you know that the United

16  States is claiming it all.  They have a big enough claim in

17  here to take it all, purportedly.

18         MR. SACHSE:  I can only refer your Honor to the

19  cases.  I will go this far:  Every single case that I know of,

20  which anywhere near approaches the physical situation:

21         Ching Chow v. Santa Barbara, the very first one --

22  it was a riparian in the same physical position as the United

23  States, at the mouth of a river.  The appropriator was upstream

24  from them.

25         Maria (phonetic) v. San Francisco -- the City of

1    San Francisco was the appropriator. The objector was the

2    Marian Farms Company in the delta of the San Joaquin River.

3          Peabody v. Vallejo -- Peabody was at the mouth of

4    whatever the name of the creek was -- I forget. The City of

5    Vallejo was upstream.

6          In each of those cases, in every case, the question

7    is, Does that appropriator stop water or purport to stop

8    water to the detriment of that downstream riparian, the one

9    that was below it?

10          Now insofar as Fallbrook and the United States are

11    concerned, that's exactly what the controversy is going to be

12    in this proceeding, and if there exists water at the boundary

13    of Camp Pendleton in excess of the needs of the United States,

14    I contend that as of now -- not the needs, pardon me; the

15    rights of the United States -- I contend that there exists now

16    a surplus so that we can appropriate. Sure, we might lose it

17    in two years or five years or ten years, but under State law

18    now there does exist a surplus. And such a trial -- back to

19    my original premise -- such a proceeding would certainly let

20    six thousand individuals stay away from this courtroom.

21          THE COURT: Well, they are going to stay away from

22    the courtroom because I'm going to use a Master on a lot of

23    these small people.

24          But your proposal, in addition to the fact that I

25    am not presently in accord with you, has the further problem

1    that any judgment entered would be an interlocutory one.   It

2    couldn't be a final judgment.   It would not be appealable

3    until --

4           MR. SACHSE:   It is appealable, as I understand the

5    rule, your Honor.

6           THE COURT:   Well, the pendente lite judgment might

7    be.   But no segmented judgment, outside of injunction, would

8    be appealable.

9           MR. SWING:   Not to prolong the discussion beyond the

10   hour of noon, but the case of Allen v. California Water

11   Company, in 29 Cal. (2nd), the Supreme Court of California

12   passed upon the question of a temporary surplus.   Judge Haines,

13   who was considered a pretty good State judge on water law,

14   had held that the fact that there was water across the

15   boundary line in Mexico could not be relied upon, because

16   Mexico had the physical and the legal right to intercept it

17   on their side of the boundary line and put it to a use, and

18   therefore he eliminated from a determination as to how much

19   water was available for the riparian or overlying landowners

20   on the California side in the Tijuana Valley.

21          The California Supreme Court said that the fact that

22   the supply coming across the boundary line was subject to

23   interruption and therefore could not be relied upon as a

24   permanent supply, that so long as it was physically available

25   on this side of the line and was coming across the policy of

the State of California, under a constitutional amendment of
1928, was that such water so long as it was available was
subject to appropriation and use.  And I think that is the
law of California.

Now in determining water rights -- and I'm using
the phrase "water rights" -- your Honor, of course, would have
to make a finding of these upstream water users, not only of
their present requirements but as their prospective -- that's
the expression -- or future water users.  You, therefore,
would find that their right was the maximum that they could
put to reasonable use upon their property.  But the water
which they do not use in any year, and the man may let some of
his land lay fallow and not be cultivated for reasons of his
own, that water, of course, is a part of his water right, but
it flows on down the stream unused and is subject to use, first,
by other riparians for riparian purposes, and if it is avail-
able it is subject to appropriation.

So I think we have to keep in mind two things:  the
present water rights of the riparians and the present water
uses, and there would be a rather wide distinction sometimes
between the riparian water rights of any year and their
riparian uses of that particular year, and there could be a
surplus.  It would be a matter of the good business judgment
and sense of the Fallbrook Public Utility District whether
they want to go to the expense of putting in a dam and paying

465

1   the cost of the structure for the purpose of catching the

2   water in the years -- there will be years -- when there will

3   be surplus, because they, as an appropriator, could only store,

4   and the riparian can only use it when it is physically avail-

5   able.--he is not permitted to store.  Therefore, we will say

6   once in seven years, or whatever might turn out to be the

7   cycle of wet periods of years and dry periods of years, there

8   would be years in which it might be that Fallbrook would be

9   warranted in spending three million dollars to build a dam in

10  order to catch the surplus in flood years when there was

11  water which otherwise would run to waste.

12          THE COURT:  Well, it's time for lunch.  I wanted to

13  come back this afternoon for a little while at least.  We have

14  several other problems I want to talk to you about.I want to

15  talk about a Master.

16          I don't know any reason why I shouldn't appoint a

17  Master immediately and get started on some of these little

18  tributaries and some of this area.  I want to discuss the

19  Master situation and how he will be used and when it should be

20  done.

21          Secondly, I want to discuss with yous the situation

22  we have come up to a time or two and never really talked

23  about, and that is the relationship between the decision, if

24  and when it's made, of this Water Rights Board and this case,

25  and tentatively to at least give us something to shoot at.

It would seem to me that it might be highly desirable to have a decision of that Board as to whether or not Santa Margarita or Fallbrook would have any rights as an appropriator.

Secondly, it would seem to me, however, that any decision that they made as to whether there was surplus would not be binding on this Court.  It would seem to me that their decision as to who could claim as an appropriator might help clear the air, and I would like to explore whether or not that decision shouldn't be accepted by this Court.

There may be other things.  I'm just thinking of a couple of things that I want to take up with you this afternoon.

There is the further discussion of when we're going to start on this; whether we're going to start by trial on the merits, or whether we're going to start by a pendente lite proceeding, or with Mr. Sachse's suggestion.  Offhand, I would say that it seems to me that any pendente lite proceeding, unless it was absolutely necessary to maintain the status quo, is going to be a duplication of effort.  I think eventually, in the case on the merits, you're going to have to retry the things that you have tried in the pendente lite proceeding.

Do you want to be back at, say, one-thirty?

(RECESS)

SAN DIEGO, CALIFORNIA, TUESDAY, DECEMBER 3, 1957, 1:30 P.M.

- - -

MR. VEEDER:  Your Honor, the United States would like to make an observation, if permitted, not so much in response to what Mr. Sachse and Mr. Swing have said but directed to the general proposition of the kind and type of relief for which the United States prayed, and in that connection refer to their repeated statements that this Court would be called upon to make a determination as to whether there is going to be a surplus or not.

To me, the question of surplus is purely academic; nor do I see how this Court, or any other court, could say that there will be or will not be a surplus.  It is our view, of course, that there is none, and I think the facts will bear us out.

There is but one question, as we see it, as far as Fallbrook is concerned, and that is whether Fallbrook desires, in the light of all the circumstances, to build a dam.  The question of whether there is surplus or not I don't believe would be adjudicated.  I think that the relief that we would seek here, and are now seeking, is to have your Honor chronicle the rights on the River, set them up in order of priority.  We believe that when that is done and the riparian rights are put together in a decree, the result will be that there cannot be a surplus at all, rather that there would be

1   a deficit.  But I can't envision a decree by your Honor saying

2   that there is a surplus and Fallbrook will be permitted to

3   appropriate water.   I don't believe that your Honor or this

4   Court has jurisdiction to make such an adjudication, and I

5   believe the matter is totally irrelevant.

6   With that thought, I turn to the question of the

7   State of California and what it has undertaken.  It is a party

8   here, and it is an adverse party.  It is joined as a party

9   defendant and has vigorously opposed the National Government

10  throughout this litigation.  We now have the unusual spectacle

11  of an adverse party seeking to adjudicate the rights, in

12  effect, of the United States, and seeking, we believe, to

13  usurp the functions of this Court.

14  We would be very much opposed, necessarily we would

15  be opposed, for the California Water Board to come down with a

16  ruling saying, "We believe that there is water available for

17  appropriation."   Firstly, we think that it invades your

18  Honor's prerogatives and the jurisdiction of this Court.

19  Secondly, on the basis of the data that we have before us,

20  namely, Bulletin No. 57, we believe that the State would

21  probably come up with a conclusion that there is water avail-

22  able for appropriation, for we find numerous errors in that

23  Bulletin.

24  We find, for example, that the United States is

25  being seriously penalized for using sewage affluent to get by

these years of drastic shortage.

So we sincerely hope that we will not be forced to request your Honor for a ruling prohibiting the State of California to undertake to make a determination whether there is or is not surplus water.  We would feel this way, that it is a question of law, a question of jurisdiction, if you please, that might be ruled in advance of a hearing.

Now there is one question that we would be very pleased to proceed on at the earliest possible date, before California does come down with the statement that there is a surplus.  I think it would place the United States in a very embarrassing position, and I think it would be embarrassing to this Court.  We see no reason for it.  There is no such great fire that they can't await the time when your Honor will make a determination of the respective rights of the parties.  When that determination is made, we won't care whether there is a surplus or not a surplus or anything else.  That will depend on Mother Nature, and Mr. Hall, the engineer for Vail, made the point very well.  There is only one question that Fallbrook is concerned with, and that is the matter whether the dam and project that Fallbrook proposes is economically feasible.  That's the whole thing.  Do they want to take the chance?  I don't see how they could, and based on my knowledge of this area I don't think they can.

But I certainly think that if California comes down

1    and says, "Yes, there is surplus water here.  Go out and spend

2    your money," we're right in the middle of a really difficult

3    injunction proceeding, because if there is such a declaration

4    as that we think that it is an invasion of your Honor's

5    prerogatives, as I said before, and I can't see any possi-

6    bility of anything but great confusion if California under-

7    takes to make such a determination as has been proposed.

8              THE COURT:  Before you finish, tell me -- maybe Mr.

9    Moskovitz would like to tell me -- exactly the issues that are

10   pending before this Water Rights Board.  There has been an

11   application made by Santa Margarita and an application made

12   by Fallbrook to appropriate water; is that right?

13             MR. MOSKOVITZ:  That is correct, your Honor.

14             THE COURT:  What will that Board be required to

15   decide in the proceedings there pending?

16             MR. MOSKOVITZ:  I am very glad that this matter

17   came up, and I am glad that I can comment also on what Mr.

18   Veeder has said.

19             To answer your question directly as to what is

20   pending before the State Water Rights Board, there are these

21   two applications, or rather applications by two applicants --

22   there are more than two applications -- and the issue before

23   the State Water Rights Board is whether and to whom a permit

24   to appropriate unappropriated water shall be issued.

25             Now as a condition precedent to the issuance of a

471

1   permit, as a factual condition that must exist, under our

2   Water Code, the Board must make what you might call a

3   tentative prediction as to whether there will be any un-

4   appropriated water to which this permit can pertain. This is

5   a jurisdictional prerequisite. It is not the objective of the

6   proceeding at all. The objective of the proceeding is to

7   determine whether to issue the permit and what the conditions

8   shall be. But before a permit may be issued, the Code says

9   that there must be unappropriated water.

10          THE COURT: There must be a finding, then, by the

11   Board.

12          MR. MOSKOVITZ: A finding. But it is not -- to jump

13   ahead a step -- it is not anything which is binding in the

14   sense of being a judicial conclusion. It is not binding on

15   you. It is not binding on any person who claims water rights.

16   It is a finding that must be made, however, before the Water

17   Rights Board, under the Code, can say, "Yes, a permit will be

18   issued." It is a prediction as to the future. If the pre-

19   diction doesn't turn out to be correct, the permit that is

20   issued doesn't apply to anything. But they must make that

21   finding first.

                                    that
22          And then, after deciding/the probabilities are, on

23   the basis of the records that they have on the River as to

24   what they know concerning the rights and the uses -- again

25   not an adjudication of rights and uses -- there probably will

1   be surplus water and we will grant a permit to this or that

2   of the applicants, and these are the conditions which we think

3   will be necessary in the public interest.

4           As I said, the finding of the existence of un-

5   appropriated water is a prediction as to what will happen in

6   the future, and if that prediction turns out not to be true

7   then there just isn't anything that the permittee can use.

8           Now I think that Mr. Veeder was right at the outset

9   of his statement today when he said that the existence or the

10  non-existence of unappropriated water is not in issue before

11  your Honor -- I think he's right on that, and I was nodding

12  my head and going along with him, until he stopped me short a

13  little while later when he said that the fact that the Water

14  Rights Board is going to have to make that determination is a

15  usurpation of the jurisdiction of this Court, and I don't

16  see how that can follow at all.

17          If he is right, and I think he is, that whether

18  there is unappropriated water or not is not an issue for you

19  -- and I'll tell you why I think so.  I don't see why the

20  fact that the Water Rights Board goes into that question can

21  in any way be a usurpation of your jurisdiction.  Now it seems

22  to me that the jurisdiction of your Honor, as Mr. Veeder

23  pointed out, is to make a determination of rights.  It is a

24  quiet title action, so you may determine the rights of all

25  the people who are before you.

1      Now after these rights are catalogued and their

2  order established, then those who have been held to own these

3  rights may exercise them as set forth on the water which comes

4  down from year to year, under the conditions that nature

5  provides.  Now if, as a matter of fact, after everbody has

6  exercised the rights that you say exist, there is still some

7  water left over, that water is unappropriated water, not

8  because you found it to be so but because that is the fact

9  after the rights that you have held exist have been exercised.

10  Now it is that which is left after all the rights which you

11  adjudge to exist have been exercised, that is what whoever

12  gets a permit from the State Water Rights Board may be able to

13  use.

14      So I can't see any conflict between the two tasks

15  that your Honor has and the State Water Rights Board has.

16  There is no point of conflict whatsoever.

17      Does that help to answer the question?

18      THE COURT:  Does the Water Rights Board, at this

19  hearing, take any evidence on the nature and extent of the

20  riparian rights on the River?

21      MR. MOSKOVITZ:  I didn't sit through the hearing.

22  Maybe Mr. Sachse can answer it.

23      MR. SACHSE:  I'll try to answer it, your Honor.

24      I want to correct Mr. Moskovitz on one minor fact.

25  The hearing involved involves -- it's still pending -- two

1   applications of Fallbrook, two of the Rancho Santa Margarita,

2   and one of the United States.   The United States did not

3   appear, or perhaps I should say appeared specially to state

4   that they didn't want these proceedings continued, so there

5   was no evidence taken submitted by the United States on the

6   application.   The United States was also a protestant to the

7   Fallbrook applications and a protestant to the Santa

8   Margarita applications.   They offered no evidence in protest.

9           Now the nature of the hearing was a 3-day trial,

10  at which both the State, through its Water Resources

11  Department, and the applicants and protestants introduced

12  evidence as to what they thought the state of the River was,

13  that is, whether or not there was water available for appro-

14  priation.   I'll accept Mr. Moskovitz' word; it's much better

15  than "surplus."

16          The practical consideration, as you well realize,

17  your Honor, is that the very, very, very great percentage of

18  the stream flow occurs in a very limited period of time --

19  it occurs in the wet season.   It has been Fallbrook's legal

20  position, and I believe has been the legal position of the

21  State, that those winter floods,which can only be utilized

22  by storage, can only be utilized under appropriative rights.

23  It is, therefore, entirely possible -- I think it's

24  practically a certainty that the Water Rights Board will

25  issue a permit to either Fallbrook or to Santa Margarita to

store a certain amount of water during the winter months, which
will probably read between November 1 and May 1 or whatever
the dates are, and under certain conditions.  What those
conditions are I don't know.  Perhaps it will require that a
constant flow be maintained downstream to protect the lower
riparians.  But I feel quite certain that a permit will issue
for winter storage, and that permit will be, or should be,
surrounded with restrictions and conditions which, in the
mind of the Water Rights Board, are deemed to be sufficient
to protect the rights of the holders of downstream water
rights.

Now that is what they heard, and while I can't
prophecy who will get a permit, or I won't attempt to prophecy
what the restrictions will be, I feel quite certain that one
will issue.

THE COURT:  Well, then, it's obvious, from what you
say, that in the 3-day hearing the Water Rights Board didn't
take any evidence on the nature and extent of riparian rights,
but really approached it, as you indicate, on the other side,
talking largely about the flood flows.

MR. SACHSE:  No, sir, they also took -- we didn't
have the benefit, of course, of evidence from the downstream
protestant.  He didn't show u p.  But it was certainly a
proper part of their proceeding.  They usually do take eviden-
ce as to the extent of the downstream rights.  They are very

476

1   much concerned with them, because there is no other way to

2   determine what conditions need to be attached to these permits

3   to protect them.  In the absence of testimony from the United

4   States, the Department of Water Resources itself presented its

5   analysis, in Bulletin 57, to which Mr. Veeder just referred,

6   of what it felt were the needs of the downstream users.  It

7   was presented; true, not by an adverse party -- they didn't

8   show up.

9          MR. VEEDER:  May I make further observation on that,

10  your Honor.

11          These are elements which are squarely before your

12  Honor for determination, and which, in my view, are essential

13  for determination by the Water Board when it makes disposition

14  of the matter before it.  For example, what about sewage

15  affluent to meet our demands downstream; should that be

16  charged against the United States?  Are we going to be re-

17  quired to live on it by some ruling of the State?

18          The use of water outside the watershed.  Necessarily,

19  they will have to make that determination, if they are going

20  to consider the question whether there is water available for

21  Fallbrook to appropriate, in making any determination of the

22  unappropriated water.  Necessarily they have to consider that.

23          What is floodwater?  Perhaps one of the most difficult

24  questions in this litigation is, What is floodwater?  And they

25  are going to make that determination.

1    It has been stated that this is simply an administra-
2  tive board.  I don't believe that there has been a determina-
3  tion on that.  I think it is quasi-judicial.  But in any event
4  the finding by an administrative tribunal is a matter that
5  has been considered by some of the courts, at least, to be an
6  invasion of the judiciary -- in this instance, this Court.  So
7  when they come down and say, "There is unappropriated water,"
8  they are saying, "This floodwater does not benefit the United
9  States," and as I say, certainly your Honor will find that as
10  an issue for your resolution here.

11    A military use.  It has been denied by Mr. Sachse
12  and Mr. Swing that the National Government can use riparian
13  water for the military.  Necessarily that's a question to be
14  determined, for if it is not a military use Fallbrook might,
15  every fifteen years, get some water.

16    The next thing that is important is, Mr. Moskovitz
17  has filed a brief here saying, "I think that a military use
18  is a riparian use, but we think that there is q eustion of
19  the reasonableness in this instance."  So the State of
20  California, an adverse party here, is going to determine
21  whether we are reasonably using water, and if it determines
22  that our uses are unreasonable then there may be more water
23  available for appropriation.

24    The question of our right to recharge the basin with
25  the winter flow.  There is another question squarely before

478

1    your Honor for resolution, extremely important in this liti-

2    gation, and certainly if they're going to say that when X

3    second feet are flowing at flood then it becomes an issue

4    again which your Honor is going to have to determine ere a

5    decree is entered.

6         Similarly, they are talking about winter runoff,

7    which is closely related to the matter of floodwaters.  When

8    is it winter runoff?  We had a decree entered by the State in

9    connection with the Vail litigation.  It is extremely important

10    to us that that matter and the effect of that decree be

11    resolved here.  It is going to be an issue here, and we

12    already know how the State feels.  It says, "Well, the fact

13    that Vail is delivering you 3 second feet is meaningless to

14    anybody but you."  So they will probably say that 3 second

15    feet is available for appropriation, or at least they could,

16    and in any event it is an issue that they're going to undertake

17    to resolve.

18         To me the four corners of this litigation must be

19    passed upon by the State of California, which is in here

20    fighting the United States with everything it has, and it's

21    incredible that they would proceed and jeopardize and embarrass

22    the jurisdiction of this Court.

23         THE COURT:  Mr. Sachse, suppose the Water Rights

24    Board makes a preliminary finding that there is unappropriated

25    water and grants a permit, we'll say, to Fallbrook.  What is

1    your view as to the effect of that ruling on these proceedings?

2         MR. SACHSE:  Well, let me be very specific in

3    answer, because it makes it simpler than talking in generali-

4    ties.

5         Let us assume that Fallbrook's applications, as they

6    now stand, basically were granted by the State Water Rights

7    Board.  Those applications are for Fallbrook to store, between

8    November and May of each year, not to exceed 30,000 acre

9    feet of the runoff of the River.  If the State Water Rights

10   Board grants such permit, and let's say, for the sake of

11   argument, without any conditions whatsoever -- just that way,

12   that permit will have, in capital letters, printed as part of

13   the form on which it is written:  "THIS PERMIT IS GIVEN

14   SUBJECT TO VESTED RIGHTS."

15        These proceedings, as I understand it, would

16   continue.  Your Honor would determine, in these proceedings,

17   the extent of the vested rights of the United States, and as

18   far as our permit is concerned probably they would be the only

19   persons directly concerned, because people upstream can take

20   the water first -- they can take all they want before it

21   reaches us.  So upstream vested rights we would not be con-

22   cerned with.  But downstream vested rights of the United

23   States could very seriously affect how we exercise this

24   permit or how much we took under it, and if your Honor's

25   finding were that the entire flow of the River, at the utmost

1   peak of a flood that washed out the sandbar into the Pacific,

2   if your Honor's finding should be that all that water is the

3   vested right of the United States, then our permit would be

4   worthless.

5           If, on the other hand, your Honor's finding were

6   that the vested rights of the United States were something

7   less than that, then to whatever extent a differential were

8   left over to that extent our permit would be valuable and

9   useful.

10          The permit would in no way affect your Honor's

11  authority to make a ruling as to the rights of the United

12  States, and subject to the right of appeal when those rights

13  of the United States were once determined vested they would be

14  prior to our permit.

15          That is my understanding of the effect of it.

16          THE COURT:  Do you agree, Mr. Moskovitz?

17          MR. MOSKOVITZ:  Yes, your Honor, exactly, and that is

18  why I say that the ruling of the Water Rights Board can't

19  prejudice the United States or infringe upon your Honor's

20  jurisdiction.

21          THE COURT:  Well, what's wrong with that, Mr.

22  Veeder?  The door is wide open for an adjudication here of

23  what the rights on the stream are and what the vested rights

24  are.  Why would we be concerned with what the Board recommend-

25  ed or did as to who might appropriate, if there was anything

481

1      left over.

2          MR. VEEDER:  I can say this for sure, that if

3      Fallbrook is granted a permit, why, it will have an addition-

4      al lever which it well knows how to use and embarrass us very

5      much.

6          THE COURT:  It may have some effect upon real estate

7      speculators and some effects that wouldn't concern the legal

8      issues of this case.  It would be a good talking point for

9      people selling property and all that.  But what effect would

10     it have on this case?

11         MR. VEEDER:  Well, I think that a state tribunal

12     having made a ruling that touches on each one of these points

13     necessarily has an impact on the jurisdiction of this Court,

14     and I daresay that it would be a matter of great import to

15     your Honor to have a determination that there was unappropriated

16     water and have such a determination by the State.

17         THE COURT:  You mean that I'd be influenced by

18     that?

19         MR. VEEDER:  I sincerely hope not.

20         THE COURT:  Well, by "hope not" you mean you think

21     not?

22         MR. VEEDER:  Oh, I think not, your Honor.  But it

23     is a fact that it's there.  We have also --

24         THE COURT:  You have also the parties, both the

25     State and Fallbrook, disclaiming any effect in that decision

482

other than their right to use what might be left over.

MR. VEEDER:  I've noticed that both of them anchored their arguments on the fact that the permits are issued subject to vested rights.  That's an interesting phenomenon.  Then they say, "We will issue the permit because we find that there is water available for appropriation."  Now we are the last one on the Creek below Fallbrook.  So what do they do?  They say, "There's unappropriated water."  So they have had to determine what are our vested rights, and in so doing, as I've already mentioned, they run down all the beads to come out at a statement that there is unappropriated water.  In other words, they say --

THE COURT:  Well, haven't Fallbrook and the State of California practically estopped themselves by their statements here of taking any other position as to a decision by the State Water Rights Board than that it has no impact upon what this Court decides?

MR. VEEDER:  Well, your Honor, I've heard that --

THE COURT:  Wouldn't they be in pretty poor standing to come in and change their position and say, "Now we made these assurances to you so that you wouldn't take any injunctive action against us or against the State.  Now we flop over and take a different position"?

MR. VEEDER:  I think that that would certainly transpire.  I think that this would be the situation:

483

1    "We now have a permit.  Let's go to Congress."

2         But again I say, and I must take issue with these

3    gentlemen -- I must take issue with them on this basis:  that

4    they cannot make a determination of unappropriated water

5    without determining what our rights are.  It necessarily

6    starts from that.

7         THE COURT:  Well, let me ask about a couple of other

8    things.  Is there any possibility, from a procedural stand-

9    point, apart from what might be called the merits in this

10   Water Rights hearing, that Santa Margarita or Fallbrook might

11   be thrown out?

12        MR. SACHSE:  I think unquestionably one or the

13   other will be, your Honor.

14        THE COURT:  I mean on some procedural matter.  Are

15   there any alleged defects in the applications or matters of

16   that sort which might eliminate Santa Margarita, let's say?

17        MR. SACHSE:  I know of nothing to that effect, your

18   Honor.

19        THE COURT:  Now another question, Mr. Veeder.  Let's

20   suppose that the Water Rights Board held up its decision and

21   this Court adjudicated the rights on the stream -- the rights

22   that existed, their priority, catalogued them, as you say.

23   Thereafter, wouldn't it be entirely within the jurisdiction of

24   the Water Rights Board to determine who might appropriate

25   water, if there were water available?  This Court is not going

1    to pass upon an application to appropriate water.

2              MR. VEEDER:  No, and as far as that is concerned,

3    when the decree is entered and somebody wants to build a dam,

4    fine.

5              I think that Mr. Moskovitz' use of the term

6    "prediction" is excellent, because they are going to predict

7    that there is going to be water available, and if they want to

8    assume the responsibility, that is fine with us.  But as of the

9    moment, for the State to give the blessing to Fallbrook to

10   start moving dirt to build a dam and issue that permit, in my

11   view, as I have said several times this afternoon, is the most

12   clear, definite invasion of this Court's jurisdiction.  What

13   we do, your Honor, when we see them start moving dirt, we go

14   in for a pendente lite injunction.  That will be an interesting

15   phase, because there will be an immediate and a direct conflict

16   between this Court and an embarrassment of jurisdiction, I'm

17   sure, because we will be testing your Honor's knowledge and

18   ability to determine these issues against Mr. Holsinger's.

19   Because when they advance all these statements of "No, we're

20   not conflicting," but don't respond to the five points that I

21   presented to them, I'm sure that they can't respond.  I'm sure

22   that they all know that they're going to have to determine the

23   measure of our rights.  How can they do it otherwise?

24             THE COURT:  On the other hand, here's a fight between

25   two out-and-out appropriators.  Neither one, Santa Margarita

1  or Fallbrook, makes any claim other than that of an appropria-

2  tor of surplus water.  If the Water Rights Board decided

3  between them and said "You're it and the other one is out,"

4  as between those two it would pretty near adjudicate that

5  problem and would eliminate one of our problems.  If, for

6  instance, Santa Margarita went out of the case, it would be

7  doing exactly what Judge Yankwich thought he was doing when he

8  decided the first part of this case.

9          MR. VEEDER:  Your Honor, I think I have to take

10  issue with that, for this reason:  This is a quiet title suit.

11  I think that Santa Margarita Mutual could go on claiming to

12  the end of time, as far as we are concerned, just so our rights

13  are declared prior to it; and the same way in regard to

14  Fallbrook.  But --

15          THE COURT:  Well, that's probably true.  As a

16  practical matter, it might eliminate one, but as a legal

17  matter I suppose you would still have to adjudicate the rights

18  that they had.

19          MR. VEEDER:  So I can't see such great urgency in

20  this matter.  Mr. Moskovitz is still to reply to our brief that

21  was filed at your direction.  If he would want to include in

22  that a further review of why the State of California is not

23  in conflict with this litigation, we'd be glad to join issue

24  in that and file a brief for argument on the proposition.

25  Because I think this, that if California is going blithely

486

1    ahead, as we say, invading this Court's jurisdiction, it is

2    time that there be a ruling on it so that we will know what

3    way to turn.   I truly can't envision a party to this liti-

4    gation doing such a thing, but I think it's going to do it.

5         MR. MOSKOVITZ:  Your Honor, Mr. Veeder keeps saying

6    that the Water Rights Board's action will invade the juris-

7    diction of this Court, but he didn't say how, or why.  He

8    just keeps saying it over and over again.  k Whereas we

9    pointed out that the ruling of the State Water Rights Board

10   can in no way prejudice you.  It is not a court.  It doesn't

11   have you under its jurisdiction.  It's the other way around.

12   The State of California is a party here.  It will grant a

13   permit to somebody, and again that permit will have meaning

14   only if, after the rights have been adjudicated, there is

15   some surplus water left from time to time, and that's the only

16   effect that it can have.

17        I see no reason to argue this point in a brief or

18   anything.  It's a very simple matter.

19        And again, I still say that there is no reason how

20   or why the Water Rights Board's action can in any way embarrass

21   the jurisdiction of this Court.

22        MR. VEEDER:  May I, while Mr. Moskovitz is on it.

23        You say that I have failed to point out the invasion

24   of this Court's jurisdiction.  Now I listed whether the United

25   States had the right to use water outside the watershed.  Well,

1  that question being before the State Board --

2       MR. MOSKOVITZ:  Your Honor, I haven't sat through the

3  hearings, and I don't know what the Water Rights Board is

4  going to rule.  But it doesn't seem to me that that is the

5  issue before the State Water Rights Board.

6       MR. VEEDER:  Well, do you know, or don't you know?

7       MR. MOSKOVITZ:  I don't know.  But I do not believe

8  that that is the issue before the State Water Rights Board.

9       MR. VEEDER:  Is it a question from the standpoint of

10  the reasonableness of the military use?  Will that be a

11  factor in determining whether there is water available for

12  appropriation?

13       MR. MOSKOVITZ:  My understanding is that that will

14  not be a factor either.  As a matter of fact, --

15       THE COURT:  Well, I think I have both your positions.

16  Mr. Moskovitz, your statement is pretty broad, and Mr. Veeder

17  has given no reasons -- he has given some reasons, but his

18  statement is, likewise, pretty broad.

19       As a matter of fact, I don't know why this whole

20  thing couldn't be settled by a stipulation right now, in view

21  of the statements of the parties, that if and when the Water

22  Rights Board decides the matter the decision that it makes is

23  not binding on this Court, and that the right to water under

24  a permit exists only as and when and after the rights on the

25  River have been adjudicated there is any water to which a

1   permit could apply.

2          MR. VEEDER:  By this Court.

3          THE COURT:  Yes.  That's what everybody is agreed

4   on.

5          MR. VEEDER:  Well, that's fine.

6          THE COURT:  We could take this matter right out of

7   the case.

8          MR. VEEDER:  As far as we're concerned, if Mr.

9   Moskovitz would propose that stipulation, it makes sense to

10  me.  If they want to go ahead and spin their wheels, it's

11  all right.  But I don't --

12         THE COURT:  Well, isn't that what we've all said?

13  Isn't that what Mr. Sachse said?  Isn't that what you said,

14  Mr. Moskovitz?

15         MR. MOSKOVITZ:  Yes, the statement to which I agreed,

16  your Honor, was that the ruling of the Water Rights Board

17  would have no effect on whether or not anybody had vested

18  rights; that that would be determined by this Court.

19         THE COURT:  And their decision wouldn't be binding

20  on me.

21         MR. MOSKOVITZ:  And their decision wouldn't be

22  binding on you.

23         MR. VEEDER:  Nor relied upon here.

24         MR. SACHSE:  Wait a minute.

25         THE COURT:  Well, I don't think that anybody would

1  think that there was any profit in relying upon a decision on

2  another record, where I didn't have that record and was making

3  my own.  If you would want to include that also, maybe Mr.

4  Veeder would feel better.

5       MR. VEEDER:  I would like that in there.

6       THE COURT:  It seems to me that --

7       MR. SACHSE:  That's part of the color of our title.

8  At least if we get a permit, we have one of them now.

9       THE COURT:  I think you could spell out to what

10  extent you would rely on it.  Maybe you could spell out to

11  what extent you would rely on it.  Certainly if the fact that

12  you had a permit from the Water Rights Board would have no

13  impact at all on the question of the riparian rights on the

14  stream, it would have no effect on the Government's proposi-

15  tion of prior appropriation, because they either have their

16  prior appropriation which is valid or they haven't.  If it is

17  valid, it's prior.  If it's not valid, it means nothing.

18       MR. SACHSE:  So far I agree.

19       THE COURT:  I don't see how there could be much

20  impact on this case by a decision of that Board.  Why doesn't

21  somebody try to spell out a stipulation that would eliminate

22  that issue?  That would let Mr. Veeder sleep a little better

23  tonight and not worry about it.  I don't see what his concern

24  is, really.

25       MR. SACHSE:  Well, I want to make this point clear,

1  your Honor.  I don't want to mislead the Court or Mr. Veeder.

2  I don't know what kind of stipulation it is going to be.  I

3  don't know what we're going to be told that we can or cannot

4  do.  Assume that we get this permit, and assuming that this

5  case is still pending, and with all the desire for speed I

6  see from the United States it will probably go on for the

7  next twenty years, will we be foreclosed by a stipulation from

8  proceeding under this permit?

9          MR. VEEDER:  Make it for a year.

10          MR. SACHSE:  We've kicked this one around on volun-

11  tary bases, your Honor, and I have expressed Fallbrook's

12  position in no uncertain terms, and I am not going to agree

13  voluntarily to stopping what the Board of Directors of the

14  District conceive to be the only solution for the salvation of

15  their community.  Now I want to go ahead and get the permit.

16  I see no --

17          THE COURT:  Well, I'm proposing a stipulation,

18  based upon your statement to me, which is in the record here,

19  and based upon my asking Mr. Moskovitz if he agreed and he

20  said that he was in substantial agreement.

21          As I understand the matter, you are seeking to

22  appropriate water that exists over and above the vested rights

23  on the River.

24          MR. SACHSE:  That's correct.

25          THE COURT:  And that you want the permit, but that

491

1   what that Board does, does not affect the decision that I

2   make (1) as to vested rights on the River.

3          MR. SACHSE:   That's absolutely ⅃⅃

4          THE COURT:   (2) It doesn't affect the decision that

5   I make as to whether the Government has rights by appropria-

6   tion downstream.

7          MR. SACHSE:   That's correct.   I'll agree to that.

8          THE COURT:   (3)  It doesn't affect my decision as

9   to what rights the Government has by prescription, if any.

10         MR. SACHSE:   We'll agree to that.

11         THE COURT:   Other than that, I don't know how else

12   it could enter into it, except that if I were cataloguing the

13   rights on the River, after I got through with the vested

14   rights and came to appropriative rights, and if I said that

15   the Government has no rights by appropriation downstream,

16   and then finally got up to what appropriative rights were

17   left, I might say that there is an appropriative right to

18   Fallbrook granted on such-and-such date by permit so-and-so,

19   or there is an appropriative right to Santa Margarita

20   granted on a certain date, which comes at the end of the line

21   after all the other rights have been catalogued.

22         MR. SACHSE:   Well, we could agree to all of that.

23   The only stumbling block that I had, and perhaps I just

24   misunderstood your Honor the first time, was whether there was

25   implicit in this proposed stipulation the proposal that

1　regardless of what the State does we stop doing.

2　　　　Now I, personally, am willing to acknowledge your

3　Honor's complete jurisdiction over it.

4　　　　THE COURT:  Well, now, Mr. Veeder, can't you go

5　along the line I have just outlined?

6　　　　MR. VEEDER:  I can go along, and then I'd want to

7　take a couple steps further, your Honor.

8　　　　I think that we have tendered a reasonable request,

9　that this question be resolved by your Honor as a matter of

10　law.  But if they are willing to stipulate (1) that the permit

11　has no legal effect until these rights are adjudicated, I say

12　that's fine.

13　　　　MR. SACHSE:  No, I won't do it.

14　　　　MR. VEEDER:  In other words, just as I said today,

15　they are going to get a permit and they are going to say, "We

16　are going to start moving dirt," and I think that the status

17　quo is upset.  I think that this is certainly a drastic change

18　of position from a piece of paper filed with the State and the

19　State coming along and giving its blessing to them to start

20　moving dirt.

21　　　　Now it may be that we could find a basis of stipu-

22　lation, but it would have to be the stipulation that would

23　maintain the status quo until these matters are adjudicated .

24

25

1          MR. SWING:   If your Honor please, Mr. Veeder has

2     here today and has repeatedly at previous hearings before your

3     Honor stated that they have no objection to Fallbrook's going

4     ahead and building its dam, if in the wisdom of the Board of

5     Directors of Fallbrook, who have certain statutory responsi-

6     bilities, they want to make an economic determination that

7     they think it best for their community to build a dam there,

8     of course, subject to the vested rights of the United States,

9     as to which your Honor has recited some of the possibilties.

10    Since he has already stated the position of the Government

11    that they have no objection to Fallbrook if it wants to go a-

12    head and spend the money and take its chance upon the future

13    flood years coming to give them water or use it for some other

14    purpose -- I have not mentioned storing of Colorado River

15    water in there during winter excess and using it for summer

16    stress,  but since they have already made that statement, we

17    say that there is no justification for his now saying that he

18    wants to maintain the status quo and have Fallbrook do nothing,

19    which the responsibility of the law places upon their Board of

20    Directors to take some action as they think economically wise

21    and good business from their point of view.

22          MR. VEEDER:   I still suggest that we argue this

23    matter as a matter of law, and I would be very pleased to

24    touch on the various things which Judge Swing has reviewed

25    here and point out the the position of the United States.

THE COURT:  Well, now, you have said that you could go along with the statements I made that this decision of the Water Rights Board would have no effect upon the riparian rights of the United States, that it would have no effect upon the alleged prescriptive rights, that it would have no effect upon the alleged appropriative rights, and apparently you are also in agreement that it would be proper for me to take into account this permit, if one was granted, when it came time to catalogue the appropriative rights on the River that had been granted   That far you went along with me, as I understood it

MR. VEEDER:  Well, as far as I am concerned, if the permit is issued and Fallbrook doesn't change their position by reason of it, fine.

THE COURT:  All right.  Now then, we come to what you say would be the problem, that Fallbrook would begin to turn dirt on a dam.  Of course, that presents other problems.  But I don't think that's insoluble.  First, there is no doubt about the right, in my opinion, of Fallbrook to build a dam to store water that they might buy from the Colorado River, if, for instance, the dam was not built so that it blocked the River.  But when you build a dam on the River, then, of course, if you put the dam there, there would have to be definite assurance and guarantee that the downstream rights were

not affected by that dam until some adjudication was made
In other words the status quo of the downstream users would
have to be preserved, if you are going to put/a dam across the
River. But I don't think that's insurmountable. It's pretty
difficult for me to see why, if the downstream users' rights
to have a hearing here and have their rights determined was
guaranteed and not be prejudiced, why there would be any harm
for the Government having a dam built, if economically Fall-
brook wanted to take that chance.

But with two strings to their bow, Fallbrook might
well decide to take the chance. They might say, as Mr. Sachse
put it, "we may or we may not get water, but we do know that
in the winter months there will be water available from the
Metropolitan Aqueduct. We could buy water at that time, and
we could store it and use it in the winter. If next year
there are excess floods and we do get some water which we can
legally use, maybe we will not have to buy water next winter."

Now, I don't see how the Government could stop Fall-
brook if they wanted to do that, as long as there was a guar-
antee that the construction of this dam would not prejudice
the decision in this case as to the rights on the River and
that meanwhile the downstream users would not be hurt by the
construction of this dam, which would, I take it, mean that
if the dam went down to bedrock there would have to be a cer-
tain amount of water run through at all times to preserve the
status quo.

MR. VEEDER:  Your Honor has touched on the very point, there, to which Mr. Sachse had reference.  The Utt Act is precisely that point and has been our guide.  The Utt Act says, and we have always said, when our rights are determined and adjudicated we don't care what Fallbrook does.  If they want to pour $3,000,000 into a dam, fine.  But we do believe that the status quo would be changed prior to the time that these issues to which we have made reference are resolved.

THE COURT:  How would it be changed?

MR. VEEDER:  I truly believe politically, for one thing.  You say that's outside the realm of the Court.  We don't work in a vacuum here, your Honor.  We all know that.

And secondly, --

THE COURT:  What do you mean by "politically?"  How would that affect the Court -- politically?

MR. VEEDER:  Well, it could affect the Court in this way.

THE COURT:  I don't stand for election.

MR. VEEDER:  No, but --

THE COURT:  And I doubt if I will be impeached because of my decision in this case.

MR. VEEDER:  I can see a line of legislation: there will be no more money spent for prosecution of this case.

The point I am trying to make, though, is that we have a difficult problem presented by the action of a party

to this cause, namely, the State of California, and I believe that as a litigant here we will be severely prejudiced by the action that the State Board might take.  And so it is a question --

THE COURT:  Well, if I understand you, you claim that you would prejudiced not so much by the fact that the State Board would grant a permit, but by what Fallbrook might do after it got the permit.  Is that your point?

MR. VEEDER:  Realistically, yes.

THE COURT:  Well, isn't it possible to solve that problem by stipulation?

MR. VEEDER:  If they would stipulate the way I have asked them to.

THE COURT:  Well, am I whistling up a hollow log, Mr. Sachse?  You have heard the concession that Mr. Veeder made, and you have heard him say where he says that he parts company with me.  Is there any possibility of solving this matter by a stipulation?

MR. SACHSE:  If this stipulation requires us to stop, I will say no, your Honor, and I will say I'm not trying to--

THE COURT:  Well, what about a stipulation that didn't require you to stop but required you to give adequate assurance as to the status of the downstream users until there has been a complete adjudication --various things of that sort?

MR. SACHSE:  I'll answer that in just a moment, if I may.  I first want to point out something.

Mr. Veeder suggested a moment ago that we stipulate for a year, when I made some accusation -- he says, "Well, will you stipulate for a year?" or something of that kind. May I point out to your Honor that it takes more than a year to build this dam.. When we start building the dam, the first thing we have to do is to create some kind of pipe to let the whole flow of the River go around, because we can't build a dam where the water is. We have got to, in the building process, permit every drop of water to go to Pendleton. That's the first thing in the job. And if he wants a stipulation that during the dam construction we will not stop any water in the River more than we are today taking under today's permit, I will stipulate to it.

MR. VEEDER: Good.

THE COURT: What about that?

MR. VEEDER: I am extremely interested in some of these developments.

When are you going to start letting that water down now?

MR. SACHSE: I said the water that we are today taking under today's permits. If you don't like those permits, you have your remedy, Mr. Veeder.

MR. VEEDER: We have them, and we are right in Court for that very purpose. We are seeking our remedy now because you are invading our rights now.

499

MR. SACHSE:  Well, Mr. Veeder certainly is not going to ask me to stipulate to an injunction against us.  We have a color of title.  We have a document from the State of California that says that we can take a certain amount of water. Now we recognize that your Honor has the power, based on certain findings, to tell us to stop taking that water.  But I'm certainly not going to stipulate to it.

THE COURT:  Well, Mr. Veeder, all you wanted to preserve, as I understand it, was the status quo, and the status quo is that Fallbrook is taking this water that you claim belongs to the Government.

MR. VEEDER:  Your Honor, we may be anticipating somewhat a ruling as to what the status quo may be.  The status quo, in our view, is this: that Fallbrook, under a gratuitous and irrevocable license from the United States of America was taking a small quantity of water in 1948.  That is our view of what the status quo would be in the event that we go pendente lite, because in determining what is the status quo, as your Honor well knows, we go back to the last uncontested time, which was when Fallbrook was being given some water by the United States of America.

So we feel that the crux of this matter is well pointed up by the fact that Fallbrook, having violated the irrevocable license, went in and got a permit from one of the parties to this cause and is now saying, "We have got a legal

1  right to take that water from you," and it doesn't take any

2  strain of the imagination whatever to see one more permit and

3  one more such claim.

4       So I truly believe that it is a matter that could be

5  resolved as a question of :. law and resolved by your Honor

6  at any time.   I think it is a pure question of law as to .

7  whether a party, California, can do this.

8       THE COURT:   It might be resolved either way as a

9  question of law; it might be resolved that you get an injunc-

10 tion, it might be resolved by a declaration by the Court that

11 I saw nothing wrong with what the Water Rights Board was plan-

12 ning to do, in view of the position of the parties.

13      MR. VEEDER:   And, of course, we would proceed on

14 that basis.

15      THE COURT:   Well, you have an issue now.   You will

16 either settle it by stipulation of some kind, if somebody wants

17 to work on it, or we will get some predicate of facts agreed

18 to, which are probably all contained in our pre-trial stipu-

19 lation on which we are working and on the basis of that predi-

20 cate of facts make your motion and we will get an adjudication

21 on it.   We will do it one way or the other.

22

23      MR. VEEDER:   That may be the proper approach, and

24 I think this, that if Mr. Sachse wants to tender a stipulation

25 to us we will look at it.   We may tender some amendments.   If

there can't be an agreement, then I think the next thing is

a motion for a ruling as to whether or not the State may pro-
ceed under the circumstances.

THE COURT:  Well, before you make your motion, let's
get the pre-trial stipulation worked up that has the necessary
predicate of facts.

MR. VEEDER:  Yes, your Honor.

MR. STAHLMAN:  If I may, your Honor, in connection
with this stipulation before the Court here.

I am trying to determine in my mind what the Ninth Cir-
cuit Court of Appeals had in mind when they wrote, in their
decision reversing the Government case against Santa Margarita
Mutual, this particular statement:

"The key question in this case is who had the right
to store these flood waters for future disposition, Vail,
Santa Margarita, Fallbrook, or the United States, or perhaps
some other owner intermediate on the stream, or perhaps some
physical solution by or controlled under Court decree could
permit participation by all of the conservation of all the
flow of the watershed for beneficial use so that no drop would
waste uselessly into the Pacific."

I read out of that that the Court has indicated that
the physical solution, the method of control, the method where
diversion should be and where water should be stored would be
under the jurisdiction of this Court here to determine, after
the evidence was in the case, as to where a dam, if any,
should be built on the River.

1     THE COURT:  Well, yes and no.  If it turned out that

2     there were only rights of riparian owners and prescriptive

3     users and prior appropriators involved, we might talk about

4     that kind of physical solution.  But if, on the other hand,

5     it turned out that there was not only water for all of those

6     people, but that there were also water for X number of appro-

7     priators, who later on might seek to appropriate water, then

8     I don't think this Court would take on itself the task of de-

9     ciding who should appropriate water, and how much, and where,

10    etc., and I don't think the physical solution would work there.

11    That is a horseback guess on it.

12        MR. STAHLMAN:  This other thought -- I merely want

13    to pass this -- this other thought struck me with relation to

14    the determination as to whether there is a surplus.  I think

15    the Court has to make that determination, with all due respect

16    to Mr. Veeder, at some stage of this case, when you reach the

17    point where the decision of the Court in order to be made

18    operative would have to be by some injunctive process.

19

20        THE COURT:  Well, tentatively, I don't see how I

21    could make that adjudication, because I don't know what is

22    going to occur in the future.  I think what I would have to do

23    is to catalogue the rights to the water, and that has to be

24    fixed and the correlative rights of the parties.  Then after

25    you have done that, if there is anything left over -- it may

1    be one gallon, it may be a million gallons, but I can't make

2    a decree that next year there will be a million gallon surplus.

3    I can say what the rights are on the stream and who gets the

4    first dip out of it.  But I can't say how much somebody else

5    is going to get after that.

6         MR. VEEDER:  That's all we are asking.

7         THE COURT:  Well, all right, let's pass this one up,

8    or leave it this way: how many days do you want to think about

9    whether you want to try for a stipulation on this, Mr. Sachse?

10        MR. SACHSE:  Your Honor, I'm perfectly willing -- I

11   don't want to take any days at all.  It is quite clear what we

12   all do.  I agree with Mr. Moskovitz; this is no problem.  I

13   think the more we talk, the more time we waste, the closer

14   the State Water Rights Board comes to its decision.  It's

15   going to be here.  It's going to render one one of these days.

16   What we are really talking about is the academic question of

17   how your Honor is going to treat it, and you are the only per-

18   son who knows that -- we don't.  There will be a decision, one

19   of these days, of the Water Rights Board.  What weight you will

20   give it, I don't know.

21        THE COURT:  We could find out what your position is

22   going to be.  You have, I think, made it pretty clear --.

23        MR. SACHSE:  Well, I will state it again.  As far as

24   we are concerned, we recognize that whatever permit we get from

25   the State of California will be subject to the vested rights

as determined by your Honor.   I don't know what else it needs
to tell the story than just that.

MR. VEEDER:   Were it not for the fact that both you
and Mr. Moskovitz -- and this will be the last gasp, your
Honor -- said that you have to have, as a jurisdictional
factor, a finding that there is unappropriated water, I would
agree completely that the permit would be meaningless.

MR. SACHSE:   Well, then I will stipulate one step
further and take care of that, that whatever determination
the State Water Rights Board may make as to the existence or
the nonexistence of surplus is in no sense binding on your
Honor.   I hope that it will be influential, but I don't think
it is binding in any way whatsoever.

MR. VEEDER:   Well, now, I'm sure of that.   The point
of it is, is it going to be pressed here?

MR. MOSKOVITZ:   Your Honor, let me clarify that.
The only purpose for which the Water Rights Board will make
this determination as to whether there is or is not unappro-
priated water is for the purpose of deciding whether it has
the power, under California law, to issue a permit.   It has no
other purpose which affects this Court and its job.

THE COURT:   Well, I think the record is pretty clear.
I don't see that there is any problem.   But you may do as you
please, Mr. Veeder.

1    MR. VEEDER:  Well, as I understand it, if we don't

2    get a stipulation, then your Honor will entertain a motion on

3    that.

4    MR. SACHSE:  Well, I told you what I will stipulate

5    to.  If it is not enough, make your motion.

6    THE COURT:  Well, I think Mr. Veeder, you had better

7    draft a stipulation, if you think you can stipulate.  If not,

8    make your motion.  Let's pass that one up.

9    Now when is the State of California going to have

10   this brief in?

11   MR. MOSKOVITZ:  We'll get the brief in by the dead-

12   line on the 13th of December, your Honor.

13   THE COURT:  We should fix a date, I suppose, to

14   hear argument on these new positions advanced by the Government.

15   I use the word "new" advisedly.

16   MR. SACHSE:  We have completed our filings, your

17   Honor.

18   THE COURT:  You have filed.  We're waiting for the

19   State.

20   Do you want a chance to answer the State's brief,

21   Mr. Veeder, before you re-argue?

22   MR. VEEDER:  I think so, yes, your Honor.. And rumor

23   has it that Mr. Swing has filed something purporting to be a

24   response to our brief.  I haven't had the pleasure of being

25   served with it.

1    MR. SWING:  Your Honor, the affadavit on file says

2 that it was sent to him at his official mailing address and

3 his superior, Mr. Rankin, in Washington, D.C., which, I assume,

4 is your base of operations.

5    THE COURT:  Well, Mr. Veeder is all over the country.

6 Probably if you communicate with your office you will find that

7 your brief is there.

8    MR. VEEDER:  Yes, I would like to respond, your

9 Honor.  I would like to have, if I may, ten days to respond.

10 That will be Christmas, though.  Well, ten days I would like

11 to respond after the 13th if I may, your Honor.

12    THE COURT:  Well, then, let's set another hearing --

13 let's put it over until after Christmas -- set a hearing for

14 January 6th, a Monday.  How is that?

15    MR. VEEDER:  That is aggreeable with us, your Honor.

16    THE COURT:  To hear your argument on these legal

17 propositions, Monday, January 6th, at 10 O'clock, and you have

18 ten days after December 13th, Mr. Veeder, to file your brief,

19 so you would have until -- well, I'll be generous with you,

20 I'll give you until Christmas Eve, the 24th of December.  I'll

21 give you an extra day.

22    MR. STAHLMAN:  Have Santa Claus deliver it.

23    MR. VEEDER:  I think I'll have Santa Claus write it.

24    MR. STAHLMAN:  I think Santa Claus wrote the other

25 one.

1    THE COURT:  Mr. Veeder, one thing I want to hear you

2    on, on January 6th, is why there has not been a change in your

3    position, from reading your brief and reading Mr. Sachse's

4    brief, in which he quotes you at length/before Congressional

5    committees, and in which he quotes Mr. Vanesch, an old friend

6    of mine, before Congressional committees.  I can't reconcile

7    your statements then and your position now that you set forth

8    in your brief.

9        MR. VEEDER:  Your Honor, when I have studied this

10   thing through, if I understand it, there is quite a bit of

11   selective pruning in what they did to these Congressional Re-

12   ports, but I will certainly go through and read what they have

13   reported.

14       THE COURT:  Well, they have got up a pretty good

15   literary job.  One Senator says that, "Well, we're in trouble

16   about this matter of the sovereign rights of the United States.

17   Let's have this understood.  What do you claim?"

18       You said, "We claim nothing except the rights that

19   we acquired through our condemnation and our purchase.  We

20   claim no other rights, because we are the Government of the

21   United States."

22       And then some other Senator, even the present Vice

23   President interjected: "Let's make this clear now."  And again

24   and again it was repeated.

25

1          Well, you read it.  You haven't read it.  You'll

2     enjoy it.

3          MR. VEEDER:  I have enjoyed every moment of what I

4     have heard about it, your Honor.  I think Mr. Swing probably

5     outdid himself.  I did read part of it last evening late.

6     "Alice in Wonderland" is good solid stuff in  comparison.

7          THE COURT:  Well, I'm merely indicating, from, what

8     I have read -- I've read your brief and I've read theirs --

9     I'm telling you now that the burden is on you to tell me why

10    you haven't changed your position.

11         MR. VEEDER:  Well, your Honor, we will undertake to

12    do that.

13         THE COURT:  Now, let's talk about this Master situ-

14    ation.  I'm fairly certain that I'm going to appoint a Master

15    in this case and have him take the evidence from a lot of these

16    little people.  I don't propose to use him in the major part

17    of the controversy between Fallbrook and Santa Margarita and

18    the Marine Corps., but I would imagine that on a lot of this

19    area there are places where this Master could do the job.  As

20    a matter of fact, I don't know why the Master couldn't start

21    very shortly, under a proper order of direction, to start to

22    take evidence from various people as to what their rights were,

23    whether their rights were riparian or not, the extent of their

24    use, the extent of their potential use, and start on this job.

25         Now what do you think, Mr. Veeder?

MR. VEEDER: Well, I think (1) I'm very much in fa-
vor of the appointment of a Master. I think that is an excel-
lent idea, and I think it will be a great aid in carrying out
whatever order you enter in regard to the trial. As I under-
stand it, we could try the case in the various areas where the
people are located and save money that way. I think that is
excellent.

From the standpoint of proceeding by the Master, I
think we should expedite in every way to get this case on the
road. I'm not exactly sure of the date when that would be
accomplished. But there are certainly areas where the parties
have been served -- we checked those out yesterday. There are
large areas where the parties are quite up-to-date, and I
think it would be entirely appropriate to fix an early date
for trial, as early as possible, and to have the Master ap-
pointed.

THE COURT: When you say a date for trial, did you
mean a date for the Master to conduct some hearings, or the
trial date of this case?

MR. VEEDER: Well, your Honor, when you go on the
merits, I would assume that the Master would -- or do you in-
tend to have a period in advance where you would rule on a
question of the relationship between Fallbrook and the Marines?
I'm not quite sure what your Honor said there.

1    THE COURT:  Well, when you said fix a trial date,

2    did you mean the trial date in the District Court, or are you

3    talking about a trial date that the Master would fix for hear-

4    ing the claims on the De Luz Creek, we'll say?

5    MR. VEEDER:  I would assume that the first date that

6    your Honor set would be the trial date, whether it was before

7    the Master or before yourself.

8    THE COURT:  Well, I don't see that there is any

9    necessary correlation, to start with, between the trial date

10   here and the date the Master starts.  Now, follow me and see

11   if we are thinking alike.  If the Master -- well, let's take

12   De Luz Creek --and maybe decide that he was going to conduct

13   the hearings as to the extent of rights on De Luz Creek, and

14   he would have to get himself some facilities somewhere up in

15   that area, and notice to these people that on a certain day

16   he would take testimony as to what their rights were.  All his

17   findings and conclusions would be interlocutory recommendations

18   to this Court.  He would go ahead and conduct his hearings.

19   We couldn't ever conclude the trial on the major

20   issues of the case and enter our final judgment until the Mas-

21   ter had submitted his various recommendations and there had

22   been a chance for everybody to shoot at them and they had been

23   adopted by the Court, and I would guess that that would be

24   done not at all at one time but probably piecemeal, tributary

25   by tributary.  And maybe when he concludes the  De Luz, he

1   submits a report, and it is then made a part of the record of

2   the District Court Trial, opportunity is given to the people

3   who object to his findings and his conclusions, and the Court

4   would either adopt them or reject them or revise them.   They

5   would then become a part of the record of this case, and on

6   and on, until eventually we have completed the case and could

7   enter a judgment.

8           So that as I try to visualize it, I don't see any

9   particular correlation between when we would start our trial

10  here and when the Master might start to work.

11          MR. VEEDER:  May I inquire on that?  Would the case

12  in chief of the United States go in first, and then the Master--

13  how would that be handled?  Or would we simply start in taking

14  evidence in regard to the individuals and later conclude the

15  overall trial between Fallbrook and Santa Margarita Mutual?

16          THE COURT:  Well, I didn't contemplate that the Mas-

17  ter -- we'll say that he is up on De Luz Creek -- I wouldn't

18  contemplate that he would take evidence concerning the United

19  States' case in chief.  I think he would be taking evidence

20  from the small property owners, particularly, who can't afford

21  lawyers, who have a right to be heard and have a right to make

22  their record, and they would then make their record as to what

23  land they owned, what the facts were that showed whether it

24  was riparian or not riparian, what use they had made of water,

25  what potential use they could make of water --all the things

1   that would go to make up their position, and he could make his

2   interlocutory findings and make his conclusions of law either

3   individually or preferably in the groups or by tributaries --

4   he would submit those to the Court.

5        At that time there would be an opportunity given to

6   any other party to object, or to the party about whose pro-

7   perty the Master had made findings to object -- to have due

8   process.

9        The Court would either adopt the findings and con-

10   clusions, modify them, or reject them.   In certain cases the

11   Court might refer them back for further testimony.   All the

12   things that happen when you have a Master.

13        Now, somewhere along the line, the Government's

14   case in chief is going to be put on in the courtroom here.

15   I'm not going to make you go out, parcel by parcel, and put

16   your case on.   And now there may be   certain modifications

17   of that.   For instance, we might decide that some of this

18   geological water data and all that you have collected should

19   be presented to the Master parcel by parcel as he went along

20   on these cases, but it would be upon the assumption that it

21   would be merely to assist him at that time or on a predicate

22   that that evidence was going to be later on offered into

23   Court.   There is going to be a little dovetailing that has to

24   be done.

25

MR. VEEDER:  I'm following you now.  I was not, at

first, your Honor.

THE COURT:  Well now, am I all off on this?

MR. VEEDER:  No, I think it is entirely proper, but

I hadn't correlated the activities on that basis, frankly.

THE COURT:  Well, I mean, it doesn't seem to me that

I have to say that I'm going to start the trial on this case

today and therefore today the Master starts in his work.  I

think it's entirely possible to work out a procedure where,

as soon as we can get a pre-trial order that we can send out,

as soon as we have people served in a given area so that we

have that whole area served, we could start the Master to work.

I apprehend, also, that any Master worth his salt is

going to want to read the file in this case.  He is going to

want to study some of these legal propositions.  He is going to

want to know generally what the case is about, so that he doesn't

go out in the woods to decide some questions in a vacuum.  He

has to know how what he does fits in/what we're doing here.
                                    with

MR. VEEDER:  He should have some preliminary time to

review it.

THE COURT:  That's right.  So I'm suggesting that we

face up to this Master situation and work out some detailed

procedures as to how the Master would fit into this picture.

MR. VEEDER:  If we have additional pre-trial time

on January 6th, maybe January 6th, 7th, and 8th, maybe by that

1    time we would have these things formulated

2            THE COURT:  It's agreeable with me.

3            MR. SACHSE:  May I ask a question.  If we are going

4    into this, I am very much in favor of going into it on the 6th,

5    7th, and 8th, because I think it is a very big question, your

6    Honor.  But I'm a little at a loss as to whether this would

7    work --.

8            MR. VEEDER:  Why?

9            MR. SACHSE:  Well, Mr. Veeder, if I may.

10           Because this is a serious question.  I happen to

11   have a few individual defendents.  One of them happens to be

12   on De Luz Creek.  Let's be very specific.  How I would re-

13   present him before a Master in asserting his claimed rights

14   would depend a great deal on what your Honor's rulings might

15   be on the United States.  To go to the ridiculous extreme,

16   suppose that your Honor should make rulings of law in a pre-

17   trial order which, in my opinion, have the practical effect of

18   saying that none of the uses of the United States were proper

19   riparian uses.  Well, /I will handle my gentleman on De Luz
                                How

20   Creek is very different under such conditions, than it would

21   be --.

22           THE COURT:  I don't follow you on that.  How would

23   that have any effect on how many acres of ground he has, where

24   the ground is located with reference to the stream, does it

25   overlie a basin, has he only percolating water, what use has

515

he made of water in the past, how many acres has he used it on, how much water has he used, how much water could he reasonably use in the future --.  All those are factual matters which would have no connection whatsoever with what I might rule. This Master can't, when he hears your piece on De Luz Creek, determine correlatively what your man's right is, but he has to make some findings as to basic facts, so that eventually this Court, based on the findings on your man on De Luz Creek and based on Camp Pendleton at the mouth of it, can make some determination as to what their correlative rights are.

MR. SACHSE:  Well, perhaps I misunderstood you.  I follow that.  That's simply a question of finding of facts. But the point that I was trying to make is that the Master is going to have a rather rough time with his recommendations. Frankly, I don't see how he could make a recommendation until the basic issue of the rights of the United States is settled.

THE COURT:  Well, I'm glad we are exploring this, because I had to sort of think of this thing in a vacuum.  I was just trying to visualize how this would work.

Now, let's take your man on De Luz Creek.  First of all, there is this distinction.  You represent him as attorney in this Court.  You are going to be here at the trial.  I wouldn't be too concerned about your man up there because he has a lawyer and his lawyer is going to have to be here in Court, except that if we are going to try this by tributaries

it might be more logical to take his proof at the same time

that we are taking proof of other people on the Creek.  Do you

follow me on that?  That would be the only reason why I would

say that we need worry about him.

I'm thinking particularly about three thousand

people here who have no lawyers.

Now, how many acres has your man got up there?

MR. SACHSE:  I have two of them, your Honor.  One of

them has about one hundred and forty, and one has in the neigh-

borhood of one hundred and thirty.  Both of them are riparians

to tributaries of De Luz Creek.

THE COURT:  Now, here's what I would visualize --

and you gentlemen feel free.  There are a lot of older heads

here than I am.  In fact, I'm a little younger than most of

you except Mr. Sachse and Mr. Moskovitz.  But here's how I

would visualize this.  Let's assume that your man has no law-

yer, like many other people haven't.  Notice is served that

the Master, at a building or store somewhere, is going to hold

some hearings on De Luz Creek and its tributaries, and maybe

he posts the order in which certain things are going to be

taken up.  Notice is given.  You would have to work out some

way to give notice to other people who may want to be present.

The Master first finds out what the title is -- who

owns the property, he finds out the area, he takes the facts,

the testimony as to its location adjoining a stream -- maybe a

piece of property which at one time was part of another part

which was riparian; maybe the rights passed and maybe they

didn't -- he takes the testimony as to what use has been made

of this water, what potential use, how many acres could be

irrigated, etc.

Meanwhile the Government would have to have some

representative there who would have available this physical

data that the Government has gathered, and I think that if

this property owner wanted to avail himself of that data he

should have that right.  The Government should make it avail-

able -- "here's what we found out."  If the property owner is

satisfied with that, all right.  If he isn't, he can dispute

it.  The Government's physical data may say, "Our investigation

shows -- here's our report -- that this is not riparian to a

stream, it's not over a basin, it's percolating water which

has no bearing or effect on the stream at all."

MR. SACHSE:  I follow you.  I apparently misunder-

stood.

THE COURT:  Then I think the Master would have to,

parcel by parcel, find facts, he would have to draw certain

conclusions of law pertaining to this man's property -- either

that this man had a riparian right or that he did not have a

riparian right, and so on down the line.

Eventually, when those findings were adopted by the

Court on the basis of the finding as to parcel A, B, C, and

the Marine Corps., the Court eventually -- maybe with the help of the Master to assist him, I don't know -- but eventually the Court is going to have to determine the correlative rights.

Now I am thinking of using the Master to make the record as to a lot of people who haven't got lawyers. He may even have to have a form of answer or general denial or something that he can have the parties sign up right then and there and have it ready to file, so that we can have some record of the appearance by these people.

Now let me have your ideas. What do you think the Master should do?

MR. SACHSE: I was offside. I had misunderstood what you had in mind. Insofar as the taking of this factual evidence on the property is concerned, I see no objection to that at all. I think that would be helpful. I don't want to belabor a dead horse. I still think the case would move in a more orderly fashion if we got down to the nut of it first and perhaps we wouldn't need a Master.

THE COURT: Maybe while the Master is going on we are getting to the nut of here. There is no reason why we couldn't/go~~ing to~~ **be** trial here.

MR. SACHSE: You mean simultaneously?

THE COURT: Well I don't think Mr. Veeder is going to appear at all these hearings before the Master on finding out how many acres the man has -- he may on some of the bigger

ones, but I would be surprised if he were out there on the little ones.

MR. SWING: Your Honor, as long as you are in the mood to give helpful aid to lawyers who need it, I want to get in while the gate open.

With reference to whether or not the Master would make recommendations as to the law on certain points, or whether your Honor will, before a Master starts these hearings, give the principal attorneys, at least -- maybe all the attorneys -- your views on the questions of law. They have been briefed once. We were in Court. Your Honor tentatively indicated some rulings.

THE COURT: May I interrupt you. I intend to rule on those matters, but we presently are in the position, in a way, of discussing it in a vacuum until the pre-trial order is agreed upon, --

MR. SWING: That's right.

THE COURT: -- which gives us a predicate to base some of these rulings on you can't very well make rulings. Now I intend to rule on many of those things, but I doubt that very many of them, if any of them, will have any effect on what the Master concludes as to some of these smaller parcels.

MR. SWING: I have a client who has been served by Mr. Veeder's agents up on the top of Palomar Mountain. He has a weekend cabin up there and goes up there and drinks and

flushes the toilet and comes down for the rest of the time to

La Jolla.  He was served as invading the rights of the United

States.

Now, when we get down to percolating water, or water

which is a part of the stream, or which is on its way to the

stream -- when we get a ruling on that, if it should be adverse,

I would want to amend my answer to shorten the case with re-

ference to your Honor"s ruling. And so I think, your Honor,

when you do make the rulings, --

THE COURT:  Well, you do suggest something to me.

I think very definitely there would be the problem for the

Master, in many of these cases, as to his views and conclusions

and findings, as to whether the land was over a basin or over

a part of the stream, or whether it was riparian, or whether

this was merely percolating water.  But I think on that matter

we could probably agree on some statement of the law or some

authorities that distinguish between water which is moving

underground and is, therefore, part of the water system, and

water which is not.

Is that expecting too much, that we could instruct

the Master that we all looked upon the law as being so-and-so

and give him some predicate to proceed on, on that basis?

MR. VEEDER:  Mr. Swing's question and your Honor"s

answer coincide completely with my understanding of the function

of the Master.  If he encounters a problem, he can petition the

1  Court and he can ask for directions.

2  THE COURT:  Well, I think we might well do this. If

3  we get the Master appointed, the Master could be present and

4  participate in some discussion and resolution as to the differ-

5  ence between percolating waters and waters which are a part of

6  the stream or are the stream.

7  MR. VEEDER:  Did I understand your Honor to say that

8  we could have the 6th, 7th and 8th of January?

9  THE COURT:  Yes, I have that time available.  We will

10  use as much time as we want to.

11  Do you think you can have that pre-trial stipulation

12  revised and circulated and see if we can get the rest of the

13  knots ironed out by that time?

14  MR. VEEDER:  Well, that was one of the primary con-

15  cerns.  I think that we can distribute again the suggested

16  changes of today, and if we have that three day period I think

17  we probably can pull together the complete agreed facts, at

18  least.

19  THE COURT:  All right.  We will list that as an item.

20  MR. VEEDER:  And then have it and reproduce it at

21  that time.

22  THE COURT:  List that as Item 2 for that hearing.

23  First is the legal argument on these briefs.  Second is this

24  pre-trial stipulation.

25

MR. SACHSE:  May I ask your Honor the same question that Mr. Veeder mentioned earlier, that I raised with him at the recess: what about these contentions?  Is there anything to be accomplished?  Will we expedite it at all by attempting to draft our legal contentions at this time, or won't we be better off to/wait the completion of a factual order and your Honor's ruling on the evidence?  You have't made any order directing us when you want those in.

THE COURT:  Well, of course, the contentions are helpful in pointing up the issues that are to be tried.  You can do it piecemeal.  You can have your factual pre-trial stipulation separate, and later we could list the contentions. I don't know any reason why you shouldn't list your contentions by that date and see what we have.

MR. SACHSE:  We can do it.

Now the last thing, which I would much prefer postponing until the last minute, if we can, and that is the physical preparation of the exhibits.  At least, as far as Fallbrook is concerned, they cost a lot of money -- and they are expensive. Whatever can possibly be covered by/stipulation in the order itself, I would just as soon not have to prepare twenty copies to circulate among all the counsel.

MR. VEEDER:  Are you talking about pre-trial exhibits?

MR. SACHSE:  Yes.

1       MR. VEEDER:  Your Honor, we have abandoned -- at

2  least we have dropped all references to exhibits for that very

3  reason, in this pre-trial order.

4       MR. SACHSE:  I haven't had time to read it -- I

5  didn't notice.  You have nothing in it like there was in the

6  old Yankwich order.

7       MR. VEEDER:  That's right; there are none.

8       MR. SACHSE:  That takes care of that.

9       THE COURT:  Well, eventually, we're going to have

10  to face the issue of exhibits.

11       MR. SACHSE:  Yes.

12       THE COURT:  There needn't be any duplication, and we

13  should know before trial what the exhibits are.  We can't do

14  everything at one time.  We can put down on the calendar for

15  the 6th and 7th some discussion on this question of exhibits.

16  I wouldn't expect anybody to be ready to go on it, but a

17  general exploration of the question how to handle the exhibits.

18       MR. VEEDER:  I think that before we are through,

19  before your Honor enters a final order, your Honor would have

20  a list of the exhibits that are offered.

21       MR. SACHSE:  But you don't expect them by the 6th.

22       MR. VEEDER:  No.

23       THE COURT:  No, we'll put it down for discussion,

24  for further procedure, on exhibits.

25       Number 4 on that agenda will be this problem of the

1   Master.  Do you think that you could formulate an order --

2         MR. VEEDER:  Of reference?

3         THE COURT:  -- a proposed order of reference for me?

4         MR. VEEDER:  Yes, your Honor, we'll submit that.  Do

5   you want that on the 6th?

6         THE COURT:  It could be amended from time to time.

7   We could formulate a general order to start with.  We could

8   issue specific orders at particular times, if we needed to.

9   Give me something to start on.

10        MR. VEEDER:  Yes, your Honor, I will.  That is on

11  the 6th?

12        THE COURT:  Yes.  I would like to have it submitted

13  to me a good bit earlier than that.

14        MR. VEEDER:  We'll have it the first of next week.

15        THE COURT:  All right, we'll have something to work

16  on.

17        Now, as to whom I appoint as a Master, of course,

18  I imagine that it's in the discretion of the Court.  Do you

19  gentlemen want to be heard on this?

20        MR. VEEDER:  Mr. Burby has asked that we stipulate

21  that he might be.

22        THE COURT:  Unfortunately, he got his feet wet,

23  here, working for the Government or he might have made a good

24  Master.  I'm afraid that he's disqualified by "guilt by

25  association."

3

525

I think that I expressed myself once before that I thought that the Government ought to pay the freight on this matter.

MR. VEEDER:  Your Honor, I heard that suggestion, and I'll take it up just as soon as I get back to Washington.

THE COURT:  You haven't taken it up yet?

MR. VEEDER:  Well, it takes a certain amount of courage to go and tell them --

THE COURT:  Well, that's what you did in Oregon and Washington.

MR. VEEDER:  Yes, it took courage there, too.  But it's going to run quite expensive.

I'll do it the first of this week.

THE COURT:  Well, I've heard a lot of things about you, but I've never heard that you lacked courage.

MR. VEEDER:  It might be a lack of good sense, your Honor.

THE COURT:  Well, I don't know how else we can do this.  The Government is bringing a quiet title suit.  It has the laboring oar.  You certainly can't apportion this expense among all these defendants.  If you tried to apportion it among some of the major defendants, you would have a serious problem.

MR. VEEDER:  They all contribute anyway through their taxes.

1          I'll do it and I'll report, your Honor.

2          THE COURT:  All right.

3          Let me tell you what I have done, then, on that score.

4  I consulted Judge Haines, in this County, who is a very

5  excellent trial judge and who also was reputed to be a water

6  expert in this community, and originally I thought that I might

7  be able to induce him to act.  But I didn't know his age --

8  he's 80, and although he seems to be in pretty good health he

9  would not be available.  He gets compensation from the State

10  and anything he received from this type of work would be

11  deducted from his State pension, and he made it clear to me

12  that he couldn't help me.

13          I also consulted my colleague Judge Weinberger, and

14  I have consulted other people around the community, and from

15  Judge Haines, Judge Weinberger and a number of lawyers I

16  talked to one name keeps cropping up as the logical man to do

17  this job in this community.  His name is Cranston, a lawyer

18  with the firm of Cary, Gray, Ames, etc.  He is a Stanford

19  man, which he could live down, of course -- being a graduate

20  of the Stanford Law School.  Mr. Burby and I having come from

21  SC, of course, we take a dim view of that; but he can live

22  that down.  He had the misfortune, in one class on one

23  occasion, of getting a B.  I think that all the rest of his

24  grades in law school were A's.  He is an able man, and from

25  what I hear he bears an excellent reputation.  He is attorney

for a couple of water districts outside this watershed.  He

has had some experience in water law.

Mr. Reporter, I would like to see you after court.

This is a public hearing, but I prefer that there not be

speculation on this at present.  I'll talk to you later about

it.

The best thing is that Cranston is recommended by

Judge Haines and by Judge Weinberger and several other lawyers

in this community.  Presently, if we can come to some terms

as to what his charges would be, that is whom I would probably

appoint.

Mr. Swing, you must know him.  You've been around

here since the memory of man runneth not to the contrary.

MR. STAHLMAN:  Longer than that, your Honor.

THE COURT:  Would you have objection to his appoint-

ment?

MR. SWING:  None that I have heard you name; I

haven't any objection to any of them.  Cranston?

MR. STAHLMAN:  John Cranston.

THE COURT:  Cranston.

MR. SWING:  No, your Honor.  I thought you first

suggested Judge Haines.

THE COURT:  He was not available.

MR. SWING:  I have no objection.

THE COURT:  Does anybody have any objection?

6

1   I'll not pursue it further, except that that is what

2   I am thinking about.  I think you need a local man.  I think

3   that it would be silly to bring somebody in from outside this

4   community.  I think you also need a man of some stature who

5   bears a good reputation and in whom people would have some

6   confidence.  There is many a young lawyer who could probably

7   do a pretty good job for you.  On the other hand, I don't

8   think we can consider that.  I think we have to get a man with

9   some 20 years experience or so at the Bar.  You have to get a

10  man vigorous enough to do the job, and get a man who has at

11  least some knowledge of water law, and a man who has elemental

12  good sense.

13          In the North I understand you got a Dean of a Law

14  School.

15          MR. VEEDER:  That's right.

16          THE COURT:  We have had in the past only one law

17  school down here, and it folded up.  Now San Diego University

18  has a Law School starting up, but the young man who is the

19  Dean of that Law School is just a young practitioner and he

20  makes no claim to the stature that you would ordinarily

21  attach to a dean of an established law school.  We have no

22  Professors of Law, that I know of, down here.  If there were

23  some retired men, you would still have the problem of their

24  physical ability to do the job.

25          Well, I'm about ready to wind up this day.  Does

529

7

1   anybody else have anything for the good of the order, before

2   we adjourn?  I have another matter on this afternoon, inci-

3   dentally -- I have more work to do, here, besides Fallbrook.

4   Has anyone else anything else to suggest?

5         MR. MOSKOVITZ:  Your Honor, one more question.  In

6   filing briefs, are we still filing the number of copies with

7   the Clerk?

8         THE COURT:  That's what I understood.

9         Also, in filing briefs, I still want you to limit

10  your subject-matter one to a brief.  I don't know what system

11  you men are using to file.  But if you are just using a

12  chronological order of filing, then you are looking through

13  volume after volume to find what you want.  I have been

14  grouping these by subject-matter categories.  It's a lot

15  easier for me to work.  So, if you don't mind, when you have

16  two miscellaneous subjects to discuss, take them in separate

17  briefs.  I don't think we have any problem on that now.

18        MR. VEEDER:  I thought that on this brief that we

19  would file this time your Honor said it would be permissable

20  because the matters are so related.

21        THE COURT:  Yes, that is entirely proper in this

22  present legal problem that we're discussing.

23        I think that I would like to see Counsel in Chambers

24  and talk a little bit more about this Master situation.  Come

25  in for a minute or two.

1              All right, the Government's brief to be filed by

2    December 24th.

3              The pre-trial stipulation to be worked over and be

4    ready, if we can have it, for final closing it up on the 6th.

5              We will talk about the exhibits.

6              We will talk about the Master.

7              And we will, undoubtedly, talk about the date of

8    trial.

9              Anything else?

10             (ADJOURNMENT)

11                            - - -