# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA
### SOUTHERN
### ~~CENTRAL~~ DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

           Plaintiff,

    vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
Et al.,

           Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place: San Diego, California

Date: January 6, 1958

Pages: 532 to 649

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY

**JOHN SWADER**
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211 • EXT. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA, )
)
                    Plaintiff,)
)
vs. )
)   No. 1247-SD-C
FALLBROOK PUBLIC UTILITY )
)
DISTRICT, et al )
)
                    Defendants)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

January 6, 1958

APPEARANCES:

    For the Plaintiff:            WILLIAM H. VEEDER, Esq.,
                                  WILLIAM E. BURBY, Esq.
                                  Special Assistants to the
                                  Attorney-General
                                  Department of Justice
                                  Washington, D. C.

1  APPEARANCE   (continued):

2       For U. S. Marine Corps.:        LT. DAVID MILLER

3       For Defendant Vail Company:     GEORGE E. STAHLMAN, Esq.

4       For Defendant Fallbrook
        Public Utility District:        F. R. SACHSE, Esq.
5

6       For Defendant State of          EDMUND G. BROWN, Esq.
        California:                     Attorney-General, by
                                        ADOLPHUS MOSKOVITZ, Esq.,
7                                       Deputy Attorney General.

8       Santa Margarita Mutual          W. B. DENNIS, Esq.
        Water Company:
9

10      Arthur G. Reuter,               CLAYSON, STARK & ROTHROCK, by
        Katherine C. Gibbon, Philo      GEORGE GROVER, Esq.
        Reuter and Wm. W. Cottle:
11

12      Carl N. Halde and               TOM HALDE, by
        Hester M. Halde:                GEORGE GROVER, Esq.
13

14

15

16

17

18

19

20

21

22

23

24

25

1   SAN DIEGO, CALIFORNIA, MONDAY, JANUARY 6, 1958, 10:00 A.M.

2               (OTHER MATTERS.)

3               THE COURT:  Mr. Clerk, there was an error made in the

4   Government's brief of November 12 in the Fallbrook matter.  I

5   have corrected it on my copy.  I would like to have you correct

6   it in the original.

7               THE CLERK:  Yes, your Honor.

8               THE COURT:  I might say that it looks to me like a

9   Freudian slip.  You recall the mistake that was made.  The

10  Government in the first page of their brief said that they got

11  all the right to all the water that they require when they con-

12  demned the Rancho Santa Margarita.  They now want to change that

13  to state that they got all the water that they acquired, not

14  that they require.

15              (OTHER MATTERS.)

16              THE COURT:  Call the Fallbrook matter, Mr. Clerk.

17              THE CLERK:  No. 4 on the calendar, case No. 1247-SD-C,

18  United States vs. Fallbrook.

19              THE COURT:  In what order to you want to take up these

20  various matters, Counsel?

21              MR. VEEDER:  Are you addressing me, your Honor?

22              THE COURT:  Well, you are as good as any, Mr. Veeder.

23              MR. VEEDER:  Well, we have a motion pending, your

24  Honor, which I believe certainly is extremely material from the

25  standpoint of the future handling of this lawsuit.  We take the

534

1  position that there has been a stipulation entered into and that

2  there appears to be some question about the meaning of it, the

3  scope of it, and we would like to get a ruling on it as soon as

4  we can.

5         MR. SACHSE:  I would concur, your Honor.

6         THE COURT:  You think that that is the first order of

7  business?

8         MR. SACHSE:  That is very satisfactory.

9         THE COURT:  Then what do you want to take up -- further

10  work on this pre-trial stipulation?

11        MR. VEEDER:  In that connection, your Honor, we have

12  prepared and we have fifty (50) copies here of the proposals

13  that have been made by Fallbrook and by the State to amend the

14  pre-trial "Agreed Facts" of December 3, and it would occur to

15  me that Counsel could probably sit down and go through these

16  and then bring up the questions later on, because they may not

17  accept what we proposed.

18        MR. SACHSE:  We have just received them, your Honor.

19  If it doesn't meet with your disapproval or Mr. Veeder's, I

20  would like to have overnight to look them over and perhaps do

21  that tomorrow, and if we could stay on the legal matters, such

22  as, first, the motion on the stipulation, and second, the ruling

23  on points of law, it seems to me that that would be a little

24  easier for me.  I don't know how your Honor or Mr. Veeder feel

25  about it.

535

1      MR. VEEDER:  I'm certainly pleased to do whatever your

2  Honor desires.

3      THE COURT:  I don't feel like going ahead with this

4  temperature in here at 78 or 80 degrees.  Let's take a short

5  recess and see what we can do to get this cut off or something

6  done about it.

7      (RECESS)

8      THE COURT:  Before we start the argument, I under-

9  stand that Fallbrook is willing to be bound by this stipulation

10  of 1951.  Is that agreeable?

11      MR. SACHSE:  The stipulation between the United States

12  and California, yes, your Honor.  We request specific ruling as

13  to these controversial propositions.

14      THE COURT:  Is it agreeable with you that Fallbrook

15  join in this stipulation?

16      MR. SACHSE:  Yes, your Honor.

17      THE COURT:  Mr. Veeder?

18      MR. VEEDER:  Yes.  I really think that Fallbrook is

19  a party to it now by reason of the original pre-trial order.

20  It certainly was incorporated into the pre-trial order and they

21  signed the order.

22      THE COURT:  All right, that will be the order of the

23  Court.  Fallbrook has now joined in the stipulation.

24      MR. SACHSE:  Very good, your Honor.

25      THE COURT:  Mr. Veeder, I think you have the labouring

1 oar in this matter..

2      MR. VEEDER:  Well, as far as I am concerned, as long

3 as Fallbrook agrees, and I feel that the State agrees --

4      THE COURT:  Does the State of California agree that

5 Fallbrook may join in this stipulation?

6      MR. MOSKOVITZ:  Yes, it is agreeable with us, your

7 Honor.

8      THE COURT:  Who else is a party to it?  Santa Margarita?

9      MR. SACHSE:  We are the only parties, your Honor.

10      MR. VEEDER:  Just the State and the National Govern-

11 ment.

12      MR. MOSKOVITZ:  As I recall, Santa Margarita Mutual

13 Water Company was also a signatory party to the pre-trial

14 order, if that is the basis, that the parties who signed the

15 stipulation are bound by it.

16      THE COURT:  I wonder what the position of Santa Mar-

17 garita is.  Do you want to be bound by this stipulation, too?

18      MR. DENNIS:  Santa Margarita will be bound by the

19 stipulation, your Honor.

20      THE COURT:  Is that agreeable?

21      MR. VEEDER:  It is agreeable, your Honor.

22      THE COURT:  Is the State of California agreeable?

23      MR. MOSKOVITZ:  Yes.

24      THE COURT:  How about your clients?

25      MR. STAHLMAN:  'Your Honor, the factors that enter

1   into that do not affect the Vail Company.  There is a separate

2   stipulation covering such matters that is incorporated in the

3   pre-trial order and our stipulation is limited to those matters.

4          THE COURT:  All right.

5          MR. VEEDER:  There is a matter, as long as everyone

6   is in accord with the stipulation and willing to be bound by it,

7   that I think we might as well take cognizance of here, and

8   certainly as I am an Agent of the Court and your Honor's Agent

9   in these matters, certainly in representing the United States

10  I am perfectly willing to initiate an argument or discussion in

11  regard to the import and effect of the stipulation and to raise

12  the question as to whether I, personally, or anybody in the

13  National Government, anybody representing the United States in

14  this cause, has departed from an agreement.  I have no desire

15  to appear before your Honor and to have charges directed a-

16  gainst us as to bad faith.  If your Honor cares to hear us on

17  that proposition, we will be glad to proceed.

18         THE COURT:  I'll be glad to hear from you.

19         I will state preliminarily that I think you have the

20  labouring oar.  I have read your original brief filed November

21  12, 1957, I have read Fallbrook's brief filed November 27, 1957,

22  I have read the State of California's brief filed November 16,

23  1957, and I have read your brief and motion of December 30, 1957,

24  and the response by California filed January 3, 1958, and the

25  response by Fallbrook filed this morning -- it came in over the

    weekend.

1          MR. VEEDER:  Well, I will proceed, your Honor--

2          THE COURT:  And I think that you have the labouring

3    oar, and I think in particular that the brief by Mr. Moskovitz,

4    just to take one document which seems to me to be pretty pat,

5    I am tentatively in accord with what Mr. Moskovitz has set

6    forth in his brief of December 16, 1957, and I think that the

7    Fallbrook brief pins you right to the floor on the representa-

8    tions that you made to Congressional Committees and I have to

9    be shown that you are not departing from it in what you are now

10   claiming.

11         MR. VEEDER:  Your Honor, I am glad to undertake that.

12   From our standpoint, the United States of America acquired the

13   Rancho Santa Margarita and all of the rights that the Rancho

14   had at the time.  We have checked through from the standpoint

15   of the rights which the Rancho was there exercising, and it is

16   my view and has always been my view that the Navy succeeded to

17   and purchased rights sufficient to take care of the needs of

18   the three military establishments involved.

19         THE COURT:  Well, now, wait, you have begged the

20   question with that last statement.  I don't think anybody here

21   disputes that the Government of the United States acquired by

22   condemnation whatever rights the Rancho Santa Margarita had.

23         MR. VEEDER:  That is right.

24         THE COURT:  Whether they were sufficient to take

25   care of the needs of the military installations is another thing.

MR. VEEDER:  Well, your Honor, that is exactly the thing I am saying.  I am saying that I am convinced, personally, that the United States when they purchased these rights did an intelligent act and acquired rights sufficient to take care of all the needs.  I still say that and have always said it.

I believe, however, your Honor, that the evidence may show that the United States may have gained some rights by pre-scription or use or both, and I daresay that we would have been derelict in preparing or working out this stipulation not to add that additional phrase, whatever rights may have been gained by prescription or use or both.

THE COURT:  Nobody disputes that.  If you gained a right by some use which developed into a right, or if you gained a right by a continued use adversely, which would be prescriptive, you have that right.  But now you are urging two or three pro-positions that I think are entirely outside the stipulation. You are urging, first, that as to the water that you are using outside the watershed, that the Government, as an appropriator could appropriate that water without complying with the pro-visions of California law.

MR. VEEDER:  That is correct, your Honor.

THE COURT:  And that I have to be convinced on, and I think you are wrong.

You are urging, secondly, that the Government in its sovereign state -- it has no other state other than that of a

1    sovereign -- has some rights to water that may have originated

2    on some ~~eminent~~ public domain land upstream.  Is that right?

3                 MR. VEEDER:  That is correct, your Honor.

4                 THE COURT:  I don't think that that is true.  That is

5    the second thing on which I want to hear you.

6                 You are urging, also, that by inverse condemnation

7    you acquired rights to the use of water outside the watershed

8    because of the use the Government has made when they acquired

9    the Rancho Santa Margarita, and of course if you did acquire

10   them by inverse condemnation, query: whether that would come

11   within the word "use."  It might well come within the word

12   "use" and so your stipulation might be broad enough to let you

13   urge that you have rights growing out of use which you now

14   characterize as "inverse condemnation."  I can't see any in-

15   verse condemnation in this case at all.  So I want you to be

16   heard on that.

17                 You make another contention that the words in the

18   stipulation --

19                 MR. VEEDER:  Your Honor, the stipulation is set forth

20   in full following the motion.

21                 THE COURT:  Well, it concerns your paragraph III --

22   claims no rights greater than as set forth in paragraph II, and

23   we have talked about paragraph II; but it is this question of

24   measuring the rights solely by the beneficial use, which was

25   discussed by you and by Mr. Moskovitz.  Tentatively, I don't

1  agree with you on that.  So that is another question I want you
2  to talk about.

3          I think those are probably the four major matters in
4  dispute, are they not?

5          MR. VEEDER:  Well, I think that certainly issue has
6  been taken by Fallbrook and the State on those propositions,
7  your Honor.

8          THE COURT:  Fifth, there could also be listed as a
9  general one, just what is the history of water rights -- the
10 State of California doesn't say much about that but it has
11 been briefed -- the effect of the desert lands acts, etc., and
12 just what the status of the United States was after the passage
13 of those various desert land acts, and whether there is any
14 reason why the United States, having turned over to the States
15 the right as it were to administer this water for the public
16 good, can now come in and say, "No, that applies to everybody
17 but us.  We don't have to comply with those statutes."  That
18 might be a fifth one that is tied in with the rest of the pro-
19 blem.

20         MR. VEEDER:  I think that is, your Honor.

21         THE COURT:  Are those about the major points of dif-
22 ference between your views and the views of the other parties
23 to this stipulation?

24         MR. VEEDER:  I think that that is probably true, that
25 the review of those points would pretty largely cover the

1    issues that we have raised by our motion and also by our origi-

2    nal brief in October.

3            THE COURT:  All right.

4            MR. VEEDER:  I would like, as an initial statement,

5    to recall some of the history that was entailed in this matter--

6    and I greatly regret that Mr. Swing is not here this morning,

7    for I think that he would have probably, in his inimitable

8    style, contribute something to the review of the history.

9            Now the circumstances which gave rise to the stipu-

10   lation were simply these.  At the time when this lawsuit was

11   initiated, the question arose -- well, it had been pending, in

12   fact -- the question of the ownership of the off-shore rights.

13   There was an assertion that when we used the term "paramount"

14   in our Complaint, that we were using the term "paramount" in

15   the sense that it was used in the case of the United States vs.

16   California, reported in 332 U.S. 19, I think, wherein the

17   highest court said there resided in the National Government

18   title to the off-shore properties.  Now the furor that came

19   from the use of the word "paramount" attracted a great deal of

20   attention and on frequent occasions I was asked what it meant.

21           Simply stated, we used and actually dictated the

22   Complaint from the case of Peabody vs. Vallejo, in which that

23   term "paramount" was used to mean "prior" or "superior" and

24   that was what we were asserting.  As time went by, it became

25   increasingly apparent that some benefit might accrue to all

1  concerned if the United States and the State of California would

2  stipulate in regard to the issues in this case.  On the day of

3  November 29, 1951, as I recall, I met in Los Angeles with Mr.

4  Arvin Shaw, Pat Brown, the Attorney-General, and I think Mr.

5  Grover was there.  At that time the matter was discussed as to

6  how the United States was appearing in the litigation and the

7  basis upon which we were making this claim.  It was agreed by

8  all that the National Government could not acquire and did not

9  acquire any rights other than in its sovereign status.  After

10  considerable discussion, some of it rather heated, it was

11  agreed that whatever rights the United States had and held was

12  necessarily in its sovereign status.  It is not like a munici-

13  pality.  It does not and cannot own property in the socalled

14  proprietary status.  It has to hold it as a sovereign.  I

15  think everyone is agreed on that.

16  So the question was resolved by the paragraph III,

17  that the United States of America was claiming in regard to

18  Camp Pendleton and these military establishments in its sove-

19  reign status no greater rights than those which it acquired

20  from the Rancho Santa Margarita, and with the additional caveat

21  "which it may have gained by prescription or use, or both...."

22  THE COURT:  Well, doesn't that shut the door on you

23  right there as to any claim, even if it were good, that you

24  had any rights to water coming off the public lands and lands

25  in the public domain?

544

1        MR. VEEDER:  No, your Honor, in my mind --

2        THE COURT:  How could that come in under use or pre-

3   scription or acquisition from Santa Margarita?

4        MR. VEEDER:  Your Honor, in that connection, and cer-

5   tainly I am as aware as anyone of what we meant by that word

6   "use" because it was mine, I used it originally in this court-

7   room or the one downstairs in May, 1951.  We knew that there

8   was water being used outside the watershed by the Marines in

9   large quantities.  We thought, and I repeat, that there was

10  sufficient appropriative or non-riparian water exercised by the

11  Rancho to take care of it, but in the event that there was not

12  we have always added that one caveat, that one protective

13  measure, that if there was additional water we were going to

14  claim it as the United States'.  We were not claiming, your

15  Honor, we were not claiming and we are not now claiming, as was

16  the concern in those days, namely, that we could invade and

17  take from a man his vested rights without just compensation.

18  That is why I brought to your attention the fact that at the

19  very time that this stipulation was entered into the matter of

20  the paramount right involving off-shore oil was extremely im-

21  portant.

22        THE COURT:  I am very clear on that.  I understand

23  how the word "paramount" was used.  It was used in the sense

24  that it is used in the law of water rights, and the Los Angeles

25  newspapers, or some of them, got off of the deep end on what

1   was meant by this word "paramount." That has all been settled.

2   I don't think there is any problem about that and I accept your

3   statement that that was one of the considerations for drafting

4   the stipulation.

5           MR. VEEDER:  Now in regard to the term 'use" as it

6   was used -- and it was my view, and it is still my view, that

7   when the National Government exercises a right in a stream,

8   that is, in the Western United States, it is exercising a right

9   that is already residing in it -- the word "use" was an all-

10  inclusive phrase purposely used.

11          THE COURT:  If that is true, how did it happen that --

12  you appeared before these Congressional Committees, did you not?

13          MR. VEEDER:  Oh, yes.

14          THE COURT:  Why didn't you ever say something to one

15  of those Committees that you were also claiming under the word

16  "use" water that might originate on public land and flow down

17  through a stream, water that flowed in a non-navigable stream

18  which you claim the Government in its sovereign capacity owned

19  notwithstanding the Desert Land Acts and the Supreme Court de-

20  cisions?  How come that some statement like that was never made

21  to these Senators or Congressmen?

22          MR. VEEDER:  I believe when we check back through

23  the whole history of this litigation that it is not even doubt-

24  ful that the Congress was fully informed on that.  As I recall,

25  the first time that this stipulation went to Congress, I think

it was in January, 1952 -- I have forgotten just when it was,

but certainly I don't believe that there was a moment through

the whole history of this litigation that Congress was not fully

informed and fully advised that the United States was asserting

that it may have gained some additional rights above the Rancho

Santa Margarita, and the only reason in the world that I think

it was necessary to put that in was the possibility, and now

I say there is a probability, but certainly when I testified

before the Committee and as I say to your Honor now I am con-

vinced that there was sufficient rights bought and paid for and

acquired from the Rancho Santa Margarita to take care of all

the needs of the Marines.  But should there be -- and this is

something that is extremely important -- your Honor has looked

at this aerial photograph that we put in page 12 of our memo-

randum.  You observe that there is a large area outside the

watershed, concerning which we had full knowledge.

        THE COURT:  Yes, I know that, but I am looking now at

page 15 of the Fallbrook memorandum.  This is Mr. Walters speak-

ing.  I suppose he is the Congressman from Pennsylvania.

        MR. SACHSE:  That is right, your Honor.

        THE COURT:  "Mr. Walter:  Let me see if I can get this

thing through my mind.  Are you contending that the United

States purchased what its grantor had or that it purchased a

sufficient amount of water to meet the maximum needs determined

by the number of men that the Marines decided to have at Camp

Pendleton?

1 "Mr. Veeder:   --

2 I take it that that is you?

3 MR. VEEDER:  Yes.

4 THE COURT:  "We claim that the measure of our rights

5 are the rights to which we succeeded from Rancho Santa Margarita."

6 MR. VEEDER:  That is right.

7 THE COURT:  Now, in Mr. Walter's question where he

8 added this expanding alternative: Did you purchase sufficient

9 water for the maximum needs determined by the number of men at

10 Camp Pendleton -- if that were so, and if the Government owned

11 the rights in the non-navigable streams and had water that

12 flowed off lands in the public domain that it could pick up,

13 then your answer should have been, if you were thinking then

14 about what you are thinking now, "Yes, Mr. Walter, we think that

15 we can expand the water that we have beyond the rights of our

16 grantor, because we claim the right, the title to the use of

17 water in the non-navigable streams and water flowing from the

18 public domain."  You didn't say anything like that.

19 "Mr. Walter:  And nothing more; and without regard to

20 the needs of the Marine Corps. at Pendleton?

21 "Mr. Veeder:  That is correct, sir."

22 MR. VEEDER:  I believe, as I said before, your Honor,

23 when the record is run and this case is completed that we did

24 succeed to sufficient rights in the Rancho Santa Margarita.

25 I also say that as a lawyer representing the National

1   Government, when I sit down and stipulate I am going to cover

2   the prospect and the possibility that is presented here.

3          I am, of course, completely amenable and completely

4   accountable to the Congress of the United States, and I hesitate

5   not at all to have a full accounting to them.  But I add that

6   from my own standpoint and from my standpoint as addressing

7   your Honor, that when we get through with this case your Honor

8   will in all likihood, because I am sure that Justice will pre-

9   vail, accord to the United States sufficient waters for its

10  needs inside and outside the watershed, and I think that your

11  Honor will find that there was enough appropriative water used

12  by the Rancho Santa Margarita to take care of these uses out-

13  side the watershed.  Now that is a question of fact that must

14  be tried.

15         THE COURT:  Well, that is something else again.  If

16  Santa Margarita had rights to the use of a sufficient amount of

17  water, and if you are the successor of Santa Margarita, you are

18  in.

19         MR. VEEDER:  That is right.

20         THE COURT:  That is not what we are talking about.

21  I am talking about these statements that you made to these Con-

22  gressmen.

23         MR. VEEDER:  That was the predicate upon which those

24  were made, your Honor.

25         THE COURT:  Mr. Fellows said, "Do you claim only that

the State law applies?

"Mr. Veeder:  Yes, sir.  The measure of our rights, the measure of the State law governs entirely our demand upon the Santa Margarita River.  In other words, we certainly cannot claim more than we acquired from the Rancho Santa Margarita.

"Mr. Fellows:  And you claim no more?

"Mr. Veeder:  That is correct."

I don't know what is the date of that.  Of course, if that was prior to the stipulation --

MR. VEEDER:  That is right.

THE COURT:  Your stipulation is broadened out to say, "use and presciption thereafter."

MR. VEEDER:  It was broadened out for the very reason that I expressed, your Honor, and I don't believe that Congress was in the slightest misled.  I don't believe that anyone was misled by it.  I am very sure, your Honor, that when the Congress adopted the Utt Act -- and the history of that Act is extremely interesting -- that the very men, with the exception, I think, of Congressman Walter, the men who inquired the furtherest into this question -- Congressman Saylor, I think Congressman Engel, on the Senate side Senator Watkins -- each and every one of those men, your Honor, signed a report on behalf of the branch of the Congress that they represented and everyone of them reported that the Utt Act was acceptable to them, and in the Utt Act was written the identical words that I used, "pre-

JOHN SWISHER  OFFICIAL REPORTER

1  scription or use or both."

2  Congress having enacted the very language into law

3  that we used can scarcely be of the view that they were misled --

4  the very precise language; in fact, when the Utt Act was drawn

5  we wrote into the Utt Act the very language that is used in the

6  stipulation.  Now for someone to come in and say that we misled

7  Congress, in the light of the precise terminology that is used,

8  I think is simply misleading to your Honor, for throughout the

9  whole history of this litigation there has been a full and com-

10  plete knowledge that we were confronted with the problem of

11  proving up rights to the use of water outside the watershed.

12  There has never been a doubt about it.  Now we were confronted

13  with that problem when we signed the stipulation, we were con-

14  fronted with the problem when the matter came up in the Utt Act,

15  and very, very extensive investigations were made into it.

16  I assure your Honor that there was no purpose on my

17  part to do other than to protect the interests of the United

18  States clear across the board, and when it came time to formulate

19  and to put into a final organized statement the position that

20  we would assert here, we wrote the stipulation, and I'm sure

21  that if Congress desires to make further interrogation it can

22  call us up and we will be glad to go and we will say precisely

23  what we are saying to your Honor.

24  THE COURT:  I have no doubt that under the stipulation

25  you can claim any water on which you base your right on any

1  kind of use -- the use inside, the use outside, maybe use of

2  water which you claim came down from public lands -- that would

3  probably come within "use."  That is a very broad word.  I am

4  just concerned now as to why the Congressional Committees were

5  never told about these theories of use that you had, or whether

6  these were theories of use which you developed thereafter.

7     MR. VEEDER:  Your Honor, in that connection, I would

8  hesitate to say how much Congress had been advised.  Mr. Rankin

9  has testified, Mr. Brownell and many others, and Gus Vanech

10  and many others.  As far as I am concerned, I was fully cogni-

11  zant of the meaning of the word "appropriation" and I advoided

12  the use of it because I did not want to be limited to the term

13  "appropriation" as such, because for a great many years -- and

14  I have been representing the Government now for a quarter cen-

15  tury -- I have always felt, and I feel now and I think the

16  appellate decisions sustain the proposition, that the United

17  States of America, as owner of the public land, owned all the

18  rights to the use of water and all the land, and that under

19  the Acts of 1866, 1870 and 1877 it separated the rights to the

20  use of water from the land, and thereafter, as in the terms of

21  the California-Oregon Power Company case, they were separately

22  acquired.

23     Now the important thing here on that proposition --

24     THE COURT:  Well, didn't that go further?  Didn't

25  the effect of those statutes turn over to the States the right

to administer that water?

MR. VEEDER:  Yes, so far as the individuals are concerned, there is no question, and I think Howell v. Johnson says it very well.  It said in the case that we cite to your Honor, and the one that was relied upon and the only one cited in the California-Oregon Power Company decision: The catalyst, or whatever term you want to use, the thing that causes the title to pass from the National Government is compliance with the State law.  But the genesis of the title, the source of the title, the deraignment of the title to these rights to the use of water, this usufruct or this incorporeal hereditament, these rights passed from the United States.  How?  By compliance with State law.  In other words, you acquired the land by compliance with one set of National statutes, you acquired the rights to the water through one set of National statutes, with the condition that they comply with State law to acquire that right.

THE COURT:  Let me ask you.  Do you have any other case besides the Howell case that draws that conclusion?

MR. VEEDER:  Yes, I cited them to your Honor.  I cited cases from Oregon, from California in particular, in our brief in which we referred to the fact that the California doctrine itself, as distinguished from the Colorado doctrine, and that is why I say that we are in complete conformity with the law of California, the law of California as announced by Lux v. Haggin and the law relied upon by the Supreme Court in

1   the California-Oregon Power Company case and the case of Hough

2   v. Porter, both of them have said with specificity that the

3   title is found in National Government.   Indeed, there are other

4   cases from Oregon which say precisely the same thing, and in

5   addition add this further point, that the only conceivable

6   source of the title could be the United States of America.   Why?

7   Because there was never a conveyance from the United States to

8   the States, and no one can ever point that out.   The only thing

9   that can ever be relied upon by those who take a contrary posi-

10  tion -- and I am amazed that the California lawyers take a con-

11  trary position in view of their own Supreme Court decisions --

12  they all go back to the proposition that the Acts of 1866, 1870

13  and 1877 contain no words of grant at all.   They simply estab-

14  lish the means pursuant to which rights could be acquired --

15  everyone of them.

16         Now the California doctrine, and this is the thing

17  that I think is the most important here, from our standpoint,

18  has been held repeatedly, and I cite ---

19         THE COURT:   What page are you talking about?

20         MR. VEEDER:   On page 4 of the Brief in Response,

21  Title to Rights to the Use of Water Vests in the Owner....

22         THE COURT:   Is this in the latter part of your brief?

23         MR. VEEDER:   Well, yes.

24         MR. SACHSE:   I am confused.   Are we arguing on the

25  motion, or are we arguing the brief?   I thought we were arguing

    the motion.

MR. VEEDER:  I am perfectly willing to argue anything that you want.  Your Honor gave me a list of things that you wanted to hear me on.

THE COURT:  I want to know, are you referring to the document that you filed on December 30th?

MR. VEEDER:  That is right, your Honor.

THE COURT:  On what page are you?

MR. VEEDER:  If your Honor will start on page 4 of the Response -- at the Brief in Support of the Motion ends on page 12 and then the Brief in Response starts, and there we outline and cite to your Honor the cases supporting the proposition that title to the unappropriated rights to the use of water resides in the United States (Howell v. Johnson, on page 6).

THE COURT:  Yes, I remember that you referred to Howell v. Johnson.  I see it now.

What are the other cases?

MR. VEEDER:  The other case, of course, is the California-Oregon Power Company case; Wiel on Water Rights.

If you move over to page 9, the heading under California's Law - the California Doctrine - Recognizes the National Government as the Source of All Titles to Appropriative Rights to the Use of Water, that is where we are now.

The case of Lux v. Haggin, which is certainly the keystone case in this State, says without question that the source of the title is the National Government.

THE COURT:  Well, when you make a statement like that it could be used in two senses.  Certainly the source of the title in the lands which are in the public domain was at one time in the United States, there is no doubt, if you are just looking historically at the source of title.  If, on the other hand, you mean by the statement that when somebody appropriates water following State procedure and gets some title to the use of water, that as they do that the title to whatever they get at that moment flows from the United States through the channel of the State procedure into the appropriator, that is another thing.  When you talk about the United States being the source of title, you could mean either of those two situations.  I don't know whether I have made myself clear.

MR. VEEDER:  Yes.  The point that I would make, your Honor, is that your use of the term "channel through which the title passed -- the title, in our view, did not pass through the State.  The State was accorded by Congress, as it has been in mineral matters involving the acquisition of mineral rights, they have accorded to the State the right to establish the principles upon which the title would pass from the United States. In other words it was not the view of the Congress that it should declare that all States should adhere to the appropriative doctrine or that all States should adhere to the riparian doctrine.  It said that we own the rights to the use of water. The States then say how those rights will be acquired.  Now

556

1  there was not a deraignment from the National Government to the

2  State to the user.   There was a deraignment from the National

3  Government to the user conditioned upon compliance with State

4  law, and that is all there was.

5          Now that is certainly the law of California and it

6  has always been the law of California and I believe it is the

7  law today.

8          THE COURT:   What cases make that the law of California?

9          MR. VEEDER:   Lux v. Haggin, your Honor.   There is just

10  no doubt that the California doctrine has always been that.   Wiel

11  cites them at the point where he discusses the California doc-

12  trine, and I think that there are seven or eight different

13  statements on that proposition, namely -- and it certainly is

14  the law of the Supreme Court of the National Government; the

15  Supreme Court has held that squarely -- that the source of all

16  titles, irrespective of arguments to the contrary, has to be

17  from the Federal Government.   It couldn't have passed to the

18  States.

19          If we recall the language of the Desert Land Act, the

20  Act of 1877, it says that the surplus waters on the public lands

21  may be appropriated.   Now certainly the State of California,

22  under any twist that it might put on that language, has not

23  appropriated those rights to the use of water, and I might add

24  that the word "appropriation" in 1877 was a word of art in

25  water law, namely, the word meant the appropriation of the

usufructive right in a stream.  California and other states have
come along and made layer upon layer upon layer of complex ad-
ministrative law, but they could not and did not change the
meaning of the word "appropriation."  True as among their citi-
zens it is not even doubtful that they could, and certainly
should, establish requirements as to how the citizen would ac-
quire those rights.  But when the National Government comes
along and exercises this usufruct, this incorporeal heredita-
ment, and diverts the water out of the watershed and uses it
itself, why should it have to go to the State to do that to
acquire a title that is already in it?  And I challenge the
good men who are opposing us here to show how the title could
pass out of the United States and into California.

THE COURT:  Well, we have got our finger right on a
key point in this case now.  If you are right on this, one
thing flows from it, and if you are wrong, another thing flows
from it.  This is a very crucial point, in my opinion.  I see
your argument that the Desert Land Act, you say, didn't pass
title, but I don't read the California-Oregon case and the
Supreme Court like you read it.  Maybe no case has passed on
this particular point, but in that case they were talking about
reserved lands of the United States.

MR. VEEDER:  Your Honor, I am not talking about the
appellate decision now.  I am talking about 295 U. S.  That was
the original case where two individuals were claiming rights to

1   the use of water in a stream in the State of Oregon.   One claim-

2   ed that it succeeded to a riparian right, so the Court had to

3   go back and follow through and see what was the source of these

4   titles, and that is what transpired there.   The Court says:

5         "After 1877 one who acquired a tract of land from the

6   public lands, as distinguished from the reserved lands, acquired

7   only the land and no rights to the use of water."

8         And the question was, why?   And the reason why was

9   that the National Government, in the exercise of its powers,

10  had separated all of the rights to the use of water from the

11  land, so that when one acquired a patent he did not get a ri-

12  parian right in the State of Oregon, and that is what it amount-

13  ed to, and the reasoning there is very clear and it is a matter,

14  in my view, of the simplest kind of real estate question, namely:

15  Here is an owner of all the sticks in the bundle of rights that

16  constitutes title and the National Government, in the exercise

17  of its power, reserved those sticks from that bundle that con-

18  stitute title which are representative of the rights to the use

19  of water.   Now anyone after that date who complied with the

20  State law could acquire a title from the United States of America.

21        The reason why the California-Oregon Power Company

22  case is extremely important is this.   There were two sides to

23  the argument.   The Supreme Court of the State of Washington had

24  declared that the homestead right, as distinguished from the

25  Desert Land Acquisitions, would carry with it the riparian

1  right.  On the other hand, Hough v. Porter, which was the key

2  case in that decision, was the Oregon Supreme Court decision

3  and that Oregon Supreme Court decision specifically and repeated-

4  ly declares that the United States, as owner of all the rights

5  to the use of water on the public lands, could and did separate

6  the rights to the use of water from the land.

7           Now the reason why I continue to emphasize those

8  Oregon cases is this, that the Supreme Court after a great deal

9  of consideration rejected the contrary cases and said that the

10 Federal Government, being the owner of the rights to the use

11 of water, could prescribe the manner in which those rights could

12 be acquired, and California and Oregon have gone side by side

13 down through the years in sustaining that proposition.

14          Now the Colorado doctrine is different.  I don't know

15 what the results would be.  My own view is that Colorado couldn't

16 change that law.  The Colorado doctrine is that the source of

17 the title to the use of water comes from the State.  But that

18 matter has never ever been passed upon in a Colorado case.

19 Those where it has been passed upon, Oregon follows the Cali-

20 fornia doctrine and it has, as I say, in the California-Oregon

21 Power Company case, specifically the position that we have taken

22 in our brief, namely, that the title resides in the United

23 States.

24          Now in regard to the Pelton decision to which your

25 Honor made reference, that, in our view, is extremely important

1  here.  On the west side of the River there were Indian lands,

2  but on the east side of the Deschutes River there were public

3  lands which were open to entry and acquisition down to about

4  1912, at which time the Federal Government withdrew those lands

5  or the lands bordering on the River for a power site.  Now the

6  question was squarely presented --

7       THE COURT:  To interrupt you for just a moment, at

8  that time, after the withdrawal, then the lands on both sides

9  of the River were the equivalent of reserved lands of the Govern-

10 ment, weren't they?

11      MR. VEEDER:  That is right, your Honor.

12      Now after that time, the Court specifically held in

13 the Pelton decision that the police regulations, to which we

14 are referring here, had no application whatever, and that the

15 National Government had the exclusive and complete control as

16 to the methods of acquiring and using the water on that reserved

17 land.  In other words, in complete conformity with the California-

18 Oregon Power Company decision, which indeed was cited, they

19 said that the United States of America has the power to separate

20 and to dispose of the water and the land at the same time, or

21 when it wants to it can reserve the title to the land and the

22 title to the unappropriated water, and that is precisely what

23 it did there.

24      The facts are important.  The Portland General Electric

25 Company filed for a license from the Federal Power Commission

and went in and commenced the building of the Deschutes Plant,
the Pelton Plant.  The State of Oregon undertook to prevent the
building of that and said that you cannot build it because you
haven't complied with our law, and the highest Court said, no,
there is no dual control there.  Why?  Because that land is no
longer part of the public lands open to disposition.

In my view, both those cases are in complete accord
with the basic and simple property law.  In other words, they
both say that rights to the use of water are interests in real
property, and that the National Government being the owner of
them has the power to prescribe the methods of their acquisi-
tion.  Now that law has never been changed.

We are asked here -- the question came up in the dis-
cussion, but I have forgotten who raised it; I think your Honor
did -- as to how could we assert this proposition in this case,
in view of the fact that the Rancho Santa Margarita and the
Vail estate were in private ownership at the time the Treaty
of Guadalupe Hidalgo?  To me there is no difficulty there at
all, and I think that the State has agreed to this statement
which I am going to make, that insofar as there were public
lands the United States of America at Guadalupe Hidalgo acquired
all the sticks in the bundle of rights -- the rights to the use
of the water, the rights to the land.

Now -- and this goes back to the ABC's of water law,
and I hope that your Honor was not perturbed by my going into

1    such elementary things, but in the stream there are rights which

2    can be acquired independent of the land, and that stems from the

3    Act of 1877.  Now those rights, insofar as they were surplus to

4    the needs of the Vails or the Rancho, were open to appropriation

5    even though those waters did traverse lands in private property,

6    else it would be impossible, for example, for Fallbrook to ac-

7    quire an appropriative right, if their thesis was carried

8    through to completion, because they would say the Vails own all

9    the water or the Rancho owns all the water and none of the water

10   is available for appropriation.  Again, the history is important

11   there, because were it not for the Act of 1877, there would

12   never have been the severance of the water from the land and

13   the ability to acquire it by prior appropriation.

14        So from our standpoint, your Honor, and I have read

15   very carefully every decision that has been cited, I have found

16   not a single one that will go contrary to the ideas of real

17   property law that we have expressed here, namely, that the

18   rights to the use of water in the stream are independent of the

19   land and are available for acquisition, and they are independent

20   of the land because the National Government owned them, separated

21   them from the land, and when the Government itself undertakes

22   the use of the water it does not and need not comply with State

23   law because the title is in it in the original instance.

24        Now I will refer in that connection to two cases which

25   are, in my view, extremely important.

THE COURT: On what page?

MR. VEEDER: On page 10. The case of Story vs. Woolverton, et al. Now there was a case in which the United States had a military camp. It used water. Then it sold the land to the State, and the State made a claim in regard to the rights to the use of water. The Supreme Court of Montana said, no, when the Government was using that land -- the terms that it used are very important -- the United States owned the land and all the water. "It was therefore unnecessary for the Government to appropriate the water. It owned it already." Those are the exact words of the Court. "All it had to do was to take it and use it."

That is precisely what we are saying here. There was unappropriated water when the Marines started diverting water out of the watershed, and when they did that the authorized agents of the National Government were simply exercising title already vested in the National Government, and that is why the word "use" in the stipulation is of great importance.

Now there is another case from Oregon in which exactly the same proposition was raised, and I hasten to emphasize the importance of the Oregon decision because they are the genesis of the theory of the California-Oregon Power Company case in 295 U.S. They are the ones that repeatedly have held that the title to unappropriated water resides in the United States.

Now from the standpoint of title then, it is not even

564

1  doubtful, in my view, that the usufruct, the right now being

2  exercised outside the watershed is a right already in the United

3  States and exercised prior to the time of Fallbrook.  There can

4  be no doubt, it seems to me, that there resides with the State

5  in this case and with Fallbrook the obligation and the responsi-

6  bility of showing your Honor how title passed from United States

7  to the State of California.  They have that obligation because

8  they must show, in our view, a deraignment of title rather than

9  simply a declaration, as in the Code, that the State owns all

10  of the water.  I think we have already treated of that in an

11  earlier brief.  I don't believe it is even doubtful that the

12  ownership claimed by the State is for regulation only and cannot

13  be from the standpoint of the ownership of title.  It is not a

14  proprietary interest.  We have cited innumerable cases in that

15  connection in the opening brief.

16          So unless California can produce some cases or a

17  transfer in some way, I think that the title to these freehold

18  interests, and that is what they are -- when you appropriate

19  and divert water to a beneficial use, you acquire a right that

20  has equal dignity with the right to real estate itself -- and

21  that title in our view is acquired from the United States.

22          I don't know that any more can be added on that

23  particular point, your Honor.  I believe that we have come for-

24  ward with that proposition.  We believe that it is certainly

25  within the term "use."  It was certainly contemplated by me

1   at the time, I assure you, and I certainly intended at the time

2   that if there was a need for additional water, if we had actually

3   used water in excess of that which we acquired, that we were

4   doing so as the owner of the unappropriated water; and in addi-

5   tion, when we wrote the word "use" in there, we had this in

6   mind, that even under the California law you acquire a right to

7   the use of water by the diversion and application of it to a

8   beneficial use.  Now it is true that the State can condition

9   as part of its police regulations the means and manner of ac-

10  quisition, but I daresay that we should go back to the real

11  basis upon which the word "appropriation" was used in 1877 and

12  not by any perversion that might have occurred in the use of

13  that term by subsequent State legislation.  It is too clear to

14  question, I believe, that State legislation cannot change a

15  Federal law or cannot affect Federal title.

16        But assuming that in some manner the title can reside,

17  and does now reside in the State, we repeat, your Honor, that

18  the diversion and application of that water to a beneficial use

19  accomplished the passage of title, and the cases that we cite

20  bear that out.

21        I have read carefully the cases cited by Mr. Moskovitz.

22  Fortunately, in regard to the Utah cases I am very familiar

23  with them because we have encountered them before.  The cases

24  that he cites sustain the proposition that we have advanced

25  throughout.  Certainly the Adams case that he cites sustained

1    completely and held diametrically opposed to the position that

2    he takes, and every single case that he cites you will find

3    that where there was a contest against a man who was using the

4    water the man who was using the water was accorded the right to

5    continue that use when the contest stemmed from a subsequent

6    filing.   The cases all have gone on the basis, one way or the

7    other, that where a man is actually using the water he will be

8    protected, and that is precisely the circumstance in which we

9    are today.

10        We are in the circumstance -- this aerial photograph

11   is extremely interesting -- that with full knowledge of the

12   Marines and millions of dollars expended outside the watershed,

13   the Fallbrook Public Utility District now seeks to dry up that

14   area by claiming that by the filing of a piece of paper they

15   could acquire a better right, and I submit that there are no

16   cases in any Western state that will support that proposition.

17        The Wyoming case that was cited in Mr. Moskovitz'

18   brief is very interesting, for it turns on the Colorado cases

19   that we have cited to your Honor, which hold specifically that

20   the police regulations which govern the acquisition of the

21   rights to the use of water are evidentiary in character.   In

22   other words, you make a filing for the purpose of evidencing

23   to the world your claim, and that is all that it is.   If you

24   have diverted and applied the water to a beneficial use prior

25   to the time that there is an intervening claim, the title

1  continues to reside in the user and the subsequent claimant has

2  not been permitted to interfere or take the property.

3     It is not difficult to imagine that unscrupulous

4  people could come and make filings -- I will not say unscrupulous

5  people in regard to Fallbrook -- but they would make filings

6  subsequent to the time that the National Government was using

7  the water and they would make filings with full knowledge of

8  that use.  I submit that there has to be a showing of very,

9  very good authority, and they haven't come up with that author-

10  ity, to say that the National Government, by such an act of

11  filing by the Santa Margarita Mutual Water Company, for example,

12  could be deprived of that water and that it would have to go and

13  condemn those rights.  There is no authority to support them

14  on that proposition -- none.

15     Now there are two propositions as to the acquisition

16  of those rights.  You could either take the position that the

17  United States already owns the rights when it diverted the

18  water out of the watershed, or that even if it didn't own it, it

19  did effect an appropriation of the water by an application of

20  the water to a beneficial use.

21     THE COURT:  Those two points are definitely in the

22  case.

23     MR. VEEDER:  That's right, those are there.

24     The additional point that your Honor pointed to is

25  inverse condemnation.

1          THE COURT:  Let's take that up later.

2          You have addressed yourself to the general problem of

3  the chain of title, and a compilation of state law and the

4  Government's alleged right to the use of water from public

5  domain, which left the inverse condemnation question and also

6  this argument that you make that the measure of the Government's

7  rights is only its beneficial use.  Is that another way of

8  stating what you have been stating to me here for the last hour?

9          MR. VEEDER:  No.

10         THE COURT:  Or do you have a different argument?

11         MR. VEEDER:  No, from our standpoint, going back and

12  reiterating, that I firmly believe that we acquired sufficient

13  water when we condemned the Rancho, the additional point that

14  we would make there in regard to the law of California and the

15  measure of the right, at the time that the stipulation was

16  signed there was no doubt in my mind -- I don't know what Arvin

17  Shaw had in mind, but certainly the only question that could

18  conceivably be presented there was the question, how much water

19  were you claiming, and we were certainly claiming only that

20  which we could beneficially use.  I don't believe we could

21  claim any more.

22         So if there is something in addition, I would be glad

23  to have California read into the stipulation the California

24  doctrine that I have talked on for an hour, because I think that

25  is part of the California law.  Certainly California always

1  recognizes that title is in the United States to unappropriated

2  rights to the use of water.  So there we have it.  If there is

3  some additional point that is in some manner involved, I'll be

4  glad to discuss it.  But I believe that the only thing that

5  could be applicable would be beneficial use, for this reason,

6  that California has ceded to the United States exclusive juris-

7  diction and has always admitted that it had no power within the

8  enclave.  I know of no other factor that would be involved.

9  Maybe they would like now to control the Commandant of the Marine

10  Corps. in regard to the change of point of use and point of

11  diversion and things like that.  I don't believe they can.  But

12  I know of no other principles that would be involved other than

13  the measure of the right and the measure would be on the basis

14  of the right to a beneficial use.  If there is something more

15  that California wants to raise, all right.  I didn't find it in

16  their brief.

17       THE COURT:  Let's see if I can summarize your position.

18  Your position is, first of all, that originally the Government --

19  we're talking now about the land in the public domain; I haven't

20  caught your point really on the Rancho, and I'll pass that up --

21  that as to the land in the public domain the Government owned

22  the land and the water; that on the basis of what might be

23  called hornbook real estate law, the law of real property,

24  that the Government made a severance of land and water; that

25  the Desert Land Acts did not pass title to the water -- title

1    remained in the United States, but it permitted States to handle

2    the question of who should be appropriators of that water --

3            MR. VEEDER:   And how it could be appropriated.

4            THE COURT:   -- and how it could be appropriated, and

5    that therefore when a legal appropriation came into effect and

6    was based upon a State authority, that at that moment title

7    would then pass from the United States to the appropriator.

8            MR. VEEDER:   That is correct.

9            THE COURT:   That title had not passed by the Desert

10   Land Acts or by any decision of the Supreme Court or any other

11   act of Congress.

12           MR. VEEDER:   That is correct.

13           THE COURT:   Your second position is that even if that

14   is not true, and if the State does have title and the right to

15   pass upon the question of appropriators, that because of the

16   substantial investment made by the Marine Corps. the mere paper

17   filing by Fallbrook after the investment by the Marine Corps.

18   should not be permitted to prevail over the Marines' investment.

19           MR. VEEDER:   I think there are two bites out of the

20   apple on that, your Honor, as you stated it.   In other words,

21   I think that when there was a diversion and application of

22   water to a beneficial use, the incorporeal hereditament, the

23   usufruct, passed to the United States, assuming that it was not

24   already in it.   Then there is the additional factor that Fall-

25   brook, having sat by using water under a gratuitous permit from

571

1  us, could not, by the simple act of filing a piece of paper,

2  take away from the United States all its rights to this water.

3  It smacks of estoppel, as an additional factor.

4        THE COURT:   It's predicated upon the alternate pro-

5  position, for argument only, that conceding that the State does

6  have title to water and the right, therefore, to apportion it

7  under State law.   That's the way you proceed.

8        MR. VEEDER:   That is correct.

9        THE COURT:   And then, finally, from what you have said,

10  that therefore the measure of the right of the United States

11  is what it may beneficially use of what you claim it owns.

12        MR. VEEDER:   That is correct.   Certainly any water

13  above and beyond that would be available for appropriation.

14        THE COURT:   You mentioned the Pelton case.

15        MR. VEEDER:   That is 349 U. S., Fed. Power Commission

16  vs. State of Oregon.

17        THE COURT:   Why do you call it the Pelton case?

18        MR. VEEDER:   The reason that we call it Pelton is

19  that the name of the dam on the Deschutes River is the Pelton

20  Dam.

21        THE COURT:   That is what misled me.   There are two of

22  those Oregon cases.

23        MR. VEEDER:   Yes, your Honor.   One is 295 U.S. 142,

24  California-Oregon Power Company vs. the Beaver Portland Cement

25  Company, and the other a much more recent case is the Fed. Power

1  Commission vs. Oregon, 349 U.S. 435.

2      THE COURT:  I have read them both.  In fact, I have

3  them briefed in a notebook.  The latter one is the case where

4  the Indian land is on one side and the land withdrawn is on the

5  other.

6      MR. VEEDER:  That is right, land that was originally

7  opened for disposition.

8      THE COURT:  And then withdrawn.

9      MR. VEEDER:  Yes, and then it was made reserved land,

10  and the Court said that the Act of 1877 no longer applied to it.

11      THE COURT:  All right, we will take our recess until

12  2:00 o'clock.

13      (NOON RECESS)

14

15

16

17

18

19

20

21

22

23

24

25

5739

1   SAN DIEGO, CALIFORNIA, MONDAY, JANUARY 6, 1957, 2:00 P.M.

2               THE COURT:  Mr. Veeder, in the California-Oregon

3   Power Company vs. the Beaver Portland Cement Company, 295 U.S.

4   142, the Court said, at 163 and 164:

5               "What we hold is that following the Act of 1877, if

6   not before --

7               I interject that that probably was the last of the

8   Desert Land Acts.

9               "--all non-navigable waters then a part of the public

10  domain became publici juris subject to the plenary control of

11  the designated States....."

12              I interject that the word "plenary" I take it, means

13  full control, complete control.

14              "....including those since created (those States since

15  created) out of the Territories named, with the right in each

16  to determine for itself to what extent the rule of appropriation

17  or the common law rule in respect to riparian rights should

18  obtain."

19              Now suppose that California instead of deciding that

20  the law of appropriative rights should apply, had decided that

21  the law of riparian rights should apply.  Would the United

22  States, in view of this decision of the Supreme Court, and as-

23  suming that this isn't dictum -- let's just assume that this

24  means what it says, for argument -- would the United States

25  be able to make this claim that it has made?

1       MR. VEEDER:   I think so, your Honor.   I think the cir-

2  cumstance that exists in California is precisely what your Honor

3  has outlined now.

4       THE COURT:   In other words, then, if the cat had

5  jumped the other way in California and we had not recognized

6  appropriative rights but had recognized riparian rights, then

7  the United States could come in ahead of any person who had a

8  riparian right to claim such water as it needed.

9       MR. VEEDER:   No, I would not agree with that, your

10  Honor.

11       THE COURT:   Well, here is a twofold statement, "....

12  plenary control of the States, with a right in each to determine

13  for itself to what extent the rule of appropriation or the

14  common law rule in respect to riparian rights should obtain."

15  Now California followed the rule of appropriation, and you say

16  that in that set of facts the United States can come in and

17  claim water by reason of its prior title.   Suppose that Cali-

18  fornia had not followed the rule of appropriation but the rule

19  of riparian rights, so that each homestead had a riparian right

20  to the use of water on that homestead.   Do you think that the

21  United States came in ahead of these people?

22       MR. VEEDER:   No.

23       THE COURT:   Than why do you draw one conclusion in

24  the case of appropriation and the other conclusion in the case

25  of riparian rights?

1      MR. VEEDER:  The answer, as I see it, your Honor, is

2   this, and what you have described is the circumstance that I

3   truly believe prevails in California.  In other words, whether

4   it be under the Desert Land Act or under the Homestead Act,

5   when a man acquires a tract of land by patent which abuts upon

6   a stream, he acquires a riparian right in that property to the

7   extent of the full riparian rights, subject to any previously

8   vested rights appropriative in character, and I think that that

9   is the law in California today.

10      THE COURT:  Well, all right, then, if that is the law,

11   that even points our problem up a little better.  Is your claim,

12   then, that notwithstanding what the Supreme Court said that

13   Congress did prior to 1877, is it your contention that the

14   United States, if it needs more water at Pendleton, can take

15   away the riparian rights?

16      MR. VEEDER:  No, your Honor.  I will say this.  It

17   is only to the extent that there is unappropriated water that

18   the thesis that we have advanced would be applicable.  In other

19   words, there has to be unappropriated rights to the use of

20   water before the thesis we have advanced could be maintained.

21      THE COURT:  What is the logic of the difference?

22   We are trying to follow down your chain-of- title idea.

23      MR. VEEDER:  Yes.

24      THE COURT:  The Government had the title to the water,

25   and severed the land from the water.  The question is, what did

1  the Government do by those Acts?  I have read from one of the

2  authorities upon which you have relied, which says that this

3  became publici juris subject to the plenary control of the States,

4  with a right in each to determine for itself whether the common

5  law riparian rule should apply or the appropriative rule.  Now

6  you answer and say, "Well, actually, the riparian rule does

7  apply, subject to appropriative rights or prior vested appro-

8  priative rights," and you say that the United States can come

9  in ahead as far as appropriative rights are concerned and can

10 appropriate water which no one up to that time has appropriated--

11          MR. VEEDER:  That is right, your Honor.

12          THE COURT:  -- on the theory that you own the water,

13 the use of it.

14          MR. VEEDER:  On the theory that the title was separated.

15          THE COURT:  Unless my logic fails me, you contend

16 that these Acts ending in 1877 didn't pass any real rights to

17 the States and that you still have the title to the water.  If

18 that is true, then, if you needed it, you could diminish every

19 riparian right on the River without any regard to correlative

20 rights simply because you have the right to the use of the water

21 and had a need for it.

22          MR. VEEDER:  No, your Honor.  If I have said --

23          THE COURT:  Oh, you haven't said that, but if the

24 logic of your argument is good on the appropriative side, why

25 isn't it good on the other horn of this dilemma?

1  MR. VEEDER:  Let me take the appropriative side, your

2 Honor, and point out my views on that.  We have a stream in

3 which there are unappropriated rights to the use of water, and

4 Joe Doakes comes along and appropriates 10 second feet of that

5 water pursuant to the State law.  At that moment there passes

6 out of the National Government and into Joe Doakes the right

7 to 10 second feet of water and the National Government could no

8 more invade that 10 second feet of water without paying just

9 compensation than it could invade Joe Doakes' right to the 40

10 acres of land to which he has a patent from the National Government.

11 ment.

12  In other words, the case which your Honor has cited

13 points that up.  It says that there are two ways now, there are

14 distinct means of acquiring the rights to the use of water and

15 rights to land, but when the title passes to the rights to the

16 use of water, in conformity with the Desert Land Act, at that

17 moment there resides in that individual any usufructive right

18 in the stream, which has all the dignity of a freehold estate

19 in the land upon which the patent was issued.

20  THE COURT:  So that I understand your position, you

21 say, "We have the right to the use of this water, but once it

22 has been appropriated, we cannot assert a right, and once it

23 has been passed on, has been approved by the State as a riparian

24 right, we cannot invade it, except correlatively."

25  MR. VEEDER:  That is correct, your Honor, and our

1  view is this, that to the extent that an appropriative right is

2  acquired in the stream, to that extent the title of the National

3  Government in that stream diminished.

4        THE COURT:  What is meant by the use of the word

5  "public" in these cases?  In this case it speaks of "publici

6  juris," and at another place it is the "public."  Does that

7  mean the people of the United States, or does it mean the Govern-

8  ment and the people?

9        MR. VEEDER:  The case of Hough vs. Porter, on which

10  they rely very heavily in that California-Oregon Power Company

11  decision, goes into that question, as I remember, and the

12  "public" means, as I construe it, the people who are entitled

13  to acquire rights, for example, in the public lands that were

14  available for homesteading at that time.

15        THE COURT:  It wouldn't include the Government of the

16  United States, would it?

17        MR. VEEDER:  No.  But the Government comes along and

18  says, "We open this up, just like we opened the vast public

19  domain.  Here you are.  You're entitled to homestead it."

20        THE COURT:  We are agreed that the word "public"

21  means people and does not include the United States of America.

22        MR. VEEDER:  That is correct.  It is this kind of

23  circumstance where we say, "These lands are open to acquisition,

24  but at a point where the National Government says, 'We are

25  withdrawing these for the National forests,' which they did --

1  at one time, for example, the Cleveland National Forest was open

2  to acquisition, but the day that the National Government said,

3  "No, that is no longer public land," "public land" being a word

4  of art, too, meaning the lands that are open to disposition,

5  immediately when the National Government said, "These lands are

6  no longer open to homestead," then they can no longer be ac-

7  quired.  That is exactly what the Pelton decision says.

8  THE COURT:  The California-Oregon Power Company case,

9  295 U. S. 160, construes Howell v. Johnson and says that that

10  case "held that the legal effect of the language already quoted

11  from the Desert Land Act was to dedicate to the public all in-

12  terest, riparian or otherwise, in the water of the public do-

13  main."

14  MR. VEEDER:  That is right.

15  THE COURT:  If it is dedicated to the public, then

16  it no longer belongs to the United States.  Hasn't the Supreme

17  Court said that, by the Desert Land Acts, the Congress gave

18  away, which it would have a right to do, or dedicated to the

19  public the rights to the water, and then it follows up with

20  the language about "plenary control," etc.

21  MR. VEEDER:  That is right.

22  THE COURT:  If that decision means what it says, how

23  could a Court anymore clearly state that the United States no

24  longer has any title?  It dedicated these rights to the public.

25  It gave them away.

1    MR. VEEDER:  It held all those rights open to ac-

2    quisition, so long as the Government held them open to acquisi-

3    tion.  The word "dedicated" there could not mean a vesting of

4    title, and I think the same rules would apply in regard to

5    rights to the use of water as applied to land.  A title could

6    not ever be in abeyance -- it has to be someplace and what the

7    National Government did was to throw those waters open to ap-

8    propriation, and as long as they were dedicated to the public

9    that way the people could come in and acquire the rights to the

10   use of the water.  That is exactly what occurred, and I think

11   that that is why the Pelton case is so important.  That as soon

12   as those lands are no longer open to the public for acquisition,

13   then title cannot pass from it.  You have exactly the same

14   thing on your forest lands, on your forest property, on your

15   Indian property; those lands are not open to acquisition, nor

16   are the waters on them open to acquisition.  That is the cir-

17   cumstance that prevails throughout the West today.

18        In regard to the word "plenary," as used there, there

19   is no doubt that the Congress said there, and very appropriately,

20   "We, the Congress of the United States, are not going to pass

21   a law as to how these rights are to be acquired."  Just like it

22   did in regard to its mineral lands; it said that those rights

23   can be acquired in the manner and in accordance with State law.

24   In other words, the National Government did not dictate whether

25   it would be a strict appropriation State such as Colorado,

1    Wyoming and Montana, or whether it would be a strict riparian

2    State, or whether it would be a hybrid State like the State of

3    California wherein both riparian and appropriative rights are

4    recognized.   And the word "plenary," in my view, your Honor,

5    means that there is full control and determination by each

6    State as to the kind and type of title to rights to the use of

7    water the individual can acquire.

8           Now, there are no words of grant, and I think it is

9    highly significant in the California-Oregon Power Company case,

10   295 U.S., that it doesn't declare that the title passed to the

11   States.   It talks about the "public," and the "public," as the

12   Public Land Laws indicate, are all the people.   Anyone who could

13   acquire a right to the use of water in the State could come in

14   and acquire it.   But certainly Hough v. Porter, certainly the

15   Nevada Ditch Company v. Bennett, certainly the Montana cases

16   we cited, and certainly Lux v. Haggin in this State all say

17   that the source of title is the National Government and that it

18   remains in the National Government.

19           THE COURT:   There again we come to the two meanings

20   of "the source of title."   If you mean by "source of title"

21   that title eventually can be traced back to the Government,

22   nobody is going to disagree with you.   But if you mean that the

23   Government has title at the very moment when the appropriation

24   is made, that is a question for argument.   I haven't read all

25   of those cases yet to analyze them on that basis.   In which

1    sense are you using "source of title?"

2         MR. VEEDER:  I am using "source of title" precisely

3    the way I would use "source of title" if you were acquiring

4    160 acres of land from the National Government directly.

5         THE COURT:  You are using it in the sense that title

6    had remained in the United States, and that at the very moment

7    that some appropriation is approved by a State, instanter at

8    that time the title then passes from the United States to the

9    appropriator.

10        MR. VEEDER:  That is right.  Title passes out of the

11   Government, and I think innumerable examples exist, your Honor,

12   some of which I might bring to your attention now.  For example,

13   in the Indian cases and the Walker River case over in Nevada,

14   an interesting one where the United States withdrew public lands

15   to establish an Indian reservation.  This was not a treaty at

16   all.  The Indians didn't have title to the land.  The National

17   Government did.

18        THE COURT:  What is the name of that case?  The

19   McIntyre case?

20        MR. VEEDER:  No, the McIntyre case is a Montana case.

21        In the Walker River, Walker River v. United States,

22   I think 104 Fed. Sec., a Ninth Circuit Decision, the United

23   States withdrew from the public lands the properties and created

24   the Walker Indian River Reservation.  The question arose there

25   as to how the Indians could claim rights to the use of water,

1  they having failed to comply with State law and the Ninth Cir-

2  cuit declared, applying the Winters doctrine, and the United

3  States, when it with drew the lands from entry and established

4  the Indian reservation, impliedly reserved from the non-navigable

5  streams crossing that reservation a quantity of water sufficient

6  to irrigate those lands to the extent that experience showed

7  the lands were brought into cultivation.  There is a precise

8  case which turns on the so-called Winters doctrine, which in

9  itself was a treaty arrangement, which was a little different

10  category.  But here was an executive order reservation where

11  public lands were withdrawn and segregated, and with them was

12  withdrawn and segregated, as the Ninth Circuit says, a quantity

13  of water sufficient to irrigate Indian lands.

14          THE COURT:  Water that was flowing through the land.

15          MR. VEEDER:  That is correct, but it was flowing

16  through the public lands prior to the withdrawal, and white

17  water users who were claiming under State law were declared not

18  to be able to invade those Indian  rights even though they had

19  complied with the State law, the reason being -- and I use the

20  term here out of the Winters doctrine -- it says that the

21  National Government can at any time withdraw the water and the

22  land and reserve them for whatever purpose it chooses.

23          Now, had there been rights to the use of water acquired,

24  I would say this, if there had been private rights in that

25  stream and they had been invaded by this withdrawal for the

1  Indian reservation, I think the National Government would have

2  had to pay for them under the Fifth Amendment.   But nevertheless

3  the unappropriated waters were segregated and reserved, and to-

4  day those Indians are using that water -- and it's a very in-

5  teresting case, as a matter of fact, as time goes -- and the

6  very questions that your Honor has pointed up today were de-

7  cided by that case.   I think Judge Healy wrote the opinion.

8          Now we have another case.   Your Honor has mentioned

9  the McIntyre case.   That is 101 Fed. Sec.   That was a Montana

10 case in which it was said that the State laws had never applied

11 to Indian reservations and therefore the water was not available

12 for appropriation and therefore could not be used by these

13 claimants.

14         But in every instance -- I think the Winters doctrine

15 is important here, because you have raised the point, and as I

16 remember Mr. Moskovitz cites the case -- there in unequivocal

17 terms the Supreme Court says that as the owner of the land and

18 the waters it has a right to segregate and to reserve the waters.

19         THE COURT:   What do you say to United States v.

20 Humbolt in this Circuit, which was earlier in time?   There was

21 a case in which the United States was a party and the Court said

22 that whatever right appellant may have and the extent thereof

23 must be determined by the law of the State of Nevada -- talking

24 about the United States a party to the litigation.

25         MR. VEEDER:   As I remember that case -- are you speaking

1   of the District Court decision or the Ninth Circuit?

2         THE COURT:   I am speaking of the United States v.

3   Humbolt, Lovelock Irrigation, Light and Power Company 98 Fed.
    (2d)
4   See. 38.   The United States brought an action for injunction

5   concerning the waters.   Its predecessor had acquired water by

6   appropriation.   It had been transferred to an irrigation dis-

7   trict and from the irrigation district to the United States.

8         MR. VEEDER:   That is correct.   That was an irrigation

9   project.

10        THE COURT:   The Court said, "Whatever rights appellant

11  (the United States) may have and the extent thereof are to be

12  determined by the law of Nevada." (Citing the California-Oregon

13  Power Company case).

14        MR. VEEDER:   That is correct.   I think this.   The

15  facts are different there.   To begin with, as I remember, that

16  is a reclamation project, and as I remember the United States

17  went in and bought the rights to the use of water that were

18  there involved.   They were reserved rights.

19        THE COURT:   Well, the point is, the Government claimed

20  title, and its chain-of-title came down from appropriative

21  rights.

22        MR. VEEDER:   That is right.

23        THE COURT:   So the question was, what rights did the

24  Government have?   And the Court held that whatever rights the

25  Government had were controlled by State law.

586

1          MR. VEEDER:  It bought, your Honor, though, previously

2   invested appropriative right under the law of the State of

3   Nevada.

4          Now, in our view of this case -- and I will review

5   that Humbolt case again -- I think certainly the Walker River

6   case and the McIntyre case, which are later, would reflect the

7   law of the Ninth Circuit, but in any event, if the United States

8   went in and purchased rights which had already been appropriated

9   and they were in private ownership, the measure of those rights

10  would be exactly what the owner had, and that is our case here.

11  We couldn't claim beyond what the Rancho Santa Margarita had by

12  reason of the Rancho's title, but by reason of our ownership of

13  the unappropriated waters, if we applied it to a use -- and I

14  always say "if," because we are not sure until the facts are

15  proved -- we acquired, we exercised, we gained that additional

16  usufructive right.

17         That is our position.

18         THE COURT:  Let me ask you this, to jump around a bit.

19  Section II of this stipulation says -- we're talking about the

20  stipulation:

21         "That in this cause, the United States of America

22  claims only such rights to the use of water as it acquired when

23  it purchased the Rancho Santa Margarita, together with any rights

24  to the use of water which it may have gained by prescription or

25  use, or both, since its acquisition of the Rancho Santa Margarita."

1        MR. VEEDER:  That is precisely --

2        THE COURT:  Did you read the word "since" when you

3 signed that stipulation?

4        MR. VEEDER:  I wrote it, your Honor.

5        THE COURT:  Then your stipulation, as I read it, in

6 plain English, regardless of what the law may be, your stipu-

7 lation was that you claim the rights that you purchased, that

8 you got from the purchase or the condemnation of the Rancho

9 Santa Margarita, together with any rights to the use of water

10 which you may have got thereafter by use or prescription.

11        MR. VEEDER:  That is right, by reason of this fact --

12 I want to reiterate --

13        THE COURT:  Let me finish.  If that is what you agreed

14 to, how can you now come in good faith before this Court and

15 say that we are claiming a right we had all of the time, a

16 right we had before 1877, and a right that came down to us not-

17 withstanding the Government Land Acts, and a right which we had

18 the moment we signed this stipulation.

19        MR. VEEDER:  That is right.

20        THE COURT:  How can you justify that?

21        MR. VEEDER:  The reason is very clear, your Honor.

22 The terminology that was selected -- and it was selected care-

23 fully: the rights that it may have gained by use -- in other

24 words, if we are exercising, and I hate to use the term, but

25 I have no other term to use, if we exercised an incorporeal

1   hereditament in the stream over and above that which Rancho

2   Santa Margarita had, we were exercising an incorporeal heredita-

3   ment that already resided in the National Government, and to

4   that extent the quantities of unappropriated water, be there

5   any in the Santa Margarita, was diminished and we have the right

6   to use that which we already had.

7         THE COURT:  Then did you see the word "gained?"

8         MR. VEEDER:  I used it.

9         THE COURT:  "That it may have gained by prescription

10   or use.... since...." If you had the right beforehand, how do

11   you gain it after the date of the stipulation?

12         MR. VEEDER:  The rights, your Honor, were available

13   for appropriation.  They were, as the California-Oregon Power

14   Company case states, those rights that would be dedicated and

15   were available for the use by the public.  Now the Marines came

16   along with authority from Congress to erect a vast Marine estab-

17   lishment and began to utilize water of the stream and began to

18   exercise the usufructive right in the stream.

19         THE COURT:  Mr. Veeder, you are a very smart and able

20   lawyer and I take my hat off to you in the way you can work

21   some of these problems around and for your agility on your feet,

22   but I can't be convinced that when you signed that stipulation

23   you had any thought like that in mind; that you claimed the

24   right you got from the condemnation of Rancho Santa Margarita,

25   together with any rights to the use of water which it may have

589

1  gained by prescription or use since its acquisition.  Now you

2  were talking about rights that you might acquire after your

3  condemnation of Santa Margarita, and that language certainly

4  doesn't talk about rights that you claimed existed prior to

5  1877 and still exist.

6    MR. VEEDER:  Your Honor, I can only say this to you,

7  that for about twenty-five years I have asserted that we owned

8  the unappropriated water, and I can only say this to you more-

9  over that I have always been totally convinced that at any time

10  that the National Government undertook to divert water from the

11  stream and the waters were unappropriated that at that time it

12  was exercising a right residing in it.  I have never doubted

13  that.  I think that some of my -- I won't say "admirers" --

14  have always been very critical of our approach in this type of

15  litigation, that I have always asserted that there resided in

16  the National Government the title to unappropriated water.

17  I am sure that even at the time that I signed this there were

18  a great many people who knew that that was what I thought.  I

19  thought it at that time, and I think it now.

20    THE COURT:  Did you ever tell the Congress that the

21  Government claimed the right to the unappropriated water in

22  the State?

23    MR. VEEDER:  I believe I have, your Honor.  I am not

24  just sure when, but I am certain that at one time or another

25  I have advanced that theory.

590

1          THE COURT:  I mean in this case.

2          MR. VEEDER:  No, I don't think I ever did, but I don't

3   believe that the matter ever came up.

4          THE COURT:  As I read those hearings, some pretty

5   able people were trying to pin you down as to just what you

6   claimed.

7          MR. VEEDER:  Yes, they were, Your Honor, and I re-

8   vert to what I originally said and I reiterate what I said,

9   that when we wrote that language we were most careful, we were

10  very, very careful that we didn't give anything away, and in

11  addition we were most careful to see that there would be a day

12  such as this when there would be an accounting rendered and I

13  am very pleased to render it.  I say this, that from our stand-

14  point I was convinced that Arvin Shaw, who was one of the most

15  competent lawyers I ever encountered, was quite aware of what

16  was going on, and he was also quite aware that when we used the

17  term "sovereign state," for this reason, that we had quite a

18  hassle about it and when all was said and done I said, "I'm not

19  going to agree to anything that will jeopardize the interests

20  of the United States.  I'm not sure how much water we are going

21  to need."  But I insisted, and I repeat now, that from my

22  standpoint the National Government has a right to divert and

23  use the water as it is now using.  It doesn't have to comply

24  with State law, there would be no reason for its complying with

25  State law, and when we used the word "gained" we were very

1  careful there, too, because we were not sure, and I wasn't sure

2  then.

3          THE COURT:   Who was Mr. Shaw -- representing the

4  State of California?

5          MR. VEEDER:   Arvin Shaw.

6          THE COURT:   Representing the State of California?

7          MR. VEEDER:   Yes.

8          THE COURT:   You told him at the time the stipulation

9  was signed that you were claiming a right to the unappropriated

10  waters?

11          MR. VEEDER:   No.   No, I told him, from the standpoint

12  of use we were making it just as broad as --

13          THE COURT: Well, wait, what did you tell him?

14          Read it back, Mr. Reporter.

15          Were you telling me then what you told Shaw or what

16  you were thinking about?

17          MR. VEEDER:   Well, I think we had better go back and

18  read what I said, your Honor.

19          THE COURT:   Read it, Mr. Swader -- where he mentioned

20  Mr. Shaw's name, and then from there on.

21          (The Reporter read the record as follows: I was con-

22  vinced that Arvin Shaw, who was one of the most competent lawyers

23  I ever encountered was quite aware of what was going on, and he

24  was also quite aware that when we used the term "sovereign state,"

25  for this reason, we had quite a hassle about it and when all was

JOHN SWADER, OFFICIAL REPORTER

1  said and done I said, 'I'm not going to agree to anything that

2  will jeopardize the interests of the United States.   I'm not

3  sure how much water we are going to need.'  But I insisted, and

4  I repeat now, that from my standpoint the National Government

5  has a right to divert and use the water as it is now using.  It

6  doesn't have to comply with State law, there would be no reason

7  for it complying with State law, and when we used the word

8  'gained' we were very careful there, too, because we were not

9  sure, and I was not sure then.

10        "THE COURT:  Who was Shaw?)

11        THE COURT:  Then I understand you to say that you told

12  Shaw before you signed the stipulation that the Government didn't

13  have to comply with the State law.  That is the way I heard it

14  read.

15        MR. VEEDER:  I would not say that at that time I had

16  said that, your Honor.  I think that the first time that I ever

17  said into the record that the United States would not have to

18  comply with State law for the acquisition of water was before

19  Judge -- I think it was -- it was down in one of these court-

20  rooms, in which we outlined our whole idea in regard to use and

21  in regard to the applicability of State law.

22        THE COURT:  You mean before I got into the case?

23        MR. VEEDER:  Yes.

24        THE COURT:  Before Judge Weinberger or Judge Yankwich

25        MR. VEEDER:  I'm sure, however, that Arvin Shaw was

1  present during those arguments

2          THE COURT:  This was after the stipulation was signed?

3          MR. VEEDER:  No.  But I would like to check the whole

4  thing back, because you asked me about some things that were a

5  long time ago.

6          THE COURT:  I merely throw out at this time this

7  question or thought.  You are asking me to interpret a stipu-

8  lation.  I take it that if the stipulation is not ambiguous,

9  I can interpret it ~~very~~ from the four corners thereof.  Do you claim

10  that there is any ambiguity in this stipulation?

11          MR. VEEDER:  I am dreadfully sorry if there is.  I

12  hope there isn't.  I think we used the word --

13          THE COURT:  Let's get away from whether you hope, etc.

14          MR. VEEDER:  I don't believe it is ambiguous.

15          THE COURT:  Do you contend that there is any ambiguity

16  in the stipulation?

17          MR. VEEDER:  I contend that there is none at all, your

18  Honor.

19          THE COURT:  All right, then, if that is the case, I

20  don't have to go into your negotiations with Mr. Shaw, do I?

21          MR. VEEDER:  I think it might be helpful.

22          THE COURT:  If there is no ambiguity in the document,

23  the Court would not be permitted to go into the conversations

24  between the parties before it was signed.

25          MR. VEEDER:  Well, I view this as a very informal

1   argument here today, and I am very, very pleased to discuss the

2   whole thing from start to finish, emphasizing throughout that

3   the term "use," as written into this document, was intended to

4   have the broadest possible meaning ascribed to it.  I used that

5   term intentionally because I didn't want to limit the matter to

6   appropriation.

7          THE COURT:  Well, I have your point, and I think that

8   "use," standing alone, probably has to be given a broad meaning.

9   It may be broad enough to cover your point on inverse condemnation-

10  which, however, I don't think is good, even though the stipu-

11  lation may cover it.

12         But my question is -- you have already answered it

13  once -- you do not ~~intend~~ contend that this stipulation is am-

14  biguous?

15         MR. VEEDER:  No, I don't.

16         I think your Honor may have a problem in his mind --

17  George Stahlman just brought it to my attention -- the only

18  thing we are claiming here in regard to the term "use" is that

19  we are asserting in the variety of ways that we could have ac-

20  quired the right only to the extent of the use outside the

21  watershed, whatever quantity of water that may be.  We are not

22  claiming anything above and beyond what we have termed the

23  measure of our right, namely, beneficial use.  In other words,

24  to the extent of the usufructive right, to the extent of that

25  use, we say, we have title to it.  I think that we have title

595

1    in a variety of ways.

2              THE COURT:  I think I follow your position.  Under

3    the word "use" actually, under your theory, it would be broad

4    enough to cover your claimed prescriptive right.

5              MR. VEEDER:  That is right.

6              THE COURT:  Although you have used the word "pre-

7    scription."

8              MR. VEEDER:  That is right.

9              THE COURT:  It would be broad enough to cover your

10   contention that you acquired rights to the water by inverse

11   condemnation.

12             MR. VEEDER:  I think, that is possible.

13             THE COURT:  And you also claim that it is broad

14   enough to cover rights which you already had but which you had

15   not exercised.

16             MR. VEEDER:  That is correct.

17             There is an additional one.  I think that it is

18   sufficiently broad so that, assuming that title was in the

19   State of California when we diverted and applied the water to

20   a beneficial use, at that time title did move into us.

21             THE COURT:  Now some of those I might go along with.

22   But when you use the word "rights to the use of water it may

23   have gained by use," you already had a right to this water.

24   Isn't it different to say that you gained it by use?

25

1          MR. VEEDER: Perhaps the word "gained" was not the

2    happiest word that could have been used.  I assure your Honor,

3    however, that the term "use" and "gained" were used in the

4    broadest conceivable sense to the end that whatever rights we

5    needed we would have, to the extent of our use at that time.

6    Our maximum use had been attained at that time -- I think the

7    maximum use was in 1946 before Fallbrook ever claimed any water.

8    But the fact remains -- and I wouldn't really know how to word

9    it otherwise, even in the light of your Honor's inquiries --

10   I think that we said if there were any rights exercised above

11   and beyond those purchased from the Rancho Santa Margarita, we

12   claim that we have title to them, and that is certainly the full

13   meaning and concept of the stipulation.  If there is ambiguity --

14          THE COURT:  What did you mean by paragraph IV when

15   you said that the rights of the United States to the use of

16   water are to be measured in accordance with the laws of Cali-

17   fornia?  Did you have in mind the requirements of filing an

18   application to appropriate water?

19          MR. VEEDER:  Oh, no.

20          THE COURT:  You didn't think about that.

21          MR. VEEDER:  No.  No, I have never ever taken the

22   position that the State of California could be an entity with

23   power to veto the acquisition of property needed for National

24   defense. 'If we take the --

25          THE COURT:  That doesn't lead us anywhere.  We all

597

1  concede that the Government can come in and condemn and pay for

2  whatever is for the Governmental use.

3        MR. VEEDER:  But even to the extent of unappropriated

4  water --

5        THE COURT:  California can't veto.  You can condemn

6  water.

7        MR. VEEDER:  But I think, your Honor, that the logical

8  sequitur of where we are going, if we were to follow the State's

9  views, would be that the State could say at a hearing of the

10  character that they had on the 12th and 14th, "We tell you,

11  the United States of America, that you cannot acquire these

12  rights."  Now that's precisely where we go if we take the turn

13  that they ask us to take.

14        THE COURT:  The State might say, "You did not file

15  an application to appropriate.  You are, therefore, junior to

16  other appropriators.  You have no rights by virtue of the

17  State law on appropriation, and you have no rights to get it

18  except by appropriation."  That's not the end.  You still have

19  the trump card.  You can say, "All right, we will condemn it.

20  We will pay for it."  The State of California can't stop the

21  Government from getting water.

22        MR. VEEDER:  I think it could.  I think the logical

23  end could very well be this, that if each State in the Union

24  would say to the National Government, "You can't use the water

25  here, you have got to go out and buy it," the result could be

598

1   virtual bankruptcy.   If you ever stop and think how much they

2   would require us to pay down through the years in a variety of

3   places, the fact remains that it would not be a great deal

4   different from taxation.   If every State, if every entity could

5   say, "United States of America, you go and pay for some water.

6   Under our law you can't have any without it." -- and I think

7   that is precisely where they are going -- to me it is so ri-

8   diculous that we would have to go to the State sixteen years

9   later to acquire rights that we were exercising a good many

10  years before Fallbrook ever made a filing for water.

11          Now I would like to go back again, though, to this

12  matter of measurement.   I have never understood the term to

13  mean anything other than beneficial use, and that is certainly

14  the four corners of our claim here.   Whatever rights we have

15  used outside the watershed -- and I am using "outside the

16  watershed" for a reason that I will go back to -- whatever

17  rights we have used outside the watershed are measured on the

18  basis of beneficial use.   Certainly we are not claiming more

19  water than we need to meet the demands of the military in-

20  stallation.

21          THE COURT:   That could be your outside claim, under

22  paragraph VI; the one interpretation would be that that is the

23  outside limits of your claim.

24          MR. VEEDER:   That's right.

25          THE COURT:   You are arguing more than that.   You are

599

1    arguing that what you meant by that, when you referred to Cali-

2    fornia law, you were just talking about beneficial use; that

3    you were not talking about the statutes on appropriation.

4              MR. VEEDER:  Your Honor, in regard to compliance with

5    the statutes for appropriation, I don't believe that there has

6    ever been a time in this litigation that anyone ever heard me

7    even intimate that we had to comply with State law to acquire

8    rights to the use of water.  On the contrary, I think every

9    brief and every statement that I have ever made has been to the

10   contrary.  I certainly deny, and there is no reason ever to

11   assume that I would say anything to the contrary, because it

12   would be a subversion of the National Government to a control

13   by the State, and I don't believe that under the Constitution--

14   I think Article VI precludes such a thing.  I think the paramount

15   on rights -- I shouldn't use "paramount" -- I think the rights

16   of the National Government which have been delegated to it are

17   superior within the sphere of its delegated authority, and I

18   think that is precisely the point where we are today.

19             I don't know whether I have responded to your Honor's

20   question on measurement or not completely.  I would like to

21   cover that.  Your Honor had made the observation that you didn't

22   quite follow what I was saying in regard to the acquisition

23   from the Rancho Santa Margarita.

24             THE COURT:  Yes, I want to hear you again on that.

25             MR. VEEDER:  I'll go into that, but I want to cover

1    this measurement, if I may, if you want more on that.

2          THE COURT:  I think I understand your position.  You

3    claim that that language in paragraph IV with reference to the

4    laws of the State of California means only that those laws shall

5    apply insofar as the rule on beneficial use is limited to

6    Government rights; that it does not mean that the laws of the

7    State of California with reference to appropriation have any-

8    thing to do with your rights.

9          MR. VEEDER:  You see, your Honor, had I --

10         THE COURT:  That's what you contend.

11         MR. VEEDER:  Yes.  I have always said this, in regard

12   to this filing that was made with the State, (1) that I didn't

13   see why in the world the filing was made, but in any event I

14   took the position that to the extent that the United States was

15   using water title was in it at the time.  Certainly there has

16   never been an intimation or a thought from me that the United

17   States would have to go to the State and ask for water, and I

18   don't believe that anyone has ever even intimated that I did

19   adopt such a position.  Certainly in regard to this paragraph

20   IV, there is no reason to read into that word "measured" that

21   we would go and initiate a right to the use of water under State

22   law.

23         The principal reason for the litigation, I might add,

24   and one of the principal reasons why we thought it essential

25   to bring it was that Mr. Swing -- and again I regret that he

1   isn't here -- had come to me in Washington and had discussed

2   this matter and I advised him that certainly the worst thing

3   that the National Government could do, and I repeated it many

4   times, would be to go and say, "We are subject to State law, we

5   must initiate our rights," for immediately when we made that

6   admission we would be at the bottom of the totem pole. Here are

7   two paper corporations, with paper rights, who went in and made

8   filings. If we came along now and said, "Well, the only way

9   that we could get a right to use water is to make a filing," in

10  view of the fact that we had already spent $100,000,000, I think

11  that the admission would -- well, it would just absolutely be

12  inane, and we have never taken that position.

13          I have never felt in any regard, in any use of water,

14  whether it is on the Forest Service lands, on the Indian lands

15  or anyplace else, that the United States is subject to the con-

16  trol of the States in the acquisition of water any more than

17  it is subject to the control of the State in regard to the ac-

18  quisition of land. There certainly can be no sound reason, I

19  think, why the United States should go and initiate rights under

20  the circumstances, or, assuming that it didn't have title, why

21  you would have to go through all the regulations and ultimately

22  say, "Well, please, State, will you let us have some water,"

23  and then be advised that there wasn't any available for appro-

24  priation.

25          You say that the answer to that is condemnation. .

1   Well, my answer to that is that the State could, and I think

2   would, be arbitrary in regard to the availability of water.

3   Certainly their citizens would come in ahead in any contest. I

4   have no doubt on that.

5        But the point that I wish to make is that the United

6   States had actually done, in our view, all that anyone would be

7   required to do, individual or otherwise, to acquire a right to

8.   the use of water when Fallbrook instituted and started ~~its~~

9   seeking to get some rights in the River.

10        So it makes no difference, under the Federal Rules

11   of Civil Procedure, in my view, whether at the conclusion of

12   this case it is held one way or the other how we got our title.

13   I think under the Federal Rules you get the relief which the

14   facts support, and when all is said and done we have diverted,

15   we have used the water, and we used it in advance of Fallbrook's

16   claims.   I believe that the doctrine of estoppel could very

17   well be applied.   I am certainly not going to limit us in any

18   way to these what I think are frivolous claims in this River,

19   and when we signed the stipulation I assure your Honor that we

20   had no intention of giving up any.   It may be unfortunate that

21   we used the word "gained."   I have been searching in my mind

22   for a better word.   But be that as it may, it was used, and we

23   certainly intended, and intend now, to claim title to any water

24   that we are using.

25        THE COURT:   I'm squared away on what your contention

1    is as to water that originates in the public domain.

2            But now what about the lands that were privately

3    owned in what is now California at the time of the Treaty of

4    Guadalupe Hidalgo?  How do you spell out your theory on that?

5        MR. VEEDER:  I think that to the extent that those

6    rights were vested and exercised and recognized under the

7    Mexican law, I think that they would be preserved the same as

8    any other vested right.  I don't believe that the National

9    Government could invade the rights.  It couldn't invade the

10   Vail rights, for example.

11           THE COURT:  You then disclaim any right to water which

12   originates on property that was part of the old Mexican ranchos--

13   that is, disclaim it under this theory of this right that the

14   Government has to water on public domain.

15           MR. VEEDER:  That is right.  The only right the

16   United States or anybody else could acquire, and the rule is

17   as applicable to Fallbrook as it is to us, the only rights that

18   could be acquired in the Santa Margarita River would be those

19   over and above -- that is, the unappropriated water of the

20   Santa Margarita River.

21           THE COURT:  But your broad claim about this right of

22   the Government to water, which antedates 1877, you don't make

23   that claim as to the land that was part of the old ranchos?

24           MR. VEEDER:  No, you couldn't.

25           THE COURT:  Well, I misunderstood you this morning.

1 I thought you said something different.

2    MR. VEEDER:  No.  If I did --

3    THE COURT:  At least I didn't follow you in what you

4 said this morning.  That is why I opened it up again.

5    MR. VEEDER:  The whole thesis of the claim of the

6 rights to the use of water, in my view, is that this right to

7 the use of water, if I may repeat once more, is exactly the

8 same as the right to the use of land, when you acquire in the

9 natural resource in the stream a title to divert and use water,

10 and I think one of the reasons why we took some issue with both

11 Fallbrook/with the State of California -- and with all respect

12 to the gentlemen -- I think they got somewhat confused between

13 the corpus, the molecules of the water and the right to the use

14 of those waters, and all we are talking about here and the only

15 thing that is involved here is the freehold estate, the right,

16 the usufruct to the water in the stream.

17    THE COURT:  Going back to your argument that the

18 Government severed the water from the land, historically was

19 there any State in which the Congress turned over to the State

20 the right to handle the homesteading of that land?

21    MR. VEEDER:  Not to my knowledge, your Honor.

22    THE COURT:  It was all handled by the Government.

23    MR. VEEDER:  I can give an example, though.  It was

24 not a homestead act, really; it was the old Carey Act, which was

25 antecedent to the Reclamation Act.  The Government did this.

1  They would put up a million acres of land to these States, and

2  promotion companies would go in and title would be acquired to

3  these lands under the Carey Act projects.  But that is the

4  closest thing that I know of where lands were turned over for

5  acquisition.  Minerals are a prime example, though, of where

6  the Federal Government said that these minerals are available

7  for appropriation, acquisition, whatever you want to say, and

8  there was compliance with State law and State laws governed.

9  But title passed from the United States.

10  A good example of that would be -- and George Stahlman

11  and I were talking about it today -- a man goes in and makes a

12  filing on his 200 foot strip or 1500 foot strip, whatever it is.

13  He complies with the State law up to a point, and then he doesn't

14  do his work -- he has so much work he has to do each year.  The

15  title to that land reverts to the National Government, although

16  the State is the entity which prescribes the manner in which

17  those rights would be acquired.

18  THE COURT:  The mineral patents all issued from the

19  Federal Government?

20  MR. VEEDER:  That is right.

21  THE COURT:  Then you have three situation: land,

22  minerals, and waters.

23  MR. VEEDER:  Yes.

24  THE COURT:  The lands were all patented by administrative

25  procedures through the Federal Government, and title passed

1    through the Federal Government.   The minerals were patented
2    through the Federal Government, but there was a requirement that
3    the applicant had also to comply with the State law.

4        MR. VEEDER:   That's right.

5        THE COURT:   I sat on a case where there was some con-
6    flict between the State and Federal regulations.   I remember
7    something about that.

8        Now as to water, you claim that the Desert Land Acts
9    didn't dedicate the water to the public use; the water remained
10   in the United States.

11       MR. VEEDER:   It didn't relinquish the title.   It open-
12   ed up the title, all the rights to the use of water for appro-
13   priation upon public lands, and by compliance with the State
14   law the title would pass from the United States to the individual.

15       THE COURT:   All right.

16       MR. VEEDER:   Your Honor, should I move on to some
17   other point?

18       THE COURT:   If you have something more to present now--

19       MR. VEEDER:   Well, you had raised the question about
20   what our thoughts were about what we acquired from the Rancho
21   Santa Margarita and I can cover that if you want me to.

22       THE COURT:   Is there any dispute about that?

23       MR. VEEDER:   I thought you had said there was some
24   doubt in your mind about what our views were as to what we ac-
25   quired from the Rancho.   I think it is important, for this

1  reason: there was a large area in the Rancho Santa Margarita

2  when the National Government acquired title to it that was

3  under irrigation.  Now some of that land was within and some of

4  it was without the watershed.  Now to the extent that the waters

5  within the watershed were used beyond the point of reasonableness,

6  that was a non-riparian use to which the United States succeed-

7  ed.  Lake O'Neill is an example of that which could not be a

8  riparian right because it is a storage right.  There was a large

9  acreage where it might be that the waters that were used were

10  in excess of what would be a reasonable riparian right.  We suc-

11  ceeded to those rights, and I don't think the State law could

12  interfere with it.

13      Similarly -- and your Honor has a map up there that

14  we have prepared for you showing where the water was used out-

15  side the watershed, on the Stuart Mesa and on the South Mesa,

16  waters were used outside the watershed -- and we succeeded to

17  whatever rights the Rancho had.

18      Now it is our view that the measure of those rights

19  would be whatever we purchased from the Rancho, and that we

20  couldn't be dis-seized of those properties.  I don't believe

21  that they could be taken from us.

22      THE COURT:  I don't think that anybody is going to

23  dispute that if you establish some title in Santa Margarita as

24  to water that you got what Santa Margarita had.  Now what do you

25  claim?  That Santa Margarita has a downstream owner acquired

1    rights by prescription against upstream owners?

2         MR. VEEDER:  I think that that is an argument that

3    certainly we advanced.  I advance the additional one, however,

4    that in the case of Lake O'Neill certainly an appropriative

5    right had been acquired there, because that was exercised as

6    early as 1883, long before California had adopted the regu-

7    lations to which they now refer.  In those days there was no

8    doubt that there were two ways of acquiring rights: one by

9    statutory methods, and the other by just a diversion and

10   application of water to beneficial use.  Down through many,

11   many years the Rancho Santa Margarita was using water in large

12   quantities to irrigate land.  It is entirely possible but still

13   it is a factual questions whether appropriative rights to some

14   extent had been acquired within the watershed of the Santa

15   Margarita River in addition to the Lake O'Neill rights.  If

16   that is true, we have appropriative rights plus the riparian

17   rights within the watershed -- we don't know, and that is one

18   of the reasons why we use the terminology that we did in the

19   stipulation.  We don't know, and we will not know until this

20   case is proved, whether the rights that we succeeded to from

21   the Rancho were entirely adequate to meet our needs.  We don't

22   know.  But in the event that they are not, we rely upon these

23   other premises that we have advanced.

24         So it completely possible that when the last bit of

25   testimony is in and your Honor enters his findings, he may find

609

1   that the rights we succeeded to on the Rancho Santa Margarita

2   were entirely adequate for the demands we are now making.  We

3   don't know.

4        But -- the final shot, in regard to inverse condemnation-

5   in the event that there are other arrows in the quiver to which

6   I have made reference and they are inadequate for one reason

7   or another we assert that when we diverted and applied water to

8   a beneficial use, as we have, to that extent the United States

9   of America has a right to that water subject to paying just

10  compensation.

11       Now again we go back to the ABC's of water law.  It

12  is our view that when the National Government diverts and

13  applies water to beneficial use it is exercising a right in real

14  property.  It is not, as the State and Fallbrook have indicated,

15  that we are just sitting at the end of the rainspout with a

16  bucket.  We are not doing that.  We are claiming that in the

17  Santa Margarita River we have a right to have that water come

18  down to us.

19       THE COURT:  I have thought about this inverse con-

20  demnation problem, and I read the Gerlach case very carefully

21  and I was grasping around in my mind for some distinction.  I

22  thought the State of California did it pretty well in their

23  brief.  In other words, the mere fact that you use the water

24  doesn't mean that it is inverse condemnation.  You have to take

25  the water from somebody, and when you sit at the end of the

610

1    rainspout with a bucket you are not taking it from anybody; you

2    are taking just the water that was left over and came down the

3    stream.   That is entirely different from the farmer along the

4    banks of the San Joaquin where the Government built a dam.

5    There would be no more water that would come down and flood these

6    bank lands.

7         MR. VEEDER:   There is a difference, your Honor.   We

8    are sitting down there at the Friant Dam, and I am quite well

9    acquainted with that, too, and we are claiming if anybody up-

10   stream interferes with that right to have that reservoir filled

11   we are asserting our right against them upstream.

12        THE COURT:   That may be right, but that wasn't what

13   was decided in the Gerlach case.

14        MR. VEEDER:   No, but it is exactly the same principle,

15   and where the National Government is diverting and using water

16   under the claim of right, and I think that will be a question

17   to be tried out here, frankly: what is the extent of the demands

18   on the stream?   What is the extent of the demands that you are

19   making on the stream?   And when we find, if we find, that there

20   is a conflict between our claims and our demands on the River,

21   then to that extent, and to only that extent, is there an in-

22   vasion of the upstream rights.

23        THE COURT:   I don't see how you can have inverse

24   condemnation unless you have actually taken something.   The

25   mere fact that you claim something, you're not depriving

1   someone else of it, doesn't mean that it is inverse condemnation.

2   The very term which has been applied to it, "Inverse condemnation,"

3   instead of condemning it in a Court procedure you have condemned

4   it by self-help.  You have actually taken it.

5          MR. VEEDER:  That is right.

6          THE COURT:  You have deprived somebody else of it.

7   If it is something that you can look ahead in the future and take

8   by condemnation, there is no need to talk about "inverse-con-

9   demnation."  It would have to be a fait accompli, I suppose, as

10   Brother Yankwich would say.

11          MR. VEEDER:  I think it has been.

12          THE COURT:  It's something which has been done.

13          MR. VEEDER:  It has been done, to the extent that we

14   are using water outside the watershed.  We are claiming up-

15   stream against the stream a right to have that water come down

16   to us, and that will be an issue in this case.

17          THE COURT:  Well, you claim, but the only water that

18   you are using is what has already passed these upstream owners

19   and been left over.

20          MR. VEEDER:  And if they interfere with it, the answer

21   is that we will assert against them, as we will assert --

22          THE COURT:  You will assert a claim.  All right, go

23   out and condemn it.  Why talk about "inverse condemnation?"

24          MR. VEEDER:  We are asserting that claim right now

25   here, your Honor.  Here is an additional factor.

1    THE COURT:  I thought the State pretty well analyzed

2  those cases.  I would like to have you show me a case that is

3  on all fours with your proposition.

4    MR. VEEDER:  I think the Lynah case is an interesting

5  case.  I think it is 188 U. S.

6    THE COURT:  Do you cite it?

7    MR. VEEDER:  I don't recall whether I did or not,

8  your Honor.

9    That case was an instance where the United States

10  didn't go on the man's land.  It changed the course of a river,

11  raised the water table on the stream, and the man came in and

12  said, "You have taken my property.  I wanted to be paid of it."

13    THE COURT: What did they do -- flood his land?

14    MR. VEEDER:  The water table arose and the land became

15  water-logged.

16    THE COURT:  Well, you did something.  You hurt him.

17  You destroyed his property right there.

18    MR. VEEDER:  But the whole concept, your Honor, of

19  condemnation -- and again I think that Fallbrook and the State

20  have both erred in the idea that you must invade an upstream

21  right to acquire a right in the stream.  How could you appro-

22  priate water, if that were true?  How could you acquire a right?

23  What we are doing here, and we have asserted to the world the

24  facts that we are claiming in your stream the right to have

25  water delivered to us and to come down to us.  What more would

613

1   you do?  Would we go all the way up the stream?  I don't know,

2   when they talk about invading rights, when we come along and

3   make a claim that we own a right to the use of water and that

4   we own the title to it, at that point, I believe, that is all

5   that is ever required.  How could you do otherwise?  Would we

6   go up, tap a man on the shoulder and say, "You let this water

7   down to us?"  I don't know, your Honor.  I think that from the

8   standpoint of acquiring any right, an appropriation is not a

9   bit different than inverse condemnation, when you analyze it.

10  A downstream man diverts water and applies it on his land and

11  if anybody upstream interferes with it, then he comes along and

12  asserts his right.  But there is no other invasion.  There is

13  no invasion of a man's land in this instance, certainly, because,

14  as I said before, you have taken the sticks that constitute

15  the title to the rights to the use of water and have separated

16  them from the land.  There is no basis whatever for saying that

17  you must invade a man's land to acquire a right in a stream.

18          THE COURT:  If I understand what you are saying --

19  and I may want some help on that from the other side -- you are

20  saying that a downstream owner -- let's take the situation be-

21  fore 1913 -- could acquire legal rights by appropriation against

22  upstream owners.

23          MR. VEEDER:  That is right, your Honor.

24          THE COURT:  And you are saying, how can that be true

25  and at the same time a downstream owner could not obtain

614

prescriptive rights against an upstream owner; is that your point?

      MR. VEEDER:  That is right.

      THE COURT:  It may be, and my offhand thought is this, that appropriation was a different kind of legal animal than was prescription.  Prescription came down from the old common law, and a prescriptive right had certain necessary antecedents attached to it, while this appropriative right was something that grew up in the Western country and maybe it is a different kind of legal animal.  Otherwise, I think you have a point.

      What is the difference between a downstream owner, before 1913, acquiring a valid appropriative right which would be good against a later appropriator on a stream and a downstream owner attempting to assert a prescriptive right against upstream owners?  I want somebody to tell me the difference between them.

      MR. VEEDER:  I think, your Honor, that historically you will find a series of cases that say that the genesis of the doctrine of prior appropriation was prescription.  There are cases that draw the analogy, and I think the California cases --

      THE COURT:  Yes, it might be the genesis, but then the law might have done a little diverging thereafter, because these California cases are right on the nose that a downstream owner can't get a prescriptive right against upstream owners,

1   and you have the cases right on the nose that a downstream

2   appropriative right is good against a later appropriator.

3          MR. VEEDER:  That is right, and I submit, your Honor,

4   that you have made a complete answer to the question of inverse

5   condemnation for the reason that you have just expressed.  A

6   man can acquire a right to the use of water against everyone

7   upstream without any invasion of their rights and all he has

8   to do is to claim the usufruct in that stream to the unappro-

9   priated water and every subsequent claimant takes subject to

10  that claim.

11         THE COURT:  Well, I don't know, if by what you have

12  just said you think you have convinced me, you haven't.

13         MR. VEEDER:  Well, this is still early in the day.

14         THE COURT:  I don't know what the distinction is,

15  now, between this prescriptive and appropriative proposition.

16  But I would say, tentatively, that the law of California says

17  that a downstream owner may not acquire a prescriptive right

18  against an upstream owner.  The law of California also says

19  that a downstream appropriator, prior to 1913, by his appro-

20  priation could get a good right against a later appropriator

21  upstream or down.

22         MR. VEEDER:  I think this, your Honor -- and we cer-

23  tainly haven't abandoned the idea of prescription -- I was

24  hoping that we would have the whole Larsen record here.  I

25  haven't seen it, and I will get it.

616

1    The fact does remain, however, I see no reason, from

2 the standpoint of the theories of the law that are involved why

3 when a man diverts and applies water under a claim of right

4 against a stream which is in very short supply and another man

5 sitting upstream makes no claim to that water, I don't see why,

6 on theory at least, that the acquisition of the usufructive

7 right could not be acquired upstream against a claimant. I

8 think it is sound legal theory.

9    THE COURT:  Of course, there is this difference.  The

10 downstream owner who claims a precriptive right is claiming it

11 for so many years against a person who sat upstream and did

12 nothing.

13    MR. VEEDER:  That is right.

14    THE COURT:  But the law says that you can't get it

15 because your use was not adverse to him.  The man who claims a

16 downstream appropriative right is not claiming, necessarily,

17 against the man who is sitting by and doing nothing.  He is

18 claiming that his appropriation ripened into a right and that

19 a later appropriator, undoubtedly a person who came in later

20 and then sought to take the water out, cannot now claim.  So

21 are there are differences between the two.  I'm just trying to

22 see what they are.  I think that is very definitely a differ-

23 ence.

24    MR. VEEDER:  But I think that in each instance,

25 whether it is inverse condemnation or appropriation or

1   prescription, there is no invasion of an upstream right.  What

2   occurs is that you claim a title in the stream to a particular-

3   the right to a particular quantity of water, that is, it is a

4   title independent of the land through which the water flows,

5   and I think that that is the crux of this matter, an analysis

6   of what is claimed by downstream user, and to me, on theory,

7   it is certainly very sound to say, "I am claiming this right

8   in the stream.  I have been using it.  I am claiming it against

9   the world," and whether you call it inverse condemnation by the

10  National Government or not that is precisely what we are

11  claiming, and that is what we have been using.

12       Is there more, your Honor?  I think I have covered

13  the points you made reference to.

14       THE COURT:  That will be good for now.  You had a

15  busy day so far.

16       After recess, who wants to be heard?

17       MR. MOSKOVITZ:  I would like to be heard, your Honor.

18       THE COURT:  All right, take a short recess.

19       (RECESS)

20       THE COURT:  Mr. Moskovitz.

21       MR. MOSKOVITZ:  Your Honor, at the outset, I thought

22  I might answer the question you asked at the end of Mr. Veeder's

23  discussion as to the difference between an appropriation down-

24  stream and a prescriptive right.

25       I think the distinction is quite fundamental.  It lies

1   not in whether there is unappropriated water available for appro-

2   priation.   If there is unappropriated water available for appro-

3   priation, which means that nobody has any rights to this water

4   that is flowing uselessly to the ocean, then a downstream di-

5   verter and user may, let us say before 1913 in California, could

6   have, by diverting and putting it to beneficial use, acquired

7   an appropriative right which would be good as against later

8   would-be appropriators upstream and precluded them from inter-

9   fering with the flow upon which the downstream diverter relied.

10          Now there is no element of adversity or hostility in

11   the diversion by the downstream appropriator, because what he

12   is diverting is water which is unappropriated subject to no

13   one else's proprietary rights.   By contrast a prescription, and

14   also by analogy inverse condemnation by an entity having the

15   eminent domain power, involves interference with someone else's

16   property rights.   It is this element of interference which makes

17   it necessary for the interference with the flow of water or the

18   diversion to be above in order for a prescriptive right to re-

19   sult, because otherwise there is no interference.

20          Now the United States, as the lowermost diverter on

21   the Santa Margarita River, if it took the required steps could

22   get an appropriative right, and it seems to me that all through

23   this discussion and throughout this case what the United States

24   has really been asserting is an appropriative right and it has

25   been attempting to justify it on a number of grounds.   But it is

an appropriative right, because it says that it is water to
which no one else had a right when we started using.   In order
to get an appropriative right, we say that the California law
must be complied with, absent comdemnation, and California law
since 1914 has required the filing of an application.

Prescription is different, as I say, because the ele-
ment of adversity, and a downstream user, by the very nature of
his use below anyone else, can't be adverse or hostile to any-
one else, and likewise a downstream diverter, if it is an entity
with the power of eminent domain, cannot, by the action of di-
verting water, acquire a right by inverse condemnation, because
that same element is lacking.

Now I don't know whether your Honor would like me to
discuss the stipulation.   I have some points that I would like
to make before getting into the merits of the various arguments.

THE COURT:   All right.

MR. MOSKOVITZ:   First of all, I think we can go down
paragraph by paragraph and see what the differences are between
the United States and the State as to the meaning of the stipu-
lation.   Apparently, all parties that have indicated their
views agree that the stipulation is binding upon the parties to
it and upon the Fallbrook Public Utility District and Santa
Margarita, so we will not have to argue that issue.

Paragraph I of this stipulation concerns the meaning
of the word "paramount."   I don't think there is any difference

1   of view among the parties on that.

2   As to paragraph II, I think your Honor has pointed

3   out the problem that is created by the phrasing of that para-

4   graph as to what rights the United States claims by virtue of

5   prescription or use or both, which it may have gained since the

6   acquisition of the Rancho Santa Margarita.  It seems to me that

7   you can analyze this problem in a little different way and come

8   to the same result.  Apparently, the United States bases its

9   claim of right by virtue of ownership of public land upstream

10  as coming from the fact of ownership of the land.  The reason

11  that it says that it merely exercised rights already owned is

12  because previously, before it used water, it owned land, and

13  according to the argument that the ownership of land has ac-

14  companied with it ownership to water of some kind.  I want to

15  analyze that further.  But the point is, it is the ownership of

16  land which gave rise to the rights.

17  If it is ownership of land which is the basis of the

18  claim of right, based upon the public domain lying upstream,

19  how can that conceivably be covered either by the use of the

20  word "prescription" or the use of the word "use?"  Neither

21  prescription or use relates to ownership of land.  So aside from

22  the fact that the rights claimed are those which may have been

23  acquired since the acquisition of the Rancho Santa Margarita,

24  also they are rights claimed to have arisen by virtue of pre-

25  scription or use, and by the very nature of the claim it doesn't

1  flow from either of those activities.   It flows from ownership

2  of land.

3          In addition it seems to me that we have had an inter-

4  pretation of the word "use" in the stipulation by the Ninth

5  Circuit Court of Appeals, and just very briefly I will call your

6  attention to 235 Fed. Sec. (2d) at page 660, where the Court said:

7          "Use of water can mean nothing more than appropriation

8  and application to some purpose.   Since no estoppel could be

9  raised against other landowners and appropriators, the phrase

10  used in the stipulation must mean 'prescription' or 'appro-

11  priation.'"

12          Now this has been the understanding of the word "use"

13  that the State has had all along.   For that reason we don't

14  think that the word "use" can fairly be said to cover rights

15  which may arise by virtue of inverse condemnation, aside from

16  whether the facts here even permit that result to follow, and

17  we have shown that none of the cases covering inverse con-

18  demnation are in any way similar to the facts here.   I will go

19  into that a little more later on.

20          The Ninth Circuit Court of Appeals has also made it

21  plain that there is a distinction between corpus of water and

22  a water right.   Mr. Veeder has chastized Fallbrook and the State

23  for making this amateur confusion between corpus and rights.

24  But if we made a mistake, we are joined in such mistake by the

25  Ninth Circuit Court of Appeals.   On page 656 of 235 Fed. Sec.,

622

1    the Court said:

2         "But the physical possession of the corpus of the

3    water after it enters the enclave and the ability and legal

4    right then to use it for whatever purposes are not evidentiary

5    of a water right.  We must not fall into the fallacy of be-

6    lieving that because the United States by its sovereignty made

7    use of the corpus of the water which entered the enclave, as

8    it showed, it thereby acquired property rights in the flow

9    against riparians or appropriators under municipal law."

10         On page 661 of the opinion there is similar language:

11         "As soon as the United States took sovereignty of

12    the enclave, as we have heretofore noted, its agents had the

13    right to use the corpus of any water on any part of the area

14    for any purpose."

15         Then let's go on to paragraph III of the stipulation,

16    and we find that the difference of opinion revolves around

17    whether the reference to the sovereign status of the United

18    States is a claim or a disclaimer of rights based upon sovereign

19    status.  Mr. Veeder says that the use of that word indicates

20    squarely that the United States was making a claim based upon

21    its sovereign status.  I submit that the language of the sti-

22    pulation is clearly to the contrary.  It is a disclaimer of any

23    rights based upon sovereign status.  Let's read it again:

24         "That the United States of America claims by reason

25    of its sovereign status no right to the use of a greater

quantity of water than is stated in paragraph II hereof."

It is not a claim, as I say; it is a disclaimer.

It seems to me that paragraph IV is the very heart of the stipulation, and it states:

"That the rights of the United States of America to the use of water herein are to be measured in accordance with the laws of the State of California."

Now the word "measure," apparently, is the word about which the difference revolves between the parties. In my response to the motion of the United States, I quoted from the definition of the word "measure" from Webster's New International Dictionary. It means: to ascertain the extent, degree, quantity, dimensions or capacity of, by a standard. Now the standard which is set forth in this paragraph is the laws of the State of California, and in all respects except as the stipulation may otherwise except, this paragraph says that the rights of the United States to use water are to be measured, are to be placed against the standard of the laws of the State of California, and that means all the laws of the State of California.

Mr. Veeder has suggested that the State indicate what other possible principles of California law than beneficial use would be relevant. Well, I can think of a number of them. First of all, California law says that the riparian right pertains only to the smallest parcel of land in the chain-of-title

624

which is contiguous to the stream.  California also says that the riparian right may be exercised only to the extent that the water is available naturally, and that if the water is stored either on the surface or underground you are departing from the exercise of a riparian right and getting into appropriation. California says that an appropriative right to the use of water of a stream can be acquired, since 1914, only by filing an application and securing a permit, in addition to the necessity of putting the water to beneficial use.  California law says that a prescriptive right may not be acquired by a downstream diverter.  So we say that there are other principles which are relevant in this case, and these principles were certainly in the minds of those who drafted this stipulation, since they didn't talk about beneficial use at all.  They have stated that the rights would be measured in accordance with the laws of the State of California, without making any exceptions.

THE COURT:  Isn't it true, also, that you would have to read the stipulation together, and you would have to read II and IV together, and in view of what is claimed in II what you have said about IV makes sense.  If II, on the other hand, had said, "And the Government also claims rights which it may or may not elect to use or has elected to use which it possessed even prior to 1877," then of course there would be some question whether California law would apply to those rights. It seems to me that you have to read II  and IV together, in interpreting this document.

625

1        MR. MOSKOVITZ:   That is right.  As I stated, there

2  might have been in the stipulation some indication of an ex-

3  ception from the general applicability of the laws of the State

4  of California.  But there is not any.  Certainly rights can be

5  acquired under California law by a use, together with the filing

6  of an application and the securing of a permit.

7        Now one of the issues that has existed from the very

8  beginning of this case between the United States and the State,

9  and the principal defendants, on the other hand, was whether,

10  in fact, under California law, it was necessary to file an appli-

11  cation and get a permit in order to get an appropriative right,

12  and Mr. Veeder has given authorities and made argument indicating

13  that anybody -- he mentioned your Honor one time -- anybody by

14  diverting water and putting it to beneficial use would get a

15  valid appropriative right under California law; that the state-

16  ments in the Water Code saying that the application had to be

17  filed and a permit had to be secured were just an alternative

18  way of securing a water right.  This is a legitimate area for

19  disagreement.  It is, what is the requirement of California

20  law?  If we disagree on that, that's all right; we will put it

21  up to your Honor, to read the cases, to find out which is the

22  correct rule.

23        But it is another thing to say that we stipulate

24  that California law will be the measure, but one of the very

25  important aspects of California law has no relevancy to us.

626

1    You are giving with one hand and taking away with the other,

2    except that they gave in writing and now they are trying to take

3    away orally.

4           It seems to me that that covers the meaning of the

5    stipulation.

6           On the basis that the United States has nevertheless

7    made arguments to sustain its claim of rights to use water out-

8    side the watershed, which I may feel are not covered by the

9    stipulation but are made nevertheless, and I assume in good

10   faith, I think it is well to discuss those arguments on their

11   merits and see whether, even if we feel they should not have

12   been made, they may nevertheless have some merit to them.

13          Now the first point that the United States comes back

14   to is this claim that under California law anyone can secure a

15   right without filing and without getting a permit from the State.

16   Mr. Veeder claims that he has read all the cases that we have

17   cited in our brief showing that in other Western states their

18   codes have been construed as requiring such procedural pre-

19   requisites and that, in fact, there was a case, and he cited it

20   to you and quoted from the language in it, where an earlier

21   user of water who had not complied with State procedure was pre-

22   vented and was held to have an inferior right as against a later

23   user who filed under State procedures, and the case is Deseret

24   Livestock Company v. Hoopiania, a Utah case in 1925.   I hear

25   Mr. Veeder whispering that the case was reversed.   Actually, I

627

1    traced through the history of that case and --

2          MR. VEEDER:  I'm sorry, but I didn't whisper.

3          MR. MOSKOVITZ:  That's all right, it helped with my

4    argument here.

5          As I pointed out, a later decision, Raffle v. Johnson

6    of the Utah Supreme Court, purported to overrule the holding in

7    the Hoopiania case, and I cite that later decision on page 8 of

8    our memorandum.  This was by a three to two decision.  Later,

9    however, in a number of cases, the Utah Supreme Court said that

10   the Hoopiania decision was correct and that the Raffle v. John-

11   son, when it said that it was overruling the Hoopiania case, was

12   mere dictum.  I cite those cases to your Honor.

13         The upshot is that the law of Utah, according to the

14   Utah Supreme Court, has always been since about 1905 or so that

15   someone who uses water without getting a permit does not have a

16   right under State law and if someone later comes in and files an

17   application and gets a permit his right is superior to that of

18   the person from whom he got it.

19         Now we say that that is the law in California.  That

20   is, that the mere diversion and use of water does not create an

21   appropriative right.  I wanted to point out, and I did in this

22   memorandum very carefully, that that doesn't necessarily mean

23   that somebody who files two days before somebody else will get

24   the better right.  There is a wide area of discretion in the

25   Water Rights Board to heed the public interest in granting

1    permits and there can be circumstances under which someone who

2    files later will be held to have the public interest on his side.

3    So it is not just a race for the clerk's office to file your

4    piece of paper.   There are many other factors that enter into

5    it and to claim that the position of the State would give the

6    better right to a person who comes in and files a paper claim

7    is not to state it accurately.

8            Now I think that the most interesting issue that was

9    discussed today concerned the status of the United States and

10   the rights which it may claim by virtue of the ownership of

11   public land.

12           THE COURT:   Let's hear how you trace title and where

13   you think title rests, etc.   You didn't particularly brief that

14   in your memorandum.

15           MR. MOSKOVITZ:   No, your Honor, I didn't, and I didn't

16   very deliberately because I felt that giving the broadest possi-

17   ble interpretation to the claims of the United States as an

18   owner of public land would still not help it in this case.

19           THE COURT:   Let me ask you.   You asked for time to

20   file this brief in order that California's position might be

21   consistent in various litigation that the State of California

22   is carrying on before the Supreme Court of Nevada, before the

23   Water Master of the Supreme Court of the United States, this

24   case, maybe others.   Is that one of the places where you have had

25   a problem as to your position, or is your position clear in this

     respect?

1          MR. MOSKOVITZ:  I think that the position of the State

2    in these cases is not, as far as I know, developed to the point

3    where I want to say definitely that this is the position of the

4    State as to where title to water comes from.  I can say this,

5    and I believe that this is consistent with every case in which

6    we are involved, I have cited cases in our memorandum and there

7    are some more to which I will refer, which indicate that the

8    rights which the United States may have -- I'm not saying ne-

9    cessarily have, but may have -- as an owner of public land are

10   riparian rights.  True enough, when the United States became the

11   owner of these public lands and after the States were carved out

12   of these public lands, the United States was the owner of the

13   land just as anyone else would be the owner of the land, and

14   presumably could claim that rights to water which ordinarily

15   go with rights to land were in the United States.  I think this

16   must be distinguished from the all-encompassing claim that is

17   made by a nation -- Mr. Veeder cited from _Vattel on_ the Law of Nations --

18   that a nation makes to everything that can be found on the sur-

19   face or under the ground of a territory which it takes over.

20   In that case the nation can be said to own everything -- that

21   is, there is nothing which is outside its dominion.

22         THE COURT:  Well, it claims sovereignty over it.  That

23   is really what it does.  It doesn't claim title to it.

24         MR. MOSKOVITZ:  It claims sovereignty, and by virtue

25   of that sovereignty, I assume, it can make the rules as to how

1    property titles can be acquired.

2           Now what happened when the State created was that the
                                        ^was^

3    United States no longer had that all-encompassing sovereignty

4    over the land.  This went to the State.  What the United States

5    retained was a property ownership in the public land.  Now this

6    property ownership would presumably include rights to water

7    rising from ownership of the land.

8           THE COURT:  Therefore, riparian.

9           MR. MOSKOVITZ:  Therefore, riparian.

10          THE COURT:  What do you say to the fact that the

11   United States apparently severed the water from the land?

12          MR. MOSKOVITZ:  It seems to me that you have to read

13   the cases and see what they meant by severed the water from the

14   land.  It is a familiar course of action which riparian owners

15   sometimes take to convey the riparian land but to reserve from

16   that land water rights which ordinarily would go with the land.

17          Now this is what I think the United States did when

18   it said that the waters on the public lands are held apart from

19   the land itself, so that when a patentee secures title to the

20   land he doesn't, by the very force of the patent, get title to

21   the water rights which ordinarily would accompany the land.

22   These are held apart, and being held apart they are no longer

23   held by the United States.

24          THE COURT:  Why not?  Go ahead.

25          MR. MOSKVITZ:  They are held by no one, and because

1 they are held by no one it is the State which succeeds to them.

2 THE COURT: Well, now, wait a minute. Mr. Veeder is

3 smart enough a lawyer in his own right, but you know he has

4 sitting beside him here Mr. Burby, who claims to be and is an

5 expert in real property and he has taught a lot of lawyers and

6 judges Real Property. Unfortunately, he had never taught me

7 Real Property; I had already had it before I came to the law

8 school where he taught. I might have learned something if I

9 had attended his class. But he is not going to go along with

10 that, that it didn't belong to anybody. You have got to give

11 me some help on this or I might part company with you.

12 Presently, I am of the view, as I read the Supreme

13 Court cases, they interpret the Desert Land Act as having dedi-

14 cated this water to the public and as having given the States

15 plenary control over it, and I would assume that if they dedi-

16 cated it to the public then it doesn't belong to the Government

17 any more -- it belongs to the people, if you can draw that dis-

18 tinction. But don't tell me that it didn't belong to anybody.

19 MR. MOSKOVITZ: I have no quarrel with that. I say

20 that was the result of severing the water from the land, that

21 it became under the control of the States.

22 Now I would like to read some language which indicates

23 the nature of the Government's claim to water rising from pub-

24 lic land.

25 THE COURT: Are these cited?

1     MR. MOSKOVITZ:  I cited some of them.   There is a
      from the
2  quotation/Palmer case, Palmer v. the Railroad Commission.

3          THE COURT:  At what page of your brief?

4          MR. MOSKOVITZ:  No, this is one which I had found

5  since then and I wanted to cite it for that reason -- I did not

6  have it in my brief.  This is 167 Cal. 163, at 168.

7          Do you     have Pacific?

8          THE COURT:  No, I have only Cal.

9          MR. MOSKOVITZ:  For Mr. Veeder's sake it is 138 Pac.

10 997 at 999.

11         This is the quotation:

12         "The United States, with respect to the lands which

13 it owns in this State, is a riparian proprietor as to the

14 streams running through such lands.  It is only by virtue of that

15 fact that it has any right or power of disposition over the

16 water thereof, and its right and power in that respect is no

17 greater and no less than that of any other riparian proprietor."

18         Now we know that a riparian proprietor may not convey

19 his riparian right to someone for use on non-riparian land --

20 this is fundamental, because the riparian right is a right which

21 attaches and it can be used in connection with the riparian land

22 and only there.  If it can't be used there, it can't be used any-

23 where, and the water to which the riparian may have had a right

24 before the water right was severed or relinquished is no longer

25 subject to riparian right or anyone's private right.  It then

633

1   becomes subject to appropriation.

2           And this is what happened.  This is the explanation

3   of the result in the Power Company case.  This is the explanation

4   of a number of cases which the California Supreme Court has

5   decided.

6           On page 16 of my brief I did quote from the case of

7   Canal Irrigation Company v. Worswick, which makes a similar ex-

8   planation of what the status of the United States was as an

9   owner of public land.

10          THE COURT:  Then what do you conclude?  That the

11  United States then, although there was an alleged severance of

12  land and water, still owned the water on the public domain as

13  a riparian owner only?

14          MR. MOSKOVITZ:  I say that to the extent that the

15  United States has anything by virtue of the ownership of public

16  land, which is as far as we have to go here, is that of a ripar-

17  ian land owner.

18          THE COURT:  When does the title pass?  The minute when

19  the appropriation under State law takes place?  Or has title

20  passed to the State as trustee for the public?  Or has it been

21  dedicated to the public?  Or what?

22          MR. MOSKOVITZ:  I think this discussion is interesting

23  and I will be happy to go into it.  I would like to make this

24  point, that I don't think it is necessary to decide those

25  questions here and we can probably get bogged down by them.  The

1  reason I say that they are not necessary here is that the place

2  where the United States has put the water to use and intends to

3  put water to use pursuant to a claim of right is land that never

4  was public land.  It was Mexican rancho land at the very begin-

5  ning.  So even if the United States still has the riparian right

6  by virtue of the public land, it can exercise it only on that

7  land.  Once the water leaves that land, then it is not longer

8  subject to the United States right and it is subject to State

9  right.

10       THE COURT:  Carry your argument further.  You start

11  with the premise that the rights which the United States origi-

12  nally had were only riparian rights and that this talk about

13  severing the water in which the Supreme Court engaged doesn't

14  mean that, in some metaphysical sense, the Government set aside

15  the water on all the land separate and apart from the land but

16  that they merely severed it in the sense that they said to each

17  State, "You may decide whether or not you will go according to

18  the rule of appropriation or whether you will follow the strict

19  common law riparian rights."

20       MR. MOSKOVITZ:  I think that what the Congress said

21  was that insofar as the United States is concerned as an owner

22  of land and insofar as it may have rights to water, we relinquish

23  that as against those who file or proceed under State law and

24  acquire a right which is recognized as vested under State law.

25       THE COURT:  And retain our other rights.  When we use

1   the word "relinquish" those rights, then you inferentially mean

2   that you are taking some other right.

3         MR. MOSKOVITZ:   Well, what they still hold, of course,

4   is the public land itself, and all the other rights to narrows

5   and such which go with the land.

6         THE COURT:   And riparian rights to water?

7         MR. MOSKOVITZ:   Well, I think what they have said is

8   that insofar as we have riparian rights, we are not going to

9   object to those who file and proceed under State law and get

10  vested rights.

11        Let me read again from this Worswick case which I cite

12  on page 16.   The Court was analyzing why the appropriative right

13  of a diverter on public land is superior to the riparian rights

14  of a subsequent purchaser of public land from the United States,

15  and the Court said, after discussing certain previous cases:

16        "The opinions in these cases decide the question but

17  do not state fully the reasons for the conclusion.   It is apparent,

18  however, that they must be based on the hypothesis that the

19  reservation provided for by Section 17 of the Act of 1870 (the

20  one I have been referring to) in favor of accrued and vested

21  rights runs to the appropriator of water upon land of the United

22  States and creates in him a right superior to that of the ri-

23  parian right of the United States pertaining to the land it then

24  owns situated above the place of diversion, so that a subsequent

25  purchaser of such upper lands takes subject to the lower

appropriation."

1        Now it may be --

2        THE COURT:  Tell me, why didn't you brief this point?

3   The Government fairly well spell it out in their brief.  Was

4   there any particular reason why you didn't want to brief this

5   point?

6        MR. MOSKOVITZ:  Well, your Honor, I felt that by

7   citing these cases involving the nature of the Government's ri-

8   parian right that I was covering the issue to the extent that

9   was necessary in this case, and as you well know, it can be very

10  dangerous to speculate on issues which are not involved in a

11  case and we very carefully attempt to avoid doing that.  If it is

12  necessary, of course, we take a position.  But it seems to me

13  that this disposes of it.

14       THE COURT:  Well, it may.  Of course, the Government

15  has tried to spell this out in the ABC's of conveyancing, and

16  my offhand view was that the Supreme Court cases have indicated

17  some dedication to the public.  Your argument today indicates

18  to me that you don't see any dedication involving these water

19  rights to the public, but merely a reservation to the United

20  States of its riparian rights, except insofar as they are af-

21  fected by appropriations allowed by the State.

22       MR. MOSKOVITZ:  This is what I am saying, your Honor,

23  that I have no objection, and in a proper case may very well

24  assert this proposition, that there was a dedication to the

25  public, and that in fact it may have been irretrievable, but

1    I am saying that giving the United States the benefit of any

2    doubt, that even assuming that the United States has retained

3    riparian rights, has not given them all up, it still makes no

4    difference because here they cannot use those rights on land

5    that was never public land.

6              THE COURT: The conservative approach, in other words.

7              MR. MOSKOVITZ: Yes, your Honor.  And I cited other

8    cases, your Honor, which indicate that this is as far as the

9    Courts of the United States have ever gone in recognizing a

10   retention of a right by virtue of ownership of public land.  All

11   the cases which Mr. Veeder cited to you involved the use of

12   water on the land through which the stream ran, that is, the

13   public land which may have been reserved from entry, or perhaps

14   not.

15             It seems to me that in the McIntire case and in the

16   Walker River Irrigation District case, both of which involve

17   Indian reservations, those were public lands through which or

18   along the border of which a stream flowed.

19             In the case of Story v. Woolverton and in Nevada Ditch

20   Company v. Bennett, again, the place where the Court was dis-

21   cussing that the water might be used was public land through

22   which the stream ran.

23             There is not a case where there has been an upholding

24   of a right to refuse that water somewhere else.

25             THE COURT:  Of course, the Government answers that by

1    saying that they are using this on public land.

2            MR. MOSKOVITZ:  They are?

3            THE COURT:  They answer that in the latter part of

4    their brief.  They point out that they are using this water on

5    public land, now reserved lands of the United States.

6            MR. MOSKOVITZ:  Well, your Honor, first of all, I

7    don't believe they would say they are using it on public land.

8            THE COURT:  They said reserved lands.

9            MR. MOSKOVITZ:  Reserved land.  What they meant there

10   was that the land is certainly not open to entry.  I have no

11   dispute with that.  What I was talking about was public land,

12   because this is the basis of their argument on this point --

13   that it is the ownership of public land, the land that they ac-

14   quired under the Treaty of Guadalupe Hidalgo.

15           THE COURT:  I mean, they claim that they are using

16   this water on Camp Pendleton, which is reserved land, and there-

17   fore they try to read themselves into some of these cases like

18   the Oregon case and maybe some of these Indian cases.  Of course

19   the fallacy, if there is one, is the long gap between when the

20   water left the public lands up in the domain and where it reach-

21   ed the reserved lands down at Camp Pendleton.

22           MR. MOSKOVITZ:  It seems to me that that is just the

23   very point.  If their right is that of a riparian, then it is

24   to use water on the land through which the water runs.  This

25   land outside the watershed at Camp Pendleton is not the land

1  from which the right has sprung.  Presumably that has sprung

2  from the land in the upper portion of the watershed.  It's

3  making a fallacy here between a riparian right and an appro-

4  priative right.  It is true that an appropriative right can be

5  exercised on land that is not contiguous to the stream.  Of

6  course that's true.  But it takes other prerequisites than the

7  ownership of land to give rise to an appropriative right.  If

8  they are relying upon ownership of land, then the right that

9  they can claim at most is a riparian right.  If they claim an

10  appropriative right, there are other things that they have to

11  do, and they haven't done them.

12  Now, following through what your Honor was discussing

13  before, that there was a severance by the Acts of 1866, 1870

14  and 1877 of water rights from land and that those were dedicated

15  to the public, if the United States is relying upon a severance

16  as contrasted with the ownership of the public land, then there

17  is another difficulty that they have to overcome.  On page 7 of

18  the United States Responding Brief it is stated as follows --

19  on lines 6 to 10:

20  "What transpired when the United States of America

21  severed from the bundle of rights constituting full title to

22  its lands, those which pertained to the use of water, is a

23  proposition of immense importance here for that severance per-

24  mitting the appropriation of the rights to water separate from

25  the land constitutes the crux of this case...."

1    I don't think it does.  But let's assume that that is

2 the crux.  I might point out that we have never been so informed

3 before that the so-called severance of water from public land

4 is the crux of this case.  Where did that severance occur; if

5 there was a severance in so many words?  It occurred by virtue

6 of the Acts of 1866, 1870 and 1877.  And what do those Acts say,

7 as they have been construed by the Courts, particularly in the

8 Beaver Portland Cement Company cases?  They say that the result

9 of the severance was to make this water publici juris, that is,

10 to subject it to the control of the States, and this control is

11 plenary, and that the only way people can get a private right

12 to use that water is to comply with the laws of the States.

13    Now how that can help the United States when it has

14 admittedly failed to comply with the law of the States, I can't

15 see.  If it is relying upon the ownership of the land, as I said

16 before, all it can claim is a riparian right.  If it is relying

17 upon severance, then it must claim an appropriative right.

18    THE COURT:  Although it might be heresy, couldn't we

19 say that probably the Supreme Court might have used the words

20 "severed the water right" in too broad a sense?  That what the

21 statutes actually did -- this is following your line of argu-

22 ment now -- would be to provide that although the Government

23 had owned the land and the water, that appropriators who appro-

24 priated under State laws, as so provided, had good title against

25 the Government and its grantees to that water, and therefore

1   the Court did not have to go so far as to say that all this
2   water was severed from the land.  It merely provided that the
3   patentee of the land got a limited right.  He got the land, and
4   he might get a riparian right seriously prejudiced by appro-
5   priative rights recognized by the State.  So that actually the
6   Court did not have to say that there was some carving up and
7   severing water from land.  Maybe a part of our trouble stems
8   from that broad language of severed the land from the water.
9   It wouldn't have had to say that.  The Court could
10   have said, "All right, patentee now takes the land, but as to
11   water rights we are turning that over to State control and he
12   takes just such water rights as the State says he has, and if
13   the State wants to follow the common law riparian theory that
14   is what he gets, and if the State wants to follow the appropriative
15   theory then he gets maybe riparian rights but seriously cut into
16   by vested appropriative rights."  That's all they needed to have
17   said about those statutes.
18   MR. MOSKOVITZ:  Your Honor, I think you have made an
19   analysis that certainly can be fitted into the case.  On behalf
20   of the State, I am not taking the position as to which it did
21   say.  I am saying that the construction most favorable to the
22   United States in this litigation is the one I have just given,
23   that is, that the United States retained whatever had not gone
24   into vested right, but I am saying that even under that assumption
25   the Government retained riparian rights.  It cannot exercise

those rights by using the water on land which was never public land.

I wanted to point out that in the case of Federal Power Commission v. State of Oregon, the so-called Pelton Dam case, there, too, to the extent that rights to use water were involved at all it was the right to use water on the public land through which the stream ran.  Public lands in these cases were reserved from entry.

THE COURT:

That case is limited in its application.  Mr. Veeder would stretch that case out a lot further than is indicated by its facts.

MR. MOSKOVITZ:  Yes, I think he attempted to draw a rule from that which, I think, is much, much broader; a rule that, without going through State procedures, as long as permission from the United States is gained your water can be used anywhere, and the case just doesn't cover that at all.

With reference to what I just stated, I might refer to that statement in Mr. Veeder's brief on page 11 of the Memorandum in Response.  After discussing the so-called Pelton Dam case, on lines 6 to 9, this is stated:

"Thus the Supreme Court has specifically declared that in regard to non-navigable streams traversing reserved lands of the United States of America rights to the use of water may be acquired by licensees without compliance with the State police regulations.  If a licensee may thus acquire rights in

1   the unappropriated waters of a stream, it follows a fortiori

2   that the National Government need not comply with State law in

3   its use of waters the rights to which are unappropriated at the

4   time the waters are diverted and used by it.  Applying that

5   principle the United States of America by its diversion and use

6   of Santa Margarita River water outside of the watershed of that

7   stream in effect asserted its rights to the quantity of unappro-

8   priated water that it needed for the purpose in question,....."

9          THE COURT:  Well, if it will make you feel any better,

10  I have a big question mark opposite that statement in Mr. Veeder's

11  brief.  It starts out with a premise and then he draws a con-

12  clusion which I think completely runs away with his premise.

13         MR. MOSKOVITZ:  At this point I would like to comment

14  on another phrase which Mr. Veeder has been using, which I don't

15  think is really helpful in analysis.  He used the term "unappro-

16  priated rights to water."  What does he mean by "unappropriated

17  rights to water?"  I understand the term "unappropriated water."

18  It means water as to which there are no rights.  But it seems

19  to me that when someone has a right to use water, it is either

20  an appropriative right or it is a right which arises by virtue

21  of a riparian ownership or it is something like a pueblo right,

22  which is a unique creature.  But there is no such thing as

23  "unappropriated rights to water."  If water is unappropriated,

24  there are no rights to it.  And it is the error involved in the

25  use of that term which pervades Mr. Veeder's entire argument,

appropriate water, you don't talk about "unappropriated water,"
because no one owns the corpus of the water; but you do talk
about "unappropriated rights," the way you talk about unappro-
priated land.  What we are discussing here, if I may use the
term again, these incorporeal hereditaments are unappropriated,
they are rights, and no one versed in this business would ever
talk about "unappropriated water."  I'm not being captious with
Counsel.  I am saying that I am somewhat shocked at this juncture
that we would be discussing here the question of ownership of
the water, because no one owns the water.

THE COURT:  I don't think there is any dispute about
that.  "Unappropriated water" is a shorthand for the fact that
there is certain water to which rights have not been asserted
by appropriation.

MR. VEEDER:  All right, as long as we put in "to which
rights have not been asserted."

I think that that may be one of the reasons for the
confusion this afternoon.

MR. MOSKOVITZ:  I am not the first person who used the
term "unappropriated water."

THE COURT:  It's used quite often, but it means water
to which there are no existing appropriative or riparian rights.
It is a kind of shorthand, isn't it for that?

MR. MOSKOVITZ:  That is right, yes, it means water as
to which there are no appropriative rights.

1        THE COURT:  Or riparian rights.

2        MR. MOSKOVITZ:  I want to qualify that just a bit,

3   your Honor.  There may be a riparian right that has not been

4   utilized to its full extent.

5        THE COURT:  All right.

6        MR. MOSKOVITZ:  To the extent that that water has been

7   utilized, it may be subject to appropriation in the interim.

8        THE COURT:  All right, I'll accept that.

9        Is this a good stopping place?  After you listen to

10  these metaphysical propositions for several hours, it gets to

11  be almost a trial to follow and you can't follow this kind of

12  argument unless you listen to every word that a man says.  I

13  get tired.  Do you?

14        MR. MOSKOVITZ:  Yes, your Honor.  I don't want to tax

15  you.  I can finish in about one minute.

16        THE COURT:  Good.

17        MR. MOSKOVITZ:  Getting to the argument about inverse

18  condemnation, unless you have questions I will let our memoran-

19  dum speak for itself, except to point out that the United States

20  has cited a few additional cases involving inverse condemnation.

21  These are cited on page 20 of the Memorandum in Response.  I

22  have read these cases and most of them involve a clear invasion

23  of the land owned by Indian tribes.  The element of adversity

24  or hostility or invasion is clearly present.  So they fall with-

                                       of
25  in all/the other cases that we have analyzed, as contrasted with

1    this one.

2            Finally, I would like to point this out.  With re-

3    spect to the quotation on page 21 of the United States' Memoran-

4    dum in Response, the quotation from the Utt Act, at the end of

5    line 14, where the quotation ends and you see the stars, a

6    couple of important words, I think, were left out.  Those were

7    the words "if any," referring to rights which the United States

8    may have acquired.  I point this out because I don't think the

9    Utt Act can be regarded as a Congressional recognition that the

10   United States has in fact rights which it may have acquired by

11   prescription or use.  It was merely stating whatever rights

12   there may have been, without making any declaration or indicating

13   any understanding that those rights had in fact been acquired.

14           Those are the points I want to make now.

15           THE COURT:  All right.

16           What are your desires with regard to tomorrow?

17   Mr. Sachse?  Mr. Grover?  Do you want to be heard?

18           MR. SACHSE:  I would like to be heard very briefly

19   on the stipulation again.  In other words, I was under the im-

20   pression that we were starting on this today and trying to get

21   a ruling on it, and I would like to come back to it.  I have a

22   few points that I don't think have been covered by either Mr.

23   Moskovitz or by your questioning of Mr. Veeder.

24           I do not intend to argue the briefs, unless your Honor

25   has questions.

1    THE COURT:   Who else wants to be heard tomorrow?

2    MR. SACHSE:   I will be very brief on the stipulation.

3    THE COURT:   Mr. Stahlman?

4    MR. DENNIS:   I didn't think that the motion called for

5  Santa Margarita to be a party on the motion on the stipulation.

6  Now that we are a party to it, I would like to be heard.   It

7  won't take more than five minutes.

8    THE COURT:   Mr. Stahlman, do you want to be heard

9  tomorrow?

10   MR. STAHLMAN:   I'll be very brief in anything I have

11 to say.   As far as the stipulation is concerned, we are not a

12 party to it, and therefore I feel that I shouldn't invade it.

13 If your Honor has any questions that you feel Vail might be in-

14 terested in, I'll be glad to respond.

15   MR. GROVER:   Your Honor, I wonder when the time may

16 come to discuss the problem uppermost in my mind, and that is

17 the problem of limiting the number of parties to the suit.   I

18 know your Honor has avoided reaching that question, but just the

19 burden of this case upon my relatively small clients is such

20 that that is uppermost in our mind, and while I naturally have

21 speculative ideas along with everyone else on some of these meta-

22 physical points I'm not sure that there is any point expressing

23 opinions on them or even being present, and we would like to

24 present the question in connection with the pre-trial order

25 that the case be limited to the actual pleadings instead of,

1  as Judge Yankwich left it, making everybody adverse to everyone

2  else so that it is impossible to get out of the case.  If we

3  could be limited to our action with the United States, or rather

4  the United States' action against us, it might be possible to

5  negotiate our way out.  But with 3000 more defendants, it is

6  not possible, if we are adverse to them.  We wanted to raise

7  solely the question at this time of --

8          THE COURT:  Do you have some authority on that, or

9  logic, or what are you going to present tomorrow?

10          MR. GROVER:  Well, your Honor, the main thing is just

11  the propriety of maintaining it, and I did have some comments

12  that I would like to make about the method for relief there of

13  that situation, if your Honor is so inclined.

14          THE COURT:  Can I hear you tomorrow on it?

15          MR. GROVER:  Yes, your Honor.  It would be helpful to

16  me if it could be early in the morning.

17          THE COURT:  All right.

18          I want you to look over these proposed inserts to the

19  stipulation of facts, if you will, and I want to discuss with

20  you what procedure should be followed in appointing this Master,

21  and also discuss with you and see if we can work out a procedure

22  to handle this stipulation of facts.  It will, of course, bind

23  only those people who sign it.  We have discussed it a little

24  bit.  I trust that some of us have given that some thought.

25          Let's say 9:30 tomorrow morning then.
          (ADJOURNMENT UNTIL 9:30 A.M. TUESDAY, JANUARY 7, 1958)