# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN

~~CENTRAL~~ DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

              Plaintiff,

       vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

             Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:   San Diego, California

Date:   January 7, 1958

Pages:   650 to 806

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
                 DEPUTY

JOHN SWADER
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
(BELMONT 4-6211 - EXT. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION


HONORABLE JAMES M. CARTER, JUDGE PRESIDING


UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )
                                    )
vs.                                 )           No. 1247-SD-C
                                    )
FALLBROOK PUBLIC UTILITY            )
DISTRICT, et al,                    )
                                    )
                    Defendants.)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

January 7, 1958


APPEARANCES:

   For the Plaintiff:        WILLIAM H. VEEDER, Esq.,
                              WILLIAM E. BURBY, Esq.,
                              Special Assistants to the
                              Attorney-General
                              Department of Justice
                              Washington, D. C.

APPEARANCES (continued):

    For U. S. Marine Corps:          LT. DAVID MILLER

    For Defendant Vail Company:     GEORGE E. STAHLMAN, Esq.

    **For Defendant Fallbrook**       SWING, SCHARNIKOW &
    **Public Utility District:**       STANIFORTH, by:
                                    PHIL D. SWING, Esq., and
                                    F. R. SACHSE, Esq.

    For Defendant State of       EDMUND G. BROWN, Esq.
    California:                   Attorney-General, by
                                    ADOLPHUS MOSKOVITZ, Esq.,
                                    Deputy Attorney-General.

    Santa Margarita Mutual      W. B. DENNIS, Esq.
    **Water Company:**

    Arthur G. Reuter,          CLAYSON, STARK & ROTHROCK, by
    Katherine C. Gibbon, Philo   GEORGE GROVER, Esq.
    Reuter and Wm. W. Cottle:

    **Carl N. Halde** and        TOM HALDE, by
    Hester M. Halde:        GEORGE GROVER, Esq.

1   SAN DIEGO, CALIFORNIA, TUESDAY, JANUARY 7, 1958, 9:30 A.M.

2        (OTHER MATTERS)

3        THE COURT:  Call the Fallbrook matter.

4        THE CLERK:  No. 1 on the calendar, 1247-SD-C, United

5   States v. Fallbrook, et al.

6        MR. SACHSE:  May it please the Court, I want to talk

7   very briefly about an aspect of this stipulation and motion

8   that I don't think was fully covered by Mr. Moskovitz or by

9   your Honor's questions of Mr. Veeder yesterday.

10       We seem to be in fairly clear understanding of what

11  paragraph II of the stipulation says.  Mr. Veeder disagrees as

12  to the effect of the phrase "may have gained" and "since its

13  acquisition," but I don't think I am misquoting when I say that

14  I think we all agree that under paragraph II the United States

15  claims only the rights that it acquired when it purchased the

16  Rancho Santa Margarita, and then the second part of that claim--

17  rights which it may have acquired since, through prescription

18  or use, or both.  But you have to read, in my opinion, paragraph

19  II with paragraph III, and paragraph III states:

20       "That the United States of America claims by reason

21  of its sovereign status no right to the use of a greater quantity

22  of water than is stated in paragraph II."

23       Now, to me that is a clear and simple disclaimer of

24  any right to any quantity of water greater than might be enjoyed

25  by a private citizen under the same circumstances.  It is a

653

1   disclaimer of any quantity of water by reason of the fact that

2   the United States is a sovereign.  If that isn't what the para-

3   graph says, there is no earthly purpose for putting the para-

4   graph in the stipulation.

5        Mr. Veeder's memorandum attempts to argue that this

6   is, in some peculiar way, a recognition of the sovereign rights

7   of the United States.  On page 4 of his memorandum at the bottom

8   he states:

9        "California in stipulating that the United States of

10  America had acquired through its 'sovereign status' the rights

11  to the use of water which it is exercising...."

12       Well, if you can find any stipulation that the United

13  States had acquired anything, in paragraph III, I can't.  He

14  has changed a negative to an affirmative.  What paragraph III

15  says is that the United States claims no right; not that it

16  claims a right, but that it claims no right.

17       Now Mr. Veeder discussed yesterday a little of the

18  history of this stipulation, particularly with reference to the

19  first paragraph, in which the phrase "paramount rights" is used.

20  I would like to point out that the Congressional controversy

21  was not limited to this word "paramount," but was very directly

22  also concerned with the use of the word "sovereign," and Mr.

23  Veeder and his superiors have repeatedly expressed themselves

24  in interpretation first of the lawsuit itself and finally of

25  this very stipulation as saying that the United States asserts

1  no right greater than would be enjoyed by a private citizen

2  under the same circumstances.

3       THE COURT:  To refresh my recollection, some of these

4  hearings preceded the stipulation and some came afterward; is

5  that right?

6       MR. SACHSE:  That is right.

7       THE COURT:  After the stipulation?

8       MR. SACHSE:  After the stipulation.  The hearings

9  preceding the stipulation generally were concerned with the

10 fact that for three consecutive years the Congress attached a

11 rider to the Department of Justice's appropriation saying that

12 they couldn't spend money on this lawsuit and repeatedly testi-

13 mony was offered by representatives of the Department of Justice

14 interpreting or purporting to interpret what the Government

15 sought in this lawsuit, and then this stipulation was drawn.

16      Now the testimony of Attorney-General Brownell, which

17 is in our memorandum on the motion, at page 27, I would like

18 to call specifically to your Honor's attention.  That was dealing

19 with this very stipulation.  The Attorney-General was referring

20 to this stipulation, and it is an exchange between the Attorney-

21 General and Senator Knowland of California, and I quote:

22      "Attorney-General Brownell:  I would like to point

23 out to the Committee also that the United States has entered

24 into a stipulation with the other parties here that its rights

25 will be no greater than the rights of a private individual if

1 they held this same land.  The stipulation between the parties

2 also provides that the laws of the State of California shall

3 govern in this case."

4 Then further down Senator Hill asks Attorney-General

5 Brownell: "As I understand it now, you are asking for no more

6 rights than what a private owner of the property would have?

7 "Attorney-General Brownell:  That is correct."

8 Mr. Veeder, himself, before the stipulation was entered

9 into -- I am reading now on page 15 of our memorandum at line

10 25; this is the same language, your Honor, that you read to Mr.

11 Veeder, although I would like to read a little more, and this

12 is the language in response to Congressman Walter's question:

13 "Mr. Veeder:  We claim that the measure of our rights

14 are the rights to which we succeeded from the Rancho Santa Mar-

15 garita.

16 "Mr. Walter:  And nothing more; and without regard to

17 the needs of the Marines at Camp Pendleton?

18 "Mr. Veeder:  That is correct, sir."

19 Then on the next page, at lines 7 to 12:

20 "Mr. Veeder:  The measure of our rights, the measure

21 of the State law governs entirely our demand upon the Santa

22 Margarita River.  In other words, we certainly cannot claim

23 more than we acquired from the Rancho Santa Margarita.

24 "Mr. Fellows:  And you claim no more?

25 "Mr. Veeder:  That is correct."

1        Now, I think it is ABC that when parties to a stipu-

2   lation talk, act, adopt a course of conduct interpreting it,

3   that course of conduct should be considered in determining what

4   the stipulation means.  There has been no reference, either in

5   the first trial of this case or in the appeal of this case, to

6   the sovereign right that the United States might claim by reason

7   of its ownership of lands on the slope of Palomar in the National

8   Forest.  It was never asserted before.  In the first trial and

9   on the appeal this provision was adhered to.  The question of

10  the sovereign power of inverse condemnation -- and it is a

11  sovereign power, it is a power that can't be exercised by a

12  private individual --that never came up, that was never adverted

13  to by the United States in the first trial or on the appeal.

14  You will never find any word of it in the record, until Mr.

15  Veeder sprung it on us a month or two ago.

16        We have quoted a great many statements of officials

17  of the United States interpreting this provision of the stipu-

18  lation, but we think the stipulation itself is so crystal clear

19  that you don't need them.  It is a statement that the United

20  States of America claims by reason of its sovereign status no

21  right to the use of any greater quantity of water than is stated

22  in paragraph II, and there is nothing in paragraph II that by

23  any stretch of the imagination can be held to include claims

24  because of the ownership of public domain at the upper reaches

25  of the watershed.

Now a word about paragraph IV.  Paragraph IV reads:

"The rights of the United States to the use of water herein are to be measured with accordance with the laws of the State of California."

Mr. Veeder has suggested that the word "measure" means one thing only, beneficial use, and he has an exclamation point behind it.  Well, it deserves it.  It's obvious, it's so obvious that I don't think it takes argument that when you measure the extent of a water right you have to consider a great deal more than beneficial use.  The very sweeping nature of the statement shows how silly it is.  If beneficial use is the sole yardstick, then there wouldn't be any such thing as a permanent riparian right standing against subsequent appropriators. A riparian who made no use would of course be junior to an appropriator who makes a beneficial use, because we know that isn't the law, and we know that Mr. Veeder's statement is incorrect.

Mr. Veeder seems to be pretty shocked at the prospect of an agency of the United States Government, the Navy, being asked to file and to proceed under State laws to perfect an appropriative right.  To him that seems unreasonable, it seems something that should not be required of the United States, and that we shouldn't even consider that the United States, a sovereign, ought to even think about that.

I would like to remind your Honor that the United States Government has been doing that very thing in the State

1   of California for years.  The Bureau of Reclamation has con-

2   sistently and repeatedly made State filings or acquired State

3   filings for its projects.  More than the Bureau of Reclamation,

4   I will go so far as to say that there is not a public camp in

5   the National Forests or on public domain, your Honor, there's

6   not a Forest Service public camp ground where a pipe comes out

7   of a spring in the mountain to serve domestic water for the

8   camp that isn't under a permit of the State of California.  The

9   Department of Agriculture has been doing it consistently.

10          In the Cleveland National Forest the United States

11  Government has filed in this very county on six springs and

12  has obtained permits and even licenses from the State of Cali-

13  fornia to the use of the water for domestic, recreational,

14  fire protection purposes.  They have done it.

15          Even more dramatic, the Yosemite National Park is an

16  enclave jurisdiction of which has been ceded to the United States.

17  Its State police power doesn't run in it; it is an enclave.

18  When the City of San Francisco sought to develop water,

19  they had to go the Congress of the United States to get per-

20  mission.  The Congress passed an act giving them permission to

21  build a dam inside the enclave of Yosemite.  But from whom did

22  they get the permission?  From the State of California.  They

23  applied for it, and they took it, and they have operated under

24  it ever since.  The domestic water that is served to the hotels,

25  to the camp grounds, the water that runs in the gas stations,

1  the water that is in the swimming pools in Yosemite Park, in

2  Lassen Park and in King's Canyon Park is under permit and li-

3  cense from the State of California, and I don't think there is

4  anything shocking or unusual in asking the Marine Corps to do

5  exactly the same thing that has been done by the United States

6  since the beginning.

7  Now that is all that I have to say except that I would

8  like to paraphrase what I think this stipulation says. I be-

9  lieve that paragraph II states that the United States agrees to

10  limit its claims to two groups: (a) Rights acquired when it

11  purchased the Rancho, those necessarily of course being private

12  rights because that is all the private owner could have, (b)

13  rights which since the acquisition the United States has ac-

14  quired through prescription -- we know what that is, and I will

15  substitute the word "appropriation," I think that is what the

16  word "use" means -- through prescription or appropriation, or

17  both.

18  Then the United States has agreed that the extent of

19  its rights is to be determined without regard to the fact that

20  the United States is sovereign and that the rights so acquired

21  are neither to be increased or decreased one iota by reason of

22  the fact that the United States is a plaintiff herein instead

23  of me.

24  And finally, that in determining the extent of those

25  rights -- I'll use that instead of the word "measure," but I

1  mean "measure" -- in determining the extent of those rights,

2  sooner or later your Honor is going to make a determination in

3  acre feet or second feet or percentage of stream flow or some-

4  thing of the sort, and when you make that determination in

5  making it you shall apply the laws of the State of California.

6       That is what I think the stipulation says.  That is

7  what I think the plain language of it states.  I agree with

8  your Honor's statement and with Mr. Veeder's statement that it

9  is unambiguous, and you have the full power to give us the in-

10 terpretation of what this means and what it shall mean by just

11 taking the four corners of the stipulation itself and making a

12 ruling in this Court and telling us.

13       So much for that.

14       I have one brief correction I want to make.  Mr. Veeder

15 repeated a misstatement in his brief and in his oral argument

16 so many times that I'm just afraid that somebody may believe it.

17 He has repeatedly said that Fallbrook violated a gratuitous

18 license from the United States of America.  Now that is not true.

19 The gratuitous license to which Mr. Veeder refers is set forth

20 in full in his own memorandum of August 18th.  It is a license

21 dated in 1932 before the United States had any interest, direct

22 or indirect, in the Santa Margarita Rancho.  It is a personal

23 license from the Santa Margarita Rancho to take ten miner's

24 inches or ninety gallons a minute of water -- ninety gallons a

25 minute.  It is a personal license from the Rancho Santa Margarita,

1  not from the United States Government.  It never was from the

2  United States Government, and Mr. Veeder knows it, and I see no

3  point in constantly cluttering up the record here with a bald-

4  faced misstatement and I would like to get that one corrected

5  once and for all.

6      THE COURT:  Didn't the United States step into the

7  shoes of the Rancho Santa Margarita as far as --

8      MR. SACHSE:  Your Honor, whether a successor in interest

9  is bound by a purely revocable -- it doesn't say that they are

10  bound -- the license doesn't bind successors and assigns.  This

11  isn't an easement.  This is purely/personal license.  It's a

12  question of real property law, perhaps, I don't know.  But they

13  are not bound by it.  They never repeated it.  They never gave

14  Fallbrook a license at all.

15      THE COURT:  Well, then, if your theory is correct,

16  it terminated when the Government condemned the Rancho.

17      MR. SACHSE:  That is correct, and there is nothing

18  that was violated by Fallbrook whatsoever.

19      Further, I will point out -- I realize that this is

20  a little astray; I didn't want to get started on this except

21  to correct a misstatement -- there is not one covenant, not one

22  agreement on the part of Fallbrook in the entire three pages of

23  the license.  There is not one covenant or agreement of any

24  kind on the part of Fallbrook.  So there is nothing for us to

25  violate.

1    As I say, it has no point at this time, but I think

2 that the constant reiteration of an erroneous statement may

3 sometimes mislead people.  In fact I learned yesterday from one

4 of the counsel here -- he said, "Well, I thought it was a li-

5 cense from the United States.  I have heard it so often."  So

6 I think it deserves correction.

7    Thank you, your Honor.

8    MR. DENNIS:  I will try to be as brief as possible.

9    I think we ought to refer to Mr. Veeder's motion.  He

10 asks for two things: first, he asks the Court to declare in ad-

11 vance of trial that the parties mentioned -- that would be the

12 State of California at that time and the United States of

13 America -- are bound by the stipulation.  Yesterday Fallbrook

14 and Santa Margarita also became parties to that stipulation,

15 and I assume that in the proceedings that took place here the

16 Court gave its approval as required by the rules of Court to

17 our joining in and becoming a party to that stipulation.

18    THE COURT:  Well, I approved your joinder.

19    MR. DENNIS:  Yes.

20    THE COURT:  It still leaves the motion, however,

21 hanging as to only the State of California.

22    MR. DENNIS:  It still leaves the motion, and I believe

23 that as far as Santa Margarita is concerned it is satisfactory

24 to us that the Court grant the relief asked for by Mr. Veeder

25 or the Government that we are bound and the United States are

963

1   now bound by that stipulation.

2        The second part of the motion is that the Court declare

3   that the language in the stipulation be given its usual meaning.

4   To that we also have no objection.  We believe that that follows

5   as a matter of course, and we believe that the Court should

6   make such an order.  Perhaps, in view of some of the arguments

7   by Counsel, it would be advisable for the Court to go somewhat

8   further and also state what is the usual meaning of the word

9   "use."  As I see the stipulation, and Mr. Veeder has stated

10  that he does not think it is ambiguous -- certainly I do not

11  think it is ambiguous -- paragraphs II and III refer to the

12  claims of the United States; not what their rights are, but

13  what their claims are, what their contentions are.

14       Paragraph IV refers to what the rights of the United

15  States will be once that their claims have been adjudicated

16  and their rights determined.  How will those rights be measured?

17  Certainly, as I listened to the argument yesterday, there is no

18  question but that, and Santa Margarita is not making any point

19  that the United States is not entitled to any and all rights

20  which the Rancho Santa Margarita had to the waters of the Santa

21  Margarita River system at the time the Government acquired title

22  to it.  Naturally if the United States had gained any rights by

23  prescription or use, or both, since they acquired the Rancho

24  Santa Margarita, they also have certain rights.  However, those

25  are claims of the United States, and as I see it the whole

controversy revolves around the word "use." How far does the word "use" go?  Does it have only that meaning which was given to it by the Ninth Circuit in the appeal in the present action that it be water which is acquired by appropriation, appro- priative water, or does it goes so far as to include/which the United States might acquire by inverse condemnation -- eminent domain, in other words, or water which they already had title to by virtue of the fact that the title resided in the United States and never passed out of the United States?  It seems to me that that is stretching the interpretation of the word "use." Certainly if the United States had title to the water of the Santa Margarita River and had only allowed the State of Cali- fornia to administer how the surplus or unappropriated water should be administered, if they had title, then they couldn't acquire any use, either by prescription or use, because if you own something you certainly can't acquire a title by prescription. Certainly if you own it you can't condemn it, because you already own it.  Because as I understand eminent domain or condemnation, it is the taking of property.  Title results from taking the property.  Use is not involved.

THE COURT:  In inverse condemnation, of course, it might be the continued use of the thing and the prospective continuance of that use which would constitute the taking.  It might not be done momentarily.

MR. DENNIS:  No.  Plus certain other factors.  The

1  mere use itself, I do not believe, under the law, would result

2  in a taking of that property, and I don't see how Mr. Veeder can

3  consistently claim that the Government owns title to these waters,

4  and then in the next breath say that they have acquired title

5  to these waters by inverse condemnation.  In either event, I

6  don't think that comes under the usual meaning of the word

7  "use."  I think the Ninth Circuit Court of Appeals so stated.

8         I think the Court would get some help in looking at

9  the contentions of the United States of America incorporated in

10 the pre-trial order and the order on pre-trial hearing which was

11 signed by Judge Yankwich on August 25, 1952.  In that order there

12 is absolutely no contention made by the United States of America--

13 at least, I can't find it, and I wish that Mr. Veeder would

14 call my attention to it if it is there -- that the United States

15 claims title to these waters, that the United States claims that

16 they have acquired the rights to certain waters of the Santa

17 Margarita by inverse condemnation or eminent domain proceedings.

18 As a matter of fact, in paragraphs XXVII and XXVIII of the Con-

19 tentions set forth in that order, they state that there are no

20 waters subject to appropriation by virtue of the fact that they

21 had acquired the rights to those waters under the stipulated

22 judgment entered into between the Vails and the Coahuila, and

23 they went further in paragraph XXVIII, stating that under and

24 pursuant to the terms of that stipulated judgment they add the

25 right to use the unappropriated water outside the watershed of

666

the Santa Margarita River and that therefore there were no waters
that could be allowed Santa Margarita or Fallbrook.

That is paragraphs XXVII and XXVIII, and I believe it
is on page 2 of the Contentions.  And it is on page 27 of that
particular order.

I believe that the stretching of the word "use" to
cover claims which might be made by virtue of inverse condemnation
stretches the meaning of that word.

I also want to call the Court's attention to the fact
that if the findings, conclusions and declarations which were
signed by Judge Yankwich are inspected that I also fail to find
in them any claim by the United States that it owns title to all
of the unappropriated or surplus waters from the State of Cali-
fornia; nor do I find any claim that they have acquired title to
the waters by virtue of inverse condemnation.  It is true that
Mr. Veeder was not present at the trial and so far as I know
had no part in the drafting of those findings, declarations and
conclusions, but Counsel for the United States were present and
they certainly were familiar with the stipulated judgment and
I would say that their interpretation was the same as mine and
the same as the Ninth Circuit's.  The usual meaning of the term
"use" refers to waters to which title or rights have been gained
by appropriation and not by inverse condemnation, or waters
which the United States claims that they held title to and never
passed to the State of California.

667

MR. GROVER:   Your Honor, I have just a word on this question of the public domain and the right of the United States to appropriate water by reason of its ownership of the public domain.

It seems to me that the United States is seeking to assert a right to appropriate its own property, and I think if we go back to the ABC's of water law we can see that that is the basic fallacy of Mr. Veeder's argument in this connection.

The United States owned property, practically all the property in the State -- not all; it did not own this Rancho -- but it owned practically all the property in the State, and so the cases in which the law of appropriation arose naturally talk almost exclusively about appropriations on the public do-main.  But I think that it is very clear that it was because the Government was a proprietor and not because it was the Govern-ment in any abstract sense that it became involved and its statutes and its policies became involved in the development of the doctrine of appropriation.

In the case of Antioch v. Williams Irrigation District, which is 188 Cal. 451, there is a discussion by Justice Shaw of the nature of the doctrine of appropriation, and as a matter of fact this was a theory which developed over the years -- in earlier cases perhaps the theory was not articulated on the same basis, but the position of the Court is that the appropriator has a good title against all but the true owner because he is

1  first in time.  The later appropriator can't rely on the true

2  owner's title is the reason that it was finally decided that the

3  appropriator could win out against the later appropriator.  But

4  as against the true owner of the water right the appropriator

5  had no right -- he was a trespasser, and he could acquire by

6  consent of the true owner, and that is the significance of the

7  Federal statutes of 1866, '70 and '77.  The Gerlach/explains
                                                        case,

8  this.  He could acquire it by consent  of the true owner.  With

9  respect to the United States, that consent was given as to the

10 public domain, or he could acquire it by prescription against

11 the true owner.

12      Now suppose there is private land not covered by the

13 statutes of 1866, '70 and '77, because the Government can't

14 consent to giving away any property, then the appropriator has

15 no right against the private owner unless he gets it by pre-

16 scription or by some other type of grant.  Because of the quantity

17 of Government land in California we tend to lose sight of the

18 fact that the appropriation can apply as to a private owner in

19 a similar way, and we tend to lose sight of the fact that the

20 Government as an owner of land, in these statutes, as Mr. Mosko-

21 vitz said yesterday, relinquished its right to object to an

22 interference with its riparian right.

23      What is the Government's title, then?  What is its

24 right to the waters which it owns as a riparian proprietor?  It

25 is the same riparian right which everybody else has.  It is

1   aright to use on riparian land, it is a right to use without

2   storage, it is a right to use within the watershed.

3          Now the Government had a riparian right limited by

4   riparian restrictions to use water on this public domain, and

5   when it gave the right or consented to a relinquishment of the

6   right to other people under certain circumstances, with State

7   permission according to State law, the Government didn't change

8   its own right, and thereafter its right to exercise its riparian

9   right is just as much limited today by the doctrines of riparian

10  law as it was before, and therefore the Government's right is a

11  right as against other owners to a riparian use of the water on

12  the public domain.  But it seeks now, because other people, in

13  connection with Federal statutes which have no bearing on the

14  Government's own right, because other people acquired their

15  rights by using as aginst the Government according to State

16  law, the Government seeks to invent a doctrine of appropriation

17  in the abstract, in the air somewhere -- that if you use water,

18  you get a right.  That isn't the theory at all.  It was simply

19  that those statutes said that if you use water in a certain way

20  according to State law, then the Government will not assert its

21  riparian right against you.  The Government itself, however,

22  cannot bootstrap itself in by mere use into a right against

23  other people with rights in the stream, and the Government's own

24  right to water on public domain is not increased by the fact

25  that it uses water outside the watershed.

1       Now what right does the Government get against other

2   riparian proprietors and other owners of water rights in the

3   stream when it uses water outside the watershed?  It is limited

4   to the second type of water right that you can get, and that is

5   by prescription, and the upstream riparian owners who have not

6   consented to the Government's taking water outside the watershed

7   are limited by the Government's use outside the watershed only

8   if they are prescriptive, and of course they are not prescriptive

9   because the Government is the last owner on the stream.

10      As I say, it seems to me that it comes down to the

11  basic fallacy that the Government asserts now an increased right

12  because it appropriated its own property, and it seems to me

13  that that is not possible.

14      With respect to inverse condemnation, the question

15  was fully explored yesterday, except that I think the cases on

16  appropriation are directly in point on inverse condemnation,

17  because in the process of inverse condemnation from the time of

18  taking until the statute runs on the Tucker Act there is a

19  cause of action against the United States for compensation and

20  a cause of action for an invasion of the rights of the party

21  who is given this cause of action, and I think that the essence

22  of the cases on prescription is that no cause of action arises

23  when you are the last owner on the stream, and to the extent

24  that that is true on prescription -- the cases fully explore

25  that -- I think it is just as true in inverse condemnation that

1  there is no cause of action for taking under the Tucker Act be-

2  cause no one can sue the Government for taking water that they

3  had allowed to go down to the Government.

4       These are the only observations that I had with regard

5  to what was said yesterday, but as I mentioned, your Honor, we

6  have been concerned all along with the fact that this is an

7  enormous lawsuit --

8       THE COURT:  Before you go to that other point, let's

9  finish up on this one.

10      MR. GROVER:  All right, your Honor.

11      THE COURT:  Have you anything to say in rebuttal?

12      MR. VEEDER:  I was waiting.

13      THE COURT:  I am anticipating that he is now proceeding

14  to talk about the question whether each defendant should be ad-

15  verse to every other defendant, which is a different subject

16  matter.

17      MR. GROVER:  That is right.

18      THE COURT:  I will give you the floor first, after you

19  finish with this.

20      MR. VEEDER:  Your Honor, I would like to run down

21  briefly on some of these propositions that were raised by Mr.

22  Moskovitz, at the outset.

23      The point was made by him that the words "if any" were

24  omitted from our quotation from the Utt Act.  I would simply

25  want to say that when we say "if any," we were using the same

1   thought and terminology that we were using in the stipulation

2   when we said "may have gained by prescription or use, or both."

3   In other words, it is a factual question, when all is said and

4   done, as to what, if any, rights were acquired by the United

5   States, or what, if any, rights were needed by the United States

6   through prescription or use, or both.  In other words, there

7   has always been the contingency, the question, the protective

8   aspect of the insertion of the possibility that the United States

9   has actually exercised rights above and beyond those to which

10  it succeeded from the Rancho Santa Margarita.

11          So that explains the reason "if any" was written into

12  the Utt Act.  I recommended that it be put in.

13          I also was the one who used the term "may have gained,"

14  because on the basis of our investigations in the original in-

15  stance and on the basis of our present investigations it is

16  quite possible, quite probable in my view, that the proof in

17  this case will reveal that the National Government acquired from

18  the Rancho Santa Margarita all the rights that it needs or will

19  require.  So it may be that all this sound and fury has been

20  nothing more or less than exercise, for when they try out the

21  case it may be that these questions are moot.  We have simply

22  protected ourselves in the hope that if there should be rights

23  used beyond those which we succeeded to that we would be pro-

24  tected.

25          Now in connection with the statements repeatedly made

1  by Mr. Moskovitz, and recently by this gentleman here, that there

2  has not been a separation of rights to the use of water from the

3  land, it is somewhat amazing -- in fact, it is incredible.  I

4  haven't undertaken to brief all the California cases for your

5  Honor, but I would like to have the privilege of submitting some

6  more cases to you in that connection.  To demonstrate that the

7  State of California itself has always recognized, since the Act

8  of 1877, that rights to the use of water could be acquired in-

9  dependent and separate from the land.

10         THE COURT:  There is no dispute about that, is there?

11         MR. VEEDER:  That is right.  I am amazed to hear it

12  at all.

13         THE COURT:  I don't know what you are talking about --

14  what you're amazed at hearing.

15         MR. VEEDER:  I am amazed to hear someone say that the

16  United States did not separate the rights to the use of water

17  from the land and that the only thing that the United States now

18  has is riparian rights.  Daily rights are being acquired by

19  appropriation, I assume, and they can only be acquired by appro-

20  priation by reason of that separation of the rights to the use

21  of water from the land.  It couldn't be otherwise.  Search the

22  law forward and backward and there will be only three statutes

23  that could create that circumstance.  They are Congressional

24  enactments to which we have made reference repeatedly.  Those

25  Acts, I might add, are inclusive of, I think, seventeen States.

1  They provide in all of those States that rights can be acquired

2  independent from the land itself.  Now there is no doubt about

3  it.  So how can we get this fantastic approach that the rights

4  have never been separated?

5       THE COURT:  There could have been two things done.

6  In some metaphysical fashion, the statutes could have separated

7  the rights of all land from all water, and I commented yesterday

8  that maybe that is what the Supreme Court was saying but maybe

9  they said too much.

10       Or secondly, they could have provided that as an appro-

11  priative right developed and matured and finally, under a State

12  law, was recognized as a right, at that moment that water right

13  would be separated from the land.

14       You don't have to go into the metaphysical separation

15  of all the water from all the land, to get this second result.

16       MR. VEEDER:  But, your Honor, the right to appropriate

17  water was a right fully recognized in the Territories.  There

18  was no question about it.  The right was there, the right to

19  the use could be acquired in many, many States where a riparian

20  right is not even recognized.  So how can it possibly be that

21  the Act of Congress, the Act of 1877, if not before, did not

22  separate the land from the rights to the use of water?

23       THE COURT:  Well, regardless of what the law of the

24  Territory might be, the Congress merely said -- this is one

25  hypothesis -- merely said, "As far as our rights are concerned,

1    the rights of the Government, we consent that appropriative

2    rights may be gained, and when they are gained, the water is

3    severed from the land as far as we are concerned -- as far as

4    the Government is concerned."

5            MR. VEEDER:   I think that it did, and I think --

6            THE COURT:   That doesn't mean that all other rights

7    of the United States where there were no appropriations were

8    automatically severed from the land and stood apart in some

9    metaphysical fashion -- land on one side and water on the other.

10   It could be just as logical that where no appropriative rights

11   were concerned the Government still owned that land and the

12   water rights there as a riparian owner, without any metaphysical

13   separation.

14           MR. VEEDER:   Your Honor, to me it is not metaphysical

15   in the slightest.   It is good sound real estate law that a man

16   can separate water from his land and he can sell it independently.

17           THE COURT:   Why would there be any purpose for the

18   Government to separate its water from its land on any property,

19   except that property which is going to have accrued appropriative

20   rights?   Where would the Government gain anything?   Why would

21   it be concerned in separating its water from its land except in

22   those instances where it said that appropriative rights can come

23   into existence and one can get title good against the Government

24   and its grantees?

25           MR. VEEDER:   The history is very interesting, on that,

1  your Honor, and is a complete response to your Honor's question.

2  By 1877 the land along the streams had been acquired.  By 1877

3  the good lands had been very largely taken up and the only

4  method that lands away from the streams in these semi-arid areas

5  could be acquired was that they could be irrigated, and the whole

6  history of the Act of 1877 is precisely that point, because under

7  the old common law doctrines that had prevailed it was impossible

8  to use water on land other than those abutting on the stream.

9  So Congress in its wisdom, and I think it was a very wise thing,

10  passed this Act and said that independent of the land rights to

11  the use of surplus water on the public lands may be acquired,

12  and that is precisely what occurred.

13      THE COURT:  But why do you have to say, when Congress

14  went that far, that they also then separated their water from

15  their land up on the badlands?

16      MR. VEEDER:  That is precisely what occurred, your

17  Honor.  Up in the badlands, in the stretches of the river where

18  the terrain was such that it was not subject to agriculture,

19  they said, "You can go in there and you can divert that water

20  and you can use it many miles away from the stream."  The Con-

21  gress said -- and the history is strong on this point -- Con-

22  gress said that the only way that these vast areas of land

23  widely separated and far away from the streams can be made in-

24  habitable is by the doctrine of prior appropriation.  That is

25  the history of it, and the reason for it was that the common

677

1    law would not permit the severance of rights to the use of water

2    from the land, that the riparian right should itself be parcel

3    to the land.

4         THE COURT:  Much of what you say I agree with, but you

5    are not directing yourself to the thing in which I am interested.

6    Maybe I haven't made myself clear.

7         Assume that the Congress decide that they would re-

8    cognize the doctrine of prior appropriation and that an appro-

9    priator could get title to the water apart from the land, that

10   his land didn't have to be riparian -- he could move the water

11   across to some piece of ground where he would use the appropriated

12   water.  Does that necessarily mean that as to other land which

13   was riparian and where the Government had riparian rights that

14   the right of the Government to the use of water on that land

15   was separated from the land?  Or didn't the Government remain

16   merely as a riparian owner until such time as somebody perfected

17   an appropriative right?

18        MR. VEEDER:  No, I don't think so, your Honor, because

19   I think the cases are very, very clear on that.  I think if we

20   go back to the basis upon which the California-Oregon Power Com-

21   pany decision was predicated entirely -- and it is interesting

22   that those California and Oregon cases are almost identical in

23   their statements -- that they viewed the necessity for the

24   severance of the rights to the use of water on the public lands

25   as part of the means of disposing of the public domain, and

678

that is precisely what the Courts and the cases hold; that there
was a complete and an entire severance of the rights to the use
of water in the non-navigable streams, and the acquisition of
those rights was precisely the same, as I said yesterday repeat-
edly, as the acquisition of title to the land.

True, the California cases, Palmer v. Railroad Com-
mission and others, say that the United States is a riparian
owner.  Fine, there is no objection to that. Probably it is.
But that doesn't negative in the slightest the proposition that
these incorporeal hereditaments, these rights, these independent
rights to the use of water were owned by the National Government
at the outset and are presently owned today.

Now that is our view, and I believe that the cases --
indeed, I think every case where this proposition was squarely
presented -- of course, the best one is Howell v. Johnson --
the point was made that the National Government as owner of all
the rights to the use of water and all the land could separate
them, it did indeed separate them, and that was a method pur-
sued in disposing of this land in accordance with the policies
of Congress.

Now, to say, as these two gentlemen have said, that
those rights were never separated is simply contrary to the
whole basis of the California doctrine, and the California
doctrine -- and this is a rather surprising thing -- the Cali-
fornia doctrine, as we point out in our brief, commenced with

the idea that the title was in the United States and that the persons were trespassers using the rights that belonged to the United States, and therefore it was necessary that the Act of 1866 be passed and the Act of 1866 was very simple.  It simply said that so far as rights to the use of water have been acquired in the public domain, the United States of America loses those rights.  Then four years later another Act was passed.  It said that so far as any subsequent persons acquiring land from the United States, they will recognize the vested appropriative rights.  So there are the steps that were taken.

The gentleman says, "the true owner."  True, the true owner, as the cases say, was the National Government, and those are the California cases that say it.

So we have the instance where the Government said, "We will recognize these trespassers and we will not interfere with their rights.  These miners have to have this water."  Then we have the instance where the subsequent persons acquiring rights in land on the public domain took subject to those appropriative rights.  And the final instance was where the Act of 1877 separated entirely these rights to the use of water from the land.

Now in the State of California the doctrine, the hybrid principle of appropriation and riparian rights prevail side by side, and Congress said, "Fine, if that is how you want it, you can say that a man has riparian rights in the State, but

1  those riparian rights are subject to previously acquired appro-

2  priative rights."

3          So how could it be otherwise from the standpoint of

4  pure real estate law other than that there was a severance?  But

5  if California says, "We want those rights to be parcel to the

6  land," fine.

7          THE COURT:  Let's get down to brass tacks on this.

8  What you are talking about is this.  You are talking about this

9  severance because you want to contend that this water originating

10  up on the public domain many miles from Camp Pendleton, because

11  of the severance, after it flowed down twenty or thirty miles

12  to Pendleton, since it was an incorporeal hereditament it was

13  not part of the land anymore -- it had been separated, and

14  therefore the Government had some right to the water when it

15  got down to Pendleton.  That is what you want me to decide.

16  Because this isn't a case where you are using the water in the

17  public domain.  You are claiming rights to the water off of

18  the public domain because you say the water has been severed.

19          Now there is a hornbook principle of real estate law

20  that if a man has two rights in real property they merge, unless

21  there is some very good reason why they shouldn't.  So you want

22  to argue that you severed the water, but the very next moment

23  you can argue that they merged and again the Government is a

24  mere riparian owner, its rights had merged, and all it had was

25  a riparian right to use the water on the land which it owned.

1        MR. VEEDER:  Well, the point that I was alluding to,

2   your Honor, is that the usufructive rights in the stream itself

3   are one of the independent rights, and the mere fact that the

4   water is flowing over lands title to which has passed from the

5   National Government doesn't mean that there is not water avail-

6   able for appropriation or that the usufructive rights can be

7   acquired in the stream wholly independent from the land itself.

8        THE COURT:  Maybe I misunderstand your argument.  But

9   for your argument that you can at Pendleton assert a title to

10  the use of water that originated in the public domain to be

11  valid, you have to get it in some way separated from the land

12  and get it out of the category and have it merely be something

13  different from an alleged riparian right.  So you want to separate

14  the water from the land.  Then when the water flows down twenty

15  or thirty miles and comes onto Pendleton, you want to say,

16  "Well, welcome.  Here's our water.  It originated in the public

17  domain.  Years ago it got separated from the land.  Now it is

18  an incorporeal hereditament.  We can capture it down at Pendleton."

19        Isn't that your argument?

20        MR. VEEDER:  No, your Honor.

21        THE COURT:  Maybe I misunderstand.

22        MR. VEEDER:  In that connection, when we say that the

23  water originates up on the public domain, it doesn't matter where

24  the water originates, the molecules of the water.  The presence

25  of the right to use the water is entirely independent of where

1   it arises, and that is what we are speaking of here. We are

2   speaking of these independent interests in real property that

3   exist in the stream and which can be acquired just the same as

4         THE COURT: That you are not interested in where the

5   water originates? Your whole argument was predicated on the

6   fact that the Government owned part of the public domain back

7   of this watershed.

8         MR. VEEDER: The water flow is across the land, your

9   Honor.

10         THE COURT: You are disclaiming that premise for your

11   argument?

12         MR. VEEDER: No. The point of it is that a landowner

13   the only thing that a man has when he owns a right to the use

14   of water is to have the water come down to his headgate, to

15   his place of use, and that is an interest in real property that

16   extends the full length of the stream and is good against every-

17   body, and that is the whole idea.

18         I will say this. If what your Honor has said and

19   what has been raised here are valid assertions, then why doesn't

20   it apply equally to Fallbrook, who is seeking now to appro-

21   priate water or rights in the Santa Margarita? Why isn't it

22   just as valid to say, "How can Fallbrook acquire a usufruct in

23   the stream? It is next to the last one in the valley." It is

24   exactly the same thing. That's my point. Everyone seems to

25   think that Fallbrook and the United States of America are in

1  different categories from the standpoint of locale.   They are

2  not.   They are almost identical, and Fallbrook has to make a

3  claim in the stream independent of any land, independent of any

4  right above, and they are in exactly the same position.

5          THE COURT:   There is no argument about that, in the

6  sense that, first of all, Fallbrook admits that it is nothing

7  but an appropriator, in the sense that the United States claims

8  that it is an appropriator and cuts out all this gobbledy-gook

9  about some right the Government had in the severance of water.

10 If the Government wants to be just an appropriator, then there

11 is a parallel, except in the difference in location, because

12 then you are both attempting to appropriate water out of a

13 stream.

14         But you talk out of one corner of your mouth one

15 moment and out of the other the next.   You are not going to

16 limit your claim to that, because you spent yesterday telling

17 me about this right that you had that grew out of the public

18 domain, which grew out of the fact that the water was severed,

19 which makes you a different kind of appropriator down below --

20 you are claiming some right that Fallbrook hasn't got.   Fallbrook

21 was never a sovereign.   Fallbrook never had any public domain,

22 and so you say the United States isn't in the same position

23 that Fallbrook was in.

24         MR. VEEDER:   But, your Honor, the point that I am

25 making is that the interest that Fallbrook is seeking to

684

1   acquire in the stream, that is, the kind and type of real estate

2   that Fallbrook is seeking to acquire is exactly the kind and

3   type of real estate, real property, that the United States is

4   stating now that it presently owns.  There is not one bit of

5   difference, because it is a right, it is an interest in the

6   stream -- it has nothing to do with land, and that is certainly

7   the California doctrine, namely, that these rights, these in-

8   dependent interests in a natural resource -- and that is the

9   term that is used -- are property interests, and what Fallbrook

10  is seeking to do is to acquire a property interest in the stream.

11  And from whom?  It is our view that they are seeking to acquire

12  a right from the United States in conformity with the laws of

13  California, and that is the California doctrine, that when Fall-

14  brook gets a right, when Fallbrook gets a right to the use of

15  water, that right will come from the United States of America,

16  and that is California law.  That is the point.

17          THE COURT:  Well, suppose that a man owned ground up-

18  stream up where the Government Indian reservations are and had

19  riparian rights up there, and then suppose that he decided to

20  buy a piece of ground downstream -- I'm talking about a private

21  individual.  So he bought the Rancho Santa Margarita downstream.

22  Then he came in and was going to appropriate some water, take

23  some water downstream in the Santa Margarita.  The only rights

24  that he would have would be the rights of an appropriator, if

25  he was going to use it off the watershed.  Is that right?  Could

1  he claim any rights in that water because at one time some of

2  the water had been riparian water to his upstream property?

3        MR. VEEDER:  Not in the slightest.

4        THE COURT: Why is the Government in any different

5  position than that private owner, first, under your stipulation,

6  and second, as a matter of law?

7        MR. VEEDER:  In the original instance, as we have said

8  before, the United States owned all the rights to the use of

9  water and all the land, and that is the difference, and when the

10 severance was accomplished and as long as the laws of 1866,

11 1870 and 1877 apply, that severance is still effective and

12 operative.

13       When the lands, for example, in our Pelton decision

14 were withdrawn from the public domain, they were no longer avail-

15 able for appropriation under State law -- that is the difference,

16 and it is a matter of real property law and nothing more that

17 these interests in the stream were separated from the land so

18 that they could be acquired independent from the land, and I

19 respectfully submit that that is certainly the law in 295 U.S.,

20 the California-Oregon Power Company case, and that is certainly

21 the basis upon which the whole history of the West developed;

22 that the party who patented the water -- we'll use that term

23 for simplicity's sake -- the man who patents the rights to the

24 use of water gets his rights from the Federal Government.

25       All we have to do is read from a California decision.

1   It says here in Lux v. Haggin, for example:   "It has never been

2   held that the right to appropriate waters on the public lands

3   of the United States was derived directly from the State of

4   California as the owner of innavigable streams and their beds;

5   and, since the Act of Congress granting or recognizing a pro-

6   perty in the waters actually diverted and usefully applied on

7   the public lands of the United States, such rights have always

8   been claimed to be deraigned by private persons under the Act

9   of Congress, from the recognition accorded by the Act, or from

10  the acquiescence of the Federal Government in previous appro-

11  priations made with its presumed sanction and approval."

12      Now that is California law, and the California law

13  has always adhered to the very premise concerning which I am

14  directing my comments.

15      So when we say that there is something unusual in

16  the position that we have taken and tried to say that it is by

17  reason of public land upstream that these rights exist, that

18  is not the situation at all.   There is hardly an area in the

19  Western United States today where all of the land along the

20  stream has not been passed into private ownership, but there

21  still remains and every day appropriations are accomplished of

22  those usufructive rights in the stream independent from the lands

23  abutting on the streams.   So we still have the circumstance,

24  and Fallbrook is a prime example of that circumstance, where

25  by going in and complying with the Acts of Congress which says

1  that the States will set up the means of acquisition, Fallbrook

2  acquires a usufructive right in Santa Margarita.   From whom?

3  From the United States, predicated upon California's own de-

4  cision.   There is no question about that.   Those are the de-

5  cisions which say that when Fallbrook acquires whatever rights

6  it acquires, it acquires from the United States of America be-

7  cause it is the owner of the unappropriated rights to the use

8  of water in the stream.

9       I didn't dream the California doctrine.   The Cali-

10  fornia doctrine has spelled out historically and repeatedly

11  precisely what I am saying, namely, that it matters not a bit

12  where the water that you seek to appropriate is found, because

13  when you acquire a right to that water it necessarily stems

14  from the original owner -- the United States of America.

15       Now that is the proposition that is being ignored when

16  we come down to say, "Well, what kind of claim are you making

17  when you say that the United States diverted water and exercised

18  its own rights?"   If there was unappropriated water in the

19  stream -- and I use the term "if" advisedly, because I am not

20  sure that there is -- but if there was unappropriated water in

21  the stream when we diverted it outside the watershed, the

22  United States of America was exercising a usufructive right

23  that resided in it, and Fallbrook at this moment is competing

24  for that same usufructive right.   That is the whole idea of the

25  doctrine of appropriation in California, and it is certainly

1    the law of California that the source of title is the National
2    Government.

3    Well, I have laboured that as far as it seems warranted.

4    Now the next question which has arisen -- I didn't
5    follow entirely what Mr. Sachse was driving at when he said that
6    he didn't comprehend the meaning of the terms in paragraph III
7    in the light in which I had made my statement.

8    That paragraph says:

9    "That the United States of America claims by reason
10   of its sovereign status no right to the use of a greater quantity
11   of water than is stated in paragraph II."

12   As I stated in the history of this stipulation, the
13   matter came up as to whether the United States was claiming
14   any water under a sovereign status in this litigation, and Arvin
15   Shaw and Pat Brown, as I remember, talked the matter through,
16   and I said, "Well, the National Government can only own water
17   or rights to it by reason of its sovereign status and we would
18   claim no rights any greater by reason of it." And I want to
19   go back and go over it again because it was apparently not un-
20   derstood, that at the time there was concern that the United
21   States was claiming all the rights up the valley, and the
22   reason for our statement here, our unequivocal statement, was
23   to avoid the idea that we could invade vested rights upstream
24   other than by eminent domain. That was the sum and substance
25   of the stipulation. I explained to your Honor yesterday -- I

689

1    thought I did -- the basis upon which the stipulation was enter-

2    ed into; that we simply wrote in a caveat to protect us if there

3    was more water and greater rights were being exercised than

4    those to which we succeeded.

5            So far as we are concerned, what the proof may be we

6    don't know, but there is a problem that I think will have to be

7    passed upon by your Honor in this litigation: how much water

8    was the Rancho exercising as a riparian?

9            THE COURT: Let's not go into that. You have told

10   me that three or four times, and it is certainly true --

11           MR. VEEDER: All right.

12           THE COURT: And I might say right now -- this is a

13   good time to say it -- the mere fact that I indicate that I am

14   adverse to your positions on some of these other matters does

15   not mean that I will not give you a full hearing as to what

16   rights you acquired from Santa Margarita, and it may well be

17   that the rights you acquired from Santa Margarita are such that

18   Fallbrook, who came along later in this picture, may be on the

19   wrong end of the waterspout, because I am certainly going to

20   take into account the situation as it existed when the Govern-

21   ment condemned this Rancho and the uses that were made by

22   Santa Margarita and Fallbrook are admittedly nothing but those

23   of an appropriator. If there is anything left over to appro-

24   priate, that is the extent of Fallbrook's right. They must

25   know that they are not in a good position. It may turn out

1  that there is something for Fallbrook.  We will go into that

2  later and find out what you got from Santa Margarita.

3      MR. VEEDER:  May I touch on one more point, perhaps

4  it is something you would like to put over, the question of this

5  gratuitous license and the effect of it.

6      My own view is that in view of what Mr. Sachse and

7  Mr. Swing have said, I would like to have them enter as an agreed

8  fact and spell out in the Agreed Facts that they were, certainly

9  until 1948, using water under this revocable permit and the

10  United States revoked the permit in 1948 by reason of what we

11  thought was a violation.  Now they may not agree all the way on

12  this, but I think that it should be recited in the Agreed Facts

13  that they didn't have any rights when we bought Rancho Santa

14  Margarita and so they were using it under a revocable permit

15  and let the law fall where it may.

16      THE COURT:  We will go into that when we get into this

17  stipulation.

18      MR. VEEDER:  Yes.

19      MR. GROVER:  Your Honor, could I give you an addition-

20  al citation.  I didn't realize that so much was going to be

21  pressed upon the word "severance."  I think your Honor has the

22  thing in hand when you talk about a metaphysical term.  Your

23  Honor may wish to look at Williams v. San Francisco; the cita-

24  tion is 24 CA (2d) 630.  It is a Cal. Ap. case, but hearing was

25  denied in the Supreme Court.  It came up again in '56 CA (2d) 374,

1   and again the State Supreme Court denied a hearing, and on that

2   one certiorari was denied by the United States Supreme Court

3   (San Francisco v. Williams 319 U.S. 771).  In that case, as Mr.

4   Veeder, I understand, has conceded, the California doctrine was

5   upheld in that under the California-Oregon Power Company case

6   if the State wants to recognize riparian law then riparian law

7   flows from the statutes to which we refer.  In other States

8   where the stricter appropriative doctrine was adopted, it was

9   the contention that there had been a severance and so that the

10  appropriative doctrine could stem from the statutes, and as the

11  California-Oregon Power Company case points out it is up to the

12  State to decide and in California they decided that there would

13  not be a severance.  I'm not sure that they used that term, but

14  that is the effect of it, that when a patent goes from the pub-

15  lic land in California riparian rights flow.

16          THE COURT:  Subject to vested appropriative rights.

17          MR. GROVER:  Subject to vested appropriative rights,

18  certainly, and also subject to the further right --

19          THE COURT:  Of later appropriation.

20          MR. GROVER:  -- of surplus after the vested right, and

21  I don't really think that is in conflict with anything that has

22  been said, except that it may be a case that your Honor would

23  like to read.

24          As to Lux v. Haggin, the key words in that citation--

25  I would have said this before, except I thought that everybody

1   understood it -- the key words there are "public domain." The

2   California cases so often are concerned with the Government's

3   role in the thing because the Government owned so much land,

4   but not because, as Mr. Veeder said, the Government owned all

5   the waters. We certainly dispute that the Government ever owned

6   all of the water in this watershed, because Rancho Santa Mar-

7   garita was never in the public domain. Under the Treaty of

8   Guadalupe Hidalgo, the private riparian rights were recognized from

9   the first and were perfectly good rights. Under the Treaty

10   even pueblo right have been recognized, special types of Mexi-

11   can rights that weren't recognized at common law, because the

12   Government never got a right superior to those or the right to

13   interfere with those private rights, and when the Government,

14   under the statutes acquiesced -- and that was the word in one

15   of those cases -- "acquiesced" in what these other people were

16   doing it was not conveying them a right. It was merely saying,

17   "We, as one of the riparian proprietors in the State, are not

18   going to object if you want to interfere with our riparian right,"

19   and the Government cannot give itself a right beyond its ri-

20   parian right. It can, as against itself alone, give someone else

21   the right to take water outside the watershed, but it doesn't

22   give them a right to take it out. It merely says that we will

23   not object if you do.

24        MR. MOSKOVITZ:   I have just a couple of points, your

25   Honor.

693

THE COURT:  All right.

MR. MOSKOVITZ:  Mr. Veeder says that his contention as to the status of the United States and its power to separate land from water is just good real estate law and that any riparian owner could separate his land from his water and convey the water right to someone else to use on non-riparian land. This is directly contrary to a number of California cases.  The riparian owner cannot do that because he does not have the right himself to use the water off the riparian land.

If your Honor is interested, we can dig up the citations on those.

The second point is that if Mr. Veeder is correct in the metaphysical sense that there has been and can be a separation of the land from the water as a result of the Acts of 1866, 1870 and 1877, then I don't see how he can explain the result in this Pelton Dam decision (Federal Power Commission v. State of Oregon).

Let us review what happened.  First of all, the Acts of 1866, 1870 and 1877 were passed.  Let us assume that there was this complete severance.  Then there was established a reservation on one side of the River.  It was considered in the Pelton decision.  The Supreme Court held that this reservation of the public land, in effect, took the water that flowed over or by that land out of the Desert Land Acts and therefore the effect of the Desert Land Acts no longer applied here.  In

694

1    other words, I think Mr. Veeder has said elsewhere that the

2    result was that there was a reservation of the water, too.

3    What was the reservation, actually, in terms of the language

4    that was used?  There was a reservation of the land from entry.

5    In none of those reservation orders was there anything said

6    about water.  But the Court read into the reservation of land

7    the reservation of the water, too.  The only way you can read

8    that into it is because the water is appurtenant to the land.

9    If it separated just the reservation of the land, it wouldn't

10   take the water with it.  It seems to me that that is the only

11   way you can explain Federal Power Commission v. Oregon.  That

12   language is that there was not this inseparable severance.

             THE COURT:  Well, let's take our morning recess. We

14   have about completed this phase of the motion, with one ex-

15   ception.

             Mr. Veeder, you consented to the joinder of Fallbrook

17   and Santa Margarita to this stipulation.  I take it that be-

18   cause of your desire to have a ruling on this stipulation you

19   will amend your motion to require that they will be bound by

20   the stipulation also.

             MR. VEEDER:  As I said before, and I didn't say it in

22   regard to Santa Margarita Mutual, although I believe that fact

23   prevailed, I think that when there was written into the original

24   pre-trial order that everybody who signed the order became

25   bound by it --

1          THE COURT:   They both agreed yesterday that they would

2    be bound by it.

3          MR. VEEDER:   Yes, so let's have the motion applicable

4    to each one, and we will amend to that effect.

5          THE COURT:   The motion will be therefore considered

6    as amended --

7          MR. DENNIS:   We consent to the amendment.

8          THE COURT: -- to include all the persons bound by that

9    stipulation in 1951.

10         Is that agreed?

11         MR. SACHSE:   Yes.

12         MR. DENNIS:   Yes.

13         THE COURT:   All right, take a short recess.

14         (RECESS)

15

16

17

18

19

20

21

22

23

24

25

1  (AFTER THE MORNING RECESS)

2  THE COURT:  I am prepared to rule on the motion for

3  rulings respecting the stipulation.  That is a narrower pro-

4  blem than some of the things that we have been discussing.

5  The motion requests that the Court declare in ad-

6  vance of trial that the parties mentioned are bound by the

7  stipulation.  It also moves that the Court declare the stipu-

8  lation have ascribed to it the usual meaning of the terms set

9  forth therein.

10  The Court grants the motion and rules that the

11  parties are bound by the stipulation, including the United

12  States of America, and will proceed to interpret the stipulation.

13  In interpreting the stipulation, I have in mind that

14  Mr. Veeder has stated that the stipulation is not ambiguous.

15  Therefore, the Court will not be required to go into matters

16  prior to the execution of the stipulation.  I think, on the

17  other hand, that there is no doubt that the Court could con-

18  sider the conduct of the parties after the stipulation was enter-

19  ed into, in determining what meaning they ascribed to the sti-

20  pulation.

21  It is a common rule of law that/the parties by their
when

22  conduct ascribe a certain meaning to a document into which they

23  have entered,      they are therefore bound by their actions.

24  If Mr. Veeder had been a young man right out of law

25  school who was drawing his first stipulation, I might be

1  inclined to go along with some of the arguments which he has

2  made.  But he is not in that position.  He is a skilled practi-

3  tioner.  His ingenuity has been demonstrated time and time again

4  in this courtroom, and the Court therefore assumes that he

5  meant what he said in the stipulation.

6       I don't think there is any dispute as to paragraph I

7  of the stipulation, which was inserted for the purpose of de-

8  fining the word "paramount," and reference is made to Peabody

9  vs. Vallejo, and/the word is obviously used in the sense that the

10  word is used in the law of water rights, and has nothing to do

11  with any sovereign character of the plaintiff in this action.

12       As to paragraphs II, III and IV, first of all, they

13  have to be read together and they cannot be read each isolated

14  from the others.

15       Paragraph II lists what the United States claims.  It

16  claims (1) the right to the use of water that it acquired when

17  it purchased the Rancho Santa Margarita.  In that sense, the

18  plaintiff stands in the same position as a private party who

19  would have purchased the Rancho.  The condemnation had no other

20  effect.  Whatever rights the Rancho Santa Margarita had passed

21  to     the United States -- no more, no less.

22       (2) The stipulation says, "Together with any rights

23  to the use of water which it (United States) may have gained by

24  prescription or use since its acquisition of the Rancho Santa

25  Margarita."  On the very wording of the stipulation, it excludes

1    rights of the United States in any sovereign capacity -- it can

2    probably act only in a sovereign capacity, but any rights which

3    the United States at that time had in the stream because the

4    stipulation is express.  It merely added/what it bought from

5    the Rancho Santa Margarita -- those which it gained.  "Gained"

6    means something added to, something in addition, and can have

7    no reference in its ordinary language to rights which the

8    United States might have claimed it already owned in the water

9    or rights to the water.

10           Some of this will not be in order.  I'll put it to-

11   gether later.

12           Paragraph III: "The United States of America claims

13   by reason of its sovereign status no right to the use of a

14   greater quantity of water than is stated in paragraph II." The

15   Court can take judicial notice of the furor that existed when

16   this suit was filed -- the newspaper stories about the sovereign

17   rights of the United States, and the misinterpretation that they

18   applied to the word "paramount." So here is a disclaimer which,

19   in its language, in substance says that the United States claims

20   by reason of its sovereign status no greater rights than were

21   set forth in paragraph II -- claiming no rights greater than a

22   citizen would claim, and I reject Mr. Veeder's argument that

23   this was merely to show that the Government was acting in a

24   sovereign capacity and not in a proprietary capacity.  There is

25   no question about that.  How anybody would have raised that

4

699

1    question I don't know.  It seems to me to be a side issue in-

2    jected at this late date.  There is a lot of State law on

3    sovereign and proprietary capacity.  I don't know of any Federal

4    law on that.  The rule is different on the Federal side.  The

5    Government acts in a sovereign capacity, and if that was the

6    reason that it was put in there Mr. Veeder is able enough that

7    he could have stated in simple language, "The Government of the

8    United States acts, and can only act, in its sovereign capacity

9    It is does not act in a proprietary capacity."  If that is the

10   language he wants to read in there, I don't see that in there.

11   It is a disclaimer of any rights other than those rights that

12   a person not a sovereign would claim.

13         Now as to paragraph IV, "that the rights of the

14   United States of America to the use of water herein are to be

15   measured in accordance with the laws of the State of California,"

16   I reject Mr. Veeder's interpretation that the word "measured"

17   means that beneficial use is referred to.  I think it means all
                only

18   of the laws of the State of California: its laws as to riparian

19   rights, its laws as to prescription, its laws as to use or

20   appropriation, its laws as to diversion outside of watersheds,

21   its laws as to how water may be appropriated and the machinery

22   set up therefore.

23         Now paragraph IV clearly has that meaning, and when

24   read with paragraph II shows that the Government is not claiming,

25   at the time this stipulation was entered into, any rights that

1   preceded 1877 or any rights that came about by severance of the

2   water from land, if that did occur, after 1877, because if that

3   were true then the Government would not have said that the

4   rights of the United States are to be measured by the laws of

5   California but would have stated that certain of its rights

6   were to be measured by California law, that the right to water

7   that the Government claimed is owned as the original proprietor

8   under public domain would be interpreted by the laws of the

9   United States.   The State of California would have nothing to do

10  with those laws as to those rights, except insofar as the Desert

11  Land Acts affected them.   But certainly the Federal law would

12  be involved.   And so paragraph IV read with paragraph II assists

13  there.

14        Now coming back to paragraph II again, this second

15  right, the right to water gained by prescription, it is clear

16  enough what "prescription" means: the acquiring of a right by

17  acts adverse to someone else's right.   "Use" is a very broad

18  term, and "use" is broad enough to include "appropriation."

19  It is broad enough to spell out of it some other right from use

20  if you can do it under the laws of the State of California.

21        However, interpreting paragraph IV with paragraph II,

22  it seems to me to read out any of this late talk about "inverse

23  condemnation," because if you argue that use led to inverse

24  condemnation then you are not talking about the laws of Cali-

25  fornia; you are talking about the decisions of the Federal courts,

1 which interpret what amounts to an inverse condemnation.  I

2 think, however, that that is academic because I am convinced,

3 as a matter of law, from the facts as I suppose they are, that

4 this use downstream outside the watershed, which is not disputed,

5 by the last user, in my opinion, could not constitute inverse

6 condemnation.   The Government can't be particularly hurt on

7 that interpretation, but I think the word "use" read with para-

8 graph IV reads out anything about inverse condemnation; and I

9 think that the word "use" in paragraph II read with paragraph

10 IV reads out, again, any right to this so-called right asserted

11 to water from the public domain upstream, and it also reads out,

12 I think, as I have already said, any rights that the Government

13 claims that they held as a proprietor or sovereign or in any

14 other way in the rights in this stream.  Of course, paragraph III

15 has an impact on that also.

16    Now it is obvious, from the excerpts submitted, re-

17 ferring now to those matters after the date of the signing of

18 the stipulation, that the Attorney-General of the United States,

19 the chief law enforcement officer of this Country, to whom Mr.

20 Veeder, I take it, is responsible --

21    Let's get it correct.  You are not responsible solely

22 to the Solicitor of the Department of the Interior?

23    MR. VEEDER:  I have not relationship whatever to the

24 Department of the Interior, your Honor.  I am working for the

25 Attorney-General of the United States.

1          THE COURT:  The excerpts called attention to by Mr.

2   Sachse -- and I am assuming without checking now that this

3   occurred after the date of the stipulation; this is obviously

4   so, because Mr. Brownell became Attorney-General after the date

5   of this stipulation -- are clearly in accord with the inter-

6   pretation which this Court has given. "Its rights will be no

7   greater than the rights of a private individual if a private

8   individual held this same land." Then 'this stipulation between

9   the parties also provides that the laws of the State of Cali-

10  fornia shall govern in this case." That is a broader statement

11  than is contained in paragraph IV, but it shows obviously what

12  was meant by paragraph IV, and it shows that this talk about

13  using only the California principle of the beneficial use to

14  measure the rights of the United States is not accurate.

15          Now have I covered the points that Counsel have in

16  mind?  Have I omitted anything in this interpretation of the

17  stipulation?

18          (DEFENSE COUNSEL CONFERRING OFF THE RECORD)

19          THE COURT:  Does anyone have any suggestions?

20          MR. MOSKOVITZ:  Your Honor, it might be advisable,

21  if we could secure copies from the Reporter of what you stated

22  and go over it.

23          THE COURT:  All right, it's very short.  Maybe he can

24  get this for you over the noon-hour.

25          I will direct that an order be prepared containing

1  my interpretation of this stipulation and my ruling that the

2  parties who have signed it and those who here joined it and

3  the Government of the United States are bound by it, and I will

4  direct that Mr. Moskovitz, -- I merely select him to give some-

5  one the responsibility -- take the responsibility of preparing

6  it, but that he confer with Mr. Sachse, Mr. Swing, Mr. Grover,

7  Mr. Dennis, to work out the language which they can approve.

8  I will give opportunity under the rules, to object to the word-

9  ing of the order, if they desire.

10      Now secondly, on this matter of this so-called sever-

11  ance of water, this isn't involved in the stipulation problem

12  but it is involved in this case, and somewhere along the line

13  after we get a pre-trial order with sufficient facts to base

14  some kind of ruling on I want to formulate some kind of state-

15  ment on that.   It seems to me that there are various alternatives

16  as to what that situation is.

17      One situation which I originally leaned to but am not

18  quite as enthusiastic about now as I was is that the three Acts,

19  the Desert Land Acts ending with 1877, had the effect of dedi-

20  cating the water to public use and, in substance, making the

21  States the trustee or the vehicle by which the public would

22  exercise the rights to that dedication.   I would like to have

23  somebody experiment with that.   I am not too sure about it.

24      A second alternative is the so-called metaphysical

25  approach which Mr. Veeder is here urging that by these Acts

1  the Government, for all time and for all effects, separated the

2  land from the water, and that the water became an incorporeal

3  hereditament and that the water was therefore subject to patent,

4  to use Mr. Veeder's shorthand, the same as land and mineral

5  rights -- that you had to comply with State procedures and

6  methods in acquiring the water rights. I am not too sure about

7  that alternative. It seems to me that the language of the

8  Supreme Court about the severance constituted more than they

9  needed to have said, particularly if it is interpreted as

10  meaning a severance of all the water for all purposes at all

11  times.

12      The third alternative seems to me the most logical

13  and reasonable one, and that is that the Government said, by

14  those Acts, that insofar as we, the Government, have rights

15  in the water in public domain we will let our rights be tramp-

16  led on and severed when appropriative titles are secured, and

17  that therefore there was a severance if, as and when rights

18  were secured. But it was not a severance of all the other

19  waters. It was a severance pro tanto as rights accrued and

20  ripened pursuant to the laws of the State. It seems to me that

21  the very fact that the cases indicate that the States could

22  adopt either a common law riparian system, if they wanted to,

23  or could adopt a strict appropriative system, or some com-

24  bination of the two, indicates that it was not a severance for

25  all purposes, because insofar as the statutes and decisions

of the Supreme Court permitted a continuance of the riparian
system it was no severance.  You don't have a riparian right if
it is severed.  And so even under the California system, Cali-
fornia recognizes riparian rights, but it recognizes also appro-
priative rights.

So that as far as the riparian rights are concerned,
all of this talk about this metaphysical severance does violence
to the recognition of a riparian right.

Following that along, if, therefore, what the Congress
did was to say that we will stand still insofar as rights
which we have in water are secured under whatever methods the
State wants to set up, and you had a severance pro tanto as and
when it occurred, and it was not a severance of all water in
all land -- the "badlands" as Mr. Veeder calls them.

So that the Government, then, continued to be the
riparian owner of land and water except where these rights
which it had permitted to come into existence came into existence.
So that the remaining lands of the United States, such as they
now have in the Indian reservations in the watershed of this
country, the Government is the riparian owner, and the fact
that it is a riparian owner gives it no right greater than a
private proprietor would have who is a riparian owner.  Once
the water has left those Indian lands, the Government cannot go
down with a bucket at the end of the stream and say, "It was
water that was once riparian to land that we now have, and now

1  we are going to grab it at the bottom and claim it because we

2  own land upstream." The Government would have the right that

3  any other person would have to appropriate water that is sur-

4  plus, but it has no added rights because of the fact that the

5  Government is also an upstream owner.

6  That alternative seems to me the most logical. Whether

7  that will jibe with the reading of these cases, I would like to

8  do some study. I think the best way to handle it would be for

9  the Government to be required to submit a brief and succinct

10  analysis -- I'm not talking now about a brief, but in the

11  nature of a statement of this alternate number two which the

12  Government contends for -- the severance, and require the de-

13  fendants to work one out on paragraph III, and if one of them

14  would be courteous enough to take a shot at number one, the

15  dedication theory, it would be appreciated.

16  Do you have a suggestion, Mr. Veeder?

17  MR. VEEDER: I fell off the sled back there, your

18  Honor.

19  THE COURT: I outlined three possible theories, maybe

20  more. One was what I called the dedication theory, that the

21  State is a sort of trustee; one was your complete severance

22  theory; and the third was a sort of pro tanto severance, if and

23  when appropriative rights came into existence which permitted

24  the continuance of riparian rights, and which is what most of

25  the defendants here have contended for. I have asked the

1 defendants to summarize that situation.  I am thinking of language

2 that would be suitable for a pre-trial order, if and when we

3 get to it.  But I would like to have you do it while this is

4 fresh in mind, and have the Government summarize their pro-

5 position as to this severance.  I am not going to use them both,

6 but I would like to have them before me.

7          MR. SACHSE:  This is not a brief, you said?

8          THE COURT:  No.

9          MR. SACHSE:  Just a statement of the principle?

10          THE COURT:  A statement such as I would use in a pre-

11 trial order, if I get to the place of making an order on this

12 legal principle.  Obviously I can't use II and III or I and II.

13 But I would like to have the Government work out its statement

14 on II, the defendants on III and at this time I will give Mr.

15 Sachse the responsibility.  You can work with Mr. Moskovitz,

16 Mr. Dennis, and Mr. Grover.

17          Are you clear now about what I want?

18          MR. MOSKOVITZ:  Your Honor, will these be submitted

19 to you in the form of a letter, or do you want these filed and

20 served?

21          THE COURT:  I think they might as well be submitted

22 informally without filing.

23          Does anybody have any objection to that?

24          Put them on legal size paper.

25          Does anybody have any objection to that?  Mr. Veeder?

1      MR. VEEDER:  No, your Honor.

2      THE COURT:  I am talking now not about the ruling on

3 the motion; I am talking about this other matter.

4      All right, see if you can get the order in, in ten

5 days.  If you want more time I will give it to you.

6      MR. MOSKOVITZ:  I am not sure that I can do it in ten

7 days, your Honor.

8      THE COURT:  And see if you can get yours in within

9 ten days, Mr. Sachse.

10      MR. SACHSE:  Yes, your Honor.

11      THE COURT:  Now, Mr. Grover, you wanted to be heard

12 on another proposition.

13

14

15

16

17

18

19

20

21

22

23

24

25

1   MR. GROVER:  Yes, your Honor,  As you know, the in-

2  terests of my particular clients don't really justify an ex-

3  tensive participation.

4          THE COURT:  Whom do you represent?

5          MR. GROVER:  We represent Cottle and Gibbon, in the

6  north part or the upper part of the Temecula half of the water-

7  shed above the confluence.  As a matter of fact, I came down

8  here today thinking at the time of the pre-trial order we could

9  work out a little bit more as to when it is appropriate for us

10  to appear, and not because I really meant to get into these

11  discussions among the major parties.  The thing at the present

12  time that bothers us the most is the fact that there are so

13  many thousand defendants who are here under the order that

14  Judge Yankwich made adverse to each other.

15          Now as your Honor must know, there are controversies --

16  I will not say controversies -- there are conflicts, there are

17  points of contact all up and down the stream among all the

18  owners and they can go on from year to year, by and large, with-

19  out litigation; but they would all have to be brought out, if

20  there were a general adjudication of all parties, so that we

21  were adverse to all of the other parties.  We take water from

22  places that may, for example, be part of the stream and may not,

23  and you have to hire an engineer to find that out, and your

24  engineer has to get on the stand and testify in competition with

25  other engineers with competing views.  So that it is just a

1  tremendous financial burden for the average landowner to thrash

2  this out, and they try to work them out from year to year as

3  best they can among themselves without litigation.

4          As a matter of history, this lawsuit arose when the

5  negotiations broke down between the United States and the major

6  appropriators here on the plan that they originally had, that

7  originally was signed by a number of important people but not

8  completely signed, plans for a dam to appropriate what was then

9  thought to be surplus water of the stream, and there undoubtedly

10  would not have been a lawsuit, a general adjudication, had those

11  original purposes and plans of the parties gone ahead as con-

12  templated.  We think that, basically, the controversy still

13  lies, as far as anything justifying a vast adjudication is con-

14  cerned, that the controversy still lies among these major parties,

15  and yet all the parties on the stream, some of whom don't even

16  claim interests on the stream are forced to come into Court and

17  protect their rights.

18          I know that your Honor, and I will say the same thing

19  of Judge Yankwich, your Honor is aware of this situation and is

20  taking steps to see that nothing is foreclosed.  But on these

21  preliminary legal discussions I am sure your Honor realizes

22  that it is really being decided today, I mean among these major

23  parties, and I will not say that the attorneys for the other

24  thousands of defendants would have much to contribute.  But it

25  is really being decided without their participation.

THE COURT:  We will have to work out some procedure on that.  For instance, there has been submitted to me some legal propositions of law which I want to rule on before trial, particularly if the pre-trial stipulation justifies it.  But obviously that can bind only those people who participated. We are going to have to work out some procedure whereby we will give notice to people that this matter will be heard and anybody will have a right to come in and present their matters at that time.

MR. GROVER:  I understand that your Honor is going to preserve the technical right to come in before a party is bound. But realistically your Honor is going into that now, and there again, without reviewing perhaps all of the arguments and certainly all of the briefs and certainly your Honor's ruling and researching them, etc., these various other parties aren't represented and a vast majority of them can't afford to be represented at all.  Their rights are going to be foreclosed simply because they can't afford to be heard.

Now the United States can sue our people, there's no doubt about it.  The Courts are open to the United States just like they are to anyone else and you can't keep someone from suing you.  But it seems to me that this development that everybody is adverse to everybody else, that we are required to sue each other when we don't want to, is an unnecessary aspect of the case, and that it does lead to a burden which is really an

1    intolerable one.

2         Your Honor asked me for authorities on it, and quite

3    frankly my hope is to convince your Honor that as a practical

4    matter of justice, the suit becomes oppressive if it becomes

5    too vast.  I checked the equitable maxims.  I find that equity

6    delights in equality, or, as they put it, "equity delighteth in

7    equality."  I couldn't find any case, however, in which it was

8    applied in this sort of circumstance.  But "equity delighteth

9    in equality," as a general principle, and the United States is

10   here asking for equity but we can't be equal.

11         THE COURT:  Let me give you another little example

12   and see what effect that has upon your thinking.  Let's take a

13   stream and here are two tributaries off the stream.  You have a

14   client up at one end of one tributary, Mr. Swing has one up at

15   the beginning of the other tributary, and downstream on each

16   of the little branches there are other people.  Obviously, as

17   to this little branch of this stream where you and various

18   other people have water rights you are all adverse to each

19   other, because your rights are correlative rights among your-

20   selves and as to the United States.  But on the other hand you

21   probably have nothing adverse between you at the top end of

22   this branch and the fellow at the top end of the other branch.

23   Nor do you have any quarrel with any of the other people in the

24   other branch whose water comes into the stream below your

25   property.

1    MR. GROVER:  It could get even more complicated than

2  that, your Honor.  The downstream owner, because he has a right

3  in both tributaries, his correlative right as to each tribu-

4  tary may depend in equity, upon the amount that he gets from the

5  other tributary.  It is interrelated.

6    THE COURT:  In view of that fact, there are instances

7  where clearly you are adverse to various other defendants.  How

8  can you say that the case can be tried without at least being

9  adverse to those people that you are in fact adverse to?

10    MR. GROVER:  I don't say that we are not adverse to

11  these people, and the fact that we are is the very reason that

12  I would have to come in and be in Court and go to all this ex-

13  pense, because there are adverse interests.  But we believe that

14  our controversy with the United States can be settled without

15  bringing in our controversy with the other people.  We could

16  settle our rights as against the United States, and that is what

17  we would like to limit it to -- for one reason, as your Honor

18  has just said, the United States is encouraging settlements.

19  Our particular clients have not gotten into negotiations with

20  them, and we may not -- I can't make a representation; but if

21  we could settle it with the United States and get out, that would

22  be the solution for us.  But we can't do that if we still have

23  to make settlement with Mr. Swing and all the other riparian

24  owners and everyone else.

25    What we would like to have is a reversal of that

order that Judge Yankwich has made that everybody is adverse to everyone else and that no further pleadings are necessary, and limit the case to the pleadings.

THE COURT: What has happened in other suits on other watersheds? This is the first one of these that I have ever had.

MR. GROVER: There are countless water suits, your Honor, where parties with riparian, appropriative, prescriptive rights, even pueblo rights, have had disputes among themselves, where there was not a general adjudication of the stream.

Mr. Swing was mentioning the Allen case on the Tijuana River where there were a very large number of parties, but the findings were limited to the relationship with each other.

There is such a thing as a general adjudication, but it is a vast thing and it is an enormous project. There is even a procedure to have it done by the State Water Rights Board in California, because it is such a difficult thing for a Court.

But we don't think that there is any occasion for that here. When you are up against the Government, you are up against countless resources, any number of engineers and legal talent, as your Honor has pointed out, of great ability, and we think that is burden enough, without being required, for no particular reason, to thrash out among ourselves all these other possible conflicts that we may have.

1        THE COURT:   I neglected to throw a bouquet to Mr.

2   Burby here.  I apologize, Mr. Burby.  I was commenting on Mr.

3   Veeder's ability.  I didn't mean by my negative not to mention

4   you, sir.

5        MR. VEEDER:  I missed the bouquet, your Honor.

6        THE COURT:   You did?  I can admire a man's ability

7   and disagree with him.  I don't find any trouble in doing that.

8        MR. VEEDER:  I was attempting humor, your Honor.

9        THE COURT:  Mr. Veeder, what do you think about this?

10  Was it your purpose in this suit to have a plenary suit to ad-

11  judicate all the rights on the River?

12        MR. VEEDER:  In that regard, your Honor, I truly be-

13  lieve that in this kind of litigation -- I will answer yes.  I

14  think there has to be a full adjudication, and I, personally,

15  concur with the proposition and with his concern.  But I don't

16  know how; with riparian rights involved, that you can do other-

17  wise than as the State of California asked Judge Yankwich to do,

18  namely, to try out all the rights one against the other.  In my

19  own view, I have never been able to understand how correlative

20  rights and riparian rights can be tried otherwise, and I think

21  that when the case is tried I don't believe that it will -- I

22  can't envision how it would be any different from an evidentiary

23  standpoint whether these rights were tried one against the other

24  or not.  Maybe Mr. Grover can explain that.  I haven't followed

25  his thinking as to why, when he puts in his claim and Mr. Swing

1  puts in his several clients', how it would make any difference

2  from the standpoint of findings that your Honor would enter.  I

3  don't see it.

4       THE COURT:  I think his point is that if he is adverse

5  to everybody he would feel that he had a duty to his client to

6  be present and contest the proceedings or to see that the e-

7  vidence came in properly when Mr. Swing was putting in all of

8  his claims and when Mr. So-and-So was putting in his claims.

9  The facts showing what each claimant would claim would have to

10 precede some eventual conclusion and finding as to the corre-

11 lative rights.  I think that is what he has in mind.  That he

12 wouldn't be in position then, either to paddle his own canoe

13 without concern about these others, nor would he be in position

14 to settle.

15       MR. GROVER:  That is one important aspect of it, your

16 Honor, really the more important aspect of it.  But there is a

17 second one, and that is that our rights are different with re-

18 spect to different parties.  There are different kinds of parties,

19 wherever they go.  We might have, for example, a prescriptive

20 right against one person and because of the law of prescription,

21 with regard to the United States, not a prescriptive right a-

22 gainst another person.

23       MR. VEEDER:  I thought your Honor's outline as to how

24 you propose to -- at least, your suggested thought as to how

25 you were going to try the lawsuit takes care, in my view, of the

1  problem that he has just raised.  For example, I would assume

2  that you would have all the evidence with regard to De Luz Creek

3  taken at one time, and I don't/see why -- your clients are situated

4  on Temecula Creek, above Nigger Canyon?

5          MR. GROVER:  Yes.

6          MR. VEEDER:  It would seem to me that that area in

7  there would be tried out and there would be no great problem

8  from the standpoint of worrying about cross-examination.  I

9  think the matter would be relatively simple.  It would take just

10  one day probably.  I don't know.

11          THE COURT:  It might be that as far as Nigger Canyon

12  is concerned or whatever that area is, but Mr. Grover might feel

13  that out of a duty to his client he should sit in while the

14  Government and the major parties are fighting about this down-

15  stream situation also.

16          MR. VEEDER:  Under those circumstances, I realize the

17  cost, and it is not unusual in this type of litigation for law-

18  yers to be present all of the time.  But I think he would cer-

19  tainly have the opportunity to review the record, and if there

20  was a contest he would have a right, in my view, and I would

21  recommend that he have the opportunity, of raising the issue

22  and having it resolved.  I don't believe that you can say there

23  is an issue as against everybody/in the whole watershed in every instance

24  I don't believe that that is true, and I don't believe that it

25  will work out that way.

1          THE COURT: Is there any possibility that the Govern-

2   ment can eliminate out of this lawsuit any of these people who

3   aren't riparian to the stream, for instance, and get them out

4   of the suit?

5          MR. VEEDER: We will try that, your Honor. I don't

6   know, under the Ninth Circuit ruling, what we can do. If Mr.

7   Grover would like to settle his claims in this case, I would

8   suggest that we might make it a test case and try it out on

9   other Counsel. Let's work out a stipulation with him in regard

10  to the rights of the parties and then if other parties object,

11  the matter can be brought up. I don't fancy that there is going

12  to be the conflict that he says there is among all of these

13  parties. It might be as good a time as any to endeavor to work

14  out a stipulation with him and see whether Mr. Swing and Mr.

15  Sachse and Mr. Dennis would be willing to agree that his rights

16  are to be riparian rights for so many irrigable acres and try

17  it out that way. I think that might be a good place to start.

18  We will certainly sit down with Mr. Grover when we are through

19  here, if he wants to do that. Then we can tender it to your

20  Honor for consideration. It might be a bellwether case here.

21          MR. SWING: Your Honor, please, my guilt in this sit-

22  uation we find ourselves in is the guilt of silence. When this

23  was proposed that everybody be declared to be adverse to every-

24  body else, I was silent instead of protesting the proposal, as

25  I think I should have done. In the beginning I was sure that

1  there was no necessity of any such legal procedure.  Every answer

2  that I filed for every individual defendant served by the United

3  States Government wound up with alleging "as against the United

4  States" we claim so-and-so and so-and-so.  It was unthinkable

5  to me at that time that people who had lived for fifty and

6  seventy-five years, with neighbors up and down this entire water-

7  shed, without a lawsuit, should suddenly be forced against their

8  will to engage in a battle royal, the net result of which would

9  be merely an encyclopedic determination of their theoretical

10  water rights.  But, your Honor, I find myself in the position of

11  a man with a foot sunk in a bog or quicksand and wandering how

12  I can pull it out.  We have got this order entered some time

13  ago, a long time ago, and I am not bright enough or a clear

14  enough thinker to point the way to back out of it.

15       I do think that this might be an appropriate time to

16  find out from Mr. Veeder what report he has to make upon the

17  last time I had the pleasure of sitting in his company and that

18  of your Honor, of ascertaining whether you are going to be able

19  to get your superiors to contribute a small amount of money to

20  pay the costs of a Master and have the Master go out and try

21  to see if he can't work out on some of these streams a proposed

22  order that might settle them.

23       Is there any report from your superiors?

24       MR. VEEDER:  Yes.

25       I submitted to your Honor a proposed order of reference,

1    and while there has been no final determination as to the ex-

2    tent of the responsibility that the United States would bear

3    in connection with the cost of the Master, undoubtedly as a

4    party litigant it will assume some of the responsibility.

5                   MR. SWING:  You want to spread that out over the

6    3600 defendants that you have brought into Court?

7                   MR. VEEDER:  I believe, Mr. Swing, that the Master

8    would work for all parties.  I suppose that is what you mean

9    by "spread it out."

10                  MR. SWING:  He works for none of the parties; he works

11   for Justice.

12                  MR. VEEDER:  I beg your pardon.

13                  The cost would be assumed by the United States to

14   whatever sum your Honor would fix.

15                  MR. SWING:  The discussion was, you suggested that

16   you had a precedent of $100.  I made the almost immodest sug-

17   gestion that you raise that to $150 a day for a "Deputy Judge"

18   so to speak, someone capable of taking some of the burdens off

19   the Court and doing some of the thrashing of the straw to find

20   out whether there is any grains of wheat in it.

21                  MR. VEEDER:  Well, I have inquired, yes, I have

22   answered you, Mr. Swing.  I don't know      precisely what you

23   are asking about.  The Government will assume some of the costs.

24   I assume that the Court will ultimately enter the order as to

25   how the costs are to be shared.

MR. SWING:  The question was, as I understood it, when we went out of the Judge's chambers, whether you would make a contribution of $150 a day for the Master to settle as many of these cases as possible.  I think that is a very modest sum compared with what you are now spending on your Office of Water Supply and engineers running all over the country seeking to work out a settlement ex parte, and at that point I just throw the question in: if you, the United States, and some of these 3000 landowners, after your engineers have gone over their property agree and work out a stipulation, how is that stipulation going to be final in a suit in which, as Mr. Grover has pointed out, all of them /adverse to each other?

THE COURT:  Well, Mr. Swing, let me interrupt you for a minute.

MR. SWING:  I am glad to have your Honor.

THE COURT:  Some of the discussion about the Master was on the record and some was privately with Counsel, and I suggested the names of some people I had been considering. Also, the discussion about what the Master should be paid I don't think was on the record.

As I understand, Mr. Veeder has tendered a proposal for the compensation of the Master which, as to amount per day and per hour, is agreeable to the Court.  He has tendered it, however, with the suggestion that the Government pay half of the expense and the other defendants pay the other half.

1        I would like to wind this matter up, and it is my view

2   that the Government ought to foot this bill. The Government

3   brought this litigation. The Government is the one that wants

4   the rights adjudicated. You have a very difficult problem in

5   trying to spread this liability over thousands of defendants,

6   and I would like to cut this knot and get right ahead with this

7   and make an order that the Government will pay the bill, and

8   appoint a Master and put him to work.

9        You also told me that there was some problem about

10  whether you could find money enough lying around at Fort Knox

11  or various Treasury establishments of the United States. I'm

12  not being facetious. I know that budgetary problems are pro-

13  blems. What did you find out about that?

14       MR. VEEDER: We are going to take that under dis-

15  cussion and there has been no final determination. I wrote your

16  Honor a letter and tendered to you a proposed form of order of

17  reference, as you asked me to, and the matter of cost has not

18  yet been settled. I assume that the United States would have

19  to assume some of it. The sum of $150 a day is quite a jolt.

20  But I will renew the conversations when I get back to Washington.

21  If your Honor has ordered that we pay all these costs, it is a

22  matter I will have to bring to my superiors' attention. That is

23  all I can say, your Honor. It has not been finally determined.

24       THE COURT: I haven't made any order, but I have in-

25  dicated that that is what I think I would make. How can you

1  ask Bill Jones up the stream to bear some pro rata of the ex-

2  pense on a little piece of ground where he can't afford even to

3  have a lawyer come in and saddle him with a Master?

4          MR. VEEDER:  I think under those circumstances I would

5  recommend that Bill Jones not assume charges.  On the other

6  hand, it occurs to me that there are other large owners who

7  could -- Fallbrook, for example, could share some of the cost.

8  I don't know about Santa Margarita Mutual, but I would assume

9  that it should.

10         But in any event, I think that the matter of the fixing

11 of the fee would be after the full review by your Honor of these

12 matters.  I think that this litigation, while certainly the

13 United States is the plaintiff in it, stemmed from the invasion

14 of its rights, in our view, and we feel that there should be

15 costs assumed by other parties in addition to the United States.

16 Your Honor, of course, has the final determination on it.

17         MR. SWING:  Your Honor, the only reason I brought it up

18 was that I understood that on the agenda for yesterday, today

19 and tomorrow was the matter of setting a tentative date for the

20 trial of this case.  Of course, if your Honor is going to be

21 assisted, as I think is proper, with a Master, which I believe

22 was a request which the plaintiff itself made, or in which it

23 heartily concurred -- having a Master appointed, then of course

24 there will be no trial in this Court until the Master has gone

25 to work, and apparently, taking a short look at it, he has three

1   months, I would say, going up and down these creek streams and

2   holding hearings near where the parties are located and where

3   the land is located and where the water is located.   So the

4   sooner that we could agree that the Court should appoint a

5   Master, I am perfectly willing to leave it for a later deter-

6   mination as to what the apportionment should be, but I do think

7   that we should agree that the Court should make/appointment and
                                                         an

8   what the salary would be so that he would know whom we could

9   get.  For $75 a day he would get a $75 a day man, for $100 he

10  would get one not much better.   I think perhaps in the interests

11  of someone who would be probably dedicated, if I may use that

12  expression -- you no doubt understand what that means, dedicated

13  to the public interest and to Justice -- it would probably take

14  $150 a day, because he would consider that he would be serving

15  Justice and serving his Country and serving his fellow man.

16          MR. VEEDER:  So far as I am concerned, it is up to you,

17  your Honor.  We can settle it now, or we can settle it later.

18          THE COURT:  Tell me, for the record, what did you pay

19  this Master in the case in Oregon or Washington?

20          MR. VEEDER:  $100 a day.

21          THE COURT:  He was a dean of a law school; is that

22  right?

23          MR. VEEDER:  Yes, your Honor.

24          THE COURT:  So he had no problem of continuing office

25  expense -- books, telephone, all of that sort of thing, which

1   the ordinary practitioner would have to contend with.  He merely

2   left the law school, the sacred realms of the law school, became

3   a Master for awhile, and then went back to the law school.  I

4   think with that in mind that $150 a day or $25 an hour for

5   office work, as suggested in your letter, is satisfactory.

6            The trouble with putting this matter over for appor-

7   tionment -- I have no objection to putting that over and later

8   determining it -- but we have to have compensation for the

9   Master as we go along.  I don't expect to put a man to work for

10  three, six, nine months -- I don't know how long it is going

11  to take -- with some doubt as to how he is going to be paid.

12           What about the State of California?  You are in this

13  controversy.  Are you willing to bear any small cost of a

14  Master?

15           MR. MOSKOVITZ:  Frankly, your Honor, I have never

16  explored the problem with my superiors or other officers of

17  the State.  I can't say.

18           THE COURT:  It has not been taken up?

19           MR. MOSKOVITZ:  It has not been taken up.  I can ask.

20  Of course, we have very little interest in the facts as such,

21  except to make available whatever we have gathered through our

22  own efforts to all of the parties.  I would anticipate a re-

23  luctance to pay very much.

24           THE COURT:  Another problem, also, is the procedure

25  to appoint this Master.  I just checked briefly the Cyc of

1  of Federal Procedure.  In most of the cases, of course, you have

2  just a few people and they are all in Court and you take it up

3  and make the order.  But whether we will need a motion here and

4  a showing to be made I don't know.  There is a requirement that

5  the facts justify the appointment and the Court must exercise

6  its discretion.  The facts must be sufficient to justify that

7  exercise of discretion.  I have no doubt that a showing could

8  be made.  But whether we have to make it on a motion or whether

9  the Court makes it on its own motion without notice to the

10  parties -- have you looked into that, Mr. Veeder?

11      MR. VEEDER:  I have never looked into the question

12  whether the Court had to notify all parties.  I don't think that

13  it does.  I think the fact is that the Court suis spondi can

14  go ahead and appoint a Master and if anybody raises a question

15  then it becomes a matter of law whether he was properly appointed.

16      THE COURT:  Think about it over the noon hour, be-

17  cause I wouldn't be surprised that that is right, that later

18  on within a reasonable time there could be some objection.  I

19  notice cases indicating that unless there is prompt objection

20  the parties are deemed to have consented.  If that is the state

21  of the law and we can work some of these other things out, I

22  am prepared to appoint a Master today.  I don't know any reason

23  why the Master can't, under proper instructions, start some of

24  his work even before the trial in this Court of some of the

25  major issues starts.  The Master doesn't have to work the same

1  days that I work.   There is plenty to do in the case.

2          Think it over during the noon hour and we will convene

3  again at 2:00 o'clock.

4          (NOON RECESS)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAN DIEGO, CALIFORNIA, TUESDAY, JANUARY 7, 1958, 2:00 P.M.

THE COURT: Mr. Veeder, thinking over this Master situation, what do you think of this kind of proposal: that I appoint a Master, that I order the expense of the Master paid by the Government without prejudice to an apportionment between the parties to the litigation at the conclusion thereof? If I find that Fallbrook has invaded the Government's rights, that would be a very persuasive finding that would have a bearing upon what portion of the Master's expense Fallbrook should pay.

The situation on the State of California is a little different. Whether they should pay any is an interesting question.

Santa Margarita, depending on the outcome of this litigation, may or may not be apportioned some of the expense.

That would let us get underway on this matter, and it would still preserve this contention that you make, because I can't tell yet whether Fallbrook has invaded any of the Government's rights or not. I don't want you to take a cat in the bag. If they haven't, I figure that the Government probably ought to pay for the expense of this Master. If they have, tentatively I think they should pay some proportion of the expense of it.

How would you feel about that kind of order?

MR. VEEDER: Well, my view would be this. I think that Fallbrook are invading our rights now, by their present

1   diversions, and I certainly think they are clouding our title

2   by their conduct.  If you should hold that we have prior rights

3   and that they are in fact invading our rights, why shouldn't

4   they pay?  Let's make a percentage of it -- fifty per cent.

5            THE COURT:  I don't want to pass on that now.  I

6   originally suggested that the Government pay all the freight

7   on this Master, but I'm willing to leave the apportionment

8   open pending the conclusion of this litigation and direct the

9   Government now to pay the expense of the Master, without pre-

10  judice to a consideration of the matter when I have all the

11  facts.  That is a better proposition than the one I originally

12  had in mind.  I think there should be some assurance that the

13  Master will be compensated.

14           That takes care of that and it leaves it open.  I am

15  not going to commit myself now as to what the facts will show

16  in this case.

17           MR. VEEDER:  I appreciate that, but I would hesitate

18  to say that I could bind the Government at this point to pay

19  $150 a day, because when I brought the proposition up in Washing-

20  ton the idea was along this fifty per cent.  Again, I am saying

21  that I'm not even binding the Government to fifty per cent, but

22  I am saying that I can take to the proper authorities who con-

23  trol the Government's money back there and present what your

24  Honor has just stated, namely, that as we progress -- I want to

25  be sure that I understand it -- that as we progress and payments

1  are made, compensation is paid to the Commissioner, it will be

2  on the basis of a possible reapportionment at the conclusion of

3  the litigation.

4          THE COURT:  Without prejudice to your right to move

5  for an apportion/ment of the expenses at the conclusion of the liti-

6  gation.

7          MR. VEEDER:  On the basis that if it is found that

8  Fallbrook is invading the rights of the United States.

9          THE COURT:  That would be one factor.

10         MR. VEEDER:  Yes.

11         THE COURT:  Let's not try to foreclose what the various

12  factors might be.

13         MR. VEEDER:  No, but that was one of the things your

14  Honor made reference.

15         THE COURT:  That is right.

16         MR. VEEDER:  Well, I will certainly report that and

17  your Honor will be advised as to the disposition they make of

18  it.  None of us has the authority at this point to say that we

19  can obligate the Department of Justice for $150 a day.  I don't

20  have that power.

21         THE COURT:  Are you raising a question now as to the

22  amount that I expect to pay this Master, or on your authority

23  to agree to any amount?

24         MR. VEEDER:  I think this, that from the standpoint

25  of the Master, I think that if a Master is appointed the Government