1     will pay some money.  How much is an additional question.

2            THE COURT:  Maybe I should say on the record what I

3     told you privately, so there will be no misunderstanding about

4     this.  I think that the Master in this case should be a com-

5     petent, experienced lawyer.  I think he should be a man in whom

6     the litigants would have some confidence.  I think he should

7     be a man who has had some experience in the law of real pro-

8     perty, in water law, somebody who knows something about the

9     problems involved in this case.  That kind of man isn't easy

10    to find.  You were fortunate in the North to find a Dean of a

11    law school.  Of course, in Southern California you have elim-

12    inated a man who might have made a very excellent Master by

13    employing Mr. Burby, who got his feet wet on the Government's

14    side of the case, and I therefore can't consider him.  It might

15    have been a very wise thing if I had done some thinking about

16    that earlier.  Maybe you employed him before I got into the

17    case.  To find the kind of man I am talking about is difficult.

18    I am willing to do it on the basis of merit entirely ---merit

19    and ability without any reference to politics.  In fact, the

20    man I am thinking of naming is, I understand, a Republican.

21    I have never met this man.  I have heard about him from various

22    sources.  He has been recommended time and time again by various

23    people who know something about this field.  I feel that the

24    compensation we are proposing to pay is certainly not excessive,

25    in view of the fact that as a practicing lawyer he has obligations

1  in connection with the fixed charges of his office and is not

2  in the situation of a Dean of a law school.

3          On the other hand, if the Government doesn't want to

4  pay for that kind of man and will not pay for that kind of man,

5  we will have to do the next best thing we can, and I haven't

6  any doubt but that there are a number of able young lawyers

7  around this County who would just be tickled to death to be

8  appointed a Master in this matter, and I am not so sure that

9  some of them couldn't do a pretty good job for a lot less money,

10  maybe, than we would pay the man I am thinking about.

11          That is what it comes down to.  If your employers

12  want me to get a good man, that is what it is going to cost.

13          MR. VEEDER:  I think you can be sure that the Depart-

14  ment of Justice wants a competent man and a good man, and as

15  I say you hadn't mentioned $150 a day.  At your request I sub-

16  mitted an order of reference of fifty per cent to be assumed

17  by the Federal Government.  That was the last word that I had

18  on it.

19          THE COURT:  You had authority -- as a matter of fact,

20  I think that letter was signed by Mr. Rankin.

21          MR. VEEDER:  Yes, the Solicitor General wrote the

22  letter and transmitted to you the order of reference.  So on

23  that basis I would simply not be empowered at this moment to

24  tell you that we could assume the full cost, asssuming the sum

25  that has been mentioned of $150 a day.

733

1          THE COURT:  Will you go into that immediately?

2          MR. VEEDER:  Yes, your Honor.

3          THE COURT:  And if we can work that out, is there any

4    objection to appointing this man now without notice?  We have

5    talked about it with various of the major parties, who have all

6    been informed, and let anyone object within some reasonable

7    time, if they want to object to it.

8          MR. VEEDER:  That was my understanding of it, on the

9    basis of the conversations in your chambers the other day.  I

10   had understood that the major parties were all in agreement,

11   including the State of California, and under those circumstances

12   I don't believe that a motion is required.  I went to the

13   library and took a run through the books this afternoon, as you

14   suggested, and while certainly the matter of reference can be

15   raised on motion it can also be on agreement among the parties

16   as in this case. So I don't believe that a formal motion is

17   requisite.

18          In regard to compensation, I think the only real ob-

19   jection that any individual could make would be that he was

20   assessed some of the costs, and that is the only grounds that I

21   can see that he could object on.  Certainly this is the kind

22   and type of case where, historically, there have been references.

23          MR. SWING:  If the Court please, in the Allen case,

24   which is still pending almost as long as this case has been,

25   the initiator of the action, the California Water and Telephone

734

1  Company, advanced the money for the State to make a survey, sub-

2  ject to being reapportioned, and I'm wondering -- you and I

3  have been in this case from the beginning and have gotten along

4  pretty well.

5      MR. VEEDER:  This is an attempt at humor again.

6      MR. SWING:  Why could you not put it up to Mr. Rankin

7  and your superiors.  Others of us have a restricted budget, and

8  you, since a few years ago, have no longer been restricted by

9  Congressional activity.  Get them to put up the money for the

10  Master, subject to reapportionment at the time the matter is

11  presented to the Court here and we will go along with you on

12  that.

13      MR. VEEDER:  Wasn't that what your Honor had in mind?

14      THE COURT:  Yes, but I would like to have it done as

15  promptly as possible.  I would like to get started on this.  I

16  think that whoever is appointed as Master should learn something

17  about this case, and there will immediately be the question of

18  laying out areas for his work, and I see no reason why that

19  can't be going on while we are going on.

20      What is your schedule?  Are you going back to Washing-

21  ton, or are you going to fry some fish at various other parts

22  of the country?

23      MR. VEEDER:  I am frying fish generally, but the tele-

24  phones are still working, your Honor.  It is too late to call

25  now.

1          THE COURT:  Yes.

2          MR. VEEDER:  But I will try to find out as rapidly as

3 possible.  I don't think that it will be decided on the tele-

4 phone, but I will try very hard by the time I leave town to

5 have some information on it.

6          THE COURT:  Can we leave that subject matter now?

7 Has anyone else any further proposals in that connection?

8          Let's take up the matter of these additions to this

9 pre-trial stipulation.  These additions are to a document filed,

10 or lodged, on November 19, called "Proposed Order on Pre-Trial."

11 Is that right?

12          MR. VEEDER:  That is correct, your Honor, as revised

13 by the December 3rd revision.

14          THE COURT:  We have certain matters that we discussed

15 on December 3rd.  Are those the matters which are incorporated

16 in these sheets that have been handed to me?

17          MR. VEEDER:  That is correct, your Honor.

18          MR. SACHSE:  I have gone over this very hastily, your

19 Honor, and I am not ready to say that I have covered every parcel

20 of it there, but I think there are several in the revision that

21 are factual in series.  For example, on page 13 of the revision

22 in lines 29 and 30, in discussing the Fallbrook application

23 there, Mr. Veeder says that the application is for storage of

24 10,000 acre feet per annum from Rainbow Creek.  That is not

25 correct.  I don't have my application here -- I didn't bring

1   that file.  But I'm quite certain that it was not all from

2   Rainbow Creek.  It was part from Rainbow Creek and part from

3   the Santa Margarita River.

4           MR. VEEDER:  Are we free to have a discussion at this

5   time, your Honor?

6           THE COURT: Yes.

7           MR. VEEDER:  The reason why it is drafted the way it

8   is, Mr. Sachse, is that your statement was not factually cor-

9   rect.  You made your filing for 10,000 acre feet on Rainbow

10  Creek, and then subsequently you amended.  I didn't know when

11  the amendment was made, or the circumstances under which it was

12  made, nor do I have the data in regard to it.  So I set it up

13  this way and I am hopeful that you will have the information in

14  regard to when the amendment was made.

15          MR. SACHSE:  The amendment was made -- I can't give

16  it to you now.  I don't have it here.  I will have to dig it

17  out when I get back to the office.

18          MR. VEEDER:  That is the circumstance which created

19  the terminology that we use.  In other words, we think there

20  was a very serious doubt whether you could claim the present

21  priority by reason of the amendment which you made.

22          MR. SACHSE:  Then I presume that you would make the

23  same reply in reply to my next objection, which would be on the

24  next page, on page 14 at lines 23 and 24.  Again they stated

25  10,000 acre feet from Sandia.  The same situation exists in that

    case?

1     MR. VEEDER:  The copy of the application that we have,

2     and that is all I had to work from, shows that you made a filing

3     in regard to Sandia, and I understand that you made a subsequent

4     amendment.

5     MR. SACHSE:  All right, I will undertake, then -- I

6     guess I can do it by tomorrow, I will try -- to have the exact

7     dates of these amendments and we can correct this to show them.

8     MR. VEEDER:  That is right.  I have no objection to

9     it.  I just simply didn't know what the dates were.

10    MR. SACHSE:  With your Honor's permission, I am just

11    jumping around, because, as I say, I haven't gone over it in

12    any great detail.

13    THE COURT:  Let's take up the matters that you do have.

14    MR. SACHSE:  Then on page 12, Mr. Veeder, with re-

15    ference to your own application, or the Navy's application or

16    purported application No. 12576, I do not have that here with

17    me, but it is my understanding or recollection that it was an

18    application for 165,000 acre feet and not 12,500.

19    MR. VEEDER:  That is a matter that I think you will

20    want to look at.  The capacity of the structure was 165,000,

21    and the annual claim 12,500.

22    MR. SACHSE:  However, as I recall -- please correct

23    me if I am wrong, and if you are not sure I would like you to

24    check it; I have your application -- as I recall, you sought a

25    permit from the State of California to store 165,000 acre feet.

1  In other words, this statement is erroneous.  Your application

2  was to appropriate 165,000 acre feet for storage, not 12,500.

3          MR. VEEDER:  Well, as I say, this is a matter that

        be

4  has to/checked out, apparently.  But we will of course bring

5  that up to date.

6          MR. SACHSE:  Further on page 13, your number 3, start-

7  ing at line 6, the facts -- I am not criticizing your statement,

8  Mr. Veeder, but the facts have changed, that is, the statement

9  is no longer correct.  On December 31, 1957, the State of

10 California issued its license on this application.  So to recite

11 the facts as they now exist an additional sentence or two will

12 have to be inserted to reflect the facts as they now exist in

13 that case.

14         MR. VEEDER:  If that is something that has occurred--

15         MR. SACHSE:  Yes, I don't know that you know that.

16         MR. VEEDER:  No, I don't.

17         MR. SACHSE:  But it is a fact that on December 31, 1957,

18 a license has been issued and it has been filed for record in

19 the County Recorder's Office of San Diego County.  So if those

20 facts are to be accurate, we will want to correct that.

21         THE COURT:  What is the effect of the license?  That

22 is different from a permit?

23         MR. SACHSE:  The easiest way to explain it is to re-

24 view what happens.  Somebody applies for water and tells how

25 much he wants and where he expects to put it to use.  The State

1   then issues him a permit saying that he can do so.  Then the

2   person does it, and when he has done it and when he has put the

3   water to beneficial use and proved that he can do so, then the

4   State issues a license, which becomes the last step in the title

5   that the State can give to an appropriation.  It is subject to

6   further action by the State always.  It could be revoked or it

7   could be modified.  But it is the ultimate muniment of title

8   that you get from the State on a water rights application.

9        The matter that you discussed very briefly in argu-

10  ment, on page 14a, this question of the revocable license of

11  the O'Neill's, I would suggest that if you and I are in this-

12  agreement as to what the effect of this is we either delete

13  lines 5 to 12 entirely and cover it by contentions, since we

14  can't get together on the effect of this license which you in-

15  sist is a license to the United States when actually it is a

16  license to the O'Neills.

17       THE COURT:  What are you talking about, page 14a?

18       MR. SACHSE:  Yes.

19       MR. VEEDER:  No, page 14, isn't it?

20       MR. SACHSE:  Both places.

21       MR. VEEDER:  Page 14 and 14a, that's right.

22       MR. SACHSE:  It is on lines 11 to 18 on page 14, and

23  lines 5 to 12 on page 14a.

24       MR. VEEDER:  As a matter of fact, I think it would be

25  wise, I think we could probably save some space by consolidating

740

1  the reference to the revocable license and to the objection that

2  the United States has made.  But I do believe that the existence

3  of the revocable license is a matter concerning which there can

4  be an agreement, and the legal effect of it would be a question

5  of law.  I don't believe that you would deny that when the

6  United States bought the Rancho Santa Margarita the only water

7  that Fallbrook was taking from the Santa Margarita River was

8  pursuant to this revocable license.  Isn't that correct?

9       MR. SACHSE:  I will agree that there was in existence

10  a revocable license from the O'Neill interests, from Rancho

11  Santa Margarita to Fallbrook; but that is all I would agree --

12  and that we were taking water under it.  I will not agree that

13  it was a license of the United States, and I will not agree that

14  we have violated the license.

15       THE COURT:  I think you can get together on this.

16  All we want are the facts.  This must be in writing.

17       MR. SACHSE:  Yes, sir; Mr. Veeder has quoted it.

18       THE COURT:  The date of it, the wording of it, if you

19  want it, that when the United States condemned the Rancho Santa

20  Margarita it was then in existence, that you had been taking

21  water under it --

22       Had you been taking more than that amount of water,

23  or just that amount?

24       MR. SACHSE:  I don't know, your Honor.

25       MR. VEEDER:  We can go further than that, your Honor.

1  I think we can put into the Agreed Facts the quantity of water

2  historically diverted by Fallbrook prior to -- well, up until

3  1948.  I think we can agree on those, because those are certain-

4  ly facts concerning which we have knowledge.

5        MR. SACHSE:  We can't agree on them, Mr. Veeder, unless

6  I know what they are, and the only document you have presented

7  to me for my approval is that Fallbrook is the holder of a gra-

8  tuitous license from the United States of America.  I am not

9  going to agree that we are the holder of a gratuitous license

10  from the United States of America, because we are not.

11        THE COURT:  That is understood.

12        MR. VEEDER:  Mr. Sachse, all I did was a rewrite job

13  for his Honor, as I see it.

14        THE COURT:  It is understood that that is not the way

15  it will be worded.  But can you get together on the facts?  What

16  water do you claim that Fallbrook took prior to 1948?   .

17        MR. VEEDER:  I think the quantity of water that Fall-

18  brook took prior to 1948 was, at the outside, 10 miners inches,

19  which is a fifth of a second foot, and we have, as I remember,

20  a tabulation from Fallbrook showing those quantities.  Now I

21  think we could write that in.  I think it would be important as

22  an Agreed Fact.

23        , In 1925 they took 2.5.  I think 70 acre feet is the

24  most that you took prior to that.

25        MR. SACHSE:  Mr. Veeder, I don't know what you are

1   looking at.

2        THE COURT:   What is the source of the figures, Mr.

3   Veeder?

4        MR. VEEDER:   Fallbrook.

5        MR. SACHSE:   This is an exhibit from the pre-trial

6   order.  Yes, anything that is an exhibit in the last pre-trial

7   order, I am hopeful I will get them all in on this one.

8        MR. VEEDER:   Yes.  All I am saying is that what I

9   think we should do is for you and me to agree on the facts and

10   let the Court decide the law; but put in the quantities of water

11   you have historically taken.

12        MR. SACHSE:   That is quite satisfactory.

13        THE COURT:   All right, you gentlemen ought to be able

14   to work that out without any problem, and reserve whatever legal

15   points you want to reserve -- if you want to, just call it a

16   document, and let the Court decide what it is.

17        There was a notice of some kind sent from the Govern-

18   ment to Fallbrook.

19        MR. VEEDER:   Cancelling the license, that is correct.

20        THE COURT:   Do you want to leave the legal effect of

21   that open?

22        MR. VEEDER:   No, I think it should be an Agreed Fact

23   that such a letter was written.

24        MR. SACHSE:   Put it in and we will agree.

25        THE COURT:   I am talking about this language cancelling

1  the license.  If Mr. Sachse's contention is right, it may have

2  been a personal license that didn't survive the conclusion of

3  the condemnation.  Therefore, there would be nothing to cancel.

4  So you can skip those problems, too.  That a certain letter was

5  written, and stating what the letter said, and let the Court

6  decide what the effect of it was.

7          MR. VEEDER:  That is right.

8          MR. SACHSE:  We will have no objection, because the

9  letter very definitely was written by the Navy.  We have a copy.

10  But as I have stated, your Honor, it was our position that there

11  wasn't anything to cancel.  This was a personal license.  It was

12  not binding on their successors and assigns.  When it went into

13  the possession of the O'Neills it ceased to exist, and any di-

14  version we made at that time was adverse.

15          MR. VEEDER:  I am perfectly willing to argue the law

16  now, or shall we just agree that those are the facts?

17          MR. SACHSE:  I am simply stating what one of my con-

18  tentions is going to be.  You will write your contentions, Mr.

19  Veeder, and I will write mine.

20          THE COURT:  All right, what other matters?

21          MR. SACHSE:  Could I pass for a minute and skim over

22  this one?

23          THE COURT:  Yes.

24          MR. SACHSE:  I think Mr. Dennis and some of the others

25  have been working on this and maybe the two or three of us can

1   move faster.  I have not exhaustedly covered it.

2       MR. VEEDER:  I think, your Honor, we could improve,

3   or at least cut down the language of it.  I was talking to Mr.

4   Moskovitz about this.  I think we can make one contention in

5   regard to the legal effect as to what transpired at the hearing

6   on August 12 through 14th and just recite that in the same place

7   which would be applicable to Santa Margarita and Fallbrook Pub-

8   lic Utility.  I think that would cut this down to some degree.

9       THE COURT:  Is there any objection to consolidating

10  that into one paragraph instead of two?

11      MR. SACHSE:  I have no objection to consolidating

12  that, your Honor.

13      MR. VEEDER:  I would like to ask California a question

14  at this point, because it is a matter which I think is of a

15  great deal of importance to the United States in this litigation,

16  and I assume it is certainly to the Court.

17      We had arguments as to what the State would consider

18  and what would be the legal effect of the issuance of a permit

19  in connection with applications now pending before the State

20  Water Board.  I wonder if Mr. Moskovitz could state for us the

21  matters which the State of California is presently taking under

22  consideration in acting on this permit, because I think they

23  will have a great deal of effect upon what the Agreed Facts

24  might be and certainly what the questions of law would be.

25      THE COURT:  You mean what issues the Water Board has

    before it?

1          MR. VEEDER:   In passing on these applications to

2     build this dam.

3          MR. MOSKOVITZ:   Your Honor, I am not an employee of

4     the State Water Rights Board.   I am certainly not a member of

5     Board.   I don't know what is going through the minds of the

6     Board as it is considering these applications.   I hardly think

7     it would be appropriate for me to inquire.

8          I am certainly willing to state the position of the

9     State of California as to what will be the effect of the de-

10    cision of the Board upon this Court.   I think I have stated it

11    before for the record.   I will state it again, and I will state

12    it in a stipulation in writing, if Mr. Veeder wants.

13         MR. VEEDER:   What I would like to do, because I think

14    it will certainly have an effect on the course of this liti-

15    gation, as I recall, you stated that the matters to be passed

16    upon by the State Board were not issues to be passed upon by

17    this Court.   If that is not what Mr. Moskovitz said, I am in-

18    terested in knowing, because as I recall the only issue that

19    we talked about, and it was highly important, was the question

20    whether there was any surplus, and I said that the only way I

21    think you can arrive at a surplus is really to pass on the rights

22    of the Marine Corps.

23         I think that it is appropriate in a pre-trial confer-

24    ence to inquire as to what actually the State is going to do,

25    because certainly as a party to this litigation we are entitled

1  to know what the State intends to do and what it is going to

2  pass on in this determination.  I think that Mr. Moskovitz, if

3  he doesn't know what they are thinking about as their lawyer --

4  and he is their lawyer here -- could ask them what they are

5  going to do.

6  THE COURT:  You mean ask them what they are going to

7  decide?

8  MR. VEEDER:  Ask them what issues they are going to

9  pass on.  I certainly wouldn't ask him to find out what they

10  are going to decide, although I think I would like to know what

11  the issues are and what factors they are considering in making

12  their determination as to whether a permit would be issued or

13  not.

14  MR. MOSKOVITZ:  Your Honor, I have before me the tran-

15  script from the last hearing, the hearing on December 3rd, in

16  which I commented on this question -- this is on page 470.

17  Perhaps if I read it, it will help clarify Mr. Veeder's mind.

18  Beginning on line 22 on page 470 I said:

19  ".....the issue before the State Water Rights Board

20  is whether and to whom a permit to appropriate unappropriated

21  water shall be issued.

22  "Now as a condition precedent to the issuance of a

23  permit, as a factual condition that must exist, under our

24  Water Code, the Board must make what you might call a tentative

25  prediction as to whether there will be any unappropriated water

1  to which this permit can pertain.  That is a jurisdictional

2  prerequisite.  It is not the objective of the proceeding at all.

3  The objective of the proceeding is to determine whether to issue

4  the permit and what the conditions shall be.  But before a

5  permit may be issued, the Code says that there must be unappro-

6  priated water.

7          "THE COURT:  There must be a finding, then, by the

8  Board.

9          "MR. MOSKOVITZ:  A finding.  But it is not -- to jump

10  ahead a step -- it is not anything which is bidding in the

11  sense of being a judicial conclusion.  It is not binding on

12  you.  It is not binding on any person who claims water rights.

13  It is a finding that must be made, however, before the Water

14  Rights Board, under the Code, can say, 'Yes, a permit will be

15  issued.'  It is a prediction as to the future.  If the pre-

16  diction doesn't turn out to be correct, the permit that is

17  issued doesn't apply to anything.  But they must make that

18  finding first.

19          "And then, after deciding that the probabilities are,

20  on the basis of the records that they have on the River as to

21  what they know concerning the rights and the uses -- again

22  not an adjudication of rights and uses -- there probably will

23  be surplus water and we will grant a permit to this or that

24  of the applicants, and these are the conditions which we think

25  will be necessary in the public interest.

1          "As I said, the finding of the existence of un-

2     appropriated water is a prediction as to what will happen in

3     the future, and if that prediction turns out not to be true

4     then there just isn't anything that the permittee can use."

5          MR. VEEDER:  I have gone through all that he said and

6     I know what he said.  But I do think that it is important here,

7     what are the actual elements that they are going to consider in

8     determining whether there is or is not a surplus, and I think

9     it is entirely appropriate and proper to have such a matter

10    settled in the pre-trial order.

11         MR. SACHSE:  Your Honor, Mr. Veeder has at least a

12    half dozen times in the course of this latest revision denied

13    that California has any right to hold these hearings, and I have

14    in effect denied that it means a thing.  If it doesn't mean

15    a thing, if it has no effect, if that is his legal contention,

16    why waste our time putting it forth in an Agreed Statement of

17    Facts?  He has already said three or four times that these don't

18    mean anything, that the United States denies any validity to

19    the proceedings of the Water Rights Board.  I think what he is

20    talking about here is a contention of the United States, which

21    should be put in the proper place as a contention, not as an

22    Agreed Statement of Facts.

23         MR. VEEDER:  We have made the contention, your Honor,

24    that it has no legal effect; but we would like to know, and I

25    think it is appropriate for us to know, and certainly our course

1 of conduct in this litigation might be governed by this consid-

2 eration -- in other words, we feel that the jurisdiction in

3 this Court has been invaded.  But if Mr. Moskovitz could show

4 us what they are considering and what they will consider in

5 making the determination, then we would be able to formulate

6 our contentions more precisely.

7    MR. SACHSE:  If Mr. Veeder is interested, I can bring

8 him down a transcript about that thick, three days, a complete

9 record of what they considered.  I don't think we are going to

10 boil down that transcript to anything intelligent or compre-

11 hensible for a pre-trial order.

12    THE COURT:  Can we get at it this way: without going

13 into what they are going to consider, can we arrive at some

14 conclusion as to what the effect of their action, if they take

15 any, prior to our decision, will be upon the action of this

16 Court?  That is the ultimate question.  If, for instance, their

17 finding is not res adjudicata on this case, then if we agree

18 to that, state to that effect.

19    MR. SACHSE:  It is agreed to in the last transcript,

20 your Honor.  We did it very specifically: the finding is not

21 binding on this Court.

22    THE COURT:  You agreed to that.  What effect will the

23 finding have?  Suppose you get a permit issued to you, Fall-

24 brook Public Utility District, what will you contend is the

25 effect of that?  Will you ask the Court to consider that at all,

1  or just to ignore it?

2  MR. SWING:  I think Mr. Veeder put his finger upon

3  what is bothering him and what his position is, that a hearing

4  by the Water Rights Board invaded the jurisdiction of this

5  Court.  He has said that repeatedly, both here and before the

6  Water Rights Board.

7  The decisions of the Supreme Court of California have

8  repeatedly held that the Water Rights Board and its predecessor,

9  the Division of Water Resources, was an administrative agency

10  of the State and had no judicial qualifications or character-

11  istics; and here it is an administrative body making a de-

12  termination which the law of California, for orderly procedure

13  in the matter, directs it make, and before this Court it has

14  no binding effect whatever.  But it is helpful, as I believe,

15  in determining who is entitled to receive a permit.  The value

16  of the permit in acre feet of water, or of any water at all,

17  is a matter which is left entirely to the Courts: subsequently

18  and to private parties interested in the matter to determine,

19  according to State law, as administered by the Courts, including

20  this Court.

21  That is my view of the matter.

22  THE COURT:  Could we sum it up this way?  Can we get

23  a stipulation that the decision of the Water Rights Board would

24  in no respect be binding on this Court, but that Counsel may

25  want to argue that all or part of their decision or their

1  reasons are persuasive and that that is entirely up to the Court

2  whether the Court wants to accord any weight from a persuasive

3  standpoint or not?  Do you agree upon that statement?

4        MR. MOSKOVITZ:  We would be willing to agree on it,

5  your Honor.

6        MR. VEEDER:  That is precisely what I am concerned

7  about.

8        THE COURT:  Would you agree to that statement?

9        MR. VEEDER:  No, I wouldn't.  I look at it this way,

10  Mr. Swing has said that the matter has been decided as to

11  whether this is a judicial or a quasi-judicial entity.  I don't

12  believe that that has been passed upon under the new law.  I

13  don't know, frankly, just exactly what kind of tribunal the

14  State Water Rights Board is at the present time, and that is

15  one of the reasons that I am concerned.

16        THE COURT:  If they are willing to stipulate that the

17  decision of the Water Board will not be binding on this Court

18  in any respect, what do you care what the law turns out to be?

19  They are entering that stipulation, knowing what the situation

20  is, that the cases may come up in the future; they are present-

21  ly willing to be bound by that stipulation.

22        MR. VEEDER:  They are willing to agree that it will

23  be not res adjudicata and will have no binding effect whatever

24  upon this Court.

25        THE COURT:  That is what they say.  If they want to

1    argue that it is persuasive, I don't know how you could keep

2    them from doing it.  Whether the Court considered it persuasive

3    or not would be another thing.

4            But this is an equity suit.  The decree will be as

5    of the date of the decree.  Everything that has taken place

6    prior to the decree, technically, has a right to be in the

7    record.  I don't know how you could keep it out of the record,

8    if it is something that happened before the date of the decree.

9    Apparently, all they want is to reserve the right to make some

10   arguments on the ground that some aspect of what the Board does

11   might be persuasive on this Court.  They might say, "Look,

12   Fallbrook got the permit and Santa Margarita didn't get it.  We

13   are only going to argue that that should be persuasive to the

14   Court that as between Fallbrook and Santa Margarita, Fallbrook

15   has a superior right."

16           But they have stipulated meanwhile that it is not

17   binding, and if I understand the plain words of that stipulation,

18   the Court could decide the case as it saw fit without being

19   bound by what the Water Board did.

20           MR. VEEDER:  And then we go right into page 12a,

21   paragraph IV, where we have this language: "On August 12-14,

22   1957, hearings were held.  Whatever result may be forthcoming

23   from the California Water Board will have no effect whatever

24   upon these proceedings."

25           MR. SWING:  That isn't what the Court said.

1          THE COURT:   That it will not be binding upon this

2  Court, but the defendants may be permitted to argue that they

3  are persuasive and the Government may be permitted to argue

4  that they are not persuasive.

5          MR. MOSKOVITZ:   Before we go much further, your

6  Honor, I want to make comment on a statement that you just

7  made.   I believe that it would be the position of the State

8  that as between Fallbrook and Santa Margarita neither of them

9  could collaterally attack the permit that might be issued to

10  one or the other by the State Water Rights Board and attempt

11  to avoid the effect of the permit being issued by going into

12  another Court.

13          THE COURT:   Well, all right.

14          Do you agree to that, Mr. Dennis and Mr. Sachse?

15          MR. SACHSE:   Yes, definitely, your Honor.

16          THE COURT:   Mr. Dennis?

17          MR. SACHSE:   I think that the decision of the Water

18  Rights Board is going to be conclusive on Mr. Dennis and myself,

19  subject to whatever right of appeal we might have from the

20  decision of the Water Rights Board.

21          THE COURT:   Is there any objection to writing that in,

22  Mr. Veeder?   That doesn't concern the Government -- as between

23  those parties alone, that the hearing would bind them.

24          MR. VEEDER:   Well, I would like to see them draft

25  some language and look at it.

1          MR. SACHSE:  We kicked this around at some length

2     the last time and you asked me at one point in the transcript--

3     suggested that I draft a stipulation.  I declined.  I said that

4     I was quite willing to stipulate to what you just said.  I

5     didn't see that any draft was needed.

6          Since then, the United States has drafted a stipu-

7     lation and sent it to us for our approval, and we most assured-

8     ly will not sign that stipulation.  It says that in the event

9     the California State Water Rights Board should issue a permit

10    or permits with regard to the applications of Fallbrook Public

11    Utility District and the Santa Margarita Mutual, neither the

12    State of California, the Santa Margarita Mutual, nor Fallbrook

13    Public Utility District will, in this cause, assert that the

14    issuance of the permit (a) will change the status quo among

15    the parties -- I don't know what that means, (b) constitute a

16    basis of a claim or claims for rights to the use of water on

17    the Santa Margarita River, and (c) evidence the existence or

18    the non-existence of water available.

19          Finally it says: neither does the State of California,

20    nor will the other defendants, rely upon or offer in evidence

21    the permits.

22          That we will not stipulate to.  It is ridiculous.

23    If we get a permit, it is part of the indicia of our title,

24    your Honor, it is like a deed and we most assuredly will offer

25    it in evidence and we will most assuredly will say to your Honor

1 that if the vested rights of the United States, as determined

2 by you, amount to something less than the water available in

3 the stream, then we claim that our permit moves in and takes

4 that water that is left over and above the vested rights of the

5 United States.  We most definitely assert that.

6       I don't know what Mr. Veeder is getting at.  I have

7 a suspicion that this is some kind of a manuever to stipulate

8 us out of the State Water Rights Board and perhaps out of

9 Court.  I don't see any reason why we need to worry about an

10 Agreed Statement of Facts or a stipulation as to what is happen-

11 ing before the Water Rights Board beyond this simple fact, that

12 we will agree -- and I think it is a legal conclusion and not

13 a question of facts; your Honor can put it in your legal rulings--

14 we will agree that your Honor is not bound by it.  Anything

15 beyond that is surplusage, and I must confess that I am extreme-

16 ly suspicious of Mr. Veeder's purposes in trying to get it in.

17 We don't need it.  It is not binding on you.  How we use it,

18 how we think it may help our case, time will tell -- I don't

19 know.  But I am perfectly willing to say that it is not bind-

20 ing on your Honor.  But nothing more.

21       THE COURT:  Well, of course, it might be binding on

22 me as between Fallbrook and Santa Margarita.

23       MR. SACHSE:  Pardon me -- with that correction.  I

24 believe it is binding on your Honor as between Santa Margarita

25 and Fallbrook.  I mean it is not binding on your Honor as to a

1    determination of water available for appropriation or as to

2    the extent of the vested rights of the United States -- it is

3    not binding on your Honor.

4           MR. DENNIS:  I think maybe Counsel for Santa Margarita

5    ought to make a few observations.

6           This particular question has been somewhat puzzling

7    to me.  As Counsel for Santa Margarita, we have no objection to

8    stipulating to anything that is a matter of fact, if we know

9    it, or if we can't see where that fact will hurt us.  But this

10   particular thing which we are talking about now seems to me

11   to be a matter of law, and I am not sure whether Counsel for

12   any client should stipulate as to what the law is.  It seems

13   to me that that is probably something for the Court to deter-

14   mine.  I am sure that I have made mistakes in the past in what

15   I thought the law was, I'm sure that everybody sitting around

16   this table has made mistakes.

17          Not only that, there are so many contingencies, so

18   many unforeseen things which may come up during the trial of

19   this case which would affect the meaning of the language that

20   we would use in this particular matter.  I think we are trying

21   to stipulate as to a matter of law and we are trying to cover

22   something that we all agree on as to one broad principle, but I

23   am afraid that the language we would use would foreclose us in

24   several other particulars.

25          There have been a number of things that I was against

1   going ahead and objected to the State Board proceeding while

2   this matter is before this Court, and I didn't have any support,

3   particularly, except from the Government on it.  But one thing

4   that has puzzled me /that there are proceedings, if you are
                        is

5   dissatisfied with the State Board hearing -- you can take an

6   appeal and go to the State Court.  I'm not sure whether we

7   will have to proceed in the State Court or whether we will have

8   to take that appeal and proceed in this Court.  I am not sure

9   then whether in the State Court they will say, "There is an-

10  other action pending," in this Court or whether the people can

11  come into this Court and say, "Here, this action is pending in

12  the other Court."  I think we have ourselves in the position

13  where we have multiplied our problems and I am afraid if we

14  tried to stipulate what the law is in regard to the issuance

15  of a permit or the non-issuance of a permit by the State Water

16  Rights Board, that we are going to complicate the proceedings

17  in the future, and also that if Counsel should make a mistake

18  in what they thought the law was they would seriously damage

19  the rights of their clients.

20         MR. VEEDER:  I think Mr. Dennis has stated entirely

21  the proper position.  I would be very reluctant to be in his

22  spot from the standpoint of determining whether he should appeal

23  to the Superior Court of the State of Washington or whether to

24  come in here, and that is precisely the point that I am making;

25  that here we have a tribunal that Mr. Swing tells us is not

1    even quasi-judicial -- I am not sure, under the present law

2    what it is.  But I do know that we have a State tribunal pass-

3    ing on issues which are squarely before your Honor and the

4    legal implications of which I have simply no idea.  I don't

5    know.  I don't believe that anybody knows.

6            MR. SACHSE:   Then let us not stipulate.

7            MR. VEEDER:   And the point that I make is that if

8    Mr. Moskovitz is right, if all they do is consider whether

9    there is surplus or not, that's one thing.  But it is highly

10   important to us in this litigation to know what the legal im-

11   plications are and what the determinations will be.  If it

12   should turn out to be a quasi-judicial body, I think there is

13   a clear conflict with your Honor's jurisdiction.  Certainly if

14   there is an appeal to the State Court from the ruling of the

15   State Water Board there is a conflict, and certainly when there

16   has been a permit issued I don't see how one or the other could

17   possibly avoid taking an appeal, under the circumstances.

18           THE COURT:   Why don't we let the matter stand as now

19   set forth in this stipulation which sets forth the facts of the

20   applications, the date of the hearings, and the fact that they

21   are undecided, and when something happens in the matter sub-

22   sequently go on from there?  We can probably dispose of it as

23   quickly that way as by trying to get something in this pre-trial

24   stipulation.

25           MR. SACHSE:   That is exactly our position, your Honor.

51    1   We think that the facts are very simple.  The hearing was held,

2   the matter is under submission.  If prior to the completion of

3   this pre-trial order, within two or three weeks, a decision

4   should come down, that would be a fact, and I would suggest

5   that we add to the pre-trial order the fact that Santa Margarita

6   got a permit or whatever the fact may be.  But I don't want

7   to go beyond the facts in this Agreed Statement of Facts.

8            THE COURT:  I have your position.

9            Mr. Veeder?

10           MR. VEEDER:  That is all right with me.

11           THE COURT:  Then we will let the matter stay as is.

12           What other Counsel have objections or suggestions to

13   these addenda?

14           MR. DENNIS:  I don't know whether they are objections,

15   your Honor, but on page 14b it seems to me now that the lan-

16   guage should be changed to show that Santa Margarita, Fallbrook

17   Public Utility District and the State of California and the

18   United States of America have entered into this stipulation.

19           THE COURT:  What stipulation?

20           MR. DENNIS:  That is the stipulation of --

21           MR. VEEDER:  November 29, 1951.

22           THE COURT:  Yes, that should be added.  I don't know

23   where it goes logically.

24           MR. DENNIS:  I am not sure either, your Honor.

25           MR. VEEDER:  If you will turn over to page 14b, you

1  will find the stipulation set forth on this January 6th re-

2  vision -- at least it starts there, and I would assume that

3  that would be the place to put it. It is simply a statement

4  that all parties are bound by this stipulation.

5           MR. DENNIS:  Or we could do it on pages 14 and 15.

6           MR. VEEDER:  That is right.

7           MR. DENNIS:  Either place, I think.

8           I also have the same reservation in regard to some

9  of the facts that Mr. Sachse has.  This was handed to us yes-

10  terday, and there are two applications by Santa Margarita and

11  four by Fallbrook and one by the Navy, and I haven't had a

12  chance to check.  They look all right in substance, but I haven't

13  had a chance to check the filing dates, the purposes for which

14  they were made, nor the place of use.  All of the applications,

15  with the exception of the Navy, which perhaps is amended by a

16  letter, all of Santa Margarita's and all of Fallbrook's appli-

17  cations were amended, and in those amendments the purpose for

18  which the water was being appropriated and in some instances

19  the area for which the water was appropriated or the particular

20  location was changed, also the points of diversion.  It seems

21  to me that in those corrections which are to made that should

22  be taken care of.

23           There is one other matter.  I have gone over the

24  original stipulation a number of times and one thing I didn't

25  catch until yesterday is that in the original document submitted,

1  the Proposed Order on Pre-Trial, we find some language that is

2  the same, like the Pauba Grant of the Vail Estate, the Little

3  Temecula Grant of the Vail Estate, and the Temecula Grant of

4  the Vail Estate.  That language is not entirely clear to me.

5  I assume that by that is meant that the Pauba Grant owned by

6  the Vail Estate, and that is correct so far as the Pauba Grant

7  and the Santa Rosa are concerned.  But if that is the inter-

8  pretation to be put on that language, it is not correct as far

9  as the Little Temecula and the Temecula Grants are concerned,

10  because the Vail Estate only owns a portion of those two Grants,

11  I believe.

12          Is that correct?

13      MR. STAHLMAN:  I think they own practically all of

14  them now.

15      MR. DENNIS:  Mr. Hall states that I am correct on

16  that, and if we are interpreting that language to mean that

17  those Grants are owned by the Vail Estate, then there should

18  be some corrections made in paragraph V and paragraph VI on

19  page 3 of the original Proposed Order on Pre-Trial.

20      MR. VEEDER:  I think those are things that the Vail

21  Estate can provide us with and they will be simply written in

22  as we have written in these other suggested revisions.  That is

23  all we can do.

24      THE COURT:  When can the Vail Estate give us what

25  Mr. Veeder says they can?

162

1        MR. DENNIS:  Mr. Hall suggested that it can easily be

2   done, if that is the interpretation that we are placing on it.

3   We can just say that part of the Little Temecula or that portion

4   of the Little Temecula --

5        MR. VEEDER:  To which paragraph are you referring?

6        MR. DENNIS:  That is paragraph V, on pages 3, 5 and 6

7   of the original.

8        MR. VEEDER:  Give me the line again.

9        MR. DENNIS:  It would be on line 27.

10        MR. VEEDER:  On which page?

11        MR. DENNIS:  On page 3.

12        THE COURT:  Of the original draft?

13        MR. DENNIS:  Of the original draft -- and on line 28.

14        THE COURT:  How would you word it?

15        MR. DENNIS:  Just say "the westerly part across that

16   portion of the Little Temecula Grant of the Vail Estate."

17        MR. MOSKOVITZ:  Belonging to the Vail Estate.

18        MR. DENNIS:  Yes, belonging to the Vail Estate.

19        MR. VEEDER:  Title to which is in the Vail Estate?

20        MR. DENNIS:  That would be satisfactory, as far as I

21   am concerned.

22        THE COURT:  How are we going to determine what that

23   portion is?

24        MR. DENNIS:  There are maps, your Honor, which were

25   introduced by the Government at the former trial which clearly

763

1    show those portions owned by the Vails and that portion of the

2    two Grants which are owned by other individuals.

3         THE COURT:   Is there anything wrong about the first

4    line of paragraph V, "the Pauba Grant of the Vail Estate."?

5         MR. DENNIS:   No, as far as I know, you own all of the

6    Pauba Grant?

7         MR. STAHLMAN:   Yes.

8         THE COURT:   What about the Temecula Grant?

9         MR. DENNIS:   As to the Temecula Grant, the same ob-

10   jection and the same correction.

52
11        THE COURT:   "...enters that portion of the Temecula

12   Grant," is that right?

13        MR. DENNIS:   Yes, your Honor.

14        THE COURT:   "... title to which is in the Vail Estate,"

15        MR. DENNIS:   "Title to which is in the Vail Estate."

16        THE COURT:   That applies also to 6: "leaving that

17   portion of the Temecula Grant title to which is in the Vail

18   Estate."?

19        MR. DENNIS:   That is on page --

20        THE COURT:   On the same page.

21        MR. DENNIS:   Yes, that is correct.   I was looking at

22   line 6.

23        THE COURT:   Line 30.

24        Do you have that in mind, Mr. Veeder?

25        MR. VEEDER:   Yes, we will get that.

1   THE COURT:  Let me understand this procedure that you

2   are following.  You had certain sheets in your original Pro-

3   posed Order on Pre-Trial.

4   MR. VEEDER:  That is correct.

5   THE COURT:  Then you submitted sheets dated December

6   3rd on the bottom which would be inserted where they supplant

7   another page.

8   MR. VEEDER:  That is right.

9   THE COURT:  And now the sheets of January 6th would

10   be replaced.

11   MR. VEEDER:  That is right.

12   THE COURT:  They would go in where they replace other

13   sheets.

14   MR. VEEDER:  That is correct.  Ultimately they will

15   all be consolidated and page numbers will be changed.

16   THE COURT:  What else can we do on this pre-trial

17   stipulation?

18   MR. MOSKOVITZ:  Your Honor, I have one minor point

19   to take up still, if it is in order now.

20   THE COURT:  About this stipulation?

21   MR. MOSKOVITZ:  About the stipulation.

22   THE COURT:  All right.

23   MR. MOSKOVITZ:  On the end of the pages for insertion

24   there is an explanation of the disposition made of the sug-

25   gestion by California.  There was one that was not accepted

1  and I would just like to make a point about that.  It is dis-

2  cussed on lines 22-24 on page 1 of those of the State of Cali-

3  fornia.  That is the first of the last of the two pages.  Have

4  I identified it for you, your Honor.

5       THE COURT:  It starts out, "the term 'substantial'...

6       MR. MOSKOVITZ:  Yes -- well, it starts on line 22,

7  page 5 of the original draft and "delete the word 'substantial'"

8  was our suggestion, and the disposition is that they feel that

9  the term "substantial" is appropriate and that it was not de-

10  leted.  Our point is this, your Honor, that that page concerned

11  the mentioning of two ground water basins.  Let me get the

12  language that was used here.

13       THE COURT:  "Both Terwilliger and Coahuila Valleys

14  are alluvial filled and serve as underground reservoirs."

15       MR. MOSKOVITZ:  Yes.  As a matter of fact, those two

16  underground basins differ considerably in size, I believe.  One

17  of them has a capacity of about 5000 acre feet, and the other

18  in the neighborhood of 20-25,000 acre feet.  This is a small

19  point, but we felt that by treating them together and describ-

20  ing them as "substantial" there was an implication that they

21  were about the same size.  5000 is substantial when you look

22  at it from a certain point of view -- we have no objection to

23  that, but if the same adjective is used we thought it might be

24  better to indicate that they are of different size.  I don't

25  want to make an issue of it, but that was the reason for the

1   suggestion.

2       THE COURT:  This is going to be a stipulation which

3 you are going to sign or not sign.  If you are not going to

4 sign it with the word "substantial," out it comes.  But it

5 doesn't seem to me to make a lot of difference.

6       MR. MOSKOVITZ:  It doesn't but we don't think that

7 the implication is accurate when you leave in the word "sub-

8 stantial."  As I say, if the United States is not willing to

9 clarify it, we are not going to make a particular issue, but

10 I do think the objection has some basis.

11       THE COURT:  What do you want to do?

12       MR. MOSKOVITZ:  I suggest taking out the word "sub-

13 stantial," because then, you see, they are ground water basins

14 and there is no implication about their size or their relative

15 size.  Our suggestion is to delete the word "substantial."

16       THE COURT:  Is that agreeable?

17       MR. VEEDER:  I have no real objection to it.

18       THE COURT:  All right, take it out.

19       MR. VEEDER:  I wish to call your attention to line 28

20 on that page.

21       Did you have anything else, Mr. Moskovitz?

22       MR. MOSKOVITZ:  No.

23       MR. VEEDER:  We have another suggestion that we might

24 put in there.

25       MR. DENNIS:  On what page?

767
75

1     MR. VEEDER:  On page 1 of the suggestion of California.

2 You will find down there the terminology that is used and that

3 has been suggested.

4     THE COURT:  What are you talking about now?  I don't

5 follow you.  Page 1 of California's suggestions?

6     MR. VEEDER:  That is right.

7     THE COURT:  What line?

8     MR. VEEDER:  Line 28.  It has been proposed that this

9 language be substituted: other affluencts of Temecula Creek,

10 Arroyo Seco and Chihuahua Creek are intermittent in character,

11 flowing only during periods" -- in other words, we would sub-

12 stitute that on page 6 of the original offering.  That is some-

13 thing that came up since we re-wrote this page.

14     THE COURT:  I am looking at page 6 of your original

15 proposal.

16     MR. VEEDER:  That is right.

17     THE COURT:  How would that paragraph beginning at

18 line 4 read, then?

19     MR. VEEDER:  It would now read: "Other affluents of

20 Temecula Creek, Arroyo Seco and Chihuahua Creek are intermit-

21 tent in character, flowing only during periods of high pre-

22 cipitation and entering Temecula Creek above Nigger Canyon."

23     THE COURT:  And you would eliminate this reference

24 to Lancaster Creek?

25     MR. VEEDER:  That is right.

1    THE COURT:  Any objection to that?

2    MR. DENNIS:  No objection.

3    MR. SACHSE:  No objection.

4    MR. MOSKOVITZ:  When I went over these and made these

5    suggestions, it was on the advice of our engineer, who is not

6    here now.  I assume that this has been checked out by the en-

7    gineer.

8    MR. VEEDER:  We are in this position.  We had pro-

9    posed that as soon as there had been agreement on these various

10   paragraphs we would start re-writing them.  But if you want to

11   check them out --

12   MR. MOSKOVITZ:  Put it in and I will write you if I

13   have any further information.  If you don't hear from me, go

14   ahead.

15   MR. VEEDER:  That is quite an order, because once we

16   distribute them to sixty-five lawyers --

17   THE COURT:  When can you advise him?

18   MR. MOSKOVITZ:  I will advise him before this hearing

19   is over, your Honor.

20   THE COURT:  All right, do that, please.

21   What other suggestions are there on these?  Some of

22   them now have been left for discussion between you and Mr.

23   Sachse and Mr. Dennis to check their application files.

24   MR. VEEDER:  Until we do get that information, there

25   is not much we can do on those.  We can't re-write them.

? 53

1          MR. MOSKOVITZ:  I think, your Honor, I can get this

2     data for Mr. Veeder tomorrow.  I will ask Mr. Yackey now if he

3     can bring down the original application files so that we can

4     have them here in the Courtroom and perhaps straighten those

5     matters out by interlineation during the recess tomorrow --

6     that is, this Sandia Creek and Rainbow Creek appropriation;

7     and as far as the license is concerned, I have a photostat

8     here.  It is not certified.  I will give it to Mr. Veeder and

9     with that he can make whatever change he wants in the appro-

10    priate paragraph to reflect this fact also.

11         THE COURT:  All right.  Let's leave this matter then

12    at this time.

13         Do you contemplate being here again tomorrow?

14         MR. VEEDER:  We planned on being here tomorrow, your

15    Honor.

16         THE COURT:  See what you can do tomorrow morning to

17    clean up this stipulation.  Let's make that the first order of

18    business tomorrow, if you can get some of these things done

19    tonight.

20         It is time for a recess.  What do you want to take up

21    next?  We have a matter here of exhibits.  We have covered al-

22    most everything else.

23         MR. GROVER:  Your Honor, I was hoping that I could

24    leave, if your Honor was prepared to make some kind of ruling

25    about my request that I made earlier.  I am not really prepared

1    to be of any assistance to the --

2            THE COURT:   I couldn't make any ruling on that matter

3    except to deny your request, if you want it made now.  I think

4    the problem is too complicated to grant the relief that you

5    ask on the showing and discussion that we have had.  If you

6    want a ruling right now, all I can do is deny it.

7            MR. GROVER:   I don't want to force your Honor into

8    a ruling that you are not prepared to make, but do I understand

9    that you might consider some such relief?

10           THE COURT:   Well, it is a pretty complicated problem.

11   You obviously are adverse to those people on the same stream,

12   on the same tributary.  You are adverse to people down the

13   stream whose rights are correlative to the riparian rights of

14   your clients.  I see your dilemna, but I don't know that I can

15   change the character of this suit.  Judge Fee had a good bit

16   to say about the nature of this action.  It is predicated on

17   the order made by Judge Yankwich.

18           MR. GROVER:   Do we have to be legally in this suit

19   in order to discuss with the United States the relationships

20   we might have with the others?  What I mean to say is, we might

21   agree with the United States for the purposes of our suit with

22   them that this or that right exists in someone else at another

23   place.  But is it necessary that we adjudicate that right with

24   the other person in order to reach that agreement?

25           For example, there might be   100,000 acre feet of

771

1  demand on the stream in total.  We might agree with the United

2  States, for the purpose of ironing out our differences, that

3  there is such a demand.  It is just a collateral fact in a

4  bilateral action, without actually adjudicating with all those

5  other people that that is the fact.  I appreciate that we have

6  to know the whole picture in order to iron out the inter-

7  relationships, but we don't have to adjudicate the whole pic-

8  ture as to every single party.  We can just say that the United

9  States and our people agree or it is thrashed out and your

10  Honor finds that as far as the controversy between us is con-

11  cerned we have to take into consideration the collateral fact

12  that there are certain other rights on the stream.

13         It is a matter of some importance to us in how we

14  go about appearing in the case, your Honor.

15         MR. VEEDER:  I had made an offer to sit down with

16  Mr. Grover and attempt to work out some kind of stipulation,

17  and I would like to have consideration given to that by your

18  Honor.

19         THE COURT:  That was a suggestion, and I thought that

20  was the way we left it: that you were going to see what you

21  could work out and see what we could do and then give it some

22  more consideration.  I am not prepared to make the ruling that

23  you ask for today, Mr. Grover.

24         MR. GROVER:  I didn't really understand that we had

25  settled it.  But where I think Mr. Veeder's offer falls is that,

1  as things now stand, even if we do reach a stipulation, it is

2  not binding on anyone else and we can't drop out in the lawsuit

3  where we are adverse legally or are going to be bound by a

4  judgment involving the 3000 other people, merely because we have

5  settled with the United States.  I would like to see us do that,

6  but it is the fact that we can't accomplish anything by such a

7  stipulation that has prompted my request here now.

8        If your Honor would like to give some thought to it --

9        THE COURT:  You have submitted no authority.  I don't

10  know what the practice has been in these other cases.  In this

11  suit, of course, the plaintiff in a way calls the tune as to

12  the nature of the suit filed.  In this suit the plaintiff did

13  not sue just Fallbrook; they sued everybody that had any rights

14  on the River.

15        MR. GROVER:  He sued them individually until Judge

16  Yankwich's order was made.  It was a suit between the United

17  States as one party and all the others.

18        MR. STAHLMAN:  May I have something to say on this

19  point, your Honor?

20        THE COURT:  Do it after the recess.

21        (RECESS)

22        MR. STAHLMAN:  Shall I proceed, your Honor?

23        THE COURT:  Yes.

24        MR. STAHLMAN:  I have only a few comments in relation

25  to the matter that Mr. Grover presented, your Honor.

1          I feel that the order which Judge Yankwich made was
2    made for a purpose, and I think it serves its purpose in this
3    case because it eliminates the necessity of filing many cross-
4    complaints that would be necessary in this case as far as the
5    small property owners are concerned as well as Vail.  One of
6    them is in connection with certain people that we feel are
7    appropriating water that should not be appropriated, and it
8    would be necessary to cross-complain if it were not for that
9    order.  Furthermore, the statute of limitations would be run-
10   ning on that matter during the period of time in which there
11   was no cross-complaint filed.  So I feel that it serves a very
12   good purpose and I don't see anything to get excited about.
13   It is a protection to the litigants in the suit, and as pre-
14   viously indicated the classes of litigants in this case fall
15   into certain categories in which those matters will eventually
16   work themselves out.  I think the Master, in the manner in
17   which he hears these matters, can lace together or eliminate
18   and point up what conflicts there will be where the purpose of
19   filing a cross-complaint would have been served and I think
20   there are only some instances in which that would be proper.

21          I feel that the order that Judge Yankwich made is a
22   good order and should remain, your Honor.

23          MR. GROVER:  On this question of cross-complaints,
24   we know where we stand when we have pleadings, we articulate
25   our claims, and here with this vague order that everybody is

1   adverse to everybody else we just postpone the time when we

2   have to articulate those claims. We don't save even Mr.

3   Stahlman the difficulty of stating his claim.

4          THE COURT:  Mr. Grover, take a riparian owner midway

5   on this stream.  If you had to have cross-complaints, he would

6   have to list as cross-defendants every other person on that

7   stream that had a riparian right, assuming that the cross-

8   complainant had a riparian right, because their rights are

9   correlative.

10          MR. GROVER:  If he wanted to do that, and if he didn't

11   want to do it, then he wouldn't have even that problem.  The

12   Vails' position is a little different, because of course they

13   are in the case anyway, and it is not on behalf of the parties

14   who are substantially involved, in any event, that I was speak-

15   ing.

16          THE COURT:  Well, I am not going to grant your

17   motion on the showing here made.  I think we can dispose of it

18   on the record and I will deny it, without prejudice to a re-

19   newal.  If you want to brief it, and if you want to go into

20   this case and analyze what the situation will be with or with-

21   out that order and want to make some showing at a hearing, I

22   will consider it.  But I am not going to set aside the order on

23   the discussion we had here today.

24          To keep the record straight, I will deny it, without

25   prejudice to its renewal.

1          Meanwhile, you and Mr. Veeder see what you can work

2    out. He suggested that this might be a pilot experiment to

3    see what can be done in working out some agreement between you

4    which might be woven into the case in some way.

5          What other matters do we still have to discuss? We

6    put over until tomorrow the work on your stipulation.

7          MR. DENNIS: I have a matter. Perhaps this would be

8    the right time to bring it up, your Honor.

9          On the 31st of March, 1952, Judge Weinberger made an

10   order ordering separate trials as to the Fallbrook Public

11   Utility District and Santa Margarita Mutual Water Company and

12   the State of California. Subsequent to that time, on the 28th

13   day of August, 1952, Judge Yankwich made an order on a pre-

14   trial hearing and an order on pre-trial, and on the 9th of

15   December, 1952, Judge Yankwich gave an opinion on the merits

16   and an order re judgment and findings. That was followed in

17   February, 1953, by Judgment and Findings, which were appealed

18   from. The case, as you know, was reversed and remanded to the

19   Court to set aside the judgment of February 24th in accordance

20   with the judgment of the Circuit Court of Appeals.

21         However, the order of the separate trials, so far as

22   Fallbrook, Santa Margarita, and the State are concerned, is

23   still standing. There is a valid order presumably on an order

24   for a pre-trial and order on pre-trial hearing binding on the

25   three defendants that I mentioned, and there is the order on

1    judgment and findings of December 9, 1952.

2              It seems to me that before we proceed any further

3    in connection with the preparation and the actual adoption of

4    this Proposed Order on the Pre-Trial, and before we decide what

5    procedure we are going to have, it is going to be incumbent

6    upon the Court, in accordance with the instructions of the

7    Ninth Circuit Court, to proceed in accordance with the opinion

8    to do one of three things: either those orders ordering a

9    separate trial, the order on pre-trial and the pre-trial hear-

10   ings are going to have to be set aside, or the matter is going

11   to have to be re-opened because the order of Judge Yankwich

12   of December 9th states that the matter has been tried as to

13   the State of California -- tried, argued and submitted by the

14   State of California and by Santa Margarita Mutual Water Com-

15   pany, so it is going to have to be re-opened, or the Court is

16   going to have to say that in accordance with the judgment of

17   the Ninth Circuit Court of Appeals those were valid orders and

18   cannot be disturbed; and so we are right up against that par-

19   ticular problem that is going to face us eventually and if you

20   don't dispose of it I am afraid it is going to haunt us in

21   the future.

22             THE COURT:  Shouldn't the orders be set aside?  Is

23   there any argument about that?  I think, since you raised the

24   problem, you had better prepare the order.

25             MR. DENNIS:  That will be good.

1          MR. VEEDER:   I would like to have it clear, other

2    than just a statement from Counsel.   If he will, formulate

3    exactly the orders to which he is making reference and formulate

4    exactly the reason why he wants it done.

5          THE COURT:   That is what I have in mind, to formulate

6    a written order specifying the orders that are to be set aside

7    and the grounds for setting them aside and serve it on Counsel.

8          MR. VEEDER:   Fine.

9          MR. DENNIS:   I will be glad to do that, although in

10   my own mind I am not at all clear as to whether or not the

11   Circuit Court held that it was erroneous to try the matter as

12   to one or two defendants separately.   That is a matter of law.

13   There is language in the decision which would indicate that

14   there was no error in trying certain defendants separately.

15   There is language in the decision which would indicate that it

16   was error to do it or that you can't do it.   Actually, I can't

17   see how anything can be done but to set aside the order in

18   view of the fact that no final judgment can be entered under

19   the Ninth Circuit Court's decision until the case has been tried

20   as to all of the defendants where a different Judge is going to

21   hear the evidence than the Judge who heard the evidence against

22   the two defendants.

23          However, as I say, in my own mind, that is why I haven't

24   prepared such an order; I am not sure what the law is in respect

25   to it.   But in accordance with the wishes of the Court, I will

1   prepare such a motion.

2          THE COURT:   I think the Circuit contemplated there

3   being one final judgment.   It is possible that there could

4   finally be some interlocutory orders and judgments, but the

5   Circuit contemplated one final judgment, and certainly the

6   matters tried before Judge Yankwich, I think, should be re-

7   tried.   So I see no alternative but to set it aside.

8          Mr. Veeder, you were going to get up.   Is there any

9   objection?

10          MR. VEEDER:   I object -- I raise the proposition,

11   sir, that your Honor has stated from the Bench that the only

12   decision that was final in regard to the Ninth Circuit decision

13   was that there are indispensible parties which are not before

14   the Court.

15          THE COURT:   And that the judgment be set aside and

16   no final judgment entered, I take it, until final judgment in-

17   volving all the parties.

18          MR. VEEDER:   The reason I was concerned, the reason

19   I asked that we have specific references to the matters to

20   which Mr. Dennis is alluding, that we be able to check that

21   back against the Ninth Circuit decision, and that is the only

22   thing I wanted to be sure of.   I feel that that is obiter

23   dictum, except --

24          THE COURT:   I will not make any minute order at this

25   time, but you submit a proposed order, Mr. Dennis.

MR. DENNIS:  Any particular day that it should be noticed for, your Honor?

THE COURT:  You don't have to notice it.  I can take this motion under submission.  Serve it on Counsel,  They have the customary time to object and look the matter over.  If somebody wants a hearing and it is important enough, we will fix a hearing on it.

MR. DENNIS:  Suppose that I prepare the motion and the form of the proposed order and serve it on the people and send them a letter saying that if it is not satisfactory then I will notice it for a particular date.

MR. VEEDER:  Isn't that appropriate for the pre-trial order -- that is what I was thinking about -- the very matter upon which we are now working?

THE COURT:  It could be included in the pre-trial order, yes.  You can do it that way.  You prepare the language of it and we will see if we can work it in.

Are we going to be able to get any facts, even some general rudimentary facts in this pre-trial stipulation that will enable the Court to make some rulings that it has indicated that it probably would make?  I don't like to make a ruling in a vacuum.

But let's take prescription.  Have you got anything in this proposed stipulation that the Government has used water outside the watershed downstream, or without specifying the

1  amount of water but for a sufficient period of time -- five

2  years, it now claims a prescriptive right, and facts which

3  would show that all other persons against whom the Government

4  would claim that right are upstream, and then put the case in

5  a posture for the Court to make a pre-trial ruling, which I

6  propose to make, that the Government has acquired no rights by

7  prescription -- can't that be done?

8          MR. VEEDER:  Are you looking at me, your Honor?

9          THE COURT:  I am looking right at you.

10          MR. VEEDER:  Your Honor, I have been in the business

11  for quite awhile and I don't invite an order like that if I

12  can help it.

13          THE COURT:  Let's be practical.  You have to face

14  the music some day.  You might as well know now where you stand,

15          MR. VEEDER:  I'm very pleased to.  I have no objection

16  to knowing where I stand.  Are there other questions that your

17  Honor proposes to deal with?

18          THE COURT:  Well, we had several of these that we

19  discussed sort of up in a vacuum and I expressed some tentative

20  views.  I don't know how many of those we could take care of

21  in this pre-trial stipulation and order.  As many as we could

22  should be taken care of.

23          MR. VEEDER:  We can certainly get the language to-

24  gether and see if we can work it out and that would be some-

25  thing that we would have to undertake.  The language is not in

1  the pre-trial order as it is now written.

2  THE COURT:  I think that this one I am just suggest-

3  ing is a simple one.  I think there would be no problem stating

4  enough facts in a short paragraph that would justify that

5  order, if I decide to make it, and I am presently of the frame

6  of mind that I will.

7  MR. VEEDER:  Would it be possible also to frame some

8  language to the effect that Fallbrook is now and has been

9  pumping water above the enclave and invading our rights and

10  have you pass on that?

11  I think certainly that if we can stipulate in regard

12  to the use of water outside the enclave we can stipulate that

13  Fallbrook has put a couple of pumps down above us and is pre-

14  sently pumping water out, and that during the short season,

15  for example, all/summer, I think we can all stipulate that the
   of last

16  River dried up, and I would like to have your Honor rule on

17  that point, too.

18  In other words, I think we can show, by stipulation

19  and agreement, that Fallbrook's diversion above us has invaded

20  our rights, and we would ask to have you rule on that.

21  MR. SACHSE:  If your Honor please, I am reading from

22  my own proposed changes in Mr. Veeder's pre-trial order.  The

23  last sentence of the proposed change on page 13 of his pre-

24  trial order, referring to our 2½ second foot diversion: "There-

25  after the Fallbrook Public Utility District has exercised its

1    rights under said permit and has diverted and put to bene-

2    ficial use the full amount granted under said permit.  The

3    amount of said diversions is set forth in Fallbrook's Exhibit

4    attached hereto and made a part here of by reference."  And Mr.

5    Veeder didn't choose to put it in.  I offered the very thing

6    that he is asking, in my own revision.  I was just wasting

7    time.

8        It is right in front of you, Mr. Veeder, in my own

9    proposed revision.  We offered to stipulate that we have exer-

10   cised our rights, we have taken 2½ second feet and to attach

11   a schedule, an exhibit if you please, a copy of which I have

12   mailed to you.

13       MR. VEEDER:  Fine.  All you have to do now is, we

14   will add the additional statement that the River has been dried

15   up below the Fallbrook pump and pumping plant.  I think we can

16   agree to that.

17       MR. SACHSE:  No, we won't.

18       MR. VEEDER:  I think that your suggestion is excel-

19   lent, because I confess that when you made the proposal I

20   thought it would be better as a contention, and I still think

21   that it should be.  That is why I didn't want it as an agreed

22   fact.

23       But why not go a step further and say that you have

24   put in these large pumping plants, that you have put a dam

25   across the River, that the water has not been reaching our

1   Ammunition Depot, and have his Honor rule as to whether that

2   is an invasion of our riparian right?

3       MR. SACHSE:  Now, you are specifying a great many

4   facts.  If you want to spell out the size of pump, if you want

5   to describe exactly what we have -- we have a "sump" is what

6   I call it, if you want to say that the River was dry on such

7   and such days of the year so many miles below our diversion and

8   that it rose to the surface again so many, anything that is a

9   fact I will agree to.

10      MR. VEEDER:  All right.

11      MR. SACHSE:  But I'm not going to agree that the

12  River was dry below our diversions, because it is not.

13      MR. VEEDER:  Let us agree to as much as we can agree

14  to and submit to your Honor whether there is an invasion of

15  our riparian right.

16      MR. SACHSE:  I'll go a step further, on the question

17  of invasion of riparian rights, I do not think that that is a

18  question, with due respect to your Honor, for decision on a

19  ruling on the pre-trial order.  That is what you are going to

20  decide, I think, in the case.

21      MR. VEEDER:  His Honor is going to consider the

22  question -- the question of prescription is just as good a

23  question as I know of.  But there is no reason why, on the facts

24  that exist, that your Honor can't rule on whether Fallbrook

25  invades our rights at Camp Pendleton, at the Ammunition Depot,

1    by its present activities.  I think that would be an excellent

2    question on which to rule.  You could at the same time rule

3    on the question whether the riparian right is a military right--

4    can be used for military use.  Now there are two excellent

5    questions, and the United States petitions your Honor now to

6    rule on those two questions.

7         MR. SACHSE:  The second one I wouldn't object to.

8    It is a question of law.

9         THE COURT:  That second one bothers me.  In that one,

10   of course, you have a three-cornered proposition here where

11   the State of California joined the Federal Government in its

12   position on that and Fallbrook took the other position.  That

13   one I want to do a lot of work on, and that one may be one

14   that will require a determination after all of the facts are in.

15        However, I would like to rule on as many of these

16   as I can.  Whether you can get together on enough facts to get

17   a ruling here I don't know.  Let's see what you can do.

18        But let's not hold up the completion of this stipu-

19   lation by getting into a wrangle about this.

20        For instance, this statement that thereafter there

21   was no water in the River -- what do you mean?  The surface of

22   the River, or under the River, and when the water came up and

23   flowed on top for awhile and then flowed underneath?  I mean,

24   you have so many intangibles there on a pre-trial stipulation.

25        MR. VEEDER:  We would have the same problem in knowing

785

1  where the watershed line is, your Honor, on the question of

2  prescription.  My own view is that there are just as many facts

3  in regard to Fallbrook's invasion of our rights in the summer-

4  time as there are in regard to the question of prescription.

5      THE COURT:  Have you any doubt that you are pumping

6  water outside the watershed?  I thought you conceded that.

7      MR. VEEDER:  I haven't any doubt that Fallbrook is

8  invading our rights, and I think that we should be permitted to

9  work out an agreed set of facts so that your Honor will enjoin

10 them from pumping water during the summertime under the circum-

11 stances that I think everyone will agree to.

12     THE COURT:  If you can work the facts out and have

13 enough facts that I can pass on it, I may or I may not.  But

14 see what you can do.

15     MR. VEEDER:  We will work at this along with the

16 question of prescription.

17     THE COURT:  Not necessarily.  Just because one pro-

18 blem is easier to get in shape to decide and another is more

19 difficult, there is no reason to say that we will decide

20 neither of the two or we will decide the two together.  I think

21 this prescription problem is a relatively simple one.  It could

22 be set forth almost in a paragraph of facts and get a ruling

23 on it and know where you stand.  Then you can make what kind

24 of record you want to make.

25     It may be that we can get in shape this problem on

1  appropriation.   The ruling I made interpreting this stipulation

2  definitely has an impact on one of your claimed rights there.

3        MR. VEEDER:   The matter of severance.

4        THE COURT:   That is right, and the matter of inverse

5  condemnation, and it also affects this right to take downstream

6  what you claim you already owned.

7        MR. VEEDER:   Also the question whether we had to

8  make a filing with the State.

9        THE COURT:   Yes.

10        Now of course, in addition to being on the horns of

11  the dilemma because of your stipulation, I am willing and con-

12  tent to rule alternately that notwithstanding your stipulation

13  there is no inverse condemnation, if I can get a sufficient

14  factual showing on which to base that, and the factual showing

15  that I would want there is that these activities upon which you

16  claim inverse condemnation are all downstream of every other

17  user on the River and that therefore they were not adverse and

18  that you did not permanently deprive the upstream owners of

19  that water and therefore you have no rights by inverse con-

20  demnation.   I think we can get that ruling.

21        But the defendants, as to that, for instance, have

22  a double-barreled shot at you.   First of all, you are bound by

23  your stipulation, and even without your stipulation there is no

24  inverse condemnation.   Do you follow me?

25        MR. VEEDER:   I know where you are going on it, your

1   Honor, but I'm not sure that I follow you. What I am trying to

2   do is to see that we balance this out a little bit. I think

3   we can get some facts to show that our rights are invaded,

4   certainly, and I would like to have your Honor rule. For

5   example, they are claiming that whatever rights they have are

6   subject to vested rights. I think your Honor could very easily

7   go out and see for yourself the situation which prevails and

8   then have a ruling on that. I am for it. I think today is

9   the day that we have all been waiting for where we can have a

10  catalyst and bring these things down, and I do think that this

11  2½ second feet that we feel have been stolen from us for a

12  long time should be ruled upon, and I think that --

13          THE COURT:  I don't know. Let me ask you this. Do

14  you claim that they are taking more than 2½ second feet?

15          MR. VEEDER:  No, I don't know, really, what the size

16  of their pumps are; but I am saying that any water that they

17  are taking is invading water that we need and taking from us

18  water that would naturally flow to us and water to which we

19  are legally entitled -- assuming that your Honor rules against

20  us on using water outside the watershed, although    I don't

21  know that you have it mind. Certainly the water within the

22  watershed, for example, at the Naval Ammunition Depot, now

23  there is a clear and a definite invasion.

24          THE COURT:  Before I could say that, Mr. Veeder, I

25  have to find out what the quantum of your rights is on the

River, and I have to find out if there is any water subject to appropriation, and only in the event that there was no water subject to appropriation have your rights been invaded.

MR. VEEDER:  Well, the point being that we have an Ammunition Depot there, with a gallery from which water is pumped.  Water would flow down there were it not interfered with.  We know that there is an interference of some kind there, and I don't believe that anybody can deny that Fallbrook is taking water out of the River and that the River is dry at that point.  We believe that that is an invasion of riparian right.

THE COURT:  Well, if you can work out some statement, I'll see whether I will rule on it or not.  Of course, one of Fallbrook's objects in this case is to get the right to store what it calls "surplus water" that comes down in the winter.

MR. VEEDER:  Right.

THE COURT:  Taking a regular amount out of the stream month in and month out is entirely a different thing from trying to store surplus water.

MR. VEEDER:  Right.

THE COURT:  I realize that there is a difference there.  It may be that the Court might find that there were surplus waters coming down in the winter months that could be stored, but that in certain months there was not water, taking into account the demands on the River, that would permit

720

1  by additional facts.

2          MR. VEEDER:  I was thinking, too, the Sawday diversion

3  is made without any application being made to the State, and

4  we know that the Sawdays are pumping now, and I think that we

5  could probably get a question raised on that proposition.

6          THE COURT:  We couldn't bind the Sawdays.  They

7  haven't gat in on these hearings.

8          MR. STAHLMAN:  Mr. Swing is their attorney.

9          THE COURT:  Are you representing the Sawdays, Mr.

10  Swing?

11          MR. STAHLMAN:  He said that he was before.

12          THE COURT:  Are you representing the Sawdays?

13          MR. SWING:  At the present time I am.  I'm looking

14  for another attorney to represent them.

15          But speaking of Mr. Veeder's closing remarks --

16          THE COURT:  Let's not get too far away from the Sawdays.

17  We will come back to them in a minute.  Go ahead, Mr. Swing.

18          MR. SWING:  The answer is yes, your Honor.

19          Mr. Veeder certainly is learning California riparian

20  law, and his assertions were before the other trial -- what

21  was it -- 36,000 acres of riparian land in the Rancho.  Of

22  course, he has to pump water from the Santa Margarita stream

23  in order to get the benefit of it on certain portions of his

24  riparian land which are not immediately in contact with the

25  flow of the stream surface or sub-surface.

1          Now he is complaining here that although for sixteen

2  or eighteen miles there is a sub-surface flow in the Santa

3  Margarita on the Rancho, of which the Government is the owner,

4  he objects, he says that he has to pump some of the water back

5  to the Ammunition Depot, which is no different from his pump-

6  ing water to some other portions of the 38,000 acres of land

7  within the watershed which is riparian to the stream.

8          So when the time comes to his saying that we have

9  invaded his riparian rights because the water isn't on the sur-

10  face available to every acre of their riparian land and they

11  have to pump it some place, we will be prepared to meet that

12  situation to show that there is a surface flow for nineteen

13  miles available to them underground and they can get that very

14  easily without violating the laws of the State against waste.

15          Now I really arose to divert attention to try and

16  make progress, because we are about to get a Master, I hope,

17  with Mr. Veeder's assistance, to hear the defendants that he

18  has brought into Court present their claims.  Yet he told this

19  Court and the rest of us that he was going to add some 1500

20  new defendants.  When the Master goes out, how is he going to

21  know whether he is going to hear defendants some of which Mr.

22  Veeder told us he was going to dismiss and some more of which

23  he was going to add?  I want to get this thing going, I want

24  to get some progress made, and I would like to know how far a-

25  long Mr. Veeder is with the motion to bring in new defendants

1  which he thinks are necessary?

2          MR. VEEDER:  The order has already been entered.

3          MR. DENNIS:  I haven't got a copy.

4          MR. SWING:  I don't know anything about it.

5          THE COURT:  I made the order permitting new defendants

6  to be brought in and ordering defendants dismissed, but I held

7  up service on it, thinking we could serve some other things

8  along with the Complaints.  Is that about it?

9          MR. VEEDER:  That is correct, your Honor.  It is my

10  understanding from our discussions that there were to be a-

11  mendments to the Complaint, that there would be the Complaint

12  itself and that there would be as far as we can get along on

13  these Agreed Facts, and they would all be served at the same

14  time, saving a great deal of time.

15          MR. SWING:  Your Honor, we would like to be treated

16  as if we were in the case and we would like to have an oppor-

17  tunity to see whether the plaintiff is bringing in new causes

18  of action.  I don't know what his amendments are.  He has

19  vigorously stated, in every Court except this one, and he has

20  been pretty vigorous here, that his 1951 Complaint was perfect.

21  I tried to get him to make some changes in it, something more

22  specific, and he told me that it had been written most care-

23  fully and he stood upon it all the way up to the Ninth Circuit

24  Court of Appeals.  I would like to have an opportunity to get

25  a copy and be prepared to make some motions with reference to it.

1    THE COURT:  Mr. Swing, you recall that we had the

2  discussion whether these parties would be added on a motion or

3  ex parte.  Do you remember that?  They brought the order in to

4  me dropping a number of parties that were either dead or had

5  sold their property and what not, and adding a bunch of other

6  parties, and then this arose that there would have to be an

7  Amended Complaint, at least an Amended Summons, I suppose, on

8  the amendment naming these new parties.  There have been no

9  changes, as I understand, in the language of the Complaint --

10  it is just a matter of parties, and it was decided that pro-

11  bably the best thing to do was to hold that up until we could

12  make some service on a lot of these people all at one time.

13  I should have advised you.  I thought everybody knew about this.

14    MR. SWING:  That is very encouraging to know that he

15  isn't switching to some new causes of action.

16    MR. VEEDER:  In that regard, your Honor, I brought

17  to your attention that in the light of the Ninth Circuit de-

18  cision that every piece of land had to be before the Court.

19  There are the Indian reservations -- I propose to file an amend-

20  ment bringing those in, and there are also Forest rights and

21  some other rights that we will file a motion with your Honor

22  to amend the Complaint bringing those additional rights in to

23  which I have just made reference.  I had mentioned to your

24  Honor before that we did have these Indian rights up there,

25  that now they are beginning to use water quite extensively,

1   and under the circumstances, in the light of Judge Fee's opinion,

2   we feel that the only safe thing to do to avoid splitting a

3   cause of action is to bring them in.

4          MR. SWING:  Your Honor, I would like to ask Mr. Veeder--

5   I will ask it as a courtesy if it is not a right -- that you

6   serve us with a notice of your intention to move the Court for

7   permission to file a Supplemental and Amended Complaint and

8   that we may be heard upon it.

9          MR. VEEDER:  I know of no other way of amending it

10  other than filing with your Honor a motion to amend, and as I

11  brought out in the original instance --

12          THE COURT:  The order so far dropping parties, as I

13  understand, involved parties who were dead or who had sold

14  their interests.  There has been no lis pendens filed.  That is

15  another reason why it was probably not desirable to start whole-

16  sale service of these Complaints -- if the Government was going

17  to file a lis pendens in this action.

18          As to adding parties, there was no amendment to the

19  Complaint, except to add new parties where parties had sold

20  out and new people had come in, and I suppose --

21          Were there some new parties because of added ground?

22          MR. VEEDER:  No, your Honor.

23          THE COURT:  Just changes of ownership?

24          MR. VEEDER:  That is right, your Honor.

25          THE COURT:  So far.  So at that stage I said, "Well,

1  let's not get everybody upset again by serving a bunch of docu-

2  ments," and I made an order just letting the thing ride on that

3  basis.   Parties were added, parties were dropped, but the Com-

4  plaint up to this time remains the same.

5        If the Complaint is to be amended in its language

6  to set up other rights or to make any difference in the Com-

7  plaint from the way it now reads, it will have to done on

8  motion and you will have a chance to be heard.   Part of it may

9  have to be by Supplemental as well as Amended Complaint.  Mr.

10  Veeder, I am sure, understands our practice in California.

11        MR. VEEDER:  That's right.

12        THE COURT:  Things happening after the filing of the

13  action should appear by Supplemental Complaint.

14        MR. SWING:  Have you filed the list of new names?

15        MR. VEEDER:  Yes.

16        MR. SWING:  You have done it?

17        MR. VEEDER:  Yes, I have.

18        MR. SWING:  Thank you very much.

19        THE COURT:  Mr. Swing, what about the Sawdays?  Can

20  we enter a stipulation and enjoin them?

21        MR. SWING:  I am assuming that your Honor does not

22  proceed in the manner of European Courts and enter a judgment

23  without hearing the evidence in the case.

24        THE COURT:  Well, I was assuming that there was no

25  dispute but that the use of the water was outside the watershed

1  and that they had no permit from the State of California.

2  MR. SWING:  They have, your Honor -- if I am called

3  upon to testify.  Some people have got them out of the water-

4  shed.  I don't think they are out of the watershed, and they

5  have riparian lands and they have riparian rights.  They own

6  riparian land in the bed of the River itself, they own lands

7  riparian to tributaries on the stream, the rights to which they

8  do not have to get an appropriative right.  There are other

9  elements of evidence, if I may call them elements of evidence,

10  that I am sure your Honor will want to hear before he sentences

11  them to execution.

12  THE COURT:  Well, unless the matter can be stipulated

13  to, of course, obviously I will want to hear it.  I thought

14  there was no dispute but that this water was being used outside

15  the watershed.

16  MR. SWING:  There are no facts which would justify

17  the entry of a decree without hearing what the facts are.

18  MR. VEEDER:  There is a query that I would like to

19  present then, I think.  This being a pre-trial conference, it

20  would seem appropriate.  Is it not true that Santa Margarita

21  River water is being used on Sawday's lands which are non-

22  riparian?

23  MR. SWING:  I would have to call the witnesses and

24  have them testify to that.  I am not prepared myself to say.

25  THE COURT:  Well, it is obvious that Mr. Swing is not

1  of a mind to stipulate to an injunction. So any matter in-

2  volving the Sawdays had better be brought on by motion.

3          Now where are we?  What do we still have to do here?

4          MR. SACHSE:  Your Honor, one question.  We got a

5  little mixed up here.  I am still not quite sure that I under-

6  stand.  May I ask Mr. Veeder:

7          Do you contemplate an Amended or Supplemental Com-

8  plaint?

9          MR. VEEDER:  Yes, we do.

10         MR. SACHSE:  Amended and Supplemental both?  Well,

11  then --

12         THE COURT:  When?

13         MR. SACHSE:  That is it.  How can we very intelligent-

14  ly write an Agreed Statement of Facts for a pre-trial order?

15  For all we know, there may be sixteen new allegations in the

16  Amended or Supplemental Complaint.

17         MR. VEEDER:  The lands that we will bring in, your

18  Honor, are Indian lands and some of the public lands, and in

19  view of the agreement by Mr. Moskovitz that all those acres are

20  entitled to riparian rights I see no alternative but to bring

21  them in.  So we are going to file our motion to amend and file

22  our Supplemental Complaint very soon.

23         THE COURT:  What is very soon?  I think Mr. Sachse

24  is right.  He can't formulate a pre-trial order if there is

25  going to be an amendment to the Complaint.

1    MR. VEEDER:  I think in regard to anything, your

2 Honor -- and I will say emphatically, in regard to anything that

3 has been suggested by us as Agreed Facts certainly will be un-

4 changed by any Supplemental or Amended Complaint insofar as I

5 can see it now.  The only thing we can do is bring in this new

6 additional land and the physical features of the Valley are

7 unchanged.  It was my understanding, based on our conversations

8 that the thing to do would be to serve the Complaint and the

9 Amended Complaint and the motion to amend and the Agreed Facts

10 all at the same time.  In other words, there was no sense cover-

11 ing the whole waterfront two or three times.

12    THE COURT:  That would make sense if your amendments

13 don't upset some of the things that we have done.  But can't

14 we have this Amended Complaint at least lodged, so that Counsel

15 can see what it is?

16    MR. VEEDER:  Yes, I will prepare that amendment and

17 I will lodge it just as rapidly as I can.  I have had to check

18 out some of these additional areas that are involved.  But as

19 I say, the Agreed Facts down to this point will certainly be

20 not in any wise changed by the suggested amendments.

21    THE COURT:  When do you contemplate that you can

22 lodge this proposed Amended or Supplemental Complaint?

23    MR. VEEDER:  I will try to have it lodged here by the

24 end of next week.

25    THE COURT:  And can you make at the same time a copy

.1 | available for Counsel?

2 | MR. VEEDER: Oh, yes, and as I understand it, I think

3 | we will have to serve this proposed motion to amend, along with

4 | the amendment, and I think it has to go to everyone, and I

5 | think that is one reason, from the standpoint of the work the

6 | Marshal has, that we have waited until now as far as we can go,

7 | and I think our pre-trial order on Agreed Facts will be about

8 | as far as we can anyway by the time we conclude with your pro-

9 | posal. There should be no reason for delay in it, as I see it,

10 | at all. In fact, it is necessary for us to take this course

11 | rather than have to go back and re-serve this amendment on

12 | everybody.

13 | MR. SACHSE: Your Honor, that is exactly what I am

14 | getting at, is this question of service.  I don't know what

15 | Mr. Veeder has in mind as to his amendment or Supplemental

16 | Complaints, but I will say now that if one of the amendments

17 | is to attempt to quiet title also to certain alleged Indian

18 | rights, an entirely new place that nobody has ever heard of,

19 | that was never contained in this Complaint -- this Complaint

20 | deals with Camp Joseph H. Pendleton and the Naval Ammunition

21 | Depot, and if one of the amendments is to attempt to prove

22 | certain Indian rights, either as an independent thing entirely

23 | of Camp Pendleton or because of this theory that we discussed

24 | earlier today of reaching upstream and having a right up there

25 | and then transporting it down below, on either of those bases

1 I am sure your Honor can anticipate there will be some very

2 vigorous objections from Fallbrook.

3        Why waste the time of the United States Marshal and

4 all the dollars -- they are your dollars, Mr. Veeder -- by

5 serving all these people, if that is what you have in mind,

6 because I don't think -- I am certainly not trying to rule for

7 Judge Carter, but I don't think, in the light of his Honor's

8 rulings today on this stipulation, that he will permit you to

9 reach upstream and take the Indian rights and bring them down

10 to Camp Pendleton, and if you try to join the Indians and bring

11 in a wholly separate and independent quiet title action and

12 join it with this one I am going to object to that.

13        So let's settle that before we start serving 3500

14 copies.

15        MR. VEEDER:  I have no objection to his objecting,

16 your Honor.  I think we can demonstrate completely, or try to

17 demonstrate completely that certainly these lands and these

18 rights belong with the United States of America; that there is

19 one thing that is certain, that the Ninth Circuit has declared

20 that every piece of land in the watershed has to be in, and

21 under those circumstances and for an additional factor that there

22 are changes that have transpired since the initiation of this

23 suit.  Those are matters which these people may desire to argue.

24 Probably they will object to them.  Certainly we can expect ob-

25 jections.  But I think that everyone who has previously been

1   served is likewise entitled to be heard in regard to those

2   amendments.  It is not going to take any more time, in our view.

3   But by the time that we lodge this Amended Complaint, your

4   Honor can see what it is and we can have a ruling on it.  That

5   is all.  There is nothing unusual about amending.  I think Mr.

6   Swing has amended all his pleadings at one time or another.

7   These are circumstances that we have to bring before the Court,

8   and they will be brought before the Court.

9       MR. MOSKOVITZ:  Your Honor, I want to make one ob-

10  servation concerning the meaning of the Ninth Circuit Court of

11  Appeals discussion of the necessity of all those in the suit

12  having their claims adjudicated at the same time.  I really

13  believe, and I think it might be helpful to the United States

14  if they went along with me, that the Ninth Circuit did not say

15  that everybody in the water shed must be joined.  I think that

16  all the Ninth Circuit said was that everybody in the watershed

17  who is in the suit already must have their claims adjudicated

18  in one judgment.  But it was not an invitation to broaden the

19  lawsuit, and I don't see that the United States must bring in

20  the Indians now if there is no threat to their rights.  I think

21  it would be an unwarranted extension of this case, which is

22  complicated enough as it is.

23      MR. VEEDER:  I think I can quote from what the Ninth

24  Circuit said on the proposition.  It says: "The only proper way

25  to try this lawsuit is that every water user within the watershed

to

1   and every claimant of the right/use water outside the watershed

2   must be before the Court."  That is exactly what the Court said.

3   And again, it is a proposition which will be before your Honor

4   for ruling.  I am simply advising these gentlemen, from the

5   standpoint of the work that we have accomplished now, the Agreed

6   Facts will not be changed in any degree by the amendments.  So

7   there has been no waste of time.  And certainly there are issues

8   that we would be severely prejudiced, I believe, if we were to

9   leave them out, in the light of Judge Fee's opinion, and every

10  man has to discharge his own responsibilities in these circum-

11  stances.

12          However, they will be lodged with your Honor for the

13  purpose of having rulings from you in regard to them.  I know

14  of no other way of handling it.

15          THE COURT:  Has anybody any other ideas about how to

16  make this more complicated?

17          MR. DENNIS:  I wonder if I might ask Mr. Veeder if he

18  has filed a lis pendens.

19          MR. VEEDER:  We have not yet.

20          MR. DENNIS:  So that we can anticipate that some-

21  time in the future there will have to be another amendment

22  bringing in new parties, because they are being transferred at

23  the present time.

24          MR. VEEDER:  What we will do is bring the whole thing

25  down to date and service is started and at that time a lis pendens

803

1    will be filed.

2            THE COURT:   When do you contemplate that you can file

3    your lis pendens?

4            MR. VEEDER:   I think the lis pendens can probably be

5    filed almost at any time, your Honor.   The only point that I

6    have, the only reason that I have withheld it in the past is

7    that I thought it would be better not to do it until we got

8    underway.   But we can certainly file the lis pendens, and the

9    names can be included.   As a matter of fact, I believe, your

10   Honor, the very presence of this case, the filing in the Federal

11   Court has the effect of a lis pendens, although there may be

12   some doubt to it.

13           THE COURT:   You mentioned the names in the lis

14   pendens.   I don't apprehend that the lis pendens has to have

15   the names of the parties.   The lis pendens has to show the

16   legal description of the property.

17           MR. VEEDER:   That is right, the whole area that is

18   being brought in.

19           THE COURT:   I have filed lots of lis pendens and I

20   never had any names listed in any of them.

21           MR. VEEDER:   The problem in that connection, and cer-

22   tainly the one that causes the most concern, is the additional

23   land that we are bringing in.   When we get that done, we will

24   file the lis pendens.

25           Why are you concerned on that?

1    MR. DENNIS:  I am just thinking about the delays and

2  the length of time it will take, because it is going to take

3  a considerable length of time to serve these new defendants,

4  and if there are going to be transfers it is going to take time

5  to determine who the new owners are and to make service again.

6    MR. VEEDER:  No, I don't think you will have that

7  concern at all, once we have filed the lis pendens.

8    MR. DENNIS:  Once it is filed you don't have to --

9    MR. VEEDER:  As a matter of fact, I am not sure that

10  under the law it is necessary to file a lis pendens, but we are

11  going to have to file one.

12    THE COURT:  Do you think, gentlemen, that I could

13  part company with you by noon tomorrow?  I hate to see you go.

14  Do you think we can finish up what we set out to do by noon

15  tomorrow?

16    MR. VEEDER:  Well, there is the mechanical matter of

17  putting this thing together and I don't believe that your Honor

18  would have to participate in that.

19    THE COURT:  No.

20    MR. VEEDER:  I have arranged to stay until Friday after-

21  noon and we will get it done.

22    THE COURT:  This evening can you give some thought,

23  Mr. Veeder --

24    I take it that you have some legal secretaries a-

25  vailable?

1    MR. VEEDER:  Yes, your Honor.

2    THE COURT:  We discussed these various points that

3 were broken down as 8(a),-(b),-(c), etc.

4    MR. VEEDER:  Yes.

5    THE COURT:  See how many of those we can get a factual

6 stipulation on for a ruling.

7    MR. VEEDER:  We will put those together, your Honor.

8    THE COURT:  See what you can do with those tonight.

9    MR. VEEDER:  He says that he will work with me to-

10 morrow on it.

11    THE COURT:  All right.  10:00 o'clock tomorrow

12 morning.

13    MR. MOSKOVITZ:  Your Honor, may I make one request?

14 The transcript of your remarks this morning was handed to us

15 by the Reporter during the recess this afternoon, and there is

16 one correction that I think probably should be made on page 9,

17 if you have your copy.

18    THE COURT:  Yes.

19    MR. MOSKOVITZ:  At line 15, there is the term "eminent

20 domain," and I think you probably said "public domain," and it

21 would make a difference.

22    THE COURT:  Yes.

23    MR. VEEDER:  That is right.

24    MR. MOSKOVITZ:  Page 9, line 15.

25    THE COURT:  I probably said "eminent" but I meant

1    "public."  All right.

2           You can read this over.  If there are any other cor-

3    rections or any other matters you want me to rule on in con-

4    nection with that stipulation, let me have it tomorrow.

5           MR. VEEDER:  Did I understand you to say that you

6    wanted all these changes made by morning?

7           THE COURT:  No, I don't care when they are done

8    mechanically, but there are certain matters that you are going

9    to discuss.  Mr. Sachse and Mr. Dennis are going to look up

10   certain facts.  I would like to have you propose some wording

11   on some factual matters that might be gone over and see if we

12   can get approval on and justify rulings on some of the matters

13   of law that we have argued before.

14          I will be here all week.  I have the "Convair" people

15   in here on an apportionment matter on Thursday and Friday.  I'll

16   be available.  I may even take time out for a few minutes, if

17   necessary.  But I would like to do all of our discussing, if

18   I can, tomorrow morning, and let you gentlemen get to work on

19   this thing.

20          MR. VEEDER:  Yes, your Honor.

21          (ADJOURNMENT UNTIL WEDNESDAY, JANUARY 8, 1958, AT

22   10:00 O'CLOCK A.M.)

23

24

25