# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### CENTRAL DIVISION

- - -

#### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

　　　　　　　　Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al,

　　　　　　　　Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:　　　　　　San Diego, California

Date:　　　　　　April 7, 1958

Pages:　　889 to 982

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____
DEPUTY

JOHN SWADER
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211 - EXT. 370

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
                 Plaintiff,    )
                               )
vs.                            )      No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al,               )
                               )
                 Defendants.)
                               )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

April 7, 1958

APPEARANCES:

    For Plaintiff:        WILLIAM H. VEEDER, Esq.,
                            WILLIAM E. BURBY, Esq.,
                            Special Assistants to the
                            Attorney-General
                            Department of Justice
                            Washington, D. C.

- - -

890

APPEARANCES: (continued)

For U. S. Marine Corps:    COL. A. C. BOWEN
    COL. ELLIOT ROBERTSON
    COMDR. DANIEL FLYNN
    LT. DAVID MILLER
    LT. ROBERT NAGLE

For Defendant Vail Company:  GEORGE E. STAHLMAN, Esq.

For Defendant Fallbrook
Public Utility District:    SWING, SCHARNIKOW & STANIFORTH, by
    PHIL D. SWING, Esq. and
    F. R. SACHSE, Esq.

For Defendant State of
California:    EDMUND G. BROWN, Esq.,
    Attorney-General, by
    ADOLPHUS MOSKOVITZ, Esq.,
    Deputy Attorney-General

For Defendants Arthur G.    CLAYSON, STARK & ROTHROCK, by
Reuter, Katherina C.    GEORGE GROVER, Esq.
Gibbon, Philo Reuter and
Wm. W. Cottle:

For Defendants Carl N. Halde
and Hester M. Halde:    TOM HALDE , Esq. by
    GEORGE GROVER, Esq.

For Defendant Faulkner:    BERT BUZZINI, Esq.

SPECIAL MASTER:    JOHN M. CRANSTON, Esq.

1    SAN DIEGO, CALIFORNIA, MONDAY, APRIL 7, 1958, 10:45 A.M.

2              THE COURT:  Call the Fallbrook Case.

3              THE CLERK:  No. 14, 1247-SD-C, United States vs.

4    Fallbrook, etc., et al.

5              Hearing plaintiff's motion.

6              THE COURT:  Let me look over this document which was

7    just handed to me.

8              By the way, have you gentlemen served copies of your

9    papers on the Master?

10             MR. MOSKOVITZ:  I just gave the Master a copy, your

11   Honor.

12             THE COURT:  Just now?

13             MR. MOSKOVITZ:  Yes, your Honor.

14             THE COURT:  Hereafter when you serve any briefs or

15   documents, count him in.

16             MR. VEEDER:  Is your Honor considering the objection

17   of the defendant Fallbrook Public Utility District?

18             THE COURT:  I have just now received it.  I would

19   like to look it over.

20             MR. VEEDER:  So would I.

21             THE COURT:  You read while I read.

22             MR. VEEDER:  I was looking for a moment of bitterness

23   about just being served.

24             (A pause.)

25             THE COURT:  No. 1, plaintiff's motion to file a

1  supplementary and amendatory complaint.  Who wants to be heard?

2          MR. VEEDER:  Your Honor, we are the movants and will

3  briefly comment upon the material that has been served upon the

4  United States of America, the motion of defendant Fallbrook

5  Public Utility District to dismiss, and the motion to strike

6  is, I believe, premature, and I believe that Mr. Sachse agrees

7  with that; that certainly at this juncture the matter to be

8  heard is a question of propriety of the filing of the supple-

9  mentary and amendatory complaint as distinguished from a con-

10  sideration under Rule 12.

11          MR. SACHSE:  That is correct, your Honor.

12          We have filed objections also.

13          THE COURT:  Of course, if I grant the motion to per-

14  mit the amended Complaint to be filed, actually your motion is

15  technically premature until it is filed; but we can obviate

16  that by letting you re-file it.

17          MR. SACHSE:  By letting me re-notice it, I presume.

18          THE COURT:  Well, possibly.

19          MR. VEEDER:  Now, the State of California has filed

20  opposition to the United States' motion, which is a great deal

21  like the motion of the defendants to dismiss.  Throughout, the

22  statements are made in the State"s filing that new issues are

23  brought in and that they are subject to motions to dismiss.

24  However, on reading further it becomes apparent that the State,

25  too, is arguing in regard to matters which could only appropriately

893

be raised under Rule 12.

For example, the question of the merits of allegations respecting the issuance of licenses by the State of California certainly has no proper place at this juncture. It may be proper later on, but certainly that is premature.

On page 3, continuing along the same line, issues are raised by California in regard to the questions of due diligence as pleaded in the matter lodged with the Court by the United States. Again, that is not, in our view, appropriate at this juncture. It has nothing to do with the propriety of the filing.

On page 4, reference is made to the doctrine respecting the availability of administrative remedies. Again, that goes to the merits of the pleading and have nothing whatever to do with the question of the filing. It is argued that control over the appropriation of unappropriated water lies with the State of California, which has -- well, it may be true or it may not be true, but the fact remains that from the standpoint of our pleading it has no proper place here. It is argued that no prejudice can result to the United States by reason of the allegations which are made, and again we say that that has nothing to do with the question of the propriety of the filing.

Throughout the entire memorandum of the State these arguments continue as to whether we are right or wrong in our pleadings, but it has nothing to do with whether they should

694

1    be permitted to be filed.  That is true on page 5.

2         It is argued on page 6 that the prayer is based upon

3    an erroneous theory.  Again, if that matter is to be argued,

4    it can only be argued, in our view, after the filing has been

5    accomplished.

6         Respecting the matter just received by us from the

7    Fallbrook Public Utility District within the last half hour,

8    it is quite a sizable document and we will undertake to respond

9    to it.

10        I don't know whether your Honor desires the filing

11   of authorities or not in response.  However, in any event,

12   Fallbrook seems to follow quite closely the theories advanced

13   by the State of California, both going to the matters which can

14   only be raised by motions to dismiss.  However, in paragraph 3

15   on page 2 it is complained that there has been an unreasonable

16   length of time in making this amendment and supplement.  We

17   wish to point out there that we have made it in contemplation

18   of the opinion of the Ninth Circuit.  We had no alternative,

19   in our view, in view of the rationale of that decision.  So we

20   see no basis whatever for the contention that this is not

21   timely.  We have no alternative but to bring our pleadings

22   within the scope of the Ninth Circuit's opinion.

23        It is discussed that there will be a delay in the

24   completion of the trial and the final determination if this

25   amendment is permitted.  We believe, in response to such an

1   assertion, that it reduces -- there will be no multiplicity of

2   suits if the matter is disposed in the single pleading.   I

3   believe, actually, that the most important phase and factor of

4   the supplementary and amendatory pleading is that very element.

5          We know now that there are challenges throughout the

6   entire Santa Margarita valley in connection with every right,

7   title and interest which the United States of America has on

8   all of its lands.  We further know that the importance of the

9   Ninth Circuit decision turned on the matter of the bringing in

10  of all claims.  Judge Fee in explicit terms said that the only

11  proper way to try the lawsuit was to have every piece of land

12  within the watershed before the Court, and we are simply com-

13  plying with that mandate.

14          We further know that since the initiation of this

15  litigation there has been a great increase of water use in the

16  valley and a great increase in the number of demands which are

17  being made and which are now in conflict with the Indian rights

18  and the rights of the land administered by the Department of

19  the Interior and by the Department of Agriculture.  We have no

20  alternative, therefore, but to bring in those rights, in our

21  view.

22          The argument is advanced -- I see no basis for it --

23  that the Department of Justice is acting at variance with the

24  Department of the Interior.  Certainly that is not a proper

25  question at this juncture.  The only question is whether the

1  pleadings should be filed.  If Mr. Swing desires to argue

2  whether there is a conflict within the Executive branch of the

3  United States, I question its relevance but it certainly is

4  premature at this juncture.

5        I think most of us are familiar with the cases which

6  have been cited.  They are cases which, I am certain, can be

7  distinguished in every instance from this particular case.

8        It is to be noted that the whole concept of the

9  Federal Rules of Civil Procedure has been to simplify and to

10  clarify the matter of instituting and prosecuting litigation.

11  The old idea of the common law pleading went out about twenty

12  years ago.  Rule 15, which is cited by the Fallbrook Public

13  Utility District, certainly dissipates the arguments which are

14  advanced.  That Rule provides that amendments shall be freely

15  permitted when Justice so requires.

16        Here the United States of America, by reason of the

17  decision by the Ninth Circuit, is confronted with the question

18  of splitting their claim, splitting the cause of action, and

19  we have no alternative but to pursue the course which we are

20  pursuing and to deny us the right and privilege of bringing in

21  these matters which we think are important, and indeed we think

22  they are essential to the protection of our interests, would

23  certainly be contrary to the whole idea of the Federal Rules

24  of Civil Procedure.

25        As nearly as I can see, the argument which is advanced

by Mr. Swing has not changed a great deal since 1951, and it is

the same old cry that the Fallbrook Public Utility District would

like to get the water from the United States and should get it

by reason of their anxiety over real estate speculations.  I am

not going to get into that, but I certainly don't believe that

it is proper at this juncture to argue it.  Perhaps in the law-

suit, after the pleadings have been filed and the matter is on

the merits, that may come up.  I'm not sure.

Finally, on page 16 and page 17 we observe a quota-

tion in regard to -- I presume it is directed to the Winters

Doctrine, the doctrine of implied reservation.  That may be an

appropriate argument sometime, but certainly it is not appro-

priate at this juncture.

I have no further comment to make, your Honor.  I

would like to have a moment to respond after we have heard from

the opposition.

MR. MOSKOVITZ:  Your Honor, the State's opposition,

as set forth in the written material filed last week, is based

upon the understanding that it is within the discretion of the

Court to refuse the filing of a proposed supplementary or

amendatory pleading, if that pleading contains, or to the ex-

tent that that pleading contains, claims for relief which are

not proper and upon which relief cannot be granted.  This sort

of objection in opposition is, I grant, something that could

be brought up in a motion to dismiss subsequent to the filing

1   of an action, but the Court is not precluded from considering

2   this sort of objection upon the consideration of the motion for

3   leave to file.

4           THE COURT:  Oh, I think that that is true.  In other

5   words, I think it is a discretionary matter whether this is

6   filed or not, and as the case which is cited by Mr. Sachse and

7   Mr. Swing in their memorandum, which I just read, illustrates,

8   it depends on the facts of each particular case.  One of the

9   cases was where a fellow had made three attempts to state a

10  cause of action and now he came in the fourth time and apparent-

11  ly his pleading was still defective and the Court said, appar-

12  ently, "Well, we have had enough of this.  I will call a halt

13  and refuse to give him leave."  I think it is true that these

14  other matters could be considered.

15          Go ahead.

16          MR. MOSKOVITZ:  The case that I cited on page 2 of

17  our memorandum was not one in which there had been successive

18  attempts to state a cause of action and failure and then after

19  that the Court got tired, but it was a case in which the attempt

20  was for the first time.

21          THE COURT:  What do you say, though, to the point

22  that sticks out like a sore thumb here, and that is that Judge

23  Fee, when he decided this case in the Circuit, reversed because

24  Judge Yankwich had purported to enter a judgment involving some

25  of the rights on the River and in substance said, "The way to

1    try this case is to adjudicate all the rights on the River?"

2    What do you say to that?  Even though it may not, strictly, be

3    the law of the case -- we have been all over that -- it comes

4    pretty close to being the law of the case, and it is pretty

5    persuasive, and the practice of that Court is very often to

6    have the same Judge who writes one decision sit on the case the

7    next time around.

8              MR. MOSKOVITZ:  Your Honor, I have some views on that

9    point.  I will discuss them now, although that isn't the basis

10   for the objection or opposition which we filed.

11             On that point, these are the views that we have.  We

12   feel that the language of Judge Fee has to be read in light

13   of the facts of that case.  The facts of that case as it came

14   up in the Ninth Circuit were that only three of some 3000

15   litigants had their claims tried by the trial court.  There were

16   actually about 3000 people already named as parties in the

17   action.  Their claims hadn't been considered at all.  Never-

18   theless the Court entered a judgment.

19             Now I believe that what the Ninth Circuit had in

20   mind, what Judge Fee had in mind was that that was an error;

21   that you had to consider all of the claims that were actually

22   in the lawsuit before judgment could be rendered.  I do not

23   believe that the broad language which admittedly appears in

24   that opinion can be taken to mean that every time one party

25   on the stream sues another party or other parties to quiet

1   title that automatically everybody else in this watershed have

2   to be brought into the action.  I think that is an unreasonable

3   rule and I don't think Judge Fee had that in mind.

4        THE COURT:  What about this?  I take it that the

5   Government is a trustee for whatever rights the Indians have,

6   or that the Government has some interest in these Indian lands.

7        MR. MOSKOVITZ:  Yes, your Honor.

8        THE COURT:  Suppose that the Indian lands have water

9   that is riparian.  How could an adjudication be made as to what

10  water is surplus, what water is available for Fallbrook's

11  appropriation over and above the riparian rights on the stream,

12  unless some consideration is given to whether or not there are

13  some riparian rights on this Indian land, used or not used?

14       MR. MOSKOVITZ:  I want our position to be clear,

15  your Honor.  We have not asserted that the United States may

16  not bring in those claims.  We have doubts as to the necessity.

17  We think it is going unduly to complicate the case.  We feel

18  that it would be better had they not done so.  We think the

19  real issues in this lawsuit that led the United States to file

20  the action, in the first place, can be adjudicated without

21  bringing in the Indians.  What the United States set out to do

22  was to quiet its title that it felt it had for use on Camp

23  Pendleton.  I think that can be done.  You can set that forth.

24  You can set forth the rights of the other parties, and those

25  people who may have --

1       THE COURT:  The maximum rights that the Government

2  might have, without regard to anyone else on the stream, could

3  be adjudicated; but that wouldn't solve this problem, because

4  Fallbrook's position all along has been that they are seeking

5  only surplus waters, waters to which no one has a riparian right,

6  water which no one has appropriated -- water that is surplus,

7  outside of some other rights which Fallbrook maintains, which

8  are not too extensive.  Certainly this case will not be de-

9  cided on the basis of a decree giving the Government the full

10  maximum claim to rights on the River.  Their rights are correl-

11  ative.  As riparian owners, their rights are correlative and

12  are to be finally determined on the basis of what they have as

13  compared with what other rights people have on the stream.

14       MR. MOSKOVITZ:  That is true, your Honor.  There is

15  no dispute about that.

16       Again, I want to say, I'm not saying that the Govern-

17  ment hasn't the right, if it feels it must, to assert other

18  claims.  What I am saying now is that it is not necessary and

19  never has been, in water rights cases, to bring in everybody

20  because two people have a dispute.  It is true that in consider-

21  ing their rights you may have to consider other factors, but

22  you don't have to have a final adjudication of everybody's

23  rights in every instance where there is a dispute.

24       I will not press that at this point, your Honor.  I

25  do feel that the United States is making an error.  I think it

1    complicates their own problems to bring in these other claims.

2    It is going to lengthen the lawsuit.  But under the circum-

3    stances, if they want to bring it in, they probably can.

4         I do want to call your attention to the case of

5    United States vs. Central Stockholders Corporation.  If you

6    haven't read it yet, I will give you the citation.

7         THE COURT:  A water rights case?

8         MR. MOSKOVITZ:  It is a water rights case, your Honor,

9    in which the United States sued to quiet title to its asserted

10   riparian rights in the San Joaquin River by virtue of ownership

11   of public domain in the National Forest in the upper part of

12   the San Joaquin River area.  It is a case that was decided in

13   1931 (52 F. 2d 322, particularly at page 339).  The Court

14   dismissed the action by the United States to quiet its title

15   to riparian rights on the ground that there was no need for it

16   to do so.  The rights were those to use water in the upper

17   portion of the watershed, similar to the ones asserted here by

18   the Government for the Indians and the other public domain, and

19   the defendant was a downstream owner.  The Court held there that

20   it was not necessary for the Government to quiet its title be-

21   cause the downstream claim posed no threat.

22        Now I'm not sure that that situation exists here.  On

23   the face of it, I think it does.  But it may be within the

24   broad scope of the proposed pleadings of the United States in

25   its proposed Amendatory and Supplementary Complaint.  Those

903

1    who claim rights adverse to the Government upstream from the

2    Government's rights in the upper portion of the watershed, in

3    that case I assume they have a right to bring the action.  But

4    we think that this is not a wise thing.  It is going to compli-

5    cate the case, and while we are not urging that the Government

6    be forbidden from making these new claims we think some thought

7    should be given to it.

8            The main part of our opposition is to the assertion

9    of claims for relief which we think have no basis whatsoever.

10   We think that on the face of it they just have no foundation,

11   no validity, and those are the ones which we set forth, those

12   which most obviously spring up from the pages of the proposed

13   Supplementary and Amendatory Complaint insofar as they affect

14   the State of California, and those are the claims which they

15   make generally based on their misunderstanding of the role of

16   the State in the appropriation of water.  We have set them forth

17   one by one.

18           For example, we have objection to paragraphs VI and

19   VII appearing in Count V on page 13.  They allege that the

20   issuance of a license by the California State Water Rights

21   Board to the Fallbrook Public Utility District invades the rights

22   of the Government, drastically changes the status of the

23   parties, and this gives rise, they feel, to some right to re-

24   lief by this Court.

25           We submit that there is no right to relief whatsoever,

1   because as we have pointed out time and time again the license

2   applies to what may be unappropriated water. The State of

3   California Water Rights Board is the only agency that can grant

4   such license, the only one who can go through the appropriation

5   procedure to grant permits and licenses.

6           THE COURT:  But somebody has to determine that there

7   was unappropriated water.

8           MR. MOSKOVITZ:  Yes, and this Court is the one which

9   will make the judicial determination.  The action of the Water

10  Rights Board doesn't prejudice you or embarrass you or limit

11  you in any way.

12          I don't see how any relief can be granted on the basis

13  of those allegations.

14          The same is true of the succeeding ones that we

15  mention.  Count VII, paragraphs II and III on page 15, relates

16  to a question whether the Fallbrook Public Utility District and

17  Santa Margarita Mutual Water Co. may have lost rights by failure

18  to exercise due diligence in prosecuting their applications or

19  permits, as the case may be.  Again, this is a matter which is

20  in the sole jurisdiction, at this point, of the State Water

21  Rights Board.  Until that procedure has been exhausted, there

22  is nothing before any Court.  Certainly the administrative

23  remedy must be exhausted, whether you proceed under State theory

24  or Federal theory.  There is an administrative remedy.  It is

25  the only one there is on this issue.

905

Likewise, Count X, paragraphs II-V on page 19 of the proposed Supplementary and Amendatory Complaint.  These paragraphs claim that there is no right, no power in the Water Rights Board to hold hearings, as long as this case is pending, involving the appropriation of water of the Santa Margarita River.

Well, again, if, as we feel, there is no conflict between your jurisdiction and that of the Water Rights Board, why shouldn't there be, and all the controversies existing in the River cannot be settled by your Honor.  There must be a hearing and a determination as to who gets the right to appropriate unappropriated water, and that must be the State Water Rights Board.

Then in Count XXIV, paragraph II on page 37, the Government asserts a storage right by virtue of an application which it filed.  Now here we certainly have a clear example of inconsistency.  The United States challenges the Water Rights Board for proceeding to consider applications of others, and yet it makes a claim for rights of its own by virtue of an application.

THE COURT:  Isn't that permissible, under Federal pleading and even under State pleading?  You can claim rights in the alternative.  You can set up defenses in the alternative. It is true that the positions are inconsistent, but the Government in one count can say that we have a right to take from the Water Rights Board, in another count they can say that the

906

1   Water Rights Board has no right to give you rights.  They are

2   inconsistent, but that doesn't mean that a party may not assert

3   inconsistent claims -- at least, as I understand the law.

4         MR. MOSKOVITZ:  The problem with this Count, your

5   Honor, is that the Government wants to have the Court declare

6   the priority on the basis of the application which is before

7   the Water Rights Board.  Now an application of itself gives

8   no right to take water, and there are all kinds of issues to be

9   determined by the Water Rights Board.  The application was filed

10  with the Water Rights Board.  That is where this matter should

11  be pursued.  Eventually, this may give rise to a right, but it

12  doesn't now, and stating it here will not permit your Honor to

13  give the Government any relief whatsoever, except perhaps say-

14  ing what is the fact -- that the application has been filed and

15  is pending before the Water Rights Board.  If that is all they

16  want, there is certainly no objection.  But what they have asked

17  you to do, or what they have asserted is a storage right with

18  certain priority.  There is no storage right.  If a permit is

19  granted and action is taken by the Government to protect it

20  and the license is issued, then there would be a storage right

21  with this priority.  But there is none now on the basis of

22  those facts.  And so it goes.

23         We mentioned Count No. XXV, paragraph II, which

24  alleges, in a general way, that the State has invaded the juris-

25  diction of the Court and has clouded the title of the United

1    States. Again, for the reason I have indicated, I think it is

2    obviously in error and should not even be brought into the law-

3    suit, although I feel that this, together with the others,

4    could be raised by a motion to dismiss and by subsequent action.

5          We object to the prayers for relief based upon those

6    allegations and theories that we think are wrong.

7          THE COURT: Mr. Swing.

8          MR. SWING: If your Honor please, I have desired to

9    make of record my views of the novel proceeding taken by the

10    attorneys for the Government in filing the motion at this time,

11    under these circumstances, for leave to amend in the manner

12    in which they have done so or propose to do so. I'm suffering

13    from a physical disability of shortness of breath and I am

14    unable to carry on any particular discussion. I am therefore

15    asking my associate, Mr. Sachse, to reply for me.

16          THE COURT: Thank you.

17          MR. SACHSE: If your Honor please, our basic objection

18    to this amendment is general, and under the Federal Rules.

19    However, we have filed, as you know, specific objections, and

20    we concur with Mr. Moskovitz that if this new pleading in fact

21    fails to state grounds on which your Honor can grant any re-

22    lief, then of course there is no earthly purpose in permitting

23    the amendment and cluttering up our record with Counts which

24    should simply be stricken later on.

25          I simply want to make it clear that I am not arguing

1 the detailed Counts at this time.  I want to stick to the general

2 question of the propriety of the amendment.

3       I do want to say one thing, however, with regard to

4 this confusion over the authority and effect of Water Rights

5 Board actions.  The events of the last twenty days and today

6 very clearly establish that there is today a surplus in the

7 River -- there is water available for appropriation.  It is

8 running into the Pacific.  Now someone, under the laws of Cali-

9 fornia, is entitled to that water.  Your Honor cannot grant the

10 permit.  There is no machinery by which Fallbrook or Santa

11 Margarita or any other individual can come before you and say

12 to your Honor, "Give us a permit to build a dam and take this

13 water."  The only mechanics by which this can be accomplished

14 is to go to the State of California.

15       Now your Honor has it in his power, I guess, to make

16 any permit worthless.  You have that power.  That is what this

17 Court can do.  Your Honor knows that any license or permit is

18 subject to vested rights and therefore should you so enlarge

19 vested rights that there is nothing for a permittee to take,

20 should you so hedge in with restrictions, his permit can be

21 made worthless.  But your Honor can not prevent the issuance

22 of a permit.  There isn't anyone else who can issue.  There is

23 no Federal procedure, there is no Federal statute.

24       THE COURT:  That is my tentative view so far.  I

25 am not deciding that.

909

1          MR. SACHSE:  So much for that.

2          As I say, our basic objection is to the fundamental

3    principle of this amendment, and I would like to take a very

4    few minutes on that subject.

5          Now the whole concept -- I will subscribe to Mr. Veeder's

6    words -- the entire concept of Rule 15 is to simplify liti-

7    gation and to promote the interests of Justice.  Rule 1, the

8    very first Rule, reads that these Rules "shall be construed

9    to secure the just, speedy, and inexpensive determination of

10   every action."  Your Honor stated just five minutes ago that

11   each case must be decided on its facts.  I think in determining

12   this motion of the United States we have to consider the facts

13   that have gone before.  I want to talk for a moment about them.

14         Over eight years ago the United States brought this

15   action.  It brought it specifically to quiet the title to

16   certain water rights allegedly owned by the Navy in connection

17   with a military reservation.  Because of a very unfortunate

18   choice of words in the original Complaint and because of the

19   widespread concern over what sort of rights the United States

20   was asserting a stipulation was entered into in August, 1951,

21   between the United States and the State of California to clari-

22   fy the proceeding.  The preamble of the stipulation said,

23   "....for the clarification of the issues in this litigation..."

24   The first clause of the stipulation read, and again I'm quoting,

25   "that in this cause the United States claims only the rights

1    it acquired by purchase of the Santa Margarita Rancho, or rights

2    acquired by prescription or use, or both, since then."  The

3    stipulation said that "in this cause" the rights of the United

4    States were being measured in accordance with the laws of the

5    State of California.

6          In December of last year the United States itself

7    made a motion to have that stipulation declared binding.  The

8    matter was briefed and argued.  The brief of the United States

9    on the subject is almost as thick as the Amended Complaint.

10    After briefing and argument, your Honor made its order declaring

11    the stipulation to be binding on the signatories and inter-

12    preting it, and Fallbrook and Santa Margarita Mutual stated for

13    the record that they, too, were bound by it.

14          Now what are we doing?  Apparently dissatisfied with

15    your Honor's ruling on its own motion, the very one he pre-

16    sented, the United States is trying, in effect, completely to

17    repudiate the stipulation by filing Supplementary and Amendatory

18    matter that wipes it out.  Is that the interest of Justice?

19          THE COURT:  Now you have put your finger on a pretty

20    important point, and I don't know what we are going to do about

21    that.  But if this is or would be construed to be a motion to

22    relieve the United States of that stipulation, then I might

23    deny the filing of this petition.

24          MR. SACHSE:  Your Honor, I would like to carry it a

25    little further.  I think very definitely that it does.

1   THE COURT: Now, wait. Of course, we have discussed

2   part of this. As to rights in the Indian reservations, as to

3   rights on the public domain, the stipulation didn't pertain to

4   those matters.

5   MR. SACHSE: The stipulation said that "in this cause,"

6   that is, the cause of the United States vs. Fallbrook, No. 1247-

7   SD-C, these things are going to be done. Now they create a

8   cause and bring in a set of rights over 750 square miles. I

9   say that that is an absolute repudiation of the stipulation.

10   May I continue, please, your Honor?

11   THE COURT: Yes.

12   MR. SACHSE: The new map that has been brought in

13   was never in this cause. There is not a word of it in the

14   original Complaint which is pleaded here -- Indian lands,

15   National Forest lands, other public domain, prescriptive rights

16   upstream, appropriative rights upstream, a demand for an in-

17   junction against the State of California, an assertion that

18   the State of California cannot conduct water rights hearings;

19   everyone of those is a new issue.

20   THE COURT: Well, now, don't take it too seriously.

21   You know Mr. Veeder. If he is going to file an Amended Com-

22   plaint, he is going to put in there everything that he possibly

23   can, even if he knows when he puts it in that he is going to

24   get his ears knocked down on some of the matters that he has

25   in there.

1     MR. SACHSE:  You have put your finger on the point,

2  your Honor.  If these amendments are going to be permitted in

3  the interests of Justice, it is Justice to whom?

4     THE COURT:  The Government is entitled to make their

5  record.  You know that when a Judge has indicated that he is

6  going to rule against an attorney it doesn't mean that the

7  attorney is helpless.  He can make a record and take the matter

8  up and see if the Judge is right.

9     MR. SACHSE:  Well, my concern is with this.  My con-

10  cern is with the fact that these new acts, this new document

11  presented by the United States, is intended to completely de-

12  stroy the litigation that is pending before your Honor and the

13  stipulation that was entered into, and I do not agree with

14  Mr. Veeder that the Circuit Court ordered this.  The Circuit

15  Court never ordered that every landowner in the watershed

16  should be made a party.  The Circuit Court did direct that all

17  parties to the cause had to be a party to the judgment, but

18  the Circuit Court never directed Mr. Veeder to join an Indian

19  or anyone of the 7000 new defendants.  There isn't anything in

20  the decision of the Circuit Court or in the basic law that

21  prevents the United States, if it so chooses, from bringing

22  an injunctive action -- I'll pull another name out of the hat,

23  to leave Fallbrook alone for a minute -- against, let us say,

24  Sawday.  He has talked a great deal about a Sawday diversion.

25  If he wants to, he can enjoin Sawday.  He doesn't have to join

6

everybody else in these proceedings.  That is the ABC of water adjudication on a river.

I would like to say this to your Honor.  Would you, under these circumstances, with eight years or more having passed since the Complaint was filed, two years or more since the decision of the Circuit Court that he says forced them to do it, but now two years later he is doing it, after he himself asked for an order on this stipulation, after you have given him an order which he didn't like, would you permit a private litigant to make this kind of amendment?

THE COURT:  I might.

MR. SACHSE:  I think the defendants have to be considered.  I think they do.  I think the ends of Justice, which the Rules require, are not furthered by clouding the title to another 7000 people.  I think they require a legal solution of this problem and not a solution that is born of financial exhaustion and bankruptcy on the part of the defendants.  Now I may get heated, but I will say this, that just a week ago another 800 people came into this case.  Next week there will be 10, 20, or 200 more, and the reason that will happen is that the United States hasn't filed a lis pendens, and I will say frankly for the record that I don't think they ever intend to.  How in Heaven's name are we ever going to settle this if every birth, every death, every marriage, every divorce brings in new parties?

914

1    THE COURT:  They tell me they are going to file one,

2    and if necessary the Court could order it filed.

3    MR. SACHSE:  I don't know if this is the appropriate

4    time, your Honor --

5    THE COURT:  It works both ways.  A lis pendens is

6    pretty rough on the property owner, but maybe not as rough as

7    the situation is now.

8    MR. SACHSE:  I will say, with apology, if I am doing

9    Mr. Veeder an injustice, but it was six months ago that I heard

10   him say that he was going to file a lis pendens, and he still

11   hasn't done it.  I still say that they don't intend to.

12   Now we are further away today from coming to grips

13   with the issues in this case than we were a year ago when we

14   walked into this Court.  We have spent days working out a pre-

15   trial order, we have worked out contentions, we have strained

16   over legal issues.  We can take every one of those things and

17   tear them up and throw them away and start all over again, if

18   this piece of paper is filed.

19   THE COURT:  Why?

20   MR. SACHSE:  Because everything in it is entirely

21   new.  I don't know how to answer in behalf of Fallbrook all this

22   Indian stuff.  I haven't the slightest idea.  As far as Fall-

23   brook is concerned, we have stated in this Court Room for the

24   record many times that our rights are appropriative.  We take

25   the water as it comes to us.  We don't care if the Indians own

1  a hundred acres or ten thousand riparian acres upstream. It is

2  their water and they will get it first.  Our controversy is

3  with the United States Navy.  That is our controversy.

4      THE COURT:  But you are asking me to decide whether

5  or not there is unappropriated water that comes to you after --

6      MR. SACHSE:  No, your Honor, I am not asking you to

7  decide that, and I think that is a basic misconception that

8  comes up again and again in our discussion.  The State of Cali-

9  fornia, I hope, will some day give us a permit.  We will start

10  to take water under that permit some day.  If we were doing it

11  tomorrow and your Honor were ready to render judgment in this

12  case, your Honor would say that our takings injure the United

13  States, or that our takings don't injure the United States.

14  Your Honor would enjoin us, or your Honor would restrict us,

15  or your Honor would forbid us.  You could do that, but you are

16  not going to tell us whether we can appropriate water.  The

17  State of California is going to tell us that.

18      THE COURT:  I understood that I was going to decide

19  whether there was any unappropriated water left over after we

20  checked up on what riparian and appropriative rights there were

21  on the stream.  Am I wrong in that?

22      MR. SACHSE:  I was looking at something that Mr.

23  Veeder handed me, your Honor.  I'm sorry.

24      THE COURT:  Read it, Mr. Reporter.

25      MR. SACHSE:  I didn't follow the last part of your

statement.

THE REPORTER:   Shall I read it, your Honor?

THE COURT:   Yes.   The Reporter will read it.

MR. SACHSE:   As far as whether water is or is not surplus, the basic case in California states that the needs of a riparian or the amount of surplus changes day by day, season by season, maybe even hour by hour.   A riparian has no abstract, absolute right any longer to the uninterrupted flow of the river past its door.   A riparian has a right to make use of it, and if there is a surplus today an appropriator can use it.   If that surplus ceases to be available tomorrow, the appropriator will lose it.   But that is the law of California.   But he will have the right when the surplus is there, and that is what the State gives us.

What I would like to do is to get rid of this case, the case that we are now trying, forgetting the document that is before you, the case that is in the basic file, the case that is in the original pleadings, the case where the United States said that the United States owns certain water rights which it acquired when it purchased the Rancho Santa Margarita and which it acquired by prescription or use, or both, since that purchase.   That is the case that was filed.   That is the case that was argued before Judge Fee.   That is the case that Judge Fee stated that no judgment against a single one of those defendants quieting the title of the Navy's rights is proper. That is what Judge Fee said.   He said, "Get all of those

1    defendants in and settle that case." But he didn't say to

2    settle the case of the whole 750 square miles of watershed.

3         The United States itself, I will repeat, by stipu-

4    lation limited the issues in this case. That can be done. It

5    is done every day. Parties come before your Honor and will

6    stipulate that certain things are out of the issue. They have

7    done it. It is before you, when your Honor made an order on

8    it on their own motion.

9         Now the issues are no longer limited. Now we have

10   77 more pages of issues that are coming in anyway. I say that

11   to permit this amendment won't further Justice, won't speed

12   the administration of Justice, won't tend to terminate con-

13   troversies. All it is going to do is pile one on top of an-

14   other, foul up forever and ever more the basic water law of

15   California, the water law that created the economy that, I

16   guess, supports all of us, except maybe Mr. Veeder and the

17   Marines. It will tie up titles for the next 20 years. Let's

18   settle this lawsuit that we have been on here for eight years,

19   and I'll repeat again two years since the reversal and one

20   year in your Honor's Court and where are we? We are absolutely

21   nowhere, and with this document filed I will make book with

22   anybody in the Court Room that there will not be a trial in

23   another year. I think the amendment should be refused and the

24   United States should be told to stick to what you agreed in

25   the stipulation and let's get to trial, and Fallbrook so re-

     spectfully requests.   JOHN SWADER, OFFICIAL REPORTER

1          THE COURT:  Mr. Stahlman, do you want to be heard?

2          MR. STAHLMAN:  Your Honor, I will be very brief.  As

3    far as the Vail Company is concerned, as far as the Amended

4    Complaint and the motion before the Court is concerned, we have

5    to approach it on a sort of neutral ground.  However, there is

6    this thought running through my mind as I have been listening

7    to these discussions here.  It affects the Vail Company, your

8    Honor knows that the history shows that we thought we were

9    through with litigation years ago and now we are in another

10   big lawsuit, and we realize that we are necessary parties to

11   the suit.  Upstream from the Vail interests we feel that there

12   are appropriations taking place on the part of property-holders

13   up there that are not only invading the rights of Vail but are

14   invading downstream rights.  I think it is quite apparent from

15   just what is happening today, in other words, with all this

16   rain we have had, there has never been the anticipated or

17   expected or engineer-calculated runoff into the Vail dam that

18   should have been there.  I think the same thing happens on

19   other rivers down here and just what effect these Indian re-

20   servations would have, if this Complaint is permitted to be

21   filed, and what action we would have to take in order to create

22   issues in relation to our contentions, is something that would

23   have to be in the future.

24          However, we do feel that having been brought into

25   the lawsuit and being a party to it, that the rest of the

1  people upstream from us who are appropriating water should be

2  made parties to it also.  So my attitude and my idea that I

3  would like to express to your Honor is not so much concerned

4  with the filing of the Complaint as it is with the opposition

5  arguments that if you are going to settle this on the River

6  I think Judge Fee is right.  Let's settle it for all parties,

7  not just part of them.  There are many matters that Fallbrook

8  and Santa Margarita and the State have that I don't believe

9  Vail has any concern with.  I don't want to stick my nose into

10 them.  However, these discussions about settling a part of the

11 rights on the River and not the others, I must rise to state'

12 that there is already one suit, the Oviatt suit up there, and

13 that brings in only some of the people up there.  So as long

14 as there are persons on the River which your Honor has called

15 one of the principal defendants in the case, which we are hoping

16 we are not -- however, we do have substantial rights, both as

17 riparian and under a permit from the State -- we feel that

18 those rights  are being affected by persons upstream and that

19 they should be made a party to the suit.  Now the Government,

20 I presume, has machinery to serve and bring those parties in,

21 and if they didn't I think the next few years would see a

22 multiplicity of litigation with relation to rights upstream

23 because we would certainly have to bring action in connection

24 with persons who, as we found them from time to time, were

25 appropriating water up there that we would have to proceed

1  against, and as long as we have this lawsuit, already an ex-

2  pensive suit, the parties north of Vail should be brought into

3  it also.

4        That is our view, your Honor.

5        THE COURT:  Mr. Grover?

6        Mr. Veeder.

7        MR. VEEDER:  I would like to say a few words in

8  response to the statements that have been advanced here.  As

9  I understand, Mr. Moskovitz is not really opposing the filing--

10  he simply thinks it is undesirable, and of course those of us

11  with responsibility have to make decision on these things, and

12  I am sure he wouldn't want me to tell him what California

13  should do.

14        In regard to the question whether the license and

15  permits issued by the State cloud the title, I apparently did

16  not make it too clear what our position is.  We are not arguing

17  on the merits at this point as to the effect of the license or

18  the permit.  We do say that the holder of a permit and the

19  holder of licenses asserts rights against us, clouding our

20  title by reason of having these inchoate claims.  We think it

21  is entirely appropriate and wholely fitting for the United

22  States to have its title quieted.

23        THE COURT:  Aren't all those licenses on a form that

24  says, "Subject to vested rights?"

25        MR. VEEDER:  Yes, they are, your Honor, but until the

1   extent and the nature of our rights are determined, it is ab-

2   solutely impossible to know what the meaning of that term may

3   be.  Certainly these people who hold permits are claiming under

4   them, they are seeking to exercise rights, and in so doing are

5   conflicting with our claimed rights.

6        So it is our view, and I certainly think Judge Fee's

7   opinion was unequivocal on the proposition that this is a

8   quiet title suit, it is a general adjudication suit, and he

9   says that the only proper way to try such a suit is to have all

10  landowners who are claiming a right to use water within the

11  watershed and outside the watershed before the Court.  We have

12  attempted to do that.

13

14

15

16

17

18

19

20

21

22

23

24

25

In regard to what appears to be an extraneous matter, the filing of notice of lis pendens, we waited until now to prepare it for filing.  I have it here.  Of course, we are interested in the disposition of the motion now before your Honor as to the course we should pursue.

We feel this way, that the issues are extremely broad.  We know, as a matter of fact, that what has transpired at the Santa Margarita River in the last 30 days proves our point, one to which Mr. Stahlman alluded; there is simply not the run-off there was in previous years, and that is a matter of great concern to us.  We think the whole matter can be adjudicated.

I assure Mr. Sachse that we will press for an early determination of the suit.  We have every desire to have it accomplished.  I am not sure that it is in good taste for the Fallbrook Public Utility District to approach us as it has, in view of the activities taken to prevent the trial in 1951-- and they were successful.  I know that personally.

So our view is this, your Honor:  If permitted to make this amendment, to have your Honor pass upon the issues that are presented will be in furtherance of Justice and will dispose of this controversy, which has dragged on far too long.  We do have the machinery to prosecute this case rapidly, and it is certainly our intention to proceed that way.

In regard to the challenge given us a moment ago by

1   Mr. Sachse that we were seeking to avoid the stipulation con-

2   cerning which your Honor has ruled, we have far too much re-

3   spect for your Honor to even think that we could get away with

4   such a thing, had we any desire to do so.  Your Honor has

5   entered a full and complete order in regard to the matter.  I

6   think it is an all-inclusive order.  I think we are bound by

7   that order in this Court.  I think that your Honor has circum-

8   scribed and defined and delineated the issues as you see them,

9   and I am sure that Mr. Sachse doesn't mean what he said.

10  Moreover, you have before you an additional order for con-

11  sideration in regard to the stipulation of November 29, 1951.

12  We hope that sometime this week that can be entered.

13          We feel, as I say, that the issues that are present-

14  ed here are fully within the four corners of the decision of

15  the Ninth Circuit.  We do not believe the stipulation of

16  November 29, 1951, precluded the United States from taking

17  cognizance of changes which have transpired and which we have

18  pleaded.  We believe this is wholly appropriate, and indeed

19  I think it is desirable for a pleading to be filed at this

20  time to bring to date the issues as they now exist, issues

21  which did not exist in 1951 when the Complaint was filed.

22          So we respectfully petition your Honor to permit

23  us to file this Amendatory and Supplementary Complaint so that

24  we can go ahead and get the matter adjudicated at the earliest

25  possible time.

1    MR. SACHSE:  May I ask Mr. Veeder a question, your

2  Honor?

3         With reference to the effect of this stipulation and

4  the supplemental order which Mr. Veeder presented to your

5  Honor, without advising Counsel, it states, Mr. Veeder, that

6  the stipulation of November 29, 1951, is strictly limited to

7  the acres of land in San Diego County.  Do I understand that

8  that language means that the section of the stipulation which

9  reads, "The laws of the State of California shall govern,"

10  that that only applies to San Diego County, or do the laws of

11  the State of California also apply to your upstream factors

12  just proposed?

13         MR. VEEDER:  I think, Mr. Sachse, that the answer

14  is complete.  I think his Honor answered that himself.

15         MR. SACHSE:  I'm asking what you meant by your re-

16  quested supplemental order changing it.

17         MR. VEEDER:  May I see it, Franz?  I have forgotten

18  what I wrote.

19         MR. SACHSE:  Yes.

20         MR. VEEDER:  "The stipulation of November 29, 1951,

21  referred to in this order is strictly limited to

22  approximately 133,000 acres of land in San Diego

23  County, California...."

24         Now, what's your problem?

25         MR. SACHSE:  Continuing,  ".....acquired by the

United States of America from the Rancho Santa

Margarita, which now constitutes the sites for

Camp Pendleton," etc., etc.

Now the stipulation, it so happens, also contains

the language that the issues "in this cause" are to be govern-

ed by the laws of the State of California.

MR. VEEDER:  I believe that in any litigation,

Franz, to the extent applicable, the State laws would be appli-

cable.

MR. SACHSE:  To the extent applicable.  I want to

know if they are applicable to your land upstream in this

cause.

MR. VEEDER:  I would doubt very much that they are

applicable to the Indian reservations.  I would doubt very

much that they are applicable to the lands owned by the

National Government as part of the public domain.  I doubt

very much if they are applicable to the National Forests.  But

I respectfully submit that it is a matter for the Court to

rule upon.

MR. SACHSE:  And I respectfully submit, your Honor,

that the United States has stipulated, in this very cause --

in this cause, the United States is asserting prescriptive

rights upstream, in this new Complaint, it is asserting appro-

priative rights upstream, Indian rights upstream, in the

National Forests.  Do the laws of the State of California

apply to that?

MR. VEEDER:  It is for his Honor to determine.

MR. SACHSE:  I say that it is not.  I say that you,

by your stipulation, and his Honor by his order, have already

determined it, and that this amendment destroys the validity

of that stipulation.

MR. VEEDER:  If that is your view, then what is

your concern?

THE COURT:  Let's look at it calmly here.  When that

stipulation was entered into, the Government was asserting

and presenting for adjudication only the rights that it had

in connection with the Rancho Santa Margarita, that it

acquired, and it stipulated that the water rights that it

claimed were those that it had acquired from the Rancho Santa

Margarita or had acquired thereafter, by prescription or use.

Some months ago the Government injected into this

case the fact that they were going to raise the question of

the Indian lands and the National Forests, etc., and finally

that has now come down and is set down in the various causes

of this proposed Amended Complaint.

Obviously, the stipulation that was entered into

was not entered into with reference to these other properties,

except in a limited fashion.  The Government said that all

rights to be claimed as pertaining to the Rancho Santa

927

1    Margarita we bought or we acquired by prescription or use.

2         Therefore, my first point is that it is obvious that

3    they have stipulated themselves out of saying that any water

4    that we had an interest in upstream growing out of some rights

5    we might have on Indian reservations or in the National Forests,

6    in the public domain, etc., we can come down and catch at the

7    bottom.  By your stipulation you have precluded that.

8         However, where the stipulation says that laws of

9    the State of California will control, then I take it that up-

10   stream, if there are riparian rights on land that belongs to

11   the Government, then those rights are correlative with lower

12   riparian rights, and in that sense, by that very stipulation,

13   the Government would be entitled to have the Court take into

14   account whatever riparian rights were upstream.

15        On this proposed new order that the Government

16   drafted -- and no one else has seen fit, apparently, to give

17   me a different draft, although I didn't think the draft cover-

18   ed what we talked about -- in this new order the Government

19   disclaims here any right to augment its claims to the water

20   rights in the Santa Margarita by virtue of this new matter.

21        I mean, this is a kind of complicated problem to

22   which you cannot say Yes or No.  This stipulation has some

23   impact on this new matter, there are other matters where it

24   has no impact, and we are going to have to get the stipulation

25   or order or both on this matter to clean this matter up.

I am not going to permit this Amended Complaint to be filed if there is any contention by the Government that it relieves them of what they have already stipulated to insofar as it pertains to their rights to the Rancho Santa Margarita. I don't think there will be any problem on that. I think the Government has already indicated that it so agrees. But let us have that understood.

Now, how far it goes in its impact elsewhere is to be looked at as of the time that the stipulation was entered into. Obviously, the parties weren't stipulating to situations that we did not have then in mind. I don't think it is a difficult problem to work out. I think it is going to take a little wording to clarify this situation.

Also, tentatively I am of the view that these problems on these Indian reservations, National Forests, public domain, etc., would be a part of this hearing which would come after we had tried the mainstream of this River, and I don't see that it is going to give us a lot of concern. We are not ready to jump into that now. We can't do everything at one time.

Also, I have this view. If I were to pass on the problems of law that are now raised as to whether I should permit this Complaint to be filed because some of the alleged causes of action do not state causes of action, I would have to do considerable work to be sure that what I decided I was

1    right on.   That delays us further.   I am anxious to go ahead

2    with this trial.   On the other hand, if I permit this Amended

3    Complaint to be filed there may be some of these causes which

4    would be subject to a motion to dismiss or possibly a motion

5    for summary judgment or pre-trial rulings where we could get

6    some of the issues the Government wanted to tender out of the

7    way.

8            I think I understand the Government's position.

9    They want to assert every right they think they have, and

10   they want a ruling on it, and if I am wrong, they are going

11   to take it up.   But just because some of these issues are

12   tendered doesn't necessarily follow that there will be a trial

13   on some of those issues, and under proper motions or motions

14   plus briefing and the use of pre-trial or something, I think

15   we can get some rulings that will dispose of some of these

16   issues.   Maybe we can, maybe we can't.   But if the matter is

17   as important as Mr. Sachse and Mr. Moskovitz think it is, I

18   think so.

19           For instance, I have already tentatively ruled --

20   you know my views; somebody might tip   me over -- but I

21   presently haven't any doubt but that water rights are deter-

22   mined by California law and that the California Water Board

23   is a part of that set-up.   I don't intend to/the work that
                                                 do

24   the California Water Board was set up to do.   This comes as

25   no shock to you.   You heard me tell you what I thought about

1   this.  This was, of course, one of the things that led to

2   Mr. Veeder's dredging some of these novel theories, what I

3   call novel theories, about the separation of the water and

4   the land, and led him to dig up also, apparently, whatever

5   other contentions the Government might have in this area,  I

6   don't find that strange.

7          The mere fact that something is alleged in a Com-

8   plaint doesn't mean that it is true, it doesn't mean that

9   it is there for always.  Maybe it is disposed of by pre-trial

10  rulings.  It may be disposed of by a motion to dismiss a cer-

11  tain cause.  It may be disposed of by a motion for summary

12  judgment.

13         I would be interested in some serious discussion as

14  to how these amendments are going to change our program for

15  the trial of this case.  I presently don't think they are

16  going to.  If Mr. Sachse wants more specifically to tell me

17  why they are going to do it, I would be glad to hear him.

18         I also very definitely think that in connection with

19  any rulings I make on this, I want the stipulation or the order

20  about the effect of this prior stipulation, I want to do it

21  about the same time, because I certainly don't intend that the

22  Government be relieved of its stipulation by reason of an

23  Amended Complaint.  However, the stipulation, as I said before,

24  has limited application.  In some respects it does concern

25  these new matters, in other respects it doesn't.

1          I think it can be stated.  It will take a little

2    work.

3          MR. VEEDER:  Your Honor has had reference to this

4    proposed order that we tendered to you?

5          THE COURT:  Yes.

6          MR. VEEDER:  We certainly understand, and certainly

7    I have never indicated, I don't believe, that by this amend-

8    ment we proposed to be relieved of that stipulation at all,

9    and if Mr. Sachse --

10          THE COURT:  You haven't said that, Mr. Veeder, but

11   your ingenious approach to legal problems is such that Counsel

12   kind of like to have the edges of the tent tacked down real

13   well before they --

14          MR. VEEDER:  I think common sense would dictate that.

15   But so far as I am concerned, I would be glad to have it

16   written into the order.

17          THE COURT:  Well, I have some sentences at 2:00 o'clock.

18   What are you planning to do this noon, you and Mr. Sachse,

19   Mr. Veeder?

20          MR. VEEDER:  I am not sure whether Mr. Sachse wants

21   to associate with me.

22          THE COURT:  Since you are both good friends and both

23   good lawyers, I thought you might have lunch together, take

24   this order you submitted, which I don't think went as far as

25   the stipulation you made here in Court, and see what you can

arrive at.  First, I would like to have the Government's position stipulated clearly, and then I want an order that will be in line with my rulings on your stipulation.

Now it's a sort of a matter of tearing this apart. You entered into the stipulation at a time when the Government was asserting only its rights to the Santa Margarita, and so (1) the stipulation is to control on the Amended Complaint insofar as rights are asserted to the Rancho Santa Margarita.

(2) Nothing that you have put in here as to rights the Government may have as to Indian lands, or public domain, etc., are to augment your rights downstream of the Santa . Margarita, except -- and the only one I can think of so far is this -- that your stipulation provided that your rights downstream were measured by California law, California law would require a correlative determination of downstream riparian rights as against upstream riparian rights and, I suppose, appropriative rights would have to be considered. So that in that sense, when you stipulated that you would be governed by California law as to Santa Margarita, one thing that was involved was the fact that you had correlative rights and took into account the vested rights of other persons on the stream, and in that sense, whether you thought about the Indians or the public domain or not, I think that goes within the stipulation.  However, of course, if it should be adjudicated that there are certain riparian rights on Indian

533

reservations, that doesn't add to Santa Margarita's rights. If anything, i t may detract, in the sense that those upstream rights are correlative and if you take them into account maybe Santa Margarita has less.  There can be no adding of what you have upstream to what you have downstream; they are two different pots -- the Indians, the public domain and the Rancho.

Now, as to whether California law applies to what you assert on the Indian reservations and the public domain, etc., I don't think your -- well, there is a question about your stipulation.  You said, "In this cause!"  Those were not in the cause, and I thought that it was conceded at our last hearing that those rights are exempt from the stipulation. However, I don't think it is too important, because I have already ruled, or intended to rule, that California is going to control these rights.  Well, I might have to leave that open on lands still in the Government's hands.  I don't know about that.  I think something can be worked out on this matter.

MR. SACHSE:  That last point that you mentioned  is, of course, the one that concerns me most.  If we are going to apply one set of legal principles, for example, to a deter- mination of what prescriptive or use rights the United States may have on a military reservation and then a different set of legal principles on prescriptive or use rights that they may have on National Forests, I want to know it now.  It is

my understanding that the law to be applied is the law of the
State of California, and it doesn't matter whether those
rights are asserted on Camp Pendleton or in an Indian re-
servation or on Bureau of Land Management lands or on National
Forest lands.   That is what I think that stipulation means,
and I am afraid that Mr. Veeder disagrees.

THE COURT:   You can mark out your areas of agree-
ment and areas of disagreement and get this thing to where we
can talk about it.   The thing that was going through my head
that caused me to stop was this.   Here is land that the Govern-
ment owns, we will say, which has water running through it.
Probably that land has riparian rights as any land would
ordinarily have.   The Government has never parted with that
land.   Under the Desert Land Acts, if you want to be consistent,
the land that the Government parted with, I have held, or I
am going to hold, that the statute contemplated that the States
could adopt such system as they wanted to, and California
adopted a riparian system and appropriative system and that
the land and water rights in connection with it were determined
under California law -- under State law.   Query:   What about
land that has not yet left the title of the United States?
Maybe you can straighten me out in a hurry about that.

As a practical matter, I don't think that as far as
the public domain land is concerned this is going to be very
important.   This public domain is up in the mountains.   It is

not subject to irrigation.  The amounts of water used would be minimum.  As to the Indian reservations, some of which may be lie in valleys and have tillable land, you may have a little different problem.

MR. VEEDER:  It goes to the merits, your Honor.  It goes to the kind of proof we will introduce.

I will be candid on this matter that the Indian rights have been viewed by the Ninth Circuit and by the Supreme Court, that argument being based on implied reservation, and I think that they will be.

THE COURT:  The rights that you establish for the Indian lands diminish to some extent the rights that you establish for Santa Margarita.

MR. VEEDER:  That is right, and that is not unusual in any watershed in the West.  The National Government is frequently competing against itself in regard to utilization of water.  But that is a happenstance that stems from owner-ship, and it is not unusual for a party to own land at both ends of the watershed.

THE COURT:  Well, let's adjourn until, say, 2:45, and, Mr. Veeder, you and Mr. Sachse and anybody else who wants to sit in, see what you can work out on this stipulation and this order.

MR. SACHSE:  We will at least see how far apart we are.

936

1    MR. VEEDER:  May I inquire for a moment now, --

2    THE COURT:  Yes.

3    MR. VEEDER:  -- so that we can plan our time. Will

4    your Honor have any time tomorrow for these matters?   Perhaps

5    informal pre-trial?

6    THE COURT:  I will make you some time if I have to

7    get down here at 8:00 o'clock and stay until 7:00 or 8:00.   I

8    have a jury trial set.

9    Have you heard what is going to happen to it, Mr.

10   Clerk?

11   THE CLERK:  I understand that it is going on.  We

12   have a jury coming in, your Honor.

13   MR. VEEDER:  Anytime during the week, as far as my-

14   self personally is concerned, but there are mechanical matters

15   that we would like to discuss with you and Mr. Cranston,

16   frankly.

17   THE COURT:  Yes, all right, we will make some time.

18   We can talk about it tonight when we get through.

19   Court will adjourn until 2:00 o'clock for this

20   calendar, and this case will be adjourned until 2:45.

21   (NOON RECESS)

22

23

24

25

SAN DIEGO, CALIFORNIA, MONDAY, APRIL 7, 1958, 3:45 P.M.

THE COURT:  Call the Fallbrook case.

THE CLERK:  No. 1247-SD-C, United States vs. Fall-brook.

THE COURT:  Did you and Mr. Sachse meet?

MR. VEEDER:  Yes, we met, your Honor.

THE COURT:  Met and parted?

MR. VEEDER:  Yes, we did, and we met and parted without agreement, your Honor.

The two points upon which we are in disagreement -- first, I will say that we are in agreement on this and we have an understanding that the United States claims no right to bring water down to Camp Pendleton by reason of its ownership of the stream, we have already agreed to that, and that is taken care of and we will formulate the language for that. The disagreement stems as to the applicability to these other lands of the National Government pleaded in the Supplementary and Amendatory Complaint.

Your Honor has before him the order which you entered on February 11, 1958.  It is on page 4, paragraphs B and C. There your Honor entered this proviso as part of its order: Paragraph  III of the Stipulation is a disclaimer by the United States that by reason of its sovereign status it has rights to a greater quantity of water than a person not sovereign would have standing in the same position as the United States.

1    Paragraph C on page 4 of the Stipulation: The measure

2    of the rights claimed by the United States in this action is

3    all of the laws of the State of California pertaining to water

4    rights, and among them are the laws relating to riparian rights,

5    to prescriptive rights and to appropriative rights, including

6    the method and procedure established by California law for

7    the acquisition of appropriative rights.

8    Your Honor, on both of those scores there certainly

9    were not within the contemplation of the parties when the

10   stipulation of November 29, 1951, was entered into -- I would

11   be powerless to undertake to bind the United States in that

12   matter.

13   THE COURT:  I don't follow you for sure, now.  I

14   have in mind what those two clauses of the interpretation

15   stated.  But now what is your point?  That you would be power-

16   less to bind the United States as they also apply to these

17   new rights that the Government asserts?

18   MR. VEEDER:  That is certainly true, your Honor.

19   THE COURT:  Is that your point?

20   MR. VEEDER:  Yes, your Honor.

21   THE COURT:  Of course, one would be a non sequitur.

22   Certainly where the Government owned land and claimed some

23   rights in the land, they are not acquiring new rights; it is

24   rights that they had.

25   MR. VEEDER:  That is right.

1        THE COURT:  And certainly the language of that

2   stipulation could not apply in this respect.

3        MR. VEEDER:  That is correct, and that is our view.

4   The rights to which we are making reference now are lands which

5   are not part of the public lands as that term has been used

6   in the law.  In other words, those lands not subject to ac-

7   quisition, and the Desert Land Act and the antecedent Acts

8   of 1866 and 1870 would have no application to them whatever.

9   So for that reason it would be impossible to agree that the

10  United States could only acquire rights to the use of water

11  under State law for the Indian lands or for the Forest lands.

12       THE COURT:  That seems patent to me.  Does anybody

13  dispute that?

14       MR. VEEDER:  Mr. Sachse does.

15       THE COURT:  How?

16       MR. SACHSE:  For one thing, the Complaint itself

17  alleges the existence of prescriptive rights in these up-

18  stream lands.

19       THE COURT:  Now, wait, Mr. Veeder.  If you are claim-

20  ing prescriptive rights upstream, what about that?

21       MR. VEEDER:  I didn't hear that.

22       THE COURT:  Mr. Sachse just said that you are claim-

23  ing prescriptive rights upstream.

24       MR. VEEDER:  You mean we are claiming upstream

25  rights prescriptive in character?

MR. SACHSE: What I am saying, to make it clear to Mr. Veeder, is that there is, in paragraph XXI of your Complaint, for example, which is one example of it, the allegation that you have acquired prescriptive rights upstream. I insist that if you acquired any prescriptive rights upstream, under your stipulation the extent of those prescriptive rights, the method and procedure of acquiring them shall be determined by State law.

MR. VEEDER: I am in accord with that.

MR. SACHSE: Good.

MR. VEEDER: I am in accord with that, that from the standpoint of acquiring by prescription -- if I may point out on this map, your Honor, what might be involved -- we have the Indian reservation here. Water had been used on there for a long time. Conceivably the rights have been used adversely to the people downstream, and certainly in our proof, if our proof supports it, we would entitled to a prescriptive right.

THE COURT: But as to those rights, you concede that they would be measured by State law.

MR. VEEDER: The prescriptive rights.

THE COURT: Prescriptive rights.

MR. VEEDER: Yes, that is right. There is no question on that. I didn't realize that that is what was bothering Mr. Sachse.

MR. SACHSE:   That is one of them.

The second thing is, and it is particularly noticeable in Count XVIII, which is National Forests, and on page 31, the last paragraph of the Count, there in the middle of the page:

"Attached to this Supplementary and Amendatory Complaint is a list of the licensees who have been permitted to use waters arising upon the Cleveland National Forest and the San Bernardino National Forest. That list marked Exhibit F is by reference made a part of this Supplementary and Amendatory Complaint. Title to those rights to the use of water being thus permissively used resides in the United States...."

Now Exhibit F, which is a part of this Complaint, if you will look at page 61, you will see Exhibit F, your Honor, and Exhibit F tabulates a list of vested appropriative rights of the State.   Mr. Veeder gives us the application number, the permit number, license number, but he doesn't tell us the date.   However, I have checked these dates and I will call your attention to the first one -- Milton M. Lloyd and Evelyn M. Lloyd.   That is an application to appropriate, I think it is, 650 gallons a day from an unnamed spring, and its effective date is March 13, 1931.   Now that particular right was under the laws of the State of California, an absolutely vested right long before the United States ever

1    acquired Camp Pendleton, long before this action was filed.

2    Do the laws of California apply to these licensees?   He says

3    they don't.

4              MR. VEEDER:  May I inquire, are you representing/of any
those?

5    those?

6              MR. SACHSE:   I represent not a single one, but I

7    assume that the availability of water to Fallbrook, to my

8    client downstream, is going to be very largely determined by

9    what law is governing in this case, and I am very happy with

10   the present stipulation that the laws of the State of Cali-

11   fornia apply and I am therefore very much concerned when the

12   Complaint expressly and specifically says that it doesn't

13   apply to this group of licensees.

14             MR. VEEDER:  May I tender this thought in that con-

15   nection, your Honor?   There are involved in this paragraph XI

16   a combination of questions none of which, I think, involve

17   Mr. Sachse's clients at all.   But if he is interested in the

18   problem presented there, in this San Bernardino National

19   Forest --

20             MR. SACHSE:  Cleveland National Forest.

21             MR. VEEDER:   -- both of them, we are stating that

22   those rights to the use of water which are referred to in

23   Exhibit F were never relinquished to those people.   All they

24   have is a permissive right to use them.   The reason for that

25   is that the State laws have never applied in the National

1   Forest, in our view.  But if we are in error on that, then

2   your Honor rules on it.

3           THE COURT:  But you are getting away from the question

4   of this stipulation and its application.

5           Now shoot at this, Mr. Sachse:  It seems to me only

6   common fairness  to take this position.  When the stipulation

7   was entered into, the Government had in its Complaint only its

8   rights to the Santa Margarita, and the stipulation was entered

9   into with that factual background.  Now it seems to me that

10  you are taking a rather strained position if you contend that

11  the Government, on entering that stipulation, was therefore

12  bound when they come in with an Amended Complaint and assert

13  certain rights which don't augment the rights of Santa Margari-

14  ta to Indian reservations and National Forests.  Those were

15  never in contemplation when the stipulation was signed.  We

16  have agreed that if the Government claims prescriptive rights

17  up there, they are going to be measured by State law.  Mr.

18  Veeder says he is not going to contest that, and the Court

19  would so rule anyhow.  That could be taken care of.

20          But now the question  is, when the Government says

21  that all we claim is so-and-so, I think in fairness that that

22  stipulation has to be read as to the rights at Santa Margarita,

23  with a loose end, of course, that if a correlative right up-

24  stream of a riparian nature affects a right downstream the

25  law of California applies, and in that sense the stipulation

1    also concerns anything in the new Complaint in the sense that

2    the Government cannot augment their right in Santa Margarita

3    by what they have now put into this Complaint in new causes.

4    Do I make myself clear?

5         MR. SACHSE:  You make yourself clear, your Honor,

6    but my feeling on this is this.  First, to repeat the basic

7    principle -- I will not argue it any longer, but simply to

8    repeat it -- I feel that the stipulation, because of its very

9    language, ought to preclude any amendment.  I argued that this

10   morning.

11        The second point is this.  This stipulation didn't

12   occur in a vacuum, it didn't just pop up out of a vacuum, but

13   there was a reason, that was a very real reason, and the briefs

14   that have been submitted to your Honor on the Government's

15   motion to make the ruling on this stipulation, I think, spell

16   out the reason.  The stipulation was entered into because of

17   wide-spread concern in the Congress and elsewhere over the

18   nature of the claims that the United States was asserting.

19        THE COURT:  At Santa Margarita.

20        MR. SACHSE:  To the River.  If it is at Santa Mar-

21   garita only, then I think Mr. Veeder must find himself on the

22   horns of a dilemma.  If that stipulation was entered into be-

23   cause of Santa Margarita only, then under no circumstances

24   should your Honor permit the amendment of this Complaint to

25   drag in new things and thereby undo this stipulation in this

case, because then the whole effect of this stipulation is thereby destroyed.  If applied to the entire River, if applied to a doctrine or a philosophy of water rights, then maybe he can amend, whether we like it or not.  But if he amends, the same restriction should apply to this reservation.

The heart and soul of this stipulation, to anyone who is familiar with or reads the transcripts of Congressional hearings, etc., the heart and soul oddly enough, isn't paragraph II of the stipulation itself.  The heart and soul were paragraphs I, III and IV: Paragraph I where they complain about the word "paramount," an  unfortunate choice of words; paragraph III, the word "sovereign;" and paragraph IV, "laws of the State of California."  That is the reason for the stipulation.

THE COURT:  Well, you have to look at the stipulation as the situation was when it was drafted.  At that time the Government was claiming the right to quiet title to its rights acquired from the Santa Margarita, and this word "paramount" got kicked around by somebody in the newspapers and whatnot, and the stipulation made it clear that the Government was claiming nothing in their sovereign right.

MR. SACHSE:  That is right.

THE COURT:  However, after that developed and the Circuit came along and talked about adjudicating the rights on the River, it then became apparent that there were Indian reservations.

1    What is the Government -- trustee for these Indians?

2    MR. VEEDER:  That is correct.

3    THE COURT:  Obviously, the stipulation was never

4 drawn with that in mind, and we have already stopped the gap

5 that that upstream water cannot be caught in a bucket and used

6 down at Camp Pendleton.  It is merely a matter of adjudicating

7 what rights adhere to these Indian lands.

8    MR. SACHSE:  I have only one reply -- and I will not

9 belabor it, I see no reason for briefing it; I think it is all

10 there in front of you -- and that is this:  One of these cases

11 cited in our memorandum in objection to the filing of the

12 Amended Complaint at all was a situation where plaintiff at-

13 tempted to throw in a new theory of action.  In this case it

14 was a question whether it was ex contractu or ex delicto.

15 Anyhow, here sits a defendant, the only one, Fallbrook I'm

16 speaking for, who has been party to this action for better

17 than eight years, on a stipulated basis, a stipulated basis

18 as to facts and a stipulated basis as to the law; we have

19 gotten together and eliminated a potential conflict of laws.

20 Now, two years after the appeal and seven years after the

21 stipulation, this defendant is being told, "Forget all that

22 and start all over again."  For that reason we object.

23    THE COURT:  No, I understand that Mr. Veeder concedes

24 that the stipulation entered into still applies, although he

25 may amend his Complaint, to those rights which are claimed to

1    pertain to the Rancho Santa Margarita.

2                Is that right?

3                MR. VEEDER:  That is correct, your Honor.

4                THE COURT:  Mr. Sachse, look at it this way.  Follow

5    me and tell me where I am wrong.  Let's suppose that the

6    Government proceeded with its suit as to its rights at Santa

7    Margarita and said nothing about Indian reservations or

8    National Forests or public domain, and let us assume

9    that the Circuit either hadn't said what it did or that there

10   was no decision of the Circuit Court about the matter.  So

11   there was an adjudication made of the Government's rights at

12   Santa Margarita.  Since the Government had alleged only rights

13   at Santa Margarita, do you think that that would estop the

14   Government if some judgment was entered, from later coming on

15   in some later litigation and saying that the Government has

16   riparian rights on this Indian land?

17               MR. SACHSE:  Absolutely not.

18               THE COURT:  I don't think it would either, because

19   the issues are those that are tried.

20               Secondly, if that is true and the vested rights, if

21   any, the Government had pertinent to Indian land or National

22   Forests or public domain were open for adjudication later,

23   then what is wrong with having the Government state all its

24   claims on this watershed, with the exception that it may en-

25   large the issues to be tried?

MR. SACHSE:  There is nothing wrong with it, except that that is the basis of our objection, your Honor.  That is what I was so heated about this morning, is the injustice to the defendants.

THE COURT:  Let's analyze it a minute.  Do you contemplate that the inclusion of these alleged rights on Indian reservations and public domain will have to alter our plan of trial in this case?

MR. SACHSE:  There is absolutely no question about it.  Your Honor raised that before the recess and I gave a little thought to what I personally would want to do.  I can't state for anybody else;  I talked briefly to Mr. Moskovitz. For one thing, it will certainly mean, there isn't the slightest question, that at least there will be half a dozen formal motions to make definite and certain and after that some very expensive discovery procedure, because I don't anything about those Indian reservations.  I don't know where I will get the information.  I frankly don't.  I don't know when they were withdrawn, I don't know when they were reserved, I don't know how many Indians live on them, I don't know what their acreages are, I don't know what the potential use is -- I don't know anything at all about them.

I am just going to mention a few of the things that are going to have to be discovered.  I will have to discover them or else I will not know how to prepare to contest this

case.  I will have to discover why, in Exhibit F, Mr. Veeder

contends that the rights of Milton and Evelyn Lloyd or the

license dated 1931 are property of the Government in the

National Forest, when the Forest Service itself has, in 1926,

1931, 1934, 1937, 1949 and 1955 been going right to the State

itself and applying for water in the same National Forest.  I

am going to have to ascertain that.  There is something very

lacking when the very agency whose rights he says he is pro-

tecting, whose rights he says are prior, that Mr. Lloyd was

a permissive user and Mr. Jurkovich is a permissive user,

when that very same agency has gotten no less than half a

dozen permits itself that it went to the State to get.  We are

opening up new vistas here that are just fantastic.

THE COURT:  This amount of water used up there in

the National Forest can't have any appreciable impact on this

case, can it?

MR. VEEDER:  Are you addressing me, your Honor?

THE COURT:  Both of you.

MR. VEEDER:  The point that we make in regard to

what Mr. Sachse has said is that there is a question of law

perhaps between the holders of these licenses and the United

States of America.  I see no conflict whatever, though, with

the Fallbrook Public Utility District, and while Mr. Sachse

may be interested in it from a theoretical standpoint I see

no merit in his approach to the problem from the standpoint

1    why would we plead it?

2         We would be very glad to submit briefs and cover this

3    at the appropriate time, and undoubtedly will be called upon

4    to. Now to me that is a question not concerning Mr. Sachse,

5    nor is it of concern to his client.

6         Now, he says that he is concerned about the necessity

7    of discovery process. We have available and will make available

8    to him the aerial photographs delineating the irrigable acreage.

9    We have full and complete information in regard to those areas

10   that will be available to him. I don't believe that he will

11   have to indulge in discovery process in that connection at all,

12   because we will certainly see that he can locate those matters

13   himself. There is no hidden meaning in these things. We

14   spell it out as fairly and as explicity as we can.

15        We do feel that the case will not, in any sense,

16   be delayed from the standpoint of trial, in view of your

17   Honor's plan of taking the evidence. Certainly these areas

18   which are segregated for purposes of hearing embrace National

19   property, and I daresay that in any hearing before Mr. Cranston,

20   whether these were pleaded or not, he would want information

21   about water use on the properties of the United States. I

22   don't see how it could be otherwise. The fact that we have

23   set them up and pleaded them makes no difference. Certainly

24   I am assuming that the trier of the facts must know all of

25   the facts in regard to water use. So how could it make any

1   difference to anyone from the standpoint of time of trial?

2          I admit, your Honor, that we have pleaded in regard

3   to Fallbrook's rights, but there is nothing new there.  If

4   your Honor would review the reply filed by the United States

5   of America, it will be observed that those very issues were

6   pleaded in the replication.  I thought it better to put them

7   in the Supplementary Complaint and we would try to bring this

8   case to date.

9          So we alleged, and we reiterate now, that Fallbrook

10  has not complied with the State law in regard to filing, has

11  not acquired an appropriative right or even an inchoate right,

12  and we think that is a very important issue.  But it is not a

13  new issue.  It is an issue that has been in the case since

14  1952.

15         Now I see no basis whatever for his assertion that

16  the filing of this Supplementary and Amendatory pleading

17  would in any way prejudice his rights or interests.  He is not

18  going to be in any different position.  Everything that is

19  pleaded there, those rights and interests were in existence,

20  and certainly Fallbrook had to take into contemplation those

21  upstream.  I do not see how the State of California could issue

22  a permit without taking into consideration the Indian rights.

23  So there is nothing written into this pleading that was not

24  present and that I believe would have been taken into con-

25  sideration by your Honor in the ultimate disposition of this

matter.  Certainly we wouldn't be working in a vacuum.  Certainly the Coahuila Indian Reservation, a large irrigable acreage, would have been taken into consideration even if it had not been pled.  I think we have put them on notice, myself.

MR. SACHSE:  Let me answer in just half a dozen words, your Honor.  If Mr. Veeder, with the tremendous resources of the United States, with the complete facilities of the Bureau of Indian Affairs and the Department of Agriculture and everybody else at his elbow, if it has taken him a little over two years to work this thing up so that he can honestly try to do a legitimate good and fair job for these reservations, how does he expect me to do a good and fair job for my client when he throws at my feet aerial photographs and says, "Answer this thing?"  It can't be done.

THE COURT:  Mr. Veeder, of course, has been trying another case in Spokane.  I don't think he has been looking at this Indian problem for two years, Mr. Sachse.

MR. VEEDER:  That is right, and I make no apology in that connection, your Honor.  I feel this way, that certainly Mr. Sachse, as Counsel for the Fallbrook Public Utility District and purporting to build a dam, certainly a competent Counsel had investigated all those upstream claims before he went so far as he has.  I don't see how he could possibly bring a condemnation proceeding without knowing that.  The eminent Counsel couldn't have possibly made such an error.

1    And I feel the same way about the State.   They certainly knew

2    all these things or they would not have gone as far as they

3    had.

4              MR. COURT:  Mr. Grover.

5              MR. GROVER:   I have nothing to add to what Mr. Sachse

6    has said this morning, your Honor, but in view of what has

7    been said since by your Honor and others there are a couple of

8    observations I would like to make from the standpoint of some-

9    one in a quite different position from that of the Fallbrook

10   Public Utility District.

11             The matters brought up in the proposed Amended and

12   Supplemental Complaint that do affect the people upstream,

13   such as my clients above the Vail Dam in a very direct way,

14   will burden us even more than they burden us today.   I don't

15   want to try your Honor's patience by repeating what I said

16   earlier, that the suit was a great burden on such people, but

17   it seems to me that that was the essence of the stipulation

18   with the State; that Mr. Veeder's own client, Congress, re-

19   presenting the people of the United States, was disturbed

20   about the effect of the lawsuit upon thousands of people in

21   this watershed, and that it was in that context that the sti-

22   pulation said "in this cause."

23             It is true, your Honor, that they had in mind at

24   that time only the Rancho Santa Margarita or Camp Pendleton,

25   and that the legal effect of California law  was not thought

955

of in terms of the Indians; but they did have in mind very

much the complaints in Congress, which the Attorney-General

himself was called upon to discuss before Congress, the com-

plaints that the United States was, as it was alleged, in-

dulging in oppressive litigation, and so the United States

stipulated with the State on behalf of such people as my clients

that "in this cause" we will make only certain claims. Now

if the other claims were not within the scope of their think-

ing at that time, the stipulation may not bind them; but at

the same time the heart of the stipulation was that they

wouldn't go into those other claims.

I would like to give a few examples of how we would

be affected. First of all, Camp Pendleton is the last one on

the stream. As the Central Stockholders case, I believe

(Ninth Circuit 1931), cited by Mr. Moskovitz today, points

out, your position on the stream has a great deal to do with

whether or not you need quiet title relief. As long as we are

upstream from the Government, we don't have the problem with

the Government's rights that we would have if the Government

were asserting rights upstream from us, as they would be if

the Indians, National Forests and public domain lands are

brought in. So we have an additional problem by changing our

position on the stream relative to the Government.

Then there are the Indian rights, the public domain

rights and the National Forest rights. As your Honor knows,

1   there are many massive litigations going on today, including

2   the Colorado River case in the United States Supreme Court,

3   in which, in which the Indian rights problem, which is theoreti-

4   cal and involves profound problems of jurisdiction between the

5   United States and the State -- there are massive litigations

6   in which these are being decided on the long range basis and

7   it is going to be a generation before they are decided and we,

8   as little owners up there, don't want to be caught up in that

9   sort of problem.

10          Then of course the pleading itself is, in my opinion,

11   prolix -- it is argumentative in many places.  To do a fair

12   job for my clients, I would have to make motions to strike,

13   I would have to indulge, as Mr. Sachse says, in discovery pro-

14   cedure that I might not otherwise be required to were the issues

15   more limited.

16          As an example of the factual problems we would get

17   into -- I can't guarantee this, but as I glance through it I

18   got the impression that the water duty for all of the Govern-

19   ment lands was 4.2 acre feet per acre.  The testimony of the

20   Government's witnesses in the first trial was that the water

21   duty varies with the type of land, and I can't really believe,

22   if I am right in reading that, that the lands involved do all

23   have the water duty of 4.2 acre feet per acre, and we would

24   have to go into that sort of thing with respect to lands up-

25   stream.  In other words, to make it short, the litigation is

957

immensely more complicated, immensely more burdensome upon the smaller people upstream, and it was the purpose of the stipulation to satisfy Congress that we were not going to have any more burdensome litigation than the stipulation recited.

THE COURT: Mr. Grover, I have heard of instances where permits have been issued on game preserves and matters of that sort -- they have been kicked around by some of the commentators. But the Congress would really be on its warhorse if some attorney for the Government tried to give away or prejudiced in any way rights that pertained to Indian reservations or National Forests or public domain. I don't think that there would be any question but that there really would be a hearing if Mr. Veeder would get up here and say, "Yes, I entered this stipulation at a time when the Government was merely talking about its rights in Santa Margarita, and now because of that stipulation, which I made in this cause, the Government therefore must necessarily concede that it relinquishes any rights that it had pertaining to Indian reservations, National Forest lands or public domain. He would be out of Washington so quick that --

MR. GROVER: I don't understand that the Government would relinquish these claims if they were not alleged, your Honor.

THE COURT: You say that this stipulation is going to control, that the Government says that it doesn't claim

1      anything except this, and that therefore --

2          MR. GROVER:   In this cause, your Honor.   But as I

3      believe you asked Mr. Sachse, if the Government in another

4      suit made these claims, they would presumably be considered.

5      But in this cause the United States is just not presenting those

6      claims, and I don't mean to suggest that they are relinquishing

7      them.

8          THE COURT:   I can't read the stipulation that way.

9      It was not a stipulation that the Government was now only

10     going to present claims that it might have in Santa Margarita

11     and was not going to present claims on Indian lands, National

12     Forest  lands or public domain.   I can't read it that way.

13         MR. GROVER:   I think your Honor's own analysis of

14     the stipulation leads to that, if I may say so.   You pointed

15     out that the stipulation must be read in context and in the

16     context of the thinking that they had, and therefore I believe

17     we must say that they made the stipulation only in the con-

18     text of the claims they were then presenting, and in that con-

19     text they did limit their case, and I think it would be wrong,

20     as your Honor suggested, to apply the stipulation to all these

21     other claims that they weren't thinking of.   But I think it is

22     just as wrong to bring in these new claims, to have them in

23     the case at all.   It is not the scope of the stipulation with

24     respect to the binding nature of California law that I am dis-

25     cussing, but rather whether or not these new matters should be

1    brought into this particular lawsuit.

2         THE COURT:  Let's suppose, for argument -- and this

3    is probably not going to be elicited because the Indian re-

4    servation is away up in the watershed; in other words, there

5    is not much back-country that feeds it -- but let us suppose

6    that there were very substantial riparian rights that per-

7    tained to this Indian land, a large amount of water was legiti-

8    mately allocated to that land, and let us suppose that this

9    case was adjudicated without that Indian problem being de-

10   cided, and since that was not presented to the Court, the

11   Court considered the rest of the watershed, took into account

12   what riparian rights pertained to Santa Margarita, what rights

13   there were of appropriators, and came up with the answer,

14   some kind of formula, that there was obviously a lot of sur-

15   plus on this stream and then relying on  that Fallbrook goes

16   ahead and expends a lot of money and builds a dam to use this

17   surplus water, and about the time they get the dam built the

18   Government comes in and says, "Well, now, we want to present

19   to the Court the riparian claims that pertained to this Indian

20   reservation," and let's assume, for argument, that the amount

21   of water that could legitimately be allocated to the Indian

22   lands was sufficient to destroy completely any surplus that

23   the Court otherwise might have found to exist. It would be a

24   fine kettle of fish, wouldn't it?

25        MR.  GROVER:  Of course, Mr. Sachse is the one to

1    answer that question, but I think of a couple of things that

2    might bear on it.  For one thing, Fallbrook might be willing

3    to build the dam if the Indians were not using that today.

4    They are going to have to take a calculated risk as to ex-

5    pansion of riparian uses, because obviously there is going to

6    be more riparian use authorized than exists today.  That is

7    inevitable.

8         Another item that occurs to me is that the nature

9    of this surplus is such that riparians cannot use it in many

10   cases.  The storm, such as we have had recently and such as

11   the history on this River indicates, are of such that they

12   cannot be used without storage by the riparians.  Then it would

13   be available only to an appropriator.

14        So that your Honor could perhaps adjudicate all the

15   necessary questions of these rights without actually getting

16   into the rights of the parties themselves and it would not

17   bind the Indian rights presumably in any sense, even though we

18   might have to discuss to some extent as called for -- that is,

19   Fallbrook might have to; I don't believe our clients would be,

20   but Fallbrook might have to discuss to some extent these

21   riparian uses, as a matter of fact, not in a way to bind those

22   parties but merely to discuss what the likelihood of their

23   use would be, and from the standpoint of my client's position

24   in the case we would much rather have that the case where it

25   is just a fact question for Mr. Sachse and Mr. Veeder than to

1  have the case of those rights in interest as against our

2  clients and therefore have to adjudicate those rights right

3  down to the last acre foot.  So that I don't believe that it

4  is essential that we adjudicate those rights in order to treat

5  them in this lawsuit to the limited extent to which they would

6  come up.

7         But as I say, Mr. Sachse probably ought to answer

8  that, because it affects him more directly.

9         THE COURT: Well, you lose me along the route some-

10 where, Mr. Grover.

11        MR. GROVER:  Well, my remarks were just directed

12 merely to the stipulation and the purpose of it and the mean-

13 ing of it when they said that they were claiming only certain

14 things in this cause; they were trying to assure everybody

15 that we were not going off on the sort of thing we are ob-

16 viously are going off on now, and that if the stipulation is

17 treated in context, that was its real purpose, it seems to me.

18        THE COURT:  Does anyone else want to be heard?

19        Well, I want somebody to prepare another draft of

20 this order as to how this stipulation and the interpretation

21 that I placed upon it fits into this new picture.  I suppose,

22 Mr. Veeder, you can start on it.

23        MR. VEEDER:  Yes, your Honor, I will.

24        THE COURT:  Do you plan to be here a good part of

25 this week?

1          MR. VEEDER:   I will be here through Friday, your

2     Honor.

3          THE COURT:   When do you think you could have a draft

4     of that?

5          MR. VEEDER:   Is Mr. Sachse going to be down tomorrow?

6          Are you going to be down?

7          MR. SACHSE:   I haven't decided.   I haven't planned.

8          THE COURT:   I think you should, Mr. Sachse.

9          MR. SACHSE:   I can arrange it.

10         THE COURT:   The first order you presented generally

11    looked all right, except that it did not have in it the con-

12    cession you made here in Court that your rights upstream, if

13    any, were not going to augment your rights downstream.

14         MR. VEEDER:   We will write in a third paragraph on

15    that.

16         MR. SACHSE:   I think we can avoid keeping Mr. Veeder

17    any longer than we have to, if your Honor is inclined to rule,

18    to disagree with us, and would so tell us -- because after all

19    we have to write the type of order your Honor wants -- if your

20    Honor is going to rule that the language of paragraphs 4b and

21    4c of this order do not apply to any rights except the rights

22    pleaded in the original Complaint.

23         THE COURT:   Let me see that interpretation that I

24    made.   I don't have it in front of me here.   Who has a copy of

25    it?

1    MR. SACHSE:  My file has fallen apart so badly.

2    MR. VEEDER:  I have it here (handing document to

3    the Court).

4    MR. SACHSE:  If you will so indicate, I think we

5    can write the order right now, is what I am trying to say.

6    Mr. Veeder's statement was correct, incidentally.

7    I concede that paragraph 4a of the order applies only to the

8    military reservation lands.  There is no argument about that.

9    THE COURT:  Well, there is no problem about 4b, is

10    there -- the rights gained by prescription?

11    MR. SACHSE:  I am speaking of capital B -- everything

12    down to capital B is all right.

13    THE COURT:  I am going to rule that capital B per-

14    tains only to the Santa Margarita picture.

15    MR. SACHSE:  Only to the lands covered in the original

16    Complaint is probably as good a way to phrase it as any, isn't

17    it, Mr. Veeder?

18    MR. VEEDER:  I would like to be sure I heard what

19    your Honor said.

20    MR. SACHSE:  He said he is going to rule, and then

21    he hesitated as to how to phrase it.

22    THE COURT:  Talking about the disclaimer by the

23    United States, capital B talks only about the lands described

24    in the Complaint, the Santa Margarita picture.

25    MR. MOSKOVITZ:  In other words, Camp Pendleton, the

964

1    Hospital and the Ammunition Depot.

2         THE COURT:   In other words, in substance, you draw

3    the order, in substance, that the stipulation was entered into

4    at a time when the Government was asserting only its rights

5    in connection with the Rancho Santa Margarita.   Therefore, the

6    stipulation speaks as of that time.   There is one exception,

7    and that is where I held that the Government's riparian rights

8    were determined by California law, automatically that meant

9    that they were correlative rights in connection with any other

10   riparian rights in the watershed.   Do you follow me on that?

11   And that would be true whether the Government was asserting

12   water rights on the Indian reservation now or not, because

13   under California law their riparian right would be correlative.

14   Now as to these new areas, Mr. Veeder has conceded that the

15   prescriptive rights that are claimed upstream in connection

16   with these new lands are subject to California law, and the

17   Court will rule that that is true.   They want this provision--

18   and we are in agreement on that -- there is no right to bring

19   water downstream from these Government areas to augment the

20   rights of the Rancho Santa Margarita.

21        Can you draw an order taking care of this situation?

22        MR. SACHSE:   I will be happy to cooperate with the

23   drawing of the order, your Honor.   I want it understood, your

24   Honor, that we are not stipulating to the order.

25        THE COURT:   I understand.   I am not asking you to

1    stipulate.   I am ruling on it.

2        MR. VEEDER:   Respecting C, if C is held to relate

3    only to prescriptive rights, we can write it in that way, your

4    Honor.-- on page 4, paragraph C.

5        THE COURT:   Well, as it stands now, essentially C

6    of course pertains to the Rancho Santa Margarita and the rights

7    downstream.

8        MR. VEEDER: Yes.

9        THE COURT:   I wouldn't modify it, except that I would

10   say that C pertained to that only and not to anything else,

11   but that as to these lands upstream prescriptive rights are

12   to be governed by California law.

13       MR. SACHSE:   Your Honor, let me point out, I don't

14   think that is accurate and I don't think, with apology, that

15   that is what you mean.   Paragraph B of Mr. Veeder's presently

16   proposed order says, "No other lands or rights to the use of

17   water in this litigation will be subject to or bound by the

18   stipulation of November 29."   Rights to the use of water, now,

19   will no longer be bound by California law, except rights to

20   the use of water on the reservation, if I understand you right.

21       MR. VEEDER:   I certainly think that C has to be

22   modified in accord with our tendered paragraph B in this order.

23   It has to be modified in the light of your Honor's present

24   ruling.   Shall we take that up?

25       THE COURT:   I think it has to be modified because,

1  as I understand it, the C that is in that interpretation, I

2  will state, pertains to the Santa Margarita picture to start

3  with.   Now as to these new lands the Government is putting in

4  this Complaint, you have the question, to which I don't know

5  the answer now, of rights which the Government may have on

6  lands with which they have never parted, and I don't think we

7  can say that they are necessarily controlled by California

8  law.  They may well be measured that way.   There is no Federal

9  law.  How are you going to determine the measure of the ri-

10 parian right without looking at the California law?

11        MR. SACHSE:  Let me be extremely specific as to the

12 kind of problem that worries me.  Your present language in

13 C says, "....among them are the laws relating to riparian

14 rights...."  Let's stop there for a moment.  Under California

15 law, as I understand it, a riparian cannot store, and that is

16 a vital issue in this case -- whether the ownership of ri-

17 parian lands on an Indian reservation or a National Forest

18 gives the Federal Government the right to impound winter floods.

19 I want to know before we start the trial of this case whether

20 California law, as I understand it, applies up there.  That is

21 just one.

22        THE COURT:  I don't know that we can do it all in

23 one bite, Mr. Sachse.  I say that that letter C in the inter-

24 pretation will have to apply presently to the Rancho Santa

25 Margarita and the rights claimed downstream; that as far as

1  the rights pertinent to these lands are concerned, we are going

2  to have to leave the door open until we can look into a little

3  law.  One point we can determine, and that is if the Govern-

4  ment is claiming prescriptive rights in that area, it is going

5  to be measured by California law.

6       Now you raise this question of storage.

7       MR. SACHSE:  That is just one.  There are lots of

8  them.

9       THE COURT:  There comes to my mind this fact, that

10  in some of these cases where the Government has built dams

11  they have used Indian lands for the purpose of building dams,

12  and this is going to require some study.  I can't pass on it

13  right now.  But how the Government's rights are measured, such

14  as a riparian right or the right to store water -- the right

15  to store water would be one kind of problem.  As to a riparian

16  right, I suppose you would have to go back to the time when

17  this property came into the public domain.  The common law,

18  as it has been applied to the picture, and the common law at

19  that time on riparian rights, really Mexican law which we

20  adopted in the West here, is much the same as our riparian

21  law today.

22       But that can't all be contained in this order I am

23  asking you to draw.

24       MR. VEEDER:  That is right.  That goes to the trial

25  on the merits, I think.

1          MR. MOSKOVITZ:  Your Honor, I wanted to add -- I

2     have been silent -- that as to the interpretation of the sti-

3     pulation, I think your Honor has been on the right line.  But

4     I think we do have to separate the interpretation of the sti-

5     pulation from the issues of law on the merits as to what these

6     rights may be, we can't adjudicate them at this point, and I

7     think it will require a fair amount of briefing before we fully

8     explore those counts.

9          MR. VEEDER:  That is the understatement of the day.

10          MR. MOSKOVITZ:  Those are among the big problems

11    that Mr. Grover had in mind as to why introducing these new

12    claims will affect this litigation.  I think that will happen

13    without doubt.  Both factually and legally there will be a

14    lot of issues that will take time to explore.

15          But I don't say that the Government can be forbidden

16    to bring them in, if the Government feels that it must,

17    although I don't agree that it must, and I also do not honest-

18    ly see that we can limit the Government   in its claims by

19    virtue of that stipulation as to what it may now assert for

20    the Indian reservations, although again, I think it opens up

21    a lot of problems.

22          THE COURT:  Well, I think you have enough to work

23    on.  As a matter of fact, you can put some proviso in here

24    that nothing herein is a determination of this, that or the

25    other problem, or you can merely omit it.

1    I think we are clear as to what I think about this

2  stipulation and how it applies, and I would like to have you

3  work on it tomorrow and get some draft to me as early as

4  possible, and other Counsel who represent these major defen-

5  dants are invited to participate and be here -- I don't know

6  about getting you a copy if you are not around -- and try to

7  see what we can do.

8    MR. SACHSE:  Then may we also have an indication

9  from your Honor -- as I understood you this morning, if this

10  supplement to your order on the stipulation is worked out and

11  approved as to form, at least, by us, may we then have an in-

12  dication as to your attitude on the motion to amend as a whole?

13  The reason I raise the question, I think it is a time matter;

14  I would like to plan now what we are going to do with our

15  other motions.

16    THE COURT:  I am/prepared to rule on that right now.

17    I am going to grant the motion to file the Amended

18  and Supplemental Complaint, reserving the right to any Counsel

19  to make a motion to dismiss as to some particular cause, to

20  make a motion for summary judgment, and will leave the time

21  open.  It may take, you see, discovery before you are ready

22  to present some of these problems.  I am not so sure that some

23  of these problems can't be ruled upon either by a ruling on a

24  motion or in pre-trial before the trial, if we ever get to

25  that stage of the trial.

970

1      MR. SACHSE:  I agree.  I think they can.

2      THE COURT:  But that can be done in some orderly

3  manner.  Rather than delay this case further by hearing all

4  those beforehand, I would rather permit this amendment to be

5  filed, get this on the way and get service started, then

6  Counsel may make  motions if they want to.

7      MR. SACHSE:  May I ask for my own information: The

8  motion I filed may have been premature, but I can readily

9  re-draft it.

10      THE COURT:  By stipulation we can provide right now

11  that it may be considered as going to the Amended and Supple-

12  mental Complaint.

13      MR. SACHSE:  I will appreciate that, if Mr. Veeder

14  will so stipulate.

15      MR. VEEDER:  Yes.

16      MR. SACHSE:  I would like to have it set for the

17  earliest possible hearing date.  I am in agreement with your

18  Honor.  Once this monstrosity is in the file, believe me, there

19  are a lot of things that will be struck before we are through

20  and the sooner we get through with it the better.  So I would

21  like an early hearing date on the motion.

22      MR. STAHLMAN:  What will the situation be in regard

23  to answering?

24      MR. VEEDER:  It is contemplated that all the ob-

25  jections will be embraced in the Answers -- in other words,

1  you will combine your Rule 12 objections.

2  MR. SACHSE:  No, I would rather not, if I may.

3  MR. VEEDER:  I am inquiring.

4  MR. SACHSE:  That is what I am asking his Honor.  I

5  mailed you last week some specific motions.  Some of them --

6  one at least is to make more definite and certain, and I in-

7  tend to press it very vigorously.  I think we need the in-

8  formation before we can answer.  And there are a couple to

9  dismiss and a good number to strike.  I would like those ruled

10  on before I try to file an Answer.

11  MR. MOSKOVITZ:  The State would probably also want

12  to file motions to dismiss some of these Counts, and we would

13  like to have those heard also before Answers are required,

14  your Honor.

15  THE COURT:  What I am thinking about -- and maybe

16  you can help me on it -- is this:  Is there any reason why

17  you can't file Answers and hear these motions to dismiss, for

18  summary judgment and to strike at some other time?

19  MR. SACHSE:  There is not any reason at all, your

20  Honor, except again a simple matter of convenience and ex-

21  pense.  If any single one of my motions is well taken -- let

22  us say, for example, there is one in here that raises again

23  the old question of prescription running upstream, on which

24  your Honor has even indicated your views.  I think these

25  proceedings now give a basis for a ruling to dismiss as to

972

1    that Count.  If we can dispose of that in an hour's or half a

2    day's or a day's argument, the expense to my client and to

3    everybody else is a great deal less than if we go through

4    six months of trial with the prescription issue involved every

5    second of the way.

6              THE COURT:  You don't follow me.  Is there any reason

7    why you can't file your Answers, even if you have to deny on

8    lack of information and belief, reserving to you your right

9    to make subsequent motions to strike, for summary judgment and

10   to dismiss as to particular Counts of the Complaint, and then

11   go at this in a more leisurely way?

12             MR. VEEDER:  Can't he incorporate those in his Answer?

13   I think the Rules contemplate that.

14             MR. SACHSE:  I can.

15             THE COURT:  He can, but if he puts them in his

16   Answer then ordinarily we don't rule on them before trial,

17   unless they are brought up in pre-trial.  Can we stipulate

18   that if they file an Answer now, it is without prejudice at

19   a later date to file a motion to strike, to dismiss, or for

20   summary judgment?

21             MR. VEEDER:  That is perfectly all right, your Honor.

22             THE COURT:  I was just looking at the Rule --

23   Rule 12b:

24             "Every defense, in law or fact, to a claim for

25        relief in any pleading,.....shall be asserted in the

responsive pleading thereto if one is required,
except that the following defenses may at the op-
tion of the pleader be made by motion: (1) lack of
jurisdiction over the subject matter, (2) lack of
jurisdiction over the person, (3) improper venue,
(4) insufficiency of process, (5) insufficiency of
service of process, (6) failure to state a claim upon
which relief can be granted, (7) failure to join an
indispensable party.  A motion making any of these
defenses shall be made before pleading if a further
pleading is permitted...."

MR. SACHSE:  There are several of those.

THE COURT:  That would mean that if you filed ac-
cording to the Rule, you would have to make those motions and
then file your responsive pleading.  But I don't know why we
cannot, by stipulation between the parties who are here con-
cerned, permit you to file your Answer, get this at issue,
and take up at our leisure some of these fringe problems that
don't concern the mainstream on this River.

MR. SACHSE:  I want to be sure I understand you,
your Honor.  Your idea would be to file an Answer, however, by
stipulation, reserving the right before trial to determine the
motions.

THE COURT:  That is right, and to make motions --
in other words, you may want to make other motions -- to make

1    additional motions, or in your particular case you have one on

2    file now by stipulation.  In other words, we can either have

3    hearings on these motions, or we could couple them with pre-

4    trial.  We could get some rulings made before we eventually

5    went to trial on these issues that have been brought into it,

6    or, if necessary, before we went to trial on the main stem of

7    the stream.

8            MR. SACHSE:  That is all right with me.  I can think

9    of only one conceivable objection.  Maybe I shouldn't worry

10   about it, Mr. Veeder.  I can imagine, under those conditions,

11   we file our Answer, and then some of our motions turn out to

12   be well taken -- let's just imagine that maybe I did find a

13   hole in your Amended Complaint.  Then Mr. Veeder has a right

14   to amend under the Rules, if your Honor feels that he made a

15   bona fide mistake and I find it, and we have our motion sus-

16   tained, then we have a new Answer to file.

17           MR. VEEDER:  When I find somebody worrying about me,

18   I'm always --

19           MR. SACHSE:  I am vain enough to think that I might

20   find a hole in your Complaint.  It is not just you that I am

21   worrying about.

22           THE COURT:  That is a possibility.  I will bear it

23   in mind on whether I decide these on motions or decide them

24   at trial.

25           MR. SACHSE:  Then the other question is, there are

1   certain motions to make more definite and certain.

2           THE COURT:  I will /you, I granted two or three of
                                tell

3   them since I have been on the Bench, and in view of Mr. Veeder's

4   statement of cooperation here I am willing to use a club, if

5   necessary, to get you the information you want.  But I don't

6   know of any need immediately to jump in with motions to make

7   more definite and certain.

8           MR. SACHSE:  Maybe the thing to do is to state for

9   the record some of the things we want and see if we get it

10  and put this off calendar for awhile.

11          MR. VEEDER:  If you have something in mind now, why

12  don't you express it?  Maybe we will be able to help you.

13          MR. SACHSE:  I would like to.

14          I would like the gauge readings at Isadora, at De

15  Luz Creek, at the O'Neill Ditch, at the O'Neill spillway,

16  day by day since the first of the year.

17          I would like a complete breakdown of the acreage in

18  each of these Indian reservations by land use, as Col. Bowen

19  has so ably done it for the reservation and for these private

20  individuals.  I would like to know just where you get the

21  acreages of 4.2 acre feet per acre.

22          And here is a very specific one.  In about four or

23  five of your Counts, particularly on the Indian reservation,

24  or all your public lands, Indian reservation and everything

25  else, you use the phrase that there were reserved by the

976

United States certain waters.  I would like to know when they
were reserved, how they were reserved -- by executive order,
by statute, in a grant, in what manner.  I would like to know
that.

MR. VEEDER:  Are you asking for that legal conclusion
with your discovery process?

MR. SACHSE:  You said, "Let me know what you want."
I am telling you.

THE COURT:  So far I think they all sound good.

MR. SACHSE:  You said there were reserved rights to
the use of water.  I would like to know how and where.

MR. VEEDER:  You read Winters vs. United States,
207 U. S. 547, and you will get the idea.

MR. SACHSE:  I don't want the idea.  I want to know
where in this case that was reserved.

And finally, in the same Counts exactly, you use
this language:

        "The rights to the use of water that are owned
    by the United States."

I would like to know whether those rights are ri-
parian, appropriative, prescriptive rights, or some kind of
right I never heard of before.  I would like to know that on
each of those.

MR. VEEDER:  Are you limiting yourself now -- and
this is important to us -- to the reserved land?

1      MR. SACHSE:   All I am limiting myself to at the

2   moment is --

3      MR. VEEDER:   National Forest, Indian lands?

4      MR. SACHSE:   -- to Counts XV, XVI, XVII.

5      MR. VEEDER:   Tomorrow I can help him a great deal

6   on that, your Honor.

7      THE COURT:   Aren't you generally talking about the

8   allegations that appear in the Counts concerning either forest

9   land, public domain or Indian lands?

10      MR. SACHSE:   In all three there is the same general

11   statement that the United States owns certain rights, without

12   telling us what kind, and that the United States reserved

13   certain rights.   I want to know whether this is an executive

14   order reservation, a statutory reservation, what it is, and

15   I want to know what rights were reserved -- not just blanketing

16   them.

17      MR. VEEDER:   I can tell you this, that all of those

18   have reference to executive order withdrawal.

19      THE COURT:   Don't do it now.   I think his request

20   has been reasonable.

21      MR. VEEDER:   I'm anxious to help him.

22      THE COURT:   Within a reasonable time, I think you

23   should supply it to him by a letter.

24      MR. SACHSE:   How about the figures on the run-offs?

25   Am I to get those?

1    MR. VEEDER:  I don't even know if they are available.

2    MR. SACHSE:  If they are available, may I have them?

3    MR. VEEDER:  Yes.

4    THE COURT:  If they are available, he should have

5    them.

6    MR. VEEDER:  As far as I am concerned.

7    MR. SACHSE:  As soon as they are available?

8    MR. VEEDER:  As soon as they are available, so far

9    as I am concerned, you are certainly entitled to them.

10    MR. MOSKOVITZ:  There are a few other points in con-

11    nection with what Mr. Sachse asked for that perhaps could be

12    gotten at the same time on these reservations, forest lands

13    and public domain: the actual water use that you had on those

14    lands, when the use started, for what purposes, the quantities,

15    so that there is some history of water use up to the present

16    day.  There may be other things that occur.  But this material

17    is important.

18    MR. SACHSE:  I certainly was not attempting to

19    limit myself.  I can think of a lot more.

20    MR. VEEDER:  I was going to say, we might as well

21    try it this afternoon.

22    THE COURT:  I think I want an order filed permitting

23    the filing of this Amended and Supplemental Complaint, pro-

24    viding that pursuant to stipulation the motions made by Fall-

25    brook may be considered as now re-filed and as directed to the

979

Complaint as filed; an order providing that the defendants

will answer within 20 days, reserving to them, notwithstand-

ing any provisions in the Rules, a right at any time prior to

trial and subject to further order of the Court to make motions

to dismiss, to strike, or for summary judgment as to the Com-

plaint or any particular Counts thereof; probably including

in there a provision that the Court may decide to hear these

motions separately or in connection with pre-trial -- not

tie my hands on that -- or some of them I may put over for

trial on the merits.

Now you gentlemen have other work to do.  Why don't

you be back here tomorrow morning?

MR. SACHSE:  Can you give us one more indication?

How about time to answer this?  In view of the stipulation on

the motions, it doesn't matter much to me.  I can be pretty

swift.

THE COURT:  You have 20 days under the Rules.

MR. SACHSE:  Does that suit everybody else?

MR. VEEDER:  The 20 days starts tomorrow, doesn't it?

THE COURT:  Exclude today; start tomorrow.  I think

that is enough.  I will be lenient in permitting you later a

right to amend an Answer and set other matters that come to you

as we go along.

MR. MOSKOVITZ:  Your Honor, it seems appropriate

when we file our Answer at this time to allege our State's

1    owned rights.  We mentioned that we may have some lands, and

2    we have discovered some.  I am not sure whether our study will

3    be completed in time to do this.

4            Also, there are some problems I have with other things.

5    I just want to mention it now in case I have to ask for a

6    little more time before the 20 days are up.

7            THE COURT:  All right, I am going to be very lenient

8    in permitting you to amend.  Get your Answer in.  If you want

9    later to amend it and be more particular, do it that way.

10           MR. MOSKOVITZ:  Very well.

11           THE COURT:  I will be around here all week.  I have

12   one case to try for sure, maybe two, but I will have time

13   before Court, I will have time after noon before I go back on

14   the Bench to see you gentlemen.  Do you want to be down here

15   at   9:00 o'clock in the morning and talk about some more

16   matters?

17           MR. VEEDER:  I think it would be most helpful if

18   we could, in the presence of your Honor and Mr. Cranston,

19   review some of these procedural matters, so that everyone

20   knows where we are going on it.

21           (Discussion between the Court and the United States

22   attorney with reference to a criminal case set for tomorrow.)

23           THE COURT:  Tomorrow, then, you don't need to come

24   in at 9:00.  You can come in at 9:30, I would like to have

25   you all here.  There are a number of things I want to discuss

1    I asked Mr. Veeder sometime back to prepare something in

2    writing about some sort of timetable on procedure, how we are

3    going to proceed.  Have you got anything on that yet?

4             MR. VEEDER:  We have been discussing it and attempt-

5    ing to get something.

6             THE COURT:  I want to talk to you about how far the

7    stipulations you have entered into, or have practically agreed

8    upon, are going to pertain to this new Complaint -- the first

9    part of it is much the same -- how much additional work you

10   are going to have to do on some of these other matters, how

11   many of them can be put over until discovery, etc.  I want to

12   go over that.

13            I want to talk to you about the Master's hearings --

14   a number of things.

15            So let's continue this.

16            MR. CRANSTON:  In that connection I can be here in

17   the morning, but I do have a meeting at Encinitas that I'm

18   afraid I have to go to tomorrow afternoon.

19            THE COURT:  We will try to take the matter that

20   particularly concerns you in the morning.

21            MR. CRANSTON:  Yes.

22            THE COURT:  What do you say about 9:30?

23            MR. VEEDER:  Fine.

24            MR. SACHSE:  Fine.

25            THE COURT:  The hearing is continued until 9:30 A.M.

1   tomorrow.   There are several other requests I have, Mr. Veeder.

2   Be prepared tomorrow to tell me what you have or when you are

3   going to have it.

4              MR. VEEDER:  Yes, your Honor.

5              THE COURT:  All right, 9:30 tomorrow.

6              (ADJOURNMENT UNTIL TUESDAY, APRIL 8, 1958, AT

7   9:30 A.M.)