Case 3:51-cv-01247-JW-JBC   Document 4512   Filed 09/24/63   PageID.21758   Page 1 of 33

ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA
### SOUTHERN
### XXXXXXXX DIVISION

- - -

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al,

               Defendants.

No.    1247-SD-C

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:                      San Diego, California

Date:                      April 9, 1958

Pages:             1045 to 1076

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ Deputy

JOHN SWADER
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211   EXT. 370

1045

1

IN THE UNITED STATES DISTRICT COURT

2

SOUTHERN DISTRICT OF CALIFORNIA

3

SOUTHERN DIVISION

4

- - -

5

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6

- - -

7  UNITED STATES OF AMERICA,          )
                                      )
8                      Plaintiff,     )
                                      )
9  vs.                                )          No. 1247-SD-C
                                      )
10  FALLBROOK PUBLIC UTILITY          )
    DISTRICT, et al,                  )
11                                    )
                                      )
12                     Defendants.)
    ————————————————————————————————)

13

14

REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

San Diego, California

16

April 9, 1958

17

18  APPEARANCES:

19          For Plaintiff:          WILLIAM H. VEEDER, Esq.,
                                    WILLIAM E. BURBY, Esq.,
20                                  Special Assistants to the
                                    Attorney-General
21                                  Department of Justice
                                    Washington, D. C.

22                                       - - -

23

24

25

1046

```
 1    APPEARANCES: (continued)

 2

 3          For U. S. Marine Corps:        COL. A. C. BOWEN
                                           COL. ELLIOT ROBERTSON
 4                                         COMDR. DANIEL FLYNN
                                           LT. DAVID MILLER
 5                                         LT. ROBERT NAGLE

 6          For Defendant Vail Company:  GEORGE E. STAHLMAN, Esq.

 7          For Defendant Fallbrook
            Public Utility District:     SWING, SCHARNIKOW & STANIFORTH, by
 8
                                         F. R. SACHSE, Esq.
 9
            For Defendant State of
10          California:                  EDMUND G. BROWN, Esq.,
                                         Attorney-General, by
11                                       ADOLPHUS MOSKOVITZ, Esq.,
                                         Deputy Attorney-General
12

13          For Defendants Arthur G.      CLAYSON, STARK & ROTHROCK, by
            Reuter, Katherina C.          GEORGE GROVER, Esq.
            Gibbon, Philo Reuter and
14          Wm. W. Cottle:

15          For Defendants Carl N. Halde
            and Hester M. Halde:          TOM HALDE , Esq. by
16                                        GEORGE GROVER, Esq.

17

18          SPECIAL MASTER:              JOHN M. CRANSTON, Esq.

19

20

21

22

23

24

25
```

22

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, APRIL 9, 1958, 9:30 A.M.

2         THE CLERK:  1-1247-SD-C, United States vs. Fallbrook.

3         MR. VEEDER:  Last evening, your Honor, at the con-

4    clusion of our informal discussions, several orders were re-

5    viewed and we now have copies of those that I would like to

6    tender, if I may.

7         THE COURT:  All right.  Have you given Counsel copies?

8         MR. VEEDER:  Counsel have copies.  I think they

9    have read them all.

10        THE COURT:  Did you arrange for someone to file an

11   Answer?

12        MR. STAHLMAN:  When do you want it?

13        THE COURT:  Since we discussed it, I would like to

14   have an Answer filed, and then after the Answer is filed I

15   will sign this order setting the case for trial.  It can be

16   filed today, can't it?  You can dictate it to my secretary.

17        MR. STAHLMAN:  We will arrange it, yes.

18        THE COURT:  You can dictate one paragraph, that will

19   be the general denial, and I will make a minute order that

20   you be given time to amend.

21        MR. STAHLMAN:  Yes, your Honor.

22        THE COURT:  Mr. Stahlman representing the Vail in-

23   terests is today filing a general Answer to the Amended and

24   Supplemental Complaint, and permission is therefore given to

25   Mr. Stahlman to file an Amended Answer within 20 days.

1        MR. STAHLMAN:  Very well.

2        THE COURT:  And it will be understood that that

3   Answer is filed by the Clerk.

4        Better put an hour on it when it is filed, Mr. Clerk.

5        THE CLERK:  Yes, your Honor.

6        THE COURT:  Prior to the time this order setting

7   this case for trial is made and filed.  Put an hour on this,

8   too.

9        THE CLERK:  Yes, your Honor.

10       THE COURT:  They look all right to me.

11       Anything further?

12       MR. VEEDER:  There is only one thing, your Honor.

13   We are going to include all of these in the service.  I hope

14   that everyone understands that.

15       THE COURT:  Yes.

16       Anything further?

17       MR. VEEDER:  I have nothing further, your Honor.

18       THE COURT:  You have prepared a notice concerning

19   objection to the appointment of a Master?

20       MR. VEEDER:  That is correct, your Honor.

21       THE COURT:  That is the one you showed me last night.

22   And I have signed the additional interpretation of the sti-

23   pulation.

24       I think that covers it.

25       MR. STAHLMAN:  There is one thing.  I don't know

1   whether you noticed the change in name of the Vail Company.

2   I would like all proceedings hereafter as they affect the Vail

3   Estate to be now changed to the Vail Company.  All interests

4   affected by this action are now held in the name of the corpora-

5   tion.  It was incorporated on the first day of January of this

6   year.

7           THE COURT:  There is a change in the legal status?

8           MR. STAHLMAN:  Yes, your Honor.

9           THE COURT:  Wouldn't that be a proper matter to put

10  in your Answer, that the Vail Company, the successor in in-

11  terest to whatever it was previously, now appears and answers.

12          MR. STAHLMAN:  Very well.

13          THE COURT:  Does thatsound all right to everybody?

14          Anything further, gentlemen?

15          MR. VEEDER:  I don't know whether your Honor has

16  seen the transcript of yesterday's proceedings.  It is the

17  summarization of the course we are going to pursue, and unless

18  there is some question on it we will go ahead with the acti-

19  vities on that basis.

20          THE COURT:  How many pages is it?

21          MR. VEEDER:  It is very short.  The Reporter just

22  gave it to us, and I thought you might want to see it.

23          (Mr. Veeder hands to the Court a partial transcript,

24  now designated as pages 1027 to 1033.)

25          THE COURT:  Is this new summons now ready to submit

1    to the Clerk?

2            MR. VEEDER:  It is ready, your Honor.  It will be

3    submitted this morning.

4            THE COURT:  All right.

5            We haven't set any time for getting your briefs in

6    to argue some of these motions that may be presented on June

7    16th.  I don't think that is too important, for this reason,

8    that we don't have a jury in this case; we can adjust our

9    proceedings to suit your convenience.  In other words, we can

10   start and hear part of the Government's case in chief, we can

11   adjourn that part of the case and hear some of the motions as

12   these special counts, and if it is agreeable to you I would

13   prefer to work it out in that manner.  It might suit all our

14   conveniences better as long as we were, say, a week ahead of

15   the time that certain matters are to be taken up.  I would

16   think you should get busy with your motions and your briefs

17   so that we could work on this on the 16th or sometime there-

18   after.  But I don't think it is important on what day we do

19   it.  Are we all in accord on that?

20           MR. SACHSE:  As far as Fallbrook is concerned, your

21   Honor, we will undertake to have all our motions, at least

22   that we intend to notice for the 16th, all in at least two

23   weeks ahead of time.  The briefs themselves, I agree with

24   your Honor, it might be all right to be a little slower with

25   them because you can defer ruling on the motions.

1       THE COURT:  That is correct.

2           Mr. Clerk, I didn't notice in the copy of the minutes

3   that you sent an order that I made, and it should appear, that

4   Answers may be filed, and that after filing the Answers these

5   motions may be made.

6           On other words, ordinarily you would make these

7   motions before you filed your Answer, but I will permit you to

8   make them thereafter as long as they are filed, we will say,

9   by June 5th.  That will give you ample time to notice them for

10  the 16th.

11          Is there any objection to that, Mr. Veeder?

12          MR. VEEDER:  No, your Honor.  I feel about this

13  matter of motions, though --

14          Mr. Sachse, do you contemplate additional motions

15  to the one you have already filed?

16          MR. SACHSE:  Perhaps very, very few, and then I con-

17  template perhaps a repetition of some of the motions for in-

18  dividual defendants.  But I will not file new briefs, naturally.

19          MR. VEEDER:  Well, it becomes important timewise to

20  us in regard to these motions.

21          THE COURT:  Well, he should have an opportunity to

22  decide what motions he is going to make, and I would like to

23  suggest this, that as different problems are involved on diff-

24  erent Counts of this Amended and Supplementary Complaint

25  there be separate briefs.  It is my practice to keep a file

1    not in chronological order but to keep it, in substance, by

2    subject matter, and if you get two or three subjects all thrown

3    into one brief then I have trouble finding it.   The Clerk's

4    file, of course, is always chronological; I can turn to it for

5    that.   But for my work in Chambers I prefer separate subject

6    matters in separate briefs.

7            One of these causes, for instance, is subject to a

8    motion on the ground that the lower user cannot get a pre-

9    scriptive right.   Well, that question has been briefed.   I

10   have no objection to its incorporation by reference to your

11   previous brief.   I have the file on that.   But that should

12   not be coupled in with some other motion that might be made

13   on the question of priority dates on applications.

14           MR. SACHSE:   So even though we have lumped a great

15   many motions into a single document before you, you would pre-

16   fer the briefs on each one of them be separate.

17           THE COURT: Yes.   It is a mechanical matter.

18           Now, there is a nice point that I am going to want

19   briefed by both sides, even apart from motions, and that is,

20   what are the rights of the Government on the lands in the

21   Indian reservations, the National Forests, the public domain,

22   etc.   We haven't been into that.   It was squinted at in some

23   of these other cases, I noticed, that I have read in the past.

24   That is a nice problem and I think the Government should lead

25   off with a brief on just what rights you claim up there.

1    MR. VEEDER:   The character of the rights?

2    THE COURT:   The character of the rights and how you

3    spell them out.

4    MR. VEEDER:   Yes.

5    THE COURT:   I think you should get that.   How long

6    do you want to get that brief in?   We can use it in connection

7    with any motion that raises any question about it.   But just

8    as a pre-trial matter, I would like to have those briefs so

9    I could be working on that problem, whether it is raised by

10   motion or not.

11   MR. VEEDER:   I think it is raised by Mr. Sachse's

12   motion, and we have to file a response to it.

13   MR. SACHSE:   I am not sure that it is, Mr. Veeder.

14   I made a motion to make more definite and certain, that I

15   discussed yesterday.   But we will forget that and I will try

16   to --

17   MR. VEEDER:   When you move to dismiss, I think we

18   have to come forward in our response in opposition.

19   THE COURT:   I don't know whether it is raised or

20   not, Mr. Veeder, but Mr. Sachse is asking you for certain

21   material --

22   MR. VEEDER::   Yes.

23   THE COURT:   -- which I think you should supply, and

24   at the time or shortly after you supply that material then

25   there ought to be a legal exposition of just what these rights

1  are and what you claim flows from them.

2          MR. VEEDER:  Yes.

3          THE COURT:  It may be that you are claiming only

4  that the Government has the same riparian right that any other

5  owner has in the watershed, and if that is the extent of your

6  claim I don't think that is going to cause too much concern.

7          MR. STAHLMAN:  I might say, in that connection, that

8  the Vail Company are also interested in that question, naturally,

9  and I would request Mr. Veeder also to furnish us the same

10  information as he furnishes to Mr. Sachse.

11          MR. SACHSE:  Your Honor, there is one other thing.

12  In our raising general legal questions here, frankly, I have

13  not yet devised a way to present it by motion.  I have dis-

14  cussed this briefly with Mr. Veeder yesterday.  I don't think

15  the pleadings, in their present form, are susceptible to a

16  motion.  I think it is fundamental to this case; it is going

17  to come up time and time again.  It is one of the questions

18  that you posed to us a year ago, on the question of percolating

19  waters, which we all briefed at some length.  This Complaint

20  seeks to quiet title   to water in the River and from the

21  River, and as we can readily see  from the map there are

22  going to be a great many individual owners here whose land

23  doesn't touch the River or a tributary, and it is the Govern-

24  ment's contention, as I understand it, that all those per-

25  colating ground waters contribute to the stream and that any

1    diversion of those percolating ground waters affects their

2    rights.  But we do have before you a pretty lengthy brief on

3    it.  I don't know whether you want anything more on the sub-

4    ject or not.  It is going to come up time and time again,

5    particularly before the Master, in my opinion.  Mr. Cranston

6    is going to find parcel after parcel where the defendant is

7    going to contend that his diversions, whatever they may be,

8    are not diversions of water up the River.

9        THE COURT:  Well, I thought -- maybe I'm wrong --

10   I thought that you gentlemen were almost in a position to

11   spell out a definition which we would use for the purpose of

12   this case.  I maybe a mile away from it, but here is my re-

13   collection: that it was substantially agreed between us that

14   if water in some continuity lay underground and fed a stream

15   it was of one character; if, on the other hand, it was water

16   in the ground which was not in direct contact, in the sense

17   of supplementing a stream in a canyon, creek, ravine or

18   something, that it was of a different type; and that we were

19   going to agree upon the term, whether it was legally correct

20   or not, which we would agree to as distinguishing the two

21   situations, and we talked about the use of "ground water," as

22   I recall, and there was some discussion about that.  Now

23   isn't this what happened?

24       MR. VEEDER:  Yes, your Honor, and we agreed to

25   disagree yesterday afternoon late, Mr. Sachse and I, and Mr.

1  Moskovitz.  I don't know that Mr. Moskovitz agreed to dis-
2  agree, but anyway I think he was present at part of the con-
3  versation as to how we would handle, where as you describe,
4  all that appears to be involved is ground water, which is not
5  in any way in contact with the main stem of the Santa Margarita
6  River or any of its tributaries.  After an extensive discussion
7  with Mr. Sachse on it, it was agreed that the best way -- I
8  want you to correct me on this, Franz -- the best way to pro-
9  ceed would be to go to the merits on it and if someone appeared
10  who made no claim whatever to water in the stream, then when
11  that case came forward the party would be dismissed out and
12  we would request a disclaimer of any rights in the Santa Mar-
13  garita, it being understood that the only water that would be
14  used would be domestic in character.
15        THE COURT:  Well, let me say this.  It is not going
16  to be easy factually in certain situations to say whether the
17  cat is white or black.  But if we have a definition, if we
18  have a term that we can all use and there is a situation that
19  comes up where we don't have a dispute and we can  say this
20  is the black cat, this clearly is the white cat, if we have
21  some term so that we don't have to/fumbling around and trying
22  to make a legal statement of the character of this water --
23  that is what I am asking you to do.  I am not asking you to
24  resolve the factual disputes which will exist in certain
25  cases as to whether this is or whether it is not the kind of

1   water that the Government is going to claim, but to see if you

2   can agree upon a term.  Can't you do that?

3          MR. VEEDER:  We have undertaken with our experts to

4   find out just exactly what we would be willing to accept, and

5   while I haven't had the opportunity fully to resolve the matter,

6   Mr. Wertz, our principal ground water expert, has suggested

7   some terms that I will tender to Counsel and maybe they will

8   be willing to accept.

9          THE COURT:  The terms ought to be the easiest thing

10  in the world.  You could call it the A situation and the B

11  situation.  So it not a matter of what you call it.  It is what

12  you can agree upon as a name.  Now your real problems will be

13  those situations where factually it is difficult to say whether

14  this is A or B.

15         MR. SACHSE:  Your Honor, I don't think it is quite

16  that simple.  There are two aspects to it, as far as we are

17  concerned:  First, the contention that the Complaint by its

18  language seeks -- reading from it --

19         "to have declared its rights to the use of water

20      in the Santa Margarita and its tributaries,"

21  which is what this lawsuit is about; then the next question is,

22  what is the River and its tributaries?  It is our contention,

23  and this is where Mr. Veeder and I definitely disagree, that

24  under California law, as I understand it, underground water

25  is presumed to be percolating and each overlying landowner can

1058

have a correlative right to its use, in the absence of proof

that it constitutes a stream, and the burden of proving that

contention that it constitutes a stream, either surface or

underground, is upon the plaintiff.

Now that is our fundamental disagreement, in a very

few words, so a mere definition can't avoid, as I see it, the

factual question in each case.

THE COURT:  Mr. Sachse, you still don't understand

me.  I am not trying to resolve this dispute either as to who

has the burden -- I saw Mr. Veeder shake his head; I don't

know right now -- or as to what is water that is part of the

stream.  But the Government has said that there are instances

where there is water in the ground that they are not going to

make any claim to as long as the parties are using it for

domestic use, and if we have a definition of terms that this

is the A situation, the Government is willing to dismiss,

take a disclaimer from the party of any right to water except

for domestic use in a certain area, we automatically say,

"All right."

MR. SACHSE:  Your Honor, I wouldn't permit any of

my clients, even in this A situation, to sign a disclaimer

based on domestic use only, because it is my contention that

if this water is in fact ground water independent of the

stream then they have a perfect correlative right to use it

for irrigation or for anything else they want to use it for.

1059

1    So the suggestion that the matter can be solved by saying that

2    in a certain area -- let's say Fallbrook; it is up on a mesa --

3    Mr. Veeder would be willing to accept disclaimers from all

4    these people, in which he would agree to the entry of a judg-

5    ment affirming their right to domestic water, as far as my

6    clients are concerned I'm not going to let them sign it, be-

7    cause I think their rights are great enough --

8             THE COURT:   You don't represent everybody.

9             MR. SACHSE:   No, but I want to make clear my position.

10            THE COURT:   There are a lot of people who probably

11   claim only that, and once that claim was secure would be con-

12   tent to be rid of this lawsuit.

13            MR. SACHSE:   I have agreed with Mr. Veeder that that

14   stipulation is fine as far as it goes.   I just don't think it

15   is going to include very many clients.   I agreed yesterday

16   that I have no objection to that stipulation on the domestic

17   water.   I think it is quite all right.   But I don't think it

18   is going to accomplish very much in getting rid of defendants.

19            MR. VEEDER:   May I make an observation on that to

20   clarify my headshaking.   I showed disagreement with Mr. Sachse

21   simply from the standpoint of burden of proof.   The United

22   States goes in and proves its case.   We don't go in to disprove

23   except upon rebuttal.   If a man is claiming that he has a

24   right to use water in the Santa Margarita, he pleads it and

25   then he proves it.   Now if he doesn't have any claim at all,

1060

1  I would petition him to disclaim and get out.

2          THE COURT:  Let's not get into the question of burden
3  of proof on that issue.  I am confident that as this case pro-
4  ceeds there will be many a time and situation, whether it is
5  one of your clients or some pro per defendant, where somebody,
6  either pro per or with a lawyer, comes before the Master where
7  there will be land with water, some spring or some water on
8  the land, where nobody is going to claim any riparian right.
9  All they want to do is to say, "Look, we want to use what
10  little bit of water we have up here and not be worried about
11  this lawsuit," and I would like to have a term that we agree
12  can be applied to that situation, so that we can say, "All
13  right, this comes within term A and we therefore will handle
          is
14  it that way.  If it/agreeable with you, sign up these docu-
15  ments.  That is the end of it."

16          MR. SACHSE:  It is all right with me, if you can do
17  it.

18          THE COURT:  What is wrong with that, Mr. Moskovitz?
19          MR. MOSKOVITZ:  Your Honor, I think the real pro-
20  blem is, who will bear the responsibility of predicting what
21  the facts are.  Let me give you an illustration, your Honor.
22  Suppose a man says, "All I care about is pumping this water
23  that is under my ground, and I want to use it for whatever
24  purpose suits me -- just the water that is under my ground,
25  and I don't think that my pumping is going to hurt the Santa

1  Margarita River.  But I don't know how this water eventually

2  travels and no engineer and no geologist can tell me for sure.

3  But I want to be sure that I can do this, and that if I do

4  this, the United States won't object."  The United States pro-

5  bably would say, "We can't guarantee that we will let you do

6  that if, at some future time, we find that it does affect the

7  River."  Who is the one who bears the burden of being wrong?

8  That is the problem.

9  THE COURT:  Mr. Moskovitz, in that situation, I don't

10  think we could make any adjustment any how, because I think

11  the Government claim is going to be that if there is pumping

12  of water for irrigation uses then the Government is going to

13  want a trial on it and we will have to find out who has the

14  burden of proof.  I'm not trying to get you to agree to some-

15  thing to solve these disputes.  They are going to be difficult.

16  But let us take another man who has a 50 acre

17  mountain piece up here and has a little spring.  He would never

18  grow anything on his place anyhow, but he wants domestic water,

19  and he comes in, by attorney or by himself, and says, "I don't

20  claim that I am ever going to irrigate this ground.  I have

21  only a little bit of water.  I would like to be secure in my

22  water and get out of this lawsuit."  Is there reason why he

23  shouldn't be out of it?

24  MR. VEEDER:  No, no reason at all.

25  THE COURT:  Or another situation, where a man said,

1    "I don't think that the water that I have got here feeds ap-

2    preciably these streams," and the Government says, "Well, we

3    agree.  We don't think this is enough to worry about."  Can't

4    we have a term to apply to that kind of water?

5         MR. MOSKOVITZ:  It is very simple, your Honor, but

6    your Honor realizes that somebody is taking a risk there.  If

7    the Government says, "All right, you can pump that water as

8    long as you do so for domestic uses,   and we will not object,"

9    they are taking the risk that that might cut down on what

10   comes to them and what they are claiming a right to use.  As

11   long as they are willing to do that, that is fine.  But one

12   or the other has to take a risk of some sort in the absence

13   of actual knowledge of what the facts are as to the contri-

14   bution of that water to the River.

15        MR. VEEDER:  We have already said we would take

16   that responsibility on domestic use.

17        THE COURT:  I can't follow you, Mr. Moskovitz.  If

18   there is a dispute, it is going to have to be figured out,

19   and the Master or the Court may say, "No, this water appre-

20   ciably feeds the stream," or, "This water is part of a basin

21   that underlies this property," or the Court may decide that

22   there is not that kind of water.  I want some term agreed

23   upon that we can say that one is A and one is B -- the black

24   cat and the white cat.  As to the gray ones, we will have to

25   hear evidence and decide.

1    I am kind of reasoning from my own situation in the

2    other watershed.  I have a little well that I can pump for

3    about 50 or 60 minutes.  When I get through with that, there

4    is no water until the next day.  If there was a dispute on

5    that watershed and somebody came around to me and said, "Look,

6    we will let you pump this well and get you out of a lawsuit,"

7    I would grab at it, because I know that I never can pump that

8    well to do anything except what I am going to do right now --

9    irrigate a few little trees around the cabin.  There must be

10   a lot of people around these watersheds with a similar pro-

11   blem.

12        MR. SACHSE:  Another aspect to this matter is that

13   we don't know yet from the United States where or how far this

14   offer applies.

15        THE COURT:  Well, all right.

16        MR. SACHSE:  For instance, I want to point out

17   again there is a specific prayer -- and I have been consulted

18   by one of these people -- a specific prayer to quiet the title

19   of certain licensees.  One of them 450 gallons a day from an

20   unnamed spring for domestic use only away in the upper reaches

21   of the Cleveland National Forest.  Here is a specific prayer

22   to quiet the title against that sort of use in this Complaint,

23   and I could readily pick it out on a map where it is.

24        THE COURT:  I understand that, and I don't antici-

25   pate that when we get to trying that it is going to be too

1      much of a problem.

2              This is part of the Government's claim in the

3      National Forest, isn't it?

4              MR. VEEDER: That is correct, your Honor.  It has

5      nothing whatever to do with the individual who has had his

6      land and his title and he has a well and he says, "I'm not in-

7      terested in anything but my domestic use."  We simply say,

8      "We will stipulate you out of the lawsuit," and that is it,

9      and I think a vast majority of the claimants within the area

10     come within that category.

11             THE COURT:  When are you going to demark these areas?

12             MR. VEEDER:  We can't delimit them alone.  We talked

13     to Mr. Sachse yesterday and the upshot of it was just what I

14     outlined, namely, that it comes down to almost a parcel by

15     parcel discussion.

16             Am I right, Franz?

17             MR. SACHSE:  Well, you didn't tell me any area --

18             MR. VEEDER:  I said as far as we were concerned

19     within the metropolitan area of Fallbrook, Murietta and

20     Temicula, and then there is probably also some high land out

21     there that can come in.

22             THE COURT:  Why do you have to have any agreement

23     by Mr. Sachse to demark an area and say that the Government

24     is in a position to do this in certain areas?  Then the Master

25     knows, when people come in, whether this is within an area

1065

1  that you have laid out and whether it is part of the land as

2  to which you are willing to work in this manner.  Whether Mr.

3  Sachse agrees doesn't make any difference.  If he doesn't

4  want to come in for his clients, that is up to them.

5        MR. VEEDER:  I am perfectly willing to go at it

6  unilaterally, so to speak, and supply a delineated area of

7  the character we meant and we will submit it to the Master and

8  to Counsel and that will be it.  But there are instances

9  throughout the entire watershed, I am convinced from personal

10 observation, that here is a man who has a well and has a

11 cabin to which he goes on the weekend.  I am certain that he

12 is not interested in a lawsuit.  Nevertheless, it is conceivable

13 that some future date he might want to put a burden on the

14 stream.  If he wants to stipulate the extent of his claims for

15 the X acres of land described as thus and so as for domestic

16 purposes, we want him out -- we have no interest in him.

17       THE COURT:  I want you to go ahead and demark the

18 areas and make them available to the Court, the Master and

19 the defense Counsel.

20       MR. VEEDER:  All right.  To all of them, your Honor --

21 to all 65?

22       THE COURT:  No, to the attorneys who have partici-

23 pated in the pre-trial.

24       MR. VEEDER:  We will do that this week.

25       THE COURT:  You will do it this week?

26

1         MR. VEEDER:  Yes, your Honor.

2         THE COURT:  What about the lis pendens?

3         MR. VEEDER:  That has been filed.  That was filed

4 day before yesterday -- yesterday.

5         THE COURT:  Filed April 8?

6         MR. VEEDER:  That is correct.

7         We are going to file the new summons that is pre-

8 pared immediately when we leave here.

9         There is one thing that does come to my mind, your

10 Honor.  You entered a minute order permitting us to file the

11 Amendatory and Supplemental Complaint.  I have proceeded on

12 the basis of that with the petition itself.  Do you want a

13 formal order?

14         THE COURT:  I directed a formal order which would

15 cover this matter of the motion made after answer filed, as

16 I recall.  But I told the Clerk to make that minute order.  If

17 you don't want a formal order, I can set the direction aside

18 and no formal order will be necessary.

19         MR. VEEDER:  I am perfectly willing to do it, but it

20 was not clear in my mind.

21         THE COURT:  I see.  No formal order will be necessary.

22         MR. VEEDER:  All right, thank you.

23         THE COURT:  Now, another matter.  We argued a series

24 of legal propositions and I made some tentative rulings --

25 that is, I told you what I was thinking about.  I have made no

ruling
1  /on those for pre-trial purposes.  As I recall, I didn't rule

2  on the question whether military use was a riparian use, or

3  indicate what I was going to rule; but I did indicate my views

4  on a number of other matters.  Do you think those should be

5  formalized in some way?

6        MR. VEEDER:  I would like to point out, in regard

7  to the matter of prescription, that Mr. Sachse in his motion

8  has raised the specific point.  Before any ruling by your

9  Honor on that point, I would like to file our brief in re-

10  sponse to his motion, which I think might bring to your Honor's

11  attention some factors that could conceivably be important to

12  you in that connection.

13        THE COURT:  That is agreeable.

14        Of course, when I say formalize these rulings, about

15  all I could do would be, either by memorandum or opinion, to

16  say that certain of these legal problems had been briefed and

17  argued and that at the trial, in the absence of controlling

18  precedent or something to change my mind, that it would be my

19  intention to rule in accord with the pre-trial rulings that I

20  was making.  Of course, strictly speaking, that would bind

21  only you people who participated in pre-trial.  Mr. X, who

22  was never in Court, would have a right to have his day in

23  Court and say, "I don't think your ruling is right," and I

24  would give anybody a right to be heard.  But at least he would

25  know as the trial went along what my rulings were going to be.

1068

1          MR. SACHSE:  Certainly it would be helpful to have

2    an advance idea, it would save a lot of time and probably a

3    lot of objections.

4          MR. VEEDER:  If I may respectfully suggest, we don't

5    want a ruling that the facts won't support, and that is my

6    thought on this prescriptive matter now.  I think the only

7    disputed fact that has ever been reviewed by your Honor is the

8    question of whether a riparian use is a military use.

9          THE COURT:  Oh, we had a series of problems.  I have

10   some of them listed here.

11         Prescription.  Can a downstream user obtain adverse

12   possession to an upstream user?

13         Does California law control in these problems of

14   water rights?

15         Inverse condemnation.  The Government's theory of

16   severance of land and water.

17         The Government's right to appropriate.  Does it

18   have to comply with State law?

19         There are some of them.

20         Now in the Convair case that we tried, we had no

21   pre-trial stipulation of facts, but there were extensive

22   hearings on law before trial, and I issued a series of pre-

23   trial orders as to rulings I was going to make.  Of course,

24   the facts were a little simpler, in one sense.  The Govern-

25   ment took certain land.  I merely ordered that, in the

1    absence of controlling precedent, when these problems came up

2    this was the way I was going to rule, and the parties could

3    make their record further, if they wanted to -- probably did

4    make their record.  But we avoided all the argument during

5    trial.  As I recollect, there were only about two major pro-

6    blems that came up during the trial.  We had to take time out

7    to argue the law.

8         MR. MOSKOVITZ:  Your Honor, it seems to me that you

9    can make these rulings of law on the basis of the assumptions

10   the parties had in writing their briefs.  If the facts come

11   in that change those assumptions, then the rulings of law

12   would be made accordingly.

13        THE COURT:  They are not a ruling that you can appeal

14   from.  The Court is merely saying that, as I see this case,

15   in the absence of facts that change my mind, in the absence of

16   some controlling precedent which may be called to my attention,

17   or in the absence of changing my mind when this problem comes

18   up, this is the way I propose to rule.  You make your record

19   and the Court makes its ruling.  If there is any appeal, your

20   record is made at the time the Court rules.  But the point is

21   we did a lot of this work and I am just wondering whether it

22   would help any to crystalize some of these things.

23        MR. CRANSTON:  Your Honor, certainly I think it

24   would help the proceedings before the Master.  I presume that

25   if a question comes up to the introduction of evidence, I

1  would probably be in a position where I should let the evidence

2  come in, even though I thought that because of some ruling you

3  had made you would not consider the evidence -- it was im-

4  material.  It would probably come in so that you would have it

5  to review later.  But if I knew how you intended to rule on

6  it, to facilitate any rulings I would make so that I would not

7  be ruling one way and having objections then made to you and

8  you overruling my rulings.  So that I think to that extent it

9  would facilitate proceedings before me if those statements

10  could be crystalized.  The issues, of course, would not be

11  finally determined.  The evidence would be in and you could

12  later, upon further argument, come to a different conclusion,

13  if you wished.

14          THE COURT:  Of course, I know what you are worrying

15  about, Mr. Veeder.  You don't want too many doors closed in

16  your face until the Court has heard some of these facts.

17          MR. VEEDER:  I try to be realistic, your Honor, and

18  I have great faith in powers of persuasion.  I hate to see

19  anyone --

20          THE COURT:  Well, some of them I don't think I

21  would rule on.  The ones that I think I would like to start

22  to work on would be prescription generally, as to whether a

23  downstream owner can get a prescriptive right against an up-

24  stream owner, and if you want me to wait until I see your

25  brief in response to Mr. Sachse's motion, I will do that.

1          MR. VEEDER: . I would like to have that, your Honor.

2          THE COURT:  Second:  Does California law control?  Of

3     course, generally there may be some ifs and ands about that,

4     but I can't see now -- I'll take that back; I am thinking out

5     loud.  It may be that what rights you have on the Government

6     domain, what rights you have initially in the Indian reservations

7     are matters of Federal law.  What happens to your rights there-

8     after may be a matter of State law.  I am just thinking tenta-

9     tively.

10         On the next one, inverse condemnation, I am prepared

11    to rule in principle.

12         I am willing to rule on this business of this sever-

13    ance of land and water, your theory on that which I characterized

14    as this metaphysical concept of coming down at the end of

15    the stream and catching in a bucket the water that came down

16    from the land up above.

17         MR. VEEDER:  I think that one of the principal

18    reasons, your Honor, why I'm a little bit worried is that

19    metaphysical or otherwise, I would like to present a little

20    evidence along the line and to argue the law on the basis of

21    the facts as they exist.

22         In other words, here is how I view this lawsuit.

23    There are, it is true, some factors which perhaps might be

24    ripe for summary judgment or declaratory judgment, some phase

25    or facet; but I have yet to view a single factor in this  case

1    where there is not a factual element, which, if considered,

2    might affect your ruling, and an adverse ruling, for example,

3    on prescription downstream could have a very, very important

4    impact on our cause in regard to the Vail estate, for the Vail

5    estate, under their agreement with us, your Honor, have for

6    a great many years been delivering water into the stream. Now

7    there is a factor that certainly casts a different aspect --

8            THE COURT:  These aren't going to be rulings similar

9    to summary judgment. They are merely a statement by the Court

10   that from what I have heard to date, unless I am persuaded

11   otherwise, this is going to be my ruling. Now I'll back up.

12           In the condemnation case I originally took a certain

13   position contrary to the Government's position. Before I got

14   through working over it, I found myself coming back, in one

15   of these situations where I couldn't make it fit. I had to

16   back up and changed my mind, and when I took the other position

17   things began to fall in place.

18           So it doesn't mean that I wouldn't hear new matter

19   or consider the facts as they pertain to the ruling. But some

20   of these matters are ripe for at least a tentative ruling to

21   give Counsel some idea how this case is going to proceed.

22           MR. VEEDER:  May I tender one more thought on this

23   matter of severance, for example, of rights to the use of

24   water from the land. The factor first arose, as I remember,

25   in connection with the Camp Pendleton property. Whatever the

1  ruling might be there, I would worry greatly about its effect

2  on the other lands.  But as I say, it is certainly within your

3  Honor's discretion to do what he chooses, and that is it.

4      THE COURT:  You practically conceded that point,

5  because in this new stipulation that you made -- and I take it

6  that you are in good health and your usually sharp, acute

7  mind is operating -- in this new stipulation you have agreed

8  that these rights that you may have up in the Indian re-

9  servations and in the Government lands do not augment your

10  rights downstream at Camp Pendleton.

11      MR. VEEDER:  Right, and I don't believe that it is

12  with  any slipping of the gears that we stipulated on that,

13  because certainly we have no desire to change the point of

14  diversion and place of use of the water.

15      THE COURT:  I know, but if I can paraphrase it,

16  that stipulation kind of throws out the window this bucket of

17  water at the end of the stream deal.

18      MR. VEEDER:  And that is precisely the thing that

19  concerns me, because the bucket of water at the end of the

20  stream isn't quite our theory and perhaps our "metaphysical"

21  approach didn't reach you.  That is my conception now.

22      THE COURT:  Whatever approach you might make now,

23  you have stipulated that none of these rights that you have

24  upstream can augment or increase the rights that you got when

25  you bought the Rancho Santa Margarita or that you acquired

1   thereafter by prescription or use.

2       MR. VEEDER:   That is right, your Honor.   But we have

3   never argued at any time that the rights to the use of water

4   in the Cleveland National Forest could in any way augment the

5   rights to the use of water at Camp Pendleton.   What we did

6   argue, to get back to the "metaphysical" aspect of it, as your

7   Honor pointed out, is that these usufructive rights were se-

8   parated from the land prior to patent being issued, and those

9   incorporeal hereditaments were just exactly like title to 40

10  acres  of land and the title to the unappropriated right to

11  the use of water remained in the National Government.

12      Now I realize that your non-acceptance should shock

13  my soul, but I still think that one of the sticks in the

14  bundle of rights that constitutes title was separated from

15  the other sticks in the bundle of rights.   We have still title

16  to the separated stick.

17      THE COURT:   What are you going to do though?   You

18  have agreed that that separated stick can't be added to your

19  sticks downstream.

20      MR. VEEDER:   But that has nothing to do with land

21  title to which is in the United States.   But it does have to

22  do with rights to the use of water which remain unappropriated

23  in the stream.   That is the problem, and that's why --

24      THE COURT:   Well, Mr. Sachse may want to accept this

25  proposition.   If this water had been separated upstream and is

1  therefore unappropriated, and if it is subject to appropriation,

2  maybe you are spelling out a greater amount of water that

3  could be appropriated.

4  MR. VEEDER:  That is precisely the point.  The water

5  is available for appropriation by reason of that very severance,

6  if there is any water left, and that is the point.

7  THE COURT:  We will not pursue it further now.  I

8  don't know.  Mr. Sachse may get some comfort out of this.

9  MR. VEEDER:  I think Mr. Sachse is in deep shock

10  now.

11  MR. SACHSE:  No, I would like to add just one more

12  of these questions that I think maybe you overlooked, your

13  Honor, and which I believe you expressed an opinion on pretty

14  strongly, and that is whether or not appropriations have to be

15  made under State law.

16  THE COURT:  Yes, I expressed an opinion on that.

17  Well, I will not do anything hasty, gentlemen, but

18  I am going to give this a little thought.

19  MR. VEEDER:  Would your Honor sign those orders,

20  all but the one in regard to --

21  THE COURT:  I will sign them as soon as this Answer

22  is filed.  My secretary is available.

23  MR. VEEDER:  We will get that out.  We have help

24  available.

25  THE COURT:  Thank you very much for your cooperation,

1    gentlemen.   I think we are making progress and beginning to

2    get this case in some shape where we can get our hands on it.

3            (ADJOURNMENT)