Case VOLUME: 14247-JLS-BC   Document 4513   Filed 08/24/60   PageID-21701   Page 1 of 125    ORIGINAL

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA
### SOUTHERN
### ~~CENTRAL~~ DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al,

      Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:          San Diego, California

Date:          May 19, 1958

Pages:       1077-1200

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____ DEPUTY

**JOHN SWADER**
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211 • EXT. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,   )
                           )
            Plaintiff, )
                           )
        vs.          )     No. 1247-SD-C
                           )
FALLBROOK PUBLIC UTILITY   )
DISTRICT, et al,         )
                           )
          Defendants.)
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

May 19, 1958

APPEARANCES:

    For Plaintiff:          WILLIAM H. VEEDER, Esq.,
                              WILLIAM E. BURBY, Esq.,
                              Special Assistants to the
                              Attorney-General
                              Department of Justice
                              Washington, D. C.

— — —

1 APPEARANCES (continued):

2   For U. S. Marine Corps:  COL. A. C. BOWEN
               COL. ELLIOT ROBERTSON
3                 LT. DAVID MILLER

4   For Defendant Vail Company: GEORGE E. STAHLMAN, Esq.

5   For Defendant Fallbrook  SWING, SCHARNIKOW & STANIFORTH,
   Public Utility District:  by,
6                 F. R. SACHSE, Esq.

7   For Defendant State of  EDMUND G. BROWN, Esq.,
   California:        Attorney-General, by
8                 ADOLPHUS MOSKOVITZ, Esq.,
9                 Deputy Attorney-General

10   SPECIAL MASTER:     JOHN M. CRANSTON, Esq.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAN DIEGO, CALIFORNIA, MONDAY, MAY 19, 1958, 10:00 A.M.

(In Chambers.)

THE COURT:  Let the record show that Messrs. Veeder, Stahlman, Sachse, Burby, Lt. Miller and the officers from Camp Pendleton are present.

We have been talking about a motion that has been noticed for May 21 at the Reche School.

I don't know that I understand your position yet, Mr. Veeder, about this matter of California law.  In this memorandum here you apparently quote, on page 5, from the State of California's Brief in the Circuit Court.  You say, "Pertinent in regard to the consistent courses of conduct adhered to by the United States of America is this statement from California's Brief before the Court of Appeals: ' The State of California feels called upon to advise this honorable Court that the United States has very largely adhered to the stipulation.'"  Going ahead with the quote, "We disagree with the United States as to just what California law provides. There can be no doubt of the sincerity of the United States in recognizing that the Court should apply California law to this litigation."

Is it your general contention, apart from this motion, that California law should apply to this litigation?

MR. VEEDER:  Your Honor, may I start and clarify our position just one word here.  In regard to calling

1   Mr. Goldberg, I had asked to call him as a witness independent

2   of this motion.   I also, under Rule 43, had desired to have

3   him introduce evidence in support of the motion.

4           THE COURT:   I understand that, but this general back-

5   ground matter.

6           MR. VEEDER:   The statements there and the reason for

7   bringing the matter up to your Honor's attention in that form

8   was this.   In the pre-trial order the United States set out

9   specifically -- and I'm speaking of the pre-trial order in the

10  first case -- the United States set out specifically the claim

11  or right to divert water outside the watershed and to continue

12  to use it.   There was a specific finding in the original case

13  to the effect that the United States was diverting water out

14  of the watershed and using large quantities of it in the areas

15  supplying the main part of the Camp, which is outside the water-

16  shed.   California knew it, and California accepted it, and

17  California did not think that we were breaching the stipulation

18  when we were diverting and using water outside the watershed.

19  That is the reason for that statement.   California knew at all

20  times that we were using water outside the watershed without

21  complying with State law.   At no time did anyone ever think we

22  had stipulated and agreed that we would have to initiate a

23  right to use that water outside the watershed.   In fact, it

24  would have been tantamount to abandonment of it.   That is why

25  I put that in there.

THE COURT:  Still going back to my question, do you concede that California water law controls in this litigation?

MR. VEEDER:  I will delineate what I mean by that, your Honor.  First, I say that the rights to the use of water of the United States are measured by the laws of California, meaning this: (1) beneficial use, (2) that we can't use riparian water outside the watershed, (3) that we can't store riparian water cyclically.

I deny that when we --

THE COURT:  The nature of a riparian right is also determined by California law.

MR. VEEDER:  Absolutely.  There is no other law, and we certainly have never claimed that we could increase the burden on the stream over and above the right of a riparian when we are using riparian water.

THE COURT:  In other words, you want to apply California law to this litigation except the law as to appropriation; is that right?  Is that what it amounts to?

MR. VEEDER:  Could I clarify that a little?  I will refer to your Honor's order, which is at page 84 of the Notice and Orders and Complaint and Supplementary and Amendatory Complaint.  While we object to a great deal of the order, this, in particular, is what we complain about here.  At paragraph C on page 84, which is actually paragraph IV of the order Subdivision C, here is what it says:

"Paragrah IV of the stipulation means that the measure of the rights claimed by the United States in this action is all the laws of the State of California pertaining to water rights.....including the method and procedure established by California law for the acquisition of appropriative rights."

We deny that we did desire it, or indeed could have stipulated that we would have to go back and initiate under the filings of the State of California to acquire the rights to divert water out of the watershed.  We deny that.

THE COURT:  You still haven't answered my question. I was not asking you about the stipulation.  I have in mind your memorandum where you cite law to the effect that parties cannot stipulate to the law.  I'm asking you now, generally and specifically, as to your contentions.  Let's forget about stipulation, as though the stipulation never existed.

As I understand it, you agree that California law as to the nature of riparian rights, their extent, how it operates --

MR. VEEDER:  Yes, sir.

THE COURT:   -- rights gained by prescription, both those kinds of rights are governed by California law.

MR. VEEDER:  Yes, sir.

THE COURT:  That California water law and general law applies to this case in all respects, except as to the

matter of appropriative rights.   Is that your position?

MR. VEEDER:   Except as to non-riparian and pre-
scriptive rights.

THE COURT:  You are just stating it a little broader.

MR. VEEDER:   Yes.

THE COURT:   Apparently not wanting to be pinned down.
That the only thing you say that California law doesn't apply
to is appropriative rights.   I don't know what you have in
mind in that broader, reverse statement.

MR. VEEDER:   I have this in mind, your Honor.   For
example, it has always been our position that there were two
or three bites that could be taken out of the apple from the
standpoint of the water used outside the watershed.   In other
words, I believe that it is California law that when you di-
vert and apply water to beneficial use outside the watershed
prior to the time that there is an intervening appropriative
right filed in compliance with the statutory procedure, that
you have acquired a right under the California law.

THE COURT:   Then you would want to use California
law on that.

MR. VEEDER:   I'm not saying that I would be limited
to it.

Your Honor has been quite sharply critical of what
you have called the "metaphysical" approach, but I truly be-
lieve there can exist in a stream a usufructive right that

could be acquired independently of land.   I will say this.   I have felt that the State has muddied the waters, such as there are, by saying that we have asserted that we could move Forest Service rights downstream.   It is too bad that they brought that up, because we certainly contended that.   But I say there are different ways and means of acquiring water, and when we use the word "use" in there, your Honor, we used "use" purposely and intentionally -- the broadest concept of it.

THE COURT:   But generally speaking you are going to contend, apart from the stipulation, that California law applies to certain parts of this case, and that to certain parts of it California law does not apply?

MR. VEEDER:   The reason why I have been hesitant to really respond to your question as your Honor has put it is this.   I think that the California law, the specific matter of California law is the California doctrine that the United States of America is the owner of the unappropriated water in a non-navigable stream.   I believe that is California law. I'm not trying in any way to increase the burden on the stream.

I think the affidavit respecting Mr. Goldberg's statement is extremely important.   When Arvin Shaw and I and Pat Brown and Mr. Goldberg were negotiating this matter, the concern was, are you going to say that  under your riparian right you claim more water than the ordinary riparian?   And we say no, because that would be an encroachment on upstream

1   rights. But in regard to such waters as were unappropriated

2   at the time that we began diverting and using that water out-

3   side the watershed, we say that now we have a vested and in-

4   defeasible title to it. What that title is, is a question.

5   But we deny Fallbrook's subsequent filings could interfere

6   with those rights.

7          I think that paragraph C of the order from which I

8   just read is absolutely a violation of certainly our under-

9   standing of the stipulation. But there has never been an in-

10  tent on our part to say that we could use riparian waters in

11  greater quantities than an individual similarly situated, and

12  I think that Mr. Goldberg's testimony on that would be very

13  helpful.

14         THE COURT: I didn't understand until this morning

15  when I read your memorandum and your motion over that Mr.

16  Goldberg had been served with a subpoena.

17         MR. VEEDER: Yes, he has.

18         THE COURT: What is Mr. Moskovitz's reply to that?

19  I had understood that he had just been requested to be present.

20         MR. VEEDER: No. I would hesitate to say what Mr.

21  Moskovitz has said. I think he has intimated at least that he

22  doesn't think that the subpoena was any good. I don't know.

23         THE COURT: Because it was served where -- in Sacra-

24  mento?

25         MR. VEEDER: In Washington, D. C.

THE COURT:  Well, the subpoena isn't good served in Washington, D. C., is it?

MR. VEEDER:  Well, he said, "If you will serve a subpoena on me, I will show up and testify," and I handed it to him.

THE COURT:  Can he make rules that vary the Rules of Civil Procedure?

MR. VEEDER:  I would say that I am quite convinced that a man can agree, as a lawyer representing California -- and he was there talking to me as a representative of California on the subject -- he says, "If you will get me a subpoena, I will show up," and I did just exactly what he ordered.

I will go additional step, your Honor.  On April 23 I wrote to California and told them that we wanted Mr. Goldberg as a witness, and it was understood that he would be there. On May 1, after talking to Mr. Goldberg and Mr. Moskovitz in Washington, D. C., a letter was written saying that pursuant to our agreement Mr. Goldberg will be there.  I am advised when I get out here on Saturday, day before yesterday, that they aren't going to produce Mr. Goldberg.  I think it is a very clear violation of agreements by California in this matter.  I'm somewhat amazed that Mr. Moskovitz is not here, because I told him the course we were going to pursue, and actually I am amazed because fraud is about what is being charged to California as of now and it is a serious matter.

10887

He was our first witness, and, your Honor, Mr. Moskovitz told

me that if -- I'll say this into the record, because Mr. Mosko-

vitz was talking pretty fast when I was on the phone with him

Saturday night and I wanted him to have an opportunity to con-

tradict this if he chooses to -- he told me that if today you

would order or direct Mr. Goldberg to appear on the 21st, Mr.

Goldberg would be there.  But he presents this incongruous

thing to me and says that until you rule on the motion he will

not produce Mr. Goldberg.  But Mr. Goldberg is called for the

purpose of supporting the motion, so while it is a clever caper

it is extremely difficult for us.  I think that we have --

THE COURT:  I talked to Mr. Moskovitz on the phone

last Saturday afternoon and he said that he could not be here

today or tomorrow, but he could be down on Wednesday -- he

planned to be here on Wednesday.  That he had other engagements

and that he couldn't be here.   I was wondering whether we

could hear some of this tomorrow.  He said he couldn't be here

today and I understood that that was because of prior commit-

ments and not just a matter of wanting to stay away.  I didn't

know at the time that you were also going to call Mr. Goldberg

on general matters about your case.  In my conversation with

him I was assuming that it was in connection with your motion.

I said that I haven't read the motion yet and I don't know

what it is all about, but I said that if the Court rules that

Mr. Goldberg's testimony is material, then it seems to me that

1    it would be a lot better to have him present as a live witness

2    than to take his deposition, assuming that a subpoena could

3    only run -- I didn't know that he had been subpoenaed.   Maybe

4    I misunderstood.   He was talking about whether a subpoena ran

5    more than a hundred miles out of the District.

6         MR. STAHLMAN:   May I make an observation, your

7    Honor.   Although I don't see the interest of the parties I

8    represent in this immediate conflict, it does disturb me.   I

9    have had dealings with State officials in these water cases.

10   It would seem to me that if an attorney in the case -- and we

11   may have a repetition of this -- if I would want some State

12   engineer or some member of the Utility District, or if they

13   should want a member of the Vail Ranch or an engineer of Vail,

14   I think there should be sufficient comity among Counsel in

15   this case that you would produce especially a State official.

16   I have run into this once before where I have subpoenaed the

17   head of the Southern California Office of the State Water

18   Resources.   He called me on the phone and told me that he would

19   not be in Court and abused me and insulted me because a sub-

20   poena was served more than a hundred miles.   He said that his

21   home was in Glendale, and although Los Angeles was within a

22   hundred miles, because he was served at his home he wouldn't

23   be there.   When it was found out that the other side wanted

24   him, then he showed up.

25        It seems to me that we should  not have things in

1  this case that are going to disturb orderly process, especially

2  by State officials.  If an attorney -- and it is assumed that

3  he is going to act in good conscience -- feels that he needs

4  that he needs a witness, any party to the litigation ought to

5  produce that witness.

6      THE COURT:  That is true.  Let's not worry about

7  that.

8      I was going to finish my conversation with Mr. Mosko-

9  vitz.  I said that it seemed to me that having a live witness

10  was preferable to having his deposition.  He said that if the

11  Court directs or wishes that Mr. Goldberg be present, he would

12  have him present -- I understood him to say on the 21st --

13  that he would have him present if we needed him at that time.

14      MR. VEEDER:  Here we are in the position, though, --

15  I called your Honor because I wanted to be sure that you would

16  be sitting that day, I called your Honor I think on the 24th

17  or 23rd of April and said that Mr. Goldberg was going to be

18  the first witness and I referred to the course we were going

19  to pursue.

20      THE COURT:  Well, you didn't tell me anything about

21  this motion.

22      MR. VEEDER:  Of course, I didn't.  I didn't think

23  it was proper.

24      THE COURT:  I do recall that you told me you were

25  going to use Mr. Goldberg as a witness generally in connection

1090

1      with the case.

2              MR. VEEDER:  And also in regard to your order.  Now

3      I did that because I thought that everyone should be noticed

4      as to the course we were going to pursue, and that in support

5      of my motion I was calling Mr. Goldberg.  Mr. Moskovitz says,

6      we rule on the motion before we hear the witness, and I say

7      that we have to have the witness before the motion can be

8      ruled on.

9              THE COURT:  Whether a man is the first or the tenth

10     witness?

11             MR. VEEDER:  It makes a great deal of difference to

12     us.

13             THE COURT:  Why?

14             MR. VEEDER:  Because we have organized and planned

15     our case this way.

16             THE COURT:  You don't have a jury.  I have organized

17     and planned cases where you do certain things because I have a

18     jury or for other reasons.  But many a case is tried so that

19     evidence comes in at various times.

20             MR. VEEDER:  But, your Honor, in this instance we

21     are confronted with -- I think your Honor used the term very,

22     very graphically and very pictorially when you said, "This

23     order pins you to the floor."

24             THE COURT:  Did I say that?

25             MR. VEEDER:  Yes, your Honor.  I am trying to get it

1091

1    right out of my, I think it is, gizzard and I'm retching on

2    it right now.

3            THE COURT:  I don't recall saying that.  I may have

4    indicated that the order fixed the terms of that stipulation.

5    But you drew it.

6            What were you going to say, Mr. Sachse?

7            MR. SACHSE:  It seems to me that there are two differ-

8    ent things we are talking about, your Honor.  First, there are

9    two motions here.  There is a motion which seeks leave to in-

10   troduce oral evidence in the interpretation of the stipulation.

11   Then there is a motion to correct or revise your Honor's in-

12   terpretation.  Now the first one, to introduce oral evidence

13   in the interpretation or to assist in the interpretation of

14   the stipulation, we certainly should not dispose of that ex

15   parte when there is a motion and objections to it noticed for

16   hearing.

17           MR. VEEDER:  No one is asking that that be done, Mr.

18   Sachse.

19           MR. SACHSE:  The second half is that Mr. Veeder says

20   that he wants the witness Abbott Goldberg.  All I know about

21   the Goldberg testimony is what is contained in the affidavit

22   attached to the motions.  Mr. Goldberg isn't an engineer.

23           MR. VEEDER:  Then you haven't read my motion.

24           MR. SACHSE:  Yes, I have read your motion and affa-

25   davit attached to your motion.

1    Whether or not a party produces a witness or a Court

2    issues an order for the production, the question of relevancy

3    and materiality has something to do with it.

4    MR. VEEDER:  You test that with the witness on the

5    stand, Mr. Sachse.

6    MR. SACHSE:  That is right, and there are immediate

7    objections to relevancy and materiality perhaps forthcoming.

8    MR. VEEDER:  Yes.

9    MR. SACHSE:  Mr. Veeder is upset at the change in

10   his plans for trial.  I am frankly a little upset, too.  There

11   are and there have been pending before your Honor since April

12   7 a half dozen motions of mine that I think are pretty good.

13   THE COURT:  What do you mean?

14   MR. SACHSE:  Motions to strike, motions to dismiss,

15   etc.

16   MR. VEEDER:  You agreed to set those over to June 15.

17   MR. SACHSE:  At his Honor's request, I set them over

18   to June 16.  I don't anticipate that Mr. Veeder is going to

19   open the case in chief and get in all the evidence in support

20   of Counts as to which I have pending motions to strike without

21   a ruling from your Honor on the motions.

22   THE COURT:  That is not important either, because

23   the order in which I hear these things doesn't make a lot of

24   difference.  I might conceivably grant Mr. Veeder some relief

25   at one stage and later he might have the ground cut out from

1   under him on another.

2          MR. SACHSE:   If the question of Mr. Veeder's plan of

3   trying this case is important for your Honor to consider, then

4   I think your Honor should also be aware of what our theory is,

5   that we were going to hear evidence on the De Luz Creek water-

6   shed and that the fundamental issue of the rights of the

7   United States was coming up before your Honor on June 16 and

8   before evidence was taken a great many motions -- there will

9   be more filed, we have discussed that, which we hope will e-

10  liminate some of these issues -- will be disposed of.

11         MR. VEEDER:   I don't know what he is talking about,

12  your Honor.

13         THE COURT:   I know what he is talking about.

14         MR. SACHSE:   As far as the attitude of the United

15  States toward the stipulation is concerned, I have been listen-

16  ing with very great interest to Mr. Veeder's answers, and I

17  can draw only one conclusion.   Just paraphrasing him -- until

18  I get the whole transcript -- paraphrasing what I understand

19  were answers to his Honor, it spells out to me only this, that

20  the United States does not recognize that the laws of the

21  State of California governing appropriation of water apply in

22  this case.

23         MR. VEEDER:   I don't know how you arrive at that

24  conclusion.   I simply say that we didn't stipulate to be bound

25  by them.

1094

MR. SACHSE:   I will correct that.

MR. VEEDER:   Because the ruling of law will govern that.   That is a question of law.

MR. SACHSE:   But the stipulation does not cover the laws of the State of California as regards appropriation of water.

MR. VEEDER:   Those are your words.   They are not mine.   I am not agreeing to what you are saying.   You may put any interpretation you want to.   I'm not accepting your interpretation.

THE COURT:   It is pretty close to it, as I understood your position.

MR. SACHSE:   My interpretation of this stipulation at all times has been that all of the laws of the State of California -- prescription, appropriation, extent of riparian rights, measure of riparian rights, acquisition of rights, what constitutes a riparian use and what does not constitute riparian use -- every one applies.

MR. VEEDER:   I will ask one question:   Does anyone here think that I stipulated that we would have to go down and make a filing in Sacramento to acquire a right to use the water we have been using since 1942 outside of the watershed?

MR. SACHSE:   I do, and I think the Congress of the United States thought so, too.   As I read the Utt Act, the Congress of the United States expressly directed --

MR. VEEDER:  I might add that one of the reasons
that I am a little perturbed about not getting Mr. Goldberg on
the stand is that someone has been in touch with Congressman
Utt and the other Congressmen in regard to this motion, and
I wanted to get that evidence in the record.

THE COURT:  Let's keep Congress out of it.

MR. VEEDER:  Did you call Mr. Utt?

MR. SACHSE:  I did not.

MR. VEEDER:  Did you wire him?

MR. SACHSE:  I did not wire him.

Section II of the Utt Act says:  "In the interest of
comity between the United States of America and the State of
California, and consistent with the historic policy of the
United States of America of Federal non-interference with
State water law, the Secretary of the Navy shall promptly com-
ply with the procedures for the acquisition of appropriative
rights acquired under the law of the State of California."

We are as satisfied with the advice of the Attorney-
General of the United States that such action will not adverse-
ly affect the right of the United States --"

MR. VEEDER:  Read it all.

MR. SACHSE:  I have read every word of it.

" -- will not adversely affect the rights of the United
States of America under the laws of the State of California --"

MR. VEEDER:  You just hanged yourself.

1    MR. SACHSE:  You don't need to wonder about telegrams

2    to Mr. Utt.  You were on the stand, and I heard you, and I

3    heard Mr. Utt question you at great length about this same

4    Section.  He knows all about it.

5    MR. VEEDER:  He didn't ask me any questions on this,

6    not one word.

7    MR. SACHSE:  I have the transcript, and he certainly

8    questioned, if it was not you, he questioned a great many.

9    He questioned you as to whether --

10   MR. VEEDER:  About the stipulation and this motion.

11   MR. SACHSE:  About the meaning of this clause, had

12   you instructed the Navy Department not to proceed with its

13   application, and then he asked --

14   MR. VEEDER:  You are flipping from one side to the

15   other.

16   MR. SACHSE:  I am talking about Section II of the

17   Utt Act.

18   MR. VEEDER:  I don't know what that has to do with

19   this.  I will go back and check the transcript on what you

20   said.

21   MR. SACHSE:  I have them in the office.

22   MR. VEEDER:  The Utt Act has nothing to do with this

23   matter before the Court.

24   MR. SACHSE:  I raised the Utt Act in answer to your

25   question, does anyone here think that I stipulated so and so.

MR. VEEDER:  The Utt Act doesn't even mention the stipulation.

THE COURT:  Well, let me talk awhile.  You fellows are getting hot under the collar.  We will see what the Utt Act means when we get to it.

In your memorandum -- and I am not pre-judging this; I'll tell you some of the reactions I have to it and you can be governed accordingly when we argue it -- you set up two principles of law involving contracts requiring interpretation.

One is the principle that the surrounding circumstances may be shown as an aid to interpretation.  It is my understanding, subject to being corrected, that that can be done, if requested, in any case regardless whether the contract is ambiguous or not.  You can show the surrounding circumstances.

The second principle upon which you rely is that if a contract is ambiguous, then evidence of the negotiations and what was said may be received to explain the meaning, not to vary it but explain the meaning of the ambiguous portion.

Now of course in this case when this matter came up I saw, and I thought you saw, the possibility that somebody would claim that this stipulation was ambiguous.  I asked you in Court to state your position, Mr. Veeder -- I can't quote the transcript -- that this contract is not ambiguous and that I can interpret/from the four corners thereof.

1   MR. SACHSE:  It is in his motion that it is not

2   ambiguous.

3   THE COURT:  And you said, "Yes, sir, your Honor."

4   So I thought that that ended that right there.

5   MR. VEEDER:  It is not ambiguous to me.

6   THE COURT:  That was not the question.  Were you

7   willing, in substance, to stipulate that I might interpret it

8   from the four corners thereof, and I thought we had that all

9   under the bridge and went on from there.

10   Now I'm inclined to think that in order to leave a

11   record in this case, regardless of what I eventually do, that

12   you would be entitled in any instance, if we go into it again,

13   to show the surrounding circumstances.  I haven't checked with

14   the Professor here.  That rule about showing the surrounding

15   circumstances is not limited to ambiguity?

16   MR. BURBY:  No, sir.

17   MR. VEEDER:  If the word is subject to one of two

18   different interpretations.

19   THE COURT:  No, I'm talking about surrounding cir-

20   cumstances.  In other words, whether a contract is ambiguous

21   or not, you can show the position of the parties -- that one

22   of the contracting parties was the president of a trucking

23   concern and spent his life in the trucking business, and that

24   the other party was a farmer from Kansas who had sold his farm

25   and came out.  For whatever it is worth, you can show the

surrounding circumstances.  I'm inclined to think that if we
do let you re-examine the issue, you would be entitled to put
on that kind of proof.  Whether you are entitled to put on
proof as to the intention of the parties and Mr. Goldberg's
view depends somewhat on how much you are bound by this dis-
cussion we had in Court when I raised this very point.

It is an axiom in trying cases that you don't get
two bites at the apple ordinarily.  If a competent lawyer,
who is in good health and mentally alert, said that he is not
contending that there is any ambiguity in the contract and
that it can be interpreted from the four corners thereof, and
then the ruling is adverse, then it is a little unusual to come
back and say that I want to put in evidence as to intention.
Anyhow, your problem breaks down into two parts.

Thirdly, as I read what the Attorney-Generals and
various of the officials of Justice have told Congress -- and
I have looked through to see if you had the Swing brief in
here which you have not.

MR. SACHSE:  I didn't incorporate it, your Honor.

THE COURT:  A lot of this is set forth in there.

It seems to me that the interpretation that I placed
on that stipulation was confirmed by the course of conduct
that Justice thereafter took.

If you recall, when I interpreted that stipulation
and made my oral ruling, I referred to that solely on the

1100

1    principle that the way the people themselves interpret a con-

2    tract may be used by the Court to tell what the contract means,

3    which is a different principle entirely from the one leading

4    to an examination of an alleged ambiguity, and as I recall the

5    Attorney-General Brownell and probably the other deputies

6    came in and said that the United States claims no right of

7    sovereignty here, that the United States claims only what it

8    bought from the Rancho Santa Margarita, that the United States

9    concedes that this case is to be tried according to California

10   law, etc.

11           That is neither here nor there.

12           Now fourth, I don't intend to hear this motion at

13   Fallbrook on the 21st.  I have pretty well made up my mind on

14   that.  Here we have hearings starting where we are going to

15   take evidence and where there is going to be a lot of people

16   present, including some screwballs, and I anticipate that

17   some fellow like this man who has been writing these editorials --

18   what is his name?

19           MR. SACHSE:  Rogers.

20           THE COURT:  Rogers will probably want to get up and

21   make a speech and I'll probably have to listen awhile and tell

22   him to go home and write another editorial and that I don't

23   care to hear anymore of his speech.  It may well be that I

24   will have to take the Marshal along and have a couple of

25   people moved out of that hearing to get going on this thing.

1101

1  I intend to run this thing as gently as I can, but I don't

2  intend to put up with any monkey business with a bunch of

3  screwballs at that meeting, and I intend to say a few concilia-

4  tory things to start with to try to get people quieted down.

5  But the worst thing we could do would be to go down and have

6  a hearing at the Reche School on this motion or on any legal

7  problem that would further concern these witnesses.  I don't

8  think that is the place to hear it.  I'm willing to fix some

9  other time.

10       I think if you want Mr. Goldberg on this factual

11  presentation, I'm inclined to think that Mr. Moskovitz ought

12  to bring him down, if you can separate the material to ask

13  him, and I don't think he would have any trouble, from the

14  type of thing you have set forth in this motion.

15       MR. VEEDER:  In that connection, I would call Mr.

16  Goldberg and put in this background material, yes, but I would

17  like similarly --

18       THE COURT:  What do you mean by "background material?"

19  If you call Mr. Goldberg for any other purpose than the things

20  contained in this motion, I have no objection to calling him

21  as a witness if by "background material" you mean background

22  of the case.  If you mean the background for this stipulation,

23  that doesn't go.  We take that up after we hear this motion.

24  Do you follow me?

25       MR. VEEDER:  But, your Honor, I simply say I am

confronted on two sides, (1) with a political aspect that I
would be very reluctant to ignore, and (2) --

THE COURT:  What is that?  I don't follow you.

MR. VEEDER:  Mr. Sachse and his politicians, for
one thing-- Mr. Phil Swing and his politicians.

THE COURT:  How?

MR. VEEDER:  The last thing that occurred when I
left Washington, D. C., was that I was asked by Congressman
Utt to send this matter up to them -- I was asked by Counsel
for the Committee that investigated us to send this material
up to them.

THE COURT:  By that you mean the material in your
motion?

MR. VEEDER:  Yes, your Honor.

THE COURT:  So what?  You don't think that Congress
is going to rule on this motion, do you?

MR. VEEDER:  Congress can certainly rule on the
whole over-all question, and Fallbrook for ten years has been
using politics to try this lawsuit.

I submit that I told everyone long ago what my ob-
jective was in calling Mr. Goldberg and having him at the
Reche School.  I am afraid to have one line of evidence in
this lawsuit go into the record without having Mr. Goldberg's
testimony in there ahead of it.

THE COURT:  Mr. Goldberg's testimony as to the matters in this stipulation?

MR. VEEDER:  Yes, your Honor.

THE COURT:  Why are you afraid?

MR. VEEDER:  I can tell you what the course will be in this lawsuit.

First, there will be the continued political drive, and there will be the continued efforts to warp and distort the Government's position.

Secondly, I am confronted with the proposition that in all likelihood Fallbrook or somebody else will try to get a writ of prohibition into this case or get us into the Ninth Circuit, and I am afraid that I would jeopardize the rights of the Marine Corps if there was one scintilla of evidence in this case without having the background material in regard to your Honor's order.

THE COURT:  What you are saying, if I understand you, is that you don't want to put one line of evidence in until I rule on this motion.

MR. VEEDER:  I am not asking you to rule on the motion.  I simply say that I want Mr. Goldberg's evidence in there in full and in its entirety, and then we can argue the law.  But I think that evidence should be in the record.

THE COURT:  I'm inclined to think, whatever I rule, I'm going to have Mr. Goldberg's evidence taken and not rely

1    upon this so-called telephone conversation.

2          MR. VEEDER:  He dictated the large share of the

3    affidavit.

4          THE COURT:  But there was no cross-examination.  I

5    would rather have his evidence in the record as part of the

6    motion and rule on it.

7          Why can't you use Mr. Goldberg for whatever purposes

8    you want him, for knowledge of this case, omitting these

9    matters that concern this motion, and hear the motion down

10   here some day?

11         MR. VEEDER:  Call Mr. Goldberg again?

12         THE COURT:  You can call him again.  Why not?

13         MR. VEEDER:  I say this, your Honor.  From our

14   standpoint I would like to call Mr. Goldberg and interrogate

15   him as to the background and what he knew about our uses of

16   water outside of the watershed before they ever intervened.

17   I would like to put all of that evidence into the record, and

18   part of that is going to be after we put in early statements

19   about Mr. Goldberg's going over to Pendleton and viewing the

20   area.  I will move right on to the other aspects.  Then when

21   your Honor calls the motions up, you will have the transcript

22   before you just exactly the same.

23         But I would feel this way, that absent that material

24   in the record, if, for any reason, this case is suspended,

25   if for any reason it goes on appeal, I think I would be

1    imperiling the Marine Corps' rights without Mr. Goldberg's

2    full and complete and entire testimony.

3         I might add that Mr. Goldberg is a sick man and if

4    he were to die, I can't imagine what would happen to this case.

5         I agree with your Honor to hold off the legal argu-

6    ments in the case, hold off the legal arguments in regard to

7    the motions, put in the evidence, and use it for what it is

8    worth.  If you rule against us, strike it, but by all means,

9    your Honor, when I have Mr. Goldberg there, let me interrogate

10   him in full.

11        MR. SACHSE:  If we are going in with one party on

12   the surrounding circumstances -- and I agree with your analysis

13   that you always have a right to go into the surrounding circum-

14   stances -- if we are going to get the testimony of one person

15   as to the circumstances, I want the testimony of a few others.

16   I want the Comptroller General of the United States, I want

17   Mr. Brownell, I want proof of the statutory restrictions on

18   the Navy's spending money and the Justice Department.

19        MR. VEEDER:  You put your case in first.

20        MR. SACHSE:  No, this is on the motion, the surround-

21   ing circumstances on the motion, and I will tell you right now

22   that if you intend to put any evidence in on surrounding cir-

23   cumstances, I am going to rely on his Honor's advice and Mr.

24   Stahlman's remarks about cooperation with each other, and I

25   want from Washington testimony as to the surrounding

circumstances when this stipulation was made, that there could
be no expenditure of funds on the case -- all the surrounding
circumstances, not just Mr. Goldberg's surrounding circum-
stances but all of them.

If we let this stipulation ride on its four corners,
I'm willing to try a clean lawsuit. But if we are going into
the surrounding circumstances in this case, then we are in
politics and we are in it big. If we are going into all the
surrounding circumstances, let's have them all.

MR. VEEDER:  You call the turn.

THE COURT:  What does Mr. Goldberg know about this
case, leaving out these matters that would support your
motion?

MR. VEEDER:  He came into this case, your Honor --

THE COURT:  Suppose that I had heard from Mr. Gold-
berg on your motion and that I had denied your motion -- that
is just a supposition, because I am not pre-judging this --

MR. VEEDER:  Yes.

THE COURT:  -- and then on Wednesday we were going
to start in at Reche School. What would you call Mr. Goldberg
for?

MR. VEEDER:  I would call Mr. Goldberg for testimony
in regard to uses of water in 1951, what we did, what his
investigations were, how he went all over the watershed.

MR. SACHSE:  You mean you would qualify/as an expert
                                             him

1       on the Marines' use of water?   That is an honest question.

2               MR. VEEDER:   I don't know what you are talking about.

3       Why can't he testify as to what he saw?

4               THE COURT:   You would have him tell about what uses

5       of water you were making at that time?

6               MR. VEEDER:   That is right, that he was aware of,

7       the basis upon which the State decided to intervene and the

8       reason why the State of California is in the case today.

9               THE COURT:   Why is that material -- why they inter-

10      vened?

11              MR. VEEDER:   Because it is all a part of our case

12      in chief.   Our first five witnesses are going to be of the

13      State of California and we fully intend at the outset to get

14      into the record the participation of California in this law-

15      suit.   I don't dare to put in any evidence without that evidence

16      being in the record.

17              THE COURT:   How long is that going to take?

18              MR. VEEDER:   I don't know, your Honor.   It depends

19      on how long -- Mr. Holsinger will probably take more time than

20      anyone else.   I suppose Mr. Holsinger will probably take a

21      day, but I don't know.

22              MR. SACHSE:   There, your Honor, on Mr. Holsinger

23      for just a second.   He is the Chairman of the Water Rights

24      Board presently, and previously at the first trial I guess he

25      was chief Counsel of the Department of Water Resources.   There

1100

1   is a concrete one where my motions to which I am referring for

2   the 16th, in my opinion, will eliminate any relevancy or

3   materiality to his testimony.

4         My position is -- I have no objection to letting you

5   know what it is right now -- that the whole smear is moot;

6   that an independent State administrative agency has made a

7   ruling and that we are not going collaterally to attack or

8   inquire into the reasons for that ruling this Court.

9         MR. VEEDER:  Who has made any reference to any

10   ruling?

11         MR. SACHSE:  There is nothing else to which Mr.

12   Holsinger can testify.  That is all he knows -- the State

13   Water Rights Board and applications.

14         THE COURT:  To what would you have Mr. Holsinger

15   testify for a day?

16         MR. VEEDER:  About his knowledge of the Santa

17   Margarita River.  I have a right to do that.

18         MR. SACHSE:  If he knows anything about the River

19   as such.  If it is his decisions, no.  If it is the River,

20   yes, you can ask him questions.

21         MR. VEEDER:  I say in all sincerity, though, your

22   Honor, that if Mr. Goldberg, -- and I am very strong about

23   this matter of Mr. Goldberg being called -- full notice was

24   given to everyone as to what we were  going to do and they

25   had full time up to Saturday to make objections and no

1   objections were made.  I heard nothing from anyone.  I told

2   them the whole story.  I set my case up on that basis and I

3   realize how cold the feet are of some of these men, but I

4   insist that as Counsel for the United States we have to make

5   our decision as to how to proceed.

6           MR. SACHSE:  Wait a minute.  I received your motion --

7           MR. VEEDER:  You received my letter on the 23rd of

8   April, about a month ago, when I said I was going to call

9   Mr. Goldberg.

10          MR. SACHSE:  You said that you were asking for Mr.

11   Goldberg, but I had no idea what you were asking him for, and

12   I received your motion on the 12th of May, and on the 16th of

13   May I sent out my objections.

14          MR. VEEDER:  Where are they?

15          MR. SACHSE:  I don't know.  They were mailed to

16   this building here, so there was no delay in the delivery.

17   They ought to be in your files.

18          THE COURT:  Let me ask a couple of other questions

19   here.

20          I notice that some of these answers came in with

21   about three copies.  Are they requiring these defendants to

22   file three copies?

23          MR. STAHLMAN:  Four, I understood.

24          MR. SACHSE:  I understood three and one for the

25   service.

MR. VEEDER:   There are several things that came up that I wanted to talk to you about, your Honor.

THE COURT:   I have a calendar.   That answers my question on that.   What other matter do you want to talk about?

MR. VEEDER:   Well, if Mr. Goldberg is going to be on the stand, I have to notify him this morning or very soon, I'm sure of that.

THE COURT:   We have Friday afternoon available. We will be through on the "Standard" case by noontime.   So we have Friday afternoon available.   What use do you want to make of it?

MR. SACHSE:   Are you going simply to open the case and then go before Mr. Cranston?

THE COURT:   Mr. Cranston and I talked about it and I was just going to be there, but then in discussing it with him some matters came up on which he might not want to rule and might want to talk to me, and if we conferred on the Bench or got off the Bench and conferred a lot of these folks would think, what kind of Master is this -- he has to  ask the Judge about everything that comes up.   We decided that from the standpoint of public relations it would be better if I presided and he sat with me and participated, but let me carry the ball and not put him on the spot.   I would like to get him off on the right foot and not have them think that this man can't say "yes" or "no" without talking to the Judge.

1      Of course, you know Mr. Cranston -- that isn't true; he is

2      a very able fellow.

3                MR. SACHSE:  Again, I will make the assumption that

4      your Honor made to Mr. Veeder.  Assume that you should rule

5      against this motion and Mr. Holsinger or Mr. Goldberg are on

6      the stand before Mr. Cranston, there are going to be objections,

7      there isn't any doubt in my mind, if Mr. Veeder is going to ask

8      Mr. Holsinger  about Water Rights Board procedure, and there

9      isn't doubt that he will ask him.

10               THE COURT:  I will start out.  Mr. Cranston will

11     just participate with me.  Is there any objection to that?

12               MR. VEEDER:  I have no objection if your Honor is

13     going to preside.  That is all I want to know.

14               THE COURT:  But I can be there only on Wednesday
                                        of
15     and Thursday because/this Standard matter, and on Friday

16     afternoon.

17               MR. SACHSE:  Maybe this shows my ignorance.  I

18     have never tried a case before a Master.  What is the pro-

19     cedure?  We will assume this hypothetical case, that you have

20     overruled Mr. Veeder's motion, and that Mr. Veeder then before

21     the Master attempts to put on evidence from Mr. Holsinger as

22     to what happened in the Water Rights Board on the Fallbrook

23     applications, and there will be immediate objections that it

24     is immaterial, irrelevant, etc.   If Mr. Cranston rules one

25     way Mr. Veeder doesn't like it.  If he rules another way, I

1   don't like it.  What do we do?  Just accept the ruling and

2   argue later?

3   　　　　　THE COURT:  If I'm not there, you accept the ruling

4   and saw wood.  If he is not right, we take more evidence.  If

5   he is right, we go from there.

6   　　　　　MR. SACHSE:  I'm a one-girl, one-man law office,

7   your Honor.  Mr. Swing has had a heart attack and he hasn't

8   left his house.  In fairness to me, I think I should be per-

9   mitted to re-set and re-notice.  I can't do it by Friday --

10   I can't get the physical work done, because I want to change

11   a couple of the motions because the facts have changed since

12   the motions, but I think I should be permitted to re-set and

13   re-notice those motions, because I think I have some good ones.

14   I set the 16th only because of the conference that we had in

15   this Court where it was suggested that the first couple of

16   days of hearing before you might well be devoted to clearing

17   the legal brushwood.

18   　　　　　One other thing I haven't mentioned that I might as

19   well mention instead of firing another bombshell later on.

20   On the 11th of April informal interrogatories were addressed

21   to the United States by Fallbrook.  They have neither been

22   answered nor objected to.  At his Honor's request or suggestion

23   those were redrafted without a word changed except that a

24   title was put on it and have been filed with the Court.  The

25   time for objection has gone and still no word,

1   MR. VEEDER:  What time for objection?

2   MR. SACHSE:  Ten days.

3   MR. VEEDER:  Mr. Sachse, you told Lt. Miller that

4   you didn't care when they were answered.

5   MR. SACHSE:  I told Lt. Miller that after the in-

6   formal ones had been sent to you, and I certainly expected an

7   answer before the case went to trial.

8   THE COURT:  Are you going to answer them?

9   MR. VEEDER:  Yes, your Honor.

10   MR. SACHSE:  When?  I would like to have them before

11   you start putting on your case.

12   MR. VEEDER:  I am going to object strenuously to

13   your refusal to answer my  interrogatories.

14   THE COURT:  Well, I have a long calendar this

15   morning.  I will have time this afternoon.  I should be

16   through by 2:15.

17   But here's what I am going to do on this and you

18   may not like it.  We have to have some determination made on

19   these matters.  I may be in error, but I'm seldom in doubt.

20   I'm not going to hear this motion at Fallbrook.  I will con-

21   tinue the motion, if you want, to Friday afternoon down here,

22   or to some other date.  We can talk about that this afternoon.

23   I will permit and direct that Mr. Goldberg be there,

24   as long as what you question him about are factual matters

25   concerning his knowledge of things that he can testify to

1    that don't concern this motion.  As far as the showing on this

2    motion, we can start and take his testimony Friday afternoon

3    down here on that.  But I don't think you have given me any

4    good reason why we should put in the record up there the things

5    that pertain to this motion.

6           MR. VEEDER:  Is that your Honor's ruling?

7           THE COURT:  I have to determine these things and

8    get going.  It seems to me that that is fair and logical and

9    lets you proceed where you ought to proceed on this motion.

10                  for
            Now as /other things Mr. Goldberg knows, he may know

11   a lot of matters.  Certainly you probably can't qualify him

12   as an expert engineer, but things that he saw, and steer away

13   from these matters that would pertain to this motion.

14          MR. VEEDER:  Then, your Honor, I want a  thirty

15   days' continuance.  I don't dare --

16          THE COURT:  Why?

17          MR. VEEDER:  I don't dare to proceed without being

18   able to put into the record all of Mr. Goldberg's testimony

19   and Mr. Moskovitz's testimony.

20          THE COURT:  I  can state that a motion has been

21   noticed for this hearing, that that motion will be continued

22   to fixed date, and that it will be fully heard at that time.

23          MR. VEEDER:  Everyone knew that I was going to

24   raise this point.

25          THE COURT:  We are not going to raise it in the

Master's hearing.

MR. VEEDER:  I have moved for a thirty day con-
tinuance then.

THE COURT:  Your motion is denied on that.

Again, there may be things that Mr. Holsinger knows
or should know about that stream, and I have no objection to
factual matters.

As to what went on in the hearings, I suppose that --
was the transcript written up?

MR. SACHSE:  Yes, sir.  You mean the hearings on
the Fallbrook applications?

THE COURT:  Yes.

MR. SACHSE:  Yes.

THE COURT:  Is there any objection to the use of
any parts of those transcripts in the record?

MR. VEEDER:  I wouldn't permit them, your Honor, --

MR. SACHSE:  I'm not asking for them.

THE COURT:  I just asked.

As to why the Board made the decision that it did,
I don't think we are going to go into that.  If you have legal
questions on those things, I'm going to put over a lot of
those matters.  I'm going to try to conduct a factual hearing
up there, and if matters come up which are going to take
time to argue and to discuss, they are going to get put over.

MR. VEEDER:  I have a very serious problem to decide

1   whether we wouldn't be more damaged --

2          THE COURT:   How can you be hurt?   For instance, you

3   talk about that there might be a writ.   If there is going to

4   be a writ sought, it is going to be sought regardless of how

5   this hearing starts up there.

6          You talk about these politicians being active.   No

7   doubt a lot of people are trying to make political hay out of

8   playing on these people who are defendants in this case.   But

9   what we do up there isn't going to add fuel to the fire if we

10  start a factual hearing on the facts and circumstances that

11  concern this watershed and then eventually into De Luz Creek.

12         MR. VEEDER:   I have talked to Mr. Rankin about this

13  prospect, and I have explained to him that California, in my

14  view, got this order at least by misrepresentation if not

15  fraud on you.   I know that any evidence that is taken will be

16  subject to that order.   I told Mr. Rankin that if this --

17         THE COURT:   Lawsuit have to be tried as witnesses

18  are available.   It is seldom that any lawyer is ever able to

19  say that this is the way I'm going to try my lawsuit.   You have

20  to fit in a piece here and there.

21         I'm going to give you a right by oral testimony to

22  make a showing on this motion and will then pass on the merits

23  of the motion.   I don't think it has anything to do with a

24  prima facie case of the Government up there, because I may

25  rule one way or the other.   If I rule that the motion isn't

1    good, you have made your record.  If you have a right of appeal,

2    you have it.  But it has no part in that hearing up there.

3              MR. VEEDER:  But, your Honor, we start in and here is

4    the Special Master who is operating under your order of

5    February 11 and I offer evidence that water is used outside of

6    the watershed.  Then what occurs?  As your Honor has said, I

7    have the javelin clear through me and I am stuck to the floor.

8              THE COURT:  I have a hunch that the Special Master is

9    going to take these facts and even though he may have certain

10   views as to what flows from your use of water outside of the

11   watershed, my view would be that you would make that proof.  You

12   are entitled to make a record and the only way you can preserve

13   the point on appeal, if there is an adverse ruling, is to have

14   either an offer of proof or to have the evidence in.

15             MR. VEEDER:  But, your Honor, I can't start in this

16   case with a series of offers of proof and nothing more, because

17   that is what it is going to amount to.

18             THE COURT:  Do you anticipate that if you offer before

19   me your use of water outside of the watershed that I would

20   exclude it entirely?  There is no jury here.  The evidence comes

21   in that water was used outside of the watershed.  We are in a

22   position shortly to make some rulings on some of these things.

23             MR. SACHSE:  If you don't put it in, I'll guarantee

24   you that I will try to put in for my witnesses how much is used

25   outside of the watershed.

1        MR. VEEDER:   I just need your help.

2        MR. SACHSE:   So don't worry about that.

3        MR. VEEDER:   The fact remains that I have talked to

4  Mr. Rankin whether it would be better for us not to go up at all.

5  I am amazed that California would even hesitate to have its

6  people there, so that before any evidence is in this record we

7  will at least have our position clear in regard to the order of

8  February 11.   I have asked for the continuance and you have

9  denied it.   I have the alternative of simply saying that we

10  can't proceed.

11        THE COURT:   Why can't you proceed?

12        MR. VEEDER:   Your Honor, if the record --

13        THE COURT:   In other words, you are taking the position

14  that when I hear all the facts I'm going to grant your motion

15  and that you are going to proceed with this stipulation set

16  aside.   Suppose I don't grant your motion.   Suppose I heard your

17  motion at Fallbrook and denied it.   Would you then be prepared

18  to proceed?

19        MR. VEEDER:   I would be prepared to proceed on the

20  ruling, whatever your Honor makes.   But for me to put in any

21  evidence subject to that order is simply asking for me to be in

22  trouble if this matter should go on appeal or to the Appellate

23  Court at any time before our full case was in, and it is a

24  peril.

25        THE COURT:   If it could get up some way before your

1   case was in, any Judge would know that the hearings had been

2   interrupted because of some writ and that what you put on up

3   to that date certainly wouldn't be your case.

4           MR. VEEDER:  It would be subject to the order.

5           THE COURT:  I don't know, Mr. Veeder.  You haven't

6   convinced me.

7           There is one other alternative -- and I don't want to

8   give you any false hopes, and I'm not going to discuss it longer

9   this morning; I'll discuss it this afternoon -- and that is that

10  we adjourn the hearings on the 21st and start down here on your

11  motion.

12          MR. VEEDER:  That would suit me.

13          THE COURT:  But I don't see any reason for that.  I

14  can't follow you.  You can't do everything in a lawsuit at one

15  time.

16          MR. VEEDER:  That is right.  But, your Honor, I gave

17  thirty days' notice to everyone of what my plans were.

18          THE COURT:  Not thirty days on your motion.  That is

19  what we are talking about.

20          MR. VEEDER:  That I was calling Mr. Goldberg for the

21  purpose of attacking the order.  I told your Honor that on the

22  phone.

23          MR. SACHSE:  You didn't call us.

24          MR. VEEDER:  I said that I was going to call him in

25  regard to the stipulation, and you said, "Can you put in oral

9

1    evidence in that regard?"  I said, "All I can do is call Mr.

2    Goldberg and make the offer, and if the objection is sustained

3    I will make an offer of proof."  I have told Mr. Goldberg that

4    and Mr. Moskovitz, the whole bunch of them knew it, and I am

5    very sincere.  I was completely amazed when the order of

6    February 11 came down, and I was completely amazed that Cali-

7    fornia didn't advise you, because Mr. Goldberg had told me then

8    that Mr. Moskovitz was not bringing the facts to your Honor's

9    attention.  Those are almost precisely the words that Mr. Gold-

10   berg used.

11         MR. SACHSE:  Don't forget that Fallbrook is objecting

12   to the motion as well as California.

13         MR. VEEDER:  I expected you to.  Mr. Moskovitz has

14   been doing what you told him all the way through.

15         THE COURT:  Well, we'll be back at 2:15.

16         Here are some mailings.  I don't know what they are.

17   They must be people who have appeared pro per.  They have been

18   returned -- Riverside, Whittier, Burbank.

19         We will be back at 2:15.  If you fellows can discuss

20   this matter without getting off into the bushes and without

21   getting too hot, you have time to do it.  We have practical

22   problems.  A lot of people know that these hearings are supposed

23   to start.  They are supposed to be factual hearings.  I will

24   give you time.  Maybe we can go on next week on this motion.

25   But meanwhile I think the hearings ought to start as scheduled,

1   and I think you can state that you have other evidence which is

2   connected with the motion and that I have set a time to hear

3   the motion and that you want it understood in the record that

4   your showing isn't complete without this, but if your motion is

5   granted, you intend thereafter to go into these matters.  I don't

6   see the spot you find yourself in at all.

7          MR. STAHLMAN:  Would you do this, your Honor.  When

8   you get up there, let the people know what the thing is about

9   and then adjourn here on this motion?

10         THE COURT:  We could do that.

11         I think it is important that somebody be up there and

12  try to pour a little oil on the waters and let these people

13  understand that this isn't such a terrible thing.  They talk

14  about these defaults.  I'm not going to make an order, but I'm

15  going to tell these people that nobody's rights are going to

16  be prejudiced by a so-called default for a long time yet to

17  come, and they have the alternative of pro per answers or they

18  can get together in groups and hire individual  lawyers.

19         MR. VEEDER:  I didn't hear Mr. Stahlman.

20         THE COURT:  He said would it be possible to start

21  the meeting and go over some of the general matters and then

22  adjourn the hearing down here and start on the motion.

23         MR. VEEDER:  Excellent.  That would be fine.

24         THE COURT:  I don't know.  You might have some time

25  to talk about it.

1          (Whereupon the conference in Chambers was adjourned

2  and the Court proceeded with its criminal calendar in open

3  Court.)

1    SAN DIEGO, CALIFORNIA, MONDAY, MAY 19, 1958, 2:00 P.M.

2                 (Criminal matters in open Court.)

3                 (In Chambers, same Counsel present as before.)

4                 THE COURT:  Did anything come of your discussions?

5    Did you have any discussions?

6                 MR. VEEDER:  Yes, we had quite extensive discussions

7    and there was a certain amount of gravel in it, but by and

8    large I think it was productive.

9                 THE COURT:  Good.

10                MR. VEEDER:  As I understand, Mr. Sachse, except for

11   the record, will make no objection to Mr. Stahlman's suggestion

12   about opening the case and then bringing it down here for the

13   arguments and the calling of the witnesses.

14                THE COURT:  I am sorry I made that suggestion.

15                MR. SACHSE:  That was Mr. Stahlman's suggestion.

16                MR. STAHLMAN:  I made it, your Honor.

17                THE COURT:  I'm sorry you made it.

18                MR. SACHSE:  Mr. Veeder's statement is quite correct.

19   My position is that I will object for the record in behalf of

20   some of my 20-odd clients on the basis that the United States

21   has served its notice, it has set this for hearing, and we are

22   ready to go, and as far as we are concerned De Luz Creek can be

23   heard first and the Government later, and that it makes abso-
                                        no
24   lutely/matter whether proof of John Smith's rights come before

25   or after the Federal proof, and that we prefer to proceed in orderly

1   fashion, but I'm not going to beat my breast over it.

2   THE COURT:  Mr. Veeder, did you ever read Dale

3   Carnegie's book on "How to Win Friends and Influence People?"

4   MR. VEEDER:  Yes, I did.

5   THE COURT:  Have you ever had a course in Public Re-

6   lations?

7   MR. VEEDER:  Yes.

8   THE COURT:  I had lunch with the Master --

9   MR. VEEDER:  I had better strike that.  I don't be-

10  lieve I ever did read Carnegie, but I think he set the country

11  back five hundred years.

12  MR. SACHSE:  I will venture to guess that the Master

13  is not in favor of a continuance.

14  THE COURT:  I had lunch with the Master and I told

15  him what I had done, and he said, "Do you mean that Mr. Veeder

16  wanted first to argue this motion to reopen this stipulation

17  at a hearing in Fallbrook?"  I said, "Well, that is what he

18  noticed it for, but I have already ruled that I'm not going to

19  hear that up there."  He said, "Well, that is the worst possi-

20  ble thing the Government could do in that area," the way the

21  feeling is up there at the present time -- as to a lot of these

22  people running around making speeches, etc.  "That," he said,

23  "I can't conceive of."

24  MR. VEEDER:  If he had my responsibility, he might.

25  THE COURT:  Well, he is looking at it  from the

1    standpoint of public relations -- not getting these people

2    stirred up more than they are, and he said, "I can't conceive

3    of that."

4       Here is a further problem.  You have a hearing noticed

5    for Wednesday up there and you have people who are going to come

6    down for this hearing and it is supposed to be the start of

7    the Master's hearings, and then you call a meeting to order and

8    say, "Now this matter can't proceed.  We have to adjourn it to

9    such and such a day to San Diego and we will hear the motion

10   down there," etc.  That also isn't going to be good.  That is

11   my idea.  I think it is entirely a wrong approach to this.

12      Of course, you have a lawsuit and you don't care what

13   the litigants say about it as long as you're doing your job.

14   But why bring any more heat on the Government and the Department

15   of Justice and the Marines than you have on them already?

16      MR. VEEDER:  Do you want my response to that, your

17   Honor?

18      THE COURT:  If you want to respond.

19      MR. VEEDER:  I explained my position respecting the

20   impact of this order of February 11, a thing concerning which

21   the responsibility is very great.  I have no desire to have

22   any comment adverse to the Marines, to the Department of Justice,

23   or to myself.  But I am very concerned that any matter which,

24   to me, is of prime importance in the handling of the litigation

25   that I can't proceed as I had planned, because here is

1   California, a party to the litigation, acting in a manner that

2   is inconceivable to me for responsible men to act, refusing to

3   produce a witness who is, in my view, absolutely essential.

4          THE COURT:  We have agreed.  I will tell him to have

5   the witness there at the start of the hearing.  If you want to

6   put him on for these two matters, other than his conversations

7   about the stipulation --

8          MR. VEEDER:  But, your Honor, I looked at it in this

9   way.  I can see no reason at all why, once I have called this

10  man, that I couldn't put him through, put Mr. Moskovitz through

11  and the rest of them, because who would be angry about that?

12  As far as I am concerned, it would simply be a matter of cross-

13  examination.

14         THE COURT:  Yes, but these people aren't exactly dumb.

15  Even if nobody said what the purpose of the motion would be,

16  it would become apparent that the first crack out of the box

17  what the Government did at the Fallbrook Master's hearing was

18  to ask to be relieved of the stipulation that they entered into

19  again.  Public relations-wise you can talk yourself blue in the

20  fact and you can't get some of these diehards up there to think

21  that you are merely trying to raise a legal point -- that the

22  Government is trying to crawl out.

23         MR. VEEDER:  No, I'm not trying to crawl out of a

24  thing.

25         THE COURT:  I'm just saying what the reaction of the

1    people is going to be.

2         MR. VEEDER:  I look at it this way.  It is a respon-

3    sibility that I have to assume, and it is a responsibility that

4    I must take, from the standpoint of what I think is essential

5    and proper representation.  I go into this business quite often

6    and I have heard people talk about shooting.  It's too bad.

7    Everybody wants to be tough -- hard-nosed.  As far as I am con-

8    cerned, the State of California has acted improperly and has

9    put my client behind a barrier that can prejudice and cause us

10   to lose this lawsuit.

11        MR. SACHSE:  Absolutely I agree to the last four words,

12   everything except the "improper."

13        THE COURT:  When did you decide that California had

14   so acted and that this was such a vital part of this lawsuit

15   to have this motion brought on?

16        MR. VEEDER:  I think it was in December, your Honor.

17        THE COURT:  Then why hasn't your motion been made?

18   Why didn't you serve notice immediately after my ruling that

19   you moved to reconsider and make your showing?

20        MR. VEEDER:  Because until April 25 I had no opportun-

21   ity to have Mr. Goldberg's statement and to dictate into the

22   record what actually transpired.

23        THE COURT:  You had conversations?

24        MR. VEEDER:  Yes.

25        THE COURT:  You were there, weren't you?

1        MR. VEEDER:   Where?

2        THE COURT:   You were present when you had these con-

3   versations with Mr. Goldberg, weren't you?

4        MR. VEEDER:   I was on the telephone.

5        THE COURT:   The conversations that Mr. Goldberg had

6   with you at the time    this stipulation was signed up -- you

7   were present, weren't you?

8        MR. VEEDER:   Why, sure, I signed it.

9        THE COURT:   Couldn't you have made a showing?   Of

10   course, you could have had some other lawyer argue the matter

11   for you, but you could have made a showing and a motion as to

12   what went on.

13        MR. VEEDER:   I think we had better review what transpir-

14   ed.   At the hearing at which you entered that order, it was on

15   January 6, 7 and 8, I didn't receive the California brief until

16   I walked into the courtroom, and I brought that fact to your

17   attention.   I had no idea what position the State of California

18   was going to take.   We argued the matter and you ruled on the

19   matter that afternoon.

20        THE COURT:   You were not in doubt as to what I thought

21   about it?

22        MR. VEEDER:   Not in the slightest.

23        THE COURT:   That afternoon you could have begun

24   thinking about asking for a further hearing on it.

25        MR. VEEDER:   I began thinking.   I began laying the

1      groundwork very carefully, your Honor, and I brought it down

2      to the point --

3              THE COURT:  That was in January.

4              MR. VEEDER:  Oh, yes.  I had to reconfirm what Mr.

5      Goldberg had told me on the phone, namely, that he had told Mr.

6      Moskovitz that he disagreed with Mr. Moskovitz's position.

7              THE COURT:  Did that take until May 12 to do that?

8              MR. VEEDER:  Until Mr. Goldberg came to Washington it

9      was absolutely impossible for me to formulate --

10             THE COURT:  Couldn't you have gone to Sacramento and

11     seen Mr. Goldberg?  Did you have to get him to Washington to

12     talk to him?

13             MR. VEEDER:  I wanted to be very sure to come in and

14     tell my boss the whole story.

15             THE COURT:  You have travel orders that you carry

16     around like I do.  You could go anywhere.  You could have hop-

17     ped up to Sacramento.

18             MR. VEEDER:  That is right.  The only point I make,

19     your Honor, is this, that with care I checked this whole thing

20     out, because I was going back to --

21             First, I feel that I am not on the defensive at all

22     in this matter, for the reason that I noticed and I told every-

23     body on April 23 what I intended to do; I intended to attack

24     the order -- there was no doubt about it.

25             MR. SACHSE:  Let me interrupt you.  On April 8 you

1   went to Judge Carter and got an ex parte order respecting and

2   modifying the previous order.

3            MR. VEEDER:  That is right.

4            MR. SACHSE:  If you wanted to shoot your artillery,

5   that would have been a very logical time to get an order on the

6   whole thing.

7            MR. VEEDER:  No, sir.

8            THE COURT:  What was that ex parte order?

9            MR. SACHSE:  That order that you issued on the sti-

10  pulation that said that it didn't apply to the two areas.

11           THE COURT:  That was not exactly ex parte.  We dis-

12  cussed that in Court.

13           MR. SACHSE:  Yes, it had been discussed, but I mean

14  the actual signing.

15           But the point I make is that on April 8 you could have

16  done it.

17           MR. VEEDER:  I was planning it on April 8.  I wanted

18  to be sure that Mr. Moskovitz and Mr. Goldberg would have full

19  and complete opportunity to discuss this and to review it.

20           I might add, also, that in April Mr. Rankin suggested

21  to Mr. Goldberg that he and Mr. Moskovitz or that some effort

22  be made to bring to your attention the facts which we know to

23  exist.  They made no effort.  The story continues this way.

24  Mr. Goldberg was coming to Washington on the Ivanhoe case.  Mr.

25  Rankin said, "I want you to check with Mr. Goldberg in regard

1   to his story that you have told me," and this telephone con-

2   versation which I had shown to Mr. Rankin.

3          So as soon as Mr. Goldberg got there, I called him

4   in, I said, "Here is the story." Now this was April 24. Mr.

5   Rankin said to Mr. Goldberg, "Now, listen, this is a serious

6   matter. I don't know whether there has been obstruction of

7   Justice or not by Mr. Moskovitz, but in any event we are going

8   to clear up the record in that case before we go any further."

9          They were fully apprised and Mr. Moskovitz was apprised,

10  because I called Mr. Moskovitz and talked to him about it.

11         THE COURT:  Now, wait.  You told me you advised me on

12  April 23 that you were going to move to modify this stipulation,

13         MR. VEEDER:  And that I was going to call Mr. Goldberg

14  as a witness.

15         THE COURT:  Well, I disclaim -- at least it never

16  percolated through my cranium that you were going to do that at

17  the hearing before the Master.

18         MR. VEEDER:  I think you will notice that the letter

19  that I wrote to Pat Brown said that we are calling these wit-

20  nesses for the Reche School at 10:00 o'clock.

21         THE COURT:  I know, I read that, but I assumed that

22  all this matter at the Reche School involved the Government's

23  showing of their case and didn't involve this stipulation.

24         MR. VEEDER:  May I proceed, because I think this is

25  important in the record.

1      THE COURT:  Secondly, I recall that when I first

2   started holding pre-trial hearings on this, Mr. Moskovitz said

3   that they wanted some time to file a brief or something because

4   there was some possible conflict in the various cases in which

5   the State was appearing and I think the Ivanhoe case.

6          Is that the one at Hawthorne?

7      MR. VEEDER:  No.

8      THE COURT:  He mentioned the Hawthorne case and a

9   couple of other cases that were pending where there was some

10  possible difference of opinion in the Department.  I don't know,

11  but I have a hunch that probably in a situation like this that

12  this matter went beyond Mr. Moskovitz or Mr. Goldberg -- pro-

13  bably to the Attorney-General.

14     MR. SACHSE:  No question about it.

15     MR. VEEDER:  Mr. Goldberg went in and told Pat Brown,

16  as a matter of fact, that Mr. Moskovitz's position to you was

17  not factual.  There is no doubt about that.

18     MR. SACHSE:  May I say something here?

19     MR. VEEDER:  May I finish?

20     MR. SACHSE:  Go ahead.

21     MR. VEEDER:  Your Honor asked me why I didn't do

22  certain things, and it is highly important.

23          Mr. Goldberg then got to Washington and talked to

24  Mr. Lee Rankin, the Solicitor General, on this subject.  He

25  told Mr. Rankin the whole and complete story as he had dictated

1 to Mrs. Miller and as he had stated it on the telephone. Mr.

2 Rankin said, "Now, look," he says, "This is a political year.

3 These are matters that we should straighten out with the Court

4 and avoid a conflict if possible." I agreed with that entirely.

5 I think it is too bad that I was ever forced to file this

6 motion. I thought it would be straightened out.

7    Then Mr. Goldberg called me from the airport on his

8 way to Boston. He says, "I will plan on being back next week."

9 I said, "Check on it, Abbott, because we are getting down to

10 the point where we are going to have to go to trial and I cannot

11 try the lawsuit with that order in its present form."

12    THE COURT: Suppose I don't change my order. Then

13 what are you going to do?

14    MR. VEEDER: At least, I will have a crack at the

15 order. And I am, frankly, thinking about the Appellate Court.

16    So Mr. Goldberg called his man Westphal, I think his

17 name was -- I think that is his immediate superior -- and then

18 called me and said that he would return the next week. I

19 waited for him and he didn't show up. I was beginning to get

20 very concerned then, because I knew I had to bring this into

21 Court and I had to bring it before any evidence.

22    THE COURT: Why? I think I see your strategy. I

23 want you to lay it right on the table. Why did you have to

24 bring it in before any evidence is taken?

25    MR. VEEDER: Because of the fact that the order, if

1    I don't fight against it before I put in any evidence, I may be

2    stuck with it.

3              THE COURT:   Why?   I will make an order right now that

4    whatever transpires is without prejudice to my ruling on this

5    motion.   I think I see your strategy, and if you will not tell

6    me I'll tell you what your strategy is.   Your strategy is this:

7    You want this motion argued and ruled on first, and if I rule

8    adversely to you then you will probably be the one who either

9    tries to get me to say that this is not an interlocutory order

10   that it is final for the purpose of appeal, and if I don't do

11   that then you will probably try to seek a writ of prohibition

12   or mandamus and get it reviewed on the ground that it goes to

13   the guts of the Government's case and you will jump into the

14   Appellate Court.

15             MR. VEEDER:   That had not even entered my mind.

16             THE COURT:   I don't want to put ideas in your head,

17   Mr. Veeder, and that wouldn't shock me.   If I were you and I

18   thought this went to the guts of my case, I might be thinking

19   of the same strategy.   But for the life of me I can't see how

20   you prejudice yourself by going ahead before the Master and

21   letting us hear it at San Diego, without the great number of

22   spectators, and have a full hearing on this thing -- let you

23   call your witnesses.   I intend not to put you to an offer of

24   proof.   I intend to hear what these witnesses say and make a

25   deliberate, intelligent ruling on this motion.   I have indicated

1   that I haven't made up my mind on it.  I think you have the

2   laboring oar, but I intend to give you a full hearing.

3          How are you hurt if we go ahead with the Master's

4   hearing and not interject this into it up there where all of

5   these people are waiting for this hearing to start?  The whole

6   success of our hearing with this Master is going to depend on

7   getting off on the right foot, and if we get off on the right

8   foot and start doing this in a workmanlike manner up there,

9   it is going to make all the difference of day and night in this

10  case.

11         I will go even so far as this.  If you don't want to

12  start your proof before the Master, I am perfectly willing to

13  let you sit back and not offer any evidence and start to take

14  some evidence from these people on De Luz Creek.  We have only

15  two days that I am going to be up there.  The Master has already

16  arranged to go over to Temicula and Murietta on Friday and put

17  out the fire up there, if he can -- in other words, meet with

18  the group.  He has already had a meeting with two hundred of

19  them up around Oak Grove someplace.

20         MR. STAHLMAN:  Aguanga.

21         THE COURT:  Somewhere up there.  He went up there

22  Saturday and he has this meeting set up for Friday.  So we have

23  only a couple of days.

24         You wouldn't have to offer a thing.  If you think

25  that you are going to prejudice your position by offering

1    something at the start, let the Master start taking testimony

2    from the people on De Luz Creek.  I would like to see this thing

3    get off on an even start -- even if afterward you decided to do

4    something, if I ruled adversely to you and if you think you have

5    to take other proceedings.

6         But I can't see -- maybe I am a little dumb -- I can't

7    see where you are prejudiced in taking the steps where you have

8    made your motion, you have noticed it for the start of the

9    hearing, and I, as the Judge, have ruled that I don't want to

10   hear it up there, I want to hear it here, and I have said that

11   we have two days of hearings and I want to go ahead with those

12   hearings.  How are you hurt?

13        MR. VEEDER:  I'll say this, that in quite a number of

14   years of experience in this business I have learned that you

15   have to sit down and plan your strategy and you have      to plan

16   your lawsuit a long way ahead, and I sat down and planned this

17   a long way ahead and I sat down and I planned it this way.  I

18   planned it on this basis, that I think I really got a javelin

19   thrown through me.  I think that the State of California in-

20   tentionally misled you.  I think that I should have a right to

21   correct it or that they should correct it themselves.

22        I have done a lot of work in front of Masters.  I

23   think there is a mistake in the minds of some of these people

24   that when we go into that courtroom that there is something

25   different than a trial.  To me every moment in the courtroom

1   whether it is before a Master or before your Honor is real tough

2   litigation, and I can't see myself letting any evidence go in

3   until I have the record straight and clear and fair, if it goes

4   to an Appellate Court, and certainly from the standpoint of the

5   trial of this lawsuit I think I have a right and maybe the

6   obligation to open the case and how I want to open it.

7       I would be perfectly to call the witness and then let

8   you rule on the motion next June 15, but I would want the Cali-

9   fornia evidence in the record at the start of this lawsuit,

10  and I will tell the Master this and I will also speak to your

11  Honor about it. I would like to avoid a possible scene up there.

12  I don't think we will have it. I have been through this before.

13  There will be no problem.

14      If I put Mr. Goldberg on the stand, and then Mr.

15  Moskovitz on the stand, and then Mr. Holsinger on the stand, I

16  will have started the lawsuit so that I will know, in my mind,

17  that I have represented the Marine Corps as effectively as I

18  know how.

19      And I think this, that certainly the evidence which

20  I would seek to introduce would be competent and relevant and

21  material in every phase of the case, and particularly in regard

22  to De Luz. There is a misconception, in my mind, at least I

23  have heard from Franz here, up there about the kind of trial

24  that we are going to have. My own view of this case is that

25  while we will try the details in front of your Honor, there

1   resides with us the obligation to put on a pretty full case ex-

2   tending from Sandia and Rainbow Creek down to the ocean.  I have

3   bled pure gold about California proceeding to issue permits to

4   Fallbrook, and when they did that on April 10 that put us

5   squarely behind the eight ball from the standpoint of an orderly

6   progression of evidence, because now Fallbrook is saying, "We

7   have the State's blessing and the only thing that is standing

8   between us and the building of the dam is the United States of

9   America."  Now the State, over my objection, went ahead and did

10  that.  The State, in my view, has acted in a manner reprehensible.

11  But when they did it, they pushed me into the position where I

12  am today: (1) they have failed to straighten out the truth to

13  you in regard to the stipulation, (2) they issued a permit that

14  radically changed the status of the De Luz litigation.

15          Here is a dam put immediately above De Luz Creek, and

16  if I don't litigate the effect of that dam, then what are the

17  correlative rights of the United States and the people on De Luz?

18  It is a very important factor, because here is our status now.

19  They have thrown us, for practical purposes, onto De Luz Creek

20  for a source of water, and that is our only source of water,

21  and we are going to litigate that in this litigation on the

22  De Luz Creek area right up to the hilt, because I am not going

23  to permit the Marines to be jeopardized by the conduct of

24  California, which, with full knowledge of what it was doing,

25  issued a permit to Fallbrook to change the whole status of the

case.

THE COURT:  I don't think it does that.  I think maybe it cleared the air.  If we tried this case with that Water Rights Board hearing and decision in abeyance, I think there would be more of a problem than there is with the fact that it has come down.  As I read it, they make it clear that they are not adjudicating any of the rights on the stream, but they say that prima facie there is a surplus of unappropriated water and that if there is then they give them a permit.  That still leaves for this Court to decide whether there is unappropriated water.

I'm not going to pre-judge this case, but I'm going to guess that when all of the riparian rights are added up on this stream there is going to be little water except flood waters that are available for appropriation.  I think that is exactly what Mr. Sachse's position was when you were talking about settlement.

MR. SACHSE:  Absolutely.

THE COURT:  They knew that they had to recognize these rights, and they knew that there were a lot of them, and they were asking a permit to take waters that might go into the ocean.  They went into the ocean this year.  We don't know about next year.

MR. VEEDER:  But may I say this, your Honor, that the water that went into the ocean, two-thirds of it came down De Luz Creek, and the point that I make -- well, I simply say, your Honor, from my own standpoint, that the case that we intend

1    to put in when we start up there on De Luz is the case that will

2    show the burden on the stream of the 23,000 acre feet for us

3    and it will show what it would do to us if Fallbrook builds a

4    dam.

5            THE COURT:  I don't think anybody is going to hinder

6    you from making a case and making your showing.

7            What were you going to say?

8            MR. SACHSE:  We are proceeding, I thought, under a

9    procedure that we had agreed to ourselves in many conferences

10   here and then in a notice, of which your Honor just had ten of

11   them there that have been unsuccessfully mailed.

12           I don't know whether Mr. Cranston wrote to you himself

13   or checked it with you.

14           MR. VEEDER:  He didn't check it with me.

15           MR. SACHSE:  I'm quite certain that it represents

16   what my understandings of our brief conferences were.

17           THE COURT:  He checked it with me.

18           MR. SACHSE:  The notice says:

19           "The United States of America will present its

20       evidence first.  It is expected that the evidence will

21       cover the general topography and nature of the watershed,

22       with special reference to the De Luz Creek area.  The

23       United States will also offer testimony in support of

24       the facts referred to in the enclosed stipulation on

25       pre-trial, which facts have been agreed to by Counsel

1    for the United Staes and for some of the major de-

2    fendants.  It is expected that this testimony will take

3    more than one day....."

4        That is my clear recollection, that we discussed at

5   some length how we were going to get jurisdictionally a prima

6   facie case, and his Honor suggested that we have some one

7   person from your staff take the stand and testify in substance

8   to what we have agreed to here, get the thing into the record,

9   and then start tributary by tributary to prove the rights.

10       As I said earlier, as far as I am concerned, if this

11  were only De Luz and forgetting Fallbrook entirely now, if the

12  whole litigation were De Luz Creek, I say that it make abso-

13  lutely no difference whatsoever whether the extent of Phillip

14  Garnsey's landholdings, whether or not they are riparian, the

15  effective date of his applications and permits, because he

16  has them, how much arable land he has -- I don't think it

17  makes a bit of difference to the decision of this case whether

18  that is heard first or last.

19       MR. VEEDER:  The difference that it makes is that

20  California and you changed the status of this case completely

21  and entirely two days after our last pre-trial conference.

22  That is the difference.  When the permits were issued as they

23  were issued, and I would say, based on what I know of that now,

24  that it was a California move -- they thought that we would be

25

1  foolish enough to go in there and play penny ante when you folks

2  had a permit to build a dam.  We are not playing penny ante.

3  We are going to play clear across the board.

4          THE COURT:  Wait a minute.  I know that lawyers ar-

5  range the order in which they are going to try their cases.

6  I was trying a Mann Act case before Judge Ben Harrison.  I had

7  a little eleven girl, my only witness, whose stepfather had

8  taken her across the country, and I could see her freezing up

9  on the stand.  It was a jury trial.  I decided that I was going

10  to question her as to transportation first.  I was not going to

11  talk about misconduct until I got in transportation.  Then I

12  was going to go back and say, "Now, on this trip from Kentucky

13  down to Louisiana," etc.  By that time she would have been on

14  the stand for forty minutes and would be at home and wouldn't

15  freeze up on me.  I got a jury and went down to Judge Harrison's

16  Court, and in my questioning I got her to about El Paso.  Then

17  Judge Harrison says, "All right, Counsel, let's get into this."

18  I said, "Well, if the Court please, I have laid out my method

19  of trying this case, if you will let me proceed."  I didn't

20  want to say what it was.  He said, "All right, Counsel, stew in

21  your own juice.  I'm just trying to help you," right in front

22  of the jury.

23          I know that Judges get arbitrary sometimes about how

24  they want cases tried.  I'm not trying to be arbitrary.  I'm

25  proceeding on this premise.  We are starting Master's hearings

1    and we have all agreed that we can't try this case without a

2    Master or we would be trying it forever.  I want to get these

3    hearings off on the right foot and I don't want a lot of argu-

4    ments of the Government seeking again to be relieved of the

5    stipulation.

6              MR. VEEDER:  I am not seeking it.

7              THE COURT:  Well, you want me to reverse my ruling.

8    I have done it before, and I might do it again.  You want a full

9    hearing and you will get it and I will hear you on Wednesday.

10   You will not have to make offers of proof.  You will make your

11   record on it.

12             But for the life of me I can't see -- and this is the

13   guts of the thing -- how you are prejudiced by letting those

14   Master's hearings start before we get into this motion.  If you

15   can, point out to me as a lawyer why you are prejudiced.  The

16   only thing that could be said would be that the Government was

17   present and participated in the Master's hearing before a ruling

18   came up -- assuming that it is adverse, for the purpose of this

19   argument.  You can participate there under protest, you can make

20   a record here a mile long and I will incorporate it by reference

21   on the day the hearings start and overrule it and say, "We will

22   proceed up there on the factual matters on the stream and your

23   objections heretofore made are incorporated by reference."

24             In fact, I can go even further.  You are an officer

25   of this Court, I take it, admitted for the purpose of these

1  proceedings, are you?

2            MR. VEEDER: Oh, yes.

3            THE COURT:  I can make an order that you be there,

4  Mr. Veeder, and you can make your record as to why you don't

5  want to be there, and I can make an order that you be there and

6  be present, and if you don't want to offer any evidence I'll go

7  along with you on that and we will let some of the landowners

8  come in and take up a couple of days putting on some proof, all

9  without prejudice to your contention that you were forced into

10  a hearing before I ruled on a stipulation.  You will have a

11  record, and you can make it right here and you don't have to

12  make it up there in front of all of those people.

13            MR. VEEDER:  But, your Honor, the point I am trying

14  to make to you is this, that I want the evidence in the record

15  that I think is essential to my case, and I think that when I

16  start this case the only way that I can protect the Marines is

17  to do what I outlined on April 23, to have Mr. Goldberg first,

18  Mr. Moskovitz next, Mr. Holsinger next.

19            I would like to be able to say --

20            THE COURT:  Give me a lawyer-like reason why a case

21  has to be tried in any particular order.  Let's take the position

22  where I don't require you to go forward and instead of that we

23  start out asking some of the landowners to go forward.

24            MR. VEEDER:  And we wind up with a bobtailed record.

25            THE COURT:  Not bobtailed.

JOHN SWADER, OFFICIAL REPORTER

1    MR. VEEDER:  We wind up/with a bobtailed record in the

2  Ninth Circuit, and what do I say?  Franz is smart, and so is Mr.

3  Moskovitz.  They know that the order that your Honor entered is

4  the biggest break that they ever had, and they know that if they

5  can get me --

6    THE COURT:  To quote Mr. Sachse, "He is happy as a

7  clam."

8    MR. SACHSE:  That is right; I still am.

9    MR. VEEDER:  He should be as happy as a clam.  But it

10  is not always going to be high tide for Mr. Sachse -- you can

11  start with that.

12    I feel that I have a responsibility, and a tremendous

13  one, namely, to put into the record the evidence that I have

14  outlined to you.

15    THE COURT:  Tell me as a lawyer how you are prejudiced

16  if you object to going ahead and you make your record and I

17  overrule your objection and I tell you to be there even if you

18  don't want to go ahead with your proof.

19    MR. VEEDER:  The moment that I am in front of an

20  Appellate Court under any circumstances, or the moment that I

21  am in front of a Congressional Committee without those facts in

22  there, I am seriously prejudiced, particularly before an Appellate

23  Court.

24    THE COURT:  I will make a record here so that no

25  Congressman or no Appellate Judge would have any doubt at all

1   that you were up there under coercion.  I will make it under

2   the threat of going over to see our County Jail, if the record

3   would look better, and you make your record, and I will say in

4   so many words, "Mr. Veeder, you be there under penalty of con-

5   tempt."  If that doesn't make a strong record for you before

6   an Appellate Judge or a Congressional Committee, I don't know

7   what you need.

8           MR. VEEDER:  I'll tell you.

9           THE COURT:  What?

10          MR. VEEDER:  I need the California evidence in there,

11  and without that California evidence in there the record will

12  always show to me an order to which I should never have been

13  subjected, javelin or no javelin, and which has no relationship

14  to what was agreed upon between California and the United States,

15  and I can't see why it would ever have to go to trial until I

16  got a crack at that order the way I wanted to.

17          I didn't get a chance to finish my story in response

18  to your question as to why it was not until May 9 that I made

19  this motion.  It had been agreed that the Deputy Attorney-

20  General B. Abbott Goldberg would come back and talk to the

21  Solicitor General and we would straighten that out with you.

22  Then Pat Brown, Attorney-General of California, called Mr.

23  Goldberg and said, "You get out of enemy country.  You get on

24  home."  So the plan that had been outlined and worked out with

25  Mr. Rankin and Mr. Goldberg and me blew up in our faces.

1    I said, "Look, Mr. Rankin" -- I don't have to say,

2  "Look" to him because he is a smart fellow and knows his business

3  and knows what it means to go to trial under the circumstances --

4  I said, "I hate to do this, but we have to file this affidavit.

5  We have to file it because, in my view, there was fraud on the

6  Court and I can't go to trial without taking a crack at that

7  order."

8    I can't help how the Court is going to rule on it,

9  but a bobtailed record without my attack on that order, is

10  going to look this way.  We appear in an Appellate Court or we

11  appear any place else and it is going to show as (1) your

12  interpretation based upon Mr. Moskovitz's misrepresentations

13  to you, and I'm supposed to live with that order and I'm sup-

14  posed to argue to the Appellate Court that actually that order

15  may not mean anything.  I can hear the Judge say, "Don't talk

16  to me about that.  That order is on record and you will live

17  with it."  And there is your lawsuit.

18    MR. SACHSE:  May I ask you a question, Bill?  Why

19  has the United States of America got a vested right to change

20  its mind as often as it wants to in this lawsuit, but --

21    MR. VEEDER:  Because California changed its.

22    MR. SACHSE:  -- but if California wants to change it,

23  it suddenly becomes an act of fraud.

24    MR. VEEDER:  It was  an act of fraud.

25    MR. SACHSE:  I don't think they ever changed it even.

THE COURT: You are both out of order. That hasn't got anything to do with what we are talking about now. I am still asking Mr. Veeder to point out to me, as a lawyer: How are you prejudiced if you make a record as to why you don't want to go into the hearing until this motion is ruled on and start this, if not for the convenience of my calendar for the convenience of the Master's calendar, and because of the fact that we have noticed these hearings we are going to start, and if I further say that you can make whatever kind of record you want and I will back up my order with whatever pressure is needed to make clear to any Congressman or Circuit Judge that you did this under protest -- how are you hurt?

MR. VEEDER: The only thing that can possibly straighten this out in this matter and clarify the record is to have the California representatives clarify it on cross-examination, and if I got a good Southern exposure in the County Jail, it would be a whole lot better than going to Fall-brook. But I state in all sincerity that in this lawsuit -- and I think I know about it as much as anybody -- in this law-suit there are no rules and there haven't been. I was hauled in front of a Congressional Committee just two weeks ago without a bit of warning, without any knowledge why it was occurring, and I was told to explain my lawsuit, which I did, and they gave us a full and complete hearing and I have no complaint on it. But I also know that in all the cases I worked in I have never

1  before been subjected to anything like this, and I don't dare,

2  out of protecting the Marines in this matter, I don't dare to

3  agree --

4       THE COURT:  I don't ask you to agree to anything.

5       MR. VEEDER:  Well, I ask for a continuance of thirty

6  days and I get a deposition and we start off that way.

7       THE COURT:  I am willing to give you this full hear-

8  ing on your motion and take your evidence.  But I'm still asking

9  you, what is wrong, in view of the fact that this hearing has

10  been noticed up there, with starting with that hearing, even

11  though you do it under protest?

12       MR. VEEDER:  Your Honor, I have stated many times

13  that when the State of California changed the complete status

14  of this lawsuit by the issuance of the permits, we had to pull

15  every single thing around and take care of ourselves.

16       THE COURT:  I could see somebody arguing, if you went

17  up there without protest and started a hearing, that you entered

18  into the hearing.  But I don't even know what that would get

19  them.  But certainly if you do it under Court order, and I will

20  back it up with whatever sanctions I think are proper and I will

21  make them plenty, I don't know how anybody could then criticize

22  you for what you did.  I can even go all the way on it, you

23  know.  I can have the Marshal escort you up there into the

24  courtroom.  You can have all the objection you want.

25       MR. SACHSE:  That would really please the Fallbrook

crowd.

THE COURT:  Of course, we might have the Marines in-
tervene then and we would really get into conflict between the
power of the Court and the Marines.

MR. VEEDER:  Let me just ask a question, your Honor.
While I was listening to you, I tried to analyze what would be
wrong with doing exactly as I had proposed.  Mr. Goldberg's
testimony at the outside would not take more than two hours
with cross-examination.  Mr. Moskovitz's testimony would take
less than that.  We would move on to Mr. Holsinger and to Mr.
Bookman and I think that by the end of the second day we would
be through.

THE COURT:  You are not going to budge me on this.
I am going to hear that motion here.

MR. VEEDER:  But, your Honor, it is just the evidence.

THE COURT:  I am going to hear that evidence here.
I'm not going to hear it up at Fallbrook.   You may not think
it would have an adverse effect.  I don't agree with you.  I
am going to hear that motion here.

We are not talking about that.  We are talking about
whether we go ahead with two days of hearing at Fallbrook before
we start to hear the motion.  That is what we are talking about.
I have ruled that I am going to hear that motion here, and that
is where it is going to be heard.

MR. VEEDER:  That will be heard on Friday?

THE COURT:  I am prepared to start on it Friday

1151

1   afternoon, if you are ready.  I don't like this business of con-

2   tinuing those hearings up there, but even that would be pre-

3   ferable to some of these other things.  Maybe I am a little more

4   concerned about keeping the Marines in fairly good standing and

5   keeping Justice from being lambasted around, but I can't think

6   of anything more detrimental to the final orderly trial of this

7   case than to drag this all out up there at Fallbrook.

8         MR. VEEDER:  I can.  I can envision without the

9   slightest bit of difficulty the idea that the Marines would not

10  be permitted to use water outside the watershed without having

11  gone and filed with the State of California, and that is what

12  your Honor's order says.  I admit, I know the boulders that can

13  fly -- I haven't any doubt on it, but I say this, your Honor:

14  The prime responsibility has to reside with the man who is

15  trying the lawsuit, and the prime responsibility, as I see it,

16  your Honor, is this, that if there should be the slightest slip,

17  Franz Sachse will attempt to cash in on that order -- I haven't

18  a doubt about it, and if that transpires then the Marines are

19  greatly prejudiced.

20         I have been at Fallbrook enough to know this, that it

21  is a civilized community and that we could put in --

22         Now, George, you shouldn't laugh.

23         George doesn't think that it is a civilized community,

24  and I'm going to insist that it is a civilized community.

25         I will look at it this way.  It may be that the thing

1  to do is to call old man Holsinger first.  I don't care which

2  one of these people gets on the stand, but I want to be very

3  sure that there be continuous evidence to show -- it may not be

4  criminally collusive, but Fallbrook and the State of California

5  have worked hand and glove to the dire prejudice of the Marine

6  Corps, and I think that has to be first in evidence.

7        THE COURT:  I am beginning to see your strategy.  You

8  think that if you got up there and put on this proof as to what

9  rascals Mr. Moskovitz and Mr. Sachse and Mr. Swing are, etc.,

10 and how the Marines have been dastardly treated by their col-

11 lusive activities, you might improve the atmosphere for the

12 trial of this suit, even if the Court ruled adversely to you on

13 your motion thereafter.  But you are up there where there is

14 only one paper -- you don't have any competing process, and you

15 can bet your bottom dollar that the headline won't be about the

16 charges of fraud against Mr. Moskovitz but will be something

17 like this, "The Government again --

18        MR. SACHSE:  -- welches on its stipulation."

19        THE COURT:  Yes.

20        MR. VEEDER:  Franz has already written it and he will

21 write it again.

22        THE COURT:  Maybe he has.

23        MR. VEEDER:  He has been writing them for years.

24        THE COURT:  "The Government welches on its stipulation,"

25 again  attempts to impeach the contract which it signed. You

1   will not get anything out of that Fallbrook paper that will do

2   anything but baste you and the Marines over the head.

3           MR. VEEDER:  I am not trying this lawsuit in the papers.

4           MR. STAHLMAN:  Even when he is informed what the facts

5   are he will not print them.

6           MR. VEEDER:  There isn't even the slightest doubt.

7           MR. SACHSE:  I don't think we are trying Mackey.

8           MR. VEEDER:  Who is Mackey?

9           MR. SACHSE:  The editor of the paper, the publisher.

10          THE COURT:  I am now leaving the room.  Talk off the

11  record.

12          (The Court temporarily leaves the room and returns

13  momentarily.)

14          THE COURT:  I am a grown man and I have tried a few

15  lawsuits and I think I know something of your strategy.  I would

16  be the last man to say that you haven't diligently represented

17  the Marines.  I think they are lucky to have a man of your

18  tenacity and imagination representing them.  You certainly don't

19  take anything lying down.  I think I can guess some of your

20  strategy.  I told the Master at lunch today, "One of the major

21  points in this case is the question of the water that the

22  Marines have diverted outside of the watershed and the impact

23  of State law on that situation," and I said, "I think we possibly

24  ought to be able to get the record in shape early maybe to make

25  a ruling on that."  I said, "If that ruling is adverse to the

1  Government, they are going to represent that that is pretty

2  near the guts of their case, and they may then either seek to

3  have an order -- assuming that I rule adversely to them -- to

4  have an order made that that is appealable, if that is possible.

5  If not, they may seek some other type of review of that order.

6  And if that order sticks, I don't know what might happen to this

7  lawsuit."

8          I think I don't underestimate the importance of that

9  particular point to this case, and I understand your basic

10  argument that you were using this water outside of the watershed

11  years before Fallbrook came along and started to make application

12  for it.  It is a very important point in this case because of

13  the amount of water involved, and I would be adverse to throw-

14  ing rocks in your way to let you get that reviewed in a hurry,

15  if there is some way to do it.  I don't know whether it is

16  possible to do it.  I am not trying to be arbitrary and pre-

17  judice your position.  In fact, I have tried to outline some

18  procedure which would bring you protesting to the last minute

19  into this hearing.

20          The only concern I have on this matter about the

21  hearing up there is this.  You have a touchy situation.  If we

22  try this case, the success of it is largely going to depend on

23  how the Master gets along.

24          MR. VEEDER:  May I make one inquiry there, your Honor?

25  When you say the "success" of it, what do you mean?

1    THE COURT:  The success of the hearings by the Master,
2  how rapidly we proceed, what kind of record we get, how well we
3  take care of hearing these small people who can't afford
4  attorneys, etc., depends on how these Master's hearings start
5  out.

6    Here we have had all kinds of publicity that we are
7  going to start on De Luz Creek on the 21st.  People have been
8  notified to be there.  They have been told that the Government
9  is going to start putting on some proof.  I could even get over
10  that hump and let somebody put on some proof to start with.  In
11  addition to that, there will be people from Temecula, from
12  Murietta, there will be spectators, there will be a big crowd
13  at the start of this hearing.  You are not going to gain any-
14  thing by arguing this motion up there, and I'm not going to hear
15  this motion up there.  We have that settled.

16    The thing boils down to whether we start the hearings
17  up there, even if the Government doesn't produce proof -- do
18  some other things that have to be done.

19    MR. SACHSE:  Let me offer this as a way out and to
20  make my own position clear.  I don't know that I would be entire-
21  ly able, if your Honor should rule that we would have to pro-
22  ceed as individuals, I don't know that by Wednesday I could have
23  all of my people ready; but I would be perfectly willing to
24  start the show by calling Col. Bowen as an adverse witness and
25  going over the watershed with him, etc., and I'm quite sure it

1  would take a day's record to do it, and I have a right, as I

2  understand the Federal Rules, to make such a request.

3          If you want to shove the burden to us, I will ask you

4  to have Col. Bowen available, put the maps in evidence that you

5  showed me Saturday, and we will start laying the foundation

6  proof for the watershed.  I'll do it.

7          MR. VEEDER:  I have to make myself clear.  Apparently

8  I haven't yet.  California and Fallbrook changed the status of

9  this case with that permit, and I want it understood that when

10  they did that, coupled with what they did in regard to this

11  order, that I simply feel that it is extremely adverse and

12  wholly detrimental to our interest to pursue a course differently

13  than that which I outlined.  I simply cannot feel that this

14  record could be reflective of the propriety of the trial at all

15  if the United States didn't proceed to put in its skeleton case

16  and didn't proceed to clarify the record.

17          I realize that the happy thing to do would be to back

18  down on this.  I would like to back down on it.  I would like to

19  say, "Let Franz put in the case first."  I would like to read

20  "How to Win Friends and Influence People."  But I truly mean

21  this: that as long as paragraph IV-C of your order is in effect

22  and paragraph IV-A is in effect, if your Honor would suspend

23  the operation of those by an order as of today, I would go ahead

24  as your Honor has pointed out -- it would seem to me that that

25  would be fair and proper, and I will prepare an order simply to

1    say that these are suspended until such time -- just simply

2    saying that they are abrogated and are of no force and effect

3    until such time as this matter of this order is reconsidered.

4        MR. SACHSE:  If you do that -- so that there is no

5    misunderstanding -- if his Honor should sign such an order, the

6    very first thing I would be compelled to do at the De Luz Creek

7    hearings, for the protection of my own clients, would be to make

8    an oral motion and to ask every possible indulgence of the Court

9    to argue the question whether or not the laws of the State of

10   California still apply, or whether or not the order should be

11   immediately reinstated, and, if necessary, I would try to have

12   a written motion available to serve the minute that we walked

13   into that Court.

14       THE COURT:  We are not going to do that, for this

15   reason.  If this were a case with three or four litigants, it

16   would be a very simple matter to say that we will just set

17   aside the order until we have heard the motion.  But you have

18   served these people with the motion, so I'm not going to do that.

19       Let me ask you a question, and I wish you would be

20   frank on it.

21       MR. VEEDER:  I have been completely frank all day,

22   your Honor.

23       THE COURT:  My tentative view is, as I have already

24   indicated, that regardless of the stipulation, the state of the

25   law is such that if this is ruled on as a matter of law, the

1  result would be just about the same as in the stipulation.

2        Now, we have a record on some of these stipulated

3  facts and we can shortly make whatever additional record is

4  necessary, and let's forget about when these hearings start and

5  all of that.  Suppose you argue your motion to open up this

6  stipulation, and suppose that I rule against you and you

7  make your record.  Then suppose that we get, by stipulation or

8  by evidence, enough into the record to let the Court make a

9  ruling, as a matter of law, on this matter of this water used

10  by the Government without making appropriative steps under the

11  California law.

12        MR. VEEDER:  May I inquire, are you speaking wholly

13  aside from the stipulation at this juncture?

14        THE COURT:  Aside from the stipulation.

15        MR. VEEDER:  Yes.

16        THE COURT:  I am assuming some things adverse to you,

17  which I tell you is all assumption because I haven't heard the

18  motion and I haven't heard your witnesses.  But assuming that

19  I rule against you on your motion, then assuming that, by sti-

20  pulation of facts or the taking of testimony, you get the re-

21  cord in shape that, as a matter of law, I could make a definite

22  ruling on this matter of your rights, if they are rights, that

23  you started up there before Fallbrook filed, and then assuming

24  that I make a ruling adverse to you, I think that I am right

25  that that is pretty well the guts of a good part of your case.

1          MR. SACHSE:  If you throw in prescription, that is the
2  whole thing.

3          THE COURT:  I have tentatively ruled on the matter of
4  prescriptive rights.  Throw that in, too.

5          What would the Government's position then be, assuming
6  that those orders were made?

7          MR. VEEDER:  We would beat Fallbrook's brains out,
8  from the standpoint that they haven't complied with the State
9  law.

10          THE COURT:  I mean, what would your position be?
11  Would you then go ahead with the trial of the case?

12          MR. VEEDER:  Oh, yes.

13          THE COURT:  And try to review this at a later date?
14  Or would you then seek to have some immediate review, if possible,
15  of these preliminary problems?

16          MR. VEEDER:  I had never thought of this aspect of
17  it, but so far as I am concerned I have pleaded in a manner
18  where I would ask for you to rule -- and I think your Honor has
19  raised an extremely interesting point -- I would ask your Honor
20  to enter a declaratory judgment in regard to Fallbrook's com-
21  pliance with the State law and whether Fallbrook, indeed, could
22  get a priority at all.  In other words, I would say this --

23          THE COURT:  Suppose that we get that part of the
24  record in shape and I made that ruling, and let us assume that
25  that was adverse to you.  Would you then want to go ahead and

1  try the rest of the case, or --

2          MR. VEEDER:  I would try the whole lawsuit.

3          MR. STAHLMAN:  Vail is sitting up there wanting to

4  get around to the point where we are going to see what the rights

5  are of these people north of us who are affecting the flow of

6  the River up there.

7          MR. VEEDER:  We have stipulated judgment with Vail.

8          MR. STAHLMAN:  I think the Judge ought to be brought

9  up to date on something else, Mr. Veeder.

10         You know, Judge Carter, that the ruling was made by

11 the State Water Rights Board, that Mr. Dennis has carried out

12 a writ in the Superior Court as of the 9th of this month --

13 he has an alternative writ issued now, revoking the permit.

14         MR. SACHSE:  He hasn't revoked them.  It is a writ

15 seeking to revoke them.  It says they are revoked unless a re-

16 turn is made.  They aren't revoked yet.  The return is due on

17 the 22nd.

18         THE COURT:  The review of those Water Rights Board's

19 orders goes to the Superior Court?

20         MR. VEEDER:  That is right.

21         MR. SACHSE:  And then is appealable.

22         MR. STAHLMAN:  There is a question whether or not it

23 shouldn't be brought over here.

24         MR. VEEDER:  The thing to do would be to remove it

25 here and have the whole thing passed on.

1   MR. STAHLMAN:  Also, there are several other matters

2   to be litigated, such as the condemnation of the Vail Ranch.

3   I think it all ties in, in view of the stipulated judgment.

4   MR. VEEDER:  And the question of prescriptive rights

5   is tied directly to the stipulated judgment of the Vails.  I

6   intend to fight this thing all the way through.  It just so

7   happens that we have been shooting one lance at me.

8   The point I make is we have an extremely strong case

9   wholly aside from any other aspects.  I think that Fallbrook

10  we can beat on the State law ourselves.

11  THE COURT:  Here is Mr. Cranston now.

12  Sit down, Mr. Cranston.

13  You didn't understand my question.

14  MR. SACHSE:  I think I understood it.

15  THE COURT:  Assuming that these rulings were all

16  adverse, including this last one about whether Fallbrook had

17  complied, would you then want to suspend, as it were, the trial

18  of the rest of the case and, if possible -- I don't know that

19  it is even possible -- get some review of those rulings?

20  MR. VEEDER:  I don't see how there could be a review.

21  I myself don't see how there could be a review, but the point

22  that I am making on that is that when we get through --

23  THE COURT:  Well, under the multiple-claim rule, we

24  might look at it.  You have multiple claims.  You are claiming

25  a use of water outside of the watershed, you are claiming

1   prescriptive rights, you are claiming appropriative rights, you

2   are claiming riparian rights. Maybe they are multiple claims,

3   maybe they are not. I'm just thinking about that. It would be

4   a ruling which would underlie the whole case thereafter.

5        MR. VEEDER:  The reason why these things are so impor-

6   tant, your Honor, is that three of my witnesses that I intend to

7   call on the De Luz Creek case will show uses of tremendous

8   quantities of water far above the riparian right prior to 1912.

9   Now it is entirely possible that those rights which are used

10  outside of the watershed, they are appropriative rights, and

11  certainly we can use them wherever we choose. So I have never

12  felt, and I will never feel, that your Honor could possibly

13  say as of this moment --

14       THE COURT:  You mean you are the owners now of these

15  rights that were acquired?

16       MR. VEEDER:  Yes, we bought and paid for them.

17       MR. SACHSE:  Don't let my silence indicate agreement.

18       MR. VEEDER:  I haven't touched on these before. The

19  point I make is that when we try this lawsuit clear across the

20  board, and you could say that even with the order on the sti-

21  pulation, which I think was completely in error on the basis of

22  the truth, even there we could have appropriative rights of

23  sufficient quantity to take care of the Marines outside of the

24  watershed, and that is an issue that has to be tried.

25       Now there is only one of two questions which I think

1    could actually be tried out on the basis of stipulated facts.

2    Has Fallbrook complied with the law?  I don't think it has, and

3    we would be glad to try that out.

4         But I'm not about to agree that we didn't buy and

5    pay for enough water which is susceptible of being used outside

6    of the watershed to give us the water that we need, and I'm not

7    sure that there is not enough water there, on the proof that we

8    can adduce, that would show that that water was acquired prior

9    to 1914.

10        THE COURT:  If you got that kind of water from De Luz,

11   you could fold up and let Fallbrook build their dam.

12        MR. VEEDER:  I don't mean that.  I mean this water

13   that we are using was Santa Margarita River water and was used

14   to irrigate a tremendous area and was used far in excess of any

15   reasonable riparian's right.  We know that.  They would have

16   appropriative rights in addition to Lake O'Neill.  They had

17   surface diversions that were big.

18        So I'm not about to agree that even if this collusive

19   action to which I have made reference were all held against me

20   that we wouldn't be entitled to judgment for all the water that

21   we are using right now.

22        THE COURT:  Let me bring Mr. Cranston up to date and

23   find out what we are talking about and then make some decision

24   on this thing.

25        As you know, the Government has made a motion to call

1    Mr. Goldberg and Mr. Moskovitz as witnesses to the meaning of

2    the stipulation, and they have made a motion, as it were, to

3    have the Court reverse itself after hearing those witnesses on

4    the meaning of at least part of the stipulation.   They have

5    noticed it for the 21st at the Reche School.

6          I have ruled already, and I'm not going to re-analyze

7    this, that I'm not going to hear that motion at the Reche

8    School.   I'm going to transfer it down here and hear it.   We

9    haven't decided when, whether I am going to hear it on Wednesday,

10   the 21st, or whether I am going to start to hear it on Friday.

11         In any event, I have told Mr. Veeder that I will give

12   him a full hearing on that motion.   I will not require him to

13   make offers of proof.   I will let him put Mr. Goldberg and Mr.

14   Moskovitz on to make his record as to what was said and done

15   before I rule on that motion, and also hear the surrounding

16   circumstances, etc. -- give him a full hearing on that motion.

17         But since no agreement has been reached as to when

18   I would hear that motion down here, the question arose as to

19   whether or not we couldn't proceed with the hearings scheduled

20   before the Master at the Reche School on Wednesday, the 21st.

21   Mr. Veeder insists that he can't proceed until this motion is

22   ruled on.

23         I also suggested that if he didn't want to proceed,

24   if he were  present, that maybe Mr. Sachse could proceed with

25   some of his clients, or pro per defendants could put proof on

1165

1   out of order as to what they had -- other things we might do,

2   even if the Government didn't proceed.

3          Mr. Veeder says that he still can't proceed and will

4   not proceed until the motion is ruled on, and one of the reasons

5   he gives me is that some Circuit Court or some Congressional

6   Committee might feel that he had prejudiced the rights of the

7   Marines by starting that hearing before he had a ruling on this

8   motion.

9          Finally, I went all the way with him and called

10  attention to the fact that he is an officer of this Court and

11  that I could let him make a record right here of where he pro-

12  tested, as long as he wants to talk to this Reporter, and then

13  it would be possible for me to order him to be there and, if

14  necessary, to order him under penalty of contempt to be present

15  at that hearing, so that no Circuit Judge or no Congressman

16  could ever feel that he voluntarily went into this hearing, and

17  I could put as many sanctions on it as I thought would make it

18  clear to such a Circuit Judge or Congressman.

19         Mr. Veeder says that that still doesn't solve the pro-

20  blem.

21         MR. VEEDER:  May I interrupt to comment?

22         THE COURT:  Yes.

23         MR. VEEDER:  With all respect, I have said that I was

24  not concerned as to the date when you ruled on the motion; that

25  I would like to have the evidence in the record and you could

21

1   rule whenever you choose.  I checked the law on that thoroughly

2   yesterday, and under Rule 43(e) it is entirely proper and there

3   is a Ninth Circuit decision on that matter, namely, that in

4   ruling on this motion that we have your Honor could take into

5   consideration the record from previous hearings.  In other words,

6   Rule 43(e) provides for the taking of evidence in regard to

7   motions, but you could use the evidence adduced at the trial

8   both in regard to the trial of the case and in regard to the

9   motion.

10      Perhaps I didn't make myself clear.  I don't care

11  when your Honor rules on the motion, just so I have my evidence

12  in the record when we proceed, and that is my own feeling.  I

13  understand the problems of law that are entailed and I would

14  certainly not expect to argue the points of law up at Reche

15  School.  I would simply want to put in the evidence to the end,

16  as I said, that -- I can't think of any other descriptive term

17  than having a bobtailed record on appeal could be very dangerous

18  to us, under the order of February 11.

19      THE COURT:  Further to complete the picture, that I

20  thought possibly Mr. Veeder might, having in mind that if the

21  ruling were adverse on the motion, which he wants at least in

22  the sense of taking evidence before he goes ahead with the

23  hearing at the Reche School, he might have in mind trying to

24  get some kind of order that was not interlocutory that could be

25  appealable or try some extraordinary writ or something like

1   that.  He disclaims, however, that he has any such intention.

2        Then in response to a hypothetical question that if

3   the ruling on the motion on the stipulation were adverse to him,

4   if I ruled adversely on lower prescriptive rights, if I ruled

5   adversely on the antecedent situation of the Government with

6   respect to use of water outside the watershed prior to Fall-

7   brook's appropriations or applications, and if I ruled that there

8   were no uses after the amendment of the California law --

9        What was the date of that -- 1912?

10       MR. VEEDER:  1914 is when it became effective.

11       THE COURT:  This is after 1914, not prior to it.

12       -- and that even if I ruled adversely to him as to

13  whether Fallbrook had complied with State law with reference to

14  their applications to appropriate, whether he then had in mind

15  seeking a review of that part of the case before he went ahead.

16       And your answer was no?

17       MR. VEEDER:  Definitely no.

18       THE COURT:  If that is the case, then I go back to

19  what I said before.  What does the order of proof have to do

20  with starting these hearings?

21       MR. VEEDER:  Simply this, your Honor, and with all

22  respect to your Honor,  I can't go ahead in good conscience as

23  a lawyer without first putting in the California evidence, which

24  I think conclusively shows the error in your order of February

25  11, 1958.  I would be afraid to do it.

1       As I say, I know the politics of this matter. Fall-

2   brook has already been to the Ninth Circuit twice for writs of

3   prohibition.

4       I look at it this way, and I daresay that if you were

5   in my position you would say the same thing. That I cannot

6   possibly proceed one foot in this case now without having that

7   review, at least the evidence upon which you can review your

8   order, and secondly to directly proceed in regard to the effect

9   of the Fallbrook Dam upon the correlative rights of the ri-

10  parians on De Luz Creek.

11      The State of California changed and Fallbrook changed

12  the status quo of this case. It is a radically different law-

13  suit now that these permits are issued. I begged them not to --

14  I asked them not to. They proceeded anyway. Now the permit so

15  completely and so radically changes this lawsuit that whatever

16  was said before April 10, I think I would be sustained in any

17  Court, no longer adheres.

18      I expect when we call the first witness, and I point-

19  ed out to Mr. Sachse the area we intend to try -- we intend to

20  try the area west of  Sandia and west of Rainbow in this part

21  of the proceedings. It is impossible to do otherwise. I would

22  be assuming too great a risk not to put in evidence of our use

23  of water and our history of use and call the old timers to show

24  what our use was prior to 1914.

25      I regret it, but I have analyzed my lawsuit, I have

1  analyzed my responsibilities, I have analyzed the order as care-

2  fully as I know how, and the stakes are much too great for me to

3  take a different position.

4  THE COURT:  It seems to be that there are just three

5  alternatives -- maybe there is a fourth.  One alternative would

6  be what you are contending for, that you be permitted to call

7  Mr. Moskovitz and Mr. Goldberg on evidentiary matters, including

8  conversations, which would then be the basis for your motion;

9  to do that at the Reche School, but not argue the motion.

10  MR. VEEDER:  No, there would be no argument on the

11  law at all.

12  THE COURT:  To hear the witnesses, let you put this

13  proof on up there as a part of the start of your case, and then

14  later to argue the matter on the motion down here.

15  The second alternative would be on Wednesday morning

16  to continue the hearing of the motion from Reche School to San

17  Diego and then hear Mr. Goldberg and Mr. Moskovitz on matters

18  that pertained only to the motion and as early as possible to

19  get a ruling on that motion.

20  MR. VEEDER:  I don't care when you rule on it.

21  THE COURT:  You don't care when I rule on it.

22  The third alternative would be to order you to be

23  present at the Reche School under threat of contempt, so that

24  you were up there under compulsion, and you could make your

25  record that you didn't go there voluntarily -- you were ordered

to be  there, and in that state of the case I wouldn't feel like ordering you to go ahead and present proof but then proceed to hear other matters that would be ordinarily heard before that hearing, such as the possibility of Mr. Sachse going ahead with some of his defendants or some of the pro per defendants putting on proof as to their rights on De Luz Creek, out of order as it were.

Those are the three alternatives that I see. There is no fourth, is there?

MR. CRANSTON:  Wouldn't there be a possible fourth alternative in that Mr. Veeder would present evidence relating to De Luz Creek on the first day or two, without in any way having waived his motion, so that the people who come there expecting to hear that evidence will not be let down?  Then the hearing be continued and the evidence in regard to the motion and any motion be argued, etc.

THE COURT:  Yes, that is an alternative, but Mr. Veeder has refused.

MR. CRANSTON:  I just can't see why that is impossible from his viewpoint.

MR. VEEDER:  There is a fifth alternative, your Honor, and one which I think would rectify it with a stroke:  Simply set aside the order of February 11 until the motion was heard.

THE COURT:  I reject that one now.  I did it heretofore. I'm not going to do that.  If there were just several parties

1   here, that is one thing; but this order has been served on a

2   lot of these people.

3        MR. CRANSTON:   This has been attached to every summons,

4   your Honor.

5        THE COURT:   I'm not going to set aside the order at

6   this time.   That fifth one is out.

7        And you refuse to proceed on the fourth one, present-

8   ing evidence, for instance, on the stipulated facts and general

9   background, where we certainly can use up a couple of days with-

10  out straining -- I understand that you refuse to proceed on

11  that one.

12       MR. VEEDER:   Your Honor is using the term "refuse."

13  I simply say that I think my clients would be very dangerously

14  prejudiced by not having in the record the full testimony in re-

15  gard to the order on which the case is being tried.

16       MR. CRANSTON:   I don't see that, personally, Mr. Veeder.

17  Maybe I am missing something.   But if you have requested the

18  opportunity to put in the evidence on your motion first and that

19  is denied, you have protected your record  in that respect and

20  it is continued for two days only.   I don't see under what possi-

21  ble interpretation of the law you would be prejudiced by using

22  that two day period to present other evidence which have to be

23  presented whether you won or lost on that motion.   Isn't that

24  true?

25       MR. VEEDER:   If I were able to foresee, Mr. Cranston,

1  the happenings of this lawsuit, things would be entirely differ-
2  ent; but I cannot foresee what might occur if I do not get into
3  the record what California has done in regard to that order.  I
4  see no reason -- none.  What would be the error in calling Mr.
5  Goldberg and Mr. Moskovitz as I have stated, put them on as ad-
6  verse witnesses, examine them, get it into the record?  I truth-
7  fully can see no reason why we should not proceed that way.

8      MR. STAHLMAN:  My suggestion usually is not worth
9  much, your Honor, and as I previously indicated I have no part
10 in this particular situation here -- it doesn't affect my people.
11 But Vail does have a lot of property on De Luz Creek.  Some time
12 along in the trial we will be hearing evidence on that and we
13 may be interested in the testimony of some other people.  But
14 knowing the situation up there to some extent, and knowing the
15 feeling and the atmosphere, I would think that if you went up
16 there and made an explanation to these people, as you have in-
17 dicated, about what this lawsuit is about, etc., and tried to
18 talk a little reasoning and calmness into some people, which I
19 think can be done and I think you will do it readily and pro-
20 bably effectively, and then if they are told how this matter is
21 going to proceed -- that it is going to take a matter of days
22 and it will be worked out in such manner as to cause the least
23 convenience to the witnesses.  I presume that you have idea of
24 the program, how you are going to proceed -- I think from the
25 bottom part of the stream; let them know that they will not have

1   to be hanging around the courtroom all of that time, and that

2   since the matter has been set a couple of legal motions will

3   have to be disposed of and you are going to retire to San Diego

4   as soon as the hearing is over to start work on those matters.

5   I don't think it will cause any great commotion up there regard-

6   ing that and you will probably make more progress after you get

7   through, because the next time that you appear back there you

8   will find that the "mob" will have cleared away and you will go

9   ahead more rapidly anyhow.  For a day or two when you start in

10  on witnesses they are going to be hanging around there like

11  flies around a honey barrel.  You have a lot of farmers up there

12  with a lot of time.  Regardless of how you proceed, in a few

13  days they are going to drift away and you will have only the

14  witnesses there who are interested in the immediate problem.

15          That is merely a suggestion on my part.  I don't know

16  what it is worth.

17          MR. VEEDER:  May I ask you a question?

18          MR. STAHLMAN:  Yes.

19          MR. VEEDER:  Is it all right to proceed this way,

20  your Honor?

21          THE COURT:  Yes.

22          MR. VEEDER:  You are up there.  If Mr. Goldberg were

23  called -- and you have read the affidavit -- and he were examined

24  as an adverse witness, as I propose to -- I will write out the

25  questions I am going to ask him -- would it be any less or any

1   more volatile by reason of B. Abbott Goldberg being the first

2   witness than somebody else?  I'm just asking you.

3   　　　　MR. STAHLMAN:  No, I don't know, but you have several

4   things to consider.  In the first place, you have a lot of hot-

5   heads up there.  I presume that Mr. Cranston has found that out.

6   　　　　MR. CRANSTON:  I have met a few of them.

7   　　　　MR. STAHLMAN:  You can straighten out a lot of those

8   people.  I personally think that the place to argue and to take

9   the testimony on the motion is here in Court.  I say that for

10  what it is worth.  That is one man's opinion who has nothing to

11  do with that particular phase of the case.  If you start that

12  up there, I don't know what the temper of the "mob" is going to

13  be.  They have been talking about tearing that Reche Schoolhouse

14  board from board -- some of them.

15  　　　　MR. SACHSE:  Relax, George.  There will be a crowd

16  there, yes.  There will be no bricks.

17  　　　　MR. STAHLMAN:  No, I don't think they are going to do

18  anything like that.  If Judge Carter came up there the first

19  day, he would put a quietus on a whole lot of this.  Of course,

20  they would like to see a show naturally.

21  　　　　THE COURT:  Of course, you put a different light on

22  this in a way in that first alternative, to hear Mr. Goldberg

23  and Mr. Moskovitz but not to argue the motion.  I'm not very

24  keen about that alternative.  But since I am going to let him

25  make a record on this for the purpose of this motion and not

1  require him to make an offer of proof, what would be your posi-

2  tion on that first alternative, Mr. Sachse?  The motion is on

3  the calendar.  Let him start to call these witnesses, hear wit-

4  nesses as to the conversations and all that and other things

5  from Mr. Goldberg that he says that don't concern the motion,

6  no argument on the motion, and there wouldn't have to be any

7  objection on it, just hear it, and then go on with the hearing

8  as we planned.  As I understood you, you would be over with Mr.

9  Goldberg and Mr. Moskovitz probably the first day.

10  　　　　　MR. VEEDER:  My own thought about the progression of

11  events at the trial is that I would assume that your Honor would

12  make some brief statement when you assumed the Bench.  I had

13  planned to make an opening statement.  I would make an opening

14  statement and then I would call Mr. Goldberg, and I think that

15  Mr. Goldberg would be through with direct examination by noon

16  certainly, because my opening statement would be brief.  Cross-

17  examination would/after lunch.  I would call Mr. Moskovitz next.
　　　　　　　　　　　　　　be

18  The cross-examination would be over.  Then I would call Mr.

19  Holsinger.  By then we would at that juncture start putting in

20  my documentary case and the basic maps which would be offered

21  and using Mr. Holsinger in regard to documents and materials in

22  his custody.

23  　　　　　I truly have -- as I say, I have spent my life in this

24  work, and I have been in very many bitter lawsuits, but I don't

25  believe that anybody is going to throw any bricks.

1        MR. STAHLMAN:  Neither did Nixon.

2        MR. VEEDER:  Well, look what it did for him.

3        THE COURT:  I understand what you propose to do.

4        MR. SACHSE:  Have you asked me what my reaction is?

5   First, I don't care if your Honor goes to Reche School and hears

6   the whole thing and rules on it.  My understanding was that your

7   objection was -- I'm trying to paraphrase your thoughts here

8   this morning -- that you were not very much inclined to start

9   a loud vocal controversy between attorneys and witnesses and

10  the Court that could be construed by listeners to say that the

11  United States is welching on its stipulation.  That was your

12  concern, as I understood it, the reason for not wanting to have

13  this heard there.

14       THE COURT:  That is right.

15       MR. SACHSE:  But as far as I am concerned, I am ready

16  to hear the motion, I'm ready to show up and go to trial, but

17  I will make no commitments that if Mr. Goldberg and Mr. Mosko-

18  vitz and Mr. Holsinger are put on the stand that I'm not going

19  to object to evidence, that I'm not going to just raise every

20  single kind of Cain of what I think is absolutely improper

21  evidence.  His Honor can overrule and say that he will defer

22  the decision, but I am going to make my record, just as you are.

23  You can do it either way.

24       MR. VEEDER:  I would certainly assume that the ob-

25  jection would be made that it is irrelevant, incompetent and

1      immaterial and does not tend to prove any facts.

2             MR. SACHSE:  That it is controlled by the order here-

3      tofore made by his Honor, etc., and that it is absolutely out

4      of order, and I will make a holy show of it.

5             MR. VEEDER:  If you want to stir the animals up,

6      that's your business.

7             MR. SACHSE:  Well, it's my case.  You're concerned

8      about your case.  I'm concerned about mine.

9             I have offered you this, and again repeat it:  If you

10     want to try this case exactly the way the order that has been

11     served on everybody says, if you want to get up and offer proof

12     on the Santa Margarita watershed and you don't want to put any-

13     thing on -- you don't even open your mouth and Judge Carter

14     makes an order switching the order of proof, the only thing I

15     will ask of you is that I want Col. Bowen available so that I

16     can call him, and I will run that case so that there will be

17     enough to keep us busy for two days without Mr. Goldberg or

18     Mr. Moskovitz ever being mentioned.  If you want to run the show

19     that way, I'll do it.  I don't want to.  I think I'm doing you

20     a big favor.  I would rather do yours first.

21            MR. VEEDER:  I reject the idea.

22            MR. SACHSE:  But if it will get this show on the road,

23     I'll take the load and start proving the physical facts of the

24     De Luz watershed.

25            MR. VEEDER:  No.

1        MR. SACHSE:  All right.

2        MR. VEEDER:  We have the opening of the case.  We have

3   the responsibility to proceed.  We have the responsibility of

4   putting on a prima facie case, and I think that is the way we

5   should do it.

6        MR. SACHSE:  Let's go then.  Let's show up and go to

7   trial.

8        MR. VEEDER:  As I said before, I see no reason why

9   the alternative No. 1 that has been read should cause any diffi-

10  culty, because I never thought that the motion would be ruled

11  upon until subsequently anyhow.

12       MR. SACHSE:  All right.

13       THE COURT:  What would your opening statement consist

14  of?  Would you go into the matters in this motion in your open-

15  ing statement?

16       MR. VEEDER:  No.  My opening statement would simply

17  be that we were going to put in a quiet title suit and prove

18  our case, and in connection with that that we are using water

19  outside of the watershed and had been since 1942; that there

20  was a conflict over the rights to the use of water and that we

21  assumed and believed and know that our title to those rights

22  had been clouded.  That would be my opening statement.  I would

23  say nothing more.  There would be nothing more than that.

24       Franz will certainly make his objection to Mr. Gold-

25  berg and Mr. Moskovitz.

1        MR. SACHSE:  Let me remind you, I can't speak for Mr.

2   Moskovitz.

3        MR. VEEDER:  But if he pours gasoline on the crowd

4   and they catch fire, I can't be responsible for that.  But I

5   certainly have no idea on my part of doing anything more than

6   calling witnesses, and through a process of cross-examination

7   because I am calling them as adverse witnesses, adduce into the

8   record these things that I think are important.  Right after

9   that I would call Mr. Holsinger, put on the maps I have, put in

10  my documents and go ahead, and then call Max Bookman, the Cali-

11  fornia engineer, because I think his testimony is important,

12  and I assume that Franz will be objecting on the grounds that I

13  am attacking his permit.  I don't really intend to make any

14  reference to the permit.

15       MR. SACHSE:  You can put Mr. Bookman on.  If you don't,

16  I will.  It just depends on what you ask him.

17       MR. VEEDER:  As far I am concerned, we would have our

18  skeleton case in very soon, and this Ninth Circuit decision --

19       THE COURT:  How much time would it take to put in the

20  matters that involve this motion?  I can be up there only those

21  two days.

22       MR. VEEDER:  The matters involved in the motion, as I

23  say, will be through the first day.  I see no reason at all.

24  There are only two witnesses:  Mr. Goldberg says that the sti-

25  pulation means this, and Mr. Moskovitz says that it means that.

1   If they are on the stand over three hours, the two of them, it

2   will not be by reason of any examination from me.

3      MR. SACHSE:  You are overlooking the fact that there

4   will be some vigorous objections.  You have taken four and a

5   half hours to make your record on legal arguments, without wit-

6   nesses.  I don't expect to be quite as verbose, but I'm telling

7   you I have some very strong opinions on this testimony and I

8   don't think that Judge Carter will cut me off without giving me

9   a chance to be heard on my objections.

10      MR. VEEDER:  My own view is that if you interpose the

11   standard objections to which you are entitled and we refrain

12   from argument --

13      MR. SACHSE:  I am not going to refrain from argument.

14   I certainly am going to argue on that point.

15      MR. VEEDER:  You will have full opportunity to argue

16   the case before Judge Carter when the questions of law are up

17   on the motions.

18      MR. SACHSE:  All right.  I have told you that we can

19   try it anyway, as far as I'm concerned, but if his Honor is

20   worried about making a public display of this question of fraud

21   by the State of California, collusive action of Fallbrook with

22   the Water Rights Board, I am going to state for the record that

23   there has been none, and I am going to state it in public.  You

24   have stated here a half a dozen times that there has been col-

25   lusive action between Fallbrook and the Water Rights Board, and

1    this is part of the record in this case.  If this case goes up

2    on appeal, an Appellate Court is going to read those statements.

3    You don't think that I'm going to leave those statements un-

4    challenged with the possibility of an appeal staring me in the

5    face.  I am most certainly going to do everything in my power

6    to make a record that will show that your language was loose and

7    ill-advised and that you didn't know what you were talking about.

8         MR. VEEDER:  My own view is that we are getting off at

9    a very high level, and if you want to do that at Reche School,

10   it is up to you.  I don't intend to do more than I just outlined.

11   We would call witnesses, I would put the evidence in.  Certainly

12   it would be subject to a motion to strike.

13        MR. SACHSE:  I might also add that I can't represent

14   Mr. Moskovitz.  I don't know what he is going to do.  But I do

15   know that the first time I heard the word "fraud" used in this

16   connection was on the phone from him, and he said that the ac-

17   cusation is being made that California has acted fraudulently

18   and he is pretty unhappy and his boss is very unhappy.

19        MR. VEEDER:  Yes.

20        MR. SACHSE:  As I say, I don't know what they are going

21   to do, but regardless of what I might do, I don't think for five

22   minutes they are going to sit back without an awful lot of buck-

23   ing in allowing this evidence to go into the record which is

24   designed to show that the State of California acted fraudulently.

25   So I think you have two of us that are going to be doing some

1  talking, and you will not get done in two days.

2  THE COURT:  Of course, the Court can always say,

3  "Make your objection and refrain from argument."

4  MR. SACHSE:  Quite true.  But I don't anticipate that

5  you would do it without reasonable opportunity to be heard.  As

6  I say, we spent four and a half hours listening to Mr. Veeder

7  hold forth on why he can't do a perfectly simple, common, ordinary

8  thing that is done every day, which is to try cases out of order.

9  The last time that Mr. Stahlman and I were in Court together

10  we tried one out of order by agreement, in a condemnation case,

11  on opposite sides.  It is done every day.  There is nothing

12  unusual about it.

13  MR. STAHLMAN:  Of course, that Judge over there also

14  told us that if we made objections we were not going to argue

15  them.

16  MR. SACHSE:  There is nothing unusual, as I say, about

17  trying a case out of order.  I have offered to go "whole hog"

18  on the thing.

19  THE COURT:  Let me ask you this.  How many people are

20  going to be there on Wednesday on Reche School?  What is your

21  estimate of the number of spectators and all that will be there?

22

23  MR. SACHSE:  I wouldn't have the wildest guess.  I

24  think it will be jammed.

25  THE COURT:  Do you think we will have to adjourn down

to the auditorium?

1          MR. SACHSE:  You will not get them all in the Reche

2    School.

3          THE COURT:  How many miles is it from Reche School to

4    this auditorium, the Marine Theater?

5          AN OFFICER:  On the order of twenty miles, your Honor.

6          MR. SACHSE:  I think you would have a howling mob for

7    about two hours, a real crowd.  They are asking questions about

8    such things as, "Will there be a loudspeaker so they can hear

9    outside?"  So I'm assuming that for the first two hours of this

10   case you will have a mob.  For the next two or three or four

11   days, as George says, it will taper off.  You will have a gradu-

12   ally decreasing crowd and probably one that can be handled in-

13   side.

14         THE COURT:  Do you think we ought to probably get out

15   there at 9:30 and adjourn to the other auditorium and have some-

16   body advise them where it is going to be held?

17         MR. SACHSE:  I don't know, if you are asking me.

18         MR. VEEDER:  You don't know, or --

19         MR. SACHSE:  No, I don't think we should do that.

20         THE COURT:  Why?  It is not going to be satisfactory

21   for people who want to hear and participate to be listening out-

22   side over a loudspeaker.

23         MR. SACHSE:  They have been told that this is going to

24   happen.  It has been shouted from the housetops.  Mr. Cranston

25   has put notices in the Fallbrook paper and in the Murrieta,

1184

1   Hemet and Anza.  I don't know what you said at your meeting at

2   Anza on Saturday, but I guess that you told them that it was

3   starting.

4          MR. CRANSTON:  I told them that it was starting on the

5   De Luz area.

6          MR. SACHSE:  I have told them that, and they said,

                any
7   "Is there/point in my going down and listening?"  I said, "No,

8   it is going to be on the De Luz area."  But there is going to be

9   a tremendous bunch of Fallbrook people, for one thing in parti-

10  cular, that I think all of us overlook, and there is an awful

11  bundle of these people that have pro per answers, the forms that

12  Mr. Cranston has given them, and they are worried not so much

13  about writing the answers as how to act in Court, what do you

14  say, what do you do, what is the other man going to say first?

15  There are going to be a lot of them there as observers to find

16  out how they will function when the Fallbrook hearings start,

17  and I think that as laymen they have a right to try to do it.

18         THE COURT:  What I was thinking about was that if this

19  hearing had to be adjourned to the theater, it would take some

20  time and even if you started out at 9:30 and left word you

21  wouldn't get going until about 10:30 by the time we had gone

22  over, generally, what the case is about and what we intended

23  to do -- it would take a good bit of time to do that.  There

24  would probably be some questions that probably, in fairness,

25  should be answered, and because of that and by the time you made

1   an opening statement we might call it a day and come back up

2   here the next day and hear your witnesses on your motion.  It

3   is pretty hard for me to visualize how to run that meeting at

4   the Reche School if there is going to be a crowd, with people

5   outside wanting to get in.

6      MR. SACHSE:  I think you make a very serious mistake,

7   your Honor.

8      THE COURT:  To move it?

9      MR. SACHSE:  If that Court doesn't open after this

10  publicity, open physically -- your own presence there, something

11  said and done.  That has nothing to do with my case.  That has

12  to do with the welfare of the Court, and I am serious.

13     THE COURT:  But does it have to open there, or could

14  it open at the auditorium?

15     MR. SACHSE:  I think it has to open there.  That is

16  my opinion.

17     MR. VEEDER:  You mean calling the first witness?

18     MR. SACHSE:  Yes, I think the show has to start.

19  There has been too much publicity.

20     THE COURT:  But follow me for a minute.  Suppose you

21  open up at the Reche School, and assume that we don't move it

22  down to the auditorium and there is a mob scene, and by the

23  time you get started, I can visualize a good hour or more going

24  over this case preliminarily, the remarks that the Court would

25  make and some questions that the Court might answer, I could

1  imagine at least an hour and maybe it might take all morning

2  before you ever got through that.  How long would your opening

3  statement take?

4         MR. VEEDER:  Fifteen or twenty minutes.

5         MR. SACHSE:  All that, I think, should happen there --

6  every bit of it.

7         THE COURT:  Not be moved?

8         MR. SACHSE:  Every bit of it.  Again, I am speaking

9  only of the welfare of the Court and the attitude of the com-

10  munity.  People will be asking questions.

11         MR. STAHLMAN:  If you get out there and find there is

12  a mob and there are more people outside than there are inside,

13  isn't it reasonable to tell these people that by reason of the

14  large number of people who have attended that those people out-

15  side have as much right to hear what is going on as those who

16  are inside, and that they have no seats out there, and that

17  therefore -- you have to have a reason for it -- the reason is

18  that by reason of the crowd you would retire to someplace else.

19         MR. SACHSE:  When we left here at noon, I said that

20  I was going to quit giving public relations advice, but I will

21  say one thing more.  If you want to really bring down coals of

22  fire on your head, your Honor, transfer this to a theater on

23  Camp Pendleton.  That is the kiss of death.  Transfer it any-

24  where else you want to, but not to something on the Marine in-

25  stallation, where nobody can go in to present his case without

1   being checked, getting a pass, going through two gates -- the

2   only way is to through the Ammunition Depot and then through

3   another one, unless they go twenty-five miles through Oceanside.

4   That would be a disaster.

5          That is the end of my public relations advice.

6          They would have to go around through the San Luis

7   gate.  If you think that the Commandant of the Ammunition Depot

8   wants a couple of thousand people in his --

9          MR. STAHLMAN:  I don't know whether he does or not.

10          MR. VEEDER:  Maybe find some ten-year-old tampering

11   with an atomic bomb.

12          MR. SACHSE:  I think it is the kiss of death to move

13   this case into a Marine reservation.  That is the end of my

14   public relations advice.

15          MR. STAHLMAN:  I still go back to my suggestion, that

16   if it were stated that there were some motions that had to be

17   heard before we could proceed with the case and give them a talk,

18   then the next day or two days after that you will find there

19   will be no mob there.

20          THE COURT:  What is your schedule next week?  On

21   Monday I have law and motion calendar.  What is your schedule

22   for Tuesday, Wednesday, Thursday, etc.?

23          MR. CRANSTON:  I thought we would have the hearings

24   on Monday and Tuesday next week.  I have to have a conference

25   in Los Angeles on Wednesday on this other tax case.  On Thursday

1    I would be available for it.  Of course, on Friday I am available,

2    as far as I am concerned, but it is Memorial Day.  It is per-

3    fectly all right with me to go ahead on Friday.  I would be

4    available next week.

5         THE COURT:  Friday of next week is Memorial Day.

6    You couldn't take care of that conference on a Monday?

7         MR. CRANSTON:  No, it is a situation where there is

8    going to be a second conference on a revision of a brief.  We

9    have got to have an extra couple of days to get another brief

10   in and look at it.

11        I'm inclined to agree with what Mr. Sachse says about

12   bad public relations in removing it to a Marine theater, if it

13   could possibly be avoided.

14        THE COURT:  If it got too bad, it might be even more

15   desirable to bring a desk out in the open.  You would be better

16   off that way than to have part of them inside and part of them

17   out, if there was a "mob scene."

18        MR. VEEDER:  I don't think there will be a mob scene,

19   your Honor.  I truly don't.

20        MR. SACHSE:  Then let's go to trial.  Let's quit fool-

21   ing around.  I'm not worried about it.

22        MR. VEEDER:  I'm ready to go to trial.  I have spent

23   four hours arguing the point.  I am a firm believe that suffi-

24   cient to the day is the evil thereof.  Let's start off with the

25   lawsuit.

THE COURT:  Have you got equipment enough to get

loudspeakers strung outside, if necessary?

COL. ROBERTSON:  It is my understanding that we are

ready to do that, yes, sir.

THE COURT:  Not only from inside the courtroom, but

if we decide to move outside set up the speaker outside and

conduct an open-air hearing.

COL. ROBERTSON:  That is my understanding, sir.  We

will check it tonight.

Do you know definitely, Dave?

LT. MILLER:  No, I don't, sir.

COL. ROBERTSON:  I am sure it is lined up, but we

will check it out, sir.

THE COURT:  Of course, you know what I would like to

do.

MR. VEEDER:  That javelin, your Honor, is still

sticking out.

THE COURT:  I want to talk to Mr. Cranston for a

minute.

(The Court and Mr. Cranston then left the conference

chambers momentarily and then returned.)

THE COURT:  I will tell you what we are going to do.

On Wednesday we are going up to the Reche School and, unless it

is absolutely imperative, we will not move it down to the

theater.  If necessary, we will hold Court outside.  It may be

1  desirable, if there is a crowd, to have them all where they can

2  all hear it.

3          I want to take considerable time to tell these people

4  a little bit about the Court's function and the Master's function

5  and what this lawsuit is about and see if I can have any luck

6  calming them down.  I am going to have the United States Marshal

7  up there and if somebody doesn't behave himself I am going to

8  right off the bat, after I have given him ample time to behave

9  himself -- I'm not going to let the meeting get out of hand.

10          I contemplate that by the time we answer some questions

11  we are going to spend an hour or more on that sort of thing.

12          Is that a fair estimate?

13          MR. SACHSE:  I think that is just about right.

14          MR. VEEDER:  I myself think that is conservative.

15          MR. SACHSE:  I think it depends partly on how long

16  you take.  The more time you take the less questions.

17          THE COURT:  After we have completed that, I would ask

18  Mr. Veeder to make his opening statement.

19          I am not adament on this.  If you think that pre-

20  judices your position, I will not even make you do that.  But

21  I don't see how that enters into it.

22          Then I would tell these people that in starting one

23  of these lawsuits of this magnitude, many problems come up and

24  it is difficult to get things rolling and that we have all sorts

25  of problems -- in fact, the Master has arranged for meetings up

1   in another part of the area for Thursday; he is going to conduct

2   a meeting on Thursday up there -- and I would say that the

3   matter was then continued from Wednesday until Friday morning

4   at the Reche School.

5          We would come back down here on Wednesday afternoon

6   and start in with your testimony of your witnesses on your

7   motion and also give you all day on Thursday -- the Master

8   needn't be here -- and complete the factual showing on this

9   motion and have your arguments, etc., on your motion.

10          We would go back up to the Reche School on Friday and

11   start your presentation of the other evidence.

12          How about that?

13          MR. VEEDER:  I dislike to keep these California wit-

14   nesses, Mr. Holsinger and those other men, tied up, but that's

15   all right with me.

16          THE COURT:  The Master is prepared to go ahead on

17   Monday, although I cannot be there on Monday.  He is also pre-

18   pared to go ahead on Tuesday.

19          MR. CRANSTON:  Not witnesses, but I could go on Thurs-

20   day, or else we could have hearings just two days next week,

21   depending on the convenience of the attorneys.  In other words,

22   whether you would rather go back on Thursday or whether you

23   would rather adjourn until Monday.

24          THE COURT:  I would say you had better figure on

25   Monday, Tuesday and Thursday.

1          MR. SACHSE:  That is the following week?

2          THE COURT:  Yes.

3          MR. STAHLMAN:  Not Friday, because that is a big day

4  up there.

5          MR. SACHSE:  On Wednesday you are suggesting that we

6  open at Fallbrook, that we be through by noon?

7          THE COURT:  Try to be through by noon or run on to

8  1:00 p.m., if necessary.

9          Are you going to make an opening statement?

10          MR. VEEDER:  Yes, I would just as soon.

11          MR. SACHSE:  Anyway, we would get to San Diego in

12  time to put on part of the evidence and argument on the motion.

13          THE COURT:  Whatever time we got here -- we would

14  estimate how long it would take to get a bite, and give you all

15  day Thursday.

16          MR. VEEDER:  I don't see how it could take that much

17  time.

18          THE COURT:  All right.

19          MR. SACHSE:  On Friday we have nothing.

20          THE COURT:  On Wednesday we adjourn up there, we

21  tell them that the Court has some matters of law and that the

22  hearings at the Reche School are set over until Friday morning

23  and fix the hour, probably start at 9:30 up there at the Reche

24  School on Friday and go all day on Friday up there.  Then at

25  the end of that Friday, tell them it is continued until

1  Monday.   The Master will be there -- I will not be there Monday,

2  but I could be back again on Tuesday.   I may go back on Tues-

3  day, I might not.   I will decide before I let them know whether

4  I will be there or not.   Then that week we would have Monday,

5  Tuesday, take a day off on Wednesday, and then go again on

6  Thursday and then Friday off, and from then on you will have to

7  start to work out your schedule.   I think that is the way we

8  want to do it.

9         Is there any objection to that?

10        MR. VEEDER:   It suits me very well.

11        MR. SACHSE:   On Thursday you are off, or Wednesday?

12        THE COURT:   He is off Wednesday.

13        MR. CRANSTON:   Wednesday, the 28th, I have to be in

14  Los Angeles.

15        THE COURT:   On Thursday while we are hearing this

16  motion he will be in another part of the District.

17        MR. SACHSE:   But there will be no De Luz hearing on

18  Thursday of this week.

19        MR. CRANSTON:   No, sir.

20        THE COURT:   That is set aside, what is left of Wednes-

21  day and Thursday, for this motion and the evidence on this

22  motion, and then on Friday, back to the schoolhouse.

23        MR. SACHSE:   Do we anticipate that we are in this

24  manner getting a ruling and can avoid the public argument on

25  the admissibility of Mr. Holsinger's and Mr. Goldberg's and

1   other testimony on the case in chief as distinguished from the

2   case on the motion?

3           THE COURT:  I am not going to have their testimony

4   repeated up there on matters that involve the stipulation.  If

5   there are other things you want from Mr. Goldberg up there,

6   things that he knows that don't concern this -- physical facts

7   that he knows, that is all right.

8           MR. VEEDER:  My own view is, why not put Mr. Goldberg

9   through the hoops down here and get him out of town and done

10  with.

11          THE COURT:  The Master will be here that day.  But

12  the point is that I don't want you to put matters on when the

13  Master isn't here.  I want him to hear all of your showing.

14  The motion I'm willing to hear whether he is here or not, but

15  the rest of it I want him to hear.  If he is here, it won't

16  make any difference.

17          MR. VEEDER:  He will be here on Wednesday.

18          THE COURT:  Yes.

19          MR. CRANSTON:  I will be here Wednesday.  The one

20  reason I suggested that I would not be here Thursday is that I

21  would be conferring with defendants up there in Riverside County,

22  at Temecula and Murrieta.  Some of them asked me to come up there.

23  I said I didn't know when I could do it this week, that I would

24  be over at the Reche Schoolhouse on the next three days, but

25  that I could be there on Thursday to help them with their answers.

1        MR. SACHSE:   Have you talked to some groups?

2        MR. CRANSTON:   The only group in Riverside was at

3   Anza.

4        MR. VEEDER:   Your Honor, as far as I am concerned,

5   we will simply put on evidence in regard to the motions down

6   here on Wednesday afternoon and Thursday if the time is re-

7   quired.

8        MR. SACHSE:   What about the minor problem that the

9   State of California may have some evidence of its own that it

10  wants to put in on the motion, and that Fallbrook might have?

11  Do you think you could get me out a few people from Washington

12  by Wednesday?

13       MR. VEEDER:   That I would suggest is your problem.

14       THE COURT:   Here is the point on that.  If there is

15  other evidence to be heard on the motion, we will adjourn it

16  to some other date and talk about it when we get here.   In

17  other words, I will not clip you off on a showing if you think

18  one is necessary.   In other words, we certainly can't do it on

19  Wednesday and Thursday.   So, if before the motion is ruled on,

20  if that is to be done, we will fix a time and can then look at

21  what we are going to do about it.

22       MR. VEEDER:   I have this thought.   Where did you say

23  Mr. Moskovitz is now?

24       MR. SACHSE:   As I understood it, he is at the Tri-

25  State Compact meeting or some such thing at Reno.   I didn't get

1   him on the phone.  I just heard conversation of the operator

2   and the secretary.  He will be there part of tomorrow and ex-

3   pects to be in Los Angeles tomorrow night.

4         MR. VEEDER:  I have to call him right now.

5         MR. STAHLMAN:  How are you going to handle that

6   matter of producing Mr. Goldberg?

7         THE COURT:  He told me that he would produce him if

8   I said he should be produced.  I think we could get him there

9   now.

10         MR. VEEDER:  We might try.

11         MR. SACHSE:  I think she said the Mapes Hotel.

12         MR. VEEDER:  There is a Mapes Hotel.

13         MR. STAHLMAN:  It is ten after 5:00.

14         (The Court then makes a long-distance telephone call.)

15         MR. CRANSTON:  Do I understand correctly that if this

16   evidence was presented down here on Wednesday and Thursday and

17   hadn't been ruled upon, that you would have objections that you

18   would feel you would have to make?

19         MR. SACHSE:  If Mr. Moskovitz, Mr. Holsinger, Mr.

20   Goldberg, etc., are called at the Reche School or anywhere else.

21         MR. CRANSTON:  Although all they were testifying to

22   was the matter of --

23         MR. SACHSE:  No, there isn't anything else that they

24   can testify to.  He isn't kidding me.

25         MR. VEEDER:  Let me hear you again.  Do you think I

1   am calling Mr. Holsinger to have anything to do with this sti-

2   pulation?

3           MR. SACHSE:  The objection in Mr. Holsinger's case

4   will be entirely different.

5           MR. VEEDER:  That's what I'm saying.

6           MR. SACHSE:  I misunderstood.  The objection is entire-

7   ly different.  I will have other objections on that which I

8   will mention in a minute.

9           MR. CRANSTON:  But it will not have anything to do

10   with the stipulation.

11           MR. SACHSE:  Not on Mr. Holsinger, but it will have

12   to do with two other things.

13           THE COURT:  Will you try to reach Mr. Moskovitz to-

14   night?

15           MR. VEEDER:  Yes.

16           THE COURT:  And if he has any questions, have him

17   call me tomorrow, and then report to me tomorrow what you find

18   out.

19           MR. VEEDER:  Yes.

20           MR. SACHSE:  I still think that if we are going to

21   start ruling on motions and we are going to adjourn this at

22   all, it might not be out of order to consider the wisdom of

23   dusting off some of the other motions, Fallbrook's motions,

24   that will eliminate some of these issues, and I can say right

25   now that while you were on the phone, Mr. Veeder and Mr.

1  Cranston and I talked, and he expects to offer evidence to the

2  Master in the person of Henry Holsinger as to the operations

3  of the State Water Rights Board, Fallbrook's permit -- whether

4  we complied, etc., and I have motions on it, motions for your

5  Honor's ruling that are now pending that are filed in Court.

6  I would like to get rid of those.  We are going to have that

7  coming up, too -- instead of passing the buck to Mr. Cranston.

8           MR. VEEDER:  What are those motions?

9           MR. SACHSE:  My motions would have to be re-drafted

10  because my motions were written before the Water Rights Board

11  had made its ruling.

12           THE COURT:  What is the substance of your motions?

13           MR. SACHSE:  That the whole smear is moot; that the

14  Water Rights Board has acted and the question of a priority

15  date, of an amendment of a motion, of anything else in the

16  hands of the Water Rights Board is now moot and all these

17  questions, some six or seven in the middle of the Complaint --

18  I can look their numbers up readily -- are moot.  They are not

19  at issue in this proceeding because the Water Rights Board has

20  acted and everything is of record in this case already.

21           THE COURT:  In order to get this show on the road up

22  there, do you have any objection if he puts this person on sub-

23  ject to your general objection, which you could state without

24  argument, and then arrange to set these motions for hearing,

25  and that will give you time to amend your motions and all that

1   sort of thing?  What harm does it do?

2        MR. SACHSE:  I would like to ask the Reporter to

3   look up and I would love to use Mr. Veeder's phrase:  It dis-

4   rupts my planning on the way I run this case.  I have planned

5   the way I was going to run this case.

6        MR. VEEDER:  I think you are going to hurt George's

7   feelings on that.

8        MR. SACHSE:  The United States of America is in a

9   very happy position of having the rules, the orders juggled

10  any way they see fit, whereas the single litigant here apparent-

11  ly is not.  That's all.

12       THE COURT:  Well, let's not get our feelings hurt.

13  Suppose he puts this proof on subject to your objection.  This

14  is not a jury trial.  You want time anyhow properly to frame

15  your motion.  You want a chance to argue it in detail.  Is

16  there any objection if, subject to objection, he puts this

17  proof on?

18       How long is it going to take with Mr. Holsinger?

19       MR. VEEDER:  It should take maybe -- I think that

20  his testimony would probably be in in half a day.

21       THE COURT:  Wouldn't that be the logical way to do

22  it?  Make your objection, don't argue it, and then give you

23  time to look over your motions and revise them on the change

24  of circumstances, and then have a chance to argue them out,

25  and if this Holsinger turns out to be a bubble of air what

1 | harm has been done?  He would have a right anyhow to make an

2 | offer of proof and protect the record on it.

3 |    MR. VEEDER:  We have quite a number of documents to

4 | put in with Mr. Holsinger.

5 |    THE COURT:  What do you think, Mr. Sachse?

6 |    MR. SACHSE:  If that is your ruling, that is it.

7 | That's all.  That is easy.  I can handle it.

8 |    THE COURT:  Well, I think we have done everything

9 | that we can.  Let's show up at the Reche School at 9:30.

10 |    (Adjournment until Wednesday, May 21, 1958, at 10:00

11 | A.M., at Reche School in Oak Grove, at Fallbrook, California.)