# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN
### CENTRAL DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al,

        Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:                San Diego, California

Date:                May 21, 1958

Pages:    1201-1259

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____ DEPUTY

JOHN SWADER
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211 • EXT. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1247-SD-C |
| ) | |
| FALLBROOK PUBLIC UTILITY ) | |
| DISTRICT, et al, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

May 21, 1958

APPEARANCES:

    For Plaintiff:          WILLIAM H. VEEDER, Esq.,
                              WILLIAM E. BURBY, Esq.,
                              Special Assistants to the
                              Attorney-General
                              Department of Justice
                              Washington, D. C.

— — —

1 APPEARANCES (continued):

2  For U. S. Marine Corps:           COL. ELLIOT ROBERTSON
                                     LT. DAVID MILLER

3

4  For Defendant Vail Company:  GEORGE E. STAHLMAN, Esq.

   For Defendant State of            EDMUND G. BROWN, Esq.
5  California:                       Attorney-General, by
                                     ADOLPHUS MOSKOVITZ, Esq.
6                                    Deputy Attorney-General

7  For Defendants A. S.              HARRY ASHTON, Esq.
   Richardson and Aileen
8  Richardson:

9  For Defendant David W.            GEORGE GROVER, Esq.
   Miller:
10

   For Defendant Fallbrook          F. R. SACHSE, Esq.
11 Public Utility District:

12 For Some Other Defendants:    BEST, BEST & KRIEGER, by
                                 ARTHUR L. LITTLEWORTH and
13                               JAMES KRIEGER, Esq.

14

15

16

17

18

19

20

21

22

23

24

25

1   SAN DIEGO, CALIFORNIA, WEDNESDAY, MAY 21, 1958, 2:00 P.M.

2   THE CLERK:   No. 1247-SD-C, United States vs. Fallbrook,

3   et al.

4   Hearings on motions.

5   THE COURT:   You have two motions: The motion to call

6   Mr. Goldberg and Mr. Moskovitz for the purpose of eliciting

7   testimony in regard to the proper interpretation to be placed

8   on the stipulation dated November 29, 1951, and a motion to

9   reconsider the order of February 11, 1958 interpreting the sti-

10  pulation.

11  As I told you in the conference that we had in Cham-

12  bers, I propose to let you make your record over any objection

13  here on it.  Rather than to make it by an offer of proof, I

14  propose to let you call your witnesses.  If thereafter the parties

15  feel that the evidence is not material, I will entertain a

16  motion to strike.

17  Any objection to this procedure?

18  MR. MOSKOVITZ:   Your Honor, the State submitted an

19  opposition to both motions.  We do want to make all those ob-

20  jections that we made there and make them on the motion to call

21  the witnesses and the motion to reconsider.  If your Honor chooses

22  to overrule those objections and go ahead, our objections are of

23  record and we will renew them by a motion to strike or any other

24  way that is deemed proper.

25  THE COURT:   The objections set forth in your memorandum

1   may be considered read as part of your objection at this time,

2   and I will overrule them insofar as eliciting this testimony is

3   concerned but without prejudice to your motion thereafter to

4   strike on the same grounds or on other grounds that you have

5   stated.

6      Has anyone else an objection?

7      MR. SACHSE:  I have an objection, your Honor, not only

8   on the grounds stated in my objections, but I believe that these

9   motions shouldn't be heard at all.  There is an order of this

10  Court dated the 11th of February which itself states that the

11  stipulation is not ambiguous, and it is my position that there

12  is nothing contained in the motions of the United States or the

13  affidavits in support thereof that would justify a hearing.

14     I will only point out at this time, and then do as Mr.

15  Moskovitz did, renew our motion to strike -- I will only point

16  out this, that as between present litigants the affidavit of a

17  junior member of the law firm who disagreed with the interpre-

18  tation of the superior's clients as to the meaning of a contract,

19  the Court would not look at it for two reasons:  First, the

20  opinions of the junior are the absolute epitomy of irrelevancy;

21  second, the attorney-client relationship would absolutely pro-

22  hibit any disclosure by the junior as to any conversations, the

23  circumstances or events that led up to the drawing of the con-

24  tract.

25     I will renew it later by a motion to strike.

1          THE COURT:  I overrule your objection and reserve to

2    you a motion to strike。

3          Any other objection?

4          I propose to grant the first motion and hear this testi-

5    mony rather than to get it in the record by an offer of proof。

6    The motion says, however:

7          "It is to be observed in regard to Mr. Goldberg's

8          testimony that it will not be limited entirely to the

9          phase of the case last mentioned...。"

10          I will not grant that part of the motion.  I am grant-

11    ing the motion only as to the phase of the case concerning this

12    stipulation problem。

13          We have other evidence from Mr. Goldberg to be present-

14    ed at the Master's hearing?

15          MR. VEEDER:  That was my understanding。  I will state

16    that that was purely explanatory.

17          THE COURT:  I will now take up the motion to reconsider

18    and see what happens。

19          MR. MOSKOVITZ:  May it please the Court, your ruling

20    on the first motion doesn't constitute a ruling, I assume, on

21    objections to particular questions that may be asked -- you are

22    not ruling in advance on those?

23          THE COURT:  No.

24          Proceed。

25          MR. VEEDER:  Is it permissible for me to proceed,

1   your Honor?

2            THE COURT:   Proceed.

3            MR. VEEDER:   I would like briefly to make a statement

4   before calling the witnesses.

5            Your Honor, on page 84 of the Notice and Orders, Com-

6   plaint and Supplementary and Amendatory Complaint, a portion of

7   the order of February 11 to which I respectfully call your

8   Honor's attention, to that item we direct our first statements.

9            THE COURT:   What item are you talking about?

10           MR. VEEDER:   IV-C.

11           THE COURT:   I don't have it before me.   I can get a

12  copy.   Isn't the stipulation set forth in your motion here?

13           MR. VEEDER:   The stipulation is, but the order is not,

14  your Honor.

15           THE COURT:   Mr. Clerk, in my briefcase is a copy of

16  this order.

17           (The Clerk leaves momentarily and then returns.)

18           MR. VEEDER:   On page 84, commencing on line 26 and

19  continuing on through to the end of the order --

20           THE COURT:   I have it.

21           MR. VEEDER:   There it will be observed that this

22  statement is made in the order:

23           "Paragraph IV of the stipulation means that the

24           measure of the rights claimed by the United States in

25           this action is all of the laws of the State of California

1    pertaining to water rights.  Among them are the laws

2    relating to riparian rights, to prescriptive rights

3    and to appropriative rights, including the method and

4    procedure established by California law for the ac-

5    quisitions of appropriative rights."

6        Now, included in that reference are the words "all of

7    the laws" and then specific reference to this "including the

8    method and procedure established by California law for the

9    acquisition of appropriative rights."

10        The California Water Code, Section 1225, says:

11        "Compliance with provisions of Division," and this

12    is the probative part of it:  "No right to appropriate

13    water or use  water subject to appropriation shall be

14    acquired except upon compliance with the provisions of

15    this Division."

16        Now, if your Honor will look at page 8 of California's

17    Brief in Response, starting at line 31 and continuing on to page

18    9, this statement is made:

19        "The State has never contended that the United

20    States agreed specifically that it would have to file

21    applications and obtain permits in order to acquire

22    appropriative rights.  The State has always recognized

23    that the question whether under California law a permit

24    is required for an appropriative right is for the Court

25    to decide as a matter of law.  The United States has

1208

1      cited authority and made arguments that a water user

2      may acquire an appropriative right in California with-

3      out permit.  The State has cited authorities and made

4      arguments to the contrary.  The stipulation does not

5      foreclose that issue."

6         But there is no reference to what your Honor's order

7  of February 11 does.  Then we continue:

8      "What the State has contended is that in para-

9      graph IV of the stipulation the United States has agreed

10     that California law pertaining to water rights and all

11     its aspects is the standard against which the rights

12     asserted by the United States at Camp Pendleton are to

13     be tested.  The order of February 11, 1958, states no

14     more.  Thus, whatever method and procedure the Court de-

15     termines has been established by California law for the

16     acquisition of appropriative rights are among the laws

17     of California which are the measure of the United States'

18     rights."

19        I submit, your Honor, that if that is California's

20 interpretation of your Honor's order, then the order has been

21 stripped of much of its probative value to them, because in ex-

22 press words your Honor's order says that there must be a filing,

23 there must be permits.

24        THE COURT:  I didn't say that.

25        MR. VEEDER:  I think that is what your Honor's order says.

1    THE COURT:   I said that among them are the laws, etc.

2  including the method and procedure established by California

3  law for the  acquisition of appropriative rights.   I have never

4  ruled finally on this question of the constitutionality of this

5  Section of the Water Code -- it's interpretation.   On its face

6  it seems to have a certain meaning.   I'm in complete agreement

7  with Mr. Moskovitz and his interpretation.   I don't think the

8  issue is foreclosed as to what this Section means.

9       When you say,  "California law," you mean as inter-

10 preted by California Courts, and if you can't find a California

11 Supreme Court decision then the law is clear that a Federal

12 Court should decide it as the Court of Last Resort of California

13 would decide it if the question were presented.

14      MR. VEEDER:  Your Honor, the reason why I brought this

15 up is that I wanted to be very clear in my own mind and I wanted

16 the record to be very clear as to the problem that has been pre-

17 sented here, and the reason why I called these two witnesses.

18      If I may make a brief opening statement --

19      THE COURT:  Before you start on that, let me ask some

20 of the other defendants:

21      Mr. Sachse and Mr. Stahlman, are you in accord with

22 California's interpretation of the. stipulation as applied to

23 this situation?

24      MR. SACHSE:  Yes, your Honor.  In fact,  I think there

25 are pending motions by Fallbrook not yet set which will squarely

1 set this question whether the appropriative rights can be ac-

2 quired in any other way than that set forth in the Code itself.

3 THE COURT:  Mr. Stahlman, what is your position?

4 MR. VEEDER:  I think, your Honor, the question that

5 you presented was as to the stipulation.  I am referring specifi-

6 cally to your order, and there is the difference.

7 THE COURT:  I am talking about my order interpreting

8 it.

9 What is your position, Mr. Stahlman?

10 MR. STAHLMAN:  My understanding is that insofar as the

11 recitation in the brief is concerned, I think that is what the

12 situation should be.  However, I didn't understand that your

13 Honor's order meant that.  Frankly, I thought that the right to

14 acquire by appropriation would have to be, regardless of what

15 the circumstances were, in accordance with the State Water Code.

16 THE COURT:  Well, I did not say Section so-and-so of

17 the Water Code; I said California law.  We have never fully

18 briefed and argued in this Court the effect of Section 1225.

19 We have never fully briefed and argued exactly what it means.

20 On its face it would seem to mean that unless you make appli-

21 cation to appropriate water after the date of that statute, you

22 did not get any rights.  That is what it would seem to mean on

23 its face.

24 There may be many problems concerning that Section.

25 We haven't done that yet, and I see nothing wrong with my order,

1   which says that California law will apply, and among them will

2   be the method and procedure established by California law.

3       The law is clear in the Federal Court that if you don't

4   find a Code Section or statute or cases that tell you what Cali-

5   fornia law is, and if you have to follow California law, then a

6   Federal Court should ascertain what the Supreme Court of the

7   State would say if the particular problem was presented to it,

8   and you are then still following California law although you

9   may be postulating what it is going to be.

10      MR. STAHLMAN:   Your Honor, representing the clients

11  that I do, I am really not concerned with that situation.   Even

12  if your Honor's order meant what Mr. Veeder thinks it meant and

13  what I had thought it meant, it may benefit my clients.   However,

14  you asked me an abstract question, and that was the answer that

15  I had to give you.

16      MR. MOSKOVITZ:   May I just remind those present of the

17  memoranda that I referred to when I made the statement in the

18  brief.   The memoranda on law which the United States submitted

19  and which the State of California submitted discussed that

20  question:   Under California law can anyone else....?   And I

21  remember the arguments before the Court, Mr. Veeder saying that

22  even your Honor can secure an appropriative right without filing

23  an application.   That issue, I say, is open, and it is properly

24  open under the stipulation.   That is the point I make.

25      MR. VEEDER:   May I continue then, your Honor?

THE COURT:   Yes.

MR. VEEDER:   Because I look at the situation in this light, that the word "measure" could not conceivably, in my view, relate to the method of appropriation at all.   That is one reason why I want to have the witness on the stand.

THE COURT:   All right.

MR. VEEDER:   Secondly, Mr. Moskovitz has alluded to his brief, and I call your Honor's attention -- I think the brief was filed on the 13th of December, and in that brief there are specific and repeated references to the assertion that the only way you could acquire a right to the use of water would be by compliance with the State law.

THE COURT:   I know.

MR. VEEDER:   And he refers to the methods and pro-cedures for acquiring rights, and the methods and procedures for acquiring rights is to file an application, get a permit and get a license, and at the very time that this stipulation was signed and entered into with California, and everyone knew it, the United States has the Rancho Santa Margarita, was di-verting and applying water to beneficial use outside of the watershed and had not complied with California law.

Now when your Honor enters an order which, as I repeat once more, says:   All the laws of California are applicable. Among them are the laws relating to riparian and prescriptive rights and to appropriative rights, including the method and

1    procedure established by California law for the acquisition of

2    appropriative rights, to me it is clear beyond doubt that we

3    will be confronted on appeal with this kind of language:   The

4    Court entered the order of February 11 and declared to you that

5    unless you file an application you could not acquire a right to

6    the use of water from California.

7            THE COURT:   Mr. Veeder, if you will remember, when we

8    had this problem briefed I made some observations as to what I

9    thought the situation was.   I didn't make any rulings.   I didn't

10   make any formal rulings on adverse user by a downstream owner,

11   but I told you that I thought I knew what the law was.   I told

12   you that I thought that I knew what the law was here, but I

13   didn't make any formal ruling.   I also told all you gentlemen

14   later that I expected when we got far enough in the case by

15   pre-trial stipulation or agreement on facts and had the matter

16   presented that I would decide some of these things.

17           I think there is no doubt that you have the laboring

18   oar, if Section 1225 means what it says.   If you can't find

19   some way around it, you are faced with a statute that says that

20   you can't get an appropriative right after the date of that

21   statute without filing and complying with State procedure.

22           But I haven't even yet ruled.  You may look at the

23   record anywhere.   I have never made a ruling in the sense of a

24   formal ruling, by minute order or order of any kind, as to what

25   I think Section 1225 means.   I told you what I think it means

1   and suggested what I think will be my ruling.

2   MR. VEEDER:  Your Honor, as I stated, in this order

3   in which you construe the word "measure" -- "...the rights of

4   the United States will be measured by California law..." --

5   to mean that the United States of America must make a filing,

6   must get a permit, and must get a license.  That is what your

7   Honor's order states.

8   THE COURT:  That is not what it states.  It states

9   just what it says in so many words, that whatever rights the

10   Government has here are measured by California law as we shall

11   determine what California law is.  I haven't made any ruling

12   yet as to what the riparian law is.  I think I know -- I don't

13   think there is much dispute between us, but I haven't made any

14   order.  I indicated as to presciptive rights what I thought the

15   ruling was, but I haven't ruled.  We had it up only for pre-

16   trial discussion.  We didn't have even a stipulation of facts

17   then on which to base a ruling.  I intend to make some rulings

18   as to what I think these laws mean.

19   MR. VEEDER:  Your Honor, then I will say this, that

20   certainly paragraph IV-C of your order of February 11, 1958, is

21   not clear, with all respect to your Honor.  If that is the con-

22   struction which your Honor places upon that language, then I

23   would respectfully propose an amendment to it to the effect that

24   the word "measured," as used in the stipulation of November 29,

25   1951, means that the measure of the rights would be of this

1    character:   (1) You can't use riparian water outside of the

2    watershed, (2) you cannot impound riparian water,

3            THE COURT:  We are not going to make any amendments

4    now.  You may proceed, for the purpose of your motion, on the

5    assumption that, when I get ready to interpret these rights,

6    I am, as I have indicated orally, probably going to interpret

7    them adversely to your position.  So you still have your motion

8    to argue。

9            MR. VEEDER:  The thing that struck me when I read Mr。

10   Moskovitz's brief was that there was, in my view, a complete

11   failure to join issue.

12           I will call Mr. Goldberg as a witness。

13           THE COURT:  I don't know why you are confused about

14   it。  The same is true as to prescriptive rights。  I told you

15   orally that I didn't think there was any possible way where a

16   downstream user could  get prescriptive rights against an up-

17   stream user。  But I made no order.  I even indicated that I

18   might write a brief opinion when we got the case in shape where

19   we could decide something。  I didn't decide them in a vacuum。

20   At the time we argued the matter, we didn't have even a sti-

21   pulation of facts。  I knew what the facts would show; that you

22   are downstream, and that the other people are upstream,  I in-

23   dicated that I would make a ruling on that。  The same is true

24   with regard to riparian rights.  There is not much argument

25   about that。  But there is a field for good argument as to this

1    appropriative question, and you have the laboring oar.

2         If the statute means what it says, and if there are

3    no exceptions to it, then you have got to comply with State law.

4    I haven't ruled on that.

5         MR. VEEDER:  Then I would ask that it be changed.

6         But I will call Mr. Goldberg for the purpose of ad-

7    ducing evidence as to the meaning of the stipulation, particular-

8    ly the word "measure" as used in the stipulation.

9         Mr. Goldberg, will you take the stand.

10                    B. ABBOTT GOLDBERG

11   called as a witness for the plaintiff being first duly sworn on

12   his oath testified as follows:

13                    DIRECT EXAMINATION

14        Q    BY MR. VEEDER:  Would you state your full name,

15   Mr. Goldberg.

16        A    My name is Abbott Goldberg.

17        Q    How old are you, Mr. Goldberg?

18        A    Forty-one.

19        Q    Are you a member of the California Bar?

20        A    Yes.

21        Q    How long have you been a member of the Bar, Mr.

22   Goldberg?

23        A    Since 1944.

24        Q    Where are you presently employed?

25        A    In the Office of the Attorney-General of the

1  State of California in San Francisco.

2         Q    Mr. Goldberg, would you state what your employ-

3  ment was prior to the time that you went to work for the Attorney-

4  General's Office?

5         A    I was employed as a research attorney by the

6  Judicial Council of the State of California.

7         Q    And prior to that time?

8         A    Prior to that time I was in the Army.

9         Q    Were you ever employed to do work for any of the

10 Justices of the Supreme Court of the State of California?

11        A    As research attorney for the Judicial Council,

12 from time to time I worked with various of the Judges, parti-

13 cularly the Chief Justice.

14        Q    During the period since you have been employed

15 with the Attorney-General's Office of the State of California,

16 would you state the water litigation in which you have been

17 engaged?  What is your most recent case, Mr. Goldberg?

18        A    My most recent case is the Ivanhoe case.

19        Q    With whom were you associated in that case for

20 the State of California?

21        A    Mr. Moskovitz.

22        Q    And how frequently did you see Mr. Moskovitz

23 during the period when you were preparing this brief?

24        A    Well, I --

25        MR. MOSKOVITZ:  Your Honor, I think this is an

1    irrelevant question.  A certain number of foundational questions

2    I have permitted to come in, but I can't see where this would

3    lead to anything relevant to the issues of this case.  I object

4    on that basis.

5            THE COURT:  Overruled.

6            MR. VEEDER:  Would you read the question, please?

7            THE COURT:  Read the question.

8            (The Reporter read the pending question.)

9            THE COURT:  What brief do you mean?

10           MR. VEEDER:  The Ivanhoe brief.

11           THE WITNESS: I can't give you a numerical answer, Mr.

12   Veeder.  All I can say is that we had frequent consultations.

13           Q    BY MR. VEEDER:  And you saw him constantly for --

14           By the way, where does he work?  Does he work in your

15   office?

16           A    No, Mr. Moskovitz is from Sacramento.

17           Q    How frequently do you see him then in your work?

18           A    As I say, I can't give you a numerical answer.

19           Q    But you see him very frequently?

20           A    During the course of the Ivanhoe case I saw him

21   frequently.

22           THE COURT:  That doesn't mean anything to me.

23           Q    BY MR. VEEDER:  What period was it when you were

24   preparing the brief?

25           MR. MOSKOVITZ:  Which brief?

1        MR. VEEDER:   The Ivanhoe brief.

2        THE WITNESS:   In the Supreme Court of the United

3   States.

4        Oh, off and on, for the past year, I would say.

5        Q        BY MR. VEEDER:   You would say that you have seen

6   Mr. Moskovitz constantly or quite frequently since May, 1957;

7   is that correct?

8        A        Frequently, yes.

9        Q        Did you have occasion, Mr. Goldberg, to discuss

10   with him the Fallbrook case?

11       MR. MOSKOVITZ:   Your Honor, I object to that question

12   also as not being relevant to the issues here, as to whether he

13   discussed the Fallbrook case with me.

14       MR. VEEDER:   I can't imagine anything more relevant,

15   your Honor.

16       THE COURT:   Overruled.   If we do not take the testi-

17   mony orally, it will be made by offer of proof.   Let's get the

18   record made and then talk about where we are.   Overruled.

19       MR. VEEDER:   Would you read the question, please?

20       (The Reporter read the pending question.)

21       THE WITNESS:   We may have mentioned the Fallbrook case

22   from time to time.   I don't recall that we ever had an actual

23   conference on the Fallbrook case.

24       Q        BY MR. VEEDER:   I don't expect you to call him

25   up from San Francisco and say, "We're going to confer on this."

1    Did you ever ask him any questions about it?

2         A    I don't recall whether I asked him questions or

3    he asked me, but --

4         Q    Let's forget whether they are questions or

5    answers.  You did discuss the case; is that right?

6         MR. SACHSE:  I object, your Honor.  This is direct

7    examination.  Mr. Veeder did not call him as an adverse witness,

8    and I don't know whether he could if he wanted to, and Mr.

9    Veeder's form of question is strictly for cross and improper

10   direct.

11        MR. VEEDER:  If you are laboring under the idea that

12   I didn't call him as an adverse witness --

13        MR. SACHSE:  I will ask the Reporter to check the

14   record, and if you had called him as an adverse witness, I would

15   object to that.

16        MR. VEEDER:  I will say that I constitute Mr. Goldberg

17   an adverse witness,

18        THE COURT:  First of all, you didn't call him as an

19   adverse witness, and secondly, the Federal Rules, as I under-

20   stand them, talk about an officer or managing director.  It is

21   limited.  It doesn't mean any employee of an adverse party.

22   However, let's not waste a lot of time on it.  I will give you

23   some reasonable latitude in questioning him.  But you did not

24   call him, and I don't think you can, as an adverse witness.

25        MR. VEEDER:  In our letter of April 23, 1958, I said

1221

1  that I was calling these four witnesses from California as ad-

2  verse witnesses, your Honor.

3  THE COURT:  You can't make them adverse witnesses by

4  just saying that you are going to call them as adverse witnesses.

5  MR. VEEDER:  I think he is an officer of the State of

6  California, your Honor, and certainly he is a lawyer, and I

7  might add that I could constitute him a hostile witness if need

8  be.

9  THE COURT:  I told you that I would give you some

10  latitude.  It is academic.  But just to be technical about this

11  business of his being adverse, Rule 43(b) states: "A party may

12  call an adverse party or an officer, director or managing agent

13  of a public or private corporation...."  Now at best you would

14  have to argue that the State was a public corporation.

15  MR. VEEDER:  I think it is, your Honor.

16  THE COURT:  I have some serious doubt.  What do you

17  contend, that he is an officer?

18  MR. VEEDER:  I certainly do, your Honor.  He certainly

19  signed the stipulation as an officer of the State of California.

20  THE COURT:  Well, I'm going to permit you latitude,

21  so it is academic.

22  MR. VEEDER:  Would you read the question, please?

23  (The Reporter read the pending question, as follows:

24  Q.  Let's forget whether they are questions or answers.  You

25  did discuss the case; is that right?)

1      THE WITNESS:  The answer is, yes.

2           Q      BY MR. VEEDER:  In the course of your conversa-

3   tion with Mr. Moskovitz, did you state to him that you disagreed

4   with the position that he was taking in this case?

5           A      Yes.

6      MR. MOSKOVITZ:  I want to make an objection now,

7   which I will not repeat, that I believe that all of this dis-

8   cussion and questioning about the conversation between Mr. Gold-

9   berg and me in the recent past, during the time that the Ivanhoe

10  brief was being written, had nothing to do with the issues for

11  which Mr. Veeder has said he is calling Mr. Goldberg, which is

12  to testify to the meaning of certain words and negotiations

13  leading up to the adoption of the stipulation back in 1951.

14      THE COURT:  Well, it may or may not.  It is a little

15  hard to see.  But the objection is overruled.  You may have that

16  continuing objection, Mr. Moskovitz.

17      Was the question answered?

18      MR. VEEDER:  He said, yes.

19      THE COURT:  All right.

20      MR. VEEDER:  However, I would like to have the record

21  read.  I want to be sure the answer is in.

22      (The Reporter read the last question and answer.)

23           Q      BY MR. VEEDER:  Did you state to your superiors

24  your views in regard to the meaning of the stipulation of

25  November 29, 1951, which you joined in executing?

1        MR. MOSKOVITZ:  Your Honor, I want to make an objection

2  at this on another basis and get this into the record also.  I

3  believe conversations of that sort are within the attorney-

4  client privilege and Mr. Veeder is tampering with something which

5  should be held sacred -- discussions within an office between

6  the Attorney-General and his deputies as to matters involving

7  litigation.

8        MR. VEEDER:  Well now, I would like to have clarified

9  Mr. Moskovitz's position for a moment.  Mr. Goldberg is not

10  claiming the privilege, and I don't believe that Mr. Moskovitz

11  can claim it for him.

12        MR. MOSKOVITZ:  I'm asking as the attorney for Mr.

13  Goldberg at this point.

14        MR. VEEDER:  You should have told me.

15        MR. MOSKOVITZ:  I'm telling you.

16        THE COURT:  You are appearing as attorney for Mr.

17  Goldberg at this hearing?

18        MR. MOSKOVITZ:  Well, I am here appearing as attorney

19  for the State of California, and Mr. Goldberg is here -- he is

20  on duty right now.

21        MR. VEEDER:  I'll say he is.

22        THE COURT:  Is Mr. Moskovitz your attorney as you sit

23  there on the witness stand, Mr. Goldberg?

24        THE WITNESS:  Your Honor, Mr. Moskovitz is attorney

25  for my client.  We both work for the same client.  I believe that

1  privilege is the privilege of my client, and that Mr. Moskovitz

2  of course can assert it.

3          MR. VEEDER:  Is that a ruling?

4          Your Honor, I called this man as a witness entirely

5  independent of the State of California.  I am an agent of this

6  Court as much as is Mr. Moskovitz, and I truly think that your

7  Honor was misled in regard to some of these things, and I can't

8  believe that Mr. Goldberg can raise the privilege as to his

9  relationship with Pat Brown.

10          THE COURT:  Well, you gentlemen are just wasting time,

11  because suppose I sustain this objection.  Mr. Veeder is a good

12  lawyer.  Mr. Veeder will then make an offer of proof into the

13  record.  I would rather hear it directly.  An offer of proof

14  can be quite broad.  If the Court sustains an objection, the

15  man says, "I'll make an offer of proof," and he offers to prove

16  that the moon is made of green cheese.  He can't prove it in a

17  million years, but if you cut him off and he makes an offer of

18  proof, where are you?  I would rather hear it from the witnesses.

19          MR. MOSKOVITZ:  For the purpose of the record, I be-

20  lieve I must make all objections which are appropriate.  I

21  sympathize with the purpose.

22          THE COURT:  I think that the really material questions

23  are, what did you intend?  And what were the conversations that

24  went on at the time the stipulation was entered into?  And I

25  suppose this sort of thing is preliminary to that.

1          Is that right?

2          MR. VEEDER:  That is right, your Honor.  I just can't

3    haul off and ask him the question or there would be an objection.

4          THE COURT:  I will overrule your objection and over-

5    rule your claim of privilege.  This concerns the Court.  Mr.

6    Veeder has charged in almost so many words that   the Court has

7    been hoodwinked.  I think the Court has a right to hear about

8    this.

9          MR. VEEDER:  I will ask another question, your Honor.

10   I'm not abandoning that phase of it.  I will just save some time

11   here.

12          Q     Did you bring to your superiors' attention, Mr.

13   Goldberg, your views in regard to California's interpretation

14   of the stipulation of November 29, 1951?

15          A     Yes.

16          Q     And would you state what you advised the

17   Attorney-General in regard to the present interpretation of Mr.

18   Moskovitz of that stipulation?

19          MR. MOSKOVITZ:  Let the record show a continuing

20   objection, your Honor.

21          THE COURT:  The record may show a continuing objection,

22   but the objection is overruled.  You may have one without making

23   it.

24          THE WITNESS:  I stated to Mr. Brown that in my opinion

25   that stipulation was intended to refer only to the quantity of

1228

water to which the Government was entitled.  I must correct that.
When I say "only" I am thinking of, I think it is, paragraphs
III and IV.  Of course, the stipulation was intended to refer to
the question of the use of the word "paramount" in the Complaint.

Q        BY MR. VEEDER:  But in regard to the term
"measure" as used in the paragraph numbered IV, you stated to
the Attorney-General of California that you thought that that
related only to the question of the quantity of water; is that
correct?

A       Yes.

THE COURT:  Let me point out to you, Mr. Veeder, you
can go ahead and do this, but this doesn't mean a thing; what
the man told the Attorney-General has no bearing on what the
situation was at the time the stipulation was entered.  So this
is just a little window-dressing to get down to what might be
the guts of this thing.

MR. VEEDER:  That is correct.

THE COURT:  All right.

Q        BY MR. VEEDER:  Now, Mr. Goldberg, will you state
your recollection of the circumstances leading up to the exe-
cution of this stipulation by you?  When were you first acquaint-
ed with Camp Pendleton?

A       It was sometime in the Spring of 1951.

Q       And would you state in detail the circumstances
that brought you to Camp Pendleton?

1        A      I can't actually recall how I got to Camp Pendle-

2    ton.  In preparation for testifying here, I have reviewed my

3    files, and I simply can't answer that question.  I do know that

4    in May, 1951, I had corresponded with you with regard to this

5    case.

6        Q      And you proceeded then to Camp Pendleton?  Whom

7    did you meet at Camp Pendleton at the time you went down there

8    the first time?

9        A      I think, Mr. Veeder, that I was at Camp Pendleton

10   only once, and that was in August of 1951.

11       Q      Did you go on the enclave at that time and view

12   the properties?

13       A      Yes.  You were in the party, I recall.  We went

14   to a building, I think Office of Ground Water Resources.  You

15   were present and another attorney was present from the Navy --

16   I think a Mr. Turnbull.

17       Q      Was Mr. Arvin Shaw with you on that occasion?

18   Do you recall?

19       A      My recollection is that Mr. Shaw was not.

20       Q      Would you just state for the record the status

21   of Mr. Shaw in the litigation at that time?

22       A      In August, 1951, I don't recall that Mr. Shaw

23   had any status in the litigation.

24            THE COURT:  Who was he in August, 1951?

25            THE WITNESS:  Mr. Shaw, your Honor, was Assistant

1228

1    Attorney-General of the State of California, who, at that time,

2    was employed primarily to work on the Colorado River case which

3    was then being anticipated.

4             Q     Would you state your relationship with Mr. Shaw

5    on that case?

6             A     Well --

7             Q     I'm speaking of the Santa Margarita.

8             A     Sometime in November, prior to the time the

9    stipulation was executed, Mr. Shaw was put in charge of the

10   Fallbrook case.

11            Q     Would it be safe to say that during this period

12   antecedent to the execution of the stipulation that you were in

13   charge of the matter as far as the State of California was con-

14   cerned, under the supervision of the Attorney-General?

15            A     Yes.

16            Q     And at that time did you investigate, for the

17   purpose of preparing your answer and pleadings for the State of

18   California, the elements of the case?

19            A     Yes.

20            Q     Would you state in some detail the extent of your

21   familiarity, prior to the preparation of the pleadings that you

22   filed as intervenor representing the State of California?

23            A     This is extremely difficult to state in detail

24   from memory, Mr. Veeder.  I will have to refer to my notes.

25            Q     Well, do you recall whether the United States at

1    that time was diverting water out of the watershed and not in

2    compliance with the laws of the State of California from the

3    standpoint of appropriators?

4         MR. MOSKOVITZ:  Your Honor, it seems to me that this

5    calls for a legal conclusion.

6         THE COURT:  It does.  Sustained.

7         Q    BY MR. VEEDER:  Mr. Goldberg, at the time when

8    you were investigating Camp Pendleton, in preparation of the

9    pleadings, were you aware of the use of water by the Marines at

10   Camp Pendleton?

11        A    Yes.

12        Q    And was there in issue at that time the question

13   whether the United States was required to make a filing with

14   the State of California to appropriate waters?

15        THE COURT:  What do you mean by "was there an issue?"

16   An issue between whom?

17        MR. VEEDER:  Between California and the United States.

18        MR. SACHSE:  Same objection, your Honor; calls for a

19   conclusion of the witness.

20        THE COURT:  That is a little different.  Overruled.

21        By "issue," was there discussion or contention --

22        MR. VEEDER:  That is right.

23        THE COURT:  -- between the attorneys for the State of

24   California and the attorneys for the United States on the sub-

25   ject matter?

1          THE WITNESS:   There was discussion, your Honor, about

2    the fact that the United States was taking water out of the

3    watershed.

4          Q     BY MR. VEEDER:   In other words, the State of

5    California was fully apprised of the fact that the United States

6    was diverting water out of the watershed at that time?

7          A     Yes.

8          Q     Do you have a recollection as to whether there

9    was an issue raised as to the fact that its predecessor in in-

10   terest had diverted water out of the watershed without making a

11   filing with the State?

12         A     Some place there was a discussion about a Lake

13   O'Neill, but I couldn't identify Lake O'Neill now as being in or

14   out of the watershed.

15         Q     Now, in regard to the preparation of the plead-

16   ings for the State of California, did you raise the issue of

17   the necessity of the United States complying with the laws of

18   the State of California, do you recall?

19         A     I would have to look at the pleading.

20         Q     You don't recall?

21         A     No.

22         Q     Now, Mr. Goldberg, at the time that the stipu-

23   lation was entered into, do you recall whether there were dis-

24   cussions as to whether the United States had to make a filing

25   with the State of California before it diverted water out of

1231

1   the watershed?

2           MR. SACHSE:  That is objected to, your Honor; I want

3   to know with whom the discussions were.

4           THE COURT:  Sustained.

5           Q     BY MR. VEEDER:  Did you discuss with me, Mr.

6   Goldberg, that question?

7           THE COURT:  Answer the question yes or no.

8           THE WITNESS:  Yes.

9           THE COURT:  Who was present?  Where did it take place?

10          Q     BY MR. VEEDER:  And will you state the circum-

11  stances under which the conversation took place?

12          A     Well, if we are limiting it to the time the

13  stipulation was actually drawn, that was sometime toward the

14  end of November, 1951, and the discussion took place, I believe,

15  in the Office of the Attorney-General Brown in Los Angeles.

16          THE COURT:  Who was present?

17          THE WITNESS:  Arvin Shaw.

18          Q     BY MR. VEEDER:  That is the same Arvin Shaw,

19  the Assistant Attorney-General?

20          A     Yes.

21          Q     Was the Attorney-General himself there?

22          A     Yes.

23          Q     And who else?

24          A     I think Mr. Lawrence or Loren Wright, represent-

25  ing the Vail interests, you, Mr. Veeder, Mr. Turnbull and myself.

1          Q     And at that time, Mr. Goldberg, was there a

2  discussion as to the meaning of the word "sovereign," as used

3  in the stipulation?

4          A     Yes.

5          Q     And would you state your recollection of the

6  discussion of that issue?

7          THE COURT:  Let's have the whole conversation, in-

8  cluding the word "sovereign" and including this other problem

9  about the filing.  What was said, and who said it?

10          THE WITNESS:  I am going to have to refer to my notes,

11  Mr. Veeder.  In preparation for this, I have gone through my

12  files and tried to see what we have there.  Now, as far as re-

13  constructing the conversation of almost seven years ago, you

14  can appreciate how difficult that is.  However, I did make various

15  memoranda on the discussion, which may have some relevance to

16  the question, if I may use them.

17          MR. VEEDER:  You may get your --

18          THE COURT:  Do you have your memoranda with you?

19          THE WITNESS:  Yes, I brought them with me.

20          THE COURT:  Are these memoranda that you made at or

21  near the time of this discussion?

22          THE WITNESS:  Yes.

23          THE COURT:  And you have no objection to their being

24  inspected by other parties?

25          THE WITNESS:  No.

1235

1   THE COURT:   They will be marked for identification

2  after you have referred to them.

3   THE WITNESS:   What I am about to refer to, your Honor,

4  is, of course, our office file.   I would like not to have the

5  file withdrawn from me permanently.   Perhaps copies could be

6  used.   But they are here and available.

7   THE COURT:   We can substitute copies.

8   Let me ask you a couple of preliminary questions.

9   At the time this conversation took place, had the

10  document which became the stipulation of November 29, 1951, been

11  drafted?

12   THE WITNESS:   No, your Honor.

13   THE COURT:   It had not been drafted?

14   THE WITNESS:   No.

15   MR. VEEDER:   I am extremely anxious to see these

16  memoranda myself, your Honor, because I think I have a right to

17  examine them first.   I still say that he is an adverse witness.

18   THE WITNESS:   What I am about to refer to is what I

19  believe to be preliminary drafts of the stipulation.

20   MR. MOSKOVITZ:   Your Honor, I would like to raise

21  again this attorney-client privilege.   Now Mr. Veeder is delving

22  into notes and memoranda which were made by the attorney in

23  charge of the case, or the files of the office.   It seems to me

24  that this is going beyond the purpose that Mr. Veeder had in

25  mind when he called Mr. Goldberg to relate the conversations and

negotiations.

1    THE COURT:  I know, but the witness has said that this

2  was information of years ago and that he can't reconstruct the

3  conversation.  He thinks that he might give us some help if he

4  could look at some documents.  Mr. Veeder is not offering the

5  documents.  I merely inquired whether he had an objection to

6  their being inspected by other parties.  If he refers to these

7  documents, then the other parties should have a chance to look

8  at them.

9    THE WITNESS:  Your Honor, some of these, I think, are

10  in Mr. Veeder's handwriting.

11    The reason, your Honor, why I even mentioned these

12  documents is that they were prepared in Mr. Veeder's presence,

13  as far as I can now recall.

14    THE COURT:  If that is true, that would obviate your

15  objection.

16    Q    BY MR. VEEDER:  Do you recall, Mr. Goldberg,

17  the discussion  involving the meaning of the word "sovereign?"

18    A    Yes.

19    THE COURT:  Is there any issue now about this "sovereign"

20  matter?  I thought "sovereign" and  "paramount" had been buried

21  deep.

22    MR. VEEDER:  I think this is all part of the over-all

23  examination on these points, your Honor.  I am trying to bring

24  to his mind --  I realize that this is seven years ago, but he

25  does, in the affidavit I filed, refer to his recollection of

1  the meaning of the word "sovereign," as used there, namely --

2  well, I will let him testify.

3        THE WITNESS:  I have a document which is undated but

4  which I believe to have been prepared as a prior draft of what

5  I spoke of as the stipulation, a document which states, among

6  other things --

7        THE COURT:  Who prepared it first?

8        Q   BY MR. VEEDER:  Did you prepare it, Mr. Goldberg?

9        A   I think it was primarily prepared by Mr. Shaw.

10  I think he took the lead in drafting these things.

11        The one I am reading here is typed.  It has notes

12  some of which are in my handwriting.  I have another one which

13  has a note which, I think, is in Mr. Veeder's handwriting and

14  Mr. Shaw's and, in part, mine.

15        But my best recollection is that this was a sort of

16  conference thing.

17        THE COURT:  You were around a table trying to work

18  this thing out?

19        THE WITNESS:  Yes.

20        THE COURT:  All right.

21        MR. VEEDER:  I have a question, Mr. Goldberg.

22        THE WITNESS:  Yes.

23        Q  BY MR. VEEDER:  State, if you remember, the

24  discussions in regard to the word "sovereign."

25        A   Well, the discussion with regard to the word

1236

1  "sovereign" came down to this:  That the United States could

2  act only in its sovereign capacity, and the reason I state that

3  so positively is that one of the prior versions of this stipu-

4  lation contained the statement "that the United States is claim-

5  ing only such rights as a private person would have as the owner

6  of the Ranch," which, as I recall, led into a discussion of the

7  need for distinguishing between the property interest of the

8  United States on the one hand and the right of the United States

9  to deal with that property once it had acquired it.

10       And as I recall, Mr. Veeder, you said, "Well, the

11  United States can acquire a property right similar to the right

12  which a private person has, but once it deals with the property

13  it acts only in a sovereign capacity."  You cited a case which

14  I later looked up.  I can't give you the citation now; I think

15  Federal Land Bank v. Bismarck, which has language to that effect.

16       THE COURT:  You knew, of course, that under California

17  law there is such a thing as a State or an instrumentality of

18  the State acting in either its proprietary or its sovereign

19  capacity.

20       THE WITNESS:  Yes, your Honor.

21       THE COURT:  And you were under the impression then,

22  to start with, that the Federal Government could act in either

23  capacity.

24       THE WITNESS:  Yes.

25       THE COURT:  I will inform you, I think it is hornbook

1  law on the Federal side, in which I wouldn't expect you to be a

2  specialist, that the Federal Government may act only in a

3  sovereign capacity and the proprietary theory has no place in

4  Federal law.

5       THE WITNESS:  I was surprised when Mr. Veeder said

6  that as an item of hornbook law, and I looked it up and I thought

7  what a handy thing it would be for the State of California.

8       ·MR. VEEDER:  I don't want any slights in regard to

9  hornbook law, out of deference to Mr. Burby.

10      THE COURT:  Go ahead.

11      Q     BY MR. VEEDER:  Mr. Goldberg, in other words,

12  the proviso respecting the ownership as a  sovereign was changed

13  from the draft to which you have made reference to its present

14  form in the stipulation, which I shall read:

15      "That the United States claims, by reason of its

16      sovereign status, no right to the use of a greater

17      quantity of water than is stated by paragraph II hereof;"

18  in other words, your meaning and the meaning of the parties who

19  executed the stipulation was that the United States could and

20  did and does hold only as a sovereign in this case, is that

21  correct?

22      A    Yes.

23      Q    I didn't hear you.

24      A    Yes.

25      Q    Now, in regard to the negotiations surrounding

1  the execution of the stipulation, was there ever at any time an

2  intimation by me or by any representative of the United States

3  that we would abandon any rights to the use of water or that we

4  would lose any rights to the use of water by the execution of

5  the stipulation of November 29, 1951?

6         A    On the contrary, it was the position taken by

7  you that you would not abandon your rights that resulted in the

8  insertion of the words "prescription and use."

9         Q    In regard to the matter of compliance by the

10  United States with State law, from the standpoint of diverting

11  water out of the watershed, do you recall any discussion at

12  that time?

13         A    My recollection is that that question was left

14  open as to whether you had the right to take the water out of

15  the watershed. It was not precluded by the stipulation.

16         Q    Now, what do you mean by "was not precluded by

17  the stipulation?" Do you mean that we did not agree to cease

18  diverting water out of the watershed absent the filing of an

19  application with the State of California?

20         A    You did not agree to file an application with

21  the State of California.

22         THE COURT:  You say that that question was left open.

23  Now tell us in your own words what you mean by that. The

24  question whether the Government could take water out of the

25  watershed -- how was it left open?

1239

A       The question at that time, your Honor, or the

questions, one, was the use of the "paramount."   Although I

recognize that that question is immaterial at this hearing, in

the context of drafting the stipulation that was very important.

The next thing was to place a quantitative limit on

what the Government was claiming.   These various assertions had

been made that the United States, by virtue of its sovereignty,

was somehow going to claim the right to take rights which were

valid under the law of California without compensation, and one

reason I am so indefinite on what the nature of that claim was

is that that claim was never made definite to me.   But there was

always a sort of sinister implication that the United States,

by virtue of its sovereignty, was going to take the valid rights

without paying for them.   So it became important to put a

quantitative limit on what the United States was claiming, and

that was my understanding of what the purpose of the stipulation

was.

THE COURT: Have you forgotten my question?   We were

talking about the United States taking water out of the water-

shed, and you said it was your impression that that was left

open, and I said, "What do you mean, in your own words, by

'being left open?'"   That was my question.

THE WITNESS:   I am coming to that, your Honor.

We were aware that the United States was taking water

out of the watershed.   We were also under the impression

1240

1   time -- I have been told that it has been changed since, but we

2   were under the impression at that time that the United States

3   was claiming only its riparian rights or the riparian right that

4   it had succeeded to when it acquired the Rancho, and a question

5   was, how are you going to put a quantitative limit on those

6   riparian rights?  That was my understanding of the word "measure,"

7   that the riparian quantity would be measured in accordance with

8   the law of the State of California, although the stipulation was

9   not intended to settle the question whether the United States

10  had the right to take that riparian quantity out of the water-

11  shed or not.  There were two problems that were in our minds:

12  (1) the effect of the cession of jurisdiction, and (2) does any-

13  body upstream have the right to object to what the downstream

14  riparian does within the limits of the riparian quantity?  Those

15  questions were not intended to be precluded by the stipulation.

16          THE COURT:  In other words, then, the question of the

17  right of the Government to take the water after it got on the

18  enclave out of the watershed is not, in your opinion, foreclosed

19  or thereby foreclosed by the stipulation?

20          THE WITNESS:  That is right.

21          MR. VEEDER:  May I proceed, your Honor?

22          THE COURT:  Yes.

23          Q     BY MR. VEEDER:  Now, Mr. Goldberg, in regard to

24  the question of the meaning of the word "measure," did you in-

25  terpret the word "measured" to mean that even though the United

1    States was then diverting water outside of the watershed that it

2    would make a filing with the State of California and thus initiate

3    a right to appropriate water in accordance with the laws and

4    procedures of California?

5              A     No.

6              MR. MOSKOVITZ:  I object to that question, your Honor.
The question was, "Did you interpret....?"  I don't think Mr.

7    interpretation is important.  I think that is certainly ir-

8    relevant.

9

10             MR. VEEDER:  I certainly think the whole question of

11   calling Mr. Goldberg is to find out what was the parties' in-

12   tention and interpretation at the time that this matter was

13   signed.

14             THE COURT:  It is an immaterial matter.  That is not

15   the question you asked.  You asked the broad question how he

16   interpreted it.  You didn't say when and where.  If you want to

17   ask him prior to the time or at the time of the signing of this

18   what he thought the stipulation meant, what his intention was,

19   why don't you ask him.  But as to these shotgun questions, he

20   may have given a dozen interpretations since the date that this

21   was signed.

22             MR. VEEDER:  I will reframe it, your Honor.

23             Q     When the word "measured" was written into the

24   stipulation, Mr. Goldberg, was your understanding that it meant

25   that the United States of America, even though using water

1  out of the watershed, at that time would agree to make a filing

2  with the State of California so as to get a permit to divert

3  that water?

4          MR. MOSKOVITZ:  Your Honor, I object again, and let

5  me explain a little more.  The unexpressed understandings of

6  parties to negotiations of an agreement have no relevance what-

7  soever.

8          THE COURT:  What was said, and what was done?

9          MR. MOSKOVITZ:  What was said and what was done.  On

10  that basis I object to the question.

11          THE COURT:  In other words, how would a man's secret

12  intention or secret interpretation have any bearing, unless he

13  did something to express it?

14          MR. VEEDER:  Well, I think he did, but I will ask him

15  some more questions.

16          Q     Mr. Goldberg, at the time of the execution of

17  the stipulation and the use of the word "measure," did you know

18  yourself that water was being diverted out of the watershed of

19  the Santa Margarita River by the United States of America?

20          A     Yes.

21          Q     Mr. Goldberg, did I ever at any time indicate

22  that I would recommend or that the United States of America would

23  make a filing in accordance with the laws of the State of Cali-

24  fornia to permit us to divert that water out of the watershed?

25          A     No.

1    THE COURT:   In the same connection, let me ask now:

2 At that time, before the stipulation was signed, did you or

3 any officer of the State of California ever say to Mr. Veeder

4 that the Government had the absolute right to divert that water

5 out of the watershed without a filing?

6    THE WITNESS:   No.

7    THE COURT:   In other words, nothing was said either

8 way about it?

9    THE WITNESS:   That is right.  That is what I mean,

10 your Honor, when I say that these questions were not concluded

11 by this stipulation.

12    Q    BY MR. VEEDER:   Now, Mr. Goldberg, do you re-

13 member stating to me that I had always denied that we would be

14 required to make a filing with the State of California to permit

15 us to divert the water out of the watershed?

16    MR. MOSKOVITZ:   I object to the question on the ground

17 that no basis for attempting to impeach the witness has been

18 laid -- no foundation.

19    THE COURT:   I am going to give him latitude, because

20 of the odd situation here -- an associate of yours and an employee

21 of the State of California.  I will sustain an objection myself.

22 It doesn't refer to times prior to the date of the stipulation.

23    Q    BY MR. VEEDER:   Mr. Goldberg, on the date of the

24 stipulation, the day that the stipulation was entered into, and

25 prior to that date, do you recall any conversations with me in

1    regard to the necessity of making a filing with the State of

2    California?

3         A    Yes.

4         Q    Before we could divert water out of the water-

5    shed?

6         A    Yes.

7         Q    And would you state your recollection as to the

8    statements that I made on the day of the execution of the sti-

9    pulation and prior to that time as to the question whether the

10   United States would make a filing with the State of California?

11        THE COURT:  Give us the foundation, first.  Where did

12   the conversation take place?  Who was present?

13        Q    BY MR. VEEDER:  Mr. Goldberg, I'm speaking now --

14        THE COURT:  Let's break it up.  Let's take the day,

15   find out first the day it was signed.

16        Q    BY MR. VEEDER:  On November 29, 1951, do you re-

17   call the conversations in regard to the compliance with State

18   law before water could be diverted out of the watershed?

19        A    I can't pinpoint to that day, Mr. Veeder.

20        THE COURT:  Do you recall any conversation where you

21   can tell us who was present and where it took place, where some-

22   thing was said about that, prior to the date of the signing?

23        THE WITNESS:  Well, I had various conversations with

24   Mr. Veeder about that time -- I can't state with precision

25   whether it was prior to the date of the signing or shortly after

1  the signing, and the reason for my difficulty there is that we

2  had a hearing in San Diego on December 3, 1951, very shortly

3  after the stipulation was filed, and we discussed the matter at

4  that time and I can't disentangle in my mind whether we talked

5  about it then or talked about it before. But certainly the

6  matter was discussed.

7          THE COURT:  Do you remember who was present?

8          THE WITNESS:  No.

9          THE COURT:  What did you say and what did Mr. Veeder

10 say?

11         THE WITNESS:  I don't think I said much of anything.

12         Mr. Veeder said that he believed that the United States

13 was not required to file applications for permits to appropriate,

14 because the Water Code is a statute of a police character which

15 is not binding on the United States.

16         Q     BY MR. VEEDER:  In regard to the use of the

17 word "measured," on the day that the stipulation was executed

18 or at the time immediately antecedent to that, do you recall

19 that I stated that when we used the word "measured" it would

20 mean that we would make a filing with the State of California?

21         MR. SACHSE:  I object to that as being leading and

22 suggestive; improper cross-examination -- it is impeachment of

23 his own witness.

24         THE COURT:  It has been already answered, but if you

25 want him to answer it again -- he answered both sides of it; he

1   answered your question, and then he answered mine.  The objection

2   is overruled.

3        MR. VEEDER:  I have to say this in regard to your

4   question, your Honor.  I'm not entirely sure of the meaning of

5   your question, nor whether Mr. Goldberg's response to your

6   question was made with full knowledge of what might be some of

7   the implications.  I truly don't know.

8        THE COURT:  Are you insinuating that my question was

9   unintelligible?  That's a facetious question.

10       MR. VEEDER:  I'll say this, the reason I am going back

11  over it again is that I fell off the sled when Mr. Goldberg

12  started to respond to your Honor's question.

13       THE COURT:  Let's get the Reporter to find the

14  question that you want him to answer and have it read back.

15       MR. VEEDER:  Go back, if you will, Mr. Reporter, and

16  find the question where the Court asked --

17       THE COURT:  No, the one you are asking now.

18       MR. VEEDER:  All right, your Honor.

19       THE WITNESS:  While the Reporter is looking, might I

20  have a short recess to cancel an airplane reservation, your Honor,

21  or may I ask the Clerk to do it for me.

22       THE COURT:  Yes, either way.

23       THE WITNESS:  If I may have just a couple of minutes.

24

25       THE COURT:  You can take care of it, or do you want

the Clerk to take care of it for you?

1             (The Witness confers with the Clerk.)

2             THE COURT:  Read the question, Mr. Reporter.

3             (The Reporter read the impending question, as follows:

4  "Q.  In regard to the use of the word 'measured,' on the day

5  that the stipulation was executed or at the time immediately

6  antecedent to that, do you recall that I stated that when we

7  used the word 'measured' it would mean that we would make a

8  filing with the State of California?")

9             THE WITNESS:  The answer is no.

10             THE COURT:  Did Mr. Veeder state, at that same time

11  and place, that he would not make a filing with the State of

12  California?

13             THE WITNESS:  He insisted on the right of the United

14  States to appropriate without a filing.

15             THE COURT:  Did he say that he would not make a filing?

16             THE WITNESS:  Your Honor, I can't say that he used

17  those very words, but in substance it is, yes, that he said that

18  the United States didn't have to file.

19             MR. SACHSE:  Your Honor, please, I object and move to

20  strike it.  This is ridiculous.  It is either corroboration or

21  it is impeachment.  If we want to know what Mr. Veeder said, we

22  have him right here.  This is the rawest hearsay I ever heard

23  of.  He has another witness on the stand to testify to what he

24  said.  It is either to impeach something or to corroborate

25  something, and we haven't got a thing before us either to impeach

1248

1   or to corroborate.

2          MR. VEEDER:  All I say, your Honor, is that when you

3   asked your question of Mr. Goldberg in regard to the word

4   "measured," the response that I heard was -- I'm not entirely

5   sure of what he did say at that time.

6          THE COURT:  Read it tomorrow or the next day.

7          MR. VEEDER:  Well, I'm afraid that if Mr. Goldberg

8   catches the airplane, I might not straighten out the record.

9          THE COURT:  Who drafted this final stipulation?

10          THE WITNESS:  I think Mr. Shaw did, but again it was a

11   group effort.

12          THE COURT:  You mean that Mr. Veeder didn't?

13          THE WITNESS:  No, my recollection is that the principal

14   draftsman was Mr. Shaw.

15          MR. SACHSE:  For the record, is my objection on the

16   grounds that it is hearsay overruled?

17          THE COURT:  Yes, it is overruled.

18          I understood that Mr. Veeder drafted the stipulation

19   when we argued the matter heretofore.

20          THE WITNESS:  If credit is due for the drafting of

21   that stipulation, Mr. Veeder is welcome to it as far as I am

22   concerned.

23          THE COURT:  It was a joint effort; you all had a hand

24   in it?  Is that right?

25          THE WITNESS:  Yes, sir.

1      Q    BY MR. VEEDER:  Now, Mr. Goldberg, in regard to

2 the paragraph numbered III of the stipulation -- do you have a

3 copy of that stipulation?

4      A    Yes.

5      Q    You are not using the one that Arvin Shaw drafted,

6 are you?

7      A    I have a copy.  Where is the paragraph, Mr.

8 Veeder?

9      Q    Paragraph numbered III?

10     A    Yes.

11     Q    Would you state for the record what was the in-

12 tentment of the parties when they signed the stipulation con-

13 taining the provision that "the United States of America claims,

14 by reason of its sovereign status, no rights to the use of a

15 greater quantity of water than is stated in paragraph II hereof?"

16     MR. MOSKOVITZ:  Your Honor, I object to that  question.

17 It calls for either a conclusion of the witness as to what

18 other parties thought, or calls for his own unannounced and un-

19 communicated conclusion as to the meaning of the language.

20     THE COURT:  Sustained.

21     Q    BY MR. VEEDER:  Mr. Goldberg, at the time when

22 the stipulation was executed, was there any statement by Counsel

23 for the United States that it would stipulate to comply with the

24 laws of the State of California?

25     A    No.

1    Q    And was there ever a statement by anyone with
2  whom you dealt in connection with this stipulation and on the
3  day that the stipulation was executed that the United States
4  would comply with the laws of the State of California?

5    A    As I recall, Mr. Veeder -- this is based again
6  on this prior draft. We had an initial version or an earlier
7  version -- I don't whether it was the initial one, but we had
8  an earlier version that stated that such rights, that is, the
9  rights to which the United States was laying claim, that such
10 rights are defined and measured in accordance with the law of
11 the State of California, and at your insistence the word "defined"
12 was stricken and we were left with the word "measured" alone,
13 which I think you related to the question of beneficial use --
14 that you had acquired the right, that the law of California
15 grants no water right unless the water is put to use beneficially,
16 and that you were referring to the law of California in that
17 sense.

18         MR. VEEDER:  I have no further questions, your Honor.
19                     CROSS-EXAMINATION
20    Q    BY MR. SACHSE:  Mr. Goldberg, when you were
21 answering the questions of Mr. Veeder regarding appropriations
22 of the United States of America, were you aware that on June 30,
23 1948, the United States did have an application to appropriate
24 water from the Santa Margarita?

25         A    Yes.

1        Q     Was any discussion of that appropriation had

2  between you and Mr. Veeder at this time?

3        A     Well, again, I have difficulty in referring to

4  times here, but someplace along the line we had a discussion

5  that that application didn't relate to the particular uses which

6  were in question.

7        Q     But it did relate, did it not, to the United

8  States' seeking to appropriate water through the machinery set

9  up by the State of California?

10       MR. VEEDER:  I am going to object to that --

11       MR. SACHSE:  This is cross-examination.

12       MR. VEEDER:  I am going to object to it on the grounds

13  (1) that it calls for a legal conclusion, and it also calls for

14  a question whether Mr. Goldberg knew the intentment of the

15  parties who signed the application and filed it, and therefore

16  he is certainly not qualified to make a response to that.

17       THE COURT:  Read the question, Mr. Reporter.

18       (The Reporter read the pending question.)

19       THE COURT:  The question is overruled.

20       THE WITNESS:  Yes.

21       MR. VEEDER:  May I have one more objection, too, your

22  Honor?  I would like also to put in this objection, that this

23  is beyond the scope of the examination, because it related to

24  the diversion and use of direct flow rights, and the whole in-

25  quiry  this afternoon on the part of the Government has been in

1   regard to direct flow rights and storage rights are the only

2   rights that are involved with connection with the application

3   of the United States dated, I think it is, June --

4           MR. SACHSE:   June 30.

5           MR. VEEDER:   -- June 30, 1948.

6           THE COURT:   Your objection on the ground that it is

7   beyond the scope of the cross-examination is also overruled.

8           THE WITNESS:   The answer to your question is yes.

9           MR. SACHSE:   That is all.

10          THE COURT:   Mr. Moskovitz, do you have any questions?

11          MR. MOSKOVITZ:   I have two questions, your Honor.

12                          CROSS-EXAMINATION

13          Q       BY MR. MOSKOVITZ:   Mr. Goldberg, at the time

14  the stipulation was being negotiated when you were sitting a-

15  round the table drafting it, at the time the stipulation was

16  signed, who was in charge of the case for the State of Cali-

17  fornia?

18          A       Mr. Shaw.

19          Q       Did Mr. Shaw arrive today?

20          A       No.

21          Q       I think you testified that your understanding

22  of the use of the word "measured" was that it was to refer to

23  the quantity of water that the United States was claiming in

24  the lawsuit; is that correct?

25          A       That is right.

1   Q   Can you explain what the word "measure" referred

2   to with respect to the variety of rights that were being dis-

3   cussed at that time?

4   MR. VEEDER:  I object to that on the grounds that it

5   is incoherent to begin with -- the variety of rights.  What does

6   it mean?

7   MR. MOSKOVITZ:  Whether the rights were riparian,

8   appropriative or prescriptive.

9   THE COURT:  With that modification, the objection is

10   overruled.

11   You may answer.

12   THE WITNESS:  Well, as far as we were aware what

13   riparian rights were, yes, the riparian rights and also the fact

14   that the water is being taken out of the watershed, the word

15   "measured," I thought, was used to cover two situations; as to

16   the riparian rights, that the quantity necessary for those ri-

17   parian rights would be determined by determining the riparian

18   land which the Government had acquired and determining the uses

19   on those riparian lands, and with regard to other rights that

20   the quantity would be determined by the amounts that had been

21   applied to beneficial use.

22   Q   BY MR. MOSKOVITZ:  Was there discussion in

23   connection with the use of the word "measured" on riparian

24   rights as to where the quantity of water to which those riparian

25   rights pertained would be used?

1234

1      A      That question was not determined, but -- yes,

2  there was discussion.

3      Q      I'm asking about the discussion.

4      A      Yes, there was discussion about it, and the

5  stipulation was intended to be drafted so that the question of

6  the Government's right to take the riparian water out of the

7  watershed was not concluded by the stipulation; that all the

8  stipulation did was define the quantity but did not relate to

9  the Government's right to deal with that quantity.

10     Q      Did the United States' representatives assert

11  then a claim of right to take that riparian water and use it

12  outside of the watershed?

13     A      Yes.

14     MR. MOSKOVITZ:  That's all.

15     THE COURT:  Now, let me see if I understand this.

16  When you gentlemen were sitting around the table before this

17  stipulation was signed, did you talk about the fact that Cali-

18  fornia law on the law of riparian rights would probably control

19  this lawsuit?

20     THE WITNESS:  We talked about the problem, your Honor,

21  of (1) defining the United States' property interest and (2)

22  what we thought to be a different problem.  I find it necessary

23  to say that I'm not trying to argue the merits of this thing.

24  I'm simply trying to recall what we were talking about then.

25  We had in mind two different things: (1) the property which the

1   United States had acquired, the quantum -- that is to what the

2   stipulation referred, and (2) the United States' right to deal

3   with that quantity, take it out of the watershed, specifically,

4   and that is what the stipulation did not refer to -- that was

5   the question that was left open.

6   THE COURT:  In other words -- this may be an improper

7   question and anybody can object -- it is your recollection that

8   the purpose of the stipulation at its execution was not to

9   foreclose the United States on a contention that it might still

10   take this water out of the watershed?

11   THE WITNESS:  That is right.

12   THE COURT:  That was left open?

13   THE WITNESS:  Yes.

14   THE COURT:  Did representatives of the State of Cali-

15   fornia say that it was clear that the Government had a right to

16   take this water out of the watershed?

17   THE WITNESS:  No, we didn't say it was clear that they

18   had a right to do it.  That was a question.

19   THE COURT:  In other words, it was just a problem?

20   THE WITNESS:  Yes.

21   THE COURT:  And it was left open?

22   THE WITNESS:  Yes.

23   Your Honor, if I may, we have actually a contemporaneous

24   memorandum of what this was about in the hearing which was held

25   on December 3, 1951, and I asked the Clerk to bring that

1256

1    transcript here.  I have gone through it this morning, and for

2    whatever it may be worth, there are statements in there as to

3    what this stipulation meant.

4         THE COURT:  Is the transcript here?

5         THE WITNESS:  Yes.

6         (The Clerk hands a document to the Court.)

7         THE COURT:  Have you looked it over, Mr. Veeder?

8         MR. VEEDER:  No, sir, not now.  I would like to look

9    at it, if I may, your Honor.

10        THE COURT:  Well, it is 97 pages.  It was a hearing

11   held on December 3, 1951.  Is there any objection, for what it

12   is worth, to having it in the record?

13        MR. VEEDER:  No, your Honor.

14        MR. MOSKOVITZ:  Not at all, your Honor.

15        THE COURT:  Nothing could be added to or detracted

16   from it now.

17        MR. VEEDER:  I'm in favor of it.  I hope that I argued

18   vehemently on the matter.

19        THE COURT:  Is this part of the files in this case

20   now?

21        THE WITNESS:  I think it is.  I acquired it from the

22   Clerk.

23        THE CLERK:  Yes, it is on file downstairs, your Honor.

24        THE COURT:  Well, incorporate by reference the tran-

25   script of proceedings held on December 3, 1951.  It doesn't state

1  who the Judge presiding was.

2          THE WITNESS:  Judge Weinberg, your Honor.

3          THE COURT:  Judge Weinberger.  It was filed with the

4  Clerk of the Court on January 2, 1952.  It may be made part of

5  the record.

6          One of you can take it out this evening and the other

7  fellow can come down early tomorrow morning and read it.  Flip

8  a coin.

9          MR. VEEDER:  I would just as soon take it this evening.

10         MR. MOSKOVITZ:  So would I.

11         THE COURT:  Flip a coin to see who gets it.

12         THE CLERK:  It may be released then?

13         THE COURT:  That is right.  It may be released to

14  whoever they agree among them can have it, and the other man can

15  have it the first thing in the morning.  Come down early.

16         Anything further?

17                  FURTHER DIRECT EXAMINATION

18      Q       BY MR. VEEDER:  Mr. Goldberg, did you read the

19  brief of the United States that was filed on December 27, 1957,

20  in regard to the interpretation of the stipulation of November 29,

21  1951?

22         THE COURT:  I know what you are going to get to, and

23  the Court would be very glad to have Mr. Goldberg's view as to

24  this and that, but it will have no bearing on how I decide this

25  matter.

1          You may answer the question.  Did you read it?

2          THE WITNESS:  I looked at it.  I didn't read it care-

3    fully.

4          Q     BY MR. VEEDER:  Did you agree with it?

5          MR. MOSKOVITZ:  I object, your Honor.

6          MR. SACHSE:  I object.

7          MR. VEEDER:  It is already answered.

8          THE COURT:  Is it answered?  Did you answer it?

9          THE WITNESS:  No, I didn't think so.

10         MR. VEEDER:  I thought you said yes.

11         THE WITNESS:  No.

12         THE COURT:  I am going to warn you now, I don't know

13   what probative value it could have whether he agreed with you or

14   not, but I am kind of curious whether he did.

15         Did you agree?

16         THE WITNESS:  Yes, in general.

17         THE COURT:  Do you think it was a good brief?

18         THE WITNESS:  Yes.

19         THE COURT:  Well-prepared?

20         THE WITNESS:  Yes.

21         THE COURT:  Persuasive?

22         THE WITNESS:  To me it is persuasive.  Of course, that

23   is one of the principal reasons I am not in this case.

24         MR. VEEDER:  I have no further questions, your Honor.

25         THE COURT:  May this witness be excused?

1    MR. VEEDER:  I would like to have him have dinner with

2  me tonight.  No, he is excused, as far as I am concerned.

3    THE COURT:  All right.

4    May we adjourn then, until tomorrow morning?

5    THE WITNESS:  Am I excused by Mr. Moskovitz?

6    MR. MOSKOVITZ:  Yes, you are excused.

7    THE COURT:  You are excused, Mr. Goldberg.  Thank you.

8    THE WITNESS:   Thank you.

9    THE COURT:  How about 9:30 tomorrow morning?

10    MR. VEEDER:  Fine, your Honor.

11    (Adjournment until Thursday, May 22, 1958, 9:30 A.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25