# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN
### CENTRAL DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

        Plaintiff,

      vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al,

        Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**        San Diego, California

**Date:**        May 22, 1958

**Pages:** 1250-1388

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By_____ DEPUTY

**JOHN SWADER**
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211 · EXT. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>FALLBROOK PUBLIC UTILITY )<br>DISTRICT, et al, )<br>)<br>Defendants.) | No. 1247-SD-C |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

May 22, 1958

APPEARANCES:

        For Plaintiff:

WILLIAM H. VEEDER, Esq.,
WILLIAM E. BURBY, Esq.,
Special Assistants to the
Attorney-General
Department of Justice
Washington, D. C.

— — —

1   APPEARANCES (continued):

2        For U. S. Marine Corps:        COL. ELLIOT ROBERTSON
                                        CDR. DANIEL FLYNN
3

4        For Defendant Vail Company:   GEORGE E. STAHLMAN, Esq.

5        For Defendant Fallbrook        F. R. SACHSE, Esq.
         Public Utility District:

6        For Defendant State of         EDMUND G. BROWN, Esq.
         California:                    Attorney-General, by
7                                       ADOLPHUS MOSKOVITZ, Esq.
                                        Deputy Attorney-General
8

9        For Defendants Charlotte       BERT BUZZINI, Esq.
         Faulkner and Raymond C.
10       Faulkner:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SAN DIEGO, CALIFORNIA, THURSDAY, MAY 22, 1958, 9:30 A.M.

2    THE CLERK:  2-1247-SD-C, United States v. Fallbrook,

3    etc., et al.

4    Further hearing on motion.

5    MR. VEEDER:  Your Honor, the witness, Mr. B. A. Gold-

6    berg, called my attention to the fact that he disagreed with

7    one of the statements in the affidavit filed by the United

8    States in support of the motions now under consideration.  I

9    asked Mr. Goldberg to come to the Courtroom this morning and,

10   if your Honor will permit it, I would like to call him to the

11   stand and ask him questions to the end that he can straighten

12   what he considers to be an error in this affidavit, if I may.

13   THE COURT:  You may.  The affidavit, of course, is

14   not evidence.

15   MR. VEEDER:  I did not offer it in evidence, but it

16   is important to me that he have the opportunity to explain it,

17   because --

18   THE COURT:  All right, call him.

19   MR. VEEDER:  Mr. Goldberg, would you please take the

20   stand.

21                       B. ABBOTT GOLDBERG,

22   having been previously sworn, resumed the witness stand and on

23   his oath testified further as follows:

24                     DIRECT EXAMINATION resumed

25   Q     BY MR. VEEDER:  Mr. Goldberg, would you please

1   refer to that phase of the affidavit filed by the United States

2   in support of the motions now under consideration concerning

3   which you have disagreement?

4           A       I am referring to the affidavit signed by Inez

5   M. Miller and dated May 9, 1958.  On page 3 of that affidavit,

6   in numbered paragraph 12, appears the statement,

7           "Although Mr. Goldberg made other statements

8       which he claimed were privileged communications to

9       his superior, he nevertheless stated that he told him

10      that he disagreed with Mr. Moskovitz's brief and his

11      position in Court because 'it did not seem to me

12      (Goldberg) to be factual.'"

13          That statement is not correct.  I stated to my superior

14  that I disagreed with Mr. Moskovitz's brief not because it was

15  not factual, but because I took a different view as to the legal

16  theory or the legal position.  This is not a disagreement as to

17  facts, but one as to law.

18          Q       Now, you are alluding to the brief, "Response

19  and Memorandum of Points and Authorities of the State of Cali-

20  fornia to Proposed Motion of the United States for Rulings of

21  Law Respecting the Stipulation of November 29, 1951, Between

22  the United States and the State of California," that brief

23  being dated January 2, 1958, and signed by Adolphus Moskovitz,

24  Deputy Attorney-General; is that correct?

25          A       That is right.

1         Q     Now, in making this statement, Mr. Goldberg,

2    you are not intending to convey to the Court an intention to

3    change your testimony in regard to the facts and circumstances

4    surrounding the execution of the stipulation of November 29, 1951,

5    are you?

6         A     No, we are talking now about an episode that

7    occurred either late in 1957 or early in 1958, whereas yesterday

8    with regard to the facts concerning the negotiation of the sti-

9    pulation we were talking with regard to 1951, and I am not

10   changing that testimony.

11        MR. VEEDER:  I have no further questions, your Honor.

12        MR. MOSKOVITZ:  Your Honor, I would like to ask a

13   question to clarify a matter which I think probably would help

14   your understanding of the situation.

15                  CROSS-EXAMINATION

16        Q     BY MR. MOSKOVITZ:  Mr. Goldberg, you stated

17   yesterday that you were associated in the conduct of this case

18   around the time that the stipulation was entered into in November,

19   1951; is that correct?

20        A     Yes.

21        Q     You are not associated with the conduct of this

22   litigation today?

23        A     No.

24        Q     When were you disassociated from this case?

25        A     Either very late in 1951 or early in 1952.

1    Q    Thereafter are you aware of which of the attorneys

2    in the Attorney-General's Office has been in charge of this

3    litigation?

4    A    Yes.  It went from me to Mr. Shaw, then it went

5    to Mr. Shaw and George Grover, then, as I recall, from George

6    Grover to you.

7    Q    When you say it went from you to Mr. Shaw, you

8    are not affecting your testimony that at the time the stipulation

9    was entered into, Mr. Shaw was associated with the case and was

10   in charge of the case?

11   A    No.  What actually happened was that there was

12   an interval where we both worked on the case.  Actually, I

13   worked on it under Mr. Shaw's supervision.

14   MR. MOSKOVITZ:  That is all.

15   MR. SACHSE:  I have no questions.

16   THE COURT:  Let me ask a question.  Anybody can object,

17   if you want to.

18   When you were getting ready to draw up this stipulation--

19   by you I mean Mr. Shaw, yourself and Mr. Veeder -- and before

20   it was signed, was there ever any discussion between you as to

21   the meaning and effect of Section 1225 of the Water Code on the

22   appropriation of water?

23   THE WITNESS:  I don't recall that we talked about the

24   Section by number.  We certainly had discussion about the filing

25   procedure in general.

1    THE COURT:  And this question whether there could be

2    appropriations of water after the change in California law that

3    was shown by that Section, this problem, then, about appro-

4    priation of water with or without complying with the State pro-

5    cedure, this was the question that you say was left open?

6    THE WITNESS:  Yes, your Honor.

7    THE COURT:  All right.

8    MR. VEEDER:  I have no further questions.

9    MR. MOSKOVITZ:  No further questions.

10   MR. SACHSE:  No questions.

11   THE COURT:  Thank you.  May the witness be excused?

12   MR. MOSKOVITZ:  The witness may be excused.

13   THE COURT:  You may catch your plane now which re-

14   turns to Sacramento or elsewhere.

15   THE WITNESS:  I'm glad I have your Honor's permission.

16   I only wish I had the same from the airlines.

17   MR. VEEDER:  Thank you, Mr. Goldberg.

18   I have no further oral testimony, your Honor.  I don't

19   believe I will call Mr. Moskovitz.  I think he can speak for

20   himself.

21   I would, however, like to have marked for identification

22   and then offer in evidence some maps.

23   THE COURT:  These are for the purpose of this hearing

24   only?

25   MR. VEEDER:  Here is what I would like to do.  I would

1 like to offer them for this hearing, and then they will be re-

2 offered on the merits, if that is agreeable.

3              THE COURT:  All right.

4              MR. VEEDER:  United States geological survey maps and

5 some aerials that were taken.

6              THE COURT:  All right.  How many do you have?

7              MR. VEEDER:  I have three aerials, and then I have

8 this folder of the United States geological survey maps.

9              THE COURT:  Government's Exhibits 1, 2, 3 and 4 for

10 the purpose of this hearing, and then if you want them in the

11 record of the case otherwise, you may offer them again.

12              (The documents above referred to were marked Govern-

13 ment's Exhibits 1, 2, 3 and 4 for identification.)

14              MR. VEEDER:  These gentlemen asked me this question--

15 I will say it in the record.  The aerials show the large con-

16 struction outside the watershed -- is that better? -- it shows

17 the immense part of Camp Pendleton that is located outside the

18 watershed and was located outside the watershed prior to the

19 time that the stipulation of November 29, 1951, was executed.

20              MR. SACHSE:  If your Honor please, before we go any

21 further on these, I'm going to object.  This first one that I

22 hold in my hands says that it is an aerial taken on the 29th of

23 March, 1955.  That was not before the stipulation was executed.

24              MR. VEEDER:  Why don't you let me finish?

25              MR. SACHSE:  The next one is --

1268

1    Furthermore, I don't think any of these delineate the

2  watershed outlined.  There is no delineation on the aerial where

3  the watershed begins or ends.

4    Finally, I don't think it has anything whatsoever to

5  do with the physical conditions.

6    MR. VEEDER:  Are you through?

7    MR. SACHSE:  I am through now.

8    MR. VEEDER:  What I was trying to state to your Honor

9  was this:  These aerial photographs show graphically the con-

10  struction outside the watershed.  The 1948 United States Geologi-

11  cal Survey maps show the same area, the same location of the

12  buildings and tie directly to these aerial photographs concern-

13  ing which I have just made reference, and I think they will help

14  your Honor in locating these areas.  I do not offer the 1955

15  aerials to show anything prior to 1955, but they do show graphi-

16  cally the areas in relation to the United States Geological

17  Maps which located the areas.

18    THE COURT:  Mr. Sachse, what you say in your objection

19  makes sense, but there is not any dispute, is there, that the

20  Government had a big installation outside the watershed in

21  November, 1951?

22    MR. SACHSE:  There is no dispute, your Honor.  I

23  would hope that each one of these will be in the case on the

24  merits.

25    THE COURT:  I am going to admit them for the purpose

JOHN SWADER, OFFICIAL REPORTER

1    of the hearing of this motion, with the understanding that they

2    show the situation in 1955 but that it is conceded that there

3    was a big installation outside the watershed in November, 1951.

4            MR. SACHSE:   There is no testimony as to how that has

5    been expanded between 1951 and 1955.

6            MR. VEEDER:   I will cal Col. Robertson for that pur-

7    pose now.

8            THE COURT:   Just mark them presently Government's 1,

9    2, 3 and 4 for identification, for the purpose of this hearing

10   only.

11           MR. VEEDER:   Will you take the stand, Colonel.

12                       ELLIOT B. ROBERTSON

13   called as a witness for the plaintiff being first duly sworn

14   on his oath was examined and testified as follows:

15           THE CLERK:   State your name, please.

16           THE WITNESS:   Elliot B. Robertson.

17                       DIRECT EXAMINATION

18           Q     BY MR. VEEDER:   Col. Robertson, would you state

19   your present position in the Marine Corps?

20           A     Colonel, United States Marine Corps.

21           Q     Were you acquainted with Camp Pendleton prior

22   to November 29, 1951?

23           A     Yes.

24           Q     Would you state the circumstances of your know-

25   ledge of that Camp?

1        A       I first visited Camp Pendleton in July, 1943,

2    and took a general tour of the place with a qualified guide and

3    became fairly familiar with it.   In 1946 I again came back and

4    on numerous occasions, anywhere from twice a year to twice a

5    month every since that time, I have been involved in the manage-

6    ment of all Marine Corps Stations -- I should say I have con-

7    tinuously been involved in the management of all Marine Corps

8    Stations, and as far as Camp Pendleton is concerned, I have been

9    there on monthly, weekly and sometimes twice a year basis every

10   since.   I have been directly interested in the location and

11   operation and construction of all facilities there.

12        Q       What is your background and training from an

13   educational standpoint, Col. Robertson?

14        A       I have a Bachelor's Degree in Civil Engineering.

15        Q       Have you, in the work that you have been con-

16   ducting, observed the Santa Margarita Watershed and the basin of

17   the Santa Margarita River?

18        A       I have.

19        Q       Are you acquainted with the general location of

20   the watershed line of the Santa Margarita River?

21        A       Yes.

22        Q       I hand you an aerial photograph dated 29 March

23   1955, No. 20282, which has been marked for identification in

24   this hearing as plaintiff United States of America's Exhibit 1

25   and I ask you to look at that aerial and state, based upon your

1271

1    knowledge of the area, if that is a true representation.

2         MR. SACHSE:  Of what?

3         MR. VEEDER:  Of portions of Camp Pendleton located

4    outside the watershed.

5         MR. SACHSE:  I will object, if the Court please.  There

6    is no delineation on the photograph of what the watershed line

7    is, and how can you say what is outside the watershed line?

8         MR. VEEDER:  I asked Col. Robertson if he knew where

9    the watershed line was and he said he knew where it was, so he

10   can look at the aerial.

11        THE COURT:  The objection is overruled.  I don't know

12   much about Civil Engineering, but I can stand up on the divide

13   and tell which way the water is going to run, if I know the

14   area.

15        THE WITNESS:  May I have the question repeated.

16        MR. VEEDER:  Would you read the question, please.

17        (The Reporter read the pending question.)

18        THE WITNESS:  Parts of this picture represent parts

19   of our building installations which are outside the watershed.

20        Q    BY MR. VEEDER:  And would you state the designa-

21   tion of those areas from the standpoint of the locations estab-

22   lished by the Marine Corps in regard to administration?

23        A    They are, roughly, the 12, 13, 14, 15, 16 areas,

24   as we call them, in Camp Pendleton.

25        Q    Now, will you state for the record whether those

15

1   installations were there prior to November 29, 1951?

2          A      They were.  They were there when I first visited

3   the property in 1943.  From many years studying the construction

4   drawings and reports of this place, they were in the original

5   Camp which was built in the 1941-42 period.

6          Q      Are there other areas over at Camp Pendleton --

7          THE COURT:  Before you pass this picture, can you take

8   a red pencil and show approximately where the watershed line

9   runs along there?  Point out first the River.

10         THE WITNESS:  It is rather difficult to do without a

11  map to give you the contours to follow where you come in, but

12  I can give it to you roughly.

13         THE COURT:  I understand it will be rough.

14         THE WITNESS:  This is the thread of the stream, rough-

15  ly, the Santa Margarita River over here.  The watershed line is

16  roughly along this ridge, cutting down roughly through here to

17  a knob that I can't see -- it is just off this photograph.

18         THE COURT:  Put an X in this portion here on the right.

19         The portion on the right is the portion which you say

20  would be outside the watershed?

21         THE WITNESS:  Yes, sir.

22         This is in the San Luis Rey watershed.

23         THE COURT:  And the installations which you described

24  by number are the installations shown in the area marked X?

25         THE WITNESS:  They are, sir.

1          THE COURT:  All right, let me see it and go on to

2   the next one, Mr. Veeder.

3          Q     BY MR. VEEDER:  Col. Robertson, I ask you to

4   look at the aerial photograph dated 29 March 1955 and marked in

5   this hearing as identification No. 1 and ask you if that is a

6   factual representation of the area of Camp Pendleton shown there,

7   and ask you similarly to mark the watershed line on that.

8          THE COURT:  That Exhibit 2, I take it, is immediately

9   east of Exhibit 1 which has just been identified?

10         MR. VEEDER:  Would you compare those?

11         They are close to being identical, your Honor, but I

12  would like to have --

13         THE WITNESS:  There is an overlapping of the two, and

14  the numbered 1 photograph goes roughly to the northward.

15         THE COURT:  Wait a minute.  Did we start with --

16         THE WITNESS:  We started with No. 2, sir.

17         THE COURT:  All right.  We talked about No. 1.  Let

18  the record show that the testimony heretofore taken involved

19  Exhibit 2.

20         THE WITNESS:  Now that you have this extention, I

21  would like to modify my watershed line.  I can now see the other

22  features which I couldn't pick up from the section of the map

23  that we had.  This line rather than cutting across here cuts up

24  here.

25         THE COURT:  Mark X on Exhibit 1, the area outside the

1274

1   watershed。

2          What is that there -- Lake O'Neill?

3          THE WITNESS:  This is Lake O'Neill。

4          MR. VEEDER:  May I proceed, your Honor。

5          THE COURT:  Yes。

6          Q    BY MR. VEEDER:  Col. Robertson, I hand  you the

7   aerial photograph dated 29 March 1955, which has been marked

8   for identification in this hearing as plaintiff's Exhibit No。 3,

9   and ask you to state whether that is a fair representation of

10  the portion of the area of Camp Pendleton outside the watershed

11  of the Santa Margarita River?

12         A     Here again you have a part of the areas which are

13  outside of the watershed, and I believe that all that is on this

14  picture is also on the last one numbered 1.

15         THE COURT:  It doesn't add anything?

16         THE WITNESS:  It doesn't add anything。  The left is

17  in this direction --

18         THE COURT:  In other words, No. 3 there extends

19  further east?

20         THE WITNESS:  Further to the northward generally, sir --

21  slightly east。  There is no additional area。

22         MR. VEEDER:  It does not bring in any?

23         All right, your Honor, I will withdraw No。 3, then.

24  There is no reason for it。

25         Q     BY MR. VEEDER:  I will hand you plaintiff's

1   Exhibit marked for identification No. 4, concerning which no

2   objection has been made.

3           Is there an objection?

4           MR. SACHSE:  Wait a minute.  Is this entire photograph

5   going in?  I have looked only at one map.

6           MR. VEEDER:  I'm just going to have him look at the

7   one map and have that in the record.

8           MR. SACHSE:  May we reserve objections to any other

9   maps at the proper time, your Honor?  He is introducing a folder

10  of maps and showing one.

11          THE COURT:  Why break up his folder?  I will look at

12  only the one map that he offers for this hearing.

13          MR. VEEDER:  And I offer it for evidence, your Honor.

14          THE COURT:  Mr. Clerk, mark the particular map and

15  put a flag on the outside on it.

16          MR. VEEDER:  I have already flagged it, your Honor.

17          THE COURT:  Clip it on the underside, so that it

18  doesn't cover the map, Mr. Clerk.

19          (The document above referred to was marked plaintiff's

20  Exhibit 4.)

21          Q     BY MR. VEEDER:  Col. Robertson, I ask you to

22  view that map and state what it is.

23          THE COURT:  This is Exhibit 4, this particular map,

24  for this hearing.

25          MR. VEEDER:  Exhibit 4.

1276

1    Q    And state what it is, first, and then state

2  whether the red line on there delineates the watershed line of

3  the Santa Margarita River insofar as that map is concerned.

4    THE COURT:  There are two red lines, one on the left,

5  and one on the right.

6    THE WITNESS:  This is a one-color reproduction of a

7  United States Department of Interior Geological Survey Map,

8  Monroe Hill Quadrangle.  The red lines on this map reflect the

9  southeasterly and the northwesterly limits of the watershed of

10 the Santa Margarita River as it crosses this map.

11   THE COURT:  Draw a line across here.  This is the

12 watershed, I take it through there?

13   Q    BY MR. VEEDER:  Now, Col. Robertson, would you

14 compare the areas shown on the aerial photographs, Exhibits 1

15 and 2, with that area delineated and depicted on plaintiff's

16 Exhibit 4?

17   A    The picture numbered 2 is the southerly of the

18 two pictures, this curve, and Vandergrift Boulevard is this

19 curve here.

20   Q    Would you put an X where you said "here?"

21   MR. SACHSE:  Just a minute.

22   THE WITNESS:  This curve here, which I will mark with

23 an X and a circle --

24   MR. SACHSE:  I see.

25   THE WITNESS:  -- are coincidental points on Vandergrift

16

1    Boulevard.  The next road intersection which I will give you as

2    coincident is this one here, which I will also mark with an X

3    and a circle.  Therefore, roughly speaking, this area to the

4    eastward of the red line on the southeasterly side of the water-

5    shed, up to roughly this intersection, is depicted in this area

6    here, which I have marked X and shown as San Luis Rey watershed

7    on photograph No. 2.

8            The second picture takes us further to the northward

9    and shows some of the same area.  The second circle that I put

10   an X in is a point here, which I will mark with a Y and put an

11   X in.  So that we have here a slight northerly extention within

12   the watershed before the watershed line goes off the photograph.

13   The picture then goes on into the watershed and shows Lake

14   O'Neill and its northerly and central area.

15           THE COURT:  Let me see the map.

16           MR. VEEDER:  Do you have the briefs filed in support

17   of the motion of the United States for a ruling respecting

18   California's stipulation of November 29, 1951, with the United

19   States of America?

20           Q     Col. Robertson, I refer to the record in this

21   case, No. 1247-C, the file in the Clerk's Office on the outside

22   dated May 1, 1958, Volume 9.  I hand to you that file in the

23   Clerk's Office and refer to the motion for rulings of law re-

24   specting California's stipulation on November 29, 1951, with the

25   United States of America and ask you to look at page 12 of the

1  memorandum in response to reply briefs of California and Fall-

2  brook Public Utility District and ask you to state what you ob-

3  serve at page 12 of that brief.

4        A    There is an aerial photograph attached to the

5  page. The page is labeled "Aerial Photograph of Camp Pendleton

6  Lying Outside the Watershed of Santa Margarita River." Except

7  for the right roughly three inches of that photograph, you have

8  on here the same information which is on the last two photo-

9  graphs we looked at.

10        Q    And those photographs are plaintiff's Exhibits

11  1 and 2?

12        A    That is correct.

13        Q    Can you identify them as being identical with

14  the exception to which you just made reference?

15        A    That is correct.

16        Q    Now, Col. Robertson, to your personal knowledge

17  are there other areas which are situated outside -- are there

18  other areas of Camp Pendleton on which there are houses and

19  other structures which are presently built and are presently

20  located outside the watershed of the Santa Margarita River?

21        MR. SACHSE:  I object, if the Court please, without

22  some connection between the present and 1951.

23        MR. VEEDER:  I can't ask all the questions at once,

24  Counsel.

25        THE COURT:  Overruled.

1          THE WITNESS:   There are.

2          Q      BY MR. VEEDER:   Were there any other areas

3    situated outside the watershed upon which buildings were con-

4    structed and Marines housed prior to November 29, 1951?

5          A      There were.

6          MR. VEEDER:   I will ask to have marked for identifi-

7    cation a map designated --

8          I wonder if the Clerk would mark that while it is on

9    the easel.   It will be easier to handle.

10         (The document above referred to was marked Government's

11   Exhibit 5.)

12         Q      BY MR. VEEDER:   Col. Robertson, I ask you to

13   approach the easel and view, if you would, a map designated

14   "Santa Margarita River Watershed Within Camp Pendleton," marked

15   further "Water Distribution System," which has been marked for

16   identification in this hearing as plaintiff's Exhibit 5, and I

17   ask you if that map was made under your direction -- under your

18   supervision?

19         A      Under my indirect supervision.  I watched it

20   being made and saw the progress of it.

21         Q      And you are in charge, are you not, of the

22   litigation and Ground Water Resources Office, with Col. Bowen

23   under your immediate --

24         A      That is correct.

25         Q      Viewing that strictly for the purpose of location,

1    does that map correctly depict the areas outside the watershed

2    of the Santa Margarita River as they are today?

3         A    Yes.

4         Q    And does it correctly locate the distribution

5    system for the delivery of water to this area outside the water-

6    shed of Santa Margarita River?

7         A    Yes.

8         Q    Would you state if there are any differences

9    between that system of distribution at the present time and as

10   of date prior to November 29, 1951, if you know?

11        A    I can give you some.  I may not be complete.

12   These two points here are housing developments which were built,

13   marked A & B, they are housing developments which were built

14   since that time.

15        Q    Since November 29, 1951?

16        A    That is correct.  I am not sure of the exact

17   date, but I believe since that time.  You are speaking of water

18   system?

19        Q    That is correct.

20        A    I believe that is the entire change.

21        Q    What are those numbers 11, 13, 14 that you ob-

22   serve outside the watershed?

23        THE COURT:  I take it this is the watershed line?

24        MR. VEEDER:  Yes, that is correct.

25        THE COURT:  And this is the watershed line on the

other side, with the heavy line?

THE WITNESS:  Yes.

THE COURT:  What is that?

THE WITNESS:  This is marked on this side here.

MR. VEEDER:  I will rephrase the question.

Q     Would you state what those numbers are -- 11, 13, 14?

A     These numbers are identifying numbers used for administrative purposes to delineate or to define specific areas of Camp Pendleton.

Q     You made reference, when you were testifying in regard to the earlier photographs, to plaintiff's Exhibits 1 and 2.  In regard to the administrative areas, are those the same administrative areas to which you made reference?

A     These are -- I believe that on one of those photographs I gave the numbers which did not include the 17 area which is shown here.

Q     And the 17 area is an area outside the watershed?

A     That is correct.

Q     Was that in existence prior to November 29, 1951?

A     It was.

Q     In regard to the areas down toward the ocean, would you state which of the installations are situated there

1    which are outside the watershed?

2         A    The areas I marked A and B are two segments

3    where we are maintaining some one thousand houses.  There is an

4    area here which is known locally as Little Tokyo, which was

5    originally a camp, now a family trailer housing development.

6    The watershed line almost bisects that.

7         Q    Was that outside the watershed on November 29,

8    1951?

9         A    The water system shown here is the original

10   water system which preceded 1951.  The houses, the trailers

11   which were placed there were placed there since that time.  The

12   camp was there before that time.

13        Q    It was serving an area, though, outside the

14   watershed at that time, November 29, 1951?

15        A    The system was there and the area was being used

16   to some degree.

17        Q    Would you mark the other areas, if there are

18   any, that are outside the watershed?

19        A    There is another which I missed.  I will mark

20   that roughly D.  We had at that time some 650 dwelling units,

21   known as the Moser Housing.  It has been since razed.

22        Q    At that time, you are still alluding to --

23        A    I am alluding to the 1951 date.

24             There was also some other housing in here and some

25   camp installations in here, between the area marked D and the

1   ocean.   Some of it was administered along with D as housing,

2   some was camp installations.   They have since been razed.

3         Q    Are there any other areas outside the watershed

4   that were using water on November 29, 1951?

5         A    Not for military purposes.   There were two

6   other areas using water at that time, and they are, roughly,

7   in the area I will mark X and Y, and were used for agricultural

8   purposes under lease.

9         Q    And your date is still November 29, 1951 -- prior

10   to that time?

11         A    That is correct.

12         Q    Was the State of California using any water out-

13   side the watershed down in that area at that time?

14        MR. SACHSE:   Objection, if the Court please, as being

15   immaterial.   The State of California isn't a party.   You are

16   not arguing about the State of California's use in this matter.

17        MR. VEEDER:   Well, I would like to bring to the Court's

18   attention that the State of California has been leasing land

19   down there and using water for agricultural purposes, and was at

20   that time using water for agricultural purposes.   It has some

21   kind of experimental station using Santa Margarita River water

22   for agricultural purposes.

23        THE COURT:   On November 29, 1951?

24        MR. VEEDER:   I was going to ask that question.

25        THE COURT:   The objection is overruled.

1284

1          THE WITNESS:  Of my direct personal knowledge, I can't

2    say.  From talking to the sub-lessee --

3          MR. SACHSE:  I object --

4          THE WITNESS:  -- and from looking at our official

5    records of the lands that were under lease, I can answer the

6    question.

7          Q      BY MR. VEEDER:  Will you proceed to answer?

8          A      In the area where I have marked this X, the

9    State of California, acting through a sub-lessee of theirs,

10   Mr. Paul Sloop, was growing test plots of seed potatoes for all

11   parts of the United States and for part of Canada.

12         Q      That was prior to November 29, 1951?

13         A      Yes, sir.

14         MR. VEEDER:  I have no further questions of the

15   Colonel.

16         I would like to reserve the right, of course, if I

17   may, your Honor, to call the Colonel for the case on the merits

18   and I want to be sure there is no objection to that.

19         THE COURT:  You mean on the trial itself?

20         MR. VEEDER:  Yes, your Honor.

21         THE COURT:  Of course.

22         MR. SACHSE:  I have no questions at this time, your

23   Honor.

24         I want to be sure, this same map, No. 5, will be used --

25         MR. VEEDER:  May I interrupt for just a moment.

1    I wish to offer that map in evidence marked for identi-

2 fication as plaintiff's Exhibit 5.  I did not make the offer,

3 your Honor.

4    THE COURT:  In this proceeding on the motion?

5    MR. VEEDER:  Yes, your Honor.

6    THE COURT:  It is received for the purposes of the

7 motion only.

8    (The document marked Government's Exhibit No. 5 for

9 identification was received in evidence.)

10    THE COURT:  What about Exhibits 1, 2 and 4?

11    MR. VEEDER:  I have already offered No. 4, and --

12    THE COURT:  No.

13    MR. VEEDER:  You perhaps didn't hear me.  I desire to

14 offer plaintiff's Exhibits marked for identification 1 and 2 in

15 evidence, and I desire to offer in evidence plaintiff's Exhibit

16 for identification No. 4.

17    THE COURT:  Government's Exhibits 1, 2, 4 and 5 re-

18 ceived in evidence.

19    MR. SACHSE:  This is for the motion only?

20    THE COURT:  For the purpose of the motion only.

21    MR. SACHSE:  No objection.

22    MR. MOSKOVITZ:  Your Honor, we are still going to

23 make our motion to strike, and that will include all the evidence

24 that will be presented on this matter, and I hope that the fact

25 that we haven't objected at this time will not preclude us from

1    making those motions.

2              THE COURT:  No.

3              MR. SACHSE:  No questions, your Honor.

4              THE COURT:  You must have taken Exhibit 3.

5              MR. VEEDER:  Yes, I have taken that.

6              THE COURT:  Let the record show that he withdrew it.

7              MR. VEEDER:  Yes.

8              I have no further evidence to offer, your Honor, in

9    support of our motion to have your Honor reconsider the order

10   of February 11, 1958, and to grant our request for a revision

11   of that order.

12             I would like to make a statement, if I may, and touch

13   on some of the points and authorities that we have relied upon,

14   if that is agreeable, your Honor.

15             THE COURT:  Let's find out if anybody else wants to

16   offer any evidence on this motion or whether it can be submitted.

17             Can it be stipulated that, for the purpose of this

18   motion, the various officials of the Department of Justice who

19   are quoted in the Fallbrook brief, I believe it is, heretofore

20   filed concerning this problem.  May it be stipulated that they

21   did so testify before the Houses of Congress as set forth in

22   the Fallbrook brief?

23             MR. VEEDER:  I would want to check those out.

24             Now I want to be sure what briefs.  Mr. Swing filed

25   a brief with a number of quotations.  Is that to which your

1   Honor is making reference?

2          THE COURT:  Yes, where there were quotations from Mr.

3   Brownell and Mr. Vanesh and Mr. Veeder and other people.

4          MR. SACHSE:  27th of November, 1957.

5          THE COURT:  What is the date of the brief?

6          MR. SACHSE:  27th of November, 1957.

7          MR. VEEDER:  I have never compared those with the

8   official records, and I would like to do that.  Otherwise, I

9   have no objection to that.  And I certainly have no objection,

10  and I intend fully in my statement to you to review what I have

11  said to Congress in regard to this matter.  There are statements

12  that are made, if I remember correctly, in Mr. Swing's brief

13  which are purported to be from Mr. Phillip Perlman, then the

14  Solicitor-General, and Mr. Brownell, former Attorney-General,

15  and Gus Vanesh, who was Deputy Attorney-General.  You asked me

16  if those men would be available.  I can't say.

17         THE COURT:  I didn't ask you if they would be available.

18         MR. VEEDER:  I thought --

19         THE COURT:  Not today.  I said, would you stipulate

20  that they said the things that Mr. Swing has quoted them as

21  saying in his brief of November 27, 1957?

22         MR. VEEDER:  As soon as I check them out, your Honor,

23  They appear to be substantially correct.

24         THE COURT:  How about so stipulating subject to any

25  correction that you may find where an error might occur?

1    MR. VEEDER:  Yes, certainly.

2    MR. MOSKOVITZ:  Your Honor, there is a quotation in

3  the State's lastest memorandum which I don't think appeared in

4  Mr. Swing's brief.  I wonder if that might be covered also.

5    MR. VEEDER:  Which one is that?

6    MR. MOSKOVITZ:  That is Mr. Perlman's, which is a

7  different one than those Mr. Swing quoted.  It appears on page

8  --

9    MR. VEEDER:  That is page 11?

10    MR. MOSKOVITZ:  -- on page 11 of the State's memorandum.

11    MR. VEEDER:  I made reference to that.

12    MR. SACHSE:  Yes, I think it only appears in the

13  State memorandum.

14    THE COURT:  May it also be stipulated that the quota-

15  tion quoting Phillip B. Perlman, Solicitor-General, appearing

16  on page 11, lines 6-18, was what he stated on July 1, 1952?

17    MR. VEEDER:  Subject to being checked, yes, your

18  Honor.

19    THE COURT:  All right.

20    Now this statement of the Attorney-General was in the

21  other brief, was it not?

22    MR. VEEDER:  Mr. Brownell's -- I am not sure that it

23  is identical, but it appears.  I don't know if it is all there

24  or not, but I think most of it is.

25    THE COURT:  As part of the stipulation, I take it that

1    questions asked by Senators, such as Senator Knowland and other

2    Congressmen and Senators who may have asked questions may also

3    be stipulated to as having occurred, for the purpose of under-

4    standing the colloquy that went on.

5           MR. VEEDER:  I am perfectly willing to have them in,

6    of course.  I am not sure that they are related to this stipu-

7    lation and for that reason I would say that I will object to

8    them from the standpoing of relevancy and competency and material-

9    ity.  I want the record to show that I am making those objections

10   to these matters before Congress because I don't think they

11   could possibly pertain to the facts surrounding the execution

12   of the stipulation.  So I want that very clear that those ob-

13   jections are made to the items to which I made reference.

14          Secondly, I am going to ask --

15          THE COURT:  Well, wait.  If you are not going to sti-

16   pulate to that where they are material -- certainly, if the

17   question has nothing to do with the matter, it wouldn't be con-

18   sidered; but where a Senator asked a question and then there

19   was an answer, I think the question he asked would be necessary

20   for continuity.  This last colloquy between Senator Knowland and

21   Mr. Brownell which is in Mr. Moskovitz's brief beginning on

22   page 12 and running to page 13 I think is in the Swing brief.

23          But here Senator Knowland asks, on line 12, "Is this

24   the first and only stipulation?  Was not there some other docu-

25   ment subsequently filed," etc.?  And Attorney-General Brownell

1   responds, "This is the existing stipulation in the case."

2          "Senator Knowland:  There seems to be some sub-

3      stantial dispute on that point," etc.

4          "Mr. Brownell:  Let me say it in this way, Senator,

5      in order to clear up any doubt in your mind.  The theory

6      under which the present Department of Justice will

7      operate in the case --"

8          MR. VEEDER:  Well, as I say, your Honor, one reason

9   why I asked for the privilege of checking these things out is

10  that I have no way of knowing that these are all of the state-

11  ments or whether there is some language that might vary what is

12  said here.  So I am asking that Mr. Moskovitz and Mr. Sachse

13  produce the full hearings.  We can't live with excerpts that

14  have been put into these briefs by the process of selective

15  cutting.  If they will produce those, of course, I have no ob-

16  jection.  But not that I would think they would take anything

17  out of context -- I wouldn't want anybody to think that, but I

18  think they should produce the document and have it marked and

19  then let me object, as I have, as to the materiality, relevancy

20  and competency.

21         THE COURT:  Well, go through these long hearings and

22  sort this out and sort that?

23         MR. VEEDER:  No, all I would recommend is that if they

24  want to put in some evidence they should do so in the usual

25  fashion and I would have them.  Certainly the record could stay

1   open until they get them, as far as that is concerned.  I'm

2   anxious to have that material in there, but I'm not just going

3   to let Mr. Swing pick out a paragraph and put it in a brief and

4   then say, "You live with it," because I just can't do that, and

5   I don't see why they don't produce the evidence.

6         THE COURT:  They haven't offered any evidence.  I

7   merely asked if you would stipulate that the officers of the

8   United States made the statements as quoted in these briefs,

9   and I understand that you said you would so stipulate subject

10  to correction.

11        MR. VEEDER:  That is right, your Honor.

12        THE COURT:  I am willing to let it ride at that.  If

13  you want to bring in the full transcripts and mark parts of the

14  material, I will be glad to have them in the record.

15        MR. VEEDER:  All right, I'll do that, your Honor.  I

16  am certainly anxious to have them here, but I think the only

17  proper way is to have the full report.

18        Do you have those, Mr. Sachse?

19        MR. SACHSE:  I don't have them here.

20        MR. VEEDER:  I'm not worried about it as of the

21  moment.  If they are in San Diego or in Fallbrook, they would
                                        the
22  be helpful, I think, to/record and certainly to me, because I

23  don't have them.

24        MR. SACHSE:  They are certainly available.  The

25  Congressional Record is available from Washington.  The hearings

1   of the various House and Senate Committees are available in

2   Washington.  I do not have them at hand.  I didn't get the

3   extracts.  Mr. Swing got them.  I presume that he has the docu-

4   ments, but I don't know where they are.

5         MR. VEEDER:  Will you undertake to get them?

6         MR. SACHSE:  I will undertake to get them, if I can.

7   I understand, however, that we have a stipulation that unless

8   you chose to correct them, the text contained in Mr. Swing's

9   brief will be accepted -- unless you correct it; is that correct?

10        MR. VEEDER:  And I also understand that the Court will

11  permit the filing of the entire report in each case.

12        THE COURT:  If you will mark the parts that you want

13  me to look at.  I am not going to read some long hearings with

14  a lot of material that hasn't anything to do with it.  If you

15  will mark parts of it, I will read it.

16        MR. SACHSE:  If I can locate them, I will.

17        MR. VEEDER:  Very well.

18        THE COURT:  How many different times did this come

19  up in Congress, as far as the defendants are concerned?

20        MR. SACHSE:  You mean after the stipulation?

21        THE COURT: Yes.

22        MR. SACHSE:  I don't have the records.  This all took

23  place at the time that I was not even in the United States,

24  but reading Mr. Swing's brief and assuming that he did cover

25  the principal locations, it appears to me that there were two

1   major occasions, one of them before the Senate Committee, the

2   one from which you have just read an excerpt of Mr. Brownell's

3   remarks --

4           Incidentally, they may come in the door at any minute.

5   The phone call came through that Mr. Swing's secretary, whom I

6   asked to look for this, has some papers.  They may come walking

7   in.  I don't know.

8           THE COURT:  You mean that the papers may come walking

9   in?

10          MR. SACHSE:  She may come walking in.

11          MR. VEEDER:  Some of them are strong enough to walk

12   alone.

13          MR. SACHSE:  The second major occasion are enlargments

14   of the Congressional record, which included Mr. Veeder's letter

15   to the Saturday Evening Post and the statement of David Agnew,

16   one of the attorneys for the plaintiff, and so on.  I think

17   there are about two or three principal occasions.

18          MR. VEEDER:  May I inquire, your Honor, on one point

19   in regard to this matter,  I have never had any worry at all

20   about what was said to Congress, and if they want to call me

21   back I'll be always glad to talk to them.  But what do these

22   quotations have to do with the word "measured?"  That  is what

23   I don't see.

24          THE COURT:  What do they have to do with the word

25   "measured" you say?

1294

1    MR. VEEDER:  That is the point I make, your Honor.

2  I say, at every instance that the word "measured" has been

3  quoted to the Congress, I have found not a single instance --

4  maybe these gentlemen can find some -- where an effort has been

5  made to construe the word "measured."  I don't believe that the

6  construction would be particularly important if there was any

7  reference to it by someone in Congress, because I believe it is

8  a question of law as to what the word "measured" means in water

9  law.

10    THE COURT:  Let's find out, is there any more evidence

11  going to be offered on this motion, or are you going to rest?

12    MR. VEEDER:  No, I'm going to rest.

13    THE COURT:  Are you going to start to argue it?

14    MR. VEEDER:  I'm going to rest.

15    THE COURT:  You have rested?

16    MR. VEEDER:  Yes, your Honor.

17    MR. SACHSE:  Unless I am fortunate enough that Mr.

18  Swing's secretary shows up with a couple of records, right now

19  I have nothing to offer.

20    MR. MOSKOVITZ:  I have no evidence to offer, your

21  Honor.  The quotes which I have in my memorandum are from docu-

22  ments of which the Court can take judicial notice.  I don't

23  think there is any necessity to produce these gentlemen to

24  testify to this.  They testified before Committees.  Their

25  testimony was reported and is available for all who wants to

1295

1  look at it.

2          THE COURT:   In addition, we have a stipulation that

3  it is fair, unless it is corrected.

4          Are you ready to argue?

5          MR. VEEDER:   Yes, your Honor.

6          THE COURT:   Start in, Mr. Veeder.

7          MR. VEEDER:   The crucial terminology --

8          THE COURT:   Now what you are arguing now is whether

9  I should grant your motion to again interpret the stipulation.

10  I tentatively granted your motion and heard what your showing

11  would be.   Now the question is, should I grant your motion to

12  reconsider the order of February 11, 1958 interpreting the

13  stipulation of November 29, 1951?

14          MR. SACHSE:   Your Honor, for the record, I think I

15  should renew, now that the first motion has been disposed of,

16  our motion to strike all of the testimony offered in support.

17          THE COURT:   You so move?

18          MR. SACHSE:   I so move, your Honor.

19          MR. MOSKOVITZ:   We make the same motion.

20          THE COURT:   They will both be taken under submission.

21          MR. VEEDER:   If the gentlemen have finished their

22  motioning, I will be on my way.

23          The crucial portion of the order of your Honor, as we

24  see it, is the construction that has been placed upon the word

25  "measured."   There are other factors in regard to the matter of

1296

1  sovereignty, to which I will make reference, but there are

2  factors of great concern to the United States that the word

3  "measured" would thus be construed by your Honor.  Certainly

4  Mr. Goldberg's testimony refutes, in our view, any question as

5  to, we will say, the unfortunate construction in the order of

6  February 11, 1958, in regard to that proposition.

7       I wish to call your Honor's attention to the fact that

8  this transcript was made part of the record last night.  I don't

9  know whether it was marked as an exhibit or not.  It is the

10  transcript of the hearing of December 3, 1951.

11       THE COURT:  I made an order incorporating it by re-

12  ference.  It is on file already with the Clerk.

13       MR. VEEDER:  Yes.

14       THE COURT:  It was filed, I think, in January of 1952,

15  and so I made an order incorporating it by reference as a part

16  of the present hearing on the motion.  So you may refer to it.

17       MR. VEEDER:  It will be observed, on page 25 of that

18  transcript, that Mr. Goldberg, addressing Judge Yankwich --

19       THE COURT:  Judge Yankwich or Judge Weinberger?  I

20  don't think Judge Yankwich was in this case until much later.

21       MR. VEEDER:  I thought I saw Judge Yankwich's name

22  here.  In any event, addressing this Court, Mr. Goldberg stated

23  that he had --

24       THE COURT:  At what page?

25       MR. VEEDER:  At page 25.

1297

1       -- that the stipulation had been concluded, and then

2    he made a brief statement as to the meaning ascribed to it by

3    him, he a signator of that document.  It says:

4           "....by the stipulation the first question as to

5        the quantity of water is settled.  The Government will

6        obtain that quantity measured in accordance with State

7        law.

8           "The next question is that quantity which it avers

9        as a riparian user is that limited to use on riparian

10       lands and what is the effect of the cession of exclusive

11       jurisdiction on that limitation which would otherwise

12       exist."

13          The point being, as Mr. Goldberg testified and as the

14   affidavit in support of the motion reveals, there was a single

15   question that gave rise to the phase of the stipulation to

16   which I am now alluding -- paragraph III.  The question was

17   whether the United States was claiming a right to a quantity

18   of water greater than that which at that time it was claiming

19   and using.  In other words, whatever the rights that it acquired

20   from the Rancho and the additional rights by prescriptional use

21   or both -- and I might add, if any, because we have always felt

22   that the Marines made a good deal, we have always felt that

23   they got all the water that they required if Fallbrook and the

24   others would quit stealing it.

25          Now the proposition that confronted us at that time

1  was that we had used the word "paramount" from the case of

2  Peabody vs. Vallejo, and the argument was advanced by Mr. Swing

3  and others that when we used that term of art in water law that

4  we were claiming a paramount right to the water of the entire

5  watershed, and that is the only proposition with which we were

6  then confronted.

7  　　　　Now everyone knew, certainly I knew and I was not

8  particular about telling anyone who would listen that we were

9  not about to go to the Office of State Engineer and make a

10  filing to comply with the law of California to get rights to

11  the use of water which we were then using and claiming, and

12  everyone knew we were using and claiming.  That is the reason

13  why I have such a great concern over the order which your Honor

14  entered on February 11, 1958, for certainly the terminology

15  there used, in my humble opinion -- and I state this most dis-

16  tinctly -- goes beyond, far beyond the contemplation of the parties to

17  that stipulation, and I think that Mr. Goldberg's unequivocal

18  testimony bears out the conclusion which I just expressed.  For

19  we are greatly concerned, your Honor, we are greatly concerned

20  that if this order leaves this Court it will not receive the

21  construction that your Honor placed upon it yesterday.  We be-

22  lieve, in substance, that your Honor said this, that paragraph

23  IV-C means that the United States will not divert water out of

24  the watershed under a claim of riparian right; that it will not

25  claim a right cyclically to impound water; that it will use

1  water only for a beneficial use, whether it be appropriative,

2  prescriptive rights or otherwise.  Now that is what I understood

3  your Honor to say yesterday.

4     THE COURT:  Well, I don't know.  You are not quoting

5  me, and when you paraphrase me I have trouble following you.  I

6  think the stipulation means that you acquired what rights the

7  Santa Margarita Rancho had.  The Rancho Santa Margarita, you

8  tell me, had been diverting water out of the watershed.

9     MR. VEEDER:  That is correct.

10     THE COURT:  To the extent that it had a right, what-

11  ever that right was, you acquired it.  If it was not a right,

12  you didn't acquire it.  But you got whatever the Rancho Santa

13  Margarita had.

14     MR. VEEDER:  Yes.

15     THE COURT:  If you can convince me that the Rancho

16  Santa Margarita had a right that would stand up under attack

17  here to divert that water, then the Government stands in the

18  shoes of the Rancho Santa Margarita.

19     Secondly, I understand that stipulation to provide

20  that California law is going to control this problem of water

21  rights, and California law has one very novel and important

22  point, the meaning of Section 1225 of the Water Code.  If it is

23  determined, and it has not been determined, that that Section

24  means what it says, that you cannot appropriate water without

25  complying with State procedure, and if the Section is

1300

1  constitutional, and if there are no exceptions to the Section,

2  and if you did not acquire rights from the Rancho Santa Margarita

3  which they already had, which were      against the Section --

4  in other words, if the Section means all of that, then you can't

5  appropriate water without going through State procedure.

6       On the other hand, if you have rights from the Rancho

7  Santa Margarita that are an exception to that Section, that

8  antedated that Section -- vested rights before the Section ever

9  became effective, or if there is some logical and proper in-

10  terpretation of that Section that means that it will not apply

11  to what the Rancho Santa Margarita was doing, what you were

12  doing, or if the Section is unconstitutional, or in any other

13  way, then maybe you have the right to use that water that you

14  have been appropriating.

15       Now we argued about this and we have discussed some

16  tentative opinions, but I haven't finally ruled on that.

17       MR. VEEDER:  But, your Honor, the point that I am

18  touching upon, the point that is the most crucial is, what was

19  the    meaning of the word "measured?"

20       THE COURT:  I have just looked at the section again.

21       In this stipulation you said that "the rights of the

22  United States to the use of water are to be measured...."

23       MR. VEEDER:  Yes.

24       THE COURT:  Not that the amount of water is to be

25  measured; the rights to the use of water are to be measured.

1   You couldn't use any clearer language.

2          MR. VEEDER:  The point that I make is that rights to

3   the use of water is the only proper reference  that can be made.

4   We are talking about rights here.  We are not talking about

5   the corpus of the water.  We are talking about, how do you

6   measure rights?  How do you measure them?  You measure rights

7   by the legal right to them.  You don't say that we measure rights

8   by going to California and filing an application.  That is the

9   crux of the whole matter here.  Did we use the word "measure"

10  to mean that the United States, though using water at that time,

11  though its predecessor was using water at that time, did we mean

12  that "measured" would require us to go and file an application?

13  No.  And I will say now that I would have been powerless to

14  sign such a stipulation.  I say so now, that no one has that

15  power to say, "I agree that when I used the word 'measured' I

16  will give away all that water."  That is why I put these maps

17  on the wall.

18          THE COURT: You were not talking about filing any

19  application, and you apparently didn't intend to file.  You were

20  probably proceeding upon some basis that you had a right to use

21  this water that you were using outside the watershed, and that

22  the Rancho Santa Margarita had had the right to do it.

23          You have argued to me already that you had a pre-

24  scriptive right adversely against upstream owners.  Whether you

25  are laboring under that apprehension I don't know.

1302

1   You have also argued to me that you had rights by

2   inverse condemnation, which I indicated was not good.

3   I don't know what you were thinking about, but Mr.

4   Goldberg's testimony was pretty clear that this was a point that

5   was left open; what the Government's right was to use this

6   water outside the watershed.  This was not foreclosed.  But the

7   stipulation was that California law did measure your rights.

8   MR. VEEDER:  Absolutely right.  But "measured" doesn't

9   mean that we would go and initiate a right under the procedures

10  and methods of the law of California.

11  THE COURT:  When did you file your application -- in

12  1948?

13  MR. VEEDER:  That was a filing made by the Navy in

14  regard to impounding of water behind the dam, and we are not

15  talking about that now and we have never talked about that.  We

16  are talking now about the direct-flow rights which were used,

17  and when I say "direct-flow rights" I mean the rights where you

18  have a pump, you raise the water, put it into a pipe and take it

19  out of the watershed.

20  THE COURT:  What proportion of the water that you used

21  in your entire set-up at Pendleton in 1951 was being used out-

22  side of the watershed?

23  MR. VEEDER:  I will say this subject to correction --

24  THE COURT:  Roughly?

25  MR. VEEDER:  I would say that probably from 65-75% of

1303

1   the water was being used outside the watershed.

2          THE COURT:   What about presently -- what percentage?

3          MR. VEEDER:   I am talking about military uses.  The

4   large percentage of the areas using water are used outside the

5   watershed.

6          THE COURT:   What percentage?   What is "large?"

7          MR. VEEDER:   I said from 65-75%.   I would be reluctant

8   to be held to it, but I know that it is an extremely large

9   proportion of the water.   I know that no one who signed that

10  stipulation believed that we were agreeing to go and make a

11  filing for a direct-flow right to take water to those areas.

12  No one believed it, and certainly I didn't, and certainly I

13  would have been powerless --

14         THE COURT:   That doesn't answer the question.   I

15  could conceive that you didn't think you had an application,

16  but that doesn't answer it.   You could have thought a dozen

17  other things.   You could have thought that you had prescriptive

18  rights, you could have been confident that you had rights from

19  the Rancho Santa Margarita that antedated any of the State

20  laws, you could have been confident that you had rights of

21  inverse condemnation -- you just name one thing, I think I

22  would go along with you; but you apparently never intended to

23  file any application with the State.

24         MR. VEEDER:   That is correct.

25         THE COURT:   But that doesn't answer the question.

1304

1    MR. VEEDER:  The question, and the sole and only

2  question, is right here, your Honor, and I allude to your Honor's

3  order, and that is the proposition that I'm here about this

4  morning; that your Honor's order, paragraph IV-C, on page 84,

5  says that paragraph IV of the stipulation means that the measure

6  of the rights claimed by the United States will be governed in

7  this action by all of the laws.  The part of those laws in the

8  filing of an application for a direct-flow right.

9    THE COURT:  When you say that the measure of the

10  rights will be decided by California law, why shouldn't, apart

11  from the stipulation, your claims be measured by California law?

12    MR. VEEDER:  Your Honor, there is no other law by

13  which they could be measured.

14    THE COURT:  Then apart from the stipulation, shouldn't

15  California law control the measure of your rights?

16    MR. VEEDER:  The thing that concerns me so greatly is

17  the introduction of this wholly foreign aspect of it by saying

18  that all of the laws, and then having included in all those

19  laws these that relate to the filing of an application for a

20  direct-flow right.

21    THE COURT:  You want to consider California law as

22  being applicable in those instances where it will favor your

23  position, and in those instances where it will hurt you you

24  don't want to consider California law,

25    MR. VEEDER:  No, your Honor.  The proposition, with

1 all respect to your Honor, is simply this:  The word "measured"

2 is a word of art in water law, and it is this type of word --

3 for example, if we were talking about real estate, it would

4 relate to forty acres.  If it related to water, it is the number

5 of second feet.  It is what you can get from a riparian right.

6 It is matters like that.  But it's not, I respectfully submit,

7 your Honor, "measured" does not contemplate that phase of the

8 California law respecting the procedural aspects of filing an

9 application to get a right to the use of water.

10        THE COURT:  Everybody seemed to have understood this

11 differently than you did.  I noticed, after checking on this,

12 that Judge Yankwich, when he had this suit, said that it was

13 clear that the parties had stipulated that California law should

14 control this case.

15        MR. VEEDER:  From the standpoint of the measure of the

16 rights.

17        THE COURT:  From the standpoint of the measure of the

18 rights.

19        MR. VEEDER:  Yes.

20        THE COURT:  All right.

21        MR. VEEDER:  But the point that I make -- I don't re-

22 call Judge Yankwich ever commenting on this particular matter,

23 but it has ever been, in the Congress or in any record of which

24 I am aware, where the United States agreed or is said to have

25 agreed that although we are presently using water outside the

1   watershed the word "measured" will mean that we will go and

2   make a filing to get that right.

3       THE COURT:  Well, that may be true that you have never

4   said that you were going to file any application, but you

5   came in here very blithely to me and argued that you had a

6   prescriptive right downstream against upstream owners, and we

7   looked up the law and you had two cases both of which were dis-

8   tinguishable, and all the other cases in California said that

9   you couldn't get a prescriptive right downstream against an

10  upstream owner.  So that blows up.

11      Then you argued inverse condemnation, and I was not

12  convinced.  I couldn't see inverse condemnation.

13      Meanwhile the time gets shorter and shorter -- I mean

14  your position gets more precarious.

15      MR. VEEDER:  Oh, no.

16      THE COURT:  So now you come in and after much delay,

17  after I have made an interpretation back in February, now you

18  come in and want me to reconstrue the stipulation, because it

19  now puts you back to a position where you have to find some

20  way around Section 1225 of the Water Code, or you have to

21  have to find some right that antedates the date of that law or

22  you are in bad shape for 65% of your water.

23      MR. VEEDER:  But, your Honor, the reason why Mr.

24  Goldberg came here and testified, and he jeopardized himself in

25  doing so, was to make the point that I am arguing to your Honor

1  today, namely, that it related only to the quantity of water

2  and did not and could not mean methods and procedures established

3  by the law of California, and no one ever urged that.  How far

4  your Honor would consider --

5      THE COURT:  I haven't read the transcript that has

6  been written up yet, but I certainly didn't consider his testi-

7  mony very satisfactory as being any assistance to me in this

8  problem, I'll tell you very frankly.  About I could get out of

9  it was that the matter about this water outside the watershed

10  was left open -- it was not determined.

11      MR. VEEDER:  That's right.

12      THE COURT:  All right, it is still open under the

13  stipulation.  California law will control.  What is the impact

14  of California law on that situation?

15      MR. VEEDER:  The only thing that concerns me is this--

16  and this is not a Johnny-come-lately with me -- these people

17  never argued before that we had to make a filing under the law

18  of California to acquire a right to the use of water, that we

19  would stipulate away those rights.  That is the thing that brings

20  me here now.

21      THE COURT:  If you have rights, you haven't stipulated

22  them away.  If you didn't have any rights, then it is not a

23  matter of stipulating them away; it is a matter of sitting around

24  and doing nothing and letting your rights get away from you that

25  you could have done something about.

1          MR. VEEDER:  What could I do?  What could anyone do?

2   Does anyone for a moment think that I stipulated, knowing that

3   Fallbrook had four applications ahead of ours, that Santa

4   Margarita had rights ahead of ours, that I would stipulate to

5   an agreement that we would ever have to go and file with the

6   State of California?

7          I would like to read this again.

8          THE COURT:  This in a way is academic, because this

9   stipulation, although it binds the major parties, and although

10  yesterday I saw for the first time that you made it for the

11  benefit of everybody else --

12         MR. VEEDER:  We did.

13         THE COURT:  -- it still is a matter of law.  I think

14  we meet the same problem apart from the stipulation.  What is

15  the meaning of Section 1225?

16         MR. VEEDER:  Yes, we do, but, your Honor, the thing

17  that concerns me and the reason why I am petitioning you to

18  reconsider the order of February 11, 1958, is that you say, in

19  so many words, that the word "measured" relates to the filing

20  of applications, and I simply say that we didn't stipulate and

21  agree to that.

22         THE COURT:  I haven't said that it related to appli-

23  cations.  I have said that you have used very simple language:

24  the rights of the United States -- the rights, not the quantity

25  of water.  Whatever rights you had to the use of water are to

1309

be measured in accordance with the laws of the State of Cali-

fornia.   I don't know how you could say it any more simply.

        MR. VEEDER:   That's right.

        THE COURT:   And everybody thought this is what it

meant, that California law was to control this lawsuit.   Judge

Yankwich thought it.

        MR. VEEDER:   That the word "measured" would require

us to make a filing?

        THE COURT:   Not necessarily.   You keep harping on

that.   It is going to require you to show that, under California

law, you either got a right from the Rancho Santa Margarita that

antedates these statutes, that you have a right by prescription,

that you have a right by inverse condemnation, that for some

reason you don't have to file or that the statute is unconsti-

tutional or that there is an exception to it as to matters in

progress if they were at the time the statute became effective --

you have a number of doors that you can go out.   But the trouble

with you is that you think that most of these doors are precluded

on you.

        MR. VEEDER:   No.

        THE COURT:   So now you keep talking about that this

means that you have to file an application.

        MR. VEEDER:   Did I understand you to say that the door

is open to argue inverse condemnation and ownership of appro-

priative rights?

1        THE COURT:  I haven't formally ruled on it.  I have

2   indicated what I might do.

3        MR. VEEDER:  In other words, the stipulation does not

4   preclude me from arguing that point?

5        THE COURT:  Well, I want to think about that, because

6   inverse condemnation is, in a way, condemnation and it cuts

7   through whatever rights -- the right of condemnation is superior

8   to all other rights.

9        MR. VEEDER:  That is right.

10       THE COURT:  In other words, the Government can condemn

11  anything it wants and pay fair compensation.

12       MR. VEEDER:  That is right.

13       THE COURT:  As I said earlier in this case, if you

14  have not enough water down there, you have a right to condemn

15  the land and pay for it.  So we will pass that up.

16       But what I was trying to say, I was talking about

17  that under this stipulation there was not just one door open.

18  I don't know what the Government's position was at that time --

19  it has not been satisfactorily explained to me, but it could

20  have been a number of things.  If could have been that you claim-

21  ed this right through prescription --

22       MR. VEEDER:  That is right.

23       THE COURT:  Plus your claim because you had a right

24  from the Rancho Santa Margarita that went away back.

25       MR. VEEDER:  That is right.

1    THE COURT:  Or that you had a right that had been

2    exercised before these statutes went into effect, or by inverse

3    condemnation.

4    MR. VEEDER:  Or that the United States, by the simple

5    use of the water, could acquire it.

6    THE COURT:  Maybe that is it.  But you keep saying

7    that the stipulation, at the time it was entered, the way I

8    interpreted it, puts you down into one little channel that you

9    had to file an application.

10   MR. VEEDER:  Yes.

11   THE COURT:  No, the stipulation merely says that what-

12   ever water rights you claim up there are going to be measured

13   by California law.

14   MR. VEEDER:  All right, your Honor.  May I read what

15   was put into this order?  In paragraph IV, page 83, sub-paragraph

16   2c, there it is stated that by this stipulation I agreed to

17   exclude --

18   THE COURT:  Where are you reading?

19   MR. VEEDER:  I am reading starting on line 14, at

20   page 84, and I will read the whole paragraph:

21        "Because the word 'use' is a very broad term,

22        the rights gained by 'use,' which the United States

23        may claim under this Paragraph II, include rights by

24        'appropriation' as well as other kinds of rights that

25        may arise by use, limited, however, because of

Paragraph IV of the stipulation, to such rights by use
as may be acquired under the laws of the State of
California.  Excluded, therefore, are claims by the
United States of rights acquired by inverse condemnation,
since the law by which rights would be measured is Fed-
eral law as set forth in decisions of Federal Courts
involving inverse condemnation by the United States
and not California law."

And I respectfully submit, your Honor, --

THE COURT:  I might be wrong on that.

MR. VEEDER:  -- that I didn't agree to that when I
signed that stipulation.

THE COURT:  We haven't even talked about that.

MR. VEEDER:  I was working up  to it, your Honor, and
I am there now, and that is the point.

THE COURT:  Well, I think the Grand Jury is ready.
Would you submit to an interruption to let some other legal
business go ahead, Mr. Veeder?

MR. VEEDER:  I'm glad to leave it on that level, too,
your Honor.

(Another matter.)

MR. VEEDER:  Your Honor, I would like to reserve a
few minutes for closing.  I don't know whether there is any
time limit.

THE COURT:  No, I would like to get through, if we

1  could, this morning.  But let's see what someone else has to

2  say on this matter.

3         MR. VEEDER:  I would like to say a few more words on

4  it.

5         We had left off in regard to the question whether the

6  stipulation excluded, for instance, the claim of inverse con-

7  demnation.  Mr. Goldberg stated that it was his recollection

8  that the stipulation left open the question of the right of the

9  United States to use water outside the watershed.  It left it

10  open so that the United States of America could, under the sti-

11  pulation, assert a claim for the acquisition of rights to the

12  use of water irrespective of what kind and theory the Court

13  might have adopted or accepted.  In other words, the question

14  of inverse condemnation was not precluded by the stipulation.

15  That is our view.

16         THE COURT:  Tell me, the key point in this case is

17  the Government's right to continue to use water outside the

18  watershed in the areas that have been shown on Exhibit 5 there.

19         MR. VEEDER:  That is correct, your Honor.

20         THE COURT:  What theories does the Government presently

21  stand on to prove that right?  Let's summarize it.

22         MR. VEEDER:  Well, we can summarize them.  We have,

23  for example, the stipulated judgment with the Vails, pursuant to

24  which there was agreement that water could be used outside the

25  watershed.

THE COURT:  Well, as to Vails, there wouldn't be any dispute about that, then.

MR. VEEDER:  I say that Vail is the biggest owner and certainly our settlement with them is extremely important, and they are the biggest single defendant in this lawsuit.  Now, as I read, certainly the stipulation didn't preclude us from claiming the rights under that stipulated judgment.

THE COURT:  That was one of the rights you got from the Rancho Santa Margarita.

MR. VEEDER:  That is right.

THE COURT:  Because that was a decree between the Rancho Santa Margarita and Vail.

MR. VEEDER:  Right.

THE COURT:  What else?  What other theories?

MR. VEEDER:  We claim the right that by the simple process of diverting and using the water that we acquired a vested right to continue to use that water.  That would turn on a question -- and I hope that no one winces -- of the exercise of an incorporeal hereditament, of a right to the use of water in the stream at the time we acquired the property and began using it, there being no vested rights to use that water at the time we began using it.

THE COURT:  Based on your theory of the severance of land and water.

MR. VEEDER:  Right.

1315

1    THE COURT:  What I called your "metaphysical approach."

2    MR. VEEDER:  Yes.  That always hurts me.

3    But anyhow, I don't think the stipulation precluded

4    us from making that claim, metaphysical though it may be.

5    THE COURT:  No, because your stipulation says what you

6    got from the Rancho Santa Margarita or what you acquired there-

7    after by use.

8    MR. VEEDER:  Yes.

9    THE COURT:  We have that straightened out.  What else?

10   MR. VEEDER:  We have the metaphysical situation, then.

11   Then we have the inverse condemnation, concerning

12   which you are not greatly impressed, but I do feel that the

13   stipulation didn't preclude us from advancing that theory.

14   Certainly it never dawned on me when we signed the stipulation

15   that we couldn't get our rights under any theory that would

16   work.

17   THE COURT:  Well, what you have acquired since by use,

18   what you got from the Rancho Santa Margarita -- I don't know.

19   I said I was a little concerned about that one paragraph.  But

20   if Santa Margarita had been using water out of the watershed,

21   that would not be inverse condemnation, because they weren't

22   an agency of the Government.

23   MR. VEEDER:  That is right.

24   THE COURT:  Now you come along and thereafter you use

25   it out of the watershed.

1        MR. VEEDER:  Maybe some more above what the Rancho

2   was.  I don't know.

3        THE COURT:  Well, regardless whether you used more or

4   less, any inverse condemnation would start as of the date that

5   the United States started to use.

6        MR. VEEDER:  Right.

7        THE COURT:  And would apply to what they did use.

8        MR. VEEDER:  Yes.

9        THE COURT:  Because I don't think that inverse con-

10  demnation theory is worth a red cent.  The question now is --

11       MR. VEEDER:  Would the stipulation preclude us from

12  advancing it?

13       THE COURT:  I will think about that one.

14       What other one?  Lower prescriptive right?

15       MR. VEEDER:  Yes.

16       THE COURT:  That is certainly available to you, if

17  it is any good.

18       MR. VEEDER:  Right.  Any theory, though, whatever it

19  may be, pursuant to which those rights could be vested in us,

20  I would say that we should be permitted to advance in this trial

21  and have you rule upon it as a matter of law, and it is our

22  position, your Honor, that when we signed the stipulation of

23  November 29, 1951, we did not limit ourselves to the exclusive

24  method of acquiring a right to the use of water, namely, the

25  filing of an application.  That is the reason why we are here

1   today. We believe that the stipulation did not shut any door

2   to us upon which we could have adjudicated to us the right to

3   divert the water out of the watershed. I believe that Mr.

4   Goldberg summed it precisely and correctly when he said that

5   the stipulation left open the theory of law upon which the United

6   States could continue to use the water outside the watershed.

7   That is truly what I believe.

8         THE COURT: Well, it is still kind of open. I have

9   been over that a couple of times with you.

10        MR. VEEDER: Well, it is kind of open, except --

11        THE COURT: It is bad.

12        MR. VEEDER: It looks awful bad, for this reason.

13   Your Honor, we have right straight before us Section 1225, and

14   if Section 1225 is applicable to us then our theory, even our

15   metaphysical theory, is out, because that says that there is

16   only one way to acquire a right to the use of water and that is

17   by filing an application.

18        THE COURT: Well, no, you see, if your metaphysical

19   theory is good, then you have some kind of tag on that water

20   and it is not State water.

21        MR. VEEDER: That is right, and I think the stipulation

22   left us open to be able to put that tag on, if the tag will

23   stick.

24        THE COURT: Except, of course, your difficulty there

25   is, there is all this talk about sovereignty. You said in the

1    stipulation that we don't claim any rights when we proceed in

2    our sovereign capacity.  That is the only way you can proceed.

3        MR. VEEDER:  Yes.

4        THE COURT:  Mr. Goldberg, of course, was mixed up with

5    State law and proprietary.

6        MR. VEEDER:  Yes.

7        THE COURT:  But you say that we claim only rights that

8    a private person would have.

9        MR. VEEDER:  Your Honor, in that regard, in paragraph

10   III we say this:

11       "The United States, by reason of its sovereign status,

12       no rights to the use of a greater quantity of water

13       than is stated in paragraph II;"

14   and in paragraph II there are three items:  There is the Rancho

15   Santa Margarita's rights to which we succeeded, there  is pre-

16   scription, concerning which you take a dim view, and then there

17   is the word "use."  Now, we claim no greater quantity of water

18   than that which we purchased from the Rancho Santa Margarita,

19   that which we might have acquired by prescription or that at

20   that time we were using.  In other words, --

21       THE COURT:  Or that you acquired, or that were gained

22   by use, the way it reads.  If you had a Government tag on this

23   water, on your metaphysical theory, then you already had it.

24   You didn't didn't gain anything by using it.  Though you sort

25   of disclaimed that.

1319

1    Of course, being honest with me, this metaphysical

2    theory is an afterthought that you dug up here following one

3    of our arguments when things got going a little rough and you

4    did a little work and dug this theory up.  You didn't think

5    about that before, because you say, by your Paragraph II, you

6    have disclaimed any right that you might have this water with

7    a Government tag because you have said "rights to the use of

8    water which you may have gained."  It doesn't talk about any-

9    thing it had before.  If you had ever thought, when you signed

10   this stipulation, that you had some rights to tag this water

11   when it came down this stream, you never would have signed the

12   stipulation that said "may have gained by use...since the ac-

13   quisition of the Rancho Santa Margarita."

14       MR. VEEDER:  But, your Honor, there is only one thing

15   that I am asking you now, and that is that your Honor view this

16   stipulation.  I am not arguing the merits as to this tag or

17   inverse condemnation or anything else.  I'm simply petitioning

18   your Honor to enter an order saying that the stipulation did not

19   foreclose the United States in this litigation from advancing

20   any theory upon which it could have secured rights to use water

21   outside the watershed, and I respectfully submit that the order

22   as drafted now does preclude us from making all kinds of claims

23   or any kind of claim.

24       I think this, and I believe the Rules certainly sup-

25   port us on this proposition, that if a plaintiff is entitled

1320

1   to judgment upon any theory he is entitled to judgment -- he

2   may have had the wrong theory, but when he gets in his evidence

3   and he finds that he is entitled to judgment on a quantum

4   meruit basis rather than upon a State contract basis, the Rules

5   say that he is entitled to judgment.

6        Now, I view your construction, your Honor, and your

7   order of February 11, 1958, as precluding us.  For example, we

8   can put in the evidence and prove the right to the use of all

9   this water -- I don't believe it can be denied; I think Col.

10  Robertson proved it today -- that in 1951 we were diverting

11  and using water outside the watershed.

12       Our view in regard to this stipulation is that there

13  was no intendment on the part of the United States or on the

14  part of California to preclude us from advancing any theory or

15  to preclude the Court from granting us relief on any theory,

16  if the facts would support it.

17       THE COURT:  Wait just a minute.  Of course, I can see

18  coming up now two other motions, if I deny this one.  The next

19  motion will be that you had no authority to enter into the

20  stipulation and then you will want to have it set aside on that

21  ground, and then finally the motion that you have never made

22  and I asked you one time if you were going to make it and you

23  said, "Absolutely not," and that is a motion to be relieved of

24  the stipulation on the ground that substantial justice requires

25  that the Government have a right to litigate all its claims.

1     I prophesy a little bit here, looking through my glasses, what

2 will come along next.

3         But let us just assume for argument that this stipulation

4 was not in existence.  You are up against the same gun exactly

5 in Section 1225 that you would be up against without the sti-

6 pulation.  What is your position going to be?  Let's assume

7 that there is no stipulation, and so I permit you to make proof,

8 which I probably will, of the amount of water that you used

9 after you got the Rancho and the fact that the Fallbrook Public

10 Utility District and the Johnny-come-latelies have come along

11 later on and the area began to be settled up and people acquired

12 water.  Then what is your position going to be?

13     MR. VEEDER:  We are certainly confronted with this

14 question, your Honor:  Is the United States of America, wholly

15 aside from the stipulation, bound by Section 1225?  That is a

16 question of law, and we are confronted with it irrespective of

17 the stipulation.  There's no doubt about it.

18     THE COURT:  That is right.

19     MR. VEEDER:  And we all know it.  But your Honor's

20 order of February 11, 1958, says this, that because of Cali-

21 fornia law, which includes Section 1225, there is no other pro-

22 cedure than the California law for the appropriation of rights

23 to the use of water, and I submit --

24     THE COURT:  Now I have told you that we will look to

25 California law, what that Section means and whether it is valid.

1322

1   Now the mere fact that the Supreme Court of California may or

2   may not have held the statute constitutional or all-embracing

3   doesn't answer your question.  The question would be, what would

4   the Supreme Court of California do if there were squarely pre-

5   sented to it a problem of the United States having used water

6   and whether it was bound by the statute?

7           MR. VEEDER:  Yes.

8           THE COURT:  And then I have to determine, under

9   California law, how that statute would be interpreted, taking

10  into account, as a California Court would have to do, the Con-

11  stitution of the United States.

12          MR. VEEDER:  Yes.

13          THE COURT:  Because the California Court is required

14  very often to determine the constitutionality of the State

15  statutes from a Federal standpoint.

16          MR. VEEDER:  Right.

17          THE COURT:  And then if I make the wrong interpreta-

18  tion one thing happens; if I make the right one, another thing

19  happens.  You are up against the same gun.

20          MR. VEEDER:  I appreciate that, your Honor.  We are

21  up against the gun whether the United States can acquire a

22  right to the use of water in any manner.  We are confronted

23  always with the question whether Section 1225 prevents us from

24  using water absent compliance with the State law.  That is one

25  of the things with which we are confronted.  But there are other

1   ways, in our view, of acquiring rights to the use of water.

2   You have mentioned the metaphysical, prescription, the reserved

3   rights of the United States.

4        THE COURT:   The reserved rights -- now, that is a new

5   one.   What do you mean?

6        MR. VEEDER: A part of the metaphysical idea -- in

7   other words, there is an incorporeal hereditament that is in

8   the stream, and you may disagree with all those theories.

9        My objection, your Honor, is that your order of

10  February 11, 1958, reads to me as precluding us from acquiring

11  a right under any theory except the single theory of filing a

12  paper with the State Engineer of the State of California.

13       THE COURT:   That is not the way it reads.   You might

14  argue that my order, when I said that these rights would be

15  determined by California law -- you might argue, but you haven't

16  -- that that excludes any consideration of Federal law or Federal

17  constitutional law.   But that isn't true, because California

18  law would have to take into account the Federal Constitution.

19       MR. VEEDER:   Because this is part of the California

20  law.

21       THE COURT:   Because this is part of the California

22  law.   So that when I say "California law," that is broad enough

23  to include a consideration by the California Courts of the

24  constitutional provisions of the United States Constitution on

25  the impact and the meaning of Section 1225 and the Constitutional

1   Amendment.

2          MR. VEEDER:  And also whether the Action of 1877,

3   which separated the land from the water, conveyed away all the

4   rights to the use of water in the stream, in my view, and also

5   in regard to inverse condemnation.  That is the point that I

6   am making, that we would like to have this order revised to

7   permit us to proceed to get a right of any kind which the law

8   will support -- all law.

9          Now, I think, and the reason why this is extremely

10  important --

11         THE COURT:  Of course, you want to push all the but-

12  tons.  It seems patent to me that you couldn't possibly have

13  a right under inverse condemnation, regardless of the stipu-

14  lation.  I am practically prepared to write a memorandum and to

15  rule on that, with a few stipulated facts here, that stipulation

16  or no stipulation you haven't any case on inverse condemnation.

17         MR. VEEDER:  But, your Honor, our concern is that you

18  have so construed the stipulation that we couldn't advance that,

19  even though it is completely in error -- "excluded, therefore,

20  are claims by the United States"--

21         THE COURT:  I have always contemplated that since

22  this stipulation concerns only several parties -- I never

23  noticed that other language about "for the benefit of everybody

24  else," and I don't really know what it means -- but I had always

25  contemplated that I was going to have to rule on these matters

1  as a matter of law as to other parties, and this stipulation

2  seemed pretty simple to me.  In fact, my tentative thinking is

3  that most of my rulings would be much in accord with the sti-

4  pulation and my interpretation.  In fact, I thought you had done

5  a pretty good job on that stipulation.

6        MR. VEEDER:  I thought I had.

7        THE COURT:  I thought you had narrowed this case down

8  and made it pretty clear as to what you were claiming and what

9  law would apply.  I thought you had done a pretty workmanlike

10 job on it.

11       MR. VEEDER:  I did, too.  The point of it was, and as

12 Mr. Goldberg said and as your Honor said, that the stipulation

13 left it wide open from the standpoint of, how do you acquire

14 the right to use water outside the watershed?  Now I certainly --

15       THE COURT:  The Attorney-General, to this day, in his

16 memorandum indicates that that is a nice question.  I am not

17 sure what position the State of California would eventually come

18 up with on that.  It is a real nice question.

19       MR. VEEDER:  It is truly a nice question.

20       I would hate to have your order of February 11, 1958,

21 exclude our right to claim under inverse condemnation and have

22 a ruling on it.  I would hate to have this order of February 11

23 exclude the opportunity for us to claim that you can acquire a

24 right to the use of water without compliance with the  State

25 law and that that is the State law.

1          I would like to be able to prove, that the Rancho

2    Santa Margarita was using a large quantity of water within the

3    watershed under an appropriative right and that we are permitted

4    to take that water out of the watershed.

5          I think there are a great many principles that should

6    be tried out in this case in regard to use of water.  But I

7    think that the construction placed upon the stipulation by the

8    order of February 11, 1958, restricts us to one method of ac-

9    quiring a right, and I don't --

10          THE COURT:  Only because you think that some of these

11    other doors are pretty securely locked.

12          MR. VEEDER:  Oh, no.

13          THE COURT:  It doesn't restrict you from proving a

14    prescriptive right to the use of water downstream.  But you

15    are not talking about that, because you know that I am probably

16    right, that you haven't got a prescriptive right.

17          MR. VEEDER:  I don't care if the door is slammed in

18    my face --

19          THE COURT:  I'm not talking about slamming.  I'm talk-

20    ing about just locked by Court decision.

21          MR. VEEDER:  I don't care if a Court decision locked

22    the door.  I don't want the stipulation of November 29 con-

23    strued to say, "It doesn't bother you, boy, whether that door

24    is locked or not, because you stipulated that you couldn't go

25    there and knock," and that is what it amounts to and that is

1  what your interpretation means.

2      THE COURT: Let me interrupt you for a minute.  I have

3  a Rotary lunch this noon.

4      MR. VEEDER: Excuse me, your Honor.

5      THE COURT:  Mr. Stahlman, you wanted to say something?

6      MR. STAHLMAN:  Are you coming back at 2:00 o'clock?

7      THE COURT:  I will be back here this afternoon.  I

8  suggest that we come back and talk a little more.

9      MR. STAHLMAN:  I think so, your Honor.  Although we

10  are not part of the stipulation, I would like to, because I see

11  some matters as to what may occur in the future which will af-

12  fect some of our problems.  We have five affirmative defenses

13  and some of them are a little inconsistent.

14      THE COURT:  Why don't we do this?  You have a secretary,

15  haven't you, Mr. Veeder, here?

16      MR. VEEDER:  I can get one.

17      THE COURT:  Why don't you summarize succinctly your

18  various theories that you want to advance on this water up

19  there that is being used outside the watershed?  That is what

20  we are talking about now.

21      MR. VEEDER:  Yes.

22      THE COURT:  State them succinctly but enough to identi-

23  fy these theories, and if you are not ready by 2:00 o'clock,

24  whenever you get ready, come in and let's have a look at them

25  in writing and see how many of them are foreclosed by this

1    stipulation.

2              MR. VEEDER:  How many are foreclosed?

3              THE COURT:  How many, if any, are foreclosed by this

4    stipulation.  Let's have a complete list of all your theories

5    that you have advanced.

6              MR. VEEDER:  Very good.

7              THE COURT:  Good or bad, for this water that you are

8    using outside the watershed.

9              MR. VEEDER:  I'll be glad to -- in fact, I'm anxious

10   to, and I will try to have it by 2:00 o'clock.

11             THE COURT:  It doesn't have to be long.

12             MR. VEEDER:  No.

13             THE COURT:  We have been kicking them around, we know

14   generally what they are, but let's have them all dragged out

15   and laid alongside the stipulation.

16             MR. VEEDER:  All right.

17             THE COURT:  Adjourned until 2:15 o'clock this afternoon.

18             (Noon recess.)

19

20

21

22

23

24

25

1   SAN DIEGO, CALIFORNIA, THURSDAY, MAY 22, 1958, 2:00 P.M.

2            (Other matters.)

3            THE CLERK:  No. 1247-SD-C, United States of America

4   v. Fallbrook, etc., et al.

5            THE COURT:  Has everybody got a copy of the little

6   sheet that Mr. Veeder gave you?

7            MR. MOSKOVITZ:  Yes, your Honor.

8            THE COURT:  Going down this list, No. 1, rights to

9   the use of water claimed and exercised by the United States in

10  the Santa Margarita River for Camp Pendleton outside the water-

11  shed -- I think there are only two there that I presently see

12  that present any problem -- one by changing the point of di-

13  version and place of use of water under a claimed appropriative

14  right from inside the watershed to outside the watershed.

15           MR. VEEDER:  Very important to us, your Honor.

16           THE COURT:  You are now talking about something that

17  you did after you acquired the Rancho Santa Margarita.  If so,

18  you come within "use."  If it something that Santa Margarita

19  did beforehand, you are heir to whatever Santa Margarita had,

20  whatever it is.  Either way you look at it, I think one comes

21  under the word "use."

22           Does anybody have any objection to that?

23           MR. MOSKOVITZ:  I have no  objection.  I just want a

24  little clarification.

25           As I understand it, this would be consistent with the

1      stipulation if the claimed appropriative right inside the water-

2      shed was established as valid under California law and the

3      change of the point of diversion and use to outside the water-

4      shed was shown to be consistent with California law.   Then I

5      would feel that it would be consistent with the stipulation.

6            MR. VEEDER:   Of course, that is where the trouble

7      comes in, because the California law, under the order of

8      February 11, 1958, would require the United States to go to the

9      State Engineer's Office and file an application and request per-

10     mission to make that change.

11           Now we submit that we are not thusly controlled under

12     the law of California.  We say that, for example, if we desire

13     to use our appropriative rights in Lake O'Neill outside the

14     watershed without placing a greater burden on the stream or in-

15     fringing anybody's rights, we can do so without complying with

16     the laws of California which require a request for permission

17     from the State Engineer to do that.

18           Now I don't believe, and certainly I know that I did

19     not stipulate, that the Marine Corps would have to go and ask

20     permission to make that change.

21           There are other rights equally important to us.   Now

22     I am pointing to our Exhibit 5.   There are areas which are de-

23     signated down here in 22 area and 23 area, and probably in the

24     20 and 31 areas, and up here in the 26 area, where the Rancho

25     Santa Margarita, prior to 1914, was, in our view, appropriating

1   and using water.  We intend, indeed I think we are now diverting

2   that appropriative water outside the watershed without complying

3   with the laws of California in regard to the change of point of

4   diversion and place of use.

5           I submit that the stipulation did not comprehend, and

6   certainly none of us comprehended, that the word "measure"

7   would require us to go and ask the State Engineer, "Please, we

8   have got a lot of Marines, Mr. State Engineer, will you let us

9   use our water outside the watershed?"

10          THE COURT:  Well, are your claims, under Item No. 1,

11  claims that existed as of the date you bought the Rancho Santa

12  Margarita?

13          MR. VEEDER:  Yes, your Honor.

14          MR. MOSKOVITZ:  May I be heard on that point, because

15  I think Mr. Veeder is misinformed as to California law here.

16  I would like to correct it.

17          With respect to appropriative rights which vested

18  under prior to 1914 law in California, there is no requirement

19  that to change the place of use there must be an application to

20  and a permit from the California State Water Rights Board.   The

21  place of use may be changed as long as it does not deprive any-

22  one else of a valid right to water.   It is only with respect

23  to rights which vested pursuant to procedure established in

24  1914 by the Water Commission Act that there must be that per-

25  mission for change of use.

1    THE COURT:  In other words, rights that antedated

2  1914, if it were a valid appropriative right, then the individ-

3  ual who owns that righ can change the point of use of that

4  water and it is nobody else's business.

5    MR. MOSKOVITZ:  As long as it doesn't harm anyone

6  else in so doing.  In this case I don't see how it could.

7    THE COURT:  Harm anyone in the sense of taking water,

8  because you presuppose the valid appropriative right to a cer-

9  tain amount of water.

10    MR. MOSKOVITZ:  There are certain fact situations

11  where it could.  I don't think they apply here.  For example,

12  if somebody upstream had an appropriative right which he used

13  inside the watershed and the return flow went back into the

14  River and somebody had been appropriating downstream, if he

15  thereby changed the use to outside the watershed, there might

16  be harm.  That is the only qualification.  Here I don't think

17  it would be true.

18    MR. VEEDER:  I would like to check it.

19    No, 1, I am not accepting Mr. Moskovitz's interpreta-

20  tion of the law, to begin with.  I don't believe it is right.

21    THE COURT:  You would like to have that the law,

22  wouldn't you?

23    MR. VEEDER:  No, because so far as I am concerned we

24  are going to divert and apply that water outside the watershed,

25  and I submit that your order as written now, your Honor, would

1333

1   preclude us from doing that.   I don't believe that we are re-

2   quired to ask the State of California for any permission to do

3   anything at any place.

4   THE COURT:   He says that you are not required.

5   MR. VEEDER:   I don't believe he is right.

6   THE COURT:   Let's assume for argument that he is.   I

7   don't see any problem here, because everything you claim under

8   Item No. 1 you claim was a right that Rancho Santa Margarita

9   had before you condemned the property.   Therefore, if it is a

10   right that you had when you bought the Rancho Santa Margarita,

11   then the stipulation provides that you claim whatever right

12   Rancho Santa Margarita had.

13   MR. VEEDER:   Yes,

14   THE COURT:   You stepped into their shoes.   If   they

15   would have the right to change the point of use of appropriative

16   water, the Government has the right.   I don't see much of a

17   problem on that.

18   MR. VEEDER:   Well, your Honor, the problem shouldn't

19   be there, but it is here:

20   "Paragraph IV of the stipulation means that the

21   measure of the rights claimed by the United States

22   in this action is all the laws of California,"

23   and would include the right to change the point of diversion

24   and place of use.

25   THE COURT:   Well, now, wait, you are setting up a

1334

1   strawman and arguing to me that that is the law.   I understand

2   that this business of control over change of point of appro-

3   priation was part of this law that came in after 1914.

4        MR. VEEDER:   I will say this, that the right to change

5   the point of diversion and place of use is a right controlled

6   by the laws of California, and as Mr. Moskovitz says if there

7   is a threat or a danger that someone is hurt or could be hurt

8   or that our rights would be expanded, then someone can come

9   along and ask that we be prevented from making that change.   And

10  I submit --

11       THE COURT:   You are the downstream user.   How could

12  anybody else be hurt?

13       MR. VEEDER:   Because they are saying that we are

14  putting a bigger burden on the stream.

15       THE COURT:   It wouldn't make any difference.   An

16  appropriative right is a right, not a correlative right.

17       MR. VEEDER:   No.

18       THE COURT:   An appropriative right is a right to a

19  certain amount of water.

20       MR. VEEDER:   Here is the point, though, your Honor,

21  and this matter is in issue and will be in issue.   Right now

22  we are claiming 4,000-plus acre feet for Lake O'Neill.   It is

23  our view that we can move that water outside the watershed

24  without applying for a right from the State of California.

25       THE COURT:   Is there anybody else downstream of Lake

O'Neill?

1          MR. VEEDER: No, but the claim will be that we are

2   changing a storage right to a direct-flow right, that is pre-

3   cisely the point, and I say that we don't have to comply the

4   law of California to do that.

5          THE COURT:  You can look up some law and advise me on

6   that.  I'm not going to argue with you about it, if you don't

7   know what the law is.  You tell me you don't know.

8          MR. VEEDER:  Well, I do. I think I know what the law

9   is.  I have been in points-of-diversion in many proceedings

10  involving the point of diversion and place of use, and I know

11  what the statutory police regulations are in regard to it.  Now

12  it may be that under the new laws if there is some proviso that

13  has changed it, fine.

14          But my point is this, that if the Marines choose to

15  do so, they should be permitted without compliance with the

16  law of California to divert all of the water from Lake O'Neill

17  outside the watershed.  They should be permitted without re-

18  gard to the law of California to take their appropriative waters

19  that were used on the sugar beet areas, on the alfalfa areas,

20  dating back to 1913, without regard to the law respecting the

21  change of point of diversion and place of use.

22          Now the point I make, again, is that the State of

23  California should have no controls whatever.  But as your order

24  stands --

25          THE COURT:  As my order stands, suppose that there

1330

1    are some California laws that say that you can't do that.   Then

2    you might have a point.

3               Let's quit supposing.  I have your point.   If you

4    have some California authorities, cite them to me.

5               MR. MOSKOVITZ:  Would it be helpful if I read the

6    statute?

7               THE COURT:  Yes.

8               MR. MOSKOVITZ:  The specific question covering Mr.

9    Veeder's situation, that is, assuming an appropriation prior

10   to 1914, is Water Code Section 1706, and I will read that:

11              "The person entitled to the use of water by virtue

12          of an appropriation other than under the Water Com-

13          mission Act or this Code may change the point of di-

14          version, place or use or purpose of use, if others are

15          not injured by such change, and may extend the ditch,

16          flume, pipe or aqueduct by which the diversion is

17          made to places beyond that where the first use is made."

18              This is to be contrasted with the situation where

19   the appropriation was under the Water Commission Act.  I will

20   read that Section to you, because I think that is what Mr.

21   Veeder had in mind -- Water Code Section 1700:

22              "Water appropriated under the Water Commission

23          Act or this Code for no specific purpose shall not be

24          deemed to be appropriated for any other or different

25          purpose, but the purpose of use of such water may be

changed as provided by this Code."

Section 1701 continues:

"At any time after notice of an application is given, an applicant, permitee or licensee may change the point of diversion, place of use or purpose of use from that specified in the application, permit or license, but such change may be made only upon permission of this Department."

Section 1702:

"Before permission to make such change is granted, the petitioner shall establish to the satisfaction of the Department and it shall find that the change will not operate to the injury of any legal user of the water involved."

There are a few other procedural Sections as to how the water rights will be acquired.

THE COURT: Let me ask you this. He has postulated two different propositions: One, to move the use of water which he claims the Government has appropriative rights to, to some beet fields, we will say, off of the watershed; and then he makes reference also to Lake O'Neill. Now, there water is in storage. How could anyone be hurt upstream by what the Government did downstream? Assuming that the Government had a right to store water in Lake O'Neill, where would anyone be hurt if they continued to store it there and then moved part of

1338

1    it or all of it at their convenience outside the watershed?

2         MR. MOSKOVITZ:   If you postulate that situation, I

3    can't right now visualize any damage to anyone else.

4         MR. VEEDER:   May I ask a question?  Do you interpret

5    that first statute that you read to mean that we can divert all

6    of the Lake O'Neill water out of the watershed without com-

7    pliance with State law?  This statute doesn't refer to storage

8    water at all.

9         MR. MOSKOVITZ:   It doesn't.

10        MR. VEEDER:   No, it doesn't.

11        MR. MOSKOVITZ:   It doesn't talk about storage water.

12   Of course, appropriations may be either direct diversion or

13   storage for later use.  In either case, of course, there is no

14   appropriative right that can be created unless there is a bene-

15   ficial use of the water at one time or another.  Storage alone

16   does not result in an appropriation.  There must be the appro-

17   priative right arising.  There must be some use.  But assuming

18   that there was storage and use out of Lake O'Neill as a storage

19   site, offhand, looking at the statute, I don't see why that is

20   not as capable of being changed as a direct diversion right.

21   That point I have   not researched.

22        The point I would want to make is that permission,

23   if you have a prior to 1914 right, in order to make a change --

24        MR. VEEDER:   I asked you a question whether you think

25   it applies to our appropriative right to Lake O'Neill.

1          MR. MOSKOVITZ:  I would like to check that.

2          MR. SACHSE:  The whole rub is, under the law of the

3    State of California do these several rights exist?  If an appro-

4    priative right exists in Lake O'Neill, then this Section

5    will apply.  But Mr. Veeder is saying, can we divert the water

6    in Lake O'Neill?  Before you can answer that question you must

7    find that there is an appropriative right.

8          MR. VEEDER:  I think all of us understand that the

9    case hasn't been tried.

10          The reason I brought up and referred first to Lake

11    O'Neill is that the statute makes no reference to storage rights;

12    it makes no reference whatever to this kind of type of situation.

13    I believe the Marines have the right --

14          THE COURT:  How far back does Lake O'Neill go?

15          MR. VEEDER:  1883, and I might add this --

16          THE COURT:  Well, I think we are wasting time about

17    Lake O'Neill.

18          MR. VEEDER:  Here is the point I make, that I am very

19    sure that the day that we ask this Court to enter a decree per-

20    mitting us to use all of our Lake O'Neill water, either inside

21    or outside the watershed, there will be an objection that the

22    law of California would not permit us to do so.

23          THE COURT:  I have your point on Item No. 1, and I

24    don't think it is too much of a problem.  If you want to look

25    it up and have some law contrary to the Sections that have been

1   read, you may do so.

2        MR. VEEDER:   I want to add one more bite out of that

3   apple.   I want it understood that we are claiming the right to

4   change this storage right from a storage right to a direct-flow

5   right, if we choose to do so.

6        MR. MOSKOVITZ:   May I ask a couple of questions just

7   to make sure that I do understand Mr. Veeder's contention.

8        First of all, you are relating the appropriative

9   right to claim within the watershed to a right which was ac-

10  quired before 1914; is that correct?   You are not talking about

11  something that was acquired since then?

12       MR. VEEDER:   Again, we get into a difficult problem,

13  for this reason.   We are in this situation.   The evidence will

14  show that the size of Lake O'Neill has been increased somewhat

15  since 1913-1914.   So we have some rights that go back to 1883

16  for a certain quantity of stored water.   We have other rights

17  which we claim that are an increased burden on the stream for

18  Lake O'Neill because of increased storage capacity.   So you

19  have two situations -- in fact, you have three situations.   You

20  have our assertion of the right to change from a storage right

21  to a direct-flow right -- and I know what will happen on that

22  one; we have a claim from 1883-1913 for a certain quantity of

23  stored water; and from 1921, I believe  it is, for another

24  right.   Now we say that we are permitted to do that.   But if I

25  construe the meaning of this Paragraph IV-C, we are not permitted,

1 based upon your interpretation of the stipulation, to do so.

2          THE COURT:  Well, now, Mr. Veeder, I have been all

3 over this before.  I have asked you to cite to me authority

4 why you can't do it as to rights you acquired before 1913.  As

5 to rights that you claim after 1913-14, there is a different

6 legal problem involved.

7          MR. VEEDER:  Yes.

8          THE COURT:  And I realize that as to those rights

9 that you claim afterward, we are back to the same problem that

10 we were about California law.

11          MR. VEEDER:  Yes.  All I am doing is bringing up the

12 reasons why I think that the interpretation of the stipulation

13 is so harsh.

14          Did you want to say something?

15          MR. MOSKOVITZ:  May I ask Mr. Veeder another question?

16          When you say that you want to change the storage

17 right into a direct diversion right, do you mean to say that

18 you would assert the right to divert directly at different

19 times than you did in order to store the water?

20          MR. VEEDER:  Quite conceivably.

21          MR. MOSKOVITZ:  At different times in the year.

22          THE COURT:  That injects an entirely different ele-

23 ment.

24          MR. MOSKOVITZ:  Yes, it certainly does.

25          MR. VEEDER:  I say this, that we claim, as to the

1342

1   quantity of water right here in Lake O'Neill, that we can divert

2   and make changes without regard to California law.

3          MR. MOSKOVITZ:  I think I would like to say something

4   here, your Honor.  I hope it is helpful.  It seems to me that

5   Mr. Veeder has revealed one of the basic fallacies in the legal

6   thinking of the United States in this case, and that is to argue

7   that a water right relates only to quantity -- it is a right to

8   a quantity of water, and that isn't the only characteristic of

9   a water right.  A water right is a right to a certain quantity

10  of water at certain times for certain uses in certain places.

11  That is what a water right is.  All of those are characteristic

12  of the property rights.

13         MR. VEEDER:  If there is anything more elementary

14  than that statement, I'll quit.

15         THE COURT:  In other words, you agree.

16         MR. VEEDER:  Sure.  Priority and quite a number of

17  other things -- appropriation of rights to the use of water

18  through the actual diversion and application of water to a

19  beneficial use outside the watershed.

20         THE COURT:  How does this differ from Item No. 1?

21  This is something you did after you got the Rancho?

22         MR. VEEDER:  Yes, conceivably.

23         THE COURT:  Again, doesn't that come within the word

24  "use?"

25         MR. VEEDER:  Yes, it comes within the word "use."

1  But when we say "measured by the laws and procedures of Cali-

2  fornia," as you have it in your Paragraph IV-C, then, as I see

3  it, we are foreclosed from trying that question out.

4          THE COURT:  Is your contention that you have a right,

5  after you acquired the Rancho Santa Margarita, to appropriate --

6          We are talking now about water that was not previously

7  appropriated.

8          MR. VEEDER:  That is right.

9          THE COURT:  -- to appropriate and to get a good title

10  to that water against upstream users?

11          MR. VEEDER:  Yes.

12          THE COURT:  Just on the Government's say-so by taking

13  it out and using it?

14          MR. VEEDER: Just simply by diverting and applying it

15  to a beneficial use.

16          THE COURT:  What law would pass on that, Federal law --

17  the Government's sovereignty as the Government of the United

18  States, or do you think that any person would have that same

19  right?

20          MR. VEEDER:  I truly believe that any person would.

21  But, your Honor, I think there is a very, very important factor

22  there and certainly a factor, if we review the hearings that we

23  had on December 3, 1951, that one of the big questions that was

24  before us at that time was whether the United States was or

25  could be subjected to the police power of the State of California,

1  and that is what I have been driving at all day long in regard

2  to this question.

3          We deny that the United States of America was or

4  could be bound by the police regulations which govern the appro-

5  priation of rights to the use of water or the change of point

6  of diversion and place of use.  Certainly it was within the

7  contemplation of every man who signed that stipulation that I

8  denied completely, and no one ever believed, that I stipulated

9  that the police regulations of the State of California would be

10 applicable to the United States.

11         I simply say, your Honor, that there is not a scintilla

12 of evidence, whether we reach into the vagaries of the Con-

13 gressional hearings or anyplace else, that I agreed, indeed I

14 wouldn't have the power to agree, that Article VI of the Con-

15 stitution of the United States could be abrogated, and that is

16 what it amounts to.

17         Article VI, as we all know, simply provides that the

18 laws of the United States are  the supreme laws of the land,

19 and that is precisely what is involved here.  Do we have to

20 ask the State of California for anything?  No.  And I submit

21 that I couldn't stipulate to that control.  Nor did I.

22         THE COURT:  The position that you are taking now and

23 the position that you took in the stipulation that the United

24 States claims, by reason of its sovereign status, no right to

25 a greater quantity of water than stated in Paragraph II?

MR. VEEDER:  That is precisely the point, your Honor.
We are simply saying that as of the date --

THE COURT:  If you are saying that you are a sovereign
and therefore are not subject to the police power of the State,
then you are talking exactly contrary to Paragraph III of the
stipulation.

MR. VEEDER:  No, your Honor.  The reason that Mr.
Goldberg's statement is so important is this, that the question
and the only question at that time was whether the United States
was going to increase the burden on the stream by reason of its
sovereignty, and I said, "No," and if you will observe in the
report of the hearing on December 3, 1951, there are two e
important elements upon which we bore down.  The police re-
gulations, we said, could not apply to the United States, but
we always said this, that we desire to increase the burden on
the stream over and above the rights which we were then exer-
cising because we had no other claims.  But certainly Arvin
Shaw and the rest of them had no conception that I was agreed
that the police powers could apply to us.  Now that is why your
Honor touched on an important point.

I simply say this, that I would have been powerless
to enter into such an agreement, and yet that is precisely what
is said here in Paragraph IV-C.  Now in regard to that, I
don't need to bear down on that anymore.  We have gone into it.

I simply say that if the evidence shows that we did,

1    to some degree -- it wouldn't be very much -- increase the

2    quantities of water that we are taking out of the watershed

3    above the Rancho Santa Margarita, if we did that prior to 1951,

4    we were not controlled by the law of California and we would

5    not have to take steps in connection with that law.

6          THE COURT:  Now here again, what is the difference

7    then, between saying that you are a sovereign and you can take

8    what you want and ignore California law -- that is the very

9    thing you were trying to avoid when you entered into this sti-

10   pulation.   There was a lot of heat on the Government because of

11   what they were going to do and the stipulation was entered into,

12   there isn't any doubt, to quiet down the fears of the people

13   that the Government would go in there and claim a sovereign

14   right, the right as a sovereign to take what it wanted of the

15   water.

16         MR. VEEDER:  But, your Honor, the important thing in

17   that regard is that we and Mr. Goldberg cleared that up, too,

18   in my view.  Mr. Goldberg stated and we all knew that Arvin

19   Shaw was very much interested at the time in having us agree

20   that we were not a sovereign and that we were controlled by the

21   police regulations of the State.

22         THE COURT:  I never heard anything in what Mr. Gold-

23   berg said about talk about police regulations.

24         MR. VEEDER:  Well, it is in the record, your Honor.

25         Now the second point that I wish to make, in that

1347

1  connection, is that at the time that the stipulation was enter-

2  ed into there was one fear, that the United States, by reason

3  of its sovereign capacity, was going to claim a greater quantity

4  of water at some subsequent time by reason of the alleged para-

5  mount right.

6       Now the idea at that time was to reduce the rights

7  that the United States had -- I know personally the idea was

8  that we could not, by reason of our sovereignty, reduce the

9  riparian rights which were upstream.  At the very moment that

10  that stipulation was entered into, we knew, and the world knew,

11  that Fallbrook had applications ahead of us, so it would have

12  been a futile act on our part to file on the stream because we

13  know that Fallbrook's priority would have taken all the water

14  that would have been available.  So if we were to initiate new

15  rights --

16       THE COURT:  That isn't the law, that priority alone

17  controls.  Time controls the granting of an appropriative right.

18       MR. VEEDER:  I believe that it is, your Honor.

19       MR. SACHSE:  If you want a good example, your Honor,

20  the very permit that Mr. Veeder is concerned about today that

21  Fallbrook holds, the decision for which I have right here in

22  the briefcase, rejected prior applicants and gave it to Fall-

23  brook.  If there is any question about that phase of the law,

24  that the first in time doesn't get it, we have the finest proof

25  in the world before us.  If priority of application is all that

1    is necessary, the Water Rights Board need only consist of a

2    clerk and a time and date stamp.  You don't need a Water Rights

3    Board, just stamp them as they come and give it to the first in

4    line.  But that isn't the law.

5            MR. VEEDER:  Rest assured it was certainly the law at

6    that time.  I believe it is still the law, because I don't be-

7    lieve the State of California or any sovereign could confer the

8    arbitrary powers which the State Board is attempting to exercise

9    now.  I simply deny that that is the law, and I believe it will

10   be tested out and be proved to be right.

11           But the point I am trying to make is this --

12           THE COURT:  I know your point.

13           MR. VEEDER:  Well, the point I am trying to make is

14   that, as far as I am concerned, I certainly didn't stipulate

15   to that.

16           Now, in regard to the Vail Estate and the rights of

17   the Vail Company, there is a very important factor there.

18           We claim -- I am pointing to Exhibit 5 -- that the

19   Vail Estate delivers into the Santa Margarita River water to

20   which we are entitled by contract.  We believe that that water

21   delivered into there by the Vail Estate or permitted to run

22   down to us from the Vail Estate is not subject to appropriation

23   under the laws of California.

24           We believe that for the reason that that water would

25   not be there were it not for our stipulated judgment, for

1349

1    certainly the Vails can't use it all and dry up the whole stream.

2    Yet if I understand the meaning of this here, that we might have

3    the doors shut to us, I'm not saying whether we are right or

4    wrong --

5         THE COURT:  Wouldn't that problem be decided by Cali-

6    fornia?

7         MR. VEEDER:  I am not sure, for this reason.  Assuming

8    that the Rainbow Creek District undertook to prosecute its con-

9    demnation proceeding, and it is a party to this stipulation --

10        MR. SACHSE:  Who is?

11        MR. VEEDER:  The Rainbow District.

12        MR. SACHSE:  Rainbow didn't sign the stipulation.

13        MR. VEEDER:  I didn't say that it did.  I said that

14   this stipulation is for the benefit of all parties, and the Cali-

15   fornia signed parens patriae.  The point I make is that the

16   first time that the Rainbow Irrigation District attempts to con-

17   demn under California law the rights in the Vail Estate, I mean

18   actually prosecutes that, we will  simply step in and say, "As

19   a sovereign, you can't touch that, because we have a vested

20   right in that  water and it is not subject to condemnation,"

21   and yet it is entirely possible that this order of February 11,

22   1958, could be construed to mean that I stipulated that we

23   wouldn't assert that power in regard to our interests to parti-

24   cipate in the Vail water.

25        THE COURT:  I think it would be very unfair if that

1330

1    happened to you, because as between you and Vail your rights

2    are fixed.   But I think the way the stipulation into which you

3    entered reads it might well be subject to that interpretation,

4    because I have this disclaimer of any right as a sovereign.  You

5    apparently weren't even thinking about the fact that somebody

6    might try to condemn the rights that you have.  Now you think

7    about it and then the stipulation doesn't read good to you. --

8    "The United States claims, by reason of its sovereign status,

9    no right to a greater amount of water than it stated in Paragraph

10   II."  Well, now, of course, it may be that that is taken care

11   of, because you claim what you purchased from the Rancho Santa

12   Margarita, any right that you had growing out of Vail's dealings

13   with the Rancho Santa Margarita.  So you probably haven't got

14   any problem there.

15        MR. VEEDER:   Of course, I truly think we have, your

16   Honor.

17        THE COURT:  What is your next item here?   Prescription --

18   I guess we needn't talk about that, unless you have some new

19   angle on it.

20        MR. VEEDER:   There are rights, we think, that are

21   there.

22        MR. MOSKOVITZ:  May I ask a question on that.

23        Are you asserting that the standard or the rules on

24   prescription that govern you are rules other than those estab-

25   lished by California law, as to Item No. 5?

1          MR. VEEDER:  No.

2          MR. MOSKOVITZ:  Why not?

3          MR. VEEDER:  I don't think it is any of your business

4    why or why not?  I'm simply saying that the way we are acquiring

5    prescriptive rights, I know of no other law than the California

6    law for that.  This, Mr. Moskovitz, was prepared at the request

7    of the Court as to the varieties of ways that we might claim

8    water.

9          Now, in regard to No. 6, we talked about --

10         THE COURT:  You just talked about Item 6.  Item 6 is

11   the word that hurts you, that phrase that disturbs you.

12         MR. VEEDER:  Concerning which I suffer.

13         THE COURT:  That is right.

14         MR. VEEDER:  Yes.  I assure your Honor that when the

15   stipulation was signed we didn't slam that door, nor did we

16   slam that door as to the kind and type of rights we claim.

17         THE COURT:  You hadn't thought about that point at that

18   time.

19         MR. VEEDER:  No; that is true.  But, your Honor, as

20   I say to you now, I have tried a great number of lawsuits in my

21   day and there is an amazing number of them that are won by this

22   reason, you try it clear across the board, and this might be

23   called shotgunning because when you try a lawsuit you go in to

24   win it and you go in hard to win it and you win it on any theory

25   that the Court will go with you, and I certainly slam no doors,

1  I intended to slam no doors, and I surely hope that no doors are

2  slammed by reason of your order of February 11.

3      THE COURT:  When I tried the treason case, one of the

4  G.I.'s who had been a prisoner on Bataan and a flyer said to

5  me after Court one day about the defense lawyer, "You know, the

6  way this lawyer operates makes me think of when we used to go

7  on bombing missions.  We always hoped our eggs would hit, and

8  if they didn't hit, we hoped they would splatter."  That is what

9  you are doing here, and it is all right -- I don't blame you.

10 You want to raise every possible point that you can in the

11 hope that if you don't make a direct hit, there might be enough

12 splatter around on one of them that you might sneak through on

13 it.

14     MR. VEEDER:  Right.  I'll say this, I don't believe

15 there is a trial man alive who doesn't do it, and do it every

16 day, or else I'll tell you he is not going to be very successful.

17     THE COURT:  We have agreed that Item No. 6 was some-

18 thing that you thought about after this.

19     MR. VEEDER:  Not necessarily, your Honor.  I agree on

20 this reference to incorporeal hereditament.  But I have never

21 put from my mind the sound basis of law that when the Act of

22 1877 separated the land and the water that there was reserved to

23 the United States the unappropriated water until such time as

24 that water was appropriated, and that is all that that says

25 there.

1353

1    I confess that I had never said "incorporeal heredita-

2    ment" until one day we started arguing about it, but I have al-

3    ways believed and I still believe, and we wrote the briefs in

4    the Pelton case on the basis of this very theory and it was very

5    successful.

6        So the point I make is that that is certainly not, in

7    my view, provided for in the statutory procedure for the ac-

8    quisition of rights to the use of water.  Yet I believe that

9    your Honor would be doing a grave injustice to shut the door on

10   us by reason of that interpretation because we use the word "use."

11   We use the word "use" in the broadest conceivable sense.  We

12   would have used 'appropriation" --

13       THE COURT:  Ordinarily this stipulation just binds the

14   parties who sign it.  You are trying this case against a lot of

15   other people.  I am going to have to rule on this matter as to

16   other people apart from the stipulation, unless that little

17   phrase that you have in there has any meaning, and I was tenta-

18   tively of the view that the law was in accord with the stipu-

19   lation.  That is why I thought you did such a nice job on the

20   stipulation.

21       MR. VEEDER:  I did a nice job.  The thing that

22   worries me, your Honor, is that if your Honor's interpretation

23   is applied to the stipulation, I was powerless to sign it.  I

24   will concede that I had power to sign it the way I believed it

25   to be, but I certainly did not have the power to foreclose

1354

1   myself from claiming the ownership of the unappropriated water

2   or the incorporeal hereditament.

3               THE COURT:  Did you tell this last Congressional Com-

4   mittee anything about these new ideas you have since you appear-

5   ed before me the last time?

6               MR. VEEDER:  Oh, yes.

7               THE COURT:  You did?

8               MR. VEEDER:  We went into great detail in regard to

9   the reserved water rights.

10              THE COURT:  "Reserved water rights" -- that is a

11  phrase you used this morning.  I couldn't pick up what you

12  meant.

13              MR. VEEDER:  It is the same thing as Item No. 6.

14              THE COURT:  The same as incorporeal hereditament?

15              MR. VEEDER:  Yes.

16              THE COURT:  I'm talking about the Congressional Com-

17  mittee hearings.

18              MR. VEEDER:  I think I talked about reserved water

19  rights.  I'll go back and tell them that that is a term I tossed

20  in.

21              The next one is inverse condemnation.

22              And the next one is compliance with the State law.

23              The example that Mr. Moskovitz wrote into this order

24  as to -- in Paragraph IV 2-c, appearing on page 84, the state-

25  ment where he says, "Excluded, therefore, are claims by the

1  United States of rights acquired by inverse condemnation, since

2  the law by which such rights would be measured is Federal law

3  as set forth in the decisions of Federal Courts involving in-

4  verse condemnation by the United States and not California law.

5  I submit, your Honor, that the stipulation signed by

6  me and by the representatives of California, as Mr. Goldberg

7  very emphatically stated, did not foreclose us of advancing any

8  theory as to how we could acquire a right, and as I say, I know

9  no trial man who would sit down and say, "I'm going to put a

10  straitjacket on myself when I go into Court." So when we use

11  the term "use" -- I'll say this for Mr. Moskovitz, when he

12  whipped up this order, he is right -- the word "use" is a very

13  broad term, indeed it is the broadest term we could get, and

14  that is why we used it. We certainly didn't limit ourselves

15  to appropriation, we certainly limited ourselves not at all,

16  for precisely the same reason as I have just stated, that it

17  would be a very, very smart lawyer who could envision all series

18  in regard to rights to the use of water.

19  THE COURT: Tell me succinctly, since you are now

20  saddled with this stipulation, why you ever entered into it in

21  the first place.

22  MR. VEEDER: Because the Congressional Committee and

23  the other Committees, stirred up by misrepresentations from

24  Fallbrook, demanded that we specify what we meant by the word

25  "paramount," and so we did that.

1          THE COURT:  And what you claimed.

2          MR. VEEDER:  And they wanted to know what quantity of

3     water we were claiming.

4          THE COURT:  Quantity?  Did these Congressional Com-

5     mittees ever talk about quantity?  Or did they talk about what

6     rights you claimed?  If they talked about quantity, you gave

7     the Congressional Committee the runaround, because you didn't

8     use the word "quantity" in your stipulation.

9          MR. VEEDER:  Yes, it is in there.

10          THE COURT:  Are you sure that the Congressional Com-

11     mittees didn't say, "What rights is the Government claiming?"

12          MR. VEEDER:  May I continue, may I call your attention

13     to the language used, "The United States claims, by reason of

14     its sovereign status, no right to a greater quantity of water

15     than is stated in Paragraph II."  We use "quantity" right in

16     the language of the stipulation, and it was certainly --

17          MR. SACHSE:  Not in Paragraph IV.

18          MR. VEEDER:  In Paragraph III it is.

19          The point I make is that we were talking quantity-

20     wise.  We were assuring riparian users.  We looked at Fallbrook

21     as we do now.

22          THE COURT:  Of course, Paragraph II tells what rights

23     you claim, and then Paragraph III does use "quantity" but refers

24     back to Paragraph II.

25          MR. VEEDER:  That is right.

1    THE COURT:  So in Paragraph II you set forth what

2  rights you assert, and in Paragraph III you disclaim that, by

3  reason of those rights, you claim any right to use a greater

4  quantity of water than that arising from the rights set forth

5  in Paragraph II.

6    MR. VEEDER:  But the answer to your question, your

7  Honor, is precisely that.  We said this, that the Marines are

8  using this water down here now.  Conceivably there is some water

9  over and above that which we purchased, although I am not sure

10  that there is at all, but we took the position that should the

11  proof disclose that we were using water outside the watershed

12  in excess of that which we acquired from the Rancho we wanted

13  to be protected.

14    THE COURT:  You have never said that.  That is a

15  pretty simple statement.  You have never said that in the sti-

16  pulation.

17    MR. VEEDER:  But that is what we do say, your Honor,

18  exactly.

19    THE COURT:  In case the Marines are using more water

20  outside the watershed, then -- what was the rest of it -- you

21  want to be protected?

22    MR. VEEDER:  Yes, and that is what it says; the rights

23  to the use of water that it acquired by purchase from the Rancho

24  Santa Margarita, together with any rights to the use of water

25  which it may have gained by prescription or use, or both.  We

1  didn't know, and we will not know, until all the evidence is in,

2  whether we are presently using in these areas outside the water-

3  shed waters non-riparian in character in excess of those that

4  were required by the Rancho.

5          That is why I say that to have an order in effect slam-

6  ming the doors on us as to these various points of law to which

7  I make reference is to put us into a severe straitjacket that

8  the stipulation never contemplated.

9          THE COURT:  Do you realize that you have made arguments

10  and contentions on this matter that you never made when we heard

11  this matter before the 11th of February?

12          MR. VEEDER:  I don't recall.  Which ones, for example?

13          THE COURT:  Many of these.  We had some arguments on

14  your motion to have the stipulation enforced, and many of these

15  things you are talking about are matters you didn't talk about

16  then.

17          MR. VEEDER:  I'll say this, your Honor, that so far as

18  I am concerned, when we start moving into trial there are a

19  great many matters that are not covered at hearings; but cer-

20  tainly there is nothing here, there is nothing that I have

21  mentioned that is new or radical or in any way changes the pro-

22  position.  I have always said, and to my dying day I will re-

23  peat, we are not subject to the police power of the State of

24  California.

25          In regard to our statement at Congressional hearings,

1359

1   I have readily told them what I have said to you.  I think our

2   rights to the use of water from the Rancho Santa Margarita are

3   adequate.  We certainly have no claim to the right to go up-

4   stream and invade vested rights.  I have always said that.

5          When we got down to the proposition of putting to-

6   gether a formal stipulation, we covered the contingencies with

7   the use of those words.  Now Arvin Shaw was a water man, he

8   knew his business, and when we wrote the word "measured" in

9   there I am sure that he didn't think that I was agreeing that

10  we would be controlled by the laws and procedures, the methods

11  and procedures established by California law for the acquisition

12  of appropriative rights.

13         THE COURT:  Of course, the word "measured" doesn't

14  appear alone; it is "the rights claimed by the United States

15  shall be measured...."

16         MR. VEEDER:  That is right.

17         THE COURT:  Not the amount of water; the rights shall

18  be measured.

19         MR. VEEDER:  I have never said anything contrary.

20         THE COURT:  That is the statement I don't find am-

21  biguous, "the rights claimed by the United States shall be

22  measured by California law."

23         MR. VEEDER:  But, your Honor, how could the word

24  "measured" include the agreement on my part -- put yourself in

25  my position for a moment -- how could the word "measured" be

1   taken out of its normal meaning in water law and have attri-

2   buted to it the meaning that, though we were using water outside

3   the watershed, though we knew that there were at least four

4   priorities ahead of us filed by Fallbrook and Santa Margarita,

5   and indeed there were more than that, that we would agree that

6   the word "measured" meant that we would go and initiate a right

7   under the laws of California?

8         THE COURT:  When you agreed that California law would

9   control, you had available to you the law on prescription, you

10  had available rights acquired before 1913-14, you had the theory

11  of inverse condemnation, you had, you now tell me, always in

12  your mind the incorporeal hereditament, the reserve theory --

13  the bucket-at-the-end-of-the-stream, if you want to call it

14  that -- you apparently had a lot of other things in mind.  It

15  was not until I began to get into some of these problems and

16  made some tentative rulings that you began to get concerned

17  about this stipulation.

18        MR. VEEDER:  Your Honor, I was not ever concerned

19  about the stipulation.  I am greatly concerned about your order

20  of February 11.  I think that your order of February 11 is so

21  constituted that I did not have the power to stipulate in the

22  manner that you so construe it.

23        THE COURT:  If I deny your motion, when will you pre-

24  sent that other motion which I prophesied you would this

25  morning?

1          MR. VEEDER:  I usually try to be timely about such

2    things, your Honor.

3          THE COURT:  At one time you disclaimed -- let's be
                                                    it
4    correct here -- at one time when I mentioned/before you dis-

5    claimed that you would ever seek to be relieved of this sti-

6    pulation.

7          MR. VEEDER:  Oh, no, I'm not seeking to be relieved

8    of it, not in the slightest.  I'm simply saying --

9          THE COURT:  Now the next move is, of course, to move

10   that it does not apply to you because you had not power to sign

11   it, if it means what I say it means.  Then if I denied that,

12   ultimately you have to go the last step and come in and say,

13   "Relieve me of the stipulation because, as you have now con-

14   strued it, and since you now hold that I had power to sign it

15   as you have construed it, the substantial interest of the United

16   States is such that I must ask to be relieved of it."

17         MR. VEEDER:  I'll say this, your Honor, I fully in-

18   tend to win the lawsuit, and I fully intend that if this sti-

19   pulation is being construed in a manner that would be detri-

20   mental to my country, I will do whatever I have to do.  If it

21   is eating the crow of saying that I did not have the power to

22   sign it, you can start with that.  I haven't the slightest bit

23   of pride and I'll go straight through.  As I say, we are going

24   to win the lawsuit and I am not going to have a stipulation

25   signed by me prevent our winning this case.  So whatever

1    construction is placed upon it, if that construction is detri-

2    mental, in my view, I will file whatever motions are required.

3          THE COURT:  Then forget about this disclaimer that

4    you made to me at one time in the past.

5          MR. VEEDER:  I will say, in regard to that disclaimer,

6    that it was foolishly made.  You see, I have no pride from that

7    standpoint, because I know what I meant when I signed the sti-

8    pulation, and it truly was not this order.

9          THE COURT:  I had this happen once before where law-

10   yers entered a stipulation.  It was not quite as serious as

11   this.  They moved to be relieved from one.  It had been approved

12   by me.  I denied their motion to be relieved on the ground that

13   it is not good policy to let lawyers make stipulations and then

14   relieve themselves.  But then of my own motion I set it aside

15   on the grounds that I had inadvertently approved it.  I tried

16   to save the lawyers' reputation.

17         MR. VEEDER:  Your Honor, I am not worried about my

18   reputation.

19         THE COURT:  Of course, I didn't approve this stipu-

20   lation.  Some other Judge did.

21         MR. VEEDER:  I have absolutely no worry about that.

22   There is only one thing I would worry about in regard to my

23   stipulation, and that is that if I let Fallbrook get any water

24   ahead of us -- and I will be perfectly frank and candid with

25   your Honor, I don't believe they have a right that is worth a

1    darn, but  I do say this, that in regard to the stipulation and

2    in regard to the use of water outside the watershed, I certainly

3    did not preclude ourselves from making any kind or type of

4    claim to get that water.

5         THE COURT:  Well, I am not going to decide this.  Does

6    somebody want to be heard?

7         I have a suggestion to make.  I would like to forget

8    about Fallbrook for an hour or two and get a little work done

9    on some other matters.

10        This whole situation is a very key point in this case,

11   and I very frankly don't think you have made any kind of show-

12   ing, on the basis of Mr. Goldberg's testimony, to open up the

13   order interpreting the stipulation.

14        Your showing was untimely.  You did nothing about it

15   until just before these hearings were to start before the

16   Master.  You have raised points that you never raised before.

17   I don't see that the oral testimony you have taken helps a bit.

18        However, I am willing to look over this stipulation

19   and the order interpreting it to be sure that I am satisfied

20   with what I have done, and I think that somewhere along the

21   line I should make the ruling, not only on this problem but the

22   related problem of what the law is, apart from this stipulation.

23   How soon we will be in position to do that I don't know.  Some

24   of these matters could be passed on, I think, with a very brief

25   factual statement -- the prescription problem.  Maybe the thing

1    to do is to wait until the evidence comes in, make your showing

2    that you want to make, and the case would be a posture then to

3    decide some of these problems.

4           MR. VEEDER:  I think that would be better, your Honor.

5           MR. SACHSE:  I didn't understand the last suggestion.

6           THE COURT:  I said that maybe it would be better,

7    instead of trying to work out some ruling on some of these pro-

8    blems now, where we have the problem of what kind of record

9    supports the ruling, to wait until the facts are in and then

10   rule on them, because these items that you present pose questions

11   of law that concern other people apart from this stipulation.

12   You can throw the stipulation out the window.  You still have

13   a nice legal problem on a number of these points.

14          MR. SACHSE:  I have only one thought, your Honor.  I

15   recall very positively and specifically that just last Monday --

16   maybe Mr. Swader can get us the record in a hurry -- Mr. Veeder

17   was even making motions to your Honor for a thirty-day con-

18   tinuance of proceedings in this case until this very  motion was

19   ruled on.

20          THE COURT:  No.

21          MR. VEEDER:  No.

22          THE COURT:  Until it was heard.  He expressly said

23   that he didn't care when I ruled on it.  He had some reason

24   that he wanted this in the record before any testimony was

25   presented before the Master.  I was never able to find out why,

1  but he wanted to do that, and we have accommodated him.

2  MR. STAHLMAN:  I am happy with the suggestion that

3  your Honor made.  I have been listening to this as a sort of

4  innocent bystander.  I could get splattered, depending on what

5  the facts and the evidence may be in relation to some of the

6  affirmative defenses which the Vail Co. has put in the record.

7  As I say, we are not a party to this stipulation.  I know the

8  atmosphere in which the stipulation was spawned, and I think it

9  is unfortunate that there ever was a stipulation in this case,

10  by whatever influences there were that brought about the necessi-

11  ty for it.  However, it may be very beneficial to our side of

12  the case.  I am sitting back here just waiting to see whether

13  I should jump in and try to be a party to this stipulation.

14  However, I will say, your Honor, that I did give con-

15  sideration to what I thought the stipulation meant, and after

16  reading your order I received entirely different ideas about it.

17  My  conclusions were not the same as the Court's, although the

18  Court's conclusions might be more beneficial to my clients, de-

19  pending on certain circumstances and evidence.  As the case

20  proceeds I may want to be a party to it.

21  However, as I say, there are some factors that may

22  affect this lawsuit in relation to that stipulation that it

23  would be a whole lot better if we were not in it.

24  I can go further into it, but I don't think that I

25  should, in view of your Honor's intention as to what to do.

1      MR. MOSKOVITZ:  You just suggested, your Honor, that

2    you might defer rulings on these issues of law until the evidence

3    is in.  I know you have made that suggestion before.  It seems

4    to me that the few basic factual foundations that are needed to

5    rule on these are pretty much undisputed.  On prescription, for

6    example, the factual predicate you need --

7      THE COURT:  I have no problem on prescription.  I

8    could rule on that on what we have in the pre-trial stipulation.

9      MR. MOSKOVITZ:  On the question of the rights to use

10   water outside the watershed and other theories, I think the

11   important facts, which Mr. Veeder has conceded time and time

12   again, at least in argument, are that the water is used outside

13   the watershed, the point of diversion of taking that water out

14   is within Camp Pendleton, and that there have been no permits

15   received from the State.

16     THE COURT:  We have nothing except Mr. Veeder's state-

17   ment as to when these rights originated.  There is absent a

18   factual predicate on that.  We have nothing but his estimate of

19   the fact, and he didn't even give me a figure, as to how much

20   water in Lake O'Neill was based on capacity prior to 1921 and

21   how much after.  There is a complete absence of any factual

22   predicate there.

23     MR. MOSKOVITZ:  Well, certainly no specific facts as

24   to quantities, but I don't think that that is needed to make

25   your ruling on the issue of law.  You can make one ruling as to

1   those rights which were acquired and which the evidence will

2   prove to have been acquired prior to 1914 and another as to

3   those which were not vested until after 1914, without knowing

4   the specific quantities.

5          I really think it would be helpful to have these

6   things settled before the trial starts.  I think it would be

7   for the guidance of everyone.  Everyone will know what the

8   ground rules are.

9          Judge Yankwich did this before the first trial.  I

10  think it was a very good idea.  At that time I think the United

11  States was agreeable to that being done.  Even though Judge

12  Yankwich's rulings of law, the State believed, in large measure

13  were erroneous, at least you knew what the ground rules were

14  as you entered the trial of the case.  It is my suggestion to

15  make them beforehand.

16         MR. SACHSE:  I'm concerned with the same thing that

17  Mr. Moskovitz mentioned, but perhaps in a little more personal

18  way.  I have a bundle of clients whose case I am going to be

19  arguing before the Master and there are going to be a very

20  great many questions of evidence as to which I am going to be

21  confronted with the problem of trying to decide what law I

22  think I should argue to protect our rights.

23         I would like to point out, in this connection, I don't

24  think that this stipulation itself is the only thing that makes

25  California water law apply.  I think your Honor pointed that

1  out to Mr. Veeder.  As far as I am aware, it is the only sub-

2  stantive law that is available.  There is no Federal law of

3  water rights, there is no Federal law of appropriation, there

4  is no Federal law of anything.  Whatever rights he seeks to

5  establish, unless we are going to conjure one up, is going to

6  have to be found in the statutory law of California.  There

7  isn't any place else to go.

8          The argument that has been made here, I would like to

9  point out to your Honor, isn't really whether or not California

10 law applies.  The argument that Mr. Veeder is making is that,

11 by reason of the stipulation, California law doesn't apply.

12 That is his argument.  He is saying that, by reason of Paragraph

13 IV -- what I believe is a strained construction that he puts on

14 it, a strained interpretation of the word "measure" -- the

15 standard or rules by which we would determine the extent of our

16 water right -- "measure" it, if you want to call it that -- the

17 standard rules that we would use in California are not to be

18 used.  He says that this stipulation means that we use something

19 entirely different.  And what it is that is different, or how

20 it is different, I don't know.

21          After all, my people on De Luz Creek have water rights,

22 some of them are diverting out of one watershed into another --

23 little local watersheds.  Those things are very important to

24 the trial of the De Luz controversy.  If we are going to go into

25 this thing completely blind, with the only person in the whole

1   procedure of all the thousands of Counsel, the only man who

2   knows what law applies is Mr. Veeder, that is a kind of peculiar

3   situation for Counsel to operate under, and that is precisely

4   where we sit if his contentions are upheld.

5   　　　　As I see the picture as of this minute -- and I'm

6   going to sit down because I don't think I am hurt -- as I see

7   it at this minute, your Honor's order is in effect, it is still

8   there -- you haven't ruled anything on it, so as of today and

9   as of tomorrow's hearing on De Luz Creek we are applying the

10  law of the State of California, not only by reason of the sti-

11  pulation but also because it is the only substantive law

12  available.  But if there is going to be a changeover and that

13  doesn't apply, then a great deal of what we may do in the next

14  few days is going to have to be undone.

15  　　　　MR. VEEDER:  May I make a brief observation, your

16  Honor.

17  　　　　I see no basis whatever for his comment just then.

18  The only thing I have ever said in regard to the law of the

19  State of California is this, that from our standpoint there is

20  no need to make a filing to acquire an appropriation so far as

21  the United States is concerned.  That is my claim.  There is

22  nothing whatever on De Luz Creek that causes any problem, and

23  the only question that is presented here and that has been argued

24  all day long is the question of the rules and regulations and

25  the procedures for filing papers.  That is all.  It has nothing

1  to do with the substantive rights.  We have agreed throughout

2  that our riparian rights are correlative.  We know that.  The

3  only question is whether the police regulations of the State

4  of California will govern all of our rights.

5        MR. SACHSE:  Mr. Veeder, you stated to Judge Carter

6  not three hours ago in this Courtroom, in response to his

7  question, that you truly believe that a private citizen, that

8  Judge Carter himself could acquire an appropriative right today

9  by taking water, putting it to beneficial use, without comply-

10  ing with the State law.  If that is the law, I don't want to

11  start hashing out Fern Creek, North Fork, South Fork, East Fork,

12  De Luz Creek, without knowing it.  I don't think we can get to

13  first base without knowing it, if that is the law, and that is

14  what you stated to the Judge in this record this morning.

15        MR. VEEDER:  Have you got clients who are diverting

16  water without complying with State law?

17        MR. SACHSE:  I have clients who are diverting water

18  from one place to another.

19        MR. VEEDER:  Without complying with State law?

20        MR. SACHSE:  What my clients are doing you will find

21  out in Court.  I want to know what the ground rules in this

22  case are.

23        MR. VEEDER:  So  all you are doing is dreaming.

24        MR. SACHSE:  I have clients who are diverting water

25  from one watershed to another and have not a permit for it.  I

1    have others who have permits.

2              MR. VEEDER:   That is all I asked for.

L 1

1          MR. SACHSE:  I want to know what the ground rules

2     are.

3          THE COURT:  Of course, one of the problems is find-

4     ing time to work out a written memorandum, even if it is not

5     an opinion, on some rulings on these matters -- even if I de-

6     cided to do it at this stage of the case.  There is a time

7     problem.  It is a very difficult one.  I have other work here.

8     I have been assigned to sit in Los Angeles for two weeks, the

9     weeks of the 3rd and the 10th of June, over my objection.  I

10    have work to do here.  I have been told to go up and try a

11    big criminal case.

12         MR. SACHSE:  You misunderstand me, your Honor.  I'm

13    not pressing you for rulings on questions of law.  I want to

14    be a hundred percent sure that the ground rules under which

15    we start tomorrow -- that the order is still in effect, that

16    as of tomorrow's trial the laws of California apply.  If that

17    is the rule, I will run the hazard of determining myself what

18    California law is.

19         THE COURT:  If I take this matter under submission,

20    obviously my order of February 11 is still in effect.

21         But that is one of the problems.  I can see for

22    both sides a lot of advantage to getting some memoranda out

23    and making some rulings both on these problems of the sti-

24    pulation, if necessary, and also on the problem of law apart

25    from the stipulation as if the stipulation never existed.

2

1373

There are advantages to waiting until this thing is tried and

doing it.  The time problem is one of the problems.

This little sketchy outline that Mr. Veeder has

given me and this discussion is helpful.  I think that you

ought to follow this up with a more detailed memorandum on

some of these matters that are relatively new that you haven't

raised before.  You have briefs on your incorporeal heredita-

ment problem and your police power problem.

MR. VEEDER:  I didn't hear your Honor.

THE COURT:  You have briefs on file on that already.

MR. VEEDER:  Yes, we have.

THE COURT:  You don't have to have any further briefs

on that.

You have briefs on inverse condemnation, although

this is the first time that you have ever raised the point

that the way the stipulation was worded on that score  caused

you the concern that you said.  You objected to my order in-

terpreting the stipulation, but I didn't know that you ob-

jected particularly on this matter of the inverse condemnation.

I would like to have you spell out how this order should read

on that score.

Prescription you needn't brief further.  You have

briefs on that.

The rights under the Vail judgment -- I think you

should spell 4 out, particularly in view of what you say the

facts are, and I think that, in a way, is tied in with your No. 1, changing the point of diversion. I think you should brief the law on that.

You have made some suppositions here which Mr. Moskovitz claims aren't correct, and see what the law is on that.

No. 2, I suppose, raises directly the question of the application of Section 1225. If you have everything you want on that in the file, all right. If not, you had better do some work on that.

In other words, I would like a memorandum from the Government on these eight points, making reference to their prior briefs where they are already covered, such as prescription and incorporeal hereditament, spelling out in more detail exactly what their claim is and what law is involved -- whether or not California law applies. If you claim it doesn't apply, why?

MR. VEEDER: I think I have briefed that for your Honor, but I will cover it again.

THE COURT: If you have briefed it, refer to where you have. We have a world of briefs in here.

MR. STAHLMAN: Did your Honor say that the police power question has been briefed? That is the one with which we are concerned.

THE COURT: Wasn't it briefed in connection with your incorporeal hereditament brief?

MR. VEEDER:  I want to review the briefs, going

back almost a year now.  As I remember, we wrote a brief for

your Honor to the effect (1) that these are police regulations

and nothing more, and (2) that the police regulations are in-

applicable to the United States.  I'm certain there is a brief

in on that.

THE COURT:  There is a brief like that, yes.

You have never written any brief attacking the

constitutionality of Section 1225.

MR. VEEDER:  Your Honor, on that I would say this,

that the State of California or any other State -- it would

be helpful to make my views known now -- I believe that the

State of California can very properly pass a law saying that,

for the good of the State, no one will be permitted to divert

water without complying with the statute.  I believe that

that is within the police power  of the State for the purpose

of sensible distribution.  I have no complaint on that.

THE COURT:  Even though you contend that this water

had been severed from the land and the water belonged to the

Government.

MR. VEEDER:  Well, because the Act of 1877 and the

antecedent Acts of 1866 and 1870 provide that the individuals

can acquire rights to the use of water by compliance with the

laws of the State.  That is all.  All that the laws of the

States do, in accordance with Johnson v. Howell, which I have

cited to your Honor, is to provide a means for acquiring title from the United States, and we have briefed that. But there is nothing, in my view, to the contrary. I think it is absolutely essential that there be police regulations in regard to acquisition of mineral rights and as to the use of land.

THE COURT:  I am going to ask you to prepare a brief on these points, incorporating by reference briefs that you have heretofore filed if you have briefed it, spelling out your right, with particular emphasis as to what law applies, and give me a full picture of your position on these eight points.

MR. VEEDER:  Yes, your Honor.

THE COURT:  How much time would you want on that?

MR. VEEDER:  I don't need to tell your Honor that we are going to be somewhat busy after tomorrow, but I am very, very desirous of advancing these theories to you because I'm anxious to get judgment in our favor. So I will get at this just as rapidly as I can.

When is Memorial Day?

THE COURT:  Friday of next week.

MR. VEEDER:  A week from tomorrow. Well, if we could have fifteen days, your Honor. I have got to get some days out of Court to write the brief. If I can have fifteen days, I'll get at it.

THE COURT:  Then of course that brings us up within

1   about a week of the start of the trial, and I take it that

2   Mr. Sachse, Mr. Moskovitz and Mr. Stahlman might or might not

3   want to reply to this brief.

4           MR. VEEDER:   I have with me for filing -- you had

5   asked me for a brief in regard to these reserved rights, and

6   I will file that when your interrogatories are responded to.

7   You asked me some time back to write that brief, and I have it

8   prepared now.

9           MR. MOSKOVITZ:   Did your Honor grant time for response

10  to the United States' brief?

11          THE COURT:   No.   How long would you like to respond?

12  Ten days?

13          MR. MOSKOVITZ:   I think ten days should be sufficient.

14          THE COURT:   All right, ten days to reply.

15          Now, you asked me to tell you something of the dates

16  that this Court had, which might have something to do with

17  when you would have time off so you could get away.

18          The Judicial Conference of the Ninth Circuit is

19  going to be held commencing Friday, August 29.   The first day

20  of that Conference will be held in the Circuit Chambers in

21  Los Angeles on Friday.   The Conference will then adjourn down

22  to the Del Coronado Hotel in Coronado, and Monday, September 1

23  (Labor Day), September 2 and September 3 will be occupied by

24  the Conference here in San Diego at the Del Coronado.

25          MR. SACHSE:   That is August 29 through September 3,

your Honor?

1          THE COURT:  Through September 3.  That is the week-

2     end over Labor Day.

3          MR. STAHLMAN:  Your Honor, on July 14 -- I just re-

4     alized that you probably don't know what the situation will

5     be then; we will probably be on trial here -- I have/ trial
                                                              a

6     that will probably require about four days in Indio, and

7     as I have indicated I merely bring this up to say that at that

8     time I'll probably be in the case.  If the case is in such a

9     state that we do not have matters that affect the Vail interests,

10    may I be excused from attendance?

11         THE COURT:  All right.

12         Going ahead with these dates that the Court is con-

13    cerned with, the date of August 29 is Friday of the week that

14    the American Bar meets in Los Angeles.  The American Bar meets

15    the week of Monday, August 25 through the 29th, and Friday of

16    that week is the first day of the Judicial Conference.  I will

17    not be in attendance at the American Bar all week, but I'll

18    probably not hold Court that week because I know that many

19    lawyers will want to attend that session.

20         The week of August 18 through Saturday, August 23,

21    the Pre-Trial Committee of the Judicial Conference of the

22    United States has scheduled a whole week's work at Stanford

23    University.  I have been invited.  There are only thirty

24    judges to attend from the United States, and I have been in-

25    vited to attend that and I would like to do it.  So I don't

1    expect to have any Court here the week of August 18 to the 23rd.

2    I intend to attend the meetings at Stanford University.

3         I have made no plans for a vacation of my own, and

4    I don't know that I can plan one.

5         If we started this trial on June 16, I wouldn't

6    expect to operate on Mondays.  I may have to spend time on

7    this calendar and other matters on Mondays.  So we would go

8    only four days, Tuesday through Friday.

9         MR. MOSKOVITZ:  June 16 is a Monday.  So that day

10   we will go on a Monday?

11        THE COURT:  Well, maybe, maybe not.  I don't know.

12   Judge Weinberger has been directed to come up and try

13   criminal cases at Los Angeles and he has been directed to show

14   up there on the 16th of June.  If he went, I would certainly

15   have to use the 16th here for our criminal calendar.

16        This is none of your concern, but we have some pro-

17   blems.

18        At any rate, if we started the 16th or 17th of June,

19   two weeks in June, four weeks in July, and two weeks in August

20   would take us up to the beginning of the Pre-Trial Conference.

21   That would be about eight weeks there before the August 18

22   date at Stanford.  You would have available, however, about

23   two and a half or three weeks down through September 3, pro-

24   bably the end of that week, September 5.  I suggest that if

25   some of you can get your vacation in during that  time, maybe

1    that is a good time to do it.

2           I may not be able to proceed continuously on this

3    case even if we start on the 16th or 17th of June, depending

4    again on what orders my colleagues make in Los Angeles.  It

5    seems that they are convinced that I have nothing to do down

6    here, and that Judge Weinberger and I just have a nice pleasant

7    time in San Diego.  So they make these orders about coming up

8    there and helping them out.  If we have to do that, there are

9    people in jail here whose cases will have to be tried -- I

10   don't know what will happen.  We might go two or three weeks

11   and take a week off and try to try some criminal cases here.

12          That is the best I can tell you about my plans.

13          I would like to inquire of you gentlemen.  I know

14   that when you get toward the beginning of a trial quite often

15   there is a request at the last minute that the trial be de-

16   layed for one or two weeks because you need time for preparation.

17   If anybody anticipates that there is going to be a request that

18   this trial start not on the 16th or 17th but a week or two

19   later --

20          MR. VEEDER:  I have a matter to bring to your attention,

21   your Honor, and that relates to the completion of service of

22   summons.  We are pressing hard and the Marshal has done a really

23   tremendous job in that connection and the summonses, I believe,

24   are very well along.  Now I don't know whether your Honor would

25   want to wait -- I am just speculating now in regard to the

1   June 16 date。  I am anxious to go ahead on June 16。  But would

2   your Honor refuse to proceed if all service at that time was not

3   complete?  For this reason, there are some -- at first blush it

4   has been easy, we have gone through service very rapidly and we

5   have taken care of those -- there are people at a distance, in

6   distant towns, there are people in Canada, there are people in

7   foreign countries。  I am just prognosticating -- I'm not even

8   prognosticating, but I'm just saying that the situation may be

9   that if you inquire whether all parties are served, I may have

10  to say that     all parties we could get have been served but

11  there are some that we may have to go after。  I hope that will

12  not cause any delay.

13          THE COURT:  That situation has to be thought through。

14  We haven't been particularly concerned with the Master's hearings,

15  because the Master can't hear them all at once anyhow。  If you

16  have to publish against somebody and set a subsequent date for

17  hearing, that is easy enough to do and direct them to come in at

18  some other time。  But as to the trial itself, suppose there are

19  people whom you have to serve by publication and people haven't

20  been served and the trial starts。  Then what happens?  You have

21  to hold the trial on the mainstream over again because a half a

22  dozen people weren't served。

23          MR。 VEEDER:  I don't think so。  I really don't。  I

24  think it would depend somewhat on the kind and type of claim

25  they would be asserting。  There might be several questions

1  involved.  It is a pretty general matter.  I would hate to guess

2  at it.  So I am bringing that to your attention, though, and I

3  will check and find out.

4          THE COURT:  I think we should get a report from the

5  Marshal and you submit it to me, with copies to Counsel of what-

6  ever you submit, showing how far you have progressed on this and

7  numerically what your problems are on the service and who hasn't

8  been served and who has, and how many people seem to be outside

9  the United States against whom you will have to publish, things

10 of that sort.  Can you get a little report on that?

11         MR. VEEDER:  I'll try to get something for you this

12 week, your Honor.  But that is something that you should know

13 about.

14         THE COURT:  All right.

15         The motions are submitted.  The Clerk will make a note

16 on these submitted matters.  There are submitted motions to

17 strike by both the State of California and the Fallbrook Public

18 Utility District, all material produced on this hearing on the

19 motion.

20         There is submitted also the motion as to whether I

21 should reconsider my order of February 11, 1958, in which I in-

22 terpreted the stipulation.

23         The Government is/to file briefs in fifteen days on the

24 eight claims.  Defendants to have ten days thereafter to answer.

25         MR. MOSKOVITZ:  Your Honor, there is one point that I

1   would like to raise with you before we close, if I may.

2   　　　　Mr. Veeder wrote a letter to the Attorney-General

3   requesting that a long list of documents relating to water rights

4   applications, permits, and correspondence in the files of the

5   State be furnished to the United States.

6   　　　　THE COURT:  I have read the correspondence, and you

7   said that you would furnish them if he would pay the bill for

8   photostating.

9   　　　　MR. MOSKOVITZ:  Yes.  You see, these particular papers

10   have been taken out of the files, they are in a pile waiting for

11   Mr. Veeder, and I would like to clarify whether he wants them or

12   not.  If not, they will go back in the files, because they are

13   needed.  I bring it up now because he apparently thought it was

14   a matter in which your Honor would have some interest.

15   　　　　MR. VEEDER:  Has the question been asked me?

16   　　　　MR. MOSKOVITZ:  Yes.

17   　　　　THE COURT:  I'm not going to spend much time on that.

18   I think if you want them to supply you with copies of documents

19   where cost is involved, you have to pay the bill.  There are

20   certain documents that they said they could supply you without

21   expense, and apparently they have done that.

22   　　　　MR. VEEDER:  The matter, I imagine, will come up to-

23   morrow when we begin offering in evidence some of these copies

24   of some of these documents.

25   　　　　MR. MOSKOVITZ:  In other words, as far as you are

1   concerned, you don't care to look at the material we have gather-

2   ed together; we can put them back in the file, is that right?

3          MR. VEEDER:  No, I don't see why you can't bring those

4   documents down and let us take a look at them and then we can

5   photostat them.

6          MR. MOSKOVITZ:  If you want them, come up to Sacra-

7   mento and look them over and make copies there.  We can't let

8   all of those files out of the office.

9          MR. VEEDER:  I thought you said the material was pulled

10  out of the file.

11         MR. MOSKOVITZ:  It was pulled out of the files, but

12  we are keeping them in the office.

13         MR. VEEDER:  Well, they are public records.  I thought

14  you might bring them down and let me look at them.

15         MR. MOSKOVITZ:  We cannot do that.

16         MR. STAHLMAN:  Why?  Maybe some of the rest of us would

17  like to look at them.

18         MR. MOSKOVITZ:  They are available in the office there.

19         THE COURT:  Are they bulky?

20         MR. MOSKOVITZ:  Quite bulky.

21         MR. STAHLMAN:  How bulky?

22         MR. MOSKOVITZ:  Well, there are a few piles of them.

23  I can't recall.

24         MR. STAHLMAN:  The State Water Board comes down and

25  brings all kinds of records.  Is it a truckload?

1          MR. MOSKOVITZ:  No.

2          MR. VEEDER:  It would not be a pile as large as that

3   in front of you, and you know it.

4          MR. MOSKOVITZ:  I believe the pile is bigger than that.

5          THE COURT:  Of course, here is what California is

6   probably thinking about.  They bring these originals down and

7   you say, "We will use the original and later a photostat will be

8   made."  If you want photostats of them, pay for them and get

9   them made.  Let's not tie up the original files in this pro-

10  ceeding.

11         MR. VEEDER:  The only point I make is this.  If that

12  material would be brought down, we could look at it, designate

13  it.  I certainly wouldn't offer it in evidence -- I wouldn't offer

14  in evidence the originals.  Then I would have photostated the

15  copies that I wanted and that would be it.  There is a great

16  deal of material, there is extensive correspondence, some of

17  which I would like.  Now the $700 bill was steep.  To begin with,

18  I thought there would be a full and free exchange of data, and

19  I am glad that Mr. Moskovitz has set a precedent.  Next time he

20  asks me for maps from us, he will pay for them.  That was one of

21  the reasons I wanted to be sure it would be taken care of.

22  Secondly, California stipulated to provide the material.

23         THE COURT:  How many documents are there?

24         MR. MOSKOVITZ:  What makes the cost so great is, I

25  understand, there are over thirteen hundred separate pages of

1   documents of which we have only one copy in the files, which

2   would have to be photostated.  This is something I don't know of

3   my own personal knowledge.  I have been told that.

4          THE COURT:  It may be that if they are brought down here

5   and kep in your possession where they can be inspected, some docu-

6   ment of a couple of hundred pages they will not want and they can

7   eliminate that, and other documents that they want they will have

8   to have photostated.

9          MR. VEEDER:  And we will pay for the photostating, if

10  we can look at it.

11         MR. MOSKOVITZ:  You put your finger on the problem we

12  were afraid of, that the documents could be taken and placed in

13  evidence.

14         MR. VEEDER:  I said that I wouldn't.

15         THE COURT:  He said that he wouldn't, and I said that

16  I wouldn't let him.  Bring them down here and let him have a chance

17  to inspect them.  Then if he want copies, he will have to photo-

18  stat or arrange for the photostat work at Government expense.

19         MR. VEEDER:  I have this fact that I want to bring to

20  your Honor's attention in connection with the trial tomorrow.

21  I have copies of some of that material and I want to be certain

22  California is not going to object in regard to the offer of

23  copies.

24         MR. MOSKOVITZ:  We are not going to.

25         THE COURT:  They may go in subject to correction if

1   they are not true copies of the originals.

2          MR. MOSKOVITZ:  There is another point I want to make.

3   Certainly the State is not going to take the position each time

4   that somebody asks for a copy of a document that we are going to

5   charge them, but when the bill came for $700 this was just more

6   than we could afford.

7          THE COURT:  That is right.

8          MR. VEEDER:  I have agreed to --

9          THE COURT:  It may be that when Mr. Veeder sees what

10  he wants, instead of being that big a job it may be only certain

11  documents.  He admits that he has some copies of the material

12  already.  He would like to have the originals present.  Can you

13  have them down here tomorrow?

14         MR. MOSKOVITZ:  I couldn't have them down here to-

15  morrow.

16         THE COURT:  When can you have them down here?  The

17  first of the week?

18         MR. MOSKOVITZ:  I could have them down the early part

19  of next week.

20         MR. VEEDER:  Would that be at the Reche School?

21         MR. MOSKOVITZ:  I will bring them down there.

22         MR. VEEDER:  Fine.

23         MR. MOSKOVITZ:  The early part of next week may not be

24  Monday.  I have another hearing.

25         THE COURT:  Are you going to attend the Reche School

1    hearings?

2            MR. MOSKOVITZ:  Well, my clients are in a state of

3    flux.  I think I will be down there for part of the hearings

4    next week.

5            How long is it expected that it will go on -- Monday

6    and Tuesday of next week?

7            MR. STAHLMAN:  Monday, Tuesday and Thursday.

8            MR. VEEDER:  Monday, Tuesday and Thursday.

9            THE COURT:  Friday is a holiday.

10           THE CLERK:  There is another matter on the calendar

11   today, your Honor; hearing on the objections to interrogatories.

12           MR. SACHSE:  Yes.  My notice of hearing on our ob-

13   jections to the United States' interrogatories is on the calendar.

14   I have no desire to press it.  Mr. Veeder has objections to our

15   interrogatories.  Maybe we can pile them up together.  I simply

16   did it to protect my client.

17           THE COURT:  Put it over to June 16.  See if you can

18   get together on it.

19           MR. VEEDER:  Fine.

20           (Adjournment.)

21

22

23

24

25