# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA
SOUTHERN
### CENTRAL DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.                No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al,

        Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:             San Diego, California

Date:              May 29, 1958

Pages:   1389-1445

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____

JOHN SWADER
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211 : EXT. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1247-SD-C |
| ) | |
| FALLBROOK PUBLIC UTILITY ) | |
| DISTRICT, et al, ) | |
| ) | |
| Defendants. ) | |
| ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

May 29, 1958

APPEARANCES:

    For Plaintiff:
                            WILLIAM H. VEEDER, Esq.,
                            WILLIAM E. BURBY, Esq.,
                            Special Assistants to the
                            Attorney-General
                            Department of Justice
                            Washington, D. C.

— — —

1390

1  APPEARANCES (continued):

2     For U. S. Marine Corps:          COL. ELLIOT ROBERTSON
                                        LT. DAVID MILLER
3

4     For Defendant Fallbrook          F. R. SACHSE, Esq.
      Public Utility District:

5     For Defendant Santa             W. B. DENNIS, Esq.
      Margarita Mutual Water Co.:
6

7     SPECIAL MASTER:                  JOHN M. CRANSTON, Esq.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1391

1    SAN DIEGO, CALIFORNIA, THURSDAY, MAY 29, 1958, 9:00 A.M.

2              (In Chambers)

3              MR. SACHSE:  Mr. Veeder hasn't misstated me, but I

4    don't think he has stated quite exactly what I was after.

5              I would like, from a personal standpoint, to know at

6    what point we are saying that you are through proving your case

7    from the standpoing of my private clients now, I'm not speaking

8    about Fallbrook, and it seems to me that the land capability

9    aspect  of this is of secondary importance, and -- don't jump

10   in horror -- my reasoning is this:  In any adjudication of any

11   creek -- let's confine ourselves to De Luz for a minute -- the

12   question of land capability and irrigable land only becomes of

13   moment when the Court is required to apportion water, to say

14   that each one can have only so much.  Until that time comes,

15   the important question is the character of the right that each

16   landowner has.  If we assume that every landowner is a riparian,

17   to use your very example to the public, each of them has an

18   equal correlative right to the extent of his irrigable acreage,

19   and that is modified by the fact that domestic use may have a

20   priority over agricultural use and so on.

21             So it seems to me, and I had assumed at the outset of

22   this case, that what we were primarily interested in, initially

23   at least, in De Luz Creek was this cataloging of rights, the

24   type of right that is involved in each case.  Having done so,

25   if we are blessed with a ten-year wet cycle, your Honor isn't

1392

1   going to probably make any order allocating water on De Luz

2   Creek today.  The problem won't perhaps arise today, to say that

3   John Smith can have just so much, because what he can take, as

4   we all know, varies certainly year by year and possibly month by

5   month and hour by hour even.

6           MR. VEEDER:  We are going to enter decrees of that

7   character, anyway.

8           MR. SACHSE:  That is what I say.  The question of

9   getting this all in at this particular minute is relatively

10  unimportant to the character of rights that are involved in this.

11  That is the first thing.

12          THE COURT:  You mean the adaptability of the land and

13  what part is irrigable.

14          MR. SACHSE:  Exactly.

15          THE COURT:  That is secondary.

16          MR. SACHSE:  Whether a particular forty out of a

17  hundred has forty one-hundredths because it is all irrigable,

18  or twenty one-hundredths because half of it is rock, or ten one-

19  hundredths or whatever the facts may be, such a determination,

20  as you are well aware, still isn't final because a particular

21  forty might not be used today and yet be a hundred percent

22  irrigable.  So today you throw out that forty and take only ones

23  that are being used.  What I am getting at is that this material

24  is not an essential at this stage of the proceedings.  I don't

25  see why we can't go ahead without having in all of the soil

1 studies.

2      MR. VEEDER:  I think that it goes beyond a question

3 of semantics.  It goes to an understanding of what we are talk-

4 ing about.  What we are talking about is the water.  We are

5 talking about rights to water and the number of irrigable acres

6 of land that are riparian and the number of acres of land that

7 are irrigable, and so far as I am concerned the Court will never

8 say that this piece of land is entitled to this quantity of

9 water but the Court will say, and all that it will ever say, is

10 that these lands are irrigable and they are entitled to water

11 under a riparian right or an appropriative right, and if the

12 Lord blesses with water some of the land will get water and it

13 is the irrigable land that will get it.

14      MR. SACHSE:  I concur, but --

15      MR. VEEDER:  Let me finish.

16      The reason why I am saying that is that the very

17 heart and soul of this litigation is the very point that your

18 Honor is looking at, namely, irrigable acreage, land that is

19 susceptible of profitable irrigation, and not any X percentage

20 of water; and I have always said, and I repeat it, it is not for

21 the Court, if I may respectfully state it, to say whether there

22 is or is not a surplus.  I don't see how anybody could give us

23 that.  Nor are we asking it.  We are asking for a chronicling

24 of the riparian and appropriative rights and the acreages to

25 which they apply, and this is the crux of it, because as I

1 | envision your Honor's decree it will be the southwest border of
2 | the southwest border of section 27 township and range X acres
3 | of land irrigated, X acres of land irrigable --

4 |      MR. SACHSE:  May I interrupt at that point.

5 |      That is the last sticker in this.  If we can visualize
6 | your Honor making this very decree that was spoken of, twenty-
7 | five years ago X acres of land, without even efficient gasoline
8 | pumps, irrigation effected by gravity distribution or windmills,
9 | that is one thing.  If we visualize your Honor making a deter-
10 | mination as of today -- let's not say today, let's say ten years
11 | ago -- if we visualize your Honor making it as of today, with
12 | new types of irrigation -- sprinkler systems, which, as Col.
13 | Bowen has testified, have changed the quantity of irrigable soil
14 | because they reduce the erosion factor -- this irrigable acreage
15 | is not absolute.  This is something that, as new crops are de-
16 | vised, as new techniques are devised, constantly changes.

17 |      All I am saying is, I agree with Mr. Veeder as to the
18 | type of decree that will be entered.  My only point is that
19 | there is no need to hold up all for these soil surveys.  Even
20 | if he is absolutely right, you are not going to enter a decree
21 | for at least a year.

22 |      If we take the whole of this case -- Cuneys,
23 | for example -- that raises a legal question, as you can see
24 | from the map.  The stream goes through here, through here,
25 | through two corners.  He may or may not be a riparian owner on

1  every parcel of this.  It is something we have to find out.  He

2  doesn't happen to have an appropriative claim, but there is some.

3  It seems to me that the first thing we ought to do is determine

4  that this portion of Cuney's is riparian, this portion isn't,

5  this portion is.

6        Then you have a half dozen or more appropriative claims

7  in the Valley which you are going to have to catalog, and I

8  think you are going to have a couple of assertions of pre-

9  scriptive ones, and that is it.  The rest of it can be brought

10  in later.

11        MR. VEEDER:  But you are not going to come up and say,

12  "This is a riparian right, but I don't know how many acres are

13  irrigable."

14        MR. SACHSE:  Not yet.  I am saying it backward.  I

15  mean, you don't have to say it at this moment.  You have a year

16  and a half to determine that.

17        MR. VEEDER:  I have no desire to hold up this liti-

18  gation, and here is my thought and I will tender your Honor

19  this thought now and I'm convinced that it can be done.  Let's

20  try the case of the United States of America v. Fallbrook Public

21  Utility District and the Santa Margarita Mutual Water Co. right

22  now.  Then we will have the balance of these land utilization

23  maps, etc., completed.  But we have the facts now, and I brought

24  this map along to show, where your Honor could start trying

25  the case of the United States v. Fallbrook and the legal

1   issues that are entailed there.

2          THE COURT:   That is what we planned to do on the 17th,

3   isn't it?

4          MR. VEEDER:   That is what I say.   I don't want to see

5   the case held up and I would like to go ahead.   Let's just take

6   those two and start trying it on June 16 or 17 and quit worry-

7   ing about when we are going to finish up in the De Luz area.

8          It is a mechanical task that is tremendous.   We could

9   say, "We don't care.   They are defendants and they should prove

10  their rights."   But we can't do that.   We have told the people

11  that we would help them on that, and I think that we should.

12  But I would be very much opposed to delaying this matter.

13         That then brings us to the additional question of this

14  matter of cross-examination before the Special Master.   It has

15  been my view that when we get before your Honor we will be

16  trying out the main case, we will be trying out issues that are

17  separate and apart, in some regard, to the De Luz Creek area,

18  and I was very much surprised, for example, that Mr. Moskovitz

19  was reserving the right to cross-examine three months from now

20  maybe.

21         MR. SACHSE:   I want to reserve the same right.

22         THE COURT:   Tell me about this.

23         MR. VEEDER:   Here is what we are doing.   We are put-

24  ting Col. Bowen on the stand and putting in what we have always

25  referred to as our prima facie case.   We have had to go a long

1  ways, because Franz threw in Bulletin No. 57 and I am worried

2  about it because I don't think it is evidentiary in character.

3  But anyway it is there.  So we began putting in our case on it.

4  Mr. Moskovitz and Franz reserve the right to cross-examine sub-

5  sequently the witnesses that I am calling, and I can't envision

6  a record where Col. Bowen would not be subject to cross-examina-

7  tion until -- well, I don't know when.  I can't envision it, and

8  I never dreamed that the Special Master wouldn't hear our prima

9  facie case and wouldn't rule on our rights to the extent that

10  they are relevant in this De Luz area and that we couldn't go

11  ahead and put in right now our water uses down there and our

12  uses inside and outside the watershed.  Some of the record, I

13  would think, would be stipulated right into your main case, and

14  that would be it.  But the idea of having a record where there

15  will be fifteen or twenty intervening witnesses without knowing

16  where the cross-examination is coming or has been, so that we can

17  prepare our re-direct examination as the cross-examination pro-

18  ceeds, is going to be murder.

19            THE COURT:  I still don't get the problem.  You are

20  trying the De Luz Creek area by itself.  The Government is going

21  to put in a prima facie case at that hearing.

22            MR. VEEDER:  That is right.

23            MR. CRANSTON:  The question arose primarily in this

24  way, that we put in the soil surveys and the general statement--

25  classification of lands between the Vail Ranch and the Camp

1  Pendleton.   Then Col. Bowen began the identification and Mr.

2  Veeder offered in evidence aerial photographs of the Camp Pendle-

3  ton area itself, which were keyed in to show the --

4        MR. VEEDER:   There are field sheets and soil surveys.

5        MR. CRANSTON:   Yes -- to show the nature of the Camp

6  Pendleton land.

7        Then Mr. Sachse raised the objection that that type

8  of evidence was not included within the order of reference.

9        Now the order of reference recites that the major

10  parties have filed these memoranda and then says,

11        "Recognition being accorded to the fact that in-

12      volved in this action are the claimed rights in the

13      Santa Margarita River of many water users whose claims

14      and interests this Court and all parties concerned are

15      desireous of protecting at minimum cost and inconvenience,

16      and the prinidpal parties having agreed to the reference

17      of the issue involving the proof of the claims of

18      certain users..."

19

20        Then the Court goes on and says that pursuant to the

21  Rules, etc., the cause exists to appoint a Master, and then,

22       "There shall be taken by the Special Master evidence

23      offered in proof of the claim to rights to the use of

24      water in the Santa Margarita and its tributaries of the

25      numerous claimants referred to above, including but

       not limited to the title in lands or interests in lands

1    claimed by them; their claimed irrigated and irri-

2    gable acreage; the kind, extent, type and character

3    of their claimed rights to the use of water."

4         That is the end of the paragraph which purports to

5    recite what the Master shall hear.

6         As I understood Mr. Sachse's position, it is that that

7    does not give the Master any power to hear evidence or make

8    findings on the rights --

9         MR. SACHSE:  No; I said to make findings.  If Mr.

10   Veeder chooses to put in evidence and submit it to Judge Carter

11   on the transcript, that is fine.  But the position that I made

12   to you was that I do not believe that you have the authority,

13   under the existing order, to make a finding -- I was very speci-

14   fic -- as to the irrigable acreage in Camp Pendleton.  I think

15   you have the right to make a prima facie finding that Camp

16   Pendleton owns rights and irrigable land.  That is enough to

17   set up the case for De Luz Creek.  They have irrigable land, it

18   is stipulated, and they have riparian land.  That is enough.

19   We are ready to try what these people on De Luz Creek claim.

20   But the trial of the extent of the Government's rights I did not

21   understand was referred to the Master.

22         THE COURT:  I think you are in agreement.  I don't

23   think Mr. Veeder or Mr. Cranston anticipate that the Master is

24   going to make findings as to the Government's rights.

25         Are you?

1    MR. CRANSTON:  I am in agreement, your Honor.

2    MR. MOSKOVITZ:  He stated that he would not do it

3 without modification of the order.

4    MR. CRANSTON:  Yes.

5    THE COURT:  I thought this argument came up, however,

6 on the question of how much Government land was in the De Luz

7 watershed.

8    MR. SACHSE:  No.

9    MR. VEEDER:  That is one of the factors.

10   MR. SACHSE:  That is one of the factors, but the big

11 issue was  as Mr. Cranston has stated it.

12   Now if that is correct, and if, under the existing order,

13 Mr. Cranston could not make a finding -- the finding would be

14 your Honor's responsibility -- on the irrigable acreage of the

15 United States, my position is this -- and I want to distinguish

16 it from California's;  I will mention that in a minute, because

17 Mr. Moskovitz asked me to state it -- my position is that, with

18 all due respect to Mr. Cranston, this is a life and death mat-

19 ter for Fallbrook and I prefer to get whatever advantage I can

20 from my cross-examination by presenting the cross-examination

21 in the flesh to the Judge who is going to make the findings.

22 That is what I want to do.  I don't want a naked record.  Your

23 Honor has tried enough cases that you well know perhaps that the

24 printed word is not nearly as good as the real thing, with the

25 charts on the board and so on.  I want to reserve that.  That is

1  my position.

2  Mr. Moskovitz's position is a little different and I

3  am going to try to phrase it, because he asked me to.   His posi-

4  tion is that because of this order the State of California has

5  at all times taken the position that they had only a very minor

6  interest in the Master's hearings.   They have no direct concern

7  with the claims of these individuals.   Their basic concern is

8  to protect what they conceive to be the system of water rights

9  in California, which, they feel, is under implied attack at

10  least in this proceeding.   So they are vitally concerned in all

11  of the hearings before your Honor and have made arrangements to

12  be fully represented -- to have engineers in attendance besides

13  Mr. Moskovitz.   They have not made such arrangements for the

14  hearings on these tributaries.   If Mr. Veeder produces evidence

15  which they will not know anything about except when they read

16  the transcript, which they feel deals with these basic questions

17  in which the State is interested, they want to reserve the right

18  to raise that argument again before you.

19  I hope I am doing a good job for him.   He asked me to

20  state it.

21  THE COURT:   I see what the State is interested in.

22  Mr. Veeder, let me ask you this.   If there was a show-

23  ing made that the Government owned riparian lands downstream

24  and had riparian rights downstream, --

25  MR. SACHSE:   And irrigable land.

1        THE COURT:  -- and irrigable land, without trying to

2 go into anything further, what more do you need in connection

3 with a prima facie case on this De Luz area?  Why can't all that

4 business be reserved for the trial in front of me?  I am not too

5 concerned about this order.  We can always amend an order.  But

6 I visualized, and I think Mr. Cranston did, that he was going

7 up and find out about the smaller people in this watershed, and

8 why do we need a complete showing before the Master of what you

9 call the Government's complete prima facie case?

10        MR. VEEDER:  Here is my view, and we were cutting it

11 very short because I anticipated putting in additional very

12 technical evidence before you, but I view our prima facie case

13 this way -- and I may be in error, but I think the man with the

14 responsibility is always a little more concerned about whether

15 he makes out a prima facie case or not -- I began putting in

16 our field sheets of soil surveys.  It is impossible to break

17 down.  Here are all of the areas which are involved, and you

18 start in here.

19        MR. SACHSE:  The large map is in Court.

20        MR. CRANSTON:  About four or five times as big as

21 that.

22        MR. VEEDER:  But here is where we go.  You can't just

23 reach in -- and Col. Robertson, you correct me if I am wrong --

24 you can't just reach in and pull out an aerial photograph of

25 one part of the watershed and say that this is it.  You have

29a

1  Robler Creek that showed up almost at once, and we began to put

2  in our aerials.  My view is that we would put in, as part of our

3  prima facie case, these soil survey maps, and that was when the

4  question of cross-examination came up.

5         THE COURT:  Let's restrict ourselves to this question

6  of what you need in this case on De Luz.  Now this De Luz hear-

7  ing can't stand on its own feet anyway.  Eventually it has to

8  become integrated as part of the trial of this whole action.

9         MR. VEEDER:  Yes, your Honor.

10        THE COURT:  So there could be no contention that you

11 failed to make a case on De Luz  or anything of that sort as

12 long as there was just a brief showing that you had land down-

13 stream, riparian irrigable land, and that therefore you had a

14 concern in De Luz.  So that I don't follow you on having  to

15 make a prima facie case on De Luz, outside of maybe a map on

16 the watershed or something like that.

17        MR. VEEDER:  Here is our problem.  On those areas you

18 will find that almost at once on our field sheet Robler Creek,

19 which enters De Luz Creek right here, is within the watershed

20 of the De Luz Creek.  But --

21        THE COURT:  Where?

22        MR. VEEDER:  This is De Luz Creek coming down here.

23 This is Robler Creek coming down here.  It arises almost

24 entirely on the lands of the United States and it flows all the

25 way down here and enters De Luz Creek.  It is

1   a major affluent of De Luz Creek.  When we started in, almost at

2   once our aerials bring this into play.  We are entitled, and

3   every owner in De Luz Creek is entitled, in my view, to know

4   exactly what the demands are going to be on Robler Creek, how

5   many acres of irrigable land we have and the whole problem of

6   how these correlative rights can be enjoyed.

7          MR. SACHSE:  Ultimately, but not today.  That is my

8   point.

9          THE COURT:  You can't get non-suited before a Master.

10         MR. SACHSE:  I mean if you want to get real technical,

11  you would have, in my view, a one hundred percent prima facie

12  case enough to throw the burden to these people, if you simply

13  have in evidence that you are a riparian owner downstream and

14  that you own irrigable land.  Now these people are willing to

15  pick up the burden of proving the extent of their rights.  All

16  you have to prove is that you have a right.  Now they are going

17  to prove the extent of theirs.  You don't have to prove the ex-

18  tent of yours yet.  Prove that before Judge Carter.  That is my

19  position.

20         THE COURT: I don't see that the Master has to try out,

21  for instance, the effect of Robler Creek here, as eventually this

22  all has to be integrated, and if the Master tries out the claims

23  of these small people, what they have got, and he makes findings

24  on those, eventually this has all got to be woven together, and

25  you can't do it all at one time, and it seems to me that

1405

1   what you are going to do is to burden this Master's hearing

2   with a bunch of material that will probably have to be gone into

3   again before the Court anyhow.

4              MR. VEEDER:   That is why I asked to go into this.

5              THE COURT:   Why can't we cut some of this out?

6              What do you think?

7              MR. CRANSTON:  I agree with your Honor on that, that

8   the hearings before the Master could very properly be limited,

9   just as I think they are by the order, to the specific detailed

10   rights of the individual claimants.   If those are all cataloged,

11   that is going to be enough of a job for me, as far as I'm con-

12   cerned.   I will have plenty to do.   Then those would be pre-

13   sented in findings to you.   You would bear those facts in mind,

14   of course after objection and argument, etc., in connection with

15   the findings that you would make as to the major defendants,

16   the State of California and the plaintiff.   I see no objection

17   to following that course.

18              THE COURT:   In other words, let me put it this way.

19   We have said that the Master is going to try the rights on De

20   Luz Creek.   It wouldn't be quite as efficient, but the thing

21   would work exactly the same way if we said that the Master was

22   going to try out these small claims alphabetically; that he was

23   going to take up Temecula and try Claim A, and A has 160 acres

24   and 80 acres is riparian and he makes a finding about Claim A.

25   Then he tries out Claim B on De Luz and he makes a finding on B.

1406

1　Eventually you will have to weave all of this together.  That

2　would be pretty clumsy and you wouldn't know where the hearings

3　are.  So we simply say that he goes up to De Luz and hears these

4　small ones.  When he gets through there is really no case made on

5　a particular watershed.  It is going to have to be woven in

6　again with the rest of it.

7　　　　　`  MR. VEEDER:  Then we take the next step.  Here are the

8　Vails, who have a tremendous acreage on the upper end.  I think

9　they own more land than everyone else combined on De Luz Creek.

10　They are going to put in that phase of their case.  Is that it?

11　　　　　MR. SACHSE:  No.

12　　　　　THE COURT:  I don't know why they should either.  Later

13　on they will present their case and what they have and what

14　they present has an impact on these rights in the De Luz area.

15　But why they should hear part of the Vail case merely because it

16　has an impact on De Luz, I don't know.  I don't know how it would

17　help the Master any.

18　　　　　MR. VEEDER:  Well, you see, the Vails own all of this,

19　they own this whole (indicating map) --

20　　　　　MR. CRANSTON:  Above the line there.

21　　　　　MR. VEEDER:  Everything here (indicating) is Vail's.

22　　　　　MR. SACHSE:  Inside this red line.

23　　　　　MR. VEEDER:  Here is the problem with which I feel I

24　am confronted, from the standpoint of putting in this case.  I

25　would like then to go ahead and finish up putting in these soil

1    survey maps and the aerials and the field sheets.  You have no

2    objection to that?

3              MR. SACHSE:  I have no objection to anything going in,

4    Bill.  Let's understand, you can put in anything you want.

5              MR. VEEDER:  Because we can't break down our soil sur-

6    veys.  I tried that yesterday.  I asked Col. Bowen the question,

7    if you recall.  I said, "Well, now, tell us how many acres" --

8    we were moving into this area, here -- I said, "Take it section

9    by section and tell us," and he said, "I can't do it, because

10   there is a variance between the breakdown section by section and

11   by the soil survey."  Generally, he didn't stop at section lines

12   at all.  So I will/safer if I can go ahead and put it in.  It
                          feel

13   will not take long.  Put in the rest of our field sheets, put in

14   the areas outside the watershed where our buildings are located.

15              THE COURT:  Again, maps and field sheets?

16              MR. VEEDER:  That is right.

17              MR. CRANSTON:  That just saves your Honor's time.

18              THE COURT:  Yes.

19              MR. SACHSE:  Which means practically at that one point,

20   then, again.  When the case comes before your Honor, if we have

21   cross-examination of Col. Bowen relating to a quarrel with, let

22   us say, the way he has classified this piece of land, we cross-

23   examine him before your Honor.  That is the point.

24              THE COURT:  I wouldn't see any reason to have Col.

25   Bowen giving a lot of testimony.

1408

1          MR. SACHSE:  He is just the vehicle.

2          MR. VEEDER:  All he is doing is identifying the ex-

3 hibits.  That's all.

4          THE COURT:  And then try that out in front of me.

5          MR. VEEDER:  All right.

6          There is an important question, and it is relating

7 strictly to De Luz Creek, and I appreciate your giving us this

8 time because I need direction, frankly.  We are going to call a

9 geologist and put him on the stand and put in pretty complex

10 exhibits to prove the De Luz Creek geology and part of the areas

11 important to us within the watershed of De Luz Creek.

12          THE COURT:  What do you need that for?

13          MR. VEEDER:  Well, the question has come up, of course,--

14          THE COURT:  Why couldn't that come in before me?

15          MR. VEEDER:  It is perfectly all right with me.

16          THE COURT:  Meanwhile the Master has made his finding

17 on these small people.

18          I take it that this geologist is going to show that

19 there are some basins and alluvia?

20          MR. VEEDER:  Yes.

21          THE COURT:   It is going to have impact on the entire

22 case.  But why can't the Master's findings on the holdings of

23 these smaller people be made and eventually woven into the case

24 you make before me on the geology of De Luz?

25          MR. CRANSTON:  The nature of the land is independent

1469

1 of the basin water underneath it.

2        MR. VEEDER:  In other words, we will simply put that

3 phase of the case over until we come before your Honor.

4        THE COURT:  That is the way I think it ought to be done.

5 The Master is going to have plenty to do with cataloging these

6 people, without putting in a lot of material before him which

7 would probably have to be repeated before me.

8        MR. SACHSE:  That's the whole thing.

9        MR. VEEDER:  That is the problem.  Of course, we have

10 been talking with Mr. Stahlman as to what he plans to do.  He

11 hasn't confided in us really what he has, but I know George

12 Stahlman well enough to know that he is going to try the buttons

13 right off our shirt, and it suits me very well.

14        Col. Robertson just made a point.  When Vail starts,

15 will the small owners have to come back in to hear what the Vails

16 have to say?

17        MR. SACHSE:  That is the problem of the small owners,

18 as I see it.  They have had their notice, they have been told

19 the order in which this case is going to be tried, and they are

20 given an opportunity to be present and to present their rights.

21 You don't have to talk about Vail.  You can talk about any two

22 parcels that adjoin each other at De Luz Creek.  If Rowley wants

23 to be present when Garnsey's case is heard, he had better be

24 there if he thinks that he has a claim against him.  If he has

25 no complaint on it, he will not be there.  As far as my people

1410

1    are concerned, I will be there, so that if they have fights with

2    Vail, I will be there to take care of it. As far as the individ-

3    ual is concerned, they have had their notice and they are told

4    that Vail comes on later. If they are worried about Vail's

5    rights, they had better show up.

6          THE COURT:  I don't know of any way to get around

7    that.  The same thing would be true.  Suppose that Vail put their

8    proof on before the Master, suppose you put your proof on before

9    the Master.  Eventually the nut of the coconut is the correlative

10   right of all these people, when you weave this all together,

11   and that is as important a time for people to be present who have

12   something to say as any other time, and there is no way that we

13   can keep from saying that every person can come in and will be

14   heard if they want to be heard.  As a practical matter, a lot of

15   them will not be here.

16         MR. SACHSE:  Ninety percent.

17         THE COURT:  On the other hand, we are going to do all

18   we can to give them a crack at it, and by letting the Master go

19   out and take their proof we have done the most we can do, plus

20   the fact that the Court is open for anybody to be heard when we

21   really get down to the heart of it that affects their rights,

22   the determination of the rights they have in relation to other

23   people.  The Master can't do that now, anyhow.

24         MR. VEEDER:  I had scheduled three, I call them, old

25   timers because I have no better designation, who can trace back

1   a long way the history of the use of the stream.   In other words,

2   that should come in before your Honor rather than before the

3   Master?

4          THE COURT:   I think so.   I think all you have to do,

5   and I don't really know whether you have to do this on these

6   Master hearings, I think all you would have to do at best is to

7   say that we are downstream, we have riparian rights, we have

8   irrigable land.   I don't see why you have to do that.   We know

9   that.   It is in the case.   The Court has said that the Master

10  finds what these other people have in acreage, in irrigable

11  ground, get some descriptions where they lie on these streams,

12  etc.   I don't know why you have to show them that you have a

13  prima facie case downstream, and if you did that in every Master's

14  hearing this would be intolerable.

15         MR. VEEDER:   That is the additional factor that brought

16  us out of the brush yesterday, and here is what is concerning me,

17  also.   Frankly, I would like to get the field sheets in, and as

18  I understand they are going in without objection?

19         MR. SACHSE:   Sure.

20         MR. VEEDER:   Certainly you are relying on them, aren't

21  you?

22         MR. SACHSE:   Yes.   I haven't had any objection to them.

23  All I want to do is to reserve cross-examination.

24         MR. VEEDER:   I would like to put in the areas outside

25  the watershed where we have a plant in operation.

1412

1        MR. SACHSE:  The sooner they are in, it would be of

2  help.  I would like to see them in because then I have them to

3  work up my case in the future

4        MR. VEEDER:  Fine.  Then we will go ahead.  Then we

5  will show the quantities of water that we have, just a tabulation

6  of the quantities of water used within and without the watershed.

7        MR. SACHSE:  Bill just expressed something in my ear

8  that I had overlooked.  Of course, all these exhibits that are

9  introduced particularly talk about uses outside the watershed.

10  Assuming certain possible rulings from his Honor, I want to re-

11  serve possible motions to strike.  I will not object to the

12  factual material.

13        MR. VEEDER:  What would be your motion to strike?

14        MR. SACHSE:  If his Honor, for instance, should rule

15  that it is impossible for you to acquire an appropriative right

16  to the use of water outside the watershed, on a formal motion

17  to strike pleadings such as are coming up, then I might say

18  that it is utterly irrelevant to have any of this material out-

19  side the watershed.

20        MR. VEEDER:  I couldn't see what you were talking

21  about on that.  I think this.  For my own peace of mind, I want

22  to put in what I am talking about now on aerials, I want to hold

23  this De Luz geology up until I get before you, I want to put in

24  the field sheets, I want to put in the uses of water outside the

25  watershed and that will be the extent of it, unless

1  something shows up then.  Then we will be through on De Luz.  At

2  least I will feel that the record shows our acreages, our uses

3  and our claims to water, and then I will be through.  Does that

4  sound all right?

5          THE COURT:  Well, try this for size.  When you get

6  toward the end of the hearings that can be scheduled, and there

7  will be probably other people later who will have to have hear-

8  ings, people against whom you had to publish, then I think you

9  could state on the record to the people who are there that the

10  Government intends at the trial before the Court to introduce

11  evidence as to the complete geology of De Luz Creek, water geol-

12  ogy, etc., and how it is set up, and that the Vail Co. intends

13  to put on their proof before the Court as to their land in that

14  area, etc., and just make the record that this thing isn't

15  complete, that there is other evidence that may concern these

16  people that will be heard later but that things that they can

17  produce have been taken care of.

18          MR. VEEDER:  Right.  We were talking and I wanted to

19  get the ground rules on this, because I was a little worried

20  that if we didn't make out a case in this De Luz area by our

21  claims down here and our claims on Robler and our areas in here

22  there might be a foreclosing of touching on those parts.  But

23  as I understand it now, they can go ahead very soon with  these

24  small individuals coming in and begin putting in their claims.

25  Is that right?

1414

1    MR. SACHSE:  That is what I would like.

2    MR. VEEDER:  Now, in regard to your claims, Franz,

3  when can you start on your small ones?

4    MR. SACHSE:  I have.  I am not deferring our cross-

5  examination.  I have cross-examination of Col. Bowen in con-

6  nection with the small claimants.  I will do that before I put

7  on any witnesses.  I sent postcards out to all of them, because

8  none of them have phones, telling them to show up next Monday.

9  I have sent by the grapevine, Paul Rever style, going around

10  the Valley telling them that it will not be Monday -- Monday

11  is too soon.

12    MR. VEEDER:  May I ask you about cross-examination of

13  Col. Bowen, because that is important to us from the standpoint

14  of scheduling.  Do you intend intensive cross-examination on the

15  area where he has been?

16    MR. SACHSE:  I intend a pretty thorough cross-examina-

17  tion for my clients.

18    THE COURT:  You mean of his testimony as it pertains

19  to your clients?

20    MR. SACHSE:  As it pertains to my clients, yes; not

21  Fallbrook.  I am speaking of my individual clients.

22    MR. CRANSTON:  How long would the balance of your

23  presentation take aside from cross-examination?

24    MR. VEEDER:  I will try very hard to get it in Monday,

25  because I had truly thought that I had the burden of putting in

1415

1    a little more than your Honor indicated.

2         MR. SACHSE:  I will have clients available to pick up

3    the slack and start putting on the case.  If you finish and I

4    run out of gas on cross-examination, I will have people there to

5    start going.

6         MR. CRANSTON:  If Mr. Veeder takes Monday, you would

7    have cross-examination and witnesses to take all of Wednesday

8    and Thursday.

9         MR. SACHSE:  I will have witnesses ready to start my

10   case.  It is conceivable that something might develop that we

11   would have to quit at 3:00, but I will be ready to go ahead with

12   my people.

13        MR. VEEDER:  How many claims  do you anticipate in

14   regard to the case in chief, the main case?  What would be the

15   designation of the parties on that?

16        I would like to tender this thought in that regard.

17   I think that if we tried the United States, Santa Margarita,

18   Fallbrook and Vail --

19        MR. SACHSE:  And California.

20        MR. VEEDER:  California hasn't anything except --

21        MR. SACHSE:  Does he have that done?

22        MR. VEEDER:  I want it done.  That is all he has done

23   up to this point.

24        MR. DENNIS:  Sawday.

25        MR. VEEDER:  That is the point.  Do we take Sawday,

1    the whole bunch of them?

2              MR. DENNIS:   And the appropriators.

3              MR. VEEDER:   All right.

4              When we hit the main stem Fallbrook Public Utility

5    District was in two different positions -- it was a property

6    owner on the main stem and it owns a lot of land down there now,

7    and of course it is a major party in the major controversy that

8    is going on with the United States.   So my recollection was that

9    at that time you used some phrase such as that you expected to

10   try the main stem yourself.   I think we should clarify this.

11   John brought that up in connection with Sandia Creek.   If you

12   move to Sandia next, I believe -- I would say that 70% or 50%

13   of the riparian acreage is owned by the P.U.D.   There is the

14   Hansen estate, the Marchants and --

15             MR. DENNIS:   They may not be riparian any longer,

16   but I think you have several others.

17             Mr. Veeder brought up something that has been worry-

18   ing me considerably, and that is that so far as I know as yet

19   there has been no order made ordering a separate trial as to

20   certain defendants, and we do have an order saying that everybody

21   is a cross-defendant as against everybody else.   Now as I under-

22   stand it, the Navy has served approximately 60% of the defendants.

23   In what position are we going to be if we go to trial as against

24   three or four defendants without an order saying that there

25   should be a separate trial as to those defendants, and what

1  position are we going to be in as to those defendants who have

2  not been served or those defendants who have not had an opportun-

3  ity to answer?  We went through this once before.

4       The reason I am probably so concerned with it is that

5  there was a separate trial as to Santa Margarita and the State,

6  and then they said that there should not have been a separate

7  judgment as to those defendants -- everybody should have been

8  before the Court.

9       THE COURT:  There is a difference between trial and

10  judgment.

11       MR. DENNIS:  That is right.  But we have no order yet

12  saying there is a separate trial as to any certain number of

13  defendants, and are we entitled to go to the extent of entering

14  into a separate trial as to a certain number of defendants with-

15  out an order having been made and some kind of notice having

16  been given that the Court will proceed to try this case as to

17  those defendants only?  That is from a legal standpoint and

18  what might happen on appeal.

19       From a practical standpoint it bothers me because

20  while there is a great deal of talk about these small teacup

21  users and these possible defendants, the people such as Santa

22  Margarita and Fallbrook that represent on the whole a great

23  number of small defendants, they are the real beneficiaries of

24  this water and they are going to bear the expense of this liti-

25  gation, and are they going to have to come in to protect their

1418

1  rights?  Say that we don't make the Oviatts a party to this

2  separate trial, and the Sawdays, then are we going to have to go

3  and try the action all over again against the Oviatts and the

4  Sawdays?  They probably would be in the position that they would

5  insist that they would have a right to have the testimony put

6  on while they were present and have the right of cross-examination.

7  Are we going to be              and so on -- to appear at the

8  trial of half a dozen lawsuits against these when it comes to

9  a trial against other large riparian owners?  The Oviatts

10  own actually more acreage than any other landowner  within

11  Fallbrook or within Santa Margarita or within Rainbow.  We have

12  to pay the cost down to them and it is a real serious situation.

13  The people of Santa Margarita, I know, are worrying about it,

14  because they are saying, "We split the cost of one lawsuit.  Now

15  we are going into another."  If there are going to be ten

16  separate trials, are we going to have to appear at each one of

17  these actions?

18          I am not trying to delay it.  I have always wanted to

19  have this case tried, but I hate to be in the position where we

20  go up maybe on appeal on the grounds that there is no notice

21  having been made for separate trials and have it reversed on

22  that ground and, second, I don't want to see clients in the

23  position where they are going to have to appear in ten different

24  trials in this same action.  The findings that he makes later

25  must be approved and everybody gets a chance to be heard.

1          As to what we call the trial on the main stream,  the

2   only thing that really concerns me is the people who have not

3   been served at the time the trial starts.  Let's put that aside.

4   Let's assume that everybody has been served and we are in the

5   case.  Then I don't think that you would make an order that

6   there is going to be a separate trial as to certain defendants.

7   I think what you really would do, when the trial started, say,

8   on the 17th, you would say that there was going to be allocated

9   to the United States an opportunity to present its case, and

10  reserving rights later on to put on other evidence, and that in

11  an orderly manner thereafter that Fallbrook was going to present

12  its contentions, and then Santa Margarita, Rainbow, Sawday, down

13  the line and that this is an open trial and anybody could come

14  in and be heard at any time.

15          THE COURT:  We are not going to try it all in one day

16  and we are going to try it in some orderly manner.  I don't think

17  I would say that there is going to be a separate trial -- you

18  have a separate trial when nobody is adverse, but as the trial

19  progresses, parts of the trial are going to concern particularly

20  certain defendants.

21          Is that the way you look at it?

22          MR. VEEDER:  That is the way I look at it.

23          MR. DENNIS:  I agree with your Honor that those people

24  who have been served with notice of the trial we don't have to

25  have an order as to a separate trial as to those defendants.

1    THE COURT:  The problem that does concern me -- we

2 have kicked it around before -- that we have been trying to get

3 started and service has been going on and hasn't been completed

4 and there are undoubtedly going to be people who could be served

5 against whom you will have to publish.

6    MR. VEEDER:  We have done the over-all job of service

7 down to a very small percentage that have not been contacted.

8 We are down now to where it is no longer an easy job.  I imagine

9 that there are probably 2000 named defendants whom we can touch

10 only with publication.  I think that is where we are.

11    THE COURT:  Let's say there are 2000 defendants, or

12 1000, against whom you  are going to have to publish --

13    MR. CRANSTON:  But none of those is a major defendant

14 like the Oviatts.

15    MR. VEEDER:  No.

16    MR. CRANSTON:  They have been served personally.

17    MR. VEEDER:  Right at this moment the principal parties

18 litigant have been served, and that has been done.  We are down

19 now --

20    THE COURT:  Let's take 1000 small people around the

21 watershed whose publication is not completed at the time the

22 trial starts.  What is the situation as to them?  It  is true

23 that we could later pick up proof as to their claims by the use

24 of a Master or a Court going out and holding hearings or holding

25 hearings here.

1          MR. SACHSE: Suppose they don't ever appear.

2          THE COURT:   The point that would concern me would be
3     their point on appeal would be this: It is true that we had a
4     right to make a showing, you gave us a right to make a showing
5     of  what we had, etc., but we were not served and brought into
6     the case at the time the proof went on as to a lot of these
7     other defendants.   Therefore, we never had a chance to be in the
8     Courtroom.

9          MR. VEEDER:   That is why I would think that an order
10    for a separate trial from your Honor designating certain specific
11    parties whose interests would be tried before you starting on
12    June 17 would be helpful.   In other words, if an order were
13    entered naming Fallbrook, Santa Margarita, the Vail Estate,
14    Oviatt, Rainbow, Sawday and any other diverters of any considerable
15    quantity of water, if we had a four-cornered order on it -- here
16    is what I am worried about.   This jurisdictional attack we had
17    once before.

18          THE COURT:   What good would that order do?

19          (An interruption.)

20          THE COURT:   Let's take Mr. Veeder's suggestion.   That
21    doesn't solve the problem.   Here I sit and I have 160 acres of
22    land.   An order is made for a separate trial, and I live in New
23    York and nobody has ever served me.   So there is no jurisdiction
24    over me personally.   Of course, this is an in rem action, but
25    even then the party is entitled to some notice.   So you make an

1   order for this trial and go ahead and try it.  Finally the

2   service on me is completed and by the time it is completed and

3   you have jurisdiction of me the trial has been had.  So I come

4   in and the Court says, "All right, we will send a Master out

5   and hear what you have."  That is all right as to what I have.

6   Now my rights are adverse to everybody else and you had a trial

7   and I was not present and I didn't have a chance to object.  Of

8   course, it is silly, but from the legal standpoint he could say,

9   "I didn't have a chance to combat what was put on."

10          I think about the only thing you can do -- and Mr.

11   Veeder, get hold of your chair now -- I think about the only

12   thing we can do is something like Judge Hall did in the case on

13   the San Joaquin, and that is segregate these people of whom we

14   haven't got jurisdiction and then after we finally complete

15   service and get them all in give them a notice that we are going

16   to have a trial and that at that trial we are going to intro-

17   duce in evidence the transcript of what went on before and that

18   if any one of them wants to cross-examine any one of those wit-

19   nesses, the witness will be called back -- all they have to do

20   is to tell us whom they want.  As a practical matter, these are

21   going to be small people and I don't think we are going to have

22   too much trouble.  We are going to have to say, "The evidence is

23   going to be re-introduced.  At that time you will have a chance

24   to object to any document that is in the record.  The oral testi-

25   mony of the witnesses will be then tendered.  If you want the

1423

1    witness present, we will have to bring him back."

2         I don't see that there is any other way that we can

3    do it.  That is what Judge Hall did to you.

4         MR. VEEDER:  That is what he undertook to do.

5         MR. SACHSE:  It is not quite as serious, your Honor.

6    I think Mr. Veeder's suggestion is  highly practical, for this

7    reason, if you look at the physical facts, between the Fallbrook

8    Dam site, which represents a part of the controversy, let us

9    say, of Santa Margarita and Rainbow and Fallbrook and the enclave,

10   I think are two or at the most three riparian owners.  There

11   aren't over half a dozen in the watershed below that point,

12   other than the De Luz people.  So your hypothetical New Yorker,

13   who is away up here, has almost no practical reason at all for

14   complaining about what they find down there.  He is at the top.

15   He gets it first anyway, theoretically.

16        MR. DENNIS:  Theoretically, you are right.  But I

17   was looking at a file on another river about a month or so ago,

18   and the large appropriator who got licked, I saw, was making

19   arrangements to furnish Counsel to the boy upstream who hadn't

20   had sufficient notice to go ahead and see if they couldn't up-

21   set the judgment.  It is not beyond the realm of possibility

22   that that might happen here.

23        THE COURT:  My man with the 160 acres is going to

24   take the legal position that he didn't get notice of this trial

25   and he was not in the case at the time.  His land was there,

1424

1   but that isn't enough.  He didn't get notice that the hearing

2   was going to be had, he didn't have a chance to object to the

3   maps and other documents, he didn't have a chance to hear the

4   witnesses, etc.

5   I think that probably if we gathered together those

6   who aren't in the case at the time the trial starts, those who

7   haven't been served, and offer to do whatever they want, I doubt

8   if we would have too much of a problem, because as you say most

9   of them are up around the outer fringe.

10   MR. DENNIS:  Your Honor, it seems to me that you have

11   a practical situation.  As I understand, the Ninth Circuit

12   decision says that there can be only one judgment entered in

13   this case.  So you are not going to be able to enter a final

14   judgment until everybody in this case has been tried.  So you

15   are not delaying anything if you avoided some of these problems

16   and got all of these people before the Court before you started

17   in.  I mean,  you are going to end up, your final judgment is

18   going to be entered on exactly the same day, it is going to be

19   signed in either way; so here we are taking chances and putting

20   people in the position that maybe they are going to have to

21   appear before two hearings.  The man with the 160 acres is going

22   to have to buy an expensive transcript to find out what happened

23   before, which probably he wouldn't have to do.  There are

24   questions which we are actually manufacturing here by proceeding

25   in this way.  To finish up the job it would take maybe three or

1425

1   four months and we don't delay our judgment at all.  You will

2   not be able to enter a judgment after the matter is tried as

3   between the people who are now before the Court.

4           MR. VEEDER:  Let me tender a thought on that, then.

5   Suppose I move for declaratory judgment against Fallbrook and

6   Santa Margarita Mutual and ask you to enjoin Fallbrook from

7   doing anything more on this dam and try that out.  I am anxious

8   to get this thing going.  We would have a big lawsuit right

9   there, and we would knock Fallbrook out and it would be very

10  simple to finish up the lawsuit.

11          MR. SACHSE:  I suggested a long while ago that you go

12  ahead and apply for a writ.

13          THE COURT:  Another thing that might be done would be

14  this.  Instead of starting this trial on the 16th on the main

15  stream, go ahead with these Master's hearings, let me take the

16  time that has been set aside and start some hearings the equiva-

17  lent of a Master's hearing on some of these other tributaries.

18          MR. SACHSE:  One minor thought, your Honor.

19          MR. VEEDER:  We want to take a crack at Fallbrook.

20          MR. SACHSE:  That is fine.  We are ready.  We will go

21  in the ring at any time.  But we have been trying for a year to

22  hammer out a few legal issues, and they aren't hammered out

23  yet, and I want some motions ruled on, and I think there will

24  be a solid week of arguments on motions, and there are going to

25  be more of them.

1426

1        THE COURT:  We are going to hear these motions that

2   week, but the start of the trial is to be put over until we

3   hear these motions.  But after we have done that, that will

4   kind of clear the air on some of this.

5        MR. SACHSE:  Either way, either you go out, or we

6   try Fallbrook.  I don't care.

7        THE COURT:  I wonder if we would be in a jackpot by

8   trying to run two hearings at the same time.

9        MR. CRANSTON:  You have the question of Counsel appear-

10  ing.

11.      MR. SACHSE:  If you ran two Masters' hearings, you

12  wouldn't be in a jackpot.  Well, you could.

13       THE COURT:  The only jackpot we would be in would be

14  in case somebody wanted to be at both of them, as a practical

15  problem.  But since they are only a limited hearing, a fact-

16  finding on what the fellow has and they don't concern his corre-

17  lative rights, which are going to be tried in the main part of

18  the case, I don't think there would be any jurisdictional ob-

19  jection to having me conduct some hearings in some areas while

20  John was working in another area.

21       MR. VEEDER:  My thought is this, though, that if you

22  were to start trial on June 17, in regard to the United States

23  and Fallbrook and Santa Margarita Mutual on the question of de-

24  claratory relief in connection with the respective priorities

25  of the United States and those two, then Bill Dennis' objection

1 would fall into line.  In other words, we would be in this

2 position, of taking a crack at Fallbrook early and getting the

3 matter cleared up from the standpoint of whether they could put

4 in --

5    THE COURT:  Suppose you set up a hearing on an order

6 to show cause for an injunction and supplemental Complaint, or --

7    MR. VEEDER:  I have already pleaded everything.

8    THE COURT: -- or a motion for declaratory relief, etc.,

9 and you named just certain people.

10    MR. SACHSE:  He can do that without your consent.

11    THE COURT:  When that was all tried out, you then

12 eventually would have to repeat all of that evidence as to every-

13 body else, because you would be duplicating there because nobody

14 would get notice of that but the people you were trying to stand

15 up and shoot at.

16    MR. VEEDER:  I thought you would take a page out of

17 Pearson Hall's book on that.

18    MR. SACHSE:  If he got licked that might end the case.

19    THE COURT:  You are thinking of some way to avoid that.

20    MR. VEEDER:  I am not recommending it, because we are

21 going to hear that in the Ninth Circuit shortly.  But the point

22 I make is that here you have 12178 and 12179.  We don't believe

23 they are worth a darn.  We think, first, that Mr. Holsinger's

24 order is a complete absurdity.  Why not take these two and see

25 whether Fallbrook didn't make such a drastic change in its

1   project that, under any circumstances, it would come in behind

2   our 12576.  That would be the end of the lawsuit.

3               THE COURT:          talk about the validity of State

4   permits?

5               MR. SACHSE:  Thank you, your Honor.

6               MR. VEEDER:  My goodness.

7               THE COURT:  It seems to me that there are provisions

8   to review the actions of State administrative agencies.  Where

9   would I have any jurisdiction?  The permits say that they are

10  not adjudicating the vested rights on the River.  They just make

11  a prima facie finding that there is a surplus.

12              MR. SACHSE:  I have a motion on this.  Let's argue

13  this properly to the Court.

14              MR. VEEDER:  Your Honor has before you not only every

15  question that is before us -- except this matter of surplus,

16  which is assinine, you have before you the question of the re-

17  lative priorities of the parties, that's for sure, and the re-

18  lative priorities were acted upon by Mr. Holsinger when he re-

19  jected our application.  Certainly your Honor can review that.

20  I don't see how anybody could cut in on this Court's juris-

21  diction to say that Fallbrook either did or did not have a

22  priority ahead of us, because to do otherwise -- here is where

23  we are standing at this exact moment.  Mr. Holsinger threw out

24  our  12576.  He says, "You have no priority at all."  Now he

25  couldn't do that.  He couldn't deprive you of the jurisdiction

1   to rule on that, because he said I only appeared specially in

2   this matter, therefore, our priority is thrown out.  Certainly

3   your Honor can pass on the question of the relative priorities,

4   and the State of California couldn't enact laws that would de-

5   prive you of that jurisdiction -- it would be impossible, and

6   certainly your Honor had jurisdiction far ahead of the time that

7   the State Board began to move.

8           MR. SACHSE:  Far ahead of the time what?

9           MR. VEEDER:  Or before the State Board had its hearing.

10          MR. SACHSE:  Before the State Board had the case,

11  before the State Board had the filings?

12          MR. VEEDER:  Before the State Board had the hearings

13  on August 12.

14          MR. SACHSE:  Before it had the filings?

15          MR. VEEDER:  This Court had jurisdiction before you

16  made your amendment.

17          MR. SACHSE:  This Court didn't have jurisdiction before

18  the filings.

19          MR. VEEDER:  It had jurisdiction before you made your

20  filings for 35,000 acre feet.  It sure did.

21          MR. SACHSE:  Let's argue it on the motion.

22          THE COURT:  Let's pass it up.  We have some nice

23  questions there.  Undoubtedly you have a right to determine

24  whether somebody has an appropriative or a riparian right.

25          MR. VEEDER:  Or the priorities.  It would be impossible

1  to have it any other way.

2       MR. SACHSE:  My silence is not consent to the priorities.

3       THE COURT:  This is going to take some work.

4       MR. VEEDER:  I'll say, and the day that we are advised

5  that the Federal Court can't make a determination as to priority

6  use of water --

7       MR. SACHSE:  That means that you are advising us that

8  the Federal Court can overrule a State administrative agency?

9       MR. VEEDER:  You bet your life we are arguing that.

10       MR. SACHSE:  That is the argument.

11       MR. VEEDER:  There is squarely before your Honor the

12  question whether Fallbrook has complied with the State law and

13  whether Fallbrook's priorities are not junior to ours.  Certainly

14  California can't set up a procedure that would prevent the

15  United States of America from being heard in its own forum.

16  That is what they are coming up with now.

17       MR. SACHSE:  I'm not coming up with it.  You are.  I

18  have a motion set for the 16th of June.  I will argue it then.

19       MR. VEEDER:  I am very anxious about the order of

20  February 11, 1958.

21       The point I make, though, is that there is a nice

22  clean cut lawsuit as to whether you can deny us the right to be

23  heard in regard to our priority 12576 and whether we can be

24  denied the right to be heard on these other matters by reason

25  of this phony hearing of August 12-14.

1          MR. SACHSE:  I would like, if I may, to drop it and

2   get this thing back on the track.

3          MR. VEEDER:  I am talking about a good new lawsuit

4   right there.

5          MR. SACHSE:  Fine, let's try it.  But if we are going

6   to start trying that on the 16th, let's face a couple of reali-

7   ties.  There is at Camp Pendleton today, and there was there

8   yesterday, a mountain of documents that the State of California

9   sent down for the United States to copy.

10          My answers and my objections to the United States'

11   interrogatories were in, in five days.

12          On April 11 I sent the informal requests for interro-

13   gatories to the United States.  I didn't get the courtesy of a

14   reply.  I sent in formal requests at your Honor's suggestion.

15   I haven't had anything.  I have requests for admissions on file.

16   I got nothing.  I have --

17          MR. VEEDER:  Franz, you are not telling the truth.

18   I'm telling you, you're not telling the truth.  I want that clear

19   in the record.

20          MR. SACHSE:  Let me finish.  Put it in the record.  I

21   have made informal requests in accordance with an understanding

22   expressed by your Honor and others that there would be full dis-

23   closure and cooperation.  No letter, not a word back on the in-

24   formal requests.  On Monday I asked Mr. Veeder, "Well, I'm going

25   to have to deny it."  He didn't tell me.  I had to ask him.  Now

1432

1  I have to make a motion.

2       It is my understanding that pre-trial discovery pro-

3  cedures are, in part, designed to assist the parties in a trial,

4  and if Mr. Veeder writes the rules in this game so that he blows

5  the whistle or rings the bell on every round whenever he feels

6  like --

7       MR. VEEDER:  I think the Judge does that.

8       MR. SACHSE:  If he is in trouble, he rings it early,

9  and if his opponent is in trouble, he rings it late, if he comes

10  in with a brick in each glove and complains if somebody even

11  applauds for the opposition, we are going to have to hammer a

12  couple of these things out.

13       There is absolutely no question -- Mr. Veeder says

14  it is not true -- the physical fact is that I do not have any

15  answer to any request I have made -- none.

16       MR. VEEDER:  I have advised repeatedly and I have

17  discussed with you repeatedly, and you talked with Lt. Miller,

18  that all the interrogatories --

19       MR. SACHSE:  You told me on Monday that I would have

20  them on Tuesday.  This is Thursday.  I haven't got them.  You

21  told me that verbally.

22       MR. VEEDER:  I didn't tell you that at all.

23       MR. SACHSE:  You said, "I will have them Tuesday."

24       MR. VEEDER:  I didn't tell you that.  I said that we

25  are working on them.  You said that there is nothing to be

1    concerned about.

2            MR. SACHSE:   That is absolutely untrue.   I need those

3    documents to try this case.

4            THE COURT:   When will you have them?

5            MR. VEEDER:   They are completed; you have them with

6    you?

7            LT. MILLER:   In the rough.

8            THE COURT:   When will they be ready to be served and

9    filed?

10           MR. VEEDER:   What day is tomorrow? .

11           THE COURT:   Tomorrow is a holiday.

12           MR. VEEDER:   They will be filed on Saturday morning

13   here.

14           THE COURT:   There will not be any Clerk here on Sat-

15   urday.

16           MR. VEEDER:   I thought there was on Saturday morning.

17           THE COURT:   I don't think so.

18           MR. VEEDER:   I will send a man out.

19           THE COURT:   You can serve them Saturday, but you can't

20   file them.

21           MR. VEEDER:   That's right.

22           THE COURT:   Are you going to object to some of them,

23   or are you going to answer them all?

24           MR. VEEDER:   The vast majority of them are simply

25   questions of law and I have the answers on those.   We are not

1434

1  going to object to any of them.  Some of them aren't coherent,

2  so we are going to say, "We don't know what you are talking about."

3  But the rest of them we are going to give them the answers.  I

4  will say this, that from our standpoint the data that Mr. Sachse

5  has asked for he already has.  He asked some questions about the

6  Indian Reservations.  I checked that out again yesterday.  I

7  was a little bit concerned to be sure that our acreages were

8  straight, etc.  But from the standpoint of the information that

9  he has asked for, he hasn't been delayed any.

10        MR. SACHSE:  Let me judge that.  I don't have it.  I

11  am not wasting my stenographer's time -- I have only one girl

12  in the office -- I am not writing interrogatories for the fun

13  of writing them.

14        THE COURT:  Let me ask you this.  I wrote Franz a

15  letter the other day.  I noticed that he was attaching some

16  requests to answers.  The Clerk hasn't picked them up.  Maybe

17  you haven't picked them up.

18        MR. SACHSE:  My stenographer, apparently in stupidity --

19  I didn't realize it -- has stapled the request for admissions

20  to the back of the answer.

21        THE COURT:  Most of the answers that Mr. Sachse has

22  filed have stapled on the back of them the requests for ad-

23  missions.

24        MR. VEEDER:  Is that what you are howling about?

25        MR. SACHSE:  No.

1    THE COURT:   They haven't been separately filed.   The
2  Clerk didn't know that they were there.

3    MR. SACHSE:   I am not concerned about those.   Those
4  are all Fallbrook.   I am perfectly willing to get them from
5  Dave Miller and I have gotten along very well.   I am talking
6  about Fallbrook's requests for admissions.   I have them in on
7  every single person who, I contend, is an overlying landowner
8  in the Fallbrook area, because I think having this proof I can
9  get them out of this case.   I think through a request for ad-
10  missions I can create a state of facts where I can come before
11  his Honor with a motion for summary judgment and get rid of
12  some of these little people.   There are six of them that that
13  happened.

14    MR. VEEDER:   You made a very serious accusation.   What
15  data haven't you received on your interrogatories that you need
16  to prepare your case?   I thought you had agreed with me that I
17  did not have to get them in, but it's all right.

18    MR. SACHSE:   I need every single question that I asked
19  in those interrogatories answered, and I need every single
20  question on Fallbrook's request for admissions -- not the little
21  people.   You can take your time on those.

22    MR. VEEDER:   I asked you a question.   We are on the
23  record.

24    MR. SACHSE:   I want them all.

25    MR. VEEDER:   What do you need?

MR. SACHSE:   I want all the questions answered.

THE COURT:   You are going to answer them by Monday?

MR. VEEDER:   Yes, your Honor.

THE COURT:   Then why spend any more time on it now?

MR. VEEDER:   All right.

MR. SACHSE:   Then we have this other item, which is on the motion.

MR. VEEDER:   Bill Dennis has raised a point that has concerned me somewhat, but I do believe that we could try out Fallbrook's case and our case and Santa Margarita Mutual and have you rule on the respective priorities and on our right to divert water outside the watershed, and then if they are still concerned about these small people -- I see that there would be concern there.

MR. DENNIS:   I think you should try it as to the Vails and the couple of the other appropriators.

MR. SACHSE:   All appropriators ought to be in it.

MR. VEEDER:   If we try out 12178 and 12179, in my view, --

MR. SACHSE:   What about the Santa Margarita applications?

MR. VEEDER:   Well, I will take them all and try out the question of the respective priorities where we would come up.

THE COURT:   It is largely a question of law.

MR. VEEDER:   Yes, and I think we have the facts.

MR. SACHSE:   I think it will be ruled on, on the motion.

1437

1    MR. VEEDER:  I think we have agreed to sufficient
2    facts and sufficient data in the record.  That is why I was very
3    anxious to have your Honor there.  I wanted to get in these
4    12178 and 12179 very early and point up that these questions,
5    the questions which I would like to have tried out, and if your
6    Honor rules in our favor, stop Fallbrook's -- they are not
7    building a dam, but they make a lot of noise about building one --
8    and have the matter straightened out, make them answer the in-
9    terrogatories I served on them that they went under the bed on.
10   Then we would be in the position --

11       MR. SACHSE:  I gave you a motion on them.

12       MR. VEEDER:  You were out of time and I am going to
13   move to strike it.

14       What I am going to do, though, if your Honor would
15   permit us, would be to segregate these speculative claims and
16   try them out.  Then this matter that Mr. Dennis has raised would
17   fall in line, and if your Honor could -- I didn't think you
18   would, but if your Honor could, go and hear, along with Mr.
19   Cranston, these small users.

20       THE COURT:  You mean separately?

21       MR. VEEDER:  Yes.  Then you would accelerate this
22   matter immeasurably and we would have no more of this bulldozing
23   upstream when somebody pays their water bill.  That is what we
24   are confronted with.  I think Fallbrook's claims are phony and
25   I would like to knock them out.

1438

THE COURT:  You have motions on for the 16th?

MR. SACHSE:  There are going to be several of them, several more.  I am noticing them all for the 16th, figuring there will be a solid week's work.

THE COURT:  Let us agree, then, Mr. Veeder.  Why don't we get into this legal question about the priority dates and why don't you prepare some kind of motion or pleading, or whatever is necessary, to bring it on for hearing, this legal question as to priorities between Santa Margarita, Fallbrook and the United States?

MR. VEEDER:  What would you think of my removing this matter from the Superior Court over here, this petition for a writ of mandate, so that you would have everything squarely before you?  I could file a petition removing Mr. Dennis' case from the Superior Court over here.

MR. SACHSE:  You wouldn't even have to remove it.  I am encouraging you.  Go ahead.

MR. VEEDER:  I have spent a lot of time thinking about this.

MR. SACHSE:  You have until the 10th to remove your own.

MR. VEEDER:  I'm not about to do that.  What I would like to do is to bring Mr. Dennis' case over here for you to review or to consider.  We would offer what is laughingly referred to as evidence in the August 10-12 proceeding and then

1   you could pass on the question of priority of Fallbrook, Santa

2   Margarita and our right to use water outside the watershed.

3   That would give Mr. Cranston --

4        MR. SACHSE:  I am all for it.  But you can't do that

5   on the 16th, because --

6        MR. DENNIS:  I have no objection.

7        MR. SACHSE:  I haven't either.  Let's have no mis-

8   understanding.  You can't do that on the 16th.

9        MR. VEEDER:  Why not?

10        MR. SACHSE:  We have sixteen days for the State of

11   California to be ready to answer that question.  They are the

12   party who are suing.  It is on a mandate.

13        MR. VEEDER:  No, no.

14        THE COURT:  Wait a minute.  Anybody can remove any

15   case to the Federal Court, right or wrong, and the removal is

16   complete as soon as you file a petition.

17        MR. VEEDER:  Yes.

18        THE COURT:  Then the other side has to come in with

19   a motion to remand it.

20        MR. VEEDER:  Bill has already agreed that he will not.

21        MR. DENNIS:  I can't say what the respondent will do.

22        MR. SACHSE:  The respondent is the State of California.

23        THE COURT:  If you improperly remove it, it is the

24   Court's duty to send it back.

25        MR. SACHSE:  I am not even a party to the case.

1440

THE COURT:  If you remove the case, whether anybody

makes a motion or not, I will then put it on the calendar on

the 16th, on the Court's motion to remand it.  If you want to

brief that as we go ahead with these other arguments, --

MR. VEEDER:  You wouldn't have to act on the motion

to remand for six weeks or so.

MR. SACHSE:  Don't forget that the respondent is the

State of California.  It is not the State Water Rights Board.

MR. VEEDER:  But Bill Dennis would be the respondent

when I filed the petition for removal and he would be the one

to petition for a remand, and he says that he will not.

THE COURT:  Are you a party to this mandamus?

MR. VEEDER:  We are in this position, of having been

pleaded in that petition of the Santa Margarita Mutual Water Co.

MR. SACHSE:  Then intervene.

THE COURT:  How can you remove, if you are not a party?

MR. VEEDER:  The point is that we can show that we are,

in truth and fact, a defendant by reason of this fact, that for

the Superior Court to review the matter it will have to pass on

our interests and adverse position so far as these people are

concerned, and I have handled these removals before on State

proceedings.

MR. SACHSE:  But you will have to intervene and be a

party.

MR. VEEDER:  Let me go ahead.  I will file the

1  petition and bring the case over here for your review and con-

2  sideration as to whether we are in the position of being not

3  nominally a defendant but in actuality a defendant, in passing

4  on this question, and that is what is involved in any proceeding

5  of removal.   I have had this thing in Colorado, where they don't

6  have parties at all but where the United States was named, just

7  like it is here, and the ruling there was simply this:  Well,

8  it doesn't matter whether you are named a plaintiff or defendant.

9  Can an adverse judgment be entered against you in the State

10  Court?  That will determine whether you are a defendant or not,

11  or whether you can remove or not.  In other words, so far as

12  we are concerned, we are a defendant because our rights will be

13  passed upon in an adverse proceeding.  So that would be the

14  reason.  While I file my petition

15

16          MR. SACHSE:  If we review the propositions of law;

17  not when.

18          THE COURT:  Well, of course, I don't know what the

19  situation is.  I have never read of those cases you talk about.

20  But if you remove it, the general rule is, I suppose, subject to

21  limitations, that the removal is complete when you file the

22  petition and give the notice.

23          MR. VEEDER:  That is right, as soon as/file it with

24  you.

25

          THE COURT:  Then the Court has a duty, if nobody makes

1    a question on the remand, to look into its jurisdiction, and if

2    it has no jurisdiction or if the State Court had no jurisdiction

3    when the matter was filed in the State Court, in that instance

4    it is dismissed.  If the State Court had jurisdiction and the

5    Federal Court doesn't, it is remanded.  But it wouldn't compli-

6    cate the issue, because we would have the whole thing over here.

7            MR. VEEDER:  You would have the whole thing here,

8    and I would ask that the whole record be before you because this

9    question of our status, whether we are a defendant or not, is

10   extremely important.  My own view is that, based on Bill's

11   pleadings for the writ of remand and the issues that would have

12   to be resolved in regard to the interests of the United States,

13   it makes us a defendant whether we want to be or not.  So, so

14   far as I am concerned, we can drop this petition into the slot

15   and have the thing over here for June 16.

16           THE COURT:  Can you get up some motion to raise these

17   legal points on these priority dates and notice that for the

18   16th?

19           MR. VEEDER:  Yes.

20           THE COURT:  How much notice can the other side have

21   of your motion, so that we will know.  We will have some time,

22   of course, because we have motions already on which we can start.

23   But when will you serve it?

24           MR. VEEDER:  I will try hard to serve it on Monday.

25           MR. CRANSTON:  You could notice that for the 20th.

1    You will still be in session.

2              THE COURT:  Yes.

3              MR. VEEDER:  Here is the additional factor that I

4    would like to have considered on these motions.  You have motions

5    to strike.  You haven't filed any briefs yet, have you?

6              MR. SACHSE:  I have a very short memorandum of points

7    and authorities.

8              MR. VEEDER:  Do you intend to file additional briefs?

9              MR. SACHSE:  If his Honor wants them, I will supply

10   them.

11             MR. VEEDER:  Better read your Rule 3b.

12             MR. SACHSE:  I will file no more unless they are re-

13   quested.  I am satisfied with the matter that is attached, at

14   the moment, unless his Honor says he wants the thing briefed.

15   Does that answer you?

16             THE COURT:  Are you talking about your present motions?

17             MR. SACHSE:  Yes.

18             MR. VEEDER:  They are not briefed.

19             MR. SACHSE:  There is a memorandum of points and

20   authorities attached.

21             MR. VEEDER:  If that is the extent of your effort, it

22   suits me very well.  I thought you were going to file some

23   more briefs.  I will answer those right away.

24             The point that I am going to make, though, is that

25   I believe that this motion that I would file for declaratory

1  judgment on the matters of priorities would embrace everything

2  so far as these motions that you have.

3  MR. SACHSE:  Absolutely not.  This is the old story

4  of if you don't like the ground rules change them.  There are

5  pending motions and I am vain enough to believe that at least

6  two or three of them are well taken, and if they are granted

7  then this whole business of priority dates is out the window.

8  If Judge Carter grants the motion, your priority dates are gone.

9  THE COURT:  Let's argue it when it comes up.

10  MR. CRANSTON:  May I raise a question of personal

11  privilege.  I am going to have to make some phone calls and

12  cancel some appointments or leave.  I didn't realize that we

13  were going to be here this long.

14  THE COURT:  Neither did I.

15  MR. VEEDER:  Neither did I.

16  MR. CRANSTON:  If we are going to continue I will

17  have to make some phone calls.

18  THE COURT:  You may go.  We are about through here,

19  I think.

20  MR. SACHSE:  As I understand, we are going to go

21  ahead with your short schedule that you had between now and the

22  16th as we are on De Luz Creek.

23  MR. CRANSTON:  Yes, we have six dates scheduled be-

24  tween now and the 16th.

25  MR. SACHSE:  We have some  people ready.  We are then

1  going in down here on motions, and what happens after that we

2  will decide.

3           MR. CRANSTON:  Very well.

4           If I may be excused then.

5           THE COURT:  Yes.

6           (Mr. Cranston leaves.)

7           THE COURT:  This is off the record.

8           (Discussion off the record.)

9           THE COURT:  Well, let's get going.

10          (Adjournment.)

11          (Other matters in open Court.)