Case 3:51-cv-01247-JO-SBC   Document 4517   Filed 09/24/63   PageID.22164   Page 1 of 76

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA
SOUTHERN
~~CENTRAL~~ DIVISION

– – –

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

– – –

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

                            No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al,

           Defendants.

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:               San Diego, California

Date:               June 16, 1958

Pages:           1446-1520

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ Deputy

**JOHN SWADER**
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211 • EXT. 370

VOLUME 18

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | )   No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al, | ) |
| Defendants. | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

June 16, 1958

- - -

APPEARANCES:

    For the Plaintiff:        WILLIAM H. VEEDER, Esq.
                                    WILLIAM E. BURBY, Esq.
                                      Special Assistants to the
                                      Attorney-General
                                      Department of Justice
                                      Washington, D. C.

- - -

1447

1  APPEARANCES (continued):

2      For U. S. Marine Corps:        COL. ELLIOT ROBERTSON
                                       LT. COL. A. C. BOWEN
3                                      LT. DAVID MILLER

4      For Defendant Vail             GEORGE E. STAHLMAN, Esq.
       Company:
5

6      For Defendants Fallbrook       F. R. SACHSE, Esq.
       Public Utility District,
7      Goodchap, Sachse, et al:

8      For Defendant State of         EDMUND G. BROWN, Esq.
       California:                    Attorney-General, by
9                                     ADOLPHUS MOSKOVITZ, Esq.
                                      Deputy Attorney-General
10     For Defendants Gibbon          GEORGE GROVER, Esq.
       and Cottle and
11
12     For Defendants Halde:

13     For Defendant Santa Mar-       W. B. DENNIS, Esq.
       garita Mutual Water Co.:
14
15     For Defendants Bennett and     TRENT G. ANDERSON, Esq.
       Knox:

16     For Defendant Querry:          CLAYTON L. HOWLAND, Esq.

17     For Defendants Suderman:       G. NORMAN KENNEDY, Esq.

18

19

20

21

22

23

24

25

1    SAN DIEGO, CALIFORNIA, MONDAY, JUNE 16, 1958, 10:00 A.M.

2              (Other matters.)

3              THE COURT:  In the Fallbrook case, Mr. Kennedy is

4    here and has a problem.  I told him that I would hear his matter

5    early.  Is there any objection if I take up the Suderman matter?

6              MR. SACHSE:  Not from Fallbrook, your Honor.

7              THE COURT:  Mr. Veeder, is there any objection if I

8    take up the Suderman matter?

9              MR. VEEDER:  I think he is from out of town.  It

10   might be helpful.

11             MR. KENNEDY:  If the Court please, I would like, first

12   of all, to point out, I walked into a little room down the hall

13   where Counsel for the Government and some other Counsel were

14   talking and I was served with what purports to be a response

15   to a motion for summary judgment.  I question whether I would

16   have gotten it had I not happened to walk into that little room.

17   In that connection, I call your Honor's attention to Rule 3(d)

18   of this Court, which requires, 'Each party opposing the motion

19   or other application shall (A), within 5 days after service of

20   the notice thereof upon him, serve and file a brief, but com-

21   plete, written statement of all reasons in opposition thereto

22   and an answering memorandum," etc.  I take it therefore, that

23   the motion, which bears a file stamp of June 16, 1958, and the

24   response served on me this morning is not properly before the

25   Court at this time.

1     On the question whether or not these lands of Mr. and

2  Mrs. Suderman are riparian, these matters were served upon the

3  defendants on or about May 16.  No reply or response was made

4  thereto within the time allowed by Rule 36 and, accordingly,

5  under Rule 56, I filed notice for motion of summary judgment.

6     Some days later, or sometime after the time had

7  elapsed, I received what again purported to be a response to

8  the motion for summary judgment.  I take it that under the Rules

9  --

10     THE COURT:  You mean a response to the request for

11  admissions?

12     MR. KENNEDY:  Yes, your Honor.  I'm sorry.  I take it

13  that under Rule 36 those facts, which are facts and not mixed

14  questions of law and fact or which are not questions of law,

15  are therefore deemed admitted.

16     The term "riparian," in and of itself, I take it,

17  is not a legal question; it is one of fact whether or not as

18  in this particular case, the land is contiguous to Rainbow

19  Creek -- that is a question of fact.  That request was asked,

20  and was admitted.

21     Now the question whether or not these people have

22  riparian rights or riparian status is quite a different matter.

23  That is not asked to be admitted, being clearly a question of

24  law.  But insofar as this particular plaintiff is concerned,

25  it seems quite clear to me that on that matter they are also

precluded.   It seems to me also that if it weren't for Walker,
you would have to be forming drainage districts rather than
irrigation districts down here, with the pleadings that have
been filed by the Government in this case.   There can be no
question but that this person has, as to this plaintiff, his
correlative rights to the flow of this water and to the bene-
ficial use thereof.

Now on the question whether or not the term "fee
simple absolute" is one of law, it clearly is.   These people,
however,  were joined as one of several thousand parties defend-
ant, and as to the Government, it would seem to me therefore
that they are either owners of the land or owners of riparian
rights.   There is no question but that the land is there, and
the water in the creek is there and the fact was asked to be
admitted and it was neither admitted or denied.

As I see it, further, to grant summary judgment, in
all fairness, to my entire motion at this time, I think would
not be feasible, since there has been no determination of
what these correlative rights are, and the Court will, in the
last analysis, have to make that determination,  without de-
termining its particular share of the water.

The Government has pleaded that 4.2 acre feet per
year is a reasonable burden.   We admit that in our request for
admissions.   In our request for admissions, it is a fact that
will be admitted -- is deemed admitted.

1451

It would therefore seem that, as between the plain-
tiff and these particular defendants, we have before us the
question that they are riparian, that they have the land, and
that 4.2 acre feet is a reasonable water duty.  At least that
much, it seems to me, can be ruled upon at this time.  What
effect, if any, it would have upon other parties to the action,
it would seem to me, would have to be ruled upon by the Court
at a later date after hearing the case in its entirety.

MR. VEEDER:  May I respond, your Honor.

THE COURT:  Yes, sir.

MR. VEEDER:  The situation is this, as I see it,
your Honor.  A man has come in and asked your Honor to give
him a judgment in regard to one of the most controversial
situations that could conceivably exist.  First, he says that
his lands are riparian.

THE COURT:  Maybe I had better ask you some questions.
You are just going to give me the material you have set forth
in that response?

MR. VEEDER:  I really was not, your Honor.  I have
some additional authorities.

THE COURT:  All right.  Go ahead.

MR. VEEDER:  The proposition that I would like to
advance to you is that the decree which you will ultimately
enter will entail a very complex determination involving owners
of lands throughout the entire watershed.  Assuming that these

1　lands are riparian, it would be absolutely essential for your

2　Honor in this case, it is my view, to ascertain how his rights

3　relate to someone else's, irrespective of the rights of the

4　United States.  It is also essential that your Honor take into

5　consideration the proportionate share of the water that these

6　acres might conceivably receive.  It would be absolutely im-

7　possible for your Honor to enter a summary judgment without a

8　definitive disclosure of the lands and a description of the

9　lands for which the 10 acres are claimed.  I admit that I took

10　perhaps too lightly the requests for admissions, because it

11　would be inconceivable for a judgment of any kind, in my view,

12　to be entered in that regard.  We haven't the slightest idea

13　what lands he is making reference to.  We have his own ad-

14　mission here that the question of the owner in fee simple title

15　is strictly a legal question.  Until your Honor knows who owns

16　the fee simple title, it would be purely a moot question to

17　attempt to decide the proposition that he has asked.  At least,

18　it is now simply a request for an advisory opinion.

19　　　　He says, assuming that I own a fee simple title, and

20　assuming that it is riparian, would your Honor please give us

21　4.2 acre feet per acre.  I respectfully submit that no Court,

22　under any circumstances, would ever enter a summary judgment

23　as here prayed.

24　　　　You couldn't conceivably resolve the question whether

25　4.2 is a proper duty of water for a particular piece of land.

We have one of Mr. Sachse's clients -- Mr. Holzworth.  Now it was shown that the United States couldn't agree to 4.2 because it was our belief, and I believe the facts will sustain it, that he was entitled to water for a small garden.  So there is immediately and clearly a conflict throughout in regard to each individual case.

The United States is very willing and very anxious to go upon these lands and make the technical investigations.  We simply do not have the personnel in every instance to clear up these questions as soon as they are ready.  We move as rapidly as we can.  We are anxious to do it.  We will do all we can.  But I petition your Honor to deny this motion for summary judgment because of the facts to which I have just made reference.

THE COURT:  I have some things to talk to you about on that.

But as to your motion, Mr. Kennedy, it has to be denied, and you, yourself, put your finger on a couple of the problems.  First  of all, if it were granted and the Court said that you had riparian rights that were correlative, that doesn't answer the problem.  We have to know how those rights compare with other people who have rights on the stream, and there would have to be a hearing to determine that, and while we are having that hearing we might as well determine these other matters.

Secondly, as between yourself and the Government, had the Government answered your request for admissions you might have been in a position to be out of the litigation as far as the Government was concerned.  But everybody is adverse to everybody else.  Somebody upstream from you, or downstream from you, would have a right to be heard.  Therefore, there would have to be a hearing before the Master or before the Court in which there would be adduced these facts and at which other people, if they wanted to object, could come in and be heard.  The chances are, as a practical matter, that they might not come in, but it is the purpose of the Court that there be a hearing held or an opportunity for a hearing of everyone of these parcels.

Therefore, your motion for summary judgment is denied.

I'm not satisfied, however, with the Government's blanket denials to these requests for admissions.  Somebody asks a request for an admission that a man is the owner in fee of this property.  It is just another way of saying, "Don't your records indicate that I am the owner of this property?"  You have the records there.  I think your obligation, Mr. Veeder, is to interpret those records on a reasonable basis and respond to them that your records indicate that So-and-so is the owner of the property and that at the hearing the Government's proof, if you are going to put on proof, will be to that extent or that you don't contest that fact.

MR. VEEDER:  We will undertake that, your Honor.

THE COURT:  This business of quibbling around about the phrase "owner in fee title" being an intricate legal problem, we could never try this case if that was going to be the attitude.  Somebody owns this property.  Who is it?  Your records show it.

Now I understand your position to be -- I think I do -- that it is not your burden to prove these ownerships.  But there will be instances where owners don't appear, and the Court will call upon you to introduce such proof as you have of ownership.  So when a request for admission is made of you as to what your records show, I think it should be answered.

MR. VEEDER:  We will, your Honor.

MR. KENNEDY:  May I be heard a little bit more, your Honor.

THE COURT:  Yes.  On what point -- your motion?

MR. KENNEDY:  Yes, in part on the motion, if the Court please -- I would like you to reserve it just for a moment, and in part on the point of view taken by the Government with these little people.  It will take me just about thirty seconds.

THE COURT:  Wait just a minute until I get through.

MR. KENNEDY:  Yes, your Honor.  I thought you were through.

THE COURT:  I am not satisfied with your answers on

these questions about the riparian proposition.  It is true that these requests for admissions can be effective only as between you and the party demanding it.  They don't bind anybody else.  You could admit that 20 acres were riparian to a stream or tributary, and 20 other people could come in and contest it.  But largely these people are interested in what the Government's position is.  They are not too concerned with fighting with other people.  They want to know what your position is.  I think you ought to be able to make some kind of answer to that.

MR. VEEDER:  Very well, your Honor,

Here's our view.  We can show, from the aerials that are now in evidence, that the land is traversed by a stream; that from our records at least part of it is riparian.  Here's the proceeding as we have gone forward for the Special Master, and we have discussed the matter with Mr. Sachse.  We have said this.  So far as we are concerned, you were putting in your evidence about these people.  Unless we introduce evidence in rebuttal showing that their lands are not riparian, we will proceed on the basis that they are, assuming that the lands are within the watershed and have the other characteristics.  We have no desire to fight about it.

THE COURT:  Of course, you are dealing with Mr. Sachse where you can see him almost every day.  But here are attorneys who are from out of the city.  Here is a man from

1   Pasadena.

2          MR. VEEDER:  He was entitled to better treatment than

3   he got, your Honor.

4          THE COURT:  He was entitled to better treatment.

5          MR. VEEDER:  Yes.

6          THE COURT:  Suppose that you didn't have the in-

7   formation.  Your reply could have been that you didn't have

8   it, you asked time in which to file amended answers -- that you

9   would communicate with him.

10          "The Court has ruled that this case is one where

11   everybody is adverse to everybody else.  Even if you and I

12   come to some agreement, there is going to have to be a hearing

13   where some day proof is made of what you have.  Now as far as

14   the Government is concerned, our records show that your clients

15   are owners of this property.  We are not going to contest that.

16   Our records show that you lie on a stream and apparently,

17   therefore, because of where you lie, all your land is riparian.

18   We haven't made (or we have made) a survey as to how much is

19   irrigable.  Our records show that 15 or 20 acres are irrigable,

20   and we don't think that anybody can legitimately claim more

21   than 4.2 acre feet of water duty.  That is going to be our

22   position.  Eventually, of course, there are going to be more

23   demands for water on this stream than there is water.  Your

24   rights are going to be correlative."  All of this can be taken

25   care of.

MR. VEEDER:  Yes, sir.  It was an unfortunate circumstance, and apologies never come easy for me, but I think Mr. Kennedy is entitled to one for this reason:  We simply didn't get to his request in time, and it was just too bad, and I would like to be able to come forward with some stronger answer.

MR. KENNEDY:  If he had just given me the courtesy of a telephone call and asked for more time, I would have said, "Of course you may have more time."

THE COURT:  Well, he is on his knees now.

MR. KENNEDY:  This is the majesty of the Government working with one little man with 17 acres of land.

THE COURT:  Yes, I know, but on the other hand he is on his knees now and his head is bloody and he is penitent. Of course, in his defense, we know that there has been a terrific amount of material come in.  We had the unfortunate situation here that some of these answers came in with requests appended to the answers.  Even the Clerk didn't catch the fact that there were requests for admissions.  There have been all kinds of problems.

MR. KENNEDY:  My only point was, your Honor, that as between the Government and these two little defendants, with this little 17½ acres of land, number one it is certainly uneconomic for them to spend much money for Counsel; it is uneconomic for Counsel, number two, as a matter of strict practical day to day living.

1459

1    Number three, there are certain facts here which, as

2  the Court points out, it seems to me the Court must, under the

3  Rule, consider as being admitted, and at least in part, it seems

4  to me, that as between these people and the Government, without

5  reference to other parties who are not on the motion, they are

6  concluded.  This man is not going to be able to afford the

7  expense of a trial to defend himself properly, absent the ad-

8  mission of some facts.

9    So far as a survey of the land is concerned, you can

10  drive down Highway 395 and look a 100 feet off and you can see

11  a stream running through the land.  It is absurd to say they

12  have not had an opportunity --

13    MR. VEEDER:  May I tender a thought in that regard.

14    THE COURT:  Let Mr. Kennedy finish.

15    MR. VEEDER:  I'm sorry.

16    MR. KENNEDY:  Quite frankly, I am disturbed by this

17  awful majesty of the Government in these pleadings by the

18  pound against little people.

19    THE COURT:  We are all disturbed.  But the Circuit

20  Court said that all these people had to be brought in.  I didn't

21  do it.  Mr. Veeder didn't do it.  We have a Court that is

22  higher than my Court.  They said that you couldn't adjudicate

23  the Government's rights without bringing in all defendants.

24  So they were brought in.

25    MR. VEEDER:  I will prepare and submit to Mr.

Kennedy a stipulation covering these points as soon as this matter can be checked out.  I don't want him to be concerned about it anymore.

THE COURT:  All right, let's do this.  I am going to set aside my order denying his motion.  I am going to keep it under submission and see what is done here.

I think a procedure ought to be outlined, Mr. Veeder, to take care of all attorneys for these small people, but particularly the people out of the immediate district where they can't by telephone or personal call get the information. A form letter could be prepared where you advise them what the situation is.

Now in this man's case it seems to me that some stipulation could be entered into whereby it would be agreed that at the hearing the Government proposed to offer the following proof, etc., to which the Government would stipulate; so that if he were content with what you were going to offer at the hearing, outside of the hazard that he might take that someone else would come into the hearing and oppose, he might be willing to be absent from the hearing if he knew what your position was going to be.  Do you follow me on that?

MR. VEEDER:  I understand, and I am in complete accord with it, your Honor.

THE COURT:  For instance, if you had a stipulation and he was advised by letter -- of course, you     couldn't

1   bind other parties -- that at the hearing that was held on this

2   parcel, whenever it came up, the Government proposed to show

3   that his clients were owners of the property, the Government

4   proposed to show that the stream ran through the land and the

5   land was riparian, the Government proposed to show that so

6   many acres was irrigable -- at least to the extent that you

7   could agree on those things, those matters are out of the way.

8   There would still be problems, but you would have simplified

9   the case to that extent.

10          MR. VEEDER:  I understand it completely, your Honor,

11  and we will certainly undertake it.

12          MR. KENNEDY:  I thank the Court for your courtesy.

13          THE COURT:  I am taking the matter under submission

14  largely to see whether we can get some action around here.

15          I think the granting of your motion, however, really

16  doesn't solve your problem, because there has to be a hearing

17  before this Court where other people have a chance to be heard.

18  That is not going to happen very often, although it has already

19  happened at least once before the Master where you have con-

20  testants on the same stream who have problems one against the

21  other.

22          This will be submitted.

23          MR. KENNEDY:  Thank you.

24          THE COURT:  What do you propose to take up next?

25          MR. VEEDER:  I have filed with your Honor a motion

1  to take up our motion for summary judgment against the Fall-

2  brook Public Utility District.

3       It is our view that we are entitled to such a judg-

4  ment, of course, and it our further view that should your

5  Honor consider any one of the propositions that we advance in

6  our favor, if you should rule in our favor, the Fallbrook

7  Public Utility District would be out of the litigation and I

8  think that from the standpoint of matters now pending it

9  would be beneficial to all concerned.  We are confronted in the

10  early part of July with the condemnation proceeding that the

11  Fallbrook Public Utility District is undertaking.  We think it

12  gravely prejudices not only the United States of America

13  but a lot of small users and owners.

14       We believe (1) that the Fallbrook Public Utility

15  District's filings --

16       MR. SACHSE:  Is this going to be argued?

17       THE COURT:  Let's not start arguing it.  I'm just

18  going to decide in what order we are going to take these up.

19       MR. SACHSE:  May I suggest, your Honor, I have two

20  matters that are practically identical with the one just dis-

21  cussed by Mr. Kennedy.  They are not motions for summary judg-

22  ment.  I have motions for summary judgment on file, but in a

23  memorandum I made it clear that I recognized the fact that it

24  would be impossible to decide that motion until, first, the

25  prior motions for requests that certain facts be deemed admitted

1       in the case of Goodchap and of Sachse (myself) be disposed of.

2               Now this is exactly parallel to the matter you have

3       just discussed with Mr. Veeder.  I am most interested in his

4       assurances to Mr. Kennedy.  I represent other people besides

5       Fallbrook Public Utility District, and with your Honor's per-

6       mission I would like to hammer out those two now.  They are the

7       same sort of case, except I think somewhat stronger than Mr.

8       Kennedy's.

9               THE COURT:  What other Counsel are there here with

10      private motions, other than the major defendants?

11              MR. GROVER:  Your Honor, I represent a couple of

12      small defendants who made motions to dismiss.  Mr. Halde

13      couldn't be here and he asked that I do it for him also on a

14      similar motion.

15              THE COURT:  You made a motion to dismiss on behalf

16      of whom?

17              MR. GROVER:  On behalf of Gibbon and Cottle, and Mr.

18      Halde's are for his parents, the Haldes.

19              THE COURT:  Those are to dismiss some of the addition-

20      al counts?

21              MR. GROVER:  Some of the counts.  However, the argu-

22      ment is similar to the argument on motions made by Fallbrook

23      and the State, so they should be considered together with those.

24              THE COURT:  I want to spend some time on that, but

25      I don't think I want to start with those, Mr. Grover.

1    MR. GROVER:  Yes, I understand that, your Honor, and

2  I am not suggesting that I should go first.

3    THE COURT:  Let's take up these Sachse motions that

4  are similar to the one Mr. Kennedy presented -- No. 16, motion

5  of defendants William A. and Robert L. Goodchap, and No. 13,

6  motion of defendants Franz and Rowena Sachse.

7    MR. SACHSE:  I will take them up one at a time,

8  Goodchaps' first.

9    This is a motion that certain facts be deemed ad-

10  mitted by reason of the failure of the United States to deny

11  them under oath, the failure to make timely denial, and the

12  point with which I am primarily concerned is the failure to

13  live up to the spirit and exact language of Federal Rule 36.

14    This is a very big and serious thing to me.  I re-

15  present a great many small individual landowners and I have

16  looked to this requests for admissions procedure of Rule 36 as

17  possibly providing a device whereby these small individuals

18  could create a state of fact before your Honor which would, for

19  all practical purposes, get them out of the case.  I therefore

20  have habitually, in cases of my clients whose rights are simple,

21  filed a request for admissions.  It has been my understanding

22  that the United States welcomed this approach because it gave

23  them a chance to eliminate some of these little fellows who

24  didn't belong here.

25    Now taking Goodchap first -- it is the one most nearly

similar to Mr. Kennedy's case -- there is one fact that makes

it even stronger than Mr. Kennedy's.  In the case of the Good-

chaps, the United States has completed one of these engineering

studies to which your Honor has referred.  It has introduced

it into evidence as part of its case in chief.  Now it is true

that I did not have that request or that study before me at

the time I drafted the answer and the request for admissions.

But it is in evidence now.

The first request was that the United States admit

that the lands described in the answer contain five acres of

irrigable land.  The whole tract is only five acres.  I did

not have the Federal report, so I said five.  The Federal

study made by the Marine Corps shows 4.4.  Now the        Rule

states:

"If written objections to a part of the request

are made, the remainder of the request shall be

answered within the period designated in the request.

A denial shall fairly meet the substance of requested

admission, and when good faith requires that a party

deny only a part or a qualification of a matter of

which an admission is requested, he shall specify

so much of it as is true and deny only the remainder."

The United States denies that there five acres.  I

have read some cases on Rule 36 and the law that seems to be

applied by the Courts is very similar to the strict old rule of

1466

common law pleading that if you alleged that a man owed you

$100 and he denied that he owed you $100, he thereby admitted

that he owed you $99, and I think that is what the United

States has done in this reply. By blandly denying that there

are 5 acres of irrigable land, when they have their own engineer-

ing study introduced in evidence in this very proceeding, the

United States has admitted that there are 4.4 acres of irri-

gable land.

THE COURT: Let me interrupt a minute. Do your

apologies to Mr. Kennedy apply to Mr. Sachse?

MR. VEEDER: I will bleed for Mr. Sachse -- I mean,

yes, your Honor, they certainly do.

THE COURT: Why in that case couldn't your answer

have been that your evidence would show there was 4.4 acres?

MR. VEEDER: So far as we are concerned, we truly

were somewhat amazed, having prepared this engineering report.

But nevertheless we will agree with Mr. Sachse that the engineer-

ing report has covered the matter.

THE COURT: If I grant permission, you will first

answer these requests in detail?

MR. VEEDER: Yes, your Honor, we will.

I might add, it is not becoming to excuse yourself

from anything, but I truly thought that Mr. Sachse and I had

quite a complete understanding in regard to this matter.

MR. SACHSE: I thought that we had, too, but it is

1    not working out.

2           However, to save time, I suggest that Goodchap be

3    dropped, that we put it off calendar.  I will reset it if with-

4    in a reasonable period of time I don't get a set of admissions

5    from Mr. Veeder.

6           But Sachse isn't quite that simple.  There is another

7    little angle involved.

8           THE COURT:  All right, the Goodchap motion, No. 16,

9    will go off the calendar and will be reset on motion, or dis-

10   missed if you get what you want.

11          MR. SACHSE:  Yes, your Honor.

12          MR. VEEDER:  May I inquire now.  Now that we have

13   introduced into the record the report, what more do you want,

14   Mr. Sachse?

15          MR. SACHSE:  I want your admission in the record.

16          MR. VEEDER:  I would swear that when we introduce

17   evidence along that line it is better than an admission.

18          THE COURT:  When was the motion made?  Before it was

19   introduced in evidence, or afterward?

20          MR. SACHSE:  Before.

21          THE COURT:  The motion was made before?

22          MR. SACHSE:  Yes, sir.

23          MR. VEEDER:  Yes, your Honor.

24          THE COURT:  Then this report was introduced in

25   evidence.

1      At least you could, by letter or telephone conver-

2   sation, say, "Look, we put our report in evidence.  Do you still

3   want the answer?"

4      MR. SACHSE:  There is one thing that we should mention

5   here that will apply to each and every one of these engineering

6   reports.  I have uniformly used the figure 4.2 acre feet per

7   acre per year as a reasonable irrigation duty, which figure I

8   have taken verbatim from the pleadings of the United States

9   which they are claiming on the public lands involved.  Now the

10   engineering reports being filed are using a different kind of

11   water duty.  It has been testified, as Mr. Veeder will certain-

12   ly agree, that the water duty on Federal land is what he calls

13   a "project duty," that is, the amount of water to be taken.

14   The water duty that is stated in these reports is the amount

15   necessary to be applied to irrigate a crop.

16      I believe I want an answer as to what amount of water

17   each person has a right to take from a stream in order to be

18   able to apply that amount to his crop.  In other words, I think

19   the United States should fairly meet the issue.  If 4.2 is a

20   reasonable project duty for every foot of National Forest land,

21   what is a reasonable project duty for 5 acres immediately along-

22   side the creek?  And that is the point to which the United

23   States doesn't make an answer.

24      MR. VEEDER:  May I make a remark along that line,

25   your Honor.  I am glad that Mr. Sachse brought it up.  It sort

1469

1    of converts this into a pre-trial conference.  If it is all

2    right with your Honor, I will respond to it, though.

3            Here's our view.  We will send a man out and he will

4    make an engineering report which will come back and disclose

5    how these lands could be utilized and how at the moment it

6    appeared at the time the engineering report was made that the

7    lands could be applied to the highest and best use.  The net

8    result of that is that the quantities of water required for the

9    highest and best use may be less than 4.2.  But if I were re-

10   presenting a client as Mr. Sachse is representing a client, I

11   would put in some evidence in addition to the engineering re-

12   port, because as we stated in the record there is no  reason

13   for a man utilizing his farm precisely in the way our engineer-

14   ing report discloses.  It might be that he would desire to put

15   the whole thing into pasture, which would have a duty of

16   approximately 4.2.

17           MR. SACHSE:  That is the admission I want.  If 4.2

18   is a reasonable water duty for all of the Federal lands, then

19   I contend why isn't it a reasonable duty regardless of the

20   crop that the man wants to put on it?

21           THE COURT:  If I understand Mr. Sachse's inquiry, it

22   is this: He has assumed that you were using the figure 4.2 as

23   a sort of maximum water duty --

24           MR. VEEDER:  That is correct.

25           THE COURT:  -- that any land would need, and he assumed

that the Government's claim was going to be 4.2 for land that it claimed was riparian.  Now he makes the suggestion that you have some other kind of claim that is not necessarily bounded by 4.2 as to the Government land.

MR. VEEDER:  I was attempting to explain the reason why we have done that.

THE COURT:  What is that?

MR. VEEDER:  Well, the 4.2 is what I would recommend to any Counsel representing his client to claim in this litigation.  As I say, the engineering reports that we tender to these people should not be accepted by them as the maximum water duty that their lawyer should put in on their behalf, and I have said that repeatedly.

THE COURT:  Answer my inquiry.  What is this claim that the Government has?  Something exceeding 4.2?

MR. VEEDER:  No, 4.2 is the maximum we claim.  That is the quantity of water that would be required to be diverted from the stream in these instances to raise pasture.

MR. SACHSE:  But the point is, your Honor, not that they will claim a greater amount than that.  The point is that having claimed 4.2 as a proper maximum, I would like them to admit when I ask them that 4.2 is a proper maximum for the Goodchap property.  If the Goodchap property will grow avocados, it will grow pasture.  That is ABC.  If it will grow anything, it will grow pasture.  If 4.2 is a proper duty in one case, 4.2

is a proper duty in the other, and a blind denial that the fact

is true, in my opinion, would justify your Honor in ruling that

4.2 has been admitted, and if you make such a ruling we will

take it just like that.

THE COURT:  Can't you concede that the Government's

position is, as to Goodchap, that 4.2 is a maximum water duty?

MR. VEEDER:  Yes, I will concede that right now.

THE COURT:  What is this other matter that you said?

MR. VEEDER:  I tried to explain the reason why there

does appear this difference between the engineering report and

and the 4.2.

MR. SACHSE:  That is the other matter.

THE COURT:  What is that?  I don't understand it.

MR. SACHSE:  The point is this, as I understand it.

The engineering report -- and I'm attempting to paraphrase a

witness who testified on this subject at great length on direct

examination and cross-examination, and I hope I don't do him

an injustice -- the engineering reports represent his best

judgment and that of his staff as to the highest and best and

most profitable use of the land concerned, and in certain cases

where the land is low and flat that highest and best use might,

let us say, be row crops with a high water duty.  In other cases

where it is higher on the hills and frost-free but has more

shallow soil, the highest and best use might be citrus or avo-

cados, with a lesser water duty than row crops.  So in his

1    individual engineering studies of these parcels he has made a

2    determination of what, in his opinion, is the best use of each

3    parcel and of each section and of each section of the ownership,

4    and as to one section one field will be ascribed a water duty

5    for row crops at perhaps 3.8, to another section the holding

6    will be ascribed a water duty for lemons of 1.8, to another

7    section will be ascribed a water duty for avocados of 2.5.  So

8    that the maximum water duty which the Government investigation

9    finds, in the case of any of these reports that they make for

10   the individual, results in a combination of a great many differ-

11   ent highest and best uses.

12             Now in the case of the holdings of the United States,

13   there is the simple flat statement that it is all 4.2 -- in

14   other words, the lowest value crop, pasture, but the highest

15   water duty.

16             It is my contention that if I am the owner of 20 acres

17   of land on the stream, my correlative right in the stream is

18   based upon my potential water use of the stream on my irrigable

19   land, just exactly as the Government's is, and that if it is

20   sauce for the goose it is sauce for the gander and that we shall

21   apply a similar yardstick in both cases.

22             THE COURT:  You don't complain about the type of

23   study the Government has made, that is, breaking down a parti-

24   cular parcel as to the type of highest and best use possible

25   and the water duty pertaining to that use -- you don't complain

1    about that?

2           MR. SACHSE:  No, I may quarrel about individual ones,

3    but the study as a whole is very good.

4           THE COURT:  You don't quarrel with the principle?

5           MR. SACHSE:  No, your Honor.

6           THE COURT:  A man might have 10 acres of bottom land

7    used for one purpose, and he might have another 10 acres of

8    which a very small portion might be usable for a limited pur-

9    pose.

10          MR. SACHSE:  That is true.

11          THE COURT:  But the Government is not breaking down

12   their holdings; they are just asking for the maximum.

13          MR. SACHSE:  They are just asking for the maximum,

14   and when a request for admissions is made for a maximum on

15   our basis, it is denied.  We have allowed even the counter-

16   answer on what is a proper use.

17          MR. VEEDER:  I think Mr. Sachse is referring to the

18   pleadings, and I think there is a great deal of difference

19   between pleadings and the ultimate studies.  As I have stated,

20   I sincerely hope that all these people understand that from

21   our standpoint by all means they shouldn't limit themselves

22   to less than the quantity of water that would be  the maximum

23   potential that they would require.

24          THE COURT:  Let's get back to the Government for a

25   moment.  It is your purpose somewhere along this trial to break

1474

1   down the Government's holdings?

2         MR. VEEDER:  Yes, your Honor.

3         THE COURT:  And to show particular areas and claim

4   a certain water duty for different areas based upon the char-

5   acteristics of that area?

6         MR. VEEDER:  Yes.

7         THE COURT:  And not to claim a blanket 4.2 for every-

8   thing?

9         MR. VEEDER:  It is conceivable that there would be

10   areas where it would not be reasonable to apply 4.2.  I think

11   there is a difference between the pleadings and the ultimate

12   proof, however.

13         THE COURT:  I understand, and so does Mr. Sachse,

14   about the pleadings.

15         Does this clear it up in your mind, Mr. Sachse?

16         MR. SACHSE:  It clears it up if my understanding is

17   that the Government is going to comply with the provisions of

18   the Rule and in its denials fairly meet the substance of the

19   requested admissions and when good faith requires deny only a

20   part or a qualification that it makes such qualification.  When

21   I say 4.2 Mr. Veeder doesn't have to agree, but I don't want

22   him to say that he denies it.  I want him to say how much he

23   thinks is a reasonable water duty.

24         THE COURT:  Not so much what he thinks.  You want

25   him to state what the Government's proof is expected to show.

MR. SACHSE:  That is right, your Honor.

The Sachse motion is very similar to Goodchap's, but it poses a problem that has not been discussed by either Mr. Kennedy or myself in the case of Goodchap.  One of my requests for admissions -- and this is my own property, and I assure your Honor I was trying, to the best of my ability, to make a guinea pig out of this, because I think it will get rid of some people.

MR. VEEDER:  Is Mr. Sachse the guinea pig now?

MR. SACHSE:  I am.  One of the requests for admission is this request for admission No. 4: The lands described as Parcel 2 in the answers of these defendants are not riparian to the Santa Margarita River or to any of its tributaries.

Now it so happens that that is a 4.5 acre piece of ground which Mr. Veeder drives past four times a day when the Master's hearings are on.  He has introduced a USGS map showing the area.  Anybody in one minute can plot on the map and locate it.  You can see that it is four miles from the nearest river, but he denies it for want of information and belief.  I don't think that that is in keeping with the intent and the desire of this Court to try to make it easy to get a little fellow out of here.

THE COURT:  I think ordinarily that the Rule would be that that ought to be answered.  If this ground is not riparian, the Government has the facilities to find it out,

1476

1   and if that is what their proof is going to show they should so

2   state.  But the fact that your ground is not riparian -- I don't

3   know what piece of ground you are talking about, but the fact

4   that it is not riparian does not, in and of itself, take it

5   completely out of the case.

6   MR. SACHSE:  No, not that alone.  But there are three

7   requests which together in my mind, in the case of literally

8   hundreds of defendants, would create a state of facts where

9   they could kiss this case goodbye and forget about it and never

10   spend another nickel on it.

11   Mind you, it is denied for want of information and

12   belief.

13   Now the next one is:  The waters underlying the lands

14   described as Parcel 2 are percolating ground waters.

15   The United States is without knowledge or information

16   sufficient to form a belief.

17   Now if I can get those two admissions, and then

18   finally that the lands are irrigable, which he denied -- and

19   I might add that the avocados were so big and thick that I had

20   to cut half of them off this year, and if that isn't irrigable

21   land I don't know what is.  If you will admit those three

22   things --

23   THE COURT:  How does the fact that they are irrigable

24   enter into the picture?

25   MR. SACHSE:  I don't think it matters in the case of

1477

1    percolating ground waters a bit.  In the case of my other parcel

2    -- and it is a blanket request for admission for both parcels

3    that they are all irrigable.

4               THE COURT:  All right.

5               MR. SACHSE:  So it covers the other one.

6               But if the United States would admit that Parcel 2

7    is not riparian and that the waters underlying Parcel 2 are

8    percolating ground waters, so far as I am concerned that de-

9    fendant -- not me, because I have another piece of ground --

10   but take some other person with the same facts, that defendant

11   could tear up the Complaint, leave town and forget about the

12   case.

13              THE COURT:  Well, as to the Government, and the

14   chances are that no one else would contest it, and if that were

15   true as to that parcel you would wind up with a decree that you

16   didn't have anything to do with the Santa Margarita River.

17              MR. SACHSE:  Absolutely nothing, and your Honor,

18   let me remind you, I said hundreds -- I believe that literally

19   in excess of a thousand, probably two thousand of your defend-

20   ants are going to be in exactly such state of facts: not ri-

21   parian, and the water is no part of the stream, and this is the

22   mechanics whereby we can get rid of them.

23              THE COURT:  It is a good point.

24              I have been pleading with Counsel for the major de-

25   fendants to agree upon a term which would define the characteristics

1478

of waters such as you claim exist on Parcel 2, but you haven't
favored me with any suggestions.  Has any work been done on
that?

MR. SACHSE:  I phoned in -- I hope that your secretary
gave you the citation -- after our last chamber's conference,
the case of County of Los Angeles v. Pomeroy, which I contend
spells out the presumption in cases such as this.

THE COURT:  I read the case.

MR. VEEDER:  Shall I respond, your Honor?

THE COURT:  It is not necessary right now.

What about this term?  Can we agree that you can
formulate, at least among the major defendants in this case,
that the term "percolating waters" or "percolating ground
waters" or "ground waters" or coin a phrase -- I don't care --
are waters which are not in contact with any stream or basin
and do not materially impede or augment any stream or basin?

MR. SACHSE:  Mr. Veeder's own witness, under cross-
examination, in the case of four of the seven parcels that have
been heard wholly or in part before the Master, has in the case
of parcels of land in the De Luz watershed within a hundred or
two feet of De Luz Creek -- not four miles, like this one --
has stated, in response to my question, "In my opinion, the
waters underlying those lands are not part of the waters of
the stream."  It has been so stated by his own expert, the man
whom he calls upon to answer these questions.  He has done that

1479

1  in the case of Holsworth, he has done that in the case of

2  Chestmolowitz, he has done that in the case of John Kuhnis as

3  to a parcel removed by 40 from the stream, and he did it in the

4  case of McDowell.  So why can't he do it here?

5      THE COURT:  This witness is apparently an honest

6  witness, from your standpoint?

7      MR. SACHSE:  I think so.  But I want to get rid of

8  some of these cases.

9      THE COURT:  So do I.  I am hopeful that as to people

10  with that kind of water we can get a preliminary finding that

11  they are not part of the Santa Margarita and they can go home

12  and when the decree finally comes down they will have an ad-

13  judication good as against everybody in the watershed that they

14  are not part of the stream and they will wind up with better

15  water rights than they had when they went into this thing, if

16  they have any water.

17      MR. VEEDER:  The amazing thing about Mr. Sachse's

18  speech here this morning is that he should have filed a dis-

19  claimer: I disclaim any right, title or interest to the waters

20  in the Santa Margarita, and he would have been out.

21      THE COURT:  It is true that he might have been out,

22  but the affirmative end of it is just as important to him,

23  namely, that he is not part of the River, whatever rights he

24  has belonging to him, and that the Government has no claim on

25  him.

MR. VEEDER:  All right, if he disclaimed any right, title or interest in and to the waters of the Santa Margarita River or its tributaries, he is through.

MR. SACHSE:  Wait a minute.  I am charged in this Complaint.  The Complaint says I am taking water from the River. To disclaim that I am doing it does me no good.  I want an affirmative declaration that the water under my land is not a part of the River.

THE COURT:  That is right.

Well, I have a 1:15 calendar.  Can we wind up this Franz and Rowena Sachse motion now?

MR. VEEDER:  Let's get a ruling on it, your Honor.

THE COURT:  Can you answer these things?

MR. VEEDER:  Sure, I will answer it.  As I said to Mr. Kennedy, the circumstances are such I will stipulate.  I didn't have the information.

THE COURT:  Do you want me to rule that you answer this, or put it off calendar and you answer it?

MR. SACHSE:  Your Honor, put it off.  This is more than me.  I will be here every day.  Put it off calendar and if I don't get a decent answer, I will make another motion, because this goes beyond my case, your Honor.

THE COURT:  All right, it is off calendar.  Are you going to answer it?

MR. VEEDER:  Yes, sir, as rapidly as possible,

1   your Honor.

2         THE COURT:  Along the line we have discussed?

3         MR. VEEDER:  Yes, sir.

4         THE COURT:  At 2:00 o'clock I have sentences, and I

5   have this other matter at 1:15.  I don't think I will be ready

6   for you until pretty close to 3:00 o'clock, and we will have to

7   go tomorrow on these matters, and maybe on Wednesday -- maybe

8   throughout the week until we finish up.  We have some important

9   motions here for consideration.  Is that the understanding?

10        MR. VEEDER:  Yes, sir.

11        MR. SACHSE:  Yes, sir.

12        MR. VEEDER:  It suits me very well, your Honor.

13        THE COURT:  About 3:00 o'clock.

14        (Noon recess.)

15

16

17

18

19

20

21

22

23

24

25

SAN DIEGO, CALIFORNIA, MONDAY, JUNE 16, 1958, 3:00 P.M.

THE CLERK:  No. 16 on the calendar, 1247-SD-C, United States v. Fallbrook.

MR. SACHSE:  Your Honor, I don't know what your desires are.  I have at least one other matter that is very closely related to the type of thing we took up this morning and that I believe could be very quickly disposed of.

THE COURT:  What is that?

MR. SACHSE:  That is the motion of the Fallbrook Public Utility District for a determination that the genuineness of a document be admitted.

THE COURT:  Before we go into that, No. 7 on the calendar was a motion of yourself and your wife for summary judgment.  We didn't talk about that.

MR. SACHSE:  That may be put off calendar, or it may be denied, if your Honor please.

THE COURT:  All right, denied.

MR. SACHSE:  The motion of Goodchap for summary judgment I prefer just be put off calendar.

THE COURT:  Yes, that went off calendar.

And your motion that certain facts be deemed established?

MR. SACHSE:  Off calendar.

THE COURT:  Off calendar?

MR. SACHSE:  Yes, your Honor.

1483

THE COURT:  We take up this motion on this document that is that press release?

MR. SACHSE:  Yes, your Honor.

MR. VEEDER:  I thought I had agreed that that was an original document.  I told you that five days ago at Reche School, Mr. Sachse.

MR. SACHSE:  In the first place, I don't recall it.

In the second place, the reason I would like the admission -- I will drop it if you agree, but I would like it in writing.  Otherwise, I have to produce four witnesses to identify the document.

MR. VEEDER:  I told you that at Reche School, and I am on the record now, as far as I am concerned, it is a genuine document.

MR. SACHSE:  Very well.

Then I am personally agreeable to take up whatever matter Mr. Veeder wants to take up next.

THE COURT:  All right.  Of course, Mr. Sachse, that still raises the question of its admissibility --

MR. SACHSE:  I am well aware of that.

THE COURT:  -- and the authority of the Public Relations man.

MR. SACHSE:  The only purpose for the motion was that without the admission that it is a true copy it would have taken me four different subpoenas to bring it in here and to

1   prove it.  I have a true copy at least now and we can go from

2   there.

3           THE COURT:  Which number is that on the calendar?

4           THE CLERK:  No. 11, your Honor.

5           MR. SACHSE:  I don't have a copy of the calendar be-

6   fore me, your Honor.

7           THE COURT:  The stipulation is that the genuineness

8   of the document is admitted.  So the motion will go off calendar.

9           MR. VEEDER:  That is right.

10          THE COURT:  Any other short matter that we can take

11   up?

12          MR. VEEDER:  I have a problem here in regard to a

13   series of requests for admissions which, by reason of the facts

14   I explained to your Honor this morning, we have had to simply

15   deny it because we didn't know, and it would take a great deal

16   of research to obtain the answers.  Now I would like to pro-

17   ceed in regard to these requests which have been made in the

18   same manner as I have agreed to proceed.

19          THE COURT:  Would you like time to file an amended

20   answer to these requests?  Is that the request?

21          MR. VEEDER:  Yes, your Honor, we would.

22          MR. SACHSE:  No objection at all.

23          MR. VEEDER:  It is just a matter of time and personnel.

24          THE COURT:  They are not on the calendar here, are

25   they?

1485

1    MR. SACHSE:  Yes, there is a motion of the Fallbrook

2    Public Utility District that certain facts would be deemed

3    admitted.  If Mr. Veeder wants time on it, that can go off

4    calendar pending his further reply.

5        THE COURT:  That is No. 15.

6        MR. VEEDER:  There is another problem there in re-

7    gard to this request concerning --

8        THE COURT:  No. 15 is off calendar.

9        MR. VEEDER:  -- the problem of Col. Robertson's state-

10   ment before the Committee.

11       MR. SACHSE:  That I would like very much to get dis-

12   posed of, but I am afraid, your Honor, that you might want to

13   t ake evidence on that particular motion.  I don't know.  You

14   might want to call Col. Robertson and interrogate him as to

15   the type of document that is, and whether you would choose to

16   make an order or whether you feel it is bound by restrictions --

17       THE COURT:  Before we pass it up, Mr. Veeder had a

18   package of requests there.  They are not before the Court on

19   motions.  These are --

20       MR. VEEDER:  We have to respond to them now or they

21   will be out of time.

22       THE COURT:  You mean they are ones that you have not

23   even filed this dummy answer to, that you know nothing about?

24       MR. VEEDER:  That is right.  I'm getting ready to

25   file that "dummy answer" now, though, if your Honor doesn't

spring the time.

THE COURT:  Will you read off the list and then we will give you time to answer.

MR. VEEDER:  All right.

DeMolay Schigurt and Gladys F. Schigurt.

MR. SACHSE:  That is I, your Honor.

MR. VEEDER:  The next is Marion L. Cartright.

MR. SACHSE:  That is I.

MR. VEEDER:  O. Lester Riggle and Maude A. Riggle.

MR. SACHSE:  That is my case.

MR. VEEDER:  George Elmer Sowby and Dorothy L.

MR. SACHSE:  That is all one parcel.

MR. VEEDER:  Everett D. Bragg and Vanita Bragg.

MR. SACHSE:  That is my case.

MR. VEEDER:  Gavilan Development Co., Inc.

MR. SACHSE:  That is not my case.

THE COURT:  Who is appearing as Counsel in that?

MR. SACHSE:  I don't know.

MR. VEEDER:  I will have to check that out.  The name doesn't appear here.

THE COURT:  Are there any more?

MR. VEEDER:  Mr. Teasdale is the lawyer for that. That is all we have at the moment, your Honor.

THE COURT:  How much time do you want?

MR. VEEDER:  I would like to have ten days, if I could.

1    MR. SACHSE:  No objection.

2    THE COURT:  Certainly.  If you need more time in

3    certain cases, make an application.  Let's get an answer in

4    that does some good.

5    MR. VEEDER:  All right, your Honor.

6    THE COURT:  Do you also want permission to file amend-

7    ed answers to some of these requests for admissions heretofore

8    made?

9    MR. VEEDER:  From the standpoint that I agreed in

10   regard to this Kennedy situation, Mr. Kennedy was here --

11   THE COURT:  I am talking about the people who haven't

12   kicked about it.  You have got these denials and haven't brought

13   it on for hearing.

14   MR. VEEDER:  I don't believe there are any others,

15   your Honor.

16   MR. SACHSE:  I think  there is only one more, Mr.

17   Veeder, and I haven't set it.  There is one that has the same

18   type of answer.  The same thing would apply.

19   THE COURT:  Well, if there are only a few of them,

20   I will make a blanket order.  In those cases you may have

21   additional ten days to prepare an amended response to the re-

22   quests for admissions, and if good cause is shown I may give

23   you some additional time.

24   MR. VEEDER:  Thank you, your Honor.  It is just a

25   matter of personnel now.

1488

THE COURT:  I understand.

This motion of the United States with respect to hearing various motions I will give a little study tonight and we will arrive at some decision on that.

MR. VEEDER:  That is the motion for summary judgment?

THE COURT:  No, the first one on the calendar, the motion you made with suggestions as to the order of hearing various motions.  The Clerk will have to get it off his calendar. I will give you something on that tomorrow morning.

Fallbrook also filed a similar motion which has been added as No. 17 on the calendar.  I will take about those tomorrow morning.

MR. SACHSE:  Practically, I think we have pretty well disposed of both of them.

THE COURT:  That leaves us Fallbrook's motion to dismiss, to strike --

MR. SACHSE:  May we take up very briefly, and perhaps if your Honor feels that it would take evidence we could set a specific date -- I would like very briefly to consider and see Mr. Veeder's reaction to Fallbrook's motion requiring the production of this engineering report, the motion requiring the production of documents.

MR. VEEDER:  Your Honor, I feel that that comes within the purview of the stipulation of November 29, 1951.  If the military says that it is something that might be embarrassing

1   to them, I believe that it comes within the purview of that

2   provision, and until I am advised there is nothing we can do

3   about it, as I see it.

4         MR. SACHSE:  I appreciate that there is nothing you

5   can do, but it is my position that any engineering study that

6   was made prior to the acquisition of Camp Pendleton by the

7   United States that deals with the water rights of the United

8   States is not prima facie a matter of military concern, and I

9   think his Honor might want to hear evidence on what this re-

10  port is about.

11        THE COURT:  Let's go to another matter.

12        As to this motion of the defendants Carl and Hester

13  Halde to dismiss, some comment was made this morning.

14        MR. GROVER:  That is the same as my motion, your

15  Honor.

16        THE COURT:  And your motion is what?

17        THE CLERK:  No. 10, your Honor.

18        MR. VEEDER:  I believe, in that regard -- correct me

19  if it is not right -- I think the issues that have been raised

20  by both the State and Fallbrook embrace everything that Mr.

21  Grover has raised.  Is that not correct?

22        MR. GROVER:  I think that is substantially so.

23        THE COURT:  We will hear those at the same time.

24        MR. GROVER:  Yes.

25        MR. VEEDER:  That is important to us from the

1490

standpoint of time, your Honor.

THE COURT:   I am willing to take up next anyone that you want to take up.  Maybe you can talk about it.  I see that Mr. Valenzuela is here on the criminal matter.

(Another matter.)

MR. SACHSE:   Your Honor, I still think it would be most helpful, and we will have to face the issue squarely, to consider for a minute this motion for production of documents.

THE COURT:   All right, let's hear No. 8.

MR. SACHSE:   No. 8 is a motion on the part of Fallbrook to require the United States to produce a certain engineering report or a report of a Board of Officers.

My only knowledge of this report is based upon the testimony of Col. Robertson before the House Interior and Insular Affairs Committee in Washington, D. C., on May 2.  At that time, under questioning by members of the Committee, Col. Robertson stated that the decision to acquire the Rancho Santa Margarita as a Marine Base was made after very careful study by a Board of Officers that considered all of the aspects that affect its usefulness for a military installation for training, and specifically that this Board considered the question of water rights.

Now it is vigorously contended by Mr. Veeder in this case that the United States is the successor to certain appropriative rights acquired by the Rancho Santa Margarita in advance

1    of the purchase of the Rancho by the United States.   It is our

2    position that no such appropriative rights were ever acquired.

3    We are confronted with a problem of proving a negative, that

4    there was not anything.   I believe that if given access to this

5    report we would find an analysis of what this Board of Officers

6    found the water rights of the Rancho Santa Margarita to be.

7    That is all I want.   If there are any military secrets in it,

8    I don't want them.   But I do believe that in view of the extreme

9    difficulty of attempting to prove the negative fact that no

10   appropriative rights were ever asserted by the Rancho Santa

11   Margarita, we have a right and should be given the privilege

12   of examining this document.

13            Now the defense that it is a military secret to me

14   doesn't carry a great deal of weight.   This all happened even

15   before the War.   This survey of what water rights are there is

16   certainly not as confidential material as the detailed aerial

17   photographs that are floating around in Court every day of what

18   is inside Camp Pendleton and the Naval Ammunition Depot, and

19   I certainly can't understand the unwillingness of the United

20   States to produce this document, unless the very thing that I

21   contend is exactly in it, namely, a statement that the only

22   water rights on the Rancho are their riparian rights and what-

23   ever rights exist under the Vail judgment, and I think your Honor

24   will agree that if such a statement exists it would be of tre-

25   mendous assistance not only to this defendant but to the Court

     in limiting the issues in the case, and I would

1    respectfully request the Court to make an order that this re-

2    port of the engineers be produced.

3         THE COURT:   Has there been any response prepared by

4    the Government to this motion?

5         MR. VEEDER:   I have responded verbally to Mr. Sachse.

6         MR. SACHSE:   You responded verbally immediately and

7    advised me immediately that it was outside of your jurisdiction;

8    that Col. Robertson was recommending to the Commandant of the

9    Marine Corps that the document not be released; and I presume

10    that Mr. Veeder as such can do nothing more about it without

11    a Court order.

12         THE COURT:   I mean has there been any response in

13    writing to this motion?

14         MR. SACHSE:   There is no response in writing, your

15    Honor.

16         MR. VEEDER:   My understanding from the conversation

17    was that Mr. Sachse knew our position on it; that he might want

18    to call for some evidence on it, and that was the end of it.

19    What I will do under the circumstances is simply to say what

20    Col. Robertson just told me, that some of this data is not

21    available.   There are Army reports, there is a variety of re-

22    ports that are entailed here that it is a matter of judgment

23    for the military to determine upon.   I have never seen the

24    report.   I haven't the slightest idea what it would contain.

25         I feel this way, your Honor, that there will be no

1493

1    reliance by the United States of America upon the report, that's

2    for sure, from the standpoint of the proof of rights to the use

3    of water.   I believe that Mr. Sachse has presented the reverse

4    of the circumstance.   The burden resides with the United States

5    of America to prove its rights and not for Mr. Sachse to dis-

6    prove them.   When we call our witnesses -- and I will tell you

7    now the witnesses we will call -- we are going to call men who

8    knew the area long, long prior to the time that we purchased

9    the property, that is the best evidence that we have, in re-

10   gard to our appropriative rights, and again I don't see what

11   an Army, Navy or military report would mean from the standpoint

12   of the proof of the rights to the use of water.

13          THE COURT:   First of all, let's find out what we can.

14   Col. Robertson testified that a Board of Officers went out and

15   searched the property.   Where is there anything showing that

16   there was an actual report made?

17          MR. SACHSE:   Only in the Colonel's testimony to the

18   Congressional Committee and in the statement which Mr. Veeder

19   made to me that he would recommend that the material not be

20   released.

21          THE COURT:   Well, is there such a report in existence?

22   You made some remark, Mr. Veeder, about some of the material

23   being missing or lost or something.

24          MR. VEEDER:   Col. Robertson tells me that there was

25   never an engineering report in regard to the water on this

1    particular property.

2            THE COURT:  Was the report as to the land?

3            MR. VEEDER:  There is a report, as I understand it,

4    that was prepared after quite extensive investigation.

5            MR. SACHSE:  Col. Robertson's testimony to the Con-

6    gressional Committee reads as follows:

7            "Mr. Utt:  There is no doubt that they bought and

8        paid for considerable water rights, but did they take

9        into consideration the United States' geological sur-

10       veys showing the flood waters that ran into the Pacific

11       Ocean between 1924 and 1942?

12           "Col. Robertson:  The Board of Officers took those

13       matters into consideration and there is considerable

14       discussion in their reports of those figures.

15           "Mr. Utt:  Of those figures?

16           "Col. Robertson:  Features.  That is, the run-off

17       features and so on."

18           Then it goes on, and --

19           "Col. Robertson:  The legal aspects were also

20       looked into, sir."

21           Now at the beginning of the extract, he states that

22   the Board found that in their opinion there was plenty of water

23   there.

24           To me it is absolutely imperative whether that Board

25   of Officers -- and as far as materiality is concerned it would

be the finest kind of admission against interest if I could

produce a document where the United States said that there is

all the water we need in our riparian right and in the Vail

judgment, that we haven't got anything else.  If that sort of

document exists, I would like to really have it, your Honor.

THE COURT:  Let us assume for argument that there is

a document where not only some officer who made some independent

survey said that there is ample water available in the riparian

rights to the Rancho Santa Margarita and that we have no need

for anything except our riparian right, there is no need for

us even to talk about appropriative rights, etc.  Let us assume,

further, that the entire Board of Officers, if there was a

Board, met and considered the matter and came to their con-

clusions and wrote that down as a memorandum or as a memorial

of their opinion.

Let's assume that is in existence.  How is that going

to help me decide this case?

First of all, you have the legal question as to

whether the admission could be used against the Government of

the United States.  You have a long line of cases that the

Government hire officers to make admissions contrary to their

interest.  It not like a private litigant.  Whether you like

the rule or not, the old argument about admissions against

interest doesn't ordinarily apply to the United States, and it

doesn't even apply where people have relied upon the admissions.

1    In other words, estoppel doesn't run against the Government of

2    the United States.

3    The best example of that was that little case in the

4    town of West Point.  I don't know whether it was up near the

5    Academy or not.  The military wanted some water, so they went

6    to the city fathers and said, "Let us condemn this water up

7    here and then you will not have any problem -- you can have

8    water as long as you want to," and they got a letter from some

9    high official in the military establishment confirming this.

10    So they took the water from the town of West Point, and later

11    on litigation arose and the Court held that the man who wrote

12    this letter was not employed to make admissions or grants of

13    that sort.  Even though the town had relied upon it, it had no

14    effect.

15    That is No 1.  You have a legal problem whether it

16    would ever be admissible.

17    No. 2, suppose that it is admissible.  With all re-

18    spect to the Marines -- of course, there might have been a

19    water man in the group, but let us assume that just ordinary

20    fighting men of the United States make some admissions about

21    this matter.  Do you think I am going to decide the lawsuit on

22    the basis of what they said about that?

23    MR. SACHSE:  Your questions are obviously addressed

24    to me, your Honor.

25    THE COURT:  That is right.

1  　　　　MR. SACHSE:   I don't think you will decide the law-

2  suit on the basis of it, and I don't think you will decide this

3  lawsuit on the basis of any single item of evidence.   But one

4  of the biggest issues that is involved in this Complaint is

5  whether or not the Rancho Santa Margarita itself ever claimed

6  any appropriative rights, and it is the old headache of the

7  proof of a negative.   I have gone through the whole decision

8  of Santa Margarita v. Vail.   There is not a word about such

9  rights in that decision.   That doesn't prove that they never

10 asserted them.   That is evidence that they never asserted them

11 at all.   I have read the briefs.   There is nothing about it in

12 them.   It is just evidence.   The United States itself has filed

13 no less than half a dozen documents before the State Water

14 Rights Board, in each one of which appears the question, what

15 water rights do you have?   And in none of them is there any

16 assertion of an appropriative right.   That doesn't settle it.

17 That is simply evidence.

18 　　　　If I can find another piece of paper which says that

19 there are no appropriative rights, the only rights of the

20 Rancho Santa Margarita are its riparian rights and whatever

21 rights it has under the Vail judgment, I submit that that is

22 another piece of evidence which I am entitled to present to

23 your Honor to help you to determine this very difficult nega-

24 tive that no such rights were ever asserted.   That is the whole

25 point.

1        MR. VEEDER:   Your Honor, we are getting into a

2    rather unusual circumstance.   The Rancho Santa Margarita ob-

3    viously was using the Lake O'Neill.   They are claiming that is

4    an appropriative right.   We feel that the Rancho was using

5    appropriative rights outside the watershed.   We feel that they

6    were using appropriative rights within the watershed.   So it is

7    a matter of proof, isn't it?

8        THE COURT:   What is your objection to producing the

9    report?

10       MR. VEEDER:   I have none, personally.

11       THE COURT:   Mr. Sachse, if it is not produced, will

12   swear as long as he lives that in that report there was some

13   very valuable admission and that there were leads to other

14   evidence and he will never be happy.

15       MR. VEEDER:   I am on my knees and I have a spear

16   through me now.   I am going to see if I can't talk the Marines

17   into releasing the thing, because certainly I don't want to

18   have a crown of thorns.   The point I am trying to make is that

19   if they will release it, I will certainly want to show up with

20   it, because I think I can hear him telling his grandchildren--

21       THE COURT:   That's right.

22       MR. VEEDER:   -- about how he would have won this

23   lawsuit if he could have had this report.   But the fact re-

24   mains, your Honor, that I will talk to the Colonel again to-

25   night and if we can find some way of getting something to

1   show Franz how wrong he is we will do it.

2          THE COURT:  I think, first of all, you ought to find

3   that report, and No. 2, you ought to determine whether you are

4   going to make any objection to my looking at it on whatever

5   grounds you may have, and then after I inspect it in camera

6   whether or not there would be any objection to Counsel seeing

7   it.

8          MR. SACHSE:  That would be very satisfactory.

9          THE COURT:  Of course, the report has another signi-

10   ficance that might be important, even if it is not admissible

11   as an admission -- and I'm not going to rule on that; it might

12   furnish leads for other material as to which proof could be

13   made as to some of these matters.  Unless there is some com-

14   pelling grounds of military necessity, I don't know why it

15   shouldn't be produced.

16          MR. VEEDER:  I, personally, agree, and I say I am

17   sure there is nothing that could hurt us, and I know, as I say,

18   that Franz will have an excuse the rest of his life.

19          THE COURT:  The decision whether you produce it or

20   not is not made on the basis whether it hurts you or not; it

21   is made on the basis whether there is any legal reason that you

22   can't produce it.

23          MR. VEEDER:  I will produce it, if I can.  The fact

24   is, the Colonel just told me that there are some excerpts of

25   the thing, which, I believe, is the limit of the reference to

1   the water rights and is going to break Franz's heart when he

2   sees it.  But I will try and get clearance as far as we can on

3   all matters, and certainly I want to assure your Honor that as

4   far as I am concerned it is available.

5         MR. SACHSE:  Let's take this one off calendar, too,

6   your Honor, and let's wait and see.  I think most of these

7   things should have been done without troubling your Honor with

8   these motions.

9         MR. VEEDER:  So do I.

10        MR. SACHSE:  Let's take it off calendar.

11        THE COURT:  How long do you think it will take you to

12  make this exploratory search?  Later in the week? Let's continue

13  it on the calendar for ruling -- I don't want to put things off

14  calendar, unless I have to, that have to be ruled on -- and see

15  what you come up with.

16        MR. VEEDER:  The reason why I have taken the view on

17  it that I have, I understood Mr. Sachse wanted to cross-examine

18  the Colonel on it, and if that is the case, certainly we have

19  no way of preventing that.

20        THE COURT:  Well, he wouldn't do it here right away.

21        MR. VEEDER:  I didn't know what his thoughts were on

22  that.

23        MR. SACHSE:  My only reason for cross-examining the

24  Colonel would be if there has been a statement on the part of

25  the United States that this document cannot be produced by

1   reason of its military character, and there has been no such

2   statement.

3           THE COURT:   In other words, any examination of the

4   Colonel would be on the basis of laying a foundation for your

5   motion.

6           MR. SACHSE:   Yes, sir, and they haven't even raised

7   the objection.   I haven't heard a soul say yet that this is a

8   confidential document.

9           THE COURT:   Well, let's take it easy.   Maybe the

10  thing is going to be produced and we will not have to question

11  the Colonel about it.   Let's continue it on the calendar, Mr.

12  Clerk, and Mr. Veeder, you advise us.

13          MR. VEEDER:   I will advise you as rapidly as I can,

14  your Honor.

15          There is one point that I would like to raise, if I

16  may now, and if I am correct, as I understand it, Mr. Stahlman

17  has stated that he would join us in this motion to remove his

18  case.

19          Is that right?

20          MR. STAHLMAN:   Are you speaking of the State Water

21  Rights case?

22          MR. VEEDER:   That is right.

23          MR. STAHLMAN:   Yes, I am willing that that matter, as

24  long as there has been an action taken to have it reviewed, I

25  think this is the place that it should be reviewed.

1502

THE COURT:  The Vail Estate was a party to these

proceedings before the State Water Rights Board?

MR. STAHLMAN:  Yes, your Honor.

MR. SACHSE:  He is not a party anymore than Fallbrook

is a party to the petition for writ of mandate.  We haven't been

served.  We aren't even named.  Neither is Mr. Stahlman named

or served.  I am not a party to that proceeding.

THE COURT:  I am not going to take any oral matter on

this.  If you want to join in a petition to remove, you could

file some document here.

MR. STAHLMAN:  I understood that Mr. Dennis also wanted

it.  He filed a petition.

MR. DENNIS:  What?

THE COURT:  He filed a petition what?  He filed a

petition in the State Court for a writ of mandate.

MR. DENNIS:  That is right.

MR. STAHLMAN:  He also filed in the Superior Court

of Riverside County.

Isn't that right?

MR. DENNIS:  The Rainbow Municipal Water District,

the Santa Margarita Mutual Water Company, Guy C. Earl, Jr., and

Herbert Ham filed a petition for an alternative writ of mandate

in the Superior Court of the State of California in and for

San Diego County; also they filed a petition for an alternative

writ of mandate in the Superior Court for the County of Riverside.

The Government has asked for the San Diego proceedings to be removed, but no action has been taken on the Riverside County petition.  So far as my clients are concerned, they haven't so far instructed me as to whether or not I should file a petition for removal or not.

I made the statement before the Court, I will make it again, and I think before Counsel for some of the principal parties in this case, insofar as I am concerned personally I have absolutely no objection to the matter being heard before this Court.  I feel the same as Mr. Stahlman does that it is better to have these matters all being heard by one Court than trying to conduct two or three lawsuits in different jurisdictions at the same time.  But there are other things to be taken into consideration, and I said that my clients have not said whether or not they would consent to filing a petition for removal.

MR. MOSKOVITZ:  The State of California, that is, the California State Water Rights Board has been named as respondent in these mandate actions.  The Water Rights Board have not been served with summons yet.  We have not received any papers whatsoever.  We just know by word of mouth that the matter has been brought to the Superior Court.  Knowing that the petition for removal has been filed by the United States, I have made inquiry of the Water Rights Board's desires and I have been informed, with    due respect to your Honor and without any

1    reflection upon the way you would decide the case, the Water

2    Rights Board feels that in order to keep the law straight,

3    should we become a party by way of summons, we would move to

4    remand the matter to the Trial Court in the State of California

5    so that when the proper time comes we will make that motion.

6          MR. DENNIS:   I believe probably I had better restate

7    the statement I made before the Master in connection with this

8    matter.

9          At the time I filed the petition I called in Mr.

10   Craig, who is attorney for the State Water Rights Board, and

11   told him that I had intended to file an amended petition as

12   soon as certain exhibits had been prepared.  I also told him

13   that the Court had not seen fit to give the State Water Rights

14   Board thirty days in which to answer and I knew he would want

15   more time, and at that time he said, "When you get your amended

16   petition, send it up, together with a stipulation in blank,

17   both as to the time of the return date and also as to what

18   Counsel will represent the State Water Rights Board, because

19   I am not sure whether somebody in the Attorney-General's Office

20   of the State of California will handle or whether somebody who

21   is a member of the staff of the State Water Rights Board will

22   handle it."  He said, "In the meantime, and in an effort to

23   determine how much time we will want in which to make the re-

24   turn and after we have seen the amended petition, I think it

25   would be advisable for the interested parties to get together

1  and see just what documents in the files of the State Water

2  Rights Board we will want forwarded to the Superior Court, be-

3  cause it will be most inconvenient to send down our entire

4  files." And I said that I was perfectly willing to enter into

5  a stipulation with him along that line, provided it was an open-

6  end stipulation so that in the event all of the documents that

7  were necessary for hearing the matter were not forwarded they

8  could be brought down.

9  　　　　THE COURT:  Do you want to go into this removal matter

10  at this time?

11  　　　　MR. VEEDER:  No, your Honor.  As far as I see the

12  situation, until the motion to remand has been filed, I would

13  just bring your Honor's attention to this most recent develop-

14  ment in regard to my discussion with Mr. Stahlman and Mr.

15  Dennis.

16  　　　　I would like very much to go into the question of our

17  motion for summary judgment against the Fallbrook Public Utility

18  District.

19  　　　　MR. SACHSE:  It is all right with me, your Honor.

20  　　　　THE COURT:  Before we pass this removal question, the

21  Court doesn't need a motion to remand.  The Court has an obli-

22  gation to determine whether there is any jurisdiction and

23  whether a case is properly removed, and if it is not properly

24  removed the Court, on its own motion, can remand it.

25  　　　　MR. VEEDER:  I understand.

1    THE COURT:   I propose to look into this matter and

2  not let it drag along.  Maybe sometime this week I want to hear

3  you on that.  The Clerk can put on the calendar the Court's

4  motion for consideration as to whether I should remand this

5  case to the Superior Court.

6    MR. VEEDER:   In that connection, your Honor, it is a

7  complex question that we would like to have an opportunity to

8  brief.

9    THE COURT:   Well, Mr. Veeder, it may be pretty com-

10  plex, but let me tell you what you have to convince.  You have

11  to convince me that there is jurisdiction in this Court, so

12  that the action that was filed in the Superior Court of San

13  Diego County could have been filed in this Court in the first

14  instance.

15    MR. VEEDER:   That is correct.

16    THE COURT:   For an action to be removed, there must

17  have been jurisdiction in the Court in which it was filed and

18  in this Court.

19    MR. VEEDER:   That is true.

20    THE COURT:   And if there was no jurisdiction in this

21  Court for the filing of that writ of mandate, then the matter

22  has to be remanded.

23    I will tell you very frankly, you have the laboring

24  oar to show me that I have any jurisdiction to consider that

25  writ of mandate that was filed in the Superior Court.

1        MR. VEEDER:  I realize the problem, and I realize the

2  complexity of these removal cases, having had several of them.

3  I would like, though, to have the matter squared away by the

4  parties who indicate their desire to participate in it to be

5  before the Court before that matter is taken up.

6        THE COURT:  I have suggested that anybody who wants

7  to join or to file another removal petition or anything they

8  want to do, do it in writing and let us find out how you line

9  up, what side you are on here, so that I can count noses and

10  see who prevails on the motion.

11        MR. VEEDER:  There is an additional factor that has

12  caused me to hesitate somewhat in the course to be pursued in

13  regard to this removal, and that relates to proposed amendments

14  by Mr. Dennis, because I am not sure what the issues are going

15  to be on this proposed revision, which is extremely important

16  from our standpoint.

17        THE COURT:  Once it has been removed, he can't amend

18  in the State Court.

19        MR. VEEDER:  I think he would have to file both here

20  and there.

21        THE COURT:  He can't file anything in the State.

22  Under the removal procedure, when the removal petition was filed,

23  whether it is good or bad, it is removed.  The case in the

24  Superior Court of San Diego County is now here in the Federal

25  Court.  It is now here even if the removal was on the most

1   tenuous, improper, erroneous grounds you can think of, and I

2   don't know that there is anything you can file in the State

3   Court in the way of an amendment or anything once it has been

4   removed.  The remedy is to consider remand of it, and if it is

5   improperly here to send it back to the State Court.

6       MR. VEEDER:  I will not argue it any more.  Your Honor

7   is absolutely right from that standpoint.  I didn't know where

8   he intended to file the amendment, frankly.

9       THE COURT:  What difference does it make?

10      MR. VEEDER:  If he files it here and it is different

11  kind and type of pleading, raising a different kind and type of

12  factors, I would like to take a look at it myself, because I

13  don't know what is entailed.

14      THE COURT:  Removal is good or bad as of the time it

15  was removed, and what you do subsequently can't have very much

16  effect on it.

17      MR. VEEDER:  It might create another basis for re-

18  moval.  That is the point.

19      THE COURT:  The Clerk will put this removal matter on

20  the calendar and we will continue it along and before the week

21  is over I may want to hear you on it.

22      MR. SACHSE:  I have a practical question.  Your Honor

23  says he wants our noses counted and where we stand on this.

24      THE COURT:  I am being facetious.  I don't care where

25  you stand, but if Mr. Stahlman wants to join in I want something

1   in writing.

2          MR. SACHSE:  Can we do it?  That is my question.  We

3   aren't even parties.  Neither Mr. Stahlman nor I are parties

4   to this proceeding.

5          THE COURT:  I don't know whether you can or not, but

6   what you do I want you to do in writing and not just orally.

7          MR. VEEDER:  I will not go  into the argument.  I

8   think the matter of parties is, of course, one of the basic

9   factors here and what is entailed by the kind and type of

10  petition that was filed in the Superior Court.

11         MR. MOSKOVITZ:  Just to make it clear to me, if we

12  plan to offer argument at all when you consider this remand on

13  your own motion, we should then file some sort of written

14  paper with you before that occurs.  Is that the point?

15         THE COURT:  No, that isn't what I was talking about.

16  Mr. Stahlman made a statement that he, apparently his client,

17  the Vail Estate, was orally joining in this removal in some

18  way.  I merely wanted anything of that nature to be in writing.

19  I am not going to require you, unless you want to, to do any

20  briefing on this matter of removal.  If you have some ideas on

21  it, you may present them orally.  If you have some authorities,

22  you can present them orally or in writing.  I'm not requiring

23  you to file any briefs.  I don't think it  is an intricate

24  problem.  Maybe Mr. Veeder can stir it up and make it a little

25  difficult.  I think the case has to be remanded.  He has the

1   laboring oar to show me how there is any jurisdiction in this

2   Court to hear a writ of mandate involving a Water Board hearing.

3        I may be wrong; I am just giving you an offhand

4   guess after looking at the petition.

5        MR. VEEDER:  It might all be academic when you sus-

6   tain our motion for summary judgment.

7        MR. SACHSE:  I am very happy to have the motion for

8   summary judgment taken up at any time, your Honor.

9        THE COURT:  You may get under way on that.  We are

10  going to quit here at a quarter of 5:00.  I will give you some

11  time without interruption.  This has been a bad day.

12       MR. VEEDER:  Your Honor, the primary points which we

13  have touched upon in our motion and in our brief in support

14  turn upon the kind and type of entity that was created when

15  the Fallbrook Public Utility District was organized.  We be-

16  lieve that that is one of the basic and fundamental issues

17  here today.  Could the Fallbrook Public Utility District ac-

18  quire a right to the use of water for purposes of irrigation?

19  We say that it could not.  But assuming that the Fallbrook

20  Public Utility District could acquire a right for purposes of

21  irrigation, we say that it did not acquire such a right by the

22  original filings.

23       We have for your Honor's consideration the schematic

24  drawings which will be important in this argument.  I will give

25  copies of them to Counsel, and I will have them handed to your

1   Honor.   Those drawings are reflected on plaintiff's Exhibit

2   M-14, and they will disclose drastic changes which have been

3   made in the filings of the Fallbrook Public Utility District

4   in regard to its Applications 12179 and 12178.   They are pro-

5   ductive, in our view, of complete proof that there has been a

6   tremendous increase in the claims of the Fallbrook Public

7   Utility District in connection with these two main claims which

8   they have made and concerning which the State Water Rights

9   Board purported to act on April 10 when it purported to issue

10   permits.

11        But we go back further in regard to our primary

12   argument in connection with this matter.   I refer to the fact,

13   an  admitted fact and a fact that is proved in the record, that

14   the Fallbrook Public Utility District was created in 1922.   It

15   was created under a law that had as its sole and only objective

16   the providing to people in suburban areas with the utilities

17   normally provided by municipalities.   The law is very clear

18   on that and the history of the law is extremely interesting.

19        In 1911 the California Constitution was amended to

20   provide, by Article 11, Section 19, that a municipal corpora-

21   tion could acquire utilities for the purpose of providing its

22   inhabitants with the telephone service, light service, water

23   and similar utilities which had previously been considered un-

24   available to the municipalities and which were provided by

25   private corporations down to that point in history.

It is of very great importance, I believe, in the

consideration pending before your Honor to consider this fact,

that the identical language that was written into the Constitu-

tion of California to permit a municipal corporation to provide

the municipal services to which I have alluded is included in

the Organic Act pursuant to which the Fallbrook Public Utility

District was organized.  In other words, the legislature of

this State decided that it would create a corporation or permit

the creation of a corporation which would bring to the suburban

areas the same facilities as are provided by the city, and in

so doing it used the same language that was used in the Con-

stitution for that purpose.

At the very moment when the Fallbrook Public Utility

District, which is nothing more nor less than a municipal cor-

poration, was created and functioned, there was an irrigation

district, the Fallbrook Irrigation District, functioning in

identically the same area and which, indeed, was seeking to

appropriate water and had applications to appropriate

rights to the use of water for a dam, a dam at identically the

same location where the Fallbrook Public Utility District is

today seeking to build a dam.  So it starts a course of conduct

which I believe is conclusive in this matter,  a course of

conduct which goes  back to 1922 to when, side by side, these

two entities existed, one to provide irrigation water and one

to provide water for the area, suburban though it was, with the

1    facilities of a municipal corporation.

2          So there is the beginning of a course of conduct

3    which has come down to the present time, and it is extremely

4    interesting to observe that in 1932 the Fallbrook Public Utility

5    District, while the Fallbrook Irrigation District was then

6    attempting to get a permit to appropriate rights to the use of

7    water, entered into this gratuitous revocable license to which

8    we have made reference so many times, and it was provided in

9    that revocable license that the Rancho Santa Margarita grants

10   to Fallbrook Public Utility District a revocable license or

11   permit to divert and take from the Santa Margarita River 10

12   miner's inches of water continuous flow for the sole and ex-

13   clusive purpose of supplying inhabitants of said Fallbrook

14   Public Utility District with water for municipal purposes.   So

15   the course of conduct continues.   The Fallbrook Public Utility

16   District in 1932 entered into this gratuitous license with the

17   Rancho Santa Margarita to get water for domestic uses.

18         It is of interest, and in due course I will offer

19   in evidence some of the clippings from the Fallbrook Enter-

20   prise.  One of them is in 1932, and as of this date there was

21   a great hallelujah there as there is now.  The Fallbrook

22   Public Utility District had received 10 miner's inches --

23   headlines -- from the Rancho Santa Margarita.  Some more of

24   this course of conduct, the understanding of the functions,

25   the responsibilities and what could be performed by this

1   municipal corporation.  Indeed, they sent to the Vail Corporation

2   a resolution; very, very happy that the Vail Corporation agreed

3   that they could take  this 10 miner's inches.

4         Now we proceed along this line in a course of con-

5   duct.  The Santa Margarita Mutual Water Company sprinted in

6   ahead of the Fallbrook Public Utility District and filed an

7   application to appropriate rights to the use of water for irri-

8   gation purposes.  About a week later the Fallbrook Public

9   Utility District filed an application to appropriate rights to

10   the use of water, and the amazing thing about that is that even

11   though it knew it was being beaten out from the standpoint of

12   priorities it filed an application for only 2½ second feet, and

13   the application for the 2½ second feet was for domestic and

14   municipal uses.  Now that is extremely important.  I will go

15   back and touch upon a point later in regard to some handwriting

16   on the application.

17         But in any event, in 1946 (October) the Fallbrook

18   Public Utility District made a claim for a very small quantity

19   of water for municipal and domestic uses only.

20         On February 18, 1948, in regard to that 2.5 second

21   feet, there was issued a permit to the Fallbrook Public Utility

22   District which provided that the Utility District would have

23   a permit No. 7033 to appropriate a quantity of water which

24   shall be beneficially used and "shall not exceed 2.5 cubic feet

25   per second from about April 1 to about November 1 of each year

1515

1  and throughout the remainder of the year as required for domes-

2  tic and municipal purposes."

3          So there the conduct continues.  You have an appli-

4  cation for a very, very small quantity of water, 2.5 second feet

5  of water, and a permit issued by the State of California for

6  municipal and domestic uses.

7          But that is not all.  At the time that the filing

8  was made for the 2.5 second feet of water, the Fallbrook Public

9  Utility District filed an application with the State Water

10  Board, or what was then the State Engineer's Office, to appro-

11  priate how much water?  10,000 acre feet of storage at the site

12  where it now proposes to build a dam.  And what did it file for?

13  It filed for domestic and municipal uses only.

14          So at that time, at that very moment, on the main

15  stem of the Santa Margarita River, the Fallbrook Public Utility

16  District made its applications for municipal and domestic uses,

17  and it did so in keeping with the kind and type of powers that

18  it had and for the purposes for which it could make applications.

19  It limited it to that.

20          That application for municipal and domestic uses

21  continued on record, and subsequent to that filing for 10,000

22  acre feet and subsequent to the 2.5 second feet, the United

23  States of America filed Application 12576.  That was filed in

24  June, 1948.

25          Subsequently, and a long time subsequently, the

1  Fallbrook Public Utility District filed an attempted amendment,

2  filed on December 11, 1950, thirty months after the filing by

3  the United States of America, a proposed amendment to make the

4  claim for the 10,000 acre feet of water not for municipal and

5  domestic uses as it originally intended but now, many months

6  subsequent to the filing by the United States of America, it

7  filed an amendment seeking to get water for purposes of irri-

8  gation.

9       Now the point is very clear, in our view, that the

10  Fallbrook Public Utility District did not, at the time it made

11  its filings, think that it desired, and I assume that it thought

12  it did not have the power, to claim water for purposes of irri-

13  gation.

14       Now I will refer at this time to the filings 12178

15  and 12179, and I have presented your Honor with the schematic

16  drawings of those two filings.  It will be observed that those

17  drawings disclose that on Sandia Creek there was a claim 12179

18  to appropriate water from Sandia.  There was also one, 12178,

19  for appropriations on the Rainbow Creek.  Those combined appro-

20  priations were for 20,000 acre feet of water.

21       Now we come to the "Dear Franz, Dear Henry" exchange

22  of correspondence which I made part of the record while your

23  Honor was up at Reche School.  In 1955 Mr. Sachse wrote and said,

24  "When I was president of the Fallbrook Public Utility District,

25  I filed an application, or it filed an application which was a

1   shotgun application for the appropriation of rights to the use

2   of water on Sandia Creek."   In so doing I think Mr. Sachse

3   shotgunned his own application right out of the water, because

4   it proved at that time, in 1955, that the Fallbrook Public

5   Utility District, assuming that it had a right to appropriate

6   rights to the use of water for purposes of irrigation, did not

7   then have a plan, doesn't have a plan now, I don't believe it

8   will ever have a plan, to build a dam because it didn't know

9   in 1955 how much water it was going to claim or the source from

10  which it would make the claim.

11         It is very apparent, in our point of view, in that

12  connection, that the Fallbrook Public Utility District has yet

13  to formulate a plan for the development of its claimed rights

14  to the use of water for purposes of irrigation.  For right now

15  it has made a filing with the State Water Rights Board to claim

16  2000 acre feet of water.  It doesn't yet have a permit for that

17  quantity of water.  Indeed, I don't believe it has the slightest

18  conception of how it would obtain the water or how it would use

19  the water or what kind of plans or designs would be utilized.

20         Now this leads us to a very important factor from the

21  standpoint of the interrogatories that we filed and which Mr.

22  Sachse did not answer.  But we asked the questions, and we be-

23  lieve that they are extremely important, and before we are

24  through we are sincerely hopeful that your Honor, in connection

25  with this motion, will deem it desirable to interrogate Counsel

1    for the Fallbrook Public Utility District in regard to its

2    failure to respond to these very, very basic questions, the

3    fundamental questions here whether the Fallbrook Public Utility

4    District has to date an application to appropriate rights to

5    the use of water.

6            Did your Honor say that you desired to quit at a

7    quarter of 5:00?

8            THE COURT:  Yes.

9            MR. VEEDER:  It is a quarter of 5:00.

10           THE COURT:  I have to take up this other matter.

11           May I inquire, Mr. Sachse, in the memorandum you

12   filed in opposition to the motion for summary judgment, no

13   word was said about the capacity of Fallbrook.

14           MR. SACHSE:  About ultra vires?  Well, your Honor,

15   in my memorandum that I filed on the question of the order in

16   which these should be heard, I stated this:  That I was served

17   with a memorandum, Mr. Veeder's memorandum, in support of the

18   motion at noon on June 10, and I have had no opportunity to

19   prepare a brief, and furthermore -- by odd coincidence I haven't

20   blamed Mr. Veeder for this, but he knows that it happened --

21   the copy of his motion that he originally served on me had

22   page 13 missing.  So when you go through my points you will

23   find that there are certain points that are covered on page 13

24   that I didn't even cover in my reply.  I am very anxious to

25   brief ultra vires.  But you have asked me a question.  I will

1  take only a moment to give you a quick answer.

2      Each one of these very permits and applications to

3  which Mr. Veeder refers also happens to be a permit to have

4  water for domestic use and municipal use, and Mr. Veeder con-

5  cedes that domestic and municipal use is a proper exercise of

6  its authority.  So your Honor is going to have to determine

7  the extent and the validity of our existing permits to domestic

8  and municipal use of water because we don't have irrigation

9  power and so your Honor has nothing to grant a summary judg-

10 ment about.

11      You have the express question.  We have permits of

12 the State of California giving us the right to take water for

13 municipal, domestic and irrigation purposes.  If irrigation is

14 ultra vires, does our entire permit fall?

15      MR. VEEDER:  That is all I wanted to hear.

16      THE COURT:  Has this ever been presented to the State

17 Water Board, this problem about the capacity of your District?

18      MR. SACHSE:  I will say this, your Honor.  It was

19 presented to the Water Board on the very first permit the Fall-

20 brook Public Utility District ever got, which Mr. Veeder hasn't

21 mentioned because it is not in this watershed.  The first permit

22 that we got was from the San Luis Rey River.  I filed it back

23 in 1935, and it is an irrigation permit.

24      THE COURT:  Has this question ever been raised before

25 the State Water Rights Board?

1           MR. SACHSE:   Has anyone challenged our right to water?

2    No, sir, it has never been challenged.

3           MR. VEEDER:   It has now.

4           MR. SACHSE:   It has now.

5           THE COURT:   10:00 o'clock tomorrow morning.

6           (Adjournment until Tuesday, June 17, 1958, at 10:00

7    A.M.)