VOLUME 12

COPY

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN ~~CENTRAL~~ DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

    Plaintiff,

  vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al,

    Defendants.

No. 1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    Tuesday, June 17, 1958

Pages: 1521-1667

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
    Deputy

JOHN SWADER
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4-6211 · EXT. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 21247-SD-C |
| | ) | |
| FALLBROOK PUBLIC UTILITY | ) | |
| DISTRICT, et al, | ) | |
| | ) | |
| Defendants. | ) | |

- - -

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, June 17, 1958

- - -

APPEARANCES:

    For the Plaintiff:    WILLIAM H. VEEDER, Esq.
                                 WILLIAM E. BURBY, Esq.
                                 Special Assistants to the
                                 Attorney General
                                 Department of Justice
                                 Washington, D. C.

- - -

1    APPEARANCES (continued):

2        For U. S. Marine Corps:        COL. ELLIOT ROBERTSON
                                        LT. COL. A. C. BOWEN
3                                       LT. DAVID MILLER

4        For Defendant Vail             GEORGE E. STAHLMAN, Esq.
         Company:
5

6        For Defendants Fallbrook       F. R. SACHSE, Esq.
         Public Utility District,
         Goodchap, Sachse, et al:
7

8        For Defendant State of         EDMUND G. BROWN, Esq.
         California:                    Attorney-General, by
                                        ADOLPHUS MOSKOVITZ, Esq.
9                                       Deputy Attorney-General

10       For Defendants Gibbon          GEORGE GROVER, Esq.
         and Cottle and
11
         For Defendants Halde:
12

13       For Defendant Santa Mar-       W. B. DENNIS, Esq.
         garita Mutual Water Co.:
14

15       For Defendants Bennett and     TRENT G. ANDERSON, Esq.
         Knox:

16       For Defendant Querry:          CLAYTON L. HOWLAND, Esq.

17       For Defendants Suderman:       G. NORMAN KENNEDY, Esq.

18

19

20

21

22

23

24

25

SAN DIEGO, CALIFORNIA, TUESDAY, JUNE 17, 1958, 10:00 A. M.

- - -

THE CLERK:  No. 1 on the calendar:  1247-SD-C, United States vs. Fallbrook, for further hearing.

THE COURT:  Yes, sir?

MR. VEEDER:  May I proceed, your Honor?

THE COURT:  You may.

MR. VEEDER:  In the closing moments of yesterday Mr. Sachse touched on a very important subject.  He stated that even if the Fallbrook Public Utility District was empowered only to appropriate rights to the use of water for domestic and municipal purposes, this court would nevertheless be unable to enter a summary judgment on the subject because there would be a conflict of facts.  We will direct our views and statements very largely to that phase of what Mr. Sachse has said.  And it turns on the financial capacity of any entity to limit its rights to the use of water in the manner that would ensue if it was determined that the claims for irrigation rights were ultra vires.  How could the Fallbrook Public Utility District finance a structure of the kind and character that would be required for the purpose of using only water for municipal and district rights?  And the answer is obvious that it could not and would not, and it couldn't sell its bonds; and we can be sure of that.  For this reason: assuming that the town serves 10,000 people -- and we deny

1    that -- but we will assume it.  And we will accord to each

2    one in the community 200 gallons of water a day -- and we

3    deny that they would ever get that.  That would run around

4    six acres feet a day, which would run a little over 2,000

5    acres feet a year.  We know that the structure could not cost

6    less than $6,000,000, and we know, for that reason, it would

7    be absolutely impossible for Fallbrook to proceed.

8         Now, the important factor, from the standpoint of financing,

9    is the kind and type of entity which is here involved.  And

10   we refer in that connection to what, I believe, is the key

11   case in this litigation.  It is In re Orosi -- O-r-o-s-i --

12   Public Utility District, 196 Cal. 43 at page 55 and 56.

13        THE COURT:  I read it.

14        MR. VEEDER:  It distinguishes there, as your Honor has

15   read it, the entity, the municipal corporation, and how it can

16   levy assessments and how it can levy taxes.  It can levy taxes

17   generally.  It can do so by reason of the fact that there are

18   benefits accruing to all by the maintenance of schools and

19   fire departments.  It differs drastically from an irrigation

20   district, as your Honor observed in reading the case, and that

21   is the crux of the matter here as we see it.  That case

22   recognizes  that the power to levy assessments and taxes is

23   one of the underlying factors in distinguishing between the

24   quasi-municipal corporation of the character of the Fallbrook

25   Public Utility District and the irrigation districts.

1   We know that the Fallbrook Public Utility District -- I

2   think this court will probably take judicial notice that the

3   official publications are of that nature.  We know that the

4   Fallbrook Public Utility District has an assessment valuation

5   of real and personal property of $7,100,000.  We know that the

6   law provides that it can only assess up to 20 per cent of

7   that.  We know, therefore, that the irrigation district can

8   issue bonds probably around a million and a half.  That is

9   already indebted.  Now, we know that.  So its ability to issue

10  bonds would defeat entirely any proposed project.

11      Now, it is basic in the law of California that the

12  inability of an entity to finance a project can defeat that

13  project.  Indeed, financial capacity is a basic and a funda-

14  mental element in the appropriation of rights totthe use of

15  water.  I cite in that connection, your Honor, the case of

16  Mitchell  Amador --   A-m-a-d-o-r -- Canal Company, 75 Cal.

17  464, 482.  That case and many others emphasize the fact that

18  no corporation, no entity, and no individual is permitted to

19  make a filing for rights to the use of water and to tie up

20  those rights for the use of water by fictitious claims --

21      THE COURT:  Is that cited in your brief?

22      MR. VEEDER:  No, your Honor, it is not.  There is another

23  citation that may be of importance to your Honor:  25 Cal.

24  Jurisprudence at page 84 -- I beg your pardon -- 26 Cal.

25  Jurisprudence at page 84, and 4 Cal. Law Review 209, 213.

1  And in each one of those citations will be found additional

2  cases bearing out the proposition which I am advancing here.

3  Namely, that the Fallbrook Public Utility District, by reason

4  of its financial incapacity, could not possibly formulate the

5  requisite intent to appropriate rights to the use of water,

6  and intention.  I believe your Honor will accept as an

7  elementary factor in this litigation the intent to appropriate

8  water, the intent to formulate the ability, to formulate the

9  intention of appropriating rights to the use of water under-

10  lying the entire case.  And that is why these filings to which

11  I have made reference are so important.  It was manifest that

12  the Fallbrook Public Utility District honestly felt in

13  October 1947 that it didn't have the power to appropriate

14  rights to the use of water for municipal and domestic purposes,

15  and that is how they happened to formulate their kind and

16  type of applications.  I refer in particular to application

17  11586.  Now, that is for two and a half second feet.  And a

18  copy of that application is filed with the court, and it has

19  also been marked as an exhibit.  It will be observed that

20  there is written into that form application 11586 in hand-

21  writing "and irrigation."  And there is some unknown person's

22  initials on there.  And then "10/25/46."  In other words,

23  a couple of weeks after the original filing was made someone

24  altered the document.

25      THE COURT:  You don't expect that I can take any account

M1B

1　　about a document with some interlineation on it without proof

2　　as to when the interlineation was made, do you?

3　　　　MR. VEEDER:  That is precisely the point, your Honor.

4　　There was absolutely no compliance with the law of the State

5　　of California for the purpose of amending.  There was no

6　　amendment whatsoever.  There is no amendment today so far as

7　　the law is concerned.

8　　　　THE COURT:  How do you know today that the document was

9　　filed?  It didn't have on it the interlineation at the moment

10　　it was filed with the State authority.

11　　　　MR. VEEDER:  Your Honor, I will hand you the copy that I

12　　have, and you will observe in the middle of the page that the

13　　interlineation is there and the date.

14　　　　THE COURT:  I can hardly read it.  "10 --

15　　　　MR. SACHSE:  I will concede, your Honor, that Mr. Veeder

16　　is correct.  The date appears 10/25/46, and the initials, I

17　　am not quite certain; and the notation above it, "Paragraph 13."

18　　And if you will turn over to Paragraph 13, the entire explana-

19　　tion is on Paragraph 13 on the next page.

20　　　　MR. VEEDER:  I also hand to your Honor a copy of the

21　　11587, which shows domestic and muncipal use as the only use.

22　　And it will be noted that there was no revision whatever.

23　　Now the importance of this 11587 is this:  It is the storage

24　　right, it is the storage claim --

25　　　　THE COURT:  Of course, Paragraph 13 in this document, the

1    irrigation section, is filled out.

2        MR. VEEDER:  That is granted.  But the point remains, and

3    the fact remains, that on the important claim here, the im-

4    portant claim so far as this phase of the litigation is con-

5    cerned, is the claim 11587 which was filed in 1947 for 10,000

6    acre feet.  It remained 10,000 acre feet until sometime in

7    1950 when they made a formal change and they complied with the

8    law or attempted to comply with the law.

9        THE COURT:  Mr. Veeder, you have got a nice point.  But

10   in your motion you have a lot of things the court, I don't

11   believe, can consider.  And the problem, as I see it, is this:

12   You probably have in the record the status of the Fallbrook

13   Public Utility District, and it may be a matter that the court

14   could either take judicial notice of -- I am not sure about

15   that, but let's assume you have got it in the record.  Now

16   its organization, the structure, and so forth.  And you make

17   a motion for summary judgment which, more accurately, would

18   be called a motion for a partial summary judgment because it

19   is proper to have a summary judgment on some issue in the case.

20   And first of all, your point, if it is a point to be con-

21   sidered, is that this corporation is in this court claiming

22   rights to irrigation water and it has no power or authority to

23   deal in irrigation water.  All of this material gets into

24   another question, talking particularly about the two applica-

25   tions you handed up.  And that is this:  what authority this

1    court has to pass on what the State Water Rights Board does.

2         Now, I am without any doubt when this point was raised

3    before the State Water Rights Board or some State court some

4    judge will have a problem to decide as to the authority of

5    this district.  And I haven't heard from Mr. Sachse.  He is

6    trying to brief it, if it becomes material.  There may be

7    answers to it.  There may not.  But it definitely is a problem

8    here.  But you proceed upon the theory that this court has

9    some authority to determine priority dates.  Now, that is the

10   real issue in the case.  This court has a right to determine

11   the rights to water on this river generally.  It certainly

12   doesn't have any power to supervise the activities of the

13   State Water Rights Board.  The State Water Rights Board makes

14   the prima facie showing.  The finding is that there is surplus

15   and then says who can have the surplus.  But its decision is

16   predicated upon the proposition that it doesn't impinge upon

17   any vested rights in the river, either riparian or appropria-

18   tive or prescriptive that exists on the river.

19        Now, the real question, if I am to consider anything other

20   than the status of the Fallbrook Public Utility District, the

21   real question is whether I have any authority to determine

22   priority dates.

23        MR. VEEDER:  Is there any doubt on that?

24        THE COURT:  There is in my mind.  On appropriations.

25        Now, nobody has undertaken to brief this problem, and

1    this is the guts of the problem.  Now, I think it is true

2    as to the prescriptive rights which can be acquired without

3    the activities of the State Water Rights Board, this court

4    can determine if it is a prescriptive right.  And probably in

5    matters and dates prior to the '13 or '14 -- what was the date

6    of this (inaudible) --

7         MR. SACHSE:  December, 1914.

8         THE COURT:  1914.  This court probably can decide what

9    appropriative rights were obtained to the river.  Now, query:

10   to what the power of this court is after that date in dealing

11   with the appropriative rights.  The appropriative rights since

12   that date have to be channeled through a State agency who

13   allows the appropriation or denies it,  who is not bound by

14   dates of filing may consider a later application and grant it

15   over an earlier one if good cause is shown.  And you are

16   proceeding with a very light and nimble touch.  You take some

17   hurdles that I want to hear some discussion about.

18        MR. VEEDER:  I will be glad to discuss it.

19        THE COURT:  You proceed upon the theory that I can deter-

20   mine priority dates.

21        MR. VEEDER:  May I argue that now?

22        THE COURT:  You make a good argument.  That may cause the

23   State tribunal a good bit of trouble about the change in the

24   character of these applications and the fact that a district

25   that has no power to deal with the irrigation water starts out

1    with applications to get irrigation water and starts out with

2    applications on two creeks and then switches the thing and

3    turns out to be an application on the main stream for a dam

4    to hold far more water than was involved in either one of the

5    other applications.  And it may be that the State Water Rights

6    Board was not properly advised and was clear off the track

7    in what they did.  But the question is:  What power do I have

8    to talk about that?

9        MR. VEEDER:  May I argue that now?

10       THE COURT:  Yes, in just a minute.

11       Now, going back to what you are talking about:  Your

12   motion for summary judgment.  I have been thinking about this.

13   This is supposed entirely.  Supposing I was to grant some

14   motion for summary judgment, partial summary judgment.  And

15   no doubt but what Fallbrook has a right to domestic water.

16   There is no doubt that even if the Fallbrook Public Utility

17   District vanished and blew out the window, the people who live

18   in the watershed in what is part of the Fallbrook district

19   have rights which are to be adjudicated in this case.  Well,

20   what kind of summary judgment or partial summary judgment could

21   I render?   It seems to me at the outside it would be a finding,

22   a judgment that Fallbrook, because of its status, has no right

23   in this court to claim irrigation water.  But the case would

24   still have to proceed against Fallbrook on its right to

25   domestic water.  The case would still have to proceed against

M1C

the people who live in the district for what rights they
had as to property that was located in the district.   But
a lot of this material in the motion for summary judgment
has no place in such a motion, and it would have no bearing
on what the court could do.   I am just telling you what I
am thinking.   I should like to have your views on how I can
determine priority dates after 1914.

MR. VEEDER:   Absolutely.

MR. SACHSE:   At this time, your Honor --

MR. VEEDER:   Mr. Sachse, I will give you plenty of time.

THE COURT:   What was it you said, Mr. Sachse?

MR. SACHSE:   I say that, it seems to me, is the heart
and soul involved in the motions of California, Fallbrook
and Cottle to dismiss a great many of the counts of Mr.
Veeder's complaint on that very basis that you --

THE COURT:   We can hear those as they come along.   And
the fact that argument may be directed to one motion may
have some bearing on another won't bother the court.

MR. VEEDER:   Your Honor, from the outset, if your Honor
is going to hold against us, please dismiss our complain now
so we can get to the Ninth Circuit.   That is my view.   But
in any event --

THE COURT:   I am not talking about dismissing your
complaint.   How can I dismiss your complaint?

MR. VEEDER:   You dismiss our views.

THE COURT:   You say the cause of action is in quiet title?

MR. VEEDER:   You dismiss our counts, and we are in the Ninth Circuit tomorrow.   So that is how I view it.   I look at it this way, your Honor.

THE COURT:   And now, there are some provisions in the Federal Rules whereby the court can make rules that a partial judgment be entered.   There is no reason for delay; and that the matter shall be appealable.   And if and when we cross bridges like that, I may make those kinds of orders.   I am not indicating how I am going to rule on your motions.   I haven't heard the defendants' motions.   I haven't heard them. But let's not get agitated about problems like that.

MR. VEEDER:   The reason I am agitated, your Honor, and I am truly agitated, the Fallbrook Public Utility District, pistol in hand, is driving people off the lands to build a silly dam.   They con't have the money; they don't have the ability.   I have avoided in joining that outfit for one reason:   I didn't want them to come up and say that we prevented them from exercising due diligence.   And that is the only reason.

THE COURT:   I understand your problem there, and I also see what you are talking about; that if bonds are attempted to be issued and sold -- unless Mr. Sachse has a good answer to this ultra vires problem --

MR. SACHSE:   I am very anxious to answer it, your

Honor, and I don't think it needs briefing.

THE COURT:   I have serious doubt how you can get an

adjudication that bonds can be sold; but maybe Mr. Sachse

has an answer to that.  But I don't know that that is before

me.

MR. SACHSE:   I am anxious to answer it.

THE COURT:   How can I pass on a motion for summary

judgment or partial summary judgment on financial ability

of this corporation?  You made some estimates here; say I

can take judicial notice of things like that.  Well, that

would be a matter for trial if that issue was before me.

MR. VEEDER:   I would like to try it.  I would like to

have that segregated now and try it today and start in.  Mr.

Yackey  is here,  I would like to cross examine him.  The

point I make, your Honor, is that we are being pressed

harder and harder and harder from the standpoint of just

common decency.  We are hard-pressed, and we see these

people having their lands taken from them and not being able

to do anything, because we know of the scurrilous attacks

that are being directed against us.  That is a fact.  Here

we are.  Your Honor asked some questions, and I think they

are highly important.  You say, "Can this court adjudicate

these rights?" Obviously they can; obviously it has that

power.  And many, many cases have held that a Federal court

1  has a broad power of equity and the ability to determine

2  priorities.  It is inconceivable; it would be impossible,

3  totally unconstitutional for the State of California to pass

4  a law that can, in any way, jeopardize or imperil or change

5  this court's jurisdiction.  If this court had jurisdiction

6  in 1914, it has jurisdiction now to adjudicate priorities.

7  And that is what we are here for.  We are not in any kind of

8  a kangaroo court of the kind that the State runs.  We are

9  here to adjudicate priorities.  And when I say "kangaroo

10  court," that is the only kind of thing I could think of on

11  the point I make of --

12      THE COURT:  The court takes into account that counsel

13  in heat or argument say things that they wouldn't say --

14      MR. VEEDER:  I have said this.  I have said this every

15  day.  The point I make, your Honor, the point I make, your

16  Honor, and it is extremely important to me that your Honor

17  even consider the question doubtful in regard to your

18  jurisdiction.  There are innumerable cases tried in Federal

19  courts in regard to general adjudications; and it has not one

20  thing to do with the silly procedure of the State of Cali-

21  fornia.  The question is:  Is there a property right in-

22  volved?  And obviously there is.  There is a property right

23  involved, and the State --

24      THE COURT:  I am not making my mind up on it at all.  I

25  am merely pointing out this is the heart of the thing, and I

have got to have some help on it.  Nobody has ever briefed it.

MR. VEEDER:  I gave you some authorities yesterday.

THE COURT:  All right.  Authorities where?

MR. VEEDER:  In response to the assertions that your Honor didn't have jurisdiction and on motion to dismiss. The Inyo case, 163 Cal., and other cases, show that even though the filing of a notice is not in itself a completed right, it, nevertheless, has in it the priority date, which, if the water is diverted and applied to beneficial use, ripens into an interest in real property.  And it is proper under the California law to quiet title to that kind of a right, title and interest.  And that is the type we are doing here.  And we are asking you, and I understand Fallbrook is asking you, to adjudicate priorities; and that is all. It could occur, your Honor, that the State of California might throw out somebody's application, but at the time that we filed the lawsuit the rights were fixed, and they were set at that time.  And your Honor certainly has the power, this court certainly has the power to make an adjudication in regard to the respective priorities.  And that is the reason why on summary judgment I raised these points.

THE COURT:  Now, let's reason this out.  Let's start in to begin with.  This is a suit to quiet title properly brought by the Government in the Federal court, and the

Federal court, therefore, has the duty to determine the rights of the United States and the claims adverse thereto. The general principles, we all agree on that.

Now, on the other side of the fence we have a constitutional amendment of the State of California and a statute that says from and after '13 or '14 appropriation of water shall not be done as it was done in the past, but shall be done through the procedure of the State; and the State is given the authority to lay out the procedures and determine how these appropriations started to be made. I am not too concerned about the constitutionality of that or about the legality of it. We talked about it before. I can't agree with the metaphysical theory about the separation of land and water. I think what the Federal Government has gone is to provide that the states might set up their systems, how water could be appropriated, that water could be appropriated -- this apart from the lands. And I don't think it is inconsistent that the title where required, of course, stems from the United States. But I think it is obvious from all the cases that the Federal Government has entrusted to the states the way to handle this matter. So, as a result, appropriations of water could be made which would otherwise, water would otherwise have been riparian to land. Somebody could legally appropriate. The land, therefore, had lost its riparian rights. But by the same token, the State

could decide that if no one had appropriated the water
that the man who acquired the land acquired riparian rights.
I am not so sure but what the State system isn't a com-
bination of the recognition of riparian rights plus recog-
nition of appropriation. We have a State procedure set up
now. There is a delicate balance between the activities
of Federal courts and State courts. This court is not
superior to a State court. A State court is not superior
to this court. Principles of comity control. We have
difficult problems. Some are giving judges and legislators
a good bit of concern. For instance, a Federal court has
a right to grant a writ of habeas corpus to a prisoner after
his conviction has been affirmed by the Supreme Court of the
State. Well, that has caused all kinds of trouble. The
council of Chief Justices of the State have rebelled, and
rightly so, that some little district judge could, in
substance, overrule the Supreme Court of the State. And
there is legislation pending to work that out, to put new
strength upon the power of a Federal judge, trial court, as
it were, set aside the decision of the Supreme Court of the
State. We have a delicate balance in what a Federal court
does when it comes into contact or impact with the actors
of the State court.

Now, here we have a quiet title suit. The general
principle there is that it is an equitable matter, and once

1  equity attaches it is prior to, in the other court that

2  seeks to exercise equitable jurisdiction.  Now how is this

3  court to then treat this appropriative set-up of the State?

4  One alternative, of course, would be to say that since this

5  is entrusted to the State what the State decides as to the

6  appropriation and as to the date of priority controls.  You,

7  apparently, make the contention that, first of all, the

8  State activities on appropriation have no impact upon the

9  Government's rights to appropriate.  That is your very broad

10  position.  Then, secondly, somebody takes the version that

11  even if the State has the right to make orders appropriating

12  the surplus water, permitting the appropriation of surplus

13  water, that as to priority dates this court can, under

14  contract, and say, "Well, it might have been all right, but

15  you have the wrong priority date." Since you have got the

16  wrong priority date, this court will come in and set that

17  all aside, and say, "These are the rights of the parties."

18

19

20

21

22

23

24

25

B-1

1    It is a very nice little problem that has not been

2    briefed extensively or at all that I know of, and that is the

3    guts of this problem.

4    MR. VEEDER:  But, your Honor, in that connection --

5    and you have touched on another phase in passing -- as we go

6    along, we can't bite this whole piece at once.

7    The point that I make, though, is that, in our view,

8    there is truly a question of comity and it is certainly entirely

9    inappropriate for the Court in San Diego to proceed to adjudicate

10   precisely the same points that you have here, and that is the

11   case.  Mr. Moskovitz and the others have repeatedly stated that

12   the only thing that has to be determined was the question of the

13   availability of surplus waters, and that was one reason why we

14   called Mr. Holsinger down, and Mr. Holsinger left no doubt as

15   to his idea as to what he would do and he had power to do,

16   namely, to determine priorities, and that is exactly why we are

17   here, and your Honor certainly has the power to adjudicate and

18   to determine priorities to the rights to the use of water and

19   no State can conceivably undercut that power.

20   If your Honor wants citations, we have many of them in

21   which these adjudications have been made.

22   THE COURT:  Well, I want a brief on that point.  I

23   want a brief on what power I have to determine priority dates.

24   MR. VEEDER:  You certainly have.  It is not even doubt-

25   ful.  If you  want a relatively recent case, there is Brooks vs.

1    United States, 119 Fed. 2d 636, CCA 9 (1941), cert denied 313

2    U. S. 594.   That case involved an adjudication identical with

3    this.   That is the adjudication of the Gila River, and there

4    was never doubt about the authority there and New Mexico has and

5    Arizona has exactly the same kind of over-all approach to in-

6    dividuals appropriating water.   There is no question about that.

7            The most recent case, I think, is 236 Fed. 321, United

8    States vs. Ahtanum Irrigation District.

9            THE COURT:   Is this on the same point?

10           MR. VEEDER:   Exactly.

11           THE COURT:   Is it Federal or Federal 2d?

12           MR. VEEDER:   236 Fed. 2d at page 321, your Honor.

13           His Honor Judge Fee was overruled very sharply on that

14   point by the Ninth Circuit, because he said that he didn't have

15   the power, and in his inimitable style he threw me out of Court.

16           THE COURT:   With finesse and dispatch.

17           MR. VEEDER:   No finesse when he threw me out that

18   time, your Honor.   But we reversed him, and reversed him sharp-

19   ly on about twenty-five points, because he said that he didn't

20   have the power -- he said that the power resided with the State

21   of Washington, and the Ninth Circuit cut him in half and said

22   this, "There is no basis for such a conclusion, because the

23   power of the Federal Court is as broad as is necessary to ad-

24   judicate any of these questions," and they have been, and right

25

1  at the moment the case is being tried, with not as many de-

2  fendants perhaps, but certainly the identically same issues.

3        THE COURT:  That is the case which Judge Lindberg is

4  trying?

5        MR. VEEDER:  That is correct; exactly the same case.

6  And far more interesting there, there was a general adjudication

7  in the State, started by the State Engineer, just exactly of

8  the same kind and character as here, and the Court said and has

9  ruled that that adjudication could have no effect -- none.  The

10  fact is the Ninth Circuit says that it is obvious that the State

11  could not make an adjudication that would affect the juris-

12  diction of this Court, and that is precisely the reason why we

13  are here today on a request for a summary judgment.  If your

14  Honor should declare, and you certainly have the power in our

15  view to declare, priorities, you have the right (1) on summary

16  judgment, as I view it, to say whether Fallbrook has or has not

17  the power to appropriate rights to the use of water for irri-

18  gation purposes.  Now that is certainly strictly and entirely

19  a question for your Honor to decide.

20        THE COURT:  Let's pause a minute.  If these cases

21  hold what you say they hold, let's see where we are.  If they

22  hold in that manner, then if you had an action by a State Water

23  Board and you had litigation in the State Court where the

24  United States was not a party and no land of the United States

25  was concerned, then the State action of course would be final

1543

1   on the problem.   But if you had a situation where rights of

2   the United States were involved and where the United States

3   District Court had taken jurisdiction over the problem, then as

4   I understand your reading of these cases the actions of the

5   State Board would have to yield to the earlier jurisdiction of

6   the United States Court and the United States Court would then

7   determine the priorities and give as much credence as they could

8   to what the State had done; but if the State was wrong, their

9   action would have to fall and yield to the determination of the

10   United States District Court.   That is about the way we wind up,

11   if these cases hold what you say they do.

12         MR. VEEDER:   May I review those.   I have the decision

13   here in the United States vs. Ahtanum Irrigation District, 236

14   Fed. 2d 321.   It is extremely important now, because I had never

15   thought that the question as to your authority to make the de-

16   cision would arise.   I have no doubt on the matter.

17         THE COURT:   There are a lot of things that you pro-

18   bably know about irrigation law that I don't know.

19         MR. VEEDER:   I didn't intend it to sound that way,

20   your Honor.

21         THE COURT:   I'm not being nasty about it.   But don't

22   assume that on some of these major problems I know anything

23   about it.   I can read cases if you cite them to me, and once in

24   awhile I can find one with a little work.   I'll be glad to have

25   your authorities.

1544

MR. VEEDER:  This case here, as I say, was a case Judge Fee had tried, and he said no, the Acts of 1866, 1870 and 1877 had put the plenary and complete control of water matters under the State, and he was reversed on that precise point.  On page 328 of 236 Fed. 2d --

THE COURT:  Who wrote the opinion, first?

MR. VEEDER:  Judge Pope.

THE COURT:  And who sat on the panel with him?

MR. VEEDER:  Judge Lemon and Judge Chambers.  They were very fine -- they went with us.

THE COURT:  Well, they are good judges.  You don't have to apologize.  Judge Pope is one of the scholars on that Court.

MR. VEEDER:  The point being, your Honor, that the issue was raised in this manner.  There had been an adjudication in 1926 in the State Court brought by the State Engineer.

THE COURT:  Who were parties to that adjudication?

MR. VEEDER:  All parties with the exception of the United States, and the State attempted to serve the United States, and indeed the crux of the question was this:  Could the United States of America be served in a State Court proceeding?

THE COURT:  Made a party and served?

MR. VEEDER:  That is right.

THE COURT:  They held that it couldn't.

MR. VEEDER:  It was remarkably the same as this

1  situation here.  They said there (1) that the United States

2  had been served personally, and although the Sheriff's return

3  showed that the United States couldn't be found, nevertheless

4  they said they tried to get it by publication.

5           THE COURT:  You mean that they couldn't find the

6  United States?

7           MR. VEEDER:  That is the problem that these people

8  seem to be having.  I think that they think that the United

9  States seceded from California.

10          In any event, the decision came down and adjudicated

11  the rights clear across the board and Judge Fee said, "Well,

12  now, that's it," and it made the decision -- and actually that

13  is what the Court said -- it decided that the United States

14  would get 25% of the stream.  But the Ninth Circuit said, "Ab-

15  solutely no.  First, the Federal Court has the power to make

16  this adjudication and determination.  Second, it would be im-

17  possible for the State to enact laws which could preclude such

18  a determination," and they cited the Federal Power Commission

19  vs. Oregon, 349 U.S. 435 at page 444.

20          To me it is the crux of the question, and I was not

21  being in the slightest bit captious.  I think the happiest thing

22  that could happen to us would be to dismiss out of here and go

23  to the Ninth Circuit, if your Honor would refuse to adjudicate

24  priorities, because we feel that certainly there is no forum

25  that could grant the relief that we need other than this Federal

1546

1    Court and we believe implicitly that the State of California

2    could not and does not have the power to enact legislation which

3    can in any way affect this Court's jurisdiction.

4            THE COURT:  Let's pause right there.  You may have a

5    point.  Now here's a problem that arises in the State and

6    various private individuals in the State and the Government

7    have interests.  The United States can't be sued without its

8    consent, and it has not consented to be sued in the State Court,

9    with one or two rare exceptions.  One exception is in the case

10   where the Government claims a lien on State property.  It has

11   to be a lien.  It is not a case where the Government claims

12   title.  If they claim a lien, they can be sued in the State

13   Court.  Otherwise they can't be sued in the State Court.  There-

14   fore, how could you have an adjudication in a State forum which

15   would affect the rights of the Government?  Of course, if you

16   had merely the State having an interest and the Government,

17   there would be a means to try that out in the Federal Court;

18   and if you have other parties involved and Government, I sup-

19   pose the United States Court is the only Court then that would

20   have jurisdiction to adjudicate its rights.

21           MR. VEEDER:  There is 43 U.S.C. 666, which was a rider,

22   a rather costly rider, to the Department of Justice Appropriation

23   Act, in which it purports to waive the sovereign immunity of the

24   United States from suit in water litigation.  However, we have

25   removed those cases to the Federal Court and have tried whenever

1  they have arisen, with one exception, and that is pending in

2  Utah now.   The Courts has invariably held, and the Fifth Circuit

3  has recently held, that the immunity of the United States is

4  such that it can prescribe with precision as to how it can be

5  sued and the circumstances which must be pursued.

6           THE COURT:   That is an exception I didn't know.

7  There is an express statute in water litigation?

8           MR. VEEDER:   That is right.

9           THE COURT:   The Government has waived immunity to be

10  sued in the State Court.

11           MR. VEEDER:   Not in the State Court.   It can be sued

12  in either Court, and it can remove the State Court cases, which

13  raises an interesting problem.

14           THE COURT:   But where it has been sued it has uni-

15  formly removed the case then to the United States Court?

16           MR. VEEDER:   Yes.

17           THE COURT:   When it has been sued in a State Court,

18  it has removed the case.

19           MR. VEEDER:   That is right.

20           THE COURT:   There has been no problem about that

21  removal.

22           MR. VEEDER:   I think there is a Utah case that is yet

23  to be decided in which a removal was made and the Court sent it

24  back by reason of the status of the case.   But in the other

25  cases which have arisen we have removed it --

THE COURT:   I don't think there is any problem about that.   The power of the Government to remove a case even against its employees or officials to the Federal Court has been exercised time and time again.

MR. VEEDER:   That is precisely the point.

THE COURT:   And of course where the Government itself is a party I don't think there would be any problem about the removal.   As a matter of fact, the matter went so far that when I was United States Attorney -- I don't like to cause any re-flection on the Marines, and this didn't concern Marine officers but it concerned Army officers -- I used to get these requests from the Department of Justice.   Col. So-and-so has been arrested for speeding and has been cited to appear at Soledad Justice Court.   Kindly remove the action to the United States District Court.   I would have to remove the action and of course that was the end of it -- they never proceeded with the prosecution in the Federal Court, although they could   have.   So every time an Army officer got a ticket between Camp Cook and Los Angeles in came the case into the Federal Court.

If they can remove an Army colonel's case, I would not have much doubt about the Government's removing a case in-volving itself.

MR. VEEDER:   The point we come to, your Honor, though, on this thing now --

THE COURT:   You have shaken me a little bit on this.

1    MR. MOSKOVITZ:  You haven't heard from us yet, your

2  Honor.

3    MR. SACHSE:  You haven't heard from us yet.

4    THE COURT:  Well, you know, the J.P. trying the case

5  heard the plaintiff and when the plaintiff got through with the

6  case, he said, "Judgment for the plaintiff." The defendant

7  spoke up and said, "Why, your Honor, we haven't even put on our

8  case." The J.P. says, "Well, all right, let's hear what you

9  have to say." So the defendant told his story. When he got

10 through the J.P. says, "Judgment for the defendant." That is

11 what happens in these cases sometimes.

12    MR. VEEDER:  When the firm of "Sachsevitch" move on

13 I'm sure you hear a great deal of wind, but I don't believe

14 they are going to change the law one iota or that they can strip

15 your Honor of the jurisdiction of adjudicating completely and

16 entirely and wholly every single aspect of this lawsuit, and I

17 don't believe that there is any question whatever that this

18 Court assumed jurisdiction first, that it has complete juris-

19 diction to render complete relief in this litigation.

20    Now we have a nice question across the street here

21 in the Superior Court of San Diego County. I think there is a

22 question of comity there  and I don't believe that that Court

23 should proceed. I have hesitated because I don't think it is

24 proper ever to try to restrain a State Court. But I do think

25 it may be proper to restrain these eager beavers from going into

1    another Court and into another Court and going down the line and

2    preventing your Honor from rendering a final determination here.

3            THE COURT:  Let's follow along with your argument.

4    Let's assume for argument that you are right and that since this

5    is an equity suit I have jurisdiction to decide priority.  Now

6    your contention is going to be that the Government made a filing.

7    Of course, you have never taken a definite position as to

8    whether that was a filing by the Government or a filing by some

9    officer of the United States without authority from the Govern-

10   ment.  You are going to have to decide which horse you are

11   going to ride there.  And then, what are you going to do about

12   the fact that although you made a filing you just folded up?

13           MR. VEEDER:  Oh, no, I didn't, your Honor.

14           THE COURT:  You went to the Water Rights Board and

15   said that you appeared specially and wouldn't participate.

16   What are you going to do about that?

17           MR. VEEDER:  I had a great deal of respect for your

18   Honor and for his Court.  The point I am making --

19           THE COURT:  The argument being that since I had juris-

20   diction anything they did would be a nullity.

21           MR. VEEDER:  That is right.  I think that is the

22   situation today, for this reason -- I believe this, and I be-

23   lieve the cases sustain us on it -- that when we filed this

24   lawsuit the subject matter of the case, the res, passed to the

25   jurisdiction of this Court, and the res is all the rights to

1    the use of water in the Santa Margarita River.  I don't think

2    there could be a change in the status.

3           I wish that Mr. Moskovitz and Mr. Grover be quiet

4    while I am arguing.

5           The point I am trying to make is that this Court

6    should not have its jurisdiction imperiled by the changes that

7    came about, first, by amendments by the Fallbrook Public Utility

8    District in its Applications 12178 and 12179 which occurred

9    after this suit had been filed; secondly, there were licenses

10   and permits issued by the State of California while it was

11   still a party to this case and changing the status further.

12   Finally, and to me the most flagrant invasion of this Court's

13   jurisdiction was when, on April 10, with full knowledge that we

14   were going to go to trial, they came and changed the status

15   entirely and exercised what is laughingly referred to as "dis-

16   cretion" -- they took the Santa Margarita Mutual Water Co.'s

17   filings, which were in advance of Fallbrook's and threw them

18   out, and they rejected ours, and the reason they rejected ours

19   is that although I appeared specially and said I can't submit

20   to their jurisdiction, they said, "No, we will throw it out."

21          But the history of this whole nefarious deal, and

22   that is all you can call it, comes down to this.  Can these

23   people act as they have and strip this Court of its power to

24   render an adjudication?  That is the whole question this

25   morning, and that is why I brought this motion for summary

judgment, because, your Honor, I believe that under Rule 56 you can segregate any issue and pass upon it.  There is broad discretion, but I am not sure that the discretion is so broad that where, as here, there are clear-cut and well-defined matters, that a judgment should not be entered (1) as to Fallbrook's ability to appropriate water for irrigation purposes.  Now that is certainly within the purview of your Honor.  There are numerous cases, Federal cases.  I don't believe that even the firm that I just mentioned would deny that this Court can determine the respective rights to the use of water among parties. It has been done I don't know how many times, and is being done every day in the Federal Courts.

So the sole and only question, as I see it, for your Honor to consider now is, whether Fallbrook has the capacity to appropriate rights to the use of water for irrigation, and whether the State could change the course of this trial by what it has done.  Now they have actually decided priorities in violation of this Court's jurisdiction, because when they say, "Mr. Dennis' client will not have his rights at all.  We will give everything that he had, although he had a priority ahead of Fallbrook, we will give that priority to Fallbrook," there was a drastic and a great change in the status of this litigation.

Now if your Honor truly feels that he does not have jurisdiction, my own view on it is that it would be far better

B-4

1 ‖ to dismiss our counts now and let them be reviewed, because I

2 ‖ feel that we are being imperiled daily.  The Marine Corps has

3 ‖ for all these years been precluded from securing money until

4 ‖ just this year -- they got $5,000,000.  They would like to

5 ‖ build some regulatory structures within the enclave, but they

6 ‖ are being precluded from doing so.

7 ‖          THE COURT:  Let me ask you a question.  Of course, on

8 ‖ the facts of this case -- this lawsuit was filed in 1950, I

9 ‖ guess.

10 ‖          MR. VEEDER:  January 25, 1951, your Honor.

11 ‖          THE COURT:  1951.  Suppose the lawsuit had been on

12 ‖ file and applications had been made before the Water Rights

13 ‖ Board, including the application of the United States -- this is

14 ‖ academic -- what would your position have been then?  No suit

15 ‖ was on file, no Court had taken jurisdiction, but the United

16 ‖ States, as well as some private parties, were applicants before

17 ‖ the Water Board for appropriation of water.  What would you have

18 ‖ done then?

19 ‖          MR. VEEDER:  That happens every day and it is going

20 ‖ on, I think, in all seventeen western states; there are appli-

21 ‖ cations being made and appropriations being perfected daily.

22 ‖          THE COURT:  Including applications by the United

23 ‖ States?

24 ‖          MR. VEEDER:  Well, no, not daily by the United States.

25 ‖          THE COURT:  My case is this:  No suit is on file, a

1   Water Board is available to hear applications for appropriations.

2   So the United States files an application along with some pri-

3   vate parties.  Now is there any instance where the United States

4   has participated in one of those hearings and abided the de-

5   cision of a State Water Rights Board?

6          MR. VEEDER:  Oh, yes.  One with which I am particularly

7   familiar is on the Provo River in the State of Utah.

8          THE COURT:  What is the Government's position in that

9   case?  The position is that no Federal Court has taken juris-

10  diction and the United States then comes in, as any party, and

11  pursues their application.

12         MR. VEEDER:  We have the situation now in Rank vs.

13  Krug, in which, I believe in complete error, the Bureau of

14  Reclamation is putting in evidence in regard to the Central

15  Valley Project.  It is inconceivable to me that the  State of

16  California could pass on rights which have been so long exer-

17  cised and vested in the United States, which it has been exer-

18  cising.

19         THE COURT:  The United States is appearing before the

20  Water Board?

21         MR. VEEDER:  The United States, the Bureau of Re-

22  clamation is, your Honor.

23         THE COURT:  The Bureau of Reclamation is putting on

24  proof of their claim?

25         MR. VEEDER:  Putting on some proof; that is right.

1    THE COURT:   The Bureau of Reclamation is part of the

2   Government of the United States.

3    MR. VEEDER:   Sometimes I wonder.

4    But the point I make is that you set up a circumstance

5   and then ask me a question, and it is true that on occasion

6   that is being done.

7    My own view on it, in regard to the United States in

8   the Central Valley Project, is the same view that I have ex-

9   pressed here; that when the Congress authorized the construction

10   of Friant Dam and Shasta Dam and they went in and built the dam,

11   they acquired whatever rights were necessary, and it couldn't

12   be otherwise; and the same way with the Marines.   When the

13   Marines came in here and began diverting water and using it,

14   I don't believe anybody could take it from them.

15    THE COURT:   There is a distinction there, because

16   when they built those dams there is a good argument, and it has

17   been so held, that there was inverse condemnation of people

18   downstream of the Government.

19    MR. VEEDER:   That is right.

20    THE COURT:   But that is the reverse of our situation.

21   Here the Government is at the end of the River.   If the Govern-

22   ment built dams and interfered with rights downstream, whether

23   they brought a condemnation action or not, that is a typical

24   case of inverse condemnation.

25    MR. VEEDER:   That is right, your Honor.

1556

THE COURT:  But that doesn't parallel this situation.

MR. VEEDER:  Of course, I will argue that.

But the point I make, and the crux, to get back to what I think is so important here because we are facing a deadline here, we are facing this condemnation proceeding and we look at it this way:  That your Honor has the power to determine and to decide every issue here and the State can do nothing in regard to it. We believe that our motion for summary judgment is, as you said, for a partial summary judgment. We believe that your Honor could decide the issues that were raised in it. We believe that your Honor could decide not only the matter of ultra vires. We believe your Honor could decide today the question whether the evidence before you would indicate, by a course of conduct, that Fallbrook intended, in 1946 when it made its filings, to seek only water for domestic and municipal purposes.

THE COURT:  Let's take a recess and give the Reporter a rest and I will read a couple of these cases and then you may proceed.

(Recess.)

M3A

THE COURT:  I have looked at these two cases.  The Ahtanum case, of course, doesn't hit our problem.  On page 328 the court said:

"It is too clear to require exposition that the State water right decree could have no effect upon the rights of the United States.  Rights reserved by treaties, such as this, are not subject to appropriation under State law nor has the State power to dispose of them."

And they cite the Federal Power Commission for the State of Oregon, which is properly in point, because there was involved reserved lands and here you had Indian lands.  And so all the case must be considered in connection with our problem.  It doesn't go as far as what you contend.  On the other hand, the Brooks case, the most interesting case, has a lot of authority cited; and here was a case in which the parties from out of the state apparently had come in and consented to jurisdiction it would appear; so that the District Court in Arizona had jurisdiction.

MR. VEEDER:  That is right.  The Gila decree, your Honor, is entered by the United States District Court in the State of Arizona.

THE COURT:  Affected people in New Mexico.

MR. VEEDER:  That is right.  And they appeared voluntarily.  They are up on the upper reaches of the Gila River

which arises in the San Francisco Mountains of western
New Mexico. But exactly the same issues were there. And,
in fact, if I remember correctly, the complaint in this case
is on all fours from the standpoint of parties, issues,
pleadings.

THE COURT: It is closer. This was a case in the
Arizona District Court. No. Yes, Arizona District Court.
And they say we are not dealing with an attempt to exercise
exclusive jurisdiction by preventing recourse to the courts
of New Mexico, page 640; but merely with the power of the
court in Arizona to concur as it may be, to act where all the
parties are before it and are consenting to a decree therein
with relation to both Arizona and New Mexico water users.

MR. VEEDER: That is right.

THE COURT: That is, in effect, assumed and agreed by
the parties to the Arizona decree that the determination of
the water rights of defendants in New Mexico, and so forth
that it be determined in Arizona below.

Of course, even more interesting in the Brooks case is
the court's analysis of this decision in Walker River affirmed
by the Supreme Court (Rickey Land & Cattle Company vs.
Miller -- Miller and Lawrence) -- and there was a fine
hassle where a suit was brought in the District Court
of Nevada and subsequently state litigation was brought in
California and Nevada, and the court apparently restrained

1559

the activities in these other courts.  Now that doesn't,

of course, involve a water rights board, the questions of

priority; but it emphasizes the rule that once a court has

taken jurisdiction of the issues, even a State court, which,

of course, has more status than a water rights board, aren't

going to be allowed to interfere with the actions of the

court.  This problem needs extensive briefing, and I will be

very anxious to hear what Mr. Moskovitz and Mr. Sachse and

Mr. Grover have to say.

Proceed, Mr. Veeder.

MR. VEEDER:  The phase and the facets to which we are

alluding here -- may I interrupt my statement for just a

moment on the question raised by Mr. Sachse.  Colonel

Robertson has now given me -- if I may interrupt.  You recall

that he requested a document?

THE COURT:  The report?

MR. VEEDER:  Yes.

THE COURT:  Yes.

MR. VEEDER:  And Colonel Robertson has now handed me

those portions of the report, or at least portions of the

file, that we believe would be pertinent.  And I should like

to hand it to Mr. Sachse and let him view it with the under-

standing that he either return it to us for making copies

or that he make some copies and give us some copies of it.

MR. SACHSE:  I would prefer that he follow your Honor's

M3b

1    suggestion yesterday and return not portions but the whole

2    file over to your Honor to look at in camera and tell us if

3    any of it is pertinent, not just Colonel Robertson's decision

4    of what might be pertinent to the case.

5        THE COURT:  What have you done, taken parts of a bigger

6    file?

7        MR. VEEDER:  That is right.

8        MR. SACHSE:  I suggest the whole file be given to his

9    Honor.

10       THE COURT:  Well, there is nothing that is going to

11   keep you from looking at what has been handed to you, Mr.

12   Sachse, but I agree with you to do this properly the report

13   should be submitted.  If there is a lot of material in the

14   report about land titles and price, and all that, that

15   doesn't concern you, I can seal the report and make

16   available those parts that might be pertinent to your

17   problem of water.

18       MR. SACHSE:  That is right.

19       THE COURT:  We are not interested in anything but

20   water.

21       MR. SACHSE:  That is all I am concerned with.

22       THE COURT:  We will assume for the time being that this

23   is a good faith exhibit to you, but we will follow up --

24   how big is this whole report?

25       MR. VEEDER:  I should like to have Colonel Robertson

1    state that to your Honor.

2        COLONEL ROBERTSON:  Your Honor, the report of the Army

3    which is part of the basic reports involved covered military

4    locations and considerations from the Mexican Border to

5    Canada.  We didn't think they were pertinent.  We searched

6    the files and found the Kansas City, an extract which was

7    used by the Marine Corps with relation to Camp Pendleton

8    alone.  The covering letter there shows that the extracts

9    enclosed in it were those that were considered.  We don't

10   think the rest of the report is pertinent.

11       THE COURT:  You mean the other report doesn't concern

12   Pendleton?

13       COLONEL ROBERTSON:  No, sir.

14       THE COURT:  The other report concerns other locations?

15       COLONEL ROBERTSON:  Yes, sir.

16       THE COURT:  You mean everything concerning Pendleton

17   is in this?

18       COLONEL ROBERTSON:  I think all that is pertinent is

19   there.

20       THE COURT:  Well, you look it over, Mr. Sachse.

21       COLONEL ROBERTSON:  Of all the Camp Pendleton papers

22   that have been thrown my way I believe these are the most

23   complete papers that I have had.

24       THE COURT:  You look it over, Mr. Sachse.  From my

25   dealings with Colonel Robertson I have a little bit of

confidence in his representations.  If you insist that I

spend the time to go through a long report telling me about

prospective places from the Mexican Border to Canada, I will

have to do it.

MR. SACHSE:  Not at all.

THE COURT:  But look at it at the noon hour and see

what you have got, and we will probably take it up later.

MR. SACHSE:  Very good, your Honor.

THE COURT:  Go ahead, Mr. Veeder.

MR. VEEDER:  As I see the issue now, formulated now,

your Honor, it is this -- I desire to be corrected on it if

I am in error.  The basic and fundamental question that has

come out of our motion for summary judgment is this:  A

query as to whether your Honor has the power and the

authority to proceed to a court to the United States of

America the relief that is prayed for by reason of inter-

ference by the State of California which is a party to this

cause.  That simply and succinctly is the issue today.  The

question is:  Does the United States of America have to go

to the State of California and abide by the rules of the

State of California when there was established its own form

to adjudicate its own rights.  And that is where we are today.

Can the State of California enact legislation which could,

in any manner or any way, prevent you from rendering com-

plete relief and say that it is so clear that the State

1   could not thus interfere.  The Constitution was written for

2   that very reason, envisioned what would be entailed now.  If

3   we were required to protect our rights to proceed through the

4   San Diego court here through the District Court on appeal,

5   the intermediate appellate court in this state, and then to

6   the Supreme Court of the State of California, this case

7   could never be tried.  And it is that simple.  For if the

8   Fallbrook Public Utility District is able to go into the

9   State and preclude your Honor from considering its rights --

10   that is what it is saying now.  It is saying this:  This

11   court has jurisdiction to do something or other, but it

12   certainly doesn't have the jurisdiction to decide our

13   priorities.  Now, that is incomprehensible because what is

14   involved?  Involved are interests in real property.  We will

15   have statements made, of course, that an application is not

16   an interest in real property.  It is at least an inchoate

17   interest and certainly your Honor has the power to adjudicate

18   that.  And your Honor has all of the power and all of the

19   authority that would reside anywhere to make that deter-

20   mination.  There is the statement that the state could

21   decide to invest the board with discretionary power which

22   could turn its back on all the rules of property observed.

23   There is no question in our view that full and complete

24   authority attached to the res when our complaint was filed,

25   and it has never changed.  And if it were impossible, if --

1564

let's follow that through。 Does it mean that the United
States of America or anyone else cannot resort to this
court without going through the State Board? That is
incredible, for this reason: We are engaged here in testing
the respective titles. And you would be stripped of your
power and authority and jurisdiction by any board that the
State might create. So I submit the additional factor is
this: Can it be sensibly urged that before we can go on
with this trial that we have to go through the San Diego
court? I deny that。 I submit that the San Diego court
should not proceed one step until this adjudication is
completed because you had jurisdiction first.

So we are now down to the question of what do we do
tomorrow and the next day? Do we suspend operations here?
That is apparently what we are going to have to do if we
follow through the rationale that has been advanced here.
Does it mean that we can't get relief in our own courts, the
Federal Government? I submit that we can, your Honor, and I
submit the additional point that there are tremendous
numbers of individual claims that are crying to be adjudi-
cated. Sooner or later they have to be adjudicated. Do
those people, including the United States, and the United
States likewise, are we to be prevented from getting relief?
It is highly important. It is extremely important that we
know now because if we are going to be advised, if the

decree is going to come down to the effect that your Honor can't accord us complete relief, we have to take some kind of action. We don't want to go through -- with all respects to Judge Hall -- 220 days of trial, and when we got through we had gotten no place. I can see us going on and on and on here and finally coming back and saying, "No, this court is impotent. This court can't render a decree. This court will wait for Mr. Holsinger to make his decision as to what is to be done." And I submit that no court can be hamstrung in that manner. Perhaps we should have gotten an injunction very early and prevented all of this, but I didn't think that that was the right course to pursue. But, apparently, if we follow through this thing, there is no remedy, there is no relief, there is no opportunity to get the Marine Corps' rights adjudicated. Why? Because of a State tribunal.

THE COURT: Of course, this problem would not be diffcult, if it were not for the fact of the filing made by the United States. If there had been no filing made by the United States and there had been a contest before the State's Water Rights Board between the Santa Margarita and Fallbrook, and any other parties, even the State; and the Water Board rendered its decision which they said was without prejudice to vested rights, we would have no problem because the court would then adjudicate what rights there were, vested rights on the river; and what was left over

would be subject to the action of the Water Board.   But the

fact that the United States made a claim -- probably had

various claims -- the thing that distinguishes that situa-

tion, though, is that the fat is in the fire.

MR. VEEDER:   I don't believe the fat is so badly in

the fire that we can't take it out.

THE COURT:   We are going to have to take it out, but

with which hand?

MR. VEEDER:   I will reach right in, your Honor.

Here is how I feel about the fire and the fat.   There

are a series of rights that are involved.   The rights that

are the direct flow rights presently used outside of the

watershed having nothing to do with the filing that we have

before the State Board.   It has nothing to do with it.   We

have got evidence in the record right now showing, I suppose,

that 75 per cent of our rights are being used outside of the

watershed.   They are certainly not for the State Board.   We

are diverting and applying to a use right now the direct

flow rights which antedate the filing of 1948.   Let's forget

the 1948 filing right now and consider this matter of

summary judgment that I filed and consider it strictly and

entirely in regard to those direct flow rights, and putting

aside this question of the filing 12576 completed, and test

out the question of whether or not the Fallbrook Public

Utility District can appropriate rights to the use of water

1  for irrigation purposes and, in so doing, invade those
2  rights.
3      THE COURT:  You are throwing into your motion a lot of
4  things that probably aren't considered.  You say you have
5  got evidence in.  We haven't heard evidence on the other
6  side.  Nobody has said that portion of the case is going
7  to be decided.  It may be possible that we can work out
8  some stipulation that would raise a question that would be
9  decided on summary judgment, but just because you put some
10 evidence in before the Master is not predicated before a
11 motion for summary judgment.
12     MR. VEEDER:  We look at it this way:  I think this.  I
13 think that Mr. Sachse will certainly stipulate that we are
14 using at the present time water which are direct flow rights,
15 turning on the direct flow use of water.
16     THE COURT:  I suppose there is no dispute about what
17 you are doing and have been doing.  The dispute would hinge
18 about what right you had to do it.  Now if there was found
19 that you had appropriative water in the past, before 1914,
20 and had directflow rights and storage rights of dominion
21 that was established, then probably there wouldn't be much
22 of a problem of getting together on a stipulation of facts
23 as to what you could do with the water since then.  But
24 you would have to have both of those things in as a predi-
25 cate for motion for summary judgment.

MR. VEEDER:  I don't believe there is any dispute.  I believe that the stipulation, I think that the agreed facts that we already have cover that precise point.  I think it is already there.  It has been agreed, for example, that we have riparian rights.  It is written into the stipulated agreement.  I don't say how much, but we do have riparian rights.  They also agreed that Lake O'Neill was there; and, if I remember, we referred to 1883.  I may be wrong on that. But, in any event, there is a complete agreement, your Honor, that there are rights to the use of water belonging to the United States, along riparian, limited to that.  And let's go to issue on this proposition whether Fallbrook upstream from us can go ahead and appropriate rights to the use of water for irrigation purposes.  I am certain that a ruling one way or the other would greatly facilitate this lawsuit because -- and I am saying this in all respect -- we will probably be putting in evidence for several months, and for several months there will be a complete hiatus from the standpoint of the operation of Camp Pendleton.  However, should your Honor consider this matter of summary judgment on a stipulated factual arrangement and hold for us in connection with any one, any one of these points -- for example, if your Honor should say that the Fallbrook Public Utility District could not change, as it has attempted to do, 12178 and 12179, because it put a greater burden on the

stream; if your Honor would say that they had abandoned

12178 and 12179; if your Honor would say that the 10,000

acre foot right to the use of water was separate and apart

from the other two claims; if your Honor would say that the

rights are limited to municipal and domestic uses, which is

purely a question of law, Fallbrook would be through. We

could go ahead with the trial, and there could be an appeal

by Fallbrook, I think, if your Honor enters the right kind

of an order, appealable in nature. You could have it

reviewed itself. We are in this position: We are sitting

down at the lower end of the stream. The buildings are

becoming more deteriorated all the time. The costs to us

are terrific, and they are getting worse.

THE COURT: Let's go back. There is probably presented

the question as to the status of Fallbrook and ultra vires,

the question of ultra vires. But don't forget Fallbrook's

position in this case as they stated it when I attempted to

settle it. It said, "We have to recognize all riparian

rights in the stream."

1    They said, "We have to recognize all appropriative rights, all

2    prescriptive rights, all vested rights, and all we are claiming

3    is a right to impound water that might be available over and

4    above those rights," and they very frankly said, "We anticipate

5    that those waters that we might claim would be limited to what

6    might be called flood waters in years when they flow by and are

7    not used by upper riparian owners and would otherwise flood

8    across the Marine reservation into the sea."

9           Now limited, of course, by the problem of their status,

10   this right to handle irrigation waters, in any decree I might

11   make, there would be no reason why, in any event, Fallbrook

12   shouldn't have that right, if they ever have those kind of

13   waters.

14          Now it is an elusory proposition in this western

15   country.  This year we had waters flowing into the sea.  It may

16   never flow into the sea again for ten years.  On the other hand,

17   we may have a wet cycle for five or six years, with water flow-

18   ing every year.

19          Now I think you conceded that if waters came down as

20   far as where Fallbrook wanted to get them, and if it was apparent

21   that they would thereafter flow over the reservation and into

22   the sea, there is no reason why Fallbrook shouldn't have those

23   waters that may otherwise flow into the sea.

24          It would be a difficult thing to formulate, but aren't

25   we in agreement on that?

MR. VEEDER:  I have said from the outset that if it were possible, fine.  But we have the additional factor, your Honor, and we might as well face it.  We have this situation: (1) We don't think that Fallbrook has the financial capacity to proceed; (2) we believe that, as a matter of law, Fallbrook should not be permitted to condemn any more land or take one step further until this case is completed.  I think Mr. Sachse said, "Well, the Board of Directors are taking a chance.  They might be stupid -- they might just put up a dam and maybe have no water."  We can't accept that.  We have an obligation here, your Honor.  Do we sit by and let them condemn the rest of the land?  Do we sit by and let them build their dam?  I don't see how we can.

THE COURT:  There is no doubt in my mind that I have authority, if they build a dam, to provide what kind of flow went down that River, what was released from the dam, and that the dam would have to be a dam which didn't interfere with the ordinary flow of that River.

But again, Fallbrook's position is that "we can go ahead and build a dam, and if we catch flood waters all right; if not, we can buy water and have a place to store them."

MR. VEEDER:  Well, of course, even the State said that it would be the worst thing you can do to put Colorado River Water behind a dam.  Economically they couldn't possibly do it.  It has been proven that when you store foreign water

1    and when you do have run-off, you lose your water.  That happen-

2    ed in one of the dams close by.  They bought 3,000 acre feet

3    of Colorado River Water.  They had a little run-off.  They lost

4    3,000 acre feet because they didn't have storage capacity.  So

5    even the State will say that it is uneconomic to do that.

6              THE COURT:  We are not going to decide what is good

7    business or what is not good business for Fallbrook to do.  Fall-

8    brook has a problem, and they concede their problem.  They know

9    that they are not riparian -- that is, the District isn't ri-

10   parian.  Other people who live in the District may have.  They

11   realize they have problems.  But I am not going to make any

12   decision as to whether what they do is good business or not.

13   I may decide whether they have the power to do certain things.

14   I am not going to decide whether it is good business to do it.

15             MR. VEEDER:  I would like very much to have your

16   Honor decide whether they have power to appropriate water

17   for irrigation purposes right now, and I think that would main-

18   tain the status quo until this case was completed.

19             THE COURT:  I have your point.  But I am pointing out

20   the difficulties, assuming for argument that you are right on

21   some of these things, the difficulties even apart from summary

22   judgment.  Let us assume that they had no power to deal with

23   water for irrigation purposes.  They would have power to take

24   flood waters over and above vested rights for domestic uses,

25   and ordinarily they should have a right to build a dam for that

1573

1    purpose.

2         MR. VEEDER:  They certainly wouldn't have the power

3    to build a 35,000 acre foot dam.

4         THE COURT:  Again, that would be a matter of business.

5    If they have a right only to domestic water and they want to

6    build a huge dam there, they probably would have a right to do

7    it as long as the Court saw to it that that dam didn't affect

8    the rights of other people on the stream who have vested rights.

9    Of course, as a practical matter, if they have only rights to

10   domestic water, they are probably not going to build a big dam.

11   After all, you know, economic legs are longer and always get

12   there first.  Economic motives will decide what kind of dam

13   they build.

14        MR. VEEDER:  I would like to have a moment to respond

15   to whatever the gentlemen have to offer, your Honor.

16        THE COURT:  You may.

17        You have seven minutes to get in a couple of good

18   blows now and we can think about them over the noon hour and

19   then you may take up after lunch.

20        Who wants to start?

21        MR. SACHSE:  I will start, because the motion seems

22   to be directed still at the motion for summary judgment, although,

23   frankly, Mr. Veeder's ability to jump from precipice to pre-

24   cipice is such that sometimes I don't know what he is arguing.

25   But there is a motion on file, and because your Honor is

1    going to have to rule on it, either in whole or in part, I am

2    going to start out at least by confining myself strictly and

3    positively to the propriety of the motion for summary judgment.

4    I am going to start with the fundamentals and go on from there.

5         THE COURT:  You have that in your brief, Mr. Sachse.

6    I agree that I cannot grant summary judgment where there is a

7    disputed issue of fact.  I have always commented that Mr. Veeder

8    has a lot in this motion that is not probably before me.  Let's

9    get down to the guts of it.

D-2    10         MR. SACHSE:  Let's accept that and let's start off

11   then right away and take only a moment or two and go right into

12   ultra vires.

13         If Mr. Veeder had taken the trouble to read the

14   Organic Act under which the Fallbrook Public Utility District

15   was created, he would have learned these things:

16         (1) That the basic power of a public utility district

17   is to acquire, construct, own, operate, control or use, within

18   or without, or partly within and partly without, the district,

19   works for supplying its inhabitants with light, water, power,

20   heat, etc., etc., and thereafter may do all things necessary

21   or convenient to the full exercise of the powers granted.

22         THE COURT:  What section is that?

23         MR. SACHSE:  That is section 16461 of the Public

24   Utility District Code (West, Santa Fe).

25         It doesn't say that the district can supply its

1   inhabitants with domestic water or with irrigation water or with

2   fire protection water or with sanitary water.  It says supply

3   them with water.

4           THE COURT:  Mr. Veeder cited the section.  I read it

5   along with the case.

6           MR. SACHSE:  Mr. Veeder didn't cite you a couple of

7   other sections that deal expressly with irrigation water, and

8   I will request your Honor to take down these numbers: 16407 --

9           MR. VEEDER:  I cited that.

10          MR. SACHSE:  -- 16408 and 16409.

11          Section 16409 reads:  "For the purpose of obtaining

12      and supplying water for domestic, irrigation and fire

13      protection purposes, a district may cooperate and con-

14      tract with the United States and borrow or procure money

15      from the United States in the same manner and under the

16      same procedures as irrigation districts under sub-

17      division so-and-so."

18          It is our Organic Act, under which we are today oper-

19   ating.  It became law before this action was filed by you.

20          MR. VEEDER:  It did not.

21          MR. SACHSE:  May I finish the argument and then you

22   reply.

23          This is the Organic law under which the district

24   operates.

25          Section 16407 gives to public utility districts the

same powers with reference to improvement districts that are granted to irrigation districts.

THE COURT:  Mr. Veeder cited these sections, and the one you first read I can understand.  But sections -407 and -408 I have some trouble with.  Maybe you can explain them to me.

MR. SACHSE:  Well, to understand -407 you have to go to section 23600 of the Water Code -- 23600 and sections following.  The first section provides:  "Land which need not be contiguous may be formed into an improvement district for one of the following: (a) irrigation or domestic service...."

Now Fallbrook has, under -407, the same powers that an irrigation district has to create improvement districts within its boundaries.  These improvement districts are analogous to what your Honor may recall as the Mattoon Act districts.

THE COURT:  But that has never been done, has it?

MR. VEEDER:  That is right.

MR. SACHSE:  Not by Fallbrook.  Why should we do it, if our budget is adequate?  Our tax rate has gone down every year for ten years.  We have never defaulted on anything.  We have better than a million and a quarter of bonding capacity. Why in heaven's name must we be compelled to create a special improvement district and levy special assessments if we don't have to?

THE COURT:  Except that the Supreme Court, in 196 Cal., went into this in some detail and distinguished between

1   the improvement district and a quasi-municipal district or

2   public utility district, and they pointed out that in the case

3   of municipalities and public utility districts, as a quasi-

4   municipality, there were general powers to raise taxes for the

5   utilities and for general purposes.  But in the case of an

6   improvement district, where taxes were to be levied for a

7   special improvement, then the people who had to pay the bill

8   had different rights than the people had in the city.  It's

9   quite an interesting discussion.

MR. SACHSE:  It's very interesting.  But suppose that

11  it is true that the only way that Fallbrook could serve irri-

12  gation water would be by the creation of a special improvement

13  district.  I don't believe that for one moment.  But let us

14  assume it and follow your Honor's suggestion to its logical

15  conclusion.  The only way that we could provide irrigation water

16  would be to create an improvement district.  What is  to stop

17  us from doing it tomorrow?  We haven't started to serve any

18  water under any of these permits.  The machinations of Mr.

19  Veeder and the United States has kept this thing hanging since

20  1946.  45,000 acre feet of water ran into the Pacific Ocean in

21  two months this year.  That is why there is no improvement

22  district, that is why there is no bond issue, that is why there

23  is no dam.  But certainly nothing, in heaven's name, is to stop

24  us from creating an improvement district if we want to -- the

25  power is there, if that is what we have to do.

1            But I will go a lot further, your Honor.  The pro-

2    position is so fundamental, and lawyers don't like to say this

3    but frankly I don't think you will find any cases on it, and

4    that is that a municipality has a right to sell irrigation

5    water and that "municipal use" includes the term "irrigation

6    use."

7            Your Honor grew up, you told us, on the hills north-

8    west of Los Angeles, and you know that three-quarters of the

9    San Fernando Valley was irrigated by the City of Los Angeles.

10   We know that the City of San Diego --

11           THE COURT:  I know, but I wonder whether there was

12   special statutes in connection with that.

13           MR. SACHSE:  There are no special statutes, I will

14   assure you.

15           The power of a municipality to serve water to anyone

16   is a power, as stated by Mr. Veeder, granted by the Constitutional

17   provision that he quoted to your Honor.

18           The language of the Constitutional provision is

19   exactly the same as the language granting Fallbrook the power:

20   The power to supply its inhabitants with water.  That is the

21   power of a city, under the Constitutional provision.  That is

22   the power of a public utility district.

23           THE COURT:  I know what happened in Los Angeles.

24   The San Fernando Valley was incorporated within the limits of

25   the City of Los Angeles because the farmers wanted to get water --

1579

1   that is the only way they could get it, and that is why the

2   City of Los Angeles today has within its limit the San Fernando

3   Valley.  The farmers voted into the City and assumed the burden

4   of city taxation in order to get Colorado River water.

5           But I would like to see some authorities.

6           MR. SACHSE:  Your Honor, the identical factual situation

7   -- I'm a director of the San Diego County Water Authority, and

8   I sit in on it, and Mr. Dennis is a director -- the identical

9   situation is existing right now.  The City of Oceanside is run-

10  ning an annexation up to the Bonsall Bridge for that exact pur-

11  pose; that every bean farmer, flower grower, tomato farmer down

12  the valley of the San Luis Rey River wants irrigation water

13  through the safer supply of the city.

14          THE COURT:  It's 12:00 o'clock.  It's a good place

15  to stop.  2:00 o'clock.

16          (Noon recess.)

17

18

19

20

21

22

23

24

25

SAN DIEGO, CALIFORNIA, TUESDAY, JUNE 17, 1958, 2:00 P.M.

M5A

MR. SACHSE:  I should like to go back, your Honor, to
the basic section of our Organic Act 16461, which grants to
Fallbrook or any other public utility district power to
supply its inhabitants with water.  Now, I submit that our
approach here is a little backwards.  If the word "water"
does not include all types of water, it seems to me the
burden of exclusively establishing that fact would be on the
person who so contends.  I don't think your Honor would
listen with a great deal of sympathy if the suggestion were
made that we can't supply water to fire hydrants because
the word "fire protection" is not contained in this Organic
Act.  I don't think you would listen with a great deal of
sympathy if the contention were made that water could not
be supplied to a manufacturing establishment because the
word "industrial use" is not included.  I don't think you
would listen with sympathy if it were contended that we can't
irrigate, let us say, a golf course or a park.  I don't
think you would listen with sympathy if an attack were made
on our right to use water for recreational uses, swimming
pools.  Now, none of those things are named in Section 16461.
We are simply given basic power to supply water.  And yet,
if you go through other sections of this act, you will from
time to time find references to specific ones of those
powers, not, I submit, because the legislature
suddenly decided that the act did not include originally the

power to serve water for fire purposes.  Let's take that.
Section 16409 authorizing contracts with the United States
for domestic, irrigation and fire protection purposes.
That does not imply that the right to use water for fire
protection purposes didn't exist originally.  It doesn't
imply that the right to use water for irrigation purposes
didn't exist originally.

THE COURT:  Of course, that would fit in with the case
of 196 California, because there an express section provides
that you may contract for irrigation water; and since you
contract for it, there is no burden on the district for the
improvement, which is what we are discussing in 196 Cal.

MR. SACHSE:  However, 16409 gives us the authority to
cooperate and contract with the United States and borrow or
procure money from the United States in exactly the same
manner that irrigation districts can do so.  And Section
16407, as I pointed out earlier, gives us the same authority
to create, if the need arise, a special assessment district.
It doesn't impose the duty or obligation on us of creating
a special assessment district.  There are many cases --
there are statutes which authorize the city, for example,
to create special assessment districts for special benefits.
But that doesn't mean that every time they supply water
service they must use the mechanics of a special assessment
district.  They don't have to.

Now, I think a second thing that may be confusing us is the use of the word "irrigation," used as though it were something peculiar and unique of itself.  The California Administrative Code specifies the different types of uses of water which can be applied for when you seek to appropriate it, domestic use.  Then it defines it.  Irrigation use. It defines very briefly.  I will read it.

> "Irrigation use includes any application of water to production of irrigated crops -- any application to the production of irrigating crops or the maintenance of large areas of lawn, shrubbery, or gardens."

A large area of lawn, shrubbery or garden is a part. That is an irrigation use.  Power use is then defined. Municipal use.

> "Municipal use includes all those uses common to the municipal water supply of a city, town, or other similar population group and use incidental thereto for any beneficial purpose."

The broadest use in the book is municipal.  Immediately after that comes industrial use.  Are we to assume that because industrial use includes those uses wherein the water serves the purposes of commerce, trade or industry that industrial use is not included within municipal use?  It is the most obvious thing in the world that the service of water

1583

1   to the purposes of commerce, trade or industry is a

2   perfectly logical, normal, andordinary function of the city.

3   The bigger the city the more water goes to commerce, trade

4   and industry.  It is included in municipal use.

5       THE COURT:  You would suppose that a person making

6   application for appropriate water under the California law

7   and a situation where it was going to be an industrial use

8   or going to be an irrigation use as well as domestic would

9   make their application based on all these grounds.

10      MR. SACHSE:  Which is exactly what we did.  Now, it is

11  true Mr. Veeder argues and your Honor has already pointed

12  out that this is a question of fact, whether the application

13  was amended, whether it was a valid application, whether

14  the interlineation of the word "irrigation" (inaudible).

15  Those are questions of fact you will have to discuss later.

16  As the file of documents before me, before the court in the

17  pretrial order will disclose we have applied for the types of

18  uses that we believe are the proper purposes for which water

19  should be supplied to the inhabitants of our district, water

20  supplied to them.  And there are only three, or I should say

21  not only three -- the three are all embracing -- there are

22  irrigation, domestic, and municipal.  But we aren't fore-

23  closing ourselves thereby from saying that we could never

24  sell a drop of water to a factory.  We aren't foreclosing

25  ourselves from saying that we could never sell a drop of

1584

water for a recreational purpose.  The last specific type of
use named in the Administrative Code is stock water.  Well,
does that mean that Fallbrook can't have a livery stable in
Fallbrook because we did not add the words "stock watering"?
Or stated differently because our basic act simply says we
can supply water and doesn't say water for stock watering?
Mr. Veeder would contend that we can't supply water to a
livery stable.  And because our basic act does not say
"industrial," Mr. Veeder would contend that we can't sell
water to a factory.  And because our basic act does not
say "recreational," he would contend that we can't operate a
swimming pool, although it is expressly named in the
Administrative Code as a recreational use.  But I submit that
they are all entirely wrapped up within municipal.  Municipal
use includes all those uses common to the municipal water
supply of a city, town or similar population group, and
use incidental thereto for any beneficial purpose.

Now, the real significance of the words "irrigation,
municipal, and domestic" have nothing to do with this ultra
vires proposition.  The real significance of those words in
the water code is that our water code gives priority to
certain characters of appropriation.  And when there is
insufficient water, domestic gets the first priority.  That
is the real significance of the selection of terms you use
in filing your application.

1       I will repeat.  I don't believe there are any cases.

2  I would challenge the United States to find one -- I will

3  try -- that will spell out, that will spell out the question

4  of whether or not a municipality has the right to sell

5  water for irrigation purposes.  It is obvious to me that it

6  does, because the mere definition of irrigation, including

7  any application of water to the production of irrigated

8  crops -- well, "any application to irrigated crops" is a

9  pretty broad term.

10     THE COURT:  We may never reach the problem here.  I

11  don't know.  But I will wager you right now a crisp one

12  dollar bill, the extent of my wager, you could never sell a

13  bond to build a dam until you had an adjudication by a State

14  court as to what you could in this public utility district.

15     MR. SACHSE:  Your Honor, I will say this:  The Fallbrook

16  Public Utility District has to date issued something over --

17  most of them paid off -- I think we have got about three

18  hundred thousand left unpaid -- something over $2,000,000

19  worth of bonds to finance works, to bring water from the

20  San Luis Rey River for irrigation purposes.  The bonds have

21  been sold.  There have been at least three different issues.

22  We have never had a default on them.

23     THE COURT:  Did you have any adjudication before you

24  sold them?

25     MR. SACHSE:  They were handled through the best bond

firm in Southern California, O'Melveny & Myers, and they have gone --

THE COURT:  This point has never been raised except --

MR. VEEDER:  That is the irrigation district rights or the utility?

MR. SACHSE:  That is the utility district.  The very first ever obtained by the utility district was to take water from the San Luis Rey River.

THE COURT:  This point had never been raised at that time; is that it?

MR. SACHSE:  Let's put it this way:  Nobody has ever assumed that the word "water," to supply water to its inhabitants doesn't mean water for any useful beneficial purposes.  To me it is so obviously simple that if you can serve water to a person, it is not only water to brush his teeth with, but it is water to flush the toilet.  It is water for all purposes.

THE COURT:  Maybe there was nobody with the ingenuity of Mr. Veeder around at that time.

MR. SACHSE:  I think you are very right, your Honor.

THE COURT:  Of course, I could go along very easily with you on your arguments except for that case in 196 California.

MR. SACHSE:  You mean the Orosi case?

THE COURT:  The Orosi case.

1587

MR. SACHSE:  The only thing --

THE COURT:  That was the case that looks to me like you are presented with a problem.  It may not be insurmountable.

MR. SACHSE:  I disagree.  I am thoroughly familiar with the Orosi case.  I will concede frankly it is practically the Bible in the public utility districts.  There is practically almost no other case law that has really analyzed the act.  It was the first case, as far as I am aware, that went up after the Public Utilities District Act was passed.  And if your Honor will just stop and think what the case was, I think it will be clear.  The point was that the gentleman who attacked the bond issue contended that it was compulsory, that a special assessment mechanics be used to provide this water service.  That is what he contended.  And all the court said was, "No, it is not necessary that a special assessment mechanics be used."  That is all the court said.

THE COURT:  The authority of the case, of course, is limited to that.  The thing that would, part of it that would cause the difficulty is what might be called the dictum wherein the court talks about the contrasting of that kind of a district with a special improvement district.

MR. SACHSE:  There have been a recent case.  I certainly don't concede whatever I am going to cite is

1    dictum, the purest kind of dictum, but it is interesting.

2    The most recent case in the California Reports, reported

3    California cases, is Cal. Appellate, happens to involve

4    Fallbrook, the most recent public utilities district case.

5    It is the case of Fallbrook Public Utility District against

6    Martin, 151 Cal. App.(2nd) 84.   A rehearing was denied

7    before the District Court, and a hearing before the Supreme

8    Court was denied.   Now that case was a case of eminent

9    domain.   And the very first sentence in the appellate court

10   decision -- I concede this is nothing but dicta.   But spells

11   out that the Fallbrook Public Utility District organized

12   under the laws of California for the purpose of procuring

13   water to its inhabitants seeks by eminent domain to condemn

14   lands for irrigation purposes.   That is the very first thing

15   in front of the court in the case.   They come right out and

16   say:   This is what the whole project is for, irrigation

17   purposes.   Now, mind you, this appeal and decision was

18   after a lower court had ruled the project was unnecessary.

19   That was the basic substance of the lower court ruling.

20   The express question of ultra vires wasn't raised.   It

21   wasn't at all.   There was a great deal of question as to the

22   necessity, but there wasn't a whisper of power.   And the

23   first sentence of the court says:

24          "This case involves the power of Fallbrook to

25       condemn lands for a reservoir for irrigation purposes."

1    There then follows a half dozen pages of decision which

2    decides that the project was necessary.  And I might add --

3    this is perhaps a side issue -- but Mr. Veeder states that

4    your Honor can take judicial notice that Fallbrook could

5    not finance a project.  Maybe it is res judicata, but this

6    case says we can.  I don't think it's material at this stage

7    of the proceedings.

8        THE COURT:  You directed your remarks to the fact it is

9    dicta, and you know and I know that many times a problem

10   will not be before a court and the problem is raised and we

11   get a decision on the problem.

12       MR. SACHSE:  Except the only point I am making is:  I

13   come back again and again and again to my fundamental

14   principles, your Honor.  This power is the power to supply

15   water.  Now here was an express case where our power to

16   condemn lands for irrigation projects was being attacked.

17   The mere failure to raise the question, if you chose to

18   put it that way, is itself evident, it itself an argument

19   that the power to supply water to inhabitants of necessity

20   includes, as I say, power to supply water to wash your car,

21   to irrigate your garden, and so on.

22       THE COURT:  I accept your statement.

23       MR. SACHSE:  I am not going to argue.

24       THE COURT:  It isn't very much authority on the ques-

25   tion there.

MR. SACHSE:  I concede it is not much authority, and I
don't think anybody is going to find much more.

MR. STAHLMAN:  I was on the other side of that case, and
I wish I was liar enough to know about this point when I
went up on it.

THE COURT:  You hadn't met Mr. Veeder then?

MR. STAHLMAN:  I had met him, but he had never told me
his point.

MR. SACHSE:  I am going to drop the --

MR. VEEDER:  (Inaudible)  I wanted to try it out when
the chips were down.

THE COURT:  When did you run onto this point?

MR. VEEDER:  1946.

THE COURT:  You have been sitting on this from '46 to
'56?  When?

MR. VEEDER:  The first time that we ran into Frank
Kepp (phonetic) for trying to steal our water.  And it
appeared to me the Fallbrook Public Utility District was
organized like other municipalities.  And in regard -- this
is not new either, your Honor.  We had the same thing in the
City and County of Denver case.  They were going to in-
corporate 400,000 acre feet of the Colorado River water for
irrigation purposes, but they had to have a special act to
permit them to  appropriate water for municipal purposes
and then allow them to lease it until they needed it for

municipal purposes.  There is a great deal of authority on this proposition.

MR. SACHSE:  Let me remind your Honor again what the power of the statutes themselves give us:  The power to supply water, the power to contract with the United States and borrow money for water for irrigation.  That is the statute itself.  And the same powers regarding improvement districts if we choose to use them.  They don't say you have to do it;  but if we choose to use them, the same powers regarding improvement districts and irrigation districts have, and the very first power under the improvement district section is the power to create improvement districts for works to supply irrigation water.  I will rest it on that. If further briefing is desired, I will brief it.  Now, I should like to get on to a couple of these other points Mr. Veeder has raised.

The first one -- and I want to say in passing again it seems to me that this is really unconnected, or let's say only slightly connected, to the question of a motion for summary judgment in so far as Fallbrook is concerned. Whether you grant or deny Mr. Veeder's motion for summary judgment against Fallbrook, there remains before your Honor motions to dismiss particular and specific paragraphs of the pleadings of the United States which raise the express question of your power to review and go into the, go behind

the decisions of the Water Rights Board.

THE COURT:  Do you want to wait until we get to those motions to argue that point?

MR. SACHSE:  I feel that your Honor has quizzed Mr. Veeder at some length on this, and it is entirely, of course, up to you.  But at such time as you start to make your mind up on this question of the infringement of the Water Rights Board on your jurisdiction, of the usurpation on your jurisdiction, and so on, I definitely want to be heard on the subject.  I will state flatly that I intend to press most vigorously the motions to dismiss, because I don't think they are properly before your Honor and I don't think you have any jurisdiction whatsoever to hear them.

MR. VEEDER:  These motions --

MR. SACHSE:  Here are those paragraphs with these particular items is why I intend to press my motions to dismiss because you have no jurisdiction to hear the allegations contained in those particular paragraphs of Mr. Veeder's complaint wherein he requests you to find that Fallbrook's application was abandoned, that it was not amended, that the change in place of use was so drastic that it amounted to a new application, and so on.  I don't think your Honor has any jurisdiction on them.  I think they have been disposed of in a proceeding of which  the United States was a party.  And I don't think we ought to forget it.  Now,

1 if you want this argued later, that is fine; but I think some

2 of the points should be made now.

3   First, let's preserve the chronology of this. Appli-

4 cations of Fallbrook, Santa Margarita, Vail were all filed

5 with the State's Water Rights Board long, long prior to the

6 filing of this case. Every one of the applications that is

7 before your Honor was filed from five to six years before

8 this case was filed. Even the United States' own application

9 was filed four years before this case, or three years before

10 this case was filed. The United States' own application to

11 the Water Rights Board three years prior. In every one of

12 the Fallbrook applications, in the Santa Margarita applica-

13 tion, even in the Vail application, which isn't before this

14 court, the United States filed protests. There are protests

15 in the file, and the evidence will be presented to you. It

16 will be presented by Fallbrook in other connections if not

17 in this; because, as I suggested earlier, we have the problem

18 of proving a negative that there never was any appropriation

19 by the United States. And so we are going to present every

20 single protest they ever made wherein they have stated what

21 they claim their rights were. And they appeared and filed

22 a written protest of Vail, then did not contest it at the

23 actual hearing. Fallbrooks' two and a half second foot

24 permit was heard before the Water Rights Board at the same

25 time, and it was a complete joint proposition with the Vail

1   application for the Vail Dam.  Mr. Hall was present.  I was

2   present.  The United States was represented.  No objection.

3   The representative was physically there in the courtroom.

4   And if we choose to get the official record, I have an

5   extract of it, verified.  Right off the bat, appears for the

6   United States Commander Fogg (phonetic) of the Navy.  First

7   thing, very first page.  No comment at all.  Our two and a

8   half second foot permit granted.

9        THE COURT:  Well, now, wait.  Wait.  This two and a

10   half second permit, was that something to do with the con-

11   tract Santa Margarita had with Fallbrook?

12        MR. SACHSE:  Not a thing, your Honor.  That is the

13   permit, or that is the use, shall I say, that Mr. Veeder

14   said constituted the breach, the United States after we got

15   the permit.  Then, or after we filed the application.

16   Pardon me.  After we filed the application, the United States

17   then canceled the revocable license to which Mr. Veeder has

18   referred.

19

20

21

22

23

24

25

F-1

MR. SACHSE:   An application was filed to cancel the revocable license, we proceeded with our application, they filed the protest, they appeared before the Water Rights Board, the permit was granted.   The matter has gone on through the slow grinding of the wheels of the Water Rights Board and its predecessors, and we  now have a license, the highest degree of an appropriative right that you could obtain.

We filed the next one -- I don't remember the number -- in any event, it was filed the same day, for 10,000 acre feet of storage.

MR. VEEDER:   587.

MR. SACHSE:   Thank you.

The United States filed a protest.   It is in the files. That application has gone to permit.   I believe that went to permit without a hearing.   I'm not certain, I don't know.

Applications 12178 and 12179 were filed by Fallbrook. Protests were filed by the United States with the Water Rights Board.   Then the United States filed its own application -- the same river -- had protests pending.   That was noticed.

And finally, at the last minute, when the proceedings opened up in the Court House two blocks away, the United States showed up and said, "We are making a special appearance and we will go no further with this."

Now if there is any question of jurisdiction having vested in anybody -- I'm not now speaking of superior

1  jurisdiction, the right to take something away, which is another

2  question -- but if there is any question as to where jurisdiction

3  vested in this matter, I submit there isn't the slightest argu-

4  ment.  There are at least a dozen documents whereby the United

5  States, on this same river, for these same waters, appeared be-

6  fore the Water Rights Board and its predecessors, chugged along,

7  sometimes happily, perfectly content with the Vail Dam, no ob-

8  jection; apparently perfectly content with Fallbrook's 2½ second

9  feet -- no objection; granted, gone clear to license stage --

10 no objection; apparently perfectly content with Fallbrook's

11 first 10,000 acre feet; until in January, 1951, this lawsuit is

12 filed.  So if there is any argument as to where the jurisdiction

13 in this case first vested --

14         THE COURT:  Do you argue that jurisdiction vested in

15 the Water Rights Board to quiet title to the Government's water

16 downstream?

17         MR. SACHSE:  Not at all.  That is the next question,

18 and that is the point that I --

19         THE COURT:  In other words, if the Water Board had any

20 jurisdiction, it was a limited jurisdiction to hear claims pre-

21 sented and to make rulings thereon which went to the --

22         MR. SACHSE:  Absolutely.  Your Honor stated it, I

23 think, fairly well in your last discussion with Mr. Veeder.

24         As far as I am concerned, the claimants, the applicants,

25 whether they be Fallbrook, Santa Margarita, Vail, have absolutely

or had absolutely no other way to proceed than what they have
done.  Your Honor would throw us out of Court if we came in here
and said, "Will you give Fallbrook a permit to appropriate water?"
You would say, "Mr. Sachse, get me some authority.  By what
jurisdiction can I grant a permit?"  I would say, "Well, there
isn't any, but Mr. Veeder says that the State Water Rights
Board can't give it, and the Constitution of the State of Cali-
fornia says, 'You shall not waste water,' and Mr. Veeder says,
'This Court has exclusive jurisdiction of the problem.'  So
please, your Honor, 45,000 acre feet went into the Pacific this
year.  Somebody must have a right to give us a permit.  If it
isn't the Water Rights Board, who is it?"

        We are going to the Water Rights Board to do exactly
what your Honor said, to get a permit to use surplus water, and
this Court has the power to distroy that permit completely, to
make it absolutely valueless to us, or you have the power, in
your final judgment, to make it a thing of worth and value.
That power is unquestioned.  But you haven't any authority to
say who gets a permit or, among several applicants, which one
has priority.

        THE COURT:  Wait just a minute.  There is no doubt
that as long as rights of the United States are not involved
the procedures of application before the Water Board are the
proper way for parties to come in and get permission to take
water.  But the real question is, once the rights of the United

1    States are involved and are asserted, then what can the Water

2    Rights Board do insofar as affecting the rights of the United

3    States?

4            MR. SACHSE:  Nothing.  The Water Rights Board has done

5    nothing to affect the rights of the United States, except on

6    the one thing when the United States submitted it to it -- throw

7    out its application.  But on the basis of the rights of the

8    United States to riparian water, to appropriative water, by

9    whatever ingenious theory Mr. Veeder can work out, any vested

10   right of the United States the State Water Rights Board can't

11   touch.

12           THE COURT:  What about inchoate right and unmatured

13   right that would arise from having made a filing to appropriate

14   water?

15           MR. SACHSE:  That is a filing before an administrative

16   tribunal of the State of California.  Let's put it this way.

17   Let me pose the question back, your Honor.  Suppose this law-

18   suit didn't exist and the United States had filed its appli-

19   cation with the State and suddenly it got a little worried --

20   no lawsuit here yet, but they said, "I don't know whether this

21   is a very good idea to have a State tribunal decide who gets it

22   -- Santa Margarita, who is first in line; Fallbrook, who is

23   second; or the United States, who is third -- I think I am going

24   to ask Judge Carter to give us a permit to take water of the

25   Santa Margarita River."  What would you do?

1399

1        THE COURT:  Let's not get into the ridiculous.  I'm

2   talking about, what about a claimed right of the United States

3   which it claimed arose when it made a filing for water, and

4   this gets into the question of priority dates -- what about

5   that?  Is the State Water Rights Board going to say, "We are

6   going to adjudicate the rights of the National Government on a

7   permit for water?"

8        MR. SACHSE:  Either the Water Rights Board is, or

9   nobody is.  There is no Federal statute providing for adjudi-

10  cation, and you have no jurisdiction.  Mr. Veeder dusted off

11  very lightly about the right of the Federal Government submitting

12  to this.  I will give you an example.  There is not a single

13  reclamation project in the State of California but in which case

14  the United States has submitted itself to the jurisdiction of

15  the Water Rights Board or its predecessor and got a permit.

16  One of the most recent decisions of the Water Rights Board --

17  I'll bring it down in the morning; it came out, I think, a

18  matter of weeks before the Fallbrook permit --when it came out

19  I read it with tremendous interest, because it was another

20  case where the Water Rights Board granted the permit to much

21  the junior applicant, not the first in time.  They took one who

22  was away junior.  Who was it?  The United States.  The Water

23  Rights Board turned down the City of Stockton, they turned down

24  Oakdale Irrigation District, they turned down half a dozen

25  other applicants in California and granted the permit to the

1  United States.

2  THE COURT:  There is a special statute -- I have been

3  looking into this, too -- there is a special statute which pro-

4  vides as to reclamation districts and taking water for re-

5  clamation districts, that State law will control.  I was re-

6  searching that the other day.  That is an express statute in

7  the chapter on reclamation districts.

8  MR. SACHSE:  You cut me off too soon, your Honor.

9  There are no less than half a dozen appropriations by the

10  United States Forest Service in the Cleveland National Forest,

11  the very one we are talking about here, for water for domestic

12  use, for camp grounds, for recreational use, for springs.  The

13  United States Forest Service has gone before the State Water

14  Rights Boards and has gotten permits and has got a license.

15  That is characteristic of every National Forest in the State of

16  California, as far as I know.

17  I am the holder of a Forest Service lease on Silver

18  Lake in the High Sierras.  The people on that side of the Lake

19  got together years ago, put up matching money for CCC project

20  help and put in a water system -- Forest Service land, bought

21  United States leases, but it brings pressure water to our place.

22  Where did we get the permit?  From  the State of California.

23  The use in Yosemite National Park.  Complete juris-

24  diction ceded to the United States, just like Camp Pendleton.

25  Applications of the United States, Department of Interior,

1   National Park Service, to use the water.

2           I haven't had time -- I think it will be very in-

3   teresting, if this is going to be important, to go up to the

4   files of the Water Rights Board and see if we could find even

5   a few military reservations here and there that will apply, and

6   I think we can.

7           THE COURT:  Of course, this is persuasive, that those

8   practices have been followed, but that doesn't take us along the

9   road as to what the law is.  The practice might have been

10  followed for years, and when an analysis of the law was made it

11  might be determined that it was unnecessary.

12          MR. SACHSE:  My only answer to that is this --

13          THE COURT:  You don't bind the United States by a

14  practice.

15          MR. SACHSE:  I concede.  But you cannot adjudicate

16  water rights in a vacuum.  Somebody has to do it.  Some person

17  has to have the authority and the power to look at a stream and

18  say, "We don't want that water to waste."  Assume that 100,000

19  acre feet a year were rushing down the Santa Margarita River

20  through Camp Pendleton -- it's an assumption,  that's all --

21  somebody has to have the right to say --

22          THE COURT:  There is no doubt about it that the State

23  Board has, insofar as rights of the United States are not in-

24  volved.  But what we are discussing here is, what happens when

25  the United States has a right involved?

1    MR. SACHSE:   When the rights of the United States are

2 invovled, the rights of the United States, vested property

3 rights, are not affected by the decision of the State Water

4 Rights Boards.

5    The rights that the United States has sought to ac-

6 quire through State law are under the State Water Rights Board.

7 And you can't go halfway down the track under the State Water

8 Rights Board and then pull them out and do what you chided me

9 for a moment ago and said, "Let's not be ridiculous."   But

10 either the United States was going to get a permit from the

11 State of California, or else it was going to pull it out and

12 ask for permits from somebody else.   And who else could it ask?

13 Not you.   You would have thrown Mr. Veeder out if he came in

14 and asked you to give him a permit, because you haven't got that

15 authority, and the only place that he could obtain a permit is

16 from the State of California, and having failed to do so he is

17 back on his vested rights -- his vested, appropriative rights,

18 his riparian rights, his vested, prescriptive rights, if any.

19    That is my position insofar as the State Water Rights

20 Board is concerned, and I will go the final step, further, that

21 once that decision is rendered we don't go behind it, any more

22 than you permit Mr. Veeder to ask questions as to why they

23 rendered the decision they did.   We  don't go behind it now.

24    Finally, we know that, having invoked an administrative

25 remedy -- and the United States invoked one; they filed with the

1    State -- we know it is ABC law that you are supposed to exhaust

2    it, and they didn't exhaust it and walked out, and I will add

3    in passing they have let the time expire now.  They even tried

4    to appeal.

5         THE COURT:  What do I say in a decree when I quiet

6    title as to what rights the United States has on the river, what

7    do I say when I come to the question of their application for

8    appropriative water?

9         MR. SACHSE:  Whose application?

10        THE COURT:  The application of the United States.

11        MR. SACHSE:  You say, "That application has been

12   denied and is no longer in good standing.  The United States

13   has no right.  It is gone."  You determine the extent of the

14   United States' riparian right, you determine the extent of

15   whatever appropriative rights they prove, you determine their

16   prescriptive rights, and you name them first on the River.

17        THE COURT:  Do you think the Superior Court of the

18   County of San Diego, in some independent action, could adjudi-

19   cate the rights of the United States?

20        MR. SACHSE:  In an independent action, no, your Honor.

21        THE COURT:  Then how can you argue that the Water

22   Board can adjudicate them?

23        MR. SACHSE:  Because the United States submitted it-

24   self to its jurisdiction.  The section of the United States

25   Code which Mr. Veeder cited states that it is a proper thing to

1604

1  do to submit to jurisdiction in matters of appropriation under

2  State law.  It has been done.  And you have the practical ob-

3  stacles staring you in the face, if what I say is not sound and

4  how could any permit ever be granted to any private applicant

5  on any stream where the United States owned a foot of ground?

6  How could it ever be done?  If we apply for water on any stream,

7  notice is necessarily given by State law to all of the parties

8  who, theoretically, are affected by that application.  Let's

9  say one of them is the United States.  It is downstream.  Call

10  it the Forest Service.  Call it Fort Smith.  Call it anything

11  you want.  It doesn't have to be Camp Pendleton.  But Federal

12  land is on the stream.  Fallbrook applies for a permit.  Notice

13  is given to the United States.  The United States says, "No,

14  we are not going to do anything about it.  We just sit back."

15  Is my permit any good?  Has the State given me anything, or

16  has the refusal of the United States to stir a stump meant that

17  the water has to go on to waste forever?  And remember, your

18  Honor, they haven't refused.  Only since the fertile brain of

19  Mr. Veeder came into this picture has this happened.  There are

20  a dozen documents in the file where the United States has come

21  in and said, "Please, Water Rights Board, do this for us."  In

22  this file is their own application.  There is an amendment to

23  the application, there are letters from a couple of Marine

24  generals on it, there is a protest to every one of Fallbrook's

25  filings, there is a protest to Santa Margarita's filing, there

1605

1   is a protest to the Vail filing -- there are appearances in

2   there.

3            THE COURT:  Are these all made by the Navy?

4            MR. SACHSE:  Every one, your Honor.

5            THE COURT:  By the Navy?

6            MR. SACHSE:  Let's not be hasty.  I don't know how

7   they are all signed.

8            THE COURT:  There is another point in this matter,

9   and that is why Mr. Veeder has been riding two horses about

10  that permit.  Just because a man is a general in the Marine

11  Corps doesn't mean that he can represent the United States.

12  The question of authority is a very important matter.  The United

13  States ordinarily conducts its litigation through the Justice

14  Department.  Marine generals have a lot of authority.  But you

15  might have a problem to show what a Marine general's authority

16  was.  He is hired to train soldiers and to fight wars.  He is

17  not hired to handle Government lawsuits.

18           MR. SACHSE:  If your Honor chooses, we can start

19  through them and find out.  Some of them undoubtedly came from

20  one office and some from another.

21           But the fact remains that they are appearances.  If

22  Mr. Veeder will finally make up his mind whether he claims any-

23  thing under the United States' application or not, I think that

24  will go a long way toward simplifying the issues in this case.

25           Now the point that it seems to me that no one can

1  forget.  Mr. Veeder has on a number of occasions criticized me

2  for my political activity in this case.  Believe me, if his

3  analysis of the law is right, somebody had better really start

4  doing some political activity, because if his analysis is cor-

5  rect how in heaven's name can anybody on any stream in Cali-

6  fornia, where the United States owns a foot of land, start a

7  project to save the water?  How can the Feather River Project

8  proceed?  They own National Forests all around the upper end of

9  it.  How can that go ahead?  They own Indian reservation land

10 on the San Diego River.  The Marine Recruit Training Depot is

11 at the mouth of the San Diego River.  Does that mean that the

12 applications of the City of San Diego on Cuyamaca and elsewhere

13 upstream are no good?  We had better get some law, we had better

14 do some politicking, if this is correct, because it is going to

15 leave the most horrible vacuum in the law of California for

16 what I don't think anyone will quarrel is the most vital re-

17 source in the West today, and that is water.

18          THE COURT:  Of course, you get some terrific problems

19 here.  You could argue that where an application is made and

20 rights of the United States are affected -- you could argue this,

21 at least; I don't know how good it would be -- that the United

22 States, sitting still and doing nothing, by its course of con-

23 duct put itself in the position where it later can't complain.

24 Of course, that is in substance estoppel against the United

25 States.

1   MR. SACHSE:   I think Judge Mathes said once that you

2   could do it, but he is about the only one.

3   THE COURT:   It is possible, but he is about the only

4   Judge I have ever read that said that that is possible.

5   MR. SACHSE:   I agree.

6   THE COURT:   On the other hand, in contrast with that,

7   where the United States intervenes in a situation by bringing a

8   suit -- suppose the dams that we talk about were going to be

9   built and the United States stepped in and said, "We want an

10  adjudication of what our rights are, and after we get that you

11  can go ahead and build a dam."  Query: Whether the United

12  States wouldn't have a right to get some adjudication as to

13  what rights it might have?  And of course, that in a way is

14  what has happened here.  The United States has filed a quiet

15  title suit and made everybody parties.  It has gone into the

16  tribunal fixed by the Congress for the United States to try its

17  lawsuits.

18  There are some terrific problems here.

19  MR. SACHSE:   Your Honor, they didn't file a quiet

20  title suit in 1951 to quiet title to the appropriative rights

21  of the United States as evidenced by their application.

22  THE COURT:   They filed a quiet title suit, but it

23  didn't name everybody.

24  MR. SACHSE:   This, again, is another creature of Mr.

25  Veeder's brain.

1          THE COURT:  Wasn't the suit that was originally filed

2    a quiet title suit?

3          MR. SACHSE:  Yes, sir.  But this bright idea of usurpa-

4    tion of the Court's jurisdiction was not raised in 1951, and

5    the water rights proceedings were pending.  No attempt was made

6    to enjoin the Water Rights Board or to withdraw from the Water

7    Rights Board the United States' own application which was be-

8    fore the Water Rights Board in 1951.  It was there.  Fallbrook's

9    applications 12178 and 12179 were there.  The protests of the

10   United States were there.  But this case breezed through a first

11   trial and went to the Circuit and back, without anybody attempt-

12   ing to take it away from the Water Rights Board.  You can search

13   the old pleadings and the transcript on appeal and you will not

14   find anything about it.

15          I don't know.  I haven't used the word "estoppel."

16   I don't believe you can estop the United States.  The only

17   argument I can think of is that they have submitted themselves

18   to the jurisdiction and that they have got to be able to do it

19   or else you leave a vacuum, as I said before, that is hopeless

20   that can't be permitted to exist.  The law in a case like this

21   would abhor a vacuum, just the way physics does.

22          I think it might be wise if, instead of having me go

23   flying off on another tangent now, I ask that maybe it wouldn't

24   be worthwhile to hear from the State of California on this very

25   same issue.

THE COURT:  Yes, I think that would be a good idea.
I will hear from Mr. Moskovitz.

MR. MOSKOVITZ:  Your Honor, it seems to me that at
the outset I must register a protest here against some of the
language that Mr. Veeder has used with respect to the State of
California.  I think he has used unwarranted and undignified
slurs against the State, its laws and its agencies.  You have
said that you will excuse Counsel who, in the heat of argument,
make assertions which they otherwise would not make.  I hope
this is true on his part.  I think it is improper for him to
refer to the State Water Rights Board as a "kangaroo court,"
and I think it is improper for him to refer to the procedure
as a "silly" procedure.  It may be somewhat amusing -- I can
laugh, too -- but still I don't think it is something that ought
to be done in a Court of law.  I think this sort of attack is
part of the general scheme of the United States to evade the
proper sphere of activity that the State Water Rights Board has
-- and I say "proper sphere."

Mr. Veeder has asserted, and still asserts, that the
United States has certain appropriative rights which it has
acquired by proceeding to take and use water.  Now he may be
right.  I think he is wrong.  I don't think he can use "self-
help," as you put it, to acquire rights.

THE COURT:  You are talking about after 1914?

MR. MOSKOVITZ:  I am talking about after 1914, yes,

1610

1   your Honor, certainly.

2         THE COURT:  All right.

3         MR. MOSKOVITZ:  He may be right,  If he is right, he

4   got those water rights by the activities upon which he relies.

5   The Water Rights Board can't affect those rights, if they exist,

6   because they vested before the Water Rights Board acted on

7   these applications that are being challenged now.

8         But Mr. Veeder is not content with reliance upon that.

9   The United States Navy, or officers of the Navy, purporting to

10  act for the United States, filed an application.  Mr. Veeder

11  wants to get as much comfort as he can from that.  He is not

12  willing to abandon that, although he claims that they didn't

13  have to file an application.

14        THE COURT:  He is not willing to abandon it, nor is

15  he willing to adopt it as the act of the United States.  He is

16  still riding two horses.  I don't know if we will ever find out

17  what position he takes on that.

18        MR. MOSKOVITZ:  The most that we can assume is that

19  he does one thing and then does the other and see what the

20  consequences are.  If he decides that he is going to disown it

21  -- it's a bastard, he will have nothing  of it, the United

22  States didn't father it at all -- then we are at the point that

23  the Water Rights Board's action couldn't affect it.  But if he

24  decides, "I had better adopt it.  In my old age it might support

25  me," then the question is, what must he do with it, how must he

1    bring it up in order that it reaches its maturity?   If this

2    application before the State Water Rights Board is of no value

3    at all, unless a permit is issued, his application itself

4    doesn't create a right to use water.   There must be a permit.

5         Now your Honor raised the question, can the Water

6    Rights Board adjudicate the rights of the United States?   Cer-

7    tainly not.   It cannot adjudicate the rights of the United

8    States.   But if the United States is seeking to acquire a right

9    which it does not have by some other means and files an appli-

10   cation with the Water Rights Board, then it must pursue the

11   procedure which is provided.

12        Now that procedure is to appear before a hearing, if

13   a hearing is called, and if there are competing applicants to

14   make known the evidence, the arguments, the equities which would

15   favor the United States and which would require the Board, in

16   the exercise of its discretion, to grant the permit of the

17   United States.

18        THE COURT:   Let me interrupt for a minute.   Following

19   your line of thought there, if, on any of these hearings before

20   the Water Rights Board, the Government should say, "We have

21   some vested rights in this stream which are going to be affect-

22   ed by your action," the answer of the Water Rights Board is,

23   "Well, our action is always subject to and not in contravention

24   of the vested rights on the stream.   Therefore, we don't affect

25   your vested rights."

1612

MR. MOSKOVITZ:  As a matter of fact, they usually go
further, your Honor.  They do what you said and they attempt
to go further by including conditions in these permits to try to
protect the vested rights.  This is not necessary to protect
them in that they are always prior, but they do attempt as an
administrative matter to put restrictions on the permittee and
require him to operate in such a way as to prevent any en-
croachment.

Now this is an imperfect way of doing it.  It is not
exact, because they don't know what the full nature of the
vested right is.  But they do try to do that, and they did so
in this case.  The opinion of the conclusions in the issuance
of the permit to Fallbrook recently contains a number of re-
strictions on how they must operate.

So I say that the fact that the United States has
appeared before the Water Rights Board and has said, "We would
like to have a permit from the State," means that to the extent
that they rely upon that they must follow the proper procedure.

THE COURT:  And following that argument up, in other
words, the very fact that they asked a permit or seek to appro-
priate water indicates that they had no right to the water be-
forehand or they wouldn't be asking to appropriate it.  If
they had a vested right, they would say, "We don't have to
make any application; we have a vested right.  Your action will
not have any effect on our vested rights, and you have to say

1    that in your order.   Therefore, we are not concerned with what

2    you do."  But if the Government has no vested right and is

3    seeking a right they do not then have, then they must seek it

4    under California law through the Water Rights Board.

5        MR. MOSKOVITZ:  Exactly, your Honor.

6        Now the United States lays great stress on the relative

7    priority of its application and the applications of Fallbrook.

8    I have no views as to what the correct priority date may be at

9    this time.  But the existence of a priority of time of filing

10   an application is not determinative as to who has the priority

11   of right.  You have mentioned it before.  The State Water Rights

12   Board has discretion to pick and choose, depending on where,

13   in its opinion, the public interest lies.  So that even if your

14   Honor were to take this issue, assume jurisdiction over it and

15   decide, "Yes, the United States has the highest priority of time

16   of filing," so what?  They have no permit.  As a matter of fact,

17   their application has been rejected.

18       THE COURT:  Let's think out loud as we go along.  If

19   there is any significance to a priority date, it is a signifi-

20   cance that arises under California law.

21       MR. MOSKOVITZ:  That is right.

22       THE COURT:  It is not something that arises under

23   United States law.  Priority is something that concerns the

24   appropriation of water under California law.  Therefore, the

25   determination of a priority date is with the Board and is not

1    with this Court.

2            MR. MOSKOVITZ:  Yes, your Honor.  And this doesn't

3    mean that there is no judicial remedy.  If the Board has acted

4    arbitrarily or erroneously, there is a method of review, and

5    one of the litigants in this case has followed it with respect

6    to his application which was rejected, and the United States

7    could do the same thing if it chose to take advantage of the

8    State appropriative procedure, which I think it ought to do.

9            I think I have mentioned this before.  I think the

10   United States has made a mistake.  The State of California would

11   treat the United States as fairly as any other litigant, and

12   the record on other applications of the United States shows that

13   to be so.

14           MR. VEEDER:  You do admit the existence of the United

15   States.

16           MR. MOSKOVITZ: Again Mr. Veeder is being flippant

17   about the position of the second largest State in the United

18   States, and I don't think it is appropriate for him to do so.

19   We have respect for the United States.  The United States is in

20   this State, on a military base, in all kinds of activities.

21   The State of California and the Attorney-General, for whom I

22   am speaking, have never taken the position, "Get the United

23   States out at all costs."

24           THE COURT:  We residents of California resent these

25   outlanders who come in here from some other State and cast

1    aspersionary remarks about our State.

2    MR. VEEDER:  It's just some of the help, your Honor.

3    I love California deeply.

4    THE COURT:  I agree with Mr. Moskovitz.  This is a

5    great State.

6    MR. STAHLMAN:  It's a good thing this is not being

7    heard in Texas.

8    THE COURT:  It certainly is.  They would give you

9    short shift down in Texas, Mr. Veeder.  We Californians are a

10    very tolerant people.  We put up with some of these remarks.

11    MR. MOSKOVITZ:  In short, your Honor, if you truly

12    have some trouble with whether what the Water Rights Board has

13    done infringed your jurisdiction, or whether you have the juris-

14    diction, it is proper for you to assume unto yourself a de-

15    cision as to priorities, as to who should get whatever un-

16    appropriated water exists, then I think this matter should be

17    thoroughly briefed.  But I don't think it is really a question.

18    THE COURT:  This goes back and fits into the dis-

19    cussions we had about the effect of the Desert Land Acts, etc.

20    Just what did the Government do about this water?  And if we

21    follow up along with the theory I had at that time, that the

22    Government of the United States permitted the States to set up

23    their own systems on this matter of appropriation of water,

24    then it seems to me that the Water Rights Board does have

25    jurisdiction over these appropriations and the United States

1   has brought about a situation about which they can't complain.

2   The Federal Government said to the States, "You handle the

3   unappropriated waters." They didn't say to the States, "You

4   handle the vested rights of the United States." They didn't

5   say to the States, "You determine what waters our Indian lands

6   are entitled to," like in the Winters case or in the case which

7   Judge Lindberg is trying. They didn't say, "You, the State,

8   will determine the nature and extent of the Government's vested

9   rights." They in substance said, "The States will determine

10  how to handle this water to which up to now the United States

11  has had some title, but which we turn over to the States and

12  let them handle who appropriates this water." And I thought at

13  time that that was argued that it was a very strong argument,

14  and I am inclined to think that the United States, if it wants

15  to appropriate water, is like any other person -- they have to

16  come in and comply with that procedure.

17          The thing that bothers me -- I suppose no matter what

18  we do we will be at loose ends -- in adjudicating the rights

19  of the United States, I don't have any doubts but that I can

20  determine whether or not the United States got a right by pre-

21  scription, and yet that arises under California law. Then

22  query: The point as to priority of dates on appropriation?

23  The answer to that may be that the whole appropriative setup

24  was turned over to the States and therefore this Court can de-

25  termine dates that rights arose by prescription, determine

F-6

1617

1   riparian rights of the lands of the United States, but as to the

2   appropriative field it has been turned over to the States.   The

3   United States, as it were, washed its hands of it.   It said,

4   "Each State work out its own system."

5            MR. MOSKOVITZ:   Your Honor, I don't think you have to

6   go quite that far.   For example, the Superior Court of San Diego

7   County, no more than your Honor, the Federal Court, can grant a

8   permit or determine a priority so as to exclude the exercise of

9   discretion by the State Water Rights Board.   The distinction,

10  your Honor, is that there has been an administrative remedy

11  established for determining who, among competing applicants,

12  will secure a State permit.

13           THE COURT:   Well, that is all right as far as it goes.

14  There has been an administrative remedy established by the

15  State.   You have to have more than that.   You have to have

16  participation by the Federal Government saying to the State,

17  "You may do this," because the mere fact that the State set up

18  an administrative remedy wouldn't mean that the United States

19  would have to go in and exhaust that remedy.

20           But this goes back to the Desert Land Acts and goes

21  back to the result of what happened then.   Mr. Veeder has

22  claimed that the Government severed the land and the water --

23  we have been all over that, and he points out that when water

24  is appropriated title comes down from the United States through

25  the State to the person who gets the appropriation.   There is no

1   doubt about the chain of title.  But I think we have to weave

2   what happened then in with the fact that the State then set up

3   an administrative procedure.  The mere fact that they set it up,

4   by itself, doesn't affect the United States.  But if the United

5   States has said, "You set up whatever system you want to handle

6   appropriation of water and we will be content with what you did,"

7   then the Congress of the United States, who has the power to

8   say what can be done with Government land and Government water,

9   has said to the State, "You shall have power to handle these

10  matters and we are out of the picture."

             MR. MOSKOVITZ:  I agree with your Honor.  You must

12  consider those statutes in the whole scheme of things.

             The point I wanted to make is that even a State

14  Court cannot assume this function of deciding who gets unappro-

15  priated water, whereas a State Court and your Honor can make

16  findings as to what has happened with respect to the appro-

17  priation of unappropriated water.  For example, I think if you

18  chose you could include in your decree that certain permits

19  have been granted, if they had been, or that if no permits had

20  yet been granted that there were applications pending before

21  the Water Rights Board.  I don't think they would decide rights,

22  because those rights had not yet vested if they hadn't gone

23  through the procedures yet, and after the rights had been ac-

24  quired pursuant to the procedures -- for example, if you find

25  that there is enough water in the stream so that some

1    appropriations can be added onto your list after considering

2    the older vested rights, you can say that the Fallbrook Public

3    Utility District has a license and has acted under it to appro-

4    priate 2½ second feet of water.  This is proper.

5           But to go back before that and decide who has the

6    priority under applications and who shall get the permit, I

7    think, goes beyond what is properly before you.

8           As I said before, if there is any further difficulty,

9    this matter should be briefed.  But I don't think it has that

10   character.

11          MR. GROVER:  Your Honor, I am not a party to the

12   motion for summary judgment, nor are Mr. Halde's clients.  But

13   there is one aspect of it that I would like to call to your

14   Honor's attention.

15          THE COURT:  I'll be glad to have your help, Mr.

16   Grover.

17          MR. GROVER:  Thank you.

18          It seems to me that one remark your Honor might have

19   protested on Mr. Veeder's part was his rather undignified re-

20   ference to cutting Judge Fee in half.  But it seems to me that

21   on the merits he is trying to cut Judge Fee in half again.

22          MR. VEEDER:  He is a dear old friend of mine.  I didn't

23   insult him.  I have known him for twenty years, and I'm sure he

24   would laugh if he heard about it.

25          MR. GROVER:  I'm sorry, your Honor, that I am not that

1  well acquainted with Judge Fee.  I am, however, acquainted with

2  his opinion in this case, and he did say, and the one thing

3  that he said that Mr. Veeder agreed to was, that there could be

4  no final judgment against anyone until there was a final judg-

5  ment against all.

6       Now at another time, and I hope this afternoon, your

7  Honor, if there is time, I should like to make some general

8  remarks, if I might say so, about the deplorable state in which

9  the case stands now.

10       But on this motion for summary judgment I should merely

11  like to remind your Honor that you cannot enter a judgment which

12  would do us any good at all unless you can do it as to the

13  Fallbrook Public Utility District and as to the other 5599

14  parties; and as one of those parties, as one, as a matter of

15  fact who protested having all the interrelated plenary issues

16  which are in the case, I must merely say, we are wasting every-

17  body's time by trying to have a partial judgment as against

18  one party.  It just seems to me open and shut on that issue,

19  because it does waste so much time, your Honor, that we shouldn't

20  fuss with it, to be perfectly honest.

21       THE COURT:  Don't you contemplate that there could be

22  partial adjudications as long as, eventually, they are all woven

23  into a final judgment?

24       MR. GROVER:  Oh, certainly, there could be a partial

25  trial, etc., but Mr. Veeder had a motion to hear this ahead of

1  everything else.  It is no more important than anything else.

2  It is delaying issues.  Fallbrook is still going to be in the

3  case.  It is an abstract theoretical matter that is tying up

4  the entire litigation.  We were supposed to have the trial

5  start yesterday, and so forth, and I have waited two days here,

6  and perhaps will have to wait more, while we discuss these

7  matters that really hold up the progress of the major elements

8  of the litigation.

9  THE COURT:  Well, what you say may be partly true.

10  But this discussion is very helpful to me.  There is a very

11  fundamental decision that has to be made here on the effect of

12  State action on appropriations and the effect be given to

13  Water Rights Board decisions, and it has been helpful to me.

14  You know enough about water law that this all fits into place

15  in your mind, but it is not that easy for me.

16  MR. GROVER:  I don't make any such representation as

17  that, your Honor.  I think, however, maybe it illustrates that

18  we ought to sit down and have some real schedule as to where

19  we are going.  I never know when a motion comes into my office

20  -- about a dozen came in for yesterday -- I never know whether

21  we ought to appear or not, and our people simply can't afford

22  it.  That is the real tragedy of this lawsuit.  The real irony

23  is Mr. Veeder's horror at Fallbrook's treatment of the little

24  people, when the big thing of this lawsuit is that the people

25  of this watershed are being defaulted out, even those who appear.

1    MR. STAHLMAN:  If this goes on, I am going to have to

2  get into this, because I have been fighting for the little

3  people down there and I am going to have something to    say

4  about that.

5    THE COURT:  I don't know that anybody's rights have

6  been defaulted out of this case or are going to be defaulted.

7    MR. GROVER:  It is the practical result, your Honor.

8  As I say, I would like to address myself to that sometime during

9  this session.

10    THE COURT:  I'll hear you later.

11    MR. GROVER:  But on the motion for summary judgment,

12  I would just like to suggest that it is merely one of 6000

13  times 6000 issues that are here, one combination of parties,

14  and we oughtn't to take any more time with it.

15    There was one thing that occurred to me on the merits

16  of it -- your Honor made a remark, and I believe I mentioned it

17  once before -- the Reclamation Act is not the only expression

18  of Congress as to the quality of State rights.  You might say

19  that in the precedent legislation on the National issue in which

20  the question of the paramount rights, etc., was so controversial

21  in the matter of the so-called tidelands, the nation really did

22  consider that at great length, and after the Court held that

23  the United States had paramount rights in that area it was one

24  of the major election issues in 1952 whether or not the Court,

25  as a practical matter, would be sustained.  No lawyer ever said

1   that the Court was wrong.  But Mr. Eisenhower, who supported

2   legislation in that area, was elected.  Maybe he would have been

3   elected anyway.  But it was an issue.  As much of these matters

4   may be debated in a nation as large as ours, that was debated,

5   and Congress, after great deliberation, reached the decision

6   about such rights, and the lands under navigable waters was the

7   major issue and the bill was passed and signed by the President

8   and upheld by the Supreme Court of the United States.

9        It is true that officials of the Government cannot

10  estop the Government, but Congress can bind the Government in

11  this matter, and related to that issue of paramount right -- in

12  fact, this case was the basis of  a  part of the Republican

13  platform of 1952 -- was the question how this paramount rights

14  doctrine would affect water law in the Western States, and one

15  of the things that Congress very carefully and deliberately

16  considered at that same time was the question of water rights

17  in the Western States, and they added this to the Tidelands Bill:

18       "Nothing in this Act shall be construed as affect-

19      ing or intended to affect, or in any way interfere with

20      or modify the laws of the State which lie wholly or in

21      part westward of the 98th meridian relating to the owner-

22      ship and control of ground and surface waters" -- then

23      they go on to say:  "And the control, appropriation,

24      use and distribution of such water shall continue to

25      be in accordance with the laws of such States."

1          Now granted Congress is not the Supreme Court.

2          THE COURT:  Give me the citation.

3          MR. GROVER:  Public Law 31, 67 Statutes 29, Section

4   3-E.

5          Now granted when Congress used the word "continue"

6   they were perhaps doing two things: (1) saying what they believed

7   the law was until that time.  I believe Mr. Sachse similarly

8   indicates that that was a pretty definite understanding all

9   around, and to that extent maybe Congress was indulging in a

10  judicial function.  But certainly Congress has a right to set

11  the National policy for the future, and when it said that it

12  shall continue to be this way in the future they were setting

13  the policy for the future, and when we were discussing settle-

14  ment, Mr. Veeder with emphasis asserted the fact that he was

15  bound by Congressional enactments, and I think in this case he

16  is bound by the Congressional policy that was set which estab-

17  lished that State laws would be applicable.

18         THE COURT:  Let me see the pamphlet from which you

19  have been reading.

20         MR. GROVER:  This is from the brief on appeal in this

21  case, your Honor, the only copy of it I have.

22         THE COURT:  Let's take a short recess and I will hear

23  you, Mr. Veeder.

24         Can you close this part up in about 30 minutes?

25         MR. VEEDER:  Yes, your Honor.

1          THE COURT:   Then I would like to hear what Mr. Grover

2    has to say, because I think he wants to get away.

3          Is that right?

4          MR. GROVER:   Yes, your Honor, if I could.

M7a

1    MR. VEEDER:  For the benefit of the State of California

2    and Mr. Glover I have talked it over with Mr. Moskovitz, and

3    he says I am not an unadulterated pettifogger; he says

4    adulterated pettifogger.  I think that is what he called me.

5    MR. MOSKOVITZ:  I beg your pardon.

6    MR. VEEDER:  We are exchanging names here.

7    THE COURT:  Let's get on with the merits of the case.  I

8    have enough to decide without worrying about these things.

9    MR. VEEDER:  I think there is one important thing that

10   has come out of this, your Honor.  And that is the failure

11   to distinguish between adjudication and appropriation, or

12   better stated, appropriation and adjudication.  It is true

13   that to acquire a title the average citizen, citizens,

14   people, corporations must pursue a particular course to

15   acquire title to get a right to the use of water.  That is

16   an appropriation.  We certainly are not here to ask your

17   Honor to have anything to do with the field of appropriation.

18   It is entirely beyond the province of the judiciary.  It is

19   within the province of the judiciary to render an adjudica-

20   tion.  And that adjudication, your Honor, in our view,

21   entails the review of every single facet and factor involving

22   appropriation.  That is why we are here.  We believe it is

23   fully within the province of your Honor to consider the fact

24   that Fallbrook has claims 12178 and 12179 on Sandia Creek

25   concerning which it took such a dim view that it didn't even

1  plead in the first instance. We think that is important.

2  We believe that you can review that fact.

3  THE COURT: You mean now that I have authority to review

4  the action of the Water Rights Board?

5  MR. VEEDER: No. I think you have the authority to

6  review the steps that have been taken and which were taken

7  for the purpose of acquiring title.

8  THE COURT: Well, that is reviewing the action of the

9  Water Rights Board. That is what they are supposed to have

10  done.

11  MR. VEEDER: I don't believe though you can be excluded

12  from it, because I believe this: that the judiciary has the

13  full power to review those facts. And that is what we are

14  touching on today. We are touching on the power of the

15  judiciary. It is a question -- it is not even doubtful that

16  you have full power to review the recording acts which will

17  govern the question of whether a party has notice or not of

18  an outstanding lien or a deed. And that precisely is what is

19  involved here. You, your Honor, are invested with the

20  authority to pass on the title and to determine whether or

21  not a title has vested. Now, it may be true that there are

22  other elements that have to be completed before a title is

23  completely vested, but the cases which I cited your Honor

24  show very clearly that once a piece of paper is filed, there

25  is invested in the owner of that piece of paper, the filing

1   with the State Board, an inchoate title.   And your Honor is

2   invested with authority to adjudicate that inchoate titles;

3   and that is one of the reasons why we are here.   You can

4   determine under the law of California whether there has been

5   compliance with that particular step and the acquisition of

6   a complete title.   Now it is in our view that that is the

7   whole crux of the matter here.   This is a judicial question.

8   It is not an understatement when they say your Honor could

9   issue a permit I have to laugh.   You couldn't possibly issue

10  a permit; but you could determine whether the elements had

11  been complied with pursuant to which a permit should be

12  issued.

13       Now, your Honor, in regard to this matter I should like

14  to call your attention to Section 2075 of West Annotated

15  California Codes.   It says this: --

16       MR. SACHSE:  Which Code?

17       THE COURT:  Which Code?

18       MR. VEEDER:  Water Code.

19       There it says:

20           "Acceptance by the partners.  References in

21       Federal Court.  In case suit is brought in Federal

22       Court for determination of rights to water within

23       or partially within the State, the department may

24       accept as reference of such suit as master or referee

25       for the court."

1   That is right.  There is no doubt about it.  The State
2   of California recognizes that you can adjudicate the whole
3   thing.
4       And Section 2076, which is a companion statute says:
5           "In acting under this chapter the department
6       shall proceed according to the rules of practice
7       and procedure of the court or as otherwise directed
8       by the court."
9       In other words, it is fully recognized in the law of
10  California that this court has the power to function in its
11  judicial capacity to determine the precise point which I have
12  just made reference to.  It is not even doubtful in our view
13  that if we keep straight the difference between an appropria-
14  tion, that is, the acquisition of title and the adjudication
15  of that title, we won't have the problem that we have had
16  all day today.  And that is the whole crux of this matter.
17      THE COURT:  Now you are talking something else again.
18  First you told me I could determine the relative dates of
19  priority.  Now, that would be something different from
20  reviewing a proceeding by the Water Board to see what they did.
21  Now you are arguing that I can review the decision of the
22  Water Board.  If I had a right to review a decision of the
23  Water Board, it could only be a review when its decision
24  becomes final and if it has been reviewed by the State court
25  and the thing was at an end.  And I don't think I have a

1  right to review the proceedings of the Water Board.

2  MR. VEEDER:  Your Honor, that is the difference.  And I

3  believe this:  that the basic element that is so important

4  here is that when this case was filed, and at that moment

5  the rights were all fixed and couldn't and shouldn't have

6  been changed until the final decree was entered; because the

7  initial step of acquiring the right to the use of water under

8  the State procedure is the filing of an application to

9  appropriate rights to the use of water.  And you, I respect-

10  fully submit, have the power to determine the respective

11  priorities as of that time.  And that is what we are asking

12  for now.  And that is the whole gist of this problem that we

13  have discussed today:  that it isn't, in my view, not even

14  doubtful that you can review each and every element in

15  regard to the acquisition of title.  It may be that under the

16  State procedure something might occur which would cause the

17  right that you adjudicated to be lost but, as of the time

18  of your adjudication, you certainly have the power to make

19  such a determination.  And that is our view.  It is not

20  reviewing the acts of the Board at all.  It is determining

21  that at the time the suit was brought a man had an inceptive

22  right and he is entitled to protection under the jurisdiction

23  of this court.

24  THE COURT:  But if that inceptive right, as you call it,

25  was a right that he had to perfect under State law, then

1   State law is going to control as to what that right is.

2        MR. VEEDER:  It is entirely possible.

3        THE COURT:  State law will have to run its course and

4   decide what it is.

5        MR. VEEDER:  But I submit that this court doesn't have

6   to sit by until the whole matter has gone through to the

7   Supreme Court of the United States before it can act, and

8   that would be the logical sequitur of adopting the position

9   of my friends on my left.  I am trying to say that certainly

10  your Honor doesn't have to wait and hold in abeyance this

11  matter until every last shoelace is put onto the rights.

12  You couldn't.  There would be no adjudication.

13       THE COURT:  I would wager that the State proceedings

14  would be final before we get around to entering the decree

15  in this case.

16       MR. VEEDER:  Not if we hadn't been stopped.  We would

17  have been through in 1952 if we had had a chance.

18       Now, the point that I desire to make, some additional

19  observations, if I can, in regard to the Fallbrook Public

20  Utility District and some of the statements made by counsel

21  in his argument.

22       It is extremely important, I believe, that the sequences

23  of the investiture of power and to these public utility

24  districts be considered.  They were organized under the Act

25  of 1921, and we reviewed the history of why that act was

1   written to give to suburban areas the benefits of the
2   municipal public services.  After this lawsuit was started
3   and many years, six years, after Fallbrook had made its
4   filings for municipal and domestic uses, and at the time
5   that it wasn't even claiming any rights under 12178 and
6   12179, the law was amended, the law of California was amended,
7   by an act of 1951, which became effective on September 1 of
8   1951, which permitted the Fallbrook Public Utilities District
9   and agents similarly organized to succeed to the benefits
10  of the powers that the irrigation districts had in regard
11  to public improvement districts.  And the reason for that
12  was obvious.  The powers of irrigation districts included
13  these.  They could in an area establish a system for the
14  distribution of water for irrigation purposes.  And up to
15  that time the word "irrigation" was never used in the Cali-
16  fornia law in connection with the public utility districts.
17  At the same time they also passed after this, the 1951 act,
18  they also passed legislation permitting the Fallbrook Public
19  Utility District and similarly situated organizations to
20  cooperate with the United States of America for the purpose
21  of securing a system for supplying domestic and irrigation
22  water.
23      Now, the acts in question to which I have made reference
24  are companion acts.  Fallbrook didn't have the power until
25  1951, after every single one of her filings had been made.

1    Now, we touch on the question of intent.  We believe

2    the very essence of any appropriation is intent, the intention

3    to appropriate rights to the use of water for a particular

4    purpose.  And I submit Fallbrook Public Utility District did

5    not, when it made its filings in 1946, and when it amended

6    them subsequently, it did not have the power to appropriate

7    water rights for the purposes of irrigation.  And I think

8    that, your Honor, the sequences of these enactments are

9    extremely important.  I found in the San Diego Law Library

10   the chain of session laws which so clearly demonstrate that

11   the Fallbrook Public Utility District was powerless to

12   appropriate water for purposes of irrigation.  And it is not

13   difficult to follow through, because the citations are on

14   16 4, on 6 16 4, on 7 16 4, on 8, and 16409.  And they show

15   that at that time the legislator who introduced it was a

16   lady from San Diego.  She introduced these bills to give to

17   the Fallbrook Public Utility District the needed power to

18   dispose, to distribute, and appropriate and use water.  I

19   shouldn't say "use," to distribute water for purposes of

20   irrigation.

21       THE COURT:  But if the matter of appropriation of water

22   is to be controlled under State law, then isn't this all

23   beside the point?  It is a State problem, what Fallbrook's

24   capacity it.  Ultra vires is a State problem.  If the

25   Government has to comply with State law to appropriate, go

to State law and see what they give you.  And if you can
knock out Fallbrook because they were acting beyond their
powers, more power to you.  If this is entirely a matter of
State law, this is all beside the point.  We can wipe this
all off and say, "All right, this is a State problem.  If
you, Fallbrook gets water, or the Government gets water by
appropriation, this court will recognize it."

MR. VEEDER:  But there is where the difference between
appropriation and adjudication is so all important.  Your
Honor has the full power, this court has the full power to
adjudicate the questions of law that are involved, including
the question of ultra vires.

THE COURT:  You cite me some authority in addition to
Veeder on water rights on that point.

MR. VEEDER:  Yes.  Yes.  I will.  Because it is
eminently clear now that the whole difficulty and the whole
problem has arisen from this very distinction between acqui-
sition and adjudication.  The factors that are extremely
important -- and so far as I am concerned this court is not
powerless to review State law.  Indeed, the sections that I
cited to you show that the California court, the California
legislature contemplates precisely that point.  But we do
find with great care that the laws of California distinguish
and distinguish clearly between irrigation and municipal
usage.  Else why are all these -- I have cited the statutes,

1   and I have quoted them in my brief to your Honor.   They are

2   very, very clear.   They are very, very specific.   But they

3   become extremely important when we consider the Orosi case,

4   because that case -- and I respectfully submit this was not

5   open to dictum -- it was the heart and soul of that decision.

6   They point out that a municipality can provide schools and

7   fire departments and garbage disposals and a refuse disposal,

8   and all the elements that are required to bring to suburban

9   people the benefits of a municipal corporation.   And then

10  they say this -- and here was the basis, if I may respectfully

11  submit it to you:  They said, "All that you have argued,

12  Mr. Appellant, would be right if the utility district was an

13  irrigation district."   And then they said the difference is

14  this:  "The municipal district, the quasi-municipal district,

15  the Fallbrook Public Utility District, can levy a tax right

16  straight across the board and no one can complain."   The

17  man with the butcher shop, the beauty parlor, they can all

18  be charged the same way.   Why?   Because they all benefit the

19  same way by reason of the general tax.   A bachelor without

20  any children can be assessed to provide a school.   Now, that

21  is the difference.   But when you get down to the question of

22  providing water for purposes of irrigation -- and this is

23  why the Orosi case is so important -- they say this:   "Those

24  lands are especially benefited."   So the difference is a

25  kind of tax that can be levied.   And that goes to the heart

1    and soul of these claimed appropriative rights which raises

2    a judicial question which is far and away and beyond any

3    power of the State Board.  And I will not use that term

4    again.  The point I mean, and I desire to make is that this

5    district hasn't the power under the Orosi case to levy special

6    assessments and special assessments are requisite for an

7    irrigation project because, why?  A man with five acres of

8    land receives extra benefits, so he pays extra assessments

9    for his irrigation.

10         THE COURT:  I read the Orosi case the same as you do.

11   I have already said that.  But why should the Government be

12   concerned about these appropriative rights obtained by

13   Fallbrook under State law except in so far as they impinged

14   upon appropriative rights claimed by the Government?

15         MR. VEEDER:  Well, that is beside the point.

16         THE COURT:  And if State law governs appropriative rights,

17   then you get your remedy under the State law for your

18   appropriative rights.

19         MR. VEEDER:  Oh, but, your Honor, the National Govern-

20   ment can come to its own tribunal and have any question of

21   law with which it is concerned tried out; and this is

22   certainly a question of law.

23         THE COURT:  This court may be wrong, but this court can

24   say that appropriative rights are within the realm of State

25   action and that the Government like anyone else has to go to

1    the State tribunals to get those rights.

2       MR. VEEDER:  But, your Honor, the important thing here --

3  and this is the crux of why we are taking most of the day --

4  if the Fallbrook Public Utility District as a matter of law,

5  and your Honor certainly is invested with power to make that

6  decision, if the Fallbrook Public Utility District can

7  appropriate rights to the use of water only for purposes of

8  municipal and domestic uses, and it is ultra vires to claim

9  anything else, then I submit your Honor can rule on that

10  point.  And if your Honor does rule on it, there will be no

11  project here, because you couldn't build a project for

12  10,000 acre feet.  They can't show a beneficial use to it.

13       There is an additional factor that your Honor touched

14  upon when you mentioned Section 8 of the Reclamation Act.

15  And I think that is 43 U.S.C. 321.

16       THE COURT:  383, I think it is.

17       MR. VEEDER:  383.

18       That act provides that in building reclamation projects

19  the Secretary of the Interior will proceed in accordance

20  with State law and will respect vested rights.  There is no

21  question about the language that is used.  There is no

22  question on the proposition that the Congress thought it

23  essential to make specific provisions for the protection of

24  vested rights.  And I am certainly in complete accord with

25  that.

1638

1        THE COURT:  Also provided that the appropriative rights,

2   if they secured for the district, would be secured under

3   State law.

4        MR. VEEDER:  Your Honor, in that regard -- again, I

5   have spent about 25 years in this business -- I have never

6   seen the Federal Government comply with State law; and I

7   don't think it can.  Many times it tries, and it spends a

8   lot of money.  But the Federal Government very, very fre-

9   quently cannot comply with State law.  And the fact is the

10  Reclamation Act itself contains language which is contrary

11  to State law.  I believe that Mr. Moskovitz in joining with

12  Mr. Goldberg in the Ivanhoe brief reviews at great length

13  how the National Government can pass the hundred and sixty

14  acre limitation and proceed in disregard of the State law.

15  You will find in the Reclamation Act where it says:

16        "Rights to the use of water will be appurtenant

17   to the land."

18  And they are, and they are expected to be appurtenant.  That

19  is contrary to the law of Arizona and many other states.  I

20  beg your pardon, Montana and not Arizona.  The point I make

21  is that there is seldom a time that the Federal Government

22  can comply with State law.  And tht is extremely important.

23  There is another act, the Federal Power Commission Act, which

24  says that in proceeding with the exercise of the powers under

25  the Federal Power Commission they will proceed in accordance with

    State law.

1          However, a case very, very much in point has arisen,

2   and I would like to cite it to your Honor.   It is the First Iowa

3   Co-op vs. Power Commission, 328 U.S. 152.   Now, the language

4   of the Federal Power Commission Act in regard to compliance with

5   State law is very, very similar to Section 8 of the Reclamation

6   Act.   But the issue came up this way in that First Iowa Co-op

7   case.   There had been failure to comply by a licensee of the

8   Federal Power Commission with the laws of the State of Iowa.

9   It was denied that the licensee could go ahead with its project.

10  Why?   Because the licensee of the National Government hadn't

11  complied with the State law.

12          But here is what the Supreme Court of the United

13  States declared, I think it was Justice Burton speaking, and it

14  touched on the very heart and soul of what we have been arguing

15  about today.   It says,

16          "To require the petitioner to secure the actual

17      grant to it of a State permit under 7767 as a condi-

18      tion precedent to securing a Federal license for the

19      same project under the Federal Power Act,  would vest

20      in the executive council of Iowa a veto power over the

21      Federal project.   Such a veto power easily could destroy

22      the effectiveness of the Federal Act.   It would subordinate

23      to the control of the State comprehensive planning which

24      the Act provides shall depend upon the judgment of the

25      Federal Power Commission or other representatives of

1640

1        the Federal Government."

2            THE COURT:  Is this a navigable stream?

3            MR. VEEDER:  I think it was a tributary of a navi-

4    gable stream, your Honor.

5            In any event, however, it touched upon the very

6    important basis of whether, when the National Government acts,

7    its acts are subject to the veto by the States, and I submit

8    that they are not and could not be.

9            That case is also cited, of course, in the Federal

10   Power Commission case, 349 U.S. 435 (444).

11           The point that I desire to make is that Article VI

12   of the Constitution, which makes the law of the National Govern-

13   ment the supreme law of the land and concerning which all

14   State tribunals must take cognizance, is directly and immediate-

15   ly involved here today.  I submit, your Honor, that if it were

16   not true the National Government couldn't live fifteen minutes.

17   I submit that the State of California could not deny water to

18   the United States of America for the reason that one State can-

19   not deny the remaining forty-seven States the right to exist,

20   and that is exactly what is directly and immediately involved

21   here.  There is no power in any State to veto the other forty-

22   seven States in having a Marine Corps Base down here at Camp

23   Pendleton.

24           THE COURT:  That is a pretty far-fetched argument.

25   Let's stick to what we have here.

1   MR. VEEDER: Well, I am moving into it, because the

2   logical sequitur of what has been advanced here necessarily

3   follows, because the United States has been diverting and using

4   water for all these many years and been doing so through the

5   acts of authorized personnel, and there is before you for ad-

6   judication, I submit, without regard to any other tribunal or

7   any other activities, the question whether the Fallbrook Public

8   Utility District and the other claimants have initiated titles

9   which could deprive the United States of America of its claimed

10  rights, and that is where we are today.

11      We are here today to consider one important factor:

12  Could the State of California, through its laws, act in a manner

13  which would deprive the United States of rights which it claims

14  and which it has been exercising?  And it is our view that the

15  procedure that was established by California could not con-

16  ceivably have that result, or it would necessarily result in

17  the ultimate destruction of the country.

18      But we take the additional step, we go right on down

19  the line.  In regard to your Honor's statement about the Acts

20  of 1877, and this is why it is extremely important, your Honor

21  said that it was clear to him that you trace the title back to

22  the National Government.  At least I thought I heard you say

23  that.  I think you are right.  I think that is the California

24  theory.  It is not even doubtful that Lux vs. Hagan declared

25  so, and it has always been the law in California that you

1   deraign your title from the National Government.

2              So what did the word "appropriation" mean in 1877?

3   And I think it is the crux of the case.  "Appropriation" meant

4   one thing in 1877.  It meant a diversion and application of

5   water to a beneficial use, and I submit that the idea of the

6   priority system had its origin prior to that time but it was

7   written into the law of 1877 and when Congress said this, "You

8   States establish your own means of permitting your citizens to

9   acquire title from the National Government, by all means we are

10  not telling you what kind of laws to have -- establish your

11  laws and if they follow through with compliance with those laws

12  there will be an investiture of title."  That is Howell vs.

13  Johnson that we have cited to you before.  It is certainly the

14  decision relied upon in the case of the California-Oregon

15  Power Company, 295 U.S.

16             So what did we have?  We have a method of acquiring,

17  a very simple method.  Then it became more complex.  But the

18  idea was always the same; you acquired title this way.  But now

19  we have a new twist in this thing.  We have a Board -- and I

20  apologize for what I said about the Board; I'm sorry -- the

21  point I make is that I don't believe that the Board could act

22  in a discretionary manner which would abrogate the Act of 1877,

23  because the Act of 1877 was specific and clear; it established

24  the means pursuant to which title could be acquired, and this

25  is defeating it.

1            THE COURT:  If your argument is correct, then every

2    title to appropriated water passed by the State would be subject

3    to a defeasance if the United States decided that it wanted the

4    water.

5            MR. VEEDER:  No.  The point that I make is that when

6    you put this additional hook on it where you say, "We will

7    exercise our discretion," that is something else again, and I

8    doubt the validity of it.

9            But in any event, we have tendered a thought to your

10   Honor, I suppose you will call it.  The point I am trying to

11   make is that I believe that the whole concept of appropriation

12   has been perverted, and very badly perverted, in the course that

13   has been adopted in these highly technical regulations that

14   have been enacted.  I believe that the best law was the law

15   which declared that it was an administrative act and purely an

16   administrative act, and the first in time was first in right,

17   and I believe that that should be and is the law, because the

18   idea of appropriating rights to the use of water prior in time

19   is prior in right, and that was the law in 1877 when the Act

20   was passed and I don't think it has changed.

21           But we have had some references to the fact that there

22   have been filings by certain agencies, the Forest Service and

23   others.  I don't believe that that could conceivably affect the

24   title of the United States in any way.  The mere fact that some

25   bureaucrat, who wants a job by  filing a few papers each year --

1  and I know them, I face them, and we have a good time -- but I

2  submit that those bureaucrats couldn't change the law one bit.

3  And I happen to be a bureaucrat of the first rank.  The point

4  I make is that they could not change the law, and that is the

5  problem, your Honor.

6      I will give you an example.  Franz has been talking

7  about these characters who file these papers.  They will file

8  a paper for a pipe about that big -- they will call it 1/1000

9  of a second foot.  Now I submit that that is not all the water

10 that is required in the particular area.  Thousands of heads

11 of stock will water at those streams, grass is raised by the

12 water that flows down from the mountain, and yet here is a

13 bureaucrat who files a paper claiming water for this teensy-

14 weensy bit that some kid will drink if he happens to be up there

15 on the 4th of July.

16     Now, no one can abrogate the rights to the use of

17 water of the National Government in that manner.

18     We talk about the Yosemite National Park.  This is a

19 good one.  We have a falls up there and it is a very fine one,

20 but there is no law that would permit us to appropriate water

21 for the beauty of it.  By the time those filings were made in

22 there it just wasn't possible.  Is anybody going to tell me

23 that you could appropriate and destroy that beauty?  No.  No

24 more than you could appropriate Old Faithful under the State

25 law.  They didn't make a filing there, I submit.  But it would

1  be just as sensible.  Or the Yellowstone Falls.  No one has

2  done anything about that.  And there are thousands upon thousands

3  upon thousands of water uses made on our National reserves for

4  which no filings have been made.  The fact is that the bureau-

5  crats in the Forest Service apparently file only when they don't

6  have anything else to do.

7          THE COURT:  Well, of course, the National Parks are

8  reserved lands, just like Indian reservations.

9          MR. VEEDER:  So are the National Forests.

10         THE COURT:  They are in a different category.  There

11  isn't any problem with those things.

12         MR. VEEDER:  I did not believe there is any problem,

13  except that these precedents that are cited certainly aren't

14  binding here.

15         Thank you, your Honor.

16         THE COURT:  Mr. Grover, you wanted to be heard on

17  some matter.  Tell me how you would try this lawsuit.  You say

18  that it is in deplorable shape and you have had some experience

19  in water law.  What would you do about it?

20         MR. GROVER:  Your Honor, I would think the most de-

21  plorable thing is that we have started hearings before the

22  Master and not everybody has been served and I can't for the

23  life of me see how those proceedings can bind people who have

24  not been served, and those people are, through the interre-

25  lationships with everybody in the watershed, through your Honor's

1    order and the fact that it is a "plenary" suit, in Judge Fee's

2    words, those issues affect the people who are not yet served.

3           THE COURT:  How are people on De Luz affected by

4    people up on Sandia?

5           MR. GROVER:  Well, the amount of water that people

6    get on De Luz Creek -- those who are riparian owners will have

7    to share it with the Government, since the Government is down

8    below them -- may depend upon --

9           THE COURT:  They are concerned with the Government

10   down below them.

11          MR. GROVER:  That is right.

12          THE COURT:  But are they concerned with people on

13   Sandia?

14          MR. GROVER:  If your Honor is to give the Government

15   a portion of De Luz Creek, you will have to consider how much

16   the Government will get from Sandia, because there isn't enough

17   water to go around for all of the theoretical prospective uses,

18   and if your Honor makes a quantitative apportionment of the

19   water, you must consider the Government at the very bottom of

20   the stream sharing in all the tributaries, you must consider

21   how much they get from each tributary before you can determine

22   how much they should get from another tributary.

23          Now I don't know this, your Honor, because I am not

24   familiar with all the procedural aspects of the case, but I did

25   understand that even all the people in the De Luz Creek area

1   hadn't been served.  That may be true.  But that, it seems to

2   me, is where you would have a plenary suit.  It is just as im-

3   portant as for a final judgment that they have notice of hear-

4   ings before the suit starts.

5        To go back to summary judgment, it is true that your

6   Honor may, as far as the Government and Fallbrook are concerned,

7   make a partial adjudication on this summary judgment.  But

8   there are other people not parties to this motion and not even

9   served yet, who may want to get Fallbrook out of the case on

10  the same grounds.  They may not have much to add to what the

11  Government has said here today, but theoretically your Honor

12  should accord them a hearing on exactly the same issues.

13       THE COURT:  The Clerk's office is open to the filing

14  of a motion.

15       MR. GROVER:  But as to the people who are not served,

16  your Honor, that certainly is not the answer.

17       More than that, there is a great deal of misunderstand-

18  ing as to your Honor's attitude about defaults.  There were

19  several things that were said at the schoolhouse on the first

20  day that it was not appropriate to bring up that day that later

21  on in the afternoon I would like to comment on.

22       It seems to me that your Honor may not yet appreciate

23  the responsibility of a plenary suit of this character when

24  people who, as a practical matter, are not going to have Counsel.

25       I would like to give an example of that.  One is the

1   offer of settlement by the United States.  Your Honor said that

2   day -- and I don't have a transcript and I am not trying to

3   give the exact words, but your Honor said that the rights of

4   the riparian owners were correlative and the water would have

5   to be shared.   Then there were allusions to the offer of settle-

6   ment which I don't think your Honor meant to say that you sponsor-

7   ed that offer, still you said that you had influenced the

8   Government to make such an offer, and they may actually have

9   thought that your Honor was behind the offer in some broader

10  way.

11          But the offer of settlement ignores one of the rights

12  that they have under the doctrine of natural uses.  As I under-

13  stand the law of California, the upper owner can take all he

14  wants for domestic uses.  He can dry it up as far as the lower

15  owner is concerned.   I think your Honor did not have that in

16  mind when you said that the water must be shared.  Your Honor

17  had in mind the irrigation uses, which are not under the doctrine

18  of natural uses, and that your Honor may have misled some of

19  these people into thinking that they had to share under any

20  circumstances.

21          And more than that, this offer of settlement gives

22  them a half acre of lawn and one family, one domestic household,

23  Actually, if there are ten domestic households on 500 acres,

24  they are entitled to all that is necessary for all those house-

25  holds.   If they had known that they didn't have to share for

1    domestic purposes with lower owners, their attitude toward that

2    settlement might be quite different.  They might have insisted,

3    those who had signed, "Well, I can get it for ten households,

4    because that is how many I have, rather than settling for one."

5    You remember the man who asked the question about the duplex.

6         All I mean to suggest is that the way the thing is

7    now, inadvertently your Honor may be prejudicing these people

8    by going ahead at the present time before they are all served

9    and by appearing to sponsor settlements of this character.

10         I saw in the paper the other day -- it is just a

11   newspaper item, but one of the ways we get notice in this case

12   is through the Riverside Enterprise; that was one of your Honor's

13   ideas -- Representative Saund says that defendants can get forms

14   for answering from Mr. Veeder.  I am not suggesting at all that

15   Mr. Veeder is not sincere in presenting such forms, but I

16   question whether it is Mr. Veeder's function to provide forms

17   for his opponents to answer.  I think we place a burden on him

18   that he can't possibly fulfil, particularly with his loyalty to

19   his client and the zeal that he has.

20         This offer of settlement, as I say, is less than the

21   minimum these people are entitled to, and I wonder if we should

22   suggest that they should go to Mr. Veeder for those forms.

23   There are attorneys in this County of the highest reputation

24   who will not touch this case.  It's so involved.  And that's

25   just part of the difficulty that people get into in this lawsuit.

1      THE COURT:  Would you like to try this case?  I would

2   be tickled to death.

3      MR. GROVER:  Your Honor, I have to make a living, I

4   pay the taxes that Mr. Veeder spends, and it's just beyond me.

5   I shouldn't be facetious about that.

6      THE COURT:  What would you suggest?  How would you

7   handle this?  We all know that we have problems.  But let's be

8   constructive.  What would you suggest?

9      MR. GROVER:  Well, the first thing that I think we

10   have to do is to wait until everyone is served before we go

11   ahead.  The trial was due to start this week, and under the

12   circumstance that not everyone has been served I just feel that

13   we must wait, and I would like to see us settle some of these

14   questions.

15      The arguments that were made today are the same as

16   we made I don't know how many months ago when we discussed

17   exactly the same issues, and we have no rulings on them, and

18   I think, your Honor, even though new ideas on these arguments

19   come up from time to time, I think we must make a stand and

20   know where we are going on some of them, even though we miss

21   the benefit of later reflection on them.

22      I had hoped that we would get a ruling on stream

23   prescription.  But today in these proceedings for the first

24   time we have the suggestion made that because of the Vail

25   judgment the Government is not absolutely the last owner on the

1  stream; something that after years of litigation was suggested

2  for the first time.

3      It does seem to me that if we would have some schedule

4  for definite rulings on these issues that we would make progress.

5      THE COURT:  The only reason we didn't make definite

6  rulings when we discussed some of these problems in pre-trial

7  and the one today, although it slops over into something we

8  have discussed before, is again a new problem, this question of

9  date of priority -- it has never been argued before, the Fall-

10  brook situation has never been argued before; the reason we

11  didn't make definite rulings is that we didn't have a pre-trial

12  stipulation or a factual record where we could make any ruling.

13  We are now in that position.

14      As a matter of fact, some of my thoughts are in accord

15  with yours.  I'm inclined to think that the actual trial of this

16  matter will probably have to be continued until after publication

17  of service of summons, and I am inclined to think that I should

18  be given some time to rule upon a number of the issues that

19  will be presented, in part by these motions, and where not

20  pointed up by motions make some pre-trial rulings and reduce

21  them to  writing in a memorandum for the assistance of Counsel

22  and the Master; and in that sense some of the things you are

23  thinking about are in accord with what I am thinking about.  I

24  contemplated that we would discuss them later this week.  If

25  you can't be here, we will have the benefit of your thoughts on

1   it today.

2          MR. GROVER:  I was going to suggest that the Master's

3   proceedings perhaps should be held up for the same reason --

4   after all, these pro pers have appearances to make, and perhaps

5   some of these issues should be settled, so that the proceedings

6   may be guided.

7          THE COURT:  I don't follow you on that.  We have

8   served the majority of these people in the De Luz area.  We

9   know there are people who will probably have to be served by

10  publication.  We will probably have to set a date for hearing

11  and ask them to come in at some later date.  But all these

12  people who appear before the Master are going to be given a

13  chance to appear before this Court at any time to complain about

14  the tentative findings of the Master and to be heard at any

15  stage of the proceedings.  Nobody is going to be cut off from

16  being heard.  We can take testimony from a man on De Luz as to

17  how many acres he has, how much is riparian, the character of

18  his land, what is irrigable.  I see no reason why that part of

19  it can't be heard before the Master, even though we are not

20  ready to progress with the rest of the case.  A part of this,

21  of course, is prompted by our desire to get on with this case.

22         MR. GROVER:  I understand, your Honor.

23         THE COURT:  I don't anticipate any problem there.

24  You can't try the whole case before the Master.  We are sending

25  the Master out to accommodate these people.  I didn't order

1   6000 people brought in here -- the Circuit Court did, and I

2   have tried to devise a procedure to make it easy for these

3   people and we are trying to do what we can for them. We are

4   sending the Master out to take testimony, not about all the

5   case, but about things that concern them particularly. I don't

6   know what else we can do.

7        MR. STAHLMAN:  May I make an observation on this

8   particular thing, your Honor. I have sat still all day.

9        THE COURT:  I think you are entitled to say something,

10  Mr. Stahlman.

11       MR. STAHLMAN:  We gathered together here on a number

12  of occasions and tried to work out these matters and be of

13  assistance to the Court and to each other. I have made trips

14  down here and Mr. Sachse has. We have tried to work out some

15  plan in this case and get some ideas. Mr. Grover wasn't here,

16  and your Honor invited all of the lawyers, and he could have

17  been here, and I think it would be nice if he could offer some

18  constructive assistance to the Court today. But all he has is

19  criticism of what has been done. I don't think that is going

20  to get us any place -- criticism about what is going on, without

21  a suggestion as to how it may be corrected or cured.

22       MR. GROVER:  My suggestion was that as long as there

23  is a person in the De Luz area who is not served -- it is just

24  simple due process -- I don't see how you can  bind him by

25  proceedings taken before.

1    THE COURT:  We have discussed that when you haven't

2    been here, Mr. Grover.

3    MR. GROVER:  I'm sorry.

4    THE COURT:  We think we know what we might be able

5    to do.  If we followed your suggestion on that, that everybody

6    had to be served, that summons had to be published against

7    everybody, then you would have to have a complete check made to

8    be sure that everybody had been served and appeared, to be sure

9    that everything had been  done in that connection.  No matter

10   how careful you were, there could well crop up some error,

11   either somebody was served by mistake or something -- there may

12   have been an affidavit of service on file that George Grover

13   was served and it turned out that it was not the George Grover.

14   Do you mean to say the Court would have to retry this whole case?

15   MR. GROVER:  No, your Honor.

16   THE COURT:  What we planned is that if we have some

17   loose ends later on, we will serve these people with notice of

18   further hearing and we will advise them that we propose to use

19   the record that has been made up to that  date and that we will

20   bring in for their cross-examination, for any inquiry they want

21   to make, any witness who has appeared and let them have as much

22   time as they want on the matter.  I think that would due pro-

23   cess.

24

25   But if we have to have a  certificate by a title

company that we have served every one of these people and that

1 we have the right person before we can turn a wheel in this case,

2 this case couldn't be tried for a long, long time, and then no

3 matter how careful you were somebody would pop up with, "My

4 name is Joe Doakes.  You have on file an affidavit of service

5 that I was served, but I was not served."  What are we going to

6 do?  Start the case all over again?

7          MR. GROVER:  That could happen in any case, and that

8 is the inequity of these suits, that there are so many parties

9 that you would have to so careful.

10          THE COURT:  What do you do then?

11          MR. GROVER:  If I may be permitted to say so, it was

12 not Judge Fee who ordered this.  Judge Fee didn't say that A

13 cannot sue B in a water suit.  If I may read from his opinion,

14 I would just like to have the exact language on that.

15          THE COURT:  You are going to talk yourself into an

16 order of this Court that you be here as this trial proceeds,

17 you know.  I'm just thinking about this.  You have appeared in

18 this case and you have these suggestions, which I welcome of

19 course.  Maybe I can't dispense with your presence and I may

20 have to make an order that you be here each day that this case

21 is tried.

22          MR. GROVER:  But just think what a hardship that

23 would be, your Honor.

24          THE COURT:  This case is a hard case.  Anybody who

25 says that it is not doesn't know about the case.  It is difficult

1  for everybody.  But you have some concrete suggestions, you

2  have some hocus-pocus that will let me decide this case in

3  ten or fifteen minutes or even ten or fifteen days, I'll be

4  glad to have it.  But to stand up here and criticize what we

5  have done and not make concrete suggestions -- I would be glad

6  to have them, if you have them.

7          MR. GROVER:  I meant to be constructive.

8          THE COURT:  What were you going to read from?

9          MR. GROVER:  Judge Fee says, on the last page, page

10  22 of the opinion:

11          "Since this action includes the entire watershed,

12      it is in the nature of a plenary suit to settle the

13      correlative right of everyone interested in the water."

14          That is what Judge Fee said, and it was Mr. Veeder

15  and not Judge Fee who included the entire watershed and made it

16  a plenary suit.  He says that the only proper way to adjudicate

17  the rights on a stream is to bring them in.  Now we had only

18  3000 people at that time and only two of the people got judg-

19  ment.

20          THE COURT:  How do you read that paragraph?

21          MR. GROVER:  All he is saying, your Honor, is that if

22  you have a plenary suit, if someone like the United States brings

23  a plenary suit, then it has got to be plenary.

24          THE COURT:  Do you read that decision that he hasn't

25  characterized this as being a plenary suit?

1   MR. GROVER:  That is right.  But I don't think it is

2   Judge Fee's fault.  I think the Government made it what it is.

3   THE COURT:  I am not talking about fault.  We are

4   talking about how the case got into the shape in which it is.

5   It went to the Circuit once and the Circuit, as I read the

6   decision, says that since the Government is the last owner on

7   the stream, everybody up above is affected.  They all have to

8   be parties.

9   MR. GROVER:  That is true.  I started to talk about

10   this once before and, as your Honor said, you didn't follow me.

11   But the distress that I see when people talk about it and that

12   people find themselves in has prompted me to talk about it again.

13   My position was that the Government could settle the important

14   issues it had with the important water users without bringing

15   in all these people, that it didn't have to be a plenary suit;

16   that engineers could go out and estimate, for all practical

17   purposes that were necessary, what uses would be made, and that

18   those could be used by the Court and by the parties and get

19   substantially all that they wanted in terms of the dispute that

20   the Government had with those people, and that it was a de-

21   liberate choice on the part of the Government to bring this

22   suit against all these people; and I suggested that since this

23   is a Court of equity and since it is such a hardship on them,

24   that your Honor could refuse to entertain that, where it did

25   cause this much distress unnecessarily, and the answer has been

all along, you see, that Judge Fee has ordered this.  But he

didn't order a plenary suit in the first instance; he merely

says that that is what the Government has.  Then they have got

to make it 100% instead of 50%.

Perhaps we ought to think about it more and argue it

some more.  But I haven't brought it up before, in part because

I thought your Honor was completely unreceptive to it.  But we

might argue whether we have to have this great big lawsuit,

with all the hardship that it involves, if we assume that Judge

Fee didn't order it, whether your Honor would consider using

your good offices to try to accomplish substantial justice for

the parties who are involved without requiring the other people

to get into it, because they are going to be adversely affected,

your Honor.  They can't afford the representation that would

be necessary.

THE COURT:  You have just talked yourself into a job.

I will ask you to file with me a written document with your

concrete suggestions as to how this suit should be handled.  I

would like to study it over.

I don't read that decision as you/read it.  I think that

is what happened before.  The Government went in against the

Santa Margarita and Judge Yankwich figured that that was the

simplest one to dispose of, and Judge Yankwich made an order

with reference to the Government's rights in the Santa Margarita.

I think that the Circuit might well have said that although this

1   has been characterized as a final judgment, we will treat it

2   as an interlocutory one, a part of the trial of the case, and

3   the case can go back for further trial and eventually one judg-

4   ment be entered.  But they didn't do that.  They set aside the

5   matter and they said, "Don't enter any final judgment until you

6   adjudicate all the rights on the River."  I read that decision

7   only one way.

8          MR. VEEDER:  Mr. Grover didn't read it the way it was

9   written.  That is the problem.  The Court says, "The only proper

10  method of adjudicating rights on the stream, whether riparian

11  or appropriative, is to have all the land in the watershed and

12  all appropriators who use water from the stream involved in

13  another watershed in Court at the same time."  He didn't read

14  it the way it is.  That's the problem.

15         MR. GROVER:  The one I read is the other one.

16         MR. VEEDER:  You skipped.

17         MR. GROVER:  The other one I said in substance.

18         The point I wanted to make was "the water rights" was

19  what he said.  Does Mr. Veeder really believe that A cannot sue

20  B when there are other people in the watershed and determine

21  their water rights?

22         THE COURT:  That isn't the problem.  The ordinary case

23  between A and B in a watershed is up in the middle of the water-

24  shed somewhere and involves some rights between A and B.  This is

25  an unusual case and I challenge you to show me one just like it

1    where the plaintiff is at the very bottom of the watershed.

2            MR. GROVER:  Santa Margarita vs. Vail.

3            THE COURT:  What?

4            MR. GROVER:  Santa Margarita vs. Vail.  They didn't

5    have everybody in that suit.

6            MR. VEEDER:  They tried.

7            MR. STAHLMAN:  I can tell you something about that.

8    A motion was made.  If Judge Fee's decision had been down at

9    that time, it would have been granted.  This case would have

10   been over years ago.

11           MR. GROVER:  May I say this about that.  That was not

12   briefed by anybody.

13           THE COURT:  Were you in the case at the time?

14           MR. GROVER:  Yes, your Honor.

15           THE COURT:  Did you petition for a re-hearing?

16           MR. GROVER:  No, your Honor.

17           THE COURT:  If you think a decision is not correct,

18   and before it becomes final, as a lawyer you know that you have

19   a right to go to the Circuit and say, "Here is something that

20   was not briefed.  May we brief this?  Will you reconsider this

21   problem?"  I wasn't in the case.

22           MR. GROVER:  No, I was not in the case when the

23   appellate decision came down.

24           But more than that, as I interpret it, that is his

25   reaction as to final judgments in this type of case, that if you

1    are going to have --

2         THE COURT:  He didn't sit alone.  He sat with two

3    other Judges.  It was a unanimous decision.

4         MR. GROVER:  Yes, I don't mean to suggest that it was

5    not at all.  But I just thought when I heard your Honor say

6    yesterday that Mr. Veeder didn't do it, with reference to all

7    of these parties, that perhaps if your Honor appreciated that

8    the remarks of the Ninth Circuit were made after Mr. Veeder did

9    do it, after he or whoever authorizes --

10        THE COURT:  I have enough to decide without worrying

11   about whether Mr. Veeder was wrong in what he did.

12        MR. GROVER:  You met the point when you said that,

13   your Honor, and that is what I would say, that the United States

14   did it.

15        But it was the plaintiff who characterized the type

16   of suit that we have, and I think without realizing perhaps the

17   difficulties that would be involved.

18        THE COURT:  Don't forget, you could have a suit by

19   one party restraining another party from doing certain things

20   that interfere with their rights.  But when you bring a suit to

21   quiet title to your rights,  and you are the bottom owner,

22   those  rights that you want to quiet title to affect all the

23   people up above you, and I am not here to pass on whether the

24   Government is right or wrong.  But the Government spent a lot

25   of money for the Rancho Santa Margarita.  They built a military

1    establishment.  They are entitled to have their rights adjudicated,

2    just the same as you would be if you represented a client who

3    had bought that Rancho and had spent money for it and you claim-

4    ed that there were interferences with your rights above -- you

5    would have that right.  I'm not here to decide whether this was

6    the thing to do or not to do.  Maybe another alternative would

7    have been to condemn some water, maybe another alternative would

8    have been to have bought water.  That is not my job to decide

9    those things.

M9A

1    THE COURT:  I should like to have you write down in

2    writing and put your name on it as attorney for your client

3    and your suggestions of how this case ought to be tried and

4    what we are doing wrong and what we can do to correct it.

5    And I will be glad to read it over, look it over.

6        MR. GROVER:  Your Honor, I didn't offer the suggestions

7    in any way as criticism other than to suggest improvements.

8    And one that I have in mind right now is that we should wait

9    until everybody is served; and that when we have hearings on

10   summary judgment at Fallbrook before (inaudible) we should

11   be in a position that that could be disposed of as to all

12   parties so that we aren't proceeding in such piecemeal

13   fashion.

14       THE COURT:  I know you can do a better job in writing

15   this out than you do orally.  I know that if you put this

16   down in writing, you will do a better job than you do orally,

17   and I can see it.

18       MR. GROVER:  Thank you.  The principal thing that I have

19   here is, of course, the motion to dismiss, and I don't know

20   whether your Honor wants to take that now.  We move to dis-

21   miss Counts 21, 22, and 24 of the Complaint.

22       THE COURT:  Couldn't you afford us the time to be here

23   tomorrow?

24       MR. GROVER:  I can be here tomorrow.

25       THE COURT:  We are all putting a lot of time in this.

1    If you want to, I will schedule you the first thing tomorrow

2    morning, let you lead out on that.  Is that agreeable?  Is

3    that agreeable?

4         MR. GROVER:  With me, yes.

5         THE COURT:  And how long a time would you want to file

6    this memorandum?  I want suggestions.  Five, ten days?

7         MR. GROVER:  Ten days, at least, your Honor.

8         THE COURT:  Whenever you would like to have it.  What I

9    am thinking about is this.  I mentioned this to Mr. Veeder.

10   I haven't mentioned it yet to Mr. Sachse.  Not that there is

11   any secret about it, but I mentioned when these arguments

12   are over with I probably want time to formulate some decisions

13   and memorandums, and that we might well put over the trial.

14        MR. SACHSE:  Mr. Veeder showed me his little memorandum

15   on it.

16        THE COURT:  Or asked him to prepare something, and he

17   showed it.  Well then, you know what the discussion is.  We

18   will take that up later.  And that fits in line with some

19   of the suggestions you made.

20        MR. SACHSE:  Your Honor, one thought on it.  I mentioned

21   it to Mr. Veeder at noon.  I think Mr. Cranston is quite

22   concerned.  He expressed it to me and to Mr. Veeder, if it

23   is humanly possible, to try to get a statement out about what

24   he is going to do next week, because he has scheduled hearings.

25   And if there was any thought of stopping them, the word

1    should be available for publication in the local paper which

2    has a Wednesday noon deadline.  So if there is any thought of

3    stopping next week's master hearings, we ought to do it.

4        THE COURT:  Think it over this evening.

5        MR. SACHSE:  If we decide in the morning, we could phone.

6        THE COURT:  You heard what Mr. Grover had to say.

7        MR. SACHSE:  I don't necessarily think --

8        THE COURT:  I don't see any jurisdiction defect since

9    these are master's hearings.  No master ever heard all of the

10   case, and obviously you couldn't put all these people in one

11   room.  Nobody would argue for that.  Therefore, we do it the

12   most logical way we can.  We say, "Well, take it tributary

13   by tributary."  We start with De Luz.  We get as much word

14   out as we can on De Luz that this is what we are talking

15   about.  Other people can be there if they want to, but this

16   is primarily their show.  And later when findings are made

17   on De Luz and they are made on Sandia, this all has to be

18   woven into a decree. If at that time you want to hear what

19   the program was, then to send out notice to everyone.  They

20   have a right to be heard on the way the adoption of these

21   various findings were made and the weaving of them into a

22   decree.  And that is all a landowner would have a right to

23   talk about it anyhow.  He has certain land over on one side

24   of the watershed and somebody has some over on another

25   tributary.  The correlative rights are involved.  They have a

1  chance to be heard, a right to be heard.  What more can we

2  ask?  More than that, the door is open for any of these

3  people any time to come in to offer further evidence or to

4  raise any question that they want to raise.  You can't put

5  6,000 people in one auditorium.

6      MR. VEEDER:  I truly believe that if Mr. Grover had read

7  your order on reference, many of these things wouldn't have

8  been brought up, because you covered every one of those

9  points.

10     THE COURT:  Did you read the order?

11     MR. VEEDER:  Did you read it?

12     MR. GROVER:  Yes, I did.  I understand, your Honor, that

13  the areas have to be broken down.  That is a perfectly satis-

14  factory procedure, and I don't see any other way.  But as I

15  understand it, some people involved in that area have not

16  been served, you see.  And that was what was disturbing about

17  the master's proceedings.

18     THE COURT:  It disturbed all of us.  We have been over

19  this three or four times.  But give me your answer to the

20  situation.  There are ten people.  After you get a certificate

21  from the title company that you have served everybody, ten

22  people show up and say, "My name is so-and-so.  You have an

23  affidavit you served me, but I am not the fellow.  You served

24  the wrong man."  Then, what do you do, try the case all over

25  again?  Or do you work out some kind of procedure to give

1 subsidy, due process to this man who says he didn't get in on

2 the show?

3     MR. GROVER:  I think your Honor should do everything

4 that you can, subject to possible error, which is when you

5 know some people have not been served; but that you should

6 wait.  I think there is that difference.

7     THE COURT:  Anybody that has any ideas about postponing

8 the master's hearings, I will hear them first thing in the

9 morning, 10:00 o'clock, and then I will hear Mr. Grover.

10     Adjourn until 10:00 o'clock tomorrow morning.

11     (Whereupon at 4:30 o'clock p.m. an adjournment was taken

12 until Wednesday, June 18, 1958, at 10:00 a.m.)

13

14

15     - - -

16

17

18

19

20

21

22

23

24

25