# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA
### SOUTHERN
### ~~CENTRAL~~ DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

        Plaintiff,

   vs.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al,

       Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:              San Diego, California

Date:              Wednesday, June 18, 1958

Pages:           1668 to 1824

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**JOHN SWADER**
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELMONT 4.6211 • EXT. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al, | ) | |
| Defendants. | ) | |

- - -

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, June 18, 1958

- - -

APPEARANCES:

    For the Plaintiff:    WILLIAM H. VEEDER, Esq.
                                  WILLIAM E. BURBY, Esq.
                                  Special Assistants to the
                                  Attorney General
                                  Department of Justice
                                  Washington, D. C.

- - -

APPEARANCES (continued):

| | |
|---|---|
| For U. S. Marine Corps: | COL. ELLIOT ROBERTSON<br>LT. COL. A. C. BOWEN<br>LT. DAVID MILLER |
| For Defendant Vail Company: | GEORGE E. STAHLMAN, Esq. |
| For Defendants Fallbrook Public Utility District, Goodchap, Sachse, et al: | F. R. SACHSE, Esq. |
| For Defendant State of California: | EDMUND G. BROWN, Esq.<br>Attorney-General, by<br>ADOLPHUS MOSKOVITZ, Esq.<br>Deputy Attorney-General |
| For Defendants Gibbon and Cottle and<br><br>For Defendants Halde: | GEORGE GROVER, Esq. |
| For Defendant Santa Margarita Mutual Water Co.: | W. B. DENNIS, Esq. |
| For Defendants Bennett and Knox: | TRENT G. ANDERSON, Esq. |
| For Defendant Querry: | CLAYTON L. HOWLAND, Esq. |
| For Defendants Suderman: | G. NORMAN KENNEDY, Esq. |

A1
ML

SAN DIEGO, CALIFORNIA, WEDNESDAY, JUNE 18, 1958, 10:00 A. M.

- - -

THE CLERK:  Case No. 1247-SD-C, United States vs. Fallbrook.  For further hearing.

THE COURT:  The first thing we were going to talk about was whether anyone had any suggestions in connection with the continuance of the master's hearings and the present status of the case.

Mr. Dennis.

MR. DENNIS:  I will make a suggestion.  I think I am the only party in this action that was in it originally at the time it was tried originally.  And I think all of the procedures that we have taken today either met with my approval or I have consented to them; so I have no criticism of what we have done today.

However, I have given the matter some thought, and I think that if the court would reset this case for trial and continue this trial to sometime in the fall of this year and instruct counsel for plaintiff to send out the adequate notices reflecting either the continuance or the setting of the case for trial to that date, and then instruct the master and all of the interested parties to proceed with due diligence to conclude the hearings at De Luz watershed and the master prepare his findings and conclusions; and anybody who is dissatisfied to object in accordance with the

order appointing the master.  That at the time the objections come on for hearing before this court that we then sit down and reconsider our actions in the past and at that time make an effort to determine whether or not we have accomplished what we intended to accomplish; that is, bringing this action to a speedy conclusion and evolving a method procedure which would protect, so far as possible, the small landowners and the riparian landowners on the Santa Margarita River; taking into consideration at that time whether or not we are comply-ing with the various Federal rules and the rules which govern the trial of an action in so far as avoiding any prejudicial error in connection with the proceedings.  In the meantime, of course, all of the parties involved would be at liberty to make any motions or take any proceedings which they wish which would be preliminary to the trial of the action.

THE COURT:  Thank you, Mr. Dennis.

Mr. Grover.

MR. GROVER:  Your Honor, my concern about the master's hearings is the same as that for the trial.  I would concur that we should put the trial off until probably some-time this fall.  But in the case of the master's hearings, too, while I realize that they have begun, nevertheless it does seem to me that  those who have not been served in that area are going to be at a disadvantage and possibly the

matter may be raised on appeal if they are not there when

all the other cases are put on.  It is a fact -- it isn't

a frequent fact -- but it is a fact that throughout the water-

shed there are neighbors who are in disagreement.  Perhaps

they wouldn't have sued had there not been this case, but now

that they are in the case and are at issue with each other

they do have conflicts of interest which they will have to

thresh out.  And if any of those were to come in at a later

time, then the parties with whom they have particular con-

troversies would also have to be called back along with any

Government witnesses; and it would make it difficult and,

to a great extent, vitiate the benefits of having gone ahead

with the master's hearings.

THE COURT:  I have a thought on that, and it was

this:  Let's assume for argument there were ten or fifteen

people in De Luz that hadn't been served; had to be published.

This could be multiplied throughout the watershed.  We would

have to get our record, serve notice on them of hearing,

assure them that they could have as full a hearing as they

wanted, try to use the transcript that had been made as

possibly to direct them to a witness, making the witness

available for cross, see if anybody wanted to cross examine

that witness.  And I think if that was done, that would be

due process.  And the person who had that right, to go as far

as he wanted to any witness and make what showing he wanted,

call any witness back who had been there before.  What more could he ask?

MR. GROVER:  That could be done, your Honor, but I did have some remarks.  I have been thinking and trying to be more constructive now over the evening.  I think that it would be of great benefit if before we have any more of the trial for many of these people, before we have any trial of any kind if we could have a definite pretrial opinion on the law --

THE COURT:  Now, let me interrupt you there.  I am in accord with what Mr. Dennis said.  I thought he put this very succinctly, and it was a very constructive suggestion. I, as I said, have discussed it with Mr. Veeder.  There isn't any secret about it.  I asked him to prepare a draft of something, which he showed to Mr. Sachse, and I suppose some of the rest of you have seen it, and I suggested that possibly the trial itself should go over.  When these hearings end on these motions, I should give myself a week or two weeks to formulate the memorandum of counsel, my rulings on a number of these matters, my rulings on some of the pretrial proposi- tions that have been discussed, some of which I tentatively have expressed an opinion on; get something in the hands of counsel and the master who sort of crystallize where we are to date.  I also contemplated, if not discussed it, that we could take this additional time and further work on a

formulation of issues.  Now, there has been some work done
on that, but that hasn't been accomplished.  And with a
memorandum of the court's views on various of these problems
that would crystallize itself very rapidly.  And then, put
the trial over to a date beyond expiration of the period of
publication, and go on from there.

MR. GROVER:  My thought was that that would be
of tremendous importance to all the people who are going to
hit this case rather piecemeal and perhaps without counsel
even.  Because if those issues were settled ahead of time
before they had to make their case, before even they had to
make their answer -- although I know your Honor isn't going
to hold to any technicalities on the answers.

THE COURT:  They have a right to amend at any time
on the answers, so we have no problem there.

MR. GROVER:  That is right.  But before they have
to actually put on their case it would seem to me it would be
of tremendous benefit for them to have the advantage of your
Honor's rulings knowing not only how the case is going to
proceed from your Honor's viewpoint but also learning a great
deal about things that aren't in controversy but which they
don't know.

THE COURT:  I haven't been avoiding makeing rules.
One of my favorite expressions is:  I may be in error but I
am seldom in doubt.  There isn't any question of trying to

avoid the decisions.  I postponed some decisions originally

because I didn't think we were in a place where they could

be made.  But I think we are in a place now where most, if

not all of these, at least can be made, and the air cleared

as to what my position is going to be.

MR. GROVER:  My only thought was, your Honor, it

would help a great deal to the people down in the De Luz

area if that would be your answer.

MR. VEEDER:  Have you clients in the De Luz area?

MR. GROVER:  No, I have not.  I am trying to be

constructive.

MR. STAHLMAN:  Have you ever attended the master's

meetings up there?

MR. GROVER:  I attended the first few.

MR. STAHLMAN:  We were there during all the

meetings.

MR. GROVER:  I am sure you are well advised, Mr.

Stahlman.

MR. SACHSE:  Your Honor, I find myself in a

little disagreement with George Grover and in agreement with

Bill Dennis.  I don't see that there is any great point in

stopping the De Luz hearings.  I recognize there is a hazard

when your Honor expressed that someone might come in and force

us to reopen.  Frankly, I think the hazard is infinitesimal.

I will say in passing I have no individual De Luz clients.

1876

I expect there are even pro pers. But I think a great deal could be accomplished by following Mr. Dennis's suggestion: go ahead with the De Luz hearings. I don't think very many of these big legal issues that are involved in the rulings that we all hope are forthcoming which are going to affect our trial at De Luz very much. I think it is, by and large, a question of facts, and I personally would be very much interested in seeing a master's report. I think it is too much to expect that all parties agree that it is a satis-factory report. And I am not now speaking of the details of his findings; I am speaking rather of the form of them, the matters he takes up, how he handles mixed law and fact. There are going to be all sorts of questions about what the master does that are going to affect us as he gets farther up the stream. I would like very much to have just what Mr. Dennis suggested, a set of findings on a relatively simple stream, which we can, if there is anything that we can isolate on this river at all, it is De Luz Creek. We can't isolate it, but it comes as close as being a little package of its own as anything. And I am very much in favor of Mr. Dennis's suggestion. However, I do want to second Mr. Grover. I hope that we can have the benefit for the big trial just as soon as your Honor can get them out, of the rulings that will eliminate, if possible, or settle as many of these issues. But as far as De Luz goes I think we ought

1    to keep right on going.

2            THE COURT:  De Luz becomes almost a little pilot

3    plant to see how this procedure works and to profit by the

4    mistakes and by correct procedures and be better prepared

5    to thereafter try other areas.  I contemplate to get this

6    case going and after we conclude the trial here if it can

7    work out the master may hold hearings in some areas and I may

8    hold hearings in others.  I am not adverse to going out and

9    taking the court out to Temecula or the Anza Valley and trying

10   to bring this to a conclusion as soon as we can.

11           Mr. Stahlman.

12           MR. STAHLMAN:  Your Honor, painful as it is, I

13   sort of agree with Mr. Sachse.  He was present at all those

14   hearings, and I was present at hearings in De Luz and I think

15   as a trial balloon it has accomplished in this respect.  In

16   the first place we know that this very complicated lawsuit

17   has created a great many misconceived opinions as to what it

18   is about in conflict between people.  And we found out at

19   the De Luz hearings progressed there was quite a crowd the

20   first day, but they tapered off and the agitation was gone,

21   which I think is an important thing in a case of this kind.

22   The fact of the matter is, you could shoot a shotgun through

23   the schoolhouse there.  I think the average attendance was

24   about three or four after the hearings got started.  And I

25   think get into hearing these matters and the people see what's

going on, we have done a great deal to sort of pour a little
oil on the troubled waters so that we know the way this case
is headed and isn't thought too much of. And now, this matter
of putting the case off, I see the necessity of it. However,
I think time should be the essence, because there is a great
deal of feeling, and I have it, and we have at Vail. Of
course, we have been in litigation for years and years, and
now we are back into a case in which the same issues prac-
tically are to be tried over, many of the same. And we are
hopeful all the Vails won't be dead before this case is
finally completed. So I think that when we talk about a date
that the case is to be continued, that it should be anchored
to good solid reason and necessity by considering the factors
that have to be done, and that they should be done as
expeditiously as possible, and then the case should get on its
way.

Now, another phase of the matter that concerns me
greatly -- and I think I feel thepulse of the people in that
community probably more sensitively than some of the lawyers
who don't live in the community. This matter here, we have
got a great deal of concern up there over this case. The
people, particularly on the Temecula and the Santa Margarita
that are riparian but have been in the condemnation, now,
they don't know whether this condemnation is going ahead.
Sometimes they say it will; sometimes they say it won't.

1  Going to take immediate possession one day, and the next day

2  it is abandoned.  And they don't know whether their property

3  is going to be taken or whether it is not going to be taken.

4  And they have been struggling along with that problem for

5  some time.  And I think that if there is going to be any

6  continuance -- and I am talking against my pocketbook when

7  I say this to the court -- that the case should be in status

8  quo.  There shouldn't be these manipulations and movements

9  and advantages that are attempted to be taken of some other

10  person on the stream.  That condition shifts rapidly, and

11  every time it shifts it raises greater doubt and greater

12  concern and greater suffering on the part of some of those

13  people.  And if there is any necessity of this matter being

14  continued, I strongly feel that all of the factors in this

15  case -- I think it should have been done long ago in the

16  early stages of this case -- that the court should have

17  required that all the parties to the case not change their

18  position in connection with this case where there is a

19  possibility of injury to other persons.

20          MR. GROVER:  Excuse me.  I did have a few more

21  remarks related but not right on that, if there is time.

22          THE COURT:  Very well.

23          MR. GROVER:  I am frank to admit that I have no

24  clients in the De Luz Area, and I am not familiar with the

25  way the trial has proceeded there.  I know the appointment of

the master and the way he has conducted himself has done a great deal to satisfy a lot of people who are concerned.  I think, however, that a great deal could be accomplished if we do a couple of other things before we actually get to trial.  I am speaking generally now and not specifically of the De Luz area.  The appointment of the master, as I recall somewhat little I saw when I participated in the early stages about a year ago, the appointment of the master was in recognition on the part of the court that something practical had to be done.  The master is being financed, as I understand it, by the United States, which is rather unusual.  And more than that, your Honor said that the smaller people would never have to pay for the master's costs as a part of the cost of the suit, although some of the larger parties might have to share if it came to a matter of costs. In other words, as chancellor, your Honor has already imposed upon the United States the financial burden in recognition of the fact that the United States, simply because it is our Government and is well financed, is in a position -- and I don't mean that they do it intentionally, but they are just naturally in a position to overwhelm people who can't take care of themselves.  And the master is serving a very valuable function in that connection.

B-1

It seems to me that if your Honor could appoint an engineer in the same spirit that a great deal of the trouble of this trial could be dispensed with.  I may have confidence in Major Bowen -- I have known him for several years, but a great many people don't because he represents the opposition in this case and they don't know him.  But if there were an independent engineer who carried out the interests of the Court rather than the interests of simply one party, and if the method of financing his services could be obtained, people could get from him the same type of service which they are getting from the Master, and if, after we have a definite resolution of some of the major legal questions, the engineer could just go around and advise people, in most cases it would take care of their problem.

Now your Honor has invited me to offer a memorandum, and that is one of the things on which I would like to elaborate. I merely am suggesting it now so that other people can be thinking about it.

Another thing that occurs to me is that an absolute plenary judgment in this case really isn't necessary and may not be helpful, your Honor.  That's the thing that concerned me so much, because I am not sure that the United States is getting the benefit of all the trouble that everyone is going to, including the United States.  There will be many people who are riparian to the stream who are not using water today and the judgment will merely state that they are riparian and they may

1    at some future time use water.

2           Now your Honor may or may not come to an actual ap-

3    portionment, in quantitative terms, of the water that is availa-

4    ble in this year. You may retain jurisdiction to do it year

5    by year, etc. But until that man begins to use water, we are

6    not going to apportion him anything, and when he does start to

7    use water it is going to depend on how many other people at the

8    same time are increased, and it is going to depend every year

9    on the weather and upon the status of the basins for previous

10   years. So that the actual physical apportionment, the practical

11   benefit of the decree, as far as that man is concerned, is

12   going to be a continuing engineering problem. So that that

13   man could be gotten out of the case right now if we merely de-

14   cided ahead of time what his legal rights are and let him talk

15   with engineers so that we have some idea what the status of his

16   property is without any great controversy, and if he is satisfied

17   that the major legal questions have been resolved by the Court

18   the engineers advise them and in the light of those then we

19   could dispense with them; and we don't need him in the case,

20   because getting a more definite judgment in the case isn't

21   going to help us this year or next year if he is not using water.

22           Again, these are tentative thoughts, and I will admit

23   that I am late on this. I have only small clients.

24           MR. VEEDER:  Too late and too little, without any

25   knowledge.

1      MR. GROVER:  And stupid, as was said yesterday.

2      But at the same time, your Honor, as the service took

3 place and as the condition of the people became more apparent

4 to me from conversations, the practical implications and some

5 of the practical things that might be done also occurred to me,

6 and late as it is I don't think it is too late and I think it

7 will save time in the end.

8      We had a trial.  We went up and, although the Circuit

9 Court put the ruling of reversal on one issue primarily, and

10 I'm not going into whether there were any other things in it

11 besides dictum, nevertheless there was quite a bit of dictum

12 based upon very careful briefing, and still we don't know what

13 the issues are.  I know that your Honor is about to rule on

14 them.  But if we could have just taken the benefit of the Court

15 of Appeals and made progress from that point on instead of, in

16 effect, throwing away all the work that went into the appeal,

17 we would be further along; and if we can be practical again now

18 and not worry about people whose rights are small and whose

19 rights are unnecessary, really, to be determined, but at the

20 same time find some way to protect, I think we can make pro-

21 gress.

22      Another thought that occurred to me is that, while

23 no attorney of course can estop the United States anymore than

24 the Secretary of the Interior could in the Tidelands case and

25 only Congress and the Court can, nevertheless orderly procedure

1  at this trial requires that at some time the United States

2  decide, for this trial, whether or not it is going to rely, for

3  example, on the application.

4        And another thing I should like to have the United

5  States decide ahead of time -- I realize that there is con-

6  troversy on this, again, and I am merely making the suggestion --

7  is the type of project which they have in mind. At the first

8  trial Mr. Henderson testified to a certain type of project. I

9  don't know whether that is still the plan of the United States

10  or not. But at the same time, if it is true, as we contended

11  on the appeal and as the Court of Appeals suggests, that a

12  riparian owner cannot store water by reason of his riparian

13  right, then if we could thresh that out ahead of time in terms

14  of the project that the United States contemplates before we

15  actually go into the trial it would go a long ways toward de-

16  termining what the United States might get out of this trial.

17  As your Honor said at the very beginning, if the Court of Appeals

18  is right the United States had a lot of trouble, and if the

19  United States knew where it stood early in the game on those

20  things it would be helpful.

21        THE COURT:  On this matter of the Government storing

22  water -- maybe I am over-simplifying it, but once water has

23  reached the enclave, I don't know of anything that prevents the

24  United States from storing it there.

25        MR. GROVER:  That is a distinction that is important.

B-2

We must bear in mind, your Honor, that once the water reaches the enclave it is the Government's, and it wouldn't matter whether it were the Government or myself living down there.

THE COURT: There is no prohibition against dams on the enclave.

MR. GROVER: Not at all. They can build all the dams they want.

THE COURT: The Government has never proposed a project except on the enclave, have they?

MR. GROVER: No, barring some of the Indian land business, about which we are not talking now. But the point is that the Government wants an injunction to require other people to fill the reservoir behind the dam, and that brings the impact of the judgment upstream.

THE COURT: Oh, yes, the Government wants a declaration of what its rights are and to have the water come down that stream.

MR. GROVER: I wouldn't suggest for a minute that --

THE COURT: Well, how would any exploration of what the Government proposes in the way of a project assist us at all?

MR. GROVER: I think the question is simpler than it may appear on the surface. Under Moore vs. California-Oregon Power Co., where storage was not permitted even overnight -- you see, the essence of the ban on storage by a riparian owner

1    is for use at a later time.  He can store for electric power if

2    he is going to use it right now, and he can take a few minutes

3    or hours or whatever is involved for getting ahead with his

4    electricity.  But he can't store for electricity for tomorrow,

5    because that involves storage for a later time.  The point is

6    that it doesn't matter how late the time is.

7          Now it is hard for me to imagine any kind of storage

8    project that the United States had there for purposes of use

9    at a later time that wouldn't be outside the riparian rights.

10          THE COURT:  You mean in the enclave?

11          MR. GROVER:  In the enclave, but with water to be

12   ordered down by the Court.

13          THE COURT:  Why don't you separate in your thinking

14   what they build and their right to have water come down the

15   River?  What they build has no relation whatsoever to their

16   rights to have water come down the River.  They have some rights

17   to have water come down the River.  When that water comes down,

18   it doesn't make any difference whether they build a 10-foot or

19   100-foot dam.

20          MR. GROVER:  That is right, your Honor, and I meant

21   to have that discussion carried over from a moment ago.  But

22   they want your Honor to order the water down to fill the dam.

23          THE COURT:  Well, they are  not insisting that any

24   order have any relationship to any structure down there.  They

25   want an order that certain water come down the River.  But what

1   they do with it when it gets down there -- if they want to

2   bottle it up and save it, if they want to build a dam, if they

3   want to pour it into the ground -- once the water comes down,

4   as I see it, it is their business what they want to do with it.

5         MR. GROVER:  Suppose they want to take it out of the

6   watershed.

7         THE COURT:  If they have the right to have a certain

8   amount of water come down there, --

9         MR. GROVER:  I think this is an important distinction,

10   your Honor, and --

11         MR. VEEDER:  Had he been here he would have heard what

12   we said about it.  We have always said that as a riparian

13   claimant we couldn't demand water to be released downstream to

14   us for impounding.  I have said that a million times.  I said

15   that we can't demand riparian water downstream to us and take it

16   out of the watershed as a riparian right.  I don't know what

17   more --

18         THE COURT:  Well, your appropriative rights are maybe

19   different.

20         MR. VEEDER:  Had he been here, he would have heard it.

21         MR. GROVER:  I did hear it.

22         MR. VEEDER:  You are laboring it some more.

23         MR. GROVER:  I am not laboring it, Mr. Veeder, and

24   the issue is not whether I remember or whether I was here.  The

25   issue is a legal one that I do want to be heard on.  I was here

1       But the point is that if they didn't want to even use

2    it on the watershed -- suppose that they announced that they

3    never were going to use it in the watershed.  Would your Honor

4    ever give them an injunction?

5       THE COURT:  It depends on the kind of water.

6       MR. GROVER:  I mean under a riparian right.

7       THE COURT:  In other words, you have a different pro-

8    blem on their riparian rights and on their appropriative rights.

9    Suppose they have rights going back to 1883.

10      MR. GROVER:  Granted.

11      THE COURT:  An appropriative right.  I think it pro-

12   bably stands in a different category than a riparian right.

13      MR. GROVER:  Granted, your Honor.  But limiting it for

14   a moment to a riparian right, could they get an injunction if

15   they admittedly were not going to use the water anywhere but

16   outside the watershed?  It is true that if that water is left

17   over after other people take their rights, the United States

18   could use the water.

19      THE COURT:  They have disclaimed any contention that

20   they can use riparian water outside the watershed.

21      MR. GROVER:  I concede that Mr. Veeder made that quite

22   clear, and now at this trial it is quite clear -- and I should

23   say that Mr. Veeder was not Counsel at the first trial.  But on

24   the storage I don't think it is quite so clear, because I think

25   the Government has plans to introduce water, pursuant to  its

riparian right, into the underground by artificial means, and to ask your Honor to order water to be released to be introduced into the underground artificially at a later time; and I think if we could thresh that out and if your Honor should hold with what I believe to be the law that it would simplify the trial a great deal.

But as I said, I think this was merely another example of the United States being asked to make clear at some time, in the interests of orderly procedure, what their position on certain points is, and the most important one there is their position on the application for an appropriation. Ultimately they will have to decide, and I think that that is one of the things that should be handled before the trial.

THE COURT: That would come under the head of some work on these issues.

MR. GROVER: That is right, your Honor.

MR. MOSKOVITZ: Your Honor, I for one want to go on record as believing that Mr. Grover has made a very important contribution. I know that he can, possibly, be criticized for not having been present at previous discussions of this type, but he does represent a client to a limited extent and he has taken the trouble and effort and subjected himself to criticism in making these suggestions, which I know come in good faith, and I for one want to say that I thank him for doing so.

THE COURT: The Court appreciates his suggestions. I

don't want to be understood that I haven't appreciated them.
I know his background and experience and I appreciate his con-
tribution.

MR. MOSKOVITZ:  I appreciate that you do, your Honor,
and I want to state that, though there might have been hostile
criticism by others against him around the Counsel table, that
I don't join in them.  I want to make that plain.

MR. VEEDER:  We will stipulate to that.

MR. MOSKOVITZ:  I do believe that Mr. Dennis' sug-
gestions for the future are, in the main, sound.

I have the same trepidations that Mr. Grover has
expressed, the technical objections that could be raised by
some people who have not been served, but I do feel that it is
a calculated risk and probably not a very great one, and I think
that with the De Luz hearings already underway they should be
continued in progress.

I think that if, in the future, some landowner who
has not been served comes in and says, "I have been deprived of
my right to hear the evidence as it was presented by the wit-
nesses, to be present at the time, to cross-examine the witnesses
at that time," I think that could be solved by making available
to him a transcript of the proceedings.  It is not the same as
being there, but I think probably we can overcome that objection.
I would recommend going ahead.

THE COURT:  A transcript of the proceedings, plus the

1  right to have present any witness whom he wants to interrogate.

2       MR. MOSKOVITZ:  That is right.  But what I mean is

3  that I don't think he could insist that he have the witness

4  state over again orally in the same way as the witness stated

5  originally the evidence.  I don't think he could do that.  But

6  those problems, I think, can be faced when they come up, and

7  they may never arise as a practical matter.  So I'm satisfied

8  to endorse Mr. Dennis', Mr. Sachse's and Mr. Stahlman's sug-

9  gestions and just go on record as so stated.

10      MR. DENNIS:  My thought on the De Luz watershed, your

11 Honor, is that we have already spent a number of days in trial

12 before the Master, we have made considerable headway, and actually

13 what we are getting is a trial run, and I think that at the

14 time the Master prepares his findings and his conclusions and

15 at the time for the objections or having an opportunity of

16 seeing the objections that the various parties may make, that

17 the Court and Counsel will be in a much better position to

18 decide some of these questions that are bothering us at this

19 time.  I think we will be able to do it much more intelligently

20 at that time because we will be in a position at that time that

21 at least some of the parties, as to a majority of the issues,

22 will have to make their positions  clear.  I think it will aid

23 the Court in arriving at a decision as to this summary matter

24 that has been presented to the Court from time to time in having

25 a chance to view the conclusions and findings of the Master and

1   the chance to consider the objections which will undoubtedly be

2   made by parties on both sides to some of the findings and con-

3   clusions that will be had.

4   One thing I forgot. I do think that there should be

5   some understanding with the plaintiff that they will proceed

6   with due diligence either to serve the remaining defendants and

7   to start publication of summons against those defendants who

8   cannot be served.

9   THE COURT: There is no problem there. They are

10  working hard on that.

11  MR. DENNIS: Yes.

12  MR. SACHSE: Your Honor, I don't want my silence to

13  be misconstrued. I appreciate Mr. Stahlman's agreeing with me

14  on even half an issue. I do not agree in any way, shape or

15  form, to this "status quo" argument. I think your Honor stated

16  it very succinctly in questioning Mr. Veeder yesterday. I do

17  not acknowledge that anybody can stop us from condemning land.

18  We have had a trial go up to the Supreme Court of the State of

19  California now telling us that we could. Your Honor stated

20  here yesterday that you recognize that we have a right to build

21  a dam, although you, in turn, have the absolute right to tell

22  us to put a hole in it if you so desire, and I have been in-

23  structed positively that I will not consent to any delays in

24  going ahead with our project as best we can. If any party wants

25  to take proper legal means to attempt to enjoin us, of course,

1  I can't prevent them.  On the other hand, I cannot stipulate

2  beyond the instructions of my client and I do not stipulate to

3  any maintenance of the status quo.

4      THE COURT:  We will probably follow, generally, Mr.

5  Dennis' suggestions, but we will pass it up for the time being

6  and take care of it before we conclude these sessions.

7      I might point out one other thing.  This delay isn't

8  as harmful as it might sound, for the reason that the vacation

9  period intervenes where all of Counsel and the Court expect to

10  have some little time away from their duties.  In addition, the

11  Court would like a week or two on some of these legal problems.

12  So you wind up with five or six weeks' time that has to be taken

13  out in any event.  In fact the delay would come at a good time,

14  over the summer season.

15      Are we ready to proceed?  Have we finished the argu-

16  ments on the Government's motion for summary judgment and the

17  argument of the defense?

18      MR. VEEDER:  Yes, your Honor.

19      MR. SACHSE:  I will submit it, your Honor.

20      THE COURT:  That matter will be submitted.

21      MR. VEEDER:  Are we going to have a further oppor-

22  tunity to outline some of the additional issues that I think

23  stem from our argument of yesterday?  My thought on that is

24  this, that you raised the question in regard to your jurisdiction,

25  as to which I would like to file a full and     complete brief.

1694

1      THE COURT:  I think you have the laboring oar on

2  that problem.

3      MR. VEEDER:  I accept it, your Honor.

4      THE COURT:  And if you would like to file a brief,

5  I would like to have you file one.

6      MR. VEEDER:  I would like to have that included in

7  the issues.  I realize that we have submitted quite a number of

8  them, but I believe the question of your authority to grant full

9  and complete relief to the United States in regard to priorities

10  is a matter that I was somewhat surprised at that there was a

11  question about it, and I would like very much to have that in-

12  cluded in your consideration of points to be ruled upon  in

13  advance of trial, because I believe it is an imperative

14  question -- I would say it is the most important question.

15      THE COURT:  You file a brief on it.  How soon can

16  you do that?  It would be difficult to do it until this week is

17  over, until we conclude these hearings.

18      MR. VEEDER:  That is correct, your Honor.  I will

19  move as rapidly as I can on it.  It is a matter that I think is

20  very basic.

21      THE COURT:  Can you have it ready by the end of next

22  week?  I don't know how long we are going to go on here, but

23  we ought to finish tomorrow on this matter.

24      MR. VEEDER:  I certainly think so.

25      THE COURT:  By the end of next week?

1    MR. VEEDER:  Could you give me a week from Monday?

2    THE COURT:  A week from Monday would be --

3    THE CLERK:  That would be June 30, your Honor.

4    THE COURT:  All right, to June 30.

5    MR. MOSKOVITZ:  I would like to have an opportunity

6    to respond to that, your Honor.

7    THE COURT:  You can be working on your law meanwhile.

8    It would be a nice time to work over the 4th of July holiday.

9    MR. MOSKOVITZ:  Down at the Reche Schoolhouse?

10    THE COURT:  It seems to me that you could organize

11    your material and you ought to be able to get it in within

12    three or four days.

13    MR. MOSKOVITZ:  I can get it in by the end of that

14    week.

15    THE COURT:  You know what the Government is going to

16    argue about.

17    MR. MOSKOVITZ:  Yes, your Honor.

18    THE COURT:  The 4th of July is a holiday.  You pro-

19    bably should get it in by the 3rd.

20    MR. SACHSE:  Mr. Veeder has until the 30th, as I

21    understand it.  Is that the date?

22    THE COURT:  Yes.

23    MR. VEEDER:  Yes.

24    I would like combined in that, and I believe it is

25    directly and immediately interrelated, the question of the

1  matter of removal.  I think upon both those factors that we

2  have authorities, and we have encountered these identical

3  issues in the past.

4          MR. SACHSE:  I would like to see that.

5          Let's get the removal right in with it.

6          MR. MOSKOVITZ:  I think those are related issues.

7          MR. VEEDER:  If we could have that time.

8          MR. MOSKOVITZ:  Your Honor, I would like, if I could,

9  to have until the 7th of July.  If Mr. Veeder's brief is filed

10  on the 30th, we might not even get it until the 1st, and then

11  even to mimeograph it --

12         THE COURT:  All right, to July 7 for defendants, if

13  so advised, to answer, on two general propositions:  (1) The

14  power of the Court to grant full relief, as Mr. Veeder puts it,

15  and that, as I understand, encompasses your arguments that I

16  can decide dates of priority, that I can, in substance, review

17  what the Water Rights Board did, that I have power to decide

18  that Fallbrook has altered their applications and that the

19  applications are, in substance, new applications -- all that

20  sort of thing.

21         MR. VEEDER:  Yes, sir.

22         MR. SACHSE:  I think it is all included.

23         THE COURT:  And the second point is the jurisdiction

24  of this Court on removal, whether this matter should be re-

25  manded.

B-5

1        MR. VEEDER:  Yes, your Honor.  I can't extricate one

2  problem from the other.

3        And I would like to know if Mr. Dennis has completed

4  his revision.

5        We would like to take a crack at everything, Mr.

6  Dennis.

7        MR. DENNIS:  I checked this morning before I came

8  down and I would say that it is probably 60-70% completed.  I

9  will have it sometime before the first of next week, because

10  it may be finished over the weekend, depending on how our hear-

11  ings progress here.

12        MR. STAHLMAN:  Do/ you expect to file one in Riverside

13  County also?

14        MR. DENNIS:  Yes.

15        MR. STAHLMAN:  And in San Diego County?

16        MR. DENNIS:  We filed an original petition in River-

17  side County and in San Diego County, and I expect to file an

18  amended petition in each county, and I will serve you, and I

19  told Mr. Sachse I would serve him, with a copy, and I will give

20  a copy to Mr. Veeder, and if anybody else wants one I will be

21  glad to give to them.

22        MR. STAHLMAN:  Will you send me a copy of the original

23  and the amended?

24        MR. DENNIS:  I haven't got an extra copy of the

25  original.  That is why I didn't do it.

1        MR. SACHSE:  They are attached to Mr. Veeder's petition

2  for removal.  The whole thing is attached to that, Mr. Stahlman.

3        MR. DENNIS:  I would have to re-run it.

4        THE COURT:  I suppose that all of you have read this

5  series of articles in the California Law Review, the issue de-

6  voted to water rights?

7        MR. MOSKOVITZ:  I didn't hear the first part of the

8  question, your Honor.

9        THE COURT:  I assume that most of you have read or

10  have looked over these articles in the California Law Review,

11  the series devoted to water rights?

12        MR. MOSKOVITZ:  Yes, your Honor.

13        THE COURT:  Mr. Moskovitz has one in there.

14        MR. MOSKOVITZ:  I read that one very carefully.

15        THE COURT:  I skipped that one.  I was not so in-

16  terested in the subject matter.

17        Who else has looked at those articles?  Have you, Mr.

18  Veeder?

19        MR. VEEDER:  Yes.

20        MR. SACHSE:  I have glanced at them.  I haven't read

21  the whole thing.

22        MR. MOSKOVITZ:  I read them over sometime ago, your

23  Honor.

24        THE COURT:  I spent most of last evening looking at

25  those articles -- I had read some of them before, and one of my

1  tentative conclusions is that some of these problems are any-

2  thing but open and shut.

3         I don't know who the man was, but one man in there

4  wrote an article that made more sense to me than some of the

5  others.  He said that when these questions of State and Federal

6  rights come up they are not going to be decided by the Supreme

7  Court on the basis of property law -- that going back over the

8  cases they haven't in the past decided them on that basis; that

9  they are going to be decided, first, on an inquiry as to what

10  is the power of the United States, and when that inquiry is

11  done there is going to have to be a finding that the power of

12  the United States is pretty broad and pretty big and pretty

13  expensive.  Then the second inquiry is going to be, should that

14  power be exercised, and in that connection there comes into

15  play the entire problem of the interrelationship between the

16  Federal Government and the State -- the entire problem which has

17  arisen back through the history of this country, the proper

18  function of the State and the proper function of the Federal

19  Government, and there are going to be a lot of other practical

20  considerations looked to aside from the strict rules of pro-

21  perty law.

22         Have any of you read that article?

23         MR. MOSKOVITZ:  I heard the paper delivered, as a

24  matter of fact, your Honor.

25         THE COURT:  Who delivered that one?

1700

1           MR. MOSKOVITZ:   I think you are referring to the

2  article by Mr. Corker, who discussed Federal regulations and

3  the Barrett Bill.  Is that the one?

4           THE COURT:   Well, the Barrett Bill was a separate

5  article.  This was a later one in the volume.  The Barrett Bill

6  was not discussed in this article.  It was a discussion of

7  State and Federal relationships.

8           MR. VEEDER:   I would like to have reference to that,

9  your Honor, because that seems to come pretty close to home.

10  Not that I attended that conference.

11           THE COURT:   Have you got the volume?

12           MR. VEEDER:   I have it in Washington.  I don't have

13  it with me.  But I don't remember that statement.

14           THE COURT:   When you  say that it comes pretty close

15  to home, what do you mean?

16           MR. VEEDER:   I believe that Article VI of the Con-

17  stitution controls in this case and controls the whole dis-

18  position.

19           THE COURT:   Of course, the articles are very in-

20  teresting, also, in that they quote your superior, Mr. Rankin,

21  on a number of matters -- it quotes the Solicitor of the Interior

22  Department on some of these problems.

23           It is the kind of volume that you would have to read

24  two or three times.  I was quite fascinated with it.  Of course,

25  I realize that several of the authors were on the staff of the

1701

1   Attorney-General of the State of California and I made due allow-

2   ance for that.

3            MR. VEEDER:  I'm glad you did, your Honor, because if

4   there was ever a book concerning which I took a dim view, it

5   was that.

6            THE COURT:  All right, are we ready to proceed now

7   on some of these motions to dismiss?  I think that was the next

8   order of business.

9            Mr. Grover will be given a chance to be heard.  I

10  have a world of papers up here, if I can get hold of your

11  papers.

12           MR. GROVER:  It is the blue one, your Honor.

13           THE COURT:  They all seem to be blue.

14           MR. GROVER:  I'm sorry.

15           THE COURT:  This is the motion of --

16           MR. GROVER:  Defendants Gibbon and Cottle.  Up at

17  line 6 or 7 it gives the defendants' names, your Honor.

18           THE CLERK:  It is No. 9 on the calendar today, your

19  Honor.

20           THE COURT:  Were you also going to argue the Halde

21  motion?

22           MR. GROVER:  Yes,  your Honor.

23           When I said that it was blue, I meant that the type

24  was blue, not the back.  That may be the only one that is in

25  blue type.

1        THE COURT:  I understand that this is in blue typing?

2        MR. GROVER:  Yes, it is a ditto process, your Honor.

3        MR. VEEDER:  Do you want to use ours, your Honor?

4        THE COURT:  Some how I never got that copy or didn't

5   get it sorted out.

6        MR. STAHLMAN:  Counts 21, 22 and 24.  Is that right?

7        MR. GROVER:  Yes.

8        Mr. Halde and I collaborated on this, and it was con-

9   cluded that the easiest way to get it before the Court was

10  merely to make a motion and adopt our memorandum.

11       MR. STAHLMAN:  I wonder if I might ask a question of

12  Mr. Grover before you proceed, your Honor.

13       I am not familiar with the property of Mr. Halde

14  which you are representing, Mr. Grover.  Will you tell us some-

15  thing about the property -- what type and kind of rights?  Just

16  merely what is the property, where is it located, is it on a

17  stream, is it riparian?

18       MR. VEEDER:  Is it in conflict with any other?

19       MR. STAHLMAN:  Yes.  So that I can follow your argu-

20  ment.

21       MR. GROVER:  Mr. Halde's property, or that of his

22  clients, his parents, is on the Murrieta, and I really don't

23  know anything more about it than that.

24       The defendants whom I represent, Katherine Gibbon

25  and William Cottle, have property near Radec, right where

B-6

1703

1    Highway 71 deadends into Highway 79.  It is upstream from the

2    Vail Dam, and it is riparian, and also there is an old filing

3    going back to the 19th century and is in use right at the pre-

4    sent time.

5           MR. VEEDER:  Riparian to what?

6           MR. GROVER:  To the Temecula River.

7           MR. STAHLMAN:  The mainstream of the Temecula?  It

8    branches into three separate branches.

9           MR. GROVER:  I understand that it is the mainstream,

10   although I am not that familiar with the branches of the stream,

11   to guarantee that.

12          MR. STAHLMAN:  What is it used for?

13          MR. GROVER:  It is used for cattle and growing feed

14   for cattle, for domestic purposes, and -- I have my notes at

15   home on the detailed facts of it -- but I believe it is about

16   600 acres or something like that.  I am not sure whether that

17   is one of the parcels or both of them.  Mr. Cottle and Mrs.

18   Gibbon are brother and sister, and when their father originally

19   owned it, it was one parcel and now it is divided.  Probably

20   Col. Bowen knows at this moment more of the details of that

21   than I do.

22          THE COURT:  Now, various of the defendants have

23   motions directed to Count 21, which, I take it, you are going

24   to give your attention to first.  You would like to conclude

25   your argument and leave?

1      MR. GROVER:  No, your Honor, I was going to suggest

2  the very first thing that I went home last night and took care

3  of things that I had to do today and I can stay, if necessary,

4  all day, and I think it would be orderly procedure to take at

5  least these three Counts that we are interested in from the

6  standpoint of all the parties.

7      THE COURT:  All right.

8      MR. GROVER:  If your Honor wants me to begin or one

9  of the others --

10     THE COURT:  You might begin.  You are starting with

11 Count 21?

12     MR. GROVER:  Yes, your Honor.

13     Count 21, as your Honor knows, relates to pre-

14 scriptive rights.  Now there is a technical difficulty that I

15 don't believe we are against, but which I do want to suggest,

16 your Honor, because I am not trying to get around it, and

17 that is that as each Count proceeded in the Amended and Supple-

18 mental Complaint all the previous paragraphs were included.

19 Obviously, if any one of those states a cause of action --

20     THE COURT:  I have thought about that, and obviously

21 if your motion is treated as a motion to dismiss it has to be

22 denied because of the incorporation of the prior material.

23     MR. GROVER:  All right, your Honor.

24     THE COURT:  Is there any objection to treating the

25 motion to dismiss as a motion to strike the allegations of

1   Count 21, Mr. Veeder?

2       MR. VEEDER:  Yes, your Honor.  I think it is quite

3 one thing to have a motion to strike and quite another to have

4 a motion to dismiss.  I think it is entirely different.

5       THE COURT:  Why?

6       MR. VEEDER:  For this reason, your Honor:  First, I

7 briefed the law in regard to a motion to dismiss, and secondly,

8 I have proceeded on the basis of a single unit lawsuit.  The

9 fact that we broke it down into Counts was to make it more

10 simple and more understandable.  I certainly can't, at this

11 juncture, accept the view that, in regard to prescription, this

12 motion to be treated as being a motion to strike, because there

13 are rights scattered out throughout the entire watershed and

14 even if your Honor should disagree with us in regard to the

15 operation of prescription downstream there is no single right

16 to the use of water in any single area to which that ruling

17 would be applicable, because certainly the Coahuila Indian

18 Reservation with its rights, the Pachanga, the areas of the

19 National Forests, are all upstream from many of the claims,

20 and certainly the Coahuila and the National Forests are up-

21 stream from Mr. Grover's client.

22       THE COURT:  Is there any objection to treating it

23 as a motion to strike, paragraph by paragraph?

24       MR. VEEDER:  Yes, your Honor.

25       THE COURT:  How would your briefing be any different?

1   Suppose the argument now is directed to paragraph 2 of Count 21.

2       MR. VEEDER:   To begin with, your Honor, there is a

3   disagreement in regard to facts.  The Vail Estate has readily

4   admitted in Court that it delivers to us, at our point of di-

5   version, for at least three second feet -- probably the most

6   valuable right that we have -- at the mouth of Railroad Canyon

7   and Temecula Canyon, and it is certainly above innumerable

8   defendants.  It is not upstream, perhaps, if I understand where

9   Mr. Grover's clients are situated.

10       Are they above the Vail Dam?

11       MR. GROVER:  Yes.

12       MR. VEEDER:  They are above the Vail Dam?

13       MR. GROVER:  Yes.

14       MR. VEEDER: Well, now, I don't know how that would

15   operate, but certainly we have a situation where -- I view the

16   Vail Dam and the enclave down here operating as a single unit.

17   That is how it has operated since some time in the 20's.

18       THE COURT:  You take the position that the amount of

19   water the Vails allow to pass at this point at Railroad Canyon

20   is water that belongs to the United States.

21       MR. VEEDER:  It is the point of delivery, yes, sir.

22       THE COURT:  And is not water that is riparian water

23   going on down the stream?

24       MR. VEEDER:  Well, it is delivered to us.  Call it

25   what you will -- whether it is contract water, riparian water,

1   or what it is -- it is water that would not be in that river

2   were it not for the fact that the Vails and the Rancho Santa

3   Margarita went into litigation in 1925.

4           THE COURT:  Yes, but assume that you had a right-of-

5   way from the enclave up to that diversion point.  Do you think

6   you could put a pipe in there and pick all that water up at

7   that point?

8           MR. VEEDER:  Oh, yes.  But we have the additional

9   factor in regard to State law, with which I am very much im-

10   pressed, that under the law of California we have the right to

11   deliver water into a natural stream and to go down to the other

12   end and pick it up, subject to evaporation losses. And that is

13   very good California law.

14           The point that I make --

15           THE COURT:  Well, as to Vail, you might have a right

16   to go up and pick up the water, but you wouldn't have a right

17   to take that water as to other people on that stream.

18           MR. VEEDER:  Well, your Honor, so far as we are con-

19   cerned, these interlopers, such as Fallbrook --

20           THE COURT:  Let's forget about the "interlopers."

21   What about the riparian owners below that point?

22           MR. VEEDER:  So far as we are concerned, we have no

23   struggle with those riparian owners, and I believe certainly

24   the question is moot in regard to Mr. Grover.  I don't believe

25   we have a contest on that at all.

1        MR. SACHSE:  You have a contest with Fallbrook, be-

2   cause Fallbrook owns 800-some acres of riparian land.

3        MR. VEEDER:  But his Honor just said the interlopers

4   are out.

5        MR. STAHLMAN:  They don't own 800-some acres of ri-

6   parian land down there.

7        MR. SACHSE:  The exhibit is attached.  Look it up.

8        MR. STAHLMAN:  O.K.

9        MR. VEEDER:  The point that I make, your Honor, is

10  that in regard to the delivery of water by the Vail Estate all

11  one has to do is to take a look at the run-off records and the

12  period just antecedent to the case of the Rancho Santa Margarita

13  vs. Vail and the thing that precipitated that case was the fact

14  that the Vails had put a well in here and pulled down the

15  stream with the result that there was no longer water reaching

16  the Rancho Santa Margarita.  An injunction was obtained and

17  the Vails delivered water into the stream.  Subsequently a

18  stipulated judgment was entered into that continued the delivery

19  of that water.

20        THE COURT:  Maybe I am over-simplifying, but this

21  seems very simple to me.  If the Rancho Santa Margarita, now

22  Camp Pendleton, and Vails were the only people on this stream,

23  in view of that judgment with the Vails I think if you had a

24  right-of-way you would have a right to run a pipe up there and
                                                    to
25  pick up that water and take it down/the enclave.  But since

1   you are not the only people on the stream and since a lot of

2   other riparian owners intervened between this release point and

3   the point downstream, I don't think you have any right to that

4   water exclusively.  I think it is riparian water.  It goes down

5   the stream and everybody else has a crack at it.

6        MR. VEEDER:  Well, I will say this, that I believe

7   there are perhaps some of the rights that are riparian, but I

8   don't believe that is in issue.  I think this, that that water

9   which is in that stream is water that is there by reason of a

10  contractual arrangement.  It might be that there are other

11  riparians, and indeed some of them are in the stipulated judg-

12  ment, and we recognize their rights and we are for them.  But

13  in regard to an appropriator coming in, for example, the Sawdays

14  and the others, we say that that water is there by reason of

15  the contract and for no other reason, and I think it is an

16  extremely important point in this case.

17        THE COURT:  You might have some merit with reference

18  to appropriators, but I'm inquiring now about riparian owners.

19  You act as if that water belonged to the Government the moment

20  that it left that diversion point.

21        MR. VEEDER:  No, there are ten or eleven -- don't

22  hold me to that -- there are riparian owners who are in the

23  stipulated judgment in addition to us, your Honor.

24        THE COURT:  Then your position is that that water

25  belongs just to those people who are in the stipulated judgment,

1    at the point of release.

2              MR. VEEDER:   That is right.

3              THE COURT:   Without regard to the other riparians

4    downstream.

5              MR. VEEDER:   I don't know of any other riparian, but

6    if there are the riparians and organizations like the Fallbrook

7    Public Utility District, we certainly say that the prescriptive

8    period has long run in regard to that delivery of water down

9    there.

10             THE COURT:   You claim a prescriptive right up there?

11             MR. VEEDER:   Against anyone who would interfere with

12   the delivery of the water by the Vail Estate, certainly.

13             THE COURT:   Where have you had any adverse user up

14   there?

15             MR. VEEDER:   The point of it is that had it not been

16   for an injunction there wouldn't be any water in that stream

17   at all, because the Vails have the physical capacity and indeed

18   they were using all of it until that injunction was entered.

19             THE COURT:   You are talking about prescriptive rights

20   against people downstream.

21             MR. VEEDER:   Right.

22             THE COURT:   Not upstream.

23             MR. VEEDER:   Right.

24             THE COURT:   All right.   Now, if, following the entry

25   of the Vail judgment, you and the other parties to it had gone

up there, had a right-of-way and had put a pipeline up there

and had taken that water at the release point, I might be able

to see a prescriptive right. But the water, as I understand it,

was released and went down on the surface and the underground

of the stream. Where has there been anything adverse done?

MR. VEEDER: The fact that we are using the granitic

bed of the stream -- and that is what it is -- that runs across

bedrock the whole distance, and in California and in many other

western States you can use the bed of a stream to deliver water,

and that is what has transpired. We are using it just the

same as if it were put in a pipeline, because, as I say, the

Vail Estate is delivering that water to us. Now had we put it

in a pipe or had we put it in a jug, I don't believe it makes

a dime's worth of difference in regard to our rights to have

that water continue to come down to us from our point of di-

version and delivery.

THE COURT: If you will not consent that this be con-

sidered as a motion to strike, can we agree upon a set of facts

and let the Court take into account the facts and convert this

into some other kind of motion and get a pre-trial ruling on

it or get a motion for a partial summary judgment?

MR. VEEDER: I believe, your Honor, that all of the

facts to which I have just made reference can be gleaned from

the agreed facts in your order on pre-trial stipulation.

THE COURT: Well, let's go on. If you will not

stipulate, if we can't stipulate to some set of facts or if you will not treat this as a motion to dismiss or a motion to strike certain paragraphs, or if we can't work out some other thing, I intend to make at least a pre-trial ruling on it on the basis of facts in the file and we will go from there.

Go ahead, Mr. Grover.

MR. GROVER:  Your Honor, I think Mr. Veeder has, in the course of discussing whether or not a motion to strike is stipulated to, gone into the merits of the motion.

I should like to say that, as far as I know, the point is newly brought forward that the Vail delivery relieves the Government from the position we have always considered them in as the last owner on the stream.  Now as far as that particular point is concerned, I will have a word in a moment.

But leaving that aside for a moment, since I didn't have it in time at the time the memorandum was prepared, I would like merely to amplify my memorandum just a little bit.

In the first place, if this is not to be considered a motion to strike and it is to be denied arbitrarily because of those previous Counts pleaded in the first paragraph, then I would like the Court's leave to file a motion to strike or to bring it up in some other way.  I think maybe it illustrates how hard it is to operate in this case.  The Count is obviously there, it presents some independent claim, some independent right, independent of what had already been done, and we plead

1   it in the first paragraph.  It was to eliminate it as an in-

2   dependent Count that I made it a motion to dismiss.  However,

3   I would be just as satisfied to have a pre-trial ruling in the

4   form really of an opinion.  I mean, the dismissal aspect isn't

5   important, but I do think that the determination of it prior

6   to trial is important.  That was one thing which the Court of

7   Appeals refused to decide.

8           The first thing that I would like to say about the

9   point of being the last owner on the stream -- and let us assume

10  for a moment that the Government is the last owner on the

11  stream, and it's only in that capacity that it is present --

12  the Court of Appeals said that it would not pass on the

13  question whether or not the lower owner could obtain a pre-

14  scriptive right against the upper owner and therefore it is not

15  one in which we have the benefit of their views.  However, it

16  was fully briefed in the appellate proceedings and all I did

17  from my memorandum was take three of the key cases of a list of

18  ten square holdings on that point, and those holdings are in

19  the appellant's brief on appeal (pages 46 and 47 in the Opening

20  Brief).  Those cases were carefully checked, from Cory vs.

21  Smith in 206 Cal. down to Hargrave vs. Cook in 108 Cal. and

22  they are holdings, and your Honor realizes how unusual it is

23  to have ten square holdings on any point.

24          THE COURT:  Were you here when this matter was argued

25  and when the Court gave some tentative rulings on this

1    prescriptive problem?

2         MR. GROVER:  Yes, your Honor.  Well, I will not be-

3    labor the point, then.  I will just refer to those cases.

4         THE COURT:  Yes.

5         MR. GROVER:  I do have some additional ones that I

6    ran across this week after I filed the memorandum, one decided

7    since the appellate brief was filed, and that is Lindsay v.

8    King, (1956), the decision of the District Court of Appeals for

9    the First District, up in the Bay Area -- Mr. Justice Peters

10   wrote the opinion -- 138 Cal. App. 2d 333 at pages 340 and 341.

11   The Pacific citation given to me -- I haven't checked it -- is

12   292 Pacific 2d 23.

13        The case is actually a dictum because like the

14   situation that the United States replied on in the Larsen case

15   it was a case where the Court found that the invasion had

16   actually been made upstream on the property of the prior owner

17   and therefore it was prescriptive and they determined, as a

18   matter of fact, that it was not the lower diversion but a di-

19   version on, and hence it illustrates the distinction that we

20   made, as your Honor will recall, in discussing the Larsen case,

21   and because it was on the property there was no occasion for

22   the Court to do anything more than say, as a dictum, that if it

23   had been below, of course, there would have been no prescriptive

24   right.

25        I think we have never cited the Cal. Jur. citation

1    on this, too.  It is 25 Cal. Jur. 1183 and 1185.

2              THE COURT:  That was the Cal. Jur 2d.

3              MR. GROVER:  No, it is not down to Waters yet in Cal.

4    Jur. 2d, your Honor.  As you know, you have to go to the ten

5    year supplement and then the 1955 supplement and then the 1958

6    supplement.  But I did run them all down and there appears to

7    be no disagreement.  That is Section 199 of the matter on

8    Waters.

9              And Weil, who is an old authority but a very respect-

10   able one, Third Edition Volume One at pages 637 and 916; the

11   benefit of his discussion is that it includes citations from

12   other western States.

C1

1          I am assuming here that California law is what

2     controls, but Mr. Veeder does give a lot from other states.

3     Well, I think that pretty much presents the point I wanted

4     to make.

5          THE COURT:  All right.

6          MR. GROVER:  And it was just to get a ruling on

7     that motion as far as that point is made.

8          Now, Mr. Veeder has raised what I believe is some-

9     thing worth talking about.  Albeit I didn't realize he had

10    it in mind when I filed the memorandum, and that is the

11    point that the Vails in some way by reason of this stipulated

12    judgment give the United States a prescriptive right.  There

13    is an interesting comment of the Court of Appeals on that.

14         MR. SACHSE:  Page 657.

15         MR. GROVER:  I don't have the Federal case.  I

16    carry this in my brief case.  Page 16 of the original piece

17    of the opinion, advance sheet of the opinion.

18         MR. SACHSE:  It is page 657 of the Report.

19         THE COURT:  What is the volume on that?

20         MR. SACHSE:  235 Fed.(2nd) 647.

21         THE COURT:  At 657.

22         MR. SACHSE:  At 657.  That is the advance sheet,

23    your Honor.  Wait a minute.

24         MR. GROVER:  I have it.  It is on page 16, the one

25    I have reference to of the court's printed opinion, Mr.

1    Moskovitz.  Here, that would be page 661 or 60 and 61.

2            THE COURT:  All right.

3            MR. GROVER:  Of the Fed. (2nd).  The court is

4    talking about prescription.  It says:

5            "Title to a water right by prescription must be

6        founded on like essentials and it must be further

7        founded on the use of a specified quantity on a

8        given parcel continuous through the period.  There

9        is no prescriptive right in growth.  There can be

10       no acquisition of such right for a purpose not

11       beneficial.  The findings to support the acquisition of

12       the title by either method in Rancho are conspicuously

13       absent.  The trial court seems also to have laid

14       emphasis upon the proposition that the use by

15       Rancho was adverse because in violation of the

16       Vail agreement."

17           So it seems to me that we have a new position

18   here.  Now they are relying upon the Vail agreement, although

19   up to that time, as you see, there was some suggestion that

20   they would get around this prescriptive hurdle  by claiming

21   it was in violation; therefore, adverse to Vail.  I think as

22   far as being adverse to Vail is concerned that their use

23   again, no matter how deliberate, was downstream after Vail

24   had given it to them; and, therefore, not adverse.  But after

25   people in the watershed between the place where Vail, let's

say, diverts the water for the Government, assuming that the Government has an interest in that diversion, not just a contract right but a property right; that the owners between them, the question is, is it adverse to them? And it seems to me that it is not, because the whole essence of that stipulated judgment was to deliver the water that they were entitled to as riparians.

Now, it may be that under the court's decree waters made available at one time that were not in a state of nature, but it is merely the mechanics of making a court decree carry out the basic rights of the parties. And it was to deliver water which the lower owners were entitled to as a riparian right that the decree was entered. Now, it is my understanding. Therefore, it is not adverse to them. Now, it might not be adverse to other people, but it is adverse at this time to the one with the prior rights. That makes it a prescriptive right.

I know that Mr. Sachse is more concerned with this, because he has land there. And it does not affect me. And our clients are either on the Murrieta in the case of Haldes, and therefore not concerned with the diversions on the Temecula, or they are upstream from the Vail's diversions on the Temecula in the case of Cottle and Gibbons. Therefore, it is clearly non-adverse to us even though material. So much for prescription so far as the Camp Pendleton area

1    is concerned.

2              Now, I do understand from one of our previous

3    meetings here that it is here stipulated that the rights of

4    the Government upstream  are Indian lands, Bureau of Land

5    Managment lands, and forest lands are not transferrable,

6    in effect, to Camp Pendleton.

7              THE COURT:  That is my understanding.

8              MR. GROVER:  That there is no argument on that,

9    and I will go on that assumption.  The objection, of course,

10   to the prescriptive claims in the following paragraph with

11   regard to the diversions upstream is that there is not

12   allegation of use of the matter, of the water of the

13   prescriptive period.

14             THE COURT:  There is a backhanded allegation.

15   It alleges in connection with the diversion and use of water

16   on the reservations, and so forth.

17             MR. GROVER:  Well, of course, all right, your Honor.

18   Now, I don't want to be captious about this.  I want to clean

19   up the point is what I really want to do, because I know

20   the Government has used water up there, and that it may make

21   out a case that it was adverse.  But I do think we ought to

22   have it understood here that they must allege a use and that

23   the use must be beneficial.  And the remarks that I quoted

24   from the opinion of the Ninth Circuit are directly on that

25   point.

1          Now, if your Honor is satisfied --

2          THE COURT:  Go ahead.

3          MR. GROVER:  I was going to say if your Honor is

4    satisfied that an allegation of use is there, then the only

5    point would be that there is no allegation of beneficial use.

6    And I merely would like to have the point cleaned up so we

7    know there is no question about proving anything other than

8    beneficial use that we get a prescriptive right.

9          THE COURT:  All right.  Thank you, Mr. Grover.

10         MR. GROVER:  Did you want to have the other parties

11   discuss Count 21 first?

12         THE COURT:  Yes, I will hear anybody else on 21

13   before we go to the next count.

14         MR. STAHLMAN:  I should like to ask Mr. Grover a

15   question.  Did you receive a copy of the Vail answer?

16         MR. GROVER:  No, I did not.

17         MR. STAHLMAN:  May the record show I am delivering

18   a copy to you.

19         MR. GROVER:  Thank you.

20         MR. VEEDER:  As long as we are asking one another

21   these questions, I should like you ask you:  Did you receive

22   a copy of the memorandum we prepared for the court?  It was

23   dated June 11, and it was distributed to all counsel.

24         MR. GROVER:  I believe I did.

25         MR. VEEDER:  Did you read it?

THE COURT:  What was that, about the water rights?

MR. VEEDER:  Yes.

MR. GROVER:  Yes.

THE COURT:  What factual situation do you expect to show on these Government lands, Indian reservations, forest domain would lead to any finding of prescriptive use?

MR. VEEDER:  They have been using water up there for many years, your Honor, using water up there.

THE COURT:  Who?  Is there a lot of land riparian?

MR. VEEDER:  Yes.  Yes.

THE COURT:  Then, how can you exercise a riparian right and get a prescriptive use?

MR. VEEDER:  You can certainly have -- probably the prime example of the ownership of an appropriative right and riparian right at the same time used exactly the same land as the Vail estate.  There is absolutely no reason whatsoever, your Honor, why a riparian user cannot acquire an appropriative right.  Indeed, the law in California is extremely clear on it.  The --

THE COURT:  Well, now, wait a minute.  Can one acquire an appropriative right by exercise of his riparian right?

MR. VEEDER:  Oh, no.  No.  No.  But when he uses water which would be in excess of his riparian right, he becomes an appropriator to that extent.  The case of Rindge

1    vs. Craggs Land Company is probably the most recent one on

2    that, which I cited to your Honor, and which the court said --

3         THE COURT:  Is it in your brief?

4         MR. VEEDER:  Oh, yes.  Yes.  The court said very

5    specifically that it would be entirely possible for an

6    appropriator -- I mean, or a riparian owner -- seeing that

7    his riparian rights would be inadequate to irrigate his land

8    to proceed to make an appropriation which would, in effect,

9    destroy the riparian characteristics of lands as yet un-

10   pacted.  So you have the circumstance where -- and we are

11   certainly claiming -- we are in a position of asserting on

12   these lands and on the lands of the Rancho Santa Margarita

13   to be a very important point.  The Rancho Santa Margarita,

14   in our view -- and it was a question of fact that will have

15   to be proved -- the Rancho Santa Margarita, in our view,

16   used water from 1910 far in excess of its share of the rights

17   to the use of water in the stream as a riparian.  And we

18   believe to that extent it did make an appropriation.

19        THE COURT:  I am not talking now about your down-

20   stream user.  I am talking about this use you claim on

21   Indian reservations, forest reserves, and public domain.

22        MR. VEEDER:  Yes.  Yes.  I am convinced that there

23   are areas up there where they are probably, and have in the

24   past used rights in excess of what would be an adequate share

25   of their riparian rights.

1       THE COURT:  Let's analyze that.  Here is a riparian

2   owner, and here are some people downstream.  The people

3   downstream aren't exercising their riparian rights.  The

4   upper riparian owner could use all the water and he wouldn't

5   be adverse.  Is that true?

6           MR. VEEDER:  But that is a question of fact.

7           THE COURT:  Well, isn't that true?

8           MR. VEEDER:  Quite possibly, yes.

9           THE COURT:  Where the upper riparian owner with

10  acts of hostility and adversely to an attempted user down-

11  stream had appropriated more than his reasonable share

12  could you even have a situation arise where the upper owner

13  activities could be adverse.  Are you prepared to show

14  situations like that?

15          MR. VEEDER:  We will undertake to show, yes.  I am

16  not sure just what the facts will bear out.  I believe that

17  it is academic.  I believe that it is truly academic, because

18  I believe this:  that when the Coahuila Indian Reservation

19  was established that there was reserved quantities of water

20  under the doctrine of the interstates that simply provided

21  for whatever water was required properly to irrigate those

22  lands.

23          THE COURT:  I am familiar with that rule and seems

24  to be follows by our Circuit.  But why inject into this case

25  issues if you are not certain that hey have some real merit?

1  I am talking now about this prescriptive use on these

2  Indian Reservations and Government lands.

3       MR. VEEDER:  Your Honor, I certainly didn't want to

4  be precluded.

5       THE COURT:  I know out of an abundance of caution

6  you would claim all the rights you could, but we are getting

7  ready to try this case.  I have serious doubts whether you

8  can show any prescriptive rights up there on those Indian

9  Reservations and forest domains.  And if you can't, why not

10  fold up on it, and let's get down to the case.

11      MR. VEEDER:  No, I couldn't fold up on it, your

12  Honor.  I think that --

13      THE COURT:  Can you outline any factual situation

14  up there that would show a prescriptive right?

15      MR. VEEDER:  Yes; they put in --

16      THE COURT:  Who is "they"?

17      MR. VEEDER:  -- many, many years ago wells and

18  pipelines and diversions; and they have been using water up

19  there.  I think it goes back to certainly the early 1900's.

20      THE COURT:  Where is this, on the Indian Reservation?

21      MR. VEEDER:  Yes.  So when you ask me to abandon

22  the point, I can't.  It is that simple.  And I could be in

23  error -- that is why these motions to dismiss startle me a

24  little bit, because your Honor is asking now to rule on a

25  preclusion of evidence in advance of trial.  So we have to

protect ourselves in these matters.

THE COURT: All right. Mr. Sachse.

MR. SACHSE: Yes, your Honor, I would like to say a few words, approach the thing in a reverse order, that is, talk first about the upstream claim. Your Honor has asked Mr. Veeder some pointed questions about the Indian Reservations. I would go a step farther and state flatly that there can't be conceivably any evidence, any evidence, of a prescriptive right, and that is what we are talking about. Now, let's not get mixed up; not appropriation and not a reserved right. Paragraph 21 to which this motion is directed -- and I too have a motion directed to it, Count 21 -- deals with a prescriptive right to the use of water. And I think we ought to get rid of it. I don't think we ought to clutter up this file indefinitely with claims that can't be established.

Now, Bureau of Land Management lands, your Honor knows are public domain in the highest sense of the word, lands that may or may not be open to entry, may or may not be open to Taylor Grazing Act. There is nothing on them. If you want to buy it, you ask the Department of Interior to quote you a price. Now, if Mr. Veeder can stand up in front of this court and in good faith tell your Honor that he thinks he can prove an adverse beneficial use, hostile to everybody downstream on public domain lands, it is childish.

THE COURT:  You are talking about public domain and forest reserves?

MR. SACHSE:  Yes, forest reserves.  It is impossible; it simply can't be done.

THE COURT:  He has been talking about Indian Reservations, specifically one about the forest domain and -- the forest reserves and the public domain lands.

Can't you eliminate those?

MR. VEEDER:  No.  No.  No.  The Cleveland National Forest is situated right here, as your Honor knows.  And there are uses up there today.

MR. SACHSE:  Prescriptive uses, Mr. Veeder?

MR. VEEDER:  Prescriptive uses adverse, hostile, open, notorious to those downstream?  That is the point I am trying to make.  I think your problem, Mr. Sachse, is that you are getting hysterical.  My view is that there are uses up through here which have been made.  They have water uses by individuals on some of these lands where cattle have been grazed for a good many years.  There are homesites.  There are a great many, there are a variety of uses.

THE COURT:  Mr. Veeder, now you are talking about forest reserves?

MR. VEEDER:  Yes.

THE COURT:  How could these people in the forest reserves by permission of the Government pay rent for a cabin

1    site or get land to run cattle on, how could any use they make

2    be adverse?

3            MR. VEEDER:   Why not?

4            THE COURT:   To anybody downstream.

5            MR. VEEDER:   Well, they are using it as a licensee

6    of the National Government.  And I can see absolutely no

7    reason whatever why I couldn't have a man come onto our

8    lands and have him use water for a prescriptive period openly,

9    adversely, and notoriously and that it wouldn't accrue to the

10   owner of the lands.  Even Mr. Sachse would agree that a man

11   could acquire a prescriptive use through the actions of his

12   tenant.  These people are, in effect, tenants, and they are,

13   in effect, using the water.  The problem is that a motion

14   to dismiss is so hard.

15           THE COURT:   Well, I am so abandoned in thought in

16   view of your allegations that I can probably grant a motion

17   to dismiss.  I am just asking you to eliminate a lot of these

18   frills out of this case, so that we can talk about the things

19   that are material.  Who cares whether somebody has a cabin

20   up there and has used water even if you could prove it was

21   hostile, had used a little bit of water in the summer?  Who

22   cares about that?  What impact does that have on anybody in

23   this lawsuit?

24           MR. VEEDER:   It is very important.

25           THE COURT:   It wouldn't be worth the time to try it

1    it out.

2              MR. VEEDER:  I can abandon it, your Honor.  I

3    suggested yesterday that Fallbrook get out.  That would save

4    a lot of time.  And I don't think they have as much right as

5    those people up there in the sidehills.

6              MR. SACHSE:  I will press no further on that.

7              THE COURT:  All right.

8              MR. SACHSE:  It seems to me so obvious.  I want to

9    add one thing very briefly, because your Honor is obviously

10   very thoroughly familiar with the facts of the upstream,

11   prescription running upstream.  I want to add one thought on

12   this matter.  The delivery water or the diversion of water by

13   the United States being actually at the upper end of Temecula

14   Canyon where they contend Vail makes delivery.  Now there is

15   a circuit and, again, your Honor has tentatively ruled that

16   this is of necessity only persuasive; this is not the law of

17   the case.  But your Honor also said you would find the opinion

18   persuasive, so I will take the liberty of reading from the

19   Circuit decision; again from the advance sheet at 657; in

20   the advance sheet.  That should be the right number.

21             "The stipulation that it is necessary for Vail

22         to release these three cubic feet was and is, of

23         course, binding upon the parties thereto.  But the

24         release at that point is obviously not a delivery to

25         the United States.  It only means that Vail was not

1       not entitled to any use of water unless and until

2       there had been such a quantity released.  It must

3       be assumed that the rights of the intervening land-

4       owners and appropriators between the point of release

5       and the boundary of the Rancho must have been con-

6       sidered.  In any event, neither the State court nor

7       the Rancho and Vail had power to bind such parties

8       or the State of California.  This feature must be

9       considered since it was given so much weight by the

10      trial court in determining there was no surplus."

11      Now, I concede without any argument that Mr.

12  Veeder was a hundred per cent right that the law of Cali-

13  fornia allows the use of the stream channel as a diversion

14  vehicle.  And if a man does make an appropriation, any

15  proper appropriation, from the State of California at a point

16  upstream, he can run the water downstream to another one

17  and take it out.  That can be done; you can use the stream

18  channel.

19      But again, we loosely throw these words of

20  "appropriation" and "prescription" around, and they are two

21  extremely different things.  Prescription means a taking from

22  somebody.  Open, notorious, hostile and adverse, it is a

23  taking.  And what in heaven's name are they taking?

24      THE COURT:  Well, you don't have to labor that

25  point.

1730

1    MR. SACHSE:  They are not taking anything.  They

2    are letting it come by.  We are getting it.  They weren't

3    taking it.

4    THE COURT:  You don't have to labor that point.

5    MR. SACHSE:  On the prescriptive issue, your Honor,

6    I have nothing more to say.

7    THE COURT:  What about this point that Mr. Veeder

8    just made?  Is there any dispute as to this?  Mr. Veeder

9    asserts that an agent or a licensee, adverse user, may inure

10   in benefit of an owner.  I have never run onto that before.

11   Maybe that is the law, maybe it is not.

12   MR. SACHSE:  I wouldn't attempt to answer it, your

13   Honor, without checking it.

14   THE COURT:  Let's hear from Professor Burby.  He

15   taught real property law at U.S.C., and we are waiting to

16   ask him to give us a dissertation on the laws.  What is the

17   law, Mr. Burby?

18   MR. BURBY:  Well, your Honor, in answer to that

19   specific question I don't believer here is any doubt but that

20   the occupants of land making an adverse use may acquire rights

21   in favor of the owner; and I think that is the point that

22   Mr. Veeder tried to make.

23   THE COURT:  Yes.  In other words, you mean this

24   would be true even if there was not knowledge on the part of

25   the owner that he was so acting?

MR. BURBY:  I believe that is true, your Honor, if the one who occupies the land is claiming a prescriptive right.  Of course, you have to have the requirements for prescription.

THE COURT:  The difficulty that has with it would be that the licensee or the agent or the employee would, in many cases, would be claiming the prescriptive right himself, and he wouldn't be claiming it in behalf of the landowner.

MR. BURBY:  He would be estopped to deny the rights of the landlord, I believe.

THE COURT:  Could you submit me a few authorities on that?

MR. BURBY:  Yes, I would be very happy to, your Honor.

There is one point:  I don't believe we can classify them as licensees, though.  In other words, it is just a case, as I understand it, where the licensee of land is making the use of this water not as a licensee.

THE COURT:  I would anticipate that the facts would show in the national forest that these persons are licensees of the United States.

MR. BURBY:  I would have to determine the status of them.  I have been speaking only with respect to a person who is a tenant.  A licensee is one who does not have possession as distinguished from a tenant.

THE COURT: Will you also then see what you find on a licensee, because I think the facts will show that these people who have cabins -- I don't know whether they are licensees or tenants.

MR. BURBY: I don't believe they can be classified as licensees, because they have possession of the land. And, of course, that is the difference between the licensee and the tenant.

MR. SACHSE: Mr. Burby, what they actually say -- I happen to have one myself. It is entitled "Special Use Permit" at the top. And then it proceeds to say that I have a right to the use.

MR. BURBY: I will certainly see, your Honor, if I can find something to clarify that.

THE COURT: All right.

Mr. Moskovitz, you want to be heard?

MR. MOSKOVITZ: After the discussions by Mr. Grover and Mr. Sachse, just a thought or two, without repeating what they have said.

There was some problem in your mind as to whether we can treat these motions to dismiss and grant them in light of the repleading, and the first paragraphs of, well, the first paragraph of this particular count of all the previous counts. It seems to me that you can properly treat the particular paragraph as stating a separate cause of action,

1    because, in reality, that is what it does.  Paragraph 2 of

2    this Count No. 21 attempts to plead a cause of action for

3    prescriptive rights for the downstream Naval enclave.  It

4    is separate from everything else.  And it seems to me that

5    you can treat that separately and determine whether facts

6    are stated there sufficiently to grant relief on it;

7    separate from Paragraph 3 which states a cause of action

8    for prescriptive rights for the upstream lands of the United

9    States.  These problems may be different.  I think they are.

10   But it seems to me as far as Paragraph 2 is concerned you

11   can consider that as we have in the past in all our arguments

12   as to whether a downstream diverter lowermost on the river

13   can acquire prescriptive rights by a diversion at that point.

14   And I think that the arguments of Mr. Grover and Mr. Sachse

15   point out that the stipulated judgment just has nothing to

16   do with it, and that the place where the water is taken out

17   of the river and where it might have an adverse effect is

18   downstream from everybody else.

19        THE COURT:  All right.  Do you want to say anything

20   about this, Mr. Veeder?

21        MR. VEEDER:  Yes, I do.

22        I think that the problem is this:  that they have

23   come in here on motions to dismiss.  And the rule is so

24   utterly simple that this court must have as a certainty in

25   its mind that the United States could obtain no relief under

1  any state of fact.  And I take the position that absent that

2  circumstance the motions, in all respect to your Honor, should

3  be denied.

4          THE COURT:  What about a pretrial ruling?

5          MR. VEEDER:  Pretrial ruling on what, your Honor?

6          THE COURT:  On the issues that stick out of this

7  pleading and these motions.  Do you object to that?

8          MR. VEEDER:  I would prefer to get around trying

9  the lawsuit, frankly.  I look at it this way, that when we

10  put in our case, we will go rapidly along.  We are well

11  prepared.  It won't take long.  And when we get through --

12  why, let's try it out that way.

13          I will be frank with your Honor:  I have no desire

14  to have a millstone around my neck in regard to prescription.

15  I look at it this way:  When we get through proving our

16  rights, I think your Honor will sustain our claims.  I

17  truly believe that or I wouldn't have pleaded it.  I also

18  believe this:  that one javelin through us, small though it

19  may be, will be blown into a balloon of big magnitude.  I

20  have seen these things happen.  A little thing happens in

21  this courtroom and when it hits Washington, boom.  Big.

22          Now, I think your Honor is desirous of rendering

23  justice, and I know it.  My own view is, why not just let's

24  go along.  These motions to dismiss, I would have to take

25  an appeal on them.  I look at it this way:  We pleaded very

1   very carefully in this case, and we set up a lot of facts

2   that we think we can prove.  What advantage would accrue to

3   anyone if we were to have what Mr. Sachse desires to have

4   done?  He would have you knock out Counts 2, 3, 4, 5, 7, 10,

5   21, 22, 24.  Well, I have a deep affection for that complaint,

6   and I don't want any bones broken in it before we get to

7   trial.  So I don't know what our remedy would be, but I do

8   say that nothing will be gained.

9           THE COURT:  Why not?  Supposing we make the rule

10  that downstream use can't be adverse to upstream users.  Can't

11  we save some time?  We don't have to take any evidence on

12  that.  You have got your point.  If you want to appeal it, why

13  it is a nice --

14          MR. VEEDER:  I don't want to appeal it now.

15          THE COURT:  You couldn't appeal it now anyhow.

16          MR. VEEDER:  Oh, yes.  If a motion to dismiss is

17  sustained, I can appeal it tomorrow by filing a piece of

18  paper.  And I am not threatening.

19          THE COURT:  Oh, not unless I exercise my discretion

20  by saying this is such an important matter and it is severable,

21  and that there is no just reason why a judgment shouldn't be

22  entered, and so forth.  I do that, not you.

23          MR. VEEDER:  Well, the point of it is, until --

24  well, I shouldn't get into it.  I know what I will do, and I

25  know why I should do it.

1        THE COURT:  I know.  I am curious.  What would you

2  do?

3        MR. VEEDER:  Well, just one small piece of paper

4  takes jurisdiction away from this court until they say that

5  my appeal was no good.

6        The point I make is that I think that everything

7  that is in here is essential.  And I am willing to bet --

8        THE COURT:  You do that, and I will ask the

9  Circuit by formal order to fine you if you file any fic-

10  titious appeals just to take jurisdiction away from this

11  court.

12        MR. VEEDER:  I didn't mean it the way it sounded,

13  your Honor.

14        THE COURT:  I will tell you that right now.

15        MR. VEEDER:  I simply say that might be the net

16  result.  But why are we doing that?

17        THE COURT:  If you have a substantial problem where

18  there can be a severable judgment, I will give you a right

19  to appeal but --

20        MR. VEEDER:  The point I make, though, is that I

21  believe that we can put into the record a great deal of

22  evidence and a great deal of proof.  They would like to have

23  us forget about the stipulated judgment.  They would like to

24  have us say that it is not important.  But it is vastly

25  important.  That three second feet of water that has been

stolen from the United States of America every year since

1948 is probably as valuable a single property right as there

is in the valley.  And that water is there for one reason.

The Vail Estate is not exercising its riparian rights to the

fullest, and we want to put evidence in on that.

We feel the same way about our other rights.  And

we believe that nothing will be gained other than political

(inaudible) by some of these rulings of law; because, when

all is said and done, we believe this: that the Fallbrook

Public Utility District cannot and will not and hasn't the

capacity to build a dam.

THE COURT:  Well, we have talked about that.  Is

there anything else you want to say about this Count 21?

MR. VEEDER:  No.

THE COURT:  All right.  Let's hear you on Count 22.

MR. VEEDER:  These boys.  You want to hear me on 22?

THE COURT:  Well, Mr. Grover.

MR. GROVER:  The point that I have to make on

Count 22 is stated, I think, as much as I care to state it

in the memorandum.  And that is that use, beneficial use,

must be pleaded.  And in Count 22 -- in Lake O'Neill, for

example, there is actually quite a problem there.  Storage

is not itself a beneficial use.  You could store something in

a pond and never touch it again, and you would have no water

right.  You would have no appropriation or prescriptive right

1    there, and the Bassett case is cited on that point.

2           THE COURT:  The complaint alleges on page 34, line

3    25, for beneficial purposes.  Isn't that the equivalent of

4    beneficial use?

5           MR. STAHLMAN:  Surely it is.

6           MR. GROVER:  By reason of its riparian rights,

7    your Honor.

8           MR. SACHSE:  What page?

9           MR. GROVER:  That is page 34.

10          It says, "By reason of its riparian rights," is

11   that statement.

12          Now, I want to say again I am not trying to catch

13   you; I am trying to clear up just exactly what the --

14          THE COURT:  Of course, that is a sloppy pleading.

15   You talked about appropriating water by reason of your

16   riparian rights.  What does that mean?

17          MR. VEEDER:  I haven't said that.

18          THE COURT:  That is what you said.

19          MR. GROVER:  It's on page 2 and top of page 3.

20          THE COURT:  Paraphrasing:  "There has been

21   appropriated --

22          MR. VEEDER:  Yes, that is right.

23          THE COURT:  " -- 12,300 feet of water from the

24   surface and subsurface flow of the river by the U. S. by

25   reason of its riparian rights."  There has been appropriated

1    by reason of its riparian rights.

2              MR. VEEDER:  The term "appropriated" means diversion

3    and application to use, your Honor.

4              THE COURT:  This is not an allegation then of

5    appropriation in the legal sense of the word?

6              MR. VEEDER:  No, that is right.  "Appropriated and

7    used" means we diverted and used it.

8              And I might add that he is wasting a lot of time.

9    "Beneficial use" is a legal conclusion brought out in the

10   pleadings, I assume.  And when I did use it, it was out of

11   habit.  You say "use."  Then you prove whether it is beneficial

12   or not.  "Beneficial" is simply a legal conclusion.

13             MR. GROVER:  I think it is a fact in the case,

14   your Honor.  The point is confusing, because it said --

15   as I pointed out on the bottom of page 2 and the top of page

16   3 of the memorandum -- we don't know whether he really means

17   in addition to the riparian rights or by reason of them.  But

18   an appropriation by reason of riparian rights, that is the

19   appropriation in the physical sense -- the way an embezzler

20   appropriates or misappropriates money -- this is the idea

21   of taking -- appropriation does have that general sense.

22   If I take by reason of riparian rights -- I don't get an

23   appropriative right.  And hence, nothing new there.  He has

24   alleged his riparian rights earlier.

25             And he wants to stipulate that Paragraph 2 doesn't

1    give him an appropriative water right, and we understand that

2    in water law, why, of course, it is just surplusage.  It is

3    another statement of his riparian rights.

4            To get to Paragraph III:  The storage rights in

5    Lake O'Neill is really a problem here, because we had it at

6    the first trial.  The evidence there was of a diversion to

7    Lake O'Neill.

8            MR. VEEDER:  You are on IIIa now?

9            MR. GROVER:  I am on Paragraph IIIa, yes.  Roman

10   III, small a.

11           And, therefore, I think, in view of that history,

12   the United States ought to be required to allege that this

13   was for beneficial purposes.  And Judge Fee stated in his

14   opinion and is the opinion of the Court of Appeals that

15   requirement.  So there is no question about it.

16           Then, the 4,800 acre feet in and out of the water-

17   shed, of course, we have the problem there of the dates of

18   the Water Commission Act.  Again, as I say, I am assuming

19   that California law will apply here.  It has thoughly been

20   discussed before your Honor.  And my objection to that

21   paragraph turns on the fact that there is nothing alleged

22   in there prior to 1914, or December, 1914.  And hence, a

23   permit would be necessary for an appropriative right.

24           Now c raises quite a question.  It is one that

25   your Honor touched upon in discussing the matter with Mr.

Veeder here of the Indian lands upstream.  The objection that I have made here is that there is no allegation that the use was beneficial and that is the objection that I have.  Mr. Veeder may well have a point -- and it was not my intention to bring it up today -- about a riparian owner getting an appropriative or prescriptive right by using more than his share.  Now, Mr. Moskovitz has brought that up in his memorandum.  He says that it cannot be done.  But I should like to distinguish between a prescriptive and an appropriative right there.  A person might, by taking more than his share, give rise to a cause of action against him by a lower owner to let the lower owner have his share come down; and by reason of the failure to file that cause of action, the prescriptive period might run and a prescriptive title accrue. But here as an appropriation Mr. Moskovitz's point is that it is not an appropriation; that it is within his activity as a riparian owner.  Now, that is a point possibly that we ought to brief more fully, but it is not one that I have presented as an objection to Mr. Veeder's pleading there.

I think our people will be in a position of proving that on riparian lands they may have used (inaudible). Now, this may come up later; they may have used more than their share, and they may wish to claim that we have a prescriptive right as against the other riparian owners for that reason, as we have alleged prescription in our answer.

1              So whatever Mr. Moskovitz may have to say on

2      that it is not a point I am advancing against Mr. Veeder.

3              MR. VEEDER:  I wish you would say it is a point

4      that you are advancing against the United States and not

5      against Mr. Veeder.  You are breaking my spirit.

6              MR. GROVER:  I meant to say the United States.

7              THE COURT:  All right.  You want to come back at

8      1:30?

9              MR. SACHSE:  Yes, sir.

10             (Noon recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1743

E1

SAN DIEGO, CALIFORNIA, WEDNESDAY, JUNE 18, 1957, 1:30 P.M.

- - -

MR. VEEDER:  Your Honor, at this time I would like to -- oh, is anyone arguing?  Am I interrupting an argument now?

MR. SACHSE:  I certainly intended to make an argument to Mr. Veeder on Paragraph 22.

MR. VEEDER:  This is one of these mechanical things, Franz.  If I can go ahead with the housekeeping deal, that I had better take care of.

These are requests for admissions, your Honor; a series from Mr. Sachse and one from Mr. Teasdale.  I should like to handle these requests in the same manner.  And would you like, as I arranged yesterday, and do you want the names read into the record?

MR. SACHSE:  I will consent to all of them in the future.

THE COURT:  You have got a list.  Can you hand the list to the clerk?

MR. VEEDER:  May I do that, sir?

THE COURT:  Yes.

MR. SACHSE:  I know Mr. Teasdale.  I don't know him very well.

THE COURT:  Do you have a copy of the list for yourself?

MR. VEEDER:  I hope to get it back from him.

THE COURT:  All right.

MR. VEEDER:  We have one.

THE COURT:  Make a copy of it, Mr. Clerk, and file it.

And you want time on these now?

MR. VEEDER:  I would like to have -- what time did we get on that yesterday?

MR. SACHSE:  We just left that open.

MR. VEEDER:  We should like to have the same time, the same arrangement.

THE COURT:  Mr. Veeder, there is a long distance call for you.  And whoever is calling you -- President or the Solicitor -- I am being facetious -- has to leave in ten minutes.  Do you want to take the call?

(Short intermission.)

THE COURT:  Do you remember what time we gave you, Mr. Veeder, on those amended answers?

MR. VEEDER:  I believe it was open ended, your Honor.

MR. SACHSE:  The understanding was that Mr. Veeder within a reasonable time would get me the material and, if it was forthcoming, I would object.  But I am sure --

THE COURT:  All right.  We will not fix the date.  But get busy on it.  And we may have additional time to file

amended responses to the list that you submitted to the clerk.

MR. VEEDER:  Thank you, your Honor.

MR. SACHSE:  And I will undertake to see that Mr. Teasdale is advised.  I can see that he is.

THE COURT:  Thank you.  Mr. Sachse now.

MR. SACHSE:  We are on Count 22.  I am not going to be quite as brief as Mr. Grover was.  I think there is a little more there.  But before I get into the count itself, I want to make a comment or two on some statements as to the purpose of all of this.  Mr. Veeder suggested, in replying to the motion to dismiss Count 21, this served no useful purpose and we should get to trial.  Well, your Honor suggested earlier this morning that during the interval between now and the trial date, among other things, that we could well spend our time on would be the matter of resolving some issues.  And I certainly agree.  But I don't think it is a very practical project to try to undertake to write issues when the pleadings themselves are as wide open as this.  And I think it is useful not only to the court but to counsel to try to chop out dead wood or to eliminate claims that cannot, by any stretch of the imagination, be substantiated or that the law would not recognize if they were.  Now, still speaking generally, it seems to me that there is a lot in this complaint that is like sitting in a duck blind and firing both barrels with nothing and hoping you hit a duck.

And we have got a couple of cripples floating around on the water out here that we should pick up and get rid of. We have got the motion to --

MR. STAHLMAN: I have been wanting an excuse to bring my dog to court.

MR. SACHSE: We have got the motion to set aside the order of February 12th. We have got this prescriptive thing which we have been kicking around now for better than a year, and has been pretty exhaustively briefed; and I believe we have got the appropriative question which I am now going to get into in detail.

Now, Count 22. I think we ought to get rid of them. I think we should find a way why motion to strike, motion to dismiss, whatever the appropriate order or pretrial order of your Honor stating that a certain principle will be applied, any one is satisfactory to me. But we should find a way to eliminate some of these things from future consideration. Now, taking Count 22 itself. The count asserts about five different kinds of appropriative rights, the way I read it. There asserts rights acquired since 1942 by diversion, appropriation and use under claim of right by the United States. Then, it asserts rights acquired since 1942 by appropriation and use by the United States by reason of its riparian rights, and both within and without the watershed, since 1942. Then, it asserts a storage right to store water

based upon such storage since 1883.  Then, it asserts an appropriative right that dates from January 1, 1937 to divert surface and subsurface flow of the river.  And finally, it asserts an appropriative right that dates from January 1, 1910, to divert surface and subsurface flow of the river.

Now, I realize that it is perfectly proper to plead sometimes conflicting claims.  If you aren't quite sure which one holds water, why we can't object if claims that appear on their face to conflict are nevertheless pleaded.  That will have to wait for proof.  But some of these things, I think, on the very face will have to fail.  You have got to recognize the court can't even permit evidence on a couple of these.  The first one is the basic claim to an appropriative right.  And I am using the word "appropriative" as a right, not as appropriation, as a mere taking.  An appropriative right --

THE COURT:  What paragraph does this come in?

MR. SACHSE:  This will come under specifically Paragraph 1 of Count 22, in which the United States alleges that it diverted for beneficial purposes -- diverted, appropriated, and used.

Now, I conceive that to be a statement of a claim of right by the United States.  And if that claim of right were recognized, then the United States would have a right to reach upstream and insist that the amount of water covered

by that appropriation come on down to it, if it is a valid right.

Now, if there is anything that is beyond argument in the law of this State, Mr. Veeder notwithstanding, it is that since December 19, 1914, the exclusive method of appropriating water is by compliance with the Water Code.

THE COURT:  This is the same problem that we discussed in part yesterday, and raises the question as to whether or not the Government must comply with the Water Code on the appropriation of water.

MR. SACHSE:  That is in part except we did not discuss what the Water Code says.  As I understand it, Mr. Veeder has repeatedly also here advanced the proposition that it is perfectly possible for a private individual -- as I recall it, he even once said your Honor -- could, by taking and using water, get a valid appropriative right in California. Well, I think we ought to settle that.  We ought to find out if this is right or wrong.  And it is my absolute contention that that is wrong; that a private individual cannot, since December, 1914, obtain a right to use of water by the mere taking and putting to beneficial use.  Mr. Veeder suggested yesterday that the only proper method of appropriation was the old, let's say common law or non-statutory -- the first method ever used in the west of simply taking and using -- and that any possible changes or refinements of that by

State statute were wrong, were invalid.  One doesn't have to be a water expert to know why these refinements took place when the only diversions and uses were surface diversion by means of a flume or a ditch for purposes of a mine or surface irrigation of a field.  It was reasonably practical to calculate, to determine who was the first man on the spot and who first took the water.  But when you get into situations such as the one that confronts us here -- and I will confine myself to this one rather than theoretical ones, even though it is a nasty word for Mr. Veeder.  Here is Fallbrook.  Now, Fallbrook wants to build a dam.  Fallbrook is, under my instructions, complying with the only law it knows how to comply with.  There is no other statute.  We have asked for permits.  We have obtained them.  We believe that we have got a right by applying and receiving the permit.  Nobody in his right mind is going to spend millions of dollars, which Mr. Veeder mentioned, on a water conservation program without having a piece of paper to tell him he can do so.  And I believe this court should find, I believe the court must find -- whether it does it by dismissing this paragraph, or whether it does it by pretrial ruling -- how your Honor expects to rule on evidence is relatively of little importance -- but I believe you must tell us before we go further in the trial of the case whether you still will listen to the proposition that since December 19, 1914, someone, just someone -- leave

out the United States -- could have acquired a right to the use of water without compliance with the Water Code. I think your Honor is going to have to rule on it.

THE COURT: Well, I am going to rule on that. Of course, that is a very major point in this case. That I will rule on, if I have to rule as a matter of pretrial ruling, or it may come about as a part of the Government's motion for a summary judgment. Don't worry about that.

MR. SACHSE: All right. Then, the second one, your Honor, is this matter of claimed rights to store in Lake O'Neill. Now, the complaint of the United States simply says "store." It is very interesting, and I realize that on motions to dismiss we do not consider other documents. But in answer to an interrogatory -- pardon me, a request for admissions, not an interrogatory -- by Fallbrook, the United States denied, denied expressly under Mr. Veeder's oath that water from Lake O'Neill was put to direct use for irrigation purposes prior to the acquisition by the United States.

If it wasn't put to use for irrigation purposes -- they certainly didn't drink it, not a lakeful on the Rancho. There couldn't possibly be any beneficial use connected with it. We have then a pure naked matter of storage, storage alone; somebody has diverted water out of a stream to fill up a pond. It is a beautiful thing to look at; and he has

1    never used it; never used it at all.

2    Mr. Grover cited Basset (phon.) v. Nugget Bar which is

3    a most recent case, but the language I cited in my memorandum

4    comes from the Round Valley, Lindbaum against Round Valley

5    Water Company; and it was also stated in the Basset   case;

6    and it is short and to the point.  It says that all that it --

7    being the Round Valley Water Company --

8    MR. VEEDER:  Counsel, could we have the citation on

9    that.

10   MR. SACHSE:  Yes, Lindbaum vs. Round Valley Water

11   Company, 178 Cal. 450 at 456.

12   THE COURT:  450?

13   MR. SACHSE:  At 456, yes, your Honor.

14   And this is a quotation.  It is short.

15   "All it could acquire by diverting or impounding the

16       water was the usufructuary rights, not an ownership

17       of the corpus of water, except perhaps so much thereof

18       as it has actually reduced the possesion in its

19       reservoir.  The matter here in dispute is not the

20       ownership of any particular quantity now impounded

21       but the right to dam and control the water as it

22       runs into and through Round Valley.  Storage of water

23       is not in itself a beneficial use.  It is a mere means

24       to the end of applying the water to such use."

25   Now again, it is immaterial to me whether the

1  ruling is on a --

2          THE COURT:  You are talking about Paragraph 3 a

3  in parenthesis now?

4          MR. SACHSE:  I am now on Paragraph -- let me make

5  sure I am right -- Paragraph 3 a parenthesis, 3 sub a, yes,

6  your Honor.

7          It doesn't matter whether the ruling is on our

8  motion to dismiss or, again, as your Honor suggested in

9  connection with the last point, simply in the form of a pre-

10  trial order.  But I believe we should know before we take

11  evidence on this case whether -- I think the United States

12  would want to know -- whether your Honor will rule that the

13  mere act of storage since 1883 -- let's concede it for this

14  argument -- the mere act of storage could give anybody a

15  right.  I think we should know that.  That is a very, very

16  important legal question.  If it could give them a right,

17  then the proof, the rebuttal, the impeachment will take one

18  direction.  If it can't give them a right, the mere naked

19  storage, then certainly Mr. Veeder's proof for his side is

20  going to have to be different.  And there again is something

21  that I think, so to speak, clears away a little fog and makes

22  it possible for all the parties to know a little better what

23  we are trying here.

24          Now, I would most respectfully suggest that you

25  could quite properly make a ruling either on this motion or

in the form of a pretrial order as to whether or not the

pure storage with nothing else attached to it confers any

right whatsoever.

THE COURT:  It is your point that the Government

has not alleged enough?  They have not alleged that they

diverted the water into this reservoir and thereafter used it

for a beneficial use?

MR. SACHSE:  My point is two-fold:  It is first

that there is no allegation in the complaint that the water

in the reservoir has ever been put to a beneficial use.  And

what is a great deal more important to me at the ultimate

trial is that I have a sworn response to a request for

admissions in which they state that the O'Neills never put

the Lake O'Neill water to irrigation use, to irrigate.  There

might have been other beneficial uses, but to irrigation; it

is limited to that beneficial use.

MR. VEEDER:  I think you are going to waste a lot

of time on what you are saying, Franz, if I may interrupt you

for just a moment.  If you will read your interrogatory, you

will find that you did not inquire on the point concerning

which you are now arguing.

MR. SACHSE:  It is request for admissions, not an

interrogatory, Mr. Veeder.

MR. VEEDER:  Yes, request for admissions.

MR. SACHSE:  I have read it 16 times, and I am sure

1          of what I ask.

2                    MR. VEEDER:  You are wasting the court's time and

3          your own.

4                    MR. SACHSE:  I have read it 16 times.

5                    THE COURT:  What, so I can follow this, what is

6          your contention, that in a request for admissions the

7          Government made an admission that --

8                    MR. SACHSE:  If your Honor will indulge me just a

9          moment, I will find it.

10                   MR. VEEDER:  I will read the request --

11                   MR. SACHSE:  Let me be sure you are reading the

12         one I want.  If you want to show it to me and save me a

13         minute's time, all right.  Let me see if it is the one.  Yes.

14                   "Prior to the acquisition of Camp Joseph" --

15              this is the statement that I made -- "Prior to the

16              acquisition of Camp  Pendleton by the United States

17              in 1942 water stored in Lake O'Neill was used for

18              direct irrigation of crops."

19              Response:

20              "The United States of America denies the truth

21              of the statement."

22              And the next one:

23              "The only use of the O'Neill ditch is to divert

24              water to Santa Margarita River into Lake O'Neill."

25              "The United States denies the truth of this

statement."

And so there is a whole series.

MR. VEEDER:  You want me to explain it?

THE COURT:  Let me see it.  You re ad it so fast
I was trying to follow you.

MR. VEEDER:  I think the crux of the question was
Mr. Sachse's unfortunate use of the word "direct."  Had he
used a different word, the response would have been different.
There is a difference between a storage right, Mr. Sachse,
and a direct flow right.  It is a very important way we
use the water.

THE COURT:  Go ahead.

MR. SACHSE:  The point I am making, your Honor,
is simply this:  I am not going to win a case on a single
request for admissions, or a single denial, or a single
admission.  But the point I am making is that all of these
things are going to be deeply involved in facts.  One of
them is going to be what happened on Lake O'Neill.  What
the O'Neills did with Lake O'Neill.  For what purpose was
Lake O'Neill there.  How did they use the water.  And if
your Honor can help us by laying out the ground rule, shall
I say that storage alone with nothing else does not confer
an appropriative right.  If your Honor made such a rule, it
would be of great benefit to Mr. Veeder.

THE COURT:  Have you cited cases to that effect in

your memorandum?

MR. SACHSE:  I have.  I have cited them, your Honor, including one, I think the most recent is 1956.

Now then, the next of these to which I refer to as a shotgun  paragraph -- this is pretty hard for me to understand how anybody would store water unless there were some beneficial use that they put it to.

MR. VEEDER:  That is right, your Honor.

MR. SACHSE:  Your Honor can see two very fine examples if you will read the Lindbaum case and the Nugget Bar case.  They stored water, and they didn't do anything with it for years and years and years.  And then they wanted to do something with it.  No appropriative right.

THE COURT:  Do you have any thought that the proof is going to show that the water has just been stored up there at O'Neill for the Marines to shoot ducks on and no use has been made of the water?

MR. SACHSE:  Your Honor, Lake O'Neill, as I understand it -- and, again, we are getting off onto a side issue now on facts -- in the first place, Lake O'Neill is not an artificial lake; it is a lake that is made larger by artificial means.  But Lake O'Neill itself is lower than the bed of the Santa Margarita River.  You can't drain Lake O'Neill; you have got to pump the water out.  Lake O'Neill was there before the first Indians were in the country.

Because it is a little sink into which Fallbrook Creek empties.
Now, it is true dykes were created around it.  Its level was
raised, and water was diverted into it by the O'Neills.

I don't know what Mr. Veeder's proof is going to
show the purpose for this diversion was.  I don't know.  But
I am very interested in knowing from your Honor whether you
will require it to show a beneficial use or you will be
satisfied with the storage alone.  I do not believe you can
be satisfied with the storage alone.

THE COURT:  What?

MR. VEEDER:  I assure your Honor that we will not
only prove that water was diverted and impounded into Lake
O'Neill and subsequently used beneficially; we will show
that water was run directly through the lake and out the other
end as part of our proof.  As I say, it is a matter of
semantics.  It was unfortunate Franz asked the questions that
he did.  Had he been more specific, he would have got a
different answer.

MR. SACHSE:  If we are going to discuss semantics,
these motions were addressed to the pleadings as they exist;
and there is absolutely no allegation that the water, no
allegation in the pleadings that the water was put to bene-
ficial purpose.  There isn't.

MR. VEEDER:  If you turn to page 6 and look at
Paragraph VIII you would have it.

E4

THE COURT:  Page 6?

MR. SACHSE:  Page 6.  My motion is directed to this paragraph.

THE COURT:  I have it.  But this count incorporated by reference everything that went before.

MR. VEEDER:  That is right.

THE COURT:  What have you got on page 6?

MR. VEEDER:  A complete statement about application of water to beneficial use.

"Those rights to the use of water described above have, since the acquisition of the property to which those rights are appurtenant, then applied to a beneficial and consumptive use by the United States of America in the performance of the varied functions ..." and on and on and on.

I didn't think I had to repeat it every time. It is there all the way through.

MR. SACHSE:  The rights to the use of water described above which are the paragraphs before Paragraph VI of the original complaint.  That is the above.  It is Paragraphs I through V.  There isn't a word in it about Lake O'Neill.  Nothing.

MR. VEEDER:  We claimed all of our rights in there.

MR. SACHSE:  That is my story.  You shoot a gun into the air, and you hope you hit a duck.  I want to know

what duck you are aiming at, Mr. Veeder.  And I think

pleadings are designed for that purpose, to assist all parties

in the court in knowing what the issues are going to be.

MR. VEEDER:  You might also look at your agreed

facts, Franz.  We agreed to all of this.

MR. SACHSE:  We didn't agree to beneficial use.

THE COURT:  Go ahead.

MR. SACHSE:  Now, Paragraph III, subparagraph b.

I confess I have trouble finding what they are after.  It

talks about what I read to be an appropriative right based

on diversion and use both from surface and subsurface within

and without the watershed.  That one I can cover very briefly,

if that is an appropriative right since 1937, which they

allege.  Well, it will be disposed of by your Honor's ruling

on the first point, namely, whether an appropriation can be

accomplished since 1914 without a filing.  And if it is not

an appropriative right, I certainly should like to know what

it is.  Is this just a rehash of what we have said before?

Are there riparian rights?  If it is an appropriative right,

it is going to be covered by your Honor's rulings on the

requirements of making a filing.  If it is an appropriative

right, it doesn't tell us what it is.  This whole count

deals with appropriative rights, so I am assuming it is an

appropriative right.

Now, the same comment would apply to the next one,

1   except the comments regarding its indefiniteness, except the

2   next subparagraph alleges that this subparagraph, this parti-

3   cular one, has taken place since 1910.  If it was an appro-

4   priation of water, I will concede without argument that

5   appropriation was possible in 1910 without filing a piece of

6   paper.  There were certain other standards applied.  If it is

7   a prescriptive right, I want to know.  But even if it is an

8   appropriation, I want to know what kind of an appropriation.

9   How this appropriation came into existence.  The law prior

10  to 1910 or to 1912 -- wait a minute, 1914; pardon me --

11  permitted the appropriation of water by the mere taking of

12  it and putting it to beneficial use.  But the cases are

13  absolutely critical here that the appropriation was completed

14  only when the water was put to use.  The mere starting of

15  diversion, the mere posting a notice, all the preliminaries

16  accomplished nothing until that water was put to use.  And

17  when it was put to use, the appropriation was completed.  And

18  I don't find any allegation that this water was put to use.

19  Now, if it was used within the watershed -- he says, "used

20  within and without" -- if it was used within the watershed,

21  then I believe that the presumption will be it was used under

22  a riparian right.  These are riparian owners.  He had a

23  perfect right to take the waters of the stream and use them

24  within the watershed.  I believe that will be the presumption.

25      This also is further complicated all the way through

these subparagraphs by what seems to be an attempt to sub-
stitute uses.  I am stealing that word from a certain court
decision.  Assuming that the Rancho made an appropriation to
take water outside of the watershed and supply a bean field
with it.  I do not believe that the United States can sub-
stitute for such an appropriation a new use outside of the
watershed to supply a Marine barracks.  I do not.  It must,
of necessity, be a new appropriation.  Mr. Veeder has made a
tremendous point in many arguments, standing here at the
board and talking about the Sandia Creek appropriation and
the Rainbow Creek appropriation, about changes -- changes in
place of diversion -- and, actually, they are only a half
a mile apart; and it is all on the same stream.  Now, I
don't believe that the United States can rely upon, assuming
it proves it, assuming it proves that appropriation for
agricultural purposes in bean fields or for cattle watering
or for anything else by the Rancho Santa Margarita outside
the watershed,  that the United States can then say, well,
they made an appropriation for bean fields outside the water
shed; we are going to take the thing outside the watershed
in the other direction and wharf landing craft with it or
house Marines.

THE COURT:  That is a point on which you and Mr.
Moskovitch don't agree, isn't it?

MR. SACHSE:  We are at a half disagreement.  Mr.

1762

1   Moskovitz says it is perfectly possible that it can be

2   changed, but I do not understand Mr. Moskovitz to disagree

3   to the extent that he says it is not possible that the appro-

4   priation could be abandoned.  There is a question of fact

5   by reason of a completely different type of use.  Mr.

6   Moskovitz disagress that the mere change of use necessarily --

7   he had better speak for himself -- but my understanding is

8   his contention would be that the mere change of use of and

9   by itself did not necessarily terminate the validity of the

10  appropriation.  But I think he will concede the language of

11  the Water  Code:  That it could be abandoned; and if the

12  change in circumstances, if the type of use were sufficiently

13  great -- and I think they are -- then that appropriation has

14  lapsed by reason of non-use over a period of five years, and

15  it is now once again public water of the State subject to

16  appropriation by anyone.  I would ask your Honor to ask Mr.

17  Moskovitz to discuss it.

18          I think that covers the specific points.  And I

19  should like to state them very rapidly in summation, if I may.

20  First, I don't believe that the United States could -- I don't

21  think any allegation in this count which deals with a right

22  acquired since 1942 -- I think none of them are any good.

23  Since 1942 it is my position that the only way that right

24  could have been acquired was by compliance with the Water

25  Code.  Then, since 1937, he has another one.  That couldn't be

1  any good for the same reason.

2       Now, he has two claims that are prior to the

3  Water Commission Act:  One to store in Lake O'Neill, and one,

4  this appropriative right dating from January 1, 1910.  On the

5  right to store in Lake O'Neill I have cited your Honor the

6  cases.  I believe that without some proof, some allegation of

7  beneficial use no appropriation could have existed.  And as

8  to the right to divert surface and subsurface flow of the

9  river subsequent to January 1, 1910, I make the two points:

10 One, that since the diversion is within the watershed, and

11 he is a riparian, we must presume it was a riparian use rather

12 than an appropriation; and the absence of some showing that

13 it was an excess of riparian rights.  And the second point

14 that I stated a moment ago, that the appropriation was for

15 one purpose.  Then it is conversion to an entirely different

16 purpose for a period of more than five years has resulted in

17 the loss of the appropriation and the diversion of that

18 water to public waters of the State.

19       THE COURT:  Well, even you concede that would be a

20 question of fact.

21       MR. SACHSE:  Pardon me, sir?

22       THE COURT:  Even you concede that would be a

23 question of fact.

24       MR. SACHSE:  Whether the use has been changed?  Yes,

25 your Honor; but I again direct your attention to the fact that

1764

1     the motions are directed to the pleadings, and the pleadings

2     don't tell us anything.  The pleadings don't say.

3         THE COURT:  You have a right to make requests for

4     admissions and submit interrogatories with reference to

5     pleadings.  Your motion is a motion to dismiss.  Motion to

6     dismiss could only be granted if under any conceivable theory

7     of the facts alleged there would be no relief granted.

8         Mr. Moskovitz.

9         MR. MOSKOVITZ:  Your Honor, I should like to direct

10    my attention first with respect to this appropriative claim

11    of the United States, or these appropriative claims of the

12    United States to Paragraph II, which appears on page 34.

13    Just to clarify a point, and direct your attention to the two

14    sentences that appear on page 34 at the bottom of the page.

15        "There have been, for beneficial purposes,

16       annually diverted, appropriated and used by the

17       United States of America approximately 12,300 acre-

18       feet of water from both the surface and subsurface

19       flow of the Santa Margarita River by the United

20       States of Ameria by reason of its riparian rights.

21       That quantity of water is utilized for both mili-

22       tary and agricultural purposes both within and

23       outside of the watershed of the Santa Margarita

24       River, dependent upon demands."

25        It is difficult to tell for sure what the purpose

E5

1    of this allegation is.  Presumably these allegations all have

2    the common purpose of setting forth facts upon which a water

3    right can be based.  Now, what kind of water right can you

4    base upon those two sentences?  It takes about "by reason of

5    riparian rights," and Mr. Veeder said the use of the word

6    "appropriated" in that first sentence didn't have reference

7    to an appropriative right.  In effect, I assume he said that

8    it had reference to a reiteration of riparian rights.  But

9    the second sentence talks about use of that water both

10   within and outside of the watershed.  Now, if he is talking

11   merely about the fact that as water is coming down the United

12   has used it both within and outside, just a fact, I suppose

13   that is all right.  But that fact doesn't give rise to any

14   rights, that is, the use outside the watershed of water which

15   is claimed or is due by reason of riparian rights, just

16   doesn't make sense.  Mr. Veeder accuses me of reaching for

17   issues when I said that that paragraph seems to assert a

18   right to use water outside the watershed by reason of

19   riparian rights.  I said that is page 1 of the memorandum

20   on this appropriative right issue.  And Mr. Veeder chided

21   me for saying "seems."  Well, that is the best thing I can

22   say about it.  It is quite indefinite.  And to the extent

23   that it does assert that kind of right, obviously it has

24   no place in the complaint.  It should be thrown out.

25           Now, Mr. Veeder has assured the court, and I

accept the assurance, that there are no claims made of a
right to use water outside the watershed based upon riparian
ownership or riparian rights.  And if that is the case, we
can read this Paragraph II as merely a rather confused
statement of something else.

Now, going on to Paragraph III which details the
various types of what I gather are appropriative claims or
claims of appropriative rights.  I think the comments that
Mr. Sachse made are all appropriate with the exception of the
point on which we do have a disagreement.  And I will go into
that.  But on subparagraph (a) I think the allegation of
beneficial use isn't necessary.  If that is implied by other
paragraphs, I wouldn't push this any further.  I would say,
"Let Mr. Veeder put in his claim."

THE COURT:  And if it became necessary that that
be in there, there could be an amendment to conform to proof
in view of the general allegations, proceedings in
the complaint; could there not?

MR. MOSKOVITZ:  I would say so.  I certainly
wouldn't be technical and say that it had to be thrown out
of court, not on that account.  But I think the issue is
important because the amount of water, the quantity of the
appropriative right which might result from the uses of
Lake O'Neill would be affected by whether the water was
stored in order to have a beautiful lake to look at --

perhaps a place for swimming. I don't know if they swim

there -- but the beneficial use might be material, the

evaporation from the surface. Whereas, if the water was

stored and actually put to use for crops, or for other

purposes consumed in some way, that would be entirely dif-

ferent. So I think it would be important to remember that

there must be some kind of beneficial use, and the use can

be just keeping it there to look at.

THE COURT: If Mr. Sachse is right, that this Lake

O'Neill was originally a natural lake, a sink, the water

ran through this sink and then on down the stream -- let's

assume that that is all there was. Do you know of any law

that would require a man to fill up a sink where water might

from that sink seep down into the underground?

MR. MOSKOVITZ: No. No, I think that to the extent

it is a natural condition, your Honor, no appropriative

right need be required to continue to maintain it. But

then, of course, there would be no reason to allege it. It

is only to the extent that it involved more than the main-

tenance of natural conditions that an allegation has to be

made of appropriative right.

Now, on subparagraph (b) we have the question of

the possibility under California law of an applicant of

an   acquisition and an appropriative right without the

permit and we have argued that many times before. It is

involved also in Paragraph I of Count XXII on the previous

page.  I won't belabor that further, but I do want to call

your attention to the briefs that have been submitted.  I

think over the intervening months since those briefs were

submitted and those points argued the issues and the law

may have become somewhat vague.  And I know that all the

parties did a lot of research and put a lot of time into

those cases, and I think they are all applicable now in the

arguments on the motion.  And if you desire further argument

on those, I would be happy to make it; but I don't want to

repeat things that you have well in mind and feel you have

had sufficient argument upon.  We do still urge upon you that

there is no other law, no other way by which the United

States can secure a right to compel the delivery of water by

those upstream than by proceeding under California law.

Because here, your Honor, with respect to the Rancho Santa

Margarita we never had a situation where the United States

had some right based upon its sovereign ownership of land

when the Treaty of Guadalupe Hidalgo was signed.  The Rancho

Santa Margarita was in private ownership at that time.  It

was a Spanish rancho under Mexican rule.  The United States

cannot trace any right to use water on that ranch except

by diversion from the Rancho or by what it might have acquired

since, since it acquired the Rancho.  The fact that on public

lands, on forest lands it may have some other kind of right,

1  it cannot help it down at the Rancho Santa Margarita.  And if

2  it wants a right, then it has to get it the way anybody else

3  would under the only law that is applicable, the State of

4  California.

5       THE COURT:  I am inclined to agree with you, but,

6  again, that is not as clear as you would make it appear.

7  Going back to these arguments I spent the night reading:

8  One of these learned gentlemen states that the Government has

9  certain rights that come to it from reserved lands.  How

10  logically can you say that the Government doesn't have the

11  same kind of right if it acquires land by condemnation or

12  purchases?

13       MR. MOSKOVITZ:  The difference is this, your Honor.

14  When the United States acquired the land upstream by cession

15  from Mexico -- this was at a time prior to the formation of

16  the State of California -- now, presumably there were certain

17  property rights which attached to the ownership of these

18  lands, certain rights to water.

19       THE COURT:  That is not what I am talking about

20  here.  Here is what I am talking about.  Take the Crocker

21  (phonetic) Dam case.  That is the case, wasn't it, where the

22  Government had reserved lands on either side?

23       MR. MOSKOVITZ:  That is correct, your Honor.

24       THE COURT:  And because they had reserved lands

25  the Supreme Court said that they could build this dam and

1  didn't have to worry about the State situation.

2          Now, this particular writer -- I am not indicating

3  I agree with him -- proposes this question:  Instead of the

4  Government having to reserve lands supposing it were con-

5  demned or purchased lands on either side of the river

6  where appellant dam was to be built.  Would the result be

7  any different?

8          MR. MOSKOVITZ:  Your Honor, I say that the result

9  might very well be different if the United States purchased

10  the land or condemned it, either one.  It could receive no

11  more than the owner had in the way of property rights.  There

12  is a point as to what can the United States do with the

13  property that it gets.  It may not be restricted the way

14  the private owner is restricted, but certainly he can rise

15  no further than the property rights.  And the question is:

16  What is the property right in this case?  Now, this doesn't

17  mean the United States is precluded from exercising its

18  constitutional duties and responsibilities and rights.  If it

19  is the Congress has authorized a certain activity and the

20  Constitution permits that activity by the United States,

21  the United States can get whatever property rights it needs;

22  but it must proceed in a way by which it can get those

23  property rights.  And if it cannot get those property rights

24  by purchase, because the present owner didn't have them,

25  it must use other means.  Right?  I never have urged and I

1    wouldn't urge that the United States cannot get what it

2    needs by one means or another.  But the question is:  Has it

3    done so by the means it has so far used?  And my point is,

4    with respect to the Rancho, the Rancho Santa Margarita, it

5    couldn't rely upon the ownership of land that came to it

6    before the State was created.

7            THE COURT:  That is upstream?

8            MR. MOSKOVITZ:  That is upstream.

9            THE COURT:  The Government has conceded that, has

10   it not, that nothing that they have upstream can augment

11   their rights at Pendleton?

12           MR. MOSKOVITZ:  That is right.  And the further

13   point I want to make, your Honor, is:  These Acts of 1866,

14   1870 and 1877 that have been referred to all concern rights

15   to the use of water, to relinquish the rights to the use of

16   water that the Government had because it was the owner of

17   public lands.  And you don't have to rely upon those when

18   we talk about the Rancho Santa Margarita, because there the

19   Government never had those rights.  The Acts of 1866 and '70

20   and '77 are not needed in order to prove the point that to

21   get a right as to use there State law must be complied with.

22   There is no other source.

23           Moving on to subparagraph (c) on page 35.  I feel

24   and I have so argued that the United States if it succeeded

25   to an appropriative right from the Rancho could transfer the

place of use and the purpose of use of that right.  And at

the last meeting we had a week or so or two weeks ago I cited

the Code sections which make this plain.  If this was a

right that was acquired before 1914, the change could be

made without coming to the State Engineer or the Water

Rights Board at all.  And if there is issue between us,

Mr. Sachse and me, on this, so be it.  I think his point is

correct that there may be a fact issue as to whether there

was an abandonment.  Now, I think abandonment could result

if there was a failure of use for the proper period of time,

five years, and then an attempt to revive the use somewhere

else; now there might be an abandonment.  But if there was

a shift without a cessation of use -- I think this is all

right.  I think the key question is:  Does subparagraph (c)

allege the facts sufficient to assert an appropriative

right in the Rancho that could be transferred?  And, as I

read that subparagraph, it fails to do so.  What it states

with respect to the prior rights of the Rancho is that "The

United States of America is informed and believes"  -- this

begins on line 22, page 35 -- "and upon that information

and belief alleges that its predecessors in interest diverted

and used within the watershed of the Santa Margarita River

large quantities of water in excess of their riparian

entitlement, diverting that water from the Santa Margarita

River by means of pumps."

And then the paragraph goes on to state that this use dated from 1910.

Now, I think it is important to analyze that sentence which I quoted. There was use within the watershed of quantities of water in excess of riparian entitlement of the Rancho. Now, I say, your Honor, that this could not be so as a matter of law. If the use was within the watershed, and if the use was of a direct flow of the stream, and, that is, without artificial storage, as the water came down naturally, then the use within the watershed of that quantity of water was within the riparian entitlement of the Rancho. It could not have been otherwise. The riparian has the right to use whatever quantity of water is not taken by the others, especially when he is the last user on the stream. And use that within the watershed. This is a riparian entitlement. He would not have to get an appropriative right, appropriative permit, to do that. He could not be stopped from doing that no matter who he was. And I cited cases in my memorandum to that effect, that the right of the riparian is to the full flow of the stream if he doesn't interfere with other riparians. And it follows that the last user on the stream who uses water that has been permitted to come down to him couldn't be interfering with someone else. So I say that the use which was alleged here in the certain sentences I quoted is riparian use and could not result in an

appropriative right.   And for that reason I say the entire

subparagraph (c) does not state a cause of action for an

appropriative right.

I believe, therefore, your Honor, that except for

subparagraph (a), which, if we are liberal in construing it,

may, by reference, by incorporation, assert a beneficial

use of the stored water, except for subparagraph (a) this

entire count, Count XXII, should be dismissed; because it

just doesn't state facts upon which a claim can be or relief

can be granted under the law.

MR. STAHLMAN:   May I make a comment, your Honor.

I have not filed any motions in connection with this, and I

don't want the court to believe that we may not have some

ideas or some opinions of the law in relation to these matters.

I am accused of being a little unorthodox at times in my

practice.   However, I don't feel that anything can be

accomplished except to fertilize Mr. Veeder's already very

fertile brain.   However, we merely denied the allegations of

these counts.   And I think that questions relative to the

application of the law can much better be determined when

the proof is in.   And I have ideas on this thing, on many

of the questions that come up.   I think it is a very cogent

part of this pleading.   However, it seems a lot of time

spent on a complaint that is, goodness knows, how many pages

long here, talking about taking out one paragraph.   Let's

1   leave it in there and let's see what the proof is that is

2   going to be positive to me and to the interests of Vail.

3          THE COURT:  Mr. Veeder.

4          MR. VEEDER:  Yes, sir.

5          THE COURT:  When I looked this over -- I did it

6   hurriedly -- but I sort of come to the conclusion that your

7   enumeration on page 35 of your three different items which

8   total 12,300 acre feet was merely an itemization of what

9   you had in Paragraph II on page 34 of 12,300 feet.  Is that

10  just a coincidence that they are the same, or am I wrong that

11  you are claiming twice 12,300 feet, or are those three items

12  on the following page all part of your general Paragraph II

13  on page 34?

14         MR. VEEDER:  We have had to plead alternatively

15  on the subject, for this reason:  We are not completely sure,

16  and I don't believe anyone will be completely sure until the

17  evidence is all in.  That is why I have sort of maybe been

18  a little captious with my friends at the left.  We are

19  confronted with the problem -- if your Honor had been in the

20  courtroom when Mr. McNerney and Mr. Cannon testified, you

21  would see the problem which we are confronting.  We have an

22  area roughly the entire south border of Camp Pendleton where,

23  I assume, that 75 per cent of our uses are outside the

24  watershed.  And yet, when I asked Mr. McNerney on the stand --

25  and he is the man that opens and shuts the valves -- I said,

1776

1    "How do you know what water is used where?"   "How do you

2    know when you take the pump water out of the Santa Margarita

3    Basin that it will be applied to a Marine within or without

4    the watershed?"  He said he didn't know.  And the answer is

5    obvious.  You have one complete and single system, by and

6    large, to serve the area.  So we pleaded alternatively and

7    not in --

8              THE COURT:  Your total claim is 12,300 feet?

9              MR. VEEDER:  That is correct.  That is how much

10   we are using today.

11             THE COURT:  That is your total claim?

12             MR. VEEDER:  That is right.  We are claiming a

13   maximum of 23,000 acre feet in time of complete mobilization.

14   But we are confronted with the problem -- we are not claiming

15   24,600, but that --

16             THE COURT:  These are alternatively pleaded?

17             MR. VEEDER:  Yes, it is alternatively pleaded,

18   your Honor.

19             THE COURT:  All right.

20             MR. VEEDER:  And I just hope that explains the

21   situation.  I assure the gentlemen who have been critical

22   of the pleadings that the difficulty which we are encounter-

23   ing is that if we were to limit ourselves entirely to a

24   particular kind and type of use used in a particular kind

25   and type of place, why, we simply don't have the facts; we

truly don't know.  And I think that your Honor will have to make findings on it, because, for example, the (inaudible). Is the arguing all through, or am I to go ahead?  I would like to respond --

THE COURT:  Go ahead.

MR. VEEDER:  The problem with which we are confronted is that the uses now being made encompass a vastly larger area than water was applied to irrigation; and yet, I believe that the law of California will support our position that if there is not an increased burden on the stream, you can change point of diversion and place of use of the water without regard to the historical use of it.  I think the law is so clear on that that I don't see how there can be a reasonable argument on it.  And the reason for it is very sensible and goes back, I think, to the very earliest history of this State's water law, that if there is no increased burden, who can legitimately complain?  And that is the criterion that we desire to have made applicable here.

We believe that alternative pleading, to begin with, to answer the immediate question, is certainly proper; and we further believe that we have pleaded alternatively.  I think when we use the words "these rights have been exercised" that it encompasses the diversion application of water to beneficial use.

But in my memorandum to your Honor of June 11, 1958, answering what was designated "Proposition No. 1" we touched upon the questions that have been discussed here. And I don't believe that the State of California is in difference, is in conflict with us in this matter at all. I believe that the State recognizes that we can use Lake O'Neill water, that we can use the waters that we say are appropriative -- but that is a question of law -- that were acquired within the watershed.  Mr. Moskovitz has touched on the question of our being the lowest party on the stream-- at least at the bottom end of the stream; not the lowest, I hope -- that we couldn't acquire an appropriative use.  But I think that the evidence which we will introduce -- and we have men that were actually the farmers in that area.  We are going to call them as witnesses.  They pumped the water during the very driest period of the year; and that was the source of their water, was pumped water from our subterranean basin.

We claim that we have a right, in addition to the riparian right, to have water come down from upstream and to recharge those basins.  Again, it is a question of fact. That is why these arguments on motions to dismiss seem so futile.  Because if we fail to prove our claims, the appropriate relief is a motion for judgment.  But certainly, I respectfully submit, that a preclusion of the National

1  Government from putting in evidence now will be so futile,

2  because, when we get this evidence in, we are going to have --

3  I understand our obligation -- we are going to have to show

4  what uses are made and what waters are used and where.  And

5  it may be that we will simply have to say to your Honor,

6  "Well, now, here is the circumstance:  We have impounded

7  water in Lake O'Neill.  We have released it.  It has been

8  pumped out of the basin."  Now, is that an increased burden

9  on the stream?  We don't know.  But we truly believe that

10  we are entitled to claim that the upstream diverters and

11  users must release water down to us to meet those obligations.

12      So how can we possibly handle such a circumstance

13  as that as a matter of law?  When they filed their motions

14  to dismiss, they admit everything that was well pleaded.  And

15  they will say, well, they weren't well pleaded.  I disagree,

16  of course, because when we used the words "diverted and

17  applied the water to a beneficial use" throughout the

18  complaint and reincorporated it in each paragraph, I think it

19  is there.  We were very specific in our pleadings in regard

20  to Lake O'Neill.

21      But, again, I should like to allude to the facts

22  that when Mr. Sachse filed with us his interrogatory and

23  asked for a response, he used an unfortunate term, as I have

24  said.  He says, "used for direct irrigation."  Now, we have

25  a problem.

THE COURT:   By that you mean the water from O'Neill was allowed to flow down --

MR. VEEDER:   Direct.

THE COURT: -- recharge the basin, and the water was pumped out of the basin for irrigation purposes; is that it?

MR. VEEDER:   It can work both ways, your Honor. And historically, we have men who are well up in their eighties who talk about Lake O'Neill and how it was operated and how it functioned, and men more recent on the subject. It appears, and it is quite possible, that we will be able to show that some of the diversion came out of the main stem of the Santa Margarita, entered Lake O'Neill and flowed on through.   And I believe that would probably be a riparian right, because there was nothing more than a diversion there. We also have them saying that whenever water was available they would divert it and they would impound it and they would store it.   Now, that is strictly an appropriation.   So, when we were asked the question, we couldn't answer it with the specificity that would be required.   But we do say, we do say, that Lake O'Neill certainly and historically has been used, at least for the major part, as an appropriative right. The interesting thing about it -- and your Honor touched on it one day when you pointed out that an appropriative right can be for time or for quantity or for several other

1  things; you have touched on a matter that is extremely

2  important from the standpoint of our proof of our rights to

3  the use of water.  Our witnesses will testify that whenever

4  water was available in the stream during the low water

5  periods -- that is extremely important to us here -- they

6  diverted and they impounded water and they held it there

7  as long as they could; and they didn't impound water during

8  the high runoff period.  And that is an important factor, too,

9  because water was used for purposes of maintaining the

10  grass coverage.  There was a livestock operation in those

11  days.  So we have a variety of uses, a variety of circum-

12  stances concerning which proof and proof alone will govern.

13  When Mr. Moskovitz says in his memorandum, "Your pleadings

14  do not establish," I don't understand that.  My only hope

15  was that we would state a claim which would permit us to

16  introduce evidence of the kind and type and variety of

17  interests that we have.  Now, it may be that evidence that

18  we have introduced -- and I want to thank Mr. Sachse for it --

19  will show that our riparian rights down here on the south

20  mesa are substantially larger then we originally thought they

21  were.  Here is what occurred:  We had a man who had not

22  previously advised me of the facts that when he came here in

23  1942, the riparian lands of the National Government extended

24  down versely to the enclave line.  Well, I am glad that

25  we didn't plead more specifically than we did, because I

1   think we picked up maybe a thousand acre feet that way.  At

2   any event, there is situated --

3           THE COURT:  Whatchange occurred since 1942?  Some

4   geographical change?

5           MR. VEEDER:  Yes, sir.  What they did, they put in

6   a boat basin down there.  And we are going to claim -- I

7   think the evidence is presently in to support it -- that in

8   the state of nature, in the state of nature, the watershed

9   line was considerably further south than it is now.  But

10  when we put in a boat basin, which is part of the installation

11  there, there was an artificial change of the watershed line.

12  But those are complications and perplexing complications

13  with which we are confronted.

14          This 1910 right, the man who went in and started

15  raising sugar beets told us quite a story about it.  I hope

16  it was a true story.  Anyway, he told us a story about it.

17  He said that they went in there, and they broke out that

18  land, and they put in big pumps, and they began using the

19  water during the dry season of the year.  I am not sure

20  whether that was entirely riparian right or partly an

21  appropriative right, but I think it was probably both.  And

22  I believe that the California cases which I have cited to

23  your Honor will sustain our proposition that you can't have

24  a riparian right and an appropriative right on the same acre

25  of land.  You cannot.  You can't take three acre feet of

water, that being your duty under a riparian right, and an additional three under the appropriative right.  The aggregate must be a reasonable duty of water.  But that is what we pleaded.

Now, in regard to the appropriative rights, all appropriative rights.  We are stating that we can use those rights within and without the watershed, the sole criterion being:  Will it increase the burden on the stream?  Can we, by making those changes, make demands on these people upstream and demand that they release more water to us?  I think that that is a question of fact.  I think it is an extremely important question of fact.  But certainly one that couldn't be settled on a motion to dismiss.  I just don't see how on a motion to dismiss it could be done.  If there was stipulated fact -- and I won't stipulate, so there is a problem presented -- it might be different.  But we aren't until we get the evidence in going to be finally in a position to rest in regard to what rights are we claiming riparian and what are we claiming appropriative.  We have an  additional factor: the uses of water within the watershed and the exercise of our riparian rights have been increased, been substantially increased, since the previous lawsuit.  We also have substantial increases outside the watershed.  But we are saying that when we increase the uses outside the watershed, we simply change the point of diversion and place

1    of use of our appropriative rights; and that is it.  But we

2    think it is a matter for your Honor to resolve, not on

3    pleadings but on the facts.

4              THE COURT:  All right.  I have your position.

5              MR. SACHSE:  May I make one very, very brief

6    reply, your Honor.

7              I want to make it clear I don't object, I don't

8    care if your Honor chooses not to grant the motion to dis-

9    miss.  But the point is that these things have to be clari-

10   fied to help us settle this trial.  You don't adjudicate

11   a river, even a simple case, by having somebody say, "The

12   water is mine."  You don't.  You have to know why it is his,

13   how it is his, on what basis, or else you are absolutely

14   hamstrung.   In the hearings before the Congressional

15   Committee, referring to the upstream claims, this was,

16   Chairman Engle used the words to Mr. Veeder, "It was an open

17   end reservation in the United States."  He was referring to

18   the Forest Service.  It has nothing to do with this exact

19   motion, but it seems to me that the same phrase could be

20   applied here.  This is an open end claim.

21             Now, I believe that as attorney for a number of

22   defendants who are going to be required unquestionably when

23   this case is over to let certain amounts of water down --

24   there is no doubt about it; the United States is going to

25   have some rights.  There isn't any question.  Well, I believe

I have a right to know what exactly they demand and what

they are asking for.  And not that -- I am referring now to

Mr. Veeder's own response, the most recent document he filed

with us.  In Count XXII the United States of America alleges

that it is principally exercising extensive rights in addition

to those which are riparian in character.  Does he mean it is

presently making extensive use in addition to riparian, or

does he say he has extensive rights?  If he has extensive

rights, I have a right to know what the rights are.  If all

he means is that he is making extensive uses, we could well

drop the entire subject; because, as you have clearly pointed

out, what he does with the water once it reaches the enclave

is nobody's business but his own.  But when he says it is a

right, then I am very much concerned.  And later in the same

reply, in response to the memo, first page, line 25:

      "It is possible that it --

      MR. VEEDER:  Mr. Sachse, if you will just give me

a chance.  We have got quite a flutter here.  How many?

Which one are you talking about?

      MR. SACHSE:  This is the response to memorandum

in support of the defendant Fallbrook Public Utility District's

motion to dismiss Count XXII.  It was filed June 16.  The

first quote was the very first three lines and I am now

quoting from line 25.

      "It is possible that it also exercised additional

1        rights.  In any event, they are rights."

2            Well, what kind of rights?

3            THE COURT:  Mr. Sachse, I had the same request that

4        you had, that Mr. Veeder specify what these rights were;

5        and in response to that he filed, Mr. Veeder filed, on June

6        11, or June 12, with the clerk these memorandums on eight

7        propositions.  Well, he pretty well broke down his various

8        claims.  You have looked that over, havn't you?  Whether

9        you agree with him or not at least he has particularized

10       what his claims to water are.  You looked that over?

11           MR. SACHSE:  Oh, yes, sir.

12           Well, the only comment I would make further --

13       and I want to make it very clear I don't want Mr. Veeder or

14       your Honor to be concerned about this.  It is a motion to

15       dismiss.  But I am tremendously concerned that these things

16       be clarified as soon as possible in fairness to the defendants.

17       Now, we have a difficult problem.

18           THE COURT:  Some of these things can be decided,

19       and some may not.

20           MR. SACHSE:  Mr. Veeder, your Honor, pointed out

21       the difficulty of his problem.  If his is that difficult --

22       he is the plaintiff -- what position does it put the

23       unfortunate defendant in who doesn't have the foggiest notion

24       of what the plaintiff is claiming?

25           THE COURT:  You ought to have more than a foggy

1    notion after looking at this document of June 11.

2           MR. SACHSE:  I have a pretty good idea of what he

3    asks for in amount, but I don't know under what legal theory

4    he is --

5           THE COURT:  Doesn't this document help you any?

6    Proposition No. 1, "The right to change the place of

7    diversion"?  Proposition No. 2, "Appropriation to actual

8    diversion and application"?  Proposition 3, "Exercise of

9    right to purchase from the Santa Margarita"?

10          MR. SACHSE:  Yes, but, your Honor -- take 2, the

11   one just a moment ago, "through active diversion and use."

12   The point I am trying to make is that I think it is ele-

13   mentary that some of those rights don't exist, that they

14   can't, that he is asking for the moon.  And some of them --

15          THE COURT:  I am not saying I am putting any

16   stamp of approval on any of the claims he makes here; I am

17   merely saying that I think he has complied with my request

18   to break down what his claims are.

19          MR. SACHSE:  All I am saying is that I am not

20   waiving a motion to dismiss.  I want to know as soon as I

21   possibly can which ones of these, your Honor, we are going

22   to have to reply to, which ones we are going to have to

23   rebut, which ones we are going to have to impeach.  That is

24   our problem.

25          THE COURT:  Let me say this:  I think that on some

of these there can be rulings made even if they are only

pretrial rulings.  I don't think your motion to dismiss

should be granted.  I think you will have to concede they

can't be, because a motion to dismiss throws out the entire

cause.  If there is any one thing set forth in there, the

motion to dismiss has to be denied.

MR. SACHSE:  As I say, I might accept --

THE COURT:  Some of these we can probably have

pretrial rulings on.  I expect I may be able to make a ruling

on this matter of appropriation.  Others, this matter that

you talk about on O'Neill.  I would hesitate to make any

rulings on this matter of storage until I knew more about the

facts of O'Neill.  I just know today more about it than ever

before.  Apparently it was a natural sink, that thereafter

it was artificially made a little bigger.  I think your

proposition like the claimed storage rights should await the

trial of this action.

Some of these matters, it may be possible to make

rulings, pretrial rulings on it and clear the air a little

bit.  Some are so inextricably wound up with others that we

will probably have to wait and see.

MR. SACHSE:  We certainly can't complain, your

Honor.  It is up to --

THE COURT:  I will do the best we can.

1          MR. SACHSE:  Do all you can to help us.

2          THE COURT:  I will do all we can to clear the air

3  on some of these legal propositions.

4          MR. STAHLMAN:  Your Honor, may we take a recess at

5  this time?

6          THE COURT:  Take a recess right now.

7          (Recess.)

D-1

MR. GROVER:  Your Honor, I just thought I might summarize, in the case of Count 22, what I believe to be the status of it, now that Mr. Veeder has clarified this alternative pleading point.

In paragraph 2 on page 34, this is the riparian right alternative, and it is the same 12,300, but there is one point about it that I do think we should bear in mind and that is that it says both within and out of the watershed.  As far as the 12,300 total is concerned, we do know from Mr. Veeder's explanation that it is both within and without, but the part that is by riparian right, as I understand it, is none of it out.  I don't know how much of the 12,300 is out, but the part he is claiming in this paragraph for the riparian right, he is claiming just the total use, so that he will have the full claim in there and let his proof determine the facts on it. The part he is claiming as a riparian right is none of it, as I understand it, out of the watershed.  I could understand the alternative pleading a little better if he had said that the United States has used 12,300 within by riparian right, which is the maximum possible that they could show that has been used within; but the confusion came when, in stating that as their riparian alternative, they thought of the 12,300 as their total use, which is of course not all riparian.

With that clarifying thought --

THE COURT:  It is still not clear to me, because if

1  the 12,300 feet alleged in paragraph 2 on page 34 is an alternative

2  tive to the 12,300 feet alleged on page 35, page 35, as I read

3  it doesn't allege any riparian use.

4      MR. GROVER:  Well, as I understand it, it is the

5  riparian way of pleading.  May I put it this way.  As I under-

6  stand from Mr. Veeder, 12,300 is the total that they used at

7  Pendleton, in and out, and that they wanted in paragraph 2 to

8  claim that whole total by riparian right because they don't

9  know how much of it is riparian use, and then in paragraph 3

10  they wanted to claim that whole total alternatively by their

11  various appropriative rights.

12      THE COURT:  Is that your position, Mr. Veeder?

13      MR. VEEDER:  Well, your Honor, here is the circum-

14  stance we find down there.  You will find that there are rights

15  to the use of water that are exercised in a variety of ways

16  and there is a variety of circumstances.  For example, we are

17  making a claim in regard to the water to maintain vegetative

18  cover.  I don't know how to break that down and be absolutely

19  precise about it, but I do know that water is being used there.

20  If it would make anybody any happier, I could call a witness

21  and put him on the stand.

22      THE COURT:  No.

23      MR. VEEDER:  But I simply am not going to undertake

24  now -- I couldn't.  I think your Honor will have to make find-

25  ings on the matter.  We have set up what I believe is a claim.

1    I believe there is a claim to the rights to the use of water.

2    It may be that our proof, when it is in, will be somewhat at

3    variance with the pleadings, and if so they should be amended

4    accordingly after the evidence is in, and I am very, very

5    certain that when Mr. Sachse's evidence is in, in regard to

6    each one of his claims, he is going to find some variance be-

7    tween the proof and the pleadings.  Now, we can go on, on these

8    matters, indefinitely, but so far as I am concerned we have done

9    the very best that we can in regard to these pleadings.  If you

10   will turn to the pleading on page 36, you will find that we

11   have set up a claim for the waters on 4600 acres of land.  We

12   claim that there is an aggregate there --

                    THE COURT:  Yes, I notice it.  Your pleadings are

14   probably broad enough to cover any possible right that you may

15   have.  If you have missed anything, it is purely an inadvertence.

16                  MR. VEEDER:  I hope you will bear that in mind when

17   you come to the judgment, your Honor.

18                  MR. GROVER:  Your Honor, I was just trying to clarify

19   why the United States claims, by reason of its riparian rights,

20   use outside the watershed.

21                  THE COURT:  All right.

22                  MR. GROVER:  And if my explanation is correct, then

23   I am satisfied with it.

24                  MR. VEEDER:  If you are happy, Mr. Grover, then I am.

25                  MR. GROVER:  I am not happy, because I don't know

1  whether my explanation is correct. But I don't want to press

2  the point any more. I was just trying to elucidate.

3         THE COURT: All right.

4         MR. GROVER: As far as paragraph 3 goes, to summarize

5  my objections to it, I would just as soon have a pre-trial

6  memorandum and under the circumstances perhaps we can't expect

7  a ruling favorable to us on our motion to dismiss anyway, but

8  I would like a ruling that beneficial use is required, and I

9  believe that   it is not pleaded as to the various paragraphs

10  here where it is critical. There is a defect as to a, b, and

11  c on one or two scores in each case, either no beneficial use

12  is alleged or the use is all after December, 1914, and if we

13  could have a clarification of those two points before we go to

14  trial that would accomplish everything I intended to get.

15         THE COURT: I don't think there is any problem on

16  that. Mr. Veeder concedes that he has to show a beneficial use.

17      Do you not, Mr. Veeder?

18         MR. VEEDER: Sure, except for our maximum potential

19  riparian use, which I don't believe you are arguing about, are

20  you?

21         MR. GROVER: No, I was talking about the --

22         THE COURT: You mean unused riparian?

23         MR. VEEDER: That is right.

24         MR. GROVER: Appropriative rights, yes.

25         THE COURT: All right.

1794

1          MR. VEEDER:  I submit, your Honor, that as I said be-

2    fore when you plead beneficial use you are pleading a legal

3    conclusion.  Maybe they disagree with it.

4          THE COURT:  We all agree that whether you properly

5    plead it or artfully plead it, it has to be proved, --

6          MR. VEEDER:  Right.

7          THE COURT: -- and the Court is of the view that if it

8    is necessary to amend your pleadings they can be amended to

9    conform to your proof, and I don't think it is stretching the

10   interpretation of the complaint to say that because of this

11   incorporation by reference you have beneficial use in every one

12   of these causes.

13         MR. GROVER:  Are we ready, then, to go to Count 24,

14   your Honor?

15         THE COURT:  Yes.

16         MR. GROVER:  Count 24 sets up the Government's appro-

17   priative application, and naturally the Government wants to

18   get all the rights that it can.  My point in filing the motion

19   to dismiss was not to get into the controversy before the State

20   Water Rights Board and whether the Government has lost its

21   rights, etc., but merely to nail down what kind of right it

22   has merely by reason of an application.  The last sentence of

23   paragraph 2 on page 37 says, "The United States claims priority

24   as of June 30, 1948, for the storage right of 165,000 acre feet"

25   etc.

1      Now our position is that by filing an application

2  you get no storage right, you do get a priority for certain

3  procedural purposes, and in that connection I would like to go

4  back a little bit to the history of the doctrine of relation.

5      In the earliest days you had to apply the water to

6  beneficial use to get an appropriative right, and still it was

7  found that it was very hard on a fellow who wanted to build a

8  dam that took six months to build to let him spend five months

9  to build it and then just before he was to apply the water, to

10  start storing the water or applying it to beneficial use, to

11  have someone else come in with a flimsier project that he could

12  throw up in a hurry and start taking the water and cut the other

13  man out.  So the doctrine of diligence and relation came up and

14  fixed the beginning date of your work, through whatever pro-

15  cedure was required, and then your final application of water

16  to beneficial use which gave you an appropriative right would

17  relate back to the date of the initiation of your works or

18  whatever it was that gave you your priority.

19      Well, under the Code Procedure, that is what filing

20  the application does.  It doesn't give you a right to appro-

21  priate water.  It merely gives you a date as of which, when you

22  get the right, the right will apply, to which it will relate

23  back.

24      Consequently, the most that the United States has

25  here -- and I'm not arguing whether they can have it

1   determined here or not; it is perfectly all right for your

2   Honor to declare that they have that right -- but the most they

3   have is a date which, if it ripens into a storage right, will

4   be the date of the proof.

5          THE COURT:   I understand that.

6          MR. GROVER:   That is my objection to it.  Under the

7   Code Procedure today you have to get the permit, which is more

8   or less the temporary interim right from the State, or a li-

9   cense for the final appropriative right in order to have the

10  right to store.

11         I think probably and I am frank to admit it that the

12  appropriate thing would have been perhaps to move to strike the

13  last sentence rather than to dismiss it, since the earlier part

14  has set up the rights of the United States.

15         THE COURT:   I understand.

16         Does anybody else have any comments on Count 24?

17         MR. SACHSE:   Nothing on that Count, your Honor.

18         THE COURT:   Mr. Veeder, any comments?

19         MR. VEEDER:   Everybody is happy about it, as I under-

20  stand.

21         THE COURT:   I wouldn't say that they are happy, but

22  I think we understand.

23         MR. VEEDER:   I would like to cut the argument short.

24         THE COURT:   What is the next one?

25         MR. SACHSE:   I guess the next one passes the ball to

1   me, your Honor.  That is a whole bundle of them, and these are

2   motions to strike.

3        MR. VEEDER:  I want it understood that I don't agree

4   with Mr. Grover in what he says, but I think we can move along

5   as long as he is not objecting to it.

6        MR. GROVER:  This may look a little different in cold

7   print in the transcript, your Honor.  I do object to that

8   feature, as I said, that last sentence.

9        THE COURT:  I understand your objection to it.  You

10  say that your motion to dismiss more properly should have been

11  a motion to strike.  Mr. Veeder has heretofore said that he will

12  not stipulate that motions to dismiss be called motions to

13  strike and we are going on from there.

14       MR. SACHSE:  In my original motion, your Honor, I

15  made duplicate motions as to Counts 2, 3, 4, 5, 7 and 10, both

16  to dismiss and to strike, so it may be that this procedural

17  difficulty we ran into by reason of the re-pleading will not

18  apply to some of this argument.

19       These Counts are, generally speaking, if I may class

20  them all with one generic title, are Water Rights Board  Counts,

21  Counts that in one  way or another concern applications before

22  the Water Rights Board, actions of the Water Rights Board, etc.

23       THE COURT:  You know, I tried diligently to sort out

24  these motions as they came in.  Although I have your memorandum

25  in support of this motion and I have the memorandum of the State

1    in the same matter, I never found your motion.

2         MR. SACHSE:  The motion was away back, your Honor --

3    April 3.  The motion was made almost immediately when the com-

4    plaint was filed.  We moved before we answered.

5         THE CLERK:  It was filed on April 4.

6         THE COURT:  All right, go ahead.

7         MR. SACHSE:  Now, taking them in order -- and I think

8    I can safely say that perhaps 75% of the argument applies to

9    all of them, although there are a few slight differences --

10   the first count, which is found on page 8 of the complaint, in

11   substance, is an allegation that Fallbrook abandoned its claims

12   to rights in the Santa Margarita River under Applications

13   12178 and 12179.

14        The second one -- going through them in order to see

15   what we are talking about first -- Count 3 is a contention that

16   we changed drastically -- those are the words of the Count --

17   our project 12178 and 12179 and thereby, in some manner, lost

18   priority.

19        And Count 4, on page 10, appears to be a restatement

20   of Counts 2 and 3 in the alternative.

21        In other words, Counts 2, 3, and 4 present the

22   alternative contentions   that Fallbrook, by reason of its

23   actions, either abandoned Applications 12178 and 12179, or, by

24   reason of its actions, lost its original filing date priority

25   and should, at best, take a new and later priority date.

1      Now, I would like to discuss those three first, if

2  I may, because the arguments on the others are a little differ-

3  ent.

4      THE COURT:  If the Court holds that the appropriation

5  of water is subject to California law, and if this Court has no

6  jurisdiction to review actions of the Water Board or to de-

7  termine alleged priority dates in proceedings before the Water

8  Board, these Counts are out the window, aren't they, Mr.

9  Veeder -- most of them?

10      MR. VEEDER:  I certainly would want to reserve com-

11  ment on your inquiry.  I can't agree with your Honor.  I think

12  that this Court has full and complete jurisdiction to render

13  complete relief.  But I would assume, if you would say this,

14  that you have no power whatever to consider priorities, that

15  you have been excluded from that consideration by reason of

16  State law, there might be a response to that which, of course,

17  would be very detrimental to the United States.

18      But I believe this, that in each one of these pro-

19  positions that are presented the question of the change of the

20  status of the parties is perhaps the most important factor

21  raised by these pleadings, because I truly believe that when

22  we filed the complaint, as of that moment all the rights and

23  interests were fixed and couldn't be changed.  That is why I

24  can't give you an unequivocal answer.

25      THE COURT:  Of course, this isn't that kind of

1   complaint, to start with.  The big difference between law and

2   equity is that law speaks as of the date of the filing of your

3   complaint.  Equity speaks as of the date you render a decree.

4   Is that right?

5        MR. VEEDER:  I don't believe so, your Honor.

6        THE COURT:  I think that is hornbook law.

7        How about it, Professor Burby?

8        In other words, as I understand the law, if you file

9   a complaint at law, and if you don't file a supplemental com-

10   plaint, your relief that is granted speaks as of the date the

11   action is filed.  When you file a suit in equity, relief speaks

12   as of the date the decree is entered.

13        MR. BURBY:  Your Honor, in response to your request,

14   I have read those statements from time to time -- I'm not sure

15   that they are in a hornbook, and I'm not sure that that is the

16   uniform rule.

17        MR. VEEDER:  Or that they are applicable.

18        THE COURT:  Well, let's see, I had this up some time

19   ago.  I may have written an opinion with this in it.  If you

20   haven't reviewed the authorities, maybe I can find it and tell

21   you about it tomorrow.  But I think that is the law.

22        MR. MOSKOVITZ:   I think one of the leading cases on

23   it is the Lindsay-Strathmore case.  The case had to be reversed

24   after years of litigation because the law had changed on appeal.

25        MR. VEEDER:  That is not the point here.

1      MR. MOSKOVITZ:  The point made was that it was an

2   equitable proceeding.

3      THE COURT:  That is one example of what could happen.

4   If relief is given as of the date of the decree, then inter-

5   vening situations can be considered, and one of the types of

6   things that can considered is a change in the law, a change in

7   the status of parties.

8      MR. VEEDER:  Deaths and things like that, you are

9   quite right.  But I believe, your Honor, --

10      THE COURT:  I think I had this up in an anti-trust

11   matter where the contention was that the parties were no longer

12   doing the things they did when the suit was filed.  Of course,

13   that was not conclusive that no relief should be granted, but

14   it was something that had to be considered, because it was a

15   showing of things that had existed before the decree would be

16   entered.

17      We will pass it now for the time being and maybe I

18   can find what I am talking about for tomorrow.

19      I interrupted you, Mr. Sachse.  Go ahead.

20      MR. SACHSE:  Your Honor has stated in your question

21   to Mr. Veeder very much what is our proposition, and in its

22   essence, to phrase it in just a word, that every one of these

23   three questions, or two questions stated three times -- abandon-

24   ment, loss of priority -- they are moot, they are done, they

25   are finished.  The State of California created an agency -- I am

1   not talking now of the question of its right to bind the United

2   States; I am talking only of Fallbrook -- the State of Cali-

3   fornia created an agency to whom an applicant must go if he wants

4   to appropriate water. Fallbrook did it. So did Santa Margarita

5   Mutual. We will leave the consideration out entirely at this

6   point of the fact that the United States did, because I don't

7   think that has anything particular to do with the point I

8   make. Fallbrook went to the only place to which it could go.

9   As I said yesterday in another argument, your Honor would have

10  thrown me out of the courtroom so fast that I wouldn't know what

11  hit me if I had asked you to give me a permit. So would any

12  Federal Judge. So would any State Judge. I can't go before

13  a Federal agency to ask for a permit. There is simply no place

14  to which the Fallbrook Public Utility District can go if it

15  seeks a permit to appropriate water except the State Water

16  Rights Board or its predecessor. In 1946 it was the Division

17  of Water Resources. We did what we were told to do by State

18  law and the machinery of State law -- possibly silly machinery,

19  as Mr. Veeder characterized it yesterday -- but nevertheless

20  the machinery ground and in due course out came a judgment,

21  a decision, to use the technical language, and following the

22  decision a permit.

23          Now the question whether, while these proceedings

24  were pending, we abandoned our application, or the question

25  whether, while they were pending, we made such drastic changes

1803

1   that we should have been given a different priority date by the

2   State Water Rights Board, that is a matter that was determined

3   by the judgment of the State Water Rights Board, not by anybody

4   else.  And following through with your Honor's comment to Mr.

5   Veeder of a moment ago, since this is the fact -- no one can

6   deny it, in fact it is in the files of this case; the United

7   States reproduced them along with the other pre-trial documents,

8   all of Fallbrook's permits are filed, even the decision of the

9   State Water Rights Board is filed with the Clerk -- and that is

10   now one of these facts to which you just alluded that you, as

11   chancellor in equity, have to consider.  That is a fact that is

12   before you today.  The fact is the permit, not what went before

13   the permit.

14            THE COURT:  Isn't this subject matter that Mr. Veeder

15   wants to brief and which you, in substance, want to reply to?

16            MR. VEEDER:  That is exactly it.

17            THE COURT:  The basic law that underlies your motion

18   to dismiss.

19            MR. SACHSE:  Not quite, because I believe your specific

20   question has nothing whatsoever to do with the United States.

21   Mr. Veeder discussed at great length whether the Water Rights

22   Board can bind the United States.  I am making only this point,

23   that the Water Rights Board certainly bound Fallbrook, it certain-

24   ly did, and as of today it has bound Santa Margarita.  There are

25   mechanics by which it can be attempted to be upset, but as of

today, and if your judgment were entered at this minute, if you were entering a judgment you would have to take into considera-tion, as a chancellor in equity, a permit to Fallbrook, and you would have no right whatsoever to take into consideration the things that the Board considered when it granted that permit.

THE COURT:  It is not that simple, because if Mr. Veeder's contention is correct it is because the United States is involved and had made a claim no State agency had any authority to adjudicate or to deal with the rights of the United States.  If you follow that to its logical conclusion, this whole proceeding, as far as the United States is concerned, is out and what they did for you doesn't mean anything as far as the rights of the United States are concerned.

MR. SACHSE:  I apologize, your Honor, I think you are misstating it.  As far as the rights of the United States, yes. As far as the rights of Fallbrook, they mean everything.

We can conceive, for instance, that the Congress of the United States tomorrow might decide to close up Pendleton and there is no use there and for the next hundred years the Rancho Santa Margarita's uses, however great they may be, might cease to exist.

THE COURT:  I would concede that you might have rights -- assuming that Mr. Veeder's basic proposition were correct, I would concede that you might have rights inter se, with other owners on the watershed, regardless of the position of the

1  Government, and to that extent there might be some validity in

2  what was done.

3      MR. SACHSE:   Your Honor, it is more than a matter as

4  simple as that.   I certainly can't pre-judge a case for your

5  Honor.

6      THE COURT:   I have made a very basic assumption for

7  argument that Mr. Veeder is correct.   I have indicated that

8  I'm not inclined to think he is.   But let us assume that he is

9  correct and the Water Rights Board can't do anything to affect

10  the rights of the United States, that this Court has juris-

11  diction as far as the United States is concerned to   adjudicate

12  the claims and rights of the United States.   Even if that were

13  true, the proceedings of the Water Rights Board, insofar as

14  they might have a bearing or effect on other parties other than

15  the United States, might have some validity between themselves,

16  because as you point out suppose Pendleton moved away, no

17  longer asserted rights, suppose the ocean came up and took the

18  whole plain down there, as between you and other people on

19  the stream maybe what the Water Rights Board did has some

20  binding effect.

21      MR. SACHSE:   Vital effect to Fallbrook.   If you were

22  entering a decree today, and  even if Mr. Veeder is a hundred

23  percent correct on the position of the United States -- if Mr.

24  Veeder is absolutely correct, for the sake of argument, that

25  the Water Rights Board can't find him, you will have to find

1   that today the Water Rights Board has given us a permit.  That

2   is my position.  That is a fact before your Honor.  It is sti-

3   pulated, it is in the files.

4          Now this is my legal point.  Once you find, once you

5   are confronted with that stipulated fact that we have a permit,

6   you have no jurisdiction to go behind it and say, "Why, Mr.

7   Holsinger, did you do this?" or "How come you did that?"  That

8   is the point I am making.

9          THE COURT:  Maybe you don't apprehend the basic point

10  that the Government makes.  Their point is that if this Court

11  has jurisdiction, then what this Water Rights Board did, as far

12  as the Government, is a nullity and doesn't affect them at all.

13  They can ignore it.  They went to the hearing and asserted that

14  they made a special appearance and then stayed away.  That of

15  course is all closed from the basic contention that Mr. Veeder

16  makes that only a tribunal of the United States can affect the

17  rights of the United States.

18         MR. SACHSE:  What intrigues me about it, and I am

19  very much interested in this discussion with your Honor, is

20  what seems to be now a corollary to it.  I am willing to con-

21  cede, for the sake of argument only -- make that very clear,

22  for argument only -- that possibly the Water Rights Board couldn't

23  affect the United States.  You know that I disagree vigorously

24  on it, as I argued yesterday.  But suppose that it couldn't

25  affect the United States.  Is Mr. Veeder going to say -- let

1    us say that Mr. Dennis had the permit and that there was no

2    disagreement between Mr. Dennis and the United States at all --

3    is Mr. Veeder going to say that Mr. Dennis' permit is no good

4    now? It is good. I have a permit. Regardless of its effect

5    on --

6        THE COURT: If Mr. Veeder is right on his basic

7    proposition, you would have a permit, and as far as the United

8    States was concerned it wouldn't mean a thing. It might be a

9    valid adjudication between you and Mr. Dennis' client. It

10   might be of some value to other people upstream who were noti-

11   fied and didn't appear, but because of the fact that the major

12   party concerned was not bound by it, it would be of questionable

13   value as to your permit.

14       MR. SACHSE: It would have this value, your Honor,

15   practically, that you could immediately, forthwith, attempt

16   to start construction on a project, and the United States, if

17   it felt that it was not bound, would then step in and attempt

18   to enjoin you. But it would establish our right to proceed

19   subject to the condition that we must not injure the right of

20   the United States, and that is as far as Fallbrook is con-

21   cerned the vital and fundamental premise on which our entire

22   position in this case is built; that we have a right, subject

23   to the prior vested rights of the United States and other

24   riparians, we have a right.

25       Now, it is your Honor's place to say how to protect

1  the United States.  It is your Honor's place to limit the

2  exercise of our right.  But I say it is not your Honor's place

3  and it is wholly outside your Honor's jurisdiction to say that

4  we don't have the right.

5        And going back to these first three Counts that I'm

6  discussing, they don't say that we don't have the right.  They

7  don't even go that far.  They ask your Honor to substitute

8  yourself for a part of that adjudication, just one single thing

9  concerned in that adjudication; they ask you to say, not that

10  the Water Rights Board shouldn't give Fallbrook a permit --

11  it doesn't ask that in No. 2, it doesn't ask that in No. 3 --

12  they ask you to make a single specific finding that a priority

13  date should be changed.  I submit that it is, bluntly stated,

14  not this Court's business.  It is the business of the only

15  agency -- I will come back to the premise -- that there is in

16  the laws anywhere in the United States that can grant this

17  right.

18        I don't want to belabor this if it is going to be

19  briefed.

20        THE COURT:  The basic problem underlying it is going

21  to be briefed.  The brief will be directed to these basic

22  problems, as I understand it.  Isn't that right?

23        MR. VEEDER:  That is correct, your Honor.

24        MR. SACHSE:  I will concede this.  If your Honor

25  should, after extensive briefing, say that you have no authority

1    over the Water Rights Board, of course there is no question.

2    I haven't any complaint.  But the point I am trying to make is

3    that even if your Honor assumes that the Water Rights Board

4    could not have affected the United States, if you assume that

5    jurisdiction -- I hope you will not, and I don't think you

6    will -- but if you did that, you would still be compelled, as

7    to Counts 2, 3 and 4, to say that insofar as Fallbrook is con-

8    cerned we have got a valid piece of paper that you, as chancellor,

9    must acknowledge, and that you have no authority to go behind

10   that piece of paper and determine the conditions that went to

11   create it.  Even if you accept Mr. Veeder's proposition, you

12   are going to have to say --

         THE COURT:  Well, you might say that what the Water

14   Rights Board did could not affect the rights of the United

15   States and the priority date claimed by the United States would

16   have to be adjudicated and that any rights found by this Court

17   to exist in the United States would, therefore, be prior to

18   any rights granted under the permit, and that the permit there-

19   fore was only a valid permit insofar as it affected other

20   parties to the proceeding other than the United States.

21       MR. SACHSE:  I think the permit says that it is sub-

22   ject to all vested rights.

23       THE COURT:  I have your point.  You may be right.

24       MR. SACHSE:  All right.  Then I will try hastily to

25   cover the next two or three.

1    The next one is Count 5 -- and this one is one that

2    I truly believe with all my heart ought to be stricken -- the

3    substance of Count 5 is that the Fallbrook Public Utility Dis-

4    trict violated a gratuitous license of the predecessor of the

5    United States, and that therefore we couldn't get a right through

6    appropriation.

7            That is the greatest non sequitur that I ever heard

8    in my life.

9            THE COURT:   I have a little trouble following the

10   logic on that.  I would pass that and let Mr. Veeder answer

11   that, if I were you.

12           MR. VEEDER:   I will be glad to.

13           MR. SACHSE:   I will pass it.  I can't understand how,

14   if we violated a gratuitous license of the Rancho, that forever

15   estopped us from getting a right through appropriation.

16           THE COURT:   I think he is relying on what they call

17   the "bad boy" statute.

18           MR. SACHSE:   We were bad once and we are bad forever.

19           THE COURT:   You were bad once and you don't have

20   anymore rights and all rulings should go against you.

21           MR. SACHSE:   Count 7 is a due diligence count.  Count

22   7 gets exactly the same treatment -- I will not repeat it --

23   that I expressed on Counts 2, 3 and 4.

24           THE COURT:   All right.

25           MR. SACHSE:   And Count 10 is going to be briefed.

1811

1   That is the heart and soul, as I understand it, of Mr. Veeder's

2   contention here that the Water Rights Board, once we objected,

3   should never have turned another wheel.  If that one is going

4   to be extensively briefed, I will sit down on that now.

5        I would hastily repeat again, your Honor, please,

6   from the standpoint of this defendant, draw the distinction

7   between the effect of the Water Rights Board's action on the

8   United States and its effect on Fallbrook.  They are very

9   different, and very, very vital.

10       THE COURT:  Does anyone want to be heard on this

11  before Mr. Veeder replies?

12       MR. MOSKOVITZ:   Your Honor, I want to be heard only

13  to the extent of saying that the counts and paragraphs we

14  have moved to dismiss relating to the activities of the

15  California State Water Rights Board are involved in and based

16  upon the questions which you have asked to be briefed, and I

17  will say no more at this time.

18       THE COURT:  Mr. Veeder.

19       MR. VEEDER:  Isn't Mr. Moskovitz going to fire a

20  shot?

21       MR. MOSKOVITZ:  No, I have nothing on these.

22       MR. GROVER:  Your Honor understands that I am just

23  not affected.  I could have views, but --

24       THE COURT:  All right.

25       I think most of them are going to be covered by this

1   basic problem that you said you wanted to brief, but I would

2   be interested, if you wanted to tell me, in any logic about

3   how the violation of a gratuitous license has any bearing

4   on preventing Fallbrook from making an appropriation.

5          MR. VEEDER:  Estoppel, your Honor, I think estoppel

6   and equity.  I assume that when a decree is entered for the

7   United States of America, as it will be, the most important

8   thing of all will be just good old-fashioned common honesty

9   and equity.

10         The Fallbroo, Public Utility District was receiving

11  water pursuant to a gratuitious and revocable license con-

12  cerning which we have pleaded in our motion for summary

13  judgment, and we also have evidence in the record now and I

14  think Mr. Sachse will agree that, with full knowledge of the

15  great needs and demands of the United States of America, it

16  went in and attempted to make a claim against the United

17  States of America.

18         THE COURT:  Was there anything sinful about that?

19  Suppose I were a property owner on a stream or near a stream

20  and I knew that some man had great need down below.  Is there

21  any law that would keep me from exercising what rights I might

22  have?

23         MR. VEEDER:  Yes, sir, your Honor.

24         THE COURT:   Outside of the law of christian

25  charity to stand aside because somebody had a great and pressing

1    need?

2            MR. VEEDER:  The important thing is this, though.

3    When a man has acknowledged your prior right, title and

4    interest and has received a gratuitous license to enjoy a

5    property right which he knows resides in another, it becomes

6    extremely important, from the standpoint of title and the

7    ability to initiate a title against the United States of

8    America.

9            THE COURT:  Are you going to be able to prove that

10   this gratuitous license that you gave them was for water that

11   you had appropriated by self-help?

12           MR. VEEDER:  It was certainly an invasion of our

13   vested riparian rights, concerning which there is a stipulation.

14           THE COURT:  Well, the application of Fallbrook to

15   appropriate water can't affect your riparian rights.  They

16   concede that.

17           MR. VEEDER:  If there is anything that will come out

18   of this two days of haranguing, your Honor, it is that

19   Fallbrook couldn't conceivably build this dam without invading

20   our rights.

21           But in any event there is a proposition of law which,

22   I believe, is very strong and very good law, that when a man

23   is using rights by reason of a license, he is estopped to come

24   forward and deny the title of the other party.

25           You say, your Honor, that all they are claiming is

1   flood waters.  Obiously they are not.  They have been using

2   one and a half second feet of water immediately above us

3   direct flow rights.  So the revocable license is an extremely

4   important facet and factor in our case at equity against them,

5   because it evinces a knowledge on their part of our rights

6   and of their agreement only to use water for the domestic

7   purposes within the municipality.  A very important factor,

8   from the standpoint of this ultra vires proposition which we

9   argued yesterday.

10         So there is no question, in our view, that the

11  historical relationship stemming from this document referred

12  to in Count 5 is of extreme importance, and we believe, in

13  response to the claim under the motion to dismiss, that we

14  certainly have pleaded a right concerning which we should not

15  be precluded from introducing evidence.  That is all that is

16  involved here today:  Should we be permitted to introduce this

17  evidence?  I respectfully submit that we should.

18         There is the additional factor -- and Fallbrook has

19  gone to our aid once again -- they are claiming a prescriptive

20  right in their own answer.  That is extremely important.  They

21  say, "We are entitled to rights because we were above you and

22  because the five year period has run."  Now, if there is any-

23  thing that is elementary, in my view, it is that certainly

24  there could be no adversity under the circumstances, and

25  certainly there could be no claim under the circumstances of

1    hostility or any of the other numerous factors which must

2    be pleaded and proved as long as Fallbrook was receiving

3    water pursuant to a revocable license."  Now, they will say,

4    "Well, we canceled that ourselves," just like that.  That is

5    a question of fact, and so far as I am concerned, your Honor,

6    I still think we have pleaded a claim concerning which we

7    should be permitted to introduce evidence.

8         THE COURT:  I don't have any question but that the

9    facts about this license and this revocation and all should

10   come into evidence.  I think Mr. Sachse's concern is more

11   with the fact that you set this up and predicated, as it were,

12   a separate cause of action upon it.  If it goes into evidence,

13   the court will consider it and will see what effect it has

14   on the general picture.  But what you have done is to try to

15   predicate a separate cause of action, separately stated, upon

16   this document.

17        MR. VEEDER:  In equity, yes, and I think in equity --

18   I think the question of proving an estoppel under this

19   revocable license is extremely important, and I know of no

20   other way of creating estoppel than the manner in which this

21   has been set up, or at least in equity, that would not pre-

22   clude a ripening of legal title against the United States of

23   America under the circumstances.  And so I submit that this is

24   a very important factor in the case, particularly when you

25   consider the litigation concerning the only right that they

D7

1    have ever exercised -- did I say "right"?  -- the only

2    pilfering that ever came about was by the two and a half

3    second feet, and they started it by reason of this license.

4         Now, I think that it is going to be extremely

5    important -- we all like to talk in great big vagaries --

6    when you get to trying this lawsuit, when you are really

7    cutting down into the business, we will try this case real

8    hard on each separate and individual right, and when we get

9    to trying it in regard to the two and a half second feet I

10   don't believe there is going to be a more important count in

11   the Complaint than this one, certainly from the standpoint of

12   equity.

13        MR. SACHSE:  Your Honor, I must say only one thing.

14   This was argued away back, this question came up, I don't

15   know, last fall and you asked some questions about this.

16        Mr. Veeder makes one misstatement.  This is not an

17   agreement.  I believe the document is attached to certain

18   of the pretrial papers here.  I don't have it or I could read

19   it.  This is an absolutely unilateral, entirely revocable at

20   the option of the licensor arrangement.  There is not one

21   commitment -- you can read it from the first sentence to the

22   last -- at no point is there any commitment of any kind on the

23   part of Fallbrook.

24        Mr. Veeder's argument that an estoppel could arise

25   because of this absolutely personal, terminable at will,

1   unilateral proposition is, I think, a little farfetched, and

2   particularly that he should set up a cause of action -- and

3   that is what this cause of action is -- the cause of action to

4   which I object is his contention that because we were bad boys

5   to Mr. O'Neill we can never go to the Water Rights Board, I

6   don't care if a million acre feet were running merrily down

7   into the Pacific,  we can't ask the Water Rights Board for it.

8          THE COURT:  Of course, there is in patent law and

9   maybe in other fields, too, a rule of law that if you take a

10  license from an inventor you are estopped thereafter to

11  challenge the validity of his patent, and Mr. Veeder reasons

12  from that or kindred principles that may exist in real estate

13  law and talks about estoppel.

14          It might well be true that if you took a license,

15  revocable or not, from A, you couldn't thereafter challenge

16  the title of A to the water you got by that license.  But that

17  would assume that all the Santa Margarita had was the 2 1/2

18  second feet and no other water.  It would assume a lot of other

19  things that I don't think follow.

20          It is a far different thing for the licensee to go

21  in and seek to appropriate water which he claims is unappro-

22  priated.

23          I have a lot of trouble with it.  Whether it should

24  go out or not I am not prepared to say now.  I am going to

25  study this over.

1        If it goes out, I am certainly going to permit the

2   Government to show the license and to make whatever arguments

3   that they want to make about it.

4        I think the difficulty that you find, Mr. Sachse,

5   is that the Government attempts to predicate a separate cause

6   of action on it.

7        MR. SACHSE:  I have just one further thought on it.

8   This was mentioned, as I said, months ago and your Honor may

9   have forgotten about it, and that is that Mr. Veeder points

10  out the fact that we have a claim in that for prescription,

11  and that is quite true.

12       Your Honor will remember, you queried me -- in fact

13  I will blame you for that one -- you asked me whether a

14  revocable license of this kind terminated on the transfer

15  from O'Neill to the United States, and it put a bug in my

16  ear and I started looking into it, and I decided that this

17  purely personal license did terminate on the date of acquisi-

18  tion, and if you will check our answer you will find that we

19  have alleged a prescriptive right from the day that the

20  United States took over the Rancho.  From that date, we

21  contend that we were taking adversely.  It is a legal question.

22       THE COURT:  I regret that I complicated this lawsuit.

23       MR. VEEDER:  I am rather pleased about it, because

24  if there is any doubt that I have properly pleaded a claim

25  here I think Mr. Sachse just removed it.  I don't see how it

1   could possibly be stricken, under the circumstances.

2       THE COURT:  All right, these matters will be sub-

3   mitted.  Naturally, I want to see this brief on this under-

4   lying proposition before I decide these.

5       Before we adjourn this evening, we will consider

6   tomorrow (1) this matter of the continuance of the Master's

7   Hearings, although I don't think I am going to continue them;

8   (2) a motion by the United States with reference to the order

9   of hearing motions -- that is disposed of; (3) a motion of

10  defendant to dismiss, to strike, and for an order directing

11  plaintiff to file a more definite statement.

12      MR. SACHSE:  That latter, your Honor, I filed a

13  document stating that we abandoned it -- the more definite;

14  it is taken care of in the interrogatories.

15      THE COURT:  All right.  That is the one we have

16  just been hearing.

17      We still have No. 4, objections of the defendant

18  Fallbrook to interrogatories of the United States?

19      MR. SACHSE:  That is still pending, as far as I am

20  concerned.  I have applied the Federal rule, I have filed

21  objections and I noticed it.  It has been continued twice.  I

22  am very content if it sits forever.

23      THE COURT:  I would ask you and Mr. Veeder tonight

24  before you leave to talk about that and see how much of that,

25  if any, you can eliminate.

1          The motion of the State of California to dismiss

2    we haven't heard.  Or did we hear that along with the other?

3          MR. MOSKOVITZ:  Yes, your Honor.

4          THE COURT:  You are moving to dismiss Counts 21

5    and 22.

6          MR. MOSKOVITZ:  And also some earlier ones relating

7    to the Water Rights Board.

8          THE COURT:  That is disposed of then.

9          Defendant Fallbrook's motion requiring the production

10   of documents.

11         MR. SACHSE:  That has been disposed of by Colonel

12   Robertson producing --

13         THE COURT:  Are you content with what you got?

14         MR. SACHSE:  If that is it, I am content with it.

15         THE COURT:  All right, the motion will be denied

16   on the ground that it is in compliance.

17         MR. SACHSE:  Very well.

18         THE COURT:  No. 8, the motion of Fallbrook compelling

19   plaintiff to answer interrogatories under oath, motion of

20   defendant Fallbrook for an order directing plaintiff to furnish

21   more complete answer to interrogatories 1 through 8, motion

22   of Defendant Fallbrook for order directing plaintiff to

23   answer interrogatories 10, 11a -- what about those?

24         MR. SACHSE:  They pose a problem -- they really do.

25         THE COURT:  Talk to Mr. Veeder tonight about them.

1     MR. SACHSE:  We have talked that one over.  I don't

2   think there is much chance of getting together.

3          THE COURT:  Motion of defendants Katharine C.

4   and William W. Cottle to dismiss.

5          MR. GROVER:  Those are the ones we argued, your

6   Honor.

7          THE COURT:  That was submitted, wasn't it?  We

8   didn't talk particularly about it, but we considered it at

9   the same time that we considered defendant Carl and Hester

10  Halde's motions.

11         MR. GROVER:  Yes, sir, your Honor.  Because of

12  Mr. Halde's inability to be here, I did mean to make an

13  appearance for him.

14         THE COURT:  All right, that will be submitted.

15         11, Fallbrook's motion concerning hearings.  That

16  is disposed of.

17         MR. SACHSE:  Yes.

18         THE COURT:  The court trial matter will go over

19  until tomorrow.

20         It seems also, although the clerk didn't have it

21  on the calendar, didn't our order appointing a master provide

22  that any objections to the appointment of a master were to

23  be made and noticed for June 16th?

24         MR. VEEDER:  I believe that is correct.

25         MR. SACHSE:  Yes.

1       THE COURT:  But none have been made.  I take it

2  that there is no action that we need to note, except that

3  none have been made.  You might check that order.  I think

4  that is what the order provided.

5       MR. VEEDER:  I believe that the order of reference

6  had that in it.

7       THE COURT:  The order of reference provided that

8  the appointment be considered final unless objections were

9  made.

10      The clerk will note that on the hearings opening

11  on June 16th and again on the 17th and 18th no objections

12  have been filed or made to the appointment of the master.

13      We ought to finish up tomorrow morning, don't you

14  think?

15      MR. SACHSE:  I think so.
                                          and
16      THE COURT:  I wish you  Mr. Veeder would talk

17  about these things that we have named and see what could be

18  done to streamline that for tomorrow.

19      MR. SACHSE:  May I ask a question, your Honor.

20  What are your thoughts on how we should present to you, or

21  how you want presented, this removal question on remand?

22      MR. VEEDER:  It is going to be briefed, it was

23  agreed this morning.

24      MR. SACHSE:  Is it?  Who is to brief it?  I recog-

25  nize very well the technical rules that I am not a party --

1       THE COURT:  Mr Veeder indicated that he was going

2   to cover it in this memorandum that he files and he has the

3   laboring oar.  It seems to me that the basic problem there

4   is that there was no jurisdiction in this court for the

5   filing of the writ of mandate here.

6       MR. SACHSE:  No, the question I was getting at is,

7   since Fallbrook is unquestionably a real party in interest,

8   I know Mr. Veeder would agree, we are not a party to Santa

9   Margarita vs. State of California, is there any objection if

10  we plug in our brief on this subject?

11      THE COURT:  You can be a friend of the court, if

12  you want to phrase it that way.  I will be glad to hear from

13  you.

14      MR. VEEDER:  He can be a friend of the United States,

15  as far as I am concerned.

16      THE COURT:  I think if you look into this, Mr.

17  Veeder, and find that you are wrong on it, I think you would

18  save us a lot of time to concede it.  The rule is very clear

19  that there has to be jurisdiction in this court for the

20  proceeding to be originally filed, and if it was then filed

21  in the Superior Court that had jurisdiction it would have to

22  be removed.  So you will have to show me jurisdiction for

23  that writ of mandate to have been filed in this District

24  Court.

25      MR. VEEDER:  As I say, your Honor, I am going to

1 brief the whole question of jurisdiction, and I think in

2 briefing the jurisdiction I will cover it.

3          THE COURT:  All right.

4          Let's start at 9:30 and be sure we finish up

5 tomorrow.

6          MR. GROVER:  I handed the court the appellant's

7 brief on appeal yesterday.  If your Honor is through with it --

8          THE COURT:  I will hand it back to you, Mr. Grover.

9          (Whereupon an adjournment was taken until Thursday,

10 June 19, 1958 at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25