# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### ~~SOUTHERN~~ ~~CENTRAL~~ DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

                    No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al,

          Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**           San Diego, California

**Date:**           June 19, 1958

**Pages:** 1825 to 1899

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
                Deputy

**JOHN SWADER**
OFFICIAL REPORTER
UNITED STATES DISTRICT COURT
325 WEST F STREET
SAN DIEGO 1, CALIFORNIA
BELmont 4-6211 • Ext. 370

1      IN THE UNITED STATES DISTRICT COURT

2      SOUTHERN DISTRICT OF CALIFORNIA

3      SOUTHERN DIVISION

4      - - -

5      HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6      - - -

7    UNITED STATES OF AMERICA,        )
                                       )
8                     Plaintiff,  )
                                       )
9         vs.                          )        No. 1247-SD-C
                                       )
10   FALLBROOK PUBLIC UTILITY          )
     DISTRICT, et al,                  )
11                                     )
                      Defendants.)
12
                                       - - -
13
14      REPORTER'S TRANSCRIPT OF PROCEEDINGS

15      San Diego, California

16      Thursday, June 19, 1958

17      - - -

18   APPEARANCES:

19        For the Plaintiff:          WILLIAM H. VEEDER, Esq.
                                      WILLIAM E. BURBY, Esq.
20                                    Special Assistants to the
                                      Attorney-General
21                                    Department of Justice
                                      Washington, D. C.
22

23

24

25

1    APPEARANCES (continued):

2        For U. S. Marine Corps:        COL. ELLIOT ROBERTSON
                                        LT. COL. A. C. BOWEN
3                                       LT. DAVID MILLER

4        For Defendant Vail            GEORGE E. STAHLMAN, Esq.
         Company:
5
         For Defendants Fallbrook      F. R. SACHSE, Esq.
6        Public Utility District,
         Goodchap, Sachse, et al:
7
         For Defendant State of        EDMUND G. BROWN, Esq.
8        California:                   Attorney-General, by
                                       ADOLPHUS MOSKOVITZ, Esq.
9                                      Deputy Attorney-General

10

11

12

         For Defendant Santa Mar-      W. B. DENNIS, Esq.
13       garita Mutual Water Co.:

14       For Defendants Bennett and    TRENT G. ANDERSON, Esq.
         Knox:
15
         For Defendant Querry:         CLAYTON L. HOWLAND, Esq.
16
17       For Defendants Suderman:      G. NORMAN KENNEDY, Esq.

18

19

20

21

22

23

24

25

1827

1   SAN DIEGO, CALIFORNIA, THURSDAY, JUNE 19, 1958, 9:30 A.M.

2        THE CLERK:  No. 1 on the calendar, case No. 1247-SD-C,

3   United States v. Fallbrook.

4        MR. VEEDER:  Your Honor, the question about proceeding

5   before the Special Master has been the subject of conversation

6   with Mr. Sachse and I have tendered the thought that the pro-

7   ceedings should certainly go on, but that they go on, first at

8   least, in regard to the pro pers, believing that they are the

9   most hard pressed and believing that the real objective of these

10   Special Master hearings are for the benefit of those who cannot

11   afford Counsel.

12        It is my belief, as we set forth in that memorandum

13   to your Honor, that the scope of the proceedings in regard to

14   parties represented by Counsel is considerably broader by

15   reason of the kind and type of questions that are asked and the

16   kind and type of evidence that is introduced, and that we could

17   do it just as well here in San Diego before your Honor and let

18   the Master devote himself to pro pers.  Mr. Sachse disagrees

19   with that and I think he can express himself on it, because we

20   haven't come to an agreement on it.

21        MR. SACHSE:  Your Honor, my views are influenced by

22   two considerations, first, my personal ones, and second I think

23   the orderly procedure of the trial.

24        As far as I personally am concerned, this is an ad-

25   verse proceeding, each party against the other, and I have, I

1  believe, seventeen or eighteen individual clients on De Luz

2  Creek where there would be some disagreements between them and

3  pro per owners.  Now, I was under the impression that by hold-

4  ing the whole De Luz watershed hearings now we could wipe that

5  out before we came down before your Honor on the case in chief.

6  That is the first one.

7          The second one is that I don't think it will make for

8  the orderly procedure of the trial before your Honor to inter-

9  rupt the major issues repeatedly with testimony of little

10  people as to the evidence of their acreage, how many acres are

11  in corn, beans, tomatoes, etc.  I think that can best be done

12  by the Master, and let's hammer out the big problems.  I believe

13  that our general understanding yesterday, with the exception of

14  Mr. Grover, who thought that we should stop them entirely --

15  I was under the impression yesterday that all parties thought

16  we were going to push De Luz Creek through to conclusion, get

17  findings from the Master so that we could check over the find-

18  ings and perhaps decide if we wanted to offer changes in pro-

19  cedure.

20          THE COURT:  My view of that is this, and I  think this

21  will be the direction:  These De Luz Creek hearings are sort of

22  a pilot experiment to see how this works, and I think the hear-

23  ings should proceed both as to pro per defendants and to de-

24  fendants represented by Counsel.  Now it has various ramifica-

25  tions probably:  (1) The Master, when he finishes De Luz, will

1829

then take time out to prepare findings and to follow through the procedure outlined.  I understand that he is going to take August off and he may by that time be through with the hearings. Some of that time, I suppose, would be vacation; some of the time he will spend working on his findings, and he will have to, of course, work those findings out before the matter gets too old.

Secondly, I think there is a real value in having proceedings where defendants are represented by Counsel going on before the Master as well as pro per hearings.  This is an educational process for these people.  They get some idea of what we are doing.  From what I have heard, I have a feeling that these Master's hearings have been healthy up in that area. They have discovered various things:  That all the stories they have heard about the Government going to appropriate all their water and dry up the valley aren't true.  They have discovered that Government witnesses, such as Col. Bowen, have taken the stand, at least in certain of the cases, and have testified that this water was percolating water and not part of the stream, which would mean that they had correlative rights to that per-colating water even if they never put a bit of evidence on be-cause the findings could be made on the basis of the Government's own testimony.

In addition, the people who will appear pro per have the benefit of seeing what the case looks like when some Counsel is presenting it.

1    I think the Master's hearings should continue both as

2  to the pro pers and the defendants represented by Counsel and

3  clean up as much as we can of that De Luz area and see what we

4  get and how it works and how many problems we have.  We can

5  learn by experience -- the Court, the Master and Counsel.

6    So that will be the direction on that.

7    MR. VEEDER:  Very well, your Honor.

8    MR. STAHLMAN:  May I state that inasmuch as your Honor

9  has recognized what I consider to be a valuable factor in the

10  De Luz hearings, that is, the educational process so to speak,

11  the eliminating of some of the turmoil and feelings and con-

12  fusions which I'm sure the De Luz hearings even up to this point

13  have demonstrated that that was done, I think at least insofar

14  as the people in the area are concerned before the Master, they

15  have indicated that they are obtaining an appreciation and

16  understanding of what the matter is about.

17    I mention that because in the Murrieta area I have

18  had visits and I have had telephone calls even as recently as

19  this morning and there is a great deal of misunderstanding and

20  a great deal of agitation up there of people who are, seemingly,

21  extending themselves to create misunderstanding in that area.

22  Now I have no personal familiarity with it because I have never

23  been in that area for quite a long period of time or haven't

24  been at meetings -- and they do have them regularly.

25    In fact, it was suggested to me that I state to your

1  Honor -- I'm just a messenger boy for some people up there --

2  that it would be very helpful and very healthy if the Court

3  could have a meeting up there as it did in the De Luz area.

4          THE COURT:  I would be glad to do that.

5          MR. STAHLMAN:  They have a meeting up there on the

6  27th of June, I was told this morning.  I will get the informa-

7  tion to your Honor.

8          I think an explanation from the Court could do a

9  great deal, because the people in that area are busy writing

10  letters to Congressmen and politicians and I think your Honor

11  can better understand when you see it.  I have heard a lot of

12  rumors that certain people are stirring it up.  The very fact

13  that agitation does exist there I think it would be very well

14  if your Honor could do that.

15          THE COURT:  Well, sometimes a little knowledge is a

16  dangerous thing, you know.  After all, the people at Fallbrook,

17  I was confident that a number of them who had lived out in this

18  country knew as much or more about water than some of the

19  engineers.  But I was also convinced that there were a lot of

20  them who didn't know nearly as much about it as they thought

21  they did.

22          I would be glad to go up there -- the 27th, I think,

23  is free on my calendar -- if you will advise me of the time and

24  place.

25          MR. STAHLMAN:  I will get the information, your Honor.

THE COURT:  I have thought about this.  I think the sooner we get things down on an orderly basis throughout the district the better -- the realization up in that area that we won't be up there for some time, and that they have plenty of time to work on their answers; let them know what some of these issues are and how the case is going to be tried.  I'll be glad to go.

MR. STAHLMAN:  Thank you, your Honor.  I will get you the information.

THE COURT:  Now, the second point in Mr. Veeder's suggestions was that the Master's proceedings should resume commencing June 21.  That is proper.

That the case should be called in the order in which the engineering reports of the United States have been and will be submitted.  I prefer to leave it to the discretion of the Master, but obviously we have to have those reports before he can very well proceed with some of the cases.

MR. VEEDER:  That is the problem with which we are confronted.  The scheduling is very important in getting the material before him.

MR. SACHSE:  I think you have the wrong date, your Honor; the 21st is a Saturday.

MR. VEEDER:  It might be the 23rd.

MR. SACHSE:  No, the Master's tentative setting was

for the 24th.  The notice that he put out was for Tuesday, the 24th.

THE COURT:  Tuesday, the 24th?

MR. SACHSE:  Yes.

THE COURT:  I took the date Mr. Veeder had there and inadvertently got the wrong date, apparently.

MR. SACHSE:  June 23 is a Monday.  I was mistaken. Pardon me, your Honor.

THE COURT:  June 23?

MR. SACHSE:  Yes.

THE COURT:  All right, June 23.

No. 3:  We have taken care of both the hearing on the Government's motion and the additional brief that Mr. Veeder wants to file.

Now the fourth item is the continuation of the trial of the case.  Actually, I have felt all along that when we crowded to start this trial on the 16th of June that we were not going to make it.  I have started other big trials and you can set a target date, but lots of things remain to be done; and I want carefully to consider the briefs you are going to file and that have been filed in the past.  We have argued some of these matters before.  I have given some tentative views and I would like to formulate in writing for you my views on this matter.  Where it is impossible to rule directly on a motion, the points of law you have raised, if possible, I will

1   treat as pre-trial rulings.

2        I had that in the Convair case and I led off with a

3 statement that in the absence of controlling precedent or of

4 facts which would change the Court's view, the Court intended

5 to rule at the trial on the following propositions of law in

6 the following manner.  Obviously the Court can change its mind

7 and anything could happen.

8        By the way, in the Idaho case, has cert been granted

9 in that?

10       MR. MOSKOVITZ:  Your Honor, that case was argued at

11 this term and we are awaiting a decision.

12       THE COURT:  That decision might come down at any time.

13 It might or it might not be of some help.

14       MR. MOSKOVITZ:  That is correct.

15       THE COURT:  So anything could happen here.

16       That is what I would propose to do, and in that I will

17 certainly pick up the submitted matters concerning the Govern-

18 ment's motion to modify the stipulation and rulings on as many

19 of these matters as possible.

20       I don't think I'm stating it incorrectly when I say

21 that the major issue right now in this case, and it will affect

22 this case all the way through, is this question as to whether

23 or not State law must be complied with on appropriation.  Mr.

24 Veeder, don't you think that is a major point in this case?

25       MR. VEEDER:  Well, I think that the major point, your

1  Honor, embraces that, certainly; but I think the most important

2  single question, at least as I have it, your Honor, was the one

3  that came up in regard to your Honor's observation respecting

4  his own jurisdiction to determine priorities.

5          THE COURT:  Well, that is tied in with it.

6          MR. VEEDER:  I think it is all embraced.

7          THE COURT:  Now, regardless of which way the Court

8  rules on that matter, if there were any way to formulate some

9  partial judgment that could be made appealable under the Rules,

10  I would be glad to consider it.  I don't think that that is

11  going to be possible.  Certainly a pre-trial ruling wouldn't be

12  that kind of order, and I have serious doubts whether the

13  motions that have been made mechanically are such that I can,

14  either way, do that.  There might, one side or the other, be

15  some possibility.  I will explore that.  There are difficulties,

16  we    all realize.

17          As to the Government's motion for summary judgment,

18  of course, you could have summary judgment on limited issues of

19  the case.  But assuming everything that the Government says,

20  Fallbrook still has certain rights.  Assuming that everything

21  the Government contends for, they have a right to domestic

22  water, they have probably some rights to flood waters, surplus

23  over and above all vested rights, if, as and when, etc.

24          And on the defendants' side of the case,  various of

25  these motions to these causes present the same problem.

1      I will work on this with that in mind, but I have

2   serious doubt whether it is going to be possible to get any

3   kind of order that could be appealed, either way the Court de-

4   cides the matter.

5      MR. VEEDER:  Your Honor has raised a point.  May I

6   make an observation now?

7      THE COURT:  Yes, sir.

8      MR. VEEDER:  I have before me our interrogatories to

9   Fallbrook and the responses to them.  Mr. Sachse has scheduled

10  that for hearing today -- the objections, and we have talked

11  about them.  There are some seventy-seven or eighty inter-

12  rogatories, however many there were, where there were at least

13  what I consider to be the salient questions respecting Fall-

14  brook's rights to the use of water and its power and authority

15  to construct a dam under the circumstances.

16     We are now confronted, though, with something that is

17  precipitous in my mind.  We are confronted with the condemnation

18  proceedings which will commence on July 7, as I understand it.

19  We are confronted with the petition for writ of mandate which

20  Mr. Dennis has filed.  We are confronted/Fallbrook's request
                                            with

21  to change the diversion and place of use of 2,000 acre feet of

22  water pending before the State Water Rights Board.

23     I believe it is within your power, your Honor, sua

24  sponte and on your own motion, to direct that all matters be

25  maintained in status quo at this time.  I believe that it would

1   be one of the most beneficial things that could happen right

2   now.  Our concern about appeal, our concern about the disposition

3   of these matters, our concern about the course to pursue -- we

4   are continually having our elbow bumped, so to speak, because

5   we are confronted with deadlines that are occurring in other

6   forms.  The removal of the case from the San Diego Court was

7   precipitated largely by my concern about time, and I believe

8   that comity between the State and the Federal Court would ac-

9   cord to your Honor the first jurisdiction and the right to

10  pursue this matter to its conclusion in advance of any State

11  Court actions or any action by the State Water Rights Board.

12          That is our concern this morning, your Honor. .It is

13  the most pressing concern that we have.  We feel this way, that

14  we can't stand by any longer.  We don't want to undertake the

15  harsh process of injunction.  We don't believe that anyone

16  would be prejudiced if your Honor were simply to direct that

17  the parties make no changes in their status between now and

18  the completion of the trial in chief.  I believe that if that

19  were done the concern about appeals would be gone.

20          The only reason that we are concerned about appeals

21  at all, your Honor, frankly, is that we are being prejudiced

22  by these changes that are taking place.  We hesitate, for

23  political reasons, frankly, to undertake to stop things by in-

24  junctive relief or to sue for injunction.  But we do believe

25  that there resides with your Honor to say, "No one changes his

1838

1  position from now until after I have heard the case in chief."

2  At that time your Honor would have a full opportunity to con-

3  sider the matter of our charge of ultra vires acts -- whether

4  or not these priorities could be recognized.

5          But until we have those directions from your Honor,

6  we are pretty much in the dark and we are greatly concerned.

7          THE COURT:  Well, you say until the completion of the

8  trial in chief.  The trial in chief should encompass, finally,

9  a decree in this matter, a settling of issues.  None of us knows

10  when that will be because it concerns not only the trial, as we

11  speak of it, on the main stem, but it concerns these other

12  trials elsewhere in the district and the final weaving of a

13  decree, and that is a long time in the future.

14          MR. VEEDER:  Right.  But the point I make in re-

15  gard to  the trial in chief, as I actually see the trial in

16  chief, the issues presented are between the Fallbrook Public

17  Utility District, Santa Margarita Mutual Water Co. and the

18  State of California, and those will be tried and completed,

19  our case in chief will be done and completed and Fallbrook's

20  and Santa Margarita's case in chief will be in, within a matter

21  of three or four months at the outside.

22          THE COURT:  Well, it may be that the decisions on

23  these pending matters will go far enough to clear the air.

24          MR. VEEDER:  But they will not be before July 7,

25  your Honor.

1    THE COURT:  I realize that.  Your last week will be

2  July 7.  I have asked Judge Weinberger to try to arrange the

3  criminal calendar so that I will be relieved of the other trials

4  here and have the next two or three weeks to work on this as

5  much as I need.  Some of it I will need before the 7th, and

6  some of it I will have to wait until the final briefs come in.

7  It may be that those rulings will clear the air.

8    What do you have?  A trial date  set in the con-

9  demnation matter?

10    MR. SACHSE:  Yes, your Honor.  July 7 is the re-

11  sumption of trial which started.

12    What is it?  Five parcels that have been submitted?

13    MR. STAHLMAN:  Four.

14    MR. SACHSE:  Four parcels have been submitted, and

15  no judgment.

16    MR. STAHLMAN:  Four parcels have been submitted, and

17  the remaining eighteen or twenty parcels start trial on the

18  7th.

19    THE COURT:  Which Judge is handling that?

20    MR. STAHLMAN:  Judge Harden.

21    Judge Harden expressed himself on this question at

22  one time.  He wanted to know whether we thought there was going

23  to be an intervention, and I told him that I didn't know.  I

24  happened to meet him on the street a day or two ago and he

25  asked me what was going on over here and whether there was going

1840

1   to be any interference or stoppage, but he would like to know

2   before then if there was.   I think his observation was that he

3   isn't concerned one way or the other whether the case is tried

4   over there or not, but he would like to know because he has

5   the case set for the 7th.

6            MR. SACHSE:   I don't agree with that interpretation.

7   I talked with Judge Harden   in the parking lot Monday after-

8   noon after I left this Court,   By pure coincidence he was

9   driving out and stopped his car and he asked me if there was

10  any possibility that his proceedings would be enjoined.   I told

11  him that I didn't think so, and his exact words were, "I certain-

12  ly hope not."

13           MR. STAHLMAN:   Well, he didn't express himself to me

14  that way at all.

15           MR. SACHSE:   I think it is academic what Judge Harden

16  may wish or may not wish, your Honor.   I have stated this a

17  great many times.   I simply cannot see what business it is of

18  the United States of America whether the Fallbrook Public Utility

19  District chooses to build a dam on its own land on a non-

20  navigable stream.   It has the complete protection of this Court.

21  You have told them any number of times.   I have acknowledged

22  it.   I can't say it any more often.   You can tell us to put a

23  hole in the dam, you can force us to let any amount of water

24  you want to go through.   But what concern is it of the United

25  States of America whether or not we condemn some real estate?

1841

1   What possible concern is it of the United States of America

2   that the directors of the Fallbrook Public Utility District are

3   attempting to carry out their responsibilities to their con-

4   stituents and decide that they need to condemn some land?  It

5   is absolutely none of the business of the United States of

6   America.  I don't think your Honor could enjoin it.  You could

7   prevent the use of the dam, yes, but you cannot prevent the

8   building of it.

9          MR. VEEDER:  I submit, your Honor, in that connection--

10  and this, of course, ties back again to the question of your

11  Honor's interpretation of his own jurisdiction -- we have, as

12  I say, presented these interrogatories raising what I believe

13  to be the crux of Fallbrook's priority dates.  In other words,

14  the question of financial feasibility is an extremely important

15  factor in regard to the right to appropriate rights to the use

16  of water, that is an element, and I think that your Honor will

17  ultimately pass on that  question.  I think your Honor will

18  ultimately pass upon the question whether Fallbrook could build

19  a dam.  I think that is part of the question that you have

20  before you.  And I believe that by this precipitous action

21  during a trial of starting to build a dam does prejudice the

22  United States.

23          I asked in these interrogatories, "What action have

24  you taken?  What plans have you made to protect the interests

25  of the United States during the period of construction?"  They

1842

1   said, "We have no plans. We don't know what we are going to do.

2   We haven't any concept about how we are going to build the dam.

3   We haven't issued any bonds."

4         They have nothing except this, they have bulldozers

5   up there above our place and they are moving dirt, and I under-

6   stand their problem because I know they don't have the financial

7   capacity. They have revenue bond authority. They can issue

8   revenue bonds, but they haven't got the bonding authority for

9   a general obligation, and that is why our summary judgment is

10   so important. I would say that your Honor could direct them

11   now to refrain from doing anything further in this condemnation

12   proceeding and it would be perfectly valid and perfectly in-

13   forcible.

14         THE COURT: The only thing I would consider would be

15   merely an inquiry of Judge Harden whether he had any objection

16   to holding up the trial of that matter, say, until about July

17   15 or August 1, until I have made these pre-trial rulings. I

18   have the feeling that these pre-trial rulings will clear the

19   air, and then at that time, if the rulings are such that any

20   further steps should be taken, we can talk about it, and if they

21   are such that no further concern need be had about Fallbrook's

22   activities on the dam then that is that. However, I do feel

23   that there might be some advantage in a slight delay in that

24   case, if it didnt inconvenience the Court and Counsel too

25   much. I anticipate that I ought to be able to be through with

1   this within a week or ten days after the 7th of July.

2       MR. STAHLMAN:  Your Honor, if you are going to talk

3 to Judge Harden, may I give you a little background information

4 on this condemnation?

5       There  was a Bulletin published by the State Engineer,

6 Bulletin No. 26, published in 1929.  It gives a history of the

7 area of Fallbrook and it shows that there were two previous

8 condemnations at this very same point on the river.

9       I happened to find another one that is not in the

10 Bulletin, in 1886 or thereabouts, and it is surprising that the

11 complaint in that case was very similar to the complaint filed

12 in this case -- at least the reasons for condemnation are the

13 same.

14       Fallbrook first started in 1951 and filed this con-

15 demnation and never did a thing on it, not even served any of

16 the defendants in the case, and then by reason of the lapse of

17 time and the California Code, were forced to dismiss that action

18 because they had slept on it over that period.

19       Then in 1955 they dismissed that case and then they

20 filed another case, and it was a matter of two or three months

21 before anyone in the area, even the people whose property was

22 being condemned, even knew that there was a condemnation on --

23 they never served any of my clients in the case, and at the

24 time we answered we were the first answering defendants who

25 answered the complaint without even service.

1    Now that we get to the critical part of this case,

2  as we are now, there is such a rush and urgency suddenly to

3  put on the steam and open the throttle to have something done

4  on that river that could be disastrous to a lot of people.

5    So I give that to your Honor as background informa-

6  tion as to what has happened in the past.  It seems very pe-

7  culiar to me, and I think maybe even Mr. Sachse made the state-

8  ment to your Honor that even he knew more than what he spoke.

9    THE COURT:  Mr. Sachse, let me ask you this.  If I

10  get out some rulings on pre-trial and on these motions, which

11  would come, I hope, shortly after July 7, you would be in trial

12  of this action, you obviously would be interested in immediate-

13  ly analyzing what I had decided and what impact it had on this

14  case, and you would be trying to ride two horses -- one, to

15  do justice to the trial of this condemnation matter, and the

16  other more adequately to inform yourself as to where you stood

17  as a result of these rulings.

18    Would you have any objection if I talked to Judge

19  Harden and merely suggested that, because of these forthcoming

20  rulings, which I hope will clear the air and clarify the Court's

21  position on a number of matters, that this trial might well be

22  put over until about the first of August?

23    MR. SACHSE:  Yes, sir, I have objection.

24    THE COURT:  What?

25    MR. SACHSE:  This is not precipitous haste, as Mr.

1    Stahlman stated.   This is one of the reasons for my objection.

2    As I say, this is not precipitous haste.   We have been trying

3    hard -- it is correct that the 1951 action was abandoned, and

4    it was abandoned because of the pendency of this proceeding --

5    we have been trying hard since 1956 to get a project which the

6    community itself, at repeated elections and repeated election

7    by substantial margin of those who stood for the project, has

8    indicated the community itself believes that it is its salva-

9    tion.

10       I have stated here a number of times, your Honor,

11   that we intend to build a dam if it is only to take what you,

12   yourself, have described as the once in an extremely rare flood

13   that runs down the river.   We have the right to store Colorado

14   River water in it.   There is under construction today a second

15   aqueduct, which will be completed  within, we are told by the

16   Water Authority, by the Fall or irrigation season of 1960,

17   which will be completed to serve only the area that is known

18   generally as Rainbow, Fallbrook, Oceanside -- it will be no

19   further south.   It will be exactly twice the quantity of water

20   flowing into San Diego County with that second aqueduct as there

21   is today, and there will be no place to put it.   There will be

22   easy free and cheap water available if we have a place to store

23   it.

24

25       I am absolutely convinced that there is some ulterior

motive.   What I frankly don't know.   I frankly don't know why

needed public improvement has, at every step of the way, been so bitterly contested not only by the individuals whose land was being taken but first in an attack on the authority of the District to do it at all, an attack on the need for the project.

The case I cited you yesterday of Fallbrook Public Utility District v. Martin is worth reading.

We have been stopped and stymied and blocked every time we attempt to do anything on this project, and I am instructed by my board and I can go no further than to say that we learned our bitter lesson last Fall, your Honor, when we stipulated to a maintenance of the status quo, at your Honor's request, to permit the submission of settlement proposals, and I heard your Honor's own words in this courtroom to the United States, "This is an offer of settlement?"  Those are your Honor's own words.

THE COURT:  Don't remind me of it.  The doctor says to keep my blood pressure down.

MR. SACHSE:  We stopped everything we were doing and we submitted, and I heard your Honor say, "You call this an offer of settlement, Mr. Veeder?"  Nothing.  Absolutely there has not been one indication of an effort to compromise, there has not been one indication of an effort to assist us in building the project that we so  desperately need.

We don't think that the United States District Courts are going to take over the government of every quasi-municipal

1  organization in the State of California.  I don't think it is

2  the business of the United States District Courts to decide

3  what is a good project for Podunk.  We think that Podunk will

4  decide for itself, under the American system, and I don't think

5  it is your Honor's responsibility to tell us whether or not

6  what we are doing is good for us.  We don't believe in the

7  Big Brother concept, and we are going ahead as best we can with

8  our own poor brains and our own poor talents, and I will not

9  consent and I am not authorized to consent to any postponement

10  of our project.

11          THE COURT:  I am not going to make any order, but I

12  am going to consider the matter and I will advise Counsel now

13  that I may or I may not decide informally to request Judge

14  Harden to continue that  trial for a week or two until I get

15  this memorandum out on these issues.  And if I do that, I don't

16  think it is going seriously to hurt you.  But I will make no

17  order on it at this time.

18          MR. DENNIS:  Your Honor please, I would assume that

19  if you  made any order as is suggested by Mr. Veeder that it

20  would be until further order of the Court.

21          THE COURT:  I am not going to make any order.  If I

22  do anything, I will merely request, as a matter of courtesy,

23  the Superior Court Judge to let me get this memorandum out be-

24  fore he proceeds further with the other trial.

25          MR. DENNIS:  That settles the thing that was bothering m

1848

1    THE COURT:  On this date of trial:  Outline for me

2  briefly your problems or problem, Mr. Veeder.

3        MR. VEEDER:  The problems are these, your Honor.  We

4  are down now to the point where it is virtually impossible to

5  make personal service on anymore parties, but there are some,

6  and we are proceeding with it as rapidly and as expeditiously

7  as we can.  We believe that three weeks from Monday would be

8  probably the time when we will have completed, to the best of

9  our ability, the full and thorough checking of all names and

10  all parties, and we believe that shortly after that we could

11  proceed with publication, which will require thirty days.

12        THE COURT:  Three weeks from Monday -- Monday is the

13  23rd, the first week is the 30th, then the 7th, then the 14th --

14  in other words, you estimate that by the 14th you would be

15  prepared to start publication.

16        LT. MILLER:  That would be the minimum -- three weeks.

17        THE COURT:  You are through with your checking?

18        MR. VEEDER:  That is right, your Honor.

19        THE COURT:  How long would it then take you to get

20  your papers ready for publication?

21        MR. VEEDER:  We will start preparing those and get

22  things lined up and plan for it right away, but from the stand-

23  point of carrying out the publications we can't start until

24  after the expiration of --

25        THE COURT:  What is required, a thirty-day publication?

1        MR. VEEDER:  Thirty days, that's right.

2        THE COURT:  I am not too familiar -- I should be, but
3   I see very little of these orders.  The law provides that when
4   the thirty days has expired the service is then complete, and
5   then the defendant against whom publication has been had has
6   his twenty days -- or does he have more time?

7        MR. VEEDER:  I think he is limited to twenty days,
8   your Honor.

9        THE COURT:  Twenty days to answer.

10        MR. VEEDER:  From the completion of the publication.
11   But the point of it is on that, I believe -- I know that in the
12   past we have completed the publication and simply gone right
13   ahead, because after that publication, with the number of
14   people, it is virtually impossible, in my view, to cover every
15   single conceivable angle, and I think we would be certainly safe
16   in going ahead on the 15th of September or the 1st of October,
17   the way we counted our days, as I remember.  There may be some
18   one show up later, but I think this --

19        THE COURT:  Well, you check this now.

20        MR. VEEDER:  Yes.

21        THE COURT:  I am trying to think.  In interpleader
22   cases, I guess is what I am thinking about -- this wouldn't
23   apply, if I am thinking about the right thing -- service runs
24   throughout the United States and it has always been customary
25   to fix a date in those orders giving the individual more than

1  the twenty-day period to answer because he is in some other

2  district.  I guess I am thinking about that and not about publi-

3  cation.

4        MR. VEEDER:  The safe procedure which I would re-

5  commend, which would be concomitant with this publication, would

6  be that your Honor set a date well into the Fall in regard to

7  defaults.  Then there would be no question on that and we would

8  follow through -- at least this would be my recommendation,

9  that we follow through with notice on defaults as a sure follow-

10 up and give them thirty days after their receipt of the notice.

11 It is true that it may hold the ultimate decree open a little

12 while, but I think it would be the safest thing to do before we

13 wind the thing up.  So you correlate publication with defaults

14 at the same time and there is no question that due process

15 would be taken care of in that manner.

16       THE COURT:  This order you were talking about on de-

17 faults, are you going to publish that, too?

18       MR. VEEDER:  My recommendation would be that it be

19 mailed out to all the parties.

20       THE COURT:  I think any order of that sort, coupled

21 with your publication order, might cause trouble.

22       MR. VEEDER:  It wouldn't be coupled with the publi-

23 cation order.

24       THE COURT:  It seems to me that you ought to publish

25 in the regular manner.  There is twenty days allowed for

1    appearance after the completion of your publication.

2         Is the Federal law the same as the State law, that

3    after an order of publication has been made the service of a

4    document personally on a person outside the State is the equiva-

5    lent of the publication?

6         MR. VEEDER:  I have to check that, your Honor.  I

7    would be reluctant --

8         THE COURT:  That is the State law, isn't it, Mr.

9    Sachse?

10        MR. SACHSE:  Yes, your Honor.

11        THE COURT:  Mr. Stahlman?

12        MR. STAHLMAN:  Yes, your Honor.

13        THE COURT:  In other words, you get an order for

14   publication, and even though you don't publish it you personally

15   serve the individual outside the State.

16        MR. SACHSE:  Yes.

17        THE COURT:  In other words, the theory being that

18   that personal service is just as good or better than the publi-

19   cation in the newspaper would have been.

20        MR. SACHSE:  That is right.

21        THE COURT:  Then it would seem to me that this matter

22   of defaults we should take up later after publication has been

23   completed.

24        MR. VEEDER:  I agree on that.  I am simply saying --

25        THE COURT:  Let's not worry about any cutting off of

the time to answer.  The situation is bad enough now.

MR. SACHSE:  Aren't we fairly safe anyway?  Looking at my calendar, I am under the impression that you have cleared away the last two weeks and first three days of September, that we were not going to do anything anyhow.

THE COURT:  Yes.

MR. SACHSE:  So the earliest practical date, I think, Mr. Veeder, would be about the 15th of September, and I think that would give you time, wouldn't it?

MR. VEEDER:  That is what we had figured on, from the standpoint of the work.

THE COURT:  Well, from the computation that I was just making here, it looks to me like you might be safer to say later in September or even October 1.  You have to get up your affidavits and complete checking of names.  You have a mechanical problem of getting your publication started.  If you got started in the third week in August, September 15th is all right.  But if you have any trouble on that, you slop over beyond the trial date again.

MR. VEEDER:  That is right.  The suggestion we made of October 1 -- I have forgotten who made it -- might be the safer date.

Did you make that?

MR. DENNIS:  I think I did.

I think there is one other reason.  From what the

1    Court said I don't assume that we will have the Master's findings

2    and conclusions until the latter part of August or the first

3    part of September, and I think that we would all like to have

4    a chance to go over those in connection with the trial.

5           MR. SACHSE:  It is all right with me.

6           THE COURT:  October 1 is not a Tuesday, but it is a

7    good date to remember.

8           MR. MOSKOVITZ:  It is a Wednesday.

9           THE COURT:  It is a Wednesday.

10          I think that is the date, then.

11          The Clerk called my attention to the fact that the

12   following week is the State Bar Convention, October 6-10.  It

13   is held in San Diego this year.

14          MR. STAHLMAN:  We will all be here.  We can attend

15   the evening sessions.

16          MR. MOSKOVITZ:   Just what I said.

17          THE COURT:  I don't see any reason not to leave it

18   on October 1, attend the State Bar, it would be an easy thing to

19   do.

20          Is there anybody here who has made plans to go to

21   that meeting or is on some committee who feels he would have

22   to be present?

23          There may be other lawyers.

24          I think we will leave it October 1.  The trial of

25   this action is continued to October 1, 1958, at 10:00 o'clock AM.

1    in this Court.

2        MR. STAHLMAN:  Now that your Honor has set this

3    matter for that time, there is another matter that I would like

4    to bring to the Court's attention.

5        I know that between now and that time there are going

6    to be a good many papers served back and forth, etc., and I

7    happen to have one here that gives me some concern.  It will

8    probably be followed by a great deal more.

9        I received in the mail last evening from Mr. Sachse

10   answers in connection with two parcels of land, which I presume

11   are north of the Vail Ranch.

12        MR. SACHSE:  They should be or I wouldn't have sent

13   it, George.   Which ones are they?

14        MR. STAHLMAN:  One is the Paul A. Hernley --

15        MR. SACHSE:  Yes.

16        MR. STAHLMAN:  And the other is the Tule Valley Land

17   and Cattle Co.

18        MR. SACHSE:  That is away north.

19        MR. STAHLMAN:  We didn't know where it was.  I talked

20   to Mr. Hall and he merely heard of it.

21        In connection with these answers, there is a request,

22   under Rule 36, that we furnish certain information as to the

23   Vail Co., and I feel, I strongly feel that the request in this

24

25

1   case is not consistent with the spirit and purpose of Rule 36,
2   it is quite inconsistent with it, and the type and character
3   of admissions that are requested here I think I just merely
4   have to send back the answer that I don't know.

5           Incidentally, in one of these cases there is not
6   even a description of the land.  It says the land in Exhibit A,
7   but there is no Exhibit A.

8           MR. SACHSE:  There isn't any Exhibit A to the request
9   for admissions.  There is an Exhibit A in the answer of each
10  case and the land is described in the answer in each case, Mr.
11  Stahlman.

12          MR. STAHLMAN:  In one of them we don't have it.
13          Anyway, here is the request, your Honor, the one that
14  was requested of the Government:

15          "The defendants are the owners of the land de-
16      scribed in the answer herein."

17          Now, your Honor's answer to Mr. Veeder was that they
18  had facilities over there and they could make some form of
19  answer.  The Vail Co. does not have those facilities.

20          The next one is: "The lands described in the
21      answer of defendants include seventy acres of irri-
22      gable land."

23          We certainly have no information in regard to that.
24          The point I am making is, why send requests for in-
25  formation that we don't have?  If this had been a request for

1    information about Vail's land that they needed, I could see

2    some sense to it, if it was pertinent to the issues.  But they

3    ask us to admit that there are so many acres of irrigable land.

4              Now the next one is in regard to a reasonable water

5    duty.  That is something that your Honor is going to find in

6    connection with all the land anyway.  We are supposed to admit

7    that they have a reasonable water duty of 4.2 acre feet.

8              That the lands of the defendants do not abut upon

9    and are not riparian to any stream.  I presume that that is

10   something that will have to come out in the evidence anyway.

11             That the waters underlying the lands of defendants

12   are percolating ground waters not a part of any stream.  I don't

13   see why Vail Co. should be called upon to make admissions of

14   that character.  I think the Rule was intended to elicit in-

15   formation that is obviously within the knowledge of the parties

16   from whom the request is made.

17             These questions are peculiarly within the knowledge

18   of the party who makes the request, and they are matters which

19   certainly will have to be presented in    evidence and matters

20   that will require very little time.  I certainly don't want

21   to do anything, regardless of whatever is going on between Mr.

22   Sachse and myself, in any way to impede his representation of

23   his clients.

24             This brings forth another question in which I have

25   some little concern.  I'm not Mr. Sachse's keeper of his ethics

1  or his conscience, but I perceive that there are conflicts of

2  interest in connection with these people and even his own clients.

3          MR. SACHSE:  Pardon me just a moment.

4          MR. STAHLMAN:  Just a moment.

5          MR. SACHSE:  I suggest that if you know of any con-

6  flicts of interest take them to the State Bar.

7          MR. STAHLMAN:  Just a moment.

8          MR. SACHSE:  I will police my own morals.

9          MR. STAHLMAN:  Just a minute,

10          THE COURT:  Wait, wait, wait.

11          MR. STAHLMAN:  I am not policing your morals, Mr.

12  Sachse.  I am merely pointing out something to the Court.

13          THE COURT:  Wait a minute.  Let's stop that.

14          As I understand the law to be, a man may represent

15  clients who have adverse interests if the clients understand

16  the situation.

17          MR. SACHSE:  That's right.

18          THE COURT:  That is a matter that --

19          MR. STAHLMAN:  As I say, I'm not the keeper of Mr.

20  Sachse's morals.  I am not telling Mr. Sachse what clients he

21  can have or whom he can represent, and I am not running to any

22  Bar Association -- I don't do that.  I have sat on a few com-

23  mittees and I think I understand something about the grievance

24  committees of the Bar Association.  I have sat on the com-

25  mittees not once but many times.

1      The thing that I perceive in this case is that some

2  day one of Mr. Sachse's clients makes a point of the fact that

3  there has been some conflict in interest in the case insofar

4  as the Vail Co. is concerned, because we are certainly going

5  to have some fights with Mr. Sachse's clients regarding some

6  of these situations.  Then we will be placed in the position

7  where the innocent bystander has to probably re-try certain

8  phases of the case, if that should occur -- and that is not an

9  impossibility.  There are going to be people who will be dis-

10  gruntled with their --

11      THE COURT:  Well, Mr. Stahlman, on that score, every

12  lawyer has to work as he sees fit.

13      MR. STAHLMAN:  Very well.

14      THE COURT:  If I were Mr. Sachse, I would have a

15  letter in which I outlined the fact that I represented people

16  all around this district and that their interests were adverse,

17  and I would tell the client, "If you want me to represent you,

18  read this over and sign it," and then I would put it in the

19  file.

20      MR. STAHLMAN:  There was an article in last week's

21  paper in which the Board of Directors discussed this very thing,

22  and the newspaper article quoted Mr. Sachse -- Mr. Veeder called

23  him on this before the Master; I stayed completely out of it --

24  and now we are up there with Vail, and the explanation there was

25  that he was representing people downstream and therefore there

1    couldn't be any conflict.

2            As I say, I'm calling it to your Honor's attention.

3    I am not out to police Mr. Sachse.  I am not going to bring the

4    matter up again.  But I do perceive that there are difficulties

5    that can be encountered that will affect persons in the case

6    who are no party to that situation, and I bring it your Honor's

7    attention, and I purposely wanted to put it on the record.

8            THE COURT:  All right.

9            Now, on this matter of the requests.

10           MR. SACHSE:  I would like to be heard on it, your

11   Honor.

12           THE COURT:  Mr. Sachse's purpose, obviously, is to

13   see what areas of dispute between his clients and the Vail Co.

14   can be obviated by your answers, and as a matter of fact you

15   should be as interested in cutting down the area of dispute as

16   he should be.

17           MR. STAHLMAN:  What is the dispute?

18           THE COURT:  Maybe there isn't any.

19           MR. STAHLMAN:  If there is any dispute, I am perfectly

20   willing to sit down with Mr. Sachse and outline to him any

21   information that he wants about Vail's uses of water.

22           THE COURT:  I understand that his clients are up-

23   stream of the Vails.

24           MR. STAHLMAN:  Yes.

25           THE COURT:  Now he asks you to admit that their land

1    is non-riparian.

2        MR. STAHLMAN:  I think that is obvious.

3        THE COURT:  If that is disposed of, a major part of

4    the problem is out the window between you and those people.

5        MR. STAHLMAN:  Let's take the next one that I didn't

6    read, your Honor.  We have never been on the land, we know

7    nothing about it, and yet here is the request:

8        "That the lands of defendants in Sections 22,

9        23 and 24 are riparian to Tule Creek."

10       Maybe we can get a map and find out, and if it looks

11   like they are we will say O.K.

12       "The lands of defendants in Section 13 are

13       riparian to an unnamed intermittent stream flowing

14       into Coahuila Creek.

15       "The springs arising upon the lands of defendants

16       are from local percolating ground waters and are not

17       a part of any stream."

18       He said that there are some twenty springs on this

19   land.  I don't know.

20       THE COURT:  Well, Mr. Stahlman, if there is dispute

21   between the Vails and these upstream owners, those problems

22   some day have to be resolved, and the purpose of the request

23   for admissions is to see how far you can go in resolving them.

24       I make this suggestion to you -- I know you gentle-

25   men have had your problems, and you both happen to be old and

1861

1   good friends of mine -- I ask you to sit down and look into

2   this and see what you can do to work it out.  If you need

3   additional time, all right.  But eventually you are going to

4   have to face that issue.

5        If there are twenty springs up there, you are going

6   to have to have your engineers look at them and you are going

7   to have to say either that these are springs that are perco-

8   lating waters and that therefore they don't concern us people

9   in the correlative right to percolating waters, or they are

10  part of the stream and therefore they concern us.

11       Now I don't say that you have to do this -- if you

12  want time to do it, I am sure that Mr. Sachse will give you a

13  stipulation of time to answer.

14       MR. SACHSE:  No objection at all.

15       MR. STAHLMAN:  All right.

16       THE COURT:  But eventually you are going to have to

17  face these issues.  The sooner you do it, the sooner you re-

18  solve at least parts of the conflict between these upstream

19  owners and your client.

20       MR. STAHLMAN:  No objection to sitting down with Mr.

21  Sachse, and I think Mr. Sachse and I sat down calmly on many,

22  many things and ironed out a lot of problems.  In fact, I have

23  no personal feeling with Mr. Sachse.  It is only in relation to

24  that --

25       THE COURT:  I understand.

1    MR. STAHLMAN:  He has, I think, the same with me.

2    THE COURT:  You are both diligently representing your

3    client.

4    MR. STAHLMAN:  However, I perceive that there might

5    be a lot more of these things and there may be other problems

6    up there.  That is the reason why I bring these things up.  I

7    would much prefer to sit down and say, "Let's see your map, Mr.

8    Sachse.  What is up there?  Let me go to my engineer and talk

9    to him.  I don't know anything about the springs and the

10   geology of the land."

11   THE COURT:  Your only problem is that the Rules re-

12   quire you to answer within so many days.  So the simple thing is

13   to call up Mr. Sachse and say, "Look, I can't possibly even

14   approach this problem within  the time provided in the Rules.

15   Either give me time until you request an answer, or let's put

16   it over for thirty or sixty days.  Let's get together and talk

17   about it."

18   MR. STAHLMAN:  Very well.  Let's put it over for

19   sixty days.  If I have to do it within ten days --

20   MR. SACHSE:  He can have all the time he wants.  But

21   I think we ought to understand this.  I have a great many

22   clients here and I think I have covered myself pretty well on

23   any hazards of conflict of interest.

24   MR. STAHLMAN:  I'll never bring that question up

25   again.

1    MR. SACHSE:  But I have worked out a theory -- as

2  Mr. Veeder discussed here sometime ago, the United States has

3  a theory as to how they are trying it -- I'm not speaking of

4  a theory of trial but I am speaking of the mechanics, and that

5  mechanics entails the attempt to eliminate, as you said, as

6  many of the non-controversial issues as I can, and in most

7  cases, if possible, put these people into a position where I

8  can say, "Go home, sit down and forget about it."

9    Now Hernley -- this is really funny -- Hernley tanks

10  his water, and they have tanked it for ten years.  They haven't

11  got any water -- this poor fellow that Mr. Stahlman talks about.

12    MR. STAHLMAN:  I don't know.

13    MR. SACHSE:  They don't have any water.

14    THE COURT:  All right, let me suggest this, Mr.

15  Sachse.  When you serve on some Counsel a request for admissions,

16  and you will probably be serving them on some other people,

17  it would be a simple matter to have your secretary have a form

18  letter in which you say, "Dear Mr. Blow:  The Rules, of course,

19  require that these be answered within ten days.  We understand

20  that this maybe impossible, and my purpose is to see how many

21  issues in this matter we can get out.  Be assured that you may

22  have as much time as you need," etc.  In other words, let's

23  have a little public relations activity in connection with

24  these requests.

25    MR. SACHSE:  I think it is a good suggestion, your

1864

1    Honor.  I will go a step further.  I will state right now to

2    Mr. Veeder and Mr. Stahlman that they can totally ignore the

3    time limit on it and that I will not in any case move for the

4    admission that a fact be deemed admitted without calling them

5    first and giving them first notice of it.

6                MR. STAHLMAN:  There is one other thing, too.  The

7    Vail Co. is a corporation, and this asks for certain knowledge.

8                MR. SACHSE:  It tells you how to do it in the Federal

9    Rules.

10               MR. STAHLMAN:  I have read the Federal Rules.

11               MR. VEEDER:  I would like to inquire of Mr. Sachse,

12   though.  May we have access to all your lands?

13               MR. SACHSE:  Absolutely.

14               MR. VEEDER:  That's in the record.

15               MR. SACHSE:  That's in the record.

16               MR. STAHLMAN:  In connection with a lot of these lands

17   we relied upon the Government's surveys, and I don't think they

18   have made a survey up there yet.  So I would make some admission

19   that may be changed by the survey.

20               THE COURT:  Sure.

21               Now, we have on the calendar No. 2, objections of

22   defendant Fallbrook to interrogatories.  These are the objections

23   to these interrogatories which the Government has filed, asking

24   you all the facts about the dam and when you are going to start

25   and your financial ability and all that.

1    MR. SACHSE:   Three basic subjects, your Honor: Physi-

2  cal condition, physical structure of the dam and the outlets,

3  etc., the financing of the dam, and the very last one is a

4  group of about four questions at the very end dealing with all

5  rights under the San Diego County Water Authority.   Those are

6  the three general categories under which the questions fall.

7       Our position is extremely simple.   The dam, when it

8  is built -- if it is built, to make Mr. Veeder happy -- will

9  be built under the restrictions imposed on us and everybody

10  else in the State of California by the laws of the State of

11  California.   We will have to have a permit from the Dam Depart-

12  ment, we will have to have an approval of our plans, and I

13  haven't the foggiest notion whether the outlet works are going

14  to be sixteen feet wide, twelve feet wide, or eighteen, what

15  kind of gate is going to on them or anything of the kind.   If

16  Mr. Veeder would let us alone and let us try to go ahead with

17  this project and get this project on the road I might be able

18  to answer some of their questions.   But I can't    today.   And

19  I think they are irrelevant and immaterial.   If we can build a

20  dam, it  will be built under the restrictions of this Court

21  and the State Dam Department.

22       THE COURT:   All right.

23       MR. VEEDER:   In other words, as I understand it, you

24  will try to answer these questions.   Is that right?

25       MR. SACHSE:   I will not try to answer the questions

1    I cannot answer them -- unless the Court orders me, and if the

2    Court orders me I will have to state that there is no answer.

3            MR. VEEDER: I understand your problems, and I haven't

4    pressed you in regard to the answer to these interrogatories;

5    but I do believe that they are very, very pertinent in the trial

6    of this case.   I think we are entitled to have the knowledge

7    that that encompasses.

8            THE COURT:  All right, just a minute.  I'm going to

9    continue this matter until after I make these pre-trial rulings.

10   It may be entirely possible that the rulings I make may obviate

11   any problem on this.  If it does, why should I sweat over these

12   matters?

13           MR. VEEDER:  I will probably sweat over them until I

14   hear from you, your Honor.

15           THE COURT:  And I think I will fix a further date in

16   here.  Following this filing of this memorandum, I would like

17   to meet with you on matters of issues. .

18           MR. SACHSE:  Following the filing of your memorandum?

19           THE COURT:  After my memorandum is out and you have

20   had a chance to look it over and there have been tentative

21   suggestions of issues filed by both sides, I would like to meet

22   with you then again on the issues prior to the trial of this

23   action.   I am just trying to see what might be a satisfactory

24   date.

25           MR. VEEDER:  The last part of August would be best for

1  us, your Honor.

2          MR. SACHSE:  I would think that sounds pretty good.
3  We would be through with De Luz by then.

4          MR. MOSKOVITZ:  Your Honor stated that you   had some
5  outside engagements in the last part of August.

6          THE COURT:  Yes.  The week of the 18th of August on
7  I am attending this Judicial Seminar at Stanford on pre-trial.

8          MR. VEEDER:  And thereafter?

9          THE COURT:  Then the week of the 25th to the 29th is
10  the American Bar Association meeting.  I don't intend to go to
11  many of those sessions.

12          The week of September 1, 2 and 3 is the Judicial
13  Conference at Coronado.

14          I could fix       several days     either during the
15  week of August 25th or I could fix some time during the week
16  of September 9th.

17          MR. SACHSE:  I think we would get further toward
18  issues, if we are going to trial on October 1, I think we
19  would be better off to do it the week of August 25 and give us
20  a little more time to hammer them out, your Honor.

21          THE COURT:  Yes.

22          Let me check something else here.  I do have Tuesday,
23  August 26.  I haven't any idea of what kind of Monday I  will
24  have.  Mondays here are apt to be bad.  I do have Tuesday,
25  August 26 and I can probably lay out as being available not over

1   two days, the 26th and 27th, and I think we could hammer out

2   what we have to do in that time.   Is that agreeable?

3           MR. VEEDER:   Fine.

4           THE CLERK:   At 10:00 o'clock, your Honor?

5           THE COURT:   At 10:00 o'clock.

6           Item 2 on the calendar, these objections of Fallbrook

7   to interrogatories will be continued to that time.

8           MR. SACHSE:   To that date?

9           THE COURT:   To that date.

10          What is the nature of this item 3?

11          MR. SACHSE:   Those are mine, and they are similar.

12          THE COURT:   To compell plaintiff to answer under oath

13  defendants' interrogatories.

14          MR. SACHSE:   There are two problems involved.   One

15  of them is simple and, let us say, it can be stated shortly

16  and sweetly; I don't know what the law is myself.   I have tried

17  to find out.   The Federal Rules provide that requests for ad-

18  missions and specifically that denials shall be made under oath.

19  As originally served on me, the response of the United States

20  to requests for admission were not under oath, and I filed this

21  motion and immediately Mr. Veeder did resubmit replies which

22  were sworn to by Mr. Veeder.

23          I am not accusing Mr. Veeder of being a liar -- I'm

24  serious, I'm not facetious -- but it seems to me that the re-

25  quest for admissions poses two problems.   One of the values of

the response is that you have in front of you a piece of paper
with the signature of an adverse party that can be used, if
the need arise, for purposes of impeachment, for purposes of
challenging testimony and so on; and when I asked if it is true
that water was spilled from Lake O'Neill into spreading basins
during the past winter, or rather I allege that it is true and
request the admission, and I have the sworn denial by Mr. Veeder,
and then I have testimony on the witness stand from other
witnesses that I think that I can find a rather startling con-
flict, I think I am in kind of a difficult position and I would
like to have answers to these requests signed by the people who
know, not by Mr. Veeder on information and belief.

That is the first.  I frankly state to your Honor that
I can find no law.  The United States obviously can't swear to
anything.  It can't raise its right hand.

THE COURT:  Were these answers that you put out in
a hurry, or are these subject to modification upon further in-
quiry of Mr. Sachse?

MR. VEEDER:  Each one of those responses that I made
is based upon careful checking on my part with men on whom I
rely.  I have never felt that there was anything improper in a
lawyer saying, "These are the responses that we are making."
I feel that, with several people doing the work, it should
channel through some place, and I channel it through myself.
If Mr. Sachse feels that he has found a tremendous discrepancy,

1   that is an issue of law, as I see it.

2       MR. SACHSE:  It is an issue of fact.  It is facts

3   that I am talking about.

4       MR. VEEDER:  The point that I make is that it is just

5   a part of the litigation and if he thinks that someone testified

6   contrary to what our statements reflect, I think that he can

7   show that we were in error.  I am not in any great concern.

8       THE COURT:  I want you, as accurately as you can, to

9   answer these requests and not blanket fashion deny them if

10  inquiry would permit you to answer, because just as in the con-

11  troversy between Mr. Stahlman and Mr. Sachse to the extent that

12  we can get accurate answers we might obviate some of the

13  necessity for trial time.

14      MR. VEEDER:  Right, your Honor.

15      THE COURT:  Of course, if you need time, ask for it.

16  But I think you are right that they have to be channelled

17  through someone, and of course the obvious answer is, what do

18  you do in a situation where ten different people supply you

19  with information?  You can't have ten people verify it.

20      What is the other part of the problem?

21      MR. SACHSE:  The other part gets down to specific

22  questions, and some of them, I frankly believe, are evasive.

23  The United States does not meet the issue.

24      I have just flipped to that section and the first

25  one I see is this request for admission:

"The United States Navy, represented by Capt.
A. K. Fogg, appeared at the hearing held before the
Honorable Gordon Alexander, examiner for the State
of California Department of Public Works, Division of
Water Resources, on December 16, 1947, at which hear-
ing there was considered Application 11586 of the
Fallbrook Public Utility District to appropriate
2½ cubic feet per second of the water of the Santa
Margarita River."

The response:  "Whether or not Capt. A. K. Fogg
appeared at this hearing is a legal question that must
be determined by the Court."

MR. VEEDER:  That is true.

THE COURT:  I don't approve of that.  I see what you
are talking about.  You are talking about the word "appeared."
You could answer that by saying that it is true that Mr. Fogg
was present at the time, etc.  Your request uses the word
"appeared."  If that is used in the sense of an appearance for
the United States, it presents a legal question and we reserve
answer.  But I don't think you ought to, to use the vernacular,
kiss that off with the kind of answer that you gave.

MR. SACHSE:  Captain Fogg is dead --

THE COURT:  Couldn't you preserve your right just
as well by a little fuller answer?

MR. VEEDER:  All right, I will check and see

1    whether he was there.

2         I think he was, wasn't he?

3         MR. SACHSE:  Yes, he was.

4         MR. VEEDER:  I think he was physically there.

5         MR. SACHSE:  He's a dead man and I'm going to have

6    a tough time proving it.

7         THE COURT:  Is it right that the thing you're con-

8    cerned about is the word "appeared"?

9         MR. VEEDER:  Of course.

10         THE COURT:  Well, then let's save time arguing.  Say

11    he was there present in the flesh.  Your request uses the word

12    "appeared" in the sense that that presents the question whether

13    he appeared for the United States or for the Navy in a legal

14    sense -- that it presents a legal question, and you reserve

15    answer on that.

16         MR. VEEDER:  All right, your Honor.

17         THE COURT:  Go as far as you can on these things.

18    You're smart enough to formulate answers that will preserve

19    your points without having to make a blanket denial.

20         MR. VEEDER:  I hope that we have learned something

21    in the process of these motions and arguments.  If someone

22    talks to me about a "direct flow," or if someone talks to me

23    about "appearance," life is too short for me to do otherwise

24    than simply to say "Be specific."

25         From our standpoint, I will certainly follow your

1   Honor's guidance in the matter.  But I think that it would

2   save a great deal of time if Mr. Sachse would, from the stand-

3   point of semantics, be a little more accurate.

4            THE COURT:  How many more are there?

5            MR. SACHSE:  Let me point this out -- 89:  " . . .

6   shall fairly meet the substance of a request for admission,

7   and when good faith requires that a party deny only a part or

8   a qualification of a matter of which the admission is requested

9   he shall so specify."

10           THE COURT:  That's right.

11           How many of these are there?  Are you talking about

12   3 (b) now on the calendar?

13           MR. SACHSE:  The two items are intermingled; some

14   are interrogatories, and some are requests for admissions.

15           THE COURT:  Well, give me another example or two,

16   and then I'm going to put the two of you to work here.

17           MR. VEEDER:  If I don't get schizophrenia doing it.

18           MR. SACHSE:  I'll switch over to interrogatories

19   for a moment, because that poses a different kind of problem.

20           The interogatory is:  "Please state the average

21   number of civilians resident off base employed on Camp

22   Pendleton" for a certain series of years.

23           Now the answer is:  "There is no record showing the

24   breakdown of civilian employees resident on and those who are

25   resident off available."

1          Now your Honor, they give me a list just above of the

2     number of residents on, and they certainly have a civilian

3     personnel office on Pendleton that knows how many civilians

4     they have employed.  So the difference is between the number

5     of civilian employees who live on the base and those who live

6     off the base.  But no, they can't give me that information.

7          THE COURT:  You say "resident off the base."  In

8     other words, what you are trying to find out is the total

9     number of civilian employees there and the number of those who

10    live on the base.

11         MR. SACHSE:  That is correct.  I didn't ask -- perhaps

12    I should have -- perhaps it would have been better if I had

13    asked for the total number of civilians.  But I didn't.  I

14    asked for the total number of civilians resident on the base

15    and the total number of civilians resident off the base.

16         THE COURT:  Mr. Veeder, you can tell him how many

17    civilian employees you had at various times, can't you?

18         MR. VEEDER:  Well, I'll say this, your Honor.  On

19    these requests that we received from Mr. Sachse we spent a

20    great deal of time, and in regard particularly the the people

21    who are on and off the base I don't know how many hours were

22    spent trying to determine it.

23         MR. SACHSE:  MR. SACHSE:  Well, of course, your

24    Honor has the privilege of relieving Mr. Veeder if the

25    requests are too burdensome.  If they are, okay.

1          MR. VEEDER: No. Colonel Robertson, who certainly

2     is as anxious as I am to answer these questions, points out

3     that there would be a civilian wife who works part-time on the

4     base and there will be a civilian daughter who lives on the

5     base, and it has been absolutely impossible to tell who the

6     parties are or how many.

7          THE COURT: Well, in certain of these instances you

8     may have problems, and the problems may be obviated by an

9     informal modification of the request. I am going to require

10    that the two of you sit down, and Mr. Veeder, you have with

11    you, if necessary, Colonel Robertson or Lieutenant Miller

12    or Lieutenant Nagle or whoever has the information, and see

13    what you can work out on these.

14         MR. VEEDER: May I inquire now, your Honor.

15         What significance is ascribed to that request, Mr.

16    Sachse? I truly don't know.

17         MR. SACHSE: Well, I will tell you, I hate to

18    educate you. You are ingenious enough with legal arguments

19    as it is.

20         MR. VEEDER: Drop the gravel. What is it?

21         MR. SACHSE: But the suggestion has been made by

22    Mr. Moskovitz, in which your Honor showed a little interest,

23    that it might be that even if a military use is a riparian

24    use, Camp Pendleton's military use is an overburden, it has

25    become unreasonable, and I am very much interested in finding

1876

1   out what kind of load Camp Pendleton is putting upon the

2   stream.   I hope that his Honor will rule that your use is

3   municipal and as such is non-riparian.   But if he will not go

4   that far, I am going to take the next step, and that is that

5   you can have twenty cattle but when you put on a hundred

6   cattle it ceases to be a riparian use.   That is the case of

7   Cowell v. Armstrong.

8          MR. VEEDER:   I believe that this is completely

9   irrelevant, from the standpoint of the Fallbrook Public Utility

10  District.

11         THE COURT:   Well, just a minute.   In this conference

12  that you have, you may inquire back and forth as to relevancy.

13  But the Federal Rules require that there should be an answer

14  to requests for admissions and to interrogatories even though

15  the answer isn't even admissible.   I don't know whether you

16  are familiar with that rule.

17         MR. VEEDER:   Oh, yes, I'm familiar with it, your

18  Honor.   But I don't believe that we are required to assume an

19  unseemly burden.   A burden of this character is terrific.

20         THE COURT:   I don't think that it is that kind of

21  burden, Mr. Veeder, and I'm going to ask that you sit down

22  together and go over these, and in certain instances maybe the

23  request can be modified.   Mr. Sachse can tell you why he wants

24  what he wants and maybe he can get an equivalent answer that

25  will solve his purpose.

1    Let's have another one.

2    MR. SACHSE:  "Please state the number of personnel,

3    military, dependent and non-dependent civilian, housed within

4    Camp Pendleton but outside the watershed and supplied with

5    water from the River."

6    MR. VEEDER:  What is the number?

7    MR. SACHSE:  Number 12 (i).

8    I think it is of tremendous importance as to how

9    many bodies are being supplied with water from the Santa

10   Margarita River that are quartered outside the watershed, and

11   as far as the difficulty of doing it is concerned we have maps

12   on a much larger scale than this, your Honor, which show every

13   street, practically every building, introduced before the

14   Master, and show where the watershed line goes through the

15   middle of the housing area.  The material is in front of the

16   United States.

17   MR. VEEDER:  We also put the evidence in the record

18   concerning which I commented yesterday, your Honor, that it is

19   absolutely impossible to know where a particular drop of water

20   is going to go.

21   MR. SACHSE:  Not the water.  I am asking you how

22   many people live outside the watershed and are served with

23   water from inside.  That's all the question is.  You know

24   perfectly well how many people live outside the watershed, and

25   you don't serve anybody on Camp Pendleton.

1878

1          THE COURT:  Well, I don't care whether it's answered

2     to within ten or a hundred, but I don't think that's a burden-

3     some request.  Of course, you do have the problem --

4          MR. VEEDER:  There is fluctuation.

5          MR. SACHSE:  Well, this was asked for a series of

6     years.

7          THE COURT:  -- at different times.  There could be

8     an approximation.  You do have the problem that it is your

9     contention that the watershed line may be different.  You're

10    going to have to answer that alternatively.  If the watershed

11    line is finally determined to be so and so, then approximately

12    so many; but if it is determined to be so and so as shown on

13    exhibit so and so, it is so many.  I don't think that is burden-

14    some.

15         MR. VEEDER:  We will undertake it.

16         THE COURT:  If you fellows saw what these defendants

17    have to do in antitrust cases, you would know what is meant by

18    "burdensome."

19         MR. SACHSE:  There is one more I want to bring up,

20    your Honor, because it is in a different category.  Do you

21    have these before you?

22         THE COURT:  No.

23         MR. SACHSE:  This is a little long.

24         MR. VEEDER:  Which number?

25         MR. SACHSE:  Interrogatories No. 1 to 8.

1    Interrogatories No. 1 to 8 were each the identical

2    interrogatory, and each referred to different paragraphs and

3    counts of the complaint, and the question reads:  With reference

4    to paragraph so and so and so and so, "what are the ' rights

5    to the use of water' referred to therein, and specifically

6    are those rights intended to be riparian rights, appropriative

7    rights, prescriptive rights or some other form of rights?"

8    Then after asking them we also ask, with reference

9    to the same paragraphs, when the reservation of waters in

10   said paragraph took place, and whether such reservation was

11   by statute, in grant, executive order or in some other form,

12   and if possible a copy.

13   Now this is a tremendously important thing.  The

14   paragraphs referred to are the ones with which your Honor is

15   thoroughly familiar, in which the United States alleges reserved

16   rights to the use of water on the forests, public domain and

17   Indian lands.

18   THE COURT:  When were these filed?

19   MR. SACHSE:  These interrogatories?  These are my

20   interrogatories.  I filed them a long while ago.

21   THE COURT:  This is the motion of defendant Fallbrook

22   for an order requiring the plaintiff to answer 1 through 8.

23   When was your motion filed?

24   MR. SACHSE:  I'm sorry, sir, I don't have a file

25   stamp on my copy, but I can give it to you roughly from the

1    date of mailing.

2            THE COURT:   Is your motion entitled "Motion That

3    Certain Facts Be Deemed Admitted"?

4            MR. SACHSE:   No, there are two of them; there is a

5    motion on the interrogatories, and there's a motion on the

6    facts.   It is entitled "Notice of Motion," and it was mailed

7    on June 4.

8            THE COURT:   You just called it "Notice of Motion."

9            MR. SACHSE:   "Notice of Motion," and then it states

10   "The defendant will move the Court for an order directing

11   plaintiff to make complete answer to Interrogatories 1 through

12   8," etcetera, and it is 1 through 8 to which I am now referring.

13           Now the significance of this question is that it is

14   of tremendous importance in this case.   In fact, I would say

15   that, as far as the national consequence of this litigation

16   is concerned -- forgetting the individuals -- it is the biggest

17   question in the whole case, and that is the nature and the

18   extent of these reserved rights of the United States of

19   America to waters that arise on various types and kinds of

20   public lands -- Indian, forests, etc.   If those reservations

21   are broad enough, if they are sweeping enough and large

22   enough to stop the appropriation through State mechanics of

23   400 gallons a minute, as is the case with my client

24   Williamson, who has a specific request to enjoin and declare

25   void -- pardon me, 400 gallons a day -- then there is no earthly

1    reason why that same power can't --

2         MR. VEEDER:  Pardon me just a moment.  May I inter-

3    rupt a minute.

4         Did you say that we have requested to have declared

5    void that permit.

6         MR. SACHSE:  You have requested, in Exhibit F or G

7    -- I forget which, you can find it faster than I can -- you

8    have listed the express permit granted to Williamson.  He

9    isn't just named as a defendant.  You have the express permit,

10   and in the count which refers to G you ask to have your title

11   quieted as against it.

12        MR. VEEDER:  We haven't said to have it declared

13   void.

14        MR. SACHSE:  Well, you ask to have your title

15   quieted.

16        MR. VEEDER:  All right.  You just be accurate in

17   what you say.

18        MR. SACHSE:  All right, you ask to have your title

19   quieted.

20        If they can quiet title against a permit to 400

21   gallons a day that arises s on the National Forest, why can't

22   you quiet title against a permit that asks for 400 feet or

23   400,000 feet (acre feet) and the whole Feather River Project?

24        THE COURT:  Wait just a minute.  I think that what

25   the Government is asking, and it may not have been made clear,

1882

1   is that the Government wants an order that they own the land

2   and the water on the reserved lands, and that the man who holds

3   a permit holds it subject to the superior right of the Govern-

4   ment.

5   MR. VEEDER:  Of course.

6   THE COURT:  And there is no intention on the

7   Government's part to cancel these permits.  As a matter of

8   fact, it is almost one of these a fortiori things.  If this is

9   reserved land, and if he had a permit, it is certainly not --

10  maybe I'm wrong --

11  MR. SACHSE:  Your Honor, I am the first to concede

12  that I don't think Uncle Sam is ever going to take away Mr.

13  Williamson's poor little 400 gallons a day.  I don't think

14  they are.  But if they had the right to do it, even if they

15  don't, because it originates on National Forest land, then

16  they have the right to do the same thing to 400,000 acre feet

17  a day or to anything else a day that arises on National Forest

18  land, and forthwith by one stroke you have destroyed the whole

19  appropriative system.

20  THE COURT:  There is a big difference between water

21  which arises on National Forest lands or even reserved lands

22  and flows into a river and is then subject to appropriation

23  and a situation where water is actually on the land and is

24  being originated on the land and hasn't flowed into a river.

25  MR. SACHSE:  This water is being used off the

1    Forest by Mr. Williamson.

2           THE COURT:  I know, but it originated on the land.

3           MR. SACHSE:  Yes.

4           THE COURT:  It has never flowed into a stream.

5           MR. SACHSE:  No.  It's spring water.  He has a pipe

6    that runs about a mile up to each spring.

7           But the point is -- I am not arguing about William-

8    son -- the reason I emphasized it is --

9           THE COURT:  You want to know --

10          MR. SACHSE:  I want to know what kind of reservation

11   this is, and I want to know when; and that question was never

12   answered.  The United States gave me an answer, which I think

13   is inadequate, as to what they contend it is; but they never

14   answered the dates for any of these things, and the date is

15   vital, because the last sentence of Mr. Veeder's own answer

16   says, "They (referring to the reserved rights) are not subject

17   to diminution by appropriative or riparian rights which vested

18   subsequent to the reservation."  So I would certainly like to

19   know when the reservation was made, so that I can determine

20   whether my man's right vested subsequently.

21          THE COURT:  Now, in these reservations I take it,

22   to start with, that certain land was set aside in the

23   National Forests at certain dates.

24          MR. VEEDER:  That is correct, and it is a matter of --

25          THE COURT:  Now that date should be given to Counsel.

1884

1      MR. VEEDER:  It is a matter of law.  But I will give
2  it to him.

3      THE COURT:  All right.

4      Now, the next question is, Was there, in addition to
5  the mere physical setting aside of the National Forest, any
6  executive order or any proceeding of any kind where water was
7  set aside?

8      MR. SACHSE:  That is what I want to know.

9      MR. VEEDER:  Of course, that is a question of law,
10  your Honor.

11      THE COURT:  Well, I think you should answer it.

12      MR. VEEDER:  As a question of law?

13      THE COURT:  It may have ramifications of law, but
14  it's a question of fact:  Was there any executive order or
15  other document that had any bearing on this situation?

16      MR. VEEDER:  Of course.  The basic law under which
17  the National Forests were established, I think, was passed in
18  1897, and it contains the express language that the objective
19  of the law was for the preservation of the watersheds and for
20  the preservation of the timber within these watersheds.

21      THE COURT:  Well, whatever it is, I am as interested
22  as Counsel is.

23      MR. VEEDER:  Yes.

24      THE COURT:  Now in the case of the Indian Reservations --

25      MR. VEEDER:  May I interrupt for just a moment, your

1  Honor.  I wrote a brief on this matter and submitted it to

2  your Honor, pursuant to your request.  You asked me to write

3  you a memorandum respecting the rights of the United States

4  in connection with the reserved lands of the United States of

5  America.  I went to considerable trouble, and I think Counsel

6  should read it.

7          MR. SACHSE:  I've read it.  But I want some dates,

8  Mr. Veeder.

9          MR. VEEDER:  There we set out the basis upon which

10  rights to the use of water are reserved upon these lands

11  withdrawn from the public lands.

12          THE COURT:  I understand.  This is the legal approach.

13  Now Counsel is asking, from the factual approach, dates of

14  these matters.  You are familiar with these.

15          MR. VEEDER:  Yes.

16          THE COURT:  You have been engaged in the law of

17  water rights for many years.

18          MR. VEEDER:  I have the dates.

19          THE COURT:  I think you ought to supply them.

20          MR. VEEDER:  All right.

21          THE COURT:  Now in the case of Indian Reservations,

22  I take it that when a reservation was created certain land

23  was reserved.

24          MR. VEEDER:  That is right.

25          THE COURT:  Now maybe that's all that was done --

—

1    just reserved the land.

2              In other instances, as we know, there were trees of

3    one kind or another that had an impact on the case.  If any

4    other things of that sort are involved, Counsel should be

5    informed.

6              MR. VEEDER:  I have copies of the executive orders

7    setting aside all the Indian Reservations.

8              THE COURT:  I don't recall, from the little that I

9    know of California history, that we had any tree problems here

10   in Southern California.

11             MR. VEEDER:  I am unfamiliar, and I don't believe there

12   are trees involved here.  I believe these are all executive

13   order withdrawals.

14             THE COURT:  Now that is what Counsel is asking for,

15   and I think, in addition to the brief on the law -- which I

16   read, and it was well done -- there should be compliance, if

17   you have to sit down and talk it over and find out what he

18   wants.  I know what he is talking about.  He wants to know

19   what factual background -- by "facts" I mean, really, laws,

20   executive orders, treaties -- that might have a bearing on

21   this problem.

22             MR. VEEDER:  The circumstance on that, of course, is

23   this, that there was originally a large withdrawal.  Then there

24   were reductions and changes and numerous pieces of land

25   switched around.  I'll get it to him.

1   THE COURT:  All right.  We'll take a recess.  Have

2   you had enough on these?

3   MR. SACHSE:  Just one or two more I want to mention,

4   after recess or --

5   THE COURT:  After the recess.

6   (RECESS)

7   MR. SACHSE:  The remainder is very brief, your

8   Honor.  There are just three more questions.

9   THE COURT:  I have it before me now, if you will tell

10  me the numbers.

11  MR. SACHSE:  Interrogatory No. 10.  If you will look

12  at the United States' reply, it has both the interrogatory and

13  the answer set forth, on page 3.

14  THE COURT:  The Clerk has found the motion, but he

15  hasn't found the interrogatory.

16  MR. SACHSE:  It is a brief one.  I can state it

17  simply.  It requests a tabulation of the licenses and permits

18  issued by the State of California to the United States for the

19  use of water in the Cleveland National Forest, indicating

20  certain data.  Then the same question for the San Bernardino

21  National Forest.

22  THE COURT:  Were these issued to the United States,

23  or by it?

24  MR. SACHSE:  Issued to the United States, by the

25  State of California.

1        The answer is, "None within the Santa Margarita

2   watershed."

3        MR. VEEDER:  I acted on your Honor's direction in

4   that regard.  Your Honor's letter said that it would be

5   limited to that.

6        MR. SACHSE:  This comes back to the other thing,

7   either a question of where you got the data and who swears

8   to it, because I have -- let me state it this way.  Is Mr.

9   Veeder fly-specking?  Is the United States Forest Service part

10  of the United States or isn't it?  Because the Forest Service

11  has permits.

12        THE COURT:  What about that?

13        MR. SACHSE:  In the Cleveland National Forest,

14  inside the watershed.

15        THE COURT:  Are you familiar with that?

16        MR. VEEDER:  Of the Santa Margarita?

17        MR. SACHSE:  Yes.

18        MR. VEEDER:  That is an error.

19        MR. SACHSE:  Then I am wrong -- then somebody is

20  wrong.

21        THE COURT:  I limit3d that to inside the watershed,

22  and I thought properly so.  Now in that case Mr. Veeder says

23  you are in error.  You say that you have certain information.

24  The two of you sit down together, tell him what you have,

25  where you found it, and Mr. Veeder might check on it.

1    MR. SACHSE:  We will hammer this one out.  But I had

2    what I thought was positive, definite information.  Possibly I

3    am wrong, possibly he is wrong.

4    THE COURT:  Somebody is wrong.

5    MR. SACHSE:  No. 11:  "Please state whether or not

6    Application 12576 was, when filed, an application of the United

7    States of America."

8    I am trying to get Mr. Veeder to decide which horse

9    he is riding.

10   Answer:  "The United States of America claims what-

11   ever rights would accrue to it by virtue of the application."

12   MR. VEEDER:  Right.  Those are questions of law, your

13   Honor, and I don't believe that I should have my elbow bumped

14   on this one.  The day will come when we will settle down and

15   we will have a good fight about this whole thing.  But I don't

16   feel that there is any obligation on my part to tell Mr. Sachse

17   the kind and type of position that we take in this matter.

18   The man will admit that it was filed by Navy Personnel, and the

19   Board recognized it down here on August 12 and threw it out.

20   Now so far as I am concerned, I have stated precisely

21   our point.  If there is any merit to that claim, we are going

22   to get it all out of it, and I don't believe it is anybody's

23   business but ours as to how we are going to get the most from

24   it, because I think your Honor's rulings are going to be extremely

25   important on that.

THE COURT:  Well, as to that one, Mr. Sachse, I feel that this is making a party elect as to which horse he is going to ride, and I think the party should have a right to wait until the case is tried to make that decision.

We have this come up in other fields of law where it is argued that the man should elect -- in the field of admiralty, whether he is going to elect to stand on the Jones Act or on seaworthiness.  In that particular case, I recall that one of our Judges held that he had to elect before trial, and I was lucky -- I took the other view, and the Circuit took the view that I took, that he didn't have to elect until the case is tried.

He has said, however, very frankly, that whatever position he can take he is going to squeeze everything that he can out of that.

MR. SACHSE:  I'm sure of that.

THE COURT:  I will say, however, that before the case is finally submitted on that issue, the Government is going to have to take a definite position on the matter; that you either disclaim the actions of the Navy officer, or that you stand on them as the action of the United States.

MR. SACHSE:  I have to concur with Mr. Veeder, as much as I regret it.  I think your Honor's rulings on some of these matters that are coming forth in your memorandum will undoubtedly dispose of the question, and I am perfectly willing

1891

1    to drop it until then.

2           The third one is disposed of in the same way; it

3    related to exactly the same thing.  It was a question as to

4    when the United States decided that there was no longer water

5    available for appropriation in the River, since on June 30,

6    1948, they filed for appropriation of water.  When after that

7    did they decide that water was no longer available?  I presume

8    that it should be handled in the same way as this one.

9           That is all I have, your Honor.

10          MR. VEEDER:  You put ours over with the others.

11          THE COURT:  I put the Government's over.  But I ask

12   that you gentlemen, now, sit down together as lawyers and work

13   the rest of these matters out.  I think that there is mis-

14   understanding.  I don't think that Mr. Veeder wants to make a

15   false report about Forest permits.  Somebody is mistaken.  Let's

16   see what you've got.

17          MR. VEEDER:  All I can rely on is what the Forest

18   Service tells us.

19          THE COURT:  Act like competent lawyers -- you're both

20   competent lawyers.  Save me the mental pain of having to worry

21   about things like this.

22          MR. SACHSE:  All right, sir.

23          THE COURT:  Anything else that is on our calendar

24   that we haven't covered?

25          MR. DENNIS:  Just one technicality.  Are we continuing

1   the case for trial until the date in October, or are we re-

2   setting it?  Which way will the order be?

3           THE COURT:  We are continuing it.  The case was set

4   for trial on the 16th.  It has been continued from day to day

5   the Clerk to this day.  It is now continued to October 1.

6           We still have the mechanical problem of a notice of

7   trial.  We will talk about the possibility of that and what

8   you think about that later.

9           MR. VEEDER:  I have that order, your Honor, about

10  the Indians etc., that I would like to have you sign.  I will

11  bring it into chambers.

12          THE COURT:  Are there reporters present here?

13          This is the most wonderful story.  I stopped by the

14  hotel this morning and Mr. Veeder was having breakfast and I

15  had a cup of coffee, and he told me the story, and I think the

16  press should be told about it.

17          Here are the Indians up on the reservation, and

18  under the Winters case and the law about Indian reservations

19  there isn't much doubt but that the Indians have a lot of rights

20  up there.  The United States Marines, a very powerful military

21  organization, attempts to enter the reservation to make some

22  surveys and protect the rights of these Indians, and they

23  encounter the Indians and the .. Marines have to retreat.  They

24  are run off by force.

25          COLONEL ROBERTSON:  That is denied.

1        THE COURT:   I think that's the best laugh in the

2 case.

3        MR. VEEDER:   The Marines say that they did not

4 retreat, and I'll have to accept their word.

5        THE COURT:   They didn't advance any further, though,

6 did they?

7        MR. VEEDER:   I'll have to plead ignorance, your

8 Honor.

9        THE COURT:   Well, I don't want to embarrass anybody,

10 but this struck me as really a good one.

11        Do you have an order on that?

12        MR. VEEDER:   I'll bring it around to chambers, if I

13 may, your Honor.

14        MR. SACHSE:   Maybe the Indians don't recognize the

15 jurisdiction of the United States District Court.

16        THE COURT:   Well, in a way, I don't blame the

17 Indians.  The treatment they have had at the hands of the

18 white man has been such that I wouldn't blame any Indian for

19 being suspicious if somebody came around the reservation.

20        You wanted to brief the removal matter.  Probably

21 we'll just have to submit that.

22        MR. VEEDER:   Yes, your Honor, as I understood it.

23        THE COURT:   Submitted on the brief.

24        MR. VEEDER:   It was part of this jurisdictional

25 brief that I am going to write.

1894

1          THE COURT:  All right.

2          MR. SACHSE:  If any party to the cause wants to file

3     a --

4          You will serve us, will you, Mr. Veeder?  I am not

5     a party, but I would like to see the brief.

6          MR. VEEDER:  Yes.

7          MR. STAHLMAN:  Mr. Dennis is going to give us a copy

8     of that amended petition.

9          MR. DENNIS:  Yes, that is correct.

10          MR. VEEDER:  And you are going to give us a copy of

11     your answer one of these days; is that right?

12          THE COURT:  Well, wait a minute, what's this talk

13     about Mr. Dennis filing an amendment?

14          MR. SACHSE:  He can't.

15          MR. DENNIS:  I think that has been mentioned several

16     times.

17          THE COURT:  Where are you going to file it?

18          MR. DENNIS:  I am going to file it in Riverside

19     County and here, your Honor.

20          THE COURT:  I was going to say that you certainly

21     can't file it in San Diego County.

22          MR. DENNIS:  I can't file it in San Diego County, no.

23     In the Riverside County proceeding there has been no effort to

24     remove that.

25          THE COURT:  Then what are you going to do after it

1  is amended?  Of course, there has been no motion to remand.

2  The Court is considering it of its own motion.  I suppose

3  that is all right.

4          MR. DENNIS:  As I understood our conversation here

5  the other day it was that you would not take any action on

6  that until you have seen Mr. Veeder's brief.

7          THE COURT:  That's right.

8          MR. SACHSE:  Your Honor, I have been sitting on this

9  and kind of chuckling, but I think, in fairness, we shouldn't

10  wait for what may have been purely a bald-faced blunder on

11  this removal matter.

12          Mr. Veeder, your petition recites that the writ of

13  mandate is filed in San Diego County.  Then your exhibit is

14  the Riverside County writ of mandate.  But the Clerk of San

15  Diego County has certified that it is a true copy of the

16  Riverside County records.

17          MR. VEEDER:  I don't know who made the bald-faced

18  blunder.  That is what the record is, young man, and I can't

19  change it.

20          MR. SACHSE:  You mean that the Riverside County

21  petition is filed in San Diego?

22          MR. VEEDER:  All I have to say is that what you have

23  there is from San Diego.

24          MR. SACHSE:  Maybe we haven't even got a petition

25  for a writ, then.  Maybe we have nothing for you to remove.

1      MR. DENNIS:   I think that you will find that he just

2  was not careful enough in certifying.

3      MR. VEEDER:   We have San Diego County's certification.

4  I can't help that.

5      THE COURT:   Before we pass it, in looking over your

6  petition for removal, your argument runs like this:   that the

7  United States is, in fact, a party --

8      MR. VEEDER:   Yes, sir.

9      THE COURT:   -- and that a federal question is

10  involved.

11      MR. VEEDER:   Yes, sir.

12      THE COURT:   Still the real nut in the case is,

13  Could the writ of mandate then have been filed originally in

14  this court?

15      MR. VEEDER:   I believe that it can, sir, and I

16  believe that we can get some authorities for you.

17      THE COURT:   That's the issue, now.   It might not be

18  too hard to say that you are, in fact, a party, and that there

19  probably is a federal question involved.   But the real question

20  is, Assuming that those things are true, could Mr. Dennis,

21  when he filed his writ of mandate to review the proceedings

22  of the Water Rights Board, have filed that in the federal

23  court?

24      MR. VEEDER:   I think that he could have, particularly

25  in view of the pendency of this action, and particularly in

1   view of the fact that the rights of the United States to the

2   use of water are directly involved.  But I would like to brief

3   it, your Honor.

4          THE COURT:  Is there a statutory provision that you

5   review the actions of the Water Rights Board by mandamus?

6          MR. DENNIS:  No, there is not a statutory provision.

7          MR. SACHSE:  Yes, there is a statute.

8          MR. MOSKOVITZ:  Yes, there is a statute, passed at

9   this last session.  I can cite it.

10         MR. VEEDER:  We are in the status of a defendant in

11  that action.

12         MR. STAHLMAN:  I think that there is another question

13  there.  Although that writ is directed against the State Water

14  Rights Board, what about the parties to it?

15         MR. VEEDER:  Every party is involved.

16         MR. SACHSE:  As I understand the law, we have to

17  intervene.

18         MR. STAHLMAN:  What about a corporation?

19         MR. MOSKOVITZ:  Your Honor, if you want the statu-

20  tory citation I can give it to you.  It is cited in the

21  mandate.  It is Water Code Section 1360:  "Any person interested

22  in any application may, within thirty days after final action

23  by the Board, file a petition for a writ of mandate in the

24  Superior Court in and for the County in which the applicant

25  seeks to divert water under the application to inquire into

1    the validity of the action of the Board."

2           THE COURT:  I call your attention to Rule 81 of the

3    Civil Rules -- 81 (b):  "The writs of scire facias and

4    mandamus are abolished.  Relief heretofore available by man-

5    damus or scire facias may be obtained by appropriate action or

6    by appropriate motion under the practice prescribed in these

7    rules."

8           MR. VEEDER:  We get relief in the broad, general

9    terms of whatever a motion can raise, that's all, and I believe

10   that a motion can raise any one of those points.

11          MR. DENNIS:  Your Honor, the section that Mr.

12   Moskovitz called your attention to is an amendment of the

13   section that has been declared unconstitutional in one other

14   instance, where it referred to the word "appeal."  That was

15   carried over afterward.  That was in the Water Commission Act.

16   It was then carried over into the Water Code.  So far as I

17   know there were no decisions under it after it was carried

18   over into the Water Code, and this was an attempt to amend in

19   regard to proceedings by writ of mandate.

20          MR. VEEDER:  Your Honor, there is one point that I

21   would like to bring up.  The Vail estate, which is a Nevada

22   corporation, can bring in diversity of citizenship.

23          MR. SACHSE:  Diverse citizenship of one defendant is

24   not enough to --

25          MR. VEEDER:  Why don't you wait until I'm  through --

1899

1   your ill manners.

2          It is anxious to become a party to this matter.   So

3   we'll have it a little more complicated as we go along, your

4   Honor.

5          THE COURT:   Did you have something, Mr. Hall?

6          MR. HALL:   No, thank you.

7          (ADJOURNMENT.)

8                              - - -