# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

– – –

## HONORABLE JAMES M. CARTER, JUDGE PRESIDING

– – –

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California   (Murrieta)

Date:      June 27, 1958

Pages:     1900 to 1958

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By_____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1          IN THE UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3                SOUTHERN DIVISION

4                  - - -

5   UNITED STATES OF AMERICA,        )
                                     )
6                      Plaintiff,    )
                                     )
7                                    )
                                     )
8   vs.                              )        No. 1247-SD-C
                                     )
9                                    )
                                     )
10  FALLBROOK PUBLIC UTILITY         )
    DISTRICT, ET AL,                 )
11                                   )
                       Defendants.   )
12

13                  - - -

14      REPORTER'S TRANSCRIPT OF PROCEEDINGS

15           Murrieta, California

16         Friday, June 27,  1958.

17                  - - -

18

19

20

21

22

23

24

25

1    MURRIETA, CALIFORNIA, FRIDAY, JUNE 27, 1958, 8:00 P. M.

2                              - - -

3         JUDGE VERNON VICTOR HILLIARD:  Let's come to order,

4    ladies and gentlemen.

5         We will waive the reading of the minutes of the last

6    meeting.

7         At this time, ladies and gentlemen, I have the honor

8    and the pleasure of introducing to you the Honorable James M.

9    Carter, who will be the trial judge in this water dispute.

10   Judge Carter.   (Applause)

11        JUDGE CARTER:  Judge Hilliard and ladies and gentle-

12   men, this is rather an unusual approach to a lawsuit -- to come

13   out and talk to litigants before the lawsuit starts; but this

14   lawsuit is unusual in more respects than this, and therefore I

15   was very happy to come down here and to have the opportunity to

16   talk to you a little bit about the lawsuit.

17        If you don't mind a word of levity, it makes me think

18   of the time that Al Smith went to Sing Sing.

19        By the way, until I went on the Bench about nine

20   years ago I did my part in politics and I used to have to go

21   out and make speeches, and this occasion makes me think of

22   those occasions.  Now that I'm on the Bench, I'm a political

23   eunuch.  I vote as I please, but I stay out of politics.

24        This is one of my old stories that I used to like to

25   tell.  Al Smith went down to Sing Sing to talk to the prison-

1 ers, and he got up in front of them and in his best oratorical

2 style he said "Fellow Democrats . . ." And then he realized

3 that not all these people in Sing Sing were Democrats and he

4 became a little confused, and he said "Fellow Citizens . . ."

5 And then he realized, of course, that all of these people had

6 lost their citizenship rights and he became a little more

7 confused. Then he said, "Well, I'm glad to see so many of

8 you here."

9      I'm pleased at this nice turnout. When we started

10 the Master's hearings at Fallbrook, I went down on the opening

11 day of the hearings and talked to a group of people at Fall-

12 brook. We had a group of this size or larger, with a loud-

13 speaker system to take care of some of those who couldn't get

14 inside. We did that as part of the trial of the suit. This

15 is not the start of the trial of the suit up here, but I'm

16 doing it for the same reason that I did it at Fallbrook -- to

17 talk to you personally about this case and to dispel some of

18 the apprehensions that you have, to tall you a little bit

19 about our plans for trying this case. And just so that I will

20 not be misquoted and so that we will have a record of what I

21 said, I brought along my official court reporter, Mr. John

22 Swader, a good friend of mine, whom you may see more of as

23 this case progresses.

24      First of all, I'm not Jesse Carter, who was in the

25 newspapers here some time back about getting his trusty rifle

1   and keeping people from draining his reservoir up in the

2   peninsula.  You may have read about that in the newspapers.

3   Somebody at Fallbrook said that they thought it was terrible

4   having that Judge who was going to use his gun on all these

5   people in this lawsuit.  My name is not Jesse Carter.

6        My name is James M. Carter.  I have been a property

7   otnwer in this county since 1945.  I have a piece of raw

8   mountain land on one of the tributaries of the San Luis Rey.

9   It is not in this watershed, and so I'm not personally concern-

10  ed in this case.  I was born in California at Santa Barbara.

11  I have lived all my life in Southern California.  I was gradu-

12  ated from High School at San Fernando.  I know something about

13  the problems of a semiarid country such as we live in.  I know

14  something about how hard water is to get and how we hate to

15  see it run away and some of those problems that confront all

16  of us.

17       A word about the right of the United States to bring

18  this lawsuit.  The United States condemned, or purchased as

19  part of a prospective condemnation proceedings -- I'm not sure

20  which -- the Rancho Santa Margarita.  Now the United States

21  acquired, therefore, as would any owner, whatever rights the

22  Rancho Santa Margarita had.  If you buy a piece of property

23  from a former owner, you fall heir to whatever rights he had.

24       Essentially, what the Government is claiming in this

25  case are the rights which the Rancho Santa Margarita had

1904

1   which they, the Government, acquired when they bought the

2   Rancho clear back in 1951.   The Government has said that all

3   they are claiming are the rights that they acquired when they

4   purchased the Rancho Santa Margarita, plus any other rights

5   that they acquired thereafter by appropriation (which is a

6   technical word in the field of water law) or by prescription.

7        "Prescription" is a word meaning something like

8   adverse possession, where you use something adversely to some-

9   body else.   There are certain situations where rights can

10   develop.   However, I have already ruled tentatively on pre-

11   scription, and I have ruled that a downstream owner cannot

12   obtain any prescriptive rights against an upstream owner,

13   because his rights cannot be adverse to the man upstream -- he

14   gets only what water comes down to him.

15        Actually, I think the case boils down to this, that

16   the rights claimed by the Government are those that they used

17   when they purchased the Rancho Santa Margarita and those that

18   they secured by appropriation.

19        This is not anything like the Owens Valley case.

20   Some of you may know about Owens Valley, where the City of

21   Los Angeles was interested in developing water and went up and

22   condemned or purchased the land and channelled the water down

23   through the aqueduct and eventually dried up the Valley.

24   The Government is not seeking to condemn property.   The

25   Government is bringing a suit which is called a "quiet title

1    action." That term goes back to the old days of the common

2    law. A person who owned real estate or an interest in real

3    estate might bring an action and have a court declare what his

4    rights were against anybody else who might possibly claim a

5    right. It is a very common form of action and is used in the

6    courts today. Somebody has a piece of property and there are

7    some adverse claims made, and they bring an action to quiet the

8    title. It is an equity suit and it is tried under the prin-

9    ciples of equity.

10         I'm not here to give you a course in law, but the

11   byplay between law and equity has been a fascinating thing.

12   Equity grew out of the common law. In the days of the common

13   law they had fixed rules of law. But the King always had a

14   Chancellor, who was supposed to be the keeper of the King's

15   conscience, and when the rules of law did not provide any

16   remedy the matter would be referred to the Chancellor. The

17   Chancellor, representing the conscience of the King, was not

18   bound by the rules of law. He could do what was the right

19   thing under the circumstances. Most of these chancellors were

20   not lawyers, and so for a long time in the old days in England

21   they just rocked along, one chancellor after another. And

22   then came along a few chancellors who were lawyers, who saw

23   this thing that was going on, and then began the development

24   of certain principles. Instead of taking these cases that

25   came up and deciding them hit and miss, they decided to make a

little order out of it.  So there grew up "principles of
equity."  Where the common law didn't give any relief, the
Chancellor could.  They used to say, jokingly, that the prin-
ciples of equity, as administered by the Chancellor, varied
with the length of the Chancellor's nose or of the Chancellor's
foot, because there was no order.  But eventually order came
out of the activities of a series of later chancellors who
were lawyers and there grew up a body of principles of equity
as opposed to rules of law.  In our law today we have actions
which we, as lawyers, say "sound in equity" -- they are on the
equity side of the court.  We have other actions that "sound
in law."

A "quiet title action" is an equity action in which
the court attempts to secure the facts and to arrive at a just
decision as to the title.

Now one of the things that concerns you is why you
were all made defendants to this lawsuit.  It is true that I
signed the order permitting you to be joined.  But I'm just a
little judge, I'm a trial judge at the bottom of the heap, and
above me there are nine Circuit judges, the second step, who
sit in San Francisco, and above them are nine judges on the
Supreme Court of the United States.  Under our legal system, I
have to do what the nine judges on the Circuit Court say I
have to do, and the nine Circuit judges, in turn, have to
follow the law of the Supreme Court.  Incidentally, there are

1907

1  ten Circuits in the United States.  I don't have to follow

2  what the First Circuit or the Third Circuit does, but I'm in

3  the Ninth Circuit and I have to follow what the Ninth Circuit

4  says the law is.

5       There was a previous partial trial of this case in

6  which the Government and the Santa Margarita Mutual Water

7  Company went around and around and judgment was entered as

8  between only the Government and the Santa Margarita Mutual

9  Water Company.  That judgment was appealed by the Government,

10  and the Government lost that appeal -- the judgment was re-

11  versed.  But when that appeal came down, the Judge who wrote

12  the decision for the Court of Appeals said, in substance:

13  "Here is the United States owning the piece of ground at the

14  very bottom of the River.  If there is going to be any decree

15  settling and determining what rights the Government has,

16  everybody upstream who claims an interest in this River has

17  to be made a defendant.'

18       So there was no alternative but that your rights be

19  adjudicated.  As I will explain to you later, in some instances

20  that may turn out to be a very favorable thing to you; in

21  other cases, it may result in hardship.  But that is the

22  reason you are in this lawsuit.  It is different than most

23  cases.  The United States is the last owner on the stream.

24  Nobody owns any land downstream from the land owned by the

25  United States.  Therefore, everybody who claimed an interest

in this stream were made parties defendant.

1       They talk about six thousand defendants, and there

2   are probably six thousand; but don't forget that among those

3   defendants are husbands and wives and children.   There are not

4   six thousand families involved in this case.   Don't forget

5   that every bank that has a deed of trust, every title company

6   that is a trustee of a deed of trust or has any kind of inter-

7   est in the property has been made a defendant because they

8   have some interest.   They will probably sit by and not take

9   any active part in it.   The interests of many of those indivi-

10  duals who have been named in this lawsuit are in common --

11  that is, a husband and wife, or a mother and four or five

12  children, etcetera.   It's bad enough, but let's not make it

13  any worse than it is.

14      Now there was served upon you a big bundle of

15  papers.   That was not done to confuse you.   I ordered a lot of

16  those things put in there because I thought you ought to know

17  what had been going on, and I'm going to try to explain to

18  you tonight what is in that bundle of papers.   It is not a very

19  mysterious thing, if you read through them and use your head a

20  little bit about what is in there.

21      First of all, there is the so-called "First Cause of

22  Action," which is identical to the Complaint that was origin-

23  ally filed and originally served.   There has been no change

24  made in that at all.   When the new Complaint was prepared the

25  Government took that first Complaint that they had made and

1908

1    put it in the new one as their First Cause of Action, and then

2    there are additional causes of action set forth.

3        Now some of those additional causes of action do not

4    concern you people up here at Murrieta at all.  A number of

5    them are controversies between the United States and the Fall-

6    brook Public Utility District.  By reading them you can easily

7    ascertain what they are.  They are matters that particularly

8    concern the relationship of the United States with the Fall-

9    brook Public Utility District.

10       However, there are set forth in that Complaint some

11   additional causes of action where the Government had rights

12   upstream, and those fall into three categories.  The Govern-

13   ment, as we know, owns National Forests, the Government owns

14   public domain, and the Government is trustee for Indians who

15   have the beneficial rights on certain Indian Reservations.  Of

16   course, when we say "the Government" we mean all of us.

17       As a result of this order of the Circuit that all

18   parties interested should litigate their rights in this action,

19   the Government set up the rights that it claimed upstream

20   growing out of the National Forest lands, the public domain

21   and the Indian Reservation.  This was proper, because if the

22   Government had rights there, whatever those rights were should

23   be fixed in this decree that will be finally entered.

24       Immediately the question arose and was discussed in

25   court, and I made an order on it:  Does the Government claim

1909

1   that because it has certain water rights in National Forest

2   lands or in the public domain or in the Indian lands, where it

3   is trustee for the Indians, that it can take those water rights

4   upstream and pick them up at Pendleton with a bucket at the

5   end of the stream?   The Government very frankly disclaimed

6   that.   The Government said, "That is not what we contend.  We

7   don't contend that we can move any of our rights down from

8   upstream to Pendleton and take water that pertains to the

9   National Forest, the public domain or the Indian lands and

10  transfer it and claim it at Pendleton."   So in one of the

11  documents is an order which states that the Government has

12  stipulated that it claims downstream no greater rights because

13  of these lands upstream, and it does not claim that it can

14  transfer these rights downstream.

15          Do you understand me on that?   I'm trying to tell

16  you in simple language what some of these problems are.

17          But what the Government says is this:   "If there are

18  certain water rights that pertain to the National Forest, this

19  is the action where they will have to be shown and where the

20  court will have to adjudicate just what those rights are."

21  Particularly is that true with reference to the Indian lands.

22          I see some of my Indian friends here tonight.   Mr.

23  Solgado was down to see me and I invited them to come to this

24  meeting and bring some of their committee.   I'm not going to

25  apologize to you for the way the American people have treated

1910

1   the American Indian -- I think we are all cognizant of that;

2   but fortunately, so far as water rights are concerned, the

3   Supreme Court has spoken very frankly and fully on the rights

4   of the Indians to water on their reservations.  One of the

5   cases that went to the Supreme Court was the Winters case, a

6   leading case that has been followed in this Circuit, and other

7   cases.

8           I haven't ruled on this point yet.  I want to point

9   out that as these points come along lawyers are going to have

10  a right to present their views.  I can read some of these

11  cases.  I have read the Winters case and I think I know what

12  the law is, but I haven't ruled on this yet.

13          But as I read the Winters case, the Supreme Court

14  said that the Indians on the reservations -- and the Govern-

15  ment, of course, holds the land as trustee for them -- are

16  entitled to all the water they can now use and all that they

17  can reasonably use in the future.  I would say that if anybody

18  has a good water right in this lawsuit it is probably the

19  Indians or the Government on behalf of the Indians.  As the

20  Court pointed out, I think it would be a silly thing to put

21  the Indians on the reservation, as the Government did, and

22  then deny them the right to use water so as effectively to use

23  the reservation that was given.

24          At any rate, the Indian lands are in this case, and

25  the court is going to have to determine what water is now being

1911

1 used on those lands and what water can reasonably be used on

2 them.

3         I haven't seen these Indian reservations.  I'm

4 familiar with some that are in the watershed in which my pro-

5 perty is located -- I know something about Rincon and Mesa

6 Grande, and I know that in those reservations there are some

7 mountains.  I don't think that anybody is going to say that

8 they are going to put water on the top of the mountain.  I

9 have a hunch that there is a good bit of Indian ground that

10 cannot now and probably not in the future ever be successfully

11 irrigated.  But there is also some good land, some bottom land,

12 some land on the sides of the hills that can be used, and the

13 Government is going to attempt to prove up what water is now

14 used and what can reasonably be used in the future on those

15 lands.

16         Now, for the benefit of any committees that may be

17 here from the Indians, let me say that the Government has

18 asked permission to go on your reservations to make a survey

19 in order to make this proof.  Unfortunately, I don't think the

20 Government exercised very good public relations.  I think there

21 should have been some attempt made to contact the proper com-

22 mittee, explain to them why they wanted to go on the ground,

23 and pave the way for a proper survey.  I will say very frankly

24 that if I were an Indian, knowing what I do about American

25 history, and a group of surveyors started to come on my land,

1   I would be suspicious, too -- I would figure that here goes

2   the rest of the reservation right now, and I would want to

3   know what this is all about.

4           But I want to say to the representatives of the

5   Indian groups here that the purpose of the Government's going

6   on your reservation is to find out what you now use and what

7   water you can reasonably use in the future, how much of your

8   ground is irrigable, what streams flow through, how much water

9   you can reasonably use, in order to make proof in this case;

10  so that when a decree is entered your rights to water will be

11  protected.   That is the long and the short of it as far as the

12  Indian reservations are concerned.

13          Now in this bundle of papers that were served upon

14  you, in addition to the various causes of action in the

15  Complaint there is a stipulation of November 29, 1951.   This

16  was entered into between the Government and the State of

17  California.   By the way, "stipulation" means "agreement."

18  "Stipulation" is a four-bit word that lawyers use in court

19  that means "agreement."   They say "we stipulate."   That means

20  "we agree."   This stipulation was entered into in 1951 between

21  the Government and the State of California.

22          Subsequently some of the other major parties to the

23  litigation also entered into that stipulation.

24          That stipulation outlined what the Government

25  claimed, and it stated that the Government claims the rights

1   that it acquired when it bought the Rancho Santa Margarita

2   and what it acquired afterward by prescription or appropria-

3   tion.

4   There are still some legal problems pending, but

5   the stipulation, as I interpreted it, as the matter now

6   stands, provided that the case would be controlled by Calif-

7   ornia law.  It is very difficult to see how it could be other-

8   wise.  There is no body of water law as far as the federal

9   law is concerned.  Water law is ordinarily the law of the

10  particular state where the water exists.  The stipulation

11  states that the matter will be controlled by California law.

12  That stipulation binds only the parties who signed

13  it.  It does not bind any of you people, if you disclaim any

14  interest in it, because you did not sign it.  However, the

15  Government put into that stipulation that they made that they

16  stipulate for the benefit of themselves and all other persons

17  who might be affected or benefited thereby.  We have't

18  crossed the bridge as to what that means, but at least there

19  is a possibility that the stipulation may be for the benefit

20  of the various litigants in this lawsuit.  Many of those

21  problems we have eventually to rule upon.

22  The document served upon you contained also a pre-

23  trial stipulation.  Now this pre-trial stipulation was entered

24  into between only some of the major parties, and it concerns

25  largely undisputed geographical facts.  If you will read that

1914

1   over, you will notice that it tells where the streams flow,

2   tne various areas involved, and I doubt that anybody is going

3   to challenge any of those facts.  The lawyers representing

4   the major defendants have all agreed that these facts are not

5   in dispute, and why should we have to take a lot of time to

6   prove them?  I ordered that document to be served upon you so

7   that you will know what has been done.  You will have an

8   opp ortunity, if you want it, at a hearing before the Court

9   or before the Master, to dispute any of those facts.  But if

10  nobody disputes those facts, then the Master and I, at hear-

11  ings that each of us may hold, are going to find those facts

12  to be true and go on from there.  We have more important things

13  to worry about than where the streams flow.  We know that

14  many other things are important besides that.

15      There is also in that assembly of documents some

16  reference to the matter of defaults.  Originally I made an

17  order that no defaults would be entered.  When I took over

18  this case in April 1956 I didn't intend that anybody be de-

19  faulted out of their rights without a chance to be heard, and

20  I made an order that no defaults be entered.  I had to set

21  that aside because a new complaint had to be served.  I will

22  tell you right now that we don't intend to enter defaults for

23  some period of time -- anyone will have ample time to file

24  answers, and even in the case where a defendant should sleep on

25  his rights and not answer or get his name of record, the court

1915

1   is going to require the Government to make proof of the facts

2   which they have about this particular piece of land.

3     A lawsuit is not a game.  In the days of the common

4   law you had trial by champion.  You hired a champion and the

5   other fellow hired a champion, and your two champions, in full

6   armor, went out and tilted in the lists on horseback, and the

7   man whose champion lost the contest lost the lawsuit.  It was

8   a kind of sporting proposition.

9     A lawsuit today is not a sporting proposition.  Con-

10  trary to what you see on TV and in the movies, we are trying

11  to find out what are the facts and what is the law that

12  pertains to those facts.  It is as simple as that.

13    At any rate, I had to set aside the order about

14  defaults.  No one has been turned down on any request, no

15  default has been entered, and the chances are that no default

16  will be entered until this case is tried.  Then if we haven't

17  been able to coax somebody to come in and at least get an

18  Answer on file and find out what kind of showing he can make

19  as to his property, we may finally have to say, "Well, this

20  man never appeared," and in substance have to default him,

21  which means that he can't answer.  But that doesn't mean that

22  we read him out as having any rights, because if, on the

23  evidence, he has rights, he is going to get them whether he

24  appeared in the lawsuit or not.

25    There is another order in there that talks about

1916

1    cross-pleadings and that everyone is adverse to everybody

2    else.  Well, that is the way I read the decree of the Circuit

3    Court, that everyone in this watershed who claims rights on

4    the River is adverse to everyone else, because your rights on

5    a river are correlative.  No one has rights to all of the

6    water, and what rights you may have affect the rights of

7    everybody else.  And rather than have a situation where, when

8    you filed an Answer, you had to answer 500 or 5000 other

9    people who filed Answers, I just made an order that your rights

10   were adverse even though you didn't file Answers to everybody

11   else's Answer.

12           You could imagine the situation we would have if I

13   hadn't made that kind of order.  X files a claim to water.

14   Without that kind of order, everybody else would have to come

15   in and answer X's claim.  We would have really had a mess.

16   We are in bad enough shape now.  But we tried to simplify that

17   situation a little bit.  That is why that order is in there --

18   it says that everyone is adverse to everyone else, and the

19   purpose is to save paper work.

20           There is also an order in there about your Answers,

21   and it provides that if you have already filed an Answer to

22   that first Complaint you don't have to answer it again.  There

23   is no harm done if you do answer it again.  The only thing you

24   are concerned with, then, is the additional causes of action

25   that were set forth in the new Complaint.  You are not concerned

1  with Fallbrook's fight.  You might be concerned with the

2  Government's claims upstream for Indian lands, National Forest

3  lands and public domain.  But you wouldn't have to answer the

4  first Complaint unless you wanted to.  Anyhow, your Answer that

5  has heretofore been filed to the original Complaint may stand,

6  the Court has ordered, or you may file a new Answer setting

7  forth your position.

8        I'll talk about these Answers in a minute.

9        When it became apparent that this case was going to

10  involve this whole watershed and that, in addition to people

11  like Fallbrook Public Utility District, the Vail Estate,

12  Santa Margarita Mutual Water Company, the State of California

13  and various of the major defendants who have had lawyers,

14  there were a lot of people who did'nt have lawyers and who

15  couldn't come down to San Diego and attend a court trial day

16  after day for a long time, I insisted that the Court be per-

17  mitted to appoint a Special Master and that the Master, in

18  substance, be able to take the court to the people.  That is

19  why a Master was appointed.

20        I appointed as Master a man by name of John M.

21  Cranston.  I had never met him at the time that I appointed

22  him.  I inquired around among the judges and lawyers of San

23  Diego County for a qualified man who knew something about

24  water law and who was able and experienced.  First I went to

25  Judge Haines, now retired, who tried some of the biggest water

1   rights cases in San Diego County.  He recommended John

2   Cranston.  I went to my colleague Judge Weinberger, and he

3   recommended John Cranston.  Everywhere I went John Cranston's

4   name popped up.  Confidentially, he belongs to a different

5   political party than I do; so politics had nothing to do with

6   the appointment.

7        Mr. Cranston was graduated from Stanford.  He is a

8   member of the Order of the Coif, a scholarship society in the

9   Law.  He has lived here all his life.  He went to school at

10   Escondido.  He is thoroughly familiar with your area here.

11   He has represented water companies in the Escondido watershed,

12   but not in the Santa Margarita watershed.  I think he is well-

13   qualified, so I appointed him as Special Master to take the

14   court to the people.

15        Now Mr. Cranston is a Judge.  It is true that what

16   he decides is subject to approval by me.  He makes findings

17   of fact and he draws conclusions of law and submits them to

18   me.  If I am not satisfied with them, I can modify them, or

19   I can send them back for further hearings.  Or I can approve

20   them.

21        Here is how Mr. Cranston is going to operate.  We

22   picked De Luz Creek as sort of a pilot plot to make a test.

23   He is now conducting hearings on De Luz Creek on the other

24   side of the mountains.  A number of those people down there

25   have no lawyers.  Some of them have lawyers.  He has been

1   hearing both the people with and without lawyers as to what
2   kind of ground they have, what their legal title is, the
3   ownership, the legal description, the amount of acreage, how
4   much of it is tillable, what use can be made of it, how much
5   water can be used on all of it if water were available, where
6   it is situated with reference to the stream, whether the water
7   is riparian water (about which I will talk in a minute) or
8   whether it is percolating water from mountain springs.  That is
9   the kind of thing he has been doing.

10      We expect those hearings on De Luz to be concluded
11   in July, and then he is going to prepare his report on De Luz
12   Creek and submit it and we will have the pilot operation to
13   see how this worked.

14      I needn't tell you that it is a lot more convenient
15   for people at De Luz to go down to Reche School and present
16   their evidence before the Master, with a little juggling that
17   has to be done to find out who is going to come next and when
18   they can put on their case, than it is to come to San Diego and
19   take their turn for their case to be tried down there.

20      It is our plan to do that on various other tributar-
21   ies.  There is Sandia Creek down there.  There are creeks and
22   tributaries   up here.

23      In addition to the Master holding hearings on some of
24   those tributaries, I may go out, if I have time, and actually
25   get a schoolhouse somewhere and hold these hearings on these

1   tributaries to take proof of what rights there are in the

2   adjacent areas.  We will probably do it stream by stream.

3          Finally, what we are going to have to do is to weave

4   all of this together into a decree that establishes the rights

5   on the River.  It is a pretty tough job, but it is one of those

6   things that has to be done, and that is going to be my

7   responsibility. I hope to have some pretty good help.

8          Going ahead a little further about how this Master

9   operates, suppose that he comes out here -- and we're not

10   going to get out around Murrieta for quite awhile, but he is

11   going to hold hearings -- suppose that we get a schoolhouse

12   or other building somewhere, you come in and put on your proof,

13   he draws up findings about your property and then submits them

14   to you and you have a chance then to complain to him, "You

15   didn't do it right.  You found that I had only 30 acres of

16   irrigable land.  I contended that I had 32 acres."  He can

17   correct it.  If he rules against you, he is a judge -- he has

18   made the findings of fact.

19          Then after the Master has made all those findings of

20   fact and has given you a chance to shoot at them, he has to

21   submit them to me, and you willi be notified of the time that

22   they come up before me for hearing and again you will have a

23   chance to come before me and say, "I protest.  I had 32 acres,

24   and the Master found that I had only 30 acres," and I will

25   have to make the decision that you have 32 acres or that you

1    have 30 acres, whatever it is.

2            Finally, when it is all woven together and the final

3    decree is proposed you are again going to have a chance to

4    come in and object to the way the matter is being handled.

5            In other words, it is our purpose to give you your

6    full day in court as easily as we can. We know that you can't

7    afford to sit around for a year in the courtroom at San Diego.

8    We are going to make it possible for you to be heard on the

9    things that concern you. You are welcome to be present at any

10   other time in the courtroom or at any of the Master's hearings.

11           That is about the way it works.

12           Also in that document there is an order that if you

13   have any objection to the Master's appointment you may come in

14   and be heard. The first date passed on July 16. Of those

15   people who had been served before, nobody objected to the

16   appointment of the Master. As to some other people who have to

17   be served by publication we fixed again the date of October 1

18   when the trial on the main stream starts. If anybody has any

19   objection to the appointment of this Master, that is the time

20   to come in and be heard or hold your peace. I doubt very much

21   that we will have any objections later on. But again, it gives

22   you a chance to be heard on the appointment of this Master.

23           Now, I want to talk to you a little bit about how you

24   may answer. First of all, if you want to hire a lawyer and can

25   afford to, you can talk to him. Certainly lawyers are the best

1    able to represent you in court.  If you don't care to hire a

2    lawyer, you can file an Answer, as we say, in pro per -- in

3    propria persona (I almost forgot my Latin) -- literally, in

4    your own proper person.  You can appear in pro per.  The Clerk

5    has forms of Answers, the Master has forms of Answers.  All

6    you have to do is to write to the Clerk of the Court and ask

7    him to give you some forms of Answers.  Your Answer can be as

8    simple as stating that "I deny all the allegations of the

9    Government's Complaint."  But we would also like to have you

10   set forth the legal title to the property that you have, and

11   we want your address on this document so that we know how to

12   notify you of other proceedings, and we would prefer, if we

13   can, to know what your claim is.  Maybe you have some ground

14   on top of a mountain up here that you don't contend has any

15   riparian rights and you claim that you have spring water or

16   percolating water.  Don't take positions unless you know what

17   you are talking about.  But if you answer pro per, you can

18   set forth in your Answer, in ordinary language, what your

19   position is.  I am going to be very lenient in letting you

20   amend if problems come up where you have made a mistake.  If

21   you prove something that you haven't alleged in your Answer,

22   the Court has authority to let you amend your Answer to

23   conform to what is proved and go on that basis.

24           Now the purpose of getting Answers on file is, first

25   of all, so that there will never be any necessity for defaulting

1    you, which means cutting off your chance to answer; and secondly,
2    so that we can have your name and address or the name and
3    address of your attorney and mail notices to you.  When an
4    order is served, it has to be served on you personally. So we
5    want your name and address.  A husband and wife can file their
6    Answer together, or if a family owns a piece of property all
7    of them together can file an Answer.  Answers should be filed.
8    If you need time, take the time, but let's get your appearances
9    on file in this lawsuit.

10            There is another matter I want to talk to you about,
11   and that is the Government's offer to settle as to small areas
12   of half an acre or less where water is used only for domestic
13   purposes or for not exceeding a half acre of irrigation.  It
14   was at my urging that the Government came forward with that
15   suggestion.  They originally said that they were willing to
16   demark out areas which they didn't think had any connection
17   with the stream.  It was pointed out that since everybody was
18   adverse the mere fact that you and the Government might get
19   together on this offer couldn't keep somebody else from
20   objecting.  So we tried to take care of that, and it is pro-
21   vided that if you make this offer and if the Government is
22   willing to approve it, it doesn't conclusively settle it
23   because your neighbor might come in and kick about this and
24   he would have a right to be heard.  But that is so improbable
25   that I doubt very much that we are going to have that kind of

1    situation come up.  And once a settlement is made with the

2    Government where the Government says, "We concede that you have

3    a right to your domestic water or for your half-acre of ground,"

4    it ought to take care of some of the very small parcels.

5        When the Government got around to doing this, instead

6    of demarking special areas they finally went all the way and

7    they said, "We will do  this in any part of the watershed" -- I

8    think I'm right about this -- "even on a piece of ground right

9    over a basin or right over a stream," and that was for the

10   purpose of taking care of a lot of small people who live at

11   Fallbrook, Temecula and Murrieta in the small-lot areas.  The

12   chances are -- I haven't heard any testimony, but I am going to

13   guess that the towns of Fallbrook and Murrieta are such that

14   they pretty well lie over the underground stream or basin,

15   which wouldn't be true of the ground on top of a mountain.  But

16   the Government, as I understand, is willing to enter into this

17   anywhere in the watershed for a small piece of ground.

18       If a person is in that situation and that is all they

19   claim and they want to do that, they can ask the Government for

20   copies of these documents, fill them out with a legal descrip-

21   tion of their property and what they claim and submit them,

22   and they are filed.  We are doing nothing further but filing

23   them.  Eventually we will set some kind of hearing.  If anybody

24   wants to kick about these rights being established in that

25   manner, they can be heard, and finally in the decree that would

1   be entered there would be the provision as to each of these

2   people that they had this right and it will be confirmed by

3   the Court.  That is our plan.

4          This does not affect your right to get water from

5   some water district.  If you are in a district where you are

6   getting water from some company, any settlement which you make,

7   or this "Offer of Settlement" is what it is called, doesn't

8   affect your right to get water from the company.  This concerns

9   River rights that you have to that particular piece of ground.

10  Obviously it is not useful as to large areas.

11         Now the Government has a Soil Survey Office.  I think

12  their headquarters are at Pendleton.  Do they still have an

13  office at Rainbow?

14         A VOICE:  Yes, sir.

15         JUDGE CARTER:  They have an office at Rainbow.

16         Some of these Marine officers, who look like they

17  are fighting men of the Marines -- I suppose they are all

18  fighting men, but if you want to know the honest truth they

19  are engineers; Colonel Bowen, who sits at the rear of the room,

20  is a water engineer, and Colonel Robertson is a civil engineer

21  -- have offered to go on the ground and make a survey of your

22  ground, if you will let them.  They will not come on your

23  ground without your permission.

24         I recommend that you let these Marine officers go

25  on your ground, for this reason:  if you let them go on your

1   ground and make a survey, you are going to get a copy of it

2   and you will get a peek at the Government's case.  If you don't

3   like it, you can then do what you want to build up your case.

4   But suppose that you get a report and you find out that the

5   report has been favorable to what you claim, you can pretty

6   well lay back on the oars because this is what the Government

7   is going to offer to prove.  If you don't let them go on the

8   ground, they have all the surveys that have ever been made of

9   this area -- they know what the man next door has, and the man

10  across the street, and the chances are that they can put on

11  proof about what you have whether you let them go on or not.  I

12  don't think you are hurt by letting them go on.  You get a copy

13  of their survey, and generally speaking this would include

14  how much ground you had in acres, how much of it is suitable

15  for cultivation, what kind of cultivation -- what crops you can

16  raise, the amount of water per year you would need for different

17  types of crops (if there were ample water for everybody), the

18  maximum amount of water that you could use.

19          Have you included in those surveys a situation where

20  a man has spring water unconnected with a stream or percolating

21  water which you decide is not connected with a stream?

22          The Colonel indicates in the affirmative.

23          Therefore, I don't see that you are hurt.  You are

24  getting a peek, as it were, at the Government's evidence.  This

25  is in line with the way that we try cases in the Federal Court

1   now.  We say that nobody has a corner on evidence.  If anybody

2   has evidence, make him produce it.

3        But these Marine officers will not go on your land

4   without your permission.  So I would suggest that the first

5   thing to do is to give them that permission.  It may turn out

6   that you have a piece of ground that, according to the report,

7   is not connected with any stream or basin -- the water in it is

8   percolating water.  If that is true, you are out of the River

9   case, as it were.  Your rights to percolating water are

10  correlative rights, and your only quarrel may be with the man

11  near you -- you are not part of the River.  On the other hand,

12  if you have rights that are riparian, then you have certain

13  definite rights and certain obligations.  I want to talk about

14  that a little.

15       Now there are various kinds of water in the State of

16  California -- and this is a pretty technical subject, but I will

17  try simply to tell you about a few of them.  We speak first of

18  a "riparian" right.  "Riparian" comes from the Latin; "ripar"

19  meant "river," and "riparian" pertains to a river.

20       To give you a simple illustration, suppose that there

21  is a little creek up here and it runs down about a mile and

22  empties right into the ocean -- just a little, short stream.

23  Suppose that there are ten people who live on that creek and

24  each has ten acres and each can cultivate his whole ten acres,

25  and we'll say the kind of crops they can grow are all the same.

1   Their rights on that creek are correlative -- that is, each of

2   their rights has to be exercised in relation to the other

3   fellow's rights.  One man, particularly upstream, can't say,

4   "I'm going to take all the water."  He has a right to a reason-

5   able use of that water, taking into account the people below

6   him who also have a right to water.  That is just common sense.

7        That law of riparian water rights grew up in the

8   western country where water was scarce.  There was no problem

9   in the state where streams ran the year around and you had

10  rains in July and August.  But in the West, where water was

11  scarce, the rule grew up that this water had to be used so

12  that each person on the stream would have some right to it and

13  no one could take it all.  That is about what it means.

14       Suppose we take the same example and here is a

15  fellow who has a hundred acres and nine others have ten acres

16  each, and all of the hundred acres could be cultivated and

17  all of the 10-acre parcels could be cultivated.  Again, the

18  man with the larger acreage has a right to a larger amount of

19  water.

20       You can't lose riparian rights by disuse.  Suppose

21  that I own a piece of ground on a stream, and six of you above

22  me on the stream might be using all the water.  I haven't been

23  trying to use any water -- I'm living in Europe, we'll say.

24  I own this land just for investment.  I come back some day and

25  I want to use some of the water.  You say, "It's too bad.  We

1  have been using the water for ten years." That is not the law.

2  You don't lose a riparian right by disuse where your property

3  is on the stream or adjoins a stream.

4         You can lose a riparian right by adverse user.  But

5  there the person who takes the water from you has to take it

6  from you to your detriment, and he has to take it continuously

7  and over your protest for at least five years.  It would be

8  very difficult to prove prescriptive rights or rights by

9  adverse user.  If any of you claim that kind of rights, I would

10  advise you to see a lawyer, because it is not the kind of thing

11  that a layman is competent to handle or to prove.  It is a

12  technical field of law.  If you think that you have a right by

13  prescription, or if you think your neighbor might have that

14  kind of right from you, certainly you should see a lawyer.  It

15  is a very technical field of the law.

16         Now there are what we speak of as "appropriative"

17  rights.  Under California water law presently, to appropriate

18  unused water out of a stream you have to go through the State

19  Water Rights Board.  One of the legal problems before the

20  Court is whether that procedure pertains to this case.  Briefs

21  have been filed, and more are going to be filed, and I expect

22  to rule on that very shortly.

23         In addition to riparian water, the cases talk about

24  "percolating water" or "ground water" -- ground water that is

25  percolating.  Incidentally, a stream can run on the surface

   or it can run underneath the surface.  There can be a stream

1   running underneath as well as on the surface, and riparian law

2   would apply to that.   The rules of riparian law would be

3   applicable to basin water.   There would be correlative rights

4   to the use of water in the basin.   Water underground is spoken

5   of as "ground water."   But a certain kind of ground water

6   they speak of as "percolating water"  -- water which is not

7   in direct contact with and, in substance, feeding a stream on

8   the ground or under the ground.   Percolating water doesn't

9   belong absolutely to the man on whose ground it is.   Percolating

10  water does not come within the law of riparian use; it is not

11  riparian water -- it is not affected by riparian rights.   You

12  have a right to a correlative use of percolating water with

13  other people in the vicinity who are drawing upon the same

14  percolating water.

15         I can't in detail give you any further description

16  of these matters, except that there is a big difference between

17  owning a piece of ground right on a river which may flow only

18  in the winter where there is probably a stream of water or a

19  basin underneath, and owning a piece of ground on a hillside

20  which might be found to be unconnected with that stream but

21  which has percolating water in the ground which an engineer

22  can't say was not connected with or not in direct contact with

23  that stream, at least not in appreciable amount -- it is not

24  connected in the sense that it is really substantially feeding

25  that stream, and that kind of water would be percolating water.

1   You don't own it absolutely because you own the ground.  You

2   have a correlative right to the use of it with other people who

3   have a similar kind of water.  But your problem is simplified

4   in that case because you are concerned with only the people

5   immediately around you, whereas if you have a claim to water

6   in a stream then you are concerned with everybody else who has

7   the same right as you have to a reasonable use of the water

8   out of that stream.

9          Now this case is difficult enough without things

10   that act as irritants and make it more difficult to try.  I

11   said at Fallbrook, and I am going to say here, that a lot of

12   you people who live in this area probably know more about

13   water and water conditions than some of these experts will ever

14   know about water conditions here.  I wouldn't be surprised if

15   some of you didn't think you knew a lot more about it than you

16   really do know.  I am not pointing at anybody in particular,

17   but I have read some stories and heard some reports of some

18   speeches, etc.  Sometimes a little knowledge is a dangerous

19   thing.  Let's be temperate about this thing.  I am going to try

20   to see that there is a fair trial conducted and that anybody

21   who has a right is going to have it protected.

22          I serve for life.  I don't run for election.  To get

23   rid of me you have to impeach me, and I have to be pretty

24   rotten to be impeached.  Very few federalj judges have ever

25   been impeached.  I don't care whether anybody likes me or

1932

1   doesn't like me.  I don't care whether the Government likes me

2   or whether the big landowner likes me.  I have a job to do and

3   I am going to do it.  I am going to try to get along with

4   people and try fairly to decide this case.  It is a rough deal,

5   I'll concede, that you are brought into a lawsuit that you

6   didn't bring and you have to do something to protect your

7   rights.  But let's make the best of it, and I am going to try

8   to see that this case is fairly tried and a fair decision

9   reached, and anybody that is involved in this lawsuit is going

10  to have his chance to have his day in court.

11          That is about all I have to say to you.  I have

12  talked longer than I intended to.  With the limitation that

13  you may ask me a question and I may not want to answer because

14  it may be something I have not ruled on, where I must hear

15  from the lawyers on both sides before I rule, I would be glad

16  to answer questions.

17          I am not interested in the politics of this.  I have

18  nothing against politicians.  I suppose that at one time I

19  would have been called a politician -- I held a state office.

20  But I read some of these speeches that are made, and frankly

21  I wish that some of them would choke on bones.  This seems to

22  be a fertile field where some of them think they are going to

23  get votes.  I don't know that they are helping any by making

24  speeches and rattling the dice around in the barrel, so to

25  speak, and making a lot of noise.  Maybe I'm wrong.

1      At any rate, I'm happy to have come up here.  I want

2  to be helpful, and I'll be glad to answer some questions.

3      (Applause)

4      JUDGE HILLIARD:  Thank you, Judge Carter, for giving

5  so freely of your time, driving up here from San Diego to

6  address us here this evening.  I think your address has been

7  most helpful to a lot of people who have been worrying here,

8  especially the small lot owner who has been worried about this

9  suit.

10      Now if any of you would like to ask Judge Carter

11  some questions, start in now.

12      State your name, please.

13      MRS. PEARL:  Mrs. Pearl, from Murrieta.

14      My question is this.  I don't understand about the

15  adjudication part of it.  Does that mean that after all the

16  testimony is in and everything, that what water is available

17  will be divided among the people?  Is that what "adjudication"

18  means?

19      JUDGE CARTER:  To "adjudicate" means to decide, to

20  enter a judgment.  You "adjudicate" something when you decide

21  it, and you do that by a written judgment.  When the case is

22  finally concluded there has to be a judgment or a decree --

23  since it is a suit in equity, if you want to be technical, we

24  call it a "decree" rather than a judgment.  It is the same

25  thing.  It is something signed by the Court, where the Court

1    finds certain facts, and there is a decree, and the decree

2    would decide or adjudicate the riparian rights and it would

3    probably adjudicate the maximum use that those people might

4    have if water were available for all, and then an attempt

5    would be made to prorate that water equitably among the persons

6    entitled to it.

7        MRS. PEARL:  When you say "equitably" you don't

8    mean on the basis of each individual case, whether there will

9    be hardship; it is just the amount of land that is riparian on

10   the stream?

11       THE COURT:  Equity wouldn't take into account the

12   fact that one family had ten children and the other man was a

13   bachelor.  That is a good question.  You might think that

14   "equitably," which means "fairly," would take into account

15   other considerations; but it doesn't take into account that

16   kind.  It takes into account where your ground is, how much

17   there is of it, how much of it you can till, what kind of

18   crops you can raise, how much water you will need for those

19   crops.  Do you follow me?

20       MRS. PEARL:  Yes.  When the water is divided up,

21   then, at the end, a person who is pumping 80 inches of water

22   now, suppose they ended up with 60 inches of water after it was

23   all divided up.

24       JUDGE CARTER:  It could happen.

25       MRS. PEARL:  It could happen that way.

1          What enforcement will there be to see that everybody

2  is not using 70 or 80 inches again?

3          JUDGE CARTER:  There are all kinds of problems, and

4  that is one of them.  But these decrees of this sort are not

5  new.  They have been entered before.  In some instances there

6  has been an administrative procedure set up for enforcement.

7  Sometimes it is done on a voluntary basis.  It is not new.  It

8  has been done in this state for years.  The old "zanquero"

9  the Mexican name for the watertender, was the fellow who

10  equitably distributed the water out of the canals.  It is the

11  same kind of problem.

12          For instance, you have been pumping 80 inches.  If it

13  is adjudicated that 60 inches is your maximum, as long as no

14  one else is hurt, if there is plenty of water, you could still

15  get your 80 inches.  There is no limitation on the use of

16  water, unless other people are hurt; and if other people are

17  hurt who have a right to the use of that water, then in fair-

18  ness you shouldn't pump your 80 inches.  Do you follow me?

19          MRS. PEARL:  Yes.  But what I was asking was about

20  the enforcement of it.

21          JUDGE CARTER:  That is one of the many problems we

22  are going to have to work out.  Rome wasn't built in a day,

23  and this case isn't going to be wound up in a day.

24          MR. URSURY:  How long may we expect litigation like

25  this that might work hardship on someone who had borrowed

1936

1    money with the expectation of selling a particular piece of

2    property and then the people refused to take it due to this

3    litigation?  And yet our first title says that no suit shall

4    be entered against these owners?

5            JUDGE CARTER:  Your name is Tarwater?

6            MR. URSURY:  No, sir; my name is <u>Ursury</u>.

7            JUDGE CARTER:  I mention that name because I read an

8    Answer where that contention was made.

9            MR. URSURY:  I only own 20 acres.

10           JUDGE CARTER:  Nobody can give you a title which

11   says that you can't be sued.

12           MR. URSURY:  It was a title at one time.

13           JUDGE CARTER:  No.  It is true that nobody might

14   ever succeed against you, but there is no way to say that you

15   can't be sued. X could sue you tomorrow for running over his

16   prize dog.  Maybe you didn't run over it, but you could be

17   sued.  Y could sue you, claiming that he owned your land.  You

18   could show that he never had a speck of interest in it.  In

19   certain cases, if it was maliciously brought, there is a remedy

20   for malicious prosecution.

21           But no one can give you a title that says that you

22   can't be sued.

23           MR. URSURY:  You mean back in 1860 or sometime before

24   that?

25           JUDGE CARTER:  No, I'm telling you this, that no

1   title company, no one, can give you a title which says that

2   you can't be sued.  They can give you a title where they say

3   that you will be protected, that if you are sued they will back

4   you up, or various other kinds of title.  But nobody can give

5   you a title where they say that you can't be sued.

6        MR. URSURY:  That would be very well.  But recently

7   in my own case I borrowed money with an agreement with another

8   party that I was going to sell ten acres, and since that time

9   this suit has come up and it has been refused.  I could very

10  easily lose my place.

11       JUDGE CARTER:  Your particular question was, how long

12  do we anticipate that this litigation will take?  It is hard to

13  say.  The De Luz creek is a pilot case.  I think we discovered

14  that the hearings went faster than was anticipated.  We didn't

15  expect them to close up in July.  This was the first one.  We

16  are going to profit by experience.  In addition to trying the

17  case on the main stream, as I plan to do beginning in October,

18  I am also willing to conduct hearings on these tributaries.

19  We are going to try to do it as fast as we can.  How long it

20  will take I can't tell you.  But certainly the end is not in

21  view within six months or a year.

22       MR. URSURY:  I happen to be on two tributaries.

23       JUDGE CARTER:  Well, we will have to work that out.

24  Maybe we will have to hear you on both of them.

25       Any other questions?

1     MR. ANDRES:  My name is Frank H. Andres, and I own

2   480 acres, on which I have a soil test made from the U. S.

3   Government and it showed about 420 acres of farm land that

4   would grow crops.  It is now planted in wheat and barley and

5   some is summer-fallowed, and I would need water for that land,

6   if it could be found, for permanent pasturing.

7          What I was wondering -- which is my way of asking

8   the question -- about five years ago I looked at some land in

9   Oceanside and it was reported to me as lima bean land which

10  only would need a half-acre-foot in the dry years to grow a

11  crop, whereas on this ranch here I would need about two and a

12  half or better acre-foot to grow a bean crop.  (I was served

13  last week or ten days ago and I'm combining and very busy now.)

14  Just how would you determine, or how would the Master determine

15  the need to raise a crop like at Camp Pendleton where they are

16  alongside the ocean where they get the fog and the mist and

17  stuff there and they don't need a third of the water on their

18  agricultural land to grow a crop?  Yet they state that the

19  water is used practically equal to grow crops.  I couldn't quite

20  agree with that.

21          That is question one.

22          The other question I have is this.  I have a friend

23  that I know at Anza, which is in this watershed -- Mr. Percy,

24  that has on his 400 acres small wells all around and has found

25  but very little water.  He got himself a hydraulic engineer

1   from Corrigan Wells and he came out on top of a knoll and

2   surveyed the area and laid out a place for him and he said,

3   "You drill in this area here around eight feet, here," he says,

4   "and you will find water."  The water analysis made from that

5   which is in the vicinity of the Santa Margarita watershed is

6   not the type of water we have here.  The water might come to

7   like the San Andreas fault, and he pumps now, as I seen it,

8   day and night out of that one pump around between 30 and 40

9   inches of water.

10          I claim I am on the little stream there with my land,

11   and if I drilled how would the neighbor on the Santa Margarita

12   affect my water?

13          JUDGE CARTER:  It depends on what facts are present.

14   The Government presents facts that you are satisfied with, or

15   if not you present facts showing where this water comes from

16   and what character it is.  We cannot decide these things in a

17   vacuum.  That is why we are holding these hearings.

18          The man you speak of might be able to introduce

19   proof by his engineer that this water is of a different

20   character.  It may originate in some way in which it is not

21   connected with the watershed.  It is entirely possible that

22   that might be true.  It may not be in contact with the stream,

23   or it may be.  That is entirely a matter of fact.  You have

24   spelled out a case that may be difficult.  Some of them will

25   not be that difficult.  Some of them will be much simpler.

1          I can't answer a question like that.  I wouldn't try

2   until I heard all the facts about where the land is.

3          You say that you have 400 acres or so.  I might point

4   out that any water that you have there, of course, has to

5   originate above you.  You have no right to any water below you.

6   And if there is not water in that area, this lawsuit isn't

7   going to give you water.  You understand that.  Nobody is

8   going to move water upstream to people who haven't got water

9   on their ground.

10         I would have to hear the facts in detail, and the

11  Master and I are going to hear those facts and decide those

12  things.

13         MR. TAYLOR:  Bert Taylor is my name.

14         I talked to a good many engineers and I never heard

15  two of them agree.  I would like to know how you are going to

16  decide whose testimony to take for where the water originates

17  -- that is, on the ground water.

18         JUDGE CARTER:  That is not a new problem in this

19  lawsuit.  I have been trying cases for nine years and I have

20  heard people disagree, and the trier of fact, whether it be

21  a court or a jury, eventually has to find what it thinks is

22  the truth.  We are going to do the best we can.

23         MR. DAVIS:  H. M. Davis.

24         I would like to ask, what is the object of the

25  Government, and what is the Government trying to do?  Are they

1    trying to prove that somebody is wasting water?  Are they

2    taking into consideration that we have been in a dry cycle for

3    ten years?  There is a scarcity of water now.  What is the

4    Government trying to do, anyway?  What is their object?  That

5    is what I want to know.

6            JUDGE CARTER:  The Government spent a lot of money --

7            MR. DAVIS:  I know that.  But what is their object?

8            JUDGE CARTER:  They spent a lot of money and built a

9    Marine Base.  The Government has been conserving water down

10   there.  They have actually be pumping sewer affluent after

11   treatment into the ground to keep the water level from dimin-

12   ishing completely and to keep salt water out.  And the

13   Government's contention is that people upstream -- and I don't

14   think I am telling tales out of school -- they are particularly

15   claiming that the Fallbrook Public Utility District and some

16   of the other big users are using water that they are not

17   entitled to use.

18           MR. DAVIS:  Then why take in all these 7,000 people

19   away up here?

20           JUDGE CARTER:  I tried to explain to you that the

21   Government is the last on the stream.  The Government's right

22   is correlative.  Its right is not absolute.  Nor is yours.

23   Rights on the stream are correlative.  The Circuit, in

24   deciding that, said that since the Government is the last

25   owner on the stream, if it wanted to quiet title and get a

1  decision as to what its rights were it had to bring in every-

2  body on the stream and give them a chance to be heard.

3  MR. DAVIS:  Don't you think it would be just as well

4  for the Government to spend a little more money to build another

5  line alongside San Diego and stop all this litigation and have

6  a lot of water?  The money they are spending right now would

7  pay for it.

8  JUDGE CARTER:  The Government is divided into three

9  parts -- Executive, Legislative and Judicial.  I am not in

10  Congress.  If I were in Congress, I would have a vote.  As it

11  is, I am a judge.  I have to decide what is presented to me.

12  It is not my business to pass laws.  It is my business to

13  interpret them and apply them.  I see your point.  But let's

14  be realistic about it.  I have no more business voting a law

15  than the man in the moon.  We don't have a judge call in his

16  secretary and say, "Take a law."  That is not the judge's

17  business.

18  MR. DAVIS:  If there was another supply available,

19  it would be different; but there is no other supply available.

20  If they would just take the money that the taxpayers are

21  putting up, they would have all the water available that they

22  need at Camp Pendleton.

23  MR. DETHWICK:  My name is F. J. Dethwick.

24  I had my land surveyed roughly about six years ago.

25  Is that right, Mr. Christiansen?  Is Clyde around?

1943

1          A VOICE:   That's right.

2          MR. DETHWICK:   And I got a clean bill of health from

3     Washington, and it didn't do me any good.

4          JUDGE CARTER:   Is that a legal document?

5          MR. DETHWICK:   I have had it in a safety deposit box.

6     It is about the same as my marriage license.

7          The water that falls on my place does not enter the

8     Santa Margarita River; it all belongs to you -- F. J. Dethwick;

9     and I just wonder if that is really going to hold water this

10    time.  And I believe Harry Truman was in there about that time.

11         JUDGE CARTER:   What kind of document is this that you

12    have?

13         MR. DETHWICK:   It's a wonderful thing.  I got it in

14    Hemet.

15         JUDGE CARTER:   Is it a grant for a homestead?

16         MR. DETHWICK:   It tells me that I have a clean bill of

17    health; none of that stuff you have on your place belongs to

18    the Government, nor any of the people down below at the Santa

19    Margarita River, it says.  Now you just don't pay any attention

20    to any of those people.

21         These Marines, you know, did the survey over there,

22    and boy oh boy!  They had about six thousand yards of red

23    flags out there.

24         JUDGE CARTER:   If you have a document like that

25    signed by the right man, you might have something.  But I

1    would have to see it.

2            MR. DETHWICK:  It's the right-hand power to Harry

3    Truman.

4            THE COURT:  I'll wait until I see it.

5            MR. DETHWICK:  I'm going to bring it over some of

6    these days and just for the fun of it I'm going to let you look

7    at it.

8            Do we have to be tried under state law in this case?

9            JUDGE CARTER:  The order of the Court presently is

10   that state water law applies.

11           MR. DETHWICK:  What does "presently" mean?

12           JUDGE CARTER:  Because after I made that ruling the

13   Government made application to have me change the ruling.  I

14   haven't ruled on their application.  I am trying to find time

15   to decide it.

16           MR. TARWATER:  My name is Tarwater.

17           JUDGE CARTER:  Mr. Tarwater, don't misunderstand me.

18   I read with interest your Answer.  You had the ingenuity to

19   dig up some documents that I hadn't seen.  I appreciated it very

20   much.  I made a special file of your Answer.  I meant nothing

21   discourteous when I called your name.

22           MR. TARWATER:  Thank you.

23           I am not myself asking for any special privilege,

24   and I don't think very many people here want a special

25   privilege.  But if this state law that we are being summoned

1.  under has permanency, then what water rights we get won't be

2.  later subject to moving from one place to another because of

3.  certain shifts in population.  I think it might make some

4.  difference in the attitude of some of the people.  But to go

5.  under state law, when it is subject to the State Board of

6.  Water Resources, in my opinion -- I don't know whether that is

7.  right or not.  And I would like to know for sure whether these

8.  rulings that a judge makes will be permanent even after it goes

9.  to the Supreme Court, if we are under state law.  If you bring

10.  it clear through to the Supreme Court, then will the ruling

11.  be permanent?

12.          Any water rights that you may now have, under state

13.  law, are subject to quite a little bit of maneuvering by the

14.  State Water Resources Board under state law; and under the

15.  federal law it is more fixed;and the thought in my mind was

16.  that if we could find the laws we have always had in the past

17.  and we could hold to them, people would have security, and we

18.  would have independence, and we would have the liberty of the

19.  individual to exercise property rights, where if we go under

20.  state law we become sort of a collective state and we are

21.  subject to the moving of water to suit the population through

22.  the channels of some corporation.

23.          JUDGE CARTER:  Mr. Tarwater, from reading your plead-

24.  ings and hearing you talk, I take it that you are a man of some

25.  education.  You probably heard of Heraclitus, the philosopher,

1   who said that there is nothing permanent but change, and change

2   is always changing.

3        I don't know how I can enter a decree in this case

4   that there will be no change.  I don't anticipate that I can

5   enter a decree that the Temecula Valley or the Murrieta

6   Valley will always remain rural or will always remain a little

7   place with farms of a certain size.  Change is something that

8   occurs, and there is no way that man can stop it.  And it's

9   true that your rights are variable, depending upon changed

10   conditions.

11        MR. TARWATER:  Under state law; is that right?

12        JUDGE CARTER:  I don't know what you mean by "under

13   federal law."  There is no body of federal law with respect to

14   water rights.

15        MR. TARWATER:  No, there is no body of federal rights.

16   But in the case of a treaty, like in this particular Treaty I

17   refer to, there are certain definite provisions in the Treaty

18   and they refer to the provisions in the title.

19        JUDGE CARTER:  No one has briefed the point that you

20   made in your Answer.  I made a special file on it.  But the

21   thing that struck me immediately when I read it is the fact

22   that our law of rights to water comes from the Latin-American,

23   the Mexican, side of the fence, and I have a hunch that you

24   will find that Mexican law with respect to water rights is very

25   similar to California state law, because this western water

1   law that grew up came out of the arid country and most of this

2   arid country belonged to Mexico.  I am not sure.  It has not

3   been briefed, and I'm not going to pass on it.

4         MR. TARWATER:  The point I made, how good is a

5   treaty or how good is a statute, like a patent to a piece of

6   land that has been granted by the United States -- how good

7   are they?

8         JUDGE CARTER:  It depends on how you interpret them.

9   I will say now that I am in disagreement with certain of your

10   contentions, the same as the gentleman over here that there's

11   something in there to the effect that your title was protected

12   and you spelled out some argument that you cannot be sued.

13   No treaty would say that.  That isn't what it means.

14         MR. TARWATER:  I don't think you could be drawn into

15   court -- pardon me for speaking before you got through -- but I

16   rather think you can be drawn into the court, but it would then

17   probably be the thing to do to follow the treaty and remove the

18   matter from the court.

19         JUDGE CARTER:  That problem we will get to.  I,

20   myself, haven't looked into it yet.

21         MR. TARWATER:  My water happens to be my bank account

22   I don't think anybody here would like to share his bank account.

23         I wish to thank you while I'm up here.  I am very

24   glad you came up here.  You have eased our minds a lot.

25         But I still would just like to make that statement.

1      JUDGE CARTER:  A lot of people have the mistaken idea

2  that they own all the water that is on the ground which they

3  own.

4      MR. TARWATER:  Doesn't the dictionary give a defini-

5  tion that we own property indefinitely underneath?

6      JUDGE CARTER:  If your dictionary says that, it is a

7  limited definition, --

8      MR. TARWATER:  It is a law dictionary.

9      JUDGE CARTER:  Because that is not the law.

10      MR. TARWATER:  The law has not been changed since our

11  titles.

12      JUDGE CARTER:  There is no ownership in water as such

13  except when you buy it from water companies or in bottles.

14  There are only rights to the use of water.  It is not a right

15  to the water itself.

16      MR. TARWATER:  I, myself, don't wish to have Califor-

17  nia adjudicate my water.  I would rather the Government did

18  that, and I will stick with the Government of the United States

19  and the Marine Corps.

20      MR. DETHWICK:  Talking about that little document

21  again from Washington, D. C., for six years we have been under

22  the impression that that is a very valuable piece of paper.

23      JUDGE CARTER:  It may be.

24      MR. DETHWICK:  You were just saying awhile ago that

25  maybe it is, maybe it is not.

JUDGE CARTER:   I don't know.  I haven't seen it.

MR. DETHWICK:   When we find out that that piece of paper is no good, I would sue the Government for my rent on the safety deposit box.

JUDGE CARTER:   Very good.

MRS. PERRY:   My name is Mrs. Perry.

Could you tell me, Judge Carter, is there a possibility of the Government stipulating to a certain amount of water on land which is located on the overlying basin and where only percolating rights are claimed?

JUDGE CARTER:   Of course, you have an inconsistency there, where you say that you are on land overlying the basin but you claim only percolating rights.  You claim only percolating rights.

MRS. PERRY:   Yes.

JUDGE CARTER:   The stipulation that the Government has been entering into, these offers that have been made so far, pertain to the half-acre piece of ground for domestic use -- half-acre of garden.  The only other situation I know of where the Government wouldn't quarrel with you would be where they made a survey and found a certain character and type of water and you were content with what they found.  Your quarrel with the Government might be at an end, unless somebody wanted to quarrel with you.  I couldn't tell you --

1    MRS. PERRY:  Do I understand that it is advisable,

2    then, to have the Marine Corps come in, and are they considered

3    to be experts -- even if you aren't particularly asking for

4    water for farm uses but for a particular use?

5    JUDGE CARTER:  Well, they are sufficiently expert

6    that the Government has qualified them and used some of them as

7    experts in the trial of this case to date before the Master,

8    and if you let them come in and make a survey you know what

9    they are going to testify to.

10    MRS. PERRY:  What are they supposed to be experts on?

11    That is what I don't understand.

12    JUDGE CARTER:  Land uses in connection with water,

13    character of the water in the ground and under the ground.  One

14    of the men in particular, Colonel Bowen, who is here, is a

15    water engineer.  It has been his specialty.  He came out of

16    private industry to join the Marine Corps.

17    MRS. PERRY:  I understand that.  But I have a rather

18    particular use for my own particular small piece of land, and I

19    am not sure that civil engineers or water engineers would

20    necessarily know how much water I need.

21    JUDGE CARTER:  Then you would have to get somebody

22    to come in.

23    MRS. PERRY:  What would you consider an expert in the

24    case?

25    JUDGE CARTER:  I don't know what your use is.

1931

1    MRS. PERRY:  It is so particular, it only affects me.

2    JUDGE CARTER:  I am not going to recommend any

3    engineers for an unknown use, or for any use, for that matter.

4    MRS. PERRY:  Do you still think it should be the

5    Marines to tell me.

6    JUDGE CARTER:  I would, first of all, let them come

7    in and find out what they say.  Then you will know what the

8    area of disagreement is.  You have some ideas of your own.

9    MRS. PERRY:  Yes, I do.

10   JUDGE CARTER:  Find out what they think about it.

11   MRS. PERRY:  Is that the Marine Corps Engineers that

12   is going to make the survey?

13   JUDGE CARTER:  This unit is under the direction of

14   the Marine Corps.

15   MR. PHILLIAN:  I am Alexander J. Phillian.

16   Judge Carter, from what I have read of the Complaint

17   of the Government, its allegations are based totally on the

18   theories of these engineers who think they know the course of

19   flow of water underground and actually try to tell us where it

20   is flowing, and on these reports the Government has contended

21   that some people are stealing its water, etc.

22   We do have someone, who may even be considered

23   insane, who has propounded theories and has sufficient evidence

24   scientifically and has gained recognition world-wide, who has

25   proven that the so-called science on which these engineers

1952

1  base their conclusions is as false and as obsolete as the

2  theory that the world is flat, and this man has brought out

3  and has proven and this same man has found water for the Navy

4  on an island where certainly the encroachment of salt water

5  would be more possible than even around Camp Pendleton.

6      The Court is put in the position of accepting one

7  theory or another.  I should think that it would be safer for

8  a court of equity to base its judgments on much more sound

9  evidence, such as the flow of water on the surface of the

10  ground where it can really be seen and does not have to depend

11  on the theories of some engineers.  Of course, we have to

12  follow them as much as we can.

13      Would the evidence of someone who does not have a

14  college degree but does have the recognition of scientists

15  around the world be admitted in your court?

16      JUDGE CARTER:  First of all, you are not laboring

17  under any misapprehension that judges don't have presented to

18  them, day after day, conflicts in testimony -- let's forget

19  about expert testimony -- where two people get on the stand

20  and one says that the horse was white and the other says that

21  it was black.  If you think that it is a difficult thing to do,

22  we have to do it every day.  We may be right or wrong, but we

23  have to decide whether it was black or whether it was white.

24      So much for that.

25      Answering your other question, an owner, of course,

1   always testify generally about his own property; and if a man

2   can be qualified as an expert by experience and training he

3   may give an opinion.  He does not have to have a college

4   degree, but he has to demonstrate to the Court that he is

5   entitled to give his opinion.  A man who is not an expert can-

6   not give his opinion.  But if he has had enough experience

7   that the Court finds that he is an expert and is qualified to

8   express an opinion, then he may testify.  That is a question of

9   what kind of foundation is laid -- what kind of proof is put

10   on before he testifies.

11             MR. TARWATER:  May I ask another question, sir?

12             Do you think that after we get an adjudication under

13   State law that later on the State Water Resources Board may

14   grant, due to a shift in population, our water rights and the

15   rights of the Indians, if we are all subject to change -- can

16   the Indians lose their water rights and the rest of us, if the

17   population centers move, take the water away from some and

18   give it to others?

19             JUDGE CARTER:  I don't understand that the State

20   Water Rights Board has any power to deal with riparian rights.

21   Nor does it have any power to deal with the Indian reservations

22   and their water.  The State Water Rights Board has a right to

23   determine who may apply for excess water -- surplus water, and

24   that is one of the big contentions in this case:  Is there

25   surplus water?

1954

1       MR. TARWATER:  When we use water here and take sur-

2  plus water, do we fill our basin -- are we entitled to refill

3  our basin with the surplus water?   Under this State law or

4  under the Federal law or under the Treaty rights or homestead

5  rights, we have a right to use the water that we can use on

6  our land, I believe.  But under the State law if we stipulate

7  an agreement it is a dangerous thing, just in my opinion.  The

8  same way if we enter into a stipulated agreement in the case

9  of this land where there is a federal grant, then we will be

10  subject later to changes and the Treaty and the statute will

11  not be supreme any more -- the State law will override us.  I

12  would rather have the security of those statutes and treaties

13  than I would the State law.

14       JUDGE CARTER:  If that is a question, I can't answer

15  it.

16       Mr. Solgado.

17       MR. SOLGADO:  My name is Bill Solgado.  I am a

18  member from the   Klamath   Indian Reservation.

19       Mr. Carter, we have been wondering how 4.2 acre feet

20  is put on, on this summons, and whether we, the Indians, are

21  listed as a defendant in this case.

22       JUDGE CARTER:  I don't think you are listed as

23  defendants.  The Government is bringing the suit partly in your

24  behalf.  Now there might be Indians who owned land privately

25  who were made defendants.  But as far as the Reservations are

1955

1    concerned, they are on the plaintiff's side of the case.   The

2    Government is seeking to adjudicate their rights.   They are not

3    on the defendants' side of the case.   The Government is repre-

4    senting your interests in the matter.

5            MR. SOLGADO:   This 4.2 acre feet that is on this

6    summons, since we are on it, does that mean that that is the

7    amount of water that we are entitled to now and in the future,

8    if there is a decree that should be rendered?

9            JUDGE CARTER:   There is no decision on that.   The

10   Government is asking for that much water.   If you had 4.2 acre

11   feet of water available for your irrigable land, you would have

12   no problem.   I don't know what use you could make where you

13   could use more water than that.   But that is not decided.   The

14   question to be decided is how much water you may reasonably

15   need in the future and how much water you are using now.

16           MR. SOLGADO:   We have wondered, and I know some of

17   the members have been wondering, as to their water rights, if

18   there is any adjudication that should be made.   In a lot of

19   instances where we have more or less, you might say, been

20   tricked, we have lost certain things merely by having someone

21   perhaps tell us that we were not involved in a lawsuit, and

22   when the decree was rendered we found out that we were coming

23   into this, and by doing so we have lost some benefits.

24           Now the Indians on the Reservation feel that as far

25   as the water rights are concerned throughout our occupancy

1  we have always felt that we have priority water rights; and as

2  far as the Indian offer, or the Government making a fixed

3  amount of water for us to use, some not knowing the amount of

4  water that 4.2 acre feet is, without any explanation, they

5  have come to think, "Well, maybe we will lose all our water

6  rights."  But I know, as you have mentioned once before, that

7  you would see that as far as our water rights, the Indians'

8  water rights, are concerned, they were fairly protected."

9      JUDGE CARTER:  I have said that I think the law is

10 clear,if it is clear on anything, about what the rights of the

11 Indian Reservations are.  But certainly there is no objection

12 to the Indians', if they want to, employing an attorney to look

13 into the matter.  You have that right.  I am just guessing.

14 That is just my view, as I see it now, of where you are in this

15 case.

16     MR. SOLGADO:  Now sir, I believe the United States

17 Attorney is representing the Government.

18     JUDGE CARTER:  The Attorney General's office, not

19 the United States Attorney.

20     MR. SOLGADO:  That would be the place for us to go,

21 would it not, since they would be representing the Indian

22 lands?

23     JUDGE CARTER:  I would think so.

24     I would suggest that you arrange to have a talk with

25 Mr. Veeder or some of his representatives and see what his

1    plans are and what he thinks about your rights, and if you are

2    not satisfied with the representation you received, of course,

3    you have a right to be heard.  I am willing to hear anybody

4    who wants to be heard in this case.

5            I want to bring this to an end, if I can.

6            JUDGE HILLIARD:  This could continue indefinitely.

7            MRS. CARR:  I am Mrs. Carr.

8            Is a soil survey, with maps and recommendations by

9    the Government Soil Conservation, considered good evidence in

10   court?

11           JUDGE CARTER:  I don't know what has been the prac-

12   tice in the matter of soil surveys.  Does any of you know?

13           COLONEL BOWEN:  We are willing to accept the Soil

14   Conservation surveys.  We have found that they conform very

15   closely to the surveys that we make.

16           JUDGE HILLIARD:  Thank you, Colonel Bowen.

17           JUDGE CARTER:  One more question, and then I have to

18   go.

19           MR. SPORE:  I am Clifford Spore.

20           We are told to answer these summonses, and I didn't

21   have any form and didn't know where to get one, so I just

22   answered by letter.  I gave the kind of title I have, and the

23   legal description and how much, something about the amount of

24   water I have been using.  Is that sufficient?  Or do I need

25   more?

1          JUDGE CARTER:  For the time being we are treating

2    those letters as Answers.  They are being filed with the Clerk.

3          MR. SPORE:  That is all that is necessary, then?

4          JUDGE CARTER:  For the time being.  We may later want

5    you to come in and put on some proof as to what your rights

6    are.

7          JUDGE HILLIARD:  Thank you, Judge Carter, again for

8    coming up here.  This could continue all night, as you know,

9    and I know that you want to get home.  On behalf of the

10   association in this group and all the people here, I want to

11   thank you very much.

12         JUDGE CARTER:  I'm glad to be here, Judge.

13         (Applause.)

14                        - - -

15

16

17

18

19

20

21

22

23

24

25