VOLUME NO. 47   Mr. Veeder

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.   1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      August 26, 1958

Pages:     1959 to 2083

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1959

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,                )
                                         )
                            Plaintiff,   )
                                         )
vs.                                      )
                                         )     No. 1247-SD-C
FALLBROOK PUBLIC UTILITY                 )
DISTRICT, et al,                         )
                                         )
                            Defendants.  )

- - -

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, August 26, 1958.

- - -

APPEARANCES:

        For the Plaintiff:      WILLIAM H. VEEDER, Esq.
                                WILLIAM E. BURBY, Esq.
                                Special Assistants to the
                                Attorney-General
                                Department of Justice
                                Washington, D. C.

APPEARANCES (continued):

        For U. S. Marine Corps:      COL. ELLIOT ROBERTSON
                                          LT. COL. A. C. BOWEN
                                          CMDR. DONALD W. REDD

        For Defendant Vail          GEORGE E. STAHLMAN,Esq.
        Company:

        For defendant State of     EDMUND G. BROWN, Esq.
        California:                  Attorney-General, by
                                            ADOLPHUS MOSKOVITZ,Esq.
                                            Deputy Attorney-General
                                            CARL BARONKAY, Esq.

        For defendants Fallbrook    F. R.SACHSE, Esq.
        Public Utility District,   PHIL D. SWING, Esq.
        et al:

- - -

1961

1   SAN DIEGO, CALIFORNIA, TUESDAY, AUGUST 26, 1958, 10:00 A. M.

2                               - - -

3           THE CLERK:   1 - 1247-SD-C, United States of America

4   vs. Fallbrook Public Utility District, et al.

5           THE COURT:   We have on the calendar the matter of

6   objections to interrogatories and the matter of defining

7   issues.

8           We have a pre-trial stipulation of facts, and I have

9   made certain rulings, and I would like to have demarked and

10  laid out the issues that remain to be tried in this case.   I

11  don't think it is too difficult a job.

12          MR. VEEDER:   May I tender a thought at the outset,

13  your Honor.   It might be important in the discussion of today.

14          The United States of America moves to dismiss the

15  Second Separate and Affirmative Defense of the Fallbrook Public

16  Utility District, which starts on page 16, paragraph 3 (a),

17  (b), (c), (d) and (e).

18          Similarly we move to dismiss the Second and Further

19  Distinct Defense of the Santa Margarita Mutual Water Company.

20          We move to strike from the pleadings of both the

21  Fallbrook Public Utility District and the Santa Margarita

22  Mutual Water Company the prayers pertaining to those two

23  defenses.

24          As we interpret your opinion, this Court does not

25

1662

1   have jurisdiction of the permits or the applications of the

2   Fallbrook Public Utility District.  Now those have been pleaded

3   affirmatively.  So we feel that those affirmative defenses, of

4   course, are out.

5           THE COURT:  Are you making an oral motion, or do you

6   have a written one?

7           MR. VEEDER:  I am going to tender a written motion,

8   your Honor.  But in the light of the discussions that were

9   coming up, it seemed to me that it would be a good idea to

10   have the matters before your Honor, because as I say those

11   affirmative defenses of the parties and their prayers relating

12   to applications and permits, as I understand it, are out of the

13   case, and in formulating the issues to be tried we think that

14   we should do it on the background of these motions and, I

15   assume, your Honor's order dismissing those phases of the

16   Answers of the parties.

17           THE COURT:  Do you have this ready to file?

18           MR. VEEDER:  I will file it at noon, your Honor.

19           THE COURT:  You are giving notice now that you are

20   going to file such motion.

21           MR. VEEDER:  Yes, because your Honor said that you

22   wanted to formulate the issues, and I thought that you should

23   know that the motion is going to be made.

24           THE COURT:  To strike from the Answers of the

25   Fallbrook Public Utility District and the Santa Margarita

1   Mutual Water Company.

2          MR. VEEDER:  Yes, your Honor.  In fact, that would be

3   tantamount to dismissal entirely out of the case of the Santa

4   Margarita Mutual Water Company.  Fallbrook has a small claim

5   of 2.5 second feet, which is the only wet water that they have

6   ever used.  As I understand your Honor's opinion, any un-

7   perfected right is out of the case.  So Fallbrook has the 2.5

8   second feet which we know she is claiming.  But any unperfected

9   rights necessarily are beyond the jurisdiction of this Court.

10         THE COURT:  Well, that is pretty broad language --

11  "any unperfected right."  I would have to see what you are

12  talking about.

13         MR. VEEDER:  I will formalize it, but I thought it

14  was essential that your Honor have it in mind.

15         THE COURT:  Mr. Sachse, we just started.  You didn't

16  miss anything.  I got your note.

17         MR. SACHSE:  Thank you.  I hope you did.  I phoned

18  ahead.

19         THE COURT:  Mr. Veeder just gave notice that he is

20  going to file a motion to strike certain parts of the Answers

21  of Fallbrook and Santa Margarita, in view of the opinion that

22  I have filed and in view of the fact that we wanted to

23  formulate the issues.

24         Another matter that I would like to discuss with you

25  is whether or not we could formulate a formal order on the

1964

1    dismissal of certain of the Government's Counts and comply with

2    the Rule and make the order an appealable one.  Whether that is

3    possible or not, I haven't analyzed it.

4           MR. VEEDER:  I have checked that, your Honor.  I

5    doubt very much, based upon an investigation of the law on the

6    subject, that there is anything appealable at this time.  I

7    believe that as long as any Count remains in the Complaint

8    that the order of dismissal would not be final in character

9    and would not be subject to review.  I may be wrong.  But the

10   cases so indicate -- Your Honor may rest assured that I took a

11   look at it -- and I came back disappointed.  I don't believe

12   that there is grounds for appeal here.

13          THE COURT:  What is the Rule on it?

14          MR. VEEDER:  I don't believe there is a Rule on it.

15          THE COURT:  Oh, yes.

16          MR. MOSKOVITZ:  Rule 54 (b), I believe, your Honor.

17   If there is an applicable rule, that is the one.

18          THE COURT:  Yes.

19               "When more than one claim for relief is

20          presented in an action, whether as a claim,

21          counterclaim, cross-claim, or third-party claim,

22          the court may direct the entry of a final judgment

23          upon one or more but less than all of the claims

24          only upon an express determination that there is

25          no just reason for delay and upon an express

1965

1        direction for the entry of judgment. . ."

2            So the real question is whether there is more than

3    one claim for relief.

4            MR. VEEDER:  I think there is a decision of the

5    Supreme Court on it, your Honor, which says -- this being a

6    quiet title suit -- that as long as there is grounds upon which

7    the issues can be tried it will be necessary to try it out and

8    then appeal the whole thing .  That is the way that I read the

9    cases.

10           THE COURT:  I don't know about the Supreme Court

11   cases.  There is a split in the Circuit as to the meaning of

12   this section.  I can get the cases and we can look at them.

13   The Ninth Circuit and the Second Circuit, in particular, are

14   not in accord as to the meaning of this Rule.  I have some cases

15   cited in my notes that we can check into later.

16           How do you want to proceed in this matter?

17           MR. VEEDER:  We want to go to trial on October 1, if

18   we can, your Honor.  We have formulated by agreement most of

19   the facts that are pertinent, I think, and if it is possible to

20   try out at least the important aspects of the case, then maybe

21   an appealable order might be entered on the basis of an in-

22   junction or something like that.  But we are afraid of a

23   piecemeal appeal, frankly, and we want to get this matter

24   settled.  The Marines have waited a long while to get Fallbrook

25   into court, and I'm quite delighted with your Honor's ruling

1  that we have finally got them here.  So the way to proceed,

2  I would assume, in view of the pre-trial agreements that we

3  have, is to go to trial.  Let's get this issue tried.  I went

4  through the agreed facts that we have.  I think they are in

5  good shape.  I think we understand your Honor's opinion.

6         THE COURT:  I want a list of the issues now that

7  remain to be tried.

8         Mr. Clerk, have you got my copy of that Complaint

9  that I let you borrow?

10        THE CLERK:  I'll get it, your Honor.

11        THE COURT:  You have a number of causes left there

12 that present a number of issues.  Has anybody turned a hand to

13 this matter of formulating issues?  Certain documents on

14 issues were filed sometime ago -- proposed issues.  I have a

15 file on some of that material in the office.

16        MR. MOSKOVITZ:  Your Honor, I took a look at those,

17 and it seems to me that your opinion has determined just about

18 all those issues that we said were in the case.

19        I am interested in exploring a little further, if we

20 can, the possibility of making these motions to dismiss

21 appealable.

22        It seems to me that the rulings that you have made

23 pretty much eliminate from the case the major bases on which

24 the United States may acquire the water rights which it claims.

25 Now the United States apparently does not agree.

1          It seems to me, from the little reading that I have

2     done, that these may be separable from those issues which

3     still remain.

4          THE COURT:  Yes, but the United States apparently is

5     not interested in an appeal, even if one could be obtained.

6          MR. VEEDER:  I have talked this over with the

7     Solicitor-General, your Honor, and we have no desire to appeal.

8     We want to cut through, we want to get this thing done.  We

9     have no desire for a piecemeal appeal, and we think that it is

10    a waste of time, frankly, to have the State of California

11    suggest to us that we appeal.  While I know that the good

12    offices of the State have all been with us, the fact remains

13    that we want to go to trial.  No appeals, no mandamus, no

14    prohibition.  The facts are with us.  We want to try it.

15         THE COURT:  Even that nice invitation I held out to

16    you about remand?

17         MR. VEEDER:  Your Honor has been so good to me, and

18    I read them in the same light.

19         THE COURT:  No, I was serious about that.  I felt

20    that it would give you some way to raise that question, if you

21    wanted to, before I remanded the case.

22         MR. SWING:  If your Honor please, I didn't get the

23    full import of Counsel's last remark about "no appeal, no

24    writ of prohibition, no mandamus."

25         I had noticed for this morning a motion on behalf of

1   Fallbrook to intervene as a defendant and respondent in the

2   mandamus proceeding, in which your Honor had, in one of your

3   pre-trial decisions, stated that on September 15 you would

4   issue an order remanding this case to the state court which

5   has been brought here by Mr. Veeder and his associates.

6           Now as Fallbrook is the real party in interest, it

7   seems to me that they should be permitted to intervene, so that

8   whatever action the Government takes or Mr. Dennis should

9   take on his writ of mandate, which was first taken to the

10   state court and then on the Government's insistence was

11   brought here, and which your Honor very reasonably and gener-

12   ously announced so that Mr. Veeder could have the advantage of

13   taking any course he wanted to that on the 15th you would

14   make an order remanding it back to the state court -- since

15   Fallbrook is the real party in interest, I have moved and

16   noticed for this hour a motion and a proposed Answer that we

17   will offer, if your Honor permits us,to intervene, so that we

18   can carry the burden which rightfully belongs to us as the

19   real party in interest. Notwithstanding Mr. Veeder's assuran-

20   ces, as I understood, that he was not going to seek any writ

21   of mandate, any writ of prohibition or appeal, I want to be

22   fortified, because sometimes the Government's attorney has

23   changed his position later on being, as he thought, better

24   advised in the matter.

25           So when the proper times come. I would like to have

1  this motion presented, and I hope that Mr. Veeder and Mr.

2  Dennis, if he is here or represented here, will not object to

3  our being permitted to intervene as the real party in interest

4  and file this Answer.

5          THE COURT:  Why should I rule on that motion?  If I

6  am going to remand the Water Rights Board case to the Superior

7  Court, why should I rule on the motion?  You have filed the

8  motion and you have noticed it.  If the case is remanded it

9  goes back to the Superior Court, and I take it that what happens

10 here -- filing your motion -- goes back with it.  Or you could

11 repeat your motion in the Superior Court.  Why should I attempt

12 to do anything in the case if I am remanding it on the grounds

13 that this court has no jurisdiction?

14         MR. SACHSE:  The reason, your Honor, is as stated by

15 Mr. Swing.  The motion was made solely to fortify us against

16 the possibility that a writ of prohibition might be sought.

17 We would, of course, have no interest, we would be not of

18 record, and there would be nothing requiring the United States

19 or anyone to advise us, in the present state of the files.  We

20 are the real party concerned, and we wanted to be protected

21 against the possibility of suddenly having this occur and then

22 being forced to appear perhaps as only amicus curiae without

23 the appeal rights that go to an actual party litigant.  It is

24 solely a protective act, and since your Honor does have

25 jurisdiction, since I can conceive of no reasonable objection

1  from anyone -- in fact, I have discussed it with Mr. Dennis

2  (I'm sorry he isn't here) and he said that it is all right with

3  him, and I have advised Mr. Stahlman that I was going to do it

4  and while I haven't had any stipulation or anything he said

5  that he had no objection -- I can't conceive why anyone would

6  object to our being made a party in the case at this time, if

7  we are going to be anyway, so that our **future conduct** could be

8  protected in the event of anything that may take place.  Mr.

9  Veeder has changed his mind before.  I don't doubt the sincerity

10 of his statement, but I would like to be in a position that if

11 prohibition or mandamus is sought we are a part of it.

12          MR. VEEDER:  I will say this.  I have never heard

13 such goings-on in my life.  As far as I'm concerned, there will

14 be no petition for prohibition, there will be no petition for

15 mandamus.  Mr. Rankin said so as recently as Saturday.  I went

16 to Pasadena and I went over the whole matter and he was as

17 delighted as I am that we finally got the mouse out of the

18 brush and we're ready to go to trial.  So as far as we are

19 concerned, we -- we have no desire for any appellate practice.

20 I like appellate work, your Honor, but I also like a trial, and

21 we want to get at it.

22          THE COURT:  Well, if Mr. Veeder states that he

23 doesn't intend to take any further steps, I can remand the

24 case today.

25          MR. SACHSE:  I assure your Honor -- this entire file

1  will probably go back to Judge Turrentine -- that I have no

2  preference as to who signs the order.  I just want to be part

3  of the case.  I don't care whether you sign it or whether

4  Judge Turrentine signs it.

5       As far as Mr. Veeder is concerned, he is not a party
6  to the case at all.

7       THE COURT:  But Mr. Sachse, I have jurisdiction to
8  determine whether I have jurisdiction of the case.  That sounds
9  kind of silly, but that is exactly the jurisdiction that I
10  have.  I have jurisdiction, when that case is removed over
11  here, to determine whether this court has jurisdiction in that
12  action, and I have determined that it hasn't jurisdiction and
13  I've said that I am going to remand it.  I was just delaying
14  to let the Government have a reasonable time to see what they
15  might want to do.  Now in view of my holding that I have no
16  jurisdiction in the case, I have no jurisdiction to let you
17  intervene.  You have a motion on file.  It will probably
18  accompany the file back.  If not, you can refile it.

19       I am willing to remand the case today, --

20       MR. SACHSE:  That would make us most happy.

21       THE COURT:  -- in view of Mr. Veeder's statements,
22  and have that done with right now.

23       MR. SACHSE:  I would strongly suggest, to avoid
24  retyping, that we leave the motion in the file, take it off
25  calendar, and the same documents will be presented to Judge

1  Turrentine.

2       MR. VEEDER:  Then I move to strike it.

3       MR. SACHSE:  You are not a party to the mandamus

4  proceeding.

5       MR. VEEDER:  I have the view, however, that I don't

6  want any motion of the character that is here lurking in this

7  file.  It's the most self-serving, argumentative thing I ever

8  read.

9       THE COURT:  I haven't read it.

10      MR. VEEDER:  Well, you should, your Honor.

11      MR. SACHSE:  It is not in this file.  It's in a

12  separate file.

13      THE COURT:  We are talking about number 2 on the

14  calendar, No. 2147, Santa Margarita vs. State Water Rights

15  Board.

16      MR. VEEDER:  I haven't the slightest doubt about

17  that.  But this complete argument in regard to the lawsuit is

18  in the Federal Court, and I see no reason for it being here at

19  all.  Your Honor has jurisdiction to say that he doesn't have

20  jurisdiction.  I can't see any reason for any more filings in

21  this court in regard to the removed case.

22      THE COURT:  I think I should have a formal order

23  remanding this.  You are not in a position, I suppose, to

24  prepare one for me today.

25      MR. SACHSE:  Fallbrook isn't even a party to that,

1975

1 ber we will be happy to do the typing.

2       THE COURT:  I'll draw it myself, then.  If I have

3 time, I'll dictate it to my stenographer and remand that case

4 today.

5       If you are making a motion to strike from the files

6 the motion that Fallbrook be permitted to intervene, I will deny

7 your motion.  I have no jurisdiction in this case except to

8 decide that this court has no jurisdiction.  I have decided

9 that I have't and the case goes back to the state court.  The

10 only problem in my mind was whether to do it at the time I

11 filed that opinion or to give you a chance to look around.  You

12 have said, 'I've looked the situation over.  We're not going to

13 do anything about it.'  All right, let's remand it and get it

14 out of here.

15       MR. VEEDER:  Fine.

16       MR. SACHSE:  Just so that I am quite clear, your

17 Honor,  that there will be a remand and that the present pend-

18 ing documents will accompany the file back to the Superior

19 Court.

20       THE COURT:  I suppose they will.  I don't know.  I'm

21 not striking them out of the file.

22       MR. SACHSE:  We will check with that your there.

23       THE COURT:  I have declined to rule on the motion

24 of Fallbrook to intervene in No. 2147, I have denied Mr. Veeder's

25 oral motion to strike these documents, and I will today sign an

order remanding No. 2147 back to the state court.  That takes

1    care of that.

2            The Clerk is going down to try to find these interro-

3    gatories.  I don't have them before me.

4            How long is it going to take us to go over these

5    interrogatories?

6            We are back in No. 1247.

7            MR. SACHSE.  I don't know that the record is entirely

8    clear on my objections to the United States, and I think I

9    should make it clear.

10           Your Honor will recall that we left the question of

11   certain replies to Fallbrook's interrogatories simply hanging

12   in the air on the understanding that Mr. Veeder would get the

13   answers.  As far as I am advised, he has done a good job and I

14   haven't any complaints at this moment.  So any complaints that

15   Fallbrook has or had or that may still appear in the file, any

16   objections to answers, can be regarded as settled and done

17   with.

18           THE COURT:  That's all there is, isn't it?

19           MR. SACHSE:  Mr. Veeder has, however, still the

20   privilege, as I understand it, of insisting that I reply to

21   his interrogatories to which I objected and which motion was

22   noticed repeatedly and continued specifically to this date,

23   and from what he told me on Friday I assume that he wanted to

24   talk about our answers to his interrogatories.

25           MR. VEEDER:  Yes.

1    MR. SACHSE:  I have none.  He is carrying the ball.

2    MR. VEEDER:  Yes, we handed to Fallbrook a bouquet

3    with 77 interrogatories, and they didn't answer them.  Now I

4    admit that 12178 and 12179 or any unperfected rights of Fall-

5    brook is out of this case.  But they are claiming 2.5 second

6    feet.  Now the interrogatories relate to everything.

7    THE COURT:  Now wait a minute.  You have submitted

8    about 77 interrogatories?

9    MR. VEEDER:  Yes, sir.

10    THE COURT:  Did Fallbrook answer any of them?

11    MR. SACHSE:  Yes, sir.

12    MR. VEEDER:  Some.

13    THE COURT:  Do you have a list of the ones that they

14    object to that they haven't answered?

15    MR. VEEDER:  Yes, sir.  There are very few that they

16    responded to.

17    THE COURT:  All right, I am going to take a short

18    recess and let you gentlemen go over those and eliminate those

19    which are disposed of by my opinion.  Now any interrogatories

20    that concern these applications are out of the case, as far as

21    I'm concerned.  Let's find out the numbers of the interrogator-

22    ies that we have to talk about.  Can't you do that in a few

23    minutes?

24    MR. SACHSE:  Yes.  I think we could speed this up

25    even more if you could give us one advance indication of your

1        thinking.

2               I have repeatedly objected to and refused to answer

3        interrogatories of the United States asking us to state what

4        the dam will cost, how long it will take to construct, submit

5        detailed plans for outlet works, etc.-- questions pertaining

6        to the physical structure.  I have refused to answer them

7        because I contend that they are no part of the issues in this

8        case.  They are absolutely and completely irrelevant and

9        immaterial.  The dam will have to be constructed under orders

10       of the Division of Dams of the Department of Water Resources

11       and not under orders of this Court, except insofar as your

12       Honor tells us how to operate.

13              But I would like an indication of that before I sit

14       down with Mr. Veeder.

15              MR. VEEDER:  Before your Honor leaves the Bench, I

16       would like to interrogate Counsel in this regard.

17              Do I understand, Mr. Sachse, that you have now

18       abandoned your affirmative plea in your Answer where you claim

19       the right to 30,000 acre feet of storage?

20              MR. SACHSE:  You understand nothing of the kind.

21              MR. VEEDER:  Your Honor, if I properly construe your

22       Honor's opinion, 12178 and 12179, which are the storage right

23       claims, are out of the case.  Now if that is the case, then we

24       will abandon a great deal of our interrogatories, because if I

25       understand correctly Fallbrook is not in a position to claim

1   in this court any storage rights.  So that will eliminate --

2   indeed, it will put Santa Margarita Mutual clear out of the

3   case -- but it will certainly eliminate the need to respond to

4   these interrogatories, all of which pertain to the construction

5   of this ephemeral dam that they have been talking about all

6   these many years and concerning which they don't desire to

7   litigate.

8           Now if that is the case, and if I correctly inter-

9   pret what your Honor has said, certainly the rules that you

10  applied to our Supplementary and Amendatory Complaint should

11  be applied to their Answer.

12          So under those circumstances I think that Mr. Sachse

13  and I -- it will be a strange sensation -- will get along very

14  well on quite a number of these things, because we simply say,

15  "As far as we're concerned, there is no dam."

16          But we are interested, though, in the number of

17  irrigated acres, the number of acres within this Public Utility

18  District that have water from other sources than their claim

19  to Santa Margarita.  That kind of claim we think is important

20  because of their 2.5 second feet claim.

21          MR. SACHSE:  Your Honor, I'm a little at a loss.  I

22  can't follow Mr. Veeder correctly.

23          THE COURT:  I got lost somewhere along the line.

24          MR. SACHSE:  To use his words, I certainly fell off

25  the sled.  I thought that if anything was understood it was

    that Fallbrook claims the right to store some water.  We think

1   your Honor's opinion has said that you recognize the validity

2   and substance of these permits and that you are not going to

3   reconsider them.  But that doesn't mean that they are out of

4   this case.  Your Honor still reserves the absolute right, as I

5   understand your opinion, to impose conditions on how we do

6   this to protect the United States.  Now maybe it doesn't.  If

7   it doesn't, then that's great -- then I won a bigger victory

8   than I thought.

9          But I am definitely of the opinion that our rights

10  are in the case and are to be catalogued.

11         Now that is point number one.

12         As to these other questions, I don't think your

13  Honor cares -- I've said this many, many times -- I don't

14  think your Honor cares in the least whether a dam is built.  I

15  don't think he cares how high, how thick, how wide it is or

16  anything else.  What he does care about is how much water is

17  allowed to go through and under what conditions.  I don't think

18  your Honor is going to second-guess the Department of Dams of

19  the State of California.  I think that is something that is

20  out of this case and I would like to get rid of it.  I am not

21  going to answer these questions unless your Honor orders me to

22  answer them.

23         THE COURT:  It seems to me that you men are making a

24  simple matter difficult.  If Fallbrook ever builds a dam, I

25  haven't any doubt about what I'm going to do.  I'm going to

1   say that this Court is going to have something to say about

2   how that dam operates and what effect it has upon the flow of

3   the River that would ordinarily come down that stream.

4         But I don't think I should go into a lot of inquiry

5   at this time as to when you are going to build it, or how big

6   it is.  Let's cross those bridges when we get to it.  Why

7   complicate this case with interrogatories as to whether they

8   can finance a dam -- maybe they can -- as to when they are

9   going to build a dam, or that sort of thing?  This Court will

10   reserve jurisdiction to consider later on any problems about

11   a dam, if and as they get ready to build a dam.

12         MR. VEEDER:  Your Honor, I look at it this way -- and

13   I am pleased to have this unravelled a little bit.  Your Honor

14   dismissed from our Supplementary Complaint any reference to any

15   applications or to any permits or to any factors relating to

16   unperfected rights.  Now if Mr. Sachse is going to attempt to

17   put in evidence in support of his Second Affirmative Defense,

18   which I have moved to dismiss -- and we will make a formali-

19   zation of it, then I have to confess that I am completely in

20   the dark as to the meaning of what your Honor has stated,

21   because you have declared that those matters are before a

22   state tribunal.  So how in the world can Mr. Sachse drag them

23   in with a Second Affirmative Defense when we can't get them

24   in, in a Supplementary Complaint?

25         MR. SACHSE:  I'm willing to take a quick crack at

1   that, your Honor.

2           This is a quiet title action.  You have directed

3   every one of us to come in and set forth our rights.  That is

4   what we have done.  Mr. Veeder has tried in the De Luz hearings

5   with me this exact situation on permits and applications of

6   other people before the State Department of Water Resources.

7   Our Second Affirmative Defense sets forth the rights that we

8   contend we have in this River, and they are certainly in the

9   case.  They have got to stay in the case.

10          MR. VEEDER:  I truly don't understand that at all.

11          THE COURT:  I can't follow you on that.  Your Counts

12  that were dismissed were dismissed because of the nature of

13  the claims you asserted on them.  If you want to go down the

14  list --

15          MR. VEEDER:  I have them here, your Honor, and we've

16  gone through this very, very carefully.  We took a look at the

17  matter from the standpoint of the issues which are presented.

18  If your Honor will turn to page 8, we refer to 12178 and 12179,

19  which are the applications of Fallbrook to store water, and

20  your Honor --

21          THE COURT:  Just a minute.  You are referring to

22  your Count II, which I dismissed?

23          MR. VEEDER:  That's right.

24          THE COURT:  You referred to the applications, it's

25  true.

MR. VEEDER:  That's right.

THE COURT:  You have no cause of action by referring to them.  Let's see what you said.  In paragraph III you say: "By failing to assert in its Answer its claimed rights to these applications, Fallbrook has abandoned in this litigation and is precluded from claiming in this litigation any rights by reason of these applications."  Now that's what you rely upon for a cause of action.  I say that it goes out.  That is no cause of action.  That does not mean that I may not consider these applications.  Your cause of action, if you have one, in view of my ruling about your incorporation by reference, rests upon your three paragraphs, and the gist of that is that Fallbrook has abandoned these applications and is, therefore, precluded from claiming any rights under them.  I say that goes out.  You haven't stated anything.

MR. VEEDER:  The reason why your Honor stated that it went out is that your Honor says that those matters are pending before a state tribunal, and I refer your Honor to your opinion.

THE COURT:  Yes, they are.  The tribunal will decide whether there are any rights under those applications.  But that is only part of the picture.  The tribunal will decide that.  But you have tried to predicate a cause of action, in II, on the ground that Fallbrook has abandoned these applications and is, therefore, precluded from claiming any rights.  I say that that is not good.

1    MR. VEEDER:  If your Honor proceeds to Count III --

2    THE COURT:  All right.

3    MR. VEEDER:  -- and just go straight down the line

4    on each one of those, and if I understood your opinion --

5    THE COURT:  All right, let's go down the line here.

6    In Count III you again refer to these applications,

7    and you talk about how there was 10,000 feet from Rainbow and

8    10,000 feet from Sandia, with their minor tributaries, and

9    that subsequent to the initiation of this action Application

10   12178 changed the project and 12179 changed it, and in para-

11   graph V that Fallbrook has greatly and drastically increased

12   its demand over the already over-apportioned Santa Margarita

13   River.

14   Now what you are there asking me to do is to say that

15   by the amendments to the applications the amended applications

16   become, in substance, new applications and therefore you are

17   prior in time to the new applications by Fallbrook.  That is

18   not a matter for me to decide.

19   MR. VEEDER:  All right.  Now that is how I interpret

20   your Honor's opinion.  In other words, it is not for this Court,

21   in your Honor's view, to decide whether Fallbrook has or has

22   not proper applications.  If that is true -- if that is the

23   basis of your Honor's opinion, then I respectfully submit that

24   12178 and 12179 are out of the case completely and entirely.

25   THE COURT:  They're not out of the case.

1          MR. SACHSE:   May I ask a question, your Honor.

2          THE COURT:   Applications have been made, they are now

3     pending before a state agency, and when the mandamus proceed-

4     ing is heard and the decision becomes final, there may be

5     something in connection with those applications that we will

6     have to take into account.   But you can't do it this way.

7          MR. SACHSE:   May I ask Mr. Veeder a question, your

8     Honor.

9          Mr. Veeder, what does the first one of your "Where-

10    fore's" mean in your Complaint?   Your very first prayer is

11    that all defendants named in this action be required to answer

12    the Complaint and Supplementary Complaint and set up fully

13    their claims to rights in the River.   We've done it.   They are

14    set up in front of you.

15         MR. VEEDER:   You have struck them down, your Honor,

16    and I submit that that is the import of your Honor's opinion.

17         THE COURT:   I haven't struck the applications out

18    of the case anywhere.   I have struck out causes of action

19    which you purported to spell out based on some theory that I

20    could make some adjudication of these claims.   These claims

21    may ripen into rights.   If they are rights on the River, they

22    will be taken into account by the Court.

23         But you are attempting unduly to complicate a quiet

24    title action by attempting to predicate a lot of causes of

25    action based upon an asserted invalidity of certain claims.

1   You fly right in the face of quiet title law.  The law is clear

2   in a quiet title action that you must prevail on the strength

3   of your title and not on the weakness of the defendant's title.

4          MR. VEEDER:   I have no problem there at all.   The

5   reason I brought about this conversation or colloquy or what-

6   ever it is between Court and Counsel is to know why, then,

7   should we not have responses to our interrogatories?  Because

8   if they are in here claiming any rights whatever in the River

9   by reason of their applications, we are certainly entitled to

10   know the number of acres of land upon which they intend, or

11   purport to intend, to apply water for purposes of irrigation.

12   Now that's one of the interrogatories.  We want to know how

13   many acres of land do you intend to irrigate, and what --

14          THE COURT:   Well, now, we can't hear this all at one

15   time.  I want you to go over them first.  Some of those I may

16   require them to answer.  I am not presently inclined to make

17   them answer a lot of these questions about this proposed dam.

18          MR. VEEDER:   But what about financial feasibility?

19          THE COURT:   What could I decide on that?

20          MR. SACHSE:   It has absolutely no place in this court.

21          THE COURT:   Is it my job, in quieting title of the

22   Government to their rights on the River, to decide whether

23   Fallbrook builds a dam or not?

24          MR. VEEDER:   I believe that under Rule 33 of the

25   Federal Rules of Civil Procedure, your Honor, that we are

1985

1    entitled to know the place where Fallbrook intends to use the

2    water, we are entitled to know when they intend to build their

3    dam, we are entitled to know those things in the preparation of

4    our case.   That is the whole objective of the discovery pro-

5    cess, and that is the reason I brought this conversation around

6    as I have, your Honor.   I want to know whether they are going

7    to be permitted to put in evidence in regard to their alleged

8    dams.   If they are, we are, in the course of our preparation,

9    entitled to know the responses and to have responses made to

10   our interrogatories.

11          THE COURT:   Why should this court, at this stage of

12   this litigation, try out any issues about this proposed dam?

13          MR. VEEDER:   Because, your Honor, if they cannot

14   finance a dam -- and I don't think they can -- then it is

15   manifest, under the laws of California, that they are not

16   entitled to any claimed rights to the use of water on the Santa

17   Margarita River.   Now that is a cloud on our title, it remains

18   a cloud on our title as long as they are asserting these

19   spurious claims, and in the preparation to defend against these

20   spurious claims we have the right to have responses to those

21   interrogatories; in regard to financial ability, we also have

22   the right, I respectfully submit, to know the acreages --

23          THE COURT:   Maybe you have a right to some of that.

24   Let's see what we have got.   The Government claims rights on

25   the River.   The Government has substantial rights through the

acquisition of the Rancho Santa Margarita.  It is the purpose
of this Court to adjudicate what rights the Government has.  It
would be the purpose of the Court to indicate that water on
certain property is not part of the River and get that out.
You have in the case, then, certain people who have on this
River certain riparian rights, certain prescriptive rights,
the rights that have been adjudicated, etc.  State agencies
are determining whether or not the Government may appropriate
water.  It may be an academic question except as to flood-
waters.  I have said before in this Court that it is hard for
me to believe that there is very much unappropriated water on
the River in this semi-arid country, except floodwaters in
exceptionally rainy seasons that flow into the ocean.

       Now if the State agencies want to say that Fallbrook
has a right to appropriate some floodwaters, that's their job,
and when and if they have done it and the thing becomes
final certainly at that time I will take into account what
type of right they were accorded.  Up to that time I will take
into account the fact that there is an application pending
for that right; it is in the process of being adjudicated by
the State authorities.  When it is adjudicated, I will take it
into account.  But when I take it into account I will, first
of all, say that nothing that that agency has done can impinge
upon the prior vested right on the River.  The agency hasn't
purported to do that.  It can't do it.  With anything left

1    over above vested rights the State agency may have some right

2    to deal.

3         Now there is talk about a dam.  Any decree that I

4    render in this case is going to say that this Court reserves

5    jurisdiction to determine whether or not any dam built on this

6    River interferes with the flow of water that would ordinarily

7    pass the site where the dam is located and interferes with

8    water that should properly pass that point.  But that is a

9    mechanical matter.   Why are we, therefore, concerned about the

10   dam, if until they build the dam the water flows down the

11   stream?

12        MR. VEEDER:  Your Honor, the whole objective of a

13   quiet title suit at this juncture and the reason why we brought

14   this suit prior to the time that they built their dam was to

15   have an adjudication in regard to the priorities, and I submit

16   to your Honor --

17        THE COURT:  We'll get to that.

18        MR. VEEDER:  The point that I desire to interpose

19   now is this:  Do I construe your Honor to mean that before

20   Fallbrook can have tried out in this case the question of its

21   right to build a dam it must first build a dam?  That's very

22   important.

23        THE COURT:  You have no action here to restrain them

24   from building a dam.  This is a quiet title action to the rights

25   to the waters on the River.  You have a lot of talk in here

11988

1  about a dam, but I see nothing in here where you attempt to

2  restrain anybody from building a dam, and I doubt if --

3          MR. VEEDER:  I doubt if you would give us an injunc-

4  tion.

5          MR. SACHSE:  So do I.

6          THE COURT:  That isn't what I was going to say.

7          MR. VEEDER:  Excuse me, your Honor.

8          THE COURT:  But you can guess or speculate.

9          MR. VEEDER:  Well, Mr. Sachse and I will discuss

10 this, then, your Honor.  If he is willing to agree to anything,

11 we can eliminate some of them.  But the ones that strike me as

12 most important, frankly, and the ones that I desire to move on

13 most rapidly relate (1) to the financial inability to build a

14 dam, which I submit is very important, and (2) I am extremely

15 interested in our claim that Fallbrook is acting ultra vires

16 as of the moment.

17         THE COURT:  Mr. Veeder, let me ask you how it makes

18 any difference to the Government at all whether they build a

19 dam or not (1) if the rights that the United States has on

20 this River are catalogued and it is determined what rights you

21 got when you purchased the Rancho Santa Margarita and what you

22 got thereafter by prescription or use, or both; (2) Fallbrook

23 has never asserted -- I will not say that it doesn't assert

24 any riparian rights at all; it condemned some land on the

25 River, and I don't know what we are going to do about that

1   issue -- but Fallbrook has claimed only a right to unappropria-

2   ted waters over and above the vested rights on the River;  (3)

3   the State agency is going to determine whom they are going to

4   let appropriate this supposed unappropriated water, and the

5   state agency, when final determination is made, will make that

6   determination subject to the vested rights on the River?   Now

7   with those premises, how can the Government be hurt?   Plus (5)

8   that anything they do on that River this Court is going to see

9   will not interfere with the rights that the Government has

10  downstream to its water.   That's a mechanical problem.   If the

11  Government is found to have certain rights to the water flowing

12  in that stream, it can be worked out mechanically.   Any dam

13  that is built will have to see that that water goes by -- is

14  released.   Now how can the Government be hurt?   Why does the

15  Government even worry about what they want to do up there?

16         MR. VEEDER:   Because as long as Fallbrook is making

17  the claims that it is, it is clouding our title and it is

18  affecting our rights, and until --

19         THE COURT:   We will dispose of the clouding of the

20  title.   We'll say what your rights are.   The State agencies

21  will have completed their work, undoubtedly, before we get

22  through, and we'll say what appropriative rights Fallbrook has,

23  that they are subject to your vested rights, that they have

24  some rights over and above what the United States and other

25  people have on the stream, and if they can catch some floodwaters

1    some day coming down, all right, as long as there are proper

2    arrangements made that any structure on the stream does not

3    interfere with the vested rights of the people below that

4    structure.

5         I think that Fallbrook all along has conceded that

6    they have to take that into account.  Why are we concerned

7    about this dam?  It may never be built.  We don't know.  Maybe

8    it will be built.  But when we get through with this case,

9    your title to your rights will not be clouded.  The Court will

10   determine what rights the United States has.  The Court will

11   determine that there is continuing jurisdiction in this Court

12   to see that nothing in the way of a structure interferes with

13   those rights.  And if they can get some unappropriated water,

14   more power to them.

15        MR. VEEDER:  All right, we'll go ahead with the

16   interrogatories, then, your Honor.

17        THE COURT:  All right, look them over and see if

18   you can weed out the ones on which I am to pass.

19        Mr. Clerk, see if you can find the interrogatories

20   in the file and the objections thereto.

21        (RECESS)

22        MR. VEEDER:  Your Honor, we have, as directed by

23   you, undertaken a review of the interrogatories served by the

24   United States of America upon the Fallbrook Public Utility

25   District, and Mr. Sachse is continuing with his objections

1   respecting all matters pertaining to the kind and type of dam,

2   the kind and type of operation, the kind and type of financing,

3   and by and large has objected to virtually every interrogatory

4   that we have tendered where he has been able to give us the

5   figures he has, such as the diversions of water and the quanti-

6   ties diverted and the times.

7            We still feel, your Honor, and we will continue to

8   press our position in this regard, that these are matters that

9   are relevant to the preparation of our case.

10           We believe that necessarily we will want the record

11  to show objections to your rulings.  You have, as I understood,

12  already ruled that from the standpoint of the dam the type of

13  dam and the financing of it you do not believe would be

14  relevant in this case.  Is that right?

15           THE COURT:  Well, it's premature.  The time may come

16  when I will very definitely have to talk about a dam.  But

17  it's premature.

18           MR. VEEDER:  In other words, because there are quite

19  a number of them, I want the record to show our objection to

20  your ruling, although it is not necessary for the maintenance

21  of the record, in regard to sustaining Fallbrook's objections

22  to these interrogatories, the interrogatories pertaining to the

23  dam and the financing of it -- that's all I have talked about

24  up to now.

25           We are, however, concerned with the acreages within

1  the service area of the Fallbrook Public Utility District

2  which will be demanding water.  We believe that that's an issue

3  in this case.  We believe that the burden on the stream will be

4  measured by the irrigated and irrigable acreage within the

5  service area as presently constituted and the service area --

6  THE COURT:  That can't ever be the measure of the

7  burden on the stream.  The burden on the stream will be what

8  water, if any, is left over after the vested rights in the

9  River are catalogued, and what rights Fallbrook gets from

10  State authorities to use some or all of that unappropriated

11  water.  What they might want to do with it, how many acres they

12  might want to irrigate can't have any bearing on it.  If there

13  is that water available, they can use it the way they want to

14  use it.  I may require some answers to those.  I don't know.

15  But that is not the measure of their right -- how much they

16  need.

17  MR. VEEDER:  Your Honor, I respectfully submit, in

18  that regard, that the criterion which I believe would be the

19  prime guide in this case is the matter of beneficial use.  I

20  don't believe that the Fallbrook Public Utility District or

21  anyone else  is entitled to a right to the use of water

22  without proof as to its need, place of use, method of appli-

23  cation and procedures for distribution.

24  If I understand your Honor, you disagree on that,

25  and that we are not entitled to that information.  Is that

1    correct, your Honor, because --

2         THE COURT:  I'm not ruling on these now.  You are

3    presenting to me, I thought, the numbers of some interrogatories

4    that might be disposed of without my considering them.

5         MR. SACHSE:  Let me take a crack at this, your Honor.

6    I want to cooperate with Mr. Veeder.  I am glad to give him

7    this information on No. 46.  But I can't.  I don't have this

8    kind of records.  Nobody keeps them at Fallbrook.  We are not

9    a farm agency.

10        MR. VEEDER:  No. 46 is extremely important to us:

11             What acreage within the service area of the

12             Fallbrook Public Utility District is presently

13             or will be planted to avocados, citrus or other

14             crops?

15   That is important to us.

16        MR. SACHSE:  In the first place, what is going to be

17   planted?  We don't have a crystal ball.  In the second place,

18   we serve water to our consumers, and whether they put it on

19   strawberries or avacados or give it to the pigs I don't know.

20   We have absolutely no way of giving Mr. Veeder that information,

21   unless we run a census of some kind.

22        MR. VEEDER:  Your Honor, I submit that when a man

23   claims a right to the use of water from a stream, the proof

24   entails the showing of the need for water.  You are not going

25   to take judicial notice, I assume, of Fallbrook's needs

1    without proof.

2          MR. SACHSE:  Your Honor, we can tell Mr. Veeder --

3    and we'll be happy to do it without the necessity of written

4    interrogatories -- we can tell him how many meters we have,

5    we can tell him the amount of water that we have delivered to

6    those meters, we can tell him fairly accurately how many acres

7    are presently under irrigation, from the District, although

8    that would necessitate another estimated calculation; but I

9    can't tell him how many acres are in avocados, how many are in

10   citrus, or how many are in other crops, and I can't tell him

11   how many acres will be planted.

12         MR. VEEDER:  I would like, then, to have a specific

13   ruling, if I could, your Honor, if your Honor has before you

14   the interrogatories which start at 43, because you have already

15   said that the financing was not your concern.   Interrogatory

16   No. 43, however, involves this new 3,000 acres of land that they

17   intend to bring in, and we are, of course, interested in

18   knowing whether water is going to be used there or not, how

19   they are going to finance the construction of that area in

20   there.

21         THE COURT:  How are you concerned with that?   So

22   long as the Court effects your vested rights on the River,

23   and if they get water from the State authorities, how are you

24   concerned where they use it?   I can't follow you on that, Mr.

25   Veeder.

1995

1    MR. VEEDER:  Your Honor, as far as I am concerned, I

2    think your Honor knows that I am simply making a record now,

3    and I think, frankly, that before the Fallbrook Public Utility

4    District could possibly have a priority decreed to it or its

5    rights chronicled it will have to show a present use of water

6    and then it will have to show the potential use of its claimed

7    inchoate rights.  Now I submit that if they don't do that, we

8    will move for judgment against them, of course, and --

9    THE COURT:  Well, I suppose it is true that a right

10   must be used in accordance with California water law, and you

11   can lose that right after you have obtained it.  There might

12   be circumstances where it never really ripened into a license,

13   and even after it ripened into a license it could be lost.

14   MR. SACHSE:  That isn't question 43.  Question No. 43

15   states:

16        Will revenue bonds be issued based upon

17        income to the Fallbrook Public Utility District

18        or based upon the alleged 3,000 acres?

19   THE COURT:  I was not looking at any particular

20   section.  I was just thinking generally as to some of these.

21   MR. SACHSE:  Again, I will try to answer Mr. Veeder

22   how many acres are irrigable, and how many acres are planted --

23   THE COURT:  I thought that you were going to give me

24   some list that we could eliminate.  If not, I will start in

25   down the line and make some rulings on these matters.

1596

1   MR. VEEDER:  I think that is the thing to do.  Does

2   your Honor have the interrogatories before him?

3   THE COURT:  Yes, I found two copies.  The Clerk can't

4   even find the original on file, but I can let him have one of

5   these copies.  They are obviously both copies.  I can let him

6   have one to be filed.  They apparently were never filed.  I

7   don't know what happened to the original.

8   MR. VEEDER:  The original was filed.

9   MR. SACHSE:  No, your Honor.

10  THE COURT:  I can't find it.

11  MR. SACHSE:  The original typed sheet was apparently

12  served on me, because the one I have in my file is an original.

13  There was apparently some error in Mr. Veeder's mailing.  I

14  didn't realize that you didn't have one.  But this is the

15  original.

16  THE COURT:  Apparently you have the original.  There

17  is no harm done.  Here is a copy -- check with yours, Mr.

18  Sachse -- it is dated April 21.

19  MR. SACHSE:  That is the one, and this is signed

20  original -- J. Lee Rankin and Mr. Veeder.

21  THE COURT:  We will assume that it is the original.

22  I will give it to the Clerk.

23  Does yours have a filing stamp on it?

24  MR. SACHSE:  No, sir; this came to me in the mail.

25  THE COURT:  It will be filed now nunc pro tunc as of

1    April 22, 1958.

2            MR. SACHSE:  I'll be happy to give up this original,

3    but I have worked on it.

4            THE COURT:  A copy is just as good, if nobody

5    objects to the fact that it is not signed by Mr. Veeder and

6    Mr. Rankin but merely has their names printed on it.

7            Let me look at these interrogatories.

8            MR. VEEDER:  Your Honor, if you will look at

9    interrogatories 1 through 9, there are objections.

10           MR. SACHSE:  Not quite, your Honor.  One of those is

11   answered, or two or three are answered.

12           MR. VEEDER:  You will find objection to interroga-

13   tories 3, 4, 5 and 6 to start.

14           THE COURT:  I have the interrogatories and the

15   objections before me.

16           MR. VEEDER:  We think it is important to know when

17   Fallbrook is going to undertake the construction of the dam.

18           MR. SACHSE:  I answered.

19           MR. VEEDER:  They said that they don't know.

20           THE COURT:  How about letting me look at these now?

21   Sit down and let me look at them.

22           MR. VEEDER:  All right.

23           THE COURT:  We're not getting anywhere here.

24           Before I proceed, Mr. Moskovitz -- you've been a

25   help to this court from time to time -- what is your view, in

1    a few words, as to how these pending applications and the

2    actions of the State Board on finally determining the right to

3    appropriate alleged unappropriated water would fit into the

4    trial of this case?  And secondly, what is your view on this

5    "dam" talk -- this talk about a dam?

6          MR. MOSKOVITZ:  On the applications and permits, it

7    would seem to me that the Court could, and probably should,

8    include in the decree a recital of what outstanding applica-

9    tions and permits are of record before the State Water Rights

10   Board, a recital of the facts as shown by the introduction of

11   certified copies.  The recital, if there are applications,

12   would not mean that there is anything more at that time than a

13   right to proceed and possibly get a permit and, if action is

14   taken under the permit, to get a license and therefore to get

15   an appropriative right and then be entitled to a license.  It

16   wouldn't be an adjudication that these people have a vested

17   right.  Similarly, when you recited that there was a permit,

18   this means that the people could, by proceeding under a

19   permit, using water pursuant to the permit and its conditions,

20   perfect a right.

21         THE COURT:  Well, now, suppose that the State pro-

22   ceeding is entirely completed and final by the time the final

23   decree comes down.

24         MR. MOSKOVITZ:  I think that that should be recited,

25   and if there has actually been use under the permit I think

1    that use, which of course would be taken into account by the

2    State Water Rights Board in issuing the license, could be

3    taken into account by the Court in declaring that a vested

4    right had actually been acquired and would be catalogued in its

5    proper place in a list of appropriative rights.

6              THE COURT:  Well, am I to be concerned with where

7    water is to be used, how it is to be used?  The reasonableness

8    of the use?

9              MR. MOSKOVITZ:  Your Honor, I want to give this some

10   more thought, but as of this time it seems to me that before

11   you could decree that there was a vested appropriative right

12   you would have to have evidence before you which showed that

13   the water had been put to use.

14             THE COURT:   And it would follow also that even if I

15   found that there was a vested appropriative right under

16   California law, some change in the conditions could result in

17   a loss of that right.

18             MR. MOSKOVITZ:  That is correct.  This could always

19   happen.

20             Prior to the time that use had been made, prior to

21   the time that the right had become perfected, I think that you

22   should recite what actually had gone on before the permit had

23   been issued.  But this would not be, as I say, the decree of

24   a vested right, because more would have to be done.  To decree

25   a vested right, I believe that you would have to receive

1   evidence that the water had been used pursuant to the permit,

2   because use of water outside the conditions of the permit

3   would not ripen into a vested right, under California law.

4           This is my present view.  I have not given it

5   extensive thought, your Honor.

6           As to the second question -- if you would like me to

7   get into that --

8           THE COURT:  All right.

9           MR. MOSKOVITZ:   -- it seems to me that as of this

10  time what is before you with respect to Fallbrook, with the

11  exception of this 2 1/2 second feet that they claim under a

12  license, but under the permits of Fallbrook there has not been

13  use, there has been no construction of the dam or the works

14  for the delivery of the water, and what those works will be

15  and what the dam will look like and when it will be built I

16  think is irrelevant.  Because as I mentioned before, what you

17  would recite in your decree, unless something more had actually

18  been done, it would be merely the existence of of a permit.

19  So it does seem to me that in any event the physical details

20  of the dam would be irrelevant.

21          THE COURT:  At this time.

22          MR. MOSKOVITZ:  At this time.  And I think that the

23  physical details of the dam would be irrelevant except to the

24  extent that the release of water through it to satisfy down-

25  stream rights is brought into focus.

THE COURT:  Well, that the dam was so constructed that these waters could be released.  The problem of the dam and its impingement upon the vested rights below would certainly be an inquiry that this Court could go into at the proper time.

MR. MOSKOVITZ:  That is correct, your Honor.  But there are so many details about the dam which do not affect that whatsoever.  The financing, for example, I think is wholly irrelevant.

THE COURT:  Mr. Sachse, Fallbrook has been condemning land on the River, and I take it that when you have condemned this land you have acquired the fee simple --

MR. SACHSE:  Yes, sir.

THE COURT:  -- including the water rights.

MR. SACHSE:  We acquired the fee in the land, and much of the land is riparian.

THE COURT:  What have you done about the water rights on the riparian land that you have acquired for the dam?

MR. SACHSE:  We have done nothing.  The riparian rights are still attached to the land.

THE COURT:  What is your position going to be on that?  That Fallbrook then claims riparian rights in this stream by virtue of the land that you have condemned?

MR. SACHSE:  That is an extremely complicated question, and I will try to explain what our position is, briefly.

1        Insofar as riparian rights attached to any land

2    condemned -- of course, it will be flooded, theoretically --

3    there aren't any more riparian rights.  They're gone.  The

4    land that we actually, physically take for the dam, those

5    riparian rights are gone.

6        THE COURT:  After the dam is built.

7        MR. SACHSE:  That is correct.

8        THE COURT:  But until the dam is built?

9        MR. SACHSE:  That is the next point I am coming to.

10       What we have done, in all voluntary settlements --

11   we can't do this in the eminent domain proceedings, as your

12   Honor will well appreciate -- but when there has been a

13   voluntary agreement, the landowner has reserved to himself for

14   the remainder of his land the riparian rights from the part

15   taken and has an agreement on our part that he can continue to

16   exercise those rights until such time as an alternative system

17   is provided by the District.

18       In other words, that is to prevent thse people whose

19   land we have severed from drying up their groves or being

20   unable to get drinking water.

21       So at the time that the dam is finished and distribu-

22   tion works are constructed, those people will cease to exer-

23   cise their riparian right -- they won't be sucking out of the

24   dam.

25       Now we, however, have attempted in that instrument --

1 and I'm frank to say that I hope it is legally valid, but I'm

2 not certain -- we have attempted in that instrument, then, to

3 make us their agent for delivery of their riparian water to

4 them.  Whether that will work or not I don't know.

5          But insofar as the effect of the dam on the River is

6 concerned, I agree entirely with what Mr. Moskovitz said.  How

7 the dam is built, how big it is, how wide it is, whether it is

8 of dirt or of concrete, how big the spillway is -- none of

9 those has any bearing whatsoever on the rights that your Honor

10 is going to chronicle.

11          The one thing that is important is how much can be

12 held behind the dam, and how much must be allowed to go through

13 it, and under what conditions.

14          Whether it is a big dam or a little dam, whether it

15 is dirt or concrete, makes no difference on that determination.

16 And that is the determination you will make.

17          There is one other factor.  There is no sense in

18 concealing weaknesses in your own case.  There is, of course,

19 an extremely serious doubt that an agency such as a public

20 utility district can exercise a riparian right.  You have heard

21 me argue here on the question of a municipal use on the part

22 of the Navy.  So I'm certainly not going to do a switch.  I

23 don't believe that a public utility district, as such, can

24 exercise a riparian right.

25          THE COURT:  Of course, there are people within your

1    District who have riparian rights.

2           MR. SACHSE:  That is right.

3           THE COURT:  You don't claim any rights from them.

4           MR. SACHSE:  No.  They can exercise the right as an

5    individual, but not the District as such.

6           There are none within our District, incidentally --

7    within its present boundaries -- who have riparian rights in

8    the River.  Our boundaries do not encompass the River at this

9    time.  This dam is outside our boundaries.  This dam is within

10   the proposed annexation area.

11          Now when the annexation is completed there will be

12   riparians within the District, there will be about three of

13   them, below the dam -- three or four people who own riparian

14   land below the dam, and they will also be within the boundaries

15   of the Utility District.

16          But at the present time there are none.

17          THE COURT:  Now in addition to these riparian rights

18   which you may acquire by condemnation, which we have just

19   talked about, and your claimed appropriative rights under your

20   applications, the only other right on the stream that Fallbrook

21   claims is this permit and license -- what is it?

22          MR. SACHSE:  Two and a half second feet?  Yes, your

23   Honor.

24          THE COURT:  Where is that described?

25          MR. SACHSE:  It is described in the Second Affirmative

1    Defense --License 4906.

2         THE COURT:  And based upon Permit No. 7035,

3    Application No. 11586, 2 1/2 cubic feet per second of stream

4    flow.

5         MR. SACHSE:  That's right.

6         THE COURT:  When was that license issued?

7         MR. SACHSE:  As to the actual date of the issuance

8    of the license, I don't have it here in my file.

9         MR. VEEDER:  You will find it in the Agreed Facts,

10   I think, on page 14.

11        MR. SACHSE:  Oh, yes.

12        THE COURT:  It's in the Agreed Facts?

13        MR. SACHSE:  Yes.

14        MR. VEEDER:  On December 21, 1957, the California

15   state board issued to Fallbrook Public Utility District a

16   license for Diversion 4906.

17        THE COURT:  And when was the permit issued?

18        MR. SACHSE:  Do you have that, again, Bill?

19        MR. VEEDER:  Issued on February 1948, Permit No. 7033.

20        THE COURT:  February '48.

21        MR. VEEDER:  That is not correct, your Honor.  That

22   relates to the storage claim.  We don't have the date of the

23   permit on that.

24        THE COURT:  Was this a permit and a license concern-

25   ing unappropriated water?

1    MR. SACHSE:  Yes, your Honor.  And so that we are

2    clear on that, that represents a determination by the State

3    that at that time there was unappropriated stream felow in the

4    summer that would allow us to take.  I concede that that can

5    be cancelled by your Honor.

6         THE COURT:  You concede that that is subject to other

7    vested rights on the stream.

8         MR. SACHSE:  Absolutely.  It so states in the permit,

9    and I concede that if your Honor, in the course of taking the

10   evidence in this case, finds that the draught is so great,

11   that permit might be rendered valueless -- that license.

12        THE COURT:  I'll tell you what I want you to do, Mr.

13   Sachse.  Are you still trying that condemnation case?

14        MR. SACHSE:  Yes, your Honor.  But we have about a

15   10-day break, if you want to give me some work.

16        THE COURT:  I want a definitive statement by you in

17   writing, filed here, as to these rights that you claim.  It

18   can be very simple as to (1) your appropriative claims under

19   these applications -- just the numbers of the applications and

20   that you claim such rights as you will eventually get from the

21   State court, (2) your claim under this license and permit, and

22   your concession that it is -- and I take it that that is clear

23   -- subject to other vested rights on the stream.

24        MR. SACHSE:  Well, it is attached to the Facts, and

25   it says right on the top "Subject to vested rights."

THE COURT:   (3) A summary of your statement here to
me of what riparian rights you may have got in the condemnation
of this land, and how you have handled these water rights on
this land that you have acquired not by condemnation but by
purchase outside of condemnation.

It can be very simple.   Just concisely state your
position and serve it on these other people.

MR. SACHSE:   I will.

I would like to correct something.   Your Honor has
repeatedly stated this morning, in discussion with Mr. Veeder
and Mr. Moskovitz both, "when these 12178 and 12179 are acted
upon."   They are.   There is a decision of the Water Rights
Board.   The next step is for us to do enough work so that we
get the permit.

THE COURT:   Well, when I say "finally acted upon,"
I mean when this mandamus proceeding is concluded.   I take it
that the effect of the mandamus proceeding is probably to
suspend your rights if a trial de novo is indicated.   I don't
think until that proceeding is contemplated you have anything
but a prospective right.

MR. SACHSE:   I simply want to make quite clear to
your Honor that as far as the Water Rights Board itself is
concerned the application has been granted and we now have to
proceed to put the water to beneficial use finally to get a
license.

1          Now there is one other right we have pleaded, a very

2    minor one in quantity.

3          THE COURT:  What is that?

4          MR. SACHSE:  That is that we have a prescriptive

5    right to ten miner's inches that Mr. Veeder so vigorously

6    asserts that we've been stealing.  We say that if we have been

7    stealing it, we have been doing it for so long that we have a

8    right to it.  That is a very small quantity, but I will put

9    that in the chronicle also.

10         THE COURT:  Was that the water used under the

11   revocable license?

12         MR. SACHSE:  It was taken originally under a

13   revocable license, and that license was cancelled by the

14   United States and we kept right on taking it.

15         THE COURT:  You claim that it ripened into a pre-

16   scriptive right.

17         MR. SACHSE:  Yes, your Honor.

18         THE COURT:  All right.

19         MR. SACHSE:  I realize the hazards in pleading it

20   against Uncle, but you don't blame me for pleading everything

21   I can think of.

22         THE COURT:  Catalog it, too.

23         MR. SACHSE:  I will, your Honor.

24         You did not give me any deadline on that.  Will two

25   weeks be all right?

1    THE COURT:   Two weeks will be satisfactory.

2    MR. MOSKOVITZ:   Your Honor, I would like to remark

3    on the comment you made about the effect of the mandate action.

4    First of all, as I mentioned in prior hearings, the

5    State has not yet been served.   In other words, as far as the

6    State of California Water Rights Board is concerned, there is

7    no mandate action.   We know about it informally.   The alterna-

8    tive writ that was originally issued but never served merely

9    asked the Board to come forth on a certain day and show cause

10   why the action we took was proper.   But since there is nothing

11   served upon the Board or upon the District, the permit is as

12   effective now as it was when it issued, and presumably the

13   District can proceed under it and its actions would be valid.

14   MR. SACHSE:   That is correct.   There has not even

15   been service.

16   THE COURT:   We won't cross that bridge.   It's

17   academic as far as I'm concerned.   However, the mere fact that

18   it has not been served, as I read the cases, wouldn't make much

19   difference.   It has been filed, and if service isn't made

20   eventually it can be dismissed.   But until it is dismissed,

21   or until it's settled, I don't -- my offhand guess is that

22   there is some question about the present rights.   But that is

23   beside the point here.

24   MR. VEEDER:   My failure to respond to the gentlemen

25   in regard to the responsibilities of this Court in the

1 adjudication of the rights should not be accepted as a sign of

2 agreement.

3    MR. MOSKOVITZ:   I would be happy if Mr. Veeder would

4 present his views on that.

5    MR. VEEDER:   Mr. Moskovitz, if I can make you happy,

6 I will work.

7    We truly believe, your Honor, that the most serious

8 error will stem from a failure on the part of this Court to

9 adjudicate the inchoate rights of Fallbrook.  We believe that

10 they are in issue, and we believe that we will be flying on one

11 wing if we don't get a determination by this Court in regard to

12 those inchoate rights.  We believe that an inchoate right is

13 an interest, under the laws of the State of California, which

14 is subject to being adjudicated, and we believe that Fallbrook

15 is taking a grave hazard if it fails to prove its inchoate

16 rights.   We believe that the matter of the applications is

17 insufficient.  We believe that they will have to appear and

18 prove their financial capacity for building this dam.

19    THE COURT:   Appear where?

20    MR. VEEDER:   Right here.  And their failure to do so,

21 we believe, can have but one effect, and that will be for

22 judgment against them to that extent for failure to prove.

23    So I am leading back to these interrogatories, and I

24 might add if you are looking at how they are responded to --

25 I am not being critical of Franz -- they are broken down into

1    two phases.

2            MR. SACHSE:   The answers are in one bundle, and the

3    objections are in another.

4            THE COURT:   Which ones have been answered?   I asked

5    you gentlemen to tell me.

6            MR. VEEDER:   I will let Mr. Sachse explain how he

7    answered them, mechanically.

8            MR. SACHSE:   Presumably Mr. Veeder has no objection

9    to the answers.   I wish he would tell me which ones he objects

10   to.

11           THE COURT:   Which ones have not been answered?   Which

12   ones did you object to?

13           MR. SACHSE:   I objected to approximately fifty of

14   them, and he has the list in front of him.   I thought that we

15   were going to go down the line and settle them.

16           MR. VEEDER:   I thought that is what your Honor

17   wanted to do now, to go down the line and rule on them.

18           THE COURT:   We'll do that.

19           I take it that these objections that you filed on

20   April 30 -- for instance, you object to 3, 4, 5 and 6.

21           MR. SACHSE:   That is right, your Honor.

22           THE COURT:   And you object to 8.

23           MR. SACHSE:   If you want to check them off, I can

24   give them to you very quickly.

25           THE COURT:   You apparently answered 7?

2012

1          MR. SACHSE:   I did.   I answered 1 and 2.

2          THE COURT:   Next you object to 13?

3          MR. SACHSE:   Through 20.

4          MR. VEEDER:   As I pointed out, your Honor, these all

5     relate to the financing of the dam.

6          MR. SACHSE:   I answered 22 and 23, and objected to

7     24, and I answered everything down to 33 -- I answered every-

8     thing to and including 32, and I objected to 33 through 45,

9     inclusive.   I objected to 46, answered 47 and 48, objected to

10    49, 50 and 51, answered 52, then objected to 53 through 67.

11         THE COURT:   Well, there's a 62 in there answered.

12         MR. SACHSE:   I beg your pardon.   Yes, I answered 62.

13    I objected to 53 through 61, and 63 through 67.

14         THE COURT:   There may be a misprint there.   You have

15    objections to 60, 61, 61, 63.   Do you know whether you

16    answered 62 or not?

17         MR. SACHSE:   I can tell you in a minute.   I objected

18    to it.   It is a misprint.   It is 62 instead of 61.

19         THE COURT:   All right.

20         MR. SACHSE:   I answered through 73, and objected to

21    74 through 77.   And that is the total.   I objected to the

22    remainder, in other words -- 75, 76, 77.

23         THE COURT:   Well, it's 12 o'clock.

24         I am going to rule on the first series of unanswered

25    interrogatories, those we have just enumerated, beginning with

1   3 and running through 45.   The Court sustains the objections

2   of Fallbrook to answering those interrogatories, without

3   prejudice to some renewal at some later stage of the case. The

4   reason for the Court's ruling is that the matter at this time

5   is entirely premature.  It has nothing to do with cataloging

6   the vested rights of the United States on the River.   That the

7   Court will catalog and adjudicate those rights.

8           The Court will also find the present status as of

9   the date of the interrogatory and final decree of Fallbrook's

10  applications to appropriate water, what has been done pursuant

11  to the permits issued, whether or not licenses have issued,

12  and that such rights as Fallbrook secures from the State to

13  appropriate water will be, of course, subject to all other

14  vested rights on the River, including those of the United States,

15  and that therefore any talk at this time about detailed inquiry

16  into this proposed dam is entirely premature.

17          The Court, in any decree, will reserve jurisdiction

18  to pass upon the effect of any structure on that River upon the

19  vested rights of the United States, and will, if, as and when

20  the matter becomes material, enter into the matter and consider

21  the problem.  The extent to which we go into it at that time

22  will be determined by the issues then framed, and will, of

23  course, center largely upon the fact that no structure is to

24  be built on this River which will not adequately protect the

25  rights of downstream users and downstream owners on that

stream.

1       It would serve no useful purpose to go into the

2  matter and would merely complicate what is already an over-

3  complicated case.   The United States would suffer no prejudice

4  for the reason that if, as and when some immediate threat were

5  made to erect that dam it is time enough then to find out what

6  arrangements are going to be made to protect the rights of the

7  United States.

8       So down through 45 the objections to the unanswered

9  interrogatories are sustained, without prejudice to some later

10  consideration if, as and when it becomes material.

11       After lunch I will take up the remaining ones and

12  get that disposed of.

13       Before I leave this for lunch, let me say this.  This

14  is a big case and I don't propose to go to trial on it until

15  we have formulated a series of issues to be tried.  You can

16  take as much time as you want to do it, but we are not going

17  to trial until it is done.

18       Secondly, I want also a list of the documentary

19  evidence that each side proposes to offer.  I want to be sure

20  that that has been exhibited to the other parties before

21  trial.   I will probably have those exhibits marked before

22  trial, and I want a notation of the particular reservation that

23  any party is going to have to the introduction in evidence of

24  those exhibits.

25       I am not going to stumble into this case without

1   formulating these issues by a pre-trial order.

2       MR. VEEDER:  When you use the term "documentary,"
3   your Honor, do you mean maps -- does that include maps?

4       THE COURT:  Maps, contracts, decrees, reports,
5   statistical studies -- anything in the way of documentary
6   evidence that comes in as exhibits.

7       MR. VEEDER:  And you want a list of those.

8       THE COURT:  Yes.

9       MR. VEEDER:  Did your Honor state any time when he
10  wants them.

11      THE COURT:  Well, I've talked about this before, and
12  I thought you would be prepared to work on this today.  But
13  chances are that we can't.  You will have to tell me when you
14  have them ready, you will have to exchange them, and I want to
15  be sure that everybody has seen these documents.  When we go
16  into this trial and somebody offers a document, it is going to
17  be marked and there is not going to be any delay by somebody
18  saying, "Let me read this now," and sit down and take a half
19  hour to read some document -- you will know about it before-
20  hand, and I think it would be a proper thing for each of you
21  to furnish the limited number of major counsel in this case who
22  will participate in this trial with copies of these documents,
23  if possible.  There may be situations where it may be difficult
24  to do.  But I think you should all know what the documentary
25  evidence is before this trial starts, and we should know what

1    objection any party is going to make to it.  And you can make

2    any objection you want, but I want a specific.  I don't want a

3    general shotgun objection that it's incompetent, irrelevant

4    and immaterial.  The courts have held time and time again that

5    if the Court sustains or overrules one of those objections

6    there is no error, unless counsel particularizes how it is not

7    proper evidence.  So particularize your objection before trial.

8            MR. VEEDER:  Very well.

9            It would seem to me that perhaps the most feasible

10   way of exchanging this information would be to deposit our

11   maps and documents into the Clerk's office.  Then it wouldn't

12   be necessary -- then they would be available for review by

13   counsel for all parties.  And if others would do the same thing,

14   it would be most helpful to us.  This having to run around --

15           THE COURT:  I think that that may be the answer.

16   Then you could come down here and fix some date on which you

17   would reach some agreement on these and know what you are going

18   to do and mark those that are going to be offered, so we get

19   those all lined up.

20           Be thinking about it over the lunch hour and I'll

21   see you back here at 2:00 o'clock.

22           (NOON RECESS)

23                                  - - -

24

25

1    SAN DIEGO, CALIFORNIA, TUESDAY, AUGUST 26, 1958, 2:00 P. M.

2                              ---

3             MR. VEEDER:  We were down to Interrogatory No. 46, as

4    I recall, your Honor.

5             THE COURT:  Yes.

6             An appropriative use has to be a reasonable use,

7    doesn't it?

8             MR. SACHSE:  Yes, your Honor.

9             THE COURT:  Any argument about that?  Mr. Moskovitz?

10            MR. MOSKOVITZ:  No, sir.

11            THE COURT:  I will sustain Fallbrook's objection to

12   46a, -b and -c iii.  I will overrule the objection to 46a, -b

13   and -c i and ii.

14            I don't expect that your answer will have to be a

15   detailed inventory to the last half-acre of ground, but a

16   reasonable approximation, giving the source of such information

17   as you have, and even if you have to go out and spend a little

18   money to answer his interrogatories.  It is your District and

19   you can find out about it.

20            MR. SACHSE:  I will so undertake, your Honor.

21            May I clarify, though, this 46 -- "or will be planted."

22            THE COURT:  Well, "or will be" is a speculative thing

23   to which I don't see that you could make an answer.  The

24   objection is sustained to the "or will be planted."

25            But as to the present acreage of avocados, citrus

1    or other crops, you will have to give a reasonable interpreta-

2    tion to the "other crops."  I don't expect a complete itemiza-

3    tion of crops.  But what other major crops do you have up

4    there?

5            MR. SACHSE:  I think it would satisfy the United

6    States.  The only other major classification would come under

7    the general term "row crops."

8            THE COURT:  You don't have much of that, do you?

9            MR. SACHSE:  Yes, there is quite a bit; strawberries,

10   tomatoes, things of that kind, which vary season by season.

11           MR. VEEDER:  Those are the crops to which I had

12   reference.  You have strawberries, tomatoes, and some berries,

13   don't you?

14           MR. SACHSE:  Yes.  But you don't want a breakdown.

15           MR. VEEDER:  No, sir.

16           MR. SACHSE:  Treat those all as row crops.

17           MR. VEEDER:  You can come in with that category, if

18   you want to.  I didn't know that strawberries were row crops.

19   Maybe they are.

20           THE COURT:  As to 47 the objections of Fallbrook

21   are overruled.  It may be answered by an approximate acreage

22   of matured trees which do not presently receive water from the

23   District.  The answer as to the source of the water would

24   either be private wells or, I take it, there is some irrigation

25   from the Metropolitan?

         MR. SACHSE:  Your Honor, everything in Fallbrook

1   would have to be private wells or our system.

2           THE COURT:  All right, that simplifies that.

3           Next is 48, as to lands upon which trees are planted

4   but not yet matured.  Of course, that is a difficult thing to

5   do or to ascertain.  What is an accepted age for maturity of

6   avocados?

7           MR. SACHSE:  Five years.  The County Assessor lets

8   you have them free for five years and then starts assessing

9   them.

10          THE COURT:  Can we take five years for that?

11          MR. VEEDER:  That's satisfactory.

12          THE COURT:  What is the accepted age for maturity of

13  citrus?

14          MR. SACHSE:  In the case of citrus, he assesses, I

15  think it is, a 7-year tree.  But if we are going to calculate

16  this --

17          THE COURT:  Shall we make them both five years?

18          MR. SACHSE:  It doesn't matter.  One is as easy as

19  the other.

20          THE COURT:  Five years, Mr. Veeder?

21          MR. VEEDER:  That will be all right.

22          I want to be sure to hear what Mr. Sachse says about

23  the 5-year period.

24          You are going to supply us with the data of the

25  immature trees under five years of age; is that right?

1          MR. SACHSE:  Yes.

2          THE COURT:  As to both categories.  All right.

3          The objection of Fallbrook to Interrogatory No. 52

4   will be sustained on the grounds heretofore stated.

5          MR. VEEDER:  Are they granted as to 48, 49, 50 and

6   51?

7          MR. SACHSE:  Nos. 49 and 50 are answered.  No. 51

8   has an objection pending.

9          THE COURT:  Nos. 47 and 48 supposedly have been

10  answered already.

11         MR. VEEDER:  What about 49?

12         THE COURT:  Wait a minute.  There is no objection to

13  47 and 48.

14         MR. SACHSE:  Yes, your Honor.

15         MR. VEEDER:  If you're confused, your Honor, so am I.

16         MR. SACHSE:  I stated that we maintained no records.

17  I didn't object.  But we will get the information.

18         THE COURT:  All right.

19         Now we're up to 49.

20         MR. SACHSE:  Yes.

21         MR. VEEDER:  Yes.

22         THE COURT:  I will presently sustain the objection

23  to 49.

24         These are without prejudice to a renewal.

25         I will sustain the objection to 50.

1    MR. VEEDER:  You wouldn't let me argue that a little

2    bit, would you?

3              THE COURT:  Yes.

4              MR. VEEDER:  From our standpoint, your Honor, the

5    measure of the rights -- and I use the term "measure"

6    advisedly -- will be, in our view, predicated upon the number

7    of acres which will receive water, and upon the new acreage

8    which will be brought in which will receive water.

9              THE COURT:  I don't follow you.  You say the measure

10    of the rights.  Now we're talking about Fallbrook's use of
                                    they
11    unappropriated water that/may get from the State statutory

12    setup.  How are you concerned?  That isn't measured, as far

13    as you are concerned, by the area on which it is used.  It is

14    measured on the basis of what they give them.  It doesn't

15    concern the Government at all.

16              MR. VEEDER:  Your Honor, I cannot pitch the trial of

17    a lawsuit upon the belief that your Honor is going to grant

18    us everything for which we pray.  If I were sure that we were

19    going to win on everything, I'd say "Fine."  But I'm not --

20    although I have supreme confidence.  The point I make, though,

21    your Honor, is that they can fail, too, in their proof, and if

22    they do not show lands which are susceptible to being irrigated

23    then in that event and to that extent their rights are cut

24    down, and I believe that that is in issue here.

25              MR. SACHSE:  Your Honor, I'll make it easy.  I'll

1    answer it, and the answer will simply say that all the area

2    will receive water for domestic, irrigation, municipal or

3    some purpose.

4              MR. VEEDER:  And I'll certainly object to such

5    answer.

6              THE COURT:  Why wouldn't the whole area be suscept-

7    ible to irrigation?

8              MR. VEEDER:  Your Honor, half of it is a rockpile,

9    to begin with, and the other half is on a slant of about ninety

10   degrees.  So if they tried to put water on it there would be

11   a flood.  So I submit, your Honor, that the circumstance is

12   such that we are entitled, I respectfully submit, to know what

13   they are going to do with this water, where they are going to

14   use it.

15             THE COURT:  How would it concern the Government,

16   under the rulings I have made?  Under my rulings, if you are

17   interested in unappropriated water you go to the State and

18   make your application, or you enter into this proceeding and

19   try to overturn the decision of the Water Rights Board on this

20   mandamus proceeding.  You go back in and instead of appearing

21   specially you assert your cause and see what they give you.

22   How does it concern you?  It doesn't concern your riparian

23   rights.  It doesn't concern appropriative rights which the

24   Rancho had when you got it.

25             MR. VEEDER:  Let's face up to it, your Honor.  The

1   real crux of the problem before your Honor is the use of water

2   by the United States of America outside the watershed, and I

3   submit that when we try this lawsuit, irrespective of your

4   present rulings, I don't believe that your Honor is going to

5   prohibit the introduction of evidence in regard to the use of

6   water outside the watershed; and I submit, further, that the

7   Appellate Court should be, in my view, entitled to have before

8   it proof that the Fallbrook Public Utility District could

9   apply beneficially the waters which may or may not be acquired

10  by it, whether by the State procedure or by your adjudication.

11  The proposition, as I see it, is that we are entitled to know

12  and to test by cross examination and by rebuttal when they say

13  that they are going to use the water throughout the entire

14  service system.

15        MR. SACHSE:  Your Honor, I'll answer it, and I'll try

16  to arrive at a reasonable figure for waste.

17        THE COURT:  All right, objection overruled, and in

18  making a reasonable computation obviously rockpiles and rocky

19  mountains are excepted.

20        MR. SACHSE:  That's right.

21        THE COURT:  Now I apprehend that there is a lot of

22  hillside ground that can be terraced and on which citrus and

23  avocado could be grown.

24        MR. VEEDER:  Your Honor, I also submit that there

25  are areas where a mountain goat wouldn't be safe.

1      MR. SACHSE:   I'll except them, Mr. Veeder.

2      THE COURT:   All right, I want some reasonable differentiation made between some ground on which obviously you couldn't grow anything but a plant or two and other ground which might be susceptible to terracing and being used.   So an answer "all of it" isn't a correct answer.

7      Now 51 concerns 3,000 acres of land to be annexed. The objection will be overruled, and give the same answer to that.   If you don't know the character of the area within your District and the annexation to it, you will have to find out.

12      MR. SACHSE:   All right, I'll do that.   The only problem there is one of source material.   That calls for the same information as numbers 47 and 48, and I want Mr. Veeder to understand that we don't have any records on area to be annexed.   That one we are going to have to get sweating on.

17      THE COURT:   You mean that you are annexing ground and don't know anything about the character of it?

19      MR. SACHSE :   No, we know about it, your Honor, but we don't have, for example, data on wells, we don't know the number of planted acres.   But we can get it.   I may delay an answer to 51 longer than I delay the other answers.

23      THE COURT:   You may make these answers in segments.

24      MR. SACHSE:   That's the point I'm trying to make.

25      THE COURT:   And take additional time for the ones

1    on which you need time.

2           MR. VEEDER:  May we have them, though, your Honor,

3    by September 25, then?

4           MR. SACHSE:  September 25?  I'll give them to you

5    earlier.

6           MR. VEEDER:  Fine.

7           THE COURT:  No. 52 was apparently answered.

8           MR. SACHSE:  It was.

9           THE COURT:  As to 52, objection sustained.

10          As to 54, it is conceded that no work has started on

11   the dam itself.

12          MR. VEEDER:  I would like to have the answer on

13   that, if I could.

14          THE COURT:  All right, objection overruled.

15          Interrogatory No. 55.

16          MR. VEEDER:  We would like to know what they have

17   been doing up there.

18          THE COURT:  What is this "within a matter of days"?

19          MR. VEEDER:  Well, when Mr. Yackey was, we'll call

20   it, testifying before the State Water Rights Board, he said

21   that within a matter of days they are going to start con-

22   struction.  I don't believe him.  But I would like to know what

23   he meant by that.

24          MR. SACHSE:  I'll tell you what we have done to date.

25   Will that take care of 54 and 55 together?

1     MR. VEEDER:  All right.

2     THE COURT:  All right.

3     As to 56 the objection is sustained.

4     As to 57 the objection is sustained.

5     These are all without prejudice, unless I indicate

6 otherwise.

7     As to 58 the objection is sustained.

8     As to 59 the objection is sustained.

9     MR. VEEDER:  There may I be heard before your Honor

10 overrules us, not that I am anticipating on that.

11     MR. SACHSE:  On which one?

12     MR. VEEDER:  On 60.

13     We have matters of security down there on Camp

14 Pendleton, and a jerry-built dam above us is a very, very

15 serious problem.

16     THE COURT:  Well, I concede that.  But that is

17 premature.  That's a very pertinent inquiry when the time comes

18 that a dam is going to be constructed.

19     I'll tell Fallbrook right now, I want to be advised

20 in writing before any contract is let, when you propose to

21 let a contract.  I want to be advised in writing before any

22 work is done on the dam proper.  You can scratch as much dirt

23 as you want around the bottom, but before any dam is constructed

24 I want to know about it.

25     MR. SACHSE:  Very well.

1    THE COURT:   Then these are pertinent questions.   It
2  is not an issue I'm going to try out now.

3    The objection to 60 is sustained.

4    The objection to 61 is sustained.

5    MR. VEEDER:   May I interpose a thought there.

6    When Fallbrook files whatever it intends to file to
7  obtain approval by the State as to the kind and type of
8  structure it intends to put in, we should be advised immedi-
9  ately.

10    MR. SACHSE:   I'll so undertake.

11    THE COURT:   I think you're right.   I said before they
12  start working, before they let a contract.   I was not thinking
13  about the other end of it.   They would have to apply to the
14  State.

15    MR. VEEDER:   That's right.

16    THE COURT:   And all counsel in this case should be
17  advised and given copies of your application, so we'll know
18  what's going on.   Is that understood?

19    MR. SACHSE:   You're making it pretty tough, your
20  Honor.   When you say "copies of your application," there is a
21  formal application to the State Dam Department that is a very
22  complicated piece of paper.   To give all counsel a copy --
23    THE COURT:   I'm talking about the counsel partici-
24  pating in these pre-trial hearings.

25    MR. SACHSE:   Very well.

THE COURT:  If they aren't interested enough to come in on this matter, they will have to look at the copies filed with the Court.  Counsel who appear at the pre-trial and the Court.

As to 62 --

MR. VEEDER:  That will run on down to 67, your Honor.

THE COURT:  -- 63, 64, 65 and 66, the objections are sustained.

Then the next series have been answered.

MR. VEEDER:  Do I understand, in regard to all those, that we will be advised immediately when Fallbrook has formulated plans and undertaken any action?

MR. SACHSE:  I will do so.

MR. VEEDER:  I would much rather hear from the Court than from Mr. Sachse on that.

THE COURT:  Well, I understand that they are going to give us a copy of their application and we know what the status of the situation is, and then if a hearing is indicated we may go into these interrogatories.

MR. VEEDER:  As long as it is understood that we will be kept fully advised.  As I say, we have a safety matter down there.

THE COURT:  You have two problems.  You have the safety measure and that you don't want your Camp flooded out

1      by some half-built dam.  And secondly you have a right to have

2      whatever waters you are entitled to flow down there without

3      impediment, and if a dam is built arrangements have to be made

4      to let it flow by.  So you will be advised.

5                  They have answered down through 73.

6                  MR. VEEDER:  Yes, sir.

7                  THE COURT:  As to 74, I don't know -- I'll overrule

8      the objection.  You can answer it.

9                  I will overrule the objection to 75.  You can answer

10     that.

11                 MR. VEEDER:  I would like an answer to 76, though,

12     your Honor.  I think it is very important for us to know from

13     the standpoint of beneficial use.

14                 MR. SACHSE:  Your Honor please, that is a pure and

15     simple case of economics within the Fallbrook Public Utility

16     District.  If you give us a right, whatever right you give us

17     when this proceeding is finally over is going to be a right

18     that we can exercise whether it costs our people five dollars

19     or five hundred dollars.  It then becomes a question whether

20     the individual is willing to pay the amount of money that the

21     water costs him.  I can see absolutely no relevancy of any

22     kind in trying to estimate what this water is goingoto cost

23     the consumer.

24                 MR. VEEDER:  If they haven't made that estimation

25     yet, they shouldn't be building the dam.

1          MR. SACHSE:  We have made it.  But I don't see any
2    relevancy to this proceeding.

3          MR. VEEDER:  If you have made it, I make demand for
4    it now, because, your Honor --

5          THE COURT:  Well, I'm kind of curious.  These matters
6    have a public interest.  People who live in this District,
7    people who are parties to this suit are entitled to know the
8    facts about this matter, and if you have made some computations
9    I see no reason why you shouldn't set them forth.  Presently
10   I have some doubt as to the materiality of it, because, as Mr.
11   Sachse says, if Fallbrook has a right to take some floodwaters
12   and they want to be improvident enough to impound it at a cost
13   five times what it would cost them to buy water from the
14   Colorado River, that is their problem.

15         But again, I take it that the residents of their
16   District will have some right to be heard on the matter of cost
17   to build a dam, and they'll have their own problem to solve on
18   that.

19         But I'll overrule the objection and you may answer
20   it.

21         What is the difference between 77 and 76?

22         MR. SACHSE:  They're the same.

23         THE COURT:  All right.

24         MR. SACHSE:  An answer to one is an answer to the
25   other.

1       THE COURT:  All right, answer the two of them

2   together.

3       MR. VEEDER:  I would like to have the record show

4   objections of the United States to your Honor's orders sus-

5   taining any of the objections.

6       THE COURT:  You may have the exception.  I don't

7   think it is required any more under the new Rules.

8       MR. VEEDER:  That's right.

9       THE COURT:  But out of an abundance of caution you

10   may have it.

11       MR. SACHSE:  As to the time, your Honor, with the

12   possible exception of the questions involving the area not

13   presently within the District, I believe I could get it done

14   by the middle of next month.

15       THE COURT:  I think you should try to shoot for

16   September 15.

17       MR. SACHSE:  I will give them as fast as I get them.

18       THE COURT:  All right.

19       MR. SACHSE:  I think I can get most of these before

20   the 8th.

21       MR. VEEDER:  I feel very generous right now.

22       MR. SACHSE:  All right.

23       THE COURT:  I have before me an order remanding

24   Santa Margarita vs. State Water Rights Board, No. 2147, to

25   the state court.  Before I sign the order, if anybody wants to

1  look at it, here are some copies.  Since I am doing it sua

2  sponte, I have to draw my own order.

3          MR. SACHSE:  Neither of the parties to this mandamus

4  is in court before your Honor.

5          THE COURT:  Well, Mr. Dennis knew that it was on the

6  calendar; and the State Water Rights Board, I suppose, is part

7  of the State of California.

8          MR. SACHSE:  They haven't been served, though.

9          THE COURT:  It doesn't have anything to do with my

10  remanding this case.

11          MR. SACHSE:  No.

12          THE COURT:  Has anybody any suggestions as to this

13  order of remand?

14          MR. MOSKOVITZ:  It looks fine to me, your Honor.

15          THE COURT:  The Clerk will file it.

16          You may keep the copies.

17          MR. VEEDER:  I had suggested this morning that

18  motions would be filed in regard to Fallbrook and Santa

19  Margarita.  Having heard your Honor's thoughts this morning on

20  these matters, I believe that I will simply refrain from filing

21  a motion in either of those cases and preserve our record by

22  objection to evidence, because now that we have the mouse out

23  of the weeds I don't want them appealing should your Honor

24  sustain us.  So we will go ahead that way, your Honor.

25          THE COURT:  The next thing, then, that we should

1   talk about are issues, and I want a pre-trial order drawn, and

2   I'm inclined to direct Mr. Moskovitz to do the job preliminar-

3   ily, that is, to draw the proposed order and give you a chance

4   to shoot at it.  I may ask each of you to supply him with

5   certain material.

6          I want a comprehensive pre-trial order containing

7   the rulings that I have indicated in this memorandum, plus the

8   reservation in another portion thereof of the various matters

9   that are left open for decision at trial, and also as part

10  of that the list of the issues to be tried in this case.

11         That isn't the kind of job that we can do very well

12  in the courtroom.  It is the kind of job that somebody has to

13  sit down and work on and prepare some kind of draft and then

14  see what you can arrive at to formulate it.  I have this file

15  of suggestions on issues which I have gathered from papers

16  that you have submitted to me.

17         Before I go into that, also in this document I want

18  a list of the written documentary material that is going to be

19  offered in evidence, and each of you will prepare and serve on

20  the others and forward to Mr. Moskovitz this list of documents

21  upon which you are going to rely, and then we're going to have

22  to find out to which ones there are no objections and to which

23  ones somebody is going to reserve an objection.

24         MR. VEEDER:  May I inquire there, your Honor, as to

25  the modus operandi.

1    We have tentatively thought that we would shoot for a

2  September 7 date for the exchange of documentary data, reserv-

3  ing the right, if need be, for additional exhibits down to a

4  date which would be agreeable to your Honor.  But we feel this

5  way, that we have no desire to expose our case and to deliver

6  up our exhibits if there is going to be a request for an

7  extension of time from October 1 -- if there is going to be a

8  continuance.  We think that it is very important.

9    THE COURT:  Well, now, if I understand you correctly,

10  you say to the defendants, "If you will agree not to ask for a

11  continuance from October 1, then we will show you our documen-

12  tary evidence."  Now that just doesn't make sense to me.  That

13  is not in accord with the way you pre-try cases.  The very

14  purpose of exhibiting your documentary evidence is to see to

15  it that the other party may meet it, and the procedure that

16  you suggest would be the very kind of thing that would lead to

17  a continuance.  You hold something back up your sleeve and then

18  you spring it out a week before the trial and they say, "Well,

19  now, wait a minute.  This we didn't contemplate.  We want

20  time."

21    MR. VEEDER:  Well, they will know, your Honor.

22    THE COURT:  You have got to show your hand on what

23  you have in the way of documentary evidence.

24    MR. VEEDER:  I have no reticence whatever in that

25  regard.  The only point that I make is that if we are going to

1   arrive at a time for exchange of information, Counsel for the

2   opposition know whether they are going to be ready to go to

3   trial on October 1, and if they are fine.

4          MR. SACHSE:  I'm ready.

5          MR. VEEDER:  All right.

6          THE COURT:  Well, I understand that we're all ready.

7   I haven't yet looked over the shape of my calendar, but my

8   contemplations are to start this trial at or about that date.

9   So I would think that the 7th of September would be the time

10  to give to each other the list of copies of the documentary

11  evidence, and if you aren't certain about something you might

12  take another week on the ones on which you are not certain

13  about it.  But by the 14th or 15th of September we ought to

14  know what everybody is going to want to offer in evidence at

15  this trial and find out what documents there are no objections

16  to and what documents there are objections to.

17         MR. SACHSE:  There is only one very slight modifica-

18  tion or question I have in this connection.  The dates are all

19  right.  But this hedge -- I can readily describe to Mr. Veeder

20  what certain exhibits that are being prepared will disclose.

21  Whether physically each exhibit will be completed for delivery

22  is another question.

23         THE COURT:  Well, do the best you can in a situation

24  like that.  If you don't have the thing ready, you say it is

25  in the process of preparation, tell about when it will be ready

and describe what it is.  It may be a matter in which the other

1    side will have no concern.   It may be a matter on which they

2    will wait with bated breath to see what you've cooked up.   You

3    do the best you can on that -- both of you.

4            MR. VEEDER:   That's satisfactory.

5            MR. MOSKOVITZ:   Your Honor, the date again is the

6    7th of September when the list should be exchanged and the

7    copies, if they are available.

8            THE COURT:   That's right.

9            MR. VEEDER:   Now are we exchanging copies of these

10   exhibits, or are we going to deliver them here for examination?

11           THE COURT:   I think the ones you are going to use

12   should be delivered here to the Clerk.   But I think it would

13   be a real accommodation to all of you to exchange and give to

14   the other side, at least these lawyers for the major defendants,

15   copies if they can be obtained.

16           MR. VEEDER:   It's quite one thing to make copies

17   available to the parties here and to make them available to

18   65 lawyers.

19           THE COURT:   I'm talking about only the lawyers who

20   participated in this pre-trial.   There is no need to worry

21   about these others.   We will have to handle them much the same

22   way we are going to handle the other defendants on the pre-

23   trial stipulation.   In other words, I am going to indicate

24   that unless I am convinced by controlling precedent or to

25   prevent miscarriage of justice I am going to make the same

2037

1   rulings.   However, the court will be open to anybody to come

2   in and be heard on these rulings.   If they haven't participated,

3   I'll still hear them.   It may be a short hearing.   But they'll

4   be heard if they want to be heard.   Nobody is going to be hurt.

5   But certainly as to the defendants who participated in this

6   pre-trial we can find out just exactly what your positions

7   are.

8           MR. SACHSE:   Mr. Stahlman made what I think is a

9   very good suggestion.   Probably it will not apply to the

10  United States or to me in our relation to each other, because

11  undoubtedly I will want all of Mr. Veeder's exhibits and he

12  will want all of mine.   But undoubtedly there will be a lot of

13  exhibits that Vail has with which Fallbrook has no concern

14  whatsoever.

15          So I am perfectly willing to exchange these lists

16  and agree to show each other the courtesy of saying, "Look, I

17  don't want that stuff, so you don't have to reproduce it."

18          THE COURT:   I think that is a very sensible sugges-

19  tion.   Get your lists ready, and as to certain documents that

20  you know the other side is going to want get them copies, and

21  if there is a question as to some of them check with them and

22  say, "We have item 6 here.   Are you concerned or aren't you?

23  If you aren't, that will save me the trouble of making copies

24  of them."

25          Now on this matter of issues of law that remain in

1    this case, a summary of the rulings of the Court contained in

2    this memorandum of August 8 will be formalized in this docu-

3    ment.

4      There also will appear from that memorandum that

5    certain matters were put over until time of trial, such as the

6    question of reasonable use, is military use a reasonable use,

7    matters of storage, the matter of surcharging the basin, and

8    the question, for instance, of irrigation which might indirectly

9    surcharge the basin.  Anyhow you can pick those out.

10     In addition, there are a number of issues in this

11   case, and we want to try to catalog them if we can.

12     Mr. Moskovitz wrote me a letter in April in which he

13   said that he thought the issues, first of all, were those that

14   had been listed in that paragraph 8 (h), and I tried to use

15   the same subparagraph numbers in my memorandum.  That happens

16   to be paragraph VII in the memorandum, but the same subparagraph

17   numbers were used as were used in that brief.

18     Then Mr. Moskovitz said that there were two addition-

19   al issues which were briefed but were never stated in any

20   written order:

21     (1)  Does ownership of Indian lands and National

22   Forests by the United States give the United States any right

23   to use water of the River on Pendleton outside the watershed?

24   That has been disposed of by the concession of the United

25   States that they were not going to augment their claims

2039

1   downstream by reason of their rights upstream on the National

2   lands.   That is clear, isn't it, on that one?   So that is a

3   matter of listing the concession of the United States and the

4   ruling of the Court.

5          (2)   Inverse condemnation.   The Court has ruled on

6   that.

7          While I have his letter here, he mentions certain of

8   the exhibits that he proposed:   the California Water Plan

9   (May 1957), and Bulletin No. 57, Volumes I and II, dated

10  June 6, 1956.

11         Is the Government going to have objection to those

12  documents?

13         MR. VEEDER:   Yes, sir -- violently.

14         THE COURT:   On what grounds?

15         MR. VEEDER:   Incompetent, irrelevant and immaterial;

16  not tending to prove any issue; improperly prepared, poorly

17  prepared, with little understanding; and hearsay.

18         I might also add that there is a legal conclusion

19  in there at greath length by Mr. Holsinger.   I think it is

20  entirely improper.   Isn't that part of Bulletin No. 57?

21         THE COURT:   Is it possible to segregate the compila-

22  tions and the factual material from the legal conclusions in

23  the document?

24         MR. MOSKOVITZ:   Your Honor, Mr. Veeder mentioned

25  when the Master's hearings began that he would be having

1    objections to these volumes on the Santa Margarita River

2    Investigation and said that he would go to great lengths to

3    keep them out.  Actually, that Bulletin, which was the result

4    of the investigation of the Santa Margarita River, contains a

5    lot of material that isn't material to this case, I agree.

6    It was supposed to be a comprehensive investigation of the

7    land and water resources of the stream and some proposals of

8    the solution of the water problem which is not before your

9    Honor.  I think the State can save time by extracting and

10   bringing up to date, which will be our undertaking, the

11   material which is relevant to the case and not putting the

12   whole study before you, because it does have so much material

13   that we do not need.

14          THE COURT:  I think very definitely that is a

15   practical suggestion for the solution of the problem of

16   objectionable material contained in the document.  If you

17   limit it to the part upon which you want to rely, it may solve

18   some of the problem.  Are you undertaking that, or are you

19   doing that now?

20          MR. MOSKOVITZ:  We are now preparing some exhibits

21   which would show the sort of thing we have in mind from that

22   document.

23          THE COURT:  And you propose to offer those rather

24   than the Bulletin itself.

25          MR. MOSKOVITZ:  Yes.

2041

1          THE COURT:   Are you talking now about Bulletin No.

2    57?

3          MR. MOSKOVITZ:   I was talking about Bulletin No. 57.

4          THE COURT:   Is that true also of the Water Plan?

5          MR. MOSKOVITZ:   As to the Water Plan, we would hope

6    to introduce the whole thing.

7          We would be willing to get together with Mr. Veeder

8    and agree on the material that he feels is not relevant.  I am

9    sure that there is material there that is not relevant.

10          MR. VEEDER:   Why don't you mark what you are going to

11    offer and submit it to us?

12          MR. MOSKOVITZ:   We can do that.

13          THE COURT:   One or the other.

14          MR. VEEDER:   I would rather have him do that in

15    advance of September 7.

16          Can that be done?   It is going to make a difference

17    as to the course we pursue.

18          MR. SACHSE:   That same Bulletin is of extreme import-

19    ance to Fallbrook.   This is the first time I have heard Mr.

20    Moskovitz say that the State had this in mind.  So I am caught

21    completely by surprise.  I didn't know that he was doing it.

22    In my way of thinking, some of the most important aspects of

23    Bulletin No. 57 are the conclusions.  That is, of course,

24    exactly what Mr. Veeder objects to.

25          MR. VEEDER:   Yes, sir.

2042

1          MR. SACHSE:   And that is exactly what we want to get

2     into evidence.

3          THE COURT:   The conclusions of the experts?

4          MR. SACHSE:   Yes, the conclusions of the experts of

5     the state department charged with this duty.

6          THE COURT:   How can put in the conclusions of the

7     experts just by putting in the documents?

8          MR. SACHSE:   We will have the expert here.

9          Mr. Veeder's objections are objections as to the

10    weight.

11         We will undertake to prove how Bulletion No. 57 was

12    prepared, what it is, who did it, what studies were made, and

13    I am quite confident that we can lay sufficient foundation for

14    its introduction from the standpoint of quality of preparation.

15         I think Mr. Veeder's objection is one to weight,

16    not to anything else.

17         MR. VEEDER:   There is no sense sweating about it now.

18    There will be voir dire, there will be a great many things

19    before the matter gets into the record anyway.   If you are

20    going to offer the whole Bulletin, it's interesting.

21         THE COURT:   Well, it is worthwhile sweating about it

22    now.   We can do it a lot more expeditiously now than we can at

23    the time of trial.

24         What about this, Mr. Veeder?   If they call this

25    expert, do you have any doubt that he would testify on direct

1  the same things that he put in writing in his Bulletin?   Could

2  you let the written conclusions go in as canned testimony, as

3  his testimony on direct, and then take him on cross examina-

4  tion?

5  MR. VEEDER:  Oh, no.  No.  There is no foundation

6  whatever for a tremendous amount of that data.  We would

7  object not only on the grounds of the method of preparation.

8  We would object on the basic factor that the Bulletin is shot

9  through with data that was not and could not have been pre-

10  pared under the direction of Mr. Bookman.

11  MR. SACHSE:  I say that his objection goes to its

12  weight, your Honor, and I call your Honor's attention to the

13  fact that this is a public document authorized by an act of

14  the Legislature of the State of California directing its

15  preparation.  There is an express federal rule and there are

16  federal cases -- I didn't anticipate this and I don't have my

17  memo, but I checked it for the Master's hearings -- on this

18  exact type of studies made by the Department of Interior and

19  by others, and the whole study can go into evidence as a

20  public document without even foundation.  But we expect to

21  put in the foundation.

22  THE COURT:  Well, it is not quite as simple as that.

23  Recently I had the case here in San Diego County where the

24  forest fire got back up in the hills and killed a supervisor

25  and a number of other men, and there was a contest between the

1    Government and the plaintiffs over a report prepared by the

2    United States, through its department that was concerned in

3    this matter, of a study of this particular fire -- an official

4    document, etc., a very extensive and careful memorandum

5    prepared; and it is not an open and shut question.

6         But assuming that you are going to have the expert

7    here to testify, and assuming that you lay some general

8    foundation, then you get into another problem, and that is

9    what an expert relies upon and what weight he gives to it. And

10   I have been of the view that you couldn't say to an expert

11   what he could or could not take into account.  It is a matter

12   of the weight to which his testimony is entitled.  It is a

13   matter of cross examination.

14        You come into this in condemnation all of the time.

15   My favorite example is the example of the expert appraiser

16   who gives as his basis and his reason that he went out and

17   rubbed a crystal ball and he came up with the answer as to what

18   the property was worth.  That's an extreme example.

19        But I think that an expert has a right to say upon

20   what he relied.  You could expose his basis as being utterly

21   valueless, but it goes to the weight of his testimony and it

22   doesn't preclude him from testifying.

23        MR. VEEDER:  Your Honor, I can accept -- I will not

24   say that I will accept that view.  I understand what your Honor

25   is saying.  But we are now down to the point where conclusions

1    are being sought to be brought in by a publication, and there

2    will be no evidence in the record to support those conclusions,

3    and that strikes at the very basis and the very fundamental

4    aspect of opinion evidence.  And that's one reason.

5         I may be overplaying my hand at the moment.  But one

6    of the fundamental objections to the conclusions that are

7    expressed in Bulletin No. 57 is that there are no bases for

8    the conclusions in many instances which are set forth, and

9    cross examination simply can't reach that kind of thing.  I

10   think this projected offer goes to the very heart of opinion

11   evidence.  I don't believe there is a single case concerning

12   which I have any knowledge that would permit a variety of

13   complex conclusions that are stated in almost every sentence

14   of the Bulletin.

15        THE COURT:  Give me an example of one of these con-

16   clusions which you say has no basis to rest upon.

17        MR. VEEDER:  I can give you one very easily.  The

18   anticipated reduction of runoff by future development in the

19   Murrieta area and in the Temecula area.  I submit that there

20   is no basis for the conclusions that are there expressed.

21        THE COURT:  That is hard to follow.  Here is an

22   expert who qualifies himself as knowing something about the

23   runoff of water, he goes over and looks over the ground, he

24   predicates some economic development in the area, which is not

25   a difficult thing to do and would probably be proper, and then

1  he draws conclusions.  Now you can cross-examine and show that

2  his basis is wrong.  But why hasn't he got the essential

3  elements right there for an opinion as to reduction of runoff?

4       MR. VEEDER:  Because part of it will be predicated

5  on the question of consumptive use of water, and I submit that

6  he didn't make that investigation.

7       THE COURT:  Well, Mr. Veeder, if an expert were

8  entitled to rely only upon the things that he, himself, had

9  done, how many experts could you ever call upon?  A doctor

10  takes the witness-stand and he is going to give me an opinion

11  about a fracture, and so he qualifies that he has studied, etc.

12  Suppose that he says he read "Jones on Fractures."

13       MR. VEEDER:  Good.  But he is still a doctor.  And

14  here is an engineer who takes a soil scientist's conclusions

15  and applies them.

16       THE COURT:  That is what is done every day in expert

17  testimony.  A doctor takes the opinion of a roentgenologist who

18  says, "I looked at the X-rays and here is what they show."

19  The doctor himself says, "I can't read X-rays, but this man

20  pointed this out to me, and that plus what I saw leads me to

21  this conclusion."  This is done every day.

22       MR. VEEDER:  I have gone through this in very recent

23  months, and I think the authorities will support us in our

24  conclusions in regard to what I have just been stating.  This

25  isn't like a doctor or a medical case.  I dare say that if a

2047

1    doctor came along and said, "Well, I've been watching people

2    going into outer space," you wouldn't permit him to testify.

3              THE COURT:  I might, on the theory that he would be

4    exposed immediately that his basis was fallacious.  It would

5    be a matter of cross examination.  But if that were the only

6    factor upon which he relied, I might strike his testimony.  But

7    if he had other factors, it would be a matter of cross-

8    examination and I would decide how much weight to give this

9    expert who relied upon that kind of factor.

10              MR. VEEDER:  You will find, your Honor, that Mr.

11    Bookman went into outer space and has been in orbit for about

12    two years on this deal.  I would simply repeat that we do have

13    vident objection to it, and I have stated the objections that

14    I have in mind.  I plagiarized from the Professor one word.

15              THE COURT:  The best word in the bunch.

16              MR. VEEDER:  Well, that is your Honor's idea.  The

17    point is that if and when Bulletin No. 57 is offered we will

18    be prepared to meet it.

19              MR. SACHSE:  May I offer this one thought, your Honor.

20    If this is sound -- and I'm fascinated, I don't know whether to

21    be delighted -- there isn't one stick of evidence that can

22    come in that was collected on Camp Pendleton, because every bit

23    of it is somebody did this, somebody else did that.  That is

24    what a military structure is like.  That is how the Government

25    operates.  If this objection of Mr. Veeder is sound and he puts

1 on his case first, we will certainly have a lot of fun with

2 some of the expert testimony that is going to go in.

3      MR. VEEDER:  I have no concern.  Our side has put

4 out this work itself.  They didn't have a whole mass of

5 material swept into one pile and then staple it together and

6 put it out as a Bulletin.

7      MR. SACHSE:  That isn't what the Master's transcript

8 showed.

9      MR. VEEDER:  Well, I don't know why we are arguing

10 about Bulletin No. 57 until it is offered.  As I understand,

11 Mr. Moskovitz in any event is going to revise it.

12      MR. SACHSE:  I am going to offer it.

13      MR. VEEDER:  Well, you're going to have problems.

14      THE COURT:  Except that obviously it may take a good

15 bit of time.  It might take more time arguing about Bulletin

16 No. 57 than trying the rest of the case, from the way it sounds

17 here today.

18      MR. VEEDER:  Well, I think it would be worth quite

19 a lot of time, because -- I don't want to hurt anybody's

20 feelings.  But we simply can't agree to its being offered in

21 evidence.

22      MR. SACHSE:  It has already been marked, incidentally.

23 I offered and marked it at the Master's hearings and I presume

24 that it will be down here.

25      That raises a point.  Are we supposed to re-list

1    everything that has been offered already?

2         THE COURT:  I think probably in the hearing before

3    me I will want them independently marked.

4         Looking over the issues suggested by Mr. Sachse --

5         You have most of these papers, don't you, Mr.

6    Moskovitz?

7         MR. MOSKOVITZ:  I have copies of most of them.

8         THE COURT:  -- I think most of them are repetition

9    of matters that we have discussed.

10        MR. MOSKOVITZ:  Yes.

11        THE COURT:  Mr. Veeder also submitted a list of

12   issues, in very general terms.

13        Now there are other specific issues in this case

14   that are going to have to be listed and are going to have to be

15   met, and I would like to explore with you for awhile what

16   some of these are at random.

17        (1) The Government has intimated from time to time

18   that it makes some claim in connection with waters released

19   by the Vails under the decree between the Vails and Santa

20   Margarita, and as I understand it the Government's contention

21   there is that the stream was the same as a pipe or a canal or

22   a conduit and that the Government owned outright all the

23   water that was released by Vail, and that the stream merely

24   conveyed it down and the Government had a right to that water

25   at Pendleton as a successor to the Rancho Santa Margarita.

1      Is that your position?

2      MR. VEEDER:   That's right.

3      THE COURT:   Now that issue has to be listed.

4      I take it that the contra position is that Vail was

5  merely required to release a certain amount of water into the

6  stream, and that thereafter it was water of the stream in

7  which the United States and various other riparians had some

8  correlative rights.

9      MR. VEEDER:   That would be a matter of interpreting

10  the document.

11      THE COURT:   Well, that issue has to be formulated.

12  That is an issue with which we haven't yet come to grips.

13      MR. SACHSE:   That is in the decision by the Ninth

14  Circuit also, your Honor.

15      MR. VEEDER:   Of course, we think, on the basis of

16  your Honor's ruling, that anything in the decision of the

17  Ninth Circuit was completely moot and everything before Judge

18  Yankwich was moot, because the only issues there were the

19  filings before the State Board, and if your Honor is correct

20  there was absolutely no trial.

21      THE COURT:   It is obvious that the decision of the

22  Ninth Circuit bound only the people who participated in it at

23  any rate -- the United States, the State of California and

24  Santa Margarita, and the Court has ruled as to what the holding

25  is and whom it binds and that the other language in the opinion

1  is persuasive and intended for the guidance of the court.  The

2  court doesn't have to follow it.

3        But let's formulate this issue about this water

4  released by Vail.

5        MR. VEEDER:  Yes.  Do you desire me to do that, or do

6  you want --

7        THE COURT:  Well, it's a cooperative venture.  If you

8  want to try to frame it first and submit it to Mr. Moskovitz,

9  you may.  You frame it and submit it to him for inclusion in

10  this list.

11        MR. VEEDER:  All right.

12        THE COURT:  Now at random another one is this question

13  about which I queried Mr. Sachse, and that is whether Mr. Sachse

14  is claiming any riparian rights by virtue of land that they

15  acquired by condemnation or purchase.  I think his statement

16  this morning fairly well took care of that.

17        MR. SACHSE:  I stated that as an issue in my proposed

18  list of issues, your Honor.

19        THE COURT:  Well, what do you claim?  This morning

20  you said that the District, as such, you felt couldn't exercise

21  riparian rights; that until the dam was built and the land was

22  covered up people from whom you acquired ground were allowed to

23  reserve their rights to the use of water on the condition that

24  thereafter they would take water from the District; and, as I

25  understood, that on land that you acquire by condemnation, after

it is covered by water, there is nothing there -- there is no

riparian right, and until such time as it is covered by water you have the right but that you almost concede that you have no right as a District to exercise a riparian right.

MR. SACHSE:  It is not quite that simple.  What we are really talking about is two different things:  the right we have, and then what its extent might be.  For instance, we will own land unquestionably around the fringe of the water in the reservoir which will be riparian land.  Now we can't, as I understand --

THE COURT:  Now wait.  You mean that it will become riparian land because it borders on the reservoir?

MR. SACHSE:  Well, it was to start with, and it borders it now -- it still borders the water supply.  In other words, it is a riparian parcel that was partly flooded.

THE COURT:  If it was riparian before the dam was built, I suppose it will be riparian afterward.

MR. SACHSE:  It will remain so.

MR. VEEDER:  The District is not claiming that, is it?

MR. SACHSE:  I am trying to make my position clear to his Honor.

I don't believe for one minute that we could exercise that riparian right -- put water on it and sell the water to our consumers as a general supply.  I don't believe our riparian right goes that far, and I will frankly so concede.

1    But I don't know of any rule that would prohibit us, ourselves,

2    from exercising a riparian right on that specific ground for

3    us.

4              THE COURT:  You mean for the District to grow

5    avocados.

6              MR. SACHSE:  That is correct.  Whether we can do it

7    I don't know. - But we have such a right.  We can put in a park

8    on that land and water some grass with it, if we want to.  The

9    quantity is going to be infinitesmal, but the right will exist.

10             THE COURT:  I want you to try to formulate that

11   issue and submit it to Counsel, including Mr. Moskovitz, to

12   shoot at and for incorporation, because we will have to have

13   a determination on that.

14             MR. SACHSE:  Very well.

15             MR. VEEDER:  Your Honor, I would like at this time to

16   inquire.  I was not quite sure what your Honor meant when he

17   disposed of our motion for summary judgment.  We think that

18   one of the prime issues here is the matter of ultra vires, and

19   we believe that it is crucial in the trial of this case, not

20   only by reason of the efforts to acquire rights to the use of

21   water, but the very basic proposition that the Fallbrook Public

22   Utility District should not be permitted to quiet title to

23   water for other than domestic and municipal purposes.  Now

24   that is an issue that I am hoping your Honor will permit to be

25   tried in this case.

2054

1    THE COURT:  In view of Fallbrook's claim, if Fall-

2  brook claims that they have acquired some rights by the

3  acquisition of this property, ultra vires may get back into

4  the case.  But ultra vires, as far as building the dam is

5  concerned, is not presently before me.  I indicated that there

6  might be a time in the future when it may be.  It may be passed

7  upon by the State authorities.

8    MR. VEEDER:  And I think the matter of ultra vires

9  is certainly in the case, is it not, your Honor, in regard to

10  the 2.5 second feet that it is attempting now to divert?

11    THE COURT:  It may be.

12    MR. VEEDER:  Can we formulate an issue on that?

13    THE COURT:  You may try it.  I'll see whether I'll

14  put it in.  You can work on it and formulate your issue.

15    MR. VEEDER:  All right.

16    THE COURT:  Now also, Mr. Sachse, you are claiming

17  a prescriptive right, as I understand, to the extent of ten

18  miner's inches?

19    MR. SACHSE:  Yes, your Honor.

20    MR. VEEDER:  There is the question of ultra vires

21  on that.

22    THE COURT:  You are limiting it to a prescriptive

23  right?

24    MR. SACHSE:  Yes, your Honor.

25    THE COURT:  You should formulate that issue.  And

1  ultra vires may be in the case on that.

2  MR. VEEDER:  It has to be, your Honor.  Excuse me --

3  I'm sorry.

4  THE COURT:  What other loose issues of law are in

5  this case that we haven't really spent some time on and aren't

6  indicated in the rulings heretofore made?

7  MR. VEEDER:  We believe that the issue in regard to

8  the stipulated judgment of the Vails is very much in the case.

9  THE COURT:  Yes.  But what is the extent of it?

10  Certainly it binds the Government and the Vails.  But whom

11  else does it bind?

12  MR. SACHSE:  Mr. Veeder has pleaded that it is no

13  longer in effect.

14  MR. VEEDER:  The point I make is that we believe,

15  though, that there is a contractual arrangement going behond

16  the three second feet.  We believe that that stream would be

17  shut off virtually entirely were it not for our downstream

18  claim.  And we believe that the matter of the stipulated

19  judgment, irrespective of what Judge Fee said about it, is

20  very much in the case, and we think that it is an issue that

21  must be tried.

22  THE COURT:  I am not familiar with the pleadings of

23  the Vails.  What is your position, Mr. Stahlman, on the

24  stipulated judgment?

25  MR. STAHLMAN:  Your Honor, It depends, I think, a

2056

1    great deal on a lot of matters that go before us here.  But

2    we take the position that there has been a great change in

3    relation to the stipulation that was entered into, conditions

4    which make it inoperative and ineffective, and we have prayed

5    to have the stipulated judgment expunged.

6            THE COURT:  Have it what?

7            MR. STAHLMAN:  Have it expunged.

8            THE COURT:  In other words, you are attacking the

9    stipulated judgment.

10           MR. STAHLMAN:  Yes.

11           THE COURT:  On the basis of changed conditions?

12           MR. STAHLMAN:  Yes, that and other conditions that

13   exist in it, the fact that it is impractical to operate it,

14   and that certain conditions that your Honor may consider in

15   this case may make the judgment completely inoperative.

16           THE COURT:  You should formulate the issue that you

17   are proposing as to that stipulated judgment.

18           MR. STAHLMAN:  Yes.

19           THE COURT:  Now Mr. Veeder, I don't quite understand

20   your position.  First of all, we start out with the premise

21   that this judgment between the Rancho Santa Margarita and the

22   Vails originally bound Santa Margarita Rancho and the Vails.

23           MR. VEEDER:  Plus some small riparians in the canyon

24   between the two ownerships.

25           THE COURT:  All right.  And then the Government

1    stepped into the Rancho Santa Margarita's shoes.

2              MR. VEEDER:  That is right.

3              THE COURT:  Now are you standing on that judgment?

4    Or are you attacking it?

5              MR. VEEDER:  We are standing on the judgment, we

6    plead it as Exhibit "A," and we believe that it is legally

7    enforcible.

8              THE COURT:  Against the Vails and these other

9    riparians who were parties.

10             MR. VEEDER:  Yes.

11             THE COURT:  What effect do you claim it has on other

12   people who weren't parties to the suit?

13             MR. VEEDER:  To the extent that water is in the

14   stream that would not otherwise be there, we claim that in

15   addition to the three second feet we believe there is a large

16   quantity of water that comes down which probably would not come

17   down were it not for the stipulated judgment, which is a

18   question of fact.

19             THE COURT:  I don't follow you now.  The judgment

20   provided that a certain amount of water be released by the

21   Vails into the stream; is that right?

22             MR. VEEDER:  That is right.

23             THE COURT:  What is this talk about a larger amount

24   of water?

25             MR. VEEDER:  Divided upon a one-third two-thirds

2058

1  basis, the United States is entitled to two-third, and by and

2  large that quantity of water -- we know that the Vails could

3  use more water than they are using.   I want to say now that

4  this is entirely an amicable circumstance between the Vails

5  and Mr. Stahlman and the Marines.  But we think that anyone

6  who is tapping that supply of water that is in there by reason

7  of the stipulated judgment are taking water for which we have

8  a contract for delivery, just the same as if they were

9  taking wheat or anything else that was contracted to be

10  delivered.

11           THE COURT:  Are you talking now about the riparian

12  owners downstream who is using some of that water, or are you

13  talking about an appropriator?

14           MR. VEEDER:  We are talking about an appropriator

15  primarily, because we have no quarrel with the small riparian.

16  We're talking about Fallbrook, we're talking about Sawday and

17  the rest of them who are now participating in the supply of

18  water which we believe would not be there, or a great deal of

                        be
19  it would not/there, were it not for the contract with the

20  Vails.  We view the stipulation as nothing more or less than

21  a contract.  That is what it is.

22           THE COURT:  Well, isn't it your position that you

23  have certain riparian rights and that these appropriators are

24  interfering with your riparian rights?

25           MR. VEEDER:  That is one facet of it.

2059

1    THE COURT:  How does a judgment add anything to it?

2    MR. VEEDER:  It simply gives an even greater blessing

3  to the water that is released down to us, and it is specified

4  in the stipulated judgment that these waters would be delivered.

5  Now it may be true that we have only to rely upon our riparian

6  right, but we do have a contract that the United States suc-

7  ceeded to and which puts us in a better position than we would

8  otherwise have been as a normal average riparian.

9    THE COURT:  Do you have some theory there that this

10  water is sort of delivered to you at the Temecula Canyon?

11    MR. VEEDER:  Yes, sir.

12    THE COURT:  And that the corpus of the water then

13  belongs to the United States?

14    MR. VEEDER:  Yes.  Yes, the water that is actually

15  there.

16    THE COURT:  In other words, that so many measurable

17  feet of water --

18    MR. VEEDER:  No, we're not saying that.

19    THE COURT:   -- from that time on is the property of

20  the United States; is that it?

21    MR. VEEDER:  As a matter of fact, we can prove that

22  there is a great deal of merit in that.

23    THE COURT:  You also claim that, in any event, you

24  have certain riparian rights to that water.

25    MR. VEEDER:  Oh, yes.

1    THE COURT:  I'd like to have you formulate this in

2    the nature of a legal proposition, so that I'll have some idea

3    of what you are contending.

4    MR. VEEDER:  We will.  We certainly intend to, your

5    Honor.  It is a very important document.  Do you want me to

6    submit that to the State?

7    THE COURT:  Yes.  Spell it out so we can understand

8    it.  I have a little trouble understanding just what your

9    theories are with reference to that Vail situation.  Apparently

10   you claim riparian rights to that water, bolstered in some way

11   by the decree, and you also seem to have some claim that the

12   water is yours once it leaves the Vail property.

13   MR. VEEDER:  That's getting close to it, your Honor.

14   Any water that would not normally be delivered into the stream

15   except for the stipulated judgment, we believe, comes within

16   the purview of that contract.

17   THE COURT:  All right, see what you can do with that.

18   Now what other issues are there in this case?

19   MR. SACHSE:  I don't know whether to call it an

20   issue, your Honor, the question, the heart and soul of this

21   whole thing, which we discussed before Mr. Cranston, and that

22   is the question whether or not this case does entail a

23   quantitative apportionment.  Stated as simply as I can, I don't

24   see how it could, because taking the surplus case first and

25   leaving Fallbrook out of it -- taking a pure riparian, you

1   can't quantitatively apportion something which is a constantly

2   fluctuating quantity.  One riparian can use all the water in

3   the stream as against another riparian if the other one is not

4   using it.  When you further complicate that fairly simple

5   problem of two riparians by imposing then appropriative claims

6   to water, you bring in the additional question of what is

7   surplus, and surplus is certainly a quantity that fluctuates

8   drastically year by year and day by day.  Maybe I am talking

9   now right about the heart and soul of this thing.  When this is

10  all done and your Honor is writing a judgment, can you or will

11  you say that there shall be permitted to flow to the United

12  States X acre feet per year?  I don't think you can.

13          Jumping ahead now.  I think you can make a percentage

14  apportionment, possibly.  I think you can among riparians, not

15  among appropriators, because an appropriator is taking surplus,

16  theoretically, and unless you find that there is no surplus

17  you don't care how much an appropriator takes, within the

18  limits of his appropriation.  If there is surplus there and he

19  is taking it, he takes it all.

20          And finally, the biggest issue and the one on which

21  that finding, if there is any quantitative apportionment or any

22  apportionment, would have to be predicated -- would be a

23  finding of a present inadequacy of supply for the present

24  needs of the riparians.  Without a present inadequacy of supply,

25  there is no reason whatsoever  for stopping any riparian from

1  taking what he wants.  I am confining this now to the ripar-

2  ians.

3          So the first issue in this whole case is, Is there

4  a present shortage among riparians?  That is the first and

5  biggest one.

6          THE COURT:  Mr. Veeder.

7          MR. VEEDER:  I disagree completely with Mr. Sachse

8  as to the relief that would be accorded here.  It is my under-

9  standing of this kind and type of litigation -- and I sincerely

10  hope I'm not in error in it -- as I see this litigation, when

11  all is said and done it is not for your Honor to declare

12  whether there is or is not a surplus.  I don't believe you

13  could.  I don't believe it is an issue, and I don't believe it

14  would be relevant.

15          I believe that what your Honor is requested to do

16  by the United States of America at least, and with the cross-

17  pleadings that exist, is to decree and to adjudicate the

18  rights to the use of water to which the United States of

19  America is entitled and to which each and every party is en-

20  titled.

21          THE COURT:  That begs the question.  Quantitatively?

22  Percentage?  How?

23          MR. VEEDER:  On the basis of irrigable acreage.  On

24  the basis of military needs.  You will, as I see it, make an

25  adjudication, and you will decree the priority of use.  I am

1  assuming that the riparians will certainly have the first crack

2  at the available supply of water.  So they will have the para-

3  mount right, if I may use that term. Now following there will be

4  chronicled the rights of each individual to the extent of the

5  maximum irrigable acreage.  Now, if there is a surplus of

6  water available after all the riparians have gotten what they

7  are entitled to and the earliest appropriators, then the

8  Johnnie-Come-Lately like Fallbrook might get some water.

9       But it is not a matter, I submit, for this Court to

10  say, "Well, there's a surplus of 5,000 acre feet or X acre feet

11  or any acre feet," because it is conceivable, in a year of

12  high runoff, that a priority as junior as the Fallbrook priority

13  of 1946 might participate in some water.

14       But it is not, I submit, for your Honor to do more

15  than to chronicle or, as you said this morning, to catalog the

16  rights to the use of water, putting down the irrigated and

17  irrigable acreage, the location of the legal subdivision, and

18  the order in which they will participate in the yearly and the

19  daily varying supply of water.  I don't believe there is any-

20  thing more that your Honor can decree.

21       And that is what I think is going to occur.  It will

22  be, to a degree, a quantative allocation, but it will not be a

23  statement that so many acre feet are going to be available to a

24  given party at a given time, because supply is the thing that

25  is going to operate there.  But if the maximum is shown that

2064

1   each user is entitled to, and when he has used all the water

2   to which he is entitled, to the full extent of his riparian

3   rights, then the next claimant is entitled to participate.  And

4   that is how I think the water will be distributed.

5        Now certainly that is how the decrees function today

6   throughout the West.  There is no declaration that there is X

7   quantity of water in the stream, because no one knows how much

8   is going to be there.  But there is a declaration as to the

9   maximum that an individual can take under his vested rights.

10       The thing that concerns me in your Honor's ruling

11  when he threw out the inchoate rights is that it is impossible

12  to ascertain what the burden is going to be on the stream, and

13  that is why I have been very hopeful that your Honor would say,

14  "Applications 12178 and 12179 have this priority, if any, and

15  are entitled to this quantity of water, if and when structures

16  are put in and if and when water is beneficially applied."

17       THE COURT:  Well, I may still say that.

18       MR. VEEDER:  Well, I'm hoping.

19       THE COURT:  You keep talking about my throwing out

20  these applications.  I threw out causes of action in which you

21  asked me to determine priority dates.  Now if the State agency

22  grants a permit based upon an application, and that becomes

23  final, it can be incoproated into the decree, and subject to

24  the limitations that you suggest.

25       But in case you didn't understand what I said, I'm

2065

1  not going to sit here and perform a legislative function and

2  decide priority dates.

3          MR. SACHSE:  Either I don't understand Mr. Veeder, or

4  he doesn't understand me.

5          The point I am trying to make is this -- and I think

6  this is worthy of consideration, and I am not discussing at

7  this point Fallbrook's rights at all; but we are going to have

8  to sit through this whole case and so I am very much concerned

9  -- as between riparians, as between simply the United States

10  and every other riparian up that River, Mr. Veeder or the

11  United States (Camp Pendleton) isn't going to get a right to

12  have a certain amount of water come to it.

13          MR. VEEDER:  I said that.

14          MR. SACHSE:  He is going to get a determination that

15  he is a riparian.

16          MR. VEEDER:  That is what I said.

17          MR. SACHSE:  He is going to get a determination that

18  if, at some future date, a shortage should actually exist, it

19  might be sufficient for the Court then to apportion.  It might

20  not, because circumstances change also and what is irrigable

21  acreage may be a great deal different later on and what is

22  reasonable may be a great deal different.

23          But now as to the appropriator, all we take is water

24  that is presently surplus -- now that is presently surplus to

25  the present uses and the present needs of the riparians, and it

1   is entirely conceivable, in fact it has existed on many rivers,

2   we can imagine that there was no use whatsoever of any kind by

3   the Vails or anybody else above us, there would be a present

4   surplus in the Santa Margarita River which we would take and

5   have a perfect right to take, which could certainly be taken

6   away from us again at such time as the Vails proceeded to put

7   the water to use.

8          Now exactly the same thing is the condition that

9   exists in our relation to the United States.  If there is water

10  flowing to us which is not needed for the United States today,

11  there is surplus today.  So any quantitative determination

12  that the United States is entitled to so many acre feet or

13  so many second feet is impossible -- it can't be done.

14         MR. VEEDER:  I don't believe there is any disagree-

15  ment.

16         MR. SACHSE:  Maybe there isn't.

17         MR. VEEDER:  I don't believe there is.

18         MR. SACHSE:  But if I was thick and didn't follow

19  you, I'm sorry.  But please let me spell it out and then we

20  will know that we are in agreement.

21         In the second place, you couldn't possibly make such

22  finding without first determining the existence of a shortage.

23  And I think it is going to be rather hard to prove.

24         I think, therefore, the first basic issue of fact

25  that is going to be in this case is the question whether or not

there is presently on this stream a shortage.  If there is not

a shortage, there is no need for an injunction, there is no

need for an allocation, there is no need for anything.

MR. VEEDER:  I would just like to take one more shot

at this.

As far as I see this case -- this case is not an

injunction case, to begin with -- you can certainly have an

adjudication on a stream where there is momentarily a surplus

on certain occasions.  I think Mr. Sachse stated what I think

is about correct, in that he understood that I said that there

would be a quantitative distribution.  I didn't say that. I

said that you could have an adjudication of the maximum

quantities to which we would be entitled as against the appro-

priators, but as mong the riparians we would enjoy the thing

correlatively with them, and whatever is available we would

participate on that basis.

THE COURT:  Mr. Moskovitz, you were about ready to

make a contribution of your ideas about a final decree in this

case.

MR. MOSKOVITZ:  Well, one point is that there is a

prayer for injunction, here.  I don't know whether Mr. Veeder

is disclaiming that now.

MR. VEEDER:  Why, of course not.  The way you enforce

it ultimately, you can pray that the adjudication be enforced

in accordance with the decree, and that is why you put in the

1    paragraph for injunctive relief.  If we want an injunction

2    earlier, we simply file another motion, Mr. Moskovitz.

3              MR. MOSKOVITZ:  All right.  But essentially what the

4    United States is asking for is an adjudication of rights.  Now

5    the United States gets an adjudication that it is a riparian

6    owner and that there are so many acres of land that are

7    riparian, and presumably you would do this for all the other

8    riparians on the stream.  All along in this case I have had the

9    basic question:  So what?  Then what?  What have you really

10   accomplished?

11             I think Mr. Grover has set forth, in the memorandum

12   that he submitted to your Honor about a month ago, the real

13   problem here, that in going through all these long hearings and

14   gathering all this evidence the result will not be anything

15   immediately usable.

16             And on the apportionment part I agree with Mr. Sachse.

17   Certainly an apportionment of water, I don't think could be

18   rendered on the basis of the kind of evidence that is available,

19   and it certainly wouldn't do any good because next week it would

20   have to be different.

21             I am expressing some very basic doubts about the

22   purpose and course of this litigation, as to what will come out

23   of it and who is going to be benefitted by what does come out.

24   But I certainly think this is an issue that we will have to

25   face:  What will be the nature of the decree that comes out?

1    MR. VEEDER:  I submit you a copy of the kind of

2  decree that we have entered in other cases.  Take a look at it.

3         MR. MOSKOVITZ:  I want to make one comment on that.

4  I may be wrong, but I think the kind of decree that Mr. Veeder

5  has in mind are decrees which are rendered on the basis of

6  appropriative rights.  These are priorities which are decreed.

7  Mr. Veeder uses the word "priorities" quite often, and what he

8  has in mind are these decrees that you get in states like

9  Nevada or Colorado, which are appropriative states pure and

10  simple.  And there you can do this.  You can have a catalog of

11  rights, starting with the earliest down to the latest, and in

12  each one you can indicate the point of diversion and the

13  quantity of water because these are established by use.  With

14  a riparian right you can't do that, because it is a constantly

15  shifting thing, and the shares are co-equal among riparians who

16  have the same status.

17         MR. VEEDER:  I will send you a copy of the Feather

18  River adjudication.  That is in California.

19         THE COURT:  Let's see a copy of a decree that might

20  have some relationship to one you propose in this case.

21         MR. STAHLMAN:  Does your Honor propose to take a

22  recess this afternoon?

23         THE COURT:  Yes, right now.  Take a short recess.

24         (RECESS)

25                         - - -

2071

1    MR. BURBY:  If the Court please, I would like to

2  move for the admission of Commander Redd to practise law in

3  the Federal Courts of this District.

4    The Commander is a member of the Bar of California,

5  and I am very happy to vouch for his integrity.

6    THE COURT:  One of your former students?

7    MR. BURBY:  No, your Honor.  I'm sorry about that.

8    THE COURT:  Have you filled out the card here?

9    MR. BURBY:  Yes, I have, your Honor.

10    THE COURT:  This is a general admission that you are

11  moving.

12    MR. BURBY:  Yes, your Honor.

13    THE COURT:  Commander, I am very happy to grant this

14  motion.

15    The Clerk will administer the oath.

16    THE CLERK:  You do solemnly swear to support the

17  Constitution of the United States; that you will bear true

18  faith and allegiance to the Government of the United States;

19  that you will maintain the respect due to the courts of justice

20  and to the judicial officers; that you will demean yourself as

21  an attorney, proctor, advocate, solicitor and counsellor of

22  this court uprightly.  So help you God.

23    COMMANDER RED:  I do.

24    THE COURT:  Commander, it is a pleasure to admit you

25  to practise in the District Court for the Southern District of

1    California.

2              COMMANDER REDD:   Thank you.

3              THE COURT:   You come well recommended by Professor

4    Burby.   I don't know whether you know it or not, but he was

5    the scourge of the law students who attended the University of

6    Southern California.   I was one of those fortunate individuals

7    who never had to take a course from him.   I was getting out of

8    school about the time he came in.   But he has long been an

9    expert in the field of real property law and/or water rights,

10   more currently water rights.   We will look forward to your

11   participation in this case.

12             COMMANDER REDD:   Thank you, sir.

13             MR. STAHLMAN:   Has your Honor heard that Mr. Burby's

14   most recent book is on Criminal Law?

15             THE COURT:   I know that he changed fields here

16   completely.

17             Have you written a book on Criminal Law?

18             MR. BURBY:   I have some material on criminal law,

19   your Honor.

20             THE COURT:   I could ask you a very embarrassing

21   question, which I will not do.

22             MR. STAHLMAN:   Now you know whom to appoint the next

23   time that you have one of these indigent cases.

24             THE COURT:   He may have been preparing for that, you

25   see.

2073

1    What else can we do on this matter of talking about

2  issues that may come up in this case?

3    One issue, of course, is what kind of decree we

4  would frame eventually.  In that respect, in thinking about

5  this from time to time, it seems to me that as we go along we

6  will wind up with several interlocutory decrees as part of the

7  case and probably eventually try to fit them together.  This is

8  offhand thinking, and I would welcome your ideas, too.

9    For instance, the offers that have been made by

10  people who have a small piece of ground, where the Government

11  says, "We're not going to object if you use water."  It

12  presents some problems.  Everyone else in the case has a right

13  to shoot at that, and one problem that has been bothering me

14  about that is that some of those people are undoubtedly

15  riparian users and some may not be.  As to those riparian

16  users, in the matter of the stipulation of the Government, their

17  rights are correlative rights with all other riparians.  As to

18  those who might be taking percolating water, they have

19  correlative rights with their neighbors.  At any rate, we

20  ought to have some way to gather most of those up at one time

21  and notice a hearing on them and probably enter some inter-

22  locutory decree taking care of that group of people.

23    It may also be desirable to take a number of the

24  people in the district who are found by the Court or by the

25  Master to have percolating water not part of the stream and

1   enter some interlocutory decree that they have no rights as

2   part of the stream, have no effect upon the stream; that they

3   have rights to percolating water; that their rights are

4   correlative with their neighbors; that this Court does not

5   make any attempt to adjudge what those correlative rights may

6   be or the extent of them.  Leave that open for disputes that

7   may come up later, and handle that kind of people in a group.

8           It may be desirable to take some of these tribu-

9   taries, although that presents problems.  We have already run

10  onto them at De Luz where, in addition to the small owners,

11  which would make it appear that we might handle that stream as

12  a unit, there are the rights of some of the big defendants

13  involved in that watershed.  I don't know whether we could

14  ever do this on a tributary basis.

15          But it would seem to me proper from time to time to

16  get some interlocutory decree as to a portion of this case

17  lined up, circulate it and give the people a chance to be

18  heard and get parts of the case out in that manner.

19          This is very rough thinking about how we're going to

20  handle these matters.

21          MR. MOSKOVITZ:  Your Honor, certainly we all agree

22  that the nature of the decree, the way that rights will be

23  described ultimately is one of the important issues, and I

24  would propose to include it in the form of order.

25          I wonder whether that is perhaps not such an

1  important issue that there ought to be thinking about it and

2  perhaps some sort of resolution tentatively of that problem

3  before the trial.  Now I have no intention of postponing the

4  trial.  But I wonder if the nature of the evidence to be

5  introduced will be shaped by that.  In the De Luz hearings

6  there was some evidence about irrigability, there was a little

7  evidence about economic feasibility -- not very much.  Perhaps

8  the evidence would have been different, perhaps greater or

9  maybe less, if there had been a clear idea of what the findings

10  would be like, what the Master or the Court were aiming at.

11  The Master would ask for suggestions from Counsel on that

12  after most of the evidence had been taken.

13          I am just raising the question whether this is

14  something that should be thought of beforehand like these other

15  issues of law which have been largely disposed of.

16          THE COURT:   I think we could well give it some

17  consideration.  We are probably going to have to have another

18  hearing finally to formalize and iron out the differences that

19  you may have between you on the statement of these issues in

20  this proposed pre-trial order.  We could spend some time on

21  that profitably.

22          I would like to see this decree in the Feather River

23  case, and I would like to have from Mr. Veeder, Mr. Moskovitz,

24  Mr. Sachse and Mr. Stahlman some concrete suggestions on not

25  only the form of the final decree but also on probably some

1  preliminary interlocutory decrees; whether that is desirable,

2  and if so what they should concern.

3       Don't you think we could explore this profitably,

4  Mr. Veeder?

5       MR. SACHSE:  Mr. Veeder and I have been working hard

6  on that, your Honor, in connection with the chances on a lot

7  of these little people.  I'll tell you frankly, I don't think,

8  in the present state of this file and your Honor's orders,

9  that it can be done.  Now if we can get rid of this everybody

10  adverse to everybody else, yes.  But Mr. Veeder has given

11  answers to requests for admissions that are of such nature

12  that I have felt free to write to those individual clients that

13  as far as the United States is concerned they can forget this

14  lawsuit.  But they are not out of the lawsuit.  There is still

15  a lis pendens on their property.  I don't know what Mr. Veeder

16  can do about it.  I don't blame him.  I think they are going to

17  stay in it, unless we can find some way to eliminate this

18  all parties are adverse to everybody else.

19       THE COURT:  They will probably stay in it.  But I was

20  thinking suppose a number of these were gathered up in an

21  interlocutory decree, a proposed decree and findings were

22  circulated and served, hearings set, and an interloctory decree

23  was entered as to certain category of people.  Tentatively I

24  don't see that it is in conflict with the order of the Circuit.

25  You would eventually have to work out a final decree, one

1    final judgment.  But it would go a long way toward clearing up

2    certain segments of this case.

3              MR. VEEDER:  I concur, your Honor.  It seems to me

4    that as to the matters that Mr. Sachse has made reference to,

5    there would be no objection that I can see why an interlocutory

6    order saying they have or have not riparian rights.  I think

7    that certainly it might delineate and define the areas of the

8    litigation.  I think it would be helpful, and we will under-

9    take to tender some thoughts along that line.

10             MR. SACHSE:  You have given me, I believe, 19 defendants

11   less now, if we can do it.

12             MR. VEEDER:  I think we will be in better shape to

13   approach the ultimate form of the decree when Mr. Cranston

14   comes down with his proposed findings.  That was a matter that

15   we went into at Reche School the other day.  I had hoped that

16   he would come down with a statement as to whether, in his

17   opinion, the lands were riparian, the irrigated and irrigable

18   acreage.  If he comes down with a finding like that, I think

19   we will be a long way down the road as to the kind and type

20   of decree that will be entered.

21             THE COURT:  I think he is going to do that.  But

22   let's fix a further date of hearing.  What about the 15th or

23   the 22nd of September to iron out and have ready for submission,

24   as far as possible, a proposed pre-trial order on these rulings

25   and on these issues?  And at that time also have in writing

1    from you some suggestions, at least in general principle, as

2    to the form of the final decree or these interlocutory

3    decrees, so that as Mr. Moskovitz suggested we could be

4    thinking about the type of decree that would be entered.  It

5    might have a definite bearing on the way we tried the case, on

6    the scope of the evidence.

7         Are you in agreement that we could do something like

8    that?  Mr. Veeder?

9         MR. VEEDER:  I was pondering for a moment.  I think

10   we can.  I've been thinking about the kind and type of clause

11   that would embrace the military use, and how we would specify

12   what we think are our present needs and our ultimate demands

13   in the event of full mobilization.  We would want to correlate

14   those in with our agricultural use.  I hesitated for a moment

15   because I think it is a problem we are going to have to put

16   together, and I think it is going to depend a great deal upon

17   how your Honor rules in regard to the military use and the

18   riparian use; and my own thinking, one step further, I don't

19   believe it is an appropriator's business in regard to reason-

20   ableness on riparian land.

21        So you have quite a number of closely  correlated

22   and extremely difficult problems when you view the needs and

23   the demands of the Marines at Camp Pendleton.  I think it is a

24   relatively simple process in regard to the small riparian

25   owners.  I don't see any problem there.

1       THE COURT:  Well, there is a variety of things we

2 would have to cover, and I would appreciate your suggestions.

3       What do you suggest, the 15th or the 22nd?

4       MR. SACHSE:  May I request the 22nd, your Honor.  Mr.

5 Stahlman and I will certainly be through by the 22nd, but by

6 the 15th we may not be.

7       MR. VEEDER:  I may have a conflict on the 22nd.

8       THE COURT:  What is that?

9       MR. VEEDER:  I might have a case coming up.  I'll

10 see if I can adjust it, though.

11      THE COURT:  I suggested the 22nd for the reason that

12 on that day I don't have the criminal calendar and I would

13 have most of the day available.  If you had a conference, do

14 you think you could postpone it one day?

15      MR. VEEDER:  Yes, I will try.  I would like to get

16 this done, and the 22nd, I suppose, is the best time to do it.

17      THE COURT:  I don't think we can do it before that

18 date.  You will have to submit to Mr. Moskovitz some material.

19 He can be working on a rough draft and be prepared to work

20 some of this material in, and then as soon as he has something

21 for you to shoot at he can mail out to you a draft. I want

22 copies as you go along.

23      MR. MOSKOVITZ:  Yes.  You don't want them filed, do

24 you?

25      THE COURT:  No, they don't have to be filed -- mail

1  it to me personally, and see what we can do to get this into

2  some kind of shape to where we know what we're trying.

3        Is there anything else this afternoon, then,

4  gentlemen?

5        MR. VEEDER:  I know of nothing else, your Honor,

6  unless you want to enter judgment for us now.

7        THE COURT:  Well, I have already entered judgment for

8  you for your riparian rights.  You haven't any complaint about

9  that.  It is a question of how much they are.

10       MR. VEEDER:  Thank you very much.

11       THE COURT:  Now I urge you to do this.  In order to

12  get this thing on the way, each of you whom I have designated

13  to spell out some of these issues that concern these problems

14  should do that promptly and send them to Mr. Moskovitz,

15  because he can't get you something overall to shoot at until

16  you have supplied to him, and each of you have certain tasks

17  assigned to you that concern the particular issues that you

18  have raised:  Mr. Stahlman on the Vail end of it, Mr. Veeder

19  on the Vail judgment and this claim that the United States

20  makes there -- I'm not naming them all, Mr. Sachse on some of

21  his claims.  In addition, there are a number of other issues

22  that I am sure Mr. Moskovitz will pick up.  For instance, we

23  have the issue on the rights on the Indian lands and the

24  Forests upstream, and I think it is pretty clear now that those

25  rights are questions of what are the rights that pertain to

1 those lands and not elsewhere.

2          So I urge you to do this promptly and give Mr.

3 Moskovitz some chance to work on this.  He is probably the

4 proper man, because --

5          I understand you have a few issues on a little bit

6 of State land, but that is very minor.

7          MR. MOSKOVITZ:  Very minor.

8          THE COURT:  You are, therefore, in the position of

9 not having the burden of this case to do a little of this work.

10          MR. MOSKOVITZ:  I'll be happy to.

11          MR. VEEDER:  Your Honor, there is one problem that

12 came up, in regard to the maintenance of our office at

13 Rainbow.  We would like to change it; in fact, we are going to

14 have to change it.  We would like, moreover, to cut down the

15 time that a man is required to be present there.  I don't

16 believe it will prejudice anyone's interest.  Probably to the

17 contrary, if we would have a man available it would be more

18 assistance to cut this period down to one day a week.  We are

19 going to have to move out of the present location which is

20 spelled out on page 3 of your Honor's order.  Will we be in

21 contempt of court if we make those changes?

22          THE COURT:  Certainly not in contempt of court.  I

23 understand that you have completed a lot of your work in the

24 Fallbrook area.

25          MR. VEEDER:  That is right.

2082

1    THE COURT:  Are you going to maintain a similar

2  office up around Murrieta?

3    MR. VEEDER:  We are going to get into what is known

4  as the Swing Building up at Temecula.

5    THE COURT:  Is it owned by Mr. Swing?

6    MR. VEEDER:  No, but I thought it was a humerous

7  touch.

8    THE COURT:  The Master is authorized, under this

9  order, to publich notices.  I think the thing to do would be to

10  get a notice out in the paper cutting down the hours at

11  Rainbow, and as soon as you can designate your new office for

12  this other area you are moving into.

13    MR. VEEDER:  Yes, we will do that.

14    There is one other thing.  Is your Honor going to be

15  in town tomorrow and the next day?

16    THE COURT:  On Friday our Judicial Conference starts

17  at Los Angeles.  I'll be in Los Angeles on Friday.  I may be

18  here on Thursday or I may not be.  I may be here, probably will

19  be here at least tomorrow morning.

20    MR. VEEDER:  We are in this position.  San Diego has

21  some data that we desire in the preparation of the case.  They

22  have asked me to get a court order from your Honor directing

23  them to deliver to us this material that they have accumulated

24  down through the years.  We can have the order for your Honor

25  to sign in the morning.

1        THE COURT:   That who has accumulated?

2        MR. VEEDER:   The County of San Diego.  We will have

3   an order for you in the morning.

4        THE COURT:   All right.

5        Thank you very much.

6        (ADJOURNMENT.)

7                              - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25