# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

—  —  —

#### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

—  —  —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No.  1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      September 22, 1958

Pages:     2084 to 2186

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME NO. 23

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
                                   )
vs.                                )
                                   )     No. 1247-SD-C
FALLBROOK PUBLIC UTILITY           )
DISTRICT, et al,                   )
                                   )
                    Defendants.    )

- - -

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Monday, September 22, 1958

- - -

APPEARANCES:

     For the Plaintiff:     WILLIAM H. VEEDER, Esq.
                                WILLIAM E. BURBY, Esq.
                                Special Assistants to the
                                Attorney-General
                                Department of Justice
                                Washington, D. C.

2085

1 APPEARANCES (continued):

2   For U. S. Marine Corps:   COL. ELLIOT ROBERTSON
                 LT. COL. A. C. BOWEN
3                 CMDR. DONALD W. REDD

4    For Defendant Vail    GEORGE E. STAHLMAN, Esq.
    Company:

5

6    For defendants Fallbrook F. R. SACHSE, Esq.
    Public Utility District,
    et al:

7

8    For defendant State of  EDMUND G. BROWN, Esq.
    California:       Attorney-General, by
                 ADOLPHUS MOSKOVITZ, Esq.
9                 Deputy Attorney-General
                 CARL BARONKAY, Esq.

10

    For Defendant Santa  W. B. DENNIS, Esq.
11   Margarita Mutual Water Co:

12   For Defendants Gibbon and
    Cottle, and for Defendants GEORGE C. GROVER, Esq.
13   Halde:

14   For Defendants Hartman,  BEST, BEST & KRIEGER, by
    Lewis, Wilks and Bayle:  JAMES H. KRIEGER, Esq.
15   Defendants Oviatt:    ARTHUR L. LITTLEWORTH, Esq.

16   For Defendants Sawday:  LUCE, FORWARD, KUNZEL &
                 SCRIPPS, by
17               ROBERT MCGINNIS, Esq.

18

19

20

21

22

23

24

25

2086

1   SAN DIEGO, CALIFORNIA, MONDAY, SEPTEMBER 22, 1958, 10:00 A. M.

2                            - - -

3            THE COURT:  Call the case, Mr. Clerk.

4            THE CLERK:  1 - 1247-SD-C, United States of America

5   vs. Fallbrook Public Utility District, et al.

6            THE COURT:  Mr. Moskovitz.

7            MR. MOSKOVITZ:  Your Honor, I have distributed to

8   Counsel, and I hand to you, the latest draft of this proposed

9   pre-trial order that you asked me to prepare.  It is not

10  complete, your Honor.  I have't received lists of exhibits

11  from all Counsel, but the extent to which I have received lists

12  of exhibits and comments and suggestions as to issues are all

13  included in that proposed order.

14           THE COURT:  I saw a series of correspondence come in.

15  I didn't see anything from the Vail Estate.

16           MR. STAHLMAN:  Your Honor, I can take care of that, I

17  think, right here.  All of the exhibits which we will use are

18  exhibits which are already designated in evidence.  The

19  Government has all our maps and soil studies.  I have some

20  here -- just got them this morning -- I am ready to submit

21  them now.

22           THE COURT:  What about the statement of the issues?

23           MR. STAHLMAN:  The issues, such as the result of the

24  stipulated judgment, are all in the report, the one that I read

25  previously.

1    THE COURT:   In other words, Mr. Moskovitz has formu-

2  lated issues that are satisfactory to you.

3    MR. STAHLMAN:   Yes.

4    THE COURT:   Has the material as to issues from all

5  parties been received by you, Mr. Moskovitz?

6    MR. MOSKOVITZ:   I received suggestions from Mr.

7  Sachse and Mr. Veeder, and those are incorporated.

8    THE COURT:   What about Mr. Dennis?

9    MR. MOSKOVITZ:   Nothing came from him, your Honor.

10    MR. STAHLMAN:   We would have these completed if

11  these could be marked as our exhibits for identification.

12    THE COURT:   There is no objection to that, except

13  that none of the other exhibits have been marked by the Clerk.

14  They have so far only been listed in this proposed pre-trial

15  order as to issues.

16    MR. STAHLMAN:   Of course, we are familiar with the

17  fact that in the previous trial of this case those exhibits

18  were in evidence.   We know that those exhibits with which we

19  are concerned were in evidence, and the Government has already

20  listed those exhibits.   They are already marked and are already

21  in the case.

22    THE COURT:   Have you listed those exhibits from the

23  previous trial, Mr. Moskovitz?

24    MR. MOSKOVITZ:   No, I didn't realize that I was

25  supposed to, your Honor.

2088

1        You listed those?

2        MR. VEEDER:  We listed material that either embraced

3   everything that was in the former trial, or we now have that

4   material in the Special Master's hearings.  So I think that

5   what Mr. Stahlman has said is correct.  We have enlarged, in

6   some respects, those exhibits.  But I think that what he has

7   said is absolutely right.

8        MR. STAHLMAN:  The soil studies and the maps, the

9   documentary evidence upon which we rely, are all there, plus

10  these from the State of California.

11       THE COURT:  I have no objection to marking them now.

12  Let me ask you what your desires are in that respect.  The

13  Government's exhibits will be numbered the 1, 2, 3 series.  Do

14  the defendants want a separate series of numbers for each

15  defendant?  Or just the letter series?   What is the thought

16  of Counsel?  Shall we use the name of the defendant?

17       MR. VEEDER:  I would prefer that myself.

18       THE COURT:  California's A, B, C; Vail's A, B, C;

19  Santa Margarita A, B, C; etc?

20       MR. VEEDER:  That is much easier.

21       MR. MOSKOVITZ:  I think so.

22       THE COURT:  All right, hand those to the Clerk, Mr.

23  Stahlman.  How many are there?

24       MR. STAHLMAN:  They comprise three separate

25  documents.  However, they may all be marked as one.  All of

1  them pertain to the same subject matter.

2      THE COURT:  All right, they will be marked Vail's

3  Exhibit A for identification.

4      MR. SACHSE:  I understand, then, that we are not

5  going to receive a list of these Vail exhibits?  I think a list

6  would be extremely helpful.

7      THE COURT:  They will be incorporated in this order

8  which Mr. Moskovitz is working on.

9      MR. SACHSE:  That is, the ones that are in evidence

10  already in the previous case.

11      MR. VEEDER:  We would like to re-tabulate those.  I

12  think they are matters based upon your Honor's opinion that

13  have direct, immediate application to the Special Master's

14  exhibits.  That is why we didn't have them.

15      THE COURT:  I want them re-tabulated in this document

16  you are working on.  I want any exhibits out of that first

17  trial re-listed by whoever is going to use them.  That first

18  trial has no part in this trial at all.  As to the Master's

19  exhibits, they should be listed.  How many of them are there?

20      MR. VEEDER:  There are a great number of them, your

21  Honor.  As I was telling the gentlemen here, I have a full set

22  of those exhibits, and a full set of our tabulated exhibits in

23  the office downstairs available for the people to review.  I

24  think that what is going to occur, though, as we go ahead with

25  the list of each individual, we are going to find cumulative

1    and duplicative evidence.   So that is why I would like to sit

2    down with Counsel and sort these things out.

3            THE COURT:   That is what I want you to do.

4            MR. SACHSE:   That's exactly what I told him.

5            THE COURT:   Before we pass it, you are not going to

6    offer before me every exhibit offered before the Master, are

7    you?

8            MR. VEEDER:   No, sir.

9            THE COURT:   Well, then, pull out those that you want

10   to offer in the case in chief here and have a list of them

11   available so that we can include those in our summary.

12           MR. VEEDER:   Yes, we'll do that.   I think that there

13   will probably be some shooting about it, but I will outline

14   what I think -- for example, we offered in evidence Applications

15   12178 and 12179.   As I understand your Honor's opinion, those

16   are not relevant in the case here and should not be in the

17   record.   As I understand it, you have ruled that you do not

18   have jurisdiction of applications that have not been finally

19   acted upon by the State.   So I don't see their relevance.

20   That is the reason why I didn't tabulate them.

21           THE COURT:   If you want to add them in, there is no

22   objection; merely that some application has been made that

23   hasn't yet gone through the State route.   There is no particular

24   problem there.   There is no dispute but that they exist.   Those

25   are the ones that the Water Rights Board ruled on?

1   MR. VEEDER:  That the Water Rights Board has ruled

2   on, and Mr. Dennis has brought his proceedings for a writ of

3   mandate, concerning which there has been no final action, of

4   course, and that of course happened before the Department of

5   Navy's Application 12576.

6   THE COURT:  Mr. Dennis, have you supplied Mr.

7   Moskovitz a statement of issues?

8   MR. DENNIS:  I haven't supplied him with a state-

9   ment.  Maybe in view of your Honor's statement just now, I

10  have been in error.  But the only exhibits which Santa Margarita

11  Mutual or Rainbow have proposed to introduce were those which

12  were already introduced at the other trial between the State of

13  California and the Santa Margarita Mutual Water Company and

14  the United States of America.

15  As I read the decision of the Ninth Circuit Court of

16  Appeals, it held that going ahead with the trial as to Santa

17  Margarita was not improper, but it was improper to enter the

18  judgment at that time; and I assumed that all that we were

19  doing, as far as Santa Margarita was concerned, that Rainbow

20  was only their successor in interest and we were reopening the

21  case as to Santa Margarita and the State of California so that

22  additional evidence will go in, in regard to the other

23  defendants.

24  THE COURT:  I am not going to reopen the case, as I

25  understand it.  We're going to try the case -- start over

1   again.

2       MR. DENNIS:  As I recall the decision -- I may be in

3   error, but I believe there was language, you will recall, that

4   at the time they set the case for separate trial as to Santa

5   Margarita, the State of California and Fallbrook, Fallbrook

6   and Santa Margarita asked for a writ of mandate on the grounds

7   that the court was without jurisdiction and that the order was

8   improper, and they held that it was proper; and in the Ninth

9   Circuit Court decision I believe there is language which says

10  that the court was correct in trying the action separately as

11  to Santa Margarita and the State of California, but that it was

12  in error in entering a judgment at that time and that the

13  court was in error in making certain findings and conclusions.

14      However, there are no exhibits which Santa Margarita

15  intends to introduce if they are not already introduced in

16  evidence, in regard to the present trial which is coming up,

17  other than those which  they introduced at the trial of the

18  action before.

19      THE COURT:  Well, I'm not going to complicate the

20  matter by accepting, as it were, the former trial and then

21  trying to patch it up, with a right of everybody else to be

22  heard.  We're going to start afresh.  Therefore, I want you to

23  supply Mr. Moskovitz with a statement of the issues in this

24  case insofar as Santa Margarita is concerned.

25      MR. DENNIS:  I will do that, then, your Honor.  And

    I will say now that we have no intention of introducing any

1  exhibits other than those that were introduced.

2          THE COURT:  That is not enough either.

3          MR. DENNIS:  I will supply him with a list of those

4  exhibits.

5          THE COURT:  Supply him with a list of those exhibits

6  that were introduced at the former trial that you propose to

7  rely upon at this time.

8          MR. DENNIS:  We will do that within forty-eight

9  hours.

10          THE COURT:  Well, forty-eight hours.

11          MR. DENNIS:  I think that Mr. Moskovitz already has

12  the transcript on that, which shows the exhibits which were

13  introduced in the case.  But I will be glad to copy them.

14          THE COURT:  Let's not wait forty-eight hours.  I

15  expect you gentlemen to do some conferring here today and work

16  some of these problems out.

17          MR. DENNIS:  We can work that out today.

18          THE COURT:  The Clerk says that he has some of the

19  Government's exhibits that have been handed to him.  Are these

20  the originals that you propose to use at the trial, Mr. Veeder?

21          MR. VEEDER:  Those are exhibits that we are making

22  available for examination by Counsel.

23          THE COURT:  I see.  Let's not worry about marking

24  them now until we get some list of them catalogued and see

25  what we have, and then we may mark some of them before the

2084

1    trial starts.

2            MR. VEEDER:  That is entirely possible.  But I say,

3    there are duplicates in there.

4            MR. MOSKOVITZ:  Your Honor, we have some exhibitss

5    that are ready for submission to the Clerk for examination by

6    the parties.  I didn't know just how they should be handed to

7    him, whether they should be marked or just given to him

8    informally.  I thought I would ask you before we did that.

9            THE COURT:  It might facilitate your work, I suppose,

10   if there were some identification on them.  I have no objection

11   to your assigning your California A, B, C to these exhibits

12   and making it part of the record.  I don't have to be in here

13   when you do that.  Just work out with the Clerk what letters

14   you are going to assign to them.

15           MR. MOSKOVITZ:  Very well.

16           THE COURT:  Mr. Veeder can do the same thing with

17   this group that he has handed to the Clerk.

18           MR. VEEDER:  We have assigned numbers to them and

19   they are listed with the kind of number we would like to have

20   placed on them.  Our itemization sets that up.

21           THE COURT:  No one has had a chance to go over this

22   matter in any detail that Mr. Moskovitz has prepared, here.

23           MR. MOSKOVITZ:  Your Honor, there are only a few

24   changes in this draft over the first draft which was sent to

25   Counsel insofar as issues are concerned.

1        First, I had no list of exhibits.

2        But I can point out which issues have been added and

3   the changes.

4        On page 5, which continues the issues which I felt

5   had been determined by your Honor's opinion, number 15 has been

6   added.   This was at the suggestion of Mr. Sachse.

7        MR. VEEDER:   Your Honor, I might as well interpose

8   now.   I think that as far as the United States is concerned

9   it is a waste of time to consider what Mr. Moskovitz has done

10  from 1 through 6.   We certainly cannot accept his interpretation

11  of your Honor's opinion, and we don't believe that it has any

12  proper place in a pre-trial order.

13        Your Honor wrote an opinion.   I think the opinion

14  speaks for itself.   I think for us to undertake to try a law-

15  suit with a canned interpretation of your Honor's opinion

16  would be simply inviting disaster for us.   So we take the view

17  -- and we have written a letter, I think, to all Counsel in

18  regard to it -- we don't believe that it is proper or appro-

19  priate or juridical to have such an effort tendered for a

20  pre-trial order.

21        THE COURT:   You say 1 through 6.   You mean page 1

22  through 6?

23        MR. VEEDER:   Pages 1 through 6 of the new offer.

24        THE COURT:   I'll hear you on it, but I'm not in

25  agreement with you.   I think that it is proper procedure to

1  summarize in a pre-trial order rulings that a court has made.

2  It is an order that I would sign.  Therefore, I would have to

3  be content with it.  So I would like to know what your

4  objections are.

5  　　　　MR. VEEDER:  To begin with, as I said, I think it is

6  for your Honor to determine and not for the parties to stipu-

7  late what your Honor meant.

8  　　　　THE COURT:  It's not a stipulation.  This is an

9  order.  Look at page 2:  it is ordered as follows.

10  　　　　MR. VEEDER:  In other words, the United States is not

11  being requested to approve it.

12  　　　　THE COURT:  Well, you're requested to approve it.

13  But if you can't agree, I'll hear why you can't.  And that

14  portion of it that I ordered is a matter on which I must make

15  a decision.  If you approve it, all right.  If you don't, I

16  would probably go ahead and make an order anyhow.

17  　　　　MR. VEEDER:  All right.  We will just save some

18  time.  The United States objects to it.  We want the record to

19  show that objection.

20  　　　　THE COURT:  Well, an objection doesn't mean anything

21  unless you tell me why you object.  What do you find wrong

22  with the summarization?

23  　　　　MR. VEEDER:  Very well.  We can start in on it,

24  your Honor.

25  　　　　THE COURT:  Let's take up number 1, on page 2.

1          MR. VEEDER:  Let's go over to 3.  I'm not saying

2     that I agree to any of them, but I'll start in on 3.

3          THE COURT:  Wait a minute.  You are a member of the

4     Bar here.  You have an obligation, when I request you, to tell

5     me if you have an objection to a certain order.

6          I f  the paragraph is merely a summarization or a

7     repetition of what I have said in the memorandum, you don't

8     have to restate your objection.  But if you claim that this

9     varies from the ruling that I made, I want to know why.

10         MR. VEEDER:  In regard to your Honor's interpreta-

11    tion of the stipulation of November 29, 1951, we interpose our

12    objection (1) to your interpretation of it, and (2) to your

13    reference in your opinion of August 8, 1958 in regard to it.

14    We feel that any time that an order like this is signed before

15    trial it is putting us with one hand tied behind us, to begin

16    with, at the trial.  We feel that it is error in law, and

17    that is the primary objection to paragraph number 1.

18         THE COURT:  In other words, as I understand you,

19    then, these are all objections that you have made heretofore.

20    You have no new objection.  What you are objecting to is what

21    I decided in the memorandum.  Is that right?

22         MR. VEEDER:  Yes, that's right.

23         THE COURT:  Well, is this paragraph 1 a fair summary

24    of what   I decided?

25         MR. VEEDER:  I would not say that it is a fair

2068

1    summary, your Honor.

2              THE COURT:   What is wrong with it?

3              MR. VEEDER:   For one thing, I simply believe that it

4    is entirely improper for any kind of order.   I can't analyze

5    what they have in mind.   But I have found that we get a pretty

6    good working over, your Honor, any time we agree with

7    California or Fallbrook.

8              THE COURT:   This isn't new.   This is something that I

9    do all the time, draw an order concerning the issues of the

10   case.   If I have made pre-trial rulings, summarize them in

11   some manner so that as the trial goes along that's out the

12   window, unless somebody convinces me that there has been mani-

13   fest error or unless some controlling precedent comes down.

14   This isn't anything new.

15             MR. VEEDER:   Well, I've expressed myself in regard to

16   it, your Honor.

17             Now in regard to number 2, number 2 paraphrases

18   pretty closely what your Honor said in the opinion.

19             THE COURT:   Any further objection to it?

20             MR. VEEDER:   Other than the ones that I expressed

21   as to number 1.

22             THE COURT:   All right.

23             MR. VEEDER:   We object to number 3.   Number 3 states:

24             "Under its riparian rights the United States

25             may not compel upstream water users or claimants

1          to release to the military enclave Santa

2          Margarita River water for diversion to and use

3          by the United States outside the watershed of the

4          Santa Margarita River."

5          We are not entirely sure as to what all of this means.

6   We do know that from our stipulated judgment we certainly

7   intend to insist that water be delivered to us pursuant to it.

8   As written it is much too broad.  In the stipulated judgment,

9   with the Vail Estate there is agreement that we can use water

10  outside the watershed as far as the Vails are concerned.  More-

11  over, we don't believe that anybody should be permitted to

12  interrupt the delivery of that water to us.  The language is far

13  too broad.

14          Secondly, we know that there are people upstream who

15  are diverting and utilizing water at the present time who are

16  simply interlopers on the stream -- Sawdays and others.  There

17  is absolutely no reason for their being permitted to take that

18  water.  We think that the United States is entitled to it.

19          Number 4 --

20          THE COURT:  Your first point, before you go any

21  further, is covered in one of the issues that are included

22  later on, I think, or that was in the preliminary draft.  And I

23  have no objection if 3 is enlarged to make it clear that the

24  language of 3 is not  supposed to cut off this further issue.

25          As to your second point, there is no doubt but that

1  riparian users would have a right to complain about these

2  diversions.   There is no purpose, as I read it, to foreclose

3  the Government on that issue.

4          You were going to say something, Mr. Moskovitz.

5          MR. MOSKOVITZ:   I was going to say, your Honor, that

6  number 3 is limited to what the United States may claim under

7  its riparian rights.   That is what is meant.   And I don't think

8  it does foreclose them from claiming something else under a

9  stipulated decree, if that gives them more than their riparian

10  rights.

11          THE COURT:   Maybe this is the only way we can say it.

12  It looks a little awkward.

13          MR. MOSKOVITZ:   Your Honor, I thought that this would

14  be without any objection at all, because the United States has

15  conceded that as a riparian owner it can't use water outside

16  the watershed, and that's all that it says.

17          THE COURT:   Well, why don't you word it that way?

18          MR. MOSKOVITZ:   I worded it this way, your Honor,

19  because we have all recognized, certainly the State has, that

20  once water gets onto the enclave the United States can do what

21  it wishes with it, and it can use it outside the watershed.

22  Nobody can object to that.   The question is, can it insist upon

23  the delivery of that water by people outside the enclave?   And

24  that is why I word it this way.   If I said that the United

25  States cannot use water outside the watershed, that would be

1    too broad.

2           MR. VEEDER:  That's right.  Mr. Moskovitz is very

3    careful, and as I say I'm sure that we're going to get worked

4    over with this approach.

5           THE COURT:  Well, let's not worry about your getting

6    worked over.  We are going to try to formulate these issues to

7    protect whatever rights you have, to protect the issues that

8    you want raised.  Now it may be possible that you and Mr.

9    Moskovitz can sit down and maybe by adding an exception or two

10   or making reference to  things which are not included in this

11   take care of it.

12          MR. VEEDER:  Well, there are two things, and I'll

13   summarize them:  (1)  We believe that with our arrangement with

14   the Vails, which relates to riparian rights, we have certain

15   rights in regard to them.  The language is "water users or

16   claimants."

17          THE COURT:  All right, we can say that this will be

18   without prejudice to the rights of the United States, such as

19   they may be, under the Vail stipulated judgment.

20          MR. VEEDER:  All right, that is very helpful.

21          Now in regard to the second aspect of this, we

22   believe that the United States of America, as against inter-

23   lopers on the stream who have absolutely no right whatever to

24   be on the stream, has a better right than they have, and that

25   we can use the water outside the watershed.

1          Now Sawday is pumping water without a scintilla of

2   right, with absolutely no right at all, and as against them we

3   say that, absent the intervention of the State of California,

4   we have a better right even though there has not been compliance

5   by either party.  We started using water before Sawday.  We

6   would be glad to litigate that with them.

7          We believe that the rule of law would be this.

8   Assuming that your Honor is correct in regard to applicability

9   of State water law to us, as between two who have not complied

10  with State law we assert that the first in time is first in

11  right.

12         Now with that second addition in there, I think it

13  would be all right.

14         Or else we could drop this.  The term "water users

15  and claimants" is as broad as all outdoors.  If they would

16  change that terminology to "people with legal right to divert

17  water" or something like that.

18         But certainly these interlopers on the stream are

19  people with whom we have issue, and we believe that under the

20  rules that we have already cited to your Honor, as I said,

21  where two people have not complied with State law the first in

22  time should be first in right.  And I think that that would be

23  applicable here.

24         THE COURT:  Your contention is, as I understand it

25  now, that as to the appropriators, the interlopers, who have

2103

1   made no application with the State and are taking water outside

2   of the watershed, that the United States would have a right to

3   take water outside of the watershed.  This wouldn't be riparian

4   water that you would be taking outside the watershed.

5           MR. VEEDER:  No, it would not be.  It would be appro-

6   priative water.

7           THE COURT:  Surplus water, water over and above your

8   riparian rights.  Is that what you're talking about?

9           MR. VEEDER:  That is what it amounts to.  And as

10  against those interlopers, I believe that they have no standing

11  whatever, and I believe it would be just the same as two tres-

12  passers, if you want to treat them that way.  But certainly we

13  have a prior right to Sawday.

14          THE COURT:  Of course, you may have started to use

15  this before they did.  But then they are upstream from you,

16  and if they later on start to use it and they get at it first,

17  if neither of you has any rights it's sort of who takes it, I

18  suppose.

19          Now if you want to reserve an issue on that, the way

20  to do this is to put in another exception and reserve an issue

21  later on to be tried out as to surplus water over and above

22  your riparian rights as to appropriators upstream who are

23  taking water out of the watershed who have not complied with

24  State law and who have claimed no appropriative rights before

25  1914 and no prescriptive rights; that the United States claims

1   that it has a better right than they have to appropriate this

2   water downstream and outside the watershed.

3        MR. VEEDER:  Because it was prior in time.

4        THE COURT:  Because you were prior in time, although

5   downstream.  Is that right?

6        MR. VEEDER:  Yes.

7        THE COURT:  Well, that's easy enough, if you want to

8   raise that issue, to save it out of this.

9        MR. VEEDER:  All right.

10       THE COURT:  There is no intention to cut you off on

11  issues that you want to raise.  It is a question of formalizing

12  these issues and knowing what we are going to have to meet and

13  what we are going to have to decide.

14       Do you think, Mr. Moskovitz, that you can work out

15  a second exception to clear up this point?

16       MR. MOSKOVITZ:  Yes, your Honor.  Actually, I feel

17  that the first four words makes it plain that that exception

18  is already there.  It says "under its riparian rights."

19       THE COURT:  I know.  But I would rather have Mr.

20  Veeder content that he wasn't being worked over or cut off at

21  the pockets, to use his terminology.

22       MR. VEEDER:  I'm used to it, so I'm not --

23       MR. STAHLMAN:  I want to be content, also, your

24  Honor.  I don't believe that in formulating the legal issues

25  it is necessary to single out the Vail judgment in this case,

1  because there are other issues in this case.  If it is singled

2  out, I am very much concerned about the language in which the

3  Vail judgment is singled out.

4        THE COURT:  The only reference to the Vail judgment

5  here would be to make it clear that this did not concern the

6  Vail judgment issue, and then later on your Vail judgment

7  issue is set up.  You certainly have a right to look at it.

8        Now is there anything else that concerns you about 3?

9        MR. VEEDER:  Other than the general principles that

10  I have enunciated.

11        THE COURT:  What about 4?

12        MR. VEEDER:  We believe that 4 is an incorrect state-

13  ment of the law.

14            "Use of water by the United States for

15            military purposes on the military enclave within

16            the waterhsed of the Santa Margarita River may

17            be a proper riparian use if it is reasonable in

18            light of all surrounding facts and circumstances.

19            . . ."

20  We don't believe that reasonableness has anything to do with

21  interlopers, like Fallbrook, Sawday and the others.  Reason-

22  ableness may be important in regard to riparian --

23        THE COURT:  Well, you can't put every issue into

24  one paragraph.  This point is limited to the fact that the

25  issue to be tried as to your riparian use is the matter of

1    reasonableness.

2        MR. VEEDER:  Well, it is reasonableness, your Honor,

3    in regard to other riparians.  That is the point I make.  And

4    I think that that should be added.  Certainly your Honor says

5    that in his opinion.

6        THE COURT:  If it is reasonable -- you mean as to

7    other riparians.

8        MR. VEEDER:  Other riparians.  It has nothing to do

9    with Fallbrook.

10       MR. MOSKOVITZ:  Your Honor, that is an incorrect

11   statement of California law.  At one time it was the law that

12   reasonableness applied only as among riparians.  But the

13   constitutional amendment of 1928 was designed to broaden that

14   and get away from this right of the riparians as against

15   others to an unreasonable use of water.  And the requirement

16   of reasonableness applies as to everyone, no matter what the

17   type of right.

18       MR. VEEDER:  Your Honor, I don't like to have the

19   rules changed in the middle of the game.  If your Honor will

20   turn to page 27 of his opinion, lines 12 to 14:

21           "Taking a disproportionate share of the

22           water to the detriment of other riparian owners

23           would not be a reasonable use."

24   Now that is what your Honor stated.  I assumed that Mr.

25   Moskovitz was summarizing your Honor's opinion, and we would

1   like to have it stated that way.

2           I don't agree with what Mr. Moskovitz stated in

3   regard to the law of California today. I still think that it

4   applies only to riparians.

5           But in any event, we are now construing your Honor's

6   opinion, and I would like to have the rules adhered to.

7           THE COURT:  Well, of course, as to that little

8   statement that you read there, it is almost axiomatic that it

9   goes that far. The question is, does the rule go further?

10  The constitutional amendment certainly had an impact on

11  California law in that respect.

12          MR. VEEDER:  But your Honor does not say that it is

13  applicable to appropriators only, or that it is applicable to

14  appropriators.  For that reason, I think that we should adhere

15  to what your Honor has stated.

16          THE COURT:  Well, I don't care what I stated.  I

17  want to get a correct statement of the law here.  I'm not

18  proud.  If I didn't go far enough in what I had to say in the

19  memorandum, it's my fault.

20          MR. MOSKOVITZ:  Your Honor, I think you did go

21  further on page 26-A, lines 12 through 18:

22              "The real question is the reasonableness of

23              the use.  This is a question of fact.  Whether

24              the military use is reasonable depends on the

25              circumstances of the case.  Tulare District v.

1  Lindsay Strathmore District, 3 Cal 2d 489. . . ."

2  That is a case that involved rights of those coming in as

3  riparians and overlying owners and those claiming as appro-

4  priators, and that case is one of the leading cases construing

5  the constitutional amendment and the overriding requirement of

6  reasonableness as among all types of water right holders.

7  MR. VEEDER:  I would like to see that applied strictly

8  to an appropriator.  I don't believe that that is the way it

9  was.

10  THE COURT:  Well, I'm content with 4 the way it now

11  stands.  Do you have any other objections to it, Mr. Veeder?

12  Number 5.

13  MR. VEEDER:  Yes, I have.  I have a strenuous

14  objection to it.  Paragraph 5 provides:

15  "Under its riparian rights, the United States

16  may not compel upstream water users or claimants

17  to release to the military enclave Santa Margarita

18  River water to be stored for future use thereon."

19  That is an incorrect statement of the law.

20  The law prohibits cyclic and seasonal storing, and

21  we agree to that; but it certainly does not prohibit future

22  storing of water.  Indeed your Honor again cites, I think it is,

23  the Mount Shasta case, which says that water may be impounded

24  for the purpose of getting up a head to develop power.

25  THE COURT:  But there is no power problem here, is

there?

2109

1  MR. VEEDER:  Would it make any difference that we

2  have historically impounded water for maybe a day or a week to

3  build up a head better to utilize the water?  I submit that

4  the riparian concept contemplates the highest and most

5  efficient procedures for using that riparian water.  So the

6  word "future" is far more limiting than the law of California

7  today in regard to seasonal and cyclic storage.

8  THE COURT:  Specifically, what do you contend for?

9  MR. VEEDER:  We contend that while we cannot impound

10  water for cyclical or seasonal periods, that we can impound

11  water for future use.

12  THE COURT:  How?

13  MR. VEEDER:  For example, we put water into tanks,

14  which may stay there for twenty-four, maybe forty-eight hours,

15  I don't know how many hours.  But in any event, the only way

16  that we can build up our fire protection water is by some

17  future storage.

18  Now this can be revised to say that under its

19  riparian rights the United States may not compel upstream

20  water users or claimants to release to the military enclave

21  Santa Margarita River water for seasonal or cyclic storage.

22  That would be the law, and that would permit us the latitude

23  that I think is essential for proper operation.

24  THE COURT:  Well, I haven't any doubt but that,

25  unless somebody convinces me to the contrary, I would certainly

1  hold that you had a right to store water in tanks for fire

2  protection purposes, etc. I'm not going to cut you out of

3  that.

4      MR. VEEDER: Let's change the language, then.

5      THE COURT: Mr. Moskovitz, how about it? Can we

6  modify that? Can you use the words "seasonal or cyclical

7  storage"?

8      MR. MOSKOVITZ: I think that is too broad the other

9  way, your Honor. I admit that Mr. Veeder is correct that you

10  can store water for a few hours or for a day or two. But to

11  limit it to seasonal and cyclical is something else.

12      THE COURT: Well, you and he work on it, see if you

13  can get together on something. You admit that this is possibly

14  too broad, in view of his statement. See if you can work out

15  something that takes care of his problem.

16      MR. MOSKOVITZ: Maybe we can put in those exceptions

17  that he mentioned -- the storage for a few days for fire

18  protection purposes.

19      MR. VEEDER: You and I can talk about it.

20      THE COURT: Talk about it, and I'll hear you later.

21      MR. VEEDER: Now we still have the same objection in

22  regard to the use of the term "water users or claimants. We

23  believe that those interlopers upstream, like Sawday and

24  others, who are simply trespassing on the stream, should be

25  permitted to interfere with our storage of water when needed.

1   They are not before the Court, as I see it.  They have no rights

2   whatever.

3               THE COURT:  Haven't they been served in this action?

4               MR. VEEDER:  They aren't here by Counsel.

5               THE COURT:  Who represents them?

6               MR. VEEDER:  Mr. Swing came out from under a rock

7   one time and said that he was representing them.

8               THE COURT:  Who represents Sawdays?

9               MR. MCGINNIS:  Robert McGinnis, your Honor.

10              THE COURT:  I suggest that you be in attendance

11  hereafter.

12              MR. MCGINNIS:  Yes.

13              THE COURT:  Your firm, or you individually?

14              MR. MCGINNIS:  I am representing the Sawday inter-

15  ests through the firm.

16              THE COURT:  You mean that your firm is representing

17  them through you?

18              MR. MCGINNIS:  Yes, sir.

19              THE COURT:  All right, what do you have to say about

20  it?

21              MR. MCGINNIS:  I heard the issue that was mentioned

22  earlier by Mr. Veeder regarding, I believe, number 3, and I'm

23  perfectly agreeable that that issue be stated here, and at

24  that time since it was so stated by your Honor I had no

25  comment.  And as far as the surplus water is concerned, we are

1    willing to try that issue.

2           THE COURT:  Now under 5 here, Mr. Veeder, of course

3    this is limited again to your riparian rights.  Your claim

4    there is -- of course, you have an inconsistency -- your claim

5    is that in addition to your riparian rights, if there were

6    unappropriated water on the River, the United States has a

7    better claim to that for storage --

8           MR. VEEDER:  That is right.

9           THE COURT:  -- than the Sawdays have for diversion.

10          MR. VEEDER:  That is right.

11          THE COURT:  That is what you are really contending.

12          MR. VEEDER:  That is right.

13          THE COURT:  Of course, the use of the term "riparian

14   rights," strictly speaking, makes it, in a way, unnecessary to

15   put that in here, because this is limited now to your claims

16   as a riparian.  But I have no objection to formulating a

17   clause in here such as was done with number 3, to make it

18   clear that this other issue is preserved and later on list it

19   as an issue to be tried in the case.

20          Have you any objection to that, Mr. McGinnis?

21          MR. MCGINNIS:  I have no objection, your Honor.

22          THE COURT:  Mr. Moskovitz, you can probably use

23   language similar to that you used in 3.

24          MR. MOSKOVITZ:  Yes, sir.

25          THE COURT:  Then, of course, follow it up with

1   specific issues between the Government and the Sawdays.

2            MR. MOSKOVITZ:  Yes.

3            THE COURT:  Work with Mr. McGinnis on that.

4            MR. VEEDER:  Is Mr. McGinnis going to tender exhibits,

5   etc?  That is important to us.

6            THE COURT:  Let's inquire right now.

7            Were you here since court started this morning?

8            MR. MCGINNIS:  Yes, sir.

9            THE COURT:  What issues do you want to propose in

10  this case?  The man who is receiving them and working them

11  into our order here is Mr. Moskovitz.

12           MR. MCGINNIS:  I will tender my issues to Mr.

13  Moskovitz.

14          THE COURT:  Copies to other Counsel here, the

15  attorneys for the major parties in the case.

16          MR. MCGINNIS:  Yes, sir.

17          THE COURT:  What exhibits do you have upon which you

18  are going to rely?

19          MR. MCGINNIS:  We are, of course, going to introduce

20  the deed to the property, and we will have maps showing the

21  location of the watershed and the location of wells on the

22  property which will be used in connection with the testimony

23  that we present.

24          THE COURT:  Can you submit a list of those, so that

25  we can incorporate them into this order?

1          MR. MCGINNIS:  Yes, sir.

2          THE COURT:  When can you do that?

3          MR. MCGINNIS:  Shortly -- today.

4          THE COURT:  All right.

5          Go ahead.  I interrupted you.

6          MR. MCGINNIS:  We also intend to offer the applica-

7     tions which we have submitted to the State Water Rights Board,

8     even though they have not been finally acted upon.  Now Mr.

9     Veeder has mentioned a point which might make them objection-

10    able.  But that will have to be decided at the time of trial.

11         THE COURT:  Just a minute now.  You say that you

12    filed applications with the State Water Rights Board.

13         MR. MCGINNIS:  This regards water on Bryant Creek,

14    your Honor; not on the River.

15         THE COURT:  Well, Bryant Creek doesn't mean anything

16    to me.

17         MR. MCGINNIS:  That is a tributary to the Santa

18    Margarita.  And our water rights on that tributary, as I

19    understand it from my previous understanding, I believe those

20    rights will be tried at the same time as the rights on the

21    main stream of the River.

22         THE COURT:  And you have filed applications with the

23    State Water Rights Board to divert water out of Bryant Creek

24    and use it outside the watershed?

25         MR. MCGINNIS:  No, sir.

1   THE COURT:   To use it where?

2   MR. MCGINNIS:   Within the Bryant Creek watershed.

3   THE COURT:   To take water out of Bryant Creek, a

4   tributary of Santa Margarita, and use it within --

5   MR. MCGINNIS:   -- the Bryant Creek watershed.

6   THE COURT:   That application was not included in

7   our assembly of applications, I take it, was it?

8   MR. MOSKOVITZ:   No, your Honor.

9   MR. SACHSE:   No, your Honor.

10   THE COURT:   Do you have copies of that application

11   that you can submit?

12   MR. MCGINNIS:   Yes, sir.

13   MR. VEEDER:   May I inquire when that filing was made?

14   MR. MCGINNIS:   The exact date I don't have on the tip

15   of my tongue here.   The Answer was filed with the court.   One

16   application was filed several years ago.   One application was

17   filed --

18   THE COURT:   What other documentary evidence?   Maps?

19   MR. MCGINNIS:   Maps, the applications, and deeds to

20   the property.   That is all I contemplate, your Honor.

21   THE COURT:   The charge is made here that your clients

22   are diverting water outside of the watershed.   Are you going

23   to contend that you have any right to do that?

24   MR. MCGINNIS:   Your Honor, we have set up in our

25   Answer a prescriptive right to the use of water.   Now we do

1    not maintain that this prescriptive right is valid against the

2    United States.  But we do maintain that the right is valid

3    against the other downstream owners of property on the River.

4              THE COURT:  What is the date of the inception of

5    this?

6              MR. MCGINNIS:  I believe it is April of 1953.

7              MR. VEEDER:  May I interrupt for just a moment.

8              I see here reference to Paul D. Bradshaw.  If that

9    is the same claim, that is on Bryant Creek.

10             MR. MCGINNIS:  That is the same application.

11             MR. VEEDER:  We didn't understand it.  Bradshaw is

12   one of the Sawday parties.

13             MR. MCGINNIS:  That is right.  The Sawday Ranch is

14   a partnership, and Bradshaw is one of the partners.

15             THE COURT:  You will work with Mr. Moskovitz in

16   formulating that issue.

17             MR. MCGINNIS:  Yes, sir.

18             THE COURT:  What about 6, Mr. Veeder?

19             MR. VEEDER:  We disagree with that.  We have already

20   stated, your Honor, that we have formulated an issue, and your

21   Honor has recognized the issue in his opinion.

22             THE COURT:  Doesn't this summarize what I said in

23   my opinion?

24             MR. VEEDER:  No.  The question of what we have

25   acquired by the stipulated judgment, the delivery of water to

1     the mouth of Temecula Canyon.

2           THE COURT:  Well, you can add to 6 except your claim

3     under the stipulated judgment.  I mention that in the opinion.

4           MR. MOSKOVITZ:  Your Honor, you will notice later on

5     where the issue is left open.  There is such an issue about

6     prescription.

7           THE COURT:  Put in an exception here to make it

8     clear.

9           What else about it, Mr. Veeder?

10          MR. VEEDER:  That's it.

11          THE COURT:  All right.  Paragraph 7.

12          MR. VEEDER:  Of course, your Honor, that paragraph

13    is the reason why I wore belt and suspenders both today,

14    because I fully expected that we would have just this experi-

15    ence.  And I'm not joking about that -- I came prepared.

16          On such a statement as that, I simply say that we

17    interpose our objection to it.  I am not sure that Mr.

18    Moskovitz, working as a rewrite man on a country newspaper,

19    didn't do all right.  I think he may have summarized what you

20    said.  But we certainly are not going to agree to it.

21          THE COURT:  Well, I don't ask you to agree to it.

22    If he did a job of summarizing, all right.

23          Of course, it leaves open another issue:  1914 or

24    1923, and you probably should carry over into the issues that

25    question.  I don't know the answer to that.  I tried to find

2118

1    out something about it, but didn't succeed very well.  Appar-

2    ently in 1914 this first statute was passed, and then in 1923

3    the legislature very expressly used language that was perti-

4    nent to the problem.

5            Have the California cases decided what was the

6    effective date there?

7            MR. MOSKOVITZ:  Your Honor, the one California case

8    that we cited to you -- Crane vs. Stevenson -- gives the date

9    as 1913.  I think there, there was a failure to appreciate

10   that there was a referendum on it.  So 1914 would seem to be

11   the date that they indicate as being the correct one, and I

12   agree with it.

13           THE COURT:  Did they consider the effect of the

14   1923 statute?

15           MR. MOSKOVITZ:  No, there was no express discussion

16   of that, your Honor.  But I believe 1914 is the correct date.

17   In 1914, when the Act went into effect, there was a provision,

18   as there still is, that the diversion of water without a

19   permit -- the diversion and use of any water subject to the

20   Act without a permit was a trespass and could be enjoined.

21   Now I take that as being really the equivalent of stating that

22   such diversion and use of water is without right.

23           THE COURT:  Well, I was not certain about it.  Since

24   it has not been decided, you had better run that in as an

25   issue, whether 1923 or 1914 is the date.

1          MR. MOSKOVITZ:  All right.

2          THE COURT:  Any other objection to 7, Mr. Veeder?

3          MR. VEEDER:  Well, other than the general objection.

4          THE COURT:  8.

5          MR. VEEDER:  Yes, certainly.  That statement is

6     totally incorrect, contrary to your Honor's opinion and

7     certainly to the obiter dictum in the Ninth Circuit's

8     decision.  Any water that comes down to us we are certainly

9     entitled to divert, to impound, to handle in any way that we

10    want.

11         THE COURT:  Well, that is, I think, conceded.  In

12    other words, once water comes on this Base -- I think 8 has to

13    be revised -- I think once water gets on this Base neither the

14    State nor any private party has anything to do about it.  They

15    can't sue you without your consent, and you have control of

16    the enclave.  The point is, can you compel people upstream to

17    release water so that it gets on your Base so that you can do

18    with it as you please?

19         MR. VEEDER:  Well, your Honor, certainly as

20    written --

21         THE COURT:  Well, we've agreed that as written it

22    is subject to modification and has to be modified.

23         MR. VEEDER:  All right.  Now from our standpoint,

24    as written this would preclude a direct condemnation proceed-

25    ing.  Apparently -- although I totally disagree with it -- it

1    is believed that in some manner we stripped the National

2    Government of sovereignty and burned up the Constitution with

3    the stipulation of November 29. We will reverse that. But

4    the point that I am making is that, as written, the National

5    Government is something less than a mutual water company. And

6    so I would like to see the whole thing changed.

7            Nor can I tender any Christian thought to Mr.

8    Moskovitz in regard to how that sentence could be revised.

9            MR. MOSKOVITZ: Your Honor, I see that this is

10   stated too broadly, as you pointed out, and I think that it

11   can be revised, and I think I can do so without Mr. Veeder's

12   help.

13           THE COURT: Work it over. I think what you can say

14   is, in substance, (1) that the theories which the Government

15   has advanced based on soveriegnty , the theories of sovereignty

16   requiring water to come onto the enclave, are foreclosed by

17   the stipulation, and (2) that the Court has held that they

18   are not good at law.

19           Work it over.

20           Nine.

21           MR. VEEDER: Well, the first sentence of it. So

22   far as we are concerned, if I understand 9, it simply says

23   that the only thing that is in litigation is the Santa

24   Margarita River and its tributaries.

25           THE COURT: And underground basins.

1          MR. VEEDER:  Yes.

2          THE COURT:  All right.

3          Ten.

4          MR. VEEDER:  Of course, again I disagree on that.

5 But I think that that may summarize what your Honor said.

6          THE COURT:  All right.

7          Eleven.

8          MR. VEEDER:  In that regard, your Honor, I have a

9 great deal of difficulty comprehending exactly what your Honor

10 meant.  In 11 it says:

11          "This Court does not have jurisdiction to

12          perform the quasi-legislative function of

13          determining which, if any, of the competing

14          applicants to the State of California to appro-

15          priate unappropriated water of the Santa

16          Margarita River should receive a permit to do

17          so. . . ."

18          (1) I am not sure that your Honor said that it is

19 quasi-legislative, this filing of the application.  I have to

20 confess that I am not sure what quasi-legislative means.  I am

21 not sure that your Honor intended to say that the acquisition

22 of rights to the use of water in accordance with the police

23 regulations of the State of California is a quasi-legislative

24 function.  Did your Honor rule that specifically?

25          THE COURT:  I ruled that the action of the State

1    Water Rights Board is a quasi-legislative function.  The

2    filing of the application, of course, is done by an individual.

3    He files an application to appropriate water.  It comes before

4    the State Water Rights Board.  The State Water Rights Board

5    then performs a quasi-legislative function, in the performance

6    of which the date of application is not the sole factor to

7    be considered.  Public interest is to be considered in whose

8    application is to be granted.

9            MR. VEEDER:  I am searching for light on this.  I

10   believe that Mr. Holsinger stated that in his view it was

11   quasi-judicial.  He said that he was performing both a legal

12   and a factual determination.

13           THE COURT:  Well, I am trying to follow what the
                                        of California
14   Supreme Court/has said and not what Mr. Holsinger has said on

15   this matter.

16           MR. VEEDER:  If your Honor has ruled that this is a

17   quasi-legislative function, I admit that Mr. Moskovitz has

18   probably paraphrased it correctly.

19           THE COURT:  All right.

20           Twelve.

21           MR. VEEDER:  Well, as I said before -- and I believe

22   that Mr. Moskovitz' tabulation of what he thinks should be in

23   findings of fact and conclusions of law is contrary to this

24   statement.  In his proposed findings and conclusions he

25   declares that they should embrace a showing of inchoate

1    rights, including applications.

2    THE COURT: Well, that can be done.

3    MR. VEEDER: I doubt that under the clause of the

4    Constitution establishing the National courts, if your Honor

5    -- I'll not get into that.

6    The point I meant is that if the summarization is

7    correct that this is a quasi-legislative power, that is, the

8    filing of the application and the passage on it, there is no

9    case in controversy and there is no issue presented which

10   would permit this Court to entertain such an issue in any way.

11   Therefore, the Constitution itself would preclude your Honor's

12   considering applications at all. I don't believe that they

13   present a case in controversy that could be entertained in

14   this court. And I think that necessarily it would be an

15   inappropriate issue here, for the very reason that I expressed

16   -- that if an application is nothing at all, you can't hear

17   it.

18   THE COURT: Well, you kind of lost me in all this

19   talk now. We are not talking about an issue here that's

20   open. We're talking about one that I have foreclosed by my

21   rulings, which I am now trying to formalize.

22   Now 12 says:

23         "Before an applicant to appropriate

24         unappropriated water may obtain a judicial

25         determination of his priority as against competing

2124

1          applicants . . . before he may obtain judicial

2          review of the action of the State Water Rights

3          Board on his application, he must exhaust the

4          administrative remedies available from the

5          Board."

6   That is all that holding is.  It doesn't say that I couldn't,

7   in findings of fact in this court, say that on a certain day

8   the Government filed a certain application.  So what?  On a

9   certain other day somebody else filed a certain other applica-

10  tion.  And if those applications later ripened into rights,

11  and you make identification, the application has been made.

12          MR. VEEDER:  Well, the point that I make, your

13  Honor -- and perhaps I didn't make myself clear on it -- is

14  that in the formulation of findings of fact and conclusions

15  of law applications are included, and based upon this summari-

16  zation of this ruling right here in paragraph 12 it would

17  exclude, as I understand, your Honor's even making reference

18  to them in your findings of fact.

19          THE COURT:  In other words, suppose that in my

20  findings I listed the various applications for water that had

21  been made.  That is a fact.  Nobody disputes that on certain

22  dates certain people made applications.  The trouble is that

23  you wanted me then to go ahead and say that the various

24  applicants had priorities on the basis of the date that they

25  filed them.

1          MR. VEEDER:  No, your Honor.  I think that that is

2    one of the very serious things with which we are confronted in

3    your opinion.  All that we ever asked, in our pleadings and

4    Supplemental Complaint, is that your Honor say that here is an

5    inchoate right created by this application which some day might

6    ripen into a vested right and the priority date would be this

7    if it were to ripen.

8          THE COURT:  Well, Mr. Veeder, I would think that you

9    have reversed your field completely.  I can show you where you

10   argued in your briefs that I should determine the priority of

11   the United States as of the date of its filing and that other

12   applicants were subsequent in point of time, that other

13   applicants who had filed earlier had so substantially changed

14   the character of their applications that in substance it was a

15   new application and therefore junior to that of the United

16   States.

17         MR. VEEDER:  Precisely what I just got through

18   saying, Your Honor.  I think that your Honor has that juris-

19   diction.

20         THE COURT:  Well, let's not worry about it then.

21   In my findings I will probably find that certain applications

22   were made on certain dates, and I will find what happened

23   thereafter to them as far as the State Water Rights Board is

24   concerned, and I would contemplate that before a final decree

25   is entered the mandamus proceeding will have been heard and

2126

1  disposed of.  Then I could find what rights the State had

2  according to the various applicants who filed.

3  MR. VEEDER:  I simply interpose what I said to your

4  Honor, the very grave issue that 12 raises.

5  THE COURT:  It will be understood without so saying

6  that this is not going to preclude my making findings of fact

7  on --

8  MR. VEEDER:  May we have a sentence in there on 12

9  to that effect, then.  I would like to have that in there.

10  THE COURT:  I don't think it adds anything.

11  MR. VEEDER:  I think it is highly important to us to

12  know that even though the ultimate determination, in your

13  Honor's view, resides with the state tribunal, you neverthe-

14  less feel that in chronicling the rights and in entering your

15  decree that you can reflect that applications were filed on

16  such and such a date with the State of California.  I think

17  that by putting that sentence in there it would go a long way

18  in clarifying the objection that we have.  Certainly Mr.

19  Moskovitz apparently agrees, because he is tendering that in

20  his proposed findings and conclusions.

21  THE COURT:  You say that, of course, in chronicling

22  the rights I would list the applications.  Now if I understand

23  you correctly, if all that you are asking is that I make

24  findings of fact as to the dates on which various applications

25  were filed and what happened to them, you have no dispute.

1  I'll be glad to do that.

2  MR. VEEDER:  I'd like to have a sentence in there to

3  that effect.

4  MR. MOSKOVITZ:  Your Honor, I was not sure in my own

5  mind whether that issue had been decided, and you will note

6  that I listed among the issues the very last issue, number 20

7  at page 9 on line 24:

8  "In connection with the nature of the decree

9  to be rendered, should inchoate rights be included?"

10  I do believe that they should be, in the manner in which I set

11  forth the proposals for the form of decree.  But I was not

12  sure whether it was open or not.

13  THE COURT:  Well, I thought that probably by the time

14  that we ever got around to getting a final decree in this case

15  most of those things would have been decided and disposed of.

16  Of course, meanwhile somebody else files a new application

17  tomorrow, and we can't wait forever for all these hearings.

18  So I don't care what you call them.  They are applications

19  which have not yet gone through the mill.  You speak of them

20  as "inchoate rights."  I have no objection.  You speak of them

21  as applications which may eventually ripen into some kind of

22  right.

23  MR. VEEDER:  I think that "inchoate right" is

24  reflective of what they are.  I think that if a man comes

25  through he has an inceptive right based on the priority as

1    reflected in his application.

2           THE COURT:  Well, he certainly has something more

3    than the fellow who made no application and did nothing.  At

4    least he has his foot in the door.  He indicates that he wants

5    to acquire certain rights and he is following a certain

6    statutory procedure to get them.  When along the line you

7    could say that he has an inchoate right, I don't know -- I

8    don't think I have to decide.  "Inchoate" means that --

9           MR. VEEDER:  He is taking an initial step, as I see

10   it.

11          THE COURT:  -- he has a claimed right.

12          Let's not worry about terminology.  On 12 talk to

13   Mr. Moskovitz.  If you want to put some clause in there that

14   will make you feel better or that will make Mr. Rankin feel

15   better when he reads it, I have no objection.  But I propose

16   to list in the facts these applications, and in the conclusions

17   of law I propose to draw some conclusion as to what has

18   resulted from what has happened up to date.

19          MR. STAHLMAN:  Is your Honor going to take a recess?

20          THE COURT:  Yes, this is a good time.  Take a short

21   recess.

22          (RECESS)

23          THE COURT:  Once in a while you pick up some

24   document in a legal case that is of more than passing interest.

25   I received a copy of a letter which was mailed to the Clerk

1   on September 17, 1958, from Anna P. Schroeder, Jacksonville,

2   North Carolina.

3      "Clerk

4      United States District Court

5      Southern District of California

6      Dear Sir:

7       As a defendant in the case of United

8      States vs. Fallbrook Public Utility District,

9      et al, I wish to state that in this regard I

10     am in complete accord with the interests of

11     the United States of America and will be

12     willing to abide by the decision made by the

13     Court.  I therefore feel that a personal

14     appearance or representation in my behalf is

15     unnecessary.

16         Sincerely yours,

17         Anna P. Schroeder."

18    MR. VEEDER:  I wonder if I shouldn't warn her about

19  that.

20    THE COURT:  You'd better just leave it alone.

21    MR. VEEDER:  After what happened to us.

22    MR. SACHSE:  What town was that in North Carolina?

23  Camp Le Jeune?

24    THE COURT:  Jacksonville.

25    Mr. Clerk, make a minute order to treat that as an

appearance, so that we can have her name and send her copies
of other documents that we have to send out.

We were down to about 13.

MR. VEEDER:   That is just a pious platitude, your
Honor.   What has it got to do with this case?

THE COURT:   It has to do with this case that it
probably should be added that this is not a decision that this
court can make.

MR. VEEDER:   I would like to have you say that, your
Honor.

THE COURT:   Go ahead and add to it.   I don't think
it was ever intended that this court would decide what permits
were in the public interest to grant or what permits were not
in the public interest to grant.   I think it should be added,
Mr. Moskovitz.

Anything else on 13?

MR. VEEDER:   No, sir.

I think again, in regard to 14, that we are going
to encounter a severe conflict of jurisdiction with the State
of California's courts.

THE COURT:   Where?

MR. VEEDER:   By reason of the conclusion expressed
there.   "After exhaustion of the administrative remedies
available from the State Water Rights Board, an applicant to
appropriate may obtain direct review of the Board's file . . ."

2131

We have this situation -- Mr. Moskovitz was telling me that he is going to leave town this evening, so I think we had better bring it up now -- we view it this way.  Your Honor has before him for determination at this time Permit No. 8511, which is for 10,000 acre feet of water, issued April 23, 1951, to the Fallbrook Public Utility District.  We believe that it is a situation where there is finality, and based upon your Honor's opinion it is up to him for review and consideration in accordance with his opinion.

THE COURT:  What Permit is this now?

MR. VEEDER:  That is Permit No. 8511 to the Fallbrook Public Utility District.  That was issued about seven years ago, or more than that.  It is an application that was originally made when Fallbrook didn't have the delusions of grandeur that it could appropriate water for irrigation rights.

But in any event, there is finality there.  There has been no appeal taken from it.  And yet, if I understand -- and I don't claim that I do -- the decision of the State Water Rights Board, they took that into consideration, they took that 10,000 acre feet into consideration when they rendered their Decisions 896 and 897, I think they are.

Now we have this circumstance.  That to get anywhere near the 35,000 acre feet concerning which Mr. Yackey testified before the State Water Rights Board, you have to include Permit No. 8511.  So we have Fallbrook on one side with a

permit before your Honor for adjudication.  Then we have

before Judge Turrentine's court Applications No. 12178 and

12179, which would constitute the balance of this alleged

project of Fallbrook.

THE COURT:  You say that this first permit that was

granted seven or eight years ago is before me for adjudica-

tion.  It is before me.  But you mean to say that you are

going collaterally to attack it and prove that it is a void

permit or something like that?

MR. VEEDER:  Possibly.

THE COURT:  I am not going to hear that.  Now I

take it that it is a permit that says that it does not affect

any vested rights on the River, and it is a permit that will

apply only to unappropriated water over and above vested

rights on the River, and that I would determine -- I would

find out whether there was anything to which it applied.

Maybe it is an ineffective --

MR. VEEDER:  That is precisely the point that I

make, your Honor.

THE COURT:  That is not a matter of adjudicating

the permit.  That is a matter of seeing how it fits into the

scheme of vested rights on the River.

MR. VEEDER:  I have no objection to the terminology

that is used.  But it is before your Honor for whatever action

your Honor deems that he has jurisdiction to take in regard to

it.

1    THE COURT:  It will be catalogued, and we will say

2 that it comes behind all riparian, appropriative, prescriptive

3 rights on the River.  It is exactly what it is.  If there is

4 anything left over, that permit has some effect.

5    MR. VEEDER:  And that is before your Honor.  Is that

6 correct, your Honor?

7    THE COURT:  How it fits in, yes, I think is before

8 me.

9    MR. VEEDER:  I have nothing more on 14, your Honor.

10    THE COURT:  Let's see if there is anything in 14

11 that militates against that view.

12    MR. VEEDER:  I just wanted an interpretation of Mr.

13 Moskovitz' interpretation of your Honor.

14    THE COURT:  I don't consider that what I have said

15 about that permit constitutes a collateral attack on it.

16    MR. VEEDER:  No.  I intend to attempt collaterally

17 to attack it.  I assume that you will overrule it.  Then I will

18 take it across the board on the grounds that your Honor has

19 facts pursuant to which you could knock it out.  But that

20 awaits the trial.

21    THE COURT:  I doubt that I could knock it out.  I

22 might say that there was no water against which it could be

23 effective.  But it would still be there.  You might get into a

24 series of wet years when there would be so much water in this

25 stream that Fallbrook would be able to use every bit of the

1   amount allocated in that permit.  I don't think I should knock

2   it out.  It's there.  The question is, Is there anything for

3   it to apply to?

4           MR. VEEDER:  That is correct.  And before we are

5   through I am hopeful that we can review again the interlocu-

6   tory concerning which we discussed last time, because I think

7   that those interlocutories are directed as much to Permit No.

8   8511 as they are to the rest of it.  Before we get to trial

9   I am going to ask your Honor to rule on those.  In other

10  words, the question of irrigated and irrigable acreage,

11  Fallbrook's ability to finance a dam for 10,000 acre feet is

12  squarely before your Honor now.

13          I am just being helpful along this line.

14          THE COURT:  If you have some issues there, I want

15  them listed later on.

16          MR. VEEDER:  Yes, we will.

17          I think 15 has already been taken care of, has it

18  not?  As I understand, you are saying that you are not going

19  to review the applications, but you are going to chronicle

20  them.  Is that right?

21          THE COURT:  Yes.  You may add that this court will

22  list in its findings all existing applications as of the date

23  of the decree, together with their present stage of progress

24  through the administrative and court procedure, and will

25  conclude what rights, if any, attach to them.

1      MR. VEEDER:  I must say, I don't know that I under-

2    stand what 15 means:  that specifically this court does not

3    have jurisdiction in this case to review the action of the

4    State Board.

5       THE COURT:  This was put in, as it were, better to

6    reflect my remand of the mandamus action, I take it.  Is that

7    right, Mr. Moskovitz?

8       MR. MOSKOVITZ:  That is exactly it.  In this you

9    refer to the mandamus, in the mandamus you refer to the

10    opinion, and I think that they should go in to tie them

11    together.

12       THE COURT:  I see no harm in it.  But I do think

13    that you can put in this addition we were talking about.

14       MR. VEEDER:  Why can't we do this:  that specifically

15    the Court does not have jurisdiction in this case to review

16    the action of the State Water Rights Board respecting appli-

17    cations to appropriate rights to the use of water (period)?

18    I think there are going to be additional applications in the

19    future that are going to be filed.

20       MR. SACHSE:  I think that is a very good suggestion,

21    your Honor.  We know already of one other one here -- Sawdays.

22       THE COURT:  All right, take that into account, Mr.

23    Moskovitz.

24       MR. MOSKOVITZ:  All right.

25       MR. VEEDER:  I hope that doesn't sound like I am

1  agreeing with anything here.

2      THE COURT:  Now, next is a list of issues.  I

3  haven't had a chance to study them.  I would like to have a

4  chance to look them over and when you come back this after-

5  noon we can talk about about it, and that will give you some

6  time to work on it this morning.  I have a sentence calendar.

7  You might as well not come back until three o'clock.

8      MR. MOSKOVITZ:  It might be helpful if I just

9  pointed out the new ones that I added since sending out the

10 first draft.

11     On page 7, at line 19, 8 (a) is new.

12     On the bottom of that page, 11 (a).

13     And going on to page 8, 11 (b).

14     I think that is all.

15     THE COURT:  Now I am going to instruct all Counsel

16 here to work out some arrangement to confer with Mr.

17 Moskovitz and to see whether or not you are satisfied with

18 the issues as he has formulated them with respect to your end

19 of the case.  He can't see you all at once, but you can work

20 out some schedule when he can talk to you.

21     This goes particularly for you, Mr. McGinnis.  We're

22 favored in having your presence.  We have been hearing a lot

23 about your claims all through this case, and we want you to

24 participate in this matter.

25     Incidentally, we had a pre-trial stipulation of

1   facts which we don't think are in dispute, and I would like

2   to have you look that over and see if you can't join in that

3   stipulation.  Have you a copy of it?

4           MR. MCGINNIS:  I have already read that over, and I

5   believe that everything in there is acceptable.  I will check

6   it.

7           THE COURT:  If you decide to do that, then I want

8   you to sign it on behalf of your client and advise the Clerk

9   so that he can make a minute order to the effect that, at the

10  Court's direction, you have inspected it and on behalf of

11  your clients you have signed it.  We tried to get all the

12  major parties together on that matter.

13          Now, what is your program for the rest of the week?

14  Do I understand correctly, Mr. Moskovitz, that you have come

15  to our fair city and mean to leave immediately?

16          MR. MOSKOVITZ:  When this hearing was set for the

17  22nd there was no talk about going on the 23rd and 24th, and

18  I did set another hearing starting tomorrow at Tule Lake.

19          THE COURT:  We said that we were going to finish

20  up this work before we start our trial.

21          MR. MOSKOVITZ:  Yes.

22          THE COURT:  How long are you going to be at Tule

23  Lake?

24          MR. MOSKOVITZ:  Through Thursday, your Honor.

25          MR. VEEDER:  Your Honor, all the rest of us are

2138

1    going to be here at this time.

2              MR. MOSKOVITZ:  I wouldn't have done so, your Honor,

3    had I realized that we would go on.

4              THE COURT:  Well, if we have to go ahead with this,

5    as I think we will, there are some other things I want done.

6    You will have to see what you can accomplish today, and then

7    we will designate somebody else to step into your shoes and

8    carry on the responsibility of perfecting this in your

9    absence.  If we have to talk to you on the phone, is there

10   some place where we can reach you up there?

11             MR. MOSKOVITZ:  Yes.

12             THE COURT:  Will you leave word?

13             MR. MOSKOVITZ:  I will leave word with the Clerk.

14   Well, I can tell you right now.  It is the City Hall at Tule

15   Lake, California.

16             THE COURT:  Now the next thing I am interested in is

17   finding out how many of these exhibits there is going to be no

18   objection to and how many there is going to be objection to.

19   Have you given thought to that?

20             MR. VEEDER:  Yes, sir.  I am certainly going to

21   object to Bulletin No. 57.

22             THE COURT:  I have that in mind.  I know that.  But

23   there are a lot of these others.  To some of these there

24   probably should be no objection.  You've all had a chance to

25   see these.  I am going to put that over to this afternoon to

1  advise me on that.

2         I would like to have in the record today before you

3  leave, Mr. Veeder -- and I'm going to let you go very shortly

4  now -- your specific objection to the Bulletin.  I want to do

5  some work on this before the trial.  I'm talking about both

6  Volumes I and II of Bulletin No. 57.

7         MR. VEEDER:  May I tender a thought there.  Do you

8  have a copy of the letter from California?

9         THE COURT:  Yes; they are not going to offer it all,

10 I understand that.

11        MR. VEEDER:  That's right.  Now I can give you a

12 brief thought as to the revulsion I feel toward Bulletin No.

13 57.  I will read it to you.  On page 56, the second paragraph,

14 respecting the export and import of water from the Santa

15 Margarita River, this is what they are offering in evidence,

16 your Honor.  Have you found it?

17        THE COURT:  Yes.

18        MR. VEEDER:  "Officials of the District indicate

19 that in the past two years all of the Santa Margarita River

20 water has been used in the Santa Margarita River watershed,

21 and all water from the Bonsall Basin has been used in the

22 San Luis Rey waterhsed.  It is therefore assumed that on the

23 average as regards the Fallbrook Public Utility District there

24 has been no net export or import between the two waterhseds

25 for the period for which data are presented herein."

1          Now your Honor, if there is anything evidentiary

2     about that statement --

3          THE COURT:  I think that Mr. Sachse would be the

4     first to say that that paragraph could go out and not be

5     considered.

6          What I am getting at is this.  Do you have parti-

7     cular objections to particular things?  Or do you have a

8     general objection --

9          MR. VEEDER:  We have the general objection to which

10    I made reference before.  There is absolutely no statute and

11    no rule of law pursuant to which the numerous conclusions and

12    opinions contained in paragraph 2 could conceivably constitute

13    evidence..  In other words, they are a summation of the

14    thoughts of a great number of people concerning which we ask

15    your Honor, we petition your Honor for the right to cross-

16    examine.

17          I had the opportunity to talk to Mr. Criddle, who

18    is State Engineer for the State of Utah.  I said, "How was

19    57 written?"  And he explained it to me this way, he said --

20    I believe I am paraphrasing him:  Max Bookman was nothing

21    more nor less than a central figure who brought together the

22    data, and as I understand it some was even brought together

23    by letters or telephone calls.

24          Bulletin No. 57 does not represent, in other

25    words, a document of the kind and character that is envision-

1    ed as evidentiary in nature.  In other words, it is not a

2    compilation of data that the law requires to be tabulated,

3    such as a birth certificate, a death certificate, the catalog-

4    ing of runoff records and things like that.  These are

5    experts' opinions based upon conclusions which are hearsay

6    upon hearsay upon hearsay.  They are a composite of specula-

7    tions and guesses and fond hopes concerning which there is no

8    rule of law that would permit them to be accepted in evidence.

9         THE COURT:  What about the portion that the State of

10   California proposes to offer?

11        MR. VEEDER:  That is what I am referring to, your

12   Honor.  This gem about the diversion of water outside the

13   watershed from Santa Margarita and San Luis Rey is the part

14   that California desires us to swallow.  We say that Section 2,

15   Chapter II, is as bad as the rest of the whole thing.

16        It is an effort, moreover, to depart from the basic

17   rule of Section 43 (a) of the Federal Rules of Civil Pro-

18   cedure, which say that all evidence will be by direct testimony

19   in the court.  Here are summations and interpretations through-

20   out as to what things mean.  On page 25 they define for us

21   "annual," "seasonal," "precipitation," "runoff," "average,"

22   "mean," "mean period."  Then they go ahead and discuss at

23   great length things concerning which they don't know.  For

24   example, they have a tabulation here of records kept, in many

25   instances, by private people.  Moreover, they go across the

1   desert area here and they make calculations and come up with

2   conclusions that they attempt to apply to the Santa Margarita

3   Valley.  We say that there is absolutely no rule of evidence

4   which would permit such an undertaking.

5           THE COURT:   Is there any part of it at all that

6   you could accept?  Some of the charts, diagrams, statistics?

7           MR. VEEDER:   I think that anything that is worth-

8   while we already have, your Honor.  We have exactly the same

9   data that we have prepared and that we would offer for your

10  Honor to consider.

11          But we believe that they are attempting to under-

12  take the responsibility, your Honor, of making determinations

13  as the judge in this case.  We turn in particular to matters

14  such as underground hydrology.

15          MR. MOSKOVITZ:   What page?

16          MR. VEEDER:   Starting on 62.

17          We have complele disagreement with many things

18  that they say.  I can give you an example of that.  They go

19  on quite at length, and at page 102 toward the bottom of the

20  page it is stated:  "The poor quality of water very likely is

21  derived from the La Jolla Formation."  Now that is strictly

22  and entirely a guess, it is a pure whimsy, and it is entirely

23  and completely contrary to the evidence that the United States

24  of America intends to introduce.

25          Now I have tabulated only a few of those, but

1  throughout the whole writeup, your Honor, there are state-

2  ments of that character.  And your Honor, and your Honor

3  alone, is the only one who can make those determinations and

4  those conclusions.  I know of no rule of law which would

5  permit a summation of opinions and conclusions by a series of

6  men spread across the country and who wrote to Mr. Bookman

7  and then the exhibit is marked and your Honor can make

8  findings of fact.  I believe it is contrary to law.

9          And I have other objections to it.

10          THE COURT:  Mr. Moskovitz, do you want to say some-

11  thing?

12          MR. MOSKOVITZ:  Your Honor, I want to point out,

13  first of all, that this Bulletin was prepared as a result of

14  an express legislative direction.  There was a statute which

15  appropriated money and required the preparation of the

16  Bulletin as a result of investigations which were done by the

17  old Division of Water Resources.

18          Secondly, we have no objection whatsoever, and plan

19  to have a witness who would testify to how this Bulletin was

20  prepared and the information upon which it was based, and he

21  can be cross-examined as to the conclusions.

22          Now Mr. Veeder keeps saying that there are things

23  here with which he cannot agree.  We expect that.  There are

24  things which he will introduce with which we cannot agree.

25  But that is not a reason for excluding it from the evidence

1   in the case.

2           And the fact that it contains conclusions is just

3   what your Honor wants.  Your Honor as a layman cannot try

4   this case and make a decision without some assistance from the

5   experts.  And that is what this constitutes, experts' opinions

6   and conclusions on the data that they have gathered.

7           THE COURT:  Will you have something further to say

8   about this, this afternoon?

9           MR. VEEDER:  Yes, sir.

10          THE COURT:  You object to all of it?

11          MR. VEEDER:  Yes, sir.

12          THE COURT:  No part of it that you will accept?

13          MR. VEEDER:  There is no part of it that we believe

14  was prepared by responsible people.

15          THE COURT:  Doesn't that go to the weight?

16          MR. VEEDER:  No, your Honor.  Here is what your

17  Honor will find when he reads through it.  He will find that

18  these conclusions are composites of a variety of scientific

19  investigations, and Mr. Bookman simply wrote down what he

20  thought somebody had concluded.

21          Now this is entirely different than the circumstance

22  where a hospital record, for example, reporting what a

23  physician had said at a time in regard to a man's illness.

24  The physician might show up and you could cross-examine him.

25  So there might be an objection and an exception to the hearsay

1    rule.

2         But this, as I said before, is hearsay upon hearsay

3    upon hearsay.  It is simply Mr. Bookman's interpretation of

4    another scientist's views.

5         THE COURT:  Suppose that is brought out on your

6    examination of Mr. Bookman.  Doesn't that go, then, to the

7    weight of it?

8         MR. VEEDER:  No, your Honor.  Mr. Bookman didn't do

9    the work.  It was not done under his direction.  Mr. Bookman

10   will admit, I believe, that he had very little to do with a

11   great deal of the data that is written into Chapter 2, other

12   than the writing of the narrative.  I think that Mr. Bookman

13   will be the first to admit that in regard to the consumptive

14   use of water and things like that, that he didn't do it.  Nor

15   that it was done under his direction.  I dare say that men

16   like Blainey and the others, who did do work on it, were not

17   working for Mr. Bookman.  They were independent.  And he was

18   simply picking up what they did.

19        Now if your Honor is interested, I can go through

20   almost page by page and point out to your Honor the sentence

21   after sentence and line after line which are conclusions

22   which, I believe, are nothing more nor less than the vague

23   hopes of the narrator here.

24        THE COURT:  All right.

25        What were you going to say, Mr. Moskovitz?

1        MR. MOSKOVITZ:  Your Honor, I was going to say that

2  there have been a lot of gratuitous aspersions on the quality

3  of the State's professional work, and I resent it.  Mr. Book-

4  man was in charge of this.  There was a professional staff

5  that he directed, and he outlined the work that they should do.

6  They did the work.  Certainly he couldn't have done all the

7  leg work himself.  No professional man can, in a work of this

8  comprehensive magnitude.  And for Mr. Veeder to say that he

9  just gathered random samples of someone's opinions and threw

10  them together in a narrative form, I think is incorrect.

11        THE COURT:  Let's wind this part of it up now.  Be

12  back at three o'clock and look over some of these exhibits

13  that are listed, see which ones are going to be disputed and

14  which ones are not going to be disputed, and see what we can

15  do on that.

16        MR. MOSKOVITZ:  Your Honor, we have all had an

17  opportunity, at least the major parties, to look at the lists

18  of exhibits that have been thus far exchanged by the parties.

19  I don't believe that we have all had an opportunity to

20  examine the exhibits themselves.

21        MR. VEEDER:  I have told him that they are available

22  for everyone to look at right now.

23        MR. MOSKOVITZ:  And we will begin to look at them.

24  But I don't know that we can come to a final conclusion as to

25  their admissibility just from the list.

1       MR. VEEDER:  May I inquire, your Honor, in regard to

2   your plans.

3       THE COURT:  Well, I have time tomorrow and Wednesday.

4   I would like to go as far as we can with this matter.

5       MR. VEEDER:  My view about how I would like to

6   introduce the evidence is this -- we can mark them for identifi-

7   fication, fine -- I respectfully submit, I think the better

8   practice is to have the witness on the stand and hand him the

9   exhibit and let him testify in regard to it, rather than for

10  us to try to have exhibits offered and entered of record prior

11  to the trial.

12      THE COURT:  Well, I will not ask you to offer them

13  prior to trial.  But suppose you have an exhibit down the

14  line here to which nobody objects.  Why do we have to worry

15  about calling any witness?  It goes in, nobody objects, it's

16  in the record.

17      MR. VEEDER:  I don't believe that there is a single

18  exhibit, outside of the title documentary evidence, that we

19  would try to offer without having a man on the stand.  I have

20  tried to go through records in the past where you have a

21  stack of exhibits that are just admitted, and if you don't

22  identify them with a witness and follow through with what is

23  being done your chronology of events in the offering and the

24  testimony is all broken up and you find yourself some day

25  writing a brief --

THE COURT:  Well, it is one thing to have to lay a legal foundation and to resist a motion to strike or an objection to an admission.  It is another thing possibly to have a witness give a few words of explanation as to where the exhibit came from or who prepared it where nobody is objecting to it -- the purpose being to see how fast we can move along on this matter.

MR. VEEDER:  Fine.  There is not going to be anything offered prior to the trial.

THE COURT:  No.  We may mark some of them for identification, but I don't propose to ask you to offer them now.  I would rather have them offered as the trial goes along.  But I would like to know particularly the ones as to which there is going to be some real argument, like this Bulletin No. 57.  I would like to know about those to which nobody objects.  There must be some of those.  And if you have some of those as to which you want to put a witness on the stand to say a word or two about it, if you think it is going to add anything, I am not going to object.  But let's know where we are going to have our problems and where we are not going to have them.

MR. VEEDER:  Fine.  I just didn't know the modus operandi, your Honor.

THE COURT:  Three o'clock.

(RECESS)

2149

SAN DIEGO, CALIFORNIA, MONDAY, SEPTEMBER 22, 1958, 3:00 P.M.

- - -

THE CLERK:  1 - 1247-SD-C, United States vs.
Fallbrook etc., et al.

Further pre-trial.

MR. MOSKOVITZ:  Your Honor, Counsel present have
conferred after lunch until now on the formulation of issues
and the statement of the principles that have been decided,
and although I hesitate to speak for anybody I believe that
we have reached substantial agreement on the amendments to
the statement of the principles which you have decided.

We revamped a number of the issues and I think have
agreed on most of them.  But I believe that there are some
outstanding controversies on issues.  If you like, I can go
over them in detail.

THE COURT:  Where you have agreed on an issue, all
right.  But can we take up the controversies?

MR. MOSKOVITZ:  Yes, we can, your Honor.

The one that immediately comes to mind is on page 7
of the proposed order.  It is number 8 (a) on line 19.

MR. VEEDER:  Why don't you start at the beginning,
Mr. Moskovitz?  We disagree that this is an itemization of the
following issues.  We say that it may be some of the issues,
it may be among the issues, it may be certain issues.

THE COURT:  I want them all itemized.  If you have

1   some more, let's drag them out.

2     MR. VEEDER:  Yes, I will be glad to present the one

3   that I think is absolutely essential, which we put as number

4   one.

5     THE COURT:  What's that?

6     MR. VEEDER:  That the issue to be judged by this

7   Court is the irrigated and irrigable acreage in the Santa

8   Margarita Valley.  I think that is number one.  But it is not

9   even referred to, here.

10    THE COURT:  Well, it was referred to indirectly, at

11  least, in 19.

12    MR. VEEDER:  I would like to see that spelled out

13  as the number one issue, and then --

14    THE COURT:  Any objection to listing that as an

15  issue?

16    MR. MOSKOVITZ:  I have no objection, your Honor.  I

17  received no suggestions from Mr. Veeder after the first draft.

18    MR. VEEDER:  Your Honor told me what to submit to

19  him, and I did that.

20    THE COURT:  Well, I told you to submit proposed

21  issues.  Did you ever submit that issue to him?

22    MR. VEEDER:  Just now.

23    THE COURT:  Well, all right.  It's a little late,

24  but that is what we are here for -- to list issues.

25    MR. SACHSE:  Your Honor, I won't say I have an

1 objection to it as an issue, but I think the point is this:

2 if listing it as an issue is intended to eliminate the possi-

3 bility of an objection to relevancy or materiality, I think

4 we have to get straight on that right now.

5 My understanding of what can ultimately be done in

6 a case such as this -- and I thought that Mr. Veeder was in

7 agreement at our last session -- is that there can be no

8 quantitative apportionment of water in the absence of a show-

9 ing of present deficiency.

10 Now I anticipate that when this particular question

11 would come up and the first piece of evidence of the United

12 States on irrigable acreage would be offered, that I would

13 object. Unquestionably I would be overruled by your Honor --

14 because of the simple order of proof I would be overruled.

15 But I would ask for the right to reserve a motion to strike

16 this whole thing if, at the conclusion of the trial, there is

17 in fact no showing of a present deficiency and therefore no

18 reason for a quantitative apportionment. If there is no

19 reason for a quantitative apportionment, then how many irri-

20 gable acres there are is absolutely immaterial.

21 MR. VEEDER:  I would like to ask Mr. Sachse, if I

22 may.

23 I truly don't understand the meaning of the term

24 "quantitative apportionment." We filed our petition here

25 requesting an adjudication in regard to all claims to the

rights to the use of water in the Santa Margarita Valley.

2152

1    That related to the present use and the future potential use.

2    And the is the only conceivable reason for our being here.

3              Now we know this, that this is a quiet title suit,

4    and we know that we have a large military enclave dependent

5    upon the Santa Margarita River for our water supply, and it is

6    extremely important to us to know not only the quantity of

7    water that is presently being used under vested rights but how

8    much will be used in the future.  And I certainly believe

9    that the law of California, indeed any law, and indeed the

10   equitable powers of this Court can make an adjudication on the

11   proposition.  And we might as well fold our tents and get out

12   of here if we are not going to have an adjudication of that

13   character.

14             Here is the Murrieta area.  They certainly haven't

15   reached full development.  We know that Temecula hasn't reached

16   full development.  But we do want to know what is the maximum

17   potential use that will be expected in the future.  We don't

18   say adjudicate so much water to each parcel of land.  We say

19   determine that that land is irrigable and determine what the

20   maximum duty of water would be.

21             Now again, that brings us to the proposition, the

22   duty of water is one of the prime issues in this case.  And I

23   think that it is essential that there be such an adjudication,

24   based upon the introduction of evidence.

25             So we go on and on and on.  There are innumerable

questions.  While I disagree with many of these propositions

that are advanced here, I say that they're here.  But let's be

done with saying let's limit it.  Because a man will introd-

duce some evidence.  Part of his land might be riparian and

part of it might be overlying.  So you have a situation like

that and you have innumerable issues presented by it.

MR. SACHSE:  I would like to attempt to answer Mr.

Veeder's question.

I believe that if the finding should be that there

is present at the time of judgment ample water in this stream

for all present proper riparian uses, your Honor's judgment

will necessarily, as far as any quantity goes, stop at that

point.  You may reserve continuing jurisdiction.  You will

undoubtedly spell out the extent of the riparian acreages,

acreages of riparian land.  You will undoubtedly make an order

that all riparians are to be protected in their proper

riparian uses for the future as well as in the past against

encroachment by persons seeking prescriptive rights or

appropriators.

But unless there is a present inadequate supply,

there is no purpose, no point in any quantitative apportion-

ment.

THE COURT:  Well, you gentlemen are talking about

the same thing.  But Mr. Veeder is pointing out that this

Court should find not only the present riparian uses but the

2154

1     potential riparian uses on this stream.

2         MR. SACHSE:  I believe that is absolutely improper.

3 I believe that, for example, what is reasonable is a constantly

4 changing factor.  I believe that what is irrigable is con-

5 stantly changing.  What was irrigable by gravity diversions

6 from the stream is certainly a very different situation than

7 what is irrigable with good pumps when you can lift it to a

8 higher elevation.  I believe that what is surplus is unques-

9 tionably a factor that changes day by day.  So any specific

10 allocation in amount to the future is impossible.

11         THE COURT:  Mr. Veeder is not talking about specific

12 allocation in the future.

13         MR. SACHSE:  I think he is, your Honor.  I think he

14 is asking that there be a determination of irrigable acreage,

15 --

16         MR. VEEDER:  Of course.

17         MR. SACHSE:  -- stating that the rights for all

18 time are now to be determined on that basis.  And I think

19 that that is improper.

20         MR. VEEDER:  Not in the slightest.  I have never

21 been in one of these lawsuits yet where the court didn't

22 retain continuing jurisdiction for the purpose of meeting

23 changing circumstances.  There is not a single valley in the

24 West where an adjudication has been entered but which land

25 has gone sour by too much water being applied to it, where

1   land has become alkaline for one reason or another.  It is no

2   longer irrigable.  You come in on an order to show cause and

3   eliminate that land.  But as of the time that your Honor

4   enters his adjudication he can determine the present irri-

5   gated and the present irrigable acreage on the basis of the

6   facts that are before him.  Absent that there is no conceiv-

7   able reason for an adjudication.  The Marines are entitled to

8   know, I respectfully submit, what will the demands be above

9   them?  What can we anticipate on the basis of irrigable

10  acreage in the future?

11       THE COURT:  But you are not asking me to make an

12  allocation of water for the future.

13       MR. VEEDER:  No, I am simply saying that when you

14  determine what the irrigable acreage is, at least we can

15  anticipate what quantity of water will be available on the

16  basis of our riparian correlative rights.  And that is the

17  sole and only purpose of the adjudication.

18       THE COURT:  I still don't think you are so far

19  apart in what you are talking about.  Mr. Sachse objects to

20  there being any allocation of water for the future or any

21  allocation presently, unless there is a shortage.  And you

22  say that you don't ask for an allocation of water for the

23  future, but you contend that the facts are going to show a

24  shortage and that presently, as I understand you, there will

25  have to be some allocation of water.

2156

1    MR. VEEDER:  That is right.  But from our standpoint

2    we also want a decree showing the maximum irrigable acreage

3    -- the maximum riparian irrigable acreage of the Vail Estate,

4    the maximum irrigable and riparian acreage of the Oviatts.

5    And that is what we are asking here, and I think that is the

6    kind of decree that your Honor can enter.

7        MR. SACHSE:  Well, we're not far apart.  But Mr.

8    Veeder seems to ignore or not to understand my basic point,

9    and that is, why determine irrigable acreage, if it is not an

10   issue?  If there is no problem of a quantitative allocation?

11   Because what is irrigable and what is a reasonable use can

12   change drastically before there might be a shortage.  It might

13   be utterly unreasonable to carry on certain kinds of uses

14   that I can conceive of.

15       THE COURT:  Well, if for no other reason, it ought

16   to be done in order to be honest with a lot of people in this

17   watershed who, if I went part way and said that there are

18   just so many irrigable acres now and said nothing more, might

19   jump to the conclusion that there was therefore a lot of

20   surplus water involved.  I'm guessing that there is not a

21   lot of surplus in this stream.  I've been guessing that for a

22   long time.  At least let the public know what the situation

23   is.

24       I intend presently, unless you convince me other-

25   wise, to catalog also what irrigable land is in the area that

1    has riparian rights; subject, however, to showing of changed

2    conditions, to showing of situations of urban development, to

3    showing of changes in potential uses.  All that, of course,

4    might have to be looked into again.

5         But I think that in fairness to the people involved

6    in this district they ought to know exactly what riparian land

7    there is in this area.

8         MR. SACHSE:  Riparian land, yes, your Honor.

9         THE COURT:  And what irrigable land.

10        MR. SACHSE:  I am not going to press the point,

11   because as I said when I started I feel that unquestionably

12   the evidence will come in and properly should come in because

13   there may be a shortage when you are all through with your

14   findings.

15        But I will say this.  I think the closest parallel

16   is a California case -- I can't give you the citation, I can

17   tell you the name -- Bigelow vs. Mertz, where the plea was for

18   a quantitative allocation among riparians and among appropria-

19   tors, and where the court took a great deal of evidence on it,

20   and then the trial court refused to make a quantitative

21   allocation.  And on appeal they sought reversal on that basis,

22   and the Supreme Court said that they were quite correct, that

23   since there was no present shortage the court's action in

24   cataloging their rights as riparians, in cataloging the

25   extent of the riparian acreage and nothing else, and reserving

1    continuing jurisdiction, was all that should have been done.

2          But not irrigable acreage.  Simply riparian land

3    and its extent.

4          THE COURT:  Well, I don't know.  We can just say

5    riparian land.  You were pretty close -- you pretty nearly

6    said "irrigable land."

7          MR. SACHSE:  Not according to the testimony of the

8    United States on De Luz Creek, your Honor.

9          THE COURT:  Well, I realize that there would be

10   situations of riparian land but which would be so full of rocks

11   that you couldn't grow anything.

12         MR. VEEDER:  Like Fallbrook.

13         THE COURT:  But I know that there is also hill land

14   where groves are presently being cultivated on terraces on

15   hillsides.  Which I think is a proper riparian use, isn't it?

16   Is there any law that says that you have to run the water to

17   the land by gravity?

18         MR. SACHSE:  No.  No, your Honor.

19         That's all I have on that.  I'm not pressing it.

20         THE COURT:  Of course, if we're going to do this

21   right -- I'm not too happy with the way this thing is being

22   set up -- if we're going to do this right, we ought to list

23   our issues of law and our issues of fact.  This one that Mr.

24   Veeder suggests is an issue of fact.  Most of these matters

25   contained in the present 20 items are issues of law.

1        MR. MOSKOVITZ:  Your Honor, I think there was general

2   agreement among Counsel that it was impossible to predicate

3   with safety all the issues that would eventually arise; that

4   we could try to pick out the ones that come to mind, but make

5   sure that this is not foreclosing the raising of other issues

6   as they do appear at the trial.

7        THE COURT:  Well, I think we'll have to leave the

8   door open a little broader in this case than we would in the

9   ordinary case because of its complexity.  But I do insist

10   that Counsel now list the issues of law that they know about.

11   Particularly your issues of fact would have to be stated very

12   broadly.

13        An issue of fact would be, what is the stream system

14   and basin system of the Santa Margarita River?

15        Another issue of fact is, what is the riparian land?

16        What is now irrigated?

17        What is irrigable?

18        What is the water duty presently?

19        You have a series of general fact issues that you

20   can innumerate separately from these legal issues.  Let's try

21   to make a separate category of some very broad fact issues.

22   I certainly haven't exhausted them.  But they will have to be

23   very broad in scope.

24        Let's presently, now, try to confine ourselves to

25   some of these legal issues.  What are the disputes as to the

1    legal issues, as we go down the line?

2        MR. VEEDER:  Your Honor, I would like to bring up

3 again -- and I hate continually to belabor that proposition,

4 because it may sound like I'm trying to re-hash what your

5 Honor has considered in his pre-trial opinion -- but we

6 believe that there are sharp legal questions to be determined

7 in regard to the financial capacity of the Fallbrook Public

8 Utility District, in regard to the Rainbow Municipal Water

9 District, in regard to the Santa Margarita Mutual Water

10 Company.

11        THE COURT:  Well, some of them are listed.  Fall-

12 brook's are listed here in 13 (a), (b), (c) as to Fallbrook.

13        MR. VEEDER:  That is right.

14        THE COURT:  Do you want similar ones as to Santa

15 Margarita?

16        MR. VEEDER:  I would think that we should apply

17 that to any taxing subdivision or any water company.

18        I don't know when Mr. Moskovitz is leaving town.

19 If your Honor believes that those are proper legal questions,

20 I'll undertake to --

21        MR. MOSKOVITZ:  My plane leaves at 5:55.

22        THE COURT:  Well, they are stated in paragraph 13,

23 except that 13 starts with certain permits, etc.  There would

24 have to be some little variation as to Santa Margarita

25 Mutual.  What is the other district?

2161

1        MR. VEEDER:   Rainbow Municipal Water District.

2        THE COURT:   All right, Mr. Veeder, work out your

3    legal issues as to that, and any general factual issues.

4        MR. VEEDER:   All right.

5        THE COURT:   We can't specify in particular all the

6    factual issues, but we can lay out the broad areas of factual

7    issues.

8        What other legal issue is there dispute about?

9        MR. MOSKOVITZ:   Your Honor, my own notes indicate

10   that number 9 is the only one that Mr. Stahlman felt should go

11   out.

12       MR. STAHLMAN:   I think it is a factual issue.   I

13   don't think it is a legal issue.

14       MR. VEEDER:   8 (a).

15       MR. MOSKOVITZ:   Yes, it's number 8 (a), on page 7,

16   your Honor.   It starts on line 19 on page 7.   It appears as

17   though it might be properly a factual issue.

18       THE COURT:   Well, yes, you could move that into the

19   factual group.   Probably it would be better to do it that way.

20       What other problems do you have in connection with

21   the issues?

22       MR. MOSKOVITZ:   Your Honor, nothing more specifically,

23   except that I had the feeling that Mr. Veeder had a lot of

24   general objections.

25       MR. VEEDER:   I think I can save you some problems

1    here.

2    Your Honor has stated, as I understand it, that the

3    question of irrigated and irrigable acreage and the legal

4    questions attendant upon such a determination -- I think that

5    embraces a great many of the problems that I had.  If we can

6    spell that out as that kind and type of issue, and that we

7    will be permitted to try the lawsuit on that basis, that

8    would make this much more palatable to me than it was before.

9    THE COURT:  I want broad issues, but I don't want

10   some blanket issue that doesn't tell me what it is about.

11   MR. VEEDER:  I can give you an example of what we

12   have found.  We have found, up along the Cahuila Indian

13   Reservation, that there has been a reduction of the water

14   table to a very appreciable extent.  Just how to formulate

15   that issue is not entirely clear, because we don't know

16   exactly how that transpired.  But we do know that there are a

17   great number of people up there who are pumping up there right

18   now.  If we could make a general and a broad issue in that

19   regard.  I don't believe there is anybody here representing

20   any client in that area.  But in any event, we do know that

21   there are issues that are flowing from that factual issue

22   that will need determination.

23   THE COURT:  Well, I don't want to sit here on the

24   Bench and do this, but it doesn't seem to me that it would be

25   a hard job to spell out your factual issues here.  It seems

to me that if you want to approach it logically you would
start out:

(1) The description and the extent of the stream
and the basins of the Santa Margarita River.

MR. VEEDER:  We have stipulated to that already.

THE COURT:  All right.

(2)  The factual question, What are the riparian,
appropriative, prescriptive rights on this River?  And I
suppose that you would have to add rights in process of being
acquired or inchoate rights, whatever you want to call them,
on the River.  A very broad statement.

(3)  We're getting a little more specific now, but
we can add general and more specific statements of it:  the
description of the cataloging of the riparian land  on the
River, and the --

MR. VEEDER:  Irrigated and irrigable riparian
acreage.

THE COURT:  Yes, and the water charges in connection
with the riparian land, and a tentative estimate of the water
charges on the irrigable but not irrigated riparian land.

MR. MOSKOVITZ:  Your Honor, by water charge you
mean the amount of water that's being used.

THE COURT:  Yes.

You could start down the line and in short order
you ought to be able generally to formulate most of these

1    factual issues that we're going to go into.

2          Now you have a factual issue, as well as a legal

3    issue, on Fallbrook's financial ability.  It's a combination.

4    You could list it in both places.  First, you have a factual

5    issue as to Fallbrook's financial ability to build a dam.  You

6    have a legal issue as to its power to build and operate a

7    dam.  You have a legal issue as to its power to supply irri-

8    gation water.

9          MR. SACHSE:  Haven't we got a very fundamental

10   issue:  Does a present deficiency exist?  And if so, what is

11   the extent of the deficiency?  And if so, what is the cause

12   of the deficiency?

13         THE COURT:  All right.

14         MR. SACHSE:  If the deficiency is caused by improper

15   acts by riparians, it creates one state of affairs.  If it's

16   caused by an illegal appropriation, that is another state of

17   facts.

18         THE COURT:  You have a factual issue, Are there

19   appropriators, who are without right, taking water outside the

20   watershed?  And if so, to what extent?  I don't know that we

21   have to measure the extent, if they are taking it out of the

22   watershed without right.

23         It's the kind of thing where somebody is going to

24   have to sit down and formulate something and you sit around a

25   counsel table and work it out.

MR. VEEDER:  Isn't this true, your Honor, then, on the basis of what you have just said, that in regard to all riparian rights, appropriative rights, prescriptive rights and overlying rights there will be a determination as to the irrigated and the irrigable acreage?  In other words, not only as to the riparian rights; the irrigable lands for which appropriative rights are being claimed.  It's true it is an inchoate right, to that extent.  Of course, in regard to pre-scription, the irrigable question is not important.  But in regard to overlying rights it would be.  So we would have those issues in regard to each type of rights that would be adjudi-cated here, and the duty of water as to all of those rights. We can formulate that, if you want us to.

THE COURT:  Well, I don't know the form in which you would draw it up.  But it doesn't seem to me to be a task. Hasn't any judge ever made you  get out a pre-trial order in a water rights case?

MR. VEEDER:  Yes, sir.  But I never had it handed to Mr. Moskovitz before.   That's the problem.  Had you told me, I would have written one.

THE COURT:  Well, I gave it to Mr. Moskovitz because he is more in the middle here than most of you people.  He has very few rights that the State itself is asserting and there-fore he has less of a burden, apparently, in preparing for this cause than some of the rest of you.  Plus the fact that I have

1    been impressed with his workmanship.  He's now leaving, and

2    you are going to have the responsibility, Mr. Veeder, of

3    taking over where he leaves off.

4            MR. VEEDER:  It suits me.

5            THE COURT:  So get off your coat.

6            What other legal issues are there in addition to the

7    20 that have been spelled out?

8            MR. MOSKOVITZ:  Your Honor, may I state this, that

9    Counsel felt that numbers 18, 19 and 20 on page 9, beginning

10   on line 13 and down through line 25, should not be included.

11   They felt that this was a separate area.

12           THE COURT:  Well, I don't think that we have to

13   worry about the nature of the decree.

14           MR. MOSKOVITZ:  And the subsequent questions are

15   related to the nature of the decree.  So those have been

16   eliminated.

17           THE COURT:  Yes.

18           MR. MOSKOVITZ:  Mr. Veeder, I believe, did object to

19   number 6.

20           THE COURT:  Before we go to 6, the only thing about

21   eliminating anything, here, about the nature of the decree is

22   this, that if we had some at least general agreement as to the

23   nature of this decree it would be some guide to us as we try

24   the case.  Now you submitted back and forth some material on

25   the nature of this decree.  Outside of this flurry between Mr.

Sachse and Mr. Beeder, which indicates to me that they are not too far apart, it seems to me that there is fairly general agreement as to what the nature of this decree is going to be.

MR. VEEDER:  I submitted to your Honor, on September 11, a suggested format page that could be used and generally has been used throughout the West.

THE COURT:  Let me spend a little time looking over what you have submitted as to the nature of this decree and we'll pass that up for the time being, and tomorrow sometime I would like to talk to you about that and see if we can work out something where we can at least get in brief form, maybe in general principle, some sort of idea of the kind of decree we're shooting for.  It would be of some assistance as we try the case.

Go on to 6 now.  What is your objection to 6?

MR. VEEDER:  The objection that I have to 6, your Honor, is this.  Mr. Moskovitz has written 6 this way:

"What appropriative rights, if any, does the United States possess for use on the military enclave by virtue of succession from its predecessor of rights acquired by use prior to the date when compliance with the provisions of the California Water Commission Act became the exclusive method of acquiring appropriative rights?"

Well, my own feeling about this formulation of issues is that we should formulate the issue without embracing in it the

legal conclusion that's set up.  My suggestion to Mr.
Moskovitz was this:

> "6.  What appropriative rights, if any, does
> the United States possess for use in the military
> enclave (period)?"

THE COURT:  It then becomes a factual issue.

MR. VEEDER:  Yes.

THE COURT:  And not a legal issue.

MR. VEEDER:  That's right.  And your Honor has
already ruled on the law.

THE COURT:  I have previously ruled that you have
only those rights which your successor had prior to either
1914 or 1923.

MR. VEEDER:  That's right.

THE COURT:  And it is a legal issue as to whether
it is 1914 or 1923.

MR. VEEDER:  That is right.  Why do we go on with
the rest of that harangue?  Why don't we just set it up that
way?

THE COURT:  Well, it's six of one and half-dozen of
the other.  It seems to me that it doesn't make any difference.
It merelym makes it a little clearer, here, to somebody who
didn't understand what appropriative rights you're going to
have to talk about.

MR. VEEDER:  Well, as I see our position in this

1    regard, your Honor, and one of the real difficulties that we

2    have encountered in formulating a pre-trial order here, is that

3    if we limit these things to matters concerning which we are

4    now discussing, if we limit it to what is the extent of the

5    riparian rights of the United States, what quantity of water

6    is it entitled to, that's one thing.  But when we go on and

7    append to that a legal conclusion, I begin to drag my feet

8    because I don't know where it is going to take us.

9         THE COURT:  Well, now, of course you could formulate

10   the issue by saying, What are the rights of the United States

11   in the Santa Margarita River?  But that's so broad that that

12   doesn't help us out.  So we break it down and we say, What

13   are your riparian rights?  What are your appropriative rights?

14   We've held that you have no prescriptive rights, no rights by

15   inverse condemnation.  So we try to break it down.  And this

16   is limited to what appropriative rights you had.

17        MR. VEEDER:  Why don't we just put a question mark

18   after "enclave" and let it go?

19        MR. MOSKOVITZ:  Your Honor, it is obvious that what

20   Mr. Veeder wants is another crack at this claim that the

21   United States has appropriative rights without complying with

22   the Water Commission Act.  Well, this has been precluded by

23   your opinion, and I see no reason to restate the issue that

24   has already been decided.  Let's limit it to what has been

25   undecided.

MR. VEEDER:  Well, it's one thing if I am not going to be asked to sign this.  If your Honor is going to enter this without my signature, that's one thing.  If the signature of Counsel is going to be requested, I simply say that I'm not going to put a rope around my neck.  It's that simple. We can go a long, long way and you'll find that we'll cooperate in every regard to get a decent pre-trial order.  But I'm not about to sign any agreement to anything beyond the word "enclave" because -- life's too short.

THE COURT:  " . . . enclave by virtue of succession from its predecessor in interest . . ."  I have already ruled that you haven't any appropriative rights except those that you may have got from the Rancho Santa Margarita.  And if you go that far, then what's wrong with saying acquired prior to 1914 and 1923?

MR. VEEDER:  I can go along down to "succession from its predecessor."  But I would just as soon stop there, your Honor.

THE COURT:  It's six of one and half-dozen of another.  As far as I'm concerned, I've already ruled what your appropriative rights, if any, are.  So your factual issue, then, becomes, What is the extent of the appropriative rights which I have ruled you could possibly have?  And I'm not going to back up, unless you hit me over the head with some late decision of the Ninth Circuit or you make some kind

1    of showing where I should change my ruling.

2        MR. VEEDER:  The point that I am making is that I

3    thought that the reason why we are getting together as Counsel

4    is that we are going to set up the kind of facts to which we

5    can agree.  I'm not about to agree, your Honor, frankly, on

6    these legalistic conclusions that are written into these

7    factual questions.  If your Honor orders me to, I will.  But

8    I'll make that clear.  But I see no reason why we couldn't

9    just itemize the facts concerning which there are issues and

10   let it go at that.  Let Moskovitz have his day.  But he

11   shouldn't have it in every paragraph.  That's my point.

12       THE COURT:  It leaves me cold.  I can live with it

13   either way.  I don't see your objection.  On the other hand,

14   I don't see why it's necessary to add what Mr. Moskovitz has

15   added.  I don't see the harm in doing it, and I don't see the

16   need of doing it.  It's clear to me.  But if you're going to

17   feel better about it, we'll cut that down a little.

18       MR. VEEDER:  Fine.

19       THE COURT:  But you have the responsibility of doing

20   some drafting around here, so we'll see what you come up with.

21       MR. VEEDER:  We will, your Honor.

22       THE COURT:  What else do you have in the way of

23   legal issues? What else do you want to talk about?

24       MR. VEEDER: My own view, your Honor, is that we can

25   write up the irrigated and the irrigable lands, we can write

up the question in regard to the storage capacity of the basins

within the enclave and the storage capacity of the basins

throughout the Valley.  I think those might be issues of fact

that will certainly be involved.  The question of the avail-

ability of water supply.

MR. SACHSE:  Present deficiency.

MR. VEEDER:  Present deficiency.  We're out of

water.

MR. SACHSE:  Cause of deficiency.

MR. VEEDER:  Why, yes.  Yes.  Franz, you're coming

right along now.  And admit that Fallbrook is one of the

principal causes of the deficiency.  I think that we can get

that.

THE COURT:  All right, I want to save you some time

to talk to Mr. Moskovitz before he leaves tonight.  He has

some notes that he has made.  He is now temporarily resigning

as draftsman and you're being appointed as successor.

MR. VEEDER:  Fine.

THE COURT:  I think you should sit down and spend

some time with him.  So I'm going to terminate this now for

today with just a couple of questions.

Is Mr. Dennis still here?

Are you satisfied with the issues as to your end of

this case?

MR. DENNIS:  I think so, in view of the discussion

1    that took place there.  I think that there will be some

2    additional issues, because Mr. Veeder, as I understood it,

3    figured that those issues which he was foreclosed from raising

4    by reason of your Honor's decision he was not bothering to

5    put in.  I think that they will probably be introduced.

6    I think that two or three principal issues in the

7    case haven't been covered, and those are:  What lands of the

8    United States are riparian?  What are the size, capacity and

9    locations of the various basins?  What basins are part of the

10   stream flow of the River?  And whether or not an overlying

11   landowner has the right to use the waters from the underground

12   basins on lands other than overlying basin land.

13   Those are the primary things, and those, as I

14   understand it, Mr. Veeder felt that he had more or less been

15   foreclosed.  I think that probably they will be coming into

16   the issues.

17   THE COURT:  You say that he thought those were

18   foreclosed?  By what?

19   MR. VEEDER:  By your opinion, your Honor.  You broke

20   our spirit.

21   THE COURT:  Where?

22   MR. DENNIS:  I was just quoting his remarks.  I

23   figure that those will come in.

24   THE COURT:  Where did I foreclose you from any

25   showing as to the extent of these basins and the rights of

1  people on land over the basin?

2       MR. VEEDER:  Truly, your Honor, I think that Mr.

3  Dennis went one step further.  But I wasn't quite sure whether

4  your Honor was going to permit us to describe, for example,

5  the large acreage that we have outside the watershed, concern-

6  ing which we have a claim of water.  I didn't know what your

7  Honor is going to do about that.  As I understand, you are

8  going to let us put in some evidence on that.

9       THE COURT:  Well, we should have a record on that.

10  I may wind up and say that you have no right to insist that

11  water come downstream to be used on that land.  But I think

12  the record should show what you have.  I have made just some

13  general rulings.  You'll have to apply them to the facts.

14       MR. VEEDER:  We'll whip up something for you, your

15  Honor.

16       THE COURT:  All right.

17       Mr. Stahlman, are you generally satisfied with the

18  issues that will come up between Vail and the various other

19  parties?

20       MR. STAHLMAN:  Well, yes, generally satisfied.  I

21  think most of these things present issues of fact.

22       THE COURT:  Mr. Sachse, have you got most of your

23  issues listed here?

24       MR. SACHSE:  I believe I've put in everything I can

25  think of.

1    THE COURT:  Mr. Moskovitz, have you got most of

2  yours in here?

3    MR. MOSKOVITZ:  Yes, your Honor.  I think you're

4  right; these are primarily legal issues, and the issues that

5  we have in mind are here.

6    THE COURT:  Separate out the general factual issues

7  that we have discussed.

8    And Mr. Veeder, you're the only one so far who is

9  not generally content with the issues, and since you're given

10  the job of drafting something talk with Mr. Moskovitz and get

11  busy.

12    MR. VEEDER:  Fine.

13    MR. MOSKOVITZ:  Your Honor, I would like to raise a

14  question which may have some relationship to this.  I think

15  there is some confusion among Counsel as to just what is

16  going to be tried before your Honor -- that is, what parties

17  and what rights.  Some of the people who own land and claim

18  water rights on the Temecula, for example, upstream, will

19  wonder whether they are going to have their rights tried

20  before you or before the Master.  And this might influence

21  what factual issues we list as being open here.

22    I think I am speaking for some of the people here

23  correctly.  If not, I would like to have them correct me.

24    MR. SACHSE:  Has your Honor had any indication from

25  Mr. Cranston as to when he might have some kind of draft?

2176

1    THE COURT:  I haven't seen him in some time.  I know

2  that he is working on it.

3    It is something that we probably should discuss at

4  greater length, and I want to give you some time to talk to

5  Mr. Moskovitz before he leaves tonight, Mr. Veeder.

6    We can't try this case all at one time.  There is

7  no possibility of doing that.  We are going to have to dove-

8  tail work done at one time and work done at another time.  I

9  wonder what we can do about that.  We have Vail in here.  They

10  are up in the Temecula Valley.

11    MR. GROVER:  Speaking for some owners who are up

12  above the Vail Dam there, your Honor -- I think I've expressed

13  this before -- it would be a burden for us to get into the

14  more lengthy and detailed type of case that will be presented

15  with the major parties present.

16    THE COURT:  Why wouldn't your rights be protected if

17  you made no appearance at this time but indicated a desire to

18  be heard at a later date, at which time we probably would have

19  shaken down what is done at this hearing, maybe in the form of

20  some set of findings as far as we've gone, and give you a

21  chance to pick up from there and shoot at those at which

22  you're unhappy.

23    MR. GROVER:  That is what I would like to do,

24  exactly, as far as our people are concerned.  I think we get

25  the maximum benefit out of the efforts of the major parties

1    and yet have a chance to --

2            THE COURT:   They couldn't be findings.   They would

3    have to be proposed findings.

4            MR. STAHLMAN:   A few of those people up above are not

5    so minor either.   There are some pretty fair pieces of land up

6    there, as far as water duty is concerned.   It's a question

7    what their rights are.

8            THE COURT:   Well, that's something we'll have to

9    think about.   How many large property owners are there above

10   Vail?

11           MR. VEEDER:   There are several, your Honor, that are

12   sizable, in our view.   I think Oviatt is one of the biggest --

13   certainly one of the ones that is actually competing with the

14   Vails.   The old Barbee property is a good-sized property.

15           MR. KRIEGER:   In this connection, your Honor, we

16   have been silent up to now but we are in the process of group-

17   ing a/number of landowners, including the Oviatts.   We have

     large

18   not completed the substitutions required in many of those

19   cases.   But we will be representing approximately 25,000 or

20   30,000 acres of land.

21           In this connection, it seems important that we

22   thoroughly explore the possibility of getting many of these

23   people out of this lawsuit, people who we think can prove that

24   they are percolating water users and not riparians on the

25   stream.   We've been exploring this in the halls a little bit

1   to see if there isn't some way in which we might, upon a

2   mutual engineering study, stipulate these parties out; and

3   we've run into a problem in that connection to meet the court's

4   order that all the parties are adverse to one another.  But

5   if we can meet that problem then I think we have an opportunity

6   to get a large number of people out and save them the expense

7   of this trial.

8              THE COURT:  Will you be representing the Barbee

9   interests, too?

10             MR. KRIEGER:  No, not the Barbee interests.

11             THE COURT:  Who represents the Barbees?

12             MR. VEEDER:  Mr. Swing did, originally.

13             MR. STAHLMAN:  Is your Honor aware of the fact that

14  there was an action -- I think I mentioned it before -- Barbee

15  vs. Oviatt, filed in the State court?  I think the same issues

16  are in that case.  Vail is an intervenor in that case.  How-

17  ever, all of the issues in that case -- and I think Counsel

18  agrees with me insofar as he represents the Oviatts -- are

19  encompassed by this action here.

20             Is that right?

21             MR. KRIEGER:  Well, I believe so.  But here again,

22  we are not representing Oviatt in the Barbee suit.  I think

23  Mr. Oviatt is hoping, as you indicated, that this suit will

24  settle that dispute, too.

25             MR. STAHLMAN:  I think logically and reasonably.

2179

1    The issue is a question of water, only we have more people

2    in this case than they have in that case.

3           Then, of course, we have people on some of these

4    other tributaries, too.  When you get up into the Murrieta

5    Valley we have some concerns up there.  We have some in the

6    De Luz and in the Sandia.  Of course, De Luz has been heard,

7    with the exception of Vail.  It is not of great importance

8    there, because we are at the headwaters, and I think your

9    Honor has indicated that before this is over they will be all

10   laced in here.

11          But the trial procedure here as to what particular

12   areas may be heard by your Honor or by the Master, we will

13   have to be concerned with these various hearings as to when

14   and how they will be heard.  We may have an interest in a lot

15   of these hearings on the various tributaries.

16          MR. SACHSE:  Your Honor, I think it was in Mr.

17   Grover's memorandum -- I've read so much sent by so many

18   Counsel that I'm not sure to whom to give credit -- but I

19   believe it was in Mr. Grover's memorandum that the suggestion

20   was made that it might be of tremendous help to the small

21   people about whom he was talking if some sort of tentative or

22   interlocutory findings as to the United States could be made.

23          I think it was in your memorandum, wasn't it?

24          MR. GROVER:  Yes.

25          MR. SACHSE:  That such a set of findings might, for

instance, cover a lot of people that those findings wouldn't

hurt in the least.  That they could just quit and default.

And I was wondering -- your Honor spoke a moment ago of doing

this in sections -- if you have given that thought any possi-

bility.

THE COURT:  What was your suggestion in detail on

this, Mr. Grover?

MR. GROVER:  As I put it, it was not limited to

just the United States, but to the major parties as far as the

ones who have been participating in the bulk of these pre-

trial hearings.  If the work of all those parties were done

and then evaluated tentatively by the Court, an opportunity

would then be given the smaller parties to review what was

done and if they are happy with it to abide by it, and if not

then make the relatively few objections that would be appro-

priate.  It is essentially what your Honor said a moment ago.

MR. STAHLMAN:  Your Honor, I think that after this

case gets under way and the plaintiff puts on its evidence,

we are going to find the same thing occurring here that

happens in a lot of lawsuits.  It then settles down to where

we get our sights and perspective and determine a lot of these

things and it will be a lot clearer than it is at this time.

After the plaintiff's evidence is in, the complexion of the

case in relation to a lot of these parties and their properties

will take on a different aspect.

2181

1    THE COURT:  Well, Mr. Veeder, what areas did you

2  propose to offer proof on?  You were going to offer proof, of

3  course, as to the Government's holdings.  Were you going to

4  offer any proof -- I suppose it would only be on rebuttal

5  after the defendants have put on proof -- as to other pro-

6  perties?

7    MR. VEEDER:  Well, I was going to undertake -- there

8  might be objection to it, although I don't think there would

9  be -- we intend in our case in chief to put in not only the

10  geology, as we see it, within the enclave, but the geology

11  throughout the whole area.

12    We expect to put in evidence respecting the runoff

13  throughout the whole area.

14    We expect to put in comprehensive data on hydrology,

15  on precipitation, on many -- in fact, all of the scientific

16  aspects of the Valley.

17    And I think that when that is in, as Mr. Stahlman

18  just stated, there will be an opportunity for the coalescence

19  at that time of such issues as are truly presented in this

20  case.  I believe that there will be an elimination of much of

21  the difficulty concerning which we are now talking.  That

22  invariably happens when you take a whole valley.

23    Secondly, I believe, in line with these gentlemen's

24  remarks here, while I'm not sure yet that I would agree to an

25  interlocutory order, but I do believe that there are areas of

1  stipulation in which, not only in regard to these people whose

2  rights are solely and entirely percolating in character; I

3  think that there are areas of agreement, where a man has

4  25,000 or 30,000 acres of land concerning which he is liti-

5  gating, I think there are vast areas where we can settle by

6  stipulation a great many of the factors that could be written

7  into the kind and type of decree that we have proposed.  I

8  really believe that when we get in our case in chief that that

9  will be the next reasonable step that will fall right in line.

10      THE COURT:  Well, recently I went back up to the

11  top end of Temecula.  I've seen it several times before.  But

12  there is a lot of that area that, it seems to me, can go out

13  of this case in short order.

14      MR. VEEDER:  I think it will.  When we put in our

15  U. S. --

16      THE COURT:  As to some of that ground, if anybody

17  has any water on it, he's entitled to it, it seems to me.

18  I'll listen to the engineers.  But as to some of that desert

19  land, if he found any water on it you'd have trouble convinc-

20  ing me that it's connected with any stream.  I'm not talking

21  about the canyon bottoms or the little tributaries.  But

22  there is tremendous acreage up in there that probably should

23  be gotten out of this case as early as possible.

24      MR. VEEDER:  We have a witness, when we get to our

25  geology, who will show those areas, and I think that will

2183

1  fall by the wayside without difficulty.

2      THE COURT:  Well, now, what do you want to do?  Do

3  you want to come in at ten, or do you want to take until

4  eleven to work on this?  I'm going to keep you working on this

5  until we get it done.

6      MR. VEEDER:  Well, I would like to rough out some of

7  these things, and by eleven o'clock tomorrow come in and show

8  you what we are doing generally and then begin to put it into

9  a final.

10      THE COURT:  Do you want to come in at 11, or do you

11  want to come in at 2?  When do you want to come in?

12      MR. STAHLMAN:  Does your Honor want the rest of us

13  here tomorrow?

14      MR. VEEDER:  Whatever suits your Honor.

15      MR. STAHLMAN:  We are in trial in another case.

16      THE COURT:  You'll have to continue with your trial

17  then.

18      MR. SACHSE:  I have co-counsel.  The trial is pro-

19  ceeding today in our absence.

20      MR. STAHLMAN:  However, I want to be there tomorrow.

21  There is something in which I'm interested.

22      MR. VEEDER:  We'll run it so that there will be

23  rough drafts and we'll make it available to Mr. Stahlman and

24  Mr. Sachse.

25      MR. SACHSE:  At noon we can come over.

1    MR. VEEDER:  And of course to you.

2    MR. SACHSE:  It will be a great convenience if you

3 can do it that way.  At noon I can take a rough draft.

4    THE COURT:  Let's say 2 o'clock, then.

5    MR. VEEDER:  Two o'clock is fine.

6    THE COURT:  In redrafting the pages will you follow

7 the same system you followed on the facts?

8    MR. VEEDER:  Yes, sir.

9   . THE COURT:  Put down the date of the page, so that

10 we can insert and know what we have.

11    MR. VEEDER:  Yes, we will go ahead on that basis.

12    THE COURT:  It may be that if we make a little

13 progress tomorrow we could then mail this out to some of the

14 other Counsel and get you back in again the end of the week.

15    MR. VEEDER:  When is Mr. Moskovitz going to be

16 through?  It is hard to work without him.

17    THE COURT:  Mr. Veeder is going to find that it's

18 one thing to punch holes in a proposed order and another thing

19 to draw one.

20    MR. VEEDER:  It's a whole lot easier to write than

21 to punch holes.  I prefer to write than to punch holes.

22    THE COURT:  We'll see.

23    Two o'clock tomorrow, then.  Is that agreeable?

24    MR. MOSKOVITZ:  Maybe we ought to clarify this.  Do

25 you plan to have a hearing on Friday also?

1    THE COURT:  I don't know.  I have these days avail-

2    able.  I'm going to keep working at this until we get some

3    kind of order out here.

4    MR. VEEDER:  October 1 is not so far away.  That's

5    why I am getting concerned about this.

6    THE COURT:  For instance, if we got something worked

7    up tomorrow we could mail it up to you and you could get it

8    back to us.  We could talk to you on the phone about some of

9    the matters.

10   MR. MOSKOVITZ:  You could talk to me on the phone,

11   and I could be back here on Friday.  I don't know that it would

12   be the first thing in the morning, but I could be here on

13   Friday.

14   THE COURT:  Well, let's meet again tomorrow and

15   give you the morning to see what can be done, and meet again

16   tomorrow afternoon.

17   MR. MOSKOVITZ:  Mr. Baronkay will be here and he can

18   get in touch with me.

19   THE COURT:  All right.

20   MR. MOSKOVITZ:  There will be someone here for the

21   State.

22   MR. GROVER:  Because October 1 is so near, and

23   because  I would rather not have to come back this week, too,

24   if possible, I wonder if you could make an early decision

25   about the scope of the trial.

1          THE COURT:  I'm going to think about it.  I don't

2     know the answer.  But I want to terminate here today and let

3     Mr. Veeder talk to Mr. Moskovitz and bet the benefit of his

4     notes here before he leaves tonight.

5          MR. VEEDER:  Is it all right to work here for a

6     little while?

7          THE COURT:  Yes.

8          MR. GROVER:  On page 5 of the memorandum, if your

9     Honor wants to refer to that, is where I made the suggestions

10    about the scope of the trial.

11         THE COURT:  All right.

12         (ADJOURNMENT.)

13                             - - -