# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

               Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      October 1, 1958.

Pages:    2250 to 2383

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

Z-1

2250

Kunkel
P 2292

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
     vs.                       )      No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
            Defendants.        )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, October 1, 1958

— — —
-
-

Z-2

2251

APPEARANCES:

| | |
|---|---|
| For the Plaintiff | WILLIAM H. VEEDER, ESQ., WILLIAM E. BURBY, ESQ., Special Assistants to the Attorney-General, Department of Justice, Washington, D.C. |
| For U.S. Marine Corps | COL. ELLIOT ROBERTSON CMDR. DONALD W. REDD. |
| For Defendant Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For defendants Fall-Brook Public Utility District, et al. | FRANZ R. SACHSE, ESQ. |
| For Defendant State of California | EDMUND G. BROWN, ESQ., Attorney-General, by ADOLPHUS MOSKOVITZ, ESQ., Deputy Attorney-General CARL BARONKAY, ESQ. |
| For Defendant Santa Margarita Mutual Water Company | W. B. DENNIS, ESQ. |
| For Defendants Gibbon and Cottle, and for Defendants Halde | GEORGE C. GROVER, ESQ. |
| For Defendants Hartman, Lewis, Wilks and Bayle , and | BEST, BEST & KRIEGER, by JAMES H. KRIEGER, ESQ |
| For Defendants Oviatt | |
| For Defendants Sawday | LUCE, FORWARD, KUNZEL & SCRIPPS, By ROBERT McGINNIS, ESQ. |
| For Defendants Chaffee, Kerry & Murray | TOM MENZIES, ESQ. |
| For Defendant Publix Title & Gen. Title Clearing | LEO GOODMAN, ESQ. |
| For Defendants Samuel M. and Hazel A. Wilson | RAY C. EBERHARD, ESQ. |
| For Defendant Butler | JOHN B. MYERS, ESQ. |

Z-3
A-1

1   SAN DIEGO, CALIFORNIA, TUESDAY, OCTOBER 1, 1958.  10:00 A.M.

2

3       THE CLERK:  1247-SD-C, U.S.A. versus Fallbrook, et al.,

4   for court trial.

5       Your Honor, I believe it will be necessary to swear Mr.

6   Stewart as the alternate reporter.

7       THE COURT:  Swear the reporter.

8       (Alex Stewart sworn as official reporter pro tem.)

9       THE COURT:  If I recall rightly in some of the process

10  that was served on the defendants in the latter round of ser-

11  vice was a notice to object to the appointment of the master,

12  and I think this date was fixed as a date in which objections

13  could be made.

14      MR. VEEDER:  That is correct.

15      THE COURT:  Have you any objections to the appointment

16  of the master heretofore made in this case?

17      The record will show no objection is noted.

18      I have some miscellaneous matters here.  A pre-trial order

19  on ground rules was mailed out to all counsel of record.  We

20  had a direction in it the United States publish and post it.

21  Are you doing anything about that?  It has been mailed out.

22      MR. VEEDER:  It has been mailed out to everyone, your

23  Honor.

24      THE COURT:  Well, it was mailed out to counsel of record,

25  but also the order is that it be printed in the Fallbrook

Z-4
Z-1

1  Enterprise, Riverside News, and the Daily Transcript of San

2  Diego.  Will somebody take care of that?

3      MR. VEEDER:  That will be done, your Honor.

4      THE COURT:  And also there is the direction it be posted

5  in the Reche School and various post offices in the area.

6      MR. VEEDER:  I will follow through on that, your Honor.

7      THE COURT:  I would like to get that underway today some-

8  time.

9      MR. VEEDER:  We will start today.

10      THE COURT:  Will you assign somebody of responsibility to

11  take care of that?

12      MR. VEEDER:  Yes, your Honor.

13      THE COURT:  And report to me when it has been accomplished.

14      MR. VEEDER:  Yes, your Honor.

15      THE COURT:  There is another matter we haven't discussed,

16  and this is an appropriate time to do it.  It probably should

17  have been done earlier in connection with the master's hear-

18  ings, but it is not too late to start on it.  And that is what

19  plans have the Government made for making a summary or an index

20  of this record as we proceed? Does the Government have any

21  plans in that respect?

22      MR. VEEDER:  We do, your Honor.  We will proceed along

23  this line in using a method that I have used in the past suc-

24  cessfully, by having each tract of land described in the name

25  of the land owner.  The volume and page of each reference to

Z-5
A-1

1  the parcel of land and to the ownership tract will be entered

2  as we progress.  There will be a large sheet, probably that

3  large, three feet long, maybe two and a half feet wide,  It

4  will be used for the purpose of making a cross-reference

5  throughout the entire transcript of any exhibit or of any oral

6  testimony pertaining to the tract of land in issue.

7      THE COURT:  I take it your index will be in most cases

8  by section, township--

9      MR. VEEDER:  It will be by legal subdivision, and where

10 there is a too long metes and bounds description we will put

11 in adequate reference so there will be no question of the

12 property involved.

13     THE COURT:  Will that be available in the courtroom here

14 for inspection by counsel?

15     MR. VEEDER:  I hadn't thought of it that way, your Honor,

16 but it can be done.  We usually maintain it in the office.

17     THE COURT:  Your offices are one floor below.

18     MR. VEEDER:  That is correct.

19     THE COURT:  It will be available for inspection either

20 there or here.

21     MR. VEEDER:  That is correct.

22     THE COURT:  That will be a help, because that is largely

23 for your convenience, and that doesn't go as far as what I am

24 thinking about.  You don't intend to have any summary made as

25 you go along?

Z-6
A-1

1    MR. VEEDER:  There will be a summarization.  There will

2  be a page-- there will be a line for remarks, in which a

3  summary of--

4         THE COURT:  You are talking about this chart still?

5         MR. VEEDER:  That is correct.

6         THE COURT:  What I am thinking about is this:  In a big

7  case ordinarily both sides, where you have two sides to the

8  case, often prepare a summary as they go along, and also an

9  index by name and subject matter and so forth.  Now I am

10  wondering if there is any kind of a procedure that could be

11  worked out here whereby something like that be done.  A

12  summarization doesn't have to be in detail.  But what I have

13  in mind is this:  If we had someone who could take the

14  transcript after it has been prepared and pull out the name

15  of the witness and the page where his testimony started, if

16  he could then summarize-- I give an example to you.  You start

17  out your case at page 25 of the record, description of the

18  main stream of the Santa Margarita; page 52, a description

19  of the Vail Dam; page 75 is watershed from the junction between

20  the Temecula and the Murrieta upward.  Subject matter references

21  as we go along.  Later on when we get into particular areas,

22  tract references, with the possibility of having this thing

23  mimeographed from time to time or duplicated and sent out to

24  counsel who participate in this case.  It would be a big help

25  to them to have some summary of proceedings.

Z-7
A-1

1    MR. VEEDER:  I believe that I didn't make myself clear,

2   because what will be the procedure we will follow, and be

3   almost identical with that, we will have several lines where,

4   for example, our first witness, Mr. Kunkel, will testify in

5   regard to the location of a particular physical phenomena.

6   And we will have a summarization as to the location, utiliza-

7   tion of the facility, if it is a facility, and the page

8   reference to where you would find it.

9    Now the reason why we feel that in this kind and type of

10   case it is essential is that our approach to it, at least,

11   and until your Honor directs to the contrary we will go that

12   way, will be to view it as the ultimate determination of the

13   location of the land with relation to the stream, the irriga-

14   tion and irrigable acreage, and uses of water.

15    Now there will be several items concerning which summar-

16   ization will be made as we go along.

17    THE COURT:  What I am thinking about, I have no objec-

18   tion to what you state you are doing for yourself, and that

19   probably should be done.  I am thinking about a possibility

20   of having, for what it is worth, some copy of this summariza-

21   tion go out to counsel who have participated in this case.

22   Now they, at their peril, can accept your summarization.

23   And you may, of course, be noting the things that you are

24   interested in from your standpoint of the case.  But to the

25   extent that the summarization is made it would be helpful to

Z-8
A-1

1  counsel in letting them have such kind of a reference to pages

2  of the transcript as would be useful for them in their case.

3  In other words, if you are going to do certain work, do you

4  have any objection to making it available day by day as it is

5  done to other counsel?  But not necessarily day by day, but

6  once a week or twice a week.

7      MR. VEEDER:  I personally have no objection to it.  I

8  see no-- it is something that is going to be done for us.

9  After all, we are the United States.  And we have no objec-

10  tion to doing that.  The costs, I don't know what they will

11  be.  I certainly, however, do not want to assume any personal

12  responsibility for the Government for summarization.  I think

13  the cross-reference would be valuable possibly to counsel.

14      THE COURT:  I understand that.  Now in other cases I have

15  tried that took considerable time, the Monolith case, it took

16  three or four months, each side prepared a summary as we went

17  along.  And I requested they give me copies.  Well, of course,

18  each side was emphasizing the things that they thought were

19  important to their case.  But I had available, therefore, two

20  indexes to get the material that I might want in the record.

21  And I just set up a notebook, and as the summaries came in

22  I threw them in the notebook, and I had therefore the means

23  to find out generally what was in this record.

24      These summarizations don't have to be long.  They only

25  indicate-- of course, you can make them for whatever purpose

Z-9
A-1

1   you want to make them.  But I am wondering if we can't work

2   out some procedure whereby what you do can't be made available

3   to other counsel.  They may not be content with how you

4   summarize the record, but at least for what it is worth there

5   will be a page index as to where certain matters went on.

6        MR. VEEDER:  We can make it available, your Honor.  We

7   will.

8        THE COURT:  Do other counsel have any other thoughts in

9   this matter?  You are going to be here all the time and some

10  of these other counsel are not.  That is why I am looking

11  particularly at you.

12       MR. VEEDER:  Well, it is a work that I think has to be

13  done, and while I have never made a throw sheet out of my

14  summarizations, I will be glad to pass it around, your Honor,

15  for what it is worth.

16       THE COURT:  Mr. Moskovitz.

17       MR. MOSKOVITZ:  Your Honor, the State has tentatively

18  decided to attempt to make a summary of the evidence as it

19  comes in, and possibly an index of sorts.  I can't say now

20  what form it is going to take.  But we do have that in mind.

21  And we have no objection at all to making it available to other

22  counsel.  The problem of cost may enter into it, but I don't

23  think that will be an insuperable obstacle.

24       THE COURT:  The duplicating of copies, after you got it

25  made, for counsel who participate, or even for all counsel who

2259

Z-10
A-1

1    appear, wouldn't be insurmountable.

2         MR. MOSKOVITZ:  I don't think so, either.

3         THE COURT:  Let's discuss it then between the three of

4    us later on, and let's see between the two of you what we are

5    going to get out of this and whether it can't be made avail-

6    able to other counsel.

7         MR. VEEDER:  Is counsel going to maintain an office here

8    throughout the trial?

9         MR. MOSKOVITZ:  We are now attempting to make arrange-

10   ments for an office.  I don't think we can get anything-- since

11   we haven't been told we can get anything all around the clock

12   here in this building, I think we are going to try to get

13   office space close by if we can, but we are still making

14   arrangements.

15        THE COURT:  Have you talked to the U. S. Attorney about

16   the possibility of using that one room of his library?

17        MR. MOSKOVITZ:  No, we haven't, your Honor.  I thought

18   you indicated the only room you thought may be available was

19   the grand jury room or the petit jury room.

20        THE COURT:  It would be worth a discussion with him.

21   They have their books in there in the one room.  The other

22   room is a more private room.  They have grand jury files and

23   so forth.

24        MR. MOSKOVITZ:  I will check with him.

25        THE COURT:  I might discuss it with him.  However, the

Z-11
A-1

1   petty jury room across the hall is available for files and

2   the grand jury room is available practically any day except

3   every other Thursday.  And there is no reason why any of you

4   gentlemen can't make use of this petty jury room over here.

5       MR. MOSKOVITZ:  I have already made arrangements, you

6   having told me about the petty jury room being available for

7   files, to have a filing cabinet sent up.  It is coming up

8   today.

9       THE COURT:  Let's discuss further then-- we can do it

10  probably informally-- the matter of a summarization index

11  to be available to all counsel in the case.

12      Now on the pre-trial stipulation of facts, that has

13  heretofore been approved and filed.  I understand that other

14  counsel are willing to join in that statement of facts.

15      MR. VEEDER:  I have heard that perhaps Mr. Grover-- He

16  had better speak for himself.

17      MR. GROVER:  Your Honor, I have followed from a distance

18  the preparation of that stipulation.

19      THE COURT:  You are talking now about the facts?

20      MR. GROVER:  That is right.  And at the time I found no

21  fact I wasn't personally willing to agree to.  But it is only

22  the last few days that I understood we were to stipulate to

23  it formally, and I would like a few days to contact my clients

24  and be sure the facts are agreeable to them.  If I could have

25  a week--

Z-12
A-1

1    THE COURT:   I think what we had better do is to draw up

2    some kind of a document reciting that this stipulation of

3    facts was heretofore entered into between certain of the parties

4    and that other parties are now willing to join.   And just have

5    some spaces there, and ask counsel to sign as they get ready

6    on behalf of the name of their client and the name of counsel

7    and the date.   And that can be a continuing thing which we can

8    let the Clerk keep here.   And if there is no dispute on these

9    facts-- and no one has yet suggested any dispute-- I don't

10    know why the parties that are here by counsel can't all

11    eventually join in that stipulation of facts.

12    MR. VEEDER:   It may interest your Honor that Mr. Sachse

13    signed what you had suggested and used this form:

14             "I, Franz Sachse, of the firm of Sachse

15             and Price, appearing for and acting on behalf

16             of the hereafter named defendant, agrees to

17             be bound by the order on pre-trial stipulation

18             dated May 8, 1958, and the stipulation on pre-

19             trial to which the last mentioned order pertains:"

20    and he named the parties.

21    MR. SACHSE:   That, your Honor, only covers the four

22    major ones.   I will supply Mr. Veeder with a full list.   I

23    don't have it today but of all my clients, who are all small,

24    and they will all subscribe to the same stipulation.

25    THE COURT:   You will complete that document.

Z-13
A-1

1    MR. SACHSE:  This is only for the marjor parties that

2    you suggested.  But I will complete it as to all the parties.

3    THE COURT:  This is as to the facts stipulation.

4    MR. SACHSE:  That is right, and also as to the--

5    MR. VEEDER:  If that form is satisfactory, we will have

6    it reproduced and available for counsels' signature.

7    THE COURT:  Does this include both facts and the stip-

8    ulation of issues?

9    MR. VEEDER:  This only embraces the stipulation of facts

10   which were attached to your order of May 8, 1958.  Now, he

11   has-- Mr. Sachse has also signed this paper, stipulation

12   respecting pre-trial order on issues and exhibits.  California,

13   the Vail Company, Fallbrook, Santa Margarita, the United

14   States and Fallbrook have all signed that now.  And I am

15   making that available for you.

16   THE COURT:  Let's see the form Mr. Sachse signed on the

17   facts stipulation.  We might use that.

18   MR. VEEDER:  In fact, I will give you both of them.

19   THE COURT:  Then this is ready to be handed to the Clerk

20   for filing, is it not?

21   MR. VEEDER:  Yes, your Honor.  I have copies there that

22   I would like to conform, though, before, if I could do that.

23   THE COURT:  I will hand it back to you and you do it.

24   MR. VEEDER:  Then I will hand it to Mr. Luddy.

25   THE COURT:  All right.  Now, let's go into this matter

Z-14
Z-A1

1   of the stipulation as to issues and exhibits.

2       MR. VEEDER:  I will pass out copies of those to counsel,

3   your Honor.  I hope they don't keep them among their souvenirs.

4   I would like to get them back.

5       THE COURT:  We will have them duplicated, will we not?

6       MR. VEEDER:  Yes, your Honor.  But if necessary it is

7   open ended until your Honor has approved it and it is approved

8   by all parties.

9       THE COURT:  All right.  If counsel will look it over and

10  ahon it back.  What do you have for me to look at here?  Now

11  I take it you have all noted that Mr. Veeder has added to the

12  list of the Government exhibits a paragraph on the last page,

13  which I suggested.  In other words, he has generally

14  characterized for you the nature of these first 56 exhibits.

15  This is in a very general way.

16          "The above-listed exhibits of the United

17          States of America, except those pertaining

18          to source of title and the cession of ex-

19          clusive jurisdiction of the Naval enclave,

20          relate primarily to the geographical, geological,

21          hydrological, climatological and and topographic

22          data respecting the watershed of the Santa

23          Margarita River.  Additional exhibits of the

24          United States of America relating to soil

25          surveys, land classification, land use and

Z-15
A-1

1   water use will be subsequently tabulated and filed with the

2   Court in accordance with its direction."

3       Now by "its direction" he is referring to the pre-trial

4   order I made on ground rules.  Did you all get a copy of that?

5   Anybody here who didn't?  And one of the orders in there is

6   that all exhibits to be used must be lodged with the Clerk ten

7   days before, and numbered ten days before they are offered in

8   evidence in the trial of this action.  And the Government, so

9   I understand, has certain other exhibits which are not yet

10  completed.  The State of California has not yet completed its

11  exhibits.  But these are to be lodged ten days before they are

12  offered in evidence.  And announcement is to be made in open

13  court at the time of their lodging, so that there will be a

14  notice in the record that they have been lodged and are avail-

15  able for inspection.

16      The order also provides that it is your responsibility

17  to look at these exhibits.  And I am not going to sit around

18  on the bench while somebody looks over a 20-page brochure or

19  studies a large map, and time is taken out of the time of

20  other counsel and the Court while some counsel makes that

21  inspection.  It is their responsibility to do that beforehand.

22  I am going to be reasonable about this thing, but that is the

23  general way in which I am going to proceed.

24      Now, as I understand, this pre-trial order and stipulation

25  have been put together-- you have not prepared it-- and order

Z-16
A-1

1   of the Court approving-- this is in fact the order of the

2   Court.

3        MR. VEEDER:  It is prepared for your signature, but I

4   have necessarily left it open if there is to be anything

5   added to it.

6        THE COURT:  Now, as in the case of the stipulations as

7   to facts, these issues are broadly framed, and they are also

8   rather specifically framed.  But there is no intention to

9   cut anybody off at the pockets.  And the stipulation that you

10  will be requested to sign states that the issues outlined

11  generally covers the issues to be tried, it being understood

12  that the Court, because of the nature of the case, will be

13  willing to hear other issues which may arise and properly

14  pertain to the case.  It is pretty hard for me to conceive of

15  any issue that may arise in this case that isn't outlined in

16  these issues.  No one so far has worked out-- has found any,

17  or they would be listed here.  So I would likewise like to

18  request that counsel, at your convenience-- and we can wait

19  until this is approved as to the major parties, they have

20  signed it, and duplicated and sent to you to study, if you

21  want to, to join in this stipulation as to these issues in

22  this matter.  Is that in line with your thinking, Mr. Veeder?

23       MR. VEEDER:  That is correct, your Honor.  That is our

24  view.

25       THE COURT:  Well, let's see now.  Rainbow.  You have

Z-17
A-1

1   signed for Santa Margarita.  What about Rainbow, Mr. Dennis?

2        MR. DENNIS:  They had no provision for Rainbow on there.

3   But I said I will sign for Rainbow when provision is made for

4   Rainbow.

5        MR. VEEDER:  We left a column open there for signatures

6   of that character.  I wouldn't want to undertake to specify

7   the correct names of all parties.

8        THE COURT:  Mr. Sachse, you represent a series of people.

9   Do you want to prepare some document similar to the one you

10  prepared as to the fact stipulation and list at least the

11  major ones who will be participating in this case?

12       MR. SACHSE:  I have done it, your Honor, for the major

13  parties who we discussed in your chambers.  That is the Tule

14  Land and Cattle.  Now there is one more I just learned about

15  yesterday, and it is certainly a major party, but I haven't

16  had a chance to read the pleadings.  The one you told me about

17  from Los Angeles.

18       THE COURT:  You say "will do it" or "have done it"?

19       MR. SACHSE:  I have done it for the major parties.

20       THE COURT:  Where?

21       MR. SACHSE:  Right here.

22       MR. VEEDER:  Mr. Sachse, I think you signed the stipula-

23  tion agreement as to facts, but not this.

24       THE COURT:  The one you signed was as to facts only.

25       MR. SACHSE:  I beg your pardon.  I will sign this for the

Z-18
A-1

1   same major parties.  I prefer not signing for the little

2   individuals, because their issues may be different.

3       THE COURT:  We are concerned now with the major parties.

4   Mr. Krieger?

5       MR. KRIEGER:  We will also sign for the defendants we

6   represent as soon as I have had a chance to review it.  We

7   did participate somewhat in the drafting of it, but I haven't

8   had a chance to review the latest draft.

9       Incidentally, your Honor, may I state that many of the

10  answers of the people we represent have not yet been filed,

11  but will be filed in the next day or two.  And we have many

12  substitutions also to arrange before our filing will be

13  complete.

14      THE COURT:  All right.  Will you prepare some document

15  in which you join, for the parties you represent, in the

16  pre-trial stipulation of facts and the stipulation of issues?

17      MR. KRIEGER:  We will do that.

18      THE COURT:  You have a number of them all in one docu-

19  ment.

20      MR. KRIEGER:  Yes.

21      THE COURT:  Now, Mr. McGinnis.

22      MR. McGINNIS:  Your Honor, we will sign the stipulation

23  as to issues and exhibits.  I am reading the final draft now.

24  But we will sign that.

25      THE COURT:  That will be down on the column Mr. Veeder

has here.

A-1
J-1

1    THE COURT:  What about Mr. Daugherty -- is he

2  present?

3    MR. DAUGHERTY:  Yes, I am, your Honor.

4    THE COURT:  How are you, Mr. Daugherty?

5    MR. DAUGHERTY:  Fine, your Honor.

6    Your Honor, as soon as I review it I will sign it.

7    THE COURT:  Good.

8    MR. GROVER:  Your Honor, I reviewed it yesterday,

9  and I realize that it is difficult to get everybody in agree-

10  ment on wording, but there were a couple of points that I

11  thought we might discuss here today to clarify our understand-

12  ing of them and perhaps it wouldn't be necessary to do some

13  retyping.

14    On page 12, paragraph 3, right at the very bottom:

15    "Under its riparian rights the United States

16    may not compell upstream water users or claimants to

17    release to the military enclave of the Santa Margarita

18    River water for diversion to and use by the United

19    States outside the watershed of the Santa Margarita

20    River."

21    That is one of the principles which your Honor set

22  forth in your opinion.  The following has been added:

23    "The foregoing statement has no relation (a) to

24    the claim of the United States under the Vail stipulated

25    judgment, and (b) to the claims of the United States

P-2

1       against the non-riparian water users..."

2               I have no objection to the United States being free

3       to raise claims in that connection, notwithstanding the first

4       sentence of the paragraph, but as I understand it what is

5       really meant is that this statement does not foreclose those

6       claims and it does not really mean that your Honor has ruled

7       that those claims are free from that statement.

8               THE COURT:  We are all in agreement.  That was Mr.

9       Moskovitz's draft, as I recall, and was based on my memorandum

10      in which I pointed out that I was not passing on anything in

11      connection with the Vail matter.  In other words, that was left

12      open.  And ofccourse, this matter of the second part is also

13      open.

14              In other words, your point is that this second sentence

15      beginning on line 2 at page 12 is not to be construed as a

16      ruling of law, but only that the matter is left open for con-

17      sideration?

18              MR. GROVER:  Exactly.

19              THE COURT:  That is exactly what we mean by it.  We

20      may not have said it too well, but that is what we mean.

21              MR. GROVER:  Then I am perfectly satisfied.  And that

22      same reservation appears in several other paragraphs.  There

23      will not be any necessity for reciting them.

24              Then the other point that I had was on page 16,

25      paragraph 7 -- this is as to issues:

2270

P-3

1         "Could diversion by a riparian owner of the Santa

2    Margarita system water for immediate use on its ri-

3    parian land without storage which resulted in the

4    acquisition of appropriative rights by such landowner.."

5        Now it is just a thought that I have that I would

6  like to see the word "prescriptive" added there -- "appro-

7  priative or prescriptive rights."  It may be that prescriptive

8  rights necessarily involve an appropriation in every case, and

9  yet I am not sure in my own mind about that, and since the

10  point hasn't really been threshed out as an issue, if I wanted

11  to assert, for example, a prescriptive right I wouldn't want

12  to be bound by this statement that you have to prove an appro-

13  priative right first.

14        THE COURT:  As I understand, the thing involved here

15  is that you have to distinguish between what is a riparian use

16  and what is not.

17        MR. GROVER:  Yes, your Honor.

18        THE COURT:  And if someone makes a contention that

19  they made an appropriation or that they have a right by pre-

20  scription and it turns out that all they have done is exercise

21  a proper riparian use, then they have nothing but a proper ri-

22  parian right.  Is that right?

23        MR. GROVER:  Yes, your Honor.

24        THE COURT:  Is that the point of law involved?

25        MR. GROVER:  Yes, that's right.

2271

P-4

1        THE COURT:  Does anybody object to inserting the

2  word "prescriptive," "acquisition of prescriptive and/or

3  appropriative rights?"

4        MR. VEEDER:  I have certainly no objection to it,

5  your Honor.

6        THE COURT:  Let's add it, then.

7        MR. GROVER:  All right, then I will sign the stipu-

8  lation.

9        THE COURT:  Anything else?

10       Do you know where that appears, Mr. Veeder?

11        MR. VEEDER: "Acquisition of prescriptive or appro-

12  priative," is that it?

13        THE COURT:  Yes, on line 23, page 16.  Do you find

14  it?

15        MR. VEEDER:  Yes, your Honor.

16        THE COURT:  Let's get those parties signatory to this

17  stipulation that we can today sometime, and after the noon

18  hour let's file it and give you something that you can have

19  duplicated and mailed out to all counsel of record.

20        MR. VEEDER:  May I inquire, your Honor, is there any-

21  thing further to be added by anyone?  Because we would pre-

22  pare then a place for your Honor's signature and for the date.

23        THE COURT:  Unless some of the parties have their

24  lists of exhibits they want to add, those that are ready, with

25  the same reservation of those that aren't ready.

MR. MOSKOVITZ: Your Honor, I signed the stipulation, although I found some errors of typing -- repetition of words. I didn't think they were material. But if there is going to be a retyping, perhaps there should be a correction of some of those clerical errors.

THE COURT: Call them to Mr. Veeder's attention. If they are bad enough, he will correct them. Otherwise we'll forget about them.

How about the State? Are you ready to list some of your exhibits? Or do you want to wait, Mr. Moskovitz?

MR. MOSKOVITZ: We have already listed the bulk of the exhibits we have in mind.

THE COURT: Have they been lodged?

MR. MOSKOVITZ: The list was attached to the draft of the pretrial order that I submitted last week. It certainly should be added to this order. I see no reason why it shouldn't be, your Honor.

THE COURT: Does that list include all exhibits that you now have ready? Or does that include some that are in preparation?

MR. MOSKOVITZ: It includes some that are not yet ready, your Honor.

MR. VEEDER: Your inquiry was, were they lodged?

MR. MOSKOVITZ: Only one has been lodged. We are ready to lodge another one. We thought that we would get the

P-6

1   numbers straight before announcing in court sometime today

2   which ones have been lodged, and we will have copies for all

3   counsel.

4          THE COURT:   I was just wondering, if this document

5   is going to be duplicated and sent out to all counsel of record,

6   if we should not have your list of exhibits even if you weren't

7   through and made a note after certain of them or a note down at

8   the bottom that numbers so and so have not yet been lodged but

9   will be in/the order on ground rules or something like that.
               accordance with

10  Counsel will then have a list of the exhibits that you are

11  going to put in.

12         MR. MOSKOVITZ:   We understood that the list we had

13  previously furnished would be included, even though some had

14  not been lodged yet.

15         THE COURT:   Will you get his list, Mr. Veeder, and

16  make a note on those that are not yet ready and are in the

17  process of completion, or a note at the bottom that numbers

18  so and so have not been completed but will be lodged according

19  to the order on ground rules.

20         How about yours, Mr. Sachse?

21         MR. SACHSE:   I submitted a list, your Honor, and

22  frankly I'm not satisfied with it, the principal reason being

23  that if I am going to number them I am afraid the numbering

24  is going to be utterly illogical with their actual presentation.

25  I would rather re-work the thing, because I gave Mr. Veeder a

P-7

1   list and copy of those that were available.  I'm trying to

2   look ahead and anticipate how our presentation of evidence

3   might go.  I hesitated to try to give him the numbers, or I

4   would be putting in number Y and then number A and then Z,

5   etc.  I have lodged nothing.  But I have supplied Mr. Veeder

6   with copies of all of them that were listed.  But I have lodged

7   nothing with the clerk.

8              THE COURT:  We have problems there.  Is it better to

9   have a list of your proposed exhibits go out to all counsel of

10  record, even if when you go to offer them in the trial you don't

11  offer them in the same order in which they have been numbered

12  -- offer Z first, and then M, and finally A and B?  Or is it

13  better not to have a list go out to counsel and then eventually

14  have your exhibits go in, in order -- A, B, C?

15             MR. SACHSE:  If the list could be used as is, with-

16  out necessarily indicating any number, then counsel will know

17  what we contemplate offering, and by the time I would lodge

18  them I would attempt to have them in some sensible order.  But

19  the list that Mr. Veeder has now could, I think, properly be

20  included in the order.

21             THE COURT:  Let's take your list and put a note at

22  the bottom that these are your proposed exhibits, that you

23  have not yet lodged them, and that when they are lodged they

24  will not necessarily be in this sequence or with these numbers;

25  that this is the list of exhibits presently that you have in mind.

P-8

1    MR. SACHSE:  And that is it not completed.

2    THE COURT:  All right.

3    Can you do that?

4    MR. VEEDER:  Yes, your Honor.

5    THE COURT:  What about Vail?

6    MR. STAHLMAN:  Your Honor, we are working on them.

7    We have some of them at the Vail office at the ranch, and I

8    think there are some matters that I'm going to have to go to

9    Los Angeles to the Vail office.

10    THE COURT:  You are not ready to make a list then yet?

11    MR. STAHLMAN:  I could do this, which I think would

12    accomplish the same purpose, I could indicate what the character

13    of the exhibits will be.

14    For instance, when you get into this question of

15    establishing the ownership of land on the Vail ranch, a lot of

16    which lands have been acquired even since the stipulated judg-

17    ment, we have to get those in establishing the chain of title

18    from different sources.

19    THE COURT:  Well, I don't think anybody would be in-

20    terested in that.

21    MR. STAHLMAN:  I don't think so.

22    THE COURT:  The question is, if you haven't got some-

23    thing ready, we want to get this filed.

24    MR. STAHLMAN:  We are ready to lodge these other

25    exhibits which were in evidence in the previous case.  We are

P-9

1   going over them only for corrections.  It may be that Mr. Hall

2   has them, and in about a day or so we will have those ready.

3   At least I can make up a list on that very quickly.

4   THE COURT:  Mr. Veeder, do you want to wait for a

5   list from Vail?

6   MR. VEEDER:  I have no feeling one way or the other

7   about it, your Honor.

8   MR. STAHLMAN:  We gave them what we thought were the

9   essential exhibits.

10   THE COURT:  You gave a list already?

11   MR. STAHLMAN:  Yes, your Honor.

12   THE COURT:  Why don't you take the list he has given

13   you, with the same notation as to Mr. Sachse, that these have

14   not yet been lodged and that the numbers will not be the same,

15   but that this is generally what Vail proposes to offer.

16   MR. VEEDER::  Fine.  I had thought that both Mr. Sachse

17   and Mr. Stahlman were going to take advantage of the ten day

18   rule.

19   THE COURT:  I think that is apparently what they are

20   thinking about.  But since this is going to be duplicated and

21   go out to all counsel of record, I think it is going to be help-

22   ful to have a list, even though the numbers aren't right, so

23   that other counsel will know what is going into this case.

24   MR. VEEDER:  Excellent.

B-3
25   MR. STAHLMAN:  I do not doubt that there will be other

P-9

1   exhibits as the case progresses that will have to go in.

2       THE COURT:  Yes.

3       Does anybody else have some exhibits?  Mr. Dennis,

4  you must know what you are going to rely on.

5       MR. DENNIS:  As I said before, the only exhibits we

6  contemplated putting in were the exhibits that we placed in the

7  trial of the action of Santa Margarita v. State of California.

8       After looking over the list which the plaintiff

9  supplied last week, we will probably put in plaintiff's exhibit

10  22, which was introduced at the last trial; and then there is

11  this question that hasn't been resolved yet as to whether or

12  not the exhibits which the plaintiff put in before the Master

13  are treated as being introduced before the Court here or

14  whether the plaintiff intends to introduce those exhibits.

15  If they do not, we will probably want to introduce the Master's

16  exhibits 15 and 17 to 28 inclusive.

17       That is a matter that is hard to resolve at this

18  time.

19       MR. VEEDER:  I might explain to the gentleman in

20  that regard.

21       We have melted into one list those of the original

22  trial, those of the Master's proceedings and any new data,

23  and they are all made as part of a single list, and they will

24  all be re-offered in the order and designation which we re-

25  ported them in this list.

THE COURT:   And some of them may not yet be on the list?

MR. VEEDER:   That is correct.

THE COURT:   In view of that, Mr. Dennis, do you want to list any exhibits on this stipulation that goes out?

MR. DENNIS:   Those exhibits that he introduced before the Master he was going to introduce before the Court.   Until that time, it is hard to say.

However, as I take it, all those exhibits which have been introduced at the former trial are considered as being lodged before the Court, at this time, are they not?

MR. VEEDER:   A good example why I can't answer Mr. Dennis right off is that Mr. Sachse has listed many of the exhibits we have offered.   So it would be very foolish for us to re-offer those ourselves.   We have the Master's exhibits here.   I think that someone's list will exhaust all the Special Master's exhibits.   But that is certainly not the case at the present time.

MR. DENNIS:   I believe it is true, though, Mr. Veeder, that you are going to put on your case before any of the defendants put on their case.   So if you are going to introduce any of these exhibits they will be introduced as part of your case and it will not be necessary for the defendants to re-introduce the same exhibits or an exhibit covering exactly the same material.   In many instances the exhibit covers

P-12

1    substantially the same material and for all practical pur-

2    poses one exhibit would be sufficient to cover any information.

3         THE COURT:  Keep your voice up, Mr. Dennis.

4         MR. DENNIS:  I say, it would cover the same subject

5    matters that would be in the exhibit which we would wish to

6    introduce, because the exhibits sometimes are overlapping may-

7    be only as to 90% of the period.

8         MR. VEEDER:  We have no grand design, your Honor.

9    We are willing to offer all the exhibits that pertain to our

10   proceeding.  But I can't see why I would be offering Mr.

11   Sachse's exhibits.  Nor could I anticipate everything that Mr.

12   Stahlman is going to offer.

13        THE COURT:  The point is that you will know what the

14   Government is going to offer.  They have a list already, and

15   there   will be a supplemental list coming out.  Now can't you

16   submit a list and attach  it to this?  If it turns out later

17   that the Government offers them in evidence, then you don't

18   have to offer them.

19        MR. DENNIS:  I can do that.

20        THE COURT:  How soon can you do it?

21        MR. DENNIS:  As I say, the only exhibits we will

22   want to offer will be the ones that we introduced at the last

23   trial, plaintiff's exhibit 22 at the last trial, and the

24   Master's exhibits M-15 and M-17 to M-28 inclusive, in the

25   event that plaintiff does not introduce them.

P-13

THE COURT:   Just make a statement to that effect and incorporate it in this Santa Margarita and Rainbow exhibit.

Also, Mr. Veeder, on your list of exhibits, at the end where you have made this note, add another paragraph in which you state just what you have stated here, that the list of the Government's exhibits heretofore listed and as supplemented by later exhibits will include all the exhibits at the prior trial and the Master's exhibits, etc. -- whatever that statement was that you made -- have been melted together in one list for the information of counsel.  Will you do that?

MR. VEEDER:   Yes, your Honor, I will.

THE COURT:   In that order on ground rules I made a mistake, but we can correct it here, and that is instead of the defendants' exhibits being numbered 1, 2, 3, they will be marked A, B, C -- it would be Fallbrook's A, B, C.  That will be the order in which they will be numbered as lodged.

And by this word "lodge" I mean that you deliver to the clerk, and the clerk and the reporter -- we will have to get a reporter in here; the reporter can make a summation later -- will make a list of these exhibits and the numbers that are assigned to them.

That answers your inquiry, Mr. Dennis, that the exhibits at the prior trial are not lodged.  They are part  of the records of this court in the sense that they are offered in evidence and they are now in the hands of the clerk.  But

P-14

B-4

an exhibit is lodged when it is numbered with the party's next number in order and has the clerk's filing stamp on it for identification and where the reporter gets a notation in the record that it has been numbered and marked for identification, and then it is in the possession of the clerk for inspection. And we will be lenient about letting these exhibits be moved around to let people look at them.

Do we all understand each other on that?

MR. VEEDER:  In regard to copies, may I add one thing on that.  We have a large number of copies of the exhibits of this fifty-six that we have here.  I would ask that the gentlemen who desire to get copies talk to Cdr. Redd -- I think they all know him, and give a list of the exhibits they are taking so that we will have a good and accurate accounting of what is happening to them.  There are quite a number of counsel.

THE COURT:  All right.  You will see Cdr. Redd about copies of the Government's fifty-eight exhibits on their list.

Is there anything else that is a preliminary matter?

On the rough list I made here, I have one other matter, and that is that we agreed on the procedure about handling this pretrial stipulation of facts to make it effective as to de- fendants who didn't join in the stipulation, and as I recall the agreement we had it was that we, in some way, put on a skin case of those facts and let anybody object who wanted to object

P-15

1   to those facts, and I think I indicated in some order that un-

2   less I was convinced to the contrary I was going to find the

3   facts in accordance with that pretrial stipulation.

4         What plan does the Government has in that respect,

5   if any?

6         MR. VEEDER:  I think the question of due process is

7   there.  I will be glad to see that each and every party whose

8   address we have be sent a copy.

9         THE COURT:  Let me ask you this.  Try this for size.

10   Is Col. Bowen here this morning?

11         MR. VEEDER:  He is not here, your Honor.

12         THE COURT:  Col. Bowen probably knows all the facts

13   contained in that stipulation.  What would you think of a

14   procedure of calling Col. Bowen to the witness stand, pulling

15   out a copy of this pretrial stipulation of facts and letting

16   the Colonel say that he is familiar with this and is familiar

17   with these facts and that if he were to testify he would testi-

18   fy to the facts in that stipulation; that he now hands it to

19   the clerk and let it be put into the record as to what his

20   testimony would be, and anybody who wants to now or at some

21   subsequent time cross-examine may do so.  He is available.  Do

22   you think that constitutes due process?

23         MR. VEEDER:  I think it would be helpful, and I

24   certainly think that if people were notified that that has

25   transpired, we would have our foot in the door.

P-16

THE COURT:  Well, it is in the record, and secondly they have all been notified that something like that is going to be done, and that unless they have other facts to offer the Court is going to find the facts in accordance with that pre-trial stipulation.

Anyone have any thought about that?  Some of our experts on due process here?  Mr. Moskovitz?  Mr. Grover?

MR. GROVER:  It appears all right to me, your Honor. Of course, I can't speak for the people who are not present. I think it would be satisfactory and adequate procedure.

THE COURT:  I don't see any difference between having him sit up here and read the stipulation under oath or testify to those facts without looking at the stipulation and saying, "Here's my testimony.  I hand it to the reporter.  Put it in the record.  I'm available for cross-examination on those facts."

MR. MOSKOVITZ:  Your Honor, assuming that all parties had notice of the trial so that they could be here if they wanted to and, adding one further thought, assuming that those who are here may have a copy before them to read if he doesn't orally state the whole thing, I don't see why that wouldn't be due process.

MR. VEEDER:  It appears to me that if your Honor were to read those facts which have been agreed to among the parties into the record or just direct that it be put into the record, I have no objection.

P-17

1    THE COURT:  Let's do it with Col. Bowen, let the

2    record show that he was here as a witness.  Does he know those

3    facts?

4         MR. VEEDER:  He had better.

5         THE COURT:  What about Col. Robertson?  Does he know

6    the facts?

7         MR. VEEDER:  I think Col. Robertson knows the facts

8    himself, yes.

9         THE COURT:  I noticed as I sat here that Col. Robert-

10   son was shaking his head about this procedure.  Maybe we are

11   having Col. Bowen, in his opinion, bite off more than he is

12   able to testify to.  Talk it over with him at the recess.

13        MR. VEEDER:  I will, your Honor.

14        THE COURT:  We'll see.  Unless I am convinced other-

15   wise, I think that is the way we will do it.

16        MR. VEEDER:  If there is some reservation on the part

17   of the Marine Corps, I will let you know, your Honor.

18        THE COURT:  Are we ready to start with some testimony?

19        MR. VEEDER:  Yes, your Honor.

20        MR. MOSKOVITZ:  There is one further matter.  Just to

21   be sure that I understood what happened some months ago, is

22   the four day a week schedule that you anticipated --

23        THE COURT:  I'm glad that you called that to my

24   attention, too.

25        I'm going to get rid of these aliens that we have to

P-18

1   take during the week in order to keep our interpreter.  You

2   people may wonder why we go to the inconvenience of having an

3   alien here in the morning and in the afternoon.  The Government

4   pays this interpreter just for the day that he is here and if

5   we had him do all the interpreting on a Monday he would pro-

6   bably get $30 a week and we couldn't keep him.  In order to keep

7   our interpreter we have to scatter these throughout the week.

8   He is very able and we need him.  So we are in a spot.

9        However, I am going to get Judge Weinberger, I think,

10  to take care of those during the week.

11       On Mondays I am ordinarily going to have to devote

12  myself to assisting on this criminal calendar.  Judge Weinberger

13  will be doing nothing but criminal cases and he will not be able

14  to keep up with the load that we have.  There may be Mondays

15  where we could work, but I think the ordinary rule is that we

16  will have to work four days a week, unless you get notice

17  otherwise.

18       I told some of counsel that I have set a rather im-

19  portant motion in the Standard Oil case for October 21 and 22.

20  I think it will take two days.  Mr. Veeder claims that he has

21  to have some time off on some matter, and I think the time he

22  requested was the following week.

23       MR. VEEDER:  That is correct, your Honor, coming up

24  on the 7th through Friday, and I will be through.

25       THE COURT:  That one week, the 27th through the 30th?

B-5

P-20

1    MR. VEEDER:  That is right, your Honor.

2    THE COURT:  What do you have, a court appearance?

3    MR. VEEDER:  That is right.

4    THE COURT:  Where is this?

5    MR. VEEDER:  At Spokane.

6    THE COURT:  Is that ready to go now?

7    MR. VEEDER:  It is winding up now.

8    THE COURT:  You are certain that that time will be

9    needed up there?

10   MR. VEEDER:  Oh, yes.

11   THE COURT:  What I could do in that respect, then,

12   would be to confer with counsel in the oil case and see if I

13   could continue their motions from the 21st and 22nd to the

14   28th and 29th, with the result then that we would be in a

15   position to work through the week of the 21st, and that would

16   mean then that you would have off the last week of this month,

17   if that works out.

18   Does that sound agreeable?

19   I am going to have to try to accommodate counsel as

20   we go along in this case.

21   There is one other immediate problem, and that is

22   that sometime back I let some lawyers twist my arm and agreed

23   to appear on a panel at the State Bar meeting on Thursday,

24   October 9, and accordingly we will have no court the morning of

25   October 9 -- I will have to be at the State Bar meeting, and

P-21

2-45

1  that will give you gentlemen a chance to get over and visit

2  some of your friends.

3       Anyone else anticipate any problems in October?

4       I will let you know as soon as I find out about

5  changing the Standard Oil case.

6       The Clerk also calls my attention to the fact that

7  we have a judge's meeting set for Monday, the 13th of October,

8  which means that Tuesday would ordinarily be a law and motion

9  calendar.  However, Judge Weinberger has the calendar that

10  week.  And I have a pre-trial in a criminal case, and I don't

11  know whether it will be heard or not.  So as to Tuesday,

12  October 14th, I will try to let you know very shortly whether

13  we will hold court that day or whether there will be no use

14  to come in on that day.

15       MR. SACHSE:  Your Honor, the Master has presently

16  set, according to my notes, Monday the 13th-- someone else

17  told me I had it wrong and that it was Wednesday the 15th,

18  but my calendar book has a note for the 13th for the resumption

19  of hearings at Reche School, I believe he said, on Fallbrook

20  Creek watershed.  He has not yet submitted to us his proposed

21  findings on De Luz.

22       THE COURT:  This is a second little tributary?

23       MR. SACHSE:  This is the little tributary that adjoins

24  the town of Fallbrook, yes, your Honor.

25       Frankly, I don't know what to suggest.  I don't plan

Z-46
J-1

1   on being two places at once.  I have a great many clients,

2   I would guess fifty or sixty in the Fallbrook Creek watershed.

3   I am just raising the question now without knowing what the

4   answeriis because we don'tknow what Mr. Cranston's plans are.

5   He just tentatively set this one day.

6           THE COURT:  A one-day hearing?

7           MR. SACHSE:  Well, he set this one day at which we

8   would decide, as I understood it, and it happens to be a

9   Monday so it wouldn't confict if it stopped and he doesn't

10  do anything else.  If he goes on with additional hearings,

11  I don't know where we will end up.

12          THE COURT:  You should find out about that.

13          Take a short recess and then proceed with the case.

14          (Recess.)

15

16

17

18

19

20

21

22

23

24

25

2289

Z-19

A-2

1    THE COURT:  Proceed.

2    MR. VEEDER:  Before proceeding, your Honor, timewise we

3 will undertake that your directions to perform your directions

4 in regard to the pre-trial order and the stipulations during

5 the noon recess, if that is agreeable.  It is just a matter

6 of time to get these things organized.  Are you ready for us

7 to proceed with the introduction of evidence?  We will go ahead,

8 your Honor, if you are ready.

9    THE COURT:  I take it you don't care to make any opening

10 statement.  Everybody knows what this case is all about.

11    MR. VEEDER:  I have already made an opening statement at

12 the Reche School, but I would be glad simply to state that the

13 United States is prepared to defend its right to the use of

14 water in the Santa Margarita River, and seeks to have a decree

15 quieting its title to those rights.  That is the primary ob-

16 jective.  We are interested, of course, in conserving water

17 and to see that the highest and best use is made of that water.

18 We are greatly concerned.  We understand and I believe we

19 know that the Marine Corps has been gravely prejudiced by

20 not having these rights to these waters adjudicated prior

21 to this time.  Congress has refused to provide greatly needed

22 funds for rehabilitation purposes.  So we are anxious to have

23 this case proceed to as speedy a resolution as possible.

24    Now this evidence that we seek to introduce today will

25 relate to the general geography and geology of the Santa

Z-20
Z-2

1   Margarita River watershed, that is, the upper watershed.   And

2   we will introduce these exhibits in support of our claims.

3   Your Honor hasn't indicated whether he desires to have these

4   marked for identification or not.   I have proceeded on the

5   basis that as each of our witnesses are called we will simply

6   have the exhibit--

7       THE COURT:   The Clerk will be now directed, and the

8   reporter, to mark these 58 exhibits and this pre-trial

9   stipulation of issues as the Plaintiff United States Exhibits

10  1 to 58 for Identification and we will just have that done

11  now.

12      MR. VEEDER:   You want that physically done?

13      THE COURT:   No, the Clerk at his leisure can put the mark

14  on.   I will now direct they be marked for identification in

15  the order you have listed them, 1 to 58.   So we will consider

16  each one of them as now marked for identification.   And you

17  may proceed.

18      MR. VEEDER:   There is an additional proposition that

19  has been raised by counsel to me, and I think it has a great

20  deal of merit.   The courtroom is  so located that it would

21  be easier for counsel, I believe, if we were to move the

22  tables up closer and have the easel moved so it would be more

23  accessible to the witness.   Now, I don't know whether that

24  would meet with your Honor's approval or not.

25      THE COURT:   Where do you want to move the easel?

Z-21
A-2

1    MR. VEEDER:  I would like to have that large easel over

2    closer to the witness.  It would be easier for the witness to

3    testify.

4        THE COURT:  That is all right with me.

5        MR. STAHLMAN:  I also make this suggestion, your Honor,

6    for what it is worth.  The type and kind of witness chair

7    that is provided here I don't think has its highest efficiency

8    for this type and kind of case, for there will be a lot of

9    technical evidence and a lot of the witness's going to the

10   board and back to the stand and so forth.  It is necessary

11   to go back around.  I think there would be a lot of time

12   saved if the witness chair were right out in front here where

13   the exhibits would be.

14       THE COURT:  Does anyone have any objection if the witness

15   sits down below the box here?

16       MR. VEEDER:  I would prefer to have him.

17       THE COURT:  All right, we will move the chair down below

18   and move the reporter over a little bit.

19       MR. SACHSE:  There has been a suggestion that perhaps

20   more counsel can be up here around the table if we have them

21   sit on both sides, and perhaps move the one that now faces

22   you parallel to this other table.  And then counsel sit on

23   both sides, and many more of them can be up here closer to

24   the witness.

25       THE COURT:  All right, rearrange the table.

Z-22
A-2

1   MR. DENNIS:  Your Honor, I had one question to ask before

2   we proceed.  You remarked the first 56 exhibits, I understood

3   you to say, would be 1 to 56.  But among those exhibits the

4   plaintiff has a great number of exhibits that are lettered,

5   like 29A, B, C, D, E, and F.  Is it your Honor's understand-

6   ing we will carry that lettering right straight through?

7   THE COURT:  We will carry it through.  It will be 29A,

8   B, C, D,

9   MR. VEEDER:  I will call Fred Kunkel as the first witness

10   for the United States of America.

11

12   FRED KUNKEL,

13   called as a witness by and on behalf of the plaintiff, sworn,

14   testified as follows:

15   MR. VEEDER:  If you would prefer to sit in the witness

16   chair, you may.

17   THE COURT:  You can sit either in the witness chair or

18   down below, depending upon whether you are going to be jump-

19   ing up and down.  You can start out in the chair, and if

20   they get to calling you down, then you can sit down below.

21   MR. VEEDER:  I have put on the easel, your Honor, the

22   Plaintiff's Exhibit No. 1.  It was the base map that was

23   previously used in the special master's hearing.  At that time

24   there was no objection to it.  And if there is no objection

25   to it now, I will offer that as the base map from which the

Z-23
A-2

1  United States will work, and offer it as evidence in the

2  prosecution of this case.

3      THE COURT:  Hearing no objection, it will be received

4  in evidence.

5      (The map above referred to was received in evidence as

6  Plaintiff's Exhibit 1.)

7

8                          DIRECT EXAMINATION

9  BY MR. VEEDER:

10     Q  Will you state your name, please?

11     A  Fred Kunkel, K-u-n-k-e-l.

12     Q  Would you state your age, Mr. Kunkel?

13     A  Forty.

14     Q  And where were you born, Mr. Kunkel?

15     A  Chicago, Illinois.

16     Q  Would you state where you received your elementary

17  education?

18     A  Chicago and Oak Park, Illinois.

19     Q  And did you graduate from high school?

20     A  I graduated from high school.

21     Q  Would you state the name of that high school, Mr.

22  Kunkel?

23     A  Oak Park and River Forest Township High School.

24     Q  Subsequent to the time you finished your high school

25  work, did you proceed to college?  Did you go to college,

2294

Z-24
A-3

1   Mr. Kunkel?

2     A  Yes, I went to college.

3     Q  And would you state the university which you attended?

4     A  The University of Chicago.

5     Q  And would you state the period during which you

6   maticulated at that school?

7     A  The fall of 1937 through December, 1942.

8     Q  And after the completion of that college work, what

9   degree did you receive?

10     A  In June of 1942 I received a Bachelor's Degree,

11   Bachelor of Science in Geology.

12     Q  Where do you presently reside, Mr. Kunkel?

13     A  Long Beach, California.

14     Q  And with whom are you employed?

15     A  United States Geological Survey, Ground Water Branch.

16     Q  Now, to what honorary organizations or societies do

17   you presently belong?

18     A  I am a member of the Geological Society of America,

19   the American Geophysical Union, California Association of

20   Engineering Geologists.

21     Q  Do you have any other organizations?

22     A  No other organization.

23     Q  Now, subsequent to your graduation from the University

24   of Chicago, what work in the field of geology did you under-

25   take?

2295

Z-25
A-2

1      A   In May of 1948-- I am sorry, May, 1946, through

2    June, 1948, I was employed as a geologist by the Consolidated

3    Copper Mines Corporation at Kimberly, Nevada.

4      Q   And would you state the area in which you performed

5    services for that company?

6      A   Services for the company were performed in the

7    Robinson Mining District in White Pine County near the town

8    of Ely, Nevada.

9      Q   And would you state with some specifity the kind and

10   type of work that you did while working for that company?

11     A   I engaged in surface mapping of the geologic forma-

12   tions.  I mapped the extent--

13     Q   Now, right there would you state what you mean when

14   you say "geologic mapping"?

15     A   I mapped on aerial photos by plane table mapping with

16   a plane table alidade the types, kinds, areal extent and

17   structure of the various geologic rocks, various rocks as

18   they outcropped in the area.

19     THE COURT:  You used the word "areal".

20     THE WITNESS:  A-r-e-a-l.

21     THE COURT:  What does that mean?

22     THE WITNESS:  It means the extent in two dimensions on

23   the earth surface, the extent of the rock outcrop.

24   BY MR. VEEDER:

25     Q   Now, was that work done on the actual ground?  Did you

2296

Z-26
A-2

1   go out and view the properties and make your investigation

2   on the surface areas?

3      A   That mapping was done on the surface.

4      Q   And when you say a "plane table survey," what do you mean

5   by that, Mr. Kunkel?

6      A   It is a table approximately 24 to 36 inches square.

7   It is on the tripod that is used in conjunction with a

8   surveying instrument called an alidade which you can measure

9   the altitude of points starting from a known bench mark.

10   Also you can determine various points on the earth's surface

11   in their relationship to each other.

12      Q   Now, what were you searching for when you were doing

13   this work?

14      A   In the Robinson Mining District we were primarily

15   searching for copper deposits.

16      Q   And how extensive were your surveys when you under-

17   took them?

18      A   The area of the district which we were interested in

19   was approximately, oh, five by fifteen miles.

20      Q   And when you had accomplished your geological

21   surveys and investigation, then what did you dod, Mr. Kunkel?

22      A   Well, coupled with the surface surveys, there were

23   underground surveys.  While the geologic mapping was in

24   progress on the surface, mining was taking place beneath the

25   ground.

2297

Z-27
4-2

1    Q   When you say "mining" what do you mean by that?

2    A   A shaft was sunk into the earth to a predetermined

3    depth.  Tunnels or drifts, as the mining man calls them, were

4    extended in a horizontal plane beneath the ore body.  And by

5    a system of mining known as "block caving," we extracted the

6    ore that had previously been blocked out by our surface

7    mapping, and also by drilling-- on drilling wells on the

8    surface of the ground into the ore body.

9    Q   Now, what else was accomplished by these surveys in

10   regard to the minerals for which you were searching?

11   A   To the best of our knowledge, we discovered and blocked

12   out all the existing ore that could profitably be mined.

13   Q   And what were your other responsibilities in connection

14   with that ore and the investigations that you were making?

15   A   As part of the exploration program we had a drill rig--

16   cable tool drill rig in operation at all times.  We drilled

17   approximately 1,000 feet of hole per month.  The holes ranged

18   in depth from 200 to more than a thousand feet, depending on

19   the location of the area.  The cuttings, as they came out of

20   that hole, were-- well, the sampling of the hole was super-

21   vised by me during that period, and the cuttings were delivered

22   to me and I analyzed them visually, and also visually by a

23   microscope to determine the types of mineralization and the

24   types of rock in which they were drilling.

25   Q   And what other analysis, if any, was made in

Z-28
A-2

1   connection with those specimens that were made avilable by

2   this drilling?

3       A   The copper content was quantitatively determined for

4   all samples collected.

5       Q   And what were your responsibilties in that connec-

6   tion?

7       A   Part of the time I actually ran the analysis for the

8   copper content.

9       Q   And what kind of analysis was that?

10      A   They were analyses set up by standard chemical

11  procedure.   They followed standard chemical procedure for--

12      Q   In other words, it was a chemical analysis which you

13  conducted?

14      A   It was a chemical analysis, yes.

15      Q   Now, did you do any other exploration work while

16  employed with this Consolidated Company?

17      A   Well, in addition to the mining district in particular

18  in which our lines were located, I explored neighboring

19  mining districts in the immediate vicinity.   And I also was

20  part of a team of geologists that explored and investigated

21  mining prospects throughout the entire State of Nevada, Idaho,

22  parts of Arizona and parts of California.

23      Q   What other activities did you engage in during that

24  period, Mr. Kunkel, besides the surface exploration and sub-

25  surface exploration for minerals?

2299

Z-29
A-2

1      A  Well, in the period from about January of 1948 through

2  May or June of 1948 I was also employed on a part-time basis

3  by the State of Nevada.

4      Q  What were your responsibilities in that connection?

5      A  Under the supervision of an employee of the United

6  States Geological Survey, I assisted in ground water studies

7  in the eastern part of Nevada.

8      Q  And what areas, generally, would that taken in?

9      A  Specifically it was in White Pine County, the White

10  River Valley in particular, and adjacent valleys.

11      Q  Now, would you describe the kind and type of terrain

12  and aeras generally that you performed those services in?

13      A  The areas were basin and range type of structure in

14  which there are block mountains, with intermontane valleys

15  between the mountainous areas.  The valley areas are filled

16  with thick accumulations of unconsolidated deposits and

17  contain the main water bodies in the region.

18      Q  And deposits of what?  Of what are the deposits com-

19  posed?

20      A  The unconsolidated deposits are composed predominantly

21  of clay, sand, silt, gravel and all in various combinations

22  or mixtures.

23      Q  Now, what were the results of thos investigations, Mr.

24  Kunkel, that you did in regard to the runoff in this eastern

25  Nevada area?

Z-30
A-2

1     A   The result of the investigation is published as State

2   of Nevada Bulletin No. 8.

3     Q   And subsequent to thattime, Mr. Kunkel, what other

4   work did you do in the field of geology?   Did you continue

5   in the employment of thatcompany?

6     A   I was in the employment of that company through June,

7   1948.

8     Q   And subsequent to thattime with whom were you employed?

9     A   Subsequent to that time I passed the United States

10  Geological Survey civil service examination for geologist,

11  and I was employed by the United States Geological Survey,

12  for whom I am still employed.

13    Q   And where were you stationed with the United States

14  Geological Survey after going to work for them?

15    A   My first station was in Sacramento, California.

16    Q   Would you briefly state the kind and type of work

17  that you did when you were employed by the Geological Survey?

18    A   The first project on which I was engaged was a study

19  in which we computed the ground water storage capacity of the

20  Sacramento Valley.

21    Q   And what were the processes that you pursued in making

22  such a study?

23    A   The processes involved a collection of drillers' logs

24  from well drillers throughout the Sacramento Valley, location

25  of the wells for which logs were supplied to us.   Analysis

Z-31
A-2

1  of the logs, from which we determined the specific yield of

2  the deposits.

3      Q  Now, when you say "specific yield," just what do you

4  mean?  I would appreciate having you define "specific yield"

5  as you use that term for the Court and into the record.

6      A  May I define it in terms of-- in its relation to

7  porosity and also specific retention.

8      Q  You are asking me questions that I can't respond to,

9  Mr. Kunkel.

10     A  I am sorry.

11     Q  You just go ahead and describe it scientifically, and

12  I will  hope that other people understand it.

13     A  Specific yield is a ratio generally expressed as per

14  cent of the amount of water that will drain by gravity from

15  a unit volume of rock.

16     Q  Of rock?

17     A  Or material, alluvial fill of a valley.  It is any

18  rock material.  I am using the term "rock" in the broadest

19  sense to include alluvial deposits which are mixtures of clay,

20  silt, sand and gravel.

21     Q  Now, what was the objective of determining the spe-

22  cific yield of those areas in the Sacramento Valley?

23     A  The specific yield times the thickness of the water-

24  bearing deposits times the areal extent of the water-bearing

25  deposits is the ground water storage capacity of that unit.

Z-32
Z-2

Q  Now, proceed then and tell us-- and state for the record the extent of those surveys that you made in the Sacramento Valley.

A  It involved the area from Sacramento north.  The southern boundary was the Mokelumne River.  The northern bound-ary was the vicinity of Red Bluff.  It included both sides of the valley, from the Sacramento River to the non-water-bearing deposits.  The area from the Sacramento River on both sides of the valley to the contact of the consolidated non-water-bearing rocks and the unconsolidated water-bearing rocks.

Q  You have used the term "contact".  From the stand-point of the geologist what does "contact" mean?

A  It is the point at which two types of material are physically touching each other.

Q  Now, in regard to the Sacramento Valley, would you state how the term was applied there in connection with your investigation?

A  I am not sure that I understand your question.

Q  You were speaking of the alluvium what you were investigating.  Would you state the kinds of types of areas that were involved, that you were investigating?

A  Well, it included the channel deposits of the Sacramento River, the flood plains, deposits of older alluviums and continental deposits that were water bearing, and locally, kinds and types of volcanic rocks that were water bearing.

Z-33
A-2

1   THE COURT:  You used the word previously "consolidated"

2   and "unconsolidated".  What do those terms mean?

3   THE WITNESS:  As I use the terms "consolidated" and

4   "unconsolidated", I am only making a distinction in that the

5   consolidated rocks are the rocks that are very hard, dense,

6   form large masses.  And by and large they do not contain

7   appreciable quantities of gound water, except for minor amounts

8   in cracks, fractures, and weathered zones.

9   THE COURT:  They could constitute a dam or a barrier to

10   alluvial water.

11   THE WITNESS:  They are the basin-- or they form the basin

12   and the surrounding area in which the unconsolidated deposits

13   are laid down.

14   THE COURT:  So that anything that is not consolidated

15   then is classified as unconsolidated?

16   THE WITNESS:  That is right.

17   THE COURT:  Alluvium, sand, dirt, various stratas?

18   THE WITNESS:  That is right.

19   THE COURT:  Even rock, if it is badly shattered and

20   broken?

21   THE WITNESS:  Generally that is still considered as

22   consolidated rock, that is badly shattered and broken.  The

23   term "unconsolidated deposit" generally implies a movement

24   and reworking by the agents of wind, water and gravity.

25   THE COURT:  All right, go ahead.

Z-34
A-2

1    BY MR. VEEDER:

2        Q   Now, for what period were you engaged in that in-

3    vestigation of the Sacramento Valley?

4        A   Through 1950.

5        Q   And what were the results of that investigation, Mr.

6    Kunkel?

7        A   The results were published as an appendix to State

8    Bulletin No. 1.

9        Q   Now, subsequent to that investigation, in what work

10   did you engage?

11       A   From that period through 1952 I was engaged in an

12   investigation of Napa and Sonoma Valleys in the Coast Ranges

13   north of San Francisco.

14

15

16

17

18

19

20

21

22

23

24

25

D-1

Q   And what were the objectives of that investigation?

A   The objectives of that investigation were to determine the source occurrence, movement of ground water, and the storage capacity of the water-bearing deposits.

Q   And how long did you engage in that investigation?

A   For the period 1950 through November, 1952, with a brief time in which I also investigated another area.

Q   Which area was that?

A   That area was in Lake County.  It was the period, the summer of 1951, I believe-- I would have to check my notes to be certain of the exact date, but about a three to six-months period in there I investigated nine valleys in Lake County.

Q   And when you undertook this investigation what did you do?

A   Again, we investigated the source occurrence and movements of ground water in the valleys, the relationships of the valleys to each other, and estimates of ground water supply.

Q   What was the primary data upon which you relied in making your estimations?

A   Field examination of the valleys, logs of wells--

Q   When you make a field examination of a valley, what are the things for which you look, if you are undertaking to make an estimation of the specific yield of an alluvial basin?

A   The outcrop of the various types of water-bearing rocks

1  are examined in the field, their nature with regard to the

2  degree of sorting.

3    Q  When you say "sorting" what do you mean by that?

4    A  It is the degree with which the materials in the

5  deposits are of similar size, roundness and similar in

6  character.

7    Q  What would bring about a sorting of that character?

8    A  The sorting action of water or wind.  In these areas,

9  primarily water.

10    Q  What other physical phenomena did you view when you

11  went into a valley to make an investigation of the character

12  you mentioned?

13    A  I observed the pattern of the drainage, I observed

14  the various types of rocks and deposits, I observed the

15  geography and physiography of the area, and I put these

16  results on a map of the area.

17    THE COURT:  Did you check also water well drillers' logs,

18  when you can get them?

19    THE WITNESS:  All wells that were located in these valleys

20  and all available logs were collected from the drillers.

21    THE COURT:  You said a minute ago that you investigated

22  water-bearing quality of rock.  You use "rock" in a very

23  broad sense, I take it.

24    THE WITNESS:  I use it in the broadest sense.

25    THE COURT:  All sorts of materials?

THE WITNESS:  Yes.

THE COURT:  All right.

BY MR. VEEDER:

Q  What was the objective, then, when you looked at this
material?  What do you seek to ascertain by that physical
examination?

A  The ultimate of any ground water study is to determine
the quantitative aspects of it.

Q  The what?

A  The quantitative aspect of the amount of water avail-
able.  The primary object of any ground water investigation
would be ultimately determination of the perennial yield of
the valley.

When we began the investigations in these valleys, we
had no knowledge of how much data are available.  Therefore,
we collect all the data that are available, analyze it and
draw as many conclusions as the data warrant toward that end.
In Lake County there were/enough data available to come up
with firm estimates of perennial yield.  For some valleys we
came up with an estimate of storage capacities.  For some
valleys we came up with an estimate of what the minimum
perennial yield might be, realizing that there was still more
data to be collected before a final answer could be determined.

Q  Now, you mentioned Sonoma Valley.  Did you make an
investigation in that area, too?

2308

D1

1 A Yes.

2 Q Will you describe what you did there?

3 THE COURT: Well, was it similar to what you did in the

4 Sacramento Valley and Lake, et cetera?

5 THE WITNESS: Yes, except that Sonoma and Napa Valleys

6 were more detailed. There were more data available to us and

7 the study was primarily, in this case, for the determination

8 of the ground water storage capacity of the deposits. But

9 there was more detail involved than in other studies.

10 Q What were the results of your investigations of the

11 Napa and Sonoma Valleys?

12 A Napa and Sonoma Valley is in the process -- the results

13 of our studies in Napa and Sonoma Valleys is being published

14 as a Water Supply Paper by the United States Geological

15 Survey. It is in process of publication now.

16 Q Subsequent to your two-year period in undertaking the

17 investigation of the two last mentioned valleys, what was your

18 employment-- what did you do?

19 A Upon completion of the studies to which I have just

20 testified, I was transferred to Long Beach, California. That

21 was in November, 1952.

22 Q Will you describe your responsibilities in that office

23 into the record, please?

24 A For the period 1952 through 1954 I was actively

25 engaged in investigation of the ground geology and ground

D1

1   water conditions in Indian Wells Valley for the Naval Ordnance

2   Test Station at China Lake.

3        Q   Where is that, generally speaking?

4        A   It is an area northeast of Mojave.

5        Q   What were your other responsibilities in the Long

6   Beach office?

7        A   At all times I was assistant to the Geologist in

8   Charge, Mr. Wertz, *worth* and under his direction I examined and I

9   was directed to examine all data and the logs, water level

10  measurements, maps, charts, cross-sections prepared for the

11  Camp Pendleton area.

12       Q   And what stream system was involved?

D2

13       A   It was the Santa Margarita stream system, the San

14  Mateo and other stream systems in Camp Pendleton.

15       Q   How long a period did you proceed in that kind of

16  study on the yields of the Santa Margarita River?

17       A   The study has been one of increasing responsibility.

18  In connection with my other duties, which involve studies

19  through the numerous valleys in Southern California, I have

20  assumed responsible charge of the Long Beach office and the

21  studies at Camp Pendleton.

22       Q   What is your present title, Mr. Kunkel?

23       A   I am Geologist in Charge of the Long Beach area office.

24       Q   And generally what is the area that is embraced

25  in that?

D2

1     A  Generally speaking, it is the area east of the Sierra

2  Nevada, south of the Tehachapi Mountains and the area toward

3  the Coast, exclusive of Santa Barbara County.

4     MR. GROVER:  Is that east or west?

5     THE WITNESS:  East of the Sierra Nevada, south of the

6  Tehachapi.  It includes the area of Indian Wells Vallley and

7  the area to the south.

8     THE COURT:  East of the Sierras?  You mean west of the

9  Sierras?

10     THE WITNESS:  No, east of the Sierra Nevada.  The Mojave

11  Desert region actually extends from what we consider as

12  Southern California, the Los Angeles area back east of the

13  Sierra Nevada.  It includes Owens Valley and the series of

14  valleys back there.

15     THE COURT:  Well, your answer indicated that you had a

16  responsibility only for the area east.  Do you mean the area

17  from the coast beyond the Sierra Nevada?

18     THE WITNESS:  Yes, it includes-- I don't have the counties

19  at my fingertips, but it includes Los Angeles, San Bernardino,

20  Kern, Inyo, Riverside, San Diego Counties; the whole area from

21  the coast to the Nevada line.

22     THE COURT:  I understand.

23  BY MR. VEEDER:

24     Q  Are your duties limited strictly to the ground water

25  studies in this area?

D2

1     A   It is limited to the ground water studies in that area,

2  yes.

3     Q   What personnel have you under your direction at the

4  present time, Mr. Kunkel?

5     A   At the present time, in addition to  myself, we have

6  four permanently employed professional geologists, one field

7  assistant who is also a geologist, one full-time draftsman and

8  one full-time secretary.

9     Q   What portion of the Santa Margarita River Valley was

10  involved in the studies which you undertook in conjunction

11  with Mr. Wertz?

12     A   Early in May, shortly after my transfer to Long Beach,

13  the area embracing largely the area on Camp Pendleton, but it

14  did include studies in Pauba Valley with regard to the Pauba

15  Well.

16     MR. VEEDER:  Your Honor, I observe that we are getting

17  close to the noon hour.  Did I understand your Honor to desire

18  to have Col. Bowen this afternoon undertake that phase of the

19  testimony?

20     THE COURT:  Not necessarily this afternoon.  Tomorrow

21  morning or-- no particular time.

22     MR. VEEDER:  I didn't know whether you wanted me to

23  interrupt this witness or not.

24     THE COURT:  No.

25     Col. Robertson is still shaking his head.  You discuss

D2

1    the matter.   I think we can probably call you as a witness,

2    Mr. Veeder.   I think you probably know the facts in that

3    watershed.

4         MR. VEEDER:   I am sure that my testimony would carry

5    great weight in certain areas.

6         THE COURT:   I don't know how much weight it carries, but

7    it would get us over the hump in getting some of these un-

8    disputed facts into the record.   If we don't get some agree-

9    ment I will call various witnesses around here.

10        MR. VEEDER:   I just wanted to get the modus operandi,

11   your Honor.   I will go ahead then until the noon hour.

12        Q   Mr. Kunkel, in regard to the balance of the Santa

13   Margarita River Valley, that is, the upper reaches of the

14   valley, would you state the extent of your acquaintance with

15   that segment of the watershed.   When did you first become

16   acquainted with it?

17        A   If I recall correctly, the date was October, 1955.

18   I examined the area in the company of Franklin Olmstead,

19   who was a Geological Survey employee, who has worked in the

20   area during the period of my employment.   I was in his

21   company.   We examined the area from Elsinore to Temecula,

22   examined the outlet of the Santa Margarita River at its--

23   examined the outlet of Pauba Valley at its confluence with

24   the Murrieta and Temecula Creeks.

25        THE COURT:   Pablo Valley?

D2

1  THE WITNESS:  Pauba, your Honor-- P-a-u-b-a.

2  MR. VEEDER:  Pauba.

3  THE COURT:  What is the Pauba Valley?

4  THE WITNESS:  Pauba Valley is the valley above--

5  BY MR. VEEDER:

6  Q  Why don't you step to Plaintiff's Exhibit 1, Mr.

7  Kunkel, and indicate to the Court what you mean by the Pauba

8  Valley.

9  A  The Pauba Valley is the area above the confluence of

10  Murrieta Creek and Temecula Creek to approximately this

11  point.

12  Q  And when you say "this point" would you please state

13  the area to which you have reference?

14  THE COURT:  That is downstream of the Vail Dam somewhere?

15  THE WITNESS:  It is the area downstream from the Vail

16  Dam.  I would need a--

17  THE COURT:  That is close enough.  And is the Pauba

18  Valley a valley that includes only the Temecula?  Or does it

19  slop over onto the Murrieta side?

20  THE WITNESS:  Pauba Valley, as the term is used, includes

21  only Temecula.

22  THE COURT:  Go ahead.

23  BY MR. VEEDER:

24  Q  Now proceed, then, Mr. Kunkel, and state the extent

25  of your investigation and acquaintance with the upper reaches

D2

D3

1    of the Santa Margarita, giving us the dates when you made

2    that acquaintance.

3       A  As I have testified, I believe the date was in

4    October, 1955.  It included an inspection of Murrieta Valley

5    from its headwaters between Elsinore Valley and Murrieta

6    Valley, the length of the valley to Temecula, an examination

7    of the Temecula Creek, Temecula River and Murrieta Creek.

8    It included an examination of the areas of rising water and

9    examination of the extent of the water-bearing deposits in

10    the area which I covered at that time.

11       THE COURT:  From Elsinore to the confluence of the

12    Murrieta and Temecula?

13       THE WITNESS:  Yes.  After that examination we proceeded

14    to, I believe, Mission Road and I visited the Olmstead

15    property on the outskirts of Fallbrook, examined the area

16    and inspected the water well on the property.  It was a large

17    diameter well that was used to irrigate citrus.

18    BY MR. VEEDER:

19       Q  What other investigations did you make in that general

20    time, if you made any?

21       A  The next investigation that I made was a reconnaissance

22    of the area on-- let's see-- are you referring to the upper

23    watershed or the entire watershed?

24       Q  I am referring to the watershed as a whole.  What

25    other investigation did you make?

2315

D3

1    A   Well, in October, 1954, which was a year prior to

2    this, I visited the Camp Pendleton area in the company of

3    Mr. Wertz.

4    Q   What kind of investigation did you make there?

5    A   It involved a study of the area with Mr. Wertz pointing

6    out to me the various ground water basins, the various types

7    of deposits, the location of wells, comments with regard to

8    yields, quality and information which I had previously

9    investigated while I was in preparation for the study that he

10   was directing at that time.

11   THE COURT:  This is a good time to stop.  I will give

12   you until 2 o'clock to see what you can do on this stipulation

13   between now and then.

14   Adjourn until 2 o'clock.

15   , (Noon recess.)

16

17

18

19

20

21

22

23

24

25

SAN DIEGO, CALIFORNIA, TUESDAY, OCTOBER 1, 1958.   2:00 P.M.

MR. VEEDER:  Your Honor, I have some housekeeping to do, if I could, for the moment, from the standpoint of the agreed facts.  The witness who is now on the stand will testify as to the location of the streams and tributaries, and the next witness that will come along will testify in regard to the locations of the stream gauging stations.  The next data respecting the acquisition of titles I am about to put in, the matter respecting cession of exclusive jurisdiction and related matters will largely go in at this time.  The other data pertains to the Santa Margarita Mutual Water Company and the data from the State and from the Fallbrook Public Utility District.

Now I wonder if it would be acceptable to your Honor if this witness this afternoon went through the physical features and testified along that line, rather than calling Col. Bowen, as has been suggested.

THE COURT:  Oh, yes.  Go right ahead.

MR. STAHLMAN:  I have a matter preparatory, if your Honor please.  As I believe I understood your Honor this morning, as we lodged our exhibits you desired we indicate on the record what exhibits were lodged.

THE COURT: Yes.

MR. STAHLMAN:  I have lodged with the Clerk what will be Vail Exhibits B, C, and D.  B will be map of the Pauba Ranch

Z-36
A-3

1   vicinity, Riverside County, California.  C, map of soil and

2   climatic survey, Pauba Ranch, Riverside County, California.

3   And D would be tabulation and analysis in re crop adaptation

4   of parts of Pauba, Temecula, Little Temecula, and Santa Rosa

5   Ranch.

6        MR. MOSKOVITZ:  I would like to announce the lodging of

7   certain exhibits for the State of California.  Marked State

8   Exhibit A is a hydrograph, mean daily discharge of the Santa

9   Margarita River at Ysidora, 1952-53 to 1957-58.  Marked as

10  State Exhibit B is hydrograph of mean daily discharge of

11  Santa Margarita River near Fallbrook.

12       THE COURT: Go a little slower.

13       MR. MOSKOVITZ:  B is hydrograph of mean daily discharge

14  of the Santa Margarita River near Fallbrook, 1942-53 to 1957-

15  58.  Marked as State Exhibit C, Hydrograph of mean daily

16  discharge of the Santa Margarita River near Temecula, 1942-

17  43 through 1957-58.  Marked as State Exhibit D is hydrograph

18  of mean daily discharge of Murrieta Creek at Temecula, 1942-43

19  to 1957-58.  Marked as State Exhibit E are two hydrographs

20  on the same sheet, one hydrograph of mean daily discharge of

21  Temecula Creek at Vail Dam, 1942-43 to 1957-58, and the second

22  one on that exhibit, hydrograph of mean daily discharge of

23  De Luz Creek near Fallbrook, March, 1951 through 1957-58.  And

24  one further exhibit marked State Exhibit F is a tabulation

25  showing the percentage of the annual flow in each year during

Z-37
A-3

1  the period 1942-43 through 1957-58 at the following stations,

2  Santa Margarita River near Ysidora, Santa Margarita River

3  near Fallbrook, Santa Margarita River near Temecula, Temecula

4  Creek at Vail Dam, Murrieta Creek at Temecula, De Luz Creek

5  near Fallbrook, which occurred during 1, the 30-day period

6  of greatest flow during each such year, 2, the 10-day period

7  of greatest flow during each such year, 3, the five-day period

8  of greatest flow during each such year, and 4, the one-day

9  period of greatest flow during each such year.  That exhibit

10  marked D is--

11      THE COURT:  F, wasn't it?

12      MR. MOSKOVITZ:  Yes.  Pardon me.  --is composed of a

13  number of pages stapled together, which contains the information

14  I stated.

15      THE COURT:  Mr. Stahlman, you started out with B.  You

16  heretofore lodged Exhibit A?

17      MR. STAHLMAN:  I heretofore lodged Exhibit A.

18      THE COURT:  What was that?

19      MR. STAHLMAN:  That was the three documents, the applica-

20  tion and the permit and the extension for the State Water

21  Resources Board, now the State Water Rights Board, for the

22  impounding of water in the Vail Dam.

23      MR. MOSKOVITZ:  I might say we have copies, or reduced

24  copies, in some cases, of each of these exhibits, if someone

25  wants them.

Z-38
A-3

1      THE COURT:  These exhibits will be included in the

2  stipulation, will they not, Mr. Veeder?

3      MR. VEEDER:  Yes, your Honor.  I am assuming-- Did Mr.

4  Stahlman-- did you deliver those to Mr--

5      MR. STAHLMAN:  I delivered it to the Clerk.

6      MR. VEEDER:  I mean the list.

7      MR. STAHLMAN:  Oh, we had that the other day.

8      MR. VEEDER:  That list we have down there.

9      MR. STAHLMAN:  I delivered it twice.

10     MR. VEEDER:  The index.

11     THE COURT:  All right, let's proceed.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F-1

THE COURT:  Let's proceed.

MR. VEEDER:  There is one thing.  Mr. Dennis, did you deliver to Mr. Burby or down in my office the statement that you were supposed to make?

MR. DENNIS:  I am going to deliver it tomorrow morning.

MR. STAHLMAN:  I might say, there are other exhibits that we are bringing up to date that were used in the previous trial.

THE COURT:  Mr. Dennis, you will have yours tomorrow morning?

MR. DENNIS:  I talked to the Clerk at the noon recess and he said we would probably get together tomorrow morning and have the numbers placed on the various exhibits intro-duced at the other trial.

MR. VEEDER:  That will mean that your order will not be available until tomorrow, then, your Honor.

THE COURT:  That is all right.

MR. VEEDER:  I wish to offer in evidence at this time a document marked No. 2 for the United States of America. It is a judgment and decree in condemnation for 9,147.55 acres of land.  It has been marked for identification already.  It is now offered.

THE COURT:  If there is no objection, it will be received as Exhibit 2.

MR. VEEDER:  Exhibit No. 3 is the decree on declaration

F-1

1   of taking for 123,620 acres of land more or less in San Diego

2   County.

3       THE COURT:  If there is no objection, it will be received

4   in evidence as Exhibit 3.

5       MR. VEEDER:  Exhibit 4 is for 1,676.58 acres of land,

6   more or less, in the County of San Diego.

7       THE COURT:  If there is no objection, it will be received

8   as Exhibit 4.

9       MR. DENNIS:  May I ask a question, Mr. Veeder.  These

10  are exactly the same documents that were introduced before

11  the Master in the De Luz hearing, are they not?

12      MR. VEEDER:  Yes.

13      MR. STAHLMAN:  May I point out, Mr. Veeder, that in your

14  Exhibit 2 on your list you designate that as condemnation of

15  914,755 acres.  Are those figures correct?

16      MR. VEEDER:  Apparently we made an error in going over

17  that.

18      The next is Exhibit 5, the Association grant deed for

19  112 acres in Orange County.

20      THE COURT:  Exhibit 5 will be received in evidence.

21      MR. VEEDER:  Exhibit No. 6 is Public Land Order 293,

22  which is now offered in evidence.

23      THE COURT:  Exhibit 6 will be received in evidence.

24      MR. VEEDER:  No. 7 is the letters evincing cession of

25  exclusive jurisdiction, letter of January 12, 1943, showing

2322

F-1

1  that it was submitted by James Forrestal and received by Earl

2  Warren, then Governor of the State of California.

3      THE COURT:  Exhibit 7 received in evidence.

4      MR. VEEDER:  Exhibit 8 is a document similar to Exhibit

5  7.  It is dated September 8, 1943.

6      THE COURT:  Exhibit 8 will be received in evidence.

7      MR. VEEDER:  And Exhibit 9 is a similar document dated

8  February 18, 1944.

9      THE COURT:  Exhibit 9 will be received in evidence.

10      (The documents above referred to, having been previously

11  marked for identification, were offered and received in

12  evidence as Plaintiff's Exhibits 2 to 9, inclusive.)

13  BY MR. VEEDER:

14      Q  Mr. Kunkel, while you were testifying in regard to

15  a location requested by the Court you located the area of

16  the Pauba Valley.  Have you devised a means of locating on

17  the basis of sections by projecting the section line?

18      A  Yes.  For convenience--

19      Q  Would you step to the easel and demonstrate to the

20  Court how that section grid is utilized?

21      MR. VEEDER:  Your Honor, we have, as you will observe,

22  large areas where the sections are not set forth, and I

23  think it would simplify it if Mr. Kunkel would go ahead and

24  explain the use of this device that he has.  We are going to

25  withdraw that later and tender one through which it is easier

F-1

1    to see.  But for this afternoon's work we would like to use

2    that.

3            THE COURT:  All right.

4            THE WITNESS:  Existing township and range lines for

5    convenience can be extended across the Rancho's boundaries

6    horizontally and vertically.  This is a grid drawn to scale

7    of 1 to 62,500, which is the same as the base map.

8            THE COURT:  Exhibit 1.

9            THE WITNESS:  Exhibit 1, yes.  The sections are drawn

10   and numbered within the township and by matching northwest,

11   northeast, southwest and southeast corners we can project the

12   sections on to the--

13           THE COURT:  Section 1 always begins at the right upper

14   corner, and Section 36 ends at the right lower corner?

15           THE WITNESS:  That is correct.

16   BY MR. VEEDER:

17       Q  In that regard, would you locate the area to which

18   the Court made reference this morning, namely, the Pauba

19   Valley, to the end that we will have the record more clear

20   as to that point?  If you will, use the extended lines,

21   please.

22       A  Will it be permissible to extend the lines with

23   pencil?

24           MR. VEEDER:  Yes.

25           I think it is desirable, your Honor, if it is all right,

2324

F-1

to have him extend the lines.

THE COURT:  It doesn't make any difference one way or the other.

Those present squares there are townships, aren't they?

THE WITNESS:  The townships are six miles on a side; yes.

THE COURT:  Then those present squares are just sections?

THE WITNESS:  These are sections, one mile square, yes.

THE COURT:  Just sections?

THE WITNESS:  Yes.

I will dash the projected line so that there will be no confusion between the projected and the surveyed lines.

There is no attempt to imply that these lines are accurately surveyed.  They have whatever inaccuracies are inherent in the map due to reproduction, shrinkage and distortion and the lack of precise tools at the moment.

BY MR. VEEDER:

F2

Q  Show how that works, then, from the extended lines, please.

A  The projected section, if we were interested in that point, approximately in the Vail Ranch at this point.

Q  When you say "at this point"--

A  By "this point" I will have to lay my grid over the projected sections and see that this point now falls in Section 33 projected, Township 7 South, Range 2 West.  I would have no convenient way of identifying the point

P2

otherwise.

MR. VEEDER:  We would like throughout the remainder of the trial, if we could, to use a similar device for location, your Honor.  I think it would be much simpler.

THE COURT:  It is satisfactory.

MR. VEEDER:  At this time I would also ask leave of the Court, because I think it would save considerable time, Mr. Kunkel has prepared a great number of papers for the United States Geological Survey and we have copies for all parties of this itemization of the reported papers that he has prepared, and rather than go through a long and detailed examination would that be permissible with your Honor and counsel? I would like to have that in there in regard to his qualifications.

THE COURT:  Well, serve copies on counsel and we will put the list of papers in evidence as an exhibit.

MR. VEEDER:  If that is permissible.

THE COURT:  Any objection?

MR. DENNIS:  No objection.

MR. VEEDER:  I think it would be a lot better than hearing the man tell about how many papers he wrote and on what date.

THE COURT:  That is satisfactory.

MR. DENNIS: I have no objection.

MR. VEEDER:  Now would you return to the witness stand.

2326

Q   Now, Mr. Kunkel, when was the next time that you viewed the Santa Margarita River watershed or parts of it during the course of your employment in the United States Geological Survey?

A   I am not certain exactly where we left off in point of time.  May I briefly review it?

Q   I think it was in 1955, was it not?

A   In 1954 was my first visit.  In October, 1955 I visited the upper watershed with Mr. Olmestead.

MR. STAHLMAN:  Will you keep your voice up.

THE WITNESS:  In October, 1955, I visited the property of Mr. Olmstead.  July 8, 1956, I visited the upper part of the watershed , entering from the Elsinore across the divide in the vicinity of Wildemar.  I proceeded down Murrieta Valley in a southeasterly direction.

Q   What observation did you make in the course of that tour?

A   I observed the extent of the younger alluvial deposits, the older alluvial deposits, their contacts with the con-solidated rocks.  I observed areas of rising water.

Q   In what area did you make that observation?

A   The areas of rising water were in the vicinity of the Santa Gertrudis Valley, and from there downstream to the confluence of the Murrieta.

Q   Will you step to Plaintiff's Exhibit 1 and as you

F-2

1    proceed and in your course refer to the Santa Gertrudis as

2    you just did, and state where it appears on Plaintiff's Exhibit

3    1.  Now you can use that grid that you developed there to the

4    end that the location may be more carefully defined.

5        A  The areas of rising water were at the mouth of the

6    Santa Gertrudis Valley in the Southwest Quarter of Section 26,

7    Township 7 South, Range 3 West.  The extent of the rising

8    water or moist ground extended from there south.

9        Q  From where, now?

10       A  From the point previously described southeast along

11   the flood plain of Murrieta Creek to the confluence of

12   Murrieta Creek with the Temecula River.

13       THE COURT:  Does Highway 395 traverse that area of

14   rising water?

15       THE WITNESS:  Yes, it does.  Highway 395 goes right

16   through the area of rising water.

17       THE COURT:  That is the area north and west of the town

18   of Temecula where you see the marsh grass along the side of

19   the road?

20       THE WITNESS:  That is the area, yes.

21   BY MR. VEEDER:

22       Q  Would you proceed, indicating the other points of

23   observation during the course of this trip to which you are

24   just making reference?

25       A  At the intersection of U.S. Highway 395 and State

F2

Highway, I believe it is, No. 71, I followed that highway

again up Pauba Valley.

Q  Would you locate that, using the grid to the end that

we will know exactly as possible where you turned and

proceeded up to Pauba Valley.

THE COURT:  For the record, the turnoff is, in general

terms, just south of Murrieta.

MR. DENNIS:  Temecula.

MR. STAHLMAN:  Temecula, your Honor.

THE COURT:  Pardon me.

THE WITNESS:  Temecula.

THE COURT:  South of Temecula.

THE WITNESS:  Pardon me.  You wish, Mr. Veeder--

BY MR. VEEDER:

Q  I asked you to locate, as nearly as you can, the legal

subdivision, using your grid, that would be where the turn is

made.

A  The approximate location would be in the Northwest

Quarter of Section 18, Township 8 South, Range 2 West.

Q  You are on Route No. 71.  Describe the points of

observation that you encountered as you went along there.

A  Highway 71 follows the north side or the Temecula

River across the flood plain-- across the younger alluvial

deposits of the Temecula River to a point approximately--

and without more detail on this map I have to approximate

F3

my location-- approximately in Section 10, at which point
the road crosses the Temecula River.  Approximately from that
point south to the confluence of the Temecula River and
Murrieta Creek, the ground was observed to be an area of
rising ground water.  Following Highway 71 from its crossing
with Temecula Creek you go across older alluvial deposits that
are considerably above the flood plain of the Temecula River,
you bypass Vail Reservoir-- it is not visible from the highway
or is not easily visible from the highway-- through Radec,
Aguanga, Damron, Oak Grove and Dodge Valleys, at which point
you leave the watershed.  On the course of that reconnaissance
I observed the alluvial plains in the valleys mentioned and
the approximate size of each valley, observed that there was
irrigation in the valleys, that there was use of water from
wells.

F3

Q  Subsequent to that reconnaissance which you have
just described, when was the next time that you visited the
Santa Margarita River watershed?  You may approximate the
date.

A  I am not exactly certain of the other trips.  The
following time was beginning in October, 1957.

Q  Now, describe the extent of your undertaking at that
time in regard to the valleys.

A  Subsequent to that date I have visited all the
principal ground water basins in the upper part of the

2830

F3

1  watershed.  By the upper part I am referring to the area

2  tributary, above the confluence of the Temecula and Murrieta

3  Creeks.   It involves Springs Creek, Tecolote Creek, Santa

4  Gertrudis Creek, the full length of Temecula Creek to the

5  divide, Coahuila Creek.

Z-39
A-4
G

Q   When you say the "divide" what do you mean, Mr. Kunkel?

A   To the headwaters between the Santa Margarita River watershed and the San Luis Rey watershed.  It is the point at which surface water flows from one watershed to the other.

Q   Now, you proceed and state what other further investigations you made of the Santa Margarita River watershed at that time, and the time period subsequent to that.

A   I mapped the extent of the water-bearing deposits, the extent of the non-water-bearing deposits.  I subdivided the water-bearing deposits into two groups, known as the younger alluvial deposits and the older continental deposits. I observed I believe all points of rising water along the main stems of the Temecula, Murrieta, Santa Gertrudis, Tecolote, Warm Springs, Filson Creek, Coahuila Creek.

MR. VEEDER:  Now, I would like to put a map on the board, the identification No. 15.

THE COURT:  What do you call that map again?

MR. VEEDER:  This is the geologic and hydrologic map of the Santa Margarita River watershed.

MR. SACHSE:  The number again?  I didn't get it.

MR. VEEDER:  15.

BY MR. VEEDER:

Q   Now, Mr. Kunkel, would  you state who prepared the map which has been marked as Plaintiff's Exhibit No. 15?

A   I prepared this map.

Z-40
A-4

1    Q   And would you state generally the areas which are

2    depicted on that map in color?

3    A   Would you restate your question?

4    Q   What are the colored areas?  Just generally state what

5    are the geographic location of the colored areas?

6    A   The colored areas in general occupy the high land

7    areas of the entire watershed.  They are the consolidated rocks

8    of the basement complex.

9    BY THE COURT:

10   Q   Which color is that?

11   A   The blue.

12   BY MR. VEEDER:

13   Q   What are the yellow areas that are depicted on that

14   map?

15   A   The yellow areas are the youngest alluvial deposits

16   that occupy the flood plain of the present-day stream channel

17   and their tributaries.

18   Q   Now, based upon your observations, is it your opinion

19   that that map correctly depicts the geologic areas that you

20   have investigated?

21   A   In my opinion this map accurately depicts the areas

22   which I have investigated.

23   BY THE COURT:

24   Q   What are the orange?

25   A   The orange are older continental deposits that are

Z-41
A-4

presently being dissected.

BY MR. VEEDER:

Q   When you say "dissected," mr. Kunkel, what do you mean?

A   Are being eroded during periods of precipitation and runoff, as opposed to the yellow areas, which are generally receiving alluvial deposits and are in the process of being built up or flooded at the present time.

BY THE COURT:

Q   In other words, the orange areas in some times past were built up by alluvia, as time went on now the yellow areas are receiving alluvia and are growing, might be said to be building up, while the older areas are in substance diminishing, being washed away.

A   That is correct.  The older areas in general have been uplifted due to faulting and movement of the earth's crust.  And the areas are no longer receiving alluviation, but are actually being dissected.

Q   What is the pink?

A   The pink color are volcanic rocks.  They overlie the basement complex.  And based on drillers' logs, they may be interbedded at depths with the deposits colored orange.

Q   And they crop out where indicated in the pink?

A   They crop out where indicated, and they are in general tapping high land areas, with one exception, along the northeast

Z-42
A-4

margin of Murrieta Valley.

Q  What is the gray?

A  The gray are areas underlain at very shallow depth--
by "shallow depth" I mean twenty to possibly a maximum of a
hundred feet-- by rocks of the basement complex.  The gray
materials are actually deeply weathered phases of the basement
complex.  The materials that are colored gray have not been
transported or moved by the processes of erosion, except for
possibly very short distances.

Q  Then, if I understand you, the gray is also the base-
ment rock, but due to a fault or change of the surface, has
come up to the top so it is now exposed and weathered.

A  It is the surface of the rock that is deeply weathered.
There are places where the basement rocks are not deeply
weathered.  It is due to the character of the rock itself.
And also there are areas of residuum that are not shown on
this map because they were not areas which, in my opinion,
constituted potential sources of ground water except in a
very limited degree.

MR. VEEDER:  The United States offers in evidence
Plaintiff's Exhibit marked for identification No. 15.

THE COURT:  It has been drawn to scale?

THE WITNESS:  This has been drawn to scale.

THE COURT:  From your observations and studies?

THE WITNESS:  From my observations and studies.

Z-43
A-4

THE COURT:  Any objection?  Received in evidence as Government's 15.

(The map above referred to was received in evidence as Plaintiff's Exhibit 15.)

MR. GROVER:  Your Honor, may I ask, is there a legend on that to explain those colors?

MR. VEEDER:  We will go into that.

THE COURT:  There is a legend on that.  The witness just pointed to it.

MR. VEEDER:  We will go into a great deal of detail on that, your Honor.

Q  Now, Mr. Kunkel, would you trace on that map the source of the waters, as you found them to be, of Temecula Creek, starting at the highest area of younger alluvial and proceeding down to the confluence of that stream with Murrieta Creek.

A  The highest point on Temecula Creek is in Section 36, Township 9 South, Range 2 East, which is the surface water divide between the San Luis Rey and the Santa Margarita River watersheds.

THE COURT:  Is that at about the area where the road drops over the divide down into Pala?

THE WITNESS:  No.  Well, I think you may be thinking of the road to Pala which goes off in this general direction. This is at Tido's Lodge.  There is one motel.  That is in the

Z-44
 Z A-4

G2

1    San Luis Rey watershed.                    2236

2        THE COURT:  I know where it is.

3    BY MR. VEEDER:

4        Q  Now, would you describe the surface characteristics

5    of the valley which you have marked on there as Dodge Valley,

6    with particular reference to the bed and banks of the stream

7    to which reference has been made?

8        A  All right.  Dodge Valley is approximately a quarter

9    to three-quarters of a mile wide, and one to two miles long.

10   The boundaries of the valley, as a distinct valley, are not

11   well defined.  The area indicated by yellow shows the extent

12   of the alluvial fill in the valley.  The area indicated as

13   younger alluvium is gently rolling, and in general does not

14   have any large boulders or rock outcrops.  The area is

15   covered with native grasses and trees, and occupies a lowland

16   area relative to the higher areas underlain by the rocks of

17   the basement complex on either side.  The Temecular River as

18   such in this area has no well defined bed or bank.

19       Q  Now, when you say "this area", Mr. Kunkel, I would

20   ask you to be as specific as you can in regard to location

21   by legal subdivision.

22       A  All right.  By "area" I mean Dodge Valley, which

23   occurs in-- or which lies in Sections 26, 27, Township 9

24   South, Range 2 East.

25       Q  Now, with particular reference to the area where you

G2

1    say that there are -- there is not-- perhaps it is "are not"--

2    a well defined bed and bank, would you indicate where that

3    situation was found to prevail, again alluding to the lega

4    subdivision to the nearest--

5    A  In the same sections that I previously testified to,

6    26 and 27, are the sections in which the Temecula River does

7    not have a distinct bed and bank.

8    THE COURT:  Do you have an extra copy of these exhibits?

9    MR. VEEDER:  Yes, your Honor, we do.  And they are ready

10   for distibution.

11   THE COURT:  May I have one?  I can't see too well in here.

12   MR. VEEDER:  Do you have a colored exhibit like this now?

13   They are uncolored, your Honor, but they will show the

14   areas.

15   THE WITNESS:  Just a rough draft copy that I would hate

16   to have introduced in evidence.

17   THE COURT:  No.  I just want to look at it.  If you get

18   a copy colored up--

19   MR. VEEDER: This is 15, your Honor, which is the same,

20   but it is uncolored.

21   THE COURT:  All right.  That is good enough.

22   MR.EBERHARD:  Would you repeat those section numbers?

23   THE WITNESS:  26 and 27, I believe.  I will check it out.

24   26, 27.

25   MR. EBERHARD:  What township?

2338

THE WITNESS:  9 South, 2 East.

THE COURT:  I notice that the exhibit has written on it "Dodge Valley" showing this valley you have been describing.

BY MR. VEEDER:

Q  Now, would you proceed downstream, Mr. Kunkel, and indicate where you found a well-defined bed and bank of the stream?  And again endeavoring to locate as closely as possible by legal subdivision.

A  The bed and bank in Dodge Valley begins to be well defined inthe northwest corner of Section 27.  I am sorry. Make that the north half of Section 27, following the channel which can be identified in this area, through Section-- through the southwest corner of Section 22, the southeast corner of Section 21, through the northwest corner of Section 21.  The bed and banks are defineable by a slight dissection into the youngeralluvial deposits. But in general the channel is a broad, sandy--

Q  Would you state what you mean by "dissection"?

A  Slight dissection into the younger alluvial deposits. However, in general the channel is a broad, sandy area, and not, again, well defined in that you would say that the next storm or river will flow down this particular course.

THECOURT:  On your Exhibit 15 in certain instances you have used dotted lines and in other instances you have used solid lines.  Do the solid lines indicate more the indication

G2

1    of a defined channel than the dotted lines?

2    THE WITNESS:  The dash and three dots indicate an inter-

3    mittent stream at the time the survey was made on the ground

4    by the topographic branch.

5    THE COURT:  Well, I am not talking aboutthat.  I am

6    talking about a solid line in there.  You have have indicated

7    some--

8    THE WITNESS:  You may be observing a fault along the

9    southwest side of Dodge and Oak Grove Valleys, which is a

10   dotted, dashed and solid line.  The symbol is explained,

11   under the explanation, where it says"Fault, dashed where

12   position is inferred, dotted where concealed."  Where it is

13   a solid line, the evidence indicates the position of the fault

14   is at that point and no other.

15   THE COURT:  All right.

16   THE WITNESS:  The channel of the Temecula River is

17   indicated by the dashed line and three dots.

18   BY MR. VEEDER:

19   Q  Now, proceed on down the valley, Mr. Kunkel, and

20   indicate the next alluvial valley which is shown on Plain-

21   tiff's Exhibit No. 9.

22   A  The channel of Temecula Creek in the northwest quarter

23   of Section 21, the same township and range, 9 South, 2 East,

24   the valley-- the channel of the Temecula Creek widens out into

25   Oak Grove Valley.  Oak Grove Valley is an alluviam filled

G2

valley, bounded by consolidated rocks on all sides, except

for the point of inlet and outlet along the channel of the

Temecula River.

Q Now, would you describe the legal subdivision at the

point where the-- as nearly as you can at the point where the

Temecula Creek enters the valley?

A Temecula Creek could be said to enter the valley in

the northwest quarter of Section 21, Township 9 South, Range

2 East.

Q Now, would you--

MR. STAHLMAN: Keep your voice up, if you will, please.

Keep your voice up at the end. You tend to drop.

THE WITNESS: O.K.

BY MR. VEEDER:

Q Now, would you proceed to describe the physical

characteristics and appearances of Oak Grove Valley, based

upon your investigation?

A Oak Grove Valley is an alluvium filled valley, bounded

on all sides by consolidated rocks of the basement complex.

It is bounded-- Chihuahua Creek flows along the northwest side

of the valley, and the area is gently rolling, covered with

a growth of oak trees and grasslands.

Q Would you also allude at this time to the area which

you have marked on there as Chihuahua Valley, and describe the

surface appearances of that area which you have marked on

2341

G2

Plaintiff's Exhibit 15?

A   Chihuahua Valley is a valley that lies at higher altitude than Dodge or Oak Grove Valleys.  It is an area of thin alluvial deposits.  It is gently rolling.  The surface is bouldery.  Locally within the area indicated as Chihuahua Valley, islands of basement complex or consolidated rocks crop up.  The area is covered with native grasses and scrub growth, chaparal,

Q   Would you describe the characteristics of the stream in that valley and where it becomes a well-defined bed and bank, if such is the case?

A   There is no well-defined stream in the area.  The outlet to the valley is in Section-- the Southeast Quarter of Section 8.

THE COURT:   8?

THE WITNESS:   Yes.  They have slipped an $8\frac{1}{2}$ township in there on us.

BY MR. VEEDER:

Q   Who is "they", now?

A   The topographic branch of the Geologic Survey.

MR. VEEDER:   We always want to indicate where the crime was committed.

BY THE COURT:

Q   By that you mean that first bank of townships that are half townships in altitude, top to bottom, belong not in

2342

G2

in Township 9 South, but what is called 8½?

A  8½.

MR. VEEDER:  Your reference was to section, was it not, your Honor?

THE WITNESS:  Yes.

THE COURT:  Yes, but I had numbered these, and that is what threw my numbers off.

MR. VEEDER:  Would it be of assistance, your Honor, I have a copy here of the order on pre-trial stipulation, and the stipulation on pre-trial, and as the witness proceeds through this valley it might be of assitance to you, particularly in regard to your statement in connection with the other defendants who are not here represented today.

May we proceed, your Honor?

THE COURT:  Yes.

BY MR. VEEDER:

Q  Now, from the outlet of Chihuahua Valley, would you proceed to describe the stream system which--

A  Beginning in the Southeast quarter of Section 8, following across Section 8, Section 1, into-- sorry, into Section 6, then into Section 1 of Township 9 South, Range 2 East, and across part of Section 2, and at a point in Section 11, Northeast Quarter Section 11, Township 9 South, Range 2 East, along the line that I just described, the channel of the stream Chihuahua Creek is incised in rocks of the basement

G2

complex.   There is no alluvium in the channel, or the quantity

or the amount of alluvium is so small as to be insignificant.

At the point in the northeast quarter of Section 11, where

the Chihuahua Creek enters Oak Grove Valley, the valley widens

out again into a rather broad, sandy channel, approximately

a quarter mile wide.   On the date that I visited the valley,

sometime within the period October through December, 1957,

there was no flow of water in the stream, or there was no

point of rising ground water observed in Chihuahua Valley.

Q   Now, in regard to the Oak Grove Valley, would you

just proceed with your description of the Temecula River as

it appears in that valley, with particular reference being

directed to the bed and bank of the stream.

A   From a point approximately in the northwest quarter,

Section 21, Township 9 South, Range 2 East, downstream the

bed and bank of the Temecula River become progressively more

incised in the alluvial plain, or beneath the surface of the

younger alluvial plain.   At a point in the east half, Section

17, the banks are approximately 15 to 20 feet below the surface

of the alluvial plain.   The bed of the stream I estimate to be

about a hundred feet wide.   There is a rather dense growth.

There is a dense growth of vegetation, willows, et cetera,

along the channel.

Q   Would you strike that "et cetera" and say what it is?

You said "willows," and what other growth?

A  Willows and rank growth of phreatophytes that I can't identify by name.

Q  You may proceed.

A  At the point in Section 17, ground water was observed to rise from the alluvial deposits in the channel of Temecula Creek.  The deposits-- the area is indicated-- or is an area of swamp.  There are tules growing.  And as one proceeds downstream from the point of rising water, there is an increase in the quantity of surface water flow in the channel that had its origin as rising ground water.

Q  What was the appearance of the areas in which the water emanated from the ground?  Was it springs or how would you describe that?

A  As one proceeds downstream, the ground becomes moist, muddy, and at a certain point there is actually standing water, or water that is rising from the deposits of clay, sand and gravel in the--

Q  Where are they located in regard to the bed and bank of the stream?

A  They, in Oak Grove Valley, are closer to the north bank than to the south bank.  At approximately in the middle of the channel.

Q  They are between the banks?

A  They are between the banks, in the deep part.

Q  Proceed from there on down the stream, describing it

R2 Gm2

1  as you go.

2      A  The flow of ground water in Section 17 increased along

3  the channel through Section 7.  And in Section 7 the channel

4  of the Temecula River became quite narrow, a matter of several

5  hundred feet, and at its narrowest point, possibly a hundred

6  feet or less.  However, at all points along the channel there

7  is a fill of-- a deposit of alluvium.  The consolidated rocks

8  of the basement complex are not exposed in the channel at

9  any point along the course of the river in Oak Grove Valley.

10  However, the rocks of the basement complex are on both sides

11  of the channel and rise steeply a matter of 50, 75 or 100

12  feet.

13      THE COURT:  You have the initials "BC" in Section 7.

14  That is Basement Complex?

15      THE WITNESS:  Yes.  The channel is north of the symbol.

16  The area south of the symbol is alluvium.  But that is an

17  alluvium fan washed down from the high land area to the

18  southwest.  It is not along the channel.  I have not differ-

19  entiated on these maps the channel and the alluvial plain or

20  the alluvial fans.

21      THE COURT:  The "BC" doesn' t mean the basement complex

22  is exposed there?

23      THE WITNESS:  Yes, it does.  At the point indicated as

24  "BC", the basement complex is exposed.  The channel is to the

25  north deeply incised, and to the south there is an alluvial

G2

1    wash covering the area indicated approximately a quarter of a

2    mile wide.

3         THE COURT: Go ahead.

4    BY MR. VEEDER:

5         Q  You may proceed with your description of the next

6    valley into which the Temecula Creek flows.

7         A  At a point in Section 7, Northwest Quarter of Section

8    7, Township 9 South, Range 2 East, there was an earth dam

9    across the channel of the Temecula River.

10        MR. SACHSE:  May we ask if that is the one that is

11   indicated on the map?

12        THE WITNESS:  Yes, diversion to Dameron Valley.  That is

13   an earth dam.

14   BY MR. VEEDER:

15        Q  And would you describe, if you observed, the utiliza-

16   tion which is made of that dam?

17        A  The first visit that I made to that dam there was a

18   pump in operation, and the water was being pumped from the

19   impoundment of water behind the dam, purportedly for use in

20   Dameron Valley.  I did not trace it out.

21        Q  You can only testify, Mr. Kunkel, to what you saw.

22   You observed, then, the pumping of water from that point; is

23   that correct?

24        A  I observed pumping of water from that point.

25        Q  Now, would you proceed with the description of the

valley into which the channel of Temecula Creek proceeds?

A  Below the diversion there was no flow in Temecula River. And in the northwest quarter of Section 7, Township 9 South, Range 2 East, the channel of the Temecula River widened out and flowed across an area that was underlain by alluvial deposits.  The extent of Dameron Valley is approximately a half mile square, as indicated by the area colored yellow. And it is also bordered by areas of older continental deposits along the margins of the valley in Section 6, Township 9 South, Range 2 East, and in Section 1, 9 South, Range 1 East.  There is also an outcrop of basement complex in Section 1 at the point as indicated by the map.

Q  Have you compared the areas of the continental deposit with the younger alluvium in making your investigation there?

A  Yes, I did.

Q  Would you state for the record the comparative areas, if you have them?

A  They are in area-- they are approximately equal.

Q  Now, proceeding on down from Dameron Valley, would you describe the channel of the Temecula Creek?

A  The channel of Temecula Creek in Dameron Valley is incised a matter of five of six feet beneath the alluvial plain of Dameron Valley.  In the south half of Section 1, Township Range 1 East-- sorry-- Township 9 South, Range 1 East, I observed a sump, apparently bulldozed into the channel

G2

1    of the Temecula River.  There was standing water in the river,

2    in the sump during the period that I observed it.  There was

3    no pumping on the date that I observed it.  Downstream from

4    that point--

5        Q  When you were there, did you observe facilities that

6    could be utilized for pumping?

7        A  I would have to check my notes.  I don't recall.

8        THE COURT:  This is at the place marked "Sump" in Section

9    1 of the township and range you noted?

10       THE WITNESS:  Yes, sir.

11       THE COURT:  O.K.  Go ahead.

12   BY MR. VEEDER:

13       Q  Now, would you proceed on down the Temecula?

14       A  Downstream in the same section, Section 1, Township

15   9 South, Range 1 East, the valley-- or the channel again is

16   confined between banks of basement complex.  There is also an

17   earth dam across the valley in the west half of Section 1 that

18   impounds water.  On the date that I visited the installation,

19   I observed no pumping, and there was rising water beneath

20   or below the dam in the west half of Section 1, Township 9

21   South, Range 1 East.

22       THE COURT:  Below your symbol where you show the earth

23   dam, it looks as if you might have a circle drawn there, or it

24   might be other lines.

25       THE WITNESS:  That is a circle with a solid line followed

G2

1  out.  On the color map here I have the circle here inSection 1,

2  and the solid line follows across the northeast quarter of

3  Section 2 on into Section 35, Township 8 South, Range 1 East.

4  BY MR. VEEDER:

5      Q   What is that circle supposed to mean?

6      A   The circle is a point of rising water.  Just as we

7  observed the rising ground water in Oak Grove Valley, ground

8  water was observed to rise in the channel of Temecula Creek

9  at the point indicated by that circle, and increased-- and

10  the quantity of water, as indicated by the flow in the channel,

11  increased as one proceeded down gradient.

12      THE COURT:  Before you leave that, let me go back to this

13  older continental deposit that lies north of Temecula Creek

14  there.  From the map the areas of that deposit are shown in

15  orange there.  And is that connected with the younger alluvial?

16      THE WITNESS:  It is adjacent to the younger alluvium at

17  the point approximately along the contact between Section 6 and

18  1.  The dotted line is the contact.  The older continental

19  deposits are being dissected and the younger continental

20  deposits-- or the younger alluvium is being deposited upon it.

21      THE COURT:  Go ahead.

22  BY MR. VEEDER:

23      Q   You may go on with your description of the valley,

24  Temecula Creek and on down from Dameron Valley.

25      A   The channel of Temecula Creek across the southwest

quarter, Section 35, Township 8 South, Range 1 East, is deeply incised in the consolidated rocks of the basement complex.

Q   What would you estimate the depth from the banks to the bed of the stream?

A   I would estimate the depth from the high land area on each side to the low point in the stream to be several hundred feet.   Through Section 35 the entire flow of the Temecula River flows over the consolidated rocks.   There is no fill, no alluvial fill in the valley whatsoever.

Q   What conclusion did you have as to the cause of that phenomena where there is no alluvial deposits there?

A   The gradient in this particular area is quite steep, and the stream is downcutting and eroding the material into the next lower valley, Aguanga Valley.   As material decomposes, due to the action of the elements, it is carried out by the stream flow through the area into Aguanga Valley.

Q   Now, would you proceed then and describe the area of Aguanga Valley where Temecula Creek enters it?

A   At a point approximately in the southwest quarter, Section 35, or the Southeast Quarter, Section 34, the channel of the Temecula Creek enters the alluvial plain of Aguanga Valley in Section 34.   The channel widens out to several hundred feet in width, is sand filled.   The sand is very evenly graded.   And on the date that I observed the point,

G3

the flow from Aguanga Valley was diverted into a pipeline and
transported to some other point.  I did not follow it out.
A minor amount of flow was not captured by the diversion, and
that flowed across the alluvial sand channel of Aguanga
Valley and disappeared into the ground within a matter of a
hundred feet or so.

Q  Proceeding on from that point where the water went
below the surface, would you describe the bed and bank of
Temecula Creek in that area?

A  In Section 34, a large northeast part of Section 33,
the Temecula River flows across Aguanga Valley, but it has
no well-defined bed or bank.  It is a broad area of sandy
wash.  And the river is not well defined in a channel.

Q  Would you describe the younger alluvium, and similarly
the continental deposits which appear in Aguanga Valley?

A  The younger alluvium in Aguanga Valley is a gently
rolling flat area, covered by native grasses, some cultivated
crops or pasture.  I do not recall exactly.  The older alluvial
deposits are marginal to the valley, rise to above the
alluvial plain indicated-- as indicated on the map.  The older
deposits are being dissected, and are also covered with
native grasses.

Q  From the standpoint of comparable areas, how do the
continental deposit areas relate to the younger alluvium?

A  In Aguanga Valley, it is not an accurate comparison

G3

for the simple reason  that Aguanga Valley is identified on the

map as the area colored by the younger alluvium.  It is also

a generalized local term and the boundaries of Aguanga Valley

are somewhat open to interpretation.  If we will arbitrarily

assume for the purpose of discussion or testimony that the

Aguanga Valley is bounded on the southwest by a fault indicated

across Section 32, trending approximately from the southeast

quarter to the northwest quarter of the section, and can be

projected in both directions--

THE COURT:  33, wouldn't it be?

THE WITNESS: Sorry,  It is 33.  And we will also take the

northeastern boundary of the fault line shown in Section 27,

also trending in a northwest direction, as Aguanga Valley,

the extent of the older continental deposits occupy a smaller

area than the extent of the younger alluvial deposits.

BY MR. VEEDER:

Q  Now, from that point, from the point where the water

went beneath the surface of the land, did you go on through

the valley and observe where the bed and bank became defined

again?

A  Yes, sir.  I followed down gradient to a point in

Section 28 in the southwest quarter, at which point the channel

of Temecula-- of the Temecula Creek became again well defined

and incised beneath the surface of the younger alluvial

deposit.  The channel is also incised beneath the surface of

G3

the younger alluvial deposits, and completely through them and into the older continental deposits which underlie the younger alluvium.  Also the channel of Temecula Creek is a braided channel across it.

Q  Is a what?

A  A braided channel.

Q  Will you define for the record what you mean?

A  A braided channel would be a stream channel that followed several courses across the valley from a point where they would separate to a point where they would again come together farther downstream.  There could be numerous channels to a braided channel.  In this particular case there are two channels.  The channel of the river is about 20 feet deep at this point.  And in the channel at the-- or in the two channels in the southwest quarter of Section 28 there are two points of rising water, one in each channel.  The water issues from the unconsolidated deposits in the channel.  And there is an increasing quantity of flow down gradient to a point in the southwest quarter of Section 29, at which point there is another diversion.  The channel has a growth of willows and I believe poplars in the channel.  The point-- the little point of land between the two channels of the Temecula River is a very flat table grassland.  As you stand on the top of it, you can look right across and see the tops of the trees growing in the channel at a depth of 20 feet or so below the

surface of the alluvial plain.  In the Southwest Quarter of Section 29 there is a weir along the channel in which the full flow of the Temecula Valley is diverted.  I would have to check my notes to be certain, but I believe it is a 24-inch weir.  I measured the flow in October or November-- I would again have to check my notes for the exact date, and I recall that there was approximately .86 of a second foot.  I would have to check my notes for accuracy on that.

THE COURT:  The weir leading to some open flume?

THE WITNESS:  Below the weir there is a dam and the water is diverted from the impoundment behind the dam.  I do not recall the exact details at the moment of that impoundment.  I will have to check my notes on that.

THE COURT:  We will take a recess at this time.  It is 3:20.

(Recess.)

MR. VEEDER:  Your Honor, I have heard inquiries from you and also from counsel in regard to the scientific data to which Mr. Kunkel is now referring.  Now he has a series of colored photographs and we have a camera here.  It occurs to me that the photographs that he has taken from the confluence of the Murrieta and the Temecula up to the headwaters of the Temecula would at this time be beneficial from the standpoint of what is meant by continental deposits or younger alluvia. If your Honor would permit us, we are going to show those

H1

pictures.

THE COURT:  You are going to offer the slides in evidence?

MR. VEEDER:  I will do that, your Honor.  We would have to reserve another number, but we could put them in.

THE COURT:  All right.  Any objection?

MR. DENNIS: No objection in the slightest.

THE COURT:  I have been over most of this.  In fact, Highway 71 is the old Butterfield Trail, isn't it?

THE WITNESS:  Yes, it is.  It goes across the valley to the old stage station there.

THE COURT:  It goes up pretty well through the divide.

THE WITNESS:  I believe it follows the highway, as closely as I can determine.

MR. DENNIS:  I believe, for the record, though, that Highway dies out at Radac, doesn't it?  It is another number east of there.  It is the same road.

THE COURT:  It is the road that leads down to Warner's Ranch.

THE WITNESS:  That is correct.

It would be a help if I could refer to the map for the location.

THE COURT:  You want to refer to the map?

THE WITNESS:  You may be interested in the location of the slides.  I think there is sufficient light.

THE COURT:  I can switch the light on and off.

H1

MR. DENNIS:  Will each slide be given a number as you refer to it?

THE WITNESS:  May I talk from my notes on this, Mr. Veeder?

MR. VEEDER:  Yes, you are free to refer to your notes.

THE COURT:  Yes.  Do the slides have a number?

THE WITNESS:  The slides have a number.

MR. VEEDER:  I would ask to have them marked for iden-tification, then, as Plaintiff's Exhibit 58-A, et cetera.

THE COURT:  Are they numbered alphabetically?

THE WITNESS:  The slides are numbered numerically as they came.

THE COURT:  Call them the same number, 58-1, 58-2, down the line.

MR. VEEDER:  They are being offered in evidence as we proceed, if it is all right with your Honor.

THE COURT:  Any objection, Mr. Stahlman?

MR. STAHLMAN:  No, your Honor, unless I see something objectionable.

MR. VEEDER:  I think that suffices.

THE COURT:  Go ahead.  This is Exhibit 58-1.

THE WITNESS:  We are starting with Slide No. 2 for the simple reason that they are the same shot.  I started my roll of film and the first picture was poorly done.  There are several other slides that will be skipped.  I had them

H1

2257

1   destroyed.

2        THE COURT:  There is no 58-1?

3        THE WITNESS:  No.

4        THE COURT:  All right, start with 58-2.

5        THE WITNESS:  58-2 is at the gauge near Aguanga.  It is

6   at the lower end of   Radec Valley.  The gauge is the

7   corrugated pipe and the box on the top is the-- the water

8   stage recorder is in there.  There is a small dam right there

9   in the channel of the Temecula River.

10  BY MR. VEEDER:

11       Q  When you say right there, Mr. Kunkel--

12       A  Right in the center of the picture where the boy in

13  the red coat is sitting.

14       There is no water whatsoever in the dam.  Behind the

15  dam the float for the gauge is sitting on bedrock.

16       THE COURT:  Which way does the stream run?

17       THE WITNESS:  We are looking downstream.

18       MR. DENNIS:  Give us the date.

19       THE WITNESS:  The dates are indicated in my notes.  This

20  one was taken on October 20, 1957.

21       A few feet, approximately a hundred feet or so below

22  the dam there is a dug pit.  That was covered at the time I

23  was there.  I could not get into it.  But there was reportedly

24  no water in the pit at that time.  Mr. Poor, who lived on the

25  hilltop--

58

MR. VEEDER:  That is hearsay, Mr. Kunkel, and you can't testify to that.

THE WITNESS:  I am sorry.

THE COURT:  That may go out.

Are you ready for the next one?

MR. VEEDER:  Yes, your Honor.

THE COURT:  This will be 58-3.

THE WITNESS:  This is 3.  This is along Highway 71 due south of the Temecula River where it enters or crosses the older continental deposits.  These are older continental deposits.

BY MR. VEEDER:

Q  When you say "these", Mr. Kunkel, would you indicate the areas to which you have reference?

A  The material exposed in the outcrop or the cut in the road bank are older continental deposits.  The materials in the top half of the cut are gray sand poorly consolidated. There are pebbles throughout the deposits, approximately an inch or so in diameter.  The material beneath in the lower half of the cut is reddish in color, it is more clayey than the material above, and the prospector's pick is only the contact between the two phases of the same material.  These are older continental deposits.  The deposits have a dip valleyward.  The dip can be observed in the cut along the line between the gray and the red deposits.

H2

1    THE COURT:  All right.

2    MR. MOSKOVITZ:  Are all these taken on the same date?

3    THE WITNESS:  These were taken November 20, 1957, one

4    month later.

5    THE COURT:  Which are "these"?  The ones we saw, or the

6    ones coming up?

7    THE WITNESS:  The first one was October 20th.  From now

8    on they are all taken on November 20th through slide 14, at

9    which time they will be taken on November 21st.

10   BY MR. VEEDER:

11   Q   Would you please refer to the numbers as you go, so

12   that there will be no question.  They will be 58--

13   A   All right.  This is slide No. 4.  It is the northwest

14   side of the road.  The previous slide was the southwest side

15   of the road.

16   THE COURT:  Is that about the same location?

17   THE WITNESS:  The same identical location.  That shows

18   the same thing as the other slide:  The two phases of the

19   older continental deposits, the white sandy phase, the more

20   reddish phase.  These deposits have considerable slope and

21   they are undergoing dissection.  We will show that by later

22   slides.

23   Next slide, please.

24   This is Slide No. 5.  Do you want me to give the legal

25   description on every one of these slides?

H2

MR. VEEDER:  All right, give the number and that will be sufficient identification.  They are marked on the map.

THE WITNESS:  These positions are all shown on the Exhibit No. 15.

THE COURT:  You mean the place where you took these slides?

THE WITNESS:  The place where I was standing when the slide was taken, and for distance shots I have an arrow showing the direction you are looking.

MR. VEEDER:  In that regard, on these maps, copies of which you have, those numbers have not been designated on there.  This was something that was added when I found that the witness had taken some very good photographs in the course of his investigation.

THE COURT:  What are you going to do, put them on the copies?

MR. VEEDER:  Yes, we will put them on the copies, your Honor.

THE COURT:  All right.

This was taken approximately where?

THE WITNESS:  Along Highway 71 approximately along the range line between Ranges 1 and 2 West.

THE COURT:  All right.

THE WITNESS:  This slide shows the older continental deposits.  The bedded nature of the deposits can be seen.

h2

1   The pebbles and small boulders can be seen.  Apparently right

2   through the center of the picture there is a bedding plain

3   in which there is a considerable number of coarse cobbles

4   that are several inches or larger in diameter.

5   BY MR. VEEDER:

6        Q  By "bedding plain," what do you mean?

7        A  It is the plain along which the deposits were laid down.

8   At the time they were laid down it approximated the horizontal.

9   This slide does not show it, but previous slides and other

10  slides will show that the beds have a considerable dip.

11       Next slide, please.

12       Slide No. 6 is taken approximately a quarter mile east of

13  Slide No. 5 along Highway 71.  These deposits have a considerable

14  dip as indicated by the dark line where I am standing with the

15  prospector's pick, and the beds on this entire cut are parallel

16  to the dark band shown there.

17       Q  You use the term "dip."  Would you state for the record

18  what that means, Mr. Kunkel, from the geological scientific

19  standpoint?

20       A  A dip must be defined in relation to a strike.  "Strike"

21  is a line horizontal to the earth's surface that intersects

22  any bedding plane.  The inclination of the beds perpendicular

23  to the strike is the dip.

24       Q  Now with reference to the photograph  to which you

25  are now making reference, would you state the course of the dip

H2

1    and refer to the color of it?

2        A   On these photographs the strike is approximately

3    perpendicular to the road or-- I would have to check my notes

4    on the strike if I took it at that point.  But it is--

5        THE COURT:  A "strike" is a line perpendicular to the

6    level?

7        THE WITNESS:  No, the dip is the--

8        THE COURT:  "Strike" is what, then?  The horizontal?

9        THE WITNESS:  The strike is the intersection of a bed with

10   the horizontal plane.

11       THE COURT:  The highway were is approximately horizontal,

12   then?

13       THE WITNESS:  That is right, and the strike is across

14   the highway.  The dip is toward the northwest.

15       THE COURT:  Away from the stream bed?

16       THEWITNESS:  Toward the stream bed.  This sequence here

17   would give you an idea of the type of material that would be

18   encountered by wells at depths northwest of the area where

19   we are standing or where we are looking.

20       Next slide, please.

H3

21       This is Slide No. 8.  Slide No. 7 was destroyed.  Slide

22   No. 8 is taken almost due south of Vail Dam approximately two

23   miles.

24       THE COURT:  Along the highway?

25       THE WITNESS:  Along the highway.  These are all taken

H2

along the highway in a road cut because they show up so well.

BY MR. VEEDER:

Q What do you mean by "because they show up so well"?

A  Because the exposures show up so well.  We have actually cut through the deposits.  The line across the road cut approximately in the middle of the area exposed is above, the upper part of that is a coarse, boundery cobble deposit overlying a finer grained sandy and silty deposit.  Locally this may be known as a dripping springs conglomerate. Variations of type within the older alluvium were not identified on my map and they are all mapped together as older continental deposits.

THE COURT:  Which part is the dripping springs conglomerate?

THE WITNESS:  The dripping springs conglomerate is probably the upper material.

THE COURT:  Do these both, the upper and lower sections of the picture, show the older type of alluvium?

THE WITNESS:  They both show the oder type of alluvium.

THE COURT:  The upper one as well as the lower one?

THE WITNESS:  The upper one as well as the lower one.

These materials are all lumped together as orange on my map.

Next slide, please.

This is Slide No. 9.  This was mapped by John Mann as

h2

a dripping springs conglomerate.

THE COURT:  Where was it taken?

THE WITNESS:  It was taken approximately a half mile east along the highway from the preceding slide, from Slide No. 8.

BY MR. VEEDER:

Q  Then, Mr. Kunkel, you made reference to a mapping by a John Mann, who is totally unidentified here.  Will you state who John Mann is and how you happened to make reference to him?

A  John Mann is a geologist who has mapped in the area and published a map as part of a doctor's thesis.  I am personally acquainted with Dr. Mann and I referred to  his mapping during the course of my mapping.

Q  Would you state for the record what physical phenomena would deposit boulders of the size that appear there immediately below your pick?  What forces of nature, in your opinion as a geologist-- what do you think would cause those deposits?

A  The deposits are water laid.  They would require large quantities of water or a very steep slop with comparatively lesser quantities of water.  Under any circumstances it would take a volume of water sufficient to move these deposits, and from the distribution of the deposits of this nature the evidence to me indicates that it was a large quantity of water rather than a steep slope that deposited these materials.

THE COURT:  Is all the material shown in this slide the

H2

older type of material?

THE WITNESS:  This is also material mapped as older material, older continental deposits.

THE COURT:  It would appear that there were various strata laid down at various times, the one on the bottom a much finer material.

THE WITNESS:  That is right.  One flood may lay down one bed, the next flood could conceivably scour that bed out and lay one on top of the other or not in perfect conformity. As a matter of fact if  you will notice the finer grained deposits above the pick are thicker toward the right-hand side of the photograph than they are toward the left-hand side of the photograph, indicating that the deposits are not laid down under conditions of quiet water.  If the deposits are laid down in a marine environment, where there is relative quescence, the deposits are finer grained, more evenly distributed, more uniform in character.  One of the character-istics of the continental deposits is the variation in character with position, both horizontally and vertically.

No. 11 is the next slide.  10 has been destroyed.  This is a picture taken in the northeast corner-- northeast corner, Section 23, Township 8 South, Range 1 West.  We are standing right next to the highway, looking northeast across the Sunnybrook Farm.

THE COURT:  Looking northeast also across the Temecula.

I-1

2366

I-1

THE WITNESS:  Northeast across the Temecula.

MR. SACHSE:  Excuse me.  Is that Radec or Aguanga Valley?

THE WITNESS:  This is Nigger Valley, the upper end of Nigger Valley.

The green fields that are in the central part of the picture are the younger alluvial plain, which appears yellow on Exhibit 15.  In the immediate foreground where the brush is growing, and in the distance where the deposits are dissected, are the older continental deposits.  The dissection, or the badlands character of the older continental deposits, is very well shown in this picture.  Also the type of growth on top of the deposits is shown.  The bedding planes from the distance can be observed as approximately horizontal in this area.  Actually they do have a dip, and you cannot by standing on one side of a valley, looking across, determine the dip of a formation, because from where you may be standing you may be parallel to the strike of the formation, and the deposits could be dipping very steeply away from you.  So all you ever really see on an outcrop is an apparent dip, unless you have a line that you can carefully measure for your strike.

The next slide, please.

THE COURT:  What number?

THE WITNESS:  This is No. 12.  It is in Section 27, 8 South, 1 East, and is along the highway.

THE COURT:  All right, go ahead.

I-1

THE WITNESS:  The deposits in this area are sometimes known as the Temecula arkose.  An arkose is a deposit formed from the decomposition of generally granitic type igneous rock.  The materials are sandy, but the minerals are not greatly broken down with regard to having been weathered. The felspars have undergone some weathering.  The deposits have an apparent dip, I believe in this area towards the-- generally towards the west.

THE COURT: Do I understand then this was igneous rock which was decomposed and has not been laid down by water?

THE WITNESS:  No, this has been laid down by water.  The rocks have been broken down.

THE COURT:  Elsewhere?

THE WITNESS:  Elsewhere, and have been washed and deposited here in another environment.  A great many of the fines have been washed out where the igneous rocks break down in place.

BY MR. VEEDER:

Q  What do you mean by "fines", Mr. Kunkel?

A  The fine clay materials that are the result of decomposition in place have been removed from deposits, this particular deposit.

THE COURT:  Removed before this particular deposit was made.

THE WITNESS:  That is right, in the course of trans- portation by the water that laid down these deposits.

I-1

1    THE COURT:  This is also the older material?

2    THE WITNESS:  This is also mapped as older continental

3  deposits.  Next slide, please.

4    This is a close-up of the same shot.

5    THE COURT:  What number is this?

6    THE WITNESS:  No. 13.  The attempt is to show the sandy

7  nature of the deposit and the fact that it is quite soft.

8  With a prospector's hand pick you could very easily dig back

9  into those deposits, the implication being that these

10  deposits are reasonably well sorted.  They are soft.  I

11  shouldn't say "soft".  They are not consolidated.  They would

12  beneath the water table yield water to wells.  The next slide.

13    This is the same road cut, just looking--

14    THE COURT:  What number?

15    THE WITNESS:  14.  Looking-- this is south of the high-

16  way.  It is the same outcrop except in this particular one

17  you can see a clay horizon going through the center of the

18  deposits.  Presumably the clay material that was washed out

19  of the deposits while they were in transportation by water

20  could have been deposited as that clayey band, and the sandy

21  material deposited above it.  The clayey material would not

22  yield water as freely as the sandy material above or below.

23    MR. GROVER:  What was your date on that?

24    THE WITNESS:  This is also November 20th.

25    THE COURT:  Now the series beginning No. 15 are November

2269

I-1

1  21, 1957.

2          THE WITNESS:  November 21, yes, sir.

3          THE COURT:  What is the next one?

4          THE WITNESS:  This is No. 15.  This is in Aguanga Valley,

5  in Section-- in the Southwest Quarter, Section 28, looking

6  south.  We are standing on material mapped as older continental

7  deposits.  We are looking across the incised channel of

8  Temecula Creek.  This is where I said the channel was braided,

9  and there were two channels.  This is the northernmost of the

10  two channels, and it is at the point where the channel is

11  incised into the-- below the surface of the alluvial plain.

12  Farther upstream, approximately half mile to a mile, the

13  channel is very poorly defined.  The horizon line in the

14  middle foregound is the top of the younger alluvial plain.

15  On the other side of that younger alluvial plain you can see

16  the cottonwood or poplar trees.  I was corrected on that.  I

17  am not certain which they are.  But I guess they are cotton-

18  woods.

19          MR. VEEDER:  That can be brought out on cross-examination.

20          THE WITNESS:  That can be seen growing above the surface

21  of the plain.  The material on the horizon, the higher hills,

22  are rocks of the basement complex.  The next slide.

23          This is Slide No.-- this is Slide No. 16.  It is the same

24  general position as the other, as Slide 15.  However, we are

25  closer to the bank of the stream.

I-1

THE COURT:  The bank we see here was the dark bank in the previous picture?

THE WITNESS:  That is right.  This is the south bank of the north branch.  The next slide.

BY MR. VEEDER:

Q  What is the number?

THE WITNESS:  Would you check the number on that slide?  May I have 17 again, please?

THE COURT:  17?

THE WITNESS:  Yes.  This is looking north across the south branch of the Temecula River at the point where it is shown.  That would be again Section 28, southwest quarter of Section 28 and looking north across the south branch of the Temecula River.  And the surface of our younger alluvial plain can be observed as the horizontal bank in the picture.

THE COURT:  The top of the bank?

THE WITNESS:  The top of the bank, yes, sir.  The next slide, please.

THE COURT:  That is a very interesting one.

MR. VEEDER:  A deep lake there.

MR. SACHSE:  Could I ask Mr. Kunkel, how deep do you say you estimated the bank was, that last slide?

THE WITNESS:  I would have to check my notes.  But I hand leveled it in, and I recall it to be 20 feet.

We are now standing between--

I-1

1      THE COURT:  Slide 18?

2      THE WITNESS:  Slide 18.  We are now standing between

3 the two points of rising water in Section 20-- in the

4 Southwest Quarter, Section 28, looking due west.  In the

5 center of the picture is where the two channels of the Temecula

6 River come together.  The trees that you see making a-- we

7 are looking into a V of trees.  The trees have their roots

8 in the incised channel of the Temecula River at this point.

9 And the intervening area is pastured grassland.

10      I believe the next series of slides will probably be

11 given at a later date.

12      MR. VEEDER:  We will offer those later on, your Honor.

13      THE COURT:  All right, through 18.

14      THE WITNESS:  Through 18.

15      MR. VEEDER:  At this time we offer in evidence Plaintiff's

16 Exhibit 58, 1 through 18, with the omissions that have been

17 noted.

18      THE COURT:  All right, received in evidence.

19      (The above-mentioned slides are received in evidence as

20 Plaintiff's Exhibit 58, 1-18.)

21 BY MR. VEEDER:

22      Q  Now, Mr. Kunkel, you were proceeding downstream

23 prior to the offer in evidence of Plaintiff's Exhibit No. 58.

24 You had described the Aguanga Valley.  And would you proceed

25 from the point of rising water and continue on down the valley.

I-1

2372

A   In Aguanga Valley?

Q   That is correct.

A   As indicated in Slide 18, the area shown in slide 18 was the southwest quarter of Section 28.  From that point downstream there was a flow of water in the stream, the entire quantity of which came from rising ground water.

Q   Now, you had made reference to a weir, the diversion and measurement-- I beg your pardon-- the diversion of water in connection of which you alluded to a weir.  Would you describe the utilization of it as you noted it at the time of your investigation?

A   Approximately in the Southwest Quarter of Section 29, Township 8 South, Range 1 East, I observed the entire flow of the Temecula River to be diverted into a channel which passed over a weir, 24-inch weir, and thence down gradient to a dam across the entire width of the Temecula channel, which impounded all the flow on the day that I observed it.

THE COURT:   This is at the place marked on Exhibit 15 where it says "Diversion to Radec Valley"?

THE WITNESS:   Yes, sir.

BY MR. VEEDER:

Q   Now, you stated that the weir was in in a channel. How would you describe that channel?  What was it, natural, man-made, or how did it get there?

A   The channel of the diversion was in the channel

I-1

1  of Temecula Creek, but the water was confined to a very

2  specific part of the channel by the activities of man.

3  Actually the construction of a channel within the main

4  channel.

5     Q  Now, would you proceed with the description of the

6  bed and bank of the stream from the point last mentioned?

7     A  The bed and banks of the Temecula River through the

8  southwest quarter of Section 29, through the northeast and

9  east part of Section 30, through-- the channel at that point

10 is incised a matter of a hundred or more feet beneath the

11 surface of the rocks of the basement complex.  The channel

12 is confined on both sides by the consolidated rocks.  The

13 channel is filled with alluvium of undetermined thickness.

14 However, the width of the alluvial deposits is less than a

15 hundred feet in width.  And the evidence of the proximity

16 of the banks of the basement complex would indicate the

17 thickness of the alluvium is very thin.  In Section 19,

18 south half of Section 19, the channel of the Radec-- of the

19 Temecula River widens out into Radec Valley.  The channel

20 through Radec Valley, which is in Section 19, is not deeply

21 incised.  There are banks of approximately five or six feet

22 beneath the surface of the alluvial plain.  The area along

23 the channel is covered with a growth of phreatophytes.

24     THE COURT:  Growth of what?

25     THE WITNESS:  Phreatophytes.

I-1

BY MR. VEEDER:

Q   Would you define into the record what you mean by the use of the term phreatophytes?

A   Phreatophytes are a group or class of plants that send their roots to the water table, and habitually get their water for growth from a perennial/ground/water supply.

Q   From that point would you proceed with your description of Temecula Creek?

A   Radec Valley is bounded on the south by consolidated rocks of the basement complex, and on the north by the older continental deposits.   In the central part of the channel, in the southwest quarter, Section 19, I observed rising ground water from the-- rising from the younger alluvium. The area is similar in character to the ones to which I have previously testified, inthat the area was a swamp.   And upstream from the area the ground was moist.   And as you proceeded downstream you actually came to a point where there was a flow of water.   The flow was very minor.   But as you proceeded downstream the quantity increased.   The flow in Radec below-- the flow at the lower end of Radec Valley entered a deeply incised channel, incised into the rocks of the basement complex.   And the flow continued for approximately a quarter to a half mile, at which time the flow disappeared.

Slide No. 2, which we just presented in evidence, was

I-1

taken below the point where ground water disappeared.  At the
date that I was there, there was no flow at the Radec gauge.

The alluvial fill in the channel of Temecula Creek is
very thin, or almost entirely lacking.  However, there is some
deposit for the full length of the channel.  The channel
of Temecula Creek enters or leaves the confining channel of
the basement complex in Section 24, the south half of Section
24, where it enters Nigger Valley.  At that point in Section
24 the channel widens out to the alluvium, crosses the
younger alluvial plain in Nigger Valley.

Nigger Valley is bounded on all sides by rocks, or I
will use the words deposits of the older continental type,
the older continental deposits.  There is a growth of
phreatophytes along the channel of the Temecula Canyon in
Nigger Valley.  The channel in Nigger Valley, the channel
of the Temecula River, is incised between five and fifteen
feet beneath the surface of the alluvial plain.  And the
width of the channel is 100 feet, or possibly as much as 200
feet.

BY MR. VEEDER:

Q  Proceed with your description of the Temecula Creek,
if you would, Mr. Kunkel?

A  In the Southwest Quarter of Section 14, Township 8
South, Range 1 West, projected, there is again a swampy area
of rising ground water.  And as you follow the channel down

I-1

1   gradient, the flow of water increases until you come to the

2   shoreline of Vail Lake, which is impounded behind Vail Dam.

3       Q  Would you give the section, township and range in

4   which by your projection you have been able to establish

5   generally the location?  Would you locate Vail Dam and

6   reservoir for the record?

7       A  Vail Dam and reservoir-- let's say Vail Dam is in the

8   northwest quarter of Section 10, Township 8 South, Range 1

9   West.  And the reservoir would be behind it, or upstream from

10  the dam, in Section-- throughout most of Section 10, the same

11  township and range.

12      Q  Would you describe the general terrain of that area

13  and the characteristics of the stream at the point where it

14  enters the reservoir area?

15      A  The reservoir area may either be considered as the

16  extent of the water as observed on the occasions that I

17  observed it, or it could be considered the maximum altitude

18  of the spillway.

19      Q  Well, are you able to establish it, based upon your

20  observation, the maximum area which would be covered with

21  water if the water was to the spillway?  Did you make an

22  observation of that kind?

23      A  Yes, sir, I did.  If the water was to the spillway

24  in Vail Dam, the area back to the point of rising water in

25  Vail-- in Nigger Valley would be lake or under water.

I-1

THE COURT:  That point of rising water would be the circle in Section 14?

THE WITNESS:  That is correct.

THE COURT:  Of the same township and range.

THE WITNESS:  In other words, the altitude of land surface at the point of rising water coincides with the-- very closely coincides to the altitude of the spillway.

BY MR. VEEDER:

Q  What would you describe as the kind and characteristics of the alluvium that would be inundated if that were the case?

A  The younger alluvial deposits, under those circumstances, under a full reservoir, would be under water, and parts of the area mapped as older continental deposits.

Q  Now, proceeding on downstream from the structure, would you describe the bed and bank of the stream as you observed it?

A  Beneath the-- or downstream from Vail Dam for approximately a mile and a half -- the correct distance of the river mile would be longer-- the Temecula River is deeply incised into rocks of the basement complex.  The channel is several hundred feet or more below the surface of the consolidated rocks.  The channel itself is alluvium fill.  The deposits are very, very sandy, and there is no flow.  There was no flow of water through the canyon on the period that I observed.

I-1

1    Q  Now, proceed on down into the Pauba Valley, if you

2  would, please, and describe the phenomena which you observed

3  in that area.

4    A  In the Southewest Quarter of Section 5, projected,

5  Township 8 South, Range 1 West, the Temecula-- the channel

6  of the Temecula River widens out and flows across the flood

7  plain of the younger alluvium.  The channel in this case, in

8  this area, is a broad, sandy area.  It is not deeply incised

9  beneath the alluvial plain.

10    MR. STAHLMAN:  Keep your voice up, will you, please?

11    THE WITNESS:  It is not deeply incised beneath the

12  alluvial plain.  And there was no water in the channel above

13  a point in Section-- above a point in the Southwest Quarter

14  of Section 11, Township 8 South, Range 2 West.

15    The younger alluvium is bounded on the north and on the

16  south by the older continental deposits, and on the east by

17  rocks of the basement complex.  And locally the rocks of the

18  basement complex are capped by volcanic rocks in that area.

19  BY MR. VEEDER:

20    Q  Where dis you observe the water rising?  Did you

21  state that?

22    A  Water was observed to rise in the Southwest Quarter

23  of Section 11, Township 8 South, Range 2 West.  That is a

24  point downstream from the crossing of Highway 71 and the

25  channel of Temecula Creek.  I would have to check my notes, but

I2

I-2

1   it is on the order of a quarter mile below the road crossing.

2   At that point the channel of the Temecula Creek becomes more

3   deeply incised in the younger alluvium.

4       Q   Now, from the point of rising water to the confluence

5   with the Murrieta Creek, will you describe the physical

6   features of the surface of the land in that area?

7       A   The Pauba Valley, as shown by the area identified as

8   younger alluvium, is a broad, gently rolling valley.  The large

9   part of the area is covered by grassland, pasture.  There are

10  feed lots of the Vail Ranch on the deposits of the younger

11  alluvium.  There are also feed lots extending up into the

12  older continental deposits.  Along the-- above the northwest

13  of the northwest of the channel of Temecula Creek, or Temecula

14  River, on the alluvial plain, there are swampy or moist areas.

15  And the ground is moist at shallow depth, a matter of an inch

16  or so, even in the driest summer periods, indicating that there

17  is rising ground water at or very-- rising ground water to

18  the surface, even though there is insufficient quantity to

19  cause stream flow at those points.

20      Q   Now, would you state the tributaries of Temecula

21  Creek that you investigated and compiled data on, starting

22  with the Terwilliger Valley?

23      A   I examined the tributaries of Temecula Creek, back to

24  the headwaters of the watershed in Burnt Valley.  I am sorry,

J-1   25  there is insufficient control here to give you a section

MR J-1

1    number on that, but it is in Township 7 South, Range 4 East.

2        Q  Would you describe the surface area of Burnt Valley

3    with particular reference as to the existence or non-existence

4    of a stream with well-defined bed and banks?

5        A  There is no channel of the Coahuila Creek well

6    defined in Burnt Valley.  There is an intermittent channel

7    which will carry runoff, but the channel is not well defined

8    in the central alluvial part of Burnt Valley.

9        THE COURT:  Is that fault line a line southwest of

10   Burnt Valley?

11       THE WITNESS:  Yes, sir, that is the San Jacinto a major

12   fault zone in the area.

13       MR. STAHLMAN:  What was that?

14       THE WITNESS:  That is the Jan Jacinto fault zone, one

15   of the major fault zones in the area.

16   BY MR. VEEDER:

17       Q  Would you trace the course of the tributary in

18   question from Burnt Valley on down to the next area of the

19   younger alluvia?

20       A  Burnt Valley drains surface waterwise into Terwilliger

21   Valley.  The channel of Coahuila Creek entering Terwilliger

22   Valley is very poorly defined.  There is no distinct channel

23   across the valley.  The Terwilliger valley is a broad valley

24   several square miles in extent.  The area is gently rolling,

25   and is devoted to grains and grass plants.  There are water

J-1

1   wells in the valley. There is no evidence of rising ground
2   water that flows on the surface, however, in the valley.

3   Q   would you point out the area at which there becomes
4   a well-defined bed and bank in that particular valley?

5   A   The channel of Coahuila Creek becomes well defined in
6   Section 28 or 29 and is well defined through Section 30-- I
7   am sorry-- these sections I have just described are all in
8   Township 7 South, Range 3 East.   The channel is also well
9   defined in Section 25-26, Township 7 South, Range 2 East.   The
10  channel in the area just described is approximately a
11  quarter mile between outcrops of the basement complex.   The
12  intervening area is underlain by younger alluvium and the
13  channel of the Coahuila Creek would occupy the lowest point
14  of the valley.   I would say the lowest point because the
15  channel again is not a well-defined point with distinct bed
16  and banks.   There is a growth of salt grass and other types
17  of phreatophytes that would indicate the ground water is
18  close to the surface.   But there is no actual rising water
19  and no flow of water in the stream at any point.

20  Q   The point to which you last made reference, would you
21  describe the channel of Coahuila Creek and the areas through
22  which it traverses?

23  A   In the South Half of Section 23, the North Half of
24  Section 26, Township 7 South, Range 2 East, there is rising
25  ground water along the channel of Coahuila Creek.   The flow

J-1

1  from this area continues for about half a mile.  I have

2  indicated three points of rising ground water, when in

3  reality those are the three most distinct points where the

4  maximum quantity of ground water was observed to rise.  Actually

5  the whole area is moist and could be considered as one big

6  spring area and the number of springs that you could identify--

7       Q  Would you indicate the section, township and range

8  to which you are now making reference from the standpoint of

9  rising water?

10      A  The South Half-- I have just previously testified

11  to that-- the South Half of Section 23, the Northwest Quarter

12  of Section 26 and the Northeast Quarter of Section 27,

13  Township 7 South, Range 2 East.

14      Q  And from that point would you continue on your descrip-

15  tion of Coahuila Creek?

16      A  In the Northeast Quarter of Section 27 the ground

17  water, the flow of water in Coahuila Creek disappears and

18  there is no flow for approximately a half to three-quarters

19  of a mile.  Again in the Southwest Quarter of Section 27,

20  Township 7 South, Range 2 East there is again a point of

21  rising water and a flow for about approximately a quarter

22  mile.

23      THE COURT:  Well, this is a good time to stop.

24  10 o'clock tomorrow morning.

25      Gentlemen, see what you can get done tomorrow before

J-1

1    court on this stipulation. (Mr. Dennis can get down here

2    early and bring his list.

3         Court will be in recess.

4         (Adjournment until Wednesday, October 2, 1958, at 10

5    A. M.)