# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                  Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, et al,

                  Defendants.

No.  1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      October 3, 1958.

           Pages: 2498 to 2616

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

2498

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) | |
| Defendants. | ) | |

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Friday, October 3, 1958

APPEARANCES:

| | |
|---|---|
| For the Plaintiff | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney-General, Department of Justice, Washington, D.C. |

| | | |
|---|---|---|
| 1 | For U. S. Marine Corps | COL. ELLIOT ROBERTSON. |
| 2 | For Defendant Vail Company | GEORGE E. STAHLMAN, ESQ. |
| 3 | | |
| 4 | For Defendants Fallbrook Public Utility District, et al. | FRANZ R. SACHSE, ESQ. |
| 5 | | |
| 6 | For Defendant State of California | EDMUND G. BROWN, ESQ., Attorney-General, By |
| 7 | | ADOLPHUS MUSKOVITZ, ESQ., Deputy Attorney-General. CARL BARONKAY, ESQ. |
| 8 | | |
| 9 | For Defendant Santa Margarita Mutual Water Company | W. B. DENNIS, ESQ. |
| 10 | | |
| 11 | For Defendants Hartman, Lewis, Wilks and Bayle, and Oviatt | BEST, BEST & KRIEGER, By JAMES H. KRIEGER, ESQ. |
| 12 | | |
| 13 | For Defendants Sawday | LUCE, FORWARD, KUNZEL & SCRIPPS, by ROBERT McGINNIS, ESQ. |
| 14 | | |
| 15 | For Defendants Charlotte Flo and Raymond C. Faulkner; Carl G. | BERT BUZZINI, ESQ. |
| 16 | and Mildred Daving | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

## INDEX TO WITNESSES

| For the Plaintiff: | Direct |
|---|---|
| Fred Kunkel | 2292 |
| | 2388 |
| | 2436 |
| | 2507 |

## E X H I B I T S

| Plaintiff's Exhibit - | Received |
|---|---|
| 1 - Map | 2293 |
| 2 - Judgment and Decree | 2320 |
| 3 - Decree | 2321 |
| 4 - Decree | 2321 |
| 5 - Grant Deed | 2321 |
| 6 - Public Land Order 293 | 2321 |
| 7 - Letters of Cession | 2321 |
| 8 - Letter of Cession | 2322 |
| 9 - Letter of Cession | 2322 |
| 15 - Map | 2335 |
| 16 - Map | 2505 |
| 17 - Map | 2555 |
| 58, 1-18 - Slides | 2371 |
| 29A-AB - Quadrangles | 2389 |
| 58 -- 19-26 ) - Slides<br>      31-33 ) | 2426 |

2501

1    SAN DIEGO, CALIFORNIA, FRIDAY, OCTOBER 3, 1958.   10:00 A. M.

2

3         (Charles Fivecoat sworn as official reporter pro tem.)

4         MR. SACHSE:  Your Honor, I have now prepared a complete

5    list of all the individuals whom I represent, and have in

6    their behalf prepared an agreement to be bound by the order on

7    pre-trial stipulation.  Mr. Veeder has been given a copy, and

8    the State of California has.  I don't have enough spares with

9    me.

10        THE COURT:  Both orders?

11        MR. SACHSE:  No, your Honor, just the pre-trial stipula-

12   tion, not the issues.

13        THE COURT:  The stipulation as to the facts?

14        MR. SACHSE:  Yes, your Honor.  I hesitate to try to make

15   it this broad on the issues.

16        THE COURT:  Now, you are going to join in the issues in

17   behalf of the major parties?

18        MR. SACHSE:  Yes, your Honor.

19        THE COURT:  All right, Mr. Veeder.

20        MR. VEEDER:  Your Honor, we have additional exhibits, and

21   if it is your desire I can read the numbers and the references

22   into the record, or I have a copy that can simply be made

23   available.  There are Exhibits 59 through 79 which will be

24   available at noon for inspection and for lodging with the Court.

25        THE COURT:  Do you have a list that can be filed with the

1  Clerk?

2  MR. VEEDER:  I can file a list with the Clerk.  It will

3  save me reading, but I can read it if you desire that.

4  THE COURT:  Well, can the list be incorporated in the

5  record?

6  MR. VEEDER:  I thought that was what we would do, your

7  Honor.

8  THE COURT:  Hand the list to the Clerk, and let the

9  reporter put the list in the record of the exhibits that

10  will be lodged today:

11  (The list of exhibits above referred to follows:)

12  Pl Exhibit No. 59       Area and capacity tables for Vail
                            Reservoir (6 sheets)
13

14  Pl Exhibit No. 60       Monthly and Annual Runoff for gaging

15                          stations in the Santa Margarita River

16                          Basin.

17  Pl Exhibit No. 61       Bar graph of annual runoff from streams

18                          within the Santa Margarita River Basin.

19  Pl Exhibit No. 62       Estimated annual inflow, in acre feet,

20                          to the Santa Margarita River Valley at

21                          De Luz damsite for period 1922-57.

22  Pl Exhibit No. 63       Bar graph of seasonal precipitation

23                          at selected sites in Southern California

24                          (2 sheets).

25

| | | |
|---|---|---|
| 1 | Pl Exhibit No. 64 | Comparison of mean seasonal precipitation |
| 2 | | at selected sites in Southern California. |
| 3 | Pl Exhibit No. 65 | Residual mass curves of seasonal |
| 4 | | precipitation indices. |
| 5 | Pl Exhibit No. 66 | Residual mass curves of precipitation |
| 6 | | and runoff. |
| 7 | Pl Exhibit No. 67 | De Luz Creek Watershed Geology. |
| 8 | Pl Exhibit No. 68 | Geologic Section, De Luz Creek Valley. |
| 9 | Pl Exhibit No. 69 | Sandia Creek Watershed Geology. |
| 10 | Pl Exhibit No. 70 | Santa Margarita River Minor Affluent |
| 11 | | Watershed Geology, Elsinor Fault - De Luz |
| 12 | | Creek Confluence. |
| 13 | Pl Exhibit No. 71 | Santa Margarita River Coastal Area |
| 14 | | Watershed Natural Conditions. |
| 15 | Pl Exhibit No. 72 | Santa Margarita River Coastal Area |
| 16 | | Watershed Present Conditions. |
| 17 | Pl Exhibit No. 73 | Aerial Photographs of Northwestern |
| 18 | | San Diego, 1929 Flight. |
| 19 | Pl Exhibit No. 74 | Rancho Santa Margarita y Las Flores |
| 20 | | Areas irrigated from Santa Margarita |
| 21 | | River (1929) |
| 22 | Pl Exhibit No. 75 | Aerial Photographs of Northwestern |
| 23 | | San Diego County (1938). |
| 24 | Pl Exhibit No. 76 | Map Rancho Santa Margarita y Las |
| 25 | | Flores 1939. |

| | |
|---|---|
| 1 | Pl Exhibit No. 77    Total acreage irrigated from the Santa |
| 2 | Margarita River (1939). |
| 3 | Pl Exhibit No. 78   Aerial Photographs of Entire Santa |
| 4 | Margarita River Watershed, 1955 Flight. |
| 5 | Pl Exhibit No. 79   Photographs of typical gaging station |
| 6 | installations. |

7

8      MR. VEEDER:  Now, in regards to the material on the pre-

9  trial order, I would greatly appreciate it if California

10  would come down and read what we have ready to incorporate

11  into it.  And I have spoken to Mr. Sachse about his material

12  to go into it.

13      MR. SACHSE:  I have checked it.

14      MR. VEEDER:  And is it satisfactory?

15      MR. SACHSE:  Yes.

16      THE COURT:  Mr. Moskovitz, it is your move sometime to-

17  day.

18      MR. MOSKOVITZ:  Yes, I will go down with him.

19      THE COURT:  All right.

20      MR. VEEDER:  Your Honor, that may assist you in locating

21  the sections.

22      MR. STAHLMAN: Do you have a list of those exhibits we

23  might have?

24      MR. VEEDER:  This will be made available to all counsel.

25      Your Honor, last evening at closing an objection had been

1  interposed by the State of California respecting the privil-

2  eged nature--

3      THE COURT:  I didn't hear any objection.  I heard a little

4  discussion.

5      MR. VEEDER:  I thought an objection was interposed by Mr.

6  Moskovitz.

7      THE COURT:  No offer was made of the document.

8      MR. VEEDER:  I understood it to be an objection.

9      THE COURT:  There was some discussion.

10     MR. VEEDER:  I have offered it, your Honor.  I now offer

11  it.

12     MR. KRIEGER:  I raise an objection, your Honor, and I

13  would just raise an objection for the reason that I think no

14  proper foundation has quite been laid.  And the questioning

15  last night was merely to find the source for platting the well

16  logs on Exhibit 16.  And I would, with your permission, like

17  to pursue that a little bit further perhaps relative to

18  removing my objection to the introduction of that exhibit.

19     THE COURT:  Before we go into that do you have the well

20  logs available here?

21     THE WITNESS:  No, I do not.

22     MR. VEEDER:  The well logs, your Honor, are maintained in

23  an office of the State of California, and it was that source

24  that Mr. Kunkel went to in preparing this data.  And they are

25  public records, as I understand it.  Now, that is the situation.

1      THE COURT:  In other words, we probably should have Mr.

2  Kunkel on the stand here.  Step back up here.

3

4                        FRED KUNKEL,

5  heretofore called and sworn, recalled as a witness in behalf

6  of the plaintiff, testified further as follows:

7      THE COURT:  You show a series of wells on Exhibit 16 for

8  Identification.  How many of those did you use, well logs

9  for the State of California?

10      THE WITNESS:  There is an overlapping of well log data

11  in the files of the Geological Survey and the State of

12  California, so certain of the logs are in both files.  Wells

13  located on the Camp Pendleton Reservation are logs of those

14  wells-- are in the files of the Geological Survey, and subject

15  to the approval of the Marine Corps can be made available.

16      THE COURT:  Well, can the well logs-- the wells on Camp

17  Pendleton area be produced here and marked for identifica-

18  tion, and available for inspection?

19      MR. VEEDER:  Your Honor, we will be glad to produce those

20  well logs and make them part of the record.  I would like to,

21  of course, pursue our inquiry here based upon the production

22  of those logs.

23      THE COURT:  Then as I understand it, all of the well logs

24  used were either, number one, those wells drilled on Pendleton

25  within the possession of the Marines; or two, as to the other

1    wells, either well logs from the records of the State of

2    California or, three, a possible duplication there where the

3    Geological Survey had duplicate records of some of those wells?

4         THE WITNESS:  That is correct, your Honor.  The duplicate

5    record also involves logs of wells that have been, to the best

6    of my knowledge, submitted as evidence in a previous lawsuit

7    between the Vail Company, and I am not certain which lawsuit

8    was involved, but there are logs that are indicated as having

9    previously been entered in evidence.

10        THE COURT:  You may inquire, Mr. Krieger.

11        MR. KRIEGER:  Would it be possible for the witness to

12   indicate what the source of those wells are, there aren't too

13   many of them, whether from the State of California, or from

14   Camp Pendleton, or from the third source you mentioned?  Per-

15   haps they are indicated on the exhibit.

16

17                      DIRECT EXAMINATION

18   BY MR. VEEDER:

19        Q  Would you step to the exhibit and indicate the sources

20   of those well logs?  And at this juncture, as I understand it,

21   the well logs taken from Camp Pendleton are on file in the U.S.

22   G.S. office.  Is that correct?

23        A  That is correct.

24        The well logs on Camp Pendleton are on file with the

25   Geological Survey.  These wells (indicating).

1    THE COURT:  Speak up.

2    THE WITNESS:  That includes the wells from the Naval

3  Reservation boundary south, as shown on Exhibit 16.

4    THE COURT:  From the Naval plates on Exhibit 16 where

5  it says "Naval Reservation Boundary"?

6    THE WITNESS:  Yes, sir.

7    THE COURT:  On to the left-hand side of the chart?

8    THE WITNESS:  Yes, sir.

9    On the extreme right side of the chart, at Oak Grove -

10  Dodge Valley that particular log is on file with the State

11  of California, but it is a log of the United States Forest

12  Service well and to the best of my knowledge it would also

13  be exempt from any classification.

14    MR. VEEDER:  I don't think the witness should express

15  any conclusions, your Honor.

16    THE WITNESS:  I am sorry.

17    THE COURT:  Yes.  Just tell where it is.  Do you have

18  copies of it in your files, too?

19    THE WITNESS:  I have a photographic copy of the state

20  log, which I was allowed to copy.

21  BY MR. VEEDER:

22    Q  Where are the balance?  Are they in the State now?

23  All of the rest of them?

24    A  The balance of the other logs are in the possession

25  of the State.

1    Q   Is that the source--

2    A   That is the source from which I obtained the logs.

3    THE COURT:   And that includes the deep well in about the

4    center of the chart?

5    THE WITNESS:   I am sorry, your Honor.   The Pauba well

6    was logged by the Geological Survey.

7    BY MR. VEEDER:

8    Q   Where is that maintained?

9    A   That is maintained in the files of the Geological

10   Survey.

11   THE COURT:   By the Pauba well you mean the deep well in

12   the center of the chart?

13   THE WITNESS:   The deep well, the 2400-foot well.

14   THE COURT:   Where is that log?

15   THE WITNESS:   That log is in our possession and the State

16   also has a copy in their files.

17   THE COURT:   As far as these logs are concerned, they are

18   in the possession of your Survey?

19   THE WITNESS:   United States Geological Survey.

20   THE COURT:   You will make one available here?

21   THE WITNESS:   I will make those available, subject to

22   the approval of the Marines.

23   MR. VEEDER:   The Marines have already approved and they

24   will all be available and we will have them in the courtroom

25   for inspection, your Honor.

1        THE COURT:  Mr. Moskovitz.

2        MR. MOSKOVITZ:  I wanted to clarify the objection I

3    raised about confidentiality for the information of all

4    concerned, your Honor.

5        Section 7076 of the California Water Code was passed in

6    1949 and it provides that every person who hereafter-- that

7    is, after the date of that section's enactment-- who digs,

8    bores, or drills a water well, or deepens or reperforates any

9    well, must file a report with the Regional Water Control Board;

10   and those reports include information about the location and

11   the detailed logging of the well, its description and con-

12   struction and other details.

13       THE COURT:  Does that apply to all counties?

14       MR. MOSKOVITZ:  It applies throughout the State, your

15   Honor.

16       Now, Section 7076.1 was passed in 1951, and I will read

17   the section.

18       THE COURT:  Of what code?

19       MR. MOSKOVITZ:  Of the Water Code, your Honor.  It follows

20   the other section to which I just referred.

21            "Reports made pursuant to Section 7076

22            shall not be made available for inspection

23            by the public, but shall be made available

24            to governmental agencies for use in making

25            studies."

1        I don't know of any court decisions or official interpre-

2   tation of that section, but I believe that administratively

3   the Department of Water Resources have understood that to mean

4   that it can use the information in reaching conclusions of

5   well logs which came from this source but that the precise well

6   log itself and the location may not be made public or used in

7   something which is published or something which itself is

8   subject to public inspection.  That is why I made that qual-

9   ification that all of the logs that we have in your possession

10  cannot be made available for public inspection.

11       I have no information that the logs used on Exhibit 16

12  include any of these.  But I did want to make that caveat

13  so that we wouldn't be asked to produce everything.  I would

14  guess that they don't.  If they were made available for use

15  in an exhibit, the chances are that they are not because they

16  were secured under this section.  And of course even logs

17  secured under this section, if permission were secured from

18  the owner, would, as far as the statute is concerned--

19       THE COURT: Well, I will say that at best it is an am-

20  biguous statute.  It says that they may not be available for

21  public inspection, but that they may be used by governmental

22  agencies.  And as to Governmental agencies, that is a broad

23  term and does include agencies of the Federal Government.

24       MR. MOSKOVITZ:  No doubt.

25       THE COURT:  And if an agency makes this study, the study

1   that it makes might well wind up in the courtroom.

2        It seems to me that what the Legislature probably had in

3   mind was individuals just prying around for information could

4   be told that these were confidential.  I don't know whether

5   the statute is even good.  Do we have any problem on it here?

6        MR. MOSKOVITZ:  Not that I know of, your Honor.

7        THE COURT:  Mr. Krieger, do you have any further questions?

8        MR. KRIEGER:  No, your Honor.  I just say that all the

9   parties no doubt will be relying on public documents through-

10  out this trial, and I wanted to make clear that those were

11  documents that are on public record, so that we would have

12  access to them if we want the original records to support the

13  exhibit.

14       With that explanation, I will withdraw my objection.

15       THE COURT:  All right.  Mr. Moskovitz.

16       MR. MOSKOVITZ:  Your Honor, I just wanted to ask this

17  question about the logs that didn't come from the State.

18       Was the actual well drilling done by persons under your

19  supervision, Mr. Kunkel, or by you?

20       MR. VEEDER:  In that regard, your Honor, I would like to

21  bring this point up, that those logs that are maintained in the

22  United States Geological Survey are maintained in the course

23  of business of the U. S. Geological Survey and they are in

24  his office, and kept under his custody.

25       THE COURT:  Just answer the question.  Of course, you

2513

1   didn't drill any of the wells?

2        THE WITNESS:  That is correct.

3        THE COURT:  Did you have anything to do with drilling the

4   deep well?

5        THE WITNESS:  No, sir; that was drilled before I was in

6   Long Beach.

7        THE COURT:  But these records are in your control?

8        THE WITNESS:  That is correct.

9        THE COURT:  And the wells at Pendleton and the deep well?

10       THE WITNESS:  Yes, sir.

11       THE COURT:  And in the regular course of your business

12  did you gather and keep that material?

13       THE WITNESS:  That is correct.

14       MR. MOSKOVITZ:  I just wanted to clarify that.

15       MR. SACHSE:  I think there is just one thing that Mr.

16  Krieger didn't cover.

17       What about the little section-- where did these notes

18  come from?

19       MR. VEEDER:  That is the Murrieta section to which you

20  are pointing?

21       MR. SACHSE:  Yes, the Murrieta section, the db section.

22       MR. MOSKOVITZ:  He mentioned that.

23       THE WITNESS: From the same source, from the State.

24       MR. VEEDER:  I renew my offer, your Honor.

25       THE COURT:  The exhibit will be received in evidence and

1  I expect all counsel to cooperate if someone wants to inspect

2  these logs.   The Government will be required to bring in the

3  ones they have through the Geological Survey.

4       Do you have copies that you took from the State?

5       THE WITNESS:  Yes, I have copies that were taken from

6  the State.

7       THE COURT:  When will you bring these files in?

8       THE WITNESS:  I will not be able to bring them in until

9  Monday, your Honor.

10      THE COURT: 'Tuesday.

11      THE WITNESS:  Tuesday.

12      MR. VEEDER:  We will have them here on Tuesday, your

13  Honor.

14      MR. KRIEGER:  They will be downstairs?

15      MR. STAHLMAN:  May I ask a question, with your permission?

16      THE COURT:  Mr. Stahlman:

17      MR. STAHLMAN:  Some of these are logs that came from

18  Vail?

19      MR. VEEDER:  Yes.

20      MR. STAHLMAN:  We cooperated.

21      MR. VEEDER:  Would you like to have them lodged with the

22  Court or in the office downstairs?  Whatever counsel desires

23  we will do.

24      THE COURT:  Of course, they could be marked for iden-

25  tification and made available, or they could be put in

1   evidence; but there is no use to clutter up the record.  Unless

2   somebody wants that done, let's have them available in your

3   office downstairs, and if someone wants to mark or do some

4   work on it we will bring it up and give it an exhibit number.

5        MR. VEEDER:  Thank you, your Honor.  May we proceed?

6        THE COURT:  Yes.

7   BY MR. VEEDER:

8        Q  Would you approach the exhibit, Mr. Kunkel, and with

9   reference to designations on the wells as they appear on

10  Plaintiff's Exhibit 16 would you show how those wells may be

11  located by reference to symbols and to legends appearing on

12  the exhibit?

13       A  Every well has been assigned a number which is indi-

14  cated above the well; for example, 8/2/11P1.  The first

15  number indicates the township north or south.  In this case

16  the township will be 8 North.

17       Q  Where would you find the township on this?

18       A  The townships are shown-- I said 8 North, I meant 8

19  South-- the townships are shown on the small inset map

20  immediately above.

21       Q  What is that small inset map?

22       A  That is a map of the Santa Margarita Watershed with

23  the township and range lines shown and identified.

24       Q  Will you proceed and show how you would locate the

25  smaller subdivisions as shown on the exhibit?

A   The second number indicated is the range east or west.
The well to which I am referring, 8/2-11P1, is in Range 2 West.
The number following the dash--

THE COURT:   How can you tell whether it is east or west
from that designation.

THE WITNESS:   From this designation you cannot tell.   You
will have to refer to Exhibit 15 or to a map, which will show
it.

BY MR. VEEDER:

Q   Well, the cross-section itself will show, to a certain
extent, whether the range was east or west?

A   One should be able to figure that out by working
from the Vail spillway east or west, by inspection.

Q   Why do you use the Vail spillway?

A   The Vail spillway is shown on Exhibit 16 on the cross-
section, and there is also shown-- or the Vail Lake, which
is immediately behind the dam, is also shown.   That is in
Range 1 West.   And the first well to the east is/in Range 1 West.
Other  wells to the west are in Ranges west.

Q   So from the exhibit itself would you state whether
you can truly locate yourself from the standpoint of the legal
subdivision?

A   From the Exhibit 16 it is possible to locate your
position within 40 acres within the legal subdivision as the
projected subdivisions that are shown on Exhibit 15.

Q   Would you proceed to show how you would locate the smaller subdivisions?

A   The sections are indicated by the number after the dash.  11 indicates Section 11, according to the standard system for numbering townships.  The letter following the section is a reference to a 40-acre subdivision within the section.  The letter P, as indicated by the legend under the part indicated as "Well designations," the section is divided into sixteen squares of 40 acres each.  The upper right-hand corner is lettered A.  Proceeding to the left, the letters are A, B, C, D; dropping down one, here they are numbered E, F, G, H in a direction from right to left; dropping down, they are J, K, L, M from right to left; and the lower tier is read from left to right N, P, Q, R.

THE COURT:  What is the number after the letter?

THE WITNESS:  The number after the letter is the first well located within that 40-acre subdivision.  If there is more than one well in the subdivision, they are numbered consecutively as they were located in the field.

THE COURT:  As they were located, or drilled?

THE WITNESS:  As they were located.  They do not bear a relationship to the date of drilling.

THE COURT:  What do you mean by "located"?  By your survey?

THE WITNESS:  The wells were located in the field by the U. S. Geological Survey on Camp Pendleton and by the U. S.

1   Geological Survey for certain wells off the reservation.   The

2   remainder of the wells were surveyed in by the California

3   Department of Water Resources in the regular course of their

4   business, and I examined their original records for the loca-

5   tions or for the descriptions of the logs.

6        Q   Mr. Kunkel, in regard to the State records, did you

7   undertake any checking to determine in your own mind as to

8   the accuracy of those records?

9        A   Yes, I did.   I took copies of the data which I had

10  made from the State records into the field and visited selected

11  wells for the purposes of determining the accuracy of the

12  logs as described in the State records.

13       Q   What was the result of that investigation?

14       A   I found the logs as determined by the Department of

15  Water Resources to be reliable.

16       Q   What other checks, if any, in regard to the wells did

17  you make?

18       A   I checked the measuring points as described by the

19  depth, I measured water levels in the wells.

20       Q   What were the results of those checks?

21       A   The results of those checks indicated that the measure-

22  ments and descriptions by the Department of Water Resources

23  was accurate.

24       MR. VEEDER:   Your Honor, was there anything more you

25  had in mind in regard to these locations?

1    THE COURT:  No.

2  BY MR. VEEDER:

3    Q  Would you proceed then and select a well and apply the

4  terminology to the well for the purposes of explaining the

5  operation of the legend as it relates to the wells, or at

6  least a selected well that you have on Plaintiff's Exhibit 16?

7    A  I have one other terminology on the--

8    Q  Well, proceed to finish that, will you?

9    A  --on the projection that I have not testified to.

10  The word projected is listed after certain of the wells.  Those

11  are wells that are not on the line of section, but lie within

12  a reasonable distance as determined by the geology and the

13  structure of the earth to be reasonably projected to the line

14  of section.  The line of section as shown in the inset map

15  of the entire watershed, indicated to that line of section,

16  is projected from its true position on the land surface,

17  perpendicular to the line of section.  So as you are looking

18  at a projected-- as a well, it is indicated as projected, the

19  well may be a few hundred to possibly as much as a thousand

20  feet above or below the line of section.  This is a customary

21  system in--

22    THE COURT:  Above or below.  By that do you mean from

23  one side or the other?

24    THE WITNESS:  One side or the other, yes.

25    THE COURT:  Why would you say above or below?

1    THE WITNESS:  I am thinking in terms of a plane map; north

2  up, and south down.

3    THE COURT:  The lines you are talking about are A-B, B to

4  C, and C to D?

5    THE WITNESS:  Yes, sir.

6    THE COURT:  So it well may be one side or the other of

7  that line?

8    THE WITNESS:  That is correct.

9  BY MR. VEEDER:

10    Q  Is there anything else from the standpoint of location

11  of wells as being significant?

12    A  We have colors of the locations of the wells.

13    Q  Now, would you proceed in regard to a select well to

14  show the applicability of the legend on the Plaintiff's Exhibit

15  16, and point out where those wells are found, and the sig-

16  nificance in this study?

17    A  I will select the well known as the Pauba well, it is

18  the deep well shown on Exhibit 16.  The well number is 8/2-17M1.

19  The well can best or most easily be located by reference to

20  Exhibit 15.  The well is in Township 8 South, Range 2 West,

21  Section 17, the Northwest Quarter of the Southeast Quarter of

22  that section.

23    Q  All right.  Now, proceed from there and discuss-- and

24  show what the legend means as it relates to the well and to the

25  material through which the well was drilled.

1    A    The materials through which the well was drilled and

2   as recorded on the well log are grouped into seven units,

3   identified in the legend as sand, clay, gravel, cobbles, hard

4   clay, fossil shells, silt, and consolidated rocks, which is

5   the basement complex of the geologic map or Exhibit 15.

6        The materials as indicated in the well log are shown

7   beneath the well number on the section, and the position of

8   the symbol in the legend on the section indicates or shows the

9   depth at which that material was encountered in the well.    The

10  depth of that material with respect to land surface can be

11  scaled from measurement of the position at which the well log

12  or the well is shown to start, and the position of any bed of

13  gravel, sand or clay, the altitude of that material can also

14  be determined with reference to sea level by reference to the

15  vertical scale on the right or left side of the exhibit,

16  Exhibit 16.

17       Q    Now, commencing at the highest point on the exhibit,

18  Plaintiff's Exhibit 16, what do you show at that highest point?

19       A    The highest point shows the surface water divide be-

20  tween the Santa Margarita River watershed and the adjacent

21  watershed.

22       Q    Now, you have indicated on there both the continental

23  deposits and the younger alluvium.  Would you state, based

24  upon your investigations, whether there is a faulted area in

25  there?

1    A    Along the line of section there is no faulted area.

2    Q    And as you proceed on down the valley do you find any

3    faulted areas based upon your investigation?

4    A    The first faulted area is the fault identified as the

5    Aguanga fault on the cross-section.

6    Q    Now, would you proceed on down the cross-section

7    indicating the various points of control, for example the

8    Vail Dam, where is that shown on that cross-section?

9    A    The Vail Dam is shown at a point-- beneath a point

10   labeled Vail Spillway.

11   Q    Now, from the standpoint of faulting, is there any

12   evidence of that in the region to which you have last made

13   mention?

14   A    I have inferred the existence of a fault at the base

15   of a steep cliff shown in--

16   Q    To which exhibit are you referring?

17   A    I am referring to Exhibit 15, shown in Section 10

18   projected, Township 8 South, Range 1 West.

19   THE COURT:  You have the symbols on Exhibit 15 indicating

20   a fault there at the Vail Dam?

21   THE WITNESS:  That is correct, your Honor.

22   THE COURT:  You didn't testify to that yesterday, did

23   you, when they asked you about faults?  I don't believe you

24   did.

25   MR. VEEDER:  I don't believe you went into any detail

1    on that.

2         Q   Would you locate it and express the basis upon which

3    you arrived at your opinion?

4         A   The fault as shown is in the west half of Section 10,

5    Township 8 South, Range 1 West.   The position at which the

6    fault is shown, the rocks of the basement complex occur to the

7    west, there is a very steep cliff, and at the base of the

8    cliff there are deposits of younger alluvium which are bounded

9    on the east by older continental deposits.   In my opinion

10   there was displacements along that line indicated.

11        Q   Now, proceeding on down the valley, would you indicate

12   the next area as disclosed on Plaintiff's Exhibit 16?

13        A   Below Vail Dam the area of Pauba Valley is shown.   The

14   Pauba Valley is not labeled on the cross-section, but Pauba

15   Valley extends from a second fault, approximately from a second

16   fault below Vail Dam--

17        Q   Now, how is that second fault depicted on Exhibit 16?

18        A   On Exhibit 16 it is indicated as being covered by

19   younger alluvial deposits along the line of section.

20        Q   And what underlays that-- underlies that younger

21   alluvium as shown on 16?

22        A   West of the fault indicated, older continental deposits

23   underlie the younger alluvium to the east of the fault, in-

24   dicated basement complex, underlies the younger alluvium.

25        THE COURT: Where is that second fault located on Exhibit

1 15?

2 THE WITNESS:  The second fault indicated on Exhibit 15

3 is in Section 5, Southeast Quarter, Township 8 South, Range 1

4 West.

5 THE COURT:  I see the line.  That other line appearing in

6 Section 6, however, is just an elevation line.  Is that right?

7 THE WITNESS:  The line in Section 6 with the numbers

8 1200 indicated is a water level contour.

9 THE COURT:  Not a fault?

10 THE WITNESS:  It is not a fault.

11 THE COURT:  All right.

12 BY MR. VEEDER:

13 Q  Now, would you proceed with a description of the Pauba

14 Valley as it appears on 16, with particular reference to the

15 precipitous nature of the faulted areas disclosed on 16, in

16 the Pauba Valley?

17 A  The faults shown in Pauba Valley on the cross-

18 section, Exhibit 16, are inferred to exist along the line

19 of section based on the field inspection of the area which is

20 shown on Exhibit 15.

21 Q  Now, which is the first fault line proceeding down-

22 stream that is disclosed on Plaintiff's Exhibit 16?

23 A  The first fault line is the--

24 Q  Within the area in question?

25 A  --within the area in question is on the eastern

1    part of Pauba Valley, previously testified to as occurring

2    in Section 5.

3         Q  Now, what is the next line of fault that you dis-

4    covered?

5         A  The next line of fault lies approximately six and a

6    half miles downstream along the line of section; it is

7    identified on the cross-section as the Willard Fault.

8         Q  Now, would you state--

9         MR. SACHSE:  I didn't hear the last.

10        THE WITNESS:  As the Willlard Fault.

11        THE COURT:  Willard?  Wildomar Fault.

12        THE WITNESS:  I am sorry, the Wildomar Fault.

13   BY MR. VEEDER:

14        Q  Now, how did you locate that?

15        A  The position of this fault was located by projection

16   of the fault zone identified in Exhibit 15 as lying along

17   the northeast boundary of Murrieta Valley.

18        Q  And why did you extend it down through the Pauba

19   Valley?

20        A  The existence of the fault, though not actually

21   visible on the land surface at the line of section, its

22   position is evidenced by displacements of water levels

23   in wells along its full length, and the position as shown in

24   the cross-section is the position as determined by the data

25   to which I have just testified.

Q   All right.  Now, please refer to the next faulted zone that you have located, and which you have depicted on both Plaintiff's Exhibit 15 and 16.

A   The third fault shown in Pauba Valley is identified in Exhibit 16 as the Elsinore Fault.  The Elsinore Fault is also shown on Exhibit 15, and its position is inferred from the great thickness of alluvial deposits in Murrieta Valley. The basement complex in wells in Murrieta Valley has not been encountered at depths above 2,000 feet.

Q   Above 2,000 feet?

MR. STAHLMAN:  May I have that again?  I didn't get that.

THE WITNESS:  The depths of the basement complex in Murrieta Valley has not been encountered in wells that are shallower than 2,000 feet.  To see what the maximum depth of wells is which have been drilled without the basement complex.

BY MR. VEEDER:

Q   Now, proceeding southward and across the Pauba Grant, what factors did you observe which caused you to plot on 16 and 15 both the locations which you have for Elsinore Fault?

A   The Elsinore Fault--  Sorry.

Q   Well, you proceeded on down across Elsinore Fault, and is it not shown on Plaintiff's Exhibit 16?

A   That is correct.

Q   And what are the factors that caused you to locate it there?

A  Well, it is the projection of the fault across the line
of section from its position as determined along the full
length of Murrieta-Wolf Valleys.  The reason the fault is
inferred in this position is that it is actually concealed
under the younger alluvial deposits at the line of section.
However, the evidence for the fault on both sides of the line
of section is very conclusive.

Q  What are the evidences?

A  The evidence is the thick accumulation of older
continental deposits to the northeast-- or, in the Murrieta
Valley northeast of the area mapped as basement complex.  The
basement complex rises as highland areas towards the southwest.
The evidence is a considerable displacement of several thousand
feet along that fault zone.

Q  What are the evidences of depth that you encountered
in those cross-sections in regard to the Pauba Valley?

A  Of a well, well 8/C-17M1 was drilled to a depth of
2,478 feet and did not encounter a basement complex.

Q  Now, you have a reference on Plaintiff's Exhibit 16
as to the water level profile.  Would you state what you mean
by that?

A  The water level profile is shown starting in Aguanga
Valley.  It is not shown in Radec Valley.  It is shown in
Nigger Valley, Pauba Valley, and it is shown in Murrieta
Valley.

1    THE COURT:  It is a line with a straight line and then a

2 shorter line, and then a longer line again?

3    THE WITNESS: That is correct, your Honor.

4    THE COURT:  It is not listed on your index?

5    THE WITNESS:  It is not.  But it is identified by an

6 arrow to a line-- to a statement that says water level

7 profile, November, 1953.

8    THE COURT:  I see it there.  You don't have it up in

9 Aguanga Valley.

10    THE WITNESS:  No.  But the symbol used in Pauba Valley

11 is the same as the symbol used in the other valleys.

12    THE COURT:  All right.

13    THE WITNESS: The water level profile shows the altitude

14 of the water surface or the pressure surface in water wells

15 in the various valleys in November, 1953.

16 BY MR. VEEDER:

17    Q  Now, you distinguished between water level and pressure

18 level.  Would you state into the record the reason for that

19 distinction?

20    MR. STAHLMAN:  Pressure surface.

21 BY MR. VEEDER:

22    Q  Would you state what you mean by that?

23    A  The water level in a well that is very deep-- not

24 essentially deep, in a well that penetrates a confining layer

25 such as a clay lens of-- or, a series of clay lenses of

1   appreciable extent may have a head, a pressure head greater

2   than a shallow well, or a shallower well that does not

3   penetrate beneath the confining layers.  The shallower of the

4   two wells would be considered to have a-- reflect the water

5   table conditions, a condition in which the water surface has

6   free inter-action with the atmosphere, and does not reflect a

7   head of water at a higher altitude.  The deeper--

8        THE COURT:  I have lost you completely now.  Does any-

9   body understand that?

10       MR. DENNIS:  No.

11       MR. SACHSE:  No, I don't.

12       MR. VEEDER:  Start again, Mr. Kunkel.

13       THE COURT:  Tell us in simple language.  Tell us first

14   what you are going to define.  Water level, is that what you

15   are talking about?

16       THE WITNESS:  In Pauba Valley I am going to define a

17   water level based on wells that penetrate an area of partial

18   confinement.  Therefore, I am not--

19       MR. VEEDER:  One moment, Mr. Kunkel.  You say partial

20   confinement.  Now, please state what you mean by partial

21   confinement.  You are not talking about anybody going to jail

22   now.  Partial confinement.

23       MR. STAHLMAN:  You can't tell.

24   BY MR. VEEDER:

25       Q  What do you mean by partial confinement, Mr. Kunkel?

2530

1          A   The aquifer--

2          THE COURT:  Well, by partial confinement do you mean that

3     the water instead of flowing through material below is par-

4     tially confined by therefore some sort of a base created?  Is

5     that what you mean?

6          MR. VEEDER:  I think you began confusing us, Mr. Kunkel,

7     when you used the term lenses.

8          Q   Now, would you state what a lens is in the geo-

9     graphical profile?

10          A   Mr. Veeder, may I step to the blackboard and make a

11     specific description, without reference to Pauba Valley?

12          THE COURT:  All right.  Don't feel bad about this, this

13     is what most experts get.

14          THE WITNESS:  The simplest ground water basin can be

15     thought of as a depression in the earth's surface, surrounded

16     by consolidated non-water-bearing rocks.

17     BY MR. VEEDER:

18          Q   Which is the surface of the earth there, Mr. Kunkel?

19          A   The surface of the earth will be a line approximately

20     there.

21          Q   Just write surface above it.

22          A   The surface there.  The boundaries of a ground water

23     basin.

24          Q   Now, what do you mean by the boundaries?  Are you

25     speaking of basement complex now?

          A   I am speaking of basement complex.  The container

C-12

1   which holds the unconsolidated deposits of clay, sand, silt

2   and gravel are the alluvial deposits to which I have previously

3   been testifying.

4   Q  Would you please mark under there basement complex,

5   which is the bowl in which the deposits are contained?

6   A  I will use the symbol small bc.  The simplest ground

7   water basin would be filled completely with sand, a homogenous

8   isotropic material.  The permeability would be the same in

9   all directions.  It is a theoretical consideration that

10  probably never occurs in nature.  Assuming a source of re-

11  charge-- ground water recharge can be runoff into the area,

12  precipitation on the area, water brought to the container

13  will fill the container or the coarse bases within the

14  permeable materials of alluvium to whatever the altitude of

15  a bedrock lip or outlet exists.  I have not filled the basin

16  completely, because in nature one would undoubtedly have an

17  outlet at a point below the general ground surface.  On a well

18  drilled in this-- into these deposits it would encounter

19  water at a specific point that corresponded to the water table.

20  And as one drilled deeper the water level in that well would

21  remain constant.  The coarse bases within the deposits are

22  free and open to the atmosphere.

23  A second type of basin may exist, the same symbolism;

24  the basin is contained by rocks in the basement complex, the

25  land would correspond to the line indicated as basin, and the

1    surface data.  The deposits in this basin may be filled with

2    a lens of-- or, a deposit of sand overlined by a deposit of

3    clay--

4         Q  What significance is it that there is clay overlying

5    the sand deposit?

6         A  The clay has a lower permeability, which is the ability

7    to transmit water.  Sand has a higher permeability than clay.

8    The sand will transmit water more freely than the clay.

9         THE COURT:  By lens you mean a layer of some material?

10        THE WITNESS:  A layer of some material.  In alluvial deposits

11   the layers are lenticular in nature, they are not blankets

12   of an extent that cover the full basin, but they will--

13   BY MR. VEEDER:

14        Q  Now, lenticular.  Do you mean it doesn't cover the

15   whole area?  Is that what you are saying?

16        A  Does not cover the whole area.  If I may proceed with

17   my diagram, there may be a lens of sand covered or in contact

18   with a lens of gravel.  The gravel and sand may be covered

19   with clay on up to land surface.  We can draw a series of--

20        Q  Mr. Kunkel, would you pull around?  Counsel can't see

21   there.  So that the Court can also see.

22        MR. MOSKOVITZ:  If it is turned too far the Judge won't

23   be able to see it.

24        MR. VEEDER:  We want your Honor to see it.

25        THE WITNESS:  We will fill up the basin with deposits

1  that are lenticular in character and permeability, the clays

2  having the lowest permeability.  This basin just described

3  has a water table that is graded to an outlet, and a well

4  drilled from land surface into the permeable deposits at or

5  shortly below the water table will encounter water, and water

6  will stand in that well.

7       THE COURT:  Where?

8       THE WITNESS:  In the well just described at the water

9  table the situation would be similar to the first case.

10  However, if you deepened this well, the second well, or you

11  drill another well right next to it of greather depth, the

12  water level would rise above the ground surface in the deep

13  well due to the pressure effects of the head of water at a

14  higher gradient upstream from the well that has been drilled

15  beneath the confining layer or clay.  And a series of wells

16  drilled through a very thick sequence of alluvial deposits

17  under natural conditions will, as the drilling progresses, the

18  water level every morning as the driller goes out and

19  measures his water level he will discover it is/a higher
                                                    at

20  altitude/to land surface, the depth to/water surface becomes
        relative                              the

21  shallower.  In Pauba Valley the Pauba well had a water level

22  or a pressure surface of 19 feet above land surface when

23  first drilled.  Shallower wells in the same area had water

24  levels in the well at beneath land surface.

25       THE COURT:  Do you mean water in a column of pipe will

1  stand 18 feet above land level?

2      THE WITNESS:  I believe it was 19 feet.

3      THE COURT:  If that hadn't been there the well would have

4  flowed as an artesian?

5      THE WITNESS:  The well flowed as artesian.

6      THE COURT:  May we take our recess now?

7      (Recess.)

8      MR. VEEDER:  Would you return to the blackboard, Mr.

9  Kunkel, for some questions.

10     Q  In the preliminary statements which were made

11 respecting Plaintiff's Exhibit 16 you used the term "aquifer."

12 Would you state what is meant by that term?

13     THE COURT:  Water-bearing rock?

14     THE WITNESS:  It is a rock or deposit that yields water

15 wells.

16 BY MR. VEEDER:

17     Q  What aquifers are shown on those pictures?

18     A  In the alluvial deposits the principal aquifers are

19 sand and gravel and various mixtures of sand and gravel.  The

20 better the degree of sorting or the more uniform a deposit is

21 in regard to grain size the greater is its porosity, and the--

22     THE COURT:  That wouldn't follow:  Suppose it was very

23 fine material in the nature of a clay.  It wouldn't bear as

24 much water as a more oddly sorted group of gravel of various

25 sizes.  Isn't that true?

D-1

2535

1    THE WITNESS:  May I digress to expand that statement?

2    MR. VEEDER:  To explain what statement, Mr. Kunkel?  Your

3    own statement?

4    THE WITNESS:  To explain the answer to the Judge's question

5    more fully.

6    Perfect spheres packed in this manner (drawing) have

7    the highest porosity of any manner of packing.

8    THE COURT:  The highest porosity?

9    THE WITNESS:  Porosity.  It is the amount of void space

10   between the rocks.  I will color in between the various grains.

11   The next higher porosity would be the spheres of uniform

12   size packed in the manner indicated, where you would stack

13   a quantity of cannon balls or marbles so they would fit one

14   inside the other, rather than being lined up on a perfectly

15   vertical axis.  The centers would be inclined.  The por-

16   osity--

17   THE COURT:  Spell that word.

18   THE WITNESS:  P-o-r-o-s-i-t-y.

19   THE COURT:  All right.

20   THE WITNESS:  The size of the grains is of no conse-

21   quence.  Grains a tenth of an inch in diameter, packed in

22   either of the manners indicated, have the same porosity as

23   cannon balls or oranges or apples.  It wouldn't make any

24   difference, as long as the materials you are packing are of

25   the same size and perfectly spherical.

THE COURT:   What about very fine clay?   It would be com-
posed of very small particles, wouldn't it?

THE WITNESS:   That is true, your Honor, and a very fine
clay can have a higher porosity than a silt which would
yield more water.   The reason for that is that we have the
terms "porosity," "specific yield," and "specific retention."
The porosity of a deposit is the volume of the pore spaces
expressed as a percent in relation to a unit volume.

BY MR. VEEDER:

Q   What significance has that from the standpoint of the
ability to withdraw water from where the water-bearing strata
exists?

A   As the Court just suggested, a clay made up of vary
fine materials could have a higher porosity than a silt which
would yield more water, because the ability of a deposit to
yield water is not a direct relation to the porosity but it
is related to the porosity, the specific yield and the
specific retention.

As I testified earlier, the specific yield of the deposit
is the quantity of water that would drain by gravity from the
deposit expressed as a percentage, and it also is related back
to the unit volume.   A certain quantity of water would be
retained in the deposit and would not drain by gravity-- that
is the specific retention, and it is also expressed as a
percent related back to the original.

THE COURT:   I think I am beginning to see.   In other words, all uniform material, or rather materials of uniform size, your statement is that regardless of the size, from bowling balls down to grains of sand, the porosity is the same?

THE WITNESS:   It is the same.

THE COURT:   But the specific yield of a gravel lens would be a lot more than of a clay lens?

THE WITNESS:   That is correct, because the specific yield is the quantity that is of consequence when one is thinking in terms of the yield of an aquifer.   It is not actually the porosity or the quantity of water contained in the aquifer. My definition of an aquifer was, I believe in the record, a formation that yields water freely to wells.   It did not refer to the porosity of the formation, because a clay can have a higher porosity but it does not yield water freely to wells because the specific retention is very great.

THE COURT:   All right.

BY MR. VEEDER:

Q   Now, just before you leave that blackboard, would you show the effect of pumping in the upper right-hand corner? What is the result when there is a drawdown from pumping in such an aquifer as that?

A   Under natural conditions, we have a source of recharge and a source of discharge flowing out of our space.   If a

2538

1   pump is installed in the well indicated and water is pumped

2   from the well, the water level in the well is drawn down and

3   the deposits surrounding the well are dewatered.  Water flows

4   from between the pore spaces in the retaining deposits into

5   the well and a cone of depression is created around the well

6   and water flows toward the well from all directions.  This is

7   assuming that we are in the middle of our basin and that there

8   are no faults or other interference.

9        Q  What about recharge of that cone of depression?

10       A  If pumping is continued sufficiently long enough, the

11  cone of depression or the effect of the pumping will ultimately

12  extend to the edges of the aquifer.  For any one well the

13  quantity is extremely minute, but pumping may-- there may be

14  a group of wells in an area, or depending on the size of

15  the area-- the cone of influence created by pumping will

16  intercept recharge into the basin, the quantity of outflow

17  will be reduced.

18       THE COURT:  Suppose that the source of recharge is one

19  edge of the basin and the discharge end of the basin is a

20  mile away.  Does the water level in the basin vary on one

21  side or the other?  It would seem there would be more water

22  on the side where the source was coming in than there would

23  be on the other side.

24       THE WITNESS:  The effect of the pumping cone will extend,

25  with sufficient pumping, to the edge of the basin.  The effect

1    is to induce a flow of water which must be ultimately supplied

2    by recharge.  If the pumping does not directly affect the

3    water level at a point of rising water or where the water

4    leaves the basin, the recharge that has been intercepted will

5    ultimately show up as a decline in water level which will be

6    reflected as decreased outflow from the basin.  With sufficient

7    pumping and properly spaced wells to intercept the optimum

8    amount of recharge or discharge, the entire outflow from a

9    basin can be dried up.

10   BY MR. VEEDER:

11      Q   That still doesn't answer his Honor's question.  Isn't

12   it true that there would at least be a period where the re-

13   charge into the basin might possibly just come into the basin,

14   strike the aquifer, go underground and be pumped out, is

15   that right, without passing on to the other side where the well

16   is located?

17      A   It depends on the conditions of recharge.  I would

18   have to expand my diagram considerably to go into that phase

19   of it.

20      THE COURT:  I see the point here.  In other words, you

21   are getting a cross-section.  Here is a wide basin and the

22   recharge coming in and we are just looking at one segment

23   of it.  The recharge coming in departs that basin where the

24   water level would be fairly level across and the area of the

25   wells would be this cone of depression.  It would take a larger

1    diagram.  I think I understand.

2        MR. VEEDER:  Your Honor, would it be possible for Mr.

3    Kunkel to take those drawings off and put them on a piece of

4    paper and make them an exhibit inthe record?

5        THE COURT:  You will either have to do that or we will

6    have to forget about them.

7        MR. STAHLMAN:  They are really for the purpose of

8    illustration, aren't they?

9        THE COURT:  If nobody wants them  they can be wiped off.

10       MR. VEEDER:  That is the point I make, your Honor.

11   Unless you desire them in the record.

12       THE COURT:  I don't care about them.  I think his oral

13   description is probably sufficient.

14       Does anybody want them?

15       THE WITNESS:  These concepts are adequately described in

16   U. S. Geological Water Supply Paper 489, if anyone is inter-

17   ested.

18       THE COURT:  Are there diagrams inthere?

19       THE WITNESS:  Diagrams, description, definitions of the

20   terms.  Also in U. S. Geological Water Supply Paper 494.

21       THE COURT:  Let's put a copy of each of those in the

22   record.  Do you have them?

23       THE WITNESS:  I have one of them with me.  I have No. 494

24   with me.

25       MR. VEEDER:  We will obtain them and offer them in evidence,

1 your Honor.

2 THE COURT:  They may go into the record in lieu of the

3 diagram.

4 BY MR. VEEDER:

5 Q  Would you return to Plaintiff's Exhibit 16, and again

6 alluding to the Pauba Basin point out the kind and type of

7 wells you encountered in making your survey, particularly

8 with reference to water level diagrams that you prepared.

9 MR. STAHLMAN:  I didn't hear the question.

10 MR. VEEDER:  Would you read the question, please, Mr.

11 Reporter?

12 (The reporter read the pending question.)

13 THE WITNESS:  I am not certain of the wells by number.

14 MR. VEEDER:  If you aren't certain you can't testify.

15 Just simply allude to the kind and type of wells  that you

16 encountered.

17 THE WITNESS:  There are wells in Pauba Basin that are

18 shallow and reflect water table conditions.  There are wells

19 of several hundred feet in depth, three to five hundred feet,

20 that are artesian wells.  By "artesian" I mean a well that

21 has a head above the unconfined water table.  I do not

22 necessarily mean a well that flows.  A well can have an artesian

23 head and still not be a flowing artesian well.

24 In addition, there is one very deep well, Well 8217M-1,

25 that had a head of water when it was drilled. -- the records are

2542

1   on file in the offices of the Geological Survey-- that had a

2   head of water 19 feet above land surface, where--

3       Q  How have we been referring to that well, Mr. Kunkel?

4       A  That has been referred to as the Pauba well.

5       Q  Go ahead.

6       A  In my earlier testimony I referred to partial confine-

7   ment and was questioned as to what it meant as compared to

8   complete confinement.

9       Referring back to the diagram to which I have just

10   testified, I have indicated that the deposits are lenticular

11   in character, that the deposits of clay do not blanket the

12   entire area underlain by alluvium in any one horizon, and that

13   the confining effect of the clay blanket is not complete

14   because of its lenticular character.

15       As I have also previously testified, as a well is

16   drilled or wells are drilled adjacent to each other and they

17   are of considerable depth, we will have different heads or

18   different water levels in the wells.  I did not refer to that

19   as the water table.  I referred to that as the-- well, the

20   correct word is piezometric surface or pressure head.  Under

21   natural conditions the piezometric surface in the deeper well

22   of any pair is higher than the isometric surface of the

23   shallower well.  The water level profile as indicated, there-

24   fore, cannot be arbitrarily drawn across or through the

25   measured water levels in wells.  The wells have to be

1   selected on the basis of comparable depths in order that the

2   water level profile as indicated reflects a specific zone of

3   saturation.

4        The water level profile shown on Exhibit 16 in Pauba

5   Valley reflects the water level profile in November, 1953,

6   based on water level measurements in wells of several hundred

7   feet in depth.   It does not reflect the water level in the

8   Pauba well.   It does not reflect the water level in the very

9   shallow wells.

10  BY MR. VEDDER:

11       Q  Now referring to Plaintiff's Exhibit 15, would you

12  locate the contour lines that you established in the Pauba

13  Basin and state what you found them to be.

14       A  The water level profile as shown on Exhibit 16 is

15  along the line of section.

16       Q  And when you say "along the line of section," along

17  the line of the cross-section?

18       A  Along the line of cross-section in Exhibit 15.  The

19  water level contours as shown on Exhibit 15 in Pauba Valley

20  also reflect the same period of time and are based on water

21  levels measured in wells along the line of section in

22  Exhibit 16 and on water level measurements in all other wells

23  within the area mapped as older continental deposits that

24  reflect the water level in the principal water body that has

25  been developed at the present time.

2544

1      Q  Now, alluding again to the Pauba Basin, did you lo-

2  cate the outlet of that basin and is it depicted on Plain-

3  tiff's Exhibit 16?

4      A  I have shown the outlet to Pauba Basin on Exhibit 16.

5  It is at or below the point shown as B on the cross-section.

6  It is at the point also labeled "Temecula Gaging Station."

7  Beneath the point indicated as B on the cross-section the

8  rocks of the basement complex were encountered at very

9  shallow depths and outcrop along the channel of the Temecula

10  River.  The deposits to the east, about which I have

11  previously testified, are of considerable thickness.  The

12  entire groundwater outflow from Pauba Valley, both surface

13  and ground water, leave the Santa Margarita watershed at

14  this point.

15      THE COURT:  Leaves the watershed?

16      THE WITNESS:  I am sorry.  Leave the upper part of the

17  watershed, leave the Temecula-Murrieta watershed and flow

18  into the lower part of the watershed, which is referred to

19  as the Santa Margarita River below the point of Temecula

20  Gage.

21  BY MR. VEEDER:

22      Q  Proceed on down the valley and show the course and

23  the ultimate point of delivery of water into the stream.

24      A  Ground water flow which has been forced to the surface

25  by the basement complex at shallow depth, under natural

1    conditions, flows down the Temecula Gorge or Canyon to the

2    lower part of the Santa Margarita watershed, where the flow

3    of the stream recharges the alluvial deposits on Camp Pendleton.

4         Q   What is the significance, in describing the alluvial

5    bed there, of the letters "QYAL," which means younger alluvial--

6    what is the significance of the so-called upper member and

7    lower member?

8         A   The deposits in the lower part of the watershed along

9    the Santa Margarita River are graded to sealevel.   During the

10   Pleistocene Period sea level was approximately 200 feet lower

11   than present sea level.   The water that was in the ocean at

12   that time was locked up in the glaciers on the continents and

13   the stream and the Santa Margarita and all other streams

14   flowing to the ocean at that time were graded to this lower

15   sea level.

16        With the melting of the glaciers and the rising of sea

17   level, the channel of the Santa Margarita River was backfilled

18   for approximately 200 feet.   The lower part of the younger

19   alluvium is coarser than the upper member.   This is borne out

20   by the well logs and the upper and lower member are identified

21   in the lower part of the watershed.

22        THE COURT:   This has nothing to do with the case.   But

23   you mean this coast, then, has not had, along Pendleton, then,

24   any raising or lowering movements for thousands of years?

25        THE WITNESS:   No.   The sea level was lower and the streams

     were graded to the lower sea level.   Coupled on top of that

1    change in sea level, there have been movements of the coast

2    line with regard to sea level.

3         THE COURT:  It couldn't have been very much, if you only

4    got 200 feet there of basement complex.

5         THE WITNESS:  The positions of sea level are also

6    reflected on the entire coast line of California as numerous

7    terraces and benches and cut surfaces which reflect in the

8    different position of sea level with regard to the position

9    of land surface.  There have been a numerous series of

10   movements in which land surface has moved with regard to sea

11   level as well as sea level with regard to land surface, and

12   it is an extremely complex geologic problem.

13        THE COURT:  In other words, although there is only 200

14   feet here shown, that doesn't mean that there might not have

15   been at times in the past when this ground was high above the

16   water or down below the water?

17        THE WITNESS:  That is correct, your Honor.  This par-

18   ticular profile shown as basement complex and the overlying

19   deposits are the deposits that have been deposited within the

20   last 10,000 years.  They do not reflect the movements of land

21   surface or sea level prior to that time.  And there have also

22   been movements of land surface with regard to sea level during

23   the Recent and Pleistocene times, but they are not on the

24   magnitude that affect this profile.

25        THE COURT:  All right.

BY MR. VEEDER:

Q   Now, Mr. Kunkel, I observe that on the exhibit Plaintiff's Exhibit 16 in the area of Nigger Valley you show no basement complex there.  Would you explain the reason for that?

A   There are no well data in Nigger Valley on which to base a reliable estimate or a reliable determination of the depth of the basement complex.  The position of basement complex as shown is as far as I can go, in my opinion, with a reliable boundary between the older continental deposits and the basement complex.  A contact does exist, but its position I have no data to determine.

Q   In other words, if there was not a contact it would fall right straight through; is that right?

A   There has to be a bottom of some kind.

Q   In regard to the Murrieta Valley, would you explain the presence of basement complex at one point and not at the other?

A   The basement as shown in Murrieta Valley beneath the symbol B is the same basement complex as encountered at the point B in the Pauba part of the cross-section.  The two cross-sections come together at that point.

Well 8313R1 is shown on both parts of the cross-section to tie the two sections together.

Upstream in Murrieta Valley above the fault indicated the basement complex has not been encountered in the well logs that

1   I have examined and I have no method to determine the depth

2   of the basement complex beyond the fact that it is below the

3   well logs indicated.

4       MR. VEEDER:   I would like to have placed on the easel

5   Plaintiff's Exhibit 17 marked for identification.

6       THE COURT:   I will hand you back this first one that you

7   gave me-- Exhibit 16.

8       MR. VEEDER:   All right, sir.

9       THE COURT:   Do you have a copy of Exhibit 17?

10       MR. VEEDER:   Yes, I do have, your Honor.   Here is your

11   Honor's copy of Exhibit 17.

12       Q   Would you state into the record the name of the map

13   marked for identification Plaintiff's Exhibit 17?

14       A   Exhibit 17 is entitled "Santa Margarita River Watershed

15   Showing Ground Water Storage Units."

16       Q   How was that map prepared, Mr. Kunkel, from the stand-

17   point of investigation and the data obtained in connection

18   with the data shown graphically upon it?

19       A   It is the same basement as Exhibit 15.   However, I

20   have added a boundary line shown as heavy long dash and a

21   short dash that outlines the area within which there is an

22   appreciable thickness of water-yielding deposits.

23       Q   And how did you make those determinations as to the

24   water-yielding deposits?

25       A   The extent of the water-yielding deposits was determined

1  by the surface mapping and the inspection and analysis of

2  well logs.

3       Q  And what was the source of those well logs?  The same

4  as you used in the preparation of Exhibit 16?

5       A  That is correct.

6       Q  What other sources did you use to reach the determina-

7  tion depicting the surface areas of the ground water basins?

8       A  Based on the thicknesses of the water-bearing material

9  shown by the well logs, plus the field examination of the

10  deposits.

11       Q  Did you use aerials or any other data for that pur-

12  pose?

13       A  The aerial photographs and all other inspections that

14  were done in the preparation of Exhibit 15 were applied to

15  this exhibit.  I intended to imply that with my statement

16  that it is exactly the same base map as Exhibit 15, and

17  everything that went into the preparation of Exhibit 15 was

18  utilized in preparation of Exhibit 17, plus the information

19  in the analysis of well logs.

20       Q  Would you refer to the legend that you have on the

21  Identification No. 17 and explain it?

22       A  With the exception of the locations of pictures, the

23  legend is the same, except--

24       Q  The same as what?

25       A  The same as Exhibit 15, except for the very last entry,

1   which is a circle with a number 4 inside it.  The solid heavy

2   line with a long dash and a short dash, beneath which I have

3   written "Boundary of ground water storage unit."  The number

4   refers to the unit in tabulation of ground water storage

5   capacity.

6        Q   I observe in the Pauba Basin and the continental

7   deposits immediately adjacent to it the number 4.  What do

8   you mean by that number 4?

9        A   No. 4 is the unit of older continental deposits

10  northeast of the fault zone that parallels the northeast of

11  Murrieta Valley and it is the area southwest of the boundary

12  that crosses Long Valley.

13       THE COURT:  Southwest?

14       THE WITNESS:  Southwest of the boundary line that crosses

15  Long Valley, Santa Gertrudis Valley and other tributaries

16  that drain into the Santa Margarita-Murrieta Valley area.

17       MR. STAHLMAN:  I think that record may be incorrect.

18  The question said Fallbrook.

19       MR. VEEDER:  Yes, I was referring to the Pauba Basin.

20       THE WITNESS:  You said No. 4, didn't you?

21       MR. VEEDER:  I said No. 4, which appears on both sides

22  of the Pauba Basin. That is what I intended to bring to your

23  attention and ask you to explain about this.

24       THE COURT:  Does that 4 signify that area within the lines?

25       THE WITNESS:  It signifies the area bounded by the lines

described in the legend.

THE COURT:  And the 4 lies also in the area south of
Pauba Valley?

THE WITNESS:  That is correct.

THE COURT:  The 3 is a separate area that you have de-
marked, meaning the Pauba Valley?

THE WITNESS:  Yes.

BY MR. VEEDER:

Q  Would you explain how such a circumstance could
transpire?

A  The materials indicated by the Unit 3 as Pauba Valley
are the younger alluvial deposits that overlie the older
continental deposits.  The older continental deposits are
exposed on both sides of Pauba Valley, to the north and south
of Pauba Valley, and wells drilled through the materials in
Pauba Valley also encounter materials that are of the same
character as found in Unit 4 where it is exposed on the land
surface.

Q  Now, in regard to the heavily dashed lines, did you
make the investigations yourself, make those determinations
as to locations?

A  I determined the positions of those lines myself.

Q  And in regard to the other matters depicted on the
map which is marked Plaintiff's Exhibit No. 17 for Identi-
fication, do you know that those are correct in your own

1    investigation?

2         A   They are correct as I have determined them to be.

3         MR. VEEDER:   We offer in evidence Plaintiff's Exhibit No.

4    17 for Identification.

5         MR. KRIEGER:   What does the term appreciable mean, Mr.

6    Kunkel, when you said appreciable depth or width of deposit?

7         MR. VEEDER:   Is that voir dire, your Honor?   It sounds

8    like cross-examination to me.

9         THE COURT:   The objection is overruled.   If it goes to

10   any extent then it will be cross.

11        THE WITNESS:   Were you referring to a direct statement

12   I had in the transcript?

13        MR. KRIEGER:   Yes.   You said that you marked those areas

14   where there was any appreciable depth of water-bearing deposit,

15   I think is the term you used.   And I just wondered about the

16   term appreciable, what you mean.

17        THE WITNESS:   By appreciable I mean an area within which

18   it is feasible to drill water wells and pump wells for use.

19        THE COURT:   Now, are these the equivalent of basins, or

20   are they just areas?

21        THE WITNESS:   They are the equivalent of basins, your

22   Honor.

23        THE COURT:   I notice up at the top in Diamond Valley you

24   have got two, eleven and twelve.   Is there some natural barrier

25   there that divides the two?

2553

1    THE WITNESS:  As I previously testified, there is a con-

2    striction of bedrock at that point.

3    MR. VEEDER:  Would you answer the question?

4    THE WITNESS:  Yes, there is a boundary there.

5    THE COURT:  I understand the distinction between symbol

6    3 and 4, 3 indicating the younger alluvial and 4 the older

7    alluvial.  But is that all one basin, or is that two basins?

8    THE WITNESS:  In my opinion, your Honor, the areas

9    indicated as 4 and 3 are hydrologically one basin.

10   THE COURT:  But you marked 3 off separately because of

11   the type of alluvial?

12   THE WITNESS:  That is right.  The well log showed a

13   difference in specific yield in upper materials.

14   THE COURT:  I see also that you have taken the Murrieta

15   Valley and called it No. 1, and it is largely younger alluvial?

16   THE WITNESS:  Murrieta Valley, the area indicated by the

17   number 1, with regard to the wells that have been drilled in

18   the valley are not younger alluvial.  A large part of the

19   area within the area indicated by this symbol number 1 is

20   underlain by alluvial deposits, but there is a very great

21   thickness of older continental deposits, which wells tapped--

22   even though the well may start in the younger alluvial deposits

23   it is drilled through the younger alluvium into the older

24   alluvial deposits and draw water from the older alluvial

25   deposits.

THE COURT:   Is the area you have marked by the symbol a part of the same basin as what you have marked 3 and 4?

THE WITNESS:   No, your Honor.   The water levels in the wells show that there is a break in continuity along the line of the fault shown along the northeast part of Murrieta Valley.

THE COURT:   That is the Wildomar fault?

THE WITNESS:   The Wildomar fault.   The boundary of the Unit No. 1 on the northeast corresponds to the fault except for a very minor divergence in the area near the Wildomar fault, in which I have moved southwestward slightly with my contact for the reason that the outcrops of the older continental deposits that were observed there did not appear to be the type of material that would yield water to wells.

THE COURT:   Then the area marked with the symbol 1 is a separate basin from the area marked 3 and 4?

THE WITNESS:   Yes, that is correct.

THE COURT: What about 2, is it a part of either one of these basins?

THE WITNESS:   Basin No. 2, or the area No. 2 is separate from 3 and 4.   The boundary between 1 and 2 is an arbitrary boundary which would-- talking in terms of ground water basins-- would not be affected if there was considerable pumping in the area.   The boundary was drawn for the convenience in grouping of the well logs that I used to determine specific yield for the deposits in order to get a representative

selection.

THE COURT:   Then they are all separate basins signified by the numbers in circles, with the exception of No. 3 which is a part of the general basin shown as 3 and 4?

THE WITNESS:   A qualified yes, your Honor.   We may want to emphasize the fact that Wolf Valley and Murrieta Valley are not necessarily separate basins.

THE COURT:   With that reservation.   O.K.

Any objection to the receipt in evidence of Exhibit 17?

MR. MOSKOVITZ:   I want to ask a couple of questions about the legend in the right-hand corner.   At the bottom of the box on the left-hand side it says drawn by J. O., checked by S. C., approved by J. G.

What do those notes mean?

THE WITNESS:   Those refer to the base map Exhibit No. 1. The base map was prepared by the Office of Ground Water Resources at  Camp Pendleton under the supervision of Col. Bowen , and the initials are of the men that worked on it.

THE COURT:   In other words, you just took that basic map and carried over that drawn by, checked by and approved?

THE WITNESS:   That is correct, your Honor.

THE COURT:   All right.   Any other questions?

Received in evidence as Government's 17.

(The map above referred to was received as Plaintiff's Exhibit No. 17 in evidence.)

1          MR. VEEDER:   I observe, your Honor, that it is 12

2    o'clock.

3          THE COURT:   Yes, sir.   What progress have we been making,

4    Mr. Veeder?   Are you moving along as rapidly as you expected

5    or slower than you expected?

6          MR. VEEDER:   I think we are running about four hours

7    ahead of schedule.

8          THE COURT:   We will adjourn.

9          (Noon recess.)

<u>SAN DIEGO, CALIFORNIA, FRIDAY, OCTOBER 3, 1958.   2:00 P. M.</u>

THE COURT:  Proceed.


FRED KUNKEL,

heretofore called and sworn as a witness in behalf of the
plaitiff, recalled, testified further as follows:


DIRECT EXAMINATION (Resumed)

BY MR. VEEDER:

Q  Now, Mr. Kunkel, would you state for the record the
conclusions you have reached in regard to the several ground
water basins which you depict on Plaintiff's Exhibit No. 16?

A  Exhibit No. 16 shows the ground water basins indi-
cated Oak Grove, Dodge Valley, Dameron Valley, Aguanga Valley,
Radec Valley, Nigger Canyon, Pauba Valley and the Santa
Margarita River are a series of valleys interconnected, the
higher valley draining both surface and ground water drain
to the next lower valley which in turn drained into the
valley below it.

Q  Now, how did you make the determination as to-- Strike
that.

I observe from Plaintiff's Exhibit 15 that certain
of the valleys have-- you have made your ground water level
delineation, and in some others you have not.  What was the

2558

1   basis upon which you made that determination?

2      A  The direction of ground water movement in all of the

3   principal valleys shown is either indicated by water level

4   contours or an arrow as indicated in the legend, the arrow

5   shows the direction of ground water movement. I have not

6   shown contours in Terwiliger valley or Oak Grove Valley or

7   Pechanga Valley, but arrows indicate the general direction of

8   ground water movement within those ground water basins.

9      Q  Now, referring to the Aguanga, Lancaster and Nigger

10   Valley Canyon valleys will you describe the ground water

11   levels and the contours that you established there?

12      THE COURT:  Which ones?

13      MR. VEEDER: Aguanga, Lancaster and Nigger Canyon.

14      MR. STAHLMAN:  I wonder if I might have that question

15   read.

16      MR. VEEDER:  Will you read the question?

17      (The question was read by the reporter.)

18      MR. STAHLMAN:  Referring to the contours on the map?

19      MR. VEEDER: Yes.

20      MR. STAHLMAN:  I understand.

21      THE WITNESS:  Based on the water levels in wells measured

22   during the month of November, 1953, I have determined the

23   altitude of water surface in those wells. Those points are--

24   These wells are throughout the Aguanga, Lancaster, Nigger

25   Valley areas, and in the areas mapped as older continental

1  deposits.

2  BY MR. VEEDER:

3      Q  Why is it that you have grouped them into one series

4  of water level contours when the map itself indicates and the

5  names designated indicate that there are several valleys

6  involved, at least three valleys involved?

7      A  The valley names are used locally to indicate in

8  general the area underlain by the younger alluvial deposits;

9  they are physiographic features and are not necessarily

10  coincident with the ground water body in the area.

11      Q  What do you mean by physiographic?

12      A  It is a feature on the surface of the earth that

13  reflects the surface drainage and does not necessarily corre-

14  spond to the structure of the area as determined geologically.

15      Q  Have you made a differentiation there on both the

16  subsurface geology and physiographic?

17      A  The local terms have been shown on the map as they

18  are used by the residents of the area, and as they are

19  identified on the geological survey topographic maps.  I

20  have shown the water level contours in Exhibit 15 as the data

21  indicate to me that the water level gradient and-- which

22  indicate to me what the water level gradient and profile is;

23  does not necessarily correspond to the local terminology which

24  identifies the valleys.

25      Q  Now, would you proceed and locate the contour lines

1    that you have established and point out how those were arrived

2    at across the valleys to which we have just made reference?

3         A   The water level contours may be observed in the

4    north half of Section 23, Township 8 South, Range 1 East.

5    They are shown at an altitude of 2,300 feet; moving in a

6    westerly direction contours are shown at an altitude of 2,200

7    feet, 2,100 feet, 2,000 feet, 1,900, 1,800, 1,700, 1,600,

8    1,500, 1,450 feet.   The contour indicates the direction of

9    ground water movement.   The direction of ground water movement

10   is perpendicular to the contour, and moves from the point of

11   high head to low head, or more simply down the hydraulic

12   gradient.

13        Q   Or even downhill?   Excuse me.

14            On each of those contour lines, now, what factors did

15   you take into consideration?

16        A   The depth of the wells were considered to determine

17   that they penetrated the ground water body, the altitude of

18   a reference point from which a water level was measured in the

19   well was determined, the depth to water beneath that reference

20   point was subtracted from the altitude of the reference point

21   to determine the altitude of the water surface at the well.

22   Points of rising water were also observed, their altitude

23   determined, and the points of rising water were also used as

24   control for the water level contours.

25        Q   What is the significance of those points of rising

1    water in that area from the standpoint of locating your

2    contours?

3        A   The points of rising ground water occur where the

4    slope of the water table and the slope of land surface inter-

5    sect.  Above the points of rising water the slope of the water

6    table is at a lower gradient or a lower slope than the slope

7    of land surface.  Below the point where the water table and

8    the land surface intersect there is flow in the stream.

9        Q   How is it possible--

10       A   Or it may be only moist ground without flow.  But

11   there is actually evidence of rising ground water.

12       Q   How could you establish your contour lines through

13   fault lines as appear in the Aguanga Valley area?

14       A   South of the-- central of three faults shown between

15   Lancaster and Aguanga Valley, the water levels in wells are

16   at a lower altitude, and as shown by the contours the movement

17   perpendicular to the contours in Section 34, 1900-foot contour

18   is shown; the township is 8 South, Range 1 East.  The direc-

19   tion of movement is northwesterly toward the 1850 contour.

20   The 1850 contour is shown approximately as a half circle in

21   parts of Sections 29, 28 and 33. The direction of ground water

22   movement along the contour is toward the lip or outlet of

23   Aguanga Valley.  The lip or outlet of Aguanga Valley in the

24   Southeast Quarter of Section 29, Township 8 South, Range 1

25   East forces the movement of ground water -- forces the ground

1   in the unconsolidated deposits to the surface where they pour

2   out of the valley along the channel of Temecula Creek.   The

3   middle fault is well exposed in Section 27, Township 8 South,

4   Range 1 East.   The water level contours on the south side of

5   the fault and on the north side exhibit a considerable dis-

6   placement of water level.   I believe the record will indicate

7   that I testified to a well in the Southwest Quarter of--

8       Q   Well, you will not need to repeat that phase of the

9   testimony, Mr. Kunkel.   You have already testified to that.

10      A   Yes, sir.

11      Q   If you will go ahead and point out any other phenomena

12   that you observed in that general area.

13      A   The water level contours as shown reflect the water

14   table within the area mapped as younger alluvium and older

15   continental deposits for the valleys about which I am testi-

16   fying.

17      The points of rising water in Nigger Valley and in the

18   lower part of Lancaster Valley reflect the points at which

19   the water table and the land surface intersect.   Water level

20   contours also show the source of recharge to the ground water

21   body.   The source of recharge is perpendicular to the contour

22   but up gradient.   The water level contours indicate that there

23   is ground water recharge from the highland areas east of the

24   area mapped as older continental deposits.   The precipitation

25   on the area and the runoff from the area are recharged along

the Tule Creek and by infiltration to the ground water body

on the older continental deposits and the movement is toward

Vail Dam.

Q  What do you mean by "infiltration" there, Mr. Kunkel?

A  The water as it falls on the surface of the ground

penetrates into the ground and a certain portion is consumed

by vegetation but a certain part that is not consumed by

vegetation or other uses penetrates and becomes part of the

ground water body.

Q  Now referring to Pauba Valley, how did you make your

determinations there?

A  The water level contours in Pauba Valley were de-

termined from the altitudes of the water surface in wells

that tapped the main part of the water body.

Q  Did you consider the whole Pauba Valley area or did

you consider the younger alluvium when you made those determina-

tions?

A  The altitudes of the water surface in wells and the

contours drawn on them indicate to me that the entire area

is in hydraulic continuity and that the area of younger

alluvial deposits mapped as Pauba Valley is not the only

source from which ground water may be obtained.  A deep well

drilled in the center of Pauba Valley, for example, a 2,000

foot well in the center of Pauba Valley and a 2,000 foot well

on each side of Pauba Valley would have comparable yields.

1      Q  Did you, in this analysis of yours, consider whether

2  Pauba Valley--

3      MR. STAHLMAN:  Just a moment.  May we have that answer

4  read?

5      (The reporter read the last answer.)

6      MR. VEEDER:  May we proceed, your Honor?

7      THE COURT:  Yes, go ahead.

8  BY MR. VEEDER:

9      Q  Now, in making your investigation of Pauba Valley,

10 did you arrive at a conclusion as to whether-- I am speaking

11 now of the younger alluvium-- Did you make a determination

12 as to whether there are lenses in that area or whether there

13 is a blanket layer or strata of permeable or less permeable

14 deposits?

*This is in reply to the younger deposits*

15     A  The deposits in Pauba Valley, as indicated by well

16 logs and also as indicated by my observations in the field,

17 are lenticular in nature and are not the confining deposits

18 of the aquacludes.

19     Q  Would you say that word again?

20     A  Aquacludes.

21     Q  Would you spell it, please?

22     A  A-q-u-a-c-l-u-d-e.

23     Q  Would you state for the record what that means?

24     A  It is the deposits that do not yield water freely to

25 wells, as opposed to aquifer.

Q   What was the source of ground water movement in the Pauba Valley, based upon your investigation?

A   The source of ground water movement in the Pauba Valley area is from the sources of recharge, as indicated by the water level contours to be the highland areas northeast of the area mapped as Pauba Valley and as the older continental deposit.

The ground water movement is generally in a southwesterly direction toward the confluence of the Temecula and Murrieta Creeks.  The fault zone along the northeast side of Murrieta Valley acts as a barrier to ground water movement.  The water level contours show, however, that movement is toward the barrier and must either seep over breaches or low points in the barrier or move through the barrier.  The contours indicate that there is some movement through the barrier.  The quantity has not been determined.

Also, the spring line between Santa Gertrudis Creek and Long Canyon, in the area shown as seven springs, at seven points of rising water, I previously testified, is a spring zone and it approximates or is above the fault line.  It is the point at which the water table and land surface intersect in that area.  The faults have had a barrier effect, as indicated by a displacement of water levels along the fault line.  Wells to the northeast of the fault line have a higher head than wells to the southwest.  I compared wells of similar

1    depths to eliminate the possibility of tapping different

2    aquifers or water-bearing zones.

3        Q   Now, would you describe your investigation--

4        THE COURT:  Well, now, one more question.  You were

5    asked the source of recharging water in the Pauba Valley and

6    you mentioned everything except water that might come down

7    the Temecula.  Is that a source of charging the basin?

8        THE WITNESS:  Yes, your Honor.  I thought I said that the

9    highland areas to the northeast, which includes recharge

10   along the Temecula River.  The deposits in Pauba Valley are

11   more permeable than the older continental deposits on each

12   side and the will accept recharge at a higher rate than the

13   older continental deposits.  If these deposits were dewatered

14   for a sufficient depth, the recharge that would fill deposits

15   in Pauba Valley, the younger alluvial deposits, would bleed

16   into the older continental deposits.  The rate at which the

17   older continental deposits accept recharge is at a lower rate

18   than the younger alluvial deposits.

19       THE COURT:  Go ahead.

20   BY MR. VEEDER:

21       Q   When you refer to recharge, that includes both

22   surface stream flow and precipitation?

23       A   It includes all sorts of recharge, yes.

24       Q   Would you describe your investigation in regard to

25   ground water contours in the Murrieta Valley and the results

1    of those investigations?

2        A   The measurements of water levels in Murrieta Valley

3    and the altitudes of the water surface as determined from them

4    show that ground water occurs at an altitude of 1240 feet

5    approximately at the divide between Murrieta and Elsinore

6    Valleys.  From the 1200-foot contour, as shown, the ground

7    water moves through the permeable deposits as shown by the

8    1220-- did I say the 1200-foot contour?  I mean the 1240-foot

9    contour-- they move down the hydraulic gradient down to 1240,

10   1220, 1200, 1150, decreasing gradient to a 980-foot contour--

11   I am sorry-- to a 1000-foot contour, approximately, at which

12   altitude stream flow of the rising water is observed and the

13   stream below that point has a flow during the low water period

14   derived from ground water.

15       Indication that the flow of the stream is derived from

16   ground water is shown by the shape of the contours which are

17   then arcuate upstream.  The 1000-foot contour, if one draws

18   a perpendicular arrow across it, will show flow into the

19   Murrieta Creek. The flow in Murrieta Creek increases down

20   gradient to its confluence with the Temecula Creek, at which

21   point it flows into the Santa Margarita River and ultimately

22   into the lower basin.

23       Q   Now, with regard to Wolf Valley, would you also

24   describe the investigation that you made and the currents and

25   course of the ground water in that area?

2568

F2

1    A   The water level contours in Wolf Valley, the area

2   bounded by the fault to the northeast of Wolf Valley and the

3   fault along the southwest of Wolf Valley, showing the ground

4   water movement from the 1200-foot contour in Section 34,

5   Township 8 South, Range 2 West, northwesterly down the

6   hydraulic gradient to 1150 feet, 1100 feet, 1050, 1025 and

7   ultimately the water table or the altitude of the water

8   surface in wells as mapped.   The water table intersects land

9   surfaces and rising water occurs.

10       There was no distinct spring line observed in Wolf Valley.

11   The rising waters along the channel or in the area south of

12   the channel, but there are no definite spring lines.   However,

13   the movement is northwest into the Temecula River and

14   ultimately over the bedrock lip at the base of Pauba Valley

15   and into the basin downstream.

16       Q   What is the interrelationship, if any, between Wolf

17   Valley and the newer alluvium in Wolf Valley and Pauba Valley?

18       A   The younger alluvium in Wolf Valley and the younger

19   alluvium in Pauba Valley are of the same geological age.

20       The well logs in Pauba Valley and Wolf Valley indicate

21   that the thickness of the younger alluvial deposits is greater

22   in Pauba Valley than in Wolf Valley.   Also, the well logs

23   indicate that the younger alluvium in Pauba Valley is thicker

24   than the younger alluvium in Murrieta Valley.

25       Q   From the standpoint of the hydrological connection,

1    what opinion do you have on that?

2        A  Wolf Valley and Murrieta Valley are hydrologically

3    interconnected.  The reason that they have been shown as

4    separate ground water basins or areas-- I believe I used the

5    word "areas" or "separate ground water storage unit" rather

6    than "basins" is based upon the hydrologic hydraulic gradient

7    in the area.  They both drain from a high water level to a

8    common point of discharge.  Wolf Valley, Murrieta Valley, and

9    the Pauba Valley area, which I am using to include the older

10   aluvial areas on both sides of Pauba Valley, are hydrologically

11   connected.  However, as I have previously testified, the fault

12   zone along the northeast side of Murrieta Valley does have a

13   barrier effect to the movement of ground water.

14       Q  Referring to Diamond Valley, would you state what

15   investigation you made there in regard to the ground water in

16   that valley?

17       A  The water levels in Diamond Valley indicate that

18   ground water moves from the north half of Section 15, Township

19   6 South, Range 1 West in a general northwesterly direction,

20   down gradient into the central part of Diamond Valley in the

21   north half of Sections 4 and 5, Township 6 South, Range 1 West,

22   at which point the ground water moves westerly down gradient

23   into an altitude of approximately 1,500 feet into Domenigoni

24   Valley, and water levels in Domenigoni Valley indicate, as

25   shown by the arrows, as moving southwesterly along the

H-1
Fivecoat

1   headwaters of Springs Creek, and ultimately to the area mapped

2   as Springs Creek.   The movement of ground water from the

3   Springs Creek drainage area is also recharged to the older

4   continental deposits in the--

5       Q   You are using the term Springs Creek.

6       A   Warm Springs Creek, I am sorry.

7       Q   Now, would you proceed and describe your activities

8   in Terwilliger Valley and on down Coahuila Valley as to the

9   movement of ground water?

10      A   The water levels in wells, plus the observations of

11  spring flow that I made indicate the ground water moves from

12  Burnt Valley, Terwilliger Valley, down along the stream channel,

13  the area mapped as younger alluvial deposits, into Coahuila

14  Valley, and through the area known as basement complex into

15  Wilson Valley, ultimately into Lancaster Valley, and ultimately

16  into Vail Reservoir.   Now, I have been using ground water flow

17  for the record.   The ground water moves, the ground water in

18  places--

19      Q   Would you address the Court when you say that?

20      A   The ground water in places, as indicated in earlier

21  testimony, rises to the surface and is surface flow, and the

22  ground water under natural conditions returns to the surface

23  flow which was previously ground water, again returns to ground

24  water, may be forced to the surface at another point, flows

25  a distance as surface water, again enters the water body at a

downstream basin, moves as underground flow, may again rise

as surface flow.  So when I have been referring to the movement

of ground water from one basin to the next, it has in places

been rising ground water flowing over-- or, flowing on the

surface.  In addition, there is a quantity of underflow flowing

through the alluvial deposits, in addition to the observed

surface flow that has had its origin as rising ground water.

Q  What would be the effect of digging a well in the

vicinity of that ground-- where your water-- upstream from the

point of rising water, Mr. Kunkel, in your opinion?

A  I have referred in my previous testimony to two types

of springs.  I am not certain that I have pointed up the differ-

ence, but springs of the type that are shown in the north half

of S ction 23, Township 8 South, Range 1 East, and another

spring in the Southwest Quarter of Section 2, the same town-

ship and range, were observed to issue from the rocks of the

basement complex.  If wells were drilled in the immediate

vicinity up gradient or down gradient from those springs the

well would penetrate the rocks in the basement complex either

right at the surface or at very shallow depth, and in my

opinion the well would not yield large quanties of water.  Some

water would be derived from the cracks and fractures or

deeply weathered zones, but the quantity would not be great,

and it may or may not appreciably affect the spring flow.

MR. SACHSE:  I didn't get the sections.  Would you give

1  the sections you just testified to, please?

2      THE WITNESS:  North half of 20-- I believe it is 23.

3      THE COURT:  That is right.

4      THE WITNESS:  And the southwest part of Section 2, both

5  in 8 South, Range 1 East.

6      MR. SACHSE:  Thank you.

7  BY MR. VEEDER:

8      Q  Now, proceed to--

9      A  However--

10     MR. KRIEGER:  May we have that part of the testimony

11 where he was cut off, will he repeat that answer to the

12 question?

13     (Record read.)

14     THE COURT:  Now, you can tell us about the other kind

15 of rising water.

16     THE WITNESS:  Yes, sir.  The other type of spring as

17 shown, I believe it includes--

18     MR. VEEDER:  Mr. Kunkel, you have to know, you can't

19 believe.

20     THE COURT:  A good example would be up the west of

21 Coahuila Valley, wouldn't it?

22     THE WITNESS:  An example of those springs, or we may use

23 the one in Nigger Valley.

24     MR. VEEDER:  Use the one in Coahuila Valley, please.

25     THE WITNESS:  A well drilled upstream from the springs

1    in Coahuila Valley would tap the water-bearing deposits of

2    Coahuila Valley.  They are the same deposits that are feeding

3    the spring flow in Coahuila Valley.  If a sufficient number

4    of wells were drilled the deposits would be dewatered, the

5    water would be withdrawn from the pore  spaces in the sands

6    and gravel and other permeable mixtures of clay, sand and

7    gravel in the area of the alluvial plain, the water level

8    would be lowered; it could be lowered-- would be lowered to

9    a depth sufficient to intercept the spring flow, and the

10   flow of the springs would cease.  The same would be true for

11   the group of springs shown in Tule Valley, in the Southwest

12   Quarter of Section 26, Township 8 South, Range 1 East, it would

13   be true for the spring shown in Nigger Valley in Section 14,

14   Township 8 South, Range 1 West.  It would be true for the

15   springs in Pauba Valley, the springs in Santa Gertrudis Valley,

16   the springs in Long Canyon, the springs in Murrieta Valley.

17        Q  Now, I think you have given enough examples of that.

18   How have you differentiated between the appearances of the

19   weathered basement complex and the older continental alluvium

20   in making your investigation?

21        A  On the surface--

22        Q  You are again alluding to Plaintiff's Exhibit 15?

23        A  I am alluding to 15.  On the land surface the deposits

24   are very similar in character.  In the area south of Auld

25   Valley, which is shown on Exhibit 15, where the older

1    continental deposits are mapped, the deeply weathered phases

2    of the basement complex and the older continental deposits

3    are reddish in color, they are dissected and one can walk

4    across the area shown as a contact and no apparent break can

5    be observed on the land surface.  However, wells drilled in the

6    older continental deposits penetrate a considerable depth

7    of clay, sand, silt and gravel.  The deposits are water worn,

8    they are bedded, whereas wells drilled in the area mapped as

9    deeply weathered basement complex do not encounter the

10   sedimentary deposits of clay and sand, but they are weathered

11   materials that are predominantly clay due to the breakdown

12   of the felspar minerals in the basement complex.  Also,

13   isolated patches or islands of basement complex are observed

14   to crop out throughout the area mapped as the deeply weathered

15   phase of the basement complex and along the stream, Tucalota

16   Creek the basement complex can be observed beneath the deeply

17   weathered phase of the basement complex.

18        Q  Now, with reference to Plaintiff's Exhibit 17, which

19   has its designation ground water storage units, how did you

20   make your determination as to first the surface areas of

21   those ground water storage units?

22        A  The surface area was determined or was based on my

23   studies which resulted in the preparation of Exhibit 15.  All

24   of the areas shown as ground water storage units are within

25   the areas mapped as over continental deposits or younger

1   alluvial.  The boundaries do not exactly coincide for the

2   reason that in places the older--

3        Q  Wait just a moment.  The boundaries do not exactly

4   coincide.  The boundaries of what, Mr. Kunkel?

5        A  The boundaries of the ground water storage units and

6   the boundaries of the older continental deposits and younger

7   alluvium with other rock formations.

8        Q  Now, would you explain why that situation came about?

9        A  In parts of the area, for example the area northeast

10  of Murrieta Valley where the older continental deposits are

11  in contact with the basement complex, the older continental

12  deposits overlie the basement complex in a normal rather than--

13  a depositional rather than a false contact.  Consequently,

14  a well drilled near the margins of the older continental

15  deposits would penetrate only a very shallow-- of older

16  continental deposits and enter the basement complex.

17       Q  What do you mean by depositional as distinguished from

18  fault?

19       A  As I previously testified, these deposits have been

20  laid down by the processes of erosion.

21       THE COURT:  Have been deposited, and therefore you call

22  it depositional?

23       THE WITNESS: Depositional contact as opposed to a fault.

24       MR. VEEDER:  Proceed.

25       THE WITNESS:  A well drilled very close to the margins

1   of the older continental deposits would enter the rocks of

2   the basement complex and would not yield large quantities of

3   water, compared to a well that would penetrate a thick section

4   of the older continental deposits.  The determination of the

5   boundary of the storage unit--

6   BY MR. VEEDER:

7       Q  You are speaking of the esterior boundaries now?

8       A  I am speaking of the exterior boundaries of the storage

9   unit.

10      Q  And to which exhibit are you making reference now?

11      A  As shown in Exhibit 17.  Therefore are not at all places

12  close to the margin or close to the contact between the older

13  continental deposits and basement complex.  The exact position

14  was based on information obtained in well logs that showed

15  the depth of the older continental deposits to be sufficiently

16  great that it is possible to obtain well yields that would

17  be of practical use.  Elsewhere the contact is close to the--

18  the boundary of the ground water storage unit is close to the

19  contact of the older continental and, for example, the

20  residuum, the area south of the fault shown in the South Half

21  of Section 18, Township 7 South, Range 2 West.

22      The boundary of the storage unit is close to the contact

23  or the fault contact, because it has been determined that a

24  fault is at that position, and the deposits have an appreciable

25  thickness.

1    The boundary between Unit 4 and Unit 1, as shown on

2    Exhibit 17, as I previously testified, follows the fault

3    which is shown on Exhibit 15.

4        The same is true for the southwest boundary of Units 1

5    and 2.  The boundary indicated as-- or, the boundaries on the

6    unit indicated as Unit 3 correspond approximately to the

7    thickest part of the younger alluvial deposits in Pauba

8    Valley.  They do not include all of the younger alluvial

9    deposits in Pauba Valley, because the depth to water is

10   sufficiently great in the upper part of Pauba Valley that there

11   is not an appreciable thickness of saturated younger alluvial

12   deposits.

13       Q  Now, to what depth did you make your determination

14   from the standpoint of the ground water units that you have

15   designated?

16       A  I have calculated the storage capacity of the water-

17   bearing deposits within I believe it is-- I will have to check

18   my notes.

19       Q  You may check your notes.  Go ahead and check your

20   notes if you have to.

21       A  I have determined the storage capacity in six of the

22   twelve units shown on Exhibit 17, they are the units for which

23   there was a sufficient amount of data to calculate the

24   specific yield of the deposits.

25       MR. MOSKOVITZ:  Would you repeat those numbers again?

2578

1          THE WITNESS:  Six of the twelve ground water storage

2    units shown on Exhibit 17.

3          What is the question?

4    BY MR. VEEDER:

5          Q  Well, I asked you how you arrived at the depth, what

6    depth you arrived at.  And then I will ask you how you arrived

7    at your areal extent in acres to determine the--

8          THE COURT:  We have a new reporter.  That areal is

9    a-r-e-a-l.

10          THE WITNESS:  I calculated the storage capacity for the

11    upper 100 feet of saturated materials within six of the

12    twelve storage units shown.  The top of the unit, or the top

13    of the water body-- for the top of the water body I used the

14    1953 water level measurements, and I calculated to the depth

15    of 100 feet beneath that.

16    BY MR. VEEDER:

17          Q  And what were the factors that you took into consider-

18    ation in arriving at your calculation?

19          A  I determined the specific yield of the upper 100

20    feet of the water-bearing deposits for each ground water

21    storage unit, I determined the areal extent of the ground

22    water storage unit--

23          Q  Now, when you made your determination of the areal

24    extent what did you do to make that determination?

25          A  I planimetered the areas shown as the ground water

1   storage units.

2       Q   What surface investigation did you make, if any, in

3   that regard?   Did you go upon the land?

4       A   I went upon the land in the preparation of Exhibit 15,

5   and this is on the same, and all of the same information was

6   used.

7       THE COURT:   In other words, what you have been telling

8   us for the last couple of days is the observations you made

9   the study you made of the type of rock and where it was, and

10  all of that?

11      THE WITNESS:   Yes, sir, plus the data in well logs.

12      MR. VEEDER:   Yes.   Sometimes we work harder than others.

13      THE COURT:   Don't let these attorneys bother you, you

14  are doing all right.

15      MR. VEEDER:   Well, I am with him.

16      Q   Now, when you made your determination from the stand-

17  point of specific yield, what were the elements that you took

18  into consideration from the standpoint of specific yields,

19  what sources of data did you use?

20      A   I used the well logs, drillers' logs of water wells

21  for wells in the area shown on Exhibit 17.

22      MR. SACHSE:   Did you obtain specific yield from a well

23  log?

24      THE WITNESS:   I calculated specific yield from the

25  materials described in the well logs.

1      MR. SACHSE:  Did you do the actual calculating, or did

2  you use some published table of specific yield factors for

3  different types of material?

4      THE WITNESS:  I took the log and I estimated the specific

5  yield of the wells by analysis of the materials reported by

6  the driller, the values that I assigned to the various

7  materials reported to the driller-- by the driller are based

8  on works--

9      MR. VEEDER:  I was just going to ask that the cross-

10  examination be held until later, your Honor.

11      THE COURT:  Let him finish.

12      THE WITNESS:  Based on determinations of specific yield

13  by other works.

14      MR. SACHSE:  In other words, your determination of

15  specific yield, which you told us earlier as expressed in a

16  percentage, is based upon studies made by someone else, based

17  upon what materials yield when tested in the laboratory?

18      THE WITNESS:  That is correct.

19      THE COURT:  And you took what you found in the well logs

20  and therefore calculated how much the particular kind of

21  material there was, and so forth?

22      THE WITNESS:  That is correct.

23      THE COURT:  All right.

24  BY MR. VEEDER:

25      Q  Now, I hand you plaintiff's exhibit marked for

1    identification No. 18, and I ask you to state what it is.

2       A   It is a table prepared by myself which describes the

3    twelve ground water storage units shown in Exhibit 17; it

4    lists the areal extent of each unit in acres, the thickness

5    of the uppermost water zone as determined as of November, 1953,

6    the estimated specific yield in percentage as calculated by

7    myself, and the ground water in storage in the fall of 1953

8    in the top 100 feet of saturated materials for the areas shown.

9       Q   You made those calculations yourself?

10      A   That I did.

11      Q   And do you know them to be correct?

12      A   They are correct.

13   MR. VEEDER:   We offer in evidence Plaintiff's Exhibit

14   marked for identification No. 18.

15   THE COURT:   Do you have a copy of that I can look at?   Is

16   that your last copy?

17   MR. VEEDER: No, no.

18   THE COURT: I would like to have a copy of each of these

19   exhibits as we go along.

20   MR. VEEDER:   Yes, your Honor, we have a copy right here

21   for you.

22   MR. MOSKOVITZ:   I would like to ask some questions.

23   Mr. Kunkel, could you state specifically where you

24   secured your specific yield figures?

25   THE WITNESS:   The specific yield figures were calculated

1   by me from materials reported in drillers' logs--

2       MR. SACHSE:  By what?

3       THE WITNESS:  In drillers' logs of water wells.

4       MR. MOSKOVITZ:  But you applied a factor you said which

5   you secured from some place else.  Where did you get the

6   factors?

7       THE WITNESS:  The factors are based on laboratory

8   determinations by the Geological Survey for studies in other

9   alluvial areas, specifically the Mokelumne area; in California

10  the work was done by Piper, Robinson and others, which pub-

11  lishes the United States Geological Survey Water Supply Paper;

12  the materials in the drillers' logs were also related to the

13  work by Eckis, Bulletin 45 of the Department of Water Resources,

14  and the method that has been used by myself in the studies of

15  Sacramento Valley, Napa Valley, Sonoma Valley, parts of the

16  Mojave Desert region--

17      THE COURT:  Let me ask, I think I understand what you did,

18  from studies made by other persons you would get a certain

19  percentage figure that clay would yield, I suppose?

20      THE WITNESS:  That is right.

21      THE COURT:  And another percentage figure that sand would

22  yield?

23      THE WITNESS:  That is right.

24      THE COURT:  And then you took your studies of what

25  materials you found in the well drilling logs and you came up

1  with an average percentage for the particular storage unit

2  involved?

3       THE WITNESS:  That is correct.

4       THE COURT:  So your factors actually consisted of on the

5  one hand what kind of material you found in the storage unit,

6  and the other factor was a certain specific percent for each

7  particular kind of material?

8       THE WITNESS:  That is correct.

9       THE COURT:  Now, what Mr. Moskovitz wants, I think, are

10  your percentage figures for specific kinds of material.  Isn't

11  that it?

12       MR. MOSKOVITZ:  That is it.

13       You mentioned a number of sources that you derived these

14  specific yield figures from.

15       MR. VEEDER:  Now, your Honor, I think we have laid the

16  foundation for this.  I have made the offer, and if it is a

17  matter of cross-examination--

18       THE COURT:  Just take it easy.  I can permit voir dire

19  before I rule on the offer.  Just be calm, Mr. Veeder, you

20  will live longer.

21       Do you have those handy, or would you have to dig them

22  up and bring them in, or what?

23       THE WITNESS:  I would have to get them from my files

24  in Long Beach, sir.

25       MR. MOSKOVITZ:  I would like to have them brought in.

1      MR. VEEDER:  He will bring them in.

2      THE COURT:  You don't remember specifically, for instance,

3   what percentage figure you took for let's say fine sand?  Is

4   there a standard percentage figure?

5      THE WITNESS:  The percentage figure that I-- I would

6   have to check my notes to be certain-- but the percentage

7   figure I probably applied, I believe, was 10%.

8      THE COURT:  Are these figures in  percentage for differ-

9   ent types of material fairly standard with various texts and

10  authorities?

11     THE WITNESS:  The system that is used is a standard

12  procedure that has been used throughout-- by the Geological

13  Survey in studies throughout California.  It is a standard

14  method of estimating ground water storage capacity or the

15  specific yield of deposits.

16     THE COURT:  I am not asking about the system.  I am

17  asking about this specific percent that you took from other

18  texts and other studies to apply to particular kinds of

19  material.  Is that a standard figure?

20     THE WITNESS:  No, sir.

21     THE COURT:  Do you find 10% for sand everywhere, or does

22  one authority say 10, and one 9, and another say 11?

23     THE WITNESS:  It is not a standard figure that is auto-

24  matically applied to a driller's term regardless of the area

25  in which the term is used.  The estimate and the classification

1   of the terms involve the judgment of the person making the

2   determination.   It is based on his experience, by having

3   observed numerous wells having been drilled, the observation

4   of what a driller calls the material as it comes out of a

5   well.   Locally drillers are known to use terms that are not

6   necessarily correct.

7        THE COURT:   I understand all of that.   In other words, a

8   driller might call it clay, and from your observations and

9   studies you have made, and so forth, you might decide it

10   was a rather sandy clay; that may be an impossible situation,

11   I am not talking about that.   I am talking about the specific

12   percent that would generally be attached to a particular sort

13   of material, if there was no dispute about what the material

14   was.

15        THE WITNESS:   It involves the judgment of the person making

16   the estimate, is part of the-- is one of the factors used

17   in the assignment of the specific yield value.   It is based

18   on laboratory determinations of the type of materials which

19   are being studied, but they have not necessarily been made

20   in the area of the study, and all authorities do not agree

21   exactly on the exact value of specific yield.   But all

22   authorities-- or, I should not say all, but most authorities

23   have assigned or determined values that very closely approx-

24   imate one another.

25        THE COURT:   That is what I am getting at.   Now, these

1  authorities, these values assigned by most authorities as a

2  result of laboratory experiments, you have a list of those

3  values?

4      THE WITNESS:  I do not have them available.  However,

5  they are published in Bulletin 45, they are published in the

6  United States Geological Survey Water Supply Paper for the

7  Mokelumne River investigation.

8      MR. MOSKOVITZ:  Do these authorities that you refer to

9  agree with each other?

10     THE WITNESS:  The results are for different areas, there-

11 fore, the results are not identical; the results are not in

12 disagreement.

13     THE COURT:  We are not talking about the results now.

14 What Mr. Moskovitz means, and I will ask the question for him,

15 do the authorities generally agree on these arbitrary per-

16 centages that are assigned for specific types of material as

17 the starting point?  Now, of course there will be variations

18 when you go to use your judgment, but what about the starting

19 point, the laboratory experiments as to what clay should yield,

20 and sand should yield, and so forth?

21     THE WITNESS:  In my opinion there is no disagreement.

22     THE COURT:  That is what he is asking.

23     MR. MOSKOVITZ:  So all of the authorities that you cited

24 before are in agreement, and you didn't have to choose one

25 over the other and make an interpolation between them in

1    order to get a factor that you used?

2        THE WITNESS:  I had to use my judgment.

3        THE COURT:  Well, now, wait.  Again Mr. Moskovitz means

4    before you ever took a look at the--  Supposing you had gone

5    out here, you were going to make this study, bfore you ever

6    saw the valley, before you ever saw a well, before you ever

7    saw a pile of dirt that came out of a well, if somebody would

8    ask you now what do the authorities say should be assigned

9    as a specific yield for sand, for clay, or this, that and the

10   other thing, could you give an answer on which authorities

11   would generally agree academically, a certain laboratory

12   result?

13       THE WITNESS:  I believe I could give a value that

14   authorities would generally agree on.

15       THE COURT:  That is what he is talking about.  Did you

16   have to pick and choose on these percentages from the labora-

17   tory, or are they generally in agreement?

18       THE WITNESS:  I would say they are generally in agreement.

19       THE COURT:  Then when you saw the area and saw the well

20   logs, and you saw the material that came from wells, then you

21   have to use your judgment in applying these laboratory results

22   in a particular problem?

23       THE WITNESS:  That is correct.

24       THE COURT:  But you don't use your judgment on the

25   specifics that the technicians have found out in the laboratory?

1    THE WITNESS:  That is correct.

2    THE COURT:  Does that answer your question?

3    MR. MOSKOVITZ:  That does.

4    MR. SACHSE:  I have one other question, your Honor.

5    The exhbit isn't clear to me on the column, Mr. Kunkel,

6    the second column of figures, thickness of the uppermost

7    water zone.  Did you apply your specific yield factor to the

8    entire 100 feet, or did you eliminate some top amount that was

9    dry?

10    MR. VEEDER:  Again I object on the ground it is cross-

11    examination, your Honor.

12    THE COURT:  Wait.  The objection is overruled.  He took

13    the top hundredmost feet of saturated material.  There may

14    have been 50 feet of overlay on top of that.  Is that correct?

15    THE WITNESS:  That is correct.

16    MR. SACHSE:  I misunderstood.

17    MR. MOSKOVITZ:  I take it, your Honor, Mr. Kunkel is

18    going to bring in the standards he used?

19    THE WITNESS:  Yes.

20    MR. KRIEGER:  May I ask if the wells which are the basis

21    for this study are the same wells plotted on Exhibit 16?

22    THE WITNESS:  They include the same wells.

23    MR. KRIEGER:  But are there additional wells?

24    THE WITNESS:  Yes.

25    MR. KRIEGER:  Are those wells shown anywhere on exhibits

1     16 or 17?

2          THE WITNESS:  Those wells are not shown.

3          MR. KRIEGER:  Could they be identified on one of the

4     exhibits-- located, I mean?

5          THE WITNESS:  I could give you a well number for every

6     well that was located in the forty acres.

7          THE COURT:  You can take a rough map of this watershed

8     and could you spot every well on it by number that you con-

9     sidered in this study?

10          THE WITNESS:  Yes, I could.

11          MR. KRIEGER:  I think we should know where those wells

12     are located in relation to the Exhibit 17 for Identification

13     which is marking out those bases.

14          THE COURT:  Do you have a work paper on the location of

15     these wells?

16          THE WITNESS:  Not with me.  I do have a work sheet.

17          THE COURT:  Is it one sheet or a series of sheets?

18          THE WITNESS:  It is a series of handwritten sheets on

19     which I have done my calculations.

20          THE COURT:  You didn't have an overall map that spotted

21     each well?

22          THE WITNESS:  I have not prepared it as an exhibit, no,

23     sir.

24          MR. DENNIS:  We had lodged originally--

25          THE COURT:  Before you ask it will you bring in those

1    work papers?

2        MR. VEEDER:  We will have those in the courtroom, your

3    Honor.  And we will also bring in a designation of each well.

4    If your Honor requests we will prepare a base map to show

5    each location.

6        THE COURT:  Let's wait and see.  We may or may not have

7    a problem on that.  After counsel studies this there may or

8    may not be.  We will have the material brought here.

9        MR. KRIEGER:  I think it would be most useful to look at

10   that, because I think there isn't a proper foundation unless

11   those wells are tied in with the water basins about which

12   the witness has testified.

13       THE COURT:  How big a job would it be to take another

14   map like 15, or the base map 1, and spot in those wells, all

15   of the wells that you considered in this study?

16       THE WITNESS:  To locate them accurately would be a rather

17   major undertaking.  Every well has a number assigned to it

18   according to the system described, which will locate it

19   within forty acres.

20       THE COURT:  How big a job to locate it within 40 acres,

21   we will say, that is, not worrying about what part of the 40

22   you put it on.

23       THE WITNESS:  If the locations within 40 acres is

24   satisfactory it could be done within a few-- it would take

25   some time, it could not be done by Monday morning or Tuesday

2591

1    morning.

2        THE COURT:  It would be a less job?

3        THE WITNESS:  Yes.

4        THE COURT:  And all of these wells, of course, are

5    numbered according to this classification which show the 40?

6        THE WITNESS:  That is right.

7        THE COURT:  Then if there was a particular question as to

8    some 40 as to where a particular well was located by your

9    work papers you could locate where that well was?

10       THE WITNESS:  Yes, sir.

11       MR. SACHSE:  Your Honor, I might save some time here.

12   Do you know, Mr. Kunkel, whether all of these wells you used

13   are among those some 75 or 80 pages of well logs that are

14   published in Bulletin 57?

15       MR. VEEDER:  He will have to examine them.

16       MR. SACHSE:  I am asking him if the wells he used are

17   published in Bulletin 57.  I don't mean the logs.  I mean keep

18   it to ground water data, and so on.  There is a very large

19   appendix in 57.

20       THE COURT:  That would only show the location.

21       MR. SACHSE:  It would show location and depth to ground

22   water, your Honor.

23       THE COURT:  Have you looked those over?

24       THE WITNESS:  Yes, I have.

25       THE COURT:  Are those some of the wells that you

1  considered?

2  THE WITNESS:  They are the same wells, your Honor.

3  THE COURT:  Are all the wells that are listed in that

4  Appendix 57 included on your work sheets?

5  THE WITNESS:  I am not-- all of the wells have not been

6  used.  I have eliminated certain logs as having been un-

7  reliable.  I have some additional logs that I would have to

8  check to be certain how many.

9  THE COURT:  But generally speaking you tried to get all

10  of the data on wells, and if there was a well that wasn't

11  on-- if you knew about a well you used it whether it was

12  in Bulletin 57 or not?

13  THE WITNESS:  I collected my data directly from the

14  files of the Department of Water Resources without reference

15  to Bulletin 57.

16  THE COURT:  Then if you found a well log and for some

17  reason in view of your study and experience you thought it was

18  unreliable and misleading you eliminated it as part of your

19  study?

20  THE WITNESS:  That is correct.

21  MR. KRIEGER:  In view of the Government's position in

22  view of this extensive support of ground water, I think it

23  would be very useful to have some kind of an exhibit plotting

24  the location of these wells.

25  THE COURT:  Yes.  You will have plenty of time to do it,

1    I think, Mr. Kunkel.  And I think you had better take a base

2    map and spot the wells within the 40, put them right in the

3    center of the 40's with the understanding that if there are

4    certain ones that give some concern we will try to relocate

5    them.  Will that be agreeable?

6         MR. KRIEGER:  Very good.

7         Of the wells that you used to make this exhibit about

8    which you have been testifying, are all of those logs on

9    file with the State as a public record?

10        THE WITNESS: To the best of my knowledge they are all on

11   file with the State.  There are maybe one or two exceptions.

12   If there are they will be in the files of the Geological

13   Survey and available.  There has been a complete interchange

14   of data, to the best of my knowledge, and--

15        THE COURT:  Between the State and your bureau?

16        THE WITNESS:  Yes, that is correct.  The State should

17   have everything that the Geological Survey has.

18        MR. KRIEGER:  Can I assume then on the exhibit which his

19   Honor has asked you to prepare you could not only locate the

20   well and its location, but where the record is, whether it

21   U.S.G.S. or the State of California?  That is simply for

22   giving us access to any of these well logs if we want them,

23   your Honor.

24        THE COURT:  Can you use two colors?

25        THE WITNESS:  To the best of my knowledge the State has

1      copies of all of the logs.

2           THE COURT:  Well, you say there might be one or two.  If

3      you find one or two that you think the State doesn't have

4      put them in a different color.

5           THE WITNESS:  Or I will make them available to the

6      State.  It is the intention that the State has all of the logs

7      that the Geological Survey has.

8           MR. MOSKOVITZ:  To get our information complete I think

9      we should have the level of the water in all of the wells

10     which he will have spotted on the map.  It is that information

11     he drew in the contours, it is the location plus the level.

12          THE COURT:  Do you mean the map is to show the level?

13          MR. MOSKOVITZ:  Or something to accompany it.  Nothing

14     so far introduced indicates that information, all we have so

15     far is that result, a line with a level on the map, Exhibit

16     15.

17          THE COURT:  Well, you couldn't do that on a map.  You

18     would have to type up a separate document showing the levels.

19          MR. MOSKOVITZ:  I think sooner or later that has to

20     come in.

21          MR. VEEDER:  We will do it, your Honor.  We will get the

22     material.

23          MR. DENNIS:  If your Honor please, I think you covered

24     what I was going to do.  There are two exhibits, one and four,

25     which the Government lodged, covering Camp Pendleton, in

1   which the location of the wells in that area are done.  I

2   think if the witness could follow that and also put on it a

3   symbol showing whether it was being pumped or not pumped, and

4   whether used for irrigation, as in the case of Camp Pendleton

5   area, that would also be helpful.

6        MR. VEEDER:  Your Honor, I think we are willing to have

7   assistance in the preparation of our lawsuit up to a point,

8   but beyond that I am going to object.  We simply haven't got

9   the crew to do the work that we did in the Camp Pendleton

10  area.

11       THE COURT:  We are not asking you to go out and do any

12  more work.  We are asking you to catalog some of your work

13  already on the map.  This is a pretty basic problem and is

14  foundation material, and I think counsel is proper in their

15  request.  And I haven't seen 4 there.  1 was just the base map.

16       MR. DENNIS:  That is the one that went in evidence, your

17  Honor.  It was the one that was given No. 1 on the exhibits

18  originally lodged, and since that time the exhibit numbers

19  have been changed.  And so far as the list is concerned I

20  haven't found 1 on the new list.

21       THE COURT:  Let's not talk about the old list, we are

22  talking about the list that we started in this trial with,

23  and No. 1 is the basic map on the board.

24       MR. DENNIS:  That is No. 37, your Honor.  And No. 4 I

25  referred to would be Exhibit No. 40 as so lodged.

2596

1    THE COURT:  Let's see what it looks like, what you are

2  asking to be done here.  The letters and numbers are keyed to

3  some chart, are they?

4    MR. DENNIS:  Yes.

5    THE COURT:  L-1, G-1, K-1, H-1?

6    MR. VEEDER:  That is right, your Honor.

7    THE COURT:  What does the letter have to do with it, does

8  it again describe the 40 acres?

9    MR. VEEDER:  No.  We have a key list, and our witness

10  when he is called will testify.

11    MR. DENNIS:  You are using the same key here that Mr.

12  Kunkel testified to yesterday afternoon?

13    MR. VEEDER:  Yes.

14    THE COURT:  But the letter is again the 40 acres?

15    MR. VEEDER:  That is right.

16    MR. DENNIS:  You would have to apply the section number,

17  and the township number, and the range number, place it in

18  front of the letter on the exhibit.

19    THE COURT:  How many different wells do you think are

20  involved that you would have to show on this map?

21    THE WITNESS:  In regards to Mr. Dennis's request?

22    MR. VEEDER:  You are speaking now about--

23    THE COURT:  A map we wanted you to make to show the

24  wells.

25    MR. VEEDER:  And in regard to the ground water units

1  appearing on Plaintiff's Exhibit 17.

2  THE WITNESS:  It is several hundred wells.  It is an

3  appreciable number.

4  THE COURT:  Would you gentlemen want-- or, could you

5  eliminate the wells, if any, shown up around in the blue area,

6  except near the perimeters of these basins?  It seems to me

7  to be a waste of time.

8  MR. SACHSE:  It is all right with me.

9  MR. DENNIS:  It is all right with me.

10  THE COURT:  Why don't you limit yourself to wells within

11  the basins and nearby, and where they are clearly away from

12  any one of these areas, such as well out into the blue there,

13  just eliminate them.

14  THE WITNESS:  May I show only the wells for which I used

15  the well log data and the wells from which I used water data?

16  There would be no point in showing--

17  THE COURT:  That is what you should do, just the wells

18  you used.  If you didn't use a well and somebody else wants

19  to talk about it that is all right.  But if you used the

20  well we ought to have it on this map.

21  MR. DENNIS:  Your Honor knows, too, that it bears a

22  legend showing whether the well is used for test purposes,

23  whether it is being pumped, and whether it is an irrigation

24  well or a domestic well.  In view of the fact that the witness

25  said he only took the water level in the well it would be

1    helpful to us if we had that information.  Certainly we are

2    going to want it on cross-examination.

3         THE COURT:  Well, if you have this material such as

4    you have on this future exhibit I am looking at of the Camp

5    Pendleton, it wouldn't be any bigger job to put it in.  How

6    would you designate them, much the same as you have done

7    here?

8         THE WITNESS:  The locations of the well which would be

9    designated in the same manner.  As I understand Mr. Dennis,

10   he apparently wants to know whether the water level was a

11   pumping measurement?  All measurements used were non-pumping

12   measurements.

13        THE COURT:  That is eliminated, then.  What did you use,

14   domestic wells as well as irrigation wells?

15        THE WITNESS:  Yes, sir.

16        THE COURT:  Can you differentiate between that?

17        THE WITNESS:  I don't believe my notes carry the

18   differentiation.

19        THE COURT:  If they don't carry it don't show it.  What

20   about destroyed wells?  Do you have any destroyed wells that

21   you took into account?

22        MR. VEEDER:  That is from salt water intrusion that came

23   in from the basin, I think that is how that came about.

24        THE COURT:  That wouldn't apply.  You have here also test,

25   stock or unused well.  Do you have any designations like that,

1    either?

2        MR. VEEDER:  It occurs to me, your Honor, if we were to

3    bring the basic data--

4        THE COURT:  I don't think the symbols here will be of any

5    value.  Just some key so if we have to we can take the par-

6    ticular well and chart it out more accurately than the 40.

7        THE WITNESS:  Yes, sir.

8        THE COURT:  We will take a short recess.

9        (Recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   H

1          THE COURT:  Exhibit 18 was offered in evidence.  Is there

2   any objection?  Exhibit 18 was the computations.

3          MR. KRIEGER:  With the understanding that the supporting

4   data will come in.

5          THE COURT:  Yes.

6          MR. KRIEGER:  No objection.

7          THE COURT:  It will be subject to a motion to strike, etc.

8          MR. VEEDER:  The data will be here, your Honor.  There is

9   no question about that.

10         THE COURT:  Exhibit 18 is received in evidence.

11         (The document above referred to, previously marked for

12   identification, was received in evidence as Exhibit 18.)

13  BY MR. VEEDER:

14      Q  Mr. Kunkel, referring to Exhibit 18, --

15         THE COURT:  What does the word "graben" mean?

16         THE WITNESS:  "Graben" is derived from the German word

17  meaning "grave."  It is a downdrop block or a downdrop segment

18  of the earth's crust.  It is bounded on both sides by a fault,

19  and there is an extensive valley.  I believe the term was first

20  applied in the Rhine River valley.  The Murrieta Valley is a

21  graben.

22         THE COURT:  Go ahead.

23  BY MR. VEEDER:

24      Q  Referring specifically to the Murrieta Valley, to

25  which reference is made on Plaintiff's Exhibit 18, would you

2

1    describe in some detail the methods that you followed in

2    determining the specific yield which, as shown on here, is

3    11%?  What elements did you take into consideration?

4        THE WITNESS:  I think, your Honor, I would want to

5    approach the blackboard to describe it.  Or I can describe it

6    sitting down.

7        MR. VEEDER:  If you would be happier approaching the

8    blackboard, you may approach it.

9        THE WITNESS:  (Approaching the blackboard)  The terms

10   that are used in a driller's drilling a well and compiling a

11   log are very numerous.  I would estimate the number in the

12   Santa Margarita Valley on the order of 75 or 100; in terms of

13   the variation of the same term.

14       In the area for which I have calculated storage, the terms

15   had to be related to each other in a meaningful relationship

16   and they also had to be related back to the specific laboratory

17   yield studies to which I have previously testified.

18       For each well the well number was written down (writing on

19   blackboard).  I am not certain that that is a well number, but

20   it is a number that came to my mind.  There were 5 general

21   classes selected.  Call them 1, 2, 3, 4 and 5.

22       The well logs were examined without any assignment of

23   specific yield values, but the terms that were used by the

24   drillers were studied, the position of the well was considered,

25   the types of material that were observed in the outcrop areas

1   within the watershed that were observed were related to the

2   term that the driller used, cuttings that had been observed

3   that came out of wells in this and other areas in which I have

4   worked were considered, the local peculiarity of local terms

5   that the drillers may have used were considered, and it was

6   found that many terms could be grouped into five classes.

7   The degree of compaction of the materials was considered, with

8   the knowledge that the deposits that were weathered materials

9   that were encountered in drilling were of lower yields than

10  the materials that were not deeply weathered.  All of these

11  factors were considered.

12      THE COURT:  Did you say that weathered materials were of

13  lower yield?

14      THE WITNESS:  Weathered materials have lower yields than

15  unweathered materials.  Certain of the minerals, principally

16  the felspar minerals, which are potassium aluminum silicate,

17  decomposed due to the chemical action or hydration of the

18  mineral and the fragments of felspar, actually become clay.

19  they become a clay which cements the older deposits together

20  and it imparts the reddish color to them and it results in a

21  lower specific yield.

22      THE COURT:  Go ahead.

23      THE WITNESS:  All these factors were considered.

24      The various terms that the drillers used that indicated

25  well sorting and not a high degree of weathering were grouped

1    together as Class 1 material.

2        THE COURT:  Well sorted?

3        THE WITNESS:  Well sorted material.

4        THE COURT:  Uniform?

5        THE WITNESS:  Uniform in grain size.  As I have previously

6    testified, the uniformity of grain size--

7        THE COURT: Big or small?

8        THE WITNESS:  --big or small, will have the maximum

9    specific yield.  That is the reason that the first class was

10   based on well sorted.

11       The second class of material, the materials were rounded.

12   They were sands and gravel, but they were mixed.  They were

13   the second class of materials.

14       The third class of material were materials that were

15   mixed and were believed to be or were determined to be fair

16   in yield.  The percentage of clays in the materials was not

17   great, but there was more clay than in the well sorted or in

18   the mixed deposits.

19       For convenience I just used the symbol F for my own

20   designation.

21       The fourth class was a mixture of clay and gravel or sand

22   and gravel.  There was a predominance of silt.  The sorting

23   was poor, the materials were weathered and the specific yield

24   of the deposits was determined to be lower.

25       THE COURT:  What symbol did you put there?

THE WITNESS:  CG.  It is just a symbol that I used for my own notations.

THE COURT:  Clay-gravel?

THE WITNESS:  Clay and gravel mixtures, with the general implication that it carries.  Although it is merely an office notation that I used, the third symbol that I used was C.  The materials were predominantly clay and low in yield.

In my opinion, it is necessary to assign arbitrary specific yield values to these classes of material.  The values assigned were related back to the previous laboratory determination. I assigned a value of 25% to Class 1, 20% to Class 2, 10% for the Class 3, 5% for the Class 4, and 3% for the Class 5.  It was then possible to take wells that described the various classes of material, in which the drillers described the various classes of material, and on the basis of the examination the materials were assigned the various classes and the composite log was made in which all of the materials in group 5 were grouped together and totaled, the materials in group 3 were grouped together and totaled, and we may have ended up with a log that ,say, the driller reported 30 feet of well sorted gravel.  The gravel may have occurred at three 10-foot lenses.  It was not important.  They were grouped together as 30 feet under Class 1.  He may have had 20 feet of Class 2 material, and 50 feet of Class 5 material.  The total put in was 100 feet.

1    The next well may have been 13G2.  The driller may have

2    reported 20 feet of mixed material, 30 feet of clay and

3    gravel, and the well may have bottomed at that point, and the

4    total depth of that well may have only been 50 feet.  However,

5    the largest number of wells penetrated the full thickness

6    of 100 feet.

7    This was done for a series of wells, for the whole units.

8    In some of the units there were as many as 50 or more wells

9    for which the drillers' terms were classified into various

10   specific yields.  It was then possible to total up the

11   materials.

12   Then we are assuming that there are other values here.

13   To total of the quantity materials logged by the driller--

14   the numbers I am picking are for purposes of illustration

15   only-- may have been 500 feet of clay.  The total footage

16   was then added up and converted to a percentage value.

17   I calculated the percentage of each factor as related

18   to the total and I ended up with a percentage figure for each

19   class of material, which totaled 100%.

20   THE COURT:  You mean 10% clay, 50% sand, et cetera?

21   THE WITNESS:  That is correct.  The values here would

22   total, then, 100%.  These values do not correspond in the

23   example, but actually in the calculations they do.

24   These values were then multiplied by the values of the

25   materials encountered.  Percentage values of the materials

1  encountered were multiplied by the values of specific yields

2  for each percentage, for each class.  This value was multiplied

3  by 25, this one was multiplied by 10, this one was multiplied

4  by 20, this one by 5, this one by 3.  You would come out

5  with a number for each class.  The total came out to a value

6  which would be the specific yield of the water-bearing de-

7  posits.

8      The values ranged generally from about 9½ to 16%.  The

9  values were comparable to similar studies made by myself in

10  the Sacramento Valley, Napa and Sonoma Valleys.

11  BY MR. VEEDER:

12      Q  In what regard are they comparable?

13      A  They are comparable in the magnitude of the values

14  for the types of material encountered.

15      THE COURT:  You mean the percentage?

16      THE WITNESS:  The percentage, yes.  The percentages were

17  values that, in my opinion, were reasonable and correct.

18  Experience in other areas has shown that areas of low specific

19  yield have corresponded to the areas of poorer producing wells.

20  The area of higher specific yields corresponds to the areas

21  of better producing wells.  The values are comparable from

22  one area to the other.

23      The values for which I have determined specific yields,

24  for example, for Pauba Valley the specific yield is 16%.  The

25  specific yield for the older alluvial area is 11%.  Observation

1    indicates that the yields of wells drilled only in the younger

2    alluvial deposits of Pauba Valley as compared to the yields

3    of wells drilled in the older continental deposits, the wells

4    in Pauba Valley have better specific capacities.

5      The specific capacity of a well is its rate of production

6    in gallons per minute per foot of drawdown.  It is a factor

7    that indicates the ability of the deposits to yield water.  It

8    is not a measure of the specific yield of the deposits, but

9    deposits that have higher specific yields, wells drilled in

10    those deposits generally have higher specific capacities.

11      The examination of the records of wells in the upper

12    part of the Santa Margarita River bear out the specific yield

13    values that have been determined.  Any particular driller's

14    log may be challenged as to the validity of what the driller

15    meant to call the material.  Certain terms may be challenged

16    as not being absolutely in this class or inthat class, or it

17    may be a borderline case, but statistically it has been

18    observed in the areas in which I have done calculations of

19    this type that the results or the determinations of specific

20    yield correspond in general to the yields, are comparable

21    to the yields of wells in the various units for which specific

22    yields were calculated.

23      Q  What other factor did you take into consideration when

24    you arrived at the 84,000 acre foot of ground water storage

25    in the Murrieta Valley?  What were the factors that you

1   utilized?

2       A   The factors were specific yield, which is a value in

3   percentage of the water-bearing deposits, times the thickness

4   in feet.

5       Q   Where does that appear?

6       A   Thickness in feet is shown in the second column.   And

7   the areal extent of the water-bearing units in acres, the total

8   value, the product of the three values is the ground water

9   storage capacity of the units calculated.

10      Q   And the first column is reflective, then, of what you

11  calculated to be the areal extent of the Murrieta Valley; is

12  that correct?

13      A   The first figure, the areal extent of Murrieta Valley,

14  as measured by the planimeter is 7600 acres.

15      Q   I observe on Exhibit 18 that you haven't set forth,

16  for example, in Dameron Valley the ground water and storage

17  as you have in regard to the other valleys.   Would you ex-

18  plain the reason for that presentation?

19      A   There were an insufficient number of logs to make a

20  reliable determination of specific yield.

21      Q   Is that the reason for the balance of the valleys for

22  which you have made no calculations?

23      A   That is correct.   There was no reliable data for the

24  determination of specific yield.   Therefore, I have not

25  calculated the ground water storage capacity of the deposits.

1    However, I have indicated the areal extent of various ground

2    water units in the six other basins and for one of them I

3    have indicated that the thickness is 30 feet.

4        Q  Now, based upon your observations in this valley, what

5    is your opinion as to the effect of pumping, for example,

6    in the Pauba area, from the continental deposits upon the

7    yield of the Santa Margarita River at the confluence of the

8    Murrieta and the Temecula at the head of Temecula Canyon?

9        A  A number of deep wells were drilled in the Pauba

10   Valley and in the older continental deposits adjacent to Pauba

11   Valley.  A cone of depression would be created around each

12   well due to the pumping. If the wells were sufficiently close

13   together.  The cones of depression would intersect.   There

                                                    would be
14   would be the creation of a pumping depression which centered

15   around the well or well fields from which heavy pumping would

16   be done.  The decrease in water levels in the surrounding

17   cone of influence would induce ground water flow from all

18   directions toward the center of the pumping.  The result would

19   be a lowering of water levels, in the lower part of the valley,

20   to the point that stream flow or rising water in the Temecula

21   River would be greatly reduced or cease altogether.

22       Q  Would you express your opinion as to the relationship,

23   if any, between the yield of the continental deposits and the

24   yields of the younger alluvium in the valley under the present

25   conditions?

1    A The yields of the younger alluvium, where saturated,

2    are greater for the same thickness of deposits than the

3    yields of the older continental deposits.  However, in a large

4    part of Murrieta Valley and in the other valleys such as the

5    Aguanga Valley and Lancaster Valley, the thickness of the

6    younger alluvium, the logs and geologic mapping indicate that

7    the thickness is not great and that wells drilled on the

8    alluvial plain will encounter--

9        Q  When you say the alluvial plain--

10       A  --the younger alluvial plain will encounter older

11   continental deposits at depths and a large part of the yield

12   of the well will be withdrawn from the older continental

13   deposits.  If it is a very deep well or encounters a very

14   shallow thickness of the younger alluvial deposits, the major

15   part of the yield will be from the older continental deposits.

16       THE COURT:  You are asked what the effect of pumping

17   would be.  What about this?  Suppose a well was drilled in

18   the Pauba Valley and it pumps water and irrigates land in the

19   Pauba Valley, which is the younger alluvium, how does that

20   work out?  What percentage of that water is lost?  What per-

21   centage is returned to the watershed?

22       A  A percentage will return to ground water.  A percentage

23   will be lost due to transpiration of the plants.  I cannot

24   give you an exact percentage.  It depends on many factors such

25   as the quantity of water applied.  If a large quantity of

1   water were applied, there would be more returned to ground

2   water than if there were a minimum quantity of water applied.

3   I do not know the answer to that question.

4        THE COURT:  Go ahead.

5        MR. VEEDER:  You may cross-examine.

6        MR. MOSKOVITZ:  Your Honor, I would suggest that we call

7   a recess or adjourn for the day.

8        THE COURT:  Do you think we would save time?

9        MR. MOSKOVITZ:  I do, your Honor.

10        MR. VEEDER:  I might think of some more questions over

11   the weekend.

12        THE COURT:  Well, very often counsel will save time if

13   they organize their cross-examination and know what they are

14   going to ask and not just sit around watching the clock and

15   use up thirty minutes and then take the weekend to decide

16   what the cross-examination is going to be.

17        MR. KRIEGER:  I wonder if I could ask just two questions

18   in regard to this exhibit.

19        THE COURT:  Yes.

20   BY MR. KRIEGER:

21        Q  On the Murrieta Valley on Exhibit 18 you have

22   indicated that there are 7600 acres of areal extent.  Would

23   you trace that area for me on Exhibit 15.

24        THE COURT:  It is shown on Exhibit 17, isn't it?

25        MR. VEEDER:  That is right, your Honor.

MR. KRIEGER:  What portion of it is it;

THE WITNESS:  It is on Exhibit 17.

THE COURT:  Marked No. 1, isn't it?

MR. KRIEGER:  Good.

THE WITNESS:  If you would care to mark your own copy of Exhibit 15, you could very easily follow the fault line shown along the northeast bounary of Murrieta Valley and the fault line along the southwest part, with the exception of a small area at the area of basement complex shown in projected Section 6.  The southern boundary is a vertical line approximately at the confluence of the stream.  It would be in the northwest part of Section 18.  This boundary is not truly critical with regard to ground water.  It is one of convenience for calculation.

MR. KRIEGER:  The ground water storage unit set out on Exhibit 18 coincides, then, with Exhibit 17 exactly, the numbers and all the rest?

THE WITNESS:  That is correct.

MR. KRIEGER:  I understand.

THE COURT:  Let me ask you this.  You took a maximum of 100 feet of saturated material.  Is it customary in calculating water storage units to, say, take a hundred feet? Or how did you pick a hundred feet?

THE WITNESS:  A hundred feet is an arbitrary value that I selected.  It has been customary in other studies that the

1   Geological Survey has done where we have calculated storage

2   capacity to select convenient depth zones based on the

3   thickness of the deposits and the availability of well logs,

4   and also some consideration is given to the-- well, it is the

5   reliability of the data at depth.  Not that any one well log

6   becomes less reliable, but as you calculate for greater and

7   greater depths you run into more and more wells that do

8   not penetrate that full thickness, and if one were to

9   calculate the storage capacity of, say, the Murrieta Valley

10  for 700 feet, for the zone between 600 and 700 feet there may

11  be only two well logs and it would be a very shaky estimate

12  of specific yield based on two logs.

13      THE COURT:  That would be true then, say, in Unit 5,

14  shown on Map 17, and on your calculations on Exhibit 18 as

15  to 5 where it shows a natural dike of the basement complex

16  and shows a very deep area of the older alluvium?

17      THE WITNESS:  That is correct.

18      THE COURT:  And so you arbitrarily take a hundred feet.

19      THE WITNESS:  That is correct.

20      THE COURT:  What have other experts done?  Is it often

21  that greater depths are taken?  Does it depend on the well

22  depths?

23      THE WITNESS:  It depends partly on the well depths and

24  partly on a consideration of foreseeable-- a unit that there

25  may be water in the foreseeable future.  In the Sacramento

1    Valley where we calculated the storage capacity, units were

2    calculated for the upper 50, 50 to 100, and for the unit 100

3    to 200 feet.   In that valley we had 5,000 well logs and we

4    were able to calculate the storage capacity to a greater depth

5    than in Murrieta and Temecula watershed.

6        THE COURT:   Anybody else have any question they would like

7    to ask this afternoon?

8        MR. DENNIS:   Just one thought, your Honor.   I wonder how

9    we will proceed with cross-examination as to the order between

10   the various defendants.

11       THE COURT:   In what order will you proceed, gentlemen?

12   Or shall I nominate?

13       MR. KRIEGER:   Can we chat a little about it here by

14   ourselves?

15       MR. VEEDER:   Could we have the State of California start,

16   your Honor?

17       THE COURT:   I was just thinking, with the high regard I

18   have for Mr. Moskovitz, that maybe he would feel like starting

19   out.   But you can certainly agree among yourselves.   And if

20   you can't agree, I will call on somebody.   If you can't agree

21   among yourselves, Mr. Moskovitz would be my first choice,

22   then Mr. Sachse--

23       MR. SACHSE:   Has your Honor considered the fact of owner-

24   ship that is involved in this particular area we are talking

25   about?   I am wondering if we couldn't all learn something if

1   Mr. Stahlman, who has his engineer sitting alongside him here,

2   would take this whole thing on first.  The Pauba Valley and

3   the Nigger Valley is the Vail Ranch.

4       THE COURT:  Maybe he is not interested in cross-examining

5   very much.

6       MR. STAHLMAN:  I think your Honor has outlined some of

7   the steps in one of the previous orders, the order of proof in

8   this case, and I would think that would be the way to do it.

9       THE COURT:  Well, I hope nobody is going to cross-examine

10   just for the fun of it.

11       MR. VEEDER:  Maybe they don't want to cross-examine.

12       THE COURT:  I have learned long ago that there is no use

13   of cross-examining just for the fun of it.

14       MR. MOSKOVITZ:  Your Honor, the State will be happy to

15   start out when we resume, if no other party has a burning

16   eagerness to get to his feet first.

17       THE COURT:  That is fair enough.

18       MR. MOSKOVITZ:  We have many questions.

19       THE COURT:  We will adjourn until Tuesday morning at 9:30.

20   I have the criminal calendar on Monday.  I will not have any

21   time at all on Monday.  I am going to be at the State Bar

22   Convention on Thursday morning.  There will be no court on

23   Thursday morning.  If you agree and want some additional time

24   to get over there, I will accommodate you.

25       MR. STAHLMAN:  I would like to attend some of the

1    meetings.

2         THE COURT:   Discuss it among yourselves tonight about

3    this Bar meeting.

4         (Adjournment until Tuesday, October 7, 1958, at 10 A.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25