Mr. Veeder

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No.   1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:       San Diego, California

Date:       Tuesday,
            October 7, 1958

Pages:   2617 to 2742

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

Malcolm Love

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
|       Plaintiff,   ) | |
|   -vs-   ) | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY   ) | |
| DISTRICT, et al.,   ) | |
|       Defendants.   ) | |

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, October 7, 1958

APPEARANCES:

    For the Plaintiff:        WILLIAM H. VEEDER, Esq.,
                               Special Assistant to the
                               Attorney-General,
                               Department of Justice,
                               Washington, D. C.

| | |
|---|---|
| For U. S. Marine Corps: | COL. ELLIOT ROBERTSON. |
| For Defendant Vail Company: | GEORGE E. STAHLMAN, ESQ. |
| For Defendants Fallbrook Public Utility District, et al.: | FRANZ R. SACHSE, ESQ. |
| For Defendant State of California: | EDMUND G. BROWN, ESQ., Attorney-General, By ADOLPHUS MOSKOVITZ, ESQ., Deputy Attorney-General. CARL BARONKAY, ESQ. |
| For Defendant Santa Margarita Mutual Water Company: | W. B. DENNIS, ESQ. |
| For Defendants Hartman, Lewis, Wilks and Bayle, and Oviatt: | BEST, BEST & KRIEGER, By JAMES H. KRIEGER, ESQ. |

---o---

# INDEX TO WITNESSES

**For the Plaintiff:**                                          Cross

    Fred Kunkel                                           2628


**EXHIBITS**                                                   IN EVIDENCE

Plaintiff's Exhibit –

    16-A   Well logs                                      2622


Fallbrook's Exhibit

    AA –   Bulletin 57                                    2658


* * * * *

SAN DIEGO, CALIFORNIA, TUESDAY, OCTOBER 7, 1958, 10:00 A.M.

- - -

(Other matters.)

* * * * *

THE CLERK:  No. 4: 1247-SD-C, United States vs. Fallbrook, et cetera.

THE COURT:  Mr. Kunkel is on the witness stand for cross examination.


FRED KUNKEL,

heretofore called and sworn, recalled as a witness in behalf of the plaintiff, testified further as follows:-


CROSS EXAMINATION


MR. MOSCOVITZ:  Your Honor, I want to report first I have looked at the list of exhibits to be included in the pretrial order which shows those the State is proposing to introduce in the way the explanation is made as to their introduction.  Mr. Veeder asked me to do that last Friday, and it is satisfactory with me.

MR. VEEDER:  That is true in regard to Fallbrook, is it not, Mr. Sachse?

MR. SACHSE:  Yes, I so stated for the record Friday.

MR. VEEDER:  Yes, and we will put the matters all together, then, your Honor, and I think the pretrial order then will be in a condition for signing, then, later today.

THE COURT:  All right.

MR. VEEDER:  Now, there has been --

MR. STAHLMAN:  Pardon me.  I was unable to spend the time necessary to include all the Vail exhibits.  However, I am going to remain here again in San Diego, will be with Mr. Hall, and I think during the next few days we can get all of ours.

MR. VEEDER:  Would your Honor prefer to wait until that is done?

THE COURT:  Yes, let's wait a day or so and see if we can get that pulled together, too; everything else done.

MR. VEEDER:  We have the request that was made for well logs.  Those are here in the courtroom available for examination.  Should I deposit them, your Honor, with the Clerk?

THE COURT:  We can mark them for identification or put them in evidence or have them available with the Clerk. Which do you desire?  To have them part of the record?

MR. FEEDER:  I have no feeling about them, your Honor. I think that if the defendants want them in the record, why --

THE COURT:  Are they in one volume?

MR. FEEDER:  They are loose-leaf and contained in a single folder.

THE COURT:  Folder.  This is all the well logs, now?

MR. VEEDER:  No, your Honor; these are the well logs

1  concerning which you made inquiry on the cost section which

2  is Plaintiff's Exhibit 16.

3  THE COURT:  All right, we will mark them for identifica-

4  tion as 16-A.  Any objection to their going in evidence?

5  MR. SACHSE:  No.

6  MR. MOSKOVITZ:  No, your Honor.

7  THE COURT:  Received as 16-A in evidence, to be examined

8  by counsel.

9  This is an exception to the order I made that

10  exhibits be lodged ten days before being offered, but we

11  all understood what the situation was.

12  MR. MOSKOVITZ:  Your Honor, I want to clarify:  These

13  are the logs only for the wells shown in Exhibit 16 and

14  the ones to which Mr. Kunkel relied to draw his contours

15  on Exhibit 15; and the ones on which he relied to estimate

16  storage capacity have not yet been brought in.  Is that

17  correct?

18  MR. VEEDER:  No, your Honor, they haven't.  As I under-

19  stood, your Honor desired to have a map made of that.

20  THE COURT:  Yes; and then you are going to use them, I

21  take it, in making the map.  Then you will produce them in

22  the same manner.

23  MR. VEEDER:  That is right.  Yes.

24  THE COURT:  I think the point is that those are being

25  used in the preparation of this map.

MR. VEEDER:  And may I observe in that regard, your Honor:  the preparation of that map is quite an undertaking, and we haven't yet fixed a time as to when it will be available; although we assure you it will be available as rapidly as possible.

THE COURT:  All right.

MR. VEEDER:  There is another question that I would like to raise in regard to the utilization of certain of our expert witnesses.  It is obvious that this case is being tried in segments of the valley.  And the order of presentation may entail the calling of Col. Bowen and putting him on the stand for direct examination in regard to the particular area and then calling him again in regard to another area.  I would not want to be foreclosed of using him in that manner, and I would like to know your Honor's desires.

THE COURT:  Well, I don't understand what your problem is.

MR. VEEDER:  For example, when we move into the area of Camp Pendleton, which will be in the not too distant future, we would like to put in testimony in regard to sales in the Camp Pendleton area.  It breaks down very logically in that manner.  If we were permitted to put in that data and then to call Col. Bowen again in regard to the lands of the national government in the upper reaches of the watershed, it would be much better from our standpoint.

THE COURT:  You mean break up your presentation in segments rather than to use the witness for all purposes at the time he is called?

MR. VEEDER:  That is correct, your Honor.

THE COURT:  I see no objection to that.

MR. SACHSE:  No.

MR. DENNIS:  No objection.

MR. VEEDER:  In other words, we can withdraw him and put him back on again.

THE COURT:  In fact, the record would be in better shape if he were used for the particular areas and postpone his testimony on some of the areas until we get to that part of the case.

MR. VEEDER:  And Mr. Mosckovitz and I are to discuss the preparation of the summation of the record, is that correct, as I understand it, for --

THE COURT:  Yes, you are to talk that over; since both of you were going to do something in the matter.  And the end result of your conference is to see what can come out of that that would be useful to other counsel in this case.

MR. VEEDER:  Well, I just wanted to note that.

THE COURT:  Well, this, we will say again, while I am thinking about it, about what I am thinking about:  this doesn't have to be for other counsel in great detail.  I am just looking over my notes for the first three days of this

trial -- and I have not made extensive notes, because we have a transcript -- but for the first session we had the series of housekeeping matters which we took up. The first witness was called; his name, merely, and a statement of his qualifications. All counsel needs is a page reference to find what they want. And then he started in to describe the river system from the head waters in Chihuahua Valley to its junction in the Murrieta. And there were slides shown of the rock material, other areas and other matters. And then he started with the various creeks leading into the Temecula River. Now, that is almost enough of a summary with the pages for counsel to pick up what he is looking for. There could be more detail. On Thursday, the various creeks were described, Tucalotha, Wilson; shown slides, and so forth. It doesn't list all the names of the creeks, but these creeks with the page number would be helpful to have indexed. And Friday: Exhibit 16, cross-section of Exhibit 17, the ground storage areas, computations, and so forth. You could have a short summary of subject matters by names of areas, exhibits, names of witnesses, which would be very helpful to counsel in trying to run through later on and pick out something that they wanted. Now, of course, I admit it is probably simpler -- it would have to be -- I am not thinking of a detailed summary of everything a witness testifies to. You have got the transcript. If you get something in the way of summary of

names, subject matter, and so forth which counsel could then take and cross-reference himself, he could make a card index on it and do anything he wanted to, or he could take these sheets and thumb through and he could find what he wanted. Does anyone have any different ideas about this?

MR. MOSKOVITZ: Your Honor, we are sort of feeling our way along, trying to find out what would be most useful. And we may, for our purpose, want to make it more detailed, because we may want to use it without having to go to the transcript for the need, use it rather than just the head notes.

THE COURT: Let's leave it. You and Mr. Veeder will discuss it, and I will sit in with you, and we will talk it over and see what we come up with. You are doing something for your own benefit, and Mr. Veeder is doing something for his; and I am trying to see what we can squeeze out of your efforts for the benefit of other counsel.

MR. MOSKOVITZ: We have no objection to sharing with everyone what we come up with if they want to use it.

THE COURT: We will discuss it later.

MR. VEEDER: We have one more housekeeping detail there. I talked to Mr. Luddy about this, or, rather, he has talked to me about it: We have these exhibits with numerous pages. For example, the 1938 aerials, the 1929 aerials, and the 1955 aerials. We have ascribed to them a single

exhibit number.  But it is evident that, or, rather, we
inquire what your Honor desires to have us make those, A,
B, C and D?

THE COURT:  I think we will have to do that if your
aerial map is given one number and consists of a number of
pages.  They are separate and apart, and you are to number
the pages with the letters listed following your Arabic
numerals.  You and the Clerk can work that out and get a
list up and later on we will file it for transcription with
the record.

MR. VEEDER:  Very good, your Honor.

Now, in regard to your map, the exhibit 15:  we
feel that the only way to do a satisfactory work for your
Honor on that is to send it up to Los Angeles, I mean, up
to Long Beach, and have it done there.  And if that is
agreeable, we will send it up this evening.

THE COURT:  In other words, you have an objection to
Mr. Kunkel?

MR. VEEDER:  That is right.

THE COURT:  I see no objection to that.  Does anyone
here see any objection to that?  All right.

MR. MOSKOVITZ:  Another inquiry, your Honor:  At the
outset of the testimony when you were qualifying Mr. Kunkel,
I believe you stated you would submit to the Court a list
of Mr. Kunkel's professional papers for Court and counsel.
Has that been done?

MR. VEEDER:  That has been prepared, and I think that it has been tended, although I will check it.  It has been prepared, and it is available, and available for distribution, also.  It has been completed.

MR. MOSKOVITZ:  All right.  In light of the fact that Mr. Kunkel, or the plaintiff is still preparing the map showing the well locations and well logs used for contours and for estimating storage capacity, drawing the outlines of the ground water storage units, necessarily a good part of what would be cross examination will have to be deferred until we receive those.

THE COURT:  That is agreeable.  It is understood.


CROSS EXAMINATION

BY MR. MOSKOVITZ:-

Q    Mr. Kunkel, I would like to go into some of the investigations you made in the past for the United States Geological Survey.  Was there any investigation to be made in the past which covered an area of comparable size to the upper area of the Santa Margarita River about which you have testified to in the last few days?

A    The studies in the Sacramento Valley which I have testified was a larger area.  The types of alluvial deposits were of the same ages and of the same types as those found in the upper part of the Santa Margarita River watershed. My studies in Napa and Sonoma Valleys were for an area of

1    considerable size.  However, there were two major valleys

2    in that area rather than the number indicated for the upper

3    part of the Santa Margarita River.  The deposits that I

4    studied were of the same ages and types.  However, in the

5    Napa and Sonoma Valleys areas there were appreciable thick-

6    nesses of volcanic rocks in the area that also contain

7    water, and they also were considered.  That is also true

8    of the Sacramento Valley.  There were volcanic rocks in

9    the Sacramento Valley that were considered.

10         Q    Now, as I get it, the Sacramento Valley was a

11   larger area than the Santa Margarita River upper watershed?

12         A    That is correct.

13         Q    Sonoma Valley and Napa Valley, which you studied

14   together, were comparable in size to the upper watershed of

15   the Santa Margarita River; is that correct?

16         A    Yes, they were comparable.  It does not imply the

17   same exact dimensions, that is true.

18         Q    But in the same general magnitude of size?

19         A    Same magnitude, yes.

20         Q    I believe you testified that there were just two

21   valleys there whereas in the upper watershed of the Santa

22   Margarita you have a number of valleys; is that what you

23   said?

24         A    There were two principal valley areas in Napa and

25   Sonoma Valley, yes.

1    Q    And in the Santa Margarita upper watershed how
2  many are there?

3    A    On Exhibit 17, I have differentiated twelve hydro-
4  logic units.

5    Q    Would you then conclude this upper watershed area
6  of the Santa Margarita River is probably a more complex
7  area than the Sonoma and Napa Valley areas that you studied?

8    A    No; I would say it is not more complex.

9    Q    Equal in complexity?

10    A    Again, use the word "comparable."

11    MR. VEEDER:  May I hear the question and answer?  I am
12  not sure whether he responded to the question.

13    (The reporter read back the question and answer.)

14    MR. VEEDER:  That means something to them.  It doesn't,
15  though, mean it is all right.

16    Q  BY MR. MOSKOVITZ:  Over what period of time did you
17  conduct the investigation of Sonoma and Napa Valleys?

18    A    The period of about 1950 through the fall of '52.
19  For the exact months, period down to months, I would have
20  to consult my notes.

21    Q    That would be a little over two and a half years?

22    A    About that.  About that length of time.

23    Q    Were you in charge of that investigation?

24    A    I was working under the direction of Dr. Joseph
25  Upson, who was my immediate supervisor.  And I did all of the

1   field work, supervised the work of subordinate employees;

2   and in the report that has been prepared I am the senior

3   author.

4        Q    How many men were associated with you or worked

5   under you in that investigation?

6        A    I would have to check my notes, but it involves

7   several men.

8        Q    Can you give a rough number?

9        A    I can name three of them right off by name.

10   THE COURT:  Were there fifty men, or five, or ten?

11   Approximately?

12        THE WITNESS:  I was the principal geologist in doing

13   the work.  I had assistance at times throughout the entire

14   study.

15        Q  BY MR. MOSKOVITZ:  Assistant geologist?

16        A    A field assistant who was a geologist.  His rating

17   was that of field assistant.  However, he was an accredited

18   geologist, a graduate geologist from an accredited university.

19        Q    Approximately what was the neighborhood of the

20   number of people other than you and your principal assistants

21   who worked with you in making this investigation?

22        A    Well, I did practically -- I did all of the work

23   myself, all the studies with the aid of my assistants.  I

24   have one assistant at a time; different ones through the

25   course of the investigation.



Runkel - Cross

1   Q    Did you have any other professional specialists

2   working with you on various phases of the investigation?

3   A    At all times on any study for the Geological

4   Survey you have -- you are expected not only to have access

5   to other professional men for purposes of consultation,

6   to discuss techniques to be used -- no project within the

7   Geological Survey is the product of one man.  One man may

8   do the bulk of the work, do the bulk of the field work, the

9   office analysis, but at all times he is in consultation with

10   other professional men.  And his work is in the process of

11   review for the purposes of his education and development in

12   the field of ground water and also for the maintaining the

13   accuracy and the quality of the Geological Survey publica-

14   tions.

15   Q    Now, what types of professional specialists did

16   you consult?  Whose services did you use during that period?

17   A    As I indicated, my immediate supervisor was Dr.

18   Upson.

19   Q    What was his professional specialty?

20   A    He is a geologist by profession.  He was aware at

21   all times of the geologic mapping that I was doing, the

22   collection of basic data that I was doing.  I consulted with

23   him at least once a week.

24   Q    Throughout this over two and a half-year period?

25   A    Yes, that is correct.

Kunkel    Cross

Q    And what other professional specialists?

A    In addition, I worked with -- subject to review of the District Geologist, Mr. Poland.  Also review of the report, and results were reviewed or subject to the review in consultation with Harry Wilson, who is now Acting District Geologist in Sacramento, who is an engineer by profession. The results were subject to review by the editorial staff of the Geological Survey in Washington, D. C., who include a staff of engineers and geologists.

The results of my studies in Napa and Sonoma Valley prior to publication has been reviewed by all of these persons for the accuracy of the content and the validity of the conclusions drawn from them.

Q    Could you give an estimate as to the number of man days or man months or man years, whatever measure is most convenient, that were involved in making the Sonoma and Napa investigation?

A    In excess of two man years.

Q    It would have been in excess of two man years.  You said you spent yourself over two and a half years with practically full-time assistants, and you had these other people?

A    That is right.  Also indicated in the testimony that at the same time I did a study in Lake County that involved a period of several months and --

1    Q    I see.  And you say in excess of two man years.

2    Would it be three man years?

3    A    I don't know the answer to that.  I would have to

4    check my notes and my time schedules.

5    Q    Was the Sonoma and Napa investigation typical in

6    its extensiveness and intensiveness with the investigations

7    which the United States Geological Survey makes when it

8    goes into an area and attempts to determine the ground

9    water possibilities in the area?

10    A    What do you mean by "typical"?

11    Q    Was it comparable in the methods, in the intensity,

12    in the extensity, extensiveness of the survey with others

13    that have been engaged in and made by the survey?

14    A    All studies and data -- strike the word "data" --

15    all studies involving interprative information by members

16    of the Geological Survey must go through the process of review

17    that I have indicated.  It is a legal impossibility for a

18    member of the Geological Survey to release a report without

19    review and approval through the complete chain of command

20    to the Director of the Geological Survey.

21    Q    You haven't answered my question completely.  I am

22    talking about the intensity and the extensiveness of the

23    survey, not just the review procedures.  Now, again, the

24    intensity and not analysis of which that data was treated.

25    MR. VEEDER:  Well, now, the witness has about four

1     different questions before him at the present time.  I think

2     that ought to be drawn down.  There is an intensity, and I

3     think he said extensiveness.

4          THE COURT:  Which study are you talking about?

5          MR. MOSKOVITZ:  I am talking about the Napa-Sonoma

6     study still, your Honor.

7          THE COURT:  He may answer.  Overruled.

8               The gist of the question is:  Is the study you made

9     of the Napa-Sonoma Valley comparable to the study you made

10    here, in that, was that study, the Napa-Sonoma Valley, as

11    intense, as detailed, or less intense, less detailed, and

12    so forth?

13         MR. MOSKOVITZ:  I haven't really gotten to that question,

14    your Honor.  I am coming to it.

15         THE COURT:  Restate it.

16         MR. MOSKOVITZ:  I want him to compare the intensity and

17    extensiveness of the Napa-Sonoma study with those --

18         THE COURT:  Generally.

19         MR. MOSKOVITZ:  -- generally made by the U. S. G. S.

20         THE COURT:  All right.

21         Q  BY MR. MOSKOVITZ:  Is it a typical study?

22         A    I am afraid that is an impossible question to

23    answer, because I do not --

24         Q    You do not know?

25         A    That is not my answer.  I do not say that.  The

Kunkel - Cross

1   answer I was going to say is that, to the best of my
2   opinion, there is no typical study by the Geological Survey.
3   A study may involve a one-day examination of an area.  It
4   may involve a study of an area for a period of years.  The
5   process of review is the structure -- the structure of the
6   process of review is such that the conclusions presented
7   by the Geological Survey are warranted upon the data in-
8   vestigated and presented.
9       Q    When did you start making the investigation of the
10  Santa Margarita River upper watershed which you have
11  testified about the last three days?
12      A    What?  Did you say the upper part or the watershed?
13      Q    The upper part about which you testified, specifically,
14  above the confluence; well above Temecula Gorge?
15      A    Well, the first reconnaissance of the area, as I
16  testified earlier in the record, was in October, 1955.  I
17  may have to verify my notes for the exact date.
18      Q    Did you conduct that by yourself or with others?
19      A    I was in the company of another United States
20  Geological Survey geologist who had done work on the lower
21  part of the watershed and who was acquainted with the
22  geology, hydrology, in the upper part of the watershed.  We
23  drove through the area and examined the Murrieta drainage
24  from Elsinore to the confluence of the Murrieta creek with
25  Temecula creek and the outlet at which point details of

1    the geology and hydrology were explained to me by Mr.

2    Olmstead based on scientific investigations that he, in the

3    course of his work, had done.

4        Q    Who is this Mr. Olmstead?

5        A    Mr. Olmstead is the United States Geological

6    Survey employee.  He is a graduate geologist. He has a

7    Master's degree in geology.  I perhaps had better qualify

8    that:  to the best of my knowledge he has a Master's degree

9    in geology, and he is presently employed by the Geological

10    Survey in the eastern part of the United States.  He has

11    done work under the supervision of Mr. Wortz in the Santa

12    Margarita watershed.

13        Q    So you rely to a certain extent on the work he had

14    previously done?

15        A    That is correct.

16        Q    Do you know how many days he spent in investigation

17    of the upper watershed on the basis of which he imparted

18    information to you?

19        A    No, I do not know, in number of days, what he spent

20    on the watershed.

21        Q    Do you have any estimate?

22        A    I have no method of estimating.

23        Q    In the testimony you have given it has been partly,

24    then, what he told you, and partly what you yourself observed?

25        A    The testimony that I have given has been based on

1    evidence or basic data that I have observed in the field and

2    in the files of the United States Geological Survey and

3    the State of California.

4        Q    Was it based in part upon the information which

5    Mr. Olmstead imparted to you?

6        A    My conclusions at which I have arrived would be

7    identical if Mr. Olmstead had never existed.  They are not

8    dependent upon what he told me or what we examined.  They

9    are based on what we examined on that day.  They are not

10   based on what he told me.

11       Q    So --

12       A    My --

13       Q    So the amount of work --

14   MR. VEEDER:  Let him finish his answer.

15   MR. MOSKOVITZ:  Pardon me.

16   THE WITNESS:  My conclusions are based on my own ob-

17   servations and analysis of existing data.

18       Q    BY MR. MOSKOVITZ:  So the amount of work that he may

19   have previously done played no part in your conclusions and

20   in the data on which you base your conclusions?

21       A    I would answer yes to that question.

22       Q    How many days did you spend in that first ~~reconizance~~  *reconnaissance*

23   over the Murrieta watershed?

24       A    The one which we have been testifying with Mr.

25   Olmstead?

Kunkel - Cross                                                    2639

1    Q    Yes.

2    A    One day.

3    Q    And what was the next time that you did any work

4  on the Santa Margarita upper watershed investigation?

5    A    It was a reconizance trip from Elsinore down

6  Murrieta Valley to the outskirts of Temecula where Highway

7  71 has its junction with Highway 395.  I traveled the length

8  of the watershed along the highway to the head waters at

9  Dodge Valley.

10    Q    Yes; Mr. Kunkel, although I am interested in what

11  you did, my question is, when did you do this?

12    A    July 8, 1956.

13    Q    And were you alone on that trip?

14    A    Yes, I was alone on that trip.

15    Q    How many days did you spend on that trip?

16    A    I spent one day on that trip.

17    Q    When was the next time that you conducted or took

18  part in the investigation of that upper watershed?

19    A    The exact date, I would have to check my notes, but

20  it was early in October; sometime between the 10th and 20th

21  of October, 1957.  Q  Would you like some water?

22    A    No, thank you.

23    Q    Would you like to look at your notes?

24         Did you do that investigation by yourself?

25    A    Yes, I did.

Kunkel - Cross

2640

1    Q    How many days did you spend on that one?

2    A    From the period of October, early in October,

3  through December, I investigated the watershed on a number

4  of occasions.  I would have to check my notes for the exact

5  number during that time.

6    Q    Do you have your notes with you?

7    A    No, I don't.

8    Q    Where are they?

9    A    They are in the office.

10   Q    Can you make an estimate as to the number of days?

11   A    I would estimate that I have spent on the -- during

12 the period of October through December I would estimate

13 about twenty days.

14   Q    And this is the beginning of October through the

15 end of December?

16   A    Yes, that is correct.

17   Q    It would be a period of approximately 90 days?

18   A    90 calendar days.

19   Q    90 calendar days.

20   A    60 work days.

21   Q    And you spent about half your time working days on

   that investigation?

22   A    About that time, yes.

23   Q    And this involved what, a touring through the

24 watershed and observing the geologic features of importance?

25   A    I rather object to the word "touring."  I was on

Kunkel - Cross

1    foot a great deal of the time, hiking over very rugged

2    terrain.  I would say that I conducted a detailed examination

3    of the Murrieta-Temecula Rivers and its tributaries.

4    Q    Did you do this by yourself?

5    A    With regard to the main stems of Temecula, Murrieta,

6    Warm Springs Creek, Coahuila,   Wilson Creek, I did it

7    entirely by myself.  For some of the outlying areas I had

8    the assistance of another professional geologist who was

9    working under my direct supervision.

10    Q    About how much time would you estimate he spent?

11    A    Again, I would have to check my records in Long

12    Beach, but on the order of two weeks.

13    Q    Could you check your records in the recess and

14    indicate afterwards?

15    A    I cannot check them in the recess.  I will have to

16    check his time and attendance reports in Long Beach.

17    Q    Could you check your own records in the recess and

18    report whether you want to change the estimate you made of

19    approximately 30 working days?

20    A    I again will have to check my own time and

21    attendance reports in Long Beach.

22    Q    The notes you have with you don't indicate the days

23    you spent?

24    A    No, they do not.

25    Q    I want to give you the opportunity to modify the

Kunkel - Cross

1   estimate you have given if your records show that they are

2   different.

3      MR. VEEDER:  Is that a speech or is it a question?

4      MR. MOSKOVITZ:  I am asking him to report when he has

5   had a chance to check those notes.

6      THE WITNESS:  What, specifically, what is it that you

7   are requesting that I do?

8      Q  BY MR. MOSKOVITZ:  The number of days that you spent,

9   and the number of days and man days that your assistants

10  spent in the investigation that transpired between the first

11  of October and the last part of December of 1957 in the upper

12  watershed?

13     A    That will require that I inspect my time and

14  attendance reports and my field notes and also my assistants'

15  time and attendance reports and field notes in Long Beach,

16  at which time I should be able to give you a figure for the

17  number of days that were spent in the investigation.

18     Q    Yes; if the investigation shows that your estimate

19  was materially in error, then we would like to have the

20  correct number of days.  If the estimate is substantially

21  correct, well, it is not necessary to bring in any more

22  information.

23     MR. VEEDER:  Now, I don't want this man to go to jail.

24  What do you mean by "substantial"?

25  Q BY MR. MOSKOVITZ:  Within one or two or three days.  If it

1    is a week off, two weeks off, then I would like to have the

2    information.

3        A    With regard to --?

4        Q    I think it is simple.  I just want the time that

5    was spent.

6        A    There is far more time spent on an investigation

7    than merely the field work.

8        Q    We are getting to that.  I want to find that out,

9    also.  I am talking about the field work you testified

10   about.

11       A    Just so there is no --

12       Q    Now, what other work subsequently did you perform

13   on this upper watershed investigation?

14       THE COURT:  Going on the ground, you mean?

15       MR. MOSKOVITZ:  Subsequent to the time of the --

16       THE COURT:  Well, you say, "what other work."  Now, do

17   you mean at other times or do you mean other work besides

18   going on the ground for the times we have already referred

19   to?

20       MR. MOSKOVITZ:  I had better specify.

21       Q    Up to the end of December, 1957, did you spend any

22   time in this investigation other than going over the ground?

23       A    Yes; I spent a great deal of time analyzing the

24   data available for the upper part of the watershed.

25       Q    How much time would you estimate you spent up

1       through the end of 1957 doing that?

2           A    Again, I would have to check my notes.   It was --

3           Q    Can you make an estimate?

4           A    It was the major part of the time.

5           Q    A major part of your time beginning when?

6           A    In October, 1957, through the present.

7           Q    Prior to October, 1957, did you spend any time on

8       analysis of data on work other than field inspection?

9           A    Yes.

10      MR. VEEDER:   Would you designate the areas, counsel?

11      We want to know.   That is important, the work that he did.

12          MR. MOSKOVITZ:   Well, this whole line of questioning

13      relates to the upper watershed area.

14      THE WITNESS:   Yes, I did.

15          Q   BY MR. MOSKOVITZ:   Can you estimate how much time

16      you spent prior to October, 1957?

17          A    That is the estimate that I will not be able to

18      give you from my notes, because it involved very frequent

19      conferences with Mr. Wortz and other members of the staff

20      in Long Beach.   I testified to that on my first day on the

21      stand in which I stated that the results of the studies at

22      Camp Pendleton and the Pauba Basin, the wells -- I believe

23      I used that word, specific reference to the Pauba well is

24      of, is and was of great importance to us in our analysis

25      of older continental deposits which occur throughout most

1   of the alluvium-filled valleys in California; and results

2   of the Pauba well and its test, the type of material that

3   it encountered were analyzed, referenced in considerable

4   detail, and related to other ground water studies made by

5   various members of the staff and various ground water basins.

6   As I testified to one of your earlier questions, any study

7   by a member of the Geological Survey involves conferences

8   and consultations with other men working in similar areas,

9   and to give you an exact time as to how much time was spent

10  that way, it would be a physical impossibility.  There were

11  many hours spent that were not on government time --

12  Saturdays, and week ends.  When two geologists get together,

13  they don't watch the clock.

14       MR.   STAHLMAN:  They are worse than two lawyers.

15       Q   BY MR. MUSKOVITZ:  Can you give us any estimate at all?

16       A   I wouldn't have an estimate.

17       Q   You couldn't estimate whether it was a one-man

18  month or a one-man year or ten man years?

19       A   It obviously is not ten man years.

20       THE COURT:  What you ask in time, counsel -- pardon me

21  for telling you the story.  It will illustrate the questions

22  here.  Some time back I was asked to participate in a time

23  study, along with a number of other judges in the United

24  States on cases.  We were to keep track of time we spent and

25  what kind of work we did.  It was an amazing thing to me.

1    I am working on a case, we will say.  You pick up a brief

2    or a bundle of papers; you take them home with you.  And

3    maybe on Sunday afternoon you are reading; maybe you get

4    half an hour now, a couple of hours somewhere else.  Until

5    you sit down and try to keep a compilation you haven't any

6    idea how much time you put in on some of these problems.

7    I would imagine that a professional man like a geologist

8    would have the same problem, unless he is a fellow that

9    closes his office up when he leaves at 5:00 o'clock when

10   the whistle blows and never thinks about his problem or does

11   any work on it until he opens the door when he gets back to

12   the office on a Monday morning.  What do you do about the

13   calculation?  What do you do about that?  It may not be

14   reasonable or anything.  I think occasionally when he has

15   problems a man may sit around and just contemplate it for

16   a while, think about it, with nobody around to bother him.

17   You want that time, too?

18        MR. MOSKOVITZ:  I want the time that this witness can

19   estimate for us he spent on this investigation.  Now, he can

20   consider whatever time he feels properly should be attributed

21   to it.

22        THE COURT:  Why don't you ask him to make some summary

23   from his notes in Long Beach and wait until that comes in

24   and look it over and see whether you want to question him

25   further?

1      MR. MOSKOVITZ:  That is agreeable.

2      THE WITNESS:  If I may offer a --

3      MR. MOSKOVITZ:  A comparison of the time you spent on

4  this investigation or time that was spent on this investiga-

5  tion in preparation for the testimony that you have given

6  here.

7      MR. VEEDER:  Now, your Honor, may I interpose a thought

8  there.  This witness worked with a great number of scientists

9  in the process of preparing the data that have been offered

10  here in evidence.  Now, he says, how much time did he spend.

11  How much time did Bowen spend with him?  How much time did

12  fifteen other people spend with him?  Is he to put that

13  down, Giles Walker and the others who worked with him?

14      THE COURT:  He probably could make some general

15  categories.  He could put the time in the field.  He could

16  put time in conferences with others.  He could put time of

17  study of basic materials, in his office or elsewhere.  Is

18  that about what you wanted?

19      MR. MOSKOVITZ:  Yes, your Honor.  It is our view, after

20  listening to the testimony -- at least, we want to test

21  out the view as to whether this investigation was as

22  comprehensive as the kind that is ordinarily made in in-

23  vestigating an area.  And I am attempting to find out by

24  detailed questions just how much he did spend.  Now, if the

25  witness can't make any estimate at all or cannot get the

information by looking at his records, we will drop the

1    question.

2         Q     Now, can you make such an estimate?

3         A     I can make an estimate of the exact time spent on

4    the upper Santa Margarita watershed, but that does not

5    include the unrecorded times; and there has been a very large

6    quantity of time spent in the analysis of younger and older

7    alluvial deposits, the relations to each other in Pauba

8    Valley, and the relationships of younger and older alluvial

9    deposits in the all the alluvium filled valleys which we

10   have studied in Southern California -- in California, not

11   Southern California; all of California.

12        Q     And the estimates that you --

13        A     And it is a basic problem of analysis, and the

14   results in one watershed are comparable and applicable to

15   the results in another watershed.  And if you asked me that

16   time, it has been in excess of ten years that I have studied

17   the alluvial deposits of California, of which the Santa

     Margarita watershed is only one watershed.

18        Q     In your estimate to me of the amount of time spent

19   on the Sonoma-Napa study, did you include this contemplated

20   period of over ten years?

21        A     I certainly do.

22        Q     You told me it was about two and a half years.

23        A     I have been employed by the United States Geological

24   Survey since July, 1948, at which time I have devoted my

25   full time to the study of the water-bearing deposits in

1   California which are younger and older alluvial deposits.

2       Q   I suggest that in your estimates of the Sonoma and

3   Napa Counties investigation you fill out the time which you

4   spent over the years in studying this general subject of

5   alluvial deposits.

6       A   It is a physical impossibility.

7       THE COURT:  It might be a physical impossibility for

8   you to reach the conclusions by throwing that out, but what

9   counsel means is he doesn't want to hear about that; he

10  just wants to know what other time you spent.

11      Q   BY MR. MOSKOVITZ:  I would like a comparison of the

12  amount of time that was spent on one study as against the

13  other study.

14      MR. VEEDER:  This man has got to make a living, your

15  Honor.  He can't sit down and spend all his time making Mr.

16  Moskovitz happy.

17      THE COURT:  Let's wind this up.  Get some summary from

18  your log records of how much time you and your associates

19  spent, break it down in categories; what you spent in the

20  field, what you spent in your office, and what you spent in,

21  say, conferences with other people -- or any way you can

22  break it down; some logical sequence -- and the you can

23  throw in your statement that you want to make the statement

24  complete, since 1948 you have been studying the alluvial

25  deposits in the State of California, and that there is a lot

1   of comparability between them; and that experience and study

2   also went into your study here.

3       THE WITNESS:  Right.

4       THE COURT:  But what counsel is particularly interested

5   in is specific time spent on this project.

6       Q  BY MR. MOSKOVITZ:  Now, Mr. Kunkel, you testified

7   with respect --

8       THE COURT:  You are going into another subject?

9       MR. MOSKOVITZ:  I am going to finish this one up.

10      THE COURT:  All right.

11      Q  BY MR. MOSKOVITZ:  The United States Geological

12  Survey habitually has a process of review that a study

13  passes through before it is ready for release.  Now, was

14  this process of review followed in the case of the study

15  of the upper Santa Margarita River watershed?

16      A   Yes, it was; as indicated by a press release which

17  was sent out by the United States Geological Survey, listing

18  the exhibits by the ground water and surface water branch

19  of the Geological Survey; and has gone through that process

20  of review.

21      Q   So the results in Santa Margarita received the

22  same type of review, same approval up the line as results

23  of the Sonoma-Napa studies, would you say?

24      A   That is correct.

25      Q   During the period that you conducted your Santa

Kunkel - Cross

1   Margarita River upper watershed study did you have other

2   responsibilities that you had to carry on?

3        A    Yes, as indicated in the testimony, I am in charge

4   of the works of other professional men.

5        Q    And you maintain that responsibility during the

6   periods of the investigations?

7        A    With the aid of my very qualified assistants, I do.

8        Q    Now, I have heard the terms "reconnaissance investiga-

9   tion" and "detail investigation" used in describing studies

10  by engineers, geologists, hydrologists.  Are you familiar

11  with those terms?

12       A    I am familiar with the terms.

13       Q    Could you define those two terms -- reconnaissance

14  and detailed -- in connection with these investigations?

15       A    They are terms of degree.  In general, a reconnaissance

16  study includes observations without an attempt to collect

17  and analyze all of the pertinent data in an area.  It is a

18  less complete study than a detailed study.

19       Q    How would you classify the study you made of the

20  Santa Margarita upper watershed?

21       A    For the conclusions that I have drawn, I would say

22  that the study is as detailed as the data warrants.

23       Q    The study is as detailed as the data warranted?

24       A    As the data warrants.

25  MR. VEEDER:  That should pass.

THE WITNESS:  A detailed study can never be completed, because a well will be drilled tomorrow, and there will be additional information.

Q  BY MR. MOSKOVITZ:  Are you saying you gathered all the information that was available?

A    I consulted all of the information that was available, and for the conclusions that I drew it was sufficient data.  There are many conclusions relating to geology on that map, on Exhibit 15, that have not been drawn.

Q    Because you felt it was insufficient data?

A    Or because it was not pertinent to the ground water study.

MR. MOSKOVITZ:  Recess now, your Honor?

THE COURT:  Yes.

MR. VEEDER:  May I inquire:  If it is simply a matter of scheduling, my witness is in town.  Are you going to be through with Mr. Kunkel very shortly?

MR. MOSKOVITZ:  No.

MR. VEEDER:  Will it be a day, do you think?  I hate to ask this question, but I realize --

THE COURT:  He will be the rest of the day, counsel?

MR. MOSKOVITZ:  I believe I will be the rest of the day.

MR. VEEDER:  And there are other counsel who are going to interrogate?

Kunkel – Cross

1          MR. SACHSE:  Yes.

2          MR. VEEDER:  Thank you.  Some of our people are out of

3  town.

4          THE COURT:  We will take a short recess.

5          (A short recess taken.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

B-1

Z-1

1    THE COURT:  Mr. Moskovitz, I was not meaning that you were

2    going too slow in your cross-examination.  The point of the

3    story that I told you during the recess was more whether this

4    was for the benefit of the immediate trier of fact or for your

5    benefit, you know.

6    MR. MOSKOVITZ:  Of course, your Honor, I hope that every-

7    thing was for your benefit.

8    THE COURT:  As I indicated, any professional man making a

9    study is going to rely upon a lot of things besides the time

10   he spends in the field and the time he spends reading a book.

11   You probably do that in writing a brief, don't you?

12   MR. MOSKOVITZ:  Sleepless nights on occasion.

13   THE COURT:  Allright, let's proceed.

14   BY MR. MOSKOVITZ:

15   Q  Mr. Kunkel, in making your upper Santa Margarita

16   watershed investigation, what information or studies previously

17   made did you consult?

18   MR. VEEDER:  Your Honor, I ask that he specify the area.

19   THE COURT:  Upper Santa Margarita watershed.

20   MR. VEEDER:  In what manner did he consult.  I imagine he

21   went to a lot of textbooks, he went to a lot of things.  Is

22   that what you want?

23   MR. MOSKOVITZ:  I want him to tell me which ones he

24   consulted.  Previous studies is what I asked.

25   THE COURT:  First, tell us if there were any previous

1    studies in the upper Santa Margarita.  Then tell us next if

2    there were any previous studies in the other watersheds that

3    you studied.

4        THE WITNESS:  In the upper part of the Santa Margarita

5    watershed I referred to studies by Waring, which are published

6    as a United States Geological Survey water supply paper-- the

7    exact number I do not recall, I am not certain of the exact

8    number.  I consulted the Doctor's Thesis by John Mann, to which

9    I have previously testified.  I consulted studies by the

10   California Department of Water Resources.  I conferred with

11   Mr. Fox--

12   BY MR. MOSKOVITZ:

13       Q  Would you identify the study of the California

14   Department of Water Resources?

15       A  The studies to which I am referring culminated in the

16   publication of Bulletin 57.  I referred to the basic data in

17   the files of the Department of Water Resources.  I consulted

18   with Mr. Fox--

19       THE COURT:  Who is Mr. Fox?

20       THE WITNESS:  Mr. Fox is a geologist in the courtroom

21   who is an employee of the Department of Water Resources, who

22   has worked in the upper Santa Margarita Watershed.

23       I have consulted with Dr. Mann personally in regard to

24   the studies.

25       There were unpublished studies by the Marine Corps under

B1

Z2

1    a Lt. Babcock, who is now in the Reserve.  I have consulted

2    with him on the studies--

3    BY MR. MOSKOVITZ:

4         Q  Is that also in the upper watershed?

5         A  Yes, sir.  I have consulted with him on studies that

6    he has done in the area.

7         And in addition I have relied on the body of geologic

8    literature for Southern California that has bearing on the

9    geology of the upper Santa Margarita River watershed.  It is

10   a lengthy bibliography and would serve no particular purpose

11   to try to recall it from memory.  There are many volumes.

12        Q  Was there any particular information in Bulletin 57

13   on which you relied?

14        MR. VEEDER:  He didn't say that he relied on any of it.

15   You are putting words in the man's mouth.

16        THE COURT:  His words were that he relied upon the studies

17   which culminated in Bulletin 57.

18        MR. VEEDER:  I think that he said he considered them,

19   your Honor.

20        THE COURT:  I will take back the word "relied."  He said

21   that he considered the studies which culminated in Bulletin

22   57.

23   BY MR. MOSKOVITZ:

24        I will rephrase the question.

25        Q  What particular information in Bulletin 57 did you

B1

Z4

1   consider in making your investigation?

2      THE COURT:  If somebody has a copy of that Bulletin, let

3   me see it.

4      MR. MOSKOVITZ:  I have a copy here which I would like to

5   have marked for identification, because we may refer to it from

6   time to time, your Honor.

7      MR. VEEDER:  Not in our case in chief for sure.

8      MR. MOSKOVITZ:  I may show it to the witness on cross-

9   examination.

10      THE COURT:  How did your number series run?  Is it listed

11   in your list of exhibits?

12      MR. SACHSE:  It is listed by Fallbrook, your Honor.

13      MR. MOSKOVITZ:  And portions are listed in the California

14   list.

15      MR. VEEDER:  There is only one chapter listed by

16   California.

17      MR. SACHSE:  It is listed in its entirety by Fallbrook.

18      THE COURT:  What number was assigned to it?

19      MR. SACHSE:  I am the only counsel here who doesn't have

20   a copy of that order, so I can't give it to you.

21      MR. KRIEGER:  Fallbrook's 27.

22      THE COURT:  Fallbrook's haven't been lodged yet with the

23   Clerk?

24      MR. SACHSE:  They haven't been lodged yet with the Clerk,

25   your Honor.

THE COURT:   Lodge this one and call it Fallbrook's 27 for Identification.

MR. MOSKOVITZ:   Do you want to use the letters double A instead of 27?

THE COURT:   How did you have them listed?

MR. SACHSE:   In this memorandum, your Honor will recall, we had an exception that we were going to renumber them.  My intention was to number them A through B, C, D, et cetera.  It would be AA rather than 27.

THE COURT:   All right, it will be marked as Fallbrook's AA.  Do you have a copy of it?

THE CLERK:   Yes, your Honor.

THE COURT:   There are two volumes of it.  It will be Fallbrook's AA for Identification.

(Bulletin No. 57 marked Defendant Fallbrook's Exhibit AA for Identification.)

MR. VEEDER:   Does the ten-day rule apply to this?

MR. MOSKOVITZ:   Do you wish to look at Fallbrook's AA?

MR. VEEDER:   I object to this on the ground that the ten-day period has not expired on this, we call it, the "Buck Rogers Comic Book."

MR. SACHSE:   Is Mr. Veeder suggesting that he hasn't had this for a ten-day period?

THE COURT:   The objection is overruled.  This is a Bulletin that has been circulating around.  There is no doubt

B2

Z6

1

2    but that he has seen it.

3        MR. VEEDER:   It is unfortunate, but the point I make is

4    that the State has designated what it was going to offer.   It

5    was afraid to offer more than Chapter 2.

6        THE COURT:   They are not offering it.   They are merely

7    asking the witness to look at it.   He can do what he pleases.

8    The objection is overruled.

9        MR. MOSKOVITZ:   Answer the question now.

10       THE WITNESS:   What is the question?   Have you asked me a

11   question?

12       MR. MOSKOVITZ:   Will the reporter read the question.

13       (The reporter read the pending question as follows:

14   "Q   What particular information in Bulletin 57 did you consider

15   in making your investigation?")

16       MR. VEEDER:   I object again to this question.   It is

17   beyond the scope of the direct examination in any sense of the

18   word.   We certainly wouldn't refer to it.

19       THE COURT:   Overruled.

20       Let me ask you, Mr. Witness.   You say, as I understand

21   it, that you considered certain of the studies which cul-

22   minated in the Bulletin.   The Bulletin was published at the

23   time this study was made by you?

24       THE WITNESS:   That is correct.

25       THE COURT:   Didn't you have the Bulletin before you?

Kunkel   Cross   2669

B-2
Z7

1    THE WITNESS:  I have had access to the Bulletin for several

2    years.

3    THE COURT:  Are there specific things in the Bulletin

4    that you considered?  Do you want to look it over?

5    THE WITNESS:  No.  The map that I have prepared--

6    THE COURT:  Which map?

7    THE WITNESS:  Exhibit 15.

8    -- is prepared on my own observation.  It is not prepared

9    from Bulletin 57.  If I may refer to them, the Geological

10   Survey Water Supply Paper also carries a geologic map.  The

11   Doctor's Study by Dr. Mann also carries a geologic map.  The

12   work by Lt. Babcock carries a geologic map.  My Exhibit 15

13   may or may not be in disagreement with those maps.

14   MR. MOSKOVITZ:  That is something else, Mr. Kunkel.

15   Q  You testified that you considered certain previously

16   accomplished works, and you mentioned Bulletin 57 as being

17   one of them.  Then I asked what specific information in

18   Bulletin 57 did you consider?

19   A  I am afraid I don't understand your question, because I

20   considered the entire studies done by all previous geologists

21   in the area.  To say that I specifically considered this --

22   there are things in Bulletin 57 that are identical with the works

23   that Dr. Mann has done.  I have no way of knowing.  If I have

24   something that would correspond to Mann, Babcock, Larsen or

25   Bulletin 57, how could I possibly say whose map I considered

Kunkel          Cross

3661

1   in it?  The point is, did I go out in the field and observe

2   that phenomena myself?

3        MR. VEEDER:  He doesn't know what the State plagiarized.

4        THE COURT:  Just a moment.

5        As a matter of fact, then, you considered also Bulletin

6   57.  When you say that you considered it, it doesn't mean that

7   you accepted it as the Bible, but it was part of the literature

8   on the subject and you therefore considered it?

9        THE WITNESS:  Yes, sir.

10       THE COURT:  The word "considered" is too broad.

11       MR. MOSKOVITZ:  I was using the word that he used to find

12  out whether it was anything specific.

13       I would like to ask another question.

14       Q  You considered also Bulletin 57.  Were there any

15  portions of Bulletin 57 on which you relied?

16       THE COURT:  On which you relied.

17       THE WITNESS:  No, sir.  I relied on data-- I make the

18  distinction between primary data or as close as I can get to

19  the primary source, the original source, and I have tried to

20  use the primary source of all data in the preparation of

21  Exhibit 15.  I went to the files of the Department of Water

22  Resources and copied water level measurements from the orig-

23  inal field notes of the man that (made) the well.  By doing

24  that I have eliminated any possible errors in transcription.

25       MR. VEEDER:  I don't believe your answer is responsive.

B-2

Z-9

1        May I have the first few lines of the response?

2        MR. MOSKOVITZ:  I am satisfied.

3        THE COURT:  Read it to Mr. Veeder, Mr. Reporter.

4        (The reporter read the answer as follows:  "A  No, sir.

5   I relied on data.  I make the distinction between primary

6   data....")

7        MR. VEEDER:  Would you read the question, please, Mr.

8   Reporter?

9        (The reporter read the question as follows:  "Q  Were

10   there any portions of Bulletin 57 on which you relied?")

11       MR. VEEDER:  Now would you read the answer?

12       (The reporter read the answer as follows:  "A  No, sir.

13   I relied on data . .")

14       MR. VEEDER:  The answer is "No, sir."

15       MR. MOSKOVITZ:  Have you finished your answer?

16       THE WITNESS:  Yes.

17   BY MR. MOSKOVITZ:

18       Q  What you are saying is that you relied upon data which

19   you secured from the files of the Department of Water Resources?

20       A  That is correct.

21       Q  On the facts relating to the upper watershed?

22       A  That is correct.

23       Q  Have  you checked whether that is the data which is

24   summarized in Bulletin 57?

25       A  To the best of my knowledge, some of it is summarized;

Kunkel - Cross

2663

B2
Z10

B3

1   some of it isn't.  I do not know.  I have not double-checked

2   my data to see if it is in Bulletin 57 or not.

3        Q   Is the data on which you relied from the Department

4   of Water Resources files relating to the location, the logs

5   and the water levels of wells in Bulletin 57?

6        A   Would you repeat the question, please?

7        MR. MOSKOVITZ:  Will the reporter read the question,

8   please?

9        (The reporter read the pending question as follows:

10  "Q   Is the data on which you relied from the Department of

11  Water Resources files relating to the location, the logs and

12  the water levels of wells in Bulletin 57?")

13       THE WITNESS:  Some of it is; some of it-- I do not know,

14  because I have not checked all data which I have used to see

15  whether it is in Bulletin 57 or not.  I don't know the answer

16  to that question.

17  BY MR. MOSKOVITZ:

18       Q   In making your study did you review the testimony

19  which was given in the first trial of this action?

20       A   No, I haven't.  To the best of my knowledge, I had

21  never reviewed the record on that trial.

22       Q   Mr. Kunkel, I would like to review some basic terms

23  that you have referred to.  You used the term "clay."  When

24  you use the term, are you referring to material of a certain

25  type of chemical composition, or are you referring to material

1    of a certain physical size, or both?

2        A   The terms "Clay", "Sand", "Silt," "Gravel" are all

3    related back to a size classification.

4        Q   And not to chemical character?

5        A   The terms are not directly related to chemical

6    character.

7        Q   Clay, as I understand it, is a material with the

8    smallest size particles; is that correct?

9        A   That is correct.

10       Q   And then sand?

11       A   Clay, silt, sand, up the scale.

12       Q   Now, you have referred to "specific yield" and you

13   have referred to "permeability."  Could you explain what

14   relationship, if any, there is between "specific yield" of

15   material and "permeability" of material?

16       A   Specific yield refers to the quantity of water that

17   will drain by gravity from a unit volume of rock or soil or

18   alluvial deposit.  The specific yield is a percentage related

19   to the unit of volume.

20       For example, if a one square foot volume of material were

21   saturated and the quantity of water that drained by gravity

22   was one-fourth of a cubic foot, the specific yield of the

23   deposit would be 25%.

24       The other question was permeability?

25       Q   Yes.

B3

Z12

1    A   Permeability relates or refers to the ability of a

2    rock or alluvial deposit to transmit water rather than to

3    store water within the void spaces.   It is a rate of flow

4    through the deposit rather than a quantity within the deposit.

5    Q   Now, you say rather than a quantity within the de-

6    posit.   Doesn't the term "porosity" refer to the quantity

7    within the deposit?

8    A   "Porosity" is the ratio of total void space within a

9    unit volume of rock or alluvial materials, and porosity is

10   equal to specific yield plus specific retention.

11   Q   Does the concept of specific yield have any relation

12   to the time that it would take for the water to drain out?

13   A   Time is considered in specific yield, yes.

14   Q   In what way?

15   A   If one were to drain a deposit for two minutes, you

16   would have a lower specific yield than if you were to drain

17   a deposit for two years.

18   Q   What time standards are used in arriving at the

19   specific yield factors that geologists use?

20   A   I cannot give you an exact time, but they are on the

21   order of one month or more.   I do not recall the exact time

22   of drainage used in the laboratory determinations, but they

23   are done according to a published and recognized technique--

24   the determinations are made according to a published and

25   recognized technique.

Kunkel   Cross

B3

Z13

1      Q   It would make a difference in your results how long

2 your test continued, wouldn't it?

3      A   It would not make a difference in-- my determinations

4 or assignments of specific yield values are related to the

5 laboratory determinations which are published and generally

6 accepted values.  It is not necessary for my analysis to

7 consider the element of time inthe drainage of the deposits.

8      Q   Is the time period which is used in laboratory tests

9 in determining specific yield standard throughout the liter-

10 ature so that the specific yield figures which you derived

11 from various sources would be comparable?

12      MR. VEEDER:   I object to that until he designates what

13 he means by "literature," your Honor.  There is a vast variety

14 of items included in the term "literature."

15      THE COURT:   Read the question, Mr. Reporter.

16      (The reporter read the pending question as follows:

17 "Q   Is the time period which is used in laboratory tests in

18 determining specific yield standard throughout the literature

19 so that the specific yield figures which you derived from

20 various sources would be comparable?")

21      THE COURT:   Overruled.

22      THE WITNESS:   May I go to the blackboard and answer the

23 question with a diagram?

24      MR. MOSKOVITZ:   Is it possible for you to say from the

25 stand?

Kunkel   Cross

2667

B3

Z14

1    MR. VEEDER:  If the witness wants to explain it by a
2    diagram, I submit, your Honor, that he should be permitted to
3    do so.

4    THE WITNESS:  I can explain it.

5    THE COURT:  Answer the question first, if you can, and
6    then diagram it, if necessary.

7    THE WITNESS:  The rate of drainage and the specific yield
8    values that will result over a period of drainage follow a
9    asymptotic curve.

10    THE COURT:  What kind of a curve?

11    THE WITNESS:  Asymptotic.

12    THE COURT:  Spell it, please.

13    THE WITNESS:  A-s-y-m-p-t-o-t-i-c.  It is a curve against
14    which one can plot time against specific yield during a course
15    of specific yield determinations in the laboratory, and after
16    a period of approximately one month the change of specific
17    yield values along the asymptotic curve will be of such small
18    magnitude that they are within the limites of experimental
19    error and the limits of error used in the drillers' terms that
20    the value about which we are talking is insignificant.  How-
21    ever, by very careful and precise laboratory measurements, it
22    is a measureable quantity.

23    THE COURT:  Now, the specific question is this:  Are these
24    rates of yield that are established by laboratory tests and by
25    studies that have been made sufficiently uniform that there

B4

Kunkel       Cross                    2668

B4
Z15

1    is not much dispute-- the variations are minor?  Is that what

2    you are getting at?

3        MR. MOSKOVITZ:  Yes, I want to know if the amount of time

4    periods are used so that the results would be comparable.  You

5    said a month or more.  "More" can be quite a bit more, I

6    assume.

7        THE COURT:  Now you have me mixed up about the time

8    periods.  Do you want to ask your question again?

9    BY MR. MOSKOVITZ:

10       Q  You have testified, as I understand it--

11       A  May I diagram it, please?

12       THE COURT:  Just a minute.

13   BY MR. MOSKOVITZ:

14       Q  You have testified, Mr. Kunkel, that a period of a

15   month or more is used in laboratory tests which are for the

16   purpose of determining specific yield.  What I am asking is

17   whether the time periods used in the field of geology by

18   various experimenters are uniform enough so that the results

19   they derive are comparable?

20       A  In my opinion, they are.  The results are comparable.

21   The factors considered are of similar nature.

22       THE COURT:  Do you want to show us on this diagram what

23   you are talking about?

24       THE WITNESS:  (Stepping to the blackboard and drawing)

25   If a sample of material in the laboratory is saturated and

B4
Z16

1   drained by gravity, the quantity of water that will drain from

2   the material related as a percentage back to the unit volume

3   at the beginning of the test will be zero-- no water has

4   drained.  Within one minute a certain quantity of water will

5   drain.  The exact quantity for the purposes of illustra-

6   tion is not important.  For one hour an additional quantity

7   will drain.  For one day an additional quantity will drain.

8   For a month an additional quantity will drain.  For a year a

9   tiny amount more will drain, and if the sample were allowed to

10  drain forever at some point the drainage line would become a

11  straight line.  In our determination of specific yield values

12  we are referring to values that lie within a range where the

13  slope of the curve is so flat that the quantity of additional

14  drainage involved is of no consequence in the estimate of

15  specific yield or the storage capacity of the ground water

16  basin with which we are relating the specific yield studies.

17  There is no disagreement on the fact that this is an asymptotic

18  curve and approaches a straight line towards infinity.

19      THE COURT:  These studies of the materials you use are

20  generally from a month on up?

21      THE WITNESS:  Some of the studies I can recall immed-

22  iately without checking the literature have extended for as

23  long as a period of two years.

24      THE COURT:  But none of them go back less than a month?

25  You take at least a month?

        THE WITNESS:  I couldn't testify to that under oath,

B4

Z17

1   your Honor.  I would have to check the notes.  But they are in

2   a range that is somewhere where the curve is flat.  They all

3   relate back to the point on a curve.  Whether this point

4   actually falls within two weeks, two months or two years is

5   not important.  The important thing is that the specific yield

6   that we are considering is in this point of the curve, not

7   a point where the curve is sloping rapidly.

8   BY MR. MOSKOVITZ:

9       Q   Would you remain there for a moment.  Would the curves

10  such as the one you have drawn differ with different kinds of

11  material?

12      A   Yes, they do.

13      Q   Some materials drain more rapidly than others?

14      A   Yes, they do.

15      Q   Knowing the specific yield of a material would not

16  tell you how rapidly it would drain, would it?

17      A   It would be an indication of how rapidly it would

18  drain.

19      Q   How could that be, if the curves vary with different

20  kinds of materials?

21      A   Repeat the question again, please.

22      Q   How could the specific yield be an indication of the

23  rapidity of drainage if different kinds of materials drained

24  with different rapidity?

25      A   I believe you are confusing porosity and specific

B4

Z18

1  yield.  Specific--

2      Q  Go ahead.

3      MR. VEEDER:  Just a moment.  There is a question before

4  the witness.  Have you withdrawn your first question?

5      MR. MOSKOVITZ:  No, I have not withdrawn it.  I understand

6  that he is answering it.

7      MR. VEEDER:  No, it sounds to me like argument.  If

8  counsel doesn't know the term, that is one thing.  The witness

9  has already pointed out that he doesn't believe he can respond

10  to the question before him.

11      THE COURT:  Well, you have me mixed up.  I thought you

12  asked your question that if you knew the specific yield of a

13  material, could you tell the rate of drainage, or something

14  like that.  He said, I understood, yes, specific material.

15  Am I wrong about that?  Then you threw in a question about

16  different materials.  You lost me.  If you want to do me any

17  good, back up and start over again.

18      MR. MOSKOVITZ:  I will do that, your Honor.  I will with-

19  draw the last question.

20      Q  I believe you testified that different materials will

21  drain with different rapidity so that the curves will look

22  different; is that correct?

23      A  That is correct.

24      Q  Is it also correct that you can have two materials

25  which would have the same specific yield but which would have

Kunkel   Cross   2672

B4
Z19

1  drained with different rapidity?

2      A   I cannot answer that question from memory.   I don't

3  know.

4      THE COURT:   Does the question mean, is there a difference

5  between the specific yield and the rate of rapidity of

6  drainage?

7      MR. MOSKOVITZ:   Yes, your Honor.

8      THE COURT:   Is that what you are asking?

9      MR. MOSKOVITZ:   That is it.

10      THE COURT:   As a matter of theory?

11      MR. MOSKOVITZ:   As a matter of theory.

12      THE COURT:   On water problems?

13      Is there a difference between specific yield of a

14  material and the rate at which water will drain from material?

15  Or does it mean the same thing?

16      THE WITNESS:   They are not necessarily the same thing.

17  The specific yield values about which we are--

B5

18      THE COURT:   Specific yield value is the amount of water

19  in quantity that comes from a given quantity of material?

20      THE WITNESS:   That is correct.

21      THE COURT:   Then the rate at which that water would drain

22  out of the material is a different problem?

23      THE WITNESS:   That is correct.   If one has two samples

24  of identical material, or if you saturate and drain the same

25  sample twice, measurements which involve human observation

BK5
Z20

1  are not absolutely identical.  If you drain the same material

2  twice, a curve of a slightly different slope conceivably could

3  result.  But the slopes would approach each other and the

4  differences in slope would result in a scattering of points

5  which were measured in the laboratory.  The difference would

6  be so slight that with regard to the storage capacity of the

7  deposits it would be meaningless.

8       THE COURT:  That isn't what he is asking you about.  Now

9  I would like to understand this as we go along.  Specific

10  yield has to do with a fixed quantity of material, and the

11  fixed quantity of water that will eventually drain out of it?

12       THE WITNESS:  That is correct.

13       THE COURT:  Now, the rate at which that water drains out

14  is a different problem?

15       THE WITNESS:  That is correct.

16       THE COURT:  Now Mr. Moskovitz, apparently, is asking you

17  this question:  Suppose you had two samples of material,

18  probably different material, but upon analysis the specific

19  yield in quantity from each of them was the same.  It doesn't

20  necessarily follow that the rate at which that water will

21  drain out is the same.  Is that what you are getting at?

22       MR. MOSKOVITZ:  That is the question, your Honor.

23       THE WITNESS:  You are asking me for, you might say, an

24  a priori conclusion, which can't be done.  You are asking me

25  to tell what a laboratory experiment that has a predetermined--

B5

Q Z21

1  you are starting from a predetermined conclusion and working

2  back to a premise which may or may not be valid.  There would

3  have to be laboratory determinations to discover if your

4  original conclusion that you started from is correct.

5  BY MR. MOSKOVITZ:

6       Q  That is the very point.  By knowing the specific yield,

7  you cannot tell what the rate of drainage is?

8       A  By knowing specific yield, coupled with my experience

9  and observations of water wells, I have observed that in areas

10 where specific yields determinations have been high the yields

11 of wells is a factor-- pardon me-- the yield of a well is

12 dependent upon the rate with which water will drain from the

13 deposits-- the factor to which you are referring.  In areas

14 with high specific yield and areas with wells of high specific

15 capacity, there is a correlation.  The relationship has not

16 been worked out absolutely precisely in the laboratory, but

17 the relationship does exist.

18      THE COURT:  In other words, if I understand you, putting

19 it in layman's language, if you had various samples of

20 material that had various specific yields, there is a

21 correlation between the specific yield and the rate of yield.

22 In other words, the material that has a higher yield than

23 another material will probably have a higher rate of yield

24 than the material with a lower yield?

25      THE WITNESS:  That is correct.  We are using the word

B5

Z22

1    "yield" in this discussion in two senses.  We are talking about

2    specific yield of a deposit, indicated by SY, and we are talking

3    about the yield or the rate at which the deposit would yield

4    water to the well.

5         THE COURT:  That is right.

6         THE WITNESS:  To avoid confusion, it is better to say

7    that wells-- the term "specific capacity" is used:  The

8    quantity of the drawdown in a well per foot of quantity pumped.

9    A well that would yield a hundred gallons a minute with a

10   10-foot drawdown would have a specific capacity of 10, 10

11   gallons per minute per foot of drawdown.

12        Let us assume, for the purpose of discussion, a well

13   with a specific capacity of 10, in an area where the specific

14   yield of the deposits are, say, 9%.  If one and the same

15   general area went to an area where the specific yield of the

16   deposit was-- let's make it high-- 30%, and one drilled--

17   let's take this as an average value; the average value of the

18   specific capacity of a number of wells-- 10 or more so that

19   we will eliminate the possibility of one well having to go

20   through a rather thick lens of clay, an average value of a

21   number of wells is 10.  If one will go to an area  where the

22   specific yield is 30 and drill the same number of wells--

23        THE COURT:  And the same kind of wells?

24        THE WITNESS:  --and the same kind of wells, all things

25   being equal, the average specific capacity of that group of

Kunkel- Cross

2676

B5

Z23

1  wells will be greater than 10.  If we would go to an area

2  where the specific yield was 3%, the specific capacity of a

3  number of wells would be less than 10.

4      It is a statistical thing which has proven out in the

5  examination of numerous areas in California; the Sacramento

6  Valley for one, Napa and Sonoma Valleys for another.

7  BY MR. MOSKOVITZ:

8      Q  Have there been experiments which have attempted to

9  show the correlation between specific yield and specific

10  capacity?

11      A  My studies in Napa Valley will-- Wait a minute.  It

12  has not been pointed up as a specific item, but if one will

13  examine the areas for which I have determined specific yield

14  and examined the yields of wells in that area, the specific

15  capacities in the areas of higher yields are greater.  The

16  same is true for several studies in the San Joaquin-- not the

17  San Joaquin, in the Sacramento Valley.  I would have to look

18  up the title to give you the exact reference, but there are

B6

19  references to this in the geologic literature.

20      MR. VEEDER:  If this is in response to a question, your

21  Honor, I don't know what the question is now.

22      THE COURT:  The question was, have there been studies

23  made showing this correlation between specific yield and the

24  specific capacity of wells in such areas?

25      THE WITNESS:  I have made the studies.

BY MR. MOSKOVITZ:

Q   Are these studies published?

THE COURT:   Is there any dispute about that?   It would
seem to me that it would be a matter of common sense.   Using
his example, if you had an area where the specific yield
percentagewise was 30 you obviously ought to get a greater
capacity, a greater rate of yield than in areas where your
specific yield was 3%.

MR. MOSKOVITZ:   Your Honor, you are asking me if there
is any dispute.   I will tell you that I have been advised that
specific yield does not correlate necessarily with specific
capacity; that you may have two materials of the same specific
yield and one will have a different capacity, the water will
permeate more slowly so that you cannot rely upon specific
yield, and there is some dispute as to the extent of the
correlation.

THE COURT:   Well, extent.   His answer leaves that open.
He says that there is a correlation generally, and the very
fact that he has used the word "correlation" means that it is
not true in every case.   There are variations back and forth.
But generally I think the word correlation means that ordin-
arily you would see some favorable comparison.   It doesn't
mean that it is an absolute rule.

BY MR. MOSKOVITZ:

Q   Let me ask this question:   If you saw that there were

B6

Z25

1   two areas of ground water, the materials of which had the

2   same specific yield, would you be willing then on the basis of

3   that information to conclude that the materials had the same

4   permeability and therefore that wells drilled in these two

5   bodies of material would have the same specific capacity?

6       MR. VEEDER:  Your Honor, if this is a hypothetical

7   question, we are going out in the wild blue yonder again.

8       THE COURT:  Overruled.

9       THE WITNESS:  May I have the question read back to me,

10  please.

11      (The reporter read the pending question as follows:

12  "Q  (By Mr. MOSKOVITZ)  Let me ask this question: If you

13  saw that there were two areas of ground water, the materials

14  of which had the same specific yield, would you be willing then

15  on the basis of that information to conclude that the materials

16  had the same permeability and therefore that wells drilled

17  in these two bodies of material would have the same specific

18  capacity?")

19      THE WITNESS:  I believe you have confused the relation-

20  ship of specific yield and permeability.  "Permeability" is

21  the ability to transmit water.  "Specific Yield" is the--

22  BY MR. MOSKOVITZ:

23      Q  Specific capacity and permeability are the two that I

24  tied together.

25      THE WITNESS:  Is that it?  Read the question again,

B6

Z26

1    please.

2         THE COURT:  Study it over during the noon hour.  The

3    question makes sense to me.  I understand that specific yield,

4    used technically, does not mean the same as permeability.  Is

5    that right?

6         THE WITNESS:  That is right.

7         THE COURT:  But I think that the question that Mr.

8    Moskovitz asked makes sense.  Have it read back to you, think

9    it over, and we will take it up at 2 o'clock.

10         (Noon recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAN DIEGO, CALIFORNIA, TUESDAY, OCTOBER 7, 1958, 2:00 P.M.

---o---

(Other matters.)

THE CLERK:  No. 4, case on trial, United States vs. Fallbrook.

MR. SACHSI:  Your Honor, before we go ahead with cross, Mr. Veeder has passed out to counsel apparently an index to photographs marked "Index to 19."  Somebody has given it to me.  I don't know where it came from.  It is just an index.

MR. VEEDER:  Those were, well, it is just to help you.

MR. SACHSI:  The two enlarged exhibits, photographs 19-29, flight.

Now, I would like to be quite clear on the effect of our stipulation on issues and exhibits.  I am not prepared to consent to the introduction of these photographs without some foundation.  I realize that it is going to be difficult, if not impossible, to produce the man who took the aerials, and I would not ask for that.  But you look at these things.  There are no match lines on them.  I can't read them.  I don't know what goes together.  I haven't the slightest idea of what they are or --

THE COURT:  Let me see them.

MR. VEEDER:  I didn't expect Mr. Sachsi to understand

1    them.  I will call a witness.

2    THE COURT:  Well, there should be something done to

3    match them up in some way, Mr. Veeder.

4    MR. VEEDER:  Well, of course, your Honor.  There is not

5    the slightest idea of putting those in without having the

6    witness on the stand, and a complete explanation.

7    THE COURT:  That is not what I am talking about, either.

8    We can spend a month having a witness on the stand identify

9    each one of these when, as a matter of fact, they could be

10   matched up with some sort of a lettering system on the face

11   of them so that somebody could lay them out and see what we

12   had.  And that might obviate a lot of objection.  You take

13   this package 1-A, 1-11.

14   MR. SACHSE:  This is the whole bundle, your Honor.

15   THE COURT:  I know; I just got one package.

16   MR. VEEDER:  We have a witness, your Honor, that is

17   going through, and he will match them up by section, township,

18   and range.

19   THE COURT:  I know, but are we going to sit here --

20   now, on this one little package, I have got 4, got 8, 11,

21   probably must be 12 of them here.  Should be.  Am I going to

22   sit here while he matches them up for us?  I see some

23   numbers at the bottom.  Is there some sort of key that can

24   be used to match them up?

25   MR. VEEDER:  There is a key, certainly, your Honor; the

matter of locations and national monuments by a witness who knows the area.  And I will be very --

THE COURT:  I am not talking about a witness that knows the area.  Is there some sort of key?  Each package, are they numbered the same way?

MR. VEEDER:  Yes, your Honor, they are.  They are numbered so they can be keyed right to the country.

THE COURT:  Is there some kind of key you can give us so that counsel, looking these over, can take a package, sort them out, and look at the matter?  Maybe that --

MR. VEEDER:  I think I may save some time for your Honor and for counsel if I have the man down here who has done this work, has gone through; and we can show a section, township and range areas.  I can't do any more than that, your Honor.  And if counsel wants to do that, I will be glad to have the witness here.

THE COURT:  You yourself don't know now how they should be matched up?

MR. VEEDER:  Well, they are matched up, your Honor, on the basis of township and range and section, section, township and range, and they are set up in the box here in section, township and range.

THE COURT:  I mean that within the --

MR. SACHSE:  There are two photos in each one.

THE COURT:  Two photos within a package.  You don't

1 | know what order they are matched?

2 |    MR. VEEDER:  No, I don't know that, your Honor.

3 |    THE COURT:  Let's pass it up until you get the man here.

4 | You can talk to him, so he can tell us how it is done.  In

5 | other words, they have in the right-hand corner some numbers.

6 |    MR. VEEDER:  That is right.

7 |    THE COURT:  There must be some key.

8 |    MR. VEEDER:  That is right.  There is.

9 |    THE COURT:  You can make a chart, and with that kind of

10 | a chart you can sit out here and you could lay out the

11 | photographs and find out what order they went in.  Some-

12 | body could look over an area and know a lot more about it.

13 |    MR. VEEDER:  That is right.  And the way to do it, your

14 | Honor, is to have this man talk to counsel.

15 |    MR. SACHSE:  Your Honor, I don't know why Mr. Veeder

16 | chooses to be so obtuse.

17 |    THE COURT:  Just a minute.  Mr. Veeder, have your man

18 | supply in writing a method by which the individual photographs

19 | of these packages are matched up to make a composite picture.

20 |    MR. VEEDER:  I will do that.

21 |    THE COURT:  And see what we have got from there.

22 |    MR. VEEDER:  We are having reproduction made now, and

23 | there will be additional copies available.  There is an

24 | additional factor:  I don't desire to make a Mosaic of this

25 | thing if we can avoid it because of the expense.

Kunkel - Cross

1    Now, there is nothing unreasonable in my view, but

2    I will  do what your Honor said.

3    THE COURT:  Do what I asked you to first, and we will

4    see where we go from there.

5    MR. MOSKOVITZ:  Your Honor, I believe the question is

6    pending.

7    THE COURT:  Do you have a copy of it in front of you?

8    THE WITNESS:  No, I do not.

9    MR. VEEDER:  I have an objection to the question, your

10   Honor.  Do you have a copy of the question?

11   THE COURT:  I have a copy.  Hand one to the witness.

12   MR. VEEDER:  The question, your Honor, is objectionable

13   on several grounds.  First, reference is made in the second

14   line to two areas of ground water.  It is essential that

15   the two areas be defined from the standpoint of whether

16   this is a service statement, thickness statement, or any other

17   location.  Secondly, it is necessary that there be included

18   in such a question the thickness of saturated section.  In

19   other words, it is impossible to answer the question by

20   reason of the fact that it is lacking in certain technical

21   aspects.  Thirdly, and from the standpoint of the presenta-

22   tion of this question, it comes in two parts:  the first

23   refers to permeability; and that is the question in itself.

24   The questions here, in our view, stop right like this.  The

25   materials which have had -- if you saw that there were two

areas of ground water and you specify the areas, the materials which had the same specific yield, would you be willing, then, on the basis of that information, to conclude that the material had the same permeability?  That is a question in itself.  Then they proceed on and two:  Therefore, that wells drilled in these two bodies of material would have the same specific capacity.  It is a compound question, your Honor, and absent clarification I don't believe it can be answered.

THE COURT:  I think your objection is largely technical. I will sustain it.  Break it down into two parts and also amend your question to make it clear that the two areas of ground water are areas that have the same thickness of saturated material and are identical except that the materials are different but have the same specific yield. Is that what you are getting at?

MR. MOSKOVITZ:  Yes, that is right.

THE COURT:  Amend your question.

MR. MOSKOVITZ:  I think it is agreeable to have this question relate only to relationship between specific yield and permeability.

THE COURT:  All right.

Q  BY MR. MOSKOVITZ:  Do you understand the question as it has been modified?

MR. VEEDER:  You had better present a question.

MR. MOSKOVITZ:  All right.  I will present the question.

Q   If you saw that there were two areas of ground

Kunkel - Cross                                          3686

1   water which were saturated to the same thickness and that

2   both areas had the same specific yield, would you be willing,

3   on that information, to conclude that they both had the same

4   permeability?

5       MR. VEEDER:  Your Honor, how could this witness see?

6   "If you saw."  I object to the question on the ground that

7   it is unclear.

8       Q  BY MR. MOSKOVITZ:  Assuming two areas of ground

9   water.  And answer the question.

10      A    Assuming two areas of ground water underlain by

11  saturated deposits of equal thickness and areal extent, and

12  if studies show that the specific yields of the two areas

13  are the same, I would conclude that the permeabilities of

14  the two areas are comparable.

15      THE COURT:  Do I understand that this matter of specific

16  yield is related to porosity?

17      THE WITNESS:  Specific yield is related to permeability.

18  At no time have I ever stated that they are equivalent.  One

19  is an indication of magnitude of the other.  It is not a

20  direct correlation.

21      THE COURT:  Well, specific yield is the percentage, is

22  a figure in terms of percentage of the water that you would

23  obtain from a particular cubic area of material.

24      THE WITNESS:  That is correct.

25      THE COURT:  Right?

1     THE WITNESS:  Correct.

2     MR. MOSKOVITZ:  You wish to ask further questions, your

3 Honor?

4     THE COURT:  Go ahead.

5     Q  BY MR. MOSKOVITZ:  The answer you gave to the

6 question was that the permeability would be comparable.  Are

7 you saying that the permeability would be the same?

8     A     I did not say the permeabilities would be the same.

9     Q     What do you mean by saying they would be comparable?

10    A     Values would be the same order of magnitude.

11    Q     It would be the same or nearly the same; is that

12 what you mean?

13    A     That is not what I said.  I said they would be of

14 the same order of magnitude.

15    Q     What do you mean by "the same order of magnitude"?

16    A     If there was a specific yield of one deposit that

17 was ten per cent and the permeability of the water of a  --

18 with the deposits, say, permeability of 300, another similar

19 area with a specific yield of ten per cent would have a value

20 that would be less than 1000 and more than 100.

21    Q     Then, with two materials having identical specific

22 yields, the permeability of one could be as much as, more

23 than three times as much as the other or less than one-third

24 of the other; is that correct?

25    MR. VEEDER:  Do you understand the question?

THE WITNESS:  In my opinion Mr. Moskovitz is trying to tell me what I have said.  At no time have I ever said that specific yield and permeability are equal.  One is an indication of the other.

Q  BY MR. MOSKOVITZ:  Answer the question I asked before, if you can.

Will you have it read, please.

(The reporter read back the question.)

A  You are trying to have me give you quantitative answers on a hypothetical question.  I don't see how the question can be answered without reference to specific areas and specific instances.

THE COURT:  His statement is from one to a thousand is correct as compared to 300.  And his question doesn't need any answer.  It is just another way of stating the same thing.

I want to know, to be sure I understand this: specific yield we figure in percentage.  If it is ten per cent which shows the amount of water which, regardless of time, would be yielded by a certain area of material?

THE WITNESS:  That is correct.

THE COURT:  Now, if you had a cubic yard of uniform gravel the size of marbles and you had a cubic yard of clay, both the clay and the gravel, finely sorted, the porosity of those two cubes, cubics being the same, is equal, as I understood your testimony, the amount of water in each is

1    the same.

2         THE WITNESS:  Pardon me just a minute.

3         THE COURT:  I am talking about yield now.

4         THE WITNESS:  I fail to follow your question.  If you

5    would state it again, please.

6         THE COURT:  You have a cubic yard of gravel sorted, all

7    the size of marbles, and you have a cubic yard of clay,

8    very fine particles, and that also is sorted.  I understood

9    that as to porosity, the amount of water in the two cubic

     yards would be the same.

10        THE WITNESS:  That is correct.

11        THE COURT:  Approximately the same.

12        THE WITNESS:  Correct.

13        THE COURT:  Now, specific yield would be the figure

14   that would demonstrate how much of that water you would get

15   out of that cubic yard regardless of time, not taking into

16   account the time element, the amount you would eventually

17   get out of it.

18        THE WITNESS:  That is correct.

19        THE COURT:  So, I would assume that in a case of the

20   gravel the specific yield would be considerably more than

21   in the case of the clay.

22        THE WITNESS:  That is correct.

23        THE COURT:  And therefore, there would be a larger

24   percentage figure of specific yield in the gravel than the

25   clay.  Now, apparently you have a quality of retaining water

1    to a greater extent in the gravel.  It would also be fair

2    to say that the clay had a greater, had a less permeability

3    than the gravel.

4        THE WITNESS:  That is correct.  The clay has a less

5    permeability than the gravel.

6        THE COURT:  Now, going back to Mr. Moskovitz' particular

7    problem, he is supposing two like areas, or like as to

8    extent.  They are like as to the depths of the saturated

9    material, they are alike in every respect except there is

10   some difference in the materials, one area from the other.

11   I don't know what that difference might be.  But for the

12   purpose of argument we will say they are different materials.

13   However, you suppose, also, that they have the same specific

14   yield.  The cubic yard of, the cubic foot of one of the

15   materials would yield the same amount of money, same amount

16   of water as three foot of the other material.  That is his

17   premise.  Now, I understand your answer to mean that the fact

18   that there is an identical, specific yield, the amount of

19   percentage of water that would be obtained, would be some

20   indication that there was a like permeability but that the

21   permeability would not necessarily be the same.  There could

22   be some variation.

23       THE WITNESS:  That is correct.

24       THE COURT:  Of course, you are dealing with a hypothetical

25   question, so I can't say to you on that question, "Well, you

1    don't know what these materials are, what the range of that
2    difference in permeability would be."  But is there any
3    rule or principle in the field of knowledge that you are
4    working in which gives what the maximum range could be in
5    difference in permeability where you had materials that have
6    the same specific yield?  How was there any -- first, is
7    there any rule or principle that gives some outside measure
8    to that range in permeability where we have the same
9    specific yield?

10        THE WITNESS:  The studies at this stage of the develop-
11   ment are not conclusive, and I have to answer I do not know
12   to that question.

13        THE COURT:  Give me an example, if you can think of one,
14   where you have two different materials which had approximately
15   the same specific yield and yet where you would have greater
16   permeability in one and less in the other.

17        THE WITNESS:  I would have to search the literature to
18   ask that question.  I do not recall.

19        THE COURT:  Offhand you can't recall?
20        THE WITNESS:  No, sir.
21        THE COURT:  So your testimony is that ordinarily and
22   subject to some range which you can't now mark out the finding
23   of the same specific yield would be indicative that there was
24   some similarity in permeability?

25        THE WITNESS:  That is correct.

1    MR. MOSKOVITZ: Your Honor, I believe he did say that

2 there could be a departure from a permeability of 300 in

3 one type of material of up to 1000 and down to 100. So he

4 did give some indication of the range which he believes

5 might exist.

6    THE COURT: Is that testimony you gave, is that by way

7 of an example, or were you just taking figures out of the

8 air on that?

9    THE WITNESS: Mr. Moskovitz asked me what I meant by

10 an order of magnitude. I was describing order of magnitude,

11 not order of permeability.

12    THE COURT: What do you mean by "order of magnitude"?

13         Maybe, before you tell me that, tell me, what is

14 this figure that you used, this 300, the figure indicating

15 permeability? Is there some scale of figures you use on

16 that?

17    THE WITNESS: It is the gallons per day of permeability

18 of 300's, would indicate that a cross-sectional area of

19 one foot of material under hydraulic radiant of 100 per

20 cent would transmit 300 gallons per day per foot of cross-

21 sectional area.

22    THE COURT: What do you mean by "range of magnitude"?

23    THE WITNESS: By a range of magnitude, if I were to

24 say a certain, a number of men that I saw were on the order

25 of ten, I would mean that I saw more than five and less than

twenty.  In my opinion, if I saw what I estimated to be
more than 15 men, I would say it would be on the order of 20.
It would be a range where my observation was not sufficiently
precise that I could say I saw a certain number.  I would
round a number to fall within an order of magnitude.  It is
a customary method of scientific terminology.

THE COURT:  Well, then, your example of 300 and 1000 and
100 was merely an example of, you say, in the range of
magnitude and not an indication of the spread and permeability
which would come from materials of like yield?

THE WITNESS:  That is correct.  Because I do not know
from tests and from my own observation what the range of
permeabilities is.  Range of permeabilities that have been
determined in the laboratory have a tremendous range.  They
are from fractional figures with, to, if I remember correct-
ly, on the order, again, of 900,000.  They are for all types
of materials.  And to look at a material and estimate its
permeability is practically impossible.  It must be
determined by precise tests.  Mr. Moskovitz, when asking me
to compare yields and permeabilities directly, it cannot
be done.  But it can only be done by a matter of degree.

Q  BY MR. MOSKOVITZ:  Are there any tests by which you
can determine permeability?

A    Yes, there are.

Q    What kind are they?

A    Extensive pumping tests can be conducted in the field. By pumping one well very carefully, measuring the drawdown in a nearby well with a very precise reference to time and rate of drawdown and by very careful analysis of the data it is possible to determine the transmissibility of the water-bearing section that has been tested. And the average permeability for that water-bearing section is the transmissibility divided by the total thickness tested.

D1

Z27

Q   Did you or anybody under your direction perform any tests of that sort in the upper Santa Margarita River watershed in connection with your investigation?

A   No, we did not.

Q   Do you have any estimates of the permeability of the materials that you studied in the upper Santa Margarita River watershed?

A   I have estimates of specific yield, and I have reached conclusions regarding the relative permeability of the deposits in the area.

Q   And on what data did you base your conclusions as to relative permeability?

A   On the yields of wells in the area.

Q   By "yields" what do you mean?

A   The quantity of water pumped by the well, its specific capacity, its rate of drawdown; specific capacity, which is its rate of gallons per minute per foot of drawdown.

Q   And where did you get that information?

A   That information is based on observations made of the Pauba well.  There were very careful tests run on that well,

Q   Any other wells?

A   I have investigated records of pumpage on other wells. I have observed wells in the valley pumping.  I have observed their discharge.

Q   Did you make any comparisons between specific yields

E D1

Z28

1    of material and the data that you say you looked at with

2    respect to the capacity of wells?

3        A   I considered the capacity of wells in areas with

4    regard to the specific yields.  However, my estimates of

5    specific yields were based on classification of drillers'

6    terms in water wells.

7        MR. MOSKOVITZ:  I am not sure that you answered the

8    question.

9        Read the question, please, Mr. Reporter.

10       (The reporter read the pending question as follows:

11   "Q   Did you make any comparisons between specific yields of

12   material and the data that you say you looked at with respect

13   to the capacity of wells?")

14       THE WITNESS:  No, I did not.

15   BY MR. MOSKOVITZ:

16       Q   Now, what characteristic, specific yield or permeability,

17   is the significant characteristic in determining the extent

18   to which ground water will move through a given material?

19       A   Permeability and specific yield are two of the factors.

20   There are others.

21       Q   Assuming that you have a material with a specific

22   yield of 25%, and you determined through pumping tests that

23   the permeability is on the order of 10, what would your

24   conclusion be as to whether the water would move freely

25   through such material?

D1

Z29

1      A   If I determined a specific yield of an area of 25%,

2   the figure that I would consider would be transmissability,

3   not permeability.

4      Q   Would you define the word "transmissability"?

5      A   It is the quantity of water in gallons per day that

6   will be transmitted through the full saturated thickness  of the

7   water-bearing deposits for a width of one foot.

8      Q   Can you relate the terms "permeability" and

9   "transmissability"?

10      A   "Transmissability" is the sum of all the permeabilities

11   of a saturated section.

12      Q   Then those two terms are directly related; the higher

13   the permeability, the greater the transmissability; is that

14   right?

15      A   Not necessarily.

16      Q   Explain why it wouldn't be so.

17      A   If I had a permeability of 200 and a total saturated

18   thickness of 10 feet, I would have a transmissability of

19   2,000.   If I had a permeability of 1 and 2,000, which would

20   be considerably less than the first permeability-- a

21   permeability of 1 and 2,000 feet of saturated section, I

22   would have a transmissability of 2,000.   The transmissabilities

23   of the two water-bearing sections would be identical.   The

24   permeabilities would be vastly different.

25      Q   This is because you have introduced the factor of the

D1
Z30

1    size of the deposit?

2        A   The thickness of the deposit.

3        Q   The thickness of the deposit.  But assuming that you

4    had the same thickness of deposit, the permeability and

5    transmissability are directly related, aren't they?

6        A   Where there is the same thickness of deposit, they

7    are related.

8        Q   And if you increase the thickness, then the trans-

9    missability will be increased accordingly?

10       A   That is correct.

11       Q   Let's go back to the question I asked before.  Assuming

12   that you have a specific yield of 25%, and you have material

13   of a 10-foot thickness, and your permeability is 10, would

14   you conclude that the water would move freely within that

15   material?

16       A   If you have a 10-foot thickness, the water would move--

17       MR. VEEDER:   What do you mean by "freely"?  I think that

18   is the factor that has to be defined.

19       He injected something new here.

20       THE COURT:   Yes, sustained.  That doesn't mean anything.

21   BY MR. MOSKOVITZ:

22       Q   At what rate of transmissability would the water

23   move?

24       A   You said assuming a permeability of 10?

25       Q   Yes.

D1

Z31

A   100 gallons per day per foot of width of aquifer.

Q   Now, you have computed that by considering the permeability and the thickness of the material, haven't you?

A   It can be done that way.  In practice it is not done that way.

Q   How did you just do it now?

A   I have an assumed case in which you are giving me values.  On the basis of values you are supplying, I have arrived at an answer.  It is not the way I would go about it in the field for determining the transmissability or permeability of deposits.

Q   I gave you another factor there.  I gave you specific yield of 25%.  Did you use that inyour computation?

A   I did not use that in my calculation.

Q   Would you ever use the specific yield in your calculation?

A   It is not necessary to use specific yield in my calculations.

Q   So specific yield is not considered when you are attempting to determine how fast water will move in materials underground?

A   In specific answer to your question, specific yield is not necessary for the calculations which you have been hypothecating.  Actually, by pump tests, you do determine, you also determine the specific yield of the deposits.  It

D1

Z32

D2

1    is known as the storage coefficient.

2        Q  But to determine the speed of travel of water under-

3    ground, you do not need to even consider the specific yield,

4    do you?

5        A  The specific yield does not enter into the equation

6    to which you are referring.

7        THE COURT:  That is because, I take it, the propositions

8    as stated by Mr. Moskovitz assume ample water from the stand-

9    point of specific yield, and therefore the only question is,

10   what is the thickness of the permeability?

11       THE WITNESS:  That is correct.

12   BY MR. MOSKOVITZ:

13       Q  And further, if you had two materials of the specific

14   yield, the specific yield is not the factor that you must

15   consider in computing how freely water will move through that

16   material; you consider another factor-- permeability; is that

17   correct?

18       A  You consider transmissability.

19       Q  Which is related to permeability?

20       A  Which is related to specific yield.

21       MR. VEEDER:  We have just made the complete circle.

22   BY MR. MOSKOVITZ:

23       Q  What is the relationship between specific yield and

24   transmissability?  How do you compute transmissability from

25   specific yield?

A   Transmissability and permeability are rates of flow.
Specific yield is the quantity of water that will drain from
the deposits by gravity.

Q   Then how can you say that specific yield is related to
transmissability?

A   The statement to which I have testified previously
is that on the basis of my observations I have observed that
in areas where the specific yields are high groups of wells
that have comparable depths and construction will have higher
rates of yields and specific capacities compared to areas of
lower specific yield.

Q   You cited one well that you observed, the Pauba well,
in reaching such a conclusion.  What other wells in this area
have you observed?

A   I cannot identify the well by name at the moment.  It
is in Santa Gertrudis Valley.  It is in Long Canyon.  It is
on the Vail estate.  It has been observed by me to be pumping
several hundred gallons per minute.

Q   Can you point out where that well is?  Identify it
by section.

A   May I refer to the topographic map of the area?  I
believe that is the Murrieta Quadrangle.  Where are the exhibits?

(The Clerk hands exhibits to the witness.)

MR. VEEDER:  You didn't mark that?

THE WITNESS:  I circled the well.

D2

Z34

1    MR. VEEDER:  That is an exhibit.

2    THE COURT:  What?

3    MR. VEEDER:  The witness just put a circle around a

4  point on the exhibit, and I said that he shouldn't do it.

5    THE COURT:  Let's let the record show.  What is the

6  exhibit number?

7    THE WITNESS:  I have circled a well in Long Canyon.

8    MR. VEEDER:  What is the number of the exhibit?

9    THE WITNESS:  The exhibit is 29J.

10    It is in 8 South, Township 3 West, in Section 1.

11  BY MR. MOSKOVITZ:

12    Q  Is this one of the wells that you are plotting on the

13  map that you are now preparing to show the wells that you used

14  in your investigation?

15    A  I will have to check my notes to be certain.

16    Q  You said it was reported that there were certain

17  results from pump testing.  How did you receive such reports?

18    A  Certain of the results are in the files of the

19  Department of Water Resources.

20    Q  How many other wells did you receive reports of the

21  results of pumping on and correlated that with specific yield?

22    A  I would have to check my records.  I do not know.

23    Q  Would you please do so and bring that in here?

24    A  Yes, sir.

25    Q  Now, does a specific yield figure indicate to you the

Kunkel   Cross

D2

Z35

2703

1  rate at which water would be assimilated into the material

2  from surface flow and precipitation?

3      A  Definitely not.

4      Q  What characteristic of the material would you have to

5  know before you could make a conclusion as to how the material

6  would assimilate or accept surface runoff and precipitation?

7      A  I would have to know the differences or the values

8  for vertical permeability as compared to horizontal permeabil-

9  ity.  The permeability of the deposits is not the same in

10  ivertical and horizontal directions-- now the permeability

11  of a group of deposits is not the same in vertical and

12  horizontal directions.

13     Q  Did you make determinations in your investigation of

14  the upper Santa Margarita River watershed of the vertical

15  permeability of materials?

16     A  I have made investigations of the water-bearing

17  deposits that conclusively indicate that the vertical and

18  horizontal permeabilities of the deposits are not the same.

19     Q  You conducted those investigations in the Santa

20  Margarita River upper watershed?

21     A  Those conclusions are based on my personal observation.

22     THE COURT:  This is in a situation where you have

23  materials of various kinds in a deposit; is that right?

24     THE WITNESS:  That is correct.

25     THE COURT:  What about an area of uniform material,

D2

Z36

1    a cubic yard of the same kind of material; is the permeability

2    vertically and horizontally the same?

3         THE WITNESS:  If the material were homogeneous and

4    isotropic throughout the permeability would be the same both

5    vertically and horizontally.

6         THE COURT:  I get the "homogeneous", but what is the

7    "isotropic"?

8         THE WITNESS:  The same in all directions.

9    BY MR. MOSKOVITZ:

10        Q  I believe that  you testified that the best way to

11   determine permeability--

12        I will ask you, is it true that the best way to

13   determine permeability is through field tests?

14        A  The best way to determine permeability would depend

15   upon the particular circumstances involved and at a specific

16   site.

17        Q  It might be field tests or laboratory tests; is that

18   what you are saying?

19        A  It is not necessarily the same for all areas.

20        Q  Before you could make an intelligent conclusion as to

21   the magnitude of the movement of ground water from the area

22   of what you called older continental deposits on Exhibit 15

23   to the younger alluvium area to the area of older continental

24   deposits, would it not be necessary to have information as to

25   the permeability of the materials?

D3

Kunkel   Cross

2705

D-3

Z37

1          MR. VEEDER:  I object to this, your Honor.  What does

2    "intelligent" mean--  "before you could make an intelligent

3    conclusion"?

4          THE COURT:  Overruled.

5          THE WITNESS:  Would you restate the question, please.

6          THE COURT:  Read it, Mr. Reporter.

7          (The reporter read the pending question as follows:

8    "Q  Before you could make an intelligent conclusion as

9    to the magnitude of the movement of ground water from the area

10    of what you called older continental deposits on Exhibit 15

11    to the younger alluvium area to the area of older continental

12    deposits, would it not be necessary to have information as to

13    the permeability of the materials?")

14          MR. VEEDER:  I object again to that question, your Honor.

15    It is completely vague.  It is absolutely impossible to know

16    about what he is speaking.  You have think mantles of alluvium,

17    you have thick mantles of alluvium.  All you have to do is look

18    at Plaintiff's Exhibit 16 and observe the circumstances which

19    prevail.  How in the world could the witness make a generalized

20    statement, under the circumstances?

21          MR. MOSKOVITZ:  Your Honor, I think the witness should

22    make his attempt, if he can, and if he can't he can say he

23    can't, instead of having--

24          THE COURT:  Overruled.

25          THE WITNESS:  I am sorry.  I would like to have the

D3

Z38

1    question again.

2         THE COURT:  Read it again.

3         (The reporter again read the pending question as follows:

4    "Q  Before you could make an intelligent conclusion as

5    to the magnitude of the movement of ground water from the area

6    of what you called older continental deposits on Exhibit 15

7    to the younger alluvium area to the area of older continental

8    deposits, would it not be necessary to have information as to

9    the permeability of the materials?")

10        THE WITNESS:  It is possible--

11   BY MR. MOSKOVITZ:

12        Q  Can you give a yes or no answer to that, and then

13   explain your answer?

14        THE WITNESS:  That is not a yes or no question.

15        THE COURT:  What was your answer?  If possible?

16        THE WITNESS:  He asked for a magnitude.

17   What do you mean by "magnitude"?

18        MR. MOSKOVITZ:  Let's have the question read again.

19        MR. VEEDER:  We will have it memorized shortly.

20        (The reporter again read the pending question as follows:

21   "Q  Before you could make an intelligent conclusion as to the

22   magnitude of the movement of ground water from the area of

23   what you called older continental deposits on Exhibit 15

24   to the younger alluvium area to the area of older continental

25   deposits, would it not be necessary to have information as to

2707

the permeability of the materials?")

THE WITNESS:  An intelligent estimate of magnitude?

BY MR. MOSKOVITZ:

Q  Of amount?

A  No, not amount.  Magnitude-- large, small, not a number-- I can make an intelligent estimate, based on the data available.

Q  Now, suppose that the question said, "Amount" rather than "magnitude."  Then what would you say?

A  I would not be able to give an exact value without additional testing.

Q  Additional information as to permeability?

A  As to transmissability.

Q  And you say this even though you have testified that there is no reliable information on the amount of variance that you would have in permeability with materials of the same specific yield?

A  Based on my experience and observations of the results on the Pauba test well--

Will you read the question to me again before I complete my answer, please.

(The reporter read the pending question as follows: "Q  And you say this even though you have testified that there is no reliable information on the amount of variance that you would have in permeability with materials of the same specific yield?")

1    THE WITNESS:   Will you read my previous answer?

2    (The reporter again read the record as follows:

3    "Now, suppose that the question said, "amount" rather than

4    "magnitude."  Then what would you say?  A  I would not be

5    able to give an exact value without additional testing.

6    Q  Additional information as to permeability?   A  As to

7    transmissability.   Q  And you say this even though you have

8    testified that there is no reliable information on the amount

9    of variance that you would have in permeability with materials

10   of the same specific yield?")

11   THE WITNESS:   I have the data in well logs which shows the

12   types of material penetrated.  I have observed the outcrops

13   of the deposits.  But I have not conducted sufficient tests

14   to arrive at a quantitative answer.  I have observed sufficient

15   data for a qualitative answer, large or small.

16   BY MR. MOSKOVITZ:

17   Q  Might there not be a great difference in the amount of

18   movement of ground water within the magnitude of large or

19   small?

20   A  In my opinion, there would not be a great variance.

21   Q  Might the variance not be as much as two or three times

22   the base figure?

23   MR. VEEDER:   I don't know what that means-- base figure.

24   THE COURT:   Mr. Moskovitz, suppose the movement was one

25   quart a month.  Three quarts a month wouldn't make a lot of

D3

Z41

1  difference, would it?  It is three times.

2      MR. MOSKOVITZ:  It might, your Honor, if you have an

3  area--

4      THE COURT:  If it were a hundred thousand gallons an

5  hour, three times might make a lot of difference.  There are

6  so many other factors involved.  These general questions don't

7  help me any.

8      MR. MOSKOVITZ:  Well, your Honor, the area we have been

9  talking about, the older alluvium, has been testified by Mr.

10  Kunkel to have ground water storage in the upper 100 feet of

11  saturated material of 280,000 acre feet.  Now wouldn't it

12  make a big difference there if the water moved three times as

13  fast as the figure originally assumed?  That is the reason I

14  am asking these questions.

15      THE WITNESS:  What figure was assumed?

16      THE COURT:  No figure was testified to as to the rate of

17  movement of water.  There has been testimony of areas of

18  ground water basins or storage units.

19

20

21

22

23

24

25

E-1 ML

1    MR. MOSKOVITZ: Mr. Kunkel, --

2    MR. VEEDER: There is a question pending. Has it been

3 withdrawn?

4    MR. MOSKOVITZ: No, I have no question pending.

5    THE COURT: Withdrawn.

6    MR. MOSKOVITZ: It is on the record. It is withdrawn.

7    Q   In your testimony on Friday you testified, on page

8 2609 of the transcript, beginning on line 9:

9       "A number of deep wells were drilled in the Prauba

10    Valley and in the older continental deposits adjacent

11    to Prauba Valley, a cone of depression would be created

    around each well due to the pumping."

12    MR. VEEDER: Just a moment. Would you read that again?

13    MR. MOSKOVITZ: I believe a word has been left out.

14    MR. VEEDER: I was going to say --

15    MR. MOSKOVITZ: I believe there should be the word "if"

16 at the beginning.

17    THE COURT: Insert it. Correct the record. Page what?

18    MR. MOSKOVITZ: Page 2609, line 9.

19    MR. VEEDER: And also may I have the reporter read what

20 Mr. Moskovitz read from line 9.

21    THE COURT: Well, that is just wasting time.

22    MR. VEEDER: I think that he didn't read -- I think he

23 said "deeper" rather than "deep." Maybe I didn't hear what he

24 said. But he said, "A number of deeper wells."

25    MR. MOSKOVITZ: Well, I meant to say "deep." If I said

1    "deeper," I meant to read --

2       THE COURT:  What is the correction?  Let the record

3 show what the correction is you are making.  Concerning the

4 word "if"?

5       MR. VEEDER:  I had the witness go through here, your

6 Honor, and he is satisfied with the language.  I am not

7 going to make any change.

8       MR. MOSKOVITZ:  Very well.

9       MR. VEEDER:  My objection is that I thought he said

10 "deeper" rather than "deep."

11       THE COURT:  Well, read the statement again, Mr.

12 Moskovitz.

13     Q  BY MR. MOSKOVITZ:  "A number of deep wells were

14 drilled in the Prauba Valley and in the older continental

15 deposits adjacent to Prauba Valley, a cone of depression

16 would be created around each well due to the pumping.  The

17 wells were sufficiently close together that the cone of

18 depression would be intersected.  There would be the creation

19 of a pumping depression which centered around the well or

20 well fields from which heavy pumping would be done.  The

21 decrease in water levels in the surrounding cone of influence

22 would induce ground water flow from all directions toward

23 the center of the pumping.  The result would be a lowering

24 of the water levels in the lower part of the valley to the

25 point that stream flow or rising water in the Temedula River

would be greatly reduced or cease altogether.

MR. VEEDER:  Your Honor, I would like at this point to note that the witness desires to revise line 12 on page 2609 to start the sentence with "If the wells were sufficiently close together."  Line 13, "the cones of depression," changing "cone" to "cones."  And on line 14: There would be the creation of a pumping depression which would be centered" ellipsis, the words "would be" are omitted.

THE COURT:  The record may be corrected accordingly.

Now, what is your question?  You have read the testimony.

Q  BY MR. MOSKOVITZ:  My question is, in reaching our conclusion was it not necessary to consider the rate at which ground water would flow from the Prauba Valley into the areas where the cone of depression was created by the pumping?

A    That is correct.

THE COURT:  Well, it is time for a recess.  I think that you gentlemen -- this might be an uneasy way of doing it, but you should give me some idea what you are driving at in connection with your cross examination.

I have been looking through the Bulletin 57 and I think I know one of the issues which is emerging between the State of California and the United States.  At least, from a cursory inspection of some of the plates in Exhibit 57,

or rather, in Bulletin 57, which is Fallbrook's AA for

identification.  The State of California seems to have

marked off much smaller areas of alluvial, alluvium, and

seems to have an indication of areas where they contend

there is ground which is not permeable to any great extent

as shown in the California exhibit.  It seems to be some

of the area which this witness has characterized as part

of a ground water unit in Exhibit 15, such as the areal

lines north and east of the Murrieta Valley, the older

alluvia.  But I would like to know what issue you are

directing all this matter to.  I will have forgotten it

long since unless I know what you are shooting at.

MR. MOSKOVITZ:  Do we have to do it right now, your

Honor?

THE COURT:  Well, do it after recess.  I would like to

know what the major points of disagreement are between the

United States and the State of California in some of these

matters.  If I am going to have to decide them, I am

certainly not going to decide this case on how old these

deposits are up there or on sound academic arguments about

permeability.  It has got to be related specifically to

some particular issue that is involved in the case.

Take a short recess.

(Short recess taken.)

MR. MOSKOVITZ:  Your Honor, one of the most important

1    issues in the case is the extent of the water that is out

2    of the Santa Margarita River.  How much of the ground water

3    in this basin is so connected with the river that its

4    rights -- the rights to the use of such water must be

5    adjudicated here and must be correlated with the rights to

6    take water from the river.  Now, in your opinion, on page

7    80 you quoted from a decision by the California Supreme

8    Court.  The decision is the City of San Bernardino against

9    Riverside.

10       MR. VEEDER:  What page is that?

11       MR. MOSKOVITZ:  Page 80.

12       MR. DENNIS:  8 or 80?

13       MR. MOSKOVITZ:  80; 80.

14            Now, on line 3 the quotation is, as follows:

15            "When a stream runs over a coarse material

16       saturated with water, and the underground water

17       supports the stream either by upward or lateral

         pressure, or feed it directly, persons having

18       rights in the stream will be protected against a

19       depletion thereof by adverse diversions of such

20       underground waters if they are injured thereby."

21            And the next sentence you underline, your Honor,

22    as follows:

23            "There may be a point of distance from the stream

24       at which a diversion of such underground water will

25       have so little effect on the stream that it will not

be actionable. It is ordinarily a question for the trial court to determine whether or not this is true in a particular case before it."

That is the end of the quotation that I am reading. All right, end of the quotation. I wanted it settled. One of the issues that has been included in the issues the pretrial order will cover is that very point: what waters are and are not part of the stream?

Now, it is the position of the State of California that on the information available, that of any geologist or hydrologist or engineer, can look at it. It is not proper to conclude that the large area which is colored light-brown --

THE COURT: Orange.

MR. MOSKOVITZ: Orange? Pardon me.

MR. SACHSE: Orange.

THE COURT: On 15, on Exhibit 15.

MR. MOSKOVITZ: On Exhibit 15. That large area of older continental deposits has under it waters that are part of the stream.

THE COURT: That, therefore, raises the issue of permeability and whether the water will flow from that into the stream or vice versa?

MR. MOSKOVITZ: That is correct, your Honor. And that nearly concluding what the specific yield of the materials

may be does not answer the question as to whether pumping in that material will attract toward the pumping depression water from the stream itself.

THE COURT:  I wanted to verify it that you were particularly directing your attack, or would eventually, upon the large orange-colored area?

MR. MOSKOVITZ:  Yes, sir.

THE COURT:  Is there much dispute in other areas of the basin?  A very cursory check of the map up around Diamond Valley and Coahuila and Burt Valley, and all, didn't show the differences that appear on the particular area that you are talking about.

MR. MOSKOVITZ:  Your Honor, the map itself, I think, accords fairly well with the map in Bulletin 57, except that Exhibit 15 is much less detailed.  It just didn't go into the detail and we find that Bulletin 57 did.

MR. VEEDER:  Well, now, 57 is not before the court, and I don't think counsel should argue from it, your Honor.

THE COURT:  It is all right.  I looked at it.  In fact, it looked to me like too much detail.  There is some description of a dozen different kinds of rock material in the area marked here in blue described as basic complex; and they wind up with, apparently, the same conclusion but with a terrific amount of detail on that area of the map.

MR. MOSKOVITZ:  That is true, your Honor.

THE COURT:   All of which wouldn't take me anywhere.
If it is all material that is not part of the watershed,
why, we might as well group it in one color instead of
having a rainbow on it.

MR. MOSKOVITZ:   Yes, there is no doubt about that.   Of
course, Bulletin 57 was not prepared for any particular
court action; it was supposed to be a comprehensive in-
vestigation.

MR. VEEDER:   Well, it has just plagiarized a lot of
different sources.   That was the problem.

MR. MOSKOVITZ:   Which, of course, all scientists do.
They read the literature and the          of literature.
And I point this out:  The orange area on Exhibit 15 can be
found in the maps in Bulletin 57 also.   It is entitled
"Older continental deposits of a few different types."  The
outlines I don't think are too far off.

THE COURT:  So you made your issue.   There is a question
of permeability, whether it is actually connected with the
stream.

MR. VEEDER:   Now, his statement simply is inaccurate
and it is incorrect, your Honor.   I can't permit him --

THE COURT:   What statement is inaccurate?

MR. VEEDER:   In regard to the areas of continental
deposits.

THE COURT:   His statement was that your general outlines

1  on what he is going to try to show and what you have shown
2  are about the same.

3  MR. VEEDER:  Oh, well, he is trying to give some
4  credence to this Buck Rogers comic book of his.  The point
5  I am trying to make, your Honor, is that we have a scientist
6  here who knew what he was doing and he went out and did it
7  on the ground.  And I am resentful, and I could even become
8  bitter about trying to compare Bulletin 57 with our exhibits.
9  Now, we know that they are wrong, and we think that all this
10  hurrah about permeability is laughable; but I have been
11  patient all day long.  I have let him have his moments.

12  THE COURT:  Just continue.

13  (Laughter.)

14  MR. VEEDER:  You unloaded my fists, your Honor.  I will
15  let him go ahead.

16  MR. MOSKOVITZ:  I didn't finish answering your question
17  as to whether there are any differences.  I do believe that
18  there are more areas of recent alluvium that the State found
19  than appear here.  Now, I believe that there are minor areas
20  with perhaps ten layers of alluvia, thinner layers of
21  alluvium.

22  Now, thus far, your Honor, in the cross examination,
23  I have touched on this point whether --

24  THE COURT:  You have answered my inquiry, and I was on
25  the right track.  But I wanted to have it confirmed.

MR. MOSKOVITZ:  Very good.

Now, I am not sure if I recall the answer that was given to the last question.

MR. STAHLMAN:  I don't even recall the last question.

THE COURT:  Was there a last question?

(Laughter.)

MR. VEEDER:  It wasn't a good one.

MR. MOSKOVITZ:  I would be willing to assume that there was no last question, and I will ask a question.

Q    I read the quotation to you from the transcript on page 2609, and I asked you whether you were able to reach the conclusion, that is, "The result would be a lowering of water levels in the lower part of the valley to the point that stream flow of rising water in the Temecula River would be greatly reduced or cease altogether."  You were able to reach that conclusion without considering facts as to permeability of material?

A    May I step to the blackboard and explain my conclusion?

THE COURT:  All right.

Tell us your conclusion first and then explain it.

THE WITNESS:  The answer is yes, I was able to arrive at a conclusion without knowing a value for permeability.

THE COURT:  All right.

I take it nobody wants these informal diagrams on

the board. They can be wiped off as you go along unless somebody wants them.

MR. VEEDER: If this is good enough, you may want to save it. No, this one. He is going to draw a picture that may be important.

THE WITNESS: In essence, I am going to attempt to reproduce the diagram, one of the diagrams that I had on the board several days ago in which I referred to ground water basins in general. I am now going to try reproducing the same diagram but reference to Prauba Valley in particular. (Marking.) This is land surface datum or land surface. There is basement complex at the head end of the valley beneath or below Vail Dam, below Nigger Canyon. There is a false basement complex. There is basement complex at depth. I do not know how deep it is. There is one well in excess of 2400 feet that does not encounter basement complex. It is shown on Exhibit 15 -- 16, I am sorry. The log is available, Mr. Veeder presented to the court.

THE COURT: 16-A, part of 16-A.

MR. VEEDER: Yes.

THE WITNESS: Yes, sir. May I refer to the --   It is identified as well 82 -- 8/2-17 M-1. It is known as the Prauba well. Also other well logs in Exhibit 16 which are along the line of sections indicate there are lenticular deposits, clays, silts, sands, and gravels. I will indicate

the presence of clays diagrammatically by the solid lines.
There are also lenticular deposits of sand indicated by
dots; lenticular deposits of gravel.  These deposits also
occur in  lenses  , and all mixtures and combinations.
Each and every cross-sectional area may have differing
permeabilities.  They undoubtedly do have differing
permeabilities.  The entire thickness of the alluvial
deposits to a depth in excess of 2478 feet has an average
permeability.  I have not determined it.  May I have a copy
of Exhibit 18 for reference?  Well logs indicate a
thickness of younger alluvium having an average thickness
of about 100 feet.  One log -- I am not certain of the
exact log -- I would have to check the cross section in
Exhibit 16 and relate it back to the well logs.  There was
one log, if I remember correctly, the alluvium was on the
order of 140 feet thick.  The younger alluvial, the base of
the younger alluvium and the older continental deposits,
contact between the two, is rated the outlet or ~~lift~~ lip of
Temecula Canyon.  The canyon is cut in steep walls.  And
I will indicate by a slight rise here with the statement
that the stream grade is a projection of land surface datum
in the canyon.  This would indicate the steep walls of the
canyon, the far side of my diagram.

        The Wildomar Fault zone diagrammatically indicated,
as far as my observations determined, has not offset the

1    alluvium at the surface.  The exact position at the top

2    of the movement has not been determined.  However, the

3    contact between the younger alluvium and older alluvium is

4    graded to the stream channel.  Attention to my diagram, to

5    indicate that there are no reversals or bog-down, the grading

6    is a straight gradient to the outlet of the channel.  The

7    maximum thickness as determined from well logs is 140 feet.

8    That figure is subject to slight correction, a matter of

9    five or ten feet one way or the other.  I am doing this

10   from memory.  However, the average thickness of these

11   younger alluvial deposits is on the order of 100 feet.  They

12   are also lenticular in character.  They may contain lenses

13   of clay, sand and gravel and clay, sand and gravel in all

14   mixtures and combinations.  As I have previously testified,

15   the specific yield of these younger alluvial deposits,

16    permeability of the younger alluvial deposits, is greater

17   than the, let's say the average specific yield of the younger

18   alluvial deposits and the average permeability of the

19   younger alluvial deposits is greater than the average

20   specific yieldand the average permeability of the older

21   continental deposits.

22

23

24

25

But the difference in area of short water supply is not the sole factor that determines whether the water in the younger alluvial deposits and the older continental deposits are in hydraulic continuity and whether the pumping of wells in the area will affect stream flow.

I have previously testified that in a basin of the type described, a shallow well of, say, less than 100 feet, under natural conditions, will have a water level, if no confining beds or no appreciable number of confining beds are encountered, the water level will stand at the point where water was first encountered in a well. If one were to drill a water well adjacent to it down into the older alluvial deposits, that well would also have a water level-- it would stand, under natural conditions, at a shallower depth below land surface and would have a higher head than the shallower well. A very deep well would have still a higher head and at a certain point the well would flow. It would flow when the head of water was greater than the head above land surface.

Now, under conditions of development if the deep well is pumped--

The Pauba well to which I have been referring is perforated in the zone from 243 feet to 2157 feet. The bottom of the well was at 2478 feet. Basement complex is beneath the bed of the well at an undetermined depth. Pumping in the Pauba well will draw water from the older continental deposits.

F1

Z43

1 If and when that well is pumped for a sufficient length of

2 time-- there are also other wells in the area which are also

3 pumping water from the older continental deposits.  They are

4 not as deep as the Pauba well, but they draw a large part

5 of their water supply from the older deposits.  If they are

6 perforated in the younger deposits, they may also draw water

7 from the younger deposits.  But as indicated by the Pauba well,

8 the perforations are well below any base of the younger

9 alluvial deposits.  As the Pauba well and the other wells are

10 pumped, the head of water in the Pauba well and other deep

11 wells will decline.  The decline will continue until the water

12 level in the deep wells that tap the older continental

13 deposits and draw the principal, if not their total supply,

14 of water from the older continental deposits, the water level

15 in these deep wells will drop below the water level in the

16 shallow wells.  At that point has a lower head in the deep

17 deposits than one has in the shallow deposits.

18    When that situation exists, water will move from the

19 younger alluvial deposits down into the older continental

20 deposits, and water levels in the unpumped shallow wells that

21 tap only the younger alluvial deposits will decline.  The

22 decline would take place if there were no pumping in the

23 younger alluvial deposits whatsoever.  However, there will

24 undoubtedly bee some of the water drawn from the younger

25 alluvial deposits.  The effect of the younger alluvial

F1

Z44

1   deposits recharging the older continental deposits will be

2   to decrease the area of rising water.

3       Under natural conditions there is, and was, a point of

4   rising water in Pauba Valley.  The pumpage which has already

5   been done in the valley has lowered the head sufficiently

6   that water has drained from the younger alluvial deposits,

7   causing the area of rising water to migrate downstream in

8   excess of-- and I am now referring to the Pechanga Quadrangle--

9   in excess of 1.2 miles since the Pechanga Quadrangle was

10  surveyed in 1950.

11      A  spring is shown on the Pechanga Quadrangle in Pauba

12  Valley-- Township 8 South, Range 2 West, approximately in

13  Section 12.  The sections are not projected on the Pechanga

14  Quadrangle, but the spring is indicated as the word "Spring."

15  It is under the letter "a" in the word "Pauba."

16      The point of rising water when I first observed the rising

17  water was below Highway 71 approximately one-half mile.  The

18  point of rising water as of Monday was approximately the same

19  point.

20      MR. VEEDER:  Which Monday?

21      THE WITNESS:  Last Monday, October--  What is the date?

22      THE COURT:  Yesterday, you mean?

23      THE WITNESS:  Yes, yesterday.

24      MR. MOSKOVITZ:  It seems longer than yesterday, I guess.

25      THE WITNESS:  Yes, it seems longer than that.

1      MR. VEEDER:  He spent the day with me, that's why.

2      THE WITNESS:  Yesterday.

3      If pumping were to continue by the installation of many

4      deep wells, that would draw all the water supply or all but a

5      very small part of their water supply from the older continental

6      deposits.  The point of rising ground water will continue to

7      move downstream until the head of water in the deep well will

8      cause a reduction in water level or pressure head below the

9      lip or outlet of Pauba Valley,  at which point there will be

10     no additional outflow from the valley.

11     This diagram is a simplification.  I have not considered

12     the effect of the Wildomar Fault-- there will be an effect,

13     but wells can be drilled on both sides of the fault.  The

14     combined total of the pumping effect will be the same with

15     regard to drying up the rising water in the valley whether

16     the fault was there or not.  The exact mechanics of how it

17     will take place might be slightly different, but the ultimate

18     effect will be the same.

19     At this point now, under natural conditions-- if we may

20     go back-- with a point of rising water somewhere up gradient,

21     when winter storms cause a flow of water into Pauba Valley,

22     water under natural conditions flows across the upper part of

23     the Pauba Valley in the area above rising ground water and

24     surface water flow from the stream moves into and recharges

25     the younger alluvium.

F2

Z46

Precipitation on the highland areas on both sides of Pauba Valley and minor quantities of locally derived runoff will also in part recharge the ground water. The quantity for any unit area is admittedly less. But a principal source of recharge is from the flow of the Temecula River into the younger alluvial deposits. When the flowing surface storm runoff reaches the point of rising water in Temecula Valley, the quantity of water in the stream at that point will, under natural conditions, continue right through the valley and out the combined Murrieta-Temecula watershed into the lower part of the Santa Margarita watershed, where it is recharged to the ground water bodies downstream.

The reason for that is that the head of water, the rising water does not allow, or will reject, the available recharge because the ground water basin is full below the point of rising water. However, with the drying up of the area of rising water, the increment of stream flow that would normally go through the valley, a quantity of that stream flow will go underground and recharge the younger alluvial deposits.

If, under such circumstances, it would be possible for the recharge to fill up the younger alluvial deposits, soak up the water like a sponge, do it rapidly to the point that the shallow wells would rise in head almost immediately and would reflect a shallow water level, whereas the water levels in deep wells would continue to be at a lower head than the

F2

Z47

1    shallow wells and when the storm ceased the ground water,

2    under natural conditions, would then discharge out of the basin

3    in the summer months as rising water.  Instead of discharging

4    as rising water, it would continue its downward travel and

5    recharge the older alluvial deposits.

6        The evidence that the deep wells, wells such as the

7    Pauba well in excess of 2478 feet deep, when pumped at the

8    rate of 2,326 gallons a minute, with a drawdown of 98.9 feet

9    below land surface, when the Pauba well was pumped at that

10   rate--

11       MR. MOSKOVITZ:  What were you reading from?

12       THE WITNESS:  The log which is available in court, the

13   log of the Pauba well.

14       MR. MOSKOVITZ:  In Exhibit 16?

15       THE WITNESS:  It is a part of the record, yes, sir.

16       At that time the flow in the nearby Studley well--

17       The Studley well was flowing before the test of the

18   Pauba well.  I will have to check the log, but the Studley well

19   is 500 plus or minus feet deep.  Maybe slightly deeper or

20   slightly shallower, but it is on that order.  It is not a

21   1000-foot well, it is not a 200-foot deep well; it is about

22   500 feet deep.

23       --ceased to flow during the test of the Pauba well,

24   indicating that sufficient water is withdrawn from the older

25   continental deposits appreciably to affect the flow and also

the quantity of water yielded by the other wells in the area that are shallower.

THE COURT:  How far was the Studley well from the Pauba well-- what distance?

THE WITNESS:  I will have to check my notes.  I can give you that figure.

MR. MOSKOVITZ:  Can you give us just a rough estimate?

THE WITNESS:  I cannot recall the exact number of the Studley well, but it is a quarter to a half mile away.  I will have to check my notes and correct the record if that is an incorrect statement.

BY MR. MOSKOVITZ:

Q  They both take water from the older alluvium?

A  Yes, sir, they do.

THE COURT:  This whole explanation now-- keep your mind on the question-- is devoted to how you knew without more data that there was permeability in the older alluvial deposits.

THE WITNESS:  That is correct.

THE COURT:  That is what you are shooting at.

THE WITNESS:  That is correct.

Now this phenomena of drying up rising water has been observed to happen throughout many ground water basins in California.  It is not necessary to know the permeability of the deposits to know that the water will drain downward.  It is only necessary to know that they do have a permeability.

1   The younger alluvium may act as a sponge that holds recharge

2   and will accept recharge more rapidly than the older alluvium.

3   But it has all summer in which to allow that water to drain

4   from the younger alluvial deposits into the older alluvial

5   deposits.

6   BY MR. MOSKOVITZ:

7       Q   Mr. Kunkel, you have been talking about the Pauba

8   well.  Where is that located on Exhibit 15?

9       A   On Exhibit 15 it is located in Section 17, the M

10  Quadrangle projected, and it is approximately 1000 feet--

11  again I will have to check the record to make certain that is

12  correct-- but approximately 1000 feet northeast of the fault

13  zone along the northeast side of Murrieta Valley.

14      Q   Does it lie on the yellow material or on the orange?

15      A   The well lies right at the top of the little patch

16  of yellow material showing outcropping within Temecula Valley.

17  In my opinion, the Pauba well is drilled in older continental

18  deposits for its entire depth.

19      MR. VEEDER:   Now let's get the record straight on this.

20  It does not show up  on Plaintiff's Exhibit 15, does it?

21      THE WITNESS:   It does not show up on Plaintiff's Exhibit

22  15.  However, I have described its position in relation to

23  Plaintiff's Exhibit 15.

24  BY MR. MOSKOVITZ:

25      Q   It is located in the yellow material which is

F2

Z50

1    continuous with the material that is on Pauba Valley; is

2    that correct?

3          A   The yellow material--

4          MR. VEEDER:   That is contrary to what he has testified.

5          THE WITNESS:   It is also projected, if you will notice--

6    BY MR. MOSKOVITZ:

7          Q   It does go through younger alluvium, according to

8    your Exhibit 16?

9          A   No, it does not go through the younger alluvium,

F3      10   according to my Exhibit 16.

11         Q   On Exhibit 16 what is the uppermost material shown

12   in the log of that well?

13         A   Soil, sandy, gray, 4 feet; sand, very coarse, some

14   gravel, 26 feet.

15         Q   You are reading now from Exhibit 16-B?

16         A   That is the exhibit in the record.

17         MR. VEEDER:   16-A.

18         MR. MOSKOVITZ:   16-A.

19         Q   And how do you know that is older alluvium?

20         A   I observed the outcrop of the deposits at the well.

21   There is a small, or a thin, veneer of younger alluvium

22   material above the well.   There is a little island of older

23   continental deposits cropping out in the main part or in the

24   area indicated on Exhibit 15.   There is an island of older

25   continental deposits within the area mapped as "Qyal."

1    Now the important point, without any regard to where your

2    contact of your younger or older alluvial deposits is, the

3    first perforations in the well are at 235 feet.  The water in

4    the perforated zone without a doubt is coming from the older

5    continental deposits.  By no geologic process can the younger

6    alluvium be 243 feet thick at that point.

7    Q  Now this well is located adjacent to or actually within

8    the mantle of younger alluvium that covers Pauba Valley?

9    A  As I have previously testified, there are islands of

10   older continental deposits cropping out within the areas in

11   Murrieta and Pauba Valleys, within the areas that are mapped

12   as younger alluvium.  The geologic term is an outlier of the

13   type of deposit.

14   THE COURT:    Is this well on one of those islands?

15   THE WITNESS:  This well is on one of those islands or

16   right adjacent to it.

17   BY MR. MOSKOVITZ:

18   Q  Now, in the statement from the record on page 2609

19   of the reporter's transcript which I read, you referred to

20   deeper wells drilled in the Pauba Valley and in the older

21   continental deposits adjacent to Pauba Valley.  By "older

22   continental deposits adjacent to Pauba Valley," did you have

23   in mind the entire area which is colored orange north and west

24   of Pauba Valley?

25   A  I had in mind the entire area colored orange north

Fm3

Z52

1    and south of Pauba Valley, the area colored orange within

2    Murrieta Valley.

3        Q  Do you have any well that you have records of test

4    pumping on that is located in the orange area northeast of

5    Santa Gertrudis Creek?

6        A  I would have to check my records for that.  I have no

7    immediate recollection of a specific well.

8        Q  If there were such a well there, in your opinion would

9    the pumping from such a well induce the flow of water from

10   the younger alluvium in Pauba Valley to that well?

11       A  In my opinion, a properly drilled large diameter--

12       MR. VEEDER:  Your Honor, I submit that he hasn't given

13   the witness sufficient facts upon which to predicate his

14   hypothesis.  There is certainly nothing in the record to support

15   the hypothetical question that has been tendered here.

16       THE COURT:  Overruled.

17       Go ahead and finish your answer.

18       THE WITNESS:  In my opinion, a properly drilled deep well

19   in the older continental deposits as mapped--

20   BY MR.MOSKOVITZ:

21       Q  Northwest of Santa Gertrudis?

22       A  --northwest of Santa Gertrudis Valley-- two places

23   specifically there-- if it encountered a sufficient thickness

24   of older continental deposits would have a yield comparable

25   to the Pauba well.

F3

Z53

1    Q  That is not the question I asked you, Mr. Kunkel.

2    A  Pumping in that well would lower water levels.  A

3  pumping depression would be created around the well. There would

4  be a reduction of head in the aquifers and water would move

5  toward that well from all directions.  When the pumping cone

6  of that well or a group of wells, if you want to combine the

7  effect of their pumping cones, intercepted or was lower than

8  the water table in Santa Gertrudis or any other valley in

9  hydraulic continuity with them, the recharge would be induced

10  into the older alluvial deposits from the overlying materials.

11    Q  And did you testify that the material which would lie

12  under such a well northwest of the Santa Gertrudis Creek would

13  be in hydraulic continuity with the material in Pauba Valley?

14    A  According to the contours as shown, the areas is in

15  hydraulic continuity.

16    Q  Your line of contours that you have drawn on Exhibit

17  15?

18    A  The contours are conclusive evidence.

19    MR. SACHSE:  I didn't hear that last answer.

20    THE COURT:  Read it.

21    (The reporter read the last answer as follows: "A  The

22  contours are conclusive evidence.")

23    THE COURT:  You are referring to the water level contours

24  shown on Exhibit 15.

25

BY MR. MOSKOVITZ:

Q And the permeability of the material between such a well drilled northwest of the Santa Gertrudis Creek and the material in Pauba Valley would not be a factor in so far as the amount of water that would be taken from the Temecula River and from the Recent alluvium underlying; is that right?

A The sum of the permeabilities, the transmissability of the deposits would be the determining factor; not the permeability.

Q The transmissability would be an important factor?

A It is an important factor.

Q And when you made this statement at page 2609 of the reporter's transcript that the result of drilling wells in the older continental deposits adjacent to Pauba Valley, which you have testified encloses the entire orange area on Exhibit 15, would result in a lowering of water levels in the lower part of the valley to a point where stream flow or rising water in the Temecula River would be greatly reduced or cease altogether--

A May we check the questions and answers a little bit closer?

Q Let me finish my question, please.

A You are including a couple of them at me at once.

Q Let me finish my question.

A Go ahead.

F4

Z55

1    Q  Did you or did you not consider the transmissability

2    that you testified just now would be a material factor?

3    A  I certainly did, as based upon the evidence of the

4    Pauba well.

5    Q  And you are projecting the evidence of the Pauba well

6    as being typical of the conditions that would exist throughout

7    the entire orange area on Exhibit 15?

8    A  I am basing my interpretation of the potential

9    yields of wells in the area mapped as orange on the basis of

10   materials encountered in drillers' logs and also on the Pauba

11   well.  The evidence of the Pauba well is not the only evidence

12   that has been considered.

13   Q  And on the basis of the evidence you have, you say

14   that such a well north of the Santa Gertrudis Valley would

15   induce the flow of water lowering the water levels under

16   Pauba Valley?

17   A  Are you reading from the record, Mr. Moskovitz?

18   Q  I am just referring to the record.

19   MR. VEEDER:  No, he is not.

20   MR. MOSKOVITZ:  Just a moment.  I haven't finished.  I

21   am asking you now:

22   Q  Are you saying that such a well pumped in that area

23   would induce the flow of water from the sands of the Recent

24   alluvium under Pauba Valley and therefore reduce and result

25   in the entire cessation of the flow of the Temecula River?

F4

Z56

A   I do not recall having said exactly those words.

Q   I am asking you if you say that now?

A   Are you putting the words in my mouth? Or may I answer in my own manner?

Q   You may answer yes or no and then explain.

A   It is not a yes or no question.

THE COURT:   The question in the record was corrected, and properly so, to read "if"-- if sufficient wells were drilled, this would happen.  It is just common sense that-- and this isn't a yes or no answer-- that a well drilled up in the yellow which produced X gallons of water you can't say is going to lower the stream in Pauba Valley, unless you know how big the well is or how many wells there are and how much they produced.

As I understand, his testimony is that if sufficient wells are drilled there, the permeability is sufficient that there would be a lowering.  But you are asking him to say that a well drilled up there in Santa Gertrudis Valley would lower the level in Pauba Valley.  He says that it is not a yes or no answer.  Maybe it is a 10-foot thing.  Maybe it throws a million gallons of water.  Maybe it has a windmill on it and pumps 10 gallons a day.

THE WITNESS:   Your Honor, may I offer an explanation.

One gallon of water removed from the bottom of the Pauba well will induce a movement of every other drop of water that

F4

Z57

1  is in hydraulic continuity with that well.

2      THE COURT:  Mathematically it would.

3      THE WITNESS:  Mathematically it would.

4      THE COURT:  But appreciably it probably wouldn't.

5      THE WITNESS:  That is correct.

6      Does that answer the question?

7      MR. MOSKOVITZ:  I will ask another question.

8      Q  Appreciably it may or may not.  Is that the answer?

9      A  I didn't say that.

10     Q  I am asking you now if that is the answer.

11     A  Is it a question, or are you telling me?

12     THE COURT:  Mr. Moskovitz, you didn't ask a full question.

13  He talked about a gallon of water.  Are you still talking about

14  the gallon of water, or about the well?

15     MR. MOSKOVITZ:  Let's talk about the well north and west

16  of Santa Gertrudis Valley.

17     THE COURT:  Come on back to the stand.

18

19

20

21

22

23

24

25

tk G ML

1    You frame a question and we will see about the
2 answer.

3    Q  BY MR. MOSKOVITZ:  And ask whether it were drilled,
4 let us say, to the depth of the Prauba well and were
5 pumped --

6    THE COURT:  The extent of the Prauba well.

7    Q  BY MR. MOSKOVITZ:  -- and pumped to the extent of the
8 Prauba well, whether there would be any appreciable effect
9 on the water in the alluvian in Prauba valley and on the
10 flow of the stream?

11    A    There has been no showing yet the extent of pump-
12 ing the Prauba well.

13    MR. MOSKOVITZ:  I believe you testified to it.

14    THE COURT:  I am assuming he is referring to the
15 testimony he gave that the Prauba well was pumped so many
16 gallons a minute at a drawdown of 98 feet, as I recall.

17    MR. VEEDER:  That is what I understood, yes, all right.
18    THE COURT:  Over 2000 gallons a minute, wasn't it?
19    THE WITNESS:  That is correct.
20    THE COURT:  Brought down to some 98 feet?
21    THE WITNESS:  That is approximately correct; 91, 98;
22 I don't recall.

23    One well, deep well drilled northeast of Santa
24 Gertrudus Creek to the depth of 2000 feet and pumped in
25 excess of several thousand gallons a minute -- one well, I

state -- will not dry up the flow in the Temecula Creek.
But you place a sufficient number of wells in those deposits
and pump them, ultimately the cone of influence of those
wells, the combined cone of influence, the combined effect,
will dry up the flow in Temecula Creek.

Q  BY MR. MOSKOVITZ:  And wouldn't it make a difference
as to whether such pumping did or did not dry up the flow
how permeable the material was between the wells and Prauba
Valley?

A    Sufficient time and sufficient pumping will have
the effect that I described.  Permeability is one of the
factors, yes.

Q    Now, referring to your ground water confluence on
Exhibit 15, I notice that some are solid lines and some are
dotted lines.  What is the difference between solid lines
and dotted lines?

A    I read the ledger.  Water level contour, November,
1953 -- where inferred number shows altitude and ground
water surface; arrow shows direction of ground water move-
ment.  I have indicated in a large part of the area underlain
by older continental deposits that the water level contours
are inferred.  By infer I wish to imply that there is not
the degree of control that there is in the areas where the
contours are solid.  They are solid in places in the old
continental deposits.  They are not solid in other places.

It is to show the degree of water level control. There was control, however, wherever contour is drawn.

Q    What do you mean by "degree of control"?

A    The number and positions of wells for which there are water level measurements, on which the water level contour is based.

Q    In layman's language, you mean if you had a number of well levels, then you had better control? If you had a few well levels, then you had poor control?

A    That is correct.

Q    Was there any particular number of wells per square mile or per quarter section that you felt you needed to have before you would draw a solid line?

A    No; the control has to be coupled along with the knowledge of the extent of the water bearing deposits which also -- the control, the additional control, as my observations in the field, is to the extent of those deposits. My observations of thicknesses of section where exposed in road cuts, the information gathered in one facet of the study had to be considered and applied in the final analysis of ground water flowing movement. It would be impossible to take a series of water level measurements, and not knowing the geology of the area, to draw a meaningful contour map. The result would be chaos.

MR. STAHLMAN:  This is a good place to stop, on chaos.

1          THE COURT:   I think so.   We will take our adjournment

2     until 10:00 o'clock tomorrow morning.

3          (Whereupon an adjournment was had at 4:35 o'clock p.m.

4     until 10:00 o'clock, Wednesday, October 8, 1958.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25