Vol. 29

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et. al.,

Defendants.

No.   1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      Wednesday/ October 8, 1958

Pages:   2743 to 2877

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ Deputy

MALCOLM E. LOVE
**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211    Ext. 370

1

2

3

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

4

---o---

5

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6

---o---

7

| | | |
|---|---|---|
| 8 | UNITED STATES OF AMERICA, | ) |
| 9 | Plaintiff, | ) |
| 10 | -vs- | ) No. 1247-SD-C |
| 11 | FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) |
| 12 | Defendants. | ) |

13

14

15   REPORTERS' TRANSCRIPT OF PROCEEDINGS

16

San Diego, California

17   Wednesday, October 8, 1958

18

19   APPEARANCES:

20   For the Plaintiff:              WILLIAM H. VEEDER, ESQ.,
                                     Special Assistant to the
21                                   Attorney-General,
                                     Department of Justice,
22                                   Washington, D. C.
                                     WILLIAM E. BURBY, ESQ.

23

24

25

| | | |
|---|---|---|
| 1 | For U. S. Marine Corps: | COL. ELLIOT ROBERTSON. |
| 2 | For Defendant Vail<br>Company: | GEORGE E. STAHLMAN, ESQ. |
| 3 | | |
| 4 | For Defendants Fallbrook<br>Public Utility District, | FRANZ R. SACHSE, ESQ. |
| 5 | et al.: | |
| 6 | For Defendant State of<br>California: | EDMUND G. BROWN, ESQ.,<br>Attorney-General, By |
| 7 | | ADOLPHUS MOSKOVITZ, ESQ.,<br>Deputy Attorney-General. |
| 8 | | CARL BARONKAY, ESQ. |
| 9 | For Defendant Santa<br>Margarita Mutual Water | W. B. DENNIS, ESQ. |
| 10 | Company: | |
| 11 | For Defendants Hartman,<br>Lewis, Wilks and Bayle, | BEST, BEST & KRIEGER,<br>By JAMES H. KRIEGER, ESQ. |
| 12 | and Oviatt: | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

1
2

I N D E X

3

| WITNESS FOR PLAINTIFF | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Fred Kunkel | | 2746 | | |
| (By Mr. Sachse) | | 2795 | | |
| *noshority* | | 2751 | | |

4
5
6
7
8
9
10
11

12   EXHIBITS

13                 (None.)

14
15
16
17
18              *  *  *  *  *
19
20
21
22
23
24
25

A-1

Z-1

1 | SAN DIEGO, CALIFORNIA, WEDNESDAY, OCTOBER 8, 1958. 10:00 A.M.

2

3    (Other matters.)

4    THE CLERK:  United States vs. Fallbrook Public Utility

5 District, et al. 1

6

7           FRED KUNKEL,

8 recalled as a witness in behalf of the plaintiff, having been

9 previously sworn, testified further as follows:

10

11    MR. VEEDER:  Your Honor, we have a bibliography for Mr.

12 Fred Kunkel, the witness presently on the stand.  Copies have

13 been passed out to counsel.  I am not sure whether your Honor

14 desires that this be made part of the record, or whether it

15 should be marked as an exhibit.

16    THE COURT:  I thought the easiest way to do it was just to

17 hand it to the reporter and let it be typed into the record.

18    MR. VEEDER:  I think that would be very agreeable.  We

19 would like to have that done, your Honor.

20    THE COURT:  Mr. Kunkel, if you were testifying under oath

21 as to the various papers that you have prepared and the reports

22 you have made and the data tabulation, et cetera, it would be

23 the matter set forth on this sheet called "Bibliography"?

24    THE WITNESS:  That is correct, your Honor.

25    THE COURT:  All right, the reporter will be instructed to

1  include it in the record as part of the testimony of the witness

2  Kunkel.

3       (The Bibliography of the witness Fred Kunkel, above

4  referred to, is in words and figures as follows, to wit:)

BIBLIOGRAPHY

Fred Kunkel

U. S. Geological Survey

Water-Supply Papers

    Upson, J. E. and Kunkel, Fred, 1955, Ground water
        of the Lower Lake-Middletown area, Lake County
        Calif.:  U. S. Geol. Survey Water-Supply Paper
        1297, 83 p., 1 pl.

    Kunkel, Fred, and Riley, F. S., 1956, Geologic
        reconnaissance and test-well drilling at Camp
        Irwin, Calif.:  U. S. Geol. Survey mimeo. rept.,
        56 p., 1 pl.  (In preparation for publication as
        Water-Supply Paper 1460-F.)

    Kunkel, Fred, and Upson, J. E., 1958, Geology and
        ground water in Napa and Sonoma Valleys, Napa and
        Sonoma Counties, Calif.:  U. S. Geol. Survey
        typewritten rept. 194 p. (In preparation for
        publication as Water-Supply Paper (number unknown).)

Open file

    Kunkel, Fred, 1956, A brief hydrologic and geologic
        reconnaissance of Pinto Basin, Joshua Tree

A1

Z3

1    National Monument, Riverside County, Calif.:

2    U. S. Geol. Survey mimeo. rept., 35 p., 5 pls.,

3    6 tables.

4    Kunkel, Fred, 1956, Data on water wells in Cuddeback,

5    Superior, and Harper Valleys, San Bernardino

6    County, Calif.:  U. S. Geol. Survey mimeo. rept.,

7    73 P., 1 pl. (Includes reconnaissance geologic

8    map.)

9    Kunkel, Fred, and others, 1957, Data on water wells

10    in the Willow Springs, Gloster, and Chaffee areas,

11    Kern County, Calif.; U. S. Geol. Survey mimeo.

12    rept., 67 p., 1 pl.  (Includes reconnaissance

13    geologic map.)

14    Bader, J. S., and Kunkel, Fred, 1958, A brief

15    memorandum on the water supply at five forest

16    Service Guard Stations, Cleveland National Forest,

17    San Diego County, Calif.:  U. S. Geol. Survey

18    typewritten rept., 17 p.

19    Pistrang, M. A., and Kunkel, Fred, 1958, Geology and

20    ground water in the Furnace Creek Wash area,

21    Death Valley National Monument, Calif.:  U. S.

22    Geol. Survey mimeo. rept., 63 p., 6 pls.

23    Cooperating agency

24    Poland, J. F., Davis, G. H., Olmsted, F. H., and

25    Kunkel, Fred, 1951, Ground-water storage capacity

A1

Z4

1    of the Sacramento Valley, Calif., in Water

2    Resources of California:   Calif. Water Res.

3    Board, Bull. 1., app. D, p. 617-632.

4 **Reports prepared under direction of Fred Kunkel**

5    Olmsted, F. H., 1956, Geologic reconnaissance of San

6    Clemente Island, Calif.:   U. S. Geol. Survey

7    open-file typewritten rept., 30 p., 2 pls.

8    Stone, R. S., 1957, ground-water reconnaissance in the

9    western part of the Mojave Desert, Calif., with

10    particular respect to the boron content of well

11    waters:   U. S. Geol. Survey open-file typewritten

12    rept., 102 p., 13 pls.

13 **Data tabulation** -- No interpretive map or text

14    Garrett, A. A., Kunkel, Fred, LeRoux, E. F., Scott,

15    M. B., and Wilson, H. D., Jr., 1953, Water levels

16    and artesian pressures in observation wells in the

17    United States in 1950, part 6.   Southwestern

18    states and Territory of Hawaii, California

19    section:   U. S. Geol. Survey Water-Supply Paper

20    1170, p. 44-97.

21    Kunkel, Fred, and Upson, J. E., 1958, Appendix tables

22    of selected basic data to accompany report on

23    geology and ground water in Napa and Sonoma Valleys,

24    Napa and Sonoma Counties, Calif.:   U. S. Geol.

25    Survey mimeo. rept., 225 p., released to open file

A1

Z5

1          August 21, 1958.  To be published as part of

2               water-supply paper (number unknown.)

3  In addition to the above reports, Mr. Kunkel has prepared 7, and

4  has directed the preparation of 8 closed file Ground Water

5  Reports for various military establishments in Southern

6  California.

7                         - - - - -

8        MR. VEEDER:  I would like to substitute in a couple of the

9  exhibits that have been marked a correction that has now been

10 made by the United States Geological Survey for the runoff for

11 Murrieta Creek for the month of January, 1952.  What we would

12 do would be to substitute pages in Exhibit 22, which has been

13 marked for identification, and in Exhibit 60.  Those changes

14 are officials changes in the records which have just come to

15 our hand now, your Honor.

16       THE COURT:  The record will show that you are making

17 substitutions.  It may be done at the recess.  Take out the

18 pages and put the new ones in.

19       MR. VEEDER:  Yes.

20       THE COURT:  Are you substituting the entire exhibit?

21       MR. VEEDER:  No, sir; just the page, your Honor, and the

22 page will be available for distribution.

23       THE COURT:  Can you tell what pages are now being sub-

24 stituted?

25       MR. VEEDER:  It will be the runoff period for 1952-- that

A1

Z6

1   is how it is set up, your Honor, and those are the order in which

2   they will be and we will simply withdraw the present pages for

3   1952 and substitute these changes.  They are very small.

4        THE COURT:  In other words, it is the 1952 runoff on each

5   exhibit?

6        MR. VEEDER:  On the Murrieta exhibit.

7        THE COURT:  The numbers that were given.

8        MR. VEEDER:  That is right, Exhibit 22 and Exhibit 60.

9        THE COURT:  Exhibit 22 and Exhibit 60, and in each case you

10  are substituting a sheet showing the 1952 runoff.

11       MR. VEEDER:  That is correct, your Honor.

12       THE COURT:  All right, take care of it at the recess.

13

14                    CROSS-EXAMINATION (Resumed)

15  BY MR. MOSKOVITZ:

16       Q  Yesterday you testified as to the effect of pumping the

17  Pauba well on the water level in a nearby well which you iden-

18  tified as the Studley well in Pauba Basin.

19       A  That is correct.

20       Q  Have you been able to identify the Studley well by

21  number yet?

22       A  I am sorry, I cannot identify it by number.  I did check

23  my notes, and the Studley well is about six-tenths of a mile

24  northeast of the Pauba well.  I will supply the number.

25       Q  Is that information as to the effect of the Pauba well

upon the water level in the Studley well, in the well log of

the Pauba well which you have brought in and which is in Exhibit

16-A?

A   I do not believe it is.  I would have to check to be

certain.  To the best of my knowledge it is not.

Q   Would you like to check?

A   If you want me to.

MR. DENNIS:  Here it is.

(Mr. Moskovitz handing document to the witness.)

MR. VEEDER:  If we may withdraw 16-A, your Honor, we can

have reproductions made for all counsel.

THE COURT:  Withdraw it at the end of the day?

MR. VEEDER:  That is right.

THE COURT:  All right, you may do so.

THE WITNESS:  It is not on the well log for the Pauba well.

BY MR. MOSKOVITZ:

Q   Which is in Exhibit 16?

A   Which is in Exhibit 16.

THE COURT:  16-A.

THE WITNESS:  16-A.

BY MR. MOSKOVITZ:

Q   Where did you get the information as to the results

of the pump test?

A   The results are information collected by personnel at the

Geological Survey who were on the site at the time of the

1   drilling.

2        MR. VEEDER:  May I have that response, please?

3        THE COURT:  Read it.

4        (The reporter read the last answer as follows:  "A   The

5   results are information collected by personnel at the

6   Geological Survey who were on the site at the time of the

7   drilling.")

8   BY MR. MOSKOVITZ:

9        Q   These were persons other than yourself?

10       A   Persons other than myself.

11       Q   Did they inform you about this orally, or did you see a

12   written report?

13       A   As I have testified throughout the last several days,

14   all notes, results, manuscripts, et cetera, that are in the

15   files of the Geological Survey with regard to the Pauba well

16   have been available for my inspection at all times since I have

17   been at Long Beach since 1952.

18       THE COURT:  That was not the question, Mr. Kunkel.  The

19   question was, did they inform you orally, or did they make a

20   written report in your files, or did they do both?

21       THE WITNESS:  Both.

22       THE COURT:  There is a written report in the files about

23   the pumping from the Pauba well?

24       THE WITNESS:  There is a written record in the files

25   concerning the pumping of the Pauba well.

A1

Z9

BY MR. MOSKOVITZ:

1

2      Q  Could you bring that record in?

3      A  Subject to the approval of the Marine Corps, the records

4  can be made available.

5      MR. VEEDER:  They will be made available.

6  BY MR. MOSKOVITZ:

7      Q  Did the pump tests which were made as to the effect of

8  pumping of the Pauba well measure the effect on any other wells

9  than the Studley well?

10     MR. VEEDER:  I object to that question, your Honor.

11     What do you mean by "measure"?

12     THE COURT:  I will sustain the objection on the grounds

13  that the question is ambiguous.  I can't understand it.  I think

14  you mean, did you check to see whether other wells were affected

15  at the same time that you checked to see if the Studley well

16  was affected.  Say it over again.

17  BY MR. MOSKOVITZ:

A2

18     Q  Were the levels of water in other wells than the Studley

19  well checked to see whether they were affected by the pumping

20  of the Pauba well?

21     A  I would have to check the records in the files of the

22  Geological Survey to answer that with certainty.  I do not know

23  how precise and the exact times at which measurements were made.

24  Measurements were made in other wells, to the best of my

25  knowledge.  Measurements were made in other wells before-- after

A2

Z10

1  the test.  The number of measurements made during the test, if

2  any, I am not certain from memory.

3      Q  But the report that you are going to bring in would have

4  the results of the measurements and levels in all wells which

5  were measured to determine if there was any effect from the

6  pumping of the Pauba well; is that correct?

7      A  The report that I was going to bring in is the written

8  record on the effect of pumping the Pauba well on the Studley

9  well.  That was what I was asked for.

10      Q  Could you bring in the record showing whatever measure-

11  ments may have been made of the levels of any other wells that

12  were measured to see the effect of the pumping of the Pauba

13  well?

14      A  I will not be able to do that at the recess.  I will

15  need time to go into the files of the Geological Survey in Long

16  Beach and get whatever record is available to reply to that

17  question.  I don't know when it will be.

18      THE COURT:  Certainly by over the weekend?

19      THE WITNESS:  By the weekend.

20  BY MR. MOSKOVITZ:

21      Q  I believe you testified under direct examination that

22  the water level in the Pauba well stood higher than the water

23  level in wells drilled in the Recent Alluvium, is that correct,

24  in Pauba Valley?

25      A  With regard to the head of water above land surface,

A2

Z11

1   that is correct.

2       Q   Now, what is the cause of that phenomena?

3       A   It indicates a hydrostatic pressure up gradient, up the

4   hydraulic gradient above the Pauba well.  It indicates an area

5   of confinement.

6       Q   By "area of confinement" I assume you mean that there is

7   some relatively impermeable material between the Recent

8   alluvium and the older alluvium which is tapped by the Pauba

9   well; is that correct?

10      A   The evidence is not based wholly upon the head of water

11  in the Pauba well.  The evidence is based on the head of water

12  in the Pauba well, the log of the well and the logs of other

13  wells in the valley, as shown on Exhibit 16.

14      THE COURT:   Now you haven't answered the question.

15      Read the question.

16      (The reporter read the pending question as follows:  "Q   By

17  'area of confinement' I assume you mean that there is some

18  relatively impermeable material between the Recent alluvium

19  and the older alluvium which is tapped by the Pauba well; is

20  that correct?")

21      THE WITNESS:   There is relatively impermeable material

22  within the alluvial deposits.

23      THE COURT:   You say there is relatively permeable material?

24      THE WITNESS:   There is relatively impermeable material

25  within the area of the alluvial deposits.

A2

Z12

1  BY MR. MOSKOVITZ:

2      Q   Which alluvial deposits?

3      MR. VEEDER:   I interpose an objection to the question now.

4  It is obvious that it is going beyond the scope of the direct

5  examination.   There was no showing in regard to the exact line

6  or demarcation of the younger alluvium and the older alluvium.

7  Until we get this matter straightened out from the standpoint

8  of the testimony, I think the witness can be very much confused

9  by the question that was asked.   He pointed out in his original

10  testimony that the Pauba well was drilled into the continental

11  deposits.   So I think the objection should be interposed and

12  the cross-examination should stay within the scope of the direct

13  examination, your Honor.

14      THE COURT:   Overruled.

15      But understand the question.   What we are talking about now

16  is the fact that the Pauba well had a higher head of water than

17  some of the other wells.

18      THE WITNESS:   That is correct.

19      THE COURT:   And you have said that this was due to something

20  about an area of confinement?

21      THE WITNESS:   That is correct.

22      THE COURT:   Now counsel has asked you--

23      I don't want to frame your question.   I can't frame it.

24      Will the reporter read it, or can you restate it?   Do you

25  have it in mind, Mr. Moskovitz?

ZZ A2

Z12

1   MR. MOSKOVITZ: I think perhaps the witness's last answer

2   should be read, and then restate the next question.

3   THE COURT: His answer was clear off the mark. If you

4   want to have it read, all right.

5   MR. MOSKOVITZ: Yes, I think I would like to have it read.

6   THE COURT: Read the last answer.

7   MR. MOSKOVITZ: I think his last answer was leading

8   toward the mark.

9   MR. VEEDER: You think his last answer was what-- leading

10   toward the mark?

11   THE COURT: Read it.

12   (The reporter read the last answer as follows: "A  The

13   evidence is not based wholly upon the head of water in the

14   Pauba well. The evidence is based on the head of water in the

15   Pauba well, the log of the well and the logs of other wells

16   in the valley, as shown on Exhibit 16.")

17   MR. MOSKOVITZ: Then there is another answer after that.

18   (The reporter read the record further as follows: "THE

19   COURT: Now you haven't answered the question. Read the ques-

20   tion. (The last question was read.) THE WITNESS: There is

21   relatively impermeable material within the alluvial deposits.")

22   MR. MOSKOVITZ: Then I asked the question, what alluvial

23   deposits are these relatively impermeable materials in?

24   THE WITNESS: In the Pauba well they are in the older

25   continental deposits. I have testified that, in my opinion,

2759

A2

Z13

A3

1  the Pauba well penetrates older continental deposits for its

2  entire depth, with the possible exception of the very thin--

3  and I am speaking with regard to a matter of less than five or

4  six feet of younger alluvium which is not saturated.  It would

5  be a matter of opinion as to whether we were actually talking

6  about alluvium or soil in the upper zone.  Therefore, the

7  relatively impermeable deposits to which I was referring are,

8  for the Pauba well, in the older continental deposits.

9  BY MR. MOSKOVITZ:

10      Q  Is this relatively impermeable material in the Recent

11  alluvium in Pauba Valley?

12      A  The well logs indicate that the permeability of the

13  younger alluvium in Pauba Valley is not the same throughout.

14  There are lenses of material that are relatively less permeable

15  than other lenses of material.  That is true in virtually all

16  continental deposits.

17      Q  Now, between the area which you have colored yellow on

18  Exhibit 16 in Pauba Valley and the older continental deposits

19  from which the Pauba well has secured its water, are there these

20  impermeable materials?

21      THE WITNESS:  Could you read the question back to me,

22  please?

23      (The reporter read the pending question as follows:  "Q  Now,

24  between the area which you have colored yellow on Exhibit 16 in

25  Pauba Valley and the older continental deposits from which the

1 Pauba well has secured its water, are there these impermeable

2 materials?")

3      THE WITNESS:  In essence, you are asking me if the contact

4 is a contact of impermeable materials with permeable materials.

5      MR. VEEDER:  If the witness doesn't understand the ques-

6 stion, I think it should be rephrased.  I don't understand the

7 question myself, your Honor, and I don't think the witness

8 should rephrase the question for counsel.

9      THE COURT:  To save time, I think the question is:  At the

10 line of contact between the younger alluvium and the older

11 alluvium, is there a line of lens of impermeable materials,

12 whether that is in the older or in the younger?  But is there

13 a line of impermeable materials between the two alluvia?

14      Is that the question?

15      MR. MOSKOVITZ:  That is the question, your Honor.

16      THE COURT:  A lens or a layer or something.

17      THE WITNESS:  At points along the line, there may be lenses

18 of relatively impermeable material.  The logs of wells do not

19 indicate that the lenses of impermeable material are a continuous

20 blanket throughout the entire area.  As I have testified, the

21 deposits are lenticular in character.

22      THE COURT:  Talking now particularly with regard to the

23 contact line between the older and the younger alluvia?

24      THE WITNESS:  That is correct.

25

A3

Z15

1   BY MR. MOSKOVITZ:

2       Q   Isn't the very fact that you have pressure character-

3   istics in the deeper wells and you have the free ground water

4   characteristics in the shallower wells that tap only the younger

5   alluvium, doesn't that fact indicate that there are extensive

6   relatively impermeable materials between the water bodies

7   tapped by these two kinds of wells?

8       THE WITNESS:   Would you read the question again, please?

9       (The reporter read the question as follows:   "Q   Isn't

10   the very fact that you have pressure characteristics in the

11   deeper wells and you have the free ground water characteristics

12   in the shallower wells that tap only the younger alluvium,

13   doesn't that fact indicate that there are extensive relatively

14   impermeable materials between the water bodies tapped by these

15   two kinds of wells?")

16       THE WITNESS:   Not necessarily so.

17   BY MR. MOSKOVITZ:

18       Q   Well, why would you have higher pressure in the deep

19   wells, unless there were impermeable materials separating that

20   deeper area from the Recent alluvium in which shallow wells

21   were drilled?

22       A   There are lenses of impermeable material.   The extent

23   is not a blanket along a specific horizon, but as I have

24   testified earlier, illustrated by my diagrams, the deposits

25   are lenticular in character and the head in a series of wells

A3

Z16

1  of various depths, under natural conditions, before any pumping

2  in the valley, would be one of an increasing head with depth.

3  There is no one single point where you have confinement and

4  below which there is no additional confinement.  The differences

5  in head and the effects of confinement are one of degree.  The

6  fact to which I have previously testified that materials have

7  different horizontal and different vertical permeabilities, and

8  the fact that they are lenticular, without any one horizon

9  being predominant throughout an area, if wells were drilled in

10  such a basin the deeper wells would have higher heads than the

11  shallower wells throughout the basin and it would indicate

12  confinement.  It would necessarily indicate an extensive blanket

13  of a single group or a single lens of relatively impermeable

14  material.  I have emphasized throughout my testimony that these

15  deposits are lenticular in character.

16      Q  Again, the very fact that there is a difference in

17  head, in pressure, indicates that there is some barrier to

18  free movement of water between the lower area and the upper area;

19  is thatnot correct?

20      MR. VEEDER:  That is the first time that question has been

21  asked, your Honor.

22    BY MR. MOSKOVITZ:

23      Q  Is that not correct?

24      THE COURT:  Overruled.

25      THE WITNESS:  That is correct.

A3

Z17

1        THE COURT:  What?

2        THE WITNESS:  That is correct.  But it is limited to the

3   older or the younger deposits.

4   BY MR. MOSKOVITZ:

5        Q  Did you not testify that shallow wells drilled in the

6   younger alluvium in Pauba Valley had water levels which re-

7   flected the free ground water table?

8        A  Could we refer to the record on that?

9        MR. VEEDER:  I object to that because that is incorrect.

10  We object to the use of the word "free water"-- "the water

11  being freely confined," I think was the phrase, or something

12  like that, that counsel used.  We objected to it and the objec-

13  tion was sustained.  Now the term was not used by the witness.

14       THE COURT:  Do you have reference to the record, the part

15  you are talking about?

16       MR. MOSKOVITZ:  I have no particular citation at this

17  point, your Honor.  I am trying to find out whether or not this

18  is not what he has testified from his recollection.

19       Q  If you say no, we will ask a question on it.

20       A  To the best of my recollection, I have not testified

21  to the question as you have phrased it.

22       Q  Let me pose the question, then.  Let's take a particular

23  well on Exhibit 16.  Do you want to come down to the board and

24  look at it?

25       MR. VEEDER:  Is that question withdrawn, then-- the

A3

Z18

1   original question?

2       THE COURT:  He answered it.  He answered that he didn't

3   recall that he had testified in that manner.

4   BY MR. MOSKOVITZ:

5       Q  Let's take Well No. 8211P1 in Pauba Valley.  Is that

6   well drilled into Recent alluvium only?

7       A  As indicated on Exhibit 16, the well is drilled in

8   Recent alluvium only.

9       Q  As indicated on Exhibit 16, would it be your opinion

10  that the level of the water in the well would reflect the free

11  ground water table?

12      MR. VEEDER:  Again, the term "free ground water table"

13  hasn't been defined, and I don't believe that this witness has

14  ever used the term.

15      THE COURT:  He didn't use the term.  Let's define it.

16      MR. MOSKOVITZ:  Your Honor, there was extensive explana-

17  tion by the witness the other day on the board showing the

18  difference between water which is under confinement and water

19  which is not under confinement.  He first drew a little diagram

20  showing how water would act if it were not under confinement.

21  I think this has been gone into.

22      THE COURT:  Define your term for him.  The objection was

23  that the term was not used.  Define your term and ask the ques-

24  tion.

25      MR. MOSKOVITZ:  I will restate the question, then.  I have

A3

Z19

1  a preliminary question.

2      Q   In a basin which has no confining material in it, what

3  would you call the water level in that basin, the ground water

4  level in that basin?

5      A   In a basin filled with a homogeneous isotropic material

6  that was saturated to a depth below which there would be satura-

7  tion, the upper line of saturation would be called the water

8  table.

9      Q   Would the water level in a well drilled into such

10  material show any pressure characteristics?

11      A   Under the hypothetical situation that we have just

12  described, of a homogeneous isotropic material, a well drilled

13  to the water table at a very shallow depth beneath it would

14  not show a pressure effect.

15      Q   Let's take Well 8211P1 in Pauba Valley.  Would the

16  water level in such a well show pressure characteristics?

17      A   I have not measured that specific well.  Are you asking

18  me for an opinion?

19      Q   And opinion based upon the appearance of the log of

20  that well on Exhibit 16.

21      A   Based on my experience and observing many wells having

22  been drilled through alluvial deposits, it is my opinion that

23  the water level in that well, when water was first encountered

24  and measured by the driller, stood at one level, and that the

25  drilling took a period of days and he continued to deepen that

A3

Z20

1   well; that if he made precise and careful measurements, the

2   driller would have discovered that his water level stood at

3   higher altitude every morning that he drilled.  I would be

4   extremely surprised that any other situation existed.

5      Q  What is the reason for your saying that?

6      A  The deposits in the younger alluvium, the younger

7   alluvial deposits in Pauba valley as well as the older alluvial

8   deposits have different vertical and horizontal permeabilities

9   and the deposits are lenticular in character.

10      Q  And you say there would be areas of confinement within

11   the Recent alluvium that Well 8211F1 tapped; is that what you

12   are saying?

13      A  There would be a local confinement; that is correct.

14      Q  Now, as you went further down, if you drilled into

15   Pauba Valley, would you encounter more areas of confinement?

16      A  As I have previously testified in the diagram that is

17   still on the blackboard, I have indicated that in drilling,

18   as the well went successively deeper, the head of water that

19   was reflected by the water level in the well would be higher

20   as the well went deeper.  This is assuming natural conditions

21   with no effects of interference pumping.

22      Q  So the further down you went the more confining layers

23   you would probably encounter?

24      A  That is correct.

25      Q  And the permeability of the material through which

1   you went would probably be less than the permeability of the

2   material in the Recent alluvium; is that right?

3       A   The permeability of the continental deposits, both

4   younger and older, decrease with depth.  The deeper you go,

5   the older the material you are encountering, the greater time

6   you have for compaction.  As the materials compact, they are

7   less permeable.  There is--

8       Q   So the answer is yes, isn't it?

9       THE WITNESS:  Read the question before I give you a yes

10  answer.

11      (The reporter read the last question as follows:  "Q  And

12  the permeability of the material through which you went would

13  probably be less than the permeability of the material in

14  the Recent alluvium; is that right?")

15      THE WITNESS:  As a matter of court procedure, can a witness

16  object to a leading question?

17      MR. VEEDER:  Not on cross-examination.  I think the

18  question is loaded.

19      THE WITNESS:  I apologize.  I don't know procedure.

20      THE COURT:  Taking him seriously, you may not, you see,

21  because you are on cross-examination.  A leading question is a

22  question which suggests the answer, and it is improper to lead

23  a witness-- in other words, to suggest to him what you want

24  him to testify to; but when you are on cross-examination, they

25  may ask what amounts to a leading question:  Isn't it a fact

    so and so?

Kunkel   Cross   2768

A3

Z22

1      You just got through testifying that the deeper these areas

2  of alluvia, the more compacted they were, didn't you?

3      THE WITNESS:  That is correct.

4      THE COURT:  And I thought you also said that the more

5  compacted, the less permeable they were.

6      THE WITNESS:  That is correct.

7      THE COURT:  Well, then, he is just gilding the lilly, of

8  course, when he asks the further question, isn't it a fact then

9  that the deeper you go the more impermeable is the alluvium?

10      MR. MOSKOVITZ:  That was not the last question I asked, your

11  Honor.

12      THE COURT:  What was it?

13      MR. MOSKOVITZ:  It was not phrased that way, your Honor.

14      MR. VEEDER:  His question was loaded, and your Honor's

15  was proper.

16      THE COURT:  Let's read the question.

17      MR. MOSKOVITZ:  Read the question.

18      THE WITNESS:  For the record, I wish to apologize to Mr.

19  Moskovitz.  I meant no offense.

20      MR. MOSKOVITZ:  I take no offense.

21      THE WITNESS:  All right.

22      MR. MOSKOVITZ:  There is nothing personal in any of this.

23      MR. STAHLMAN:  This illustrates that I heard about water

24  cases, that the engineers like to be lawyers and the lawyers

25  like to be engineers.

A3

Z23

1    MR. MOSKOVITZ:  May I have the last question read, please?

2    (The reporter read the pending question as follows:  "Q And

3 the permeability of the material through which you went would

4 probably be less than the permeability of the material in the

5 Recent alluvium; is that right?")

6    MR. VEEDER:  I am not sure that the witness understands

7 the question, your Honor.

8    THE COURT:  Is that all the question?

9    THE WITNESS:  I am formulating an answer.  I understand the

10 question perfectly.

11    THE COURT:  All right, then answer it.

12    THE WITNESS:  The conclusion is valid that in general the

13 average permeability of deposits at one thousand feet will be

14 less permeable than the average permeability of the deposits at

15 five hundred feet which, in turn, will have an average permeability

16 that is less than deposits at two hundred feet, which in turn

17 will have an average permeability of deposits at one hundred

18 feet.  The contact between the older and the younger continental

19 deposits is not the determining characteristic.  The determining

20 characteristic is depth.  With depth the alluvial deposits tend

21 to become less permeable.

22 BY MR. MOSKOVITZ:

23    Q  You say that this is true in general.  In any of the

24 wells which you have plotted in Pauba Valley on Exhibit 16, is

25 that not true?

A3

Z24

1     THE WITNESS:  Pardon me.  Would you read the question,

2  please?

3     (The reporter read the pending question as follows:  "Q  You

4  say this is true in general.  In any of the wells which you

5  have plotted in Pauba Valley on Exhibit 16, is that not true?")

6     MR. STAHLMAN:  I don't understand the question.

7     THE WITNESS:  I don't understand the question.

8     MR. STAHLMAN:  Because the answer could be yes or no and

9  mean the same thing.

10     THE COURT:  The objection is sustained.

11  BY MR. MOSKOVITZ:

12     Q  Looking at all the wells which are plotted in Pauba

13  Valley on Exhibit 16, is it not true that in every case, and

14  not just in general, in every case the material is more im-

15  permeable in the older continental deposits, the orange, than

16  in the Recent alluvium, the yellow?

17     A  Yes, it is.

18     Q  Now, I take it, then, that water would have a tendency

19  to move more readily in the Recent alluvium in any direction

20  than it would to go down through the older continental deposits;

21  is that correct?

22     MR. STAHLMAN:  That is not a question.

23     THE WITNESS:  That is not correct.

24  BY MR. MOSKOVITZ:

25     Q  If the permeability of the Recent alluvium is greater

A3

Z25

1  than the permeability of the older deposits, why would not the

2  water move more readily in the recent alluvium?

3       THE WITNESS:  Would you restate the question?

4       THE COURT:  Read it.

5       THE WITNESS:  The question to which I answered "No."

6       (The reporter read the question as follows:  "Q  Now, I

7  take it, then, that water would have a tendency to move more

8  readily in the Recent alluvium in any direction than it would

9  to go down through the older continental deposits; is that

10  correct?"  A  That is not correct.")

11       THE WITNESS:  In the question to which I answered no, you

12  had the statement "in any direction."  The vertical and

13  horizontal permeability of alluvial deposits, including the

14  younger alluvial deposits of Pauba Valley, is not the same in

15  all directions.

16  BY MR. MOSKOVITZ:

17       Q  That was not my question.

18       A  You said "in any direction."

19       THE COURT:  He explained to you why he answered "No" to

20  your previous question.  That still leaves unanswered the present

21  question.

22       MR. MOSKOVITZ:  May we have the present question read?

23       THE COURT:  Read it.

24       THE WITNESS:  May I have the question, please?

25       (The reporter read the pending question as follows:  "Q  If

A3

Z26

1  the permeability of the Recent alluvium is greater than the

2  permeability of the older deposits, why would not the water

3  move more readily in the Recent alluvium?")

4       THE WITNESS:  Water moves down the hydraulic gradient,

5  not in the direction of greatest permeability.  If-- well, that's

6  the answer.

7  BY MR. MOSKOVITZ:

8       Q  And if the hydraulic gradient--

9       Let me ask you this:  What do you mean by "hydraulic

10 gradient"?

11      A  A point of higher head is a point higher up the hydraulic

12 gradient than a point of lower head.

13      Q  Isn't it possible that water applied to Pauba Valley

14 would move toward the outlet of the valley into Temecula

15 Gorge, as well as down into the older continental deposits,

16 even though water was being withdrawn from the older continental

17 deposits by pumping?

18      THE WITNESS:  May I have the question again, please?

19      (The reporter read the pending question as follows:    "Q

20 Isn't it possible that water applied to Pauba Valley would

21 move toward the outlet of the valley into Temecula Gorge, as

22 well as down into the older continental deposits, even though

23 water was being withdrawn from the older continental deposits

24 by pumping?")

25      THE WITNESS:  May I step to the blackboard and put an

A3

Z27

1    equation on the board.

2        MR. MOSKOVITZ:  Could you answer that question yes or no,

3    first?

4        THE WITNESS:  The question whether water moves down the

5    hydraulic gradient, it depends on what the hydraulic gradient

6    is at the time you are referring to.  I don't believe that is

7    in the question.

8        Would you read the question again, please?

9        (The reporter again read the pending question as follows:

10   "Q  Isn't it possible that water applied to Pauba Valley would

11   move toward the outlet of the valley into Temecula Gorge, as

12   well as down into the older continental deposits, even though

13   water was being withdrawn from the older continental deposits

14   by pumping?")

15       THE COURT:  It doesn't make sense to me.

16       THE WITNESS:  It is possible-- possible question mark is

17   my answer.

18       MR. STAHLMAN:  That is an Amos 'n Andy answer--  Yes and

19   no.

20       THE WITNESS:  There are apt to be animals on the back side

21   of the moon.  It is possible.  I don't know.

22       THE COURT:  The thing that confused me about it was that

23   the question was, isn't it possible that water would both move

24   out of the Pauba Valley down into the Temecula Gorge and also

25   move down into the older alluvial deposits?

A3

Z28

1        MR. MOSKOVITZ:  Even though water was being pumped from

2   the older alluvial deposits.

3        THE COURT:  Obviously, it would be a question of degree.

4   How could anybody answer unless they knew how much pumping there

5   was?

6        MR. MOSKOVITZ:  I think that is the point.  It is a question

7   of degree.

8        THE COURT:  If somebody had a windmill up there--

9        MR. STAHLMAN:  If he desires to illustrate, your Honor,

10  I have found in the past that his illustrations seemed to be

11  good.

12       THE COURT:  Go ahead.

13       MR. VEEDER:  We desire to preserve for posterity the

14  drawing on there, and if the witness would like to prepare an

15  exhibit from that drawing I think it would explain Mr.

16  Moskovitz's question to begin with.

17       THE COURT:  Leave it on temporarily and the witness can

18  prepare a drawing picking up what he has on the board.  Turn

19  the board around now and let's take the other side.

20       THE WITNESS:  There is no other side, your Honor.

21       MR. VEEDER:  There is room above it.

22       THE WITNESS:  The quantity of water moving through any

23  alluvial deposit or ground water basin-- for example, let's use

24  Pauba Valley and the older alluvial deposits on both sides--

25  the quantity of water moving down the hydraulic gradient, as

A3

Z29

1 indicated by the water level contours, is equal to the trans-

2 missability of the deposits times the hydraulic gradient times

3 the length along a water level contour along which you would be

4 computing the quantity of ground water logged.

5     THE COURT: "D" means length there?

6     THE WITNESS: It is the length along a water level contour.

7 The unit of measurement is generally a mile.

8     Hydraulic gradient-- the units of measurement are feet

9 per mile.

10     Transmissability-- the units of measurement are gallons

11 per day per foot width of saturated section. That is the total

12 thickness of your aquifer.

13     Since I have added units to my equation, I must add the

14 numbers 00.0012, which is a converted factor to convert the units

15 that you have given to acre feet per year.

16     The quantity of water moving down and out of Temecula

17 Canyon-- and all of the ground water is in motion. There is

18 no such thing as stagnant ground water. All ground water moves.

19 It may take years for a drop of water that enters the ground

20 water body at the upper end of Pauba Basin to make a very deep

21 circuit and ultimately discharge out and over the lip of the

22 Temecula Gorge or to be consumed by transpiration or to be pumped

23 out of the ground by a well.

24     However, the motion of the ground water at all times is

25 through the deposits toward the outlet of the basin.

Kunkel   Cross

2776

A3

z30

1    Transmissability can be determined by precise pumping tests.

2    Hydraulic gradient can be determined by measurements of water

3    levels in wells and construction of water level contours.   The

4    length along a contour for which transmissabilities have been

5    determined can be measured.   The three values can be multiplied

6    together.   That is the outflow of a ground water basin.

7        Does that answer your question, Mr. Moskovitz?

8    BY MR. MOSKOVITZ:

9        Q   Now, in your equation that you put on the board, you

10   have the letter T, and that stands for transmissability?

11       A   That is correct.

12       Q   In that equation the greater the transmissibility,

13   keeping the other factors on the right-hand side the same, the

14   greater the transmissability the greater the quantity of water;

15   is that correct?

16       A   That is correct.

17       Q   And if the transmissability were greater, a shallower

18   hydraulic gradient would result in the same quantity of water

19   percolating; is that correct?

20       A   Pardon me.   If the hydraulic gradient were reduced and

21   the other factors held constant?

22       MR. VEEDER:   He said shallower.

23   BY MR. MOSKOVITZ:

24       Q   If the hydraulic gradient were reduced and the trans-

25   missibility increased, you would get the same quantity of water?

A4

XA4

Z32

1    A  It would then follow that there had been an increase in

2  the hydraulic gradient.

3        MR. SACHSE:  What was the answer, please?

4        (The reporter read the last answer as follows:  "A  It

5  would then follow that there had been an increase in the

6  hydraulic gradient.")

7        THE COURT:  Increase?

8        THE WITNESS:  You decrease T?

9  BY MR. MOSKOVITZ:

10       Q  You increased T and kept Q and D the same.

11       A  Q is increased?

12       Q  Q is kept the same.

13       A  Q is constant.  T is increased?

14       Q  T is increased.

15       A  Hydraulic gradient is the same?

16       Q  I am going to ask you what happens to the hydraulic

17  gradient.  D is kept the same.

18       A  D is kept the same?  The hydraulic gradient would de-

19  crease.

20       Q  Would decrease?

21       A  That is correct.

22       Q  If the material were more transmissible, the same

23  quantity of water would percolate, if you kept the distance the

24  same, even though you had a smaller hydraulic gradient?

25       A  Transmissibility is a--

Kunkel - Cross

2779

A4

Z33

1        Would you repeat the question, please?

2        THE COURT:  Well, I will sustain an objection to it.  You

3  say the same quantity of water.  You can't get an exact answer,

4  and you are gilding the lilly again.  You have made the point

5  that the relationship between transmissibility and hydraulic

6  gradient and the other factors give you the result.

7        MR. MOSKOVITZ:  I will move on, your Honor.

8        Q  Now, assume that there is extensive pumping from wells

9  like the Pauba well in the Pauba Valley, and assume that a cone

10  of depression is created around those wells.  As a result, would

11  the water table in the older alluvium, if you drew it on a cross-

12  section, show a continuous line down the cone of depression?

13        A  No.  Pardon me.  May I retract the answer?  Would you

14  restate the question, please?

15        THE COURT:  Read it.

16        MR. VEEDER:  No, no, it is not a matter of restating the

17  question.

18        THE COURT:  Do you want it re-read?

19        MR. VEEDER:  Do you want it re-read?  He can't restate it.

20        THE WITNESS:  I am sorry.  Will you read the question,

21  please?

22        (The reporter read the pending question as follows:  "Q

23  Now, assume that there is extensive pumping from wells like the

24  Pauba well in the Pauba Valley, and assume that a cone of

25  depression is created around those wells.  As a result, would

Kunkel   Cross                                                2780

A4
Z34

1    the water table in the older alluvium, if you drew it on a

2    cross-section, show a continuous line down the cone of

3    depression?")

4         MR. STAHLMAN:  I don't understand the question.  I object

5    to it on the grounds that it is indefinite and uncertain.

6         THE COURT:  Sustained.

7         Also, you say if a cone of depression is created, and

8    then  as I understand it, you assume that there is a line down

9    showing the cone.  Then your question is, would you have a

10   water table with a continuous straight line?  They are incon-

11   sistent-- depending on where these wells were.  I can't see

12   how anybody could answer the question.

13        MR. MOSKOVITZ:  I will attempt to rephrase the question

14   your Honor.

15        MR. VEEDER:  Your Honor, haven't we labored this far

16   enough?  That question was answered yesterday and the whole

17   thing that he is worried about now is that he got a bad answer.

18   The answer was this, that there are pumps down there and the

19   Temecula River could be, and indeed has been, dried up by the

20   fact that there was pumping out of the continental deposits.

21   So why is he trying to make the witness back up and change

22   something that we all know as a matter of fact?

23        MR. SACHSE:  I would prefer hearing testimony from Mr.

24   Kunkel and the Geological Survey than I would from Mr. Veeder

25   of the Department of Justice.

Kunkel  Cross

A4

Z35

1      THE COURT:  The objection is overruled.

2   BY MR. MOSKOVITZ:

3      Q  Mr. Kunkel, could you not have a water table in the

4   Recent alluvium which ran in the Recent alluvium fromthe top

5   of the valley in Pauba Valley down to the outlet, even though

6   there was a very great amount of water pumped from the older

7   continental deposits?

8      MR. VEEDER:  I still don't follow what he is trying to do

9   here.  I don't believe there are any facts in the record that

10  would conceivably support the hypothesis.  I think the witness

11  has done the best he can for Mr. Moskovitz.  We have all been--

12  I will take back the word "patient", but it seems to me that

13  the thing has been answered previously.  I think it is simply

14  laboring the point.

15      THE COURT:  The objection is sustained.

16      You are not adding anything here.  There are so many

17  variables.  You say even if water was pumped from the Pauba

18  Valley-- what kind of pumping?  Certainly if you have a wind-

19  mill running down there and a few gallons of water being

20  thrown out, I would guess that youcould have a water table

21  in the younger alluvium.  But suppose you had a hundred wells

22  of three-foot diameter down into the older part.  Would you

23  give the same answer to that as you would to the one windmill?

24  Maybe you would, maybe you wouldn't.  You have so many variables

25  there.  You can't ask a witness to answer a question like that

A4

Z36

1    without more facts.  If he thinks about a windmill, he would

2    say, "Sure, you have a water table in the younger alluvium."

3    It is all a matter of degree, isn't it?

4         MR. MOSKOVITZ:  It is all a matter of degree.

5         THE COURT:  Is it your contention that there is no possible

6    pumping that could be done in the older alluvium in the Pauba

7    Valley which would affect the water table in the younger

8    alluvium?

9         MR. MOSKOVITZ:  No, your Honor, that is not the contention

10   at all.

11        THE COURT:  What are you arguing about?

12        MR. MOSKOVITZ:  The contention is the fact that there was

13   pumping would mean there would be no outflow at all from Pauba

14   Valley into Temecula.

15        MR. VEEDER:  It is the degree of pumping, the quantity of

16   pumping, and where.

17        THE COURT:  It is a question of degree.  Your question

18   doesn't help me any.  That is why I sustained the objection.

19        Let's take a short recess.

20        (Recess.)

21

22

23

24

25

ML-B-1 j

1    THE COURT:  All right, proceed.

2    MR. SACHSE:  Mr. Moskovitz stepped out for just a

3  moment, your Honor.  He ought to be back in just a minute.

4    (Pause.)

5    THE COURT:  Let me ask one question on that formula D.

6  Is the length crosswise following one of the water contours?

7    THE WITNESS:  Would be along a water level contour.

8    THE COURT:  All right, Mr. Moskovitz.

9    Q  BY MR. MOSKOVITZ:  I believe the import of your

10  testimony is that if there were sufficient pumping from the

11  older continental deposits, you could so lower the water

12  table in Pauba Valley that you have no areas of rising

13  water, and, therefore, no outflow from the basin; is that it?

14    MR. VEEDER:  Now, I don't think the witness should be

15  called upon to summarize his testimony, your Honor.  And

16  that is exactly what that inquiry presents.

17    THE COURT:  He may answer, though.  The objection is

18  overruled.

19    THE WITNESS:  The question, please?  Have it read back.

20    THE COURT:  Read it.

21    (The reporter read back the question.)

22    THE WITNESS:  In summary, it could be stated that if

23  sufficient quantity of water were pumped from the alluvial

24  deposits, the Pauba Valley area, the outflow would be

25  materially decreased or cease altogether.  They are talking

2

1    about a --    What is going to happen in the future no one

2    knows.

3        Q   BY MR. MOSKOVITZ:   Now, would the amount of water

4    coming into the basin in surface runoff and precipitation

5    be a factor?

6        MR. VEEDER:   Be a factor in what, your Honor?

7        THE COURT:   In connection with your last question.

8        MR. MOSKOVITZ:   Yes, in connection with the cessation

9    or decrease of flow out of the basin.

10       THE COURT:   Let's say yes and go on with it.   If we had

11   a flood across there, you would have water running out of

12   the basin.   I don't have to be an engineer to know that.

13       MR. MOSKOVITZ:   Your Honor, I would like the witness to

14   say it.

15       THE WITNESS:   I am under --

16       MR. VEEDER:   Now, excuse me --

17       MR. MOSKOVITZ:   May of these things, I think, are

18   obvious; but the witness is the one who has to say them,

19   your Honor.

20       MR. VEEDER:   It is obvious.   Why do we labor it?

21       THE COURT:   I don't care what the witness says.   You

22   say if there was a sufficient flow of water.   And again,

23   these are generalities.   In the argument (inaudible), if

24   you had a flood coming down there for two or three months

25   during the winter -- let us take an extreme case -- washing

1  across there, you would have water go out the lip.    It

2  makes no difference how much something is going on.    It

3  takes time for water to sink in.    I have seen flash floods.

4  I know how they operate.    So again --

5       MR. MOSKOVITZ:    You are way ahead of me, then.

6       THE COURT:    It is a question of matter of degree.    How

7  much do you mean, sufficient water?    You mean a wet winter,

8  or a nice little runoff that follows in the spring after

9  you have had a wet winter?    Or do you mean one of these

10 flash floods that come out of these canyons that can move

11 boulders as big as a five-room house, a small house or a

12 big garage?    I have seen the --    I used to live on the Big

13 Tujunga.    I know how the Big Tujunga operated in the winter-

14 time if you had a flood.    It makes no difference what kind

15 of material you have, that water would go out.    On the other

16 hand, if you are talking about what happens after a wet

17 winter when you have nice little streams that flow out of

18 your canyons for months at a time after a wet winter, you

19 are gradually coming into an area, something else happens.

20      MR. MOSKOVITZ:    I agree with your Honor.    There are a

21 number of factors that influence this, and I was attempting

22 to ask the witness if these factors are the ones that would

23 affect the results.

24      Q    And I assume that your answer, Mr. Kunkel, is the

25 water coming into the basin the way it came would be a

2785

Kunkel - Cross

factor; is that correct?

A     The way your question is phrased is the reason I hesitated.  I was not certain whether you were asking me with regard to ground water or surface water.  I have been testifying with regard to ground water.  When you say "basin," what are we referring to?

Q     I am referring to water which came in on the surface from precipitation and runoff or water which came in underground.

MR. VEEDER:  Well, now, your Honor, again I point out in this matter that Mr. Moskovitz is dealing up in the ozone again.

THE COURT:  Sustained.  Break your question down into parts, ground water and --

Q  BY MR. MOSKOVITZ: Would the amount of water coming in on the surface, runoff and precipitation, be a factor in the reduction or cessation of flow out of the Pauba Basin?

B-2

1    THE COURT:  And that is a circumstance of your previous

2  question?

3    MR. MOSKOVITZ:  Yes.

4    THE WITNESS:  It would be a factor.

5    Q  BY MR. MOSKOVITZ:  Would the amount of return flow

6  from irrigation be a factor?

7    A    It would be a factor.

8    Q    And would the permeability, the vertical permeability

9  in a vertical direction, transmissibility in a vertical

10  direction of the materials in the basin also be a factor?

11    MR. VEEDER:  Materials.  Now, I don't understand that

12  at all.  In materials, what material is he talking about?

13    THE COURT:  I understand it.  He is talking about the

14  characteristics of the alluvia -- older, younger, whatever

15  it may be -- in the basin; or whatever material might be

16  in a basin.  I understand it.  Would be a factor?

17    THE WITNESS:  Yes.  I believe the question contained

18  the word "transmissibility."  That was not meaningful to me.

19    THE COURT:  Read the last question.

20    (The reporter read back the question.)

21    THE WITNESS:  I do not understand the question.

22    Q  BY MR. MOSKOVITZ:  Would the vertical permeability of

23  the material within the basin be a factor?

24    A    Permeability of the materials in the basin would

25  be a factor.

Q     Mr. Kunkel, in your investigation of this upper
Santa Margarita watershed area did you make any water
quality studies?

A     I did not.

Q     Did you make any studies of the safe yield of the
various ground water units that you have outlined?

A     In my opinion, there are insufficient data for
estimates of safe yield.

THE COURT:  So you made no estimates?

THE WITNESS:  I made no estimates.

THE COURT:  That was the question.

Q     BY MR. MOSKOVITZ:  Now, Mr. Kunkel, in your
description of the basin during your first and second day
of direct testimony did you describe the two streams which
flow from the south into Temecula Canyon in Township 8
South, Range 1 East, and Township 7 South, Range 1 East?

A     I think your township designation is inaccurate.

THE COURT:  You are in 9 South.

THE WITNESS:  It is 9 South, 1 East and 8 South, 1
East.  I would have to check the record to be certain, but
I do not recall testifying as to those two particular
streams.

THE COURT:  Apparently Mr. Moskovitz is referring to
Map 15.  One line appears to be some kind of a creek which
originates in Section 8, Township 9 South 1 East, runs

northward to the corner, 5 to the west side of 4, backward
of 5, and ends up into 32 Township -- Pardon me. I said
it started out -- That should have been 9 South 1 East.
And the section, it runs up into Section 32, 8 South 1 East,
and apparently up into 30, 8 South 1 East. And the second
one originates over in 24. 9 South 1 East runs into 23,
into 14 up through 10 to 3. It is pretty hard to trace it.
It runs on up about Section 34 or 28, 2 South 1 East. Are
those the two you are talking about?

MR. MOSKOVITZ: Those are the two I am talking about.

MR. VEEDER: I don't remember whether he testified or
not.

MR. STAHLMAN: There was no testimony.

THE WITNESS: I do not recall any.

THE COURT: Is your position going to be that there is
substantial water out of this stream?

MR. MOSKOVITZ: Your Honor, we have some records for
a few years of runoff from which you can get a fairly good
idea of how much comes from those two streams.

MR. VEEDER: We are going to call witnesses ourselves,
your Honor, in regard to those areas.

THE COURT: I have been a little confused about the way
this case is going. I see it generally. The Government
has shown, supposed to show larger storage basins. And
California thinks of this, and apparently Fallbrook is

1   lined up with California in showing smaller storage units.

2   And I am trying to follow this thing through in my mind.

3   It would seem that this all would tend to show that it was

4   smaller storage units, probably less water in the river,

5   and, therefore, less water to meet the riparian needs.  And

6   if there is less water to meet the riparian needs, then

7   the chances are there is less water for appropriation.  I

8   am a little confused.  The Government's position of larger

9   basins would indicate more water.  And then we find out

10  what the riparian needs are.  May even be something for

11  appropriation.  Have you gentlemen given this any consider-

12  ation?

13       MR. SACHSE:  Fallbrook hasn't said a word, your Honor.

14       THE COURT:  I know, but the record will show there has

15  been consultation between Sachse for Fallbrook and

16  Moskovitz for the State of California, which I have observed

17  here.

18       MR. STAHLMAN:  It is more than consultation.

19       MR. VEEDER:  And when bitterness breaks out the way it

20  did this morning --

21       THE COURT:  I am just wondering where we are going on

22  this thing.

23       (Off the record remarks.)

24       MR. VEEDER:  I would be glad to outline it, your Honor.

25       THE COURT:  Give me your ideas.  I would like to know

the issues in this case.

MR. VEEDER: I would be very pleased to give your Honor the -- There is only so much water enters this valley, we know that. We know what the runoff is. We know the demands on the ground water here have a direct and immediate bearing upon the quantity of water that reaches Camp Pendleton. We know our next witness, witness that we will have very shortly, will show the quantity of water entering the valley. And the reason why Fallbrook and California suffer so much in this phase of the testimony is this: that when these basins are pulled down, as they are being pulled down, the quantity of water, which will not greatly increase, which enters the valley will be consumed and pulled down and will not go through the gorge on down to Fallbrook's figment which we called a dam. And that is the reason why we are taking this position.

Here are wells going into the continental deposits which are water-bearing and which must be recharged from the water entering the valley. And when those waters are pulled down, your Honor, it immediately cuts down on the quantity of water that comes down Temecula Canyon. There is our position.

THE COURT: Well, now, maybe that has gotten straightened out. Therefore, if the State and Fallbrook contend the basins alluded to are much smaller --

10

1    MR. VEEDER:  That is right.

2    THE COURT:  -- then of the water falling in the valley,

3    more would go through the barrels than down the Santa

4    Margarita.

5    MR. VEEDER:  And would fill up this little deal that

6    Fallbrook would like --

7    THE COURT:  You don't have any burden to show me

8    whether it will fill the dam or not.  You don't have any

9    burden to show me whether it will fill the dam or not, I

10   don't think.

11   MR. VEEDER:  No, no, no.  And we will put on our

12   hydrologist in that regard.  Mr. Kunkel has testified it

13   is obvious, if the Vails would throw their pumps onto this

14   Pauba Valley here, they would shut down the whole stream.

15   MR. MOSKOVITZ:  The State doesn't take the position

16   that these orange areas on Exhibit 15 are definitely not

17   hydrologically connected with the stream.  What we are

18   saying is that the state of the data which is now known is

19   such that you cannot conclude it now.  Maybe it is so, but

20   there are not those facts upon which you can so conclude.

21   And there aren't sufficient facts for saying that all of

22   that area is part of the stream.  Maybe it is.  Maybe

23   future facts will show it.

24   THE COURT:  I will keep an open mind and see what facts

25   are produced.

11

1    MR. MOSKOVITZ:  I want to conclude just by closing up

2    this last point about those two streams.

3        THE COURT:  All right.  The ones I identified were

4    from the Exhibit 15.

5        MR. MOSKOVITZ:  Yes, that is correct.  And on page 2430

6    of the transcript Mr. Veeder gave some testimony.  I don't

7    know whether the witness has seen it or not.

8        MR. VEEDER:  It is probably very good.

9            Now, what is your point?

10       MR. MOSKOVITZ:  These two here.

11       MR. VEEDER:  I take it there are no other creeks running

12   in the Temecula that have to be described?

13       MR. MOSKOVITZ:  I will read it into the record.  The

14   Court asks, on line 13, page 2430:

15           "I take it there are no other creeks that run

16       into Temecula that have to be described.  There is

17       none running from the south?

18           "MR. VEEDER:  There are none of any importance,

19       your Honor, other than those we have described, the

         sources that we have proceeded through."

20       MR. VEEDER:  From the standpoint of the geology that

21   we are putting in, obviously those streams rise on the

22   Cleveland National Forest, and they are important to the

23   Forestry Service, but not from the standpoint of the

24   geological phenomena that we are being advised by the witness.

25       MR. MOSKOVITZ:  Well, I will just ask the witness.

THE COURT:  All right.

Q  BY MR. MOSKOVITZ:  Do you agree with the statements Mr. Veeder made in the record?  Do you adopt that as your testimony?

A    May I see it?

Q    Yes.

MR. STAHLMAN:  It is a kind of funny way to get evidence in the record.

MR. VEEDER:  He was testifying in regard to one particular phase of the litigation, your Honor.  And I really don't know what we are searching for, your Honor.

THE COURT:  I just heard some talk.  I haven't heard any objections of any kind.

MR. VEEDER:  I am interested in what the man is going to develop.  Certainly the witness won't testify concerning something that he didn't undertake a study of, I hope.

THE COURT:  Well, you heard those two streams described?

THE WITNESS:  Yes.

THE COURT:  Do they have any significance in connection with the runoff into this area?

MR. VEEDER:  Your Honor, he didn't study runoff, nor did he testify about it.  He talked about geology and underground basins.

THE COURT:  I see your point, Mr. Veeder.  This witness didn't testify about runoff.  He was outlining alluvial

13

1    basins and the way the water moved in the underground system.

2    So I don't think -- I might as well abandon the inquiry.

3    You want it answered?

4        MR. MOSKOVITZ:  In light of your comments and Mr.

5    Veeder's explanation, I don't think so.

6        THE COURT:  Maybe this will tell us there is runoff.

7    You apparently have evidence there is.

8        MR. MOSKOVITZ:  I will drop the question.

9        THE COURT:  All right.  Anything further?

10        Are you through, Mr. Moskovitz?

11       MR. MOSKOVITZ:  Just a moment, your Honor.  No, there

12   is nothing further, your Honor; with this reservation:

13   we don't have those well logs and we will want to go into

14   those, and the contours, when we receive them.

15       THE COURT:  Mr. Witness, you will have to check this

16   transcript of your testimony.  We may find your errors on

17   errors of the reporter while you are at it, but check it

18   for these things you are going to dig up and bring down

19   here at some later date.

20       (Off the record remarks.)

21       THE COURT:  Who wants to proceed with Mr. Moskovitz?

22       MR. SACHSE:  I will go ahead, your Honor.

23       THE COURT:  All right.

24

25

14

CROSS EXAMINATION

BY MR. SACHSE:-

Q    Mr. Kunkel, apropos to the last question his Honor just asked of you, have you reviewed the transcript of your testimony up to date?

A    Not in total.

Q    Pardon me?

A    Not the total transcript.

Q    Have you yet reviewed the transcript for October 3rd?

A    Yes, I have reviewed that transcript.

Q    When did you do that?

A    Over the week end.

Q    How much up to date since then have you gotten? How much beyond the transcript of October 3rd?

A    I have reviewed the transcript through part of yesterday's proceedings.

MR. VEEDER:  I am interested in this.  I never heard of a cross examination of this kind before.  If there is a mistake in the record, I think counsel should tell us.

MR. SACHSE:  Mr. Veeder, --

THE COURT:  Let us go ahead.  We will hear a lot of things in this trial.

Q  BY MR. SACHSE:  I want to state now, if I may, Mr. Kunkel, some errors in nomenclature or confusion in

15

1   nomenclature.  You have used three different names to

2   describe the two faults at the lower end of Pauba Valley.

3   You have used Wildomar, Willard, and Elsinore.  Now, could

4   you tell us where which name overlaps?

5       A    The "Willard" is an incorrect --

6   MR. VEEDER:  I don't believe he --

7   THE WITNESS:  -- spelling or reference.  The term is

8   Wildomar.

9       Q  BY MR. SACHSE:  The Willard and the Wildomar are

10  the same, then, in this reference?

11      A    There is a Wildomar Fault zone.  Where the other

12  word occurs in the testimony it is incorrect.

13  THE COURT:  The Wildomar Fault is the one that is the

14  most northerly of the two faults and runs from the north-

15  west to the southeast?

16  THE WITNESS:  That is correct.  On Exhibit 16 they are

17  shown as the Wildomar Fault zone, the fault zone along the

18  northeast side of Murrieta Valley.  Elsinore Fault is the

19  fault along the southwest side of the valley.  They were

20  not named on Exhibit 15, but they are named on Exhibit 16.

21  The names that are on Exhibit 16 are correct.

22      Q  BY MR. SACHSE:  The name "Willard," then, is a pure

23  error?

24      A    It is an error.

25      Q    Have you ever heard of the Willard Fault in this

area?

A    The term is there.  I cannot spot it.  It may be in the work by John Mann; I am not certain.  I will have to check the reference.

Q    You have heard of a Willard Fault?

A    I did not say that I have heard of a Willard Fault.  The faults to which I referred were the Wildomar.  Where I have said "Willard" in the record, the context will bear out that I was referring to the fault zone that is described as Wildomar.

Q    You made an exhaustive study of all the material you could obtain on the geology of this upper watershed, did you not?

A    That is correct.

Q    And you found no reference to the Elsinore Fault by the name Willard in any of your geological studies?

A    I do not know the answer to that question.

Q    Did you find any reference to what you have called Elsinore Fault as the Willard Fault in any of your studies?

A    I do not remember a reference to it by that name at the moment.

Q    Now, there are a few other names upon which I am confused.  On your Exhibit 15 you have indicated the Terwilliger Valley.  And is that, generally speaking, the same area that in Fallbrook's AA, Bulletin 57, indicated as

17

the Anza Valley?

I would like to have the witness look at the plate so he can --

MR. VEEDER:  I object to the question.

THE COURT:  Overruled.

MR. VEEDER:  The exhibit is not in the record.

THE COURT:  What is the plate number?

MR. SACHSE:  I would like to have the witness look --

THE COURT:  Plate 218 --  221-B?

MR. SACHSE:  2-B.  Very earliest one.

MR. STAHLMAN:  Wait a minute.

MR. SACHSE:  2-B in Volume 1.

I just want to get some nomenclature.

MR. STAHLMAN:  May I see the plate?  We have something to say about some of these plates, too.

MR. VEEDER:  Their trying to lend dignity to that thing by using our exhibits is painful to me, your Honor.

THE COURT:  Here is the --

MR. STAHLMAN:  May I borrow this, Mr. Sachse?

MR. SACHSE:  Surely.

Q  BY MR. SACHSE:  The question was --  I will simply rephrase it:  Is the area delineated on plate 2-B of Fallbrook's AA as Anza Valley generally the same thing that you are referring to as Terwilliger Valley?

A    In general, the valley area of Terwilliger Valley and Anza Valley, as you have described it, are the same. The town of Anza occurs in Terwilliger Valley.

B-85

18

1    Q    Now, then, moving on down the same stream, on
2    plate 2-B.  Coahuila Valley, as indicated on plate 2-B,
3    appears to take in a large area of alluvium extending north
4    and east of Coahuila Valley as indicated on 15; is that
5    correct?

6    A    I do not recall the terminology I have used or the
7    latest terminology in the U. S. Geological Survey topographic
8    maps which have been entered in evidence.

9    MR. VEEDER:  I renew my objection, your Honor.  I think
10   it is entirely improper.

11   THE COURT:  Overruled.

12   MR. VEEDER:  His trying to qualify this Buck Rogers
13   comic by using our witness is highly objectionable.

14   Q  BY MR. SACHSE:  Have you in exhibit 15 adopted
15   place-name terminology from any specific source?

16   A    Yes, sir.  Place-name terminology, as indicated on
17   Exhibit 15, are from the United States Geological Survey
18   topographic maps which are entered in evidence.

19   Q    Mr. Kunkel, in your testimony regarding the ground
20   water storage capacity -- I don't know that you have stated
21   the formula -- but would it be correct to state that this
22   ground water storage capacity of the basins that you have
23   set forth on Exhibit 18 is arrived at by multiplying the
24   surface area you have indicated times the depth you have
25   indicated times the specific yield?  Exhibit 18, it is not

on the board.

A    That is correct.  I am acquainted with Exhibit 18.

MR. VEEDER:  May we have 18?  I would like to see it.

THE WITNESS:  Your statement with regard to the mathematics on Exhibit 18 is correct.

Q  BY MR. SACHSE:  You calculated the areal extent of each of those valleys yourself by perimeter as you have delineated them on 17, is that correct?

A    That is correct.

Q    In this next column of figures you indicate thickness of uppermost water zone.  Now, what is the significance of the word "uppermost" in that type?

A    As can be observed on Exhibit 16, the water-bearing deposits are of appreciable thickness, greater than 100 feet.  The zone for which specific yield was calculated was the depth from the top of the saturated materials to a depth of 100 feet.  In some areas the deposits are less than 100 feet thick, in which case a thickness of less than 100 feet was indicated.

Q    Then, the figure of 100 feet, taking the very first valley, for example, Murrieta Valley, as listed on 18, is not intended to indicate the actual depth of ground water storage area?

A    The actual thickness of the water-bearing deposits? No, the thicknesses indicated as being at least 100 -- at

least 449 feet and --

THE COURT:  Which basin are you talking about?

THE WITNESS:  Murrieta Valley.

MR. SACHSE:  No. 1.

THE WITNESS:  No. 1, Exhibit 18.

And the maximum thickness based on the geologic studies is estimated to be more than 1000 feet.

Q  BY MR. SACHSE:  Is there any magic to this figure 100?  Why do we use it?  Why not, in this case, then, 249 or 449?

A    There is no particular magic to the 100-foot interval.  It is a depth interval within which there are the greatest number of logged wells.

THE COURT:  I am going to adjourn.  I want to go to this luncheon.  And we will take up again at 2:00.

(Whereupon a recess was had until 2:00 o'clock p.m. of the same day.)

C-1

Z37

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, OCTOBER 8, 1958.   2:00 P.M.

2

3                          FRED KUNKEL,

4    heretofore called and sworn, recalled as a witness in behalf

5    of the plaintiff, testified further as follows:

6

7                    CROSS-EXAMINATION (Resumed)

8    BY MR. SACHSE:

9        Q  Mr. Kunkel, still directing your attention to your

10   Exhibit 18, do you have it available?

11       A  I returned it to the Clerk of the Court.

12       (The exhibit is handed to the witness.)

13   BY MR. SACHSE:

14       Q  I direct your attention to the title of the exhibit,

15   "The estimate of ground water storage capacity of the alluvial

16   deposits, upper Santa Margarita River Basin, California."  That

17   is not an accurate title, is it?

18       A  I wouldn't say that it was inaccurate.

19       Q  Are there not, in fact, very large areas of alluvium

20   in the upper Santa Margarita Basin not included in this calcula-

21   tion of storage capacity?

22       A  I think from an inspection of the table that is an

23   obvious conclusion.

24       Q  So there are substantial areas of alluvium not included

25   in this table?

1     A   There are large areas of alluvium not included in this

2   table.

3     Q   Now, taking the very first item, Murrietta Valley, the

4   second sentence of descriptive matter reads, "The greatest

5   known thickness of the water-yielding deposits is 449 feet."

6   From what source did you obtain your information that this is

7   the greatest known thickness?

8     A   Well logs on file with the Department of Water Resources

9   in Los Angeles.

10     Q   And the next sentence, "The maximum thickness is

11   probably more than a thousand feet."  From what source did

12   you obtain or draw that conclusion?

13     A   That is my conclusion based on the geology of the

14   region.

15     Q   In other words, you have located, if I understand you

16   correctly, well logs going down to 449 feet, and based on other

17   observations you calculate possible additional depth up to a

18   thousand feet?

19     A   That is correct.

20     Q   In your testimony of October 3rd--

21     I am now referring, Mr. Veeder, to page 2526 of the

22   transcript of line 8.

23     I am reading from one of your answers:  "The basement

24   complex in wells in Murrieta Valley have not been encountered

25   at depths above 2,000 feet.

C-1

Z39

1    "Q  Above 2,000 feet?

2    "MR. STAHLMAN:  May I have that again?  I didn't get that.

3    "THE WITNESS:  The depth of the basement complex in

4    Murrieta Valley has not been encountered in wells that are

5    shallower than 2,000 feet."

6    Q  Why the figure 2,000?

7    A  In part I am relying on a reported driller's log of an

8    oil well which I have not personally inspected.  However, I

9    have checked out, to the best of my ability, all information

10   that is available, that I was able to secure on that log.

11   Q  In other words, you have not seen the log, as I under-

12   stand you?

13   A  That is correct.  That is the reason why.

14   Q  You have hearsay information that the log exists which

15   you believe reliable; is that right?

16   A  I believe the information that the log exists is

17   reliable.

18   Q  And what it indicates you also believe to be reliable?

19   A  I have not seen the log.  I do not know first hand what

20   it indicates, and I have drawn no definite conclusions as to

21   the exact position of the basement complex.  However, as in-

22   dicated in my testimony, I have indicated what my observations

23   of the region, coupled with the hearsay evidence, lead me to

24   conclude to be an figure beneath which basement complex is

25   encountered.

C1

Z40

Q   From whom did you obtain this information?

A   I discussed this personally with Dr. John Mann, who has studied the area. I do not recall the exact course of my discussions with him, but he had either talked to the driller or the property owner and he has visited the site of the well, and in his opinion the depth to basement complex was also greater than 2,000 feet. In his doctor's thesis, if I remember correctly, he has stated specific depths to which the Santa Rosa basalt was encountered in the well log. But on the basis of my investigation, I could not agree or disagree with him as to whether the Santa Rosa basalt was encountered or was not encountered. He had in the course of his studies evidence that was not unreasonable, in my opinion.

Q   Mr. Kunkel, in your testimony that I have just read to you, you state, in substance, that the basement complex has not been encountered at less than 2,000 feet. In your Exhibit 18 you state, "The maximum thickness is probably more than 1,000." Now, those two statements are 100% apart. Which one is more nearly correct, your testimony or your exhibit?

A   The maximum thickness probably is more than 1,000. That is a statement indicating that the deposits are greater than that thickness. I have not committed myself as to a bottom figure, because I do not know. As far as I can determine, wells have not encountered basement complex in Pauba Valley.

Q   Then would you say that your statement in the testimony

Cl

Z41

1   that the basement complex is at depths below 2,000 is incorrect?

2   A   No, sir.

3   Q   Would it be correct, then, to state that the maximum

4   thickness probably is as much as 2,000 feet?

5   A   It would be correct to state that the maximum thickness

6   is probably greater than 2,000 feet.

7   Q   I will direct your attention to the next item, No. 2,

8   Wolf Valley, and again the same language:  "The greatest known

9   thickness of the water-yielding deposits is 524 feet."  Where

10  did you get the 524 feet?

11  A   Again, it is based on a driller's log of a water well.

12  MR. VEEDER:   What is your reference, Mr. Sachse?

13  MR. SACHSE:   My reference is to item 2 on Exhibit 18.   I

14  will repeat the question, Mr. Kunkel.

15  Q   Where did you obtain the figure 524 feet?

16  A   From logs on file with the Department of Water

17  Resources.

18  Q   And the next sentence, "The maximum thickness is

19  probably more than a thousand feet."   Where did you get that

20  figure?

21  A   That is again an estimate based upon my own studies.

22  Q   The next item, Pauba Valley, the sentence, "Underlain

23  by older water-yielding deposits to a depth of at least 2,147

24  feet."   I presume that is the Pauba well?

25  A   That is the Pauba well.

C1

Z42

Q  And the next item, the older alluvial area, "The greatest known thickness of water-yielding deposits is 2,147 feet."  I presume that is also the Pauba well?

A  That is also the Pauba well.

Q  So you were using the Pauba well as a sort of basement on both the Pauba Valley area and the older alluvial area?

A  That is absolutely correct.

Q  Although the Pauba well is at the extreme southwesterly corner of the older alluvial area, is it not?

A  That is correct.

Q  Now, on No. 5, Nigger-Lancaster-Aguanga and Radec Valley, "Maximum reported thickness of unconsolidated deposits is more than 2,500 feet;" where did you get that figure?

A  A driller's log of an oil well in the area north of the middle of three fault zones shown in the area between Aguanga and Lancaster Valleys.

Q  And from whom was this oil well log obtained?

A  This log was also obtained from the Department of Water Resources.

Q  Of the State of California?

A  Of the State of California.

Q  Jumping down to No. 7, Oak Grove Valley, you indicate that the greatest known thickness is 170 feet.  Where did you obtain that data?

A  From a driller's log for a well in Oak Grove Valley.

Kunkel    Cross

2808

C1

Z43

1   I will correct that — from a well log.

2       Q   And you obtained that well log from the Department of

3   Water Resources?

4       A   From the Department of Water Resources.

5       Q   Was that the original log in the original files of the

6   Department that you checked, or the published form?

7       A   It was on -- I do not recall exactly what form it was

8   on.  The Department of Water Resources has a file of loose-leaf

9   notebooks in which they have various types of forms on which

10  they filed their logs.  It was the most original or the closest

11  to the primary data in their files that I could secure.

12      Q   In their files?

13      A   Yes.

14      Q   Did you check any of these Department of Water Resources

15  well logs that we have heretofore referred to against the

16  descriptions of the depth of alluvium contained in Bulletin

17  57 for the comparable areas?

18      A   I have examined the well logs.  I have examined Bulletin

19  57.

20      THE COURT:  Let's see Exhibit 18, Mr. Clerk.

21      MR. SACHSE:  That doesn't quite answer my question, Mr.

22  Kunkel.  Did you understand my question?

23      THE WITNESS:  Would the reporter repeat the question,

24  please?

25      (The reporter read the last question as follows:  "Q  Did

2809

Z44

1  you check any of these Department of Water Resources well logs

2  that we have heretofore referred to against the descriptions

3  of depth of alluvium contained in Bulletin 57 for the compar-

4  able areas?")

5      THE WITNESS:  Not in the preparation of my Exhibit 18.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Q    Did you check it after you did the job?

A    Yes.

Q    And what did you find?

MR. VEEDER:  I object to that.  I object to that  "What did you find?"

Q  BY MR. SACHSE:  Did you find any discrepancies?

MR. VEEDER:  Now, again, I object to that.  You must be specific.  We know there are a vast number of discrepancies.

What phase of the book are you having reference to, Mr. Sachse?

MR. SACHSE:  I will submit the question, your Honor. I would like it reread, and I would like the witness to answer.

THE COURT:  Discrepancies between what?

MR. SACHSE:  The reporter has left with the question I would like.

THE COURT:  Rephrase it.

MR. SACHSE:  Well, I will rephrase it.

Q    You stated that you did check the data you obtained from your primary sources in the Department of Water Resources against the published material in Bulletin 57 which recited the depths of alluvium in various areas?  You so stated a moment ago?

A    That is correct.

Q    In making that check did you find any discrepancies

in any area?

A    May I ask the Court a question for information?

MR. VEEDER:  No.

THE WITNESS:  I am ignorant of court procedures.

THE COURT:  What is your question?

MR. VEEDER:  I am going to impose an objection.

THE WITNESS:  I want to hear the question read back again.

MR. VEEDER:  I request that the matter be made specific to this witness, your Honor.  I am sure that he doesn't know exactly what reference is being made to, and I certainly am not sure myself.  I think Mr. Sachse can indicate where these errors that he is --

MR. SACHSE:  I am indicating no error, Mr. Veeder.  I am asking if he found any.

MR. VEEDER:  In what phase of the book, your Honor?  It is a very thick production.

MR. SACHSE:  I will be quite specific if Mr. Veeder wants me to.  Withdraw the question and start again.

Q    When you checked the primary data in well logs which you found in the office of the Department of Water Resources against Bulletin 57, do you recall which exact table you checked it against in Bulletin 57?

MR. VEEDER:  I believe he said he checked that.

MR. SACHSE:  He said he did check it specifically.

1      THE WITNESS: Your Honor, may I ask for advice?

2      THE COURT: Yes.

3      THE WITNESS: I feel I am being placed in a very

4 embarrassing position. I have the highest regard for Mr.

5 Dillingsworth and Mr. Fox as individuals. I am being asked

6 publicly to evaluate their works in my opinion. If I am in

7 disagreement and I so state, I feel I am violating ethical

8 concepts.

9      MR. SACHSE: I am not asking --

10      THE WITNESS: If I agree, I am in a position of accept-

11 ing their bulletin.

12      MR. SACHSE: I am not asking for a conclusion; I am

13 asking for a fact, your Honor.

14      THE COURT: Just a minute. Wait a minute.

15      You scientists have some ethical concept that you

16 can't disagree with another scientist?

17      THE WITNESS: It is my personal concept, your Honor.

18 I may be wrong. I will follow your advice.

19      THE COURT: When you become a witness in court, you lay

20 aside matters of that sort. I don't see anything unethical

21 in disagreeing with the findings of a fellow engineer or

22 the conclusions that he draws from these findings. Lawyers

23 disagree every day, and I would imagine that ethical concepts

24 among lawyers, because of their dealings with clients, and

25 so forth, are probably developed to a greater extent than

1    any ethical concepts between engineers.

2    MR. STAHLMAN:  The fact of the matter is lawyers usually

3    agree to disagree.

4    THE COURT:  Lawyers disagree with the judge.  Nobody

5    takes any offense with that.  A judge isn't God.  He is

6    liable to be as wrong as one of the lawyers.  He is some-

7    times more wrong.  Let us not worry about that.  We want

8    your honest opinion.

9    MR. SACHSE:  I am not asking even an opinion at the

10   moment, your Honor.  I am asking him for the simple facts.

11   THE COURT:  I am answering his question now.  I am

12   talking about your question.  We want you to give us facts

13   which you have ascertained.  You have given us a conclusion

14   which was your opinion.  I don't think you should have any

15   concern about that.

16   THE WITNESS:  If you wish to reask the question, if his

17   Honor wishes to request me to answer it, I will.

18   MR. VEEDER:  Mr. Kunkel, you have no alternative, I

19   don't believe, other than to answer the question if it is

20   properly presented, and we haven't objected and objection

21   is not sustained.  For I think that --

22   THE COURT:  All right, what is your specific question?

23   THE WITNESS:  In my opinion, I have found considerable

24   variance between my conclusions and those expressed in

25   Bulletin 57.  On the basis of the data that I have examined

1   I am convinced that my conclusions are correct.

2      Q  BY MR. SACHSE:  That is very interesting, but that

3   is not the question I asked you, Mr. Kunkel.  The question

4   I asked you was:  In comparing the original source of

5   material which you examined in the files of the Department

6   of Resources with that material as reproduced in Bulletin

7   57, did you find any discrepancies between the original

8   source material and Bulletin 57?

9      MR. VEEDER:  I don't believe that he said he checked

10   it back, your Honor.

11      MR. SACHSE:  He has said it at least three times, Mr.

12   Veeder.

13      THE COURT:  Did you find any discrepancies?

14      THE WITNESS:              I have not found appreciable

15   I have not found discrepancies, with the possible exception

16   of a slight number of changes due to differences in our

17   production of the grid or --

18      MR. SACHSE:  May I ask --   I don't mean to interrupt --

19   but I didn't get the first word of your answer.

20      THE WITNESS:  With regard to the data I have not found

21   discrepancies.

22      Q  BY MR. SACHSE:  By "data," you mean, I presume, the

23   factual data as distinct from the conclusions?

24      A    Factual data as distinct from the conclusions.

25      MR. VEEDER:  And limited to the well logs; is that

right?

MR. SACHSE:  Limited to nothing.  I asked him what was the data that he checked against 57.

Q    Do you wish to modify your answer?

A    Data includes --

Q    Did you understand my question, that I am referring to all data you obtained from primary sources in the Department of Water Resources, which data you checked against its reproduced form in Bulletin 57.  Did you find factual discrepancies?

A    Perhaps we had better define data more exactly.

Q    Any factual information as distinct from conclusions?

A    Water level measurements that I have checked, in my opinion --

Q    Did you find --

THE COURT:  Just let him finish, Mr. Sachse.

MR. VEEDER:  Just let him finish.

THE WITNESS:  -- are correct, I must say in my opinion, because when I go and measure a water level in a well that has previously been measured, there is no way whatsoever that I can be certain that their measurement was correct or incorrect.  But if, on the basis of what I know of the water level trends in the area, if their measurement is reasonable, their series of measurements which I have examined follow a reasonable pattern, I am personally

1  acquainted with the persons that have directed the studies,

2  I have no other conclusion but to assume that the data is

3  accurate.

4  Q  BY MR. SACHSE:  What about the well logs?  Take

5  another specific item.

6  A  The well logs, as presented to me and as used by

7  the Department of Water Resources, I have every reason to

8  believe they are the same logs.  My interpretation, from

9  those logs, may or may not be different.

10  MR. VEEDER:  Now, just a moment.  The well logs are

11  not in Bulletin 57.  There are references to them, but the

12  well logs are not in the book.

13  Q  BY MR. SACHSE:  Have you found any discrepancy

14  between the well logs on file with the Department of Water

15  Resources and the references and the summation of those logs

16  in Bulletin 57?

17  A  I have not checked them out that closely.

18  Q  Have you found any?

19  A  It is impossible for me to -- when a log is

20  diagramed on a cross section from a description of a

21  driller's term it, of necessity, involves some interpretation

22  on the part of the man doing it; and differences of that

23  nature I ascribe to differences in professional judgment.

24  Q  Let us try another subject, then.  What about the

25  descriptions found in Bulletin 57 of the location of wells

1   as compared with the basic records in the Department of

2   Water Resources?   Have you found errors or discrepancies?

3       A     Any errors or discrepancies that I have observed

4   are not of a magnitude that will affect any interpretation.

5   I would definitely have to check my notes to discover if

6   the positions of certain wells, or all wells, were the same

7   as the positions that I have observed.

8       Q     Let me be very --

9       MR. VEEDER:   I am going to object to anything further

10  in regard to Bulletin 57.   It is not in the record, your

11  Honor, and I see no reason why this type of cross examina-

12  tion should proceed.   We disagree with Bulletin 57.   It is

13  not in the record.   It hasn't been offered.   And it is

14  incredible to me that they are trying to breathe some life

15  into that work, or whatever it is, through our witnesses.

16  If it were before your Honor it would be an entirely

17  different matter.   As it is, we have no basis for cross

18  examination, because this man is our witness.   So I renew

19  my objection to it as not being before the Court and not

20  made a part of the record.

21      THE COURT:   The witness has testified that he was aware

22  of Bulletin 57 and considered it -- not that he relied

23  upon it; considered it -- and I think it is proper cross

24  examination.   It is all right to talk about these matters.

25  I am not going to let this go on forever.

MR. SACHSE:   I assure your Honor it is not going to go on forever.

MR. VEEDER:   Well, that is a relief.

MR. SACHSE:   Would you read the last question back?

(The reporter read back the question.)

MR. SACHSE:   You don't need to read the answer.   Thank you.

Q     Now, have you found any case, for example, in which Bulletin 57 reported a non-existant well?

A     That is an impossible question to answer.   If I were to go to a well that was described in Bulletin 57, and it did not exist, I would have no way of knowing under certain circumstances without --

MR. VEEDER:   Somebody must have stolen it.

THE WITNESS:   -- an appreciable amount of checking whether the well was cut off at six feet below land surface and plowed over by a rancher.   If I discovered such a circumstance, I would conclude, unless there were evidence to the contrary, the data were correct.   I would search for additional evidence.

Q  BY MR. SACHSE:   But you found no such condition to exist, did you?   That is my question, Mr. Kunkel.

A     I cannot answer that, because I honestly do not recall.

Q     I would like to invite your attention, Mr. Kunkel,

1    now, to plate 9-B.

2        MR. VEEDER:  I renew my objection as to the using of

3    Bulletin 57, your Honor.

4        MR. SACHSE:  Now we are getting down to specific

5    questions, your Honor.  9-B.

6        THE COURT:  Your objection is overruled.  Let us see

7    what the answer is.

8        MR. SACHSE:  That is the wrong plate, your Honor.  9-B.

9    If you will hand me the bulletin, I can pick it out

10   quickly.

11       THE COURT:  That is my copy.  You can show it to him.

12       MR. SACHSE:  I will show the witness my own.  I just

13   wanted to get it open here.  I will show him Mr. Veeder's,

14   if you prefer.

15       MR. KRIEGER:  Here is one.

16       MR. MOSKOVITZ:  Take one of mine.

17       THE COURT:  Point 9-B in Bulletin 57 refers to locations

18   of wells in the inland area.

19       MR. SACHSE:  That is correct, your Honor.

20       Q    I believe you testified a day or two ago -- I can

21   find the reference quickly -- that the wells you studied in

22   making your water-level contours were the same wells that

23   were published in Bulletin 57; is that correct?

24       A    That is correct.

25       Q    Now, let me direct your attention to what you have

MALCOLM E. LOVE, OFFICIAL REPORTER

1    delineated on Exhibit 15 as Terwilliger Valley, and what in

2    Bulletin 57 is delineated as the Anza Valley.

3        MR. VEEDER:  Your Honor, we went through this this

4    morning.  It is repetition, and I object to it.

5        MR. SACHSE:  This is not a repetition.

6        THE COURT:  Overruled.  Tell us what it is about.

7        Q  BY MR. SACHSE:  Have you located the area, Mr.

8    Kunkel?

9        A    I am aware of the area.

10       Q    Inviting your attention to your Exhibit 18, I find

11    no determination by you as to thickness of alluvial deposits

12    and no determination by you of specific yield, explained in

13    a footnote:  "Insufficient data are available on which

14    to base an estimate."  Is that correct?

15       A   That is correct.

16       Q    How many wells do you need to base an estimate in

17    the Terwilliger Valley area?

18       A    I would have to check my notes, but I have no --

19    to the best of my knowledge I have no well logs  for wells

20    drilled in Terwilliger Valley.

21       Q    Those well logs were available in the same place

22    that you obtained the other logs, were they not?

23       A    I was told by the Department of Water Resources

24    that I had all well logs in their files.  None were given to

25    me for Terwilliger Valley.

1    Q    None were given to you for Terwilliger Valley?

2    A    No, sir.

3    Q    Do you think that a density of wells, such as

4    indicated on plate 9-B, would, under normal conditions, be

5    sufficient to draw ground water contours?

6        MR. VEEDER:  I object, again, your Honor, to this line

7    of cross examination.  The witness has explained his position

8    in this regard.  He has stated that so far as he is concerned

9    the data was unavailable.  Now, if Mr. Sachse is unhappy

10   about it, that is too bad.  Certainly, I don't see what can

11   be elicited on cross examination along this line.

12       THE COURT:  You are asking about ground water contours

13   now?

14       THE WITNESS:  May I check the record?  There may be a

15   misstatement by me.

16           Would you read Mr. Sachse's last question regard-

17   ing the availability of well logs and my answer?

18       (The reporter read back the question and the answer.)

19   Q  BY MR. SACHSE:  Did you want to correct that answer,

20   Mr. Kunkel?

21   A    No, sir, that is the correct answer.

22   Q    Now, then, back to my next question.  I think

23   there is a pending objection.  My question was --   I will

24   rephrase it, your Honor, and Mr. Veeder can renew his ob-

25   jection.

1          Do you believe that the density of wells that

2   is shown on plate 9-B for Terwilliger Valley is sufficient

3   to make a reasonable estimate of the depths of alluvial

4   deposits?

5          MR. VEEDER:  Well, your Honor, here are --

6          MR. SACHSE:  I have rephrased the question.

7          MR. VEEDER:  Some specks on this BRCB, and he is to

8   come up with a conclusion as to whether he could make a

9   determination in regard to availability of water.

10         THE COURT:  No, the question is depth of alluvial

11  deposits.  And he says he didn't see any well logs.  I don't

12  know how he could answer your question.  I will sustain the

13  objection.

14         Q  BY MR. SACHSE:  I will direct your attention, Mr.

15  Kunkel, still on 9-B, to those areas indicated in the plate

16  in purple lying immediately north and east of Pauba Valley

17  and south of Santa Gertrudus Valley.  Have I made myself

18  clear?

19         A    That which is referred to as French Valley on

20  Exhibit --

21         Q    No, lying north in the purple, lying north and east

22  of Pauba Valley and south of Santa Gertrudus Valley.  The

23  area --

24         A    Oh, yes, yes, I follow you.

25         Q    Would you please, so there is no misunderstanding,

Kunkel - Cross

1  indicate on 15, just by a pointer, the area to which I have

2  referred on 9-B?

3      MR. VEEDER:  And I want to have a continuing objection

4  to this whole line of cross examination in regard to

5  Bulletin 57, if I may.

6      THE COURT:  You may.  You are overruled.

7      THE WITNESS:  I understand you are referring to the

8  area colored orange on Exhibit 15 between Santa Gertrudus

9  Creek on the south and Pauba Valley on the north.

10     Q  BY MR. SACHSE:  Yes; you reversed your directions.

11  Santa Gertrudus on the north and Pauba on the south.

12     A    The area lies south of Santa Gertrudus and north

13  of Pauba.

14     Q    That is correct.

15         Do you have any present recollection of how many

16  well logs for that area you had available to you when you

17  drew your ground water contours indicated in Exhibit 17?

18     MR. VEEDER:  Now, may I inquire:  Does your inquiry

19  embrace your reference to the Bulletin 57?

20     MR. SACHSE:  No, I am asking --

21     MR. VEEDER:  You dropped that out of your question?

22     MR. SACHSE:  I have asked the witness if he has any

23  present recollection of the number of well logs which you

24  had available to you between Santa Gertrudus Creek on the

25  north and Pauba Valley on the south at the time you drew your

MALCOLM E. LOVE, OFFICIAL REPORTER

1  water level contours?

2      MR. VEEDER:  Wasn't there a location made in Bulletin

3  57 as part of your question?

4      MR. SACHSE:  Not as part of this question.  Let me

5  conduct my cross examination, please, Mr. Veeder.

6      THE WITNESS:  Mr. Sachse, water level contours are not

7  drawn on well logs.

8      Q  BY MR. SACHSE:  Thank you for correcting me.  I

9  appreciate that.

10         On well depths and well records, how many well

11  records did you have available in that area when you drew

12  your water level contours?

13      A    I do not recall the exact number.  The number was

14  sufficient, in my opinion, to draw a meaningful water level

15  contour.

16      Q    Did you have more than ten wells?

17      A    I would estimate, subject to revision in my notes

18  which I, checking my notes, -- and I have been instructed

19  by the Court to supply the wells to you subject to whatever

20  correction will be introduced at that time -- I estimate

21  that I had on the order of ten.

22      Q    We went through this "on the order of" once before.

23  Now, is that as much as 15 or as few as five?  Is that

24  about it?

25      A    It is of that magnitude.

1    Q    It could be as few as five?

2    A    I will have to check my notes -- which I will

3    submit to the Court as requested -- for an exact answer.

4    Q    At this time do you know, if you recollect,

5    whether any of those well logs were obtained from any

6    source other than the State of California Department of

7    Water Resources?   I believe I used the word "logs"; well

8    records, were obtained from any source other than State of

9    California Department of Water Resources?

10   MR. VEEDER:  Are you referring to water level measure-

11   ments now?

12   MR. SACHSE:  Yes.

13   THE WITNESS:  I would have to check my notes to be

14   certain.  It is my recollection that records of the Vail

15   Company were considered.  Now, it does not follow in

16   considering the position of a well in which a water level

17   was measured at an earlier date in an area on which there

18   is poor control, if one knows the general water level trend

19   from other data in the area, it is not unreasonable to use

20   an adjusted, older measurement in considering the positioning

21   of a water level contour.  It is not the only points on

22   which the water level contours are drawn.  But the other

23   water level measurements and the knowledge that you have,

24   that one has, as to the water level at a specific time

25   related to water level trends in the area, can be used as

D-3

1   control to draw water level contours.

2       Q    In other words, you may or you may not have had

3   other water level information?  You don't recall at this

4   time?

5       A .  I do not recall at this time.

6       Q    Now, I will direct your attention to what you have

7   delineated as area 11 on your 18, Domenigoni Valley.  Did

8   you obtain any well water level data from any source in

9   that area?

10      A    I would have to check the exact water level

11  measurements, the exact well; but I have measured water

12  levels in that area myself.

13      Q    You have?

14      A    I have.

15      Q    Do you know how many?

16      A    It is several.

17      Q    Well, --

18      A    Less than ten.

19      Q    Less than ten.

20      A    Perhaps less than five.  There are very few wells

21  in that particular valley.

22      Q    There are very few?

23      A    There are few wells in that valley.

24  THE COURT:  The purpose of the cross examination on

25  this valley could only be to go to the credibility of the

1    witness.

2        MR. SACHSE:  That is right, your Honor.

3        THE COURT:  Because they have submitted no figures on

4    this valley.  And if the record winds up with the State

5    producing its figures on Domenigoni Valley, and there are

6    no other figures on the valley, I suppose, other things

7    being equal, I suppose I would probably accept the State's

8    figures.  So, what are you getting at?  The Government

9    has offered no area in acre feet on that valley.  Unless

10   you are cross examining now for the purpose of impeaching

11   the type of work he did or how he did it.

12       MR. SACHSE:  You are close but not quite, your Honor.

13   Perhaps another question or two on this will dispose of it.

14       Q    Would you care to count the number of wells, Mr.

15   Kunkel, that are indicated in Domenigoni Valley on plate

16   9-B?

17       MR. VEEDER:  Again, I object to this line, your Honor.

18       THE COURT:  Have you counted them, Mr. Sachse?

19       MR. SACHSE:  There are substantially in excess of ten.

20       THE COURT:  All right.  Let's assume he counted them,

21   then.

22       Q  BY MR. SACHSE:  Do I understand you to believe, Mr.

23   Kunkel, that you have sufficient data to draw water levels

24   for the very large area, water level contours, for the very

25   large area between Santa Gertrudis Creek and the Pauba Basin

1   on information obtained from on the order of ten wells,

2   or, as you can't do it for the small area of Domenigoni

3   Valley with the same number?

4       A   I am afraid you have not read the exhibit carefully,

5   Mr. Sachsi.   I have not stated that there are insufficient

6   data on which to draw water level contours.   I have stated

7   that there are insufficient -- the statement, footnote A:

8   "Insufficient data are available on which to base an

9   estimate."   The estimate to which I am referring is these

10  big -- (Footnote A) -- "occur at places beneath the column

11  that is labelled thickness of uppermost water bearing zone

12  estimated specific yield, and ground water in storage."

13  These are insufficient estimates on which to base an

14  estimate of specific yield which is based on well log data;

15  whereas, water level contours are based on water level

16  measurements in wells.   You are not comparing like things.

17      Q   Is it not also true that you have indicated in-

18  sufficient data to determine the thickness of the uppermost

19  water bearing zone in Domenigoni Valley?

20      A   That is correct.

21      Q   But you have sufficient data for a much larger area

22  in the older continental deposits on a lesser number of

23  well, is that right?

24      A   That is correct.   And if you will also read the

25  table --   You are referring to Domenigoni Valley, I

believe?

Q    Yes.

A    "Maximum thickness of the alluvial" -- under item 11, Domenigoni Valley, alluvium-filled valley -- "Maximum thickness of alluvial deposits is unknown but may be about fifty feet.  I have made an estimate based on the information that is available.  There were an insufficient number of well logs available."  But I did use my judgment with regard to the geology and structure of the area.

Ext E-1

Z45

1    Q  You quarreled with me about my reference to water level

2  contours.  Am I mistaken?  Did you draw water level contours

3  for Domenigoni Valley?  I don't see any.

4    A  There are none drawn for Domenigoni Valley.  I have not

5  testified to water level contours for Domenigoni Valley.

6    Q  Well, is there any reason why you selected only some

7  of these basins to draw water level contours?  Were you in-

8  structed which ones to draw water level contours in?

9    A  I was not instructed which levels to draw water level

10  contours.

11    Q  I imagine the term--

12    MR. STAHLMAN:  Wait a minute.  Are there two questions

13  pending now?  He is about to answer one question, and you

14  asked another question.

15    MR. VEEDER:  He answered the other one.

16    MR. STAHLMAN:  I don't think he did.

17    MR. SACHSE:  I am satisfied that he answered.

18    MR. STAHLMAN:  Maybe I am not.

19    THE COURT:  One question was, were you instructed, and the

20  other question was, why didn't you?

21    MR. SACHSE:  The second one has not been answered.

22    THE WITNESS:  What was my answer?

23    MR. STAHLMAN:  I don't know which one he answered.

24    THE WITNESS:  What is the recorded answer to the first

25  question?

E1

Z46

1   (The reporter read the record as follows: "Q  You quarreled

2   with me about my reference to water level contours.  Am I

3   mistaken?  Did you draw water level contours for Domenigoni

4   Valley?  I don't see any.  A  There are none drawn for

5   Domenigoni Valley.  I have not testified to water level

6   contours for Domenigoni Valley.   Q  Is there any reason why

7   you selected only some of these basins to draw water level

8   contours?  Were you instructed which ones to draw water level

9   contours in?   A  I was not instructed which areas to draw

10  water level contours in.")

11      THE COURT:  All right, ask the new question now, the part

12  not answered.

13  BY MR. SACHSE:

14      Q  How did you determine which ones you would draw water

15  level contours in and which ones you wouldn't?

16      A  In the analysis of the area, I attempted to draw the

17  water level contours on the areas which, in my opinion and

18  judgment, have an appreciable thickness of water-yielding

19  deposits, and I have drawn water level contours on those areas

20  with the exception of Diamond Valley.  Diamond Valley water level

21  contours are drawn in that area because Lt. Giles Walker, working

22  under my direction, has investigated, to the best of my knowledge,

23  all of the wells in that particular area, and the data in that

24  particular area were sufficiently investigated by me to construct

25  those water level contours.

E1

Z47

1    Q  But you didn't do it?

2    A  I did.  There are water level contours in Diamond

3 Valley.

4    Q  Oh, in Diamond.

5    A  In the other valleys, if you will observe, there are

6 arrows indicating the direction of ground water flow which is

7 based on the examination of the water level data in the files

8 of the Department of Water Resources.

9    Q  But there is a difference between the arrow and between

10 a water level contour?

11    A  There is a difference between the arrow and the water

12 level contour, in that the water level contour indicates more

13 precisely the direction of ground water flow.

14    Q  And also indicates the depth, does it not, to which it

15 can be expected to find ground water?

16    A  No, sir.  It is the depth at which the water level

17 stands in a well.

18    Q  But the arrow alone gives you no such indication, does

19 it?

20    A  The arrow alone gives me no such indication.

21    Q  You used the word, in answering this last question,

22 "appreciable."  You said that you made water level contours

23 where there was an appreciable depth of water-bearing material,

24 I believe.

25    A  That is correct.

Kunkel   Cross

2833

El

z48

1    Q   What do you consider to be appreciable-- or did you

2 consider?

3    A   I did consider.

4    Q   What did you consider to be appreciable?

5    MR. VEEDER:   How many questions are involved here?

6    THE COURT:   Just one question.

7    What depth did you consider to be appreciable?

8    THE WITNESS:   Would you read the question, please?

9    MR. SACHSE:   I will rephrase it.

10    Q   What depth of water-bearing material did you consider

11 to be appreciable?

12    A   In Diamond Valley I considered 30 feet to be appre-

13 ciable.   In Oak Grove Valley I considered 75 feet to be appre-

14 ciable.

15    Q   Just a moment, please.   You didn't draw water level

16 contours for Oak Grove Valley, did you?

17    A   It is not--

18    THE WITNESS:   Would you read the question back to me,

19 please.   I don't think that was included.

20    MR. SACHSE:   I am going to have to rephrase it, then.

21    THE COURT:   Let's save some time.

22    What counsel is getting at, you said that you drew water

23 level contours for those areas where you thought there was an

24 appreciable depth of water-bearing material.   Now counsel is

25 trying to get what you meant by "appreciable."   Why did you draw

Kunkel   Cross

El

Z49

1   them in one area and not in the other?  You obviously thought

2   there was appreciable water-bearing alluvium in Murrieta,

3   Temecula and Pauba, but you didn't draw any water level contours

4   in Domenigoni Valley.

5   BY MR. SACHSE:

6       Q  The question was, what depth of water-bearing material

7   would you call appreciable?

8       A  It would depend on what purpose one is intending to

9   drill a well.  For a stock well a much shallower thickness would

10  be appreciable than for a person considering an irrigation

11  well.

12      Q  For the purposes of drawing water level contours, what

13  depth did you consider appreciable?

14      A  My statement was that I drew water level contours on

15  areas where I considered there to be an appreciable thickness

16  of water-bearing materials.

17      Q  Now, please tell me what that thickness is.

18      THE COURT:  Let me ask a question.  Does it vary?  Does

19  your definition of appreciable vary in different parts of the

20  watershed?

21      THE WITNESS:  It certainly does.  It varies from valley to

22  valley.

23      THE COURT:  In other words, you have no rule of thumb or

24  no yardstick that you can apply to the whole valley and say,

25  "If I find so much water-bearing alluvium, that is appreciable"?

E1

Z50

1   You have one yardstick for one valley and another yardstick for

2   another valley?

3        THE WITNESS:  That is what I did.

4        THE COURT:  Why?

5        THE WITNESS:  There is movement of ground water in every

6   alluvium-filled valley that has a water table.  If sufficient

7   data were available, it is possible to draw water level contours

8   on every stringer of alluvium shown on the map.

9        MR. VEEDER:  On every what?

10        THE WITNESS:  On every stringer of alluvium, every narrow

11   valley of alluvium shown on the map.  I did not measure, or

12   even attempt to measure, all wells in the area.

13        The purposes served by the contours, the particular

14   purpose for which that map is prepared would not contribute

15   greatly to the hydrologic story which Exhibit 15 is used to

16   depict.  It would be possible to draw water level contours on

17   the basement complex.  Wells can be drilled in the basement

18   complex and they intersect cracks and fractures and there is

19   ground water in the cracks and fractures-- the well will have

20   a water level.

21        If there are a series of wells in an area of basement

22   complex, if these wells intersect a common body of cracks and

23   fractures and the water level reflected a common hydrologic

24   unit, it would be possible to draw water level contours on the

25   basement complex.  No attempt was made to draw water level

El

Z51

1  contours on the basement complex.

2      Q  I appreciate that.  Now then, may I ask you this

3  specifically, Mr. Kunkel-- I am curious-- why in Diamond Valley,

4  with an appreciable depth of 30 feet, according to your Exhibit

5  18, did you draw a water level contour, and in Oak Grove Valley,

6  with a depth of two and a half times as great, did you not?

7  That is all I want to know.

8      A  Because in Diamond Valley I have checked out the data

9  closely enough that I am willing to draw water level contours

10  on the data.  In Oak Grove Valley I have not checked the data

11  out closely enough that I am willing to draw water level contours.

12      If the wells are available and I have checked them out to

13  the point that I am personally satisfied with the information

14  contained, I would be able to draw water level contours.

15      There is no denying that water level contours could be

16  drawn in many parts of the map where they are not drawn.  The

17  map shows what I have observed and what I have done, not what I

18  have not done.

19      Q  Can you tell me, then, why you carefully checked out the

20  data in Diamond Valley and did not carefully check it out in

21  Oak Grove?

22      MR. VEEDER:  I object, your Honor.  What can we gain by

23  this type of inquiry?  I see no purpose of it.  We put the

24  exhibit on the easel.  It has been admitted.  If they want to

25  bring in their plagiarization and make something out of this

E1

Z52

1 Buck Rogers book, fine.  I don't care.  But I don't see what

2 this is doing and we have been at it for an hour and ten

3 minutes.

4 THE COURT:  Overruled.  I am interested, too.

5 Why did you draw water level contours in Diamond Valley

6 and not in Oak Grove?

7 THE WITNESS:  Lt. Giles Walker, who was working under my

8 supervision, was in Diamond Valley during the geologic mapping

9 in that particular valley.  He was also in close association

10 with Col. Bowen and other members of Col. Bowen's staff, who

11 were doing soil studies in the area.  In the course of Lt.

12 Walker's studies in that area, he had sufficient opportunity

13 to check out water levels in wells and come up with data on

14 which to draw water level contours.

15 In Oak Grove Valley I did not have the assistance of Lt.

16 Walker. I did the study myself in that particular valley.  I

17 did not check out the same number of wells that were checked

18 out by Lt. Walker.  In my opinion, the water level contours in

19 that particular valley would not have changed the testimony I

20 have given during the course of the last several days.  The

21 hydrologic story with regard to the occurrence, source and

22 movement of ground water is accurately depicted on that map

23 without showing every single scrap of hydrologic data  that

24 exists.  There are numerous springs in the area that are not

25 shown.  I make no pretense that Exhibit 15 shows absolutely

Kunkel   Cross

E1

Z53

1    every spring that exists.

2         THE COURT:  A short answer is that you don't put everything

3    upon a map; that you had more detailed information available

4    in Diamond Valley which you thought was reliable; that you

5    didn't have detail to the same extent in Oak Grove Valley.  There-

6    fore, it appears on one and not on the other.

7         THE WITNESS:  That is correct.

8         THE COURT:  All right.

9    BY MR. SACHSE:

10        Q   Did you have anyone's help-- What was the lieutenant's

11   name?

12        A   Giles Walker.

13        Q   Did you have Lt. Walker's or anyone else's assistance

14   in drawing the water level contours between Santa Gertrudis

15   Creek and the Pauba Valley?

16        A   The water level contours, as drawn on the exhibit,

17   including the water level contours in Diamond Valley, are my

18   interpretation.

19        THE COURT:  Answer the question.  You did it yourself and

20   no one else drew the contours?

21        THE WITNESS:  I drew the contours on Exhibit 15 by myself.

22   BY MR. SACHSE:

23        Q   I think the first question I asked you-- repeating my-

24   self just to refresh my own recollection-- was that the calcula-

25   tion of storage capacity of any of your ground water storage

E1

Z54

1   areas involved a mathematical multiplication of the surface

2   area times the thickness times specific yield, and you agreed

3   that that was correct?

4       A   That is correct.

5       Q   Now, if you increase the areal extent, leave the other

6   two factors the same, obviously you increase the capacity, do

7   you not?

8       A   That is correct.

9       Q   In the case of Pauba Valley you are aware that older

10  water-yielding deposits extend to a depth of at least 2,147 feet,

11  are younot?

12      A   That is correct.

13      Q   If you used as your thickness of water zone the figure

14  500 feet, you would have then come up with 150,000 acre feet

15  storage, would you not?

16      A   If one is willing to project the estimated specific

17  yield of 11%-- now we are speaking of which valley?

18      Q   Pauba.

19      A   If one is willing to project the estimated specific

20  yield of 16% to a depth of 500 feet, and if one were willing to

21  do the mathematics, the answer would come out five times as

22  great.

23      Q   And similarly if any of these ground water storage

24  areas delineated by your own exhibit 17 you expanded the

25  surface area, left the depth and specific yield factors the same,

Kunkel   Cross

2840

El

Z55

1   you would also come up with a larger ground water capacity,

2   would you not?

3        A   That is correct.

4        Q   Now, there is an answer of yours in Volume 27 of the

5   transcript for October 3rd that I do not understand, and I

6   would like to have you clear it up for me, please.

7        I am reading, Mr. Veeder, from page 2577.

8        This question is dealing with your determination of the

9   boundaries of the water storage units on Exhibit 17.   I am

10   reading from line 8:

11        "They do not include all of the younger alluvial deposits

12   in Pauba Valley because the depth of water is sufficiently great

13   in the upper part of Pauba Valley that there is not an appre-

14   ciable thickness of saturated younger alluvial deposits."

15        Can you tell me what that means?

16        MR. VEEDER:   I would like to have the witness have the

17   transcript.

18        THE COURT:   Yes.

19        (Mr. Veeder hands document to the witness.)

20        THE WITNESS:   The extent of ground water storage unit 3,

21   shown on Exhibit 17, described on Exhibit 18, Pauba Valley,

22   says, "Area of saturated younger alluvium whose average thick-

23   ness is about 100 feet."   The depth from the water table of

24   1953 to the base of the younger alluvium is not everywhere 100

25   feet.   Some places it is shallower than 100 feet.   In other

E1

Z56

1   places it is greater than 100 feet.  If I remember correctly,

2   the record says that the maximum thickness of the younger

3   alluvium observed in Pauba Valley determined by logs in Pauba

4   Valley was 140 feet.  We are speaking of average value.  The

5   estimates-- storage capacity, specific yield, extents of areas--

6   are estimated on a conservative side.  Where I have had to

7   use a matter of judgment I have thrown my judgment on the side

8   of conservative, which would result in a low answer.

9        Q  I don't think I have made myself clear.  I am referring

10  particularly to the last part.

11       Could you show him the transcript?

12       MR. VEEDER:  He has it.

13  BY MR. SACHSE:

14       Q  To the very last part of your statement, starting with

15  the word "because" on line 9, "because the depth of water is

16  sufficiently great in the upper part of Pauba Valley that

17  there is not an appreciable thickness of saturated younger

18  alluvial deposits."

19       THE WITNESS:  Mr. Veeder, I have prepared a list of correc-

20  tions for the transcript which I have sent to you, and I believe

21  this is "depth to water."  I would have to check the notes.

22       MR. SACHSE:  All right.

23       THE COURT:  Instead of "depth of water"?

24       THE WITNESS:  Instead of "depth of water", it is "depth

25  to water."

E1

Z57

THE COURT:  Yes.  What you meant was that it was some distance to water and you were only measuring the saturated strata below where water commenced?

THE WITNESS:  That is correct.

MR. SACHSE:  You may resume your seat.

THE COURT:  We will take a short recess.

(Recess.)

Q    Mr. Kunkel, refer for a few minutes to the

matter of rising water.  As I recall your testimony, you

stated that, disregarding the influence of faults --

THE COURT:  Of what?

MR. SACHSE:  Faults.

Q    -- the phenomenon of rising water occurred when

the ground surface contour and the ground water contour

were intersected, simply stated?

A    May I refer to the record?

Q    I can't give you the exact citation, but if you

don't feel that that is an honest summation, please dis-

agree with me.  It was my impression.

A    The statement would have to be in context.  I

remember the area of testimony.  If I remember correctly,

I was at the blackboard discussing --

Q    You drew us a diagram.

A    -- discussing a generalized diagram.

Q    I will go on, then, to a specific transcript

record.  Mr. Veeder, I am referring to 2572, testimony of

October 3, Page 2572, the last line, and continuing on the

next page.

Your testimony, Mr. Kunkel:

"THE WITNESS:  A well drilled upstream from the

springs in Coahuila Valley would tap the water-bearing

deposits of the Coahuila Valley.  They are the same

1    deposits that are feeding the spring flow in Coahuila

2    Valley. If a sufficient number of wells were drilled, the

3    deposits would be de-watered, the water would be withdrawn

4    from the porous spaces in the sands and gravel and other

5    permeable mixtures of clay, sand and gravel in the area of

6    alluvial plain.    The water level would be lowered,

7    could be lowered, would be lowered to a depth sufficient to

8    intersept the spring flow; and the flow of the springs

9    would cease."

10         Do you recall in general that testimony?

11    A    Yes, I recall the testimony.

12    Q    Now, that indicates, does it not, that there is

13   some limited area, at least limited area, of ground water

14   storage upstream from points of rising water?

15    A    That is correct.

16    Q    And you have indicated on Exhibit 15 a great many

17   points of water, I believe, with a red dot; is that correct?

18    A    That is correct.

19    Q    And I don't want to consider for the moment, Mr.

20   Kunkel, any of them that are influenced by faults. You

21   understand? I want to confine myself to the ones where

22   there is no faulting effect. So correct me, please, if I

23   point one that has a fault involved.

24         Now, the Coahuila Valley rising water, is it

25   influenced by a fault?

1    A    To the best of my observation, the faulting has

2 not caused or has no affect on the rising water.

3    Q   How about Oak Grove Valley?

4    A    It is also true in Oak Grove Valley.

5    Q   How about the rising water immediately at the

6 lower end of Diamond Valley?

7    A    That is correct.

8    Q   How about the rising water in the middle of Wilson

9 Valley?

10    A    No fault relationship, that is, that forces the

11 faults to the surface.  I am not saying that there are not

12 faults in the area.  There are many faults on the map that

13 have not been mapped.  The faults that have had bearing on

14 the occurrence and movement of ground water have been mapped.

15    Q   Do you feel that the rising water that is indicated

16 is running into the side of Vail Dam is influenced by a

17 fault?

18    MR. STAHLMAN:  Keep your voice up, Mr. Sachse, I can't

19 hear.

20    Q  BY MR. SACHSE:  I asked if the rising water that is

21 indicated as running into Vail Dam -- is that influenced by

22 faulting?

23    A    I have inferred a fault along the east side of the

24 basement complex down gradient from the spring to which you

25 have just been pointing, which is the spring about one and

1     a half miles south of Vail Dam. The spring in that

2     particular area, while it is nearer to the fault, is not

3     caused by the fault; it is caused by the basement complex.

4          Q    What I want to do now, then, is to eliminate any

5     of those that you feel are caused by a fault.

6               How about the rising water in the center of the

7     Pauba Valley? Is that influenced by faulting or caused by

8     faulting?

9          MR. VEEDER: It is a kind of a stipulated judgment.

10         THE WITNESS: It is not caused by faulting.

11         Q  BY MR. SACHSE: Now, you referred to a particular

12    point of rising water which you indicated on the U. S. G. S.

13    quad for this area and which had moved downstream some

14    distance. That is the one I just referred to in Pauba

15    Valley, is it not?

16         A    That is the one.

17         Q    And you stated, I believe, also, that you had

18    rechecked its location recently?

19         A    Monday.

20         Q    And that it had not moved since last November; it

21    was about the same place?

22         A    About the same place.

23         Q    Now, have you checked any of these other points

24    of rising water since November of 1957?

25         THE COURT: 1957?

1        MR. SACHSE:  Yes, your Honor.

2        Q     Was it not your original testimony that all of

3   these were located during the period October-December, 1957?

4        A     That is correct.

5        Q     Have you checked any of the others since that time?

6        A     Yes, I have checked virtually all of the points of

7   rising water shown on that map since the period indicated

8   on Exhibit 15?

9        Q     Since the original location on 15 you have checked

10  them all?

11       A     That is correct.

12       Q     And have you found any marked change in the

13  location of rising water for any of them since that time?

14       A     I did not record the positions of rising water

15  with the same degree of exactitude that I located them

16  during the period of October through December, 1957.  How-

17  ever, revisiting the areas has indicated to me that there

18  has been only very minor changes in position of the points

19  indicated, if there have been any changes whatsoever.

20       Q     Then, Mr. Kunkel, would that not indicate that as

21  of today, at least, the phenomenon which you describe in

22  the testimony you gave October 3rd, and which I just read

23  to you, has not yet occurred in those areas?

24             And I will reread the testimony to make sure you

25  understand.

MR. STAHLMAN:  I am lost.

Q  BY MR. SACHSE:  You stated that "a well drilled upstream from the streams in Coahuila Valley would tap the water-bearing deposits of Coahuila Valley.  If a sufficient number of wells were drilled, the deposits would be de-watered and ultimately the flow of the springs would cease."

Now, that phenomenon has not yet occurred in the Coahuila Valley, has it?

A   No, it has not occurred in Coahuila Valley.

Q   So you conclude from that that the number of wells presently operating in Coahuila Valley are not affecting the ground water flow?

MR. VEEDER:  I object to that, because you must define, delineate the areas in Coahuila Valley.  Now, if you are speaking of this area that --

MR. SACHSE:  I am speaking of the ground water in Coahuila Valley.

Q   Have the wells in Coahuila Valley as of today influenced the ground water flow, Mr. Kunkel?

A   If water has been pumped out of Coahuila Valley, it has influenced the flow of the springs.

Q   A moment ago you told me there had been no material change in any of these points of rising water. "Material" was your word.  So then, would you agree that the pumping in Coahuila Valley has had no material affect on

2849

Kunkel - Cross

1    the points of rising water in Coahuila Valley?

2         A    For the period October-December, 1957 through --

3         Q    The present time?

4         A    -- October, 1958, the pumping in Coahuila Valley

5    has not caused --

6         Q    Any material affect?

7         A    That is not what I am saying.  Has not caused an

8    appreciable change.

9         THE COURT:  Change, all right.

10            Listen, you have got a gap in your logic there.

11            In other words, the witness has testified that

12   generally wells would affect the flow.  And, as I understand

13   his testimony, sufficient wells would probably dry it all

14   up.  Now, the mere fact that there is water still rising

15   in those springs doesn't mean that if wells weren't pumping

16   there would be a lot more water rising in those springs.

17        MR. SACHSE:  You are anticipating my next question,

18   your Honor.

19        Q    Did you make any water measurements in 1957 of the

20   flow from any of these points of rising water?

21        A    I observed --    Did I make --

22        Q    Any measurements of the flow from any of these

23   points of rising water in the fall of 1957?

24        A    Yes, I did.

25        Q    Which ones, or all of them?  Which ones?

1    MR. VEEDER:  Which ones, or all of them?

2    THE WITNESS:  Did you ask two questions or one question?

3    Q   BY MR. SACHSE:  Which one did you measure the flow of?

4    A    (Pointing.)  The flow that I measured specifically,

5    it is in the southwest quarter of Section 29, 8 South, 1

6    East, at which point there is a 24-inch -- at which point

7    there is a weir.  I would have to check my notes to be

8    certain whether it is a 24-inch or a 30-inch weir.

9    Q    Is that one of the points indicated in the Aguanga

10   Valley?

11   A    It is below one of the points indicated in the

12   Aguanga Valley.  It is above Radec Valley.

13   Q    Did you make any other actual measurements last

14   fall, for example, in Coahuila?

15   A    I am trying to ask for information.  I don't know

16   what procedure, to frame my question, your Honor.

17   Q    Let me withdraw it.

18   A    Would your Honor advise me.

19   Q    Let me withdraw it.  You showed us a slide, I

20   think, of a dam with water flowing over it, which, as I

21   recall, was somewhere up on Coahuila Creek.  Do you remember

22   the location?

23   A    I investigated the flow in most of these -- at most

24   of these points -- let's not say "most"; in a large part of

25   these.

F-2

1    Q    Did you break down your notes as to your estimates?

2    A    I have written down my estimates.

3    Q    Are they available?

4    A    They are available in my notes.

5    Q    Here?

6    A    Not in the courtroom.

7    Q    Did you estimate the flow at the same points on

8    your most recent visit to these points of rising water?

9    A    I did not.

10    Q    So you are not able to tell us whether the flow

11    is greater or less than it was in the fall of last year?

12    A    I do not know if the flow is greater or less.

13    Q    So then, you don't know whether the pumping that

14    has taken place above any of the points of rising water --

15    let's start with Coahuila Valley -- has affected the flow,

16    do you?

17    A    I am bothered by a problem in semantics, Mr. Sachse.

18    What does "know" mean to you?  So we may be --

19    Q    With certainty.  Do you know with certainty that

20    the pumping in Coahuila Valley has in any way reduced the

21    flow at the points of rising water at the lower end of the

22    valley?

23    MR. VEEDER:  Are you limiting your question to Coahuila

24    Valley?

25    MR. SACHSE:  Coahuila Valley.

1     MR. VEEDER:  And to Coahuila Creek?

2     MR. SACHSE:  To the points of rising water at the lower

3 end of Coahuila Valley or Coahuila Creek.

4     MR. VEEDER:  And it is limited to that confined area

5 with "Coahuila Valley" written on it, is that right?

6     MR. SACHSE:  That is correct.  That is correct, Mr.

7 Veeder.  I will ask him another one in a minute.

8     Q    But this is Coahuila Valley.

9     A    I am still bothered by semantics.  In my opinion,

10 pumping has affected the flow of Coahuila Valley.

11     Q    Do you mind answering me now if you know with

12 certainty?

13     A    Until we can arrive at a common definition of

14 "know" -- we will have to have an interchange of definition,

15 I cannot answer that question.

16     Q    You have no measurements, however, to support your

17 opinion?

18     A    I have no measurements to support my opinion.

19     Q    You can sit down if you want to.

20     Now, would your answer be the same -- you have

21 your little overlay here.  Then we will know where we are.

22     THE COURT:  Do you have an opinion as to whether or not

23 the pumping has influenced the flow?

24     THE WITNESS:  I have a definite opinion.

25     Q  BY MR. SACHSE:  Would your answer be the same as to

1  the point of rising water indicated in Section 35, Township

2  7 South, Range 1 East?

3    A    No, it would not.

4    Q    What is the difference?

5    A    The diversion at that point and the hydrologic

6  conditions up-gradient from the point of rising water

7  indicated in the northwest quarter, Section 35, Township 7

8  South, 1 East, that there are enough differences that my

9  conclusions are not necessarily the same.

10    Q    What are your conclusions?  That is what I want to

11  know.  What is your conclusion as to this last mentioned

12  point of rising water?

13    A    The last mentioned point of rising water, in my

14  opinion, represents close or approximate native conditions

15  except for the minor effect that the works of man would

16  have at that point.

17    Q    Well, can you tell me whether you would state that,

18  in your opinion, pumping up water contour from this last

19  mentioned point of rising water has or has not affected its

20  flow between the fall of 1957 and your last view?

21

22

23

24

25

Kunkel - Cross

2854

G1

Z58

1    A    I would be willing to state in that area that pumping

2  up--

3       Q    Upsteam.

4       A    Wait a minute now.  Are we talking about upsteam, the

5  area indicated as a small alluvial patch, or are we talking

6  about upstream all the way up to the headwaters?

7       Q    I am talking about the immediate alluvial basin up-

8  stream.

9       A    You are talking about the immediate alluvial basin up-

10  stream?  The alluvial basin that is indicated to be less than

11  half a mile in length on Exhibit 15-- it is in Section 35--

12  pumping in that small basin has not had an appreciable effect

13  on the spring flow at that point.

14       Q    Mr. Kunkel, I want to direct your attention to the two

15  points of rising water that appear to be almost on the boundaries

16  between Sections 23 and 26, Township 7 South, Range 2 East.  Do

17  you see the two to which I refer?

18       A    I see the two to which you refer.

19       Q    Now, in your opinion, has pumping upstream from those

20  points of rising water reduced the flow since Fall of 1957?

21       A    In that particular area, it is my opinion that the

22  flow has not been appreciably reduced.

23       THE COURT:  Point that out.  Where is it on the map?

24       MR. SACHSE:  It is the two--

25       Do you want to point them out?

G1

Z59

THE WITNESS:  The South Half of Section 23, Township 7 South, Range 2 East.

THE COURT:  All right.

BY MR. SACHSE:

Q  There is another point of rising water immediately below those two in Section 26.  The same question:  What is your opinion as to that one?

A  In my opinion, the point of rising water in the North-west Quarter of Section 26 may have been affected by pumping in Terwilliger Valley.  I do not have sufficient information at the moment to make the statement with certainty.

Q  And you have no measurements of flow at that point to help you draw a conclusion?

A  I have no comparative measurements.

Q  Moving down to the point of rising water shown in the center of Oak Grove Valley, can you answer the same question as to that point of rising water?

A  Yes, sir.  In Oak Grove Valley the point of rising water indicated, in my opinion, has been affected by pumping in both Oak Grove and Dodge Valleys.

Q  You have no measurements of any kind by which you can give us an estimate of the degree of that effect?

A  I have no measurements to state with certainty what the degree of effect has been.

Q  Isn't it a fact, Mr. Kunkel, that in order to obtain the

G1

Z60

1  most efficient use of any watershed all basins should be

2  pumped to some extent?

3       MR. VEEDER:  Your Honor, I object to that as being beyond

4  the scope of the Direct Examination.

5       THE COURT:  Sustained.

6  BY MR. SACHSE:

7       Q  Mr. Kunkel, you testified earlier today that you had

8  not made any safe yield studies in this area, is that correct?

9       A  That is correct.

10      Q  Can you define a safe yield study for us?

11      MR. VEEDER:  Again I object to that as being beyond the

12  scope.

13      MR. SACHSE:  Pardon me.  Let me make it clear, Mr. Veeder.

14  Say at the end of a ground water basin.

15      THE COURT:  Sustained.  He hasn't testified about safe

16  yields.

17  BY MR. SACHSE:

18      Q  In earlier questioning before the recess by me, you

19  answered a question by stating that the Department of Water

20  Resources had not supplied you with any well logs for

21  Terwilliger Valley, to the best of your recollection.

22      A  To the best of my recollection, that is correct.

23      Q  What about water level data as distinct from well logs

24  in Terwilliger Valley?  Did you obtain such information from

25  the Department of Water Resources?

Kunkel   Cross

G1

Z61

2857

1      A   I have obtained no data concerning Terwilliger Valley

2  on which I have based any of my testimony.   I have examined no

3  data.

4      Q   You have examined none?

5      A   I have examined  no data on which I have drawn--  Pardon

6  me.

7      THE COURT:   No data from the state Department, you mean?

8      THE WITNESS:   I have examined data in the files of the

9  State Department of Water Resources for Terwilliger Valley, yes.

10 BY MR. SACHSE:

11     Q   You have, then?

12     A   I have examined data.

13     THE COURT:   I think your question related to water level

14 records, didn't it?

15     MR. SACHSE:   Water level records, yes.

16     THE COURT:   Have you examined that type of data?   Is that

17 what you are saying when you say that you  examined data?

18     THE WITNESS:   Yes.

19 BY MR. SACHSE:

20     Q   Are you familiar with Appendix G to Fallbrook's AA,

21 Bulletin 57?  It is found in Volume II, at pages G37 through

22 G41.  I will let you refresh your recollection(handing document

23 to the witness).

24     A   I am acquainted with the reference.

25     Q   That is a tabulation, is it not, Mr. Kunkel, of well

G1

Z62

1  logs, owners, depths to water surface in the well, and pumping

2  facilities, if any?

3       A  To the best of my knowledge, that is correct.

4       Q  Did you have that material available to you at the time

5  you prepared Exhibit 15?

6       MR. VEEDER:  I object.  The question is completely

7  irrelevant and immaterial.

8       THE COURT:  Overruled.

9       MR. VEEDER:  It is entirely possible that he had it avail-

10  able to him, your Honor.

11       MR. SACHSE:  That is all I want to know.

12       MR. VEEDER:  It is a published document.

13       THE WITNESS:  Available data was available to any citizen

14  of California.  It was available to me.

15  BY MR. SACHSE:

16       Q  It was in the files of the U. S. Geological Survey at

17  that time?

18       A  The State, as a matter of course, sends the Geological

19  Survey copies of all-- the Department of Water Resources sends

20  us copies of their publications, yes.

21       Q  Are you aware that the immediate reference I have given

22  you lists depths to ground water for 75 wells in that area?

23       A  I am.

24       Q  But you did not feel that that constitutes sufficient

25  data on which to base an estimate of the thickness of the water

G1

Z63

1 zone on November, 1953?

2 MR. VEEDER: Your Honor, I renew my objection. I see no

3 relevancy whatever to this cross-examination. He has an exhibit

4 here. What difference does it make? What has it got to do with

5 the issues?

6 THE COURT: Overruled.

7 THE WITNESS: Unless I had supporting well log data or

8 sufficient interviews with well owners in the area to satisfy

9 my own mind that the water levels--

10 THE COURT: Water levels wouldn't tell you the thickness

11 of the saturated alluvium, would it?

12 THE WITNESS: No, sir, they wouldn't.

13 THE COURT: Isn't that all you need to say?

14 THE WITNESS: That is correct.

15 MR. VEEDER: May I inquire, what is the response? I would

16 like to know myself now. It has nothing to do with thickness

17 of water-bearing strata; isn't that right?

18 MR. SACHSE: Are you testifying, or is the witness?

19 MR. VEEDER: I fell off the sled back there when you were

20 mixing--

21 THE COURT: I said to the witness, the answer is that level

22 of water in wells doesn't tell you the thickness of saturated

23 material; isn't that your answer? And he said, "Yes."

24 BY MR. SACHSE:

25 Q Now, do you feel that water level data on 75 wells in

G1

Z64

1 that area is not sufficient to enable you to draw water level

2 contours for the area?

3      A   In that particular area I do not believe the-- correct

4 water level contours could be drawn on any number of wells

5 that a person chooses to draw them on.  In my opinion, 75

6 would be sufficient.

7      THE COURT:  The answer is that they could be drawn?

8      THE WITNESS:  They could be drawn.

9 BY MR. SACHSE:

10     Q  You actually did draw water level contours for other

11 areas on a lesser number of water level readings, did you not?

12     MR. VEEDER:  I object to the question as being repetitious,

13 your Honor.

14     THE COURT:  Sustained.

15 BY MR. SACHSE:

16     Q  In response to my earlier question about well logs in

17 the Terwilliger Valley, did I understand you to state that you

18 were advised by the Department of Water Resources that there

19 were no such logs available?

20     A  I checked their files on at least two occasions, possibly

21 a third-- I do not recall the exact number of times I visited

22 the offices of the Department of Water Resources and went to

23 their original files.  I made specific efforts to request that

24 I be supplied with all the well logs, and I was assured by

25 Robert Thomas, who was in charge of the Geology Section at that

G1

Z65

1 time, who is still in charge, that all logs had been made

2 available to me.  If there are other logs, I would have no way

3 of knowing.

4   Q Now, in your testimony yesterday, Mr. Kunkel--

5   I am referring, Mr. Veeder, to page 2734, line 18-- I

6 had better back up to line 11.

7   "BY MR. MOSKOVITZ:

8    "Q  Did you testify that the material which would

9 lie under such a well northwest of the Santa Gertrudis Creek

10 would be in hydraulic continuity with the material in Pauba

11 Valley?

12    "A  According to the contours as shown, the area

13 is in hydraulic continuity.

14    "Q  Your line of contours that you have drawn on

15 Exhibit 15?

16    "A  The contours are conclusive evidence."

17  Do you recall that testimony?

18  A  That is correct.

19  Q  You still so maintain that the contours are conclusive

20 evidence?

21  MR. STAHLMAN:  He hasn't run out of water, but I think he

22 is running out of soap.

23  THE WITNESS:  The contours as drawn indicate hydraulic

24 continuity.

25

G1

Z66

1  BY MR. SACHSE:

2      Q   I will refer you now to your testimony, in the same

3  volume at page 2740 at line 17 and those following, where you

4  are explaining the meaning of "inferred contour."

5      A   That is correct.

6      Q   "A   I have read the legend 'Water level contour 1953

7  where inferred.  Number shows altitude and ground water surface.

8  Arrow shows direction of ground water movement.'  I have indi-

9  cated in a large part of the area underlain by older continental

10  deposits that the water level contours are inferred.  By "in-

11  ferred" I wish to imply that there is not the degree of control

12  that there is in the areas where the contours are solid."

13      Now on the next page:

14      "Q   What do you mean by 'degree of control'?

15      "A   The number and positions of wells for which there

16  are water level measurements on which the water level contour

17  is based."

18      MR. VEEDER:  I represent the taxpayers, your Honor, and

19  it seems to me that it is a little stupid to be reading and

20  reading and rereading and rereading previous testimony.  If

21  counsel can't frame questions properly, he should let somebody

22  else do it.

23      MR. STAHLMAN:  I think, your Honor, that we are piling up

24  record on record.  If this same procedure goes throughout the

25  trial, it is going to make a lot of difference in dollars and

Z67

1 cents.  It's good for the reporter.

2     MR. VEEDER:  I'm for the reporter.

3     MR. STAHLMAN:  I object to this as having been asked and

4 answered.  It is not proper cross-examination to reread the

5 transcript of a matter that is already in evidence.

6     THE COURT:  That is generally correct.

7     Can't you ask the question without re-reading the record?

8     MR. SACHSE:  I want to be sure-- I have such difficulty

9 getting this witness to know exactly what I am referring to--

10 I want to be certain that he knows the language, and I will then

11 ask the question.  The witness himself has on several occasions

12 said "Will you refer to the record?"

13     THE COURT:  Where you have a large extract, if you have

14 to, show him the transcript and the page and line, for the

15 record, and let him read it.

16     MR. SACHSE:  That is good.  I have read everything I want

17 to read to him, however.

18     THE COURT:  What is the question?

19 BY MR. SACHSE:

20     Q  My question, Mr. Kunkel, is this:  You feel that an

21 inferred water level contour can be conclusive evidence; is that

22 correct?

23     MF. VEEDER:  That is what he said.

24     MR. SACHSE:  Do you mind letting the witness answer, Mr.

25 Veeder?

G1

Z68

1          THE COURT:  He just answered that already.  The objection

2   is sustained.  I will treat Mr. Veeder's remarks as an objection.

3   He just answered that a minute ago.  You asked him the same

4   question.

5          MR. SACHSE:  I don't believe, with apology to your Honor,

6   that he answered the question I have just posed.

7          THE COURT:  He said that the contours were conclusive

8   evidence.

9          MR. SACHSE:  I am asking the witness if he feels that an

10   inferred contour can be "conclusive evidence."

11          THE COURT:  I will set aside my ruling.

12          Answer the question.

13          THE WITNESS:  The original question, as I understand it,

14   was, the water level contour shows a phenomenon to exist.

15   Assuming the water level contour to be correct, the evidence is

16   conclusive with regard to the direction of ground water move-

17   ment.  With regard to an inferred contour, the contours shown

18   as inferred or as I have indicated, it indicates less control.

19          MR. VEEDER:  Your Honor, we are arguing about terms.

20          MR. SACHSE:  May the witness finish his answer?

21          MR. VEEDER:  I have a right to interpose another objection.

22   The witness said that, in his opinion, it was conclusive

23   evidence.  If counsel doesn't like it, he can rebut it in any

24   way he chooses.  But I submit, your Honor, that he is cross-

25   examining on cross-examination, and this is the first time in

G1

Z69

1 my life I have ever heard of such a thing.

2      THE COURT:  The objection is overruled.

3      When you said that water contours are conclusive evidence,

4 did you include within that statement inferred contour lines?

5      THE WITNESS:  Assuming the contours to be correct.

6      THE COURT:  I know, but that is what we are trying to find

7 out:  Are the contour lines correct?  Certainly if the contour

8 lines are correct, I can understand that you would then say that

9 they are conclusive evidence.  But where your contour lines

10 are inferred, then I take it that is your best judgment?

11      THE WITNESS:  Then it is my best  judgment.  That is true.

12 BY MR. SACHSE:

13      Q  I have just a few questions, Mr. Kunkel, on ground

14 water found within different types of material, as indicated on

15 15.

16      I realize that by superimposing 17 on 15 you show a large

17 area of older alluvium which you have testified you feel is in

18 hydraulic continuity with the Santa Margarita system-- a large

19 area of older continental deposits.

20      A  That is correct.

21      Q There are also some areas of older continental deposits,

22 as I read 17, which is uncolored that, however, are not, in

23 your opinion, in hydraulic continuity with the stream; is that

24 correct?

25      A  No, that is not correct.

G1

Z70

1    Q   I want to get this straight, then.  In other words, the

2  delineation of a water storage unit, as you have indicated it

3  on 17, does not necessarily mean that the water is outside of

4  its boundary or in contact with the stream or not in contact?

5       MR. VEEDER:  If he can answer that, he is a good man.

6       MR. SACHSE:  Let me withdraw it.  I will rephrase it.

7    Q   Does the water storage unit boundary have any direct

8  relation to what waters are or are not in contact with the

9  stream?

10      A   It has a relation, yes.

11      Q   But it does not conclusively draw a line between those

12  that are and those that are not?

13      A   No, it does not.

14      Q   So if you were asked to express an opinion as to the

15  waters of the upper Santa Margarita River watershed that are

16  and that are not in contact with the stream, which of these

17  exhibits would you choose to indicate it on-- which would be

18  the best?

19      MR. VEEDER:  I think he is asking the witness to under-

20  take your Honor's responsibility.

21      THE COURT:  This is one of those questions where an expert

22  probably would be entitled to answer the ultimate question that

23  the Court has to decide.

24      MR. VEEDER:  I would just as soon have him decide it, your

25  Honor.  He is on our club.

G1

Z71

THE COURT:  Overruled.

BY MR. SACHSE:

1. Q   First, which of the exhibits is the best to show us your opinion on?

   A   Exhibit 15, to start with.

   Q   And can you delineate on 15 those portions of older continental deposits which you feel are not in hydraulic continuity with the stream?

   A   I would like a little further information.

   MR. VEEDER:  Mr. Sachse can give it to you.

   THE WITNESS:  Has the Court made any type of ruling as to a definition of what is in hydraulic continuity and what is not in hydraulic continuity?

   MR. SACHSE:  Better ask the Judge.

   MR. VEEDER:  That is what I meant when I objected, your Honor.

   THE COURT:  What do you mean when you say what is in hydraulic continuity?  What do you mean by it?

   THE WITNESS:  I don't mean to quibble.  But a drop of water that would fall at the top of the watershed could seep underground through a crack and fracture which was saturated and it would--

   THE COURT:  If the crack extended far enough?

   THE WITNESS:  If there were a sufficient number of cracks and fractures intersecting, it would be possible for that drop of water to follow ground water-wise to the --

G1

Z72

1    THE COURT: Come out at the ocean or the Santa Margarita

2    River?

3    THE WITNESS: That is correct.

4  BY MR. SACHSE:

5    Q  So then is it your opinion, Mr. Kunkel, that in order

6  to determine the draft and the burden upon the Santa Margarita

7  River and its tributaries, we must include every foot of area

8  within this boundary?

9    MR. STAHLMAN: I didn't hear the question.

10   MR. SACHSE: Let the question be read.

11   THE WITNESS: I drew no conclusion in the statement.

12   (The reporter read the last question as follows: "Q So

13  then is it your opinion, Mr. Kunkel, that in order to determine

14  the draft and the burden upon the Santa Margarita River and its

15  tributaries, we must include every foot of area within this

16  boundary?")

17   MR. VEEDER: Your Honor, I renew the objection again. He

18  has asked the witness to decide an important part of the case,

19  and that is your Honor's function.

20   MR. SACHSE: I am asking the witness what he thinks.

21   MR. VEEDER: That is what I object to.

22   THE COURT: I will sustain the objection. That is not

23  getting us anywhere. That is not the witness's position. But

24  you may pursue the inquiry to find what more than the drop

25  constitutes hydraulic contact.

G1

Z72

1      What do you mean when you use the term "hydraulic contact"?

2      THE WITNESS:  Hydraulic continuity?  I have used it in the

3  sense to indicate the path that a drop of water could follow

4  from a point beneath the water table without ever -- ground

5  water-- I don't believe there is a definition.

6      MR. VEEDER:  Mr. Swing used to point this way to the snow-

7  flake on Palomar.  Isn't that the question?

8      THE WITNESS:  Ground water by definition is ground water

9  that occurs beneath the water table.

10      MR. SACHSE:  Say that again?  I didn't get it.  Beneath

11  what?

12      THE WITNESS:  Beneath the water table.

13      THE COURT:  Well, let's save some time.

14      Your exhibit at the bottom of the board is what-- the

15  storage units?

16      THE WITNESS:  17 are the storage units.

17      THE COURT:  Regardless of the fact that a drop of water

18  might be in continuity with water of the river through cracks

19  and fractures, et cetera, does 17 represent your best judgment

20  as to the storage units in the upper part of the Santa Margarita

21  Basin?

22      A  No, sir.  Exhibit 15 would-- Let me have the question

23  again, please.

24      (The reporter read the pending question as follows:

25  "Q  Regardless of the fact that a drop of water might be in

G1

Z73

1   continuity with water of the river through cracks and

2   fractures, et cetera, does 17 represent your best judgment

3   as to the storage units in the upper part of the Santa

4   Margarita Basin?")

5       THE WITNESS:  They represent the areas for which I have

6   calculated ground water storage capacity.  There are areas

7   between the rocks of the basement complex and the areas of

8   ground water storage that could have sufficient water withdrawn

9   from them locally to have an appreciable effect on water in

10  ground water storage units.  The areas are small, but they do

11  exist.  That is the reason I have hesitated in my answer.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    You said that 17 represented the storage units

2    that you computed acre feet for.  Actually, you didn't

3    compute as to all of the area shown on Exhibit 17, did you?

4        THE WITNESS:  That is correct.

5        THE COURT:  Then, is this true, that Exhibit 17 shows

6    the largest of the ground water storage units in the upper

7    basin of the Santa Margarita and that you have omitted

8    from it various smaller ground water basins and units?

9        THE WITNESS:  That is correct.  It shows the principal

10   area.

11       THE COURT:  All right.  Then, there are, in your opinion,

12   other areas where there are storage units for ground water

13   but they are smaller in extent?

14       THE WITNESS:  That is right.  And they, in general, are

15   contiguous to the presently defined units or, in general,

16   most of them are contiguous to the presently defined units.

17       MR. SACHSE:  Are you through now?  Were you through

18   questioning?

19       THE COURT:  Yes.

20       Q  BY MR. SACHSE:  You still haven't defined hydrolic

21   continuity, Mr. Kunkel?

22       A    The way I have been using the term, I define

23   hydrolic continuity to mean water that could enter the

24   ground water body, go beneath the ground to the water table

25   and continue as sub-surface ground water movement without

1     actually rising to the surface of the ground as surface

2     flow.  I have been speaking in terms of one drop of water;

3     I have not been speaking in terms of large quantities of

4     underflow.

5         Q    Then, you mean that the hydrolic continuity

6     between your area 4 to the north and 3 in the center and

7     4 to the south may, in fact, be limited to a single drop of

8     water trickling underneath the rock?

9         A    No, it was an answer to your direct question

10     pertaining to the immediate testimony preceding it.  I had

11     described hydrolic continuity in relation to a drop of

12     water.  It can be more than that.  It can be areas of

13     large ground, large areas of ground water contained in a

14     basin, and that area is also in hydrolic continuity.

15         Q    Which one do you mean in the area four three?

16         A    That is an area of, large area of permeable

17     alluvial deposits that contain an appreciable quantity of

18     ground water beneath the -- I should say -- I should not use

19     the word "appreciable"; I should say contain a large

20     quantity of ground water beneath the water table.

21         Q    Would you please define for me "large" and "appre-

22     ciable" as you used them in your last answer?

23         MR. VEEDER:  You withdrew the word "appreciable" and

24     said "large."

25         MR. SACHSE:  He withdrew the word "appreciable."

Q     Define "large" as you used it in your last answer.

A     "Large," I am talking in terms of --   May I see Exhibit 18, please?  I am talking in terms of 7000-acre feet or more.

Q     Do you mind telling me where you found that on 18?

A     There is at Oak Grove Valley 7,500.  I am speaking of values in that quantity.

Q     And what area is Oak Grove Valley in hydrolic continuity with?

A     The entire area of Oak Grove Valley is in hydrolic continuity, all the water beneath the water table is in hydrolic continuity with itself.  There is also hydrolic continuity of the water table up-gradient into Dodge Valley and down-gradient into Dameron Valley.  There is a thickness of alluvial fill there beneath which there is, within which there is an actual movement of ground water that would affect the flow of the Temecula River system if it were pumped.

Q     Now, then, I conclude from what you are saying that 7500 is what you mean by "large"; that if in any area, ground water area, that you can locate anywhere on this map there exists less than 7500 acre feet of storage, it is not in hydrolic continuity?

A     No; that is not a warranted conclusion.

Q     Then, where did you draw the line between this

Kunkel - Cross

1   hypothetical drop of water that his Honor asked you about

2   and this large amount that you say is the dividing point?

3       A    It is the difference between the blue and the

4   orange.   The difference between the blue and the yellow.

5       Q    What do you mean by the difference between them?

6       A    Water in the wells drilled in the area indicated

7   as blue, in my opinion, will yield water, but the quantities

8   will not be sufficiently great that the yields will be

9   sufficient for more than domestic or minor irrigation uses.

10  Locally it might be possible, and locally it would be

11  possible, to drill a well if the person were particularly

12  fortunately in intercepting a sufficient number of the

13  cracks and fractures to which I have indicated.   And if he

14  drilled a very extensive and efficient type of well, he

15  might get as much as several hundred gallons a minute out

16  of the area indicated as blue.   But in general the area of

17  blue would not yield water in excess of quantities for

18  domestic and very minor irrigation uses.

19      Q    So, according to your definition, all the area in

20  blue would have ground waters in such small quantities

21  that they should not be considered as being in hydrolic

22  continuity with the stream system; isn't that right?

23      MR. VEEDER:   That is not what he said.

24      MR. SACHSE:   That is what I am asking him.   What is his

25  boundary line?

2875

1    THE COURT:  Mr. Sachse, I think that you maybe mis-

2  understand the purpose for which this witness was put on.

3  I don't think this witness was put on to tell you whether

4  the ground in Section 11, 8 South, 2 East -- taking a spot

5  right out of the middle of the blue -- had any water in it

6  that was in continuity with the river stream.  I think

7  there are going to be other witnesses which probably will

8  produce that testimony.  Now, this witness has been called

9  to describe generally the hydrology of this district, the

10  general type of soils and the alluvial deposits, and some

11  general information of the nature of the water system.  But

12  from the answers that he gave you it is apparent to me that

13  if you hit a well out in the middle of the blue that ran

14  across from cracks and faults and produced a good bit of

15  water, there is a strong possibility that that well might

16  be part, might or might not be part of the water system of

17  the Santa Margarita, depending on how the cracks and faults

18  ran.  But I don't think it is the Government's intention,

19  when they get through putting on their proof, to contend

20  that water found in the basement complex area is part of the

21  stream.  And I don't think this is the witness to do your

22  pinning down on.  And from his last answer I don't know how

23  you could pin him down.  He doesn't purport to tell us where

24  there might be cracks and fractures in that blue area on 15,

25  and if there were cracks and fractures, and if they were in

1   contact with some storage unit or some part of the stream

2   you could argue academically the water was part of the Santa

3   Margarita water system.  Am I generally stating the

4   Government's position correctly?

5       MR. VEEDER:  Generally, yes, your Honor.

6       THE COURT:  Do you have another witness who will tell

7   us whether, in his opinion, water in a certain section is

8   in continuity with the water system of the Santa Margarita

9   River?

10      MR. VEEDER:  To some extent, yes, your Honor.  In

11  regard to this basement complex, it is extremely difficult

12  and it is going -- whether or not the water is claimed to

13  be in hydrolic continuity with the balance of the stream

14  will depend in some degree upon the defendants' witnesses

15  and upon the claims that the defendants themselves are

16  making.  It is beyond me why poor Mr. Kunkel is being ridden

17  so hard and as to facts that he didn't testify about.

18      MR. SACHSE:  I will do it very quickly in reverse

19  English.

20      Q   Mr. Kunkel, I presume --

21      THE COURT:  Mr. Krieger, did you want to go?

22      MR. KRIEGER:  I would like to.  I have a meeting, and

23  I have an airplane at the Municipal Airport at 5:00 o'clock.

24      THE COURT:  Do you want to adjourn now or are you content

25  that we go on for a few minutes?

MR. KRIEGER:  I would appreciate leaving now and maybe be here at 9:30 Friday morning, if that would help in any way.

THE COURT:  All right.  Let's adjourn for the night and let's come in at 9:30 Friday.

(Whereupon an adjournment was had at 4:35 o'clock p.m., until 9:30 o'clock a.m., Friday, October 10, 1958.)