# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT, et al,

Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Friday, October 10, 1958

Pages: 2878 to 3033

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

MALCOLM LOVE
and
JOHN SWADER
Official Reporter
United States District Court
325 West "F" Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

---o---

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---o---

UNITED STATES OF AMERICA,       )
                                )
                 Plaintiff,     )
                                )
        -vs-                    )        No. 1247-SD-C
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                 Defendants.    )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Friday, October 10, 1958

APPEARANCES:

        For the Plaintiff:          WILLIAM H. VEEDER, ESQ.,
                                    Special Assistant to the
                                    Attorney-General,
                                    Department of Justice,
                                    Washington, D. C., and
                                    WILLIAM E. BURBY, ESQ.

| | |
|---|---|
| For U. S. Marine Corps: | COL. ELLIOT ROBERTSON. |
| For Defendant Vail Company: | GEORGE E. STAHLMAN, Esq. |
| For Defendants Fallbrook Public Utility District, et al.: | FRANZ R. SACHSE: Esq. |
| For Defendant State of California: | EDMUND G. BROWN, Esq., Attorney-General, By ADOLPHUS MOSKOVITZ, Esq., Deputy Attorney-General, and |
| For Defendant Santa Margarita Mutual Water Company: | W. B. DENNIS, Esq. |
| For Defendants Hartman, Lewis, Wilks and Bayle, and Oviatt: | BEST, BEST & KRIEGER, By JAMES H. KRIEGER, Esq. |

I N D E X

<u>PLAINTIFF'S WITNESS:</u>     <u>CROSS EXAMINATION</u>

Fred Kunkel

    (By Mr. Krieger)          2921

    (By Mr. Dennis)           3009

        Sackse              2903


<u>EXHIBITS:</u>                    <u>FOR IDENTIFICATION</u>  <u>IN EVIDENCE</u>

Plaintiff's Exhibit

16-B - Data on 146 wells                              2836

16-C - Data on 400 wells                              2890

16-D - Water well measurements                        2890

17-A - Facsimile of 17 with
      wells spotted          2835

* * * * *

SAN DIEGO, CALIFORNIA, FRIDAY, OCTOBER 10, 1958, 9:30 A.M.

1

2     THE CLERK:  No. 1 on the calendar:  1247-SD-C, United

3  States vs. Fallbrook for further court trial.

4                         FRED KUNKEL,

5  previously sworn, resumed the stand for further

6                      CROSS EXAMINATION

7     MR. VEEDER:  Your Honor, there are several things to

8  which I would like to make reference now, if I may.  The

9  question has been raised as to the kinds and type of check

10  on the exhibits which the United States is offering from

11  the United States Geological Survey.  And I was wondering

12  if there would be objection on your Honor's part and on the

13  part of counsel if we were to put in the record actually

14  the information, the press release, which went out on

15  September 8th in regard to all those exhibits.  They are

16  listed, and it might shorten matters up somewhat.

17     THE COURT:  Which exhibits are you referring to?

18     MR. VEEDER:  Well, I am referring to 16, 17 -- or 15,

19  16 and 17 were approved and the exhibits that we are going

20  to put in on hydrology were approved in that manner, and

21  the geology at Camp Pendleton and other exhibits which Mr.

22  Worts will put in.

23        Now, it may be just something that your Honor

24  wouldn't --

25     MR. STAHLMAN:  Will you keep your voice up, Mr.

   Veeder?

        I am not hearing well this morning.

2882

1      MR. VEEDER:  I understand, George, and I will keep

2  my voice up.  I didn't want to shatter your ears this

3  morning.

4      THE COURT:  I can understand.  I can understand.

5      MR. STAHLMAN:  I can entertain a bit of sympathy.

6      THE COURT:  So could Mr. Sachse.

7      MR. VEEDER:  The fact that he is ambulatory is one

8  of the miracles.

9      THE COURT:  Let's see the documents you refer to.  You

10  say it is a press release.

11      MR. STAHLMAN:  What does "press release" mean in this

12  instance?

13      MR. VEEDER:  It means the approval by the United

14  States Geological Survey, official approval; the approval

15  of the United States Geological Survey of the exhibits that

16  are going into the record.

17      MR. SACHSE:  I think it is self-serving but --

18      MR. VEEDER:  Yes, it is self-serving.  It is very

19  informative, I think.

20      THE COURT:  I understand that you have a procedure

21  with the United States Geological Survey where, after a

22  chart or a map or a draft has been worked over by the Bureau

23  and it goes through your procedures, then it is finally

24  approved as finished work by the Bureau; is that right?

25      THE WITNESS:  That is correct.  The report, or in this

1    case the exhibits, have been checked for the validity of

2    the conclusions drawn from them.

3        THE COURT:  Then, after they are so approved they are

4    considered official documents of your Bureau, I suppose?

5        THE WITNESS:  That is correct.

6        THE COURT:  And up to the time that they are approved

7    they are merely in the process of work?

8        THE WITNESS:  That is correct.

9        THE COURT:  I have no objection to doing it, but I

10   think that for clarity you ought to take these lists here

11   and reference them on the side to the exhibit numbers.

12       MR. VEEDER:  We will do that, your Honor.

13       THE COURT:  We understood that has been added to the

14   document.

15       MR. VEEDER:  We will do that, your Honor.  I will leave

16   it with Bill there.

17       THE COURT:  Then we will know what we are talking about

18   without having to hunt through and see which is which.

19       MR. VEEDER:  Yes, your Honor.  Those have all been

20   assigned exhibit numbers now.

21       THE COURT:  Now, you want to assign this an exhibit

22   number?

23       MR. VEEDER:  I had thought it might just go into the

24   record without being marked as an exhibit.

25       THE COURT:  Then it can be put into the record without

1    having any exhibit number after you have worked it over.

2         MR. VEEDER:  Yes, your Honor, I will have that done.

3         THE COURT:  Now, what else do we have to take care of?

4         MR. VEEDER:  We want to be sure that we are proceeding

5    in accordance with your Honor's desires in connection with

6    this map and well locations. I asked the geologists if they

7    would estimate the time it would take to do the job

8    properly, and they said six months.  Well, I knew that that

9    couldn't be.  But we have marked a great number of wells on

10   this exhibit.  We believe that it is reflective of what

11   your Honor desires, but before we offer it, I would like to

12   have, in view of the fact that this exhibit is at your

13   Honor's direction, I would like to have you examine it, if

14   you would, and state whether or not it is reflective of

15   what you desire.

16        THE COURT:  This is the result, therefore, of shorten-

17   ing the six months' work down to 48 hours?

18        MR. VEEDER:  It is not the way to win friends and

19   influence people, having to do a job as fast as we had to

20   do this one.

21        MR. SACHSE:  May I ask:  Is the State of California

22   map showing the well locations --   It is in 57.

23        MR. STAHLMAN:  There must be a map.  Is there a map

24   here that shows that?

25        MR. MOSKOVITZ:  In 57 there is a map.

1     MR. STAHLMAN:  He is pointing also to a big roll over

2 there.

3     THE COURT:  Let's first of all look at the symbols

4 here.  The red dot is a well.  First, we haven't any number

5 on this.  What number will this exhibit be?

6     MR. VEEDER:  Well, it will be 17-A, I believe, your

7 Honor.

8     THE COURT:  17-A.  All right.  That is the number we

9 will assign to it.  The red dot indicates a well measured

10 by the Geological Survey in '57 or '58.  The green represents

11 a well or informational log has been submitted in evidence.

12 By that you mean the log 16 --

13     MR. VEEDER:  16-A.

14     THE COURT:  16-A.  And the green with a red center

15 indicates a well, informational log and water-level record

16 by Geological Survey has been submitted in evidence.

17     MR. VEEDER:  Now, your Honor, we are anticipating a

18 little bit.  We have some additional well logs that are

19 here that we are going to offer as part of 16-A which will

20 bring it current.

21     THE COURT:  All right.  So we have a well log for each

22 of these wells indicated.

23     MR. VEEDER:  That is correct.

24     THE COURT:  What is 17?  The basin proposition and the

25 water storage units.

MR. KRIEGER:  This is really superimposed on 17.

THE COURT:  Yes.

MR. VEEDER:  Same basin.

THE COURT:  Yes, same basin.

Now, are these all the wells that the witness took into account --

MR. VEEDER:  Oh, no.

THE COURT:  In drawing the water storage units?

MR. VEEDER:  No, they are not, your Honor.  If I may show what data we have:  These are 146 wells that were utilized by the U. S. G. S.  Here are their complete set of data from U. S. G. S. records which were taken from data reported by the State of California.

Now, our concern is just how much your Honor desires in this record.

THE COURT:  Exhibits don't encumber a record too badly.  The documents you first showed me about 146 wells, for identification, so the record will show what we are talking about, will be marked 17-B.

MR. VEEDER:  Well, sir, couldn't that be 16-A, or 16-B would be --

THE COURT:  We have a 16?

MR. VEEDER:  Yes, we have a serial of well logs now that are 16-A.

THE COURT:  Well, 16-B.  All right.  You say it consists

1    of 146 --

2         MR. VEEDER:  Wells.

3         THE COURT:  -- wells.

4         MR. VEEDER:  Data.

5         THE COURT:  Data.

6              And then, 16-C.

7         MR. VEEDER:  This is all the material that the U. S.

8    G. S. had before when it was considering these from the

9    standpoint of locations of wells and similar --

10        THE COURT:  16-C.  It says here:  "More than 400 wells."

11        MR. VEEDER:  We will put this in better form, your

12   Honor.  I just wanted you to see it.

13        THE COURT:  It will be marked 16-C.

14        MR. KRIEGER:  What is the relation of 16-C to 16-B?

15        MR. VEEDER:  These are all the wells in the whole

16   valley concerning which we have data.  These are the ones

17   which are relied upon in preparing the exhibits.  It was a

18   matter of selection of wells we used.

19        THE COURT:  By this you mean 16-D?

20        MR. VEEDER:  I am referring to 16-B, your Honor.

21        THE COURT:  146 wells relied upon.

22             Now, how many of those 146 wells are shown on

23   17-A?

24        MR. VEEDER:  Mr. Kunkel, would you respond to that

25   question?

1    THE WITNESS:  I haven't counted, but it is about half.

2  It is the wells indicated with the checks, crosses or

3  dashes.  There have been a few additional wells put in for

4  other reasons.  They are the deepest of the wells.  They

5  are the most critical of the wells in regard to the

6  testimony.

7    MR. VEEDER:  When you say "critical," what do you mean

8  by that?

9    THE WITNESS:  They are the deepest.  They are the wells

10  on which the estimates of the ground water or the estimates

11  of alluvial thickness have been most accurately determined.

12  The bulk of the other wells are shallower.  In estimating

13  the storage capacity of the upper zone they have given a

14  much more reliable estimate of storage capacity to the

15  upper zone to which the storage capacity was calculated.

16    THE COURT:  Let me see if I understand this.  In

17  16-C are more than 400 wells shown with certain data about

18  them?

19    THE WITNESS:  That is correct.

20    THE COURT:  In 16-B there are 146 wells shown on a

21  selective basis?

22    THE WITNESS:  116?

23    THE COURT:  146 wells.

24    THE WITNESS:  146 wells, Exhibit 16-B, are wells for

25  which log data were considered in preparation of the Exhibit

1    16-C, or water level data on which --

2         THE COURT:   Now, in preparing a map, such as 17-A,

3    showing various wells and various other storage units, I

4    take it that it is a selective proposition?   A person making

5    the study has material before him.   Just as a lawyer

6    discards a case as an authority in lieu of a better one,

7    you select wells, pick certain wells which assist you in

8    forming your opinion as to the existence of water storage

9    units?

10        THE WITNESS:   That is very definitely a selective

11   process.

12        THE COURT:   Then would you say --

13        MR. VEEDER:   Your answer is yes.

14        THE WITNESS:   Yes.

15        THE COURT:   Would you say the wells you have shown on

16   17-A are, in your opinion, the most important of the wells

17   to enable you to formulate the opinion you have given as to

18   the location of these water storage units?

19        THE WITNESS:   Yes.

20        THE COURT:   Now we all understand each other.   In

21   other words --

22        MR. VEEDER:   We have one more factor involving the

23   selected wells that he utilized in writing out the water

24   level measurements.   And that would be, proceeding in

25   accordance to your Honor's course now, would be marked, in

A=3

1   my view, 16-D.

2        THE COURT:  Those have not yet been put on this map

3   17-A?

4        MR. VEEDER:  Yes.

5        THE COURT:  Oh, they are.

6        MR. SACHSE:  These wells are in this order?

7        THE WITNESS:  Yes.

8        MR. SACHSE:  The wells on 17-D --

9        THE COURT:  16-D.

10       MR. SACHSE:  16-D are now shown on 17-A?

11       THE COURT:  17-A.

12       MR. VEEDER:  That is correct, yes.  Again, we would

13   want to type these up and put them in neater form, but I

14   wanted your Honor to see the course we are pursuing.  I

15   wanted to be sure we get the basic data you desire.

16       THE COURT:  You mark this 16-D.  You may withdraw

17   these and prepare better copies for substitution.

18       MR. VEEDER:  And reproduction.

19       THE COURT:  And reproduction for counsel.

20            Now, have you completed, then, the job on 17-A?

21       THE WITNESS:  No, your Honor.  The 400 wells, more

22   than 400 wells for which there are water-level measurements

23   available, on which the water-level contours in ground water

24   storage units 3 and 4, 1 and 2 were drawn, the bulk of

25   those 400 wells are in those in that area.  And they are

1  the measurements.  Those measurements are not indicated as

2  yet on this map.

3      THE COURT:  But you intend to put some of those wells

4  on this map?

5      THE WITNESS:  Some 400 at this scale almost would be

6  an impossibility.  You couldn't indicate the positions of

7  them.  I will do that on a much larger scale map.

8      THE COURT:  In your judgment, what proportion of them,

9  if any, did you propose to put on this map, a certain

10  number?

11      THE WITNESS:  Certain of them, which, in my opinion,

12  told conclusively the existence and position of the water

13  level contours as they are shown.  The entire 400 are not

14  necessary to show that.

15      THE COURT:  Would you use a different colored symbol

16  for those?

17      THE WITNESS:  I had planned to use a different colored

18  symbol to differentiate measurements by the Geological

19  Survey and --

20      THE COURT:  Well, but I understand the three symbols

21  you have shown already on 17-A and the wells shown by those

22  symbols concern the depths of strata, water-bearing strata,

23  and not necessarily water contours.

24      THE WITNESS:  The red circles which also include the

25  springs -- and the springs are critical with regard to this --

2892

1   show -- are critical with the water level contours -- a

2   fourth symbol which I have not yet had time to prepare,

3   which would involve the more than 400 wells.  It would also --

4        THE COURT:  Or the part of those that you would use.

5        THE WITNESS:  Or the part that I would use are critical,

6   showing the existence and position of the water level

7   contours.  And that would be a fourth symbol which has not

8   yet been shown on this map.

9        THE COURT:  So that I understand you:  the red symbols

10   on here do have a significance as to water level contours

11   present?

12        THE WITNESS:  Yes.

13        THE COURT:  Do they have a significance as to depth of

14   strata, too?

15        THE WITNESS:  As to the thickness of the water, they

16   do not have a significance with regard to that.

17        THE COURT:  And the green symbols and the green with

18   the red centers are the ones which have reference to the

19   depths of the water bearing strata?

20        THE WITNESS:  Yes.

21        THE COURT:  And your fourth group again will concern

22   water contours?

23        THE WITNESS:  Yes.

24        THE COURT:  Fourth symbol?

25        THE WITNESS:  Yes.  The fourth symbols have to be all

1   related together to get the evidence with regard to thick-

2   ness and water levels.  They are not considered one without

3   the other.

4       MR. KRIEGER:  Where does 16-D fit into this map?

5       THE WITNESS:  They are the red symbols.

6       THE COURT:  16-D?  And are all the wells shown on

7   proposed 16-D shown on the map 17-A by red dots?

8       THE WITNESS:  Yes.

9       THE COURT:  All of them?

10      THE WITNESS:  All of them.

11      MR. SACHSE:  And again, Mr. Kunkel, on 16-B, where

12  there is a check or an X, is every one of those wells shown

13  on 17-A?

14      THE WITNESS:  Yes.  Yes.

15      MR. KRIEGER:  In green?

16      THE WITNESS:  Yes.

17      THE COURT:  Green, or green with a dot, you mean?

18      THE WITNESS:  Yes, green, or green with a dot.  There

19  are certain wells which are -- they are logged without

20  reference to the water level.

21      THE COURT:  How did you mark these wells?

22      THE WITNESS:  There is a small number beside the well.

23  The sections are projected.

24      THE COURT:  Take an example:  K-1.

25      THE WITNESS:  K-1 would be 8 South, 2 West, 3 K-1.  This

1    is section --   3 would be the well number.

2        THE COURT:  In other words, you tried to locate them

3    in two projected sections.  And from the map you can tell

4    the range and the township and the section.  The "K" in-

5    dicates the portion of the section that the well is in

6    under the symbol heretofore used?

7        THE WITNESS:  Yes.  There is one complicating problem.

8    The number, for example, 17-G-1, actually does not fall in

9    the position K-1 or 17-M-1 does not fall in the proper

10   position with regard to the section.  That does not mean

11   that the well is mislocated.  The well is properly located

12   planimetrically   with regard to the geology and the

13   physical features of the area.  The Department of Water

14   Resources and the Geological Survey have used slightly

15   different projected sections.  Because I use the numbering

16   system on the well logs that were assigned by the Department

17   of Water Resources, to avoid a confusion in numbering and

18   to avoid theproblem of long and extensive correlation lists,

19   which would be a nuisance to everybody, I have assigned the

20   same number to the well, even though it did not fall exactly

21   in the same projected section that I had used.

22       THE COURT:  The discrepancy results in the fact that

23   the projected sections used by the Department of Water

24   Resources aren't exactly like the projected sections here?

25       THE WITNESS:  That is correct.  The position of the

A-4

1  wells planimetrically is correct, even though the numbering

2  system may be at slight variance with the section that is

3  projected.

4        THE COURT:  Planimetrically, do you mean by, for

5  instance, looking down on them and their relationship to

6  physical objects such as stream beds and rocky outcroppings

7  and things of that kind?

8        THE WITNESS:  That is correct; within the original

9  limitations you suggest be set up that they be within these

10  proper 40 acres. I will not guarantee that accuracy in 53.

11  I will guarantee it to 30 acres.

12        MR. VEEDER:  Let's don't start guaranteeing things

13  here.

14        THE COURT:  Well, do we all understand?

15        MR. KRIEGER:  I think so.

16        MR. MOSKOVITZ:  I have a question:  Do you plan to

17  put more red dots on Exhibit 17-A showing wells you have

18  used water level measurements for?

19        THE WITNESS:  There are more than 400 other water

20  level measurements available.

21        THE COURT:  In 16-C.

22        THE WITNESS:  In 16-C, which I had agreed to put the

23  critical ones on.

24        THE COURT:  He is going to take 16-C on a selective

25  basis and not the entire 400.

1    MR. VEEDER:  That is a point that is important.  He

2 has not considered 400; he selected from the 400 representative

3 wells.

4    THE COURT:  That is all the wells you can do.

5    MR. DENNIS:  Couldn't the difference of the location

6 of the well within the section be the difference in the base

7 map which was used if one map was off of scale         from

8 another?  In other words, if the base map, this base map

9 wasn't exactly correct to scale, could that be responsible

10 for the fact that you represented or have the well in a

11 different forty from that which the State showed it?

12    MR. VEEDER:  Answer the question.  I don't know that.

13    THE WITNESS:  It is.  If the question is going to be

14 asked that way, I will have to answer checking on my part

15  indicated that the base map used by the State was incorrect.

16    MR. DENNIS:  So that there is a difference in the base

17 map?

18    MR. VEEDER:  Well, there is no base map that the State

19 used.

20    THE WITNESS:  I am talking of the projected depth that

21 the State used.  Now, I have not checked this out carefully.

22 The statement that I have made is that the positions of the

23 wells as I have shown them are correct planimetrically.

24 The numbering system is the number that the State has

25 assigned to the well, which may or may not correspond to the

1  position of the projected sections that I have used.

2  THE COURT:  Let me ask you this:  If some question

3  came up as to the exact location or the identification of

4  certain of these wells, it would only involve a few of these

5  wells, would it not?

6  THE WITNESS:  It would only involve a few of these

7  wells.

8  THE COURT:  Couldn't you and one of the State engineers

9  sit down and, in short order, correlate those two wells so

10  we would know which well you are talking about and the

11  State would know which of the wells it was?

12  THE WITNESS:  Certainly.

13  THE COURT:  Let's not worry about that.

14  MR. MOSKOVITZ:  One more question.  On your Exhibit

15  15, in your legend it says that the ground water level

16  contours are drawn as of levels in November, 1953.  And

17  are those the measurements which you will plot -- are the

18  wells and the measurements for 1953 going to be plotted on

19  Exhibit 17-A, or are you going to use water level measure-

20  ments which were taken at some other time?

21  THE WITNESS:  I am going to plot measurements taken

22  in 1953.  In addition, measurements of other dates before

23  and after 1953 will be considered -- I say not necessarily

24  used but considered -- as evidence in positioning water

25  level contours.  It is an accepted procedure.

1    THE COURT:   In other words, if you are using, say, the

2  base year 1953 in your contour and you want to take into

3  account some data you have got from 1957, you make an

4  adjustment on the basis of your knowledge of what has

5  occurred on water levels elsewhere to adjust that reading

6  to what it would have been in 1953?

7    THE WITNESS:   You mean 1957; yes.

8    THE COURT:   You adjust the 1957 to what it would be in

9  1953?

10    THE WITNESS:   Yes, I do that.

11    THE COURT:   In order to get some accuracy on it.   I

12  take it that you couldn't actually use a water level in

13  1957 and compare it with a water level in 1953, put it on

14  the same map, because of the difference in the years,

15  without some adjustment?

16    THE WITNESS:   Without some adjustment, that is correct.

17    THE COURT:   All right.

18    (The witness took his seat on the witness stand.)

19    MR. VEEDER:   Now, one of the reasons why we are some-

20  what precipitous in offering these matters, it involves

21  cross examination.   I didn't know whether counsel wanted

22  to continue on the line of cross examination or not that

23  they are pursuing.   We have got as much work as --

24    THE COURT:   You prefer to wait until this map is

25  completed?

1      MR. MOSKOVITZ:  And we have a chance to study it.

2      MR. SACHSE:  Yes, your Honor, I would like to ask

3  questions regarding it, but I am not prepared at the moment.

4  I have just seen it.

5      THE COURT:  All right.  Let me have a list now, Mr.

6  Clerk, of what we have marked.  17-A for identification is

7  the same as 17 with the wells spotted.

8      THE CLERK:  16-B.

9      THE COURT:  16-B.

10     THE CLERK:  146 wells.

11     THE COURT:  16-C.

12     THE CLERK:  400 wells; more than 400 wells.

13     THE COURT:  And 16-D.

14     THE CLERK:  Water levels.

15     THE COURT:  Water levels; all right.

16     MR. VEEDER:  Here, your Honor, are additional well logs

17  that we would like to have added to 16-A, which has already

18  been admitted in evidence.

19     THE COURT:  They may be admitted.

20          Now, are you going to duplicate these well logs

21  for counsel?

22     MR. VEEDER:  We will, your Honor.

23     THE COURT:  You want to withdraw 16?

24     MR. VEEDER:  What is it?

25     THE WITNESS:  There is a problem, your Honor.  The logs,

1   as submitted, are photographic copies of records in this

2   Department of Water Resources file, a large part of them

3   are photographic copies.  It is very difficult, if not

4   impossible -- I am not certain of the photographic pro-

5   cedures to reproduce the reproduction.  The information is

6   a copy of the records, exact record photographically of the

7   material in the file of the Department of Water Resources.

8   There may be a problem in duplication; I do not know.

9       THE COURT:  What about that, Mr. Moskovitz?  In order

10  to get good copies available for everyone, could the

11  originals be made available for duplication?

12      MR. MOSKOVITZ:  Your Honor, I believe that all the

13  originals have been brought in.  I have one book here, and

14  I believe we have some other books in the file across the

15  way.  So they can be used to make copies.

16      THE COURT:  Well, how do we work this?  Would you lend

17  them to the Government for that purpose, or do you want to

18  do it?

19      MR. MOSKOVITZ:  Maybe some of these gentlemen would.

20      THE COURT:  Yes.

21      MR. MOSKOVITZ:  I think we can work out a procedure

22  with the Government.

23      THE COURT:  All right.  I will leave it to counsel's

24  joint effort to work this matter out.  The point being that

25  if we are going to duplicate copies of these well logs for

1    counsel to use, they are to be readable, and they are not

2    going to be readable if they are reduplicated off of what

3    the Government now has.

4          MR. MOSKOVITZ:   Should we find out now whether counsel

5    do want copies?   We will have our originals here all the

6    time, and we have the other reproduction already made.

7          THE COURT:   Find out.

THE COURT:  Mr. Sachse?

MR. SACHSE:  As long as the originals are here, I don't care particularly, your Honor.

THE COURT:  Mr. Krieger.

MR. KRIEGER:  If they are here, I agree, your Honor.

THE COURT:  Mr. Dennis?

MR. DENNIS:  Me too.

THE COURT:  All right, then they don't have to be duplicated, except those which would be well logs that didn't come out of the State files.

MR. VEEDER:  Yes, your Honor.

THE COURT:  Those should be duplicated.

MR. VEEDER:  We will have that done.

THE COURT:  Can you check that easily enough?

THE WITNESS:  I believe there is only one log on the basis of checking.

THE COURT:  The Pauba well?

THE WITNESS:  No, sir.  That well was marked "Confidential", but it was in the files of the Department of Water Resources when I had access to them.

THE COURT:  So that is in their files.  I don't care how many there are.  Whatever ones are not in the list of original well logs which the State says they have here, which well log is in 16-A.  If it is not in the State's records or in the originals, you will duplicate.

THE WITNESS:  On the basis of cross-section there is one

I had discovered.  It is the only well, and I will supply that.

MR. VEEDER:  You will take care of that.

MR. MOSKOVITZ:  I take it that no reproduction is necessary.

THE COURT:  Except one or two that are not in your files,

Mr. Moskovitz.

MR. SACHSE:  Are you through, Mr. Veeder?

MR. VEEDER:  Yes.


CROSS-EXAMINATION (Resumed)

BY MR. SACHSE:

Q  Mr. Kunkel, 16C has two dates, or two columns that say

"Date 1953."  What is the difference?  They appear to be--

A  You are questioning me with regard to my--

Q  What it means.

A  --script that I used in tabulating my data?

Q  Yes.

A  The column to which you are referring is page 2, Exhibit

16, the red column which says "Date".  Under "Date" there is

"1953," then there is "11-16-53, 11-16- . . "  All of those

measurements are in 1953, down to a point where there is a well

number inserted that says "4-21-54."  That particular measure-

ment was in 1954.  Then the measurement beneath it was 11-17-53.

That was measured in 1953.  There are other measurements in-

dicated.

Q   What I am trying to compare, Mr. Kunkel, is simply to find out a comparison of column 3 and column 19 which has another date.   What is the relation between the two dates?

A   There are several columns.   There is a group of one, two, three, four, five columns in which the well number is listed, the altitude of the measuring point is listed, the date when the water level was measured, the distance to water from the measuring point, and the calculated altitude of the water surface.   The next column was skipped, and so was the next one. The next series of columns, which was another series of wells.

Q   I understand.   Thank you.

Mr. Kunkel, I am referring now to this press release that Mr. Veeder just distributed to counsel, listing the maps, graphs and charts approved for release by the Geological Survey, and I don't find on it a map of the upper watershed.   Or am I simply not reading it correctly?

A   May I see the exhibit?

(Mr. Sachse hands exhibit to the witness.)

A   The first paragraph says "Maps, graphs and charts of water resources of the Santa Margarita River Basin."   On the first page there is a series of tables, on the second page there is a series of illustrations, on the third page there is also a series of illustrations.   It says, "All exhibits were prepared by George F. Worts, Jr., Walter Hoffman and Fred Kunkel." The last three exhibits listed on page 3 are labeled "Data Santa

Kunkel   Cross

B
Z4

1  Margarita River Watershed, Geologic and Hydrologic Map."   That

2  is the Exhibit 15.

3      Q  What about the rest of the watershed?   That statement

4  would imply that the map approved for release covers the entire

5  watershed, wouldn't it?

6      A  There is another exhibit on here   I do not recall the

7  exact order of listing.

8      MR. VEEDER:  We will call another witness and we are going

9  to offer another exhibit.

10      MR. SACHSE:  I am just trying to find out.

11      MR. VEEDER:  You just found out.

12      THE COURT:  No, I understand that the maps approved on your

13  press release, so-called, which you are going to incorporate

14  into the record, there are maps that cover the entire watershed,

15  and that in the trial so far only a portion of those maps has

16  been offered-- Exhibit 15.

17      THE WITNESS:  To the best of my knowledge, that is correct;

18  the geologic and hydrologic map which is referred to is the

19  Exhibit 15.

20  BY MR. SACHSE:

21      Q  You mean Exhibit 15 is the part of the geologic and

22  hydrologic map reference, or is it the whole thing?  That's what

23  I want to know.

24      A  I am sorry, I don't quite follow you, Mr. Sachse.

25      Q  The reference is  to a geologic and hydrologic map of

Kunkel   Cross

B

Z5

1   the watershed.  Exhibit 15 is a geologic map of the upper

2   portion of the watershed.  Is 15 the whole reference, or a part

3   of the reference?

4        MR. VEEDER:  Exhibit 15 is the whole reference, and the

5   title block of the Exhibit 15 is reference to geologic and

6   hydrologic map Santa Margarita Watershed, and that is what is

7   shown on here, and this is the exhibit.

8        THE COURT:  Well, has there been approved and the official

9   stamp put on some map for the rest of the watershed similar to

10   15?

11        MR. VEEDER:  There is--

12        THE COURT:  Let the witness answer.

13        MR. VEEDER:  Excuse me.

14        THE WITNESS:  The reason I am hesitating, your Honor, I

15   am not certain.  Other people have worked in other areas, and

16   I am not certain exactly.  I have not checked it out to make

17   certain that their maps overlap in all parts of the watershed.

18   If Mr. Sachse is going to pin me down to every square foot as

19   being mapped--

20        THE COURT:  We are not concerned with that.

21        THE WITNESS:  To the best of my knowledge, there are three

22   maps:  the upper part, the middle part, and a lower part; and

23   to the best of my knowledge, the boundaries of the three maps

24   are contiguous.  I have not checked it out.

25        THE COURT:  We don't care whether they overlap a little bit.

Kunkel   Cross

B

Z6

1  That is not the point.  The point is that there are three maps,

2  of which Exhibit 15 is one?

3      THE WITNESS:  Yes.

4      THE COURT:  Have all three of the maps got the official

5  stamp of approval as indicated by your so-called press release?

6      MR. VEEDER:  I think I can respond to that myself, your

7  Honor.   I don't believe that this witness--

8      THE COURT:  Do you know?

9      MR. VEEDER:  Yes, I do, your Honor.

10      THE COURT:  Are the three maps listed on this press release?

11      MR. VEEDER:  No, your Honor.  We have this map here, which

12  is 15, marked "Geologic and Hydrologic Map," Mr. Kunkel's map,

13  that has been approved.  We have the map which covers the

14  geology and hydrology of Camp Pendleton, which Mr. Worts will

15  offer in evidence as of the U.S.G.S.  That has been approved.

16  We have a map made by Col. Bowen's office which is not approved

17  by the U. S. Geological Survey.

18      THE COURT:  For the middle section?

19      MR. VEEDER:  That is correct.

20      THE COURT:  As to the map of the lower watershed, which

21  you said has been approved, is it listed in your press release?

22      MR. VEEDER:  Yes, your Honor.

23      THE COURT:  Under the portion Mr. Sachse referred to?

24      MR. SACHSE:  That takes care of my question, your Honor.

25      MR. VEEDER:  If your Honor will turn to page 2-- Geologic

B

Z7

XXXXXX

1   Map Lower Santa Margarita River Basin.

2        THE COURT:  All right.

3   BY MR. SACHSE:

4        Q  Mr. Kunkel, according to my notes Mr. Moskovitz asked

5   you to attempt to prepare a time computation of the number of man

6   days or some similar yardstick used in Napa-Sonoma investigation

7   conducted by you and similar figures for the upper Santa

8   Margarita investigation.  Have you done that yet?

9        A  I have not returned to Long Beach since I have testified

10  to that, no.

11       Q  According to my notes also, Mr. Moskovitz asked that

12  you bring in certain data regarding the effect of pumping wells

13  in and around the Pauba well.  Have you brought that to him yet?

14       MR. VEEDER:  Is that data available, Mr. Kunkel?

15       THE WITNESS:  The information, to the best of my knowledge,

16  was given to you, Mr. Veeder.

17       MR. VEEDER:  If it is in my files, we can get it for you.

18       In that regard, the work was done by Mr. Worts on that

19  particular phase of it, and Mr. Worts is going to testify in

20  connection with it.

21       MR. SACHSE:  Is the data we asked Mr. Kunkel to bring in

22  available for us to look at or to question him about?

23       MR. VEEDER:  I want to check that out, if I may.

24       MR. SACHSE:  It is not presently available?

25       MR. VEEDER:  It not presently available.  Whether I can

B

z8

1 release it or not will depend somewhat on talking over the order
2 of proof we are going through.

3        MR. SACHSE:  And whether it suits the case of the United
4 States.

5        MR. VEEDER:  If you think I am trying your case, you are
6 very much mistaken.

7        THE COURT:  All right, let's save our argument for time
8 outside the courtroom.  It costs money to write up these wise
9 remarks that you and Mr. Sachse pass back and forth.

10 BY MR. SACHSE:

11        Q  Mr. Kunkel, I had a moment ago the bibliography of
12 your publications that was handed to us by Mr. Veeder, and I
13 don't find anything in there about this investigation.  Is it
14 purposely excluded?

15        A  It seems self-evident that the press release would
16 supplement that.

17        Q  Has a written report, by that I mean a text as distinct
18 from maps, been submitted as to your findings on the upper
19 Santa Margarita River watershed?

20        MR. VEEDER: May I ask to whom?

21        MR. SACHSE:  To the U. S. Geological Survey.

22        MR. VEEDER:  I object onthe grounds that it is incompetent,
23 irrelevant and immaterial.  It has nothing whatever to do with
24 this case.  If he wants to correspond with his boss, that is
25 one thing.  We are not offering it in evidence.

1        THE COURT:  Let's have the question.

2        (The reporter read the pending question as follows:  "Q  Has

3   a written report, by that I mean a text as distinct from maps,

4   been submitted as to your findings on the upper Santa Margarita

5   River watershed?")

6        THE COURT:  Objection overruled.

7        Answer it.

8        THE WITNESS:  No, a text has not been prepared.

9   BY MR. SACHSE:

10        Q  Then when you answered Mr. Moskovitz's question earlier

11   in cross-examination, you stated that your studies here had

12   gone through the same review process that is prescribed for other

13   U. S. Geological Survey studies, that is not quite correct?

14        A  That is absolutely correct.

15        Q  But no written report has been submitted?

16        A  But no written report has been submitted.

17        Q  On the last page of your bibliography it is stated that

18   Mr. Kunkel has prepared seven and has directed preparation of

19   eight closed file ground water reports for various military

20   establishments.  What do you mean by "closed file"?

21        A  A report that is not available for public inspection.

22        Q  Is this study included in those "closed file" reports?

23        A  The study to which I have been testifying is--

24        MR. VEEDER:  Just a moment.

25        The study to which he has been testifying-- do you mean

B

Z10

1  the exhibits?

2      MR. SACHSE:  The Upper Santa Margarita River Watershed

3  study.

4      Q  Is it included in the closed file report?  I am using

5  your own language.

6      A  No.

7      MR. VEEDER:  You are using the term "study" so loosely.

8  You refer to Bulletin 57 as a study.

9  BY MR. SACHSE:

10      Q  Do the closed file ground water reports referred to in

11  your bibliography include any studies in the Santa Margarita

12  River watershed?

13      A  Yes.

14      Q  Where?

15      THE COURT:  Where what?

16      MR. SACHSE:  Where-- what area?

17      THE COURT:  Where the report is filed?

18      MR. SACHSE:  What areas of the watershed?

19      THE WITNESS:  Within the enclave of the Marine Corps station

20  at Camp Pendleton.

21      Q  Nothing in the upper watershed?

22      A  Nothing in the upper watershed.

23      Q  Mr. Kunkel, when I closed yesterday, or day before

24  yesterday, I was asking you to limit in some way, if you could,

25  or explain how you limited those areas which youfelt were in

Kunkel   Cross

B
211

1    hydrologic continuity with the stream.  I ask you this:  Would

2    we be correct in saying that everything indicated in yellow on

3    Exhibit 15 is, in your opinion, in hydrologic continuity with the

4    Santa Margarita River system?

5        A  Ground water?

6        Q  Ground water?

7        A  You are not including surface water in your--

8        Q  Just ground water.

9        A  In regard to ground water only, it does not necessarily

10   follow that everything within the area colored yellow is in

     hydraulic continuity.

11       Q  It does not follow?

12       A  It does not follow that it is in hydraulic continuity.

13       THE COURT:  But as to surface water, everything in yellow

14   would be part of the stream system?

15       THE WITNESS:  In my opinion, yes.

     BY MR. SACHSE:

16       Q  Are there parts of the yellow area on Exhibit 15 where

17   you believe the ground water is not part of the Santa Margarita

     River water system?

18       MR. VEEDER:  I object to that unless there is a specification

19   of time.  Time is very important in whether or not a particular

20   area is in hydrologic continuity.  During wet season it probably

21   is.  In dry season it may not be.

22       THE COURT:  I think that is correct.  The objection is

Kunkel   Cross

B

Z12

1  sustained.

2      More than that, your questions originally started talking

3  about hydrologic continuity with the stream, and then your

4  last question talks about the Santa Margarita River water

5  system.  Whether they mean the same thing or not I don't know.

6  But you alter your predicate.

7      MR. SACHSE:  My choice of words was poor.

8      Q  Mr. Kunkel, you testified at some length on direct

9  examination that in your opinion waters, for example, in the

   orange area north of the Pauba Valley, ground waters were in

   substance a part of the Santa Margarita River system.  Now I

   am asking you if all ground waters found in the yellow areas

   on Exhibit 15 are, in your opinion, necessarily a part of the

   Santa Margarita River stream system?

      MR. VEEDER:  Again, I think this is extremely important

   that he define that to which he is now referring.  As I said

   before, there are areas we know that as of the moment they

   are probably not in hydrologic continuity down the rocky areas

   of Coahuila Creek.  We also know that during the runoff period

   they are.

      MR. SACHSE:  I am speaking of ground water, not surface

   water at all.  Ground water is my question.

      MR. VEEDER:  The map is self-evident on that.

      THE COURT:  You have a difficulty in semantics here.  You

   are talking now, in part, about hydraulic continuity.

B

Z13

1        So let's take the Coahuila Basin up there, and let's assume

2    it doesn't make much difference when-- there is some water in

3    the basin.  On the record presently, there is an area from the

4    basin on downstream where the stream bed runs over the basement

5    complex.  Now therefore it wouldn't make any difference what

6    the season was or when, as long as there was no water flowing

7    over that basement complex.  Then actually the Coahuila Basin

8    and the one below would not be in hydraulic continuity.  There

9    would be a break in there.

         MR. SACHSE:  Obviously, I didn't have to ask the question.

         THE COURT:  There is no doubt but that the basin and the

    channel below it and the basin again below are all part of the

    river system.

         MR. SACHSE:  Your Honor is away ahead of me.  I didn't

    have to ask the question at all, apparently.

         MR. VEEDER:  I think we will take judicial notice of that.

         THE COURT:  Is that what you were trying to get me to see?

         MR. SACHSE:  That is exactly what I was trying to get your

    Honor to see.

         THE COURT:  I am interested in the thing you started to

    explore.

         MR. SACHSE:  I was going to go a step further.

         THE COURT:  Mr. Kunkel shook his head, however, at what

    I said.  Apparently he disagrees with you and with me, Mr.

    Sachse.

Kunkel - Cross

1    What were you shaking your head about, Mr. Kunkel?  What

2    did we say wrong that you don't agree with?

3        MR. STAHLMAN:  He was just trying to balance the rocks.

4        THE WITNESS:  We are testifying to hydraulic continuity.

5    I have testified that a drop of water could fall on the top of

6    the watershed and move through a chain of hydraulic continuity

7    to the ocean.  If a sufficient number of cracks and fractures

8    in the basement complex were intersected, and if there was a

     saturation of ground water, wells can be obtained in the blue.

     It is theoretically possible.

        THE COURT:  Well, let's stop.  You have got me off in the

     blue again, and that is not what we are interested in right now.

     Now in hydraulic continuity you visualize one drop of water in

     contact with another drop of water?

        THE WITNESS:  Beneath the water table.

        THE COURT:  Beneath the water table?

        THE WITNESS:  That is right.

        THE COURT:  What about a stream running down a solid rocky

     gorge?  Wouldn't water be in hydraulic continuity in that gorge--

     a stream on the surface?

        THE WITNESS:  According to the definition that I have been

     using, that does not necessarily follow.

        THE COURT:  You have been using a definition, then, to talk

     only about ground water and not about surface water?

        THE WITNESS:  I have been confining my testimony to ground

Kunel   Cross

B

215

1  water.

2      THE COURT:  All right, let's leave it ground water.  Let

3  me ask you this:  Look at the Map 15 there, and Coahuila Valley,

4  the yellow section showing the younger alluvium, and then you

5  will note downstream on your map, and you will recall your

6  testimony that the stream bed there flows over the Basement

7  Complex until it get down to Wilson Valley.  Do you follow me?

8      THE WITNESS:  Yes.

9      THE COURT:  Let's take a time of the year like late summer,

10  when, let us assume, there is no water at all running down

11  Coahuila Creek below the earth dam shown below Coahuila Valley,

12  and down until you get to Wilson Valley to where the water rises

13  to the top of Wilson Valley.  Let's assume there is no water

14  running down this rocky gorge in the basement complex.  Will

15  you assume that?

16      THE WITNESS:  That is correct, Yes.

17      THE COURT:  All right.  And let's assume there is water

18  in the alluvium in Coahuila Valley underneath the surface, some

19  appreciable amount of water-- I don't care how much; and let's

20  assume there was water, again, in the alluvium in Wilson Valley.

21  So we have a time of the year now when no water is going down

22  the rocky gorge that connects them.  Would you, then, say that

23  there is hydraulic continuity between the ground water in the

24  Coahuila Valley and the ground water in Wilson Valley?  I am

25  just trying to get your definition of terms.

1        THE WITNESS:  Your Honor, a professional man under cross-

2    examination by a defense attorney--

3        MR. VEEDER:  Now go ahead and answer the question.

4        THE COURT:  We just want to know.  I am not trying to

5    trap you.  I am just trying to get your definition of terms.

6        MR. VEEDER:  Just answer the question, Mr. Kunkel.

7        THE WITNESS:  With regard to a definition of terms, the

8    answer is yes.

9        THE COURT: There would be hydraulic continuity?

10       THE WITNESS:  There could be hydraulic continuity.

11       THE COURT:  Where could it be?

12       THE WITNESS:  Beneath the-- the concept you are searching

13   for is transmissibility.

14       THE COURT:  Let me give you a further example.  But let's

15   assume there is not only no water running down the rocky gorge

16   between the two basins, but let's assume for argument, which

17   may not be true, but for argument, that in that basement complex

18   beneath that rocky gorge there is no transmissibility at all

19   and here is a completely dry gorge with solid rock with no

20   transmissibility below it and here is water in a storage unit

21   in Coahuila Valley and here is water in a storage unit in Wilson

22   Valley.  I want to know whether on that set of facts, talking as

23   you have, would you say that there is hydraulic continuity

24   between the ground water in Coahuila Valley and the ground water

25   in Wilson Valley?

2918

Kunkel   Cross

B

Z17

1       THE WITNESS:  Under that set of circumstances, with

2   absolutely no transmissibility in the basement complex, then

3   during a period in which there was absolutely no flow in the

4   surface stream, I then would say the two basins are not in

5   hydraulic continuity.

6       THE COURT:  But from your answer I understand that if I

7   hadn't given you the facts I did, you would be concerned as to

8   whether or not there was transmissibility in the basement complex

9   through faults and breaks, et cetera, so that there might well

10  be hydraulic continuity between the two basins?

11      THE WITNESS:  That is a technical problem.

12      THE COURT:  Let me ask you the next question.  Of course, I

13  think this is obvious.  But taking that same set of facts, with

14  the water in those two basins, the mere fact that there is no

15  water running down the rocky gorge doesn't affect the fact that

16  both the Coahuila Valley area and the Wilson Valley area are

17  part of the Santa Margarita water system?

18      THE WITNESS:  They are part of the same system.

19      THE COURT:  Well, then, let me ask you this question:  Look

20  now at Exhibit 15 in the yellow areas.  As to the yellow areas,

21  I take it-- this is without doubt a very simple question-- but

22  all the yellow areas on 15 are part of the Santa Margarita River

23  water system?

24      THE WITNESS:  They are part of the water system, yes.

25      THE COURT:  And is it true that all the orange-colored

Kunkel  Cross

B

1  areas are, in your opinion, part of the Santa Margarita River

2  water system?

3       THE WITNESS:  They are part of the system.

4       THE COURT:  And the gray areas?

5       THE WITNESS:  The gray areas.

6       MR. VEEDER:  He didn't answer the question as to the gray

7  areas.

8       THE WITNESS:  Yes.

9       THE COURT:  As to the blue areas, they may or may not be,

10  depending upon what faults, cracks and other matters may be

11  involved in the area.  Is that right?  Or would you say the

12  blue area is not part of the Santa Margarita River water system?

13       THE WITNESS:  It has to be part of some water system, your

14  Honor.

15       THE COURT:  Well, that isn't a fair question and I will

16  take it back, because obviously it is within the watershed and

17  water flowing on the blue areas would drain through the streams

18  and eventually into the Santa Margarita if there were sufficient

19  depths.  But you have been testifying about ground waters

20  rather than precipitation.

21

22

23

24

25

C-1 ML

THE COURT: Now, the very fact that you have shown no alluvial strata in the blue indicates that there is no material area of alluvial strata in the blue which is part of the Santa Margarita Water System?

THE WITNESS: There is no material strata?

THE COURT: Alluvium.

THE WITNESS: Of alluvium. No, I have observed no material strata of alluvium in the areas colored blue.

THE COURT: In other words, you have tried to sketch on your Exhibit 15 the major areas where this alluvia occurs?

THE WITNESS: Yes.

THE COURT: There might be small areas, insignificant, of small extent, throughout the blue?

THE WITNESS: There are other areas, but they are not shown. They are small.

THE COURT: Now, there might also be, throughout the blue areas, faults, fractures, and/or situations where water might be in hydrolic continuity with water further downstream in the yellow, orange colored areas?

THE WITNESS: That is undoubtedly a circumstance.

THE COURT: But that is a circumstance which can't be ascertained by the types of study you made of the area?

THE WITNESS: The details of it have not been ascertained.

THE COURT: Now, go back to hydrolic continuity where

1    water is in contact with water.  I understand, then, that

2    it is your testimony that as to the yellow areas and the

3    orange areas and the gray areas there is hydrolic continuity

4    of underground waters with the water which would arise and

5    flow out through the narrows into the Santa Margarita River?

6        THE WITNESS:  Yes.

7        THE COURT:   That answers some of the things you are

8    interested in?

9        MR. SACHSE:  I have no further questions, your Honor.

10       THE COURT:  Who wants to?  Mr. Krieger?

11       MR. KRIEGER:  May I ask a few questions of the witness.

12

13                    CROSS EXAMINATION

14   BY MR. KRIEGER:-

15       Q    Mr. Kunkel, how many active wells are there in

16   the Murrieta Basin?  Do you know?

17       MR. VEEDER:  May I have that clarified as to what you

18   mean by "active"?

19       MR. KRIEGER:  Active pumping wells.

20       THE COURT:  By "basin" you mean the basin he has

21   marked on Exhibit 17?

22       MR. KRIEGER:  Yes.

23       THE WITNESS:  I would estimate several hundred.

24       Q  BY MR. KRIEGER:  Do you know of any study that has

25   been made of the wells in that basin to determine their

1  specific capacity?

2      MR. HALL:   Their what?

3          Oh, specific capacity.

4      THE WITNESS:  I am thinking.  The well logs which

5  Exhibit 16-A contain --

6      THE COURT:  Now, look, Mr. Kunkel, the question is:

7  Do you know of any specific study that has been made?  The

8  well logs aren't a study.  They may show something if

9  somebody wants to study them, but do you know of any study

10  that has been made of these pumping wells or wells that can

11  be pumped in the Murrieta Basin, as marked out on Exhibit

12  17?

13      THE WITNESS:  I do not know of a published study.

14      THE COURT:  Do you know of any unpublished study?

15      THE WITNESS:  My own studies of the well logs have --

16  I have opinions as to -- my own studies, yes.

17      THE COURT:  Then, we have a problem of semantics here.

18          By "studies," Mr. Krieger, I am sure you are

19  speaking of a study that has been reduced to writing, whether

20  it is published or unpublished.

21      MR. KRIEGER:  That is correct.

22      THE COURT:  Not a study you have made and have material

23  in your mind that would permit you to form opinions.  But

24  he means a study that has been reduced to writing, whether

25  published or unpublished.

1        MR. KRIEGER:  I can refer to it, though.

2        THE COURT:  Certainly you can.

3        MR. VEEDER:  I have no objection.

4        Q  BY MR. KRIEGER:  Those wells you have indicated in

5   the green dots, do you have any pump tests for those wells?

6        A    I would have to consult the logs.  I can't recall

7   from memory.

8        Q    How do you usually compute specific capacity,

9   through well logs or through pump tests?

10       A    Through pump test data which accompanies many

11  well logs as part of the log.

12       Q    But you don't know how many pump tests you have

13  for those wells indicated on 17-A, is that right?

14       A    I have not counted them, no.

15       Q    Did you know that in Bulletin 57, which is

16  Fallbrook's AA, the State has made a study of the wells in

17  the Murrieta Basin?

18       MR. VEEDER:  I renew my objection, your Honor, to these

19  references to Bulletin 57.  I do so because now counsel

20  have dropped the identification and they are referring to

21  Fallbrook's whatever it is, the number.

22       THE COURT:  Well, it is for identification.

23       MR. VEEDER:  I submit that we are trying a lawsuit in

24  the most unusual manner that I ever heard of.

25       THE COURT:  No, we are not, Mr. Veeder.  The witness

1   has testified that he considered all available data when

2   he made his study of the upper part of this watershed, and

3   that, among other things that he considered, although he

4   has not said he particularly relied upon it, are the things

5   that he considered as part of the available data, was

6   Bulletin 57.  And I think it is proper that the witness can

7   be cross examined on the preparation he made, what he did

8   to form his opinions which he has given.  The objection is

9   overruled.

10      Q   BY MR. KRIEGER:  Have you got the question?

11      A   No.  Would you repeat it, please?

12      THE COURT:  The question was:  Did you know that in

13   Bulletin 57, Fallbrook's AA, there was a study made by

14   the State of the wells in the Murrieta Water Storage Unit

15   or Murrieta Basin?  Is that it?

16      MR. KRIEGER:  Yes.

17      THE WITNESS:  I am aware of the fact that data are

18   tabulated in Bulletin 57.

19      Q   BY MR. KRIEGER:  Do you remember reading in Volume

20   1 of that bulletin on page 75 in the second paragraph, this

21   statement:

22          "Of the 105 active wells located in the Murrieta

23      Basin 23 are equipped with pumps of five horsepower or

24      greater.  Of the better wells tested 13 yielded 100 to

25      300 gallons per minute drawdown" --

1    MR. VEEDER:  I continue to object to all of this, your

2  Honor.

3    THE COURT:  We have it.  Go ahead.

4    MR. KRIEGER:  May I finish that sentence, your Honor?

5    THE COURT:  Yes, you may.

6    Q  BY MR. KRIEGER:  -- "drawdowns are reached about

7  60 feet and specific capacities range from two to

8  ten and averaged about five gallons per minute per

9  foot of drawdown."

      Do you remember reading that, Mr. Kunkel?

10    A    Yes, I remember reading that.

11    Q    Did you go back to the original source of the

12  material for that statement and examine it?

13    A    I have testified many times in the record that I

14  have not taken the data in the files of the Department of

15  Water Resources and checked it back against Bulletin 57

16  for its accuracy.

17    THE COURT:  What page?  Pardon me.  Go ahead.

18    THE WITNESS:  I have examined well logs in the files

19  and information from which estimates of specific capacity

20  can be made.  I have not checked those figures against

21  figures in Bulletin 57.  I do not know the answer to your

22  question.

23    Q  BY MR. KRIEGER:  Have you determined an average

24  specific capacity of any number of wells in the Murrieta

25  Basin?

1     A     No, I have not.

2     THE COURT:   What page were you reading from, Mr.

3 Krieger?

4     MR. KRIEGER:   Page 75, second paragraph, Volume 1.

5     THE COURT:   Go ahead.

6     Q   BY MR. KRIEGER:   Can you tell me now how many wells

7 in that basin you actually have the pump tests for?

8     A     No, I cannot tell you a number.   I do not know.

9     Q     In those cases where you determined specific

10 capacity of wells, did you do that from inferences drawn

11 from well logs, for the most part, or from pump tests?

12     A     I relied on pump test data plus my knowledge of

13 the types and kinds of materials encountered in the wells.

14     Q     Well, I don't think that answers my question

15 exactly.

16     MR. VEEDER:   Mr. Krieger, for my information, are you

17 alluding to the whole area which is marked in orange on

18 15 in the Murrieta Valley north of the -- I mean --

19     MR. KRIEGER:   Yes.   Yes.

20     MR. VEEDER:   You are including the whole area?   Or are

21 you including in your inquiries the weathered --

22     MR. KRIEGER:   Mr. Veeder, I am including the Murrieta

23 Basin as defined in Bulletin 57 with which the witness is

24 familiar.

25     MR. VEEDER:   My concern is whether he is talking about

1    the same area.  And I think that is highly important in

2    the question.

3         MR. KRIEGER:  What is more, I think --

4         THE COURT:  Now, wait.  I understood when you started

5    out you were talking about the Murrieta Basin as shown on

6    Exhibit 17.

7         MR. KRIEGER:  I think those --

8         MR. VEEDER:  That is 15, your Honor.

9         THE COURT:  No, 17, the basin.

10        MR. KRIEGER:  The basin is shown on 17.

11        THE COURT:  The basin is shown on 17.

12        MR. VEEDER:  That is true.  But the area also that

13   the witness has been testifying to is shown on 15.

14        THE COURT:  That is right.

15        MR. KRIEGER:  That is all right.  My question can

16   readily be confined to Exhibit 17.

17        THE COURT:  All right.

18        Q  BY MR. KRIEGER:  And my question was, to repeat it,

19   Mr. Kunkel, whether or not in computing the specific

20   capacity of wells in ground water basin No. 4 on 17, you

21   relied on well logs, or whether you relied on pumping tests

22   as to each well you examined?

23        A   Without being able to recall from memory  the

24   information on each and every well log that is in evidence,

25   I considered both the pump tests and the materials encountered.

1          Q      But you cannot tell me on which wells you had

2    pump tests, is that right?

3          A      From memory, no.   The wells are in the record.

4          Q      Can you get that information?

5          A      To the best of my knowledge, the well logs are

6    in the record.

7          Q      No, I think you are not understanding my question.

8    My question is pump tests.   The point that I am making here,

9    so I can perhaps make the rest of my questioning clear,

10   is that there may be a difference between laboratory

11   studies of what certain deposits will yield as well as the

12   permeability of certain deposits, and there also may be a

13   difference between what a geological study would show as

14   against what a pump test really shows can be brought out of

15   a well, what the drawdown is, and how that well comes back.

16   And it is for that reason that I am asking you if you have

17   available the pump tests on any of the wells which you

18   studied on the whole of Exhibit 17?

19          THE COURT:   To save some time, Mr. Krieger:   He has

20   already testified that certain of the well logs showed in

21   Exhibit 16-A had also connected with them as part of the

22   well logs pump tests.

23          MR. KRIEGER:   Right.

24          THE COURT:   Now, whether they are there or not, some-

25   body can find out.   We can have him find out if you want him

1    to.

2           Now, did you have any pump tests on any of the

3    wells shown in the Murrieta storage unit on Exhibit 17-A,

4    pump tests, apart from pump tests that might have been a

5    part of the well logs?

6        THE WITNESS:  Mr. Krieger's question, as phrased, to

7    me is loaded.  It carries the complications --

8        THE COURT:  I am not talking about his question.  We

9    have forgotten about it.  I am asking the question.  When

10   I ask a question, you forget about the question the attorney

11   asks.

12       THE WITNESS:  I apologize, your Honor.

13       THE COURT:  Do you understand my question?

14       THE WITNESS:  Could it be repeated, please?

15       THE COURT:  I will repeat it.  You testified that there

16   are certain pump tests in connection with and as a part of

17   well logs in 16-A.

18       THE WITNESS:  Yes.

19       THE COURT:  Forget that, now.

20           Do you have any pump tests for any of the wells

21   in the Murrieta storage unit basin as shown on Exhibit 17 in

22   addition to or apart from those pump tests that might be

23   part of the well logs?

24       THE WITNESS:  No, I do not.

25       THE COURT:  Is that what you wanted?

C-2

1      MR. KRIEGER:  Yes.

2          Now may I ask --

3      THE COURT:  All right.

4      MR. KRIEGER:  -- if the witness would project on

5  Exhibit 17-A those wells which have pump tests connected

6  with them?

7      THE COURT:  What do you mean "project on 17"?

8      MR. KRIEGER:  Locate on them with some sort of a symbol

9  to indicate which of those wells have pump tests.

10     MR. VEEDER:  Well, now, your Honor, I think that the

11  line down which we should be asked to prepare the case for

12  counsel --  Why can't he get himself a witness and prepare

13  his own exhibits for once?  We are not trying to hold out

14  anything.

15     THE COURT:  You mean as part of this cross examination

16  or later on to put it physically on Exhibit 17?

17     MR. KRIEGER:  I would like to have it put on 17.

18     THE COURT:  17-A.

19     MR. KRIEGER:  A, yes.  And I think I have made the

20  point why I want it.  It is the difference between a

21  geological study and a hydrological study, your Honor.  And

22  I think if we have the knowledge of whether this witness is

23  testifying from specific yields over to specific capacities,

24  it will be very helpful.

25     MR. STAHLMAN:  What good would it do unless you had

them all?

MR. KRIEGER:   I think it would be very helpful, because the witness has testified he has taken index wells throughout each of these basins.   I also think, your Honor, it would throw a great deal of light on this matter for your sake, because, in showing what these recoveries are and what these drawdowns are and how they affect one well over another, may be very beneficial in deciding what waters actually get in the stream system.

THE COURT:   Well, you have a right to show me that.

MR. KRIEGER:   I tried to discover whether this witness has made such a study; that is all.

THE COURT:   He has told you that the only pump tests he has got are the pump tests that are connected with and included in the well log in 16-A; is that right?

Q   BY MR. KRIEGER:   And only some of those, is that right, Mr. Kunkel?

A   Some of what, logs or pump tests?

Q   Yes.

A   Yes, what?   Logs or pump tests?

Q   Only some of the well logs have pump tests connected with them? is that right?

A   Yes.

Q   That is right.

THE COURT:   About how many of them, do you recall, have

Kunkel - Cross

1   pump tests?

2          THE WITNESS:  I do not recall, your Honor.  I made no

3   tabulations.  I evaluated the data as I went along.

4          Q  BY MR. KRIEGER:  Can you identify which of those

5   well logs have pump tests?

6          MR. VEEDER:  They are in the record, your Honor.

7          THE WITNESS:  Yes, it would be possible just by read-

8   ing the well logs.

9          Q  BY MR. VEEDER:  I think counsel could even do it.

10         MR. KRIEGER:  Let me read those during the recess, if

11  I may, your Honor, and see if I can find out about that.

12         THE COURT:  All right.  We will take our recess now.

13         (Short recess.)

14

15

16

17

18

19

20

21

22

23

24

25

2934

D

Z19

1    Q  Mr. Kunkel, let me hand you Exhibit 16-A and ask you

2  what that exhibit purports to represent.

3    A  They are copies of well logs from files of the Depart-

4  ment of Water Resources and other sources.

5    Q  And what relation does that bear to the exhibits on the

6  board here-- 16 and 17?

7    A  The wells in Exhibit 16-A are wells which were used in

8  the preparation of Exhibits 15, 16, 17 and 18.

9    Q  Now, those are not all the well logs you used, how-

10 ever, are they?

11   A  No, sir, they are not.

12   Q  This morning Mr. Veeder has marked some additional

13 exhibits for identification, some additional well logs.  Can

14 you tell me how those additional well logs differ from the ones

15 that are in Exhibit 16-A?

16   A In general the other well logs are shallower or in one

17 regard or another, in my opinion, were less reliable.

18   Q  And hence were not used in drawing the basins referred

19 to on Exhibit 17?

20   A  I am sorry.  I misanswered that question.  The well

21 logs that I have listed in Exhibit 16-- the number I am not

22 certain.  Can you help me.

23   Q  Yes; 16-B.

24   A  I want to be certain I am talking about the correct

25 exhibit.

D

220

1        (Mr. Krieger hands document to the witness.)

2        A   May I repeat my answer.   I answered it incorrectly.   I

3   answered your question incorrectly at first.

4        The well logs indicated in Exhibit 16-B, 146 in number,

5   were used by me in the estimate of ground water storage capacity

6   of Exhibit 17.   Have I answered your question?

7        Q   What is the relation, if you will please tell me, be-

8   tween Exhibits 16-B and 16-A?

9        A The number of wells in 16-A are only part of the wells

10   indicated on Exhibit 16-B.

11        Q   16-A are the actual well logs which you have check marked

12   off, are they, on Exhibit 16-B?

13        A   That is correct.

14        Q   Now, would you please look at Exhibit 16-A, thumb

15   through those well logs and pick out the well logs that have

16   pump tests?   By that I mean the type of pump test that can

17   tell you the specific capacity of the well log.

18        THE COURT:   Of the well log, or of the well, do you mean?

19        MR. KRIEGER:   Well, in that case they are both logged

20   and pumped, your Honor, the well reported on.

21        MR. VEEDER:   I object to the question because a well log

22   is one thing and a well is another.   So let's be specific.

23        MR. KRIEGER:   All right, change the wording to the well

24   reported in the log.

25        MR. VEEDER:   I interpose another objection that this goes

D

Z21

1  beyond the scope of the direct examination, your Honor.  The

2  witness, it is true, is a hydrologist, but the primary evidence

3  that has been put in is geologic in character, and the question

4  of pumping capacity or the capacity of a pump is certainly not

5  reflective in any sense of the word of the availability of water.

6  And that is what the witness has been trying to say.

7      THE COURT:  Overruled.

8      MR. KRIEGER:  It is there in front of you.

9      THE WITNESS:  The log that happens to be on the top of the

10 pile-- they are no longer in numerical order and they are very

11 badly shuffled-- is 8South, 2 West, 29-C-1.

12     THE COURT:  Is it necessary at this time to spot these on

13 the map?  Can you go through and just sort out those by number

14 and then let counsel later look at the record and study it?

15     THE WITNESS:  All right.

16     THE COURT:  He has asked you for those that have pumping

17 tests.

18     MR. KRIEGER:  All right.

19     THE WITNESS:  8 South, 2 West, 29-C-1 -- the well states

20 "Drilled 1913.  Flowed over the top when completed for a year

21 and stood for two or three years.  Then cleaned out and flowed

22 again for two or three years.  Pump is 8-inch Byron Jackson

23 turbine, 1953.  Pump 38 inches of water."  38 inches of water

24 is 38 times 9; approximately 400 gallons a minute.  The well

25 is 500 feet deep.

1        THE COURT:  Is this what you wanted, or do you just want

2 the designation of those that had well tests?

3        MR. KRIEGER:  I want a designation of the well tests and

4 then a statement of the specific capacity, that's all.

5        THE WITNESS:  From this log--

6        MR. VEEDER:  Your Honor, I have to object again because it

7 can only be reflective of what appears at the moment on the

8 thing that was written down.  It involves the efficiency of

9 the pump, whether the perforations are fouled up.  There are a

10 thousand things that are entailed.  Now he can recite what has

11 been said here, but it doesn't show the capacity of the pump

12 as of today.

13        THE COURT:  I understand that.

14        Just pick out the well logs where there is a pumping test,

15 identify the log by your number on it and say what the capacity

16 shows on that particular log as of the date it was written.

17        THE WITNESS:  All right.

18        THE COURT:  We don't need anything more.

19        THE WITNESS:  From the information presented, from what I

20 know of the area, the examination of the well log--

21        MR. KRIEGER:  If I may say so, your Honor, I am simply

22 asking the witness to tell us what the specific capacity is of

23 that well as shown on the exhibit.

24        THE COURT:  Here is all they want you to do.  Go through

25 this file and say, "Well log 8-S-2-W, 29-C-1"-- you don't need

D

Zxx23

1    to give the date because it will appear on the log here--

2    capacity so much.

3         THE WITNESS:  Mathematically on this log and on most of the

4    other logs, the mathematical calculation of capacity is not valid.

5    BY MR. KRIEGER:

6         Q  It takes two factors, doesn't it?  It takes the amount

7    of drawdown and the gallons per minute?

8         A  That is correct.

9         Q  Can't you make a comparison from those two factors?

10        A  I can.

11        Q  Would you, please?

12        MR. VEEDER:  I respectfully submit that the exhibit speaks

13   for itself, your Honor, and I can't understand the reason for

14   this cross-examination.

15        THE COURT:  How long will it take to make these computa-

16   tions?

17        THE WITNESS:  The mechanical computation of a number for

18   most of these logs is not a mechanical possibility.

19        MR. KRIEGER:  I was not attempting to ask a prolonged

20   question.  There are about one or two, possibly three, of all

21   those logs that have pump tests, and that is what I want the

22   witness to show me.

23        MR. VEEDER:  The exhibit speaks for itself.

24        THE COURT:  There are only two or three that have pump

25   tests?

D

Z24

1        MR. KRIEGER:  That I could observe.

2        THE COURT:  Well, go through them.

3        THE WITNESS:  It is semantics again, your Honor.  There

4  are many-- I have not counted them; I would have to do it--

5  wells on which information is given with regard to pumping

6  measurements of the amount of water being pumped from the well.

7  That is by one definition a pump test.

8        MR. VEEDER:  That is the point I make, when the exhibit

9  speaks for itself.

10        MR. KRIEGER:  I have tried to ask a very simple question.

11  He has testified before about specific capacity of wells.  He

12  has testified that it equals the amount of drawdown divided

13  into the gallons per minute, and I have given him examples in

14  Bulletin 57 of how it is done.  As I have quickly gone through

15  those well logs, there are just a random few that have that

16  information, and it is exactly the point we wish to get before

17  the Court.

18        MR. STAHLMAN:  May I ask counsel, through the Court, what

19  this will prove.

20        MR. KRIEGER:  I think it will prove what we feel is one

21  of the missing links in this testimony of Mr. Kunkel, namely,

22  that the permeability of these different deposits is of the

23  essence in determining whether or not the water in those

24  deposits materially contributes to the stream system.

25        MR. VEEDER:  Well, the Pauba well is a good example.

3940

D

Z25

1          MR. KRIEGER:  May I finish my statement?

2          THE COURT:  Yes, go ahead.

3          MR. KRIEGER:  For example, we feel that there is much area,

4  in fact, all the area in orange, is not part of the stream

5  system.  We do concede that the yellow portion is.  Now so far

6  the testimony has indicated that it is neither yellow nor orange

7  nor anything else, but a line that is drawn around the boundaries

8  of the older continental deposits, basically.  I want to move

9  into that a little bit later.  But our point is simply to

10  demonstrate that if you know what these wells really do, if

11  you know the amount of drawdown, how little water they do pro-

12  duce, you will be able better to judge how much of that area

13  comes within the stream system, under the rule of riparian law.

14          MR. VEEDER:  May I respond to that somewhat, your Honor.

15          This evidence that we are showing is that you have a well

16  that is 30 feet deep and you have a well test on it.  It doesn't

17  mean a thing as to the availability of the water, and well

18  capacity as pumped has nothing to do with the issues that are

19  here presented.  The whole question is, if you put a well down

20  a particular distance, what kind and type of strata would it

21  encounter and what would be the results if you put a pump on it?

22  The mere fact that somebody had a domestic well here and pumped

23  only X quantity of water is certainly not reflective in any

24  way, nor is it germane as to whether or not there are large

25  quantities of water-bearing strata in the area marked 4 on

Kunkel   Cross

D

Z26

1  Exhibit 17.

2      Now, we submit that this whole line of questioning is

3  irrelevant because it turns entirely upon the kind and type of

4  well that a man at some given moment happened to drill into some

5  given area?  So when you take the criteria that is being used

6  in this cross-examination you are trying to add half a dozen

7  oranges and 11-25.  They simply are not comparable.

8      THE COURT:  Well,  you have a right to present your theory

9  of the case.  Defendants have a right to present their theory.

10  I may agree with you eventually.  I may agree with them.  I want

11  to find out about it.

12      Let's see these well logs.

13      The objection is overruled.

14      MR. VEEDER:  May I have those well logs all marked, each

15  individual page marked as an exhibit, that is, 16-A-1, 2, 3, 4,

16  5, all the way through, so that we will have the same gospel,

17  so to speak, from which to read.

18      THE  COURT:  Now, Mr. Krieger, you want the witness in

19  16-A to pick out those well logs where, by the information shown

20  on the sheet, apart from any knowledge the witness had or ob-

21  servations he made or inquiries or anything else, where from the

22  sheet itself there is shown some capacity of the well?

23      MR. KRIEGER:  Or the data from which-- just the data from

24  which he can compute the capacity, meaning the drawdown and the

25  gallons per minute.

1          For example, your Honor, if you will look at the Pauba

2    well-- it is a good illustration-- it is a very simple thing

3    to do.  In fact, they have the answer right on the sheet.  I

4    think it is the last one in that group.

5          THE WITNESS:  There are two logs on the Pauba well, a

6    driller's log and a Geological Survey log.

7          MR. KRIEGER:  I think that is it.

8          THE COURT:  Do you understand what Mr. Krieger is talking

9    about?

10         THE WITNESS:  I understand what Mr. Krieger is talking about

11   now.

12         THE COURT:  We are not going to take time in court to do

13   it.  How long would it take you to run through this list and

14   pick out the well logs that would come within the category that

15   he suggests?

16         MR. VEEDER:  We can do it during the noon hour, your Honor.

17         THE WITNESS:  For the well logs now in possession of the

18   Court?

19         THE COURT:  Exhibit 16-A.

20         THE WITNESS:  All right.

21         THE COURT:  Let me ask you this:  You say that you want

22   these numbered, and that is agreeable with me.  Do you want

23   to get them in some kind of order before you do that?

24         MR. VEEDER:  I think they should be in some kind of order,

25   your Honor.

THE WITNESS:  It would be considerably easier if they were in some kind of order.

THE COURT:  Get them in order and the Clerk will with a red pencil so we can see them readily assign an Arabic sub-number so they will be 16-A-1, 16-A-2, 16-A-3, et cetera.  Then when we refer to these logs we can use that exhibit number and not have to go through this 8 South, 2 West, 29-C-1 to identify it.  Is that agreeable?

MR. KRIEGER:  That is fine, your Honor.

THE COURT:  Pick these out.  Can you also, by a slip of paper attached to each one, make a computation of the capacity of the well in those cases where the data appears?

THE WITNESS:  If possible, I will.

THE COURT:  All right.

MR. VEEDER:  Your Honor, I would like the record to show that we have now assigned exhibit numbers onto the Press release of the U.S.G.S., and if agreeable to your Honor I will pass it on to the reporter.

THE COURT:  All right, hand it to the reporter.  We will postpone your cross-examination on that until this work has been done.

1

2

3

4        (The Press Release above referred to is as follows:

5

6                    DEPARTMENT OF THE INTERIOR

7                        Information Service

8   GEOLOGICAL SURVEY

9   For release SEPTEMBER 8, 1958

10            WATER-RESOURCES EXHIBITS ON SANTA MARGARITA

11                RIVER BASIN, CALIFORNIA, RELEASED

12        Maps, graphs, and charts depicting the water resources

13  of the Santa Margarita River basin, California, have been

14  approved for release by the Geological Survey, the Department

15  of the Interior announced today.

16        This material shows the geology, streamflow, and ground-

17  water hydrology of the basin, and was prepared at the request

18  of the Navy and Justice Departments for use as exhibits in the

19  case, United States v. Fallbrook Public Utility District, et

20  al.  The litigation involves certain claims of right to the

21  use of the Santa Margarita River by the Department of the Navy

22  for its Marine Base at Camp Pendleton.  The exhibits consist

23  of the following tables and illustrations:

24

25

Kunkel   Cross

D
Z30

1   U.S.A.-Pl                    Tables
     Exhibit No.

2

3          28      Seasonal precipitation, in inches, at selected

4                  sites in southern California.

5          64      Comparison of average seasonal precipitation for

6                  certain periods of selected sites in southern

7                  California.

8   27,27A,27B     Monthly and seasonal precipitation, in inches,

9                  at Los Angeles, Fallbrook, and San Diego, Calif.

10                 - 3 sheets.

11       20-26     D ily discharge, in cfs, at gaging stations in

12                 the Santa Margarita River basin.

13         60      Monthly and annual runoff, in acre-feet, at gaging

14                 stations in the Santa Margarita River basin.

15         62      Estimated annual inflow, in acre-feet, to the

16                 Santa Margarita River valley at De Luz damsite

17                 for period 1922-57.

18         18      Estimated ground-water storage capacity of the

19                 alluvial deposits, upper Santa Margarita River

20                 basin, Calif.

21         43      Estimated ground-water storage capacity of the

22                 alluvium and terrace deposits, lower Santa

23                 Margarita River basin, Camp Pendleton, California.

24                              Illustrations

25         63      Seasonal precipitation at selected sites in

D

Z31

| | | |
|---|---|---|
| 1 | 30 | Isohyetal map of Santa Margarita River basin. |
| 2 | 65 | Residual mass curves of seasonal precipitation |
| 3 | | indices. |
| 4 | 66 | Residual mass curves of precipitation and runoff. |
| 5 | 31 | Wet and dry periods in southern California. |
| 6 | 32-36 | Hydrographs of monthly runoff at gaging stations |
| 7 | | inthe Santa Margarita River basin - 5 sheets. |
| 8 | 37 | Geologic map (lower Santa Margarita River basin). |
| 9 | 38 | Geologic section E-E' through the lower Santa |
| 10 | | Margarita River valley, showing unconsolidated |
| 11 | | deposits and water-level profiles. |
| 12 | 39 | Isopach map of alluvial deposits (lower Santa |
| 13 | | Margarita River basin.) |
| 14 | 44 | Water-level contours, November 1951 (lower |
| 15 | | Santa Margarita River basin). |
| 16 | 45 | Water-level contours, October 1957 (lower Santa |
| 17 | | Margarita River basin). |
| 18 | 47 | Pumpage of ground water from Upper, Chappo, and |
| 19 | | Ysidora subbasins, Camp Pendleton, 1925-57. |
| 20 | 48 | Camp pumpage and sewage effluent returned to |
| 21 | | basin, 1942-57 (Camp Pendleton). |
| 22 | 49 | Ground-water recharge and discharge, lower Santa |
| 23 | | Margarita River basin, 1942-57. |
| 24 | 51 | Fluctuations of water levels in ten wells in the |
| 25 | | lower Santa Margarita River basin. |

D

Z32

| 1 | 46 | Hydrographs of paired shallow and deep wells |
| 2 | | in Ysidora subbasin, Camp Pendleton |
| 3 | 40 | Ground-water basin, storage units, and well |
| 4 | | locations (lower Santa Margarita River basin). |
| 5 | 41 | Bar graph showing specific yield of materials |
| 6 | | in Upper, Chappo, and Ysidora subbasins. |
| 7 | 42 | Estimated ground-water storage capacities for |
| 8 | | Upper, Chappo, and Ysidora subbasins, Camp |
| 9 | | Pendleton. |
| 10 | 50 | Ground-water storage changes, Camp Pendleton, |
| 11 | | 1942-57. |
| 12 | 52 | Effect of pumping 23,000 acre-feet per year from |
| 13 | | ground water, Camp Pendleton, during two critical |
| 14 | | dry periods, 1948-51 and 1955-57. |
| 15 | 53 | Maximum annual pumpage during droughts of 3 to |
| 16 | | 10 years, lower Santa Margarita basin. |
| 17 | 54 | Graph showing chloride content of well waters in |
| 18 | | Ysidora subbasin. |
| 19 | 55 | Chemical character of native and contaminated |
| 20 | | waters downstream from Chappo subbasin, Camp |
| 21 | | Pendleton. |
| 22 | 56 | Comparison of chemical character of well water and |
| 23 | | sewage effluent, Camp Pendleton, 1955-58. |
| 24 | 15 | Santa Margarita River watershed, geologic and |
| 25 | | hydrologic map. |

D

Z33

16      Santa Margarita River watershed, geologic cross
        section.

17      Santa Margarita River watershed, showing ground-
        water storage units.

The exhibits were prepared by G. F. Worts, Jr., Walter
Hofmann, and Fred Kunkel.  Copies of this material may be
inspected in the offices of the Geological Survey, Room 1033,
General Services Building, 18th and F Streets, NW, Washington,
D. C., and the Public Inquiries Office, Room 1031, Bartlett
Building, 215 West 7th Street, Los Angeles, Calif.; at the Office
of Ground Water Resources, Marine Corps, Camp Del Mar, Camp
Pendleton, Calif.; and at the Office of the Clerk of the Court,
Federal Courthouse, San Diego, Calif.)


MR. KRIEGER:  All right, thank you.

Q  While we are talking about these wells, you testified
on October 3rd, at page 2552 of the transcript, in reply to a
statement on line 13 referring to Exhibit 17, you said that
you marked those areas where there was any appreciable depth
of water-bearing deposit.

E-1   ML j

1    Q  BY MR. KRIEGER:  And I just wondered about the

2    term of "appreciable," what you mean.  And you answered:

3    "By 'appreciable,' I mean an area within which it is feasible

4    to draw water wells and pump wells for use."  What do you

5    mean by "feasible"?

6        A    That the yield of the well will be adequate for

7    the purpose for which it was intended.

8        Q    No matter how much it costs to pump that water?

9        A    I have made no economic analysis.

10       Q    All right.  What would be a feasible amount, then,

11   in quantity?

12       MR. VEEDER:  I object to that.  A feasible amount of

13   what?  What would be a feasible amount?

14       MR. KRIEBER:  The witness has testified that he is

15   talking about the yield of a well.  I am asking him a yield

16   in what quantity?

17       MR. VEEDER:  Is the inquiry directed to an irrigation

18   well or is it directed to a domestic well?  I think the

19   witness should be advised.

20       THE COURT:  Of course, the witness' statement was

21   feasible for the purpose intended or the use intended.

22       THE WITNESS:  That is right.

23       THE COURT:  So that is your answer.  In other words, if

24   the fellow was going to drill a well to water stock, I

25   suppose that would be if he got water enough to water stock

that would be a well sufficient for the purposes intended.

Q  BY MR. KRIEGER:  Regardless of how deep he went, regardless of what kind of a pump he had to put on that well, and regardless of the economics involved in pumping it?

MR. VEEDER:  I object to that.  It goes beyond the scope of direct examination.

THE COURT:  Overruled.

MR. KRIEGER:  That is correct.

THE COURT:  Overruled.  What is your answer?

THE WITNESS:  Yes.

THE COURT:  In other words, you made no economic studies on this at all?

THE WITNESS:  I made no economic studies.

Q  BY MR. KRIEGER:  And yet a well that was located just outside any one of your sub-basins, your ground water basins on Exhibit 17 and within such a basin line would not necessarily have produced more or less water, is that right?

A    The contact lines, as shown for the boundaries of the hydrologic units, are showing.  The contacts may be, and it is in certain cases, very abrupt and in other cases it is and it may be and also is a gradational thing.  Not the same in all places along the boundaries of the hydrologic units.

1    Q    Well, is the line itself around those basins

2    indicative of anything in particular?

3    A    It is indicative of an area within which it is

4    feasible to drill and pump wells for use.

5    Q    And did you draw those lines without making

6    specific capacity tests in the area?

7    A    Yes.

8    Q    I think you testified a little earlier that the

9    pumping of the Pauba well in the Pauba Basin had an effect

10   on the Studley well, is that right?

11   A    That is correct.

12   Q    Do you know how much effect it had?

13   A    Yes.  The Studley well, prior to the test, was

14   flowing about 200 gallons a minute.  And during the test

15   the flow ceased entirely.

16   Q    And how deep was the Studley well?

17   A    I would have to check the records in the files

18   of the Geological Survey, but I believe the well had an

19   obstruction in it so it was not possible to sound the well

20   for its full depth.

21   Q    Oh.  Do you know how long you pumped the Pauba

22   well?

23   A    I would have to check the log.  It was a considerable

24   period.

25   Q    It was a considerable period?

1    A    It was a matter of many hours; of hours.

2    Q    Hours.  Did you do it just once?

3    A    I would have to check the records.  I was not

4  present at the development and pump test of the Pauba well.

5    Q    Now, this Exhibit 16-A that we have here on the

6  Pauba well does not show this information, does it?

7    A    I would have to check it.  It may.

8    Q    During the lunch hour could you also obtain that

9  information so we don't waste time now?

10    A    I will do that.

11    Q    Thanks.

12         Did the pumping of the Pauba well have effect

13  on any other wells in the Pauba Valley?

14    A    In the Pauba Valley?

15    Q    Yes.

16    A    Again, I would have to check the notes.  I do not

17  recall.

18    Q    By "Pauba Valley" I mean unit No. 3 on Exhibit

19  17.  There are many other wells in that area, are there

20  not?

21    A    There are other wells in the area, yes.

22    Q    I would like to know if it had an effect on any

23  other wells and if you checked any other wells at the time

24  you checked the Studley  well.  Now, next question --

25         THE COURT:  You didn't personally check the effect on

1  the  Studley well, did you?  Or is that just --    Were

2  you present?

3      THE WITNESS:  I was not.  My superior, Mr. Worts,

4  personally checked the well and has reported the information

5  to me.

6      THE COURT:  All right.

7      THE WITNESS:  Personally.

8      THE COURT:  All right.  Go ahead.

9      Q  BY MR. KRIEGER:  I think you also testified that the

10  rising water in the Pauba Valley has moved downgrade toward

11  the lip of the canyon since 1950, and you were reciting

12  some of the reasons causing that, including the heavy

13  pumping in the Pauba Valley.  And I think you were asked

14  whether there were other causes that might have caused the

15  lowering of that rising water table.  Could the construction

16  of the Vail Dam have had anything to do with that?

17      A    It could have.

18      Q    Could the impounding of water behind Vail Dam

19  have an effect on it?

20      A    It could have.

21      Q    Do you think it did?

22      MR. VEEDER:  I object, your Honor.  That goes beyond

23  the scope of the direct examination.  He didn't touch on

24  the point at all.

25      THE COURT:  Overruled.  He hasn't specifically talked

about it, but he has talked about the hydrology of this area. I don't know how you can break it down and say he had to specifically talk about one item of it. It would be within the scope of cross examination. Maybe he knows; maybe he doesn't. Overruled.

THE WITNESS: Repeat the question, please.

(The reporter read back the question.)

THE WITNESS: It could have.

Q   BY MR. KRIEGER:  Well, in your opinion, did it have?

MR. VEEDER:  Now, again, your Honor, I submit that there are so many questions entailed in this. It depends on how long the Vails pumped in the valley. It entails how many pumps they had, what crops they had, how many cuttings of alfalfa. There are thousands of elements that would be entailed in such a conclusion. I submit that unless all of those elements are included the witness should not be asked that question.

THE COURT:  Overruled.

THE WITNESS:  I don't know.

THE COURT:  Next question.

Q   BY MR. KRIEGER:  Do you know whether the pumping of a Pauba well had any influence on wells outside the Pauba Valley?

A      To which ground water unit are you specifically --

Q      I said outside any place.

MR. VEEDER:  Well, could we have three or four?  We put those on for a very definite reason, your Honor, and the designation would be more helpful if counsel would refer to this --

MR. KRIEGER:  All right, surely.  I was just giving the witness latitude, that is all.

Q     Does it have any effect on your unit marked 3 on Exhibit 17?

A     I would have to check closely the position of the Studley well in the -- referring to other wells.  I am sorry; I didn't answer your question, probably.  I don't know.  I would have to check.

Q     If it is helpful to you at all, on Exhibit 17 Studley well is located within your basin No. 3, Mr. Kunkel.

A     I would have to check the notes with regard to these questions.  The notes were taken in 1951, and I have not examined them recently.

MR. KRIEGER:  I would like to have the witness bring his notes, your Honor, because to us this is a very important field of inquiry.

THE WITNESS:  The Court has requested for them, and I have promised to bring them.  They will be made available.

MR. KRIEGER:  All right.

Q     Can you answer whether the pumping of the Pauba well had any influence on wells in unit No. 4 on Exhibit 17?

1    A    I have testified that I don't recall to the notes.

2  I will have to check notes to see where the effects were.

3  The Studley well was the only one within units 3 and 4 that

4  I have a remembrance of from the record.

5    Q    And is the Pauba well the only well that was

6  pumped for the purpose of determining what influence the

7  pumping of a well in one area had on surrounding wells?

8    A    Within the scope of my study, the Pauba well is

9  the only well that I have detailed records for.

10    Q    By "detailed records," what do you mean?  You

11  have records on other wells that were used but they aren't

12  detailed?

13    A    No.  No, I have --   Without going into a search

14  of the files, I have not checked all references for effects

15  of one well on the other.  These tests have been made, but

16  I have not made these.  I have not studied the records

17  fully and analyzed the records fully as to their meaning.

18    Q    So if they were made, you didn't take them into

19  account in coming to your conclusions, is that right?

20    A    The pumping you are referring would be the effect

21  of one well upon the effect of another in pumping?

22    Q    That is right.

23    A    No, I did not consider other data.

24    Q    Then, you have no knowledge, do you, of what

25  effect the pumping of a well in unit 4 on 17 -- and to make

1    it more specific let me say -- Well, strike the question.

2        Let me ask it very simply: Then, you have no

3    knowledge of what effect the pumping of a well in unit 4

4    would have on unit 1, the wells in unit 1, do you?

5        MR. VEEDER: Now, I object to that, your Honor, the

6    question of knowledge. What does he mean by "knowledge"?

7        Q  BY MR. KRIEGER: Do you know if there is any

8    effect of pumping?

9        That is my question.

10       THE COURT: Overruled.

11       THE WITNESS: Yes, I do know.

12       Q  BY MR. KRIEGER: From what information do you know?

13       A    From my geologic and hydrologic studies I have

14   stated the evidence is conclusive.

15       Q    All right. But you do not know from any physical

16   pumping test whether your geological conclusions are borne

17   out?

18       THE COURT: What?

19       MR. VEEDER: I started to make an objection. Then I

20   decided to let the witness take care of himself.

21       THE WITNESS: I do know that there have been these

22   pumping effects. The fact that I have not personally ob-

23   served and measured them does not mean that I do not know

24   that within the scope of my study.

25       Q  BY MR. KRIEGER: Well, Mr. Kunkel, have you checked

1    the effects, has anyone checked the geological conclusions

2    which you have come to against field tests in pumping?

3         MR. VEEDER:  Now, how could he answer "anyone"?

4    That is entirely --

5         THE COURT:  If he knows.

6         MR. VEEDER:  The State has got a thousand people

7    working for them.

8         THE WITNESS:  I am not trying to be difficult.  Would

9    you please read the question back to me?  I am trying to

10   give you a true answer.

11        (The reporter read the pending question.)

12        A    Yes, they have been checked against field tests

13   of pumping.

14        Q  BY MR. KRIEGER:  Where are those tests and who made

15   them?

16        A    The tests are in ground water studies in the

17   body of literature throughout the geological survey where

18   numerous tests have been made.

19        Q    Mr. Kunkel, I am not trying to be difficult,

20   either, but I am simply asking you whether there have been

21   field tests in the area we are talking about which would

22   support the conclusions you just reached which you said

23   was conclusive on the basis of geological evidence that a

24   well pumped in unit 4 would influence the wells pumping in

25   unit No. 1.

2959

A     To the best of my knowledge, such tests have, or such observations --

Q     We are not asking about observations; we are asking about field tests.

THE COURT:   What do you mean by "a field test"?

MR. KRIEGER:   I mean pump tests, your Honor.

THE WITNESS:   To what degree of precision do you mean your test when you talk about it?

THE COURT:   What is the difference between a field test and an observation?   An accurate observation would be a field test, wouldn't it?

MR. KRIEGER:   An observation, from my point of view, takes in all the other data this witness has testified to. What I am getting at, your Honor, is this:   He has testified, to show what we are talking about, that the Pauba well has an effect upon the Studley well.   And that is the thing I am talking about.

Q     Have comparable tests been made to show that pumping in 4 affects pumping in 1?

THE COURT:   By "field test" you mean an observation of the pumping in comparison with some other wells?

MR. KRIEGER:   Yes.

THE COURT:   Notes being made, a written report being made?

MR. KRIEGER:   Yes, precisely.

1  THE COURT:  Whether published or not?

2  MR. KRIEGER:  Comparable, exactly, to the Pauba-Studley

3  relationship.

4  THE COURT:  All right.  Do you know whether or not that

5  kind of a test has been made?

6  THE WITNESS:  To that degree of intensity, to that

7  degree of precision, I do not believe there have been other

8  tests made.  The Studley test, the Pauba well, was very

9  carefully controlled.

10  THE COURT:  All right.  Now, you say that there have

11  been observations made.  Complete your answer on that.

12  Apparently observations don't go as far as the field tests

13  to which Mr. Krieger refers.

14  THE WITNESS:  In my whole testimony, Mr. Krieger, I

15  have been trying to rely entirely upon personal observations,

16  with a minimum of information, I am sure you would call

17  hearsay -- I don't know if you would or not -- but I have

18  had conferences with Mr. Hall with regard to the effect of

19  other pumping, the effect of wells that were drilled and

20  pumped and tests made on them before I was born.  I have to

21  consider that information in my evaluation.  I cannot

22  testify that I made the test, that I even know the test was

23  made.  But Mr. Hall tells me that he has observed certain

24  things.  And on the basis of what Mr. Hall has told me, who

25  is, in my opinion, a very qualified hydrologist, has led

E-3

Kunkel - Cross                                    2961

1    me to certain inescapable conclusions.  I have not made the

2    personal test myself.  In my analysis I cannot separate the

3    two.

4        MR. VEEDER:  I want to be sure I comprehend what

5    counsel is saying.  You are now referring to this No. 1

6    area through the Murrieta Valley as a relation to 4, is that

7    correct?

8        MR. KRIEGER:  I related it to 3 so far.  Did I mention

9    1?  I am going to do that next.

10       THE COURT:  You have been talking about 1 and 4, not

11   3.

12       MR. VEEDER:  That was the --

13       MR. KRIEGER:  That is still all right.  The witness

14   has still testified that there has been no field test

15   comparable to the Pauba study well test to verify his

16   geological conclusions.

17       MR. VEEDER:  With regard to 1 and 4, that is what the

18   testimony has been related to.

19       MR. KRIEGER:  That is right.

20       Q    Now, I am going to pursue that a little further

21   and ask if you have any such comparable data -- and what

22   I mean by comparable data, I mean Pauba study relationship --

23   on the influence of wells in No. 4 on No. 3, which is the

24   Pauba Valley?

25       A    I do not recall of any immediate, in any situation

Kunkel - Cross

1  within which, between those two units 4 and 3 where the

2  precise measurements have been made.

3      Q      And I mean pumping in 4 showing an effect in 3;

4  that is what I am talking about.

5      A      No, I do not have that information.

6      Q      And how about pumping in 2 having an effect on

7  basin 3?  Any studies made?

8      A      Yes.

9      Q      All right.  When and by whom?

10      A      Well, again we must relate back to the Pauba

11  well.  I remember from the record and the discussions that,

12  our conferences that we had in the Geological Survey with

13  regard to the effect of these various wells that there was --

14  well, several wells were measured in unit 2.  And during

15  the test an effect was not noted while the Pauba well was

16  being pumped.

17      Q      Oh.

18      A      The wells in unit 2 that were observed -- no

19  magnitude of fluction was observed that could be directly

20  related to the pumping of the Pauba well.

21      Q      What was the well you checked in unit No. 2 for

22  that, do you recall?

23      A      Again, I do not recall the exact well.

24      Q      Have you got it plotted on your Exhibit 17-A?

25      A      No, I -- I may or I may not have.  I did not use

1    it in --I did  not use that particular pair of wells in

2    the analysis that I have attempted to show on Exhibits 15,

3    16, 17, and 18.  That is an affect that -- the exhibits do

4    not cover that effect.

5        Q    Do you have that information, in any event, that

6    you are testifying to?

7        A    The water level measurements are available in no

8    form for measurements made during that period.

9        Q    Will you bring those back after lunch?

10       A    No, I cannot bring those after lunch.  This will

11   all have to wait until I go to Long Beach and have copies

12   made.

13       Q    Now, take the reverse of the situation we were

14   just talking about.  Do you know whether pumping in unit 2

15   affects the well levels in unit 3?

16       A    Now, again you are referring to --   I know on the

17   basis of specific tests.

18       Q    I am not asking you that, because you have

19   testified to that at length.  I am asking you on the basis

20   of the type of field test which was conducted in the Pauba

21   study relationship.

22       A    With regard to the specific tests, the answer is

23   no, I do not have that information.

24       Q    Now, finally --

25       THE COURT:  Let me inquire --

1          MR. KRIEGER:  Pardon me.

2          THE COURT:  Do you have knowledge that pumping in 2

3     affects 3?

4          MR. VEEDER:  By "knowledge," does your Honor mean an

5     opinion?

6          THE COURT:  Well, put it an opinion.

7          THE WITNESS:  I have a very definite opinion, your

8     Honor.  There have been numerous tests and studies done

9     with regard to the effect of pumping across of a ground

10    water barrier, which I have testified to, that at the

11    Wildomar Fault zone is a barrier.  I have testified that the

12    fault was located because of the barrier effect of a dis-

13    placement in water levels.  I know that there is a --

14         MR. KRIEGER:  Your Honor, I don't believe that is

15    responsive to your question.  You asked if he knew of any

16    effect, and he said that he knew that pumping in one basin

17    affected another basin.  Isn't our question here whether he

18    has observed, either himself or through pump tests that have

19    been made and are reliable, whether or not pumping affects

20    in 2 water levels in 3?

21

22

23

24

25

F

Z34

1   THE COURT: That is your question.

2   My question is, do you have an opinion, in the studies

3   you have made, as to whether or not something in Unit 2 affects

4   the water level in Unit 3, Pauba Valley. Answer that yes or no.

5   THE WITNESS: Yes, I do have an opinion.

6   THE COURT: What is your opinion?

7   THE WITNESS: My opinion is that there is an effect across

8   the barrier, but it is of a different magnitude than the effect

9   on the same side of the barrier.

10   MR. VEEDER: Pumping on the same side of the barrier; is

11   that what he means?

12   BY MR. KRIEGER:

13   Q  Can you put it in a proportion?

14   A  The proportions are shown by the water level contours.

15   On the basis of the data available, the water level contours

16   are the conclusive evidence of my statements of these effects

17   and their relationships.

18   Q  When you use the term "magnitude" again, as you have

19   before, we are simply trying to put it into a context that we

20   can understand so that if we have to challenge your data we

21   are able to do it. Is it 2 to 1, or 3 to 1, or 4 to 1?

22   A  In Pauba Valley I do not know the relationships of the

23   magnitudes.

24   Q  While we are on that question, Mr. Kunkel, can you tell

25   me if it makes any difference where you pump in Unit No. 2 as

Kunkel  Cross

F
Z35

1   to the effect it might have on Pauba Valley Unit No. 3?

2       A  Again, we are talking about degree.

3       Would you repeat the question, please?

4       Q  I can repeat it very quickly.

5       Does it make any difference where you put your well down

6   in Unit No. 2 to determine how much effect it has on Unit No.

7   3?

8       A  To determine how much effect?  The answer is yes, it

9   does make a difference where you put your well.

10      Q  Where does the well have the most effect?

11      A  A well in which unit?

12      Q  In Unit No. 2.

13      THE COURT:  Would have the most effect on No. 3?

14      MR. KRIEGER:  On No. 3, yes.

15      THE WITNESS:  A well placed where it will cause the maximum

16   displacement of hydraulic gradient will be the place where the

17   effect is the greatest.

18   BY MR. KRIEGER:

19      Q  You can't determine that by geography, then; is that

20   right?

21      A  By geography you mean?

22      Q  I mean the surface of the land-- that is what it means

23   to me.

24      Let me put it to you another way, Mr. Kunkel.  Would a

25   well sunk in the southeasterlymost portion of Unit No. 2 have

F

Z36

1 as great effect on the well levels in Unit No. 3 as a well

2 which was sunk in the northwesterly portion of that unit?

3     A  (The witness stepping down)  Would you care to put it

4 in the exact description?  It does make a difference.

5     MR. VEEDER:  Now you are looking at Exhibit 17.

6 BY MR. KRIEGER:

7     Q  Would a well which is sunk in Section 28, which is 8

8 South, 2 West, have as much effect on ground water unit No. 3

9 as a well which is sunk in Section 19 of that same township?

10     A  In my opinion, the effect of a well-- in order to stay

11 within the unit let's say the northeast quarter of Section 19--

12 would have a greater effect than a well of comparable depth,

13 yield and conditions in the Section-- what was the number?

14     THE COURT:  28.

15     THE WITNESS:  -- 28.

16 BY MR. KRIEGER:

17     Q  You don't know how much difference the effect would be,

18 do you?

19     A  No, I do not have--

20     MR. VEEDER:  That might depend on the size of the well.

21     MR. KRIEGER:  No, he said comparable well, Mr. Veeder, and

22 that is all I am talking about in any of my questions here.

23 I am not trying to take different dimensions in my questions.

24     THE WITNESS:  May I review the record to make sure our

25 answers are correct?

F

237

Kunkel   Cross

1     MR. VEEDER:  No.

2  BY MR. KRIEGER:

3     Q  By the same token, would a well that is sunk and

4  pumped in Section 24 and in the northwest quarter of it--

5     A  Northwest Quarter of Section 24--

6     Q  --7 South--

7     A  --7 South--

8     Q  --3 West, have as much effect on the water level in

9  Unit No. 3 as a well which was --

10     THE COURT:  Of equal capacity, a comparable well.

11     MR. KRIEGER:  Yes.

12     THE COURT:  Have the same effect as one drilled or pumped

13  where?

14  BY MR. KRIEGER:

15     Q  In the Northwest Qarter of Section 8, Township 8 South,

16  2 West?

17     MR. VEEDER:  Mr. Krieger, is that the land of one of your

18  clients to which you are making reference?

19     MR. KRIEGER:  Yes.

20     THE WITNESS:  All things being equal-- well size, depth,

21  construction-- the effect of the well closest to the south

22  well would be greatest.

23     Q  And again you don't know how much difference it would

24  make, do you?

25     A  Without additional tests, I do not know.

1    Q  One further question in this same category.  A well

2  pumped in Unit 3, say the Pauba well, would have less effect

3  on the well levels in the section we just mentioned before--

4        THE COURT:  Section 24, 7 South, 3 West?

5        MR. KRIEGER:  Yes.

6        --than it would have in the water levels in the section

7  closest to Unit 3 which we last mentioned?

8        MR. VEEDER:  I object to that unless he puts a specific

9  time.  The effect of time and drawdown period are important.

10        THE COURT:  I understand your question.  A comparable well.

11        MR. KRIEGER:  That is right.

12        THE COURT:  Overruled.

13        THE WITNESS:  All things being equal-- time, depth, con-

14  struction, et cetera-- the point nearest the pumping well,

15  any point-- that isn't true here, dependent-- let's keep it at

16  the specific place we have discussed, because there are some

17  other factors here.  Of the two points described, the point

18  closest to the Pauba well would experience the greatest effect.

19  BY MR. KRIEGER:

20        Q  And wouldn't the question whether there was any effect

21  at all depend somewhat upon the recharge of your ground water

22  basin from other  sources?

23        THE WITNESS:  Please repeat the question.

24        (The reporter read the pending question as follows:  "And

25  wouldn't the question whether there was any effect at all

F

Z39

1    depend somewhat upon the recharge of your ground water

2    basin from other sources?")

3    MR. VEEDER:  I object to that because it is completely

4    beyond the scope of the direct examination.  If we are talking

5    about the importation of Feather River water, that is certainly

6    not an element in this lawsuit.

7    MR. KRIEGER:  Perhaps I should have said natural recharge,

8    your Honor.

9    MR. VEEDER:  Within the watershed of the Santa Margarita.

10   THE COURT:  We will understand the question as being

11   worded that way.

12   BY MR. KRIEGER:

13   Q  My question is this:  Whether or not the pumping of any

14   well in one ground water unit affects the water levels in any

15   other ground water unit, is influenced by the rate of recharge

16   of those ground water units?  Is that not right?

17   A  Assuming natural conditions, the pumping of any well

18   will affect the water level in any other well that is in

19   hydraulic continuity, even though it is indicated as a separate

20   ground water storage unit on Exhibit 17.

21   Q  How long would it take to influence such a well, re-

22   gardless of recharge?

23   A  As I have previously testified,  one well a great

24   distance may have to pump for many, many-- let me finish--

25   pump for many, many years before you have an appreciable effect.

1    I am talking about one well.  But you put a series of wells--

2    now the effect will be there-- I am talking about a precise

3    measureable effect now.  The effect is there.  But it may take

4    many years before you could actually show the effect.  But you

5    get a sufficient number of wells in the area and their composite

6    effect will produce a measureable effect.

7        MR. VEEDER:  Now, your Honor, it is noon.  May I tender

8    the thought.

9        THE COURT:  Yes, this is a good time to stop.  We will

10   adjourn this afternoon at 4.  Do you want to come back at 1:30?

11       MR. VEEDER:  We have many things to do during the noon

12   hour, your Honor.

13       THE COURT:  All right, 2 o'clock.

14       MR. VEEDER:  May we have your map of 15?  We have a man

15   here to start putting the colors on it for you.  I don't know

16   whether your Honor has been putting it on yourself or not.

17       THE COURT:  I have been putting a lot of the blue on it

18   for him.

19       Mr. Veeder, Mr. Sachse, Mr. Moskovitz, Mr. Krieger, Mr.

20   Stahlman, may I have just a word with you.

21       (Noon recess.)

22

23

24

25

Kunkel   Cross

SAN DIEGO, CALIFORNIA, FRIDAY, OCTOBER 10, 1958.  2:00 P.M.


(Another matter.)

THE COURT:  Mr. Moskovitz.

MR. MOSKOVITZ:  Your Honor, I just wanted to announce that we have copies of the summary that Mr. Baronkay, who is associated with me, has prepared of the first day's testimony.  He is preparing summaries of each succeeding day.  I have given other counsel a copy and I have one for your Honor, if you like.  If there are any suggestions from any of counsel or from you, your Honor, I will be happy to receive them.  We will continue to do this throughout the trial.

THE COURT:  All right.

The United States hasn't yet prepared any type of material?

MR. VEEDER:  It is not ready for distribution, your Honor.

THE COURT:  All right.

Thank you, Mr. Moskovitz.

Come back to the stand, Mr. Kunkel.


FRED KUNKEL,

heretofore called and sworn, recalled as a witness in behalf of the plaintiff, testified further as follows:

THE COURT:  Mr . Clerk, in your absence while you were working in the other room I directed that you take Exhibit 16-A, the well logs, and list those various well logs in order, 16-A-1,

Kunkel - Cross

1   16-A-2, 16-A-3, et cetera.  Do it with red pencil so that we can

2   see it.  They are now supposed to be in some logical order, so

3   you can start numbering at the top and work on down.

4        Mr. Krieger, do you have something you can go ahead with

5   while the Clerk is doing this?

6        MR. KRIEGER:  Yes, indeed, your Honor.

7

8                    CROSS-EXAMINATION (Resumed)

9   BY MR. KRIEGER:

10       Q  Is it possible, Mr. Kunkel, that the degree in rate of

11   drawdown of any one of your ground water basins is influenced

12   by the rate of recharge of that basin?

13       A  The rate of recharge does not enter into the analysis.

14       THE COURT:  Do you understand the question?

15       THE WITNESS:  Yes, sir, I do.

16       THE COURT:  Is the rate of drawdown of a well in one of

17   the basins influenced by the rate of recharge?

18       MR. VEEDER:  It is a matter of semantics, apparently, your

19   Honor.  I think it is very obvious that the witness should

20   explain what he has in mind, based upon the question that is

21   presented to him.

22       THE COURT:  Do you understand the question?

23       THE WITNESS:  I believe I do.

24       MR. VEEDER:  The question is whether counsel understand

25   what he has asked.

F

Z43

1    BY MR. KRIEGER:

2        Q  Your answer to my question is that it is not an item

3    in the consideration; is that right?

4        A  Under natural conditions, the ground water basin is in a

5    state of dynamic equilibrium.  The elements of inflow and the

6    elements of outflow are in balance.  Pumping a well, any well,

7    will cause a decrease in water level.

8        Q  And will not the water level come up as that basin is

9    recharged through natural runoff?

10        A  If pumping ceases, recharge will recharge the basin.

11    If pumping is continuous, the recharge is continuously going on.

12    A well will draw down the water level in the well, even though

13    there is-- there has to be recharge to a ground water basin.

14    Every ground water basin has--

15        THE COURT:  This is a very general question.  The question,

16    as I understood it was, would not the rate of recharge-- the

17    rate or the amount of recharge?

18        MR. KRIEGER:  The rate.

19        THE COURT:  --the rate of recharge have an effect upon the

20    drawdown of the well?  He didn't ask you how much the rate of

21    recharge was, or how great or how small.  But in general terms

22    whether or not the rate of recharge would have an effect upon

23    the drawdown of the well?

24        THE WITNESS:  No.

25        THE COURT:  I am no geologist, but it seems to me that

F

Z44

1   your answer should be yes.  I will give you an example.  Here

2   is a very small basin, and it has a water level.  It is very

3   porous material.  Into this basin is coming a very large amount

4   of water from the stream that pours off bedrock and runs right

5   into this gravel.  Now, contrast that with the situation of

6   another small basin with less permeable material, with just a

7   tricklet of water running into it and a large amount of water

8   being pulled out by the well.  Isn't it obvious that in one

9   case the immense amount of water coming into this very porous

10  basin would have an effect upon the drawdown of the well?

11          THE WITNESS:  May I diagram and put an equation on the

12  board, please.  I can't explain it otherwise.

13          THE COURT:  Have you got any room to do it over there?

14          Do you still want that diagram, Mr. Veeder?

15          MR. VEEDER:  Yes, I do, your Honor.

16          THE COURT:  Pick a place over there.

17          THE WITNESS:  (Stepping to the blackboard and drawing.)

18  In any ground water basin, inflow-- let's use I for inflow--

19  over a period of years is equal to the outflow.  The inflow and

20  outflow of a ground water basin are equal.  Plus or minus the

21  change-- delta, change of storage-- the equation is written:

22  I equals O plus or minus delta S.  Inflow equals outflow plus

23  or minus change of storage.  Over a period of years in any

24  ground water basin that is not pumped, the change in storage

25  will balance out to zero and inflow equals outflow.

F

Z45

1        We will draw our ground water basin again.  Outflow is

2   coming into it.  The quantity is not critical.  The outflow is

3   equal to the inflow.  There is a quantity of ground water in

4   storage.  A well is drilled into the basin and pumped.  The

5   effect of pumping is to add an element to the outflow.  The

6   outflow does not immediately decrease by the amount pumped.

7   Therefore, our equation then becomes, for pumping one well,

8   inflow has now become equal to outflow plus the change in

9   storage.  There has been a decline of water level.  The quantity

10  of recharge has not entered into the equation.  The equation

11  is the same, regardless of what the quantities are, because

12  inflow and outflow are equal.  We are talking about change in

13  storage.

14  BY MR. KRIEGER:

15       Q  Let me put the question to you this way:  Suppose there

16  was no outflow to the basin at all.  Then isn't it true that

17  if you continued to pump that basin, sooner or later the whole

18  quantity of water would disappear?

19       A  It is a hypothetical case that does not exist in nature.

20  However, if we are willing to assume a hypothetical case that

21  does not exist, the answer would be yes.

22       Q  If, then, you let some outflow come into that basin to

23  counteract or to offset the pumping that is taking place, isn't

24  it true that the rate at which that water comes back into the

25  basin and recharges it is going to influence the total amount

F

Z46

1  of water in that basin?

2      MR. VEEDER:  Is there agreement by counsel and the witness

3  as to the meaning of the word "drawdown"?  I think that may be

4  one of the problems.

5      MR. KRIEGER:  I don't think I used that word just now,

6  Mr. Veeder.

7      MR. VEEDER:  Yes, I think you did.

8      THE COURT:  Not right now.

9      MR. KRIEGER:  No.

10      THE COURT:  But you did previously.

11      MR. KRIEGER:  I have a question now before the witness that

12  I think is clear.

13      MR. VEEDER:  I don't see how we can unlock the word

14  "drawdown" from the balance of this interrogation.  That is my

15  concern here.  Certainly the record is going to be confused

16  now.

17      MR. STAHLMAN:  Couldn't we have an explanation of what the

18  witness means by "drawdown" so as to clarify the present

19  question?

20      MR. VEEDER:  We are laboring something that seems simple

21  to me.

22      THE COURT:  All right.

23      Mr. Witness, the original question was whether the rate

24  of recharge would affect the drawdown of the well.  What did

25  you understand "drawdown of the well" to mean?

F

Z47

THE WITNESS:  To me it means a decrease in water level in the basin, a change in storage.  They are one and the same thing, in my thinking.

THE COURT:  A decrease in the water level in the basin?

THE WITNESS:  Yes.

THE COURT:  You were not referring specifically to the cone of depression?

THE WITNESS:  No, sir.

THE COURT:  You were talking about the general water level in the basin?

THE WITNESS:  That is correct.

BY MR. KRIEGER:

Q  Isn't it true that as more water flows over that basin and as the deposit over which it flows lends itself to percolation that that basin may be tapped more readily through pumping without influencing the total quantity of storage in that basin?

A  I am sorry, I did not understand your question.

THE COURT:  Let me ask this now:  You have given an example where no water came into the basin.

THE WITNESS:  That is correct.

THE COURT:  And you said that that didn't exist in nature, but if you assumed that hypothetical case then in that situation the more you pumped the basin the lower the water level would go?

THE WITNESS:  That is correct.

F
Z48

1        THE COURT:  Now, then, let's just take one step at a time.

2   Let's take a basin where only a very little bit of water is

3   coming into the basin, just a trickle, but there is an immense

4   amount being pumped out of the basin.  If the outgo exceeds

5   the inflow, the water level of the basin will drop; is that

6   right?

7        THE WITNESS:  That is right.

8        THE COURT:  Therefore, is it not true that the rate of

9   recharge has some effect upon how the water level goes down

10   in the basin?

11        THE WITNESS:  No.

12        THE COURT:  Let me give you another example.  Now instead

13   of just a little trickle coming into this basin there has been

14   a large amount of water coming into the basin and the well

15   that is pumping out of the basin is pumping only a small amount

16   of water.  Wouldn't the water level in that basin tend to stay

17   more at a regular line and not decrease because of a large amount

18   of recharge?  You have a windmill pumping water out of the basin

19   and you have a terrific flow of water coming into the basin and

20   water running out of the basin.  The little bit you pump by the

21   windmill wouldn't affect the water level in the basin, would it?

22        THE WITNESS:  No, sir.

23        THE COURT:  Then isn't there a relationship in general

24   terms between the water level in the basin and the rate of

25   recharge of the basin?

F

Z49

1    THE WITNESS:  No, sir.  I will have to draw another diagram

2    to illustrate, to see if I can clarify the question.

3       Take a bucket and fill it with sand of uniform size-- the

4    simplest possible case-- and fill the pore spaces to a point

5    we will indicate as the water level.  Have a leak in the bottom

6    of the basin which is equal to outflow.  We will have a pipe

7    over the bucket dripping water into the basin.  If the size

8    of the bucket plus the rate of inflow-- there is a definite

9    rate of inflow-- if we would start this system going, start

10   with an empty bucket, one would eventually fill the bucket

11   up to the water level, at which the hydraulic gradient or head

12   of water, whichever term we care to use, would cause the out-

13   flow to be equal to the inflow, at which point the water level

14   would then remain constant-- there would be a dynamic equilibrium

15   established.  The elements of inflow and outflow would be in

16   balance and there would be no change in storage.  It doesn't

17   matter now what we do with regard to-- if we put a pump in

18   here now and would pump water out, we would lower the water

19   level.  I am talking about the water level in the container

20   now and not the water level in our well.  The head would be

21   reduced and the outflow would decrease, and our rate of re-

22   charge, the rate at which deposits would accept water, would

23   be the same.  If we increase this quantity of water, the rate

24   of inflow would increase and the water level would rise.  But

25   the pumping in this little container would not induce an

F

Z50

1    additional rate of inflow.  It would not make any difference

2    whether you were pumping out of that basin or not as long as

3    your water level was-- I am not certain of the exact distance,

4    but it is about ten feet or more, because when water level gets

5    that close to the surface there is a capillary effect on the

6    deposits and the recharge then is rejected.  But testifying

7    as to a basin in which there is a depth of water of 20, 30, 40,

8    50 feet, the answer to your question, as I understand it, Mr.

9    Krieger, is no.

10   BY MR. KRIEGER:

11       Q  Looking at your example now for a minute, if you were

12   to increase the drip into this cup or bucket--

13       MR. VEEDER:  I am not sure the witness has the question

14   in his mind.  I don't believe anybody has.  That is what I am

15   worried about your Honor.

16       THE COURT:  I think there is some mistake somewhere, be-

17   cause it is obvious to me.

18       Take the example of the bucket and this drip you have

19   there coming from a faucet.  If you turn the fauce on full force,

20   obviously your water level in the bucket is going to rise and

21   the first thing you know it will be spilling over the top.  So

22   there must be a relationship between the amount of recharge and

23   the amount of water level of the basin.  There has to be.

24       THE WITNESS:  There is a relationship between the amount

25   of recharge and the water level in the basin, but that

F
Z51

1  relationship is not dependent on pumping in the basin until

2  your basin is brim full.  Our basins are not brim full.  Our

3  basins have a distance to water.  You have to drill wells many

4  feet before water level is encountered.  And all we are doing

5  is just moving our bucket up and down, in one sense, underneath

6  our faucet, and it has no effect on the recharge.  The water level

7  is not critical.  With regard to the pumping of a well in that

8  bucket--

9      MR. KRIEGER:  Let me pursue this in another way.  I still

10  think there is some misunderstanding here.

11      MR. VEEDER:  I would rather have him pursue it than I, at

12  the moment.

13 BY MR. KRIEGER:

14      Q  Well, this seems to me just elemental in a layman's

15  thinking, at least, as to what happens to a ground water basin.

16  What I am trying to find out here, Mr. Kunkel, is this:  In

17  determining what the level of a ground water basin is, or is

18  going to be, do you take into account natural stream runoff?

19  Is that a factor in determining how quickly a basin is going

20  to be pumped dry?

21      A  Only for that part of the stream below which there is

22  rising ground water.  As I testified to the diagram that is on

23  the board from several days ago, at which point I testified

24  that recharge flowing over the stretch below which there is

25  rising ground water would reject the available recharge.

Kunkel - Cross                                                    22872

G-1 ML j

1      A    If water levels are pumped down in that part of

2  the basin, then the recharge flowing through that would

3  normally be rejected.  It would be induced into the ground

4  water body.  But that is a different situation than you have

5  described to me in your earlier question.  Using your

6  illustration, isn't the amount of stream runoff important

7  before the point of rising water to determine how much

8  percolation there is into your underground?

9      MR. VEEDER:  We are going to keep that picture as it

10 is, Mr. Kunkel.  You can talk about it if you want to.

11     THE WITNESS:  Pointing up streamside of the diagram

12 where ground water enters the basin to the point where there

13 is rising ground water, the system, under natural conditions,

14 has been and is in balance when man enters the basin and

15 begins his activities.  Over a long period of time -- I

16 am talking now in terms of the span of years that men

17 measure their lives by; not geologic time -- the amount of

18 recharging that is going to be induced into stretch of the

19 stream between the point of inflow to the base and the

20 point of rising ground water, is unaffected by the water

21 level or what happens to the water level in the area beneath

22 land surface where there is no ground water, where there is

23 no rising ground water.

24     Q    Isn't it true that the only way to get water into

25 this basin that is being pumped is from the point upstream

1  down to the point of rising water?

2       A    Under natural conditions those are the places of

3  recharge.

4       Q    Then, the amount of runoff, natural runoff, is

5  important, is it not, in considering the ground water basin

6  and the ground water basin level and keeping it up, is it

7  not?

8       A    The water levels over a period of -- regardless

9  of what happens to the water levels at the point of rising

10  water, the charge -- I am talking only to the part of the

11  basin between the point of inflow and the point of rising

12  water -- the amount of recharge that is induced to the

13  underground cannot be increased or decreased by the lowering

14  of the water level.

15      Q    Oh.  I didn't think my question had anything to

16  do with that, Mr. Kunkel.

17      MR. VEEDER:  As a matter of fact, it didn't.

18      MR. KRIEGER:  Yes, I think there may be a misunderstand-

19  ing.

20      Q    Let me put the question to you in a concrete

21  situation.

22      THE COURT:  Come over and sit down.  Just relax and

23  don't let these lawyers bother you.  We lawyers don't know

24  how to ask the questions in technical terms, so we try to

25  ask them in terms that make sense to us.  And maybe sometimes

1  we are not talking the same language as you fellows.  Try

2  to listen to the question and see what the attorney is

3  getting at.

4      Q  BY MR. KRIEGER:  Talking about the Pauba Valley

5  now for a moment, and assuming that the Pauba well is

6  pumped and pumped vigorously so that ordinarily the water

7  level of that basin would go down, is it not important to

8  the maintenance of that basin to determine how much water

9  escapes from Vail Dam and is permitted to roll over the

10  younger alluvium and percolate into the ground water basin?

11      MR. VEEDER:  I object to the word "escape."  Released;

12  regulated; put underground.

13      THE COURT:  Well, go ahead.  Objection overruled.

14      THE WITNESS:  The question regards -- has bearing on

15  or is with regard to the management of a ground water basin.

16  By very judicious pumping, coupled with timed releases, so

17  you could control the elements or one of the elements of

18  recharge to the basin, it wouldn't, in my opinion, be

19  possible to induce an additional increment of recharge to

20  the ground water basin that does not exist under natural

21  conditions.

22      Q  BY MR. KRIEGER:  Let me put it to you still another

23  way.  If the Pauba Valley basin is going down due to

24  pumping, does the quantity of water coming  down the

25  Temecula River over the Vail Dam and down have any effect on

1    that ground water basin level?

2       A    Yes.

3       Q    Right.  And does the character of the deposit

4    over which that water flows have any effect on how quickly

5    that basin is recharged?

6       A    Yes.

7       Q    And does the rate at which that water comes have

8    any effect on that basin level?

9       A    Yes.

10       Q    And does the time of year have any effect on it?

11       A    Yes.

12       Q    And does the number of days at which water flows

13    at any given time have an effect on it?

14    THE COURT:  Flows into the basin, you mean?

15    THE WITNESS:  Yes.

16    MR. KRIEGER:  Yes.

17    THE WITNESS:  Yes.

18    Q  BY MR. KRIEGER:  Now, in making your studies con-

19    cerning these water bearing deposits and in setting out

20    your ground water units and in making the statements that

21    you have made, that if those were pumped long enough and

22    hard enough they would be exhausted, did you take into

23    account these elements of recharge which we have just

24    talked about?

25       A    No.

1    MR. VEEDER:  What was the answer?  What did you say?

2    MR. KRIEGER:  No.

3    THE WITNESS:  The answer is no.

4    MR. KRIEGER:  He did not, he said.

5    THE COURT:  That is because your study was not a

6    study of precipitation --

7    MR. VEEDER:  And runoff.

8    THE COURT:  -- how much water was falling in the area,

9    and how much water became runoff, and things of that sort.

10   Isn't it?

11   THE WITNESS:  My exhibits, or plaintiff's Exhibits 16,

12   17 and 18, are to show three things:  the source, the

13   occurrence, and the movement of ground water.  My testimony

14   has been to demonstrate the source, occurrence, and movement

15   of ground water.  The question you have asked relates to

16   the management of a ground water basin.  I have not testified

17   to that.

18   MR. KRIEGER:  Well, that is a question of the record,

19   whether he testified to that or not, of course.  I think he

20   did, your Honor, and that is why I am pursuing this line of

21   questioning.

22   MR. VEEDER:  That is argumentative, and I object to it.

23   THE COURT:  I am just as confused as some of the rest of

24   you, maybe  not as confused as the witness is.  And I don't

25   think I am as confused as some of you counsel are.  This is

1    only a part of the Government's case.

2         MR. KRIEGER:  Yes.

3         THE COURT:  The Government didn't offer by this witness

4    any testimony as to runoff or precipitation.  They tried

5    to use the witness to show where there were areas of alluvia,

6    where there were areas of basement complex, where the

7    natural water storage units would be and the fact that they

8    are connected.  Now, what effect pumping has in one area

9    and another area of this basin is a matter of degree now,

10   depending on a lot of things.

11        MR. KRIEGER:  Yes.

12        THE COURT:  Depending on how much pumping.

13        MR. KRIEGER:  Yes.

14        THE COURT:  Depending on whether water is put back

15   in the immediate area where it is pumped out, where you get

16   a certain amount of recharge.  It depends also upon how

17   much recharge there is and the direction that recharge comes

18   from, all kinds of factors that will affect what eventually

19   happens to the water level.  And this witness' testimony

20   has been limited to outlining what, in his opinion, are the

21   areas of some of these ground water units; and the fact that,

22   in his opinion, water moves from one of them to another,

23   the direction which it moves.  Now, we go on from there.

24   It is true, later we find out about how much comes in, we

25   find out about runoff, and all that.  But this witness

Rankel - Cross

1   hasn't purported to tell us anything about any relationship

2   between runoffs and pumping or estimate the amount of

3   pumping, where it has gone, or anything of that sort.

4       MR. KRIEGER:  No, he hasn't.  But he has testified on

5   several occasions that pumping would destroy a basin.  And

6   my whole line of examination here has been to show that

7   pumping does not destroy a basin.

8       THE COURT:  Again, these are generalities.  Pumping.

9   Now, what do you mean by pumping?  If you mean some small

10  amount of pumping, all right.  But "pumping" could mean

11  anything.  And if the witness says that pumping could

12  destroy the basin, I will go along with him, because the

13  term "pumping" is so broad that you could stick some pumps

14  in there that take every bit of water you could find within

15  an area of ten or fifteen miles in one of these basins.

16  And obviously, in a dry country like this you could --

17  you don't have to convince me that you could pump out more

18  water than would come in.  It is a matter of degree.  He

19  has merely testified, in principle, that certain of these

20  areas are connected.  Now, I see what you are getting at.

21  And the real issue here, the real issue is probably the

22  nature of the permeability of the area in that orange-

23  colored section.

24      MR. KRIEGER:  That is right; exactly.

25      THE COURT:  Even you can see it is permeable.  But,

1    apparently your position is that it is much less permeable

2    than the Government contends.

3        MR. KRIEGER:  That is right.

4        THE COURT:  So, again it is a matter of degree.  I

5    think you would have to concede that, given sufficient

6    pumping and over a long enough period of time, that if

7    you lowered the water levels in the yellow, clear down --

8        MR. KRIEGER:  Yes.

9        THE COURT:  -- that you could eventually run off all

10    the water, and given a limited amount of recharge you could

11    run off all the water under the yellow.  The question is

12    a matter of degree; how much pumping, how fast would the

13    water percolate through?  The essential thing and --

14        MR. KRIEGER:  Yes.

15        THE COURT:  -- I don't know whether you are attacking

16    this, is the witness' conclusion that water does move from

17    the yellow, from the orange into the yellow.  And the

18    direction of movement that he has demonstrated by his

19    arrows and his contour lines, that is the essential question;

20    plus the next question is, what is the nature of that soil

21    and how permeable is it?  How fast or slow does water go

22    through it?

23        MR. KRIEGER:  All right.

24        THE COURT:  Isn't that about the issue, instead of a

25    lot of this stuff we have been talking about?

G-2

1        MR. STAHLMAN:  I think so.

2        MR. VEEDER:  At this time, your Honor, I would like to

3   have counsel supply me with the well log and the pumping

4   rate and any data that he has in regard to the Roy Paul well

5   -- I think that is one of your clients -- which was drilled

6   in the last two years in this area.   We have been unable

7   to find it.  And if we could get that from counsel by

8   Tuesday, we would greatly appreciate it.

9        MR. KRIEGER:  We intend to make all that data avail-

10  able.

11       THE COURT:  You see if you can find it.

12       MR. KRIEGER:  We will have it all here and supply it.

13       THE COURT:  What I have said --  I am not criticizing

14  anybody.

15       MR. VEEDER:  Could you have it by Tuesday?

16       MR. KRIEGER:  No.

17       THE COURT:  I think this is the only issue so far that

18  we have come up against in this matter, I mean the major

19  issues.  If I am wrong, I want somebody to tell me about it.

20  I am trying to find out what this case is about.

21       MR. SACHSE:  Your Honor, I think you are absolutely

22  right, and that is why I reserve some cross examination

23  after well map comes in, because I think then we can come

24  back to this question of water level contours which we could

25  not intelligently discuss without the log map.

THE COURT:  Do I understand your position, Mr. Veeder?
Do I understand your position?

MR. VEEDER:  Yes.  Yes, that is correct, your Honor.
Here is the map and we will have it ready for you by
Tuesday.

MR. KRIEGER:  I have not pursued the water level
contours examination for the same reason.  But there is one
thing your Honor said which makes me want to ask this
witness one further question.

Q     Let's assume, for the minute, that the ground
water basin is, for all purposes, destroyed through pumping.
By that I mean the ground water level is below the deepest
well and no water can be pumped out.

THE COURT:  You mean destroyed temporarily?

MR. KRIEGER:  Temporarily.

THE COURT:  You couldn't destroy it forever.

MR. KRIEGER:  No.

THE COURT:  All right.

Q  BY MR. KRIEGER:  Let's assume that condition for
just a minute.  Does that mean that none of the natural
runoff won't get down into the stream system below that
basin?

MR. VEEDER:  Well, now, your Honor, I think the
question is most confusing.  We have the situation in the
Pauba Valley where we know that the water is pulled down

1   below the lip, the granitic lip of that Pauba Basin.

2       MR. SACHSE:  I don't think we know it yet, Mr. Veeder.

3   We haven't any evidence in this case.  It is your statement.

4   I don't know.

5       MR. VEEDER:  It is not my statement.  And I think the

6   question is, the witness said, "loaded."  And I don't

7   believe it covers it.

8       THE COURT:  I don't know that I fully understand the

9   question.  Is this your question:  That if there was a

10  certain natural storage basin or storage unit where under-

11  ground water ordinarily maintains a certain level, and if

12  there was very extensive pumping, and that water level went

13  clear down below the bottom of the wells and, for all

14  practical purposes, the water level was temporarily

15  destroyed, and there came rains which would recharge the

16  basin, is your question this:  Would all of that water

17  soak into the basins before it ran down the river or would

18  some soak in and some run down the river?

19      MR. KRIEGER:  Just precisely my question.

20      THE COURT:  Isn't it kind of obvious?  If you ran it

21  in slowly, it would all go in.  If you ran it down fast

22  and flood water stayed, some would go in and some would go

23  off the top so fast it would never get down into the basin.

24      MR. KRIEGER:  That is quite true.  But I am going to

25  lead -- if the witness may answer that question -- then, let

1    me ask one more.  You have answered it.

2        THE COURT:  All right.  Is my answer correct?

3            What is your next question?

4        Q  BY MR. KRIEGER:  It is impossible to determine, is

5    it not, how much of the water, under such conditions --

6    and let me give a specific illustration now to illustrate

7    the point:  Suppose the Pauba Valley basin is drawn down

8    so there is no further pumping in that basin.  Is there any

9    way of determining how much of the natural stream runoff,

10   studying the hydrolic records over a long period of time,

11   will get over that basin and over the lip of the canyon

12   and down into the stream system?

13       MR. VEEDER:  I object.  The hypothesis has no basis

14   whatever.  There is nothing in the records to support what

15   he said.  There is no instance, and we know of no instance

16   in which the wells have been pumped down to the point where

17   the water is below the lowest well basin.  There is no

18   evidence whatever in regard to that.

19       THE COURT:  I think your question, Mr. Krieger, is

20   objectionable upon the ground this witness hasn't been

21   asked about runoff and the effects of runoff on these basins.

22   I take it you have another witness that is going to testify

23   to that, Mr. Veeder?

24       MR. VEEDER:  We have a witness on runoff, your Honor.

25       THE COURT:  In view of the limited nature of his

1  testimony -- he may know, he may not; but I don't think it

2  is proper cross.

3      MR. KRIEGER:  All right.

4      Q    Now, going back to Exhibit 15, Mr. Kunkel, do

5  you know if the pumping in the area called hydrolic or

6  ground water unit No. 4 on Exhibit 17 has interfered with

7  the rising water shown on Exhibit 15 bordering the Murrieta

8  Valley?

9      THE COURT:  Do you understand the question?

10     THE WITNESS:  I understand the question.

11     Q  BY MR. KRIEGER:  To be more specific, let me

12 section it.  I am talking about Section 35, 7 South, 3 West.

13     MR. VEEDER:  And what do you mean by "interference,"

14 may I inquire?

15     MR. KRIEGER:  Interfered with the flow, reduced the

16 flow of this spring.

17     THE COURT:  Now, of course, a lot of the troubles

18 we have here:  a question is asked, then somebody, properly

19 or otherwise, interjects some statement or question; and

20 then  we forget about the question.

21         Now, as I understand it, the question is this:

22 Do you know, Mr. Kunkel, of any estimates where pumping by

23 wells in the area demarked as region 4 of your basins have

24 interfered with or -- by that is meant caused them to lessen

25 or to diminish, so forth -- the places where water came to

1    the surface naturally in Section 35 in the range and town-

2    ship indicated.

3        THE WITNESS:  I have no records of the discharge at

4    those points to prove quantitatively what has happened.

5    But I know on the basis of the hydrology of the area that

6    pumping up gradients from those wells will decrease the

7    stream flow.

8        MR. KRIEGER:  I move that answer be stricken.  That is

9    not responsive to my question, your Honor.

10       THE COURT:  The answer may remain.  You have answered

11   that you know of no instance.  Now, you say you know at

12   will.  What do you base that on?

13       THE WITNESS:  I base that on my analysis of the occurence

14   of the ground water in the area above the streams, and I

15   base it on my knowledge of the hydrolicgradient above the

16   points of ground water discharge.

17       Q   BY MR. KRIEGER:  So far as you know, you have no

18   data to demonstrate that the rising water has been reduced

19   by pumping?

20       A    No.

21       Q    All right.  In Section 35 just referred to.  What

22   is your answer to the identical question referring to the

23   rising water shown on Section 1, 8 South, 3 West?

24       A    No.

25       Q    And what is your answer to the rising water shown

1    in Section 14, 7 South, 3 West?

2        A    No.

3        Q    And to the rising water shown in Section 8, in

4    7 South, 2 West?

5        A    May I see the --   I am not sure of the point you

6    are requesting.

7        Q    Yes, on Tucalota Creek.

8        A    No.

9        Q    And the same question as to the rising water

10   shown on Section 11, 8 South, 2 West, in the Pauba Valley?

11       A    Yes.

12       THE COURT:   That is on the Temecula River itself?

13   Right?

14       THE WITNESS:   Yes.

15       Q  BY MR. KRIEGER:   And what data did you have to come

16   to that conclusion?

17       A    The point of ground, of rising ground water in

18   the year 1950, plus reported observations of the points of

19   rising ground water by other hydrologists with whom I have

20   worked.

21       Q    Any pump tests or measurement tests in that area

22   to prove out your conclusion?

23       A    In that area pump tests or measurement tests are

24   not necessary.

25       Q    But the question is:  Did you have any?

1      A      No.

2      Q      You didn't.  Would pumping in ground water unit

3  No. 1 on Exhibit 17 in Section 17, 7 South, 3 West, influence

4  other wells in the adjoining unit No. 4 to the northeast?

5      A      Yes.

6      MR. VEEDER:  You mean --   Just a moment.  Are you

7  meaning within No. 4 northeast or the whole area?

8      MR. KRIEGER:  Well, I said anywhere in No. 1.

9      THE WITNESS:  Yes.

10     Q  BY MR. KRIEGER:  But that influence, I take it,

11  would be to some extent influenced by the approximate of

12  the well being measured to the basin line; is that correct?

13     A      Correct, yes.

14     Q      And the farther away it got from that boundary

15  line the less effect it would show?

16     A      Yes.

17     Q      Would you answer the same if a well were put down

18  in the storage unit No. 1 in Section 27, the southeast

19  quarter thereof, 7 South, 3 West?

20     A      The southeast quarter is bisected by the Wildomar

21  Fault zone and dependent on which side of the fault the well,

22  a well would be drilled upon.

23     Q      Assuming it was drilled on the southwest side of

24  the fault.

25     A      You are asking what?  Pardon me.  The effect would

Kunkel - Cross                        8999

1    be with regard to what area?

2        Q    On the northeast side of the fault.

3        A    Again, there would be an effect.

4        Q    And here, again, the affect would decrease as one

5    went farther to the northeast, is that right?

6        A    It would decrease.

7        Q    It is your opinion, then, that water seeps through

8    the Wildomar fault either way, is that right?

9        A    Water seeps through the Wildomar fault from

10   points, from a point of high head to a point of low head;

11   depending on what the relative water levels are in the two

12   basins would determine the direction of ground water movement

13   across the Wildomar Fault zone.

14       Q    Is the fault a barrier in any way?

15       A    In my opinion the fault is a barrier to the

16   movement of ground water.

17       Q    But water still goes through it?

18       A    But water still goes through it.

19       Q    You have no way of measuring how much water goes

20   through it, do you?

21       A    No.

22       Q    I want to come back for a moment to some questions

23   I asked you this morning about the Pauba well and the Studley

24   well.  You said that you were going to look and see if you

25   had any data to determine whether other wells in the area

1    had been influenced.   Did you find such data?

2           A    I will have to check the files in Long Beach.

3           Q    I see.   You are going to do that?

4           A    I will do that, yes, sir.

5           Q    Now, without having your records, though, and as

6    a matter of opinion, would a shallow well existing between

7    the Pauba well and the Studley well -- by "shallow well"

8    I mean a well just sunk into the yellow alluvium, the

9    younger alluvium -- would such a well necessarily be

10   affected by the pumping in the Pauba well?

11          A    In my opinion, a shallow well penetrating, only

12   penetrating the younger alluvium --   To what depth, did you

13   say?

14          Q    Just a shallow well that did not penetrate into

15   the older continental deposits but just into the younger

16   alluvium.

17          A    In my opinion, pumping in the Pauba well would

18   affect the water level in the situation that you have just

19   described.

20          Q    In the same degree as it would the Studley well

21   which goes down into the older continental deposits?

22          A    Not to the same degree.

23          Q    Is there any way of measuring the difference in

24   degree?

25          A    Not without drilling and testing wells in the area.

1  Q   And does the effect of the impervious material

2  which exists between the yellow or younger alluvium and the

3  older have any affect on your answer to my last question?

4      MR. VEEDER:  I want to hear that question, because I

5  am not sure that it is a correct statement.

6      THE COURT:  Well, yes, read it.

7      (The reporter read back the question.)

8      MR. VEEDER:  Why, there was no such statement whatever

9  in the record.

10     MR. KRIEGER:  I think there is, but permit me to

11  withdraw it and make my question much broader.

12     MR. VEEDER:  By all means.

13     Q   BY MR. KRIEGER:  What factors would influence the

14  difference between the affect on those two wells?  I am

15  talking about a shallow well and the Studley well.

16     A   Not knowing exactly the exact depth of a Studley

17  well but knowing that it is a flowing well, it is my

18  opinion that the Studley well penetrates aqu'overge deeper

19  than you have described in the hypothetical shallow well

20  between the Studley well and the Pauba well.  Therefore, the

21  rate of effect would be much more rapid in the Studley well

22  than in the shallow well.

23     Q   Is that the only thing that would account for the

24  difference?

25     MR. VEEDER:  There are so many factors.  I hate to keep

1  interrupting on these things, your Honor, but these

2  questions are extremely difficult because of the innumerable

3  factors that necessarily enter into such a question.  How

4  far is the casing perforated is an element.  Many, many

5  other elements.

6  THE COURT:  Well, there is no doubt about that.  The

7  general questions of the hypothetical well, shallow, you

8  don't know how deep, how big, whether it is one inch or

9  twelve inches, and --

10  MR. KRIEGER:  The witness has had no difficulty,

11  though, in answering my question in its general context just

12  to see if there was any difference.  And all I am asking

13  is what the items of consideration are here.  And he has

14  stated that one of them is the depth of the Studley well.

15  Now I ask him if there are any other items.

16  THE COURT:  Overruled.  Go ahead.  Those are items

17  that have a bearing on it.

18  THE WITNESS:  The degree --

19  MR. SACHSE:  Will you keep your voice up, please.

20  THE WITNESS:  The degree of interconnection between

21  the lenticular deposits within which the wells -- the degree

22  of interconnection of the lenticular deposits in the ground

23  water basin.

24  Q  BY MR. KRIEGER:  Is there any way of determining that

25  degree of connection?

A  I have determined it by the examination of

1    thousands of wells in California.

2         Q    But not in this area?

3         A    In this area.

4         MR. SACHSE:  What was the answer?  How many wells?

5         THE WITNESS:  Thousands.  Five thousand in the

6    Sacramento Valley in particular.

7         THE COURT:  In California.  Did you say and in this

8    area or not?

9         THE WITNESS:  Thousands in California as a total, and

10   wells in this area.

11        MR. KRIEGER:  All right.  Do you want to take a recess

12   now, your Honor, or are we going right on through until

13   4:00?

14        THE COURT:  I will take a recess now.

15        (Short recess.)

16

17

18

19

20

21

22

23

24

25

BY MR. KRIEGER:

Q You have testified about the Studley well on several occasions, especially in connection with the effect of pumping the Pauba well on the Studley well. Have you got the log for the Studley well?

A No, I do not.

Q Is there a log available?

A There is some confusion on the record between the log of the Studley well and the log of Well 16-A-1.

Q Do you have a pump test on the Studley well?

A No. There is confusion between the log of the Studley well or Well 16-A-1.

Q 16-A-1 projected on Exhibit 16-- you have a log for that one?

A There is some confusion. As I understand from Mr. Hall, there were three or four wells drilled at approximately the same time. Theywere of comparable depth and the logs that were supplied and the assignment of the log to a specific well, there is some doubt withregard to whether the log of 16-A-1 is the log for Well 16-A-1 or whether it is the log for the Studley well.

Q Am I right in assuming that you are going to clear that up with Mr. Hall over the weekend?

A Mr. Hall will assist in the clarification.

Q Now, you were asked by the Court to review Exhibit 16-A

H

Z53

1 to determine which of these well logs had pump tests included

2 in them or information that would allow you to determine

3 specific capacity.  Have you done that?

4     A  I have looked at the logs of the wells as they have

5 been presented to the Court.

6     Q  And which well logs have that information?

7     A  Two well logs had both pumping tests and pumping water

8 level measurements from which an estimate of specific capacity

9 could be made.

10     Q  Which ones were those?  Can you tell me?

11     A  The Pauba well, 17-M-1.

12     Q  17 or 16-M-1?

13     A  8 South, 2 West; 17-M-1.

14     Q  These are all numbered 16, not 17.

15     A  I can find it for you-- 17-M-1, U. S. Geological Survey

16 log.
        MR. KRIEGER:

17         The figures that he was giving were not the exhibit

18 numbers, your Honor.

?? 19         THE WITNESS:  Yes.

20     MR. KRIEGER:  This is Exhibit 16-A-53.

21     THE COURT:  Is that the Pauba well?

22     THE WITNESS:  Yes, this is the Pauba well.

23 BY MR. KRIEGER:

24     Q  And what did you determine to be the specific capacity

25 of that well?

    A  20.

H

Z-54

THE COURT:  What does 20 mean?  Gallons per minute?

THE WITNESS:  Per foot of drawdown.

BY MR. KRIEGER:

Q  What other log had this information in it?

A  8 South, 2 West.

THE COURT:  Give us the number of the exhibit.

THE WITNESS:  16-A-59.  A statement at the bottom of the log says, "At 198 feet the water went over the top and continued to flow when the perforations were completed and the sand had filled up to 163 feet.  The well was flowing about eight inches of water in this condition."

MR. STAHLMAN:  Louder.  You are getting confidential up there.

THE WITNESS:  ". . the well was flowing about 8 inches of water in this condition."  Eight inches of water is 72 gallons per minute.

There is an additional statement, "These measurements are from the original Pauba casing which was 9 feet above the present level."

BY MR. KRIEGER:

Q  And from that you compute that the specific capacity is what?

A  I am sorry, I cannot compute specific capacity from those measurements.  That was incorrect.

Q  So there is only one well log from which you have the

information to compute the specific capacity; is that correct?

A   As far as I know, that is correct.

Q   Out of how many well logs?

A   60 well logs.   There are 71 well logs in the exhibit, because there are logs on Camp Pendleton which are below the area to which we are testifying.

Q   Did you have any other pump tests available to you than these that are set out here?

A   I do not know because I didn't calculate specific capacities.

Q   I think you testified that that was an important item, though, did you not, in determining permeability?

A   Could we have the record on that, please.

Q   Well, is it an important item in determining permeability?

A   No.

Q   Can you determine specific yield from specific capacity?

A   No.

Q   Can you determine a ground water storage coefficient from specific capacity tests?

A   No.

MR. KRIEGER:   There is a reference in the record, your Honor, and I don't want to waste any more time.   I will find it by the next time we resume.

Q   Isn't specific capacity the best way to determine the permeability of deposits, Mr. Kunkel?

H

Z56

A  The best way is by pumping tests.

Q  Doesn't the pumping test tell you what specific capacity is?

A  A pumping test tells you what specific capacity is.

Q  And you have used only one pumping test in making this determination of these exhibits that are on the board; is that right?

THE WITNESS:  Repeat the question, please.

(The reporter read the pending question as follows:  "Q  And you have used only one pumping test in making this determination of these exhibits that are on the board; is that right?")

THE WITNESS:  I did not use pumping tests to make the exhibits.  The exhibits were made on other data.

BY MR. KRIEGER:

Q  Referring now to Exhibit 16 for just a moment, you notice that  your water level profile, November, 1953, is extended to a point where there is a question mark, do you recall?  This is over the Pauba Valley.

A  Yes.

Q  What was the basis for making that projection?

A  (Stepping down.)  It was a reasonable projection, in my opinion.

Q  The same is true, is it, of this area on the Aguanga Valley where you have done the same thing?

A  I would have to check my notes.  What water levels I

referred to or whether it was a reasonable projection.  It is one or the other.

Q  But where you didn't have the water levels, you made a projection based upon your judgment; is that right?

A  There is no water level shown in Oak Grove, no water level shown in--

Q  I am talking about Aguanga Valley.

A  No, sir.  In Aguanga Valley the water leve contours are based on measured water levels in wells.

Q  Then what is the question mark at the end of the line on Aguanga Valley in Exhibit 16?

A  At the upper end of the valley there are insufficient wells for control to project the water level to the edge of the basin, which I have not done.

MR. KRIEGER:  Your Honor, without any further data, that concludes my cross-examination at the moment.

MR. DENNIS:  I have some questions, your Honor.

THE COURT:  Mr. Dennis.

CROSS-EXAMINATION

BY MR. DENNIS:

Q  Mr. Kunkel, I believe your said that your first trip to the upper Santa Margarita watershed-- and by upper I am referring to that portion of the Santa Margarita watershed that lies above the confluence of Murrieta Creek and Temecula Creek--

H

Z58

1    occurred in the fall of 1955; is that right?

2         A  I can't recall dates from memory.  It is difficult.

3    I believe that is correct.  I would have to check my notes to

4    be absolutely certain.

5         Q  Now, referring to Plaintiff's Exhibit 16, I notice that

6    there is a water level profile November, 1953, depicted on

7    Exhibit 16 in the Pauba Valley.

8         A  That is correct.

9         Q  Where did you obtain the information that you used in

10   compiling that water level profile?

11        A  I collected those water level measurements from the

12   original data in the files of the Department of Water Resources.

13        Q  Did you obtain any other from the files of the Vail

14   Company?

15        A  I do not recall exactly whether I did or did not.

16        Q  Primarily it is based upon data which you obtained

17   from the Division of Water Resources and not upon your own

18   observations?

19        A  Primarily; correct.

20        Q  And in connection with the water contours which you

21   placed on Exhibit 15 and on Exhibit 17, those, I think, also

22   are as of November, 1953?

23        A  That is correct.

24        Q  And the information or data from which that was compiled

25   was also obtained from the same source?

H

Z59

A   Plus supplemental measurements by myself.

Q   Now, you couldn't have made any supplemental measurements in 1953?

A   That is correct.

Q   And yet, as I understand the legend on Exhibit 15 and on Exhibit 17, the water contour levels show the water levels in November 1953?

A   That is correct.

Q   So that those contours are based purely upon information which you obtained from the Division of Water Resources?

A   That is not correct.

Q   What other sources?

A   I have depended on measurements and observations I have made during the period from October through December, 1957.

Q   Well, do I misunderstand you?  Calling your attention to the legend on Exhibit 15, it says, "Water Level Contours November, 1953."  By that do you mean to infer that that was the water level in November, 1953, or is it 1953 plus information obtained in 1957?

A   In my opinion, it is the water level as of 1953.  I have based it on water level measurements in 1953, all available measurements that I could secure, supplemented with additional measurements by myself in 1957 and interpretation of those data projected back, in my opinion, to the conditions that existed in 1953, and I drew the water level contours on

H

Z60

1    the old body of the data.

2        Q  Do I understand, then, that you would make a measurement

3    of a well in 1957 and then project that back to what you thought

4    the water level was in that well in 1953?

5        A  In areas where there is no appreciable pumping and the

6    evidence indicates that the ground water basin is at or near

7    natural conditions, that is a valid method of projection.

8        Q  Could you call my attention or designate on Exhibit 15

9    those areas in which you believed there was no appreciable

10   pumping?

11       THE COURT:  You mean no appreciable pumping between 1953

12   and 1957?

13       MR. DENNIS:  Yes, no appreciable pumping between 1953 and

14   1957.

15       THE WITNESS:  The highland area in the Aguanga Valley

16   area north of the center of three fault zones and south of the

17   northernmost of the three fault zones back above the alluvial

18   plain of Lancaster Valley.

19   BY MR. DENNIS:

20       Q  And that would be the only area in which you made

21   projections?

22       A  In part the water levels in this area are based on

23   water level measurements that go back to old water level measure-

24   ments, some of them back when the wells were originally drilled--

25   wells that I do not recall, that may or may not even be in

H

Z61

1   existence at the present time, and the water level measurements

2   in 1953 on the basis of--

3       MR. SACHSE:  Mr. Dennis, would you make it clear-- the

4   witness referred "in that area".

5   BY MR. DENNIS:

6       Q  Will you explain what you meant by "that area"?

7       A  The area that I referred to was the area north and

8   south of Pauba Valley.

9       THE COURT:  North and south?

10      THE WITNESS:  Both north and south.

11  BY MR. DENNIS:

12      Q  Which is shown on Exhibit 15 in orange?

13      A  Shown on Exhibit 15 in orange.

14      Q  Did you make any measurements in that area of the water

15  levels in the various wells prior to the late fall of 1957?

16      A  No, I do not recall ever having made measurements in

17  that period.

18      Q  Now, in connection with the water levels in the Pauba

19  Valley, do you have any information as to the quantities or

20  amounts of water that were released from the Vail Dam or

21  reservoir from time to time, from the time the gates were closed

22  until the first part of 1958?

23      MR. VEEDER:  Mr. Dennis, you are limiting your question

24  to area No. 3 on 17; is that right?

25      MR. DENNIS:  Yes, the Pauba Valley No. 3 area, although

H

Z62

Pauba Valley also is designated on Exhibit 15 and has water

contours and inferred water contours running throughout the

Pauba Valley on 15.

THE WITNESS:  I did not consider releases from Vail Dam.

BY MR. DENNIS:

Q  So you did not consider what effect the releases from

the Vail Dam might have on the movement of water in the Pauba

Valley?

A  In the construction of the water level contours, it is

not necessary.

Q  In other words, the water level contours as you have

placed them on Exhibit 15 and on Exhibit 17 do not reflect the

movement of the water in a state of nature, but the actual

condition of movement of water through the areas as a result

both of nature and acts of man?

A  In my opinion, the water level contours-- Pardon me.

The answer to the question is yes.

Q  And it is entirely possible, is it not, in your opinion,

that if there had been no pumping within the Pauba Valley and

no release of water from the Vail Dam that the water contours

which you have placed on Exhibit 15 in the Pauba Valley might

be located in different locations and the arrows indicating the

movements of water might be pointing in different directions?

A  The contours might be located in different positions.

It is entirely probable that they would.  But the arrows would

H

Z-63

1    be in the same direction, because the direction of the ground

2    water flow and movement would be still the same.

3         Q  Now, when we were talking about the direction of

4    water movement-- we are confining our remarks to ground water--

5    it is possible, is it not, that ground water will move in a

6    different direction than that from the surface of the ground?

7    In other words, the elevation of bedrock, the obstructions

8    which you may obtain and the material itself-- faults, fractures,

9    fissures, more deeply weathered portions of the soil-- may

10   influence the direction in which water moves underground, may it

11   not?

12        A  Yes.

13        Q  And is it true that ordinarily when you encounter a

14   fault that you would expect to find that that offers some

15   resistance to the movements of water from one side of the

16   fault to the other and may, or in many instances does, change

17   the movement of water along the fault line?

18        A  As clearly indicated in Exhibit 15 along Aguanga and

19   Murrieta Valley.

20        Q  I just asked you if that is what you would expect to

21   find.

22        A  Yes.

23        Q  And is it not also true that when you find large masses

24   of impermeable material, or nearly impermeable material that

25   that also will change the direction of the movement of underground

H

Z64

water?

A   That is correct.

Q   Now, did you place on Exhibit 15 and on Exhibit 17 all of the faults which you found in the upper Santa Margarita watershed?

A   I placed in the upper Santa Margarita River Watershed all of the faults that I found, yes.

Q   Isn't it true that in connection with your studies and the various works which you pursued in making this study that you found references to faults which are not shown on Exhibit 15 and on Exhibit 17?

A   That is correct.  There are undoubtedly many more faults in the area.  I haven't the slightest doubt in my mind.

Q   Isn't it true that in the study which the State made, to which we have referred as Bulletin 57, that there are faults shown in their studies which are not shown on your maps known as Exhibit 15 and Exhibit 17?

A   Yes.

MR. STAHLMAN:   You mean that there are faults in Bulletin 57?

MR. DENNIS:   I am referring now to geologic faults.

Q   Mr. Kunkel, did you prepare the base maps, that is, did you draw the maps showing the watershed, the section lines, the boundaries of the Vail properties and the United States properties and the location of the intermittent streams, or was

Kunkel   Cross

H

Z65

that supplied to you and you just placed on that base map the various geological data?

A   The base map was prepared by the Office of Ground Water Resources at Camp Pendleton, supplied to me, and I placed my geologic studies on that base map.

Q   So you are in no position to say whether or not the boundaries of the Vail property are correctly shown on Exhibit 15 and Exhibit 17?

A   I have no way whatsoever of knowing.

Q   And if Exhibit 15 and Exhibit 17 do not correspond in respect to the locations of Sections and the locations of intermittent streams to the U. S. Geological Survey's topographic maps, in your opinion, which ones would be most correct, the U. S. Geological Survey topographic maps or the base map that you used for Exhibit 15 and Exhibit 17?

A   The most exact maps of the area would be the large scale Geological Survey topographical maps, the scale of 1 to 24,000, which are entered in evidence.  I do not know the exhibit number.

Q   And those topographic maps which were prepared during the years 1953, 1954, and 1955, would they have been prepared in your office-- would you have had anything to do with them?

A   I have nothing to do with them.  They are prepared by another branch of the Geological Survey.

Q   Would they have been prepared in your office, though?

A   No, sir.

H

Z-66

1    Q  They would not?

2    A  No, sir.

3    Q  I believe you have used the same symbol for the desig-

4  nation of a spring on Exhibit 15 and on Exhibit 17 as you

5  find on the U. S. topographic maps?

6    A  I do not understand which spring you are referring to.

7    Q  I mean, generally speaking you show a circle or a circle

8  with a small tail on it as designating a spring, as shown by

9  the legend?

10    A  That is correct.

11    Q  "Spring and extent of spring flow October to December,

12  1957."

13    A  That is correct.

14

15

16

17

18

19

20

21

22

23

24

25

3019

I-1 ML j

1   Q   BY MR. DENNIS:  And so the ~~springs~~ which you have

2   placed on the map, the location of the springs and the

3   extent of the surface flow in Exhibit 15 were the results

4   of an examination of the territory that you made in the

5   late fall and early winter of 1957?

6   A   Right.

7   Q   And at the time that made your examination of the

8   properties did you have with you the U. S. topographic

9   maps?

10   A   Yes, I did.

11   Q   And at the time that you made the examination did

12   you mark the location of those springs and the extent of

13   the flow on the topographic map that you had in your

14   possession?

15   A   I did.

16   Q   And do you still have those in your possession?

17   A   They are in the custody of the geological survey

18   at Long Beach.

19   Q   I wonder if you could bring those in on Tuesday?

20   MR. VEEDER:  Bring them in.

21   THE WITNESS:  I am not certain that --

22   MR. VEEDER:  If you have them.  Don't bring them in

23   if you don't.

24   THE WITNESS:  I have them.  I am not certain they are

25   open-file information.

1    MR. VEEDER:  Well, if they are closed file you can't

2  have them, Mr. Dennis.

3    THE WITNESS:  I will have to check with the Department

4  of Interior.  I cannot release those on my own.

5    Q  BY MR. DENNIS:  If you cannot do that, can you do

6  this?  You have designated the location of the springs and

7  the extent of the surface water on Exhibit 15.  We also

8  have the copies of the topog maps as Exhibit 29, I think.

9  Can you place the springs on Exhibit 29, the ones which

10  show on Exhibit 15, on 29-J, 29-R, 29-B, and 29-K?

11    MR. VEEDER:  Your Honor, I think there is a limit

12  to which the plaintiff in this case should be required to

13  go.  I think Mr. Dennis should do his own work and bring

14  these things down.  If you want an exhibit, have him make

15  an exhibit.  Why should we have to do all this work?

16    MR. DENNIS:  I tried to do that yesterday, Mr. Veeder,

17  but I find, because of the difference in scales, and so on,

18  that I cannot accurately, or even attempt accurately to

19  show the location of those springs on the topographic maps.

20    MR. VEEDER:  Hire someone to do it for you.

21    MR. DENNIS:  I don't think anybody but the man who

22  placed them on the map is going to be in a position to do

23  that.  I think, in view of this witness' testimony and the

24  water contour levels which he has placed upon the map that

25  it is going to be extremely important that the ground

1    elevation of those points of rising waters be determined;

2    and I know of no way of determining except by placing them

3    on the topographic map or having this witness testify as to

4    the ground water elevations at the point of rising water

5    and at the point the water ceased to flow on the surface.

6        THE COURT:  Well, you indicated to me a matter being

7    held in abeyance, and we will hold this in abeyance until

8    we find out about that other matter.

9        Q  BY MR. DENNIS:  Now, Mr. Kunkel, did you, during

10   the course of your studies of the upper Santa Margarita

11   watershed have an occasion to draw down water contours for

12   any period other than the period which is shown on Exhibit

13   15 and Exhibit 17?

14       A    Yes.

15       Q    For what period of time did you prepare those

16   contours?  Is that 1927?

17       A    No, sir.

18       Q    Did the State submit --   Pardon?

19       A    Would you read --   May I have that question back,

20   the first one that I answered yes to?

21       (The pending question was read by the reporter.)

22       Q  BY MR. DENNIS:  Limit that to the Pauba Basin.

23       A    No.  No, limiting it to the Pauba Basin, definitely

24   no.

25

Q    Did you for the Murrieta Basin?

A    No.

Q    Did you for the Aguanga, Lancaster, or Nigger
Valley?

A    No.

Q    Did you for any basin lying within the upper
watershed of the Santa Margarita River?

A    No.

Q    Now, at the time that you inspected the material
in the possession, and data in possession of the State of
California, did you find there a considerable data
relative to the elevation of ground water in the spring of
1927, insofar as it pertains to the upper Santa Margarita
watershed?

A    I do not recall.

Q    At least you did not take that into consideration?
You didn't try to project that forward to arrive at any
ground water or ground water contours in connection with
the preparation of Exhibit 15?

A    I do not recall.

Q    Now, my recollection is that when you were
describing the Santa Margarita River system, that when you
came to Oak Grove Valley, you stated that the creek was
incised.  What did you mean by the term "incised"?

THE COURT:  Stated what?

1          Section what?

2              Q      Section 18.

3              A      Yes, sir.

4              Q      What was the condition of the channel at that

5      point?

6              A      I am sorry.  We must be either mistaken in the

7      record or I may be looking at the wrong township, but

8      Section 18, 8 South, 1 East, is not in the channel of the

9      Temecula.

10             Q      My notes may be in error, then.  I will check

11     them.

12                    Now, after it left the creek, left the Vail

13     reservoir, or the Vail dam, I believe you said there was

14     a deeply incised channel into the basement complex, is

15     that correct?

16             A      That is correct.

17             Q      By that you mean that the bottom of the channel

18     was cut into the basement complex?

19             A      Yes.

20             Q      And the top of the channel, would that be in the

21     basement complex, too?

22             A      The top of the channel, as indicated by Exhibit

23     15 --

24             MR. VEEDER:  That is 10, Mr. Dennis.

25             THE WITNESS:  Is floored with Alluvium.

1      Q  BY MR. DENNIS:  You say the bottom of the channel

2  is floored with alluvium?

3      A  Yes, sir.

4      Q  But I think you said that alluvium was very

5  thin?

6      A  I do not recall exactly what I said.

7      Q  Could you tell us whether the alluvium in the

8  channel for the mile and a half below the Vail dam was

9  thick or thin?

10      A  I do not know its thickness.

11      Q  You don't know its thickness.

12      A  But there are wells in it.

13      Q  You couldn't tell from a physical inspection?

14      A  No, sir.

15      Q  I think you stated, though, at the time that you

16  inspected it there was no flow through the canyon?

17      A  I observed no flow through the canyon.

18      Q  And, could you observe the thickness of the younger

19  alluvium on the side of the channel?  You said that the

20  channel was cut down into the basement complex, as I

21  understand?

22      A  The canyon walls are quite, are very steep.

23      Q  And how high are they?

24      A  Several hundred feet or more.

25      Q  So that if any water was entering the channel at

1    that point from the younger or the older alluvium, it

2    would make itself manifest on the sides of the channel

3    through where the basement complex was located?

4         A    No, the alluvium in the area to which we are

5    testifying --

6         Q    In other words, on that particular point, then,

7    the younger alluvium is laying on the basement complex?

8         A    I do not know.

9         Q    You say you observed this cut in the channel?

10        A    I observed the cut.

11        Q    What did you observe of the surface of the ground

12   to the bottom of the channel as you looked at the side of

13   the bank?

14        A    As I stood on the ground I was standing on an

15   alluvial plane.  I observed the basement.

16        Q    At the edge of the channel?

17        A    The floor of the valley, a matter of several

18   hundred feet or more, whatever the width of the channel is,

19   is floored with younger alluvium.  It would be colored

20   yellow on Exhibit 15.  The sides of the canyon are basement

21   complex.  That is what I observed.

22        Q    And there is basement complex on the top of the

23   banks?

24        A    Basement complex extended to the top of the banks.

25   There are outcrops of volcanic rocks locally in the area.

1    Q    I think you answered my question.  So that when

2    water is flowing through the one and a half miles of stream

3    channel into the basement complex, it would be impossible

4    in that portion of Nigger Valley for any water from the

5    stream to enter either the older alluvium or any portion

6    of the younger alluvium other than that which laid in the

7    bed of the stream?

8    A    That is correct.

9    Q    And any water, ground water, which would reach

10   the stream at that point would be manifest by a wet spot

11   on the side of the basement complex, would it not?

12   MR. STAHLMAN:  What do you mean?

13   Q  BY MR. DENNIS:  As it came down the side?

14   A    The side of the basement complex exposed below

15   Vail Dam could be perfectly dry under the circumstances

16   that you describe.

17   Q    It is perfectly dry?

18   A    Certainly.

19   MR. VEEDER:  Now, I don't believe that that --

20   MR. STAHLMAN:  The difficulty here is that one man

21   has seen something the other one hasn't --  (inaudible).

22   There is a false idea of what it looks like.

23   MR. DENNIS:  I am just asking this man what he saw.

24   Q    Would it be correct to say that basement complex

25   is the same thing as bedrock?

1   is the same thing as bedrock?

2      A   It would be the same thing to say.

3      Q   So that if somebody described the material as

4   bedrock, you would say that, in your mind, that would be

5   basement complex?

6      A   Coupled with my evaluation of the man's credibility

7   as personally observed.

8      Q   How about shale?  Is that basement complex?

9      A   In the area mapped, in a driller's term, it may

10   or may not be.  It would have to be considered in its

11   relationship to the rest of the well log.

12      Q   And in many instances, from the inspection of a

13   driller's log, it would be impossible to tell whether shale,

14   which was encountered in a log, would be basement complex

15   or whether it would be part of the other alluvium?

16      A   For a layman it might be.

17      Q   Could you tell?

18      A   Oh, absolutely.

19      Q   You could tell from any driller's log which it

20   could be?

21      A   It would depend on the log, on the reliability of

22   the log.  Some logs are totally unreliable.  You could just

23   throw them away if the man is not qualified to evaluate

24   the material drilled through.

25      Q   Well, you obtained a great many of these logs from

1  the State.  How would you determine whether the driller who

2  made that particular log was reliable or not?

3      A      By my examination of the log I am able, in the

4  vast majority of the cases, to evaluate the driller's logs.

5  If the driller is drilling through 200 feet of sand and

6  gravel, and he reports 40 feet of granite and then another

7  200 feet of sand, I know that something is wrong.  Physical

8  phenomena of the earth just don't occur that way.

9      Q      But it is true, is it not, that you will find a

10  strata of a gravel and a strata of a silt and a strata of

11  a clay, and then gravel again?

12      A      In nature?

13      Q      In nature.

14      A      Yes, that is a very common occurrence.

15      Q      For instance, if you were reading a driller's

16  log and you find gravel in those four or five stratas of

17  gravel, under circumstances such as I outline generally,

18  can you determine which was older, which gravel came from

19  older alluvium and which gravel came from younger alluvium?

20      A      Absolutely not.

21      Q      Now, in reference to the Wildomar Fault, can you

22  give us some idea of the width of the fault?  In other

23  words, is that fault nearly a foot wide, or can it vary from

24  a foot to 200 or 300 feet in the middle?

25      A      I have made no accurate determinations of its

I-2

1   width, but a fault of that type could vary considerably in

2   width.  It could be a few feet; it could be many feet.

3       Q    When you say "many," what would "many" mean?

4       A    Some fault zones are a quarter of a mile in width.

5       Q    There are 1200 feet?

6       A    Correct.

7       Q    And when you talk about a fault zone, you would

8   expect to find along the fault zone that the materials in

9   the immediate vicinity would be broken, fractured?

10      A    That is correct.

11      Q    And in some instances entire physical composition

12  of them can be changed?

13      A    Very definitely, yes.

14      Q    Now, did you make any efforts to determine

15  whether or not the Wildomar Fault was in a vertical position

16  as shown on Exhibit 16, or could it have a dipper or strike

17  one way or the other?

18      A    It could have a dipper or a strike one way or the

19  other.

20      Q    There was no way in which you could arrive at

21  whether or not it was vertical?

22      A    That is correct.  Why, then, on Exhibit 16 did you

23  show it as a vertical line?

24      A    In the opinion of the men who logged the well, who

25  were a crew of qualified geologists sitting on the well for

the entire period of the drilling, they were aware of the existence of the Wildomar Faults before the drilling started, and they were looking for evidences of fault (dowage (phonetic) and other evidences that would indicate the existence of a fault.  In their opinion, the fault had not, or the well did not cross the Wildomar Fault zone.

THE COURT:  How far was that well east of the Pauba Fault zone?

THE WITNESS:  How far east?

THE COURT:  Yes.

THE WITNESS:  1000 feet.

THE COURT:  So that if the fault had a strike or a tip, if it did not at least extend over 1000 feet, had a depth of 2400 feet?

THE WITNESS:  That is correct.

Q  BY MR. DENNIS:  And the well that we are referring to is the Pauba well?

A    The well that we are referring to is the Pauba well.

Q    Is the Wildomar Fault projected also on Exhibit 16 as well as the Pauba well to the line of section?

A    No, sir.

Q    Would the Pauba well be closer to the Wildomar Fault at the point at which it is drilled than it appears to as projected to the line of Section?

Q     Did you for the Murrieta Basin?

A     No.

Q     Did you for the Aguanga, Lancaster, or Nigger Valley?

A     No.

Q     Did you for any basin lying within the upper watershed of the Santa Margarita River?

A     No.

Q     Now, at the time that you inspected the material in the possession, and data in possession of the State of California, did you find there a considerable data relative to the elevation of ground water in the spring of 1927, insofar as it pertains to the upper Santa Margarita watershed?

A     I do not recall.

Q     At least you did not take that into consideration? You didn't try to project that forward to arrive at any ground water or ground water contours in connection with the preparation of Exhibit 15?

A     I do not recall.

Q     Now, my recollection is that when you were describing the Santa Margarita River system, that when you came to Oak Grove Valley, you stated that the creek was incised.  What did you mean by the term "incised"?

THE COURT:  Stated what?

1   water, and the water contours; but I think if you can bring

2   in those topog maps that you used in the field, that

3   probably will shorten things considerably.

4        MR. VEEDER:  Well, is Mr. Krieger going to come up

5   with this Roy Paul well (phonetic), and when?  That is

6   extremely important as to our redirect examination.

7        THE COURT:  You try to have it.

8        MR. KRIEGER:  But, of course, I don't know that that

9   is available, you see.

10       THE COURT:  I know.

11       MR. KRIEGER:  But I will make every effort to have

12   it, certainly.

13       THE COURT:  We will continue the matter until

14   Tuesday, the 14th, at 10:00 o'clock.  10:00 o'clock,

15   Tuesday, the 14th.

16       (Discussion off the record.)

17       (Whereupon an adjournment was had at 4:00 o'clock p.m.,

18   until 10:00 o'clock a.m., Tuesday, October 14, 1958.)

19

20

21

22

23

24

25