# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

## HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    Tuesday, October 14, 1958

Pages:    3034 to 3128

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

MALCOLM LOVE
and
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

---o---

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---o---

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
        -vs-                   )        No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                Defendants.    )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, October 14, 1958

APPEARANCES:

    For the Plaintiff:               WILLIAM H. VEEDER, ESQ.,
Special Assistant to the
Attorney-General,
Department of Justice,
Washington, D. C.
        and
WILLIAM E. BURBY, ESQ.

For U. S. Marine Corps:       CO. ELLIOT ROBERTSON.

For Defendant Vail            GEORGE E. STAHLMAN, ESQ.
Company:

For Defendants Fallbrook      EDMUND G. BROWN, ESQ.,
Public Utility District,      Attorney-General, By
et al.:                       ADOLPHUS MOSKOVITZ, ESQ.,
                              Deputy Attorney-General,
                                        and
                              CARL BARONKAY, ESQ.

For Defendant Santa           W. B. DENNIS, ESQ.
Margarita Mutual
Water Company:

For Defendants Hartman,       BEST, BEST & KRIEGER, by
Lewis, Wilks and Bayle,       A. L. LITTLEWORTH, ESQ.
and Oviatt:

I N D E X

PLAINTIFF'S WITNESS:                    CROSS EXAMINATION

Fred Kunkel
        (Resumed) Dennis                          3045


EXHIBITS

              (None.)

\* \* \* \* \*

3037

Z-1

San Diego, California, Tuesday, October 14, 1958. 10:00 A.M.

(Other matters.)

THE CLERK: No. 4 - 1247-SD-C. United States of America vs. Fallbrook, et cetera, et al., further court trial.

MR. VEEDER: Your Honor, we have been moving on your map and getting it fixed up the way you wanted.

Yesterday at the hearing before the Special Master Cranston we introduced some evidence there and we showed in general-- I thought I would report to you about it-- we showed in general the location of lands in our view as to the location of the watershed. It is quite evident that many of the parties in the Fallbrook Creek area are so situated that they can be viewed as using only percolating waters.

Now, we would like to have a little opportunity, your Honor, to review that situation, and it is quite possible that there will be an area in there where substantial number of defendants may be dismissed by reason of the physical situation which we have found by our geological investigation. If that is true, we are anxious to do it, and your Honor asked that we outline and so specify the areas where we thought interlocutory orders might be entered. It is our view that this may well be one of the places in which such an order might be entered. But we would like to have the opportunity to review further the transcript in the case to go into it a little more in

3038

Z2

1   detail to the end that the order would not have to be revised

2   in the future.

3        So if your Honor will permit us to review the record of

4   yesterday and to discuss it with you in chambers at your

5   convenience, it may be one of those instances where we can take

6   advantage of your desire to enter such an order.

7        MR. SACHSE:  Your Honor, unfortunately Mr. Veeder was not

8   present yesterday afternoon at the Master's hearing when the

9   subject matter he is commenting upon took place.

10       I was so dumbfounded by what transpired that I dictated a

11  memorandum to myself as soon as I got back to my office.

12       MR. VEEDER:  Your Honor, if we are going to have this in

13  the record-- if Mr. Sachse is going to psychoanalyze himself in

14  the record, I have a couch down there, your Honor, and I will

15  bring him the couch.

16       THE COURT:  Go ahead, Mr. Sachse.

17       MR. SACHSE:  I would like to advise the Court of what

18  took place.  Mr. Veeder has spoken in generalities.  I am going

19  to be specific, and I will say also that I directed the reporter

20  to get the transcript as rapidly as he could and sent to me in

21  care of Mr. Swader here to save time.

22       MR. VEEDER:  And did you call the press, Mr. Sachse?

23       MR. SACHSE:  I did not.  I advised my local people at the

24  board meeting of the Fallbrook Public Utility District last

25  night.

Z3

1      What transpired was this, your Honor.  Lt.Col. Bowen,

2  testifying on direct examination, stated that in his opinion

3  all of the ground waters within the Fallbrook Creek drainage

4  and outside the Naval Reservation were vagrant local percolating

5  ground waters not a part of the Santa Margarita River system.

6  All of the ground waters.

7      THE COURT:  You didn't move to strike the testimony out?

8      MR. SACHSE:  Under cross-examination by me he rephrased

9  it, but stated the same thing again.

10     In the light of this testimony, and because there were a

11  great many people there and because I represent something over

12  a hundred in that particular area, I asked Mr. Cranston if it would

13  be necessary for any defendant to present any testimony, bearing

14  in mind your Honor's pretrial ruling.  Mr. Cranston then asked

15  the legal representatives of the United States if there was any

16  intention of contradicting Col. Bowen's testimony in this water-

17  shed.  The representatives said no, there was not.

18     Mr. Cranston then stated that while he was making no ruling,

19  that it appeared to him that all persons within the Fallbrook

20  drainage who claimed only underground waters and asserted no

21  claim to surface waters were, in the light of your Honor's

22  pretrial, not properly a part of the lawsuit.  There are about

23  a thousand of them or something more, so we are not talking about

24  a very minor little aspect of this.

25     THE COURT:  Do you have any objection to Mr. Veeder's

Z4

1 having time to look this transcript over?

2      MR. SACHSE:  My objection is not to his having time to

3 look the transcript over.  My request to your Honor was going

4 to be this.  Your Honor has, during pretrial proceedings, re-

5 quested Fallbrook, for example, to spell out in detail the

6 riparian rights asserted in the river.  We have done so.  Here

7 is a case where in February of this very year each one of these

8 people was served with a pound and a half paper.  Here is a case

9 where a lis pendens in April was put on every one of these.

10 If the United States changes its mind this fast and this utterly

11 unexpected to me-- I see no logic, rhyme or reason to this broad

12 statement, very frankly, your Honor-- I think that it is about

13 time that this Court exercise its equitable authority to direct

14 the United States and give them a time limit to come in and say

15 why this exact same situation does not exist on Sandia Creek,

16 on Tucalota Creek, on Warm Springs Creek, on any creek in the

17 whole watershed.

18      THE COURT:  I imagine that it is a practical problem.  I

19 understand that surveys are being made and until they are

20 completed and somebody is competent to testify to the area, it

21 can't be done.

22      Let's go ahead with our other work.  We will not bury this

23 matter.

24      How much time would you want to think about this before

25 we sit down and discuss it?  A week or so?

Z5

1        MR. VEEDER:  Yes, I would, your Honor.

2        MR. SACHSE:  Of course, Mr. Veeder, there is another

3    master's hearing set for next Monday.

4        MR. VEEDER:  That's all right.  The point I make is that we

5    have to talk to Col. Bowen about these matters, and if there are

6    no claims to Santa Margarita River water filed that is one thing.

7    I have asked at all times that we be permitted to review the

8    physical factors and all of the pleadings before we take any

9    action.  That is all I am requesting now.

10        THE COURT:  What hearing has the Master set for next

11    Monday?

12        MR. SACHSE:  It is a continuation of the same thing.

13        MR. VEEDER:  It is a continuation of the same thing, yes.

14        THE COURT:  On Fallbrook Creek?

15        MR. SACHSE:  Yes, your Honor.

16        MR. VEEDER:  Yes, your Honor.

17        MR. SACHSE:  And also, Mr. Veeder, in case you have not

18    been advised, he did request that your staff at that time bring

19    to him the delineation on the maps you introduced of all of the

20    particular parcels that you understood might be asserting claims

21    to surface rights.  He asked for that.

22        THE COURT:  I would like to have you start on this immed-

23    iately so that we would know by the end of the week, in general

24    terms, what to instruct the Master.

25        MR. VEEDER:  Yes, your Honor.

Z6

THE COURT:  Let me point out one thing, so that we will not labor under any misapprehension.

Mr. Sachse said that I, in a pretrial ruling, held that these people are not properly in the case.  I may have used such language, but I don't recall right now.  But the point is this, if they don't claim water, if they have no rights in the stream, I don't think they ought to be dismissed out of this action.  I think they should have a decree binding on everyone else in this watershed that they are not part of this stream system.  In other words, they ought to be able to clip some sort of benefit out of having been dragged into this lawsuit.  Now a dismissal might have the same effect, it might not.  But an interlocutory decree, after notice to everybody in the watershed-- whatever procedure we would have to take-- that their property does not have water which is part of the stream and that their rights are correlative with their neighbors would heal up their titles from here on out as to future litigation on this stream.

MR. SACHSE:  That is exactly what we hope, your Honor.

MR. VEEDER:  I didn't think there was even any doubt about what your Honor's--

THE COURT:  You were using the words "dismissed out" in the broad sense, in the layman's sense of the word?

MR. VEEDER:  Mr. Sachse.

THE COURT:  You used the word, too.

MR. VEEDER:  The point is I want to have the kind and type

1  of order that your Honor mentioned entered in these instances.

2  THE COURT:  The first thing for you to do is to review the

3  transcript and then we will sit down and talk about it.

4  MR. VEEDER:  That will be done, your Honor.

5  THE COURT:  The real problem in the case is the problem

6  that everybody being adverse to somebody else in the case might

7  have a right to object, and it seems to me that we are probably

8  going to have to notice a hearing and serve, which we can do

9  by mail, those people who appeared, serve on counsel and on all

10  the defendants a notice of the hearing which might result in

11  this decree, and when you get into one of these mailings that

12  is a tremendous job and it may be that we can do two or three

13  things at one time.

14  MR. VEEDER:  That is right, your Honor.

15  THE COURT:  So let's be thinking about that.

16  Go ahead.

17  MR. VEEDER:  Your Honor, there is one thing I would like

18  to ask the State of California, if I may, at this time.

19  Mr. Moskovitz had in his possession, as I recall, some

20  folios of the well logs and water level measurements maintained

21  in their ground water office in Los Angeles.

22  Do you have those in your possession now?

23  MR. MOSKOVITZ:  I believe they are in the file.

24  MR. VEEDER:  I wonder if we could have those available to

25  us, because we are now working on some of these matters that

Z8

1   your Honor has directed and they would be most helpful to us.

2       THE COURT:   I understand that Mr. Moskovitz has some

3   originals, or at least they were a lot better copies than you

4   had.

5       Were you going to duplicate those, or lend them to the

6   Government for duplication?

7       MR. MOSKOVITZ:   Last week we talked about duplication,

8   but counsel said that as long as the records are available they

9   didn't want duplication.   They are available across the way

10  and we will make them available.

11      MR. VEEDER:   We are now preparing the map as your Honor

12  directed, showing all the wells that Mr. Kunkel utilized.

13      THE COURT:   Can they be loaned to Mr. Veeder then?

14      MR. MOSKOVITZ:   Yes, your Honor.

15      MR. VEEDER:   And we may keep them for reproduction?

16  I think it may be desirable for us to reproduce some of them

17  at least, if that is all right.

18      MR. MOSKOVITZ:   Let's work out the details outside.

19      MR. VEEDER:   Very well.

20      THE COURT:   All right.

21

22                          FRED KUNKEL,

23  recalled as a witness in behalf of the plaintiff, having been

24  previously sworn, testified further as follows:

25

3045

Z9

CROSS-EXAMINATION (Resumed)

BY MR. DENNIS:

Q   Mr. Kunkel, since last Friday have you had any opportunity to review your testimony in this case?

A   Yes, I have reviewed part of the testimony.

Q   Do you have any changes you wish to make-- any corrections?

A   No.

Q   Calling your attention to the Studley well--

A   Yes.

Q   --there seems to be some confusion in my mind as to whether or not the Studley well is one of the wells which are indicated on Plaintiff's 16.

A   The Studley on Plaintiff's 16 is not shown.

Q   It is not shown?

A   The Studley well is not shown.

Q   Do you have a log for the Studley well?

A   To the best of my knowledge, I do not have a log for the Studley well.

Q   Did you ever see a log for the Studley well?

A   No, I have not.

Q   Is the Studley well correctly located on the exhibit which you are preparing, showing the location of the various wells within the Pauba Basin and other basins within the upper Santa Margarita River watershed?

1    A   Yes, it is.

2    Q   And that is shown by a cross, is it not?

3    A   That is shown by a cross.

4    Q   Now, Exhibit 16-D purports to show the water levels in

5    various wells which were measured in the late fall and early

6    winter of 1957 by yourself and Lt. Walker.  Are those the only

7    wells that you took measurements in, in the fall of 1957, in

8    the early winter of 1957?  Is that a complete list of all the

9    wells you measured the water table in?

10   A   There are other wells that I have measured that I have

11   not been able to put my hands on the exact notes where I recorded

12   the water level.

13   Q   You haven't been able to find your notes?

14   A   I have not been able to find my notes for those wells.

15   Q   And you will bring them in if you do find them?

16   A   If at all possible to find them, I will bring them in.

17   Q   And am I correct in understanding that Exhibit 16-B

18   purports to list all of the wells or well logs that you took

19   into consideration in arriving at the specific yields of the

20   various underground basins in the upper Santa Margarita River

21   watershed?

22   A   These are all the wells that I used to calculate specific

23   yield, yes.

24   Q   You used no other wells in computing the specific yields?

25   A   For the actual computation, I used no other wells.

1    Q  Where did you obtain the logs of the wells which are

2  listed in Exhibit 16-C, I believe it is?

3    A  I do not have a copy of 16-C.

4    Q  Pardon me-- 16-B.

5    A  Where did I obtain the logs?

6    Q  Yes.

7    A  I obtained them fromthe files of the Department of

8  Water Resources.

B-1 ML j

1       A     I obtained them from the files of the Department

2  of Water Resources, some from the records of the Vail

3  Company, logs in the files of the Geological Survey.  I,

4  by inspection, cannot tell which log was obtained from

5  which source.

6       MR. MOSKOVITZ:  Your Honor, may I make an inquiry:

7  Have we been talking about 16-B or 16-D all this time?

8       MR. DENNIS:  16-B, Baker.

9       THE COURT:  We started out with D, then we switched

10 to 16-B.

11      Q  BY MR. DENNIS:  In other words, all logs, then,

12 were either obtained from the Vail Company, from the

13 Division of Water Resources, or from the U. S. G. S. or

14 Camp Pendleton?

15      A     To the best of my knowledge, that is correct.

16      Q     And as yet you have not deposited all of those

17 well logs with the court?

18      A     They are, as the record indicates, available

19 through Mr. Moskovitz.

20      Q     But you did deposit certain well logs with the

21 court as Exhibit 16-A, but those well logs did not include

22 all of the logs of the wells which are listed in 16-D?

23      A     If I remember correctly, Exhibit 16-A was prepared

24 at the direction of the Court to show the logs that were

25 used in the preparation of the cross-section which is

Plaintiff's Exhibit 16.

THE COURT:  That is right.  That is why it was given No. 16-A.

Q  BY MR. DENNIS:  Now, I wonder if you would examine Exhibit 16-A and in particular the log of well 8 South, 2 West, Section 12, H.I., which is projected.

MR. VEEDER:  Would you give the exhibit number, Mr. Dennis?

MR. DENNIS:  I think I can find that, yes.  Just a second.  That would be 16-A, 49.

THE WITNESS:  Yes.

Q  BY MR. DENNIS:  Have you found that?

A  Yes.

Q  And as I recall, that log shows that the well was drilled to approximately 510 feet?

A  515 feet.

Q  And they hit the bedrock at 510?

A  The log says bedrock at 510.

Q  And that bedrock, in view of your testimony and Exhibit 16, would be the equivalent to the basement complex, would it not?

A  No.

Q  You show, do you not, on Exhibit 16 --

MR. VEEDER:  Now, just a moment.  Just a moment.  I don't believe that the witness had completed the answer to

Kunkel - Cross

the question.

MR. DENNIS:  Oh, I beg your pardon.

THE WITNESS:  The answer was no.

Q  BY MR. DENNIS:  The answer was no?

A    That is correct.

Q    Would you examine Plaintiff's Exhibit 16 and tell the Court whether or not the symbol which is at the bottom of the well tied into the legend shows that it was in basement complex?

A    It does not show it is in basement complex.

THE COURT:  Is this well shown on 16?

MR. DENNIS:  That is shown on 16, your Honor, as 8 -- 2 -- 12 -- H-1 projected; and it is the most northerly well in the Pauba Basin, the one just below the fall.

THE COURT:  All right.

MR. SACHSE:  Would you like my eyeglasses?

Q  BY MR. DENNIS:  Mr. Kunkel, isn't it true that the legend shows that an area which has a shaded portion, hatched portion, with the lines running from the upper right-hand corner to the left-hand corner, is consolidated rock basement complex of geological map --

A    That is correct.

Q    And calling your attention to the log, is it not true that the lines at the bottom of the well shaft are slanted from upper right to lower left?

1      A      That is correct.

2      Q      Is the Exhibit 16 in error?

3      A      No, the log is in error.

4      Q      The log.  But you prepared Exhibit 16, which shows

5   basement complex at the bottom of the well 8-2-12-H.I., did

6   you not?

7      A      Repeat your question, please.

8      Q      I say, you prepared Exhibit 16, did you not?

9      A      Correct.

10     Q      And at the time you prepared 16, you placed at

11   the bottom of the well designated on 16 as 8-2-12-H.I.

12   projected, you inserted the symbol which, under the legend,

13   stands for consolidated rocks, did you not?

14     A      Correct.

15     Q      Now, have you changed your mind from the time that

16   you prepared Exhibit 16?

17     A      No, I am of the opinion that Exhibit 16 is correct.

18     Q      But does Exhibit 16 show basement complex at the

19   bottom of the well shaft for well 8-2-12-H.I.?

20     A      I am very sorry, I have made an error.  The log

21   does show basement complex, but the log is in error.  The

22   exhibit as prepared is correct.

23     THE COURT:  You mean the exhibit reflected what the log

24   showed?

25

THE WITNESS:  The exhibit reflected what the log showed.

Pardon me, your Honor.  The exhibit for the log, or for well 8-2-12-H.I. truly shows the log as reported by the driller.  In my opinion, the log is incorrect, and the exhibit as prepared by me, Exhibit 16, shows, in my opinion, the true conditions of Pauba well.

Q  BY MR. DENNIS:  But your Exhibit 16 does show basement complex, does it not, the ends or bottom of well shaft 8-2-12-H.I.?

MR. VEEDER:  I object.  The question is repetition for the seventh time.

THE WITNESS:  It shows what is reported in the log.

THE COURT:  When you said that the Exhibit 16 is correct, you were referring to your symbol QTOAL as under-lying all the wells shown there in Pauba Valley?

THE WITNESS:  That is correct, your Honor.

THE COURT:  I understand what the witness means.

Q  BY MR. DENNIS:  Now, on what do you base your opinions that the log is incorrect?  Did you ever talk to the well driller?

A    May I --

MR. STAHLMAN:  That was a compound question.

Q  BY MR. DENNIS:  I will ask this:  Did you ever talk to the party who drilled the well which we were just

xs..

mentioning?

A    You mean the well driller?

Q    The well driller.

A    No.

Q    Did you ever talk to the party who prepared the log which is in evidence as 16-A 49?

A    I, from memory, do not even remember who the driller was.  It could be --   I don't know.  There were so many different individuals drilled the wells.

Q    Did you ever see any of the cores that came out of that particular well?

A    No, I did not.

Q    Now, I wonder if you would examine Exhibit 16-A 46, the Exhibit 16-A 46, Mr. Kunkel.  And could you tell us to what depth that well was drilled?

A    117 feet.

THE COURT:  What is the number shown on the Exhibit 16?

THE WITNESS:  The well number is 8 South, 2 West 11-J 5.

THE COURT:  That well is not shown on Exhibit 16, is it?

MR. DENNIS:  That well is not shown on Exhibit 16, your Honor.

THE COURT:  All right.

Q  BY MR. DENNIS:  Will you tell the Court what the last observation of the driller or the person who kept the log is in that particular log.

1     A    It says, "116 to 117 feet.  Rock bottom? "I doubt

2  it.  FK 12/27/57.  See log well 8-2 West, 11-J-1."

3     Q    Now, the notation is your notation on the log

4  starting with "I doubt it"?

5     A    That is correct, the handwriting is mine.

6     Q    That is not part of the original log?

7     A    No, sir.

8     Q    Did you ever talk to the driller of that well?

9     A    I did not.

10     Q    Did you ever see the cores that came from the

11  well?

12     A    I did not.

13     Q    And you didn't talk to the person who kept the

14  log?

15    MR. VEEDER:  Wait a minute.  What do you mean by that,

16  "Who kept the log"?

17    MR. DENNIS:  The party who actually made the log.  I

18  don't know whether the driller made it.

19    THE WITNESS:  I am very well acquainted with the man

20  who knew the driller personally, was intimately acquainted

21  with the wells; and I have discussed these logs at consider-

22  able length with him.

23     Q  BY MR. DENNIS:  And that was Mr. Hall?

24     A    That was Mr. Hall.

25     Q    Now, will you turn to the second page of the log

1   and read the first paragraph.

2      A    "Perforations from 98 to 106 feet was tight and

3  apparently contained no water.  From 108 to 116 feet there

4  was considerable water throughout so the gravel was dirty."

5      Q    What would be your interpretation of "tight"

6  as used in that paragraph?

7      A    Interpreting the driller's log, I would take it

8  to mean that it was probably a silt.

9      Q   Now, I wonder if you would turn to 16-A 64.

10     MR. MOSKOVITZ:  Might I request, Mr. Dennis, that you

11  identify the well by its location number, too?

12     MR. DENNIS:  That would be 8S, -3W, 13 R-1.

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q  And what is the last notation made on the log?

2    A  "Stopped at granite."

3    Q  What was the depth at which they encountered granite?

4    A  83 feet.

5    Q  I wonder if you would refer to 16-A-68-- that is 9S,

6  1E, IQ 1 or 1Q1?

7    MR. SACHSE:  Could I have it again?

8    MR. DENNIS:  9S, 1E, 1Q1.

9    MR. SACHSE:  What was the exhibit number?

10   MR. DENNIS:  16-A-68.

11   Q  What is the last notation on that log?

12   A  "Solid 'hard' granite."

13   Q  What is the depth?

14   A  The depth at which the granite, according to the

15  driller, was encountered was 30 feet.

16   Q  Have you any reason to believe that that was an incorrect

17  entry?

18   A  In this particular case-- May I check my Exhibit 16?

19   Q  Certainly.

20   THE COURT: Did you say this was 9S, 2 West?

21   MR. DENNIS:  9S, 1E, 1Q1.

22   THE COURT:  Would that be Section 1?

23   MR. DENNIS:  That would be Section 1.

24   THE WITNESS:  It is in Dameron Valley.  What is the ques-

25  tion now?

3057

C
Z13

BY MR. DENNIS:

Q   I asked you if you had any reason to believe the driller's notation was incorrect?

A   In this particular case, from memory, without analyzing the exact position of the well on my field notes-- May I have the field notes for reference, please?

MR. DENNIS:  Yes.

THE WITNESS:  I will have to testify from memory on this. The exact position of the log is not shown on my field map. However, as I remember correctly-- let's see, now, to make sure I am in the right valley-- the position of the well 9S, 1E, 1Q1 is on the alluvial plain of the valley north of the channel of Temecula Creek, and as shown on the field maps that I prepared the basement complex crops out within-- on the 1 to 24,000 scale-- I shall estimate the distance several hundred feet north of the channel of Temecula Creek.

I was driven to that well by Dick Montague-- I have to make sure that I don't have my ranches confused-- No, not by Dick Montague.  It was another ranch.  I was driven to that well in the company of Paul Campo and Giles Walker.  We also conversed with the ranch manager, but I do not recall his name.

That well is not in the channel of Temecula Creek.  It is north of the channel and considerably closer to the bedrock outcrop as mapped by myself, whereas the section shown is down in the deepest part of the alluvial-filled valley.

3058

C

Z14

1    THE COURT:  By section shown you mean Exhibit 16?

2    THE WITNESS:  Exhibit 15.

3    MR. VEEDER:  Exhibit 16.

4    THE WITNESS:  Exhibit 16 is down in the deepest part of

5  the alluvium-filled valley.

6    In my opinion, this log is correct.

7  BY MR. DENNIS:

8    Q  Now Mr. Kunkel, I wonder if you would look at 16-A-38,

9  which is 8S, 1W, 13K1.  What is the last entry on the log?

10    A  The log says, "Granitic material--"

11    Q  The last entry, Mr. Kunkel?

12    A  Perforated?

13    Q  Yes.

14    A  "Perforated 2110, 2120/2535 -- 2555."

15    Q  What does that mean to you?

16    A  To me that means the depth to which the driller cut

17  slots in the casing.

18    Q  That would be the depth at which water would be

19  obtained in that particular shaft?

20    MR. VEEDER:  Now I object to the question.  That is not

21  what "perforated" means.

22    THE COURT:  Objection overruled.

23  BY MR. DENNIS:

24    Q  Would it be possible to obtain water--

25    Let's put the question another way, your Honor.

C
Z15

1           Would it be possible to obtain water through the shaft

2  at any spot other than where it was perforated?

3        A  Yes, it would.

4        Q  How?

5        A  Number one, the casing could rust; number two, the casing

6  could be damaged in the process of construction; the casing

7  could be poorly welded.  There are many ways in which water can

8  enter a well other than through perforations.

9        Q  Let me put it this way:  It is usual practice in per-

10  forating casing in a drilled well to perforate the casing at

11  the depth at which water is encountered, is it not?

12        A  No.

13        THE COURT:  Well, I know something about drilling wells.

14  You get a little bit of water, and then you get a big bunch

15  of water.  You don't perforate at your one 100-inch flow.  You

16  perforate at the big flow.

17        THE WITNESS:  Other factors enter into size.  The depth

18  at which water was encountered or incurred.  There are many

19  factors.

20        THE COURT:  Is that well a deep well?  2500 feet?

21        THE WITNESS:  Essentially 2600 feet; 2594.

22        MR. VEEDER:  I want to be sure I get the location.

23        THE WITNESS:  The well is not shown on the section.

24        MR. DENNIS:  I was going to ask him if he would locate

25  that well on Exhibit 15, the approximate location.

C
Z16

1        THE WITNESS:  I know exactly where the well is located.  It

2   is 13K1, is it not?

3        THE COURT:  13K1.

4        THE WITNESS:  13K1 is north of the projection of both the

5   south fault and the center fault of the three faults shown in

6   the Lancaster Valley area-- Lancaster-Aguanga Valleys.

7   BY MR. DENNIS:

8        Q   Could you mark the approximate location on 15?

9        A   If I have described it accurately, it is 13K1, by the

10  numbering system described.  It lies in that 40 acres north of

11  the fault, the projection of the two faults to which I have

12  testified.

13       Q   I would appreciate it, Mr. Kunkel, though, if you

14  could actually make a cross.

15       A   I can make a cross and show, according to my field maps,

16  the exact location of the well.

17       Q   Will you do that, please?

18       A   Certainly.

19       MR. VEEDER:  Your Honor, I realize that I am not on cross-

20  examination, but I wonder if the witness located the right

21  valley.  I think it was Nigger Valley rather than Lancaster

22  Valley.

23       MR. DENNIS:  I think that is correct, Mr. Veeder.

24       THE WITNESS:  It is a matter of terminology.

25       MR. VEEDER:  I am sorry.

        THE COURT:  Section 13 sort of lies between Nigger Valley

Kunkel   Cross                                           5061

C

ZixI7

1  there.

2        THE WITNESS:  I have previously testified that the valleys

3  named are local names of physiographic features, and I am

4  entirely talking in terms of ground water basins.

5        THE COURT:  If this is 8S, 1W, you are in the wrong place,

6  Mr. Stahlman.

7        MR. VEEDER:  The reason I brought up the point is that on

8  direct testimony we used the Nigger-Aguanga-Lancaster Valleys,

9  and when we use that there is no question.

10        THE WITNESS:  What is the question?  You asked me to

11  locate the well exactly?

12        MR. DENNIS:  Yes.

13        THE WITNESS:  To whom do I show this?  To the Court or to

14  Mr. Dennis?

15        THE COURT:  What do you want, Mr. Dennis?  Do you want to

16  look at his field notes or--

17        MR. DENNIS:  No, if he would just place a cross of the

18  location of the well on Exhibit 15, because I think we will be

19  referring to it.

20        THE WITNESS:  May I scale it, please?

21        MR. DENNIS:  Just approximately.  We will not hold you to

22  40 acres.

23        THE WITNESS:  This is a point which I want located right.

24        THE COURT:  Well, this is a good time to take the recess

25  while you are scaling it in.

Kunkel - Cross                    5062

C

Z18

1      (Recess.)

2   BY MR. DENNIS:

3      Q   Mr. Kunkel, I think during the recess you placed a

4   circle on Exhibit 15 and labeled it 13KI?

5      A   Kl.

6      Q   Kl?  That is Section 13, is it not, 8S, 1W?

7      A   That is correct.

8      Q   And that is as nearly as you can locate the actual

9   location of the well that we have been discussing?

10     MR. VEEDER:  Now, I object to that-- the well that we have

11  been discussing.  There have been 25 wells, and I suggest that

12  the record be--

13     MR. DENNIS:  All right.  I will say, then, the well for

14  which you have a log, which was bored to a depth of 2594 feet?

15     THE WITNESS:  Well, 13Kl, approximately 2600 feet deep;

16  that is the well to which I am testifying.

17     MR. VEEDER:  Do you have the exhibit on that, your Honor?

18     16-A-38.

19  BY MR. DENNIS:

20     Q   Where did you obtain the log which is in evidence as

21  16-A-38?

22     A   To testify for any one particular well from memory I

23  find it very difficult.  Without checking my records, I might

24  not be certain.  It could have been Barbee vs. Oviatt, the

25  court record that was in the San Diego District Court.  The

1   log is in the files of the Department of Water Resources. It

2   is also in the file of the Geological Survey.

3        Q  You don't recall whether you got that log from the State

4   or not?

5        A  That particular log, no, I don't recall whether that log

6   came from the State or not.  I know they have it.  I have seen

7   it in their file.

8        Q  Now, Mr. Kunkel, calling your attention to Exhibit 13

9   and in particular to the water contour levels which you have

10  placed on that exhibit in the vicinity of Lancaster Valley and

11  Nigger Valley, I notice that some of those contours are much

12  closer to each other than others.  The fact that they are close

13  would indicate a steep hydraulic gradient, would it not, and

14  where they are some distance, approximately a mile apart, that

15  would indicate that the hydraulic gradient would not be as

16  steep as it would where they are only half a mile apart; is that

17  correct?

18       A  Would you restate the question, please?

19       (The reporter read the pending question.)

20       THE WITNESS:  That is correct.  The closer the contours

21  are together the steeper the hydraulic gradient.

22  BY MR. DENNIS:

23       Q  The same as contours of the surface?

24       A  That is correct.

25       Q  And is it true that if you had a material where the

c
Z20

1    permeability was low that the hydraulic gradient through that

2    mass of material would be steeper than it would be through a

3    mass of material that has a much higher permeability?

4        A  Could we have the question read again, please?

5        (The reporter read the pending question.)

6        THE WITNESS:  I don't believe the question is sufficiently

7    qualified.

8        MR. VEEDER:  If you can't answer, say so.  That's the thing

9    to do.

10   BY MR. DENNIS:

11       Q  You can't answer the question?

12       A  The question is insufficiently qualified.  It cannot

13   be answered as you have presented it.

14       Q  If we had a mass of material--

15       MR. VEEDER:  Are you withdrawing your first question?

16       MR. DENNIS:  He says that he can't answer it.

17       THE COURT:  Ask your next question.

18   BY MR. DENNIS:

19       Q  If you had a mass of material which had a very low

20   permeability, you would expect to find a high hydraulic

21   gradient through that material, would you not?

22       A  No, that doesn't follow in the least.

23       Q  It does not follow?

24       A  No, sir.

25       Q  What would be the governing factor in increasing the

Kunkel - Cross

1  slope of the hydraulic gradient, the permeability of the

2  material or the porosity of the material?

3       A   The transmissibility of the material.

4       Q   The transmissibility of the material would be the

5  factor?

6       A   That is correct.

7       Q   So that if you had material that had a high trans-

8  missibility you would expect to find the hydraulic gradient

9  to be less than it would be in a mass of material that had low

10 transmissibility?  Is that correct?

1    THE COURT:  Well, first, let's see if I understand

2  what you mean by the hydrolic gradient.  It would be the

3  line which is the water level of the material?

4    MR. DENNIS:  It would be the line of the water level,

5  as I understand it, in the material.  Mr. Kunkel, on

6  Exhibit 15, has placed various water contour levels which

7  show that in the upper end of the Pauba Valley, for in-

8  stance, he has an inferred contour of 1200 feet, and in the

9  lower end of the Pauba Valley about 1025 feet.  So, the

10  lower end, the water level, the elevation above sea level,

11  the water table, would be approximately 175 feet less than

12  it would be in the other, and you would have an hydrolic

13  gradient that would be higher in the north end and lower

14  in the --

15    THE COURT:  When you use the term "gradient is less,"

16  you mean the gradient is tending more toward a horizontal?

17    MR. DENNIS:  Yes, that is right.

18    THE COURT:  You say the gradient is more, or tipping

19  away --

20    MR. DENNIS:  The angle would be greater.

21    THE COURT:  All right.

22    THE WITNESS:  The question, please.

23    THE COURT:  All right, you may re-ask it.

24    Q  BY MR. DENNIS:  Mr. Kunkel, if you had a mass of

25  material where the transmissibility would be low, the

1  hydrolic gradient would be steeper, it would be more of an

2  angle to the hydrolic gradient than it would be in a mass

3  of material that had high transmissibility, would it not?

4      A    Again, you are not stating all the factors in

5  the --

6      Q    What other factors would you have to have?

7      MR. VEEDER:  Now, I object to this, your Honor.  The

8  counsel should ask the question rather than have the

9  witness tell him what he should ask.

10      THE COURT:  Well, he is asking the witness what other

11  factors.  Objection overruled.

12      THE WITNESS:  Q equals t.i.d.

13      MR. DENNIS:  That is correct, as I see it.

14      THE WITNESS:  Thank you.

15      Q  BY MR. DENNIS:  But I still think that you can

16  answer the question that if you have high transmissibility

17  within a certain mass of material, the hydrolic gradient,

18  the slope, percentagewise, is going to be less than it

19  would be through a mass of material which had a low

20  transmissibility?  Now, it is true that you have got all

21  those factors to take into consideration to figure the

22  transmissibility.

23      A    True.

24      Q    But I am talking about the transmissibility.

25      A    You can't have an equation with one factor.

1    Q    I am not talking about that.  You have got two

2    masses of material, Mr. Kunkel.  You have a mass of material

3    here which has one transmissibility which is very low.

4    Next to it you have a mass of material with a transmissibility

5    that is very high.  In which would the hydrolic gradient

6    be the greatest?

7        A    Give me the rest of my equation and I will tell

8    you.

9        THE COURT:  Now, wait.  We are wasting time.  What do

10   you want to prove, that if there is low transmissibility

11   the gradient will be higher?

12       MR. DENNIS:  Will be higher.

13       THE COURT:  And if there is more transmissibility the

14   gradient would be less, other things being equal?

15       MR. DENNIS:  Other things being equal.

16       THE COURT:  Mr. Witness, take two basins identical in

17   every respect, size and the amount of water coming in,

18   everything else is the same except in one basin the alluvial

19   in the basin is a material with low transmissibility.  In

20   the other basin, which is identical in every other respect,

21   the material is a very high transmissibility.  Will there

22   be a difference in hydrolic gradients?

23       THE WITNESS:  Yes, sir.

24       THE COURT:  And where will the gradients be the

25   highest?

D-2

THE WITNESS:  The material with the low transmissibility, all other things being equal, will have the highest hydrolic gradient.

(Discussion off the record.)

MR. VEEDER:  Is there a question pending, Mr. Dennis?

MR. DENNIS:  No, I am just going to start it.

Q    Mr. Kunkel, on Exhibit 15 you have arrows which you testified indicated the direction of the movement of the water within the various basins.  Is that true as to the direction of movement of the water along the entire contour and inferred contour line or only that portion of the contour in which the arrow is placed?

A    A direction of ground water movement?

Q    Yes, ground water movement.

A    Is at right-angles to a water level contour.

Q    So that you would say that the ground water was moving at right-angles to the inferred contour lines which are labelled 1050, 1100, and 1150, through the basin which, on Exhibit 17, you have designated as 4?

A    I am sorry, will you repeat the question?

(The reporter read the pending question.)

Q  BY MR. DENNIS:  That is the Basin 4 that lies south and east of Pauba Basin, that portion?

A    That is correct.

THE COURT:  Now, by that answer do you mean that that

1    is the only way the water can move?

2        THE WITNESS:  We are testifying to a horizontal plane,

3    your Honor.  Any one molecule of water is moving in three

4    directions.

5        THE COURT:  What three directions?

6        THE WITNESS:  Up-gradient, down-gradient, or up, and

7    up or down the hydrolic gradient on a horizontal plane and

8    up or down with respect to the entire thickness of the aquifer.

9    So a single drop of water is not wholly as Mr. --  Pardon

10   me.  Ground water, as I have previously testified -- and

11   I am very careful to try and say it in all cases -- moves

12   down the hydrolic gradient, not downhill.  The hydrolic

13   gradients are rather complex.

14       THE COURT:  All right.  Let me ask a question:  You

15   have stated that the ground water is moving in the direction

16   of the arrows which are at right-angles to the water

17   contours put on the map?

18       THE WITNESS:  That is correct.

19       THE COURT:  Well, now, supposing you had water moving

20   in that direction immediately close by the Pauba Valley

21   and the younger alluvial and supposing there was very

22   extensive pumping in the Pauba Valley.  Couldn't that

23   ground water move in a different direction towards the

24   Pauba Valley?

25       THE WITNESS:  If there were sufficient pumping for a

long enough period of time, the hydraulic gradient could be and would be reversed and the water would move away from, could move in exactly the opposite direction.

THE COURT:  But as of the time that you made this map and as of the date that it referred to your arrows indicate the ordinary direction of movement of ground water at that time?

THE WITNESS:  In my opinion, that is correct.

Q  BY MR. DENNIS:  Irrespective of what watershed that the particular water might be in at the time?

MR. VEEDER:  I object to that question.  What do you mean?

THE COURT:  I don't understand that.  Start over again.

Q  BY MR. DENNIS:  Well, as I understand, he said that this water was moved in the direction of the slope of the water table as indicated by his water contours as placed on Exhibit 15.  Now, what I am asking the witness is:  If this land should lie in a different watershed but it still had the same ground water level contours with the water, still moved in the direction as indicated by your arrow, or would it move from the highest point of the watershed in which it was located to the lowest point on the watershed on which it was located?

MR. VEEDER:  I am going to object to that.  There is no

1    basis for the hypothesis he has created.

2         MR. DENNIS:  I think there will be.  You have an

3    exhibit in evidence which shows that this land lays in

4    four different sub-watersheds of the Santa Margarita River,

5    and that the highest gradient in the intermittent streams

6    as shown on that exhibit are, in some cases, nearly at

7    right-angles, and some places nearly 180 degrees from one

8    another.

9         THE COURT:  What are you trying to prove?  Just tell me

10   in a few words, and maybe we will all concede it is true

11   and maybe we can go on.

12        MR. DENNIS:  I think we should concede, your Honor, and

13   that is that the water does not always follow the general

14   slope of the water contours in the bottom of the valley but

15   it moves downward in each particular sub-watershed.  In

16   other words, if you had this situation in this area here and

17   you had a ground water contour which was the same in the San

18   Luis Rey Valley as it was in the Santa Margarita Valley, I

19   don't think that you could say by that contour that the

20   water was moving in any one particular direction, because

21   part of it is going to drain into the San Luis Rey and part

22   of it is going to drain into the Santa Margarita.  And,

23   therefore, under the witness' testimony that this water was

24   in hydrolic continuity, that doesn't mean it is a part of

25   this particular -- can be in hydrolic continuity within the

1    meaning of his testimony, but it doesn't mean that it is

2    part of the water of the Santa Margarita System.

3        MR. VEEDER:  Well, I renew my objection.

4        THE COURT:  Your example, of course, has nothing to

5    do with what we are talking about.  Your questions are

6    related to the area around the Pauba Valley, on either side

7    of it, within the Santa Margarita Watershed.

8        THE WITNESS:  That is correct.

9        THE COURT:  Now, you give me an example up on the

10   boundary between the Santa Margarita and the San Luis Rey.

11   Do you have some contention that the water in the area shown

12   on Exhibit 15, at or near the Pauba Valley, that drains into

13   another watershed?

14       MR. DENNIS:  No, your Honor, but that it does not move

15   in the direction --    The witness now has testified, as I

16   understand his testimony, in response to your question, that

17   this water  is now moving through this area at right-angles

18   to the water level contours.

19       MR. VEEDER:  Can I ask that the designation you are

20   pointing to, Mr. Dennis, be referred to?

21       MR. DENNIS:  I am now pointing --

22       THE COURT:  He is pointing to the Pauba Valley and the --

23       MR. DENNIS:  Basin 4, which lays south of the Pauba

24   Valley, which is bisected by the water contour levels 1150 to

25   1050.  And I believe if we will look at Exhibit 29, that

1    topog map, we will find that there are a number of sub-

2    watersheds within that area and that some of those sub-

3    watersheds drain into Pechanga Creek, which is a tributary

4    to the Santa Margarita, and some of them drain directly into

5    Temecula Creek. Therefore, the water --

6        THE COURT:  Go ahead.

7        MR. DENNIS:  That necessarily that the witness'

8    conclusion that the water is all moving in this direction

9    is incorrect.

10       MR. VEEDER:  Now, your Honor, counsel is jumping to

11   the conclusion with no basis whatever for it.

12       THE COURT:  He is talking about different things.  He

13   is talking about surface watershed.

14       MR. VEEDER:  That is right.

15       MR. DENNIS:  I am talking about the ground waters,

16   your Honor.

17       THE COURT:  Well, the ground waters don't necessarily

18   have to follow the ground watershed.

19       MR. DENNIS:  That is correct.  And that was the next

20   thing we wanted to develop from this witness, as to what

21   evidence he had as to whether or not there are impermeable

22   materials which lay between.  In other words, I believe

23   your Honor will agree that it is reasonable to expect that

24   the basement complex would be much closer to the summit of

25   a ridge than it would be to the bottom of a valley.  I

1    think the witness probably --

2        THE COURT:  That could be for a hundred reasons.  I

3    could give you examples that show you are wrong.

4        MR. DENNIS:  Necessarily, that is not true.  But I

5    will ask this:  --

6        THE COURT:  You ask the questions.

7        MR. DENNIS:  One or two other questions.

8        Q    Have you any evidence as to the depth of the

9    basement complex other than what you could observe from the

10   physical inspection of the property and what you obtained

11   from the log wells?

12       MR. VEEDER:  May I have that question.  The depth of

13   the basement complex?

14       MR. DENNIS:  Depth to basement complex.

15       THE WITNESS:  Would the reporter give me the question?

16       THE COURT:  Yes, reread it.

17       THE REPORTER:  "Have you any evidence as to the depth

18   of the basement complex" --

19       MR. DENNIS:  To the basement complex.

20       THE COURT:  Change that "to the basement complex."

21       THE REPORTER:  -- "to the basement complex other than

22   what you could observe from the physical inspection of the

23   property and what you obtained from the log wells?"

24       THE COURT:  Well logs.

25       THE WITNESS:  No.

D-3

1    Q  BY MR. DENNIS:  Now, in a valley such as the Pauba

2  Valley or the Murrieta Valley you would expect to find the

3  more porous materials, the gravel and the rocks at the

4  upper end of the valley, would you, and the finer materials,

5  the silts and clays, toward the center of the valley in the

6  lower end of the valleys?

7    A    I am sorry.  May I have the question again,

8  please?

9    (The reporter read the pending question.)

10    THE COURT:  Are you talking about on the surface?

11    MR. DENNIS:  No.

12    THE COURT:  Are you talking about underground?

13    MR. DENNIS:  Underground.

14    THE COURT:  Or what are you talking about?

15    MR. DENNIS:  As these materials were laid down in the

16  valleys, as he has testified, these alluviums were laid

17  down --

18    THE COURT:  Rephrase your question.  Make it specific.

19    Q  BY MR. DENNIS:  In the Pauba Valley, would you

20  expect that the alluvium would be of a coarser nature and

21  more porous in the upper end of the valley than in the lower

22  endof the  valley?

23    A    A priori, I wouldn't expect offhand.  I would go

24  out and investigate in the field and see what I observe, then

25  I would come to my conclusions.

Q     Have you come to any conclusions in regards to the Pauba Valley from the studies that you have made?

A     i have opinions, yes.  Conclusions, yes.

Q     And what is your opinion?

A     It is my opinion that the -- I am trying to think of a proper word -- that the flood plane materials -- a geologist uses terms that are so different from lawyers' -- I am trying to use terms that will have meaning to both of us.

MR. VEEDER:  Go ahead and talk like a geologist and see if we can catch up with you.

THE WITNESS:  The plane of Pauba Valley indicated by younger alluvial deposits at the upper end of the Pauba Valley is a sandy, highly permeable plane.  As I have previously testified, the canyon of Nigger Canyon is deeply incised.  From that it logically follows that if and when large flows of water go through Nigger Canyon, they will be confined, when the waters pass to the outlet of the canyon, the confinement of the basement complex of the surface waters would cease, the waters would spread out and would flow over the sandy deposits, also.  The flood waters at that time are carrying a load of debris'.  When they spread out, the speed of the flood waters is greatly reduced and the materials in the flood waters are dropped and the finer materials are carried ahead.  However, I have observed

Kunkel - Cross

1   through the area of rising water -- May I get my notes,

2   please.  The channel of the Temecula River, the lower part

3   of the sandy channel is permeable to a point several miles

4   downstream from the river crossing with Highway 71.  My

5   testimony has previously stated that the channel is incised

6   beneath the alluvial Plain of Pauba Valley.

7       Q  BY MR. DENNIS:  When you use "alluvial plain," are

8   you referring to the younger alluvium?  I am referring to

9   the younger alluvium.

10      MR. SACHSE:  The "incised" means the alluvial plain

11  and --

12      Q  BY MR. DENNIS:  It is incised into the older

13  alluvium?

14      A  No, sir.  May I draw a diagram?

15      MR. VEEDER:  Surely.

16      MR. STAHLMAN:  When are you going to get that off

17  there?

18      MR. VEEDER:  We have got it off.  You can erase it

19  any time.

20      THE COURT:  You have in mind what the question was, do

21  you?  If you have an opinion as to whether the alluvia in

22  the Pauba Valley generally differs in character in the upper

23  end and the lower end, and is it true that the upper end

24  would be more porous than the alluvia in the lower end; that

25  is what the question is.

THE WITNESS: Yes, and I am trying to demonstrate by my observations what the relative porosities of the materials would be.

MR. VEEDER: I think that is going beyond the response to the question, then. Didn't he answer your question, Mr. Dennis?

MR. STAHLMAN: That is Mr. Dennis' next question, I presume.

MR. VEEDER: One question has been asked, and it has been answered, as I see it.

MR. SACHSE: I haven't heard any answer.

MR. DENNIS: I don't think I heard the answer yet.

MR. VEEDER: I thought he had answered it already. If he hasn't, let him go ahead.

THE COURT: He told us he thought it was the upper end of the valley. What about it? Generally, give us the answer to the question.

THE WITNESS: I am sorry, I have to do this all the time. May I have the question again?

THE COURT: You were asked if you had some opinions as to the quality of the alluvium in the Pauba Valley, younger alluvium, and you said you had. And you were asked what your opinion was as to whether or not the younger alluvial at the upper end of the valley was of a coarser, more transmissible character than the alluvia down in the lower

1    end of the valley.  Now, just give us a general answer, yes

2    or no, and explain it.

3        THE WITNESS:  As observed on the surface at the lower

4    end of the valley, the alluvial deposits are locally of the

5    same permeability or porosity but the width of the area is

6    not as great.  The channel, however, of the Temecula --

7    and this is observation.  The statement I have just made is

8    observation.  The opinion, as supported by investigations

9    of riverages (phonetic) is that the channel of the Temecula

10   River has not been as constant, at a constant plane or at

11   a constant place throughout geologic history but has

12   fluctuated back and forth and the porosities or the

13   character of the materials, of the coarse materials, should

14   occur as positions of the old sand channels at different

15   points at depth.  The deposits are lenticular and inter-

16   fingering.

17       THE COURT:  Well, is it generally true that in the

18   lower end of the Pauba Valley there is more transmissibility

19   or less in the younger alluvial deposits than in the upper

20   part of the valley?  I am talking about the area now that

21   we have had.

22       THE WITNESS:  In my opinion, the upper part of the

23   valley, the younger alluvial deposits are thicker, have a

24   thicker water-bearing section; therefore, their trans-

25   missibility would be greater.

1    THE COURT:  Are the materials coarser at the upper end

2  of the valley as contrasted with finer materials at the

3  lower end of the valley?

4    THE WITNESS:  As observed on the surface, that is true,

5  yes.  There are finer materials at the lower end of the

6  valley.

7    THE COURT:  Go ahead, Mr. Dennis.

8    Q  BY MR. DENNIS:  And from the inspection of the well

9  logs, what would be true?  Have you come to any conclusions

10  as to the materials that are not on the surface with

11  respect to various well logs?  Would that indicate that

12  the position that you have described on the surface extends

13  down for a considerable depth from the surface?

14    A    Based on all of the well logs that I have con-

15  sidered, there are materials of equal permeability at the

16  lower end of the valley and at the upper end of the valley.

17    Q    And did you say that the same condition exists

18  in the Murrieta Valley?

19    A    No.  No.

20    Q    To what extent was there any difference in the

21  Murrieta Valley than you observed in the Pauba Valley?

22    A    The principal difference is that in the Murrieta

23  Valley the younger alluvium is extremely thin at the upper

24  end and thickens toward the lower end.  We are talking only

25  of the younger alluvium that overlies the --

Q     And the older alluvium, you would have it thicken at the upper end and thin out at the lower end, would it?

MR. SACHSE:   The older alluvium?

MR. DENNIS:   Yes.

Q     In other words, as I understood your testimony, it was that originally Murrieta drained into Elsinore; is that correct?

E
Z22

1          A   Yes.

2          Q   And was the older alluvium laid down at the time that

3    the valley was draining into Elsinore?

4          A   In large part, yes.  The bulk of the older alluvium

5    was laid down during that period.

6          Q   So during that period you would expect to find a re-

7    versal of the process; you would find the larger materials and

8    more porous materials at the head of the valley as it existed

9    prior to the time that the watershed changed from Elsinore to

10   Santa Margarita?

11         A   There are some hypothetical cases that I would not

12   expect to find anything.  I would have to go on the basis of

13   what I observed.  We don't know what the width of the channel

14   was, or what the quantity of rainfall was.

15         Q   And you couldn't tell that from observing the surface

16   then?

17         A   Locally you can know what conditions were when a certain

18   bed was laid down.

19         Q   Well, I mean, can you tell what the conditions are as

20   to the older alluvium in Murrieta Valley from physical inspec-

21   tion of the surface of the ground?

22         A   Plus the well log data.

23         Q   I say, without the well logs; just from surface examina-

24   tion of the ground?

25         A   Yes, if there are sufficient outcrops, I can come to a

E
Z23

1   conclusion.

2   Q  Well, are there in Murrieta Valley sufficient outcrops

3   there so that you could come to any conclusion?

4   A  I think there are sufficient outcrops so that I can

5   come to a conclusion, yes.

6   Q  What are your conclusions then based on?  Both surface

7   examination and the well logs which you had opportunity to

8   examine?

9   A  That there was considerable variation in conditions in

10  any one point in space as the valley built up, because a log

11  shows that one goes through a section of clay, sand, silt and

12  gravel, and another log will go through another sequence of

13  clay, sand, silt and gravel.  You cannot correlate lenses

14  across.  They are lenticular.  That is the whole problem in

15  alluvium-filled valleys.

16  Q  In other words, it was impossible for you to correlate

17  the gravels, we will say, for instance, in Murrieta Valley from

18  the well logs which you had in your possession?

19  MR. VEEDER:  What do you mean by "correlate"?

20  MR. DENNIS:  He just used the word "correlate."

21  THE WITNESS:  Correlating from one well to another,

22  absolutely, that is--

23  BY MR. DENNIS:

24  Q  You couldn't do that?

25  A  No, that cannot be done.

E
224

1       Q   And it could not be done in the Pauba Valley?

2       A   In the Pauba Valley it also cannot be done.

3       Q   And as I understand, some of these lenses that you

4   referred to are practically impermeable material?  There will

5   be clays--

6       MR. VEEDER:  I object to that.  He didn't testify to that.

7   BY MR. DENNIS:

8       Q   Well, you have inspected all of the logs which are in

9   16-A?

10      A   Yes, I certainly have, sir.

11      Q   And an inspection of those logs discloses, does it not,

12   that there were various stratas of clay, shale?

13      A   There were many terms used by drillers' logs, certainly,

14   yes.

15      Q   But there were lenses-- do the drillers' logs show

16   that there were lenses of clay within the Murrieta Valley?

17      A   Definitely.

18      Q   Does it show that there were lenses of clay in the

19   Pauba Valley?

20      A   Definitely.

21      Q   Does it show that there was gravel through which waters

22   were flowing in the Pauba Valley?

23      A   Definitely.

24      Q   Would the same be true for the Murrieta Valley?

25      A   Definitely.

E
Z25

1    Q  And would you say that the clays were, for all practical

2  purposes, non-water-bearing deposits?

3    A  No, no.

4    Q  Could you extract water from them?

5    A  Definitely.

6    Q  Would they permit water to pass from one side of the

7  lens to the other-- of the clay lens, or would it more or less

8  act as a barrier?

9    MR. VEEDER:  From one side to the other?

10    MR. DENNIS:  Yes.

11    MR. VEEDER:  Laterally?

12    MR. DENNIS:  Laterally or perpendicularly.

13    THE WITNESS:  I am not sure of your direction of movement.

14  BY MR. DENNIS:

15    Q  I say, in either direction.  In other words, isn't it

16  true, Mr. Kunkel, that clay in many instances will act as a

17  barrier to the passage of water?

18    A  Would you define "barrier" a little more exactly, please.

19    THE COURT:  Is your point that ordinarily clay is less

20  transmissible than gravel?

21    MR. DENNIS:  Much less transmissible, yes.

22    THE COURT:  Is that true, in your opinion?

23    THE WITNESS:  The word is "transmissible."  Let's get back

24  to the word "permeable" now.

25    THE COURT:  All right.

E
Z26

1          THE WITNESS:  Clay has a lower permeability than well-

2    sorted sands and gravels, by unit volume, definitely.

3    BY MR. DENNIS:

4          Q  But in respect to transmissibility?

5          A  If you had a thick enough section of clay and it had

6    the sum of the permeabilities, if you had enough of it and it

7    was saturated and you put a well in it, you would get a usable

8    well.

9          THE COURT:  Are you about through, Mr. Dennis?

10         MR. DENNIS:  I think that is my last question, your Honor.

11         THE COURT:  I am going to excuse you until 2:30.  I

12   have to get rid of a few sentences this afternoon.

13         I have talked to the people in the Standard Oil case.

14   They have terrific problems, some of them, in switching dates.

15   I have to hear their motion.  You are going to be gone, you

16   want to be gone the week of the 28th?

17         MR. VEEDER:  27th, yes, your Honor.

18         THE COURT:  All week?

19         MR. VEEDER:  Yes, your Honor.

20         THE COURT:  If I hear the Standard Oil motions, I will have

21   to interrupt this case for almost two weeks.  What is the

22   attitude of counsel on that?  Anybody object?

23         MR. DENNIS:  I have no objection.

24         MR. SACHSE:  No objection.  It might be a break to

25   interrupt it.

E
Z27

1    MR. VEEDER:  All I can say is, your Honor, I called it to

2  your attention as soon as I could.

3    THE COURT:  It's not your fault.  These commitments that

4  they made go away back, also, and the counsel particularly who

5  has the laboring oar on the motion has witnesses coming out

6  and the case set for trial and he cannot possibly change it.

7  I suppose you are in the same situation.

8    MR. VEEDER:  Yes, your Honor, I am.

9    MR. SACHSE:  That would mean, then, that we would finish

10  at the end of this week and then have a two-weeks break.

11    THE COURT:  Except that there would be a couple of days

12  that we could use the latter part of the week, maybe only one

13  day.  Maybe it is not worth assembling for that.  Are there

14  other things you could do in this period?

15    MR. VEEDER:  There are plenty of things that we could do,

16  your Honor.  If we get two days of trial next week, though, it

17  would suit me, too.

18    MR. STAHLMAN:  I would like to bring up this point.

19    Mr. Sachse, I received your letter in relation to those

20  admissions you are questioning, and I was going to prepare them

21  this noon.  I will not have to work this noon if we are going

22  to have a week.

23    MR. SACHSE:  That is all right.

24    MR. STAHLMAN:  All right.

25    THE COURT:  There is another possibility.  We might work

E
28

1  Monday.  I have a few short matters on Monday, but I don't have

2  the calendar.  We might work on Monday and Tuesday, and then

3  move the Standard Oil matters over to Wednesday, Thursday and

4  Friday of next week.  We could work Monday next week.

5      MR. SACHSE:  The Master set a hearing for Monday, your

6  Honor.

7      I was going to suggest that if Mr. Veeder wants to, we can

8  go right on with the Master's hearing for a week instead of

9  being here and work on the rest of the area around Fallbrook.

10      THE COURT:  That depends on how rapidly the Government can

11  re-analyze its position, I suppose.

12      MR. VEEDER:  We have a lot of pulling around to do on that,

13  your Honor-- I mean, from the standpoint of changing the course

14  of trial from here and starting a long proceeding there.

15      THE COURT:  I will try to find out some more about it.

16  Presently the way the matter stands Mr. Veeder wants off the

17  week of the 27th to the 31st.  I have some criminal cases set

18  that I can try, so that's all right with me.  If we can't move

19  the Standard Oil matter down to that week, we might work

20  Thursday and Friday, the 23rd and 24th, or we might work the

21  20th and 21st if we move Standard Oil over to the end of the

22  week.  The week of the 20th involves the Master.  I see that

23  he is here.  I will talk to him.

24      We will talk about it later.  Adjourn until 2:30 so that

25  I can take care of these other matters.

        (Noon recess.)

3090

Z29

<u>San Diego, California, Tuesday, October 14, 1958.   3:40 P.M.</u>

THE COURT:  I talked to Mr. Cranston at noontime and he has a hearing set for the 20th on Fallbrook Creek.

It seems to me that the Government, between now and the 20th, ought to go over this transcript, which should be ready very shortly, and see what their position is.  If their position is that they are content with the testimony of Col. Bowen and that the water in a major portion of that area is largely percolating water and that certain of the property, of course, is riparian to the streams that run only in the winter, then I think the Government should be prepared to participate.  I think Mr. Sachse, who represents a number of these people, should put himself on record as to whether he is content with a finding to that effect.  The pro per defendants ought to be checked on.  And Mr. Redd has not yet got a list of all the owners in that area.  That is another job that ought to be finished up, if possible, by the 20th.  How far along are you?

MR. VEEDER:  I know that one is being prepared and I will have to check to see whether it is complete or not, your Honor.

THE COURT:  There are certain people in that area who are riparian to that stream.  But that riparian right is a very illusory right.  There is no water in that stream except in wintertime, and nobody wants to irrigate in the winter.  So that it seems to me that there could be a proposed finding that

certain people along the stream have riparian rights, but a
further finding that it is a rather illusory right--that there
is no water in the stream in the summer when irrigation is or-
dinarily needed. They have a right to share the water in the
winter when the water goes by.  They can't legally store the
water.  It is true that they might, I suppose, do some irrigat-
ing in the sense of spreading the water on some of that ground
in the winter when there is water there, but you can imagine how
many farmers are going to try to put water on the ground when it
is raining.

MR. SACHSE:  The significant thing is, your Honor, that to
the best of my knowledge, as a matter of fact, there is no person,
even if he is riparian in that drainage, who makes any surface
diversions of water, with one single exception, a gentleman who
diverts sewage effluent, in the case of which exception I placed
it in the record so the United States could look at it, and that
is the only one I know of.  The rest are all subsurface diver-
sions through wells.  Now whether they are close to the stream or
far away from the stream channel would, in the light of Col.
Bowen's testimony, appear to me to be immaterial now.

THE COURT:  What I am saying is that I think you should go
on record for your clients as to whether you are content with
a finding in line with Col. Bowen's testimony,  and if the
record gets in that shape we will be able to wrap up that area
and do something about it maybe at the same time that we send

3092

Z31

1  out the master's report on De Luz.  But I told Mr. Cranston

2  that he ought to go ahead on the 20th at least to that limited

3  extent.

4      Now, if he gets a list of these property owners, there may

5  be some of these people who are riparian who actually probably

6  don't claim the use of any riparian rights, who are appearing

7  pro per.  If he has this list, if there are only a few of them,

8  it might be possible informally to get them down there and get

9  their position of record.

10      MR. SACHSE:  I don't believe there is any problem, your

11  Honor.  I would practically testify under oath that there is

12  not surface diversion on the whole creek.  There can't be.  They

13  are all well diversions.

14      THE COURT:  So much for that.

15      I have worked out a schedule on the rest of this.  On the

16  21st, on Tuesday, I will have to hear at least one of these

17  Standard Oil motions, and the Master's hearing on the 20th, if

18  necessary, could continue over to the 21st.  Or you can do as

19  you please about that.  I will be available to hear further

20  testimony in this case on Wednesday, Thursday and Friday, the

21  22nd, 23rd and 24th, and we will have no court the week of the

22  27th-- Mr. Veeder has his commitment, and meanwhile I have some

23  other work I can take care of.

24      MR. VEEDER:  That sounds very good to me, your Honor.

25      THE COURT:  Is that agreeable?

3093

Z32

1        MR. VEEDER:  That is fine.

2        MR. MOSKOVITZ:  One further question, your Honor.  Do you

3   plan to hold court on election day, the 4th of November?  That

4   would ordinarily be the first day of our week.

5        THE COURT:  Is election day a holiday, Mr. Clerk?

6        THE CLERK:  No, your Honor.

        MR. DENNIS:  Not in the Federal Court.

8        THE COURT:  It is not a holiday.  Are you concerned about

9   voting?

G1      10        MR. MOSKOVITZ:  If we are going to hold court, I would

11   want to get an absentee, ballot.

12        THE COURT:  We have always held court.  It is not a Federal

13   holiday.  We could work out some arrangement with you men who

14   are local who want to vote in the morning.  We will see when

15   the time comes on that.

16        Mr. Dennis, you wound up, I think.

17        MR. DENNIS:  Yes.  I went over my notes and had some

18   discussion.  I have a couple more questions I would like to

19   ask the witness.

20        THE COURT:  All right.

21

22                    FRED KUNKEL,

23   recalled as a witness in behalf of the plaintiff, having been

24   previously sworn, testified further as follows:

25

3094

G1
Z33

CROSS-EXAMINATION (Resumed)

BY MR. DENNIS:

Q   Mr. Kunkel, calling your attention to Plaintiff's Exhibit 16-C, there are some abbreviations on the head of each page.  I wonder if you could explain what the abbreviations mean. Calling your attention to the first line that starts out "Well" and then "A-h-m-p" it looks like.

A   The first column it says "Well."  It is the well number.  The second column is "Alt of MP."  That is the altitude of the measuring point from which the water level is made.  The date 1953 indicates that all the measurements were made in 1953 except as indicated in the column below where the full date is given when the measurement was not in 1953.  A measurement in 1953, if there are a series of them, have only shown the month and the day.  The "D-w-m-p" is our standard field abbreviation which means "Distance to water from the measuring point," and the "A-l-t-w-s" is "Altitude of water surface."

Q   And the altitude refers to distance above sea level?

A   The distance above sea level, yes.

THE COURT:  That is the column from which you draw your contours?

THE WITNESS:  That is the column from which the contours are drawn.  As I have emphasized, the process by which wells were used is very selective.

G1
Z34

1        THE COURT:  Anything else, Mr. Dennis?

2        MR. DENNIS:  Yes, just one or two other questions.

3        Q  Mr. Kunkel, I believe you stated that the water would

4   move in the direction of the arrow on the water contour lines.

5   Calling your attention to Exhibit 15 and the area of Murrieta

6   north and east of the Wildomar Fault, I find a contour 1050,

7   with the water moving at right angles, which would be in a

8   southwest direction, and in approximately the same vicinity I

9   see another contour for 1050 going from the Wildomar Fault to

10  the Elsinore Fault, with arrows showing that the water is

11  moving in generally a southeasterly direction.  What happens

12  to the water lying to the north and east of the Wildomar Fault

13  when it gets into the vicinity of the fault?  Does it change

14  its direction?

15       A  The movement of ground water where the ground water

16  crosses the Wildomar Fault at the lower end of Warm Springs

17  Creek, Santa Gertrudis Creek, the area to which you have just

18  been pointing, changes its direction at the fault.

19       Q  On which side of the fault does water change direction?

20  On the northeast side?

21       THE COURT:  You mean, which side of that particular fault

22  line, or which of the fault lines?

23  BY MR. DENNIS:

24       Q  On which side of the fault line will the water which

25  is flowing in a southwesterly direction change its direction

G1
Z35

1  to that of a southeasterly direction?

2       A  The change takes place at the fault line.

3       Q  But which side of the fault line?  Above the fault line

4  or below it?

5       A  There is a zone in there where the change takes place.

6  At the scale which I have worked, it cannot be pinpointed more

7  closely than that.

8       Q  And the fault line will change the direction of the

9  movement of the water?

10      A  The water as it moves from one side of the fault to the

11  other changes its direction.

12      Q  And if the basement complex is at a higher elevation

13  than the water level table, that also would change the direction

14  of the movement of the water along your water contour lines?

15  Assuming, for instance-- not that it is, but assuming for the

16  purpose that anywhere in this area the basement complex is

17  higher than the water contour lines, it would change the

18  direction of the movement of the water, would it not?

19      A  As shown by the water level contours?

20      Q  Yes.

21      A  No.

22      Q  Even though the basement complex was at a higher ele-

23  vation above sea level than the water table?

24      A  Oh, I am sorry.

25      Q  I am assuming now-- purely an assumption-- that in this

G1
Z36

1  area the elevation, the top of the basement complex is higher

2  than the water table as shown by the water contour.  Would that

3  change the direction of the movement of the water?

4      A  The hypothetical case that you have described, the

5  basement complex would be an island within the area of ground

6  water movement.

7      THE COURT:  That is the only thing it could be.  Otherwise

8  the question would be a physical impossibility.  Assume the

9  island is basement complex, would it change the movement of the

10  water?

11      THE WITNESS:  Depending on all of the circumstances, there

12  could be a change in the movement or in the position of the

13  contours as indicated, yes.

14  BY MR. DENNIS:

15      Q  Mr. Kunkel, a well that was in material with a very low

16  permeability would have a much steeper cone of depression, would

17  it not, than a well which was drilled or dug in very permeable

18  material?

19      MR. VEEDER:  I object to that, your Honor.  What kind of

20  pump do you have?  How do you get the water out?  And a hundred

21  different questions.

22      THE COURT:  Sustained.

23  BY MR. DENNIS:

24      Q  Assuming that you had comparable size pump, a low

25  comparable depth, the same type of material through which you

Kunkel   Cross

G1
Z37

1   drilled, I mean, the same depth of material, one having a very

2   low permeability and the other having a high permeability, in

3   which material would you find the cone of depression would be

4   steepest?

5       A  The cone of depression would be steepest in the well

6   with the least transmissibility.

7       Q  And where you had a steep cone of depression it would

8   take many more wells to affect the lowering of the water table

9   generally within the area, as testified to by you some days ago,

10  would it not, than where you had a well with a cone of de-

11  pression and very permeable material?

12      MR. VEEDER:  I object to that question again.  It doesn't

13  show a thing as to the depth of the well, your Honor.

14      THE COURT:  Sustained.  I can't understand it.

15  BY MR. DENNIS:  •

16      Q  In the area which you have shown as orange on Exhibit

17  15, it would take a great many wells to affect the water table

18  within that area, would it not?

19      MR. VEEDER:  I object again, your Honor.  How big is the

20  pump?  How deep is the well?

21      THE COURT:  Sustained.

22  BY MR. DENNIS:

23      Q  In the area shown as orange on Exhibit 15, you would

24  have to pump a great deal more water to lower that--

25      That won't prove it either.  I know what I am driving at,

BiG1
Z38

1    your Honor.   I am trying to make this so that it will be

2    intelligent both to the Court and to the witness.

3        THE COURT:   That is a problem.

4        MR. DENNIS:   It is a problem for me.

5        MR. VEEDER:   You can include us in, too.

6   BY MR. DENNIS:

7        Q   In other words, you would expect to produce less water

8    with the same size pump in a well that was dug into a well with

9    low permeability than you would in a well which had been dug

10   into material with high permeability?

11       A   No.

12       Q   Why not?

13       A   The quantity that a well produces is the trasmissi-

14   bility of the section penetrated.

15       Q   And the transmission would be much less in material

16   with low permeability, other things being equal, than in a

17   material with high permeability?

18       MR. VEEDER:   I renew my objection, your Honor.   There are

19   so many imponderables in Mr. Dennis's offering that I object.

20       THE COURT:   Sustained.

21       MR. DENNIS:   That is all, then.

22       THE COURT:   Mr. Stahlman.

23

24

25

G1
Z39

CROSS-EXAMINATION

BY MR. STAHLMAN:

Q   Mr. Kunkel, what were the limits of your investigation, that is, the objectives which you were attempting to accomplish in the pursuance of your study?

A   The specific objectives, as I have previously testified, were three in number:  To show the source, the occurrence and movement of ground water.

Q   You made no study in relation to the effects of the performance of the basin in relation to its operation?

A   I made no such studies.

Q   Now, directing your attention to Exhibit 16, what is the distance from the point here where the basement complex is to the east of the Pauba Basin to where you meet the Wildomar Fault line?

A   At the scale of the cross-section, a horizontal scale 1 inch equals 5000 feet, about 36-37,000 feet.

THE COURT:  I want to see the area you are talking about.

MR. STAHLMAN:  Your Honor, the question was in relation to where he has drawn the basement complex.

THE COURT:  West of the Vail spillway?

MR. STAHLMAN:  West of the Vail spillway to the point of the Wildomar fault line.

MR. SACHSE:  On Exhibit 16.

MR. STAHLMAN:  On Exhibit 16, yes.

G1
Z40

THE WITNESS:  Are you referring to the spillway or the--

BY MR. STAHLMAN:

Q  This portion of the basin that has a depth is what I have reference to, eliminating therefrom that portion between the Wildomar and the Elsinore Fault.

A  The part from the spillway to the--

Q  Being eliminated.

A  Being eliminated?

Q  Yes.

A  Approximately 35,000 feet.

Q  In miles, roughly what would it be?

A  About six and a half miles.

Q  This depth here, however, being somewhat less than half a mile, this map, of course, is not intended to show the relationship of distance and depth?

MR. SACHSE:  Which depth, Mr. Stahlman?

MR. STAHLMAN:  The depth of the basin-- the depth of the well, I should say.  We don't know how deep the basin is.  But the depth of the well as related to the length of the basin.

THE WITNESS:  That is correct.  It is a schematic diagram as indicated in the legend, one inch vertical is 200 feet, one inch horizontal is 5000 feet.

BY MR. STAHLMAN:

Q  Now, directing your attention to this well at Radec here--

A  That is the point of rising water.

G1

Z41

1    Q  --on 15, which well is that on the map 16?

2    A  The point at which you pointed, Mr. Stahlman, is a

3  spring.

4    Q  That is a spring?

5    A  Yes.

6    THE COURT:  Are you talking about the well that he marked

7  on the map earlier?

8    MR. STAHLMAN:  No, I am not at that one, your Honor.

9    Q  This is a spring?

10    A  That is a spring.

11    MR. VEEDER:  For the purpose of the record, what is the

12  location of it?

13  BY MR. STAHLMAN:

14    Q  The location of it is--

15    A  South half of Section 19, Township 8 South, Range 1

16  East.

17    Q  Now, directing your attention to Exhibit 17, is there

18  a well at this point where there is a change in position of

19  the contour line of Basin No. 5?

20    THE COURT:  Identify it.

21    THE WITNESS:  May I check my field notes, please.

22    MR. VEEDER:  Do you have the legal description, Mr. Kunkel?

23    THE WITNESS:  I want to check my field notes to be certain.

24  BY MR. STAHLMAN:

25    Q  That would be in Section 24 of Township 8 South, 1 West,

G1
Z42

1 right at this point?

2     A  I have a well shown in the northeast quarter of Section

3 24, Township 8 South, 1 West.

4     Q  You are now referring to--

5     A  This is Nigger Valley.

6     Q  Is that a well drilled in the younger alluvium?

7     A  Yes, it is.  The well starts on the younger alluvium

8 plain.

9     Q  Is it outside the boundary, though, of Basin 5 as shown

10 on map 17?

11     A  As shown on map 17, it is right at or outside the

12 boundary.

13     Q  Is that well designated and shown on Exhibit 16?

14     A  It is.  It is indicated on Exhibit 16 as 8/1-24B1

15 projected.

16     Q  Directing your attention to the well designated 8/1-

17 19Q2, where is that well as shown on Map 17?

18     A  The well in Section 19, 8 South, 1 East, 19Q2, is

19 outside the area of ground water storage unit No. 5.

20     Q  Now then, you made reference to a well--

21     THE COURT:  Before you pass it up, to whom do those wells

22 belong?

23 BY MR. STAHLMAN:

24     Q  Do you know to whom those wells belong?

25     A  The cattle ranch at that end of Nigger Valley.  It is

3104

G1
Z43

1   not the Stardust.  It is the Sunnybrook Farm.  That is the only

2   identification I know.

3      Q   Which well is that?

4      A   That the first well we testified to in the Northeast

5   Quarter of Section 24.

6      Q   That would be 8/1-24B1 projected on Map 16?

7      A   That is correct.  That is the Sunnybrook Farm.

8      Q   The other one is designated as 8/1-19Q2.  Who is the

9   owner of that well?

10     A   If I remember correctly, it is Mr. Gibbon.

11     Q   Are you acquainted with a well known as the Quarry

12  well?

13     A   Yes, I am.

14     Q   Where is that located with relation to any of these

15  exhibits you have?  Is it shown on 15?

16     A   It is not shown on Exhibit 15.

17     Q   Where is it designated on any of the exhibits which we

18  have here?

19     A   It is not designated.

20     Q   Do you have from your notes or maps that you work with

21  the designation so that you can tell us its geographical loca-

22  tion?

23     A   Yes, sir.  May I refer to the description by road inter-

24  sections?

25     Q   Well, any way in which you may give us the description

G1

Z44

1   as to its location, and can you indicate on Plaintiff's Exhibit

2   15 the location of that well?

3        A   I can indicate its approximate location.   However, be-

4   cause of a slight difference in projected section, I would have

5   to do a rather careful job of scaling, which I cannot do at the

6   moment.

7        Q   Give us the approximate position.

8        A   The approximate position is in the Southwest Quarter

9   of Section 19, 8 South, 2 West, projected section.

10       MR. VEEDER:   Did you ask him to mark that, counsel?

11       MR. STAHLMAN:   Yes, if you will, with the understanding

12   that it is an approximate location.

13       THE COURT:   8 South, 2 West, Section 19, what quarter?

14       MR. LITTLEWORTH:   Southwest Quarter, your Honor.

15       THE WITNESS:   Is that Section 19 in the record?

16       There is enough difference in projected sections that I

17   will have to put this in and verify the exact position later.

18       MR. VEEDER:   I don't believe he asked the exact position.

19       THE WITNESS:   No.

20       MR. STAHLMAN:   May I ask, Mr. Veeder, if you intend at

21   some later time to designate that well in its exact location?

22       MR. VEEDER:   On redirect examination I certainly intend

23   to go into it in some detail.   Whether we can locate it any

24   more specifically on 15 I can't guarantee at this time.

25

Case 3:51-cv-01247-JO-SBC    Document 4531    Filed 09/24/63    PageID.23825    Page 74 of 95

1      MR. VEEDER: But we will put it on the quads which

2 are in evidence based upon the exact locations we know it

3 to be.

4      MR. STAHLMAN: Thank you. May the record then show

5 that he has designated a dot with a ring around it, an

6 arrow pointing to it, with the word "Quarry." That is the

7 approximate position on Exhibit 15.

8      Q    Now, then, in relation to Exhibit 17, can you do

9 the same thing, show approximately where that well is

10 located?

11      A    Witness marks exhibit.

12      Q    The record may show, then, that on Exhibit 17 he

13 has placed a dot with a circle around it, an arrow pointing

14 thereto, with the words "Quarry approx."

15      Now, then, there is a well which Mr. Dennis

16 talked about to the east of the Vail Dam that he referred to

17 as having a depth of some 2500 feet. Do you have in mind

18 that well?

19      A    The well is indicated on Plaintiff's Exhibit 15

20 in the --

21      Q    That is 13-K --

22      A    K-1, Township 8 South, range 1 West.

23      Q    And by the way, have you any familiarity with

24 the history or background of that well or present condition?

25      A    Well, the present well is in existence. If my

memory serves me correctly, there is a windmill or some small type of pumping plant on the well.  The well was originally drilled as an oil well.

Q    You found that out in your --

A    In the course of my investigations.

THE COURT:  What section is that, 13?

THE WITNESS:  13 K-1.  The well is shown starting on the older continental deposits, not on the alluvial plain.

MR. VEEDER:  You were asked for the legal subdivision by the Court.

THE WITNESS:  I am sorry.  Southwest quarter, Section 13, 8 South, range 1 West.  It is immediately below the head of an arrow shown crossing the 1500 contour, and it is above the dotted line indicating the contact between the older continental and the younger alluvial deposits.

THE COURT:  Whose well is that?

THE WITNESS:  That is also the Sunny --   It is on the property of  the Sunnybrook Ranch.

Q  BY MR. STAHLMAN:  Did you, in your investigations, study of the area in which you made your investigation, include all of the wells to the north of the Vail ranch -- or the east of the Vail ranch, rather -- up to the head waters of the stream?

A    I am sorry, I don't quite --

Q    May I put the question to you this way:  Is it a

3108

Kunkel - Cross

1   fact that you know there to exist no numerous other wells

2   other than those you have included in your study in that

3   area?

4        A     There are other wells.

5        MR. VEEDER:  That is the area east of the --

6        MR. STAHLMAN:  Yes, east of the --

7        MR. MOSKOVITZ:  East of what?

8        MR. STAHLMAN:  East of the Vail properties.

9        THE WITNESS:  Now, east to the watershed boundary, I

10  assume?

11       Q   BY MR. STAHLMAN:  Yes.

12       A     Yes, sir.

13       Q     Now, in determining, in your opinion, the area

14  that is included within the basins, and making specific

15  reference to Basin 4, how did you determine the limits of

16  the basin in relation to where the boundary line would be?

17       A     The boundary line is the position, in my

18  opinion, where the deposits are of sufficient thickness that

19  it is feasible to draw water wells.

20       Q     Was there any determination of any specific depth

21  as to what you determined that feasibility, or was that as

22  a result of your investigation of wells in that area, or

23  some other factor?

24       A     It involved the inspection of well logs plus my

25  field inspection of the geology and the hydrologic conditions

4

1    in that area.

2        Q    Then, could you inform me as to why such wells

3    as these wells, designated on map 16, referring to 8/1-19-22

4    and 8/1-24-B, which are outside of the area of Basin 5,

5    as shown on 17, as to why those wells would not be within

6    the basin area?

7        A            In general, the total thickness of the

8    alluvial deposits in those areas is thin.  Therefore, their

9    transmissibility is low.  And in general, large producing

10   wells will not be drilled in that area.  That is the answer.

11       Q    This well here, then, as shown on 16 as 8/1-19-Q-2

12   is shown through the alluvia there.  Should that have been

13   a projected well or not?  In other words, I mean, should it

14   have shown on the map as a projected well?

15       A    I do not recall the exact distance.  Very, very

16   few of the wells actually lie on a line of section.  One

17   must project virtually all wells unless one runs his line

18   of projection from well to well, must project from a sum

19   distance or more to the line of section.  When the distance

20   became appreciable, I indicated that the well was projected.

21   If it was a matter of a few hundred feet or so, the well

22   was not indicated as projected.  I do not remember my exact

23   distances.

24       Q    Directing your attention, though, to Map 17,

25   Exhibit 17, and the basin designated as 3, and the basin to

F-2

each side designated as 4; further directing your attention to the fact that the boundary line of basin 4, as it projects itself across 3 to 4 on the south, disects the exact location of the east of Basin 3; what is the reason for that, either in the test that you made or the geology, or what factors that would indicate that that borderline happened to be just at that place?

A    The borderline that I have drawn on Exhibit 17, in my opinion, represents a point outside of which it will probably not be feasible to drill large producing wells. However, I must qualify that with the statement that, as I have previously testified, that all of my estimates have been on the conservative side.  If I have erred, I have erred on the side of conservatism.

THE COURT:  Before we leave it, the Quarry well that you identified, according to this map, was in the area of the Vail estate.

MR. STAHLMAN:  Yes, it is, your Honor.  It is right close to it.

THE COURT:  On the Vail property?

MR. STAHLMAN:  No, it is not on the Vail property.  It is right near the boundary line.  Maybe I mislocated it, but, according to the map, it is in the area shown as the Vail Rancho.

MR. LITTLEWORTH:  Or adjacent lands, I think, your

1    Honor.  Adjacent to it.

2        THE COURT:  What was the legal again on the quarry

3    well?

4        MR. STAHLMAN:  I think, your Honor, he desires to

5    correct it.

6        THE COURT:  What?

7        MR. STAHLMAN:  He desires to correct the location, I

8    think.  It is not on the Vail property.

9        THE COURT:  Where is it, then?

10       It is located in 19 to start with, section 19,

11   8 South, 2 West.

12       THE WITNESS:  I am not certain of the position of the

13   Vail boundaries on the topographic map, the Pechanga

14   topographic quadrangle map.  Are the red lines shown, the

15   boundary lines, and the quadrangle or, rather, --

16       Q  BY MR. STAHLMAN:  Directing your attention, for your

17   information, on 15, this, the quarry property should fall

18   right up in here, shouldn't it?

19       A    About in there, approximately.  And again, this

20   is an approximate location until I can scale it down from

21   one map to the other more accurately.  It would fall outside

22   of the Vail property right approximately at the point

23   indicated where the property line changes direction toward

24   the 2 Southwest.

25       THE COURT:  Well, in 19?

Case 3:51-cv-01247-JO-SBC   Document 4531   Filed 09/24/63   PageID.23831   Page 80 of 95

1    MR. STAHLMAN:  I don't think it would go 19.  Then,

2  let's measure --

3    THE COURT:  In 19 or in 20?

4    MR. STAHLMAN:  What happened to our --

5    THE WITNESS:  I have it here.  It would, according to

6  the projected map to which I am referring -- I have placed

7  the upper left-hand corner of the projected map to

8  correspond to the common corner between Townships 7 and 8

9  South and ranges 2 and 3 West.  In that position the well

10  falls in the northwest corner of Section 20.  The other well

11  numbers to which I have testified do not cast any doubt as

12  to the exact location of the well on the position of land --

13  on the exact position of the well on the land, but it is a

14  reflection of differences in projected section grids that

15  I used on different maps.

16    THE COURT:  Well, from my information:  the well is

17  on the Quarry property outside of the Vail estate?

18    MR. STAHLMAN:  Yes.

19         Now, may I request, your Honor, the record to

20  show --  May we move the Quarry locations previously

21  located on Exhibit 15 to the new position so we won't be

22  confused by the two as being the approximate location of

23  the Quarry well?

24    MR. VEEDER:  May I, just for a moment?  You have now

25  located the well in what you think is the correct place?

F-3

8

1    THE WITNESS:  It is still an approximate location.  It

2    is correct as with regards to the position of the Vail

3    property lines.  I will have to check in regards to the

4    topographic maps to get its exact position planimetrically.

5    May I erase the incorrect --

6    MR. VEEDER:  That is what I was going to inquire

7    about.  May we make the correction out of court, your

8    Honor, and have it identified; because I don't want 15

9    smeared up.

10    THE COURT:  Make it out of court.

11    MR. LITTLEWORTH:  We have no objection, your Honor.

12    I thought I could pick up a description of his land that

13    would tell us, but I can't put my finger on it.

14    THE COURT:  You represent Quarry?

15    MR. LITTLEWORTH:  He is one of our people.

16    THE COURT:  The reason I raised the question was:  as

17    first filed, it was filed in the Vail Estate.  And I couldn't

18    understand why it was called the Quarry  well.

19    Q  BY MR. STAHLMAN:  You have seen the well, haven't

20    you, been on the grounds?

21    A    I have seen the well, yes, sir.

22    Q    And it sits in what would be the northwest corner

23    of a fence which encloses property in this general location,

24    does it not?

25    A    Yes, it does.  It is southwest of the road to Pauba,

9

1   and it is southeast of a dirt road that runs perpendicular

2   to the highway --

3       Q    The well is in the extreme corner of the property

4   where those two roads --

5       A    I would have to check my notes, but it is a

6   matter of 35 feet in the road in one direction and 50 or 75

7   feet in the road in the other direction.  I have made exact

8   measurements.

9       MR. STAHLMAN:  I presume the same change should be

10  made in relation to the Exhibit 17.  You wish to do that

11  out of court also?

12      MR. VEEDER:  If it please the Court, we would like to

13  do that.

14      THE COURT:  All right, it may be done.

15      Q  BY MR. STAHLMAN:  Now, then, the position of the

16  Vail Dam -- and you have been there and observed it and

17  know the geology in the area, is that correct?

18      A    That is correct.

19      Q    And the dam sets on what?

20      THE COURT:  (To Clerk)  Let me see 29-K.

21      THE WITNESS:  The dam sets on basement complex.

22      Q  BY MR. STAHLMAN:  Down to bedrock?

23      A    Down to bedrock.

24      Q    Now, you made no studies as to the relationship

25  of the amount of storage to the amount of economical pumping

10

F-4

1    or extraction of waters, did you?

2        A    I made no such studies.

3        Q    The contours which you established as a result

4    of these tests, do they vary -- first, let me ask you the

5    question:  Why did you use the year of 1953 as the date or

6    the year of the study?

7        A    The year 1953 is the year for which there are

8    the greatest number of water level measurements in wells.

9        Q    And what would be your opinion, assuming that

10    there was --    You may have your seat, if you will, Mr.

11    Kunkel -- large extractions of water over a period of years

12    in the area in which you have plotted your contours and

13    over a period of say 20 or 25 years, would, in your opinion,

14    that affect the water level?

15        MR. MOSKOVITZ:  Where?

16        MR. STAHLMAN:  Now, wait a minute.  Let me do that one.

17    I am being the dentist now.  I want to get this thing

18    straightened out.

19        (Laughter.)

20        Q    Assuming there was large extractions of water

21    over a period of 20 to 25 years in these areas in which

22    you have established contours, would the contour levels be

23    affected, in your opinion?

24        A    It would be affected.

25        MR. SACHSE:  I would like to know what you mean by

1  "large"?

2      MR. STAHLMAN:  Are you objecting to it, Mr. Sachse?

3      MR. SACHSE:  Yes; incomprehensible.  I think he should

4  define what he means by "large extractions."

5      MR. STAHLMAN:  Intensive pumping over a period of time.

6  I am asking a general question.

7      Q    Would your answer be the same?

8      A    Yes.

9      Q    And the manner in which you made your measurements,

10  was that the static level at the time of the wells as you

11  found them, together with the readjustment of the geology

12  and the other information that you applied in order to

13  determine what the contour level would be at the time that

14  you projected your figures to?

15      MR. STAHLMAN:  Just a second.  I want to object to that

16  because you are assuming facts not in evidence.  The witness

17  has not testified that he measured these wells.  He got the

18  data from log records.

19      MR. STAHLMAN:  I believe he said he measured some wells.

20      Q    Didn't you?

21      A    I measured certain wells, yes, sir.

22      MR. STAHLMAN:  He measured certain wells.

23      MR. DENNIS:  Which wells, do you remember?

24      MR. VEEDER:  Just a moment.  There is an exhibit in

25  evidence on that.

1    MR. STAHLMAN: I am after a general matter here. I
2  am not particularly concerned about some others that you
3  may be, Mr. Dennis, so --

4    THE COURT: Is there an objection?

5    MR. DENNIS: Yes. I said that Mr. Stahlman's question,
6  as I recall it, tied in the fact that the witness had
7  measured all of these wells in 1953. The evidence so far
8  shows that he made no measurements in 1953. He made some
9  in 1957. So far as the evidence is concerned, none of the
10  wells which he measured in 1957 are within the Pauba Basin
11  or within the Lancaster, Nigger Valley, the Pechanga Basins.

12    THE COURT: He has admitted that he has relied upon
13  measurements other people made in 1953.

14    MR. DENNIS: That is correct. Mr. Stahlman asked him
15  that at the time he made these measurements was it a static
16  water table. Now, if he wants to indicate the time at which
17  the measurements were taken, if he knows that, all right.

18    THE COURT: Rephrase the question.

19    Q BY MR. STAHLMAN: In the first place, when measure-
20  ments are taken of a well, they are taken at static level of
21  the water, are they not?

22    A    If they are otherwise, if they are taken as a
23  pumping measurement, they are so indicated.

24    Q    Well, for the purpose of determining the contours
25  what condition do you take the measurements from? Either

Kunkel - Cross

1    one?

2        A       Non-pumping measurements.

3        Q       Non-pump.

         Now, that is after the pumps are shut down over

5    periods of time or have not been pumped for some time?

6        A       That is correct.

7        Q       Now, when you speak about the water level profile,

8    what do you mean by "the water level profile"?

9        A       As indicated on Plaintiff's Exhibit 16, the water

10   level profile reflects the level at which water levels would

11   stand in wells of tapping, of wells tapping comparable

12   depths.

13       Q       Now, in relation to the profile as shown on

14   Plaintiff's 16, the profile does not take a straight line

15   contour, does it?   It is not a straight line?

16       A       It need not be a straight line.

17       Q       It need not be?

18       A       No, sir.

19       Q       Is it in this case?

20       A       Again, as the map scale to which we are working --

21   it approximates a straight line.   At the scale one cannot

22   definitely tell.

23       Q       That is the line that you have plotted as a

24   result of measurements that have been taken in wells in

25   that area?

F — 5

1    A    I would have to check my notes to be absolutely

2    certain, but water level measurements in the wells indicated

3    plus the -- the consideration had to be made for the depths

4    of the wells, for the depths of the wells; for example, I

5    did not use the Pauba well for drawing the water level

6    profile because it is so much deeper and had such a head

7    differential that it would not fit into the profile.

8    Q    What do you mean by "differential"?  Will you

9    explain that?  I think that is the point I am getting at.

10   A    The water level in the Pauba well, which is

11   several thousand feet in depth, stands at a considerably

12   higher altitude above sea level than a shallower well

13   drilled within  essentially the same place.

14   Q    What, then, would be the relationship between the

15   level of that well and the water level in the basin?  Or if it

16   is different, how would you compensate for that in relation

17   to establishing a water level such as you put on the map?

18   A    One must use --  Well, could you read that.

19   MR. STAHLMAN:  Will you read the question.

20   (The reporter read the pending question.)

21   Q  BY MR. STAHLMAN:  Referring to Exhibit 16.

22   A    Would it be possible for you to rephrase your

23   question?  I do not understand.

24   Q    You don't understand it.

25        I knew I would get one of those sooner or later.

1           Well, let's see if we can get at it in another

2   way:  A basin such as the Pauba Basin does not have a level

3   contour water line throughout the length of the basin, does

4   it?

5           MR. VEEDER:  Could I hear that question, please?

6           (The reporter read the pending question.)

7           THE WITNESS:  If the water level profile were connected

8   indiscriminately down the length of the water levels from

9   one well to the next without any regard to their depths the

10  water level profile would not represent true conditions.

3121

I-
Z45

1    Q  Would not represent what?

2    A  Would not represent accurate conditions of water levels.

3    Q  Would not represent accurate conditions of water levels?

4  And that would be the average level, would it?

5    A  It would not represent the water table.  It would not

6  represent the pressure surface in deep wells.  One would have

7  to consider the depth of the wells in drawing a water level

8  profile.

9    Q  In other words, prior to the time that there are any

10  extractions, theoretically a basin would have a  water plane,

11  would it not?  It would be in balance with nature?

12    A  It would have a horizontal plane or with some gradient

13  with respect to sea level data.  Wells drilled from land surface

14  to that plane and just slightly beneath, those wells would have

15  a water level.  Those levels would not be the same as levels

16  in deeper wells drilled in the same area.

17    Q  Did you make any determination of the natural rate of

18  flow of the underground waters in the Pauba Basin?

19    A  I did not.

20    Q  And of course the rate of flow of water in a basin

21  which is pumping and one which is not pumping may be with much

22  more rapidity when the pumps are pumping and movement of water

23  is to the place where the extraction is the heaviest, we will

24  say?

25    A  The rate of movement of water would increase with

1  increase with increased hydraulic gradient.

2      Q  And of course the gradient would be changed by the

3  pumping or extraction of water?

4      A  The pumping would increase the gradient.

5      Q  Well, then, the water level profile as you have it

6  here, that is the result of the composits of different measure-

7  ments, is it?

8      THE COURT:  By "here" you mean 16?

9      MR. STAHLMAN:  On 16, yes, your Honor.

10     THE WITNESS:  That is correct.  It is a water level profile

11  indicating the gradient of the isometric surface in wells of

12  moderate depth.  It does not include wells such as the Pauba

13  well, which are drilled to several thousand feet.  It does

14  not reflect the water levels in the shallowest of the wells.

15  BY MR. STAHLMAN:

16     Q  Did you make any use of the Roripaugh well?

17     A  I didnot consider the Roripaugh well in my analysis.

18     Q  Do you have it located on the map?

19     A  I have it located in my field notes.

20     Q  Can you locate it on the map?

21     A  The Roripaugh well is located on the Murrieta Quadrangle,

22  a scale of 1 to 24,000.  The well is in Santa Gertrudis Valley.

23  The well is located approximately 4,500 feet northeast of

24  Highway 395 along Banana Avenue and approximately 950 feet

25  northeast of Banana Avenue.  The well lies northwest of the

3123

I

Z47

1    bed of Santa Gertrudis Creek approximately 100 feet north of the

2    bed.

3         THE COURT:  What section and township?

4         THE WITNESS:  Again, we have our problem of projected

5    sections.

6         THE COURT:  You have a section number from your Quadrangle,

7    don't you?

8         THE WITNESS:  No, there are no sections on the quadrangle.

9    It lies within the Rancho lands.  The well number that I have

10   on my notes is based on a projected section.  The number is

11   7 South, 3 West, 26J1.  However, this projected section which

12   I have just described may not exactly correspond to the

13   projected section as shown on Exhibit 15.  However, I will plot

14   the well.

15        MR. STAHLMAN:  I was going to make this suggestion.  You

16   are going to put the Quarry well, as you were asked to do

17   outside of court, on Exhibits 17 and 15.  Could we also have

18   you at that time put the Roripaugh well on those two exhibits?

19        MR. LITTLEWORTH:  This is our client's well also.  We

20   have no objection to plotting it later when they can do it

21   more accurately.

22        THE COURT:  All right, do it later.

23        THE WITNESS:  I can give you the approximate location.  It

24   is approximately at the end of the word "Santa" for the word

25   Santa Gertrudis.

3125

I

Z49

MR. VEEDER:  Could you even estimate as to time, Mr. Sachse?

MR. SACHSE:  I haven't seen your map yet with all the wells on it.  But it will not be terribly long.

THE COURT:  It will go faster now.  You have all had a chance to show what experts you were in cross-examination, and now that we have that behind us we will get down to work and cross-examine when necessary.

MR. MOSKOVITZ:  May we inquire whether certain materials which were supposed to have been brought in have been brought in?  One is the records of the tests on the Pauba Well and the effect of pumping of that well and on other wells.

MR. VEEDER:  You have those in your possession, do you not?

THE WITNESS:  I will have to check to be certain, but I believe they are right here in court.

MR. MOSKOVITZ:  Will they be left here for us to look at?

MR. VEEDER:  I would rather not leave them.  They are the official records of the U.S.G.S.  I feel much the same way you do about releasing them.

THE COURT:  You can remain here and let him look at them.

MR. VEEDER:  Yes.

THE COURT:  What other matters?

MR. MOSKOVITZ:  What about the compilations of time spent on the study of the Santa Margarita upper watershed as compared to the Sonomoa-Napa study?

Kunkel Cross

3126

I

Z50

1          THE WITNESS:  I am unable to make a comparison.  However,

2   I did check my notes the best I can, and I spent--

3          MR. VEEDER:  Is this cross-examination at the present time?

4          MR. MOSKOVITZ:  No.

5          THE COURT:  Mr. Moskovitz is just inquiring whether he has

6   got the data together that he asked for.

7          Did you get that data here?

8          THE WITNESS:  Yes, I have.

9          THE COURT:  We can get it later.

10          MR. MOSKOVITZ:  And the map with the location of all the

11   wells on it?

12          THE COURT:  How is that progressing?

13          THE WITNESS:  That is progressing very slowly, your

14   Honor.  I will have to do that at Long Beach, working closely

15   with my draftsman and other personnel, and I will need some

16   additional time.

17          THE COURT:  You may postpone your cross-examination on

18   that, then.

19          MR. STAHLMAN:  We were to have the well log of the

20   Roripaugh well.

21          MR. LITTLEWORTH:  Mr. Veeder called over the weekend for

22   that and we contacted Mr. Roripaugh and he said he would mail

23   up what he had.  I don't know whether he has the desired

24   information.

25          MR. STAHLMAN:  That applies to the Quarry well, too?

I

Z51

MR. LITTLEWORTH:  Yes.  But that request, I think, came Sunday, and we have made the request for it.  We will do our best to get it.

THE COURT:  There was a request in the record for certain data on a certain well.  I can't remember now.  It is at the very end of one of the transcripts.  Mr. Krieger was to get it.

MR. LITTLEWORTH:  These are the two wells that they have had trouble plotting on the map today on which they made tests yesterday with our permission, and Mr. Kunkel has tests on each of those two wells, one on Quarry and one on Roripaugh's.

Now the well logs are another thing.  I don't know where they are right now.

MR. VEEDER:  The State does not have them, as I understand it.

MR. BARONKAY:  They are not in our records.

MR. LITTLEWORTH:  The well they are asking for of Mr. Roripaugh was drilled in 1956.  So it was not in Bulletin 57 and their earlier computations.  I don't remember the exact date when Quarry's well was drilled.

MR. STAHLMAN:  Was it filed with the State?

MR. LITTLEWORTH:  There was a report filed, yes.

MR. STAHLMAN:  Evidently the U.S.G.S. doesn't have it.

MR. VEEDER:  I will guarantee that it is there.

MR. STAHLMAN:  I may have some further questions.  I didn't know that he had test pumped the Roripaugh well.

I

Z52

1      MR. VEEDER:  We have the data, Mr. Stahlman.

2      MR. STAHLMAN:  It will be in the record eventually?

3      MR. VEEDER:  We intended to put it in on redirect examin-

4  ation.

5      MR. STAHLMAN:  Very well.  I am still through, then.

6      THE COURT:  Either last Thursday or last Friday, at the

7  very end of the transcript, is a request of Mr. Krieger for

8  certain information.

9      MR. LITTLEWORTH:  Yes, it is for the well logs of the two

10  wells on which they made these tests.

11      THE COURT:  And you are trying to locate them?

12      MR. LITTLEWORTH:  Yes, we are, your Honor.

13      THE COURT:  Tomorrow morning at 10 o'clock.

14      (Adjournment until Wednesday, October 15, 1958, at 10

15  A.M.)

16

17

18

19

20

21

22

23

24

25