# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al;

Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   Wednesday, October 15, 1958

**Pages:**   3129 to 3260

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

MALCOLM LOVE
and
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1              IN THE UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF CALIFORNIA

3                    SOUTHERN DIVISION

4                    - - - - - - -

5        HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                    - - - - - - -

7

8   UNITED STATES OF AMERICA,        )
                                     )
            Plaintiff,               )
9                                    )
            vs.                      )        No.1247-SD-C
10                                   )
    FALLBROOK PUBLIC UTILITY         )
11  DISTRICT, et al.,                )
                                     )
12          Defendants.              )

13

14

15          REPORTERS' TRANSCRIPT OF PROCEEDINGS

16              San Diego, California

17          Wednesday, October 15, 1958

18

19  APPEARANCES:

20      For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                   Special Assistant to the
21                                 Attorney-General,
                                   Department of Justice,
22                                 Washington, D.C.,
                                        and
23                                 WILLIAM E. BURBY, ESQ.

24

25

1    For Defendant Vail Company    GEORGE E. STAHLMAN, ESQ.

2    For Defendants Fallbrook
     Public Utility District,      FRANZ R. SACHSE, ESQ.
3    et al.

4    For Defendants Hartman,       BEST, BEST & KRIEGER, by
     Lewis, Wilks and Bayle,       A. L. LITTLEWORTH, ESQ.
5    and Oviatt

6    For Defendant Santa
     Margarita Mutual Water        W. B. DENNIS, ESQ.
7    Company

8    For Defendant State of        EDMUND G. BROWN, ESQ.,
     California                    Attorney-General, by
9                                  CARL BARONKAY, ESQ.

10   For Defendants Sawday         LUCE, FORWARD, KUNZEL &
                                   SCRIPPS,
11                                 By ROBERT McGINNIS, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# INDEX TO WITNESSES

**For the Plaintiff:**

|  | Cross | Redirect |
|---|---|---|
| Fred Kunkel | | |
| (By Mr. Littleworth) | 3138 | |
| (By Mr. Sachse) | 3164 | |
| (By Mr. Moskovitz) | 3170<br>3231 | 3191 |

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, OCTOBER 15, 1958, 10:00A.M.

2                          ---o---

3

4        THE CLERK:  Case on trial, 1247-SD-C, United States

5    vs. Fallbrook.

6        MR. VEEDER:  Your Honor, I would like to report that

7    we have, in accordance with your direction, marked the

8    Querry and the Roripaul wells on Plaintiff's Exhibits 15

9    and 17.  And we have located them in accordance with the

10   record.

11       THE COURT:  How are they marked, with a symbol showing

12   the --

13       MR. VEEDER:  They are marked with a symbol, and written

14   beside the symbol is the name of the owner.

15       (The Court and counsel approach the exhibit.)

16       THE COURT:  It is right down in the corner, isn't it?

17       (The Court returns to the bench.)

18       THE COURT: What is the status on the stipulation on

19   issues?  I am ready for Mr. Stahlman to --

20       MR. STAHLMAN:  Did you turn that in?

21       A VOICE:  Oh, we have it right here.

22       MR. VEEDER:  We will finish that up today, then, your

23   Honor.

24       THE COURT:  All right.

25       MR. VEEDER:  I would like to refer to your Honor's

1   request for a summarization of matters that have transpired

2   to date.  We have made a rough draft and a general outline

3   of what we propose to do in that connection.  I don't know

4   whether your Honor would prefer to see it in chambers or

5   whether you would desire to see it here.  We have the rough

6   draft.

7       THE COURT:  I will look at it in chambers if you will

8   hand it up to me.

9       MR. STAHLMAN:  We have one matter here.  The transcript

10  of yesterday, on page 3116, there is a slight error there.

11  I asked a question and then I am objecting to myself and

12  finally arguing with myself.  That is not unusual, but it

13  didn't happen that way in the particular incident.

14      THE COURT:  The volume is on my desk, Mr. Clerk.

15      MR. SACHSE:  What is the page, George?

16      MR. STAHLMAN:  3116.  And we have the objections at

17  line 15.  It should be "Mr. Dennis."  We can just write it

18  in, I presume, to correct it.

19      MR. SACHSE:  Yes, that is correct.

20      MR. STAHLMAN:  Where it says "Mr. Stahlman" it should

21  be "Mr. Dennis."

22      THE COURT:  All right, make the change from "Stahlman"

23  to "Dennis."

24          You want to take care of yours later?

25      MR. VEEDER:  Yes, I will, your Honor.

THE COURT:  What else?  Is that all?

MR. STAHLMAN:  That is all.

MR. LITTLEWORTH:  While we are on the matter of the record, I notice Mr. Querry's name is being spelled Q-u-a-r-r-y.  Actually, it is Q-u-e-r-r-y.

THE COURT:  The reporters will note that.  We know about whom they are talking, however.

MR. LITTLEWORTH:  I would also like to report, your Honor, that I have given Mr. Veeder the log well on the Roripaul well on which tests were made Monday, and that is the well which has just been plotted on Exhibit 15.

THE COURT:  It was mentioned yesterday about tests being made.  Who were the tests made by, the Government?

MR. LITTLEWORTH:  Mr. Kunkel and one of his assistants requested permission over the week end to make some pumping tests, and we granted that permission.  They were made Monday, as I recall.

MR. VEEDER:  We went to the wells, your Honor, after Mr. Krieger had approved it, and in the company of Mr. Leo Roripaul and Mr. Querry.  We located the wells, we measured the depth to water prior to running of the pumps, and then measured the water during the time the pumps were run.  And it was in complete agreement with counsel and with the clients, I mean, with the defendants themselves.

I would like to add to the, I think it is 16-A,

3135

1    a copy of this --

2        MR. LITTLEWORTH:  It is all right.

3        MR. VEEDER:  -- Roripaul driller's report, if I may.

4    And if there is no objection to it, we will have it repro-

5    duced and return to your copy, if that is agreeable.

6        MR. LITTLEWORTH:  Fine, Mr. Veeder.

7        MR. STAHLMAN:  Make a copy for us, also.

8        THE COURT:  Just placing these names in my mind, the

9    well that is down in that angle of the lines, the south

10    part of the real estate, that is the --

11        MR. STAHLMAN:  Querry.

12        THE COURT:  -- Querry well.  That is one of the wells

13    on which this test was made?

14        MR. VEEDER:  That is correct, your Honor.

15        THE COURT:  And the Roripaul well is up off of Santa

16    Gertrudus?

17        MR. VEEDER:  That is correct.

18        THE COURT:  All right.

19        MR. VEEDER:  We will interrogate on that on redirect

20    examination.

21        MR. SACHSE:  Is this being offered or added to the

22    exhibit?  Is that my understanding?

23        MR. VEEDER:  It is going to be added to 16-A.

24        THE COURT:  It has already been added to 16 and 15.

25        MR. VEEDER:  But we have other well logs, your Honor,

1    and we are going to make it part of, that is, 16-A.

2         THE COURT:  Yes, put it in 16.

3              16-A, of course, was limited to start with to

4    well logs used on the profile.

5         MR. SACHSE:  That is my point.

6         THE COURT:  Now, don't you think, if we are going to

7    add other well logs, to avoid confusion, we ought to use

8    another exhibit number?

9         MR. VEEDER:  Well, we would like to add, at least

10   certainly have in the record -- I don't care what designa-

11   tion -- we want the Roripaul and the Querry well on it.

12        THE COURT:  This is Exhibit 15, the colored map?

13        MR. VEEDER:  Yes, your Honor, it is 15 and 17, both.

14   Those have been written on both of the wells.

15        THE COURT:  Then why not assign a sub-number  to 15 or

16   17 and put these additional well logs there?

17        MR. VEEDER:  Whatever your Honor desires.

18        THE COURT:  Will 15 be all right?

19        MR. DENNIS:  If your Honor please, though 16-A does

20   include a great many well logs which are not on either

21   Exhibit 15 or Exhibit 16 --

22        THE COURT:  16-A --

23        MR. DENNIS:  Which is the well logs.

24        THE COURT:  16-A started out to contain only the well

25   logs on the profile.

3137

A-2

K..

1    MR. DENNIS:  But it contains a great many more.

2    MR. SACHSE:  I think not, your Honor.  I think 16-A

3    started out --   Maybe we ought to ask the witness.  But

4    my understanding was 16-A represented the wells which the

5    witness had used in his various efforts to draw contours

6    and to draw the maps, and so on.

7    THE COURT:  Well, just so we understand.  I have no

8    objection to putting the additional well logs in 16-A.

9    MR. SACHSE:  Even if he didn't use them?

10    THE COURT:  Even if he didn't use them, they will be

11    in there and he will know where they are.  Put it in 16-A

12    and give it the next sub-number in order.

13    THE CLERK:  16-A 72.

14    THE COURT:  Where is the well log you are talking

15    about?  Let the Clerk mark it 16-A 72.  And that is the

16    well log of what well?

17    MR. VEEDER:  That is the Leo Roripaul well which has

18    been marked on 17.

19    MR. LITTLEWORTH:  The property is actually owned by

20    Roripaul and Katz.  They are the defendants.  They are four

21    owners: two husbands, two wives.

22    THE COURT:  All right.

23    MR. LITTLEWORTH:  It is known generally as the Roripaul

24    ranch and Roripaul well.

25    MR. VEEDER:  May I have the privilege of withdrawing

1    that for a reproduction, your Honor?

2         THE COURT:  You certainly may.

3         MR. STAHLMAN:  How about the Querry?

4         MR. VEEDER:  Well, the Querry log is coming, I under-

5    stand.

6         MR. LITTLEWORTH:  I presume that has been sent to our

7    office.  Mr. Querry had it in Riverside; and I will have

8    to wait until I go back.  I am going back tonight, and I

9    will try to find it.

10        THE COURT:  All right.

11             Well, Mr. Stahlman, do you have any further

12   questions?

13        MR. STAHLMAN:  No, your Honor.

14        THE COURT:  Does anyone else desire to cross examine?

15        MR. LITTLEWORTH:  I have some questions, your Honor.

16        THE COURT:  Let me get your name, counsel.

17        MR. LITTLEWORTH:  Littleworth.

18        THE COURT:  Littleworth.

19        (Discussion off the record.)

20

21                    CROSS EXAMINATION

22   BY MR. LITTLEWORTH:-

23        Q    Mr. Kunkel, I want to ask you some questions

24   about this Wildomar Fault.  Now, the Wildomar Fault runs

25   completely across the lower end of your basin core on

Exhibit 17, does it not?

A        The faults as shown, the Wildomar Faults as shown on Exhibits 15 and 17 run clear across the ground water storage units shown.

Q        It actually forms the lower boundary of your Basin 4 on Exhibit 17, is that right?

A        That is correct.

Q        And the general movement of the ground water through Basin 4 is in a southwesterly direction until it reaches the Wildomar Fault, is that correct?

A        In general, that is correct.

Q        You don't know how long it takes the ground water to move across Basin No. 4?

A        I do not know.

Q        And you don't know how much ground water moves across that basin?

A        I have calculated no quantity.

Q        As a matter of fact, have you made any calculations as to the quantities of ground water which moves through any of the basins on Exhibit 17?

A        No, I have not.

Q        Now, when the ground water reaches the Wildomar Fault, it either stops there, or, as you have testified, some of it goes through; is that correct?

MR. VEEDER:  I object, your Honor.  That is not what

1    the witness testified to.  He has not testified that the

2    water stops there.

3        THE COURT:  Let the witness answer.  Overruled.

4        THE WITNESS:  I have testified that there is no such

5    thing as stagnant ground water in nature.

6        THE COURT:  Which means that water doesn't stop?

7        THE WITNESS:  The water is in motion.

8        Q   BY MR. LITTLEWORTH:  When water, moving across

9    Basin 4 hits the Wildomar Fault, does it turn prior to

10   going through the fault and run towards the confluence of

11   the Temecula-Murrieta connection?

12       MR. VEEDER:  That question is beyond the scope of the

13   direct examination, your Honor, and I object to it.

14       THE COURT:  Overruled.  The point of the question was

15   this:  Does this water that you say moves out of Basin 4,

16   the two parts of Basin 4, the general southwesterly direc-

17   tion, does it come to the fault line and then turn down in

18   a southeasterly direction, or, in the case of the northern

19   part of the Basin 4, or in a northwesterly direction in the

20   part of the Basin 4 south of the Pauba Valley, or does it

21   cross the fault line and get into the next basin and then

22   turn?  That is the gist of the question.

23       THE WITNESS:  The fault line is not a fine line in

24   space.  It is a zone.  On both sides of the zone -- the fault

25   is a zone, not a point line.  Upstream from the fault at an

3141

1   undetermined distance but close with regard to the size of

2   the map scale to which I have been testifying, as shown on

3   Exhibit 15, the ground water would change its direction.

4   Hold that.  Would be perpendicular to contour.  In my

5   opinion, the contour

6   is very close to the zone we are talking about, being a

7   matter of a small scale, close distance with regards to

8   the scale of our map, would change its direction as it

9   moves through the fault zone and continued to change its

10  direction for a small distance on the other side of the

11  fault zone, at which point it would assume the direction

12  of movement shown as indicated on the next downstream

13  ground water basin.

14      Q  BY MR. LITTLEWORTH:  I am not sure I am clear yet.

15      THE COURT:  Have it read.  It sounded pretty clear to

16  me.

17      MR. LITTLEWORTH:  Maybe I can ask a question that will

18  clarify it in my own mind.

19      THE COURT:  All right.

20      Q  BY MR. LITTLEWORTH:  Are you saying, then, that no

21  water changes direction on the northerly side of the fault

22  line?  It only changes as it begins to pass through and on

23  the other side?

24      A     Where the problem exists is that there are an

25  insufficient number of contours shown on Plates 15 and 17

A-3

Pltf?

1    to show the movement at all points within the area map.

2    The contour interval is 50 feet.  It shows the over-all

3    direction of ground water movement.  A sufficient number of

4    contours which exist -- the points of head are there --

5    would show that, as one approached the fault there would be

6    a change in direction of movement from the positions in-

7    dicated by the 1050 feet contour interval in unit 4 to the

8    positions indicated at, say, the 1025 -- 1025 -- contour

9    interval, contour line in ground water storage unit 1.  The

10   map, at the scale drawn, is not in sufficient detail to

11   show that.  However, at any point the movement of the

12   ground water would be at right-angles to the contour that,

13   of necessity, exists on Exhibit 17.

14         Q    Are you saying, Mr. Kunkel, that there is not

15   sufficient data, then, to determine whether some of the

16   water hits the fault and does not go through but turns and

17   runs alongside of it?

18         A    No, no.  The ground water moves through the fault

19   and/or -- no, it moves through the fault and overreaches

20   in the fault.  The fault has a permeability.

21         Q    How thick is this faulted area?

22         A    The width of the zone?

23         Q    Yes.

24         A    I do not know.

25         Q    Do you know where the breaks in the fault are?

Kunkel - Cross

1    A    Which breaks are you referring to?

2    Q    Where water apparently goes through.

3    A    You are saying through, and you are talking of

4 breaks. I --

5    Q    Let me rephrase the question. How does water

6 get through this fault zone?

7    A    Any unit area of the fault zone -- any unit

8 area has a permeability. The sum of the permeabilities of

9 the fault zone is the transmissibility. The fault zone

10 does have a transmissibility. The water moves through

11 the fault zone.

12    Q    Now, the transmissibility of the fault zone is

13 considerably less than the rest of the materials in basin

14 4, however?

15    THE COURT:  Maybe you have got a misunderstanding of

16 terms.  Maybe I am wrong, but let's see if we understand

17 each other.  By "fault" we don't mean a dike, necessarily.

18 I suppose you could have.

19    MR. LITTLEWORTH:  Some faults, I think, are dikes.

20    THE COURT:  Ordinarily, a fault is a misplacement of

21 strata, material, one way or the other.  So it is not a

22 matter of some dike to go through.  It is a matter of

23 strata of certain types of material here that has been

24 displaced and it shows up in another area at a different

25 elevation, where there is a break in the continuity of the strata.

1    Is that what you understand by a "fault"?

2         THE WITNESS:  That is correct.

3         THE COURT:  So it is not a matter of going through a

4    fault zone; it is a matter, really, of passing over it.

5         Q  BY MR. LITTLEWORTH:  Is the fault varied in certain

6    parts so it doesn't reach the surface?

7         A      In my opinion, the fault does not reach the

8    surface at all points, particularly along the points of

9    younger alluvium.

10        Q      And it is your opinion that the ground water

11   moving from basin No. 4 all get through that fault?

12        MR. VEEDER:  Now, I ask that that question be clarified,

13   because the fault extends from a great distance there, and

14   the witness hasn't testified on that phase of it at all in

15   direct examination.  I don't care if he wants to take him

16   to some areas where we didn't cover in direct examination,

17   but I do think he should specify the areas concerning which

18   he is interrogating.

19        MR. LITTLEWORTH:  I am talking about basin 4.  And he

20   says the fault runs the full length of it.

21        MR. VEEDER:  But if you will observe, basin 4 is in

22   two units separated by unit No. 3.

23        MR. LITTLEWORTH:  I am talking only about 4.

24        THE COURT:  Which part, the upper or the lower?

25        MR. VEEDER:  Here 4 is on both sides.

Kunkel - Cross                                              3145

1        MR. LITTLEWORTH:  Yes.  My question actually applies

2   to both of them.

3        MR. VEEDER:  Well, that is why I am asking it to be

4   defined.

5        THE COURT:  He said both of them.  Overruled.

6        THE WITNESS:  Are we going to --

7        THE COURT:  Answer the question.

8        Q  BY MR. LITTLEWORTH:  Do you remember the question?

9        A    I would like to have it read back to me, please.

10       (The reporter read back the pending question.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kunkel   Cross   3146

B
Z4

1          A   All of the ground water in ground water basins-- all

2    of the ground water tributary to the area above the fault line

3    moves through or over the fault.

4          THE COURT:   Let me ask you some questions here.   I think I

5    know what counsel is getting at.

6          I have before me a copy of Exhibit 17-- if you will sit

7    down here.   Now, in basin No. 2 appears the area, at the joinder

8    of basins No. 1 and 2 appears the area where the water leaves the

9    two basins and goes down the Santa Margarita River.

10          I think counsel was interested in this particular matter.

11   In ground water unit 4, the lower basin, and the upper basin,

12   he is interested in whether the water which you say moves, moves

13   down in the direction at right angles to the contour and crosses

14   the fault line at various places into basin 1 from upper 4 and

15   into basin 2 from lower 4, or whether the water comes down near

16   the fault line and then turns within basin upper 4 and runs down

17   within the basin and then finally gets into 1 or 2.   And in

18   the lower 4, whether the water proceeds toward basin 2 and then

19   runs northwesterly and finally gets into basin 2.

20          THE WITNESS:   The first description of water moving--

21          THE COURT:   Across the fault line.

22          THE WITNESS:   --across the fault line is the correct

23   interpretation.

24          THE COURT:   Now, as a matter of fact, if the water crossing

25   at right angles to the contour in upper basin 4 should turn

B
Z5

1   within upper 4 and proceed southeasterly along the fault line,

2   you would have water contours in a different arrangement than

3   you have them now; you would have water contours showing-- well,

4   they would be almost horizontal with the bottom part of the map,

5   or tipped slightly to the southwest, would you not?

6       A  That is correct.

7       THE COURT:  And your findings show no evidence of that.

8   They show, for instance, the line 1050 running from the north-

9   west to the southeast.  You found no evidence of water contours

10  in 4, in substance, at right angles to that contour line?

11      THE WITNESS:  That is correct.

12      THE COURT:  Is that what you are getting at?

13      MR. LITTLEWORTH:  That is one point, your Honor.  That is

14  just half of the story.

15      THE COURT:  All right.

16  BY MR. LITTLEWORTH:

17      Q  The other half of the story is, how much water gets

18  through, and I want to know, Mr. Kunkel, what evidence you used

19  to conclude that water passes through the fault zone?

20      A  No. 1, as I testified, I have examined a great many

21  underground mines and I have visually observed the flow of

22  ground water through and along faults.

23      Q  But not along this particular fault?

24      A  No.

25      Q  I want to know what evidence you have on this particular

B
Z6

1  fault that the ground water moving across basin 4 passes through

2  that fault zone.

3      A   The evidence is the displacement of water levels along

4  the fault zone.  The positions of the contours as indicated on

5  Exhibit 15.

6      Q   Well, the water level in basin No. 1 is generally lower

7  than the water level in basin No. 4, is it not?

8      A   That is correct.

9      Q   And along the fault line there is rising water, is there

10 not?

11     A   That is correct.

12     Q   Doesn't that indicate that the ground water moves across

13 basin 4, hits that barrier and is forced to the surface?

14     A   A part of it is.  I have testified to that.

15     Q   I want to know what evidence you have that then some

16 goes on through.

17     A   My knowledge of hydrology.

18     Q   What evidence on this particular fault line in this

19 particular area?

20     MR. VEEDER:  Your Honor, this does go beyond the scope

21 of the direct examination.  This witness has not testified in

22 regard to stream flow runoff or hydrology in general.  He has

23 testified to the geology of the area and the basins comprising

24 the area.

25     THE COURT:  Overruled.  We are not talking about surface

Kunkel        Cross

B

Z7

1   water now.  We are talking about ground water.

2         THE WITNESS:  You are asking me now what evidence I have

3   observed that there is--

4         Would you please repeat the question?

5         MR. LITTLEWORTH:  Read the question, please.

6         (The reporter read the pending question as follows:  "Q  I

7   want to know what evidence you have that then some goes on

8   through?  A  My knowledge of hydrology.   Q  What evidence on

9   this particular fault zone in this particular area?")

10        THE WITNESS:  In part, I have had to rely on evidence

11  given to me by Mr. Hall that pumping of wells-- I do not recall

12  the wells exactly by name, but they are in the area of Pauba

13  Valley northeast of the Wildomar Fault zone--pumping of those

14  wells is reported to have had an effect on wells in Wolf Valley.

15  BY MR. LITTLEWORTH:

16        Q  That is a reverse flow to what I have been asking you

17  about; that is water flowing in a northerly direction.

18        A  The transmission of the pumping effect is not important--

19  is of extreme importance,  It is not whether the water, the

20  gradient of water in regard to the direction of movement--

21        THE COURT:  Wait a minute.  I thought he said wells

22  northeast of Pauba Valley.

23        Is that what you said?

24        MR. LITTLEWORTH:  I understood him to say in Pauba Valley

25  north of the fault line.

B
Z8

1          THE WITNESS:   Northeast of the Murrieta fault line.

2          THE COURT:   In Pauba Valley?

3          THE WITNESS:   In or right adjacent to-- in what is my

4   ground water storage unit --

5          THE COURT:   3.

6          THE WITNESS:   --4, or is right on the boundary between the

7   two.

8          THE COURT:   Which, upper 4 or lower 4?

9          THE WITNESS:   Lower 4.   It is wells approximately in a

10  position along the boundary between ground water units 3 and 4

11  northeast of Wolf Valley.

12         THE COURT:   3 and lower 4?

13         THE WITNESS:   3 and lower 4.

14  BY MR. LITTLEWORTH:

15     Q   Do you know which well that is by name so that it can

16  be identified in any way?

17     A   I would have to consult with Mr. Hall to refresh my

18  memory.   I do not recall.

19     Q   Did you rely on any other information given you by Mr.

20  Hall?

21     A   I have relied on the records in the Vail Company.   I

22  have consulted them on various occasions and have relied on

23  the data, and Mr. Hall has explained to me the first-hand

24  conditions under which the data were collected and the techniques

25  and who did the measuring.   So I relied on that type of

1    information to evaluate the reliability of the Vail records.

2        Q  Now, this is data from which you concluded that water

3    passes through the Wildomar fault zone?

4        A  That is information or data I have relied upon.

5        Q  I want to know what data.  That is what I am trying to

6    get at.  What is the evidence from which you draw this con-

7    clusion?

8        A  Well, the evidence cannot be limited to only my

9    observations in one valley.  A geologist must rely on his

10    knowledge of conditions where he has observed them elsewhere,

11    because--

12        Q  Then are you drawing this conclusion primarily from

13    observations--

14        MR. VEEDER:  Just a moment.  I object.  The witness had

15    not finished answering the question.

16        MR. LITTLEWORTH:  I apologize, if he has not.

17        THE COURT:  Go ahead.

18        MR. LITTLEWORTH:  Had you finished?

19        MR. VEEDER:  He had a "because" hanging there.

20        THE WITNESS:  Will the reporter read my answer to the

21    question.

22        (The reporter read the last answer.)

23        THE WITNESS:  --where he has observed them elsewhere and

24    relate them back to conditions in a valley that he is now

25    studying, and an example-- in other ground water basins in

B-
Z10

1   California separated by faults where the differential in head

2   across fault zones has been greatly increased-- a differential

3   in head consists of a few feet between ground water storage

4   unit 3, between ground water units 4 and ground water units 1

5   and 2-- in similar areas in California where a situation of

6   this type has existed and development has gone in and greatly

7   changed the water levels, the movement of ground water in

8   adjacent areas has been affected by the transmission of the

9   pumping effect or the actual transmission of water through the

10  fault zone.

11  BY MR. LITTLEWORTH:

12      Q   Mr. Kunkel, are you relying primarily for this con-

13  clusion that water does pass through that fault zone upon your

14  knowledge of geologic conditions in other parts of the State?

15      A   Plus my knowledge of the principles of hydrology.

16      Q   Aren't there some fault zones which are almost im-

17  permeable; for practical purposes, water does not pass through

18  them?

19      THE WITNESS:   May I go to the blackboard?

20      MR. LITTLEWORTH:   I think that can be answered, but--

21      THE COURT:   Can you answer yes to that, depending on what

22  the zone would be?  Suppose you had basement complex and you

23  had permeable strata, then you have a fault occurring, and on

24  this side the basement complex comes up right even with the

25  alluvial strata.   You would have a barrier then that would be

3153

B

Z11

1   relatively permeable, would you not?

2        THE WITNESS:  There would be a reduced area of permeability.

3   It does not follow that ground water must spill over the top

4   of that fault.  It is hydrologically sound for the quantity of

5   water to move through the fault, which I believe I can demon-

6   strate.

7        THE COURT:  All right.  This was a very general question

8   whether this was possible.

9        THE WITNESS:  (Stepping to the blackboard and drawing.)

10  Q equals TID, the formula to which we have testified.  Another

11  formula is Q equals PIA.  Transmissibility is the sum of the

12  permeability for the full thickness of the saturated aquifer.

13  D is the length along a water level contour line.  P is a value

14  or an average-- in this form it can be used as an average

15  value for the average permeability of a deposit.

16       If one considers the average permeability, we cannot

17  consider then only the length of the water level contour D in

18  the equation Q equals TID.  We must consider a cross-sectional

19  area through which the ground water moves.  We must use A as a

20  cross-sectional area.

21       Now, on the diagram it shows land surface, younger alluvial

22  deposits underlain by older alluvial deposits.  Water levels

23  on two sides of the fault line are shown.  The thickness of the

24  fault line is not critical, for the purposes of the illustra-

25  tion.  However, it does have a thickness.  It may be a matter

3154

B

Z12

1  of a few feet. It could be a half mile. It is unimportant.

2  There is a hydraulic gradient across that fault line. The

3  diagram must be considered in three dimensions. The fault line

4  has a cross-sectional area, the fault line has a permeability,

5  it has a cross-sectional area, it has a permeability and it

6  has a hydraulic gradient. This water is also in motion, it

7  has a gradient, and the water in motion is in motion through

8  the fault zone-- it has a gradient. It has an average

9  permeability, it has a cross-sectional area. The quantity of

10 water that is moving above the fault is equal to the quantity

11 of water that is moving below the fault. The water need not

12 rise and spill over the surface. If there is sufficient re-

13 charge to the area and the ground water basin is filled up to

14 the point that the water level does stand above and go over

15 the fault, some of it can and undoubtedly would spill over the

16 fault as a spillway on a dam. However, a head differential

17 would still be maintained and a portion of the water would

18 move through the fault. Studies indicate that it does move

19 through the fault. My personal observations underground

20 indicate that water does move through faults.

21 BY MR. LITTLEWORTH:

22     Q  Mr. Kunkel, aren't you giving me the formula for

23 computing how much water moves through the fault, which assumes

24 the thing I asked you? I asked you if you can't have a fault

25 zone which, for practical purposes, prevents water, or at least

B

Z13

1   any but a negligible quantity of water, from passing through?

2        A  The fault zone in Murrieta Valley is a long fault--

3        THE COURT:  Now wait.  This is a very broad question.

4   Forget about the maps and everything.  Can you have a fault

5   zone-- use the complete range of your imagination and your

6   experience-- can youhave a fault zone that would prevent water

7   from moving through it?

8        THE WITNESS:  If I understand your question, it is

9   slightly different, your Honor.

10       THE COURT:  That is his question.

11       THE WITNESS:  The question as the Court has phrased it

12  is slightly different than you have asked it.

13       MR. LITTLEWORTH:  I will accept the Court's rephrasing of

14  my question.

15       THE WITNESS:  Could you read back the Court's rephrasing

16  of the question.

17       (The reporter read the Court's question.)

18       THE WITNESS:  No.

19  BY MR. LITTLEWORTH:

20       Q  Mr. Kunkel, are you familiar with the San Jacinto Fault?

21       A  Yes.

22       Q  Generally known as Bunker Hill Dike, where it crosses

23  between San Bernardino and Riverside basin, does it not?

24       A  I am very familiar with it.

25       Q  Don't hydraulic engineers and geologists generally

B

Z14

1   consider that the Bunker Hill Dike or the San Jacinto Fault

2   prevents any water from passing from the Santa Ana River

3   watershed down into the Riverside basin, except in the center

4   portion where there is a gap in the fault?

5       MR. VEEDER:  I object to that portion.  I don't see why

6   he is asking this witness about what somebody else thinks.

7       THE COURT:  Overruled.  He is referring to a specific

8   phenomena with which the witness says he is familiar.

9       THE WITNESS:  I am acquainted with the circumstances you

10  have described, and there are hydrologists who have the opinion

11  that you have expressed.

12  BY MR. LITTLEWORTH:

13      Q  You are not one of them?

14      A  I am not one of them.

15      THE COURT:  Well, let me draw a picture (stepping down to

16  the board).

17      Let's say this is solid granite down here, and this is

18  solid granite.  This is the fault line, and this is your

19  alluvium, and this is your alluvium.  This is solid granite, the

20  hardest kind of rock.

21      THE WITNESS:  Impermeable.

22      THE COURT:  Impermeable.  Is water going to move through

23  there?  Isn't it possible, then, to have a fault line that

24  will prevent water from moving through?

25      MR. VEEDER:  It is absolutely impermeable?

Runkel  Cross                                                    3157

B
Z15

1          THE COURT:  Absolutely impermeable.  This is material here

2    that water can't go through, just solid granite, and here is

3    your fault where it has been moved up.  Is water going to go

4    through there?

5          THE WITNESS:  As illustrated, water will not move in that

6    direction.

7          THE COURT:  Let's assume that the hydraulic gradient be-

8    cause of other areas is in this general direction, and on the

9    other side it goes across here.  It is possible, then, is it

10   not, to have a fault zone which would prevent water from moving

11   across?

12         THE WITNESS:  Does the fault zone continue through the

13   alluvium?

14         THE COURT:  It probably does.  But the phenomena is the

15   displacement of the granite.

16         THE WITNESS:  With due respect, the situation as drawn

17   cannot exist in nature, unless additional factors are given--

18   this is an impossible situation.

19         THE COURT:  Well, now--

20         THE WITNESS:  I am not saying that the fault is impossible.

21   I am saying that the overall concept of what goes on with the

22   water from there on, it is just impossible.

23         THE COURT:  Why?  Listen, I have a little canyon up on

24   my place and there is probably a fault there because there is a

25   natural little dike along one part of the canyon, almost solid

B
Z16

1   rock, that runs across the bottom of the canyon and runs up

2   on the hillside on either side-- I imagine it is a fault

3   proposition.  But this is just hard rock.  There will be no

4   water in my canyon until you get right down to this little piece

5   of hard rock, where water rises and flows over the top of it.

6   I don't think it is flowing through that rock.

7        THE WITNESS:  The water in the canyon you have described--

8   water would be forced up and flow out (drawing).  But that is

9   not the circumstance of the hypothetical question set up by

10   Mr. Littleworth.

11        THE COURT:  The point is-- we are wasting time-- the

12   question is this:  Is it possible to have a fault situation--

13   forget about the Murrieta Valley-- is it possible to have a

14   fault which would prevent water from running through it?  $^{T}$he

15   water would have to go over the top or around it?

16        THE WITNESS:  In nature, the circumstance, with the possible

17   exception of the example you have drawn, the answer is no, your

18   Honor.

19        MR. LITTLEWORTH:  I will go on to another subject, your

20   Honor, unless you want to pursue this further.

21        THE COURT:  No.  Either I am awful dumb or I can't under-

22   stand the witness.

23   BY MR. LITTLEWORTH:

24        Q  Mr. Kunkel, as a way of trying to find out how much

25   water might pass through that fault, would it help if you took

1  well tests inside basin 1 and checked them against the effect

2  of the water table inside basin 4?

3      A  (Resuming the stand)  If there were sufficient tests

4  and they were run a long enough period of time, in my opinion

5  the evidence would be conclusive.

6      Q  Depending on whether the water level went down in the

7  basin 4, you would find out how much, if any, water passed on

8  through the fault zone?

9      A  The transmission effects of the pumping would be the

10  important thing.

11      Q  Now, as I understand your preparation of these basins

12  on Exhibit 17, you have drawn them to encompass the areas

13  where you can drill what you have termed a feasible well; is

14  that correct?

15      A  That is correct.

16      Q The key, then, to the lines of these basins is really

17  production of water; is that right?

18      A  That is correct.

19      Q  Then the basis of drawing those lines was not the effect

20  that any given well within that area might have on the water

21  which eventually flows through Temecula Gorge?

22      A  Could the question be repeated, please?

23      (The reporter read the pending question.)

24      A  The ground water storage units, as I have indicated,

25  were not drawn for that specific purpose.  However, a relationship

B
Z18

1   does exist.

2       Q  Tell me what the relationship is.

3       A  Yes, sir.  In my opinion, any drop of ground water

4   pumped out of ground water basins that I have indicated that

5   would have not normally been consumped by evaporation or some

5   other use as it moved down the hydraulic gradient, any well

7   that would draw water of that character is taking water out

5   of the watershed that would have normally reached the lower

9   ground water basin below Temecula Canyon.

10      Q  You don't know how long it would take to show the effect,

11  though?

12      A  I have made no estimates of the time.

13      Q  It might be a matter of years?

14      A  It might be.

15      Q  And the effect that pumping has on the water which

16  passes through Temecula Gorge varies with whether or not the

17  wells are located within any particular area?

18      A  The location of the well with regard to intercepting

19  water that would move downstream through Temecula Canyon, the

20  position of the well is not of consequence.

21      Q  Well, it varies the time factor anyway, doesn't it?

22      A  The time factor would enter in, yes.

23      Q  Do you think that is the only variable?

24      A  I have testified that I have not drawn ground water

25  storage units as indicated on Exhibit 15 with that consideration

Kunkel  cross

B
Z19

1    in mind, so I have not considered all of the factors.

2            MR. LITTLEWORTH:  All right.

3            THE COURT:  Do you want to take a recess now?

4            MR. LITTLEWORTH:  I think it might be helpful, your Honor.

5            THE COURT:  To go over your notes?

6            MR. LITTLEWORTH:  I am almost through.

7            THE COURT:  Sometimes that shortens things up rather than

8    watch the clock and use up the time and then have the time to

9    look over your notes.

10           MR. LITTLEWORTH:  Thank you, your Honor.

11           THE COURT:  Take a short recess.

12           (Recess.)

13

14

15

16

17

18

19

20

21

22

23

24

25

C-1 ML j

MR. LITTLEWORTH:  We are nearly through, your Honor.

Q     Mr. Kunkel, just one word so that I am completely clear on the information received from Mr. Hall.  You said that you used information concerning the relationship --

MR. STAHLMAN:  A little louder.

MR. LITTLEWORTH:  Excuse me.

Q     You said that you used information furnished by Mr. Hall concerning a well in Pauba and a well in Wolf Creek to substantiate your conclusions that water passes through the Wildomar Fault.  Now, did Mr. Hall give you information on any other wells that you used in forming that conclusion?

A     I do not recall.

Q     Now, Mr. Kunkel, has there been in recent years any reduction in the amount of ground water which has flowed through the Temecula Gorge?

MR. VEEDER:  Now, that is beyond the scope of the direct examination, your Honor.

THE COURT:  Sustained.

MR. LITTLEWORTH:  I have no further questions, then.

MR. SACHSE:  I have got a very few, your Honor, if nobody else wants to go ahead.

MR. VEEDER:  Do we have a round robin on this, your Honor?  I thought Mr. Sachse had had it.

MR. SACHSE:  I understood that I had reserved some

1    questions after you produced some of this well data.

2        THE COURT:  Yes.  And I am going to permit reopening,

3    but even if you --

4        MR. SACHSE:  It is brief.

5        THE COURT:  You are going into older matters, but

6    let's have as little of it as possible.  Have you got all

7    the data now you want?

8        MR. SACHSE:  I have everything I need in these

9    questions, and they are brief.

10        THE COURT:  All right, proceed.

11        MR. VEEDER:  We have been requested to produce data

12    in regard to the Pauba well which I have here, if they

13    want to work with it.

14        MR. SACHSE:  Mr. Moskovitz asked for that.

15        THE COURT:  Is it a well log?

16        MR. VEEDER:  This is a report on the Pauba well and

17    related data and --

18        THE COURT:  Would it be made an exhibit?

19        MR. VEEDER:  If they desire it to be made an exhibit,

20    I have no feeling one way or the other.

21        THE COURT:  Will it be put in 16-A?

22        MR. VEEDER:  I am going to withdraw it, Mr. Kunkel.

23        THE WITNESS:  It is from the official files of the

24    United States Geological Survey.

25        MR. VEEDER:  That is all right.  It is going to be

1    marked and withdrawn.

2        THE COURT:  We could make photostatic copies.

3        THE WITNESS:  Copies can be made.  I didn't want to

4    lose that particular copy.

5        MR. VEEDER:  There is not the slightest chance of that.

6        THE COURT:  Don't worry.  Mark it next in order, 16-A.

7    16-A --

8        THE CLERK:  73.

9        THE COURT:  16-A 73.  It may be withdrawn, copies

10   substituted.  It will be in evidence as part of 16-A.

11        I think 16-A is in evidence, isn't it?

12        THE CLERK:  Yes, your Honor.

13        THE COURT:  All right, Mr. Sachse.

                        CROSS EXAMINATION

14    Q  BY MR. SACHSE:  Mr. Kunkel, I am correct, am I not,

15   that the arrows indicating direction of flow of ground water

16   have no reference to volume or rate on Exhibit 15 or 17?

17    A    Correct.

18    Q    Now, in locating your ground water contours, is

19   it done somewhat similarly to locating surface contours, in

20   that you obtain points of reference and draw lines connecting

21   them?

22    A    In general, the same principles are used.

23    Q    And your points of reference in the case of

24   ground water are water level measurements in wells, points

25   of rising water; what else?

1      A      They would be points of rising water, water

2   levels in wells, yes.

3      Q      So then, the greater the number of points of

4   such reference -- well levels, rising water -- the more

5   accurately a ground water contour can be delineated on a

6   map, is that correct?

7      A      A qualified yes to that answer.

8      Q      Now, you testified earlier that information as

9   to ground water contours was helpful in determining the

10   amount of water moving through any alluvial deposit and

11   in determining the hydrolic gradient.  Now, are there any

12   other particular conclusions that hydrologists use ground

13   water contours in determining?  For what other purposes

14   are they useful?

15      A      The water level contours, as I have testified

16   on several occasions, is, and Exhibit 15 is to show the

17   source, the occurrence and the movement of ground water.

18      Q      If over a period of years ground water contours

19   are accurately determined, are they not also helpful in

20   determining the draft on a basin, for instance?

21      A      As that draft would affect the ground water

22   movement, yes.                    •

23      Q      As it would affect ground water level, also; is

24   that not true?

25      A      Yes.  Yes.

1          Q     And would they not also be helpful in drawing

2     a conclusion as to the rate of recharge of any basin;

3     again, a series of them over a series of years?

4          THE COURT:  The question is:  Would it be helpful?

5          THE WITNESS:  It would be helpful, yes.  Yes.

6          Q  BY MR. SACHSE:  Now, your only ground water

7     contours on Exhibits 15 and 17 are drawn as of November,

8     1953.  Have you made any attempt to determine such contours

9     for the period of your investigation in the fall of 1957?

10         A     No, I have not.

11         Q     Or at any other period since 1957?

12         A     No.

13         Q     Have you made any tabulations of fluctuation

14    of water levels in various wells in, say, Pauba Valley for

15    the period since the fall of 1957?

16         A     I have not tabulated that information.

17         Q     Or in Murrieta Valley or anywhere in the upper

18    watershed?

19         A     No, I have not.

20         Q     You are familiar with the location of the town

21    of Murrieta, are you not?

22         A     Yes.

23         Q     And am I correct in saying that it lies entirely

24    within your ground water storage area No. 1?

25         A     I do not know the exact boundaries of Murrieta,

1    so I would have -- I don't really know, but, to the best

2    of my knowledge, it does.

3        Q    Well, certainly within either 1 or 4.  It might

4    slop over into 4, is that right?

5        A    It might.  I don't know.

6        Q    Now, in answer to a question from Mr. Littleworth

7    a moment ago you stated your opinion that any well taking

8    any water out of the ground water basins would, to some

9    degree, at least, reduce the amount of water that would

10   reach Temecula Gorge?

11       A    That is correct.

12       Q    Now, when you made that statement were you aware

13   that in this case the United States of America, referring

14   to lands within the town of Temecula, had on file a sworn

15   admission stating:   "These ground waters --" referring to

16   ground waters underlying lands in the town of Murrieta --

17       THE COURT:  You said Temecula.

18       MR. SACHSE: Did I?  I beg your pardon.  Murrieta, let's

19   make it correct.

20       Q    "-- these ground waters are not a part of any

21   surface or subsurface stream or subsurface basin of the

22   Santa Margarita River or its tributaries."

23            Were you aware of such a sworn admission by the

24   United States?

25       A    I know of no -- I know nothing about it.

1    THE COURT:  Where does this appear?

2    MR. SACHSE:  I direct your Honor's attention to two

3    replies to requests for admissions.  Both of them have been

4    slipped on the originals.  Louis D. Gagnon and Katherine I.

5    Gagnon.  Both of them referring to town lots, a total number

6    of seven contiguous lots which have wells on them.  The

7    United States has made a sworn admission in each case which

8    reads, as follows, the last pertinent paragraph:

9        "The reconnaissance survey further showed that

10       the lands described in the Answer do not abut on

11       the Santa Margarita River or its tributaries; more-

12       over, that the lands probably overlie percolating

13       ground waters.  In using the term "overlie' it is

14       not to be ascribed the legal significance given the

15       term in Pasadena vs. Alhambra -- citing -- these ground

16       waters are not a part of any surface or subsurface

17       stream or subsurface basin of the Santa Margarita

18       River or its tributaries."

19   THE COURT:  Unless there is an error, the only gap

20   is whether the town of Murrieta -- and if the limits of

21   the town are broad enough to extend beyond this basin.

22   MR. SACHSE:  There is no exhibit before your Honor

23   at the present time, as far as I am aware -- I haven't

24   gone through all of United States -- from which it could be

25   accurately determined; but I will undertake later to

1   establish conclusively that the areas are here.  Now, I did

2   intend to ask the witness one further question.

3          THE COURT:  Let's not worry about this now.  You can

4   check into this, Mr. Veeder, and determine whether this is

5   correct or wrong.

6          MR. VEEDER:  Obviously, your Honor, it is a circumstance

7   where these people are -- it is one of the arrangements

8   where we are trying to get people out of it where they are

9   not competing for water with us.  And I don't care how

10  counsel uses it, under the circumstances.

11         THE COURT:  Go ahead.

12      Q  BY MR. SACHSE:  Could you, Mr. Kunkel, from

13  examination of your own plot sheets answer his Honor's

14  question as to whether the town of Murrieta lies wholly

15  within basin 1 or basin 4?

16      A     I could inspect to find out.  I never --

17      Q     Would you, please.

18      THE COURT:  Is it an incorporated town?

19      MR. SACHSE:  No, your Honor.  No, Murrieta is not

20  incorporated.

21         THE COURT:  If it is not an incorporated town, it can

22  just spread out as far as it wants over county area.  What

23  are the town limits of that unincorporated town?

24         MR. SACHSE:  It is a townsite that is laid out on a

25  map, on a recorded map.

1          THE WITNESS:  Yes, but there are no boundaries in the

2     town shown.

3          THE COURT:  Well, let's go ahead.  You had better be

4     content with your admission and not --

5          MR. SACHSE:  I am very much content.

6          (Discussion off the record.)

7          MR. SACHSE:  I have nothing further.

8          THE COURT:  Anything further from this witness?

9               Mr. Moskovitz?

10         MR. MOSKOVITZ:  Yes, your Honor, a couple of matters

11    which apparently have been brought in since I had the

12    opportunity to examine it before.


14                    FURTHER CROSS EXAMINATION

15    BY MR. MOSKOVITZ:-

16         Q     First of all, Mr. Kunkel, did you bring back

17    with you from Long Beach records as to the time you spent

18    on your study of the upper watershed about which you have

19    been testifying?

20         A     I have no records with me.  I have inspected

21    whatever was available to me to estimate and I have --

22         Q     You have an estimate?

23         A     I have a more reliable estimate in my mind.

24         Q     Can you give us your estimate of the total time

25    spent?

1    A        Yes; it was approximately 19 days in the field,

2    10 days assistance by another geologist.

3    Q        The 19 days was your time?

4    A        Was my own time.

5    Q        Ten days assistant's?

6    A        And 20 days' office assistance for other

7    calculation, and then for my own time on the analysis of

8    the data it is 60 to 90 days.  I can't estimate any more

9    closely than that.

10        THE COURT:  In addition to the 19 days in the field?

11        THE WITNESS:  In addition to the 19 days in the field.

12        Q  BY MR. MOSKOVITZ:  And is that the total?

13        A        On this, in relation to the specific study of

14    the Santa Margarita River, since I was assigned to it, that

15    is as close as I can estimate.

16        THE COURT:  The question was the upper part.

17        THE WITNESS:  Yes.  That is the upper part.  Yes, that

18    is as close as I can estimate it.

19        Q  BY MR. MOSKOVITZ:  Now, did you have any additional

20    estimate to give about the time spent on the Sonoma-Napa

21    Counties' investigation, Napa Valley investigation?

22        A        Yes, I do.  I have considered that, and I don't

23    recall exactly into the record how much time I did testify

24    to.  But, actually, comparing apples to apples, I have spent

25    far less time on the Napa-Sonoma study than as I had

C-4

1   indicated in the previous testimony; because when you were

2   questioning me with regard to what I did on Napa-Sonoma I

3   was thinking of the entire project from its inception to

4   the completion of a comprehensive report.  And so I

5   included all the report preparation time.  Also I located

6   in the field a far greater number of wells.  I had many

7   more -- I went actually and collected the drillers'

8   records from the drillers and had to do all the interpre-

9   tation from his basic record.  I didn't --

10   THE COURT:  In Sonoma, that is?

11   THE WITNESS:  Yes, in the Napa and Sonoma.  I also

12   made estimates of pumpage.  I went to power companies

13   throughout all the towns and actually estimate the quantity

14   of water pumps.  There were so many additional factors in

15   that study that you just cannot compare the two studies

16   for any degree of -- they are just not comparing apples to

17   apples.  And I had no way of breaking down the true

18   comparison except that they, in my opinion, they do compare

19   very favorably for the elements I have determined in both

20   watersheds.

21   Q  BY MR. MOSKOVITZ:  And the estimate you gave

22   originally you feel needs no change now, or you don't

23   desire to change that?

24   A      Except that I, for the elements of determining

25   source, occurrence, and movement of ground water in Napa-

1    Sonoma Valley, I actually spent far less time on it than

2    I previously indicated I spent on the entire project, and I

3    had no way of breaking it down.

4         MR. MOSKOVITZ:  Very well.

5         THE COURT:  Well, anyone else?

6         MR. MOSKOVITZ:  I have another matter.

7         THE COURT:  Oh.

8         Q   BY MR. MOSKOVITZ:  The second matter is the infor-

9    mation which was given to me last night, purportedly as

10   being the results of well level measurements on other wells

11   when the Pauba well was being pumped.

12        Q       I hand you Exhibit 16-A 73, Mr. Kunkel, and

13   ask you if you would explain what it is?

14         A       These are the original field sheets collected or

15   made during the period.  And may I check some of my notes.

16   Made before, during and after the pumping of the Pauba well.

17   They are records for a number of other wells that were

18   measured in the watershed -- not in the watershed, but in

19   the immediate vicinity of the Pauba well.

20

21

22

23

24

25

& D
Z20

Q   Now, what was the date of the test pumping of the Pauba well?

A   From the records that are available to me, the Pauba well was started pumping at 7:43 P.M. on August 3, 1951, and pumped through 11:56 P.M. on August 6, 1951.

THE COURT:   The record may show-- I don't have it on my map-- just exactly where this Pauba well is located.   Can you spot in the section for me?

THE WITNESS:   On the exhibit, your Honor?

THE COURT:   Yes, on Exhibit 15.

THE WITNESS:   The approximate location will be on Exhibit 15 above the 1025-foot number or the 1025-foot contour, below the Q in Q-T-O-A-L on an area marked "Older continental deposits." Now I will have to verify this position more exactly, but that is very close.

THE COURT:   I can't even get started until you give me -- What did you say again?   It is in the orange, red portion?

THE WITNESS:   You see the words "Temecula Valley."

THE COURT:   Yes, I see that.

THE WITNESS:   It is about four-tenths of an inch due east of the Y in Valley, and it is approximately on the contact between the older continental deposits and the younger alluvium at the point where the older continental deposits are an island. It is one-tenth of an inch west of the Q in Q-T-O-A-L.

THE COURT:   Then it is just north of that island, isn't it?

1      THE WITNESS:  It is just north of that island.

2      THE COURT:  And it is on a line between the older and the

3  younger alluvium?

4      THE WITNESS:  Yes, there is a very thin veneer of alluvium

5  shown and is mapped as yellow.  I would check my exact loca-

6  tion and description.  It may be right in that yellow or it may

7  be to one side of it.  I am not certain.

8  BY MR. MOSKOVITZ:

9      Q   And it would be about halfway between the Y in Valley

10  and the Q in Q-T-O-A-L or symbol for the island?

11      THE WITNESS:  About halfway.  It would be, I believe,

12  just a little bit above the 1025-foot contour, a little bit

13  closer to the Q-T-O-A-L.

14      THE COURT:  I have it.

15      On the projections on my map it looks like it would fall

16  in Section 17, 8 South, 2 West.

17      THE WITNESS:  17M1 is the number for the well.

18      THE COURT:  17M1?

19      THE WITNESS:  Yes.

20      THE COURT:  Yes, M1, in the southwest quarter.

21      THE WITNESS:  Yes.

22      Now, the projections that we have been using are somewhat

23  at variance with those numbers.

24      THE COURT:  Allright.

25      MR. MOSKOVITZ:  Could the witness at his leisure accurately

3176

D

Z22

1    spot that well on Exhibit 15, as he has done with the Querry.

2         THE COURT:  Yes, will you spot it in for us?

3         THE WITNESS:  Yes, I will do that.

4         MR. VEEDER:  Designating it the Pauba well.

5         THE WITNESS:  I will do that.

6         MR. MOSKOVITZ:  Would you go through Exhibit 16-A-73 and

7    call off the numbers of the wells whose levels were measured

8    in connection with the pumping of the Pauba well, so that we can

9    spot those also?

10        THE WITNESS:  I will do that.

11        MR. VEEDER:  Your Honor, the exhibit speaks for itself.

12   I don't see why the witness should be asked to read something

13   into the record that is already in the record.

14        THE COURT:  How many wells were there that were checked?

15        THE WITNESS:  I do not know right off, your Honor.

16        MR. MOSKOVITZ:  I believe it is in the neighborhood of

17   three or four, your Honor.

18        THE COURT:  Then over the noon hour will you look it over

19   and find out which ones they are and if there are only three

20   or four you can identify them for us on the map.

21        THE WITNESS:  I will be pleased to.

22        MR. MOSKOVITZ:  All right.

23        THE COURT:  The reason I suggest this is that I think this

24   would be rather  important testimony.  Here is a very deep well.

25        MR. VEEDER:  Then I withdraw it if there are only three

D
Z23

1    or four.

2         THE COURT:  I think we ought to have them spotted in and

3    know where they are.

4         MR. MOSKOVITZ:  Your Honor, perhaps it might be better to

5    ask the questions after we have located them.

6         THE COURT:  Yes.

7         MR. MOSKOVITZ:  So I will stop then.

8         THE COURT:  Let him have the exhibit.

9         MR. MOSKOVITZ:  Yes, your Honor.

10        THE COURT:  He has his work cut out during the noon hour.

11        MR. MOSKOVITZ:  There is something else I might want to

12   find out.  I am not sure that we have all the information as

13   to the depths of each of these wells.

14        THE COURT:  The other wells tested?

15        MR. MOSKOVITZ:  Yes, the depths of the other wells tested.

16        If you can figure it out, and have in your mind the

17   distance that is between the Pauba well and each of these other

18   wells.

19        THE WITNESS:  I will do my best.

20        MR. MOSKOVITZ:  And then we can ask the questions very

21   quickly.

22        THE COURT:  It looks finally as if we have got to the

23   place where you can step down temporarily, Mr. Kunkel.

24        MR. VEEDER:  I was going to have some redirect exam-

25   ination, your Honor, if it is all the same to you.

3178

D

Z24

1    THE COURT:  Yes, it is all the same to me, Mr. Veeder.

2  Pardon me.

3    MR. VEEDER:  Should I proceed while these participles are

4  dangling?

5    THE COURT:  Oh, yes, proceed.

6

7                        REDIRECT EXAMINATION

8  BY MR. VEEDER:

9    Q  Mr. Kunkel, what other areas have you undertaken a

10  study of ground water units similar to the one you undertook

11  in the area which constitutes the upper part of the Santa

12  Margarita River Valley?

13    A  I do not know the exact number of areas that I have

14  studied from memory.  The list of references, papers that I

15  have written, which have been written into the record, indicate

16  the areas that I have studied.

17    Q  For example, what has been your work in connection with

18  Twenty-Nine Palms?

19    A  I have studied the source, occurrence and movement of

20  ground water in Twenty-Nine Palms.  I have participated in

21  tests.

22    Q  What did you do in that connection?

23    A  We went into an area where there is a complete lack

24  of ground water development.

25    Q  Where is it situated?

     A  The area is situated north of the small community of

D

Z25

1    Twenty-nine Palms or the Twenty-nine Palms Oasis.  It is the

2    area in and around the area known as the Twenty-nine Palms

3    Marine Corps Training Center.

4         Q  In what county is it in the State of California, do

5    you recall?  Locate it in connection with San Diego, then,

6    if you will.

7         A  It is northeast of San Diego several hundred miles.

8         Q  And how does it compare with the area disclosed on

9    Plaintiff's Exhibit 15 from the standpoint of terrain, runoff,

10   similar physical phenomena?

11        A  It is a much larger area.  It is a desert area where

12   the conditions of runoff and precipitation are far lower than

13   in the upper part of the Santa Margarita River watershed.  The

14   area is a desert.

15        Q  Describe then the geological phenomena that exists in

16   that area?

17        A  It is a vast ground water basin underlain by rocks of

18   the basement complex.  The basin is deep and contains ground

19   water.

20        Q  And in making your analysis what factors did you take

21   into consideration in considering that ground water basin?

22        A  In the early analysis, before the place was ever in

23   existence, we went out and mapped the geology of the area,

24   outlining the areas of alluvium and continental deposits and

25   the areas of basement complex to determine the areal extent of

1   the alluvial deposits and their container, the basement complex

2   We examined the points of rising water.  There were a few.  We

3   examined water levels in wells.  There were a few.  However,

4   in the area which is now the Twenty-nine Palms Marine Corps

5   Training Center there were large areas in which there were no

6   wells.

7       Q  What were your conclusions, based upon that investiga-

8   tion, Mr. Kunkel?

9       MR. SACHSE:  I object to that, if the Court please.  That

10  is immaterial and not within the scope of the redirect.

11      THE COURT:  Sustained.

12  BY MR. VEEDER:

13      Q  What were the results of your investigation there,

14  Mr. Kunkel?

15      MR. SACHSE:  Same objection, your Honor.

16      THE COURT:  Sustained.

17      MR. VEEDER:  Your Honor, I submit that they have been

18  attacking the whole concept of the study that has been made

19  here, and there has been extensive cross-examination as to the

20  kind and type of investigations that were made in regard to the

21  Santa Margarita River Valley, particularly in the area of the

22  Pauba Ranch.  Our view is that these techniques that were used

23  to show that there is a very substantial quantity of water are

24  identical to those that were used at Twenty-nine Palms, and

25  that it is extremely important.

D

Z27

1   THE COURT:  I have no objection to your putting into the

2   record, as you have, that he made this investigation.  But

3   when you say, what were your results and what did you find,

4   then you open up for cross-examination a whole collateral

5   field.  You may ask him generally if he used the same techniques

6   in that investigation that he used here.

7   MR. VEEDER:  That is what I have been doing, your Honor.

8   THE COURT:  That is not what you did.  Your last question

9   was, what were the results of your investigation?  That would

10  mean that we would have as much direct testimony as we had here

11  on the results of his studies of the Murrieta Valley.

12  MR. VEEDER:  I will ask him the question that your Honor

13  suggested, then.

14  Q  Would you compare the techniques you used on Twenty-

15  nine Palms with those used here?

16  A  They were the same.

17  Q  What other areas did you undertake investigations

18  comparable to this that you have undertaken in the Santa

19  Margarita River Valley?

20  A  Studies at the Inyokern  Naval Ordnance Test Station.

21  Q  What did you do there?  What data did you have in

22  making that investigation as to the availability of ground

23  water?

24  A  Water levels in wells and my well log data and geologic

25  mapping and that's all.

D

Z28

3182

1    Q   Now, Mr. Kunkel, would you state into the record your

2    conclusion as to the relationship between the areas marked in

3    orange on Plaintiff's Exhibit 15 and the areas marked in yellow

4    on that exhibit as they relate to the supply of water for

5    Camp Pendleton and the other naval installations in the lower

6    Santa Margarita River Valley.

7    A   The areas mapped as older continental deposits on

8    Exhibit 15 are the principal source of ground water for wells

9    150 to 2400 feet in depth.

10   Q   In connection with Camp Pendleton?

11   A   The water pumped from those wells, under natural

12   conditions that water would ultimately rise to the surface,

13   flow down the Temecula Gorge, or a certain part of it will

14   move underground as ground water to the ground water basins in

15   Camp Pendleton.   If the water is pumped from wells, it is

16   not available to Camp Pendleton.

17   MR. LITTLEWORTH:   Could we have the depth of the wells?

18   I didn't catch the depth.

19   THE WITNESS:   Depending on the area, it would be wells

20   that would range from 100 to 150 feet to 2000 feet plus or

21   minus.

22   THE COURT:   You said that the older continental alluvial

23   areas were the principal source.   What about the younger

24   alluvium?   Are you including them?

25   THE WITNESS:   They are a source of ground water, but they

D

Z29

1    are not the principal source of ground water in the upper

2    part of the Santa Margarita River watershed.

3    BY MR. VEEDER:

4        Q  How does that water from the continental deposits and

5    the younger alluvium proceed from the ground water storage

6    units that you have described and flow on down to the Camp

7    Pendleton Marine Corps Base?

8        A  May I diagram it, Mr. Veeder?

9        Q  You may.

10        A  (Stepping to the blackboard)  Exhibit 15, as I have

11    previously testified, has a great difference in vertical and

12    horizontal scales which, unless one is--

13        Q  Exhibit 16?

14        A  Exhibit 16 has a vast difference in vertical and

15    horizontal scales which, if not carefully considered in the

16    analysis, could lead to incorrect interpretation.  Therefore,

17    I shall attempt to show Pauba Valley, the area of Exhibit 16,

18    only I will attempt to lengthen out the horizontal scale with

19    regard to the vertical scale.  However, there would still be a

20    distortion because it would be impossible accurately-- I

21    shouldn't say it would be impossible-- it will be very difficult

22    to prepare an exhibit if the true scales both horizontally

23    and vertically were shown.  The exhibit would be very long and

24    difficult to handle.

25        (Drawing on the board.)  I have drawn a line which will

D

Z30

1    represent land surface data. I have drawn the rocks of the

2    basement complex to the southwest.

3        THE COURT: To the gorge where the Santa Margarita starts?

4        THE WITNESS: To the gorge where the Santa Margarita starts.

5    I have projected the line of the Santa Margarita River where

6    it cuts through the gorge. I have shown at the northeast the

7    basement complex. I will also show the Wildomar fault.

8        As I have previously testified, I do not know exactly

9    whether the Wildomar Fault cuts the younger alluvial deposits

10   or not. There is a slight flexure on the surface which may

11   indicate that the alluvial deposits are deformed. Whether

12   there is a displacement I do not know. That is along the line

13   of the section of Pauba Valley.

14       THE COURT: This diagram you are making now is just the

15   Pauba Valley?

16       THE WITNESS: Yes, it is Pauba Valley.

17       THE COURT: All right.

18       THE WITNESS: There is a thickness of younger alluvial

19   deposits. The younger alluvial deposits, as indicated in

20   Plaintiff's 15, do exist. The older continental deposits do

21   exist. They are different in character. When observed on the

22   land surface, they are a mapable unit. However, on examination

23   of drillers' logs one cannot with certainty point to contact

24   and say that this is where the driller went from younger

25   alluvium to older alluvium. A geologist cannot tell with

3185

Z31

1   absolutecertainty.   However, he knows that there must be a

2   contact. .He also knows from geologic studies that the gradient

3   of the younger alluvial deposits must be to the gorge of the

4   Temecula Canyon.   If there was a down warping in them it would

5   indicate that there was a deformation or a geologic process

6   taking place that there is no evidence for having taken place

7   in the Santa Margarita Valley.

8        We know from examination of drillers' logs that there are

9   lenses of clay, gravel, sand and silt.  I have diagrammed

10  the various types:  The clay deposits, solid sand is dots,

11  and gravel as small circles.

12       Ground water recharge enters the alluvial deposits from the

13  stream flow of the Temecula River and off the line of section

14  water enters the older continental deposits as recharge from

15  infiltration and rainfall, from ground water movement out of the

16  basin along the lines of fractures and weathered zones into

17  the older continental deposits.  Groun water-wise the older

18  and younger alluvial deposits are a single hydraulic unit.

19       The ground water moves as indicated by well.  I will not

20  show the wells.  They are on the exhibit.  We have testified

21  to the water level gradient.  The shallow wells have a lower

22  head than the deep wells, under natural conditions.  But all

23  of the wells, when one compares wells of similar depth and

24  conditions, the hydraulic gradient is from the highland areas

25  completely surrounding the areas of older continental deposits

Z32

1  and younger alluvial deposits toward the Temecula Canyon.  There

2  are minor changes in direction due to differences in geologic

3  positions of faults, but the ultimate direction is from highland

4  areas surrounding the entire area of older and younger alluvial

5  deposits toward Temecula Canyon.

6      The ground water moves at right angles to the water level

7  contours on a plane surface.  In cross-section the direction

8  is down the gradient, but there is a component of downward

9  movement as well.  Ground water does not get in an aquifer

10  and then scoot in one direction horizontally to the outlet.

11      Now, for the purposes of illustration I am going to show

12  a bottom to this basin.  It has a bottom.  There is no doubt

13  about it.

14  BY MR. VEEDER:

15      Q  Mr. Kunkel, I am going to ask you to go to this un-

16  colored copy of Exhibit 16--

17          I would like to have this marked, if your Honor will

18  permit it.  It will be 16-1, because we have the A series.

19          And I would like to have you take a red pencil and

20  show the course of the water which enters the ground water

21  basin of Pauba as your investigations have disclosed.

22      THE COURT:  16-1 for Identification.

23      MR. VEEDER:  I don't want him to mark up the colored map,

24  your Honor.  It is exactly the same map.

25      You may go ahead.

G D

Z33

1      THE WITNESS:  The movement of ground water is down to the

2  very bottom of the basement.  The basement bottom on Exhibit

3  16-1--

4      THE COURT:  Put the mark on it.

5      THE WITNESS:  16-1.

6      THE COURT:  Right.

7      THE WITNESS:  For the purposes of illustration, I am

8  going to dash in a bottom to the ground water basin.  I do

9  not know where it is.  It is below 2479 feet-- in my opinion,

10  undoubtedly offsetting along the Wildomar and Elsinore fault

11  zones.  I have no idea what the conditions are with regard to

12  the degree of displacement relative to each other at this

13  depth.  This is entirely a diagrammatic picture.

14      But the testimony with regard to the movement of ground

15  water is accurate.  Every drop of water in the ground water

16  basin is in motion and it is moving to only one place; it is

17  moving to the outlets of the Temecula Canyon.  The water

18  is driven by the weight of the water column upstream or up

19  gradient.  It is the head of the water that drives the water.

20      I have previously testified, and as indicated b  the

21  drawing on the blackboard, there are differences in vertical

22  and horizontal permeability because the deposits are lenticular.

23  Therefore, it takes -- well, that's all for the moment.

24      The water moves from the upstream part of the basin down

25  to the very bottom of the basin and then moves up toward

3188

D

Z34

1  the lip or outlet of the Temecula Gorge.  However, the ground

2  water must get over or through the Wildomar fault.  I do not

3  know if the Wildomar fault comes up and intersects all of the

4  younger alluvial deposits.  Therefore, it is entirely reason-

5  able that a certain element and increment of that water will

6  move down and up and over the fault.  However, the fault does

7  have a permeability.  It is, in my opinion, a physical im-

8  possibility for the fault not to have a permeability.  There-

9  fore, an increment of the water will move through the fault

10  and repeat the same process inside of the zone between the

11  Elsinore and the Wildomar fault zones.  There is a movement

12  of ground water, and that water will move to the very bottom

13  of that basin and then it will move to the surface.

14      And again the question comes up, now what is the permea-

15  bility of the basement complex?  Where it is fractured, cracked

16  and deeply weathered, it does have a permeability.  Some of

17  it will move through those cracks and fractures.  However, the

18  permeability of the basement complex admittedly, in my opinion,

19  is far less than the permeability of the Wildomar fault zone.

20  So for all practical purposes I would be willing to grant

21  that no water does go through the basement complex, but it

22  must be kept in mind that the possibility does exist.

23      Therefore, every drop of water that enters the ground

24  water basin is in motion and is continuing to move at all times

25  and must leave the basin, and the only place the ground water

D

Z35

1   can leave the basin is as indicated by the ground water level

2   contours, the point of confluence of the Temecula and Murrieta

3   Creeks, and flow down the Santa Margarita.  Hydrologically, in

4   my opinion, there is no other possibility.

5       The question comes up:  Well, why do some of the wells

6   flow and the shallow wells don't?  It is the differences in

7   vertical and horizontal permeability that causes the wells to

8   flow.

9   BY MR. VEEDER:

10      Q   What is the relationship, Mr. Kunkel, between the water

11  in the younger alluvium, in your opinion, and the water in the

12  older alluvium?  Is there a relationship between the two?

13      A   They are in hydraulic continuity.  They are one and

14  the same ground water.  There is no differential hydrologically

15  between the water in the younger and in the older alluvium.

16      THE COURT:  It's 12 o'clock.  I have a luncheon engagement.

17  Adjourn until 2.

18      (Noon recess.)

19

20

21

22

23

24

25

E-1 ML j

SAN DIEGO, CALIFORNIA, WEDNESDAY, OCTOBER 15, 1958, 2:00P.M.

---o---

(Another matter.)

THE CLERK:  1247-SD-C, United States vs. Fallbrook.

THE COURT:  Mr. Veeder, I looked over the material you submitted to me, and it looks very good.  It seems to me that if the materials of that sort were multigraphed or copies made and delivered to counsel, it would be very helpful.  Each counsel could then work out his own index system.  He could index subject matters or names of parties. It would not particularly increase the Government's work to make the copies, and those copies, together with Mr. Moskovitz', I think, should be very helpful to co-counsel in the case.

MR. VEEDER:  We will proceed that way, then, your Honor.

THE COURT:  Mr. Kunkel.

MR. MOSKOVITZ:  Are you going to resume the redirect or attempt to finish any of the cross?

THE COURT:  What?

MR. MOSKOVITZ:  I say, are we going to resume the redirect or attempt to finish the recross that we delayed until after lunch?

MR. VEEDER:  I don't care.

THE COURT:  We were on redirect.  Let's finish the
redirect.

MR. VEEDER:  Redirect is' --

THE COURT:  Finished?

MR. VEEDER:  Oh, no, it is going to be quite compre-
hensive.

THE COURT:  Let's not go over matters --

MR. VEEDER:  No, your Honor.

THE COURT:  -- that have been already covered in the
direct.

MR. VEEDER:  Not in the slightest.  I have no desire
to do that.  I think there are matters that must be
covered on redirect.


FRED KUNKEL,

recalled as a witness on behalf of the plaintiff, having
been previously sworn, testified further, as follows:-


REDIRECT EXAMINATION

BY MR. VEEDER:-

Q     Now, Mr. Kunkel, when we concluded at noon you
were proceeding to show the course of the water through
the Pauba basin all down the valley.  Would you show
schematically and diagrammatically the course of the water
down the valley in the area between Santa Gertrudis and the

E-2

1    Pauba basin, drawing it onto 16-1, if you would, please.

2         MR. LITTLEWORTH: Your Honor, I would like to raise

3    a question here. As I understand, 16-1, it is a cross-

4    section of the Temecula. I don't understand how that can

5    be plotted, another area can be plotted on that.

6         MR. VEEDER: Would it bother anyone to have it drawn

7    right in there?

8         THE COURT: No.

9         MR. LITTLEWORTH: I thought we were going to put it

10   over here in the same thing.

11        MR. VEEDER: I don't see how that could be.

12        MR. LITTLEWORTH: Okay.

13        THE COURT: Proceed.

14        THE WITNESS: I understand I have been asked to draw

15   a schematic diagram not to scale.

16        Q  BY MR. VEEDER: That is right. A cross-section

17   showing the course of the ground water down the valley to

18   the Wildomar Fault between Santa Gertrudus Creek and

19   Temecula Creek.

20        A     I will construct a diagrammatic cross-section

21   between Santa Gertrudus Creek and the Temecula Creek as

22   requested.

23        Q     And as located on Plaintiff's Exhibit 15?

24        A     15.

25        Q     For the record.

1      A      For the record, the section that I shall

2  diagram shall lie --

3      THE COURT:  Just a minute.  It looks to me as if you

4  have got your map on what is called Long Canyon and not

5  Santa Gertrudus.

6      MR. VEEDER:  It is between the two, your Honor.

7      THE WITNESS:  Between Santa Gertrudus Canyon and

8  Temecula Creek.  The section I shall construct shall be

9  south of the area labelled Long Valley and Long Canyon and

10  north of Pauba Valley.

11      THE COURT:  All right.  You are going to draw a

12  sectional line across it?

13      THE WITNESS:  A sectional line following an area that --

14      THE COURT:  All right.  Now, describe it.  You were

15  going to when I stopped you.  Were you going to describe

16  the line by sections about where it lay, or not?

17      THE WITNESS:  May I move the position of the line

18  slightly, please.

19      THE COURT:  Yes.

20      THE WITNESS:  I would like to draw it in the older

21  alluvial deposits from the points of rising ground water

22  shown in the northwest quarter of Section 1, Township 8

23  South, range 3 West, extending northeastward perpendicular

24  to the 1050 contour toward the southwest corner of Section

25  15, Township 7 South, range 2 West.  My first line shall be

1   a land surface datum line, the line that will closely

2   approximate land surface.  There are irregularities in the

3   land surface across the older continental deposits, also

4   minor arms of younger alluvial deposits are crossed.  They

5   are not shown on the diagrammatic section, because they

6   are very shallow in thickness.  And I do not have the

7   actual surface, land surface control.  At the points of

8   rising water in projection, Section 1, northwest quarter

9   Section 1, Township 8 South, range 2 West, the older

10  continental deposits rise rather abruptly above the

11  alluvial plain at Murrieta Valley.

12        MR. DENNIS:  Mr. Kunkel, you meant 3 rather than 2

13  West?

14        THE WITNESS:  The point of the rising water, the

15  springs to which I am referring are in the northwest

16  quarter of Section 1, Township 8 South, range 3 West.  If

17  I said 2, I did not mean that.  The alluvial plain of

18  Murrieta Valley is relatively flat.  It also intersects

19  the canyon of the -- the word "canyon" is not correct --

20  intersects the bed of the Temecula --  Sorry.  It intersects

21  the bed of the Murrieta Creek, which is incised a matter of

22  ten or more feet beneath the surface of the alluvial plain

23  in the Murrieta Valley.  The alluvial plain is also a flat

24  plain southwest of the channel.  The older continental

25  deposits rise rather abruptly from the alluvial plain

E-3

1    southwest of the Murrieta Creek and overlie or are in

2    fault contact with the basement complex.   In cross-section

3    now I shall project the alluvial plain of the Murrieta

4    Creek.   I shall project the contacts between the older

5    continental deposits and the alluvial plain of Murrieta

6    Creek which, of necessity, must exist.   This is a diagram-

7    matic representation.   I have not actually taken the walls

8    of the incised Murrieta Creek down to the older alluvium

9    at this point because I have not actually observed the

10   older alluvium at that point.   However, in other valleys

11   throughout the area I have very definitely observed.   It is

12   my opinion that the particular point of contact between

13   the incised bed of the stream that deposited the younger

14   alluvial deposits are in contact or flowing over continental

15   deposits.   The exact position of the Wildomar Fault regard-

16   ing this cross-section cannot be determined to a matter of

17   a few feet, to a foot or two, on the ground; but it can be

18   determined within a matter of a hundred feet more or less.

19   The Wildomar Fault comes to the surface in the older alluvial

20   deposits, and locally along the point indicated the exact

21   position of the fault can be determined.

22       MR. LITTLEWORTH:  You were indicating an area between

23   Santa Gertrudus up to the contour level about 1250.

24       THE WITNESS:  Along the -- yes, Murrieta Fault, the

25   exact position of the Murrieta Fault along the east side of

1    the Murrieta Valley, the Wildomar Fault.

2        MR. LITTLEWORTH:  Murrieta Fault.

3        Q  BY MR. VEEDER:  I would like to have him proceed,

4    because I am going to ask him to draw that more clearly

5    onto quads as he continues this phase of the examination.

6        A      Stream flow during the fall of --    October

7    through December, 1957, was observed in Murrieta Creek.

8    Overtest 1957, I can supply the exact data which I observed,

9    that log, if that is necessary.  Also, there are points of

10   rising water where the ground water can be observed issuing

11   from the older continental deposits.  The water is not

12   issuing from the younger alluvial deposits.   The hydrolic

13   gradient, while it may not be precisely determined with

14   the data available to the nearest tenth of a foot, does

15   exist and it is --

16       MR. LITTLEWORTH:  What direction is that cross-section?

17       THE WITNESS:  Southwest northeast.  The hydrolic

18   gradient is from the northeast to the southwest.  And as

19   shown by the water level contours, is at -- the movement of

20   the water is at right-angles to the contour.

21       Q  BY MR. VEEDER:  Just a moment.  Now, when a spring

22   issues, as shown there, what does that evince from the

23   standpoint of relationship between the surface of the ground

24   and the ground water table?

25       A      It is evidenced that the ground water surface and

     the land surface have intersected.

E-4

1          I have previously testified that, in my opinion,

2   the fault shown below the area mapped is deeply water

3   basement complex, probably extends, can be projected to the

4   east.  However, the weathering over that particular area

5   is so deep and such an even mantle that the exact position

6   cannot be located with extreme precision.  However, it is,

7   in general, an extension of the fault as shown.  In my

8   opinion, the fault does exist at some depth.

9          MR. VEEDER:  Can the reporter hear that?

10         THE WITNESS:  I am sorry.  I have indicated the symbol

11  QTOAL -- BCW on the cross-section.  The BCW lies to the

12  northeast of the QTOAL.  I have drawn a wavy line to indicate

13  that at some depth, which I have not testified to as

14  occurring at an exact point but at some depth, the basement

15  complex occurs.  The basement complex beneath the weathered

16  zone is cracked and fractured.  As one goes to greater depths

17  the cracks and fractures become fewer to the certain point

18  where, for all practical purposes, they cease to exist.

19  There is a water table also in the basement complex deeply

20  weathered.  I do not know its exact position.  I have not

21  contoured the water table.  But if a sufficient number of

22  water wells are drilled in the area and if their water levels

23  are considered, it will be possible to draw water level

24  contours.

25

3198

F

Z36

1    THE COURT:  Referring now to the drain area on Exhibit

2  15.

3    THE WITNESS:  That is correct.

4    So the water table does continue.  I will use a different

5  symbol-- I will use dots for the water table, and I do not

6  wish to imply that at the point there is no break in gradient

7  or that the line is level or that it is steep.  I am not

8  testifying to that because I have not determined that.  But a

9  water table does exist.

10    THE COURT:  That is, you are not implying that the water

11  table is immediately adjacent to the basement complex.  You

12  are not testifying to thatdistance as shown on your diagram?

13    THE WITNESS:  Well, the two water tables are in contact,

14  but what happens to the gradient--

15    THE COURT:  I am talking about the basement complex under-

16  lying it.  Your line of water table and basement complex shows

17  very close together.  Does that indicate that they are close

18  together?

19    THE WITNESS:  I do not know.  They may or may not be.  The

20  water table may be above or below.  I do not know.  However,

21  the hydraulic gradient is up in all directions.  In no place

22  has it declined as one goes toward the northeast.  There are a

23  sufficient number of water levels to show that without

24  referring to specific water levels for the purposes of illustra-

25  tion.

3199

F

Z37

BY MR. VEEDER:

Q  Now, show the course of the gradient of water in its progression down the gradient toward Murrieta valley.

A  In the part of the cross-section as I have drawn it so far, there is an increment, there is recharge from the deeply-weathered basement complex and fractured basement complex.  There is infiltration of rainfall.  If there are minor streams and tributaries running over the older alluvial surface, whatever water will collect and run as surface flow in those streams and tributaries, an increment of that will also move toward ground water.

So the ground water table and the ground water body in the older continental deposits is supplied by recharge from the island areas above the older continental deposits.  The particular point is shown in the cross-section below the area I have indicated as northeast.  The Temecula River, under natural conditions, is not contributing to that recharge.  The ground water in the older continental deposits-- which, as shown and as I have previously testified, are lenticular; I will not draw the lenses diagrammatically, but we will all know that they are there-- the ground water moves down the hydraulic gradient from points of high head toward points of lower head.  Some of the water that has entered the ground water body can be observed to rise to the surface at the point indicated as the springs between Long Canyon and Santa

3200

F

Z38

1   Gertrudis Creek on Exhibit 15.  Other parts of the ground

2   water or other increments of the ground water movement will

3   go through the Wildomar fault zone.  Every drop of ground water

4   that enters the basin as recharge ultimately must leave the

5   basin as ground water outflow or as pumpage by the activities

6   of man.

7       The Murrieta Creek indicated by the flowing of water and

8   by measurements of water levels in wells, not of necessity at

9   the exact point of the cross-section, show that there is a

10  water table in Murrieta Valley.  The water table is a plane

11  that is not controlled by the contact between the younger

12  alluvial deposits or the older continental deposits.  If there

13  has been a considerable period of recharge the water table may

14  be high.  It will show a high water table.

15      Q  Would you indicate the difference between the high and

16  the low water tables?

17      A  I will.  It would be a high water table.  I have

18  indicated it by "H-1."  Part of the water will be in the

19  younger alluvial deposits, part of it will be in the older

20  alluvial deposits.  There would be more water bleeding out of

21  both the younger and older alluvial deposits to supply more

22  stream flow than if ther water table were low.  If the water

23  table were low, as indicated by the water table line, there

24  would be no stream flow, if the water table were pulled down

25  dufficiently, beneath the bed of Murrieta Creek.

Kunkel Redirect

3201

F

Z39

1    The ground water that has now been for a period of time

2    moving from its point of recharge northeast of the older

3    continental deposits toward the spring line or toward the

4    Wildomar fault, whichever you choose to think of, has gone

5    in part through the fault, in part over the fault, and has

6    entered the ground water body of Murrieta Valley.

7        Q   What is the course of the ground level contours once

8    the level has entered Murrieta Creek?  Show that.

9        A   Once the water has crossed the Wildomar fault zone,

10   either by moving through the fault or over the fault, the

11   water then is part of the Murrieta Valley ground water basin

12   and the head of water is reflected by the hydraulic conditions

13   in Murrieta Valley.

14       Q   In the schematic drawing in the upper left-hand corner

15   of 16-1, would you draw the course of the water as it pro-

16   gresses down the Murrieta Creek, using your red pencil and

17   drawing the arrows in there?

18       A   The ground water profile shown in the upper left-hand

19   corner of Exhibit 16-1 is down the center of Murrieta Valley

20   from the divide, the surface water divide between Murrieta

21   Valley and Elsinore Valley to the point indicated B, which is

22   the lip of the ground water basins above Temecula-- I am sorry--

23   it is the gorge of the Santa Margarita River.

24       MR. MOSKOVITZ:  Might I suggest that on Exhibit 16-1, on

25   the plane you have showing the Santa Margarita River watershed--

F

Z40

1      MR. VEEDER:  Just a moment, Mr. Moskovitz.  This is my

2  redirect examination.

3      MR. MOSKOVITZ:  I was just trying to be helpful to spot

4  in that cross-section on the plane, the one we just drew in in

5  redpencil.

6      THE COURT:  We can do that later.  He is on another

7  cross-section now.  He is on DB, I think.

8      THE WITNESS:  The ground water which has entered Murrieta

9  Valley from the older continental deposits now moves in the

10  direction toward us looking into our cross-section or as shown

11  on the section DB.  The movement now is down the hydraulic

12  gradient-- the same principles apply .  I will not need to draw

13  the same number of arrows.  There are an infinite number that

14  could be drawn to show the direction of flow.

15      However, I do want to emphasize again that the flow goes

16  to the very bottom of the ground water basin, which I have

17  not shown on the cross-sections in Exhibit 16-1.  However, the

18  movement does extend to the very bottom.

19      The ground water crosses the Elsinore fault zone in the

20  South Half of Section 12 and the Northeast Quarter of Section

21  13, Township 8 South, Range 3 West, where the bedrock is high

22  and the ground water is forced to the surface.  Well, the

23  ground water, on the date that I observed it also-- my state-

24  ment is correct; the ground water is forced to the surface,

25  where it ultimately discharges out of the Temecula-Murrieta

3203

F

Z41

1    drainage basins as surface flow down the Santa Margarita Creek,

2    plus whatever increment of ground water underflow there would

3    be.

4    On the date that I observed rising water in Murrieta

5    Creek, in the fall of 1957, it was at the fence line, just

6    above the fence line of the Vail property, with whoever the

7    other owner above was.  At that point there is actual rising

8    ground water.  I cannot exactly spot it on my cross-section--

9    I can, but without more precise measurements I cannot.  But

10   there is a point of rising ground water where the water table

11   of the Murrieta Creek intersects land surface.  It is as shown

12   on the cross-section approximately at Well 73 35 1.  Below

13   that point there is an increasing amount of surface water flow.

14   The increase in surface water flow is from rising ground water,

15   an increasing increment as one moves down the hydraulic

16   gradient.

17   BY MR. VEEDER:

18       Q   What is the source of that ground water?

19       A   The source of the ground water--

20       Q   To which you are just testifying?

21       A   --to which I am just testifying is from Murrieta

22   Valley.  Let me say it more exactly.  It is from the ground

23   water body between the Elsinore fault zone and the Wildomar

24   fault zone.  I have qualified it specifically because I do

25   not want to confuse the Murrieta Valley as a topographic

F-2

Z42

1    feature with Murrieta Basin as a ground water feature.

2        Q  Now, I would like to have you refer to the quadrangle

3    where the rising waters and the sump which is located on the

4    Vail properties appear and show the relationship between that

5    rising water and the picture that you have shown schematically

6    on 16-1.

7        A  May I have the Murrieta quadrangle scale of 1 to

8    24,000.

9        Q  Let me put the exhibit number in the record.  That is

10   Plaintiff's Exhibit 29J.

11       A  The point in the cross-section that I have constructed

12   and have an arrow pointing to a spring which is labeled E--

13   I will use that E later on in identifying.

14       MR. VEEDER:  May I interrupt for just a moment.

15       Did your Honor indicate that he desired to have this

16   cross-section marked on this inset?

17       Isn't that what you are talking about, Mr. Moskovitz?

18       MR. MOSKOVITZ:  That is what I was suggesting.

19       MR. VEEDER:  Now that you have completed, will you just

20   mark it so that it is evident.

21       MR. SACHSE:  Has he finished this answer?

22       MR. VEEDER:  He has not finished it.

23       MR. SACHSE:  I don't know what E is yet.

24       THE WITNESS:  I am going to show point E on this cross-

25   section so that we can have it tied.  I would like to do it

F-2

z43

1   later on today when I have had a chance for more precise

2   measurement.  The point E, however, as shown in the cross-

3   section on Exhibit 16-1, is the point of rising ground water

4   above the reservoir shown in or on Exhibit 29J south of bench

5   mark 1016.  It is about 1400 feet southeast of bench mark 1016.

6   It is labeled "Reservoir."  I have not projected the sections,

7   but if the sections were projected it would be in the North-

8   west Quarter of Section 1, Township 8 South, Range 3 West.

9        May I indicate the point on the exhibit?

10       MR. VEEDER:  I want you to mark it on 29-J, running an

11   arrow down off from it to the margin so that it can be easily

12   seen.

13       THE WITNESS:  I shall show a red dot as the point of rising

14   ground water.  I shall use a black pencil and run an arrow

15   to a point which I shall call E.

16       THE COURT:  Those are down near Long Canyon; is that right?

17       THE WITNESS:  They are near Long Canyon; yes, sir.

18  BY MR. VEEDER:

19       Q  Would you describe the structure that is located at

20   the point which you have marked E on Exhibit 29J?

21       A  The structure is at a break in slope-- by a break in

22   slope I mean the alluvial plain of Murrieta Creek is very flat

23   and is a sandy channel, a sandy alluvial plain-- the alluvial

24   plain abuts abruptly into the older continental deposits which

25   rise, as shown by the land surface contours, oh, 20, 30 feet,

F2

Z44

1    and continues to rise as one goes northeast across country

2    to points that are several hundred feet above the point of rising

3    water.

4         There has been activity by man there where the area has

5    been bulldozed out and deepened and a dam has been constructed

6    to retain the rising ground water behind the dam.

7         May I draw a diagram of the dam?

8         Q   On whose property is that situated?

9         A   To the best of my knowledge, it is on the Vail Ranch.

10        Q   Would you describe the bottom of the sump as it relates

11   to the alluvial deposits of the Murrieta Creek?

12        A   May I diagram?

13        Q   You may, by all means.

14        A   On a larger scale, I shall diagram to the left of the

15   word "Legend."

16        Q   You are working on 16-1?

17        A   I am working on 16-1.

18        (Drawing.)

F3

19   THE COURT:   On whose property is this dam?

20   MR. VEEDER:   Vail's.

21   THE COURT:   Vail's property?

22   MR. VEEDER:   Yes.  Mr. Hall is now testifying.

23   THE WITNESS:   I have observed this structure on several

24   occasions.

25

3207

F3

Z45

BY MR. VEEDER:

Q  When was the most recent occasion?

A  I have lost track of the time, Mr. Veeder.

Q  You were in my custody when we were up there on Monday, weren't you?

A  I couldn't remember whether it was Monday or Sunday.

Q  Monday.

A  It was just a few days ago.

Q  The day of the Fallbrook hearing.

A  That is the day.

THE COURT:  Is this dam right on the section line that you drew on Exhibit 16-1, or is it off the section line?

THE WITNESS:  It is right on the section line.  It is one of the key points to which I am tying.

THE COURT:  That is why you picked out that line, because the dam shown at E is right on the cross-sectional line?

THE WITNESS:  Yes, sir.  It is a very critical water level in the dam.  The surface of the water level in the pond behind the dam is supported by ground water leakage or seepage or movement into the pond from the older continental deposits.

BY MR. VEEDER:

Q  What do the arrows depict that you put on there just now?

A  The direction of water flow into the pond.

Q  From what source?

F3

Z46

1    A  From the older continental deposits.  The head of

2    water that is maintained by this ground water movement-- and

3    there is movement, because there is evaporation from the

4    pond-- there is an increment of leakage through the dam.

5    Therefore, if there were not a supply of water to maintain the

6    pond, the pond would dry up.

7        THE COURT:  Is this that reservoir that is visible from

8    Highway 395 as you go north on the left?

9        This is off the record.

10       (Off the record.)

11       THE COURT:  Go ahead.

12       THE WITNESS:  The critical point is that the water behind

13   the dame is supplied by ground water movement and inflow to

14   the dame from the older continental deposits.  The head water

15   in the dam is several feet, I estimate about five feet, above

16   the surface of Murrieta Valley.  There is a ground water table

17   below the surface in Murrieta Valley, but there is a differ-

18   ential in head within a matter of--

19  BY MR. VEEDER:

20       Q  When you say differential in head, what do you mean?

21       A  There is a difference in water level between the

22   older alluvial deposits east of the dam and in the older

23   alluvial deposits west of the dam or in the younger and older

24   alluvial deposits west of the dam.

25       Q  What other phenomena of that character that you have

3209

F3

Z47

1    just depicted on 16-1 have you observed in that area?

2        A   The phenomena which I have described is repeated many

3    times in various degree from the--

4        Q   Could you mark it on Exhibit 29-J to the end that we

5    will see where it is repeated.

6            Your Honor might have it.

7        (The Court hands document to the witness.)

8        MR. VEEDER:  I am sorry, your Honor.

9        THE COURT:  Use different letters now.  You have used E.

10   Why did you use an E, in particular?

11       THE WITNESS:  A, B, C, D, are points already shown on the

12   cross-section.  E would be the next one.

13       THE COURT:  All right.

14       THE WITNESS:  I wanted to reserve F and G for the other

15   ends of my cross-section.  So could I use H?

16       THE COURT:  Put in your F and G right now before you

17   forget it.  F is the southwesterly end of it?

18       THE WITNESS:  Yes.

19       THE COURT:  And G is the northwesterly end of it?

20       THE WITNESS:  Yes, sir.  I will show those points on the

21   section.

22       The next section is H.

23       MR. LITTLEWORTH:  Do I understand that he is showing

24   additional dams?

25       MR. VEEDER:  I will interrogate about that.

3210

F3

Z48

Q   What are you showing when you marked H on 29-J?

A   I am showing where there are additional points of rising ground water that, in my opinion, have the older alluvial deposits as their principal source of ground water.

MR. VEEDER:  Do what you have done there.  You have brought your E down below the margin.  Bring your H down below the margin for the purpose of identification.

THE COURT:  He has his H written in.

THE WITNESS:  The spring line, as I call this phenomenon, extends in a southeasterly direction to a point J on the Murrieta quadrangle and is continued for a way on the Temecula quadrangle and it is reported to me that the phenomenon--

MR. VEEDER:  You can't testify to that.

THE WITNESS:  I am sorry.

BY MR. VEEDER:

Q   Draw a red line showing the base where you have observed this water emanating from the continental deposits from H down through J.

THE COURT:  Have you got a blue one?  You have so many red marks on there now.

THE WITNESS:  What are you asking me to do?

MR. VEEDER:  Just draw a line to show the general course of it.  Draw the line broader than that.

THE COURT:  This is a line of the water coming out of the older continental alluvium?

3211

F3

Z49

1     THE WITNESS:  That is correct.  Now I do not wish to

2  imply that the quantity of water at all points shown is equal.

3  There is variation from point to point.  But the phenomenon

4  that I have described in cross-section EG is the cause of the

5  rising waters between points H and J on 29-J.

6  BY MR. VEEDER:

7     Q  Now, would you locate on 29-J where the Roripaugh well

8  which you tested on Monday is located?

9     A  May I consult my field sheet?

10     MR. VEEDER:  May I have a pause in the day's occupation,

11  your Honor.

12     We are wondering whether the State has returned to us all

13  of the well logs that have been delivered to it in the Santa

14  Margarita River watershed.

15     THE COURT:  Delivered to it by whom?

16     MR. VEEDER:  I assume that Mr. Roripaugh must have filed

17  with the State a copy of the well log, a copy of which he

18  submitted to us.

19     MR. LITTLEWORTH:  I don't think there is any requirement

20  to file it.  You are not talking about the ground water ex-

21  traction law, are you, which simply requires reports of ex-

22  tractions?

23     MR. VEEDER:  No, I am talking about the law requiring the

24  filing of well logs with the State of California.  Indeed, the

25  copy you let us see, Mr. Littleworth, was a carbon copy of the

3212

F3

Z50

1   State form, and that was not included in the State's material.

2         Are there any of the well logs that we have not been given

3   by the State?

4         MR. MOSKOVITZ:  The well logs that we brought in and have

5   in our files and available for inspection are well logs in the

6   possession of the Department of Water Resources.  The statute

7   which requires the filing of logs and other information on the

8   drilling of wells requires that the originals be filed with the

9   appropriate Regional Water Pollution Control Board, and then

10  I assume there is a furnishing of data from that board to the

11  Water Resources Department.

12        I am explaining this because I think there is a lapse of

13  time probably between the receipt of the logs by the Pollution

14  Control Board and the sending of a copy to the Department of

15  Water Resources.  Right now, in the material we have, we have

16  not found a log for the Roripaugh well.

17        MR. VEEDER:  We are in this position, your Honor.  Our

18  information indicates that Mr. Roripaugh has two wells, and

19  we would like to get that information, if we could-- two wells

20  concerning which we have no information at all.  We also under-

21  stand that he drilled in the same area a 5,000-foot oil well,

22  the log of which would be most informative, I believe, to the

23  Court.  So if we could have that data supplied to us, we would

24  greatly appreciate it.

25        THE COURT:  Who represents Roripaugh?

F3

Z51

1          MR.LITTLEWORTH:  We do, your Honor.

2          THE COURT:  Have you made any effort to find that material?

3          MR. LITTLEWORTH:  This is the first time this has been

4     requested, your Honor.

5          THE COURT:  But you are not familiar with it?

6          MR. LITTLEWORTH:  No, your Honor.

7          MR. VEEDER:  This is the first time I knew about it.  But

8     we would like to have it, your Honor please.

9          MR. LITTLEWORTH:  He has a number of wells on his

10    property.  I think he has nine wells.  He has a fairly large

11    ranch.

12         Are you really asking me for the logs and the data on

13    every well?  You are going to put it in as part of your case?

14         MR. VEEDER:  Yes, we are-- we need it very badly.

15         MR. LITTLEWORTH:  What about the rest of the people out

16    there?

17         MR. VEEDER:  As we get to them we are going to ask for

18    them.

F4    19         THE COURT:  See what you can find.  You can't do it over

20    night.  All we are interested in here are the facts, and if

21    there is a deep well it would be very interesting if there

22    is a log on it.

23         MR. LITTLEWORTH:  I would be happy to bring all that in.

24    I just had not thought that the Government was relying on

25    pump tests and the like in the presentation of its case.

3214

F4

Z52

1    MR. VEEDER:  It has nothing to do with pump tests.  If

2  you have pump tests, we would like to have them.

3    MR. STAHLMAN:  We would like to have the pump tests, too,

4  because this well log doesn't have any pump test.

5    MR. LITTLEWORTH:  Mr. Kunkel made the pump tests.

6    THE COURT:  For some reason, you see, the well logs

7  for the Roripaugh wells aren't in what we have.  Mr. Moskovitz

8  suggests that there may be a lapse of time.

9    MR. LITTLEWORTH:  Because they didn't use the Roripaugh

10  wells in any of their calculations.  That is why they aren't

11  there.

12    MR. VEEDER:  We couldn't get them.

13    THE COURT:  They didn't use them.  But Mr. Moskovitz

14  says that they are not among the State records.

15    MR. LITTLEWORTH:  I think they are referring only to

16  this last well of 1956, aren't they, of which they now have a

17  copy?  I furnished them a copy.  But they did not use any

18  of the Roripaugh wells in their calculations.  That is why

19  the State doesn't have it, and that is why they don't have it.

20    MR. VEEDER:  I don't follow that.

21    THE COURT:  The State would ordinarily have them whether

22  they use them in their calculations or not.

23    MR. LITTLEWORTH:  I don't understand the State to have

24  brought every well log that is filed with it into this court.

25    MR. MOSKOVITZ:  What we have brought in, as I understand,

F4

Z53

1    are well logs which are in the Los Angeles office of the

2    Department of Water Resources.  Now there may be well logs

3    that were filed with the Pollution Control Board that have not

4    yet been supplied to the Water Resources Department.  I don't

5    believe that we have made an exhaustive search of every place

6    where there might be well logs.

7        THE COURT:  You have brought all the well logs that were

8    in your L.A. office for this area?

9        MR. MOSKOVITZ:  Is that correct?

10       MR. ILLINGWORTH:  To the best of my knowledge, that is

11   correct.  There may be some up there.  There is usually a lag.

12   We are not always able to keep right up to date in the filing

13   of these logs.  In the first place, many of them that come

14   from the drillers aren't properly identified as to the exact

15   location and we can't use them or put them in our records until

16   they are so identified, and this means field work.  Sometimes

17   there is a quite a backlog, and it is quite possibly true that

18   there are additional well logs that have come over from the

19   Pollution Control Board that we haven't identified in the field

20   yet.

21       MR. VEEDER:  They are important to us.  We understand that

22   Mr. Roripaugh has them.  We would like to get all that he has.

23       MR. LITTLEWORTH:  We will get together all the information

24   that we have as fast as we can.

25       MR. VEEDER:  Whatever pumping tests you have would be

F4

Z54

1   very important to us.

2        THE COURT:  Spell Roripaugh for us.

3        MR. LITTLEWORTH:  R-o-r-i-p-a-u-g-h.

4        MR. STAHLMAN:  There are a lot of Roripaughs up there.

5   This is Leo.

6        THE COURT:  What are you locating now?

7        MR. VEEDER:  We are going to locate the Roripaugh well

8   on 29-J.

9        MR. STAHLMAN:  Which Roripaugh well?

10       MR. VEEDER:  The Roripaugh well that Mr. Kunkel observed

11  on Monday.

12       MR. STAHLMAN:  That you pumped up there?

13       MR. VEEDER:  That we pumped up there.

14       THE COURT:  All right.  It is generally in--

15       MR. LITTLEWORTH:  Santa Gertrudis.

16       THE WITNESS:  It is 950 feet approximately northwest of

17  Banana Avenue and about 4150 feet northeast of Highway 395.

18  The well lies north of the sandy channel of Santa Gertrudis.

19  The well lies northeast of the sandy channel of Santa Gertrudis

20  Creek.

21       THE COURT:  Can you show it in, I think it is, Section

22  26 of 8 South, 3 West, probably?

23       THE WITNESS:  May I check my notes again to make sure that

24  I get the correct letter designation.

25       The well number that was assigned in the field to the well

3217

F4

Z55

1   is 7 South, 3 West, 26-J-1.

2         MR. VEEDER:  Are you marking that on 29-J?

3         THE WITNESS:  I am marking that on 29-J.  I am also

4   indicating that it is the Roripaugh well.

5   BY MR. VEEDER:

6         Q   Now, would you describe Santa Gertrudis Creek at that

7   point, from the standpoint of its bed and bank?

8         A   May I draw a cross-section.

9         Q   Put a cross-section on 16-1.

10        A   I can draw a cross-section to the right of the word

11   "Legend" on Exhibit 16-1.  There is a copy of my field notes

12   made Monday, October 13, 1958.

13        It is diagrammatic and not to scale.  I am indicating

14   the sandy channel of Santa Gertrudis Creek as Q-Y-A-L.  It

15   is a channel about 20 feet wide, and it is in size about 6

16   feet beneath the surface of the younger alluvial plain on both

17   sides.

18        THE COURT:  What is this he is drawing now?

19        THE WITNESS:  This is a section across the channel of

20   the Santa Gertrudis Creek at the Roripaugh well.

21        MR. SACHSE:  Your Honor, may I make an objection?  I may

22   be late with this.  I certainly don't want to prevent necessary

23   important evidence coming in, but this is unquestionably not

24   within the scope of the cross-examination.  It is reopening the

25   case.

F4

Z56

1      Furthermore, and what is perhaps to me more important,

2  this is a complete violation of the Court's pretrial order

3  on the matter of submission of exhibits or lodging them with

4  the Clerk at least ten days in advance.  If we are going to

5  draw our exhibits in the courtroom, where counsel don't know

6  what is going on except as they stand and peer over the

7  shoulder of the witness, I don't think we are living up to the

8  spirit at least or the understanding that we arrived at on the

9  pretrial.

10      THE COURT:  As to its being proper redirect examination,

11  it probably isn't.  But I will permit Mr. Veeder to cover

12  matters that he omitted on the direct examination of his

13  witness.

14      MR. VEEDER:  In regard to your observation, your Honor, I

15  am very pleased to have you permit me to do it under any

16  circumstances.

17      THE COURT:  These aren't matters that were particularly

18  brought out by the cross-examination.

19      MR. VEEDER:  The attack has been made upon the ground

20  that our ground water level contours were not properly located

21  and that there is no evidence that there is a progression of

22  ground water out of these continental deposits.  We referred to

23  these previously in our direct examination, your Honor.  Now

24  when they were making their attack on cross-examination, I

25  feel, your Honor--

F4

Z57

1    THE COURT:  You may go ahead.  Limit the number of dia-

2  grams that we draw extemporaneously.  We can do it a lot

3  better if they are prepared carefully and submitted and later on

4  show them to counsel.  Finish the one you are on of the cross-

5  section of Santa Gertrudis Creek at or near the Roripaugh well.

6    THE WITNESS:  The Roripaugh well is on the younger alluvial

7  plain on the area map as Q-y-a-1 on Exhibit 15.  If I may

8  refer to the well logs--

9    MR. STAHLMAN:  May I ask if this particular log does tie

10  in with this well?

11    THE WITNESS:  This is lot 16-A-72 of the Roripaugh well.

12    MR. SACHSE:  Has it an exhibit number?

13    THE WITNESS:  It has an exhibit number, 16-A-72.

14    MR. STAHLMAN:  Is there a legal description sufficient to

15  tie it in with this particular well, if I may ask?

16    THE COURT:  It was described, I understand, as 7 South,

17  3 West, 26-J-1.

18    MR. STAHLMAN:  The point I make, your Honor please, is

19  that there are a number of wells on the Roripaugh property.

20  I think some have been drilled very recently.  Whether this

21  particular well log is the log for the well they have placed

22  on the board and which they pumped on Monday.

23    MR. LITTLEWORTH:  I don't know.  It corresponded most

24  closely with the pumping data that they have.  But I do not

25  know.

F4

Z58

1    MR. STAHLMAN:  The reason I raise the question is that

2    Mr. Hall is familiar with some of the wells that they drilled

3    and he doesn't know about this well.

4    THE WITNESS:  Mr. Roripaugh reported to me at the well

5    that the well was about 500 feet deep.  He said that he didn't

6    recall, without checking the well log.  The well log 16-A-72

7    was given to me by Mr. Littleworth as the log that corresponds

8    to the well that I visited.

9    MR. LITTLEWORTH:  Let me say this.  Mr. Kunkel gave me a

10   copy of his field notes.  I gave him papers that I had, a

11   copy of the well log which seemed to me to correspond.  I do

12   not know that it is the same one.  I gave them the best in-

13   formation that I had.

14   MR. VEEDER:  We asked you for it and it was delivered to

15   us on the basis of the request.

16   MR. STAHLMAN:  We have some doubt as to whether that is

17   the same well.

18   MR. LITTLEWORTH:  This is the same depth and is drilled

19   in the same year as the facts stated in the field notes.

20   THE COURT:  Have you compared the field notes with the

21   green sheet you have in your hand?

22   THE WITNESS:  My field observations and conferences with

23   Mr. Roripaugh, I have those, and I have the log that had been

24   submitted to me.

25   MR. STAHLMAN:  Your Honor, I think we ought to have

F4

Z59

1  this straightened out right now.  The Vail Company have come

2  up with every well log, every bit of information requested

3  both by the State, by the United States and by the Marine Corps,

4  and I think all these other well logs ought to be produced by

5  other people who have large pumpings in that area, because it

6  is just as important that those wells be properly identified

7  and that we have the information from them, as it is that they

8  have it from us.

9      THE COURT:  We have requested Mr. Krieger to produce what

10  he has.  He has brought one in.

11     MR. STAHLMAN:  The point I make is that to have a lot of

12  testimony on this particular thing and then find out later on

13  that it is not the log that fits this particular well, we are

14  certainly wasting a lot of time.

15     THE COURT:  It says "Well No. 3."  Does this mean it is

16  the third well that he drilled?

17     MR. LITTLEWORTH:  I don't know, your Honor.  I have been

18  here.  Mr. Roripaugh, of course, is a good deal of distance

19  from here.

20     THE COURT:  It says "approximately one-half mile north

21  of Banana Street."

22     MR. LITTLEWORTH:  This tended to correspond in direction

23  and time of drilling and data.

24     THE COURT:  Does it check out?

25     THE WITNESS:  The measurements that I had were 950 feet

F4

Z60

1   northwest of Banana Street.

2       MR. STAHLMAN:  I think that is a different well.  I am

3   not going on record as declaring that, but we have reason to

4   suspect that it is a different well.

5       THE COURT:  What is the size of the casing?

6       THE WITNESS:  The pump was right on top of the casing.  It

7   was reported as a 14-inch diameter casing.

8       THE COURT:  Reported?  Did you see it?

9       THE WITNESS:  I did not see it.  Mr. Roripaugh told me

10  that it was a 14-inch casing.  I was standing right next to the

11  well.  The pump is over the well to the point that no one can

12  see the casing without pulling the pump.  There was evidence

13  that the well is a rotary gravel packed and a 14-inch casing,

14  in my opinion, is a perfectly reasonable figure.  I did not

15  check it.

16      THE COURT:  "Drilled by L. Van Winkle."

17      Well, before we spend any time on it we had better find

18  out if 16-A-72 is the well.  It may be, and it may not be.  It

19  is easy enough to find out.  Mr. Roripaugh could be subpoenaed

20  in, or Mr. Van Winkle, the driller.  Let's find out.

21      MR. VEEDER:  We asked for it a week ago.

22      MR. LITTLEWORTH:  No.

23      MR. VEEDER:  It is very important to us.

24      MR. LITTLEWORTH:  Let me get this clear.  The request for

25  the Roripaugh wells had primarily been made just about ten

3223

F4

Z61

1    minutes ago.  You asked for a 1956 well.

2        THE COURT:  We are not rushing you.  Does Mr. Roripaugh

3    have logs of other wells?

4        MR. LITTLEWORTH:  He has, as I recall, nine wells, and our

5    information of that kind is in Riverside.  I don't know exactly

6    what we have.  I will have to contact him and I will have to

7    go back to the office to see what we have.

8        THE COURT:  How many of those were drilled in the last

9    year or so?

10       MR. LITTLEWORTH:  Most of the wells are older, I think.

11   His ranch is in the third generation.  His grandfather had it.

12   Some of his wells were artesian.  I think he has put some pumps

13   where they used to be artesian.

14       MR. STAHLMAN:  Mr. Hall has seen some wells up there that

15   have recently been drilled, but they are not this well.  That

16   is the thing that raises the question.

17       THE COURT:  Mr. Littleworth, why don't you consult with

18   Mr. Hall and Mr. Stahlman and your client and see if we can

19   solve this problem and get on a firm basis before we go on with

20   further cross-examination.

21       MR. LITTLEWORTH:  We will be happy to, your Honor.  We

22   didn't know that the Government wanted it as part of their

23   case.

24       THE COURT:  Take a recess.

25       (Recess.)

Q  BY MR. VEEDER:  Mr. Kunkel, would you clear up the designation on the Roripaugh well in Exhibit 29-J?  You presently have there 261, and I believe that should be 26 J-1.

A      The Roripaugh well, as I have testified, is 26 J-1 and I will so indicate it on the Exhibit 29-J.

Q      Now, based upon your observations at the cross-section of the Santa Gertrudus Creek, which appears on Plaintiff's Exhibit 16-1, would you state the kind and type of deposits into which the well was drilled?

A      The well approximately 100 feet from the --

THE COURT:  All right, now, wait a minute.  Any knowledge he has as to deposits below the surface would come from this log.  So we go to that list and find out whether we have the right log or not.

MR. VEEDER:  Your Honor, I believe that this is the log.  I believe it is the correct well.

THE COURT:  You can do this some other time as well as you can now.

MR. VEEDER:  All right.

THE COURT:  Let's be sure on that.

MR. VEEDER:  We withhold the statement, and we withhold finishing up that cross-section, if that is what your Honor desires.

THE COURT:  All right.  Go ahead.

1    Q   BY MR. VEEDER:  Alluding to the area on 16-1, which

2    is the cross-section of the Pauba where the cross-section

3    of the Pauba Valley is noted, would you state what evidence

4    of confinement, if any, you have observed in connection with

5    those ground waters?

6        MR. SACHSE:  May I have that question read.

7        THE COURT:  Read it.

8        (The reporter read the pending question.)

9        Q   BY MR. VEEDER:  Either lateral or vertical?

10       A   The evidence indicates the logs, the hydrolic

11   principles that must be involved indicate that the area is

12   not confined.

13       Q   What evidence, if any, have you observed of

14   lateral confinement of any of the ground waters in the areas

15   marked units 3 and 4 appearing on Plaintiff's Exhibit 17?

16       A   I have observed no confinement laterally between

17   ground waters, areas 3 and 4, Plaintiff's Exhibit 17.

18       MR. DENNIS:  May I ask a question, Mr. Veeder?  When

19   you are talking about unit 4, are you referring to unit 4

20   both north and south of the Pauba Basin?

21       MR. VEEDER:  Right.

22       MR. DENNIS:  Both north and south.

23       MR. VEEDER:  Right.

24       Q   Now, then, would you explain the reason for your

25   broken line that you have shown on both sides of No. 3?  Or

1    what does that demonstrate from the standpoint of the

2    exhibit?

3        A    The area of Pauba Valley in regard to the

4    exhibit, it is No. 17, was separated -- or I am not --

5    May I have the question again?  I am not certain I under-

6    stand.

7        THE COURT:  What do these broken lines mean?  You have

8    the same kind of lines around every basin.

9        Q  BY MR. VEEDER:  But in regard to No. 3 in

10   particular?

11       A    They are the boundaries of a ground water

12   storage unit beneath which I calculated the ground water

13   in storage for the upper 100 feet of saturated materials.

14       Q    What would be the effect, in your opinion, of

15   pumping in the area marked No. 4017 upon the runoff in the

16   area of Murrieta Valley contained in unit No. 1?

17       MR. LITTLEWORTH:  I will object to that on the ground

18   there is no proper foundation laid.  On my cross examination

19   he stated that he had made no measurements of the flow of

20   the underground water or of any rate at which it recharges

21   or the rate of flow.

22       MR. VEEDER:  It had nothing to do, your Honor, in

23   regard to the quantities of water pumped or anything else.

24   I simply asked him what the impact would be.  We go on now

25   to the question of the effect of the Roripaugh well upon the

1    ground water storage in unit No. 4 upon the runoff in unit

2    No. 1.  I am not asking how many acre feet.  All I am saying

3    is --

4           THE COURT:  General question.  Overruled.

5           Q  BY MR. VEEDER:  Would there be an effect?

6           A     The Roripaugh well, 26, well 26 J-1, in my

7    opinion, was drawing a fair quantity of water in the older

8    continental deposits.  Sufficient pumping of the Roripaugh

9    well -- or just the word "pumping" of the Roripaugh well

10   will decrease the quantity of ground water moving into

11   Murrieta Valley.  The decrease of ground water, a decrease

12   of ground water moving into Murrieta Valley from the older

13   continental deposits in ground water unit 4, Plaintiff's

14   Exhibit 17, will result in a lowering of water levels in

15   Murrieta Valley.  The lowering of water levels, as shown

16   in Plaintiff's Exhibit 16-1, Cross-section F-E.  The lowering

17   of water level will decrease the amount of rising water in

18   the Murrieta Creek, which is surface water flow beneath the

19   point of rising water.  It was originally ground water that

20   has risen to the surface and can be observed flowing as

21   surface water.

22          Q     Now, referring to the ground water contours which

23   appear on the Plaintiff's Exhibit 17, would you explain the

24   shape that they take at the area where the Murrieta and

25   the Temecula Creeks, at their confluences, form the Santa

Margarita River?

A    At the confluence of the Temecula and Murrieta Creeks shown on Plaintiff's Exhibit 17 and also on Plaintiff's Exhibit 16, the 980 contour specifically is shown as a slightly more than half-circle.

Q    What were the controls that established that contour at that point? What did you consider when you established the contour at that point and the factors that you took into consideration?

A    I considered the water levels in wells, the observed flow of Murrieta and Temecula Creeks.

Q    And what, in your opinion, will be the effect of the pumping of the Querry well in regard to those quantities of water which unite to form Santa Margarita Creek at the head of Temecula Canyon?

MR. LITTLEWORTH:  I will object to that on the ground no proper foundation has been laid.  We haven't got any evidence in the record so far on the Querry well.

MR. VEEDER:  He has located it, your Honor.

THE COURT:  Read the question again.

(The reporter read the pending question.)

THE COURT:  Very general question.  It is obvious what the answer would be.  Overruled.  He is not asking anything specific in amount.

Q  BY MR. VEEDER:  Would you answer the question?

A    The immediate effect would be the reduction of
water levels in the area surrounding the Querry well, which
would thereby cut down the quantity of rising ground water
in the Temecula Creek.  Sufficient pumpage over a long
enough period of time, in my opinion, would reduce the
water levels to the point that it would be entirely probable
that a reverse hydrolic gradient would be established and
ground waters from Temecula Creek would recharge the
Querry well.

Q    Now, what are the distinguishing features between
the older and the younger alluvium as you have observed them
in both the Pauba Valley and the Murrieta Valley?  How can
you distinguish them when you find them in place?

A    They are distinguished in place by their -- I
previously testified the younger alluvial deposits are
areas that are presently receiving or have in recent times --
with a capital R; the geologic periods; the recent times --
have or do receive deposition during periods of precipitation
and runoff whereas the older continental deposits are
deposits that are being disected or eroded.  I am speaking
of how they are differentiated on the land surface when
observed by a geologist.

Q    In regard to the water level contours which you
have depicted on Plaintiff's Exhibit 17, both in the area
1, which is the Murrieta Valley, and area 4, what do those

1    contours, as you have shown them, depict to you?   What do

2    they show?

3         A     The contours show that the areas underlain by

4    older and younger alluvial deposits contain a ground water

5    body that within which the ground water is moving towards

6    the confluence of the Temecula and Murrieta Creeks and

7    ultimately discharge out of the Santa Margarita River

8    Valley to recharge the ground water basins downstream.

9         Q     And downstream, what do you mean, "downstream"?

10        A     Downstream at Camp Pendleton.

11        Q     Now, assuming that you had established on that

12   Exhibit 16 a great many more of those water level contours,

13   what additional meaning would that contribute to the

14   knowledge of the Court in regard to this valley?

15        A     Determination of more contours in no way would

16   change the conclusion that ground water is moving from the

17   older and younger continental deposits out of the area

18   towards or to Camp Pendelton.

19        MR. VEEDER:   You may recross.

20        MR. MOSKOVITZ:   Your Honor, could we have our examina-

21   tion on the tests of the Pauba well I started this morning?

22        THE COURT:   Yes.

23

24

25

CROSS EXAMINATION (Continued)

BY MR. MOSKOVITZ:-

Q       Mr. Kunkel, have you located the Pauba well and the wells which were measured in Exhibit 16-A 73?

MR. VEEDER:  This is not recross now?

MR. MOSKOVITZ:  This is not recross.  This is a continuation of the previous examination.

THE WITNESS:  To the best of my knowledge, I have located the wells that were measured during the pumping of the Pauba test well, Pauba well.

Q  BY MR. MOSKOVITZ:  And on what exhibit have you located those wells?

A       I have located them on Plaintiff's Exhibit 15.

THE COURT:  How many different wells were there?

THE WITNESS:  Five.  No, four, plus the Pauba well which I have located.

THE COURT:  And where have you located them on Exhibit 15?  Can you point to them?

THE WITNESS:  They are wells 8 South, 2 West, 17 M-1, which is the Pauba well; 17 G-1, which is the Studley well, and is indicated as the Studley well with both the number and the name; well 20 L-1, which is shown between the words "Wolf Valley" and 20 D-1, which is northeast of the letter "O" in the word "Wolf," in Wolf Valley.

THE COURT:  Let me look at them.

1    MR. VEEDER:  I think we should make another exhibit on

2    that, your Honor.  I don't believe anybody can interpret

3    what that means.

4    THE COURT: Well, you ought to draw a blowup.  Better

5    blow it up.

6    THE WITNESS:  Did I read 18 R-1 into the record?  I

7    do not recall; the  Sweeney  well.

8         For the record, the distance of the

9    well, 18-R-1, is 2050 feet from the Pauba well.  Well 8 South,

10   2 West, 20 L-1, is 5550 feet from the Pauba well.  Well

11   17 G-1, the Studley well, is 3150 feet from the Pauba well.

12   Well 20 D-1 is 3200 feet from the Pauba well.

13   MR. MOSKOVITZ:  May I have that first distance again?

14   MR. DENNIS:  I wonder if he could put that on 29 J,

15   which is a much larger scale?

16   MR. VEEDER:  I would like to prepare a separate

17   exhibit on that, your Honor, if we may.

18   THE COURT:  All right.  Make a --   Can they use the

19   29 map for it?

20   MR. DENNIS:  Could you put them on the topogs?

21   MR. VEEDER:  We have the black and white map which does

22   pretty well if you use red markings on it.

23   THE COURT:  You mean the map here?

24   MR. VEEDER:  We have another map which is the base for

25   15.

1       THE COURT:  That is pretty small.

2       MR. STAHLMAN:  Your Honor, do we have to include all

3  this conversation?  This record is getting pretty expensive.

4       THE COURT:  All right, off the record.

5       (Discussion off the record.)

6       THE COURT:  All right.

7       MR. MOSCOVITZ:  Will you tell us what the depths are

8  that these wells have been drilled to?

9       A       The well 20 L-1 is reportedly 524 feet as

10  indicated by a driller's log.  Well 17 G-1 is 548 feet,

11  as reported by Mr. Hall.  Well 18 R-1 is shallow, as

12  reported by Mr. Hall.  Well 20 D-1 is 60.2 feet as measured

13  by the Geological Survey.

14       Q       Do you have the exact depth of well 18 R-1?

15       A       I do not have the exact depth of 18 R-1.

16       THE COURT:  By "shallow" you mean less than 100 feet?

17       THE WITNESS:  I do not know what Mr. Hall meant by

18  "shallow."  He indicated that it was just a small, domestic

19  well.  I would presume that it is in the neighborhood of 100

20  feet, but I do not know.

21       MR. STAHLMAN:  40 feet.

22       MR. DENNIS:  34.

23       MR. VEEDER:  Make it 45.

24       Q  BY MR. MOSKOVITZ:  Perhaps we can find the log in

25  Exhibit --

G-3

1    MR. DENNIS:  16-A 58.

2    THE WITNESS:  The log is not in Exhibit 16-A.

3    Q  BY MR. MOSKOVITZ:  I find a well here that is

4    marked 8 South, 2 West, 18 R-1.  It is 16-A 58.  Would that

5    be the well?

6    A    Oh, you mean is that 8 South, 2 West 18 R-1?

7    Q    There is a log here for such a well.

8    A    I am sorry; I failed to discover what -- I have

9    made out the record, then, during the lunch hour.

10   Q    The depth is indicated as 44 feet, is it not?

11   A    That is correct.  18 R-1 is 44 feet, from the

12   log.

13   Q    I want to ask some questions about the Exhibit

14   16-A 73.  As I look on the first page it appears to be

15   measurements of well 18 R-1, and that is the 44-foot well?

16   A    That would, according to the record that I am

17   looking at, the Exhibit 16-A 73, 8/2, 18 R-1, to the best

18   of my knowledge, is the well, the Sweeney well.

19   Q    Who made this record, 16-A 73?

20   A    This record was made by Robert L.  Waite.

21   Q    And are those his initials that appear under

22   the column "Measured by"?

23   A    Those are his initials.

24   Q    And who is Robert L. Waite?

25   A    Robert L.  Waite  is a geologist in the employ

1    of the United States Geological Survey.

2    Q    And can you tell from the exhibit when these

3    measurements were made and when they were recorded?

4    A    They were made and recorded during July 16, 17,

5    18, 19, 20, 22, 23, 24, 25; August 1, 2, 3, 4, 5, 6, 7 --

6    Q    Of what year?

7    A    1951.

8    Q    And, therefore, they covered the period during

9    which the Pauba well was test pumped?

10   A    That is correct.

11   Q    Now, by looking at the levels indicated on 16-A

12   73 for well 18 R-1, can any differences in well level be

13   noted during the period of pumping of the Pauba well?

14   MR. VEEDER:  I again state that the exhibit speaks for

15   itself.

16   THE COURT:  That is a good question.  He asked that

17   it be pointed out.  Are you trying this case just for the

18   record, or are you trying this to convince me of what the

19   facts are?  I haven't got it before me.  I can't see it

20   down there.

21   MR. VEEDER:  But George is suffering about how long the

22   record is getting, and I wanted to --

23   MR. STAHLMAN:  Not only that, I would like to ask Mr.

24   Moskovitz in relation to the answer the State had to put in

25   here, I wonder what their great interest is in this thing.

Kunkel - Cross

3856

1   I haven't seen him jump on anybody else except Vail's.  He

2   hasn't gone into any of these other wells with respect to

3   this situation.  I am just wondering.

4       THE COURT:  Let's go on.  Go ahead.  Have you another

5   question?

6       THE WITNESS:  The period of pumping of the Pauba well

7   from 7:43 p.m., August 3, 1951, through 11:56, August 3rd,

8   is shown on Plaintiff's Exhibit 16-A 73.  They are a series

9   of water level measurements during that period.

10      Q   BY MR. MOSKOVITZ:  Am I correct that the closest

11  measurement to the time when the Pauba well began pumping

12  is a measurement which was taken at 10:15 p.m. on August

13  3rd?

14      A       We are both considering another man's notes.  It

15  appears reasonable.

16      Q       And what is the depth to water indicated at

17  that time in the well 18 R-1?

18      A       August 3, 10:15 p.m., the depth of water was

19  9.48 feet.

20      THE COURT:  Was that one the nearest time when

21  pumping began?

22      Q   BY MR. MOSKOVITZ:  Mr. Kunkel, examine it.  Is

23  there a closer time?

24      THE COURT:  What significance is that?  Was there a

25  higher level later or a lower level later, or what?

Runkel - Cross                                                    3257

THE WITNESS:  On August 3rd, at 3:30 p.m., which was prior to the pumping the water level measurement was 19.55 feet.

Q  BY MR. MOSKOVITZ:  In other words, it was lower at 3:30 p.m. prior to the beginning of pumping than it was at 10:15 p.m., which was just after the pumping began?

A    Several hours after the pumping began, you are correct.

MR. VEEDER:  That is at the side of the fault.  There is no sweat about that.

Q  BY MR. MOSKOVITZ:  Now, am I correct that the closest time that 18 R-1 was measured to the time when the Pauba well stopped pumping is the time indicated as 10:10 p.m. on August 6th?

A    That appears correct.

Q    And what was the level indicated for well 18 R-1 at that time?

A    10:15 p.m., August 6th, the water level recorded is 19.31 feet.

H

Z62

Q   And am I correct, then, that the water level rose from the time that the Pauba well began pumping until the time that the Pauba well stopped pumping?

A   There was a rise of approximately .2 of a foot.

THE COURT:   Was there any time that the water level decreased in Well 18R-1 while the Pauba well was being pumped?

THE WITNESS: The water level apparently fluctuated.   There were minor amounts up and minor amounts down, a very normal occurrence ina water well.

BY MR. MOSKOVITZ:

Q   Within what limits did the fluctuation take place?

A   As I have indicated, the limits are approximately .2 of a foot.

Q   So am I correct that the readings of the level of Well 18R-1 indicates substantially no change during the time the Pauba well was being pumped?

A   During the time the Pauba well was being pumped there was substantially no change in water level in Well 18R-1.

Q   Now, the next well whose levels were measured was apparently 8 2 20 L 1; is thatcorrect?

A   From the records supplied, it appeared that the measurements in the Well 20L-1 were after the pumping in the Pauba well.

Q   After or before?

A   July 7th-- I am sorry-- July 7th and July 8th the

H

Z63

1   measurements were--

2       Q   The 17th and 18th, I believe; isn't that correct, Mr.

3   Kunkel?

4       A   Yes, you are correct.  It would still be before the

5   pumping of the Pauba well, under any circumstances.

6       THE COURT:   Was there any test made after the Pauba well

7   was pumped or while it was pumped?

8       THE WITNESS:   Not as indicated by that particular sheet.

9   BY MR. MOSKOVITZ:

10      Q   So this casts no light on the effect during the pumping

11  of the Pauba well?

12      A   That is correct.

13      MR. VEEDER:   I object to that, your Honor.   That is for

14  the Court to determine.

15      THE COURT:   I don't know what other answer there could be,

16  if there were no tests made during or after.

17      Go ahead.   What is the next well?

18  BY MR. MOSKOVITZ:

19      Q   The next well is 8 South, 2 West, 17G1, the Studley

20  artesian well; is that correct?

21      A   That is correct.

22      Q   Is that within levels measured or were measurements

23  made during the period the Pauba well was pumped?

24      A   There is a series of measurements from August 2, 9:25

25  A.M., through August 10, 6 P.M.

Runkel — Recross

H
Z64

1          Q   And am I correct that the closest measurement to the

2    time when the Pauba well began pumping was 9:35 P.M. on August

3    3rd?

4          A   There was a reading of pressure at the Pauba well at

5    9:35 P.M.   That is after pumping has started.

6          THE COURT:   You said Pauba.  You mean Studley?

7          THE WITNESS:   At the Studley well.   The Studley well was

8    a flowing well.   There was a device to measure that pressure

9    at the well.   At 2:50 P.M. the pressure was recorded at 3

10   pounds, at 9:35 P.M. the pressure was recorded at 3 pounds.

11   BY MR. MOSKOVITZ:

12         Q   And that is on the date August 3rd?

13         A   On the date August 3rd.

14         Q   What changes are indicated as having occurred during the

15   period thereafter when the Pauba well was being pumped?

16         A   The record plus information that has been reported to

17   me by the persons at the well indicate that they measured the

18   pressure as indicated-- I do not know what the device was, but

19   the device supplied by the Vail Company was on the well to

20   measure the pressure in the well.   There was also an estimate

21   and a measure of the flow in the well.

22         Does that answer your question?

23         THE COURT:   What were the effects of the pumping?

24         THE WITNESS:   As indicated from the record, the pounds

25   pressure decreased after pumping of the Pauba well started, and

H

Z65

1   field measurements of flow as the flow decreased from a value

2   that was reported to me of approximately 200 gallons per

3   minute--

4   BY MR. MOSKOVITZ:

5        Q   Is that on the record?

6        A   That is not shown on the record.  The flow decreased

7   to a OO pressure at 6:45 A.M.

8        Q   On what date?

9        A   August 6, 6:45 A.M., at which time there was no flow.

10       Q   No flow, or no pressure?

11       A   No pressure, and there was also no flow at that time.

12       MR. STAHLMAN:  I move to strike that portion of the answer.

13  It is not shown here that it was reported as a fact.

14       THE COURT:  Overruled.  These are received in evidence

15  not as a basis of fact, but as the basis for the opinion that

16  the witness gave.  As in many other instances where an expert

17  gives his opinion, he may give his reasons.  It is not received

18  in evidence as direct evidence of the fact that the flow of

19  the well dropped off to nothing and the pressure went to zero.

20  But he gives an opinion that there was an effect on the Studley

21  well by the pumping of the Pauba well, and this is one of the

22  reasons he gives for it.

23       THE WITNESS:  The persons who reported the information to

24  me are qualified Geological Survey employees.

25       THE COURT:  Just wait until you are asked questions.

H

z66

1          THE WITNESS:  I am sorry.

2          THE COURT:  It is your opinion, though, from the investi-

3    gation you have made and the facts you have ascertained and

4    the materials you have looked at that the pumping of the Pauba

5    well had an effect upon the Studley well?

6          THE WITNESS:  Yes, your Honor.

7          THE COURT:  All right.

8    BY MR. MOSKOVITZ:

9          Q  I believe you have indicated that the Studley well

10   is a fairly deep well, in your opinion?

11         A  It is 548 feet, as reported to me by Mr. Hall.

12         Q  And in your opinion that well penetrates older alluvium,

13   is that correct?

14         A That is correct.

15         Q  At what depth is the Pauba well perforated?

16         A  Without checking my notes, it is approximately 235

17   feet to approximately 2100 feet.  If you want the exact value

18   I will have to check the record.

19         Q  And the distance between those two wells is 3150 feet,

20   you testified?

21         A  That is the distance I scaled off from the measurements.

22         Q  And the distance between the Pauba well and the well

23   that you first testified about, 18R1, is 2050 feet?

24         A  Yes, sir.

25         Q  From Exhibit 16A73 does it indicate that there was a

H

Z67

1   complete cessation of flow from the Studley well as a result

2   of or during the time that the Pauba well had been pumped?

3       A   The record indicates that to me, yes.

4       Q   Does the record indicate to you that at 12 o'clock noon

5   on August 6th, 17 gallons per minute were flowing from the

6   Studley well?

7       A   That is correct.

8       Q   And wasn't that during the time the Pauba well was

9   still being pumped?

10      A   The Pauba well was not pumped continuously.  There we

11  breakdowns and other periods of shutdown which, in my opinion,

12  are reflected by the complete cessation of flow, and then the

13  Pauba well would shut down, the Studley well would start to

14  flow, and then they would do something to the Pauba well in

15  the process of test pumping and the flow in the Studley well

16  would again decrease.  But that is what it indicates to me.

17      Q   Where do you find any indication that the flow at

18  any time ceased entirely?

19      A   August 6th, 6:45 A.M., the point of zero pressure.

20      Q   And then subsequent readings after that point are

21  no longer in terms of pressure, are they?

22      A   No, sir, they are not.

23      Q   They are in terms of flow?

24      A   They are in terms of flow of gallons per minute measured

25  by Geological Survey personnel.

H

Z68

1      Q   Am I correct that at 10:30 P.M. of August 6th, which

2   is the closest time to the cessation of pumping of the Pauba

3   well, about an hour and twenty-six minutes prior to the pumping,

4   there was a flow of 6.6 gallons per minute from the Studley

5   well?

6      A   At 10:30 P.M., August 6th, the flow of the Studley

7   well as recorded is 6.6 gallons per minute.

8      THE COURT:  Do I understand that before the pumping

9   started the Studley well was flowing 200 gallons per minute?

10     THE WITNESS:  That is correct.

11  BY MR. MOSKOVITZ:

12     Q   Subsequent to the cessation of pumping of the Pauba

13  well, what does the record indicate occurred in the flow of the

14  Studley well?  Perhaps you can refer to the notations for the

15  date and time for the subsequent day.

16     THE COURT:  Just a minute.  I have a long-distance call

17  that I have to take.  I will be only a minute.  You can get

18  your answer all figured out.

19     (A pause.)

20     MR. MOSKOVITZ:  Do you recall the last question, Mr.

21  Kunkel?

22     THE WITNESS:  No, I do not.

23     THE COURT:  I thought you would have it all worked out.

24     THE WITNESS:  May I have the question?

25     (The reporter read the pending question.)

H

Z69

1      THE WITNESS:  The measurement at August 7th, 1 A.M.,

2  12 gallons per minute; 9 A.M., 27½ gallons per minute; 12:50

3  P.M., 37½ gallons per minute; 5:30 P.M., 5 gallons in  7 seconds,

4  42 gallons a minute; 7:40 P.M., 5 gallons in 7 seconds, 42

5  gallons per minute.

6      MR. MOSKOVITZ:  That is sufficient.

7      Q   That shows that the pump recovered on the day after the

8  pumping of the Pauba well ceased?

9      A   That is right.

10     THE COURT:  Mr. Veeder, you were shaking your head.  I

11 consider this as rather important testimony.

12     MR. VEEDER:  Sir, I didn't realize that I was shaking my

13 head.  I saw that it was quitting time is all.

14     THE COURT:  A few seconds ago.  Go ahead.

15 BY MR. MOSKOVITZ:

16     Q   Now, the next two sheets in this Exhibit 16-A-73

17 show measurements on Well 8 South, 2 West, 20D1; is that

18 correct?

19     A   That is correct.

20     MR. VEEDER:  I want the record to show that I do think

21 it is important evidence, your Honor.

22     THE COURT:  That is the 60-foot well?

23     MR. MOSKOVITZ:  Yes, that is the 60-foot well, your

24 Honor.

25     Q   And that well is 3200 feet from the Pauba well; is that

H

Z70

1    correct?

2        A   That is correct.

3        Q   Now, do the records of the levels in this well cover

4    the period during which the Pauba well was being pumped?

5        A   Yes, there are measurements on this well during the

6    period of pumping the Pauba well.

7        Q   Am I correct that the closest time to the beginning

8    of the pumping of the Pauba well which is shown in the records

9    of Well 20D1 is 9:50 P.M. on August 3rd?

10       A   That appears to be correct.

11       Q   And what depth to water is indicated at that time?

12       A   16.04 feet.

13       Q   I notice that the initials R.B. appear in the column

14    "Measured by."  Who would that be?

15       A   That would be Richard Boss.

16       Q   Who is Richard Boss?

17       A   He is an ex-employee of the U.S. Geological Survey.

18       Q   He was an employee at the time?

19       A   He was a geologist.

20       Q   He was an employee at the time these records were made?

21       A   Yes, sir.

22       Q   And subsequent to the beginning of pumping of the

23    Pauba well, does the record indicate any change in water

24    levels in the Well 20D1?

25       A   There is a minor fluctuation of a few hundredths of a

H

Z71

1  foot.

2      Q  The largest one seems to be up to 16.04-- that is, that

3  is the lowest reading in the succeeding period, and the highest

4  reading seems to be at 16.01 during the period the Pauba well

5  was being pumped; is that not correct?

6      A  15.99 is the shallowest depth to water before the

7  pumping of the Pauba well.

8      Q  I am talking about during the pumping of the Pauba well

9  from the first measurement to the last.

10      A  16.04 appears to be about the deepest water level

11  during the period of pumping.

12      Q  Do you find 15.99 between the time the Pauba well began

13  and the time the Pauba well ceased?

14      A  No.  That is prior to pumping.

15      Q  Now, what was the level at the time closest to the

16  termination of the pumping of the Pauba well?  Give the date

17  and the time and the level.

18      A  10 P.M., August 6th, which is still during the pumping

19  of the Pauba well, the very last measurement prior to the

20  cessation of pumping was 16.02 feet.

21      THE COURT:  He sums it all up that there were minor

22  fluctuations of a few hundredths of a foot.

23  BY MR. MOSKOVITZ:

24      Q  Now, the last sheet in this exhibit apparently contains

25  no well designation on it; is that correct?

H

Z72

1      A   That is correct.   It does not contain an identifying

2   number.

3      Q   And the dates of measurement are indicated as August

4   10th and August 11th, which is after the Pauba well ceased its

5   pump test; is that correct?

6      A   That is correct.

7      Q   So that sheet would not have any bearing on the effect

8   of the pumping of the Pauba well on the levels elsewhere;

9   would that not be correct?

10     A   That does not necessarily follow.

11     Q   Doesn't it cover a period of many days after the Pauba

12   well ceased pumping?

13     A   Yes.

14     THE COURT:   What well does it concern?

15     THE WITNESS:   In my opinion, it concerns the Studley

16   well.

17     THE COURT:   Does the record show the dates and the start-

18   ing out of the Pauba well pumping?   August 3rd at--

19     THE WITNESS:   7:43 P.M., August 3rd.

20     THE COURT:   And off and on to what date?

21     THE WITNESS:   11:56 P.M., August 6th.

22   BY MR. MOSKOVITZ:

23     Q   Mr. Kunkel, in making your investigation and reaching

24   your conclusions that you have testified to in this case, did

25   you consider any other records of well levels than the ones

H

Z73

1  about which you have just now been testifying?

2      MR. STAHLMAN:  Just a minute.  I object to the question

3  as being indefinite and uncertain.  Which conclusions are you

4  talking about?

5      THE COURT:  Sustained.

6      MR. MOSKOVITZ:  I will rephrase it.

7      Q  In your investigation of the upper watershed and in

8  your conclusions regarding the movement of ground water from

9  the area of older continental deposits to the Temecula Creek,

10  to the Murrieta Creek and to travel out to Camp Pendleton, did

11  you consider any other--

12      MR. VEEDER:  Out to where?  To travel out, did you say?

13      THE COURT:  Out to the beginning of the Santa Margarita.

14  BY MR. MOSKOVITZ:

15      Q  Did you consider any records of well levels from

16  pumping of the Pauba well than those which we have just now

17  been summarizing?  In other words, are these the only records

18  you have showing the effect of the pumping of the Pauba well

19  on other wells?

20      MR. VEEDER:  That is changing the question.

21      THE COURT:  Let the last question stand.  That is more

22  specific.

23      THE WITNESS:  In reply to your last question, these are

24  the only records that I have of this degree of precision.

25

H
Z74

1    BY MR. MOSKOVITZ:

2        Q   Now, do these records show that there was any effect

3    at all from the pumping of the Pauba well on levels of wells

4    drilled into the Recent alluvium?

5        MR. VEEDER:  I object to that.  There is not a single

6    well, perhaps with the exception of the Pauba well, that didn't

7    pierce younger alluvium on the way into the older alluvium.   It

8    is obvious.

9        THE COURT:  Overruled.

10       THE WITNESS:  Is there a question before me?  Could I

11   have the question repeated?

12       (The reporter read the pending question.)

13       THE COURT:  I understand your question to mean shallow

14   wells that only went into the Recent alluvium and didn't go

15   beyond it, such as the two wells described as 18R1 and 20D1.

16       THE WITNESS:  As I testified earlier, the results of the

17   Pauba testing in regard to the effect on the shallower wells,

18   I said, if I remember correctly, the records were inconclusive.

19   I drew no conclusions.

20       THE COURT:  You drew no conclusions as to the effect on

21   the shallow wells.  You drew conclusions as to the effect on

22   the deep wells?

23       THE WITNESS:  That is right.  With regard to the specific

24   test to which we have testified.

25       THE COURT:  I understand.

H

Z75

1          MR. MOSKOVITZ:  One further point.

2          Q  Do you know whether the Studley well has perforations

3     in the Recent alluvium?

4          A  I do not know the perforated interval in the Studley

5     well.

6          Q  Just to make sure that I am aware of all tests that you

7     know about.  Have there been any tests that you know about

8     which have recorded a change in water level of wells drilled

9     only into Recent alluvium as a result of the pumping of a well

10    drilled into the older continental deposits?

11         A  With regard to having actually examined a field record,

12    I have not examined such a record.  I do not know.

13         THE COURT:  If there is any real issue here, wouldn't it

14    be possible to pick a few selected wells and conduct a

15    pumping test?

16         MR. VEEDER:  A real issue of what, your Honor?  As to

17    whether there is a complete confinement between the deep

18    wells and the shallower wells?

19         THE COURT:  Well, as the case is proceeding, and looking

20    at charts in Exhibit 57, the study in Bulletin 57, Fallbrook's

21    Exhibit AA, which I just looked at, I would say that a couple

22    of issues are being tendered by the defendants with which

23    apparently the Government is in disagreement.

24         Number one is the extent of the underground basins that

25    are shown, the Government's evidence indicating that the

1  basins are much larger, at least the basin marked as 4 is

2  larger in area than the basin shown on Bulletin 57.

3      A second issue related to that, apparently, is a defense

4  contention of certain of the defendants that a bunch of the

5  yellow material shown in 25, in water unit No. 4 upper and

6  lower, is of a rather non-permeable material, apparently the

7  contention being that water will not pass through it in any

8  quantities into the Murrieta and the Temecula Basins 1 and 2

9  on Exhibit 17.

10      A third issue would be apparently a contention by some

11  of the defendants that pumping in the yellow area, Basin 4

12  upper and lower, shown on Exhibit 17, wouldn't particularly

13  affect basins 1 and 2.  And I suppose, conversely, that

14  pumping in 1 and 2 would not draw water out of basin 4 upper

15  and lower.

16      That is about all I can get out of what has been going

17  on here for four or five days.

18      Now, there are wells of various sizes throughout this

19  valley.  It seems to me that we could select a few selected wells

20  and make a supervised test and see what happens-- pump the

21  very dickens out of some of them.

22      MR. VEEDER:  Of course, I strenuously object to the

23  references to Bulletin 57, your Honor.

24      But it is true that we have no objection to running test

25  under controlled conditions that would be reflective of what

H

Z77

1   our contentions are, namely, that the Marine Corps is dependent

2   upon water that emanates from this large reservoir area.

3       THE COURT:  We will pass that up.  You might just think

4   about it.  It would be cheaper to run some tests than to spend

5   weeks here talking about some of the things that have or

6   haven't happened in the past.

7       MR. STAHLMAN:  I think your Honor, there should be a

8   little more light on the actual situation up there.  They have

9   been using those wells for a long period of time, and there are

10  some indications as to what can happen, and there are some

11  things that tests at a certain time won't show these things.

12      THE COURT:  All right.

13      MR. STAHLMAN:  A little engineering evidence here as to

14  what the practical outcome would be of certain tests and what

15  kind of tests would be run.

H2

16      THE COURT:  Now, another inquiry:  If it is the contention

17  of the State of California and those defendants who are

18  associated with the State of California and their legal

19  positions that there is no appreciable amount of water in

20  what the Government calls basin 4.

21      If, on the other hand, there are wells that pump water

22  out of that area, what is it-- where do they get the water?  If

23  they didn't pump the water, where would it go?  Is there any

24  doubt but that that water, somehow or other, would find its

25  way down to the very lowest part of the outlet where the Santa

H2

Z78

1    Margarita starts?  Water just doesn't lay around up there

2    without in some way getting down to that gap.  I suppose there

3    will be proof put on as to that.  But it seems to me that it

4    would be almost elemental that there would be some connection

5    between sources of water upland from what the Government calls

6    basin 1 and basin 2 and the outlet through the gap where the

7    Santa Margarita River starts.

8         MR. MOSKOVITZ:  Your Honor, the State has never contended,

9    and doesnot now contend, that there is not water in cthose

10   areas, area 4, for example, in the older continental deposits

11   and that wells may not be drilled and may not yield some water.

12   But we feel that it is the obligation of the plaintiff to show

13   that pumping from those wells is going materially to affect

14   the amount of water that goes out from Pauba basin down the

15   gorge.

16        MR. VEEDER:  Are we arguing the case now, your Honor?

17        THE COURT:  No, but I am asking for his position.  I am

18   willing to hear what he has to say.  I want to understand your

19   positions as we go along.  I don't like to try a case without

20   understanding what you are shooting at.

21        MR. MOSKOVITZ:  And that the information upon which Mr.

22   Kunkel has based his conclusions, we feel, is not sufficient

23   to show that there is any material effect, and we believe that

24   the only way you could really show that there is material effect

25   is by pumping, conducting the kind of tests that you, yourself,

H2

Z79

1    have suggested.

2        THE COURT:  I don't follow you in your statement that

3    there could be pumping of material amounts of water within the

4    watershed of the Santa Margarita without having some effect

5    upon the amount of water that would be available to go down.

6    If there is water in that watershed, in many instances it is

7    connected, and if the water is in a water basin within the

8    casement of the basement complex, as in Coahuila, where the

9    water then runs over the basement complex and gets down into

10   another area-- of course, if the water basin was lowered it

11   would take more water to fill it up again before it would

12   start to run out.  It must have some effect.

13       MR. MOSKOVITZ:  Your Honor, some is not the same as say-

14   ing that it is material.  For one thing, we don't think there

15   is evidence yet which shows that material amounts of water

16   can be extracted over that whole area.

17       Further, the problem is one of degree-- you put your

18   finger on it, and Mr. Kunkel at one point testified that the

19   difference would be the degree of interconnection between the

20   lenticular deposits.  What is that degree of interconnection?

21   How much water can move?  And how fast?  This has not been

22   shown yet.  And pumping tests would show it if you conducted

23   enough of them in the right places.

24       MR. LITTLEWORTH:  It is our position, your Honor, that

25   appreciable amounts of water do not move past the Wildomar

H2

Z80

1  fault from basin 4 on into basin 1.  The Murrieta area is

2  different from the Temecula end of the stream.  In Temecula

3  you get the stream carrying the water, and the water spreads

4  out into the basin and then it is captured again and goes into

5  another narrow area and then spreads out again.  What we are

6  talking about up at the Murrieta end is ground water which is

7  gradually moving from the upper area slowly down.  We don't

8  know how long.  Mr. Kunkel said himself that it might take years

9  for it to reach across there.  And all the cases say that the

10  speed with which ground water reaches a stream is one of the

11  factors in determining whether or not it should be considered

12  as part of a stream.  We think that when it gets to the Wildomar

13  fault there probably is some water that passes it.  We don't

14  think appreciable amounts of water pass through the fault zone.

15  What happens is, as demonstrated by the line of rising water

16  there, the fault acts as a barrier and it is forced to the

17  surface.

18      Now there is still some rising water.  What happens to it?

19  Most of it evaporates now.  Apparently some is being ponded by

20  some little dams.  How much water, if you were not pumping,

21  would rise to the surface and then not evaporate and would

22  go on down through the gorge, there is no evidence on that.

23  We don't think that the pumping in that area is going materially

24  to affect the amount of water which is getting down to Camp

25  Pendleton which is coming primarily from the Temecula end and

H2

Z81

1   is coming off of the southerly hills feeding basin 1.  Now

2   that is passing on down.  But we think that the pumping above

3   is, for practical purposes, pretty well barred by the Wildomar

4   fault.

5        THE COURT:  I shouldn't speak out of turn-- I haven't heard

6   a lot of evidence, but I will put it this way.  It is no con-

7   clusion.  It is just a question.  If there were just small wells

8   up in that orange section in Basin 4-- windmills, stock wells,

9   et cetera-- I wouldn't have much concern about it.  But if there

10  are wells up in that area that produce goodly amounts of water,

11  then somebody is going to have the burden of showing me that

12  that water is completely isolated from the rest of the water

13  that reaches the stream.  Maybe I will change.  It is very

14  tentative.  It is more of a question.  It is hard for me to

15  see, if there were substantial wells up in there, how there

16  could help but be some connection.  The area is in the water-

17  shed.  It would have to be belated in one way or another with

18  other parts of the watershed.  Now, if there are just minor

19  wells, springs that crop out here and there, and stock wells,

20  that is one thing.  But if there are some good-sized wells there

21  that are pumped, what happens if they are pumped?  What happens

22  if they are not pumped?  It is hard for me to believe that the

23  situation is identical whether they are pumped or not pumped.

24  If they are not pumped, the water would have to go somewhere.

25       MR. LITTLEWORTH:  We think that is  important, but we don't

Runkel   Cross

3258

H2

Z82

1    think the Government has come anywhere near proving that so

2    far.  All they have proved is a theoretic case that water can

3    perhaps--

4        MR. VEEDER:  We have one witness.

5        THE COURT:  Please understand what I am saying.  I am

6    trying to understand theproblems that are presented.  I think

7    I know the issue that is being tendered here between you.  I

8    want to keep my eye on this issue that is in dispute as we

9    go along and judge the testimony as it comes in.

10       From looking at the rest of the map-- I haven't made any

11   complete comparison, but there is a lot of similarity between

12   the findings in Bulletin 57 on these smaller basins and the

13   findings of the Government.  This seems to be the real area

14   of disagreement.

15       MR. MOSKOVITZ:  Your Honor, what we have been attempting

16   to show is that on geological testimony alone it is not

17   reasonable to conclude that there could be a drying up of the

18   river.  That is the point.

19       MR. VEEDER:  This amazes me.

20       THE COURT:  We understand, you have put on only one

21   witness.

22       MR. VEEDER:  But here we are going into the record, you

23   see.  Mr. Moskovitz comes along talking about this Buck Rogers

24   edition.

25       THE COURT:  Wait a minute.  Is there anything wrong with

H2

Z83

1  counsel telling what their positions are?  It is not wrong in

2  my court.  From time to time I will ask you what your positions

3  are on certain matters.

4       MR. STAHLMAN:  I am not objecting to that at all.  I think

5  the discussion is good.  I am just wondering if we need this

6  part in the record.

7       MR. LITTLEWORTH:  We have no objection to having it on

8  the record.

9       THE COURT:  Let's go off the record.  After this, if you

10 want me to ask questions off the record, I will be glad to

11 ask them off the record.  It doesn't mean anything to me.

12      Off the record.

13      MR. VEEDER:  There is no sense of my going off the record

14 now.

15      THE COURT:  Put Mr. Veeder on the record.

16      MR. VEEDER:  I know this will be mailed to a Congressman

17 or a Senator and I know there will be speeches by Mr. Sachse

18 and Mr. Moskovitz in regard to the present status of the law-

19 suit.  That is what causes me concern.

20      THE COURT:  I wouldn't be concerned.

21      MR. VEEDER:  I would.  My job is very, very dear to me,

22 your Honor.

23      THE COURT:  I think you have been doing a pretty good

24 job.

25      MR. VEEDER:  I think I have the finest witness and the

H2

Z84

1    finest exhibits I ever saw.

2       THE COURT:  I think you have been doing a pretty good

3    job.  But the case is just started.  I just want to know the

4    issue we are having to meet, and I think I do.

5       Well, all right.  Be here tomorrow again, gentlemen?

6       MR. VEEDER:  We will try and make it, your Honor.

7       MR. DENNIS:  Your Honor please, two of these wells we

8    are talking about we have no logs on as yet.. The State has

9    no record of the logs.  There is no log put in evidence.  They

10   are-- I am referring to 82 17G1 and 82 20D1.  They are both

11   on the Vail property.  I presume that the Vails have the logs.

12   I wonder if they couldn't be produced.

13      THE COURT:  Inquire privately and see if you can't get

14   them.

15      MR. STAHLMAN:  We have produced every well log, and will

16   produce every log, if Mr. Dennis wants them, in the condemnation

17   of the Vail dam.  That's his only interest.

18      (Adjournment until Thursday, October 16, 1958, at 10

19   A.M.)

20

21

22

23

24

25