

Vol 34

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

———

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

———

UNITED STATES OF AMERICA,

                   Plaintiff,

vs.

                             No.  1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                   Defendants.


REPORTER'S TRANSCRIPT OF PROCEEDINGS


Place:       San Diego, California


Date:        Friday, October 17, 1958


Pages:   3385 to 3506

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ Deputy

MALCOLM LOVE
and
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211  -  Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,     )
                              )
              Plaintiff,      )
                              )
     vs.                      )          No. 1247-SD-C
                              )
FALLBROOK PUBLIC UTILITY      )
DISTRICT, et al.,             )
                              )
              Defendants.     )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Friday, October 17, 1958

APPEARANCES:

     For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                Special Assistant to the
                                Attorney-General,
                                Department of Justice,
                                Washington, D.C.

| | |
|---|---|
| For U. S. Marine Corps | COL. ELLIOT ROBERTSON. |
| For Defendant Vail Co. | GEORGE E. STAHLMAN, ESQ. |
| For Defendants Fallbrook Public Utility District, et al., | FRANZ R. SACHSE, ESQ. |
| For Defendant State of California | EDMUND G. BROWN, ESQ., Attorney-General, by ADOLPHUS MOSKOVITZ, ESQ., Deputy Attorney General. CARL BARONKAY, ESQ. |
| For Defendant Santa Margarita Mutual Water Company | W. B. DENNIS, ESQ. |
| For Defendants Hartman, Lewis, Wilks and Bayle, and Oviatt | BEST, BEST & KRIEGER, by ARTHUR L. LITTLEWORTH, ESQ. |

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| H. M. Hall | | | | |
| (By Mr. Moskovitz) | | 3391 | | |
| (By Mr. Littleworth) | | 3405 | | |
| (By Mr. Dennis) | | 3415 | 3443 | 3480 |
| (By Mr. Moskovitz) | | 3474 | | |
| Walter Hofmann | 3481 | | | |

| EXHIBITS | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| Plaintiff's Exhibit | | |
| 96 - Clod of mesa silt | 3460 | |
| 79-A | | 3492 |
| 79-B | | 3492 |
| 79-C | | 3492 |
| 79-D | | 3492 |

SAN DIEGO, CALIFORNIA, FRIDAY, OCTOBER 17, 1958, 10:00 A.M.

---o---

THE CLERK:  Number one on the calendar:  1247-SD-C, United States vs. Fallbrook.

MR. VEEDER:  Your Honor, you had mentioned to me last evening the pretrial order on issues and exhibits.  And I inquired in regard to the approval of that document by the counsel.  I hand to your Honor a stipulation signed by counsel, the stipulation being dated October 1, 1955.  I think that meets your Honor's desires in regard to a reflection of approval of the form among counsel.

THE COURT:  All right.  Good enough.  The stipulation maybe filed, and I will sign the order.

MR. VEEDER:  Now, I have this form of agreement as to orders of pretrial signed by Mr. Sachse on behalf of certain of his clients.  I don't have the same document by others, but I assume we can get that signed, also.

THE COURT:  What order is that?

MR. VEEDER:  (To Clerk)  Would you hand this to his Honor.

THE COURT:  Mr. Sachse has signed --

MR. VEEDER:  Both documents.

THE COURT:  He has only signed for Fallbrook on the issues.

MR. SACHSE:  Also, there is a separate document for the four major, for my major defendants.  I have not signed for that tremendous list of individuals, your Honor, on the issues.  I did sign for facts.  I would be perfectly willing to if your Honor desires me to.

THE COURT:  I am just talking about the major defendants.  Where did you sign for them?

MR. SACHSE:  There is a separate document.  I don't know whether --

THE COURT:  This is --

MR. VEEDER:  That is right.  I think you list yours separately.  We have a special --

THE COURT:  Oh, yes.

MR. VEEDER:  That is right.

MR. SACHSE:  I think I covered every one Mr. Veeder wanted me to sign for, as the major ones.

MR. VEEDER:  That is right.  His Honor indicated his desires in that regard.  We drew the form, and you signed it.

THE COURT:  It is just not clear.  Mr. Sachse agrees to be bound by the orders in pretrial stipulation dated May 8, 1958.  That was on the facts.

MR. SACHSE:  That is on the facts, yes.

THE COURT:  And the stipulation on pretrial to which the last mentioned order pertains.  I suppose that means the

1    new stipulation?

2      MR. SACHSE:  That is the intent of Mr. Veeder.

3      THE COURT:  "Stipulate as to the issues and exhibits."

4    I have inserted that so we will know which one it means.

5      MR. VEEDER:  Now, will your Honor desire to have all

6    counsel sign a similar document where they represent more

7    than one client?

8      MR. STAHLMAN:  Do we get a copy of this?

9      MR. VEEDER:  Oh, yes.

10      MR. STAHLMAN:  I haven't seen it yet.

11      MR. VEEDER:  We are having a trial balloon on Mr.

12    Sachse.

13      MR. STAHLMAN:  It may never come back to earth.

14      MR. VEEDER:  Well, it may come down a ways.

15      THE COURT:  Will you have this duplicated?

16      MR. VEEDER:  Yes, your Honor.

17      THE COURT:  All right.

18       Mr. Clerk, you check and find out who of these

19    major parties have signed and who haven't.  We will ask

20    them to join it later.  I don't know who they are.  We

21    won't take time now to do it.

22      (Discussion off the record.)

23      THE COURT:  Mr. Hall, will you come back to the

24    witness stand and subject yourself to the merciless cross

25    examination?

1              H. M. HALL,

2    having been previously sworn as a witness on behalf of the

3    plaintiff, resumed the stand and testified further, as

4    follows:-

5

6              CROSS EXAMINATION   (Continued)

7    BY MR. MOSKOVITZ:-

8         Q    I have a few questions to conclude.  Mr. Hall,

9    yesterday there was some confusion about the correct

10   location and correct number designation of the McSweeney

11   well.  Have you had occasion to check that?

12        A    I have, and I can correct it by putting in the

13   record that the well No. 8 South, 2 West, 18-R-1 is the

14   McSweeney well; 44 feet deep.

15        THE COURT:  It is 18-R instead of 13-R, is that right?

16        THE WITNESS:  The well No. 13-R is the next township

17   west of that and is one of the Vail test wells.

18        THE COURT:  So it is in Section 18, not in 13?

19        THE WITNESS:  Right.

20        THE COURT:  It is incorrectly shown, then, on --

21        THE WITNESS:  It was incorrectly located on Exhibit 15.

22        MR. MOSKOVITZ:  15-1.

23        THE WITNESS:  15-1.

24        THE COURT:  You will correct it during the recess?

25        THE WITNESS:  I will.

1      THE COURT:  Fine.

2      Q  BY MR. MOSKOVITZ:  Now, did you mean to locate

3  13-R-1, also?

4      A    It doesn't do any harm, but it was not brought

5  up for any reason.

6      THE COURT:  There is a well 13-R-1?

7      THE WITNESS:  Yes.  Yes, one of our old test wells;

8  but it has not been -- and it has not appeared in the

9  testimony anywhere that I know of.

10     THE COURT:  All right.

11     Q  BY MR. MOSKOVITZ:  I believe there was another --

12     MR. VEEDER:  On page 3381?

13     MR. MOSKOVITZ:  3381, yes.

14     Q  BY MR. MOSKOVITZ:  There was some question that was

15  left open as to --

16     MR. VEEDER:  Bill, would you hand that to his Honor.

17  The Court asked a question about an abandoned well, and I

18  think we might as well straighten that out now.

19     THE COURT:  All right.  What are you looking at?

20     MR. MOSKOVITZ:  I am looking at page 3380 and 3381 of

21  yesterday's transcript.  And there was a question about a

22  well designated as 1-p-3.

23     THE WITNESS:  I have a clearance on that which will

24  explain the locations, and three or four wells in that area

25  all have the same designation except for the final number.

They are all 8 South, 3 West, 1-P -- 1, 2, 3, and 4.

THE COURT:  They are nearby?

THE WITNESS:  They are close together, yes.  Three of those wells are on the east, easterly boundary of the old Cantarini ranch which was purchased recently by the Vail Company.  And the other two wells are up in the northerly corner of that ranch.

THE COURT:  All in Section 1 there?

THE WITNESS:  Yes.

THE COURT:  Of 8 South, 3 West?

THE WITNESS:  Right.

THE COURT:  And all in the Subdivision P?

THE WITNESS:  And all abandoned and out of use except for measuring purposes, except the one that the State has not numbered, 1-P-2, which is an active well and producing around 700 acre-feet per year.  And I have the log of that, but it is also in the State publications.

Q BY MR. MOSKOVITZ:  The designation in Bulletin 57, which is Fallbrook's AA, on page F-32, the well 1-P-3 is abandoned, then; correct?

A     Yes, so far as use is concerned.  It is still there and being used for measurements only.

Q     And that is the well which you located on Exhibit 15-1?

A     Yes, except that in the scale of that map all

3394

the wells would be practically in that same spot.  If you change the designation, it would still be correct.

Q     I think that clears up the two questions which were left open.

Mr. Hall, yesterday we had some testimony from you about observations which you made on the level of the little Temecula school house well during the times when the Cantarini well was being pumped?

A     Yes.

Q     Did you inform Mr. Kunkel about those observations?

A     I haven't ever kept them a secret, and we have always talked about indications in the valley.  And I think probably I did talk it over with either him or Mr. Hofmann as to the course of the old river; geologically old.

Q     And also about the observations you made of water levels in the school house well, Temecula school house well?

A     I don't remember ever mentioning that to him.  I may have.

Q     Do you remember mentioning to him any observations or tests which you conducted as to water levels of any other wells at a time when a pump well was being operated?

A     Yes, I do.  One in particular; well No. 30, which is half a mile or more from well No. 30-A in the upper portion of Pauba Valley.

3395

Q        Does it have another location number?

A        It has.  Yes, it does.  I think I can give you that.  Oh, I don't have a record of that; but it is in the publication of the State, Bulletin 57 as well No. 30, and the number would be there.  And 30-A.

Q        I show you Volume II of Bulletin 57 --

MR. VEEDER:  I renew my objection to the reference to Bulletin 57.

THE COURT:  Overruled.

Q  BY MR. MOSKOVITZ:  And page F-55 and --

MR. VEEDER:  May I inquire now:  Is the State making an offer of Bulletin 57 or is it not, or is it simply throwing out everything but Chapter 2, as you indicated previously?

MR. MOSKOVITZ:  At this time we are merely having Mr. Hall refer to it for purposes of identifying the well.

MR. VEEDER:  I would like to have the question answered, your Honor.

THE COURT:  That is the answer, Mr. Veeder.  That is all that is being done now.  A certain well lies in here which the witness has referred to.  Objection is overruled.

What is the number of the well?

THE WITNESS:  8 South, 2 West, 11-J-1 is the pumping well, No. 30, and Vail Company numbers.  It is a production well for irrigation.  11-J-2 is a well directly between

11-J-1 and the river, about halfway between and some half-mile distant from well No. 30.  That was put down only for water plain measurements.  We installed a  Lietz recorder, water stage recorder, on well 30-A or 11-J-2 and noted that when well No. 30 was started within a couple of minutes of time, a few minutes, more or less, well No. 30-A showed an immediate abrupt drop in water plain.

Q  BY MR. MOSKOVITZ:  Now, Mr. Hall, what is the depth of well 11-J-1, that number, would you say?

A    11-J-1 is shown here as 119 feet deep.

Q    Is that correct, to your knowledge?

A    I never found any errors in these tables, but I thought that well was deeper than that when it was originally drilled.  But I can't --  Yes, I have the log here.

Q    Are you now checking with some of your own notes, Mr. Hall?

A    Some of my own records, yes.

THE COURT:  All of those wells are north of the river?

THE WITNESS:  Yes, they are.  Yes, 119 feet is the correct depth of well No. 30.

Q  BY MR. MOSKOVITZ:  And what is the depth of the well No. 30-A or wells numbered 11-J-2?

A    122 feet.

Q    And that is designated also in the table of Bulletin 57 to which I have referred?

A    Correct.

Q    Are these wells pressure wells?

A    No.

Q    They are what you would call shallow wells reflecting the water table in the recent alluvium; is that not correct?

A    Yes, that is correct.

Q    When were these observations or tests that you refer to in comparing the level when well 11-J-2 and well 11-J-1 was being pumped?  When were those tests conducted?

A    In 1926 and '27.

Q    Did you inform Mr. Kunkel about any other tests?

MR. VEEDER:  I object to this cross examination, your Honor.  It is totally and completely improper.  It goes beyond the scope of the direct examination.

THE COURT:  Sustained.  What he told Mr. Kunkel is not material.

Q  BY MR. MOSKOVITZ:  Mr. Hall, did you make any other tests or make any other observations of the effect on the level of water in one well from the pumping in another well?

A    Not in particular, but in general it is noted that water plane   has a continuity throughout that Pauba

3398

Valley.  So that if we pump one well heavily, it shows up
in another well.  And for instance, a pumping of the J.K.
well affects the windmill well, and the pumping of our new
No. 10 well also affects the windmill well.  And it has
been noted throughout that heavy pumping in one area has
its influence across to other wells.

Q     And you have actually noted these results that
you have just testified about rather than --

A     Yes.

Q     -- concluded that they must happen?

A     Yes, I have, yes.

Q     And where is the J.K. well?

A     J.K. well is in the upper part of the Pauba
Valley.  I could identify it.

THE COURT:  You say J. K.?

THE WITNESS:  J. K.  Some say it stands for gin cocktail,
but others say it is Joe Kalb, an old rancher.

Q  BY MR. MOSKOVITZ:  J. K. is the Vail Company
designation?

A     Yes.  It is well No. 8 South, 2 West, 12-K-1.

Q     And what is its depth?

A     155 feet.

Q     What is the distance between that well and the
river?

A     Oh, --

Q        If you can estimate it.

A        Oh, between a quarter and a half-mile, probably.

Q        And I believe you testified that you noted a change in the level of another well when the 12-K-J or J. K. well was being pumped.  What other well is that?

A        It is called a windmill well, our key well, No. 8 South, 2 West, 12-H-1.

Q        And when did you note such effect?

A        It has just been a general history.  I couldn't give any particular dates.

Q        How far is the windmill well 12-H-1 from the J. K. well, 12-K-1?

A        Something like half a mile.

Q        Do you have any recollections of the time that it took for the effect to be noted?

A        No, I haven't.  Time would be difficult to measure without automatic recorders, and we didn't have them on those wells.

Q        Do you have any recollections as to the depth or amount of drop in level in the windmill well from the pumping of the J. K. well?

A        That has not been noted.  What it was in feet or inches, I don't know.

Q        Now, I believe you also mentioned another well whose pumping affected the level of the windmill well.

1    What was this other well?

2        A    It is a new well, in our parlance called No.

3    10.  I don't think the State has given it a number.

4        Q    When was that drilled?

5        A    But it is directly, approximately directly

6    south of the windmill well and close to the river some

7    half-mile distance from the windmill well.  And it was

8    drilled within the last couple of years.

9        Q    And what is the depth of that well, if you

10   recall?

11       A    It is deeper than the wells we have just been

12   referring to, but I can't recall the depths; and I don't

13   have it with me.

14   MR. STAHLMAN:  Mr. Moskovitz, for my information, is

15   that last well, No. 10, is that the well I visited with

16   you at the time it was being drilled?

17   THE WITNESS:  Yes.

18   MR. STAHLMAN:  Thank you.

19   MR. VEEDER:  The question is addressed to Mr. Moskovitz,

20   and Mr. Hall answered.

21   MR. STAHLMAN:  What I meant was "Mr. Hall."

22   MR. VEEDER:  It was not Mr. Moskovitz?

23   MR. STAHLMAN:  I never had him that close to a well.

24   MR. VEEDER:  It gives me an idea.

25       Q   BY MR. MOSKOVITZ:  Mr. Hall, is a windmill well

1    a gravel-packed well?

2        A    No.

3        Q    At what depth is it perforated?

4        A    I don't know.  It was drilled in 1904 along with

5    that series of wells of which the Studley is one.  And I

6    don't know where it is perforated, but in 1915, a well

7    driller named  Hunsaker  reperforated the well and cleaned

8    it out.  And I don't have with me his testimony as to

9    where those perforations are made.

10       Q    You do have that information here in the court-

11   room?

12       A    I believe so.

13       Q    Could you find it quickly or will it take you

14   some time?

15       A    No, it can be quickly done.

16       Q    Please see if you can find it.

17   MR. VEEDER:  May I have that last question again,

18   please.

19       (The reporter read back the question and the answer.)

20   THE WITNESS:  My notes do not include the points of

21   perforation of that well.

22       Q  BY MR. MOSKOVITZ:  Mr. Hall, I show you Exhibit

23   16-A 49.  I ask you whether this is not the well log of the

24   Windmill well?

25       A    I believe it is.

A-3

1    Q    And from the well log could you give an opinion

2    as to the levels from which the Windmill well would be

3    taking water?

4    A    Yes.   Throughout practically its whole depth

5    it takes water in greater or lesser degrees as the material

6    is more cemented or more open.

7    Q    And at what levels is the material more open?

8    A    At many throughout the log.   You want them all

9    named?

10    Q    Give me the levels at which the materials are

11    open the greatest, that is, having greatest amount of

12    permeability from what you can see from the well logs.

13    A    Bearing in mind that this well was drilled in

14    1904, and we have no records of the original driller, that

15    it was reperforated in 1915 by a blind man, I can't speak

16    with definite fact; but it shows here gravel and sand down

17    to 70 feet and sand down 28 feet more and water gravel

18    down 29 feet more, and then --

19    Q    That is to a total depth of 130 feet?

20    A    217 feet.   130 --   Excuse me.   Yes, you are

21    right.

22    Q    Yes.

23    A    And then gravel down to a depth of 219 feet, and

24    more gravel at a depth of 283 feet, and more fine sand at

25    339 feet depths; and from then on down he doesn't indicate

any very loose material.  But I know Mr.  Hunsaker,
what he calls sandstone.  I have a piece in the courtroom
of what he called sandstone.  I have the depths here of
well No. 10, which goes back to your previous question, if
you desire to enter it.

Q     Well No. 10 is this new well?

A     New well; 317 feet deep.

THE COURT:  Which well is this?

THE WITNESS:  It is the well directly south of the
Windmill well and which has been drilled too recently to
be numbered by the State.

Q  BY MR. MOSKOVITZ:  And you noticed an effect in
the Windmill well when that new well No. 10 was pumped,
is that correct?

A     Yes.  Yes.

Q     From the log of the Windmill well, would you
just examine it, would it not be your opinion that the
Windmill well is drawing at least part of its water supply
from the recent alluvium?

A     It is just like all the other wells we have
drilled in that, that the very upper surface is probably
recent alluvium.  But where it merges into older alluvium,
I can't tell by the log; and the well draws water from its
whole depth; so it must be some from the so-called recent
alluvium and some from the older.

1    MR. MOSKOVITZ:  I have no more questions.

2    MR. SACHSE:  I have none of Mr. Hall, your Honor.

3    MR. LITTLEWORTH:  I have some, your Honor.

4    THE COURT:  Yes, all right.

Hall          Cross                                    3405

B
Z4

CROSS-EXAMINATION

MR. LITTLEWORTH:  If we can get back to where I can see Exhibits 15 and 17.

MR. VEEDER:  Your Honor, there has been a request for a well log by Mr. Dennis.  Do you have that well log with you, Mr. Hall?

THE WITNESS:  I do, yes.

MR. DENNIS:  Two well logs.

MR. STAHLMAN:  Put them in evidence by Mr. Dennis.

MR. VEEDER:  Are you going to cross-examine, Mr. Dennis?

If you are going to cross-examine, that's different.  I thought you had shook your head no.

THE COURT:  Let's go ahead with our cross-examination.

BY MR. LITTLEWORTH:

Q  Mr. Hall, you testified to some of these observations that you made in the '20's between the Cantarini pump well and the Temecula School House well.  Have you observed the effect between those two wells at any time since the '20's?

A  No, I have not, because I have not looked for it.

Q  Is it your opinion that the effect across the Wildomar fault between those two wells is caused by this channel of the old river bed?

A  Undoubtedly it has an influence on the time of the relative lag and the quantity of the effect, but the Wildomar fault line is not evident at all on the surface through there

B

Z5

1    and the stream crosses it as though there were no fault there.

2        Q  In your opinion, then, the Wildomar fault at that point

3    might be deep enough so that it is covered by younger alluvium

4    and the effect would be felt straight across the top of the

5    fault through the younger alluvium?

6        A  No, I don't think it could do that because of the

7    elevations of the wells where we noted the effect in the logs

8    of the wells, but the absence of indication of the fault line

9    is where the river crosses it.  But the toe of the abrupt

10   slopes of the south mesa of Pauba Ranch would indicate to me

11   a definite location for the fault line.

12       Q  Do you think the effect between these two wells, which

13   I understood you said was rather close in time--

14       A  Yes.

15       Q  --is caused by water percolating through the fault or

16   because of what you have termed this old river channel which

17   runs either through or over the top of the fault?

18       A  I think the short time lapse is probably due largely

19   to the openness of the old river channel.  But the nature of

20   the effect is not dependent upon the old river channel, in my

21   judgment.

22       Q  Mr. Hall, I think you testified also yesterday that the

23   pumping of any irrigation well on the Vail property showed an

24   effect on the Temecula runoff.  Did you mean by that the pumping

25   of any well in Pauba Valley, which is essentially this Basin

No. 3 on Exhibit 17?

A   Yes, I did.

Q   You also testified yesterday that any pumping to the east of the Wildomar fault line would affect the surface runoff of Murrieta Creek; is that correct?

A   That is, yes.

Q   Have you observed the effect of the pumping of any wells in the upper basin of basin number 4 on Exhibit 17 on the surface runoff of the creek?

A   I have observed what I considered at the time a definite effect, but there were no measurements; that was the pumping of Well No. 131 of the Murrieta Valley series, which is the Shrode well, and the effect on the springs where a little dam was shown corraling water from the springs, called the Sheep Camp Spring in our vernacular.

Q   That effect that you saw was on the rising water and not on the flow of Murrieta Creek itself?

A   Well, since one contributes to the other and there was no flow in the Murrieta Creek at that exact point, I would still consider it an effect on the Murrieta Creek because there is rising water in Murrieta creek bed just below there.

Q   But you observed the effect on the line of rising water at the fault line and not in the creek bed?

A   Yes.

Q   When did you make this observation?

B

Z7

A   In 1927.

Q   Have you made any similar observations since that time?

A   No, we have had no occasion to make any, to do any pumping or measurements in that area since the other lawsuit.

Q   How far is the Shrode well from the line of rising water where you indicated some change, approximately, Mr. Hall?

A   Oh, it is probably more than two miles.

Q   Do you remember what that effect was?

A   As I said before, it was an observed effect that I and my assistant and the two well drillers all thought was correct, but we made no measurements; so it was only an observed decrease in the normal flow from the Sheep Camp Spring.

Q   Well, do I understand you correctly that you observed the rising waters to decrease in flow?

A   Yes.

Q   Over what period of time did this observation take place?

A   Just the period when we pumped the well and came down past Sheep Camp Spring after pumping the well.

Q   Do you know how long this effect took to take place?

A   No, I do not.

Q   Do you know in terms of quantity, Mr. Hall, what the effect of pumping any wells in the upper part of basin 4 has been on the flow of the Murrieta Creek?

A   No, I do not know as to quantity.

Q  And I take it you don't know how much ground water or how fast it has been moving across basin No. 4?

A  That is correct.

MR. VEEDER:  Your Honor, I am going to object to the use of the term "basin" there.  I don't believe we have used the term "basin."  I think they are water storage units.  I think there is a very marked difference between a basin and ground water units, and I think counsel ought to refrain from interpolating into the record the term "basin."

MR. LITTLEWORTH:  I think, your Honor, the record is replete with the designation of unit No. 4 as basin 4.

THE COURT:  I have used the term.  I may have been in error, but I used it various times.

MR. LITTLEWORTH:  I am referring, at any rate, to storage unit No. 4 designated on Exhibit 17.

Q  Now, Mr. Hall, in your judgment, would the effect on the runoff of Murrieta Creek on pumping of any well be less as you move to the north of the orange area shown on Exhibit 15?

A  I can't say that the quantity would be less, but I could say that the time would be delayed-- a greater interval of lag.

Q  Don't you think there are some wells in that area whose pumping has little or no effect on the runoff of Murrieta Creek.

Hall     Cross

B

Z9

A   Now you have introduced the question of size, and where you reach an appreciable effect or a not appreciable effect, and to my notion there is no threshhold there that can be determined by anybody or agreed upon by any two engineers.

Q   Now, the effect of the pumping of any well in storage unit No. 4 on the runoff of Murrieta Creek is going to vary area by area, is it not?

A   The quantity effect I don't think would vary area by area; but the time, especially the lapse of time between effects, between cause and effect, would vary greatly.

Q   Isn't the effect that the pumping of any well has on the runoff dependent upon more than just how much water is pumped?

A   Yes.

Q   It is dependent upon recharge of the basin and where the water is used and the permeability of the soil, and probably other factors, isn't it?

A   Yes.

Q   Well, Mr. Hall, is there any way that you can really tell what the effect of pumping a well in basin or storage unit No. 4 has on the runoff of Murrieta Creek?

MR. VEEDER:   I object to that, your Honor.  That is far too vague.  How could he possibly be requested to speculate on such a matter?  A well in one place might have an effect--

Z10

MR. LITTLEWORTH:  Your Honor, I think this is extremely important.  It is my contention that actually there is not sufficient data or sufficient scientific methods really to determine what the effect is, and that is all I am asking this witness.

THE COURT:  Overruled.  Do you understand the question?  Read it.

(The reporter read the pending question.)

THE WITNESS:  I don't think there is any way to measure the quantity of the effect or the result, but after making a thorough examination of an area it seems just as obvious to me that if you take water out of that area it is going to decrease the amount that runs off from that area as it does if you take a cup of water out of a bucket.

BY MR. LITTLEWORTH:

Q  But you don't know of any way to measure how much the effect is or how fast it takes place?

A  No, I do not, without a great deal of study of the area.

Q  Well, now, are you familiar with Mr. Yoder's wells?

A  Not in detail.

Q  You know that he is located in this storage unit No. 4, isn't he?

A  Yes, he is.

Q  And he drills hot water-- as a matter of fact, he uses

B

Z11

the water to heat his house with, doesn't he?

A  Yes.

Q  You don't contend that his pumping has any effect on the runoff of Murrieta Creek, do you?

A  I do, yes.

Q  Isn't that hot water hot only because it is confined in some type of channel?

A  It is hot because it has come up from depths deep enough to be heated by the heat in the earth.  It is not due to confinement.

Q  It is mineral water, too, isn't it?

A  Hot water always dissolves more minerals than cold water.

Q  Do you think that hot mineral water helps to feed Murrieta Creek?

A  I do, yes.

Q  Say the same thing about Murrieta Hot Springs?

A  Yes.

Q  What about Mr. Borell-- Do you know where his ranch is?

A  Only approximately.

Q  Let me ask you this question, then:  Do you think that pumping in Sections 13 and 14--

A  I think he is in the gray material shown on the map.

MR. VEEDER:  Your Honor, that is beyond the scope of the direct examination.

3413

B

Z12

1          MR. LITTLEWORTH:  The question he answered was that the

2     effect of pumping anywhere to the east of Murrieta fault line

3     would have an effect on the stream runoff, and this is to the

4     east.

5          MR. VEEDER:  I renew my objection, your Honor.

6          THE COURT:  We haven't got the question yet.  The question

7     is, I take it, would pumping in Sections 13 and 14, Township

8     7 South, Range 2 West--

9          MR. LITTLEWORTH:  That is correct.

10         Q  --have an effect on the runoff of Murrieta Creek?

11         A  Yes, I do.

12         MR. VEEDER:  He gave the correct answer for that.

13    BY MR. LITTLEWORTH:

14         Q  You understand, Mr. Hall, that that area is up in this

15    gray territory?

16         A  Yes, and I don't think he could get much out of the well

17    up there pumping, but he has stopped the stream flow.

18         Q  Mr. Hall, you are a practical man, you have been in

19    charge of a water supply of a large ranch.  Do you think that,

20    practically speaking, water taken up on the Borell property

21    would have an effect on the runoff of the creek?

22         MR. STAHLMAN:  Your Honor, that is objected to as being

23    indefinite and uncertain as to what he means by "practical".

24         THE COURT:  Overruled.

25         THE WITNESS:  We objected to his application for water

Hall    Cross    3414

B

Z13

1    up there on the basis that he had no right to take more than

2    his share as an overlying owner or perhaps a riparian right

3    out of the stream.

4    BY MR. LITTLEWORTH:

5        Q  He made an application to hold surface runoff, did he

6    not?

7        MR. VEEDER:  He was not through with his answer.

8        THE WITNESS:  Yes, he made application to dam the surface

9    runoff.

10   BY MR. LITTLEWORTH:

11       Q  Yes, I am not talking about surface runoff; I am

12   talking about ground water.  Can you answer my question with

13   respect to a well on his property?

14       A  It comes then to the matter of degree.  I think a well

15   on his property would get so little water that it might

16   evaporate before you could drink it.  But it is still a matter

17   of degree and I don't think you can draw the line where water

18   extracted from an area ceases to influence or affect the

19   runoff from that area.

20       Q  Well, can you say that there are areas to the east of

21   the Wildomar fault line where the effect of pumping would be

22   negligible upon the runoff of the Murrieta stream?

23       A  That introduces, again, the question of quantity,

24   and what is negligible and what is not negligible, and I don't

25   think there is any threshhold that I could find that would

B

14

1   indicate the boundary line between the two.

2      Q  Can you say that there would be areas where such

3   pumping would have very little effect on the stream runoff?

4      A  I agree to that, yes.

5      Q  And so what you are prepared to say is that there are

6   certain wells that might have very little effect, but you don't

7   want to say that the effect would be negligible?

8      A  Right.

9   MR. LITTLEWORTH:  I think that is all I have, your Honor.

10  THE COURT:  Mr. Dennis.

11  MR. DENNIS:  Yes, I have a few questions, your Honor.

12

13                        CROSS-EXAMINATION

14  BY MR. DENNIS:

15     Q  Mr. Hall, you are not a geologist?

16     A  No, I am not technically a geologist.  I have had three

17  years study in the university on geology, but I am not a

18  recognized geologist.

19  MR. VEEDER:  I think you are, Mr. Hall.

20  THE WITNESS:  Thank you.

21  BY MR. DENNIS:

22     Q  Mr. Hall, you are familiar with all of the Vail wells

23  in the Pauba basin, are you not?

24     A  More or less, yes.

25     Q  Do they have any well at the present time drilled

B

Z15

3416

1    into the older alluvium which are being used for the purposes

2    of irrigation?

3        A   Your question involves the identity of the beginning

4    of the older alluvium in a well log, and I have--

5        THE COURT:   Let' have it reframed   I think what Mr. Dennis

6    means is, are wells drilled in the orange section on Exhibit

7    17?

8        MR. DENNIS:   I was going to come to that.

9        Q   First, I wondered whether they had any wells  at the

10   present time which are being used for irrigation which were

11   drilled through the younger alluvium in the Pauba basin into

12   the older alluvium?

13       A   I think we have, but if you confine your definition to

14   pressure wells then there are none of those being pumped for

15   irrigation.

16       Q   None of the pressure wells are being pumped for irri-

17   gation?

18       A   The windmill well comes nearest to that.  It has a

19   windmill pump on it and it is drawing from the deep underground

20   sources, and it is not used for any regular crop irrigation.

21       Q   Now, do the Vails have any wells which are drilled

22   in the area which is shown as orange, which are being used for

23   the purpose of irrigation-- the older alluvium?

24       A   No, we do not.  Excuse me.  If I want to be sure,

25   referring to the August Cantarini wells at the mouth of Long

B

Z16

Canyon, those wells are drilled at the edge of the areas colored in yellow and just where they enter the older alluvium I don't know, but they are being used for irrigation.

Q  And you are not exactly sure whether those are in the older alluvium or in the younger alluvium?

A  Well, they are drilled in the area marked "Younger alluvium" on the map, but where the log enters the older alluvium I don't know the exact point.  But I think both alluvia are in those wells.

THE COURT:  Are they used for irrigation?

THE WITNESS:  One of them is, yes.

MR. STAHLMAN:  For clarification, your Honor, I think the Cantarini well is different.

THE COURT:  He identified it as being down at the end of Long Canyon.

MR. STAHLMAN:  Yes.  I think there is a designation also as to what Cantarini well that is, is there not?

THE WITNESS:  Yes, the identification at the mouth of Long Canyon limits it to a particular well.  I am looking for the State number on that.

THE COURT:  That is that 1P3.

THE WITNESS:  Yes, that is 1P3.

THE COURT:  1P1 to 1P5.

MR. STAHLMAN:  Is that the August Cantarini well?

THE WITNESS:  Yes, the August Cantarini Ranch.

B

Z17

BY MR. DENNIS:

Q   What number is that well given by the State?

A   8South, 3 West, 1P2.

MR.DENNIS: Is there any further clarification?

MR. STAHLMAN:  No, I just wanted to clear it up.  We had
Cantarini's identification by name, and I thought it would be
well for your information to identify these names.

MR. DENNIS:  Any time that anybody wants to tie down on
of these wells more exactly, I welcome an interruption.

BY MR. DENNIS:

Q   Now, as I understand your testimony, you haven't made
any measurements of the water levels in the wells which were
drilled directly into the older alluvium, that is, the area
which is shown in orange on Exhibit 15, since about 1927?

A   We have drilled a well since then into that area for
windmill wells for watering cattle, but I have not made
personal observations as to the water levels in those wells.

Q   Approximately how many wells have you drilled in that
area since 1927?

THE COURT:  Are you talking about the yellow area?

MR. DENNIS:  No; the orange area that he just referred to.

THE COURT:  The orange area north of ground unit No. 3?

MR. DENNIS:  Either north or south of ground unit No. 3.

THE COURT:  On Exhibit 15?

MR. DENNIS:  On Exhibit 15.

B

Z18

THE WITNESS:  Probably only three or four.

MR. VEEDER:  Plaintiff's Exhibit 17 is what you are referring to when you are talking about the units.

MR. DENNIS:  It has a unit on 17, yes, but the orange area is on 15.

Q  Have you had occasion since 1927 to make measurements on the wells located within the Pauba basin as shown on 15?

A  Oh, yes.  We keep continuous record of those wells and monthly reports.

Q  And those records are kept under your supervision and direction?

A  Yes.

Q  Do you actually make any of the measurements yourself?

A  Sometimes.

Q  I believe you have stated that Vail applied to the State and secured a permit authorizing them to store water behind the Vail Dam of the Pauba Reservoir?

A  Yes.

Q  And when did you close the gates?

A  I have an exact record on that.  It was November 18, 1949, if I am correct.

MR. STAHLMAN:  That is objected to as being beyond the scope of the direct examination, your Honor.

MR. DENNIS:  No.

MR. STAHLMAN:  You are now fishing for your condemnation

B

Z19

suit on the Vail Dam.

MR. DENNIS:  No, Mr. Stahlman, you are not correct.  I think the witness testified on direct examination that they were releasing around 2000 acre feet of water in the winter into the basin for storage for use in the summer.  This has nothing to do with the condemnation suit at all.  It is going directly to the movement of water and the effect on the Vail reservoir and the water levels recorded in the Vail Dam.

THE COURT:  Overruled.

BY MR. DENNIS:

Q  And when did you commence to release water from the Vail Dam into the Pauba basin?

A  I have an exact record of all those things which I plan to put in as an exhibit.

Q  Just approximately.

A  It would be around '52.

Q  And as I understand, with the exception of the water that has been released from the Vail Dam, you have stopped the entire flow of the Temecula Creek since the time the gates were closed?

A  Except for the water that is drafted from the Vail Lake, yes.

Q  And I think you testified that the water was released from Vail Dam in two methods:  You allowed water to flow down the stream and to percolate underground, and that you

B

1   also turned the water directly into the irrigation system?

2       A  Yes.

3       Q  Could you indicate on Exhibit 15 where the water was

4   released directly into the basin for percolation into the

5   underground?

6       A  It is released in two ways:  One by direct flow into

7   the absorptive areas of Pauba Basin, but mostly it is absorption

8   by the flow down the channel of the Temecula Creek through

9   Nigger Canyon and the return irrigation water from the irriga-

10  tion use.

11      THE COURT:  What do you mean by "return irrigation water"?

12      THE WITNESS:  The difference between gross use and net

13  use.  There is always an irrigation return whenever you apply

14  water to soil.  There is some of it that goes through to the

15  water table, and some say it is 60% and some say it is 30%--

16  any figure.

17      MR. VEEDER:  It constitutes a use ana a re-use in the

18  Pauba Valley, is that not correct?

19      THE WITNESS:  Yes.

20  BY MR. DENNIS:

21      Q  Mr. Hall, just to clarify things in my own mind,

22  calling your attention to Exhibit 15 there is a symbol here

23  with an arrow saying "Vail Dam."  That is the Vail Dam's

24  approximate location?

25      A  That is right.

Hall     Cross

B

21

Q  You allow the water then to flow down Temecula Creek through Nigger Canyon to what point?

A  It is a point approximately midway in the Canyon, as shown on the map where we have a weir and a measuring station, and the head of the concrete pipe which goes directly into our irrigation system.

MR. STAHLMAN:  Would this be a good point to have a recess, your Honor?

THE COURT:  This would be a good point.  Take a short recess.

(Recess.)

Hall - Cross

1      (Discussion off the record.)

2      THE COURT:  Be seated.

3      Q    BY MR. DENNIS:  Approximately how far from the Vail

4   Dam is the water in the concrete pipes that you just

5   testified to in Nigger Canyon?

6      A    If I remember right, it is a mile and a half,

7   by the speedometer in the car two days ago.

8      Q    And at that point the water was either diverted

9   into the cement pipe and conveyed by the cement pipe to

10  various locations within the Pauba Valley or you allow it

11  to run down the river channel?

12     A    Yes.  It hasn't run down the river channel,

13  recently.

14     Q    Not since the closing of the gates of the Vail

15  Dam?

16     A    Oh, yes, since the closing of the gates of the

17  Vail Dam it has often run down into what we call the outwash

18  area or the adsorbtive area of the Pauba Basin, which is

19  just below the mouth of Nigger Canyon where the fault line

20  is shown crossing it and where the water runs into the

21  ground at a very rapid rate.

22     Q    And when you say "the fault line is shown

23  crossing it," you are referring to the fault line shown on

24  Exhibit 15?

25     THE COURT:  8 South, 1 West from --

MR. DENNIS:   Section 5.

THE COURT:   Well, it crosses the southeast corner of Section 5.   It runs in a direction from the southwest to the northeast.

THE WITNESS:   Correct, yes.

I have seen a hundred inches sink in a hundred feet at that point.   It is very porous material.

Q   BY MR. DENNIS:   And have the Vails kept any records, so far as you know, as to the quantities of water which were placed directly into this porous material into the outwash area as distinguished from the quantities of water which were placed into the pipeline, concrete pipeline?

A     Yes, we have kept accurate records of that and have it prepared.

MR. STAHLMAN:   It is one of these exhibits we designated which will be offered.

MR. DENNIS:   I haven't seen the list of your exhibits as yet, Mr. Stahlman.

Q     Now, have you had any opportunity to observe the effect on the water levels in the wells after the release of water into the outwash area?

A     Yes.   Annually there is a very definite relation between the two.   And the fact that it is now 65 feet to water in the Windmill well, which is in this outwash area,

1   when the well has been a flowing well in times past, it

2   shows a relative condition of the basin.  But any water we

3   let into it immediately is reflected in the rise of water

4   in the windmill well.

5       THE COURT:  You mentioned a windmill well.  That is

6   clear down towards the bottom of the Pauba Valley.

7       MR. STAHLMAN:  He is referring to a different wind-

8   mill well.

9       THE COURT:  Oh.

10      MR. DENNIS:  And I was just going to request that he

11  mark the approximate location of the windmill well which

12  he just referred to on Exhibit 15.

13      MR. VEEDER:  It is on 16; and we are getting so much

14  on 15, your Honor, I am not --

15      MR. STAHLMAN:  To clarify that point, there are other

16  windmill wells, but this is the name of this particular

17  well.  Is that right?  It has been referred to historically

18  as the Windmill well.  There are other wells with windmills

19  on them.

20      THE COURT:  Let's get the designation.

21      MR. STAHLMAN:  The name is Windmill well.

22      THE COURT:  Let's get the designation on it.

23      MR. VEEDER:  It is 8/2-12-H.

24      THE COURT:  What is the number on it?

25      MR. VEEDER:  8/2.  This I am referring to is from 16 now.

1    8/2-12-H projected.

2        THE COURT: 12-H.  That is 12-H?

3        MR. VEEDER:  That is right.

4        MR. STAHLMAN:  With Mr. Dennis' permission, I will

5    indicate to your Honor that this is a well which is

6    considered as reflecting the water level in the valley to

7    such an extent that it is designated as the measuring well

8    in the stipulated judgment.

9        MR. VEEDER:  Thank you, George.

10       MR. DENNIS:  I am glad you bring that out.

11       MR. STAHLMAN:  All the facts, we want.

12       THE COURT:  Just the facts, Mr. Stahlman.

13            As I understand it, the designation of this --

14   12-H?

15       THE WITNESS:  12-H-1, isn't it?

16       THE COURT:  12-H-1?

17       MR. VEEDER:  That is right.

18       THE COURT:  Is it north of the river?

19       THE WITNESS:  Yes, it is north of the river, right to

20   the middle of that channel plane of the river basin bed.

21       THE COURT:  All right.

22       Q  BY MR. DENNIS:  And approximately how far north of

23   the line of section shown on Exhibit 16 is it located?

24       MR. VEEDER:  Why don't we put it on 15-1?

25       MR. DENNIS:  That is what I requested, is to have it

CROSS

1    put on 15.

2            THE COURT:  15.

3            A VOICE:  15-1 is all right.

4            MR. VEEDER:  15-1 is the one we have been locating the

5    wells on.  That is the point.

6            THE COURT:  All right.  Put it on 15-1.

7            Q  BY MR. DENNIS:  Can you do that during the noon

8    recess, Mr. Hall?

9            A      Yes, I can.  Should I answer your last question?

10           Q      Yes.  Approximately how far north of the line

11   of section would you say it is located?

12           A      About 2000 feet if the section is a river bed.

13   Now, the section is not necessarily the river bed, because

14   it is a crooked line whereas the section must be a fairly

15   straight line.

16           Q      And it would be impossible for me to tell from

17   the inset whether the line of section follows the river

18   bed in this particular locality?

19           A      It does approximately follow it.

20           Q      Approximately?

21           A      Because it goes right up Nigger Canyon.

22           THE COURT:  Now, on 29-0 it is marked "Windmill,"

23   I think, already; isn't it?

24           THE WITNESS:  That is right.

25           MR. VEEDER:  Yes, your Honor.

1          THE COURT:  All right.  Mr. Hall, you put it on

2     15-1 during the noon hour.

3          THE WITNESS:  I shall.  Thank you.

4          THE COURT:  Mark it.

5          Q  BY MR. DENNIS:  How long after water is released

6     into the outwash area do you see its effect on the Windmill

7     well?

8          A     A matter of a day or two, depending on the

9     amount of the release.  But it is very quick, speaking

10    relatively.

11         Q     Have you noticed the effects of the release of

12    water into the outwash area in any other wells other than

13    the windmill well?

14         A     Yes.  Our test wells in that area -- PV-5, PV-4,

15    PV-3 -- all show that rise; and the well designated as the

16    J. K. well also showed that, unless it was being pumped

17    too heavily to show it.

18         Q     And in the first series of wells which you

19    mentioned, how long is it after the water is induced into

20    the outwash area before you begin to see its effect?

21         A     I couldn't measure the time accurately there, but

22    it is in wells PV-1 and -2, which are up in the canyon, the

23    effect is practically instantaneous.  And PV-3 and -4 a

24    little farther down, the effect is delayed perhaps in the

25    measure of a day or a part of a day.  And PV-5, which is

3429

close to the windmill, less than 100 feet from it, the effect is very prompt, quicker than it is into the windmill well which is in the deeper alluvia.

Q     And in the J. K. well, how long would it be before the effects of the release of water?

A     It would be a longer time, but I couldn't tell you.

Q     A matter of weeks or days or months?

A     Less than weeks, or a week or two.

Q     Are there any other wells that you have noticed the effects of the release of water into the outwash area?

A     They all show it, unless they are being pumped too heavily.  There is a very definite relation between the height of water in the Windmill well, which is in the outwash area, and the water supply down to the ranch below reaching all of our wells that are in that general area.

Q     Do you see any effect in the McSweeney well?

A     McSweeney well is only 44 feet deep, a little domestic well.  I wouldn't like to use it as a key well. But we do have an effect even on the deeper artesias of the height of water in the outwash area.  We notice a decrease in head in the Studley, Dairy, and China Garden artesian wells, that is, directly connected with the rise and fall of water in the Windmill well.

Q     But is there any relationship between the rise

and fall of the water in the wells that you just mentioned
other than the Windmill well and the release of water into
the outwash area?

MR. SACHSE:  Wait a minute.

MR. VEEDER:  May I have that again?

MR. DENNIS:  I say --

MR. STAHLMAN:  Let him read it.

(The reporter read the pending question.)

THE WITNESS:  I am sorry.  I don't understand the
question, Mr. Dennis.  The wells I just mentioned show a
response to changing in water level in the outwash area
and the Windmill well.

Q   BY MR. DENNIS:  And the wells that you just
mentioned, you are pumping continually, are you?

A     Oh, no.  Those are pressure wells I mentioned.

Q     You just mentioned pressure wells?

A     They are the ones I had just mentioned, yes.

Q     And they are drilled both into the younger
alluvium and into the older alluvium?

A     Yes.

Q     And the casings are perforated through both the
younger and the older alluvium, so far as you know?

A     Yes, they are.

Q     Now, have you ever noted the effect of the
release of water into the outwash area on any wells which

1 were drilled into the older alluvium north or south of the

2 Pauba Valley?

3     A     No, I have never noticed any sympathetic effects

4 in those areas.

5     Q     Would the manner in which the Vail reservoir

6 has been operated have any effect upon the water tables

7 in Pauba Valley?

8     MR. VEEDER:  He has testified all morning on that.

9 But go ahead.

10    MR. DENNIS:  I think it is obvious.

11    THE COURT:  Then why ask it?  Go ahead.

12    MR. DENNIS:  I want to make sure.

13    Q     Would the lowering of the water table in Pauba

14 Valley, in your opinion, result in the lowering of the

15 water table in the older alluvium immediately to the south

16 and immediately to the north of the Pauba Valley?

17    A     I have no measurements to show that except on

18 some of our irrigation lines, like PV-8 and NW7 North.

19 But the lowering of the water in Pauba Valley increases the

20 hydrolic gradient between the valley and the areas immediately

21 north or south and, therefore, does decrease the water table

22 in those areas.  Instead of saying "decrease" I should have

23 said "lower."

24    Q     You have made no physical tests, though, to back

25 up your opinion?

3432

1      A      No measurements, no.

2      Q      No measurements.

3             And is it your opinion, Mr. Hall, that a fault

4  can act as a barrier to the movement of the water through

5  a basin?

6      A      It is a matter of degree.

7      Q      But I ask you:  Can it act as a barrier?

8      A      If by a "barrier" you mean a complete water-

9  tight dam, I never have met such a case.  But if you mean

10 an area where the flow may be slowed up or perhaps even

11 causing the ground water to rise, then it certainly does

12 act that way.  As we know in our own valley, the beginning

13 of the rise in the stream is most notable just above the

14 Wildomar Fault line.

15     Q      During the time that you were advising the Vails

16 relative to the location of their water wells, did you ever

17 recommend to them that they put the well down in the older

18 alluvium, that is, the areas which are shown as orange on

19 Exhibit 15, north and south of the Pauba basin?

20     MR. STAHLMAN:  I object to that question as in-

21 competent, irrelevant and immaterial.

22     THE COURT:  Overruled.

23     THE WITNESS:  I never have, because when we want to

24 put down a well, we put it down where the pumping lift

25 will be least and the water most available.  And that would

3433

be in the Pauba basin.

Q  BY MR. DENNIS:  Where the specific capacity would be best?

MR. VEEDER:  I don't understand that question.  What do you mean, "where the specific capacity"?

MR. DENNIS:  Be the highest.

THE WITNESS:  That --   Pardon me.

THE COURT:  Go ahead.

THE WITNESS:  That introduces so many factors that -- specific capacity is a variable and depends on the height to which you are pumping.

Q  BY MR. DENNIS:  How many irrigation wells do the Vails have operating in the Pauba Valley at the present time?

A   I am in the process of making up a table that will disclose that exactly, but it is a matter of six or seven.

Q   And could you put the location of those wells on 15-1, too?

A   On 15-1?

Q   Yes, on 15-1.

A   Yes, I can put them all on there.

MR. VEEDER:  Certainly not during the noon hour, your Honor.

MR. DENNIS:  No.

1    THE COURT:  No, we can wait until you complete your

2    table and then, at your leisure later on, put them on 15-1.

3    MR. DENNIS:  Yes.

4    Q    Now, have you ever formed any opinion, Mr. Hall,

5    as to how long it takes the water which is released in the

6    outwash area of the Pauba basin to reach the Elsinore Fault?

7    A    I never made any observations that would give

8    a very accurate answer to that.

9    Q    In your opinion, can you note the effects on the

10   Elsinore Fault of the release of water into the outwash

11   area of the Pauba basin?

12   A    Oh, yes.  The release of water into the outwash

13   area of the Pauba basin immediately increases the stream

14   flow, and the stream flow has points of rising water down

15   through the basin; and immediately above the Wildomar Fault

16   the rising water is most noticeable at that -- and the

17   greatest amount of any place in the stream bed.

18   Q    Now, you said "immediately."  When you say

19   "immediately," do you mean a period of weeks or a period

20   of days or months?

21

22

23

24

25

A   Depending on the quantity; but a large quantity is noticeable in a very short time, a small quantity takes longer.

Q   A short time.   Would that be a week?

A   A few days.

Q   A few days?

A   Yes.

Q   And when you say longer with a small quantity, would that be a matter of a month or a matter of maybe just a couple weeks?

A   A matter of degree.   A very small amount would take so long that you might never discover it, but I think it is still there.

Q   I believe that most of the Vail ranch which is irrigated and cultivated overlies the Pauba Valley, does it not?

A   Most of it, yes.

Q   And when you talked--

A   Pardon me.   Include with that the Wolf or Pechanga Valley and the Temecula Valley.   It is a T-shaped area in there that is all under irrigation and cultivation.

MR. VEEDER:   That is the point.   Was he limiting it to irrigation?

MR. DENNIS:   I was limiting it to irrigation.

THE WITNESS:   We irrigate clear up to Wolf Valley, which is out of the Pauba Valley.

THE COURT:   I understand-- see if I am correct-- that

D

Z23

1    you run cattle on a lot of this ranch and you grow alfalfa

2    down in the valley to help feed the cattle.

3        THE WITNESS:  That is correct.  But the great amount of

4    water is used mostly by potatoes and other crops of that sort.

5        THE COURT:  Is there integration between your upland

6    areas where you graze cattle and your lowland areas where you

7    grow feed?

8        THE WITNESS:  There is an integration where the combined

9    use of the two areas determines the number of head of cattle

10   they can handle.

11       THE COURT:  I am just wondering if Rainbow and Santa

12   Margarita were seriously talking about condemning Vail Dam.

13   My guess would be that you would probably have to condemn not

14   only the valley land but a lot of the upland, too, if there is

15   a relationship between your upland land and the valley.

16       THE WITNESS:  Yes, the circumstances would be--

17       MR. STAHLMAN:  They have already filed an action in

18   Riverside County-- that is, Rainbow has.

19       THE COURT:  When was this filed?

20       MR. STAHLMAN:  Two years ago, your Honor.

21       MR. DENNIS:  Practically two years ago, your Honor.

22       THE COURT:  It is abandoned, though, now, is it not?

23       MR. STAHLMAN:  Well, it could be on motion of the court.

24   Shortly it will have to be.  Goodness knows what these bandits

25   will do after it is abandoned.  Probably start all over again.

D

Z24

1          MR. VEEDER:  I move to strike the word "bandits."

2          THE COURT:  It may go out.  And you observe the same rule,

3     Mr. Veeder.

4          MR. VEEDER:  I have been very good all morning.

5          MR. DENNIS:  I am trying to keep these questions away

6     from anything that might have to do with value in the con-

7     demnation suit.

8          MR. STAHLMAN:  Oh, yes, yes.

9     BY MR. DENNIS:

10          Q  In response to a question by Mr. Moskovitz, you re-

11     ferred to the Temecula field.  What did you mean by the

12     Temecula field?

13          A  Temecula field is the area irrigated and cropped by

14     Vail Company which lies toward Temecula in the area on the

15     maps marked "Temecula basin."  It is the northernmost branch

16     of the "T" in the three valleys.

17          Q  Now, in respect to the water which was taken directly

18     into the concrete pipe at that point that you testified to

19     downstream from the Vail   dam--

20          A  Yes.

21          Q  --is all of that water used for irrigation?

22          A  It is, yes.

23          Q  None of that water goes directly into the Temecula

24     basin for the purposes of recharging the basin?

25          A  No; that is correct.  It is all used for irrigation.

Hall                    Cross

D

Z25

Q   Have you any opinion as to the amount of water which is applied to the crops in the Pauba basin which returns to ground water?

A   Yes, I have an opinion,  I never met a farmer who didn't have one.  The U. S. Engineers used 40%, which I think is perhaps a fair estimate.

Q   In other words, if you applied 10 acre feet for irrigation in the Pauba Valley, approximately 4 acre feet would return to ground water and pass over the lip of the valley?

A   Yes.  It is different in different areas, but I think that might be a good general--

MR. VEEDER:  Your Honor, I object on the grounds that it is a double-barreled question.  It is entirely possible for the water to be reused-- for that 40% to be reused.  Mr. Dennis is talking about the return to the ground water and the water that is going over the lip of the fault.

MR. DENNIS:  Let's limit the question.

MR. VEEDER:  Are youwithdrawing your original question?

MR. DENNIS:  Let's limit the question to the amount of water which was returned to ground water.

THE COURT:  All right.

THE WITNESS:  Then the answer I made is about right.  I think 40% would be a good general average.  It is less in some areas, more in others.

343

D

726

BY MR. DENNIS:

1    Q   Do you have any irrigation wells in the lower portion

2    of Pauba Valley?

3    A   The Cantarini pumping plant is farthest downstream of

4    any of our irrigation wells.

5    Q   And that would be located in approximately what section?

6    THE COURT:  It has been located already.

7    MR. DENNIS:  Well, there are so many Cantarini wells,

8    your Honor.

9    THE COURT:  The Cantarini pumping well?

10   THE WITNESS:  The Cantarini pumping well.

11   THE COURT:  20Bl, 2 and 3; Section 20, 8 South, 2 West?

12   THE WITNESS:  That is correct.

13   MR. STAHLMAN:  If Mr. Dennis hadn't played hookey yester-

14   day he would know these things.

15   THE WITNESS:  To complete the record on those, 20Bl, 2 and

16   3 have been partially discontinued and another well within

17   about 50 feet called the New 28 in Bulletin 57 has replaced the

18   pumping from those three wells.  One of those three wells is

19   maintained as a domestic supply for the Superintendent's home.

20   BY MR. DENNIS:

21   Q   And when did you make the shift from the Cantarini

22   wells to the well-- was it 28?

23   A   New 28.

24   Q   --new 28?

D

Z27

1    A   Yes.

2    Q   When was that change made?

3    A   Oh, just a few years ago.  I will have that data in

4    this tabulation when I get the date of the drilling of the

5    New 28.  But it is within 50 feet of the other, and we con-

6    sidered it just a well to replace old wells that had had

7    their quantity decreased by the rusting and crenothrix in the

8    casing.  "Crenothrix" is a jelly-like growth that comes in a

9    well casing and prevents water from entering.

10   Q   In other words, the well will just destroy itself

11   through the process of time and action of the elements and you

12   find it necessary in many instances to drill a new well in

13   the immediate vicinity?

14   A   Yes, although there are some methods being suggested

15   nowadays that may avoid drilling a new well.

16   MR. DENNIS:  I think that is all, your Honor.
     THE COURT:  Mr. Stahlman.
17   MR. STAHLMAN:  May I reserve the right?  I am going to

18   put him on anyway later on.

19   THE COURT:  You may.

20   Any other questions of Mr. Hall?

21   MR. DENNIS:  If your Honor please, once they have done

22   the map 15-1 with these new wells on it, we might or might not

23   ask some additional questions.

24   THE COURT:  I want to ask one question.  I may have missed

25   it yesterday.

D

728

1    As I understand, the map 15-1 showed a series of test

2    wells drilled in the twelve months in late '26 and '27?

3    THE WITNESS:  Yes.

4    THE COURT:  Did you take water levels of those wells

5    sometime after they were drilled?

6    THE WITNESS:  Only in the general immediate time perhaps

7    as late as 1928, but since then we have not made any serious

8    effort to measure the water levels inthose wells.

9    THE COURT:  Regardless whether you took the water levels

10   in 26, 27 or 28, I am interested in this:  Starting with the

11   well to the east, which was B61, extending across roughly the

12   section line to the one on the west, 1P3, was it or was it not

13   true that the water level in the well to the east was higher than

14   the water levels as you proceeded west?

15   A  That is correct, yes, with the possible exception that

16   those wells were all draining southerly into the valley, so

17   that wells farther north from there would have shown a greater

18   hydraulic gradient to the west than those that are so near

19   Pauba Valley that they are draining right into the valley.

20   THE COURT:  Regardless how the area drains around them,

21   was each well to the east of the next well of a higher water

22   level than the one immediately west of it?

23   THE WITNESS:  In general, yes.

24   THE COURT:  Any further questions of Mr. Hall?

25   MR. VEEDER:  I will ask for those well logs later, then,

D

Z29

1    MR. STAHLMAN:  We have some well logs that I think the

2    various gentlemen, including Mr. Dennis, want, and I have

3    suggested that-- they are original logs and we would like to

4    keep them in Vail's records.  We can have duplicates made.

5    THE COURT:  Is there any objection to using duplicates?

6    MR. VEEDER:  No objection.

7    MR. DENNIS:  Can they be placed in evidence as 16--

8    THE COURT:  16-A, with a further series of numbers

9    following.

10   THE WITNESS:  There is one slight correction.  The

11   correction is this:  That we were trying to identify Well No.

12   8 South, 2 West, 20D1, and that is actually the well shown as

13   20E1 in Bulletin 57 and is the Cantarini Windmill Well, a

14   well intended only for measurements to ground water, and the

15   difference between D and E is accounted for by the difference

16   in projection of section lines across an unsurveyed area.

17   THE COURT:  So where we see a reference to 20E1 it is

18   the same as  20D1?

19   THE WITNESS:  That is correct.

20   MR. MOSKOVITZ:  Your Honor, before we leave this witness,

21   I did notice an error in the transcript, I believe an error in

22   reporting, when you said with respect to one of the wells--

23   THE COURT:  Well, correct it.

24   MR. MOSKOVITZ:  --at page 3381, Line 12, there is the date

25   1957.  I believe the date was 1927.

Hall    Redirect

3443

D

730

1    THE COURT:  All right, it will be corrected.

2    MR. VEEDER:  May I proceed, your Honor?

3    THE COURT:  You may proceed.

5                    REDIRECT EXAMINATION

6    BY MR. VEEDER:

7    Q    Now, Mr. Hall, I have handed to you the Exhibit 29-J.

8    On that exhibit you will observe, Mr. Hall, that there are a

9    series of blue crossmarks extending across the toe of the

10   continental alluvium right at the point of contact with the

11   alluvial deposits of Murrieta Creek.

12   A    Yes.

13   Q    Now, Mr. Hall, what have your observations been in

14   regard to similar phenomena disclosing the emanation of water

15   from the continental deposits along that same general area?

16   A    I have noticed it in particular beginning at what we

17   call the McSweeney Spring, which is just close to the Pauba

18   well and extending in the same northwesterly direction where

19   the blue crosses are indicated, meeting the next spring that

20   I remember on 29-J, which is on the Vail Ranch and called the

21   Sheep Camp Spring, then the next northerly of that on Leo

22   Roripaugh's land where his reservoir is located is a spring.

23   Q    Mr. Hall, would you mark those places as you proceed--

24   anything above the blue line that was put on there by Mr.

25   Kunkel?

D

Z31

1        A   The Sheep Camp Spring is at the mouth of the Long

2   Canyon area and is a point marked "Res." for Reservoir.

3        The next spring northerly of that, that I have noted, is

4   about a third of the way toward the red letter "H" which is

5   circled on 29-J and is at the home of-- near a house there.   I

6   have forgotten the man's name.

7        The next spring is at the red letter "H," which is circled

8   on the 29-J, and is at the Leo Roripaugh residence where his

9   reservoir is located.

10       Then going northwesterly from that--

11       Q   I would like to have that in the record.

12       A   I said, here is his pond which he has by his house.

13       Q   Which has been there for years?

14       A   It has been there for years, yes.

15       The next one northerly from that, that I recall person-

16   ally, is in the Urban Tarwater property southeast of Murrieta.

17       Q   I ask you to mark with a blue pencil, and better put

18   a circle around it to distinguish from the areas concerning

19   which Mr. Kunkel has testified.

20       A   I have placed a blue cross, with a blue circle around

21   it, near a little reservoir about southwesterly from the "M"

22   in Temecula, and put a "UT" for Urban Tarwater?

23       THE COURT:  Yes, draw an arrow down there and put it in

24   that blank space-- "UT" standing for Urban Tarwater.

25       THE WITNESS:  Right.

D

Z32

1      THE COURT:  It is on the north side of Garfield Avenue.

2      THE WITNESS:  Right, which is the old 395.

3      THE COURT:  Yes.

4      THE WITNESS:  Those are all the springs that I recall

5  definitely at this time.

6  BY MR. VEEDER:

7      Q  Now, you stated that similar phenomena had been ob-

8  served in the vicinity of the Pauba well.  Now, I hand to you

9  Plaintiff's Exhibit 29-0 and I ask you to mark with an X, with

10  a circle around it, where you have observed the phenomena

11  in question.

12      MR. STAHLMAN:  What phenomena is this?

13      MR. VEEDER:  That is the water leaching out of the--

14      MR. STAHLMAN:  Oh.

15      THE COURT:  Here is the Pauba well.

16      THE WITNESS:  May I have the quadrangle of Temecula.

17      MR. VEEDER:  Here you are.  That is Plaintiff's Exhibit

18  29-K (handing document to the witness).

19      Your Honor, here is a copy of it.

20      THE WITNESS:  As near as I can locate it on these maps,

21  it is near the word "Aqueduct" on 29-0, at the corner where

22  the break in the hills turns northerly, and I was searching

23  for a blue spot showing a little reservoir but I don't find

24  it on either one of these maps-- perhaps it is dried up.

25      THE COURT:  About where the contour 1100 appears there?

THE WITNESS: That is close, yes. Somewhere near the word "Aqueduct" and where those hills turn to a northwest and southeast slope.

MR. VEEDER: Would you kindly put your X there with a circle around it.

THE WITNESS: We have called that the McSweeney Spring, so I will put "McS."

THE COURT: That is the McSweeney Spring, is it?

THE WITNESS: That is the McSweeney Spring. I have written "McS," with a blue cross and a blue circle just west of the word "Aqueduct" on Exhibit 29-O.

BY MR. VEEDER:

Q Now, are there any other points along the Murrieta Valley where you have seen the water emanate from the continental alluvium?

A I don't recall any others, no.

Q Now, would you describe the terrain and the kind and type of soil and coverage that you have observed in the area on Exhibit 29-J between the Murrieta Creek and the line of X's showing where the water emanates from the continental alluvium?

A All of those springs shown along the line of X's are either at the foot or approximately close to the points where the surface rises abruptly from the general plane of the Murrieta Creek and indicate flows out of the territory lying

D

Z34

1   northeasterly of this line of X's.

2   Q  Now, would you describe the area extending westward

3   to the thread of Murrieta Creek from the standpoint of the

4   terrain and the kind and type of coverage?

5   A  It is generally more or less overflowed area, over-

6   flowed in times of extreme high water, and varies somewhat

7   from spring to spring.  For example, at the Sheep Camp Spring

8   the flow is out across a fairly level land which has had

9   so much water flowing across it that the deposited salts are

10  apparent there, so they call it a salt marsh.  But the flow

11  at the northeast point northerly of there near the house is--

12  Q  When you say near the house, that is the one which

13  you have also marked, is it not, Mr. Hall?

14  A  No, I didn't mark that.

15  Q  May I ask you to mark it now.

16  THE COURT:  Whose house is that?

17  THE WITNESS:  That is what I was trying to remember.

18  BY MR. VEEDER:

19  Q  You said you couldn't recall the name of the occu-

20  pant?

21  A  It is a well-known name up there, but when you get

22  to be over a hundred you forget these things.

23  Q  I have found that to be true, too.  Why don't you

24  just make a mark there.

25  A  Here it is.  I am going to surround a little black

3448

D

Z35

1  dot that is a map indication of a house and put a blue X in

2  the circle.

3      Q  Now, based upon your observations throughout that

4  area, is it your opinion that those springs are effluent to

5  Murrieta Creek?

6      A  Yes.

7      Q  What is the basis for your conclusion in that regard?

8      A  Water flowing toward a stream and only a short distance

9  from it must join the stream even though you don't see the

10  surface flow, because that whole surface in there is more

11  or less open and absorptive.  But we have rising water in the

12  Murrieta from that point on down, and have had ever since I

13  have known the place.

14      Q  Did you mark something on there, Mr. Hall?

15      A  The northerly boundary of the Vail Ranch I am putting

16  on here as a dashed blue line approximately marking the

17  northerly boundary of the Vail ownership.

18      THE COURT:  This house of the unknown occupant then is

19  on the Vail property?

20      THE WITNESS:  It would be, except that they bought a

21  small area out of the Vail property.

22      MR. STAHLMAN:  That is not the blind man who drilled the

23  well that lies at that house?

24      THE WITNESS:  No.

25      MR. LITTLEWORTH:  I wonder if you could clarify the point

Z36

MR. LITTLEWORTH:  I wonder if you could clarify the point where you said the rising water begins at the creek bed.

THE WITNESS:  It varies with the season, and sometimes it is northerly of the Vail property and sometimes it doesn't show up until you get to the town of Temecula.

BY MR. VEEDER:

Q  Now, what was the objective that you had when you drilled the water level wells which have been depicted on Plaintiff's Exhibit 15-1?

A  We were wanting data to indicate the continuity and general overall area of the water plane through that total area.

Q  Now, what did that series of observation wells reveal to you from the standpoint of the water plane in the mesa deposits or the older continental alluvial deposits?

MR. LITTLEWORTH:  Your Honor, I object to that question, unless it is restricted to at least the scope of the area of test wells.

MR. VEEDER:  We will be very glad to limit it.

THE COURT:  It will be so restricted.

THE WITNESS:  In drilling those test wells and measuring them through a couple of years, we established what we believe-- I believe-- is the continuity of the water plane of the Pauba Valley with the mesas to the north and the feed from the mesas to the north of the Pauba Valley down into the

D

Z37

1    valley.

2    BY MR. VEEDER:

3        Q  The feed of what?

4        A  The feed of water.  Also the slope from the mesas

5    westerly into the Murrieta Valley, like our Sheep Camp Spring

6    illustrated.

7        Q  Now, what was the relationship that you found, from

8    the standpoint of elevation, between the water plane in the

9    Pauba Valley and the water plane in the older continental

10   deposits?

11       A  The water plane in the Pauba Valley was lower than

12   the water plane in the continental deposits northerly.

13       Q  Have you an opinion with which to explain that

14   phenomena?

15       A  As you go up a hydraulic gradient you always find

16   higher elevations for water and the hydraulic gradient

17   indicates the direction of the feed.

18       · MR. VEEDER:  I observe that it is 12 o'clock, your Honor.

19       THE COURT:  Thank you.  Do you want to come back at 1:30

20   or do you want to come back at 2?

21       MR. VEEDER:  We have work for Mr. Hall to do.  Whatever

22   your Honor desires is suitable to us, however.

23       THE COURT:  Well, let's say a quarter of 2.

24       MR. VEEDER:  Fine.

25       (Noon recess.)

SAN DIEGO, CALIFORNIA, FRIDAY, OCTOBER 17, 1958, 1:45 P.M.

---o---

(Another matter.)

THE CLERK:  No. 1 on the calendar, the case on trial, 1247-SD-C, United States vs. Fallbrook.

MR. LITTLEWORTH:  Your Honor, I call attention to a correction in the record at page 3285 and the same correction is on page 3286, line 13:  The word "left" appears and I believe it should be "less" and --

THE COURT:  Wait just a minute.

MR. LITTLEWORTH:  It is page 3285, line 13:  "a hundred acre-feet of water left."

THE COURT:  Change the word "left" to "less."

MR. LITTLEWORTH:  And the same thing is repeated on page 3286 at line 7.

THE COURT:  Change the word "left" to "less."

Where are we now?

MR. VEEDER:  Further redirect, your Honor.

THE COURT:  Come forward, Mr. Hall.

H. M. HALL,
previously sworn, testified further, as follows:

REDIRECT EXAMINATION  (Continued)

BY MR. VEEDER:-

Q    Mr. Hall, you have located some wells on there for the Court, as I recall?

A    Yes.

Q        Referring to 15?

A        Where the Court has located.

Q        What is the number on that now, 15-1 or 17-1?

THE COURT:  This is 15-1.

All right.  Can I have just a minute?  Go ahead with the other work, and I will check my records.

Q  BY MR. VEEDER:  Now, Mr. Hall, I will ask you to approach Plaintiff's Exhibit 15 and orient yourself on that exhibit in regard to the Pauba Valley as shown in yellow and the mesa deposits or continental deposits shown in orange; and ask you to mark on Exhibit 15 with a blue pencil and by arrows the course which you think that the ground water  proceeds toward the Pauba Valley, based upon the investigations which you have made?

A        I will begin at the 1200-foot contour in the area north of Pauba Valley, which contour crosses the valley and, with a series of small blue arrows, show the general course of the water as I think it flows both toward Pauba Valley and in some degree toward Murrieta Creek.

Q        Can I ask you to do that on both sides of the Pauba Valley?

A        I am beginning on the range line between 1 West and 2 West with the same similar group of blue arrows showing the spread of the water in the older alluvium as **flowing** downhill.

1      Q      And does that circumstance prevail throughout

2   the -- would you say that as you progressed down across

3   contour 1150, 1100, and 1050, that there is the continued

4   increment of ground water from the older alluvium into the

5   younger alluvium?

6      A      Yes.

7      Q      Can you just show arrows on down?  Don't take

8   too much time, but just so that we will have on there

9   evidence that there is this progression.

10      A      I have placed similar groups of arrows on the

11   different contour lines showing generally the direction of

12   the flow of the incoming water, in my opinion.

13      Q      Now, generally, would you state the course of

14   the ground water from the standpoint of the area as a whole

15   and its course down towards the Murrieta Creek?

16      A      It is, in general, from a northeasterly to a

17   southwesterly area, but more principally down the steepest

18   gradient.

19      Q      And from the standpoint of water progressing

20   down a plane, how would you describe it, assuming you had

21   a plane, and would it be possible for the water to take a

22   general course down and to proceed down another gradient

23   at the same time as you have showed here?

24      A      Yes, I think it would.  In my mind, I picture it

25   somewhat as water spilled upon a sloping table is liable to

1    go straight down to the lowest edge or go sideways off the

2    table.  It goes the steepest  gradient prevailing at the

3    particular location.

4        Q    What phenomena in the Pauba Valley would cause

5    the waters in the higher area in the continental deposits

6    to proceed into the Pauba Valley?

7        A    The hydrolic gradient.

8        Q    And what creates that hydrolic gradient in that

9    area where you have shown the progession of the arrows,

10   both southward and northward?

11       A    The water table is higher at the areas of the

12   upper part of the hydrolic gradient and the water is feeding

13   in a generally southwesterly direction into the stream

14   valleys.

15       Q    You may sit down, Mr. Hall.

16            Now, in regard to the hydrolic balance of this

17   area, have you given any consideration to the sources of

18   water which have been measured into the Pauba Valley and the

19   quantities of water which have been measured out of the

20   valley?

21       A    Is it all right if I stand up, your Honor?  I

22   have a bad back.

23       THE COURT:  Yes, you can stand up if it will make it

24   easier for you.

25       THE WITNESS:  I am more comfortable standing.  Pardon me.

Q   BY MR. VEEDER:   Would you like the question again?

A       I think I have it.   For many years we have noted the conditions which tend to show that more water runs out of this general area either in stream beds or in consumptive use than is measurably accounted for by the known inflows, such as stream flow and rainfall in the valley floor.   But there are many undetermined factors: the return irrigation is one.   The change in contents of the basins is another.   The relation between evaporation and penetration of rainfall is another.   But regardless of the fact that there are some undetermined factors, all computations have pointed to a greater outflow through Temecula Gorge than is easily accounted for by the inflow.

Q       What, in your opinion, then, is a source of this increment or enhancement of the water supply over and above the measured sources which are accountable?

A       Only source left that can be given credit for the supply is the long slopes of Smith Mountain to the south and the wide areas of mesas and other formations to the north.

Q       Now, just for those of us who are not acquainted, Smith Mountain is located where?

A       Well, it is the north slope of Palomar.

Q       What investigations have you done in connection with this analysis that you have made, Mr. Hall?

3456

1     A    I have made some tabulations to explore the

2  general area and have found the evidence in the way I have

3  just testified, giving full credit to the unknown factors,

4  to the best of our experience.

5     Q    If you would approach Plaintiff's Exhibit 16,

6  I would like to interrogate regarding the well logs which

7  you have found there in the work done under your guidance.

8  What predominant kinds and types of deposits have you

9  found in the Pauba Valley where the wells have been drilled?

10    MR. LITTLEWORTH:  I will object to that question,

11  your Honor, on several grounds.  I think there has been no

12  proper foundation laid.  This witness testified on several

13  occasions that he was not able to tell from examination of

14  materials or well logs whether it was younger or older

15  alluvium, and he didn't know.

16    MR. VEEDER:  If we may have one question at a time,

17  your Honor, I think we will meet this objection and eliminate

18  it.

19    THE COURT:  Well, I think you could maybe lay a better

20  foundation.  The objection is sustained, Mr. Littleworth.

21    Q  BY MR. VEEDER:  Mr. Hall, what do you think is the

22  source of the alluvial deposits that are washed in each

23  year, even present time, into the Pauba Valley?

24     A    We have two types of incoming washes.

25    MR. SACHSE:  I object, if the Court please.  That is

not within the scope of cross examination. This is re-direct.

THE COURT: Overruled.

A     We have some detrital material that comes down with the high stream flows, deposits itself in the bed of the stream and over the surrounding areas where it spreads out. Then, we have a wash from the hills that has been coming into the valley for past ages, probably gradually piling up the edges of the Pauba basin to a higher eleva-tion than the area in the middle; so that the distinction between younger and older alluvium has always been a point that I have never been certain as to which is which; because the wash from the older alluvium on the sides is very difficult to distinguish from the younger alluvium which was already in the valley, especially after the sorting action of water upon the transmission of surface materials.

Q  BY MR. VEEDER: Now, Mr. Hall, I hand you some dirt and ask you if you have ever seen that before?

A     Yes, I have.

Q     And would you state where you found that dirt which you have in your hand?

MR. STAHLMAN: Is it dirt or a piece of earth?

MR. VEEDER: Well, these gentlemen are having their fun as to whether it is a rock, dirt, piece of alluvium.

8

1  Q  You call it what you will, Mr. Hall, and tell

2 us where you found it?

3  A  This was taken --

4  MR. MOSKOVITZ:  I object, your Honor.  This is

5 certainly going beyond the scope of cross examination.

6  THE COURT:  I think it is, but can't we let him do it?

7  MR. VEEDER:  But, your Honor, I submit that they have

8 opened up the whole area with their cross examination this

9 morning and yesterday afternoon.

10  THE COURT:  I don't care whether they opened it up or

11 not.  You will be permitted, if it is redirect, to go into

12 redirect.  Let's go ahead.

13  MR. VEEDER:  Thank you.

14  Q  Would you go ahead, and state first where that

15 piece of earth came from?

16  A  This was taken from the side of the road almost

17 directly north of the Windmill well where the abrupt slope

18 changes to nearly vertical at the road cut and the toe of

19 the older alluvium to the north meets the younger alluvium

20 of the valley.

21  Q  Now, you made reference to the Windmill well.

22 Would you state whether that is the Windmill well to which

23 reference has been made?

24  A  That is the Windmill well, or the key well, yes.

25  Q  Now, pointing to Exhibit 15.  Would you locate

just generally on that exhibit in regard to the contour lines that are there where that piece of earth, alluvium, rock, or what have you, was found?

A    It was found at the crossing of the range 1 West and range 2 West, range line where it crosses the dotted line showing the northerly side of the Pauba Valley.

Q    Would you state for the record the prevalence of that kind and type of alluvial deposits in the Pauba Valley?

A    Well, this, to my understanding, is found generally all over the whole area, and we call it mesa silt up in the dry, dryer upper reaches, and we notice that it rapidly absorbs water and becomes sand and stratified area as soon as washed with water and --

Q    I ask you to put that --

THE COURT:  Now, wait.  Are you going to destroy the exhibit by having it pulverized?

MR. VEEDER:  Your Honor, I have got about 100 pounds of it right there.

THE COURT:  Well, let's get another piece that looks about the same size.

MR. MOSKOVITZ:  Are you going to give everybody a copy of it?

MR. VEEDER:  We have a shovelful here.

        Would you hand that to his Honor, and I will give

1    each one of these clods a clod here.

2    MR. SACHSE:  Your Honor, I think we ought to lay a

3    little more foundation and make sure that is water and not

4    concentrated stomach acid like we see in the TV ads.

5    THE COURT:  Don't you think --

6    MR. VEEDER:  Would you know yourself, Mr. Sachse,

7    whether it was water?

8    THE COURT:  All right, now, just a minute.

9    THE WITNESS:  I think it is exactly the same as the

10    piece I have in my hand.

11    THE COURT:  All right.

12    THE WITNESS:  In general, a large piece that is in the

13    bag.

14    THE COURT:  All right.  This piece will be marked --

15    Do we have an exhibit number for this?

16    THE CLERK:  The next one in order would be 96, your

17    Honor.

18    MR. VEEDER:  Are they going to demand the ten days?

19    MR. SACHSE:  I would like it.  I think we ought to

20    have --

21    THE COURT:  96, Mr. Clerk, for identification.

22    Now, go ahead with your experiment with a

23    similar piece.

24    MR. VEEDER:  Q  Now, Mr. Hall, would you put the piece

25    of Exhibit 96 which you hold in your hand into the water

Hall - Redirect

and observe for the record as to what transpires when that experiment is undertaken?

A     I note the rapid rise in water in the piece of material as it is laid into the water and the rather quick solution in -- not solution, but absorption -- into the general period of the water.  It is not dissolved, but it is disintegrated.

Q     On the basis of your experience and knowledge of these kinds and types of material, what would you say as to the permeability of such soil?

A     I would say it is very permeable.  I have seen the same material come out of the wells that we have drilled.

THE COURT:  All right.

Q  BY MR. VEEDER:  Now, Mr. Hall, would you approach Plaintiff's Exhibit 16 and state whether -- this is 16 here.

MR. SACHSE:  Your Honor, I think for the record we ought --  Are you through now with this 69 or 96, finished your examination on that?

MR. VEEDER:  Why, no.

MR. SACHSE:  I am going to move to strike this if there isn't some foundation.  This thing lays on the top of the ground.  We don't know where it was picked up.  They are talking about permeability and transmissibility underground,

1   and it is a clod of dirt that was picked up off the top.

2   Now, it is absolutely irrelevant without further foundation.

3        MR. VEEDER:  Now, your Honor --

4        THE COURT:  The witness testified where he got it, and

5   it existed all over this area.

6        MR. SACHSE:  We have been testifying, solely, your

7   Honor, to underground movements of water.

8        MR. LITTLEWORTH:  I make the same objection, your

9   Honor.

10        MR. SACHSE:  There is not a word in this record from

11   Mr. Hall that this type of material is underground.  He

12   picked it up on top.  If there --

13        THE COURT:  Let me ask him.  Have you found this type

14   of material underneath the surface in the younger alluvial

15   beds?

16        MR. VEEDER:  I was going to interrogate fully on that,

17   your Honor.

18        THE COURT:  Let me ask just a couple of questions.

19        THE WITNESS:  Yes, I have, and in the older alluvial

20   beds, also.

21        THE COURT:  Underground?

22        THE WITNESS:  Underground.  In fact, this very piece

23   came from a point which must have been some 12 or 15 feet

24   underground a few months ago before the road was built

25   there in this particular area.  It was just at the foot of a

1    vertical bluff.

2         THE COURT:   Your objections are overruled.   Go ahead.

3         Q   BY MR. VEEDER:   Will you state where this piece of

4    earth, which is Plaintiff's Exhibit 96, was situated when

5    you found it, Mr. Hall?

6         A      It was at the foot of this vertical bank which

7    was at the immediate side of the road approximately where

8    the range line crosses it and in a newly, relatively newly-

9    cut area where the road has been built into the older

10   alluvium along the side of Pauba Valley.

11        THE COURT:   What do you call this, mesa silt?

12        THE WITNESS:   That is my term for it.   But it is

13   synonymous with older alluvium, in my judgment, with the

14   orange-colored areas of this map; with the understanding

15   that not all of that material will look just like this;

16   but it is predominant in that area.

17        Q   BY MR. VEEDER:   Now, Mr. Hall, again I will ask you

18   to approach Plaintiff's Exhibit 16, and which is the

19   cross-section here, and would you state whether you have

20   observed red clay being taken from any of the wells that

21   were constructed under your direction?

22        A      No, I have not, except that well drillers have

23   removed material from well logs which is of a reddish tinge

24   and which I have noted lost its red color when it dried

25   out; and it was called clay by the well driller, but I

1    wouldn't have so classified it, because the clay part of

2    the sample was less than the sands and silts.

3         Q     And what have your observations been in regard

4    to the materials taken from wells that you observed being

5    drilled from the standpoint of the material that now

6    constitutes Plaintiff's Exhibit 96?

7         A     I found this class of material in every well log

8    that we have examined, not constituting the whole material

9    that the well went through but predominantly the major

10   part of it.

11        Q     Have you an opinion as to whether there is a

12   confining layer of impervious material situated between

13   the younger and the older alluvium in the Pauba Valley?

14        A     Yes, I have.

15        Q     Would you state your opinion in that regard?

16        A     In all the investigations I have made I never

17   have found an area that I would call confining.

18        Q     Then, what, then, is your opinion as to the cause

19   of the pressure upon the China -- I think you call it the

20   China well, is that right?

21        MR. STAHLMAN:  Garden.

22        THE WITNESS:  China Garden.

23        Q  BY MR. VEEDER:  China Garden well?

24        A     Dairy, Studley --

25        Q     -- and the other three wells to which you made

reference this morning?

A    Well, I think it is a matter of what might be called partial confinement, because water in such a soil structure will travel more rapidly and more easily up a pipe than it will up through the material.  But I can't say that it is confining, because there, again, we reach the degree of what is meant by confining.

MR. VEEDER:  I have no further questions, your Honor.

MR. SACHSE:  Your Honor, I did not cross-examine, but in view of some of this extensive redirect examination I would like to have a little recross.

THE COURT:  You may.


RECROSS-EXAMINATION

BY MR. SACHSE:

Q  Mr. Hall, the blue arrows which you have drawn on Exhibit 15 at Mr. Veeder's request indicate your opinion as to the direction of ground water flow; is that correct?

A  In general, yes.

Q  I take it, then, that you are in complete disagreement with Mr. Kunkel's testimony as to the direction of ground water flow?

MR. STAHLMAN:  That is objected to as calling for a conclusion and invading the province of the Court.

THE COURT:  Overruled.

THE WITNESS:  I would say quite the reverse of that. In my notion, it substantiates the work he did.

BY MR. SACHSE:

Q  Did you hear Mr. Kunkel state on at least four or five occasions that the direction of ground water movement was at all times at right angles to the ground water contour?

A  Yes, I did.  But in explanation of my answer, I would

1    like to add that you cannot on such an area draw the detail

2    of ground water contours with all the turns and twists that

3    water will take through the soil and show the actual exact

4    course of water.  But the arrows indicate the general direction

5    and the general source of replenishment.

6        Q  Mr. Hall, I would like you to step down to Exhibit 15,

7    if you will for a moment, and use your scale as a straight-

8    edge and tell me if there is any single point in the older

9    alluvium north of Pauba Valley from which, on Mr. Kunkel's

10   ground water contours, you can draw a right-angle line that

11   intersects Pauba Valley.

12       MR. VEEDER:  I am going to object to this, your Honor,

13   on the grounds that the exhibit is offered for the purpose

14   of showing--

15       THE COURT:  I will sustain the objection without further

16   argument.  It is a matter that you could speculate on all

17   day.  The contours are not straight lines and therefore

18   obviously you could, technically, have a right angle to any

19   of them.

20       MR. SACHSE:  Many of the contours are straight lines,

21   your Honor.

22       THE COURT:  In small segments.  And if they are straight

23   lines, then it is obvious that they come down to the valley.

24   BY MR. SACHSE:

25       Q  Mr. Hall, I will direct your attention to your

Hall   Recross

testimony yesterday--

MR. VEEDER:   What page?

MR. SACHSE:   3345.

--under direct examination by Mr. Veeder:

"Q   Then based upon the observations which you have made would you state for the record your opinion as to the course of the ground water as it progresses through the older alluvium?

"A   I think it is correctly shown on Exhibit 15-1, its direction of flow.

"MR. VEEDER:   I have no further questions."

Do you feel that your delineation of ground water flow which you have just made coincides with that testimony?

A   Yes, I do, because my testimony was in a very general manner, and the exhibit is still correct in general, but it is bound to vary in detail because we know that water runs downhill.

Q   Your determination of the direction of flow of ground water, you stated, was based upon your test wells which you drilled in that older mesa area; is that correct?

A   Partly, yes; not entirely.

Q   What other factors than the water levels and directions that you obtained from test wells did you consider?

A   The knowledge that water runs downhill.

Q   And in your opinion, then, downhill below ground is

F

Z41

1    the same as downhill on the surface?

2        A   Oh, no.   No.   Downhill below ground is from a water

3    elevation that is higher to a water elevation that is lower.

4        Q   And how do you determine water elevations below

5    ground?

6        A   By drilling a well.

7        Q   Directing your attention specifically, let us say,

8    to the uppermost arrow off the 1150-foot contour, do you have

9    any record or did you make any water level measurements in that

10   area?

11       A   Not precisely, but in the general area we have

12   drilled wells--

13       Q   How close?

14   MR. VEEDER:   Are you interrogating from 15-1 now, Mr.

15   Sachse?

16   MR. SACHSE:   Yes, I am holding 15-1.   I am directing

17   his attention to 15.

18   MR. VEEDER:   Just inquiring.

19   BY MR. SACHSE:

20       Q   I directed your attention to the northernmost arrow

21   you had drawn on the 1150-foot contour.   How close is that

22   arrow to any well for which you had a measurement?

23       A   Oh, it is a long way, a matter of several miles before

24   we reach any well that is in the older alluvium, but not so

25   far into valleys into which we have stock watering wells.

F

Z42

1    Q   I still don't think you quite responded to my ques-

2  tion.   How close is it to the nearest well for which you had

3  water level measurements that you could use in determining

4  ground water contours?

5    MR. VEEDER:   Would 15-1 help you, Mr. Hall-- the wells

6  on 15-1?

7    THE WITNESS:   We had a whole string of wells along the

8  northern edge of the Pauba Valley, and the nearest one to that

9  particular arrow is about a mile away.

10  BY MR. SACHSE:

11    Q   So you then drew your conclusion as to the direction

12  of that arrow from surface observations rather than from any

13  subsurface data available to you?

14    A   Not surface observations, but general knowledge, again,

15  that water flows downhill.

16    MR. VEEDER:   I think we should stipulate to that.   Maybe

17  Mr. Sachse won't.

18    THE COURT:   Go ahead.

19  BY MR. SACHSE:

20    Q   Now, south of Pauba Valley you show a number of blue

21  arrows swinging around in more or less a half-circle from the

22  basement complex area around and to Pauba Valley.   Do you

23  see the ones to which I refer?

24    A   Yes.

25    Q   I find in that section of Exhibit 15 no contour line

F

Z43

1      indicated by Mr. Kunkel.

2          A  That is true.

3          Q  Have you determined a contour line for that area?

4          A  No, I have not, either in elevation or direction.

5          Q  Then if you haven't determined the direction, how do

6      you know how to point the arrows?

7          A  I don't like continuously to repeat, but it is the

8      knowledge that water runs downhill.

9          Q  You agreed a moment ago when I asked you that the water

10     gradient below surface is not the same as the surface

11     gradient.

12         A  True.

13         Q  And if you have no contour supplied you by anyone

14     else in the area, and you have not made your own contour and

15     you have no test measurements of any kind, how do you know

16     which direction the underground gradient goes?

17         A  Because I know the water exists within a reasonable

18     distance of the surface in those areas, and I have seen

19     repeated evidence of the feeding of those older alluvia down

20     into the Pauba Valley wherever they exist that way in nature.

21     That applies to both sides of the valley, and the same

22     reasoning would establish the blue arrows that I drew on there.

23         Q  So the blue arrows at the south, then, are based

24     entirely upon a rationalization process rather than any field

25     checking process?

F
Z44

1        A   Right.

2        Q   Did you, in determining the direction of flow as you

3    have indicated it on 15-1, have reference to any other actual

4    delineations of water level contours other than 15-1?

5        MR. VEEDER:   I don't follow that at all.   May I have it

6    read?

7        THE COURT:   Read it.

8        (The reporter read the pending question.)

9        THE WITNESS:   In drawing the direction of flow on 15-1

10   I had to rely upon the information on that exhibit and not

11   on some other exhibit.

12       THE COURT:   The question is, though, did you have refer-

13   ence to or do you know of any other diagram which shows water

14   contours in that same area?

15       MR. VEEDER:   Or investigations or studies?

16       THE COURT:   Yes.

17       THE WITNESS:   No.   I have other data of that sort, but

18   I didn't use it in putting the blue arrows on here.

19   BY MR. SACHSE:

20       Q   Can you tell us which of these other studies and

21   delineations of ground water contours show directions of flow

22   such as you have indicated on 15?

23       A   No, I cannot.

24       Q   Do any of them?

25       A   There may be, and there may not.   I haven't studied

F

Z45

1    them with that detail.

2        Q  Now, I notice that in general your movement of water,

3    as I think you have explained yourself, starts out quite

4    southwesterly and then generally curves toward the Pauba

5    Valley, and you used the example of a table where it might

6    tilt and run off one side rather than straight down the bottom.

7        A  Yes.

8        Q  Take any one of these contours, Mr. Hall, let's say

9    1100, and at what point on the 1100 contour is the arrow

10   going to start curving north toward Long Canyon?

11       A  In a situation exactly similar where it starts to

12   turn south, with the knowledge that Long Canyon has a higher

13   elevation of ground water than Pauba Valley does.

14       Q  Then I understand, do I, that in your opinion the

15   specific arrow-- you see the one to which I am pointing--

16   th specific ground water direction arrow drawn by Mr. Kunkel

17   on the 1100 contour below Long Canyon probably does not

18   indicate the direction of flow of ground waterat that point?

19       A  Not to the precise degree that could exist by

20   accurate measurement, but I think in general that it is

21   correct.

22       Q  But you just stated that you would start curving that

23   flow toward Long Canyon in that area?

24       A  I don't think Mr. Kunkel's work included these side

25   feeds that I have included in my work, so that his arrows are

F

Z46

1    in general correct.

2         Q  Without taking every one of these in detail, would

3    your answer be the same, let's jump up to the 1175 where Mr.

4    Kunkel's arrow points practically due south at right angles?

5         A  Yes.

6         Q  And there are two fingers of younger alluvium?

7         A  Right.

8         Q  One on either side of it?

9         A  Yes.

10        Q  Would your answer be the same that actually the water

11   flow from that arrow is not straight south but it probably

12   spreads off toward those two fingers on either side?

13        A  Yes, I considered the map a general picture of the

14   general direction of the water flow, and it would take detailed

15   field information to draw the arrows accurately.

16        Q  And you do not have any such detailed field informa-

17   tion?

18        A  No, I do not.

19        MR. SACHSE:  I have no further questions.

20        THE COURT:  Mr. Moskovitz?

21

22                      RECROSS-EXAMINATION

23   BY MR. MOSKOVITZ:

24        Q  Mr. Hall, I believe you testified on redirect exam-

25   ination that you have some information figures which have

indicated to you that more water flows out of Pauba Valley or is consumed by irrigation, more total both flows out and is consumed by irrigation than comes in through all the known sources of recharge to Pauba Valley; is that correct?

A   Not known sources.

MR. VEEDER:  He didn't say that.

THE WITNESS:  But measureable sources.

THE COURT:  Would it include rainfall in measureable sources?

THE WITNESS:  Yes.

BY MR. MOSKOVITZ:

Q   Would you say you actually have some figures which indicate that to you?

A   I have always had a few figures along that line. Probably still have some in my notes, yes.

THE COURT:  Do I understand that you have figures for rainfall over the whole watershed, or just in Pauba Valley?

THE WITNESS:  I think I mentioned -- in the first place, it would be just in Pauba Valley, because that is the part we were figuring the ins and outs and I said that the actual contribution of rainfall on the valley floor is one of the unknowns, and also the return irrigation is one of the unknowns, and the change in contents in the basin is another unknown. But the work was carried far enough along that, in my judgment, even allowing liberally for all of the unknowns, there

Hall      Recross      3476

F

Z48

1   is still considerable more water runs out of the valley than

2   is measureably disclosed as running in.

3       THE COURT:  You are talking about Pauba Valley?

4       THE WITNESS:  Pauba Valley.

5   BY MR. MOSKOVITZ:

6       Q  Could you produce the figures on which you base this

7   opinion?

8       A  I will try.

9       Q  Could you look and see if you can bring them in after

10  the weekend?

11      A  Yes.  They would be either in Los Angeles or at Pauba

12  Ranch, because they would be old-time computations.

13      Q  Mr. Hall, I take it that the contours which are in-

14  dicated on Exhibit 15 going across the orange-colored older

15  continental deposits and then through Pauba Valley down the

16  southern part of the older continental deposits area do not

17  reflect the direction of flow that you have indicated by your

18  blue arrows.  Am I correct?

19      A  Well, arrows are generally correct, but they indicate

20  the direction of flow, if I understand your question cor-

21  rectly.  Perhaps I missed part of it.

22      Q  Let me ask it again.  Am I correct that the contour

23  lines which are shown on Exhibit 15 in the orange area north-

24  west of Pauba Valley, going through Pauba Valley and to the

25  southeasterly over the continental area, that those contour

F

Z49

1   lines do not reflect, are not consistent with as they are

2   drawn, the direction of flow which your blue arrows indicate?

3       MR. VEEDER:  I object to this as being repetitious, your

4   Honor.  It has been covered five times already.

5       THE COURT:  Overruled.

6       THE WITNESS:  I think that they do, because the arrows

7   placed on Exhibit 15 were a very general study where I have

8   been requested to make more detailed illustrations by the

9   arrows I put on it.

10   BY MR. MOSKOVITZ:

11       Q  Mr. Hall, I think you misunderstood.  I am comparing

12   the arrows you put on Exhibit 15 with the contour lines.  Do

13   those contour lines reflect, and are they consistent with, the

14   arrows you placed on Exhibit 15?

15       A  The same answer would be given.  The contour lines

16   that would be placed on the map were done in a general

17   manner, and the arrows vertical to those contour lines in-

18   dicated the general direction of flow.  But I was requested

19   to put on more detailed arrows in an illustrative manner as

20   to water spreading out into the steepest downhill gradient.

21       Q  So that you would have to have more detailed contours

22   in order for the contours to be completely consistent with

23   the arrows you placed on Exhibit 15; is that correct?

24       A  Yes, you would have to have an immense amount of field

25   data, which would take months to acquire.

F

Z50

1    Q  Mr. Hall, could you draw on Exhibit 15 in blue pencil

2  contour lines which would be consistent with the arrows which

3  you placed on Exhibit 15?

4    A  Well, I could draw contour lines that were vertical

5  to those arrows, but you are asking for a detail which is

6  becoming apparently more concise and precise without sufficient

7  data to substantiate it.  I claim that the arrows I put on

8  illustrate the condition in a general manner, but more

9  specifically than the arrows that were placed on the map

10  originally.

11    Q  Am I correct that in order to be consistent the blue

12  arrows which you placed on the map, the contours would have

13  to swing at right angles to the direction which they now show

14  on Exhibit 15 at the northwesterly side of Pauba Valley and

15  also at the southeasterly side of Pauba Valley?

16    A  Right angles is too precise.

17    MR. VEEDER:  Just a moment, Mr. Hall.

18  We asked in a most general way for Mr. Hall to indicate

19  the flow of the water as he observed it.  On direct exam-

20  ination he testified that the water did proceed into the

21  Pauba Valley.  He knew it.

22    THE COURT:  We have had enough cross-examination on this.

23  Do you object?

24    MR. VEEDER:  Yes, sir.

25    THE COURT:  Sustained.

F

Z51

BY MR. MOSKOVITZ:

Q  Now, Mr. Hall, am I correct that it is your opinion that there is semi-confinement beneath the Recent alluvium in Pauba Valley?

MR. VEEDER:  I object, your Honor.  There was no such statement in the direct examination, no reference to semi-confinement in the older or the younger alluvium.

THE COURT:  Overruled.  This is cross-examination.  But it has been pretty well covered.  If you go too far, I am going to cut this off, too.

MR. MOSKOVITZ:  Very well, your Honor.

THE COURT:  I have heard about all I want to hear from this witness about this matter.  I think you are not going to add much.  Go ahead.  Objection overruled.

THE WITNESS:  It comes back to a matter of degree, and even if you put a piece of cloth across a flowing stream there will be semi-confinement, but if you put an impervious dam there which doesn't occur in nature you would have more complete confinement.

BY MR. MOSKOVITZ:

Q  And would it be correct to say that the amount of confinement would be related to the difference that you would find between the pressure in a well and the level of shallow wells in the same area?

A  If you say amount meaning any measurement, I would

F

Z52

have to say no, you can't determine it that way, but as a matter of approximation and direction of the quantities you are right.

Q   In other words, if you had less confinement you would have generally less difference between the pressure level and the water table level?

A   That is right.

Q   And with more cofinement you would have a greater difference?

A   Right.

MR. MOSKOVITZ:  That is all.

MR. VEEDER:  Any other questions?

THE COURT:  Mr. Littleworth?

Mr. Dennis?

MR. LITTLEWORTH:  I think I have none now, your Honor.

MR. DENNIS:  I have one or two questions, your Honor.


RECROSS-EXAMINATION

BY MR. DENNIS:

Q   Mr. Hall, during the course of your examination you referred to the northern edge of Pauba Valley.  Did you mean to indicate the watershed or just the edge of the valley fill?

A   I would have to refer back to the exact wording.  But the northern edge of Pauba Valley could be based upon where the slope abruptly changes or where the irrigation work ceases or

F

Z53

1    several other determining factors.

2        Q  As I understood your testimony, you would expect to

3    find the water in the Temecula Creek watershed, the ground water

4    generally, running from the crest of the watershed to the

5    stream?

6        A  Yes, in general, I think that would be true.

7        Q  And in nature you would generally expect to find that

8    underground water flows in exactly the same direction as

9    surface water flows, although that is not necessarily true?

10       A  It is a very general statement.

11       Q  And to come to a contrary conclusion you would need

12   some information as to the actual water level within the area?

13       A  Yes.

14   MR. DENNIS:  That is all.

15   MR. STAHLMAN:  No questions, if I may reserve the

16   right to cross-examine later when I put him on the stand.

17   THE COURT:  You may.

18   Any further questions?

19   I think you may step down, Mr. Hall.

20   THE WITNESS:  Thank you.

21   THE COURT:  Thank you.

22   MR. VEEDER:  I will call Mr. Walter Hofmann as the next

23   witness for the United States.

24

25

5.4

WALTER HOFMANN,

called as a witness in behalf of the plaintiff, being first

duly sworn, testified as follows:


THE CLERK:  State your name, please.

THE WITNESS:  Walter Hofmann.

MR. VEEDER:  Has your Honor any more interest in this

experiment?

THE COURT:  No.


DIRECT EXAMINATION

BY MR. VEEDER:

Q  How old are you, Mr. Hofmann?

A  Thirty-nine.

Q  Where were you born?

A  I was born in a small village near the town of

Frankfort, Germany.

Q  And when did you come to the United States?

A  In February of 1927.

Q  Have you lived in the United States ever since that

time?

A  Yes, I have.

Q  And would you state where your home is at the present

time?

A  At the present time my home is in Downey, California.

1    Q   Would you outline briefly your schooling, starting

2    with the elementary grades and proceeding down through high

3    school.

4        A   I went to elementary school for about a year and a

5    half in Germany, and then I was eight years old when I arrived

6    in Los Angeles.   I went to elementary school at Budlong

7    Elementary School in the Los Angeles City School System.   I

8    went to junior high school and high school at Bell High

9    School, which is also in the Los Angeles School System. I

10   graduated from high school in 1936 and that fall attended the

11   California Institute of Technology and was at that Institute

12   for four years and graduated from there in June, 1940.

13       Q   What course did you pursue while you were at Cal Tech?

14       A   Engineering, majoring in civil engineering.

15       Q   And what were any minors that you took while you were

16   there?

17       A   Well, I don't think we had such a thing as minors.

18   The basic course was the same for all engineering students for

19   the first two years or so and there was very little differ-

20   ence except in the last year or two between the various

21   engineering students specializing in mechanical or aeronautical

22   or other engineering fields.

23       Q   Do you belong to any honorary organizations or

24   societies?

25       A   I belong to no honorary societies.   I am a member of

F

56

the American Society of Civil Engineers, and am also a

member of the American Geophysical Union.

Q  Now, subsequent to your graduation, would you state

the employment that you undertook?

A  For the record, I would like to say that I did

graduate, Mr. Veeder-- I forgot to mention it earlier-- with

the degree of Bachelor of Science in Civil Engineering.

Q  Thank you, Mr. Hofmann.  We are all glad.  Now, if

you will proceed to tell after you finished what kind of jobs

you obtained, we will go ahead.

A  Well, I graduated in June, 1940, as I mentioned, and

immediately after graduating or a little before I took a

civil service examination for the Federal Government.  I

believe the title of the examination was Junior Scientist.

I have not heard any results from this, so I took an offer

from Steel Form Contracting Company, which at that time was

located in Los Angeles, as sales engineer.

Q  And subsequent to that time what did you do?

A  Well, I worked for the Steel Form Contracting Company

for about four months and heard from the Federal Civil

Service that I had passed the examination and that the

Geological Survey would like to interview me with regard to

a job as Junior Hydraulic Engineer, and because the pay was

considerably more and also the work was of a type that I

would prefer to sales work I accepted the position for the

1    Federal Government, the  U. S. Geological Survey.

2        Q  After you commenced your employment with the U. S.

3    Geological Survey what were the kind and type of duties that

4    you assumed?

5        A  I started to work for the Geological Survey in Tacoma,

6    Washington.  The first two years, that is, from October,

7    1940, to, oh, approximately 1943, my principal work consisted

8    of making stream flow measurements and analyzing and computing

9    stream flow data.  Also, part of the time I spent in the

10   construction of stream gaging stations.

11       Q  What were the streams and areas concerning which you

12   performed your services?

13       A  The District Office was in Tacoma, Washington, and

14   we covered the entire State of Washington out of Tacoma.

15   There were field trips of varying lengths, depending on the

16   areas that we visited.  But I engaged in everything from small

17   streams in the vicinity of Tacoma and other towns to the

18   Columbia River.  I can name some of the streams:  The Skagett

19   River, the Deschutes River near Olympia, the Columbia River,

20   Spokane River.

21       Q  Now, you stated that you gaged the streams.  What does

22   that mean?

23       A  To gage a stream is to measure the quantity of flow

24   past a given point known as a gaging station for a continuous

25   period of time.

F

Z58

1    Q   Exactly what did you do when you were gaging the stream?

2    A   Well, as I say, my responsibilities for the first two

3    years were primarily to make measurements, and in gaging a stream

4    it is essential that periodic measurements of flow be made to

5    relate the discharge of flow or the discharge at an instant

6    to the stage at that instant.

7    Q   How do you determine the point that you are going

8    to gage the stream?  What are the factors that are involved?

9    A   Well, the first factor that, of course, is considered

10   is the reason for the gaging station.  Generally, it can be

11   for a number of things. It can either be to obtain hydrologic

12   information for an area, to obtain stream flow data for the

13   construction of a dam, to measure the releases from hydraulic

14   structures upstream.  There are a number of reasons for collect-

15   ing stream flow data, if I understand your question correctly.

16   Q   Yes.  Now, what area would you select on a stream,

17   though, for the purpose of establishing a stream gaging

18   station?  Are there elements that you would consider in making

19   a determination as to where it would be located?

20   A   Absolutely.  The elements that need to be considered

21   would be primarily a stable stage discharge relation for the

22   gaging station.

23   Q   What do you mean by that-- stable stage discharge re-

24   lation?

25   A   The problem of gaging a stream is that you can

F

Z59

1   continuously record a change in stage by a structure on the

2   bank of the stream, with a recording device and a chart which

3   records the change in the stage or elevation of the water

4   surface.  But we have no device that will, on a natural stream,

5   continuously measure the discharge or the flow.  So that it

6   is necessary to relate the discharge to the stage by a curve

7   of relationship in order to convert stage record to discharge

8   record.

9        I might be able to--

10       Q  If you want to draw a picture, go ahead and draw a

11   picture and show what you mean when you establish a point

12   for the gaging of the stream and the elements that you take

13   into consideration in establishing the point.

14       THE COURT:  We will take a recess.  The witness can draw

15   it during the recess.

16       (Recess.)

17

18

19

20

21

22

23

24

25

1    THE COURT:  Proceed.

2    MR. VEEDER:  I would like to have the record show that

3    we are returning a copy of 16-A 73.  We withdrew the

4    original and had it reproduced.

5    THE COURT:  All right.  This is the Pauba Valley data?

6    MR. VEEDER:  That is right.

7    THE COURT:  Put it in 16-A.

8    Q   BY MR. VEEDER:  Mr. Hofmann, would you go on and

9    explain into the record the procedures utilized in

10   determining where a stream gaging station would be situated?

11   MR. STAHLMAN:  You want the record to show he has a

12   drawing on the blackboard from which he is making an

13   explanation.

14   MR. VEEDER:  Thank you, Mr. Stahlman.

15   THE WITNESS:  The diagram on the left is a schematic

16   diagram of the cross-section of a river channel.  The

17   vertical structure on the side is what we call the gaging

18   station or stilling well and recorders' shelter.  This

19   stilling well is connected to the river or stream by a

20   series of pipes.  The number of pipes is dependent upon

21   size of the stream and the size of the well.  Fluctuations

22   of water surface in the stream then will be reflected by

23   changes in the water surface in the well.  A copper float

24   floats on the water surface in the well, and a steel,

25   generally a steel, tape comes up and goes over a drive wheel

on a recorder. I have a picture that I would like to show the Court later as to a typical installation. But that is the basic principle; that this recorder records the change in stage in the river.

THE COURT: What are you trying to get at, the stage of the water level in the river or the amount of water that flows down the river?

THE WITNESS: There are some gaging stations where you are only interested in the change in stage in the river, but those are by far the minority. Generally you are interested in the amount of water that flows down the river. And that is determined by a curve of relationship, as I have mentioned earlier, which relates the stage or gage height to the discharge Q, a symbol for discharge. Now, this curve of relationship is established by making current meter measurements of the stream or measurements of the discharge at a particular stage. A man will come and visit the station one month. It will be at this stage. And he makes a discharge measurement. The next time he comes it may be at a stage two feet higher. And then he comes, and it is a stage ten feet higher. Then some other men may come and it is a lower stage. So thatyou get a range of discharge measurements through the stage which will occur, might occur at the river. And these discharge measurements are plotted, the discharge against the stage, and you will

1   get a series of discharge measurements.  And a curve is

2   drawn averaging these measurements.  Then, from this curve

3   the stage at any particular time, whether it is instant-

4   aneous or daily, can be translated to discharge.

5       THE COURT:  I understand.

6       THE WITNESS:  Now, the number of measurements that

7   need be made are dependent on the control conditions of the

8   gage, to a degree.  The Geological Survey makes it a

9   practice to visit, in Southern California, at least, and

10   most other areas, visit the stations at least once a month,

11   probably oftener, to make these discharge measurements;

12   because the features which control this stage discharge

13   relation change.  A dam in a channel of this type controls

14   the height of the water at the gage.

15       Now, generally we don't have these dams, and the

16   natural channel acts as a control.  And that is subject to

17   changes -- a scour of the channel or vegetative growth or

18   change of vegetative growth, change in channeling alinement --

19   so that it is necessary to continue to revalue the stage

20   discharge relation.  And you may, over a period of years,

21   have curves which are similar in shape but are at a higher

22   or a lower elevation.

23       Q  BY MR. VEEDER:  What are the means of determining

24   the quantity of water passing the particular gaging station,

25   the one that you have depicted on the blackboard?

4        Hofmann - Direct

1        A    The measurements are generally made using a

2    current meter.

3        Q    I hand you a current meter and ask you to explain

4    the methods used in determining the flow of the stream at

5    a given point?

6        A    The current meter is suspended into the stream.

7    And I might show a cross-section of the stream here.  At

8    a particular cross-section the depth is sounded to obtain

9    the depth at intervals across the stream.  Generally 25 to

10    30.  Then the current meter is suspended in the water,

11    either by a rod or from a cable from a car that -- cableway

12    that crosses the river.  Have a little car, and we suspend

13    it with a lead weight on it.  And the number of revolutions

14    of this current meter are related to the velocity of the

15    stream by the Bureau of Standards.  So that knowing the

16    number of revolutions that this current meter makes when

17    it is suspended at a particular point tells you the velocity

18    of the stream at that particular point.

19            Now, by averaging the velocity and the depth at

20    these sections, and by applying, getting the average for

21    a unit width, it enables you to compute the discharge

22    throughout that entire cross-section.  In other words, the

23    cross-section of an area times the mean velocity gives you

24    the discharge at any particular instant of time.

25        THE COURT:  I understand.  This is particularly suitable

for measuring large streams.  Are there any streams in this watershed big enough to be measured in that manner?

THE WITNESS:  Yes, sir.  Practically all the streams are measured in that manner except the extreme low flows where we have a small current meter that does the same thing.

THE COURT:  All right.

MR. VEEDER:  I wish at this time, your Honor, to offer in evidence Exhibits 79-A, -B, -C, and -D.  Would you hand those to the Court, please, Bill?

THE COURT:  If there isn't any objection, they will be received in evidence.

While we are at it, what about receiving in evidence 96 before we forget it, the clod of mesa silt?

MR. VEEDER:  We had offered it, and I thought it had been admitted, your Honor.

THE COURT:  No.  The clod of mesa silt will be received in evidence, also.

THE CLERK:  How many in the series was it?

THE COURT:  A, B, C, and D.

Q  BY MR. VEEDER:  I hand you Plaintiff's Exhibits -- We offer them, then, your Honor, and I will have the witness --

THE COURT:  Be received.

Q  BY MR. VEEDER:  Would you refer to Plaintiff's Exhibit 79-A and state in general what that structure is?

1    A    Exhibit 79-A is the gaging station on De Luz

2  Creek near Fallbrook. It is a 24-inch corrugated pipe well

3  on the left bank of the stream. You will note that there

4  is an opening at the bottom to enable the stream gager, --

5  or to clean out the mud that periodically enters the well

6  when flow carrying mud passes the station.

7    THE COURT: 79-B is a closeup of that?

8    THE WITNESS: Yes, sir.

9    THE COURT: A blowup.

10    THE WITNESS: If you will notice that on Exhibit 79-B

11  there is an enameled staff gage which gives the stage in

12  that well to the nearest two-hundredths of a foot. You

13  cannot -- this does not record the stage; it is simply a

14  way that the man can check the elevation in the well against

15  the outside.

16    THE COURT: You are pointing at the top, I take it?

17    THE WITNESS: Yes. And the float in the foreground

18  of the opening is the float that moves up and down as a

19  stage moves up and down.

20    THE COURT: I understand.

21    Q BY MR. VEEDER: Now, I hand you Plaintiff's Exhibit

22  79-C and ask you to state into the record what that view is?

23    A    Exhibit 79-C is a Stevens type A-35 water stage

24  recorder.

25    Q    It is a picture to begin with?

A      It is a photograph of a Stevens type A water stage recorder.  It shows the workings of the recorder. Directly in front the wheel, the pulley is the one over which the tape from the float to a counterweight passes. And as this pulley turns it activates a pen which can just be seen to the right of this float wheel.  And this pen moves up and down on this chart which is graduated in inches, in tenths of an inch.  Then, on the left of the instrument is a clock which regulates the feed of this chart in the direction perpendicular to the picture.

Q      Is this used throughout the Santa Margarita Valley, this kind of an instrument?

A      To the best of my knowledge, all the gaging stations in the Santa Margarita River operated by the Geological Survey have this type of recording instrument installed.

Q      I hand you Plaintiff's Exhibit 79 and ask you what --

THE COURT:  79-D?

Q  BY MR. VEEDER:  79-D; what it is and where it is located?

A      Exhibit 79-D is a picture of an A-frame and cable car which crosses Murrieta Creek at the gaging station which is about four-tenths of a mile upstream from its confluence with the Temecula Creek.  This is the type of

Hofmann - Direct

cable car which is used to measure flows that are too deep to wade.  The man sits in one end of the car and has a reel to which is attached this current meter -- that I have previously described -- and a sounding lead weight.  The size of the weight varies with the amount of the velocity, but generally it is   30 or 50 pounds.  And then that is suspended into the stream to make the current meter measurement.

THE COURT:  Yes.

Q  BY MR. VEEDER:  Now, during the period that you were in Tacoma what other responsibilities did you have or duties did you perform in your assignment?

A      During 1943 to approximately 1945, in addition to regular measurements of discharge   I   also made snow surveys, which consisted of going into the higher mountain area and taking samples along a predetermined course of snow and computing the amount of, or weighing the amount of water in the sample and computing and obtaining the depth of snow.

Q      You don't have that problem around here, do you?

A      Not in the Santa Margarita River watershed, no, sir.

Q      Now, when you had completed your work and assignment in Tacoma, what further work did you do for the United States Geological Survey?

A       In 1947 I was transferred to the Columbus, Ohio,
District of the Geological Survey.

Q       And what were your duties there?

A       After the Tacoma job.  Primarily, the analysis
of stream flow data and preparation of the data for pub-
lication.

Q       And what other duties did you have?

A       In addition, there were some special reports
that I assisted on pertaining to the runoff from the thunder-
storms on small drainage areas, which occur in the East
during the summer.

Q       After your assignment in Columbus, Ohio, where
did you work and what were the duties that you performed?

A       During the latter part of my assignment in
Ohio, I was detailed to our Washington, D. C. office, the
main office, for the purpose of reviewing stream flow data
from various parts of the United States.  I spent approx-
imately about four, little over four months on that detail.

Q       What did you do in reviewing the data?

A       The stream flow data collected by the Geological
Survey throughout the various states and districts of the
Survey are sent to Washington for review prior to publication.
This review consists of checking into the analysis of the
stage discharge relation to make certain that the proper
factors were considered, to check for mistakes in applying

3496

the stage discharge relation, and, in general, give them
an over-all review prior to publishing them as a Geological
Survey water supply paper.

Q   Subsequent to your assignment in Washington, what were your duties and responsibilities with the Survey?

A   Soon after my return to Columbus from my Washington detail, I was transferred to the Los Angeles subdistrict of the Geological Survey.

Q   And what did you do?   What were your duties at that post?

A   My duties in the Los Angeles subdistrict were about the same as those in Columbus initially.   I prepared these stream stage discharge relation analyses and prepared records for publication.   I also made current meter measurements during high stages.   Because high stages occur relatively infrequently, in Southern California particularly, it is necessary that every effort be made to get a discharge measurement at high stages so that the upper end of that stage discharge relation curve can be defined.

Q   And how long did you perform those functions on that assignment?

A   In the early part of 1952 I was detailed for two months to Topeka, Kansas to assist in work on a report of the flood of the Kansas and Missouri area which occurred in July, 1951.

Q   And after that assignment?

A   I returned to Los Angeles and began increasingly to work with Harold Troxell, who was the District Hydrologist

H

Z61

1    stationed at Los Angeles, and had the responsibility of

2    preparing special reports concerning the hydrology of the

3    Southern California area.

4        Q  What relationship do those reports have with the Santa

5    Margarita River watershed?

6        A  Well, Mr. Troxell had prepared a report earlier on

7    the hydrology of Western Riverside County which included most

8    of the Santa Margarita River watershed.  In addition, at the

9    time I assised him we were in the process of preparing a

10   report on the Water Resources of Southern California with

11   special reference to the drouth of 1944 to1951-- I think that

12   is the correct title, I am not certain-- and as part of that

13   report we obtained data on water resources of the Santa

14   Margarita and other drainages in Southern California.

15       Q  What kind and type of investigations did you make in

16   connection with those studies?

17       A  It was primarily an analysis of the stream flow data

18   collected by the Geological Survey in respect to the magnitude

19   of runoff from various areas and the distribution of this

20   runoff.  Also, the factors of water use and increased water

21   use in the areas was considered and tabulated.

22       Q  And subsequent to that time, Mr. Hofmann, what were

23   your duties and functions in connection with the U. S.

24   Geological Survey?

25       A  In 1954 I was detailed back to Washington, D.C., for

     five months again to work with the Flood Section of the

                    JOHN SWADER  OFFICIAL REPORTER

Geological Survey.

Q  By the way, what does a "flood" mean to you?  When
the term is used by you Geological Survey students or servants
in your reports, what does it mean to you?

A  It could mean a variety of things.  To my knowledge,
there is no definition of the term "flood".  We have used it
as loosely as describing a 45 cubic foot per second runoff
from a drainage area.  And of course generally it means a
flood of magnitude that is considerably less frequent than
once in a year or once in every two years even.  The way I
have used "flood" up to the present is to describe these
major floods which cause considerable amount of damage and
loss of life.

Q  Would you proceed and outline your responsibilities
and duties while you were on this assignment to Washington?

A  My primary duties were to review indirect measurements
of peak discharge.

Q  How did you do that?

A  Well, the direct measurement of the peak discharge
differs from a current meter measurement in that the indirect
measurement is made after the peak passes.

Q  How would you accomplish a determination, then?

A  If I may step to the board for just a minute (the
witness steps down to the blackboard).

When a peak discharge passes down a channel it has a

3500

H

Z63

1   water surface profile which can be determined after the flood

2   passes from looking at debris or wash lines on the banks of

3   the stream which marks were deposited by the flood, and the

4   slope of this high-water profile can be accurately determined

5   by taking a survey instrument, such as a transit in the field,

6   and obtaining the elevation of this mark and the position

7   with relation to the ground, in other words, the plan, so that

8   the marks can be located as to distance along the stream as

9   well as distance across the stream.  This enables you to

10  determine what the water surface profile was at the time of

11  the peak discharge for which you are making the determination.

12      Then by using the formula Q is equal to A times 1.486

13  over N  R to the two thirds, S to the one-half.  This is not

14  as complicated as it sounds.  This area is the cross-section

15  area at thetime of the flood at a particular point, and

16  generally we take two sections and consider these as an

17  average.

18      Q  When you say two sections what do you mean?

19      A  Two cross-sections across the line of the channel.

20  So that this area would be the average of those two.  I am

21  speaking in general terms.  The exact methods are a little

22  more detailed than this, but for simplification.

23      This factor N is the roughness of the stream channel.

24  In other words, it should be obvious-- pardon my terminology--

25  that if you have a concrete-lined channel that  you would get

measurements of peak discharge and things of that kind.

Q   Subsequent to that assignment what did you do, Mr. Hofmann?

A   Soon thereafter I was appointed Flood Specialist for the Southwestern Region of the United States.

Q   Did that include this area here?

A   That includes the States of Nevada, Arizona, California and the Territory of Hawaii.

Q   Do you still have that assignment, Mr. Hofmann?

A   Yes, sir.  And if I may, with the Court's permission, say that I had a very enjoyable trip to Hawaii about a month ago in connection with my duties.

Q   What is your present position, Mr. Hofmann?

A   Well, I have several positions at the present time. I work for different bosses on each one, it seems like,  Mr. Troxell, who was District Hydrologist, retired in May, 1956, and since that time I have been District Hydrologist for California stationed/Los Angeles.  In addition to that--
                            in

Q   What are your duties in that position, the one to which you just made reference?

A   They are the preparation of special reports or reports other than the compilation of publication of stream flow data that are done in the California District.  Of necessity I don't do all of them.  I work on those in the Southern part of the State, and not exclusively any more-- most of the work

1   is done under my direction, though.

2       Q   What are the other functions that you perform in your

3   present position?

4       A   As I have mentioned, I am Flood Specialist for the

5   Region previously described, which entails visiting the

6   districts periodically and instructing them in the methods

7   of indirect measurements and in connection with the collection

8   and tabulation of data pertaining to floods in the area.

9       Q   And what are your other duties in your present job?

10      A   In early 1957 they also assigned me the responsibility

11  of conducting the basic training sessions for the Geological

12  Survey Surface Water Branch.

13      I might add-- I believe that I have not previously

14  mentioned it-- that the Geological Survey consists of four

15  branches, and Mr. Kunkel, who has testified previously, is

16  with the Ground Water Branch.   I am with the Surface Water

17  Branch, and all my work has been with the Surface Water Branch.

18      But in this Training Section I have the responsibility

19  of holding one or two schools each year in a region which

20  consists of New Mexico, Colorado, Utah, Arizona, Nevada,

21  California and the Territory of Hawaii.   It is a little

22  larger than the other one.

23      Q   And what other duties do you have in your present

24  position?

25      A   I believe that is all, Mr. Veeder.

H

Z68

1      Q  Were any of them within the watershed of the Santa

2  Margarita?

3      A  No, none of the ones that we did reconstruction on

4  were in the Santa Margarita.  But at the time I spent several

5  days in the Camp Pendleton area to familiarize myself with the

6  gaging stations in Southern California and visited all the

7  gaging stations in the Santa Margarita River Basin.

8      Q  What other investigations, if any, did you make during

9  that period at Camp Pendleton or in the watershed of the Santa

10  Margarita River in general?

11      A  In the fall of 1952 Mr. Troxell and myself spent

12  approximately one week-- I think it was, let us say, three or

13  four days-- in going over the watershed of the Santa Margarita

14  River basin.  We drove into the highland area, walked over

15  some of the area.  I can remember that we drove to the top of

16  Santa Margarita Peak, I think is the name, one of the highest

17  points in the watershed.  There was a lookout up there and the

18  lookout road was quite steep.  I remember thinking at the time

19  that I didn't know whether we would get to the top, and after

20  we got up how we would come down.

21      Q  Well you came down.  And what else did you do when

22  you were making the investigation?

23      A  As I say, we examined the watershed for the type of

24  vegetation and soil types in general.  Nothing specific--

25  no detailed mapping.  The main purpose was to give me the

H

Z69

1  benefit of Mr. Troxell's knowledge of some of the hydrologic

2  factors which entered into stream flow and runoff in Southern

3  California.

4      Q  What are those factors as you investigated them from

5  the standpoint of soil types and permeability of the land

6  and soils as they relate to runoff?

7      A  The relationship between precipitation and runoff is

8  quite complex.  There are so many factors involved that it is

9  difficult for me to enumerate them all from memory.  The

10  primary ones that we consider are the absorptive and retentive

11  character of the soil and mantle rock which is grouped into

12  three general gradients:  A most absorptive and retentive, a

13  least absorptive and retentive, and a moderately absorptive

14  and retentive group.  It is obvious that with a watershed

15  that is made up of several types of soils and soil covers

16  and vegetative covers that in drawing conclusions for a

17  specific point, such as a gaging station, it is impossible

18  to evaluate effects of each individual variation within the

19  watershed.

20      THE COURT:  Well, it's 4 o'clock Friday afternoon.

21  I will be busy Monday and Tuesday.  I will see you

22  gentlemen on Wednesday at 10 o'clock.

23      (Adjournment until Wednesday, October 22, 1958, 10 A.m.)

24

25