Mr. Veeder

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.,

Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**    Wednesday, October 22, 1958

**Pages:** 3507 to 3651

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____

MALCOLM LOVE
and
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
                                )
        vs.                     )        No.1247-SD-C.
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                Defendants.     )
                                )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, October 22, 1958

APPEARANCES:

        For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                    Special Assistant to the
                                    Attorney-General,
                                    Department of Justice,
                                    Washington, D.C.
                                      and
                                    WILLIAM E. BURBY, ESQ.

Z2

| | | |
|---|---|---|
| 1 | For Defendant Vail Co. | GEORGE E. STAHLMAN, ESQ. |
| 2 | For Defendants Fallbrook | |
| | Public Utility | FRANZ R. SACHSE, ESQ. |
| 3 | District, et al., | |
| 4 | For Defendant State | EDMUND G. BROWN, ESQ., |
| | of California | Attorney-General, by |
| 5 | | ADOLPHUS MOSKOVITZ, ESQ., |
| | | Deputy Attorney General. |
| 6 | | |
| 7 | For Defendant Santa | |
| | Margarita Mutual | W. B. DENNIS, ESQ. |
| 8 | Water Company | |
| 9 | For Defendants Hartman, | BEST, BEST & KRIEGER, by |
| | Lewis, Wilks and | ARTHUR L. LITTLEWORTH, ESQ. |
| 10 | Bayle, and Oviatt | |

## INDEX TO WITNESSES

__For the Plaintiff:__                      D      X    RD      RX

     Walter Hofmann (Resumed)    3525   3617

## E X H I B I T S

|                        | For Iden. | In Evidence |
|------------------------|-----------|-------------|
| Plaintiff's Exhibit –  |           |             |
| 23                     |           | 3550        |
| 20                     |           | 3529        |
| 79-E                   |           | 3532        |
| 79-F                   |           | 3532        |
| 59                     |           | 3534        |
| 19                     |           | 3537        |
| 22                     |           | 3542        |
| 21                     |           | 3545        |
| 17                     |           | 3550        |
| 24                     |           | 3552        |
| 25                     |           | 3556        |
| 26                     |           | 3556        |
| 60                     |           | 3560        |
| 61                     |           | 3562        |
| 32                     |           | 3563        |
| 33                     |           | 3563        |
| 34                     |           | 3567        |
| 35                     |           | 3568        |
| 36                     |           | 3569        |
| 62                     |           | 3580        |
| 27                     |           | 3582        |
| 27-A                   |           | 3582        |
| 27-B                   |           | 3583        |
| 28                     |           | 3583        |
| 63-A                   |           | 3584        |
| 63-B                   |           | 3584        |
| 30                     |           | 3590        |
| 64                     |           | 3591        |
| 65                     |           | 3595        |
| 66                     |           | 3597        |

Z4

SAN DIEGO, CALIFORNIA, WEDNESDAY, OCTOBER 22, 1958. 10 A.M.

THE CLERK:  Number one on the calendar, 1247-SD-C,
United States of America vs. Fallbrook, etc., et al.

Further court trial.

THE COURT:  I didn't read all of this transcript, but I
noticed one correction, at page 3467 on line 18, a remark of
of the Court:  "The contours are not straight lines and there-
fore obviously you could not technically have a right angle."
The word "not" should be inserted after the word "could" on
line 18.

MR. VEEDER:  Are you ready to proceed, your Honor?

THE COURT:  Yes, sir.

MR. VEEDER:  Will you take the stand, Mr. Hofmann.

MR. SACHSE:  Your Honor, before Mr. Hofmann takes the
stand, I would like to inquire.  Last Tuesday a week ago your
Honor suggested that Mr. Veeder and I should review the
transcript of the Master's hearings, and you suggested that
between now and the 20th the Government should be prepared to
state whether they are content with the testimony of Col.
Bowen on the Fallbrook Creek watershed and that I should be
prepared to make a similar statement.

As your Honor knows, we had another hearing day before
yesterday.  I am curious as to the position of the United
States.  Having heard the Government's expert reconfirm the

Z5

1    testimony of the previous week, I am content.

2        THE COURT:   What happened at this master's hearing,

3    generally?

4        MR. SACHSE:   Mr. Veeder put in some routine evidence

5    that has no great connection with the subject we are discuss-

6    ing here.   He then examined Col. Bowen in greater detail as to

7    ground water movements, as to the effect of filling the wells

8    in the immediate neighborhood of Fallbrook Creek.   In his

9    testimony as to the latter question, Col. Bowen said that the

10   effect would be "negligible."

11       I had a very brief cross-examination.   I asked him

12   specifically if he in any way changes his testimony of the

13   preceding week, and he said not; and I read back to him his

14   testimony of the preceding week, and he confirmed it.

15       THE COURT:   You are still talking about the point that

16   interests you.   But I was asking generally about the hearing.

17   Did the Government, through Commander Redd, have ready the

18   ownership lists?

19       MR. SACHSE:   Yes.   They turned them over to me.

20       MR. VEEDER:   Your Honor, I would just as soon explain

21   what we did.   I think Mr. Sachse represents Fallbrook.

22       THE COURT:   All right.

23       MR. VEEDER:   The United States proceeded to offer

24   evidence in regard to the lands which we consiered to be

25   riparian and put in maps showing those lands.   We put in a

1    list of the lands to which I have made reference.  And then we
2    showed all the lands in the watershed, some of which are not,
3    in our view, riparian.  We are bringing the whole matter to
4    date and every parcel of land will be tabulated and available.
5    We have put in maps showing the general location of the
6    property, and then we introduced evidence, oral in character,
7    by Col. Bowen.

8        THE COURT:  All right.  Were there some pro per defend-
9    ants who were not represented by counsel in that area?

10       MR. VEEDER:  There were one or two who said that they
11   were not represented by counsel, but from the standpoint of
12   introducing any evidence I would question whether there was
13   evidence.  One or two asked questions concerning wells, and
14   uses of water.  But by and large I wouldn't say that there was
15   testimony put in by any pro per.

16       MR. SACHSE:  I concur.  I don't believe there was.

17       THE COURT:  To get back to the real inquiry, is the
18   Government now prepared, or will the Government be prepared
19   shortly, to make some answer to Mr. Sachse's inquiry, so that
20   we could make progress in this matter of a prospective
21   interlocutory decree that would take certain of these people
22   out of further participation in the case?

23       MR. VEEDER:  As soon as the transcript is available to
24   use-- I haven't received a copy of the transcript yet-- of
25   what transpired before Special Master Cranston, I will review

Z7

1   it and determine the course we will pursue.  We have a very

2   difficult question, in my view.  If Mr. Sachse's interpretation

3   is correct, we will be in a position, as I see it, to claim

4   all the surface runoff of Fallbrook Creek.  That is contrary

5   to any position I have ever taken or that the Government has

6   ever taken.  We believe that there are riparian owners in that

7   area.  We believe that they are entitled to share correlatively.

8   We believe, moreover, on the basis of Col. Bowen's testimony,

9   that the only source of recharge for the whole area is the

10  surface runoff and the precipitation that falls on those lands.

11  I am not about to say that those people have no riparian

12  rights in the ground water in that area.  To the contrary, I

13  say that they do have riparian rights, and that we share with

14  them correlatively.  Mr. Sachse can attack those poor farmers

15  up there if he chooses.  I am not going to be a party to it.

16      THE COURT:  Let's not make this any more difficult than

17  we have to.  As I understand theproblem in that area, it

18  falls into two categories.  First of all, there is the land

19  which is not riparian to Fallbrook Creek.

20      MR. VEEDER:  Right.

21      THE COURT:  And as to which Col. Bowen has indicated

22  that the water is vagrant, or as to some of the areas has

23  indicated that the water was vagrant percolating water not

24  part of the stream.

25      MR. VEEDER:  That is right.

        THE COURT:  As to those people, it seems to me that if

3514

Z8

1    the Government is content we should lay out a program whereby

2    we arrange to serve notice on every person who has appeared

3    in this case that this testimony has been given and that the

4    Government has no testimony contrary to it that--

5        MR. VEEDER:  Your Honor, on that I haven't had an

6    opportunity to make a statement.

7        THE COURT:  That is the very thing Mr. Sachse is asking

8    about.  So let's hear your statement.

9        MR. VEEDER:  Yes, your Honor.

10       Your Honor took one additional step that I hadn't ex-

11   pected at that time.  We are going to put in, with the witness

12   who follows Mr. Hofmann, we are going to put in before your

13   Honor, as distinguished from what was put in before the

14   Special Master, the geology from the confluence of Murrieta

15   Creek and Temecula Creek forming the Santa Margarita River

16   down to and including the De Luz Creek and including all of

17   the minor affluents to--

18       THE COURT:  Then your point is that we should wait

19   until we get that testimony?

20       MR. VEEDER:  By all means, your Honor.  We haven't put

21   in any geology at all.

22       THE COURT:  I think you are right.  But if it develops

23   that there are certain areas where there is vagrant percolat-

24   ing water and the testimony by the Government doesn't contra-

25   dict that, then I think we should start to lay plans to notify

3515

Z9

1    everyone who has appeared in this case that such proof has been

2    given as to certain parcels and that unless someone else in

3    the watershed wants to contest it the Court proposes to make

4    findings and to enter an interlocutory decree that the water

5    on their property is not part of the stream.

6        MR. VEEDER:  Right.

7        THE COURT:  That they have correlative rights with their

8    neighbors which we don't propose to adjudicate.

9        MR. VEEDER:  Right.

10       THE COURT:  Now, the second category up there is the

11   riparian land on the creek.  I have had some informal talks

12   with the Master on that, and there is no doubt that if the

13   land is riparian to the Creek they have riparian rights; but

14   the rights are illusory, in the sense that the only time that

15   water runs in the creek is in the wintertime when there is a

16   runoff, and that is the time when a riparian owner isn't about

17   to put on his raincoat and go out and irrigate his ground.

18   And we have come to no conclusion about the matter, but it

19   seems to me that the finding would have to be that the people

20   are riparian.  At the same time, that their riparian right is

21   of little moment because of the fact that it can be exercised

22   only in the wet season when runoff is coming down the stream.

23       MR. VEEDER:  But, your Honor, in that regard-- I don't

24   desire to argue the proposition now, but from the evidence,

25   as we understand it, here is a man who is riparian to the

Z10

1    stream.  The waters that he is pumping are not part of a con-

2    fined basin in the normal sense of the word, but nevertheless

3    they are recharged by the surface runoff from the stream.

4         THE COURT:  I am not talking now about pumping out of

5    there.  I am talking more about the individual who is not

6    pumping, who just has land that is riparian on the stream.

7    When we get the facts there may be areas where this will be a

8    problem.  But as to a lot of that ground that is riparian,

9    isn't it your view that although the man has a riparian right

10   he has a rather illusory one.

11        MR. VEEDER:  No, your Honor.  I think that a man of the

12   character who was in the courtroom up there at Reche School,

13   who said, "Now, I have a well, and it is a big well.  I have

14   galleries I have constructed in it, and the result of it is

15   that it is a producer-- it is a good well."  And the evidence

16   that Col. Bowen put in is that the recharge for that well came

17   from the surface runoff of Fallbrook Creek.  Now, I am not

18   sure, but I don't believe that we should preclude that man

19   from claiming a riparian right to certain of the waters to

20   recharge that ground water basin.

21        THE COURT:  I don't think there is any doubt about

22   that.

23        MR. VEEDER:  And I think he should be protected.

24        THE COURT:  Can we leave it now by agreeing that we will

25   wait until the next witness who is going to testify to the

Z11

1   geology and hydrology of the areas south of the confluence of

2   the Murrieta, Temecula and Santa Margarita?

3        MR. SACHSE:  We can, of course, leave it that way, your

4   Honor, but it poses one further additional minor question,

5   perhaps, about how this case will proceed.  I have assumed

6   that the United States' case, in so far as the rights of the

7   individual defendants on De Luz Creek and on the Fallbrook

8   drainage are concerned, has been put on before the Master.

9   I have not assumed that we are trying it before two different

10   forums.  And I would like to inquire, with all due respect,

11   does your Honor examine the Master's transcripts of these

12   things?  If it is going to go before two different forums, I

13   believe that your Honor should have the benefit of the testimony

14   offered by the United States on both those tributaries; that

15   we should not have one set of testimony offered by the United

16   States before the Master and then a different set of testimony

17   on the same very small two square miles offered for your

18   Honor.  It might be entirely different.

19        THE COURT:  I am inclined to agree that there doesn't

20   have to be a duplication.

21        MR. VEEDER:  We don't want to duplicate it, your  Honor.

22        THE COURT:  But you didn't offer before the Master

23   the geology of Fallbrook Creek?

24        MR. VEEDER:  No, your Honor.

25        THE COURT:  You offered the geology of De Luz Creek,

Z12

1   did you not?

2       MR. VEEDER:  We have additional testimony on the whole

3   score that we are going to put in.  Here is a prime example

4   of the problem with which we are confronted and with which I

5   believe the Court is confronted.  The Vail estate is the source

6   of all the principal runoff, with minor exceptions, of De Luz

7   Creek and of Sandia Creek.  There is no evidence whatever in

8   regard to Vail.  Now, here is a large area within Camp

9   Pendleton of De Luz Creek, and I don't believe there is any

10  confusion about it myself-- I think we can go ahead and dove-

11  tail this whole thing in.  But I am certainly afraid of a

12  finding without taking those things into consideration.

13      THE COURT:  We understood that from the beginning, that

14  there were parts of De Luz that were independent and in the

15  Vail properties, and we were going to hear that testimony here.

16      MR. SACHSE:  Your Honor, I am concerned now with the

17  testimony as it affects these individuals, and the fact is that

18  as to De Luz Creek, as to very large areas of it, the only

19  Government expert testified that the waters underlying the ground

20  were local vagrant, percolating and not part of the stream,

21  and the fact is that as to Fallbrook Creek, "The entire two

22  square miles, the waters underying are vagrant, local,

23  percolating ground waters."  That is a finding which vitally

24  concerns each defendant.

25      THE COURT:  Let's not do everything in one day.  I am

1   equally of a mind that you are, that at the earliest possible

2   moment we should do what we can to chop off segments of this

3   case.  But let's be a little more patient.  Let's get the

4   geology of the whole area in and then re-analyze where we are.

5   If we do it in 30 days from now, it is as good as doing it now.

6   Nobody is going to be hurt inthat period of time.  But I

7   agree with you that some of this can be taken care of before

8   this whole case terminates.  Let's be a little more patient

9   about it.

10          MR. VEEDER:  I have talked to Mr. Rankin about the

11  whole matter, your Honor, I have explained the circumstances

12  to him, and he is very anxious to get rid of as many people

13  as we can.  But we ask that a finding be made by the Special

14  Master as to the status of these people rather than having it

15  on an agreement basis, and then have an order based on that

16  finding.

17          I explained to him my concern, moreover, of using Col.

18  Bowen as we have in many instances.  We are glad to have him

19  testify.  But I am concerned, frankly, about having Col. Bowen

20  in effect testifying for the United States and testifying for

21  the small land owners and testifying for everyone.  When the

22  day is done I don't want to have somebody say, "Well, the

23  Government put in evidence that deprived us of a riparian

24  right."  It is a real concern that we have, and Mr. Rankin

25  understands it, and he says, "Go down the line and get as many

Z14

1    people out as you can and have findings to that effect."

2             THE COURT:   Let's postpone it for awhile.

3             MR. STAHLMAN:   Your Honor, in connection with this

4    question that has been discussed here relative to procedure,

5    I have been milling it over in my mind and I will toss this

6    out for what it is worth.   The order that your Honor made on

7    September 26, 1958, in relation to the proposed order of

8    trial, it seems to me that so far as the geology as testified

9    to by the United States and the cross-examination by the

10   State and the references to Bulletin 57 there are evidently

11   some difderences of opinion as to what the character of the

12   geology is and the quantity of water and sources of water

13   available, and I think that underground water situation is

14   one of the prime basic factors in this case-- at least it

15   concerns Vail greatly.

16            In other words, if there is a contention on the theory

17   produced by Mr. Kunkel, which is contrary to an investigation

18   made by the State, I think we should know what those facts

19   are at an early stage in this case, and therefore I believe it

20   would be better if the order of the defendants' proof in this

21   case were slightly changed from what your Honor has proposed

22   in that order.   In other words, I believe that the State

23   should come out with their geology as early as possible.   In

24   fact, I would think it may be even desirable to consider

25   varying the order of proof so that we would know what the

Z15

basic foundational factors are that enter into the question as to whether or not, for instance, the Vail basin operates as it does, and undoubtedly there will be other geological problems in relation to the other two areas when those witnesses testify. And I am just wondering if it wouldn't be well, after the geology is in, to hear from the State about their investigation, so that we can search out and determine what are the basic facts that underlie the question as to these quantities of water and the manner in which they move. And then when we have testimony relative to the practical opera- tion of the extraction of water in certain places it will mean a great deal more to us, I think, if we understand what the conflict is, if there is a conflict, in those two theories of geology.

THE COURT: You are suggesting that, for instance, all proof be put on as to what the Government has called the underground water units 1, 2, 3 and 4, we will say, but you are not suggesting that the Court make a final finding.

MR. STAHLMAN: No, not whatsoever.

THE COURT: That will have to wait until everyone has a chance to be heard.

MR. STAHLMAN: I merely mean as a practical means for those of us getting--

THE COURT: Having that all together in one part of the record?

216

1    MR. STAHLMAN:  Yes, having that all together in one

2    part of the record, and we will get a better grasp of the

3    evidence that follows.

4    THE COURT:  Let's think about it.  It may be the way to

5    do it.  We would have the evidence that concerned a major

6    issue all at one place in the record.  As long as the Court

7    was not required to make some finding in the case before

8    everybody had a chance to be heard, I would see no objection.

9    You are merely grouping together evidence in the case that

10   concerns a particular part of the watershed on a particular

11   issue.  Let's think about it.

12   MR. STAHLMAN:  Yes.  For instance, Vail has a great

13   deal of evidence in relation to the history and the practical-

14   ity of pumping and some of the things that have occurred

15   there.  There are some errors in the manner in which we have

16   been doing this.  But basically it is going to have to tie

17   into what is the true geological situation when we are talking

18   about underground waters.

19   THE COURT:  Let's think about it.  I have your sug-

20   gestion.

21

22

23

24

25

1522

MR. MOSKOVITZ:  I have another related matter.  Last week Mr. Hall said he would look to see if he had any notes as to calculations of runoff from Pauba Basin, into Pauba Basin.  I am just wondering if he has brought those in.

THE COURT:  Mr. Hall.

MR. HALL:  I am working on it, but it is a rather large task, and it will take a matter of a week or two before I can produce any figures.

THE COURT:  All right.  Let's proceed.

MR. VEEDER:  May we proceed, your Honor?

THE COURT:  Yes.


WALTER HOFMANN,

having been previously sworn as a witness on behalf of the plaintiff, resumed the stand and testified further, as follows:-

MR. VEEDER:  I would like to pursue the course that we have in the past.  I would like to put into the record the bibliography of the materials presented and published under the name of Walter Hofmann, the present witness, if that meets with your Honor's approval.

THE COURT:  Mr. Hofmann, you have seen this list?

THE WITNESS:  Yes, sir.

THE COURT:  And if you were to testify, you would testify as set forth in this list?

THE WITNESS:  Yes.

THE COURT:  All right.  It will be copied into the record as part of the testimony of the witness.

MR. VEEDER:  I will give counsel a copy.

"BIBLIOGRAPHY

"Walter Hofmann

"U. S. Geological Survey

"Water-Supply Papers

"Hofmann, Walter, and others, Floods of December 1955 - January 1956 in the Far-Western States:  (In preparation for publication as U.S. Geol. Survey Water-Supply Paper.  Number not yet assigned.)

"Circulars

"Floods of December 1955 - January 1956 in Far-Western States - Peak discharge tabulation; U.S. Geol. Survey Circular 380,15 p.  Hofmann, Walter and Peterson, W. C., 1957, Water Resources Summary for Southern California, 1956; U.S. Geol. Survey Circular 399, 18 p.

"Open File

"Hofmann, Walter, Briggs, R.C., and Littlefield, W.M., 1953, Southern California Water Bulletin for 1952; U.S. Geol. Survey mimeo. report.

"Hofmann, Walter, 1953, Fifth Progress Report on the Cooperative Investigation of Spring and Stream Flow in the Tecolote Tunnel Area of Santa

Barbara County, Calif.; U.S. Geol. Survey mimeo. report.

"Hofmann, Walter, Briggs, R.C., and Little-field, W. M., 1954, Southern California Water Bulletin for 1953; U.S. Geol. Survey mimeo report.

"Hofmann, Walter, Briggs, R.C., and Littlefield, W. M., 1955, Southern California Water Resources Summary for 1954; U.S. Geol. Survey mimeo report.

"Hofmann, Walter, 1955, Sixth Progress Report on the Cooperative Investigation of Springs and Stream Flow in the Tecolote Tunnel Area of Santa Barbara County, Calif.; U.S. Geol. Survey mimeo report.

"New Publication Series

"Hofmann, Walter, Kunkel, Fred, and others. Water in the Los Angeles Region; (in preparation for publication as U.S. Geol. Survey, new publication series.)

"<u>Cooperating Agency</u>

"Troxell, H.C., and Hofmann, Walter, 1954, Hydrology of the Los Angeles Region; in Geology of Southern California; Calif. Div. of Mines, Bull. 170, Chapt. VI, p. 5-12.

"Troxell, H.C., and Hofmann, Walter, 1954, Hydrology of the Mojave Desert, in Geology of Southern California; Calif. Div. of Mines, Bull.

170, Chapt. VI, p. 13.

"In addition to the above reports, Mr. Hofmann has prepared 3 closed-file surface Water R$_e$ports for military establishments in Southern California.

"Assisted H. C. Troxell in preparation of:

"1.   Water-Supply Paper 1366- Water Resources of Southern California with Special Reference to the Drought of 1944-51.

"2.   One closed-file report for the military."

DIRECT EXAMINATION

BY MR. VEEDER:-

Q   Mr. Hofmann, from the standpoint of your investigations,what did they reveal as to the kinds and types of soils that were encountered in the Santa Margarita River valley insofar as runoff is concerned?

A   In my visit to the Santa Margarita River watershed with Mr. Troxell, we examined the soil mantle of considerable portion of the watershed.  There are a variety of types of soil; and, as far as the runoff of the watershed is concerned, we made no attempt to classify individual areas as to soil characteristics.  What we in a hydrologic study consider is the over-all characteristics of the basin, the physical characteristics, which includes the types of soil, the number of ground water storage basins, small and large in the basin, the slopes and other physical aspects

1    of the drainage basin.   The soil types which permit

2    percolation of water both into the soil and then on into

3    ground water storage are the open type soils, the talus

4    deposits and residuum of the bed rock.

5         Q     When you say, "talus," would you state for the

6    record what you mean?

7         A     The word is t-a-l-u-s.   It is on the steeper

8    mountain slopes, the weathered material deposits at the

9    foot of those slopes in a pile; and they tend to -- I mean

10   they accumulate at the base of the slope where the slope

11   changes gradient.   That is a talus deposit.   We, to my

12   recollection, have no large talus deposits in the Santa

13   Margarita River Basin.

14        Q     From the standpoint of the retentiveness of

15   runoff, how would you evaluate the talus deposits?

16        A     Well, the talus deposits are quite permeable,

17   and the precipitation to the deposits percolates into the

18   deposits readily.   There is very little vegetation to these

19   deposits, so that there is very little natural water loss

20   from the deposits.   The water percolates into the deposits

21   and then moves on down the slope, either underground or

22   perhaps surfaces below.

23        Q     Now, what other kinds and types of soils did you

24   encounter, and would you describe them?

25        A     Well, I make no claims to be a soils expert and

1   can only describe the physical characteristics that we

2   considered, which were the surface features that indicated

3   the capacity of the soil to absorb water.

4        Q     Now, you named talus.  What is another kind and

5   type?

6        A     Well, the younger alluvium generally is a quite

7   absorptive type material and the exhibit presented by Mr.

8   Kunkel of the older alluvium was obviously fairly quite

9   absorptive because of the rate with which the exhibit took

10  water.

11       Q     And what are the other kinds and types that you

12  found?

13       A     The opposite of the absorptive types, I might

14  discuss a little, are the clay soils that tend to seal at

15  the surface when they are wet by precipitation or other

16  water.  And then the granite and bed rock outcrops which,

17  of course, will not absorb any water.  Those are the least

18  absorptive types of soil.

19       Q     Have you given consideration as to the relation-

20  ship between precipitation and runoff in the Santa Margarita

21  River valley?

22       A     Yes, I have given consideration.

23       Q     And what relationship have you found to exist

24  in that valley between precipation and runoff?

25       A     For the two upstream gaging stations, Murrieta

Hofmann - Direct                                                3528

1   Creek at Temecula and Temecula Creek at Vail Dam, we have,

2   in an earlier report, computed the average annual pre-

3   cipitation on the entire drainage basin.  My recollection is

4   that the average annual precipitation for the drainage

5   upstream from Temecula Creek at Vail Dam was approximately

6   18 inches.  That is 18 inches of precipitation over the

7   entire area and an average annual figure.

8       Q     What did your investigations reveal from the

9   standpoint of the runoff?

10      A     The runoff for Temecula Creek at Vail Dam

11  adjusted for the same time period was approximately seven-

12  tenths of an inch -- 0.7 of an inch less than one inch of

13  runoff from that drainage area.  Again, that is assuming

14  unit runoff over the entire drainage area.

15      THE COURT:  That is the drainage area above Vail Dam?

16      THE WITNESS:  Above that particular gaging point, yes,

17  sir.

18      Q  BY MR. VEEDER:  Now, what other areas did you give

19  consideration to?

20      A     I mentioned Murrieta Creek.  There the average

21  annual precipitation is somewhat less.

22      THE COURT:  Where at Murrieta Creek?

23      THE WITNESS:  Murrieta Creek at the gaging station

24  at Temecula, which is four-tenths of a mile above the mouth,

25  above its confluence with Temecula Creek.

1529

1       MR. VEEDER:  I think at this time, your Honor, we will

2  depart from this line of interrogation and introduce into

3  the record the data in regard to gaging stations.

4       Q     I wish to have --   Well, I hand you Plaintiff's

5  Exhibit marked 20 for identification, and I ask you to state

6  into the record what that document represents?

7       A     Plaintiff's Exhibit 20 marked for identification --

8       THE COURT:  I have a note it was received  in evidence.

9       MR. VEEDER:  Was there objection?  I was going to offer

10  these.  I think --

11       THE COURT:  Do you have it, Mr. Clerk?

12      MR. VEEDER:  Have those been admitted?

13       THE CLERK:  20?

14       MR. VEEDER:  They have been marked.

15       MR. STAHLMAN:  How would you describe this exhibit?

16  I don't --

17       MR. VEEDER:  I am going to have the witness describe

18  it.  It is simply a tabulation of the runoff records at the

19  various gaging stations throughout the valley, and I was

20  going to have him mark it on the map.

21       MR. SACHSE:  My notes indicate they are in evidence,

22  your Honor, but I --

23       THE COURT:  It doesn't make any difference.  Any

24  objection to 20?  20 will be received in evidence.  That is

25  the records of --

1    MR. VEEDER:  We have this copy.  Did your Honor

2    desire to look at it?

3         MR. STAHLMAN:  Do you have it there?

4         Q  BY MR. VEEDER:  Now, Mr. Hofmann, will you state

5    into the record the contents of the document which

6    comprises Plaintiff's Exhibit No. 20?

7         A     Plaintiff's Exhibit No. 20 consists of the

8    runoff records for the gaging station, Temecula Creek at

9    Vail Dam.  In addition, there is a field station description

10   for the gaging station and a manuscript station description

11   for the water year 1957 for the Vail gaging station.

12        MR. STAHLMAN:  Mr. Hofmann, can you talk a little

13   louder, please?

14        THE WITNESS:  Yes.

15        MR. STAHLMAN:  And Mr. Veeder, do you have a copy of

16   that here?  We have copies, but they are over at the hotel.

17        MR. VEEDER:  Yes, George.

18        MR. STAHLMAN:  Just to use it for this session.

19        MR. VEEDER:  Yes.

20        Q     Would you proceed and state the contents of that

21   page just for the record, Mr. Hofmann?

22        A     The field station description is a fold sheet

23   and gives the --

24        THE COURT:  A fold sheet of the document?

25        THE WITNESS:  Yes, sir.  It is unattached, I believe.

Hofmann - Direct    3531

1    I think it is the last sheet in your --

2        THE COURT:  Oh, last sheet in the folder.

3        THE WITNESS:  It is not attached to the rest of it.

4        THE COURT:  I see.

5        THE WITNESS:  It gives the location of the gaging

6    station, the drainage area, the date it was established,

7    and other information pertaining to the physical installation

8    of the station; the history of the station, what changes

9    were made, where discharge measurements are made, the

10   methods of computing the runoff.

11       Q  BY MR. VEEDER:  Now, would you step --   Go ahead.

12       A    Pardon me.  Did you want more detail of what

13   these sheets consisted, or would that be sufficient?

14       Q    That is sufficient.  If you would step to the

15   Plaintiff's Exhibit No. 15 and locate that gaging station

16   by a line from the point where it is located, and then write

17   the name of the gaging station at the border of the map?

18       A    (Witness marks exhibit.)

19       MR. VEEDER:  This is part of our fulfilling the

20   responsibility of the agreed stipulated facts, your Honor;

21   and, as I understand it, this is what you desire.

22       Q    Now, will you state --

23       A    I have located the gage station Temecula Creek

24   at Vail Dam on Plaintiff's Exhibit 17 at the point where

25   Vail Dam is marked on Exhibit.  And that letter, the name,

1    Temecula Creek at Vail Dam, with a line connecting the

2    lettered word to the Vail Dam location.

3         Q    Now, I hand you the Plaintiff's Exhibit 79-E,

4    which is a photograph, and ask you to state what is depicted

5    on that photograph and whether it truly portrays what is

6    set forth on the identification?

7         A    The photograph presented as Exhibit 79-E is a

8    true depiction of the water, the stilling well for the water

9    stage recorder   on the downstream face of Vail reservoir.

10   This well is connected to the reservoir itself through the

11   openings, the pipes, release pipes at the base of the dam;

12   and the water level in this well that is depicted corresponds

13   to the stage of the reservoir.

14        MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

15   No. 79-E.

16        THE COURT:  How many more exhibits in this 79 series?

17        MR. VEEDER:  One more, your Honor.

18        THE COURT:  One more.  E received in evidence.

19        Q  BY MR. VEEDER:  All right, now, we will hand you

20   Plaintiff's Exhibit marked 79-F and ask you to state what

21   that photograph depicts and whether it truly represents

22   what the photograph sets forth?

23        A    The photograph presented as Exhibit 79-F is a

24   true depiction of the evaporation pan and temperature

25   recorder located on the bank of Vail reservoir above the

1   water line, considerably above the water level on the

2   arroyo seco limb of the reservoir.

3        MR. VEEDER:  Where is Mr. Stahlman?  Here is the

4   copy of Exhibit 20 that you want.

5        MR. STAHLMAN:  Thank you.

6   Q  BY MR. VEEDER:  Now, Mr. Hofmann, would you proceed

7   to describe the methods pursued in by the United States

8   Geological Survey in making the measurements at Vail Dam?

9        A     Prior to the construction of Vail Dam, the

10  gaging station was operated approximately less than 1000

11  feet downstream from the present dam site in the normal

12  manner.  By that I mean the flow of the stream was gaged as

13  I described in my testimony last Friday.  Since the

14  construction of Vail reservoir all of the water passing

15  down Temecula Creek has been stored in their reservoir.

16  In order to compute records of runoff at the point where

17  Vail Dam is now located, it is necessary to compute first

18  the change in storage in the reservoir on a monthly basis,

19  the evaporation from the surface of the reservoir, again on

20  the monthly basis; and the releases from the reservoir.

21  By knowing those three factors, the change in contents, the

22  evaporation and the release, it is possible to compute the

23  in-flow to the reservoir or the runoff at the point where

24  the dam is now located.

25       Q     Now, I hand you the Plaintiff's Exhibit marked 59

1   for identification, and I ask you to state what that

2   document constitutes?

3           Here is a copy for your Honor.  Excuse me.

4       A   The Plaintiff's Exhibit 59 consists of three

5   sheets comprising the area table for Vail Lake and three

6   sheets comprising the capacity table for Vail Lake.

7       Q   Under whose direction are those calculations

8   made, and what is the purpose of the table?

9       A   The table, both tables were prepared by me or

10  under my direction from data furnished by the Vail Company,

11  which the data furnished by the Vail Company were the

12  Bureau of Reclamation Surveys of the reservoir site with

13  surface areas at 10-foot intervals.  The area table was

14  prepared by me or under my direction using that data, so

15  that the surface area at one-foot intervals of stage could

16  be obtained.

17      Q   Are those figures as set forth on Plaintiff's

18  Exhibit 59, accurate to your knowledge?

19      A   To my knowledge they are accurate.

20      MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

21  No. 59.

22      THE COURT:  59 received in evidence.

23      Q   BY MR. VEEDER:  Now, in determining the quantities

24  of water impounded in Vail Reservoir, what are the factors

25  which must necessarily be taken into consideration when you

1  are determining the runoff of water in the Temecula River

2  above Vail Dam?

3       A       The factors which must be taken into consider-

4  ation are the changes in storage in Vail Reservoir, the

5  evaporation from the surface of Vail Reservoir, and the

6  release of water downstream from Vail Reservoir.

7       Q       How do you calculate the evaporation losses,

8  and what facilities do you utilize, referring, in that

9  regard, to Plaintiff's Exhibit 79-F?

10      A       The evaporation losses for Vail Reservoir are

11 computed in a manner similar to the evaporation losses for

12 other reservoirs in Southern California.   The method used

13 is to maintain a record of evaporation from an evaporation

14 pan, as is shown on Exhibit 79-F, and using that record of

15 evaporation from the pan and a proper coefficient, the

16 evaporation from the reservoir can be computed.   In order

17 to compute the evaporation from the reservoir it is

18 necessary to have the surface area of the reservoir and

19 multiply that by the units of evaporation as recorded in the

20 evaporation pan, and then using a proper coefficient to

21 adjust the pan evaporation to reservoir operation.

22      THE COURT:  You get the area from Exhibit 59?

23      THE WITNESS:  Yes, sir.

24      THE COURT:  What is this coefficient you are talking

25 about?

1

2  THE WITNESS:  Because the evaporation pan is shallower

3  and it is exposed to heat energy around its entire periphery,

4  the entire evaporation from a pan is higher than it would

5  be from the surface of a reservoir.  And by previous

6  experiments in both Southern California and other areas,

7  the coefficient of eight-tenths which we use has been

8  determined to be applicable to relate the pan evaporation

9  to reservoir evaporation.

10  THE COURT:  In other words, the evaporation from the

11  reservoir would only be eight-tenths from what would be

12  evaporated from the pan?

13  THE WITNESS:  Yes, sir.

14  THE COURT:  All right.

15  THE WITNESS:  I might add at this time that we use a

16  straight coefficient of eight-tenths.  Recent experiments

17  indicate that the monthly coefficient varies from 69, .69,

18  to somewhere in the neighborhood of point nine something,

19  depending on the month.  But because there are other

20  variabilities in here that are difficult to determine, we

21  use an average coefficient of eight-tenths each month.

22  THE COURT:  All right.

23  Q  BY MR. VEEDER:  Mr. Hofmann, I hand to you Plaintiff's

24  Exhibit marked No. 19 for identification.

25  THE COURT:  No. what?

Hofman - Direct                                          3527

1      MR. VEEDER:  No. 19.

2               And ask you to state what that document is?

3      A       Plaintiff's Exhibit No. 19 is a field station

4  description for a recently-established gaging station on

5  Temecula Creek near Aguanga, California.

6      THE COURT:  Merely the description, no records?

7      THE WITNESS:  Yes, sir.  If you will notice, the

8  gaging station was established on August 23, 1957.  And we

9  are at the present time in the process of computing the

10  records for the 1958 water year, and it will probably be

11  available within the month.

12     THE COURT:  What do you call the water year?

13     THE WITNESS:  From October 1st of the year to September

14  30th of the following year.

15     MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

16  marked for identification No. 19.

17     THE COURT:  19 received in evidence.

18     Q  BY MR. VEEDER:  Now, would you step to Plaintiff's

19  Exhibit No. 17, and using your straightedge locate the

20  Aguanga station?

21     THE COURT:  You called it Radec.

22     THE WITNESS:  No, sir.  I believe I said Aguanga.

23     THE COURT:  Oh, you did?

24     THE WITNESS:  Yes.  The reason for the name, actually

25  it is at the downstream end of Radec Valley; but because

1  the community of Aguanga is a larger community, and I

2  believe is plotted on the one to **five** hundred thousand

3  base map, the name has been assigned near Aguanga so that

4  the location could be spotted easier from the base maps.

5       THE COURT:  All right.  Go ahead.

6       MR. VEEDER:  Does your Honor have a copy?

7       THE COURT:  Go ahead.

8       THE WITNESS:  The gaging station is located at the

9  downstream end of Radec Valley approximately where this

10  circle is..  The exact location, if I may, is in the south-

11  east quarter of the southwest quarter, Section 19, Township

12  8 South, range 1 East.

13       Q  BY MR. VEEDER:  Now, state in the record, if you

14  would, what you are putting on there and refer to the

15  exhibit upon which you are printing?

16       A     On Exhibit 17 I have located the gaging station,

17  Temecula Creek near Aguanga, and have drawn a straight line

18  from the gaging station location to the margin of Exhibit

19  17, and then lettering the name "Temecula Creek near Aguanga"

20  at that point.

21       MR. VEEDER:  It is true, your Honor, we did refer to

22  that as a gaging station at Radec.  And I think Mr. Kunkel

23  made the reference, but it has been changed officially to

24  Aguanga.

25       THE COURT:  I just wondered, on Exhibit 15 there was a

Hofmann - Direct

1539

point of rising water shown there.  Where is this gaging

station with reference to that point of rising water?

THE WITNESS:  It is approximately at the point of

rising water, your Honor.

THE COURT:  All right.

THE WITNESS:  I could say I could locate these more

accurately on the quadrangle sheets.  These locations on

Exhibit 17 are approximate and may be in error slightly.

1    Q   Would you state for the record the area which is

2    drained above the Aguanga Gaging Station, referring particu-

3    larly to the streams which are involved?

4    A   The drainage area above the Aguanga Gaging Station

5    consists of the main stem of the Temecula Creek, which has its

6    headwaters in Dodge Valley; Chihuahua Creek, which drains

7    Chihuahua Valley, also on the periphery of the Santa Margarita

8    River watershed; and two unnamed streams which are significant

9    contributors, however-- Cottonwood Creek and Long Canyon, I

10   believe.

11   Q   I hand you a blue pencil, sir, and I ask you to

12   write those names on Plaintiff's Exhibit 17, using a straight-

13   edge for the purpose of identifying it.

14   A   These two streams are named on the quadrangle sheets

15   which were introduced as Plaintiff's Exhibit No. 29, I

16   believe.

17   Q   If you will, draw the line down and then write the

18   name off the border, so that it will not clutter up the

19   exhibit.

20   A   I am sorry (marking the exhibit).

21   THE COURT:  The creek furthest to the west is called

22   what?

23   THE WITNESS:  Long Canyon, I believe, your Honor.

24   THE COURT:  And the one to the east is called what?

25   THE WITNESS:  Cottonwood Creek.

Hofmann - Direct

3541

Z18

BY MR. VEEDER:

Q  Is that Long Canyon Creek?

A  On the quadrangle sheets it is named Long Canyon, and the stream in it would be Long Canyon Creek.

Q  Would you add the Word "Creek" to that, then, please?

A  (Marking exhibit.)

Q  If you would, pursue further the description that you have started in regard to the streams which contribute to Temecula River at the Aguanga Gaging Station, please.

A  I believe I gave all the major contributors at the Aguanga Gaging Station.  There are minor affluents that are too small to be named, I believe.

Q  I hand you Plaintiff's Exhibit marked No. 22 for Identification and ask you to state into the record what that document constitutes.

A  Plaintiff's Exhibit No. 22 are the daily runoff records for Murrieta Creek at Temecula from the first year of record as published by the Geological Survey, 1930-1931 through the 1957 water year, and include a field station description and manuscript station description for the 1957 water year.

If I may add at this time, this manuscript station description is the description that is published in our water supply papers and gives information pertaining to the drainage area again and records available, the average discharge and

Z19

1   the extremes, various information that would be of informa-

2   tion to the user of the records.

3          The daily discharge is in a slightly different format

4   than is published in the water supply papers, but the format

5   used in the water supply papers is made up from these sheets,

6   so that these are the correct records of our data as published

7   in the water supply papers.

8          MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

9   for Identification No. 22, your Honor.

10          MR. SACHSE:  Mr. Veeder, just for the record, I am

11   under the impression that this Exhibit 22 is identical, except

12   for the narrative description which you added to it, to the

13   same matter which was introduced as Exhibit M-34G at the

14   master's hearings.  Or am I in error?

15          MR. VEEDER:  I think that is correct, but I want to be

16   sure and check it out, Mr. Sachse.  I believe that that is

17   right.

18          It has been offered, your Honor.

19          THE COURT:  Plaintiff's Exhibit 22 received in evidence.

20          (Plaintiff's Exhibit 22 previously marked for iden-

21   tification was received in evidence.)

22   BY MR. VEEDER:

23          Q  Would you step to Plaintiff's Exhibit 17 and locate

24   that gaging station represented by Plaintiff's Exhibit No. 22?

25          A  The gaging station Murrieta Creek at Temecula is

X22E

3543

Z20

1    approximately .4 of a mile upstream from its confluence with

2    Temecula Creek.

3        Q  Will you state what you are placing on Plaintiff's

4    Exhibit No. 17?

5        A  On Plaintiff's Exhibit 17 I have put a circle to

6    show the location of the gaging station Murrieta Creek at

7    Temecula and have drawn a straight line from the circle to the

8    margin of the exhibit and am writing on there the name of the

9    gaging station "Murrieta Creek." It is .4 of a mile upstream

10   from the confluence.

11       THE COURT:  Hold your pencil at it.  It is just north

12   and west of the boundary between basin 1 and basin 2 shown on

13   that map?

14       THE WITNESS:  Yes, sir.  It is approximately three-

15   eighths of an inch or so upstream from--

16       THE COURT:  Just about where that arrow comes down, is

17   it?

18       THE WITNESS:  It is a little further upstream, your

19   Honor; about three-eighths to half an inch upstream from where

20   the Santa Margarita River starts.

21       MR. LITTLEWORTH:  It is marked below the basin line.

22       THE COURT:  Below the basin?

23       THE WITNESS:  Yes, sir.

24       THE COURT:  That is approximately close enough.  What

25   do you call this station?

1      THE WITNESS:  Murrieta Creek at Temecula.

2  BY MR. VEEDER:

3      Q  Would you put the words "gaging station" in addition

4  on each one of these-- Temecula Creek and Aguanga?

5      A  (Marking exhibit.)

6      Q  Now, would you describe the areas which are drained

7  by Murrieta Creek at the point where the Murrieta Creek Gaging

8  Station has been located?

9      A  The drainage area upstream from the Murrieta Creek

10  Gaging Station consists of the main stem of Murrieta Creek,

11  which has origin at the Santa Margarita River drainage boundary

12  toward Elsinore on the Northwest and Warm Springs Creek, which

13  originates in Diamond Valley and flows through Domenigoni

14  Valley and then down into its confluence with Murrieta Creek,

15  Santa Gertrudis Creek and its tributary Tucalota Creek.  Santa

16  Gertrudis Creek originates in-- well, I have no valley to

17  locate that.

18      THE COURT:  Glen Oak Valley, isn't it, up in Section

19  23, Township 7 South, 1 West?

20      THE WITNESS:  Yes, sir, that's right.

21      MR. VEEDER:  As shown on Plaintiff's Exhibit 17, that

22  is right, your Honor.

23      THE WITNESS:  Glen Oak Valley, and then to Long Valley,

24  and Tucalota Creek originates in Willow Canyon which is

25  marked on Exhibit 17 and flows down through Auld Valley,

Z22

1    and in addition to the Santa Gertrudis drainage the Long

2    Canyon which is in the Murrieta drainage also contributes

3    surface runoff to that.

4    BY MR. VEEDER:

5        Q  Now, I hand you plaintiff's exhibit marked No. 21

6    for Identification and I ask you to state into the record what

7    that document represents.

8        A  Plaintiff's Exhibit No. 2 are the daily runoff

9    records for Santa Margarita River near Temecula Gaging Station,

10   and the exhibit includes the field station description and the

11   manuscript station descriptions for this gaging station.

12       MR. VEEDER:  We offer in evidence plaintiff's Exhibit

13   marked No. 21 for Identification.

14       THE COURT:  Exhibit 21 received in evidence.

15       (Plaintiff's Exhibit No. 21 previously marked for

16   identification was received in evidence.)

X21E    17   BY MR. VEEDER:

18       Q  Would you step to Plaintiff's Exhibit 17 and mark on

19   that exhibit the location of Plaintiff's Exhibit 21?

20       A  The location of the gaging station of the Santa

21   Margarita River near Temecula is located approximately one-

22   tenth of a mile downstream from the confluence of Temecula

23   Creek and Murrieta Creek.  I have drawn a penciled circle at

24   the location of the gaging station, and then am lettering the

25   name of the gaging station on the margin of Exhibit 17.

        (Recess.)

BY MR. VEEDER:

Q   Mr. Hofmann, in regard to the location of the Aguanga Gaging Station, would you refer again to where you have located it on Plaintiff's Exhibit 17 and state whether, in your opinion, it is precisely located at the point where it is in fact established.

A   During the recess I checked against the quadrangle sheet, your Honor, and the location as I have plotted it on Exhibit 17 is about .3 of a mile too far upstream.  It should be, rather than at the point of rising water, just at the downstream end of that line of rising water on Exhibit 17.   I would like to change it, if I may, on Exhibit 17.

THE COURT:   You may.

BY MR. VEEDER:

Q   Would you put your initial where you made the change, then, please.

A   (Marking exhibit.)

Q   Now, would you describe the area drained in the Temecula Valley above the gaging station at Vail Dam, which station is recorded in Plaintiff's Exhibit No. 20?

A   The drainage area above the gaging station at Vail Dam consists of the drainage areas of the main stem of Temecula Creek, previously described for the gaging station at Aguanga, and in addition a tributary from the south, Arroyo Seco, flows into Vail Reservoir upstream from the gaging station;

Z24

1   from the north the Coahuila Creek, which originates in Burnt

2   Valley and flows from Burnt Valley, I believe it is Hamilton

3   Creek, through Terwilliger Valley and from Terwilliger Valley

4   through Coahuila and has its confluence with Wilson Creek,

5   which originates in Reed Valley, in Range 1 East, Township 6

6   South, form together and become Wilson Creek, which is

7   tributary to Vail Reservoir, and through Lancaster Valley.

8   In addition, there are minor affluents, such as the stream

9   draining Lewis Valley and other valleys in the drainage above

10   Vail Dam.

11          THE COURT:  This question is directed to the area

12   drained at Vail Dam?

13          MR. VEEDER:  Yes, your Honor.

14          THE COURT:  You didn't ask him as to the area gaged

15   at the Santa Margarita?

16          MR. VEEDER:  I will ask him.

17          Q   Would you proceed to describe the areas drained above

18   the Santa Margarita River near Temecula Gaging Station?

19          A   The drainage area above the Santa Margarita River

20   near Temecula Gaging Station consists of the Murrieta Creek

21   drainage, which was described for the gaging station Murrieta

22   Creek at Temecula, the drainage area described for the gaging

23   station Temecula Creek at Vail Dam, and one major tributary

24   inflow, Pechanga Creek, and minor affluents into Pauba Valley.

25          THE COURT:  Well, it drains the whole watershed?

THE WITNESS:  The drainage area bove the Santa Margarita River above Temecula Gaging Station, I think, would be considered the upper part of the Santa Margarita River watershed, yes, sir.

THE COURT:  On Exhibit 20-- I was just checking through it at the recess-- I notice that the sheets from 1923 on through 1957 run consecutively from the back toward the front. However, at the front of the exhibit there are some calculations in which Vail Lake is taken into account, and the runoff for the water year 1956-57 is shown, 1955-56, and then it skips to 1953-54.  I wonder whether inadvertently the sheet for 1954-55 was omitted.  Of course, that is probably shown in the other sheets further in the back

THE WITNESS:  Your Honor, the exhibit itself has that for 1954-55.  There may have been an omission.  If so, I am sorry, and we will get a copy.

I would like to call attention to the fact that the runoff for the water years 1949 to 1952 are presented in this fold-in tabulation.

THE COURT:  I saw that; a summary for those years.

THE WITNESS:  Well, the data was not computed until 1952 for those years, and it was put in as three years of record in one Water Supply Paper.

THE COURT:  It also appears individually in the sheets in back?

Z26

1          THE WITNESS:  If I may, those individual sheets, your

2     Honor, are the measure of the release from Vail Reservoir.

3     The gaging station downstream from Vail Reservoir that used to

4     be operated is now operated to measure the release from Vail

5     Dam.  So that we have the tabulations of release in for those

6     years on a similar sheet to that used in earlier years.  But

7     it is only one factor that is considered in coming up with the

8     figure of runoff on these monthly tabulations.

9          THE COURT:  All right.

10     BY MR. VEEDER:

11          Q  I hand you Plaintiff's Exhibit for Identification

12     marked No. 23 and ask you to state what is represented by

13     that document.

14          A  Plaintiff's Exhibit No. 23 are the daily runoff

15     records for the gaging station Santa Margarita River near

16     Fallbrook.

17          MR. VEEDER:  May I interrupt for just a moment, Mr.

18     Hofmann.

19          This Exhibit 20, your Honor, in regard to that page

20     to which you made reference, that is my copy there.

21          THE COURT:  I don't need it now.

22          MR. VEEDER:  You may proceed, Mr. Hofmann.

23          THE WITNESS:  In addition to the records of runoff,

24     the station description, both the manuscript and the field

25     station descriptions, are included.

Z27

1      MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

2  No. 23.

3      MR. MOSKOVITZ:  May I just make an inquiry at this

4  point?

5      Are you now going to have more evidence on the lower

6  watershed?  I noticed that you just dropped that and are down

7  into the coastal area.  I understood that you would limit

8  your testimony to the upper watershed.

9      MR. VEEDER:  No, we are going to put in all the runoff

10  records.

11      THE COURT:  Plaintiff's Exhibit 23 received in evidence.

12      (Plaintiff's Exhibit No. 23 previously marked for

13  identifcation was received in evidence.)

14  BY MR. VEEDER:

15      Q  Would you step to Plaintiff's Exhibit 17 and mark

16  on that exhibit the location of the Fallbrook Gaging Station.

17      A  The gaging station Santa Margarita River near

18  Fallbrook is now located just inside the boundary of the United

19  States Naval Reservation at a point marked with a circle in

20  pencil on Exhibit 17.  I will draw a straight line and label

21  the gaging station inthe margin of Exhibit 17.

22      Q  Would you relate that gaging station from the stand-

23  point of its present location to the point where it was

24  previously located?

25      A  It was previously located 1.7 miles upstream from the

1    location shown on Exhibit 17.

2         THE COURT:  What is the name of that tributary or

3    creek that comes down from the north upstream a little ways

4    there?

5         THE WITNESS:  Sandia Creek, your Honor.

6         THE COURT:  And was previously below Sandia Creek?

7         THE WITNESS:  Yes, sir, your Honor.

8         THE COURT:  And still is below?

9         THE WITNESS:  Still is below Sandia Creek.

10   BY MR. VEEDER:

11        Q   Describe the area drained into the Santa Margarita

12   River above the present location of the Santa Margarita River

13   Gaging Station at Fallbrook.

14        A   The drainage area above the gaging station Santa

15   Margarita River near Fallbrook includes all of the upper water-

16   shed which is the drainage above the gaging station on the

17   Santa Margarita River near Temecula.  In addition, the Sandia

18   Creek tributary from the north and Rainbow Creek, which is

19   tributary from the east, the stream system between the two

20   gaging stations.

21        THE COURT:  Rainbow isn't shown on here.

22   BY MR. VEEDER:

23        Q   It is observed that Rainbow Creek is not on there.

24   Mr. Hofmann, would you check back against the quadrangles

25   which are Exhibits 29 and draw roughly on to Plaintiff's

Exhibit 17 the general location of Rainbow Creek?

1        THE COURT:  Can you do that at the noon hour?

2        MR. VEEDER:  We will have that done, your Honor.

3        THE WITNESS:  Yes.  How accurately do you want it, your

4    Honor?  Just schematically?

5        THE COURT:  Schematically.

6        THE WITNESS:  Fine.

7        THE COURT:  The two additional main tributaries that

8    come in above the gaging station are Sandia and Rainbow?

9        THE WITNESS:  Yes, sir.  They are minor affluents.

10   BY MR. VEEDER:

11       Q  I hand you plaintiff's Exhibit marked for Identi-

12   fication No. 24 and I ask you to state what that document

13   represents.

14       A  Plaintiff's Exhibit 24 represents the records of

15   daily discharge for De Luz Creek near Fallbrook from the year

16   1951 through 1957.  Included with the exhibit is the manu-

17   script station description, but a recent field description

18   has not yet been prepared so there is none included for this

19   station.

20       MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

21   No. 24, your Honor.

22       THE COURT:  Plaintiff's Exhibit 24 received in evidence.

23       (Plaintiff's Exhibit No. 24 for Identification received

24   in evidence.)

25

Z30

BY MR. VEEDER:

1

2      Q   I shall ask you to step to Plaintiff's Exhibit 17 and

3   mark on there the location of the DeLuz Gaging Station.

4      A   The DeLuz Creek Station is located in the Southwest

5   Quarter of the Southeast Quarter of Section 20, Township 9

6   South, Range 4 West -- that is a projected section --.   It

7   is on the left bank approximately .9 of a mile upstream from

8   its confluence with the Santa Margarita River and is just

9   about at this bend.

10     Q   When you say "this bend"--

11     A   I beg your pardon.  At a bend in the stream .9 of a

12  mile upstream.  I have put a penciled circle at the location

13  of the DeLuz Creek Gaging Station and have drawn a straight

14  line and then labeling the gaging station on the margin of

15  Exhibit 17.

16     THE COURT:  What is the name of the creek which flows

17  in from the west into DeLuz?

18     THE WITNESS:  Roblar Creek, your Honor.

19     MR. VEEDER:  We will have that marked on during the

20  noon hour, your Honor.

21     THE COURT:  All right.

22  BY MR. VEEDER:

23     Q   Describe the area which is drained above the gaging

24  station for DeLuz Creek.

25     A   The drainage area for the gaging station on DeLuz

Z31

1    Creek near Fallbrook consists of the main stem of DeLuz Creek

2    plus an east fork to the main stem and a tributary from the

3    northwest, I believe named Cottonwood Creek, and the west

4    fork of that is named Camps Creek.  The quadrangle sheets

5    presented as Exhibit 29 show the names of those streams.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D-1 ML j

1          And, in addition --   I beg your pardon --

2  Roblar Creek, which was previously mentioned which is the --

3          THE COURT:  Well, there are four branches up at the

4  top there.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  The most westerly one is Cottonwood.

7          THE WITNESS:  I think the most westerly one is Camps

8  Creek, your Honor.

9          THE COURT:  The next one --

10          THE WITNESS:  Is Cottonwood, and then what we would

11  consider the main stem of the De Luz, and then the east

12  fork.

13          THE COURT:  Yes.  You will put those on at the noon

14  hour, will you?

15          THE WITNESS:  Yes, sir.

16          MR. VEEDER:  If your Honor will leave your copy of

17  17, we will have that put on for you.

18          THE COURT:  I will put them on here.  You put them on

19  during the noon hour on the original exhibit.

20          Q   BY MR. VEEDER:  Now, I hand you, Mr. Hofmann,

21  Plaintiff's Exhibit marked No. 25 for identification and

22  ask  you to state into the record what that document

23  constitutes?

24          A     Plaintiff's Exhibit No. 25 are the records of

25  diversion from the Santa Margarita River through O'Neill

1    Ditch.   They give the daily records of diversion for the

2    period of record through the water year 1957; and included

3    is a manuscript station description for the gaging station.

4         MR. VEEDER:   We offer in evidence Plaintiff's

5    Exhibit No. 25.

6         THE COURT:   No. 25 received in evidence.

7         Q  BY MR. VEEDER:   Would you state into the record,

8    Mr. Hofmann, the -- first, would you locate the station in

9    question as to where it is located in relation to the main

10   stem of the Santa Margarita River?

11        A     The gaging station on the O'Neill Ditch is

12   located to the east of the main stem of the Santa Margarita

13   River, approximately at the center of the Lake O'Neill

14   shown on Exhibit 17.   That is an approximate location,

15   your Honor.   Not much else to tell you.

16        Q     Proceed to write on Plaintiff's Exhibit No. 17

17   the name of the gaging station as you have with the other

18   stations.

19        A     O'Neill Ditch is located on Exhibit 17 by a

20   pencil mark and a straight line.

21        Q     That was your pencil mark and not Mr. Dennis',

22   wasn't it?

23        A     Yes, sir.   Drawn to show the label, the mark

24   placed on Exhibit 17.   The proper name of the gaging station

25   is O'Neill Ditch near Ysidora, California.

1    Q    Now, I hand you Plaintiff's exhibit marked for

2    identification No. 26, and I ask you to state into the record

3    what that document constitutes.

4    A    Plaintiff's Exhibit No. 26 is the runoff record,

5    the daily runoff records for Santa Margarita River at

6    Ysidora gaging station.  It includes a manuscript station

7    description for the water year 1957.

8    MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

9    now marked 26 for identification.

10   THE COURT:  26 will be received in evidence.

11   Q  BY MR. VEEDER:  Now, would you step to Plaintiff's

12   Exhibit No. 17 and mark on that exhibit the location of the

13   gaging station to which you last made reference?

14   A    The gaging station is approximately 2.5 miles

15   upstream from the mouth and at the word "S" on the legend,

16   on the river, Santa Margarita River.  I mark the location

17   in pencil on Exhibit 17 and I am labelling the mark with

18   the name of the gaging station.

19   Q    Will you state into the record, Mr. Hofmann,

20   the area, or the reach of the Santa Margarita, rather, which

21   is drained above the gaging station at Ysidora?

22   A    The drainage area above the gaging station, Santa

23   Margarita River at Ysidora, is practically the entire

24   drainage of the Santa Margarita River watershed.  It includes

25   the drainage described for the station near Fallbrook and

for the station on De Luz creek near Fallbrook and minor

affluents between those two gaging stations and the gaging

station at Ysidora.

Q    Now, I hand to you Plaintiff's exhibit marked

for identification No. 60, and I ask you to state into the

record what is represented by that document?

A    Plaintiff's Exhibit No. 60 is a tabulation

prepared by me or under my direction of the monthly runoff

data for the gaging stations in the Santa Margarita River

watershed.

MR. STAHLMAN:  Mr. Veeder, may I ask you: Have you

prepared a list of exhibits which go beyond 54?

MR. VEEDER:  Yes, sir.

MR. STAHLMAN:  I don't seem to have a copy of it.

THE COURT:  It was passed up to me, and I assume it

was passed around to counsel.  If not, have some extra

copies made.

Do I understand that 60, then, is a sort of

summarization of the previous exhibits you have been

talking about?

THE WITNESS:  Yes, it tabulates the monthly runoff on

two sheets, and the annual, and at the last, on the second

page of each of the gaging stations there is a summarization

giving the average monthly runoff, the maximum and the

minimum monthly runoffs for each month,

1          the quartile   points and the median points.

2    That is also done for the annual total.

3          Q   BY MR. VEEDER:  Would you state into the record

4    what you mean by "quartile" points?

5          A      There are two quartiles, the upper and the lower,

6    or they could be termed the 25 per cent and 75 per cent

7    quartiles.  The lower one is 25 per cent of the items listed

8    in the array that they describe are less than the figure

9    given for the quartile, and for the upper quartile, 75

10   per cent of the items listed in the tabulation for which

11   this quartile applies are less than the figure shown.

12         THE COURT:  The median is --

13         THE WITNESS:  Is the value that 50 per cent are more

14   and 50 per cent are less than.

15         THE COURT:  I think we know what average and maximum

16   and minimum are.

17         THE WITNESS:  Yes, your Honor.

18              The thing of interest and the thing which is

19   typical of most stream flow in Southern California is that

20   the average in practically or in many instances exceeds the

21   upper quartile.  In this first one for Vail Reservoir, for

22   example, for the months of December, January, February,

23   March, many of the months, the value for the average, and

24   actually it is in excess of the value of 75 per cent of the

25   items tabulated for that month.

1    THE COURT:  Your minimum, I see where you got that.

2    You took the lowest ---

3    THE WITNESS:  Lowest.

4    THE COURT:  -- month.

5    THE WITNESS:  The lowest month.

6    MR. VEEDER:  May I make the offer now of this 60,

7    your Honor?  I haven't made the offer.

8    THE COURT:  60 will be received in evidence.

9    But on your maximum, for instance, in your first

10   column for October, you have a figure, looking at the

11   second page, "702."

12   THE WITNESS:  Yes.

13   THE COURT:  I don't see any 702 ---

14   THE WITNESS:  In 1942, your Honor, October, 19 --

15   THE COURT:  Oh, yes.  Oh, yes.

16   THE WITNESS:  Unless there is an error which has crept

17   in, why, they should be the maximum and the minimum item

18   tabulated above.

19   THE COURT:  Yes, all right.  I understand it.

20   MR. VEEDER: And it has been received?

21   THE COURT:  Be received in evidence.

22   MR. SACHSE:  Mr. Veeder, I didn't get a copy of that.

23   Do you have any spares?

24   MR. VEEDER:  Yes, we do.  There are copies of all that,

25   and I will get them for you.

1      MR. SACHSE:  Thank you.

2      Q  BY MR. VEEDER:  Now, I hand you Plaintiff's Exhibit

3  No. 61, Mr. Hofmann, and I ask you to state into the record

4  what that exhibit depicts?

5      A    Plaintiff's Exhibit 61 is a  bar  graph

6  of annual runoff for gaging stations in the Santa Margarita

7  River basin.  It does not include Temecula Creek near

8  Aguanga, because there has yet been no records computed for

9  that other than that it includes the gaging stations.

10     Q    Now, would you state the sources of the data

11  that were used?

12     A    The data used are published records of the

13  Geological Survey, with one exception.  There is a gap in

14  the Geological Survey records at Ysidora in the year 1930,

15  and for that year a figure was furnished by the Vail

16  Company on the flow in 1930, Ysidora.

17     THE COURT:  For the years you have shown across the

18  bottom --

19     THE WITNESS:  Yes, your Honor, those --

20     THE COURT:  -- they are at five-year intervals, and

21  you compute in between?

22     THE WITNESS:  Yes.

23     THE COURT:  And the figures on the left-hand side are

24  what?

25     THE WITNESS:  The annual runoff in thousands of acre-feet,

1    your Honor.   In other words, this would be, if you are

2    looking at Ysidora, the first figure would be 10,000

3    acre-feet, 20,000, 30,000, 40,000.   The same scale is used

4    for each of the gaging station records.

5         THE COURT:   All right.

6         MR. VEEDER:   We offer --

7         Q     Is that correct and accurate to your knowledge,

8    Mr. Hofmann?

9         A     It was prepared under my direction, and it is

10   accurate to the best of my knowledge.

11        THE COURT:   Be received in evidence, Exhibit 61.

12        Q   BY MR. VEEDER:   Mr. Hofmann, I hand you Plaintiff's

13   Exhibit marked 32 for identification.

14        MR. MOSKOVITZ:   What was that number?

15        MR. VEEDER:   32.

16        Q     And ask you to state what that exhibit represents?

17        A     Plaintiff's Exhibit 32 is a hydrograph of the

18   monthly runoff for Temecula Creek at Vail Dam in the lower

19   drawings, and in the upper, the hydrograph of monthly runoff

20   of O'Neill Ditch near Ysidora.

21        Q     What are the sources of data that --   For what

22   period of time is that?

23        A     The records are for the entire period of record

24   as collected by the Geological Survey, and the plotting

25   is made from the Geological Survey data.

D-2

Q     Are those, the hydrograph as depicted on the identification 32, correct to your personal knowledge?

A     They are correct to my knowledge.

MR. VEEDER:  We offer in evidence Plaintiff's Exhibit marked 32 for identification.

THE COURT:  No. 32 received in evidence.

Q  BY MR. VEEDER:  Now, I hand you Plaintiff's exhibit marked 33 for identification and I will ask you to state into the record what it represents?

A     Plaintiff's Exhibit 33 is a hydrograph of the monthly runoff in Santa Margarita River near Temecula gaging station.

Q     And for what period of time is that?

A     It is for the period 1923 through 1957, a period of record collected by the Geological Survey.

Q     Would you state the accuracy of that identification from the standpoint of your personal knowledge?

A     To the best of my knowledge, the hydrograph is an accurate and correct representation of the monthly stream flow data reflected by the survey.

MR. VEEDER:  We offer in evidence Plaintiff's Exhibit marked 33 for identification.

THE COURT:  Received in evidence.

Q  BY MR. VEEDER:  Mr. Hofmann, I hand you Plaintiff's Exhibit marked for identification No. 34, and I ask you to

1    state into the record what is represented by that identifica-

2    tion?

3        A    The Plaintiff's Exhibit No. 34 consists of a

4    one-page showing, a hydrograph, of monthly runoff of De

5    Luz Creek, in the top part of the page, and the hydrograph

6    of the monthly runoff of Murrieta Creek at Temecula at the

7    lower part of the page.

8        Q    What were the sources of data that you utilized

9    in preparing that and for what periods of time?

10       A    The data used in plotting these hydrographs were

11   the records of the Geological Survey for the entire period

12   for which record was collected at these gaging stations.

13       Q    Would you state whether or not the graph

14   correctly represents the data which it reflects?

15       A    The data were prepared -- the graphs were

16   prepared under my direction or by myself, and they correctly

17   represent the data collected by the Geological Survey.

18       MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

19   marked 34 for identification.

20       MR. SACHSE:  May I inquire, for just a moment, Mr.

21   Veeder:  I have something that seems to have a --   This is

22   the way I received it, with a red --   Is this right or is

23   this an error in my copy?

24       MR. VEEDER:  It may have been a correction.

25       MR. SACHSE:  It shows the year 1952, but somebody has

1    drawn a red line through it.

2         THE WITNESS:  Yours is corrected.  The red lines are

3    in agreement with the exhibit as presented to the Court.

4         MR. SACHSE:  Oh, I see.

5         MR. VEEDER:  Are you satisfied, Mr. Sachse?

6         MR. SACHSE:  Yes.  I wondered why I had a red crayon

7    line on mine.

8         MR. LITTLEWORTH:  I don't have one on mine.

9         THE WITNESS:  You have one that is incorrect.

10        THE COURT:  I notice for the year 1951 at De Luz

11   there is practically no runoff at all shown.

12        MR. SACHSE:  It is the year 1952 to which we are

13   referring, your Honor.

14        THE COURT:  1951.  Of course, you don't have the first

15   few months of --   Is this a water year or a calendar year?

16        THE WITNESS:  This is water years, your Honor.  The

17   gaging station was established, I think, after the -- well,

18   I could -- the date of establishment is given in the

19   manuscript description as to the De Luz records.

20        THE COURT:  All right.  Go ahead.

21        MR. LITTLEWORTH:  The copy I have, your Honor, is

22   apparently uncorrected.  So I presume, Mr. Veeder, you can

23   make the corrections.  I have no marks on mine.

24        MR. VEEDER:  You flatter me.  I am sure I couldn't

25   make the correction.  I will see that you get it.

1    THE COURT:  Well, maybe some of them didn't need
2  correction.

3    MR. LITTLEWORTH:  No, mine shows no runoff at all for
4  1952, virtually none.  And I understand the red marks show
5  a considerable runoff for that year.

6    MR. VEEDER:  If you look at the exhibit --

7    THE WITNESS:  The exhibit itself is --

8    MR. STAHLMAN:  Draw it in.

9    THE WITNESS:  Yes, yours is all right.

10    MR. LITTLEWORTH:  It will be corrected?

11    THE WITNESS:  Either I can or you can.

12    THE COURT:  It will be corrected.  Correct your
13  copies.

14    MR. VEEDER:  I think, your Honor, that we have copies
15  for everyone that are corrected.

16    THE COURT:  Oh, are corrected?

17    MR. VEEDER:  Oh, yes.

18    THE WITNESS:  Corrected copies.

19    MR. VEEDER:  There is no question on those, your
20  Honor.

21    THE COURT:  Well, Mr. Littleworth, he has changed his
22  copy, has he?

23    MR. LITTLEWORTH:  No, I will get a new copy, then,
24  your Honor.

25    THE COURT:  All right.

1          You offer 34?

2       MR. VEEDER:  Yes, your Honor.

3       THE COURT:  34 received in evidence.

4       Q  BY MR. VEEDER:  I hand you Plaintiff's Exhibit

5    marked No. 35 for identification, Mr. Hofmann, and ask you

6    to state in the record what is depicted by that exhibit?

7       MR. MOSKOVITZ:  Is that 58?

8       THE COURT:  35.

9       THE WITNESS:  Plaintiff's Exhibit 35 is a hydrograph

10   of the monthly runoff of the Santa Margarita River near

11   Fallbrook.

12      Q  BY MR. VEEDER:  And who prepared that exhibit,

13   Mr. Hofmann?                    .

14      A     The exhibit was prepared by myself or under my

15   direction.

16      Q     And what were the sources of data?

17      A     The sources of data were the records of the

18   Geological Survey.

19      Q     For what period?

20      A     For the period 1923 to 1957.  I beg your pardon,

21   1925.  I didn't look at it closely.  The records are for

22   the period 1925 to 1957.

23      Q     Does the hydrograph correctly depict the source

24   of data which you utilized in its preparation?

25      A     The hydrograph correctly depicts the monthly

1    runoff figures collected by the Geological Survey.

2         MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

3    marked 35 for identification.

4         THE COURT:  35 will be received in evidence.

5         Q  BY MR. VEEDER:  Mr. Hofmann, I hand you Plaintiff's

6    Exhibit marked 36 for identification, and I ask you to state

7    into the record what that exhibit depicts?

8         A    Plaintiff's Exhibit 36 is a hydrograph of the

9    monthly runoff of the gaging station Santa Margarita River

10   at Ysidora.

11        Q    Who prepared that identification, Mr. Hofmann?

12        A    It was prepared by myself or under my direction.

13        Q    Will you state the sources of data and the

14   period for which the hydrograph was prepared?

15        A    The sources of data are the published records

16   of the Geological Survey, and the period which it covers

17   is 1923 to 1929.  1930 is omitted from the hydrograph,

18   because, as I previously mentioned, records were not

19   collected by the Geological Survey that year.  And then from

20   1931 to 1957.

21        Q    Are the matters reflected on Plaintiff's

22   identification No. 36 correct, to your knowledge?

23        A    To my knowledge they are correct representations

24   of the monthly runoff for the gaging stations.

25        MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

No. 36.

THE COURT:  Received in evidence; 36.

MR. VEEDER:  Your Honor, I observe that it is noon. This is as good a place as any, perhaps, to quit.

THE COURT:  Yes. 2:00 o'clock?

MR. VEEDER:  Fine.

THE COURT:  Adjourn until 2:00 o'clock.

(Whereupon a recess was taken at 12:00 o'clock noon until 2:00 o'clock p.m. of the same day.)

SAN DIEGO, CALIFORNIA, WEDNESDAY, OCTOBER 22, 1958.   2:00 P.M.

MR. SACHSE:  Your Honor, before Mr. Veeder proceeds,
Exhibits No. 25 and 32 both deal with the runoff gage figures
of the O'Neill ditch.  I have no doubt that they are properly
admissible as part of the hydrography of the valley, but in
view of the pre-trial ruling would it not be appropriate to
make some sort of indication that these figures are not in-
tended to be received as evidence of any prescriptive or
appropriative right on the part of the United States or its
predecessor?  I think they are generally admissible, but
should we not indicate the scope?

THE COURT:  To the extent that they fit into other
proof, why shouldn't they be considered?  They don't in them-
selves show anything, because we don't have all of the facts
yet.  But why shouldn't they be received generally for what
they show?

MR. SACHSE:  I just wanted to be quite certain that we
are still operating under the ground rule that prescription
didn't run upstream and that evidence of use or diversion into
storage by the United States may be received in here because
it is part of the hydrography of the whole watershed.  It
doesn't establish in this case a 1931 through 1957 use of
some amount of water that may give right to a prescriptive
right.

1    THE COURT:  We will cross that bridge when we get to it.

2   I am not going to back up on my ruling, unless I am convinced

3   that I am wrong.  And to the extent that these have any bear-

4   ing on other issues in this case, they are properly in the

5   case and I will consider them.  There is in the case, of

6   course, the issue of what water the predecessor of the Govern-

7   ment and Santa Margarita used.  To a certain extent I suppose

8   this has some bearing on that.  It certainly doesn't prove

9   anything by itself.

10    MR. SACHSE:  Even on that issue, your Honor, I don't

11   think it would be relevant, because--

12    MR. VEEDER:  Is this an objection, or what is it?  Is

13   he psychoanalyzing himself?

14    THE COURT:  No, no, please.

15    MR. SACHSE:  Because the figures for O'Neill ditch come

16   in 1931, and your Honor's pre-trial ruling is that since 1914,

17   or at the latest 1923, no appropriative right could have been

18   acquired without compliance with the Water Commission Act.

19    THE COURT:  They may have no application, but they

20   will be generally in evidence for what purposes we may later

21   use them.

22    Now, I think there was some question about Exhibit 79-F.

23    MR. VEEDER:  Exhibit 79-F, your Honor, is offered in

24   evidence.

25    THE COURT:  Exhibit 79-E and F are received in evidence,

1    if it has not been so indicated before.  My records show that

2    they were received.

3        MR. VEEDER:  A question has arisen, your Honor, as to

4    Exhibit 57.  That was the bibliography for Mr. Kunkel.  Does

5    your Honor have a note on that?

6        THE COURT:  On your list that you submitted, Exhibit 57

7    is a comparison of chemical character of well and sewage

8    effluent.

9        MR. VEEDER:  We have rechecked that matter, your Honor,

10   and I want to make another check on it to make sure there is no

11   problem.  We had originally set up Exhibit 57 for Mr. Kunkel's

12   bibliography.

13       THE CLERK:  Your Honor, Exhibit 57 was on the list, but

14   I have never received the exhibit.

15       THE COURT:  Well, Mr. Kunkel's bibliography, as I recall

16   was included in the record.

17       MR. VEEDER:  That is correct.

18       THE COURT:  Without being an exhibit number.

19       MR. VEEDER:  That is the point, your Honor.

20       THE COURT:  And on the list of exhibits that you showed

21   me, Exhibit 57 is listed as a comparison of chemical character

22   of well and sewage effluent, 1955 to 1958.

23       MR. STAHLMAN:  We don't have that list, then.

24       MR. VEEDER:  Your Honor, the list that was originally

25   submitted was revised, and our objective now is to be very

1     sure that the exhibit--

2         THE COURT:  I took that off the original list.  I don't

3     have before me this revised list.

4         MR. VEEDER:  This is the list, your Honor, upon which

5     we are now offering--

6         THE COURT:  Let me see it.

7         MR. VEEDER:  Exhibit 57 went into the transcript without

8     being identified as an exhibit.  I would like to maintain that

9     57 as the bibliography of Mr. Kunkel to the end that the list

10    will be maintained properly.

11        THE COURT:  All right, then, 57 is already in the

12    record but it may be considered to be the bibliography of Fred

13    Kunkel, and I will revise my list as you done here.

14        MR. VEEDER:  I think that list your Honor has before

15    him now that I just handed him is the one that was incorporated

16    in the pre-trial order.

17        THE COURT:  Yes.  Will you make copies of this available

18    to other counsel?

19        MR. VEEDER:  Yes, your Honor.  It has been reproduced and

20    it is available.

21        THE COURT:  May I have a copy of it?

22        MR. VEEDER:  You may have that one.

23        THE COURT:  All right.

24        Do you have a copy of it for the Clerk, too?

25        MR. VEEDER:  That list is part of the pre-trial order,

E

Z36

1    so I thought everyone had it.  We will have it available for

2    everybody.

3        THE COURT:  I haven't a copy of the pre-trial order.

4        VARIOUS COUNSEL:  We haven't, either.

5        MR. VEEDER:  Those are being reproduced and will be

6    distributed.

7        THE COURT:  All right.

8

9                    WALTER HOFMANN,

10   recalled as a witness in behalf of the plaintiff, having been

11   previously sworn, testified further as follows:

12

13               DIRECT EXAMINATION (Resumed)

14   BY MR. VEEDER:

15       Q   Now, Mr. Hofmann, would you view the exhibits 32,

16   33, 34, 35 and 36 and state the facts of which they are

17   representative from the standpoint of the several gaging

18   stations concerning which you have already testified?

19       A   The exhibits have been arranged in downstream order,

20   if this monthly runoff for O'Neill ditch is ignored, and also

21   the monthly runoff of DeLuz Creek.  Those were shown simply

22   to give a pictorial record of the runoff for those two sites

23   and they are not considered in the discussion pertaining to

24   the gaging stations on the main stems of the river.

25       Exhibit 32 is a hydrograph of the monthly runoff of

1    Temecula Creek at Vail Dam.

2         Exhibit 34, the next one downstream, is a monthly runoff

3    of Murrieta Creek at Temecula.

4         Exhibit 33 is a hydrograph of the monthly runoff of

5    the Santa Margarita River near Temecula, which is next down-

6    stream from these two stations.

7         Exhibit 35 is the hydrograph of the Santa Margarita

8    River near Fallbrook.

9         And Exhibit 36 is the one for the gaging station near

10   Ysidora.

11        As I have indicated, the monthly runoff is plotted on

12   the hydrograph and the scale on the vertical is 5,000 acre

13   feet to a unit, a little over an inch along there, and the

14   horizontal scale is the time in years.  I have attempted to

15   line up the hydrographs so that the same years--

16        Q  When you say "line up the hydrographs," what do you

17   mean?

18        A  I have arranged the hydrographs on the easel so that

19   the same years follow down vertically, so that visual comparison

20   is possible between Exhibits 33, 35 and 36, and also between

21   32 and 34 on the left side of the easel.

22        One of the main features of these hydrographs is the

23   fact that generally the runoff of any magnitude occurs in a

24   few months of the year, the winter months.  That is typical of

25   all stream flow in Southern California and most of the

Southwest.  Let me retract that "most of the Southwest," be-
cause when you get over into the desert area it is not true.
But certainly the coastal regions, the major part of the runoff
occurs in the four or five winter months-- December, January,
February, March and sometimes April.

Q  Would you correlate them from the standpoing of the
several gaging stations-- that is, the runoff?

A  When there is a rise on one gaging station, generally
there is also a rise on the remainder of the gaging stations
in the basin.  In other words, the storms that come over the
area are general-- they are not spotty over one locality, so
that when you have a wet year, as 1938, it is wet at all of
the sites.  However, the storms do not hit each drainage area
with the same intensity.  For example, Temecula Creek at
Vail Dam, the 1927 year was considerably higher than the 1938
year and almost twice as high as the 1937 year.  Yet you come
over here to the Santa Margarita River at Temecula and you
will note that the-- I don't remember which month this is in
1927, but the high month in '27 compares quite closely to the
high month in March, '38.  And as you come downstream, at the
Fallbrook Gaging Station the '38 runoff for one month exceeds
that for '27, and then at Ysidora it exceeds it by considerable.
This indicates that for the '38 storm the precipitation and
runoff from the area from the lower part of the basin was
probably larger than for the '27 storm, because more was

Hofmann - Direct

3577

E

Z39

1    contributed to these later stations.

2        Q  I hand you Plaintiff's Exhibit No. 62 and ask you

3    to state what it sets forth.

4        A  Plaintiff's Exhibit 62 is a tabulation entitled

5    "The Estimated Annual Inflow in Acre Feet to the Santa Margarita

6    River Valley at DeLuz Damsite for the period '22 to '57."

7        Q  Who prepared that exhibit, Mr. Hofmann?

8        A  This exhibit was prepared by myself and Mr. Troxell.

9        Q  Do you know it to be correct?

10       A  I know it to be correct.

11       THE COURT:  Let me ask you this:  Is DeLuz dam site

12   equivalent to the DeLuz Gaging Station?

13       THE WITNESS:  No, your Honor.  DeLuz dam site is down-

14   stream from the confluence of DeLuz Creek and the Santa

15   Margarita River.

16       MR. VEEDER:  Locate it now, if you want to, for the

17   Court, on the exhibit.

18       THE WITNESS:  It is approximately-- well, I can't

19   locate it on this map because there are no features shown,

20   but in the neighborhood of a mile downstream from the confluence

21   of DeLuz Creek and Santa Margarita River.  It is the site

22   where the DeLuz Dam was proposed in some of the feasibility

23   studies that we prepared.

24       THE COURT:  Which was DeLuz dam.  Was that the one in

25   the Utt Bill?

Hofmann          Direct                                    3578

MR. VEEDER:  Yes, your Honor.

THE COURT:  Is that all agreed?  When you talk about DeLuz Dam, do you mean the dam in the Utt Bill?  About a mile downstream of the confluence?

THE WITNESS:  I think that is probably correct, your Honor.  I could  check it on the quadrangle sheet.

THE COURT:  How could you make an estimate of water at the DeLuz Dam Site withoug a gaging station?

THE WITNESS:  You just took the combinations of --

THE COURT:  DeLuz and Fallbrook?

THE WITNESS:  Yes, your Honor.  There was further complication.  For the Fallbrook Gaging Station the years '23, '24 and '25 were estimated on the basis of correlation with records for other gaging stations, in particular the gaging station near Temecula, and for DeLuz Creek the gaging station record did not start until 1951; so that prior to 1951 the estimate of runoff is based on correlation with stream flow records for Murrieta Creek and Temecula, Temecula Creek at Vail Dam and Santa Ysabel Creek near Mesa Grande, which is in the San Dieguito River Basin south of the San Luis Rey River Basin.  Those estimates for the Santa Margarita River near Fallbrook figures represent all of the inflow except 60 square miles, which are tributary between that gaging station and the DeLuz dam site, and that estimate for DeLuz Creek includes the entire 60 square miles between the Fallbrook

E

Z40

1   station and the dam site.

2   THE COURT:  In getting the figures which you call

3  DeLuz Creek, did you take the figures from the gaging station

4  on DeLuz?

5   A  Yes, after 1951 the figures at the DeLuz Creek station

6  were adjusted for differences in drainage area and precipita-

7  tion and then used.  You see, the drainage area at the DeLuz

8  Gaging Station is approximately 48 square miles and the entire

9  intervening area is 60 square miles.  So necessarily the

10  runoff figure was increased to correspond to that 60 square

11  miles of intervening area.

12   THE COURT:  The 60 square miles intervening is the

13  drainage area between the DeLuz Gaging Station and the dam

14  site?

15   THE WITNESS:  Between the Fallbrook Gaging Station,

16  your Honor, and the dam site; and of that 60 square miles,

17  DeLuz represents 48 square miles.

18   THE COURT:  Then the 60 square miles is the total, and

19  the 48 comes out of that?

20   THE WITNESS:  Yes.

21   THE COURT:  An additional 12 square miles.

22   THE WITNESS:  We adjusted to obtain those figures.

23   MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

24  62, your Honor.

25   MR. MOSKOVITZ:  I would like to make an objection to

E

Z41

1    get an explanation.  I don't see the relevancy of these figures

2    at this point.  I will object on that ground.  Possibly they

3    are, and I would like to hear the explanation.

4         MR. VEEDER:  I think the witness did explain.  I think

5    the whole issue here, your Honor, at this juncture is to try to

6    get before your Honor as full and complete a statement of the

7    hydrology of the area as possible.  This is strictly statistical

8    work to demonstrate, as nearly as we can, the water resources

9    of the Santa Margarita River watershed.

10        THE COURT:  The objection is overruled.

11        Plaintiff's Exhibit 62 is received in evidence.

12        (Plaintiff's Exhibit No. 62 for Identification was

13   received in evidence.)

14        MR. STAHLMAN:  Are you having these prepared also?

15        MR. VEEDER:  Yes.  In fact, they are available down-

16   stairs, if you want them.

17

18

19

20

21

22

23

24

25

Hofmann - Direct

F-1 ML j

1  Q  BY MR. VEEDER:  I hand you Exhibit marked for

2  identification 27 and ask you to state into the record what

3  it is, Mr. Hofmann?

4  A    Exhibit 27 is a tabulation of the monthly and

5  seasonal precipitation at Fallbrook, California, for the

6  period 1875 - 1957.  There are some monthly figures missing

7  that were estimated on the basis of correlation with other

8  gaging stations by the Geological Survey.

9  MR. VEEDER:  Now, we offer in evidence Plaintiff's

10  exhibit marked 27 for identification.

11  THE COURT:  I don't see how you get a total on the

12  minimum column.  You have all zeros except decimal aught

13  six and decimal aught eight.  Decimal aught six and

14  decimal aught two.  How do you get a seasonal total of

15  minimum seven seven aught?

16  THE WITNESS:  Your Honor, that minimum for the

17  seasonal total is the minimum year directly above it.  If

18  you will glance down the column of seasonal totals, the

19  minimum amount is 7.70/ which occurs in 1878, '79.  It is
                                    inches,

20  not a tabulation --

21  THE COURT:  Oh, I see.

22  THE WITNESS:  -- across the bottom of the sheet of

23  all the minimum.  In other words, in each month, that is

24  the tabulation of the month --

25  THE COURT:  I see.  All right.  I get it.

THE WITNESS:  Okay.

THE COURT:  In other words, where the zeros appear that means that there were months when there was no precipitation at all?

THE WITNESS:  Precipitation, that is correct.

THE COURT:  That is seasonal; looking at this other column, **7.70,**       which is your lowest figure.

THE WITNESS:  That is correct, your Honor.  And that, in the monthly tabulations, excludes the periods where there are missing records from 1903 to approximately 1909.

MR. VEEDER:  The offer has been made, your Honor.

THE COURT:  27 received in evidence.

Q  BY MR. VEEDER:  I hand you Plaintiff's exhibit marked 27-A for identification and ask you to state into the record what that document represents?

A       Exhibit 27-A is a tabulation of the monthly and seasonal precipitation in inches in San Diego, California, for the period 1850 to 1957.

Q       Did you prepare that?

A '     The data were collected by or published by the U. S. Weather Bureau, but the tabulation was prepared by myself or under my direction, yes.

MR. VEEDER:  We offer 27-A in evidence.

THE COURT:  Received in evidence.

Q  BY MR. VEEDER:  I hand you Plaintiff's Exhibit

1  marked 27-B for identification and ask you to state into

2  the record what the tabulation represents?

3       A       Exhibit 27-B is a tabulation of monthly and

4  seasonal precipitation in inches at Los Angeles, California,

5  for the period 1877 to 1957.

6       THE COURT:  Received in evidence.

7       Q  BY MR. VEEDER: I hand you Plaintiff's Exhibit

8  marked 28 for identification and ask you to state into the

9  record what the tabulation represents?

10      A       Exhibit 28 is a tabulation of the seasonal

11 precipitation only in inches at selected sites in Southern

12 California for the period of record at those sites.   The

13 sites tabulated are for Los Angeles, Tustin, Riverside,

14 Elsinore, Fallbrook, Valley Center, Warner Springs,

15 Escondido, and San Diego.

16      Q       Was that prepared by you or under your direction,

17 Mr. Hofmann?

18      A       Yes, it was.

19      THE COURT:  I am glad to see Valley Center in there,

20 the wettest point in the whole bunch, in the series:  19.12

21 on the average.  I didn't realize that was true.

22      MR. VEEDER:  We made the offer, your Honor.

23      THE COURT:  28 received in evidence.

24      Q  BY MR. VEEDER:  I hand you Plaintiff's Exhibit No.

25 63, Mr. Hofmann, and ask you to state into the record what

1   that represents?

2       A    Plaintiff's Exhibit No. 63 consists of two

3   diagrams, 63-A and 63-B, which are bar graphs of the

4   seasonal precipitation tabulated in Exhibit 28.  63-A

5   is for Los Angeles, Tustin, Riverside, Elsinore, and

6   Escondido; and 63-B is for Fallbrook, Valley Center,

7   Warner Springs, and San Diego.

8       Q    Was that prepared under your direction, Mr.

9   Hofmann?

10      A    These diagrams were prepared under my direction

11   or by myself, yes.

12      Q    And do they correctly depict what they purport

13   to represent?

14      A    They correctly depict the seasonal precipitation

15   of these selected sites.

16     MR. VEEDER:  This has been marked 63-A and 63-B,

17   your Honor, and --

18     THE COURT:  They will be separated into Exhibits 63-A

19   and 63-B and received in evidence.

20        Which one is which?

21     MR. VEEDER: Did your Honor ask a question?

22     THE COURT:  Which was which?

23     THE WITNESS:  The one with Los Angeles and Tustin is

24   63-A, your Honor.

25      Q  BY MR. VEEDER:  I hand you Plaintiff's Exhibit marked

1   30 for identification and ask you --

2       MR. STAHLMAN:  30, was it?  What number?

3       MR. VEEDER:  30.

4       Q     Let's put this up on the easel.

5             Now, would you read from the title block the

6   designation of that exhibit?

7       A     Plaintiff's Exhibit 30 is the Santa Margarita

8   River watershed isohyetal.

9       THE COURT:  Say that word again.

10      THE WITNESS:  Isohyetal (is o hy e tal) or (is o hyet

11  al).  I think both pronunciations are used.

12      THE COURT:  What does it mean?

13      THE WITNESS:  It means a map showing lines of equal

14  precipitation.

15      THE COURT:  Rainfall map?

16      THE WITNESS:  Rainfall map, your Honor.

17      Q  BY MR. VEEDER:  And what did you do in the presenta-

18  tion of this exhibit, Mr. Hofmann?  Did you disclose the

19  areas of precipitation as set forth on that map?

20      A     This map was originally prepared for an open

21  file report, probably released by the U. S. Geological

22  Survey in 1948.

23      Q     Before you go any further, would you identify the

24  areas which it depicts?

25      A     This map depicts the Santa Margarita River

1   watershed.  It is the same base map as we have used in

2   previous -- that have been presented in previous exhibits.

3       THE COURT:  The colors, I suppose the yellow  starts

4   as the least precipitation?

5       THE WITNESS:  Least; 10 to --  If I may, the period

6   covered by this map is 1880 to 1946.  But I have checked

7   the precipitation since that time against this, and the

8   difference between the period 1880 to 1957 is very small

9   compared to that for 1880 to 1946.  So that this depicts

10  the average annual precipitation over the watershed to the

11  best of my knowledge.

12      THE COURT:  Now, let's see.  The yellow is the least?

13      THE WITNESS:  Yes.

14      THE COURT:  Then comes the orange?

15      THE WITNESS:  No, then the pink, your Honor.  The

16  yellow is from 10 to 12 inches annually; the pink from 12

17  to 14; the orange from 14 to 16 inches; the brown from

18  16 to 18; the light-green from 18 to 20; the dark-green

19  from 20 to 25 inches annually; and the purple from 25 to 30

20  inches annually; the blue from 30 to 35 inches; and the

21  black in excess of 35 inches annually.

22      THE COURT:  Where is the black, the very, up near the --

23      THE WITNESS:  Just in this --

24      THE COURT:  -- north side of Palomar Mountain?

25      THE WITNESS:  Yes, your Honor.

1      THE COURT:  That is the only area?

2      THE WITNESS:  I believe so.  There is some here on the

3  Murrieta plateau that is the dark-blue, but there is no

4  other black except that small portion north of Palomar

5  Mountain.

6      Q  BY MR. VEEDER:  Now, that map as presented was

7  prepared under your direction, is that correct, Mr.

8  Hofmann?

9      A    This duplication was prepared under my direction,

10  yes.

11      Q    And in your opinion does it correctly depict the

12  areas of precipitation in the Santa Margarita River water-

13  shed?

14      A    It correctly depicts the average of -- the areas

15  of average annual precipitation of watershed.

16      THE COURT:  Where would you get figures for some of

17  these little isolated areas up in the northern part of the

18  watersheds?

19      THE WITNESS:  Your Honor, this is quite similar to the

20  water level contour maps that were discussed earlier.  In

21  that, in some areas there is a considerable amount of

22  interpolation necessary between precipitation records.  We

23  do have -- I know there is a precipitation gage at Aguanga,

24  for example, and in the Coahuila Creek area, and some of

25  the others.  I have a complete tabulation of the stations

1    that were used.

2         THE COURT:  Generally, what materials did you use?  I

3    take it you had certain materials and then you used your

4    best judgment on the basis of what you had?

5         THE WITNESS:  There were precipitation records both

6    published in the Weather Bureau publications and some of

7    the earlier State publications, some Geological Survey

8    Water Supply papers that had precipitation tabulations; and

9    at the time of the presentation of the isohyetal actually

10   a canvass was made to get private rainfall records where

11   they were available.  They were all then adjusted to the

12   same time period by use of an index.  If your period of record

13   was, say, 20 years, from 1910 to 1930, you would relate

14   that to the longer record of some of the other stations

15   which have been presented as earlier exhibits; so that they

16   would all be a comparable period.

17        THE COURT:  Then, in marking out the areas you took into

18   account the formation of the ground, I suppose?

19        THE WITNESS:  Yes, your Honor.  The datum of all of

20   the precipitation records was made at deep sea level.  In

21   other words, they were adjusted for their altitude on basis

22   of curves relating precipitation with altitude.  And

23   then, using this base, the isohyetals were drawn on the

24   quadrangle sheets similar to those that have been presented

25   as Exhibit 29, though I think 15-minute quadrangle sheets

1    were used.  And the relation of the precipitation to the

2    altitude, the orographic  effects were taken into --

3         Q  BY MR. VEEDER:  What do you mean by  "orographic"?

4         A      The variation of precipitation with altitude.

5    As the precipitation moves inland from the Pacific Ocean,

6    it is raised by the mountain masses it encounters, and the

7    air is cooled.  As a result, the precipitation is higher

8    at the higher elevations than it is at the lower elevations.

9    These facts were taken into consideration in preparing this

10   map.

11       MR. VEEDER:  We offer Plaintiff's Exhibit marked for

12   identification No. 30.

13       MR. STAHLMAN:  Before you do that may I ask one other

14   question about the graph?

15       THE COURT:  Yes.

16       MR. STAHLMAN:  The boundary lines, then, in relation

17   to the different colors bear relationship to the contour

18   elevation of the land at that place, do they?

19       THE WITNESS:  Yes.  Not necessarily a correct relation.

20   In other words, it is not meant to imply that the yellow

21   here is at the same elevation, or the pink here is at the

22   same elevation as the pink at other places.  There is, for the

23   same elevation, more precipitation along the coast than there

24   is in the inland area after the precipitation along the

25   mountain regions occur.

THE COURT:  Yes, but take the yellow areas shown up in there in the upper Temecula valley, the one you first pointed to.

THE WITNESS:  This one here, your Honor?

THE COURT:  Yes. Would that black line surrounding it be a contour of elevation about the same all the way around?

THE WITNESS:  Approximately, I believe, your Honor. It would be difficult to tie down the exact position of this line that was drawn in, as I say, with data scattered throughout; and there is probably a rain gage or two in there.  And the records were used to establish the line as well as the elevation.

THE COURT:  All right.  Any objection?  30 received in evidence.

THE CLERK:  Your Honor, is the colored map substituted for this one?

THE COURT:  What?

THE CLERK:  This one here I received.

MR. VEEDER:  We will withdraw that.  We will substitute the colored map, your Honor.

THE COURT:  Well, the colored map will be marked 30 instead of the one which the Clerk has which is uncolored.

MR. VEEDER:  Yes.

Q    I hand you Plaintiff's Exhibit No. 64 and ask you to state into the record what that tabulation discloses?

A      Exhibit 64 is a comparison of the mean seasonal precipitation at selected sites in Southern California.

And a comparison is made for the stations at Los Angeles, Tustin, Fallbrook, Valley Center, Escondido, and San Diego. This is a correlation between the two periods that I had previously discussed or mentioned, your Honor.  The first column is the period 1880 to 1946.  The second column, 1880 to 1957.  And then, the departure of the mean for one period from that of the period 1880 to 1957 is tabulated as the last column.  You will note that the difference is in the neighborhood of, most of them are three to four per cent with one being six per cent.

THE COURT:  Are those per cent figures?  Oh, yes.

THE WITNESS:  Yes, your Honor, they are.

The mean for the period 1880 to 1957 is a little less than the period for 1880 to 1946, and it includes the dry years since 1946.

THE COURT:  I see.

THE WITNESS:  But the difference is not significant on a diagram.

THE COURT:  Any objection?  Received in evidence, Exhibit 64.

Q  BY BY. VEEDER:  Mr. Hofmann, I hand you the exhibit marked 65 for identification and ask you to state into the record what that exhibit graphically discloses?

1    A    Exhibit 65 is entitled "Residual mass curves

2  of seasonal precipitation   . indices."

3    Q    I would like to put that up on the easel and have

4  you explain what it graphically discloses, if you would,

5  Mr. Hofmann.  First, was this prepared under your direction,

6  Mr. Hofmann?

7    A    Yes, it was.

8    Q    What were the sources of the data that you used

9  in this preparation?

10   A    The tabulations of precipitation previously

11 introduced as exhibit for the gaging stations Los Angeles,

12 San Diego, and Fallbrook.

13   Q    And these graphically disclose those statistics,

14 is that correct?

15   A    Yes, it is a graphical representation of those

16 statistics.

17   THE COURT:  What is meant up at the top, "Wet-dry,

18 wet-dry, wet-dry"?

19   THE WITNESS:  Your Honor, the diagram is one of

20 cumulative departures of these precipitation indexes from

21 the average, for the entire period of record.  And when a

22 series of dry years occur, they will be cumulative in a

23 downward, sloping direction.  Each following year will be

24 below average, so the cumulative effect would be a slope

25 downward to the right.  Then, when the opposite occurs,

1    when you have the series of generally wet years, the

2    cumulative -- they will all be above the average or some

3    will be above the average, so the cumulative effect will

4    be the opposite -- they will rise to the right.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  So that this is a method of delineating these general wet and

2  dry periods in Southern California that is used frequently by

3  hydrologists.

4        THE COURT:  Then if your chart is correct, the next

5  series of years should be wet years?

6        MR. VEEDER:  Your Honor--

7        MR. SACHSE:  I would like to have the answer.

8        THE WITNESS:  Your Honor, I am afraid that that con-

9  clusion can't be drawn.  It may well be that we will have

10  another fifteen years going down to the right.

11        MR. VEEDER:  When you say going down to the right, what

12  do you mean?

13        A  I mean a dry period.  There is no regularity in this

14  pattern, your Honor, and it cannot be used to predict what

15  will occur.

16        THE COURT:  This last dry period is how many years?

17  How many do you have here?

18        THE WITNESS:  Approximately--

19        THE COURT:  Thirteen?

20        THE WITNESS:  Approximately, yes, your Honor; since

21  1944, roughly.

22        THE COURT:  It goes back as far as 1883.  You have no

23  other dry period-- well, you have one other dry period there

24  of--

25        THE WITNESS: Approximately that length.

THE COURT: A little longer.

THE WITNESS: 1917 to 1934, approximately 17 years. Of course, these are really not clear-cut, because even in a dry period you have occasional wet years, or in a wet period you have occasional groupings of dry years. But in general it is true that the years tend to group themselves together in a series of dry and a few interspersed wet years, and then a series of wet years with a few interspersed dry years.

MR. VEEDER: We offer in evidence Plaintiff's Exhibit 65, your Honor.

THE COURT: Exhibit 65 received in evidence.

(Plaintiff's Exhibit No. 65 for Identification was received in evidence.)

BY MR. VEEDER:

Q Mr. Hofmann, I hand you Plaintiff's Exhibit 66 marked for identification and ask you to state into the record what is depicted on that graph? You might put it on the easel for the purpose of explanation.

A Exhibit 66 is entitled "Residual Mass Curves of Precipitation and Runoff." It represents the precipitation at Fallbrook and the runoff of Temecula Creek at Vail Dam.

Q What are the sources of the data that you used in making that graph?

A The precipitation data is the tabulation that was presented as an earlier exhibit. The runoff data is the data

G
Z44

1    collected by the Geological Survey and also put into evidence

2    earlier.

3        Q   Was this identification prepared under your direc-

4    tion?   I am now referring to 66.

5        A   Exhibit 66 was prepared under my direction.

6        Q   Do you know it to be correct?

7        A   It is correct, yes.

8        MR. VEEDER:   We offer it in evidence.

9        MR. SACHSE:   May I inquire, Mr. Veeder.

10       Why, Mr. Hofmann, do we relate in this exhibit pre-

11   cipitation at Fallbrook to runoff at the Vail Dam and at

12   Murrieta Creek gages, which are in an entirely different

13   isohyetal kind of precipitation area?

14       THE WITNESS:   Primarily because we have no precipitation

15   records of the length that we have at Fallbrook in the drain-

16   ages of Murrieta Creek and Temecula Creek.   This is the

17   seasonal precipitation and the relation between the Fallbrook

18   seasonal precipitation and the precipitation in the other areas

19   would be quite similar from season to season, year to year.

20       MR. SACHSE:   Maybe I don't understand you.   Why would

21   it not be more logical to have precipitation at Fallbrook

22   related to runoff at Fallbrook?

23       THE WITNESS:   The reason we prepare just the runoff--

24       MR. VEEDER:   Just a moment.   I don't believe this is

25   proper voir dire.   It might be all right for cross-examination.

Hofmann - Direct

3597

THE COURT: Technically you are right, but let's find out as we go along.

MR. SACHSE: I want to know what this means.

THE COURT: The objection is overruled.

THE WITNESS: The reason that the runoff in Temecula Creek at Vail Dam and the runoff in Murrieta Creek at Temecula was used is that those two runoff records, at least until relatively recent years, represented more or less virgin conditions, you might say. The watersheds have not been affected by diversions by man-- withdrawals, et cetera. The runoff records at the gaging station at Fallbrook are not of that type. There have been in recent years diversions. So that we use these two records simply as an indication. This is only an illustration of the fluctuations between the runoff pattern and the precipitation pattern. There is no conclusions drawn other than the range in the runoff is more than the range in precipitation, because runoff is a residual after precipitation falls and is subject to large natural losses, as I have mentioned earlier in the testimony.

MR. VEEDER: We offer Plaintiff's Exhibit 66, your Honor.

THE COURT: Exhibit 66 is received in evidence.

(Plaintiff's Exhibit No. 66 for Identification was received in evidence.)

MR. STAHLMAN: I would like to ask you a question for the purpose of understanding the map. Now, the precipitation

1    at Fallbrook is according to this line here, is it?

2         THE WITNESS:  Yes, the heavy line, the solid line is

3    precipitation at Fallbrook.

4         MR. STAHLMAN:  And this is the accumulated departure.

5    And that is in what?

6         THE WITNESS:  In percent from the long-term mean.  In

7    other words, it starts at zero and ends at zero for all three

8    stations, because we are using the mean for the period of

9    record as the basis.  Then for the following year the pre-

10   cipitation at Fallbrook was less than the mean, so that it

11   would come down.  Then the year after that it was greater

12   than the mean and it went up.  Then there were a series of

13   years where there was about three or four years where it was

14   less than the average.

15        THE COURT:  Average?  You have been talking about mean.

16        THE WITNESS:  I beg your pardon.  I use them inter-

17   changeably.

18        THE COURT:  Which is it-- mean or average?

19        THE WITNESS:  To me they are synonymous, your Honor.

20        MR. STAHLMAN:  For this purpose?

21        THE WITNESS:  For this purpose.  The mean for a period

22   record is the average for the period record.  It is simply

23   the total number of events tabulated and divided by the number

24   of events.

25        THE COURT:  That is average.

Hofmann — Direct

3599

1    MR. STAHLMAN:  That is average.

2    THE COURT:  Mean is the middle of the group?

3    THE WITNESS:  That is the median, your Honor.

4    THE COURT:  All right.

5    THE WITNESS:  The mean is used interchangeably with

6  average.

7    THE COURT:  All right, I stand corrected.

8    MR. STAHLMAN:  Now, then, when you come up to the dotted

9  line, that is the runoff?

10    THE WITNESS:  The dotted line is the runoff of Temecula

11  Creek at Vail Dam and the dash and dot line is the runoff of

12  Murrieta Creek near Temecula.  You will note that both start

13  at zero, though they start at different periods because the

14  records at Vail Dam started in 1923, I think-- Yes, I am sure

15  it was '23-- and the records at Murrieta didn't start until

16  1930.  But you will notice the similarity in the pattern after

17  all the records started.

18    MR. STAHLMAN:  Then the object of this particular

19  Exhibit 66 is to show a relationship between the flow and

20  the rainfall?

21    THE WITNESS:  That is correct.  The rainfall in

22  general and the runoff in general are related, and the same

23  relationship can be shown on the bar graph exhibits of runoff--

24  I don't recall the number, but if they are placed side by side

25  it will be seen that when the precipitation is high the runoff

1   is high, and when the precipitation is low the runoff is low.

2   There is a definite relationship.

3        MR. STAHLMAN:  And that is as far as it goes, isn't it?

4        THE WITNESS:  Yes.

5        MR. STAHLMAN:  It doesn't show anything as far as

6   volume?

7        THE WITNESS:  There is no repetitious pattern that

8   shows up on these.

9   BY MR. VEEDER:

10       Q  I hand you Plaintiff's Exhibit marked 31 for Iden-

11   tification.

12       A  Exhibit 31 is entitled "Wet and Dry Periods in

13   Southern California."

14       Q  Who prepared that exhibit, Mr. Hofmann?

15       A  The exhibit was prepared by myself or under my

16   direction.

17       Q  And what were the sources upon which you drew in its

18   preparation?

19       A  The diagram consists of three parts.  The upper

20   part is the precipitation indices at San Bernardino, Cali-

21   fornia.  The second diagram on the right is the runoff indices

22   of Santa Ana River near Mentone, and the lower part of the

23   diagram is the residual mass curve of tree growth indices.

24   Of these three diagrams, the precipitation one was obtained

25   from records of the Weather Bureau, the runoff records are

G
Z49m

1    those collected by the Geological Survey, and the tree growth

2    indices were tabulated by Mr. Schulman, who worked for the

3    Laboratory of Tree Ring Research of the University of Arizona

4    and it is a publication by the University of Arizona-- I

5    believe it is Bulletin 4, Tree Ring Hydrology in Southern

6    California.

7        THE COURT:  I don't understand these two bar charts

8    at the top.

9        MR. VEEDER:  I am going to ask him at the moment, your

10   Honor.

11       THE WITNESS:  The bar charts are based on the length

12   of the wet and dry period as indicated by the tree growth

13   indices, and they are arranged not in order of occurrence but

14   in order of magnitude, with the longest periods on the left

15   and the shortest periods on the right.

16       MR. VEEDER:  I am asking the witness to write above

17   those two sets of bar graphs the statement that they are

18   prepared on the basis of order of magnitude and not on the

19   basis of the order of occurrence.

20       THE WITNESS:  I am writing that they are "Arranged in

21   order of magnitude, not in order of occurrence."

22       THE COURT:  What is the purpose of putting them up

23   there?  How do they fit into the rest of the picture?

24       THE WITNESS:  Your Honor, the ones on the left are

25   wet periods, as delineated by this tree growth diagram; the

1    ones on the right are dry periods; and it is simply to show

2    how the length of these periods, wet and dry, vary over a long

3    period of records, starting from about 1385.

4         MR. SACHSE:  Period of record, did the witness say,

5    since 1385?

6         THE WITNESS:  Yes.

7         THE COURT:  Based upon tree rings.

8         THE WITNESS:  And you will note that the wet periods,

9    the longest one is approximately 24 years, there are two of

10   about 24, and then 23, and a couple of 22-year periods.  But

11   they grow as short as about four or five years.  Of the dry

12   periods, the longest one we have any record of is the 43-year

13   dry period.  Then there are three that are in the middle 20

14   years, as far as length is concerned, and then they come down

15   to the shortest period, being approximately six years of

16   record.

17        MR. STAHLMAN:  Were there more dry periods than wet

18   periods?

19        THE WITNESS:  No, they are balanced in the number of

20   wet and dry periods, because of the way they were delineated.

21   If you go from one to the other, the length varies consider-

22   ably.

23        MR. VEEDER:  May I also ask you to write the words

24   "Bar graphs arranged in order of magnitude . ."

25        THE WITNESS:  Bar graphs (Writing on exhibit).

G 2

Z51

1          MR. STAHLMAN:  May I ask what the figures are up here?

2          THE WITNESS:  Yes; they are the years.

3          MR. STAHLMAN:  Ten years, twenty years--

4          THE WITNESS:  Yes, 30 years, 40 years.

5          MR. STAHLMAN:  The length of time of the period?

6          THE WITNESS:  Yes.  The ratio of years was simply put

7   in the middle for convenience.  The length of time is the

8   period of years.

9          If I may point out, the variation from along the diagram

10  of the tree growth indices, that there is no regularity to

11  the pattern.

12         THE COURT:  Except that the tree rings indicate that

13  there were longer dry periods in the past than there were in

14  the last hundred years?

15         THE WITNESS:  They do, your Honor, particularly this

16  period centering around about 1490 to 1530-something is an

17  extremely long dry period.  For that reason I would hesitate

18  to predict the end of the current dry cycle.

19         MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

20  marked 31 for Identification, your Honor.

21         MR. MOSKOVITZ:  I would like to ask a question first.

22         MR. STAHLMAN:  I would, also.  Go ahead.

23         MR. MOSKOVITZ:  Mr. Hofmann, I don't understand the

24  indices at the right-hand corner.  First of all, what do the

25  numbers along the left side of those two graphs indicate?

THE WITNESS:  They are departures in percent from the mean, cumulative departures, the same as this cumulative departure is from the mean annual growth for the tree ring diagram.  The legend was left off, but they are cumulative departures from the mean for the period record.

MR. MOSKOVITZ:  And I take it, then, that the horizontal spaces are a key to the dates at the bottom; is that it?

THE WITNESS:  Yes, they are exactly the same period as covered by the tree ring diagram, the purpose being to show that the periods of the precipitation and runoff check the overlapping period of tree growth.

THE COURT:  I am sure this will be a big help to me in deciding this case.  I am confident that what happened in 1590 is very significant.

MR. STAHLMAN:  I think it shows why George Washington chopped down the cherry tree, your Honor.

MR. SACHSE:  I have an objection, your Honor.  There isn't any foundation, and if it is introduced it is for the purpose of attempting to project into the future from what has happened in the past.  It is absolutely immaterial.  This Court isn't going to decide how much water is going to be available in the river twenty years from now.

THE COURT:  The witness told you that his inexperienced eye, speaking modestly, could detect no particular pattern.

MR. SACHSE:  Then it has no relevancy.

3605

G2

Z53

1  MR. VEEDER:  It certainly has, your Honor.  Here we

2  have-- Mr. Stahlman refers to them as "bandits".  It hurts me

3  to say such a thing.  But here they are going out to steal

4  our water on the basis of this idiotic report by this kangaroo

5  court of California.

6  THE COURT:  Listen, let's refer to it hereafter as

7  Bulletin 57.

8  MR. VEEDER:  No, I am referring now, your Honor, to this

9  organization that came down and issued permits based upon--

10  THE COURT:  Let's call them by their right names.

11  MR. VEEDER:  Water Resources Board, isn't that right?

12  MR. SACHSE:  Water Rights Board.

13  THE COURT:  We have had enough fun.  Let's call them

14  by their right name.

15  MR. VEEDER:  They have come down, your Honor, and said

16  that the Fallbrook Public Utility District would be able to

17  get 5100 acre feet of water out of a 35,000 acre foot structure.

18  We say it is absurd.  We believe it to be absurd.  We have gone

19  into every source of information that we could get to try to

20  analyze this political approach that they have taken.  There is

21  nothing to sustain what they have done-- not a thing.  Every

22  single graph and chart that is on the board here will show

23  one matter conclusively, that there no pattern of repetition

24  of runoff.

25  MR. SACHSE:  I have a new objection, your Honor.  Mr.

G2

Z54

1    Veeder has just stated a reason which is completely disposed

2    of by your Honor's pre-trial ruling.

3         MR. VEEDER:  May I finish my argument, Mr. Sachse?

4         MR. SACHSE:  I have a new objection.

5         MR. VEEDER:  Make your objections one at a time.

6         THE COURT:  You may conclude, Mr. Veeder.

7         MR. VEEDER:  The point we are trying to make, your

8    Honor, is that there is absolutely no basis whatever for a

9    claim by the Fallbrook Public Utility District, even if it had

10   the power to appropriate water for purposes of irrigation

11   which it does not-- there is no basis whatever, as these

12   exhibits show, to calculate in the future that there would be

13   any possibility of getting a supply of water.  Now we have

14   gone to great length, we have endeavored in every way possible--

15   I concede that this is almost -- well, I almost said "Buck

16   Rogers," and I will not say it, but it is almost the same as

17   this publication of the State of California, your Honor.  I

18   admit it.

19        THE COURT:  I hope you have some ready money in your

20   pocket, because I am going to warn you now.  If I hear any

21   more about "Buck Rogers" or "Comic Book," et cetera, I am

22   going to charge you progressively for each reference.  So

23   keep a little cash in your pocket.

24        MR. VEEDER:  All right, your Honor.  The per diem I

25   get simply will not take care of that.  But I think your Honor

1  understands how I feel about the matter.

2         In any event, we have attempted to show, indeed I think

3  we have shown conclusively that you cannot prognosticate on the

4  Santa Margarita River that it will yield any quantity of water

5  at any given time.  That is why we are offering this Exhibit

6  31.  We just took it back to about 1200 and showed that the

7  same situation prevailed then, only they weren't confronted

8  with Fallbrook in those days.

9         THE COURT:  What is your objection, Mr. Sachse?

10        MR. SACHSE:  My additional objection is that under the

11 pre-trial ruling as to facts your Honor has ruled that this

12 proceeding will not go behind the proceedings of the State

13 Water Rights Board:

14            "The court does not have jurisdiction

15            in this case to review the actions of

16            the State Water Rights Board respecting

17            applications to appropriate water."

18        If that is the purpose of this exhibit, it is absol-

19 utely immaterial.

20        THE COURT:  Well, it has other purposes.  The objection

21 is overruled.

22        MR. DENNIS:  I have an objection, too, that I would

23 like to interpose to this particular exhibit.  If it is going

24 to try to prognosticate into the future, I don't think it has

25 any relevancy.  As Mr. Veeder says, this is the only way they

1    can show that there is no water within the river.  However,

2    it seems to me that it could be approached much more prac-

3    tically by assuming that there had been a dam constructed at

4    the Fallbrook site in 1923, at which time they had recorded

5    records as to diversions of the amount of flow, and assuming

6    that that dam was there and taking the figures which are dis-

7    closed by the exhibits which the plaintiff has put in and the

8    use which the plaintiff will show and the Vails will show

9    they have made of the water, would that have damaged the Vails

10   or damaged the Navy-- would there still have been water

11   to take care of their needs during that period?

12        I think it is becoming more and more apparent through

13   the trial of this lawsuit that we have had two large land

14   owners on this river who have decided that they are going to

15   divide the water between them and that irrespective of whether

16   they can use it for their legal rights they are going to keep

17   anybody else from using that water during such period of time

18   as they have no use for it.

19        THE COURT:  That might be a good argument when the

20   case is argued on the merits.  The objection is overruled.

21        MR. LITTLEWORTH:  I would like to add the objection

22   that I think there is no foundation whatsoever.  The entire

23   graph goes back to this work of Mr. Schulman.  Certainly an

24   expert can take into account something which other people

25   have done, but this is certainly putting in Mr. Schulman's

1    work through Mr. Hofmann, who states he doesn't really conclude

2    anything from it.  It seems to me that it has no foundation

3    or relevance.  ,

4         THE COURT:  The objection is overruled.  I have already

5    commented that I was confident that the figures for the year

6    1395 would not be a big help to me in deciding this case.

7    It may go into evidence.

8         (Exhibit No. 31 marked for identification was received

9    in evidence as Plaintiff's Exhibit No. 31.)

10   BY MR. VEEDER:

11        Q  Mr. Hofmann, based on your personal observations and

12   your studies of the Santa Margarita River generally, and also

13   the streams in Southern California and your analysis of

14   runoff in the area in question, would you state whether, in

15   your opinion, there is a repetitious pattern of precipitation

16   in the Santa Margarita River Valley upon which you could

17   prognosticate the precipitation for next year?

18        MR. SACHSE:  That is objected to as being irrelevant

19   and immaterial, your Honor.

20        MR. DENNIS:  He said that he couldn't.

21        THE COURT:  Overruled.

22        THE WITNESS:  In my opinion, there is no repetitious

23   pattern in the precipitation records that we have analyzed for

24   the Santa Margarita River Basin.

25        THE COURT:  For the next year.  That was the question.

X31

G4

Z58

1   THE WITNESS: For the next year.

2   BY MR. VEEDER:

3       Q   From your analysis, do you believe that there is a

4   repetitious pattern for the periods ten years, twenty years

5   or thirty years?  I am still speaking of precipitation.

6       A   There is no repetitious pattern for a ten, twenty

7   or thirty-year period.

8       THE COURT:  Well, there may be no pattern, but would you

9   say from your studies that you could not reasonably prognosti-

10  cate that within the lifetime possibly of some of us here, the

11  next twenty years, there wouldn't be again high rainfall and

12  flood waters on some occasion come down the Santa Margarita

13  River?

14      THE WITNESS:  Yes, your Honor, you could prognosticate.

15  The length of time would have a bearing on how accurately you

16  could predict.

17      THE COURT:  You couldn't say what year?

18      THE WITNESS:  You couldn't say what year, or you

19  couldn't say what the average would be.  In other words, you

20  may be in error 25% either way.  But as the period of time

21  increases in length you may come increasingly close to the

22  long period average.  But certainly you couldn't pinpoint one

23  year or probably even ten years.

24      THE COURT:  All right.

25

Hofmann   Direct

3611

G4

Z59

BY MR. VEEDER:

1

2      Q   Based upon your personal observations and your

3   studies of streams in general in Southern California and your

4   analysis of the statistics respecting runoff and precipitation

5   in the Santa Margarita River Valley, would you state whether,

6   in your opinion, there is a repetitious pattern of stream

7   discharge which would permit you to calculate the runoff of

8   the Santa Margarita River at any point for a one-year period?

9      A   There is no repetitious pattern in runoff in the

10   Santa Margarita River.

11      Q   Would you state your opinion in regard to a ten-

12   year interval, a 20-year interval, and a 30-year interval?

13      A   As runoff is a residual of precipitation, the

14   irregularity of the pattern is more pronounced, it is affected

15   more by antecedent conditions, so that for ten years you would

16   not be able to predict the runoff.

17      Q   What about twenty years and thirty years, based upon

18   your observation?

19      A   As the periods become longer and the chances of an

20   excessively long, dry period, as indicated by the tree ring

21   growth, become relatively smaller, the estimate one might

22   make of the runoff would become more accurate, but there would

23   still be a considerable possibility of variation from what

24   estimates you make.   There is no pattern by which you can

25   predict the exact answer.

G4

Z60

1   Q   What has been your observation from the standpoint

2   of increasing the cultivation upon the runoff of the streams

3   in Southern California?

4   MR. SACHSE:   That is objected to onthe ground that no

5   foundation has been laid on this one at all.

6   THE COURT:   Sustained.

7   I will take a short recess.

8   Certain exhibits that we have been over are not yet in

9   evidence. I call your attention to 17-A, 16-B, 16-C, 16-D,

10  16-1.  You might clean those up after the recess and see if

11  they go in.

12  (Recess.)

13

14

15

16

17

18

19

20

21

22

23

24

25

H-1 ML j

Hofmann - Direct

THE COURT:  What about these exhibits 17-A?

MR. VEEDER:  I am going to call witnesses, your Honor, for those.

THE COURT:  Not sufficiently identified.  You don't want to offer it in evidence now?

MR. VEEDER:  Oh, no.  I am going to have a witness and have him identify it and put those in.

THE COURT:  What about 16-B, the list of 146 wells? That should go into evidence.

MR. VEEDER:  Well, I want to check the whole thing out, your Honor, on that.

THE COURT:  Then 16-C, the list of 400 wells.  You want to check further on that?

MR. VEEDER:  Yes, your Honor, I do.

THE COURT:  16-D, list of wells showing water levels?

MR. VEEDER:  See, Mr. Kunkel has handled those matters, and he is making investigations now on a lot of this matter.  See, we are still in the process of making one of those maps.

THE COURT:  Most of these exhibits I listed we have had testimony about, and there is no reason why they shouldn't be in the record.  If you want to check them, it is all right with me.  Those are the ones --  Am I right in the list, Mr. Clerk?

THE CLERK:  Yes, your Honor.

1        THE COURT:  All right, proceed.

2        Q  BY MR. VEEDER:  What are the factors, Mr. Hofmann,

3    that you took into consideration as affecting the runoff

4    in a valley?

5        THE COURT:  What valley?

6        MR. VEEDER:  Santa Margarita River Valley.

7        THE WITNESS:  The factors affecting the runoff?

8        Q  BY MR. VEEDER:  Yes.

9        A       Would be the precipitation on the valley and the

10   amount of water used in the valley.  The difference would

11   be the runoff from the valley --

12       Q       Would you speak up, please.

13       A .      The difference would be the runoff from the

14   valley between the precipitation on the valley and including

15   the entire periphery of the valley-mountain area.  Then,

16   the use in that area subtracted from the precipitation would

17   give the runoff.

18       MR. DENNIS:  Mr. Veeder, could I ask a question?  I

19   think it will clarify the record somewhat.  The witness is

20   continually referring to the Santa Margarita Valley or the

21   Santa Margarita Basin.  I suppose he is referring to the

22   watershed of the Santa Margarita River when he so testifies?

23       THE WITNESS:  I was referring to a valley in the Santa

24   Margarita River Basin.

25       MR. DENNIS:  Not the watershed but a valley?

1    THE WITNESS:  I assumed the question was general and

2    answered it accordingly.

3    THE COURT:  Wouldn't another factor be the amount of

4    water that went into the ground to replenish the underground

5    basins, of this water which ran off, this water which fell

6    before it ran off?

7    THE WITNESS:  I beg your pardon, your Honor.  Yes, it

8    would.  I forgot to add to my statement that there would be

9    no change in storage.  If we take an area such as the upper

10   Santa Margarita River drainage with the gaging station at

11   the gorge, head of Temecula Gorge, that upstream from that

12   point the outflow from the area above is dependent upon the

13   precipitation over the entire area, the use of water in the

14   entire area -- both natural and by man -- and the evaporation.

15   That is all included in the term "use," plus the change in

16   ground water storage throughout the upper basin.

17        Q   BY MR. VEEDER:  Now, what would be the effect of

18   increased use of water such as for purposes of irrigation

19   in the Santa Margarita River watershed upon the runoff in

20   that watershed?

21        A     As such irrigation use exceeded the natural

22   losses that antedated it, it would reduce the runoff, assum-

23   ing that other conditions, such as changes in ground water,

24   storage, remained the same.

25        MR. VEEDER:  I have no further questions.

1        THE COURT:  Now, let's see that I understand this.

2    When water is used for irrigation, there is a portion of

3    that water that finds its way back into the basin?

4        THE WITNESS:  That is correct, your Honor.

5        THE COURT:  And there is a portion of it.

6    that is lost by evaporation?

7        THE WITNESS:  Evaporation and evapotranspiration as

8    used by the plants.

9        THE COURT:  What do you mean by --    Oh, by plant

10   use?

11       THE WITNESS:  Yes, straight evaporation.

12       THE COURT:  I see.  And the more water used for

13   irrigation, the more is lost proportionately -- not

14   proportionately -- but the more use is made of water by

15   irrigation the more is lost by evaporation and plant use?

16       THE WITNESS:  That is correct, your Honor.  The less

17   there is available downstream.

18       THE COURT:  Now, if a basin was low, water level in a

19   basin was low, and certain of the waters that fall by way

20   of rain and ran off in streams, surcharged that basin, that

21   would have a definite effect on the amount of runoff as to

22   gaging point, Santa Margarita gages?

23       THE WITNESS:  That is correct, your Honor.  In other

24   words, if there are withdrawals from ground water storage

25   upstream for irrigation purposes, those withdrawals would,

1   in part, at least, be satisfied by increasing recharge

2   from precipitation and surface runoff and would thus decrease

3   the runoff at the lower point.

4       THE COURT:  Also, if there had been prior withdrawals,

5   we will say, for a period of several years, there had been

6   heavy withdrawals on the basin and been a series of dry

7   years and little precipitation and runoff, then there would

8   also be water, an unknown amount, that would go into this

9   basin to raise the water levels --

10      THE WITNESS:  That is correct.

11      THE COURT:  -- which had been drained down in previous

12  years?

13      THE WITNESS:  That is correct, your Honor.

14      THE COURT:  If your water basin were full, if that is

15  a possibility -- and let's assume it -- so that they would

16  take no more water in the way of runoff, then your discharge

17  at the end of the valley should be the amount of precipitation

18  less the evaporation through use and through plant use?

19      THE WITNESS:  That is correct.

20      THE COURT:  All right.  Who wants to start?

21          Mr. Moskovitz, do you want to start this?

22                  CROSS EXAMINATION

23  BY MR. SACHSE:-

24      Q    Mr. Hofmann, first --

25      MR. STAHLMAN:  Are we going to follow the same order

1    or are we going to follow another order?

2        THE COURT:  What order did we follow before?

3        MR. SACHSE:  Mr. Moskovitz was first.

4        MR. STAHLMAN:  Mr. Moskovitz.  We went around in a

5    circle.

6        THE COURT:  You want to lead off again?

7        MR. LITTLEWORTH:  We can sacrifice him last.

8        MR. MOSKOVITZ:  I have no objection.  If Mr. Sachse

9    wants to go first, I have no objection to that, either.

10       THE COURT:  I have no objection.

11       MR. MOSKOVITZ:  Okay.

12       THE COURT:  You all illustrated to me how able you

13    were at cross examination on the previous witnesses.

14       MR. VEEDER:  That cuts it in about a third.

15       THE COURT:  And I told you a story at the recess.  So

16    let's proceed now with cross examination.

17       Q  BY MR. SACHSE:  Mr. Hofmann, I am referring now to

18    this series of exhibits, 21, 22, 23, 24; that is the series

19    of gage runoff figures?

20       A    Yes.

21       Q    And I am referring now particularly to the insert

22    sheet which Mr. Veeder gave you which was just a sample of

23    one of them.  You know the one to which I am referring?

24       A    Yes, I know the ones you mean.

25       Q    What did you call those?

H-2

1       A       Those are field station descriptions.  They are

2    prepared in connection with the operation of the gaging

3    stations and have information pertinent to that gaging

4    station.

5       Q       I was just asking generally what you would call

6    them.  Now, are they an official part of the U. S. Geological

7    Survey Water Supply papers?

8       A       No, they are not an official part of the Geological

9    Survey Water Supply papers.

10      Q       Have they been approved by the Department in the

11   manner that I believe Mr. Kunkel testified to?

12      A       Those documents have not been approved by the

13   Geological Survey in the way Mr. Kunkel's exhibits and my

14   exhibits were approved, and also the stream flow records

15   were approved.

16      Q       So the text, any inconsistencies in the text

17   would reflect what?

18      A       Simply inconsistencies in the --

19      Q       Let me direct your --

20      A       -- knowledge.  Yes, all right, I am sorry.

21      Q       Let me direct your attention specifically to the

22   insert sheet, then, in Exhibit 20, Temecula Creek at Vail

23   Dam.

24              Do you have it, Bill?

25          THE CLERK:  Which one?

MR. SACHSE:  20.

Q      I am directing your attention particularly to
the language on the last page of the folded page, fourth
paragraph from the bottom that has the heading "Regulation
and Diversion."  Do you want to read it, please, to yourself.

A      Yes, I have read that.

Q      I know that that particular language states that
there are no diversions or regulations upstream from the
lake.  What does that mean?

A      It means that this field station description, as
prepared by W. M. Littlefield was prepared incorrectly on
the basis of testimony presented by Mr. Kunkel.

Q      Do you know that it is incorrect?

A      Yes.  I have observed points of diversion up-
stream from this gaging station.

Q      Then, to that extent, this exhibit is in error?

A      To that extent this exhibit is in error.  I
believe early in the testimony I indicated these field
station descriptions were there simply for background
information on the operation of the gaging stations.  And
as was pointed out in your questions, they are not an
official publication of the Geological Survey.  They are
simply a field description prepared to aid the man who
operates the gaging stations.

Q      On the same exhibit, turning to the preceding

1    page, the third paragraph from the bottom, "Discharge

2    measurements." It states that "records of runoff represent

3    all water reaching the lake, including rainfall on the lake

4    surface," and so on. Now, the closest gage upstream is

5    the one on Aguanga, is it not?

6         A     That is correct.

7         Q     And there is no gage on any point of those

8    tributaries which you described as Coahuila, Wilson Creek,

9    and as it runs through Lancaster Valley?

10         A     That is correct.

11         Q     How does the Survey, for the purpose of

12    calculating this increment to the Vail Reservoir, determine

13    the runoff of Coahuila Creek, Wilson Creek, Lancaster Valley?

14         A     We do not determine the runoff for those, for

15    Wilson Creek. The runoff is computed for Temecula Creek

16    at Vail Dam.

17         Q     Is not the confluence of Wilson Creek and

18    Coahuila Creek with Vail Dam a separate water course from

19    the water gaged at the Aguanga gage?

20         A     Absolutely, but the records for the Aguanga gage

21    are entirely different from the records that are computed

22    at this point and to which this paragraph has reference.

23    If you will note, it says further on in that same paragraph

24    entitled "Discharge measurements": "Computed on basis of

25    records of change of storage, release,    (draft, spill and

1    evaporation)."

2        Q    I think you are missing my question:  The first

3    sentence, "Does the record of runoff represent all water

4    reaching the lake?  Well, does it represent all water

5    reaching the lake?  Does it represent --

6        A    Yes.

7        Q    -- specifically the water reaching the lake

8    through Coahuila and Wilson Creeks?

9        A    It represents all water reaching the lake, and

10   including Wilson Creek, Temecula Creek, Arroyo Seco, any

11   other minor affluents, reaching the lake and precipitation

12   on the reservoir.

13       Q    In other words, the increment to the lake, then,

14   is determined by the variations in the lake gage and not

15   by calculations of the water that came down the stream?

16       A    That is correct.

17       Q    Now, our insert sheet for the Aguanga gage, the

18   one in Exhibit 19 --   I will just hand you my copy.

19       A    All right.

20       Q    -- for which you have as yet no gage figures.

21   I note the statement:  "There is no regulation upstream from

22   the gage, but there are many small diversions for irrigation

23   and domestic supply."

24       A    Yes.

25       Q    Now, I don't see who made this one.

A     Well, I can -- all of these new station descriptions have been prepared by the same man and, apparently, the inconsistency of this statement with the other was not caught by him in preparing the one for Vail Dam.  The one for Aguanga is the correct description for the diversion.

Q     Now, then, referring to the one on 22, Murrieta Creek at Temecula, the statement is still a little different:  "There is no regulation or large diversion above the station."  Did the same fellow prepare this, also?

A     Yes, W. M. Littlefield.

Q     Do you have any idea what he means by "large diversion"?

A     I have no idea what he means by "large diversion."

Q     You don't know whether by that term he is referring only to surface diversions or whether he is including pumping?

A     In all probability he is referring only to surface diversion.

Q     I don't want probabilities.  I asked you if you knew.

A     I do not know.

Q     Now, I would like to jump for a minute, if I could, to the exhibit on which you drew your -- gosh, I hate

1    to take all this off.

2         MR. VEEDER:  Go ahead and take them off, fold them up

3    and give them to the Clerk.

4         MR. SACHSE:  There is an error.  I want to correct it.

5         THE WITNESS:  Which exhibit?

6         MR. SACHSE:  The one on which you indicated the

7    streams of the De Luz watershed, Mr. Hofmann.  I am quite

8    certain that you have made a small error, and I want to get

9    it corrected.  It is drawn on this one.

10        THE WITNESS:  It was drawn on this one, I believe.

11        MR. VEEDER:  It is on 17, Mr. Sachse.

12        Q  BY MR. SACHSE:  If you will look at the streams

13   for the De Luz Creek watershed indicated by you --  Is it

14   all right if he checks against my U.S.G.S.?  The exhibit

15   is the same.

16        MR. VEEDER:  'If it is to be checked back against an

17   exhibit, I would recommend we use the 29 series, Mr. Sachse.

18        THE WITNESS:  I believe it is 29-K.

19        MR. VEEDER:  Is it 29-K?

20        MR. SACHSE:  The Fallbrook quad.

21        THE WITNESS:  29-F.

22        MR. VEEDER:  Did you get the exhibit, Mr. Hofmann?

23        THE WITNESS:  I am sorry.

24        Q  BY MR. SACHSE:  Then, I will direct your attention

25   particularly to the streams of the --

Hofmann - Cross

1    A    Yes.

2    Q    Does that comprise the headwaters of the De Luz

3 Creek?  And check them, please, against your sections and

4 see if you are not in error on your delineations.

5    MR. VEEDER:  It might save some time if you point it

6 out, Mr. Sachse, if you would.

7    MR. SACHSE:  Over here.

8    MR. STAHLMAN:  I didn't hear you, Mr. Sachse.

9    THE COURT:  Pointing out an error on what?

10    THE WITNESS:  As far as I can tell, the stream system

11 as put on the map during the lunch hour at the request of

12 the Court is the same as that of the quad sheet exhibit 29-F.

13    MR. SACHSE:  I owe the witness an apology.

14    MR. VEEDER:  You owe me one.

15    MR. SACHSE:  I had not previously observed the lines

16 which the witness drew on the map.  I am sorry this

17 happened.

18    Q    Now, in answering some questions of his Honor

19 at the very end of your examination, you stated that, as I

20 understood you, that the precipitation minus the use would

21 equal the runoff.  Then, you further explained your answer

22 by explaining that you were assuming that all other factors

23 remained equal and that the basin was full.  You were not

24 considering the fact of the percolation in, is that correct?

25    A    I don't believe I said, "Assuming the basin was full."

1    I said, "Assuming all other factors remaining equal."

2         Q    Are you not overlooking one factor that might

3    affect runoff, and that is the works of man other than

4    irrigation?

5         A    By "use," I included the works of man other

6    than irrigation.  I didn't specify simply irrigation.  In

7    other words, evaporation from a reservoir would be a use

8    in excess of what would have been prior to --

9         Q    In addition to evaporation, would not the mere

10   impoundment behind a reservoir obviously affect the runoff

11   out of any valley?

12        A    That would come under changing storage in the

13   valley, other conditions being the same.  Whether the

14   storage is surface storage or ground water storage isn't

15   essential.

16        Q    It would be immaterial in your answer?

17        A    Yes, that is right.  You assume no change in

18   storage during that period.

19        Q    When I asked you a question in connection with

20   Exhibit 66, "Residual mass curves of precipitation and

21   runoff," you recall I asked the voir dire question as to

22   why Fallbrook runoff was compared with -- pardon me --

23   Fallbrook precipitation was compared with Murrieta and Vail

24   runoff.  My notes are that you stated that the runoff of

25   Fallbrook has been affected by man but that Murrieta and

H-3

1  Vail, it has not?

2       A     I said for the larger part of the period of

3  record it had not been.  But they were essentially natural

4  runoffs; I mean streams unaffected to any extent by the

5  works of man.

6       Q     In other words, you feel that Temecula Creek

7  and Vail Dam, let's say above Vail Dam, and Murrieta Creek

8  above the Temecula gage have been less affected by the works

9  of man than the Fallbrook gage?

10      A     Than downstream particularly, because of the

11  installation of Vail Reservoir in recent years, that is

12  correct.

13      Q     Then, you are emphasizing the variations have

14  occurred not in the vicinity of Fallbrook but higher up-

15  stream?

16      A     Well, I am saying there have been man-made

17  variations downstream from the gage, Temecula Creek at Vail

18  Dam, in recent years.  I did not pinpoint whether they were

19  upstream, or the lower part or the upper part of the

20  channel.  There have been changes and are reflected in the

21  record.

22      Q     Then, I am curious to ask you the same question,

23  then:  Why, then, not use the runoff at Fallbrook instead of

24  runoff at the other two stations to compare with precipitation

25  at Fallbrook?

1    A    Because the precipitation of Fallbrook is not

2  affected by any works of man.  It falls, as it did throughout

3  the centuries, with variations that have occurred through-

4  out the centuries.

5    Q    That is true of the precipitation everywhere,

6  isn't it?

7    A    That is true of the precipitation.  And for that

8  reason, I felt it preferable to use gaging station records

9  that were affected as little as possible by the works of

10  man.  And for that reason, I took the two upstream gaging

11  stations rather than the Fallbrook station, because the

12  Fallbrook station has been affected by the works of man

13  for the last, at least the last ten years, seriously, both

14  by diversions by the community of Fallbrook and by the

15  installation of the Vail reservoir.

16    Q    Have you attempted to relate in any of your

17  studies the diversions from any source, by any point, to

18  the variations in stream flow?

19    A    I don't believe I understand your question,

20  Mr. Sachse.  Relate in what way?

21    Q    To see if there is a relation for any gage or

22  any area between diversions upstream from that area and

23  gage flows at that area.

24    MR. STAHLMAN:  I don't get the question.

25    MR. SACHSE:  I will try again.

1    Q    You have given us several exhibits, Mr.

2    Hofmann, which compare precipitation and runoff.  Now, have

3    you attempted to make any such study comparing consumption

4    and use above any station and runoff for this watershed?

5    A    You mean natural consumption or --

6    Q    Any study for this watershed for any gage?

7    MR. VEEDER:  Well, now, that certainly goes beyond

8    the scope of the direct examination.  There is no --

9    THE COURT:  He is asking whether or not he has made

10   a study.  He can answer that very easily.

11   THE WITNESS:  I still don't understand what --

12   THE COURT:  Any sort of consumption -- natural

13   consumption or man-made consumption?  I suppose "consumption"

14   there means irrigation, evaporation because of the building

15   of a dam or diversions here and there where water is

16   temporarily impeded.

17   THE WITNESS:  The only studies that I have made are

18   pertaining to the comparison of average annual precipitation

19   to annual average runoff for these two upstream gages that

20   have been relatively unaffected by changes made by man.

21   Other than that, I have made no studies relating

22   precipitation or runoff to the utilization of the water in

23   the basin.

24   Q  BY MR. SACHSE:  Again referring to this 20 series of

25   exhibits.  Start out with the bottom, 26: "Santa Margarita

1    River near Ysidora." The last sheet covers the water year

2    ending September, 1957.

3        A    Yes, sir.

4        Q    Your office has prepared, subject to revision,

5    runoff figures for the Santa Margarita River at Ysidora

6    for a more recent period, have they not?

7        A    Yes, sir.  As a matter of fact, if I may offer

8    the information, the records for the water year 1958 have

9    been -- the first steps have been computed and the records

10   are being reviewed and sent back to Washington for review,

11   and within a short interval, probably the middle of

12   November, will be available on the same basis as these

13   records for all gaging stations in the basin.

14       Q    You will be able, then, by the middle of

15   November, to produce the runoff, approved runoff figures

16   for those gages?

17       MR. VEEDER:  We intend to offer them and add it to

18   these exhibits, your Honor.

19       Q  BY MR. SACHSE:  You are aware, are you, Mr. Hofmann,

20   just of your own knowledge?  Mr. Hofmann, you have examined

21   those, have you not?  You have seen them?

22       A    The records, the preliminary records?

23       Q    Yes.

24       A    That you are talking about?

25       Q    Yes.

A      Yes, I have seen them.

Q      Am I correct in stating --

MR. VEEDER:   I object.   This goes beyond the scope
of the direct examination.   I know what he is going to ask.

THE COURT:   Why don't we wait until we get them;
then have our cross examination on them.   You are going to
state what they show, Mr. Sachse.   Let's wait until we
get them.

Q   BY MR. SACHSE:   I would like to ask if it would be
possible, for purposes of cross examination, while we have
this witness, to get at least the unpublished records that
are subject to revision.   I have them here.   We got them
from your office; so, apparently they are available.

A      I would be happy to --    I don't know what
records you have.

Q      We have -- or the State of California has, I
should say, obtained for the water year through May, same
format, same sheet, unpublished records subject to revision.

THE COURT:   Let's wait.   Let's wait.   The Court
directs you to wait until we get the others in.   You have
the same opportunity.   The witness will be back to answer
your questions.   I know what you want to do.   You want to
show all the flood water that went to waste last winter.

MR. VEEDER:   I move to strike the word "flood."   We
don't think it is flood.

1     THE COURT:  Denied.

2     Q  BY MR. SACHSE:  Mr. Hofmann, with particular

3  reference to the Ysidora gage, how would you describe its

4  relation, its location, with its location to the ocean?

5     A     It is approximately two and a half miles up-

6  stream from the ocean.

7     Q     And how would you describe its location with

8  relation to salt water?

9     A     Well, I-

10     MR. VEEDER:  Now --

11     MR. SACHSE:  I will withdraw the question.

12     Q     You are familiar with the area below the Ysidora

13  gage, are you not?

14     A     Yes, sir.

15     Q     Is it not a fact that downstream from the

16  Ysidora gage is a very, very large salt marsh?

17     MR. VEEDER:  We will stipulate the Pacific is out

18  there.

19     Q  BY MR. SACHSE:  On the other side of that is a bar

20  and then is the ocean; is that correct?

21     MR. STAHLMAN:  That is one bar I missed.

22     Q  BY MR. SACHSE:  And when you gave me the two-and-a-

23  half-mile figure, you were calculating it from the Pacific

24  Ocean outside the bar, were you not?

25     A     That is correct.

1    Q    How far is it to the salt marsh?

2    A    I have made no study of the distance from the

3    gaging station to the salt marsh.  I do not know the extent

4    of the salt marsh upstream from the ocean.

5    Q    You wouldn't care to estimate whether it was a

6    tenth of a mile or a half a mile or two miles?

7    A    I have no way of knowing, Mr. Sachse.

8    Q    How often have you been down there?

9    A    Several times, but not for the purpose of

10   measuring the length of the salt marsh.

11   Q    Are you familiar with the diversions from the

12   Santa Margarita River below the Temecula gage -- below the

13   Ysidora gage?

14   MR. VEEDER:  I object.  This goes beyond the scope of

15   the examination.

16   THE COURT:  Sustained.

17   Q  BY MR. SACHSE:  Would you agree, Mr. Hofmann, that

18   water surface flow which passes Ysidora gage wastes into

19   the Pacific?

20   MR. VEEDER:  I object.  It goes beyond the scope of

21   the examination and has implicit in it the question of law.

22   What constitutes a waste is a matter of law.  It certainly

23   goes down the scope --

24   THE COURT:  He hasn't testified to anything about the

25   geology of the area southwest of the gage, and he has only

1   given us testimony as to gaging figures, precipitation,

2   runoff.  There will be some witness you can interrogate on

3   that subject, Mr. Sachse.

4       Q   BY MR. SACHSE:  In your various tables which deal

5   with the water supply coming into the military reservations

6   by that I am including, for example, De Luz Creek gage and

7   the calculation you made of the estimated increment to

8   the basin at the De Luz damsite -- I did not see anywhere

9   any estimate of the discharge from Fallbrook Creek.  Was

10  such an estimate made?

11      A       It was lumped together into the 60 square miles

12  of drainage area between the Fallbrook gage and the De Luz

13  damsite.  It was not singled out specifically as the

14  Fallbrook gage; I mean Fallbrook Creek drainage.

15      Q       Would that be actually correct, in fact?  Mr.

16  Hofmann, does it not, in fact, the Fallbrook drainage drain

17  into the reservation below the De Luz Creek damsite?  It

18  drains into Lake O'Neill?

19      A       That would be correct.

20      Q       Then, have you made any calculation of the

21  increment of the surface runoff to the reservation from the

22  Fallbrook Creek drainage?

23      A       No, I have not made any calculation.

24      Q       So that runoff and the increment to the military

25  reservation from that source have been completely overlooked

1   in what you have done so far?

2          A     I have made no study pertaining to Fallbrook

3   Creek runoff.

I

Z61

Hofmann        Cross

1        Q  You stated in yesterday's testimony that all of the

2   waters passing down Temecula Creek were stored in the Vail

3   Reservoir.  Did you intend that as a statement of fact, or

4   do you mean that they could be stored in Vail Reservoir?

5        A  They would be temporarily stored in the Vail Reser-

6   voir, in any event.  But in the event that Vail Reservoir was

7   completely full and spilling, it would pass through the reser-

8   voir and on over into the Temecula Creek-Nigger Canyon channel.

9   But the water all has to pass either through the dam or over

10  the dam.

11       Q  Do you know, as a matter of fact, whether at any time

12  of year the Vail Reservoir is so operated that the stream flow

13  increment to it is allowed to go out through the dam?

14       MR. VEEDER:  That is objected to as being beyond the

15  scope of the direct examination, your Honor.

16       THE COURT:  Overruled.  If you know.

17       THE WITNESS:  I do not know.

18  BY MR. SACHSE:

19       Q  Have you ever read the Vail permit from the State of

20  California for operation of the dam?

21       MR. VEEDER:  Again I object as being beyond the scope

22  of the direct examination.

23       THE COURT:  Sustained.

24  BY MR. SACHSE:

25       Q  Have you, or anyone under your direction, made any

I

Z62

1  attempt to calculate the total surface storage area in the

2  Santa Margarita watershed?

3       MR. VEEDER:  Objected to as being beyond the scope of

4  the direct.

5       THE COURT:  Surface storage area of what?

6       MR. SACHSE:  The total surface storage area in the

7  Santa Margarita River watershed. Had he or anyone under his

8  direction attempted to make such a calculation?

9       THE COURT:  That is beyond the scope of the direct

10  examination.  If you are talking about subground units and

11  basins, sustained.

12       MR. SACHSE:  Your Honor, I am taking somewhat this

13  position.  The witness has made some very sweeping conclusions

14  to Mr. Veeder's last four questions.

15       THE COURT:  What sweeping conclusions?

16       MR. SACHSE:  That the relation of precipitation, use,

17  runoff, he stated to me that he includes surface storage in

18  use.  I want to know how much he really knows about what goes

19  on in the upper watershed, and I don't think he knows.

20       THE COURT:  He hasn't testified to anything except the

21  general principle, which is axiomatic, of the water coming

22  into the watershed less use, of which he has given a broad

23  definition, less evaporation-- I am not classifying these in

24  any order, and some are included in the others-- use by plants,

25  use by man, evaporation, et cetera, less what goes into the

1   underground basin, runs out at the gaging station.  Unless

2   you object to that general principle, there is no sense in

3   cross-examining.  He hasn't given any testimony as to the

4   extent of the basins, or how much water flows into the ground.

5   His testimony was as to rainfall and runoff.  As a matter of

6   fact, I asked those questions.  They were general questions

7   about which I don't think there is any dispute.

8         MR. SACHSE:  Very well, your Honor.

9   BY MR. SACHSE:

10        Q  Mr. Hofmann, would I be correct in describing the

11   runoff of the Santa Margarita River and its tributaries in

12   this watershed as being what is called "flashy"-- they are

13   "flashy" streams?

14        A  Not entirely.

15        Q  What do you define as a flashy stream?

16        A  I have no definition for a flashy stream.

17        Q  Have you ever used the word?

18        A  Yes, I have.

19        MR. VEEDER:  Now don't say when.

20        THE WITNESS:  In the sense that it describes a stream

21   where the peak discharges are rapid as it goes from practically

22   no flow to considerable flow and right back down again.

23        Q  That is what you mean by "flashy"?

24        A  That is what I mean by flashy.

25        Q  That is what I mean.  So don't you agree that the

Hofmann            Cross

I

Z64

1    streams in this watershed should be characterized as flashy?

2         A  No, not necessarily at all.

3         Q  Let me draw your attention-- I don't think we have

4    to take any exhibits down-- to Exhibit 33, just as a sample,

5    Santa Margarita River near Temecula runoff.  Now this is by

6    what-- months?

7         A  This is by months.

8         Q  Have you ever had occasion to examine, for example,

9    the daily discharges that make up this peak showing for the

10   year 1938?

11        A  Very often.

12        Q  And would we not find, if we examined the daily

13   discharges for that month in 1938, that they showed even

14   greater variations?

15        A  Yes.

16        MR. VEEDER:  That is objected to as being beyond the

17   scope.

18        Well, he has already answered.

19   BY MR. SACHSE:

20        Q  Can you tell from your exhibit what month that is

21   in 1938?

22        A  I believe it is March, 1938.

23        Q  Would it not be true that you might find your daily

24   runoffs for the month of March showing variations five or ten

25   times as great as this?

1      MR. VEEDER:  That is objected to as being beyond the

2  scope of the direct examination.  We limited this to the

3  monthly runoff.  If he wants to put in some exhibits of his

4  own, he can do it.

5      THE COURT:  Sustained.  If you are doing this for the

6  record, it is one thing.  If you are doing it for me, I don't

7  think there is much dispute.

8      MR. SACHSE:  Thank you, your Honor.

9      THE COURT:  The average stream in Southern California

10  is one that is dry most of the year and runs real fast after

11  a few rains.  In this particular watershed you do have a

12  little difference fromwhat is found generally.  You do have

13  some streams that apparently run throughout the year with a

14  certain amount of water.  Now, to the extent that in the winter-

15  time you have flash floods, there is no dispute about that.

16  But in the summer you do have a little water that runs in

17  some of these streams.

18      MR. VEEDER:  Why don't they put in the exhibits to show

19  it?

20      MR. SACHSE:  We will put in some daily hydrographs,

21  your Honor, and they will be very impressive.

22      MR. VEEDER: Fine.

23      Am I going to get fined?  Can't I even respond to him

24  at all, your Honor?

25      THE COURT:  If it is necessary.  I didn't say that you

I

Z66

1    couldn't respond to him.  I made a particular direction about

2    a particular exhibit and thing.

3        MR. VEEDER:  All right, your Honor.  I just didn't want

4    to be too circumscribed.

5    BY MR. SACHSE:

6        Q  In your first day's testimony, Mr. Hofmann, you

7    described at some little length how you calculated, and I am

8    sure I can't quote your exact words, but how you restricted

9    these hypothetical peak runoffs where you drew us a cross-

10   section.  What did you call that?

11       A  Indirect measurement of peak discharge.

12       Q  That type of measurement is intended to do what?

13       A  To measure the peak discharge.

14       Q  And by peak that could be even momentary?

15       A  It is momentary in the sense that it applies--

16       Q  To the absolutely high water?

17       A  --to the high water, yes.

18       Q  Have you made such studies for the streams in this

19   watershed?

20       A  Yes, I have.

21       Q  Are they among your published works referred to in

22   your bibliography?

23       A  Those are not considered items which would be

24   published.  They are simply basic data, measurements of dis-

25   charge, and are in the files of the Geological Survey.

I

Z67

1    Q   In what form are they?  Could we readily obtain them

2    from you?

3        A   They are in a form that they could be obtained.

4        Q   Could I ask you to bring down whatever records you

5    have, then, on peak discharges in these streams in this water-

6    shed?

7        MR. VEEDER:  That is objected to as being beyond the

8    scope of the direct examination.  If he wants to call this

9    witness as his own, it is fine with me.  But we didn't bring

10   that into this part of the direct evidence, and it is beyond

11   the scope of the examination.

12       THE COURT:  No, you are overruled.  It is not beyond

13   the scope.  The witness has testified about runoff, and he has

14   elected to segregate it by months, and some of the exhibits

15   show by days, and I think this would be proper inquiry if he

16   has some records.

17       MR. SACHSE:  I don't want you to prepare anything.

18   Whatever you may have available, bring it down at your con-

19   venience.

20       THE COURT:  What is it that you want?

21       THE WITNESS:  What is the question?

22       MR. SACHSE:  His calculations of peak runoff at any

23   time, any place in this watershed, any calculations he may

24   have made.

25       THE COURT:  Peak runoff?

MR. SACHSE: Yes, his indirect flow runoffs that he testified to, his indirect calculations which he testified just a moment ago referred to almost a momentary peak.

If I haven't made myself clear, Mr. Hofmann, please ask me.

THE WITNESS: I have those indirect peak discharges for the watershed and I will bring them in. If I may ask, do you want the peak figure, or do you want the entire computation?

MR. SACHSE: I don't want to see your arithmetic because I wouldn't understand it, but I want to know what figure you came up with as the peak discharge.

THE WITNESS: If it is only the peak discharge you are interested in for the gaging stations in the Santa Margarita River, the peak discharge is published under extremes in the water supply papers and this manuscript station description that is included with the records of runoff shows the peak.

MR. SACHSE: You mean it is in the exhibits as we now have them?

THE WITNESS: They show some peak discharge figures for the year under consideration, as a matter of fact.

MR. SACHSE: For example, would this be it? If we have it here, I don't want any more. For Ysidora it shows extreme maximum discharge 33,600 cubic feet February 16, 1927, on the basement of slope area determination of peak flow; is that it?

THE WITNESS: That is the figure for the maximum for

I

Z69

1    the period of record, that is correct.  The maximum during the

2    year was no flow during the year.

3           MR. SACHSE:  I slope area determination the same thing?

4           THE WITNESS:  It is a measurement of peak discharge.

5    It is a technique of making the measurement.  If it is the

6    peak of the year, the results will be published in the water

7    supply papers.  The annual peak is published in the water supply

8    paper.

9           THE COURT:  This slope matter was what you diagrammed

10   on the board?

11          THE WITNESS:  Yes.

12          THE COURT:  Showing how you took the slope of the bed,

13   the amount of obstruction in the bed, the coefficient represent

14   that?

15          THE WITNESS:  It is the slope of the high water surface,

16   not the slope of the bed.  The slope of the bed is incidental.

17          THE COURT:  Plus the obstruction?

18          THE WITNESS:  Yes, the roughness of the channel and the

19   cross-sectional area.

20          MR. VEEDER:  Is there data that is requested now?

21          MR. SACHSE:  I am just looking.  Maybe I don't need it.

22   I didn't realize that it was all here.  I am looking for Vail

23   Dam.

24          THE COURT:  When you say "peak," you mean the highest

25   moment?

MR. SACHSE:  The highest known momentary or instantaneous discharges anywhere.

You say they are all here already?

THE WITNESS:  They are in the records, yes.

MR. SACHSE:  Then I don't want them.

MR. VEEDER:  What was this?

MR. SACHSE:  If they are here already, I don't want them.

BY MR. SACHSE:

Q  In your bibliography, Mr. Hofmann, you state that you have prepared three closed file surface water reports for military establishments in Southern California.  Were any of those reports concerning the Santa Margarita River watershed?

A  Could I refer to my notes on that, your Honor-- I mean the bibliography?

THE COURT:  Yes, you may look at them.

(Mr. Sachse hands a document to the witness.)

A  None of those three has anything to do with the Camp Pendleton area.

BY MR. SACHSE:

Q  With the Santa Margarita River watershed?

A  With the Santa Margarita River watershed.  I beg your pardon.

Q  Now, on the last page, you assisted H. C. Troxell in the preparation of one closed file report for the military.

I.

Z71

1 Has that anything to do with the Santa Margarita River water-

2 shed?

3 A  Yes, sir.

4 Q  What part of the watershed?

5 A  The lower part of the watershed.

6 MR. SACHSE:  Your Honor, this puts us in a funny

7 position.  I would'like to know what is in it.

8 THE COURT:  In what?

9 MR. SACHSE:  In the closed file report that Mr. Hofmann

10 prepared for the lower part of the Santa Margarita River

11 Watershed.

12 MR. VEEDER:  Your Honor, Mr. Hofmann can't release that.

13 MR. SACHSE:  I say, this puts us in a funny position.

14 I don't quite know what to do.  I don't know why surface

15 runoff figures should be a deep, dark military secret.

16 THE COURT:  Well, you are requesting Mr. Veeder, I

17 take it, indirectly in a roundabout way, to produce this study;

18 is that what you are requesting?

19 MR. SACHSE:  I have two thoughts in mind, your Honor.

20 Either I can ask some more questions of Mr. Hofmann to find

21 out what it was about, without having him spill any secrets,

22 and maybe we don't need it.  But I anticipate that that is

23 beyond the scope of the direct examination, if I try.  Other-

24 wise, I will have to make a simple request of your Honor that

25 you direct them to produce the report.

THE COURT:  I will permit a few questions as to what it is about to allow me to determine later on whether I should direct Mr. Veeder to produce it.

MR. SACHSE:  Very well, your Honor.

BY MR. SACHSE:

Q  What area of the lower watershed did this cover?

A  Principally the area inside the Camp Pendleton area.

Q  And was this a study of surface water runoff-- hydrology?

MR. VEEDER:  Objected to as being beyond the scope of the direct examination, your Honor.

THE COURT:  Overruled.

THE WITNESS:  Yes, it was in connection with the surface water.

BY MR. SACHSE:

Q  Was the study made in connection with the water requirements at Camp Pendleton?

MR. VEEDER:  I object again as being beyond the scope of the direct.

THE COURT:  Overruled.

THE WITNESS:  I do not know the purpose for which our data was collected, but one of the items that we-- it covered the entire-- let me phrase that again, your Honor.

MR. VEEDER:  I don't want Mr. Hofmann to get into any trouble with the Marines, frankly.

I

Z73

1          THE COURT:  He will not get into any trouble with the

2     Marines.

3          THE WITNESS:  It included, among other things, the

4     estimates of runoff at the DeLuz Dam Site, which was presented

5     as Exhibit 62.

6     BY MR. SACHSE:

7          Q  But it included other things besides that?

8          A  Basically, it was similar type studies for the

9     remainder of the area at Camp Pendleton rather than for the

10    lower Santa Margarita.  It was an analysis of the surface

11    runoff.

12         Q  Into Camp Pendleton?

13         A  Yes.

14         THE COURT:  You mean of other streams?

15         THE WITNESS:  Other streams.

16         THE COURT:  Besides the Santa Margarita?

17         THE WITNESS: Besides the Santa Margarita.

18         THE COURT:  There are several of them?

19         THE WITNESS: Further north, yes, your Honor.

20         THE COURT:  Up the Coast.

21    BY MR. SACHSE:

22         Q  Did it include any data for the runoff of the Santa

23    Margarita River drainage, which is not included in the data

24    you have presented here?

25         A  No, it included nothing that is not included in the

I

Z74

1  upper Santa Margarita drainage that is not included here,

2  with the exception that additional years of record are included

3  in my present tabulations in the exhibit.

4      Q  You were concerned with San Mateo Creek and matters

5  upstream?

6      A  Upstream, generally.

7      MR. SACHSE:  All right, I don't want them.

8      Q  You testified rather generally as to a study you

9  made or consideration you gave to soil types when you calculated

10  runoffs, and you made it very clear that you did not regard

11  yourself as a soil expert; but you did classify younger

12  alluvium as being quite absorptive, the older, as exhibited

13  by Mr. Hall, as absorptive, et cetera.  Are you relating those

14  descriptions that you used to any particular areas of the

15  watershed?

16      A  No, sir, I was not.  I was speaking in general terms.

17      Q  You stated that clay soils tended to seal off the

18  surface or to seal up the surface.  Do you have reference

19  to any particular portion of the watershed that you investigated

20  where you found that condition?

21      A  No, I do not have, and I do not know where there is

22  any soil of that type in the watershed.  I was speaking in

23  general terms of the soil types.

24      Q  You know there is younger alluvium in the watershed?

25      A  I have listened to the evidence introduced by Mr.

I

Z75

1    Kunkel and Mr. Hall.

2        Q  And you stated that there are no talus deposits of

3    any size in the watershed?

4        A  Again, that is a general statement and not based on

5    a thorough examination of the watershed.

6        Q  In other words, you are not ready to express any

7    conclusions as to where in the watershed the greater permeability

8    would be or where the less?

9        A  No, I am not, other than as indicated by our data on

10   runoff.

11       Q  On your Exhibit--

12       MR. VEEDER:  We can take those down, if you want.

13       MR. SACHSE:  No, this is only one question.  I am sure

14   there will be no harm in looking at this.

15       Q  On your Exhibit 17, and I am referring to the two

16   small streams that run into the Murrieta Valley from the south,

17   neither of which you noted or made any particular reference to

18   in discussing the stream system tributary to Murrieta Creek.

19       A  Yes.

20       Q  Is that because they were of insignificant importance?

21       A  No, it was that I did not recollect what their names

22   were.  I could check on the quadrangle sheet and see the

23   size of the streams.  In all probability--

24       MR. VEEDER:  Were you referring to the Vail properties?

25       MR. SACHSE:  That drain from the Vail property into

Murrieta Valley, that drain from Santa Rosa Dam to Murrieta Valley.

Q  Do you know the two to which I am referring?

A  I know the two which you have referred to on the map.  I do not know the streams personally.  I do not recollect their names.

Q  Then do you intend to include them in your description of the tributaries of Murrieta Creek, the tributaries above Temecula Gage, or don't you?

A  I believe they are included.  When I say the entire drainage, including other affluents other than those named, it would cover those two streams since they are unnamed on this map.

THE COURT:  Well, have you worked long enough today? I have a criminal matter here.

Adjourn until 10 o'clock tomorrow morning.

(Adjournment until Thursday, October 23, 1958, at 10 A.M.)