# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.

Defendants.

No.   1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:   San Diego, California

Date:   Thursday, October 23, 1958

Pages: 3652 to 3788

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By

MALCOLM LOVE
and

**JOHN SWADER**
Official Reporter,
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

3652

VOLUME 38

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

---o---

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---o---

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
        -vs-                   )          No. 1247-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                Defendants.    )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, October 23, 1958

APPEARANCES:

        For the Plaintiff:            WILLIAM H. VEEDER, ESQ.,
                                      Special Assistant to the
                                      Attorney-General,
                                      Department of Justice,
                                      Washington, D. C.,
                                              and
                                      WILLIAM E. BURBY, ESQ.

| | | |
|---|---|---|
| 1 | For U. S. Marine Corps.: | COL. ELLIOT ROBERTSON. |
| 2 | For Defendant Vail Co.: | GEORGE E. STAHLMAN, ESQ. |
| 3 | For Defendants Fallbrook Public Utility District, et al.: | FRANZ R. SACHSE, ESQ. |
| 4 | | |
| 5 | For Defendant State of California: | EDMUND G. BROWN, ESQ., Attorney-General, by |
| 6 | | ADOLPHUS MOSKOVITZ, ESQ., Deputy Attorney-General. |
| 7 | For Defendant Santa Margarita Mutual | W. B. DENNIS, ESQ. |
| 8 | Water Company: | |
| 9 | For Defendants Hartman, Lewis, Wilks and Bayle, | BEST, BEST & KRIEGER, by ARTHUR L. LITTLEWORTH, ESQ. |
| 10 | and Oviatt: | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

I N D E X

| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Walter Hofmann | | | | |
| (By Mr. Sachse) | | 3661 | | |
| (By Mr. Moskovitz) | | 3664 | | |
| (By Mr. Stahlman) | | 3708 | | |
| (By Mr. Dennis) | | 3716 | 3718 | |
| (By Mr. Littleworth) | | 3730 | | |

| EXHIBITS: | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| Plaintiff's Exhibit | | |
| 16-D | | 3659 |
| 67 | | 3757 |

| | |
|---|---|
| MORNING RECESS | 3695 |
| NOON RECESS | 3720 |
| AFTERNOON RECESS | 3760 |

1    SAN DIEGO, CALIFORNIA, THURSDAY, OCTOBER 23, 1958, 10:00 A.M.

2                              ---o---

3

4    MR. VEEDER:  Are we in business, your Honor?

5         THE COURT:  Yes, sir.

6         MR. VEEDER:  The question was presented by Mr.

7    Stahlman yesterday in regard to the possibility of the

8    State putting in its geology immediately following our last

9    geologist.  And if that proposal is going to be followed

10   it will make a great deal of difference to us in scheduling

11   our witnesses.  So is there a possibility of having some

12   thoughts expressed on that?

13        THE COURT:  Well, I --

14        MR. VEEDER:  It would suit me.  It would suit me if

15   that is more efficient from the standpoint of your Honor's

16   method of running the trial.

17        THE COURT:  What has the State thought of this change?

18        MR. MOSKOVITZ:  Of course, up until now we haven't

19   contemplated such a schedule; and we would have to rearrange

20   our program of planning for testimony if --

21        THE COURT:  You want to talk about it and let me know

22   later, today or tomorrow, your views on it?

23        MR. MOSKOVITZ:  Well, I can express some views right

24   now, your Honor, if it would be helpful.  As I understand

25   it, Mr. Stahlman's concern is knowing what the position of

1    the State would be on the geology and what areas of conflict

2    there are with the United States.   I believe I can safely

3    say that our testimony would be wholly consistent with what

4    appears in Bulletin 57; and to that extent, a reading of

5    Bulletin 57 will disclose what the position will be and

6    what basic facts that position would be predicated upon.

7    And if that would satisfy the desire for more information,

8    it might be sufficient just to do that and have the evidence

9    follow its usual course without our coming in later on.

10   However, if there is a desire on the part of counsel and

11   the Court that we go before, we can attempt to rearrange

12   our schedule and do it.   But we need a few weeks to --

13        THE COURT:   I don't know whether I understand you.

14   Your case is going to consist of more than an offering of

15   Bulletin 57.

16        MR. MOSKOVITZ:   It will be an explanation of it, your

17   Honor, amplification, in a sense, of making it understandable

18   orally.   But the basic facts are there.   The position will

19   be no different from what is expressed there and --

20        MR. VEEDER:   You are going to make it understandable?

21   I am for that.

22        MR. MOSKOVITZ:   We are going to have testimony as any

23   other party would have testimony about his exhibits.

24        MR. STAHLMAN:   Your Honor, if I may express myself:

25   My ideas were these conflicts that I perceived grew out of

1    cross examination.  And I presume that in relation to the

2    State's testimony it will have to go to cross examination

3    before we can see what these differences are and whether

4    they can be reconciled as a matter of basic facts.  And

5    that is my concern.  I was talking to Mr. Sachse about it

6    last evening, he approached me, and I would rather he speak

7    for himself.  But I think that in the long run we will

8    accomplish a great deal if we can get these basic fundamental

9    factors that must precede the other questions relative to

10   the manner of extraction, the amounts of waters, and so

11   forth, the method of operation.  And then I think after that

12   it might be well to follow with some of the practical

13   evidence or facts that have been determined over years of

14   usage of these water storage basins.

THE COURT:  Well, you give it a little further con-
sideration, Mr. Moskovitz; and we may well decide before the
week is out to have the State follow the Government with
its testimony and --

MR. MOSKOVITZ:  It might be helpful to know just when
that might be, when we can discuss it.

MR. VEEDER:  The middle of November.

THE COURT:  What?

MR. VEEDER:  Not later than the middle of November.

MR. STAHLMAN:  I take it you have two other geologists?

MR. VEEDER:  Yes, that is right.

A-2

1    MR. SACHSE:  In two other areas.

2    MR. MOSKOVITZ:  We will consider it.

3    THE COURT:  It will be about three weeks off.  And the

4    next week, of course, we will have no court.  You will have

5    a little bit of time to prepare it.

6    MR. MOSKOVITZ:  Yes, we would have to consult with the

7    people who would have to prepare the exhibits and testify

8    to see what their schedules are.  But it is something we

9    can consider further.

10    THE COURT:  All right.  Mr. Clerk, these folders here,

11    are they mine?

12    THE CLERK:  Mr. Veeder handed them to me yesterday

13    and asked me to give them to you.

14    MR. VEEDER:  Your copies of your exhibits are in those,

15    and I just passed them on to you.

16    Your Honor inquired in regard to certain exhibits

17    yesterday, 16-1 being one of them.  And in reviewing the

18    matters, it is my understanding Mr. Littleworth is going

19    to produce the well logs and data for the purpose of

20    completion of 16-1.  Isn't that correct?

21    MR. LITTLEWORTH:  Yes.  Well, we are having some trouble

22    with Mr. Querry's. That, apparently, was drilled before he

23    got the property.  But we will have a chance this next week

24    to go down there and see if we can get that.

25    MR. VEEDER:  Now, in regard to 15-1; those are the wells

1   located by Mr. Hall.  We will make an offer on those now

2   on that, Exhibit 15-1, that was.

3         THE COURT:  15-1 is already in evidence.

4         MR. VEEDER:  Wasn't that the one that your Honor

5   erased?

6         THE COURT:  No, I didn't erase 15-1.

7            Isn't it in evidence, Mr. Clerk?

8         THE CLERK:  No.

9         MR. VEEDER:  It was your Clerk, Mr. Luddy, who mentioned

10   it to me this morning.

11         THE COURT:  All right, 15-1 will be received in

12   evidence.

13         MR. STAHLMAN:  Do you have an extra copy of that?

14         MR. VEEDER:  15-1?

15         MR. STAHLMAN:  Mr. Hall will make one up; okay.

16         MR. VEEDER:  In regard to 15-B, work is still going

17   forward on that.

18         THE COURT:  15 what?

19         MR. VEEDER:  16-B.

20         THE COURT:  16-B, all right.

21         MR. VEEDER:  16-D is ready to be admitted.  There is

22   nothing more on that one, and we make the offer now, your

23   Honor.

24         THE COURT:  16-D received in evidence.

25         MR. VEEDER:  There is still work being done on 16-C.

3660

1    So we will proceed along that line.  17-A is the map which

2    involves considerable work in the field, and that has been

3    undertaken.  So that is --

4        THE COURT:  What about 16-B?

5        MR. VEEDER:  Well, I said 16-B is one of the wells,

6    one of the exhibits on which work is being done.  They are

7    checking it out.

8        THE COURT:  All right.  16-C?

9        MR. VEEDER:  16-C is another one on which work is

10   being done, your Honor.

11       THE COURT:  All right.

12       MR. STAHLMAN:  May I ask Mr. Veeder:  Did you intend

13   to revise your exhibit list to include these added

14   exhibits?

15       MR. VEEDER:  We will just put an addendum on them,

16   that is all.

17       MR. SACHSE:  Mr. Veeder, are you through?

18       MR. VEEDER:  Yes, sir.

19       MR. SACHSE:  I have a very few additional questions.

20   Will you take the stand, please, Mr. Hofmann.

21

22

23

24

25

WALTER HOFMANN,

having been previously sworn as a witness on behalf of the plaintiff, resumed the stand and testified further as follows:-

CROSS EXAMINATION

BY MR. SACHSE:-

Q    Mr. Hofmann, directing your attention to the map, Exhibit 17, have you made any attempt to proportion the increment of water to the Vail Dam between the Wilson-Coahuila watershed and -- contribution of the Wilson-Coahuila watershed and contribution of the Temecula watershed?

A    I have made no such study.

Q    And similarly, have you made any attempt to calculate the contribution of the Pechanga Creek to the flow?
to the flow registered at the Santa Margarita River near Temecula gage?

A    I have made no such study.

Q    And similarly, would your answer be the same as to the contribution of Warner Springs Creek to the Murrieta?

A    It would be the same.

Q    And the **Tucalota**, your answer would be the same?

1      A      Yes, sir.

2      Q      And of Long Valley, Long Canyon, or any of

3  these other intermittent ones you have made no proportion-

4  ment of their --

5      A      No.

6      Q      And would your answer be the same as to contribu-

7  tion of Rainbow Creek to flow as recorded at the Fallbrook

8  gage?

9      A      Yes, it would be the same.

10      Q      You have made no calculation for Rainbow?

11      A      No.

12      Q      And the same for Sandia?  No calculation?

13      A      No calculation.

14      Q      No calculation for Roblar's contribution to the

15  De Luz gage?

16      A      No.

17      MR. SACHSE:  I have no further questions, your Honor.

18      MR. VEEDER:  I might observe at this time, your Honor

19  directed that Rainbow Creek be added to Exhibit 17.  That

20  has been done.  And the names have been placed on the

21  exhibit in accordance with your direction, your Honor.

22      THE WITNESS:  Mr. Veeder?

23      MR. STAHLMAN:  I never heard what you said, Bill.

24      MR. VEEDER:  The Rainbow Creek has been added onto

25  Exhibit 17 in accordance with the Court's direction, and

A-3

1    also the names have been placed on the tributaries of

2    De Luz Creek and Sandia Creek.

3                    Was there something?

4        THE WITNESS:  I would like to explain my addition of

5    the two tributaries to De Luz Creek, if I may.

6        MR. VEEDER:  Go ahead and do so, if his Honor permits

7    you.

8        THE WITNESS:  Your Honor requested me to label the

9    tributaries to De Luz Creek.  I was, I believe, incorrect

10   in stating into the record that the tributaries indicated

11   on Exhibit 17 originally were Camps Creek, Cottonwood

12   Creek, and main stem of De Luz.  Actually, the main stem

13   of De Luz Creek is second from the west of the three

14   tributaries originally shown on the map, Exhibit 17.  Then,

15   the east fork comprises two tributaries to the east as

16   shown on Exhibit 17, and Cottonwood Creek is the tributary

17   fartherest to the west, as shown on Exhibit 17.  Camps

18   Creek and Fern Creek were not shown on Exhibit 17, and I

19   have added them in blue pencil to the map.  They are farther

20   south than Cottonwood Creek.

21       THE COURT:  All right.

22               I seem to have an extra copy of 22 here.  I will

23   hand it back to Mr. Veeder.

24       MR. VEEDER:  Thank you.

25       THE COURT:  And I have an extra copy of 19.

3664

MR. VEEDER:  Thank you.

THE COURT:  Now, do I get 21?  Here is a folder for 19.  I don't think I got a copy of 21, copy of it.

MR. VEEDER:  I will check that right now, your Honor.  Here is a copy of it if you --

THE COURT:  All right.  All right, proceed.

CROSS EXAMINATION

BY MR. MOSKOVITZ:-

Q    Mr. Hofmann, have you had any opportunity to check whether Exhibits 20, 21, 22, 23, 24, 25 and 26, which are the runoff records for the various stations, are the same as those which were introduced in the master's hearings on De Luz as the M-34 series?

A    I have not checked those against that.

MR. MOSKOVITZ:  Mr. Veeder, yesterday Mr. Sachse asked you whether they were the same and you weren't sure.

MR. VEEDER:  No, I have checked them through.  I think they are.

MR. SACHSE:  Mr. Veeder said he thought they were.  You misunderstood.

MR. MOSKOVITZ:  Oh.

Q    Now, Exhibit 30 is the isohyetal map --

A    That is right.

Q    -- of the Santa Margarita watershed?  Did I

1   understand correctly that that map is merely a copy or was

2   transferred to a larger scale from a map that appeared in

3   an earlier Geological Survey study?

4       A   No, sir; it is a copy made from the quadrangle

5   sheets on which the original data was plotted, a direct

6   tracing of the maps on individual 15-minute quadrangle

7   sheets.

8       Q   I take it, then, that the lines are the same

9   lines that appear on these maps in the earlier study?

10      A   Well, they are the same lines as the lines that

11  were drawn in preparing the map originally on the 15-minute

12  quadrangle sheets.

13      Q   And what is that earlier study?

14      A   The maps were originally prepared for a report

15  entitled "The hydrology of western Riverside County."

16      Q   Is that the report which Mr. Troxell authored?

17      A   Mr. Troxell authored, yes.

18      Q   And the information from which the lines were

19  drawn was information that was gathered for that study?

20      A   Yes.

21      Q   And no information has been gathered by you and

22  incorporated in the isohyetal map that you prepared, is

23  that correct?

24      A   That is correct.

25      Q   I want to call your attention to page 3636 of

1    the Reporter's Transcript of yesterday.

2         MR. VEEDER:  Is that 3626 or 3636?

3         MR. MOSKOVITZ:  3636.

4         Q     Lines 11 through 17.  I will ask you to read

5    that, please.

6         A     Yes, sir.

7         Q     I would also like to call your attention to

8    Exhibit 20, which is the record of runoff at the station

9    at Vail Dam.

10        A     Yes, if I may have a copy, please.

11        MR. VEEDER:  Have you the exhibit, Mr. Hofmann?

12        THE WITNESS:  Yes, sir.

13        Q  BY MR. MOSKOVITZ:  Now, calling attention, for

14   example, to the figures for the water year October, 1956,

15   to September, 1957.

16        A     Yes, sir.

17        Q     What does the column which is headed "Draft

18   acre feet" refer to?

19        A     It refers to the release from Vail Reservoir

20   through Vail Dam by the Vail Company.

21        Q     Then, is it not possible by looking at Exhibit

22   20 to determine how much water has been released through

23   Vail Dam in any particular month?

24        A     Yes, it is possible.

25        Q     Then, when you stated you did not know, in your

1    testimony of yesterday, whether in any month water which had

2    come into the reservoir had been left out, that was not

3    correct?

4         THE COURT:  You didn't ask him that.

5         MR. VEEDER:  That is not the question.

6         THE WITNESS:  I was going to say the question was not

7    that.

8         THE COURT:  The question was:  Is so operated that

9    the stream flow increment to it is allowed to pass through

10   the dam.  That is stream flow increment.  He didn't ask

11   whether any part of the stream flow increment.  The stream

12   flow increment.  And the question, as I read it, is

13   directed entirely to whether or not the dam was so operated

14   that the stream flow increment, not some part of it, was

15   allowed to go through the dam.

16        MR. VEEDER:  The quantity entering it was the same as

17   the quantity going out.

18        Q   BY MR. MOSKOVITZ:  Isn't it possible from looking

19   at Exhibit 20 to tell whether the quantity which entered

20   was permitted to go out by just comparing the figures as

21   to runoff in the right-hand column with draft in the column

22   third from the right?

23        A     Well, the column on the right is the runoff at

24   Vail Reservoir, yes.

25        Q     And the column third from the right is the amount

that is released through Vail Dam, is it not?

A    Yes, sir.

Q    So by looking at these figures -- I am trying to clarify my own mind -- can't you tell from here to what extent runoff into Vail Reservoir has been permitted to go out during that particular month?

A    Yes, sir.

Q    Have you ever heard Long Canyon Creek, which is one of the affluents of Temecula Creek, enters from the south, have you ever heard it referred to by any other name?

A    Yesterday I heard someone refer to it as Smith Creek, yes, sir.

Q    That was the first time you ever heard that name being used in connection --

A    To my knowledge, yes.  The Geological Survey topographic  maps indicate it as Long Canyon.

Q    Now, Exhibit 23 is the runoff figures for the station on Santa Margarita River near Fallbrook?

A    Yes, sir.

Q    And the description of the station in the exhibit states it has been recently moved?

A    Yes, sir.

Q    Do you know the reason why it was moved?

A    Yes, sir.

Q    What is that reason?

1    A    The gaging station for the Santa Margarita River

2    near Fallbrook was moved, because gaging conditions at

3    the upper site were such that the records of -- more

4    accurate records could be **obtained** at the new site than the

5    old.

6    Q    What were these conditions that made the records

7    less accurate at the old site?

8    A    The vegetative growth, and the fact that the

9    channel left the gaging station, and it was difficult to

10   maintain communication to the gaging station from the

11   river, were the primary reasons.

12   Q    Has the change affected the accuracy of the

13   measurements in a negative way?  Has the accuracy deminished

14   at any of the stages?

15   A    I don't quite believe I understand your question.

16   Q    You testified that the change resulted in greater

17   accuracy than could be obtained at the older site, is that

18   correct?

19   A    Yes, sir.

20   Q    Now, is that true at all stages?

21   A    Yes, it probably is true at all stages.

22   Q    There is no problem of accuracy at the very low

23   flows?

24   A    No.  Actually, the low flows, as recorded at the

25   lower site, would probably be more accurate because of this

riad?

1   lack of vegetative growth and the fact that the concrete

2   road **ford**           on the De Luz Creek road from Fallbrook

3   to the De Luz watershed acts as a stable control for the

4   gaging station.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q   Now, in your Exhibit 25, which is the runoff record

2  for O'Neill ditch, the manuscript station description, under

3  "Remarks" states that the ditch diverts water from the left

4  side of the river about a thousand feet upstream from station

5  on Santa Margarita River Ysidora and discharges into O'Neill

6  Lake.

7    A   Yes, sir.   That is what it states.

8    Q   Is that correct?

9    A   To my personal knowledge, there are times when the

10 flow of O'Neill ditch does not discharge into O'Neill Lake.

11   Q   What happens to it?

12   A   Its disposition-- I have seen water flowing in

13 O'Neill ditch which was returned to the channel or to the

14 banks of the channel.

15   Q   Then the statement in the exhibit that I referred

16 you to is incomplete or erroneous?

17   A   It is incomplete; yes.   Now that was for 1957, and

18 what I am referring to is something that occurred in 1958.   It

19 may well be that the statement is correct for the 1957 water

20 year.   I have no personal knowledge that it is incorrect.

21   Q   Let me call your attention to the figure as to the

22 distance upstream of the ditch from the station at Ysidora.

23 It states it is about a thousand feet upstream from the station

24 on the Santa Margarita River Ysidora; is that correct?

25   A   No, that is incorrect.   On the top it says:   The

Z2

1   location is 5.5 miles northeast of Ysidora, which is obviously

2   in disagreement with this thousand feet.  I think this is in

3   error and means that the ditch diverts water from the left

4   side of the Santa Margarita River about a thousand feet up-

5   stream from the O'Neill ditch gaging station.  And it is an

6   error in the "Remarks."

7        Q   In other words, a thousand feet upstream from the

8   point on the ditch where the gaging station is?

9        A   Where the gaging is made is where the diversion takes

10   place; yes, sir.

11        Q   Exhibit 27 is a tabulation of monthly and seasonal

12   precipitation at Fallbrook for the period 1875 to 1957; is that

13   correct?

14        A   Yes, sir.  I beg your pardon.  May I have that ques-

15   tion repeated?

16        (The reporter read the pending question.)

17        Q   Are these figures all taken from the same station?

18        A   No, sir, they are not.

19        Q   How many different stations are there indicated?

20        A   Approximately three, I think.  I would have to check

21   my records to be sure.

22        Q   Would it be possible to check your records and

23   indicate which stations and what their elevation is and for

24   what dates?

25        A   It would be possible.

Z3

1          MR. VEEDER:  It is possible.  But do you want them?

2          MR. MOSKOVITZ:  Yes, I would like that done.

3          THE COURT:  Maybe you can get an extra copy of the

4     exhibit from Mr. Veeder and just color it with crayons or

5     something, if there are only three sources.

6          THE WITNESS:  May I ask Mr. Moskovitz, what detail do

7     you want on the location of these various stations?

8          MR. MOSKOVITZ:  The decription or name of the station,

9     if it had one, and then the elevation of the station for each

10    date.

11         THE WITNESS:  The description and the elevation?

12         MR. MOSKOVITZ:  Yes.

13         THE WITNESS:  Yes, sir.

14    BY MR. MOSKOVITZ:

15         Q  Exhibit 66 is your exhibit for residual mass curves

16    precipitation and runoff?

17         A  Yes, sir.

18         Q  Comparing precipitation at Fallbrook with runoff

19    at Temecula Creek at Vail Dam, and runoff at Murrieta Creek

20    at Temecula.  I note that you divide the years which are

21    covered into wet and dry periods, and I call particularly your

22    attention to the period that begins, it looks as though it is,

23    1916-17 and runs through 1934-35.

24         A  Yes, sir.

25         Q  And that period is described as "Dry" at the top of

Hofmann - Cross

24

1   the exhibit?

2       A   Yes, sir.

3       Q   Would you explain why that is a dry period?

4       A   This is labeled a "Dry" period.  It was not marked

5   as a dry period as some of the others shown on the diagram.

6   It was based on the precipitation records at Fallbrook-- the

7   selection of the period.

8       Q   In other words, you were dividing the period into

9   either wet or dry and you had no place in your concept for

10  normal periods?

11      THE COURT:  What's normal?

12      MR. MOSKOVITZ:  I will ask the witness this:

13      Q   Don't the figures there indicate that there was

14  practically no deviation from the normal during that period?

15      A   That there was very little deviation from the norma.

16  of the precipitation at Fallbrook, but on the basis of hydro-

17  logic studies that I have made in Southern California other

18  places do show a more marked dry period in that period from

19  1918 to 1934.

20      Q   Although the figures at Fallbrook do not reflect

21  such a dry period?

22      A   No.  That is correct.  As you say, they reflect very

23  little deviation from the average for the long-time period.

24      MR. MOSKOVITZ:  That's all.

25      MR. LITTLEWORTH:  I have just a few questions, your

Z5

1    Honor.

2

3                            CROSS-EXAMINATION

4    BY MR. LITTLEWORTH:

5          Q   Want to ask a couple of preliminary questions first,

6    but I may want to ask some on Exhibit 60.

7          (The clerk hands a document to the witness.)

8          Q   Mr. Hofmann, commenting again on this Exhibit 66,

9    I believe you said yesterday that you had chosen the Murrieta

10   runoff station and the Temecula runoff at the Vail Dam for the

11   reason that those stations were the least affected by, I

12   believe your language was, the works of man; is that correct?

13         A   Yes, sir.

14         Q   You include pumping in this works of man?

15         A   Yes, I would include pumping.

16         Q   Now, on Exhibit 22 Mr. Sachse called your attention

17   to the field station description and the language in there that

18   there is no regulation or large diversion at that station.

19         A   Yes, sir.

20         Q   I don't believe you answered whether or not that was

21   correct to the best of your knowledge.

22         A   To the best of my knowledge it is correct, and in

23   this instance it refers to surface diversions only.

24         Q   Yes, I understand.  All of your data shows that we

25   are in a dry spell, all right, Mr. Hofmann.  When would you

1    say it began?

2         A   We have indicated on the diagrams approximately 1944-

3    45.

4         Q   And broken only by the period 1951-52 during that

5    winter?

6         A   The wet year 1952 and the wet year 1958.

7         THE COURT:   How do you get a minus figure in this

8    Exhibit 60?   For 1957, from May, there is a minus figure.

9         MR. LITTLEWORTH:   They took our water that year.

10        THE WITNESS:   Your Honor, the minus figure results from

11   the fact that the items that we consider in computing the

12   runoff are relatively large.   A change in storage and the

13   evaporation and the release-- I don't know for this particular

14   month whether they were-- but generally they are large com-

15   pared to the difference, and an error in the storage of a small

16   amount, which would be insignificant in considering the

17   storage, when you subtract the two figures it shows up as a

18   negative figure; and in the sense that if the error in stor-

19   age results in a negative answer one time it would be that

20   much more when you are again going up and filling the reser-

21   voir.   We prefer to carry the negative figure to show that

22   that could be-- actually, you can't get any more than no

23   runoff.

24        MR. VEEDER:   You can't get any less.

25        THE WITNESS:   I beg your pardon-- any less than no

Z7

1    runoff.

2         THE COURT:  All right.

3    BY MR. LITTLEWORTH:

4         Q  Mr. Hofmann, would you look at this second, I guess

5    it is third page, really, pages concerning Murrieta Creek in

6    that tabulation.

7         A  Yes, sir.

8         Q  Those figures indicate that Murrieta Creek has some

9    runoff virtually the whole year round; is that right?

10        A  Yes, sir; I believe there has never been no flow

11   at Murrieta Creek.

12        Q  During the summer months it is of course the least?

13        A  Yes.

14        Q  And that is generally from the period of May or

15   so, apparently, until about October or November?

16        A  Well, from generally about July until October or

17   November.  July to October would be the months of least

18   runoff.

19        Q  Of least runoff?

20        A  Generally.

21        Q  Looking at the years from 1951 to 1957, is it fair

22   to say just from observing here that probably the average

23   runoff per month during the summertime is less than 50 acre

24   feet?

25        A  During that period?

1    Q   Yes.

2    A   The average runoff is less than 50 acre feet during

3    the summer months, yes.

4    Q   If you turn back to the other page, starting with

5    1931, that appears to be true for all of the years going back

6    to 1931 as well, does it not?

7    A   Yes, generally, though there are some years in 1937

8    and 1938 when the flow exceeded 50 acre feet.

9    Q   But if you averaged these out you would probably

10   come up with an average flow during the summer of probably

11   less than 50 acre feet each month, wouldn't you?

12   A   Probably, yes.

13   Q   Am I correct that the average yearly flow, however,

14   for the years 1931 to the present time is 7,490 acre feet?

15   A   Yes, sir, the average for this period is 7,490.

16   Q   Then is it fair to conclude that of all the water

17   passing the Murrieta gaging station the overwhelming majority

18   of it comes from the runoff of the winter storms?

19   A   That does not necessarily follow, in that a con-

20   siderable portion of the flow in the winter is what we would

21   term outflow from ground water.  The outflow from ground water

22   bodies increases during the winter months and you have a

23   considerably higher base flow, and without making a detailed

24   study it would be difficult to say how much of that base flow

25   had increased during the winter months.

B

z9

B2

Hofmann - Cross

3679

Q  Have you made any studies on what the outflow from ground water is?

A  No.  You realize that it is only during periods of immediate rain that you have surface runoff from the tributary drainage area that a considerable part of this water goes into the ground and recharges the ground water, but then because the ground water basins are full moves right into the stream.  So that for a period of several days or weeks after the actual storm had occurred the water will continue to flow at considerably increased rate over what the summer flow would be.

Q  And those amounts are things which you have made no studies on?

A  Yes, sir.

MR. LITTLEWORTH:  Thank you.  That is all.

THE COURT:  Mr. Dennis.


CROSS-EXAMINATION

BY MR. DENNIS:

Q  Mr. Hofmann, are the records relative to the gaging stations on the Santa Margarita River kept under your direction and supervision?

A  In the sense that-- Could I have a further explanation of the question?  Do you mean that I am an employee of the Geological Survey, or do you mean am I in charge of the--

B2

710

Q   Are you in charge?

A   I am not in charge of the Los Angeles office, no.

Q   Am I correct that the discharge measurements and the gage heights charts are read and obtained by Fred E. Green?

A   Some of the discharge measurements-- I might add, the majority of the discharge measurements are made by Fred E. Green because he measures daily except for Sunday, but the Geological Survey makes measurements at the same frequency at all of the gaging stations in the Santa Margarita River that it does on other streams in Southern California.  So that the measurements of Mr. Green are incidental to the measurements obtained by the Geological Survey, and if Mr. Green stopped measuring tomorrow we would continue to/in exactly the **measure** same manner.

Q   Well, he does measure the various gaging stations or inspect them daily and furnishes you with his discharge measurements and his gage height charts, does he not?

A   I object to the word "his."  The gage height charts are furnished by the Geological Survey and the gaging stations are operated by the Geological Survey.  Mr. Green as an employee of the Department of Navy and the Vail Company makes more frequent measurements than the Geological Survey and furnishes those measurements to the Geological Survey for use in the computation of the records, yes.

Q   And then you make the computation in your office?

B2

Z11

1    A   Yes, sir.

2    Q   And then they are forwarded to Washington to be

3 checked and approved?

4    A   Yes.

5    Q   And then they are published?

6    A   Yes, sir.

7    Q   And am I correct that the various data which is shown

8 in the Exhibit 20 through 26, which are the exhibits that refer

9 to the gaging stations, are not copies of the official published

10 reports of the Geological Survey or their Water Supply Papers,

11 but are copies of data which have been prepared in your office?

12    A   You are correct.

13    Q   And if there is any variance between the data which

14 is shown in the official published reports, which would be

15 most apt to be correct, the data contained in the exhibits

16 or in the publications?

17    MR. VEEDER:   That is pure speculation, your Honor.

18    MR. DENNIS:   No.

19    MR. VEEDER:   I object to it.

20    MR. DENNIS:   There are differences.

21    MR. VEEDER:   Are you ruling, or is his Honor?

22    THE COURT:   Overruled.

23    THE WITNESS:   I would say that neither is more likely

24 to be any more correct than the other.  This is the data from

25 which the manuscripts in Washington are prepared, and there

Hofmann   cross

could be typographical errors in preparing the offset copy in

Washington which would not be caught by the proof reader.   So

in that sense the records as published may well be incorrect.

Again, these records that have been presented to the Court are

the data as approved by Washington and should be, if anything,

more correct than the published data, in that there is no

opportunity for a typographical error between this sheet and

the preparation of the offset copy.

BY MR. DENNIS:

Q   The records that are contained within the exhibits

that we are just referring to, Exhibits 20 to 26, however, do

not contain all of the data in respect to each particular

gaging station which is contained in the official published

reports?

A   No, sir, it does not.

Q   And calling your attention-- clarifying some of the

matter-- to Plaintiff's Exhibit 22--

(The Clerk hands document to the witness.)

A   Yes, sir.

Q   On each page I find the figure, under the column

headed either "October," "November," "December," for the month,

with an asterisk after it-- does that refer to second foot

days?

A   That is the total second foot days as tabulated on

an adding machine, a combined adding and tabulation machine.

Hoffmann - Cross

3683

B2

Z13

Q  So that that is the second foot days?

A  Yes, sir, total for the month.

Q  Now, you have located the various gaging stations on Plaintiff's Exhibit 17, and I notice that the gaging stations are also located on the various topographic maps which have been introduced as Plaintiff's Exhibit 29.

A  Yes, sir.

Q  In the event that there is a variance in the location of the gaging station, would the location be more apt to be that as shown on the topographic map or on Exhibit 17?

A  It would be more apt to be correct as shown on the topographic map, because I indicated I was locating them approximately on Exhibit 17.

Q  And would you say then that the location of the Ysidora gaging station as shown on Plaintiff's Exhibit 29-C is correct?

A  Yes, sir, I would.

Q  Has the location of that station been changed since the time you first started to record data obtained at that station?

A  I would have to check the manuscript description for that gaging station.

Q  Would you do that?

A  If I may have Exhibit 26, I believe it is.

MR. DENNIS:  Exhibit 26.

B2
Z14

(The Clerk hands document to the witness.)

THE WITNESS: As indicated on the manuscript description, included as part of Exhibit 26, the gaging station at Ysidora was destroyed in the flood of February 16, 1927. It was reinstalled at about the same site subsequent to that.

BY MR. DENNIS:

Q In what year?

A On February 2, 1931, apparently.

Q So that there was no gaging station in operation between February 16, 1927 and February 1, 1931 at the Ysidora site?

A You are correct, as indicated in the manuscript description.

Q And when the station was reestablished in February, 1931 was it established at the same site or was it moved upstream or downstream?

A At about the same site as indicated in the record.

Q Now, would you say that the site of the Ysidora gaging station is approximately two miles upstream from the mouth of the Santa Margarita River, or is it approximately two and a half miles upstream from the Santa Margarita River?

Hofmann - Cross

C-1 ML j

1        A        The location paragraph indicates that the
2    gaging station is about two and a half miles upstream from
3    mouth.

4        Q        Now, I believe that the published reports show
5    it as about two miles upstream from the mouth.  Do you have
6    any knowledge other than what you have obtained from
7    either the published reports or the description sheet in
8    Exhibit 26?

9        A        May I see a copy of the published report?

10   MR. VEEDER:  May I inquire as to the object of this
11   course of cross examination?  It is beyond me where we are
12   going, and I don't see the purpose of it.

13   MR. DENNIS:  I think it is going to be very important
14   to locate the number of the gaging stations in this stream
15   and to have the exact location, because of the geology that
16   is involved and because of the measurements that have been
17   made and because of the extractions and diversions of water
18   which have been made, either above or below the various
19   gaging stations.  I think it is going to tie directly into
20   the geology and also into testimony which was given by
21   your witnesses at the first trial.

22   MR. VEEDER:  Your Honor, I assume that I am limited
23   to --    Cross examination is okay, but it doesn't make
24   sense to me that we should labor this point a great deal
25   further.

MR. DENNIS:  I think you have attempted, Mr. Veeder, to locate these gaging stations; and I think we should have the correct location.

MR. VEEDER:  We attempted to locate them for purposes of facilitating the use of 17, your Honor.

THE COURT:  Are they shown on the plates, Exhibits, 29 series, the quadrangles?

MR. DENNIS:  Some of them are, your Honor.  The Ysidora station is shown on the plates.  The Fallbrook station is shown.  The Murrieta, the Temecula station is shown, the O'Neill Ditch station is shown.

THE COURT:  Are you satisfied with those plates?

MR. DENNIS:  I think so, your Honor.  However, you asked me  because of the discrepancy in locating some of the geological features on Exhibit 17, its being somewhat difficult to determine.

THE COURT:  Well, the witness has said, as I recall, that they were attempted to be put upon 17, but that they were more accurately shown upon the 29.

MR. DENNIS:  29, that is correct.

THE COURT:  We let it go at that.  If there is any argument about it, we will go to the 29 series of quadrangles and find out just where they are.

MR. DENNIS:  In other words, it is my unddrstanding, then, that the quadrangles will control over the statements

1    contained in the description of the gaging stations and the

2    various exhibits and the location of the gaging stations

3    as shown on 17?

4          THE COURT:  It is agreeable, is it, with you, Mr.

5    Veeder?

6          MR. VEEDER:  I have no objection to it, your Honor.

7          THE COURT:  We take the quadrangles, the results of the

8    Geological Survey, rather than the approximations made

9    upon exhibits here in the courtroom?

10         MR. VEEDER:  I am perfectly willing, your Honor.

11         THE COURT:  All right.

12         MR. VEEDER:  We were simply trying to conform to

13   your Honor's orders in trying to put this data on here.

14         THE WITNESS:  Your Honor, may I explain a possible

15   difference in the earlier published reports and recent

16   reports as to the location?

17         THE COURT:  Yes.

18         THE WITNESS:  Generally, the older maps were not as

19   accurately -- did not as accurately show the location of

20   the gaging stations.  And as more recent maps became

21   available and more detailed maps, the gaging station location

22   has been revised.  And for the Ysidora station, the location

23   as given in Exhibit 26, to the best of my knowledge, is

24   correct.  It locates it to nearest quarter -- well, let's

25   see -- that would be quarter of a quarter of a quarter

1    section.  And I don't think the location could be more

2    detailed than that.

3         THE COURT:  Well, you would be content to rely upon

4    the quadrangle sections, would you not?

5         THE WITNESS:  Yes, sir.  They were used in preparing

6    the location paragraph in these exhibits.  And if there

7    should be a difference, the map would be the correct source.

8         THE COURT:  All right.  Let's go ahead, then.

9         Q   BY MR. DENNIS:  Does the Ysidora gaging station

10   record only the surface flow of the Santa Margarita River

11   at that point or does it record the surface and subsurface

12   flow of the Santa Margarita River at that point?

13        A     The Ysidora gaging station records only the

14   stage of the Santa Margarita River at that point.

15        Q     When you say "the stage," is that only the

16   surface flow?

17        A     The records collected at the Ysidora gaging

18   station are only for the surface flow, yes, sir.

19        Q     And do you know whether or not there is any

20   subsurface flow at that point?

21        MR. VEEDER:  That is beyond the scope of the direct

22   examination, your Honor.

23        THE COURT:  Sustained.

24        MR. VEEDER:  If that gadget can measure out of the

25   ground, I can't believe it.

1    Q   BY MR. DENNIS:   Now, I noticed in the manuscript

2    that you say:   "The average discharge represents the flow

3    into the ocean during the period of record regardless of

4    upstream development."  By that I take it that in your

5    opinion any flow which is recorded at the Ysidora gaging

6    station is discharged into the Pacific Ocean?

7    A       That is what the sentence says, yes, sir.

8    Q       And that is your opinion?

9    A       Generally, yes.

10   Q       And as I understand the various hydrographs which

11   you have prepared representing the discharges or the flow

12   past the Ysidora gaging station, do not purport to show

13   the flow of the river as it existed in the state of nature?

14   A       No, sir, they do not.

15   Q       So that those hydrographs do not take into

16   consideration any stream diversions or the effects of

17   pumping in any of the basins or underground strata above --

18   A       May I have that question again, please?

19   (The reporter read the pending question.)

20   Q   BY MR. DENNIS:   -- the Ysidora station?

21   A       They absolutely do take into consideration those

22   diversions.  They represent the effects of those diversions

23   on the stream flow, and the hydrographs are the actual

24   runoff of surface waters past that point.

25   Q       But if there had been no surface diversions the

1   runoff would have been considerably greater at that point,

2   would it not?

3        A     It depends on your definition of "considerably."

4   I have no way of knowing what the runoff would have been

5   if there had been no surface diversions.

6        Q     And you haven't taken into consideration in any

7   of your studies the amount of water which has been diverted,

8   either through surface diversions or by extraction from the

9   underground?

10       MR. VEEDER:   That is an incorrect statement.

11       Q  BY MR. DENNIS:  You made no attempt to determine

12  the correct amount?

13       MR. VEEDER:   The exhibit shows he has taken into

14  consideration necessarily the Vail impoundment.

15       THE COURT:   Well, the difficulty is the generality

16  of the question:  Has he taken into account these diversions?

17  He has answered that; that the runoffs show the effect of

18  such diversions as there are.   If you mean take into

19  account specific amount of pumping, and so forth --

20       MR. DENNIS:   Yes, the specific amounts, your Honor.

21       THE COURT:   Well, then ask that.   There won't be any

22  argument.  I know what his answer will be.

23       MR. DENNIS:   I think I do, too, your Honor.

24       Q     In preparation of these hydrographs or in any

25  of your studies did you take into consideration the

specific amounts of water diverted by any user within the Santa Margarita watershed with the exception of the diversions made by the Vails at the Vail Dam site?

A  Yes, sir, in  preparing the hydrograph for O'Neill Ditch.  I took into account the diversions from Santa Margarita through the O'Neill Ditch.

Q  Any other than the Vail and the O'Neill ditch?

MR. VEEDER:  I think we are going to quibble --

THE WITNESS:  No.

MR. VEEDER:  -- about the words.  Now, "consideration," what does that mean?

THE COURT:  He has answered the question.

MR. VEEDER:  Are we going on with this line?  We know very well that if there were diversions, it was reflected in the gages downstream to some degree.

Q  BY MR. DENNIS:  Clarify in my mind this question of the O'Neill Ditch, Mr. Hofmann.

MR. VEEDER:  I object.  It is impossible.

THE COURT:  Mr. Veeder.

MR. VEEDER:  Excuse me, sir.  Go ahead.

Q  BY MR. DENNIS:  Do I understand that the gaging station is considerably downstream on the O'Neill Ditch from the point at which the water is diverted from the Santa Margarita River?

A  What do you mean by "considerably"?

1    Q  As I understand the situation at the present

2    time, the location of the O'Neill Ditch gaging station is

3    correctly shown on Plaintiff's 29-G.  And I believe that

4    your manuscript shows that the discharge point at the

5    gaging station was located approximately 100 feet from its

6    point of discharge into the O'Neill reservoir, is that

7    correct?

8        A  That was what the gaging station description

9    indicates, I believe.

10        Your Honor, to the best of my knowledge, I would

11   have to field check this to be certain.  The gaging station

12   located on O'Neill Ditch on Exhibit 29-G is incorrectly

13   located.  It should be approximately a quarter of --

14   three-eighths of a mile upstream.  The road crosses here,

15   and the gaging station is somewhere in the middle, in this

16   vicinity here, rather than at the point shown on the

17   quadrangle sheet.  But the exact location could be easily

18   determined in the field if that was critical.

19        THE COURT:  Is it important, gaging station on O'Neill

20   Ditch?

         MR. DENNIS:  I think it is, your Honor, because --

21

22        THE COURT:  How?  Why?

23        MR. DENNIS:  This, because part of the water, as the

24   witness has testified, is discharged into the basin, part

25   of it is discharged into Lake O'Neill.  Now, the question

Hofmann - Cross                                                   3691

C-2

1   is:  Does the gaging station only record the discharges

2   which were made into O'Neill, or does it actually record

3   all of the diversions which are made from the Santa

4   Margarita River?

5        MR. VEEDER:  If that is the point -- he is reading it

6   to us now -- the gaging station so situated could measure

7   either one.

8        THE COURT:  That is what he wants to find out.

9        MR. DENNIS:  That is what I want to find out.

10       THE COURT:  Treat that as a question and answer if

11   you know.

12       THE WITNESS:  Yes, sir.  The gaging station measures

13   the entire diversion from the Santa Margarita River.

14       THE COURT:  And not the discharge necessary into the

15   Lake O'Neill?

16       THE WITNESS:  Yes, your Honor.

17       Q  BY MR. DENNIS:  You know that of your own knowledge?

18       A    I have visited the gaging station and gone to the

19   diversion, and there was no opportunity to --

20       MR. STAHLMAN:  I can't hear you now.

21       THE WITNESS:  I have visited the site; and unless there

22   was a break in the ditch or some provision made to divert

23   from the ditch upstream, the flow, the entire diversion

24   from the Santa Margarita River would pass the gaging station

25   on O'Neill Ditch.

1    Q BY MR. DENNIS:  Is it a line ditch?

2        A     No, it is not a line ditch.

3    THE COURT:  What do you mean by a "line ditch"?

4    MR. DENNIS:  Cemented, lined with clay --

5    THE COURT:  Oh, lined ditch.

6    MR. DENNIS:  Yes; or some other impermeable material.

7        Q     So that water running through the ditch could

8    penetrate into the underground basin?

9    MR. VEEDER:  I object.  It is beyond the scope of the

10   direct examination.  We didn't go into this at all.

11   THE COURT:  Overruled.  If you know.

12   THE WITNESS:  I do not know the type of material that

13   the ditch consists of, so I cannot answer the question.

14       Q  BY MR. DENNIS:  You can't answer that question.

15           Now, recalling to Plaintiff's Exhibit 23, which

16   is the Santa Margarita River near Fallbrook.  Do you have

17   23 before you?

18       A     I believe so, yes.

19       Q     Will you tell us why that station was established?

20   MR. VEEDER:  I object to that.  It is certainly a

21   matter of policy, a consideration of which this witness has

22   no knowledge.  It is beyond the scope of the direct examina-

23   tion and --

24   THE COURT:  Sustained.

25       Q  BY MR. DENNIS:  I will call the witness' attention

1  which is in the, I think he called it, folded sheet, which

2  under the history says:  "This station was established to

3  determine the magnitude and distribution of runoff for the

4  design of a dam immediately upstream to determine the

5  water supply available to Camp Pendleton downstream."

6          You find that in the fly sheet?

7      A    Yes, sir.

8      Q    Does that station at that point record all of

9  the surface flow of the Santa Margarita River?

10     A    Essentially, yes.

11     Q    Does it record any part of the subsurface flow

12  of the Santa Margarita River?

13     A    It does not record any part of the subsurface

14  flow of the Santa Margarita River, if there is any.

15     THE COURT:  All right.  That is a good place to stop.

16     (Recess.)

17

18

19

20

21

22

23

24

25

D       1        Q  Mr. Hofmann, calling your attention once more to

5       2   Exhibit 29-G, that indicates that that map was prepared in

        3   1949 as a result of a field check in 1948, does it not?

        4        A  It says, "In addition to 1949, field check in 1948;"

        5   yes, sir.

        6        Q  And isn't it possible that at the time the field

        7   check was made and that that map was prepared that this gaging

        8   station for O'Neill ditch was in the location as shown on 29-G?

        9        A  It is not only possible.  It is probable.

       10        Q  Now, calling your attention to Plaintiff's Exhibit

       11   29-K, is the location of the Fallbrook gaging station as shown

       12   on 29K approximately correct?

       13        A  No, sir, it is not correct.  It is the location of

       14   the gaging station prior to its reestablishment, as I testi-

       15   fied into the record, which is upstream from the road ford on

       16   the road from Fallbrook to DeLuz.  This is the site of the

       17   previous gaging station.

       18        Q  And do you know whether the Sawday diversions are

       19   upstream from the gaging station as it is shown on Exhibit 29-K?

       20        A  I do not know, no, sir.

       21        Q  Do you know whether the Fallbrook diversions are

       22   upstream from the Fallbrook Gaging Station as shown on 29-K?

       23        A  Yes, they are.

       24        Q  Does that station record all of the surface flow

       25   at that particular point?

1     A   May I ask what station you have reference to?

2     Q   The Fallbrook station.

3     A   The present Fallbrook station?

4     Q   The present Fallbrook station.

5     A   Records all of the surface flow passing the gaging

6  station.

7     Q   Did the former gaging station record all of the

8  surface flow at that point?

9     A   At the point where it was located, yes, it did.

10    Q   Did either of the stations record any of the sub-

11 surface flow?

12    A   No, sir, they did not.

13    THE COURT:  Are you implying that there was subsurface

14 flow?

15    THE WITNESS:  I do not know if there was or was not,

16 your Honor.

17 BY MR. DENNIS:

18    Q   Now, Mr. Hofmann, calling your attention to the

19 location of the gaging station on 29-K which has the figures

20 975 below it--

21    THE COURT:  Where is this gaging station?

22    MR. DENNIS:  I was just going to ask if that was the

23 Murrieta gaging station.

24    THE WITNESS:  That is correct; that is the Murrieta

25 gaging station.

BY MR. DENNIS:

Q  And is that station correctly located?

A  Yes, it is correctly located.

MR. VEEDER:  correctly located on what?

MR. DENNIS:  On 29-K.

THE WITNESS:  On Exhibit 29-K and also on Exhibit 17.

BY MR. DENNIS:

Q  However, as I understood it, if there is any dis-
crepancy between the location on Exhibit 17 and the location
as shown on 29-K, 29-K would be the most accurate?

MR. VEEDER:  To whom are you addressing that question?

MR. DENNIS:  To the witness.

THE COURT:  As to the Murrieta gaging station?

MR. DENNIS:  As to the Murrieta gaging station.

THE WITNESS:  If there is any discrepancy, 29-K would
be more correct.

BY MR. DENNIS:

Q  And does that station record all of the surface flow
of Murrieta Creek at the point at which the gaging station is
located?

A  It does.

Q  Does it record any portion of the surbsurface flow?

A  If there is any subsurface flow, it does not record
it.

Q  Calling your attention to the other gaging station

3699

D

Z18

1 which is shown on 29-K, which is the gaging station with the

2 figure 957 just below it, is that th gaging station on the

3 Santa Margarita near Temecula?

4 A That is the gaging station on the Santa Margarita

5 near Temecula.

6 Q And is that station correctly located?

7 A That station is correctly located.

8 THE COURT: On 29K?

9 THE WITNESS: On Exhibit 29-K and also on Exhibit 17.

10 BY MR. DENNIS:

11 Q If there is any discrepancy you would give the same

12 answer as you did in the other?

13 A Yes.

14 Q And does that station record all of the surface flow

15 of the Santa Margarita River at that point?

16 A It does.

17 Q Does it record any portion of the subsurface flow

18 in the Santa Margarita River at that point?

19 A If there is any subsurface flow of the Santa

20 Margarita River at that point, it does not record it.

21 Q Do you know whether or not that station is located

22 downstream from the Elsinore Fault, or upstream?

23 THE COURT: Let me see it a minute.

24 (The witness hands document to the Court.)

25 THE WITNESS: I do not know positively, but in my

Hofmann     Cross                                              3700

D

Z19

1   opinion it is downstream.

2   BY MR. DENNIS:

3       Q   Do you know whether or not the Murrieta gaging sta-

4   tion is located upstream or downstream from the Elsinore fault?

5       A   I do not know.

6       Q   Now, isn't it true that the conditions of runoff in

7   streams within the Santa Margarita River are governed by the

8   intensity and frequencies of the storm, to a large extent?

9       MR. VEEDER:   I object to that, your Honor.   A great

10  many factors are involved in addition to those elements, and

11  the witness shouldn't be required to speculate.

12      THE COURT:   Overruled.   He said "to a large extent."

13      THE WITNESS:   May I have the question again, please?

14      (The reporter read the pending question.)

15      THE WITNESS:   Yes.

16  BY MR. DENNIS:

17      Q   And it is true that you could have years where the

18  annual precipitation would be higher than in other years when

19  you would have less runoff than you would in some year with

20  less precipitation?

21      MR. VEEDER:   That is objected to as being purely

22  speculative, your Honor.

23      MR. STAHLMAN:   I didn't hear it all, and I didn't

24  understand what I heard.

25      THE COURT:   Sustained.

Hofmann          Cross                    3701

1          Let's see Exhibit 29-F.

2          THE WITNESS:  I have 29-G, your Honor.

3          (The Clerk hands document to the Court.)

4    BY MR. DENNIS:

5          Q  Did you make any studies to determine the quantities

6    of water in acre feet which would be deposited in the Santa

7    Margarita River watershed?

8          MR. VEEDER:  I object.  What does the word "deposited"

9    mean?

10         THE COURT:  Sustained.

11   BY MR. DENNIS:

12         Q  Did you make any studies to determine the quantity

13   of water which would fall by precipitation within the Santa

14   Margarita River watershed?

15         A  Portions of the Santa Margarita watershed and in

16   general.

17         Q  Which portions?

18         A  The studies made by the Geological Survey pertain

19   to the Temecula Creek drainage above Vail Dam and Murrieta

20   Creek drainage above the gaging station.

21         Q  Do you have those figures with you?

22         A  Yes, I jotted down some general figures.

23         Q  I wonder if you could give us the result of your

24   investigation?

25         A  The average annual precipitation-- now this is the

3702

D

Z21

average annual-- on the Temecula Creek above the Nigger Canyon gaging station, which is essentially Vail Dam, was 18.2 inches, and from Murrieta Creek at Temecula was 14.9 inches-- that is, obtained by planimetering the isohyetal map that was presented as Exhibit 31

THE COURT:  Were these figures at these particular places or in the watersheds above those places?

THE WITNESS:  That is the precipitation in inches on the watershed above those places, your Honor.

BY MR. DENNIS:

Q  And then did you make any computations to determine the quantity of water which that precipitation would deposit in each of these areas in acre feet?

A  I don't understand the question, Mr. Dennis.

Q  As I understand your answer, you figure that the average rainfall within one of the areas was 18 inches.

A  Yes, sir.

THE COURT:  18.2.

BY MR. DENNIS:

Q  And you have the total acreage within that area?

A  Yes.

Q  And by multiplying that acreage by the 18 inches you could get the quantity of water which was dropped on that area by precipitation?

A  You mean the volume of water that was dropped?

Q  Yes, the volume.

D

Z22

1    A  It could be done.  I did not do it.

2    Q  You did not do that?

3    A  No, sir.

4    THE COURT:  Before you ask the next question, that 18.2

5    was in the part of the watershed above Vail Dam?

6    THE WITNESS:  Yes, sir.

7    THE COURT:  The 14.9 was above the Murrieta gaging

8    station?

9    THE WITNESS:  Yes, sir; the entire drainage area above

10   the Murrieta Creek gaging station.

11   MR. SACHSE:  May I inquire.  Is it Temecula Creek above

12   Vail Dam, or the whole watershed above Vail Dam?

13   THE WITNESS:  It is the entire watershed.  When I

14   say Temecula Creek above Vail Dam, it includes the entire

15   drainage above that point.

16   BY MR. DENNIS:

17   Q  Now, Mr. Hofmann, when you were explaining the method

18   in which you arrived at the runoff at Vail Dam after the

19   construction of the dam, you took into consideration, as I

20   recall, evaporation and the draft and the amount of water in

21   storage?

22   A  Yes, sir.

23   Q  Did the amount of water in storage include water

24   stored underground as well as water stored aboveground?

25   A  No, sir.

Q  It is true, is it not, that the Vail Dam extends down into the basement complex and prevents the passage of any water or substantial amount of water, underground water, from above the dam to below the dam?

MR. VEEDER:  Let me hear the question again, please.

THE COURT:  Read it.

(The reporter read the pending question.)

MR. VEEDER:  I don't know what it means.

MR. DENNIS:  I can simplify the question.

Q  Does Vail Dam prevent movement of underground water?

A  Essentially, yes.

Q  And does the construction of the Vail Dam result in a raising of the water table and the underground structures backing the water underground up into Wilson Valley and up into the various valleys upstream?

MR. STAHLMAN:  This is not part of the cross-examination.

THE COURT:  Sustained.  This witness hasn't told us anything about underground waters.

MR. DENNIS:  No.

THE COURT:  He has given us rainfall and runoff.

MR. DENNIS:  That is correct.  But I think that he has testified as to the amount of water which passes the Vail gaging station, and he says that he arrived at the amount of runoff at that station by taking into consideration the

D

Z24

1  evaporation, the amount of water in storage, changes in

2  storage and the drawdown.  Now, if there is additional sur-

3  face water which is impounded underground by the construction

4  of that dam, that is water which is properly part of the

5  runoff of Temecula Creek at that point, which he has not taken

6  into consideration.

7      MR. VEEDER:  The direct examination didn't touch on that,

8  your Honor.

9      THE COURT:  No.

10      MR. DENNIS:  No.

11      THE COURT:  But counsel has a point.

12      In your estimate of runoff at Vail Dam, did you proceed

13  upon the premise that Vail Dam cut off any underground runoff?

14      THE WITNESS:  Yes, sir; that there is essentially no

15  flow past the dam.

16      THE COURT:  So therefore you are not concerned with

17  estimating the amount of water in underground basins above

18  Vail dam?

19      THE WITNESS:  No, sir.  We made no study of the under-

20  ground basins.

21

22

23

24

25

Hofmann - Cross

3706

E-1 ML j

1    MR. DENNIS:  I just have one other question, your

2  Honor.  I will try to locate it.  I think there is a mistake

3  in one of the exhibits which I wanted to clarify.

4        Rather than take up the time of the Court, I wonder

5  if I might have permission to ask it after Mr. Stahlman

6  completes his examination.

7        THE COURT:  Yes, you may.  I think we ought to have

8  the gaging stations at Ysidora and at --

9        MR. VEEDER:  O'Neill Ditch.

10        THE COURT:  -- Fallbrook corrected on these quad-

11  rangles.

12        MR. VEEDER:  That will be done, your Honor.

13        THE COURT:  All right.  Who shall we have do it,

14  Mr. Kunkel or Mr. Hofmann?

15        MR. VEEDER:  Mr. Hofmann would be --

16        THE COURT:  Mr. Hofmann.  All right, Mr. Hofmann,

17  at your leisure.

18        THE WITNESS:  Yes, sir.

19        THE COURT:  Get as accurate a place as you can on

20  the quadrangles.

21        THE WITNESS:  Should I indicate -- I mean, the

22  Fallbrook gaging station, for example, will be on a different

23  quadrangle sheet.  Should I cross out the location?

24        THE COURT:  Make a notation here --

25        THE WITNESS:  On the margin?

1      THE COURT:  -- across in the margin:  cross it off

2   of this quadrangle and put it on an adjoining quadrangle.

3      THE WITNESS:  I will do it with a colored pencil,

4   your Honor.

5      MR. VEEDER:  May we withdraw them for that purpose?

6      THE COURT:  They may be withdrawn for that purpose.

7      MR. DENNIS:  If your Honor please, I think it would

8   be wise to show the location of the station as it now exists

9   and perhaps have some notation as to the date the station

10   was erected at that spot and the date the former station was

11   discontinued, so there will be no misunderstanding as to

12   where the readings were taken.

13      THE WITNESS:  The history of the stations --

14      THE COURT:  Put the little note on the margin.

15      THE WITNESS:  On the margin, yes, sir.

16      THE COURT:  And in the case of Ysidora, you may or

17   may not be able to ascertain if there has been a change in

18   that gaging station.

19      THE WITNESS:  The Santa Margarita River at Ysidora

20   essentially has been at the same location throughout its

21   entire period.

22      THE COURT:  I am not talking about Ysidora; I am

23   talking about the O'Neill Ditch.

24      THE WITNESS:  The O'Neill Ditch; yes, sir.

25      THE COURT:  Your change there.  See what you can find

Hofmann - Cross

1          MR. DENNIS:  Would that also apply to the station,

2    the gaging station, on the O'Neill Ditch?

3          THE COURT:  That is just what I am talking about,

4    O'Neill Ditch.  There are two of them apparently he has to

5    make a correction on.

6          Mr. Stahlman.

7          MR. STAHLMAN:  Yes, your Honor.

8

9                        CROSS EXAMINATION

10   BY MR. STAHLMAN:-

11         Q  In relation to the studies that you made regard-

12   ing the rainfall in the area east of Vail Dam as it related

13   to the flow -- I believe you indicated in your direct exam-

14   ination that 18.2 inches was the average rainfall?

15         A  Yes, sir.

16         Q  Then, the figure of .7 of an acre, was it not?

17         A  No, sir, it was 7 -- the equivalent of .7 of an

18   inch over --

19         Q  .7.

20         A  -- over the entire watershed.

21         Q  I see.  That flowed through into Vail Dam or past

22   the Vail Ditch?

23         A  Yes, flowed past the Vail Dam station.

24         Q  And that is an average figure, also, is it?

25         A  Yes, sir.  It averaged.  It was an average figure.

1.      Q How was that computed?  What I have in mind is

2   this:  Would the duration of the rainfall or the duration

3   of the dry period, would that have any effect upon the

4   amounts that would flow?

5       A  It would have an effect.  In other words, during

6   the dry period the amount would be considerably less.

7       Q Would be, yes.

8       A  But this is tabulating the entire series of events,

9   annual events, dividing by the number of years to obtain

10  the average annually of it.

11      Q  And that figure is just merely mathematical

12  proportion?

13      A  General illustration that -- of the precipitation

14  that water -- precipitation that falls on the watershed.  A

15  very small percentage actually runs off as surface runoff at

16  the Temecula gaging station.

17      THE COURT:  At Temecula or Vail?  Which are you talk-

18  ing about?

19      MR. STAHLMAN:  Vail, he is talking about.

20      THE WITNESS:  Temecula gaging station at Vail Dam,

21  your Honor.

22      THE COURT:  All right, go ahead.

23      Q  BY MR. STAHLMAN:  Was that where that -- Temecula

24  gaging station at Vail Dam?

25      A  It is Temecula Creek gaging station at Vail Dam.

Hoffmann - Cross

1    THE COURT:  What was your figure, .7 of a foot?

2    MR. STAHLMAN:  An inch.

3    THE WITNESS:  .7 of an inch, your Honor.

4    MR. STAHLMAN:  Of an inch.

5    THE WITNESS:  In other words, less than 5 per cent

6    of the amount of water that falls on the drainage on the

7    average actually runs off at a point where all the flow is

8    confined, such as Vail Dam or Nigger Canyon.

9    Q  BY MR. STAHLMAN:  Do you have, as a result of any

10   study, any opinion as to the disposition of that rainfall in

11   relation to what would flow underground or what would be

12   absorbed by vegetation, transpiration and evaporation?

13   A  The difference between this average figure of

14   precipitation and the average figure of runoff represents

15   the actual water used in the basin.  And by "use," I mean

16   both evaporation, evapotranspiration.  It does not --

17   Q  And extraction, also?

18   A  Well, extraction is in the sense that they are used

19   up.

20   Q  Yes, either by man or nature?

21   A  Either by man or nature.  Primarily by nature, I

22   think.

23   THE COURT:  It represents also what waters might be

24   being used to replenish the basin well?

25   THE WITNESS:  To a certain degree, yes, your Honor.

1    But this is a long time period.  And presumably, the change

2    in storage would be a relatively small amount when considered

3    over this long-time period.

4         THE COURT:  That is hard to understand:  that that

5    much water could fall and would result only in .7 of an inch

6    on an average.  Over what period of time was the study made?

7         THE WITNESS:  The period was projected for the runoff,

8    and the average annual precipitation used for the isohyetal

9    map was used to obtain the precipitation figure, was 1896

10   to 1946, your Honor.  And the runoff record was extended

11   backwards on the basis of correlation to cover the same

12   period.

13        Q  BY MR. STAHRMAN:  Does that bear relationship or

14   comport with studies made in other areas in this part of

15   the country?

16        A  Yes, sir.  I don't know whether I mentioned it,

17   but the runoff from Murrieta Creek where the precipitation

18   was 14.9 inches was only .8 of an inch.  A little more ran

19   off, in proportion, from Murrieta Creek.  And generally, for

20   gaging stations in Southern California, this percentage

21   holds, as far as the ratio of recoverable water to the total

22   precipitation.

23        Q  And, of course, in other areas where you would have

24   different climatic conditions it would be much higher, if

25   you want?

1    A  In an area where your precipitation is higher, a

2    larger percentage runs off.  These natural water losses do

3    not have the same range as the precipitation, as far as

4    variation is concerned.  The natural water losses are higher

5    in the lower areas of lower altitude where growing conditions

6    are better.  So that you get into this higher mountain area,

7    the natural losses are less; and the precipitation, as I have

8    explained earlier, is higher.  So that the amount of water

9    that runs off is higher in the mountain area in proportion

10   to the total precipitation.

11       Q  Contour and character of the watershed itself,

12   would that have a bearing on it, also?

13       A  Well, to a degree, yes.  If you have steep slopes

14   the water would run off faster.  If you have flat slopes,

15   the water percolates into the soil mantle and then gives the

16   plants and native vegetation opportunity to extract water

17   from the soil and use it.

18       THE COURT:  Wouldn't the arrid character of the --

19   much of that semi-desert area up there, in particular the

20   Temecula, into that valley, also be an important factor?

21       THE WITNESS:  Yes, sir; in that the density of the

22   native vegetation is less.  However, if you do have rain --

23   the rainfall is less in that area.  So that if you do have

24   rainfall, the grasses germinate and grow, and what brush

25   there is uses water; so that it is a fact that the ratio of

E-2

1  the recoverable water to the total precipitation is about

2  the same, I think, in that area.

3      THE COURT:  Take areas where there is a small amount of rain-

4  fall, and areas, semi-arrid, particularly where they are

5  subject to considerable warm weather, there is a process of

6  evaporation going on all the time, isn't there?

7      THE WITNESS:  Yes, sir.

8      THE COURT:  Surface of the earth.

9      THE WITNESS:  Yes, sir.  Only as long as water is

10 available within the certain distance of the surface of the

11 earth.  It does not draw the water from deeper sources and

12 evaporate them.  Only from the top.  So generally, it depends

13 on the type of soil.

14     MR. STAHLMAN:  I have another question which might

15 be spawned from curiosity rather than its practical effect.

16     Q  What would be your explanation as to why Valley

17 Center would have a higher average rainfall than an area

18 close to it, such as the Temecula Valley, or much higher than

19 San Diego, if you have an opinion on that?

20     A  It would be due to the effects of the mountain

21 ranges which surround Valley Center.

22     Q  Back of the clouds, so to speak?

23     A  As I have explained earlier, the water precipitates

24 as it is elevated because of the cooling action.  And Valley

25 Center may be in a range where the pattern drops, the

Hofmann - Cross                                                    3714

1   precipitation pattern is heavier, due to orographic effects

2   in the mountain range to the west.

3        THE COURT:  Does most of this rain come from the

4   west?

5        THE WITNESS:  Yes, your Honor, in Southern California

6   it generally comes from --

7        THE COURT:  Of course, that would be the answer.

8        MR. STAHLMAN:  Yes.

9        THE COURT:  Palomar Mountain is directly to the

10  west -- or to the east of this area, and it is the highest

11  mountain along there.

12       Q  BY MR. STAHLMAN:  When you spoke of the evaporation

13  from the Vail Dam, the figures you gave, were those gross

14  or net?  Do you make a distinction?

15       A  I don't know what your distinction would be, Mr.

16  Stahlman.

17       THE COURT:  There are two figures.  Then he gave a

18  coefficient to compensate for the tin pan, metal pan.

19       THE WITNESS:  Yes.  The figure I gave was the total

20  evaporation from the surface of the reservoir.  It was not

21  adjusted for any evaporation that might have occurred or **evapo-**

22  **transpi**ration that might have occurred prior to the construc-

23  tion of the Vail Reservoir.

24       Q  BY MR. STAHLMAN:  And your "evaporation," as you

25  use it in this case, includes just what the word means?

MALCOLM E. LOVE, OFFICIAL REPORTER

1    A  Yes.

2    Q  That is what goes into the atmosphere?

3    A  It is evaporation from the surface of the -- into

4  the atmosphere from the surface of the reservoir.

5    Q  One other question, and this is in connection

6  with this study of tree rings.  What is the basis upon which

7  the original study is made from which you made your observa-

8  tions relative to these periods of rainfall?

9    A  The basis is that by selecting trees on rocky

10  ridges or slopes that had access only to precipitation for

11  their annual water supply, that the growth of those trees

12  as measured by the growth in the tree rings, would be an

13  indication of the precipitation occurring during the

14  different years.

15    Q  Did you, during your analysis of that characteris-

16  tic, give consideration to the details that went into the

17  study?  By the way, what was the name of the man?

18    A  Edmund Schulman.

19    Q  Schulman.  Did you show how these trees were

20  selected and where they were selected from?

21    A  Yes, sir.  As a matter of fact, I discussed this

22  entire question with Mr. Schulman personally some years ago

23  when he visited our office.

24    Q  And that method and system of making that determina-

25  tion by tree rings is recognized and adopted by the Department

E-3

1   with which you are connected?

2       A  It is.  The diagram that I have drawn as Exhibit

3   31, I believe, is published in hydrologic Atlas I of the

4   Geological Survey and Water Supply paper 1366.  The method

5   has been reviewed by the Geological Survey prior to publi-

6   cation and has been accepted by them.

7       Q  Was Schulman the man who made the original study

8   and made the selection of the trees from which this study

9   was made?

10      A  Yes, sir; he was the one who made the selection

11  for the tree ring hydrology of Southern California.

12      Q  And was it done in other parts of the country?

13      A  Yes.  In the Colorado River basin, and I think in

14  Utah, though I do not have the exact publications in mind

15  right now.

16      MR. STAHLMAN:  That is all.

17      MR. DENNIS:  I have that other question now, if it

18  might be permissible.

19

20                  CROSS EXAMINATION

21  BY MR. DENNIS:-

22      Q  If you would turn to the fold sheet in Exhibit 20,

23  under the subheading "History" --

24      A  Yes, sir.

25      Q  -- and read the last sentence of the "History."

1    Should the word "below" in front of "gorge" be "above"?

2          MR. STAHLMAN:  I can't hear you, Bill.

3          Q  BY MR. DENNIS:  I say, shouldn't the word "below"

4    read "above"?

5          A  No, sir.

6          MR. VEEDER:  Would you read it out loud, please.

7          THE WITNESS:  Yes, sir.

8          "This station was established to collect

9    records for use in the adjudication of water

10   rights in the Santa Margarita River basin.

11   The station measures ground water seepage from

12   the alluvial in Nigger Valley and storm runoff

13   from mountain and foothill areas surrounding

14   the valley, which is inflow into Temecula Valley

15   below gorge at gaging station."

16         In other words, this is a measure of the inflow

17   into the Pauba Valley below the gorge, which is, in turn,

18   called Nigger Canyon.

19         Q  BY MR. DENNIS:  Well, the station we are referring

20   to is at the Vail Dam, is it not?

21         A  Yes, sir.  The gaging station is at the upper end

22   of the gorge, but the --

23         Q  The gorge that you are --   How are you --   The

24   inflow in Temecula below the gorge; and the gorge you are

25   referring to, then, is --

1    A   Nigger Canyon.

2    Q   Nigger Canyon Gorge?

3    A   Yes.   And by Temecula Valley is meant what has

4    been termed in the court here Pauba Valley.

5    MR. DENNIS:  Oh, all right.  I understand it.

6    MR. VEEDER:  Is that all?

7    MR. DENNIS:  That is all.

8    MR. VEEDER:  Is there any other?

9         I owe the witness an apology.  I inadvertently

10   referred to Plaintiff's Exhibit 31 as comparable to

11   Bulletin 57.

12

13                    REDIRECT EXAMINATION

14   BY MR. VEEDER:-

15        Q   Mr. Hofmann, would you approach Exhibit 31 and

16   state the factors which are taken into consideration in

17   arriving at the graph which is the lower part of the exhibit:

18   "Residual mass curve of tree growth indices."

19        MR. SACHSE:  I object.  There is no foundation this

20   witness knows anything about the facts taken into consider-

21   ation.

22        MR. VEEDER:  The exhibit is in the record.

23        THE COURT:  Overruled.

24        THE WITNESS:  May I have the question again, please.

25        MR. VEEDER:  Well, I will state it for you.

1    Q  Will you review the chart which appears at the

2  bottom of the exhibit designated "Residual mass curve of

3  tree growth indices," and state the factors that went into

4  the preparation of it?

5    A  The diagram was prepared on the basis of the

6  annual tree growth indices for selected groups of Big Cone

7  spruce in Southern California.  Some in the San Jacinto

8  mountains area, some in the San Bernardino, and some in the

9  San Gabriel mountains area.  And these indices were developed

10  for each year on the basis of tree growths in all of the

11  trees.  They were correlated one with the other, so that

12  one growth index was developed for each year of record, and

13  the average growth index for the entire period of record

14  was used.  And the deviation from this average was plotted

15  as a cumulative departure similar to those for precipitation

16  and runoff discussed -- presented as earlier exhibits.

17    Q  Now, have you considered that --  Your Honor, we

18  are getting into a new field here.  I observe it is 12:00

19  o'clock.

20    THE COURT:  All right.  We will adjourn until 2:00

21  o'clock.

22    (Whereupon a recess was had at 12:00 o'clock noon

23  until 2:00 o'clock p.m. of the same day.)

24

25

SAN DIEGO, CALIFORNIA, THURSDAY, OCTOBER 23, 1958.  2 P.M.

MR. VEEDER:  Your Honor, I would like to inquire, through you, of counsel as to whether they have received the pre-trial order on exhibits and issues.  Has that been received by counsel in the mail?

MR. MOSKOVITZ:  I have not received it.

MR. SACHSE:  I have not.

MR. DENNIS:  I have not received it.  I probably won't until today.

MR. VEEDER:  They are in the mail.

THE COURT:  Then let's wait.  They will be in the mail.  If anyone wants to borrow a copy temporarily--

MR. VEEDER:  Would your Honor care to have one?

THE COURT:  I have one.  You might as well give me a second one, though.

MR. VEEDER:  There is one additional point I would like to have Mr. Hofmann clear up in regard to diversions from O'Neill ditch, if it is permissible to have the question asked out of order, your Honor.

THE COURT:  It may be.

THE WITNESS:  I believe I testified this morning that to the best of my knowledge there was no provisions for diversion upstream from the present gaging station on O'Neill ditch.  During the noon recess I checked, and an exhibit

F1

Z26

1    offered for identification and one which will be testified to

2    by a later witness indicates that there is a provision for a

3    diversion upstream from our existing gaging station.

4    BY MR. VEEDER:

5        Q  Now, Mr. Hofmann, referring to Plaintiff's Exhibit No.

6    31, would you state whether that has been the subject of

7    publication by the United States Geological Survey?  I am

8    referring now to the wet and dry periods in Southern California.

9        A  I testified this morning that this same diagram or

10   similar diagram was published in the U.S. Geological Survey

11   Water Supply Paper 1366, which is entitled "The Water Resources

12   of Southern California with Special Reference to the 1944-1951

13   Drouth," and it is also published in "Hydrologic Atlas No. 1"--

14   I don't have the title handy.

15       Q  Would you state, Mr. Hofmann, your opinion as to the

16   acceptability of the study of tree rings to disclose the

17   historical precipitation and runoff in the area in which a

18   study is made as an accepted procedure?

19       A  The tree ring growth as an index of precipitation and

20   runoff is an accepted hydrologic procedure in analyzing

21   precipitation for long-term periods, in a general way.  It is

22   not possible from the tree growth to say that 15 inches fell

23   in this vicinity, but the relation of dry to wet can be

24   distinguished by tree growth studies.

25       Q  Now, from the standpoint of the analysis that you

F1

Z27

1  have made as shown on 31, as it relates to the short-term

2  measurement of runoff in the Santa Margarita Valley, have

3  you observed any correlation or any repetitious pattern that

4  might be of aid in prognosticating future runoff?  Or would

5  you like to have the question read again?

6          A  I would like to have the question read again.  I

7  think it is a double question, Mr. Veeder.  But perhaps I

8  am wrong.

9          Q  I shall ask it again.  Based upon your investiga-

10  tions and your studies of the data set forth on Plaintiff's

11  Exhibit No. 31, have you found any repetitious pattern from

12  the standpoint of historical precipitation in Southern

13  California?

14          A  No, there is no repetitious pattern.

15          Q  And how does that comport with the short-term

16  studies that you have made in regard to both precipitation

17  and runoff in the Santa Margarita River watershed?

18          A  There is no repetitious pattern in the short-term

19  records of precipitation and runoff.  There is a correlation

20  as indicated by Exhibit 31 between precipitation and runoff

21  and the tree ring diagram.

22          If I may point it (stepping down to diagram), the period

23  of overlap between the tree ring diagram "Precipitation Record

24  Indices at San Bernardino" and the runoff for Santa Ana River

25  near Mentone-- the reason that this Santa Ana River near

F1

228

Mentone was used is that it is a long-term **station** which was
started away back in about 1896, I believe, and it is one
of the longest records we have of runoff in Southern Cali-
fornia-- the precipitation and the runoff show a wet period,
and at the same time there is a wet period indicated by the
tree ring studies which were discontinued in 1946 and also
a dry period from approximately 1923, '22 or '23, to about,
oh, 1934, I would judge.

Q   From your observations would you state whether there
is any comparison between the longest dry period shown on
Plaintiff's Exhibit No. 3 and the dry periods as shown in the
short-term records which are avilable for the Santa Margarita
River watershed?

A   As shown by the vertical graphs, the longest dry
period of record is this one from approximately 1490 to 1533
or '34, somewhere in there, a 43-year dry period, and that of
course exceeds by a great length any dry periods during
recorded precipitation and runoff records.

Q   Have you an opinion as to whether that time might be
repeated during--

THE COURT:   Do you have your crystal ball with you?

MR. VEEDER: There is no objection, your Honor.

THE WITNESS:   I was going to say, it would take a
crystal ball.  But in the sense that it has occurred in the
past, it would seem to me that there is a possibility of its

Hofmann          Cross

F1

Z29

1    occurring again in the future, perhaps even longer.

2        THE COURT:  That is like the fellow who said, "Well,

3    it's the first day of January, and I have always discovered

4    that if I live until the first day of January I am going to

5    live another year."

6        MR. VEEDER:  I think your Honor has something there.

7        THE COURT:  Let me ask a question.  This chart, Exhibit

8    31, is based on a mean; the chart says "cumulative departures

9    from mean annual growth."

10       THE WITNESS:  Yes, sir.

11       THE COURT:  And these are percentages, I suppose--

12       THE WITNESS:  Departures, yes.

13       THE COURT:  From the mean.  How did you get a mean from

14   1380?

15       THE WITNESS:  The annual growth for each year from

16   1380 to 1946 has been tabulated.  All of the figures have

17   been added up and divided by the number of years-- I think

18   it is eight hundred some years; I would have to subtract it

19   on paper to give you the exact number of years-- but the total

20   number of events were added up and divided by the number of

21   years to give a mean growth index for the period.

22       THE COURT:  You haven't worked out any mathematical

23   equations on the basis of these wet and dry periods that,

24   based upon past experience, the percentages of wet and dry

25   periods that had a range between eight and fifteen years were

F1

30

1    a certain percentage of the total periods, and that on that

2    kind of basis-- you have made no calculation of that kind?

3         THE WITNESS:  No, your Honor.  The irregularity of the

4    occurrence of these events-- for example, here is a real

5    short-term dry period, and then a longer one, and then an

6    extremely long one.  I think a study of that type would have

7    little significance, because there is no pattern.

8         THE COURT:  We have no mathematician in the entourage

9    here or he certainly would be figuring out probabilities based

10   upon 800 years of tree rings.

11        MR. VEEDER:  Your Honor, you are going to have a sequel

12   written in 1957, if we keep after this.

13        THE COURT:  What?

14        MR. VEEDER:  There will probably be a sequel written

15   to 1957 on the basis of these three rings.

16        THE WITNESS:  Were you thinking, your Honor, of the

17   frequency of the dry periods in relation to--

18        THE COURT:  I was thinking of the probabilities of

19   the length of dry periods.  I haven't a mathematical mind.

20   But all a mathematician would have to do would be to look

21   at this and he would say, "800 years experience.  One dry

22   spell of 43 years.  The probabilities of a dry spell of 43

23   years are so and so."

24        MR. STAHLMAN:  Run it through the Univac.

25        THE COURT:  And he would take a slide rule and run

F2

Z31

Hofmann — Cross

1   this on out.  And he would take the chart there also and he

2   would say, "Out of about 20 dry periods, 50% of them vary in

3   duration from $7\frac{1}{2}$ to 15 years, and by the law of probabilities,

4   based on the experience shown, the mathematical probabilities

5   are that half the dry periods would be from $7\frac{1}{2}$ to 15 years.

6       MR. VEEDER:  But, your Honor, I think the very point

7   that is extremely important to the United States of America in

8   this litigation is just the thing.  I think actuarial tables

9   might be important to sell a life insurance policy, but we know

10  that there is no repetition here, and we went back a thousand

11  years to prove it.  That is the point.  Even if he did give a

12  mathematical calculation, it would be meaningless.

13      THE COURT:  A mathematical calculation would merely

14  be that the law of probabilities shows a certain thing.

15      MR. VEEDER:  May I ask the witness a question.

16      Q  Is there such a thing as a law of probabilities in

17  regard to precipitation and runoff?

18      (A pause.)

19      THE COURT: There is no doubt about it.  Take dice.

20  There is nothing more uncertain than what can happen on the

21  throw of the dice, and yet there is a law of probabilities

22  that the probabilities are that so many throws of the dice

23  will do so and so.  There can't be anything more uncertain.

24  The weather can't be any more uncertain than a throw of the

25  dice.

F2½

Z32

1    MR. VEEDER:  The Fallbrook Dam, I think, would be a

2    throw of the dice.

3    But I truly believe, your Honor, that if there is one

4    thing we have proved-- they can dream.

5    MR. LITTLEWORTH:  Mr. Veeder would like to withdraw

6    this exhibit.

7    MR. VEEDER:  No, I love that exhibit.  The fact is I

8    was hurt terribly yesterday when your Honor took just one

9    gander at it and put it aside.  I think it is very important.

10    THE COURT:  I looked at it more closely a few minutes

11    ago.

12    MR. VEEDER:  Yes.  I appreciated that, too.

13    THE WITNESS:  May I point out, your Honor, that the

14    mathematical study that you were talking about can be easily

15    derived fromthis bar graph, and that the reason it was arranged

16    in this fashion-- I didn't realize exactly what you wanted--

17    is that there are twenty events and this median event is in

18    the neighborhood of about 14 years, and the highest is about

19    43, and the lowest about seven years; so that the relationship

20    of the dry period mathematically is shown on the bar graph,

21    and also the wet periods.

22    THE COURT:  All right, go ahead.

23    BY MR. VEEDER:

24    Q  Have you considered, Mr. Hofmann, the history of

25    runoff as it relates to the waters which have been impounded

F2

Z33

behind Vail Dam since the closure of that structure?

A   Yes, I have.

Q   What has that study revealed from the standpoint of the quantity of water which has actually been impounded as that quantity relates to the prognostications which were based upon the previous runoff in the area prior to the time that the structure was built?

MR. MOSKOVITZ:   I object to that.   I don't think there is any foundation as to prognostications on Vail Dam.

MR. VEEDER:   There certainly are, your Honor.   The record is full--

THE COURT:   You don't have to pursue that.   I live in this area and all I have to do is look at the reservoirs around this County, which undoubtedly were built upon engineering principles and upon the basis that they would collect and gather a certain amount of water, and for years many of them were practically dry beds.   Some of them have a little bit of water in them.   I can remember going by Coolidge Dam in Arizona when it was practically stone dry.

MR. VEEDER:   It has been that way for a long time.

THE COURT:   A lot of money was spent building a big dam upon the prognostications that it would collect a certain amount of water.   Do you want to pursue this inquiry?

MR. VEEDER:   Your Honor has a very good grasp of it, so I have no further questions.

THE COURT:  I think I can take judicial notice of certain things like that, matters of common knowledge.

MR. VEEDER:  We can't take a chance that you will take judicial notice of it, your Honor.

THE COURT:  They used to fish up at Lake Hodges, and they had to tear down the fishing building.  There was no water within miles of where the fishing cottages were built. We used to fish off the bridge.  There is a sign on the bridge "No Fishing".

MR. STAHLMAN:  There is still a sign at Hodges.

THE COURT:  Yes, at Hodges, there is a sign on the bridge.

MR. STAHLMAN:  Cattle are grazing down there now.

THE COURT:  There is a sign on the bridge as you come into Elsinore "No fishing from the bridge."  I have been coming by there for eighteen years.  I can't remember when there was water in that so that you could have fished off of the bridge.

MR. VEEDER:  Mr. Sachse's in shock.

MR. STAHLMAN:  If you put a pole over there now, you will catch a beefsteak.

MR. VEEDER:  I have no further questions, your Honor.

MR. LITTLEWORTH:  I have just a few questions, your Honor.

THE COURT:  All right.

1                          CROSS-EXAMINATION

2    BY MR. LITTLEWORTH:

3        Q   I want to ask just a couple of questions, Mr.

4    Hofmann, about this relationship between precipitation and

5    runoff in the drainage area above Vail Dam.

6        A   Yes, sir.

7        Q   What I want to try to find out is what happens to

8    the water which does not show up as runoff, if you know?   Is

9    it true that if a small amount of rain falls on dry ground,

10   say, up to a quarter inch of rain, that most of that rainfall

11   would evaporate?

12       A   That is true, yes.

13       Q   Is that part of this runoff?

14       A   Pardon me.   Depending, to a certain degree, on the

15   intensity of the rainfall.

16       Q   Yes.

17       A   But generally you are right.

18       Q   Part of the average 18 inches of rainfall then, is

19   accounted for simply by evaporation because it comes in small

20   quantities and falls on relatively dry soil?

21       A   Yes, sir.   Even in larger storms part of it is

22   evaporated before it has an opportunity to --

23       Q   That is my next point.

24       MR. VEEDER:   Before it has an opportunity to what?

25       THE WITNESS:   Before it has an opportunity to percolate

Hofmann — Cross

3731

into the ground or run off.

THE COURT:  I have also lived on a farm, and I know that you can have a pretty heavy rain and go out with a shovel and be surprised to what little depth the water percolated.

MR. LITTLEWORTH:  That was my next point.

Q  That heavier storms, up to perhaps an inch, there is a certain amount of evaporation and the rest of the water percolates to fairly shallow depths, does it not?

MR. VEEDER:  I object to that unless there is some showing as to the kind of material over which it flows.

THE COURT:  That is right.

MR. LITTLEWORTH:  Let me just ask Mr. Hofmann this one question.

MR. VEEDER:  Are you withdrawing the one you started?

MR. LITTLEWORTH:  Yes.

Q  In that area, do you have any idea how much of the average 18 inches of rainfall is consumed by either evaporation or percolation into the ground but then again being lost through transpiration, having been picked up by the plants and evaporated through transpiration?

A  May I have the question again, please?

(The reporter read the pending question.)

MR. VEEDER:  I object to that, your Honor.  I don't understand it.

THE COURT:  Does the witness understand it?

F3

Z37

THE WITNESS:  I believe I do, your Honor.

I think I have testified, Mr. Littleworth, that the difference between the average annual precipitation and the average annual runoff of in excess of 17 inches is lost either through evaporation, transpiration-- essentially evaporation and transpiration; that assuming that there is no change in ground water storage, or an insignificant change in ground water storage from the beginning of the period to the end of the period that we made the study for.

THE COURT:  I think I could take judicial knowledge certainly of these matters of common knowledge.  There are so many factors involved.  There is the plane of the surface on which the water flows, there is the speed with which it falls, the amount of drizzle or cloudburst, there is the type of soil on which it falls. I have seen soil in the Nevada desert where as soon as the first rain would fall it would almost seal off the ground and the water would stand on top of the ground and look like a lake.  There is other ground where the water falls and would permeate much faster.  And if the water falls on a hillside and runs off and runs down into a sandy basin you are going to get a lot more absorption in the sandy basin than you got on the hillside.  There are so many factors on this thing.  You would have to have a specific case to make any calculations.  The cover that grows on the ground could have a definite relationship to the amount

3733

F3

Z38

1  of moisture lost by plant action.  The presence of tree roots

2  and leaf mold would have a tendency to hold water in the

3  ground, where otherwise it would run off or run out quickly.

4  The factors are innumerable.

5      But I think I can take judicial notice of most of these

6  matters of common knowledge.

7      MR. LITTLEWORTH:  I think that is all the questions I

8  have, then.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G-1 ML j

1    THE COURT:  Any other questions?

2    MR. VEEDER:  You may be excused, then.

3    THE COURT:  You are not excused, Mr. Hofmann, but

4    you may step down and go about your business.  If we need

5    you, we will call you back.  You have things to work on and

6    look up.

7    THE WITNESS:  Yes, your Honor.

8    MR. VEEDER:  Call as the next witness for the United

9    States Lt. Giles Walker of the Marine Corps.

10

11                    LT. GILES WALKER,

12   called as a witness on behalf of the Plaintiff, having been

13   first duly sworn, was examined and testified as follows:-

14   THE CLERK:  Please be seated.  Would you state your

15   name, please.

16   THE WITNESS:  Giles E. Walker.  That is G-i-l-e-s.

17

18                    DIRECT EXAMINATION

19   BY MR. VEEDER:-

20   Q  How old are you, Mr. Walker?

21   A  28.

22   Q  I mean Lt. Walker?

23   A  I am 28, sir.

24   Q  And where were you born?

25   A  I was born in Lexington, Kentucky, sir.

1    Q   Would you briefly state the schooling that you

2  have had, commencing with your elementary schooling and on

3  down through the present time?

4    A   I enrolled -- I was enrolled when I was six years

5  old in the Lawrenceberg Grade School, Lawrenceberg, Kentucky,

6  and continued my schooling in Lawrenceberg up until the

7  age of 17 when I finished my junior year in high school at

8  Lawrenceberg, Kentucky.  That would have been the year

9  1947.

10    Q   When did you finish your high school work?

11    A   I had finished my senior year of high school at

12  Bellevue  High School at Pittsburgh, Pennsylvania.

13  is a suburb of Pittsburgh.

14    Q   What year was that?

15    A That was 1948.

16    Q   Will you state your college experience, please.

17    A   Finishing up my high school at Bellevue

18  I enrolled at Penn State College in Pennsylvania, where I

19  was sent to the Forestry Extension School at Mont Alto,

20  Pennsylvania.

21    MR. SACHSE:  What extension school?

22    THE WITNESS:  It was Forestry Extension School.

23    MR. SACHSE:  Forestry.

24    Q   BY MR. VEEDER:  And after that period would you

25  state what further education you had?

A   I remained at Penn State for a period of one year.  At the end of my freshman year I transferred to the College of Wooster -- W-o-o-s-t-e-r- -- Wooster, Ohio, where I completed my undergraduate work, finishing --

Q   What was your --

THE COURT:  What year did you finish?

THE WITNESS:  In 1952, your Honor.

THE COURT:  A. B.?

THE WITNESS:  A. B., yes, sir.

Q   BY MR. VEEDER:  Would you state the studies that you pursued while you were at college?

A   At Wooster I pursued the studies of geology.

Q   And a general course in --

A   And general liberal arts requirements, which were required in addition.

Q   Now, upon the completion -- well, while you were at college what particular geological investigations did you undertake?

A   Well, beginning like any geology student I took the courses of physical geology, historical geology.  From these I took the more advanced courses in minerology, petrology.

Q   What is petrology?

A   Petrology is the study of identification of rocks and also their origin.

1    Q   And did you do any special and specific work
2    during your college period from the standpoint of field
3    investigation in geology?

4    A   We also, during our junior and senior years, --
5    the college had a program of independent study.   In the
6    junior year students were assigned various field work
7    problems commencing with, well, elementary field work,
8    field work problems such as pacing compass traverses, then
9    up through plane table work, transit work, general geological
10   mapping, construction of topographic maps.

11   Q   And during that period did you take any specific
12   study in preparation of geological maps or similar work?

13   A   May I ask you, by that do you mean reports, sir?

14   Q   Yes, that is right.

15   A   Or --

16   Q   Right here it says you did.

17   A   That is why I --   During the -- at the end of
18   the junior year, your second semester, a controlled field
19   problem was conducted under the control of the Department
20   whereby each geology major reached his own conclusions on
21   a specific problem that all were working on.   All were
22   working on the same problem, but each had -- could exercise
23   his own approach to it.   In that particular approach --
24   we were studying the glaciation in northern Ohio.

25         Now, during our senior year, each senior geology

1    student was required to take a problem of his own choice --

2    or, if he wanted, he could have one assigned to him by the

3    Department -- for six hours' credit.  Now, this problem, it

4    was left up to the student entirely how he wanted to

5    develop it, pursue it.  It was his baby.  Of course, he had

6    advice from his superiors in the Department.

7          Q   What kind of a geological investigation, from the

8    standpoint of mapping and investigations of that character,

9    did you undertake?

10         A   Well, I undertook a study of the -- well, the

11   title of my paper was, if I can recall it correctly, is

12   "insoluble residue analysis and acid etching as a means

13   of identification of the Pennsylvanian lower Mercer limestone."

14         Q   And what did that entail?

15         A   Well, that entailed -- my problem area covered

16   the County of, I believe it would have been Holmes County,

17   Ohio; somewhere around 400 square miles in area, as I

18   recall.  I would have to check into the paper to make sure.

19   Throughout this county I had studied, mapped, and sampled

                                                       occurred.
20   various outcrops of the lower Mercer limestone wherever it /

21   I was concerned with what elevations it occurred at and,

22   of course, locating these localities on a topographic map;

23   related construction of a completed map.  Samples were taken

24   of the limestone from each locality, brought to the laboratory

25   and treated by various acid tests to reduce everything but

G-3

1    the insoluble residue of that sample.  The insoluble

2    residues which were gathered after dissolving everything

3    else were then studied to see if there was any correlation

4    in the residue material over a wide area.  In other words,

5    if the same residue occurred in every sample

6    comparatively.

7        Q   Now, when you completed your college work what

8    did you do?

9        A   Upon completing my undergraduate in June of 1952,

10   I was employed by the Cerro de Pasco Corporation --

11   C-e-r-r-o  D-e  P-a-s-c-o -- Corporation, an American-owned

12   mining company in Peru, South America.

13       Q   And what did you do while you were in Peru?

14       A   I performed the duties of a mining geologist, sir.

15   My first assignment was to the mine, the coal mine at

16   Goyllarisquisga.

17       Q   I think you had better spell that.

18       A   That is G-o-y-l-l-a -r-i-s-q-u-i-s-g-a.

19       Q   And that is in Peru?

20       A   That is in Peru.

21       Q   When you got down there, wherever this was, what

22   did you do?  What were your responsibilities?

23       A   My primary responsibilities at the Goylla mine --

24   I will refer to it as Goylla -- were to try and determine

25   if there were any chances of encountering new coal reserves --

Walker - Direct                                                    1570

1   by that, new coal tonnage -- to increase the life of the

2   mine.  The coal vein they were working in at the present

3   time was -- the reserves were pretty well-known and plotted.

4   My duties were to study the deposition of these cretaceous

5   coal measures and find out, if possible, if there were any

6   other likeable or reasonable areas for exploration in these

7   measures, to interpret the depositional sequences,

8   possibly shifting centers of the depositions, throughout

9   the area there in the Andes.

10      Q   Now, from the standpoint of geological mapping,

11  what were your responsibilities?

12      A   Well, at the mine, as the assistant geologist

13  working there, I had to, in the course of this investigation,

14  I had to make my own maps, conduct all underground mapping,

15  all surface mapping relating to my work, all surface -- by

16  "surface" I mean both topographic mapping and geologic

17  mapping -- insure that all coal assays were -- coal samples

18  were cut and that the assays were made by the laboratory.

19      Q   What else?

20      A   Guide, advise on further exploration work under-

21  ground, interpret any structural problems which might have

22  been encountered in active mining that was going on under-

23  ground.

24      Q   From the standpoint of surface location and

25  natural phenomena, what kind of mapping did you undertake?

Walker - Direct                                          5747

1          A   Generally, we did our mapping with the plane table

2    and   alidade        whereby we went into the field and

3    actually constructed our own base maps as to mapping

4    topography, drainage; in other words, make ourselves a

5    topographic map.   And on which we plotted our geology as we

6    went.

7          Q   How would those compare with the U.S.G.S.

8    quadrangles with which --

9          A   Well, the base maps which we constructed as to

10   topography would be the same as the U.S.G.S., only they

11   were to different scales.

12         Q   Now, subsequent to the time that you were working

13   in the mines to which you have just made reference, what

14   were your responsibilities?

15         A   Well, while still at Goylla?

16         Q   Yes, sir.

17         A   While still at Goylla, in addition to regular

18   coal exploration, I investigated and checked out reports

19   of mineralization throughout the immediate Goylla region,

20   in other words, within two or three days on horseback,

21   investigated mineralization.   If such reports that were

22   encountered were worthwhile, I went out and mapped them,

23   likewise constructed base maps, mapping geology, mineraliza-

24   tion.   And both at -- on known mineralization occurrences

25   in which we were interested or at the main mine at Goylla

3742

1  recommending the diamond drilling and carrying out diamond

2  drilling.

3      Q   And subsequent to that phase of your employment,

4  what were your duties?

5      A   I believe it was in August, be August of 1954, I

6  was transferred to the San Cristobal Mine, Cerro de Pasco

7  Corporation, as resident geologist to take up the duties,

8  assume the duties of taking care of all the necessary

9  geological work at this mine.  I might further mention, the

10  San Cristobal Mine was the mine which had been supposedly

11  worked out in the 1930's.  The central ore body there had

12  been completely exploited, and the old miners had declared

13  that there were no further mineralization in the area.

14  Subsequent exploration had determined that what they thought

15  was the whole ore body was just the start.  So in the year

16  '54, in the immediate years preceding that, development

17  had been carried on at the mine to put this mine back into

18  a productive, onto a productive basis.  And when I went

19  there in August of '54 we were almost to the point of going

20  into production.  We went into production on the 1st of

21  January, '55.  While at San Cristobal I had an assistant

22  geologist under me and a crew of samplers.

23      Q   What were your responsibilities from the standpoint

24  of geologic mapping and similar work on that?

25      A   Well, at San Cristobal our responsibilities were

1   primarily underground.  We were interested in mapping the

2   known ore bodies and the active exploration and development

3   work as closely as possible, correlating this work to

4   previous surface mapping, surface geologic mapping which

5   had been done, and which we had assured ourselves was

6   correct.  We kept up -- we outlined our own sampling

7   programs, insuring that all samples were, of course, taken

8   down to the assay lab.  We didn't do our own assaying; the

9   mill did the assaying for us.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

We kept assay maps to guide exploration, made our interpretations as to the structural occurrence and control of the ore.

Q  How did you make determination of the structural occurrence?

A  Through the process of the underground mapping, coupled with the previous mapping on the surface, we were able to plot the trend of the ore body, or ore bodies I should say, as they occurred along a major regional fault.  We didn't answer all the questions, of course.  We were in theprocess of learning and finding out what the answers to our questions were.

We were very much interested in finding out the occurrence of the ore, what particular structural characteristics of the fault might have induced the deposition of the ore at certain places, while at other places no ore occurred.  In order to help us in gaining this information, of course, we chose likely spots for diamond drilling which we used whenever we needed it.  We requested crosscuts and general underground development and exploration work.

Q  Is there a correlation between studying diamond drilling and studying diamond drilling and studying well logs?

A  Yes, there is.  In core drilling, of course, you are taking a sample as you go of whatever rock you happen to be drilling in.  In any type of drilling, if you are taking

Walker  Direct
3745

H
Z40

samples, you are analyzing what you are going through, and
you are correlating with known geologic formations or structures
in the region.

Q  Subsequent to that period of employment what have
you done?

A  In the year 1955 I had completed my initial three-
year contract and had come back to the States on leave of
absence to return to the University of Arizona to carry on
a year of graduate study toward a Master's Degree.  So in
the fall of 1955 I enrolled at the University of Arizona as a
graduate student in geology.

Q  And what courses did you pursue in this graduate
study?

A  Courses in optical crystalography, ore finding,
advanced ore deposits, advanced structural geology, petrolography,
polished section work, or I should say identification of ore
minerals and interpretation of occurrence of ore minerals by
use of the microscope by making polished sections.

Q  What field work, if any, did you do, during this
period of advanced study at the University of Arizona?

A  Upon enrolling there, there were certain requirements
that graduate students were required to take in field work.
However, when I enrolled I was released from certain field
studies due to previous experience.

Q  Since your studies at the University of Arizona,

H
Z41

have you done any field work or field geologic mapping?

A   Upon completion of my course work in the spring of 1955-1956, I was waiting for a period of three months before entering the Marine Corps, having enlisted in the OCS program to begin in September.  During that three months I was employed at the Exploration Office in Tucson, the Exploration Office of the Cerro de Pasco Corporation.

Q   Are you still connected with that corporation?

A   I expect upon completion of my service to go back with that corporation.

Q   Would you proceed and state your other experience down to the present time, Lt. Walker?

A   Upon finishing up my summer with the exploration office in Tucson, I reported as ordered to the 17th Officer Candidate School at Quantico, whereupon I underwent twelve weeks of rather intensive training and received my commission in December, 1956.

Q   Have you done any geologic investigation in the United States since returning?

A   Yes.  During the three months that I worked for the exploration office in Tucson, we conducted extensive field work in Nevada and Arizona.

Q   What kind of work was that?

A   We were exploring, mapping and interpreting known mineralized areas that had been brought to our attention and

3747

H

Z42

upon investigating such a property a crew of three of us would go on the property and in most cases we had to map it ourselves, construct our own base maps, general topography, drainage, any features of topographic nature, plot our geology upon these maps, investigate any underground workings on the property, if any existed, sample the property, plot any sampling that we did on the base map to construct an assay map.

Then upon completion of all our studies we would interpret the geologic structure as we thought it existed, and if we thought the body was economically feasible we would recommend further investigation.  If this was the case, before leaving the property, we would lay out a program of diamond drilling.

Q   When did you first come to Camp Pendleton?

A   I came to Camp Pendleton originally in October, 1957.

Q   And what is your acquaintance with the Santa Margarita River watershed?

A   Upon being assigned to Camp Pendleton I was further assigned to the Office of Ground Water Resources.

THE COURT:  You don't mean to tell me that after you were commissioned in the Marines and you had some knowledge maybe of soil, water, minerals and geology, they put you to work?

THE WITNESS:  Yes, sir.

H
Z43

1          THE COURT:  I understood that the Army, the Navy and

2    the Marines always proceeded on the basis that if a man knew

3    something about carpentry they put him to work as a dentist,

4    and if he knew something about law they put him to work in the

5    stables or barns, and if he knew something about geology they

6    made him a cook.  As far as I know you are the great exception.

7          THE WITNESS:  Yes, sir.  I think so, sir.

8          MR. VEEDER:  The exception makes the rule.

9          THE COURT:  All right.  You were assigned to the Office

10   of Ground Water Resources?

11         THE WITNESS:  Yes, sir.  Upon being assigned there, I

12   was briefed on what my duties were to be, and immediately at

13   that time began a study of the Santa Margarita River water-

14   shed.  Of course, I was taken in hand at first, told where

15   the watershed was and led around so I wouldn't get lost.  But

16   after that it was my duty to conduct surface investigations

17   of the surface geology throughout the watershed, and par-

18   ticularly in that area lying between the Elsinore fault zone

19   and the confluence of DeLuz Creek with the Santa Margarita

20   River.

H2   21         Q  What investigations, if any, did you make in the

22   upper watershed of the Santa Margarita River?

23         A  Those investigations that were made in the upper

24   part of the watershed were connected with surveys made for

25   private owners who had made requests to the Office of Ground

Water Resources for engineering surveys.

Q  Do you recall the number of private properties that you investigated and the phase of that work, Lt. Walker?

A  Of the total number of engineering reports which we turned out on which I have done the geology reports within them, I think approximately 30 that have been sent out I have done the geologic work, and there are numerous others, I think possibly 15 or 20, which have not been completely finished as yet.

Q  Generally speaking, when you undertook an investigation in the Santa Margarita River watershed of private properties, what would be the scope of that investigation?

A  First of all, we would locate the property on our topographic maps so we would know where we were.  Then either separately or together, jointly, we would go on the property. By jointly I am referring to the engineers and the soils men also.  At times we worked together; at times we worked separately, depending on our transportation et cetera.  We would go on the property, and in my particular job I would look over the property, first of all, to determine what rock units we had on the property, what the general geology of the property was.  If several units or more than one unit was encountered, of course it was mapped.

Q  When you say "units", what do you mean by "units"?

A  For instance, two different rock types.

H2

Z45

Q   When you use the term "rock," what do you mean?

A   I am using "rock" in a general sense.

Q   Would that include alluvium?

A   Yes, it would.  But I probably should say, for simplicity, referring to all consolidated material as rock, and the other as alluvium.

I made my field sheets, conducted my field mapping on topographic maps with the aid of aerial photographs.  In our reports any bodies which were delineated were delineated on an overlay on the aerial photographs.  In addition, the reports carried a description of the alluvium or rock units.

Q   What other investigations did you make in the upper areas of the Santa Margarita River watershed, with particular reference to Plaintiff's Exhibit No. 15, which is the exhibit designated "Geologic and Hydrologic Map"?

A   By "other" you mean other properties, sir?

Q   Did you study any areas other than the ones to which you have made reference, or was there a general study that you made in any particular area?

A   Generally, I have become familiar in the course of working with private properties throughout the watershed, you would have to become more or less familiar with the general geology of the whole upper watershed.

MR. VEEDER:  For the purpose of identifying the areas in which Lt. Walker performed his services, I am placing a

1  copy of the base map on the board, which will show the general

2  outline of the watershed.

3      Q  Would you state generally where you made your most

4  intensive studies of the geology of the Santa Margarita River

5  watershed, Lt. Walker?

6      A  Shall I step to the map and indicate?

7      Q  Yes.

8      A  (Stepping down and indicating)  My most intensive

9  work has been south and west of the red line indicated on this

10  plan.

11      MR. VEEDER:  After it is identified, I am going to ask

12  leave, your Honor, to have the same red line put on to 15, if

13  it is permissible.

14      THE COURT:  All right.

15      MR. STAHLMAN:  I think the record should show that Mr.

16  Veeder has taken out a map and placed it on the board that

17  does have some red lines on that is a base map.

18      MR. VEEDER:  I think I have already said that.

19      THE COURT:  Yes.  He is going to have this same red

20  line put on.

21      MR. VEEDER:  I don't want to offer another exhibit. I

22  want to put this on 15, if I may.  I want your Honor to see

23  what he did.

24      THE COURT:  We will assume that he is talking about 15.

25      THE WITNESS:  This area south and west of the red line,

H2

Z47

1    commencing within Riverside County and what is known as the

2    Santa Rosa Grant, I believe, on the Vail Ranch and working

3    downstream-- not downstream but south and west to the con-

4    fluence of the Santa Margarita River and De Luz Creek.  Generally,

5    that is the area of my most intensive investigation.

6    BY MR. VEEDER:

7        Q  With whom did you work during the period of this

8    intensive investigation, Lt. Walker?

9        A  Such work was carried on by myself.

10       Q  Did you work at any time in cooperation with the

11   U.S. Geological Survey?

12       A  In the upper watershed, of course, I have gone and

13   investigated certain areas under or in cooperation with them

14   or under their supervision.

15       Q  And who were the members of the Geological Survey

16   with whom you worked?

17       A  Mr. Kunkel.

18       MR. VEEDER:  With your Honor's leave, during the

19   recess we would like to have the red line that is shown on

20   this base map to which you made reference placed on 15.

21       THE COURT:  It may be done.

22       The base map you are referring to is the same base

23   map as Exhibit 15.  That will prevent our having an additional

24   exhibit.

25       MR. VEEDER:  That is correct.  We will simply withdraw

1    that when we are through.

2         We are going to have another witness who will draw

3    another line, who did the work on Camp Pendleton itself.  But

4    that witness we will call subsequently.

5         THE COURT:  He can put on another line.

6         MR. VEEDER: That is correct, your Honor.

7    BY MR. VEEDER:

8         Q  Now, what kind and type of investigation did you

9    perform when you went into the field and studied the geology

10   of the area which you have delineated into the record?

11        A  First of all, of course, one had to become completely

12   familiar with the area.  To this extent and through the in-

13   vestigation, topographic maps prepared by the U. S. Geological

14   Survey were used as a base map and control for mapping. I

15   went into the area where possible by Jeep or on foot or horse-

16   back.  I have flown into isolated areas.  I covered it

17   throughout one way or another.

18        Q  I hand you Plaintiff's Exhibit marked 67 for Iden-

19   tification and ask you to state into the record or rather

20   read into the record the statement contained in the title

21   block, if you would, please.

22        A  Shall I refer to it by number?

23        Q  If you would, please.

24        A  Plaintiff's Exhibit 67, the title block is "DeLuz

25   Watershed Geology Office of Ground Water Resources, Marine

Base, Camp Pendleton, California."

Q   Would you state who prepared that identification?

A   This plan was prepared by myself.

Q   What was it based upon-- the investigations that you have made?

A   The plan was based completely upon the investigations made by myself in the field and mapped by myself in the field, using 7½-minute quadrangle maps as a base.

Q   Would you state into the record the legend and what the legend purports to disclose?

A   The legend in the column on the left shows the word "alluvium," as indicated by a yellow block, a block colored in yellow, with the letters "Qal."  Below that, colored in brown, with the letters "QR" identifying residuum.

Q   What do you mean by "residuum"?

I-1   ML j

1      A   The residuum is that material formed in place by the decomposition/underlying basement complex.
**of the**

2      the decomposition/underlying basement complex.

3      Q   How would you distinguish that from alluvium?

4      A   Residuum has not been transported.  Colorwise, it

5      has frequently got a darker color.  Frequently, it is of a

6      higher clay content.

7      Q   Higher clay content than what?

8      A   Than the alluvium.  It will also show in a good

9      exposure.  It will show a gradiation upwards from the

10     basement complex to the upper portions of the residuum.  It

11     will show a lessening or more complete decomposition, in

12     other words, a tapering down -- a tapering upwards from

13     coarser fragments up to finer fragments.

14     THE COURT:  Decomposed granite would be an example

15     of that, would it not?

16     THE WITNESS:  That is the general term used, yes, sir.

17     Q   BY MR. VEEDER:  D. G.

18     Is this map accurate, to your own personal

19     knowledge?

20     A   This map is accurate to my own personal knowledge.

21     MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

22     No. 66.

23     MR. SACHSE:  May I inquire for a moment, your Honor?

24     THE COURT:  Yes.

25     MR. SACHSE:  You said you prepared this map, Lt.

Walker?

THE WITNESS:  I have mapped the geology shown on this map, yes, sir.

MR. SACHSE:  Who is J. M. Olsen?

A   She is the draftsman who did the drafting.

Q   And who is J. L. Groff?

A   J. L. Groff is a captain formerly in our office, an engineering officer who had the base plate prepared from the seven and a half-minute quadrangle maps.

THE COURT:  This plate here is the plate on all -- is on the base map before you did the geology work, is that right?

THE WITNESS:  Yes, your Honor.

THE COURT:  The same situation we had on the other, Exhibit 15?

MR. SACHSE:  I have just one more question.  There are other items that you, of course, have not testified to. That is what I want to get here; these notations of streams, and so on.  Now, did you do that work on the map or did someone else?

THE WITNESS:  Yes, sir.  I did not getto complete --

MR. SACHSE:  You located all those other facts, as well?

THE WITNESS:  Everything shown in the legend.  Shall I go ahead and --

1    MR. SACHSE:  That is all.

2    MR. VEEDER:  That is the same.  I will withdraw it.

3    THE WITNESS:  Why don't I go right ahead and complete

4    with the legend.

5    MR. VEEDER:  I would like to make the offer, if I

6    may, and get it in evidence.  Then you can testify from it,

7    Lieutenant.

8    THE COURT:  67 will be received in evidence.

9    MR. VEEDER:  Mr. Luddy, would you mark the exhibit?

10   We withdraw the uncolored exhibit that was lodged with the

11   Court.

12   Q   Now, would you step to the easel, Lieutenant.

13   I will interrogate you in regard to the matters which appear

14   on Plaintiff's Exhibit No. 67.  First, would you state the

15   physical features which appear on it and to which reference

16   is made in the legend appearing in the lower right-hand corner

17   of the exhibit?

18   A   The physical features appearing, to start with the

19   legend on the right-hand side:  an enclosed circle blackened,
                              an
20   with/irregular line from the bottom, shows a perennial

21   spring.  An open circle of the same configuration shows

22   an intermittent spring.  A small circle enclosed in a larger

23   circle identifies a camp supply, domestic, and/or irrigation

24   well.  An open circle, a single circle, indicates a test

25   or unused well.

1      Q   Now, what are the other features that appear on

2   the map from the standpoint of creeks and streams?

3      A   Well, of course, the streams are shown by a

4   dash and three dots, two or three dots.  The symbol should

5   be three, but the draftsman slipped up.  That is an inter-

6   mittent spring, and the -- intermittent stream, pardon me,

7   and the solid line along the stream is also used for

8   perennial -- a solid line is used as perennial stream.

9      Q   How do you evidence the points of rising water?

10     A   May I make one note?

11     Q   You may.

12     A   One statement right here.  On the base plate, as

13  we have prepared it, in certain areas a solid line is used

14  to indicate a stream, a perennial stream.  Where this has

15  happened, I am not always in agreement by my mapping, and

16  I have indicated differently, which we will go into by

17  color.  But this has resulted from copying off of seven-and

18  a half-minute quadrangle topographic sheets.   In other words,

19  the draftsman has taken a straight off feature with which I

20  am not in complete accord.

21     THE COURT:  What do you mean by line of section?  Do

22  you have any statement?

23     THE WITNESS:  The line of section is indicated by

24  the long, broken -- or dashed line.  I have constructed

25  cross-sections your Honor.

1      THE COURT:  Oh, up the bottom of the --

2      THE WITNESS:  Yes, sir, along the line of the drain-

3 age.

4      MR. VEEDER:  At this point I would like to bring to

5 your Honor's attention and to the attention of counsel at

6 this time the point of rising water as shown on Plaintiff's

7 Exhibit No. 67 is somewhat higher.  I am referring now to

8 the main stem of De Luz Creek is somewhat higher than appears

9 on the copies of the maps which were lodged with the Court.

10 I don't believe it makes a great deal of difference, but

11 we have had new maps made, and they will be available for

12 distribution.  The fact is, --

13      THE COURT:  How many?  I see on my map, my copy, two

14 points of rising water.

15      MR. VEEDER:  I will have the Lieutenant explain it.

16      Q   Would you step --

17      A   These points of rising water, those are the only

18 two, your Honor, upon the, on Plaintiff's Exhibit 67, or

19 Exhibit 67.  The one on the main, or on the De Luz Creek,

20 upon rechecking plans and work, making sure everything had

21 been drafted correctly, an error was found in drafting, which

22 either I was responsible for not previously checking or else

23 it had been unnoticed.  Anyway, it was felt desirable to make

24 that correction and have it as known or as exists.

25      THE COURT:  My copy is corrected, and the one on the

1    board is correct?

2            THE WITNESS:  Yes, your Honor.

3            MR. VEEDER:  And I am handing to counsel corrected

4    copies.

5            MR. MOSKOVITZ:  Do I understand, Mr. Veeder, the map

6    you just handed us is to replace the one we previously

7    received?

8            MR. VEEDER:  Right.

9            MR. SACHSE:  That changes that, Mr. Veeder.

10           MR. DENNIS:  I made that change on that, Bill, if

11   that is the only change.

12           MR. VEEDER:  That is the only change.

13           MR. SACHSE:  If that is the only change, then I will

14   give it back to you.

15           MR. VEEDER:  It is just a matter of location.  We

16   didn't want anyone unhappy.

17           THE COURT:  What am I getting this one for when I got

18   the correct one?

19           MR. VEEDER:  They are here if anyone wants them.

20           THE COURT:  Good time for recess?

21           MR. VEEDER:  I think it is as good as any, your

22   Honor.

23           THE COURT:  Take a short recess.

24           (Recess.)

25

1       MR. VEEDER:  Would it be permissible, your Honor, to

2  permit Mr. Walter Hofmann to leave the court?

3       THE COURT:  Yes, he is excused subject to call.

4       MR. HOFMANN:  May I say that I made the notations on

5  the quadrangle sheets pertaining to the gaging station, your

6  Honor.

7       THE COURT:  Thank you.

8       MR. VEEDER:  Also, one additional fact before you leave,

9  Mr. Hofmann.

10       MR. HOFMANN:  Yes.

11       MR. VEEDER:  The location-- now referring to Plain-

12  tiff's Exhibit 23-- which is the gaging station Santa Margar-

13  ita River near Fallbrook, California should read "33 degrees

14  23 minutes 54 seconds;" is that right?

15       MR. HOFMANN:  That is correct.

16       MR. VEEDER:  Now referring to the location.

17       MR. HOFMANN:  The manuscript description is incorrect

18  in that respect, and the field station description correctly

19  gives the latitude as 33 degrees 23 minutes 54 seconds.

20       THE COURT:  Don't you think, gentlemen, that the

21  manuscript description should be corrected?

22       MR. VEEDER:  If it is agreeable, we will change it.

23       MR. MOSKOVITZ:  Are you looking at us, your Honor?

24       MR. VEEDER:  He said "gentlemen."

25       THE COURT:  Yes.  Correct it also before you leave,

1    if you will.  Put your initials on the side.

2            That is what exhibit you are correcting?

3            MR. HOFMANN:  Exhibit 23, your Honor.

4            THE COURT:  All right.

5            MR. DENNIS:  I think, too, I should call your Honor's

6    attention to the fact that there are two gaging stations on

7    the O'Neill ditch used for recording low flows, which the

8    witness has indicated is the position of the gaging station,

9    the one on the topographic map being used for low flows from

10   October, 1935, to November 201, 1955, and the one which he has

11   placed upstream on the O'Neill ditch recording the higher

12   flows during the same period.

13           THE COURT:  All right.

14           THE WITNESS:  If I may correct that statement, your

15   Honor.  At the present time there is only one gaging station

16   being operated on O'Neill Ditch.  After November 21, 1955,

17   the upper station was improved so that it could measure the

18   entire range of flow, and that lower station was used for low

19   flows only for the period indicated, October, 1935 to November

20   21, 1955.

21           THE COURT:  All right.

22

23                   GILES WALKER,

24   recalled as a witness in behalf of the plaintiff, having been

25   previously sworn, testified further as follows:

3763

J

Z52

DIRECT EXAMINATION (Resumed)

BY MR. VEEDER:

Q   Now, Lt. Walker, would you step to the Exhibit No. 67 and describe the points where the main stem of DeLuz Creek has its source?

A   Do you have an overlay?

(Mr. Veeder handing item to the witness.)

A   DeLuz Creek rises on the Santa Rosa Grant between Mesa de Colorado and Abana Loco Mesa in the western portion of Section 28 of Township 7 South, Range 4 West.  I might say at this point that by the projection within the township and range it might vary either into Section 28 or 29, depending upon the projections.  There are no projected lines across there and we are making our own projection right here by putting the township lines across the area.

THE COURT:  Put your finger on the tributary at the head of DeLuz Creek.

THE WITNESS:  (Indicating.)

THE COURT:  That broken line down there is your section line?

THE WITNESS:  Yes, sir, your Honor.  It partially obscures the channel of the stream as shown on the plan.

BY MR. VEEDER:

Q   From that point of commencement would you pursue the course of the stream down through the Santa Rosa Grant,

J

Z53

describing the kind and type of terrain through which it flows?

A   From this point of origin the stream proceeds in a southerly direction down a steep and in places almost precipitious gradient which is within the basement complex.   The stream channel has been incised into the basement complex and is generally flowing on the basement complex or else the stream channel has a spotty or thin irregular veneer of coarse or fine alluvium, just depending.   It is spotty, not always present, and irregular in nature.   The stream course, as previously stated, is steep and in places almost precipitous.

Q   Proceeding on down then?

A   The channel is characterized by the description just noted until it gets down near the Riverside County-San Diego County line in the southeast quarter of Section 17 as projected of Township 8 South, Range 4 West.   At this point minor alluvial material is encountered in the stream channel.   This alluvium is coarse to fine in character and was shallow in depth and is of limited lateral extent.   The stream channel here again is incised below some rather steep hills, below the peaks of the near lying steep hills.

Q   What is the kind and type of vegetative cover that is found through that area?

A   Throughout this area the cover is native grass and brush, and along some of the slopes coming off-- I have to

refer to one of the topo sheets to find what the mesa above
is, but occasional slopes are found characterized by sparse
and dwarf oak growths and native grasses.  Otherwise, it is
generally brush covered.

Q   And proceeding on down the main stem of the stream,
would you describe the alluvial deposits that are shown
there and other physical characteristics of the valley?

A   Proceeding downstream from the Riverside County-
San Diego County Line in Section 20 of Township 8 South,
Range 4 West, the channel is characterized in this portion by
coarse alluvial deposits.

Q   When you say "this portion"--

A   In this portion in Section 20, by coarse alluvial
deposits up to boulders in size, and also accompanying finer
deposits of alluvium.  The alluvial bodies are confined
within relatively narrow limits by steep cliff walls-- I
shouldn't say cliff-- by steep hills on either side of the
stream bed.

Coming on downstream, the alluvium progressively be-
comes of a finer nature.  At all times it is restricted
laterally by the hills rising both to the northwest and
southeast of the stream channel, until we get down to the
confluence with Cottonwood Creek.

Where Cottonwood Creek joins DeLuz Creek a minor fan
area has been built up of alluvium which has come down in

1    former times from Cottonwood Creek, developing a rather limited

2    plain and deeper area of alluvium, again restricted on all

3    sides by the sharply rising hills, both to the west, north and

4    more gently rising hills to the south.

5         Q   How do those hills compare from a geological stand-

6    point?

7         A   To the west these hills are what has been mapped and

8    colored in as basement complex.

9         Again, immediately north of the area in Section 29 of

10   Township 8 South, Range 4 West, in the area immediately north

11   of the alluvium, a minor area of residuum is encountered

12   along the stream, and beyond that we are again in the basement

13   complex.

14

15

16

17

18

19

20

21

22

23

24

25

1    A   To the south of this fan area residuum is

2  encountered overlying the low hills, and to the east a minor

3  area of the residuum is encountered, and again the basement

4  complex on the hills, or underlying the hills.

5    Q   Would you describe the main stem of De Luz Creek

6  at that juncture?

7    A   At the juncture of Cottonwood Creek and De Luz

8  Creek the alluvium is of -- the junction, the confluence, is

9  an alluvial area immediately -- not immediately -- but

10 within approximately a tenth of a mile downstream from the

11 confluence the stream channel is characterized by basement

12 complex appearing in the stream channel.  From this portion

13 down --

14    THE COURT:   Confluence with what?

15    MR. VEEDER:   Cottonwood Creek.

16    THE WITNESS:   Below the confluence of Cottonwood

17 Creek and De Luz Creek, your Honor; approximately one-tenth

18 of a mile down.  This basement complex is exposed from the

19 incising action of the De Luz Creek which has cut through

20 the alluvial deposits exposing the underlying basement

21 complex within the stream channel.  Coming downstream from

22 this fan area, the stream channel is characterized through-

23 out, underlying the principal drainage, characterized by

24 basement complex material, with minor alluvial material on

25 either side, on either side of the stream channel.  The

1    stream channel is limited both to east and west by low-

2    lying hills covered by residuum, and farther removed from

3    the stream, again the basement complex.

4        Q   BY MR. VEEDER:   Now, from that point, proceed

5    to describe the valley as you progress down.

6        A   Coming on down?

7        Q   Yes.

8        A   Down this way?   From the confluence of De Luz

9    Creek with what is noted on Exhibit 67 as the east fork of

10   De Luz Creek, the stream channel continues with the stream

11   having incised through the thin alluvium material present

12   in the channel, and the basement complex again is exposed

13   generally throughout down the stream channel to a point in

14   Section 5 in the northwest quarter of Section 5, Township

15   9 South, range 4 West.   Throughout this strip from the

16   confluence of the De Luz Creek with the east fork, down to

17   Section 5, the stream channel is a confined channel.   And

18   as to lateral extent, minor alluvial material located on

19   either side of the drainage, and basement complex exposed

20   intermittently, mixed in with minor or spotty alluvial

21   deposits down the channel.   To the west, residuum is en-

22   countered on low-benched areas.   And farther west, basement

23   complex is present.   To the east, the residuum again is

24   encountered on low-benched areas with the basement complex

25   underlying the hills, more remotely located, removed from

the stream.  In Section 5, in the northwest quarter of
Section 5, Township 9 South, range 4 West, again we are at
the confluence of De Luz Creek with an unnamed tributary,
where a small, where a minor, another fan area has been
developed in the geologic past.  This area is marked in by
alluvium and is depicted or delineated by a dashed line
to the south and west.

THE COURT:  Colored with yellow.

THE WITNESS:  Colored in yellow, yes, your Honor.

THE COURT:  On Exhibit 67.

THE WITNESS:  On Exhibit 67.

Now, this area is an area of fan alluvial -- it
is an old fan which has been washed down and deposited and
in the present process of nearly having been stripped off
again by subsequent erosion, erosive processes with the
result that spottily located throughout -- we are alternat-
ingly in coarse alluvial material, bouldery in nature, and
minor residual material, which is spotted in it.
Generally, the area has been considered as an alluvial
area, but is of a shallow  extent.  To the east of the
stream in Section 5, residuum is present immediately ad-
jacent to the stream channel on the more low-lying areas
along the stream, with the basement complex again underlying
the hills more remotely located.  The channel itself below
the alluvial, the fan area, is sharply delineated by the

1  hills rising both to the east and the west.  At the

2  southern boundary of Section 5, Township 9 South, range

3  4 West, on Exhibit 67, De Luz Creek enters the Naval

4  Reservation at Camp Pendleton.  As it crosses and flows

5  south on Camp Pendleton, the stream channel, the alluvial

6  material, is delineated throughout this area by rather

7  steeply rising hills, both in the east and west, hills

8  composed of basement complex.  In Section 20 of Township

9  9 South, range 4 West and likewise in Section 29 of

10  Township 9 South and range 4 West, a minor residual area

11  again is encountered east of the stream on old, remnants

12  of old benches lying low, of erosion benches lying along

13  the eastern portion, the eastern side of the stream.  The

14  basement complex, again, exists to the west of the stream.

15  The alluvium throughout this course, the course of the

16  stream, from the southerly portion of Section 5, Township

17  9 South, range 4 West, down to the lowerportion of the map

18  in Section29 of Township 9 South, range 4 West, the alluvium

19  is generally of a fine, of finely sorted alluvium.

20  Q  BY MR. VEEDER:  Now, turning to the properties of

21  the Vail estate, would you describe the stream, other streams

22  that rise there and which contribute to the flow of De Luz

23  Creek.  Proceeding eastward, what is your next stream?

24  A  Proceeding eastward from De Luz Creek, approximately

25  six -- well, let's locate that.  Approximately one-half to

1    one mile east of De Luz Creek, depending upon where you

2    make your measurements, there is an unnamed tributary.

3              THE COURT:  Put your ruler on it, so we can see what

4    you are talking about.  The end of your ruler.  Which one

5    are you talking about?

6              THE WITNESS:  Oh, I am sorry.  This one right here,

7    sir.

8              THE COURT:  All right.

9         Q  BY MR. VEEDER:  Refer to the stream, if you

10   would, as it relates to the residuum that you marked on --

11        A  It is the stream flowing through the easternmost

12   body of residuum located in Section, the northwest quarter

13   of Section 15, Township 8 South, range 4 West projected.

14             THE COURT:  Does it have a name?

15             THE WITNESS:  It is an unnamed tributary, your Honor.

16        Q  BY MR. VEEDER:  Would you state whether you have

17   observed water flowing in that stream?

18        A  I have observed water flowing on this, in this

19   stream during the spring of this year.

20        Q  And would you describe the two areas of residuum

21   that you have observed that you have depicted on Plaintiff's

22   Exhibit No. 67, one of which is traversed by the unnamed

23   stream and the other lies immediately to the west of it?

24        A  These areas of alluvium -- correction -- residuum

25   are gently rolling in places almost nearly level, remnants

3772

Walker Direct

of an old erosion bench lying above the main course of De Luz Creek. Topographically these areas would be approximately 100 feet in elevation above the De Luz Creek.

Q   At which point?   The point nearest to the --

A  Well, at the point nearest the bend here, which would be at the bend shown on Exhibit 67 in the southwest quarter of Section 9, Township 8 South, range 4 West projected. I say 100 feet from memory. It could be more accurately determined on a topographic map. The residuum in this area appears to be well decomposed. It is relatively free, completely of outcrops of basement complex, basement complex material. As I recall, there are oak trees. My tree identification is not necessarily certain; which grow sporadically across the area; and native grasses are dominant across the area. Around the areas brush, growths of brush are prominent and in places impenetrable. The area itself almost looks as if it at some time had been cleared.

Q  All right. Now proceed on down from the point of your last description of the stream down to the stream's confluence with the De Luz Creek or the east fork of that stream?

A  From where the stream departs, the easternmost body of residuum, in the northwest quarter of Section 15, Township 8 South, range 4 West, of Exhibit 67, from this point the stream flows in an area of basement complex

1  progressively becoming more incised into the basement

2  complex as we progress down the stream to the south.  After

3  entering San Diego County the stream continues flowing

4  through the basement complex until we reach the northwestern

5  quarter -- the northwestern quarter of the northwestern

6  quarter of Section 28, Township 8 South, range 4 West,

7  where the stream enters upon alluvium.  From this point the

8  stream flows, well, the stream channel is underlain by

9  alluvium, continuing southward to its confluence with the

10  east fork of De Luz Creek in the southwestern quarter of

11  Section 29, Township 8 South, range 4 West.

12      Q   Now, would you describe the east fork of De Luz

13  Creek from the point where it rises on the Vail estate,

14  Vail Company properties, on down to that stream's confluence

15  with the main stem of De Luz Creek?

16      A   The east fork of De Luz Creek rises in the south-

17  eastern quarter of Section 25, Township 7 South, range 4

18  West projected on Exhibit 67.

19      THE COURT:  Show me where with your ruler, where it

20  rises.  All right.

21      THE WITNESS:  In this area, your Honor.

22      THE COURT:  All right.

23      THE WITNESS:  This point, as I recall, is just to the

24  north or northwest of Mesa de la Punta.  I would have to

25  check my recollection to make sure, but I believe that is

1    the mesa line to the southeast.  From this point the stream

2    flows for a short distance westerly where it turns to the

3    south, flowing at all times in an area of basement complex.

4    I use the term "flowing" loosely.  I should probably say

5    the stream channel exists and continues through an area of

6    basement complex with a steep to precipitous gradient quite

7    characteristic in the upper portions.  Proceeding southward,

8    the stream remains incised in the basement complex to a

9    point where it enters the area where it enters upon the

10   upper edge of the residual area in the south half of

11   Section 14, Township 8 South, range 4 West projected.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

At this point the stream is surrounded by minor areas of residuum to the east and to the west, continuing to the southwest in an incised stream channel, a short distance after entering the residual area, a distance of approximately .35 of a mile.  At this point the stream channel begins to be characterized by fine to coarse alluvial deposits deposited in a very restricted ribbon, restricted laterally, a minor ribbon of alluvium in the channel as it progresses southwesterly across this residual area.  Both to the east and west of the minor alluvium and the stream channel and east and west of the residuum, basement complex underlies the area.

Proceeding to the southwest, the stream remains a laterally very restricted channel and restricted alluvium. The lateral width of the alluvium is rather restricted.  The width would be approximately 100 to 200 feet, and in places even less, to where the stream enters San Diego County and leaves Riverside County in Section 22 of Township 8 South, Range 4 West.

After entering San Diego County the stream continues to the south around a deeply incised meander in the stream, proceeds further to the southwest to the northeast quarter of Section 28, of Township 8 South, Range 4 West.  At this portion of Section 28 on Exhibit 67 the stream channel widens itself laterally and is characterized by alluvium, or rather fine natured alluvium, fine to medium grained, medium textured

Walker    Direct                                3776

L

Z57

1    The stream channel in Section 28 in width is approximately a

2    thousand feet, give or take a little.

3         To the northwest of the stream and to the southeast

4    of the stream the alluvial limits are sharply delineated by

5    the hills of basement complex which rise on either side.

6    Small bodies of residuum likewise are encountered in Section

7    28 along low terraces and benches of minor extent to the

8    northwest of the stream.

9         Proceeding southwest along the alluvial channel, we

10   arrive at the confluence of the east fork of DeLuz Creek with

11   the previously described and unidentified stream coming in

12   from the north in the Southeast Quarter of Section 29 of

13   Township 8 South, Range 4 West.  From this confluence the

14   east fork of DeLuz Creek continues to the southwest to its

15   confluence with DeLuz Creek in the northwest quarter of

16   section 32 of Township 8 South, Range 4 West.

17        Q  Would you describe the areas of residuum which are

18   depicted on Plaintiff's Exhibit 67 and lying westward of that

19   stream, particularly in the area where Camps Creek rises and

20   flows down to its confluence with the main stem of De Luz

21   Creek?

22        THE COURT:  Are you referring to the area west of DeLuz

23   Creek itself?

24        MR. VEEDER:  That is correct, your Honor.

25        THE COURT:  He described that already.

1          MR. VEEDER:  I don't believe he described where Camps

2     Creek rises and flows down across there.

3          Q   Would you describe Camps Creek and the area that

4     it traverses?

5          A   In Sections 30 and 31--

6          Q   The source of Camps Creek, to begin with.

7          A   Commencing at the source of Camps Creek in the

8     Northeast Quarter of Section 23 of Township 8 South, Range 5

9     West, from this point Camps Creek flows south and east through

10    an area of basement complex.  The stream channel is incised

11    into the basement complex, with the hills rising rather

12    steeply and precipitously along the stream course both to the

13    east and west.

14         THE COURT:  Are you talking about Camps Creek?

15         THE WITNESS:  Yes, your Honor.

16         THE COURT:  On my map it doesn't seem to run out of

17    Section 25.  You said Section 23.

18         THE WITNESS:  My error, your Honor.  Your Honor is

19    correct.  Camps Creek rises in the Northwest Quarter of

20    Section 25.  I got myself confused.

21         In the Northwest Quarter of Section 25, Township 8

22    South, Range 5 West, Camps Creek originates and flow south-

23    easterly through the basement complex in an incised channel

24    to where it arrives and begins traversing the residual area

25    in Section 30 of Township 8 South, Range 4 West.

L

Z59

North and south of Camps Creek, in Section 30, the residuum occupies an area of mild relief, crisscrossed--

BY MR. VEEDER:

Q  What do you mean by "mild relief"?

A  Mild relief I am using in a comparative sense, compared to the steeply rising hills and sharp topography further to the west-- now right offhand I can't give you a percentage exactly for the area-- gently rolling or gently inclined area, inclined to the southeast.

The residual area exists both north and south of the stream and is crisscrossed by minor tributaries to Camps Creek, which are not shown on the base map or on the plan. Each of these minor tributaries, of course, has incised itself into the residuum, creating sharp ups and downs as you traverse the area walking.  The area is characterized by the decomposed residual material and by brush.

Proceeding along Camps Creek to the south and south-east, we come to the East Half of Section 31 of Township 8 South, Range 4 West.  In this particular area Camps Creek flows through a small area of basement complex and enters the residual area immediately adjacent onthewest to De Luz Creek.

Camps Creek joins Fern Creek in the extreme western portion of Section 32 of Township 8 South, Range 4 West, and after having joined Fern Creek the two continue on to the southeast across the residuum and joins De Luz Creek.

L

Z60

Q Now, would you briefly describe the sources of Cottonwood Creek and the sections in which they rise and trace that down to the confluence with DeLuz Creek, referring to any structures or controls that you found on that stream?

A Cottonwood Creek rises in Section 13 of Township 8 South, 5 West, and flows south and easterly down a rather precipitous gradient incised into the basement complex down into Section 19 of Township 8 South, Range 4 West and to the Northeast Quarter of Section 19-- well, the south half of the northwest quarter, generally. At this portion it is joined by a major tributary, an unnamed tributary from the west. From this point in Section 19, Cottonwood Creek continues down through the basement complex to where it enters coarse alluvial material in the Southwestern Quarter of Section 19 of Township 8 South, Range 4 West, on Exhibit 67. Approximately .15 hundredths of a mile below where it enters the alluvium in Section 19, it is joined by another principal but unnamed tributary from the north.

From this point in the Southwest Quarter of Section 19, Cottonwood Creek flows or continues along an alluvial channel to the southeast into Section 30 of Township 8 South, Range 4 West. In this particular area in Section 19 and the Northern Half of the Northeastern Quarter of Section 30 the channel is limited in extent. The alluvium is of a coarse nature and the hills rising to the northeast and southwest are of basement

L

Z62

to the southwest and northeast of Cottonwood Creek in Section

30 the basement complex rises rather steeply, with the

alluvium sharply delineated by the rising hills of the basement

complex.

Q   Would you describe the point where Fern Creek rises

and trace its course down the main stem of De Luz Creek?

A   The headwaters of Fern Creek are in the West Half

of the Southwest quarter of Section 36 of Township 8 South,

Range 5 West.

M-1 ML j

Q   From the point of origin the channel proceeds easterly through the basement complex along a precipitous stream channel, stream gradient, which, progressing eastward, the channel flattens in its gradient, proceeding eastward to channel the stream enters Section 31 of Township 8 South, range 4 West, where it continues through the basement complex to the eastern -- to the northwestern quarter of the southeast quarter of Section 31; where it traverses the residuum immediately adjacent to the west of the De Luz Creek.  In the extreme western half or western portion of Section 32 at this point, the extreme western portion of Section 32, Township 8 South, range 4 West, Fern Creek joins Camps Creek.  And from this point they flow together a short distance to the southeast and join De Luz Creek.

THE COURT:  This is where I came in.  I heard this before.  You covered that once before.

THE WITNESS:  Yes, your Honor; the lower portion, I did.

Q   BY MR. VEEDER:  Roblar Creek.  Kindly describe the sources of water for that and trace it briefly.  Give a brief description of it down to the confluence of the De Luz Creek.

Do you need a drink of water?

A   I could use one.  Thank you.

1  MR. VEEDER:  We have been discriminated against here.

2  MR. STAHLMAN:  Did you order water?

3  MR. VEEDER:  We have got to keep the boy in condition

4  here.

5  THE COURT:  This is the first time you have testified

6  in court?

7  THE WITNESS:  Yes, your Honor, it is.

8  THE COURT:  Well, for the rest of your life you will

9  be able to give as one of your qualifications that you

10 testified in the Federal Court, United States vs. Fallbrook.

11 THE WITNESS:  Shall I proceed with the answer, your

12 Honor?

13 THE COURT:  Go ahead.

14 Q   BY MR. VEEDER:  Take Roblar, then.

15 A   Roblar Creek rises in the southwestern quarter

16 of Section 26, Township 8 South, range 5 West.  Flows

17 southeast, south and east through an area of basement complex,

18 an area of rather rugged topography, with the stream -- in

19 Section 26 and Section 35 to the south, immediately to the

20 south, the stream channel is rather deeply incised.  The

21 stream continues to the southeast through the basement,

22 across the basement, in the area of basement complex, where

23 it enters the Naval Reservation on the southern boundary of

24 Section 35, Township 8 South, range 5 West.

25 Q   BY MR. VEEDER:  And the Naval Reservation is Camp

1    Pendleton?

2          A   Camp Pendleton.   From this point Roblar Creek

3    continues --

4          THE COURT:   That becomes Township 9 South, then,

5    doesn't it, range 5 West?

6          THE WITNESS:   Yes, your Honor, it does.

7          From this point the northern portion of Section 2,

8    Township 9 South, range 5 West, Roblar Creek continues to

9    the southeast and swings slightly south again through an

10   area of basement complex into Section 12, Township 9 South,

11   range 5 West, where it swings easterly again, easterly and

12   southerly, continuing it through the area of basement

13   complex into Section 18 of Township 8 South, range 4 West --

14   or Township 9 South, range 4 West; pardon me.   Section 18,

15   the Creek swings to the south again for a short distance,

16   and then in the southeasterly quarter of the, southeasterly

17   quarter of Section 18, Township 8 South, range 4 West, the

18   stream turns to the east again and flows to where it joins

19   De Luz Creek in the extreme northern part, northern portion

20   of Section 20, Township 9 South, range 4 West.   At this

21   particular point, your Honor.

22         Q   Have you observed surface flow in either Camps

23   Creek, Fern Creek or Roblar Creek during the period of your

24   investigation?

25         MR. SACHSE:   Can we have the period, please?

1    MR. VEEDER:  Yes.

2    Q  First, would you state when you had observed

3  surface flow in the creeks which you have just described?

4    A  May I have the --  Camps Creek, Fern Creek and

5  Roblar Creek?

6    Q  Yes, the ones you just -- the creeks you just

7  described.

8    A  Camps Creek, northeast -- or, excuse me -- north

9  and west of where it joins Fern Creek, flow has been

10  observed in there, in this particular creek in the spring

11  and early summer.  Do you want particular --

12    Q  What year?

13    A  1958.  I don't recall on what particular days.

14    Q  For what period of time did you observe it?

15    A  Well, throughout the spring, I would say, up

16  until approximately mid-May.  I don't recall exactly what

17  date.

18    Q  Now, respecting --

19    A  Camps Creek has supported some flow but is

20  considered an intermittent stream in its character, in

21  general character.  Fern Creek --

22    MR. SACHSE:  Excuse me.  I am mixed up on the dates

23  which you stated you observed flow.

24    THE WITNESS:  Oh, I am sorry.  I have observed

25  Camps Creek in the spring of 1958 from the, after, subsequent

to the rainy season up through mid-May, possibly late May.
I don't recollect my dates exactly.

MR. SACHSE:  In 1957?

THE WITNESS:  In '58.

MR. DENNIS:  '58.

MR. SACHSE:  '58.

THE WITNESS:  South of Camps Creek and Fern Creek considerable --   Strike the word "considerable." -- a flow exists in Fern Creek and has been observed periodically throughout the spring and summer of 1958.  This flow originates in a spring in Section in the -- I would have to check my notes for exact location.

Q  BY MR. VEEDER:  That is all right.

A  In the southeastern quarter of Section 36, Township 8 South, range 5 West.  From this point down to the east, rather, the Fern Creek carries a rather strong flow of water on the surface.

Q  Now, would you state what you observed --

A  I have observed this flow.  I might, maybe in case I haven't mentioned it, I have observed it in the spring, and I have later observed it, toward the, it would have been July.

Q  Yes.

A  I have not checked it within the last, more recently.

1        Q   Referring now to Roblar Creek, if you would,
2    please.   From the standpoint of runoff, what you have
3    observed?
4        A   Roblar Creek, from runoff is an intermittent,
5    has an intermittent character.   It carries --
6        Q   Have you seen it flowing, carrying --
7        A   I have seen it flowing, after, during the rainy
8    season and immediately after the rains of early spring and
9    late winter up until late April, early May.   I forget
10   exact dates.   The flow has -- I have observed flow in that
11   stream.   It may even be later.   My memory on -- I have not
12   gone out and noted down the exact dates.
13            THE COURT:   Shall we adjourn until tomorrow?   You
14   want to quite at 4:00 o'clock, do you, tomorrow?
15            MR. DENNIS:   It is a good idea.
16            THE COURT:   We may pick up the half-hour at lunch
17   time.
18            MR. VEEDER:   Good.
19            THE COURT:   What kind of progress have you made with
20   your schedule, Mr. Veeder?
21            MR.VEEDER:   Pretty close.
22            THE COURT:   Are you ahead or behind?
23            MR. VEEDER:   We are a little bit behind.   I expected
24   to have this phase of the geology in now, but we will
25   accelerate week after next.

THE COURT:   10:00 o'clock tomorrow morning.

(Whereupon an adjournment was had at 4:00 o'clock
p.m. until 10:00 o'clock a.m., Friday, October 24, 1958.)