# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Friday, October 24, 1958

Pages:   3789 to 3908

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____
DEPUTY

MALCOLM LOVE
and

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA, )
                     )
           Plaintiff )
                     )
      vs. )      No. 1247-SD-C.
                     )
FALLBROOK PUBLIC UTILITY )
DISTRICT, et al., )
                     )
          Defendants. )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Friday, October 24, 1958

APPEARANCES:

       For the Plaintiff           WILLIAM H. VEEDER, ESQ.,
                                    Special Assistant to the
                                    Attorney-General,
                                    Department of Justice,
                                    Washington, D.C.,

For Defendant Vail Co          GEORGE E. STAHLMAN, ESQ.

For Defendants Fallbrook
Public Utility District,       FRANZ R. SACHSE, ESQ.
et al.

For Defendant State of         EDMUND G. BROWN, ESQ.,
California                     Attorney-General, by
                               ADOLPHUS MOSKOVITZ, ESQ.,
                               Deputy Attorney-General.

For Defendant Santa
Margarita Mutual               W. B. DENNIS, ESQ.
Water Company

- - -

## INDEX TO WITNESSES

| For the Plaintiff: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Giles Walker | 3793 | | 3892 | 3896 |
| (By Mr. Sachse) | | 3947 | | |
| (By Mr. Moskovitz) | | 3865 | | |
| (By Mr. Dennis) | | 3870 3889 | | |
| (By Mr. Stahlman) | | 3881 | | |
| Allen C. Bowen | 3897 | | | |

## E X H I B I T S

| Number | | For Iden. | In Evidence |
|---|---|---|---|
| 68 | | | 3814 |
| 70 | | | 3822 |
| 69 | | | 3839 |
| 73-A | Map | 3902 | |
| 73-B | Photo | 3904 | |

| | |
|---|---|
| MORNING RECESS | 3831 |
| NOON RECESS | 3847 |
| AFTERNOON RECESS | 3888 |

SAN DIEGO, CALIFORNIA, FRIDAY, OCTOBER 24, 1958.  10 A.M.

THE CLERK:  The case on trial, No. 1247-SD-C, United States of America vs. Fallbrook, etc., et al.  Further court trial.

THE COURT:  Mr. Stahlman.

MR. STAHLMAN:  Your Honor, I would like to toss out another suggestion here.  I don't want to tell Mr. Veeder how to try his case, but I think we are doing it in more detail than is necessary in relation to tracing out some of these small creeks.  I think we can make a lot better speed.  The facts that are being put in evidence are shown on the exhibits. Some explanation of the exhibit, of course, is necessary, but I don't think that we need to go into the great detail into which we are going here.  It merely encumbers the record and takes up time.  In fact, it has become quite expensive to compile a record on all of that detail.  I was wondering whether it is necessary to go into all that great detail on these matters.

THE COURT:  I have the same impression.  I think the witness should answer any questions we have as to what certain things mean.  But on the exhibits, such as Exhibit 67, which is very well prepared and very descriptive, the oral testimony we took yesterday was just repetition of what appears on the exhibit.

1     MR. VEEDER:  I have the feeling, your Honor, frankly,

2     from some of the comments that have been made in the past

3     that there was confusion in regard to the location of some of

4     these streams.  I will certainly recognize what your Honor has

5     to say.

6          THE COURT:  Some of them weren't named.  That was merely

7     a matter of adding the names onto the diagram.  For instance,

8     some of them were called unnamed tributaries.  Those could be

9     written in.

10         Lt. Walker--

11         MR. VEEDER:  Take the stand, Lieutenant.

12

13                    GILES WALKER,

14    recalled as a witness in behalf of the plaintiff, having been

15    previously sworn, testified further as follows:

16

17         THE COURT:  You read, did you not, the pre-trial

18    stipulation of facts that the major parties in this case agreed

19    to?  I think it was signed about May, 1958.

20         THE WITNESS:  I have not read the pre-trial stipulation,

21    no.

22         THE COURT:  Did you read that part of it that concerned

23    the segments of the watershed shown on Exhibit 67, describing

24    the streams, et cetera?

25         MR. VEEDER:  I don't believe he has, your Honor.

1          Your Honor was quite emphatic to me that we should put

2     in what we had agreed to.

3          THE COURT:  Yes, but I thought we would do it in a much

4     more summary fashion.  Suppose this witness hasn't done it and

5     he can't do it.  But he has been over this segment of the

6     watershed, and in that stipulation certain of these streams,

7     certainly De Luz was, described.  We could say to the witness,

8     "Are you familiar with that?  Have you read it?"  "Yes."  "If

9     you were asked to describe those streams in the watershed,

10    would your testimony be in accord with this pre-trial stipula-

11    tion of facts?"

12         "It would.  That is what I would testify to."

13         All right, go on from there.

14         Or I had originally thought that our plan was to have

15    someone who knew this entire watershed merely testify to those

16    undisputed facts.  And I was looking right down at Col. Bowen.

17    I didn't see him shaking his head, but I did see Col. Bowen

18    shake his head.

19         MR. VEEDER:  All it takes is one shake of a chicken

20    colonel's head and I am going to go the other way for a while.

21         THE COURT:  I am not concerned about colonels and

22    chicken colonels shaking their heads.

23         MR. VEEDER:  No.

24         THE COURT:  You are the lawyer in this case.

25         MR. VEEDER:  I was attempting humor, your Honor.  I

A

Z7

1   don't believe I am greatly concerned about what anyone thinks,

2   as a matter of fact.

3         THE COURT:  I am sure of that.

4         MR. VEEDER:  But from my own view, I agreed with Col.

5   Bowen on this proposition, that it was quite an onerous under-

6   taking for one man to swear to all of these facts.

7         Now, I certainly have no desire to encumber the record

8   beyond the necessity of it.  I had thought that in putting in

9   the surface geology and geography it was desirable to show the

10  course of these streams.  We can simply abandon thatphase of

11  it.

12        THE COURT:  Let's do that.

13        You have two more witnesses to complete the rest of

14  this watershed?

15        MR. VEEDER:  That is correct, your Honor.

16        THE COURT:  Let's see if each of those witnesses has

17  read the pre-trial stipulation of facts and is familiar with

18  it, familiar enough with it certainly as it pertains to the

19  part of the watershed we are going to talk about, and he

20  might as well be instructed to read the whole pre-trial

21  stipulation of facts before you call the witness.  Will you

22  so instruct him?

23        MR. VEEDER:  Yes, your Honor.  We will go ahead on this,

24  your Honor.  I had pursued the course that I had pursued,

25  being desirous to lay the fundamental basis for this whole

1   thing.  We can simply omit it and go ahead as you have directed.

2         THE COURT:  You have practically completed covering it

3   with this witness?

4         MR. VEEDER:  No, your Honor, I have about four more

5   exhibits for him.

6         THE COURT:  I mean, on this particular exhibit?

7         MR. VEEDER:  Yes, your Honor.

8         THE COURT:  Mr. Walker, you testified that you prepared

9   Exhibit 67?

10        THE WITNESS:  Yes.

11        THE COURT:  And you or someone at your direction had

12   colored in the yellow for the alluvium, and the brown section

13   for the residuum, and the blue for the basement complex?

14        THE WITNESS: That is correct; yes.

15        THE COURT:  And if you were to testify in detail to

16   every bit on that map, your testimony would be in line with

17   the diagrams shown on the map?

18        THE WITNESS:  That is correct, your Honor.

19        THE COURT:  And the base map you used was taken from

20   topographic maps?

21        THE WITNESS:  Topographic maps of the U. S. Geological

22   Survey.

23        THE COURT:  Which showed the streams and tributaries

24   of De Luz?

25        THE WITNESS:  Yes.

A2

Z9

1      THE COURT:  And you have been over most of this area,

2  you testified, on foot--

3      THE WITNESS:  On foot, by Jeep--

4      THE COURT:  And some of it you looked at by plane?

5      THE WITNESS:  Yes.

6      THE COURT:  And those stream tributaries are approxim-

7  ately as indicated on Exhibit 67?

8      THE WITNESS:  Yes, your Honor.  They were located by

9  direct tracing.

10     THE COURT:  All right.  Anything further?

11     MR. DENNIS:  If the Court please, I have an observation.

12  It is becoming more and more apparent that we are getting into

13  detail on the De Luz watershed and we have had a hearing be-

14  fore the Master on all of the parcels, some 85 parcels, which

15  are all of those except the Vail, the parcel owned by the

16  Government and the six parcels owned by various Services.  The

17  Master has made findings of fact and conclusions of law in

18  which he has outlined where the streams are, which are riparian,

19  the flow of the stream, and whether the water in it is vagrant

20  percolating water or whether it is part of the subsurface of

21  the particular tributary of De Luz Creek.  There were approx-

22  imately, I think, 13 attorneys that appeared before the

23  Master.  In so far as the testimony of this witness in regard

24  to geology or in regard to hydrology might tend to contradict

25  the findings and conclusions of the Master, is it proper?  I

thought that your Honor indicated that this evidence was simply a skin case against those defendants who were outside the De Luz watershed. But it seems to me that it is rather improper to attack the findings of the Master, if they are being attacked, and his conclusions, by testimony taken in this case at this time.

THE COURT: First of all, the Master, under the procedure we laid out, has made proposed findings, and the various parties are going to have a chance to be heard before him first before he submits the report to this Court, and then after it is submitted to this Court there will be again opportunity for any party to object to the work done by the Master before it comes before the Court. It is not yet at that stage. I didnt understand that there is any attack upon any of the Master's proceedings at this stage. Let's just not have duplication. The Master did some work. We are going to dovetail it into what we have done. We are going to go on from there into the testimony about the other areas within the segment of the watershed shown on Exhibit 67.

MR. DENNIS: In other words, when it comes to the final judgment, the final conclusions and findings of fact which will be made with respect to the 85 parcels on De Luz Creek, the Court will act on the findings of the Master and such evidence as has been placed before the Court at the time the objections to the Master's report are being heard.

Ae3

Z11

1    THE COURT:  I don't know.  I am not going to say when

2    we are going to do it.  Sometime we are going to do that.  We

3    can't do everything at once.

4    MR. VEEDER:  That is the point I was going to make.  I

5    am sincerely hopeful that Mr. Dennis's observations will not

6    preclude us from putting in our whole case from the standpoint

7    of--

8    THE COURT:  You will not be precluded.  But let's not

9    put it in twice.

10   MR. SACHSE:  I think I understand your Honor's reply

11   to Mr. Dennis, but I want to be sure.

12   THE COURT:  I know what you are thinking about.  You

13   are thinking about this business of, what can we do for

14   certain people?

15   MR. SACHSE:  Would it not be proper, your Honor, and in

16   no way injurious to the United States, as I see it, to state

17   that at this stage of the proceedings, at least, none of the

18   testimony on De Luz Creek watershed shall be regarded as

19   material or relevant to the private ownerships whose rights are

20   covered by the proposed findings of fact of the Master?

21   Speaking personally-- I haven't had time to go over

22   those findings carefully, but my plan had been to write each

23   of my clients in the watershed summarizing the Master's find-

24   ings, during this next week, and telling them whether I felt

25   there was anything wrong with them, whether they should object

1  or whether they should be content.  Now there are, as Mr.

2  Dennis has said, many people who don't know that this is

3  happening today.  I do.  I realize, of course, that there is

4  evidence in the record.  But would it not be proper simply to

5  note that at this time, at least, this testimony shall not be

6  regarded as being material or relevant to the determinations

7  on the private ownerships only?

8      THE COURT:  You can't say that, Mr. Sachse, because

9  assume that Vail has property that is upstream and is riparian--

10     MR. SACHSE:  I should have said excluding Vail.  Vail

11  was not covered by the Master.  I am speaking of the private

12  ownerships only.

13     MR. VEEDER:  So does the United States.

14     THE COURT:  The United States has properties that are

15  riparian.  Therefore, the rights eventually of the private

16  parties and of Vail and of the United States are correlative

17  rights.  I don't think we can make any statement like that.

18     The point is that you are either satisfied or you are

19  dissatisfied with the Master's findings as far as they go.

20  They are certainly an interlocutory thing.  They will be woven

21  into this whole case in some way as we progress.

22     MR. SACHSE:  The only thought that worries me is that

23  what started out to be certainly a worthwhile and well-

24  received effort to bring the trial to the little individual

25  and make it easy for him could, it seems to me, under this

A3

Z13

procedure, turn out to be a booby trap instead. Not for me.
I will be sitting here. But for some of these other attorneys
who don't know it. All they know is that they have these
findings-- they got them in the mail today, and they presume
that if the United States is going to challenge them on any
date it will challenge them on the date noticed by the Master
and not before your Honor today.

THE COURT: The United States will be required to make
their showing before the Master just like anybody else would.
If they are not content with these matters, they are going to
say so before the Master.

MR. VEEDER: And let the record show it is going to. But
I can't see what we are sweating about now. We are putting
in general material now.

MR. DENNIS: I don't think I made myself clear to the
Court.

For instance, Mr. Jones owns certain property in
Sections 28 and 33 in the De Luz Creek watershed. The Master
found that a portion of his property was riparian to the east
fork of De Luz Creek, and he found that certain other portions
were only vagrant percolating waters which did not constitute
part of the surface or subsurface flow of any tributary of
De Luz Creek or Santa Margarita River.

Now, it is impossible on these maps, because of the
scale, to find out whether the Jones property as shown on

A3

Z14

1   Exhibit 67 would overlie the portion of the east fork of De Luz

2   Creek.  There are other exhibits which are going on which

3   might destroy the riparian character of that property.

4        Now the question is, at this stage of the game, when we

5   have the Master's findings saying that that property is

6   riparian, et cetera, and we have not had, nor has the Government

7   had, the opportunity of attacking those findings in the manner

8   provided for in the order appointing the Master, is evidence

9   being introduced now going to be able to be used to show that

10  that property is not riparian to De Luz Creek at the time that

11  the objections are made to the Master's findings?

12        THE COURT:  I don't so contemplate.

13        MR. DENNIS:  That is what I wanted to clarify.

14        THE COURT:  I don't believe Mr. Veeder does.  Evidence

15  as to Mr. Jones was put on before the Master.

16        MR. DENNIS:  That is correct.

17        THE COURT:  I don't expect to sit here and have evidence

18  again put on as to Jones's particular parcel.  What we are

19  trying to do is put on evidence here that will fit in and

20  dovetail in with what the Master did as to these small defend-

21  ants.

22        Of course, Mr. Veeder has to cover this entire watershed.

23  He has to cover the geology of this entire district.  I can't

24  say that there may not be situations that may come up.  But

25  generally speaking the specific evidence as to Jones is not

Z3

Z15

1  going to be repeated here.  It may be that evidence of use

2  and riparian rights upstream may have an impact on Jones.

3          MR. DENNIS:  That is true, your Honor.

4          THE COURT:  Jones knows that.  Undoubtedly at the hear-

5  ing before the Master he was told and he either knew or should

6  have known that if he was claiming a riparian right it was a

7  correlative right.

8          But our attempt is going to be not to repeat the minute

9  details we have taken care of before the Master, but to fit

10  in here the things that have been fitted in.

11          Is that your understanding?

12          MR. VEEDER:  Yes, your Honor.

13          I want to do this, moreover, to put in-- I think there

14  are in excess of 50 of these small users whose lands have been

15  investigated, where Col. Bowen has made soil surveys-- I

16  would like to have those marked and made part of the record in

17  this case.  I think they are important.  But they are not for

18  the purpose of doing anything else than showing the kinds and

19  types of soils that are in the particular area.

20          And I think your Honor will ultimately make findings

21  on them.  I don't see how your Honor can make a finding-- and

22  I need your guidance on this now-- we have, for example,

23  innumerable exhibits that have gone into the Special Master's

24  hearing where we have made these individual investigations.

25  I thought that ultimately those would be marked and put into

A
Z16

1    the record as part of the evidence in this case.

2        THE COURT:  I have no objection, if they go in rapidly.

3        MR. VEEDER:  They will simply be marked and go in.  I

4    don't know of anybody who would object to them.  But I think

5    they have to be part of the record.

6        MR. DENNIS:  Certainly we have no objection to the

7    introduction in the record here of any of the exhibits which

8    were introduced before the Master, if all of the exhibits are

9    introduced.

10        MR. VEEDER:  I truly can't follow this.  I think there

11    may be a circumstance where the factors might change the find-

12    ing as made by the Master, but it will be on the basis of a

13    complete review of the whole question.

14        MR. DENNIS:  My concern, your Honor, is this.  Maybe I

15    haven't made myself clear.  For instance, the Master has found

16    the character of the east fork of De Luz Creek as it flows

17    through the Jones property.  Are we at this time and before

18    the Master's conclusions and findings come up to be heard and

19    the objections to them, are we now going to take evidence to

20    show that perhaps it is not riparian to the east fork of De

21    Luz Creek?

22

23        It seems to me that this evidence should be limited

24    simply to the plaintiff's skin case and to what your Honor

25    indicated, that it is necessary to take evidence as to those

Walker - Direct                                                    3805

1   parcels within the watershed which the Government owns and
2   which vail owns to determine the extents of Jones's correla-
3   tive rights and certain other effects.  But as to whether his
4   property is riparian, as to the type of stream as it goes
5   through his property, as to the general topography of the
6   Jones piece, the geology involved in it, whether the waters
7   are vagrant percolating waters, it seems to me that that is
8   matter which was heard by the Master, and the only way it
9   could be attacked would be by direct--
10          THE COURT:  Well, it seems to me, firstly, that what-
11   ever comes in there is admissible for all purposes.  Secondly,
12   I have assured you before, and I will assure you again, that
13   everybody will have a chance to have his day in court, and if
14   a situation should develop where some party contends that some
15   evidence taken here is in conflict with a proposed Master's
16   finding or a master's finding, with some of his rights in-
17   volved, we will set further hearing and straighten the matter
18   out-- find out just where we are.  Thirdly, the testimony
19   given as to topography and type of soil, although it might
20   concern the type of soil on Jones's and Smith's property, is
21   now primarily to give the Court a general understanding of
22   this particular phase of the watershed, and it is not for the
23   purpose of trying to re-try something which the Master tried.
24   There may or may not arise some discrepancies.  I doubt that
25   there will be many conflicts.

A
Z18

1     I don't think the Government proposes to put on one

2     case before the Master and prove one thing, and then prove

3     another thing here, although you never can tell what a witness

4     is going to testify to, and you might have some conflicts

5     arise.  But let's not get too excited about it.  Let's rock

6     along a little bit and see if we can't put on a case here that

7     fits in with the Master's case for this part of the watershed.

8          MR. VEEDER:  May I tender a thought along that line.

9     I can't even follow this argument here.  Certainly the Govern-

10    ment has to put in its case in chief.  Then Jones comes along.

11    He has already done it before the Master.  It is not for the

12    United States, and it would be completely out of order for us,

13    to put in any evidence as to the riparian or non-riparian

14    character of a man's land.  He wins on the strength of his

15    title, not on the proof that the United States is going to put

16    in.

17         I think it is a matter of the order of proof that has

18    Mr. Dennis concerned.  We have to put in, as I see it, the data

19    we are putting in now.

20         MR. STAHLMAN:  I think that is right.  I don't object

21    to the data.  I merely state that I don't think it is necessary

22    to put in the great detail.

23         THE COURT:  All right, we will try to cut down the

24    detail.

25         All right, Mr. Veeder.

JOHN SWADER, Official Reporter

A
Z19

●

DIRECT EXAMINATION (Resumed)

BY MR. VEEDER:

1
2
3      Q   Lt. Walker, you have depicted on Plaintiff's Exhibit
4   No. 67 the areas which are designated "residuum."  You have
5   also designated "alluvium."  From the standpoint of utilization
6   of those lands for purposes of agriculture, have you observed
7   any distinguishing features that would be important from the
8   standpoint of those two types of soils?

A4    9      A   The use of alluvium or residuum for agriculture in
10   many cases is determined by physical limitations only, and the
11   residuum or the alluvium in many cases both are adaptable to
12   crop use.
13      Q   Would you say that is applicable throughout the
14   DeLuz areas where you have designated the residuum and the
15   alluvium?
16      A   Yes, I would, with the one reservation, of course,
17   that there are certain physical aspects possibly in the
18   alluvium or in the residuum as to rockiness that might pre-
19   clude cultivation for some reason or other, and in general the
20   residuum or the alluvium could be adapted to crop use.
21      THE COURT:   In other words, this is a general statement
22   without specific reference to the character that might per-
23   tain to each particular parcel of ground?
24      THE WITNESS:   That is correct.
25      THE COURT:   In other words, you might find an area of

A4

Z20

1   residuum where there was several feet of highly decomposed

2   matter above the harder rock below as contrasted with another

3   place where you might find only a couple of inches?

4          THE WITNESS:  That is correct, your Honor.

5          THE COURT:  Or in the alluvium you might find an area

6   of pure sand and boulders as contrasted with some much more

7   fertile material?

8          THE WITNESS:  That is correct.

9          MR. STAHLMAN:  I suggest that your Honor pursue the

10  question as to the soil overlying the basement complex.

11         MR. VEEDER:  Your Honor, I don't mind Mr. Stahlman

12  undertaking the direction of my case to a point, but I think

13  I would like to ask the questions myself, if it is all the

14  same to him.

15         MR. STAHLMAN:  I am sorry.  I just made a suggestion

16  to the Court.

17         THE COURT:  All right.

18         MR. VEEDER:  I think this high school debate approach

19  is all right, your Honor, but I want to know when the ground

20  rules are changed.

21         THE COURT:  Go ahead.

22  BY MR. VEEDER:

23         Q  From the standpoint of water-bearing materials,

24  have you observed the characteristics of the alluvium and of

25  the residuum in the area concerning which you have now

A4

Z21

1    testified?

2        A    On Exhibit 67 the alluvium by far will contain the

3    greater portion of water.  The residuum most generally is

4    elevated.  It is subject to easy loss of water through drain-

5    age topographically.  Any water contained in the residuum would

6    be locally present or possibly in places there might be a

7    continuous zone of saturation in them.

8        Q    When you say "in them"--

9        A    In the residuum.

10       Q    Go ahead.

11       A    But generally the alluvium by far will carry the

12   greater quantity of water.  It would be the best source.

13       Q    From the standpoint of the distinguishing elements

14   between alluvium and residuum, what are the distinguishing

15   features when you observe residuum and alluvium in the same

16   general area, such as pointed out here, as disclosed or de-

17   picted on Exhibit 67, where Cottonwood creek has its confluence

18   with the main stem of De Luz Creek-- how would you distinguish

19   between the residuum and the alluvium?

20       A    In the particular area in question hear the con-

21   fluence of Cottonwood Creek with De Luz Creek on Exhibit 67,

22   or for any distinguishing of alluvium and residuum, the primary

23   thing of course is the formation of the material or the

24   deposition of the material in question.  Residuum is a product

25   of the basement complex which has undergone or is the result

3811

A4

Z22

of decomposition of this basement complex.  Alluvium is a
material that has been removed elsewhere and transported and
deposited.  The residuum being a product of decomposition of
the basement complex will contain a higher percentage of clays.

A good method or a good way of taking a look at
residuum, of course, as to its mode of origin is a profile
of residuum, showing a general progressing from the basement
complex to the surface of the residual mantle.  As one comes
up in the soil profile one will find progressively less rock
fragments and more decomposition.  It will be a gradational
thing from the basement complex proper to the upper surface
of the residuum.  The alluvium by nature is transported and
will to some extent be sorted.  In some areas it will be quite
well sorted as to grain size, in other places it could be quite
a mixture from fines up to rather large boulders.

One other thing which is a guide but not necessarily
distinctive criteria-- it can be used as a guide, as an out-
side means also-- topographical location, or in some places
there is a pronounced color change.

Q  From the standpoint of the location of the alluvium
as you have observed it in the De Luz Creek area, what are the
evidences of confinement which would separate the alluvium
from the residuum?

A  May I have the question restated or read back?

Q  I can restate the question.  What evidences, if any,

A4

Z23

1    of impervious materials have you found which might result in

2    a confinement of the alluvium from the residuum?

3        A   I think you are referring to possibly water contained

4    therein?

5        Q   That's right.

6        A   Where the residuum is in contact with the alluvium,

7    there is no dam, so to speak, blocking water from passing from

8    one to the other.  Water will move back and forth across that.

9        Q   I hand you plaintiff's Exhibit marked No. 68 for

10   Identification and ask you to read the title block on that

11   map into the record.

12       A   The title block on Exhibit 68 for Identification

13   is "Geologic Section, De Luz Creek Valley, Office of Ground

14   Water Resources, Marine Corps Base, Camp Pendleton, Cali-

15   fornia."  It goes on further to state--

16       Q   You don't need to proceed with that.  Would you

17   state who prepared that diagram or cross-section?

18

19

20

21

22

23

24

25

B-1 ML j

of basement complex.

1    A   These sections have been prepared by myself.

2    Q   And let's put this up on the easel so you can

3  refer to it.

4        Now, alluding to Plaintiff's exhibit marked 68

5  for identification, would you state what that identification

6  portrays?

7    A   This identification portrays, No. 68, portrays

8  a cross-section constructed along De Luz Creek and the east

9  fork of De Luz Creek above its confluence with De Luz Creek,

10  a cross-section along the stream gradient showing the, or

11  depicting the areas of alluvium and the basement complex,

12  together with the stream gradient to scale.

13    Q   Would you state whether that is prepared to

14  scale?

15    A   That is prepared to scale.

16    Q   Does it accurately portray the matters to which

17  it refers?

18    A Yes, it does.

19    MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

20  marked for identification No. 68.

21    THE COURT:  Now, let me inquire just a minute.  The

22  top profile carries down to what, on the left-hand side, to

23  what point?

24    THE WITNESS:  Excuse me, your Honor.  The De Luz

25  Creek profile extends from the confluence with the De Luz

Walker - Direct                                                      1814

1   Creek with Santa Margarita River on Camp Pendleton to the

2   headwaters of De Luz Creek between Mesa de Colorado and

3   Avena Loco Mesa.

4        THE COURT:  In other words, the left side of your

5   profile is the very bottom portion of your map 67?

6        THE WITNESS:  Yes, your Honor.

7        THE COURT:  The confluence of De Luz and the Santa

8   Margarita?

9        THE WITNESS:  Yes, that is correct.

10        THE COURT:  And your lower profile or east fork

11   carries down to its confluence with De Luz?

12        THE WITNESS:  That is correct.

13        THE COURT:  And that point of confluence is marked

14   on the top profile as the east fork of De Luz?

15        THE WITNESS:  That is correct, your Honor.

16        THE COURT:  It is marked on the top of the profile

17   at the place where the De Luz comes in?

18        THE WITNESS:  Yes, your Honor, the point of --

19        THE COURT:  Yes.

20        THE WITNESS:  -- joining is marked right there.

21        MR. VEEDER:  We have made our offer, your Honor.

22        THE COURT:  68 received in evidence.

23        Q  BY MR. VEEDER:  Now, Lieutenant, would you refer

24   to the area on the Exhibit 68 of the United States which

25   you have colored in yellow, at the uppermost part, that is,

1  in that color, and state what that depicts from the stand-

2  point of the heavy black line and the dotted line under-

3  neath?

4       A  The area colored in yellow represents the alluvial

5  material beneath the, along the stream channel.

6       Q  I made reference to this upper area here.

7       A  Excuse me.  Represents the alluvium along the

8  stream channel.  The heavy black line above the yellow

9  depicts the surface elevation along the stream, along the

10 stream channel; and the dashed black line underneath the

11 yellow, between the yellow and the blue represents the

12 approximate contacts between the alluvial material and the

13 basement complex.

14      Q  Now, what are the areas in white that you have

15 shown intersperced through the yellow?

16      A  These areas in white which have not been colored

17 are wells which have been located in the field and plotted

18 into the cross-section to scale.  The lateral width -- the

19 width of these colored areas, of course, are for illustrative

20 purposes only.  The actual width of the well, if drawn in to

21 scale, wouldn't even be the width of the line, hardly.  How-

22 ever, they represent wells which exist along the stream

23 channel and their measured depth.

24      Q  Now, alluding to the Exhibit 67, would you locate

25 the area concerning which you have just testified?

A   This area, alluvium in this part (indicating).

Q   When you say "this part," would you --

A   Oh, excuse me.  Above the rising water area, well, above the --

Q   Just read the designation.

A   -- east fork of De Luz Creek.

THE COURT:  You are referring to that portion of the top profile on Exhibit 68 that lies generally west of the San Diego County line, although it does proceed a little east of the San Diego County line and then continues westerly short of the east fork of the De Luz Creek to a point --

THE WITNESS:  I believe you are describing this portion, your Honor.

THE COURT:  I am describing it on 68.

THE WITNESS:  68.

THE COURT:  So you can now show it on 67 where it is.

THE WITNESS:  That is correct, your Honor.  This portion as just described exists, this being San Diego County-Riverside County line, indicated on Exhibit 68, is this point (indicating).

Q   BY MR. VEEDER:  Now, when you say "this point," you must allude to the --

A   This.

THE COURT:  Is the intersection of the county line with De Luz Creek as shown on 67?

1       THE WITNESS:  Yes, your Honor, that is correct.  This

2  is where De Luz Creek intersections Riverside County-San

3  Diego County line on Exhibit 67.

4       Q  BY MR. VEEDER:  And then, how far down does it

5  proceed from there?

6       A  From the county line, the alluvium extends, the

7  alluvial areas as noted, extend down in San Diego County

8   along De Luz Creek, a distance of approximately one and a

9  half miles.

10       Q  Would you locate the alluvial area designated in

11  the lower extremity of the topmost cross-section and correlate

12  that area with the map which is Plaintiff's Exhibit No. 67?

13       A  By the "lowermost" you mean the area downstream?

14       Q  Yes.  Correlate the two -- 68 and 67 -- if you

15  would, from that standpoint.

16       A  This portion of alluvial located below or down-

17  stream from the area of alluvium along De Luz Creek on

18  Exhibit 68 is that portion of alluvium which is shown on

19  67 extending from the confluence with the Santa Margarita

20  River at the southernmost portion of the map, north to the

21  confluence -- or not completely -- to, well, let's -- to

22  above the Naval Reservation boundary line at Camp Pendleton

23  indicated both on 68 and 67.  The alluvial material extends

24  above the Camp Pendleton, northern boundary of Camp

25  Pendleton for approximately a distance of approximately a

1    mile.

2         Q  Now, would you state into the record the areas

3    as depicted on the lower cross-section on 68 and from the

4    standpoint of locating that alluvial area on Plaintiff's

5    Exhibit No. 67?

6         A  The alluvial area indicated on the lower cross-

7    section on Exhibit 68 is the area of alluvium along the

8    east fork of De Luz Creek.  This particular body of alluvium

9    exists also on Exhibit 67, extending, commencing approximately

10   three-tenths of a mile above the confluence of the east fork

11   of De Luz Creek with De Luz Creek; to its point of commence-

12   ment it extends upstream to a point approximately one and

13   four-tenths miles above the San Diego County-Riverside County

14   line; on Exhibit 67 and on Exhibit 68.

15        Q  You may return to the witness chair, if you

16   would.

17             I hand you Exhibit marked Plaintiff's No. 67 for

18   identification and ask you to read into --

19             THE COURT:  67?

20             MR. VEEDER:  I beg your pardon; 70 marked for identi-

21   fication.

22             Give that to the Court, and we will substitute

23   that.

24        A  Exhibit 70 marked for identification, the title

25   block reads:  "A portion of the Santa Margarita River

watershed below Temecula.  Geology.  Office of Ground

Water Resources, Marine Corps Base, Camp Pendleton, Calif-

ornia."

THE COURT:  Now, start where you took the base map

we have used heretofore for all these exhibits in the water-

shed.  Right?

THE WITNESS:  Your Honor, the base map which has been

used before for the watershed has been on a scale of one

to sixty-two five-hundredths.  Our base map in this case is

on a scale of one to twenty-four thousand.

THE COURT:  All right.

Q  BY MR. VEEDER:  I will ask you to step to the

easel where identification No. 70 has been placed and asked

you to state what it shows and sources of data that you

used.

MR. STAHLMAN:  Keep your voice up, Mr. Veeder.  I

can't hear you.

Q  BY MR. VEEDER:  I ask you to state the sources of

data that were used in the preparation of that map and

whether you undertook the investigations yourself?

A  This area has been investigated by myself.  Again,

by traversing it by jeep, on foot, and from the air; pri-

marily by jeep and foot.

Q  Now, would you state what the contents of the

legend shows and point out on the identification those areas

1    to which the colored portions pertain?

2         A   The legend on Exhibit 70, commencing at the top,

3    is a solid line depicting a known contact.

4         Q   When you say "contact," what do you mean?

5         A   Between two, or between units, mapped units,

6    mapped geological units which are depicted on the map.   The

7    dashed line indicates an approximate contact between, a

8    contact between geological units on the map.   The block in

9    yellow, colored in yellow represents, is the color used on

10   the map to represent the areas of alluvial.

11        THE COURT: And shown as Q-T?

12        THE WITNESS:  Q-A-L, your Honor, excuse me.

13        THE COURT:  Oh, pardon me.  Q-A-L, yes.

14

15

16

17

18

19

20

21

22

23

24

25

C

Z25

1    The block colored in brown, with the letters Qr repre-

2    sents the color used to depict residuum on the plan map.

3    The block colored in orange, with the letters Qt repre-

4    sents the terrace deposits which are colored in orange on the

5    map.

6    THE COURT:  I don't see any orange.

7    THE WITNESS:  Right down in the southwest portion,

8    your Honor.

9    THE COURT:  I see.

10   BY MR. VEEDER:

11   Q  Is that map and the areas which it depicts accurate,

12   to your personal knowledge?

13   A  It is accurate.

14   THE COURT:  And the blue marked bc is basement complex?

15   THE WITNESS:  The blue marked bc is basement complex;

16   that is correct, your Honor.

17   MR. VEEDER:  The United States offers plaintiff's

18   Exhibit marked No. 70 for Identification, your Honor.

19   THE COURT:  Let me ask another question or two.

20   I see some heavy black lines running through the

21   colored area marking it into sort of units or divisions.  What

22   are they?

23   THE WITNESS:  These blank lines, your Honor, delineate

24   the areas, for instance, pointing to the easternmost portion

25   of Exhibit 70 for Identification, depict the Rainbow Creek

Walker Direct

822

1  watershed.

2        The area immediately north of the Rainbow Creek water-

3  shed is a minor drainage unit.

4        Essentially, your Honor, we have blocked out Rainbow

5  Creek watershed, Fallbrook Creek watershed, and the other minor

6  drainages which exist between these two and around the Fall-

7  brook and Rainbow Creek watersheds along the main stem of the

8  Santa Margarita River.

9        THE COURT:  And then the section in brown that lies

10  midway in the map between what you call Rainbow area and the

11  Fallbrook area are two smaller parts of the watershed, one

12  running south into the Santa Margarita and the other running

13  north into the Santa Margarita, the small tributaries?

14        THE WITNESS: That is correct, your Honor.  It is

15  actually the one unit.  However, it would be broken by the

16  Santa Margarita.  That is correct.

17        THE COURT:  These black lines are natural high points

18  that divide portions of the watershed?

19        THE WITNESS:  That is correct, your Honor.

20        MR. VEEDER:  In fact, they are subwatersheds in them-

21  selves.

22        THE COURT:  That is better stated.

23        All right, Exhibit 70 is received in evidence.

24        (Plaintiff's Exhibit No, for Identification was received

25  in evidence.)

c

Z27

BY MR. VEEDER:

Q   Now, Lt. Walker, would you state what is the kind and typ of rock or soil through which the main stem of the Santa Margarita River proceeds from the point where it enters Temecula Canyon?

A   From the point where the Santa Margarita River enters Temecula Canyon it proceeds southwesterly through an area of basement complex in a deeply incised stream channel, with minor spotty patches, thin in depth, of alluvium along the main stem.   Essentially any flow in here is passing across the basement complex.   Once the Santa Margarita River enters Section 34, the Northwestern Quarter of Section 34, Township 8 South, Range 3 West on Exhibit 70, from this point the stream channel is occupied by continuous alluvial material, although of a mixed character, and continues to the southwest.

Q   Before proceeding further, Lieutenant, would you state the number of miles over which the stream flows on the basement complex, just roughly?

A   Approximately three and a half miles, considering the meanders in the stream channel.   It is in the basement complex.

Q   Now you may proceed.

A   Well, that is over the basement complex.

Q   That is where it is flowing on the basement complex?

A   That is right.

C

Z28

From the point at, I believe it is, Section 34, the northwest quarter, the flow continues to the southwest in a channel which from now on has an alluvial filled channel.

Q From that point on?

A From that point on, yes. Within Section 33, I believe, it would be still surrounded by the basement complex, with hills of basement complex arising on both sides.

THE COURT: Which is 33? Point it out to me.

THE WITNESS: 33 would be (indicating) 33 of Township 8 South, Range 3 West. The channel is alluvial filled, but the banks on both sides are basement complex.

Continuing to the south, the stream leaves the area where the banks are of basement complex and enters an area where the banks and the hills on either side of the stream are covered, mantled in residuum.

Continuing to the south and to the northwest, the stream continues to flow through the area across an alluvial filled channel with the hills on both sides mantled in residuum, to its confluence with Sandia Canyon in the Northwest Quarter of Section 7, Township 9 South, Range 3 West.

THE COURT: Point that out, will you?

THE WITNESS: At this point, your Honor, just inside Section 7.

THE COURT: All right.

THE WITNESS: At this point the Santa Margarita River

c

Z29

1    is joined by the Sandia Creek from the north and continues to

2    the southwest, with the residuum lying to the southeast and

3    basement complex forming the banks and the hills to the north-

4    west of the Santa Margarita River.

5         Proceeding on into Section 13 of Township 9 South,

6    Range 4 West-- at this point, your Honor-- at this point the

7    stream, the Santa Margarita River--

8         THE COURT:  Is that 13?  That is 12, isn't it?

9         THE WITNESS:  Yes, your Honor.  I was pointing to the

10   point where the stream channel-- well, actually it is in 12,

11   slightly in 12, with a bit of the alluvium extending into

12   Section 13 to the south.

13        MR. VEEDER:  Is this going into too much detail, your

14   Honor, from the standpoint of tracing the river out?

15        THE WITNESS:  From here I can trace it in one or two

16   sentences.

17        THE COURT:  I don't think it is necessary.  The map

18   shows it.  The sections can be placed in.  They are not in

19   there, but they can be put in.

20        MR. VEEDER:  All right.

21        THE COURT:  You can have the witness put in the section

22   numbers.

23        I think in his last description he said Range 3 West.

24   It was really Range 2 West.

25        THE WITNESS:  No, your Honor.

C

30

THE COURT: Range 4 West.

THE WITNESS:  Yes.

THE COURT:  The Section 13 area.

THE WITNESS:  If I stated Range 3 West, it should be Range 4 West.  That is correct, your Honor.

THE COURT:  By your diagram you show the course of the Santa Margarita and the various tributaries as they go through the various sections and townships and ranges on the map?

THE WITNESS:  That is correct, your Honor.

THE COURT:  And the various areas of alluvium or residuum, terrace deposits, basement complex, you attempted to draw as nearly to scale as you could on the map?

THE WITNESS:  That is correct, your Honor.

THE COURT:  We have already talked about what the black lines mean.  What do you mean by a terrace deposit?  Is that the equivalent of an older alluvium?

THE WITNESS:  Terrace deposits, your Honor, are, in a sense, alluvium deposits, in the sense that they have been washed in and deposited, they are coarse, fine to cobbly in nature, that have been deposited by stream action or washing action.

THE COURT:  Are they older than what you show as alluvium?

THE WITNESS:  Yes, they would be older than the alluvium shown in this area, you Honor; yes, sir.

Walker - Direct

3827

THE COURT: In other words, they are also alluvium that has come in at some earlier time and are therefore older in age than the alluvium shown in the yellow?

THE WITNESS: That is correct, your Honor.

THE COURT: Do you think we have had enough identification of this map?

MR. VEEDER: The only thing I want to be sure of, your Honor, is that we do carry out your instructions from the standpoint of identifying the various rivers that we have set out as part of our stipulated agreement as to locations and courses of streams.

THE COURT: All right. Is this described in your pre-trial stipulation?

MR. VEEDER: Not in the detail we have. We simply point out where it rises and give the lengths. There is geology that, in our view, is important in the courses that the river takes. That is the next stage of the interrogation.

THE COURT: I think the exhibit is just as descriptive as oral testimony would be, maybe more so. Let's go on to something else.

BY MR. VEEDER:

Q  What has been your investigation, Lt. Walker, from the standpoint of the sources of water and the areas traversed by Rainbow Creek? You can locate where Rainbow Creek rises and then refer to the alluvial areas through which if flows.

C

Z32

●

1      A   Speaking of Rainbow Creek, Rainbow Creek rises in the

2   easternmost portion of the colored areas of the map, the West-

3   ern Half or Northwest Quarter, actually, of Section 4, Town-

4   ship 9 South, Range 2 West.

5      THE COURT:  Well, 4.  It actually rises in 3, doesn't

6   it, on your map?  Doesn't it carry over into 3?  No, you are

7   right.  I am sorry.

8   BY MR. VEEDER:

9      Q   Would you describe the kind and type of terrain

10   through which the river flows at its source and on down

11   through the valley?

12      THE COURT:  There again, doesn't the map show it?

13      MR. VEEDER:  I don't believe it shows the terrain, your

14   Honor.

15      THE COURT:  All right, go ahead and tell us the type

16   of terrain.  The map shows the alluvium, the basement complex

17   and the residuum.  Tell us anything else about the terrain.

18      THE WITNESS:  The terrain is mountainous, brush-covered

19   country, your Honor, through which the stream flows before

20   entering the alluvium in Rainbow Valley.

21   BY MR. VEEDER:

22      Q   When it reaches the valley, would you describe the

23   kind and type of area through which it flows?  Is it farm

24   area or what is it?

25      A   Rainbow Valley is an alluvium-filled area.

C

Z33

1          THE COURT:  By Rainbow Valley you mean the portion

2    shown in yellow with the word "Rainbow" in it?

3          THE WITNESS:  Yes, your Honor.

4          The stream channel continues across the Rainbow Valley

5    to where it leaves Rainbow Valley in the Northeastern Quarter

6    of Section 11, Township 9 South, Range 3 West.  In the North-

7    eastern Quarter of Section 11, Rainbow Creek leaves Rainbow

8    Valley, as the alluvium is mapped on this plan.

9    BY MR. VEEDER:

10         Q  And it proceeds on down to its confluence with the

11   Santa Margarita River; is that right?

12         A  Through basement complex and residuum areas.

13         Q  What kind and types of controls, if any, have you

14   observed on Rainbow Creek, such as dams or other diversions?

15         A  There are no known diversions along Rainbow Creek,

16   except there is a small-- I don't know whether in my own mind

17   it is a check dam or what-- immediately east of where the

18   road crosses Rainbow Creek in Section 9.  Generally in the

19   central portion of Section 9, just south of the center where

20   the road crosses Rainbow Creek, in Section 9 of Township 9

21   South, Range 3 West, there is a structure present in the

22   stream there.  However, I know nothing about it.

23

24

25

1   in the areas which are located generally between the con-

2   fluence of Rainbow Creek and the area down to and through

3   the town of Fallbrook?

4       A   The residual areas -- excuse me.  That is north

5   and south or southeast?

6       Q   On down below, downstream, yes.

7       A   The residuum crops are being raised on the residuum.

8   In quite a few areas crops are being used in the other areas.

9   There is still brush covering the slopes; other areas, it is

10  native grass.

11      Q   Now, proceeding farther on down, would you describe

12  the areas in which Fallbrook Creek rises?

13      A   Fallbrook Creek rises in Section, the southeastern

14  quarter of Section 18, Township 9 South, range 3 West, in a

15  residual area.  Then flows to the southwest across a broad

16  residual area to the Naval Ammunition Depot; and thence con-

17  tinues to the southwest to its juncture or confluence with

18  the Santa Margarita River at Lake O'Neill.  Throughout its

19  course it primarily is flowing or crossing residuum.

20      Q   What investigations, if any, have you made in

21  regard to the ground waters in the sub-basin of Fallbrook

22  Creek?

23      THE COURT:   Sub-basin?

24      Q   BY MR. VEEDER:   The sub-watershed.

25      A   Within the Fallbrook Creek watershed, within the

1    confines of the Naval Ammunition Depot, I have personally,

2    with necessary assistance, put down a series of three test

3    holes, three ordered test holes to approximate depths of

4    13 to 15 feet along Fallbrook Creek to observe what water

5    levels might be reflected in the residuum.

6         Q   What did you find?  What did those investigations

7    disclose?

8         A   Well, those investigations disclosed water present

9    in all the holes.

10        Q   And from the standpoint of the depth of the

11   residuum, what did they disclose?

12        A   Well, water table along Fallbrook Creek, where

13   tested, the water, when the holes were put in in the spring,

14   stood at relatively shallow depths, or should I, relatively

15   close to the surface of the residuum.  And progressively

16   through the summer, as we had maintained weekly measurements,

17   there has been a progressive dropping of the water level.

18        Q   Now, it is observed that within the United States

19   Naval Ammunition Depot that there is an area of basement

20   complex in the sub-watershed of Fallbrook Creek.  Would you

21   describe that phenomena as it relates to the runoff to the

22   stream in question?

23        A   Well, a surface runoff from Fallbrook Creek as it

24   passes across the basement complex mapped.

25        Q   Would you locate that basement complex, please.

1    A   The basement complex in mention occurs along

2  Fallbrook Creek in Sections 33 and 34 of Township 9 South,

3  Range 4 West.   Where Fallbrook Creek enters the basement

4  complex area in Section, in the Northwestern Quarter of

5  Section 34, it flows onto the area of basement complex, and

6  shortly thereafter within one to two hundred feet -- excuse

7  me -- at approximately two to three hundred feet after its

8  entry into the basement complex area in the Northwestern

9  Quarter of Section 34, right at the section line between

10  33 and 34, Fallbrook Creek passes over a water, an area of,

11  well, it creates a waterfall when surface runoff is flowing.

12    Q   Have you made any observations in regard to that

13  outcropping of basement complex as it relates to ground

14  water in the vicinity?

15    A   Just to the, well, we have observed waterfalls

16  area in the spring and later in the summer to see the

17  relative quantities of flow passing across this waterfalls

18  area, and the early spring.   Quantative measurements have

19  not been made, but generally speaking, in the spring a

20  greater flow is passing across the basement complex than

21  later on in the summer when it had nearly dried up entirely.

22    Q   From the standpoint of your observations, are there

23  any distinguishing features between the residuum shown on

24  Exhibit No. 70 and the residuum shown on Exhibit No. 67,

25  from the standpoint of depth or quality of the soil, or any

D-4

1    other distinguishing aspects?

2        A  As far as the residuum itself is concerned

3    generally, the makeup of the residuum will be the same.

4    They are on both Exhibit 70 and Exhibit 67.  The underlying

5    basement complex is predominantly of a granitic nature.  It is

6    granodiorite or tonalite.

7            THE COURT:  How do you spell granitic?

8            THE WITNESS:  G-r-a-n-i-t-i-c, your Honor.

9            THE COURT:  Pertaining to granite, then?

10           THE WITNESS:  Yes, sir.  It is used, granitic is

11   used in a general sense; not to identify any specific

12   igneous type rock but refers to all inclusive.

13           The depth characteristics of the residuum, its

14   determinative measurements have not been made.  It is solely

15   controlled by how much erosion has progressed in a specific

16   area, how much has been removed, or to what extent decompo-

17   sition has proceeded.  Generally speaking, in the Fallbrook

18   area, as on Exhibit 70, as compared to Exhibit 67, the

19   residuum generally is of a deeper nature.

20       Q  BY MR. VEEDER:  How did you arrive at that con-

21   clusion?

22       A  Mainly by observation, road cuts, stream channels

23   where it dissected the residuum, where erosion has dissected

24   it; personal observations and estimate.

25       Q  Would you state whether in the preparation of both

1    Exhibit 67 and 70, you undertook to disclose all of the

2    residuum found in the areas depicted on those two exhibits?

3        A   I believe I briefly referred to this.  However,

4    on both Exhibit 67 and Exhibit 70, only the principal areas

5    of residuum are portrayed.  Overlying all basement complex

6    where erosion has not stripped it off, there is, to some

7    extent, residual mantle; as it is a normal, natural process;

8    and whereby the basement complex undergoes decomposition.

9    There are conceivably other areas which are not shown which

10    would contain substantial depth of residuum.

11        Q   What about vegetative cover throughout the areas

12    which you have designated as basement complex?

13        A   Much of that area on both Exhibits 70 and 67 is

14    covered by brush.

15        Q   Is there forage, grasses, things like that growing

16    in that area?

17        A   In several instances, yes.  There are rather

18    extensive stands of natural grass, native grass, that is.

19        Q   What have you observed from the standpoint of

20    vegetative cover when you compare the basement complex with

21    the areas where there is but a thin mantle of the residuum?

22        A   I am sorry, I missed part of that question.  Would

23    you have it read, please?

24        Q   Have you made any observations in regard to

25    vegetative covers of the areas where there is a thin mantle

D-5

1   of alluvium -- I mean residuum, as compared with the base-

2   ment complex itself?  Can you distinguish the two on the

3   basis of your observation?

4   A   I understand the question now, Mr. Veeder.  On

5   those areas of basement complex, as compared to areas of

6   thin residuum, where the basement complex is completely

7   stripped of any mantle material, why, it shows up as bouldery

8   outcrops.  Where there is some thin residuum material or

9   disintegrative material, some disintegration, why, there are

10  sparse growths of brush and places of rather heavy growths

11  of brush.

12  Q   You may return to the witness chair.

13      Now, I hand you the Plaintiff's Exhibit marked

14  No. 69 for identification, and I ask you to read into the

15  record the title block of that exhibit.

16  A   The title block of Exhibit 69 for identification

17  reads:  "Sandia Creek watershed.  Geology.  Office of Ground

18  Water Resources, Marine Corps Base, Camp Pendleton, Calif-

19  ornia."

20      THE COURT:  Sandia is not shown on either one of

21  these?

22      THE WITNESS:  No, sir, your Honor, it is not.

23      Q   BY MR. VEEDER:  Now, would you step to the easel?

24  Refer first to the legend and state what is depicted in

25  regard to the exhibit in question.

        A   On the Exhibit 69 for identification?

Q  69, yes, sir.

A  Commencing on the left we have a block colored in
yellow with the letters Q.A.L.  This depicts the color used
to indicate the location of alluvium on the map.  Across to
the right the block colored in brown with the letters Q.R.
shows the color used to depict those areas of residuum
shown on the map.  Coming back to the left, the area, the
block colored in blue with the letters B.C. again shows the
color used to depict those areas of basement complex, and
colored in blue on the map.  Below this block, indicating
the B.C., there is an open circle, or a circle, a single
circle, which is a symbol used to indicate a test or unused
well.  Below this there is a solid line indicating a known
contact, such contact referring to contact between geologic
units described on the map.  To the right in the legend there
is a double circle which indicates a camp-supplied domestic
and/or irrigation well.  Below this is a black dot with red
inscribed upon it.  It is the symbol used to show areas of
rising water which are indicated on the map.  Below this
there is a dashed line, again representing approximate
contact, such contact meaning the contact between geologic
units mapped on the plan.

Q  Now, what was the base map you utilized in the
preparation of Exhibit 69?

1      A   The base map used in preparing Exhibit 69 again

2   were the seven and a half-minute quadrangle maps distributed

3   by, put out by the United States Geological Survey.

4      Q   What investigations did you make in the prepara-

5   tion of that, the geology that was depicted on Plaintiff's

6   Exhibit No. 69?

7      A   The geology was mapped by myself by walking across

8   the area and driving across the area primarily, with

9   occasional reconnaissance flights by air.

10      Q   Do you know this map to be exact from personal

11   knowledge?

12      A   Yes, this map is exact.

13      MR. VEEDER:   We offer in evidence the exhibit marked

14   69 for identification.

15      THE COURT:   Be received in evidence.   How many areas

16   of rising water are there?   I can't see from here.   One?

17      THE WITNESS:   I have indicated two, your Honor.

18      THE COURT:   Which two?

19      THE WITNESS:   Of rising water?

20      THE COURT:   Put the --

21      THE WITNESS:   One is located north of the San Diego

22   County-Riverside County line, approximately nine-tenths,

23   ninety-five hundredths of a mile north of that line.   The

24   other is approximately twenty-five hundredths of a mile

25   south of the Riverside County-San Diego County line along

1    the Sandia Creek.

2         MR. MOSKOVITZ:  May I ask a question.  This may come

3    too late for voir dire.  Mr. Veeder, is this the same map

4    that you gave us copies of?

5         MR. VEEDER:  I will have to ask the witness.

6         Q  Have there been any changes in the map?

7         A  The base map is the same.  Everything is the same.

8    I have indicated on here those areas of rising water.  And

9    I have inadvertently left -- they have been added on within

10   the last month, and the base plate having been prepared

11   before that.

12        Q  Will you state whether those points of rising

13   water are accurate, to your personal knowledge?

14        A  Those points of rising water are accurate and

15   have been checked; and located in the field, I might add.

16        THE COURT:  When did they appear as points of rising

17   water?  What time?

18        THE WITNESS:  They had been points of rising water,

19   your Honor.  They were --

20        THE COURT:  Year-around?

21        THE WITNESS:  As far as this year is concerned, your

22   Honor, yes, sir.  Over my period of investigation, of ob-

23   servance this year.

24        Q  BY MR. VEEDER:  Would you proceed and describe the

25   kind and type of terrain in which Sandia Creek rises and

1    briefly trace it to its confluence with the Santa Margarita

2    River?

3         A   Sandia Creek rises in the southern portion of

4    Section 10, Township 8 South, Range 3 West.  Flows generally

5    west for a distance of, north and west, for a distance of

6    approximately four miles, omitting any mileage around

7    meandering; generally four to five miles west before swing-

8    ing out in what we can refer to as Sandia Canyon; that area

9    in which alluvium is found along the stream channel.   In

10   this primary, in this four to five miles from where it flows

11   after rising, it is generally flowing through an area of

12   basement complex and minor residual areas.   After arriving

13   in the Southwest Quarter of Section 12, Township 8 South,

14   Range 4 West projected, the Sandia Creek turns south, flows

15   almost due south to a confined canyon area underlain, or

16   contained through a canyon containing an alluvium.   The

17   alluvium throughout this channel is confined, naturally, by

18   hills rising on both sides of the stream, hills of basement

19   complex.   Throughout this for approximately two and a half

20   miles Sandia Creek continues in a southerly direction before

21   entering, leaving Riverside County and entering San Diego

22   County in the north -- well, in the Southwestern Quarter of

23   Section 25, Township 8 South, Range 4 West projected.   At

24   this point the alluvial field channel continues for a distance

25   of approximately .75 of a mile before the alluvium ends and

     the stream continues to the south and east through an area

Walker   Direct   3842

of basement complex.

1    The stream flows through this area of basement complex

2    in Section 36, Township 8 South, Range 4 West, and in the

3    Northeastern Quarter Section of Section 1, Township 9 South,

4    Range 4 West, the stream channel is again underlain by alluvium

5    and remains alluvium filled to where Sandia Creek arrives at

6    its confluence with the Santa Margarita River in the extreme

7    Northwestern Quarter of Section 7, Township 9 South, Range 3

8    West.

9        Q   Have you compared the areas, geologically speaking,

10    that you find in the Sandia subwatershed with the areas in

11    the De Luz watershed as to the kinds and types of soils that

12    you have encountered?

13        A   Geologically, the areas are comparable.  You have

14    the same type of basement complex, the same restricted and

15    confined alluvium-filled valleys and scattered areas of

16    residuum.

17        Q   What about the utilization of the residuum from the

18    standpoint of the production of crops?  Have you encountered

19    any uses of that nature in the valley?

20        A   Primarily in the lower portion of Sandia watershed

21    the residuum is being utilized fr crops.  In the northern

22    portion of the watershed within Riverside County there has been

23    some utilization of the residuum for crop growth.

24        Q   Have you observed--

25        A   I have observed some use, and there may have been

mE

Z35

1    previous use unknown to my knowledge.  I don't know.

2        Q  What are the sources of water, if any, up in there

3    for that land to which you have just made reference?

4        A  Well, in the residuum located in the northern part

5    of the watershed-- I will use the township and range projected

6    to locate it.

7        Q  Which area of residuum are you pointing to?

8        A  I am getting ready to identify it by township and

9    range, your Honor.

10        THE COURT:  There are three of them up there.  Which

11    one?

12        THE WITNESS:  I was going to go specifically to each

13    one of them, your Honor.

14        THE COURT:  All right.

15        THE WITNESS:  I might say at this point that in this

16    area there are no township and range lines.  It has all been

17    by projection and there may be conflict in Section No. 5

18    or possibly 8, for one instance, or 6 or 7.  It is strictly

19    a matter of projection, as there haven't been any section

20    or township or range lines projected in the area, and I am

21    projecting as I go, so to speak.

22        The body of residuum located primarily in Section 7 of

23    Township 8 South, Range 3 West (projected) was in this area

24    of residuum.

25        MR. SACHSE:  Is that the most--

E

Z36

THE WITNESS:  That is the most westernmost body, yes.

Within this body of residuum there is one existent well which contains water and water is being pumped from this well by windmill.

If I may, shall I continue by township and range designation, or may I refer to it by--

MR. VEEDER:  I think you can measure it off.  However you can use your projection that will be simplest for you.

THE WITNESS:  It will be easier just to avoid that.

MR. VEEDER:  All right.

THE WITNESS:  Approximately .8 of a mile west of the residual body previously located in Section 7--

MR. SACHSE:  East?

THE WITNESS:  East-- excuse me.

-- there is a small body of residuum having three wells located therein.  I see that we have neglected to number one of those.  The northernmost, the unused well, is 5D1. That is a dry hole.  Excuse me.  The other one is lettered by the 8D1 designation.  There are only two wells.  In the case of the southernmost one, 8D1, the designation is slightly removed.  That confused me for a moment.  There is water in this well and there is a windmill upon it.  There is a well. We could not get a tape into it.  It is sealed at the top.

Proceeding to the southeast there is a residual body, the largest of the three residual bodies, approximately a

E

Z37

1    tenth to fifteen hundredths of a mile southeast of the

2    previously mentioned residual body.  There is a large area

3    of residuum located primarily around Walker Valley or Walker

4    Basin as it might be referred to.  Within this residual body

5    there is one well located in the northernmost portion,  It is

6    an unused well at present.  However, when checked in the

7    spring it did contain water.

8    BY MR. VEEDER:

9        Q  At what level, do you recall?

10       A  I would have to refer to my notes.

11       Q  What other sources have you observed in that area?

12       A  Directly south of the well noted as 5D1 in the

13   principal residual body, proceeding almost due south for a

14   distance of approximately 1.8 miles-- excuse me-- 1.9 miles,

15   there is a well noted by projection only as 17P1.  This well

16   is caped by a windmill.  It is in a minor residual area there

17   and it does contain water.

18       Q  What about the lower area of residuum?  Have you

19   investigated that from the standpoint of source of water?  I

20   am speaking now of the--

21       A  In the lower portion of the residuum located in the

22   southernmost portion of the body, there are known wells in the

23   area.  However, they have not been personally checked for

24   water levels.

25       MR. VEEDER:  You may cross-examine.

E

Z38

1         THE COURT:  It is 12 o'clock.  Do you want to come

2   back at 1:30 or a quarter of 2?

3         MR. VEEDER:  How about a quarter of 2, your Honor?

4         THE COURT:  Is 1:45 agreeable?

5         MR. SACHSE:  Right.

6         THE COURT:  All right.

7         MR. DENNIS:  Wasn't the witness to put the red line

8   on, I think, 15?

9         THE COURT:  Yes.

10        THE WITNESS:  Yes, I was going to do that.

11        MR. DENNIS:  Your Honor, I wonder if he can do that at

12  the lunch time before we get into our cross-examination.

13        THE WITNESS:  Yes.

14        MR. VEEDER:  That will be put on.

15        (Noon recess.)

16

17

18

19

20

21

22

23

24

25

E1

Z39

SAN DIEGO, CALIFORNIA, FRIDAY, OCTOBER 24, 1958.   1:45 P. M.

MR. VEEDER:  The red line has been transferred onto Plaintiff's Exhibit 15 in accordance with your authorization.

THE COURT:  All right.

MR. SACHSE:  Are you through with Direct Examination, Mr. Veeder?

MR. VEEDER:  Yes.

MR. SACHSE:  I guess I am the blocking back again, your Honor.

THE COURT:  All right.


CROSS-EXAMINATION

BY MR. SACHSE:

Q  Lt. Walker, you reported to Camp Pendleton in October, 1957?

A  That's right.

Q  And were assigned to the Ground Water Resources immediately?

A  That is right.

Q  Who was your superior officer in that unit?

A  At that time it was Major Bowen, who was the officer in charge.

Q  Is that now Lt.-Col. Bowen?

1          A   That is Lt.Col. Bowen.

2          Q   That is the same name as appears on your exhibit,

3    "Approved by A. C. Bowen"?

4          A   That is correct.

5          Q   Had you prior to your assignment to Camp Pendleton

6    had any familiarity with this watershed?

7          A   Prior to my reporting to Pendleton, no, sir, I had

8    not.

9          Q   So all of your comments as to terrain, water courses,

10   anything of that kind, are based on observations made during

11   that winter of 1957 and this year?

12         A   That is correct.

13         Q   Now you stated yesterday that you also worked on

14   about thirty completed studies for private ownerships in the

15   upper watershed?

16         A   That is private ownerships and BLM land.

17         Q   What?

18         A   Bureau of Land Management land.  Perhaps I misunder-

19   stood, or maybe I misstated.  That is not only confined to

20   the upper watershed, but throughout the watershed.

21         Q   I was just going to ask, did you work on any such

22   studies for private ownerships in any of the areas depicted

23   on your three exhibits?

24         A   Within the DeLuz watershed, yes.

25         Q   And are those the typical study that have been

E1

Z41

1    introduced in the master's hearing entitled "Engineering

2    Reports" on various parcels?

3         A  Yes, that is right.

4         Q  In what areas of the upper watershed did you make

5    such studies?

6         A  I have made such studies in the upper watershed

7    around Diamond Valley, the Diamond Valley region, and also--

8    as yet they are unpublished; by "published" I mean they have

9    not been completed in the complete report form as you have

10   them-- near Aguanga, Radec, Palomar Mountain.

11        Q  Do you know how many private ownership studies you

12   worked on in the De Luz watershed?

13        A  Immediately I cannot give you an exact number.

14        Q  Approximately.

15        A  Approximately I would say ten or twelve, Mr. Sachse.

16   I would like to recheck it for sure, of course.

17        Q  Would you be able to recall, if I suggested the

18   names of some of the ownerships, whether you worked on in-

19   dividual ownerships?  Would you recognize them by name?

20        A  Yes, sir, I believe I would.

21        Q  Did you work on Garnsey?

22        A  Garnsey-- the previous report had been done, and he

23   requested, as I recall, a recheck on the work, and to that

24   extent I rechecked the work that had previously been done.

25        Q  Did you work on Bleeker?

E1

Z42

1    A  That was not done by me, no, sir.

2    Q  Did you work on Matthews?

3    A  Matthews; yes, sir.

4    Q  Did you work on Couch?

5    A  I recall the name and approximate location.

6    Q  You are not sure?

7    A  I am not sure, no, sir.

8    Q  How about Anderson?  That is an ownership on Fern

9    Creek.

10   A  Anderson I have done; yes, sir.

11   THE COURT:  Are these reports that you were satisfied

12   with or dissatisfied with?

13   MR. SACHSE:  Satisfied, your Honor, eminently.  I just

14   want to make sure whether he worked on them.

15   Q  Now, I have been looking at the exhibits and par-

16   ticularly trying to compare 69 and the red line on 17 and I

17   am, frankly, utterly lost.  I presume that the black line at

18   the upper end of 69 should tie into this red line, should it

19   not?

20   A  That is correct.  For one thing, of course, Exhibit

21   15, I believe, is on a scale of 1 to 62,500, Exhibits 69 and

22   70 and Exhibit 67 are all on a scale of 1 to 24,000.  A change

23   of scales will cause minor differences in the curvature of the

24   line.

25   Q  Let me show you exactly where I am confused.  Exhibit

E1

Z43

1   15 indicates an area in pink marked Qtv as lying within what

2   I conceive to be the same area covered by Exhibit 69.

3       A   Yes, sir; we have overlapped that at that point.

4       Q   And I find no symbol for anything of that kind in

5   69, and in attempting to reconstruct locations I find, it looks

6   to me like, some of the residuum you have mapped on 69 would

7   be the same thing mapped by Mr. Kunkel as Qtv.  What is that?

8       A   Tertiary volcanics-- basalt.

9       Q   It looks like the same thing.

10      A   I think that I can correct the misunderstanding.

11  Mr. Kunkel, by delineating Qtv, of course he is talking about

12  the volcanics which are capping the mesa.  I have not attempted

13  to break out the volcanic unit but have included it in the

14  basement complex.

15          In this portion the residuum that you see delineated

16  in the northern portion of Exhibit 69 of the Sandia watershed,

17  these exhibits would like-- on Exhibit 15 Sandia Canyon is in

18  this location-- now these areas of residuum depicted on 69,

19  on Exhibit 15 would lie approximately in this portion, Mr.

20  Sachse.

21      Q   I am tracing, I believe, with a pointer, the line

22  of Sandia Creek running right up through the middle of it on

23  69.  Now I am tracing with a pointer the line of Sandia Creek

24  running just immediately below the Qtv, and it would appear to

25  me at least that a portion of the two ground residuums are the

E1

Z44

1   same as this.  I am just curious if they are.

2       A  Yes, Mr. Sachse, they are.  I will tell you where

3   there may be a misunderstanding.  I would have to check the

4   record to be sure.  I may have, in tracing up Sandia, inad-

5   vertently gone up the wrong fork.  I think that is where our

6   misunderstanding may exist.

7       However, in response to your question, the residuum

8   exists in this portion as shown and is not correlative to the

9   Qtv shown on Exhibit 15.

10      THE COURT:  Qtv was what?

11      THE WITNESS:  The tertiary volcanics capping the mesas,

12  your Honor.

13  BY MR. SACHSE:

14      Q  Still while we are approaching the maps, I notice

15  no distinction on either 69, 70 or 67 between older and younger

16  alluvium.  Is it intended that what you would describe as

17  older alluvium is included within the yellow on the three

18  exhibits?

19      MR. VEEDER:  May I interpose an objection there.  He

20  hasn't testified as to any older alluvium in the area.  I

21  think we can confuse this terribly if we permit the continental

22  deposits, which are the older alluvium, to be confused with

23  this part of the Valley.

24      THE COURT:  I had asked him about the orange, what he

25  called the terraces, on Exhibit 70.

E1

345

BY MR. SACHSE:

Q   We have symbols all over 15 for Qtval, which I have
understood is older alluvium, and Qtoal which is younger
alluvium, and here we have Qal.   I want to know the relation,
if any, between Qal, Qyal and Qtoal.   That is all I am trying
to find out.

A   In response to your question, the Qal as I have used
it on Exhibits 67, 69 and 70 includes all alluvium.   This
alluvium is primarily what would be considered on Exhibit 15
as the Qyal.   There are relatively-- well, there are very
minor areas that I have encountered which possibly could be
broken out as older alluvium, but they were not worth the
effort.

Q   I wanted to ask next the question that his Honor
asked about the Qt, which we have not observed on any other
previous exhibits.   What do they most closely relate to-- that
type of deposit?

A   They are an older alluvial sediment.

MR. VEEDER:   I might add, in that connection, your
Honor, that the next geologist we call will go into great
length on that phase of it.

THE COURT:   All right.

BY MR. SACHSE:

Q   Similarly on 15 we had a symbol for basement com-
plex bc with a w in brackets, which was described, according

El
z46

1   to my notes, as weathered basement complex in the gray area.

2   What is the relationship between weathered basement complex

3   and residuum, if any?

4           MR. VEEDER:  It just happens that we have a different

5   legend.  I don't believe that Lt. Walker should be examined

6   on another exhibit.  But I am perfectly willing to--

7           THE COURT:  Well, the question is whether he is using

8   the same type symbols that Mr. Kunkel is using, or whether

9   he has his own set.

10          MR. VEEDER:  They use a different color, your Honor.

11  The brown on 67 and 70 and 69 comport with the gray that Mr.

12  Kunkel used on 15.

13          MR. SACHSE:  Thank you.  That's all I was trying to

14  find out.

15          THE COURT:  In other words, what Mr. Kunkel spoke of

16  as weathered basement complex is the equivalent of what was

17  spoken of here as residuum?

18          MR. VEEDER:  That is correct, your Honor.

19          MR. SACHSE:  All right.

20          Q  Now, with particular reference to the DeLuz Creek,

21  Exhibit 67, you answered one of Mr. Veeder's questions by

22  stating that either the residuum or the alluvium in that area,

23  according to your observations, was adaptable for crop use?

24          A  Subject to physical limitations.

25          Q  Subject to physical limitations.  Isn't it a fact

E1

Z47

1    that very, very large portions of the alluvium along both stems

2    and the main stem of DeLuz Creek are extremely subject to

3    flooding; they are strewn with boulders, they would be

4    classified, in land classifications, as Class VIII worthless

5    land, suitable only for recreation or oil land?

6    A    That is correct, Mr. Sachse.  By physical limitations,

7    flooding during the rainy season, of course, there is a

8    definite handicap and would be a definite factor that would

9    have to be considered in any usage of that land.

10    Q    Still with reference to De Luz Creek, am I not

11    correct in stating that at many points along both forks and

12    the main stem solid granite basement complex appears in the

13    stream channel without any veneer of alluvium whatsoever?

14    A    That is correct, Mr. Sachse.  If you will notice

15    on Exhibit 67 the blue area depicted in the center-- not ex-

16    actly in the central, but within the yellow colored areas of

17    Qal, the blue area represents the basement complex exposed in

18    the stream channel.

19    Q    Did you attempt to measure the depth of the alluvium

20    at any points in the De Luz Creek watershed?

21    A    Measurements have been taken of the wells, I might

22    say.  However, there are no logs available definitely to say

23    if that was the base of the alluvium or not.  For that reason,

24    on Exhibit 69, on the cross-section, the contact has been

25    dashed in as approximate only.

1     Q  I was going to direct your attention next to that

2  exhibit.  Would I be correct in stating that your best

3  estimate, then, is that the greatest depth of alluvium on

4  De Luz Creek outside of the military reservation would be 50

5  feet or less?

6     A  If that is what it scales off to be, yes, sir;

7  except-- now, I might call one point to mind at this point.

8  At the location of Well 8 South, 4 West, 29M--

9     Q  That is on the Garnsay property?

10     A  That is on the Garnsay property.  It has been

11  projected into the section line.  The stream at this point

12  was incised below the upper level of the alluvium.  For that

13  matter, the well, the upper portion of the well is shown

14  standing above the section line.

15     Q  But even in scaling that off you would find only a

16  depth of 50 feet, would you not?

17

18

19

20

21

22

23

24

25

F-1 ML j

F-2

A   I believe the exact depth, as I measured it, was 56 feet but --

Q   So your best estimate of the greatest depth of alluvium on the main channel of De Luz Creek outside the military reservation would be 50 feet or less?

A   That is right.

Q   And on the east fork of the De Luz Creek would be less than 50 feet at all points?

A   Based on our well measurements.  That is all that we have to go on.  That is the best I can do.

Q   You have many more wells indicated, located on Exhibit 67 than you do on 68, and some of them appear to me to be almost squarely on the line of section.  Is there any particular reason why other wells, such as, going down the main stem now -- A-1, A-2, C-1, and so on -- were not also utilized on the geological Section 68?

A   No, sir; they could have been plotted in.  Just felt it was repetitious to be including all of them.  The three or four -- three that have been used in the upper portion of De Luz Creek is thought to give enough control to show the approximate contact.

THE COURT:  The order in which these fit together is that 70 is the most southerly, and then the Sandia segment comes in, and De Luz, is that correct?

THE WITNESS:  That is correct, your Honor.

1    Q  BY MR. SACHSE:  Sandia could be superimposed on

2    this, am I not correct, as being this area?

3    A  Right, sir.

4    Q  And the De Luz would be the area immediately --

5    (inaudible).

6    THE COURT:  All right.

7    Q  BY MR. SACHSE:  Do you know offhand the names of

8    the ownerships of these others?

9    A  I would have to check.

10   MR. VEEDER:  I object.  It is beyond the scope of

11   the direct examination.

12   THE COURT:  Sustained.

13   Q  BY MR. SACHSE:  Now, moving on to Exhibit 70.  Am

14   I correct in stating that the most southwesterly area en-

15   closed in the heavy black line I am now outlining, which

16   would be the extreme southwest; it runs through the terrace

17   department and down to Lake O'Neill; on the south representing

18   the southerly boundary of the whole watershed.  Is that the

19   Fallbrook Creek drainage?

20   A  That is correct.

21   Q  And you testified that Fallbrook Creek rose in

22   Section 19 in the residual.  Can you locate any spring or

23   exact point of rising water for Fallbrook Creek, or have you

24   ever observed such a phenomenon?

25   A  I have not observed any spring at the head of

1    Fallbrook Creek.  No, Mr. Sachse, I haven't.

2         Q  You have found no point of rising water, have

3    you, at the head of it?

4         A  No, I have not, Mr. Sachse.

5         Q  Is it not a fact that Fallbrook Creek is the

6    drainage that flows over during and immediately after

7    periods of precipitation?

8         MR. VEEDER:  I object.  It is beyond the scope of

9    the direct examination.  He didn't testify to that phase of

10   it at all.

11        THE COURT:  Sustained.

12        Q  BY MR. SACHSE:  Have you made any observations as

13   to what time of year Fallbrook Creek does flow, in your

14   observations this year?

15        A  Within my period of observation, the principal

16   period of flow has been during the rainy season and im-

17   mediately thereafter.

18        Q  Are you testifying that you drilled three test

19   holes in the Naval Ammunition Depot in the bed of Fallbrook

20   Creek?

21        A  That is correct.

22        Q  Have you made any similar tests outside the depot

23   in the Fallbrook Creek drainage?

24        A  No, I have not.

25        Q  You testified that the residual was, in your

1    opinion, generally deeper in the Fallbrook area than in the

2    De Luz area.  That conclusion is based upon --

3        A   I think I may --   Excuse me.  I think I may have

4    qualified that, Mr. Sachse, by saying that better outcrops

5    were visible for inspection along the north slopes there,

6    north of Fallbrook and in the road cuts.

7        Q   And those determinations were made on the basis

8    of examination of road cuts and things of that kind rather

9    than actual borings?

10       A   That is correct.

11       Q   Now, in the Fallbrook creek drainage I observe a

12   very small symbol.  It is in the residuum.  It is just up

13   to the northeast of the Q.R. letter.  Let's locate it.  What

14   section is it in?

15       A    That section, north edge of Section 19.

16       Q   What is that symbol?

17       A   At the moment, Mr. Sachse, I cannot answer that.

18   I do not know.

19       THE COURT:  Which symbol are you pointing to?

20       THE WITNESS:  Right here, your Honor.  North half of

21   Section 19, I believe it was.

22       MR. SACHSE:  A little irregular-shaped area enclosing

23   a dark line.

24       THE WITNESS:  It is undoubtedly traced off of a topog

25   sheet.

Walker - Cross

1          MR. VEEDER:  There is a big -- large reservoir up

2     there in Fallbrook.

3          MR. SACHSE:  Are you testifying, Mr. Veeder?  The

4     witness didn't know.

5          MR. VEEDER:  I was attempting humor, your Honor.  I

6     hope we don't get so serious we can't have a little fun.

7          Q  BY MR. SACHSE:  Now, with reference to the Sandia

8     Creek geology, and also particularly at the point, I believe

9     the extreme lowest point of Sandia Creek on the Exhibit 69,

10    is the same as the one point where the alluvium appears to

11    leave Exhibit 70, is it not, confluence of Sandia Creek and

12    the Santa Margarita?

13         A  Yes, sir, that is correct.

14         Q  Are you familiar with the bed of the Santa Margarita

15    River itself in that location, the stream bed?

16         A  Yes, I am, Mr. Sachse.

17         Q  Is that not a situation very similar to some of

18    those we just discussed on De Luz Creek where the bed rock

19    is immediately on the surface with no alluvium?

20         A  There is considerable basement complex outcropping

21    in the area and in the portions of the stream channel, yes,

22    sir.

23         Q  And that same condition exists intermittently up

24    and down, up the length of the river, does it not?  There

25    are outcroppings of basement complex in the areas you have

Walker - Cross                                              1862

indicated as alluvium, above Sandia Creek?

A   Are you referring to the central areas of the alluvium, Mr. Sachse, or along the edge?

Q   No, the stream channel in the central areas.  You have indicated the entire stream as being alluvium.  My question is:  Is it not a fact that at many points upstream from Sandia Creek the basement complex has been scoured off and is right there with nothing on top of it?  Or don't you know?

A   I have made no -- I have not seen any outcroppings of basement complex in the stream channel.

MR. VEEDER:  Now, would you state, Lieutenant, where you are pointing and to the end that the record will show by legal subdivision?

THE WITNESS:  Oh, I am sorry.  Within the area of, for instance, above -- in or within the Section 7 of Township 9 South, Range 3 West.  Having observed it along the banks I have not seen outcroppings of basement complex within the alluvial material.  Progressing upstream, where I have checked it at various points, at such points I can generally recall, at no point have I particularly noticed outcrops of basement complex within the alluvium.

Q   Now, with reference to Exhibit 69, Sandia, you have indicated in red, as I understand it, two points of rising water; and by a red line extending downstream below them

Walker — Cross

1    you have indicated the approximate --

2           A   Extent.

3           Q   -- extent of the surface flow?

4           A   That is correct.

5           Q   When was that observation made?

6           A   Well, latest observation on which these lines are

7    present were the latter part of September.

8           Q   Of this year?

9           A   Of this year.

10          Q   You observed surface flow at all points you have

11   indicated in red in September of this year on Sandia Creek?

12          A   Yes, sir.

13          Q   I notice that there are no wells indicated on

14   Exhibit 70, whereas you have indicated wells on the other

15   three geological exhibits.  Is there any particular reason

16   for that?

17          A   The reason behind that, Mr. Sachse, is that on

18   Exhibit 67 and 69, I have personally been able to check most

19   of these wells and locate them, locate them on my topographic

20   sheets.  On Exhibit 70, we had not -- well, I did not get

21   onto the properties personally to investigate or to do

22   surveys on the property personally for the owners; and for

23   that reason we have not indicated that.

24

25

Q

Z49

Walker    Cross

3864

Q  Have you attempted to locate on each of these exhibits any surface storage that you found?

A  May I have the question read?

(The reporter read the pending question.)

A  By that do you mean reservoirs, Mr. Sachse?

Q  Yes.

A  I have not plotted any reservoirs as such on the exhibit; no, sir.

Q  I will direct your attention to what I think is a reservoir.

A  Except where they have been traced off of the quadrangle maps, of which the base map was constructed.

Q  I am now referring to a symbol on Exhibit 69, immediately to the left of Section 31.  The reason that it appears on your map is not that you located it, but that it was so traced off the U.S.G.S. quads?

A  It was traced off the U.S.G.S. quads.  I also know in that particular instance that it does exist.

THE COURT:  Whose reservoir is that?

THE WITNESS:  Mr. Sawday's, I believe, your Honor, in Section 31, Township 8 South, Range 3 West.

BY MR. SACHSE:

Q  You have located also points of rising water on Exhibit 69 and on Exhibit 67, but I find no such locations on Exhibit 70.  Is that because you didn't find any?

Walker — Cross

G

Z50

1    A   There is water on Exhibit 70, Mr. Sachse.   I have

2    not shown it because it is flowing down the channel of the

3    Santa Margarita River from where we come into the map.

4    Q   I should have made myself clear.   Excluding the

5    river proper, there are no points of rising water indicated

6    for subtributaries of Rainbow Creek or of Fallbrook Creek,  Is

7    that because you did not locate any such points?

8    A   I have not personally observed any points, no, sir.

9    MR. SACHSE:   I have nothing further, your Honor.

10   THE COURT:   Mr. Moskovitz.

11   MR. MOSKOVITZ:   I have a few questions, your Honor.

12

13                      CROSS-EXAMINATION

14   BY MR. MOSKOVITZ:

15   Q   Lt. Walker, in making the studies and preparing the

16   exhibits about which you have testified, did you review any

17   previous reports or studies of geology of the same area?

18   A   In making up my exhibits, Mr. Moskovitz, it is

19   common practice to consult any additional information which

20   might have been prepared on the area, and in doing so I have

21   scanned works previously done by Larsen, by our office, and--

22   which is common knowledge-- in Bulletin 57 there is a map

23   that has also been looked at.   None, I might add, have been

24   used as a base map.   All have been used as reference works,

25   looked at, and the work has been carried on by myself in making

G

Z51

1      the--

2              THE COURT:  By 57 you are referring to Bulletin 57?

3              THE WITNESS:  Yes.

4              THE COURT:  Fallbrook's AA for Identification and

5      California's 12.

6              MR. VEEDER:  I say he is still a fine young man.

7              THE COURT: What is the plat in 57?  Do you know the

8      number?

9              THE WITNESS:  The plat number?

10             THE COURT:  The one called the Coastal Area?

11             MR. MOSKOVITZ:  13-A is the one that has the detailed

12     geology, your Honor, and another one has the geology in less

13     detail-- that is 9-A, the one that has the location of the

14     wells.

15             Q  Lt. Walker, I believe you testified that you made

16     no measurements of the depth of the alluvium other than in the

17     course of examining some of the wells in the areas you have

18     studied; is that correct?

19             A  That is correct.  That cannot be testified to as a

20     definite establishment of the depth of the alluvium.  It is

21     only the depth of the well.

22             Q  Did you get any idea of the depth of the alluvium

23     in Rainbow Valley from the study that you made?

24             A  I have not personally measured any wells in Rainbow

25     Valley.

G

Z#52

Q  I want to be clear on this.  Did you consider the depth of residuum in any of the three areas mapped on Exhibit 69, 67 and 70 in mapping those areas?

A  I believe I have previously stated that I did not use any known or definite depth of black line.

Q  In any of the three areas?

A  In any of the three areas; no, sir.

Q  And I believe you also testified that you did not study-- I will ask you the question.  Did you study any well logs in attempting to determine the depth of residuum in the Fallbrook area?

A  I have not had access to it.  As far as I know, there are no well logs.

Q  I believe you said that you based your opinion as to the approximate depth of residuum in the Fallbrook area on observation of road cuts, and I believe you also mentioned testing.  Did I misunderstand you?

A  What I was referring to there, Mr. Moskovitz, we did put in three test wells into the residuum.  We did not necessarily reach a conclusion as to the depth from those wells.

Q  Those are the three test wells on the Naval Ammunition Depot that you testified to?

A  Yes.

Q  And those did not go to the bottom of the residuum

G

Z53

1    at those points?

2         A  No, we had no way of determining if they were on the

3    bottom.

4         Q  Looking at Exhibit 68 -- that is your cross-section--

5    I didn't find any key to horizontal distance.  Is there one on

6    there?

7         A  Yes, the horizontal scale is one inch to 2,000 feet;

8    the vertical scale is one inch to 200 feet, on Exhibit 68.

9         Q  But nothing you could put a straightedge on?

10         A  No, we have no bar scale.

11         Q  Did you make any determination or did you make any

12    observations as to the sources of water at Fallbrook Creek?

13         A  Sources of water for Fallbrook Creek are primarily

14    runoff, other than-- well, sources of the creek would be

15    during and following precipitation.  Otherwise, it is con-

16    sidered an intermittent stream, except for what sewage

17    effluent is being discharged.

18         Q  Is there return flow from irrigation in the area

19    that comes down?

20         MR. VEEDER:  Objected to as being beyond the scope of

21    the direct.

22         THE COURT:  Sustained.

23    BY MR. MOSKOVITZ:

24         Q  You mentioned that there is sewage effluent.  Where

25    does the sewage effluent come from?

A   The exact position I am uncertain of.   It is a short distance above the Naval Ammunition Depot boundary line on the Fallbrook side.

THE COURT:   Is this sewage from Fallbrook?

THE WITNESS:   To the best of my knowledge, your Honor.

THE COURT:   At least it is not Pendleton sewage?

THE WITNESS:   No, sir.

In Section 25, Township 9 South, Range 4 West.   I am not sure of its exact plotting, but it is within that area, to the best of my knowledge.

BY MR. MOSKOVITZ:

Q   I believe you testified that you observed in the spring, I suppose it was of this year, and then into the summer decreasing flow in Fallbrook Creek over the area where you said there appeared to be a waterfall?

A   That is correct, Mr. Moskovitz.

Q   And this flow continued after the rains of the spring had ceased; am I correct?

A   That is correct.

Q   Do you have any observations as to the source of that water?

A   In part, at least, some of it of course is the sewage effluent which is being discharged.   Whether that is the total amount I have no measurement.   I don't know. I couldn't answer.

G

Z55

1    Q  Now, you have mapped an area in the southwesterly

2    corner of your Exhibit 70 in orange, and that is keyed as

3    terrace deposit; is that correct?

4    A  That is correct, yes.

5    Q  What is the nature of terrace deposits?  What does

6    it look like on the surface?

7    A  They are somewhat of a mixed nature.  They have

8    cobbles, fine material, some clay.

9    Q  Does anything grow on the surface?

10   A  Native grasses.

11   Q  Did you make any observations as to whether there

12   was water in the ground?

13   A  No, I have not; no, sir.

14   MR. MOSKOVITZ:  I have no more questions.

15   THE COURT:  Mr. Dennis.

16

17                      CROSS-EXAMINATION

18   BY MR. DENNIS:

19   Q  Lt. Walker, are you thoroughly familiar with the

20   course of the Santa Margarita River from the time that it

21   entered the area which you said you investigated as shown on

22   Exhibit 70?

23   A  I have walked portions of it, Mr. Dennis, and other

24   portions I have investigated locally.

25   Q  Starting up here where Santa Margarita just below

F

Z56

1    the confluence of Murrieta Creek and Temecula Creek, have

2    you started at the confluence of Murrieta Creek and Temecula

3    Creek and walked downstream?

4        A   The total distance of the stream?

5        Q   No, for any distance.

6        A   For a short distance.

7        Q   How far down?

8        A   Several hundred feet, maybe a thousand feet.

9        Q   Are you familiar with the location of the gaging

10   station which is designated as being near Temecula?

11       A   I have been on the site; yes, sir.

12       Q   Would it be possible for you to show the location

13   of that gaging station on Exhibit 70?

14       A   If I may, I would like to put it on correctly with

15   the use of a topo sheet.

16       Q   Could you do that the next time we have a recess?

17       THE COURT:   All right.

18   BY MR. DENNIS:

19       Q   You say you have only gone down the stream several

20   hundred yards?

21       A   At this particular area?   That is correct.

22       Q   How do you arrive at the character of the stream

23   and the surrounding territory in the area which would be just--

24   I need the overlay-- in Section 23, Township 8 South, 3 West?

25       A   As I mentioned earlier, portions of the area have

JOHN SWADER, Official Reporter

G

Z57

1  been checked by air, namely by helicopter, and on other than

2  where I have walked the course of the stream and inspected it

3  locally, part of the area has been checked by helicopter, and

4  I think I may have qualified myself when I described the

5  stream this morning by saying that locally alluvium is present

6  in the stream and locally bedrock.  These appear to have been

7  the primary areas of alluvial material in the Santa Margarita

8  channel as it crosses through the mountain area southwest.

9       Q  Lt. Walker, calling your attention to this part of

10  the stream as it crosses through Section 23 through the

11  basement complex, there is no alluvium present in that par-

12  ticular locality; is that correct?

13      A  There may be alluvium present in that locality,

14  Mr. Dennis, but it is of a minor nature and similar to many

15  streams throughout the watershed where there is locally

16  alluvium but of no significant amount.

17      Q  When you say of a minor nature, what do you mean?

18      A  Minor nature would be shallow depths, restricted

19  laterally.

20      Q  And shallow depth would be what, two or three feet?

21      A  If that much at times.

22      Q  Be less than that?

23      A  Could be.

24

25

Walker - Cross

3873

H-1

1      Q  You don't know that?

2      A  I have not made -- gone along and made test

3  borings, no, sir.

4      Q  I wonder if you could put the location of the three

5  test holes that you drilled in the bed of Fallbrook Creek

6  on Plaintiff's Exhibit 29-G, and if you would also designate

7  the intermittent stream which we have been referring to as

8  Fallbrook Creek on that exhibit?

9      MR. STAHLMAN:  He can do it during the recess.

10     MR. DENNIS:  He can do it at recess if he wishes.

11     THE COURT:  Yes.

12     THE WITNESS:  May I answer this?

13     Q  BY MR. DENNIS:  Yes.

14     A  I can do it right at, by memory approximately,

15  only.  I have it accurately located on a map at the office.

16     Q  Approximate, I think, would be good enough.

17     THE COURT:  Do it at recess.

18     THE WITNESS:  All right.

19     Q  BY MR. DENNIS:  Now, in the area which you refer

20  to as the residuum, you would expect to find it weathered to

21  various degrees, would you not, both as far as laterally

22  and horizontally?  In other words, some of this area would

23  be weathered much deeper than other areas?

24     A  That is correct.  The residuum, as the decomposition

25  goes, is a very indefinite extent.

Walker - Cross

3674

Q   And the degree of decomposition would also vary on the surface?

A   Vary from area to area.

Q   And you would expect to find the water in those portions of the residuum which were most deeply weathered, would you not?

A   Providing there were saturation.

Q   If there was saturation.

Did you make any attempt to determine the faults which existed in the area in which you made your examination and upon which you have reported?

A   I have not shown any faults on the map.  There are no principal faults known on the map.  There are no principal faults known within the map area, to the best of my recollection.  Although there are faults lying elsewhere.

Q   You made no attempt, though, to locate the faults in connection with the geology which you did?

A   No, I have not.

Q   But you did observe in the area evidence of minor faults within the area in which you made your study?

A   Concrete evidences of movement have not been observed on any, what I would consider any measured structure within the area.  For this reason, it has not been delineated on the map.

Q   Did you observe evidences of any faults within the

Walker - Cross

area?

A   No, I have not.

Q   Now, did I understand correctly, referring to Exhibit 69, that the area which is colored brown, south-easterly area, may be on the wrong tributary?

A   No.  No, I have not.  The area colored brown on Exhibit 69, indicating residuum, is correctly located.

Q   It is correctly located?

A   That is correctly located.

MR. VEEDER:  May I have Mr. Dennis' question on that?  I am sorry to interrupt.

MR. DENNIS:  I think I can answer the question.  He says it is correctly located.

THE COURT:  The witness made a statement heretofore about when he was going up Sandia he took the wrong branch; and what he obviously meant was, in his oral description in tracing here in the courtroom, he had taken the wrong branch.

MR. VEEDER:  Yes.

THE COURT:  Not that the area demarked was wrong.

MR. VEEDER:  I just wanted to be sure that was straight in the record.

Q   BY MR. DENNIS:  Calling your attention to Exhibit 68, and particularly alluvial basin, which is in the most northerly portion of the section line of De Luz Creek.  I wonder if you could again designate Exhibit 67 the location

Walker - Cross

1    of the southerly limits of that basin.

2        A   They are depicted as the area of rising water

3    where basement complex arises.

4        Q   As I now understand your testimony, then, the

5    downstream boundary of the most northerly basin would be in

6    the same location as the point of rising water shown on De

7    Luz Creek on Exhibit 67?

8        A   That is correct.

9        Q   And as to the basin which is shown on the east fork

10   of De Luz Creek, I wonder if you could mark the upstream and

11   the downstream boundaries of the basin on Exhibit 67?

12       A   The area depicted on the cross section of the

13   east fork of De Luz Creek on Exhibit 68, is that area

14   commencing at the point at the termination of the basement

15   complex where it is shown with any stream channel of the

16   east fork of De Luz Creek, from this point northeast to the

17   termination of the alluvium within Riverside County, approx-

18   imately a mile, a mile and a tenth above the Riverside County

19   line.

20       THE COURT:   On Exhibit what?

21       THE WITNESS:   On Exhibit 67, your Honor.

22       THE COURT:   Does the point of rising water on the

23   east fork bear any relationship to the edge of that basin?

24       THE WITNESS:   The rising water, your Honor, is slightly

25   upstream from the lower extent of the alluvium.   In other

1    words, the basement complex is somewhat removed downstream

2    from the point of rising water.

3         Q   BY MR. DENNIS:  Now, calling your attention to

4    Plaintiff's Exhibit 69, I notice that originally you had the

5    symbol for intermittent stream for Sandia Creek

6    running through Section 36, and I notice that you now have

7    replaced that with a solid red line.  Does that mean that,

8    in your opinion, that is not an intermittent stream at that

9    particular locality?

10        A   I have mapped what I have observed.  The base

11   map, as I have mentioned previously, has been prepared from

12   a seven and a half-minute topog of the United States

13   Geological Survey, and there are locally other areas where

14   their stream stages  are not in accord with mine.

15        Q   As I understand your testimony, then, that at

16   each time you have inspected Sandia Creek in Section 36, it

17   has been flowing on the surface?

18        A   When I have inspected it this year, as I believe

19   I mentioned, the latter part of September, that flow was

20   observed.

21        Q   Were there any dams upstream on Sandia Creek above

22   the point which you observed the surface flow?

23        A   To my knowledge, there are none.

24        Q   You do not know whether or not the boundaries of

25   Camp Pendleton and the United States Naval Ammunition Depot

1    are correctly depicted on Plaintiff's Exhibit 70?

2        MR. VEEDER:  I object to that.  It is beyond the

3    scope of the direct examination.

4        MR. DENNIS:  They are on the exhibits, however, and

5    I would like to know whether this witness knows whether or

6    not they are correct.

7        THE COURT:  Overruled.  Did you take them off of the

8    base map?  Or did you make the check yourself?

9        THE WITNESS:  To the best of my knowledge, your Honor,

10   they are correct; barring any drafting error in the base

11   map which I have not determined.

12       Q   BY MR. DENNIS:  Exhibit 70 purports to show the

13   boundaries of the United States Naval Ammunition Depot and

14   a portion of the boundaries of the Camp Pendleton, is that

15   correct?

16       A   Would you repeat your question, please.

17       Q   I say, Exhibit 70 purports to show the boundaries

18   of the United States Naval Ammunition Depot and a portion of

19   the boundaries of Camp Pendleton?

20       A   And a portion, exact    the N.A.D., the Naval

21   Ammunition Depot boundary is shown, but not the complete

22   over-all boundary of Camp Pendleton.  No, it is not.  This

23   is the Naval Ammunition Depot boundary line.

24       Q   That is the dash-dot line?

25       A   And is the heavy dash-dot line which follows the

1   approximate center line of the Santa Margarita River as

2   shown on Exhibit 70, the boundary line of the Naval

3   Ammunition Depot in that particular locality.

4       THE COURT:  Where does it follow the center line of

5   the Santa Margarita River?

6       MR. DENNIS:  If your Honor please, we have the overlay

7   --the overlay again.  Exhibit 70 shows that in Section 14,

8   approximately the center of Section 14, Township 9 South,

9   Range 4 West, there is a heavy dash-dot line which proceeds

10  through Section 14, 15, portions of 22, 21, and portions of

11  28.

12      Q   And I am asking the witness if that is the portion

13  of the boundary of the United States Naval Ammunition Depot?

14      A'  The line you just mentioned, Mr. Dennis, is the

15  line between, to the best of my knowledge, is the boundary

16  line between Camp Pendleton and the United States Naval

17  Ammunition Depot.

18      THE COURT:  Well, I lost you after 14, after Section

19  14.  I find the line.  Maybe my map isn't the same.  Put

20  your finger on 14.

21      MR. DENNIS:  Here is 14.

22      THE COURT:  I see the line there.

23      MR. DENNIS:  It goes up here in 15, down into 22, 21 --

24      THE COURT:  Wait a minute.  From 15 where?

25      MR. DENNIS:  15?

1      THE COURT:  Yes.  Lying in the stream bed?

2      MR. DENNIS:  Lies in the stream bed.

3      MR. VEEDER:  I renew my objection, your Honor, on

4  the ground this is beyond the scope of the direct examination.

5      THE COURT:  What difference does it make whether it

6  is in Camp Pendleton or the Ammunition Depot?

7      MR. DENNIS:  These properties, your Honor, were

8  acquired, the United States Naval Ammunition Depot properties

9  and the properties which compose Camp Pendleton, were ac-

10  quired at different times and from different people.  And I

11  think those exhibits have already been placed in evidence by

12  the plaintiff.  And I think, as time goes on, it will become

13  increasingly important as to the particular two parcels of

14  land.

15      THE COURT:  All right.  Objection is overruled.  It

16  has been answered.

17      MR. DENNIS:  I might have some question or two to

18  ask the witness after he places the three test holes he

19  drilled in the bed of Fallbrook Creek; but, other than that,

20  your Honor, I have no more questions.

21      MR. STAHLMAN:  Shall I proceed, your Honor?

22      THE COURT:  Yes, sir.

23

24

25

H-2

CROSS EXAMINATION

BY MR. STAHLMAN:-

  Q Lt. Walker, directing your attention to 67, the line referred to as the Riverside-San Diego line, you under-stand it to be the line of the boundary of the Vail ranch, do you not?

  A That is correct, Mr. Stahlman, yes, sir.

  Q Now, then, to the north of that line on 67, what is the character and the topography generally of the land included within the watershed area?

  A Fairly mountainous, Mr. Stahlman.  In fact, the place is quite precipitous.

  Q And in that area you have found no wells or dams of any kind, did you?

  A No, I have not, Mr. Stahlman.

  Q Now, directing your attention, then, to Exhibit 70, you recognize the line in the upper portion of the basement complex which runs from southwest to northeast as being the line designating the boundary of the Vail ranch, do you not?

  A Yes, sir, I do.

  Q Are you also familiar with the fact that Vail owns property that extends over the line as it was shown on the base map, from which you made Exhibit 70?  Or did you not know that?

Walker - Cross                                             3882

1          A   I am not completely familiar with the whole

2    boundary lines of the Vail ranch, Mr. Stahlman, no, sir.

3          Q   Then, insofar as the property is concerned that is

4    shown in the basement complex to the north of Exhibit 70,

5    what is the type and character of the topography of that

6    land and the vegetation, generally speaking?

7          A   Again, the country is locally generally rolling,

8    but generally hilly; place is mountainous, rough; and I

9    would say that probably the predominant cover just was brush

10   or grass, native grass.

11         Q   There are however in this area some valleys and

12   meadows and rolling hills, are there not?

13         A   Yes, sir, locally there are.

14         Q   Would you say that is true also of that portion of

15   the Vail ranch that lies to the north of the boundary line,

16   as shown in Exhibit 67?  Is that a different terrain?

17         A   No.   Before, when I answered your question, I

18   referred to the area as a whole.   However, again locally,

19   as outlined by the areas of residuum, there are areas of

20   gentle relief;     not mountainous as contrasted in your

21   surrounding areas are.

22         Q   Now, then, directing your attention to the Exhibit
                                               the
23   69 and the line running through/center of the map, dot and

24   dash line, Riverside County, and designated as such on the

25   left, and ranch down here on the right.   The area towards

1    the north on 69, you recognize that as being the Vail

2    property within the watershed as shown on 69?

3              A  That is correct, Mr. Stahlman, yes, sir.

4              Q  And what is the type and character of the topography

5    and general vegetation in that area?

6              A  Again, the area, commencing at the north, there

7    are quite precipitous slopes.  Locally, there are valleys

8    of very mild  relief    with native grasses coming further

9    below the areas of residuum depicted in the northern portion

10   of Exhibit 69.  From there generally south the region is

11   extremely hilly, place is mountainous,   rough topography;

12   and again locally, small areas of lesser relief.

13             Q  Good deer country?

14             A  Do you have transportation?

15             MR. VEEDER:  I move to strike that.  Humorous.

16             (Laughter.)

17             MR. STAHLMAN:  You are not going to fine me, are you,

18   Bill?

19             Q  Now, are you familiar with any structures that

20   exist upon the ranch in the area shown on the Exhibit 69

21   within the watershed of the Sandia Creek?

22             MR. SACHSE:  Would you clarify "structures," please,

23   Mr. Stahlman?

24             MR. STAHLMAN:  Farm structures.

25             MR. SACHSE:  I will object to that.  It is beyond the

1    scope of the direct examination.

2           THE COURT:  I didn't hear the adjective.  What kind

3    of structures?

4           MR. SACHSE:  Farm structures.

5           MR. STAHLMAN:  Buildings.

6           THE COURT:  This is beyond the scope of direct.

7           MR. STAHLMAN:  Well, I will put it another way.

8           THE COURT:  Do you have one or two matters you want

9    to cover by this witness?

10          MR. STAHLMAN:  That is all.

11          Q   You designated some wells, have you, on the

12   Exhibit 69?

13          A   Yes, sir, I have.

14          Q   How many wells did you observe on 69?

15          A   On the total exhibit, sir?

16          Q   Just in that area of the Vail properties?

17          THE COURT:  Most mountainous, northernmost part?

18          THE WITNESS:  I have observed five wells, Mr.

19   Stahlman.

20          Q   BY MR. STAHLMAN:  Five wells.

21          And were there any of those wells used for other

22   than domestic purposes, or do you know?  Did you make that

23   close an observation?

24          A   To the best of my knowledge, that is their use.

25          THE COURT:  Domestic, what do you mean by that?  As

Walker - Cross                                    3885

1    contrasted with irrigation?  Or do you mean domestic in

2    stock?

3            Q  BY MR. STAHLMAN:  You observed no wells in that

4    area used for the purpose of irrigation, did you?

5            A  No, sir, I did not.

6            Q  You observed a well at the ranch house?

7            A  By ranch house, would you --

8            Q  Did you see a house up there, and barns?

9            A  There are two areas that I know of, sir, that have

10   surface buildings.

11           Q  Surface buildings.  Were the wells in the vicinity

12   of those buildings?

13           A  That is correct, yes, sir.

14           Q  Two of them were, I presume; is that correct?

15           A  Yes, sir.

16           Q  You know which they are as designated upon the

17   map?

18           A  I know where the buildings are located.  I can

19   point to those.

20           THE COURT:  Point to them and give us the well number.

21           THE WITNESS:  7-D-2 in the northwestern portion of the

22   Exhibit 69, your Honor, there are surface buildings, a house,

23   and I believe some other farm buildings located across the

24   road from well 7-D-2.  And at well 8-D-1 to the east of

25   7-D-2, approximately one and nine-tenths of a mile, there is

1  another house with -- north of the house near the road two

2  wells, one a dry hole and one, 8-D-1 -- I was not able to get

3  a line into it.  It was sealed off.  It has a windmill on it.

4      Q  BY MR. STAHLMAN:  Now, then, when you indicated in

5  your direct examination the point of rising water, in

6  Exhibit 69, being the northernmost point of rising water,

7  what time of the year did you observe that?

8      A   That was observed in the latter portion of

9  September of this year, Mr. Stahlman.

10     Q  You don't have any opinion as to what the performance

11  of that area has been in relation to whether it flows the

12  year around or rises the year around, whether it flows to

13  one extent?

14     MR. VEEDER:  May I have that question, please.

15     (The reporter read back the question.)

16     MR. STAHLMAN:  I will withdraw it.  I don't think you

17  can understand --

18     MR. VEEDER:  George, you and I are in complete agreement.

19     MR. STAHLMAN:  -- the complete purport of it.

20     Q  The only opinion that you have in relation to the

21  performance of rising water at that point is what you actually

22  observed when you were there and not as to what the history

23  may have been in the past?

24     A  No, sir, I know nothing of its history.

25     Q  In your description generally of the areas of

1   vegetation and that which was suitable, particularly that
2   which was suitable for cultivation, you indicated that there
3   were areas in the residuum, although restricted by some
4   conditions, there are areas which are suitable for cultiva-
5   tion?

6        A   That is correct, yes, sir.

7        Q   That is also true of soils which cover the base-
8   ment complex, is it not?

9        A   That is correct.

10       Q   In other words, there are areas -- in fact, there
11  are large areas in the area of basement complex that are
12  suitable for cultivation, providing water was available for
13  dry farming?

14       A   That is correct, provided your physical limitations
15  are not such that --

16       Q   Yes.

17           Now, did you, on your direct examination, indicate
18  certain water levels on the Vail property wells?

19       A   I have made no mention of water levels.

20       Q   You didn't intend to give any information as to
21  what the performance of those wells were?

22       A   I have not studied those wells as to performance,
23  no, sir.

24           MR. STAHLMAN:   That is all.

25           THE COURT:   We will take our afternoon recess.

1          I think we can complete -- we are practically

2   through with this witness, are we not?

3          MR. VEEDER:  Yes, your Honor, we are.

4          THE COURT:  You have some things to do over the

5   recess.

6          THE WITNESS:  Yes, sir, your Honor.

7          (Recess.)

I

Z58

3889

THE COURT:  Exhibit 69 was offered in evidence.  I don't know whether the record shows that it was received or not.

THE CLERK:  Yes, your Honor.

THE COURT:  It was received?  All right.

MR. VEEDER:  Exhibit 69 was offered and was received.


CROSS-EXAMINATION (resumed)

BY MR. DENNIS:

Q  I think during the recess the witness haslocated the gaging station on the Santa Margarita near Temecula on Exhibit 70.

Is that a cross with a circle around it, Lt. Walker?

A  It is a circle, with a cross in it, yes.

Q  Have you personally visited the location of the gaging station?

A  I have been on the location; yes, sir.

Q  And are you familiar with the stream bed at that location?

A  Yes, sir, I am.

Q  Would you describe it?

A  To the best of my memory-- it has been several months since I have been there-- the gage is set against the cliff on the side, with the connection from the stream to it.  I am not an expert on stream gages.

I

Z59

1      Q  Not the station; the stream bed, the bed of the

2  stream.

3      THE COURT:  What counsel wants to know, is the stream

4  bed down on basement complex?

5      THE WITNESS:  There is some alluvium in the stream bed

6  at that point.

7  BY MR. DENNIS:

8      Q  Did you make any investigation as to the depth of

9  the alluvium at that point?

10      A  No, I have not.

11      Q  Do you have any estimation as to the width of the

12  alluvium at that point?

13      A  At the point in there it would be 30, 40 feet, as

14  my memory goes.

15      Q  I think you also located the three test wells that

16  you put in the bed of Fallbrook Creek on Plaintiff's Exhibit

17  29-G.

18      A  Yes, I have.  They are approximate in location.

19      Q  And they would be in Sections 26 and 35, Township

20  9 South, Range 4 West?

21      A  The wells that I have indicated by approximate

22  location are indicated by a circle, and the upper one on

23  Fallbrook creek would be in the extreme western portion of

24  Section 25.

25      THE COURT:  25?  26 you mean.

I

Z60

1     THE WITNESS:  I was starting with the uppermost well,

2  your Honor.

3     THE COURT:  I see.  All right.

4     THE WITNESS:  In the extreme western portion of Section

5  25, Township 9 South, Range 4 West.

6     Coming downstream, the next well is located in the

7  Southwestern Quarter, or Southeastern Quarter-- excuse me--

8  of Section 26, Township 9 South, Range 4 West.

9     The third test well is in the Northeastern Quarter of

10  the Northwestern Quarter of Section 35, Township 9 South,

11  Range 4 West.

12  BY MR. DENNIS:

13     Q  Do you know whether any sewage effluent is discharged

14  into Fallbrook Creek by Fallbrook Sanitary District?

15     A  I know that there is some sewage effluent in the

16  stream.  The name of the particular agency which is discharg-

17  ing it I do not know.

18     Q  Do you know the location at which it is discharged?

19     A  Approximately only.

20     Q  About how far upstream is it from the well which

21  was in Section 25?

22     A  As I recall, the location of the point, it would be

23  approximately a thousand feet, perhaps more.

24     Q  Do you have any estimate of the quantity of effluent

25  that is being discharged into the stream at that point?

3892

A   I have no knowledge of whatever the quantity might

be.

MR. DENNIS:   That is all.

MR. VEEDER:   Are there any other questions?

I have some redirect, your Honor.

THE COURT:   All right.


REDIRECT EXAMINATION

BY MR. VEEDER:

Q   Lt. Walker, would you approach Plaintiff's Exhibit

No. 70 and view Plaintiff's Exhibit 29-K and in the vicinity

of Fallbrook where the symbol concerning which you stated you

could not testify is located, would you state what appears

on 29-K?

A   On viewing Exhibit 29-K, the symbol referred to in

Section 19, in the northern portion of Section 19, appears to

be braiding within the stream channel, possibly, as indicated

by the stream.  It is shown as containing water.  To that

effect I have no knowledge.

Q   Would you view the exhibit on which you placed the

wells and on that mark "test wells" that were situated on the

Ammunition Depot.  I would like to have you draw a line after

each one of those wells and indicate that they are test wells

concerning which you testified.  Just simply mark them as

"Test wells."  Use a blue pencil and use the straightedge to

draw the line.

A   Do you want this notation in the margin?

Q   Just put the notation on the margin "Test wells."

A   (Marking diagram.)

Q   Now, in regard to the cross-section of Plaintiff's Exhibit No. 68, what was the line of section on that, Lt. Walker?

A   The line of section along which the cross-section--

Q   The upper cross-section.

A   The line of section is depicted on Exhibit 67 as a dashed line extending from the headwaters of De Luz Creek right completely down the entirety of De Luz Creek from the northernmost portion of the watershed down to the confluence of the Santa Margarita River.

Q   Generally speaking, where is that line of section from the standpoint of the thread of De Luz Creek?

A   The line of section throughout predominantly follows the thread of the creek, with the exception that on some meanders the line of section has cut back and forth across the thread of the creek but staying in the alluvium at all times, where there is alluvium.

Q   In regard also to that cross-section, how was it that you arrived at the depth of the alluvium throughout the lower end, starting with where the Naval Ammunition Depot boundary line is situated?

I

Z63

A   The depth of the alluvium, as shown in the lower

portion of the De Luz Creek on Exhibit 68, has been graded to

the Well 9 South, 4 West, 29L1, located near the confluence

of De Luz Creek with the Santa Margarita River.   There is a

well log for this well.   The depth of the well, or the well

log shows that the well did not encounter basement complex,

and for that reason the contact between the alluvium and the

basement complex is approximated and shown existing slightly

below the lower depth of Well 29L1.   The contact has been

constructed between Wells 9 South, 4 West, 5Q1, and 9South,

4 West, 29L1 as an approximate contact based on these two

wells.

Q   Why was it that you felt you could draw a relatively

even line as a line of contact through there?

A   That is shown for descriptive purposes, and also

to the effect that the stream when it cut its channel before

back filling would be graded throughout its distance, through-

out this portion, or throughout any portion.   There will not

be cutbacks-- in other words, the stream will not reverse its

gradient.

Q   What reason, if any, would there be for not drawing

the line in that manner?   Basically, from the standpoint of

runoff, would there be any reason to assume that there would

be an irregular line of contact along that?

A   No, there would not.   A stream actually would tend

I

Z64

1    to reduce its stream bed to a relatively even inclined gradient

2    to the sea.

3         Q   What was the reason for projecting your line of

4    contact in the manner that you did in the upper portion of the

5    alluvial deposits that you show on Plaintiff's Exhibit 68?

6         A   In this upper portion of alluvium there are some

7    wells that we can go on, maintaining a gradient to the south

8    in this case, and the base of the hole is approximated only

9    by the depth of the well, and as there are no well logs we

10   have no knowledge if that is the exact contact between the

11   alluvium and the basement complex.

12        MR. SACHSE:  Mr. Veeder, in your question you referred

13   to Naval Ammunition Depot boundary.  I know you meant Naval

14   Reservation boundary, in this last series of questions.

15        MR. VEEDER:  I meant the Camp Pendleton boundary.

16        MR. SACHSE:  Yes.

17   BY MR. VEEDER:

18        Q   In referring to outcroppings of basement complex

19   in the reach of the Santa Margarita River depicted on Plain-

20   tiff's Exhibit 70, what kind and type of rock and similar

21   deposits have you observed in that reach of the stream?  Do

22   you know the area?

23        A   I am not quite sure that I comprehend your question.

24        Q   From your observations, what is the size of the

25   alluvial deposits in the reach of the Santa Margarita River

I

Z65

1   from the point where it leaves the granitic underlay and

2   proceeds on down to the juncture with Sandia Creek?

3       A   The alluvium in this particular reach of the Santa

4   Margarita River locally widens and narrows and is sharply

5   delineated by hills or stream cut terraces on either side,

6   composed of either basement complex or residuum.

7       Q   Why was it that you did not map on the Sandia map

8   the basalt that appears on Plaintiff's Exhibit No. 15?

9       A   Because the basalt which is shown on Plaintiff's

10  Exhibit No. 15 is a basement complex unit.  It is consolidated

11  rock.  It is an extrusive rock.  For my purposes it was a

12  part of the basement complex.  I had no reason to break it

13  out differently.

14      MR. VEEDER:  I have no further questions.

15      MR. DENNIS:  I have one question, your Honor.

16

17                  RECROSS-EXAMINATION

18  BY MR. DENNIS:

19      Q   In regard to Plaintiff's Exhibit 68, did you have

20  the well log for the well which is shown as 9S 4W 5Q1?

21      A   I have no well log for that, only the measurement.

22      Q   So you have no idea of the formation or the material

23  through which that well was dug?

24      A   No, I have not.

25      Q   I notice that you have recorded the material through

I

Z66

1    which the well 9S, 4W, 29L1.

2        A   I have the log for that well.

3        THE COURT:  You gentlemen have been talking as if this

4    basalt shown on Exhibit 15 might have been depicted on Exhibit

5    69.  It looks to me that if it would have appeared properly on

6    any map, it looks to me like it would have appeared on 67.

7        MR. VEEDER:  What about that, Lt. Walker?

8        THE WITNESS:  It would have been on 69, your Honor, in

9    this portion possibly here.  It will match up your township

10   and range lines; 3 West and 4 West are passing through the

11   area of volcanics.  It would exist southwest of this portion.

12       THE COURT: All right.

13       MR. VEEDER: I have no further questions, your Honor.

14       THE COURT:  Anyone have any questions?

15       You may be excused, Lt. Walker.  Be available for

16   further call if we need you.

17       MR. VEEDER:  Call Col. Bowen.

18

19                ALLEN C. BOWEN,

20   called as a witness in behalf of the plaintiff, being first

21   duly sworn, testified as follows:

22

23       THE CLERK:  State your name, please.

24       THE WITNESS:  Allen C. Bowen.

25       MR. VEEDER:  Your Honor, a question was raised in

Bowen  Direct

regard to the 1929 aerial photographs, and I would like to

call Col. Bowen at this time for the purpose of having identi-

fied those 29 photographs and to explain the key for the

utilization.  The question was raised some ten days or two

weeks ago.  I would like to spend the remainder of the day

for that purpose, if I may, with the right of recalling Col.

Bowen for further interrogation.

THE COURT:  All right.

J-1 ML j

MR. VEEDER:  And I would like at this time, your Honor, to incorporate by reference, if possible, the qualifications of Col. Bowen concerning which he previously testified.

MR. SACHSE:  No objection.

THE COURT:  The master's hearing?

MR. VEEDER:  From the master's hearing.  It would save a great deal of time.

THE COURT:  Any objection?

MR. MOSKOVITZ:  No objection.

THE COURT:  It may be incorporated by reference at this time.


DIRECT EXAMINATION

BY MR. VEEDER:-

Q   Col. Bowen, I refer to Plaintiff's Exhibit No. 70 for Rancho Santa Margarita y Las Flores area irrigated by Santa Margarita River 1929, and the aerial photographs that were made in connection with that, and ask you to state into the  record the procedure -- it should be 73; I beg your pardon.

MR. SACHSE:  73?

MR. VEEDER:  73.

MR. SACHSE:  Please give me the title again, Mr. Veeder.

1      MR. VEEDER:  Aerial photographs of northwestern San

2  Diego, 1929; flight.

3      THE COURT:  Exhibit 73 for identification.

4      MR. VEEDER:  That is correct, your Honor.

5      THE COURT:  All right.

6      MR. VEEDER:  And could I ask the Colonel to come over

7  here?  I think it would be easier to work here.

8      THE COURT:  All right.

9      Q  BY MR. VEEDER:  Now, you may refer to the exhibits,

10  if you would.  They are 73; and they are marked 1, 2, 3,

11  on through.

12      MR. DENNIS:  Mr. Veeder, were these the photographs

13  which were obtained from the County Assessor's?

14      MR. VEEDER:  Of San Diego County.

15      MR. DENNIS:  After the trial started?  Or approximately

16  at the time of the start of the trial?

17      MR. VEEDER:  I don't know whether it was after trial

18  or not.  We obtained them prior to that time for examination.

19  I truly don't know the exact date when we got them.  First,

20  we obtained -- I would like the record to show this:  that

21  we obtained copies of the documents from the surveyor, as I

22  recall, of San Diego County; and then by subpoena we

23  obtained the negatives of identically the same flight.  Of

24  course, as I understand it, there was no objection to the

25  utilization of these aerials in the litigation, and I heard

1    no objection to them.

2         MR. DENNIS:  No, as far as the foundation is con-

3    cerned.

4         MR. VEEDER:  That is right.

5         MR. SACHSE:  No objection as far as foundation, but

6    there may be some very strong objections as to materiality

7    as we go along.

8         MR. VEEDER:  The point I am trying to make now is

9    that I would like to have the Colonel to indicate how these

10   can be seen for their proper utilization in the trial.  I

11   understand your Honor has directed me to do this.

12        THE COURT:  Now, let me inquire.  You have aerial

13   flights of later dates?

14        MR. VEEDER:  Yes, your Honor, we have '38 and '55.

15        THE COURT:  Then, why encumber the record with an

16   aerial flight of '29?

17        MR. VEEDER:  Because I am anxious to demonstrate the

18   utilization of water in Rancho Santa Margarita at that time,

19   and I think the best way to show it is the actual irrigated

20   acreage, as flight 1929 discloses.  I think it is highly

21   relevant.

22        THE COURT:  Why should we have to -- if that is

23   true -- use all of them?  Why not use those that showed the

24   Santa Margarita?

25        MR. VEEDER:  I would like to show just what a hill-

     billy community Fallbrook was at that time, your Honor, and

1  how little water that it was using.

2      MR. DENNIS:  I don't think that is relevant in this

3  matter.

4      MR. VEEDER:  It is highly important, your Honor, from

5  the standpoint of the very recent character of the claim

6  that Fallbrook Public Utility District is asserting.

7      THE COURT:  Let's go ahead and find out from the

8  Colonel how we use them.  Then, we will decide later.  Go

9  ahead.

10      THE WITNESS:  Your Honor, I have in my hnad a

11  photostatic copy of a sketch entitled "Index Map of Aerial

12  Photography of the San Diego County, California."

13      THE COURT:  We will call that 73-A.

14      THE CLERK:  Your Honor, we have a 73-A.  Those will

15  be numbered 73-A through --

16      THE COURT:  We have a 73, is that right?

17      THE CLERK:  This is 73.  73-A.  We have a 73-A.

18      THE COURT:  How far does the lettering go?

19      THE CLERK:  Oh, wait a minute.  I am in error.  It

20  is 73-1 that we have used, and A, B, C, and D.

21      THE COURT:  This will be 73-A.  Go ahead.

22      THE WITNESS:  Yes, sir.  The index map 73-A for

23  identification shows the townships delineated with a heavy

24  black line in the westerly portion of San Diego County, and

25  each of these townships is numbered with a large black

1    THE COURT:  The Clerk will mark them later.

2    THE WITNESS:  Plaintiff's Exhibit 73-B for

3 identification, the index, is the arrangement of the aerial

4 photographs with relation to the township.  Now, this sample

5 is numbered 47 on Plaintiff's Exhibit 73-A and is found

6 between the old land grants, Los Penasquitos and San Vicente,

7 as outlined on Plaintiff's Exhibit 73-A.  The lines of flight

8 are, the east-west lines of flight are lettered beginning

9 with the bottom tier, A, B, C, D, E; and F being the upper

10 tier.  Each line of flight is numbered in the tier from left

11 to right.  The number of the township appears first, and

12 referring to Plaintiff's Exhibit 73-B, number 47, the tier

13 A and the photograph in that Tier 1 is in the extreme lower

14 left-hand corner of the township, as shown on 73-B.  And

15 all the photographs in Tier A are numbered consecutively

16 from left to right.  An example is given on the Plaintiff's

17 Exhibit 73-B to select prints covering, for example, Section

18 26, which is numbered on the sample township plat, refer to

19 the photograph numbers 47-B-7 and 47-B-8, would give the

20 complete coverage of Section 26.  Now, this same sample

21 index can be used to locate the aerial photo coverage in

22 each of the folders contained in Plaintiff's Exhibit 73.

23    THE COURT:  All the flights from west to east?

24    THE WITNESS:  Yes, sir; the flight lines are a line

25 in an east-west direction.

J-2

1      Q   BY MR. VEEDER:  Now, would you locate the irrigated

2   lands, for example, within the Camp Pendleton area on those

3   exhibits?

4      MR. DENNIS:  Within or without the watershed, Mr.

5   Veeder?

6      MR. VEEDER:  Within the watershed.

7      MR. SACHSE:  I am going to object, your Honor, at

8   this time for the record.  If this is intended to affect

9   the riparian rights of the United States, it is absolutely

10   irrelevant and immaterial, what their agricultural or

11   irrigation use may have been in 1929.  A riparian right

12   is neither gained by use nor lost by non-use.  If it is

13   intended to relate to any claimed appropriative or prescriptive

14   rights, those claims are irrelevant and immaterial under

15   your Honor's pretrial ruling.

16      THE COURT:  Nobody has offered them yet.  We are just

17   hearing how they operate, Mr. Sachse.  If you have an

18   objection, it is overruled without prejudice.

19      THE WITNESS:  Now, your Honor, selecting the folder

20   at Plaintiff's Exhibit 73-A entitled "Township 14," and

21   referring to 73-A, it is noted that 14 appears within the

22   exterior boundaries of Rancho Santa Margarita y Las Flores

23   land grant, which is plotted on 73-A.  Now, selecting the

24   A line or the lower tier of photographs in this particular

25   township, which, actually, is Township 10 South, Range 5 West,

1   San Bernardino base line and Meridian, the portion of the

2   valley of the Santa Margarita River appears on the photographs

3   14-A-8 and 14-A-9.  Referring particularly to 14-A-9,

4   the Santa Margarita bed appears as a white and black area

5   on the left border of the map, or of the serial photograph.

6   The railroad track appears as a series of curves and tangents

7   from the left half of the photograph, traversing the photo-

8   graph from bottom to top.  Midway in the -- at the bottom

9   of the photograph is an area broken up in a pattern of

10  fields, which is located in the Ysidora Valley, part of the

11  Santa Margarita, lower Santa Margarita Valley, within what

12  is now known as Camp Pendleton.  And the area shown in those

13  fields was irrigated area at the time the photograph was

14  taken.  Similarly, on 14-A-8, in the lower right corner

15  appears, and overlapping in some respects 14-A-9, and some

16  of the same fields appear; and some of the area lying

17  west of the river appears on 14-A-8.

18          THE COURT:  Were you going any further, Mr. Veeder,

19  and examine the witness as to what appears, or were you

20  just going to show how to use them?

21          MR. VEEDER:  I was going to demonstrate how to use

22  them at this time, your Honor, as I understood from the

23  instructions.  Because counsel stated they didn't understand

24  how to use them, I thought this was a ious idea to get it

25  done at this time; as we are going to go over them very soon.

1    THE COURT:  I see how you put 14-A-8 and 14-A-9

2  together.  How do you put 9 to 10 now?

3    THE WITNESS:  14-A-10, your Honor, overlaps 14-A-9.

4  Excuse me.  May I have 14-A-9, your Honor?  On 14-A-9,

5  your Honor, is a dashed red line which is in the lower right-

6  hand corner of the photograph.  And the white line which is

7  running along that dash line is a road.  And that same

8  segment of the road is shown on 14-A-10 in the lower right

9  corner.  A triangular field --

10    THE COURT:  Go ahead.

11    THE WITNESS:  A triangular field, white in color,

12  which is shown in the lower right corner of 14-A-9 appears

13  in the central left margin of 14-A-10, and that, again, is

14  of the same field.

15    MR. VEEDER:  Could we go off the record for just a

16  moment, your Honor.

17    THE COURT:  Yes.

18    (Off the record discussion.)

19    THE COURT:  All right, if these are going to be used,

20  it seems to me we can put somebody busy with a pair of

21  scissors and make some assembly of them.  Have prints been

22  made, or are these the Government's prints?

23    MR. VEEDER:  We have made prints of the negatives, and

24  we will work them up into exhibits, your Honor.

25    THE COURT:  Because it is like working a jigsaw puzzle

1    to sit down here.  I suppose we eventually could superimpose

2    the parts one on the other.  Let's give some thought to it

3    and talk about it.

4            MR. VEEDER:  I am going to call witnesses, your

5    Honor, who are --

6            MR. DENNIS:  Could I ask the witness a question at

7    this time, your Honor?

8            THE COURT:  Ask him off the record.  We will adjourn

9    until, what is the date?

10           MR. STAHLMAN:  A week from next Tuesday.

11           MR. VEEDER:  Tuesday the --

12           THE CLERK:  November the 4th.

13           MR. VEEDER:  A week from next Tuesday, the 4th.

14           THE COURT:  Tuesday, election morning.

15           (Off the record discussion.)

16           (Whereupon an adjournment was had at 4:00 o'clock

17    p.m., until Tuesday, November 4, 1958, at 10:00 o'clock a.m.)

18

19

20

21

22

23

24

25