VOLUME NO. __38__

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.   1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:         October 4, 1958

Pages: 3908 to 4045.

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1          IN THE UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3                 SOUTHERN DIVISION

4                    — — —

5      HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                    — — —

7
       UNITED STATES OF AMERICA,        )
8                                       )
                          Plaintiff,    )
9                                       )
            vs.                         )        No. 1247-SD-C.
10                                      )
       FALLBROOK PUBLIC UTILITY         )
11     DISTRICT, et al.,                )
                                        )
12                        Defendants.   )

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16               San Diego, California

17            Tuesday, November 4, 1958

18
       APPEARANCES:
19
            For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
20                                      Special Assistant to the
                                       Attorney-General,
21                                     Department of Justice,
                                       Washington, D. C.
22
                                       WILLIAM E. BURBY, ESQ.,
23                                     Special Assistant to the
                                       Attorney-General,
24                                     Department of Justice,
                                       Washington, D. C.
25

1   APPEARANCES (continued):

2         For  U. S. Marine Corps:        LT. COL. A. C. BOWEN

3         For Defendant Vail
          Company:
4                                         GEORGE E. STAHLMAN, ESQ.

5         For Defendant State of
          California:
                                          EDMUND G. BROWN, ESQ.,
6                                         Attorney-General, by
                                          ADOLPHUS MOSKOVWITZ, ESQ.,
7                                         Deputy Attorney-General, and
                                          CARL BARONKAY, ESQ.

8         For Defendant Santa
          Margarita Mutual
9         Water Company:                  W. B. DENNIS, ESQ.

10        For Defendants Fallbrook
          Public Utility District,
11        et al:                          F. R. SACHSE, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# INDEX TO WITNESSES

**For the Plaintiff:**                                    Direct

       G. F. Worts, Jr.                                    3913

# INDEX TO EXHIBITS

| Number | For Iden. | In Evidence |
|---|---|---|
| 37 (colored map substituted) | | 3939 |
| 38 (colored map substituted) | | 3961 |
| 39 | | 3976 |
| 40 | | 4021 |
| 41 | | 4025 |
| 42 | | 4032 |
| 43 | | 4029 |
| 44 | | 3986 |
| 45 | | 3992 |
| 46 | | 4012 |
| 49 | | 4043 |
| 51 | | 4000 |

MORNING RECESS                                    3955

NOON RECESS                                    3979

AFTERNOON RECESS                                    4013

SAN DIEGO, CALIFORNIA, TUESDAY, NOVEMBER 4, 1958.   10 A.M.

THE CLERK:   Number one on the calendar, 1247-SD-C, United States versus Fallbrook for further court trial.

MR. VEEDER:   Are we ready for business, your Honor?

THE COURT:   Ready for business.

MR. VEEDER:   In the concluding minutes of October 24th, Colonel Bowen was testifying in regard to certain aerials of the 1929 flight.   You had indicated your desire to have the aerials delineated in a manner that would be more easily discerned.   We have gone ahead on that basis, your Honor, of getting additional reproductions; and we will make up a mosaic which will be a complete picture of the irrigated areas within Camp Pendleton.   I think it will be much easier.   It is an expensive process, and I hope that the objections which my friends have raised will not-- it will be very expensive to the taxpayers, I might point out.   At any event, it will be probably sometime next week when we will have those available.   And we will at that time offer them.   And there will be no further testimony from Colonel Bowen at this time unless your Honor desires more information.   Anything else?

THE COURT:   No.

MR. VEEDER:   I have a witness.

THE COURT:   Call your witness.

MR. VEEDER:   Mr. Worts.

1          G. F. WORTS, JR.

2 called as a witness in behalf of the plaintiff, having been

3 first duly sworn, testified as follows:

4          THE CLERK:  Just be seated.  Will you state your name,

5 please?

6          THE WITNESS:  George F. Worts, W-o-r-t-s, Jr.

7                    DIRECT EXAMINATION

8 BY MR. VEEDER:

9          Q  Would you state your age, Mr. Worts?

10         A  Forty-two.

11         Q  And where is your residence at the present time?

12         A  2540 Carson Way, Sacramento.

13         Q  And would you state into the record your schooling,

14 starting with elementary schools, and where you attended these

15 schools?

16         A  I attended elementary, junior high, and the first few

17 years of high school in Westport, Connecticut.  I was graduated

18 from high school in Clearwater, Florida.

19         Q  And would you state the year in which you finished

20 your high school work?

21         A  1935.

22         Q  And from there what schooling did you take?

23         A  I then went to Stanford University.

24         Q  And where is that located?

25         A  Palo Alto.

1    Q   And what was your course taken at Palo Alto?

2    A   I started out in engineering but changed over and was

3    graduated with a degree in geology.

4    Q   And when did you finish your work?

5    A   1939.

6    Q   Would you state the employment in which you have been

7    engaged since you left Stanford?

8    A   I had a part-time job immediately after graduation

9    doing drafting for the Honolulu Oil Corporation.  I worked part

10   time out at the geology department at Stanford.  This covered

11   a period from September, 1939, to May, 1940, at which time I

12   went to work for the U. S. Geological Survey.

13   Q   Would you state into the record the experience you

14   have had with United States Geological Survey?

15   A   Well, I have been with the U. S. Geological Survey

16   about eighteen and a half years, starting my first job in Long

17   Beach in 1940.

18   Q   What were your responsibilities at that time?

19   A   I was a temporary employee, termed a recorder, start-

20   ing out in May, 1940; and at that time we were undertaking a

21   study of the coastal strip between Long Beach and Santa Ana and

22   Newport Beach; a study of the watertightness of the so-called

23   Newport-Inglewood fault zone that runs parallel to the coast

24   line.

25   Q   How long were you employed in that kind of work?

3915

1      A   I was employed in that kind of work from May, 1940,

2   through September, 1941, at which time I was transferred to

3   Santa Barbara.

4      Q   What was your employment there?

5      A   The employment there was a study of the water re-

6   sources of the principal ground water basins in Santa Barbara

7   County, and those included the Cuyama Valley, the Santa Maria

8   Valley, the Santa Ynez Valley, the San Antonio Valley, Carpin-

9   teria Valley, and the Goleta Valley.

10      Q   When you make a study of the water resources of a

11   valley, what is entailed in such an undertaking?

12      A   Those were comprehensive studies.  And by "comprehen-

13   sive" I mean we map all of the geology, study the subsurface

14   geology, which will be the framework of your ground water basin,

15   study the hydrology.  By that I mean the recharge from streams,

16   from rainfall, from other sources; the discharge from the basin,

17   the outflow to the sea, the pumpage, the evapo-transpiration,

18   and possible other influences.

19      Q   After you had completed that phase of your employment,

20   would you state what is the next work you undertook?

21      In November, 1947-- I was in Santa Barbara from 1941 to

22   November, 1947-- 1947 I went to North Dakota to make a study

23   and write a report on a local area around the city of Fargo,

24   North Dakota, and the adjacent town, Moorhead, in Minnesota.

25   That was a short assignment, lasting until March of the following

1   year, 1948.

2       Q  What was involved in that investigation?

3       A  That was principally to determine the extent of

4   aquifers that underlay the city  and adjacent areas with a view

5   of developing ground water supplies for the two cities.  It in-

6   volved analysis of an intensive test well drilling program that

7   had been conducted there prior to my arrival.

8       Q  And what were your responsibilities, however, in con-

9   nection with this phase of the work?

10      A  My responsibilities were to analyze the geologic and

11  hydrologic data and to write a report summarizing the extent

12  and degree of interconnection of these various aquifers.

13      Q  After you had completed that work, would you state the

14  next phase of your experience?

15      A  Upon my return from Moorhead in March, I was sent to

16  Sacramento, California, to open our office there to begin two

17  studies; one, the Solano County investigation, Solano County

18  being on the west side of the Sacramento River about opposite

19  Sacramento; and also  to direct a study of the Sacramento Val-

20  ley.

21      Q  And when you say a "study," what was that work?

22      A  The Solano County study was another comprehensive

23  study in which the geology and hydrology were studied in detail.

24  The Sacramento Valley was a study of the ground water storage

25  capacity of that valley, ground water system; the purpose of

A2

1    which in the use of ground water and the available surface

2    waters, there is the possibility in the over-all plan for water

3    utilization in California to utilize the ground water reser-

4    voirs during periods of surplus water, and that is ground water

5    after wet years, when the basins had been drawn down.  If there

6    is surplus surface water to recharge them into these basins and

7    use them as underground, well, you might call them underground

8    storage areas; the big advantage being that you eliminate evap-

9    oration that you have in open lake systems, open reservoirs.

10        Q  How long were you engaged in that study, Mr. Worts?

11        A  I worked on those studies through August, 1950.  But

12   in April of 1950, at the request of the U. S. Air Force, I was

13   sent out to the Azores Islands to develop a water supply for the

14   air force base on one of the islands.

15        Q  And what was involved in that investigation?

16        A  That was a study of the geology, collecting what little

17   information there was on the wells of the island.  There, as

18   along the coast in California, we have the problem of the ocean

19   sitting right against the islands, so consideration had to be

20   given to the possibility of sea water intrusion into any of the

21   wells that might be drilled for the air force.  I left the

22   island a month later before the supply wells were actually

23   drilled.

24        Q  What did you do after that, Mr. Worts?  What was your

25   work?

1    A   In August, 1950, I was transferred back to the Long

2    Beach office where we started work on the Camp Pendleton Marine

3    Corps Base and another investigation at the same time that I was

4    in charge of at Edwards Air Force Base.

5    Q   What was the nature of those investigations, Mr.

6    Worts?

7    A   The Camp Pendleton study was a comprehensive study of

8    the four principal ground water basins on the camp, of which

9    the Santa Margarita River basin is the largest.  The study at

10   Edwards Air Force Base was more of an appraisal of the situa-

11   tion with respect to the amount of water in storage and the

12   length of time that that ground water in storage might last as

13   a supply for that base.

14   Q   What other work have you engaged in since the date

15   you last mentioned?

16   A   Well, starting in August or shortly thereafter, 1950,

17   I was in charge of the work of the Long Beach office.  And from

18   there on the jobs or the studies that we undertook become very

19   profuse here.  I have a list of them.  They ultimately, the

20   last eight years ultimately, they get up to a total of  about

21   55 studies that I have either worked on, made, or directed.

22   MR. VEEDER:  Your Honor, we have in regard to our other

23   expert witnesses from United States Geological Survey offered

24   as part of the record, for the purpose of shortening up the

25   qualifications--

1          THE COURT:  A list of the publications.

2          MR. VEEDER:  -- a list of publications, the list of the

3   works that were undertaken, and similar undertakings, if that

4   is permissible.

5          THE COURT:  Include it as part of the record.

6          This list, if you were questioned  in detail, you would

7   testify to each of the items on it?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  All right.

10          MR. VEEDER:  I will give the headings on that: "Investi-

11   gations worked on by G. F. Worts, May, 1940-September, 1958."

12   "Bibliography, G. F. Worts, Jr. (1940-1958)."  And "Investiga-

13   tions in progress under the direction of G. F. Worts, Jr., in

14   1958."

15          And I will deliver those to the Clerk for reproduction

16   in the record.

17          THE COURT:  To the reporter.  You may proceed.

18          (The documents above referred to are as follows:)

19                        BIBLIOGRAPHY

20                    G. F. Worts, Jr. (1940-58)

21   U. S. Geological Survey Water-Supply Papers

22          1.  Worts, G. F., Jr., 1951, Geology and ground-

23   water resources of the Santa Maria Valley area, Cal-

24   ifornia.:  U. S. Geol. Survey Water-Supply Paper

25   1000, 169 p., 6 pls., 9 figs., 16 tables.

2.   Upson, J. E., and Worts, G. F., Jr., 1951,
Ground water in the Cuyama Valley, Calif.:  U. S.
Geol. Survey Water-Supply Paper 1110-B, 60 p., 5
pls., 2 figs., 10 tables.

3-10.  U. S. Geol. Survey Water-Supply Papers
941, 949, 991, 1021, 1028, 1076, 1101, and 1131:
A contributing author to the annual water-level re-
ports on Santa Barbara County, Calif., 1941-4.

11.  LaRocque, G. A., Jr., Upson, J. E., and
Worts, G. F., Jr., 1950, Wells and water levels
in principal ground-water basins in Santa Barbara
County, Calif.:  U. S. Geol. Survey Water-Supply
Paper 1068, 459 p., 7 pls., 8 figs., 10 tables.

### Cooperating agencies

1.   Dennis, P. E., Akin, P. D., and Worts,
G. F., Jr., 1949, Geology and ground-water re-
sources of parts of Cass and Clay Counties, North
Dakota and Minnesota:  U. S. Geol. Survey dupli-
cated report prepared in cooperation with the cit-
ies of Fargo and Moorhead, counties of Cass and
Clay, North Dakota and Minnesota; 177 p., 8 figs.,
3 tables.

2.   Davis, G. H., Worts, G. F., Jr., and Wilson,
H. D., Jr., 1955, Water-level fluctuations in
wells:  _in_ Earthquakes in Kern County, Calif.,

during 1952:  Calif. Dept. Nat. Resources, Div.
Mines Bull. 171, pt. 10, p. 99-106, 3 figs., 1
table.

3.  Worts, G. F., Jr., 1950, Progress report
on the ground-water investigation in Solano County,
Calif.:  U. S. Geol. Survey duplicated report pre-
pared for U. S. Bureau of Reclamation, 50 p., 7 pls.

### Journal articles

1.  Upson, J. E., and Worts, G. F., Jr., 1949,
Geologic features of four coastal ground-water bas-
ins in Santa Barbara County, Calif.:  Typed paper
approved for and presented before the Soc. Econ.
Geols., Feb. 17, 1949 (not published), 20 p., 4
pls.

### Other

1.  Poland, J. F., and Worts, G. F., Jr., 1949,
New well for water supply at Veterans Administra-
tion Hospital, Livermore, Calif.:  U. S. Geol. Sur-
vey typewritten open-file memorandum, 4 p., 3 pls.

2.  Worts, G. F., Jr., 1957, A brief apprais-
al of ground-water conditions and proposed program
for water-resources investigations in the coastal
artesian basin of British Guiana:  U. S. Geol. Survey
typewritten report (110 p., 2 pls., 12 tables) in
prep. as a British Guiana Geol. Survey Bull.

Classified reports prepared by G. F. Worts,

Jr., for the Department of Defense agencies:

1.  A total of 17 classified reports prepared

between 1945 and 1958 for various military instal-

lations largely in southern California.

Reports prepared under direction of G. F.

Worts, Jr.

1.  Olmsted, F. H., 1953, Geologic features and

water resources of Campo, Mesa Grande, La Jolla,

and Pauma Indian Reservations, San Diego County,

Calif.:  U. S. Geol. Survey duplicated report.

2.  U. S. Geological Survey, 1954, Water levels

and artesian pressure in observation wells in the

United States:  Water-Supply Paper 1326, California

section.

3.  Burnham, W. L., 1954, Data on water wells in

Borrego, Octillo, San Felipe, and Vallecito Valley

areas, eastern San Diego County, Calif.:  U. S.

Geol. Survey duplicated report.

4.  Burnham, W. L., 1955, Data on water wells

in Coyote, Cronise, Soda, and Silver Lake valleys,

San Bernardino County, Calif.:  U. S. Geol. Survey

duplicated report.

5.  Kunkel, Fred, Chase, G. H., Hiltgen, W. J.,

1955, Tables of basic data on geology and ground

Worts        Direct                                    3923

water of the Inyokern Naval Ordnance Test Station
and vicinity, Calif.:  U. S. Geol. Survey duplica-
ted report.

6.  U. S. Geological Survey, 1955, Water levels
and artesian pressure in observation wells in the
United States:  Water-Supply Paper 1409, Califor-
nia section.

7.  Kunkel, Fred, Riley, F. S., 1956, Geologic
reconnaissance and test-well drilling at Camp Irwin,
Calif.:  U. S. Geol. Survey duplicated report (in
preparation as a water-supply paper).

8.  U. S. Geological Survey, 1956, Water levels
and artesian pressure in observation wells in the
United States:  Water-supply paper in preparation,
California section.

9.  Kunkel, Fred, 1956, A brief hydrologic and
geologic reconnaissance of Pinto Basin, Joshua Tree
National Monument, Riverside County, Calif.:  U. S.
Geol. Survey duplicated report.

10.  Olmsted, F. H., 1956, Geologic reconnais-
sance of San Clemente Island, Calif.:  U. S. Geol.
Survey typewritten report (in preparation as U. S.
Geol. Survey Bulletin).

11.  Olmsted, F. H., 1956, Summary of ground-
water conditions in northwestern California, <u>in</u>

Natural resources of northwestern California, water-resources appendix:  U. S. Dept. of Interior, Pacific Southwest Field Committee duplicated preliminary report.

12.  Mack, Seymour, 1956, Geology and ground-water features of Scott Valley, Siskiyou County, Calif.:  U. S. Geol. Survey typewritten report (in preparation as water-supply paper).

13.  Kunkel, Fred, 1956, Data on water wells in Cuddeback, Superior, and Harper Valleys, San Bernardino County, Calif.:  U. S. Geol. Survey duplicated report.

14.  Riley, F. S., 1956, Data on water wells in Lucerne, Johnson, Fry, and Means Valleys, San Bernardino County, Calif.:  U. S. Geol. Survey duplicated report.

15.  Evenson, R. E., 1957, Reconnaissance of the geology and ground-water features of the Eureka area, Humboldt County, Calif.:  U. S. Geol. Survey typewritten report (in preparation as water-supply paper).

16.  Mack, Seymour, 1957, Geology and ground-water features of Shasta Valley, Siskiyou County, Calif.:  U. S. Geol. Survey typewritten report (in preparation as water-supply paper).

17.  Wilson, H. D., Jr., 1957, Ground-water

appraisal of the Santa Ynez River Basin, Santa Bar-
bara County, Calif., 1945-52:  U. S. Geol. Survey
duplicated report (in preparation as a water-supply
paper).

18.   Stone, R. S., 1957, Ground-water reconnais-
sance in the western part of the Mojave Desert, Cali-
fornia, with particular respect to the boron content
of well water:  U. S. Geol. Survey typewritten report.

19.   Kunkel, Fred, and others, 1957, Data on
water wells in the Willow Springs, Gloster, and
Chaffee areas, Kern County, Calif.:  U. S. Geol.
Survey duplicated report.

20.   Davis, G. H., 1957, Reconnaissance investi-
gation of ground-water supply for Dora Belle Camp-
ground, Shaver Lake, Calif.:  U. S. Geol. Survey
typewritten report.

21.   U. S. Geological Survey, 1957, Water levels
and artesian pressure in observation wells in the
United States:  Water-supply paper in preparation,
California section.

22.   Wood, P. R., and Davis, G. H., 1957, Ground-
water  conditions in the Avenal-McKittrick area,
Kings and Kern Counties, Calif.:  U. S. Geol. Survey
typewritten report (in preparation as water-supply
paper).

Worts     Direct                                    3926

23.  Olmsted, F. H., and Davis, G. H., 1958, Geologic features and ground-water storage capacity of the Sacramento Valley, Calif.:  U. S. Geol. Survey typewritten report (in preparation as a water-supply paper).

24.  Wood, P. R., 1958, Geology and ground-water features of the Butte Valley region, Siskiyou County, Calif.:  U. S. Geol. Survey typewritten report (in preparation as water-supply paper).

25.  Dutcher, L. C., Garrett, A. A., 1958, Geologic and hydrologic features of the San Bernardino area, Calif., with special reference to the underflow across the San Jacinto fault:  U. S. Geol. Survey duplicated report (in preparation as a water-supply paper).

26.  Dutcher, L. C., Burnham, W. L., 1958, Geology and ground-water hydrology of the Mill Creek area, San Bernardino County, Calif.:  U. S. Geol. Survey typewritten report (in preparation as water-supply paper).

27.  Bader, J. S., Kunkel, Fred, 1958, A brief memorandum on the water supply at five Forest Service guard stations, Cleveland National Forest, San Diego County, Calif.:  U. S. Geol. Survey duplicated report.

28.  Pistrang, M. A., Kunkel, Fred, 1958, Geology and ground water in the Furnace Creek Wash area, Death Valley National Monument, Calif.:  U. S. Geol. Survey duplicated report.

29.  Burnham, W. L., Dutcher, L. C., 1958, Geologic and hydrologic features of the Redlands-Beaumont area, California, with special reference to ground-water outflow:  U. S. Geol. Survey typewritten report (in preparation as a water-supply paper).

30.  Bader, J. S., Page, R. W., Dutcher, L. C., 1958, Data on water wells in the Upper Mojave Valley area, San Bernardino County, Calif.:  U. S. Geol. Survey duplicated report.

31.  Bader, J. S., Moyle, W. R., Jr., 1958, Data on water wells and springs in Morongo Valley and vicinity, San Bernardino and Riverside Counties, California:  U. S. Geol. Survey duplicated report.

32.  Bader, J. S., 1958, Summary of work done by the Geological Survey at Joshua Tree National Monument in the 1958 fiscal year:  U. S. Geol. Survey typewritten report.

33.  Cardwell, G. T., 1958, Geology and ground water in the Santa Rosa and Petaluma Valley areas, Sonoma County, Calif.:  U. S. Geol. Survey Water-Supply Paper 1427.

34.   Kunkel, Fred, Upson, J. E., 1958, Geology and ground water in Napa and Sonoma Valleys, Napa and Sonoma Counties, Calif.:  U. S. Geol. Survey typewritten report (in preparation as a water-supply paper).

Classified reports prepared under the direction of G. F. Worts, Jr., for the Department of Defense agencies

1.  A total of 18 reports prepared between 1950 and 1958, for various military installations in southern California.


Investigations worked on, made by, or done under the direction of G. F. Worts, Jr., May 1940 - Sept. 1958


| Date | Investigation |
|---|---|
| 1.  Long Beach, Calif.:  May 1940 - Sept. 1941 | |
| | 1.  Long Beach-Santa Ana area |
| 2.  Santa Barbara, Calif.:  Oct. 1941 - Oct. 1947 | |
| | 2.  Santa Maria Valley |
| | 3.  Cuyama Valley |
| | 4.  Santa Ynez Valley |
| | 5.  San Antonio Valley |
| | 6.  Carpinteria basin |

                                    7.   Goleta basin.

   3.   Moorhead, Minn.:  Nov. 1947 - March 1948

                                    8.   Fargo-Moorhead area

   4.   Sacramento, Calif.:  April 1948 - July 1950

                                    9.   Solano County study

                                   10.   Sacramento Valley

   5.   Detail to Azores Islands:  April-May 1950

                                   11.   Terceira Island study

   6.   Long Beach, Calif.:  August 1950 - Sept. 1955

              1950          12.   Camp Pendleton Marine Corps Base

                            13.   Edwards Air Force Base

              1951          14.   29 Palms Marine Corps Base

              1952          15.   Inyokern Naval Ordnance  Test
                                  Station

              1953          16.   San Bernardino Valley

                            17.   Aircraft Warning Station, Mojave

                            18.   Indian reservations at Campo,
                                  Mesa Grande, La Jolla, and Pauma

                            19.   Western Mojave desert area

              1954          20.   Redlands-Beaumont area

                            21.   Reappraisal of Santa Ynez River
                                  Valley

                            22.   Borrego, Ocotillo, San Felipe,
                                  and Vallecito Valleys

                            23.   Study of Palm Springs

|     |     |     |                                              |
|-----|-----|-----|----------------------------------------------|
| 1   |     | 24. | Selection of observation wells               |
| 2   |     |     | in San Luis Rey, San Dieguito,               |
| 3   |     |     | San Diego, Otay, Sweetwater, and             |
| 4   |     |     | Tia Juana Valleys, San Diego                 |
| 5   |     |     | County                                       |
| 6   | 1955 | 25. | Calif. Section, annual water-               |
| 7   |     |     | level report                                 |
| 8   |     | 26. | Camp Irwin                                   |
| 9   |     | 27. | Mill Creek basin.                            |

7. Sacramento, Calif.: Oct. 1955 - Sept. 1958

|     |      |     |                                              |
|-----|------|-----|----------------------------------------------|
| 11  | 1955 | 28. | Sacramento Valley                            |
| 12  |      | 29. | Coyote, Cronise, Soda, and Sil-             |
| 13  |      |     | ver Lake valleys                             |
| 14  | 1956 | 30. | Mojave Marine Corps Base                     |
| 15  |      | 31. | San Clemente Island                          |
| 16  |      | 32. | Santa Rosa-Petaluma Valleys                  |
| 17  |      | 33. | Northwestern California                      |
| 18  |      | 34. | Scott Valley                                 |
| 19  |      | 35. | Pinto Basin                                  |
| 20  |      | 36. | Kings Canyon                                 |
| 21  |      | 37. | Avenal-McKittrick area                       |
| 22  |      | 38. | Cachuma-Santa Ynez Valley stor-             |
| 23  |      |     | age-change studies                           |
| 24  |      | 39. | Harper, Superior, and Cuddeback             |
| 25  |      |     | Valleys                                      |

|  |  |  |
|---|---|---|
|  | 40. | Lucerne, Johnson, Means, and Fry Valleys |
| 1957 | 41. | Willow Springs, Gloster, and Chaffee areas. |
|  | 42. | San Nicolas Island |
|  | 43. | Furnace Creek Wash |

8.  Detail to British Guiana:  February-May 1957

|  |  |  |
|---|---|---|
|  | 44. | British Guiana, S.A. |
| 1957 | 45. | Shasta Valley |
|  | 46. | Eureka area |
|  | 47. | Upper Santa Margarita River valley |
| 1958 | 48. | Pt. Arguello |
|  | 49. | Pt. Mugu |
|  | 50. | Cleveland National Forest, Guard Stations in San Diego County |
|  | 51. | Shaver Lake, USFS Campground in Sierra Nevada |
|  | 52. | Upper Mojave Valley area |
|  | 53. | Morongo Valley area |
|  | 54. | Butte Valley |
|  | 55. | Napa-Sonoma Valleys |

Investigations in progress under the direction
of G. F. Worts, Jr., in July 1958

1.  Edison-Maricopa area, San Joaquin Valley

2.  Ducor-Famoso area, San Joaquin Valley

3.  Fremont Valley, Mojave Desert

4.  Middle Mojave Valley

5.  Lower Mojave Valley

6.  Joshua Tree-Dale Lake area, Mojave Desert

7.  Specific-yield research program

8.  Russian River-Mendocino County basins (10 in all)

9.  Key observation-well measuring program

10. California section, annual water-level report

11. Los Angeles Metropolitan area report

12. San Antonio Valley, Santa Barbara County

13. Carpinteria and Goleta basins,    do.

14. Cachuma and Vaquero projects,    do.

15. Furnace Creek Wash, continuing studies

16. Pinto Basin, continuing studies

17. San Francisco Bay area

18. Edwards Air Force Base, continuing studies

19. Camp Pendleton Marine Base,    do.

20. 29 Palms Marine Base,    do.

21. Inyokern Naval Ordnance Test Station, continuing studies

22. Pr. Mugu Navy Base

23. Pt. Arguello Navy Base

24. Administrative phases, subsidence research program

25. Atomic Energy Studies, Water Development

Total funds for 1958-59 fiscal year, nearly $500,000.

BY MR. VEEDER:

Q   Now, subsequent to when you initiated this work in Camp Pendleton, what was the other employment you had with the United States Geological Survey?  What were your jobs?

A   At that time I was in charge of the activities at the Long Beach office, which included the Edwards investigation, which I mentioned, and included a study of 29 Palms, which came shortly later or shortly thereafter.  Another one at the Inyokern Naval Ordnance Test Station; and so on as shown on the list.

Q   After that period of employment with the United States Geological Survey, would you state your experience?

A   At the Long Beach office?

Q   No, after that period in the Long Beach office.

A   All right.  I was at the Long Beach office from August, 1950, through September, 1955, at which time I was transferred again back to Sacramento to become the assistant district geologist which would be in charge of all of the ground water work for the Government in California.  And one year later,

1    July, 1956, I took over as district geologist in charge of

2    ground water studies in California.

3        Q   That included the southern California area?

4        A   That included everything going on in California, in-

5    cluding Camp Pendleton and other areas.

6        Q   What has been your experience since you undertook the

7    job to which you last made reference?

8        A   I beg your pardon?

9        Q   What other experience did you have besides that?

10       A   In February of last year I was detailed to British

11   Guiana, South America, to make an appraisal of their water

12   supply and to propose methods for the study of the ground water

13   supplies there and methods of development of the ground water

14   in that colony.  After returning in May of last year, I again

15   assumed my duties as district geologist and retained them to

16   about September.

17       Q   Would you describe in some detail the work that you

18   had as district geologist in Sacramento?

19       A   I have listed on one of the papers that you handed to

20   the Clerk a moment ago, entitled "Investigations in progress

21   under the direction of G. F. Worts, Jr., in July 1958," there

22   are 25 studies in progress in California.

23       Q   How many employees do you have who are directly re-

24   sponsible to you?

25       A   Approximately 40.

Q   And would you state the kind and type of work that they perform?

A   We are now speaking of the period in about July?

Q   That is correct.

A   Approximately two-thirds of those were professional geologists and engineers engaged in making these studies that are listed on the list of investigations in progress in July. Also there is a secretarial, drafting and related staff.

Q   What is your present position?

A   My present position is branch area chief of the ground water branch, which covers the states-- covers the work of the ground water branch in California, Nevada, Idaho, Oregon, Washington, Alaska, Hawaii, and any other work that may be going on in the Pacific, such as at Guam and Truk.

Q   And what publications have you prepared, Mr. Worts? Are those similarly listed in your bibliography?

A   They are listed in the bibliography. Two that are readily available are:  The results of the study, of the comprehensive study, on Santa Maria Valley, which is U. S. Geological Survey Water Supply Paper 1000; and a less detailed study on the Cuyama Valley.  I think the number is Water Supply Paper 1110-B.  A great many of the reports and work done have been for the military, and they are not published.

MR. VEEDER:  This is for the Court.  That is Plaintiff's Exhibit 37.  And I would like to substitute this colored map for

1    the one that I originally lodged with the Court and ask you to

2    mark it for identification.  Mark the substituted copy as

3    Plaintiff's Exhibit 37 for identification.

4              THE COURT:  The change has been that you colored the map?

5              MR. VEEDER:  That is correct, your Honor.  There is to

6    be one reference to the legend that will be a matter of oral

7    testimony.

8              Bill, I think if we could move this down, we could have

9    some continuity.

10             THE COURT:  This is 37?

11             MR. VEEDER:  That is correct, your Honor.

12             Q  Now, Mr. Worts, I refer to Plaintiff's Exhibit marked

13   37 for identification, and ask you to read into the record the

14   title block.

15             A  The title block of Exhibit 37: "Santa Margarita River

16   watershed within Camp Pendleton.  Geologic map."

17             Q  Would you state whether this map has been approved

18   by the United States Geological Survey?

19             A  Yes, it has.

20             Q  And would you state the date when that approval was

21   accorded to this identification?

22             A  The date shown on the map is May, 1958.

23             Q  And this was included, was it not, in the publication,

24   the newspaper release, in regard to these exhibits?

25             A  Yes.

1      Q  Would you step to the exhibit, Mr. Worts, and state

2  the period and time that was involved in securing the data in

3  the preparation of that, the map, the geologic map, Plaintiffs

4  Exhibit marked 37 for identification.

5      A  Geologic mapping on Exhibit 37 was begun in the fall

6  of 1950, shortly after the start of the studies.  The mapping

7  proceeded-- this being only a portion of the geology of the

8  whole camp, which covered several hundred square miles, as I

9  recall, the over-all mapping in the area, and including the

10  lower Santa Margarita River Valley, continued until sometime in

11  1952 or early 1953, as we were refining the final findings.

12      Q  Would you state the extent of the area covered by

13  Plaintiff's Exhibit marked 37 for identification?

14      A  The extent of the area map is approximately from the

15  confluence of the De Luz Creek and the Santa Margarita River,

16  from there to the Pacific Ocean and within the drainage divides

17  of the stream.

18      Q  Would you make reference to the legend appearing on

19  the geologic map and point to the various areas to which the

20  legend pertains.

21      A  The legend is in the upper left-hand corner of Exhibit

22  37 and has listed in descending order of age-- that is, starting

23  with the youngest at the top going down.

24      Q  When you say "the youngest," what do you mean?

25      A  The most recent deposited materials shown at the top.

The most ancient materials listed down at the bottom.  In all, there is a total of nine geologic units shown here. The color pattern and symbol within each block in the legend correspond to that shown on the body of the geologic map.

Q  What are the other elements contained in the legend?

A  The other elements show, beneath the lowermost block, the fault.  And at this stage I would like to clarify a word here in the legend, if I may borrow a pencil.  The word "inferred" may not be precisely the one to use here, so I think "position approximate" is what is specifically meant.

Q  And you are substituting on identification 37 the word "approximate" for the word "inferred" in the legend immediately below the fault designation, is that correct?

A  "Position," if I may add the words "position approximate."

Q  Yes.

A  Under the block shown as basement complex, the word "essentially" should be struck out on Plaintiff's 37 and the word "virtually" substituted.

Q  Who did the work, the geological investigation, upon which Plaintiff's Exhibit marked 37 for identification was predicated?

A  I did a large part of it.  I had a crew that ranged from two to four geologists assisting in the mapping on the camp.

S28
A2

1    Q  Were they under your direction and immediate super-

2  vision?

3    A  Yes.

4    Q  Mr. Worts, will you state into the record whether,

5  in your opinion, Plaintiff's Exhibit marked 37 for identifica-

6  tion accurately depicts the geological structures and the lo-

7  cations as disclosed on it?

8    A  Yes.

9    MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

10  marked 37 for identification.

11    THE COURT:  Received in evidence.

12  BY MR. VEEDER:

13    Q  Now, referring specifically to the areas which are

14  marked in blue, referred to as basement complex, would you

15  explain into the record the meaning of that term.

16    A  Basement complex embraces a group of older rocks, as

17  indicated beneath or in the legend as being igneous and meta-

18  morphic rocks.

19    Q  And what are igneous and metamorphic rocks?

20    A  Well, igneous rocks are those derived from depths

21  within the earth, whereas the metamorphic rocks were those that

22  were baked or altered in the process of the intrusion of these

23  igneous rocks.

24    MR. VEEDER:  I hope everyone understands that.

25    THE WITNESS:  I could explain it further.

1    MR. VEEDER:  No, it is all right.

2    Q  Now, you may go ahead.  And the basement complex is

3  in blue on the map.  Now, does that underlay the entire area,

4  Mr. Worts?

5    A  It is exposed on the surface as far south as the lower

6  end of Upper Basin, which would be at the north end of Section

7  18, Township 10 South, Range 4 West.  North of there it is

8  exposed over a large area rising to the northward to form the

9  main **mass** of the mountains **inland.**     From the north end of Sec-

10  tion, its surface is    progressively deeper beneath the other

11  geologic units which have been deposited upon it.  The exact

12  depths at any point out toward the coast from there is not

13  known, because no wells have been drilled to reach it.

14    Q  Referring to Plaintiff's Exhibit No. 15, there is

15  disclosed on that exhibit a large area in blue which is the

16  basement complex, with which you are acquainted.  Now, would

17  you state whether the basement complex depicted on Plaintiff's

18  Exhibit 37 is the same in general characteristics as that

19  which appears on Plaintiff's Exhibit 15.

20    A  It has the same general characteristics, has the same

21  general water-bearing properties.

22    Q  Would you proceed and explain into the record the

23  areas which are depicted in green on the Plaintiff's Exhibit

24  No. 37.

25    A  In Section 1, 10 South, 5 West, there is an area, a

1    small area, of dark green which is shown in the explanation on

2    Plaintiff's 37.   It is just called a "unnamed conglomerate."

3         Q   And what is an "unnamed conglomerate"?

4         A   Well, it is a very-- in this instance, it is a small

5    outcrop covering less than probably 200 acres of a conglomerate,

6    which is a rock unit composed of, frequently of cobble, sand,

7    and clay, well-cemented in this case.   There would be no point

8    in naming a little, tiny unit like that, because we just

9    called it the "unnamed conglomerate."   It is virtually-- I

10   see another correction on the legend here.   Under "Unnamed

11   conglomerate" it is virtually non-water bearing.   So it does

12   not play a part in the water supply of the basin.

13        THE COURT:   You are changing the word "essentially" to

14   "virtually"?

15        THE WITNESS:   Yes, sir.

16        THE COURT:   You see some difference in the terms?

17        THE WITNESS:   Well, "essentially" doesn't carry the

18   connotation that "virtually" or "practically" or "nearly"

19   would.

20   BY MR. VEEDER:

21        Q   Now, would you refer to the areas depicted in light

22   green on the Plaintiff's Exhibit No. 37 and state into the

23   record the characteristics of that formation.

24        A   The large area shown on Exhibit 37 in a light green

25   extending from the north end of Township 10 South as far as

1    the center of Section 2, 11 South, 5 West, is called the La

2    Jolla formation.

1   Map symbol Tlj.

2       Q   What is the source of the La Jolla formation?

3       A   The La Jolla formation is a marine laid deposit.   By

4   that I mean it was laid down under the ocean at a great time

5   in the geologic past and consists of a series of sandstones and

6   shales.   In places it is locally fossiliferous, that is, it

7   contains fossil shells not within the watershed, were we able

8   to find any, but it is marine in origin, without doubt.

9       Q   From the standpoint of productivity of water, would

10  you make a statement into the record?

11      A   Yes.   We drilled two test wells specifically to find

12  out what the water-bearing character of the La Jolla formation

13  might be.

14      Q   Would you state where those wells are located, Mr.

15  Worts?

16      A   One well is shown as Ql in Section 23, 10 South, 5

17  West, drilled approximately 300 feet from the land surface on

18  down in sandstone and shale.

19          THE COURT:   Where is it now?

20          THE WITNESS:   It is shown by the --

21          THE COURT:   On the border between the green and the

22  yellow?

23          THE WITNESS:   Yes, sir.

24          THE COURT:   All right.

25

BY MR. VEEDER:

Q  It was, however, within the La Jolla formation; is that correct?

A  It was drilled right on the contact.

Q  Who logged the well in the process of its drilling?

A  One of my men.  And I was there part of the time.  We even took a core occasionally during the process of drilling to see how consolidated the sand was, and it was consolidated.

We drilled another test well, shown as K2, in Section 2 at the south end of Ysidora subbasin, 11 South, 5West.  That is withinthe little thin arm of green here at the bottom of the Ysidora Basin-- south end of Ysidora Basin.  That well was drilled to a depth of approximately 300 feet in sandstone and shale.

Q  Would you state the results of those two investigations?

A  We test pumped them to see what the yield might be, and the yields were so small that we could barely get enough water to get a sample for chemical analysis, and when we did get the sample run and got the analysis the water was of very poor quality.

THE COURT:  Both about 300 feet deep?

THE WITNESS:  Yes, sir.

BY MR. VEEDER:

Q  Would you state the distance that those wells are

1    located from the younger alluvium which you have depicted on

2    there as yellow?

3        A  For the Well Q1 in Section 23, 10 South, 5 West, it

4    is right on the contact-- that is, we backed the drilling rig

5    right up against the edge of the hill and proceeded to bore a

6    hole.

7        For Well K2 in Section 2, 11 South, 5 West, we actually

8    drove up onto a little bench on the La Jolla formation and

9    drilled, I would say, oh, roughly 40, 50, maybe 60 feet from the

10    edge of the alluvium.

11        Q  How well defined is the contact between the La Jolla

12    formation and the younger alluvium?

13        A  In most places it is sharp where the alluvium has

14    been deposited against steep embankments of the La Jolla.  In

15    other local places there has been slumping and land creep off

16    the slopes underlain by the La Jolla, and minor slope wash,

17    so that the contact in those places would be somewhat vague.

18    But even so, the position of the line probably would be at the

19    most/more than 200 feet off where the contact would reasonably

20    be expected.

21        Q  Now, referring to the area, the purple area that you

22    have there, will you state the name of the formation and

23    describe it generally into the record?

24        A  The name of the formation colored in kind of a bluish

25    purple is the San Onofre breccia.

1    Q   What is the meaning of the "breccia"?

2    A   Well, "breccia" is a heterogeneous type of deposit

3  composed of angular fragments of materials.  That is the

4  principal item that characterizes it-- usually large and

5  angular fragments contained in a matrix of finer materials.

6  It is a well compacted, well cemented tough unit to drill

7  through.  And we drilled one test well to determine its water-

8  bearing character.

9    Q   Where would that test well be located, Mr. Worts?

10    A   That well is up a little draw at the south end of

11  Section 2, 11 South, 5 West, denoted by the symbol P-1.

12    Q   To what depth did you drill that well?

13    A   As I recall, it, too, was on the order of 300 feet.

14  There were several of the wells in there that were drilled 250--

15  I don't recall this was 250 or 300, but it was on that general

16  order, to give a good test to the material we were interested

17  in finding out about.

18    Q   Who undertook the drilling there?

19    A   It was done under the same program of test drilling

20  as the two previously mentioned test wells, and was done under

21  my direction and logged by one of the geologists working for

22  me, and I was at the well many times-- at all these test wells

23  many times during their drilling.

24    Q   From the standpoint of the production of the well,

25  what were the results?

Z5

Werts    Direct                                                    3947

1        A   That was another dud.   It didn't yield any water--

2   dry.   I think we got just about enough water out of it to get a

3   sample.

4        The way this is done, you drill the well, in this case,

5   by the rotary method, which means that you are actually boring

6   the hole in the ground very much the way you would take a brace

7   and bit and bore a hole through a big plank.   To keep the bit

8   from jamming and from heating up they circulate mud down

9   through the center of the drill pipe, which rises on the out-

10   side and washes out the drill cuttings.

11        Q   The mud rises?

12        A   The mud is pumped down the drill pipe, goes out

13   through the holes in the bit, rises and brings the cuttings,

14   that is, the material the bit has cut out of the rock, to the

15   surface.   It also lubricates the bit, keeps it from heating and

16   burning up or wearing out so rapidly.   And when the drilling

17   process has been completed and you run casing into a hole like

18   that-- these holes were all cased with pipe, and they are still

19   there-- you end up with a casing full of mud, which isn't of

20   much value to anyone; so you go in and wash it out, you swab

21   it out, you circulate fresh water until you are satisfied that

22   the inside of the well, the perforations and any areas, any

23   zones within the formation tapped, are fairly free of this

24   mud.   And at that time you then can bail or develop the well by

25   bailing or air lifting or even put a pump on them.

3948

B

Z6

1    These were developed by air lift, and we usually ended

2    up by blowing all the water out of the well, and the well would

3    sit there for hours and we had to come back the next day before

4    the water would slowly seep in and fill up the well.  So that

5    is why I say we had trouble getting water to sample to de-

6    termine the quality of the water.

7        Q  What was the distance of that test well from the

8    younger alluvium that is disclosed on Plaintiff's 37?

9        A  It is drilled right on the edge of the alluvium in

10   a little tributary stream approaching the main stem of the

11   Santa Margarita along the south edge of Section 2, 11 South,

12   5 West.

13       Q  What is the distance-- 100 yards, 200 yards?

14       A  Oh, no.  It may even start in the slope wash for

15   about two or three feet or five feet or something before it

16   gets into the older material.  I think it is shown as being

17   just within the purple or blue-- let's call it purple, and it

18   may be-- I don't recall-- that was drilled, oh, about eight

19   years ago.

20       Q  What is the next formation that you studied, Mr.

21   Worts, in the preparation of th geologic map?

22       A  You might note in the legend that the rock types are

23   broken into two parts:  Those that we have discussed thus far are
                                 under
24   listed/the consolidated rocks;      the five shown above are the

25   unconsolidated deposit, of which the San Mateo formation is the

B

Z7

1    oldest.  The San Mateo formation is shown in brown on Plain-

2    tiff's Exhibit 37.  It rests or was deposited upon this San

3    Onofre breccia and extended from Ysidora Narrows, which is

4    right at the common corner between Sections 2, 3, 10 and 11,

5    11 South, 5 West-- extends downstream from Ysidora Narrows

6    to the Coast.  As you can see, the brown can be traced all

7    along the edge of the Santa Margarita River to th seashore

8    in Section 8, 11 South, 5 West.

9        Q  What were the results of your investigation there?

10       A  We drilled a test well, Jl, in Section 9, 11 South,

11   5 West, through the alluvium and into the underlying San Mateo

12   formation to test its water-bearing character and to determine

13   its water quality.

14       THE COURT:  What is the number of the well?

15       THE WITNESS:  The number of the well, your Honor, is

16   Jl in Section 9.

17       THE COURT:  You went through the alluvium into the brown;

18   is that it?

19       THE WITNESS:  Yes, sir.

20   BY MR. VEEDER:

21       Q  Do you redall what depth of the alluvial deposit

22   at that juncture?

23       A  It is shown on another exhibit.

24       Q  You may proceed and state what the results were on

25   this test well.

B

Z8

1      A  The well was drilled to a depth , again, of approx-

2   imately 300 feet, and the quality of water was more concen-

3   trated than that of sea water.  By that I mean the content was

4   poorer; the quality is poorer than that of sea water.

5      THE COURT:  You mean it was salty?

6      THE WITNESS: Very salty, your Honor.

7      THE COURT:  In drilling this well had you cut out the

8   water that would come in from the upper alluvium, so that the

9   water you were getting was only from what you have shown as

10   brown material?

11      THE WITNESS:  I think we would have to look at the next

12   exhibit, a geologic cross-section, to determine where that well

13   was perforated.  I believe the perforations are shown there.

14   As I recall the hole, the water-bearing section was tested at

15   most of these test wells, and I think the well was perforated

16   both in the deep, that is, in the San Mateo formation, and the

17   alluvium.

18   BY MR. VEEDER:

19      Q  What was the quantity of water that you found in

20   that well?

21      A  That well was a pretty good producer for a six-inch

22   test well.  A good supply out of a well like that would be a

23   couple of hundred gallons a minute, and I imagine that well

24   was probably a hundred gallons or less per minute, pumped with

25   an air lift, which is a very hard type of pump discharge to

B

Z9

1  handle, because the compressed air is run down through one

2  pipe and the water in the well is jetted out by the rising

3  column of compressed air and you almost have to jump to catch the

4  water.  But if you can collect it at a point and have it flow

5  down a little stream you can estimate or measure the quanity.

6      I am recalling most of this from eight years ago, but I

7  remember I was there during the time it was tested and it was

8  pumping-- it was a pretty good little testwell--  100 gallons/ **or less**

9  a minute.

10     Q  Proceeding from the San Mateo formation, would you

11 make reference to the next kind and type of formation that you

12 investigated?

13     A  I would like to make one more statement in regard to

14 the units that we have discussed, beginning with the unnamed

15 conglomerate as shown in the legend on Plaintiff's Exhibit 37,

16 and extending up through the San Mateo formation.  This group

17 of deposits or rocks dipped generally seaward.  They rest upon

18 the basement complex and they all have, as shown by these

19 little symbols on the map, you will see a line-- let's be

20 specific here and take a particular one for an exmple.  Let's

21 take Section 24, 10 South, 5 West in the southeast quarter in

22 the green, you will see a number 16 next to a little line symbol.

23 The long side of that, the longest part of that line which

24 extends in this case more or less northwest-southeast indicates

25 the strike of the bed.

B

Z10

1      THE COURT:  What does the 16 mean?

2      THE WITNESS:  The 16, your Honor, if you will see the

3 little tiny tip drawn at right angles to that northwest trending

4 line indicates the direction of the dip.  Just like you hold

5 up a sheet, such as I have in my hand here, and if I incline

6 it like this, this is the dip.  In that case the dip is 16

7 degrees.

8      In general, if you look at those through the green,

9 purple and brown areas you will find that the strikes are more

10 or less parallel to the coast, in general, and the dips range

11 10 to 20 degrees toward the coast.  So this whole sedimentary

12 sequence that we have discussed, including the unnamed con-

13 glomerate up through the San Mateo formation, are all dipping

14 seaward.

15      MR. VEEDER:  Mr. Dennis, you asked me a question.  Do

16 you want to put it in the record?

17      MR. DENNIS:  When you refer to these deposits, when you

18 started to talk about the dip, which deposits were you referring

19 to?

20      THE WITNESS:  I am referring to the La Jolla formation.

21      MR. DENNIS:  Only to the La Jolla formation?

22      THE WITNESS:  No, not only.  At that specific site I

23 am referring to the La Jolla formation.

24      MR. DENNIS:  But prior to that time you used the word

25 "these deposits."

B

Z11

THE WITNESS:  I am referring to the unnamed conglomerate,
the La Jolla, the San Onofre breccia and the San Mateo forma-
tion.  They all dip toward the coast.

BY MR. VEEDER:

Q  Would you proceed with your statement in regard to the
next kind and type of formation which you investigated?

A  The next in the legend overlying or younger than the
San Mateo formation are the terrace deposits.  These are
depicted in orange and are shown as far north as the little
remanant along the stream in Section 32, 9 South, 4 West, and
are found along the sides of the stream all the way to the
coast.  Along the coast there are extensive terrace deposits
at several levels, as shown--

Q  You use the term "terrace deposit."  Would you state
the meaning and the connotation to be ascribed to it?

A  "Terrace deposit" in this case-- let's take Chappo
subbasin and the terrace deposits that are shown in Sections 13
and 14, 10 South, 5 West.  These are old alluvial deposits,
deposited in much the same manner as the younger alluvium is
now being deposited.  The surfaces formed by these deposits
are a terrace, that is, a bench or maybe we think of it as a
mesa or a flat, above the present level of the alluvium.

In this case, in Chappo subbasin in sections 13 and 14,
as I recall, it is about 40 feet higher than the surface of the
younger alluvium, and              that surface is the terrace.

3954

B

Z12

1    The deposits that underlie that are the terrace deposits.

2         We drilled a test well, Gl, in Section 13, 10 South,

3    5 West, for the purpose of finding out just how thick they were

4    and what the water-bearing character of the terrace deposits

5    might be.

6         Q  What was the result of that investigation?

7         A  I would have to check my notes as to the thickness

8    of the terrace deposit.  Only the lower five or ten feet, as I

9    recall, were saturated at that time, that is, contained ground

10   water, and the yield was small, maybe 10, 15 gallons a minute.

11   But they are water bearing, and it is very hard-- as I

12   mentioned, we developed these wells with an air lift, and when

13   you have only a few feet of water in the bottom of a well, it

14   is extremely difficult to get it out by the air lift method.

15   So the yield was not adequately tested, but the fact that we

16   could get something on the order of five to ten gallons a minute

17   out indicated that they are water bearing.

18        Q  Would you explain the contacts between the terrace

19   deposits and the younger alluvium?  Are they well defined or

20   easy to ascertain where they are located?

21        A  Yes, they are, particularly in the places where the

22   Santa Margarita River itself has been working against the

23   exposures of the terrace deposits, such as that shown in the

24   vicinity of the Section No. 13.  The Santa Margarita River has

25   actually swung against that bank and made a very well-defined

B

Z13

1  contact and you can pinpoint it very easily in the field when

2  you are mapping.

3      Q  From the standpoint of coloration, is it apparent?

4      A  Coloration is distinct.  It is an orange, very much

5  like the color shown on the map-- that is, it has an iron stain

6  to it.  In other localities, none specifically, but where there

7  is usually of the smaller tributaries where there is not much

8  runoff and tends to be slump and erosion down the sides of the

9  areas underlain by terrace deposits so the contacts become less

10  well defined in those local areas.

11      Q  What were your other investigations in that area?

12      THE COURT:  Is it time for a recess?

13      I have been looking at Plate 13A of Fallbrook's AA for

14  Identification and California's 12.  You are laying a pretty

15  good foundation for this plate.

16      MR. VEEDER:  Well, they plagiarize completely all that

17  Mr. Worts did, you understand, your Honor.  There is no reason

18  why there shouldn't be some conformance with it.

19      THE COURT:  Take a short recess.

20      (Recess.)

21

22

23

24

25

1        MR. VEEDER:  Your Honor's last observation in regard--

2        THE COURT:  Don't let it worry you.  Don't let it worry

3    you, Mr. Veeder.

4        MR. VEEDER:  Oh, it does.

5        THE COURT:  Don't let it worry you.

6        MR. VEEDER:  I would like to make clarification, if I

7    may.  The State used, as I understand it, the original exhibit

8    that was used in the case which was tried in 1952.  This is a

9    much more complex, much more detailed, much more refined under-

10   taking than the exhibit to which you made reference and to

11   which I now make an objection.

12       MR. MOSKOWVITZ:  Is Mr. Veeder testifying as to what was

13   done by the State?

14       MR. VEEDER:  Yes.  Yes.  Yes.

15       THE COURT:  No; you can object to my remark, but there

16   has been nothing offered in evidence.

17       MR. VEEDER:  I object to the reference to it, your Honor,

18   because it is not in evidence.  And I submit that I am very

19   concerned with your Honor's looking at those things.

20       THE COURT:  Proceed.

21   BY MR. VEEDER:

22       Q  Would you proceed, Mr.-- I certainly don't want any-

23   one corrupted by bad scientific endeavor.

24       THE COURT:  If they ever pass a law that federal judges

25   can't look, you would really be in bad trouble.  I look at

1    lots of things.

2        MR. VEEDER:   I will not say another word, and we will

3    proceed.

4        Q  Would you refer next to the formations which are re-

5    ferred to as--

6        MR. STAHLMAN:  A little louder, Bill.

7    BY MR. VEEDER:

8        Q  -- the sand dunes area.

9        MR. STAHLMAN:  You talk as if you are scared.

10        MR. VEEDER:  I am terrorized.

11        THE COURT:  What color is this?

12        THE WITNESS:  The next unit is the old dune sand shown

13    on the legend and colored a light pink, shown by the map

14    symbol QSO.  These are dune sand deposits that are at high

15    altitude.  By high altitude, several hundred feet above the

16    valley floor, and in large part deposited on the terrace de-

17    posits.  They contain no water.  Any rainfall that might

18    possibly, that does fall on them, would sink right on through

19    and bleed out.  And they are of small extent.  And we did not

20    make any effort to test them.

21        Q  What is the next formation that you investigated,

22    Mr. Worts?

23        A  The next formation is the alluvium shown on the leg-

24    end by the map symbol QAL on Plaintiff's 37.  It is the prin-

25    cipal water-bearing deposit in the area.  And by "principal"

1  I mean it is the deposit in which or from which the camp and

2  irrigation wells obtain--

3      Q  That is Camp Pendleton?

4      A  Camp Pendleton, and irrigation wells obtain their

5  supply; and is shown by the legend.  These deposits yield water

6  to wells at rates up to 2,000 gallons per minute.

7      Q  Where are those generally located?  Would you make

8  reference?

9      A  As shown by the color yellow on Exhibit 37, they ex-

10  tend along the thread of the Santa Margarita River up at, in

11  as far north on this map as Section 28, 9 South, 4 West, and

12  in De Luz Creek in Section 29; extend continuously southward

13  through what is called Upper Basin, Chappo Subbasin, Ysidora

14  Subbasin, down to the coast.

15      Q  What kind and type of investigation did you make to

16  determine the water-bearing faculties of that formation, Mr.

17  Worts?

18      A  The yields of the wells and the drawdowns of the

19  wells when they were pumped, the study of the well logs, and

20  the water quality, all are considered in the study of the

21  younger or the alluvium as shown in yellow on Exhibit 37.

22      THE COURT:  Dark yellow?

23      THE WITNESS:  Yes, sir.

24  BY MR. VEEDER:

25      Q  Would you state whether the younger alluvium extends

S35
C1

Case 3:51-cv-01247-JO-SBC   Document 4538   Filed 09/24/63   PageID.24676   Page 52 of 138.

Werts    Direct

3959

1   away from the stream bed into the areas which you have depicted

2   on there as the La Jolla formation?

3        A   The younger, the alluvium extends up the minor tribu-

4   taries, minor drainages that drain off the La Jolla formation,

5   off the San Onofre breccia,        off the San Mateo formation,

6   and off the basement complex.   In those places the deposits

7   are fine grained, largely sand and silt and clay intermixed,

8   and are not a source of water compared to the quantities

9   available out of the deposits laid down by the Santa Margarita

10  River.

11       MR. VEEDER:   I desire, your Honor, to substitute with

12  the Clerk a colored map of Plaintiff's Exhibit mared for iden-

13  tification No. 38.   There is a copy.

14       THE COURT:   The same as the one lodged except now col-

15  ored?

16       MR. VEEDER:   We have now colored it, yes, and there is

17  a copy for your Honor.

18       THE WITNESS:   Might I add one thing before we leave this?

19  BY MR. VEEDER:

20       Q   Yes; proceed.

21       A   There is one last unit shown at the top of the legend

22  in light yellow.   Beach sand, shown on Plaintiff's 37, extends

23  in a very narrow band right along the beach for the full length

24  between the watershed boundaries.   It is not tapped by wells

25  and is presumably thin.

Q  What kind of investigation did you make in connection with that?

A  Mapped its outline.

Q  Mr. Worts, would you approach the exhibit marked for identification, Plaintiff's Exhibit No. 38, and read into the record the title as set forth on that identification.

A  Plaintiff's Exhibit 38 is a cross-section extending from the ocean up to and into De Luz Creek on Plaintiff's Exhibit 37, as indicated by this abbreviation: "EE Prime."

Q  And that is a line?

A  That is the line of section.  And the title of Exhibit 38 is:  "Geologic Section EE Prime through the lower Santa Margarita River Valley showing unconsolidated deposits and water level profiles."

Now, the color used for the younger alluvium is yellow, the same yellow as used on Plaintiff's 37.  The pattern used has no significance other than to distinguish the various units that are identifiable in the alluvium.

Q  Who prepared this exhibit, Mr. Worts?

A  This was prepared by me.

Q  And is it drawn to scale, Mr. Worts?

A  It is drawn to scale, but I would like to point out that the horizontal scales and the vertical scales are about 40 to 1.  In other words, if you will look at the map scale-- not the map scale but the scale shown in the lower part of the

1    diagram, it is 2,000 feet to the inch in a horizontal direction,

2    yet 50 feet to the inch in a vertical dimension.   Therefore,

3    it is highly exaggerated.

4    Q   Now, go ahead.

5    A   To explain the other geologic units that underlie the

6    alluvium, you will notice, starting at the right-hand side of

7    Plaintiff's 38, basement complex, colored in the same light

8    blue as that shown on Plaintiff's 37.   Similarly, the La Jolla

9    in light green, the San Onofre breccia in purple, and the San

10   Mateo near the coast in brown.   Now, to answer the Court's

11   question about whether the well 9J1 near the coast is perfor-

12   ated in the younger alluvium, you will notice on there verti-

13   cal arrows, next to the--

14   Q   On 38?

15   A   On Exhibit 38.   -- vertical arrows drawn next to the

16   well log which is shown diagrammatically here.   Those indicate

17   the perforated intervals.

18   MR. VEEDER:   We offer in evidence Plaintiff's Exhibit

19   marked No. 38 for identification.

20   THE COURT:   38 received in evidence.

21   THE WITNESS:   The younger alluvium or the alluvium, sim-

22   ply the alluvium here, in the right-hand part of Plaintiff's

23   38, I have used a horizontal, essentially horizontal broad -

24   yellow symbol to indicate the alluvium undifferentiated.   And

25   by "undifferentiated" I mean there is no attempt up in that

S39
C2

1   indicating sand and gravel, and gravel that would indicate a

2   high permeability in that zone.  This division, this zig-zag

3   division line just--

4       Q  Where are you pointing, Mr. Worts?  Excuse me.

5       A  I will describe where it is.  The zig-zag vertical

6   line that separates the symbol, the map color symbols right

7   next to Well 10-4-7H1 is not a precise or definite line de-

8   marking where the deposits suddenly change.  They are gradia-

9   tional.

10      THE COURT:  This is the line between the upper  and lower

11  members?

12      THE WITNESS:  No, your Honor; this vertical, on your

13  colored map, it is vertical zig-zag color line just on the

14  right-hand edge of 10-4-7H1.

15      THE COURT:  I don't see what you are talking  about.

16      MR. DENNIS:  It is not on our copy.

17      A VOICE:  It is not on  ours, either.

18      THE WITNESS:  No, it isn't.

19      MR. VEEDER:  It  is the colored.

20      THE WITNESS:  It  happens right where the division be-

21  tween the upper and lower  members stop.  I could point it out

22  on our exhibits as being--

23      THE COURT:  What color did you put  it in

24  on the exhibit on the board?

25      MR. STAHLMAN:  It is between yellow and white, isn't it?

1          THE WITNESS:  It is right here; vertical, zig-zag, in-

2     definite, oh, boundary.

3          THE COURT:  What is that now?

4          THE WITNESS:  That is just the-- where I am-- You will

5     notice that that zig-zine line is right at the upstream edge

6     where a question mark was located, between where the identifi-

7     cation of an upper member and lower member on the left is made

8     as opposed to where no identification of an upper and lower

9     member could be made on the right.  On Exhibit 38.  It was only

10    put in, your Honor, to break the color pattern.

11         THE COURT:  In other words, to the right or upstream from

12    that line you haven't made any differentiation or tried to be-

13    tween upper and lower member?

14         THE WITNESS:  That is correct.

15         THE COURT:  To the left in the map and downstream of that

16    zig-zine line you have attempted to put in a differentiation

17    between the upper and lower member; is that it?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  All right.

20         THE WITNESS:  You will notice, then, there little lens/  of clay

21    well 5D1 at a depth of approximately--

22         THE COURT:  5D1?

23         THE WITNESS:  10-4-5D1, right under the word "Subbasin"

24    in Upper Subbasin on Exhibit  38.  At a depth of approximately,

25    oh, 55 feet there is a little lens of clay, parallel-lines,

right in the perforated zone.  That conceivably could also be

1    indicating sand and gravel, and gravel that would indicate a

2    high permeability in that zone.  This division, this zig-zag

3    division line just--

4         Q  Where are you pointing, Mr. Worts?  Excuse me.

5         A  I will describe where it is.  The zig-zag vertical

6    line that separates the symbol, the map color symbols right

7    next to Well 10-4-7H1 is not a precise or definite line de-

8    marking where the deposits suddenly change.  They are gradia-

9    tional.

10        THE COURT:  This is the line between the upper  and lower

11   members?

12        THE WITNESS:  No, your Honor; this vertical, on your

13   colored map, it is vertical zig-zag color line just on the

14   right-hand edge of 10-4-7H1.

15        THE COURT:  I don't see what you are talking  about.

16        MR. DENNIS:  It is not on our copy.

17        A VOICE:  It is not on  ours, either.

18        THE WITNESS:  No, it isn't.

19        MR. VEEDER:  It  is the colored.

20        THE WITNESS:  It  happens right where the division be-

21   tween the upper and lower  members stop.  I could point it out

22   on our exhibits as being--

23        THE COURT:  What color did you put  it in

24   on the exhibit on the board?

25        MR. STAHLMAN:  It is between yellow and white, isn't it?

1        THE WITNESS:  It is right here; vertical, zig-zag, in-

2   definite, oh, boundary.

3        THE COURT:  What is that now?

4        THE WITNESS:  That is just the-- where I am-- You will

5   notice that that zig-zine line is right at the upstream edge

6   where a question mark was located, between where the identifi-

7   cation of an upper member and lower member on the left is made

8   as opposed to where no identification of an upper and lower

9   member could be made on the right.  On Exhibit 38.  It was only

10  put in, your Honor, to break the color pattern.

11       THE COURT:  In other words, to the right or upstream from

12  that line you haven't made any differentiation or tried to be-

13  tween upper and lower member?

14       THE WITNESS:  That is correct.

15       THE COURT:  To the left in the map and downstream of that

16  zig-zine line you have attempted to put in a differentiation

17  between the upper and lower member; is that it?

18       THE WITNESS:  Yes, sir.

19       THE COURT:  All right.

20       THE WITNESS:  You will notice, then, there little pink

21  well 5D1 at a depth of approximately--

22       THE COURT:  5D1?

23       THE WITNESS:  10-4-5D1, right under the word "Subbasin"

24  in Upper Subbasin on Exhibit  38.  At a depth of approximately,

25  oh, 55 feet there is a little lens of clay, parallel-lines,

    right in the perforated zone.  That conceivably could also be

1    interpreted as a division point between the upper and lower

2    members.

3            THE COURT:  I see.

4    BY MR. VEEDER:

5        Q  Now, would you proceed on down-- excuse me.

6        A  I want to just clarify and to point definitely  that

7    there is nothing magic about this end of this line here.  It is

8    merely where the geologist differentiates between the upper and

9    lower members; that is quite clearly defined in the Ysidora

10   Subbasin.  In many of these well logs,  in Chappo Subbasin, the

11   distinction is rather difficult to make, and in some was not

12   identified  at all.

13           THE COURT:  You mean that north of the zig-zag line not

14   only have  you made no attempt to make a break between the

15   upper and lower members, but do you also mean that from  the

16   information  at hand one could not  be made?

17           THE WITNESS:  I tried to indicate that you might be able

18   to extend  that line up to the clay shown in 5D1, but it would

19   be of no real significance.  In other words, this is a division

20   like between a  bed of sand, say, and a bed of gravel.  In other

21   words, you can trace the contact down through these well logs.

22   It is just a more detailed way of describing the deposits.  It

23   is a procedure that we have used and identified in basins, the

24   Long Beach-Santa Ana study, the Santa Ynez Valley, the  Santa

25   Maria Valley, and almost all the coastal basins, your Honor,

1    near the coast.  The upper  part is, in general, finer grain

2    than the lower part of the alluvium.  This distinction has been

3    made here.

4         THE COURT:  You have used the reference to 5D1 several

5    times.  That is Well 10-4-5E1?

6         THE WITNESS:  Yes, sir.

7         THE COURT:  All right.

8    BY MR. VEEDER:

9         Q  Before proceeding further--

10        MR. STAHLMAN:  Pardon me, Bill.  I wonder, while it is

11   in our minds here, if we could ask if he has an opinion as to

12   why  that differentiates  at that point.

13        THE WITNESS:  Yes, I have an opinion.  Let us take a

14   little look at the geologic history here.  The line drawn as a

15   fairly smooth line along the base of the alluvium that separ-

16   ates the alluvium from the underlying older formations repre-

17   sents a period in geologic time possibly ten, fifteen, twenty

18   thousand years ago when sea level was lowered several hundred

19   feet below its present stand; and at which time the ice in the

20   ocean was locked up in glaciers  that covered great  parts of

21   the northern and southern hemispheres.  And the stream, the

22   ancient Santa Margarita River, was cut  down to that level and--

23   BY MR. VEEDER:

24        Q  To the level--

25        A  To the level that sea level stood at that  time.  Due

1   to a change in climatic conditions, most likely, the ice melted,

2   the glaciers retreated, sea level rose; apparently was a period

3   of wetness; and, and as a result, the coarse deposits were

4   brought in here and laid  down to a maximum thickness of some-

5   thing over a hundred feet.  That must have been followed, judg-

6   ing by the fine grain character of the deposits locally in the

7   upper member, followed by a period of relative dryness, as far

8   as runoff was concerned, and we have, as you will observe, on

9   Plaintiff's 38, that Wells /11-5-2 and -3 and -2 and -4 in
                                **in**

10  Ysidora Narrows a symbol showing fossils or shells that were

11  actually-- we actually logged them when I was there.  We pulled

12  them out of the well when the well was being drilled; and in-

13  dicating that there was insufficient runoff to fill up the

14  valley during that period; so that with the ocean rising, the

15  ocean actually invaded up into the narrows, and organisms,

16  marine organisms, such as shells-- and I am using the  simpli-

17  fied terminology here-- the shells and clams and others grew

18  in brackish water or salt water lagoons, and those have been

19  reported, as I recall, upstream, even farther than Ysidora

20  Narrows.  I cannot recall which wells, but some of the drillers'

21  logs do show encountering shells in them.  So it is reasonable

22  to conclude that the deposition of the larger part of  the upper

23  member occurred under relatively dry conditions, that actually

24  may not  be too much different than those in which we are ex-

25  isting today.

1    MR. VEEDER:  Fallbrook would probably have had a hard

2 time building a dam then.

3    THE WITNESS:  Pardon?

4    THE COURT:  I didn't hear your question, Mr. Veeder.

5    MR. VEEDER:  I just made an observation.  I thought that

6 Fallbrook would probably have had a hard time building a dam

7 during that period.

8    THE COURT:  But the question Mr. Stahlman asked you was

9 how that ties in with this apparent difference upstream.

10    THE WITNESS:  Why those aren't visible upstream?

11    THE COURT:  Why the differences between an upper and a

12 lower member aren't so marked upstream as they are below  your

13 zig-zag  line.

14 BY MR. VEEDER:

15    Q  What does the velocity of water have to do with that?

16    A  That is what I was going to say.  The stream gradient

17 is steeper as you go progressively  upstream, so that any time

18 there is  water in the stream, it has greater carrying power

19 as you go **inland.**            You notice that this surface here

20 is generally concave upward, that is, it is bowed down in the

21 middle with respect to the ends.  It is flatter at the coast,

22 steeper  back here.  Furthermore, there is another matter that

23 enters into this.  That is the constriction through which the

24 water must, the surface water moving down the stream, must

25 travel.  As far down as the middle of Section 6, or 5, 10 South

5 West, the river is in a very narrow gorge; and, therefore, the

velocity, and its constriction there, its carrying ability

being much better because the stream cannot spread out as it

can when it hits this broad upper basin.  At that point  on Ex-

hibit 38 -- I had better mention that I am speaking from Exhibit

37 in describing that previous phenomenon.On Exhibit 38 that

would be approximately thirty-five hundredths of a mile below

10-4-5D1, which would be about half way between 5D1 and 7A1,

which is approximately the point where you can begin to iden-

tify the two members.

MR. VEEDER:  Does that clarify  it, your Honor?

THE COURT:  Yes.

BY MR. VEEDER:

Q  Now, Mr. Worts, before proceeding any further down

the valley, from the standpoint of a differentiation of deposits,

would you state into the record the meaning of Upper Subbasin,

Chappo Subbasin, and Ysidora, and relate it to the over-all

surface area of the--

Start
&X E1

D

Z14

1      A   In our studies starting in 1950 we decided that it

2   would be simpler, in the general treatment of the area, to

3   call the principal broad segments of the lower stream system

4   by some name that we could use conveniently in describing

5   what we were talking about.  So for purposes of convenience

6   we took-- well, I think I had better back up and explain one

7   item here.

8           In our study, which goes to the hydrology, we were,

9   first of all, faced with the problem of what was going to be

10   the upstream and downstream limits of the basin.  At the time

11   we started our study, the U. S. Corps of Engineers was actively

12   engaged in drilling test borings at what is known as DeLuz

13   Dam Site, which is shown by a series of well symbols, C1-14,

14   Section 32, 9 South, 4 West on Plaintiff's Exhibit 37.  Now

15   that is where we stopped the upstream extent of our study,

16   because the Engineers' plans for the De Luz Dam called for

17   excavation to bedrock, that is, removal of all the alluvium,

18   which at that point is shown on Exhibit 38--

19           THE COURT:  Approximately a hundred feet.

20           THE WITNESS:  --approximately 120 feet, I think--

21   approximately 120 feet.  They planned to excavate down to the

22   bottom of the alluvium at that point.  I don't know how.  I

23   assume that it was going to be a V-notch cut in which they

24   would have to dewater the deposits as they went.  But the

25   pertinent point here is that they were going to install a clay

D

Z15

1    cutoff, your Honor, on which to rest the main structure of

2    the dam, because otherwise if you had those permeable deposits

3    under your dam you wouldnot only lose water through it but you might

4    /suffer the possibility of a blow-out or some disaster occur-

5    ring.

6           So our studies were limited to as far upstream as 9-4,

7    32 C 8 or De Luz Dam Site, as shown on Plaintiff's 38.

8           Secondly, at the downstream end of the basin on Plain-

9    tiff's 37 we selected the Southwest Quarter of Section 2 and

10   specifically a line across the valley at the narrows there

11   through Well N4, as shown on Exhibit 38, because it soon

12   developed in our studies that there was sea water moving into

13   Ysidora subbasin and that if any remedial measures were to be

14   considered it would be logical that they would consider a

15   physical barrier of some type in the Narrows to try to prevent

16   that intrusion.

17          THE COURT:  The narrows would run across right there

18   at N4 and N5?

19          THE WITNESS:  Yes, sir.  The narrows as such, as we

20   have used it and as shown on Plaintiff's 38, actually extended

21   pretty much through the area shown as purple-- that is,

22   Ysidora Narrows.  About the narrowest point is through N4 and

23   N5, Section 2, 11 South, 5 West.

24          So those were the limits of the basin selected, and

25   for the reasons given.

D

Z16

Worts   Direct                                                          3971

1          To return to the original question, upper basin, then,

2     extended, then, from De Luz Dam Site in Section 32 6-1 to 14 on

3     Plaintiff's 37 down to Section 18, Township 10 South, 4 West,

4     where you see somewhat of a constricted area between the

5     basement complex on the north side of the younger alluvium

6     and the La Jolla formation on the south side.   It is obvious

7     that that is just a surface and subsurface narrowing of the

8     valley, as shown on Plaintiff's 38.   There is no difference

9     in the depth through there.   It extends as a continuous unit

10    right through that point.

11          The next basin, Chappo subbasin, extends from the pre-

12    vious point described in Section 18 on Plaintiff's 37 down-

13    steam to what appears to be or what is about the narrowest

14    point in Section 26, 10 South, 5 West through Wells L1 and L2,

15    shown there on Plaintiff's 37.

16          Ysidora subbasin-- and the term "subbasin" is merely

17    taken as an areal subdivision of the major basin that we are

18    considering here-- Ysidora subbasin extends from Wells L1 and 2

19    in Section 26 on Plaintiff's 37 downstream to Ysidora Narrows

20    to the wells we have previously described, N4 and N5 in Section

21    2.

22    BY MR. VEEDER:

23          Q   Would you state what is the relationship between the

24    upper Chappo and Ysidora Basins from the standpoint of hydrologic

25    and geologic interconnection?

D

Z17

1    A   Hydrologically and geologically, they are inter-
2    connected, as is shown on Plaintiff's 38.   They extend as
3    one continuous unit, even from above the arbitrary-- upstream
4    from the De Luz Dam Site and downstream below Ysidora Narrows
5    to the coast.

6        Basic geologic principles provide no other way for a
7    deposit such as the alluvium to be emplaced there without there
8    being a continuous unit through there.   After all, you have
9    had a through-flowing stream since the time that the ancient
10   Santa Margarita River had downcut to      the base of the
11   alluvium.   There is no way geologically that you could deposit
12   the alluvium in the valley without having it laid down as one
13   longitudinally continuous unit.

14       Q   Would you describe into the record the kind and type
15   of container in which this alluvial deposit is presently re-
16   siding?

17       A   The alluvium shown in yellow on Plaintiff's 38 is
18   surrounded, for all practical purposes, by--

19       THE COURT:   You said 38,  You mean 38 and 37?

20       THE WITNESS:   Thank you, your Honor.  I meant 37.

21       The alluvium, as shown on Exhibit 37, is surrounded by
22   these materials that I have previously testified to, these rocks,
23   the consolidated rocks that form the sides and bottom of the
24   water-bearing unit very much like a generlized and badly bent
25   bathtub.   In other words, you have an elongated deposit down

D

Z18

1    through here that is surrounded by these consolicated rocks

2    from which, in testing them for their supply, we could hardly

3    get any water out of the wells. So that it is in more or less

4    of a watertight-- well, you could hardly call it wholly water-

5    tight, but it is a nearly watertight container.

6        Q  From the standpoint of depth, extending laterally,

7    would you describe the characteristics of the younger alluvium?

8        A  I think we have an isopach map--

9        Q  I know we have.  Excuse me.

10       A  --which shows the lateral extent of the alluvium.

11   Now, the surface, as expressed in the map in the field, as shown

12   on Exhibit 37, extends from the consolidated rocks along the

13   sides from one side of the valley to the other.  We then showed

14   on Exhibit 38 what the maximum depth was down through the

15   valley, and Exhibit 39 shows the lateral extent of the younger

16   alluvium as viewed from above.

17       Q  Mr. Worts, would you need Exhibit 38 for this part

18   of your testimony?

19       A  If you cover it up I probably will.  I don't know

20   where else we could put it.  That is fine.  Then I can raise

21   it up to refer to it.

22       Q  Mr. Words, would you ;read the title block into the

23   record of plaintiff's exhibit marked for identification 39?

24       A  Exhibit 39 is titled "Santa Margarita River Watershed

25   within Camp Pendleton Isopach Map of Alluvial Deposits."

1    Q  Would you state what "Isopach" means?

2    A  "Isopach" is a Greek word, "iso"meaning equal and

3  "pach" meaning thickness.  So that the contours depicted on

4  Exhibit 39 show the thickness of the alluvium at any point

5  directly beneat the surface of that alluvial plane.

6    Q  How were those contours arrived at, Mr. Worts?

7    A  Those contours are drawn on the basis of the avail-

8  able well logs.  After all, when the wells are drilled in the

9  valley, if the well is drilled deep enough it will go through

10  the younger alluvium and into whatever consolidated rocks

11  underlies it.  But taking all of the wells, I believe possibly

12  70 or 80, in this relatively small valley, you will observe

13  that-- let's do it by taking a specific example.

14    Referring to the legend on Exhibit 39, the fifth entry

15  down in the legend in parentheses is a number (197) in the

16  legend, and that is the depth to bedrock.  Referring to Well

17  35K1 in Ysidora subbasin in Section 35, Township 10 South, 5

18  West, you will observe in parentheses under that well the

19  number (164), which means that when they drilled that well they

20  ran into the La Jolla.

21    THE COURT:  At 164 feet?

22    THE WITNESS:  At 164 feet.

23  BY MR. VEEDER:

24    Q  I observe La Jolla formation of Clark (1926).  Would

25  you state what is the meaning of that terminology appearing

D

Z20

1    on the face of the identification?

2         A   Clark named it.

3         Q   It was Clark.  Is this map drawn to scale, Mr. Worts?

4         A   The Isopachs are drawn to the best of our ability

5    with the position and number of wells that are available to draw

6    it.  You will observe that there are in places some pretty

7    long distances between wells.  Let us take, for example,

8    Section 26, 10 South, 5 West, which is about at the division

9    point between Chappo and Ysidora subbasins.  The depth there

10   was (149) in parentheses.  Now, looking downstream it is nearly

11   a mile to the nearest control.  Looking upstream it is more

12   than a mile to the nearest control.  Furthermore, next to

13   Well 149 you will notice out to the left that the depth-- the

14   thickness is 180 feet.  Well, obviously that well encountering

15   bedrock at 149 is not the well that controls that greater

16   depth.  That greater depth is controlled by the maximum depth

17   encountered in wells down at Ysidora subbasin, which happens

18   to be at Well K1 in Section 2, 11 South, 5 West, where it

19   shows (192) plus.  That means  that the well was drilled to a

20   depth of 192 feet and did not hit bedrock.  Looking upstream

21   we find a well in Section 23 labeled J2 in Chappo subbasin,

22   under which in parentheses there is (179-plus).  That means

23   that if that is the deepest part, being (179-plus) it could

24   be 180 or 182 or 185.  What it means is that if the base is

25   shallower, that well there wouldn't prove that it is shallower,

Worts    Direct                    3976

D

Z21

1  because it has a plus after it.

2          Let us go up and find one that is the same.  Here is a

3  well in Section 24, Well H2, over on the right-hand side of

4  Chappo subbasin, 10 South, 5 West.  You see in parentheses

5  (185).  That is the thickness there.  So that we know that

6  between K1 down at Ysidora subbasin and H2 in Chappo subbasin

7  the thickness is greater than 185 feet throughout that stretch.

8  Otherwise, there is a high point-- not a high point, but if there

9  is a point anywhere between those two that is higher in alti-

10 tude, it means that the stream would have to go down and fly

11 up over the hill and come back down again, which streams just

12 don't do.

13         Q   Did you prepare this yourself, Mr. Worts?

14         A   This was prepared by the Office of Ground Water

15 Resources, and I checked it over to my satisfaction and made

16 some corrections and revisions.

17         Q   Is it accurate, to your personal knowledge?

18         A   Yes.

19         MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

20 marked 39 for Identification.

21         THE WITNESS:  Could I say something else about this?

22         THE COURT:  Exhibit 39 received in evidence.

23         (Plaintiff's Exhibit No. 39 for Identification was

24 received in evidence as Plaintiff's Exhibit No. 39.)

25         THE WITNESS:  The number of wells used to control the

D-

Z22

1    deeper parts of this isopach map are fewer in number than those

2    used to control the shallower part.  By that I mean wells

3    drilled laterally along the sides or wherever they happen to

4    be drilled within the basin shown on Exhibit 39, we have a

5    great deal more data for wells that are-- to control the

6    contours and their general position under 100 feet of thickness,

7    as you drill deeper there are fewer wells to define the actual

8    trough or bottom of the ancient valleys that these contours

9    depict.  This point is important in our selection of the depth

10   zone that we used in computing the storage capacity of this

11   basin.  I wanted to mention it now while the exhibit was here.

12   BY MR. VEEDER:

13       Q  Of what is this this isopach reflective in regard to

14   the younger alluvium?

15       A  It shows the thickness of the deposits as we have

16   interpreted it here at any point, and it is a useful tool

17   particularly if you are going to drill additional wells.  In

18   other words, where in probility could you drill a well and

19   expect to tap the greatest thickness of alluvium?

20       Q  Would you correlate it with the wells that were used

21   in the preparation of Plaintiff's Exhibit 38, which is the

22   cross-section?  Is there any particular selection of wells

23   that you made?

24       A  We used every well for which there was a well log

25   in the computation of the isopach on Exhibit 39.  On Exhibit 38

D

Z23

1 we were limited to the number we could get on just by their

2 density, and we selected wells that were closest to the line

3 of section and showed the features the most clearly.

4 In looking at Exhibit 38 again, you will notice that

5 even away up in the alluvium here you will observe the symbol

6 for consolidated rock. For example, let us look at Well

7 10-5-14Q1 (Projected). Let's see where that well is located.

8 On Plaintiff's Exhibit 37 it is over here near the west edge

9 of the valley where you would expect in Chappo subbasin in

10 Section 14, 10 South, 5West, over at the side where you would

11 expect that the alluvium would be thinner than out toward the

12 middle or where the deepest part of downcut had occurred when

13 the river had downcut prior to the deposition of this alluvium.

14 So on referring again to Plaintiff's 38 you will notice that the

15 well encountered bedrock at a depth of, oh, call it 100 feet

16 roughly.

17 Q From the standpoint of the capacity of the basin

18 and the subbasins, of what use is the isopach?

19 A The isopach is most useful and is an essential part

20 of the computation of the storage capacity. It is a way that

21 we like to do it when we have the data to prepare such a

22 map. In other words, take areal extent, which is one of the

23 three considerations in storage capacity. One is the area, the

24 other is the thickness, and the other is the specific yield.

25 If we took the surface area shown on Exhibit 37 and the

Werts    Direct                                              3979

D

224

1   thickness of a hundred feet, multiply the two together to get a

2   volume, we would be considerably in error, because we would be

3   assuming that right along the edge here on both sides and

4   wherever we have taken our storage unit that the alluvium was

5   a hundred feet thick.  Well, of course, as is shown by the

6   isopach, maybe that is not the case.  So in computing the

7   storage you can take the isopach map and for your uppermost

8   zone of thickness, whichever you would care to take-- take 20

9   feet or 30 feet or 100 feet-- you can take the area around the

10  edge of the alluvium as shown in Exhibit 37 and then you can

11  come over to Exhibit 39 and measure the area as shown by the

12  hundred-foot contour.  You will notice that the area of the

13  hundred-foot contour is greatly less than the area land surface

14  as shown on Exhibit 37.  So for the hundred-foot zone, if you

15  wanted to do it all in one shot, you would take the two areas

16  and average them-- that would give you the average area, and

17  then times the thickness.

18          In our study we did a little more detail on that.  We

19  took depth zones, I think of 20 feet, and went down by incre-

20  ments of 20 feet.

21          MR. VEEDER:  I observe that it is after the noon hour,

22  your Honor.

23          THE COURT:  All right, we will adjourn until 2 o'clock.

24          (Noon recess.)

25

SAN DIEGO, CALIFORNIA, TUESDAY, NOVEMBER 4, 1958.  2 P.M.

MR. VEEDER:  Take the  stand, Mr. Worts.


DIRECT EXAMINATION (Cont'd.)

BY MR. VEEDER:

Q  Would you, based upon your investigation, Mr. Worts,
state the effect of the relationship between the alluvium that
is deposited in the area in question and the Pacific Ocean.

MR. SACHSE:  In which area, Mr. Veeder?

BY MR. VEEDER:'

Q  Down to the seashore.

A  The area in question shown on Bulletin 37, the rela-
tion of the--

Q  Did I hear Bulletin 37?

A  Thirty-seven?

Q  Thirty-seven is all right, friend.

THE COURT:  Not bulletin; exhibit.

THE WITNESS:  Exhibit; pardon me.  I am being carried
away by the by-play before we  started.

MR. VEEDER:  Don't let it cost you any money.

THE WITNESS:  Exhibit  37, the area near the shoreline,
the relation of the younger or the alluvium here to the Pacific
Ocean, that is best shown on Exhibit 38, the geologic cross-
section.  The deposits  are shown, the deposits comprising the
alluvium are shown extending beyond Well 9-J-1 and leaving the

1     matter open between that well and the Pacific Ocean off of the

2     left side of Exhibit 38.  The ocean floor here is drawn to

3     scale, as taken from the Coast and Geodetic Survey charts, and

4     if  extended seaward would eventually drop off way down below

5     the base of the younger alluvium.  And the younger alluvium

6     extends seaward and is in contact with the Pacific Ocean, start-

7     ing right on this exhibit and right on the other side, probably,

8     at the beach sand shown on Exhibit 38.  And from  there seaward

9     it is exposed.  So it is in physical contact with the seaward

10    end, the seaward extent of the alluvium.

11         Q  Now, would you relate the alluvium in the upper member

12    within the  area between De Luz Dam Site and the Ysidora Basin.

13         A  The deposits in the river channel are permeable

14    throughout the course of the stream between De Luz Dam Site and

15    the narrows.  I have walked the entire length of the channel in

16    this stretch to see what  the character of the materials might

17    be, and they are gravel and sand in the Upper Subbasin, and

18    they are fairly well-sorted sand-- that means sand of generally

19    uniform size and relatively coarse-- in the lower portion down

20    here. I mean, in Ysidora Subbasin.  This being on Exhibit 37.

21    And referring to the cross-section, Exhibit 38, the well logs

22    selected and shown on Exhibit 38 aren't necessarily for wells

23    that are right under the river.  But the upper part of the

24    upper member is coarse, relatively coarse-grained; that is,

25    sand and silts beneath the stream reach almost all the way down

1  or all the way down to the coast.  And in the narrows, Ysidora

2  Narrows, which is shown on Exhibit 38-- that is, it extends

3  through here-- you can see that there is sand in the upper part

4  in Well 2-N-4, for example, some twenty, thirty feet of it;

5  and beneath you can see that the deposits are as shown by the

6  diagrammatic symbols sand and clay beneath the river.  Now, the

7  well logs, well data, in Ysidora Subbasin in Section 2 and 35,

8  in Ysidora Subbasin on the east side of the basin, are very

9  fine-grained as logged by the drillers.  Perhaps some of those

10  have been projected into this section.  Yes; let's take a look

11  at 2, and 11-5-2K1, shown on Exhibit 38; which in the uppermost

12  hundred feet approximately is shown by the solid clay symbol.

13  Although that is shown the solid clay, we have drilled test wells

14  in Ysidora Subbasin, specifically 35-K-5① on Exhibit 37, and it

15  is our conclusion that the materials that are logged as solid

16  clay-- just the driller would just say, "Clay, 100 feet"-- is

17  a great simplification of what is actually there.  And our de-

18  tailed loggings showed that these materials are silts, fine

19  sands, sands, sand and clay; and down in the narrows the depos-

20  its are also as I described before, sand, silts and clays.  So

21  that the upper member, although appearing to be a tight unit

22  down here, is relatively tight over on the east side of Ysidora

23  Subbasin, and not tight over on the west side.  This is shown

24  by the logs that we have.

25          MR. VEEDER:  Exhibit 44.

1    THE COURT:   Are you going to comment on these projected

2  water level profiles in this map?

3    MR. VEEDER:   We are going ahead with the profiles now.

4  The water level contours are the next exhibit, your Honor.

5    THE CLERK:   Forty-four, Mr. Veeder?

6    MR. VEEDER:   Forty-four is the next.   This is for his

7  Honor.

8    Q  Mr. Worts, I ask you to approach the easel on which

9  Plaintiff's Exhibit marked for identification No. 44 has been

10  placed, and ask you to state the title block into the record,

11  if you would, please.

12    A  Title block reads:   "Santa Margarita River watershed

13  within Camp Pendleton.   Water level contours, October, 1957."

14    Q  And would you explain the legend as it is set forth

15  on that identification, please.

16    A  The legend or explanation, as it is here called, de-

17  scribes what the water level contours  are about.   The heavy

18  line in which the number "50" appears is the water level

19  contour for October, 1957.                Rather than the

20  word "uncertain" where approximately located, and then the

21  arrow  that is drawn perpendicular to that contour indicates

22  the direction of ground water flow.

23    Q  You want to change that "uncertain" to "approximate,"

24  Mr. Worts?

25    A  Yes.   "-- where position approximate."

1    MR. STAHLMAN:  You got 44.

2    MR. DENNIS:  Is that for '51?

3    MR. STAHLMAN:  You have mixed up on them some way.

4    THE WITNESS:  Oh, this is a '57.  This should have been

5    a '51.

6        Similarly, in the lower part--

7    MR. STAHLMAN:  Pardon me.  Wait until we  get this straight

8    in here.  Forty-four, as you have placed it upon the--

9    MR. VEEDER:  Would you give me 45, please.

10   MR. STAHLMAN:  Should that have been 45 or 44?

11   THE WITNESS:  This should have been 45, because they are

12   in consecutive order of age.  One is 1951, and the other is

13   1957.  I haven't realized--

14   THE COURT:  On the chart, 44 is November, 1951, and 45

15   is November, 1957.

16   THE WITNESS:  That is correct.

17   MR. VEEDER:  That is the map on which we rely, your

18   Honor.

19   MR. STAHLMAN:  It might be well to  remark them now so

20   they will be in accordance with the exhibits we have.

21   THE COURT:  We will mark 44 for November, 1951, and 45

22   for November, 1957.

23   BY MR. VEEDER:

24       Q  Referring to identification number 44, Mr. Worts,

25   would you read the  title-block on that exhibit into the record.

1    please.

2         A  Yes; "Santa Margarita River watershed within Camp

3    Pendleton.  Water level contours, November, 1951."

4         Q  And would you also review the explanation, and where

5    the word "uncertain" is used put "position approximate."

6         A  Yes; where the word "uncertain" occurs in both ex-

7    planations, on both sets of contours, within that legend, change

8    "uncertain" to "position approximate."

9         MR. STAHLMAN:  Change "uncertain" to "position approxi-

10   mate."

11        THE WITNESS:  Also in Section 2 in Ysidora Subbasin,

12   there is a Well E-1.  There should also be a "comma" after the

13   "1" and another well, "4" added there.  So we read "E-1,4."

14        THE COURT:  There are two  wells there?

15        THE WITNESS:  Two wells there within that circle.

16   BY MR. VEEDER:

17        Q  Now, who prepared the exhibit, Mr. Worts, which has

18   been identified  as No. 44?

19        A  It was prepared by me.

20        Q  Referring further  to the explanation, will you  state

21   the objective for which the exhibit was prepared?

22        A  The Exhibit 44 was prepared for several reasons:

23   First, to show the movement of water in the alluvium and terrace

24   deposits.  These are the two geologic units that contain appre-

25   ciable quantities of ground water.  And these contours have been

1    constructed, using only the wells that are shown on the map it-

2    self, as the contours show water is moving downstream toward

3    the coast from De Luz Creek and the Santa Margarita River on

4    down the  Santa Margarita through Upper Subbasin out into Chappo

5    Subbasin and down into Ysidora Subbasin.  At that point, I wish

6    to call your  attention to the zero contour line.  Now, this

7    zero is with reference to sea level.  That means that zero  is

8    sea level.

9         Q  Mr. Worts, are these accurate to your personal know-

10   ledge?

11        A  As to my knwoledge.

12        MR. VEEDER:  We offer 44 in evidence.

13        THE COURT:  Forty-four received in evidence.

14        THE WITNESS:  Zero contour is shown with a fuzzy edge

15   along the lower side, indicating  that it is a closed contour;

16   that is, that there is a depression in there.  The other, it

17   is--

18        THE COURT:  What do you mean a "closed contour"?  I

19   don't follow  you.

20        THE WITNESS:  Well, it is closed between the consolidated

21   rocks here and its companion contour down in the narrows.  The

22   direction of movement is also into this depression between  the

23   zero contours.  In other words, we don't have free movement

24   through Ysidora Subbasin and through the narrows to the coast.

25   What we  have is a pumping depression and created in Ysidora

1  Subbasin with the result that we have reversed the hydraulic

2  gradient that normally-- by "reversed" it means that it normally

3  flowed out to  the sea; but, due to man's activities, pumping,

4  the  gradient has become reversed, and the water is moving from

5  the coast into  the basin.

6  BY MR. VEEDER:

7       Q  That is as of 1951?

8       A  That is as of November, 1951, which  was at the end of

9  about  four dry years.

10       THE COURT:  Now, go ahead with this zero figure you have.

11  That means that is  at sea level there?

12       THE WITNESS:  Yes, sir; that is at sea level.

13       THE COURT:  In other  words, the  water, that is at sea

14  level, and the wells on that contour line?

15       THE WITNESS:  In the wells, it would be on that contour

16  line and between the contours they are below sea level.

17       THE COURT:  You mean the five and ten?

18       THE  WITNESS:  Between the zero contours, there is an-

19  other set of contours in here  that are probably  causing a

20  slight confusion at  the moment.  But if we will deal with the

21  southernmost zero contour in the narrows, down here, and the

22  upper zero contour across  here, the water levels  between these

23  two are below sea level.  It apparently didn't get down low

24  enough to reach minus five, or maybe they just about did reach

25  minus five.

1        THE COURT:  That five and ten are minus figures?

2        THE WITNESS:  Are you looking-- no, these-- to explain

3  those:  Those are on a shallow water, in very shallow  wells.

4  We put down some auger holes just to the top of the water to see

5  what the relationship was between  the deep water that is pumped

6  down in the lower  member and this shallow water up on top of

7  the fine materials.  And that also shows water moving, draining

8  from the east side of Ysidora Subbasin over toward the  zero

9  contour and moving inland from this zero contour in the narrows,

10  the second one here.

11       Q  Mr. Worts, could I ask you to identify those to  some

12  degree by sections?  I think it would be helpful for the record

End of
E take

13

14

15

16

17

18

19

20

21

22

23

24

25

A   All right.   Let's raise this up.

On Exhibit 44 the center of the pumping depression or the pumping hole-- residual pumping hole, I will call it, because it is the effect left over from the previous summer's pumping, the date of this being November-- centers in the lower part of Ysidora subbasin in Section 2, 11 South, 5 West.   The effect of that, pulling the water levels away down, is to create movement of water from the seaward side out here in Section 9 through 10 and through 2 and into the Ysidora sub-basin 11 South, 5 West.

MR. VEEDER:   Is your Honor oriented on that now?

THE COURT:   No.   Pulling water in-- is that salt water?

THE WITNESS:   Yes, sir.

BY MR. VEEDER:

Q   Would you proceed with your statement, Mr. Worts, in regard to how those contours were established?

A   The control for the contours are the wells that are plotted on Exhibit 44.   Every well shown was used for control. The shallow wells used to control these dotted contours in Ysidora basin are-- well, starting at the north end, it would be 35K4, 10 South, 5 West, 35R3, 10 South, 5 West, 2A5, 11 South, 5 West, 2E4, 11 South, 5 West, 2F3, 11 South, 5 West, and N5 in Section 2, 11 South, 5 West, and 9J2, 11 South, 5 West, and 10G1, 11 South, 5 West.   Those wells are used to control what is called, in the explanation, the contours on the

F

Z26

1  shallow water in Ysidora subbasin.  The remaining wells are

2  deep.  These shallow wells that I have just referred to are from

3  10 to 25 feet deep-- just nick the top of the saturated

4  materials of the younger alluvium.  The deep wells go down

5  below the upper member that we discussed on Exhibit 38 and

6  tapped the main gravel zones in depth.  Therefore, you get

7  contours showing two different directions of movement, actually.

8  The movement from the east side of Ysidora subbasin in the

9  east portion of Section 2 is bleeding out of the finer grained

10 materials that I discussed a moment ago toward the more permeable

11 and coarser material beneath the channel that I also described

12 at the same time.  And that is the picture.

13      Q  In regard to the contour lines again, would you

14 state why your contours end as you have shown them-- for

15 example, your contour line No. 50 as shown on Plaintiff's

16 Exhibit 44?

17      A  The contour lines approach the edge of the younger

18 alluvium at right angles.

19      THE COURT:  The point is, that is a contour line where

20 it is approximately 50 feet below the surface to water?

21      THE WITNESS:  No, sir.  It is the contour line that

22 is 50 feet above sea level.  And the depth to water, just

23 for the record in there, at that time might have been 10 to

24 15 feet.  But all the contours on Exhibit 44 are in relation

25 to sea level, starting at the highest up here at the confluence

F

Z27

1    of De Luz and Santa Margarita River at 135 feet above sea

2    level and decreasing in altitude down through the system.

3    Water always seeking the lowest point will be moving from the

4    points of higher level to the points of lower level, which, in

5    this case is the pumping trough or depression created in

6    Ysidora subbasin.

7    BY MR. VEEDER:

8         Q   Now, referring to Plaintiff's Exhibit marked for

9    identification 45, to which reference has previously been made,

10   would you state who prepared that exhibit?

11        A   I prepared this exhibit also.

12        Q   Would you state the procedures that you utilized?

13   Were they the same as in the preparation of Exhibit 44?

14        A   They were the same, and the wells shown on this

15   exhibit were the ones used for control.  There are minor

16   variations.  Some wells that are shown on-- for example, in

17   Section 2, I asked that Well E4 be added on Exhibit 44,

18   Township 11 South, Range 5 West, but that well was not avail-

19   able or either was not available or was not measured at this

20   time, so that just the wells that were used in the construction

21   of this map are plotted thereon.

22        Q   Would you state into the record again-- you didn't

23   show the full explanation on 45 when the reference was first

24   made to it.  Is the explanation the same as on 44?

25        A   It is essentially the same-- it is the same, except

F

Z28

1    for the date, and I wish to make the same correction of that

2    word "uncertain" and change it to "position approximate" in

3    the legend.

4              THE COURT:  I still don't think I understand what you

5    mean by "closed contour."  You have them on 44.  You don't

6    have them on 45.

7              THE WITNESS:  On 45 the condition has changed.

8              MR. VEEDER:  Your Honor, I would like to make an offer

9    of 45 now, if I may.

10             THE COURT:  It will be received in evidence.

11             (Plaintiff's Exhibit No. 45 for Identification was

12   received in evidence as Plaintiff's Exhibit No. 45.)

13             THE COURT:  I understand the condition has changed.  What

14   do you mean by "closed contour"?

15             THE WITNESS:  That perhaps was not the correct word.

16   If we had a pump operating in the center of Ysidora subbasin,

17   say in Section 2, 11 South, 5 West, pulling the water level

18   away down, the contours around in that cone of depression cre-

19   ated by pumping that well would be generally concentric around

20   the point of discharge.  That would be closed.  The zero

21   contour is not actually closed.  It is trying to be closed,

22   but it can't because it bumps against the non-water-bearing

23   rocks along the sides.  So it is not actually a closed contour

24   because it is not fully connected and can't be because of the

25   consolidated rocks around the sides.

F

Z29

1    THE COURT:  Why do you have two closed contours down

2    there in Section 10?  That is the lower part of the Ysidora

3    Narrows.

4        THE WITNESS:  Your Honor, the outside or westernmost

5    in section 10 is for the deep water.  That is the levels based

6    on the deep wells.  The wells tapping the lower and pumped

7    portion of the aquifer.  So is this heavy zero in Section 35,

8    Township 10 South, Range 5 West.  Those represent contours on

9    the deep zone, the lower member, as shown on Exhibit 38, as

10   determined from the pumped wells and test wells that tapped

11   that deep zone.

12       The zero contour toward the east side of Section 10,

13   11 South, 5 West and the one that extends northward in Section

14   2 between Wells E1 and F3 extends northward up toward into

15   Section 35 and then turns over toward the consolidated rock.

16   That is the pair that go together on the shallow water in wells

17   that only go down as I mentioned some 10 to 25 feet.

18       THE COURT:  But they are both marked as zero, which means

19   sea level?

20       THE WITNESS:  That is right.  In other words, this

21   deeper water is under semi-confinement or slight pressure

22   head, and the other water is water table or can be considered

23   as free water, being in contact with the atmosphere.

24       THE COURT:  You mean the water level in each of those

25   lineof contours is at sea level.

f

Z30

1       THE WITNESS:  Yes, sir.  And their positions are

2  slightly different, because of the physical environment that

3  controls their position.

4  BY MR. VEEDER:

5       Q  Is it possible to have a zero contour without its

6  being closed?

7       A  Well, as I explained to the Court, these are not

8  physically closed, because they bump into consolidated rock on

9  either side.

10      Q  I am going to ask you to put the section numbers on

11  10 and 35, if you would, to the end that there be--

12      A  On Exhibit 44?

13      Q  On Exhibit 44, if you would.

14      A  Section 35 is in 10 South, 5 West, Section 2, 11

15  South, 5 West, Section 1, Section 10.

16      Q  I am going to have you write "Sec." before each of those

17  numbers, so that there will be no confusion.

18      A  I am writing Sec before Section 35, Sec before

19  Section 2, Sec before Section 10, Sec before Section 9, all on

20  Exhibit 44.

21      MR. VEEDER:  Does that complete your inquiry, your

22  Honor?

23      Q  Now, would you return to Plaintiff's Exhibit 45 and

24  state into the record the meaning as depicted on this exhibit

25  from the standpoint of the contours in the Sections 35 to 10 and

9.

A  May I label them first?

Q  You may.  Use the green pencil.  As you place them on, refer also to the township and range to the end that it will appear in the record.

A  I am writing Sec 35 and 10 South, 5 West, Sec 2 and 11 South, 5 West, Sec 10 in 11 South, 5 West, and Sec 9 in 11 South, 5 West.  The difference--

Q  Before you proceed, what controls were used in that area as they relate to the controls which are used in Plaintiff's Exhibit 44?

A  Virtually the same wells shown on 44 were used to construct the contours shown on 45.  Now, there are some striking differences that have occurred in the six years that separate these two diagrams.  The 1951 year in November was at the end of four dry years.  Similarly, the conditions at the end of 1957 were at the end of three very dry years.  They are, therefore, comparable.  But I wish to point out that in Section 35, 10 South, 5 West, and Section 2 and 10, the picture of the movement of water has changed completely and this is due to a redistribution of the pumping on the Camp.  In other words, they have stopped the pumping except for irrigation from Ysidora basin, and the Camp has moved all its pumpage up into Chappo subbasin and is now in the process of preparing to pump from Upper Subbasin  The rate of that change has

F

Z32

1  caused a marked difference in Chappo Basin.  You will notice

2  that the 50-foot contour on Exhibit 44 is at about midbasin,

3  specifically in Sections 14 and 24.

4      Q  Would you write those down, please, Mr. Worts.

5      A  In Sections 14 to 24 in Exhibit 44.  In Exhibit 45,

6  due to the added burden on Chappo Basin, as a result of the

7  redistribution of the pumping, it has moved up approximately

8  a mile upstream.

9      Q  Which has moved, now?

10      A  The 50-foot contour now occurs in Section 13, which

11  I am writing on the exhibit.

12      Q  Township and range?

13      A  10 South, 5 West.  And in Section 18, 10 South, 4

14  West, showing that the redistribution of pumping load has made

15  a marked change in Ysidora subbasin and in Chappo subbasin.

16      Q  Would you compare any other contour lines which have

17  been changed by reason of that change in method?

18      A  I was using the 50-foot contour on both Exhibit 44

19  and Exhibit 45 because it was readily identifiable.  Obviously,

20  with that shift in the 50-foot contour from 1951 on Exhibit 44

21  to its position in 1957 on Exhibit 45, the other and adjacent

22  contours have shifted also.  This upstream shift indicates a

23  marked withdrawal or depletion of ground water in that basin.

24      THE COURT:  The 25-foot contour is just about the same.

25      THE WITNESS:  Yes, sir.  That is right in the narrows.

1  That was not affected appreciably.  But down in Ysidora sub-

2  basin, Sections 35, Township 10 South, 5 West, and in 2 and 10

3  in 11 South, 5 West, you will observe that the contours indi-

4  cate a seaward movement of sea water has been restored due to

5  this change in pumping regimine.

6  BY MR. VEEDER:

7      Q  What other contrasts or comparisons can you make

8  between the two Exhibits 44 and 45 from the standpoint of a

9  reversal in the gradient of the ground water in the narrows--

10 I mean, in Ysidora Basin?  What is the level there now as

11 compared in 1951?

12     A  The level in 1951 on Exhibit 44 in Section 35, in the

13 main pump zone lower member, was at sea level or below to the

14 south of the zero line.  In 1957 on Exhibit 45 at about the

15 same position was the zero contour was on 44, the 10-foot

16 contour exists, indicating a net change in that time of a

17 positive or a rise of 10 feet.

18     Q  I would like to ask some questions in regard to

19 Exhibit 38.  Referring to Plaintiff's Exhibit 38, would you

20 state the water levels as shown on that exhibit and explain

21 their relationship with 44 and 45, if you will.

22     A  The water level profiles labeled on Exhibit 38 with

23 the date given show-- you are looking at the basin from the

24 side-- just how far down the levels have been drawn or where

25 they were at the time the measurements were made.  The control

F

Z34

1   for these profiles on Exhibit 38 utilize all the wells for

2   which measurements were made.

3         Let's take a specific one. We have one here, water

4   level profile March, 1932, shown as a short-dashed line. That

5   water level profile marked 1932 is right under "Subbasin" in

6   Ysidora Subbasin. It occurs as a dashed line very close to

7   the land surface and extending on up the basin and into Ysisora

8   Narrows toward the coast. Now the lowest profile is a water

9   level profile for November, 1951, which is the same date as

10   the water level contour shown on Exhibit 44.

11         Q  Would you locate that on Exhibit 38, please?

12         A  In Ysidora subbasin, it is the profile that goes

13   down and crosses sea level, which is a reference line that

14   you can bring in from the left margin of Exhibit 38 at sea

15   level. Follow that line in and you will see where the zero

16   sea level line crosses the water level profile line, and that

17   would be approximately the same point as the zero contour

18   occurs on Exhibit 44, near Well 10-5-35K5. The profile for

F2   19   1951 crosses the zero or sea level line seaward from Well

20   11-5-10B1. The area in between those two points is below the

21   sea leve line.

22         Q  What other water level do you show on Plaintiff's

23   Exhibit 38?

24         A  The October, 1957, profile is shown for Chappo

25   Subbasin to show the marked change that occurred there due to

F2

Z35

1   the change in pumping.  It corresponds to the contours shown

2   on Exhibit 45, and they are the lowest of record in Chappo

3   Subbasin.  Similarly, the water level profiles for November,

4   1951 in Ysidora subbasin is the lowest of record.

5        Q   What was that in relation to sea level, if you will?

6        A   The 1957 contour at Chappo Subbasin everywhere is
                 feet
7   more than 2O/ above sealevel, even at the lowest downstream

8   end.

9        MR. VEEDER:  Plaintiff's Exhibit 51.

10       (The Clerk hands document to Mr. Veeder.)

11       Q   I hand you Plaintiff's Exhibit marked 51 for Iden-

12   tification and ask you to read into the record the title block--

13   rather, the title, as set forth on that.

14       A   The title of Exhibit 51 is "Fluctuations of Water

15   Levels in 10 Wells in the Lower Santa Margarita River Basin."

16       Q   What is depicted by that illustration?

17       A   These are called hydrographs or a plot of the water

18   levels in wells, with time against there along the left side,

19   we have the altitude of water level in feet above or below

20   sea level and across the top is shown the year.  The number

21   of circles in any given year are the number of measurements

22   made on that well.

23       Q   This was prepared by you?

24       A   This was prepared by me.

25       Q   And does it correctly depict the fluctuations to

wh ich you have made reference?

1      A   Yes, these wells were selected to show conditions in

2  Ysidora Subbasin in the upper two blocks, Chappo Subbasin in

3  the second two blocks, and Upper Subbasin in the Lower Block.

4      MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

5  marked 51 for identification.

6      THE COURT:  Received in evidence.

7      THE WITNESS:  These graphs show starting back in 1920,

8  that the levels had a seasonal fluctuation of a few feet.  But,

9  in general, most all stay reasonably level.  There was no

10  marked amplitude from one year to another.

11      Q   Would you state what you mean by "amplitude," Mr.

12  Worts.

13      A   That would  be the amount of the fluctuation.   In

14  other words, the trend is almost horizontal indicating very

15  little change in water level with respect to sea level.  You

16  can look at, for example, the graph of  the top well here,

17  11-5-2B2, on Exhibit 51 and see that in a wet year like  1938

18  the  graph rose up to the 20-foot altitude, which was only two

19  feet below land surface.

20      THE COURT:  I understand that on your top chart in

21  Ysidora Subbasin that two different wells were involved, both

22  at the same location.  From '20 to '38, you took Well 11-5-2B2.

23      THE WITNESS:  Yes, sir.

24      THE COURT:  And from '45 on you took 11-5-2B1.

25      THE WITNESS:  Yes.

1          THE COURT:  2-B-1.  Did something happen to the first

2     well on 2-B-- I mean  the 2-B-2  and then 2-B-1?

3          THE WITNESS:  Yes, sir; something did happen.  We just

4     weren't able to pick up the, or to obtain any measurements for

5     those years.  And the next record that showed it up was it 1945

6     on the nearby well.  I think it is only about 20 feet  away,

7     2-B-2.  2-B-1, pardon me.  Correction.

8          THE COURT:  Then, you picked up 2-B-2 again in 1951?

9          THE WITNESS:  Yes, sir.

10         THE  COURT:  Those wells are close together?

11         THE WITNESS:  Yes, sir, I think probably  within fifty

12    feet.  And they are not too different in their measured depths.

13    They were drilled, as I recall, to about 110 feet initially.

14         THE COURT:  Now, on the second well  on Ysidora Subbasin

15    we have a similar situation.  It started out  with Well 10-5-35K3.

16         THE WITNESS:  Yes, sir.

17         THE COURT:  And went to  Well 10-5-35J1.  And then you

18    went to 10-5-35K2.

19         THE  WITNESS:  K-1.

20         THE COURT:  K-1.

21         THE WITNESS:  Yes, sir.  In other words, we were trying

22    to build up in the same location a composite record to show the

23    longest span and what the water levels might have done in that

24

25

1    vicinity for the longest period that we could reconstruct.

2    Obviously, if we had one, for example, if we had been able to

3    have a record on 2-B-2 all the  way through, we would gladly

4    have used it.  But we did not.  So we had to pick up nearby

5    wells when measurements  were stopped on a nearby well.

6         THE COURT:  The  two charts are fairly similar, are they

7    not?

8         THE WITNESS:  Yes, sir.

9         Now, carrying the Ysidora Subbasin wells 2-B-1 and

10   35-K-1 forward from 1945, prior to which there is a gap of

11   record of some five years, you will observe a large fluctuation

12   as interpolated in here because there weren't sufficient meas-

13   urements.  But  by and large down through 1948 the level de-

14   clined in 2-B-1.  Similarly, the levels declined in 35-K-1 on

15   Exhibit  51.  Moreover, the decline continued down to the fall

16   of 1951, the '51 measurements being the lowest measurements,

17   are those reflected on the  water level contour number Exhib-

18   it 44.  This decline was in response to the heavy pumping from

19   wells for irrigation use in Ysidora Subbasin and for the camp

20   use during the period of  the war when the base had no choice

21   but to use what they had until the  war was over, and they

22   could get steel and put the  wells in upstream.  The winter of

23   1952, referring again to 2-B-2 and 35-K-1 on Exhibit 51, show

24   a substantial recovery there in the order of 20 feet.  The

25   fluctuations since that time have remained, you might say,

1    relatively stable, the water levels fluctuating within about

2    the  same range; even in the  very dry years of 1955, 1956,

3    1957, when the pumpage from the basin was rationed for irriga-

4    tion.

5        THE   COURT:  What are these little pumping symbols there

6    in the second well of Ysidora Subbasin?

7        THE WITNESS:  Your Honor, those  are the actual meas-

8    urements made at the  time the well was pumping.  In other

9    words, that is the position of the  water level.  When the man

10   went to  the well to make a measurement, the well was pumping,

11   he dropped the tape down, the well  measured where the water

12   level was.  And those points are where the water levels stood.

13       THE COURT:  In other words, the chart above is where the

14   water level stood in the well without pumping?

15       THE WITNESS:  Yes, sir.

16       THE COURT:  And when pumping occurred, it pulled the

17   water level down to the marks indicated below?

18       THE WITNESS:  I would like you to notice the relation

19   of those in this well to sea level.  The pumping levels in Well

20   35-K-1, which is the farthest  pumped well from  the coast in

21   Ysidora Subbasin-- I am referring now to Well K-1, 35-K-1, Sec-

22   tion 35, 10 South, 5 West, in Ysidora Subbasin on Exhibit 44;

23   which back that far from the coast the well, when it is pumping,

24   most of the time is pumping below  sea level.

25

1    BY MR. VEEDER:

2         Q   What about the distribution  from the standpoint of

3    the basin as reflected by this?  What about  drawdown in Upper

4    Basin, for example, as depicted on this?

5         A   We do not have drawdowns in Upper Basin, but a well

6    in Chappo Subbasin, Well 10-5-24Hl on Exhibit 51, toward the

7    right-hand  side, has a whole series of pumping measurements

8    that are in Chappo Basin.  They are well above sea level; ac-

9    tually on the order of 35 to 40 feet above sea level.

10        Q   And what does the kind and type of soils and

11   alluvium have to do with the effect, the illustration there

12   that you have?  Does the  greater permeability in the  Chappo

13   Basin, is that reflected on that illustration?

14        A   No;  the permeability doesn't enter into  this con-

15   sideration of where the water level stands.  I would like to

16   show that during the period '45 to '51, when Ysidora--  this is

17   on Exhibit 51-- when the water levels in Ysidora Subbasin were

18   being pulled down, the levels in Chappo Basin, as depicted by

19   graphs 24-N-1 and 24-H-1-- incompletely by 24-H-1, because of

20   lack of record between '45 and  '51-- do not show-- they show

21   a slight  decline, but nothing compared to the magnitude of

22   the drawdown of  at least 20 to 25 feet in the heart  of the

23   Ysidora Subbasin.  Here we have on the order of five.  And the

24   following period we have the reverse situation due to the

25   heavier pumping draft from Chappo Subbasin and the decrease in

1    draft  from Ysidora Subbasin.  The levels in  Chappo Subbasin

2    are showing a decline.  Admittedly, on 24-H-1 we have projected

3    in the approximate position where, in our opinion, the trend of

4    the water level would be.  We couldn't determine it precisely,

5    because the well was pumping so much of the  time we were unable

6    to obtain non-pumping levels.

7        THE COURT:  What is meant by the word "flow" in Well

8    10-5-24N-1?

9        THE WITNESS:  Your Honor, that well was flowing in the

10   periods--

11       THE COURT:  Flowing  as an artesian well?

12       THE WITNESS:  Flowing as an artesian well.

13   BY MR. VEEDER:

14       Q  What would be the circumstance  or  grade which results

15   in that well being a flowing well?

16       A  Refer to geologic map on 37; 24-N-1 is on the south

17   side of Chappo Subbasin in Township 10 South, 5 West, and is in

18   an area where the upper member of the alluvium is sufficiently

19   fine grain to cause a little flow to result in that  well when

20   the  basin is almost full.

21       Q  What kind of confinement is there?  How extensive?

22       A  Semi.  It is  poorly confined, and it is not-- it

23   extends around the south side and is identifiable.

24       Q  Around the south side of what?

25       A  Of Chappo Subbasin.

1    Q   You are pointing to section?

2    A   In Sections 23 and 24 east of the river.

3    MR. VEEDER:   Plaintiff's Exhibit No. 46.

4    MR. MOSKOWVITZ:   What was that number, Mr. Veeder?

5    MR. VEEDER:   Forty-six.

6    THE CLERK:   Are you through with 44?

7    MR. VEEDER:   Yes.

8    Q   In regard to Plaintiff's Exhibit marked 46 for iden-

9    tification, will you state the title of the exhibit.

10   A   The title of the exhibit is:   "Hydrographs of paired,

11   shallow and deep wells in Ysidora Subbasin, Camp Pendleton."

12   Q   Under whose direction was that prepared?   Did you

13   prepare that yourself?

14   A   I prepared that myself.

15   Q   And would you state what is reflected by that exhibit?

16   A   This exhibit, I hope, will clarify to some degree,

17   the distinction between the shallow water and the shallow

18   water tapped by the wells 10 to 25 feet deep in the Ysidora

19   Subbasin, and the wells that are tapping the lower member of

20   the alluvium as depicted on Exhibit 38.   On the west side of

21   Ysidora Subbasin near the river-- and I will refer to Exhibit

22   37 to spot the locations-- we have here on Exhibit 46 Wells

23   35-K-1, K-4, in Section 35, 10 South, 5 West, near the river to

24   show how the shallow water on the west side of the basin near

25   the river responds not only to recharge from the river, but also

1    from pumping effects.

2         Q  Does that exhibit  accurately depict the phenomenon

3    that you have set forth on it?

4         A  Yes; it is a plot of the actual measurements with the

5    lines  drawn in connecting the points.

6         MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

7    marked 46 for identification.

8         THE COURT:  Let's find out about  the east side.  I see

9    the west side chart with a shallow well 35 feet, or 28 feet, a

10   deep well 166 feet, and some correspondence between the depth

11   of the well, throughout the various depths of the water in the

12   well, throughout the  various years.  What does sea level data

13   mean?

14        THE WITNESS:  That is if you had passed sea level right

15   in at that level, that is the altitude at which it passes be-

16   neath this well, these paired wells.  In other words, it  is

17   22 feet below sea level in the lower graph, and it is 27,

18   approximately, below land surface.  I think I said "sea level."

19   The sea level datum line in the lower graph is two feet below

20   land surface on the lower graph, and 27 feet below land surface

21   on the upper graph.  In other words, if you stood on the land

22   at that point on the upper pair of wells, you would be standing

23   about 27 feet above sea level; and, if someone pulled the ground

24   out from under you, and you dropped down, you would hit sea level

25   at about 27 feet below you at that point.  The upper graph--

1        THE COURT:  These were wells that were pumping below sea

2   level at all times?

3        THE WITNESS:  Your Honor, the arrows that extend down

4   from  the heavy lines on the  two graphs are the pumping, per-

5   iods of pumping during which the graph has been dashed in to

6   show its approximate position.

7        THE COURT:  Yes, but the graphs-- your figures on the

8   left-hand side are all below--

9        THE WITNESS:  Land surface.

10        THE COURT:  --  below land surface.

11        THE WITNESS:  Yes, sir.

12        THE COURT:  But not below sea level?

13        THE WITNESS:  No, they are not below sea level.  This is

14   a different plot.  These are plotted with respect to land sur-

15   face.  Let's take an example here.  Here is, starting over in

16   the year 1951 on Exhibit 46, for Deep Well 10-5-35K-1, in the

17   upper  graph--

18        MR. STAHLMAN:  A little louder.

19        THE WITNESS:  I will get on the other side.

20        Starting in the early part of 1951, the graph, these are

21   non-pumping levels.  It shows a decline down to sea level in

22   the early fall.  Then, a period shown as  pumping where the

23   graph is dashed, we didn't make the measurements of the pumping

24   levels at that time.  We come to a strapulation (phonetic) of

25   the curve up to the next measure of static levels.  And the

1   great rise that you see in the early part of 1952 is due to the

2   wet year when an appreciable quantity of the  water came down

3   the stream and  recharged the alluvium right in the  area by

4   the well.  And both wells, both the shallow well and the deep

5   well, rose simultaneously or nearly right together, approxi-

6   mately 16 to 17 feet.  Now, the purpose of showing this is that

7   to avoid the possibility of a misunderstanding about the degree

8   of confinement that might exist in Ysidora Subbasin.  If this

9   were merely a pressure response in a confined aquifer, the deep

10   well would shoot, rise rapidly, the shallow well would not.

11   Now, that condition is depicted on the east side of Ysidora

12   Subbasin where the pressure effect of recharge from the river

13   along the west side transmitted rapidly across the basin to the

14   other, to the east side, and the water level in the deep well,

15   11-5-2A1, rose rapidly in a period of a few months some 20,

16   nearly 20 feet; whereas its companion shallow well, 2-A-5, only

17   about 15 feet away, hardly reflected any response to that change

18   at all.

19       THE COURT:  Then, the place where it is marked "Sewage

20   plant 2, discharging east of  well," that is the approximate

21   date?

22       THE WITNESS:  That is the approximate date that sewage

23   was brought over the divide and down the unnamed canyon.

24   BY MR. VEEDER:

25       Q  When you say "divide," would you indicate on the map

1    and refer to the section, township, and range.

2              THE COURT:  Over the divide of the watershed.

3              THE WITNESS:  Over the divide of the watershed and

4    entered this creek that heads in Section 31, 10 South, 4 West;

5    moves and continues in Section 36, 10 South, 5 West; and was

6    allowed to discharge onto the surface of the alluvium and

7    actually ponded down  at the south end of the section-- pardon

8    me, about the center of Section 2, Township 11 South, Range 5

9    West.

10   BY MR. VEEDER:

11             Q  Would you please mark on there the relative position

12   of the point where the sewage was brought into the watershed

13   in the Section 31 to which you made reference.

14             A  I will only show the portion with which I am familiar,

15   which is within the drainage of this unnamed stream that I had

16   just discussed--

17             Q  Mark it with a pink pencil, if you would.

18             A  -- showing the general course here.  I will have to

19   dash it here, because I don't know the  exact course it took

20   across the basin.  It ended up near Wells 2-F-1 and 2-K-1,

21   11 South, 5 West.  And it is quite possible that the discharge

22   of this sewage in the area east of Well 2-A-5 caused this rise

23   in the shallow water on the east side of Ysidora Subbasin.

24             Q  That pink showed up very, very poorly on the yellow,

25   younger alluvium, so if you took the blue pencil--

1          MR. STAHLMAN: Use a brown one for the sewage. It will

2    show up good.

3          THE WITNESS:  I would rather use the blue.

4          THE  COURT:  Use a blue one, and you can mark it in

5    detail at the recess. We are about  ready to take one.

6          Your chart of your deep well on the  east side of

7    Ysidora Subbasin corresponds, has some resemblance to the chart

8    of the shallow and deep well on the west side.

9          THE WITNESS:  Yes, sir, that is--

10         THE COURT:  But the shallow well on the east side of the

11   basin doesn't bear much resemblance to the other charts.

12         THE WITNESS:  That is right.  In other words, the shallow

13   water on the east side of Ysidora Subbasin is in a poor

14   hydrolic continuity or connection with the water in the deep

15   zone in that part of the basin.

16         THE COURT:  Well, now, we are in 1956, about the middle

17   of 1956.  You show sewage plant two discharging in the river;

18   that west of the well?

19         THE WITNESS:  Yes.

20         THE COURT:  And by that, does it mean it  was no longer

21   discharging east of the well?

22         THE WITNESS:  Yes, sir.  They extended a pipeline from--

23   someone else knows a lot more about how this pipeline was put

24   in than I; but I know roughly that it ran from the southwest

25   corner of Section 36, 10 South, 5 West, almost straight across

1    to  the river bed.

2    BY MR. VEEDER:

3         Q  I hand you a brown pencil and ask you to mark--

4         A  I have to retract that.  That is not correct.  I

5    believe it swings up northward from the southwest quarter of

6    Section 36, discharges in the river almost west of Well 35-K-1

7    and K-4 shown there.

8         THE COURT:  At any rate, when it was put in on the west

9    side, they terminated putting it in on the east side?

10        THE WITNESS:  Yes, sir.  And that may be the  reason why

11   the shallow water began to decline in that well thereafter.  By

12   "thereafter" I refer to July, 1956, on Exhibit 46.

13   BY MR. VEEDER:

14        Q  Can you mark that on there?

15        A  Where is it now?

16        THE COURT:  Now, you offered 46?

17        MR. VEEDER:  I offered it and renew the offer, your

18   Honor.

19        THE COURT:  Forty-six received in evidence.

20        It is a good time for a recess?

21        MR. VEEDER:  It is time for another exhibit, your Honor,

22   if we could.  It is a good time for  a recess.

23        MR. STAHLMAN:  I want to ask you something about this

24   one to clear it up.  It may save some time on cross examina-

25   tion.

Direct

1          THE COURT:  Take a short recess.

2          (Short recess taken.)

H

Z36

Vents  Direct                                         4014

1      THE COURT:  How would you men like to get up earlier

2  tomorrow morning and start at 9:30, and then maybe start at

3  1:30 and adjourn at 3:30?

4      MR. DENNIS:  I have to go to Los Angeles and be here

5  tomorrow morning by 10 o'clock.

6      THE COURT:  We could get along without you.

7      MR. VEEDER:  We would like that, your Honor.

8      THE COURT: All right, 9:30 tomorrow?

9      MR. STAHLMAN:  Yes, your Honor.  Of course, if that

10  is agreeable to anyone else.

11      THE COURT:  Anybody object seriously, besides Mr. Dennis?

12      MR. SACHSE:  Not I.

13      MR. DENNIS:  A lot of people will be listening to the

14  election returns this evening rather late to see how lucky

15  they were.

16      THE COURT:  Well, some of them may not feel too sharp

17  tomorrow anyway,  But that's all right.

18      MR. STAHLMAN:  The next thing, your Honor, is about

19  Tuesday of next week.  Will you hold court on that date?  That

20  is Armistice or Veterans Day.

21      THE CLERK:  That is a legal holiday.

22      THE COURT:  The Clerk says it is a legal holiday, so we

23  don't hold court.

24      MR. STAHLMAN:  In other words, it will be just Wednesday,

25  Thursday and Friday next week.

H

Z37

1    THE COURT:  Yes.  All right.

2    MR. VEEDER:  9:30 tomorrow morning, then.

3    MR. DENNIS:  I have one matter, too.  I think it is

4  becoming more and more apparent that we are going to need the

5  well logs on wells that Mr. Worts used in preparing Exhibits 46,

6  37, 44, 45 and 39, and because of the length of time that it

7  took to get the well logs of Mr. Kunkel I think it would save

8  considerable time if the well logs were here at the time we

9  started our cross-examination, and I would like to make a

10  request that the well logs, or copies of the well logs, that

11  Mr. Worts used in preparation of these documents be available

12  here at the time we start our cross-examination.

13    MR. VEEDER:  They are being mimeographed at the moment.

14    Is that correct?

15    THE WITNESS:  I think the water level records are being

16  mimeographed.  I am not sure what the status of the well logs

17  might be.

18    THE COURT:  Did you want the well logs or the water

19  level records?

20    MR. SACHSE:  The well logs, your Honor.  I join in Mr.

21  Dennis's request.

22    MR. DENNIS:  In response to written interrogatories in

23  the early part of 1952, your Honor, certain well logs were

24  submitted to the defendant Fallbrook Public Utility District

25  and the defendant Santa Margarita Mutual Water Company, and these

1    well logs cover not only the wells that Mr. Worts has used in

2    the preparation of these exhibits but certain other wells

3    within the area, and there seem to be some discrepancies in

4    many instances.

5              MR. VEEDER:  Does the State have those at the present

6    time?

7              MR. DENNIS:  No, the State's well logs, Mr. Veeder,

8    show that they were obtained from the testimony of Mr. Dunn,

9    and they do not purport to be copies of the well logs which

10   were submitted in response to the request for written inter-

11   rogatories.

12             THE COURT:  Does other counsel have these well logs

13   that were submitted in response to the interrogatories?  Or

14   does only Santa Margarita have them?

15             MR. SACHSE:  I have a partial set.  They are apparently

16   not complete.

17             MR. STAHLMAN:  I don't think we have them, your Honor.

18             THE WITNESS:  Your Honor, the originals from which

19   these prints are made are at my Long Beach office.  We could

20   obtain those and have prints made.

21             THE COURT:  Do you have other well logs besides those

22   in that brochure that Mr. Dennis handed you?

23             THE WITNESS:  The only ones in addition to those are

24   the new supply wells that have been drilled since about 1952--

25   I think there are some seven.

H

Z39

1    MR. DENNIS:  Some of your test wells which were drilled

2  in the vicinity of Ysidora Narrows are not included.  But the

3  main thing is if he could advise his Long Beach Office --

4    THE COURT:  Just a minute.  You say wells drilled since

5  1951 or 1952.  Where are the well logs for those?

6    THE WITNESS:  At the Camp.  I believe there are copies

7  of those being made right now.

8    THE COURT:  And you think those at the Camp plus these

9  in the brochure Mr. Dennis handed you comprise all of the well

10  logs?

11    THE WITNESS:  Mr. Dennis has indicated that there may be

12  some of the test wells missing.  I can't understand why that

13  would be.  But we have a complete file and can get blueprints

14  or Ozalid prints made just as soon as we can get them to a

15  blueprint plant.

16    MR. VEEDER:  We requested yesterday that those be pre-

17  pared and provided, and I believe they are on the way, your

18  Honor, and we are just checking them now.

19    THE COURT:  Check after court and see what you can do.

20    MR. VEEDER:  That is correct.

21    THE COURT:  You may be able to spend some time with Mr.

22  Dennis and Mr. Worts and see which ones he says are missing.

23  If you have copies prepared for everybody, so much the better,

24  but if they are not ready and we have certain ones here then

25  the addition of the camp wells and the omitted wells should

1    complete the picture.  It would be best if you have copies

2    for everyone.

3         Proceed.

4    BY MR. VEEDER:

5         Q ·I had asked you to mark the line as you recall it

6    where the sewage effluent was changed from where it appeared

7    on Plaintiff's Exhibit 46 on the left-hand side to the point

8    where the sewage discharged from Plant No. 2 into the river bed

9    west of the well in question.  Would you mark that as you

10   recollect it to be on Plaintiff's Exhibit 37.

11        A  Yes.  To the best of my recollection now-- I am not

12   exactly positive as to where this line runs, but they picked

13   up the effluent up in the unnamed canyon in Section 36, 10

14   South, 5 West, and I will show by a dashed line its approximate

15   course across the Ysidora Subbasin into Section 35 and to the

16   river by a dashed line, a brown line.

17        THE COURT:  It went over west of Well K-1 and 4; is that

18   right?

19        THE WITNESS:  Approximately, your Honor.

20        MR. VEEDER:  Plaintiff's Exhibit marked for Identi-

21   fication No. 40.

22        (The Clerk hands Mr. Veeder a document.)

23        THE WITNESS:  There is one more point on Plaintiff's

24   Exhibit 46 that may not be entirely clear.  The period that

25   Sewage Plant 2 discharged east of Well 2-A-1 and 2-A-5 extended

1  from approximately July, 1952, through June of 1956.

2      Q  I am going to ask you to mark an arrow at the line

3  there indicating that that continued through to that time.

4      A  In green pencil I am extending an arrowed line from

5  the word "Well" in "Sewage Plant Discharging East of Well" to

6  the vertical line in the middle of 1956 to indicate the span

7  of time that that water was discharged, to the best of my

8  knowledge, east of the well.

9      Q  Sewage Plant 2 discharges into the river.  That is

10  a continuing circumstance?

11      A  At this point in July, approximately July, 1956,

12  they installed this pipe line starting in the Southwest

13  Quarter of Section 36 and brought the sewage effluent over

14  through the river bed west of Well-- roughly west of Well K5

15  or Kl and 4-- I am not quite positive exactly where in that

16  vicinity the discharge was into the river.  That is on Exhibit

17  37 as shown.

18      MR. MOSKOVITZ:  I am confused.  I would like to ask

19  one question to clarify it.

20      THE COURT:  Yes, you may.

21      MR. MOSKOVITZ:  On Exhibit 46 it says "Sewage Plant 2

22  discharging east of well."  Each of which well-- 2A5?

23      THE WITNESS:  2A5 and 2A1, which are together there.

24      MR. MOSKOVITZ:  And when it says "Sewage", you are

25  referring to Well A5 again?

H

z42

H2

1        THE WITNESS:  All right, west of well, but it is on the

2   west side of the basin.  Actually, as I recall, it is west

3   of Well 35K5 or 35K1 and 4.  It is in that vicinity that the

4   sewage was brought over to the river.  Actually, the way I

5   have it drawn, it would be half a mile northwest of 2A5.

6   BY MR. VEEDER:

7        Q   Now, referring to plaintiff's exhibit marked 40 for

8   identification, I ask you to read into the record, Mr. Worts,

9   the title block of that identification.

10       A   Exhibit 40, "Santa Margarita River Watershed Within

11  Camp Pendleton Ground Water Basin Storage Units and Well Logs."

12       Q   Who prepared that exhibit?

13       A   That exhibit was prepared by the Office of Ground

14  Water Resources, and I have reviewed it.

15       Q   Does it correctly depict the element to which it makes

16  reference?

17       A   Yes.

18       Q   To your personal knowledge?

19       A   To the best of my knowledge, it does.

20       Q   Would you state what is reflected by the legend?

21       A   The legend on Exhibit 40 shows the different types

22  of wells within the reach of the River on Camp Pendleton.  The

23  double circle wells are the camp supply and irrigation wells.

24  The single circle are tests of domestic, stock or unused wells.

25  The well with the well symbol, a circle with a vertical line

H2

Z43

Worts    Direct

1    through it, is a destroyed well.  The heavy line that says

2    "Boundary of Ground Water Basin" refers to the heavy line shown

3    around the edge of the basin on Exhibit 40, but not to be

4    confused with the watershed boundary, which is a heavier line

5    and some distance outside.

6        The geologic units included within the basin are the

7    alluvium as shown on Exhibit 37 and a substantial part, most

8    of the terrace deposits on the north side of Chappo Subbasin,

9    largely in Sections 13 and 14, 10 South, 5 West.

10        Q  Is this accurate, to your personal knowledge, Mr.

11    Worts, the delineations as set forth on plaintiff's exhibit

12    marked for identification 40?

13        A  Yes.

14        MR. VEEDER:  We offer in evidence plaintiff's exhibit

15    marked  for identification 40, your Honor.

16        THE COURT:  It is received in evidence.

17        (Plaintiff's Exhibit No. 40 for Identification was re-

18    ceived in evidence as Plaintiff's Exhibit No. 40.)

19        THE WITNESS:  As I have mentioned before and here

20    labeled are the segments of the ground water basin on Camp

21    Pendleton, the upper subbasin as labeled, Chappo Subbasin,

22    Ysidora Subbasin.

23        Again, as described before, you will note that the

24    north end of the basin is terminated at De Luz dam site.  The

25    south end is terminated at Ysidora Narrows through Wells N4-N5,

X40R

H2

Z44

1   Section 2, 11 South, 5 West.  In addition, there are dotted

2   lines separating these segments.  One extends north of Well El

3   in Section 18, 10 South, 4 West, from the consolidated rock

4   on the south side of the river to the north side of the river.

5   Similarly, a dotted line separates Chappo Subbasin from

6   Ysidora Subbasin, depicted by a dotted line east and west

7   through Wells L1-I2 in Section 26, 10 South, 5 West.  And

8   these are the storage units in which the storage capacity of the

9   basin has been estimated.

10  BY MR. VEEDER:

11      Q  How did you delineate the exterior boundaries of the

12  storage basins as shown on Plaintiff's Exhibit 40?

13      A  The storage boundaries coincide with the younger

14  alluvium and most of the terrace deposits, as just described,

15  on Exhibit 37.  This is the surface area as shown on the

16  geologic map.

17      Q  Now, have you determined the areal extent of those

18  water storage units?

19      A  They were determined, and I would like to refer now

20  to Exhibit 39, which is the isopach map, which, in computing

21  the ground water storage capacity, the computations were made

22  by depth zones down to a total depth of 100 feet, and these

23  are shown on another exhibit.

24      MR. VEEDER:  Plaintiff's Exhibit 41.

25      (The Clerk hands document to Mr. Veeder.)

H2

Z45

1    BY MR. VEEDER:

2        Q  Would you read into the record the title of that

3    illustration which is Plaintiff's Exhibit marked for Iden-

4    tification 41.

5        A  Exhibit 41 is entitled "Bar Graph Showing Specific

6    Yield of Materials in Wells in Upper Chappo and Ysidora

7    Subbasins."

8        Q  Now, would you explain the exhibit as drawn and

9    depicted on 41.

10       A  Yes.  In the computation of storage capacity we

11   have three principal elements to consider.  One was the area

12   which I had started to describe of the storage units.  The

13   second item might be the thickness of the depth zone.  The

14   third is the specific yield of the deposits.

15       On Exhibit 41 each well log, every well log in the

16   three subbasins is depicted on the exhibit in bar form where

17   the driller's log have been converted into terms of specific

18   yield, the legend for which is shown at the bottom:  5% for

19   the black, 10% for the vertical heavy lines, 15% for the

20   diagonal light lines, 25% for the vertical light lines, and

21   30% for the dotted pattern.

22       Q  Is that exhibit prepared to scale?

23       A  It is prepared to scale vertically.  Obviously, the

24   position of the wells is not accurate in the left to right

25   position.  The wells are just plotted one against the other

Z46

1    all the way down from De Luz dam site to Ysidora Narrows.

2          MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

3    41 marked for identification.

4          THE COURT:  Are these the wells that are shown on the

5    cross-section?

6          THE WITNESS: Some of them are, your Honor.  But the

7    cross-section is too small to attempt to show it.

8          THE COURT:  These are all the wells?

9          THE WITNESS:  These are all the well logs that were

10    available at the time this was prepared for the whole basin

11    extending from De Luz Dam Site to Ysidora Narrows.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L1

1       MR. STAHLMAN:  May I ask a question on that line?

2   Are they the only wells on Exhibit 40?

3       THE WITNESS:  Yes.  Let me qualify that.  I am not sure

4   that every well on Exhibit 40 has a well log.  But all of

5   the wells plotted here will appear on --

6       MR. STAHLMAN:  On 40.  Thank you.

7       THE WITNESS:  On 40.

8       THE COURT:  41 received in evidence.

9       I don't understand the upper and lower charts.

10      THE WITNESS:  All right.

11      THE COURT:  Now, the upper chart is a scale of a

12  hundred feet, and the lower chart uses a scale in the same

13  distance running to two hundred feet.  The upper chart is the

14  upper hundred feet of valley fill.  Oh, I see.  And the lower

15  chart is the fill below a hundred feet?

16      THE WITNESS:  Yes, sir.

17      THE COURT:  So the same scale is used?

18      THE WITNESS:  The same scale is used.  And this one

19  hundred foot depth is the depth to which we estimated the

20  gross capacity of the basin.

21      THE COURT:  And you didn't estimate any capacity for

22  the basin below a hundred feet?

23      THE WITNESS:  No, sir.

24  BY MR. VEEDER:

25      Q  Why was it that you selected a depth of one hundred

1    feet as area in which you made your determination as to yield?

2        A   I believe that the features shown on this graph

3    are the best evidence for that selection.  If you will notice,

4    we have almost a solid block of well log depths from zero to

5    a hundred feet, in the upper hundred feet.  When you get

6    below a hundred feet, you can see that the bulk of the wells

7    extend down maybe twenty-five, maybe fifty feet, a few

8    extending down seventy-five, and maybe three or four going

9    down over a hundred seventy-five.  So that one consideration

10   then was the best log coverage to a specific depth, which is

11   a hundred feet.  Another consideration is that this is a

12   costal valley and that the point of estimating the storage

13   down two hundred feet, say, in Ysidora Narrows, as depicted

14   on Well 2-N-4 of left-most well on Exhibit 41, you would be

15   almost two hundred feet below sea level.  It could never be,

16   the storage there could never be utilized.  Another reason

17   for the selection of the one hundred feet is when, as I

18   mentioned in discussing Exhibit 39, much below a hundred feet

19   the control on the shape and volume, on the shape and volume

20   of the alluvium is not as well defined as it is above that

21   depth, for the same reason that we have better coverage up in

22   the upper one hundred feet.  So that depth zone of one hundred

23   feet is the over-all thickness that we considered in estimating

24   the storage capacity.  If there is any question about the

25   assignment of values --

L3

Q   That was the next question I was going to ask you.
Would you state how you arrived at the specific yield values
that you have depicted in the lower part of the illustration.

A   All of these well logs were  examined one by one
and values of specific yield assigned to the deposits as logged,
principally by us in our test well drilling.

Q   When you say "us," who was us?

A   The United States Geological Survey.  We drilled
approximately ten or twelve test wells in the lower Santa
Margarita River from Upper Subbasin down to the Highway U. S.
101.  And there, in so doing, we obtained a very good cross-
section of what the materials were and could work intelligently
then with the drillers' logs of older wells that have been,
that were in existence at the time we started our study.  And
it gave us a much better yardstick to use in the assigning
of specific yield values.  For an example, I will state this:
That here is a big area -- I am alluding to Exhibit 41, and
Wells 35-R-2, 2-A-1, 2-A-2, 2-A-3.  There is a heavy segment
of black in there in the upper hundred feet that the driller,
as I recall, just used the connotation clay.  Normally, a
clay would have a specific yield of one, two, three per cent,
depending on how tightly it was compacted.  However, our
logging of Wells in Ysidora Subbasin indicated that they
really weren't solid masses of clays; that actually they were
silt and silty clay, clay, silt, fine sand and silt, and fine

L4

1   sand and clay; many combinations, none of which would be fine

2   grained enough to warrant a  1 or 2 per cent assignment.  So

3   in that manner, we evaluated the drillers' logs on the basis

4   of our findings in the U. S. G. S. test drilling program.

5   And feel that we came up with a good set of specific yield

6   values to assign to all of the logs in the basin on Camp

7   Pendleton.

8        THE COURT:  I may be getting ahead, but by the use of

9   this bar graph, Exhibit 41, did you assume then that if a

10  certain well showed a certain specific yield, you took a

11  strip right across the basin based on that yield?   And,

12  likewise, a well farther north with a different specific yield,

13  you took an average right across based upon that well?

14       THE WITNESS:  Not quite, your Honor.  We took the wells

15  that are all included, for example, within Upper Subbasin.

16  That would be from De Luz dam site, the Wells C-1-14 in

17  Section 32, 9 South, 4 West, down to the lower end of the

18  basin, as depicted on Exhibit 40, the dotted line in Section

19  18, 10 South, 4 West.  We took all of the logs that fell, all

20  of the well logs in that valley and divided the depths up

21  into zones of -- perhaps it would be best to look at the next

22  exhibit to explain this a little more simply.

23       THE COURT:  Well, if I am out of -- if you have other

24  matters you want to take up before you go to that, go ahead.

25       THE WITNESS:  No, sir.

1        MR. VEEDER:  I will call for that right now, your

2   Honor.

3        THE WITNESS:  That is part of the method.

4        MR. VEEDER:  43.

5        THE WITNESS:  43, I believe.

6        MR. VEEDER:  43.

7        THE CLERK:  You want me to put it up on the board?

8        MR. VEEDER:  No.  Have you marked this?  Yes.

9        THE CLERK:  Yes.

10        MR. VEEDER:  This has been marked.  You can just use

11   this.

12        Q   That has been marked, Mr. Worts, and state into the

13   record what is depicted on Plaintiff's Exhibit marked 43.

14        A   Plaintiff's Exhibit 43 is entitled:  "Estimated

15   ground water storage capacity of the alluvium and terrace

16   deposits, lower Santa Margarita River basin, Camp Pendleton."

17        Q   And will you state who prepared that exhibit.

18        A   I prepared this exhibit.

19        Q   And is it accurate, to your personal knowledge?

20        A   Yes.

21        MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

22   marked 43 for Identification.

23        THE COURT:  43 received in evidence.

24        THE WITNESS:  You will notice across the top of the

25   table storage capacity in acre feet by depth zones in feet

below land surface.  We took the upper five feet to twenty
feet, which is fifteen feet thick, and then in response to
your question:  We took the specific yield values in that
depth zone within the whole storage unit, the subbasin.

THE COURT:  In this case the upper basin?

THE WITNESS:  The upper basin as the example I was
alluding to.

THE COURT:  Yes.

THE WITNESS:  And there you can multiply the thickness
times the average area as depicted on the isopach map.  That
would be the average area shown by the twenty-foot isopach.  And for
purposes of simplicity, we just used the surface of the
younger alluvium, as shown on Exhibit 40, the outside line,
marking the boundry of the ground water storage unit.  That
would be the upper or surface area.  The area for the twenty-
foot isopach would be somewhat less.  Referring to Exhibit 39,
the twenty-foot isopach is inside, has a smaller area than
the five foot.  The average of those two would be the area.
The thickness is fifteen feet, multiplied by the average
specific yield within that storage unit, the one we have been
alluding to as the Upper Subbasin, and the result is twenty-
nine hundred acre feet.  Similarly, with increasing depth --
take the area of the twenty-foot isopach on Exhibit 39, and
then the area of the forty-foot isopach, average them,
multiply them by thickness of twenty feet and times the average

L7

1   specific yield as determined by the well logs on Exhibit 41,

2   and multiply that times the volume, you come out with thirty-

3   three hundred acre feet.   In that manner, the grosss, the

4   upper figure five to one hundred feet was developed for each

5   subbasin.   And finally, down at the bottom of Exhibit 43 we

6   have the totals shown there:   ten thousand in the five to 5 and

7   twenty foot, and so on, over to a grand total in the upper

8   one hundred feet in the three subbasins of approximately

9   forty-eight thousand acre feet.

10  BY MR. VEEDER:

11      Q  You can show graphically that -- we offer -- I

12  refer to Plaintiff's Exhibit marked for Identification No. 42.

13  Now, would you step to Plaintiff's Exhibit marked 42 for

14  Identification and state what is depicted by that illustration,

15  Mr. Worts.

16      A  Title of Exhibit 42 is:   "Estimated ground water

17  storage capacities for upper Chappo and Ysidora subbasins,

18  Camp Pendleton."   This Exhibit 42 shows graphically the plots

19  of the materials shown in Exhibit 43.   To use that table,

20  let us look at the upper left-hand box in Exhibit 42, in which

21  the words "upper subbasin, twelve thousand five hundred acre

22  feet, twenty per cent average specific yield" appear.   If we

23  went into that basin sometime and found the average depth to

24  water was forty feet, we would read up from bottom where it

25  says "forty" until we hit the curve, and then read directly to

4032

L8

1   the left; and you would read about seven thousand acre feet

2   left in storage.

3        Q  Has this been prepared to scale, Plaintiff's Exhibit

4   No. 42?

5        A  Graphically, it is prepared to scale.

6        Q  And is it correct to your personal knowledge?

7        A  Yes.

8   MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

9   marked 42 for Identification.

10  THE COURT:  42 received in evidence.

11       Now, I notice in the chart, Exhibit 42, in all but one

12  of the boxes -- pardon me, on the Chappo subbasin and the

13  Ysidora subbasin -- you have the average depth to sea level.

14  But in the Upper subbasin you have  "physical limit set by

15  camp," apparently as a useable depth.

16  THE WITNESS:  Yes, sir.

17  THE COURT:  What is meant by that?

18  THE WITNESS:  That is the depth selected on the basis

19  of their supply wells, much below which the yields of the wells

20  would drop off; because by dewatering down to a depth of

21  seventy feet there would not be sufficient water to meet the

22  requirements of the camp from that basin without going to the

23  great expense of putting in more wells, all the time trying

24  to seek the deepest part of the alluvium.  The yield of a well

25  under water table conditions, such as we have in Upper subbasin,

L9

1    is directly proportional to the thickness of the saturated

2    deposits.  If it is fully saturated -- for example, let's say

3    the well will yield a thousand gallons a minute.  If the

4    saturation is low down to about fifty, from a hundred to fifty

5    feet, the yield will be approximately cut in half.  So that

6    you have to consider that in the development of a supply.

7    If we take a look at the Exhibit 38 again, the thickness of

8    the younger alluvium from which they will pump at the most is,

9    starting about three-tenths of a mile below Well 5-D-1  in

10   Upper subbasin on Exhibit 38, the thickness there would be

11   roughly a hundred and thirty-five feet at the upper end,

12   approximately a hundred and sixty feet at the lower end.  So

13   that it is true they could pump more from a greater depth if

14   they were fortunate enough to have all of their wells down in

15   the bottom of this deepest part of the younger alluvium.  But

16   the wells, not all of the wells are so situated.  And the

17   camp felt that seventy feet was a reasonable figure to use as

18   a physical, economical physical limit, let's say.

19        THE COURT:  It is the problem of the law of diminishing

20   returns.

21        THE WITNESS:  Precisely.

22        THE COURT:  All right.

23        THE WITNESS:  In Chappo subbasin and Ysidora subbasin

24   we have another problem.  We have the problem of sea water

25   being in the lower end of, lower portion of Ysidora subbasin.

L10

I will go into more detail in this later.  But for purposes of explaining the useable storage capacity, the water of unuseable quality for domestic purposes is between Well 1-E-1 and 2-A-1, 11 South, 5 West, in Ysidora subbasin and between Well 2-E-1 and 2-D-3 in Ysidora subbasin, 11 South, 5 West. The quality of the water in all of these -- not all, but in most of the wells seaward from that approximate line are not fit for -- I won't say they are not fit; they are not up to public health standards for drinking water, nor are they up to the Navy standards which are the same as the U. S. Public Health Service.  Therefore, with sea water in the lower part of Ysidora subbasin the useable storage capacity is greatly reduced.  With the sea water intrusion being in there, we have considered that Ysidora subbasin is really not scientifically a good place to withdraw additional water for public use. They are currently using it only for irrigation use, but it is my understanding, in talking with Colonel Robertson --

BY MR. VEEDER:

Q   Mr. Worts, I believe that would be hearsay, and I think --

A   I have been contacted on plans for replacing the two irrigation wells which I will designate -- three irrigation wells I will designate in Ysidora subbasin:  2-F-1, 11 South, 5 West; 2-D-3, 11 South --

Q   Would you wait just a moment until his Honor locates

L11

1     those.  Would you start that again now, Mr. Worts.

2     A   Yes.  2-F-1, 11 South, 5 West.  I am alluding to

3     Exhibit 37.  That is used for irrigation.  2-D-3 in the

4     upper left-hand corner of Section 2, 11 South, 5 West.

5     35-K-1, 10 South, 5 West.  Because of this quality problem

6     the U. S. Geological Survey has been contacted for selection

7     of sites for replacement irrigation wells, so that pumping

8     in Ysidora subbasin can be stopped until remedial measures

9     can be taken to alleviate the condition of sea water, salt

10    water intrusion.

11         THE COURT:  Those wells are all irrigation wells?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  And they are all of inferior quality?

14         THE WITNESS:  2-F-1 is not, nor is 2-D-3 at the moment.

15         THE COURT:  But K-1 -- 35-K-1 is?

16         THE WITNESS:  No, sir.  The wells I mentioned previously

17    -- 2-K-1 in Ysidora subbasin and 1-E-1 are of inferior quality.

18    2-F-1 is a shallower well than 2-K-1, and the sea water

19    apparently has slid in at depth beneath that well and caused

20    2-K-1 to be put out of service; I think in 1949.

21    BY MR. VEEDER:

22         Q   Would you explain the relationship between sea water

23    and fresh water when there has been an intrusion of the

24    character that has been described here.

25         A   The salt water is heavier than fresh water by a

L12

1    small amount, but it is a significant amount.  Specific

2    gravity, as determined on a sample taken off the mouth of the

3    Santa Margarita River in 1950, was on the order of 1.025 as

4    compared with 1.000 for fresh water.  As a result of the salt

5    water being heavier it will --- we discussed the reversed

6    gradient that had developed into this basin on Exhibit 44.

7    As a result, the salt water slid in beneath the fresh water

8    along the bottom, being heavier and --

9        Q   When you say "along the bottom," you mean?

10       A   Along the bottom of the alluvium.

11       Q   And in the water-bearing strata?

12       A   In the water-bearing strata in the lower-most part

13   of the alluvium.  And reached Well 2-K-1 in, as one of my

14   later graphs will show, approximately 1949.  And has now

15   rendered Well 1-E-1 in Ysidora subbasin unfit for -- that is,

16   the chlorine content is greater than the two hundred fifty

17   parts per million that the Navy and the U. S. Public Health

18   Service require.  Similarly, 2-E-1, right in the narrows and

19   right at the south edge of Ysidora subbasin --

20       THE COURT:  2-E-1?

21       THE WITNESS:  2-E-1, 11 South, 5 West.

22       THE COURT:  2-E-1 seems to be -- well, that was in 16.

23   Pardon me.  No.  It was 1-E-1.

24       THE WITNESS:  That was 1-E-1 that I had just described.

25       THE COURT:  Yes.  2 --

L13

1    THE WITNESS:  2-E-1, one mile to the west with a double

2  circle, and right at the end.

3    THE COURT:  Oh, E-1 and -4 also?

4    THE WITNESS:  Well, E-4 is a shallow well.  E-1 is the

5  deep well.

6    THE COURT:  Yes.

7    THE WITNESS:  That well has been discontinued because

8  of the chloride content increasing periodically to more than

9  two hundred fifty parts per million.

10    But to return to your original question, your Honor:

11  2-F-1 is, I think, on the order of a hundred fifty or a hundred

12  sixty feet deep; and the chloride has moved in beneath it.

13  In other words, the thickness of the alluvium there is right

14  around two hundred feet.  Chloride has moved in underneath it.

15  But the chloride content, as will be described later, is

16  increasing in that well.  But in order to prevent the further

17  invasion of the sea water, the U. S. G. S. has been contacted

18  by the Marine Corps and sites have been supplied to the Marine

19  Corps for the drilling of replacement wells, eventhough the

20  wells now used aren't salty; so that remedial measures can be

21  taken to clean out that salt water.

22    MR. VEEDER:  Exhibit 49.

23    THE WITNESS:  Therefore, from the practical standpoint,

24  referring to the right-hand series of graphs on Exhibit 42,

25  where we have the useable storage capacity shown, we have

L14

1    thrown out the Ysidora subbasin. So long as that sea water

2    is there, it is our considered scientific opinion that that

3    basin should not be pumped until the basin is, until some

4    remedial measures are taken to clean it up and get the quality

5    restored. Therefore, in Chappo subbasin we have taken sea

6    level as the useable depth, because it relates to conditions

7    in Ysidora subbasin. In other words, if we pulled Chappo

8    subbasin down below sea level, that, in turn, would cut off

9    most of the downstream movement of the ground water toward

10    Ysidora subbasin, and the water levels in both basins would

11    decline. If they declined much below sea level, that sea

12    water would move right on in to Chappo subbasin. Therefore,

13    we set sea level in Chappo subbasin as the useable depth.

14

15

16

17

18

19

20

21

22

23

24

25

J

Z47

1   And in Upper Subbasin, as previously described, the physical

2   limits set by the Camp for pumping.

3       The total usable storage, then, until such time as

4   remedial measures are taken in Ysidora Basin is the sum of

5   the two quantities shown under the name of the subbasin in upper

6   subbasin   10,000 acre feet--

7       Q  You are now referring to Plaintiff's Exhibit 42?

8       A  Yes.

9       --and Chappo Subbasin 15,000 acre feet, giving a

10  total usable storage capacity of 25,000 acre feet under the

11  existing conditions.

12      Q  Have you given consideration to the remedial acts

13  that could be taken in that regard?

14      A  Yes.  There are several methods that could be used

15  to get the salt water out of Ysidora Subbasin.

16      Q  Would you state some of the more practical ones

17  that have been used in the past?

18      A  One that has been considered, which never has been

19  accomplished to this depth of 200 feet, is to excavate a

20  trench 200 feet deep all the way across Ysidora Narrows at

21  about the approximate position of Wells N4 and N5 on Plain-

22  tiff's Exhibit 37 and backfilling that with a heavy drilling

23  mud.  Actually, to maintain the walls of this trench during

24  excavation they would have to have heavy drilling mud in the

25  trench to support the sides in much the same manner as the

J

Z49

1 Manhattan Beach and Redondo Beach. While they pump on the

2 inland side they inject fresh water near the coast to build up

3 a fresh water dam to keep the sea water from intruding the

4 basin.

5 Another possibility is to start injecting fresh water

6 in a series of wells drilled in Ysidora Narrows near Wells N4

7 and N5 on Exhibit 37, which would drive the intruded water

8 on the north side of those recharge wells toward Ysidora

9 Basin; then to install pumps or wells such as 2K1, the pump--

10 from which the pump has been taken, similarly on 2E1, from which

11 the pump has been taken or disconnected, pump those wells and

12 even though the chloride content is more than 250 parts per

13 million it could be blended with better quality water and

14 used for irrigation, for example.

15 And so on. There are other considerations, but those

16 give you a few ideas of what might be done.

17 Q How would you describe the proposal that you have

18 made in regard to the utilization of Chappo and Upper with

19 the elimination of Ysidora Basin as a means of preventing the

20 intrusion to which you have testified? What kind and type of

21 barrier is that where you leave the water?

22 A I don't think I understand quite what you mean there.

23 Q What is the effect of leaving the water in Ysidora

24 Basin in the manner that you have described?

25 A The effect of it is to greatly reduce the usefulness

J

Z50

1  of those two basins.  Without some type of protection and

2  remedial measures down here to extract much more than down to

3  sea level in Chappo Subbasin, under present conditions, I

4  think-- I am sure would be aggravating the condition in Ysidora

5  Subbasin, with the ultimate possibility, probability, that

6  that sea water would continue to move inland under the reversed

7  hydraulic gradient that I have previously described, and there-

8  fore we have set the 58 feet as the average.

9      Of course, at the lower end of Chappo Subbasin, if we

10  can now refer to Exhibit 38, about in the middle of the exhibit,

11  Well 10-5-26L1, the height above sea level at the lower end

12  there is only from land suface or five feet below land surface

13  down to the sea level line is only 35 feet or 30 feet.  Yet

14  at the upper end of Chappo Subbasin near that word Basilone

15  Road Ford, the depth to     sea level is on the order of 70,

16  75 feet.  But the average is about 58 feet.  In other words,

17  you could draw the water levels down about 25 or 30 feet at

18  the lower end of Chappo Subbasin, only that much; but at the

19  upper end you could pull them down 75 feet and be at about sea

20  level at that juncture.

21      Q  Would you step to Plaintiff's Exhibit marked 49 for

22  Identification, Mr. Worts, and state what is the title of that

23  identification.

24      A  The title of Exhibit 49 is "Ground Water Recharge and

25  Discharge, Lower Santa Margarita River Basin, 1942-1957."

1    THE COURT:  Mr. Worts, the purpose of the graph at the

2  right-hand side is to add up the deficits, less the three

3  instances of excesses, and show the total depth over the

4  period 1942 to 1958; is that it?

5    THE WITNESS:  That is what it shows, your Honor.  It

6  shows each year we add on the previous year's total.

7    THE COURT:  Plus or minus?

8    THE WITNESS:  No, your Honor, not on the right-hand

9  chart.  It is merely an accumulation of all the recharge, for

10  example--

11    THE COURT:  I see.  The total discharge and the total

12  recharge accumulated?

13    THE WITNESS:  That is correct.  As you can see, the

14  totals get up on the order of magnitude of 100 to 110,000 at

15  the end of the water year 1957.

16  BY MR. VEEDER:

17    Q  Now, would you proceed to explain the charts on the

18  left-hand side, Mr. Worts.

19    A  That is a breakdown of the various types of recharge

20  to the basin.  You will notice in the explanation of Exhibit 49

21  the recharge elements shown are sewage effluent returned to the

22  basin, we have the recharge from the river less the evaporation

23  from Lake O'Neill, the contribution from rainfall penetrating

24  the alluvial deposits and reaching the ground water, and

25  ground water inflow.

J

Z53

1      Now ground water inflow is a measure of the water moving

2   into Upper Basin-- I allude to Exhibit 37 at De Luz dam site.

3      MR. VEEDER:  May I interrupt you just a moment.

4      I have copies of well logs here that I would ask counsel

5   to examine for the purpose of determining whether they have

6   similar data, and I will get additional copies.

7      THE COURT:  All right, see you tomorrow morning at 9:30.

8   We will adjourn until that time.  Meanwhile you can look over

9   the well logs that Mr. Veeder has and advise him whether this

10  meets your needs, Mr. Dennis and Mr. Stahlman.

11     MR. VEEDER:  Thank you, your Honor.

12     MR. DENNIS:  I will probably be half an hour late,

13  tomorrow, your Honor.

14     MR. STAHLMAN:  I understand your Honor is adjourning

15  at 3 tomorrow?

16     THE COURT:  3:30, probably.

17     (Adjournment until Wednesday, November 5, 1958, at 9:30

18  A.M.)

19

20

21

22

23

24

25