# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

               Defendants.

No. 1247-SD-C

---

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**      San Diego, California

**Date:**      November 5, 1958

        **Pages:**    4046 to 4159

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,        )
                                 )
                Plaintiff,       )
                                 )
        vs.                      )        No. 1247-SD-C.
                                 )
FALLBROOK PUBLIC UTILITY         )
DISTRICT, et al.,                )
                                 )
                Defendants.      )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, November 5, 1958

APPEARANCES:

        For the Plaintiff            WILLIAM H. VEEDER, ESQ.,
                                       and
                                     WILLIAM E. BURBY, ESQ.,
                                     Special Assistants to the
                                     Attorney-General,
                                     Department of Justice,
                                     Washington, D. C.

40047

```
 1   APPEARANCES:    (Continued)

 2        For Defendant Vail            GEORGE E. STAHLMAN, ESQ.
            Company
 3
          For Defendant State          EDMUND G. BROWN, ESQ.,
 4          of California              Attorney-General, by
                                       ADOLPHUS MOSKOVITZ, ESQ.,
 5                                     Deputy Attorney-General,
                                           and
 6                                     CARL BORONKAY, ESQ.

 7        For Defendant Santa
            Margarita Mutual           W. B. DENNIS, ESQ.
 8          Water Company

 9        For Defendants Fallbrook
            Public Utility District,   FRANZ R. SACHSE, ESQ.
10          et al.,

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX TO WITNESSES

| For the Plaintiff | D | X | ReD | Voir Dire |
|---|---|---|---|---|
| G. F. Worts, Jr. | 4049 | | | |
| (Moskovitz) | | | | 4155 |

EXHIBITS

| Plaintiff's Exhibit | Iden. | In Evidence |
|---|---|---|
| 38A | | 4155 |
| 47 | | 4063 |
| 48 | | 4067 |
| 50 | | 4075 |
| 52 | | 4101 |
| 53 | | 4109 |
| 54 | | 4118 |
| 54A | | 4118 |
| 55 | | 4123 |

| | |
|---|---|
| MORNING RECESS | 4076 |
| NOON RECESS | 4117 |
| AFTERNOON RECESS | 4149 |

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, NOVEMBER 5, 1958.   9:30 A. M.

2

3         THE CLERK:  Number one on the calendar, 1247-SD-C,

4    United States vs. Fallbrook Public Utility District, et al.

5    Further court trial.

6         MR. VEEDER:  Take the stand, Mr. Worts.

7

8              G. F. WORTS, JR.,

9    recalled as a witness in behalf of the plaintiff, having been

10   previously sworn, testified further as follows:

11

12        THE COURT:  Mr. Veeder, the mailing of the pre-trial

13   stipulation is being handled out of the Office of Ground Water

14   Resources?

15        MR. VEEDER:  That is correct, your Honor.

16        THE COURT:  This (handing document to Mr. Veeder) was

17   directed to Mr. Grover at Coronado instead of Corona, appar-

18   ently.

19        Was the pre-trial order on ground rules also mailed?

20        MR. VEEDER:  Yes, sir, it was.

21        THE COURT:  It was mailed?

22        MR. VEEDER:  Yes, sir.  Is there some doubt on that?

23        THE COURT:  No.

24        MR. VEEDER:  I was sure it was.

25        THE COURT:  I don't know.  I don't get the mailings.

Worts   Direct

4050

1    I don't know what is mailed and what is not.

2        MR. VEEDER:  Yes, sir, your Honor.  There is no doubt

3    about it.

4        THE COURT:  All right.

5

6                    DIRECT EXAMINATION (Resumed)

7    BY MR. VEEDER:

8        Q  Mr. Worts, referring to Plaintiff's Exhibit 41, would

9    you state into the record the meaning of the designation on

10   that bar graph of the question marks which appear on two or

11   three places and state the reason why you utilize that symbol?

12       A  On Exhibit 41 the question marks are depicted in the

13   lots of Wells 11-5-2A4 and 10-5-35K3-- the only two that I

14   can see at the moment-- one more in 10-4-7J1, the bottom

15   portion of the well; those question marks meant that the logs

16   that we obtained showed no information in those depth inter-

17   vals, so we put a question mark in those depth intervals indi-

18   cating that we did not know what that material was.

19       Q  Now referring to Plaintiff's Exhibit 49, I hand to

20   you Plaintiff's Exhibits 60 and 62 and ask you to correlate,

21   if you will, that data with the basic data which is set forth

22   on Exhibit 49.

23       A  On Exhibit 49 above the zero line in the left-hand

24   graph is shown the types of recharge that occur within the

25   lower Santa Margarita River Basin between De Luz dam site and

1    Ysidora Narrows.

2    　　　　MR. VEEDER:  If your Honor is interested in Exhibit 62.

3    　　　　THE COURT:  I know what they are.

4    　　　　THE WITNESS:  It is readily apparent in looking at

5    Exhibit 49 that the River recharge shown by the diagonal hashered

6    line forms the most important form of natural recharge to that

7    ground water basin.  You will note in the explanation that the

8    symbol reads "River recharge less evaporation from Lake O'Neill".

9    BY MR. VEEDER:

10   　　　　Q  Would you explain the meaning of that terminology?

11   　　　　A  That terminology means that of the water that passes

12   De Luz Dam Site in the Santa Margarita River immediately down-

13   stream there is a point of diversion into O'Neill Ditch in the

14   general vicinity of Well El or E2 in Section 5, Township 10

15   South, 4 West.  The water is diverted into the lake.  Also

16   diverted into the lake is sewage effluent.  So we have a

17   complicated matter to try to resolve the amount of water that

18   is coming into the system from the upstream side.  But by

19   subtracting the only loss, which is the evaporation from that

20   lake surface, and in turn subtracting the outflow at Ysidora

21   gage, which is shown on Exhibit 60 hear the back of a group

22   of pages that are stapled together "Yearly runoff acre feet

23   Santa Margarita River at Ysidora", on Exhibit 62 is the

24   computed inflow at the De Luz Dam Site.  To arrive at the

25   quantities depicted on Exhibit 49, it is necessary to subtract

1  the outflow or the runoff at Ysidora gage from the runoff

2  computed at De Luz Dam Site and then subtract from that the

3  evaporation from Lake O'Neill.

4       Now, the evaporation from Lake O'Neill, which has an

5  area of approximately 135 acres, we used an annual evaporation

6  rate of 4 feet less the rainfall for that year, which would

7  figure out a little over three feet, or about three feet

8  during this period, giving a total evaporation of three feet

9  times the area, or approximately 400 acre feet per year evapor-

10  ation.  The seepage loss or losses from the stream between

11  De Luz Dam Site and Ysidora Gage occur throughout the entire

12  reach of the river.  That I have observed during my work at

13  Camp Pendleton.  This loss is further evidenced by the graphs

14  of the shallow and deep wells, Exhibit--

15       Q  Exhibit 51?

16       MR. MOSKOVITZ:  Would 46 be the one?

17       THE WITNESS:  --46, here it is, that we discussed

18  yesterday, showing the effect of the river on both the shallow

19  and the deep water down at Ysidora Subbasin.  This upstream

20  area, Upper Subbasin, as depicted on Plaintiff's Exhibit 40,

21  the deposits are extremely permeable, both within the channel

22  and beneath the whole surface of the alluvial plane.  Losses

23  of as much as 12 feet per day have been recorded in that basin,

24  that is, a depth of 12 feet of water has gone underground.

25       Q  When you say "losses," Mr. Worts--

A   Have seeped into the ground.

THE COURT:   You mean it is not lost to the watershed?

THE WITNESS:   No, sir.   It is a recharge to ground water in the form of water put on the surface and run underground.

THE COURT:   I notice on Exhibit 49 that you have a rainfall figure as adding to the water in the basin.   How does it happen that at only two years, in 1944 and in 1952, do you have any figure shown there for rainfall coming into the basin?   Wasn't there rain in the basin in other years?

THE WITNESS:   Yes, sir.   The rainfall during the remaining years was largely less than about 15 inches.   Studies have shown that on the average when rain falls on grass cover, which is largely present on the basin floor, when rainfall is less than 15 inches there is virtually no recharge.

THE COURT:   In other words, the amount used by plant life and evaporation, et cetera, will use that much?

THE WITNESS:   Yes, sir.

THE COURT:   So that there is no overage to go into recharging the basin?

THE WITNESS:   That is the case.   That is an average figure.   It can't be applied categorically.   It is what you would expect to happen on the average.   And these two years, 1943 and 1952, both were years of more than 15 inches of rainfall.   I believe that there is an exhibit that shows what the

Werts - Direct                4954

1  rainfall was in some nearby--  I don't know exactly what the

2  exhibit shows.

3         MR. VEEDER:  Mr. Hofmann.

4         THE WITNESS:  Mr. Hofmann put that on.

5         THE COURT:  On Exhibit 49, immediately above the zero

6  line, you show the ground water inflow.

7         THE WITNESS:  Yes, sir.

8         THE COURT:  Which is water running below the surface

9  of the ground, coming into the basin at the De Luz Dam Site?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  You have used a fairly standard figure there.

12  There is some variation in the years 1946 to 1951, but other

13  than that you have used a standard figure.  What is the explana-

14  tion for that?

15         THE WITNESS:  The explanation of that, your Honor, is

16  that the deposits in the vicinity of De Luz Dam Site have

17  remained saturated to the land surface during the whole period.

18  Therefore, the hydraulic gradient, which is one of the varia-

19  tions that control the amount of underflow, or inflow in this

20  case, has remained constant.

21         THE COURT:  How do you arrive at that figure?

22         THE WITNESS:  Of the quantitative figure shown here?

23         THE COURT:  Yes.

24         THE WITNESS:  That is the equation for underflow, which

25  is the quantity equals the average permeability, times the

1    hydraulic gradient, times the cross-sectional area.

2         Now, the cross-sectional area will remain the same if

3    the deposits remain constantly full.  Similarly, the hydraulic

4    gradient will remain constant if the deposits are completely

5    full.  Also, the average permeability will remain the same.

6    Therefore,--

7         THE COURT:  How do you get the excesses in 1946 and

8    1952, shown over the remaining--

9         THE WITNESS:  Those, your Honor, are figures of inflow,

10   roughly estimated, that came in through Ysidora Narrows when

11   we had a reverse hydraulic gradient in there as depicted by

12   the Water Level Profile on Exhibit 38 for 1951, and it is also

13   shown by the Water Level Contour Map, Exhibit 44.

14        THE COURT:  All right.

15        THE WITNESS:  The remaining elements of what we have

16   termed recharge-- it actually is not a primary source of re-

17   charge, but in the water budget or balance it has to be put

18   on the recharge side-- that is the sewage effluent that is be-

19   ing returned to the basin and mixing with the native ground

20   waters and eventually will be pumped and recycled into the

21   system-- by the system I mean through the ground water system

22   and up through the Camp system-- the use system back through

23   the sewage plants and back into the basin again.

24        THE COURT:  Why does the sewage effluent figure exceed

25   the pumpage?  Because of the fact that water from the surface

1    flow of the stream is going into the system that leads to

2    sewage effluent?

3         THE WITNESS:  I would like to correct you on that, your

4    Honor.  The pumpage is shown below the zero line.

5         THE COURT:  Yes.

6         THE WITNESS:  And you will notice-- let's take the last

7    year here, 1957, in which the sewage effluent is more than

8    about 2,000 acre feet.  If you will read from the zero line

9    down to the crosshatched line at about 6100 acre feet-- the

10   pumpage is 6100.  Of course, that includes the irrigation

11   pumpage.  Another graph that I will introduce or show will

12   show the relationship.  But it is substantially less.

13        THE COURT:  The pumpage?

14        THE WITNESS:  The pumpage is substantially more than

15   the sewage return.

16        THE COURT:  Where?  I don't see that.

17        MR. VEEDER:  Designated ground water discharge in are

18   feet.

19        THE WITNESS:  Below the zero line, you see the words

20   "Ground Water Discharge."

21        THE COURT:  Yes.

22        THE WITNESS:  If you look up in the explanation you

23   will see a diagonal hash that is contrary to the one or at

24   right angles to the one above the line for River Recharge--

25   in other words, below the zero line.

1          THE COURT:  I looked at the wrong figure.  Pardon me.

2     I see my mistake.  I was looking at the double hatched line as

3     pumpage.  Actually the single hatched line is the pumpage.

4          THE WITNESS:  Yes, sir, that is correct.

5          THE COURT: Pardon me.

6          THE WITNESS:  Those together added up give the total

7     for any one year of the recharge to the ground water basin.

8          Now, looking at the graph on the right on Exhibit 49--

9     BY MR. VEEDER:

10         Q  Mr. Worts, may I interrupt you for just a moment.

11    You had started to refer to the receptive character of the

12    sands and gravels in the stream bed and had gone down to the

13    end of the Upper Basin.  Would you state into the record the

14    receptive character of the sands and gravels through which

15    the river flows through Chappo and down to Ysidora?

16         A  The rapid response to water flowing in the river

17    and losses therefrom in observation wells located in Chappo

18    Basin, not only near the river but away from the river, indi-

19    cate that the interconnection between the river and the ground

20    water is very good in Chappo Basin.

21         Q  And again when you say losses, that is recharge

22    into the ground water?

23         A  Well, yes, that is correct.  In other words, the losses

24    are from the flow of the stream.  They percolate down through

25    the permeable sands and gravels to ground water and the result

Werts   Direct

4058

1    is ground water levels and water in storage begins to rise in

2    response to the river recharge.

3        Q   If you will, go ahead with the explanation of 49,

4    please.

5        A   The right-hand graph on Exhibit 49 shows three curves,

6    among which is one termed "accumulative recharge including the

7    sewage return." That is depicted by a solid line. The manner

8    in which that curve is constructed is simply to take the total

9    recharge of 1942 on the graph at the left, which-- if you will

10   read over to the left-hand scale-- is approximately 5,000

11   acre feet, and that is the first point plot on the graph at

12   the right along the solid line. In the year 1943 the recharge

13   is on the order of 46-47 hundred acre feet. That, in turn,

14   is added to the previous amount of 1945, giving a value of

15   around 9600-9700, et cetera. Adding each year's, each

16   subsequent year's total recharge onto the previous sum, you

17   come up with an accumulated total reaching ultimately during

18   this period of study to 106 or 107-- No, pardon me-- 104,000

19   acre feet.

20       THE COURT:  The same thing is done with each of the

21   other lines?

22       THE WITNESS:  Yes, sir, except this dotted line; if you

23   are concerned with the native or natural recharge, excluding

24   this sewage that is put back into the system--

25

1    BY MR. VEEDER:

2          Q   When you say native or natural, what do you mean by

3    that?

4          A   Native or natural includes the three natural forms

5    of recharge, namely, ground water inflow, rainfall and river

6    recharge.  By just omitting from these accumulated totals this

7    ever-increasing amount of sewage effluent shown on the left-

8    hand graph of Exhibit 49, you arrive at this dotted curve on

9    the right-hand graph, which would indicate that approximately

10   the difference between 104 and, say, 87,000, or 17,000 acre

11   feet of sewage has been put back into the system.

12          Looking at the lower part of the graph, the left-hand

13   graph of Exhibit 49, starting at the left-hand side of that

14   graph, in 1942 there is a little hashered line right under the

15   zero line which, in the legend, is termed "Ground Water Outflow."

16   Whenever there is a favorable seaward hydraulic gradient

17   through Ysidora Subbasin and out through Ysidora Narrows,

18   there is some natural ground water flow out the lower end of

19   the system occurs in much the same manner as that at the up-

20   stream or entrance to the basin but in a much lower and smaller

21   quantity because the permeability is less at the Narrows and

22   this hydraulic gradient is less.

23          THE COURT:  What about water that would flow out

24   through the river into the ocean?  Where would that be shown?

25   That same line?

1    THE WITNESS:  If there were any rising ground water at

2    the lower end of the basin, that would have to be an additional

3    form of discharge.  There has been no such phenomenon occur

4    during the period of this study, other than the natural surface

5    waters that flow all the way through.

6    THE COURT:  That is what I am talking about.  What about

7    the flood waters that flow all the way through, or surface

8    waters, if any, that flow all the way through in the absence

9    of flood?

10    THE WITNESS:  Your Honor, that was taken care of by the

11    subtraction of the surface water inflow at De Luz Dam Site, as

12    shown on Exhibit-- the inflow of all types, in years of small

13    runoff and years of large runoff, shown on Exhibit 62, is an

14    estimate of the surface flow at De Luz Dam Site.  All surface

15    waters discharging at Ysidora Narrows at the lower end of the

16    system is gaged at the Ysidora gage.  So in arriving at the

17    quantities that remain in the basin itself, for all practical

18    purposes, disregarding for the moment this evaporation problem

19    in Lake O'Neill, it is the difference between the inflow here

20    and the surface outflow there-- it is just a mathematical

21    matter.

22    THE COURT:  That is taken into account when you arrive

23    at the block called "River", et cetera, above the zero line.

24    THE WITNESS:  Yes, sir.

25    THE COURT:  All right.

1          THE WITNESS:  In other words, what I could have done

2    would have been to show here total stream flow at De Luz Dam

3    Site and run these graphs away on up on this side and show the

4    outflow of Ysidora and run the graphs away on down below.

5    But to simplify it and show the actual magnitude of the re-

6    charge from the stream, the two were subtracted inthe manner

7    shown.

8          MR. VEEDER:  Those are already in evidence.

9          THE COURT:  Yes.

10          MR. VEEDER:  The hydrographs, your Honor.

11          THE COURT:  Yes.

12          THE WITNESS:  The largest single element or type of

13    ground water discharge shown on Exhibit 49 is man's activities

14    in the form of pumpage.

15    BY MR. VEEDER:

16          Q  Mr. Worts, it is observed that you have noted here

17    the years 1944 and 1946, "Pumpage totals incomplete."  I ask

18    you to clarify that statement.  I

19          A  Yes.  In looking through the records I find that

20    those are approximate.  I will change the word "incomplete"

21    to "approximate."

22          Below that pumpage graph is the cross-hatched units of

23    discharge termed "Evapo-transpiration."  That is the natural

24    water losses due to areas of high water where evaporation

25    occurs.  In areas where there are phreatophytes or plants

1   that have their roots in the ground water, such as the willows

2   and cottonwoods and tules-- reeds and other types of grasses--

3   the quantities are estimated for an area approximately 500

4   acres of the basin       principally in Upper Subbasin and in

5   the southern part of the Chappo Subbasin.  On Exhibit 37,

6   principally the southern part of Section 23, 10 South, 5 West

7   and the northern part of Section 26, 10 South, 5 West.  The

8   depth to water in those areas ranges from right at land

9   surface to as much as about five feet.  The vaporation is a

10   part and the transpiration by the plants is a part.  Due to

11   the range in water level fluctuation by reason of the different

12   types and densities of plants involved, we computed the area

13   to be approximately 500 acres, the water used by those plants

14   and by evaporation to be about 3 acre feet per year, and again

15   we subtracted the rainfall from that figure to arrive at

16   approximately 1,000 to 1,200 acre feet per year loss from the

17   basin by these natural causes.

18       Referring again to the right-hand graph on Exhibit 49,

19   we have the accumulated discharge shown by a dashed line, and

20   that was constructed in the same manner as the graph for

21   accumulated recharge.

22   BY MR. VEEDER:

23       Q  Now, does that complete the explanation of Plain-

24   tiff's Exhibit 49, Mr. Worts?

25       A  I will wish to refer to it.

1      MR. VEEDER: Plaintiff's Exhibit 47, Mr. Clerk.

2      Q  I refer to Plaintiff's Exhibit marked for Identifica-

3  tion No. 47 and ask you to read into the record the title of

4  that illustration.

5      A  The title of Exhibit 47, "Pumpage of Ground Water

6  from Upper Chappo and Ysidora Subbasins, Camp Pendleton, 1925-

7  1957."

8      Q  Who prepared that identification, Mr. Worts?

9      A  I prepared that exhibit.

10      Q  And what does it depict?

11      A  Exhibit 47 shows the details of the pumpage on the

12  Camp Pendleton in the Santa Margarita River Basin between

13  De Luz Dam Site and Ysidora Narrows.

14      Starting with the graph at the lower part of Exhibit

15  47, it shows the distinction between pumpage for irrigation,

16  which is the graph in the lower part of that diagram, and

17  superimposed on it at the right-hand side is the pumpage for

18  Camp use.  The pumpage prior to 1941 is the Rancho Santa

19  Margarita.

20      Q  Is this drawn to scale, Mr. Worts, the information

21  which you have?

22      A  Yes, it is; it is drawn to graph scale.

23      Q  Is it accurate to your personal knowledge from that

24  standpoint?

25      A  Yes.

Werte   Direct   4064

1    MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

2    marked No. 47 for Identification.

3        THE COURT:  Exhibit 47 received in evidence.

4        (Plaintiff's Exhibit No. 47 for Identification was

5    received in evidence as Plaintiff's Exhibit No. 47.)

6        THE WITNESS:  Of particular interest are the graph on

7    the upper lefthand side of Exhibit 47, which shows the magni-

8    tude of the pumpage in each of the subbasins.  The most pro-

9    nounced feature shown by that graph is the marked increase in

10   the pumpage from Chappo Subbasin since about 1951 and the

11   marked decrease in the pumpage from Ysidora Subbasin since

12   1948.

13       You will notice the small letters within the graph:

14   A-- as a footnote in the bottom portion of that graph, indi-

15   cating incomplete or approximate pumpage totals.  I will change

16   the word "Incomplete" to "Approximate."

17       Footnote B is new wells placed in operation.  You can

18   see that in the Chappo Subbasin graph that wherever these

19   letters B are shown in the graph there is a marked increase in

20   the pumpage.  This is part of the redistribution of the pumping

21   between Ysidora Subbasin, that is, the decrease in pumpage

22   from Ysidora Subbasin to be replaced by the increased pumpage

23   in Chappo Subbasin.  In Upper Subbasin the pumpage has shown

24   a decrease since about 1952, largely due to the slow failure

25   of Well 7R1, 10 South, 4 West.

1    And finally, in 1955-56 the letter C, three new wells

2    drilled, not operating in 1957.  We have no graph-- I do not

3    know whether those wells are in operation now or not.  But the

4    purpose of those wells is further to decrease the burden on

5    the two downstream basins.  The drilling of replacement irriga-

6    tion wells which we have been requested to select the sites

7    for in Chappo Subbasin--

8        Q   When you say "we"--

9        A   The U. S. Geological Survey.

10          --will further decrease the pumpage from Ysidora

11   Subbasin.

12          The upper right-hand graph on Exhibit 47 relates to

13   the pumpage in quantities to terms of percent, so that you can

14   determine for any one year, such as 1950, for example, the

15   20% of the total pumpage was from Upper Subbasin, 30 from

16   Chappo, 51 roughly from Ysidora Subbasin.  Here again the

17   percentage distribution changes in much the same manner as the

18   quantities pumped.  Under the legend shown in the upper left-

19   hand portion of the upper right-hand graph on Exhibit 47 is

20   the statement that reads, "On the basis of usable storage

21   capacity," which we have pointed out is 25,000 acre feet--

22   15,000 from Chappo Subbasin and 10,000 from Upper Subbasin--

23   the ratio of the distribution of the pumpage on the Camp

24   should be 60% from Chappo Subbasin and 40% from Upper Subbasin,

25   and zero from Ysidora-- with the sea water intrusion as it is.

Worts   Direct

1    You can see that as of 1957 the distribution had not reached

2    that desirable ratio.  70% was being pumped from Chappo, 24%

3    roughly from Ysidora, and 6 or 7 from Upper.

4         MR. VEEDER:  Plaintiff's Exhibit No. 48.

5         Q  I refer you to Plaintiff's Exhibit marked No. 48 for

6    Identification and I ask you to read into the record the title

7    of that illustration.

8         A  Exhibit 48 is titled "Camp Pumpage and Sewage

9    Effluent Returned to Basin, 1942-1957."

10        Q  Who prepared that?

11        A  I prepared that.

12        Q  And is it to scale?

13        A  It is to graph scale.

14        Q  To your personal knowledge is it accurate on the

15   basis of the scale?

16        A  Yes.

17        Q  Would you go ahead and explain the objectives of the

18   graph?

19        A  This graph, Exhibit 48, shows, in referring to the

20   lower of the two diagrams, there is a zero line about two-

21   thirds of the way down.  Above that zero line is graphed the

22   pumpage for Camp use.  That does not include the irrigation

23   pumpage.  It is the water pumped for the use of the camp from

24   the lower Santa Margarita River Basin between De Luz Dam Site

25   and Ysidora Narrows.  The graph of the pumpage shows an

1    increase from less than 1,000 acre feet in 1942, reaching a

2    maximum in 1956 of a little more than 5,000 and only slightly

3    less in 1957.  The pumpage is pumped up to reservoirs and

4    into the Camp system, and a portion of it goes, a sizeable

5    portion of it goes through the sewage treatment plants.  The

6    amount that is actually returned to the groun water basin

7    within the watershed of the lower Santa Margarita River Basin

8    is graphed below the zero line on the lower graph on Exhibit 48.

9         MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

10   No. 48 for Identification.

11        MR. MOSKOVITZ:  I would like to ask a question, please.

12        Mr. Veeder, do you have a tabulation of the amounts

13   which are rapidly noted on this exhibit?

14        MR. VEEDER:  Yes, we are going to offer those in evi-

15   dence.

16        MR. MOSKOVITZ:  It is based on those?

17        MR. VEEDER:  This is based on evidence that will be

18   coming in, your Honor.  We have to put it in a piece at a time.

19   So there will be full and complete evidence supporting all of

20   this data.

21        THE COURT:  Allright.

22        If there is no objection, Exhibit 48 is received in

23   evidence.

24        (Plaintiff's Exhibit No. 48 for Identification was

25   received in evidence as Plaintiff's Exhibit No. 48.)

1     THE WITNESS:  The first plant put in operation, Plant

2  3 in Chappo Basin in 1944 when several hundred acre feet of

3  sewage effluent was run through that plant-- I don't know where

4  the camp pumpage was going before that time, but this was the

5  first record in 1944, and since 1944 the sewage return has

6  increased, finally Plant 1 beginning to discharge into Lake

7  O'Neill beginning in 1950, Plant 2 to Ysidora Subbasin, and in

8  1953, Plant 8 began discharging to Chappo Subbasin.

9     In the last four years shown there is a vertical hash

10  which is depicted by an explanation just below the graph

11  "Plant No. 13 discharges into the lagoon area," which is below

12  and outside the basin area that we have considered, and that

13  sewage so depicted was utilized in Exhibit 49 to show the

14  actual quantities returned to the limits of the basin as we

15  have defined them.

16     THE COURT:  That is effluent that is being returned to

17  the lagoon area?

18     THE WITNESS:  No. 13; yes, your Honor.

19     THE COURT:  This sewage effluent, the sewage goes to

20  treating plants, settling plants?

21     THE WITNESS:  Yes, sir.

22     THE COURT:  And then the water is drained off and

23  treated in some way?

24     THE WITNESS:  It is treated and is put into aeration

25  ponds and then discharged into the-- in the case of Plant 1

1   it runs down into Lake O'Neill, and in the case of Plant No. 3,

2   which is located approximately in the Southeast Quarter of

3   Section 23, 10 South, 5 West, discharges into the river.  As

4   we described yesterday, Plant No. 2 discharged into the Ysidora

5   Subbasin, first just dumping out on the ground and eventually

6   being conveyed by pipe line over to the river.  And Plant No.

7   8, the location of which I do not know-- it is in Chappo Sub-

8   basin, but its precise location I do not know except that it

9   is along the north side somewhere in possibly Section 23 but

10   it is in the northern part of that subbasin.

11       THE COURT:  Is this effluent that is returned to the

12   basin contaminated?

13       THE WITNESS:  Not bacteriologically, your Honor,  It

14   is treated and aerated properly and allowed to run out.  But

15   it carries a considerable increase in the mineral content.

16   I have some graphs later on to show that.  But that is the

17   situation.

18       THE COURT:  So it does not contaminate the basin bac-

19   teriologically?

20       THE WITNESS:  Not bacteriologically, no.

21       THE COURT:  Where was this lawsuit sometime back that

22   was tried by Judge McCormick?

23       MR. VEEDER:  Down at Pilgrim Creek.

24       THE COURT:  That isn't in this basin?

25       MR. VEEDER:  No, your Honor.  At that time it was

1  dropped out of the watershed and flowed on down into another

2  watershed.  But since then that sewage effluent has all been

3  brought back into the watershed.

4      THE COURT:  Wasn't there a finding there that it con-

5  taminated the water?

6      MR. VEEDER:  That is correct, your Honor.  And we paid

7  quite a price for it.

8      THE COURT:  Bacteriologically?

9      MR. VEEDER:  No, I don't think it was bacteriologically.

10  I think maybe the Special Master can give you more information

11  on that than anyone else, because as I recall he tried the case.

12      THE COURT:  Mr. Cranston tried the case?

13      MR. VEEDER:  Yes, your Honor.  It was under the Tort

14  Claims Act.

15      THE COURT:  I forget whether I was U. S. Attorney or

16  not.  I guess I was not.  One of the assistants was handling

17  it.  He was out of his water if he was opposing the Special

18  Master in that case.

19      MR. VEEDER:  That is what I understand.

20      THE COURT:  He was in water above his depth, put it

21  that way.

22      MR. VEEDER:  At least sewage.

23      THE WITNESS:  A word of explanation, your Honor.  With

24  regard to the bacteriological content of the water, I believe

25  the water is chlorinated, which would clean it up.  Further-

1    more, even when it does contain bacteria, if it is spread in

2    permeable sands and travels approximately a hundred feet,

3    there is very little danger of any bactereal transmission

4    beyond that.

5         MR. STAHLMAN:  Wait a minute.  Maybe I should keep

6    still, but--

7         MR. VEEDER:  It is the same, whatever name you call it.

8         THE COURT:  Let's go ahead.  I know that in the Eastern

9    cities the effluent is dumped into the river.  Washington,

10   D.C., gets its water supply out of the Potomac, and sewage

11   effluent is dumped into the river by city after city above

12   Washington, D.C.

13        MR. VEEDER:  That is right, without being cleaned up

14   to any appreciable degree.

15        THE COURT:  Well, I don't know about that.

16        MR. STAHLMAN:  If there is any dispute about that--

17   I don't care-- if the gentlemen are satisfied with it, that's

18   all right.  But I do think we are running contrary to scientific

19   findings.

20        MR. SACHSE:  Are you going to testify now, Mr. Stahlman?

21        MR. STAHLMAN:  I will keep still.  Go ahead.  You go

22   ahead and testify, Mr. Sachse.  You are better than I am.  You

23   are louder, at least.

24        MR. VEEDER:  I wish they would take the pledge the way

25   I did.  If they are going to have fun, I should have some.

1          THE COURT:  They may have to before we get through.  One

2    at a time.

3          MR. VEEDER:  It's awfully dull.  That's all I have to

4    say.

5          THE COURT:  Go ahead, Mr. Worts.

6          THE WITNESS:  You will note that there has been a

7    steady increase in the sewage effluent returned to the basin.

8    There has also been a slight increase or an increase in the

9    amount of pumpage.  But to determine the ratio one to the

10   other, the upper graph on Exhibit 48 shows the percent of the

11   Camp pumpage returned to the basin as sewage effluent.  Start-

12   ing in 1944, with something less than 10%, reaching a maximum

13   in the diagonal hashed line of nearly 50% in 1954, and de-

14   clining somewhat on the order of 42-43% in 1957.  Again,

15   superimposed on top of those bar graphs is the graph of the

16   water returned to the Lagoon area-- sewage effluent returned

17   to the lagoon area, which again is outside the upstream and

18   downstream limits of the basin as we have used them.  This is

19   water that is returned as sewage effluent within the watershed,

20   including this lower amount shown there.

21         THE COURT:  What is the purpose of returning any of

22   this effluent to the lagoon area?  And secondly, is it dumped

23   into the lagoon on the surface or underneath the ground?

24         THE WITNESS:  I am not qualified to answer on that

25   problem.  But I have observed where it is dumped.  It is

Worts   Direct
4073

1   dumped down at what I believe is called Twin Lakes in the

2   center of Section 10, 11 South, 5 West.

3        MR. VEEDER:  I am going to have two other witnesses on

4   this very point, your Honor.

5        THE COURT:  It is dumped on the surface?

6        THE WITNESS:  It is dumped on the surface, your Honor.

7        THE COURT:  Therefore, it would have no effect on pre-

8   venting the salt water intrusion?

9        THE WITNESS:  Not in the position that it is being

10   placed at the time.  If you will observe on Exhibit 37, in

11   about the center of Section 10 there is an outline of what

12   appears to be-- well, I don't know what it would appear to be,

13   but there are some lines drawn in there, and those represent

14   the position of the aeration ponds.  From that pond I have

15   observed that the water spills out and drains on down toward

16   the coast, and it is not in a position to do very much, if any,

17   good with regard to helping the situation on the sea water

18   intrusion.

19        MR. VEEDER:  However, evidence will be introduced on

20   that.

21        THE COURT:  All right.

22   BY MR. VEEDER:

23        Q  What is the effect, Mr. Worts, of the return of the

24   sewage effluent upon the quantity of the water that would pass

25   Ysidora Gaging Station?

Worts  Direct

4074

1      A   The effect of returning the sewage, which I had

2   estimated the total from graph 49, approximately 17,000 acre

3   feet of sewage has been returned to the basin during the

4   period 1944 through 1957.   This has taken the place of what

5   could well have been a much better quality of water in the

6   form of recharge from the river during any wet years when

7   there was sufficient flow to supply seepage loss and recharge

8   to ground water from the river.

9      MR. VEEDER:   Plaintiff's Exhibit marked for Identifica-

10   tion No. 50.

11      Q   Would you state into the record the designation of

12   that illustration which is designated as Plaintiff's Exhibit

13   No. 50 for Identification?

14      A   Exhibit 50 is entitled "Ground Water Storage Changes,

15   Camp Pendleton, 1942 to 1957."

16      Q   Under whose direction or who prepared that identi-

17   fication?

18      A   I prepared that.

19      Q   And is it on scale, Mr. Worts?

20      A   It is to graph scale.

21      Q   And to your personal knowledge is it accurate on that

22   scale?

23      A   Yes.

24      Q   Would you state what is reflected on the identifica-

25   tion, please.

1      A   On Exhibit 50, looking first along the left-hand

2   margin of the exhibit, you will notice a double scale.   The

3   one furthest to the left reads "Depletion of ground water in

4   storage in acre feet," which means, reading down that left-

5   hand scale you can read directly out onto the graph any point

6   and determine the amount of depletion of ground water in

7   storage at that time.

8          You will also note that the left-hand scale goes down

9   and reaches the maximum of the estimated usable storage

10   capacity of 25,000 acre feet, previously testified about.

11          The inner scale on the left is just the complement of

12   the one on the outside, showing the amount remaining in stor-

13   age at any given time.

14          MR. VEEDER:   We offer in evidence Plaintiff's Exhibit

15   marked No. 50 for Identification.

16          THE COURT:   Exhibit 50 received in evidence.

17          (Plaintiff's Exhibit No. 49 for Identification was

18   received in evidence as Plaintiff's Exhibit No. 50.)

19          THE WITNESS:   Curve A, described in the legend at the

20   bottom of Exhibit 50, is called "Accumulated difference be-

21   tween recharge and discharge since 1942."

22          Referring now to Exhibit 49 and to the graph on the

23   left, you will notice in the explanation a solid circle with a

24   horizontal line through it reading "Recharge exceeds discharge,"

25   and you will find in the graph, I believe, three points or

4076

1    three years in which the recharge exceeded the discharge.

2    That is purely a mathematical subtraction and plotted on the

3    appropriate side of the zero base.

4         Similarly, the open circle with a horizontal line

5    through it reads "Discharge exceeds recharge."

6         Those points are plotted below the zero base in the

7    appropriate magnitude of the amount shown.

8         If the accumulated difference by adding-- let's refer

9    still to the left-hand side of Exhibit 49 in the year 1942.

10   That black circle with a line through it shows that recharge

11   exceeded discharge by approximately 1,000 acre feet, in round

12   figures.  So that would be the first year-- that is not plotted

13   here, but taking the year 1943 we have a plus 1,000 and a

14   minus, call it 1,500, in 1943.  That gives you about a minus

15   500.

16        (A pause.)

17        THE COURT:  You are worried about why your curve A

18   doesn't cut in there at about twenty-four or five hundred

19   instead of twenty-five hundred; is that what bothers you?

20        THE WITNESS:  That is what bothers me at the moment,

21   your Honor.

22        THE COURT:  This will be a good time for a recess.

23   Maybe you can figure it out.

24        (Recess.)

25        MR. VEEDER:  Your Honor anticipated as early as

yesterday the question that has been raised as to basic data

upon which Mr. Worts prepared his exhibits.

We are calling other witnesses to put in all that data,

and I don't know how they choose to handle their cross-examin-

ation. But there will be the foundation for each of these

exhibits. We have two witnesses who will put in all the in-

formation. I just thought I would state that from the stand-

point of explanation. That is a matter of the order of proof.

THE COURT: We might postpone cross-examination until the

basic data is in. Counsel would probably want to see that in

organizing their cross-examination. And of course if we want

to be strictly technical about the matter, the basic data

should be in before the charts are offered in evidence. How-

ever, they can be received in evidence, as we have been doing,

subject to a motion to strike if something should develop to

determine that they are improperly received. We have been

going along very nicely on that score. We have no problem,

I think, on the order of proof.

MR. VEEDER: I just wanted to be sure that the record

is clear on the proposition.

THE COURT: Is that agreeable?

MR. MOSKOVITZ: That is agreeable. We have been making

no suggestions because we want to let the facts come in as

conveniently as possible. We feel that we do need it for cross-

examination.

1     THE COURT: We can't do it all at once.

2     MR. VEEDER: I think you can rest assured, Mr.

3 Moskovitz, that there is not a chart or any graph or illus-

4 tration that isn't fully supported concerning which we have

5 offered evidence.

6     THE COURT: You have been offering them in evidence

7 sometimes before they are even fully identified, which is all

8 right. It is preferable, I think, in a record, generally to

9 have your documents come into evidence about the time they are

10 talked about. Otherwise, you are looking all through your

11 record to find out when it was received in evidence. But

12 with that understanding, that you will submit the basic data

13 and that motions to strike are reserved, we will go ahead as

14 we have been.

15     MR. VEEDER: I truly believe that the cross-examination

16 would be directed more to the man who maintained the records

17 than to Mr. Worts.

18     THE COURT: The witness was looking at the chart.

19 BY MR. VEEDER:

20     Q  Would you proceed and explain Plaintiff's Exhibit No.

21 50, Mr. Worts.

22     A  The remaining question was the chart of curve A at

23 zero on Exhibit 50 at the end of the 1942 water year.

24     Referring back again now to Exhibit 49, on the left-

25 hand graph, the solid circle with a horizontal line through

1    it in 1942 shows that there was a surplus of water by the

2    mathematical subtraction of recharge from discharge.  There-

3    fore, you can't start out with more than a full basin.  This

4    is merely a mathematical subtraction.  Therefore, you start

5    out with a full basin according to the recharge-discharge in-

6    formation at that time.  So that point plots at zero on curve

7    A.

8         Then in the 1943 water year, on Exhibit 49, there is an

9    open circle showing a deficit of, let's say, about 1700 acre

10   feet-- 1700 acre feet, approximately.  That is the first point

11   plotted at the end of the 1943 water year.

12        In the 1944 water year there is a deficit shown of

13   about a thousand acre feet.  So that deficit is added on to

14   the previous deficit, et cetera.

15        You accumulate the differences between recharge and

16   discharge on Exhibit 49, which you will observe are all on the

17   negative portion of the graph, through and including 1951

18   water year, which brings us down on Exhibit 50 to the lowest

19   point on curve A, where we show a depletion of ground water in

20   storage of 10,000 acre feet.

21        Then in the 1952 water year we had quite a large

22   surplus of almost 10,000 acre feet, which essentially,

23   virtually replenished the basin to within several hundred

24   acre feet of being full, et cetera, through the rest of the

25   graph.

1    Let's proceed to curve B.  Curve B represents another

2  method of computing how much water you will have left in

3  storage, which is by use of water levels in the three sub-

4  basins of the Santa Margarita River on Camp Pendleton by taking

5  the average depth to water in each of the three subbasins and

6  referring to Exhibit 42, which shows the usable storage

7  capacity graphs on the right-hand side of that exhibit.  The

8  average depth to water on September 30th or near September

9  30th, which was the end of the water year-- take the average

10  depth to water on September 30, 1942-- the year is not import-

11  ant; the average depth to water is what you are dealing with

12  on Exhibit 42, and for each of the three subbasins you compute

13  the average depth to water-- and using the graphs you pick

14  off the amount of water in storage in each of the three sub-

15  basins, add the three together and you come up with the amount

16  of water in storage for that year at that time of the year.

17    In other words, let's take an example.  Suppose the

18  average depth to water in the Upper Basin on Exhibit 42 were

19  5 feet, which would coincide with your dashed vertical line

20  on that graph.  That would mean that the basin was full,

21  that there was 10,000 acre feet of storage in Upper Subbasin.

22  Let's assume that the same condition existed in Chappo Sub-

23  basin, that is, that the water level was five feet below the

24  land surface.  That basin would also be full.  That gives us

25  a total of 25,000 there.  Let us assume, disregarding the sea

Werts - Direct

4981

1    water intrusion and the usability of that basin still has to

2    be considered, that the depth to water in that basin was

3    approximately 7 feet-- let me mark that; I will put a mark on

4    Exhibit 42 on the Ysidora Subbasin graph on the lower right-

5    hand side at about 10 feet-- which would indicate that I am,

6    as an example, suggesting that the depth to water might have

7    been 10 feet in that basin in September, 1942.  Reading across,

8    we would have-- call it 500 acre feet less than the full

9    capacity.  Then by adding up all these amounts you would come

10   up with 500 acre feet less than being full over on this graph

11   50.

12         THE COURT:  I understand.  In other words, curve A and

13   curve B are two different ways to make an estimate.

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Are these both according to sound water

16   engineering principles?

17         THE WITNESS:  Yes, they are, your Honor.

18         THE COURT:  Of course, these things can't be exact, be-

19   cause of the intangibles.  I notice-- take the break between

20   1952 and 1953; your charts show a difference of about 5,000

21   acre feet.

22         THE WITNESS:  Yes, sir.

23         THE COURT:  However, by the time you got down to the

24   end of 1957 the coincidence between the two charts is probably

25   less than a thousand acre feet.

1    THE WITNESS:  That is precisely correct, your Honor.

2    THE COURT:  In other words, although there is a variance,

3    it is one of the thingsyou would expect in making calculations

4    by two different methods, and that is why they are set forth.

5    THE WITNESS:  That is correct; to show what you would

6    get by these two independent methods; and it can be observed

7    that on curve B, if you will read the legend down here "Annual

8    estimates of ground water storage computed from water level

9    data," which I had just mentioned, you will note that those

10   points for the years 1942 through 1949 are estimates based on a

11   very few water level measurements that were available to de-

12   termine that, and that as a result of these variances that

13   you can't control you may get as far off as several thousand

14   acre feet, as in 1946, between the two methods.  But in later

15   years as our data become better, I think, the proximity of the

16   two graphs tends to improve.

17   THE COURT:  Now, Charts C, D and E are merely the effect

18   shown by taking into account the sewage.

19   THE WITNESS:  That is right, your Honor.  The sewage

20   in curve C is just a mathematical subtraction from A to show

21   where the difference between recharge and discharge would be--

22   I will not say would be-- I will say could be if sewage were

23   subtracted out.  Now the reason I say could be is because in

24   the 1952 water year, when there was a large amount of water

25   available for recharge, there is every reason to expect that

1    this basin would have been recharged to a point much higher

2    on this graph than is shown here, because this is merely the

3    mathematical subtraction.

4           THE COURT:  I understand.

5           THE WITNESS:  As shown in Exhibit 60 or 62, the inflow

6    at De Luz Dam Site, that is, the amount of water available for

7    recharge in that year--

8           THE COURT:  Now, the only thing I don't understand are

9    the words on curves D and E, "Adjusted to wet year."  What kind

10   of adjustment do you make?

11         THE WITNESS:  Adjusted in this sense, your Honor, that

12   these are extremely dry years-- and when I say "these," on

13   Exhibit 50 I am referring to the years 1948, 1949, 1950 and

14   1951-- in which, if you subtracted out the sewage effluent,

15   as we have done in curve C, but only for the period starting

16   in 1948, there was not an additional surface supply available.

17       Now, to indicate what I mean by that, referring back to

18   this last point that I was just making with regard to the

19   inflow in this wet year, in 1952 there was an estimated 60,000

20   acre feet in stream flow passed De Luz Dam Site, as shown on

21   Exhibit 62, which means that there was ample water available

22   to more than fill this if the recharge could have occurred.

23   But because the 1952 runoff did essentially fill it, if it

24   had been drawn down by not returning the sewage effluent, there

25   is no saying where the amount or where the point would plot

1   because there is no way of knowing just how much of this

2   available water would go back in.

3       THE COURT:  As to B and E, then, did you do them

4   mathematically as you did C?  Or did you make some adjustment?

5       THE WITNESS:  They are not really adjusted.  The time

6   that they start is implied by the adjustment on curve A.  In

7   other words, it is a relocation of curve A, or an adjustment

8   of curve A based on the subtraction of sewage return.  But in

9   those four years, 1948 through 1951, referring to Exhibit 60,

10  "Yearly Runoff, Santa Margarita River at Ysidora," we see that

11  in 1948-49 there was only 560 acre feet and 479 acre feet

12  passing Ysidora that could have been salvaged.

13      MR. VEEDER:  That is, respectively.

14      THE WITNESS:  --respectively, that could have been

15  salvaged to increase this--

16      THE COURT:  To affect.

17      THE WITNESS:  --to affect that curve if sewage hadn't

18  been returned.  And in the following two years, 1950-51, there

19  was no outflow at Ysidora.  Therefore, there would be no way to

20  adjust it.  There would be no more runoff to salvage for that.

21      THE COURT:  In other words, the word "adjusted" merely

22  means that you started at the year 1948.

23      THE WITNESS:  That is right, and I would have to check

24  my notes, but I believe that these outflow figures of 560 and

25  480 approximately have been subtracted from the sewage effluent

1   to relocate these points, assuming that this water would have

2   been lost to the basin or recharge-- not lost to the basin,

3   but would have recharged the basin.  The same thing was done

4   in subtracting the sewage in the three very dry years of zero

5   outflow at Ysidora Gage, 1955-56-57, to show where the posi-

6   tion of the graphs would have been if sewage effluent had not

7   been returned in those three years.

8           THE COURT:  The water year 1958 ended on September 30th.

9           THE WITNESS:  Yes, sir; these are all plots for

10  September 30th.

11          THE COURT:  Is there any intention to plot on these

12  charts later and complete this through September 30th, 1958?

13          MR. VEEDER:  We hadn't planned on it, your Honor, other

14  than just to offer the data down through 1958-- I mean the

15  runoff.

16          THE COURT:  Unless I am badly mistaken, Mr. Sachse is

17  very impatient to get at the figures for the 1958 water year,

18  and since the defendants' proof may not follow exactly the

19  same pattern it seemed to me it wouldn't be too big a job to

20  have the Government on the space that is available complete on

21  these charts the same data for the water year 1958.

22          MR. SACHSE:  It would be most helpful, your Honor.

23          THE COURT:  In other words, you would have some sort

24  of comparison.  You have one approach maybe taken by the

25  Government.  You have another approach taken by the defendants.

1   You are trying to compares apples with bananas.  I have no doubt

2   but that Mr. Sachse has a staff of technicians now drawing

3   charts.

4        MR. VEEDER:  He has Mr. Moskovitz.

5        MR. STAHLMAN:  He just lost his engineer.

6        THE COURT:  But if the Government carried these charts

7   on down in places where he has here, there is a blank avail-

8   able, you at least would have the Government's picture carried

9   out for the same period that the defendants' picture would be.

10  Of course, we know what it is going to show, but--

11       MR. VEEDER:  If your Honor knows what it is going to

12  show--

13       THE COURT:  We know it is going to show water on the

14  way.

15       MR. VEEDER:  No, no, that water was used, your Honor.

16  I am not arguing with your Honor.

17       THE COURT:  Well, the water that flowed into the ocean

18  was never used.

19       MR. VEEDER:  You have to have a stream to bring the

20  water down.

21       THE COURT:  Some water was used as it flowed.

22       MR. VEEDER:  That is correct.

23       THE COURT:  Before it finally went into the ocean.  But

24  that part that went into the ocean was never used.

25       MR. VEEDER:  We think it was, your Honor.  We believe

1    it was part of the conduit that brought the water down, and if

2    your Honor thinks I am about to admit anything to the contrary

3    I think your Honor is in error, because I am not going to.

4         THE COURT:   Anyhow, give some thought to the possibility

5    of carrying these charts on through September, 1958.

6         MR. VEEDER:  Yes, your Honor, we will give some con-

7    sideration to it.

8         THE COURT:   It could be done with a different colored

9    pencil, so that we would know that they were calculations made

10   afterward.

11        MR. VEEDER:  What would your Honor think of our putting

12   it in as rebuttal, in the event that the defendants come for-

13   ward with something in that regard?

14        THE COURT:   There is nothing wrong with that, except

15   that possibly the defendants may be convinced by some of your

16   charts and drawings and they might be--

17        MR. VEEDER:  Throw in the towel?

18        THE COURT:   Not completely, but might throw the towel

19   in as to the particular chart or graph.

20        MR. VEEDER:  Yes, your Honor, we will undertake it.

21        THE COURT:   Give some consideration to it.

22        MR. VEEDER:   Is there anything further in regard to 50,

23   your Honor?

24        THE COURT:   No.

25        MR. VEEDER:  Plaintiff's Exhibit marked 52 for

1    Identification, please.

2         Q  Now, referring to Plaintiff's Exhibit marked No. 52

3    for Identification, I ask that you read in to the record the

4    designation of the illustration.

5         A  Exhibit 52 is titled "Effect of pumping 23,000 acre

6    feet per year from ground water, Camp Pendleton, during two

7    critical dry periods 1948-51 and 1955-1957."

8         MR. VEEDER:  Again, your Honor, we are confronted with

9    the problem that always occurs in cases which are somewhat

10   complex.  Our evidence will support, we believe, our claim

11   for 23,000 acre feet, and we will call Col. Robertson to show

12   that fact.  But that will come somewhat later on.

13        THE COURT: All right, we are assuming now that you are

14   going to put on evidence to the effect that you have need

15   of 23,000 acre feet from ground water.

16        MR. VEEDER:  That is correct, and that is true of the

17   other exhibits upon which foundation is going to be offered.

18        MR.MOSKOVITZ:  Need or rights?

19        MR. VEEDER:  Well, we of course assert rights to meet

20   our needs.

21        MR. SACHSE:  This, I think, we will have to object to,

22   and for the record I will for Fallbrook.

23        Have you made an offer yet?

24        MR. VEEDER:  No, I am simply explaining.  In every

25   single one of these charts it is essential that we proceed

1     this way.  Col. Robertson will not be on the stand for prob-

2     ably four or five weeks.  The data that is here can only be

3     explained by our principal geologist and hydrologist in this

4     factor.  It is simply a matter of the order of proof.

5        THE COURT:  Except that on cross-examination counsel

6     would very definitely want to cross-examine Col. Robertson,

7     I suppose, on his statements as to acre feet.

8        MR. VEEDER:  That is correct, your Honor.  But I would

9     assume that the predicate upon which Mr. Worts' work will be

10    accepted as 23,000, and cross-examined on that basis.

11       MR. SACHSE:  This is a little different.  This is not

12    just foundation.  You are quite right that we will want some

13    further foundation to cross-examine on.  But I think there is

14    the clear and definite objection of materiality.  What is

15    23,000?  Why not 123?  Why not three?  And what has need got

16    to do with this case?

17       MR. VEEDER:  I said rights and need.

18       MR. SACHSE:  Well, there is no showing of any kind to

19    justify any calculation by Mr. Worts on the basis of 23,000

20    or 3,000 or any figure.  I think it is immaterial.

21       THE COURT:  Mr. Sachse, I am no mathematical expert,

22    but with this chart, Exhibit 52, just a casual look at it, I

23    think I understand what it is.  You start out with how much

24    water was in the basin at the beginning of these dry periods.

25    If I found that the Government had a right to a certain amount

1    of water I could make a curve on here myself and have some

2    estimate.   In other words, it could be useful even if the Court

3    didn't accept the 23,000 acre feet figure.

4        MR. DENNIS:  Your Honor, I am going to object, too, on

5    the grounds that it is incompetent, irrelevant and immaterial;

6    doesn't tend to prove or disprove any of the issues in the

7    case.   The question is between the appropriators and the

8    Government as a riparian owner, or either as an appropriator

9    or as a prescriptive user, has a right to use a certain amount

10   of water provided that they can put it to beneficial use.

11       MR. VEEDER:  I haven't made the offer yet.

12       MR. DENNIS:  What the Government may or may not be able

13   to put to beneficial use, twenty or thirty years from now, as

14   I see it, has no bearing on this case.   Your Honor is going

15   to find eventually, I presume, that the Government has a right,

16   provided they put it to beneficial use by use of reasonable

17   methods of diversions and applications, such water as they can

18   use for riparian purposes where they have prescriptive rights

19   in a certain area.   And that isn't going to be tied down to

20   23,000 acre feet or 5,000 acre feet or 10,000 acre feet or

21   any other definite quantity; and there is no evidence in this

22   case, and there cannot be in view of the exhibits which have

23   already been introduced in evidence, that the Government has

24   ever used more than 6,750 acre feet at any one time.   Now, if

25   we get into charts of this kind, then the defendant can get in

Worts   Direct                                                    4091

1   and say, "What is going to happen if you use 20,000 acre feet,"

2   or "What is going to happen if you have 10,000 acre feet"?  As

3   I see it, the fact that the Government says that someday in

4   the future they might use 23,000 acre feet of water has absol-

5   utely no bearing in this case.  They are going to get down

6   eventually, as far as the basin is concerned, as to what is

7   the perennial yield or safe yield of this basin.  That is

8   going to be the measure of the right to extract water from the

9   underground basin.

10          THE COURT:  Nothing has been offered yet, Mr. Dennis.

11          Identify the chart.

12   BY MR. VEEDER:

13          Q  Would you proceed, Mr. Worts, to explain the factors

14   which are depicted on Plaintiff's Exhibit marked for Identi-

15   fication No. 52.

16          A  The Marine Corps requested the Geological Survey to

17   prepare data showing what would be the effect on the ground

18   water basin if they pumped 23,000 acre feet.  The curves

19   annually--

20          THE COURT:  During certain dry periods.

21          THE WITNESS:  Particularly during critical dry years,

22   or series of years.  And the two most critical that have

23   occurred to date, the periods 1948 to 1951 and 1955 to 1957.

24   BY MR. VEEDER:

25          Q  Have you drawn this to scale, Mr. Worts, based on the

1　statistics upon which you are relying?

2　　　　A　It is drawn to graph scale.

3　　　　Q And it is accurate to your personal knowledge?

4　　　　A　Yes.

5　　　　MR. VEEDER:　We offer in evidence Plaintiff's Exhibit

6　marked for Identification No. 52.

7　　　　THE COURT:　I am not going to rule on it at this time.

8　You may renew your offer later on.　You may go ahead and

9　explain the exhibit.

10　　　　MR. DENNIS:　I have also a right to interpose the

11　additional objection, your Honor.

12　　　　THE COURT:　We don't need any objections yet, Mr. Dennis.

13　I am not going to rule on his offer now.　When the time comes

14　for his offer, you may make your objections.

15　　　　Mr. Worts, you started, I take it, at the end of the

16　water year 1948, with about 6,000 acre feet in the basin; is

17　that it?

18　　　　THE WITNESS:　It is about 4,000.

19　　　　THE COURT:　Pardon me, 4,000 acre feet in the basin?

20　　　　THE WITNESS:　Yes, sir.

21　　　　THE COURT:　Well, now, if you used 23, it looks to me

22　like your line only went down there 5, 10, 15, 16, about 17,000

23　acre feet.

24　　　　THE WITNESS:　That is right.

25　　　　THE COURT:　What is the difference?

1    THE WITNESS:  The difference is the recharge that would

2    have occurred and the discharge that would have occurred,

3    despite the pumpage.  In other words, there was some recharge

4    in those years.

5    THE COURT:  I see, you took into account both use charts--

6    THE WITNESS:  Yes.  And those estimates of recharge and

7    discharge are made wholly by the Geological Survey.  There is

8    no reliance on anyone else's records on those.  In other words,

9    the amount of the stream flow available is the data presented

10   in Exhibits 60 and 62, where you can obtain the water available

11   for recharge from the river.  The amount of subsurface recharge entering

12   the basin at De Luz Dam Site has been estimated by the

13   Geological Survey as shown on Plaintiff's Exhibit 49 as

14   approximately 700 acre feet per year.  Similarly, the evapo-

15   transpiration losses in the form of discharge is also taken

16   into consideration and was computed by the Geological Survey.

17   So that--

18   THE COURT:  All right, I understand.

19   THE WITNESS:  So that by taking 23,000 acre feet and

20   starting with the basin at 4,000 acre feet in 1948, which was

21   derived by-- we have these two independent methods of determ-

22   ining how much water was left in storage on Exhibit 50, so we

23   took the 1948 water year and for lack of any better method of

24   computing it just took the average of the two independent

25   methods as a starting point for 1948.

1  THE COURT:  Now, your curve A is the same curve except

2  assuming a 10,000 acre feet sewage effluent returned to ground

3  water?

4  THE WITNESS:  Yes, sir.  That figure — I will refer now

5  to Exhibit 48, in which the magnitude percentagewise in the

6  upper part of the graph is shown, which is on the order of

7  40% or a little more for the last few years of sewage return

8  record.  I have rounded that off for this graph and just called

9  it 10,000, which is roughly 40% or maybe a little more than

10  40% to see what the effect would be.

11  Now, it is obvious that during the first year of the

12  drouth 1948 that would be within the estimated usable storage

13  capacity, but in the second year of the drouth their trouble

14  has developed.  They have utilized more than the usable storage

15  in the basin and the situation grows progressively worse, until

16  finally in the end of 1951, on a basis of extrapolation, that is

17  more water than there is in the whole basin.

18  THE COURT:  What is the little dotted line starting up

19  at the beginning of the water year 1952?

20  THE WITNESS:  That would indicate the wet year of 1952

21  would have caused a recoverage of storage.

22  THE COURT:  I see.  You could have done the same thing

23  with 1958?

24  THE WITNESS:  I could have, except you will note the

25  date of these.

1    THE COURT: Yes.

2    THE WITNESS: May, 1958. I had no runoff data at that

3    time.

4    MR. VEEDER: Your Honor, I don't know what your desires

5    are on it. I would like to renew the offer on the basis that

6    I have suggested. It seems to me that this Exhibit 52 illus-

7    trates the problems with which any military establishment is

8    confronted from the standpoint of making its plans, and certainly

9    on the offer of claim of 23,000 acre feet we are proceeding

10   on the basis of evidence that will be introduced in support

11   of it. I have felt that it was essential to the proper

12   presentation of our case that we go ahead and make clear what

13   the hydrology was going to disclose. We couldn't call our

14   witnesses all at the same time.

15   If your Honor would prefer to have us withhold this

16   until Col. Robertson has testified, it is all right. My own

17   thought, and the whole concept of the offer of these illustra-

18   tions and exhibits now, has been in contemplation that if we

19   did not support them it would be the normal process which we

20   have frequently followed in trials of this nature that they be

21   simply subject to a motion to strike.

22   THE COURT: It is not important enough to clutter the

23   record up with a lot of argument. I know what the defendants'

24   objection is going to be. You keep talking about need, and

25   they are going to object on the ground that need doesn't measure

Worts   Direct

1    your rights.  But it does not seem to me to be too important.

2    In other words, this is a chart on an assumption of 23,000

3    acre feet of water being pumped.  If it turns out that the

4    Government has a right to pump 20,000 acre feet or 30,000

5    acre feet, the chart is illustrative of what happens.

6         MR. MOSKOVITZ:  I would like to make my objection for

7    the record, and make this point, your Honor.  I think that

8    what Mr. Worts has said when he explained the basis on which

9    he drew it indicates that it is completely irrelevant.  They

10   are assuming pumpage of 23,000 acre feet, when it is obvious

11   they can have no such rights ever, and they would never do such

12   a thing because it would mean that within two years they would

13   be below the storage capacity of the basin.  It is a completely

14   outlandish and preposterous assumption to make.  It doesn't

15   prove anything that can help us at all.

16        MR. STAHLMAN:  As I understand, what is happening in

17   this courtroom is that all of these exhibits here, these graphs

18   and charts, although they have not been limited by a word in

19   the record, as a matter of law these are merely exhibits for

20   illustration.  Personally, I see no harm in it.  I am not

21   talking for the Government's case.  But I would certainly

22   object, because I think your Honor is aware of the fact that

23   they are making assumptions here that may or may not be proved.

24   If they are not proved, then the illustration falls of its own

25   weight.

Worts    Direct

4097

1   THE COURT:  The charts are only as good as the supporting

2  data.

3       MR. VEEDER:  That is right.

4       THE COURT:  This is graphically to illustrate something

5  that the Court could almost take judicial notice of-- what

6  happens to a limited basin of water when there is heavy

7  pumping on the basin and there is not sufficient recharge to

8  keep the basin full.

9       MR. VEEDER:  May I add one point in response to what

10  Mr. Moskovitz has stated.

11       It is true that we would be mining water-- there is no

12  question about it-- we would be throwing a tremendous burden

13  onto this area.  But in the event of a war would certainly

14  proceed exactly in that manner.  We would pump far beyond what

15  would normally be undertaken.  In other words, we would go

16  for the full 48,000 or whatever was there, rather than limit

17  it to 25,000.  There is no question, moreover, that in regard

18  to sewage effluent and all other matters, we would simply put

19  it back into the basin and have an operation on that basis.

20  But we are showing, and I believe it is essential for the

21  record to show, that we are confronted with a problem, and we

22  believe, irrespective of the contentions to the contrary, that

23  we do have the right, and that will be part of our proof.

24       MR. DENNIS:  I want to renew my objection, your Honor,

25  that this exhibit is incompetent, irrelevant and immaterial

1    and doesn't tend to prove any issues in this case; and I would

2    add an additional objection that it is irrelevant until the

3    plaintiff has made some showing that the 23,000 acre feet of

4    water could be taken from the basin during any one calendar

5    year.   In other words, if this is going to up into cross-

6    examination the question or perennial or safe yield of this

7    basin, the amount of water which can be obtained through wells

8    and otherwise, and the amount of water that can be returned

9    by natural sources, that is one thing.  But if not, if they

10   are not opening up that phase of the case, I think there is

11   no foundation laid for the exhibit.

12        MR. SACHSE:  I want to make for Fallbrook the objection

13   that there is no adequate foundation, and that it is incompe-

14   tent, irrelevant and immaterial.  The sole purpose in this

15   litigation, as stated in the pre-trial order on issues, is to

16   determine the extent of the rights of the United States and

17   that the rights of the United States are not governed in any

18   way whatsoever by a hypothetical need figure.

19        THE COURT:  Forget about need.  Suppose the United

20   States proves that it has rights to 23,000 acre feet.

21        MR. SACHSE:  That is why I say I object to it on two

22   grounds; Lack of foundation, and that it is irrelevant and

23   immaterial.

24        The second thing is, if they prove they have a right

25   as a riparian, I think that all parties will concede that their

1    right is correlative and their right will fluctuate year by

2    year.  Their right as a riparian will be less in the dry years.

3    And their need will have nothing whatever to do with it.  They

4    will share with the fellow upstream and they will share with

5    others upstream in the limited flow that is in the river.  And

6    they will not have the right to ask people upstream-- riparians

7    I am speaking of-- to curtail their uses inorder to meet a

8    particular need.  Their right is a correlative right.  It is

9    not based upon an absolute need.  It is based on the amount

10   still in the stream.

11           MR. MOSKOVITZ:  I would like to make one further point,

12   your Honor.  On the basis of the runoff figures which have

13   already been put in evidence by the Government, it is evident

14   that they would not possibly have a right to that much water,

15   and therefore the assumption is not based on any evidence in

16   the case.  It is an impossible assumption, and for that reason

17   the calculation is not relevant.

18           THE COURT:  Well, now, gentlemen, it really doesn't make

19   a lot of difference one way or the other.  Technically there

20   is no foundation yet for this.  We have to take it on an

21   assumption.  On the other hand, I intend to let the Government,

22   even though I have ruled against some of their positions, make

23   a showing of some of these contentions for the record.  I am

24   not presently of a mind that the Government's rights are

25   measured by their need, but I would think that in a case of this

1   size they should be entitled to show what their need is, and

2   it might be easier on appeal to handle the matter than if the

3   Court cut them off without their showing.  And of course, if

4   a court sustains the objection, any party always has the right

5   to make an offer of proof, which is the same thing.

6       Referring to Mr. Veeder's statement, there is no question

7   as to the power of the Government to take all the water that

8   they want -- the power to take the water.  If we got into an

9   emergency and there were over a hundred thousand men in this

10  camp and they had to take this water, first of all, whether

11  anybody liked it or not, they would take it; and secondly,

12  the chances are, depending on the extent of the emergency,

13  we would all want to see them take it.

14      But what rights would thereafter flow to the people

15  whose water was actually taken is another taken is another

16  thing, depending on how it was taken.  Being a downstream

17  owner, you couldn't take adverse to an upstream owner-- unless

18  they send up the Marines with a squad of soldiers and said,

19  "We are going to take the water."  Or if, by their need for it

20  and their power to enforce their need, they in substance took

21  the water.  There could be a taking, under certain set of

22  facts, by inverse condemnation; not by merely using the water

23  below, but by the power of the Government and the manner in

24  which that power was demonstrated.

25      So before the case is over, I don't intend that there

1    be days spent on this, but I intend to let Mr. Veeder have

2    his theory in this record.  If it can be done more quickly in

3    some instances by an offer of proof, I will let him do it by

4    an offer of proof.  But some of these matters would probably

5    come in as rapidly by proof as they would by an offer of proof.

6         It doesn't seem to me to be important whether this

7    now goes in evidence subject to a motion to strike or whether I

8    reserve ruling on it.  The important thing is that when the

9    supporting data on which this estimate is made comes in then

10   there would be objection and cross-examination.  The Court

11   would probably make a ruling on that.  This is now only an

12   illustrative chart based upon a certain assumption.  That is

13   all it is.

14        MR. VEEDER:  I renew my offer, your Honor.

15        THE COURT:  On the basis that an assumption has been

16   made, and without passing on the validity of the assumption,

17   I see no objection to the chart.  It will be received in

18   evidence subject to a motion to strike.  That will put the

19   case inthe position where we can cross-examine the witness on

20   the validity of his calculations based upon the assumption.

21        (Plaintiff's Exhibit No. 52 for Identification was

22   received in evidence as Plaintiff's Exhibit No. 52.)

23   BY MR. VEEDER:

24        Q  Mr. Worts, will you proceed to explain Exhibit 52.

25        A  Exhibit 52-- if none of the sewage effluent is

Werts - Direct                                                                4102

1   returned to the basin the depletion of the ground water in

2   storage is very dramatic, very steep, and the amount is very

3   large.  If actually it goes down below the 100-foot estimate

4   for all three subbasins, which is indicated here at about

5   48,000 acre feet as the estimated storage capacity, 5 to 100

6   feet, as I think I mentioned previously, it goes on down to

7   what very likely might be complete dewatering and even beyond

8   the total capacity, if you took all of the water out of the

9   basin right down to the bedrock.  However, curve A assumes

10  that the-- it doesn't exactly assume-- it is the same ratio,

11  roughly, of the amount of sewage effluent being returned now

12  in relation to the existing pumpage percentagewise.  It does

13  show that if the Marines are willing to drink the sewage that

14  is returned to the basin, as they are now doing, that in those

15  years in the period 1949-1950-- correction-- that starts 1948,

16  1949, 1950 and 1951, by returning 10,000 acre feet a year the

17  storage is pulled down approximately 10,000 acre feet below

18  the estimated usable storage capacity and it is physically

19  possible to so accomplish that.  The same general features are

20  shown for the period 1955 through 1957 by curve C and D on

21  Exhibit 52.

22          THE COURT:  All right.

23  BY MR. VEEDER:

24          Q  Will you refer to Plaintiff's Exhibit marked for

25  Identification No. 53 and read into the record the designation

Worts    Direct    4103

1    on that illustration.

2         A   The title of Exhibit 53 is "Maximum Annual Pumpage

3    During Drouth of 3 to 10 Years Duration Based on 1955-1957

4    Drouth Conditions in the Lower Santa Margarita River Basin."

5    This is what I heard Mr. Dennis refer to as some estimate of

6    the--

7         THE COURT: Do you have a copy for me?

8         (Mr. Veeder hands the Court a document.)

9         THE WITNESS:  This graph Exhibit 53 approaches what

10   Mr. Dennis referred to as a perennial yield.  But at this

11   juncture I would like to point out that perennial yield of a

12   ground water basin by definition indicates the amount of water

13   that can be withdrawn year after year, year in and year out,

14   henceforth and essentially for evermore.  It is an annual rate

15   of withdrawal, and that rate can be continued so long as there

16   is no detriment to the basin in the long term.  However, the

17   biggest problem that faces the hydrologist in the determination

18   of that long-term yield in the future is, what is the amount

19   of water available to deal with?  If we had made an estimate

20   of perennial yield prior to this extremely dry series of years

21   1955 through 1957, we would have come up with a higher value.

22   In the future, if stream depletion due to the normal development

23   of ground water supplies upstream from the basins above

24   Temecula Gorge or other diversions, additional burdens placed

25   on the stream will, in the future, during critical dry periods,

Worts — Direct   4104

1    quite likely result in a still lower figure of yield.  So this

2    graph, in a sense, states what the perennial yield is only

3    for the period that we know the record.  It cannot be projected

4    into the future safely.

5         Q  Mr. Worts, would you refer to the diagram in the

6    upper right-hand corner.

7         A  For example, to indicate what I have referred to

8    about upstream depletion, there is a small graph in the upper

9    right-hand corner of Exhibit 53 which shows what the yield

10   during this-- the first point on the left plotted up above

11   the number 3, which is years of drouth, this is the actual

12   three-year period 1955 to 1957, shows how much the pumpage

13   would have been reduced.  That is a comparison of the two

14   curves.  The upper curve is shown by the points-- not the points,

15   but the quantities indicated on each of the long curves in the

16   lower part of the diagram.  In other words, the first point is

17   10,400, which appears at the end of the 1957 water year.

18        THE COURT:  What is that 10,400?

19        THE WITNESS:  That is the maximum amount that could be

20   pumped during the period 1955 to 1957 with the amount of re-

21   charge and the water in storage available.

22        THE COURT:  That is the amount that could have been

23   pumped in that three-year period?

24        THE WITNESS:  Yes, sir; 10,400 acre feet, which would

25   have put the bottom point where the storage would have ended

1    up at the end of the 1957 water year right at the bottom of the

2    usable storage capacity.

3        THE COURT:  So you take that figure and put it on this

4    upper chart.

5        THE WITNESS:  That is the 10,400 plotted on the upper

6    left-hand square of the upper graph on Exhibit 53.

7        THE COURT: What did you do next?

8        THE WITNESS:  Then to continue on with that same curve,

9    if the same drouth-- when I prepared this graph or started on

10   these compilations of these data, for all I knew 1958 could

11   have been another dry year, and if it had been--

12       THE COURT:  The heavy rains had already come.

13       THE WITNESS:  Not at the time I prepared it.  The date

14   down here is the approval date.  These exhibits were sent in

15   to Washington in the fall and were approved later that year.

16   However, your Honor, wet year or not, this goes on to extrapolate

17   this minimum quantity of recharge and storage available for a

18   drouth which can conceivably last up to ten years.

19       THE COURT:  Let's take the next period that went on for

20   another year.  The 8,400-- is that an average figure per year?

21       THE WITNESS:  That is the average figure per year, your

22   Honor.

23       THE COURT:  So since it is spread over a five-year

24   period, a four-year period instead of a three-year period, it

25   is reduced?

4106

THE WITNESS:  It is reduced.

THE COURT:  That is the amount per year that could have been pumped?

THE WITNESS:  Yes.

THE COURT:  So correspondingly by spreading it over additional years you reduce the annual maximum pumpage.

THE WITNESS:  That is right.

THE COURT:  When you presupposed, after 1957, the average intake and outlet for the three succeeding years.

THE WITNESS:  Yes, sir.  The only figure that actually will stand on its own two feet, because it is history, is the first three years of actual records.  We know what that was.

THE COURT:  Now I see how you got your top curve in the upper right-hand corner.  What is the second curve?

THE WITNESS:  The lower curve shows what might have happened, or what would have happened if there had been no flow coming down the Santa Margarita, just to show how the yield would be reduced during a dry period such as this, if the flow had been detained upstream somewhere, anywhere in the system, so long as it didn't get down past De Luz Dam Site. The result is, that you can see, that some 2,400 acre feet per year involved there on the average and it has reduced the maximum amount that you could have pumped in that critical three-year period specifically, the one I like to refer to most on here because it is based on actual conditions that

1   have happened, historic record, reduces it from 10,400 to 8,000.

2   Now this is the big danger of perennial yield-- in other words,

3   if you don't consider things like upstream development, opera-

4   tions of dams, drawing down of ground water basins so that more

5   recharge is lost from streams, your perennial yield soon

6   becomes non-realistic-- it means nothing.  This has been a

7   problem that we have had in other areas in California that I

8   have worked on.  We estimated perennial yield in the Sant Ynez

9   Valley.  Then they put Cachuma Dam upstream, which completely

10  changed the stream regimen.  Similarly with some ten to fifteen

11  ground water basins up above Temecula Canyon.  I notice on

12  Plaintiff's Exhibit 15 that there are many areas of rising

13  water.  If your water levels are pulled down within those

14  ground water basins it is just a matter of hydrologic principles

15  that if the levels are pulled down the runoff coming down

16  through those valleys has greater opportunity for recharge.

17  Therefore, the burden on the stream is increased by that

18  process.  That is why I personally prefer to avoid the use of

19  the term "perennial yield," unless it is understood that we

20  are merely basing a yield computed at the present day on past

21  record and applying it to the future with the definite under-

22  standing that the amounts will be available that are available

23  during that period of prior record, and I don't think it is

24  possible when you are trying to be realistic to assume that that

25  condition would exist.

1    THE COURT:  It is a hypothetical chart.

2    THE WITNESS:  Beyond 1957, your Honor.  But to 1957

3    all the computations are made by myself, using the stream flow

4    records in Exhibits 60 and 62, using the ground water inflow

5    on Exhibit 49 as another part of the recharge, prorating the

6    evapo-transpiration estimates I made.  There are no/Camp Pendleton

7    records involved whatsoever in that exhibit.  They are all

8    my computations to arrive at the figures.

9    MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

10   marked No. 53 for Identification.

11   MR. SACHSE:  May I have a question, your Honor.  I

12   may have an objection.

13   Mr. Worts, I am not sure I understood you correctly.

14   Did you say that in the upper right-hand graph, the small on

15   on the exhibit, the difference between the top curve and the

16   bottom curve represented facts-- was historical?

17   THE WITNESS:  For the first--

18   MR. SACHSE:  For the first block of three years, that

19   that was historical fact?

20   THE WITNESS:  Certainly.

21   THE COURT:  Now, wait.  Let's not misunderstand.

22   You say the chart in the upper right-hand corner is

23   only a projection of the years of drouth.  It takes into

24   account the third year, which is historical, and therefore the

25   curve thereafter is projected.

1      MR. SACHSE:  Yes, but my question is directed to the

2  first block.

3      Don't I understand from your Exhibit 62 that there has

4  been discharge or flow at the Fallbrook Gage throughout that

5  first three-year period?

6      THE WITNESS:  That is right.  But I said-- let's read

7  what it says under here.  Assuming zero flow, in other words,

8  if you subtracted the gage runoff at the Fallbrook Gage during

9  this three-year period, you would have got the first point

10  plot.

11      MR. SACHSE:  At 8,000?

12      THE WITNESS:  At 8,000.

13      THE COURT:  But with the flow that came through at

14  Fallbrook for the three years that preceded the maximum annual

15  pumpage it could have been 10,400, which is the point plotted

16  on the first graph.

17      MR. SACHSE:  That was the question I wanted to get

18  straight.

19      If there has been an offer made, I object on the

20  ground that there has been no proper foundation laid, and that

21  it is incompetent, irrelevant and immaterial and doesn't tend

22  to prove or disprove any issue in this case.

23      THE COURT:  It is for illustrative purposes only.  The

24  objection is overruled.  It will be received in evidence.

25      (Plaintiff's Exhibit No. 53 for Identification was

1    received in evidence as Plaintiff's Exhibit No. 53.)

2              MR. MOSKOVITZ:  Your Honor, I would like to have an

3    objection in the record even though you have ruled.

4              THE COURT:  All right, put it in.

5              MR. MOSKOVITZ:  On the same grounds.

6              MR. DENNIS:  I have no objection.

7              THE COURT:  What objection do you want in the record?

8              MR. MOSKOVITZ:  I want the objection that it is not

9    relevant.  I would like to explain it for a moment, if you

10   would like to give me the opportunity.

11             THE COURT:  All right.

12             MR. MOSKOVITZ:  Again, your Honor, it seems to me that

13   illustrative exhibits are only relevant if they show something

14   which is going to help in deciding the case.  Therefore, the

15   assumptions have to be in some way possible of application.

16   Here you have the assumption that a drouth which occurred during

17   a three-year period would continue at the same intensity beyond

18   that period.  There is nothing at all in the record that we

19   have in the case which indicates that this would ever happen.

20             Secondly, we have an assumption that there would be

21   zero flow at Fallbrook Gage-- somebody would cut it all off.

22   This is an assumption which has no basis on the facts that are

23   in evidence.  So what is the purpose of showing these things

24   and showing the result?  It is as if the Government were to

25   assume that the complete flow of the Santa Margarita River were

4111

1   diverted and taken to Los Angeles, or the complete flow of

2   the Columbia River, to the contrary, were diverted to the Santa

3   Margarita River.   You could make all kinds of studies, but

4   what good do they do?

5        THE COURT:  It's just sort of like argument, Mr.

6   Moskovitz.  It is a graphic argument.  In other words, if Mr.

7   Veeder got up and argued, "Your Honor, there is growing use

8   of water in the Temecula Basin.  Now, your Honor, suppose the

9   area grows up there and more farms are irrigated and more people

10  come in and the country develops.  What is going to happen?

11  Well, there are going to be situations," he could argue, "where

12  there wouldn't be any water flowing into the Santa Margarita

13  from the gap at the edge of the valley.  Then what have you

14  got down below?  Well, you have a basin down below.  And what

15  happens?"  They are just arguments.  They are illustrative

16  only.  I agree that it doesn't tend to prove or disprove

17  anything except  possibly that top figure of 10,400, which was

18  an average amount that could have been pumped, based on the

19  records for the three years succeeding without completely

20  exhausting the basin as estimated by this witness.  That is

21  the only item of proof it could have.  Otherwise, it is

22  illustrative, it is argument graphically to illustrate what

23  is going to be the contention of the Government.

24       MR. VEEDER:  I would just like to put into the record

25  one observation.  That Mr. Moskovitz stated that there was

1  nothing to show a continued drouth beyond the three-year period.

2  We of course put in the tree ring charts showing that at one

3  period there was a 43-year drouth.

4      THE COURT:  Well, that again is speculation.  None of

5  us can foresee the future.  But we know that this country has

6  been subject to wet spells and dry spells, and anybody who

7  could tell you what it was going to do next year could make

8  himself a barrel of money.  So again it is illustrative.  By

9  the same token you could draw a chart and show what would

10  happen a hundred years off, the mathetmatical possibility based

11  upon past experience of a hundred years off would be rather

12  small.

13      This case is being tried without a jury.  I think I

14  have indicated enough that this is only illustrative.  There

15  is nothing to get excited about.

16      MR. STAHLMAN:  There can't be too many more of these

17  charts.

18      THE COURT:  No.  On some of these things, you know, you

19  don't have to beat me over the head to get me to understand

20  what you are talking about.

21      MR. VEEDER:  I understand that perfectly, your Honor.

22      We will now, if permitted, refer to Plaintiff's Exhibit

23  marked for Identification as No. 54.

24      No. 53 has been offered and is in.

25      THE COURT:  Exhibit 53 was received in evidence as

Worts   Direct   4113

1   illustrative of a hypothetical situation plus whatever factual

2   merit there is in the three-year computation.

3       Now we are going into something a little more concrete--

4   chloride content of water.

5       MR. VEEDER:  Yes.

6       Q  Mr. Worts, would you read into the record the desig-

7   nation of the illustration which has been marked for identi-

8   fication as Plaintiff's Exhibit No. 54.

9       A  The title of Exhibit 54 is "Graph showing chloride

10  content of well waters in Ysidora Subbasin."

11      Q  Did you prepare that on the basis of information

12  concerning which you have knowledge?

13      A  Yes.

14      MR. SACHSE:  I object, your Honor please; that is im-

15  material.

16      THE COURT:  As a preliminary question it is satisfactory.

17  The objection is overruled.

18      Where is this preliminary data of which you had knowledge?

19      THE WITNESS:  It is not preliminary, your Honor.  It

20  is records of chemical analyses of samples taken from these

21  wells and analyzed both by the Navy and by the U. S. Geological

22  Survey.

23      THE COURT:  Where is this supporting data-- these

24  records?

25      MR. VEEDER:  We have the supporting data, and if it is

4114

1    called for we will produce it.

2        MR. MOSKOVITZ:  We would like to see it.

3        MR. SACHSE:  We would like to see it.

4        THE COURT:  Allright, put it in a file and it will be

5    marked 37A.  When will we get it in?

6        MR. VEEDER:  I will ask Col. Bowen to provided it as

7    rapidly as we can.

8        THE COURT:  Is it a well log situation?

9        MR. VEEDER:  No, these are analyses; we took the water

10   out and analyzed it.

11       THE COURT:  Proceed.

12   BY MR. VEEDER:

13       Q  Who prepared the illustration marked for identifica-

14   tion as Plaintiff's 54?

15       A  I prepared it.

16       Q  Is it accurate to your personal knowledge?

17       A  Yes, to the graph scale shown.

18       Q  Would you proceed to explain into the record the

19   illustration?

20       A  The graph illustrates, for certain wells in Ysidora

21   Subbasin-- this being Exhibit 54-- the increase in chloride

22   content resulting from the sea water, salt water intrusion,

23   which was discussed yesterday.

24       Q  State the period of which this chart is illustrative.

25       A  Exhibit 4 covers the period 1947 through 1957.  The

1    wells utilized are 11-5-1E1 -- referring to Exhibit 37 for the

2    locations of these wells-- which is on the east side of Ysidora

3    Subbasin, 11 South, 5 West, 10B-1.

4              THE COURT:  What was the first well?

5              THE WITNESS:  1E1, your Honor, which would be in

6    Section 1, 11 South, 5 West, right at the eastern side of

7    Ysidora Subbasin, 10B1 in Section 10 down at the lower end

8    of Ysidora Narrows (Township 11 South, 5 West), 2K1 in Section

9    2, south side of Ysidora Subbasin (Township 11 South, 5 West)

10   are the three wells on this graph that show a steady increase

11   in the chloride content.

12             You will notice on the graph 54 the chloride content

13   is plotted along the left margin in parts per million.  You

14   will notice near the bottom of the graph the 250 parts per

15   million line drawn horizontally across the graph.  That is

16   the upper limited recommended by the U. S. Public Health

17   Service and adopted as official by the U. S. Navy for the

18   upper limit for domestic use.

19             The graphs, starting with Well 1-E-1 previously

20   mentioned, the first sample appearing in 1953 had about 300

21   parts per million, has slowly but progressively increased to

22   over 400 parts per million as of the autumn of 1957.  10B1 in

23   Ysidora Narrows previously described and located shows an

24   increase from around 400 parts per million in 1951 to 900 parts

25   per million in 1957.

1      The longest record is on 2K1, a deep well 192 feet

2  deep in the southern edge of Ysidora Subbasin, previously

3  described and located on Exhibit 37.  It shows an increase from

4  250 parts per million to nearly 700 parts per million in 1957.

5      THE COURT:  What is the explanation for the drop in

6  1950-51, or rather in 1951?

7      THE WITNESS:  That could be relating to-- No, it could

8  not.  I don't know, your Honor.  I would have expected a

9  drop possibly in 1952 after the year of large recharge.  But

10  for the drop as shown there I do not have a good explanation.

11      THE COURT:  And the other wells shown at the bottom,

12  of course, are identified also on Exhibit 37 and are wells

13  which stayed generally with one exception, within the range

14  of normal upper limits.

15      THE WITNESS: Yes, your Honor.  I would like to point out

16  this one well that has acted unusually in this case, this

17  Well 11-5-2E1, at the upstream edge of Ysidora Narrows, shown

18  by this symbol E1 (Section 2, 11 South, 5 West) right at the

19  mouth of the Narrows, and has shown a feature that is related

20  to the line and information drawn right along the bottom of

21  the graph. Starting in late 1947, it shows that 2E1 is pumped,

22  and you will notice that while it was being pumped the heavy

23  solid line depicting the chloride content of Well 2E1 slowly

24  rose up to the 250 parts line, at which time pumping was dis-

25  continued and the chloride content of the water decreased to

Worts    Direct                                                    4117

1    less than 200 parts.  Then it was pumped for a brief period

2    in 1950-51 and the chloride rose rapidly to about March, 1951,

3    at which time it reached 300 parts per million, and again its

4    use was discontinued.  The chloride content decreased and

5    again it was pumped, with the same general effect in 1954 or

6    1955, and has not been pumped after about July, 1955.

7           THE COURT:  Is this chloride part of salt water--

8    sodium chloride?  Is this the chloride of sodium chloride?

9           THE WITNESS:  Yes, sir.

10          THE COURT:  It is not broken down into its component

11   elements, sodium and chloride?  Or is it?

12          THE WITNESS:  It is identifiable in chemical analysis.

13   They do identify the concentration of the sodium and the

14   chloride.  It is in an ionic state, that is, in solution,

15   and it is measured by titration and usual laboratory procedures,

16   and it is a measure of the choride concentration as an ion

17   in parts per million.

18          THE COURT:  In other words, the chemical combination

19   of sodium chloride, which is salt, breaks down when it gets

20   into solution and ceases to be sodium chloride?

21          THE WITNESS:  I would say this, your Honor, that if you

22   tasted the water from a well having more than four or five

23   hundred parts per million you would taste the salty taste to

24   the water as a result of thos ions being there.

25          THE COURT:  Adjourn until 1:30.

            (Noon recess.)

S1
B1

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, NOVEMBER 5, 1958.   2 P.M.

2

3         MR. VEEDER:  Would you take the stand for just a moment,

4    Mr. Worts.

5         Your Honor, we have some of the data respecting the

6    quality of water concerning which Mr. Worts has already tes-

7    tified on Plaintiff's Exhibit marked for identification 54.   I

8    would like to offer these as 54 and have them marked as 54A,

9    with the privilege of withdrawing them and adding some addi-

10   tional data  that Colonel Bowen is going to provide.

11        THE COURT:  That may be done.

12        MR. STAHLMAN:  May I ask:  Are these over a period of

13   time, Mr. Veeder?

14        MR. VEEDER:  They are not over an extended period.   I

15   will show you them in just a moment.

16        THE CLERK:  Are we going to mark each individual one?

17        THE COURT:  They don't need to be marked individually.

18   The data will be marked 54A.   Received in evidence.

19        MR. VEEDER:  Your Honor, I haven't made the offer on 54

20   yet.   I now make the offer on 54.

21        THE COURT:  54 also will  be received in evidence.

22        MR. VEEDER:  And with permission to withdraw these for

23   reproduction.

24        THE COURT:  Permission will be granted.

25        THE CLERK:  Mr. Veeder, excuse me, may I finish that?   I

1   thought you were just going to use it for a minute.

2     MR. VEEDER:  I thought you had marked it, Mr. Luddy.

3     THE COURT:  This will be a new exhibit?

4     MR. VEEDER:  This will be a new exhibit, your Honor; 55.

5     THE COURT:  Very well.

6       DIRECT EXAMINATION (Cont'd.)

7   BY MR. VEEDER:

8     Q  Mr. Worts, would you proceed then and explain the

9   balance of the data set forth on Plaintiff's Exhibit No. 54.

10     MR. MOSKOWVITZ:  Could you speak up, please.

11   BY MR. VEEDER:

12     Q  Mr. Worts, would you proceed with your explanation

13   of the data appearing on Plaintiff's Exhibit No. 54.

14     A  Exhibit 54A just placed in evidence, if I may see it

15   for just a moment, are a group of analyses detailed in char-

16   acter that show the chloride content specifically for the last

17   point indicated on Exhibit 54, plus some additional earlier

18   chemical analyses that have been made in the basin.

19     Q  Is there further explanation to be made as to 54?

20     A  No.

21     Q  Now, referring to Plaintiff's Exhibit marked 55 for

22   identification, I ask you to read into the record the designa-

23   tion on that illustration.

24     A  Exhibit 55 is entitled:  "Chemical character of

25   native and contaminated waters downstream from Chappo Subbasin,

1  Camp Pendleton."

2      Q  Would you refer to the diagram shown on the left and

3  explain the basis on which that was prepared.

4      A  This Exhibit 55 consists of three closely grouped

5  graphs, the largest one being the top one, which is rectilinear

6  in shape; along one side being plotted-- the upper left-hand

7  side is plotted "sulphate plus chloride."  The lower side,

8  lower right-hand side:  "carbonate plus bicarbonate."  The

9  upper--

10      THE COURT:  Carbonate plus magnesium?

11      THE WITNESS:  No, your Honor.  The lower right-hand

12  side of the large rectilinear diagram:  "carbonate plus bicar-

13  bonate."  In the upper right-hand margin:  "calcium plus mag-

14  nesium."  And in the lower left-hand side:  "sodium plus po-

15  tassium."  The purpose of constructing a graph like this is to

16  show the sources and quality of the water in a ground water

17  system in a form that can be intelligently used by hydrologists

18  in determining where certain waters are derived from, how they

19  change within  the ground water system.  And what we have

20  plotted here, it is a rather technical terminology, but the

21  parts per million, as shown on Exhibit 54A, are converted to

22  what are called equivalents per million.

23      Would you care  to  see this, your Honor; follow this

24  over on the lower right-hand side of the exhibit.  "Equivalents

25  per million," which is determined by dividing atomic weight by

the valence.

BY MR. VEEDER:

Q  By the what?

A  The valence, the radical, that is, the positive or negative character of the mineral or atom, and then multiplying that times the parts per million to arrive at the equivalents per million.  That expresses the combining characteristics of the element, and that is what has to be done chemically before a plot like this can be made.  And then on Exhibit 54A the percentage that each atom or element contains as part of a total sum, the principal cations involved are calcium, magnesium, sodium and potassium.  The equivalents per million are converted to percentage of their amounts in the solution and plotted on this graph.  For example, looking in this central, large rectilinear graph, the composition, for example, of 2-D-3 isolated off by itself in the upper part of the graph, is shown in this respect to the calcium-magnesium as being about 62% calcium plus magnesium, and about-- correction-- 72 or three per cent calcium plus magnesium, and about 27% sodium plus potassium.  Similarly, for the anion of sulphate, chloride, carbonate and bicarbonate, 2-D-3 is made up of 70% of sulphate plus chloride and 30% of carbonate plus bicarbonate.

Now, you will note within this rectilinear diagram three large letters:  "A, B, C."  Each one points to the type of water at its source.  Example, taking "A", and reading in the legend

1  at the right, that is the native ground water in the alluvium

2  as it comes down to Ysidora Subbasin. Quality shown as "B" is

3  ground water in the La Jolla formation, as obtained from the

4  U.S.G.S test Wells 23-Q-1, and 2-K-2; both drilled wholly in the

5  La Jolly formation.  23-Q-1 on Exhibit 37 is in Section 23, 10

6  South, 5 West.  2-K-2, the south end of Ysidora Subbasin, 11

7  South, 5 West, Section 2.  Finally, "C" the salt water and

8  ground water in the San Mateo formation together with a sample

9  identified specifically on the rectilinear plot as Pacific

10  Ocean.  We took a sample of Pacific Ocean water right off the

11  mouth of the Santa Margarita River and had it analyzed.

12      Q  Would you refer to the block on the upper right-hand

13  corner of the illustration, Mr. Worts, please.

14      A  The block on the upper right-hand corner of Exhibit

15  55 lists on the left-hand side the wells and other sources

16  shown on the graphs.  Under "chloride" is shown the chloride

17  concentration with a footnote:  "In November, 1957, and except

18  as indicated by the U.S.G.S." The total solids-- that would

19  be the total minerals in solution in the water--  are listed

20  in the next column for all these sources.  In the fourth col-

21  umn is the depth of the perforations of the wells, so you can

22  see what zones we are dealing with in these deposits and rocks.

23  And finally, over on the right is the formation tapped by the

24  wells.

25      Q  Did you prepare this exhibit yourself, Mr. Worts?

1    A  Yes, I did.

2    Q  Is it accurate to your personal knowledge?

3    A  Yes, it is.

4    MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

5  marked for identification 55.

6    MR. MOSKOWVITZ:  I would like to  ask one question.  54A

7  has been  admitted.  But where were those figures secured from?

8    THE WITNESS:  54A?

9    MR. MOSKOWVITZ:  54A.

10    THE WITNESS:  Those are U.S.G.S.--

11    MR. VEEDER:  Those are United States Geological Survey--

12    THE WITNESS:  -- chemical analyses; analyses of water

13  run in  our quality water branch laboratory at Sacramento.  And

14  all of the U.S.G.S analyses on this-- pardon me-- on Exhibit 55

15  are in that group under Exhibit 54A.

16    MR. VEEDER:  We renew the offer, your Honor.

17    THE COURT:  55 received in evidence.

18    I don't understand how with four qualities as shown in

19  that  top graph you can chart a well.  Do you follow me?

20  BY MR. VEEDER:

21    Q  Would you explain that, Mr. Worts.

22    THE COURT:  You take into account four different qualities,

23  chemical content, as shown by the four sides of that chart.

24  Right?

25    THE WITNESS:  Yes, sir.

1    THE COURT:  How can you take the information about a well

2  and be able to chart it, four different factors influencing it?

3    THE WITNESS:  All right, sir.  If I may have the analyses

4  there, I think I can explain it right on the Exhibit 55.  Just

5  as an  example, I will take the top exhibit, topmost sheet of

6  Exhibit 54A, which is Well 23-Q-1; and in the upper left-hand

7  blank area on 55 I will show the per cent reactive values,

8  which is the process that has been gone through from parts per

9  million--

10    THE COURT:  I understand that.

11    THE WITNESS:  You have a hundred per cent for the cations

12  over in the upper column, and a hundred per cent on the anions

13  in the other column.

14    THE COURT:  I understand that.

15    THE WITNESS:  Let's take this Well 2-D-3 on Exhibit--

16  pardon me; correction on that-- that will be 23-Q-1, which is

17  the top sheet here on Exhibit 54A.  That is plotted way over

18  here in the right-hand  edge.

19    THE COURT:  All right.

20    THE WITNESS:  All right.  Now, calcium plus magnesium.

21  Calcium is 7%--

22    THE COURT:  Where  are you talking about calcium plus

23  magnesium?  The top right-hand side?

24    THE WITNESS:  Yes, sir, right opposite the right-hand

25  corner out in this block marked "B" outlined in heavy--

1          THE COURT:  But I mean, the scale that you are taking.

2   What you are considering now is the scale Ca plus Mg?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  That runs upward on the right-hand side of

5   the chart?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  What figure did you have?

8          THE WITNESS:  Calcium-- I am writing down "Ca" for calcium

9   equals 7%; and I am writing down 2% for magnesium.

10  BY MR. VEEDER:

11         Q  Now, Mr. Worts, before you proceed further, you are

12  now  referring to Exhibit 55 in evidence.  And would you also

13  kindly put above your 'Ca 7%'  the well to which you are making

14  reference.

15         A  I am writing "Well 23-Q-1, Exhibit 54A."  **The sum**

16  those, your  Honor  are 9%.

17         Q  Could you follow--

18         A  If you read up on this scale in the direction towards

19  the upper left, that will  plot at nine.

20         THE COURT:  So it will be somewhere on that line.  We

21  don't know yet whereabouts on that line?

22         THE WITNESS:  That is correct, your Honor.  It is any-

23  where along this line; that trend from lower left to upper

24  right.

25         THE COURT:  All right.

1          THE WITNESS:  Then, to pin it down in its movement, we

2     will now move to sulphate plus chloride, which is listed on the

3     upper left-hand  side of the graph, and again, Well 23-Q-1,

4     Exhibit 54A-- I am writing underneath my previous description--

5     "Sulphate equals 9% and chloride equals 80%."  Add the two

6     together:  89%.  That plots at-- controls the position in this

7     direction.

8          THE COURT:  All right; I understand  that.  Now, you

9     haven't taken into account the $CO_3$ plus $HCO_3$, nor have you

10    taken into account sodium plus potassium.

11          THE WITNESS:  All right, sir.   Sodium plus **potassium for**

12    Well 23-Q-1 in Exhibit 54A is 91% and potassium equals zero plus

13    a fraction; 91% total.  Reading back on this scale-- you see,

14    the sum of the two have to add up to a hundred.  The sum of the

15    reading this way, plus reading this way, obviously has to add

16    up to a hundred; because it is in terms of per cent.

17    BY MR. VEEDER:

18          Q  When you say "reading this way" and "reading that

19    way," would you kindly state that into the record.

20          A  Yes.  Reading for calcium and magnesium, reading

21    toward the upper left is a certain figure which, when  added to

22    sodium plus potassium, reading from upper left to lower right

23    must equal a hundred.

24          THE COURT:  Well, I am still lost.  23-Q-1 seemed to me

25    to have been accurately spotted by the first two calculations

1   you made.

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Now, you make another calculation which, for

4   some reason, comes out right, 91.  The well is already in the

5   right place.

6          THE WITNESS:  Yes, sir.

7          THE COURT:  Why is that?

8          THE WITNESS:  That is what I am trying to say, is that

9   the sum of these two--

10   BY MR. VEEDER:

11          Q   "These two," now.

12          A   The sum of calcium plus magnesium and sodium plus

13   potassium equals 100.

14          THE COURT:  Why?

15          THE WITNESS:  Because it is in terms of a total percen-

16   tage for all four:  calcium, magnesium, sodium, potassium.

17          THE  COURT:  Oh, I see; four.

18          THE WITNESS:  It is a percentage reduced to 100%.

19          THE COURT:  Let me see it.  I see.  And then, the same

20   is true of the other items?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  I see.  All right.

23          THE WITNESS:  Returning to  the three types of water

24   involved here:  The native ground waters as "A"; the ground

25   water in the La Jolla as "B"; and the salt water and ground

1  water in the San Mateo formation, including sea water. We find

2  that the ocean water and water in Well 9-J-1-- which on Exhib-

3  it 37 is in Section 9 near about within a mile of the coast;

4  11 South, 5 West-- is very similar to the sample of sea water

5  taken offshore.  Moving then to the area delineated and labeled

6  "A" in the middle of the rectilinear diagram, we find a group

7  of  wells:  23-J-1, which is in Chappo Subbasin; 26-L-1, which

8  is on the boundary between Chappo and Ysidora Subbasin; 35-K-1,

9  the northernmost pumped well in Ysidora Subbasin; and 23-L-1,

10  another well in Chappo basin.  These are the native waters, the

11  quality of the native waters moving down through the alluvium

12  toward Ysidora Subbasin.

13       THE COURT:  Now, you conclude  that they are the native

14  waters because of  their resemblance in chemical content and

15  posture on the chart to the dot marked at the river where you

16  took a test of the river; is that right?

17       THE WITNESS:  That is right, your Honor.  I was just

18  going to mention the river sample  that was taken.  Plots

19  right-- the river being the principal source of recharge to

20  ground water; would have the largest influence on its quality,

21  and plots right near that group of native ground waters.  In

22  the intervening area between the big letters "A" and "C" on

23  the rectilinear chart, Exhibit 55, I have outlined in dashed

24  line connecting the two types of water labeled, and labeled it

25  "blended waters."

1        Let's examine the wells that fall within that blended

2   water area.  The wells that are in Ysidora Narrows, and shown

3   on Exhibit 37, include 2-N-4, 10-B-1.  Those are the only two

4   wells right in the narrows.  Well 2-E-1 right at more or less

5   the border between Ysidora Subbasin and Ysidora Narrows, coming

6   into Ysidora Subbasin proper is Well 2-K-1 along the south side

7   of the basin approximately a third of a mile east of the entrance

8   into Ysidora Narrows.  These wells are all in 11 South, 5 West.

9   Well 1-E-1, a windmill well, is in Section 1, 11 South, 5 West,

10  approximately eight-tenths of a mile east of the entrance to

11  Ysidora Narrows.  2-A-1 and 2-F-1-- let's take them one at a

12  time.  2-A-1, lying at the northeast, near the northeast corner

13  of Section 2, 11 South, 5 West, is very close to native waters

14  but shows a slight edging toward the blended area on  Exhibit 55.

15  Well 2-F-1, almost a quarter of a mile from the east of the

16  mouth of the Ysidora Narrows in Section 2, 11 South, 5 West;

17  showing up as nearly the same as native waters.  And 2-D-1, a

18  well up toward the north end of Section-- correction-- northeast,

19  near the northeast corner of Section 2, 11 South, 5 West; show-

20  ing signs of being in the area of blended waters.

21       THE COURT:  Now, isn't this a matter of judgment?  Take

22  your Wells 2-A-1 and 2-E-1 and 2-F-1, which are very close to

23  the dot indicating river water.  What  was to keep you from

24  putting those into brackets and call those in the category as

25  native ground water?

1    THE WITNESS:  All right, your Honor.  Well 2-E-1, E-1

2   is the example, also plotting  on  the  same spot with 2-A-1,

3   is the well previously referred to in Exhibit 54.  That has had

4   a history of chloride contamination as shown on--

5    THE COURT:  When it is pumped.

6    THE WITNESS:  When it is pumped.

7    THE COURT:  All right.

8    THE WITNESS:  It has had--

9    THE COURT:  That is 2-E-1?

10    THE WITNESS:  2-E-1, your Honor.

11    THE COURT:  What about 2-A-1?

12    THE WITNESS:  2-A-1; we really don't  know whether the

13   salt water has gotten around that far or not.  However, I

14   couldn't very well include 2-E-1 in that square, so I couldn't

15   include 2-A-1 in the same square with it.

16    THE COURT:  Well, 2-E-1, it would depend on what test

17   of its chemical compounds you were taking.  If you took a test

18   at a time of heavy pumping, as shown on your chart Exhibit 54,

19   you would get one answer.  If you took a test at a time when

20   you had ceased pumping, as, for instance, in the latter part of

21   1950, you would get a very low  reading of chloride content.

22   So what test would you use for 2-E-1?

23   BY MR. VEEDER:

24    Q  You are now viewing 54A?

25    A  I am referring to Exhibit 54A.  2-E-1 was sampled

MALCOLM E. LOVE, OFFICAL REPORTER

November 1, 1957. 2-A-1 is November 1, 1957, the same date. And the third well questioned was-- was there a third well questioned?

THE COURT: 2-F-1.

THE WITNESS: 2-F-1. 2-F-1 was sampled November 4. In other words, the samples are all within three days.

THE COURT: 1957.

THE WITNESS: All 1957.

THE COURT: In the latter part of 1957, on the chart in Exhibit 54, is that the highest 2-A-1 had ever gone?

THE WITNESS: Yes, sir. If you notice the record, it appears to be slowly but surely climbing all the way across Exhibit 54. In fact, all the wells as a group, if you take an average through there, the trend is-- except for the lower well here, 10-5-35K1 on Exhibit 54, which is staying at a pretty steady level of about a hundred sixty to eighty or seventy parts per million of chloride-- the others are showing more spread and some rising steadily since at least 1954.

BY MR. VEEDER:

Q  Would you describe the kind and type of test that you made there, Mr. Worts, in the period of the sampling.

A  These wells are visited and pumped for a sufficient period of time to insure that the brackish or any stagnant, so-called stagnant water, is pumped out of the wells; then, a sample is taken in a sterilized glass jar and sent to the

1   laboratory for analysis.

2         Q   And that is under whose supervison?  Is that analysis

3   made by the United States Geological Survey?

4         A   Yes, sir.  These that I have here, that is as Exhibit

5   54A, have been all made by the U. S. Geological Survey.

6         THE COURT:  How do you account for a well like 2-D-3

7   over to one side there?

8         THE WITNESS:  2-D-3 on Exhibit 55 plots off the beaten

9   path of the other samples by being an inch or so to the upper

10  left of the other wells.  The position of the well on Exhibit 37

11  is in the northwest-- the position of Well 2-D-3 is in Section

12  2, 11 South, 5 West, and near the northeast corner of that

13  section.  I have no good explanation for that except to offer

14  what we usually consider in our studies of this type.  It is

15  that a phenomenon known as base exchange may occur, whereby

16  the native waters-- possibly due to some local accumulation of

17  a certain type of deposit, say, a calcium-rich deposit with

18  the ions in the water, would be exchanged for calcium ions.

19  That is a common phenomenon observed in ground water studies.

20  Particularly where water is moving over long distances, base

21  exchange does occur.

22  BY MR. VEEDER:

23        Q   Now, is that your opinion, Mr. Worts, as to the

24  explanation?

25        A   That is my opinion.

1    THE COURT:  Well, now, tell us about  the other two

2    charts.

3    THE WITNESS:  One more word, your Honor, on this other

4    correction area labeled "B" with two            wells located

5    therein-- 2-K-2 and 23-Q-1, both in the La Jolla formation.

6    The quality of the water in the La Jolla formation is poor;

7    and, as I previously testified, the yield from wells in that

8    rock are extremely poor.

9    BY MR. VEEDER:

10    Q  Would you allude to those wells on 37, giving the

11    section, township and range.

12    A  23-Q-1 is in the south part of  the Chappo Subbasin

13    in Section 23, 10 South, 5 West.  And 2-K-2, at the south end

14    of the Ysidora Subbasin, is in Section 2, 11 South, 5 West.  If

15    there had been a source of water other than the salt waters in

16    Ysidora Narrows entering the basin and affecting any of these

17    wells inside the blended area on Exhibit 55-- and particularly,

18    with reference to Wells 2-K-1 and 1-E-1 on Exhibit 54-- causing

19    the high chloride, their qualities should blend  between "A"

20    and "B" rather than between "A" and "C".  But, as you can see,

21    there is no such indication whatsoever of that connection or

22    possible source of poor quality water.  The lower left and

23    lower right triangles on Exhibit 55 in large part bear out the

24    same conclusions drawn for the large rectilinear diagram just

25    discussed on Exhibit 55; the distinction not being very clear

1  as to the native waters in the cation triangle-- the triangle

2  that consists of calcium on the bottom leg, magnesium on the

3  left leg, and sodium plus potassium on the right leg.  The

4  anion group composed of chloride, sulphate, carbonate and

5  bicarbonate, do show fairly distinct features that parallel

6  the previous discussions.  I might point out that the recti-

7  linear diagram, where you are considering  the calcium plus

8  magnesium, sodium plus potassium, as opposed to the anions of

9  carbonate plus bicarbonate and sulphate plus chloride, is the

10  most complete way of showing the over-all relations of the

11  over-all  type of the water.  The other two lower triangles

12  may or may not show as much detail or in such definite manner

13  the quality as is shown by the rectilinear diagram.

14          THE COURT:  Was it purposely done? In the triangles at

15  the very left, Exhibit 35, there is no area marked "A".

16          THE WITNESS:  As I just mentioned, your Honor, and the

17  answer to your question is:  Right, there was no clear dis-

18  tinction in the cation triangles as to the native waters.  It

19  was not possible to break them out on the basis of their source

20  and blend, because so many of the-- if you will notice, this

21  diagram all ties together.  If I may use this.  I will take a

22  pencil.  And on Exhibit 55 you will observe that the wells in

23  the rectilinear diagram in the plot of "A" and those in the

24  blended area fall in a line that is parallel to the sulphate-

25  chloride base line.  When you project those  wells-- which you

1   do right down onto this triangle-- that whole group there will

2   fall somewhere along the same, will fall precisely on the same

3   **line**  if projected parallel to these lines down in the lower

4   triangles.  Therefore, on the cation triangle, the relative

5   percentages of  all of the native and blended waters are plot

6   all very close together.  However, when you bring them down

7   this way-- pardon me-- to the lower right triangle labeled

8   "anions," they have an opportunity to express themselves as

9   being spread out when you plot them parallel to the base lines.

10  And they can be so identified on the anion triangle.

11       THE COURT:  All right.  I understand what you are saying,

12  but whether I understand it or not, that is another thing.

13       MR. VEEDER:  Your Honor, we have had marked for iden-

14  tification Plaintiff's Exhibit 38A.  We have already introduced

15  38 which, in a word, is loaded.  And I thought that for the

16  part of the testimony at this point we would use 38A, which is

17  a blank copy of the colored 38.

18       Q  You have made reference to the sources of salt water

19  which have entered the basin underlying Camp Pendleton.  And I

20  ask you to trace, using a red pencil, the area in which, in

21  your opinion, the intrusion has transpired.

22       A  In order to do that, I would like  to refer back to

23  the wells that refresh our-- my memory, anyway, on the wells

24  that have shown they are  affected by this intrusion and are

25  shown in the blended water area on Exhibit 55; also shown as

containing high chloride on Exhibit 54 in Ysidora Subbasin;

and together with the poor qualities of water in the wells in

Ysidora Narrows in toward the coast in the lagoon area.  As

previously described-- it might be best first to refer to a

map for a moment.

Q  You are now referring to Plaintiff's Exhibit No. 40?

A  Yes.  As previously mentioned, on Exhibit 40, I will

check off a few of the wells here that are definitely affected

by the saline.

Q  Would you please circle them.

A  I am circling Well 11 E-1 in Section 1 in red pencil,

11 South.  These will all be in 11 South, 5 West.  2 K-1.  The

effect on E-1, N-4, B-1 in Section 10, J-1 in Section 9.  10-B-1

has the highest chloride of the group plotted nine.  One is

not plotted on here as of the time--

Q  "On here," when you say--

A  On Exhibit 40.

THE COURT:  9-J-1?

BY MR. VEEDER:

Q  You mean 54, don't you?

THE COURT:  9-J-1 is shown.

MR. VEEDER:  I think you mean 54.

THE WITNESS:  On 54, your Honor.

THE COURT:  Oh.

THE WITNESS:  The plot of the chloride for 9-J-1, which

is in Section 9 near the coast, is not on there. At that time the chloride was 12,200 parts. I will write "12,200 ppm chloride" on Exhibit 40 beneath that well.

MR. MOSKOWVITZ: Was that beneath Well 9-J-1?

THE WITNESS: Yes. That is about 300 feet deep.

There is some indication, as previously testified, that Well A-1 up here in the north part of Section 2, 11 South 5 West, might have some indication of salt water; but I am not going to include it. I will then draw an approximate line extending from the northeast portion of Section 1 across the subbasin--

THE COURT: Northeast of Section 1?

THE WITNESS: In the northeast.

THE COURT: Northwest?

THE WITNESS: That is right, your Honor; northwest part of Section 1. I draw it roughly westward across the basin to block out to the south the wells that have shown definite indication of chloride intrusion and wells to the north which are relatively unaffected. I believe 2-D-1 could conceivably fall in that-- correction-- it does not fall in that category. So the line would pass between E-1 and D-1 in Section 2, 11 South, 5 West, on the west side of Ysidora Subbasin.

THE COURT: Between E-1--

THE WITNESS: E-1 and D-1 on the west side of Ysidora Subbasin.

1    THE COURT: Where would it pass?

2    MR. SACHSE: Could you make it more specific, like

3  between D-2 and E-2?

4    THE WITNESS: No, I can't make it specific. I don't

5  know where it is. All I know is we have a high chloride or

6  chloride activity in E-1, and we don't have much in D-1; so it

7  has to be somewhere in between. Just draw it half way in

8  between or wherever-- let's draw it, if you wish, for purposes

9  of reference, along the south edge of D-2. Similarly, on the

10  east side, for purposes of reference, let it cross at about the

11  letters "A-4." That designates the well symbol there. That

12  is approximate. We know that E-1 has 430 parts per million,

13  and A-1 above on Exhibit 54 has less than 250. So it is in

14  between the two wells some place.

15    Now, alluding to Exhibit 38A, we can show the same feat-

16  ures, looking at the subsurface.

17    THE COURT: 38A?

18    MR. VEEDER: 38A.

19    THE COURT: 38A. Yes, all right.

20    THE WITNESS: I want to locate the inland front in its

21  approximate position as drawn by the dash line on Exhibit 40.

22  BY MR. VEEDER:

23    Q Will you draw a line through there with your red

24  pencil, Mr. Worts.

25    A I will as soon as I locate it myself. Well, on

1    Exhibit 38A I have indicated 2-E-1 has been affected and have

2    indicated that 2-D-1 has not.  So I will place a zig-zag front

3    indicating the position is approximate between Wells 2-E-1 and

4    2-D-1 in the lower part of the unit.  And I shall label that on

5    Exhibit 8 approximate.

6         MR. VEEDER:  38A.

7         THE WITNESS:  What did I say?

8         MR. VEEDER:  You said, "eight," sir.

9         THE WITNESS:  38A.  Approximate position of the salt

10   water front.  Purely diagrammatic.  The indications on Exhibit

11   54 are that  the chloride in these wells in the basin, such as

12   E-1 and K-1, are increasing, so there is a possibility that

13   the movement is still inland.

14   BY MR. VEEDER:

15        Q  You have designated that by what symbol?

16        A  I have designated the fronts by the, possible con-

17   tinued intrusion, by arrows pointing inland into the lower and

18   pump member of the alluvium.

19        Now, the next question is:  Where is the upper part?  How

20   much of this vertical section is chloride?  I don't  know ex-

21   cept that at least it is high enough to affect Well 2-E-1,

22   which is shown at this position.

23        Q  When you say "this position"?

24        A  Shown Well 2-E-1 on Exhibit 38A in the lower part

25   above the consolidated rock symbol.

1      Q  Would you state into the record the level below, the

2  level to which the well had been sunk.

3      A  The well is a hundred and, about 145 feet.  But the

4  saline must be getting into above the consolidated rock there.

5  So I show the top of it, for diagrammatic purposes, as being

6  a minus one hundred feet below sea level.  And then, we can

7  dash a line on out here.  These wells all have high chloride.

8  And I will have to question this, because I don't know exactly

9  what its upper limit is.

10      Q  You are questioning the dotted line?

11      A  I am questioning the position of it.  It has to be

12  there some place.  And underneath I will color it in all red

13  indicating saline water.

14      Q  And when you say "saline," you mean salt water?

15      A  Salt water; moving inland into the  basin.

16      Returning to Exhibit 40; It might be well to color the

17  part that has the saline intrusion in Ysidora Subbasin red so

18  that it can be distinguished from the part to the north that

19  does not have any saline intrusion.  This could be extended--

20      Q  Would you extend it down towards the ocean.

21      A  I will extend diagrammatically, because the limits

22  of the younger alluvium are not shown on this map.  "By this

23  map," I am referring to Exhibit  40.  I will just make it very

24  generalized.  I indicated in red the area on Exhibit 40 under-

25  lain by the saline intrusion.  The precise limits of the lateral

1   extent, as I have shown only diagrammatically here, could be

2   drawn more accurately if we had the content as shown on Exhibit

3   37 which depicts the limit of the alluvium.

4        Q  Have you ascertained the depth to which the saline--

5   has saline, in your opinion, reached the lowest portion of the

6   basin?

7        A  Because salt water is heavier, has a greater density

8   than fresh water, it always invades a ground water basin from

9   the area of poor quality along the bottom. That is, being

10   heavier, it would slide in along the bottom.  The manner in

11   which it moves in in alluvial deposits would have-- that are

12   composed of  lenses of gravel and then sand and other types of

13   material having different permeabilities, largely control the

14   manner in which it will move in.  If you had an island out in

15   the Pacific that was composed of uniform sand, having essen-

16   tially one permeability, and you poured lots of water on it--

17   there are formulas that can be worked out or that are available

18   to show exactly where the contacts between the fresh water and

19   the salt water would be.  However, the situation is distorted

20   from that ideal condition when you have these lenses.  Here is

21   a big, thick section-- on, for example, Well 2-M-1-- of gravel

22   in the lower 50 feet, on Exhibit 38A.  And look over next to it,

23   and you find that it is changed to or logged as something dif-

24   ferent in Well 2-C-1, which extends down to the bottom of the

25   basin on Exhibit 38A. So that what the geologist looks for,

start
B5

1    gologist and hydrologist, in general, along the basal portion

2    of the younger alluvium is a section of very coarse material,

3    coarser  than, I would say, in the lower 50 feet of the lower

4    member in this reach that we are discussing on Exhibit 38A; a

5    pretty consistent coarse gravel, and some sand; and that above

6    that, between  there and the contacts between the upper and

7    lower members, you will see more heterogenous type of materials.

8    Obviously, these coarse grain deposits are supplying most of

9    the water to the pump, to the well when it is pumped.  There-

10   fore, the greatest amount of movement is occurring through

11   those deposits, and the movement of water inland, therefore,

12   will  not follow what is commonly known as the Ghyben-Herzberg

13   principal, which is the one you can apply on the sand island,

14   but you cannot apply under these conditions.

15        THE COURT:  Spell that.  Ghyben what?

16        THE WITNESS:  That is G-h-y-b-e-n hyphen H-e-r-z-b-e-r-g;

17   approximately that, your Honor.

18   BY MR. VEEDER:

19        Q  Is that a partnership?

20        A  I am not sure whether it is a partnership, but I

21   think the reason it is--

22        Q  I meant, is it two men?

23        A  It is two men.  And I believe each developed the

24   theory independently and approximately simultaneously working

25   in two different areas.  So I think they collectively call it

1  the Ghyben-Herzberg theory or principle on coastal or island

2  areas.

3       Q  From the standpoint of the hydrolic gradients or the

4  contours that you showed on Plaintiff's Exhibit 45, would you

5  indicate by arrows the course of those contours on Plaintiff's

6  Exhibit No. 38A.

7       A  Well, I can't show contours on the cross-section, but

8  we have the water level profile.

9       Q  You can show the course.  It is seaward now at the

10 present time, is it not?  The surface contours?  Is that not

11 correct?  Is not the water moving out?

12      A  Water at present is moving seaward, in 1957, through

13 the upper part or through the narrows despite the fact this

14 saline water is in and continues to move into the basin.

15      Q  Would you, with arrows, show the hydrolic gradient

16 through that area over-- using your red pencil.

17      A  Well, the hydrolic gradient is indicated by the water

18 level profile.  In November, 1951, I will show by--

19      Q  1957, Mr. Worts.

20      A  1957 does not extend through here.  But in March, 1952,

21 which was immediately following a very wet year in which the

22 basin was nearly recharged, the gradient was towards the coast,

23 very mild gradient in the coastal direction shown by a red arrow

24 on Exhibit 38A under 2-K-1.

25      Now, understand that these water level profiles are

1    non-pumping profiles, and they don't have nearly as pronounced

2    an effect on the movement of water, particularly in this pump

3    lower zone as do those pumping levels when a pump is turned on,

4    such as-- not shown on this exhibit, not shown on Exhibit 38A;

5    but on Exhibit 37, Well 35-K-1, 10 South, 5 West.  That well

6    is only 4,000 feet from the approximate salt water front as

7    drawn.  But when a  well such as that starts up, draws the

8    water level down, you creat a strong gradient from all direc-

9    tions toward that well.  And, of course, that would induce,

10    particularly in this deep zone, the movement of the poor

11    quality water inland, which probably accounts for  this con-

12    tinued increase in the chloride content as shown on Exhibit 54.

13         MR. DENNIS:  Could we have the number of that  well

14    again, the one you just referred to?

15         THE COURT:  35-K-1.

16         MR. DENNIS:  Was it 11-5 or 10-5?

17         THE WITNESS:  Ten.  Ten South, Five West, 35-K-1, as an

18    irrigation well.

19    BY MR. VEEDER:

20         Q  Now, can you show by an illustration on Plaintiff's

21    Exhibit 38A  the effect of the pumping in Chappo basin at the

22    present time as that pumping relates to the waters in Ysidora

23    Subbasin?  Can you draw a line showing a depression there and

24    the effects of pumping there as related to the water barrier

25    that is between Chappo  basin and the Pacific Ocean?

S28
B5

1      A  All right.  First, it might be desirable to block

2  out what we have defined in Chappo Subbasin as the usable stor-

3  age.  As I mentioned, it is 15,000 acre feet down to an average

4  depth of sea level.

5      Q  Would you draw that on there showing it on Plaintiff's

6  Exhibit No. 38A the area to which reference is made in Chappo

7  basin?

8      A  At the lower end on Exhibit 38A there is a vertical--

9      MR. STAHLMAN:  I don't quite get this.  Is this an

10  opinion that he has, or is this based upon--

11     MR. VEEDER:  An opinion?

12     MR. STAHLMAN:  Yes.

13     MR. VEEDER:  The evidence is in, your Honor.  It went

14  in yesterday in regard to the present  pumping in 1957 and 1958;

15  showing that as distinguished from pumping in the early 1947.

16  We have now  moved the principal draft on the basin to the

17  subbasin, which is Chappo basin.  And I am now asking him to

18  show a diagram on there-- I can't pronounce the word; I have

19  it on the end of my tongue-- showing that there is now a fresh

20  water barrier  between the Ysidora basin and the Chappo Sub-

21  basin from which pumping is now being principally--

22     THE COURT:  Answer his question.  It's a matter of

23  opinion?  It is his opinion?

24     MR. STAHLMAN:  That isright.

25     MR. VEEDER:  Yes.

1          THE WITNESS:  Yes, there is a fresh water barrier in the

2    form of an hydrolic gradient from the-- well, first of all, I

3    was going to establish on here where the-- this vertical line

4    on Exhibit 38A directly up  in the air from Well 26-L-1 is

5    marked the division line between Ysidora Subbasin and Chappo

6    Subbasin.

7    BY MR. VEEDER:

8          Q  Could I ask you to extend that with a blue pencil so

9    that there will be a clear showing of the boundaries of the

10   Chappo basin both downstream and upstream.

11         A  All right.  I am drawing a vertical line down through

12   Well 26-L-1 on Exhibit 38A.  And I will draw a similar line

13   above  the words "Basilone Road Ford" where a tick-mark is

14   indicated between Chappo Subbasin and Upper Subbasin to  indi-

15   cate the extent of the--

16         Q  Now, may I ask you to draw the line so that it will

17   show the depth.

18         THE COURT:  He wants to show the basin first.

19   BY MR. VEEDER:

20         Q  You delineated the--

21         A  I delineated the lateral extent or the downstream

22   extent of the basin on Exhibit 38A by the two blue lines.

23         Q  Now, would you show graphically the effect of the

24   depression that has been created by thepumping out of Chappo

25   basin.

start
B6

1          A  The only--

2          MR. STAHLMAN:  It is on there, isn't it?

3          THE WITNESS:  The profile is there for October, 1957,

4    which shows the lowest levels of record.  What I was alluding

5    to before was the depth to which we had estimated the storage

6    capacity, usable storage capacity there, which I was just going

7    to block out and show where sea level was, for the benefit of

8    everyone-- would be to follow right along the sea level line

9    in Chappo Subbasin.  And I had testified yesterday that the

10   storage, the ground water in storage in that segment, when the

11   thing was full, was about 15,000 acre feet.

12         Q  What has been the effect of the change of the pump-

13   ing from Ysidora basin down to the Chappo basin?

14         A  The effect of the change in the pumping regimen,

15   when in 1951, there was a heavy pumping draft pulling water

16   levels down below sea level and aggravating this intrusion.

17   Since then the levels have recovered with the realignment or

18   redistribution of pumpage into Chappo Subbasin, with the result

19   that in October, 1957, the levels in Chappo Subbasin reached

20   their record low.  Down in Ysidora Subbasin, as shown on Ex-

21   hibit 45, which as the water level contour map now shows-- the

22   water level contour map for 1957, shows that there is now a

23   smooth gradient, although relatively flat, through Ysidora

24   basin; still a flat gradient through the basin to the sea,

25   which is a favorable  situation.  And as a result, if that can be

1    maintained and, further, if the pumpage can be stopped by the

2    replacement wells that we have been asked to locate in Chappo

3    basin, the situation will be further improved; and then, pump-

4    ing in Chappo Subbasin between Chappo Subbasin and Ysidora

5    Narrows and the area of intrusion, there will be maintained a

6    more favorable, you might call it, fresh water barrier to pre-

7    vent this water from continuing to move on in.

8         Q  When you say "this water" you are pointing to--

9         A  This saline water from moving on farther upstream

10   and thereby endangering the supply in Chappo Subbasin.  You see,

11   by word of explanation here, although your water, it is pumped

12   from these wells in Chappo Subbasin, actually comes out of

13   these coarse materials at depths where the perforations--

14        Q  When you say "these coarse materials"--

15        A  These sands and gravels on Exhibit 38, shown diagram-

16   matically.  It is down in this zone where the pumping takes

17   place.

18        THE COURT:  The sub, the lower site?

19        THE WITNESS:  In the lower member.

20        THE COURT:  Lower member.

21        THE WITNESS:  Right.

22        With no recharge from the stream, and we are  going to

23   depend wholly on what water is stored in these deposits, the

24   only way that water can-- that is, the water has to come from

25   a supply-- then in the basin, and it will come by draining down

1    as these deeper deposits are pumped.  It will also move in

2    laterally from whatever sources.  It will obtain water from

3    the easiest source, and the ultimate effect will be a decline

4    of water levels throughout the basin.  Therefore, with the per-

5    forations in the lower member in Chappo  Subbasin, this threat

6    is there, any time that a favorable seaward hydrolic gradient

7    is not there and at any time when there is not sufficient re-

8    charge to help maintain that condition.

9         THE COURT:  Well, we have gone an hour and ten minutes,

10   and we are going to quit a little early tonight, so we will

11   take a break.

12        (Recess taken.)

13        (Off the record discussion.)

14   BY MR. VEEDER:

15        Q  Mr. Worts, would you compare or contrast vertical

16   and lateral permeability as it has applicability to Plaintiff's

17   Exhibit No. 38A?

18        A  The alluvial deposits, specifically the alluvium on

19   Exhibit 38A, being stream-laid, are laid down in more or less a

20   horizontal plain slightly inclined toward the coast.  As a

21   result, the gravel beds, the coarser units, such as the lower

22   member and, particularly, the basal coarse gravel that shows up

23   quite well in the wells along in the lower part of the alluvium,

24   have a high lateral permeability compared to the ability for

25   water to move, as you might say, across the grain or to move

downward.  However, this is a relative matter.  The magnitude

of the difference, I do not know.  In other words, though, the

water can move laterally much more readily than it can verti-

cally.  However, the difference with respect to recharging the

basin, the hydrographs show that the vertical permeability is

good and ample to transmit recharge down to the pump zones.

But, nevertheless, this lower gravel, which is probably the

most permeable unit, in the younger alluvium along the bottom,

is the one in which sea water intrusion has occurred.  There-

fore, wells being pumped inland from that front will cause a

much more active response to movement from all directions

toward the pumped well.  In other words, this water can move

in laterally--

Q   "This water."

A   The salt water can move in laterally much more

readily than water can drain down.  Now, that much is a matter

of degree, but it still exists and is  and would happen.

Q   Now, I refer to Plaintiff's Exhibit marked No. 56

for identification and ask you to read into the record the

designation of  that illustration.

A   Exhibit 56 is entitled:   "Comparison of chemical

character of well water and sewage effluents, Camp Pendleton,

1955-58."

Q   And of what is that reflective, Mr. Worts?

A   This Exhibit 56 compares the selected constituents

or ions in solution in the native waters with those of the

chemical quality of the sewage effluent returned to the basin.

Q  Who undertook the investigation and the chemical

analysis which is depicted on Plaintiff's Exhibit No. 56 for

identification?

A  All of the analyses of sewage effluent are by the

U. S. Navy.  And the well waters, which the legend beneath the

symbol for well water, it says, "Average of all analyses from

supply wells 10-4-5D1," which is in Upper Subbasin and shown

on Exhibit 37.  7-R-1, the well  in-- correction-- Upper Sub-

basin near the lower part of that subbasin.  The next well,

18-E-1 and 18-M-1 and 23-J-1, all in Chappo basin and plotted

on Exhibit 37, all upstream from the area of contamination from

sea water intrusion which was previously discussed, and, there-

fore, represents closely the native waters in the alluvium.

The source of those analyses-- may I examine Exhibit 44-- 54A,

the chemical analyses?

Q  54A.

A  Some may be in this group.  To save time, it might be

best not for me to look for them at this moment, but to supply

any that  we have that were used in this--

Q  Now-- go ahead.

A  I would like to refer--

Q  Did you prepare this exhibit yourself, Mr. Worts?

A  Yes.

Q  And is it prepared to  scale?

A  It is prepared to the graph scale.

Q  Now, would you go ahead and explain the relationships that are shown on that graph from the standpoint of the waters that are drawn and the chemicals that are set forth on the illustration?

A  I would like first to refer to Exhibit 48 which shows the relation quantitatively of the pumpage for camp use and the amount of sewage effluent being returned to the basins.  As previously testified by myself, the amount of sewage effluent returned is on the order, in the last three years, as indicated by the date span for the analyses on Exhibit 56, somewhere in the order of 2,000 acre feet; or more than 40% of the camp pumpage is being returned to  the basin.  The question immediately arises as  to what this means in terms of the chemical -- not the bacterial but the chemical-- quality of the water to keep **recycling** the water pumped from the basin.  You pump it. It runs through the camp use, treatment  plants, back to the basin in less than 50% but more than 40% of the amount pumped. That  **recycling** process has been going on since 1944, starting on a very small scale in that year.  But with the operation of the present sewage system, as shown by the years 1953 to 1957, on Exhibit 48, has been running over 40%.  This is a serious problem, in my opinion, to keep running this water back in the ground, **recycling** it.  So before any noticeable effect takes

1    place-- this    plot here represents--

2         Q  Which plot is that?

3         A  On Exhibit 56; the drafts for the well waters, which

4    are the left-hand of the paired bars show  the native waters

5    that so far to date-- that is, as of the early part of 1958--

6    apparently don't show any effect from this returned sewage

7    effluent.  But nevertheless, a comparison of the quality is

8    warranted.  For example, in the left-hand part of Exhibit 56

9    we have the chloride shown.  The water  pumped contains an

10   average, from the wells indicated beneath, of approximately,

11   let's say, a hundred thirty parts per million of chloride.

12   The average for the sewage effluent from the several sewage

13   effluent plants that discharge into the basin is running two

14   hundred and, roughly, ten parts, or there is an increase, as

15   indicated under the word "chloride" of 60% pick-up in chloride

16   in theprocess of running through the camp, and toilets, sewage

17   works, and back to  the basin.  Similarly, the dissolved solids,

18   which are the total minerals and chemicals in solution, average

19   about 725 parts for the pumped wells.  The sewage effluent is

20   over 850, indicated above is what the U. S. public-- the

21   U.S.P.H. stands for United States Public Health Service-- says

22   should not exceed 500 parts per million, may use up to 1,000

23   parts  per million for domestic use.  The range here is below

24   what, slightly below  the thousand, which is the recommendation

25   from the Public Health Service  as the maximum limit.

1    Returning for a moment to the chloride on the lower left.

2    It is 210, and the Public Health states 250 is a recommended

3    upper limit.  Over on the right-hand graph where we change

4    scale in concentration in parts per million, boron is critical

5    for agriculture; fluoride is critical for human consumption.

6    The U. S. Department of Agriculture states boron should not

7    exceed zero point three three to one point two  five parts per

8    million for sensitive crops, such as evergreen plants, like

9    oranges or citrus.  I notice that that pumped from wells is

10   about point one six, approximately, parts per million.  And as

11   shown under "boron" there is a hundred twenty per cent increase

12   in the boron content being returned, which puts it slightly

13   above the lowest limits recommended or stipulated by the U. S.

14   Department of Agriculture.  Fluoride, which, if taken in excess

15   amounts, can cause fluorosis and disease of the bones and

16   mottling of the teeth  and, particularly, in children.  The

17   U. S. Public Health mandatory upper limit of one point five

18   parts per million.  Native waters running around four-tenths

19   part.  Quality being returned as effluent running around 0.65

20   parts for a 60% increase.  In my opinion, the continued return

21   of this poor quality of water, which will, of course, be blended

22   with  native recharge, but still will cause an over-all increase,

23   and pumping from the basin back into the system can only cause

24   the whole scale  to continue to rise.  Very critical in the

25   amount of, very critical to the dilution or to the rate at which

1    this poor quality of water may build  up within the basin is

2    the amount of dilution it will receive by recharge coming down

3    the river and going underground to help dilute this poor quality

4    of water being recirculated in the system.

5        MR. VEEDER:  Your Honor, I wish now to offer in evidence

6    Plaintiff's Exhibit marked 38A.

7        MR. MOSKOVITZ:  I would like to object to that.  First

8    of all, I would like to ask some questions on voir dire.

9        MR. VEEDER:  38A?

10       MR. MOSKOVITZ:  Pardon me.

11       THE COURT:  38A was the illustration.

12       MR. MOSKOVITZ:  No, I mean 56.

13       THE COURT:  38A will be received in evidence. Proceed.

14       Now, what are you offering, 56?

15       MR. VEEDER:  I was going to offer 56, but I understand

16   that our friend from Sacramento had some voir dire.  Is that

17   right?  I will make the offer.

18       MR. MOSKOVITZ:  Yes.

19       MR. VEEDER:  I will make the offer, so he can ask his

20   questions.

21                VOIR DIRE EXAMINATION

22   BY MR. MOSKOVITZ:

23       Q  Mr. Worts, it is stated that the well water, Exhibit

24   56, that the well water coming from average analyses is from

25   supply wells 10-4-5D1, 7-R-1, 18-E-1, 18-M-1, and 10-5-23J1;

1    is that correct?

2            A   Yes.

3            Q   Are those analyses in any exhibits which have thus

4    far been put in evidence?

5            MR. VEEDER:   The same situation, your Honor, as we have

6    explained before.  We will put in all this basic data and have

7    it available after, well, certainly the next two or three wit-

8    nesses, have all this background, all the basic data in by that

9    time, your Honor, and as I understand it, this exhibit is in

10   no different category than the others from the standpoint of

11   the need for foundation material.

12           THE COURT:   All right.  Anything further, Mr. Moscovitz?

13           MR. MOSCOVITZ:   Well, on the basis that this is the

14   pattern we are taking, I will make no objection.

15           THE COURT:   You can have it in before you are required

16   to cross examination on this particular subject.

17           MR. VEEDER:   We offer 56, your Honor.

18           THE COURT:   56 received in evidence.

19           MR. STAHLMAN:   Just one minute.  In his testimony (in-

20   audible) basis would be and that is medical conclusions as to

21   effects of the water.

22           THE COURT:   What is that?

23           MR. STAHLMAN:   He made some medical conclusions as to

24   the effects of the water.

25           THE COURT:   He stated the statements as to findings and

start
B8

1  recommendations of the Public Health Service, U. S. Public

2  Health Service.  I don't suppose there is any dispute about it.

3  If there is any, why--

4        MR. VEEDER:  I understand the State of California has

5  adopted all the theories advanced here.

6        THE COURT:  All right.  Proceed.  Proceed.

7        MR. VEEDER:  You may cross examine.

8        MR. DENNIS:  I wonder, since we only have about fifteen

9  minutes, if it  wouldn't possibly save considerable time if we

10  start our cross examination in the morning.

11        THE COURT:  Well, it would.  Of course, this cross

12  examination, it will have to be done in segments now, because

13  you don't have the basic material here on some of these matters.

14  There is plenty to cross examine about.

15        MR. VEEDER:  I was going to say if anyone is hung up,

16  he can just start right in on 37, unless they want to  agree

17  there will be no cross examination on that.

18        MR. DENNIS:  I think we intend to start on 37 and go

19  right on down the list, Mr. Veeder.

20        MR. VEEDER:  Well, why don't you, then?

21        MR. DENNIS:  I think maybe we can cut itdown consider-

22  ably if  we leave it this evening until tomorrow morning.

23        MR. SACHSE:  I concur with Mr. Dennis, your  Honor.  I

24  will start it if you want, but I will be sort of doing it by

25  ear,  and I would rather be ready.

1          THE COURT:  Of course, you have got your earlier tran-

2    scripts already.

3          MR. SACHSE:  We haven't got them worked over.  We got

4    them this morning and haven't had time to really do it.  This

5    is only a two-day--  we received this transcript this morning,

6    so I barely started on it.

7          THE COURT:  Is that yesterday's?

8          MR. SACHSE:  Yesterday's, yes, your Honor.

9          THE COURT:  Yes.

10          MR. DENNIS:  I will be ready to  start in the morning,

11    and that will give Mr. Sachse time to read his transcript.

12          THE COURT:  I think you save time if you don't force

13    somebody to just ask questions to take up time.

14          MR. VEEDER:  Well, I have no argument with counsel as

15    to how they want to proceed.  Certainly, with the amount of

16    the geology that has gone in, I thought there would at least

17    be one or two questions.

18          THE COURT:  There will be questions.  Don't worry about

19    that.

20          Well, you want to start at 9:30 tomorrow?

21          MR. SACHSE:  That is fine, your Honor.

22          THE COURT:  So I can let you off early today.

23          MR. VEEDER:  Nine-thirty?

24          THE COURT:  Nine-thirty tomorrow.

25          What is the matter, Mr. Veeder?

1    MR. STAHLMAN:  Are we going to do this every day, nine-

2    thirty?

3    THE COURT:  No.  If you want to start at ten, it is

4    agreeable.

5    MR. VEEDER:  I have no sweat, your Honor.  Nine-thirty

6    is all right with me.

7    MR. DENNIS:  Nine-thirty is all right with me.

8    THE COURT:  At ten?

9    MR. STAHLMAN:  Surely, at ten.

10    THE COURT:  All right, ten o'clock tomorrow morning.

11    (Adjournment at 3:15 P.M. until Thursday, November 6,

12    1958, at 10:00 A.M.)