# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

               Defendants.

No.   1247-SD-C

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      ~~October~~ November 6, 1958

Pages:  4160 to 4297

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____
              DEPUTY

**J O H N   S W A D E R**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1      IN THE UNITED STATES DISTRICT COURT

2      SOUTHERN DISTRICT OF CALIFORNIA

3      SOUTHERN DIVISION

4      * * * * * *

5      HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6      * * * * * *

7

8   UNITED STATES OF AMERICA,        )
                                     )
9              Plaintiff,            )
                                     )
10       vs.                         )        No. 1247-SD-C.
                                     )
11   FALLBROOK PUBLIC UTILITY        )
     DISTRICT, et al.,               )
12                                   )
               Defendants.           )
13

14

15      REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17      San Diego, California

        Thursday, November 6, 1958
18

19   APPEARANCES:

20        For the Plaintiff:           WILLIAM H. VEEDER, ESQ.,
                                       Special Assistant to the
21                                     Attorney-General,
                                       Department of Justice,
22                                     Washington, D. C.

23        For U. S. Marine Corps.:     COL. ELLIOT ROBERTSON
                                       LT. COL. A. C. BOWEN
24

25

461

APPEARANCES (continued):

For Defendant Vail
Company:                          GEORGE E. STAHLMAN, ESQ.

For Defendant State of
California:                       EDMUND G. BROWN, ESQ.,
                                  Attorney-General, by
                                  ADOLPHUS MOSKOVITZ, ESQ.,
                                  Deputy Attorney-General, and
                                  CARL BORONKAY, ESQ.

For Defendant Santa
Margarita Mutual
Water Company:                    W. B. DENNIS, ESQ.

For Defendants Fallbrook
Public Utility District,
et al:                           F. R. SACHSE, ESQ.

<u>**INDEX TO WITNESSES**</u>

<u>For the Plaintiff:</u>                    <u>Direct</u>    <u>Cross</u>

    G. F. Worts, Jr.

        (By Mr. Dennis)                              4179

<u>**E X H I B I T S**</u>

|                        |  For   |    In    |
|------------------------|--------|----------|
| Plaintiff's Exhibit    | <u>Iden.</u> | <u>Evidence</u> |
| 118                    |        | 4180     |

MORNING RECESS          4204

NOON RECESS             4224

AFTERNOON RECESS        4265

SAN DIEGO, CALIFORNIA, THURSDAY, NOVEMBER 6, 1958.  10 A.M.


THE CLERK:  1247-SD-C, United States versus Fallbrook, for further court trial.

THE COURT:  All right.  Proceed.

MR. DENNIS:  If your Honor please, I believe Mr. Veeder has brought in the remaining well logs on Camp Pendleton.  It seems to me they ought to be made a part of Exhibit 38A-- isn't it, Mr. Veeder? -- at this time.

MR. VEEDER:  Well, it will be 38B, if that is what you desire.

MR. DENNIS:  I mean the other well logs; you want to make this separate, the numbers?

MR. VEEDER:  Oh, yes.  Yes.

THE COURT:  Was it 38A?

MR. VEEDER:  38A.

MR. DENNIS:  The other was 38A; the well logs for upstream in Camp Pendleton.

MR. VEEDER:  38A was a cross-section.

THE COURT:  Cross-section.  I know 38 was a cross-section. But what was 38A?

MR. VEEDER:  38A was another cross-section.

MR. DENNIS:  Do you have the well logs here?

MR. VEEDER:  Bill, I am not sure you are talking about the same thing.  That is the problem.

1    MR. DENNIS:   16A, your Honor, were the other well logs.

2    MR. MOSKOVITZ:   Your Honor, I think it will be confusing

3    to have the well logs for the lower area.

4    THE COURT:   Yes, we will give them another number.

5    MR. VEEDER:   Why not make it 37A, which is the--

6    THE COURT:   Watershed within the--

7    MR. VEEDER:   That is right.

8    THE COURT:   Is that agreeable?

9    MR. DENNIS:   Agreeable.

10   THE COURT:   All right.   37A, the well logs in the lower

11   part of the Santa Margarita.

12   MR. MOSKOVITZ:   Mr. Veeder, do these include the logs

13   of all the wells that are spotted on 37?

14   MR. VEEDER:   (addressing Mr. Worts)  Does that include--

15   MR. WORTS:   It includes all of the available logs, all

16   we could collect and find, or ones we drilled.

17   MR. MOSKOVITZ:   In other words, all the logs that you

18   have are for wells which are spotted on 37?

19   MR. WORTS:   That is right.   Not all the wells on the map

20   have logs.

21   THE COURT:   It will be marked 37A.   Received in evidence.

22   MR. MOSKOVITZ:   Your Honor, before we proceed with the

23   examination, I thought we might mention for the record the

24   matter I talked to  you about a couple of days ago as to the

25   State putting on its evidence in geology.

THE COURT:  Yes.  Now, when would the Government conclude its evidence on geology?

MR. VEEDER:  It depends entirely, your Honor, on cross examination.  We have additional testimony from Mr. Kunkel which you asked that we obtain in regard to the projected contour lines in the older alluvium.

THE COURT:  And the map?

MR. VEEDER:  That is right.  And that map is virtually completed.  And I believe that we would prefer when the cross examination of Mr. Worts and the redirect is through, we would call Mr. Kunkel and wind up our phases of the geology to that point.

THE COURT:  Well, I think you should also call these witnesses that you said you had to put in the supporting data.

MR. VEEDER:  Well, oh, in regard to the-- that will run it a long ways through if--

THE COURT:  Why would it take long to put in this supporting data?  It doesn't seem to me that--

MR. VEEDER:  All right.  We can just offer those exhibits, and we will get that in.  And I don't believe--

THE COURT:  That is the basis on which many of these charts were drawn.

MR. VEEDER:  Yes.  I had a different plan of offering those exhibits, but I can go ahead that way and get it in and get it through.  Then, would the State be ready to go ahead?

MR. MOSCOVITZ:  Well, the information I gave to the Court the other day was that we would not be ready until December. Our people just aren't available.  So that might permit you to go ahead as you planned on the foundation material.

MR. VEEDER:  We would depart a long  way from  geology once we start in with this other data.  That is the point.

THE COURT:  Even if we departed for a week or so from geology, we could still pick up about the first of December with  the State's case on geology.

MR. MOSCOVITZ:  Now, your Honor, in putting in our geology, we want to get the Bulletin 57 in, because our geology, our maps, and the charts which are needed to go along with the testimony are in that bulletin.  And we would want to qualify that first, so that could be referred to in the geological testimony.

THE COURT:  Mr. Veeder has indicated he is going to have an objection, but certainly we can start somewhere.

MR. VEEDER:  I will say we will.   I mean, we will start to begin with, because if anyone has the notion that they are going to get 57 in without--

MR. STAHLMAN:  Bill, be careful.  You have got to say "you know what."

MR. VEEDER:  If anybody thinks "you know what" is going in without a certain amount of difficulty, they are wrong. And my own view is that the only way you can get it in is first call

1    the witnesses and then offer it.

2            THE COURT:  I think Mr. Moscovitz has that in mind.

3            MR. VEEDER:  If he does, why, there will be fewer prob-

4    lems, I mean, so early.

5            THE COURT:  Can we count, then, on the State's planning

6    to-- what is the-- let me get a calendar.  What is the date

7    nearest to December 1st?  December 2nd is a Tuesday.  Will you

8    be prepared to start, then, about December 2nd?

start
A2

9            MR. MOSCOVITZ:  I will say yes now testatively, your

10   Honor.  If things occur that makes that not feasible, I will

11   let you know.  But here is the problem  that arises:  If Mr.

12   Veeder is going to require that we prove everything in Bulletin

13   57 before we get it admitted and thereby have it useful, then

14   we are going to be putting in our whole case before the Govern-

15   ment does.  And I don't think that is what we should be ex-

16   pected to do.

17           MR. VEEDER:  Well, the point that I make is that before

18   the phases of that get in relating to geology, certainly they

19   will call their witnesses first and put it in.  Isn't that

20   right?  As I understand it, there are phases of the bulletin

21   relating to geology.  Now, that is all that I thought was going

22   in.

23           THE COURT:  Now, the State does not propose to offer

24   the entire bulletin.

25           MR. VEEDER:  That is right.

THE COURT:  The State has listed certain parts of  the bulletin 57 which they propose to offer.  You have noted what they have proposed, have you?

MR. VEEDER:  Yes.

THE COURT:  Then, I suppose they will call the witness who assembled this matter, and he will tell us what he has done. Probably call  some witnesses who have prepared some charts, and they will tell us what they have done.  And without pre-judging this, I think it is largely the same as your presenta-tion; it is largely a matter of cross examination; largely a matter of weight.

MR. VEEDER:  There is one difference.

THE COURT:  Foundation is laid as to the bulletin.

MR. VEEDER:  There are several differences in our view. The recitations in the bulletin of conclusions are the primary things to which we have objection. If there are facts, why, we have said right along that a proven fact-- but when we--

THE COURT:  Now, I have been thinking about that.  And it seems to me we could save a lot of time in that respect. An expert, of course, testifies to two things, at least he thinks.  He testifies to the facts.  He testifies as to  opin-ion.  It seems to me that we could save a lot of time by some understanding that if the bulletin went in and contained con-clusionary matters, that that would be in substance the wit-ness's testimony on direct, and he therefore is subject to

cross examination. That has this advantage: I don't see how anyone can be hurt by that, because you know beforehand what his testimony is going to be. You are in a better position than the man who calls a live witness to make a record and give his conclusions. You know what his testimony is going to be to the extent that-- any of these things involve conclusions. He is subject to cross examination. In other words, a stipulation that any conclusions that appear in there, or, in fact, the whole written part of the bulletin, is his testimony in chief. You are then prepared to cross examine. This is done very often in the seminars on pre-trial procedures. It is spoken of as canned testimony where, instead of having some witness give question-and-answer statements, give question-and-answer testimony, the written statement is prepared. And it is by stipulation agreed to be his testimony in chief, and you, thereafter, on cross examination do what you want with it.

I tried a case where they had engineering reports the government had prepared, voluminous, and they were going to have somebody testify to all these things. Finally, we got this agreement that we could just use the folders, the reports, as the man's testimony in chief, had him there as an expert witness for cross. Then, a very strange thing happened. There was very little cross. Picked out things that were objected to, and there was detailed cross examination on that. And in other matters there was no particular cross and went in without

any problem.  Have you thought about that kind of procedure?

MR. VEEDER:  Yes.  Yes, your Honor.  I want to say I thought about it.  Certainly obvious that that is what we well might be confronted with, so we have made our review.  I can give an example, though:  The Exhibit 10B, to which your Honor has made reference.

MR. MOSCOVITZ:  Plate 10B?

MR. VEEDER:  Plate 10B.  Every phase and facet of that exhibit is predicated upon conclusions;  so--

THE COURT:  Well, do you have any thought as to-- you don't have exhibits in the records that are predicated upon conclusions and opinions?

MR. VEEDER:  Oh, but ours are very good, your Honor.

THE COURT:  It is all a matter of degree and credibility. In other words, let's take your witnesses who are testifying to storage basins and subbasins.  No one has ever been able to look down and look at this whole area.  What do they do?  Based upon their  training in the field of engineering, the studies they have made, the particular factual matters, which is a well log or a water level, an outcropping, what facts you have got to tie to, then a man gives you an opinion.  That is the  best it can be.  That is the best it can be on either side, an opinion of what he thinks lies underneat there.  Now, he may be a mile off, all or part.  That is exactly what we are going to get from both sides.  Now, you have full opportunity to cross examine.  And,

S12
A3

start
A3

1      of course, to the extent that you show that the-- you make

2      attacks on the witness, either on his qualifications or the

3      studies that he has made, the experience he has had, or the

4      correctness of some of the factual landmarks that he tries to

5      tie into; you may or may not show his opinion as ill-founded.

6      But I don't know how you can keep experts from testifying.

7          MR. VEEDER:  There is only one thing that occurs to me:

8      It is that, if I understand what Mr. Moscovitz said, they would

9      ask that Bulletin 57 or that phase of it, Chapter 2 and the

10     plates, be entered in evidence; then, they put their man on

11     the stand.

12         THE COURT:  Not exactly that way.  I think he can call

13     a witness and tell us how this was prepared, describe it, and

14     show what is in here.  Now, I have looked the thing through,

15     not in detail; but various things are in there.  For instance,

16     all this well log data is set up in detail.  And there probably

17     isn't much dispute about that.   It is a matter that has been

18     gathered, the best that could be gathered to be used.  Then,

19     there has been some plates made of various problems-- rainfall,

20     runoff, and so forth.  And, in addition to these things, which

21     might be called factual matters, then there is opinion.  Now,

22     I think we would save a lot of time if you would think about

23     this.  Let Mr. Moskovitz call a witness or two to tell us how

24     this was put together, to charge whoever it is so we will know

25     who was responsible for the opinions and conclusions, both the

       preliminary ones upon which ultimate opinions were based, and

1   ultimate opinions.  And then have an understanding that-- we

2   might have to demark a little more carefully than I am stating

3   now-- but this, in substance, was the testimony on direct. Then,

4   let you proceed to cross examine those persons who were desig-

5   nated as being responsible for certain of these opinions.  We

6   save a lot of time.

7       MR. VEEDER:  My thought is how they would handle it would

8       be as we have, that they would put in the exhibits, and

9   the man who prepared it would testify.  Is that what you pro-

10  pose?

11      MR. MOSCOVITZ:  We would have a man who is in charge of

12  the--

13      MR. VEEDER:  Mr. Bookman, in other words?

14      MR. MOSCOVITZ:  It would not be Max Bookman.

15      THE COURT:  Well, who is he?  Let's have it.

16      MR. MOSCOVITZ:  Mr. Illingworth was in charge of the

17  investigation under the general direction of the head of the

18  Southern California office, who is Max Bookman.  Mr. Bookman

19  was not in immediate charge of the investigation.

20      THE COURT:  Mr. Illingworth was detailed the responsi-

21  bility under Mr. Bookman's over-all supervision in preparing

22  the report?

23      MR. MOSCOVITZ:  That is correct.

24      MR. VEEDER:  He would be the witness, then?

25      MR. MOSCOVITZ:  He would be the witness to qualify who

1    prepared the bulletin.

2         THE COURT:  Then, did Mr. Illingworth have other engi-

3    neers who prepared some of the drawings for him?

4         MR. MOSCOVITZ:  A large staff of people very specially

5    worked under his direction.  The chief geologist for the

6    Department of Water Resources was responsible for the geologi-

7    cal material and the geological conclusions.  He will be called

8    as a witness on that phase.

9         THE COURT:  He would be available as a witness?

10        MR. MOSCOVITZ:  He would be available as a witness.

11        THE COURT:  Who else-- let's forget about draftsmen who

12   did drawings.  Who else was involved who would have responsi-

13   bility for some of the opinions and conclusions.

14        MR. MOSCOVITZ:  Between those two people, your Honor,

15   the bulletin would be covered.

16        THE COURT:  Those two.

17        Mr. Bookman's participation was merely that of an exec-

18   utive, over-all supervision?

19        MR. MOSCOVITZ:  That is right, and we have no intention

20   of calling him ourself.

21        MR. VEEDER:  Well, sufficient is the day of evil there.

22   When they start in, why, we can make our objection.

23        THE COURT:  Yes, but I am asking you now to consider

24   something  apart from that.  Here is a long case.  Assume these

25   two witnesses are called, and then some general foundation is

1  laid.  Couldn't we then have a stipulation that if these wit-

2  nesses were interrogated in detail, they would testify, without

3  conceding they are right or wrong,  they would testify to the

4  same conclusions, those two dividing the responsibility up,

5  that appear in the report?  I haven't any idea, and I don't

6  think you have that one of these men who is responsible for  ,

7  the conclusions here is going to get on the witness stand in

8  direct and give any other view than what he has stated in  that

9  bulletin.  Do you have any?  He might on cross.

10      MR. VEEDER:  Yes.

11      THE COURT:  He might on cross, but on direct, if we

12  took the time to hear him, wouldn't we get just the same thing

13  we have in the bulletin?

14      MR. VEEDER:  I will outline my--

15      THE COURT:  I don't think I am asking you to concede

16  anything.  When a witness testifies, you don't concede he is

17  right, and you have the advantage of having his testimony in

18  written form, and you know instead of rough-and-tumble of

19  direct examination, you have got it written down.  You know

20  what he is going to testify to.  I think there should be a

21  segregation.  I think the foundation material should tell us

22  which conclusionary parts Mr. Illingworth is responsible for,

23  which-- what is the other man's name?

24      MR. MOSCOVITZ:  Mr. James; Lawrence James.

25      THE COURT:  -- Mr. Lawrence James is responsible for.

1    So that in organizing your cross, you know who you want to

2    question.

3         MR. VEEDER:  Fine.  Could I have Mr. Moscovitz, prelim-

4    inary to this phase of it, submit the exhibits, a list of the

5    exhibits, to which he is going to refer and to the pages con-

6    cerning which-- request that we proceed as your Honor has out-

7    lined.

8         THE COURT:  Well, he is already to a certain extent.

9         MR. VEEDER:  He said Chapter 2, but that is more than

10   geology.

11        THE COURT:  Chapter 1, pages 22 and 23; Chapter 2 is

12   entirely; plates 1 to 20?

13        MR. VEEDER:  That is right.

14        THE COURT:  And then on the exhibits in the appendices:

15   B on geology; D on precipitation; E on stream and spring dis-

16   charge; F on water well data; and H on mineral analysis.  Now,

17   that is what he is going to offer.  Now, we could ask Mr.

18   Moscovitz to segregate and tell us which of these two witnesses

19   are going to take the responsibility for certain--

20        MR. VEEDER:  Particular plates.

21        MR. MOSCOVITZ:  Your Honor, we may want to present some

22   more of the factual material we have here.  I think perhaps it

23   would be helpful to have more than what has already been out-

24   lined because there is other data we have gathered that will be

25   valuable.  We will designate them.

1    THE COURT:  You wouldn't be limited in the matter.   I

2    am trying to work out some procedure to save some time on this

3    bulletin.

4    MR. MOSCOVITZ:  Yes.

5    THE COURT:  Will you undertake to go through the two

6    volumes of the bulletin, Fallbrook's AA and your number 12 for

7    identification, outline briefly what parts of these matters

8    are the responsibility of James and what parts are the respon-

9    sibility of Illingworth?

10    MR. MOSCOVITZ:  All right.

11    THE COURT:  And if there is any third or fourth man that

12    would be the person to answer a question about some of the

13    plates or the exhibits, have his name and have him available

14    to us.  Give this to Mr. Veeder.  Let him have a look at it.

15    MR. MOSCOVITZ:  Very well.

16    MR. VEEDER:  Fine.  Thank you.  When can I have that?

17    MR. MOSCOVITZ:  I think we had better talk about it

18    later.  I can't give you a date right now.

19    MR. STAHLMAN:  I think your Honor covered generally in

20    your last remarks all I had in my mind and I can foresee.  How-

21    ever, I believe there will be some situations where, having

22    some knowledge as to  how  this was prepared, that there may be

23    some other individuals who have direct knowledge as to some of

24    the matters covered in the bulletin on which we would want to

25    cross examine.  May it be understood they would be available if

1    that situation occurs?

2        MR. MOSCOVITZ:  Yes, we will make available anybody who

3    had anything to do with this who is still with the State.

4        THE COURT:  Then, get that information together and talk

5    to Mr. Stahlman to see the particular things that he is in-

6    terested in so that you can--

7        MR. MOSCOVITZ:  I will furnish a copy of this summary

8    to each of  the counsel present.

9        THE COURT:  Let me inquire while we are at it:  On

10   these appendices, is there any particular attack going to be

11   made on "D, Precipitation Figures"?

12       MR. VEEDER:  Without more review-- but I don't know of

13   any that would be made.  I would want to check.

14       THE COURT:  Or "E, Stream and Spring Discharge"?

15       MR. VEEDER:  I think there would be disagreement on that.

16       THE COURT:  Water well data?

17       MR. VEEDER:  Well, I believe--

18       THE COURT:  I am not asking you to stipulate, but are

19   you willing to stand still on that?

20       MR. VEEDER:  I think the well log data, those are simply

21   references?

22       THE COURT:  That is right.

23       MR. VEEDER:  By and large.

24       THE COURT:  Well, these are all references.  Mineral

25   analyses?

MR. VEEDER:  We would have disagreement on that.  That goes into the geology.

THE COURT:  Then the plates?  Well, we won't take time now.  Will you, at your earliest convenience, Mr. Moscovitz, work out something on this and give it to Mr. Veeder?

MR. MOSCOVITZ:  Yes, I should have something this week. Maybe we will want to take some time over the weekend to do it. Next week.

THE COURT:  The weekend would be a good time to do it. It seems to me about the next Tuesday or Wednesday you ought to have this ready for Mr.  Veeder.

MR. MOSCOVITZ:  When we return next Wednesday, we ought to have it.

THE COURT:  You said "return Wednesday"?

MR. VEEDER:  Yes.

MR. MOSCOVITZ:  Tuesday is a holiday, your Honor.

THE COURT:  That is right.

B-1

Z-1

1     MR. SACHSE:  I think we are going to be amazed, your

2  Honor, at the agreement rather than the disagreement, when this

3  finally comes in.

4     THE COURT:  Things have been going pretty smoothly, Mr.

5  Sachse, so far.

6     MR. VEEDER:  Rehabilitation program is really working.

7     THE COURT:  Mr. Veeder, you will be prepared to go

8  forward and complete the data material by your witnesses?

9     MR. VEEDER:  That is right.

10    THE COURT:  And possibly go forward with another week

11  or so, taking up to December 2nd.  Mr. Moskovitz will start

12  December 2nd.

13    MR. VEEDER: We will schedule it that way, your Honor.

14    THE COURT:  All right.

15    MR. VEEDER:  Mr. Worts, please.

16

17              G. F. WORTS, JR.,

18  recalled as a witness in behalf of the plaintiff, having been

19  previously sworn, testified further as follows:

20

21    MR. VEEDER:  That is the Public Health Bulletin, Mr.

22  Worts, that you have?

23    THE WITNESS:  Yes, this is the Public Health Service

24  Drinking Water Standards, 1946, the Federal Security Agency's

25  Public Health Service Bulletin on drinking water standards.

B1

Z2

1    MR. VEEDER:  We have that, if your Honor desires it as an

2  exhibit.

3    THE COURT:  Make it an exhibit.  Does the Government have

4  any number series laid out after 96?

5    MR. VEEDER:  I think 118.

6    THE CLERK:  118 will be the next number, your Honor.

7    THE COURT:  118.

8    THE CLERK:  I will have a list for you later on of the

9  ones that were lodged yesterday.

10    THE COURT:  Some additional exhibits were lodged yesterday?

11    THE CLERK:  Yes.

12    THE COURT:  You have copies of those for counsel?

13    MR. VEEDER:  Yes, they have been lodged.

14    THE COURT:  Exhibit 118 will be received in evidence, the

15  Public Health Bulletin.

16

17                    CROSS-EXAMINATION

18  BY MR. DENNIS:

19    Q  Mr. Worts, did I understand your testimony correctly

20  that at the time and for some time past all ground water studies

21  made in Southern California have been made under your direction

22  and supervision?

23    A  Since about 1950 or 1951-52, right along in there.

24    THE COURT:  All ground water studies of the U. S.

25  Geological Survey.

B1

Z3

1    MR. DENNIS:  U. S. Geological Survey.

2        Q  And so all the studies that Mr. Kunkel made in the

3    Santa Margarita River Valley were made under your direction and

4    supervision from 1952 on?

5        A  Until when?

6        Q  From 1952 to the present time?

7        A  Yes.

8        Q  And I think that you testified that Exhibit 39 was

9    made under your direction and supervision?

10       A  Yes.

11       Q  Did I understand you to testify that this particular

12   exhibit had been approved by the U. S. Geological Survey?

13       A  It has.

14       Q  What does approval of a map or chart such as Exhibit

15   39 by the U. S. Geological Survey involve?  Do they do anything

16   other than just look at the map and O.K. it?  Or do you have to

17   send to Washington the supporting data upon which it is based?

18       A  In this particular instance the map was reviewed in

19   its entirety by myself.  The data upon which the isopachs are

20   drawn are contained on the map.  Anyone desiring to interpolate

21   or place those isopach lines on the map, or in examining the

22   position in which I have O.K.'d their location, can do so with

23   the information that is contained on the map.  Therefore, after

24   I had given it what we call District Office approval in

25   Sacramento, the exhibit then goes to my Branch Chief's office

B1

Z4

1  in Washington, where it is directed to our Section Texts, where

2  it is given a review for technical and editorial quality.  If

3  the map contains any geologic names or units it is sent to a

4  special unit of the Geological Survey, where there is a committee

5  that reviews all geologic names, ages, related terminology.  It

6  then goes up to the Director of U. S. Geological Survey for

7  approval by the Bureau.  When that approval has been secured,

8  the map is then ready for public release or for whatever re-

9  lease-- not necessarily public release, but for whatever release

10  is authorized.  Frequently these maps and charts come back for

11  correction or additional work, indicating that the review

12  section may not be wholly pleased with what our interpretation

13  has shown.  We then go through the whole process again of

14  working the map or graph over and sending it in until it meets

15  the standards of the U. S. Geological Survey.

16      Q  As I understand it, then, the approval of the maps

17  in Washington either by the Bureau or by your immediate superior

18  did not involve the inspection or examination of the well logs

19  or any other data upon which the map was based?

20      A  Except a certain amount of basic interpretation by

21  the geologists in the field and engineers in the field.  Other-

22  wise, we would have to send back for every map and graph, let

23  us say, for example, the twenty-odd exhibits that constituted

24  my testimony, a truck load of basic material.  They just do

25  not have the time to go through it all, re-analyze the whole

4183

B1

Z5

1  thing.   They assume that by the time a man has worked with the

2  organization eighteen years he is in a position to use sound

3  judgment.

4      Q  Let me ask you this.   In approving Exhibit 39 in

5  Washington did they have anything before them other than the

6  map itself?

7      A  Just what you see there.

8      Q  And no other information?

9      A  No.

10      Q  And if I asked you the same question relative to

11  any of the other documents or exhibits which have been intro-

12  duced in evidence and to which it has been testified that they

13  have been approved by the U. S. Geological Survey, your

14  testimony would be the same?

15      A  20 exhibits-- I was trying to recall whether any

16  of them-- some were returned.

17      Q  I particularly call your attention to Exhibits 37, 38,

18  44 and 45, Exhibit 38 and Exhibit 40, which is the ground water

19  basins.

20      A  They had no other data for those graphs.

21      Q  And in connection with the approval of the maps which

22  were prepared by Mr. Kunkel and which have been introduced in

23  evidence, at the time you approved them did you have any data

24  before you other than the map itself?

25      A  Yes, I went over these with Mr. Kunkel with the

B1

Z6

1 data at hand to find out to my satisfaction that the work was

2 accurate within the limits of the data and the scale of the

3 map.

4 Q And in connection with the examination of those maps

5 you did inspect the well logs and other information upon which

6 that particular map was based?

7 A Yes, I did.

8 Q Now, directing your attention to Exhibit 39, does

9 that exhibit indicate the location and depth of all wells

10 within the Camp Pendleton, lying within the Santa Margarita

11 watershed, for which you had any well logs or other data?

12 A To the best of my knowledge, that is correct. I

13 think there are some 80 or 85 wells involved, possibly in this

14 compilation.

15 Q Well, do you show on Exhibit 39 any well for which

16 you do not have a log?

17 A I believe there is one that I can think of.

18 Q Do you recall which well that would be?

19 A Yes. Let me get down here. Could I look at the

20 logs (stepping down). 37A, I think it is, and I wish to check

21 11-5-1E1 (checking documents), for which there is not a log in

22 my record. That is located on the east side of Ysidora Sub-

23 basin.

24 Q I wonder if you could designate the location of that

25 well with a blue pencil so that it will show better, and circle

Watts - Cross

it.

A   On Exhibit 39?

Q   Yes, if you would circle it and place your initials after it.

THE COURT:   What was the number of that one?

THE WITNESS:   1E1.   It appears that the depth of that well is shown there as 30 feet deeper than I recall.   I can check my notes, but I believe the measured depth of that well is about 140 feet.   It looks like a typographical error, as 170-plus.

Q   Would you check your notes, then, and if there is any correction to be made, would you make the correction on the map?

A   Yes, I will.

MR. MOSKOVITZ:   There is a parenthesis that I think you are overlooking.

THE WITNESS:   Is there?

MR. MOSKOVITZ:   Look at it more closely.

THE WITNESS:   I will have to check that.   I see that I was looking at that parenthesis and calling it a 1.

BY MR. DENNIS:

Q   Just so that we can follow some of these things more closely, Exhibits 37, 39, 44 and 45, which were the two well level water contours, and 40, are all drawn to the same scale that U. S. Geological Survey used in connection with the preparation of the topographic maps, are they not?

B

Z8

1    A   Yes, they are.

2    Q   1 to 24,000?

3    A   Yes.

4    Q   And is the location of the watershed of the Santa

5    Margarita River correctly shown on Exhibit 39?

6    MR. VEEDER:  Objected to as being beyond the scope of

7    the direct examination.

8    MR. DENNIS:  The map is in evidence.  He has testified

9    that that is the line of the watershed.  I think we are entitled

10   to know whether it is correct or not.

11   MR. VEEDER:  As far as we are concerned, we have offered

12   no evidence on that.  That is just a general location.  It has

13   nothing whatever to do with Mr. Worts's testimony.

14   THE COURT:  Well, let's have it for the record.

15   Did you accept the watershed line as prepared by someone

16   else?

17   THE WITNESS:  Yes, I did, your Honor.  It is a base map.

18   I accept it.

19   THE COURT:  Go ahead.

20   Who is responsible for the base map, Mr. Veeder?

21   MR. VEEDER:  Col. Bowen's office.  But we are going to

22   put in evidence in regard to the precise watershed line.

23   THE COURT:  All right.

24   BY MR. DENNIS:

25   Q   Are there any other facts located or depicted on

1 Exhibit 39 that were not prepared by you but prepared by

2 somebody else and accepted by you?

3      A   The entire isopach-- Are you speaking of Exhibit 39?

4      Q   Yes.

5      A   The entire isopach map was prepared under my direc-

6 tion by Mr Walker.  However, when he submitted it in draft

7 form for my review I went over it and revised it to my satis-

8 faction and interpretation of the position of the contours.

9      Q   Then I take it that Mr. Walker, who is the young

10 marine who testified here some days ago, actually prepared the

11 Isopach map and you inspected it and made some changes and

12 alterations?

13      A   I made considerable changes and alterations and

14 followed every line to my satisfaction.

15      Q   And in connection with making those changes, what

16 information did you have that led you to believe that Lt.

17 Walker's work should be revised?

18      A   Just the data that is plotted on that map, plus my

19 own experience in working in other ground water basins.

20      Q   By the data which is plotted on this map you refer

21 to the various information given as to the location and depths

22 of the various wells which are shown on the map?

23      A   Yes.

24      Q   Did you also take into consideration the well logs?

25      A   To the extent of the contact between the base of the

B

Z10

1  alluvium and the underlying rocks.  That is the depth, I

2  believe, shown in parentheses in the legend.  Where there is a

3  plus after the number it indicates that the well did not reach

4  bedrock but had terminated in the alluvium.

5     Q  Did you take into consideration the altitude at which

6  the shaft intercepted the surface?

7     A  Definitely.  The land surface?

8     Q  Yes, the land surface.

9     A  Down to the-- for example, the bedrock is the figure

10  given in parentheses, unless followed by a plus.

11     Q  No, I am talking about the altitude of the surface

12  above sea level.

13     A  No, altitude has nothing to do with isopach map.

14     Q  You didn't take that into consideration?

15     A  You can't.

16     Q  Did you have the opportunity of examining the logs of

17  any of the wells which are shown on Exhibit 39 at the time

B2   18  they were drilled?

19     A  Yes, we drilled 10 or 12 test wells that are shown

20  on that exhibit.  We were at the camp during the construction

21  of several of the camp supply wells, and I personally had

22  opportunity to examine the logs of the supply wells from time

23  to time.  But mostly-- I will put it this way:  We had two

24  well rigs drilling at the same time on the test wells on Camp

25  Pendleton, of which only 10 are in this basin of the Santa

B

Z11

1    Margarita River, and I was there at all times-- not at both

2    rigs, obviously at all times, but I was at the one rig or

3    another or making arrangements for supplies and other equipment.

4         Q  Did Mr. Maynard drill those wells?

5         A  Mr. Maynard had the prime contract.

6         Q  By prime contract you mean he was the party that

7    was responsible to the Government?

8         A  Yes.

9         Q  When did you make a physical inspection of that

10   portion of Camp Pendleton that lies in the Santa Margarita

11   River watershed?

12        A  I came down from Sacramento in August, 1950, to make

13   an inspection of the watershed on Camp Pendleton and to contact

14   the Public Works Officer at Camp Pendleton, with whom we would

15   be working.

16        Q  And from that time until the fall of 1952, say the

17   first of October, how many trips did you make to the area?

18        A  Well, during most of 1951 I lived at the camp.

19        Q  And 1952?

20   MR. VEEDER:  That is only one trip.

21   MR. DENNIS:  Let the witness testify.

22   THE WITNESS:  I did go home on weekends.  I was down

23   there anywhere from once a week to once a month and sometimes

24   for weeks, that is, a week or several weeks at a time.  It all

25   depended on what phase of the work was going on.

B2

Z12

Q  Did that continue through 1953?

A  Yes, it continued into 1953.  I was in charge of the Long Beach office through September or October, 1955, and I was at Camp Pendleton frequently during that period.

Q  How about after 1955?

A  After 1955 I was in Sacramento, and in 1956 I may not have been there more than once or twice on my trip south to the Long Beach office.  In 1957 when work began to start on this trial I made frequent trips to Camp Pendleton and had an opportunity completely to refamiliarize myself with any of the new activities that had gone on with respect to the field of ground water.

Q  Does Exhibit 39 show any wells which were drilled after October, 1952?

A  Yes.

Q  I wonder if you could circle those in red.

THE COURT:  For my information, what is the significance of that date?

MR. DENNIS:  The witness prepared certain other maps and exhibits which were used in the first trial and that were introduced in evidence at that time, your Honor.

THE WITNESS:  In Upper Subbasin, 10-4-7A2.

Q  Would you consider that a deep or a shallow well?

A  Deep in the sense of the Santa Margarita River Valley, or deep in the sense of all wells in the United States?

4191

B2

Z13

1    Q  In the sense that you have made various references

2    to deep and shallow wells in your testimony.

3    A  In this basin?

4    Q  Yes, in this basin.

5    A  I would say that it is a deep well for upper subbasin.

6    7H2, 7R2, three new supply wells drilled in the last

7    two years.

8    MR. VEEDER:  7R2?

9    THE WITNESS:  Yes.

10   MR. MOSKOVITZ:  I heard two of them, 7A2 and 7R2.  What

11   was the other one?

12   THE WITNESS:  7A2, 7H2 and 7R2.

13   In Chappo Subbasin, on Exhibit 39, I would have to look

14   up some dates on the logs in Exhibit 37A to find out when

15   they were drilled with relation to the time since I went to

16   Sacramento.  That is the question?  Or since 1952?

17   BY MR. DENNIS:

18   Q  Since October, 1952.

19   A  Since October, 1952.  I would have to refer to Exhibit

20   37A.

21   Q  Could you do that during the recess?

22   A  Yes.

23   Q  Now, the only other wells which have been drilled

24   within the watershed of the Santa Margarita River and within

25   Camp Pendleton since you started firs physically to inspect

B2

Z14

1    the property were drilled in the spring of 1952, were they?

2        A   I didn't get the question.

3        Q   I say, were there any other wells drilled other than

4    those which were drilled during the year 1956 at which you were

5    present during the time they were drilled and had opportunity

6    to inspect the log?

7        THE COURT:   You mean that that is the only inspection he

8    had of a log as they were being drilled?   Or are you excluding

9    the inspections he might have made afterward where he saw the

10   well log?

11       MR. DENNIS:   The materials that came out of the well.

12       THE COURT:   The materials themselves that came out

13   of the well rathr than the well log as written down?

14       MR. DENNIS:   That is correct.

15       THE WITNESS:   Since 1952?

16       MR. DENNIS:   At any time.

17       Q   What I am trying to get you to do, Mr. Worts, is to

18   place on Exhibit 39 those wells of which you had information

19   obtained directly from the material itself as distinguished

20   from the log of the well.

21       A   I saw materials on all of the wells drilled prior to

22   my time of leaving Long Beach to go to Sacramento.

23       Q   And what wells were they?

24       A   Like I said, I don't recall the dates when these

25   wells were drilled.

B2

Z15

1    Q   Would you inspect the well logs during the recess?

2    A   Yes.

3    Q   Now, calling your attention, Mr. Worts, to Exhibit

4 45, did you take into consideration water measurements in any

5 well within the basin that is not shown on Exhibit 45?

6    A   To the best of my knowledge, all the wells used in

7 the construction of that contour map are shown on that map.

8    Q   And how many measurements did you take in each well?

9    A   For the construction of a--

10    Q   For the construction of Exhibit 45?

11    A   You will observe the legend there.  Which one are

12 you referring to?

13    Q   45-- that is October, 1957.

14    A   October, 1957.  The proper way to construct a contour

15 map for a particular instant of time is a single set of measure-

16 ments.  Obviously, this cannot be accomplished physically to

17 obtain them within the same minute and within the same hour.

18 So in an area as small as this one a man can usually measure

19 all the wells in one day.  So they usually are for a particular

20 day.  Sometimes if there is other business-- and remember that

21 the man who comes down to measure this basin has other basins

22 on the Camp to measure-- it depends on his well round route,

23 as we call it, and he may or may not have measured these on

24 one day, but he in all probability measured them within two

25 days, sometime in November.

1    Q  As I understand your testimony, you only took one

2  measurement in each well?

3    A  Only took one measurement in each well.  But under-

4  stand this, that many of those wells are periodic observation

5  wells in which measurements are made every month, so we know

6  what the trends are and we know what the measurement means when

7  we obtain it.

8    Q  And who made those measurements?

9    A  Well, they were made under my direction and, in turn,

10 under Mr. Kunkel's direction by someone in the Long Beach

11 office, on Exhibit 45, for October, 1957.

12   Q  The measurements were made by some individual in

13 your office?

14   A  That is right.

15   Q  And not by somebody on the staff at Camp Pendleton?

16   A  Oh, no.  Those are our U. S. Geological Survey measure-

17 ments.

18   Q  And your testimony would be the same with respect to

19 Exhibit 44, would it not?

20   A  Not quite, because at that time I was at Long Beach

21 and in October, 1951, I may well have measured some of those

22 wells myself.

23   Q  But it still represented a single measurement in each

24 well?

25   A  That is quite right.

B2

Z17

1       Q  In connection with the preparation of Exhibit 39 you

2 didn't take into consideration the knowledge that you had

3 obtained from viewing the premises in the area?

4       A  You say I didn't?

5       Q  Yes.

6       A  Certainly.

7       Q  You did?

8       A  Certainly.

9       Q  So that you took that into consideration in addition

10 to the information shown by the well logs?

11       A  Yes.

12       Q  Did you take into consideration any other informa-

13 tion?

14       A  My knowledge of geologic principles.

15       THE COURT:  Your experience also?

16       THE WITNESS:  And experience.

17       THE COURT:  And your training?

18       THE WITNESS:  And my training.

19       THE COURT:  Your training in school?

20       THE WITNESS:  Yes, sir.

21 BY MR. DENNIS:

22       Q  But you had no data for this particular area other

23 than the well logs upon which this was based?  When I say

24 "this", Exhibit 39.

25       A  All the things we have just mentioned go into the

B2

Z18

1   compilation of a map such as that.

2           Q   But I mean within the data itself for this particular

3   area?

4           A   Actual well log data.

5           Q   Plus the inspection, plus your general knowledge of

6   geologic conditions?

7           A   Yes.

8           THE COURT:  You keep dropping your voice, Mr. Dennis.

9           MR. DENNIS:  I will try to keep it up, your Honor.

10          THE COURT:  If you have to look at the map, all right;

11  but otherwise get further back so you will speak louder.

12  BY MR. DENNIS:

13          Q   Now, are all of the wells shown on Exhibit 37 from

14  which you constructed that exhibit, or did you take into con-

15  sideration data obtained from well logs other than those shown

16  on Exhibit 37 in the preparation of that exhibit?

17          A   Could you clarify that question?

18          Q   Well, did you take into consideration any informa-

19  tion obtained from well logs in the preparation of Exhibit 37

20  other than the information from the well logs which are shown

21  on Exhibit 37?

22          MR. VEEDER:  This is repetitious, your Honor.  This is

23  the third time around.

24          MR. DENNIS:  Not on this exhibit.

25          THE COURT:  You are limiting this to well logs?

Werts    Cross    4197

B2

Z19

1    MR. DENNIS:  Yes.

2        THE COURT:  Of course, there are many other things that

3    went into the making of Exhibit 37.

4        MR. DENNIS:  That is right.  I am just limiting it

5    to well logs.

6        THE COURT:  Just limiting it to well logs?

7        MR. DENNIS:  Yes.

8        THE COURT:  Did you have any information from well logs

9    other than those shown on Exhibit 37?

10        MR. VEEDER:  Those are wells and not logs.

11        THE WITNESS:  That is right.  The terminology is getting

12    me here, Mr. Dennis.  All this map does is the logs of all the

13    wells we visited and found on the premises.

14    BY MR. DENNIS:

15        Q  Well, you found additional wells, did you not, other

16    than the ones shown on Exhibit 37 when you visited the premises?

17        A  No.  To the best of my knowledge, every well that we

18    found is plotted on this map, from the area up at the junction

19    of De Luz and the Santa Margarita to the coast-- is plotted

20    on this map.  I won't say "this" map.  Exhibit 37.

21        Q  And you have logs for every well which is plotted on

22    Exhibit 37?

23        A  No.  Just because we found a well doesn't mean that

24    it has a log.  In other words, every log for a well is shown

25    here.  In other words, if there is a log, which I know there

4198

B2

Z20

1  is, for 2Kl in Ysidora Subbasin, that well is shown there.  The

2  logs are listed in Exhibit 37A.

3      Q  And does Exhibit 37A constitute a true copy of the

4  logs upon which you prepared Exhibits 39 and 37?

5      A  These have nothing to do with Exhibit 37.  The logs

6  themselves, the numbers.

7      Q  The numbers, yes.

8      A  The numbers will, as a correlation.

9      I find here wells that are not upon the U. S. Geological

10  Survey well form, of which these are almost all of them either

11  photostatic negatives or photostatic positives.  I can attest

12  to the accuracy of the well logs on the U. S. Geological Survey

13  well form.  Inserted in here are typed copies, the original

14  of a typed copy of certain wells that have been drilled that,

15  for reasons not known to me, are in here in typed form.  I

16  cannot attest to their accuracy.

17      Q  Are those the ones that you used in connection with the

18  preparation of Exhibit 39?

19      A  All those bearing U.S.G.S. well log plus our copies

20  of these that are shown in here in type-- not these typed ones--

21  the US.G.S. copy or compilation of the log I used.  I did not

22  use this typed copy here.

23      Q  Well, now, am I correct in my conclusion that the

24  well logs which are shown on the United States Department of

25  Interior Geologicial Survey Water Resources Division are not

1 the original well logs made by the driller at the time the well

2 was drilled; they simply represent information which you had

3 placed on one of your forms, which you obtained from some other

4 source?

5     A   That is true on all of these because they are typed

6 copies, but they are all checked carefully because these are

7 the copies that we use in our work. You also observe in here

8 that there are copies of logs that we, the U. S. Geological

9 Survey, logged personally at the site, in which case we don't

10 pay any attention to the driller's log, and those are tran-

11 scribed and checked when they are placed on the U. S. Geological

12 Survey form, and I am completely satisfied that they are as

13 accurate as human ability will permit.

14     Q   Well, where did you obtain the information upon

15 which you made your copies in respect to those wells that were

16 not drilled during the time you were actually interested in the

17 area?

18     A   Those were obtained from the Public Works Office at

19 Camp Pendleton.

20     Q   And were they the driller's logs or were they a form

21 of log that was maintained by the Public Works Office?

22     A   I don't recall. That was eight years ago that I and

23 two other men went in there and copied those records.

24     Q   So you don't recall whether they were the driller's

25 logs or the log position kept by somebody else?

B2

Z22

1          A  No, I don't.

2          Q  And as I understand your testimony, on those wells

3    in which you supervised the drilling you kept a log and the

4    driller kept a log?

5          A  I don't know whether the driller kept a log.

6          Q  Did you inspect the log that was kept by the driller?

7          THE COURT:  He said that he doesn't know whether he kept

8    the log.

9    BY MR. DENNIS:

10          Q  You made no attempt to determine whether or not the

11    driller kept a log or not?

12          MR. VEEDER:  I object; this is irrelevant.

13          MR. DENNIS:  No, I don't think so.  There was some

14    testimony in here that the drillers' logs disagreed with those

15    logs kept by the U.S.G.S.

16          THE COURT:  Overruled.

17          Did you check to see whether drillers kept a log?

18          THE WITNESS:  I didn't.  Maybe the men under my super-

19    vision, who were drilling, who were sitting on the wells-- there

20    was one geologist assigned to each drilling rig-- maybe they

21    did.

22    BY MR. DENNIS:

23          Q  But in the preparation of Exhibit 39 you did not take

24    into consideration the driller's log?

25          THE COURT:  That has been asked and answered.

B2

Z23

1    THE WITNESS:  Yes, we have considered the drillers' logs.

2    MR. DENNIS:  I don't think he understood the question.

3    THE COURT:  Your question was too broad.  What you mean

4 is, in preparing Exhibit 39 you did not take into account a

5 driller's log as to those wells which the Geological Survey

6 supervised?

7    MR. DENNIS:  That is correct.

8    THE COURT:  If such logs existed.

9    MR. DENNIS:  If such logs existed.

10    THE WITNESS:  We used our own well logs.

BY MR. DENNIS:

Q   And, as I understand it, in the preparation of Exhibit 38, that was prepared from  the logs which are now in evidence as Exhibit 37A, I believe it is?

A   Yes.

Q   And you have no other source of information in connection with the preparation of Exhibit 38 other than that obtained from the logs?

A   That is the  basic data.  Other considerations, of course, go into the construction of such an exhibit.

Q   Am I correct in my interpretation of Exhibit 39 that it shows that Lake O'Neill lies within the basin, the Pendleton basin?

A   The drainage basin?

Q   The basin itself.

MR. VEEDER:  Objection.  It is beyond the scope of the direct examination.  There is not a word in the evidence about it.

THE COURT:  There is testimony from this witness as to what constitutes the basin.

MR. DENNIS:  He also testified as to the area of the basin, subbasin.  Now, the question is whether O'Neill lies within or without one of the basins.

MR. VEEDER:  He means overlies.

THE WITNESS:  It is very clearly depicted on Exhibit 40,

1    which shows that Lake O'Neill is part of the ground water basin,

2    as is the case with these numerous minor tributaries shown in

3    yellow.   These long slim things going away from the main

4    alluvial area on Exhibit 37 were not considered.

5         THE COURT:  You said it was part of the  basin.  You

6    mean Lake O'Neill?  You said Lake O'Neill was part of the

7    ground water basin.  You meant the area of the ground water

8    basin?

9         THE WITNESS:  No, your Honor.  On Exhibit 40, the

10   outline of the basin, subbasin boundary omits the area of

11   Lake O'Neill in much the same manner as it omits all of the

12   minor tributaries coming into the main alluvial area.  Perhaps

13   I did--

14        THE COURT:   It lies outside the limits of one of the

15   basins?

16        THE WITNESS:  Outside the limits of the basin as we

17   considered it from a practical engineering standpoint.  Our

18   examination of a log, if I am correct, on some of these wells,

19   there are-- we examined the deposits, anyway, in these small

20   minor tributary valleys, around the sides of the main alluvium.

21   And, for the most part, they are fine grained and would yield

22   very small quantities of water.  They would be of no use,

23   practical use, to the Marine Corps as a source of supply.

24        THE COURT:  If you will look at Exhibit 37 you will

25   notice  that on the northwest side of Lake O'Neill there is shown

the yellow color of alluvial deposits.  On the northeast corner

there is shown alluvial deposits.  And on the east side from

the middle on down there is shown alluvial deposits.

THE WITNESS:  Yes, sir.

THE COURT:  What Mr. Dennis is getting at is, in view of

that alluvial, shown on the map, did you make any investigation

as to whether or not-- let's take a time prior to the time Lake

O'Neill was constructed-- that entire area was part of an area

of an underground basin?

THE WITNESS:  Technically, any of these arms of allu-

vial, including the one under Lake O'Neill, would be part of

the underground basin.  But from a practical standpoint of

supply, we have cut off all such  arms in our consideration of

the basin on Exhibit 40 because of the fine grained nature of

the deposits that are in those minor  tributaries.

BY MR. DENNIS:

Q  Mr. Worts, calling your attention to Exhibit--

THE COURT:  It is time for a recess, Mr. Dennis.

(Recess  taken.)

BY MR. DENNIS:

Q  Mr. Worts, I believe that yesterday you stated that

in computing the capacity of  the  basin, Pendleton basin, you

used the Exhibit 39; is that correct?

A  As part of the computation.

Q  And I believe that you said isopachs-- those are the

S23
C1

1      lines?

2              A  Those are  the lines.

3              Q  And I note you said here that the isopachs include

4      the  area of Lake O'Neill?

5              A  They don't.

6              Q  Will you show where they--

7              A  The isopachs, as shown on 39, come up and stop at the

8      edge of the heavy line that delimits the outlines of Lake

9      O'Neill at the lower downstream end in Section 8.

10             Q  The heavy line, then, which surrounds Lake O'Neill

11     is not an isopach but represents the area of alluvium  on 39?

12             A  Let us  refer to Exhibit 37.  You observe that the

13     same line occurs on all of these base maps as the outline that

14     I take to be that of the lake.

15             Q  Now, I am referring, Mr. Worts, to the heavy line

16     which entirely goes along the west, east and north side of Lake

17     O'Neill.

18             A  The outside lines--  that is not to be confused with

19     the heavy line around Lake O'Neill  itself-- is the outside

20     edge of the alluvium.

21             Q  Of the alluvium?

22             A  Where it abuts against the basement complex.

23             Q  And so, in figuring the capacity of the  basin, you

24     do not  include any of the alluvium which underlaid  Lake

25     O'Neill?

1          A  I did not.

2          Q  Calling your  attention to Exhibit 38, I notice the

3     dotted line which says, "Base of estimated storage capacity."

4          A  Correct.

5          Q  Does that represent the area for which you figured

6     storage capacity?

7          A  That represents the base of the 100 foot below land

8     surface line for which the gross storage capacity was computed

9     between De Luz Dam Site and Well 2-N-4, Ysidora Narrows.

10          Q  And I notice a line, a dashed line.  You say "lower

11     member of alluvium" on one side, and "upper member of allu-

12     vium" on the other.

13          A  Correct.

14          Q  How did you arrive at the approximate location of

15     that line?

16          A  Approximate division of  that dashed line marking

17     the general contacts between the upper and lower members is

18     based on the general change in the lithologic character of the

19     alluvium with depth.  By lithologic character, I mean the

20     grain size character.  That above the line, in general, is

21     somewhat finer grained than the grain size below that line.

22     It is particularly easy to identify in Ysidora Subbasin where

23     the drillers have made a very generalized category, and called

24     the upper hundred feet plus or minus clay.

25          Q  The only source of information would be the drillers'

1    logs, would it not?

2        A  No.

3        Q  What other information would you have?

4        A  The logs of the test wells that we personally drilled.

5        Q  And what wells were those?

6        A  Starting in the Upper Subbasin:  10-4-7H1.

7        Q  I wonder if you would circle that.  We had better use

8    a yellow pencil.

9        MR. STAHLMAN:  Pardon me, Bill.  Please don't drop your

10    voice.

11        MR. DENNIS:  I say, with a yellow pencil.

12        THE WITNESS:  If I may make a suggestion, a darker pencil

13    might show up better.

14        MR. STAHLMAN:  May I have what the question is now?

15        MR. DENNIS:  Would he please circle the wells in which

16    they had made personal observations.

17        THE COURT:  And the answer was--

18        THE WITNESS:  That is not the question.

19        THE COURT:  Oh, no.  The question was:  Which wells did

20    they drill, that is, the Geological Survey, as test wells?

21    That is the question, isn't it?

22        THE WITNESS:  Yes, sir.

23        THE COURT:  The first well you mentioned was--

24        THE WITNESS:  7-H-1.

25        THE COURT:  10-A-7H1.

THE WITNESS:  10-4-7H1.  10-5-13J1.  10-5-13G1.  Both of these are in Ysidora Subbasin-- correction-- Chappo Sub-basin.

THE COURT:  I didn't find 13-G-1 shown on here.

THE WITNESS:  It is in the--

THE COURT:  Oh.

THE WITNESS:  -- about the center and a little to the north in Section 13, 10, 5.

THE COURT:  All right.

THE WITNESS:  10-5-23L1 in the southern part of Chappo. 10-5-26L1 in along the contact between Ysidora and the Chappo Subbasins.  10-5-35K5 in Ysidora Subbasin.  10-- correction-- 11-5-2N4 in Ysidora Narrows.  10-5-10B1 farther downstream.

BY MR. DENNIS:

Q  Pardon me.  Isn't that 11-5, Mr. Worts?

A  Thank you.  That is correct.  11-5-10B1.

Q  And the former well was 11-5, I believe, too?

A  11-5-2N4 previously indicated.  11-5-9J1, are the wells drilled by the, drilled and logged, or logged, by the U. S. Geological Survey in the alluvial deposits, including one well in the terrace deposits in the basin.

Q  Did the U.S.G.S. log any other wells other than the ones  they drilled within the basin?

A  By log the well, to what extent do you mean?

Q  To the same extent as you just used the term.

start
C2

1      A  Well, we observed the drilling, visited the wells

2   while being drilled.  These would be supply wells drilled since

3   1950.  To the best of my knowledge, all the wells were visited

4   during drilling, and on certain wells we were called in for

5   consultation on depth and types of materials being penetrated

6   and where to stop the well, where to perforate the well, and

7   other technical advice.

8      Q  And those are the wells which you are going to circle

9   with a red circle during the recess?

10      A  That was not the question, as I recall.

11      Q  Will you do that, then, circle those in red?

12      MR. STAHLMAN:  We can't hear you, Bill.

13   BY MR. DENNIS:

14      Q  Will you circle them with a red pencil during the

15   recess?

16      A  It might be  a good idea to read  the question about

17   the wells I was to circle in red.  I believe that might clarify

18   the situation.

19      THE COURT:  We would have to hunt for it.  What did you

20   ask?

21      MR. DENNIS:  I say:  Will he circle in red those wells

22   which were drilled by the camp in which the U.S.G.S actually

23   supervised-- maybe "supervised" isn't the correct word.

24      THE WITNESS:  It is not the correct word.

25      MR. DENNIS:  But drilled.  What would be the correct word?

1    THE COURT: Observed.

2    THE WITNESS: Observed.

3    MR. DENNIS: Observed the drilling. And the content of

4  the material that came out of the hole.

5    THE WITNESS: Starting in Upper Subbasin on Exhibit 39,

6  10-4-7A2, 10-4-7H--

7    MR. STAHLMAN: Go a little slower.

8    THE WITNESS: 10-4-7A2, 7H2, 7R2. In Chappo Subbasin,

9  10-5-23K1, 23J1. I would have to refer to a-- 37A. Some of

10  these-- I have a list-- I will name two wells that were used,

11  three wells that were being drilled or had been completed

12  when we first arrived in August, 1950, to begin our work.

13  These were 10-5-13R2. No, that isn't correct. I will have to

14  look up some of these wells in Chappo Subbasin. But there is

15  one well in Ysidora Subbasin that was drilled, and that is

16  11-5-2D3. I observe, also, in looking at the map, that I

17  should have circled another test well that was drilled under

18  our supervision in Chappo Subbasin; 23-J-3, circled in green.

19  Wells in doubt I will have to check records on are 10-4-18M2--

20    MR. MOSCOVITZ: Wells in doubt, did you say?

21    THE WITNESS: Doubt. My doubt about whether we were

22  there when the well was drilled. These were drilled in the

23  early 1950's, maybe a month or two before we arrived. Some

24  were drilled after we arrived. There was a drilling, a supply

25  well drilling program in progress when we arrived at the camp.

1   Those wells are 10-4-18M2, 10-5-13-R2, 10-5-24H-- I can't re-

2   call whether it is H1 or 3.  They are both shown in the same

3   circle. I will have to check to find out the dates that those

4   were drilled.  Even the ones that were drilled immediately

5   before we arrived there, we had occasion to examine some of

6   the cuttings that came from those wells.

7        MR. DENNIS:  Will you do that during the noon recess,

8   then, Mr. Worts?

9        THE WITNESS:  Yes.

10  BY MR. DENNIS:

11        Q  Calling your attention to Exhibit 38, are the water

12  level profile lines which  are shown on that exhibit taken

13  from readings in the shallow wells or the deeper wells?

14        A  Those are taken from readings in the deep wells.

15        Q  In each instance?  That is the one for November,

16  1951, the one for March, 1952, and the one for October, 1957?

17        A  Yes, and I would like to indicate that they, to the

18  best of my knowledge, reflect the level in the deep portion of

19  the alluvium.

20

21

22

23

24

25

4212

D

Z24

1    Q  And also your testimony would be the same as to the

2    water profile line for March, 1932?

3    A  Yes.

4    Q  Where did you obtain the measurements which you used

5    for determining the water profile line in March, 1932?

6    A  From personnel of the Public Works Office at Camp

7    Pendleton.

8    Q  And who in particular?  Do you recall?

9    A  I believe I got them through Mr. Cannon.

10   Q  You did not obtain those through the Office of Ground

11   Water Resources?

12   A  The Office of Ground Water Resources was not in exist-

13   ence, at least to my knowledge, when we started our work in

14   1950.

15   Q  Calling your attention to Exhibit 38, was that pre-

16   pared prior to October, 1952?

17   A  Most of it was prepared prior to October, 1952.

18   Q  You have made no changes in that area which is in

19   the Ysidora Basin?

20   A  I believe I revised a water level profile for the

21   1951 year.  I have forgotten.  That was six or more years ago

22   since that first diagram I prepared.  I think I may have made

23   some minor changes in the November, 1951, profile.  Obviously,

24   the October, 1957, profile as shown as been added.  One of the

25   new supply wells in Upper Subbasin, 10-4-7A2, and another one,

D

Z25

1   10-4-7R2 have been added to that.  There may be other changes.

2   I recall a few other minor changes, such as the disposition

3   of the subbasin and a clarification to assist in showing the

4   span of Ysidora Narrows, I believe was added.  There are changes.

5       Q  But in Ysidora Basin we are using the same wells on

6   Exhibit 38 as you used prior to October, 1952?

7       A  For the 1951 profile I had to use the wells that were

8   in existence at that time.

9       Q  Let me ask, have there been any additional wells put

10  in Ysidora Basin since October, 1952?

11      A  Well, for one, as I circled in red pencil on Exhibit

12  39, there was a new replacement irrigation well drilled.  I

13  am not sure of the date that our test well-- our test well

14  program was, I think, completed by October.

15      Q  But you didn't use the well you have just referred

16  to in the preparation of Exhibit 38, or you did not use the

17  log of that well?

18      THE COURT:  You mean in the present exhibit 38?

19      MR. DENNIS:  Yes, in the present 38.

20      THE COURT:  What well are you talking about?  35K5?

21      MR. DENNIS:  No, 11-5-2D3, I believe it would be.

22      THE WITNESS:  11-5-2D3 does not appear on Exhibit 38.

23  BY MR. DENNIS:

24      Q  In your opinion, would you class the San Onofre

25  breccia as basement complex?

D-
Z26

1    A    No.

2    Q    And your answer would be the same for the La Jolla

3 formation Clark?

4    A    Yes.

5    THE COURT:  Do you contend there is water in there, Mr.

6 Dennis?

7    MR. DENNIS:  No.

8    THE COURT:  Then what is the dispute?

9    MR. DENNIS:  I think in the old exhibits this was shown

10 as basement complex, your Honor.

11    THE WITNESS:  No.

12    THE COURT:  I am not going to make any comparison with

13 the old exhibits, unless you have something specific you want

14 to call my attention to.

15    MR. DENNIS:  I thought we would get into that a little

16 later, your Honor.

17    THE WITNESS:  The contact shown beneath the base of the

18 alluvium, if you happen to have one of the old cross-sections

19 just lay it on top and you will find they are in the same place.

20 BY MR. DENNIS:

21    Q    Do you have Exhibit 37A before you?

22    A    Yes.

23    Q    Could I call your attention to the log of Well

24 11-5-9J1?

25    A    Before we go any further, I seem to have only the one

D

Z27

1 page.

2     Q  Let's take another one and maybe we can get the

3 additional pages for that one. Let me call your attention to

4 11-5-2E1, and I would ask you to examine that log and tell us

5 if you find anything in there which would indicate where that

6 well was perforated, or the casing in the well was perforated?

7     A  This is a log of the materials penetrated.

8     Q  That is correct. Where did you obtain your informa-

9 tion as to that portion of the casing which was perforated as

10 shown on Exhibit 38?

11     A  All the information that we obtained on those wells,

12 the information we obtained from the Public Works Office on these

13 older wells. Whether or not all of the information we obtained

14 from the bulk of data available at the office was transcribed

15 onto our well log form I cannot tell you.

16     Q  Well, then, you did have other information other than

17 the well log and other data that you used in the preparation

18 of Exhibit 38 and in the preparation of 39?

19     A  Not in the preparation of 39. In the preparation

20 of 38, for example, when we copied the well log records or the

21 records at the Camp, if a perforated interval were missing we

22 made an effort to find it.

23     Q  Will you look through your notes and try to find it?

24     A  Wait a minute. Excuse me. See if I am looking at

25 the same log. Did you say 2A1 or 2E1?

D

Z28

1          Q   2E1.

2          THE COURT:   The chart had a question mark at the upper

3    limits of the perforation.

4          THE WITNESS:   Yes, it does.   I was looking at 2A1 by

5    mistake.   2E1 has an upper limit question.   We may have had

6    data from some source, possibly supplied on another sheet

7    aside from the well log itself, that indicated that a certain

8    part of the lower area was perforated.

9    BY MR. DENNIS:

10         Q   Calling your attention to the log of well 10-5-35R2--

11         MR. VEEDER:   May I ask, before you go any further, have

12   you asked that we check this material out in regard to the

13   perforation?

14         MR. DENNIS:   Yes.

15         MR. VEEDER:   You made that specific request?

16         MR. DENNIS:   I made that specific request.

17         THE WITNESS:   10-5-35R2?

18   BY MR. DENNIS:

19         Q   Yes, and the first entry on that log reads--

20         A   "Clay or soil black," on Exhibit 37, "108 feet."

21         Q   That would be what-- depth from the surface to 108

22   feet?

23         A   That is right.

24         Q   And I notice on this log that you have drawn the line

25   which indicates the difference between the older alluvium and

D

Z29

1    the younger alluvium at what elevation?

2        A  What depth?

3        Q  Or depth?

4        MR. VEEDER:  Let's be consistent in our references.

5    "Upper and lower member"-- isn't that what you have been using?

6        MR. DENNIS:  Upper and lower?

7        MR. VEEDER:  Well, "older alluvium" and "younger

8    alluvium" are terms that we used above Temecula.  It is import-

9    ant, I think, that we keep our language uniform.

10       THE WITNESS:  Do you want to restate the question no

11    so that it is clear?

12    BY MR. DENNIS:

13        Q  I say at what depth did you draw the line which

14    differentiates the upper member from the lower member of the

15    alluvium in the log of Well 10-5-35R2?

16        A  At a depth of approximately 90 feet.

17        Q  Was there anything in the log which would indicate

18    that the character of the soil was around 90 feet changed?

19        A  No.

20        Q  And your testimony would be the same in respect to

21    each well log where you have drawn the line indicating the

22    differentiation between the upper alluvium and the lower

23    member of the alluvium through the same typd of material as

24    shown in each well log?

25        A  I would like to point out that that line is not based

1  on the line of one well.  It is based on the average of where

2  the major change occurred between the finer-grained upper

3  materials of the upper member and the coarser-grained materials

4  of the lower member due to differences in sedimentation, in

5  drillers' interpretations and accuracy of drillers' records,

6  their method of classification, many other considerations.

7  When you draw a line that is a dashed line, such as the one

8  delimiting the upper and lower members, it represents the

9  average, the geologist's best judgment of where the approximate

10  position or division would be.  It would be possible to connect

11  on this log section by a very erratic and zigzag line ranging

12  roughly in Ysidora Subbasin from something like 80 feet below

13  land surface to 120.  When you got through you might as well

14  draw a smooth average line through the basin.

15       THE COURT:  Well, in addition, you had upstream the

16  well which had been drilled by the Geological Survey--

17       THE WITNESS:  That is right.

18       THE COURT:  --35K5, and downstream you had 11-5-2N4.

19       THE WITNESS:  That is right, your Honor.  We naturally

20  gave the greatest weight to our carefully logged wells; and

21  that also is a part, a very definite and strong part of the

22  reason why that line is drawn through in the manner that it is.

23  BY MR. DENNIS:

24       Q  In other words, you gave more weight to a lesser

25  number of wells drilled by the U.S.G.S. than the information

Werts    Cross                                                        4219

D

Z31

1   obtained from a greater number of well logs obtained from

2   drillers who drilled the wells?

3         A   No, sir.

4         Q   Calling your attention to Exhibit 38, isn't it true

5   that in one, two, three, four, five, six, seven, eight, nine,

6   ten instances in the Ysidora Basin the line which separates

7   the upper member of the alluvium and the lower member of the

8   alluvium is drawn through the same type of material as shown

9   by the explanation on Exhibit 38, while there is one, two, three,

10  four, five wells in which you show the line where there is a

11  change in material?

12        A   Either you can't see what I can see, or I don't

13  understand what you are talking about.  If you want to go

14  through these wells one by one, they are plotted on here,

15  starting at the coast.  There is, in my opinion, a good

16  geologic pick for the point at 9J1, 10B1, 2N4, no clear one

17  at 2N3, a good one at 2K1, a good one at 2E1, a good one at

18  2D1, no clear pick at 2C1 or 2A1 or 35R2, but a good pick at

19  35K5, 35G1, 26L1.  It looks to me like the preponderance of

20  both U.S.G.S. and the drillers' logs are in close agreement.

21        Q   Would you say that the Ysidora Basin is underlain

22  by a clay blanket?

23        A   No.

24        Q   Have you had any occasion to change your opinion

25  since October, 1952 in respect to the characters of the soil

1   in Ysidora Basin?

2        A   I certainly have.

3        Q   What information have you that changed your opinion?

4        A   As of October, 1952, we had just completed, as I

5   recall the test drilling program, we had just begun an analysis

6   of the data, and the existing drillers' logs show-- not all of

7   them, but particularly those on the exhibits show clay.  At

8   that time, to the best of my knowledge, I may have said-- I

9   don't recall what I said.  I may have said that in general it

10  is covered by a clay blanket.  But it is obvious from the logs

11  of the test wells, from auger holes that I personally have

12  drilled to depths of 28 feet, that it is not a clay blanket

13  across Ysidora Subbasin.

14       Q   Does the water stand at a different level in the

15  shallow wells from that in the deeper wells in Ysidora Basin?

16       A   I spent a good deal of time yesterday on Exhibit 46

17  pointing out that entire relation, and on the west side along

18  near the stream in the paired wells 10-5-35K1 and 35K4 the

19  level almost superimposed one upon the other, shallow and

20  deep.  I pointed out that on the east side there was a very poor

21  correlation between the shallow and deep water.

22       Q   On the east side does the pumping in the deep well

23  affect the water level in the shallow well?

24       A   Over what period of time and what magnitude of pumping

25  and--

D

Z33

Q  Well, on the east side of the basin, have you ever had any occasion to observe that the pumping of a deep well affected the water table of a shallow well?

A  I would probably have to look that up.  Offhand I can't recall at the moment.

Q  In other words, if you had to answer the question at this time you would say that you have no knowledge that the pumping in a deep well would affect the level of the water in a shallow well on the east side of Ysidora Basin?

A  I would say I would have to refresh my memory.

Q  Would your answer be the same for the west side of Ysidora Basin?

A  No, sir.

Q  Have you ever had an opportunity of observing whether or not the pumping of the deep well affected the water level in a shallow well in the west side of Ysidora Basin?

A  Yes.

Q  Does it affect it?

A  Yes, it does.  Pumping of Well 35K1, a large capacity irrigation well, caused a drawdown in 35K4, a 28-foot shallow well.  That may not sound too shallow, but at the time the well was drilled it only went into the water table a few feet. But the level in the shallow well drew down in response to pumping in the deep well.

Q  About how far apart are those wells located?

Worts    Cross

D

Z34

1        A   20 feet, approximately.

2        Q   I wonder if I could have the number of the shallow

3   well again?

4        A   10-5-35K4.

5        Q   Have you had any other occasion to observe in Ysidora

6   Basin where the pumping of a deep well affected a shallow well?

7        A   Yes.

8        MR. VEEDER:  May I interrupt a moment.  What was the

9   depth of the well you said-- 10-5-35K4?

10       THE WITNESS:  There is a log of it in Exhibit 37A.  I

11   might as well look it up.

12       The depth of 28.0 is shown on Exhibit 37A.  As indicated

13   by the information on the well log, the water was reached at a

14   depth of 22 feet, so there was six feet of water in the well

15   at that time.

16   BY MR. DENNIS:

17       Q   That was a test well drilled by the U.S.G.S.?

18       A   That was one that I put down with the assistance

19   of another man, with a post hole auger.

20       Q   What other shallow wells have you noticed that were

21   affected by pumping in a deep well in the Ysidora Basin?

22       A   (Stepping down)  Referring to Exhibit 37, a pair of

23   shallow and deep wells exist at 11-5-2E1 and 2E4.  The shallow

24   well E4 responds-- responded when E1 was in operation, which

25   it is not at the present time-- responded to pumping in the

D

Z35

1    Well El.

2        Q  Are there any other shallow wells that respond to the

3    pumping of deep wells in Ysidora Basin?

4        A  I would have to check the water level records to

5    find that information.

6        Q  Are there any shallow wells in the Chappo Basin in

7    which there is any effect shown by pumping of deep wells in

8    Chappo Basin?

9        A  Yes.  We put in-- U.S.G.S. again, my own labors--

10   10-5-23J1 is a deep camp supply well; the 4 beside that well

11   number meaning Well 23J4 was a shallow well drilled by myself

12   with the assistance of another man to determine whether there

13   was an effect on the shallow water when the camp supply well

14   pumped.

15       Q  Was there any effect?

16       A  As I recall, there was an effect, but I would have

17   to again check the water record.  But to the best of my

18   knowledge there was an effect.

19       THE COURT:  All right, you may check that during the

20   noon hour.  Take a recess until 2 o'clock.

21       How much longer will you be, Mr. Dennis?

22       MR. DENNIS:  I suppose another hour and a half, your

23   Honor.

24       (Noon recess.)

25

SAN DIEGO, CALIFORNIA, THURSDAY, NOVEMBER 6, 1958.   2 P.M.

MR. VEEDER:  We had talked this morning, your Honor, in regard to the matter of the State's putting in its evidence. And I would like to ask the State whether Mr. Bookman will be available in San Diego at that time, or when the time comes for cross examination?

MR. MOSCOVITZ:  If we have some notice, advance notice, we can get him down here.  But he won't be here on our behalf while the evidence is being put in.

THE COURT:  He can be made available on advance notice?

MR. MOSCOVITZ:  Yes.

MR. VEEDER:  I don't want to go to South America or some place.

MR. STAHLMAN:  He just got back from Europe.

MR. MOSCOVITZ:  Well, I suppose I had better check and see what his itinerary is.

MR. VEEDER:  That's my boy.  I would like to have you do that.  So you let me know.  And also do I understand that Mr. Henry Holsinger   is retiring from the state; is that correct?

MR. MOSCOVITZ:  To the best of my knowledge, I believe he will be reaching retirement age sometime next year.  And I think his term of office on the Water Rights Board expires early next year, too.

1    MR. VEEDER: Will he be available along about that same

2    time? I am speaking of December, 2nd.

3    MR. MOSCOVITZ: I will check on that.

4    THE COURT: What do you want Mr. Holsinger for?

5    MR. VEEDER: To put him on the stand and to interrogate

6    him. And when objections are sustained, to make offers of

7    proof.

8    THE COURT: Just as you did at the beginning of the

9    Master's hearing?

10   MR. VEEDER: Yes. Yes, sir. And I don't want to foul

11   up this geology, but I certainly don't want to lose Henry

12   Holsinger, either.

13   THE COURT: Didn't you ask all the questions you wanted

14   at the Master's hearing?

15   MR. VEEDER: No.

16   THE COURT: Didn't you make a complete offer of proof

17   there?

18   MR. VEEDER: No, I have got a few more. We were some-

19   what under wraps up there, your Honor.

20   THE COURT: Let's not inconvenience an elderly man unless

21   you have something you want to get for your record.

22   MR. VEEDER: Oh, no, I won't.

23   MR. MOSCOVITZ: Well, your Honor, perhaps we can find

24   out beforehand what sort of questions, and we can get an advance

25   ruling so we won't have to make Mr. Holsinger take the trip.

1    MR. SACHSE: There certainly will be objections from

2    Fallbrook; I think much more pertinent than those raised at the

3    Master's hearings in the light of your Honor's pre-trial opin-

4    ion. Mr. Holsinger is not an engineer. Mr. Holsinger's only

5    connection with us has been in the quasi-legislative, quasi-

6    judicial-- whatever you choose to call it-- function of Water

7    Rights Board. Your Honor has ruled that is not being con-

8    sidered in the case.

9        THE COURT: What would you have him testify to? How

10   he arrived at his decision? How his board arrived at their

11   decision?

12       MR. VEEDER: I am not quite sure, your Honor, on that

13   point. I was just inquiring of Mr. Moscovitz.

14       THE COURT: You be prepared to make some of a showing

15   before we direct him to come down here.

16       MR. VEEDER: Yes, I will.

17       THE COURT: All right. You might inquire, Mr. Mos-

18   covitz, if he is available.

19       MR. VEEDER: But in regard to Mr. Max Bookman, I will

20   tell you now it will be very expensive in regard to all aspects

21   of "you know what" and--

22       THE COURT: Does Mr. Bookman's name appear in here?

23       MR. VEEDER: Well, he is the daddy of it.

24       MR. MOSCOVITZ: Mr. Bookman's name appears at the be-

25   ginning as the engineer in charge in the Southern California

1   office.

2       MR. VEEDER:  He also testified, if your Honor please--

3   and I can't use the term again as it is getting on to Christ-

4   mas,-- but at the hearing over here in regard to the Fallbrook

5   permits, Max Bookman testified as the witness, and he was the

6   one that offered the bulletin.

7       THE COURT:  What hearing was this?

8       MR. VEEDER:  Where the permits were issued.

9       MR. MOSCOVITZ:  The Water Rights Board.

10      MR. SACHSE:  Water Rights Board hearing.

11      MR. VEEDER:  Through  this twelve through fourteenth.

12  Now, we find he is not the father of it, I guess.  In any event,

13  so long as he is here and available, that is all we ask.

14      MR. SACHSE:  May I inquire for a minute, your Honor?

15  I am a little confused now.  I thought this suggestion was the

16  State of California, Mr. Stahlman's original suggestion, and

17  which I kind of agree with, was that this might be an orderly

18  trial, a little more orderly, if we could get the geologic

19  and hydrologic testimony in early.  Now, does that imply, how-

20  ever, that the redirect, or rebuttal testimony, I should say, of

21  the United States also goes in after California's does?

22      THE COURT:  No, I don't think so.

23      MR. SACHSE:  Then, what is the situation if California

24  should decide that it doesn't need Mr. Bookman.  Is it not then

25  a question of producing him for Mr. Veeder at such  time as

1  rebuttal is proper?

2       THE COURT:  We can find out before we ask Mr. Bookman

3  to come down what the purpose was, and if it is rebuttal, why--

4       MR. VEEDER:  No, I will probably recall him as an adverse

5  witness following California.

6       MR. SACHSE:  That is rebuttal, isn't it?

7       THE COURT:  That is rebuttal, isn't it?

8       MR. VEEDER:  No.  No, it would be part of our geology.

9       THE COURT:  Part of your geology.  Through an adverse

10 witness?

11      MR. VEEDER:  In any event, I just--

12      THE COURT:  You find out if he is available, and we will

13 take it up later.

14      MR. VEEDER:  That is all I wanted to know.

15      THE COURT:  I am not naive enough to think  that the

16 Government is going to buttress its case on the  testimony you

17 might elicit from an adverse witness.

18      MR. SACHSE:  Well, the principal concern I have, your

19 Honor, is I think we would make a very serious mistake in this

20 case if we really segmentize it and start putting the case in

21 chief, the  defense, the rebuttal, all in geology, then the

22 case in chief, defense, rebuttal, on something else.  That will

23 really foul things up.  I can see Mr. Stahlman's logic for

24 getting the direct in chief on geology, so to speak, for all

25 parties in.  I can see some sense to that; but not to break the

1    case down and then permit the United States to rebut the State's

2    geology, and then the State to surrebut the United States.  I

3    think that will really louse us up.

4         MR. VEEDER:  I think you are anticipating much to much.

5    I just simply inquired--

6         THE COURT:  Let's proceed.  Let's relax.  Mr. Moscovitz,

7    you follow through, and we will find out later.

8         Mr. Veeder, be prepared to make your showing as to why

9    you want Mr. Holsinger.

10        MR. VEEDER:  Yes.  Well, I certainly don't want Mr.

11    Holsinger to retire before we get another shot at him is all.

12        We have some water level data, your Honor.  We would

13    offer it as 51A.  We are getting the data together that has

14    been requested, and the hydrograph 51 of ten wells has been

15    offered and is in evidence.  A request is made for additional--

16    well, the supporting  data; and this is at least part of the

17    data.  We are getting all of it together as  rapidly  as we

18    can.

19        THE COURT:  Now, 51 was ten wells?

20        MR. VEEDER:  That is right; a hydrograph of those ten

21    wells, your Honor.

22        THE COURT:  And this is data supporting that?

23        MR. VEEDER:  That is correct, your Honor.  I have been

24    asked if it was supporting data, and I just think it would be

25    in support of the foundation.

S36
El

1      THE COURT:  51 will be marked 51A and received in evi-

2 dence.

3      MR. MOSCOVITZ:  May I ask a question, a further question

4 about it?   Are these the depths which were used to draw the

5 ground water contours on Exhibits 44 and 45?

6      THE WITNESS:  This material is principally used to con-

7 struct the hydrographs shown on Exhibit 51, on all water level

8 records obtained.  You will see the date, the latest date shown

9 there is December, 1952.  We are now in the process of assembling

10 the material, 1953 through December, 1957, which will make that

11 a complete unit up to date as far as we have worked the records.

12      MR. MOSCOVITZ:  Then we will have all the well level

13 data which you used when you indicated well levels or levels

14 of water on your various exhibits?

15      THE WITNESS:  To the best of my knowledge.

16                CROSS EXAMINATION (Cont'd)

17 BY MR. DENNIS:

18      Q  I wonder if it wouldn't be helpful if you didn't

19 bring that down until April and May of 1958.

20      A  We only compile these records on an annual basis

21 after they go through a process of checking.  They are worked

22 out through the calendar year.

23      Q  But you did make readings during January,  February,

24 March and May of 1958?

25      A  We did, but there are none of the data used on any

of the exhibits..

Q   Mr. Worts, I think that during the recess you were going to examine your records and see if there were any additional shallow wells which were affected by the pumping of deep wells in the Ysidora basin.  Did you find any?

A   In Ysidora Subbasin the records which now are part of 51A show very minor and sometimes no detectible change in wells on the east side, shallow wells on the east side of Ysidora Subbasin in response to pumping.  I may have records at Long Beach collected at the  time that those test wells were drilled that might not be in this compilation of water level data that would cast further information on the subject. But I can't guarantee that they are there.  That work was done in, appears to be in the fall of 1951, when most of those shallow wells were drilled; seven years ago.  Whether or not I can put my fingers on that data, I don't know.

Q   The wells which were drilled in the east portion of the Ysidora basin were either drilled in the stream channel or in close proximity thereto, were they not?

A   Referring to Exhibit 37, 10-5-35K1 and 4 are one pair of paired wells in Ysidora Subbasin on the east side, which are on the east side, paired wells, 11-5-2E1 and 4 are on the west bank of the river.  Possibly the U. S. Geological Survey topo map might delimit the actual extent of the river bed there.

Q   Now, going upstream into Chappo Subbasin, did you find

1   any effect on any of the shallow wells in Chappo by pumping

2   the deep wells?

3       A  Again, the same information applies, as I discussed

4   for the east side of Ysidora Subbasin.  There may be a record

5   showing the effects of that at the Long Beach Office.  To  the

6   best of my recollection Well 23-J-4, which was a shallow well,

7   did draw down when Well 10-5-23J1  was pumped.

8       Q  You have no recollection at this time of any other

9   shallow wells that were affected by deep well pumping in Chappo

10  Subbasin?

11      A  I believe that is the only shallow well in Chappo

12  Subbasin.

13      Q  And referring to the Upper  Basin, do you have any

14  instance in which a shallow well was affected by the  pumping

15  of a deep well in Upper Basin or Upper Subbasin?

16      A  To  the best of my recollection, there were no

17  shallow wells available for measurement or drilled by us in

18  Upper Subbasin.

19      Q  Mr. Worts, calling your attention to Exhibit 39, I

20  notice that in Section 10 South, 5 West, Section 26 and also

21  23, you have a symbol on the westerly side of that section.

22  Would you  tell us  what that symbol stands for?

23      A  I would like to look  at one of  the U.S.G.S. topo-

24  graphic maps.

25      MR. DENNIS:  Twenty-nine.

1      THE WITNESS:  Las Pulgas Canyon, probably, or Moro Hill.

2      THE COURT:  What symbol is he referring to?

3      THE WITNESS:  The hashered symbol that crosses the sec-

4   tion line between Sections 23 and 24 on Exhibit 39 on the west

5   side of where the isopach lines are depicted.

6      I called your attention to Exhibit 29B, U.S.G.S. Las

7   Pulgas Canyon, California, quadrangle, which shows west of the word

8   "river" along the east side of the quadrangle spanning Sections

9   23 and 26, 10 South, 5 West, a symbol which is a standard

10  symbol by the Topographic  Branch for swamp or boggy marsh area.

11  BY MR. DENNIS:

12     Q  Did you observe that condition in that area?

13     A  Yes.

14     Q  And, in your opinion, what is responsible for it?

15     A  The condition shown there in Sections 23, 26, on the

16  west side, Exhibit 39, is the result of the constriction or

17  narrowing down, only from the lateral viewpoint, of the allu-

18  vium through which ground water is moving.  As a result, in

19  coming down and moving down valley, the alluvium narrows in the

20  area between Ysidora and Chappo Subbasins, forcing  the water

21  to try to get through a smaller cross-sectional area.  There

22  is not enough area to carry the water, so it rises and flows.

23  That would be the primary cause, in my opinion.

24     Q  And in your  opinion, the depth of the alluvium at

25  that point does not have any bearing on  it?

1    A  No, it does not.

2    Q  And is it a fact that there is a fault running through

3  Section 26, 10 South, 5 West?  Does it have any effect on that--

4    A  No.

5    Q  -- the depth of water in that location?

6    A  No.  The fault shown is in the adjacent consolidated

7  rocks, and does not affect the alluvium.

8    Q  Are you familiar with the location of the  Fallbrook

9  Gaging Station?

10   A  No.

11   Q  Are you familiar with  the location of the Ysidora

12 Gaging Station?

13   A  Yes.

14   Q  And have you had a chance to observe it?

15   A  Yes.

16   Q  In your opinion, does that record all of the surface

17 flow of the Santa Margarita River at  that location?

18   MR. VEEDER:  I object.  That goes beyond the scope of

19 the direct examination.

20   THE COURT:  Sustained.

21   MR. DENNIS:  I think he has testified, your Honor, as

22 to the amount of water which is the recharge and the discharge

23 into the Pendleton basin.  And the question of how much  water

24 is leaving the basin was gone into on direct examination, and

25 I think that we should have the opportunity of determining just

1  how far the witness went in his investigation in determining

2  the amount of discharge from the basin.

3    MR. VEEDER:  I don't follow that argument  at all.

4    MR. DENNIS:  The exhibit which has been put in evidence

5  shows the amount of underground discharge from  the Pendleton

6  basin, and it shows the amount of charge, both underground,

7  from the underground into the basin.

8    MR. VEEDER:  The amount of charge.

9    MR. DENNIS:  The recharge.

10    THE COURT:  This question has nothing to do with the

11  underground aspect of it.  You asked whether the surface

12  gaging station--

13    MR. DENNIS:  Well, I was going to.  That was going to be

14  my next  question.

15    MR. VEEDER:  I renew my objection, your Honor.  We

16  haven't gone into that at all.  Mr. Worts hasn't testified to

17  it.

18    THE COURT:  There were figures given of the amount of

19  water, surface water, flowing into these basins.  And I ques-

20  tioned the witness, as I recall, about the amounts flowing out

21  to  the sea, and his answer  was there has been, arriving at

22  the figures on which he  based one of these charts, there  was

23  subtracted the amount of  water that flowed to  the sea from

24  the water flowing in.

25

F

Z36

1       I will change my ruling and overrule the objection.

2       THE WITNESS:  May answer is that I used the data

3  compiled by the U. S. Geological Survey surface water branch,

4  introduced as Exhibits 60 and 62, in my estimates, my measure

5  of the recharge.

6  BY MR. DENNIS:

7       Q  You made no effort to determine whether or not that

8  gaging station measured all of the surface discharge of the

9  Santa Margarita River at the point at which it is installed?

10       MR. VEEDER:  I renew my objection now, your Honor.

11  Certainly there was nothing in the direct examination on that.

12       THE COURT:  He can answer it.  Objection overruled.

13       THE WITNESS:  To the best of my knowledge, it measured

14  all the discharge going through the Narrows as surface flow.

15  BY MR. DENNIS:

16       Q  Does the Ysidora Gaging Station measure any portion

17  of subsurface flow of the Santa Margarita River at the point

18  at which it is located?

19       A  No.

20       Q  How did you arrive at the discharge of the subsurface

21  flow of the Santa Margarita River from the Pendleton Basin?

22  How did you arrive at the amount of water which is discharged

23  from the Pendleton Basin?

24       A  Ground water?

25       Q  Underground flow of the Santa Margarita River?

1    A  Where?

2    Q  At the mouth of the basin.

3    A  I didn't make any estimate at the mouth.  I made an

4 estimate at the Ysidora Gaging Station.

5    Q  All right, at the Ysidora Gaging Station.

6    A  That is in Ysidora Narrows.  That is computed by the

7 formula:  The quantity is equal to the average permeability

8 or transmissibility times the hydraulic gradient times the

9 area or the width, whichever equation you desire to use.

10   Q  And did you determine the hydraulic gradient?

11   A  Yes.

12   Q  And do you have those figures with you?

13   A  Yes.

14   Q  So that you can produce them?

15   A  Which figures do you want?

16   Q  Showing the hydraulic gradient.

17   A  Yes, I can tell you what the hydraulic gradient was

18 at several periods; not all periods.

19   Q  Could you give us the hydraulic gradient for a number

20 of periods?

21   A  I can state that the inland hydraulic gradient in

22 November, 1951, where the water was moving in through the

23 narrows into the Ysidora Subbasin, as depicted by the line

24 titled "Water Level Profile, November, 1951," on Exhibit 38A,

25 was between four and five feet per mile at that particular time.

F

Z3938

Q  And what was the permeability that you used in arriving at your figure?

A  We used—I think I had better look that up, but I am trying to think what the transmissibility was.

Q  I would prefer to have you look it up.  I know that is taxing your memory.

THE COURT:  Keep your voice up, Mr. Dennis.  Get clear back to the back of the room so that they can hear you.

BY MR. DENNIS:

Q  Now, calling your attention to Exhibit 40, which shows the underground basin, it is a fact, is it not, Mr. Worts, that in some instances you included within the limits of the basin the material which you have designated on Exhibit 37 by the symbol Qt and in some instances you eliminated material that you designated by the symbol Qt from the limits of the basin?

A  That is right.  I attested to that yesterday or the day before.

Q  What was your reason?

A  For including parts of it and excluding others?

Q  Yes.

A  We drilled Test Well 10-5-13G1, as depicted on Exhibit 37, to determine the water-bearing character of the terrace deposits, and concluded that they should be considered as part of the storage supply of that basin.  I wish to point

Wpyts   Cross   4239

F

Z39

1    out that they are fairly thin, in so far as their saturation is

2    concerned, so that they do not contribute.  By that I mean,

3    the deposits depicted in the northern and central parts of

4    Sections 13-4, 10 South, 5West do contain minor quantities of

5    water which would move out of storage during the first, oh,

6    possibly 20, 25 or 30 feet of lowering.  Thereafter they would

7    contribute nothing.

8        Other terraces, you will observe-- For example, let's

9    examine the terrace and symbol indicated by Qt down in Sections

10   26 and 35 on the east side of Ysidora Subbasin.  There is a

11   terrace deposit depicted there.  If you will examine the

12   geology, you will observe that the La Jolla formation, colored

13   green, swings nearly completely around beneath it, indicating

14   that the entire unit is above the valley floor-- by "valley

15   floor" I mean the surface of the alluvium-- and therefore in

16   no way could it contribute storage to the system or be a part

17   of the ground water--

18       Q  However, no wells have been drilled or test holes

19   put down in that area?

20       A  It is not necessary to put down test holes under

21   those conditions.

22       Q  And as I understand your testimony, referring to

23   Exhibit 37, the area which is colored green on the map would

24   be a poor producer of water and you would expect very little

25   movement from the water within that formation into the alluvium

as shown on Exhibit 37?

A   That is right.

Q   And also any water which you would find in the formation which is labeled, I believe, Tso would be obtained in small quantities and you would expect very little movement from that water into the area which is occupied by the alluvium?

A   That is correct.

Q   As to the area which is labeled Qt and which is colored orange, would you expect that there would be any movement of the water in that area into the alluvium?

A   Where?   There are lots of areas labeled Qt.

MR. VEEDER:   Could you call the section, Mr. Dennis?

BY MR. DENNIS:

Q   Referring to the alluvium in Section 10 South, 5 West, Sections 7, 12 and 13.

A   You said alluvium?

Q   Into the alluvium, yes.

A   Would you point, please, to an area that I can work from, specifically.

Q   I will point to the yellow area surrounding the well which would be 10 South, 5 West, 13J1.

THE COURT:   J or G?

BY MR. DENNIS:

Q   J-1, the alluvium inthat area, woul you expect any movement from the water contained in the area which is colored

Werts   Cross

F

Z41

1    orange, which contains the Well 10-5-13G1?

2          THE COURT:  Under what conditions?

3          MR. DENNIS:  Under natural conditions.

4          THE COURT:  Of water-- under natural conditions?

5    BY MR. DENNIS:

6          Q  Under natural conditions, would you expect to find

7    any substantial movement of water from one area to the other?

8          THE COURT:  Is this the question that he just answered,

9    that what water there would be in that orange-colored material

10   in Section 13 might move when there was a drop down to the

11   first 25 feet and thereafter there would be nothing?

12         THE WITNESS:  That is correct, your Honor.

13         THE COURT:  Haven't you covered this?

14         MR. DENNIS:  I don't know, under natural conditions.

15         THE COURT:  What do you mean by "natural conditions"?

16         MR. DENNIS:  Where there was no pumping in the basin.

17         MR. VEEDER:  I object to that as being completely

18   irrelevant at this time.

19         THE COURT:  Overruled.

20         Frame your question so we will know what you are asking.

21         MR. DENNIS:  Under natural conditions.

22         THE COURT:  What do you mean by "natural conditions"?

23   Winter?  Summer?

24         MR. DENNIS:  By "natural conditions" I mean the basin

25   and the river uninfluenced by the works of man.

Q   Under natural conditions-- that is, assuming that there was no pumping within the Pendleton Basin, and that there were no surface diversions upstream from the Pendleton Basin-- would you expect any movement from the area inwhich the well which is designated 10 South, 5 West, 13G1 in the formation which bears the symbol Qt into the alluvium in Section 13?

A   I understand your question now.

With no pumping, looking first at the younger alluvium, which is the prime source of supply in this basin, and as the movement in which is depicted on Exhibits 44 and 45, there is a general downstream movement.  There is also included in these contours the movement through the terrace deposits that you mentioned.

Q   Your answer would be yes, then?

A   Yes.

Q   Although, as I understand it, referring to Exhibit 45, they do not reflect the conditions which you would expect to experience in a state of nature; the contours on Exhibit 45 have been influenced by the pumping within the Pendleton Basin, have they not?

A   I am afraid the state of nature occurred before my birth, Mr. Dennis.  I wouldn't know.

Q   I will accept that answer.  As I understand your testimony relative to the Ysidora Basin, there is a movement of sea water-- at some periods of time during your investigation,

Worts     Cross     4243

F

Z43

1  there was a movement of sea water from seaward into the basin;

2  is that correct?

3      A  Yes.

4      Q  Did you make any attempt to measure the quantity of

5  sea water which passed through the Ysidora Narrows into the

6  Ysidora Basin?

7      A  The problem of delineating that quantity which is

8  sea water and the water that is not sea water that overlies

9  it has not been distinguished.

10      Let me explain by referring to Exhibit 38A.  In my

11  testimony yesterday I suggested an approximate position for the

12  upper limit of the salt water wedge, as we might call it, as

13  being only approximate.  Now, with a reverse hydraulic

14  gradient into Ysidora Subbasin, we have salt water moving in

15  an unknown thickness of it.  We also have fresh water up in

16  these silty sands and sandy silts overlying it, so that the

17  relative quantities of each cannot be -- I will not say cannot

18  be-- at great expense they probably could be defined by

19  drilling numerous wells to define the upper limit of this

20  contact, thereby to provide information or a division of the

21  relative proportions in the lower part and the upper part.

22  The lower part containing the salt water that is booming into

23  the basin at that time, the upper member containing fresh water,

24  which also is moving back into the basin at that time.

25      The situation where you have fluids of two different

Worts   Cross

F

Z44

1 densities in motion is very complex, which further complicates

2 the evaluation of the quantities.

3 BY MR. DENNIS:

4     Q  In other words, Mr. Worts, you made no effort to

5 determine in quantitative terms the amount of sea water which

6 at any one time was moving or had moved seaward into the basin?

7     A  No.

8     Q  How did you arrive then at the quantitative amount

9 of underground water or ground water which is discharged from

10 the basin?

11     A  That includes both fresh and salt water.

12     Q  But you did have to arrive at the quantity of water

13 which was moving out of the basin each year, whether it was

14 fresh or salt?

15     A  Not fresh or salt; fresh and salt, both of them

16 together.

17     Q  Fresh and salt.

18     A  You can roughly estimate it.  Refinements, as I

19 pointed out, require a knowledge of the mechanics at the

20 physical position of the inter-face between the fresh and

21 underlying salt water.

22     Q  So that the amount of water which you testified as

23 having been discharged from the basin represented both fresh

24 and salt water?

25     A  I don't recall testifying--

F

Z45

1   Q  You have an exhibit on file which showed the amount

2   of underground water which was discharged from the basin.

3   Exhibit 49-- do you have it?

4   A  That is right, Mr. Dennis.

5   THE CLERK:  Here is Exhibit 49 (handing document to the

6   witness).

7   THE WITNESS: Exhibit 49 shows, on the left-hand graph,

8   below the zero line, a symbol or bar symbol described under

9   "Discharge" in the explanation, a hashered line with slants

10   at the lower left, whereby estimates of the total outflow

11   irrespective of the water quality was moving seaward during

12   the years 1942, '43, '44, and picking up again in '52, '3, '4

13   and '5.  Also, observing the years '46 through '51, above the

14   zero line on that graph you will observe a wedge above a symbol

15   of similar character which depicts the magnitude of the water

16   that moved into the basin through Ysidora Narrows.

17   BY MR. DENNIS:

18   Q  And the amount of water which is shown by the symbol

19   you have just referred to would include both salt water and

20   fresh water, would it not?

21   A  Yes.

22   Q  Now was there any underground flow or movement of

23   water in De Luz Creek?

24   A  That is depicted by-- pardon me-- De Luz Creek?

25   Q  Yes.

Worts     Cross

4246

F

Z46

1     A   We made no studies in De Luz Creek.

2     Q   But calling your attention to your Exhibit 37, which

3   shows rather a large deposit of alluvium from the mouth of

4   De Luz Creek upstream, would you expect to see some underground

5   water moving from De Luz Creek into the basin?

6     A   I wouldn't expect to see it, because I can't see

7   down.   But I would expect that there would be some, yes.

8     Q   Did you make any effort to determine the quantity

9   of water which would move into the basin from De Luz Creek?

10     A   Not from De Luz Creek.

11     Q   Now, did you make any effort to determine the amount

12   of recharge into the basin from Fallbrook Creek?

13     A   Where is that?

14     Q   Fallbrook Creek is the creek which empties into Lake

15   O'Neill.

16     A   I have been in that area.   I have personally walked

17   around on the United States Naval Ammunition Depot and have

18   actually walked down the creek you are referring to as Fall-

19   brook Creek, looking at the geology.

20     I was aware of a large area of residuum, which is de-

21   composed granite, up on the Fallbrook Ammunition Depot.   I had

22   looked at the sewage treatment plant which, to the best of my

23   recollection, discharges into Fallbrook Creek.   I followed the

24   stream along in the residuum where it is crossing the residuum.

25   I can't give you the precise site, but the residuum along the

F

Z47

1   course of the stream terminates abruptly where the unweathered

2   rocks of granite or granitic material crop out and at that

3   point there is a waterfall, a dry one at all times that I

4   observed it. So my conclusion with respect to my personal

5   observations at that time was that there was no underflow

6   moving that lip of consolidated, hard, resistant granite to

7   move downstream to Lake O'Neill.

8        Q  So that it is your opinion that any water which was

9   in the residuum in the watershed of Fallbrook Creek above the

10   rock that you described where the dry waterfall is located

11   would not be moving into the alluvium in the Pendleton Basin

12   underground?

13        A  Not to the best of my knowledge. I observed Fallbrook

14   Creek, and that was my conclusion with respect to the course

15   of the stream.

16        Q  Mr. Worts, in connection with the preparation of

17   Exhibit 45, which are the water contour levels for 1957, I

18   notice that some of the wells which were used for making

19   observations were pumping wells and some of the wells are wells

20   which were just test wells and had no pumps located in them.

21   Do you know whether or not the wells which are designated as

22   pumping wells on Exhibit 39 and which are also shown on Exhibit

23   45 had been pumped or were being pumped at the time that the

24   measurements were made?

25        A  Our practice-- and it is good practice in any type

F

Z48

F2

1 of work of this type where you are trying to establish as

2 accurate a water level map as you can for the conditions

3 existing as of the time-- is not only to measure all of the

4 wells that are measureable, but to observe whether or not other

5 wells that you cannot measure and make reference to them are

6 pumping.  And we even make a strong effort-- though it is not

7 a very strong effort-- you walk into a pump house to measure a

8 well.  Those who have done it for a long time automatically

9 put their hand against the motor to fell if it is warm, which

10 would give you an indication as to whether it had been pumping

11 recently.  Sometimes it may be hot.  In that way the measurement

12 we obtain in the well, we know whether it is pumping at the

13 present time.  If the motor is unduly hot compared to the

14 weather conditions-- of course, there are all degrees of

15 temperature that you can get into there, but if the motor is

16 hot you can reasonably expect that it had been pumping recently

17 and that the water level had not recovered all the way.

18     If you will look at Exhibit-- was it Exhibit 51-A that

19 we put in with the water level measurements-- you will observe

20 in measurements footnotes indicating "Pumped recently,"

21 "Pumping nearby," or it looks to the hydrologist in his

22 interpretation and analysis of the data.

23     To answer the question, yes, we took into consideration

24 the pumping conditions at the time the map was prepared.

25     Q  Assume that we had a well that produced, say, 2,000

a minute and that well was pumped for 30 days steadily and
then the pump was shut off, the pump would probably cool off
in a period of hours, would it not?

A  Yes.

Q  And would you expect that the cone of depression
which was created by the pumping of that well would fully
recover within 24 hours?

A  It would depend.  There are too many variables in
the answer there.  I can't give you an answer because you are
getting into the hydraulics of pumping wells and there are many
considerations, such as degree of confinement.  In a water
table area such as the Upper Basin, what you have actually
done is created a cone of depression around the well, but you
have dewatered the deposit throughout the whole basin.  Most
of your recovery up there would occur in a few hours, maybe
ten hours, and the impression you might get for the uninitiated
going up there from a previous measurement is, "Well, this
can't be.  The level is down from last time."  However, you
are physically pumping water out of the deposits just like
you would be lowering the water level in a bathtub.

Q  But so far as you know you made no effort to determine
the amount of water which had been pumped in the period immed-
iately preceding the time that the measurement was made or the
last time that the pump was in use, other than by just feeling
of the pump to see whether it was hot?

Wores    Cross

F

Z50

1          A  No.  No, very fortunately at Camp Pendleton the

2    wells have discharge meters on them that meter out the quantity

3    of water pumped.  In the construction of maps such as this,

4    any time we have a question about the pumping of a certain well

5    or the amount pumped, we can refer to records kept by the camp

6    to determine the magnitude of the pumping.

7          Q  In the preparation of Exhibit 45 did you examine the

8    records of the Camp?

9          A  Certainly.

10         Q  You did?

11         A  Yes.

12         Q  As I understand it, you say that each well which is

13   pumping in the Pendleton Basin has a meter showing the amount

14   of water pumped?

15         A  To the best of my knowledge, the wells are all

16   metered-- that is, the discharge is all metered.

17         Q  And accurate records are kept of the discharge?

18         A  Well, the camp keeps them.  To the best of my

19   knowledge, they are accurate.

20         Q  That is, the Public Works?

21         A  I don't know.  We can get those records at several

22   places.  The camp maintenance man may collect them, for all I

23   know.  We can get them there.  We can get them at the Public

24   Works.  We can pick them up at the Office of Ground Water

25   Resources.  I believe the camp has a regular distribution

4251

F

Z51

1    system of information to all offices concerned with water and

2    related services.

3        Q  In the preparation of Exhibit 49 where did you

4    obtain the pumpage records?

5        A  To the best of my recollection, all-- no, I can't say

6    all, but most-- let's just say the bulk of them came from the

7    Public Works Office at Camp Pendleton.

8        Q  Did you obtain any records from any other division

9    or department?

10       A  We may have obtained-- I say we may have, because I

11   am not sure, in the last few years since I have been in

12   Sacramento-- some may have been collected from the Office of

13   Ground Water Resources.

14       Q  And do you have the copies of the figures which you

15   took in preparation of this exhibit among your records?  Did

16   you make copies?

17       A  Sometimes they were copied in longhand.  At other

18   times we were able to obtain facsimile prints.  It just

19   depended on what was available at the time.

20       Q  And those would still be among your files?

21       A  I imagine they are.  There again I can't attest to the

22   data we picked up eight years ago.

23

24

25

BY MR. DENNIS:

Q  You may have answered this on direct examination in another question when I wasn't here yesterday morning, or the morning before, but in the preparation of Exhibit 49, did you take into consideration the amount of water which was diverted from the Santa Margarita River by the O'Neill Ditch?

A  Yes.  I can explain how that is taken into consideration.  First, in answer to your question:  Yes, I did.

Q  And you obtained the amount by using the meter readings?

A  Pardon?

Q  I say, you obtained that amount by making copies of the gaging station on O'Neill Ditch?

A  I didn't need to do it that way.

Q  How did you do it?

MR. VEEDER:  Well, now, if this is cross examination to inform Mr. Dennis because he wasn't here during the period that this was gone into, I am certainly going to object to it.

MR. DENNIS:  I don't think he went into it.

THE WITNESS:  I did.  I explained how the evapo-transpiration loss--

MR. DENNIS:  I am not talking about evapo-transpiration loss.

Q  I am talking about the actual amount of water you figured was diverted from the Santa Margarita by the O'Neill

1     Ditch.  How did you arrive at the amount?

2          MR. VEEDER:  I am going to object to this.  If Mr.

3     Dennis doesn't know how it came about, why, he  should have been

4     here for the direct examination.  Why do we go into it on cross?

5          THE COURT:  Overruled.

6          THE WITNESS:  Question?

7     BY MR. DENNIS:

8          Q  I said how did you arrive at the amount of water

9     diverted  from the Santa Margarita River by the O'Neill Ditch?

10          A  I didn't.

11          Q  Do  you know whether or not water is diverted by the

12     O'Neill Ditch and discharged into  the Pendleton basin prior to

13     the time that it reaches the gauging meter on the O'Neill

14     Ditch?

15          A  I know nothing about the operation of O'Neill Ditch.

16          Q  So you didn't take into consideration any water

17     which might have been diverted by the O'Neill Ditch and placed

18     into underground storage in Pendleton basin?

19          A  Yes, I did.

20          Q  How did you take that into consideration?

21          A  Perhaps the best way to show that is by a flow

22     diagram.  I will take a  green pencil, and on the isopach map,

23     Exhibit 39, I will  draw a sketch up in the open area in the

24     upper left-hand corner.  I will diagrammatically show De Luz

25     Dam Site.  I will diagrammatically show the river as a straight

line coming down and diagrammatically show Ysidora Narrows.  I

will place over here diagrammatically Lake O'Neill.  I will

diagrammatically show by a dash line from the De Luz Dam Site

to Lake O'Neill a diversion ditch that enters or is somehow

connected to the lake.  I will show diagrammatically by a

dashed line, approaching the lake from the right, sewage

effluent from treatment plant-- I can find it.  If someone will

tell me.  Number one, I think it is.

All right, now, to estimate the net loss to the ground

water basin from this flow diagram or the difference between--

I won't call it net loss.  I will  call it recharge from the

stream system and diversion system to the ground  water basin.

I will refer to Exhibits 60 and 62, which show the computed

inflow at De Luz Dam Site on Exhibit 62, the gauged outflow

at Ysidora Narrows on Exhibit 60.  I know that the inflow at

De Luz Dam Site is computed.  We can just take a figure of

5,000 acre feet.  I wish to indicate that that 5,000 acre feet

is above the point of diversion, that the outflow at Ysidora

Narrows, for simplicity, was zero.

MR. VEEDER:  That is a good round figure.

THE WITNESS:  It matters not exactly how much diversion

took place into O'Neill Lake because it holds so much water.

It is complicated by the diversions from the sewage treatment

plant to allow either all of the water that enters this lake,

ultimately evaporates or is released into the basin. It has two

1    places to go.  I understand nobody drinks it.

2         THE COURT:  None of it is transported out of the water-

3    shed?

4         THE WITNESS:  Not to my knowledge.

5         Therefore, as I indicated yesterday, the evaporation

6    loss on the 135 acres, which is the maximum area, giving it

7    the benefit of the doubt for the maximum area of loss, and

8    **four** feet of evaporation minus the rainfall for  the year, which

9    all figures out to roughly 400 acre feet per year, goes up  in

10   smoke.  Everything else that comes in by diversion or from the

11   river or by flow from the sewage plant, if there is any surplus

12   in the diversions here, it could be released here or from the

13   east reservoir.  And to the best of my knowledge, it is all

14   accounted for as into the system.

15   BY MR. DENNIS:

16        Q  In other words, the water from Lake O'Neill is

17   either discharged as the southerly or southwesterly end of Lake

18   O'Neill, or it seeps into the alluvium which underlies the lake,

19   or is lost by evaporation?

20        A  Well, the losses that I figured naturally were the

21   surface losses.  Any other losses would be into **the** ground

22   waters.

23        Q  But you would expect to see some movement of the

24   water vertically from O'Neill into the alluvium which underlies

25   Lake O'Neill?

A   It is possible.  I can't give you a firm answer.  I have made no studies of that activity.

Q   Have you had a chance to observe the method in which this sewage effluent is handled?

A   Now, what do you mean by that?

Q   Is it allowed to flow down the stream in open channel from--

A   Where?

Q   -- from one basin to another?

A   Are you speaking there-- I think I testified yesterday to four or five sewage effluent plants.  Now, which one do you have in  mind?

Q   Well, generally, the method in which the  sewage is discharged into the basin?  In other words, is there a pipe which goes directly into the ground, or does it flow along the surface and into a spreading basin and eventually percolates into the underground?

A   Where?  We have all kinds of conditions.

Q   All right.  In any one of the sewage effluent plants? From  any one of the sewage effluent plants?

A   What?  Please--

THE COURT:  Well, is there any one of them where the sewage effluent is put down in the ground by a pipe?

THE WITNESS:  No, there is not.

THE COURT:  Is there any  one where it is put into a

1    spreading basin?

2        THE WITNESS:  They are called aeration lagoons,  I have

3    observed aeration lagoons below treatment plant-- I have no

4    exhibit that shows the positions.  Is there an exhibit that I

5    can refer to for the sewage plants?

6        MR. VEEDER:  Not yet.

7        THE COURT: You did go into it on direct.

8        THE WITNESS:  That is right, your Honor.  It is right

9    in the northern part  of Section 26 in Township 10 South, 5

10   West.  There have been constructed aeration ponds into which

11   the sewage is discharged and from which it can either sink in

12   or spill over into the river channel.  I testified yesterday

13   that the sewage plants that entered-- I am now referring to

14   Exhibit 37-- the unnamed stream in Section 31 and 36-- that

15   part in 31 being in 10 South, 4 West; that in 36 being in 10

16   South, 5 West-- had been discharged for a while just out onto

17   the alluvial flat, and some ponded in the area in the southwest

18   portion of 36.  The remainder, or another part, came down the

19   southern end and ponded near Well 2-K-1 in the southern part

20   of the Ysidora Subbasin. Subsequently, it was run into a pipe

21   that diverted it from the mouth of this creek, brought it

22   across and emptied it into the river bed some place in the

23   general vicinity of Wells 35-K-1 and  4, 10 South, 5 West.

24   BY MR. DENNIS:

25       Q  Are there losses by evaporation from  these sewage

1    effluent ponds that you have just referred to?

2        A  The losses would depend on the size of the, well,

3    simply--

4        Q  Are there losses?

5        A  There would be some.

6        Q  Did you take that into consideration in the prepara-

7    tion of Exhibit 49?

8        A  No, the metered amounts of the sewage effluents are

9    shown on Exhibit 49.

10       Q  And the amounts that actually go into the underground

11   basin would be reduced by the amount which  was lost by evap-

12   oration at the time?

13       A  Yes.

14       Q  And in response to the Court's question that no part

15   of this sewage effluent was then taken out of the basin--

16       A  I beg your pardon?

17       Q  I say, the Court asked you, as I recall, that no

18   portion of the  sewage effluent was taken outside the watershed.

19       THE  COURT:  No, that was Lake O'Neill.

20       MR. DENNIS:  Oh, from Lake O'Neill.  In Lake O'Neill.

21       Q  It is true, is it not, water which was pumped from

22   the basin, in Chappo basin, was used outside the watershed?

23       MR. VEEDER:  That is beyond the scope of direct exami-

24   nation.

25       THE WITNESS:  I have no knowledge of  the distribution

1    of the use.

2         MR. VEEDER:  There was no question of that character at

3    all.

4         THE COURT:  The direct was limited to what was called

5    pumpage.  He testified water wells were just pumped out.

6         MR. DENNIS:  I was just thinking, though, in response

7    to your Honor's question that no portion of that sewage was--

8         THE COURT:  I didn't  ask about sewage water.  I asked

9    about Lake O'Neill.

10        MR. DENNIS:  In Lake O'Neill, which is partially sewage

11   water.  He said there was sewage water which  is discharged

12   into Lake O'Neill.

13        THE COURT:  Yes, but I asked him whether anything out

14   of Lake O'Neill went out of the watershed, and he said he

15   didn't know.

16        MR. DENNIS:  We can develop that.

17        Now, there is a question pending.

18        THE COURT:  Well, ask it over.

19        MR. VEEDER:  You want to withdraw that?

20        MR. DENNIS:  I will withdraw the question.

21        Q  Do you have 37?

22        A  A?

23        Q  Mr. Worts, 37A?

24        A  The book of logs, I have.

25        Q  Will you refer to the well log for 11-5-9J1.

1    A  Yes.

2    Q  That was a test well, was it?

3    A  U. S. Geological Survey Test Well 10-5-9J1.

4    Q  And under the item "Source of data, PI," the "PI"

5    stands for physical inspection?

6    A  Physical?  No, personal inspection.

7    Q  Personal inspection?

8    A  By a representative of the Geological Survey.

9    THE COURT:  This is J-1, now?

10   MR. DENNIS:  J-1.

11   Q  And so this would be the well log which was prepared

12   by U. S. Geological Survey and not the log of the driller?

13   A  Correct.

14   Q  And calling your  attention to the perforations in

15   that well, that well was drawing water from the lower member of

16   the alluvium, the upper member of the alluvium, and from the

17   San Mateo formation of Woodford, was it not?

18   A  May I look at your copy?  The second page of the log

19   is missing from this copy.

20   Q  Yes.

21   Can we have the second page?

22   MR. VEEDER:  Yes, sir.

23   THE WITNESS:  The perforation interval shown on the,

24   typed at the bottom of the second page, the uppermost is a

25   hundred to a hundred twenty feet, which is below the base of

1    the upper member of the alluvium.  The well is perforated, as

2    depicted by the arrows in the lower member.  The well went down--

3    I am alluding now to Exhibit 38-- the well went down another

4    approximately a hundred feet below the base of the illustration.

5    Nevertheless, it is perforated in the San Mateo formation.

6         Q  And any water which was obtained from the well, would

7    be water which was obtained from both formations?

8         A  Yes.

9         THE COURT:  I wish I knew what you are trying to prove,

10   Mr. Dennis.

11        MR. DENNIS:  We have certain chemical analyses in regard

12   to these wells, and I think the perforations have more impor-

13   tance than the depths.  There are certain conclusions which

14   have been drawn from chemical analysis.

15        THE COURT:  This one well, I understand, is down there

16   in the lagoon area.  The Government's showing is that as to

17   its production of water, it is worthless.

18        MR. DENNIS:  That is correct.

19        THE COURT:  Now, do you have any contentions that the

20   water out of that well--

21        MR. DENNIS:  We have no intention of showing that is

22   good, no.

23        THE COURT:  What are we doing?

24        MR. DENNIS:  I think the chemical analysis in regard

25   to the movements--

1    MR. VEEDER:  I can't hear.

2    MR. DENNIS:  -- in regard to the movements of the water,

3    the depths of the various formations, and so on, I think we have

4    some disagreement.

5    THE COURT:  Well, to the effect that it is a brackish well,

6    has salt water in it, because it penetrates the San Mateo for-

7    mation?

8    MR. DENNIS:  I think that the testimony, your Honor,

9    was that this chemical condition was from the sea water.  And

10   it might very well have been from the chemical composition of

11   the water  that was obtained in the San Mateo formation of

12   Woodford.

13   MR. VEEDER:  So what?

14   THE COURT:  Well, what would that do then?  It would be

15   pretty hard for me to see that that well in that lagoon area

16   wasn't contaminated by the ocean. But supposing you did prove

17   that the water in that well  was good fresh water down there

18   for a couple hundred feet, and then brackish water came out of

19   the San Mateo formation--

20   MR. DENNIS:  There is no intention of showing it is

21   good water.

22   THE COURT:  What would it prove?

23   MR. DENNIS:  There is no intention of showing the water

24   in that well was good, fresh water.

25   MR. VEEDER:  Well, I am glad to hear that.

start
G2

1    THE COURT:  The Government makes no contention there

2  was any substantial amount of water in the San Mateo formation.

3    MR. VEEDER:  That is right.

4    MR. DENNIS:  That is correct.  But they are making a

5  contention that there has been salt water intrusion by the

6  water moving from the ocean inland; the intrusion which they

7  have based primarily, as I understand it, on chemical analysis

8  of the water taken from these various wells.

9    Now, there is also  even as a part of the Government's

10  case some showing that water obtained from certain other for-

11  mations, to a certain extent, have some of the characteristics,

12  at least, of sea water.

13    Mr. Worts shakes his head, but there might be a differ-

14  ence of opinion between experts on it.

15    MR. VEEDER:  And I hope he doesn't have a difference of

16  opinion with himself.  That is what it amounts to if that  is

17  what you are saying.

18    THE COURT:  I want to permit you to cross examine if we

19  are going to get anywhere, if you have got something you are

20  shooting for.  The only trouble is that I am not very smart.

21  I  don't like to be in the dark about it.  I would like to know

22  somewhere along the line what you are getting at, so I can put

23  some of it together.

24    MR. DENNIS:  I would be perfectly willing to make a

25  statement, your Honor.

1      THE COURT:  By the time you get around to arguing your

2    case, I may have forgotten about all this testimony, so once

3    in a while give me a hint as to what you are--

4      MR. STAHLMAN:  Mr. Dennis said he was going to  make a

5    statement.  That is what I have been looking for.  As a matter

6    of fact, I was going to suggest  to the Court:  What is the

7    purpose for this?  This is taking a lot of time.

8      THE COURT:  That is what I am really asking him.

9      MR. DENNIS:  I think the purpose of the proof is to

10   show if there is any salt water intrusion, the only thing that

11   is responsible for it is the manner in which the Ysidora basin

12   was pumped.  That is first.  Second, that there is practically

13   no movement of water, underground movement of water, from the

14   Ysidora basin through the Ysidora, past the Ysidora Narrows.

15     MR. VEEDER:  Would you state that again?  There is no

16   sea water coming in?  Is that what you  are saying?

17     THE COURT:  No.  No.

18     MR. VEEDER:  I want to know.

19     THE COURT:  This last statement, read it, Mr. Reporter.

20     (The reporter read back that portion of the record.)

21     MR. VEEDER:  I don't know what he means.

22     THE COURT:  He says that he wants to prove that there

23   is no movement of water underground through the narrows from

24   Ysidora Subbasin.

25     MR. VEEDER:  No sea water?

1          THE COURT:  No, he is not talking about sea water.  He

2  is talking about fresh water.

3          MR. DENNIS:  Fresh water.

4          THE COURT:  Take a short recess.  You gentlemen can

5  talk it over.

6          (Short recess taken.)

1    Q  Mr. Worts, directing your attention to Exhibit 51,

2  and in particular to the information contained as to the Well

3  11-5-2B2, I wonder if you would look at Exhibit 37A, the log

4  for that well, and tell me what depth that well is?

5    A  Referring to 37A, the log, the well was drilled in

6  1913.  At that time the driller indicated a depth of 118 feet.

7    Q  And the perforations were from 90 to 103 feet?

8    A  That is what the exhibit states.

9    Q  Do you want to make a correction, then, as to the

10  depth of the well on Exhibit 51?

11    A  No, because we measured personally, or under my

12  direction, every well that we could get into, was sounded at

13  the time of our field survey, and if that depth differs from

14  the depth of the log drilled forty years before it would be

15  my conclusion that the well had sanded in to a certain extent.

16    Q  And there would be no perforations from the surface

17  to 80 feet?

18    A  Not according to the log.

19    THE COURT:  Does this well appear on 38?  What chart are

20  you looking at?  51.  I have 51 before me.

21    MR. DENNIS:  It does show on 38, your Honor.

22    Your Honor, the graph is on the left-hand side, with the

23  depth shown in parentheses.

24    THE COURT:  All right.  I am going to have to get a

25  secretary to sit beside me to keep my maps straight.

H

Z53

1    THE WITNESS:   I was going to state that the degree of

2  connection, although the well is sounded at 80 feet, 10 feet

3  above the indicated topmost perforation on Exhibit 37, there

4  is obviously interconnection through the material that is in

5  the well, which may be sand.  For all I know, the well may be

6  now, or then at the time of the beginning of our study in

7  1950, the well was almost forty years old.  There is a very

8  good chance that the casing had rusted out.  It matters not

9  what the cause may have been.  The well does reflect, as shown

10  over in the right-hand portion of that graph, the fluctuations

11  as they occur in the vicinity of that well.  If the well had

12  been mudded up tight, you would not obtain the rapid response

13  to the pumping and recovery as depicted particularly, for

14  example, the 20-foot rise from the fall of 1951-- I am alluding

15  still to Exhibit 51-- to the early spring or late winter of

16  1952, which is the same order of magnitude as that I observed

17  in other deep observation wells in that basin.

18  BY MR. DENNIS:

19    Q  And the well having been drilled in 1913 and the

20  casing inserted at that time, it would be reasonable to believe

21  that the casing had deteriorated to the extent that it would be

22  probably extracting water from any of the formations through

23  which it passed?

24    A  I cannot verify that.

25    Q  No.  What would be your conclusion?  Do you think

H

Z54

1    it would be a possibility that that would be true?

2         A   Anything is possible.

3         Q   You made no effort to determine the state of the

4    casing, whether it rusted through, or whether--

5         A   No.

6         Q   Now, calling your attention to Exhibit 42, which is

7    the estimated ground water storage capacity for Upper Chappo

8    and Ysidora Basin, Camp Pendleton, I notice that on each one

9    of the blocks depicted on Exhibit 42 there is a dashed line on

10   the left-hand side of the block.

11        A   That is correct.

12        Q   At what elevation from the surface is that line run?

13        A   That line is drawn 5 feet below land suface.

14        Q   And does that indicate that you would figure that

15   most of the water within that five-foot area would be withdrawn

16   by evaporation and transpiration?

17        A   That is one possibility.  And probably, from a more

18   practical standpoint, the river bed of the Santa Margarita

19   River, in traversing the basin, is on the average-- May I

20   refer to the Morro Hill Quadrangle?  It is possibly Sheet 29A

21   or G.

22        MR. VEEDER:  I would like to have the record show that

23   reference.

24        THE WITNESS:  I am referring to Exhibit 29G.  In observ-

25   ing the contours in the Upper Subbasin and Chappo Subbasin

4268

H

Z55

1    it will be observed that, for example, the 100-foot contour

2    in Upper Subbasin extending generally westward across the

3    alluvial plane is about in the middle of Sections 7 and 8 or

4    a little bit north, Township 10 South, 4 West, until it approaches

5    within a few hundred feet of the river, at which point the

6    contour deflects upstream a distance of a third of a mile or

7    maybe half a mile following the lowest portion of the stream

8    channel, then crossing the stream up in the middle of Sections

9    5 and 6, 10 South, 4 West.  It then comes back down on the

10   west bank to a point almost opposite the point where it deflects

11   on the east bank and crosses the plane.  This would indicate

12   that the channel is incised slightly into the plane, so that

13   the selection of five feet, anything above five feet in water

14   level would bleed into the stream and more or less be an upper

15   limit of saturation, except momentarily following, say, a heavy

16   period of rain or for maybe for a few weeks or so after the

17   stream during high stage of flow came down and left its banks

18   inundated the upper basin, thereby adding substantially to the

19   normal recharge of the system.  Therefore, we selected five

20   feet as a practical depth below land surface to start considera-

21   tion of our storage capacity.

22        Q  Do I understand, then, that any water within the

23   upper five feet you would expect to drain into the Santa

24   Margarita River and flow downstream as surface water?

25        A  If it ever reached that height, I would expect it to.

JH

Z56

1    Q   And when you state that the usable storage capacity

2   is the first hundred feet, the upper hundred feet inthe basin,

3   do you include that five feet among the upper hundred feet?

4    A   I did not state that the upper hundred feet was the

5   usable storage capacity.

6    Q   Well, it would be an estimated storage capacity?

7    A   Or estimated.  It is not a hundred feet.  If you

8   will allude to the Exhibit 42 you will see the depth that has

9   been depicted as the usable--

10    Q   On Exhibit 42?

11    A   On Exhibit 42.

12    Q   But as I understand, on Exhibit 38 the dotted line

13   is the base of estimated storage capacity?

14    A   That is the gross storage capacity to a depth of

15   100 feet.  Definitely not to be confused with the usable

16   storage capacity.

17    Q   On your estimated storage capacity is the five feet

18   included within the 100?

19    A   It is 95 feet thick minus the top 5 feet.

20    Q   As I understand, referring to Exhibit 49, the cross-

21   hatched blocks on the graph, which say "Evapo-transpiration,"

22   represent the amount of water which would be lost by trans-

23   piration and by evaporation on the surface area of the basin,

24   as shown on Exhibit 40?

25    A   That is not what I said.

H

Z57

1      Q  What does it represent?

2      A  It represents the evapo-transpiration on an estimated

3  500 acres where the water level is shallow enough in depth for

4  some evaporation to take place, such as the swamp area

5  previously attested to in the west side of the alluvium in

6  Sections 26-23, 10 South, 5West.  It also encompasses areas

7  where there are substantial stands or growths of phreatophytes,

8  such as the willows and trees and tules and reeds, other water-

9  loving plants, that have their root system in ground water

10  and depend upon it as a source of their growth.

11      Q  Well, it does represent the loss of ground water

12  from the basin, then  by evapo-transpiration?

13      A  Yes.

14      Q  Now, referring to Exhibit 38 and the wells which are

15  depicted on the exhibit, is it not a fact, Mr. Worts, that all

16  of the wells in Ysidora Basin are extracting water from the

17  lower member of the alluvium?

18      A  That is a half-truth.  The permeable materials, by

19  far the most permeable, are in the lower member of the

20  alluvium, as indicated by the symbol for the lithology or the

21  materials penetrated.  However, I wish to allude to Exhibit 46

22  and specifically the upper diagram.

23      Wells 10-5-35K1 and K4 are graphed together.  I wish to

24  point out that during and after the principal season of re-

25  charge that the shallow water in the upper member of the

H

Z58

1   alluvium-- if we look at Exhibit 38, and if I can get out my

2   scale here-- Well 35K1, the deep well, is not plotted on here

3   but it is in the general vicinity of 35K1 and 35G1 on Exhibit

4   38.   The depth of that shallow well, if I scale off-- I will

5   take a green pencil-- I observe by looking on Exhibit 37 that

6   Well 35K4, for all practical purposes, is midway between 35K5

7   and 35G1, both of which are plotted on Exhibit 38.   So I will

8   rule in a vertical line between those two wells to represent

9   the shallow observation well for a depth of 28 feet and I will

10   put a cross line at its base and I will put a little tick above

11   land surface to indicate its approximate position, and I will

12   label it on Exhibit 38 "10-5-35K4" and I will put "Shallow"

13   in parentheses under it-- "Shallow well."

14          MR. VEEDER:   Would you add your intials to that, please.

15          THE WITNESS:   I am adding my initials.

16          Observe the relationship of the depth of Well 35K4 to

17   the depth of Well-- unfortunately, 35K1 is not plotted-- I

18   will plot it right beside it, which is indicated on Exhibit 46

19   as being 166 feet deep.   For purposes of illustration, I can't

20   possibly draw in all the distance from K4 to scale.   But I will

21   move it to the left slightly on Exhibit 38 there and draw a

22   line down 166 feet and put a tick to indicate its approximate

23   depth.   I will put a rocket or curved line to indicate which

24   well is which.   I am connecting a short line for shallow well

25   K4 and I will rocket out and up above Ysidora Subbasin on

H

Z58x
Z59

1   Exhibit 38 and label it "10-5-35K1 deep well" and add my initials.

2   I will refer to the log of Well 35K1-- that is in

3   Exhibit 37A-- and determine there that it is perforated from 98

4   feet to 123 feet.  I will change colors and select a pink and

5   scale down and place opposite the perforations on 35K1 the

6   position of those perforations 98, which is right at the base

7   of the upper member of the alluvium, 98 to 123 feet, showing

8   where the position of the perforations are according to the

9   record in the deep well 35K1.

10   I personally constructed the shallow well and we used

11   what is commonly known as a sand point, which is a piece of

12   pipe two to three feet long in which holes are bored and which

13   is wrapped in a fine screen to keep the sand from coming in.

14   It has a sharp point on it that is screwed onto the one-and-a-

15   half or two-inch pipe that we used for the well after we had

16   augered the hole and dropped it.  So that all I can do is put

17   a little cross mark at this scale near the bottom of well

18   10-5-35K4 to indicate where it is perforated.  This means that

19   the perforations in the shallow well are down near sea level,

20   as shown on Exhibit 38, and that the perforations in the deep

21   well, which is 20 feet away, or thereabouts, 98 to 123.

22   All right.  Now, to answer your question, when you turn

23   on the pump in 35K1 to extract water from the lower part of the

24   alluvium-- let's look at Exhibit 46 and observe everywhere the

25   close parallelism between the two graphs, indicating that

H

Z60

1   through this relatively permeable material on the west side

2   of Ysidora Subbasin, through an interval at that particular site

3   involving Wells K1 and K4 and through a thickness of 75 feet

4   approximately there was good interconnection.

5        Furthermore, to amplify a little bit what I have said,

6   I have personally made measurements-- to the best of my

7   recollection, I made them or one of my men made them under my

8   direction-- measurements in 35K4 before 35K1 was turned on,

9   that is, the pump was switched on, and even the response to

10  instantaneous pumping effect in a matter of a few hours the

11  water level in 35K4, the shallow well, proceeded to decline.

12       I think that the data that we have as shown on this

13  graph conclusively show that there is reasonably good inter-

14  connection between the shallow material up to and including

15  river level and the deep zone where the permeable beds are and

16  from which the water itself physically enters the well.  So

17  that the source is twofold, the water moving down through the

18  valley-- and I might add, in alluding to Exhibit 38A-- un-

19  fortunately also in from the seaward end of the valley as well

20  as downward from the deposits overlying the lower member.

21       Q   When did you make the pumping tests that you have

22  just described as to the effect of pumping the deep well 10-5-

23  35K  and 10-5-35K4?

24       A   To the best of my recollection--

25       Q   Did you make them prior to or after October, 1952?

H-
61

1        A   I don't remember.

2        Q   Now, referring to Chappo Basin, do all of the wells

3    in that basin, with the exception of 10-5-4Q1 and 10-5-13J1--

4        MR. VEEDER:   Hold it.   I think you have lost the witness.

5        THE WITNESS:   Where is 10-5-4Q1?

6        MR. DENNIS:   10-5-14Q1.

7        THE WITNESS:   I see that well now.

8        MR. DENNIS:   And 10-5-13J1.

9        THE WITNESS:   Question?

10   BY MR. DENNIS:

11       Q   Do all of the wells shown on Exhibit 38 in Chappo

12   Basin, with the exception of the two wells that I have just

13   mentioned, extract their water from the lower member of the

14   alluvium?

15       A   14Q1 is an unused well.   I believe it is now destroyed.

16   J1 is one of our test wells that never was used for public

17   supply.   I believe that you desire to know which wells are

18   pumped and which aren't, there is a very good legend shown

19   on Exhibit 37 which shows you the Camp and irrigation wells

20   that are pumped and those are indicated by a double circle.

21       Q   I will ask you this question, then.   Are all of the

22   wells which are being used for the purpose of supplying water

23   for irrigation or for camp use in Chappo and Ysidora Basin

24   producing water or extracting water from the lower member of

25   the alluvium as shown on Exhibit 38?

H

Z62

1    A  The same thing applies, but the connection increases,

2  as the whole course of testimony previously given concerning

3  Wells 10-5-35K1 and 35K4 in Ysidora Subbasin, as we go upstream

4  the degree of interconnection increases.  So that by the time

5  you reach the upper subbasin the degree of interconnection is

6  excellent.

7    Q  In Ysidora and the lower reaches of Chappo Basin,

8  the upper soils are composed chiefly of clays and silts and

9  lagoonal type mud, are they not?

10    A  The soils?

11    Q  Yes.

12    A  I am not concerned with the soils.  You are talking

13  about ground surface.

14    Q  I will put it another way.  In Ysidora Basin and in

15  Chappo Subbasin, the lower members of Chappo Subbasin, the

16  upper member of the alluvium is composed of principally clays,

17  silts and lagoonal type mud, are they not?

18    A  A study of the well logs and of our test wells

19  during drilling indicates that in part that is true and in

20  part that is not true.  That is, locally, as I have gone to

21  great lengths to explain on the exhibits of Ysidora Subbasin,

22  there seems to be a preponderance of lagoonal muds.  On the

23  west side near the river, and as indicated in some detail by

24  the logs of two wells over there that were drilled-- by "over

25  there" I mean over near the river on the west side-- by an

H

Z63

1   examination of the logs of Well 10-5-35K4, drilled personally

2   by myself, and 35K5, one of the U.S.G.S. test wells that was

3   drilled just south of the shallow well, those are the best logs

4   in that vicinity to show the character of the materials in

5   detail.  They do not appear to be masses of lagoonal muds in

6   there, by any sense of the imagination.

7        Q  How about clays and silts?

8        A  There are lenses of silty clays.  We found in the

9   drilling of the wells by hand, where we actually were using a

10  post hole auger with great difficulty in getting down to depths

11  of 28 or 25 feet, if you will examine the logs of the shallow

12  wells drilled by the U.S.G.S. in Exhibit 37A you will find

13  that I don't think there is anything in the nature of-- well,

14  to the best of my recollection, without going through each one

15  of them one by one, nothing classified as a pure clay.  I

16  believe the clays were silty, I believe they were mostly sandy.

17  There may have been a half foot bed of something here that was

18  close to clay.  By and large, they do not constitute a massive

19  deposit of clay.

20       Q  I think that you said you personally drilled 10-5-35K4?

21       A  I was there, yes.  Just who was doing the strong-arm

22  work in getting a post hole auger down to 25 feet-- I am sure

23  that I had a part in it.  I assisted in the logging of the

24  well.

25       Q  And that well was drilled in May, 1951, was it not?

H

Z64

A  The well in Exhibit 37 indicates that.  I will accept that.

Q  And in October, 1952, you had ample time to examine the log of that well and the materials and scraps that came out of the well?

A  I wouldn't say that I had ample time.  I was running the Long Beach Office.  I had many things to consider.

Q  Did you preserve any of the scraps that came out of the hole?

A  We did not save those for posterity, no.

MR. VEEDER: Or for anyone else.

BY MR. DENNIS:

Q  Now, isn't it true, Mr. Worts, that the clays and silts in Ysidora Basin form a semi-confining bed?

A  Yes, I would call it a semi-confining bed.

Q  Would you call it a clay cap of very productive gravels?

A  Not since our detailed analysis of the well logs and studies made during the course of the last nine, eight and some-odd fraction years.  I would say that is not true.

Q  What studies have you made since October, 1952, that caused you to change your opinion?

A  I am not changing it.  I am merely refining what preliminary material that we had to present at the trial in about October, 1952 as compared to the more leisurely time we

have had to study the situation. For example, just take Exhibit

46 here.   I personally feel that the number of years of records

that we have shown here are certainly more conclusive than part

of a year, a couple of years, or a shorter period of time.

Actually, the longer time we can spend in this basin the more

we will know about it, the more detail we will be able to give.

Another five years from now I could probably give you some

additional facts that will turn up in the analysis of the data.

        MR. VEEDER:   Let's hope we are not back here.

BY MR. DENNIS:

        Q   However, additional time wouldn't help you in making

any analysis of material or scrap that came out with the auger

from the well hole?

        A   Tied together with the hydrologic and chemical data,

it most certainly would.   You don't consider geology in itself

as the only tool used in the evaluation of the physical condi-

tions that occur in a ground water basin.   It takes the

geology, it takes a thorough understanding of the hydrology,

it takes a good working knowledge, the more the better, of the

geochemistry and in time, if the proper data are collected and

as time goes on, you can make a better evaluation of a ground

water basin.

        Q   Would the locations and distributions of the clays

and silts in Ysidora Basin, and particularly in the upper

member of the alluvium as shown on Exhibit 38, influence the

H

Z66

1    manner in which water would move in the basin?

2        A   Yes, it does do that.

3        Q   And would you say that generally the same conditions

4    result so far as the distribution of the clays and silts in the

5    Chappo Basin as far upstream as approximately Basilone Ford?

6        A   In observing the character of the materials depicted

7    graphically on Exhibit 38, you will observe in moving upstream

8    that the lithology-- which I explained is the grain type--

9    becomes coarser and coarser for all wells.  This is most

10   graphically, probably more graphically, illustrated by the bar

11   graph for specific yield.  If I may refer to Exhibit 41--

12   (The Clerk hands document to the witness)

13       As I testified during my testimony on Exhibit 41, the

14   specific yield, the magnitude of which I depicted by symbol

15   at the lower part of the graph, the well logs themselves--

16   their sand, gravel and other categories-- have been converted

17   to specific yield values up there.  By "up there" I mean in

18   the well logs themselves.

19       In observing the pattern at the bottom of the graph

20   underneath "Key to specific yield values," it is apparent that

21   to the right where we have the higher specific yield the

22   patterns are very light, and as we look to the left, the 5%

23   or the finer materials with less specific yield the color is

24   black.  That is a relative measure of the overall character of

25   the upper member as depicted in the upper half of this diagram,

H

Z67

1  because this is about 100 feet thick and the upper member is

2  slightly less, as you can see by comparison of the 100-foot

3  line shown on Exhibit 38 and described "Base of estimated

4  storage capacity"-- that is the 100-foot depth that corresponds

5  to the base of the upper part of the graph.  The contact between

6  the upper and lower members, from visual inspection, is 25

7  feet higher than that, but for all practical purposes the color

8  pattern as it strikes your eye in looking at Exhibit 41 shows

9  an increase in the density of the coloration blending more

10  toward black downstream and to the lighter colors upstream.

11  Therefore, the distribution of the clay lenses or silt lenses--

12        MR. STAHLMAN:  What is this?  I think we are getting

13  long explanations here that are repetitious, your Honor.

14        THE WITNESS:  I believe he asked me about the extent

15  of the clay lenses.  Pardon me.

16        MR. VEEDER:  I truly believe that the question opened

17  up a whole field of inquiry that is extremely important and

18  highly relevant in the litigation, and certainly we are anxious

19  to have these questions answered.

20        THE COURT:  What was the question, Mr. Dennis?

21        MR. DENNIS:  I asked him if it was not true that the

22  character of the clays and silts in the upper member of the

23  alluvium in Chappo Basin, from Ysidora Basin to the approximate

24  location of Basilone Ford, were similar in character and would

25  have the same effect on the movements of water as the clays and

silts in Ysidora Basin.

MR. STAHLMAN:  That calls for a yes or no answer.

MR. DENNIS:  That is all it calls for.

MR. VEEDER:  I don't believe that you can answer yes or no when you have geology of this character.  I submit that it is entirely proper.  We might as well face it.  I think the groundwork is being laid for some impeachment, which will not be effective.

MR. STAHLMAN:  That is what I am wondering, your Honor. If that is it, what is the purpose?

THE COURT:  Well, Mr. Dennis has been walking around here with a transcript, which I guess is from the hearings in 1952, and has been apparently getting ready to ask some impeaching question.

MR. VEEDER:  He has been a little bit afraid, your Honor.

THE COURT:  Well, I don't know what he has there.

MR. DENNIS:  I may make a statement, your Honor, and that is--

THE COURT:  I would guess that this witness testified at the prior trial, and I would guess that he said something that you would like to make some use of at this trial.  I would guess, from what I have heard, that he may have testified in 1952 that there was some kind of blanket of silt around there.

MR. DENNIS:  That is correct, your Honor.

H

Z69

1          THE COURT:  Well, don't keep me in suspense.  The whole

2  afternoon you have been running around with this transcript.

3  You can do it a lot more quickly.  You can say did you so

4  testify?  And then let him make his explanation.

5          MR. VEEDER:  Your Honor, I do think that we have a

6  dangling participle here or something.

7          THE COURT:  Let's let it dangle.  We should cut this

8  down in size sometime.

9  BY MR. DENNIS:

10          Q  Mr. Worts, I call your attention to the transcript

11  of the first trial, at page 242, at lines 21 to line 2 on page

12  244, and ask if you were asked those questions and gave those

13  answers.

14          THE COURT:  How many pages is that?

15          MR. DENNIS:  About two and two lines on the third page.

16  You have to take all those into consideration because they were

17  in response to questions by the Court.

18          MR. VEEDER:  If it is impeachment, the proper way to

19  do it is to ask him if he was under oath.

20          THE COURT:  He is doing it the proper way in California.

21  You first show him the transcript and then ask him, "Did you

22  give those answers?"  We can shorten that by stipulation.

23          MR. STAHLMAN:  This is cross-examination, however, your

24  Honor.

25          MR. VEEDER:  I think they should be read.

H

Z70

1    MR. STAHLMAN:  On cross-examination he has a right to

2    ask him whether or not he had so testified and read it to him.

3    MR. DENNIS:  I have no objection to doing it that way.

4    THE COURT:  First you have to show him the transcript

5    and let him have a chance to look at it, I think.

6    Is there any objection to having it read?

7    MR. DENNIS:  I have no objection to having it read,

8    your Honor.

9    THE COURT:  Mr. Veeder?

10   MR. VEEDER:  I am all for it.

11   MR. MOSKOVITZ:  I thought there was an objection.

12   THE COURT:  Well, read it into the record, then, and

13   then ask him.

14   BY MR. DENNIS:

15   Q  You were sworn, were you not, and testified at the

16   first trial of this action, did you not?

17   A  Yes.

18   Q  And at that trial the following questions and answers

19   were asked and given, referring to page 242-- this is just

20   explanatory, your Honor.

21        "This cross-section shows-- or, first,

22        I should say . . "

23   MR. VEEDER:  Is this a question?

24   MR. DENNIS:  This is the answer.  It is preliminary

25   THE COURT:  He is just picking up.

H
Z71

1    MR. DENNIS:  "This cross-section shows-- or, first, I

2    should say as shown on it in graphic form

3    the logs of wells drilled into the materials

4    beneath the alluvial plane of the lower

5    Santa Margarita River, it shows several

6    features.   Toward the coast and moving inland

7    it shows that these alluvial materials reach

8    a maximum thickness of on the order of 200

9    feet or 205 feet at the coast line and decrease

10   in thickness upstream to the site of the De Luz

11   Dam, where numerous borings have been made

12   for the dam itself, and decrease to about 120

13   feet.   It is a progressive affair, very similar

14   to the surface of the present channel, that

15   is, it is a slightly steeper surface, because

16   it is increasing in thickness going toward

17   the coast.

18       "Another feature brought out by the cross-

19   section as shown on Exhibit 11 is that the

20   alluvial materials may be divided vertically

21   into two members, an upper member and a

22   lower member.

23       "Now, the upper member near the coast

24   is fine-grained.  It is composed of clays,

25   silts, lagoonal type muds with abundant

H-
Z72

1    fossils.  By "fossils" I mean just in general

2    terms shells that were buried when the deposit

3    was laid down.  These extend inland.  They are

4    well-developed in the section of Exhibit 11

5    called Ysidora Basin, where you can see the

6    clays are very well developed in the upper

7    part of the alluvium.  Going on upstream--"

8    THE COURT:  Exhibit 11 was similar to 38 here?

9    MR. DENNIS:  It is practically the same as Exhibit 38.

10   And the Ysidora section, I believe, is identical, with the

11   exception of a slight change in water contour.

12   THE COURT:  All right.  Go ahead.

13   MR. DENNIS:  "THE COURT:  Has that structure any

14      special significance so far as being water

15      bearing?

16         "THE WITNESS:  Yes, it has, your Honor.

17   Those clays form a semi-confining bed,

18   that is, a clay cap over very productive

19   gravels inthe lower part of the valley

20   field, and, as such, influence the manner

21   in which water moves through the basin,

22   particularly when the basin is heavily

23   pumped."

24   Q  Did you give that answer?

25   A  To the best of my knowledge.  I can't remember that

H

Z73

1   well, but it sounds familiar.

2        THE COURT:  Do you want to explain any part of it?

3        THE WITNESS:  I think it is just a matter of terminology.

4   I think it is essentially the same as I have been saying all

5   along.

6        THE COURT:  It all sounds the same to me, except the

7   last statement about the clay blanket overlying rich water-

8   bearing gravel.

9        MR. VEEDER:  You said "Essentially."  You mean "virtu-

10  ally."

11       THE WITNESS:  It is virtually the same.  I think I

12  described in more detail the character of that so-called cap.

13  I indicated that it was made up of sand, silts and clays.  The

14  way that transcript reads, I called it collectively a cap.

15       MR. VEEDER:  May I have the page of that?

16       MR. DENNIS:  Page 242.

17       Q  Mr. Worts, I call your attention to page 267 of the

18  transcript, particularly the question and answer on lines 18

19  to-- unless you want to read the whole answer.

20       MR. VEEDER:  I thought you were going to read them.

21       MR. DENNIS:  I thought I would show it to him first.

22            "Q  Is there any underground flow or

23            movement of water which serves as any sub-

24            stantial source of supply for water in the

25            basin?

H

Z74

1    "A  There is no other substantial source.

2    The La Jolla formation is largely sandstone

3    and shale.  There are some relatively meagre

4    amounts could move laterally into the basin

5    but it would be very minor and the water--

6    we drilled a couple of wells just in the La

7    Jolla.  They are wells-- I am referring to

8    Exhibit 10 and to well Q1 in Section 23,

9    Township 10 South, Range 5 West.  That was

10   one drilled entirely-- it was drilled to a

11   depth of, I think, 290 feet and entirely

12   in the La Jolla.

13   "Down at the south end of Ysidora Basin

14   Well K2 in Section 2 was also drilled in

15   the La Jolla to a depth of 300 feet.  Both

16   of these wells produced essentially no water.

17   We got about all we could get out by pumping--

18   by pumping we got enough to get a sample.

19   They are very poor producers.  The quality

20   is poor.  It is marine laid formation, laid

21   under ocean conditions, let us say.  There

22   are alternating shales and sandstones.  The

23   formation, according to the textbook con-

24   cept, is on the order of 50 to 55 million

25   years old.  That is determined in a number

H

Z75

1    of ways-- in acceptable ways, anyway."

2         Q  Did you give that answer in response to any question?

3         MR. STAHLMAN:  That doesn't impeach any testimony that

4    he gave.

5         THE COURT:  Answer the question.  Did you so testify?

6         THE WITNESS:  Yes.

7         THE COURT:  That is just the testimony he gave here

8    yesterday.  There is nothing impeaching about it.

9         MR. DENNIS:  I think there was one additional fact.

10        THE COURT:  What is impeaching about it?

11        MR. DENNIS:  I say, I think there was one additional

12   fact there, your Honor.  That there was relatively no movement

13   of underground water, and yet he does show that there are at

14   times movements of underground water into the basin--

15        MR. VEEDER:  From where?

16        MR. DENNIS:  Both from De Luz, I think he testified on

17   cross-examination this morning.

18        THE COURT:  You don't understand his answer that he gave

19   at the first trial to mean that there was no movement of water

20   from De Luz Creek down into the basin, do you?

21        MR. DENNIS:  Not from the river, but from underground.

22        THE COURT:  Underground.

23        MR. DENNIS:  Yes, I understand that.

24        THE COURT:  I don't.  I think that when he is talking

25   about no movement of underground water he is talking about no

H

Z76

1  movement of water from the La Jolla formation.  That is the

2  way I understand it.

3       MR. DENNIS:  Would your Honor like to read the answer

4  (handing transcript to the Court).

5       THE COURT:  Mr. Dennis, it has to be read inconnection

6  with his previous testimony, on page 266, where he says "The

7  principal source is the runoff from the Santa Margarita River

8  system which, when reaching these basins, . . and the first

9  runoff reaching this area usually drops rather rapidly to

10 recharge or replenish the ground water basins in areas where

11 they are rechargeable."  And then he talks about rainfall.

12 Then there is this general question, "Is there any underground

13 flow or movement of water which serves as any substantial

14 source of supply for water in the basin?"  And then he says,

15 "There is no other substantial source,"-- no other than as

16 indicated above.  Then he says, "The La Jolla formation is

17 largely standstone and shale.  There are some relatively meagre

18 amounts could move laterally into the basin but it would be

19 very minor," and he talks about the well he drilled, et cetera.

20 It all fits in, as far as I am concerned.

21      MR. DENNIS:  That is satisfactory, if it fits in.

22      MR. VEEDER:  Sure it is satisfactory.

23      THE COURT:  The key words there are "no other source."

24 He has been telling about the sources.  He says, "No other

25 source," and then he tells what he means.

1        Do I understand your testimony?

2        THE WITNESS:  That is correct, your Honor.

3   BY MR. DENNIS:

4        Q  I am going to call your attention, Mr. Worts, or do

5   you want me to read this?

6        A  Please read it.

7        MR. DENNIS:  "Q  Mr. Worts, could you give us a

8             picture"--

9        MR. MOSKOVITZ: What page, Mr. Dennis?

10       MR. DENNIS:  Page 269, starting on line 21.

11            "Q  Mr. Worts, could you give us a

12            picture of the point at which the water

13            from the Santa Margarita River descends

14            from surface flow and begins to enter the

15            underground basin?  In other words, re-

16            verting to the testimony describing the

17            flow over the granitic underlay above

18            De Luz Creek, what happens to the Santa

19            Margarita River water from there on down?

20            "A  The first runoff of the season,

21            of the wet season, which is usually pre-

22            ceded by five to six months of no runoff

23            passing over these alluvial deposits,

24            which up in the vicinity of De Luz Creek--

25            I am still referring to Exhibit 10, the

H

ZX 78

1   alluvial deposits are coarse there and

2   readily rechargeable and the water loss

3   from the river percolates downward to

4   ground water.  That occurs from that point

5   downstream to approximately-- that we we

6   know from the nature of the types of

7   material that was one reason-- let us re-

8   fer for a moment to Exhibit 11, the geo-

9   logic cross-section.  That was one reason

10  why this underground-- why this upper and

11  lower member of the alluvium was pointed

12  out.  The very fine-grained portions of

13  this upper member of the alluvium, com-

14  posed of clays and silts, essentially keep

15  the surface waters from descending out of

16  the stream and reaching ground water.  So

17  that down in the lower part, say from ap-

18  proximately midway in Chappo Basin down-

19  stream the amount of water loss to ground

20  water becomes progressively less.

21       "In order to check this concept or

22  to prove our ideas on this we drilled some

23  shallow auger holes."

24  Q  Did you so testify?

25  A  I so testified.

H

Z80

1    until it is full and then the rest largely

2    moves on through to the ocean.  But upstream

3    from there through the area that I have just

4    discussed to the De Luz stream gage-- pardon

5    me, De Luz junction of De Luz Creek and on

6    upstream above the-- well, I have only been

7    down to the main stream of the Santa Margarita

8    at one point outside of the reservation and

9    that was the day we took our view of the

10   premises and went down to the pump, but

11   those gravels in there certainly all would

12   become recharged when the river flowed through

13   and during the dry part of the year they

14   would drain-- any water that wasn't diverted

15   or pumped out would drain slowly downstream.

16        "Q Into the basin?

17        "A  Into the basin, yes."

18   THE COURT:  Will you stipulate that he so answered?

19   MR. VEEDER:  Yes.

20   THE COURT:  All right.

21   Well, it is almost 4:30.

22   MR. DENNIS:  I have about three more questions, your

23   Honor.  I think, though, that the witness will probably want

24   to explain the answer to one of them.  It may take him some

25   time.

H

Z81

1   THE COURT:  Ask him the question.  See what he thinks

2   about it.

3   THE WITNESS:  If I may respond to the last quoted

4   testimony there.

5   We have this situation  On Exhibit 46, this degree of

6   non-interconnection between shallow and deep is well defined.

7   MR. VEEDER:  To which are you pointing?

8   THE WITNESS:  To Wells 2A5 and 2A1, 2A5 being the

9   shallow well and 2A1 being the deep well.

10   THE COURT:  That is on the east side?

11   THE WITNESS:  That is on the east side of the basin,

12   and on that east side I think it is readily apparent that the

13   degree of interconnection is poor, very poor.  On the west

14   side, however, as shown by wells 35K1 and K4 on Exhibit 46,

15   the degree of interconnection is very good.  If you will

16   observe the actual dates of the measurements and their posi-

17   tions, you will see that there is an actual difference in the

18   position.  Now, by lagging behind-- here is a period of

19   pumping in Ysidora subbasin on Exhibit 46-- the deep levels

20   are down below the shallow, as indicated by the altitude of

21   the two graphs.  Shallow water is following the deeper water

22   down on the east side.  During a period of storm runoff,

23   however, the two rise very rapidly almost together.  However,

24   the shallow water is at a higher level by a foot or less,

25   indicating that there is a head differential between the

H

Z82

1    water table and the water in the lower member.

2         The further studies and refinement of our material is

3    the principal reason that our conclusions are varied.   I think

4    the paired graphs show very well the degree of interconnection.

5    Whether I had plotted this to make such a study at the time

6    of the October, 1952, trial I cannot say.

7         THE COURT:   Let me inquire about tomorrow.   I have to

8    go to Los Angeles and I would like to get out of here in the

9    afternoon before it gets too foggy and too late.   How do you

10   feel about starting a little early and closing a little early?

11        VARIOUS COUNSEL:   That's all right.

12        THE COURT:   Is that agreeable?

13        VARIOUS COUNSEL:   Yes, your Honor.

14        THE COURT:   We will start at 9:30 in the morning.

15        MR. VEEDER:   May I inquire as to the extent of the

16   cross-examination, if anyone can estimate, tomorrow?

17        THE COURT:   I may shorten the noon hour a little,

18   although I have a luncheon engagement.

19        MR. VEEDER:   Will you run all the way through tomorrow

20   on cross-examination?

21        MR. DENNIS:   I have not more than ten minutes.

22        MR. SACHSE:   I will not have over an hour or two at the

23   most, I would say.

24        MR. MOSKOVITZ:   I wouldn't think I would go over a

25   couple of hours.   We ought to finish cross-examining this

H

Z83

1   witness.

2        MR. VEEDER:  You will run through tomorrow, though?

3        THE COURT:  No, it sounds like they might be through

4   by noon.

5        MR. VEEDER:  No, I beg your pardon, your Honor.

6        MR. MOSKOVITZ:  There are two of us, and each of us may

7   have as much as two hours, your Honor.

8        MR. SACHSE:  I don't think I will have two hours.  I am

9   trying to be as accurate as I can.

10        THE COURT:  Well, then you have redirect.

11        MR. VEEDER:  If I can run out the day with Mr. Worts, it

12   is one thing.  If I have to have somebody else--

13        THE COURT:  I think we will be with Mr. Worts all day

14   tomorrow, counting the redirect.  Don't you?  Mr. Stahlman

15   has some cross-examination.  Of course, he can do it very

16   efficiently.  He can speed right through it.

17        MR. STAHLMAN:  I don't think I will take more than 15

18   or 20 minutes.

19        MR. VEEDER:  That's all I want to know, your Honor.

20        THE COURT:  9:30 tomorrow morning.

21        (Adjournment until Friday, November 7, 1958, at 9:

22   30 A.M.)

23

24

25