VOLUME NO. ___ 41

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, et al,

Defendants.

No.   1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    November 7, 1958

Pages:    4298 to 4427

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1          IN THE UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3                SOUTHERN DIVISION

4                   - - -

5     HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                   - - -

7

8   UNITED STATES OF AMERICA,       )
                                    )
9               Plaintiff,          )
                                    )
10        vs.                       )        No. 1247-SD-C.
                                    )
11  FALLBROOK PUBLIC UTILITY        )
    DISTRICT, et al.,               )
                                    )
12                                  )
            Defendants.             )
13

14

15          REPORTERS' TRANSCRIPT OF PROCEEDINGS

16

17              San Diego, California

                Friday, November 7, 1958
18

19  APPEARANCES:

20      For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                   Special Assistant to the
21                                 Attorney-General,
                                   Department of Justice,
22                                 Washington, D.C.

23

24

25

1   APPEARANCES (Continued)

2       For Defendant Vail          GEORGE E. STAHLMAN, ESQ.
          Company

3

4       For Defendant State of      EDMUND G. BROWN, ESQ.,
          California                Attorney-General, by
                                    ADOLPHUS MOSKOVITZ, ESQ.,
5                                   Deputy Attorney-General,
                                      and
6                                   CARL BORONKAY, ESQ.

7       For Defendant Santa
          Margarita Mutual
8         Water Company             W. B. DENNIS, ESQ.,

9       For Defendants Fallbrook
          Public Utility           F. R. SACHSE, ESQ.
10        District, Et Al.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## INDEX TO WITNESSES

For the Plaintiff:                     D        X        RD        RX

      G. F. Worts, Jr.

        (By Mr. Dennis)                       4301

        (By Mr. Sachse)                       4306

        (By Mr. Moskovitz)                    4356


## E X H I B I T S


(None)


MORNING RECESS      4344
NOON RECESS         4380

1   SAN DIEGO, CALIFORNIA, FRIDAY, NOVEMBER 7, 1958.   9:30 A. M.

2

3       THE CLERK:  The case on trial, No. 1247-SD-C, United

4   States vs. Fallbrook, et cetera, et al.

5       THE COURT:  Come back to the stand, Mr. Worts.

6

7                   G. F. WORTS, JR.,

8   recalled as a witness in behalf of the plaintiff, having been

9   previously sworn, testified further as follows:

10

11                  CROSS-EXAMINATION (Resumed)

12   BY MR. DENNIS:

13       Q  Mr. Worts, in your opinion does the lower member of

14   the alluvium have a higher permeability than the upper member

15   of the alluvium in Chappo and Ysidora Basin?

16       A  Yes.

17       Q  In your opinion does the lower member of the alluvium

18   have a better transmissibility than the upper member of the

19   alluvium in the Chappo and Ysidora Basins?

20       A  Well, the transmissibility measures the total thick-

21   ness tested.  When you are determining transmissibility you are

22   determining the constant flow of the full saturated thickness.

23   You don't break transmissibility down by units or vertical

24   segments.

25       Q  You haven't made sufficient studies then to answer

1  that question?

2          A  Yes, I have made sufficient studies.

3          Q  Would you say that the material which is in the lower

4  member of the alluvium in Chappo and Ysidora Basin would have

5  better transmissibility than the material in the upper overall?

6          A  I say you don't-- unless I misunderstand you.

7          THE COURT:  Let me save time.  Let us assume two differ-

8  ent bodies of alluvium in two different streams.  One has the

9  kind of alluvium shown in the lower member, one has the kind of

10  alluvium shown in the upper member in the diagram.

11          THE WITNESS:  I understand, your Honor.

12          THE COURT:  Which would have the greater transmissibility?

13          THE WITNESS:  If they were set up that way, the one

14  having the lower member would have the higher transmissibility.

15  But where one overlies the other, there is no way to separate

16  them.

17  BY MR. DENNIS:

18          Q  And would you say that the lower member of the

19  alluvium in Chappo and Ysidora Basin has a higher porosity than

20  the upper member of the alluvium in the two basins?

21          A  Porosity.  I wouldn't say that, no.

22          Q  Now, in relation to wells 10-5-35K and 35K4, are they

23  in the channel or within the banks of the Santa Margarita

24  River?

25          A  They are on the alluvial plane out of the active

channel.

Q  How far from the active channel are they located?

A  Wells are not plotted on Exhibit 29G that you handed me.  I could give an order of magnitude from my own personal knowledge in the area that would be rough.

Q  That would be sufficient.

A  Several hundred feet.

Q  Have you had an opportunity to observe any shallow wells in the Ysidora Basin which were not affected by the pumping of the deep wells?

A  As I attested yesterday, on Exhibit 46, on the east side of Ysidora Subbasin--

Q  Other than the one on Exhibit 46.

A  The only other-- correction.  I believe that, to the best of my recollection, there is a shallow well 35R3 in 10 South, 5 West and a shallow well F3 in Section 2, 11 South, 5 West.  I recall that the degree of response to pumping is very small.

Q  Have you had an opportunity to observe any shallow wells in Chappo Basin that were not affected by the pumping of the deep wells?

A  There was only one shallow well drilled that I mentioned and discussed yesterday.  That was 23J4, 10 South, 5 West that responded to pumping in Well J1.

Q  There are other shallow wells in Chappo Basin,

1    are there not?

2        A   Not to my knowledge.   By shallow I mean they are only

3    in the upper member of the alluvium less than 50 feet deep.

4        Q   Now, in your opinion, what was the responsibility for

5    the salt water intrusion to which you testified in the lower

6    reaches of Ysidora Basin?

7        A   Pumping in Ysidora Subbasin.

8        Q   Could there have been any other contributing factor

9    other than the pumping in Ysidora Basin that would contribute

10   to the salt water intrusion?

11       A   The Lake O'Neill flow and recharge from the river

12   would have been a contributing factor.

13       Q   But in your opinion the principal factor was the

14   method and manner in which the basin was pumped?

15       A   Yes.

16       Q   Now, do you recall, Mr. Worts, whether or not there

17   was any surface flow of the Santa Margarita River in November,

18   1951?

19       A   At what point?

20       Q   At any point within the limits of Camp Pendleton?

21       A   To the best of my recollection, during 1951 there was

22   a low flow at De Luz Dam Site, a small flow.   I couldn't tell

23   you the amount.

24       Q   And do you recall the amount of rainfall in November,

25   1951?

4305

A

Z8

1    A  No.

2    Q  Do you recall the amount of precipitation in October,

3  1951?

4    A  No.

5    Q  In October, 1957, was there any surface flow in the

6  Santa Margarita River within the limits of Camp Pendleton?

7    A  I don't know.

8    Q  Do you recall whether there was any precipitation in

9  November, 1957, within Camp Pendleton?

10    A  I don't know.

11    Q  And your answer would be the same for October?

12    A  Yes.

13    Q  However, if there was stream flow in October and

14  precipitation in October of 1951, you would expect the water

15  levels in the basin to be higher than if there had been no

16  precipitation and if there was no surface flow in the Santa

17  Margarita River during the same months, would you not?

18    MR. VEEDER:  I object to that as being far too specu-

19  lative, your Honor; too many conceivable things involved.

20    THE COURT:  Sustained.

21  BY MR. DENNIS:

22    Q  Now, Mr. Worts, calling your attention to Plaintiff's

23  Exhibit 53, I believe that you show the various periods of time

24  that over a period of drouth consisting of what, four years,

25  you would be able to pump 10,400 acre feet in the basin?

1    A   Three years.

2    Q   Three years.  Practically, would it be possible to

3    extract that amount of water from the basin?

4    A   Yes.

5    Q   In your opinion, if sufficient pumps and wells were

6    installed in the basin you feel that you could extract 10,400

7    acre feet each year?

8    A   Yes.  The graph of pumpage depicted on Exhibit 49

9    for the year 1956, on the left-hand diagram of Exhibit 49,

10   shows that they pumped close to 7,000 from the Lower Santa

11   Margarita River Basin.  So this would only be 3,000 more.

12   MR. DENNIS:  That is all.

13   THE COURT:  Who is next?

14   MR. SACHSE:  I am, your Honor.

15

16                          CROSS-EXAMINATION

17   BY MR. SACHSE:

18   Q   Mr. Worts, directing your attention again to Exhibit

19   49, your calculation of the river recharge-- and I am disregard-

20   ing the evaporation factor now-- as I understand it, is arrived

21   at by taking the flow at the De Luz Dam Site shown on Exhibit

22   62, deducting therefrom the outflow at Ysidora Dam Site on 63

23   for the same year, and the difference represents the river

24   recharge; is that right-- disregarding the evaporation and

25   O'Neill factor?

1          A   If you subtract the evaporation, that would be right.

2          Q   Do you have Exhibit 60 before you?

3          A   No.

4          (The Clerk hands a document to the witness.)

5   BY MR. SACHSE:

6          Q   I will direct your attention to the Ysidora runoff
7   table, please.  I observe that for the year 1943, 74,270 acre
8   feet ran past the Ysidora gage to the ocean, and at the same
9   time the water in storage apparently declined about 1,700 acre
10  feet; is that correct?  I am using the Exhibit 49 and calculat-
11  ing the water in storage roughly by subtracting inflow from
12  outgo, and I didn't have a scale so I may be off a little bit.
13  But it looks to me like the water in storage would have declined
14  about 1,700 acre feet in 1943.

15         A   That is on the order.

16         Q   And for 1944 again the water in storage went down
17  about a thousand acre feet, although the outflow at Ysidora
18  was 27,800?

19         A   Yes.

20         Q   And so on across.  You will find the same phenomena
21  existing, I believe, for 1945, for 1946, '47, '48, '49 and '53.
22  In each of those years there was discharged to the ocean at
23  Ysidora, but the water in storage in the basin declined; is
24  that right?

25         A   Yes.

A
Z11

A2

1     Q  Now, Mr. Worts, I want you to assume that in the year

2  1943 there had been a structure on the Santa Margarita River

3  immediately upstream from the military reservation boundary

4  which impounded 74,270 acre feet of water.  Would that make the

5  slightest difference in your chart Exhibit 49?

6     MR. VEEDER:  That is objected to as going beyond the

7  scope of the direct examination, your Honor.

8     THE COURT:  Overruled.

9     THE WITNESS:  There would be a multiplicity of answers,

10  depending on the manner in which that discharge reached the

11  basin without the dam.

12  BY MR. SACHSE:

13     Q  Am I not correct in saying, Mr. Worts, that consider-

14  ing only now this year 1943, you arrive at the recharge figure

15  by taking the calculated flow at De Luz Dam Site and subtracting

16  therefrom the flow at Ysidora?  If you reduce the flow at De

17  Luz by 74,000 and reduce the flow at Ysidora by 74,000, your

18  result would remain exactly the same, would it not?

19     A  With no change in pumpage?

20     Q  No other factor, just the one.

21     A  May I ask if you understand the time of year that

22  these departures are computed?

23     Q  Do that on the same basis.

24     A  They are on the water year basis.  In other words,

25  this is the status as of September 30th, after the winter and

1    after the dry summer.

2      Q  And also your figures on 60 and 62 are on a water

3    year basis?

4      A  Yes.

5      THE COURT:  Let me interrupt a minute.  Where is this

6    chart that has this storage you are talking about-- 49?

7      MR. SACHSE:  I am referring to Exhibit 49, yes, your

8    Honor.  In other words, to the differential between river in-

9    flow-- I am confining myself only to river-- and river outflow.

10   Had there been 70,000 acre feet in round figures impounded above

11   De Luz, the chart for 1953 would look exactly the same, would

12   it not?

13      MR. VEEDER:  This is far too speculative, your Honor.

14      THE WITNESS:  I would say no.

15 BY MR. SACHSE:

16      Q  Will you tell me why, please?

17      A  Because you have the pumpage in an amount over 5,000

18   acre feet that occurred during the year, which completely

19   changed the regimen of the stream.  When you throw a dam up-

20   stream and the manner in which the basin will respond, when you

21   try to work it out on a graph like this, I don't think you

22   can make a mathematical subtraction and come up with a conclu-

23   sion that the difference would be the same.

24      Q  All I am wanting you to do, Mr. Worts, is--

25      THE COURT:  Wait before you ask it.  Let me see if I

1    understand this.  Exhibit 49 shows above the zero line water

2    flowing in from the river, with the hatched lines running down

3    toward the left.  You are eliminating the evaporation from con-

4    sideration.

5         MR. SACHSE:  At the moment, yes, your Honor.

6         THE COURT:  Then of course there is inflow shown by

7    ground water?

8         MR. SACHSE:  I want all factors identical except the

9    one, the stream river recharge figure.

10        THE COURT:  All right.  There is inflow into the river.

11   Now, coming out of the river is a very limited amount of out-

12   flow.

13        MR. SACHSE:  Your Honor is not looking at Exhibit 62 or

14   60.  The witness has testified that--

15        THE COURT:  What is that exhibit?

16        MR. SACHSE:  Exhibit 60 is the discharge at Ysidora.

17        May I take a whack at this in another way, your Honor.

18        Q  Mr. Worts, Exhibit 60 shows for the year 1943--

19        A  May I have Exhibit 60, please, or 62.

20        MR. SACHSE:  60 and 62- you want them both.

21        THE WITNESS:  60 and 62.

22        THE COURT:  I have copies.

23        (The Clerk hands documents to the witness.)

24        THE WITNESS:  Thank you.

25

A2

Z14

1    BY MR. SACHSE:

2         Q  For the year 1943, Exhibit 62 shows a flow at De Luz

3    Dam Site of 77,900.

4         THE COURT:  That is water flowing in.

5         MR. SACHSE:  Flowing in.

6         THE COURT:  Surface water?

7         MR. SACHSE:  Surface water flowing in.

8         Q  And on Exhibit 60 for the same water year it shows

9    water flowing out at Ysidora, 74,270; is that correct?  Sub-

10   tracting one figure from the other gives you a net river re-

11   charge, if my arithmetic is right, of 3,360 acre feet; is that

12   right?

13        A  Yes.

14        Q  Is that not adjusted for evaporation?  I am forgetting

15   that O'Neill evaporation factor.  Is that not exactly the

16   figure that shows for the year 1943 on Exhibit 49?

17        A  Yes.

18        Q  If we subtract this figure entirely and reduce the

19   flow at De Luz to 3,630, is not the chart exactly the same?

20        A  That is the net effect.

21        Q  Thank you.  In other words, Exhibit 49 would not be

22   changed as regards river recharge in any of the years in which

23   water spilled at Ysidora if all of that spill had been impounded

24   upstream from the reservation boundary; is that not correct?

25        MR. VEEDER:  Your Honor, I renew my objection to all of

A2

Z15

1  this line of questions.  It is so speculative that it is im-

2  possible for the witness to answer.

3      MR. SACHSE:  I can go over each one of these like I did

4  the last time, Mr. Veeder.

5      THE COURT:  Overruled.

6      MR. SACHSE:  I am trying to make it easy.

7      Q  Is it not a fact that the same mathematical process

8  applied to each year in which there was spill at Ysidora would

9  leave you with exactly the same chart?

10     A  Approximately.

11     THE COURT:  Your point is that this water that spills

12 goes by so fast that it doesn't have a chance to recharge the

13 basin?

14     MR. SACHSE:  That was the very next question I was going

15 to ask, your Honor.

16     Q  Mr. Worts, how do you account for the phenomenon that

17 we have observed here where as much as 74,000 acre feet went

18 to the ocean and yet the storage declined about 1,700 acre feet?

19     A  That is the period of the year for which the figures

20 are worked out.  For example, you can fill up a basin in the

21 winter, but by September 30th, with the pumpage that follows,

22 the basin is going to be pulled down even if a million acre

23 feet have gone through.

24     Q  In other words, there is a reverse lag; the basin

25 fills early and gets down late?

Werts   Cross   4313

A2

Z16

1    A   That is right.

2    Q   Now, still directing your attention to this river

3  recharge item on Exhibit 49, I understood you to testify that

4  the drainage of Fallbrook Creek had not been taken into con-

5  sideration by you?

6    A   The drainage or runoff or what?

7    Q   The runoff from the Fallbrook Creek drainage, would be

8  a better way to say it. .

9    A   No.

10    Q   And similarly, the area of the Santa Margarita River

11  watershed below the De Luz Dam Site receives some runoff in the

12  winter, doesn't it?

13    A   For the period that we have posted on Exhibit 49 the

14  runoff in all but two or three of those years would have been

15  insignificant.

16    Q   There is some runoff?

17    A   There is minor runoff.

18    Q   And it was not considered in Exhibit 49?

19    A   It was considered, but it was not put on-- that is,

20  it was not computed, but it was considered.

21    Q   It was not calculated in your river recharge?

22    A   That is right.

23    Q   Are you aware that the engineers for the State

24  Division of Water Resources have estimated the average annual

25  runoff of the Fallbrook Creek watershed at 300 acre feet per

X2

Z17

1    year?  Just are you aware of that fact?

2          A  No.

3          Q  And are you aware of the fact that the same engineers

4    have calculated the average annual runoff in the lower basin

5    at a thousand acre feet per year?

6          THE COURT:  You mean excluding Fallbrook, or including

7    Fallbrook?

8          MR. SACHSE:  Excluding Fallbrook; Fallbrook drainage as

9    distinct from the lower basin drainage.

10          THE WITNESS:  Is that an average?

11   BY MR. SACHSE:

12          Q  That is an average.

13          A  It would not be representative of what I have here,

14   then.

15          Q  I am just asking you if you are familiar with the

16   fact?

17          A  No.

18          Q  That would be a total of 1,300 acre feet a year on

19   the average which is not included?

20          A  Nor would be on that graph.

21          Q  Because you feel these are not average years?

22          A  It so happens, Mr. Sachse, that we have two of the

23   most severe dry series of years in here that Southern California

24   has exprienced, I believe.

25          Q  In other words, the chart doesn't depict the average

A2

Z18

1   condition of the basin, but rather a selected serious condition

2   of the basin?

3        A   No.

4        MR. VEEDER:   I renew my objection, your Honor, on the

5   ground that there is no average, certainly.   There is nothing

6   in the record whatever about averages.   There is no such thing

7   as an average in this.

8        THE COURT:   Well, if the witness can answer.

9        The objection is overruled.

10       THE WITNESS:   The runoff during these critical dry

11   periods, from the area between De Luz Dam Site and Ysidora,

12   would have been zero, in my opinion, during those critical dry

13   periods.   It is/my fault that the data available to me to work
                    not

14   with extends from 1942 to date.

15   BY MR. SACHSE:

16       Q   You have three plus years in there, do you not?

17       A   Yes.

18       Q   Each of those plus years presumably could have had

19   this 1,300 average, could they not-- or better?

20       A   I won't say that that is right.

21       Q   Well, if that is an accurate average--

22       MR. VEEDER:   I want my objection continued.

23       MR. SACHSE:   If the calculations of the State Engineers--

24       MR. VEEDER:   Just a moment, Mr. Sachse.   I am making an

25   objection.

Worts - Cross

A2

Z19

1    There is nothing in the world to show what is an accurate

2    average, or what is an average.

3        MR. SACHSE:  I will withdraw the question, Mr. Veeder.

4        THE COURT:  The trouble, Mr. Sachse, with the question

5    you are trying to form is that this chart from the years 1942

6    to 1957 is not based on an average but on actual figures for

7    those years.

8        MR. SACHSE:  Actual figures, which disregard, your Honor.

9        THE COURT:  Therefore, you are asking him to assume in

10   a check of an actual year an average figure.  But word your

11   question so that--

12       MR. SACHSE:  Well, I will rephrase it this way, then.

13       THE COURT:  Assume for argument that in a certain year--

14   BY MR. SACHSE:

15       Q  Assume for argument that in each one of these years--

16   just assume for argument, no matter how ridiculous it is-- that

17   1,300 acre feet of water flowed into the basin, 300 from

18   Fallbrook Creek drainage and 1,000 from the rest of the basin,

19   which is not shown on your river recharge now.  Assume that.

20   Will you take your scale, please, and 1,300 times 16 years is,

21   I believe, 20,800, and show me where the accumulated recharge

22   point would be on Exhibit 49, under that assumption.

23       A  If you will give me one more figure, I probably could

24   answer that.

25       Q  Allright.

Werts — Cross                4317

A2

Z20

1       A   How much of that 1300 is going to run off past

2   Ysidora during the same period?

3       Q   Well, all right, let's do it this way.

4       MR. VEEDER:  Are you withdrawing the question?

5       MR. SACHSE:  Yes, I will withdraw the question.   That

6   is a fair criticism.

7       Q   I ask you to assume that 1300 acre feet additional

8   had flowed into the basin, reflected on the top half of your

9   chart, in each of the years here shown.   Would that not, in

10   your opinion, throw off the accumulated recharge curve com-

11   pletely from where it is now located?

12       MR. VEEDER:  I renew my objection.   There is not the

13   slightest basis for the question.   There is nothing conceivable

14   upon which a predicate like that can be reached.   There is

15   nothing whatever for that hypothesis.

16       THE COURT:  Overruled.

17       THE WITNESS:  I would have to answer the question this

18   way, Mr. Sachse.   Referring to Exhibit 60 and to the outflow

19   at the Ysidora Gaging Station, you will observe that if there

20   were runoff from the basin in any year that there was outflow

21   at Ysidora Gage that the runoff from the basin would not change

22   the recharge picture at all but merely go on out to the ocean.

23   BY MR. SACHSE:

24       Q   So let's start--

25       A   Wait a minute.   If I may finish.

A3

Worts   Cross   4318

A3

Z21

1       For the years 1950 and '51 and 1955 through 1957, in

2   which there was zero outflow at Ysidora Gage, the figure of

3   1300 wouldn't do you any good because there was not sufficient

4   rainfall to cause 1,300 acre feet of runoff.  So therefore the

5   effect on the basin would be the same.  That is the trouble

6   with this small coastal basin.  You are in the worst trouble

7   when they are dry years.  You don't have this average.  It

8   would be nice if you could have the average inthe dry year when

9   you need it the most, but you just don't have it then.

10      Q  Starting on the assumption, Mr. Worts, that 1,300

11  acre feet flowed into the basin, let's just take the last

12  three dry years 1955, '56 and '57, you would have found 3900

13  acre feet total accrual for those three years reflected on the

14  right-hand side of the chart, would you not?

15      A  How could you have--

16      MR. VEEDER:  I am going to renew my objection.  He has

17  now changed his predicate entirely.  He is now talking about

18  1,300 acre feet flowing into the basin.

19      MR. SACHSE:  That has always been my predicate.

20      MR. VEEDER:  Is it going underground?  What is happening

21  to it?

22      MR. SACHSE:  It is going into the basin.  That is river

23  recharge.

24      MR. VEEDER:  Are you saying that the full 1,300 is going

25  underground now?

A3

Z22

1          MR. SACHSE:  I am adding to the crosshatched line,

2     river recharge.

3          MR. VEEDER:  Yes.

4          MR. SACHSE:  There is no explanation of where this goes

5     by this witness.  It is just river recharge.  I want to add to

6     river recharge 1300 acre feet a year for the last three years

7     of the chart.

8          MR. VEEDER:  Now you have changed your question.

9          THE COURT:  The objection is overruled.

10         THE WITNESS:  Mr. Sachse, as I just answered, you can't

11    assume an average of 1,300 acre feet in a year when it is

12    obviously not going to happen.

13         MR. SACHSE:  Mr. Worts, I think the Court will instruct

14    you that the witness can assume, if so requested.

15         MR. VEEDER:  I object to this as being argument with

16    the witness.

17         MR. SACHSE:  I will ask the Court to instruct the witness

18    to make such assumption.  It may be an invalid assumption, but

19    it is proper cross-examination.

20         THE COURT:  The assumption leaves me a little cold, I

21    will be frank with you.  But if the attorney asks you to make

22    an assumption, then you assume that.

23         THE WITNESS:  All right.

24         THE COURT:  The trouble with this assumption is that

25    you are taking an average figure, and by the very fact that it

A3

Z23

1   is an average figure it would mean that in dry years it would be

2   less than zero and in wet years it would be more.  So therefore

3   you are adding a figure for a dry year that obviously couldn't

4   be there.  And if you add it to a wet year, then all that

5   happens is that it runs out the other side.

6          MR. SACHSE:  Your Honor has that part of it very clear.

7          THE COURT:  Go ahead.  You must make the assumption

8   whether you like it or not.

9          THE WITNESS:  Your Honor, if this mythical situation

10  should happen, and if there were storage space in the basin to

11  take it, it would go underground and recharge the basin, pro-

12  vided-- take a look at some of these streams-- well, for all

13  practical purposes, it would go underground, inasmuch as it

14  isn't there anyway.

15         THE COURT:  And if this mythical figure of 1,300 acre

16  feet, this average figure, fell in a dry year where there

17  wasn't any particular floods, it would probably all go into

18  the underground basin?

19         THE WITNESS:  Yes, sir.

20         THE COURT:  And particularly if the 1300 acre feet fell

21  in a series of very gentle rains that wouldn't cause any flood

22  conditions.

23         MR. VEEDER:  And no evaporation, of course.

24         THE COURT:  We are leaving out evaporation, for the

25  purpose of the question.

1    MR. VEEDER:  I realize that it is completely phoney.

2 It couldn't possibly be.  Your Honor's metaphysical term, I

3 think, would be applicable now.

4    THE COURT:  It's pretty metaphysical.

5    Mr. Sachse's point is this:  That your calculations,

6 although you considered the fact that there was rainfall in the

7 basin, you have not made any calculations based on it because,

8 as I recall your testimony, the evaporation and the use by plant

9 life, et cetera, in that basin would pretty well take up what

10 fell.  I think you testified something like that.

11    THE WITNESS:  That is on the rainfall--

12    MR. SACHSE:  That was the next question, your Honor.

13    MR. VEEDER:  Let him finish.

14    THE WITNESS:  That was the rainfall infiltration on the

15 valley floor I had reference to in the two years 1943 and 1952,

16 as depicted on Exhibit 49.

17    MR. VEEDER:  In other words, the pipe they are now

18 smoking doesn't take into consideration what would happen to the

19 water up here; is that right?

20    MR. SACHSE:  Mr. Veeder, do you mind doing your redirect

21 examination after I have finished my cross-examination?

22    MR. VEEDER:  I just wanted to get that.

23    THE COURT:  Go ahead.

24 BY MR. SACHSE:

25    Q  Now, I want to direct your attention to the very

A3

Z25

1    portion of the chart you just referred to, that is, the rain-

2    fall shown in dots, and you show a measureable quantity only

3    for the year 1943 and for the year 1952?

4        A  Yes.

5        Q  And I believe I understood your testimony correctly

6    that you felt that when the rains fell on the grassy covered

7    valley floor, unless there is an excess of 15 inches, there is

8    no practical recharge to the basin, so you ignore it?

9        A  Yes.

10        Q  By that do you imply that the entire area of the

11    basin below the De Luz watershed is grass covered?

12        A  No.  I will explain how the area is there.

13        Q  Just answer that.

14        A  Would you repeat the question.

15        Q  Do you imply that the entire area is grass covered?

16        A  No.

17        Q  You know that very large parts of the area have paved

18    roads on them, don't you?

19        A  No.  Large parts?

20        Q  I will askyou to assume that there are 70 acres of

21    paved highway in the lower basin.  What would happen to the

22    water that falls on 70 acres of paved highway?

23        A  It enhances the recharge because it runs off those

24    flat surfaces and if it is not piped out of the area will go

25    underground.

A3

Z26

Q  It is not piped out as far as you know?

A  Not as far as I know.

Q  I will ask you to assume that there are 84 acres of surfaced aircraft runway on the floor of the valley.  What happens to the water that falls on that?

A  If it doesn't evaporate, it would roll off the runway and sink into the ground nearby.

Q  Are you aware of the fact that there are perhaps as much as a hundred acres of roof surface in the valley?

A  I have no idea.

Q  You don't know?

A  No.

Q  Any water that fell on the roof surfaces of the Naval Hospital, the warehouses, et cetera, would also enhance the recharge, would it not?

A  Now, I can answer partly on that.  Some of the structures to which you refer do not overlie the basin.

Q  I am referring only to the ones that overlie the basin.

A  No, you said the Naval Hospital.  It doesn't overlie the basin.

Q  Where would the runoff from the roof surfaces from the Naval Hospital go?

MR. VEEDER:  This is getting--

THE COURT:  Is it in or out of the basin?  That is the

A3

Z27

1    question.

2    BY MR. SACHSE:

3         Q  I want to know, where would it go, the water that

4    runs off the roof surfaces?

5         MR. VEEDER:  Your Honor, it is speculative.

6         THE WITNESS:  I really don't know.  I know where the

7    hospital is located, but I don't know where they run their storm

8    drains.

9    BY MR. SACHSE:

10        Q  It would drain either into Lake O'Neill or into the

11   river, would it not?

12        A  If you say so.

13        THE COURT:  Well, the point is, the Naval Hospital is

14   within the watershed, is it not?

15        MR. VEEDER:  It is within the watershed.

16        THE COURT:  What do you mean, then?  If it ran into Lake

17   O'Neill it wouldn't affect the chart?

18        THE WITNESS:  It would.  It would show up as an addi-

19   tional source of supply, minor in most years.

20        THE COURT:  Mr. Sachse, let me ask, you asked the

21   witness to assume these figures with average runoff in this

22   area, and I take it an average figure would be based over many

23   years?

24        MR. SACHSE:  Yes, your Honor.

25        THE COURT:  Do you propose to prove later the actual

     figures for the years 1942 to 1947?

A3

Z28

1    MR. SACHSE:  I am afraid not, unless it would be a pure

2    calculation.  The figures I used were taken from Bulletin 57

3    and were averages over the years.  I don't know whether the

4    State Engineers have gone that far.  I haven't asked them yet.

A4

5    THE COURT: Except for the two wet years on this chart,

6    you probably could see that there was very little.

7    MR. SACHSE:  Yes, your Honor--

8    MR. VEEDER:  Wait a minute.  I want to hear what his

9    Honor is going to say.

10    THE COURT:  It would probably be much less than the

11    average figure you have given.

12    MR. SACHSE:  Except for the three wet years, your Honor.

13    THE COURT:  Except for the three plus years.

14    MR. SACHSE:  Except for the three plus years, it would

15    be less, your Honor, yes.

16    Mr. Moskovitz has just pointed out something to me that

17    I think is true.  There are about five wet years in there.  We

18    have, according to the Government's own figures, 74,000 acre

19    feet of runoff in 1953.  I would call that a wet year.  We

20    have 27,000--

21    MR. VEEDER:  I don't know whether we have departed from

22    the trial or not, your Honor.

23    THE WITNESS:  In what year?

24    MR. SACHSE:  1943.

25    I will ask Mr. Worts:

1      Q  Is that a wet or a dry year?

2      MR. VEEDER:  I object to that as being entirely irrele-

3 vant, your Honor.  No one has yet found what a wet or a dry year

4 is.

5      MR. SACHSE:  Mr. Worts has testified that this chart has

6 only three wet years.  I am going to get him to change his

7 testimony, Mr. Veeder, if you don't mind.

8      THE COURT:  The objection is overruled.

9      THE WITNESS:  I don't think I said only three wet years,

10 Mr. Sachse, whatever exactly you mean by three wet years.

11 BY MR. SACHSE:

12      Q  There are only three years with a plus recharge on

13 this chart, is that right?

14      A  Yes.

15      Q  But there are years of a minus recharge with a very

16 large waste to the Pacific; is that right?

17      MR. VEEDER:  I object to the term "waste."

18      THE COURT:  Objection overruled.

19      THE WITNESS:  I would have to go over all these charts

20 to find out just how big this discharge to the ocean was..

21 BY MR. SACHSE:

22      Q  You have it right in front of you on 60, Mr. Worts.

23 Take a look, please, at 1943.

24      THE COURT:  What station?

25      SACHSE:  Ysidora.

A4

Z30

1    Q  Will you tell us how much it was?

2    A  74,000 in 1943.

3    Q  1944?

4    THE COURT:  Wait a minute.  I don't find the page.

5    THE WITNESS:  Next to the last sheet, your Honor, in the

6    compilation.

7    THE COURT:  All right.

8    BY MR. SACHSE:

9    Q  1943 shows a runoff to the ocean of 74,270; is that

10   right?

11   A  That is correct.

12   Q  And that is a year which on Exhibit 49 shows as a

13   minus recharge; is that right?

14   A  Yes, sir.

15   Q  In 1944, 27,800 into the ocean; is that right?

16   A  Yes.

17   Q  And that is a minus recharge?

18   A  Not a minus recharge.  It is as of September, all of

19   the elements that are influences within the basin, the end

20   result, the balance works out at the end of the year.

21

22

23

24

25

Q   The discharge exceeds recharge, is that right?

A   All elements considered, right, at that time of the year.

Q   In 1945, 20,270 ran into the ocean, is that right?

A   Yes.

Q   And that again, 49 shows discharge exceeding recharge?

A   Yes.

Q   In 1946, 11,680 ran into the ocean?

A   Yes.

Q   And that again shows discharge exceeding recharge?

A   Yes.

Q   In 1947, 6,930 feet ran into the ocean?

A   Yes.

Q   And again, discharge exceeds recharge on 49?

A   Yes.

Q   And in 1948, 562 feet ran into the ocean?

A   Yes.

Q   And again discharge exceeds recharge?

A   Yes.

Q   In 1949, 479  feet ran into the ocean?

A   Yes.

Q   Again, discharge exceeds recharge.

And then, we come down to 1952, where recharge exceeds discharge, and 47,640 ran into the ocean; is that right?

A   That is right.

Q   Just one or two more questions on this exhibit, Mr.
Worts.  In your evapo-transpiration calculations, you used an
average over-all figure of about 500  acres of water loving
plants, as I understood your  testimony?

A  And areas of shallow water, right.

Q  You used a 500 acre figure?

A  Yes.

Q  Did you use that figure uniformly across the chart,
the same 500  acres for 42 and 500 for 57?

A  The rainfall is deducted from the consumptive use
figure in those areas of evapo-transpiration, because it is an
increment that falls directly upon the plants and would  reduce
the net effect in that area of evapo-transpiration.

Q  In calculating the area where you felt evapo-transpira-
tion took place, did  you use the same surface area for each
year in the chart?

A  Yes.

Q  And is that based on any actual calculation  or
measurement of the number of  acres covered by such vegetation?

A  We made a physical inspection at  the time of our
studies down there, the first part of them.  I don't remember;
sometime in the early '50's; five or six years ago; made a
careful survey of the areas, and rounded it off at 500.

Q  And that  was done  about when?

A  Oh, about five years ago.

1    Q  Are you aware of the fact that since, within the last

2  three years, let's say, the reservation has carried on an ex-

3  tensive program of phreatophyte removal?

4    A  I am aware that they have done it, and I have watched

5  it with interest, and I have observed that it grows back.  Other

6  types take the place of the other ones within a year or so.

7    Q  So you didn't feel it was necessary to readjust your

8  acreage for the last three years?

9    A  I felt the-- we used rounded figures.  There is no

10  point in fooling ourselves on these estimates and calling them

11  459 acre feet this year and 362.  So the  area is rounded out

12  to about 500.

13    THE COURT:  You said "acre feet."  You mean acres?

14    THE WITNESS:  Yes, I did, your Honor.

15    MR. SACHSE:  Acres.

16    THE COURT:  Acres.

17  BY MR. SACHSE:

18    Q  Now, Mr. Dennis' last question, or next to the last

19  question to you, dealt with the salt water intrusion at Ysidora.

20  And as I noted your answer, you testified that, in your opin-

21  ion, the pumpage was basically responsible for the salt water

22  intrusion in Ysidora; is that right?

23    A  Yes.

24    Q  Do you know for what purposes the Ysidora wells have

25  been pumped?

1     A  Yes.

2     Q  Could you tell us what purposes?  What use is made of

3 the water?

4     A  Well, I have observed in nineteen-- well, during my

5 period at the camp, that the wells were used both for irriga-

6 tion and camp supply, when in the early '50's and since, several

7 years ago they completely discontinued the pumping for camp use

8 from Ysidora Subbasin; and the only use now is for irrigation.

9     Q  You say, "several years ago."  Could you be a little

10 more specific as to when they ceased to use Ysidora for camp

11 use?

12     A  Not without looking it up.  Let's see:  Two to four;

13 would that help?  I mean, it is in that order some place.

14     Q  And do you know what per cent of the pumpage from

15 Ysidora basin back in the early '50's was used for camp use?

16     A  Let me check one of the exhibits.

17     MR. VEEDER:  This goes beyond the direct examination.

18     THE COURT:  You can get this from some other witness,

19 Mr. Sachse.

20     MR. SACHSE:  If your Honor please, there is  an exhibit

21 introduced by this very witness.

22     THE WITNESS:  That is what I was looking for.

23     MR. SACHSE:  I can't put my finger on it at the moment.

24 I am looking for it.

25     THE WITNESS:  I am not certain I can--

1          MR. SACHSE:  For camp pumpage and irrigation pumpage.

2    Exhibit 47.

3          THE WITNESS:  Could I have Exhibit 47, please.

4          THE COURT:  I will let you have my copy here.

5          MR. VEEDER:  I give you a copy of 47.

6          THE WITNESS:  The exhibit so shown there, Mr. Sachse, I

7    don't think breaks out the percentage of the irrigation  and

8    the camp pumpage for Ysidora.  It shows the percentage for

9    Ysidora with respect to the remaining subbasin.

10   BY MR. SACHSE:

11         Q  You don't know anything other at the moment than

12   shows on the exhibit?

13         A  Not without digging into the data that are available

14   on pumpage.

15         Q  Would it be fair to conclude  that if there had been

16   no irrigation, there would have been no salt water intrusion?

17         A  What is that again?

18         MR. VEEDER:  I object to that.  How does he know what

19   the camp might have done in regard to utilization of water for

20   camp purposes?

21         THE COURT:  Sustained.  Argumentative.

22   BY MR. SACHSE:

23         Q  Are you aware where the irrigation water from Ysidora

24   goes?

25         A  In a general way.  I have not made a study of it, but

1    I have observed irrigation.

2         Q  The large part of it goes outside of the  watershed,

3    does it not?

4         A  I can't answer.

5         MR. VEEDER:  I object to that.  It goes beyond the scope

6    of  the direct examination.

7         THE COURT:  The witness says he can't answer it.  The

8    answer will stand.  Objection overruled.

9    BY MR.  SACHSE:

10        Q  Now, it is your recommendation or it was your depart-

11   ment's recommendation that--

12        MR. VEEDER:  Are you through with 47, counsel?

13        MR. SACHSE:  No, the next question deals with 47, also.

14        I am referring to Transcript 4065, Mr. Veeder.

15        Q  It is a very lengthy answer, Mr. Worts.  I am not

16   going to try to read it.  But in substance, you stated, as I

17   understood your testimony, that the U. S. Geological Survey

18   recommended that the pumpage of the camp should be distributed

19   60% from Chappo, 40% from Upper Subbasin, and zero from Ysidora

20   where sea water intrusion occurs?

21        A  That is true.  It so states on Exhibit 47.

22        Q  Your answer in the transcript  states that was because

23   of the sea water intrusion.  But is there not also an additional

24   factor in recommending such a pumping ratio, that factor being

25   that the recharge from surface  water in Upper Subbasin in Chappo

1    is much more rapid?  Do I make myself clear?

2         A  Yes, you make yourself clear.

3         Q  Is that not also a factor in--

4         A  I didn't answer your question, though.

5         Q  That is all right.  Is that not a factor in recom-

6    mending the pumping percentages?

7         A  No.

8         Q  It is not?

9         A  No.

10        Q  The speed with which one basin can be recharged as

11   compared with another did not enter into your consideration

12   when you made these recommendations?

13       A  My opinion, and the exhibits that I have shown,  such

14   as Exhibit 46-- if I may-- (exhibit handed to the witness by the

15   Clerk).  I think Exhibit 46 for the so-called wet year 1952, for

16   Wells 35-K-1 and 35-K-4 show, without much doubt, the speed with

17   which that basin, Ysidora Subbasin, can be recharged from the

18   stream.  I think that a rise, if we just want to take the

19   shallow level in Well 35-K-4, rose a good 15 feet in just a few

20   months.  I think that is a good indication of the rechargeability

21   of  that basin.

22       Q  Well, is that more or less rechargeable, to use your

23   own words, than, let's say, the Upper Basin?

24       A  The Upper Basin would be more permeable.

25       Q  And would take water faster as it runs across the

1    surface of the ground?

2         A  Well, we are dealing in relatives.  I would say this

3    was quite fast and that it would be still faster up in the

4    sieve area up in the Upper Subbasin.

5         Q  Now, a question on 47 as to the data you obtained

6    for the years 1925 up to 1940.  Where did you get that data as

7    to pumpage?

8         A  That data were obtained from the Public Works office

9    which had and made available to me all of the records that they

10   had, the source of which would be hearsay upon my part.

11        Q  You got them from Camp Pendleton?

12        A  I got them from Camp Pendleton.

13        Q  And I presume also that you then obtained your fig-

14   ures as to the percentage breakdown of pumping in the two higher

15   graphs on the page also from Camp Pendleton?

16        A  Only the data plotted on the upper left-hand graph,

17   which is an acre foot or quantity plot, came from Camp Pendle-

18   ton.  I simply reduced it to percentage and made the--

19        Q  Made the right-hand?

20        A  Made the right-hand graph from those data.

21        Q  Now, Exhibit 48 is the sewage effluent tabulation?

22        A  Yes.

23        Q  And those figures were obtained from the Public Works

24   office at Camp Pendleton, quantities?

25        A  They were obtained from Camp Pendleton.  I wanted to

1  add one-- there is one matter of interpretation in the totals

2  used that I think ought to be in the record to explain why the

3  totals from the several plants shown, as the source of  this

4  sewage returning to the basin, would not equal an arithmetical

5  sum of the discharges from the several plants.

6        Q  That is what I wanted to ask you.

7        A  Yes.  All right.  The sewage from plant two that

8  enters Ysidora Subbasin down the unnamed creek-- principally

9  in Section 36, 10 South, 5 West-- I believe comes from over

10  the watershed, and part of the effluent is used to irrigate

11  the golf course.  And I used a figure of 400 acre feet, sub-

12  tracted from the effluent that-- I believe that is below  the

13  metered point of the sewage effluent-- so that approximately

14  400 acre feet was used or deducted from the effluent, so that

15  you have, in reading these graphs over here, just subtract 400

16  from the arithmetical figures you have for the years since 1952,

17  when plant two was first run over.

18        Q  In other words, to see if I understand you, the

19  graph 48 shows, to the best of  your ability, what actually

20  went to the basin, not the discharge of the plants themselves?

21        A  That is right.

22        Q  You deducted that part of the discharge of plant two

23  which was used outside the basin?

24        A  Yes.

25        Q  Now, Mr. Worts, you have several exhibits.  43 is a

1    tabulation of the storage capacity of the ground water basins.

2    And one of your maps shows the location of the basins.   Forty.

3    Nowhere on these exhibits do I find any calculation of  the

4    surface area of the basin.   Have you made such a calculation?

5          A   Yes; that calculation would have been made at the

6    ·time that the storage estimates were derived.

7          Q   What did you use as the surface area, for  example,

8    in your calculations on Exhibit 43?

9          A   I have to refer to the isopach map which is Exhibit--

10         MR. VEEDER:   39.

11         MR. SACHSE:   We can take that basin map off.

12         THE WITNESS:   On Exhibit  39, the isopach map, and Ex-

13   hibit--

14         MR. VEEDER:   40.

15         MR. SACHSE:   40.

16         THE WITNESS:   40-- Exhibit 40 shows the surface area of

17   the alluvium considered as the topmost area used in the upper

18   calculation of storage capacity shown for the five, at five feet.

19   In other words, as shown on the isopach map, the 20-foot con-

20   tour is obviously going to be of smaller area than the surface

21   area.       For all practical purposes, we used the area of the

22   surface for  the five-foot depth, and the area of the 20-foot

23   isopach for the 20-foot depth, averaged the two to come up with

24   the average area.   Now, those were computed.   I don't have them

25   with me.   They were computed, I believe, 51 or two.

BY MR. SACHSE:

Q   In other words, to see if I understand you again: Obviously the basin hasn't got a vertical side wall; is that what you are saying?

A   That is right.

Q   It slopes?

A   That is right.

Q   So you took as the surface area the 5-foot elevation, is that correct?

A   As an approximate representation.

Q   As an approximate.   And then what-- I didn't follow you, what you said, what you did to the 20-foot contour.

A   There you have so drawn the 20-foot isopach.   To planimeter or measure the area  of the five foot or the surface, similarly with the 20-foot area enclosed within the 20 foot, average the two to come up for an average area for the volume.

Q   And then did you do the same thing for 40, 60, 80A, and so on?

A   Yes.

Q   And you say you have those calculations available?

A   Not readily.   They were made in '51 or two, and would be among the work sheets--

MR. VEEDER:   They appear in 110 Fed. Supp. 79, as I remember.

S12
B2

4339

BY MR. SACHSE:

Q  I would like to direct your attention for a moment, please, to 37, the geologic map.

A  Yes.

Q  In response to a question from Mr. Veeder, at the very outset of your direct-- I am reading from 3940, Mr. Veeder-- Mr. Veeder asked you:  "Will you state whether the basement complex depicted on Plaintiff's Exhibit 37 is the same in general characteristics as that which appears on Plaintiff's Exhibit 15?"  Your answer was:  "It has the same general characteristics, has the same general water-bearing properties."  What are those general water-bearing properties?

A  Any water contained in the unweathered portions of the granitic and metamorphic rocks, shown on Exhibits 37 and 15, would be contained in cracks, fractures, fault planes, but not--

Q  It would be the  same in both area, the upper and the lower watershed?

A  Yes.

THE COURT:  Except for faults, cracks, and so forth, the water in related quality is very, very poor?

THE WITNESS:  Very poor.

THE COURT:  I remember when that answer  was given, and I understood that he said, "The same quality."  And I made a mental note, "Poor quality."  But I see you picked that up, Mr.

Sachse.

BY MR. SACHSE:

Q   Now, with particular reference to 15, it is quite obvious that the geologic breakdown is not nearly as detailed as it is on 37.  Could you characterize the type of formations that you have indicated on 37 that are grouped within the symbol Qtoal on 15?

A   Sure.

Q   What  are they?  Which of the ones on 37 would fit Qtoal?

THE COURT:  Qtoal was the older alluvium?

MR. SACHSE:  Older continental deposits,older alluvium yes, your Honor.

MR. VEEDER:  That goes beyond the scope of the direct examination, clearly.

MR. SACHSE:  Counsel for  the United States asked him to compare the basement complex on the two.  I don't know why we can't compare something else on the two.

MR. VEEDER:  Well--

THE COURT:  If the witness can answer.  Let's not be technical.  Whether it goes beyond the scope or not, I would like to know this.

MR. VEEDER:   I would be glad to tell you.

THE COURT:  You weren't asked, Mr. Veeder.  Objection overruled.

1    MR. STAHLMAN:  You are not under oath, either.

2    THE COURT:  What on 37 would be called the older allu-

3 vial?  The terrace, marine deposits?

4    THE WITNESS:  Not the marine.  There are no marine de-

5 posits, to my knowledge, exposed on  Exhibit 15.  The terrace

6 deposits would be the only unit on Exhibit 37 that would be a

7 part of many units of that age and older included with the

8 Q--

9 BY MR. SACHSE:

10    Q  Qtoal.

11    A  Qtoal on Exhibit 15.

12    Q  Now, the same question, if you please, as to the area

13 on 15 that is indicated "Bcw"?

14    THE COURT:  Badly weathered basement?

15    MR. SACHSE:  Badly weathered basement.  Deeply weathered

16 basement complex.

17    THE WITNESS:  I have shown on this exhibit, you will

18 notice that the blue-- "by this exhibit" I am alluding to 37--

19 is just shown around the edges.  There would be some of that--

20 there is some that I am personally aware of and testified to

21 yesterday up on the Naval Ammunition Depot that would fall in

22 that Bcw category, as of being the same general type.  I have

23 not inspected and compared them to make sure, to determine

24 whether they are identical in water-bearing character or not.

25 I don't know what, just how similar they really are, but that

1   type of granite tends to weather.

2   BY MR. SACHSE:

3       Q  Now, you had no direct connection, as I understand it,

4   with the geological study made by Lt. Walker covering that

5   portion of  the river between Exhibit 15 and Exhibit 37?  Or

6   did you have any connection with it?

7       A  No direct connection.

8       Q  I would like to indicate to you this:  There appears

9   to be an overlap between yours and his in one point.  Could you

10  please take a look at 70?

11      THE COURT:  Well, now, he knows nothing about, had no

12  direct connection with Lt. Walker.

13      MR. SACHSE:  However, the two maps superimpose, and I

14  want to find out if there is-- I don't think there is a dis-

15  agreement, but I would simply like to clarify it.  Different

16  terminology is used.

17      Q  Have you got it?  Maybe it is on the board.  If you

18  don't mind, you can look at mine.  What I am referring to--

19      MR. VEEDER:  Now, let's just hold everything for a

20  moment.  If we are going to depart from the direct examination,

21  let's do it right.

22      THE CLERK:  Mr. Sachse, what number was that?

23      MR. SACHSE:  70.  I thought we didn't have it.

24      Q  Just the bottom end is all.  I am particularly direct-

25  ing your attention, Mr. Worts, to the area that you just pointed

1    to a  moment ago surrounding Lake O'Neill.

2              A  Yes.

3              Q  And it appears that alluvium is exactly the same.  It

4    appears that the terrace deposits are delineated practically

5    identically on the two.  But whereas you used the symbol "Bc"--

6              A  Yes.

7              Q  -- for  the surrounding area, Lt. Walker uses a sym-

8    bol "Qr."  Now, what is the difference?  Or is there any?

9              A  Yes, there is a difference in the character of the,

10   let's say, the physical condition of the basement complex.

11   Where he has it colored blue, it is the solid variety, the kind

12   the rings when you hit it with a hammer.  The rest, Cr.

13             Q  Qr.

14        THE COURT:   "Qr" is called residual.

15        THE WITNESS:   "Qr" is the weathered.  Same material, only

16   weathered.

17        Now, on my, on Exhibit 37, all I have said is:  "Igneous

18   and metamorphic rocks non-water bearing except where decomposed

19   when small well yield can be obtained."  I have made no attempt

20   to distinguish that veneer of weathered granitic material that

21   overlies the solid rock.  He has.

22   BY MR. SACHSE:

23             Q  In other words, "where decomposed" refers to this?

24             A  That is right.

25             Q  Refers to residual?

1    to a  moment ago surrounding Lake O'Neill.

2         A  Yes.

3         Q  And it appears that alluvium is exactly the same.  It

4    appears that  the terrace deposits are delineated practically

5    identically on the two.  But whereas you used the symbol "Bc"--

6         A  Yes.

7         Q  -- for  the surrounding area, Lt. Walker uses a sym-

8    bol "Qr."  Now, what is the difference?  Or is there any?

9         A  Yes, there is a difference in the character of the,

10   let's say, the physical condition of the basement complex.

11   Where he has it colored blue, it is the solid variety, the kind

12   the rings when you hit it with a hammer.  The rest, Cr.

13        Q  Qr.

14        THE COURT:  "Qr" is called residual.

15        THE WITNESS:  "Qr" is the weathered.  Same material, only

16   weathered.

17        Now, on my, on Exhibit 37, all I have said is:  "Igneous

18   and metamorphic rocks non-water bearing except where decomposed

19   when small well yield can be obtained."  I have made no attempt

20   to distinguish that veneer of weathered granitic material that

21   overlies the solid rock.  He has.

22   BY MR. SACHSE:

23        Q  In other words, "where decomposed" refers to this?

24        A  That is right.

25        Q  Refers to residual?

S17
B3   Case 3:51-cv-01247-JO-SBC   Document 4541   Filed 09/24/63   PageID.25064   Page 49 of 131
Worts      Cross     11344

1      A   I think that is what he means, from the paucity of

2   data there are in the legend.

3      THE COURT:   Well, I will take a recess now, and you can

4   check it over.

5      MR. SACHSE:   I am almost through.   I would appreciate a

6   recess, your Honor, so I can review what I have got.

7      THE COURT:   When you come back-- I think I understand

8   one of your points; namely, that in this chart on discharge and

9   recharge you contend that there was not taken into account

10   water that would flow off the little streams and branches in

11   this part of the Santa Margarita.   I want you to tell me in

12   three or four sentences what, in particular, your point is with

13   reference to water in and out.

14      MR. SACHSE:   I will be very happy to.

15      THE COURT:   Just so I have your position in this.

16      MR. SACHSE:   I would be very happy to.

17      THE COURT:   Take a short recess.

18      (Recess taken.)

worts   Cross                                                    4345

A C

Z31

1        MR. SACHSE:  In response to your Honor's inquiry, there

2   are two points that I was attempting to make.  The first one

3   is very obvious-- that is, that the impounding of what may waste

4   to the sea has demonstratively no effect on the regimen of the

5   basin, as was shown by Plaintiff's Exhibit 49.  But there is a

6   second point that is perhaps more important, and I tried to draw

7   it to make it clear.

8        MR. VEEDER:  Your Honor, are we going into argument on

9   this now?

10       MR. SACHSE:  I am just responding to his Honor's inquiry.

11       THE COURT:  I asked Mr. Sachse to give his position was

12   we went along so that I can judge this matter as we go along.

13   I think I have that right.

14       MR. VEEDER:  I know.  But am I to respond?  That is the

15   point.

16       THE COURT:  We will see.  This is not argument.  I just

17   want a statement.

18       MR. SACHSE:  The second point is that one of two things

19   must exist.  Either the figures of (1949) are wrong-- I will   (see p. 46 44)

20   take that first.  In 1942 the basin was full, as shown by

21   Exhibit 49, but recharge exceeded discharge and there was

22   74,200 acre feet of spill.  Mr. Worts pointed out that it is

23   possible that the basin could be lower the following year be-

24   cause the pumping takes place after the runoff, the heavy load

25   on the basin comes at this end , while the heavy inflow is at

4346

C.

Z32

1   tis end of the water year.  However, the next year we had

2   spill at Ysidora, too, and that spill ran down when the basin

3   was low-- the inflow is coming in here, and again we will say

4   that we had heavy pumping.  But the same next year we had heavy

5   spill at Ysidora, one after the other, and again the basin was

6   down.  And it suggests the possibility that something is wrong

7   with the figures.

8         But the second point is the one that your Honor asked,

9   and Mr. Worts said no, it was not the fact, that it may be

10  that this water has come so fast that it just doesn't get time

11  to get into the underground.

12        THE COURT:  I don't know that he said no to that.

13        MR. SACHSE:  Perhaps he didn't.  But our contention is

14  that from Plaintiff's Exhibit 36-- to make it clear, I will ask

15  him.

16        Q  If you will look at the years 1942, 1943, '44 and '45,

17  the Government's hydrograph as to how those figures occurred,

18  if you think they came too fast to fill the basin, in your

19  opinion?

20        MR. VEEDER:  That is objected to as going beyond the

21  direct examination.

22        THE COURT:  Objection overruled.

23        THE WITNESS:  I never heard of such a thing.  You are

24  asking me whether water comes too fast to recharge a basin?

25

BY MR. SACHSE:

Q   No, if the flow was so fast across the surface that it didn't have time fully to repercolate and refill it.   That condition can't exist?

A   No.

Q   Thank you.

A   Can I explain that a little more fully?

Q   Go ahead.

A   I would like to point to Exhibit 38 to show the bottommost water level profiles depicted on Exhibit 38, which show that the actual amount of drawdown at the deepest times of record are not very far below land surface.   Therefore, it doesn't take much water to fill it up.   However, if you had the levels pulled away down, I couldn't say that the water didn't come in too short a period to recharge the basin.

Q   In other words, that then would depend on the relative permeability of the lenses between the upper and lower layers?

A   It would depend on the magnitude and duration of the flow, the depth to which the basin were drawn down at that time, and the vertical permeability of the deposits.   Those three are the controling factors.

THE COURT:   Do I understand you, then, to say that the drawdown, from your studies as shown on Exhibit 38, has been relatively a short distance below the surface, and that when these floods come they do fill the basin?

4348

Horts  Cross

THE WITNESS:  That is right.

THE COURT:  And that what runs off then is water that could not be taken into the basin?

THE WITNESS:  That is right.  The basin has not been drawn down to the extent that its full potential as a rechargeable unit has never had an opportunity to be tested.

THE COURT:  So when this flood water runs off, the basin is full or it wouldn't run off?

THE WITNESS:  Yes, that is true.

MR. SACHSE:  That is it, your Honor.

Now, I have just a few more questions.

Q  In reviewing your bibliography, inserted into the record by Mr. Veeder, I find reference-- reading from page 3922 of the transcript:  "A total of 17 classified reports prepared between 1945 and 1958 for various military installations, largely in Southern California."  Did any of the reports involve the Santa Margarita River watershed?

A  Yes.

Q  Did any of those reports involve lands outside the military reservation of Camp Pendleton but within the Santa Margarita River watershed?

A  All of the reports, to the best of my recollection, are for the whole camp.  We have four main stems or streams: Santa Margarita, Las Flores, San Onofre and San Mateo.

Q  Those are outside the watershed.

4349

C

Z35

1      A  They may be outside the watershed, but they are all

2  considered in the reports.

3      Q  Let me rephrase the question.  Were there any of the

4  reports that were for Government lands other than military

5  lands within the Santa Margarita River watershed?

6      A  No.

7      Q  Were any of the reports for private holdings within

8  the Santa Margarita River watershed-- any of the classified

9  reports?

10     A  There was one report prepared for the military that

11  covered the construction of a well.

12     Q  And that is a classified report?

13     A  Yes.

14     Q  And that is a well on the Vail Ranch, is it?

15     A  Yes.

16     Q  Who instructed your office to classify that report?

17     A  It would either be the Department of the Navy or the

18  Commandant of the Marine Corps.

19     MR. SACHSE:  Your Honor, I am going to request that the

20  Court instruct the witness to produce the report he has just

21  referred to, which, as I understand it, is a report prepared by

22  the U. S. Geological Survey, a public agency, on private land,

23  but which has been classified by some direction of the

24  Department of the Navy or the Marine Corps.  I can conceive of

25  no defense--

1    MR. VEEDER:  Do you have a number on that?

2    MR. SACHSE:  I don't have the number.  I am reading

3  from your bibliography.

4    THE COURT:  Mr. Veeder, look into the matter of produc-

5  ing it.

6    Where is this well located?  Does it have any signifi-

7  cance to this case?

8  BY MR. SACHSE:

9    Q  What is the name of the well?

10    A  The so-called Pauba Well, drilled with Navy funds.

11    Q  On the Vail Ranch?

12    THE COURT:  We have the logs on that.

13    MR. SACHSE:  This is a report which has been classified

14  by direction of the Marine Corps, and I would like to see it.

15    MR. STAHLMAN:  A report of what?

16    MR. SACHSE:  Mr. Worts has just testified that he made

17  a report and that it was classified.

18    MR. STAHLMAN:  I don't say that I disagree with you.

19  Maybe it is something that I want to see.

20    THE COURT:  Read what it says in the bibliography, Mr.

21  Sachse.

22    MR. SACHSE:  The bibliography states that there are a

23  total of seventeen classified reports prepared, et cetera.

24  That's all it says.  I have asked him what these reports in-

25  cluded.

C2

Z37

1    THE COURT:  What is the nature of this report of the

2  Pauba well?

3    THE WITNESS:  It describes the drilling, the test pump-

4  ing, general discussion of the geology, principally what

5  happened when the well was drilled.

6    THE COURT:  I think it probably should be produced, Mr.

7  Veeder.  Will you look into it?

8    MR. VEEDER:  Yes, your Honor.

9    THE COURT:  Allright.

10  BY MR. SACHSE:

11    Q Disregarding Los Flores Creek, San Onofre Creek and

12  streams outside the Santa Margarita River Watershed, how many

13  of these seventeen classified reports involve ground water or

14  geological studies within the Santa Margarita River watershed

15  and Camp Pendleton?

16    A  I don't recall the number.  We have an agreement

17  with the military to pick up basic data-- pumpage, and render

18  services to them on ground water conditions in all of these

19  basins each year.  None of them is as detailed as the informa-

20  tion and graphic presentation as shown by all these exhibits,

21  for which all the data was taken, analyzed, plotted, in this

22  manner.

23    Q  But they represent some of the basic data used in

24  the preparation of these exhibits, do they not?

25    A  No, you have all the basic data or are in the process

C2

Z38

1    of acquiring it.  By basic data now, I refer to basic water

2    levels, pumpage, chemical analyses, sewage return or sewage

3    effluents where pertinent, well logs.

4            Q  What do these reports contain then that we don't have

5    here?

6            A  Nothing.

7            Q  But they are classified?

8            A  There are other aspects of a military nature that

9    would be hearsay on my part.  I have been told that the-- in

10   other words, we are asked questions, and the actual--

11           THE COURT:  You are asked questions of a military sig-

12   nificance?

13           THE WITNESS:  That is right.  And I have been told--

14   I have asked the military on not only Camp Pendleton, we have

15   this same situation at maybe half a dozen military bases in

16   Southern California-- Air Force, Marine Corps, Navy-- where

17   they feel that what we have presented in the report, in addi-

18   tion to the interpretation that I have given here as a purely

19   hydrologic and geologic interpretation, other further interpre-

20   tations that have to do, apparently they feel-- they do not

21   want that data released.  And I am sure that an officer could

22   give you a much better reason why these reports are not released

23   to the public than I can.

24           MR. SACHSE:  Your Honor, I have no desire to interfere

25   with the internal security of the United States, but if every-

Worts    Cross                                                    4353

C2

Z39

1    thing that is contained in those reports is already here there

2    is no earthly reason for classifying them, and I am going to

3    ask your Honor to instruct the witness to produce them and let

4    your Honor look at them and ask you to exercise your own dis-

5    cretion as to whether there is anything material or useful in

6    this case.  Frankly, I am a very suspicious character on some

7    of this classified material.

8            MR. VEEDER:  I am glad you used the term "character."

9            The point I make is that this witness under oath has

10   said that everything is presently in the courtroom concerning

11   which references have been made.  Why should we have to produce

12   them?

13           MR. SACHSE:  Why should you not produce them under the

14   agreement for full and complete exchange of information?

15           THE COURT:  Mr. Veeder, the fact that the witness under

16   oath has said that there is nothing additional doesn't answer

17   the question.  There is a possibility, of course, that the

18   conclusions in one of these reports might be different from the

19   conclusions that he gave here.  So that is the reason why

20   ordinarily the document should be produced.  From the standpoint

21   of not producing them, I can imagine where questions could be

22   asked of some military significance.  Suppose that this happened:

23   What is the situation with reference to our water supply?  What

24   are our critical areas in our water supply, et cetera?  They

25   might have military significance.  They may not.  I suppose

C2
Z40

1   there would be no objection to your discussing them with the

2   Navy authorities.

3       MR. VEEDER:  I will, your Honor.

4       THE COURT:  And if it comes down to an insistence on

5   the part of Mr. Sachse to see them, I suppose we could make an

6   in camera inspection and decide on it.

7       MR. VEEDER:  The one factor of which we are of course

8   aware is that these reports are part of reports of other

9   reports.  We don't find Santa Margarita in a single report.  It

10  is part of several other reports.  Would your Honor be satisfied

11  with the pages?

12      THE COURT:  Certainly.  We are not concerned with other

13  areas.  You would have to segregate the part of it which

14  concerned the Santa Margarita.  And I wouldn't even want to

15  make an in camera inspection of material other than material

16  on the Santa Margarita.

17      MR. VEEDER:  We will go ahead as you ask, your Honor.

18      THE COURT:  The chances are that these have been classi-

19  fied almost as a matter of course, and when you get into it

20  you may find that there is probably no good reason for at least

21  classification of the parts of it that concern the Santa

22  Margarita.

23      THE WITNESS:  Your Honor, may I say something about these

24  reports?

25      THE COURT:  Yes.

Worts    Cross                                    4355

C2

Z41

1      THE WITNESS:  I explained yesterday the release proce-

2  dure by which our reports are released to the public, the

3  complex treatment they receive.  When a report is made for

4  another federal agency that is not to be released to the public,

5  it is given what they call an administrative report treatment,

6  that is, its review and the quality of the review and what my

7  organization feels.  Let's simplify it and say that the stand-

8  ards of technical and editorial, particularly the editorial

9  inspection, is not up to the standards that are reached in

10  public release such as you find in the water supply papers.  I

11  cannot personally release the report.  It is beyond my authority.

12  It has to be released by the director of my bureau.  It has

13  to have his O.K. before I can release it.  I wanted to interject

14  that to clarify the fact that I am not authorized by my agency

15  to release reports to the public without their approval.

16      THE COURT:  We understand.

17      MR. VEEDER:  We will proceed.

18      THE COURT:  When your agency releases it to another

19  agency, the the control as far as the copy in the hands of the

20  other agency is concerned has passed to the other agency, I

21  would think.

22      THE WITNESS:  That is not right, your Honor.  The Survey

23  retains the right, if that report is to be released, to have

24  the time and put the effort into bringing it up to the standard,

25  so that when it is released to the public it will be up to

Worts    Cross                    4356

C2
Z42

1    the same standard as all other reports.

2        THE COURT:  Well, administratively that may be the rule.

3    Legally, I don't think it is the rule.  This came up in Hawaii

4    in the war when the F.B.I. had secret reports.  As long as they

5    remained in the file of the F.B.I., they were secret reports.

6    However, the F.B.I. released them to the Army, Navy and other

7    agencies, and Judge McCormick went over and tried a case and

8    ruled that when the F.B.I. had let them out of their possession

9    into the possession of another agency the administrative con-

10    trol that the F.B.I. had over them ceased.  I think there is a

11    printed opinion on that.  I can't think of the name of the case.

12        MR. SACHSE:  So that I am clear where we stand, your

13    Honor--

14        THE COURT: Mr. Veeder is going to look into the matter

15    and report back to us further.  We may find that there is nothing

16    of any moment in the reports and they may be produced.  We may

17    find that there is some matter and we may have to make some

18    in camera inspection of them.

19        MR. STAHLMAN:  I doubt that they will create any great

20    sensation.

21        MR. SACHSE:  I have no further cross-examination.

22

23                    CROSS-EXAMINATION

24        MR. MOSKOVITZ:  Mr. Worts, I want to ask a few more

25    questions about Exhibit 49, if you have it available.

Cg2

Z43

1     THE WITNESS:  I don't seem to have it here.

2     (The Clerk hands a document to the witness.)

3     MR. MOSKOVITZ:  Do you have it now, Mr. Worts?

4     THE WITNESS:  Yes.

5   BY MR. MOSKOVITZ:

6     Q  Now, near the end of Mr. Sachse's cross-examination,

7   when the Court was questioning you, you said that there wouldn't

8   be discharge to the ocean unless the basin, in effect, was full;

9   is that correct?

10     A  Would you repeat the last part of that?  That there

11   would?

12     Q  There would not be discharge to the ocean from the

13   Santa Margarita River unless the Pendleton Basin was full?

14     MR. STAHLMAN:  Do you mean under all circumstances?

15     MR. MOSKOVITZ:  I thought that was his testimony.  I

16   wanted to get that clear.

17     THE WITNESS:  I could answer it this way, that there

18   would be discharge to the ocean after the basin was full.  I

19   imagine there would be recharge going on before it was full.

20   Whether or not the stream would reach the ocean at that time

21   would depend on the magnitude of the flow and the rate of

22   seepage loss.  But once the basin was full there would be loss

23   to the ocean.

24     Q  Let me put it this way:  Looking at Exhibit --

25     THE COURT:  Now, you see, that demonstrates the value

C2
Z44

1  of cross-examination-- this last one question, you know.  Here

2  you had a good record, and now you have just knocked the props

3  right out from under it.

4        Go ahead.

5        MR. VEEDER:  I am greatly relieved.  I will always owe

6  a great deal to Mr. Moskovitz.

7        THE COURT:  Go ahead, Mr. Moskovitz.

8        MR. MOSKOVITZ:  Where shall I go?  Out of the courtroom?

9        MR. VEEDER:  I have a thought in that regard,

10       MR. MOSKOVITZ:  If I have upset your Honor, I am very

11  sorry.

12       THE COURT:  No apologizes necessary.

13       MR. SACHSE:  All we want is the facts.

14  BY MR. MOSKOVITZ:

15       Q  Looking at Exhibit 49, beginning in 1943 and con-

16  tinuing through 1949, you have a series of years in each of

17  which, if you examine Exhibit 60, the runoff figures at Ysidora,

18  there was runoff past Ysidora to the ocean; is that not correct?

19       A  1943 through '49?

20       Q  Yes.

21       A  That is correct.

22       Q  And in each of those same years your Exhibit 49 shows

23  that the amount of discharge from the basin exceeded the amount

24  of recharge to the basin?

25       A  Yes.

C2

Z45

1    Q  And that as a consequence when you look at Exhibit 50--
2    do you have that?

3    A  No.

4    (Handing document to the witness.)

5    Q  As a consequence, when you look at Exhibit 50, you
6    have calculated on curve A that the amount of water in the
7    basin decreases each year, each year there is a deficiency of
8    recharge when compared to discharge, and each year therefore
9    the basin goes down further; is that not correct?

10    A  That is what curve A shows.  Curve B, though, is an
11    independent check.  In other words, the curve A works with the
12    mathematics of all the types of recharge and all of the types
13    of discharge.

14    Q  I want to follow through with curve A for the moment.

15    A  All right.

16    Q  And the figures which were used in drawing curve A
17    are shown graphically on Exhibit 49?

18    A  Yes.

19    Q  From the fact that during all those years there was
20    outflow past Ysidora to the ocean, would you not conclude that
21    there is something wrong with the figures and that the recharge
22    that you show on Exhibit 49 should in each of those years be
23    greater?

C3
24    A  I can't conclude that, unless there is something
25    wrong with the figures.  The figures I have worked with are the

Watts Cross   4360

C3
Z46

1   figures shown for recharge from the river and those amounts shown

2   in Exhibits 60 and 62.  In stream gaging procedure, for example

3   for Ysidora gage, let us take a year like 1943 that we have

4   alluded to as being a year of high or large runoff, 74,000

5   acre feet passed that gage.  Now, I am not going to testify for

6   Mr. Hofmann, but I know from my own personal experience in

7   doing some stream gaging of my own and working with the Surface

8   Water Branch that they classify their stations as to the quality

9   of the control in measuring the discharge.  Now, if they con-

10  sider that the control is excellent, I think they allow some-

11  thing like a three to five percent-- these are only approximate--

12  three to five percent error as a possible range in the figure.

13  If it is what they call good quality, it may be five to seven,

14  et cetera.

15      Let's take a look at a figure like 74,000.  Now, it is

16  carried only on the basis of their method of rounding.  Actually,

17  carried out to four places, which gives it a significance, that

18  is pretty strong.  It is merely how it mathematically works

19  out.  They have used that figure.

20      But -- now here is the important point-- suppose that

21  figure was 5% in error-- only 5%.  Now, we are measuring under

22  pretty difficult conditions during these periods of high flow.

23  So I don't think there is any stream gager-- I guess I can't

24  speak for other stream gagers-- that within 5% would be a

25  darned good measurement for flood flow.  All right, 5% of

C3

Z47

1  74,000 acre feet is 3,500 acre feet, in round figures. There-

2  fore, if this were a good measurement for the year, that could

3  be 3,500 acre feet one way or the other. That is at a gaging

4  station.

5      Now here is a much more difficult problem on Exhibit 62,

6  where the combined flow of De Luz Creek and the Santa Margarita

7  is estimated for De Luz Dam Site. It is computed by as sound

8  a method as can be derived, and I think Mr. Hofmann described

9  that method. I was not here. And in that same year in 1943

10  the computation was 77,900.

11     So you are fussing around in a realm of error between

12  74,000 and 78,000. Now, all I have to use is the best figures

13  that can be derived for computed runoff coming into my ground

14  water basin and the gaged runoff with its limits of error at

15  the lower end. I do not have any justification for offering

16  those figures to make this minor difference between 77,900

17  and 74,200 for 1943 balance. Actually, I think that is a whale

18  of a good computation to come out as close as 1,700 acre feet,

19  when you consider the tremendous variables that are possibly

20  involved in this system. In other words, these data were

21  worked out independently by Mr. Hofmann and supplied to me

22  for my computations. I picked up the metered figures for the

23  pumpage and estimated my estimates of evapo-transpiration, and

24  here is the metered sewage effluent and my other types of

25  recharge and discharge, and dealing with the quantities that

C3

z48

1   we are-- just look at the size of them-- 75,000 just for the

2   recharge, we are dealing in 1943 with these large figures--

3   to me it is a whale of a good estimate to come out with only

4   1,700 acre feet variance.  In other words, he could have

5   estimated-- I am not saying that it is possible or right-- but

6   instead of being 77,900, suppose that his computation had been

7   1,100 more at the De Luz Dam Site.  That would have essentially

8   negated the deficit shown.

9       Q  So that the figures that you used in making your

10  computations have a margin of error which is great enough that

11  the deficit that you show for the years 1943, 1944, 1945 and

12  1946 could very well be a plus figure or at least bring it

13  up to the place where the recharge and the discharge were equal;

14  is that correct?

15      A  Not entirely correct, because there again we are in

16  the time of the year-- September 30th; you are balancing all

17  these elements of recharge and discharge.  For example, as Mr.

18  Sachse pointed out on the blackboard, your recharge for the

19  stream takes place in the winter season.  Yet your heaviest

20  pumping demand occurs in the summer.  This is all geared to

21  September 30th, which is right at the tag end of the dry season.

22  Therefore, even if you filled up your basin in February, it is

23  going to be down, from the pumping that follows after the stream

24  flow stops, in September.

25      To answer your question about the range up and down of

C3

Z49

1   this negative discharge shown on Exhibit 39, where your water

2   level stand in the basin, regardless of how much you change

3   these figures, your water levels are a true indication of how

4   the basin stands, full or empty, and the best information that

5   we have through that period is shown on Exhibit 50 for September

6   30th.  Now, if we took the water level measurements and plotted

7   them up for the middle of the winter, there is a good possi-

8   bility, for example, in the years 1943, '44, '45 and '46, for

9   example, where there is only a thousand acre feet of deficit

10  shown, by the fall I would hazard an opinion that the basin

11  could very well have been full in the winter when the floods

12  pass.  So these figures for September then appear to be quite

13  reasonable.

14      Q  On Exhibit 49 you show a deficit that discharge

15  exceeded recharge for a long period of years beginning with

16  1942 and going up through 1950, actually.

17      A  1951.

18      Q  1951.  Now, the fact that pumping comes at the latter

19  part of the year would not cause you to have a continuous

20  series of deficiencies unless  your pumping were to increase

21  every single year?  Is that not so?

22      A  That is not so.

23

24

25

1    Q   Why wouldn't the recharge, if there was ample water,

2    fill up the amount of deficiency in a previous year when it

3    came in the next year, so that in balance for the full year

4    your  recharge would equal your discharge for that year?

5    A  Well, look at the position of these discharges.  They

6    are all about the same place for the years '43 through--

7    THE COURT:  The chart?

8    THE WITNESS:  Exhibit 49.  The point plots of the de-

9    ficiencies for each year are at about the same point, give or

10   take a thousand acre feet in there, from  '43 through '48.

11   But in 1948 when your  stream flow begins to dwindle  away due

12   to an acute dry period, then your deficiencies begin to show

13   up a little more strongly, not much more but more strongly than

14   in the preceding years.  So alluding then to Exhibit 50, as I

15   explained for curve A, I have plotted on Exhibit 50  the accum-

16   ulated deficiencies on through to the lowest deficiency in 1951.

17   Q   Let me be specific:  Your curve A on Exhibit 50,

18   which you have taken from your Exhibit 49, shows each year that

19   the basin has gone lower and lower;  is that not correct?

20   A  Yes.

21   Q  From 1943, at least through 1949, lower and lower each

22   year?

23   A  Yes.

24   THE COURT:  You are talking about 50 now?

25   MR. MOSCOVITZ:  On Exhibit 50 the curve shows--

1        THE COURT:  Lower and lower through 1951?

2        MR. MOSCOVITZ:  Yes, well, I want to go up through 1949

3    only, your Honor, because those were the years when there was

4    outflow at Ysidora showing that there was ample water to refill

5    the basin.

6        THE COURT:  All right.

7    BY MR. MOSCOVITZ:

8        Q  Now, the question is:  Why would the basin drop lower

9    and lower every year when there was ample water to refill it?

10   From one September 30 to the next September 30?

11       THE COURT:  You are not asking the question right.  You

12   say, "ample water to refill it."

13       Here is what Mr. Moscovitz is getting at:  You have a

14   chart here of what you call accumulated deficits.

15       THE WITNESS:  Yes, sir.

16       THE COURT:  Yet the chart 60, Exhibit 60, shows that

17   after the so-called wet year of 1943, that in 1944, 27,800

18   acre feet flowed out of the basin.  Now, let us assume there

19   has been a drawdown on the basin before this wet period comes.

20   When this wet period comes, if this basin had taken the water

21   that came across it to the extent that it had taken the water,

22   how did 27,800 acre feet flow out unless the  basin was full?

23       THE WITNESS:  I see your point.

24       THE COURT:  Then, if the basin was full then, you don't

25   have an accumulated deficit.  Then, you do the same thing with

1   the next year.  You say now-- 1945.  Your chart shows an accum-

2   ulated deficit, but in 1945, 20,000 acre feet flowed out into

3   the sea.  Now, assume there had been heavy pumping up to Sep-

4   tember 30th, which was drawing the basin down, then comes the

5   beginning of the water year, October 1st, with water then during

6   that year running to the sea, why wouldn't the basin have been

7   filled up again?  How could you get what you speak of as an

8   accumulated deficit?

9       THE WITNESS:  It is the accumulation-- I see what you

10  mean, your Honor.  It is just the mathematical  accumulation

11  of these deficits plotted on this graph; the ultimate of which

12  shown as a minus 10,000 on Exhibit 50 would be the extent to

13  which the basin would have been drawn down at that time.

14      THE COURT:  Do you mean by that you have just given us

15  a mathematical study that has no relation to reality?

16      THE WITNESS:  Oh, yes.

17      THE COURT:  Oh, and although the basin was full each

18  year at flood time, you have made a chart to show an accumu-

19  lated deficit?

20      May I suggest to you and see what your answer is to this:

21  That I think there is another answer.  There is a possibility

22  of another answer.  When these flood  waters come down out of

23  these steep canyons, is it possible that they sweep across

24  these canyon bottoms so rapidly that you get a discharge to

25  the ocean and don't get a fill of the basin?

1       THE WITNESS:  I don't think that is true, your Honor,

2  in the case of these permeable deposits on the Camp Pendleton

3  basins.

4       THE COURT:  Have you ever seen any of our rivers at flood

5  time out here?

6       THE WITNESS:  Oh, yes.  Yes, I have.

7       THE COURT:  Heavy floods like 1952?

8       THE WITNESS:  Yes, I was on the camp in 1952.

9       THE COURT:  What is your answer to this seeming incon-

10 sistency?

11      THE WITNESS:  It is an accumulated deficit using these

12 differences between recharge and discharge, for the years 1943

13 up through 1949, as plotted on Exhibit 50, to compare it to

14 the  water level change  which you observe also occurred re-

15 gardless of the fact that the basin was supposed to have been

16 fully recharged as exhibited by curve B.  Now, there is no

17 denying the water levels in this consideration, too.  The water

18 levels have been drawn down.  Now, I don't know the reason for

19 that unless the increase in pumpage for each year after the

20 recharge came into the system caused the levels to be progres-

21 sively  lower at that time of the year.

22      THE COURT:  But your chart doesn't show any increase in

23 pumpage to that extent.  Chart 49 shows a rather uniform level

24 of pumpage.

25      MR. MOSCOVITZ:  This is my copy.

S22
D1

4368

1        THE COURT:  I can follow that if your pumpage had in-

2    creased mathematically or even geometrically, or even mathemat-

3    ically, but it hasn't.

4        THE WITNESS:  I would have to think this through a little

5    further.  You have a good point there.

6        THE COURT:  What I want to know is:  Why does water run

7    to the sea?  Why does water run to the sea?  Number 1:  It may

8    run to the sea because the basin is full.  If the basin is full,

9    then you can't have the accumulated deficits, because at some

10   time or other it was full again.  Number 2:  Water runs into

11   the sea because a certain amount of it runs by so fast it

12   doesn't have a chance to get in.  We are familiar in Southern

13   California with what is called spreading grounds.  Outside of

14   the dams that I am familiar with in the San Gabriel and the

15   Tujunga and Pacoima, there are spreading grounds where the

16   water is let out gradually.  And those spreading grounds, by

17   the way, are not even silt.  They are generally rock and gravel;

18   which would look to me like themost beautiful kind of a spread-

19   ing ground in the world.  Now, there are two possibilities why

20   water goes to the sea.  Maybe there is a third one.  Third one

21   may be that the figures are in error here.  There may be a

22   fourth possibility.  But it seems we have got some inconsis-

23   tency here.

24       THE WITNESS: To answer your question, first,  about the

25   water running to the sea:  If the water levels are far enough

start
D2

1   down, as they are in many of those canyons along the front of

2   the San Gabriel Mountains, the ability of the deposits to ab-

3   sorb the flood waters as they come down is exceeded, and the

4   water runs on through to the sea. That is true in Santa Maria

5   Valley where the depth to water is 120 feet at the upstream end

6   of the valley. And in one year that I can recall, 30,000 acre

7   feet was lost or recharged from the stream. Still water ran

8   through the stream. But the depth to water and the permeability

9   of the deposits were the controlling factors. Here in Exhibit

10  38, the depth to water has only been a few tens of feet, 20

11  feet at the most, and despite what the accumulated curve A

12  shows as a mathematical addition of these values during those

13  years, the basin would have been fully recharged if there had

14  been sufficient-- I am taking them as a group. I don't know;

15  maybe some of those years, there wasn't quite enough runoff or--

16  however, there was enough to go through to the sea. In my

17  opinion, they were largely refilled, which would, in turn, make

18  curve A an accumulated difference, which is just exactly what

19  it says down at the bottom. Whether it is realistic or not,

20  to me, is judged by where storage was in the fall of 1951, in

21  terms of the amount of water removed from the basin up to that

22  time. This mathematical difference, accumulated difference,

23  which is a strict comparison between recharge and discharge,

24  perhaps that difference is best shown just by adding the two

25  quantities up and comparing them year by year on the right-hand

1   part of Exhibit 49. But there is no question-- that is of

2   the end of the dry period, 1951. And then, with the wet year,

3   1952, which shows on the left-hand side of Exhibit 49, the

4   mathematical computation for that one wet year puts in almost

5   10,000 acre feet of recharge in excess of discharge. And simi-

6   larly, the graph rises nearly to the top of the scale. Curve

7   B was down 6,000. The accumulated departure was down 10,000.

8   As I said before, I would believe where the water levels are

9   far more than where the mathematical differences are, for the

10  reasons that I explained before. But you are right, your Honor,

11  the adding together of these to get an accumulated deficit

12  mathematically doesn't describe nearly as well the actual con-

13  ditions as do the water levels which are the real measure of

14  your balance.

15      MR. MOSCOVITZ: I don't want to pursue this matter any

16  further, your Honor. I think that point has been made.

17      MR. STAHLMAN: What point was that?

18      MR. MOSCOVITZ: Let the record speak for itself.

19      MR. STAHLMAN: Am I next?

20      MR. MOSCOVITZ: No, I still have cross-examination.

21      MR. STAHLMAN: Pardon me. I thought you were through.

22      MR. MOSCOVITZ: That is just one area.

23      MR. VEEDER: You ring down the curtain at the end of

24  each gasp, is that right?

25

BY MR. MOSCOVITZ:

Q  Now, Mr. Worts, on Exhibit 37 we have these areas of terrace deposits outlined.  Now, in looking at Exhibit 39, which depicts the isopachs for the alluvial material, did you attempt to chart the thickness of the Qt, or terrace deposits?

A  Yes.  In Sections 13 and 14 in Chappo, Sections 13 and 14, 10 South, 5 West, the-- correction-- they are not charted on this isopach map.  But, as I recall, they were charted on the one back in 1952, or whenever we made our study of the storage capcity, and the terrace deposits were included, to the best of my recollection.  These were the isopachs on the alluvium, as I recall, in the title block, I am not sure, alluvial deposits.  That could be construed to mean the terrace deposits, but it is the alluvium.

Q  And am I correct, then, that in computing the storage capacity of the various subbasins, you had to have a figure for the thickness of the various deposits included within those storage units, did you not?

A  That is right.

Q  And on Exhibit 40, which outlines the storage units for which you calculated capacity, some of the Qt, or terrace deposits, are included, aren't they

A  That is correct.  The outside boundary on the north side of Chappo basin on Exhibit--

Q  40.

A  -- 40, includes some of the terrace deposits; and they are in the storage calculations.

Q  But there is no exhibit yet introduced which indicates the manner in which you calculated those, is there?

A  There are no areas.

Q  That is, we can't planimeter it, the area the terrace deposits and find out what their thickness was in order to calculate storage capacity from the exhibits that have already been introduced?

A  That is true.

Q  Could you tell us what thickness you did use in order to get your storage?

A  What thickness?

Q  What thickness for the terrace deposits you used?  If you can't get it from Exhibit 39--

A  It was wedge-shaped, tapering, and becoming thinner away northward from the alluvium.  Our test Well 13-G-1 was used as the estimate-- not as an estimate-- as the measure of the thickness of the terrace deposits that would be five feet below the level of the adjacent alluvium, as a starting point, as the upper part of our storage unit, down to where we ran into the consolidated rock beneath.  The levels-- I was looking at the well logs or the records yesterday, and there was 20 feet of saturation as of the time the well was drilled.  I think it would be slightly more than that, when the water level within

1    the well was within five feet of the surface in the adjacent

2    alluvium.  In other words, we didn't-- bear in mind that the

3    surface of the terrace deposits that I am alluding to on Ex-

4    hibit 37 in Sections 13 and 14, 10 South, 5 West, stand 40 or

5    50 feet above the surface of the adjacent alluvial plain.

6    Therefore, it is wholly impossible to saturate them to within

7    five feet of the land surface.  So that we took a plane of

8    reference, five feet below the alluvium, and projected it back

9    into the terrace deposits until, in our opinion, it would have

10   intersected bedrock, computed the storage volume below that.

11   That volume is included with the alluvium.  It is not distin-

12   guished separately; it is just included with it.  It is a very

13   small amount, obviously, here, covering only a few hundred

14   acres; is included with the storage out in the alluvium itself.

15   So that during the first part of a water level decline through

16   the deposits, the terrace deposits would drain out, soon become

17   dry, then your whole reliance to greater depth would be upon

18   the alluvium, storage in the alluvium.

19        Q  In calculating the specific yield of that terrace

20   area, terrace deposit area, where did you get your figures?

21        A  As I recall, this was done five or six years ago.  We

22   used lower values for the terrace deposits; to the best of my

23   recollection, we did.

24        Q  Did you estimate the specific yields from any well

25   log?

1    A  Yes.  We had a test well, 10-5-13Gl in Chappo basin

2    drilled right in the terrace deposit.

3    Q  Is that well log shown on the bar graph, Exhibit 41?

4    A  No, I believe the bar graph shows just the wells in

5    the alluvium itself; because that has the specific yields used

6    for the alluvium assigned to it.  And, as I said, to the best

7    of my recollection now, the specific yield values assigned to

8    the terrace deposits was less because of the character and de-

9    composition, that is mineral decomposition, of the rock frag-

10   ments, giving a lower-- it would be lower values than those.

11   Q  Is there any exhibit thus far introduced which shows

12   what specific yield values you did use?

13   A  No.

14   Q  Do you recall what it was, the number?

15   A  We have a range, just as we have there, and I can't

16   recall what the range was.  It would be very similar to Mr.

17   Kunkel's range.

18   Q  You testified, I believe, that the terrace deposits

19   went down below the surface of the recent alluvium?

20   A  Yes.

21   Q  Do they underlie the recent alluvium in any way?

22   A  Maybe I can put a sketch on to show the approximate

23   relationship more clearly.  Very quickly on-- on Exhibit 39 I

24   will take a blue pencil and draw a cross-section line through

25   Wells G-1, 13-G-1, 13-J-1, out into the alluvium, in Section 13,

1   10 South, 5 West. Now, up on the left-hand side I will draw a

2   little line here and sketch beneath it, on Exhibit 39, just an

3   approximate representation of the cross-section. The La Jolla

4   formation exposed on the surface of the northwest end of the

5   profile I am sketching on the left side; flattening to a

6   terrace surface, dropping down to alluvial surface, rising

7   again to a terrace that contains Well 13-G-1, dropping down a

8   bluff 40 or 50 feet high; the alluvial plain with the Santa

9   Margarita River, roughly as shown. The terrace deposits-- I

10  am using a dash line to indicate where the-- if I were doing

11  this accurately I would follow this out in scale to where the

12  isopachs are which are drawn on this alluvium, but just for

13  the purposes of this sketch, this would be shown on the map,

14  symbol Qal, on Exhibit 37. The terrace deposits as determined

15  by Well 10-5-13J1-- G-1; correction-- 13-G-1, went through 80--

16  well, Exhibit 37A, please. Well, maybe it is not necessary

17  to be that detailed. Let's say 80 feet just for a rounded

18  figure. 80 feet, at which point the terrace deposits would

19  rest on that symbol Tlj in a relationship as now shown. The

20  test well went down, I believe, as I recall, all the way into

21  the La Jolla or granitic material, whichever it encountered.

22  And the segments of storage that we are discussing are very

23  small in relation to the whole. But my arbitrary upper limit

24  of five feet for computed storage, I am sketching on as a line,

25  calling it "Five feet below land," would be projected out into

start
D3

the adjacent terrace deposits to a point where the geologist would interpret that it would strike roughly the non-water bearing rocks.  This is the little segment of storage capacity that is being considered here.

Q   Thank you.

A   This is only-- at the time this well was drilled I recall that the depth to water was on the order of 65 feet; so there may have been 20 feet of saturation then.  But the depth to water I am sure in 1951, was farther than five feet below the land surface-- not below the land surface; of the alluvium.

Q   Thank you.  Now, in  outlining your various ground water units from which you calculated capacity, you excluded some areas of recent alluvium that are mapped on Exhibit 37, didn't you?

A   I excluded the arms of the minor tributaries, yes.

Q   And what was the reason for  excluding them?

A   Because the contained storage is very minor, in my opinion.  And its usability, particularly, is negligible.

Q   Usability in what way?  Pumping directly from above it?

A   Alluding to Exhibit 38A.  For example, the base of the usable storage is down, say, at the lower end of Chappo Subbasin, 25, 30 feet below land surface to the base.  You take a stream such as this unnamed creek in Sections 25 and 26,

1    10 South, 5 West, that I am alluding to on Exhibit 37.  The

2    base of the alluvium would doubtlessly intersect that altitude

3    of zero or sea level, a relatively short distance up the stream

4    bed, because the stream is rising; and furthermore  the char-

5    acter of-- the materials, in my opinion, are fine grained and,

6    therefore, their utility as part of the major storage reservoir

7    is minor.

8        Q  Did you make any effort to calculate what the stor-

9    age capacity would be in these arms which you excluded?

10        A  No.  It is so minor that I didn't bother.  In my

11    opinion, it was minor.  I didn't bother.

12        Q  How would that storage capacity compare with the

13    storage capacity which you included from the older, the terrace

14    deposits?

15        A  I couldn't evaluate that without a lot of work.

16        Q  Can you tell us whether it would be about the same

17    or greater or less?

18        A  I don't think I can without analyzing the streams to

19    find out what order of magnitude I am working with.

20        THE COURT:  Did I understand from your sketch that in

21    your computations as of to the basins, you took into account

22    areas as shown on your sketch on 39, that would possibly con-

23    tain water although they were under the terrace deposits?

24        THE WITNESS:   That is right, your Honor.  I included--

25        THE COURT:  The isopach lines run over the terrace

1    deposits, do they not?

2         THE WITNESS:  I thought they did, your Honor, but I find

3    out that they don't.  I know that at the time we made our

4    storage estimates back in 1950 and 1951, when this particular

5    map was not available, or not even made, my geologist under my

6    direction did include the terrace deposits in an isopach map

7    that would follow-- I am alluding to Exhibit 39-- that would

8    follow instead of up along the contacts of the alluvium and

9    adjacent deposits, followed up along the contacts between the

10   alluvium, terrace deposits, and the the underlying consolidated

11   rocks.  It is a minor segment.  It was something that was done

12   because we had a good test well drilled in those deposits.  If

13   there had been any reason-- I might further clarify this--

14        THE COURT:  Your test well showed what?  A small amount

15   of water?

16        THE WITNESS:  Showed a small amount of water, but coarse,

17   relatively coarse materials; because these deposits, by and

18   large, were laid in by the Santa Margarita River which has been,

19   as shown by all these logs, does carry coarse material.

20        THE COURT:  39, your isopach, does or does not include

21   the areas of coarse deposits?

22        THE WITNESS:  The isopach map does not.  It is drawn

23   only on the alluvium.  But the areas shown on Exhibit 40 do

24   outline the areas of the storage units as exposed on the sur-

25   face, and do include a segment of the terrace deposits in

1   Section 13, 14.

2        THE COURT:  Now, your figures which were on another ex-

3   hibit were taken from the isopach map; right?

4        THE WITNESS:  The figures shown on the other exhibit

5   were taken from an isopach map that we prepared, in the manner

6   shown, to include the terrace deposits.  This isopach map does

7   not show the thickness considered.

8        THE COURT:  Your figures were not taken, then, off of

9   this isopach map, No. 39?

10       THE WITNESS:  No, sir.  I can probably find my old map

11   and reconstruct this portion so that you can see what was con-

12   sidered.

13       THE COURT:  Adjourn until--

14       MR. MOSCOVITZ:  Shall we have that done, your Honor?

15       THE COURT:  What?

16       MR. MOSCOVITZ:  Shall we have him do that so the isopach

17   is complete showing everything that was used in calculating

18   storage?

19       THE COURT:  Well, I don't know how important it is.

20       MR. VEEDER:  The State's problem is this plagairizes the old

21   map.  It is putting him in a difficult spot.

22       THE COURT:  It is not a big area, in any event, we will

23   concede that.

24       MR. MOSCOVITZ:  I just wanted to clarify that point.

25       THE COURT:  Well, discuss it.  We will come back at a

1   quarter to two. I have a luncheon today. I would like to

2   come back at one-thirty, but come at a quarter to two, and we

3   will adjourn early this afternoon.

4          MR. VEEDER:  Could you give us an estimate?  What time

5   do you think, your Honor?

6          THE COURT:  About three-thirty.

7          (Noon recess.)

SAN DIEGO, CALIFORNIA, FRIDAY, NOVEMBER 7, 1958. 1:45 P.M.

MR. VEEDER: Your Honor, I would like to add to Exhibit 51A the additional data that has been requested, which is the records of the water levels in observation wells.

THE COURT: It may be added. Do you have an extra copy of it?

MR. VEEDER: Yes, your Honor.


G. F. WORTS, JR.,

recalled as a witness in behalf of the plaintiff, having been previously sworn, testified further as follows:


CROSS-EXAMINATION (Resumed)

BY MR. MOSKOVITZ:

Q Mr. Worts, I believe you testified before noon that in the comparable isopach exhibit introduced in the first trial of this case you believed that there were isopach contour lines drawn in, in the area of the terrace deposits; is that correct?

A I thought that I said that the map that we computed the isopachs and the volume upon was made by my office in the course of our study five or six years ago. The one that was introduced in the last trial was made under the same conditions that Exhibit 39 was made under, whereby the Camp drew it, I reviewed it and testified from it. I don't recall whether that

E

Z51

1   first exhibit showed the contours that went into the terrace

2   deposits or not.

3       Q  I have a copy of Government's Exhibit 12 in the first

4   trial, actually the exhibit that was introduced in evidence,

5   and I did not find any isopach contours in the terrace area.

6   Could you examine it and tell me whether--

7       A  I can tell you whether they have contours.  (Examining

8   document.)

9       No, they do not.  But I have a work map, or had a work

10  map-- it is probably still in existence-- that shows the method

11  of computing the storage in that minor volume of terrace de-

12  posits.

13      Q  Calling your attention to Exhibit 37, I note that

14  there is quite a bit of detailed mapping of units or deposits

15  which are designated as Qso and Qt and Tsn on both sides of

16  Ysidora Narrows.  Do these details have any particular sig-

17  nificance in so far as the water-bearing characteristics or the

18  manner in which the basin will fill and empty is concerned?

19      A  The deposits on Exhibit 37 that overlie the San

20  Onofre breccia are definitely above any water contained in the

21  alluvium and therefore can be disregarded from the standpoint

22  of any appreciable effect on the supply.

23      Q  That is the Tso?

24      A  That is the Tso.  Deposits seaward from approximately

25  Well 10-B-1 (11 South, 5 West), the distribution of the units

E

Z52

1    Tsn, any of the terrace deposits that happen to go down into

2    the water body or into ground water may-- I say may because we

3    have drilled no wells on the lateral sides of the valley-- may

4    have an effect on the quality of water that might enter Ysidora

5    Narrows in the event of great drawdown in the Ysidora Subbasin.

6        Q  Does the unit marked Old Dune Sand Qso have any

7    particular relevance to the water situation?

8        A  No.

9        Q  What is the significance of the mapping that you have

10   on Exhibit 37 showing the dips and strikes in the La Jolla

11   formation-- and also you have some in the San Onofre breccia

12   formation?

13       A  That is standard geologic mapping procedure to determine

14   the attitude or direction of strike and dip of the beds to

15   determine degree of folding, if any-- by folding I mean warping

16   of the beds-- to assist in, you might say, unraveling the

17   geologic picture.

18       Q  Do those strikes and dip indications have any par-

19   ticular significance in regard to the movement of ground water

20   and the amount of ground water in the basin?

21       A  To this extent.  The La Jolla dipping seaward about

22   10 to 20 degrees, if you take the rough average of all those

23   dip symbols shown, together with the dips in the San Onofre

24   breccia, they mean that the whole section is dipping seaward,

25   and because they dip at thatangle and because they occur as

E

Z53

1    they do the distribution of the rocks is such as to have formed

2    the San Onofre breccia at the present site in the narrows and

3    the La Jolla upstream.  With regard to water, there is no other

4    relationship.

5         Q  In other words, suppose that the dips were at an

6    angle of 45 degrees or 90 degrees different from the way they

7    are depicted here, would that make any difference in so far

8    as the movement and occurrence of ground water is concerned?

9         A  Not if the stream had been able to occupy its present

10   position.  But that was the point I was trying to make.  If

11   these all had been different, the present-day geologic picture

12   would in all probability have been entirely different.

13        Q  So this helps you to see how this whole geologic

14   picture had developed over the years?

15        A  Yes.

16        Q  Now, this may have been answered before, but I am

17   not sure of the answer.  Are the consolidated rocks that you

18   indicated on Exhibit 37-- the breccia, the La Jolla formation,

19   the unnamed conglomerate and the BC or basement complex-- are

20   they all equivalent to the basement complex on Exhibit 15?

21        MR. VEEDER:  What does the word "equivalent" mean?

22   BY MR. MOSKOVITZ:

23        Q  Would they be included in the basement complex on

24   Exhibit 15, where there are formations of that sort?  Or are

25   they a different type of formation?

E

Z54

1     A  You say, are they, or were they?

2     Q  Well, are they basement complex?

3     A  No.

4     Q  They are not basement complex?

5     A  No.

6     Q  Is there any geologic unit mapped on Exhibit 15 which

7  includes the breccia, the La Jolla formation and the unnamed

8  conglomerates?

9     A  No, because those are all marine-- at least, the--

10  well, the answer is simply no.

11     Q  I want to call your attention now to Exhibit 38, the

12  geologic section, and I noted in looking at the well logs which

13  are depicted that there are a number of wells showing consoli-

14  dated rock at the bottom, according to the logs, which con-

15  solidated rock is, however, above the line which is depicted

16  as the contact between the alluvium and the underlying con-

17  solidated rock-- there are a number of them beginning up at the

18  top with well 10-4-7A1 and I see one, two, three, four, five,

19  six, seven, eight, nine, ten, eleven wells, possibly more than

20  that, ending with Well 11-5-2N3 that seem to have that

21  characteristic.  Could you explain how that could be?

22     A  Yes.  The base shown on Exhibit 38 of the alluvium

23  is to depict the deepest part of the alluvium, as would be

24  represented by following the sinuous path on Exhibit 39 up

25  through the deepest part of the alluvium upstream through the

E

Z55

1    several basins around the corner or on up to De Luz Dam Site.

2    That is the representation of the base line.

3        Wells that have been, for example, projected in or that

4    are included on the line of section which is shown on Exhibit

5    37 as line E prime extending from the Pacific Ocean into De Luz

6    Creek, which is a broken series of lines that just generally

7    run the section up the valley-- now, the wells that encounter

8    bedrock at shallower depths that can be spotted on Exhibit 39

9    or found on Exhibit 39, it will be observed that they are off

10   to one side of that draw-- they have been projected in.

11       Now there is another way that this section could have

12   been drawn, and that would have been to connect with a zigzag

13   line every base of consolidated rock shown on the well log.

14   But every time you drop one well or brought another one in, you

15   would be continually changing the picture.  Actually, this is

16   to the best of our construction the base and deepest part of

17   the alluvium down through the valley.

18       THE COURT:  The chances are that if you could get down

19   there and actually see it, somewhere in the bottom of that

20   basin there would be a line that would follow just about that

21   gradient but off to the side there would be areas where the

22   basement complex on one side or the other was higher?

23       THE WITNESS:  That is right, your Honor.  That is shown

24   clearly by the isopach map.

25

E

Z56

BY MR. MOSKOVITZ:

Q   Then actually the contact line that you have depicted on Exhibit 38 between the alluvium and the La Jolla formation doesn't follow the line of section as you have the line of section on Exhibit 37; is that correct?

A   That is correct.

THE COURT:   Not exactly?

THE WITNESS:   Not exactly.

THE COURT:   The line of section varies up through the center of the alluvium, but it doesn't necessary follow the lowest place or the deepest area for the alluvium.

THE WITNESS:   That is right.   For example, in Ysidora Narrows the line of section pretty much follows the deepest part of the alluvium.

BY MR. MOSKOVITZ:

Q   But since the deepest part winds and curves and the line of section is straight, they wouldn't necessarily coincide probably?

A   That is right.   They cross one another parallel or coincide-- all combinations.

Q   On Exhibit 45 I note that you have a dark line inside the dark line that outlines the watershed, a dark line that apparently outlines the ground water storage units; is that correct?

A   No, it doesn't outline the ground water storage units.

E

Z57

1    It outlines the younger alluvium, which is largely a storage

2    unit.  In Chappo Subbasin it incorporates again some of the

3    terrace deposits on the north side of Chappo Basin in Sections

4    13 and 14, Township 10 South, 5 West.

5         Q  I notice that this dark line is broken.  Do the

6    breaks indicate where the younger alluvium goes up the stream?

7         MR. VEEDER:  Which line are you referring to?

8         MR. MOSKOVITZ:  The dark line which the witness just

9    described as outlining the younger alluvium.  I see it broken

10   in two places in Section 18, Township 10 South, Range 4 West.

11        THE WITNESS:  That is the position of the alluvium in

12   a minor tributary in Section 18 that I, in constructing this,

13   didn't follow up to its termination as it is shown on Exhibit

14   37.  It is the outline of the alluvium, but because there are

15   no contours or any data plotted in there, all the details of the

16   alluvium were not shown.

17   BY MR. MOSKOVITZ:

18        Q  What is the meaning of the dotted line?  I am looking

19   at Exhibit 45.  There is a dotted line which looks like the

20   outline of this younger alluvium area, I assume, but it is

21   dotted instead of solid, in Section 7, Township 10 South,

22   Range 4 West.  Could you tell me what that is?

23        A  Yes, that is the approximate position of the sub-

24   surface contact between the BC on Exhibit 37 extended northward

25   where it is concealed by the terrace deposits for a short

E

Z58

1    distance northward up to the unnamed tributary entering the

2    Santa Margarita River from the north in Section 12, 10 South,

3    5 West.

4        Q   On Exhibit 40 that line has been made into a solid

5    line and it is the same outline, isn't it?

6        A   Yes.

7        Q   Now, Exhibit 54 indicates that Well 11-5-1E1 appar-

8    ently has higher chloride concentration than Well 11-5-2E1; is

9    that correct?

10        A   That is correct.

11        Q   Now, locating those two wells on Exhibit 37, I find

12    that Well 2E1 is in the Ysidora Narrows and close to the river,

13    and Well 1E1 is considerably eastward of that, close to a mile?

14        A   Yes.

15        Q   Far away from the river. Now, could you explain how

16    it could be that Well 1E1 would have a higher chloride concentra-

17    tion than Well 2E1, if the chloride concentrations are coming

18    from sea water intrusion, with the relationship being as it is

19    between them.

20        A   Well, 2E1 on Exhibit 37, right at the boundary between

21    the Narrows and Ysidora Subbasin, is approximately 175 feet,

22    if I read that correctly, 125 feet approximately to where it

23    enters bedrock. The depth of the alluvium at that point is

24    deeper, almost 200 feet. That well is no longer pumped. There-

25    fore, ther is some 40, or there would be about 75 feet of

E

Z59

1    alluvium beneath that, that can contain this saline water,

2    and the forces that work within Ysidora Subbasin appear to be

3    pulling the water around and through Wells 2K1 and 1E1 and

4    may be affecting slightly 2A1.  You will observe, as I men-

5    tioned on Exhibit 38A, I was uncertain of the exact upper

6    limit of where this salt water might be in the younger alluvium

7    in the basal part.  When it is pumped heavily, as shown on

8    Exhibit 54, the chloride immediately increases, and when the

9    pumping is stopped it decreases.  When the well, an irrigation

10   or a large capacity well, such as this pump--

11           Q   Which well?

12           A   --11-5-2E1 is pumped, it is conceivable that it

13   draws the salt water up into it when it pumps from beneath.

14           Q   I think you said that Well 2E1 is not pumping now?

15           A   It is not pumping now, and thereforethe chloride

16   content is down to 200 or a little less.

17           Q   Well 1E1 is not a pumping well either, is it?

18           A   No.

19           Q   How did the salt water get all the way there to a

20   concentration greater than the concentration in Well 2E1?

21

22

23

24

25

1    A   We don't know too much about the old windmill well

2   1-E-1.  Well 2-K-1 on Exhibit 54 has a very high chloride con-

3   tent, increasing all the time.  And the depth of that well as

4   shown on Exhibit 38A is almost to the bottom of the  alluvium,

5   being 192 feet deep.  Therefore, it has become contaminated.

6   Well 1-E-1 farther east of Well 2-K-1 in Ysidora Subbasin may

7   be-- I have no idea how deep it is.  But apparently, or ob-

8   viously, it is deep enough to be affected by chloride.

9       Q   Would its relative depth compared to Well 2-K-1 be

10  important?

11      A   Depending on the direction and manner of movement of

12  the saline water through the basin, which is, in all  probabil-

13  ity, a very complex relationship.  We don't have the full de-

14  tails to know.  For example, we don't have a log on 1-E-1.  We

15  don't know how deep it was drilled.  We don't know too much

16  about it.

17      Q   I note that on Exhibit 39 you have a notation "(70

18  plus)" next to the dots where 1-E-1 is located.

19      A   Yes.

20      Q   What does "(70 plus)" mean?

21      A   I believe I indicated that in my early testimony that

22  that was one well that was on there that did not have a log.

23  I believe we had sounded the well to that depth or more, I

24  don't recall, and had, as I said, assumed that they wouldn't

25  drill a windmill well very far into bedrock.  However, the well

1   may be, the sounded depth may be no true indication at all of

2   its drilled depth.  And we really don't know how deep it is to

3   bedrock in there, right there at the well.

4          Q  What is the depth of the alluvium in that point from

5   your isopach map, Exhibit 39, where Well 1-E-1 is?

6          A  It appears to be--

7          THE COURT:  A hundred thirty?

8          THE WITNESS:  Between a hundred twenty and thirty, as

9   indicated there.

10  BY MR. MOSCOVITZ:

11         Q  Let me ask you this:  Do you know the depth of Well

12  2-E-1?

13         A  Yes.

14         THE COURT:  It is shown on the map as 133 feet.

15         THE  WITNESS:  That is where 2-E-1 encounters bedrock.

16  I said a moment ago about 125.  It scales a little over 130 on

17  Exhibit 38.

18  BY MR. MOSCOVITZ:

19         Q  Apparently, the salt water intrusion where Well 2-E-1

20  is located is at a lower level from the bottom of that well?

21         A   That is a possibility.

22         Q  The fact is that you do not get a high chloride con-

23  centration when you test that well; isn't that so?

24         A  Let me explain how we test that well.  We have a

25  little, portable gasoline pump that may pump 25 or 30 gallons

1   a minute; that we, on that particular well, if the pump is still

2   in it as it used to be, although it is not operated, required

3   running something like a garden hose or a small hose down be-

4   tween the pump column and the casing, and pumping out water

5   until we felt that we had evacuated the volume equal to the

6   contents of the well casing and assured ourselves that we had

7   a sample of formation water, not water that had been standing

8   in the well.  So that it is a very insignificant amount of the

9   water that we pumped in sampling the well as compared to what

10  happens when you turn the well on; because it is, as I recall,

11  on the order of a 1,500 gallon a minute well.

12      Q  Are you saying that your samples may not be reliable?

13      A  No; I am just saying they test the water that is

14  immediately outside the perforations at the time of our

15  sampling.

16      Q  And when you test the water in Well 1-E-1, it is

17  done the same way?

18      A  That well has a windmill on it, as I recall, which

19  is also a small capacity type pump.  Samples are taken from

20  the pump discharge.

21      Q  Well 1-E-1 couldn't be any deeper than the materials

22  in which it is drilled, the depth of the alluvium, could it?

23      MR. VEEDER:  It would stick out in China if it did.

24      THE WITNESS:  It could if they wanted to drill it

25  deeper.

BY MR. MOSCOVITZ:

Q   What deposit would it enter if it were deeper than that?

A   If it were deeper than that, it would enter the La Jolla.

Q   Assuming that it is not deeper than that, that it doesn't go into La Jolla formation, isn't the fact that it has a higher concentration of chloride than Well 2-E-1 and yet is at no greater depth than Well 2-E-1--

A   Who said it wasn't at a greater depth?

Q   I am assuming it didn't go below the recent alluvium, in this assumption.  We will take another one in a moment.  But assuming it doesn't go deeper than the recent alluvium.  Therefore, it would be at a depth less than Well 2-E-1, would it not?

A   If you want to assume that.

Q   Let us assume that for the purposes of this example. It would be at a depth less than the depth of Well 2-E-1, would it not?

A   I guess I don't understand the question.

Q   Let me go back again.

THE COURT:  One minute you say "assuming that"; the next minute you ask him if that is true.

MR. MOSCOVITZ:  I will give him both assumptions.

THE COURT:  From the chart, 1-E-1 is at a place where, apparently, the La Jolla formation would be 125, 130 feet deep.

1    MR. MOSCOVITZ:  That is right.

2    THE COURT:  2-E-1 shows here 133 feet.

3    MR. MOSCOVITZ:  Yes.

4    THE COURT:  It could be about the same depth.

5    BY MR. MOSCOVITZ:

6    Q  All right.  Let's assume that they are the same

7    depth.  Certainly, Well 1-E-1 would not be at a greater depth

8    unless it entered La Jolla formation?

9    A  No, there is no real control over on the east side

10   of Ysidora Subbasin for those contours.  They are drawn in--

11   they are naturally interpolated between the points of control.

12   If we had a log on Well 1-E-1 that showed us where bedrock

13   might be, then we would know exactly where to run the contours.

14   Without such a log to show where bedrock is, we have interpolated

15   them in there; as you can readily see near Well 2-K-1.  Observe

16   how steep the bank is, the subsurface bank, beneath the allu-

17   vium leading northward from, we will say, from the vicinity of

18   Well 2-K-2 toward Well 2-K-1, 11 South, 5 West.  That same con-

19   dition could prevail all the way around to the east.  We have

20   not the control to pin it down, so to speak.  So that we cer-

21   tainly wish we had the log on that well, but have not been

22   able to find it.

23   Q  What you are saying, then, is that the recent allu-

24   vium may go to a much greater depth than is indicated by your

25   isopach map, Exhibit 39, at that  point?

1    A  Beneath-- well, it could be shallower.  In other

2    words, it could be either way.  I don't know.

3    Q  This is the point I would like to get your testimony

4    on.  Is it reasonable that Well 1-E-1 would be getting sea

5    water when Well 2-E-2-- or is getting a higher concentration

6    of chlorides than Well 2-E-1, if they are about at the same

7    depth when Well 1-E-1 is so much farther away from the source?

8    A  "If" they are about the same depth.  You have too

9    many "if's" in there to give you a firm answer.  There is an-

10   other well that is only 150 feet deep that overlies the deep

11   part of the alluvium, 2-F-1.  It is 153 feet deep.  It does

12   not hit bedrock.  That well is still being used.  Yet, water

13   has moved in beneath that well, contaminated this deep well.

14   It is 40 feet deeper, 2-K-1; and, in my opinion, has contami-

15   nated 1-E-1, and appears to be affecting, on Exhibit--

16   THE COURT:  39?

17   THE WITNESS:  No, your Honor.  It is  the geochemical

18   plot that shows which wells I felt were in the area affected

19   by sea water.  Would that be-- 55.

20   THE COURT:  Isn't it true that there could be obstruc-

21   tions in channels down below near the La Jolla formation that

22   could run in any direction?  You could have channels in there

23   whereby sea water was running in in one area and not into

24   another?

25   THE WITNESS:  That is quite right, your Honor.  In my

1   opinion, we could guess as to depths and to reasons and to other

2   physical phenomenon that we can set up 10 or 15 combinations

3   and permutations.  But I think the chloride, or the character

4   of the waters, as depicted on Exhibit 55, to my way of deciding

5   issues such as this, is to accept what this type of plot on

6   Exhibit 55-- I am speaking of the parallelogram or rectilinear

7   type plot-- the large graph on Exhibit 55 shows.  To me that

8   shows what has happened and where the waters are coming from.

9   The physical uncertainties are thereby eliminated in my mind.

10  BY MR. MOSCOVITZ:

11      Q  You feel that the chemical character of the water

12  would conclusively show, in your opinion, what its source was?

13      A  Yes.  For example, supposing someone desired to sug-

14  gest or propose that the waters came from the La Jolla.  Here

15  is Well 2-K-2, a mere, oh, call it  700 feet from Well 2-K-1.

16  Well, it is near a thousand feet.  Very close.  A lot closer

17  than along this far-off source of sea water intrusion coming

18  this long way into the narrows, into the basin.  I would ex-

19  pect that the waters in 2-K-1, if it were a blend of the native

20  waters and the La Jolla waters, would fall in between.  I would

21  expect that of any well in Ysidora Subbasin that had a source

22  from the La Jolla.  I would expect a blend between the native

23  waters and the La Jolla waters.  But instead, I don't think

24  there can be much doubt from the way the blended area falls

25  that the sea water type is the one that has entered the basin.

Q  And, therefore, if your data as to movement is some-what ambiguous or at least not--

A  I beg your pardon.

MR. VEEDER:  My witness is sensitive now.

BY MR. MOSCOVITZ:

Q  If your data as to movement of water is not clear, then the chemical quality of the water would be the test that you would rely upon and it would be, in your opinion, conclusive as to source?

A  Well, there is still another, of course, bit of evidence that supports the sea water intrusion concept.  And that is shown on Exhibit 38A; when we knew there was a period of reversed or inland hydrolic gradient from the coast inward, which would support that hypothesis hydrologically, that water had moved in.  The reason why a well of a certain intermediate depth is or isn't affected by the intrusion is a mechanical phenomenon in the geometry of the aquifer that would require lots of study to unravel.  The thing I keep pointing to here is, where is the position of the top of the interface between the fresh water and the salt water.  We know the salt water is on the bottom, but we don't know where this is, where the interface is as shown with questions on Exhibit 38A.  And when Well 2-E-1 used to be pumped, it is possible that that front, I mean surface or contact, interface, was just beneath the well adjacent to it out in the alluvium.  And when it was turned on

1   and water began to be **drawn** in in large quantities into the

2   perforations, the well soon began to increase in salt, as de-

3   picted graphically on Exhibit 54; that every time that well

4   pumped for a while-- the chloride increase wasn't instantaneous;

5   it took place over a period of several months, and built up

6   until the base felt it was best to shut the well down.

7       Q  And the fact that the quality of the water from Well

8   1-E-1 is in between the quality of the native ground water and

9   the salt water from the Pacific Ocean convinces you that the

10  ocean must be the source of the contamination rather than La

11  Jolla formation which is removed on your rectilinear chart?

12      A  In substance, yes.

13      THE COURT:  Are you cross examining the witness to test

14  his scientific opinions, or do you have a thesis that you are

15  proposing, that maybe  the chloride content comes from else-

16  where than salt water intrusion?

17      MR. MOSCOVITZ:  No, your Honor.  We were puzzled by what

18  we thought might be a contradiction between the quality, the

19  chemical quality that he shows on Exhibit 55 and the locations

20  of the wells, and wanted to find out what could be the explan-

21  ation for the resemblance between the quality in 1-E-1 and

22  ocean when it was so far away, and there were wells closer that

23  didn't have that apparent high concentration of chlorides.

24      THE COURT:  Does water moving underground occasionally

25  work out the channels where water moves faster in one place than

S44
F2

2400

Cross

1    another?

2              THE WITNESS:  Yes, your Honor, it will follow the most--

3              THE COURT:  Line of least resistance?

4              THE WITNESS:  Line of least resistance with  the most

5    permeable material.  And, of course, it will also, because of

6    it being heavier density, will remain on the bottom.

7              MR. MOSCOVITZ:  Your Honor, from the evidence that we

8    have as to what the depth of Well 1-E-1 might be, it looked as

9    though it were a shallow well other than, or relatively shallow,

10   not as deep as some of those that showed less chloride concen-

11   trations.  But, apparently, this might or might not be true,

12   because the data is not sufficiently definite.

13             THE WITNESS:  I wish we had the log.

14             THE COURT:  Even if it were a shallow well-- let's

15   assume it was a shallow well of 70 feet plus, as shown on 39.

16   It might be entirely possible that there is a strata of mat-

17   erial in there which is  fairly permeable which twists around,

18   and, in that particular case, the sea water front is 70 feet

19   at that particular location; is  that a possibility?

20             THE WITNESS:  It is a possibility.

21   BY MR. MOSCOVITZ:

22             Q  Is that very probable?  You said, "It is a possibil-

23   ity."  I wondered whether, in your opinion, this could be the--

24             A  There are many combinations, as I mentioned before.

     That would be one.

1    THE COURT:  You don't anticipate that this front between

2  the salt water and the sea water is a perfectly even front?

3    THE WITNESS:  It certainly isn't.

4    THE COURT:  Like a piece of glass set down between the

5  two?

6    THE WITNESS:  I certainly don't, your Honor.

7    THE COURT:  In some places, it probably intrudes far-

8  ther; in other places, it does not intrude as much?

9    THE WITNESS:  That is clearly shown on Exhibit 54, which

10  shows the relative concentrations.  That is the measure of the

11  concentration of the water moving in.  If this were pure sea

12  water hitting every well, the chloride in each one would be

13  up around 18,000.  But obviously it isn't.  It has become di-

14  luted.  There has been back-and-forth surging due to pumping

15  on and off, of tidal loading, effects along the coast, many

16  forces  at work, causing this front to oscillate and, thereby,

17  result in a blend such as the graph shows, the graph, Exhibit 54.

18  BY MR. MOSCOVITZ:

19    Q  And it is Exhibit 55, your rectilinear chart, that

20  clinches the point when it shows the position of this mixed

21  water as related to the ocean water and the native ground water?

22    A  That is a clinching point.

23    THE COURT:  Let the record note the presence of eminent

24  counsel for one of the defendants here in court honors us once

25  in a while by coming in.  Mr. McGinnis is present.

S46
F2

4402

MR. STAHLMAN: Right in time for cross-examination.

BY MR. MOSCOVITZ:

Q Now, calling your attention to Exhibits 44 and 45, could you explain the purpose of drawing in the two sets of ground water contours, that is, one showing apparently the level in deeper wells, and the other showing the levels in shallow wells, on those two exhibits?

A To show the relative direction of movement of the two-- the surface of the water in-- that is picked up in shallow wells and the head reflected in the deeper wells.

Q Is this usual procedure when you are drawing contours for ground water basins, to have two sets of contours this way, or is this unique in this situation?

A Oh, no, this isn't unique; it is common.

MR. SACHSE: I didn't hear the answer.

THE WITNESS: It is a common practice if there is suf-
ficient detail to so warrant. In other words, you look at how small-- that is about a square mile or a little more down there; maybe one and a half square miles. We have four or five wells. We can show the relative direction of movements with four or five, six wells, shallow wells.

Q   This is what is ordinarily done if you have an area where some of the wells show pressure characteristics and some reflect the free ground water table?

MR. VEEDER:   I object to that question.

THE COURT:   Objection overruled.

MR. VEEDER:   But, your Honor, why would we have such a question:   Is this the ordinary practice?   Or is this the ordinary thing?   I know he is very worried about Plate 10B, and you know what.   But he is trying to get our witness to give him an assist.

THE COURT:   Answer the question.

THE WITNESS:   Shallow and deep and intermediate and other types of contours can be used for many purposes.   It is largely up to the discretion of the person who is working with the data whether he feels there is sufficient distinction to warrant drawing of separate contours.   It can be done as a reconnaissance type thing to suggest it.   But where you run into real trouble is where you have-- not in this basin, mind you, but in a basin particularly where the deposits are very deep and lenticular.   We have found that with increasing depth you get increasing head.   By increasing head I mean the deeper you go the higher the water level will rise.   The next hundred feet you hit a gravel and another little rise.   You have to decide to your satisfaction, what are you going to be drawing these contours on?   You can put a pinprick in the water surface

G

Z61

1    and pick up a very shallow water that you first encounter and

2    if you have a sufficient number of those little pinpricks you

3    can draw an upper surface.  If you have a group of wells that

4    you know are perforated at 500 feet, for example, after pene-

5    trating alternating sands, clays and gravels all perforated

6    in the same zone, those wells will rise generally to a compatible

7    level, a level through which you could draw a series of con-

8    tours.  Those are two distinctions.

9         If you run into a valley, however, where the wells are

10   all at different depths, where they are all perforated at

11   intervals, like a gravel packed well, you get a hodgepodge.

12   All you can do in that case, all I would do, unless there was a

13   tremendous amount of detail, is to draw generalized contours.

14   BY MR. MOSKOVITZ:

15        Q  You mean one set rather than more than one set?

16        A  I think that is what I would do.

17        Q  Calling your attention to Exhibit 46--

18        A  What is Exhibit 46?  Shallow and deep hydrographs?

19        Q  Yes.

20   MR. VEEDER:  Is that a paired well?

21   MR. MOSKOVITZ:  Yes.

22   THE COURT:  Do you want to look at mine?

23   THE WITNESS:  Thank you, sir.

24   BY MR. MOSKOVITZ:

25        Q  Am I correct in interpreting from this Exhibit 46

G

Z62

1  that it shows that the movement of ground water between well

2  10-5-35K1 and 10-5-35K4 is much more rapid than it is between

3  Wells 11-5-2A1 and 11-5-2A5?

4      A  You are speaking of vertical circulation?

5      Q  Yes.

6      A  Definitely.

7      Q  Would it be your opinion that the movement of ground

8  water between Wells 10-5-35K1 and 11-5-2A1 would be faster or

9  slower than the movement between Wells 11-5-2A1 and 11-5-2A5?

10     A  Can you simplify that question a little?

11     Q  Yes.  Assume the pumping of Well 11-5-2A1, and then

12  you observe the levels in Well 11-5-2A5 and in Well 10-5-35K1.

13     A  All right.

14     Q  In which well would you note the earlier reaction in

15  the dropping of the water levels?

16     A  The deep well, 35K1.

17     Q  And that deep well, 35K1, is more than half a mile

18  away from Well 11-5-2A1, is it not?

19     A  Yes, more than half a mile.

20     Q  Whereas, the linear distance between Well 11-5-2A1 and

21  Well 11-5-2A5 would be very small; they are almost next to

22  each other?

23     A  That is right.

24     Q  And the difference vertically would be relatively

25  smaller?

1      A   It is probably more than the lateral distance between

2   them.

3      Q   The vertical distance would not be more than the

4   distance between 20 and 165 feet, would it-- that is, the bottom

5   of the shallow well and the bottom of the deep well?

6      A   That is right.

7      Q   What is the reason why there is such a much more

8   rapid movement of water between Well 11-5-2A1 and well 11-5-35K1

9   than between Well 11-5-2A1 and the well adjacent to it, right

10  above it?

11     A   Between Well 2A1 and the other deep well more than a

12  half a mile away, 35K1, both of which are perforated down in

13  the very permeable gravels in the lower member of the alluvium,

14  the transmission of the pumping effect is along the grain of

15  materials through the coarse materials.  The semi-confining

16  materials on the east side of the Ysidora Subbasin speed up

17  that rate of transmission.  Therefore, Well 2A1 affects the

18  water level in Well 35K1 relatively rapidly.  But on the other

19  hand, nearby shallow well 2A5, probably 25-- call it 20 feet

20  away, the problem of vertical transmission across the grains

21  in the bedding or interconnection is not good, as I have

22  testified before, on the east side of Ysidora Subbasin.  But

23  you can see that if you turn this picture around, the effect,

24  if you pump 35K1, and its effect on its nearby well.

25     Q   Then I take it the permeability of the material between

G

Z64

1  two zones-- I guess you do have these two zones, or two members--

2  is very important in determining how rapidly and how much

3  effect there will be on one well or on one ground water source

4  from the pumping of a well in another?

5      A  Well, in a general way it does show that.  I think that

6  is self-evident on the diagram.

7      Q  And this is a general principle that would be

8  applicable wherever you encountered that phenomenon of having

9  levels which were separated by material of relatively low

10 permeability?

11     MR. VEEDER:  What do you mean by "levels" now?

12     MR. MOSKOVITZ: We are talking about the two members, the

13 lower and the upper member here.

14     THE WITNESS: Well, now, I just finished testifying that

15 on the east side of Ysidora subbasin the vertical permeability,

16 that is, the ability of water to interchange between shallow

17 and deep, is relatively poor.  Over on the west side it is

18 very good.

19 BY MR. MOSKOVITZ:

20     Q  I am asking you about it generally.  If you had

21 conditions as you do on the west side of Ysidora, then you

22 would have the same general phenomenon of water traveling in

23 a faster direction horizontally than vertically?

24     MR. VEEDER:  I object to the question.  It is far too

25 general.

G

Z65

1      THE COURT:  You may answer it.

2      THE WITNESS: That is a very general question.  Here we

3  have two units that are clearly defined by the well logs.  Where

4  you have a thicker section and other units-- because you asked

5  me the general question-- and other gravel beds thatmay occur

6  at greater depths, then you run into a real problem of inter-

7  communication.

8  BY MR. MOSKOVITZ:

9      Q  Let me ask you this question:  Would not the differ-

10  ence between the level of water in two wells, one drilled into

11  the lower member and one drilled into the upper member-- we

12  will talk about Ysidora in just a moment, the east side of

13  Ysidora-- Would not the difference in the levels of water in

14  the wells, static level, not pumped, be an indication that

15  you would have this phenomenon of slow movement of water between

16  the two levels?

17      MR. VEEDER:  I object to that question.  I don't believe

18  it is comprehensible, to begin with, and I don't believe he

19  has enough--

20      THE COURT:  I don't understand it.  The objection is

21  sustained.

22      MR. MOSKOVITZ:  I will try to rephrase it.

23      Q  When you have a difference in the level ofwater in a

24  well drilled in the lower member and the level of water drilled

25  in the upper member, is that not an indication or evidence

G

266

1   that there is a barrier to the movement of water between the

2   two levels?

3         MR. VEEDER: I don't know what he means, your Honor.

4         THE COURT: I think I understand. Objection overruled.

5         THE WITNESS: Could you clarify it for my sake? I don't

6   like the term "barrier," I don't think there are any barriers

7   in there.

8         MR. MOSKOVITZ: I think the word "barrier" is a little

9   too absolute.

10        MR. VEEDER: Then I object to the question.

11        MR. MOSKOVITZ: Instead of the word "barrier", a barrier

12   effect.

13        THE COURT: Insert "an area of less permeability"?

14        MR. MOSKOVITZ: Or an area that slows down the movement

15   of ground water.

16        MR. VEEDER: Does "area" mean "strata"?

17        THE COURT: Not necessarily.

18        THE WITNESS: Are we talking vertically or horizontally?

19        MR. MOSKOVITZ: I am talking about vertically.

20        MR. VEEDER: Are we talking about the lenticular basin,

21   such as the Pauba? About what are you speaking?

22        MR. MOSKOVITZ: I am speaking about the lower member and

23   the upper member now.

24        THE WITNESS: Ysidora?

25        MR. MOSKOVITZ: Ysidora, at this point.

G

Z67

1     MR. VEEDER:  I just don't want you to get up on the

2   Vail Company property.

3     THE WITNESS:  I think your question is pretty well

4   taken.  We have a small area of a little over a square mile--

5   I would like to show you, if I may examine again the paired

6   hydrographs-- within a distance of a little over half a mile,

7   in my opinion, and I think the graphs show that on the west side

8   we have very good correlation, very little difference in head.

9   Here, only half a mile or more away, we have poor or low-- I

10   will just say relatively poor interconnection between the shallow

11   and the deep.  So that it shows that in a basin even as small

12   as this the degree of interconnection can change within half

13   a mile.

14   BY MR. MOSKOVITZ:

15     Q  And the degree of interconnection would be evidenced

16   by whatever difference there might be between the level of

17   water in the deep well and the adjacent shallow well or the

18   shallow well that was close to it; is that not correct?

19     MR. VEEDER:  I object to that.  There are too many

20   vagaries in it.  It depends on the kind of pump you have.

21     THE COURT:  Let him answer it.  Objection overruled.

22     THE WITNESS:  The way you are asking these questions,

23   they are so generalized.

24     MR. MOSKOVITZ:  I want to get some general principles.

25     THE WITNESS:  Well, there aren't general principles to

G

Z68

1  apply to this problem, because we have here, you might say,

2  a two-layer problem with the upper layer varying rapidly in

3  lateral character, relatively impermeable on the east side

4  and quite permeable on the west side.  Now just think of all the

5  different combinations you are asking me to pull a general

6  answer for.

7  BY MR. MOSKOVITZ:

8      Q  I am just asking you to tell me whether or not the

9  fact that there is a difference in the level of water is not

10  evidence of the fact that water would move slowly from one

11  level to the other?

12      A  It would depend on the thing that had preceded the

13  taking of water levels.

14      Q  I am assuming that there were no factors which would

15  influence it, there had been no pumping beforehand; you are

16  taking static water level readings.

17      MR. VEEDER:  Out of two different pumps?

18      MR. MOSKOVITZ:  Out of two different wells that, as

19  far as area is concerned, are next to each other but one is

20  drilled into the upper member and the other is drilled into

21  the lower member.

22      THE WITNESS:  Under natural conditions, again, we have

23  another phenomenon at work.  It is a very difficult question

24  to answer generally.  There are times of the year when I

25  imagine they would coincide.  There are other times when they

Weeks   Cross                                     4412

G

Z69

1   would be at variance.

2           MR. VEEDER:  That is, in levels?

3           THE WITNESS:  In water levels, yes.

4           THE COURT:  Let me ask you, before we pass Exhibit 46.

5   You have probably told us and I forgot it.  The dotted lines

6   running down, with the arrows, to and below the sea level datum,

7   what do these indicate, particularly where there is no circle

8   shown?  Where there is a circle shown, that means that after

9   pumping it was at that level.

10          THE WITNESS:  Yes, your Honor.  To take an example, if you

11  would hand me the recently mimeographed 51A for the year 1953,

12  we will look up the pumping levels that should be shown for

13  Well 11-5-35K1, if it were measured-- we don't always measure

14  these wells when they are pumped, because sometimes we get

15  hung up or can't get down between the casing and the pump

16  column.

17          THE COURT:  Were these levels taken in 1951 while it

18  was being pumped or while it was not being pumped?

19          THE WITNESS:  These contain both, your Honor, and they

20  are footnoted to indicate whether they were pumped.  Footnote

21  B, on October 12, 1953, the depth to water was 35.67 feet

22  below land surface at that time.  My graph only goes down to

23  27, approximately, which means that the pumping level was on the

24  order of eight or nine feet below sea level.

25          THE COURT:  In other words, all these lines then indicate

Worts    Cross                                    4413

B

Z70

1  the effect of pumping?

2        THE WITNESS:  Yes.

3        THE COURT:  And where there is no dot shown for a fixed

4  point but the arrow goes to this line of about 35 feet below

5  sea level, the arrow going to that line means that the pumping

6  lowered the well even below that?

7        THE WITNESS:  That is correct, your Honor.

8        THE COURT:  What do these figures mean when there are

9  no letters such as pumping-- that is, no B before them?

10        THE WITNESS:  That means that they are not being pumped

11  or that there is no known effect upon them.  That is, the

12  levels are measured and we don't think that pumping or recent

13  pumping has affected them.

14  BY MR. MOSKOVITZ:

15        Q  Mr. Worts, I want to refer now to Exhibit 43.  I

16  don't know if you have it to look at, but it is the exhibit which

17  has the figures for the estimated ground water storage capacity

18  of the alluvial terrace deposits.  I am not going to refer to

19  any specific figure, but to the problem of computation.

20        A  In the table ?

21        Q  Yes, that's the one.  Now, as I understand the

22  process, you multiply the areal extent of the zone by the 20

23  feet, by the depth, by the specific yield, and that gives you

24  your storage capacity?

25        A  Yes.  One point-- did I understand you to say average

B

Z71

1   area between the 5 and 20-foot depths?

2        Q  I should have said average area, shouldn't I?

3        A  Yes.

4        Q  And I believe that you testified on Direct Examination

5   that you did this by basins?

6        A  Yes.

7        Q  Now, in going through your computations did you average

8   the specific yields of all the wells in each basin?

9        MR. VEEDER:  I am going to object to that question be-

10  cause the witness said subbasins.

11       MR. MOSKOVITZ:  I mean subbasins.

12       THE WITNESS: We took the specific yields of all the wells

13  in that subbasin that, to my knowledge, were available at the

14  time we made the estimates.  Now, the wells that have been

15  drilled since about sometime in 1952 or '53 have not been taken--

16  in other words, haven't had a redo of the thing because seven

17  additional wells had been drilled.  So the answer is yes, we

18  used the wells that were avilable at that time.

19       Q  Now, in doing this, did you merely total up the

20  specific yields that you derived for each well and then divided

21  the total by the number of wells in each?

22       A  I am lost.

23       Q  Pardon me.  Let's take a particular level from five

24  to twenty feet.  What you did was to get the specific yield of

25  the wells which penetrated that zone?

G

Z72

1      A   You are wrong again.

2      Q   Maybe you can correct me.

3      A   Do you want me to explain?

4      Q   This is the point I am getting at, and perhaps we can

5   shorten the time.  I will withdraw the last question.

6      MR. VEEDER:  I am not desirous of having the procedure

7   in court changed at this time.

8      MR. MOSKOVITZ:  Do you want to make an objection?

9      MR. VEEDER:  I made an observation, Mr. Moskovitz.  This

10   is an Anglo-Saxon court.  I think we should proceed question-

11   and-answerwise.

12      MR. MOSKOVITZ:  All right, I will ask the question.

13      Q   I want to know whether you weighted the specific

14   yield for any particular well because the wells are not evenly

15   spaced throughout each subbasin.  Do you understand my question?

16      A   In a general sort of way, but it's a-- you say that

17   you don't think the wells have fairly good areal distribution.

18      Q For example, I look at Well 26L1 in Township 10 South,

19   Range 5 West, and I note that it is over a mile to the closest

20   well to the north and maybe half a mile to the closest well to

21   the south, whereas in other areas the wells are grouped together

22   a little more closely.  I wonder whether you took into account

23   the fact that the distribution is not even when you made your

24   calculations?

25      A   I can't remember.  I did that six years ago.  Details

G

Z73

1   like that I don't recall.  I know we did as careful a job as

2   we could. Whether or not we took into account the areal distri-

3   bution on an areally weighted average, I don't recall.  We may

4   not have used logs of some wells for very valid reasons that

5   I can't remember now, because they were completely contradictory

6   to the evidence we gained from our test well drilling, for ex-

7   ample.  If a driller showed a log with clay, solid clay, for

8   example, if that had been done in Upper Basin, and our test

9   well and the supply wells that had been drilled there showed

10  that anywhere near any of these wells that we felt we had good

11  records for some driller showed solid clay, we would throw the

12  log out because we knew geologically -- out it goes.

13        Q  Would it not make a difference whether or not you did

14  give appropriate weight because of the difference in the

15  distribution of the wells?

16        THE COURT:  How would you weight a well?  Let's assume

17  that you had one well a mile from other wells and therefore you

18  had only one fact to tie onto in that area.  But a mile away you

19  had a cluster of wells, et cetera.  How would you weight it?

20  Would you say that you are going to discount it 10%, or would

21  you say that you are going to add 10% to the result of that well?

22  How do you mean, weight it?

23        MR. MOSKOVITZ:  There is a process, I understand from my

24  experts, by which you divide up a basin in segments, so that

25  within each segment you have a fairly even distribution of wells.

B G

Z74

1   If you didn't do that-- let's take for example an area where

2   you had 15 wells in one corner of the basin and you had one

3   well in the rest of the basin.  If you gave each well equal

4   weight, in so far as the specific yield was concerned, and the

5   materials in the corner where you had this concentration were

6   different than elsewhere, you might get a completely fallacious

7   picture of what the specific yield of the whole basin was.

8         THE COURT:  I could see how you could divide an area

9   into arbitrary sections or squares and allocate a specific

10  yield to a particular section.  But I don't see how you could

11  take one well where you knew its production and discount it

12  up or down to get a figure.

13        Did you divide this up into sections?  Maybe you had

14  better tell us again how you did it.  It may answer his ques-

15  tion.  Mr. Veeder doesn't like this, but I would like to hear

16  it again.

17        MR. VEEDER:  Mr. Veeder is happy about it, your Honor.

18        THE COURT:  All right.

19        THE WITNESS:  The storage unit map is the basic exhibit

20  40.

21        First, the area of the storage units or subbasins, as

22  we defined them, is outlined consisting of the upper, as

23  previously defined-- Chappo, Ysidora, down to the narrows.

24  The lithology is thereby segmented automatically because of the

25  mode of deposition within this system.  To me, in looking at

G

Z75

1  the distribution of the wells on this Exhibit 40, the distri-

2  bution of the wells looks pretty good.  There are places where

3  there may be a gap of maybe a mile at the most in one spot;

4  say from 26L1 up to 23L1 in 10 South, 5 West, might be a long

5  gap.  But I believe that the detail logged by the U.S.G.S. in

6  26L1 tells us the story of what the geologist would expect to

7  find within the narrows, if you wished to call it a narrows,

8  between Chappo and Ysidora Basin. There is nothing profound

9  or mysterious about such an occurrence.

10      Then for the upper or five-foot zone we assume that

11  the surface area as depicted on Exhibit 40 would more or less

12  coincide with five feet below.  That would be the upper area

13  unit, part of the area computation.  Then proceed to the isopach

14  map, except for this area of terrace deposits which has been

15  discussed and for which no isopachs are shown but for which we

16  have included an estimate of the storage.  We planimeter the

17  20-foot zone in there to get the average area; 15 feet thick

                                is the
18  times average area /gross volume.  That part of each well that

19  we considered to be a good log-- I gave an example of what

20  might be a poor log in upper subbasin, one composed of clay--

21  we computed the specific yield for the interval five to 20

22  feet in each well log and got an average.

23      THE COURT:  You then averaged in that particular inter-

24  val all the well logs in a subbasin to get that average?

25      THE WITNESS:  Except for logs or classifications that,

Woods   Cross

G

276

1    on the basis of our work, indicates that we should make changes

2    in what the logs show.  There is a valuation based on some ten

3    test wells that tells us more clearly what underlies the basin

4    than the blanket coverage as made by drillers, for example.

5        THE COURT:  Getting down to what Mr. Moskovitz is talking

6    about, if you had a well that was fairly isolated and had a

7    certain yield indicated from material in it in that particular

8    segment, and then you had a dozen wells removed a half a mile

9    away that had a different type of material in the particular

10   interval, would you average it all together, or did you weight

11   them as to area and say that this one well represents half of

12   the area and the twelve wells represent the other half of the

13   area and weight them that way?

14       THE WITNESS:  I think it would depend there upon the

15   geology that would have to be considered.  Suppose that well

16   were off in something like terrace deposits and the twelve

17   wells were down here in the younger alluvium.  You would have

18   a problem then, because one is in a different type of material.

19   You can't average wells in one lithologic type necessarily with

20   wells of another lithologic type.

21   BY MR. MOSKOVITZ:

22       Q  What did you do in that instance?

23       A  What did I do about what?

24       THE COURT:  What did you do about averaging for a

25   particular segment between a couple of the contour lines, what

G

Z77

1    did you do about the showing made by the various wells, some

2    of which were grouped and some singly isolated and removed at a

3    distance?

4         MR. VEEDER:  I don't believe that situation exists,

5    your Honor.

6         THE WITNESS:  The situation doesn't really exist here,

7    in my opinion, your Honor.

8         THE COURT:  The answer is, then, that you took the data

9    from each of the well logs that you thought reliable and aver-

10   aged them all together?

11        THE WITNESS:  Yes.  And whether there was any further

12   selection, we are getting down into the refinements of the

13   system.  That was done six years ago and I can't recall just the

14   exact manner and how we evaluated a lot of these logs that we

15   had to work with.  I really can't.

16        But in this valley we are working with one, except for

17   this minor area of terrace deposits, the values for which were

18   computed from the only well drilled in them, that well being

19   10-5-13G1, we were working with one unit called the alluvium;

20   no complication or big areas of other types of water-bearing

21   deposits.

22   BY MR. MOSKOVITZ:

23        Q  Turning now to Exhibit 51--

24        THE COURT:  Let me interrupt, off the record, Mr.

25   Moskovitz.

G

Z78

1        (Off the record.)

2        MR. MOSKOVITZ:  I have just one question about Exhibit

3   51.   That is the exhibit showing the well levels.  Do you have

4   that?

5        THE WITNESS:  Exhibit 51, fluctuations of water levels?

6        MR. MOSKOVITZ:  Yes.

7    Q   I want to know whether the years that you have indi-

8   cated are water years or calendar years.

9    A   These are calendar years.

10    Q   It appears to me, from hastily looking at the top

11   graph, that the levels fluctuate annually, and it appears as

12   though the levels are at their highest ordinarily early in the

13   year and at their lowest sometime around the middle of the year,

14   that is, they are at their highest , it appears, in February

15   and March, and then they drop to their lowest point each year

16   somewhere around June or July?

17    A   Later in the year than that.

18    Q   September, would you say?

19    A   It would appear to be toward or near the fall that

20   they reach their lowest point.

21    Q   September 30th, approximately?

22    A   I don't know-- just late summer and early fall.

23

24

25

1      Q  Fifty is the exhibit showing the-- yes, here it is.

2  Now, Exhibit 50, you have your curve B, which, I take it, is a

3  calculation of water in storage basin upon well levels?

4      A  Yes.

5      Q  Starting just under the 25,000 acre feet mark, is

6  that not correct?

7      A  In the fall of 1942.  Please observe, however, that

8  they are estimates,wherever the dash line is tied to the letter

9  "E", for the reasons given.

10     Q  And I think you already testified that chances are

11  that the level at the highest point during that year would be

12  higher than depicted as of September 30th?

13     A  The hydrograph shows that, Exhibit 51.

14     Q  Would not the high level of the basin be probably

15  over the 25,000 or full mark in 1942, in the early part of 1942,

16  if on September 30 it was at the point where you indicated?

17     A  In other words, you are going to  put more water in

18  the bathtub than it will  hold?

19     Q  I am asking whether you didn't start too high on

20  September 30?

21     A  What do you mean, didn't I start too high on Septem-

22  ber 30?

23     Q  Well, if there was the amount of water on September

24  30 in the basin you indicate where you have your "E" starting

25  on September 30.  Wouldn't it follow that it must have been

1   overfull  in the wintertime, or if it was just full in the

2   wintertime, wouldn't the starting point of September 30 have

3   had to be lower than where it appears?

4        A  I fell off the sled.  I am sorry.  I don't know--

5        THE COURT:   What he means is this:  September 30 is the

6   very end of a water year; it is right at the end of the dryest

7   time of the year.  The water year begins October 1, and you

8   begin to get a few rains in October and then more December,

9   and then January and February gets your heavy rains.  Now, if

10  your chart is starting for the year 1943 on September 30, or

11  October 1, you are, therefore, starting at the end of the dry

12  cycle of the calendar year and at the very beginning of a water

13  year.  And, therefore, at that time, you would expect your

14  water  basin, your water levels, in the basin, subbasin, to be

15  lower?

16       THE WITNESS:  · That is right.

17       THE COURT:   And you have your water level calendar up

18  to the top?

19       THE WITNESS:  My water level under "E" is approximately,

20  roughly, say, two or three hundred acre feet below a full basin

21  as of the end of 1942 water year.

22  BY MR. MOSCOVITZ:

23       Q  What I am asking is whether that is a realistic place

24  to start?

25       A  That is what the water level data suggests to me. The

1942 water year.  Therefore, the basin was full.

THE COURT:  For the purpose of your graph, it wouldn't make any difference whether you had it too high or too low as long as, relatively speaking, the graph told the story; right?

THE WITNESS:  Yes, sir.

BY MR. MOSCOVITZ:

Q  What about the two points-- one ended  September 30, 1952 and September 30, 1954-- when you show your levels, your basin nearly full, just about 300  feet from the top in September 30?  Is that realistic?

A  As I testified before, curve A is the accumulated difference between all of the recharge in the year and all of the discharge in the year taken as a mathematical difference, and I plotted up the accumulation the  way the data compiled. And that is what it shows.  I think the water level data are the most accurate to use, personally, because there are so many estimates involved-- not so many.  There are estimates of evapo-transpiration, meter pumpages, estimates of ground water inflow and outflow.  We already talked about the range of possible error in the figures of runoff. And we have the sewage effluents.  So that I would take, in any event, as the firm check on my figures, what the water level showed.

Q  You mentioned evapo-transpiration.  In calculating evapo-transpiration, did you take into account the position of the water table?

A  Yes.

Q  Did you take into account changes that might have oc-
curred in the position of the water table?  From year to year?

A  Yes.  Well, now, wait.  Year to year?  We picked
areas where the water levels-- a good example-- I will allude
to Exhibit 37, the northern part of Section 26 and the southern
part of Section 23, 10 South, 5 West, where the swamp symbol is
shown.  That is a good example of one of the areas that we have
used.  And I have not been to visit that particular spot every
year.  I have been by there.  I observe that the Vandergrift
Boulevard traverses the area on the east side of the alluvium;
and in driving up the valley, I have observed that the
phreatophytes and conditions of shallow water exist in that
area pretty much year in and year out, and would continue to
do so until such time as pumpage pulls the levels down to the
point where it would stop.

Q  What you are saying, then, is that you did not alter
your evapo-transpiration figure year by year to reflect any
changes in water table because the places where you computed
it had high water table all the time; is that what you are
saying?

A  That would be an example of a place where you have
high water level all the time.  Another area that had most of
the, a great deal of the evapo-transpiration is Upper Basin.
There has been efforts to clear the phreatophytes out, but they
come  back.  The water levels are up and down.  There is **releases**

1   from Lake O'Neill.  There are all sorts of complex operations.
2   I defy anyone to make an accurate, precise, to-the-acre estimate
3   of this, the size of this.  The only variations in these evapo-
4   transpiration figures is the amount of rainfall, annual rainfall
5   that is subtracted to get an order of magnitude of what this
6   evapo-transpiration loss is in the system.

7       THE COURT:  All right.  We can take an adjournment.  And
8   we won't be in here next Tuesday.  Be in here Wednesday, the
9   12th, at ten o'clock.

10      Adjourn until that time.

11      (Adjournment at 3:15 P.M. until Wednesday, November 12,
12   1958, at 10:00 A.M.)

13
14
15
16
17
18
19
20
21
22
23
24
25