# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                              Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                              Defendants.

                                        No.   1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:         Wednesday, November 12, 1958

          Pages:  4428 to 4571

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____ Deputy

MALCOLM LOVE
and
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1             IN THE UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3                  SOUTHERN DIVISION

4                    - - -

5        HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                    - - -

7

8   UNITED STATES OF AMERICA,        )
                                     )
9                  Plaintiff,        )
                                     )
10        vs.                        )        No. 1247-SD-C.
                                     )
11   FALLBROOK PUBLIC UTILITY        )
     DISTRICT, et al.,               )
12                                   )
                                     )
13                 Defendants.       )

14

15         REPORTERS' TRANSCRIPT OF PROCEEDINGS

16

17              San Diego, California

18         Wednesday, November 12, 1958

19

20   APPEARANCES:

21        For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                     Special Assistant to the
22                                   Attorney-General,
                                     Department of Justice,
23                                   Washington, D.C.

24

25

1    APPEARANCES (Continued)

2         For Defendant Vail              GEORGE E. STAHLMAN, ESQ.
          Company
3

4         For Defendant State            EDMUND G. BROWN, ESQ.,
          of California                  Attorney-General, by
5                                         ADOLPHUS MOSKOVITZ, ESQ.,
                                          Deputy Attorney-General,
6                                         and
                                          CARL BORONKAY, ESQ.

7         For Defendant Santa
          Margarita Mutual               W. B. DENNIS, ESQ.
8         Water Company

9         For Defendants
          Fallbrook Public
10        Utility District,              F. R. SACHSE, ESQ.
          et al.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

| PLAINTIFF'S WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| G. F. Worts, Jr. | | | | |
| (By Mr. Moskovitz) | | 4441 | | |
| (By Mr. Stahlman ) | | 4456 | 4497 | 4545 |

| EXHIBITS | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| Plaintiff's Exhibit | | |
| 51-B | 4497 | 4499 |
| 38-B | | 4537 |
| 44-A | | 4546 |

MORNING RECESS   4467

NOON RECESS   4490

AFTERNOON RECESS   4533

MALCOLM E. LOVE, OFFICAL REPORTER

SAN DIEGO, CALIFORNIA, WEDNESDAY, NOVEMBER 12, 1958,10:00A.M.

---o---

THE CLERK:   No. 1247-SD-C, United States vs. Fallbrook, for further court trial.

MR. SACHSE:   Your Honor, before Mr. Moskowitz continues his cross examination I would like to raise a question or two that is in my mind to be sure I don't slip on this pre-trial order regarding exhibits.  Mr. Veeder has lodged an additional bundle, 97 through 117, which I have had time to examine over the week end.  Now, as I understand it, we are not necessarily waiving foundation objections if we fail to raise it within the ten days.  That is my question:  Are we?  There are at least two exhibits in this bundle that I think foundation would be very, very difficult to supply. And I simply want to advise Mr. Veeder and the Court as far as Fallbrook is concerned, at least, there will be vigorous foundation objections unless something is produced; I can't imagine what.

THE COURT:   Well, I think you should, in fairness, advise Mr. Veeder what the numbers of these exhibits are.

MR. SACHSE:   My present thinking is Nos. 97 and 98, foundation.  Nothing on the exhibits indicate any foundation would be readily available, and I would expect the basic material foundation for them for base drawings to be made available.

THE COURT:   97 is supposed to be the map of Stewart

Mesa and 98 --

MR. SACHSE:  It is a map that is dated 1940, your
Honor.  And it has had additions made to it, apparently,
from the color of ink and things of that kind since.  Now,
I want to know something about that 1940 map, before a 1940
map goes in with 1958 additions.  And Exhibit 98 doesn't
bear a date, but it is extremely obvious from the type of
printing and pen work, and so on, that this is a very old
topog of some kind.  I don't know where it came from.  I
have no idea.  And it has also an addition recently prepared,
obviously recently prepared, attached to it.  Now, I think
we ought to be advised what this source material of this
very old topog is and the foundation laid before --

THE COURT:  You are interested particularly in the
foundation for the sort of a base map that was used?

MR. SACHSE:  That is correct, in both cases.  And one
of them is dated.  It is 1940.  This other one is undated.
And I am judging only by the printing and the type of
draftsmanship I see on it.  But I am certain that it is very
old.  I want to know what it is.

THE COURT:  I think you are entitled to know where it
came from, but I don't think the age itself is a defect,
particularly if explanations are made of changes in the
physical setup or if there are additions or deletions.  The
actual terrain of the ground couldn't have changed a whole

1   lot outside of activities by man.

2        MR. SACHSE:  I think that is the purpose of the

3   exhibits, your Honor, is to show that the terrain has

4   changed as a result of the activities of man.  And that is

5   why I want a thorough foundation on the basis for this

6   original.

7        THE COURT:  All right.  Inform Mr. Veeder.

8        MR. DENNIS:  I think we want to join in with that

9   objection, Mr. Sachse.  And we particularly want to have the

10  opportunity of cross examining the people who prepared the

11  map and find out under what circumstances it was prepared

12  and what they did in relation to the preparation of it.

A-2  13        MR. SACHSE:  I have one other question, your Honor.

14  I have reviewed the transcripts of Mr. Worts' testimony

15  and your Honor's colloquy with Mr. Veeder about the bringing

16  up to date of these various exhibits to 1958.  And frankly,

17  it isn't clear to me from the transcript whether the United

18  States plans to do so or not.  And if they don't and it

19  isn't clear, I want to make a request that they be instructed

20  to bring up those, Mr. Worts' several graphs, to include the

21  water year 1957-58.

22        THE COURT:  I think it was left with an inquiry by

23  the Court to Mr. Veeder as to whether or not this could not

24  be done sometime in the near future.  And I was under the

25  impression he was going to report to me later as to whether

1    the Government would do that.

2         MR. VEEDER:  Our problem, very simply, is this, your

3    Honor:  That it is quite an undertaking to bring these down

4    to date.  And my own view, I will be frank with your Honor

5    about it, is that if Mr. Sachse wants an exhibit, why, I

6    think it would be a pious idea for him to make one up.  But

7    if your Honor directs me --

8         THE COURT:  That is not a good idea for this reason:

9    You start with a certain premise.  You have certain back-

10   ground for your exhibit.  And I think, therefore, it should

11   be carried on through, so that some comparison of your

12   exhibits and exhibits which the defendants will introduce

13   could be made.  In other words, their basic approach, some

14   of their foundation material may be different from yours and

15   a different result.  I don't want to be hooking their

16   material for 1958 onto yours.  I would like to see how yours

17   runs out.  Now, I don't think it has to be done probably

18   with all exhibits.  It is just that a number of them where

19   there is a place on the graph for 1958 and where it could be

20   carried over with a little work.  I don't believe that it has

21   to be done in a week or two weeks.

22        MR. VEEDER:  That was the next thing I was going to

23   inquire.  We have a show on the road, and I hate to call a

24   man off under cross examination and start bringing exhibits

25   up to date.

1    THE COURT:  No, I don't expect you to do that.  But

2    I would like to have you look into it further and report to

3    me, when your witness is off the stand, how long it would

4    take to bring the exhibits and list of the exhibits that

5    you have in mind up to date.

6    MR. VEEDER:  I will do that, your Honor.

7    THE COURT:  All right.

8    Mr. Moskovitz, I have a copy of your letter to

9    Mr. Veeder.  And, apparently, according to your letter, you

10   are going to offer more of California's 12, the Bulletin 57,

11   than you originally listed?

12   MR. MOSKOVITZ:  Yes, your Honor.

13   THE COURT:  All right.

14   MR. MOSKOVITZ:  I also have a little more information

15   that you asked me to secure.

16   MR. VEEDER:  It gains respectability.  To begin with,

17   it has already been identified.

18   THE COURT:  Proceed, Mr. Moskovitz.

19   MR. MOSKOVITZ:  I didn't hear that comment.

20   THE COURT:  I didn't hear it, either.  Go ahead.

21   MR. MOSKOVITZ:  I was asked to find out about Mr.

22   Holsinger's availability and Mr. Bookman's availability.

23   MR. VEEDER:  And Mr. Edmonston's availability.  I

24   am going to have a request that Mr. Edmonston be available

25   along with Mr. Bookman, because, as I understand it, they

1  are the ones who were in charge of preparation of it.  And I

2  think it is essential that both Mr. Edmonston and Mr. Bookman

3  be here; because I am certainly going to strenuously object

4  to this vacillation and switching around of the State of

5  California in regard to this, whatever it is, bulletin.  And

6  we have the amazing situation where on the special master's

7  hearing Mr. Moskovitz identified Mr. Bookman as the man

8  under whose direction it was prepared.  We have the amazing

9  circumstance before the State Water Rights Board where he

10  is identified as the man who prepared it.  And then suddenly

11  they don't want him around.  And I am going to ask that both

12  of them be available.  I am similarly going to ask that Mr.

13  Holsinger be available.

14        THE COURT:  You want Bookman, Holsinger, and Edmonston?

15        MR. VEEDER:  Edmonston, yes.

16        THE COURT:  Edmonston.

17        MR. VEEDER:  Edmonston.  I think it is —s-o-n.  I am

18  not certain.

19        MR. SACHSE:  -ston, -s-t-o-n.

20        MR. MOSKOWITZ:  Well, your Honor, as far as Mr.

21  Holsinger is concerned, I think Mr. Veeder is going to have

22  to indicate to me or to your satisfaction -- I will accept

23  your judgment, your Honor --

24        MR. VEEDER: That has already been stated, your Honor.

25        MR. MOSKOWITZ:  -- as to what Mr. Holsinger can testify

1   to that would be relevant in this proceeding.  I am not

2   going to bring him down again voluntarily unless I am

3   satisfied, with your direction, your Honor, that he can

4   testify to something that is relevant.

5       MR. VEEDER:  I thought that was decided the other

6   day.  I thought your Honor said I had to show why Holsinger

7   was to be brought down.

8       THE COURT:  I think I said that.  I don't know that

9   you have convinced me yet --

10      MR. VEEDER:  I haven't even undertaken it yet, your

11  Honor.

12      THE COURT:  We are just finding out now if he is

13  available.  Is he available?

14      MR. MOSKOVITZ:  His schedule is all filled with

15  hearings during the month of December.  On January 15th his

16  term of office expires.  Right now, between January 1 and

17  January 15 he has nothing on the calendar, but he may fill

18  it very rapidly with hearings that he may want to conclude

19  before he goes off the Board.  Whether he is reappointed

20  no one can say.  And if he is reappointed, the mandatory

21  retirement date will be on July 1, 1959.  He has told me

22  that --

23      MR. VEEDER:  We will be through by then.

24      MR. MOSKOVITZ:  -- he expects to retire by that time

25  if he is reappointed.

1      THE COURT:   What about Mr. Edmonston and Mr. Bookman?

2      MR. MOSKOWITZ:   About Mr. Edmonston, I made no

3   inquiry.   I didn't know his presence was desired.

4      THE COURT:   What about Mr. Bookman?

5      MR. MOSKOWITZ:   As to Mr. Bookman, I understand that

6   he will be available about the middle of December, if

7   necessary.

8      MR. VEEDER:   December 19th?

9         Well, just so that you are on notice.

10      THE COURT:   When do you want to make your showing to

11   what Mr. Holsinger would testify to?

12      MR. VEEDER:   Well, I feel this way --

13      THE COURT:   Have in mind that you examined him before

14   the master in my presence at Fallbrook.

15      MR. VEEDER:   That is right.

16      THE COURT:   So that doesn't have to be repeated.

17      MR. VEEDER:   No.   I will come forward, your Honor,

18   with the points that I desire to interrogate him about and

19   the reason for the necessity, in our view, of the interroga-

20   tion.

21      THE COURT:   Why don't you make it in writing?

22      MR. VEEDER:   I will do that.

23      THE COURT:   Serve it, and then we will have a chance

24   to look it over before --

25      MR. VEEDER:   Fine.

4439

THE COURT:  All right.

MR. MOSKOVITZ:  Now, as I understand it, Mr. Veeder will want to have these witnesses after the State has offered Bulletin 57?   Will this be in connection with the voir dire or will this be after we put in our geological testimony?

MR. VEEDER:  I look at it this way, your Honor: There are elements in the Government's case in chief which I believe there is a burden upon us to go forward.  And it occurs to me that if we have the State of California on December 2nd calling witnesses, we might just as well go ahead and call the rest of these and proceed with that phase of our case.  It may be that your Honor will give me no greater opportunity than to make offers of proof but --

THE COURT:  Now, you are not answering Mr. Moskowitz' question directly.  The question is:  Are these witnesses called by you as part of your case or are they called in connection with the State's identification and foundation material for Bulletin 57?

MR. VEEDER:  Well, here is my view about it:  It is unusual, but I think it is all right to interrupt our case to put on the geology.  I can't believe that the State can do this whirling dervish forever, and I desire to -- when they have called Mr. Illingworth, put him on the stand, we will, of course, object and say he was not the man that did

A-4

1   the work." We will, of course, object to Mr. James.  I

2   assume that they may be permitted to testify.  So I will

3   simply call, when the State is through, and call these two

4   characters and put them on the stand and interrogate them

5   in regard to their participation.

6   THE COURT:  As I get your answer so far, just to say

7   it in simple language, this is in connection with foundation

8   matter for Bulletin 57?

9   MR. VEEDER:  Yes, sir.  And also part of our case,

10   you see, I have about four counts that your Honor knocked

11   out.  I was planning on going to have to make at least an

12   offer of proof to make the record clear to the 9th Circuit.

13   That will be part of it.

14   THE COURT:  Of course, you can do what you want to do,

15   but we all know what will probably happen.  Mr. Bookman will

16   say, "Yes, I was the principal hydrolic engineer.  In that

17   sense I was in charge of this investigation.  As anyone

18   would do in conducting an investigation, I had to assign

19   duties to men who acted under me."

20   MR. VEEDER:  I think he will follow your script word

21   for word, your Honor.

22   THE COURT:  "Mr. Illingworth acted under my direction.

23   They did certain of the work, and I was responsible in the

24   sense that I was their superior."  It is no mystery to me

25   about how these things work, and I don't think there is to

1  you.  But if you want to tell me what you want from these

2  men, and I will decide whether we will bring them down here

3  or not.

4      MR. VEEDER:  Yes.  I thought that was decided last

5  week, but I am glad to go over it again.

6      THE COURT:  All right, Mr. Worts.

7              G. F. WORTS, JR.,

8  having been previously sworn as a witness on behalf of the

9  plaintiff, resumed the stand and testified further as

10 follows:-

11

12              CROSS EXAMINATION (Continued)

13 BY MR. MOSKOVITZ:-

14     Q   Mr. Worts, as I understand your testimony about

15 the hydrolic gradient in the Ysidora Basin as of 1957, the

16 hydrolic gradient of the ground water was from Ysidora Basin

17 to the ocean; is that not correct?

18     A   What exhibit are you referring to?

19     Q   I have in mind Exhibit 45.

20     A   Exhibit 45 shows an hydrolic gradient from Ysidora

21 Basin out through the narrows.  It is a very flat gradient.

22     THE COURT:  And this is as of October, 1957?

23     THE WITNESS:  Yes, sir.

24     THE COURT:  All right.

25     Q  BY MR. MOSKOVITZ:  Now, your Exhibit 44, which

1    depicted the ground water contours as of 1951 -- It was

2    something like October or November, 1951.

3           THE COURT:   November, 1951.

4           Q   BY MR. MOSKOWITZ:   Yes, November, 1951.   -- depicts

5    the contours showing a gradient from the ocean to Ysidora

6    Basin, sub-basin; is that not correct?

7           A   Yes.

8           Q   On both Exhibits 44 and 45 you have two sets

9    of contours, one showing, as I understand it, the levels, or

10   based upon levels of shallow wells and the other based upon

11   levels in the deep wells; is that correct?

12          A   Yes.

13          Q   And in Exhibit 44, the contours based upon the

14   levels of both the shallow and deep wells show a gradient

15   from the ocean to Ysidora Basin, is that correct?

16          A   Yes.

17          Q   And on 45, the contour shows a gradient based upon

18   the contours of both the shallow and deep wells from Ysidora

19   Basin to the ocean?

20          A   Yes.

(see P. 4644)

21          Q   When was the gradient reversed from the flow into

22   Ysidora Basin to a flow out from Ysidora Basin?

23

24

25

Worts   Cross

4443

B

Z3

1      A  I would like to refer to Exhibit 51.

2         Exhibit 51, the levels in wells 11-5-2B2 and 10-5-

3  35K1 were at or near and in 2B2 below sea level during 1951,

4  so that the inland gradient existed going back as far as 1948.

5  Toward the latter part of 1948 the levels were below sea level

6  in Well 2B1.  We do not know about 47 because of lack of water

7  level data.  In 1950 they were below sea level, and in '49 and

8  in '51.  So that it was after 1951 and sometime in the early

9  part of 1952 that the levels arose above sea level, and then

10  we can refer to Exhibit 38 which shows a water level profile

11  for March, 1952, which is a seaward gradient; so that by March

12  the seaward gradient had been established.  That would not be

13  an average for the year.  You will note that by autumn or in

14  the fall of 1952 we are back to sea level again, and also in

15  the fall of 1953.  So that March, 1952, depicts the best con-

16  dition during 1952.

17      Q  Then would you say that in the fall of 1952 you once

18  again had a gradient from the ocean to Ysidora Basin?

19      A  Let me amplify this a little bit.  These are as

20  nearly as we can obtain them non-pumping levels.  On one of

21  the graphs-- in fact, most of the pumping wells in here pump

22  from a considerable distance below sea level when they are

23  operating.  So that there is a gradient during the period of

24  heavy pumping.  When a well is pumping, there is a gradient

25  from the narrows inland.  That is probably true all during the

1    period of our detailed records here.  You see, these levels

2    are-- take the 1952 through 1957 graph, the levels in all

3    years but 1954 rise about 10 feet above.  We know the pumping

4    levels are down below sea level in all those years, as shown

5    in, I think it is, the records of water levels that accompany Exhibit

6    /51.  Would that be 51A?  The pumping levels are shown on

7    there, and in almost every case, in every case-- but for most

8    of the wells, most of them that are pumping, that is the

9    record.

10         Q  You don't want to refer to it now?

11         A  No, just that in general they are below sea leve.

12         Q  What is the explanation, or is it the fact that wells

13   do pump from below sea level that explains why, in your view,

14   there is still sea water being drawn in, in Ysidora Basin,

15   although the contours for 1957 show a gradient in the opposite

16   direction toward the sea?

17         A  I would think that would be largely the cause.

18         Q  Would Exhibit 51A be the exhibit that you have re-

19   ferred to, to show that there is a gradient toward Ysidora

20   Basin even in 1957?

21         A  Well, if you will plot the pumping levels, as I have

22   done, for example on Well 35K1, which is the well farthest

23   inland in Ysidora Basin that is a pumping well, you will

24   observe that all but one of those measurements the water level

25   is below sea level.

4445

Worts   Cross

1        THE COURT:  That is the water level while--

2        THE WITNESS:  While the well is being pumped.

3    BY MR. MOSKOVITZ:

4        Q  When the well is being pumped and the water level

5    is below sea level, is sea water then being, in effect,

6    sucked into the Ysidora subbasin from the ocean?

7        A  I would say that the pumping effect in that lower

8    segment--

9        MR. VEEDER: What do you mean by "sucked," Mr.

10   Moskovitz?

11       MR. MOSKOVITZ:  I think the witness is answering the

12   question.

13       MR. VEEDER:  I was inquiring about the word "sucked".

14   I didn't know whether it was a technical word or what.  Cer-

15   tainly we are not pumping water from the sea.  Is that what

16   you mean?

17       MR. MOSKOVITZ:  I think the witness understood the

18   question and was answering it.

19       THE COURT:  Go ahead.

20       THE WITNESS: When the pumping levels in the basin are

21   below sea level, that potential is obviously established, that

22   water around the pumped well is moving in from all directions,

23   and it will move in toward the well from as far out as its

24   cone of influence extends.  So the length of time of pumping,

25   I think, has some relation to the amount of drawdown in the

B
Z5

1   pumped well, and that in turn will determine how far out the

2   cone of depression and influence of that well will extend.

3   So during periods of heavy pumping, probably the heaviest now

4   or during the summer when water levels are the lowest and when

5   irrigation demand is the highest, I would suspect that sea

6   water is still moving in during that part of the year.

7   BY MR. MOSKOVITZ:

8        Q  Is it your opinion that the continuation of such

9   pumping as you have just described results in a continual

10   jeopardy to the quality of water in the Ysidora subbasin?

11       A  Yes.

12       Q  And for what purpose, if you know?

13       THE COURT:  When you say "continued pumping," do you

14   mean pumping year after year, or do you mean pumping day by

15   day in drawing the level down?  What did you understand it to

16   mean?

17       THE WITNESS:  I understood that he meant the pumping

18   that is going on in the basin as it has historically happened,

19   your Honor.

20   BY MR. MOSKOVITZ:

21       Q  And as it has continued to the present date?

22       A  Well, I don't have the information for 1958.  I

23   don't know what the pumpage was in 1958.

24       Q  If you know, what is the purpose for which the water

25   is pumped from the wells in Ysidora Basin?

1    A    It is for irrigation.   I think I am correct in this,

2    but I will say to the best of my recollection that since or

3    beginning with 1954 virtually all of the pumpage has been for

4    irrigation.

5    Q    I would like to refer to Exhibit 49 and to the right-

6    hand graph.   In the right-hand graph there are three curves or

7    lines, and as I read it the curve or line would be made up of

8    small dotted lines "accumulated recharge excluding sewage

9    return;" am I correct that that is a mathematically arrived at

10   line?

11   A    Definitely.   I explained that, I think, the first

12   time we went over this exhibit, that these are the mathematics

13   involved in the seven types of recharge and discharge collect-

14   ively shown in the explanation.   It is how the chips fall when

15   you have these figures available to you.   This is the type of

16   plot that you get.

17   Q    Had there been no sewage return to the basin, where

18   would this curve have been, this curve "Accumulated recharge

19   excluding sewage return"-- in reality, where would that curve

20   have been?

21   A    It would depend on several factors.   You can't sub-

22   tract a unit out of a basin arbitrarily without considering

23   other influences that will affect it.

24   Q    But it would not have been where the curve is now

25   shown; it would have been somewhat higher in some of the years,

B

Z7

1    would it not?

2         A   In some of the years it probably would have been

3    higher.

4         Q   Taking 1952 as an example, is it not reasonable to

5    expect that the curve "Accumulated recharge" had there been

6    no sewage return would have approached the point at the end

7    of 1952 where the other curve entitled "Accumulated recharge

8    including sewage return" is found?

9         A   I don't know where it would work out, Mr. Moskovitz,
              you
10   because/ penetrate a preceding dry period in which sewage was

11   run in and you can see that that would have affected the amount

12   of depletion if it had not been run in during the preceding

13   four or five dry years-- it would have affected the position

14   of this dotted line.  I don't know precisely where it would

15   have worked out.  I would have to sit down and see how it might

16   work out.

17        Q   Had there been no sewage return to the basin, then

18   the basin would have been drawn down further than it actually

19   was; is that not so?

20        A   That is for sure.

21        Q   And if it had been drawn down more, when a wet year

22   came, as it did in 1952, and you had runoff into the ocean,

23   then there would have been water to fill up an additional void

24   in the ground water basin; is that not so?

25        A   If the distribution and duration of runoff were

B.

Z8

1   adequate, there would have been water available for that

2   purpose.  Whether or not it would have filled it up depends

3   on the degree to which the basin would have been drawn down

4   under your hypothetical situation.

5        Q  Let us refer to Exhibit 50.  Could you explain

6   again-- I am not sure I understood-- what curve D depicts?

7        MR. VEEDER:  I object to this as being repetitious.

8   We have been over this four times.

9        MR. MOSKOVITZ:  I will be more specific.

10       Q  What does the explanation in your legend of curve

11   D "Adjusted to wet years 1947, 1952 and 1954" mean?

12       MR. VEEDER:  Just what it says.  I object to the

13   question, your Honor.

14       THE COURT:  Overruled.  This is one point that I am

15   still in doubt about.

16       THE WITNESS:  If I may explain it by use of curve E.

17   As we know, curve A is the mathematical summation, as ex-

18   plained down here, the accumulated difference between recharge

19   and discharge.  Those are the elements depicted on Exhibit 49

20   in the left-hand graph.  As I have mentioned before, the true

21   indication of where the basin would be, in my opinion, is

22   represented by curve B, which is the water level curve, because

23   regardless of the estimates that you might make or the refine-

24   ments, no matter how closely these elements of recharge and

25   discharge listed on Exhibit 49 may be, you still have limits

B

Z9

1   of error within which you are working on all estimates.   There-

2   fore, the true measure of where this basin would be or was at

3   the end of the 1951 water year is represented by curve B, and

4   that does include the sewage that was returned to the basin.

5   Now on curve E, that graph, which adjusts that curve to show

6   the order of magnitude of where the water level in storage

7   might have been if sewage had been taken out, and I say

8   adjusted to the wet years 1947, that is the year in which I

9   start this-- in other words, I started in '48.   I don't take

10   any sewage out of the system prior to 1948.

11        Q   You say take sewage out.   You mean you wouldn't

12   include sewage return?

B1

13        A   I didn't, let us say.   So we have the departures,

14   points plotting below curve B, indicating that the sewage as

15   of 1951, the effect of it for four years, instead of having

16   a 6,000 acre-foot depletion as shown on the left side of the

17   graph it would have been on the order of in excess of 9,000.

18        Q   And that is because the difference between 6,000

19   and in excess of 9,000 is the amount that had actually been

20   returned by means of sewage?

21        A   In that period.

22        Q   In that period.

23        A   Now, taking that same concept over to the dry years

24   1955, '56 and '57, on the right-hand side of the graph on

25   Exhibit 50, starting out with curve B which shows as of

B2

Z10

1    September 30th there was a deficiency in the basin of roughly

2    3,500 acre feet-- in other words, that is where you are going

3    to start out the next period, the three dry years that follow--

4    the graph shows little change from 1954 to '55, a drop to

5    4,500, or correction, 5,000 at the end of 1956, and to 6,500

6    roughly at the end of 1957.  Looking back at curve E, which

7    departs from curve B at the beginning of 1955, the sewage

8    returned in these later years is a much greater percentage

9    of the pumpage.  Therefore, the departure between the two

10   curves is going to be considerably greater.  So that instead

11   of a 6,500 acre-foot deficiency as of the fall of 1957 we

12   end up-- would have ended up something on the order of 13,000

13   acre feet of deficiency.

14       Q  You have been talking about the difference between

15   curves B and E in the dry years.  Now, the portion of the

16   legend I wanted explained is the portion that says "Adjusted

17   to wet years 1947, '52 and '54."  What do you mean by that?

18   What sort of adjustment did you make in the wet years?

19       A  None.  I just started this at the end of the wet

20   years, just started my departure.  In other words, I started--

21   maybe the wording isn't exactly right, but what I am trying

22   to get across here is that I started these departures at the

23   beginning of dry periods for curve E and ignored what would

24   have happened during the wet periods, because I don't know

25   for sure.

4452

B2

Z11

Q   I see.   During the wet year 1952 you show that curve E moved up until at the end of 1952 it intersected with curve B. Why did you do that?

A   1952 was a wet year and the basin was nearly fully recharged, if not completely.   I don't recall exactly whether it filled right up to the brim.   Sewage is being returned to the basin in areas where there is stream flow, of course-- for example, at the Chappo sewage plant.   So that the stream waters get mixed up with the sewage waters and trying to separate the relative effect of them on the basin during that year was difficult to unravel.   Therefore, as I recall my reasoning in constructing that line from the end of 1951 to the end of 1952--

Q   The line you are talking about is curve E?

A   Curve E on Exhibit 50 was run back to the point shown on curve B because of that reason.

Q   Let me see if I understand.   Is it because you assumed that had there been no sewage returned in previous years, during 1952 the basin nevertheless would have filled up to the same point that it did because there was ample flow to do so?

A   No, that is not what I said.   I said that during the winter months of 1952 there was a substantial flow in the stream.   The discharge from these several sewage effluent plants, not all of them but some of them, was discharged into

B2

Z12

1    the streams. Therefore, I couldn't identify by this method

2    which would be stream and which would be surface. So I just

3    petered it out.

4              MR. VEEDER: You said "surface." Sewage?

5              THE WITNESS: The sewage and the surface runoff inter-

6    mix and there is no way to separate them. The principal purpose

7    of this is to show where we would have been at the end of the

8    dry years 1948 through 1951.

9    BY MR. MOSKOVITZ:

10             Q  For the purpose of this study, didn't you assume

11   that when the wet year came you would fill up your basin to

12   the same point that you would have, had there been no sewage?

13             A  I don't know about that. You see, I am starting at

14   a point down here, at which I never actually was, which is the

15   bottommost point on curve E in 1951. I can't answer it in

16   that way, because as you pull this basin farther and farther

17   down we go back to our ideas of how this basin is recharged--

18   in other words, the basin has never been pulled down, accord-

19   ing to my calculations, to the 9,500 acre feet shown by curve

20   E in 1951. The further down you pull this basin, the more

21   difficult it is going to be to recharge it during the year

22   with the manner in which the runoff occurs.

23             THE COURT: Which was the wet year-- '51 or '52?

24             THE WITNESS: 1952, your Honor.

25             THE COURT: Starting in--

B2

Z13

1    THE WITNESS:  October 1st.

2    THE COURT:  October, 1951.

3    THE WITNESS:  October 1st would be the start of the

4  year.

5    THE COURT:  That would be October 1st, 1951?

6    THE WITNESS:  1951.

7    THE COURT:  Running to October 1, 1952; that was the

8  wet year?

9    THE WITNESS:  Yes, sir.

10    THE COURT:  And that would be called 1952?

11    THE WITNESS:  That would be called 1952, your Honor.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C-1 ML j

1      THE COURT:  Well, then, what about this:  the break

2    line date, the break line between '52 and '53 is September

3    30th.  That is right at the end of the dry season.

4      THE WITNESS:  I think it would be '51-52, your Honor,

5    would be the break between the dry, preceding dry, and the

6    wet.

7      THE COURT:  I see that, but now go to the end of '52.

8      THE WITNESS:  End of '52.

9      THE COURT:  The line between '52 and '53.

10     THE WITNESS:  Yes, sir.

11     THE COURT:  That line is actually September 30, '52;

12   right?

13     THE WITNESS:  Yes.

14     THE COURT:  The line of September 30th.  Now, even

15   though that '52 year was wet, the line of breakage on

16   September 30th was the end of the summer season, and, there-

17   fore, we can assume there would be less water in the basin

18   at the end of that season than there would have been, we will

19   say, along in March, April or May after the rains and runoff

20   into the basin?

21     THE WITNESS:  That is right.  But all of the data

22   that are available to me are computed on the water year

23   basis.  You would have to go back and take them all to

24   pieces each year to find out, and you would have to play

25   them against the well data to find out when your basin was

1    recharged during that water year.  In other words, the minute
2    that a little water hits the basin doesn't mean the thing is
3    recharged.  It takes the -- I think the duration of the
4    flows will show that, as compared to the hydrographs.
5         MR. MOSKOWITZ:  I have no more questions.
6         THE COURT:  Any further questions?  Mr. Stahlman.
7         MR. STAHLMAN:  Yes, your Honor.
8
9                     CROSS EXAMINATION
10   BY MR. STAHLMAN:-
11        Q   Mr. Worts, when did you first start your studies
12   on Camp Pendleton?
13        A   I first started my studies in Camp Pendleton in
14   August, 1950.
15        Q   And at that time you occupied the position that
16   Mr. Kunkel has at the present time, is that correct?
17        A   I was in charge --   Actually, the office
18   responsibility at Long Beach was split.  I was in charge of
19   the military operations and a man by the name of Arthur
20   Garrett was finishing up some work on, some cooperative work
21   for the city -- not city; County of San Bernardino and Orange
22   County.  And he left soon thereafter for a detail to India,
23   and I took full charge of all operations.
24        Q   That was still in 1950?
25        A   No.  I was trying to recall when he left.  It may

1   have been a year or a year and a half later.  I don't recall

2   exactly.

3       Q   Your Department, in undertaking a study -- in

4   general, I am speaking about -- what initiates the study?

5       A   Well, now, are you speaking about the military or

6   another public agency?

7       Q   Yes.  Is there a difference between what would

8   initiate the study as far as a military study is concerned

9   as regards to other studies which you made?

10      A   Yes.  We do a type of work for the military that

11  we don't do for other public agencies, such as states,

12  counties and cities.

13      Q   And at the time you initiated your first studies

14  what was the objective that you had in mind at that time to

15  accomplish?

16      A   At that time we were to make a comprehensive study

17  of the water resources on Camp Pendleton.  That includes

18  ground water, surface water, quality of water.  And it in-

19  cluded all the basins on the camp.

20      Q   And were there any, to your knowledge, conditions

21  existing at that time by which the study was provoked?  You

22  understand what I mean?

23      A   Yes.  I would strongly suspect that it was --

24  the reason I have to say that is because --

25      Q   Your best judgment.

A   My best judgment of the condition in Ysidora

Sub-basin of the salt water intrusion.  The fact that the

condition was getting worse.  I will have to state this:

that in my position at that time I was not the one that

negotiated with the Marine Corps or Navy in Washington con-

cerning the start of this study.

Q   In other words, the directions and the objectives

and limitations, if any, of the study originated from

Washington?

A   Only in the case of the initial study on Camp

Pendleton.  And I think the same thing applies to our

initial study at Edwards Air Force Base.  Since that time

the District Office in Sacramento of my organization or the

Long Beach Sub-District Office, the man in charge, has

worked the negotiations and the scope of the work, works

it out with either the local base or with the Public Works

Office, District Public Works Office here in San Diego for

Navy jobs, for example.

Q   At that time what, to your knowledge, was in

contemplation as to the scope of the investigation on studies

such as you were about to make?

A   Well, the scope is just about the same as I have

run through in the course of my direct testimony here, which

is the geology, the occurrence and movement of ground water,

the recharge and discharge, the storage changes, chemical

1  quality, any special things of significance, such as sea

2  water intrusion. To my recollection those were the principal

3  objectives.

Q   In other words, those were matters which were in

5  contemplation as you negotiated your studies?

A   Yes.

Q   Was it in contemplation at that time that there

8  would be a complete study of the water shed?

A   No.

Q   In other words, such studies that have been made

11  in the upper regions of the watershed were something that

12  came after that, is that correct?

A   Yes, with the exception of the drilling of a

14  deep well up there in the Pauba  Basin, which was done in

15  1951, as I recall.

Q   Now, such studies as have been made on the entire

17  watershed,  that is, those that were made by Mr. Kunkel and

18  Lt. Walker, were those under your direction, also?

A   Mr. Kunkel's work was under my direction, but Lt.

20  Walker is, you might say, by association and discussing the

21  various problems that might be considered from the stand-

22  point of geology and ground water in an area, in the area

23  covered by Mr. Walker, Lt. --

Q   Pardon me.

A   That is all.

1    Q    Finished.  Referring to this well which was

2  drilled, you, I believe, have indicated that there was --

3    MR. VEEDER:  Which well is that now, Mr. Stahlman?

4    Q  BY MR. STAHLMAN:  The well that you just mentioned

5  as having been drilled on the Vail Ranch.  That is the well

6  you had in mind, did you not?

7    A    Yes.

8    Q    And you have testified, I believe, that the

9  matters pertaining to the drilling of that well were class-

10 ified?

11   A    Yes.

12   Q    What does that mean?

13   A    Well, maybe I am not the one to state, because

14 the Geological Survey doesn't impose a classification on it.

15 We were requested to keep it classified by the military, and

16 we did.  Which means that it is not available to the public

17 but it is kept under lock and key, so to speak.

18   Q    In other words, your particular department did

19 not classify it, as such?  It was as a result of a request

20 by the military?

21   A    Yes.

22   Q    Such information, however, as you have so far

23 given us in connection with that well were as to the factors

24 that you learned as a result of the drilling of the well?

25   A    Drilling, development, and testing.

Wortn - Cross                                                 3461

1    Q    And as far as any of those matters are concerned,

2  do you know of any reason why they should be classified?

3    A    That is beyond my knowledge, Mr. Stahlman.

4    Q    The drilling of the well was not secret, was it?

5    A    Yes.  We were given instructions not to discuss

6  any, the depth or the drilling activities, or what we were

7  finding during the course of drilling.  There wasn't a guard

8  posted there to chase people away, but the drillers,

9  drilling crews also were requested to not discuss it with

10  people that drove up to the drilling rig to inquire what was

11  going on.  They were more or less given the brush-off.

12    Q    Now, the results of that drilling gave you

13  certain information relative to the geology of that area, is

14  that correct?

15    A    Yes.

16    Q    Going back to the basin on Camp Pendleton --

17  In the first place, discussing basins in general.  I believe

18  you have indicated three factors that were considered in

19  relation to the charge of a basin, recharge.  Isn't there an

20  important  fourth?

21    A    Yes, there are other factors depending on the

22  size and shape of the basin.  There are factors that are

23  inherent in the three that I have given.  Now, I gave the

24  three as magnitude and duration of runoff as one; the

25  permeability of the deposits as another; and the depth to

1 water as a third.  Now, I was thinking, if you will observe
2 the width of the basin on Exhibit 37, you will observe that
3 it is a fairly narrow basin with a fairly large stream
4 running across it.  So, obviously, if you have a large basin
5 of great width that extends away from a river and that basin
6 is depleted during a dry period, then, when the full burden
7 of recharge is placed upon the river to recharge it, it is
8 going to take a lot of water and a long period of flow to
9 build up under the river first a mound that is more or less,
10 may or may not reach contact with the stream itself.  But
11 water will fill up and move out laterally.  And as the water
12 moves out laterally, it keeps providing more space for the
13 loss from the stream.  So that in a large basin that would be
14 an important factor.  Another factor inherent in the magn-
15 nitude of the runoff is the area over which a large flow
16 will spread.  In other words, if you have one second foot
17 moving down a stream bed, it may occupy a channel two feet
18 wide.  If you have a flow moving down the stream of ten,
19 fifteen, twenty thousand second feet, it may spread out for
20 several thousand feet because the deposits and their ability
21 to absorb the water is dependent there upon the wetted area
22 that is covered with water; because it is just as permeable
23 under the channel as it is over under this part of the
24 channel.  So the larger the area of, larger the wetted area
25 the more opportunity for recharge.  But there you have to

C-2

Worts - Cross 4463

1 consider permeability, how deep are the levels, and the size

2 of the basin as to the effectiveness of that concept.

3 Q In other words, it is true, is it not, that a

4 basin which is susceptible of recharge with a given quantity

5 of flow on the surface, that the width of the area over

6 which it flows bears a relationship to the ability to

7 charge?

8 A Definitely.

9 Q In other words, to make it simple: If you had

10 a basin -- For the record, I am drawing on the blackboard.

11 -- assuming that be a basin, if you had a stream meandering

12 through there, a wide width, a given amount of water, your

13 basin would have a better chance of charging than if it

14 were constrasted to a stream meandering through in a narrow

15 channel such as I have just indicated; is that true?

16 A Yes.

17 Q And consequently, it is also true, is it not,

18 that if we had a stream bed meandering through that was wide

19 in some parts and narrow in others, that also would bear

20 relationship to the ability to recharge the basin?

21 A Yes.

22 Q Have there been studies made in relation to

23 basins, in general I am speaking about now, which the

24 object would be to determine the efficiency of the basin in

25 relation to the charge and the discharge of the basin? I

1    am not speaking about this particular, just a general --

2    is that the objective of studies that are made by geologists

3    and hydrologists in relation to basement storage?

4         A    The past record of the inflow to the basin and

5    the outflow is the -- I am speaking of surface water.

6         Q    Start that over again, please.  I didn't follow

7    you.  The past?

8         A    The past records.

9         Q    Records.

10        A    Gage records of the water moving in and the water

11   moving out, surface water, plus the response to that in

12   water levels in the basin shows you what has happened under

13   those conditions.

14        Q    No, the point I am getting at:  In general, in

15   your business and in your profession have studies been made

16   in relation to basins -- I am talking about any basin -- with

17   the object in mind of determining the efficiency of the

18   basement in relation to its charge and discharge?  In other

19   words, what would be, if I may use an illustration:  You

20   understand in connection with surface storage that it is

21   determined in relation to the storage and the history of the

22   construction or the factors that go into the determination

23   of the construction and size of dams that there is a safe

24   annual yield factor?  That is one of the factors that is

25   determined in relation to the construction of the dam?

1   A   Right.

2   Q   Now, in underground basins, is there some such

3   similar objective in connection with studies of underground

4   basins?

5   A   This is really difficult to explain, because what

6   you are doing is trying to use the past to predict what

7   will happen in the future.

8   Q   That is what you do with a dam, too.

9   A   That is what you can't do accurately, to my

10   knowledge.

11   THE COURT:   Well, now, counsel was pointing out they

12   do that in connection with dams above the ground.   Now, is

13   anything like that done with basins below the ground?

14   MR. STAHLMAN:   That is the point.

15   THE WITNESS:   Not --

16   THE COURT:   Why would it be more difficult to do it

17   below the ground than it would above the ground?

18   THE WITNESS:   Oh, there is a big difference, because

19   you have this problem of getting the water underground.   With

20   the dam, it just hits the end of the dam and stops; and there

21   is no permeability, vertical permeability to consider.   In

22   other words, in a basin that has been -- let's take a basin

23   that has been nearly full.   You have the problem of assuming

24   that when this basin is really going to be used and they

25   eventually pull the water level down and you duplicate the

past flows over it, you know you are going to get a great deal more loss from that river than you did during the period when the water levels were high; but there is no accurate way of determining that.

THE COURT: Permeability?

THE WITNESS: Permeability, depth. We are right back again: from permeability, depth to water, magnitude and duration of flow. We have those three things to worry about every time you run a basin through an analysis that you are predicting in the future. Someone comes in and says, "How much can we get out of this basin?" If there is a stream that is historically discharged from that basin, it is a question of how much are you going to salvage when this basin is pulled down. That is a tough question to answer. There is no accurate way that I know of, to the best of my re-collection, in the literature, of estimating the amount that you are going to lose. But there is no question at the rate at which this basin, the lower Santa Margarita River Basin, fills up in the --

MR. STAHLMAN: Can't we talk about basins in general for a few moments?

THE COURT: Let me ask him a question before you do that: I take it in the case of a dam, a dam is generally constructed in an area where there is low permeability?

THE WITNESS: That is right.

1          THE COURT:  In fact, that seems to be common sense,

2     that your dam itself would have to go across pretty much to

3     bedrock on the sides and the bottom, and probably your dam

4     is in an area where you don't have an underground basin

5     upstream, or if you do, it is not a very important one?

6          THE WITNESS:  Well, that still wouldn't compare the

7     operation of a surface dam as a place to store water with

8     a ground water reservoir as a place to store water.  In

9     other words, you can take the quantities that flow in.

10    There is nothing to restrict that water from staying in

11    that surface reservoir except the end of the dam.  And when

12    you finally reach the spill level, then you know you are not

13    going to take any more -- there is not any more water going

14    to stay in that dam.  With water flowing across a ground

15    water basin, the amount that will sink in depends on those

16    three factors that I have mentioned several times already.

17         THE COURT:  All right.  Let's take a recess.

18         MR. STAHLMAN:  Very well.

19         (Recess.)

20

21

22

23

24

25

D

Z14

1    MR. SACHSE:. Your Honor, it has been brought to my

2    attention that when I signed the agreement as to the order on

3    pre-trial on behalf of all the defendants whom I represented,

4    through an inadvertence my secretary included a name that I

5    do not represent.  I do not know how she got it, frankly, but

6    it is in there and I would like the record to show that M.

7    Edward Suderman and Doris Lucille Suderman are not represented

8    by me and they should not be included in my consent.  They.

9    are represented by Mr. G. Norman Kennedy.  I have advised him.

10    THE COURT:  All right, you will find the original file

11    in the record and let the Clerk delete the names to which you

12    refer and initial it.

13    MR. VEEDER:  Your Honor, we have requested Mr. Krieger

14    some three or four weeks ago to produce data in regard to the

15    Querry and the Roripaugh wells. I haven't liked to ask your

16    Honor for an order in regard to the matter.

17    THE COURT:  Mr. Krieger and Mr. Littleworth advised us

18    that they were not going to participate in this downstream

19    part of it, so they haven't been here.  Write him a letter and

20    ask him when it will be forthcoming.  And tell him that you

21    are writing at my request.

22    Mr. Stahlman.

23

24

25

D

Z15

CROSS-EXAMINATION

BY MR. STAHLMAN:

Q  Mr. Worts, let us for the moment forget about the Santa Margarita water basin.  Speaking about any basin in general upon which there is information desired as to its function, capacity, et cetera, in your business as a geologist-- I don't mean attached to your particular department, but people who make studies of these particular basins-- to your knowledge, are there studies made that determine what would be the efficiency of the basin, in other words, the relationship between what would be under the circumstances of the particular basin reasonable and efficient discharge by pumping so as to correlate the studies of charge with the character and type of discharge to determine theefficiency of the basin?

A  In my opinion, there is no accurate way to estimate or measure the amount of water under what you might call ultimate development in the form of the pumpage which has completely changed the regimen of the ground water basin, in my opinion there is no accurate method to estimate the additional induced recharge you might get out of the river by pulling the water levels in the basin down.

Q  Let us approach it this way.  Let us assume that we have a basin, X quantity of water, and that there are extractions from that basin, and the determination by water contours

D

Z16

or water levels is such as to indicate that the basin is on

its way to exhaustion and depletion.  Would it be interesting

for you to know what would be the safe limits to which that

basin may be utilized?

A  Yes, it would be interesting to know.

Q  And do you do that?

A  We have done that here, and other places.

Q  And what is the object of that particular phase of

the study?

A  To determine how much water is available within the

basin, within certain operating levels, such as, say, sea

level as a bottom limit and maybe if the basin can be fully

recharged to within a few feet of land surface.  That gives

a block of ore, you might say, that is there for pumping

when the basin is full.  When the basin is pulled down, the

ore is exhausted and because of some other physical condition,

for example, sea water intrusion, you don't dare pull the

basin down below that level without aggravation.

Q  Assuming a basin that you do not have the factor

of sea level to contend with, isn't there a logical and a

reasonable basis for study to determine what the quantity of

extraction from that basin should be before danger would set

in?

A  There would be naturally an economic consideration.

Q  There is a field of geology that is called economic

D

Z17

1    geology, isn't there?

2         A   Yes.

3         Q   Is that a part of your studies also?

4         A   No.

5         Q   Or don't you care?  Your studies bear no relation-

6    ship to whether or not a basin, for instance, could be pumped

7    to exhaustion, or whether it would be advisable to limit the

8    pumping in relation to the history of the stream to determine

9    what would be the most efficient method of operation for the

10   continuation and perpetuation of the basin as a water supply?

11        A   Well, now, you have taken several factors there.

12        Q   Let's take the one that you want to talk about.

13        A   Let's take this economic factor, which is a very

14   serious one when you are a farmer.   In the west side of the

15   San Joaquin Valley, under a cotton subsidy they are able to

16   pump water from a pumping lift in excess of 700 feet and

17   apparently are making money at it.   In other areas, such

18   as Antelope Valley in the desert, pumping levels are consider-

19   ably less than that.   Small owners are having economic

20   problems.   So that economics is a factor.

21        We do not make economic studies.

22        Q   Do you make such studies as will come up with the

23   answer as to when the water supply may jeopardize the

24   efficient operation of the basin for producing water?

25        A   To sum up what you are saying, it is, do we make

D

Z18

1    perrenial yield studies?  How much can you pump out of this

2    system year after year without getting into economic or other

3    kinds of trouble?

4        Q  That may be an approach.

5        A  That is the term, from what I gather you are saying,

6    what you mean-- perrenial yield.  The trouble with perrenial

7    yield, as I explained earlier, is that you have to be able to

8    count on a firm supply or a natural supply reaching your

9    basin.  If by developments of one sort or another upstream,

10    providing there are possibilities of developing water upstream

11    from this general ground water basin of yours, every develop-

12    ment knocks the props out from under your natural perrenial

13    yield.

14        Q  Let's take two situations.  First, if we had a basin

15    that was continuously full, that was on a stream, there would

16    be no ability to charge the basin, would there?

17        A  If it was full all of the time, it would reject

18    recharge.

19        Q  Now if you pulled the basin down below a certain

20    point, you may never bring that basin up to charge again;

21    isn't that true?

22        A  That is right.

23        Q  You would destroy the basin as a producer of water?

24        A  If you exceed what you are calling the perrenial

25    yield, under the conditions you are setting up in your case,

D

Z19

1    in which case you end up with a continuously declining supply

2    in the basin.

3        Q  The point I am getting at now is, any of the studies

4    that you make, are they made for the purpose of determining

5    what that division may be, whether you should pump a certain

6    amount of water in relation to the history of the basin or

7    whether you just keep pumping it all of the time?

8        A  Yes, we have made studies of that nature.

9        Q  Did you make it in connection with either the Pauba

10   Basin or the Pendleton Basin?

11       A  We made it in connection with the Pendleton Basin,

12   but not the Pauba Basin.

13       Q  Now, do you take into consideration in thos studies

14   the fact of the uses to which the water may be put?

15       A  Yes.

16       Q  Before you answer that, I might indicate what I

17   have in mind.  In other words, if a basin is utilized for the

18   purpose of supplying water to a development that would require

19   a sustained and dependable source of water to sustain the

20   particular development as differentiated from the extractions

21   of water from a basin which may supply water to a type of

22   water usage that could be curtailed with the water supply--

23   do you understand what I mean?  This is foundational.

24       A  Well,--

25       Q  Do you take those factors into consideration?  In

D

Z20

1    other words, if you are studying a basin-- let me back up

2    just a minute.  I might indicate my reason.  You have indi-

3    cated that your department gives certain advices to the

4    Government as to how to operate the basin.  I believe you

5    stated that you advised the moving of wells in certain spots;

6    is that correct?

7        A  Yes.

8        Q  Then in relation to those two factors that I have

9    designated in my previous question about whether or not the

10   supply would have to be a sustained and dependable supply or

11   one that could fluctuate with the productivity of the basin,

12   do you advise in connection with those matters?

13       A  Well, that is a very general question, and I would

14   say in general we would attempt to, to the military.

15       Q  You would try to take that into consideration?

16       A  Yes.

17       Q  Now, this question of sea level, how do you determine

18   that?

19       A  Well, sea level is a plane at which the ocean

20   stands, mean sea level datum it is called, projected back

21   inland at any point is so many feet below land surface.

22       Q  And how is that mean sea level determined?

23       A  Well, that is determined, to the best of my recollec-

24   tion, as a function of the Coast and Geodetic Survey.

25       Q  Does it, to your knowledge, bear relationship to

1    high and low tide?

2        A  Yes, high and low tide is considered.  I believe

3    that on one of the surface contour maps such as have been

4    presented as exhibits here the datum is probably described.

5        Q  Do you know what the rise and fall of tide is in the

6    area of the beach where the Santa Margarita River empties into

7    the ocean?

8        A  Not offhand.  I know there is a tidal gage at the

9    so-called boat basin outlined in Section-- it is in or near the

10   basin, I am not sure just where-- in Sections 15 and 15, 11

11   South, 5 West.  I don't recall the range.

12       Q  Are you familiar with the studies in relation to

13   the change in sea level that had been made by Ewing and Donen?

14       A  Is it Ewing?

15       Q  I think it is.

16       A  Maurice Ewing?

17       Q  Yes.

18       A  I know he has a paper on the subject.

19       Q  A recent paper on that?

20       A  Yes, I know he does.

21       Q  And according to that paper, the sea level has been

22   elevated and accelerated in its elevation and during the last

23   25 years risen two feet; is that correct?

24       A  I don't know.  I haven't read the article.

25       Q  Assuming that to be the fact, a rise of two feet in

D

Z22

1    sea level during the last 25 years and a continuation of the

2    rise or the greater rate for the foreseeable future, would

3    that have any substantial effect in relation to the question

4    of salt water intrusion on a basin such as this?

5        A  Yes it would.

6        MR. VEEDER:  Maybe we should have made Neptune a party

7    defendant.

8        THE COURT:  Go ahead.

9        MR. VEEDER:  Sorry, George.

10        MR. STAHLMAN:  We will make you a party defendant--

11    the Montana Flash, as I understand.

12        MR. VEEDER:  We don't have salt water intrusion up

13    there.

14    BY MR. STAHLMAN:

15        Q  Now, that effect, you feel, would be substantial

16    in relation to the conditions that are affecting the basin

17    at the present time?

18        A  That would be adverse to the basin, to raise sea

19    level.

20        Q  I believe you testified that you were advised by

21    the Navy in relation to, or what would be rather the usable

22    quantities of water in the basin; is that correct?

23        A  We weren't advised by the Navy of the usable quan-

24    tity.

25        Q  Did you determine that?

1          A   We determined it; that is correct.

2          Q   And what were the factors that you took into con-

3     sideration in determining the usable quantities of water--

4     and I presume that by "usable" you mean the quantity of water

5     that could be extracted from the basin before you would have

6     to cease operation; is that correct?

7          A   It is the depth to which you would draw water levels

8     down before it would be necessary to stop operations, because

9     principally of sea water intrusion.

10          Q   Then the sea water intrusion was a principal factor?

11          A   That is the principal factor in the depth to which

12     water levels should be drawn down in this system.

13          Q   Are there any other factors that enter into that

14     consideration?

15          A   I would like to refer to Exhibit 42.

16              Exhibit 42, on the right-hand series of graphs,

17     the Base or Camp of Camp Pendleton, indicating the physical

18     limits for their extractions in the upper subbasin, would be

19     approximately 70 feet.

20          Q   Before we go any further, that is one question I

21     had asked you about-- physical limits set by Camp Pendleton.

22     Who set those physical limits?

23          A   The limits were set, as I recall, at a Water Control

24     Board meeting at the Camp Pendleton which involved a great

25     many of the-- involved the Public Works Officer and the Base

Worts    Cross    4478

D

Z24

1  Maintenance and several other offices.

2       Q  And you adopted those in the preparation of this

3  chart, did you?

4       A  I adopted that figure for Upper Subbasin.

5       Q  What factors were taken into consideration in

6  determining that in the Upper Basin?

7       A  The fact that as you deplete the supply the water

8  level goes down, as your water level is declining the yields

9  of your wells are also declining, the wells in Upper Subbasin

10  don't all (have) the deepest part of that subbasin; therefore,

11  you reach a point of diminishing returns on the yield of

12  wells, and when you go beyond that you are in economics.  Of

13  course, the Base would have to drill additional wells so that

14  they could keep up that same supply.

D2

15       Q  Then the determination bore relationship to the

16  existing wells as they are at the present time?

17       A  Yes, plus the consideration that to keep up a cer-

18  tain yield they would have to drill additional wells.

19       Q  Did you have any information or data in relation to

20  what the factors were that were taken into consideration to

21  determine that that would be the economic point at which it

22  would be the physical limit set?

23       A  We advised, as I recall, on the effect of the de-

24  watering.  It was up to them to make the decision whether that

25  was economically feasible.

1      Q  The point I am getting at, were you supplied any

2  data or any information by which the conclusion you have on

3  here was reached?

4      A  No.

5      Q  How was that information made known to you?

6      A  At the Water Control Board meeting.

7      Q  You attended, did you?

8      A  I was an ex-officio member of that board and that

9  was where I learned of it.  They asked my opinion whether the

10  basin could be drawn down to 70 feet.

11     Q  That would mean, or would it mean-- I am asking the

12  question now-- that it would be inadvisable to drill any other

13  wells in that portion of the basin there because of the

14  physical limitations?

15     A  If you planned to draw down below 70 feet, you had

16  better figure on drilling some more wells if you wish to

17  sustain the same extraction from that basin.

18     Q  Could that be done whether it is economically

19  feasible or not?

20     A  Yes, you can drill more wells up there.

21     Q  I don't mean whether you could drill more wells.

22  But could you sustain the supply of water by the drilling of

23  more wells, in your opinion?

24     A  Yes, you can sustain a supply of water from the wells

25  that are drilled.

D2

Z26

Q  Did you make a study to determine to what extent you could sustain that supply of water?

A  The supply, on Exhibit 47, the ratio of extractions in Upper Basin and Chappo Subbasin are shown in the upper right-hand graph as 40% from Upper Subbasin and 60% from Chappo Subbasin.  Obviously, that is not a quantity, but that was the ratio we suggested on the basis of the size of the storages in the two basins.

Q  Now, in determining the capacity of the basin, I believe you previously testified that you constructed some isopach maps by which you determined-- the one in evidence here is not the one that you used; is that correct?

A  That is not the one that we used.

Q  Can you tell us what the difference is between what the capacity of the basin would be in relation to the isopach map you constructed here and the one that you used?

A  For the alluvium there would be virtually no difference.

Q  No difference?

A  You would have to add the terrace deposits that we considered in the northern part of Chappo Subbasin in Sections 13 and 14, 10 South, 5 West.

Q  And that is principally the La Jolla?

A  No, that is the terrace deposits.

Q  The terrace deposits?

D

Z27

1          A  Colored in orange.

2          Q  How about the La Jolla?  There is no consideration

3    given to--

4          A  None.

5          Q  And it is your opinion, is it, that the character

6    of the La Jolla deposits is such that they would not con-

7    tribute materially to any increment in the basin?

8          A  Yes.

9          Q  And to what extent-- I am not asking you to give

10   me any figures, but do you have some idea about the terrace

11   deposits, is there a substantial contribution?

12         A  No, there isnot a substantial contribution.  It is

13   small.

14

15

16

17

18

19

20

21

22

23

24

25

E-1 ML j

1    A   No, it is not a substantial contribution; it is

2 a small one.

3    Q   By "small," just what do you mean by that?

4 Either in percentage or --   Can you give us your best judg-

5 ment on it?

6    A   Probably less than five per cent of the total in

7 the three subbasins.

8    Q   In the Pauba Basin, Mr. Kunkel, of course, made

9 the personal examination of the geology of that basin, but

10 you did supervise it and know what kind and character of

11 studies were going on and have --

12    A   Yes.

13    Q   -- been made in that area?

14       Were there any studies in relation to the Pauba

15 Basin in relation to what the effect of the extractions of

16 water from that basin would be upon the basin in this

17 respect?  In other words, if resorted to substantial increase

18 in pumping, would there be a detriment to the Pauba Basin?

19    A   Sure.  Yes.

20    Q   Can you explain that factor?

21    A   The increased pumping particularly during the

22 dry years has caused a substantial drawdown in water levels

23 in the Pauba Basin and in the adjacent older -- what we call

24 it is a qtoal -- older alluvial deposits that are in hydro-

25 lic -- the whole system is tied together; has caused a

1      drawdown in those.  And I suppose when you are talking of

2      Pauba Basin, you are speaking of the alluvial flat that

3      extends up --

4          Q    Yes.

5          A    -- near upon the river?

6          Q    Let's talk for the moment about the newer

7      alluvial fill in the Pauba Basin.

8          A    Well, to me the effect would be widespread there.

9      It affects laterally.  After all, the wells were all, the

10     deeper wells are perforated in the older alluvium; so at

11     this time older alluvium beneath the base, beneath the thin

12     veneer of alluvium and the older alluvium which is con-

13     tinuous out on the sides, would also and has supplied water

14     to what you are calling the Pauba Valley or Basin.

15         Q    As we understand the Pauba Basin, as such, the

16     newer alluvial fill, charges at an entirely different rate

17     than the so-called continental deposits; correct?

18         A    Yes.

19         Q    Have you made any determination, any studies as

20     to what the effect, either the immediate or the long-range

21     effect, in relation to the extraction of water from the

22     so-called deep wells in the Pauba Basin that has reached the

23     older alluvium?

24         A    The drawdown of the deeper -- well, yes, to your

25     question.

1    THE COURT:  Might I suggest that this is beyond the

2  scope of cross examination.  This witness is --

3    MR. STAHLMAN:  I think it is on this witness.  How-

4  ever, I thought, inasmuch as he had the complete charge of

5  it and being a geologist, he might throw some light on it.

6    THE COURT:  I am not going to proceed here --

7    MR. STAHLMAN:  I was going to get it sooner or

8  later.

9    THE COURT:  -- without respecting the rules of

10  evidence here if there is something you wanted to get at,

11  but this witness was not interrogated about these other

12  basins.  If you want to finish your --

13    MR. STAHLMAN:  That is right.  If your Honor is making

14  an objection, I will just go away from it.

15    MR. VEEDER:  I didn't interpose an objection.  I am

16  interested, your Honor, if you want to interrogate him on

17  this.

18    MR. STAHLMAN:  What I am asking is simply this -- my

19  approach to this case has and will continue to be that we

20  know all of the facts and circumstances on the Vail Ranch,

21  on Pendleton, and everybody else's.

22    MR. VEEDER:  George, you have had my thousand per

23  cent cooperation on that.

24    THE COURT:  Go ahead.

25    MR. VEEDER:  The record shows it.

4485

THE COURT:  All right.

MR. STAHLMAN:  And I am perfectly willing to dis-
continue this line of cross examination as long as he said
there has been and he was in charge.  I would like to then
ask the following questions, unless your Honor objects as
to what is that difference or relationship between the
charges of those two different types of material.

THE WITNESS:  I am going to have to look at this
exhibit.  Was 15 the geologic map?  Or whatever it is.

Q  BY MR. STAHLMAN:  15?

A  The Temecula River crosses the alluvium, and, to
the best of my knowledge, does not anywhere cross directly
upon the older alluvial deposits downstream from Nigger
Canyon to the mouth of Temecula Gorge.  Therefore, all of
the recharge from that river goes into the younger alluvium
first and from there it has to go down, downward -- it is
only a hundred feet or thereabouts, and then move on into
the older continental deposits to recharge them.

Q  And the point I am getting at is this:  So far as
this large quantity of water that has been indicated as
being stored in the older alluvium, is there, in your
opinion, the depletion of those waters from pumping at low
depths, low wells, deep wells, is there any substantial
charge to that basin from that pumping?

A  Wait a minute.  You say --

E-2

1      MR. VEEDER:  May I have that question?

2      THE WITNESS:  Yes.

3      THE COURT:  I got lost.  Try it again, George.

4      MR. STAHLMAN:  Yes, okay.

5      Q    What I am getting at is --   Start out this way:

6  We rely for the supply of water in the shallow wells in

7  the flow of the stream through Pauba Basin; right?

8      A    You rely on what?

9      Q    On the flow of the stream through Pauba Basin

10 for the recharge of the new alluvium; that is correct?

11     A    Yes.

12     Q    What do we rely upon for the charge, if there is

13 any charge, in the older alluvium?

14     A    It is the same source.  It has to come from the

15 river into the younger alluvial deposits and down into the

16 older deposits to recharge them.

17     THE COURT:  Does it come from rainfall or --

18     THE WITNESS:  He is talking about the river.

19     MR. STAHLMAN:  No, I am talking about -- we will

20 make it clear.

21     Q    Let's take this older alluvium that is back and

22 away from the stream bed.  There is recharge there with

23 rainfall, isn't there?

24     A    I don't want to get any misunderstanding here.

25 Explain where --   You pointed to an area where you --

Words - Cross                                                              4487

1        Q    Let's see; maybe I am completely at sea, but
2   there is water -- this is water-bearing material, is it not?
3        A    Yes.
4        THE COURT:  Pointing to --
5        MR. STAHLMAN:  Pointing at Exhibit 15.
6        THE COURT:  15.
7        MR. STAHLMAN:  To the both types of alluvium.
8        THE COURT:  Orange and yellow both.
9        MR. STAHLMAN:  Orange and yellow in the area of the
10  Vail Ranch.
11       THE WITNESS:  Well, I will go beyond the Vail Ranch.
12  Anywhere you have the orange and yellow is water-bearing
13  material.
14       Q    BY MR. STAHLMAN:  You know what the charge, you
15  can determine what the charge would be from the stream flow,
16  can you not?
17       THE COURT:  By "charge," you mean --?
18       MR. STAHLMAN:  Charge to the basin.
19       THE WITNESS:  The recharge.
20       MR. STAHLMAN:  Recharge.  Recharge, yes.
21       THE COURT:  All right.
22       THE WITNESS:  With gages, you have a gage at the dam,
23  as I understand it, and the gage at the narrows measures both
24  the flow of the -- Murrieta and the Temecula?
25       MR. STAHLMAN:  Yes.

E-3

Q    Now, there is also water stored in these deposits at an elevation above the elevation of the newer alluvium, isn't there?

A    Yes.  The head increases with depth.

Q    How is the water in the older alluvium first supplied?

A    By rainfall falling directly on the surface, and in some years will percolate down to recharge ground water. Another part is recharged from the runoff of the stream systems that come out across the older alluvium and the younger alluvium.

Q    The point I am making is in relation to the water storage there.  Have you made any determination as to what the extent of pumping from the deep wells, the artesian wells, would be, what effect it would have upon the over-all supply of the basin?

MR. VEEDER:  I am going to object until those deep wells are located as referred to.

THE COURT:  In Pauba Valley.

MR. VEEDER:  In Pauba Valley?

MR. STAHLMAN:  In Pauba Valley, yes.

MR. VEEDER:  We could blow the whistle, your Honor. It is noon.

THE COURT:  Well, let's get the answer.

THE WITNESS:  The effects of pumping the deeper wells

1   which tap the older continental or older alluvium beneath

2   the younger alluvium, the affects of pumping those is to

3   draw the water level down in the older alluvium and also

4   to --

5       MR. VEEDER:  Where did you point, Mr. Worts?

6       MR. STAHLMAN:  He pointed to both sides.

7       THE COURT:  North and south of Pauba Valley.

8       MR. VEEDER:  I want the record to show it.

9       THE WITNESS:  And also within the younger alluvium.  (see page 4643)

10       MR. STAHLMAN:  I have a little more on this point;

11   however, we can go until 2:00 o'clock if you wish.

12       THE COURT:  All right.

13       (Whereupon a recess was had until 2:00 o'clock p.m.

14   of the same day.)

15

16

17

18

19

20

21

22

23

24

25

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, NOVEMBER 12, 1958, 2:00 P.M.

2    ---o---

3

4                       G. F. WORTS, Jr.,

5    having been previously sworn as a witness on behalf of the

6    plaintiff, resumed the stand and testified further as

7    follows:-

8         MR. STAHLMAN:  Proceed, your Honor?

9         THE COURT:  Proceed.

10

11                   CROSS EXAMINATION (Continued)

12   BY MR. STAHLMAN:-

13        Q    Mr. Worts, referring to Exhibit 47, the basis of

14   the material that you used in formulating this exhibit, that

15   is, the lower part, what was the source of the information

16   that you utilized up to the year of 1942?

17        A    The whole graph, as indicated in the lower right-

18   hand corner, "Records from Public Works Office, Camp

19   Pendleton."

20        Q    What I mean, those records that you used, were

21   they records of measured pumping or were they estimates, or

22   how was that determined?  What do those records reveal?

23        A    I don't recall.  I picked that up about seven

24   years ago, and I obtained it from the material available at

25   the Public Works Office, Camp Pendleton.

1    Q   And you don't recall whether that was metered

2    measurements or those were estimates that were made as to

3    the usage of water up to the year 1942?

4    A   I don't recall.

5    Q   Then, after 1942, where you show a distinction

6    between the pumpage for camp use and that for irrigation,

7    what was the source of material that you used for irrigation

8    after that?

9    A   The records of the Public Works Office.

10    Q   And were those or any part of them based upon

11    measured flow or pumping?

12    A   I know that part of them are based on metered

13    flow.  They may have all been on metered flow; I do not

14    recall.

15    Q   Now, as to the amount which was, the pumpage as

16    shown on Exhibit 47 for camp use, those were all metered

17    measurements, are they?  Or do you know?

18    A   I don't really know about the years prior to the

19    time I came to the camp.  When I came to the camp, I have

20    observed meters on the wells.

21    Q   You observed meters on the wells.  But now, do you

22    have a recollection at this time as to the material that you

23    used in the compilation of these charts, these particular

24    charts?

25    A   No.

1    Q   Do you know this of your knowledge as to whether

2  or not, from the time that you were at the camp, whether or

3  not the water used for irrigation purpose was from different

4  wells than that used for the Camp Pendleton?

5    A   I am sure about some of the wells, but I am not

6  sure about all of them.  The distinction between which was

7  used solely for irrigation and which was used solely for

8  camp use.  And I think there may have been a well -- may

9  have been, I am not sure -- that was used for both.  But I

10  don't recall the exact distribution.

11    Q   And you don't recall as to whether or not the

12  material that you used since you started your investigation

13  was all metered material or whether some of that was --

14    A   I think it was all metered since we started.

15    Q   All metered.

16    A   Because I visited each well.

17    Q   And would that apply to both the --  Well, then,

18  if it was all metered, can you tell me during that period of

19  time how you determined the difference between, in arriving

20  at your chart, the difference between that which was used

21  for irrigation and that which was used for camp use?

22    A   The wells in Ysidora subbasin that I have

23  previously testified to as being used for irrigation have

24  meters on them.  I know which wells they are.  And those are

25  considered to be the pumpage for irrigation use.

Watts - Cross

Q   Then, let me ask you this:  Was this chart compiled -- you carry it up to the year of 1957?

A   Yes.

Q   When you prepared this chart, did you prepare it sometime after 1957, or did you make some studies and start a compilation of figures which resulted in this chart prior to 1957?

A   We went to the Public Works Office in 1950, some-time shortly after August, and there obtained all the records on the well logs and the pumpage, as well, every-thing that we could find brought up to that date; and since that time we have gone to the Public Works Office to pick up the pumpage for each subsequent year.

Q   And did you keep those records in some form under your --   You have the records from which this chart was prepared?

A   I imagine that material is still at Long Beach.

Q   The point I am getting at is this:  You did not start preparing the chart until after the 1957 figures were available?

A   The actual drawing of the graph?

Q   Yes.

A   I used everything that was available through 1957.

Q   Did you by any other means or method, either

Worts - Cross

1    graphed or some totalizing method, prepare the results that

2    have gone into this map in some form prior to the time that

3    the map was drawn?

4         A   No.

5         Q   In other words, did you --

6    MR. VEEDER:  The map?

7    THE COURT:  The chart.

8    MR. STAHLMAN:   The chart, 47, yes.  Mr. Veeder, I

9    am sorry.

10        THE WITNESS:  No.

11        Q   BY MR. STAHLMAN:   What I am getting at is this:

12   Now, at the time you drew the map then you took each in-

13   dividual pumping as of each year and at that time used those

14   for the purpose of making the chart, is that correct?

15        A   Yes.

16        Q   And part of that time had you made any compilation

17   of the figures or kept a record of the differences between

18   the waters pumped for irrigation and the waters pumped for

19   camp use?

20        A   Yes, we have a tabulation on that.

21        Q   You had tabulations on it.

22            And the tabulations were the tabulations which

23   you used in preparing this chart?

24        A   Yes.

25        Q   And you don't recall whether those tabulations

1   were pumping figures or estimates?

2       A    For the years that I was on the camp I can state

3   that the, virtually all of the wells, to the best of my

4   recollection, virtually all of the wells had meters on them

5   in 1950 or thereabouts when we started our study.  Now, I

6   can't tell you anything about the records, whether they had

7   meters on them prior to that time.

F

227
Z28

1      Q  Well, let me ask you this:  Did you yourself make any

2  estimate as to any of the matters shown on the chart?

3      A  No.

4      Q  So where you have designated on here "Totals

5  approximate," which would be for a period of three years--

6  1946, '46 and '47-- how was that arrived at?

7      A  I believe there were some estimates in the Camp

8  records that approximated the total pumpage.  There may have

9  been a meter broken.  I don't know the reason.  But the

10  approximation is shown there for those years.

11      Q  Can you tell me this:  Was the approximation that

12  was made, made as to the three years, or was there taken into

13  consideration in arriving at the approximation for the three

14  years the figures of other years?  Do you understand the

15  question?

16      A  Yes.  But to answer your question, we did not con-

17  sider the other years.  If we had, we would possibly have

18  interpolated the year 1947 as being some place between the

19  greater pumpage in 1948 and the lesser pumpage in 1946.

20      Q  Do you have any explanation for the coincidence that

21  occurs that during the period 1945, '44 and '43, the amount of

22  use in each one of those years is exactly the same?

23      A  No, I do not have any explanation for that.

24      Q  Do you have a recollection as to whether your figures

25  that you made your computations in preparing the chart showed

F

Z29

Worts   Cross

4497

1    that that usage was the same for those three years?

2          A   To the best of my recollection, that is the way it

3    was.

4          MR. STAHLMAN:   That is all.

5          MR. VEEDER:   May I proceed with the redirect examina-

6    tion, your Honor?

7          THE COURT:   You may proceed.

8

9                          REDIRECT EXAMINATION

10   MR. VEEDER:

11         I would like to have this marked for identification

12   as Plaintiff's Exhibit 51B.   Would you hand this to the Court?

13         (Document marked Plaintiff's Exhibit No. 51B for

14   Identification.)

15         MR. MOSKOVITZ:   Is this a new exhibit?

16         (Mr. Veeder showing document to counsel.)

17         THE COURT:   What exhibit are you talking about now?

18         MR. VEEDER:   I am speaking of the exhibit "Fluctuations

19   of Water Levels in 10 Wells in Santa Margarita River Basin,"

20   which we have had marked for identification as Exhibit 51B

21   for the United States.   It is the well concerning which your

22   Honor has interrogated in the cross-examination, and we are

23   going to undertake further explanation of the fluctuations

24   in question.

25         THE COURT:   All right.   You are using a new exhibit

F

Z30

now, calling it 51B?

MR. VEEDER:  Yes.  It is the same base, only there have been marked off on it certain data from the standpoint of explaining the relationship between recharge and discharge.

Q  Step to the easel, Mr. Worts, and state into the record the data depicted on Plaintiff's Exhibit 51B.

A  Exhibit 51B is merely the bringing together of data already presented, to-wit, the computed runoff at the top of the graph on Exhibit 51B, as presented in Exhibit 62, the runoff at Ysidora gage in the red figures down in the body of the graph as taken from Exhibit 60, and the dashed red lines in the intergraph area between Wells 2B1 and 35K1 shows the period of flow at Ysidora gage.  It is a duration line. That is also taken from one of the exhibits put in by Mr. Hofmann, which has to do with the daily record of flow at Ysidora gage.

THE COURT:  What are the yellow lines for?

THE WITNESS:  The yellow vertical lines, your Honor, just extend that period of flow vertically throughout the graph, so that you can see how the period of flow relates to the shape of the hydrographs and the underlying--

THE COURT:  Does it have anything to do with the period of the year?  These years that are listed, like 1941, are those calendar years?

THE WITNESS:  Those are calendar years.

F

Z31

1          THE COURT:  So you have made a water year out of it,

2    or part of a water year?

3          THE WITNESS:  That is right.  They just represent that

4    part of the water year in which there was flow at Ysidora

5    Gage.

6    BY MR. VEEDER:

7          Q  Who made these changes on Exhibit 51B?

8          A  I prepared those.

9          Q  Are those accurate to your personal knowledge?

10          A  Yes.

11          MR. VEEDER:  We offer Plaintiff's Exhibit 51B in

12    evidence.

13          THE COURT:  Exhibit 51B received in evidence.

14          (Plaintiff's Exhibit No. 51B for Identification was

15    received in evidence as Plaintiff's Exhibit No. 51B.)

16          THE COURT:  Are you going to tell us more about what

17    it means?

18          THE WITNESS:  Yes, sir.

X51B

19          MR. VEEDER:  I am looking for Exhibit 49.

20          Q  Mr. Worts, would you proceed, then, and state the

21    meaning of, first, the yellow lines that you have depicted

22    on Plaintiff's Exhibit 51B?

23          A  The vertical yellow lines drawn at each end of the

24    period of flow merely delimits the period of flow at Ysidora

25    gage in the water year shown.  Although the water years

1    aren't directly shown, they are calendar years above.  But

2    the first span in 1941-42 is for the 1941-42 water year

3    ending September 30, 1942.  It is merely a plot--

4         THE COURT:  You didn't draw it to scale, then.  In

5    other words, this is the entire water year from September

6    30th of October 1st of the following year?

7         THE WITNESS:  It contains all of the water in each one

8    of those places where there is a red line extending there.

9    It is all within the water year.  For example, 1941-42 flow

10   is after October 1st and is contained entirely in the 1941-42

11   water year.

12        THE COURT:  You put that yellow line in the middle of

13   1942 instead of running the side of it over to the next

14   water year.

15        THE WITNESS:  No, your Honor.  This is the period in

16   which there is flow at Ysidora; not the span of the water

17   year.

18        THE COURT:  That is what I am asking you.  In other

19   words, in 1941 you start on October 1?  Or do you start

20   when there is first flow?

21        THE WITNESS:  I start when there is first flow, and

22   the red line extends until there is zero flow.  The only

23   exception to that is this little dot in 1946, in which there

24   was apparently a summer flash flow down the stream.

25        THE COURT:  That is the red figures between the yellow

     lines?

1        THE WITNESS:  That is the--

2        THE COURT:  What about the blue figures at the top?

3   That is the entire water year?

4        THE WITNESS: No, that is the computed runoff at De Luz

5   Dam Site at the upstream--

6        THE COURT:  For what period of time?  For the entire

7   water year, or for the same period that your red figures down

8   below show?

9        THE WITNESS:  They are for the entire water year, your

10  Honor.  I do not have the flow duration data before me at De

11  Luz Dam Site.  They are computed runoff at that point, your

12  Honor.

13       THE COURT:  For the entire water year?

14       THE WITNESS:  For the entire water year.

15       THE COURT:  And the red figures at Ysidora are for

16  that part of the water year in which water ran?

17       THE WITNESS:  That is right.

18  BY MR. VEEDER:

19       Q  From the standpoint of the graph, would you explain

20  the characteristics of the line in the upper right-hand corner

21  as it relates to the period of runoff and the period of

22  discharge inthose years, comparing those as you proceed?

23       A The principal purpose of this diagram is to relate

24  the periods of flow at Ysidora Gage to the position of the

25  water levels in the basin during that time.

Worts  Redirect.

4502

F

Z34

1       A very good year to observe is 1954, in which there

2  was flow at Ysidora Gage from sometime early in the year, say,

3  approximately the end of January or thereabouts, on toward

4  May.  The question arose several times as to the significance

5  of flow at Ysidora Gage with respect to how full the basin

6  was.  It is obvious that when the flow first reaches Ysidora

7  in this 1954 year that the water levels were still rising,

8  rose after that for a period of several months before they

9  reached a peak, at which time the decline shown, even though

10  there was flow at Ysidora, was due to pumping starting.

11       Q  Explain the years 1955, '56 and '57 from the stand-

12  point of fluctuations in the basin.

13       A  The years 1955, '56 and '57, there was zero flow

14  at Ysidora.  The figures directly above for the entire water

15  year show 3610, 3181, 1960 as being the computed runoff at

16  De Luz Dam Site coming into the system.  The levels for the

17  years in Well 11-5-2B2 shows the summer drawdown, starting

18  in 1955 in about May, drawing on down to the autumn and then

19  recovering partly in response to a shutdown of the pumping

20  and partly in response to whatever amount of this recharge

21  reached as far-- the stream flow that became recharge in

22  response to the basin to that, and each of those years the

23  peaks are recovered to about 10 feet above sea level.

24       But as I have explained on Exhibit 47 there has been

25  a continuing shift in the relation between the magnitude of

1   the pumpage from Ysidora Subbasin and that in Chappo Subbasin,

2   Chappo Subbasin increasing and Ysidora Subbasin decreasing.

3   The result was that in those years 1955, '56 and '57 there is

4   a steady down trend indicated.  Probably what appears to be

5   in the fall of 1957 about the lowest level of record at Well

6   24N1.

7          But let us look at 1952, which was the first wet year

8   following a series of dry years preceding it, about four good

9   dry years.

10         MR. VEEDER:  Real dry years.

11         MR. STAHLMAN:  Bad dry years.

12         THE WITNESS:  The first flow came through in January at

13  Ysidora and the levels climbed, the water level in the well

14  climbed to about 10 feet above sea level, and in my opinion

15  would have continued to rise--

16         THE COURT:  Which well are you looking at?

17         THE WITNESS:  Well 2B2, your Honor, the topmost graph.

18  The point there is that although there was flow at Ysidora

19  Gage for a period of a month or more, the levels did not reach

20  their highest point until a short time later, a month or so

21  later, and in my opinion the levels would have continued to

22  rise but I suspect that Camp pumpage knocked the peak off of

23  that rise.  And I think if you will look through all of these

24  you will find a substantial delay between the time the flow

25  first started at Ysidora and the time that the storage or the

1    amount of water inthe basin as is reflected by the water

2    level reaches the peak, and it is usually--

3    BY MR. VEEDER:

4        Q   When you use the word "Peak," what do you mean by

5    that?

6        A   The highest level for the year.

7        Q   The highest level of what-- recharge?

8        A   Water level, storage recovery in the basin.

9        Q   From the standpoint of Exhibit 49, what would have

10   been the effect if the United States had not returned to the

11   basin the sewage, particularly as shown on Plaintiff's Exhibit

12   49, in the years from 1953, '54, '55, '56 and '57?

13       A   In the first two mentioned years, 1953 and '54, the

14   same problem exists with relation to the sewage that I have

15   mentioned before in my previous testimony, that it would be

16   mixed up with the surface flow moving through the basin.  But

17   in the years 1955, '56 and '57, in which there was a zero

18   flow at Ysidora Gage, it would mean just this-- on Exhibit 49

19   I am referring to the left-hand graph-- you subtract off this

20   2,000 or thereabouts acre feet of sewage return in those

21   three years and your deficit in the basin would be knocked

22   down by that amount.

23       Q   Now, referring to Plaintiff's Exhibit 44, I ask you

24   to step to that exhibit and to show by figures the effect

25   of impounding 74,270 acre feet of water or having storage

1    for that capacity immediately above Camp Pendleton for the

2    decade starting in the year 1947 and proceeding on the basis

3    that the water use in Camp Pendleton and the Naval enclave

4    would be 12,500 acre feet of water a year?

5        MR. DENNIS:  I object to that question as being

6    totally irrelevant and immaterial inthis case.  There has

7    been no showing that the United States of America has ever

8    used 12,000 acre feet in Pendleton Basin or diverted that

9    quantity from the Santa Margarita River.

10        MR. SACHSE:  I further object that that is directed at

11    my cross-examination, your Honor.  My question was the effect

12    of 74,000 acre feet of storage for the year 1943, which is

13    the year it ran into the ocean; not for the year 1947, when

14    nothing of that kind did run into the ocean.  This is reopen-

15    ing something that was not touched on in direct examination.

16    It is completely theoretical.

17        THE COURT:  Are you directing this to Mr. Sachse's

18    question?

19        MR. VEEDER:  I am directing it to the whole series of

20    cross-examination, which turns upon--

21        THE COURT:  Just a moment.  Flag the question, Mr.

22    Reporter, because we will have to have it read again.

23        Now, what is the significance of taking the figure

24    74,270?  What is the significance of that figure?

25        MR. VEEDER:  That was the size of the impounding

F

Z38

1   reservoir that has been used to test the witness in connec-

2   tion with United States Exhibit 49 and also No. 50.   The

3   questions that were formulated, not only by Mr. Sachse but

4   by Mr. Moskovitz and later by Mr. Stahlman, all point to the

5   effect of impounding water upon the recharge of the basin,

6   and they all proceeded through the entire period to which

7   Plaintiff's Exhibit 49 pertains.  Now the reason why it is

8   so important to the United States, and indeed to the Court, is

9   that when questions are promulgated and tendered as they have

10  been here they create a completely false impression, because

11  the exhibit was compared for one purpose and the cross-

12  examination, and indeed your Honor's questions, touched on

13  another phase of this matter.  But there was opened entirely

14  the question of the effect of prohibiting water to reach the

15  basin and thus to recharge it, with, in summation--

16          THE COURT:  I have your position.

17          MR. VEEDER:  All right.

18          THE COURT:  What is your answer to Mr. Sachse's state-

19  ment that his questions related to 1943 on, and you are

20  starting in 1946-47?

21          MR. VEEDER:  We are perfectly willing to admit that he

22  used the year 1943.  We objected to the hypothesis upon which

23  he proceeded because we were not quite sure of the full

24  storage capacity of the structure to which he made reference.

25  But in any event, we know that the ten years immediately

1   preceding now have been the critical years for us, and if

2   water had been impounded during that period, as it must neces-

3   sarily have been if you are going to build the kind and type

4   of structure that is made reference to here, that structure

5   would continue in operation.  Frankly, we don't know what the

6   effect would have been in 1943 through 1946, but we do know,

7   and we will show graphically if your Honor will permit us to

8   show, what would have transpired had we been forced to live

9   upon De Luz Creek.  And that is the whole theory of the ques-

10  tion.

11          THE COURT:  I have your theory.

12          MR. SACHSE:  Your Honor, I don't think your Honor

13  correctly understood my objection.  My question was expressly

14  directed-- and the transcript will bear me out, and I can get

15  it in a moment-- I took Mr. Worts through each year and said,

16  what would have been the effect if a structure upstream from

17  the reservoir in 1943 had stocked 74,000?  No effect on the

18  chart.  If in 1944 it had stocked 27,800 acre feet, being the

19  runoff at Ysidora?  If in 1945 it had stocked 20,270 acre

20  feet?  Et cetera.  I discussed no shortage project.  The sole

21  purpose was to hypothecate that the entire discharge at Ysidora

22  had been trapped at a point above.  To take that question and

23  say that question and say that I propounded 74,000 acre feet

24  of storage in 1947 is not true.  For the year 1947 I gave Mr.

25  Worts the figure 6,930 acre feet, not 74,000.  In each year

F

Z40

1    I gave Mr. Worts as a hypothetical figure the amount of runoff

2    at Ysidora. I didn't carry 74,000 straight through. It

3    obviously wouldn't follow.

4           THE COURT: I understand.

5           MR. VEEDER: May I allude to the record on that. Here

6    is the question on page 4308-- and I daresay that we all

7    proceeded along with Mr. Sachse:

8                "Q Now, Mr. Worts, I want you to

9                assume that in the year 1943 there had

10               been a structure on the Santa Margarita

11               River immediately upstream from the

12               military reservation boundary which

13               impounded 74,270 acre feet of water. . "

14          THE COURT: That is the runoff at Ysidora.

15          MR. VEEDER: Yes.

16               "Q . . If you reduce the flow at

17               De Luz by 74,000 and reduce the flow

18               at Ysidora by 74,000, your result would

19               remain exactly the same, would it not?"

20   He went on further then, and on page 4309:

21               "MR. SACHSE: I am referring to

22               Exhibit 49, yes, your Honor. In other

23               words, to the differential between

24               river inflow-- I am confining myself

25               only to river-- and river outflow. Had

F

Z41

1        there been 70,000 acre feet in round

2        figures impounded above De Luz, the chart

3        for 1953 would look lexactly the same,

4        would it not?"

5        MR. SACHSE:  That is a typographical error that I didn't

6    catch.  The chart for 1943.

7        MR. VEEDER:  May I proceed a little further over here

8    on page 4311; after following through on the series of ques-

9    tions he says:

10        "Q  In other words, Exhibit 49

11        would not be changed as regards river

12        recharge in any of the years in which

13        water spilled at Ysidora if all of that

14        spill had been impounded upstream from

15        the reservation boundary; is that not

16        correct?"

17        THE COURT:  If you are trying to meet Mr. Sachse's

18    cross-examination, then your question that you have asked the

19    witness doesn't meet it, because he took each year the runoff

20    figured at Ysidora.

21        MR. VEEDER:  Your Honor, may I proceed?

22        THE COURT:  Yes.

23        MR. VEEDER:  Then on page 4312:

24        "Q  Is it not a fact that the same

25        mathematical process applied to each

F

Z42

1    year in which there was spill at Ysidora

2    would leave you with exactly the same

3    chart?"

4    THE COURT:  He is talking about the spill at Ysidora.

5    MR. VEEDER:  But, your Honor, the spill at Ysidora is

6    nothing more nor less than the combined flow of the Santa

7    Margarita River and De Luz Creek.  That is what it amounted to

8    in his calculations.  The result of it was and the result of

9    the entire interrogation was this, and I daresay that if we

10   followed through the record it will be borne out by the kind

11   and type of response that was made and by the kind and type

12   of inquiry that was made.  In other words, we were confronted,

13   and are confronted, with a record to date which is entirely

14   false from the standpoint of the actual operation of the basin

15   as a function in the last ten years.  There has been this

16   situation.  Mr. Sachse asked these questions, and Mr.

17   Moskovitz followed through, and Mr. Stahlman even today, were

18   all talking about the recharge into the basin, the effect on

19   the basin, what it would look like under a hypothesis that Mr.

20   Sachse dreamed up.  I objected, and strenuously, because I

21   said there is no basis for that hypothesis.  Nevertheless--

22   THE COURT:  Well, now, wait.  Mr. Sachse's hypothesis

23   was directed, unless I was asleep up here, to the problem of

24   what would happen if the runoff that had wasted into the ocean

25   had been caught in the dam above.  That was what his question

1    was directed at.  That is why he took those figures.  Let's

2    not spend a lot of time arguing.  Your question is not meeting

3    his cross-examination.  But if you want to ask a question with

4    a hypothetical figure of 74,000 acre feet each year, I will

5    let you do it.  But you are not meeting his cross-examination.

6         MR. VEEDER:  Your Honor, I will be very pleased to

7    proceed on this basis.  I have no feeling one way or the other

8    on it.  But I do think it is highly important that the situa-

9    tion be clarified in regard to the kind of questions that have

10   been asked and the present state of the record.

11        THE COURT:  Let us have the question read.

12        (The Reporter read the pending question as follows:

13   "Q  Now, referring to Plaintiff's Exhibit 44, I ask you to step

14   to that exhibit and to show by figures the effect of impounding

15   74,270 acre feet of water or having storage for that capacity

16   immediately above Camp Pendleton for the decade starting in

17   the year 1947 and proceeding on the basis that the water use

18   in Camp Pendleton and the Naval enclave would be 12,500 acre

19   feet of water a year?")

20        THE COURT:  Does this figure 74,000 bear any relation-

21   ship to this proposed dam that has been talked about?

22        MR. SACHSE:  None.

23        MR. VEEDER:  The dam that Mr. Sachse propounded in the

24   original question was for 74,270 acre feet.

25        THE COURT:  For one year; for 1943, Mr. Veeder.  If

Worts  Redirect

4512

1   you are trying this for the record, as I told you before, you

2   may go ahead and ask the question.  If you are trying it for

3   my benefit, skip it, because the questions were directed as

4   to what effect on the chart the impounding of the runoff at

5   Ysidora would have.  It happened that in 1943 there was

6   74,000 acre feet.

G-1 ML j

1   You take a figure and say, a figure of 74,000 feet, for a

2   decade to remove from the year in which this ran off.  I

3   don't know if that helps me any.  I assume that --

4        MR. VEEDER:  I think it will, your Honor, and I am

5   trying it for the record.

6        THE COURT:  It will be on the record.

7        MR. SACHSE:  If we are trying it for the record, I

8   would like to object, then, on the ground of materiality

9   that there is absolutely nothing in this file, of anybody's

10  exhibit, that shows any dam of 74,000.  It shows Fallbrook's

11  project at 35,000.

12       MR. MOSKOVITZ:  Well, your Honor, --

13       THE COURT:  Mr. Moskovitz, what were you going to say?

14       MR. MOSKOVITZ:  Your Honor, I have a further objection

15  that the assumption is not relevant, because starting in

16  1947, you don't even have that much in-flow at De Luz damsite,

17  74,000.  How can you even assume that much was stored?

18       THE COURT:  I will sustain the objection.  If you want

19  to reframe your question, why, all right.

20            Why take an assumption that has no relation to

21  reality?  You start in the year 1947, where the figures show

22  there were 12,000 feet in-flow at De Luz damsite.  It

23  couldn't have been 74,000 feet.

24       MR. VEEDER:  Your Honor, I would just as soon take

25  35,000.  I would just as soon go ahead on 35,000 and show the

Worte - Redirect                                                           4543

1    destruction that would ensue.

2        THE COURT:  I have no objection to you showing what

3    you think would ensue if water was impounded upstream; but

4    if you are going to do it, do it upon some basis that bears

5    some relation to reality.

6        MR. VEEDER:  All right.

7        THE COURT:  Either take all or part of the figures

8    up at De Luz where the water is coming in or take the

9    figures that run off Ysidora, or take something that will

10   make sense to me.  And it doesn't make sense to me.  You

11   talk about impounding 74,000 feet from the year 1947 on when

12   there wasn't, except for -- well, no year -- even in 1952,

13   there was only 60,000.

14       MR. VEEDER:  Your Honor, I think that this will make

15   sense to your Honor.  We have the situation where the State

16   has planned one dam for 65,000 acre-feet and has said that

17   would be more efficient than the 35,000.

18       THE COURT:  Are you going to offer proof on that part

19   of your Bulletin 57?

20       MR. MOSKOVITZ:  No.

21       MR. VEEDER:  I didn't hear.

22       THE COURT:  He says, "No, there will be no proof

23   offered on it."

24       MR. VEEDER:  I don't blame him.  But we don't think

25   it is relevant here, your Honor, and that is the reason.

Worts - Redirect

1  We will stand behind all the things there, but in the proper

2  place.

3          They will go into the bed when the moment --

4  they will be out a little later with the 65.  You hang onto

5  your hat, your Honor.

6          Q   The point I want to make, though, is that --

7  would you take your red pencil and start on this 35,000

8  acre-foot structure?

9          THE COURT:  Well, now, what is your question?  Let's

10  get a question in the record.

11          Q  BY MR. VEEDER:  Mr. Worts, would you calculate

12  the  affect on the recharge in the basin within Camp

13  Pendleton, if there had been constructed above the enclave

14  on the Santa Margarita River a structure which would

15  impound --

16          THE COURT:  Where?

17          MR. VEEDER:  At the Fallbrook-Lippincott site.

18          THE COURT:  Not the De Luz site?

19          MR. VEEDER:  Oh, no.  35,000 acre-foot structure

20  there would just be a hump.

21          I was interrupted.  Would you read me how far I

22  had gotten.

23          THE COURT:  I am sorry.

24          (The reporter read back that portion of the record.)

25          Q  BY MR. VEEDER:  35,000 acre-feet of water annually

1    and proceeding upon the basis of the utilization within

2    Camp Pendleton and the Naval Ammunition Depot, 12,500 acre-

3    feet of water annually --

4         MR. DENNIS:  I wish to object to that question.

5         Q  BY MR. VEEDER:  Based upon the runoff as disclosed

6    in Plaintiff's Exhibit No. 60 and 62, for the period to

7    which I have made reference?

8         MR. DENNIS:  I wish to object to that question on

9    the grounds it is incompetent, irrelevant, and immaterial,

10   and does not tend to prove or disprove any of the issues in

11   this case.  The question involves the supposition that the

12   plaintiff, during the historical period, utilized 12,500

13   acre-feet from the Camp Pendleton basin.  There is no

14   evidence that they have used that.  It combines a purely

15   theoretical figure with historical figures taken from the

16   gaging stations.

17        THE COURT:  That objection is overruled.

18        On what map can I see the location of this

19   Lippincott damsite?

20        MR. SACHSE:  I think I can stipulate on that map,

21   your Honor, with Mr. Veeder, and make this speedier, if

22   that is the one you are going to work on.

23        MR. VEEDER:  Don't be in such a rush, young man.  We

24   are going to do this thoroughly.

25        MR. SACHSE:  I say, if you want, we can stipulate it

G-2

1   is immediately below Sandia Creek, if it will help you, Mr.

2   Veeder.

3   THE COURT:   Immediately below Sandia?

4   MR. SACHSE:   Immediately below the junction of Sandia

5   Creek and the Santa Margarita River.   And that would be

6   close enough for these purposes.

7   MR. VEEDER:   You just draw it on with a mark there.

8   MR. SACHSE:   That would be close enough for these

9   purposes.

10   THE COURT:   Write "To Lippincott" on that.

11   THE WITNESS:   Yes, sir.   I am writing "Lippincott

12   Damsite," the actual position of which has been designated

13   by Mr. Sachse, not by myself.

14   MR. SACHSE:   I hope I am right.

15   THE WITNESS:   I am not sure exactly where it is.

16   MR. DENNIS:   Mr. Worts, is that approximately the

17   location of the Fallbrook gaging station?

18   MR. VEEDER:   The gaging station is more inside the

19   enclave.

20   THE WITNESS:   I would have to refer to another

21   exhibit that shows the location of the --

22   MR. DENNIS:   I said, "Fallbrook."

23   THE WITNESS:   I think it is close to the Fallbrook

24   gaging station.

25   MR. MOSKOVITZ:   Your Honor, I want to object to that

1    question on the ground that the hypothesis of the 35,000

2    acre-feet being stored annually is completely irrelevant and

3    is based upon nothing in the record.

4            THE COURT:  Of course, again, Mr. Veeder, your

5    proposal for a dam up there was not to take 35,000 acre-feet

6    each year.  That is the maximum the structure could hold,

7    which would mean that sometime or other you would fill it

8    up and then thereafter you would replenish it to the extent

9    that you have depleted.  Your supposition, of course, goes

10   upon the basis that the dam will be drained of its last

11   drop of water each year and have to be refilled each year.

12   There, again, if you want to ask the question, I will follow

13   along with you and see where you get.

14           MR. SACHSE:  I have one, perhaps not an objection,

15   but I think Mr. Veeder did not specify in his question,

16   unless I didn't hear it, the dates.  I would like to be

17   sure --

18           MR. VEEDER:  During the decade from 1947 to date.

19           MR. SACHSE:  From 1947 is when you are going to

20   start his calculations?

21           THE COURT:  Including the water year of 1947, you are

22   talking about?

23           MR. VEEDER:  That is correct.

24           MR. SACHSE:  Then, your Honor, I have an objection.

25           THE COURT:  First, Mr. Moskovitz is overruled.

1    MR. SACHSE:  Mr. Veeder wants a calculation as to

2    what the effect would be on Camp Pendleton from 1947 to date.

3    And he has asked the witness to base it on the data included

4    in Exhibits 60 and 62.  And he has no data in 62 for the

5    runoff from De Luz Creek for the period 1947 up to 1951.  So,

6    obviously, the witness has no possible means from Exhibit 60

7    to know how much water was running down De Luz Creek in

8    1947, 1948, 1949, 1950 --

9        MR. VEEDER:  Observe that 62 is simply reflective,

10   if you considered it.  I said 60 and 62, Mr. Sachse.  There

11   is no problem there.

12       THE COURT:  Now, on 62 it shows the inflow of De Luz

13   Creek.

14       MR. VEEDER:  That is right.

15       MR. SACHSE:  62 shows an inflow at the De Luz,

16   estimated, a calculated inflow at the De Luz damsite.  60

17   is the gaged runoff on all the gaging stations.  There is

18   a De Luz gaging station in operation from 1950 to the present

19   time.  Now, the witness can't give me any gage figures prior

20   to 1951, certainly, from De Luz Creek.

21       MR. VEEDER:  But in view of the fact that the entire

22   interrogation is predicated upon Exhibit 60 --

23       THE COURT:  This is a matter of cross examination.

24   The objection is overruled.

25       Q  BY MR. VEEDER:  Will you proceed.

4521

G-3

A    I have listed on Exhibit 44 in the left-hand side the water years in question.  First, the pumpage item of 12,500.  That will be the same all the way through here.  For the purposes of this exhibit or this example, on the negative side, in addition to the pumpage, you would have to add on the evapotransporation which would increase this figure; but for the purposes of this illustration, let's assume that the 12,500 is the minimum extraction for the basin for the period.  On the positive side, with the Lippincott damsite at the position shown by Mr. Sachse, it's approximate catch would be the quantities shown each year on Exhibit 62 starting in 1947.  That would mean that the burden --

MR. SACHSE:  In which column?

THE WITNESS:  In the first column.  In the second column, "Annual flow of De Luz Creek," that would be all the flow and the Footnote B says, "Estimated inflow from tributary area between Fallbrook gaging station and De Luz damsite." Now, that includes the flow from De Luz Creek coming down here where I will show a red arrow.  It includes whatever flow is picked up below the Fallbrook gage up near the approximate position of the Lippincott damsite.  You will observe the low flows in 1947 of the Santa Margarita at Fallbrook of 8700, 6640, and so on.

THE COURT:  Tell me again what you are going to do.

THE WITNESS:  I am going to --

THE COURT:  Take the --

THE WITNESS:  I am going to just assume with this dam that was just constructed in 1947, to catch the 1947 flow, that 35,000 acre-foot reservoir would easily capture all those waters in those in the dry years 1947 through 1951; that the sole source of surface supply to this lower basin, then, will be Column B on Exhibit 62; the annual inflow from De Luz Creek and the tributary area between Fallbrook Gaging Station and De Luz damsite; that --

THE COURT:  So you are going to take the figures of De Luz Creek; is that what you are going to do?

THE WITNESS:  That is right, your Honor.  I will write in here:  "De Luz Creek runoff."  And in 1947, 3300, 648, 949, 650, 200 in 1951.  This is a positive increment. It is an increment of recharge.  This pumpage of 12,500 which continues throughout the period is a negative with respect to its effect on ground water.  It is a minus quantity.  On Exhibit 49 I have shown on the left-hand graph a constant ground water inflow at De Luz damsite of 700 acre-feet, which, I think, should be added as a positive increment in this system.  I will use the initials "G.W." for ground water inflow, "De Luz damsite."  And that I am going to give the benefit of the doubt and assume that it continues to be the same.  There is a good chance that it

1    might be depleted in the future by upstream developments.

2    That is also a plus figure.

3              THE COURT:  I don't understand why the pumpage is

4    a "minus past."  On, "minus pumping."  Pardon me.

5              THE WITNESS:  Coming out of the system.

6              THE COURT:  Oh, all right.

7              THE WITNESS:  We are now ready to strike a balance,

8    except for the question of where to start our computation

9    from for the first year.  So I would like to refer to Exhibit

10   50 and to the status of ground water in storage represented

11   by Curve B at the end of the 1946 water year.  The water

12   level data show that there was a deficit of some 1500 acre-

13   feet in the start of that, or at the end of the 1946 water

14   year, or at the start of the period that we are about to

15   consider.  That is starting in with a slight deficit.  I

16   will put down here "deficit from ground water," using the

17   initials "G.W." for ground water, to start out at the top

18   of this minus 1500, which is where our basin stood at the

19   end of the 1946 water year.

20             Now, we will have to make this mathematical

21   subtraction here.  Starting with 1957, we have 4,000 on the

22   plus and 12,500 minus, which gives us a minus 8,500.  We have

23   1,300 from 12,500, that is minus 11,200.  We have 1,600 from

24   12,500; that will give us a minus 11,900.  I am doing this

25   rapidly.  1,300 plus from 12,500 minus gives minus 11,200.  And

     700 and 200; roughly plus 900 from minus 12,500 gives minus 11,600.

1    Now, for the first five years of that period this

2 type of recharge-discharge situation -- this, mind you, now,

3 exclusive of evapotranspiration in the system.  But it is

4 bad enough without even adding that on.  If we add these

5 up, we have a deficit of 54,900 acre-feet, if my addition

6 is correct.  I did that hastily.  That is where we are as

7 of --

8    MR. SACHSE:  As of the wet year, is that it?

9    THE WITNESS:  As of the end of 1951,--

10    MR. VEEDER:  1952.

11    THE WITNESS:  -- the end of the dry period.

12    I would like now to refer to Exhibit 42 and

13 relate this, -- this, of course, is directly relatable to

14 the storage that is in the basin.  Minus 54,900.  If you

15 will observe on Exhibit 42, that the sum of all the storage

16 between 5 and 100 feet totals approximately 48,000.  In

17 other words, we are down to a depth in our basin of more

18 than 100 feet throughout the whole basin.  If we had with-

19 drawn it from the whole basis.  If we throw this entire

20 burden on Chappo and Upper Subbasins -- because, as of now,

21 Ysidora Subbasin has suffered salt water intrusion -- it

22 means that the fifty-four thousand nine/hundred has to be compared

23 with the sum of the storage in these two -- I won't say

24 these two; in Upper Subbasin and Chappo Subbasin --

25    MR. VEEDER:  At this point I would like to have

1  marked for identification Plaintiff's Exhibit 38-B.

2      THE WITNESS:  -- of 39,500 acre-feet.

3      MR. MOSKOVITZ:  Your Honor, I assume on this exhibit,

4  as well as on the previous one introduced on redirect, we

5  are being asked to waive the 10-day rule?

6      MR. VEEDER:  No.

7      THE COURT:  Well, the previous one was a matter of

8  calculation, and I don't -- rules are made to be used as you

9  see fit.  I don't see any problem there.  Now, I haven't

10 seen 38-B offered.  Is there another --

11     MR. MOSKOVITZ:  We didn't object.  We waived, but I --

12     MR. VEEDER:  38-B is exactly the same as 38, your

13 Honor, with the exception that --

14     THE COURT:  It is a blank, presently a blank.

15     You mean it is the same as 38 except no drawings

16 on it, except it is a base chart.

17     Q  BY MR. VEEDER:  Would you proceed and show, Mr.

18 Worts, the effects at that juncture in regard -- at the

19 juncture where you are at the present time in connection with

20 the depletion in the basin by upstream diversions -- as it

21 would affect, in your opinion, the salt water intrusion into

22 the basin which underlies Camp Pendleton, using your -- well,

23 use another color on that.

24     A  Well, --

25     MR. MOSKOVITZ:  Your Honor -- just a moment.  I am not

1  going to object to Mr. Worts' doing this but I think a

2  precedent is being established.  I think it is probably

3  necessary from time to time to do this.  But certainly new

4  material is being put on old exhibits, and the effect is a

5  new exhibit.  Now, I think it has to be done, but I don't

6  want us to be foreclosed from doing so when our turn comes.

7  And I am not going to object at this point.

8       THE COURT:  Mr. Moskovitz, I think I can take care

9  of that when it comes along.  In other words, this is an

10  exhibit that you have seen and studied, 38.  And I take it

11  that the witness is going to take a pencil and illustrate

12  his testimony, is all he is going to do, show where, in his

13  opinion, the water level would be, based upon the calculations

14  he has made.  And you will have the same privilege.

15       MR. DENNIS:  I wish to renew my objection, your Honor,

16  to this line of questioning on the same grounds I stated

17  before, and on the grounds there is no showing that the

18  plaintiff has used 12,500 acre-feet or that he has the legal

19  right to use that amount of water within the watershed.

20       THE COURT:  Well, obviously, unless the plaintiff

21  can show that this doesn't mean anything.  (Inaudible.)

22       MR. DENNIS:  Subject to motion to strike, then.

23       MR. VEEDER:  If we don't support our exhibits --

24       THE COURT:  Reserve your motion to strike.  I will

25  overrule your objection.

G-5

1       MR. SACHSE: I have no objection, your Honor, but

2  before he goes to the next one, I have been having trouble

3  reading these. And I can't quite follow. May I ask a

4  question for just a minute?

5       THE COURT: Yes.

6       MR. SACHSE: I know what these figures are. Is this

7  7500, Mr. Worts, or 1500?

8       THE WITNESS: That is 1500; and that figure comes

   off the Exhibit 50.

9       THE COURT: That is the starting depth.

10      THE WITNESS: That is the starting --

11      MR. SACHSE: Status.

12      THE WITNESS: Yes, starting status, as of beginning

13  of this period.

14      MR. SACHSE: There was a deficit there existing when

15  it started. Then, your next one represents a total of --

16      THE COURT: No.

17      MR. SACHSE: -- Twelve five less 1300, or how did you

18  get the next one?

19      THE WITNESS: That is right, twelve --

20      THE COURT: It is out of line. Actually, 8,500 is

21  the computation on the first one.

22      MR. SACHSE: It follows below the first.

23      THE WITNESS: I will put an arrow from this top line

24  down to where that 8500 should be.

25      MR. SACHSE: I understand now. Thank you.

1    THE WITNESS:  This deficit of minus 54,900, as shown

2    in the upper left-hand side of 44, Exhibit 44, is a deeper

3    zone than I have computed.  It will be some place below

4    100 feet.  So I would just as soon, to be able to show this

5    intelligently, to back off one year to show where we would

6    have been at the end of four years, which would put it

7    43,300.  That would be the accumulated deficit through

8    1943.  Now, -- pardon me; correction; 1950.  Now, where is

9    this water going to come from that is needed to meet this

10   pumpage?  It is going to have to come out of the storage that

11   in the past has not been affected to any great degree.  And

12   I will take a blue pencil and show where I think this line

13   will, how this line, how the water level average drawdown

14   in the basin might look with a deficit of 43,300.  And I

15   will explain why it is as it is when I get completed.  The

16   drawdown naturally at the upstream end of the basin is

17   limited to the upstream pumping well, which is 10-4-5D1.  So

18   that our drawdown would be something like that at this end.

19   It will follow some place close to this dotted line shown on

20   Exhibit 38-B as "Base of estimated storage."  The downstream

21   end of the drawdown, curve will be in the vicinity of the

22   downstream pump well which in Chappo -- I am assuming no

23   pumping for the benefit of the situation from Ysidora Sub-

24   basin.  The part of this downstream pumping would be at

25   well K-1, Section 23, 10 South, 5 West, in Chappo Subbasin,

G-6

1   which is right near Well 23-L-1 shown on Exhibit 38-B. So
2   at that point on 38-B I will show the lower part of the
3   storage. Now, up to this point the average drawdown is
4   roughly parallel to the land surface and approximately 100
5   feet below. By an orange pencil -- we will have to have an
6   inland hydrolic gradient coming in all the way through
7   Ysidora to that point, meaning that we did obtain some supply
8   from storage out of Ysidora as this was drawdown; because
9   the waters naturally had to move inland in response to this
10  period of depletion.

11          Now, on Exhibit 38-A I had shown the approximate
12  position of the sea water or salt water front in Ysidora
13  Subbasin as being between Wells 2-E-1 and 2-D-1 on that
14  exhibit, and I will draw in, in general, the same front to
15  indicate the position as of the present with a dashed upper
16  limit questioned on this exhibit. And this is salt water.
17  We have now pumped water levels in Chappo Subbasin down at
18  least 50 feet below sea level at this point to arrive at this
19  much storage. We have taken essentially the full 38 or 39
20  thousand down to 100 feet out of Chappo and Upper Subbasins
21  by drawing the water level down, reversing the gradient and
22  destroying the natural fresh water barrier that now exists
23  between Chappo and Ysidora Subbasins. We have created a
24  reverse or inland hydrolic gradient. We have utilized some
25  of this upper storage which, if we want to assume that it is

about half of the total for that storage unit in Ysidora

Subbasin, would be roughly half of this 8600 acre-feet shown

here; call it 4,000.  So that the thirty-eight or thirty-nine

to these two, plus 4,000 equals this figure, 43,000, approx-

imately.  What is the result now that we have pulled these

levels down?  This is all salt water in here.

Q  BY MR. VEEDER:  When you say "in here," you are

indicating to what?

A  I am referring to Exhibit 38-B and to approximately

the present position of the salt water in Ysidora Subbasin

between Wells 2-E-1 and 2-D-1.

THE COURT:  As shown by 38-A?

THE WITNESS:  As shown by 38-A.

Q  BY MR. VEEDER:  And what is the effect of the

reverse gradient which you have shown with the orange chalk?

A  The effect of the reverse gradient very obviously

is that this water is going to race on in.  And I am show-

ing by arrows to this point that is more than 50 feet below

sea level.  There is no other way that it can happen under

those conditions.  On Exhibit 44 I am pointing to Well

23-L-1, 10 South, 5 West, as the lowest point of drawdown,

which is on the order of minus 50 feet.  You will observe

that if we, say, took a 40-foot contour -- just to show

something that compares with this closed type of contour

down here; that is closed against the hard rock walls --

1    it would be on the order of between, oh, about a mile on

2    either total distance.  So, here we have minus 40-foot

3    contours.  I will put the minus in parens so you can see it.

4    Something like this, extending like this.  This is the point

5    into which all water now is moving.  Similarly, this arrow

6    would come on in --

7        Q    What subbasin is that?

8        A    We are now in Chappo Subbasin, with the minus

9    40-foot contour.  I indicated that approximate front of the

10   salt water on Exhibit 38-A and also showed on another map,

11   another exhibit, the approximate position of it, of the

12   salt water front -- I will show it roughly on Exhibit 44

13   again -- as being across in the lower part of Ysidora Sub-

14   basin on Exhibit 44.  This front then would race on in to

15   the lowest point as indicated by that arrow, and that I will

16   just label "Salt water intrusion."  When this water reaches

17   this well --

18       Q    Which well are you referring to now?

19       A    I am alluding to Exhibit 38-B, Well 10-5-23L1 in

20   Chappo Subbasin, as being closest to the most downstream

21   camp supply well in that subbasin.  So that when the salt

22   water reaches that well, it will put that one out of

23   commission.  Then, the next upstream pumping well in Chappo

24   Subbasin is 23-J-1, and so on, result being that the cone

25   just moves on up and this sea water or salt water intrusion

1    just continues to move on up the basin.

2          Q    What would be the effects of the runoff in 1952,

3    upon the basin from the standpoint of possible recharge?

4          A    In 1952 -- I am alluding now to Exhibit 62 --

5    the runoff at Fallbrook was 47,000 acre-feet, which would

6    more than have filled the 35,000 acre-foot structure.  It

7    would have given a spill of approximately 12,000.  And plus

8    the flow from De Luz Creek, would have given available

9    supply of some 25,000.  I can write these down.  We have the

10   De Luz in 1952.  I am now beginning to write again on

11   Exhibit 44 on the left-hand side.  At De Luz we had 13,000,

12   790.  Call it 800 to round it off.  At Fallbrook we had

13   47,000, which was, as I mentioned, 12,000 acre-feet more

14   than the capacity of the reservoir; so we have a spill of

15   12, which I will write at an angle here and label "From

16   S.M.R.," Santa Margarita River.  It gives us nearly 26,000

17   plus the 700 of underflow, ground water inflow at De Luz

18   damsite.  It gives us 26,000 -- call it 27,000 total, in-

19   flow, minus the pumpage here again of 12,000.

20         Q    Mr. Worts, what, in your opinion, is the effect

21   of water coming to a basin when it is drawn down to the

22   extent that it is shown on Plaintiff's Exhibit 38-B?  Will

23   that all be consumed in the basin or not?

24         MR. SACHSE:  I object.  It is too vague and indefinite.

25   Any water coming into a basin can come in in any quantity in

1  any way, shape, or form.

2          MR. VEEDER:  All right, I will rephrase it.

3          Q · Assuming that the water that came to the basin in

4  1952, after washing out the Fallbrook dam, proceeded across

5  the basin at Camp Pendleton --

6          THE COURT:  Well, let's stop now.

7          MR. SACHSE:  Be sure we get all the water now and the

8  dam washed out.

9          THE COURT:  Are you talking about the dam washing out

10  or the spill over the dam?

11          MR. VEEDER:  I was attempting to.

12          Q    Assuming that the --

13          THE COURT:  This is a good place for a recess.  You

14  reframe your question.

15          (Recess.)

16

17

18

19

20

21

22

23

24

25

MALCOLM E. LOVE.  OFFICAL REPORTER

1       (After the recess.)

2   BY MR. VEEDER:

3       Q  Mr. Worts--

4       THE COURT:  Is there any argument about this thing,

5   Mr. Veeder?  If there is not, let us go on.  In other words,

6   if there were a structure which could catch up to a maximum

7   of thirty-four or thirty-five thousand acre feet at the

8   Lippincott site in the years in question, and if there were

9   pumping permissible at 12,500 acre feet out of the basin,

10  assuming the correctness of the De Luz runoff, assuming the

11  correctness of the ground water inflow to the basin and for-

12  getting about what small amount of water might fall between

13  Lippincott and the basin, is there any doubt but that the

14  basin would be shortly pumped pretty much dry?

15      MR. SACHSE:  There is considerable doubt about the

16  extent of the figures, your Honor.  For instance, he has left

17  all the sewage return figures out of that calculation.

18      MR. VEEDER:  Those are questions for cross-examination

19      THE COURT:  That is something else again.  But why

20  take a lot of time to prove something about which there is

21  no argument?

22      MR. SACHSE:  We will do some of it on cross-examination

23  I have no quarrel with the principle.  I think your Honor

24  is quite right.  If you stop the water before it gets to

25  Pendleton, it will not get to Pendleton.

H

Z46

1      MR. VEEDER:  And will you agree that salt water will

2  very shortly destroy our basin?

3      MR. SACHSE:  No.

4      THE COURT:  Is there any doubt that if the basin was

5  pumped down, as it would be with that kind of pumping, by

6  1950 or 1951 that salt water would have further intruded into

7  the basin?  Where it would have intruded nobody can say ex-

8  actly, but it would have intruded upstream further.  Is there

9  any doubt about that?

10      MR. SACHSE:  Your Honor, I would like to reply to you

11  in this way.  I could almost say I have a little sympathy

12  with Mr. Veeder on this, too.  If we were absolutely certain

13  that your Honor understood every single point we wanted to

14  make, I might say yes, there is no doubt.  And I think you

15  have a lot of it right now.  But I don't know, and I don't

16  know which ones you have grasped and which ones you haven't,

17  to speak frankly, and so I expect to cross-examine, and I

18  imagine that Mr. Veeder feels a little the same way on direct

19  examination.

20      MR. VEEDER: There he goes psychoanalyzing me again.

21      THE COURT:  I am the one he is psychoanalyzing.  He

22  wants to know if I understand what is going on up here.

23      Assuming these figures, which we have to do at this

24  stage of the case, of runoff at De Luz, and assuming a right

25  to pump 12,500 acre feet, and assuming the ground water

Worts   Redirect

Worts   Redirect

Z47

1    inflow is 700 acre feet, assuming that the number of acre feet

2    that would flow between Lippincott and the basin and on the

3    basin would be relatively minor, a few hundred acre feet, maybe

4    your are going to have a big draft on the basin and this

5    approximation that you are going to pump water out of the

6    basin, you are going to have salt water intrusion further

7    up.  Now, it is also obvious that if you return so many

8    thousand acre feet by pumpage, you alleviate that.  How the

9    chart would work out I haven't made any computation.

10         MR. SACHSE:  I don't think there is any argument about

11    the principle of it, your Honor.  There is argument about the

12    exact detail.

13         THE COURT:  Well, hurry on through and finish it up,

14    then, and we will find out on cross-examination.

15    BY MR. VEEDER:

16         Q  Mr. Worts, would you step to the exhibit marked 44

17    and referring to Plaintiff's Exhibit 29F, locate on Exhibit 44

18    the Fallbrook Gaging Station?

19         A  With blue crayon on Exhibit 44 I am placing the

20    approximate position of the Fallbrook gage.

21         THE COURT:  What significance is that going to have on

22    the computation?

23         THE WITNESS:  Nothing, your Honor.  It just shows where

24    it relates to the--

25         THE COURT:  All right.

BY MR. VEEDER:

Q   Now, would you also mark on Exhibit 38B the inland gradient created by the pumpage, using your orange pencil?

THE COURT:  What do you mean by the inland gradient?

MR. VEEDER:  This way (indicating).

THE WITNESS:  This is an inland hydraulic gradient from the coastal end of the area to the point of greatest drawdown inland.  In Chappo Subbasin the gradient, the level here as shown is on the order of 50 feet below sea level. The distance is only a couple of miles from the present front. This being diagrammatic, it is hard to know exactly how that gradient would fall, but there is absolutely no question that it would be inland, and inland I will put an arrow on here to indicate that the gradient is in this direction and labeled "Inland hydraulic gradient."

MR. VEEDER:  We offer plaintiff's exhibit marked for identification 38B in evidence.

THE COURT:  Exhibit 38B received in evidence.

(Plaintiff's Exhibit No. 38B marked for Identification was received in evidence as Plaintiff's Exhibit No. 38B.)

BY MR. VEEDER:

Q   What, in your opinion, would be the result of the inflow of water over the Fallbrook spillway from De Luz Creek on the assumption that you have for the year 1952?

A   What I have assumed with regard to the spill at

1    Fallbrook Lippincott Dam is that in looking at the years 1947

2    through 1951 on Exhibit 62 of the flow of the Santa Margarita

3    at Fallbrook the total inflow is 27 or 28,000 acre feet during

4    that period.   I am assuming that all the water in the dam

5    would have been used during that critical dry period.   So the

6    dam was empty, and the runoff in 1952 was about 12,000 acre

7    feet more than the dam could hold.   The pumpage again 12,500

8    just about cancelled that spill from the Fallbrook Lippincott

9    dam site, leaving as a total on the surplus side of about

10   14,000 acre feet.

11   BY MR. VEEDER:

12        Q   Now, would you proceed and show the effect of the

13   succeeding year?

14        A   Well, what I have done is assumed that the total

15   flow during the wet part of the year, some 26,000 acre feet,

16   that is, the runoff at De Luz, plus the spill from the

17   Lippincott Dam, the Fallbrook Dam, would all go underground.

18   That may not be a valid assumption, because it would depend

19   again on the old story of duration and intensity of flow.   Even

20   though there is a large volume available for that flow, if

21   it came in one quick storm some of it might run out to the

22   sea. But for the purposes of this illustration you might as

23   well assume that it would go underground-- 14,000.   It would

24   be to the advantage of the basin, if it all did.   Continuing

25   on again, in 1953 the contribution from DeLuz is-- I am going

1    to round these off, because they are easier to handle --

2    1800, next year 6,000, next year 200, 1,400 in '56, a measley

3    80 in 1957.  Again we have the plus -- I am assuming that we

4    are going to continue to have this plus 700 coming into the

5    system as ground water inflow at DeLuz Dam Site.  So we run

6    through this computation again:  a plus, 2,500 from 12,500 is

7    minus 10,000.  A plus 6,700 from minus 12,500 is 5,800.  A plus

8    900 from minus 12,500 is 11,600.  A plus 2,100 from minus

9    12,500 is 10,400.  A plus 800 from minus 12,500 is 11,700 --

10   these are approximate, and I am not taking great pains in making

11   those subtractions.  So we have now to carry on from this

12   deficit of 54,900 reached in 1951, add 14,000 to it, and we

13   have approximately minus 41,000, minus 51,000, minus 57,000 --

14   anyway, we are getting down here more on the order of 80,000.

15   I could add it up.

16        Q    Why don't you add it up?

17        A    Do you want me to add it up?

18        Q    You are not including the 14,000, are you, Mr. Worts?

19        A    104,000 on the negative, and if I take off this

20   14,000 it gives us about minus 90,000, which is catastrophic --

21   in fact, there is not that much water, in my opinion, in the

22   whole basin down to the bottom of the alluvium within the three

23   storage units.

          Q    Now, assume that the water actually pumped during

24   that period was limited to 8,000 acre feet of water, rather

25   than 12,500.  What would be the result, in your opinion?

          THE COURT:  If he can answer it in one sentence, all

H

Z50

1    right.  If you are going to make another computation--

2              MR. VEEDER:  No, your Honor.

3              THE WITNESS:  For the first part of the graph-- by

4    the first part on Exhibit 44 I mean the years 1947 through

5    1951-- it would be 4,500 less, times 5, which is 22,000,

6    roughly.  We would end up with a depletion in here of around

7    32,000.

8    BY MR. VEEDER:

9              Q  Would that adhere throughout the rest of your

10   computation?

11             A  Well, you would have to recompute on down here.

                                              4,500 is
12   Another six years, six times / .  27,000, roughly; 27,000

13   and 22,000 would be roughly 60,000, if I am doing this cor-

14   rectly.  I don't know.  I would have to sit down and figure

15   it all out.  But at least for the first period it would be

16   about 22,000 less.  For the following period I would have to

17   run it on through.

18             Q  What would be the impact on the basin fromthe

19   standpoint of salt water intrusion?

20             A  Well, with 32,000 or 33,000, that would still pull

21   the storage down below the usable storage capacity, which

22   would be the sum, on Exhibit 42, of the 10,000 and the

23   15,000, or 25,000.  You would still exceed that volume of

24   storage.  So that it means that your storage, if it were

25   drawn down, which it probably would be in Chappo Subbasin,

H

Z51

1    you would be somewhat below sea level.

2         Q   During that same period what, in your opinion,

3    would be the effect of the diversion out of the watershed of

4    5,100 acre feet above Camp Pendleton?

5         A   In the years that we have considered here, there

6    is just about-- I think I was looking at this a minute ago--

7    there is about 27,000 acre feet in the five-year period. That

8    just about equals the 5,100, but that doesn't include the

9    vaporation off of the surface of the lake up there.

10        THE COURT:  What column are you looking at?

11        THE WITNESS:  I am looking at thefirst column on

12   Exhibit 62.  Adding up the inflow to this Fallbrook-Lippincott

13   Dam for the years 1947 to '51, which adds up to something

14   like 27,000, roughly, 28,000.  And in answer to Mr. Veeder's

15   question, 5,000 a year, that is 25,000 of the 27 or 28,000,

16   and that doesn't include evaporation, for one thing.

17   BY MR. VEEDER:

18        Q   What would be the impact, then, from the standpoint

19   of salt water intrusion?

20        A   It would essentially cause no change in these

21   figures.

22        Q   The 5,100 acre feet?

23        A   They would be virtually the same.  In my opinion,

24   it would be virtually the same.  Maybe 2,000 acre feet might

25   have been above and beyond the average amount needed, if it

Worts    Redirect    4542

H

Z52

1    didn't evaporate.   I don't know what the area is, or what the

2    evaporation would have been.

3            Q   Could you state into the record the areal extent

4    of the surface of the storage basins within Camp Pendleton?

5            THE COURT:   That is already in the record, isn't it?

6            MR. VEEDER:   No.

7            THE WITNESS:   I would like to refer to Exhibit 40.

8            MR. VEEDER:   The question was asked on cross-examina-

9    tion, your Honor.

10           Here is Exhibit 40.

11           Q   Would you mark on that exhibit the areal extent of

12   each of the subbasins?

13           A   Take a redpencil, or a blue pencil.   For Upper

14   Subbasin,   the surface area of this storage unit between De

15   Luz Dam Site -- by this storage unit, the Upper Subbasin of

16   De Luz Dam Site to the vertical line shown north of Well

17   18E1, 10 South, 4West, 860 acres; Chappo, 2,640 acres; for

18   Ysidora Subbasin, between Well 26L1 and Ysidora Narrows,

19   1080 acres of surface areas used.

20           MR. VEEDER:   I would like to take these down, Mr. Luddy,

21   so that I can get to Plaintiff's Exhibit No. 15.

22           Q   Now, Mr. Worts, would you state whether or not, in

23   your opinion, the area marked in yellow as the younger

24   alluvium in area designated "Pauba Valley" constitutes the

25   extent of the sources of water in the Pauba Valley and the

H

Z53

1   ground water storage unit of the Pauba Valley?

2        A   Definitely not.

3        Q   Why do you make that statement?

4        A   In working over the water level information with

5   Mr. Kunkel, it is obvious that the entire area has to be

6   considered as a single unit.  By a single ground water unit,

7   I mean from the basement complex on the southeast, northwest-

8   ward toward the word "Murrieta" up in the northwest part of

9   the basin, possibly beyond within the area largely delimited

10   in blue, with the possible exception of the water that may

11   be supplied from the decomposed material.

12        THE COURT:  Gray-colored area.

13        THE WITNESS:  Is that gray, your Honor?  Yes.  This

14   has to be considered as a single ground water unit.

15   BY MR. VEEDER:

16        Q   Now, referring to your Exhibit 37, would you

17   describe into the record the effect of pumping as it relates

18   to intrusion of salt water into the basin?  How does that

19   come about?

20        A   The water levels in Ysidora Subbasin would neces-

21   sarily have to be pulled down to and below sea level by

22   pumping to produce an inland hydraulic gradient, which is

23   created by the pumping of those wells, each well or the

24   group of wells collectively having a cone of depression

25   created by the pumping effect.  This is necessary to cause

Marco  Redirect

H

Z54

1    the water to move toward the well.  If the water level did

2    not draw down, there would be no movement into the well.  The

3    water level draws down below sea level and, as I have ex-

4    plained several times, the pumping levels in Ysidora Subbasin

5    are considerably below sea level.  Therefore, the hydraulic

6    gradient during these times is inland, inland from the coast

7    through the Narrows and into the well field.

8        Q  What, in your opinion, would be the effect on the

9    reduction of the source of fresh water into the basin under-

10   lying Camp Pendleton in so far as salt water intrusion is

11   concerned?

12       A  In the previous testimony I have indicated that the

13   river recharge is capable of recharging in Ysidora Subbasin.

14   So if you cut off the supply to the extent that it doesn't

15   get down there, you do not maintain or continue to keep high

16   the level on the inland side of the intrusion, and thereby

17   if you didn't continue to maintain that natural conservation

18   measure in there pumping would eventually pull water in by

19   pumping farther inland.

20       Q  Into what basin?

21       A  If pumping were heavy enough and if levels were

22   drawn down to and below sea level in Chappo Subbasin, as my

23   previous testimony indicated, some 40 feet below sea level

24   as a possibility at Well 23K1, you would have an inland

25   hydraulic gradient all the way, you would have every opportunity

H

Z55

Werts   Redirect   8545

1   for sea water to move rapidly through particularly that lower

2   coarse-grained part of the lower member of the alluvium.  It

3   would move in and eventually destroy that basin.

4          MR. VEEDER:  I have no further questions.

5          If there is not going to be any recross-examination,

6   I will call another witness.

7          THE COURT:  Just a minute.

8          MR. SACHSE:  I am perfectly willing to start, your

9   Honor.

10

11                    RECROSS-EXAMINATION

12          MR. SACHSE:  May I have back the exhibit you just

13   folded up, with the red letters on it.

14          MR. VEEDER: Mr. Sachse, may I ask leave to bring in

15   another Exhibit 44-- we sort of plastered that exhibit up--

16   and substitute another Exhibit 44, an unmarked one.

17          THE COURT:  What are you going to call this one then?

18          MR. VEEDER:  I would just as soon call it 44A, your

19   Honor.

20          THE COURT:  All right, this one that was marked up

21   will be 44A, and you will substitute another 44 for the one

22   that has been marked up.

23          Do you offer 44A in evidence?

24          MR. VEEDER:  Yes, 44A is offered in evidence, your

25   Honor.  And I am now substituting and delivering to the Clerk

H

Z56

X44A

1   a new Exhibit 44.

2          THE COURT:  All right. Exhibit 44A is received in

3   evidence, and the other will be substituted.

4          (Plaintiff's Exhibit 44A marked for Identification was

5   received in evidence as Plaintiff's Exhibit 44A.)

6   BY MR. SACHSE:

7          Q  Mr. Worts, I am correct in understanding that the

8   first figure you have in this red arithmetic work on Exhibit

9   44A, the 12,500 figure, you obtained by direction from counsel

10  for the United States?

11         A  I got it in the question.

12         Q  It bears no relation to the actual pumping for that

13  period, does it?

14         A  No.

15         Q  Will you take a quick look at Exhibit 47.  I have

16  attempted roughly to calculate the actual pumpage for those

17  years, and I find, according to my hasty arithmetic, that

18  it averaged about 5,800 acre feet per year for that same

19  period of 1947 through 1951.  Does that look about right?

20         MR. VEEDER:  I object to the question because I offered

21  as part of the hypothesis that we would show further evidence

22  in regard to the full demand which would run to 12,500 or

23  in excess.  That was the hypothesis of the question presented.

24         THE COURT:  Overruled.  Counsel can bring out what

25  the actual pumpage has been.

H

Z57

1          THE WITNESS:  That would be on the order, your Honor--

2          THE COURT:  5,700 acre feet per year?

3          THE WITNESS:  Well, yes.

4          MR. SACHSE:  57 or 5800, right between them, as I

5     get it.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I-1 ML J

1    Q    And that, of course, would serve to reduce the

2    deficit figure to the extent of about 4800 feet for each

3    year, would it not, if you took actual performances?

4    A    Well, it would probably be more than that.   That

5    is twelve five minus --   What did you say, 58?

6    Q    Minus 58.

7    A    Oh, it would have been 6700 for each year.   Bear

8    in mind, I was kind here and didn't put in the evapo-

9    transpiration.

10    Q    I realize that.   Your evapotranspiration figure,

11    as shown in Exhibit 49, amounts to how much per year, do

12    you recall?

13    A    On the order of a thousand, just on the average.

14    Could I have Exhibit 49, please.

15    Q    The Clerk says we have it.

16    A    Oh.

17    MR. VEEDER:   What do you have?

18    MR. SACHSE:   49.

19        Here it is.

20    THE WITNESS:   On the order of a thousand.

21    Q    BY MR. SACHSE:   So you have an order of a thousand

22    that you didn't consider and the order of 5800 --

23    THE COURT:   Well, ask the next question.   You have

24    made your point.

25    Q    BY MR. SACHSE:   Did you consider the sewage re-

1    charge in these calculations? Did you?

2        A  No, but there must be something wrong with our

3    prior figures, because, at least in -- let's see; the period

4    you are interested in is '47 to --

5        Q  '51.

6        A  '51. In other words, we are talking about a

7    total of something like 7,000, aren't we, roughly, in round

8    numbers, pumpage plus evapotranspiration?

9        Q  You tell me. I am asking you.

10       A  That is what it appears to be, roughly, in here.

11       Q  You did not consider the surplus recharge from

12   the Fallbrook Creek drainage in those figures?

13       A  There would be essentially none in those years.

14   We did not.

15       Q  You did not consider any surface recharge or

16   surface runoff from the drainage area below the De Luz

17   damsite?

18       A  Not in those dry years, I wouldn't.

19       Q  I want to go back, if you will, Mr. Worts, to

20   Exhibit 60. I am directing your attention to that portion

21   of the exhibit showing the yearly runoff at Ysidora, commenc-

22   ing with the year 1947. I will ask you if the spill into

23   the ocean at Ysidora had been impounded behind a structure at

24   the Lippincott site, would it have had any effect on the

25   regimen of the basin?

1       MR. VEEDER:   May I have that question, please?

2       THE COURT:   Read it.

3       (The reporter read back the question.)

4       MR. VEEDER:   What do you mean by "regimen of the

5 basin"?

6       MR. SACHSE:   The operation of the well, within the --

7       MR. VEEDER:   Camp basin?

8       THE WITNESS:   The amount of the pumpage I have shown

9 here I don't think there would have been any -- I mean, you

10 can't use those figures because we cannot, we are dealing

11 with --

12       MR. SACHSE:   I accept that.  I will withdraw that

13 question and rephrase it.

14       Q   Taking the actual pumpage and the actual spill

15 at Ysidora from 1947 through 1951, is it not a fact that had

16 the actual spill at Ysidora been impounded at the Lippincott

17 site, the operations of the basin as depicted on Exhibit 49

18 would have been essentially the same?

19       A   In other words, you want me to go back to the

20 initial and original --

21       Q   49.

22       A   -- conditions as they were all the way?

23       Q   Yes, sir.

24       A   And you are going to run the water over the basin,

25 pick it up at Ysidora --

1     Q    That is the hypothesis I am asking you to accept,

2   that the waste at Ysidora, only the waste, has been impounded

3   upstream.

4        MR. VEEDER:  Now, that is including the De Luz runoff

5   which, if you want to carry it upstream, I am with you, Mr.

6   Sachse, but it is going to be expensive.

7        MR. SACHSE:  If you have an objection, Mr. Veeder,

8   please make it.

9        MR. VEEDER:  Just helping you.  Just helping you.

10  I don't care.

11       THE COURT:  Go ahead.

12       THE WITNESS:  I am not so sure that I am entirely

13  clear on this.

14     Q  BY MR. SACHSE:  Had the actual waste at Ysidora --

15  take any single year, Mr. Worts.  This doesn't seem too

16  complicated to me.

17     A    Let's take the same one we are working on.

18     Q    Let's take the first one here, 1946, the top of

19  the page.  There was 11,680 feet spilled at Ysidora, was

20  there not?

21     A    That is right.

22     Q    Had the 11,680 acre-feet been impounded at

23  Lippincott, what effect would it have had upon the basin in

24  Camp Pendleton?

25     A    The only way I can answer that is to say if you

1   want to run the water that was available over the basin in

2   1946 and pick up the 11,680 at the Ysidora gage and pump it

3   up to a reservoir, the effect would have been the same.

4       Q  That is not my question.  I will ask you to answer

5   my question.  Had 11,680 acre-feet been picked up at the

6   Lippincott site --   If you want to look, look ahead and see

7   what the runoff was at Fallbrook for the same year --

8   had that been picked up at the Lippincott site, what effect

9   would it have had on your operation of your basin?

10      MR. VEEDER:  Are you changing your question, now,

11  counsel?

12      MR. SACHSE: I don't think I am.  I think I am re-

13  phrasing it.

14      THE WITNESS:  That is the same question you asked

15  about 1943 a while back?

16      Q  BY MR. SACHSE:  That is right.

17      A   And we ran it over the basin, picked it up at

18  Ysidora, and put it back into the Fallbrook dam.  That is

19  the way I understood it, and that is the way I understand

20  your question.  Because if you stop it up there, who is to

21  say you can take that much down below?

22      Q  Mr. Worts, what was the recorded spill for 1946 at

23  Fallbrook?

24      A   At the Fallbrook gage in 1946?

25      Q   Yes, the Fallbrook gage.

A    The gage flow was 11,150.

Q    What was the spill at Ysidora for that same year?

A    The runoff at Ysidora was 11,680.

Q    Had you stopped then the whole flow at Fallbrook?

A    Well, what is "whole flow"?  11,160?

Q    11,160.

A    Or 150.  What is your figure?  What is it, 11,150?

Q    I am talking about all of that.  Had you stopped all of that at Fallbrook how much still went into the ocean?

A    I don't know.

Q    How much went into the ocean at Ysidora?

A    I don't know.

Q    Well, you have --

A    Well, heavens, if you are going to stop 11,150 up at Fallbrook, you are certainly not going to have 11,680 running out at Ysidora.

Q    The actual fact is that 11,680 ran out at Ysidora at that year, is it not?

A    That is the actual gage record, yes.

Q    But you don't think you could stop 11,000 upstream without adversely affecting your basin?

A    I thought this showed that --

MR. VEEDER:  We will stipulate to that.

THE WITNESS:  It puts the whole burden on De Luz Creek.

Q  BY MR. SACHSE:  Let's take another year.  In the

1   year 1952 --

2        THE COURT:  Are you going to get any different

3   answers by taking a different year?

4        Q  BY MR. SACHSE:  Let me put it this way, then,

5   Mr. Worts.

6        MR. VEEDER:  Are you withdrawing that question?

7        MR. SACHSE:  Yes, I will withdraw it.  I didn't

8   finish the question.  I will rephrase it.

9        Q  Mr. Worts, if the waste into the sea at Ysidora

10   in any year were prevented from wasting into the sea, any

11   place, would it affect the regimen of the basin on Camp

12   Pendleton?

13        MR. VEEDER:  I am going to object to the use of the

14   word "waste."

15        THE COURT:  Overruled.

16        MR. VEEDER:  The fact that water goes into the sea,

17   your Honor, is not per se waste.

18        THE COURT:  Overruled.

19        Q  BY MR. SACHSE:  If you can't answer the question --

20        A  I can't answer that, because of the many fields

21   of operations that opens up.

22        THE COURT:  Mr. Sachse, it is easier --

23        MR. SACHSE:  I am through with it, your Honor, with

24   that series of questions.

25        THE COURT:  All right.  It is easy enough to say that

1  from your gaging station at Ysidora 11,680 feet flowed into

2  the sea. It is easy enough to say, "All right, if you

3  picked 11,680 feet up it would have no effect upon the

4  regimen of the basin," as is demonstrated in this exhibit.

5  But that doesn't necessarily follow. Flood water comes

6  down, and it comes down in a small, narrow channel or it

7  spreads over wider area. The more water that comes down,

8  the wider area it spreads over. I would guess it is

9  axiomatic that the wider the area it flows over the better

10  the absorption of the flood water. I am not convinced that

11  - - somebody would have to offer me proof that these flash

12  floods can pass over a basin and go into the sea and the

13  basin is thereby charged, completely recharged, because I

14  am of a belief that a lot of this water flows over even

15  when the basin needs water. That has to go back. Therefore,

16  the amount of water that runs down a stream has something

17  to do with the area that the water covers as it runs down.

18  If it runs down in one little channel it is percolating in-

19  to the basin from that channel. If it spreads out over

20  some of these sandy flats of alluvium plains that we are all

21  familiar with, more water goes into the basin. Now, it is

22  easy enough to say that you picked up 11,680 feet in 1946

23  before it ever went into this basin; that, therefore, the

24  regimen of the stream would be exactly the same. I don't

25  know that that follows. It may be, but the very fact that

1   an excess amount of water came down the stream would cause

2   a larger amount of absorption into the basin.  And I agree

3   with you that water shouldn't waste.  But I think you have

4   got a non sequitur there.  You channel a bit of water.  For

5   instance, you take a certain amount of water that is going

6   to flow out in a year and you divided that up in 24-hour

7   periods, hour by hour, and you let the same amount of water

8   flow down into this alluvium hour after hour for 365 days,

9   you are going to get a lot more absorption by the basin than

10  if you ran all that water across it in one day or two days.

11      MR. SACHSE:  I surely concur.

12      THE COURT:  All right.  Now, by the same token, the

13  amount of water that comes down any one time has some bearing

14  on how much water is absorbed and how much goes across

15  without getting in.  Now, I agree that water shouldn't waste

16  into the ocean.  But I think there is a non sequitur in your

17  contention, ipso facto, because 11,680 feet went into the

18  ocean in 1946 that, if you would cut off 11,680 feet, you

19  would have this same effect on the basin.  The basin may

20  well have taken more water, because some water flowed into

21  the sea.  Of course, you have a further problem.  How are

22  you going to determine in advance how to stop water from

23  flowing down so that none flows into the sea?  Of course, a

24  dam and spreading grounds would regulate that.

25      All right.

I-2

Q  BY MR. SACHSE:  Mr. Worts, you testified that you calculated the aerial extent of the basins when you gave us the figures eight sixty for Upper, twenty-six forty for Chappo and ten eighty for Ysidora.  How did you make that calculation, by planimeter from the exhibit?

A  From the storage exhibit.  Exhibit 40, I believe, is the same exhibit that was used by us in the determination of the areas.  This, I believe, reasonably accurately depicts those areas, which I wish to point out, does include some of the terrace deposits along the north side of Chappo Subbasin.

Q  What I am asking you is:  Did you planimeter the outline as it appears on this exhibit or as it appears on the isopach exhibit?

A  No, on --

Q  This exhibit?

A  This is the outline of the surface, the over-all area.

Q  So then, to make the calculations that result in the figures appearing in Exhibit 43, which is your storage capacity exhibit, you planimetered your levels below the surface from a different exhibit than you planimetered the surface on, is that right?

A  Yes; just for the upper five-foot level.  We assumed that the five-foot depth below thickness would be

1  essentially at that, or virtually along this same area.  So

2  we called the surface area virtually the same as the five-foot.

3  Now, that would give you the depth in the five-foot -- that

4  will give you the area of the uppermost part of this upper

5  unit here.  And by "this," I am talking about the five to

6  twenty unit.

7        MR. VEEDER:  Which exhibit, now?

8        THE WITNESS:  43.

9        MR. SACHSE:  43.

10       Q    And to get the twenty to forty-foot unit, however,

11  you planimetered from the isopach map?

12       A    As I explained, on the isopach map, we planimetered

13  the isopach, the twenty, and determined that area.  And

14  then, the average of those two areas, the five-foot and the

15  twenty-foot, gives you the average area for that depth zone,

16  five to twenty feet.  And so on.  Each one of these would

17  obviously be of ever-decreasing size, because the sides of

18  the valley sloped inward.  Yes.

19       Q    Now, with particular reference to the Upper

20  Subbasin, what did you use as the specific yield factor

21  when you made your calculations?

22       A    The bar graph, Exhibit 41, shows the specific

23  yields assigned to the various types of materials.

24       Q    No, that isn't my question.  I said:  What

25  specific yield factor did you use in determining the yield

of the Upper Subbasin?

A    Well, you take the average specific yield in each one of the depth zones shown on Exhibit 43, multiply it by the specific -- that is, you multiply the volume of the deposits, the thickness times the average area times the specific yield.  Average specific yield is determined for that depth zone to come up with the -- well, to answer your -- on the specific yield it is the five to twenty foot section portion of the logs converted to specific yield.

Q    That is what I want you to do, is to give me that figure.

A    I don't have it.

Q    I would like, Mr. Worts, to be able to do the arithmetic of the aerial extents, times depth, times specific yields, and see how we come out.

Now, what specific yield factor did you use in making the calculation on 43?

A    As I said, these were run back in 1951 or thereabouts, and I don't know whether we have the specific yield data that we used by depth zones.  I have indicated what the average is for the whole zone, and you can divide backwards and find out what the average area is for the upper hundred feet if you want to.

Q    Then, you cannot tell me at this time what specific yield, for instance, you used, specific yield factor, for

1    the twenty to forty-foot zone in the upper subbasin?

2         A    No, I don't have those breakdowns, those detailed

3    breakdowns with me.  The important thing, I think, is that

4    the average is twenty per cent for the upper basin.  As I

5    have shown on Exhibit 42, I have indicated there what the

6    average specific yield is of these deposits in the three

7    subbasins.

8         Q    Are you implying, then, that the average for the

9    entire subbasin, all zones, would average a twenty per cent

10   specific yield?

11        A    That is correct.  Five to one hundred feet below

12   in Upper Subbasin, fifteen per cent to five to one hundred

13   feet below in Chappo, and ten in Ysidora Subbasin.  And if

14   you want to figure average areas, you can take the gross shown

15   here at 12,500 and work backwards and figure out what the

16   area was, I believe.  To answer your specific question:  I

17   don't have the infinite number of detailed studies, that is,

18   paper work studies, we ran through to arrive at the storages.

19   And I don't know whether they are available, they being seven

20   or so years old by now.  I don't know whether we still have

21   that, those work papers, at our Long Beach office.

22        Q    I want to direct your attention for a moment to --

23        MR. VEEDER:  We will undertake to produce that, Mr.

24   Sachse, if you desire us to.

25        MR. SACHSE:  What?  For the different years?

1    MR. VEEDER:  Specific yield factors.

2    MR. SACHSE:  Yes, I would like to have them very much

3 for the different zones.

4    Q   Directing your attention to 15, did I understand

5 your testimony to be that the entire area delineated on

6 Exhibit 15 in orange or in yellow must be considered as a

7 single hydrographic unit?

8    A   Unless I overlooked some faults --

9    Q   No.

10    A   -- on that exhibit, the Wildomar Fault would be

11 a subdivision within that.  But I would say I don't see any

12 faults between the Wildomar Fault northeastward to the

13 consolidated rock.  In my opinion, this would have to be

14 considered pretty much as a single ground water unit, because

15 what goes on in one part of it in time will affect another

16 part of it.

17    Q   Taking the Wildomar Fault which you have just

18 directed my attention to, would that serve to sever the older

19 alluvium lying northeast of it from the Murrieta Valley

20 in ground water unit terminology?

21    A   Well, that is getting rather detailed.  I had

22 better say I can't answer that in such details as Mr.

23 Kunkel gave you, because it is a detailed study.

24    Q   What I am trying to get at:  Mr. Kunkel delineated

25 several units -- Murrieta Valley units, Pauba Valley units --

1      A    Storage units.

2      Q    Storage units, yes.  Now, Murrieta was one and
3   the older alluvium lies to the other side of the fault.  Now,
4   in your opinion, does the fault act as a barrier between the
5   older continental deposits and the Murrieta Valley storage
6   unit?

7      A    What kind of a barrier?

8      Q    Well, a restriction to the movement of the ground
9   water?

10     A    Yes, it acts as a restriction to the movement
11  of the ground water.

12     Q    Have you any idea how complete a restriction it
13  is at any point along the fault?

14     A    I am not that familiar with the details.

15     Q    Would you say that the effect of a fault would be
16  to change the direction of ground water as shown on Mr.
17  Kunkel's contours fore and right-angles towards the fault?
18  When the water strikes the fault, would it change its
19  direction to the southeast or would it go through the fault?

20     A    It might very well do both as long as you have a
21  restriction to the movement.  I can speak not only for that
22  fault but a lot of others that we have studied all over
23  Southern California.  The direction of flow in the Murrieta
24  Valley is not controlled by the direction of movement in the
25  area to the northwest.  That is, the water where it spills

1   over drops down into a -- it is like pouring water down an

2   inclined plank and which is about a foot off the floor, and

3   depending on which way the floor is ⁄will depend on which
                                     tilted

4   way the water will then run.  In other words, you have a

5   discontinuity along the Wildomar Fault.

6       Q   Now, Mr. Stahlman asked you some questions

7   regarding the recharge of the older continental deposits,

8   for the moment, let's say lying north of Pauba Valley.  Are

9   you following me?

10      A   Yes.  You would have to consider both sides,

11  though.

12      Q   Either one or both; it doesn't matter.  My

13  question is:  If the alluvial deposits received their

14  principal recharge from a surface runoff of the stream which

15  flows through them, where does the principal recharge of

16  these higher elevations, older continental deposits, come

17  from?  Ground water, recharge to ground water?

18      A   Well, we have a total of three sources.  We have

19  the streams; we have the rainfall in wet years; and we have

20  whatever movement occurs out of that large area of residuum

21  there and out of the fractures, systems in the basement

22  rocks.

23      Q   Let's take them one at a time.  The streams.  Now,

24  each stream shown on Exhibit 15 is delineated as having a

25  strip of alluvium along it?

A    That is right.

Q    Take Long Canyon, for example. Now, is Long Canyon recharging the older continental deposits, let us say, southeasterly and northwesterly?  Is there water movement from the alluvium in Long Canyon in the northeasterly direction into the older continental or the southeasterly?

A    I don't know.

Q    Then, you don't know that the stream in Long Canyon does recharge ground water in the older alluvium?

A    I didn't say I didn't know that.  I said I didn't know whether water moves out laterally.  You have to have a detailed, a detailed contour map.  That map shows, the water level contours on Exhibit 15 show that water is moving downstream through all deposits toward the Wildomar Fault.

Q    And if these water level contours are correct, if we have correctly delineated the water level contours in the older alluvium, they do not indicate any movement from the alluvium into the older continental, do they?

J

Z58

A   You know why they would be shaped to cause that.

Q   I am just asking you, do they, at the moment?

A   At the moment they do not.

Q   Nor do Mr. Kunkel's contours indicate any ground water movement from the older continental into the alluvium, do they?

A   Along--

Q   Anywhere?

A   Well, they could.

Q   I am asking you, do they?  Do Mr. Kunkel's contours--

A   I do not know the-- you are getting into some pretty detailed stuff down here, and I don't know how deep the water is.  The water level shown here may be under the alluvium, for all I know.  It may be up in it.  I just don't know.  In other words, you are asking me some detailed questions about an area about which I am generally familiar.  The actual details on any stream system I am not completely familiar with all the details.

Q   Well, I don't want to ask you about anything you don't know, and if you don't know, please tell me, Mr. Worts.

Now, have you any opinion as to the effect of, let us say, the water supply in Pauba Valley, of pumping a well located two miles away in the older alluvium to the northwest? Do you have any opinion?

A   How much you are going to pump, how long you are

1 going to pump, et cetera, where you are going to pump, are

2 you going to put it back on the ground?  I mean, you have got

3 to set up something I can work with.  It may be a windmill

4 well.

5       Q  I will try to give you an example from the first

6 day of your own testimony.  You described some test wells

7 which the Navy had drilled-- I can't call them by number,

8 but very close to the break between the La Jolla formation

9 and the older alluvium.  Do you recall one?

10       A  Yes, 23Q1, in the south end of Chappo Subbasin.

11       Q  As I recall your testimony, you stated that you

12 pumped them by air?

13       A  Air lift.

14       Q  Blew the water out, that it took a long while for

15 any more water, you had to come back the next day before the

16 water--

17       A  I don't think I said that.

18       Q  Well, it took quite awhile for it to come back in;

19 isn't that true?

20       A  Yes.

21       Q  Well, did the same general condition exist in the

22 Qtoal?

23       A  Definitely not, because I testified that the La

24 Jolla formation is virtually non-water bearing and the Qtoal

25 is darned good water-bearing formation that yields over

J

Z61

1  the Qtoal was something like 20 feet.  We tested two thousand

2  some-odd feet of it in the test well.

3      Q  At the Pauba Well?

4      A  At the Pauba Well.

5      Q  Do you know where the Pauba Well is that has been

6  drawn on this exhibit?

7      A  I know where it is, all right.

8      Q  Do you mind looking at it for a moment and tell

9  us whether it is drawn correctly?  It looks to me like it is

10 right on the edge of the younger alluvium.

11     A  As shown there it is shown on the edge of the

12 younger alluvium.  I don't recall whether it is right on the

13 edge or starting off in the alluvium or starting off in the

14 older material.  It doesn't matter.  It is not perforated in

15 the younger alluvium material.

16     Q  You don't mean to imply that any well drilled in

17 the older alluvium anywhere around there would produce like

18 the Pauba Well does, do you?

19     A  Are you asking for that?

20     Q  I am asking you, do you mean to imply that?

21     A  Because every deep well, to my knowledge, that has

22 been drilled in this area, has been a good producer.

23     MR. VEEDER: Which area?

24     THE WITNESS:  I am talking about the wells that are

25 drilled down into the Qtoal on Exhibit 15.  The Roripaugh and

J

Z62

1   the Pauba are two examples.  I don't know how deep they are,

2   but those deep wells drilled into the older continental

3   deposits are the principal source of supply.

4       Q  And those are all drilled through the younger

5   continental into the older continental, aren't they?

6       A  That is obvious, the reason for that, because they

7   would want to use the water for irrigation on the alluvial

8   plane.

9       Q  We are getting very slowly around to what I am

10  trying to find out from you.  Take older alluvium, Qtoal,

11  anywhere in this area, but not in a younger alluvium area,

12  anywhere where it shows only as orange.  Do you suggest

13  that a well drilled in that area would produce like the

14  Pauba?

15      A  I sure do, provided you don't put me right up

16  against the basement complex but down inthe area where, say,

17  between Long Canyon and Pauba Valley.  I will bet my buck on

18  a well in that area.

19      Q  Where again?

20      A  Between-- Is that called Long Canyon?

21      Q  Long Canyon?

22      A  Long Canyon and Pauba Valley.

23      Q  Anywhere in here?

24      A  Yes.

25      Q  Anywhere in the orange area between?

J

Z63

1      A   Yes.

2      Q   Have you had occasion to examine some of the well

3   logs of some of the wells in that area?

4      A   The shallow test wells?

5      Q   The wells that the Vails have in the area?

6      A   I have looked at a few.

7      Q   Do the Vails have any irrigation wells in that

8   area?

9      A   I don't know.

10      Q   As a matter of fact, they have nothing but stock

11   wells, don't they, windmill wells?

12      A   Well, it is stock land, I guess.

13      Q   You don't know, then, what wells are and what they

14   produce, located in this area?

15      A   As far as you are leading me, all I know is that

16   those deep wells are perforated and derive their supply from

17   the older alluvium.  The thing that bothers you so much is,

18   why are they down on the alluvial flats?  To me that is simple.

19   They are down there because the lifts are lower and because

20   that is where the good soils are, probably the better soils

21   are for irrigation.

22      Q   And that is also where the greatest storage capacity

23   of water is, is it not?

24      A   I wouldn't say that.  I imagine there is more storage

25   capacity in the orange than there is in the yellow, taken as

J

Z64

1    a whole.  That's my guess from looking at the aereal extent.

2            Q   Then you think when Mr. Kunkel delineated the

3    principal water storage units up there he left out the biggest

4    one?

5            A   I don't think he did.  I think that is his storage

6    unit-- well, do we have a storage unit map?  Let's take a

7    look at that, if we are going to wander all over the--

8            MR. STAHLMAN:  Let's do it tomorrow.

9            THE COURT:  Yes, we will do it tomorrow.

10           10 o'clock tomorrow morning.

11           (Adjournment until Thursday, November 13, 1958, at

12   10 A.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25