# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.   1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Thursday, November 13, 1958

Pages:  4572 to 4713

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

MALCOLM LOVE
and
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
      vs.                      )          No. 1247-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                Defendants.    )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, November 13, 1958

APPEARANCES:

    For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                                    Special Assistant to the
                                    Attorney-General,
                                    Department of Justice,
                                    Washington, D.C.

4573

Z2

APPEARANCES (Continued)

| | |
|---|---|
| For Defendant Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State of California | EDMUND G. BROWN, ESQ., Attorney-General, by ADOLPHUS MOSKOVITZ, ESQ., Deputy Attorney-General, and CARL BORONKAY, ESQ. |
| For Defendant Santa Margarita Mutual Water Company | W. B. DENNIS, ESQ. |
| For Defendants Fallbrook Public Utility District, et al. | F. R. SACHSE, ESQ. |
| For Defendants Hartman, Lewis, Wilks and Bayle, and Oviatt | BEST, BEST & KRIEGER, by ARTHUR L. LITTLEWORTH, ESQ. |

<u>I N D E X</u>

| Plaintiff's Witnesses: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| G. F. Worts, Jr. | | | 4620 | |
| (By Mr. Sachse) | | | | 4575 |
| (By Mr. Dennis) | | | | 4581 |
| (By Mr. Moskovitz) | | | | 4606 |
| | | | | |
| Fred Kunkel | | | | |
| (Recalled) | | | 4645 | 4673 |

| EXHIBITS: | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 15-A    Map | 4637 | |
| 15-B    Map | 4647 | |
| 17-A | | 4710 |
| 16-A-72-A | | 4689 |
| 15-C    Map | 4692 | |
| 15-D    "Calculations of Specific Yield" | 4694 | |
| 16-A73 | | 4698 |

MORNING RECESS  - 4611

NOON RECESS   - 4639

AFTERNOON RECESS - 4682

4575

Z3

A

SAN DIEGO, CALIFORNIA, THURSDAY, NOVEMBER 13, 1958.  10 A.M.

THE CLERK:  One, 1247-SD-C, United States vs. Fallbrook

Public Utility District, et al.  Further court trial.

MR. SACHSE:  Will you resume the stand, Mr. Worts,

please.


G. F. WORTS, JR.,

recalled as a witness in behalf of the plaintiff, having been

previously sworn, testified further as follows:


RECROSS-EXAMINATION (Resumed)

BY MR. SACHSE:

Q  Mr. Worts, I want to ask you a few questions relat-

ing to the salt water intrusion, and I will direct your atten-

tion to Exhibits 54 and 55.  First, as a matter of information,

on Exhibit 55 the chloride parts per million is all calculated

as of November, 1957, is that right, as I read the legend?

A  Yes-- except as indicated in the footnotes.

Q  Except as indicated in the footnotes, yes.  And the

chloride content on Exhibit 54 in one well seems to run beyond

November, 1957, but the other ones, I would calculate, end

about November, 1957, also, do they?

A  About that.

Q  Do you know offhand whether exactly the same

1    readings were used in both these exhibits?

2         A  For wells 2K1, 10B1, 1E1 on Exhibit 54 the readings

3    are the same.  For the well shown at the lower part of the

4    graph, we have access to the readings taken by the Camp, and

5    those, for example, on Well 2A1, if I am reading this properly,

6    would have been taken by the Camp at a later date.

7         Q  Now, am I correct in stating that both Exhibits 54

8    and 55 indicate salt water contamination of the wells, but

9    not necessarily salt water intrusion at that exact time?

10        A  I don't understand what you mean.

11        Q  In another exhibit, I believe it is Exhibit 44, the

12   water level contours, or Exhibit 45, you indicated a change

13   in water level contour to show a ground water movement out

14   of the basin after the pumping had been restricted in Ysidora,

15   do you recall?

16        A  I did for November.  To the best of my recollection,

17   November, 1957, shows a slight seaward gradient.

18        Q  So in November, 1957, if there is a seaward gradient

19   there wouldn't be actually salt water intrusion at that time,

20   would there?

21        MR. VEEDER:  I object to this line of questioning, your

22   Honor, unless we have the Exhibit 45 up, about which you are

23   speaking, which shows a surface gradient and not a ground water

24   gradient.

25        MR. SACHSE:  I think that is correct.

4577

Worts  Recross

MR. VEEDER:  I want the witness to explain it.

MR. SACHSE:  Maybe we had better put it up.

Q  Let me ask you this, then.  Do the solid lines, Mr. Worts, indicate water level, ground water contours?

A  That is right.

Q  So there is a ground water movement to sea as of 1957, was there not?

A  Only as of the time the contour map was drawn.  I explained in great detail yesterday and at other times that when the wells are pumping in Ysidora Basin it reverses.  These are based on non-pumping levels.  If I drew contours on the pumping levels, I would have a pumping depression there below sea level, because the wells pump below sea level.

Q  However, as of October, 1957, the ground water contours which you have delineated on Government's Exhibit 45 indicate a seaward movement of ground water?

A  That is right.

Q  If a reading of chloride content, such as is found on Exhibits 54 and 55, were taken at exactly the same time, you would still expect to find contamination in Well K1, would you not, even though there is a ground water movement to sea?

A  That is right.

Q  That is the point I was trying to make when I asked you if there could be contamination without intrusion at the moment you would find the contamination?

A

Z6

1      A  Water doesn't move that fast.  In other words, the

2   salt water was drawn in during the dry period of 1947 through

3   1951.  It has continued to be drawn inland during periods

4   when the wells are pumping heavily for irrigation, in the last

5   few years irrigation only, and at times when those wells aren't

6   pumping, are static or standing, non-pumping, water levels are

7   used to draw a contour map like this or like Exhibit 45.

8      Q  I am afraid I don't make myself clear.  Let me ask

9   you a purely hypothetical question for a minute.  Assume a

10   basin which suffered severe salt water intrusion,--

11      MR. VEEDER:  We don't have to assume it.  We have one.

12   BY MR. SACHSE:

13      Q  --assume that all pumping was discontinued in that

14   basin, and that the ground water gradient was restored to

15   seaward movement.  A year later ground water has been con-

16   stantly in seaward movement all of this time.  A year later

17   you take chloride measurements.  Would you expect to find

18   contamination?

19      A  Certainly.

20      Q  That is what I am trying to get at.

21      A  But it would be decreasing rather than increasing.

22      Q  That is the next question.  As that basin received

23   a flow of fresh water from the winter rains across it, would

24   that have the effect of diluting the contamination and causing

25   it to lessen?

Z A                                                                    4579
Z7

1          A  No, because the fresh water comes in on top, the

2     runoff recharge sinks through the permeable materials down

3     to the surface of the ground water.  That is the initial place

4     it lands.  Your salt water is down at the bottom of the

5     aquifer.  So the dilution wouldn't work from the top down.  It

6     would have to work from the pushing end back and forth

7     laterally.

8          Q  So then if the ground water in this hypothetical

9     basin moved seaward long enough, you would ultimately elim-

10     inate the chloride content?

11          A  I think so.

12          Q  Now, applying that specifically to Ysidora, we now

13     have in a non-pumping state a seaward movement of ground water;

14     is that correct?

15          A  You have a momentary or a continuous effect of that

16     kind, yes.

17          Q  Well, in non-pumping, is it only instantaneous?

18          A  Yes.

19          Q  If there is no pumping, it is a seaward gradient,

20     isn't it?

21          A  Yes, but it is only for this moment.  Maybe a week

22     later the wells are pumping again.

23          Q  If there is no pumping, we have a seaward gradient

24     in Ysidora?

25          A  Yes, as of the last--

A

Z8

1      Q  As of the last readings you took?

2      A  Yes.

3      MR. SACHSE:  I think, your Honor, that is all.

4      But before I excuse the witness I would like to ask

5  Mr. Veeder if he has yet got an answer from the Marines on

6  whether or not we are going to have available to us this

7  classified report on the Pauba Well, because some of that may

8  be concerned with my cross-examination.

9      MR. VEEDER:  I haven't yet, no.

10     MR. SACHSE:  When can we expect it?

11     MR. VEEDER: We will have Mr. Worts available, though,

12  if and when the matter is released.

13     MR. SACHSE:  May I ask when we can expect an answer?

14     MR. VEEDER:  When I receive it from the Marines.

15     MR. SACHSE:  When do you hope to get it?

16     MR. VEEDER:  Just as soon as I can get it.

17     THE COURT:  I think we will have a fairly prompt answer,

18  Mr. Sachse.

19     MR. VEEDER:  Yes.

20     THE COURT:  The witness will be excused, subject to

21  call, and will have to return.

22     MR. SACHSE:  Very well, your Honor.  I have no further

23  questions on recross-examination.

24     THE COURT:  Any further questions?

25     MR. DENNIS:  I have a few questions, your Honor.

A

Z9

1        I wonder if I might have Exhibit 47.  Do you have

2  Exhibit 47, Mr. Worts?

3        THE WITNESS:  Yes, here it is.

4

5                    RECROSS-EXAMINATION

6  BY MR. DENNIS:

7        Q  Mr. Worts, referring to the bar graph on the bottom

8  of Exhibit 47, does that represent, so far as you know,

9  correctly the entire quantity of water pumped from the

10  Pendleton Basin?

11        A  I won't know that.

12        Q  Do you know whether or not it includes the quantities

13  of water which were pumped from the wells which are shown on

14  Plaintiff's Exhibit 37 as 9 South, 4West, 29L1 and C2?

15        A  It does not include that pumpage.

16        Q  It does not include that pumpage?

17        A  It does not, in my definition, and as I think when

18  I first started to testify, my area of study was between De

19  Luz Dam Site and Ysidora Stream Gage.  So the pumpage is for

20  only that, within that reach.

21        Q  So that you know it does not include that figure?

22        A  I know that, and I also know that the pumpage from

23  those wells-- in Section 32, did you say?

24        Q  29, I believe it is-- 29.

25        A  The pumpage from those wells is very small.

A

Z10

1    Q   Now, I notice that on Exhibit 47 you show that prior

2    to 1942 all of the water was used for irrigation purposes and

3    even 1942 part of the water was used for irrigation use and

4    part for Camp use?

5    A   That is what it shows.

6    Q   And you obtained those figures from the Public

7    Works Office at Camp Pendleton?

8    A   Yes.

9    Q   And do you have any knowledge or information of what

10   portion of the water that was used for irrigation use was

11   used within the watershed and what portion was used without

12   the watershed?

13   A   I do not.

14   Q   Have you made any investigation to determine the

15   amount of return water from irrigation within the Pendleton

16   Basin?

17   A   I can speak for the period since I was there.   I

18   have not seen any irrigation within the basin shown on

19   Exhibit 37 and colored yellow.   There is some-- I don't know

20   what you want to call it-- parade grounds, but there is a

21   little sprinkling for that.   But there is no crop irrigation,

22   to the best of my recollection, between De Luz Dam Site and

23   Ysidora Gage.

24   MR. VEEDER:   I am going to interpose an objection at

25   this point, your Honor, because the question of the watershed

A

z11

line--

THE COURT:  Has not been covered by this witness.

MR. VEEDER:  That is right, your Honor.

MR. DENNIS:  This is a preliminary question leading up to one of the other exhibits, your Honor.

THE WITNESS:  There would be no return, to answer your question, because to the best of my recollection there is no irrigation within the basins.  The pumping is from Ysidora and it is placed in use on the mesas along the coast.

MR. DENNIS:  I wonder if I could have Exhibit 62 and Exhibit 49.

Do you have Exhibit 62, Mr. Worts?

THE WITNESS:  Yes.

THE CLERK:  And also 49.

BY MR. DENNIS:

Q  Mr. Worts, does Exhibit 62 correctly represent the flow of the Santa Margarita River at the Fallbrook Gaging Station, so far as you know?

A  It is not my exhibit.  It is prepared by Mr. Hofmann.

Q  But in the preparation of Exhibit 49--

A  Here is Exhibit 49.

Q  --you used the figures obtained from the column "Annual Flow, DeLuz Creek" on Exhibit 62, did you not?

A  That is part of the computation.

Q  And am I correct in my understanding that on Exhibit

A

Z12

49 the portion of the recharge to the Pendleton Basin which is shown by cross-hatched represents primarily the difference in flow as shown at the De Luz Creek Dam Site and the discharge of the basin as shown by the figures at the Ysidora Gaging Station, less the evaporation at Lake O'Neill?

A   On Exhibit 62, not to be confused with De Luz Creek, it is the third column of figures labeled "Combined flow" or "Combined Flow", which is at the De Luz Dam Site; that is correct.

Q   That would be substantially the figure that you arrived at.  Now, I think you testified in response to a question by Mr. Sachse that the water that went past the Ysidora Gaging Station represented water which passed that point after the Pendleton Basin was full?

A   No.

MR. VEEDER:  Will you repeat that, please?  I didn't hear the answer.

THE WITNESS:  I said no.

BY MR. DENNIS:

Q   Does it represent water which did not enter or serve any purpose so far as recharging the Pendleton Basin?

MR. VEEDER:  I object to that as being far, far too vague and far too speculative, your Honor, to serve any useful purpose in regard to recharge of the basin.

THE COURT:  Read the question.

A

Z13

1      (The reporter read the pending question.)

2      MR. VEEDER:  Recharging the basin involves spreading

3  out all over the basin, bringing the water to it.

4      THE COURT:  What water are you talking about?

5      MR. DENNIS:  The water which was measured at the Ysidora

6  Gaging Station, which is at the approximate location of the

7  mouth of the basin and which represents that portion of the

8  stream flow which the witness has shown on Exhibit 49 did not

9  go into the underground basin.

10      MR. VEEDER:  But, your Honor, we have exhibits showing

11  that there is a conglomerate of sewage effluent and surface

12  water, there is rising water from the basin, there are a lot

13  of otherthings that are involved in this question.

14      THE COURT:  Let's hear it again.  Maybe the witness

15  can answer.

16      (The reporter again read the pending question.)

17      THE COURT:  Overruled.

18      THE WITNESS:  Well, it certainly served the purpose.

19  I think his Honor yesterday summed up the situation when he

20  indicated that the larger flows spread out over the basin and

21  helped to recharge it more rapidly and more adequately, and

22  therefore they do serve a purpose.

23  BY MR. DENNIS:

24      Q  I think, Mr. Worts, if we refer to one or two of

25  your exhibits, I can perhaps have you demonstrate what I have

Z4

Z14

1    in mind.

2            MR. VEEDER:  This is not a question?  Is this a speech?

3            MR. DENNIS:  No, this is not a question.

4            THE COURT:  Relax, Mr. Veeder.

5    BY MR. DENNIS:

6            Q  As I understand, your Exhibit 50 shows that on

7    January 1, 1952, the basin was depleted to an extent of either

8    6,000, or 10,000 acre feet, depending on which curve you use;

9    is that correct, Mr. Worts?

10           A  No, you have the wrong date.

11           Q  What was the amount of the depletion on January 1,

12   1950?

13           A  I don't know.  It is not plotted as January.  It is

14   plotted as water years.

15           Q  This is a water year rather than a calendar year?

16           A  That is what the graph states right at the bottom.

17           Q  Is it possible from your curve, though, to determine

18   where the amount of the depletion in January of 1950 from

19   Exhibit 50?

20           A  No.

21           Q  So that the only points on your curve would be the

22   circles which actually mean anything?

23           A  Well, that is what the graph is for.  They show the

24   situation as of the end of the water year.

25           Q  They do not attempt to show what the condition was

4587

A

Z15

1   except at the end of the water year?

2       A  The water levels , curve B, shows what the situation

3   was at the end of the water year.  Curve A is the mathematic

4   accumulation of the best estimates that we could make of the

5   recharge and discharge for the water year.  And that is the

6   comparison.

7       Q  And so the only function that the line connecting

8   the various circles has is to show that there was a depletion

9   or a recharge of the basin and not to show the amount of the

10  discharge or depletion at any particular time during that water

11  year?

12      A  I can't answer that question the way you have worded

13  it.  You have got it gummed up.

14      Q  Well, it is not possible from Exhibit 50 to determine

15  the amount of depletion in the basin at any time other than

16  at the end of the water year; is that correct?

17      A  That is correct.

18      Q  Now, would you say that from an inspection of your

19  curve or your exhibit for the water years 1950-1951, would

20  you say the basin was depleted on January 1, 1952?

21      A  January 1 is not shown on this exhibit.

22      Q  No, but the basin was depleted at the end on

23  September 30, 1951-- there was depletion, was there not?

24      A  There was some depletion.

25      Q  And you can tell us the amount of that depletion,

A

Z16

1    can you not, from Exhibit 50?

2        A  Yes, I will have to refer to curve B.  It reflects

3    what the water levels show, which to me is the best measure,

4    which is on the order of 6,000 acre feet.

5        Q  Then calling your attention to Exhibit 23, which

6    represents the runoff at the Fallbrook station for the water

7    year, among other years, for the water year ending September

8    30, 1952, can you tell us the amount of water which passed

9    the Fallbrook station for the month of October, 1951, in acre

10   feet?

11       A  90.

12       Q  And for the month of November?

13       A  155.

14       Q  And for the month of December?

15       A  2,750.

16       Q  And for the first 11 days of January the flow was

17   rather negligible, was it not-- approximately some place from

18   20 to 60 acre feet a day?

19       A  That would be on the order.

20       MR. VEEDER:  I submit, your Honor, that this goes far

21   beyond anything I asked on redirect examination.

22       THE COURT:  I don't know yet what he is getting at.

23   Overruled.

24       MR. DENNIS:  I have one or two examples here, your

25   Honor, from the run of the river to show that suddenly there

A

Z17

1    are these flash floods and we can cover a period of about eight

2    days for this one year and it will show that on one day there

3    will be far more water passing the Ysidora station than passed

4    at the combined station as shown on Exhibit 29; that it shows

5    that the difference in the quantities of water which passed

6    past Ysidora as compared with the Fallbrook station, it shows

7    that the water does not all go into the underground; that the

8    condition of the flow is such, as your Honor said he thought

9    existed, and that is that when these large quantities of water

10   come down the Santa Margarita River that a large percentage

11   of it passes entirely over the basin.

12        MR. VEEDER:  I will be glad to call Mr. Hofmann back,

13   your Honor.

14        MR. DENNIS:  And I think it has a direct bearing on the

15   witness's interpretation on Exhibit 49, and also on the exhibit

16   which he prepared, which I think is 38A or B.

17        MR. VEEDER:  It makes a difference.

18        THE COURT:  Where are we going to get on this, Mr.

19   Dennis?  I think everybody in this room would concede that

20   if 50,000 acre feet-- let's take a real flood-- came down in

21   24, hours, that most of it would go over-- I will not say most

22   of it-- a large part would go right over the basin into the

23   sea.  We would also concede that if 50,000 acre feet fell in

24   a water year and could be divided up equally day by day so

25   that all through the summer, which is an impossible situation,

A

Z18

1  you had an average runoff, you would fill that basin to

2  capacity in the best possible way.

3      Now, in between those two situations it is a matter of

4  degree, and I don't know that any witness can tell you or

5  anybody can tell you what the situation is.  It depends on the

6  year in question.  Some years you will get nice easy rains,

7  the kind of rains which lead to gradual runoff, and this will

8  go on month after month.  In other years you will get a lot

9  of rain at one time and then you will not get any rain for a

10  month and you get all your water at one time.  You have a

11  different situation when you get your water spread over a

12  period of time.  I think these facts are almost self-evident.

13  Do you agree generally?

14      THE WITNESS:  I certainly do, your Honor.

15      THE COURT:  What are we going to get wasting a lot of

16  time on this?  Can anybody give me some kind of chart or

17  quadrant and say how this works?

18      MR. DENNIS:  Your Honor, I was trying to take a period

19  of about 12 days which are typical of the flood on the Santa

20  Margarita River, and I think it is in evidence and we made a

21  good record, but whether we have it before the Court-- your

22  Honor has said a couple of times if we are trying this to

23  make a record or for your information-- I think Exhibit 26,

24  Exhibit 27, Exhibit 23, that series of exhibits, plus Exhibit

25  60, which is up to 1952, is an estimate made by Mr. Kunkel,

A

Z19

1   or partially an estimate made by Mr. Kunkel--

2           THE WITNESS:  Not Mr. Kunkel.

3           MR. DENNIS:  Pardon me.  Or by Mr. Hofmann.

4           --show that in the river with which we are dealing the

5   Santa Margarita River, that you have a situation in which the

6   Pendleton Basin is depleted during the period when the

7   Pendleton Basin is depleted as shown by Plaintiff's Exhibit 50;

8   that you have these floods that come down for maybe five or

9   six days, during which period of time 50% of the water, or 60%

10   or 70% of the water passes over the basin and into the sea

11   and the basin is not materially recharged.  They will show

12   that in many instances when there is 30, 40 or 50,000 acre feet

13   of water goes into the sea the basin has only been recharged by

14   maybe two or three thousand acre feet.  An examination of those

15   exhibits will also show that out of the 33 years, in approx-

16   imately 22 of those years there was more water, the increase

17   below the Fallbrook Gaging Station and the amount of water

18   which was brought into the watershed, either through pre-

19   cipitation or runoff through the tributaries which enter the

20   Santa Margarita River below the proposed Fallbrook Dam Site

21   amounts to considerably more than the amount of water which

22   went into the underground basin.  If you use the same formula

23   which Mr. Worts used in preparing Exhibit 49, that is, if you

24   take the difference between the combined runoff at the De Luz

25   Dam Site-- when I say the combined runoff, that is the runoff

A

Z20

1    from De Luz Creek plus the runoff from the Santa Margarita

2    River at that point-- and take the amount of water which leaves

3    the Ysidora Gaging Station, which is at the mouth of the

4    basin, you will find that there is more water collected in

5    that area below the dam than you can actually put into the

6    Pendleton Basin from surface flow of the Santa Margarita River,

7    that is, disregarding underground flow and the other factors

8    which are shown on Plaintiff's Exhibit 49.

9         If your Honor is well aware that those facts can be

10    developed from those exhibits, and it only takes a casual

11    inspection of two of them, which I was going to do with this

12    witness, for January 12 to January 30, 1952, or you can take--

13    I have other examples into which I was not going to go at this

14    time-- it will demonstrate, I think, to anybody beyond question

15    of doubt, and if the plaintiff is willing to concede that point

16    I see no reason for going into this particular type of

17    evidence.

18         THE COURT:  Why don't you do this, Mr. Dennis?  If you

19    have an example or two that you want to use, why don't you

20    pull the facts out of the various exhibits where they appear

21    and prepare a sheet here and give it to the witness and let

22    him check it over to see whether your facts are right and then

23    ask him your questions on it?  You will save a lot of time.

24    He might concede the facts that you pull together.

25         MR. DENNIS:  I will be very glad to prepare such a sheet

A

Z21

1    and submit it to the witness, your Honor.  Of course, I can't

2    do it today.

3        THE COURT:  Is it all right with you to do it that way?

4        MR. DENNIS:  Yes, I would prefer to do it that way, your

5    Honor.

6        THE COURT:  All right, we will have the witness back

7    sometime and you can submit it to him.  Let the witness look

8    at it before you question him and let him check the figures on

9    it.

10       MR. VEEDER:  When will we have this, Mr. Dennis?

11       MR. DENNIS:  I will try to have it next Tuesday.  I

12   certainly will not be able to prepare it today, I don't think.

13       MR. VEEDER:  If I am to recall Mr. Worts--

14       MR. DENNIS:  You may not want to.  All you have to do

15   is check it.

16       MR. VEEDER:  I heard you testify, or whatever you were

17   doing here.  I don't believe in what you said.  You better

18   get a witness of your own.

19       THE COURT:  You can prepare it by the first of the week?

20       MR. DENNIS:  Yes, your Honor, I can do that.

21       THE COURT:  And then we can have Mr. Worts back and

22   save a lot of time.

23       MR. DENNIS:  I doubt that when it is prepared it will

24   be necessary to have Mr. Worts, because actually all it will

25   be is a tabulation of the figures contained in plaintiff's

A

Z22

1    exhibits.

2        MR. VEEDER:  Then I submit that is a point for the

3    Court to determine.

4        THE COURT:  All right.  It would be helpful to me, Mr.

5    Veeder, whether you believe it or not.

6        So you prepare it, Mr. Dennis, and submit it to Mr.

7    Veeder for Mr. Worts, and later on if we need Mr. Worts we

8    can have him back again.

9    BY MR. DENNIS:

10       Q  Mr. Worts, are you aware of the fact that the Vails

11   constructed a dam at Nigger Canyon and that the gates were

12   closed in 1948?

13       MR. VEEDER:  That goes far beyond the redirect exam-

14   ination, your Honor.

15       THE COURT:  Sustained.

16       MR. DENNIS:  What I wanted to bring out in regard to

17   this question is:  Would his figures in regard to the recharge

18   of the Pendleton Basin be different if the Vail Dam had not

19   been constructed?  In other words, by interfering with the flow

20   of the Temecula River at the Vail Dam Site, stopping the entire

21   flow during the flood periods, has had any effect upon what

22   the recharge would have been to the Pendleton Basin.

23       THE COURT:  All right, you may inquire.  I will set

24   aside my ruling.

25       THE WITNESS:  No, I haven't made any studies of that at

     all.  I have taken what the actual figures worked out on

A

Z23

1    Exhibit 60 and 62 and worked out my graph 49.  I have not

2    gone upstream to find out why the flow was what it was.  I

3    took it at what it was and its effect on the Camp Pendleton

4    Basin.

5         Q  But if the Vail Dam had not been constructed there

6    wouldn't have been an increased flow--

7         MR. VEEDER:  I renew my objection, your Honor.

8    BY MR. DENNIS:

9         Q  --into the Pendleton Basin?

10        A  I don't know.  It all depends on how the flow came.

11   There are a lot of variables there to be considered.

12        THE COURT:  Overruled.  The witness has answered.

13        The point Mr. Dennis is getting at, he asked you if

14   the Vail Dam had not been constructed whether there would have

15   been increased flow.  That, of course, as you say, you are not

16   able now to answer.

17        Assume, however, that there was a greater flow from

18   the areas of Nigger Canyon than there actually was during this

19   period, it would, I suppose, have some effect on your calcula-

20   tions?

21        THE WITNESS:  Here is the problem, your Honor, in trying

22   to restrict what would have happened.

23

24

25

B-1 ML j

1          Referring to Exhibit 15, Vail Dam so indicated,

2     when the flow that came down to that dam, and if the dam

3     were not there it has to cross this large permeable basin

4     shown on this exhibit as the Pauba Valley.  That creates an

5     immediate problem as to how much would go on through, how

6     much would -- we get into the old duration and magnitude,

7     permeability and depth to water again.  It makes it in-

8     soluble, as far as I am concerned.

9          Q  BY MR. DENNIS:  Now, I am calling your attention

10     to Exhibit 38.  I believe that you stated that the water

11     level profile in Ysidora Basin was largely controlled by the

12     pumpage in Ysidora Basin.  The reason that it sloped inland

13     from the sea was due to the pumpage in Ysidora Basin, is

14     that correct?

15          A  Well, that is the principal cause; but by the end

16     of the dry period, of course, there had been very little re-

17     charge reaching that basin, during the years 47-51.

18          Q  So that the water profile line in Ysidora Basin,

19     for practical purposes, undoubtedly represented the cone of

20     depression created by the wells which were pumped?

21          A  Definitely not.  It is our best measure of the

22     static non-pumping levels in the fall of the year.  If we

23     had used the pumping levels, the picture would be far worse

24     than that shown by the profile for --  Is it November, 1951?

25     Yes.

1    Q   I don't think you understood me correctly, Mr.

2  Worts.  Maybe I didn't make myself clear.  But if there had

3  been no pumping in the Ysidora Basin, the --

4    THE COURT:  What time?

5    MR. DENNIS:  At all.  Historically if there had been

6  no pumping in the Ysidora Basin.

7    Q   -- the water level profile line would have been

8  a gradual gradient from the head of the basin to the mouth

9  of it, would it not?

10   MR. VEEDER:  I am going to object to that, your

11 Honor.  There are ten thousand different things that could

12 occur:  pumping in Chappo Basin could have an effect, re-

13 charge, a thousand other things.

14   Q   BY MR. DENNIS:  I will put the question another way,

15 Mr. Worts:  If it had not been for pumping, the lowest

16 level of the water in the Ysidora Basin would not be in the

17 neighborhood of Wells 11-5-2D1 and 11-5-2C1 --

18   MR. VEEDER:  I am going to renew my objections, your

19 Honor.

20   Q   BY MR. DENNIS:  -- but in some other location,

21 would it not?

22   THE COURT:  Overruled.

23   THE WITNESS:  Yes.

24   THE COURT:  What are you trying to prove, that

25 pumping was harmful to the Ysidora Basin?

1    MR. DENNIS:  No.

2    THE COURT:  He has practically conceded that.

3    MR. DENNIS:  Yes.  No, your Honor, what I mean --

4    THE COURT:  The Government has ceased pumping in

5    Ysidora Basin, that is, ceased the excessive pumping that

6    was going on and moved up to Chappo.

7    What are you trying to prove?

8    MR. DENNIS:  No, the witness has testified on cross-

9    examination and redirect that he has made a great number of

10   conclusions because of the water levels shown on Exhibit 40

11   in the Wells 11-5-2E1, I believe it is -- I would have to --

12   Can we have that exhibit?

13   MR. VEEDER:  40.

14   MR. DENNIS:  Is it 40?

15   THE COURT:  I thought I could save some time, but

16   go ahead with your questions.

17   MR. DENNIS:  I might help the Court in arriving, too,

18   in setting a theory.

19   THE COURT:  Will you tell me in simple language what

20   you are trying to prove?

21   MR. DENNIS:  Yes, actually that the --    No, that

22   is the wrong one.  There is another exhibit.

23   MR. VEEDER:  That is what you asked for.

24   MR. DENNIS:  I know I asked for 40.

25   MR. VEEDER:  You want 44 or 45.

1   THE COURT: I don't want to see the exhibits. Tell

2 me what you are trying to prove.

3   MR. DENNIS: Well, he compared the runoff and the

4 contents --  If I saw the exhibits, I would get the correct

5 wells on. I think it was 11-5-2B1 and 2B2 -- and stated

6 that, in his opinion, certain conclusions could be drawn

7 from them. What I want to prove is that actually the

8 pumping of the wells during the year in question had more

9 effect on the water levels in those wells as of the recharge

10 from the river at the time that it came down had less effect

11 on the rise and lowering of the water levels in those wells

12 than the pumping did; in other words, the pumping of the

13 wells in that particular basin had more effect on those

14 water levels than any other condition.

15   THE COURT: Pumping, you say, more or less. What

16 does "more" mean? Nobody disputes the fact that the pumping

17 of those wells, those large quantities of water out of the

18 Ysidora Basin was a factor. And nobody would seriously

19 argue that if there was no recharge at all, that would be a

20 factor. If there was a small recharge, that would be a

21 factor. But how can you give the Court any help on --

22 you say one is more important than the other. What does

23 "more" mean? Certainly they are related factors. If you

24 have got a big recharge coming in, you can gage a lot of

25 pumping. If you had a small amount of recharge coming in,

1600

1   a greater amount of pumping would be more hazardous in the

2   Ysidora Basin.

3   MR. DENNIS:  That is true, your Honor, but if you

4   have this situation:  that you have a well and you pump it

5   for a month, you pull the water table in the neighborhood

6   of that well down.  Now, you may turn that well off, but it

7   doesn't come back immediately.  It may take two or three

8   months before that water table will recover to where it

9   would have been had that well not been pumped.  Now, if you

10  have a well that is in the immediate vicinity of a well

11  which has been pumped and you take only one reading in that

12  well within, we will say, four or five days after you cease

13  to pump the well, which is within several hundred feet of

14  it, or maybe even a quarter of a mile, as you might have in

15  this case, you do not get the static water table within that

16  basin; you get a reading of a water level which has been

17  affected by the fact that a well in the immediate neighbor-

18  hood of that well has been pumped.  And the water levels

19  that the witness took in Ysidora, the well which he has in

20  question, which he refers to in the exhibit, is in the close

21  proximity to two or three wells which were being pumped for

22  camp use and for irrigation use.  Now, he said when the well

23  came up, it showed that was because the basin was being re-

24  charged, as I recall.

25  THE COURT:  I didn't understand that.  I understood

1    the well came up to a certain extent when the pumping

2    ceased.

3    MR. DENNIS:  That is right.  In other words, that

4    the well -- if your Honor has well in mind that the rise in

5    the water levels was due primarily to the fact that the wells

6    in the immediate neighborhood in the particular well that

7    was measured ceased to be pumped rather than the fact that

8    there was a recharge of the basin, then, I have no other

9    questions.

10    THE COURT:  I wouldn't go that far.  But this is one

11    of these things that you can't put your finger on.  You

12    pump a well, and you form a cone of depression around the

13    well that you pump. All right.  You quit pumping that well.

14    What happens?  Obviously, water that is in the basin, what-

15    ever it is, is going to move towards this cone of depression.

16    MR. DENNIS:  Right.

17    THE COURT:  And therefore, little water or much in

18    the basin is going to then affect the level of the wells.

19    It is not going to do it immediately.  The water has to move

20    in slowly in its underground strata.  I don't know how you

21    can pin anything down and say that it is going to take so

22    many days and so many minutes to restore the level, and it

23    will do this if you have a certain amount of incharge and

24    it won't do it if you don't.  Now, if you think this is

25    important, I am going to let you go ahead.

4602

1      THE COURT:  I think your Honor has that well in mind,

2  which I see you have.  I don't see any reason for going

3  into it.

4      THE COURT:  I fully think incharge is a factor, in-

5  flow is a factor.  You can't pump a basin without having

6  water coming into it.   But whether you are going to be

7  able to give me any doubt on how much water has to come

8  into it to justify a certain amount of pumping --

9      MR. DENNIS:  I think that the witness has already

10  testified on that respect, and I don't think I will go into

11  it.                         .

12          Could I have 29-F?  I believe I have just one

13  other field I want to explore.

14      THE WITNESS:  If your Honor desires, I could clarify

15  this in just about two words.

16      THE COURT:  All right.

17      THE WITNESS:  You want to give me Exhibit 51-B,

18  please?  I would like to refer to Wells 11-5-2B2 along the

19  top of the graph.  You will observe where the water level

20  recovered in 1950 and 1951 when there was zero outflow at

21  Ysidora gage, meaning there was very little recharge in

22  Ysidora Subbasin.  You will note that in the fall of 1951,

23  the level recovered to about sea level or on that order,

24  which would have been the points at which it recovered in

25  the two previous years, the peaks, in the spring of each

B-2

year.  You will notice that following the runoff of some

47,640 acre-feet past Ysidora gage, beginning sometime in

January, that the water level recovered approximately ten

to twelve feet above the previous highs of the previous

year, of the previous preceding two years -- that is, the

high of 1950 and 1951.  That increase is a major of the

recharge from the river.  So that, in general terms, shows --

THE COURT:  While the upturn in the latter part of

1951, was water coming in from other parts of the basin to

even up or to fill up this (inaudible)?

THE WITNESS:  That is right, your Honor.  That is

right.  When the wells are pumping in those highly permeable

deposits, the major part of the recovery is very quick,

probably in the first ten minutes.  And then, from the first

ten minutes or half-hour onward, it may take a week or so

to equalize out through the basin.

Q  BY MR. DENNIS:  Did you take into consideration,

Mr. Worts, in the preparation of Exhibit 49, any of the

underground flow of De Luz Creek into the Pendleton Basin?

A    I took the underflow at De Luz damsite.

Q    And how did you arrive at the amount of sub-

surface flow at the De Luz dam -- I mean from De Luz Creek.

I am talking now, strictly speaking, from De Luz Creek.

A    No.

Q    You didn't try to compute that?

1        A    No.

2        Q    It is true, is it not, that on Exhibit 29-F,

3   which is the topog map, the topog shows that De Luz Creek is

4   not an intermittent stream above the boundaries of Camp

5   Pendleton, although it is shown as an intermittent stream on

6   Exhibit 37?  Is it not true that starting up here with the

7   east fork of the De Luz Creek where it crosses the San

8   Diego-Riverside County line there it is shown as a perennial

9   stream from that point down to approximately Section 8?

10       A    Shown as a perennial stream?

11       MR. VEEDER:  Your Honor, I object to this.  Certainly

12  29-F was not offered in evidence to prove the perennial

13  character or the intermittent character of any of these

14  streams.

15       MR. DENNIS:  The purpose for this, Mr. Veeder, is

16  that if you have the stream --

17       MR. VEEDER:  You address yourself to the Court.

18       MR. DENNIS:  -- flowing through the entire year as

19  the surface flow and it suddenly disappears into an alluvial

20  deposit, as shown on Exhibit 37, that there is considerable

21  underground or sub-surface flow in the De Luz Creek water-

22  shed and entering the Pendleton Basin.

23       THE COURT:  The objection is overruled.  The witness

24  may answer the question.  But that doesn't solve it for us.

25            What does the topog map show?

Worts — Recross                                                     4605

1    THE WITNESS: The topographic map, your Honor, shows

2    as of 1948 that there was a perennial flow through the reach

3    that Mr. Dennis mentioned, which is from the Riverside-San

4    Diego County line continuously down to the north edge of

5    Section 8, 9 South, 4 West.

6    THE COURT:  You know whether or not in that year or

7    each year thereafter there was a perennial flow (inaudible)?

8    THE WITNESS:  I have no idea, your Honor.  I am

9    going by the dates, the field check on the left-hand legend

10   of the map.

11   Q  BY MR. DENNIS:  Such portion of the perennial

12   flow of that stream that went into the alluvial deposits,

13   shown on 37, are not taken into consideration as a matter

14   of recharge for the Pendleton Basin?

15   A    Certainly they were.

16   Q    How did you arrive at the amount of water?

17   A    On Exhibit 49 we have shown ground water inflow

18   as an element in the legend, and that estimate is made at

19   De Luz damsite, which includes everything.

20   Q    How did you arrive at that figure?

21   A    By the equation:  The quantity equals the

22   transmissibility, times the hydrolic gradient, times the

23   width or distance across the inflow section.

24   Q    And you made such a study?

25   A    Yes.

1    MR. DENNIS:  That is all.

2    MR. VEEDER:  Anyone else?

3    THE COURT:  Now, we are going to have some more re-

4  redirect?

5    MR. MOSKOVITZ:  Your Honor, I have some recross.

6    THE COURT:  What is that?

7    MR. MOSKOVITZ:  I have some recross.

8    THE COURT:  All right.

9

10                    RECROSS-EXAMINATION

11  BY MR. MOSKOVITZ:-

12    Q    Mr. Worts, in your opinion, is the recent

13  alluvium in Pauba Valley and the materials, older continental

14  deposits, from which the Pauba well draws its water in

15  hydrolic continuity?

16    A    Yes.

17    Q    Would you say that that hydrolic continuity is

18  good or poor?

19    A    Well, whereabouts in the basin?

20    MR. VEEDER:  What do you mean by "good"?

21    MR. STAHLMAN:  That doesn't tell us much.

22    MR. MOSKOVITZ:  Are you making an objection, Mr.

23  Veeder?

24    MR. VEEDER:  Yes, sir.

25    MR. STAHLMAN:  I will make one.

1  MR. VEEDER: I will make an objection. What do you

2  mean by "good"?

3  THE COURT: All right. Objection sustained. You

4  may proceed.

5  Q  BY MR. MOSKOVITZ: Mr. Worts, would you say that

6  the hydrolic continuity between those two zones I described

7  is poor?

8  MR. VEEDER: I object the same way. "Good," or

9  "poor," what does he mean?

10  MR. MOSKOVITZ: Your Honor, the witness has used that

11  very adjective in describing another area, and I would like

12  to have him compare it. I can cite you the place where he

13  used it.

14  MR. VEEDER: We know in regard to the Pauba --

15  THE COURT: Wait a minute. Just a minute. I suppose

16  that that may be the only way to present some evidence here,

17  but it is not going to be a big help to the Court unless it

18  is followed up, maybe, with statement of reasons to set

19  forth more facts. And your question also doesn't talk about

20  what area of continuity between the older alluvial and the

21  younger alluvial --

22  MR. MOSKOVITZ: I can develop that if there is a

23  distinction between various areas in Pauba Valley.

24  THE COURT: Maybe there is and maybe there isn't.

25  You just generally asked the question as to contact.

1    MR. MOSKOVITZ:  And, your Honor, I do plan to pursue

2  this further.  The description of the hydrolic continuity

3  upwards being poor had some consequences, and I want to find

4  out what consequences.

5    THE COURT:  Mr. Witness, in the Pauba Valley, in the

6  areas of contact between the younger alluvial and the older

7  alluvial, which would be both north and south of Pauba

8  Valley, would you say that the contact was uniform running

9  the length of Pauba Valley, or does it differ in places?

10    MR. MOSKOVITZ:  Might I interrupt for just a moment.

11  The question I asked related to the material vertically down

12  from the younger alluvium rather than to the sides.  However,

13  I don't mind your going ahead.

14    THE COURT:  Nobody could have told that from your

15  question, if that is what you had in mind.  That is one of

16  the faults of your question:  too general.  You are talking

17  now about contacts where younger alluvial overlies older

18  alluvial?  That is what you are talking about?

19    MR. MOSKOVITZ:  Yes, your Honor.  I specified I was

20  talking about the deposits from which the Pauba well secured

21  its water.

22    THE COURT:  Maybe you are thinking about it, but I

23  didn't hear it.

24    MR. MOSKOVITZ:  No, I said that.

25    THE COURT:  I didn't hear your question.

1 MR. MOSKOVITZ: That was in the question, your Honor.

2 Q Did you not understand that to be the question?

3 A Not exactly. But these questions are getting

4 very detailed on this Upper Valley. And Mr. Kunkel knows

5 much more about the details than I do. I answered many

6 general questions on the area because the work was done

7 under my supervision, and I have talked it over with Mr.

8 Kunkel. But when you get into the fine points, I think he

9 knows the details of the area a great deal better than I.

10 And it would be more informative if you would direct your

11 questions to him.

12 THE COURT: This is the error, what ensues when I

13 let Mr. Stahlman go ahead. It was not proper cross to let

14 him go into matters in the Pauba Valley. And this witness

15 had not testified on direct about that. This witness was

16 called about the lower part of the valley. Now, he tells

17 you he is going to give you a second-hand opinion. If you

18 want it, I may or may not let you have it. But I don't

19 know why you want it when he tells you he was in charge of

20 the work; Mr. Kunkel was the man who did the work; he

21 discussed it with Mr. Kunkel. You are going to get a second-

22 hand opinion if you get one from him.

23 MR. MOSKOVITZ: First of all, your Honor, I wouldn't

24 have asked the questions had the matter not been opened up.

25 But it has been opened up, and we do have this witness'

opinion as to whether continuity is poor or good in the
areas that he made the study of.  He was in charge of the
study made in the Upper Basin.  And I would like to relate
the situation in the Upper Basin, which he does have some
knowledge of --

MR. VEEDER:  I renew my objection.

MR. MOSKOVITZ:  -- with the situation down in the
Lower Basin.  Now, the matter has been opened up.  Now, if
the witness feels he cannot answer the question, that ends
it.

MR. VEEDER:  Your Honor, I think that from the stand-
point of the presentation of the Government's case in chief
we are entitled to some consideration on this.  We didn't
offer this witness, nor did we call him in regard --

MR. MOSKOVITZ:  No, but did you object when Mr.
Stahlman asked questions of him?

MR. VEEDER:  The point I am trying to make, your
Honor, is that I don't believe that Mr. Worts should be
interrogated any further on this phase of the matter.  I
am going to call -- just as soon as Mr. Worts is off the
stand, Mr. Kunkel is going on the stand, and, pursuant to
your request that we get this data.  Now, if they want to
go into that subject, I suppose it is all right.  But I
submit we can go on forever on this thing.

THE COURT:  Again, Mr. Moskovitz, recall what I told

you before. It depends on whether you are trying this case for me or whether you think it is going to do you some good in the record. Now, personally, this man was called as a witness downstream. I am not going to pay a lot of attention to what he said about upstream or whether he was in charge of the work. I know something about how studies have to be made. A man may be in charge of it but somebody else does the work. You have a law clerk assigned to you. You are in charge of the briefs that have to be filed. You have to take the responsibility for it. Chances are he knows more about how detailed the research was than you know about it. Now, if you think you want it for the record, all right. If you want it for me, skip it, because I am going to listen more to witnesses who say they made the study in that area and not some man who said, "Yes, I was over-all in charge but that wasn't really the area where I worked."

You think it over. We will take our recess.

(Recess.)

C

Z24

1    MR. MOSKOVITZ:  Your Honor, I want to make it plain

2    that I am trying the case for you, although I do anticipate

3    there will probably be an appeal by Mr. Veeder and I would

4    like to have as good a record as possible when that happens.

5    MR. VEEDER:  Is he trying the case for you?

6    MR. MOSKOVITZ:  And certainly if the facts that are

7    brought out are not going to help you, I am not interested.

8    Although I think sometimes facts may be of value that we

9    can't anticipate when I start.  The main problem is this, that

10   we have different witnesses for different parts of the water-

11   shed, and yet it is the unit that we are trying in this law-

12   suit, we are trying the one watershed, and I think it is

13   important from time to time to try to relate the various parts

14   of the watershed together.  And this is what I am trying to do

15   here.  I would like to proceed for a little bit and if it

16   looks as though the witness can't answer it or it is of no

17   value I will stop.  But I think it might be helpful.

18   THE COURT:  All right.

19 BY MR. MOSKOVITZ:

20   Q  Now, Mr. Worts, I will pose the question again and

21   see if you can answer it.  In your opinion  is the hydraulic

22   continuity between the Recent alluvium in Pauba Valley and

23   the materials from which the Pauba Well draws its water

24   supply, is tht hydraulic continuity poor?

25   MR. VEEDER: I want to have that question read back,

4613

because I want to be sure I understand where this fellow is going.

THE COURT: Read it.

(The reporter read the pending question.)

THE WITNESS: No. As far as my connection with the studies is concerned, the entire area of both the younger and older alluvium are as shown vertically by Exhibit 16 in the Pauba Valley, and by Exhibit 15 in the Pauba Valley in the adjacent Qtoal. It is one hydrologic unit that responds to the effects of pumping from either or both of the units and responds to recharge and discharge from the entire system.

BY MR. MOSKOVITZ:

Q So your answer is that the hydraulic continuity is not poor?

A That is right.

Q Now, you testified with regard to the east side of Ysidora Basin, with respect to wells 11-5-2A5 and 11-5-2A1, that the hydraulic continuity between the water in those two wells was poor. You are not changing your testimony as to that, are you?

A I don't recall exactly how I stated it.

MR. MOSKOVITZ: Perhaps I can refer the witness to the transcript. I refer you to Volume No. 38 for November, 1958, at page 4011. It is just a few lines. Perhaps I can read it to the witness.

1    THE COURT:  Read it.

2    MR. MOSKOVITZ:  "THE COURT:  But the shallow

3         well on the east side of the basin doesn't

4         bear much resemblance to the other charts.

5             "THE WITNESS:  That is right.  In

6         other words, the shallow water on the east

7         side of Ysidora Subbasin is in a poor

8         hydraulic continuity or connection with

9         the water in the deep zone in that part

10        of the basin."

11   THE WITNESS:  That is a comparison of the two pairs of

12   shallow and deep wells on opposite sides of the basin.

13   THE COURT:  The word "poor" there is used relatively,

14   I take it, in comparison with the other side of Ysidora Basin?

15        THE WITNESS:  That is right, your Honor.

16        May I see Exhibit--

17        MR. MOSKOVITZ:  It would probably be Exhibit 46,

18   wouldn't it?

19        THE WITNESS:  Exhibit 46.  This exhibit would have shown,

20   I am sure, a much better relationship if the water in the

21   shallow well had not been affected by the sewage effluent

22   being dumped  onto the ground nearby.  By "nearby" I mean near

23   Wells 2A1 and 2A5.  You will notice that despite this sewage

24   effluent being discharged onto the basin, the minor ups and

25   downs of the shallow well reflect in a minor degree the same

C

A27

1　things shown by the major fluctuations in the deeper well.

2　Of course, that is masked, as I indicated, by the sewage plant

3　discharging nearby.

4　BY MR. MOSKOVITZ:

5　　　Q  So when you used the adjective "poor" you were com-

6　paring the hydraulic continuity that exists between the deep

7　and the shallow wells in these two sides of Ysidora Subbasin?

8　　　A  As the Court said, relative one to the other.

9　　　Q  Let us compare the hydraulic continuity in two other

10　situations.  Let us take the east side of Ysidora Subbasin and

11　the relationship between 11-5-2A5 and 11-5-2A1 on the one hand,

12　and then on the other hand the relationship between A2-17M1,

13　which is the Pauba well, and the adjacent shallow well A2-18R1.

14　　　MR. VEEDER:  I renew my objection.

15　　　THE COURT:  Overruled.

16　BY MR. MOSKOVITZ:

17　　　Q  In comparing those two, would you say that the

18　hydraulic continuity between A2-17M1 and A2-18R1 is poor?

19　　　MR. VEEDER: Just a moment.  What are the names of

20　those wells?  Maybe the witness would understand better if he

21　knew the names of them.

22　　　MR. MOSKOVITZ:  I believe that A2-17M1 is the Pauba

23　Well.  For A2-18R1 right now I see no name on Exhibit 16,

24　so I do not know.

25　　　THE COURT:  Can you answer the question, Mr. Worts?

C

Z28

1        THE WITNESS:  Not without referring to some data.  I

2    observe, for one thing, that 18R1 is across the fault, the

3    Wildomar Fault.  The Pauba Well is on the upstream side, and

4    18R1 is on the downstream side.  So it wouldn't be at all

5    comparable to the situation in Ysidora Subbasin.

6        MR. VEEDER:  You are referring to Exhibit 16 when you

7    made your response?

8        THE WITNESS:  I am referring to Exhibit 16 when I am

9    discussing the Pauba Well and Well 18R1, with the Wildomar

10   Fault between them.  I am referring to Exhibit 46 when I am

11   saying there is no lateral barrier between the wells on the

12   east and west sides of Ysidora Subbasin.

13   BY MR. MOSKOVITZ:

14       Q  Can you answer the question, nevertheless?

15       A  Not without looking at some data.  We don't have

16   any plots.  I don't even know whether there are any water

17   level records other than the few we took during a short

18   pumping test of that well.  Here we have a well that we have

19   pumped.  When I say "here", I am talking about the Pauba Well.

20   We pumped it for 72 hours, and as I recall-- this is to the

21   best of my recollection-- there was no effect in this well.

22   Down here we are--

23       Q  By "this well," which one?

24       A  18R1.  But in this, on Exhibit 46, we are talking

25   about a whole season of pumping.  In other words, we may be

C

Z29

1    talking about a few tens of acre feet pumped out of the Pauba

2    Well during the test.  We are talking about several thousand

3    being pumped out of the Ysidora Subbasin during the pumping

4    season.

5         Q  Referring to this test of the pumping of the Pauba

6    Well, that you just mentioned, I hand you Exhibit 16A-73 and

7    ask you whether this is a copy of the records which were

8    kept of that pumping test?

9         A  Yes, these are facsimile prints of the U. S.

10   Geological Survey field records.

11        Q  And were those made by you or under your direction?

12        A  These were made by Mr. Robert Waite, whose initials

13   R.W. appear in the next to the last column.

14        Q  Were they made under your direction?

15        A  Yes.

16        Q  And are they accurate as far as you know?

17        A  Yes.  I would need to have the information, I think,

18   that we supplied you as to the period of pumping the Pauba

19   Well, which is not shown on these water level sheets.  Do you

20   have that information?

21        Q  Not readily at hand.  It is in the record.

22             Without having that precise information, do you

23   know whether the pumping test that was conducted showed that

24   there was any effect on the water level in shallow wells

25   nearby the Pauba Well from the pumping of the Pauba Well?

C

230

1      A  Well, for example, what shallow well?

2      Q  Whatever shallow well that you examined.

3      A  Well, you are asking the question.  Which ones?

4      Q  You have the exhibit.

5      A  I will give it to you.

6      Q  I would rather have you look at the exhibit and
tell me whether from the exhibit you can tell whether any
change was noted?  I suggest to you that no change was noted;
is that correct?

10      A  I don't know.  To go through all these and compare
them where the wells are located and decide-- I think there
is a well in here, an intermediate depth well that we call
the Studley.  I don't even know whether this is the Studley
well on here.

15      MR. VEEDER:  That is 17G1?

16      THE WITNESS:  That is what it shows here.

17      THE COURT:  I am going to sustain my own objection to
further cross-examination along this line.  The witness was
not examined on direct examination as to that. You wanted to
do some relating back and forth.  I don't know where you have
got with your relating.  If you say it is in the record, it
is in the record.

23      MR. MOSKOVITZ:  All right, I will not pursue this
particular exhibit any further, your Honor.  May I ask a few
more questions?

C

Z31

1          THE COURT:  You may proceed.

2     BY MR. MOSKOVITZ:

3          Q  Are you aware that the level of water in wells

4     drilled into the Recent alluvium only in Pauba Basin are lower

5     than the level of water in the wells that are drilled into the

6     older continental deposits in Pauba Basin?

7          A  Whereabouts in the basin?

8          Q  Throughout the basin.

9          A  Well, I am not familiar enough to give you a

10    sweeping answer for the whole valley.

11         Q  Are you aware that in any part of the valley this is

12    so?

13         A  I know there are flowing wells of intermediate depth

14    shown on Exhibit 16 that flow-- I recall the China Garden

15    Well and the Dairy artesian well and the Studley artesian

16    well flow-- that are on the order of four or five hundred feet

17    deep.

18         Q  And this shows that their water level, if a pipe

19    were put above the ground, the water level would be above the

20    surface of the ground; is that correct?

21         A  Yes.

22         Q  Are you aware of any shallow wells, that is, wells

23    drilled only in the Recent alluvium that show such character-

24    istics?

25         A  I don't recall that well, whether there are any

C

Z32

1    flowing wells just drilled in the Recent alluvium or not on

2    the upstream side of the fault.

3         Q  Let us assume that there are no such wells, that is,

4    no shallow wells that show levels above the ground, whereas

5    deep wells do.  Would that give you any indication as to

6    whether the hydraulic continuity between two such wells, one

7    shallow and one deep, was poor?

8         MR. VEEDER:  I am going to object to this whole line

9    of questioning now, your Honor.  This witness didn't testify

10   on any of these matters.

11        THE COURT:  You had the witness examined on this

12   subject matter.  You can call your own witness on the subject

13   matter.

14        MR. MOSKOVITZ: We plan to, your Honor.

15        THE COURT:  I will sustain the objection.

16        MR. MOSKOVITZ:  I have no further questions, then.

17        MR. VEEDER:  Any further questions?

18        THE COURT:  Apparently there are no further questions.

19        Do you have an re-redirect?

20        MR. VEEDER:  Yes, your Honor, just one or two.

21

22                    RE-REDIRECT EXAMINATION

23   BY MR. VEEDER:

24        Q  Have you given consideration to the duration of time

25   which would be required to flush out the Ysidora Basin now

C

Z32

1    that chloride water has moved into that area?

2    A  In terms of natural supply without--

3    Q  That is right.

4    A  As I recall, the maximum seaward hydraulic gradient

5    that you can establish across the basin seaward, shown on

6    Exhibit 38, is approximately seven feet per mile. That would

7    be shown approximately by the March, 1932, water level profile

8    so shown. Seven feet per mile is a pretty low gradient and

9    it can't compare with the inland gradient created during

10   periods of pumping, which I have not computed precisely. But

11   in the area where the wells are pumping in the vicinity, say,

12   of 2A1--

13   Q  You are now on 38?

14   A  I am still on 38. The maximum altitude above sea

15   level would be on the order of 18 feet above sea level. If

16   that could be maintained throughout the year, you would have

17   about the maximum natural seaward movement of all waters in the

18   basin, including the sea waters underlying. The pumping

19   levels in the basin for the wells that we have measured go at

20   least that far below sea level, particularly when they are all

21   pumping and interfering one with the other, one cone inter-

22   secting with another cone. They would go, in my opinion, they

23   would probably be deeper than that. And furthermore, those

24   wells are perforated in the lower segment of the--

25   THE COURT:  Do you remember the question now?

C

Z-33

1    How long a time, under natural conditions?

2         THE WITNESS:  That is what I was trying to relate.  In

3    other words, here is natural seaward gradient.  I was trying

4    to relate how long it took to get in.  I would say it would

5    take at least as long as it took to get in, under natural

6    conditions.

C2

7    BY MR. VEEDER:

8         Q  What, in your opinion, would be the relationship,

9    if any, between the availability of fresh water coming into the

10   basin and the flushing out of the basin by fresh water?

11        A  Delivering water to Ysidora Basin to keep it re-

12   charged would be essential in that operation.

13        MR. VEEDER:  I have no further questions.

14        THE COURT:  All right, Mr. Worts, you will be temporarily

15   excused.  You will be subject to call again, if needed.

16        MR. VEEDER:  In regard to bringing these exhibits to

17   date to 1958, I have been talkint to Mr. Worts about it.  As

18   I understand it, the final figures for this water year have

19   not been received.  It will take some time and there are quite

20   a number of exhibits involved, so I will move as rapidly as

21   I can on it, your Honor.  It may be necessary to make up a

22   new set of exhibits.  But in any event, we will go ahead with

23   it as directed.

24        THE COURT:  What do you mean, new set of exhibits?

25        MR. VEEDER:  It is entirely possible.  I don't know

C

Z34

1    whether Mr. Worts will be able to come down here and work in

2    the courtroom or not.  That is what will be entailed, to

3    revise these exhibits to bring them down to date, as I under-

4    stand it.  It might be better for us simply to take a set of

5    exhibits and have him add what his calculations are.

6        THE COURT:  If he worked out his material, it wouldn't

7    take any longer than it takes to draw a line to transfer them

8    from his work sheets onto the exhibits we have, and not

9    encumber the record with a new bunch of exhibits.  He could

10   use a different colored pencil to show that they have been

11   added on.

12       MR. VEEDER:  I will do the best I can, your Honor.

13       THE COURT:  All right.

14       MR. VEEDER:  It will take a little while.

15       I would like to inquire now, if I may, as to whether

16   the Querry and the Roripaugh data we have asked for is now

17   available.

18       MR. LITTLEWORTH:  Your Honor, we have some data on the

19   Roripaugh well, which I will show Mr. Veeder during the

20   recess.  But the Querry well was drilled before our client

21   owned the property, and I don't know where the well log is.

22       MR. VEEDER:  It was not filed with the State?

23       MR. LITTLEWORTH:  If it is, I don't have it.  I don't

24   know.  I don't have it myself.

25       THE COURT:  Let me ask a question or two.  If you want

C

Z35

1    time to think about it, you may have time.   Mr. Veeder asked

2    some questions about 12,500 acre feet of pumping, and he asked

3    other questions about 8,000 acre feet of pumping.   What is

4    the Government's contention?   That the Government is entitled

5    to pump 12,500 acre feet out of this basin?

6         MR. VEEDER:   Our contention, your Honor, is that we are

7    entitled to pump 23,000 acre feet a year out of the basin.

8    We are saying that.   Our operations would run-- I don't see

9    my Colonel at the moment-- I think our operations as of the

10   present time, our calculations, would run around 13,000 acre

11   feet.

12        In other words, we are in this position,   Had we not

13   been interfered with in this matter, our demands would have

14   exceeded by now 13,000 acre feet.   We are running in the

15   neighborhood of 12,500.   That is a figure that I have been

16   given by the Marine Corps.   I selected the 12,500 because I

17   think that is the one that probably will be best supported.

18   I use the 8,000 because of the fact that that is a figure

19   that appears on Plaintiff's Exhibit 49, if you will note,

20   in the year 1950.   It is right at 8,000 acre feet.

21        THE COURT:   What is the contention of Fallbrook?

22        MR. SACHSE:   I would like, first, to ask Mr. Veeder if

23   he has a copy of Exhibit 47, which shows the absolute

24   maximum pumpage at any time at less than 7,000 acre feet.

25   It is his own exhibit.

MR. VEEDER:  Perhaps I should have said water use rather than pumpage.

MR. SACHSE:  I should hope so.

MR. VEEDER:  You have made your point.

THE COURT: What do you mean by "water use"?  Where does the difference come in?

MR. VEEDER:  There is water diverted into Lake O'Neill, there is water that is diverted out of the river, and there is water that is consumed directly out of the basins.  So there is considerable water that is utilized which does not pass through the pumps.

THE COURT:  All right, we will pursue that further.

Now, Mr. Sachse, from the standpoint of Fallbrook, does Fallbrook have a position or a contention as to how much water and how many acre feet of water should be permitted each year to pass into this basin?

MR. SACHSE:  Fallbrook has no contention as to the extent of the United States's riparian right, except that Fallbrook will attempt to limit them in accordance with the law of California.

We would immediately respond to the statement of 23,000 by saying that it is patently and on its face ridiculous to exercise such as a riparian right, because there is not that kind of riparian water in the river for all of the riparians, Vail and everybody else included.  So they

4626

c

Z37

1 can't have it as a right. That would be my immediate response

2 to that.

3 And I think I have made it clear on many occasions that

4 Fallbrook claims only as an appropriator; that we recognize

5 that we can take only the water that comes to us and that

6 cannot be used by riparians under the proper exercise of their

7 rights; and we feel that the practical limitations of the

8 riparian right are that it is covered more or less in a general

9 way by the low flows, the summer flows, because that is the

10 only water that the riparian can use without storage, -- he

11 cannot take these peak high flows. He cannot irrigate when

12 it is already soaking wet, et cetera.

13 So our contention would be that the great bulk of the

14 wet season runoff is available for appropriation and is not

15 usable under a riparian right. But we would make no attempt

16 to delimit in acre feet or second feet or any other yardstick

17 the extent of the United States's riparian rights. They are

18 going to be correlative with Vail and all the other riparians.

19 THE COURT: Does the State of California have a

20 position or a contention on this issue?

21 MR. MOSKOVITZ: Basically, our contention is similar

22 to that which Mr. Sachse has expressed, that the Government

23 has riparian rights-- no doubt about that. The extent is

24 something that is hard to fix quantitatively at any particular

25 time correlatively. The United States has a basin which does

C

Z38

1    increase the usability of its riparian water, because naturally

2    the water is held for later use.  So that the Government is

3    certainly in a better position than it would be if there were

4    a surface stream only running through the beds.  But what the

5    quantity is, we have no position, as of now.  I think later on

6    when the time comes we may be able to assist the Court in

7    deciding just how an upstream dam which seeks to catch only

8    surplus water subject to appropriation should have to release

9    water to satisfy the downstream riparian.  This is a difficult

10   problem.

11        MR. VEEDER:  That presents a question to me that I

12   would like to have the State respond to, then.  What kind of

13   dam is Fallbrook going to build?  That is something we are

14   becoming increasingly concerned about, and I think it is a

15   matter that if the State has plans as to how it is going to

16   force Fallbrook to release water to us, maybe the State can

17   tell us what kind of dam Fallbrook is going to build.

18        MR. MOSKOVITZ:  The simple answer is that it doesn't

19   make any difference what kind of dam is built.  It is a

20   question of how much water goes by it.

21        MR. VEEDER:  Anybody who has had fifteen minutes of

22   experience in this business would know that it made a great

23   deal of difference as to the kind of dam that is built and

24   how the water is to be released.  It makes a great deal of

25   difference to us, the kind and type of structure that is going

1  to be built, and how water is going to be bypassed during the

2  runoff period.  We are entitled to know that.

3      MR. SACHSE:  I would suggest-- I don't know if I have a

4  copy in the files here or not, but it should be readily avail-

5  able-- I would suggest that Mr. Veeder read the existing

6  decision of the Water Rights Board.  It is pretty long and I

7  dont like to paraphrase it.  I would like to have it in my

8  hand before I comment.  But it has some very specific restric-

9  tions in it right now, even before any actual construction

10 program has been proposed.  It has restrictions as to records

11 that must be kept, the amount of water that must be permitted

12 to pass on downstream, et cetera.  There are already some very

13 specific limitations within the State's own decision, if you

14 read it.

15     MR. VEEDER:  I have read it, and there is no specific

16 limitation.

17     THE COURT:  We will have to get to those problems when

18 we get to them.

19     Of course, it strikes me, in an offhand way, that there

20 is no doubt but that a dam is an eventual solution to some of

21 the problems.  But a dam deprives the downstream owner of

22 his right to flooding, to have the water cross the alluvia

23 as it would at flood times, which is a pretty important matter.

24     On the other hand, if the downstream owner, in substance,

25 gives up his right to that in return for the release of

C

Z40

1   certain water, the water released in an intelligent and orderly

2   fashion, with a basin downstream, could mean more to a down-

3   stream owner with a basin than the passage of flood waters,

4   as far as recharge of the basin is concerned.

5       What I am thinking about is this. Here comes a big

6   flood down the Santa Margarita. Swish, it goes over your

7   alluvia. Well, you will get some recharge, depending on the

8   amount of water and the length of time it runs and how high

9   up over the banks it floods, and many other factors. But if,

10  instead of that you had a gradual release of water, where as

11  the flood waters were impounded, you had a gradual release

12  of water into your alluvia, you would get maximum benefit

13  of the water that was released in recharging your basin--

14  again depending on how much water was released and how it was

15  released. A gradual release of water into a spreading ground

16  of the basin is certainly more desirable than once over

17  lightly with a flood.

18      But this gets down into the questions of how much to

19  release, and when it is to be released, et cetera.

20      MR. DENNIS: And where from.

21      MR. VEEDER: May I put in a statement on that, your

22  Honor-- the reason why we are gravely concerned about Fallbrook.

23  First they have a 10,000 acre foot dam. Then they grew up a

24  little apparently and they got maybe a 30,000 acre foot dam.

25  We don't think they will ever build it. I truly believe

C

Z41

1   it is ultra vires, what it is undertaking now.  But that is

2   beside the point.

3         Our view is this, that any kind of structure of that

4   size, a small structure like that is nothing from the

5   standpoint of protecting our rights and interests, because

6   they can't afford to build a dam of 35,000, we know that, and

7   give us the quantity of water to which we are entitled.  There

8   has never been an instance, since I have been in this litiga-

9   tion, that the Federal Government hadn't given direct and

10  immediate concern to constructing some kind of dam on its own

11  property.  We have always known it.  In the old case evidence

12  was put in in regard to it.  We have been precluded from

13  spending a dime on the Camp, on a dam or anything else, while

14  this matter was pending.  We don't want to see any water in

15  those rare instances when it goes to the ocean-- we have no

16  desire to see that occur.  We do know that we have the salt

17  intrusion problem that we can best fight by sensible releases

18  from a structure controled by ourselves, and that is what we

19  want to do.

20        My concern is that daily we are going on here with a

21  threat above us of a 35,000 acre foot structure, and it is

22  a threat because for them to have any kind and type of

23  economic feasibility would result in necessarily an invasion

24  into our rights.

25        Now they say, no, the State says we are going to let

C

Z42

1    the water through.  We are going to require it.  I am laughing.

2    I have said the State is shot through politically.  It is.

3    We are afraid of what the State would do.  I admit it.  This

4    has nothing to do with what I referred to as the Bulletin,

5    your Honor.  I do think that we are gravely concerned that a

6    thing that must be apparent to your Honor that the State of

7    California is the handmaiden of Fallbrook in this litigation.

8    So we have no reason to assume, and we do not assume, nor can

9    we assume, that we would get a fair shake in this matter at all.

10   So we feel that we have to fight the 35,000 acre foot struc-

11   ture above us with all that we have.

12        We do hope that we can work out some means of con-

13   serving this water, and we will.  But I am sure that it won't

14   be until we have chased the real estate speculators out of

15   the water business and withdrawn their pressure from the State

16   of California.

17        That is our concern.

18        THE COURT:  The Utt Bill provided for a dam at De Luz

19   Dam Site?

20        MR. VEEDER:  That is right.

21        MR. MOSKOVITZ:  Your Honor, I want to express for the

22   record my resentment and objection to the use of the term

23   "handmaiden" to Fallbrook.

24        MR. VEEDER:  It is the kindest thing I have said about

25   them.

4632

c

z43

THE COURT:  You are acquainted with Mr. Veeder suffi-
ciently now to know that these things fall on a deaf ear.
There probably will be eversion between the positions of the
State of California and Fallbrook on matters before we get
through here.

MR. MOSKOVITZ:  There already has been, your Honor,
and on legal issues that have been ruled on.

THE COURT:  It is not necessary to say anything more on
that.

MR. MOSKOVITZ:  For the record, your Honor.

MR. VEEDER:  That Chinaman is getting a lot of work
today.

THE COURT:  Call your next witness.

MR. VEEDER:  Mr. Kunkel.

MR. STAHLMAN:  Before we proceed, I have some views
on this matter under discussion, your Honor.

THE COURT:  I would like to hear them.

MR. STAHLMAN:  I think it is a little early to pro-
nounce them.  However, I think Vail has a concern in what is
happening downstream also.  I think before the case is over
there is going to be some logical and reasonable factors that
will indicate what will be the best means of preventing the
destruction of the basin on Camp Pendleton and providing for
the most efficient operation and utilization of the waters
that may be extracted from this river.

C

Z44

1    There are some questions of law that affect the questions

2    of fact.  All of the facts, of course, are not in.  As your

3    Honor knows, we have two issues in this case:  As to whether

4    or not the stipulated judgment remains in effect, and as to

5    whether it does not.  However, I think under either one of

6    those it is of interest to the Vail Company and every other

7    riparian owner on the river and every owner who has prior

8    rights on the river that utilization be made of these waters,

9    first, for the rights of those who have the paramount rights,

10   and then if there is any left over for the subsequent

11   appropriators.

12       However, it strikes me that with the conditions that

13   have been demonstrated as affecting the basin on Camp Pendleton,

14   that some form of mechanical means has to be devised by which

15   the basin can be restored to efficiency.  And then we have

16   some conflict, of course, with this question of law that

17   riparian owners cannot make cyclical storage of riparian

18   waters.  However, I believe that as the case progresses and

19   the facts are developed and the law that applies to those

20   facts becomes evident, that the right to the use of water

21   for the purpose of maintaining the natural condition of the

22   stream, in other words, the riparian waters can be utilized

23   for that purpose, and the natural condition of the stream

24   would be under nature a basin that would have fresh water in

25   it that would be built up to prevent the intrusion of sea water.

4634

C

Z45

1    Then we have the physical factors of the river, where

2    we have De Luz Creek, which is downstream from Fallbrook,

3    which, according to the evidence so far, delivers about one-

4    third of the runoff of the watershed on the average, and that

5    is split up into about one-third that passes the Lippincott

6    site and about one-third that passes Nigger Canyon.

7    So I feel that as this case proceeds, it is also

8    legally possible for your Honor to determine the ways and

9    means by which the stream may be preserved in its natural

10   condition and which would be the most efficient and most

11   economical means and ways to extract the waters and to utilize

12   the waters.  And I think that under those rules eventually

13   these problems that exist here can be overcome.

14   We have some concern as to whether or not water is to

15   be stopped upstream, if it is to be stopped and impounded,

16   and if the condition of the basin downstream is to remain in

17   the condition in which we find it at this time or grows worse,

18   that affects Vail also.

19   I thought that the logical thing to do would be --

20   I don't think that this river, when your evidence is all in,

21   is ever going to stand three dams.  One happens to be built

22   already.  I don't think the productivity of the rover and

23   the size of it and the topographical structure and the places

24   where the streams enter into it can ever operate efficiently

25   with three dams.  However, there should be another dam on this

c

z46

1    river some place, to prevent the water from going into the

2    ocean.

3        Those are just some generalizations that I think affect

4    this matter.   I think that when we are through here the law

5    and the facts will show us the way out of the situation.

6        THE COURT:   All right.

7        MR. DENNIS:   I would like to express a few views, your

8    Honor.

9        I agree with Mr. Stahlman and the State of California,

10   as expressed in Bulletin 57, that it is highly advisable to

11   have two dams on the river rather than three, rather than a

12   multiple number of dams, and that the only way the full

13   resources of the river can be developed is by the construction

14   of one dam rather than a number of dams.

15       However, there is one thing that other counsel have not

16   commented on, and I would like to comment on it at this time.

17   That is, as I understand it, the United States of America has

18   two types of rights.   They have riparian rights, and they have

19   those rights of an overlying landowner-- that is, disregarding

20   whether they have rights by prescription or by appropriation.

21       Their riparian rights only extend to the right to take

22   their correlative portion of the flow of the Santa Margarita

23   River, whether it is subsurface flow or whether it is surface

24   flow, at any one time, that they can put to beneficial use

25   on their lands which are riparian.   So at sometime during

C

Z47

1   this litigation this Court is going to have to decide or make

2   an order which will say that they are only entitled to a

3   certain percentage of the current flow of the river as it

4   enters Camp Pendleton for beneficial use on their lands which

5   are riparian. However, when they exceed the amount of the

6   flow and take water from the Pendleton Basin in excess of the

7   flow, surface and subsurface flow, of the Santa Margarita

8   River, they are then extracting basin waters, and when they

9   are extracting basin waters  they are bound by a different

10   rule of law, and that is that they have only the right to use

11   their basin waters on their overlying lands.

12       And so the Court is going to have to make some provision

13   which will guarantee the upstream riparian owners their rights

14   pursuant to the laws of the State of California.

15       You then have the question that if the Government

16   depletes the Pendleton Basin by taking water for use outside

17   the watershed and taking water for use outside the limits

18   of the basin, are they entitled to them as against an upper

19   riparian owner or as against an upper appropriator to compel

20   the release to an appropriator who has a prior right to any

21   right that they might have by appropriation or by prescrip-

22   tion, to compel waters to come down into Camp Pendleton to

23   recharge the basin to the extent that it has been depleted

24   for a non-riparian or a non-overlying use?  And I think those

25   questions will be presented and will have to be answered

C

Z48

1    before this litigation is over.

2         MR. VEEDER:  Shall I put my witness on the stand?  We

3    have three minutes to go.

4         THE COURT:  All right.

5         THE CLERK:  Fred Kunkel was heretofore sworn on

6    October 1.

7

8                         FRED KUNKEL,

9    recalled as a witness in behalf of the plaintiff, having been

10   previously sworn, testified further as follows:

11

12        MR. VEEDER:  I ask you to mark this as Exhibit 15-A

13   for Identification.  Do we have a 15A at the present time?

14        THE COURT:  No, I have no record of it.  We have a

15   15-1, which was the Vail test wells.

16        THE CLERK:  There is no 15-A.

17        MR. SACHSE:  Your Honor, I think time will be saved

18   if I make an objection, although there has been no offer, and

19   I intend to press this vigorously.  This is a very complicated

20   exhibit.  I have not even seen it, except a copy that Mr.

21   Moskovitz picked up after closing hours last night.  This is a

22   direct violation of what your Honor wanted when you told us

23   to lodge theseahead of time so we would not have these lengthy

24   delays.  I would strongly prefer that Mr. Veeder put somebody

25   else on and give us a few days to look this thing over.

C

Z49

1    MR. VEEDER:  May I make an observation, your Honor.

2    This map was made pursuant to your direction.  I think Mr.

3    Kunkel should be permitted to explain what he did in regard

4    to it and what is reflected by it.

5        THE COURT:  He will be.  The question is, when?  That's

6    all.  The purpose of having exhibits exhibited to counsel is

7    to save time of counsel in study and to let them know what

8    questions they are going to ask on cross-examination.  It is

9    true that this was made at my request.  It is just a matter of

10   when we do it.

11       MR. VEEDER:  If your Honor feels that way about it, it

12   suits me.  I have no strong feeling about it.  The only point

13   is that this map is simply a reflection of the Exhibit 15

14   brought to date in accordance with your Honor's desires.  I

15   truly believe that time would be saved if we were permitted

16   to go ahead.  But it is not a matter of great concern to me.

17   I would like to be able to release Mr. Kunkel and have him

18   brought back, if necessary, for cross-examination.  But I will

19   do whatever your Honor directs.

20       THE COURT:  In other words, your thought would be that

21   this afternoon you call him and let him describe what he did

22   on the map?

23       MR. VEEDER:  That is correct.

24       THE COURT:  And then reserve cross-examination until

25   a study could be made?  I see no objection to that.  That

C

Z50

1 might be helpful.

2   MR. MOSKOVITZ:  And would your Honor reserve ruling

3 on its admission?

4   THE COURT:  Yes, I will do that, too.

5   MR. VEEDER:  Well, yes.  There is only one thing I

6 would like to do.  I have a witness ready to go on the stand.

7   THE COURT:  It will be marked for identification as

8 Exhibit 15-A, and the witness this afternoon will tell us how

9 he made it and give us some information that may be helpful

10 to us in studying the exhibit, and we will postpone cross-

11 examination until counsel have a chance to study it.

12   MR. SACHSE:  I have no objection to that procedure.

13   MR. VEEDER:  I certainly think it is proper and I have

14 no objection to it.

15   THE COURT: All right. Adjourn until 2 o'clock.

16   (Noon recess.)

17

18

19

20

21

22

23

24

25

D-1 ML j

SAN DIEGO, CALIFORNIA, THURSDAY, NOVEMBER 13, 1958, 2:00 P.M.

---o---

MR. SACHSE:  Your Honor, before Mr. Veeder proceeds I would like to make a suggestion.  It is prompted by your Honor's questions of counsel this morning.  It seems to me that the complexity of issues in the case, including the great many perhaps smaller or minor items that may later loom very large in importance, makes it worthwhile for us to think for a minute about the wisdom perhaps periodically in the case of filing with your Honor some sort of a very brief summary of what respective parties contend has or has not been established on the state of the record.  Now, I don't have in mind that these would be counter-propositions to be rebutted by each other, and so on, but my thinking is that they might simultaneously file with you at some convenient time, such as at the end of geologic and hydrologic testimony, a summation of what we feel is or is not established.  We might thereby eliminate a great many issues.  We might point up to your Honor questions that you have not perhaps completely understand what we were after.  We might find situations where no further evidence would be needed; ascertain immediately that while we are in court.  I hate to suggest the estra work, but I think it would be useful.  I am going to try to do more or less the same thing, of course, for myself,

4641

1    simply to keep track of the case.  But I am curious what

2    the reaction of the rest of counsel and yourself is as to

3    such a suggestion.

4         THE COURT:  Does anyone want to express himself

5    before I do?

6         MR. DENNIS:  I think it would be helpful.

7         MR. STAHLMAN:  I will express myself after you do.

8         THE COURT:  I think it would be helpful.  I have

9    solicited from time to time what your theory or what your

10   contention is, so I can better understand the case as you go

11   along.  I like to know what is going on.  I like to know

12   what you are shooting at; what your theories are.  By and

13   large, I know what they are, but I want to understand them

14   as I go along.  I think it would be helpful.  I think it

15   would be even more helpful if responses of counsel were

16   directed to -- paragraph by paragraph -- to certain matters.

17   In other words, you have some documents that you can match

18   up one against the other.  Proposition one:  It is easy to

19   then read or see what the positions of counsel are on it.

20   Proposition two:  What the positions of counsel are.  You

21   throw it all together in a document where you have to read

22   through and sort out, it just makes a lot more work.  Now,

23   if we proceeded in that manner, what we would do would be

24   first document a series of informal problems or propositions

25   and then let everyone's attention be directed to the same

1    particular matter.

2         MR. SACHSE:  What I have done for myself, in the

3    roughest kind of form, is to take the issues as set forth

4    in the pre-trial order and try to index testimony of

5    different witnesses to the different points on the issue,

6    and then say to myself:  This is proven, or there is

7    evidence on the subject, or there is no evidence on the

8    subject, and so on.  That is all I have done now, and that is

9    about as far as in my thinking I had gone.  In the suggestion

10   I was making I hadn't gone to the idea of submitting legal

11   arguments.  I have been confining myself, your Honor, to

12   the facts.

13        THE COURT:  When we get through this geology from

14   the State and the Government, and we will have practically

15   the entire basin covered, I think we might well spend some

16   time following out your suggestion.  We could get a few

17   tentative suggestions of propositions and see just exactly

18   where counsel stood on  them.  As you pointed out, if there

19   is going to be a concession, if everybody agrees that salt

20   water intrusion is in the Ysidora Subbasin, it is something

21   that has to be stopped, and that the solution to it currently

22   is either control of pumping or the letting in of a special

23   amount of water upstream to combat the intrusion of salt

24   water, even if you were wide apart on certain parts of the

25   issue, there might be a common ground that we could start

1    talking about, namely, that we all agree that salt water

2    intrusion is bad and that it can be remedied and stopped

3    where it is.  Then, the question may be open:  What are

4    you going to do about it?  Or if, as another example, it

5    is conceded that the lower Santa Margarita River consists

6    of really one large basin and three subbasins, and that

7    there is an approximate area of surface of the storage

8    capacity, you might be in agreement somewhere along the

9    line on certain parts of these issues.  I think it is well

10   worth exploring further in a case of this size.  I suggest

11   that we be thinking about it.  In your rough notes from

12   time to time jot down matters that you have in mind.  And

13   I would think that either by some voluntary action between

14   counsel or a short conference some day informally we could

15   formulate a few propositions and see what the position of

16   counsel were on them.

17           All right, now, Mr. Kunkel is back on the stand.

18        MR. STAHLMAN:  One other matter, your Honor.  The

19   transcript of yesterday, on page 4489 at line 9, I am sure

20   is in error.  It becomes obvious when you read the matters

21   contained on page 4488.  The word "younger" should be

22   placed after the word "the."  It should read:  "And also

23   within the younger alluvium."

24           THE COURT:  If there is no objection, the correction

25   will be made.

1    MR. STAHLMAN:  It makes a great deal of difference.

2    THE COURT:  The correction will be made.

3    MR. SACHSE:  And I have one, your Honor.

4    THE COURT:  Yes.

5    MR. SACHSE:  Mr. Stahlman reminded me.  From the day

6    before, page 4345, line 19, quoting myself, it reads:

7    "Either the figures of 1949 are wrong ..."  My question was:

8    "Either the figures of Exhibit 49 are wrong ..."  It should

9    be "Exhibit" instead of "19."

10    THE COURT:  All right.  The correction will be made.

11    MR. MOSKOVITZ:  I have one now, your Honor.

12    THE COURT:  Yes.

13    MR. MOSKOVITZ:  Page 4442 of yesterday's transcript,

14    line 21.  The first word should be "when" rather than "what."

15    MR. STAHLMAN:  Which line is that?

16    MR. MOSKOVITZ:  Line 21, page 4442.

17    THE COURT:  The correction will be made.

18    MR. VEEDER:  May we proceed, your Honor?

19    THE COURT:  Yes.

20    Now, the present examination of the witness

21    Kunkel will be limited to describing what he did when he

22    prepared Exhibit 15-A, where he got his information and how

23    he constructed the chart.  In other words, foundation, as

24    it were, and then we will adjourn cross-examination to

25    some later date.

1    MR. VEEDER:  There are two exhibits that I would like

2 to have identified, the well location and 15-A, but I will

3 start with the first one.  Then, I will bring to your

4 attention the other exhibit.

5    THE COURT:  All right.

6

7              FRED KUNKEL,

8 recalled as a witness on behalf of the Plaintiff, having

9 been previously sworn, testified further as follows:-

10

11            REDIRECT EXAMINATION

12 BY MR. VEEDER:-

13    Q   Mr. Kunkel, would you state into the record the

14 steps that you took in preparation of Plaintiff's Exhibit

15 marked 15-A for identification?

16         In that regard, before proceeding, the exhibit

17 will not be admitted until after cross-examination, is that

18 correct, your Honor?

19    THE COURT:  Right.

20    Q   BY MR. VEEDER:  Would you proceed.

21    A   Exhibit 15-A is virtually the same as Exhibit 15,

22 only at a different scale.  15-A --

23    Q   Would you state the scales, then?

24    A   The scale of 15 is one to sixty-two five hundred,

25 whereas the scale of 15-A is one to twenty-four thousand.

Q   What are the areas depicted on 15-A as distinguished from the area depicted on 15?

A   The area on 15 is the entire watershed above Temecula Canyon.  The 15-A is only part of Exhibit 15.  It is the part entirely covered by the Murrieta-Bachelor Mountain quadrangles and by the part of the Temecula and Pechanga quadrangles.  Quadrangles are entered in evidence as the U. S. Geological Survey topographic maps.  They are the actual maps that were used in the field in the examination of the geology.  The field sheets that I used in the preparation of Exhibit 15-A already have circulated in court, and, to the best of my knowledge, all the attorneys examined them approximately early in October sometime.

Q   What did you do, actually, to get the contour lines which are set forth on Exhibit 15-A?

A   The contour lines on Exhibit 15-A are based on a field examination and measurements of water levels in wells on the four quadrangles described -- Murrieta, Bachelor Mountain, Temecula, and Pechanga -- during the last week in October, 1958, by myself and several men working under my direct supervision.  There are approximately 200, slightly more than two hundred wells shown on the Exhibit 15-A.

MR. VEEDER:  I would like to have marked for identification Exhibit 15-B, which is the measure of the

1    water levels in wells in Murrieta and Pauba Valley.

2         THE COURT:  15-B will be marked for identification.

3         MR. MOSKOVITZ:  Do you have copies of that, counsel?

4         MR. VEEDER:  Yes, sir.  We will have complete re-

5    productions for you.

6         Q    I will ask you to refer to Plaintiff's Exhibit

7    marked 15-B and state into the record what appears on that

8    document?

9         A    Exhibit 15-B is a six-page tabulation of the wells

10   examined by the Geological Survey, largely during the period

11   October 27, 28, 29, 30 and 31, 1958.  The exhibit gives the

12   U. S. Geological Survey number assigned to the well; other

13   numbers that have been assigned to the well.  That is for

14   the purpose of correlation with previous testimony.  The

15   altitude of the measuring point, the dates of the level

16   water measurements, and the distance of the water below the

17   measuring point in feet.  There are certain measurements in

18   1927 that are from the records of the Vail Company.  There

19   are several measurements in 1953 that are from the original

20   files of the Department of Water Resources.  Those measure-

21   ments are given, because they were considered, or an evalua-

22   tion of those measurements were used in the construction of

23   the contours.

24        Q    Will you step to the exhibit and refer to the

25   legend and point out the areas to which the legend pertains?

A    The legend on Exhibit 15 and 15-A with regard to the geology is virtually the same, with the possible exception a dashed line was used for the geologic contacts, whereas a dotted line was used on Exhibit 15.  The fault symbol is the same.  No wells are shown on Exhibit 15 with the exception of those that were added during the presentation of the testimony and during cross-examination.

Q    To your knowledge, are those wells which are set forth on 15 again set forth on 15-A?

A    To the best of my knowledge, all the wells on 15 are on 15-A, plus additional wells are on 15-A.  All of the wells given on -- I had better be careful -- to the best of my knowledge, with only one or two exceptions, all of the wells shown on 15-B are shown on 15-A; and they were visited by the Geological Survey.  Some of the wells on 15-B and 15-A are now destroyed, but the site was visited; and, where possible, the owner of the well was interviewed.

Q    Under whose direction were the well levels taken?

A    Some of them were made by me, and the rest of them were made by geologists and field assistants working under my direct supervision.  I was in the field at the same time they were, and they checked with me twice a day during the period of measuring.

Q    Would you allude to Exhibit 15 and point out the differences that appear on 15-A from the standpoint of the

contours that are set forth on the latter identification?

A   The water level contours on Exhibit 15 are for the period fall of 1953, November, 1953, whereas the water level contours on 15-A are for the period October, 1958.

Q   What have you added, then, to 15-A that does not appear on 15?  What are the contours?

A   The water level contours?

Q   That is right.

A   The water level contours have been, in some respects, are different because the differences in water levels in the wells, plus the fact that because of additional control or possibly more precise analysis -- I am not certain if that is the proper word to use -- but the water level contours have been extended over a large area to show the source, occurrence and movement of ground water where the water is coming from and where it is going.

Q   What additional contours, if any, have been added to 15-A?

A   A.  In the area north and south of Pauba Valley in Pauba Valley there is a ten fifty, an eleven hundred, eleven fifty, and twelve hundred-foot contour shown on Exhibit 15.  On 15-A there is a ten forty, a ten fifty, an eleven hundred, and eleven fifty, a twelve hundred, a thirteen hundred and a fourteen hundred contour.  In Wolf Valley there is a nine eighty contour shown, a thousand -- on

1  Exhibit 15 there is a nine eighty, a thousand, a ten twenty-
2  five, a ten fifty, an eleven, an eleven fifty, and a twelve
3  hundred-foot contour.  In Exhibit 15-A there is a nine
4  eighty, nine ninety, a thousand, a ten twenty-five, eleven
5  hundred, an eleven fifty, and a twelve hundred.  And in the
6  area on the Pechanga Indian Reservation in the southeast
7  corner of the map there is also a twelve hundred, and a
8  twelve hundred fifty, and a thirteen hundred-foot contour
9  added.  Also in the area north and south of Pauba Valley,
10  the eleven fifty, twelve hundred, and the eleven hundred
11  contour, the eleven fifty, they have all been extended to
12  show more precisely the direction and movement of ground
13  water in the older alluvial.

14      Q   When you say "extended," where has it been ex-
15  tended?  Would you indicate into the record?

16      A   Well, for example, on the basis of the data that
17  was available for November, 1953 -- I will have to get
18  another map scale.

19          The Court may want to use that.

20          On Exhibit 15, the twelve hundred-foot contour
21  at the northeast end of Pauba Valley is shown for, in a
22  distance of approximately one and a half miles, the twelve
23  hundred-foot contour, it is only across the upper part of
24  the valley.  On Exhibit 15-A the twelve hundred-foot contour
25  is shown as starting approximately in the northwest quarter

of Section 27, Township 8 South, Range 2 West, and it
extends for a distance of approximately twelve miles.  The
contour extends from northwest quarter, Section 27, 8 South,
Range 2 West, northeast across Pauba Valley.  The contour
then changes direction.  It is a large arc, and is extended
to an area in the south half of Section 17, Township 7
South, Range 2 West.  The thirteen hundred-foot contour,
which is not shown on Exhibit 15, is shown approximately a
half a mile northeast of the twelve hundred-foot contour,
northeast of Long Valley, and then extends for approximately
four miles.  The fourteen hundred contour is shown approx-
imately another half-mile northeast of the thirteen hundred-
foot contour and then extends for approximately three miles.
Neither the thirteen hundred or the fourteen hundred are
shown on Exhibit 15.  The eleven hundred fifty-foot contour
on Exhibit 15, in the vicinity of Pauba Valley, is approx-
imately four miles in length.  The eleven hundred fifty-foot
contour on Exhibit 15-A starts in the northeast quarter,
Section 28, Township 8 South, 3 West, and extends for
approximately eleven miles from the point just described and
extends to practically the stream channel of Tecolete Creek
in the south half of Section 18, Township 7 South, Range 2
West.  Likewise, the eleven hundred-foot contour on Exhibit
15 is shown in Pauba Valley for a length of approximately
four miles.

Kunkel - Redirect                                    4652

The eleven hundred-foot contour on Exhibit 15-A starts in the northeast quarter of Section 28 and extends generally in a northeast, north direction to Pauba Valley. Then it is in a northwest direction for a total distance of 13 miles to the south half of Section 8, Township 7 South, Range 3 West, just northeast of the central alluvial plain of Murrieta Valley. There is an eleven hundred seventy-five-foot contour shown on Exhibit 15 northeast of Murrieta Valley for approximately a mile and a half. That contour is not shown on Exhibit 15-A, but it would lie between eleven fifty and the twelve hundred-foot contour approximately midpoint. And it would extend for a distance of approximately three miles if it were shown. However, instead of showing eleven seventy-five and the twelve fifty, there is a ten fifty, an eleven hundred, eleven fifty, twelve hundred, twelve fifty, and a thirteen hundred-foot contour shown in two segments.

Q   Why was that type of change made between the two exhibits? What meaning has it from the standpoint of the ground water contours?

A   Part of the meaning --

Q   That is a double-barreled question. I will state it again. Why was it that the contours differ in this eleven seventy-five, ten fifty series from the original Exhibit 15?

1    A    The primary reason -- it is a double-barreled

2   question.  There are two reasons it differs.

3    Q    Answer both barrels.

4    A    One is that contours are taken for different

5   periods of time.  There have been changes in water levels

6   from 1953 to '58, plus I have -- I am not using exactly the

7   same data for 1958 that I used in 1953.  I have additional

8   wells that I did not have for control in 1953.

9    Q    You don't have to be apologetic about it.  I

10  mean, go ahead.

11   A    I am not.  I had additional wells in '58 that I

12  did not have in '53.  Therefore, I was able, with a greater

13  degree of certainty, to extend my contours for greater

14  distances.  In answer to your first question:  Why are they

15  different?  The first part of the question, they are

16  different because there has been a change in water levels,

17  as graphically shown by the windmill well which is in the

18  east half of Section 12, Township 8 South, Range 2 West.  It

19  is labelled the Windmill Well.  Its number is H-1.  No. 2

20  well is very close, together, and they both fell within the

21  same circle.  H-2 is now destroyed.  The measurements I

22  have been referring to are in Well 12-H-1.  As indicated by

23  the little arrow, it says:  1216 feet plus in 1927; 1174

24  feet in 1953; 1152 feet in 1958.  That indicates a decline

25  in water level.  In 1927 the well flowed.  The reference

point for that well is 1216 feet.  The well flowed; there-
fore, the water level stood at an altitude of higher than
1216 feet.  By 1953, the water level had declined to 1174
feet.  Now, these are altitudes of water surface above sea
level, not depth to water.  And in 1958, the water level
stood at 1152 feet, a decline of approximately 60 feet since
1927 and approximately 20 feet since 1953.  The effect of
that 20-foot decline has been to pull back or move back the
1150-foot contour as it is shown on Exhibit 15.  Now, these
contours, even on Exhibit 15, just don't go up.  We will
take an example:  The 1150-foot contour does not go up to
Long Valley and stop as it is shown, and it does not go
south of Pauba Valley and stop as it is shown.  The contour
goes some place and ultimately, if it could be traced over
a long enough distance, it would come back and **close** on
itself, if it is possible without encountering bedrock
barriers, et cetera.  And, in my opinion, even on Exhibit 15,
I don't have the control to plot is precisely, but that
1550 contour of necessity goes over to some place between
the 1050 and the 1175 contour northeast of Murrieta Valley.
The point I was trying to make is that the water levels,
as indicated in the windmill well, indicate the decline of
water levels of approximately 20 feet         '53 and 60
feet since 1927.    The result is that the 1150-foot contour
is moved back, indicating that ground water has been

1   withdrawn from storage.   Based on water levels in Wells

2   26 in 1 Township 7 South, 2 West, and other wells which are

3   tabulated in Exhibit 15-B -- I don't recall exactly which

4   ones I used at the moment -- the contours are extended.   Now,

5   I have used three types of symbols.   One is a solid line,

6   as indicated on the legend, for"water level contours,

7   October, 1958."   A dash where control is imperfect.   Long

8   dashes indicated where the position is interpolated.   Short

9   dashes indicate where the position is inferred.

10   Now, I have footnoted the words "interpolated"

11   and "inferred."   Interpolated, according to Webster's new

12   International Dictionary, means:   "To insert intermediate

13   terms in, as a series according to the law of the series;

14   to calculate intermediate values of (a function) from ob-

15   served values, according to some assumed law of change in

16   value."   To infer is:   "To derive by reasoning or implica-

17   tion; to conclude from facts or premises; to accept or

18   derive as a consequence, conclusion or probability."

19   I have tried to show the degree of control that

20   I used in the construction of Exhibit 15A by either inter-

21   polating or inferring; or where there are wells close enough

22   to my contours, that the degree of certainty, in my opinion,

23   is very small.   The contour is shown as a solid line.   Else-

24   where it is shown as a dash line.   A long dash.   Pardon me.

25   THE COURT:   Did you say where "the degree of uncertainty"

Kunkel - Redirect

1    or "certainty"?

2        MR. VEEDER:  I would like to have that read back, if

3    we may.  I think he misspoke.

4        (The reporter read back that portion of the record.)

5        Q  BY MR. VEEDER:  The degree of certainty?

6        A  The degree of uncertainty is what I meant to say.

7    Thank you.

8        Likewise, as I have indicated, the change in

9    contour for the 1150-foot contours, the 1200-foot contour

10   had to move accordingly.  You cannot have a decline along

11   1150-foot contour without a comparable decline in the 1200-

12   foot contour, the 1100-foot contour, the 1050, and the 1040

13   contours.  Therefore, none of the contours in Pauba Valley

14   could be the same in 1958 as they were in 1953, with a

15   different set of water level measurements.  Likewise, in

16   Santa Gertrudus Valley.  The measurements of wells have

17   indicated that there is a pumping hole centered around

18   Well 26-J-1, Township 7 South, Range 3 West.

19

20

21

22

23

24

25

Ex E
Z51

1    Q   What do you mean by a "pumping hole"?

2    A   A decline in water levels caused by pumping.

3    Q   How many wells did you test in that regard?

4    A   I don't recall the exact number, but, oh-- I could

5    check the record-- well in the vicinity, Wells 73-25R1 were

6    measured, 26J1 was measured, 26N1 was measured, 26R1 was

7    measured.

8    Q   What about the Roripaugh well?

9    A   The Roripaugh well is 12-26J1.  That well was

10   measured on the 13th of October at 39.23 feet, and according

11   to Mr. Roripaugh the well had been off for a considerable

12   period of time and that represented a true static water level.

13   Well 25M2 in the past has been a flowing well.  It is

14   not flowing at the present time.  I don't have a water level

15   measurement on that.  That well, according to the footnote B,

16   was inaccessible, but it was not flowing.  Therefore, we know

17   there has been a decline in that well at least since the

18   period when it flowed.

19   Well 35B1 and B2 were measured.  Well B1 was pumping

20   and that measurement was not used directly, and some consider-

21   ation can be given to the corresponding effect that there

22   would be in Well 35B2 as a result of that.  But the measurements

23   do have meaning and in part were used as control for the

24   pumping hole in the vicinity of the Roripaugh well 26J1.

25   MR. SACHSE:  I am sorry.  Is that hold?

E

Z52

1        THE WITNESS:  Pumping hole.

2            Additional points that, in my opinion, are critical is

3    the water levels in Well 8 South, 3 West, 12C1.  That well was

4    flowing in 1927.  On August 12, 1953, according to the records

5    in the State Department of Water Resources file, the water

6    level in that well was 18.2 feet.  On the 27th of October the

7    water level in that well was 27.88 feet.  But the well was

8    pumping.  There is a half-horsepower jet on that pump.  That

9    measurement was not used, but as a check the well was measured

10   on November 11, 1958, and the water level was found to be 26.8

11   feet.

12       MR. STAHLMAN:  Let me have that well again.

13       THE WITNESS:  8 South, 3 West, 12C1.  It is MB98.  It

14   is on the Vail property.

15           The indication is, from the series of water level measure-

16   ments just testified to, there has been at least a 26.8 foot

17   decline of water levels in Well 12C1 since it was drilled or

18   since 1927, and there has been approximately an 8-foot decline

19   since 1953.  The effect of the decline in Well 12C1, the

20   decline of pumping in the Santa Gertrudis area, the effect of

21   pumping in Pauba Valley has been to move all of the water

22   level contours back toward the northeast, indicating a drop in

23   water level.

24           Now, the Schrode well, Well 8 South, 2 West, 7A1 lies

25   between Pauba Valley and Santa Gertrudis Valley.  The well has

E

Z53

1    a windmill on it.  It is not a large producing well in the

2    sense that it is not pumped.  It is not a large capacity pump

3    on it.  According to discussions with Mr. Hall, he indicates

4    to me that the well is capable of producing a great deal more

5    water, and if a large diameter rotary gravel- packed well

6    were drilled there to greater depth, in my opinion it would be

7    possible to produce a very large well there.  But the point

8    I wish to make is that Well 7A1, which is on page 4 of

9    Exhibit 15B, since 1926 has declined from 64.2 feet to a

10   depth of 88.83 feet, a decline of about 25 feet.  That water

11   had to go some place.  It represents a decline in water level.

12   In my opinion, the water drained from the older alluvial

13   deposits toward areas of discharge or pumping.  On the basis

14   of the control I have, I frankly don't know whether it went

15   to Pauba Valley or Santa Gertrudis Valley.  Probably some went

16   in the general vicinity, some went to one valley and some to

17   the other.  It is relatively immaterial.

18           MR. STAHLMAN:  I don't know about that.

19           THE WITNESS:  From the point of view that the water

20   has been taken from storage, it has gone to a point of dis-

21   charge, is the point I wish to make.

22           There is additional control in Section-- I don't have

23   that section identified on the-- there is a well in the south-

24   west quarter of Section 34.  The well is 34N1 (7 South, 2

25   West).  The water level was measured in that well on October

E

Z54

1  28th.

2          THE COURT:  On what page?

3          THE WITNESS:  On page 1 of Exhibit 15B.  Well 7 South,

4  2 West, 34N1, on October 28th the water level was measured in

5  that well at 167.8 feet.  That well is and has been used as

6  an control for extending the 1100 and the 1150-foot contours

7  across the area north of Pauba Valley.

8          Wells 6B1, 8 South, 1 West, 8 South, 2 West, 2J1 and

9  3K1 were drilled in 1927.  They are now destroyed.  However,

10  the water levels for those wells are given in Exhibit 15B for

11  1927.  I don't recall exactly what they were.  We do know that

12  there has been a decline in those wells.  The decline in those

13  wells in my opinion, certainly has not exceeded the decline

14  in the windmill well.  It has been less, and the knowledge

15  that those wells were drilled in 1927 was considered.  I

16  wouldn't say that I hung my measurements on those wells, but

17  knowing what those wells were in 1927, knowing that there has

18  been a decline, knowing the order of magnitude of the decline,

19  I used those as control to extend my contours across the area

20  of the older continental deposits.  I have indicated them as

21  short dashes, indicating a rather poor degree of control.  But

22  I emphasize that the contours across Pauba Valley do not go

23  to the edge of Pauba Valley and stop.  They go somewhere.  It

24  is a hydrologic principle.  You just can't take them into

25  empty space and hang them.  They have got to join some other

Kunkel - Redirect

1   water level contour or plunge into consolidated rock, and even

2   in consolidated rock they just don't really go up there and

3   stop. The method of extending them beyond that would be very

4   complex, and with the control we have, an impossible thing to

5   do. So they have gone up there and stopped. And the reason

6   for that is a matter of degree, the difference of degree

7   between the transmissibility of the older continental deposits

8   and the basement complex or the residuum is a very great and

9   marked difference in transmissibility, in my opinion. Between

10   the younger alluvial deposits and the older alluvial deposits

11   it is also a matter of degree. The matter of degree is very

12   small between the younger alluvial deposits and the older

13   alluvial deposits. They behave as a unit.

14   BY MR. VEEDER:

15      Q   What other control did you have in the Murrieta

16   Valley?

17      A   In the Murrieta Valley I used the wells shown again

18   on Exhibit 15B. There are measurements in the McSweeney Well,

19   Well 18R1, 8 South, 2 West, for 1927, 1951 and 1958. The

20   water levels in that well have ranged --

21      THE COURT: What page is that on?

22      THE WITNESS: On page 5. It is labeled 18R1, McSweeney.

23   The altitude in the MP is 1030. In 1927 the water level in

24   that well was 19.8 feet. In 1951 it was 23.6, and in 1958

25   it was 21 feet, a very minor change in water level, indicating

E

Z56

1    that in that particular area there has not been a marked
2    difference in water levels.  I am not intimately familiar with
3    the pumpage of the Vail Company, et cetera, in that general
4    area, but as far as I can determine the area has not been
5    heavily pumped, with the possible exception of the Querry well,
6    which, in one sense, is a rather latecomer in the area.

7        Now, with that in mind, plus the fact that we know that
8    the School House Well and the Querry Well, as shown by
9    measurements, are right below the McSweeney well-- let's see,
10   subtract the distance from the MP, the distance to water from
11   the altitude of the measuring point, one would discover that
12   there is a very slight difference in the altitude of the water
13   surface.  That is complicated by the fact that you are com-
14   paring a 1927 measurement to a 1958 measurement, plus the fact
15   that the Querry Well is a great deal deeper and would reflect
16   a higher head.  But at the moment it doesn't appear that there
17   has been too great a decline in that area.

18       Now, there are also wells in Section 18 (8 South, 2
19   West), Wells M-1 N-1 and N-2, and Well 13R1 in 8 South, 3
20   West that were drilled and measured in 1927.  Bearing in mind
21   that there has not been an appreciable decline in the McSweeney
22   well and not at the moment too great a decline in the other
23   parts of Wolf Valley, in my opinion it is perfectly reasonable
24   to consider those 1927 measurements in drawing 1958 contours.

25       A series of wells were measured in the vicinity of

E

Z57

1    Temecula.  At the moment I don't remember that there is

2    anything particularly critical there, except that it did afford

3    sufficient control to draw the 980, 990 and 1000-foot contour.

4         Q   How do those differ from Exhibit 15?

5         A   On Exhibit 15 there is an inaccuracy.  The 980

6    contour is shown twice.     In going up Temecula Valley. There

7    is a 980 contour and then a 980 and then a 1000-foot contour.

8    The 980 contour above Temecula ought to be a 990 contour.  May

9    I correct that?

10        THE COURT:  Yes, you may correct it.

11        THE WITNESS:  From the scale of the map, the difference

12   in scales, there is not a great difference between the 980 and

13   the 1000-foot contours.  The 1000-foot contour as shown on

14   Exhibit 15-A is slightly downstream from the position where

15   it is shown on Exhibit 15.  On the basis of the control that

16   was available for each map and the difference in time, both

17   measurements, in my opinion, both contours are correct.  In

18   Murrieta Valley above the 1,000-foot contour there is a 1025-

19   foot contour shown, a 1050, an 1100, and there is a 1050

20   pumping hole shown.  Now, if all of the water level measurements

21   are considered and plotted against the wells indicated, it

22   will be discovered that there is a pumping effect in this area.

23        Q   When you say "this area" please state the section,

24   township and range to which you have reference.

25        A   In the area in the vicinity of the town of Murrieta,

in Sections 16, 17, 18, 20 and also Section 7, Township 7

South, Range 3 West.

With a 50-foot contour interval, the minor fluctuations

of a few feet one way or the other do not or cannot be

graphically shown, but the contours as shown do represent the

overall picture and the overall direction of ground water

movement. The one pumping hole, the 1050-foot pumping hole in

Section 7 is shown because the altitude of the water level

contour at that particular place happened to correspond very

closely to the 1050-foot contour and there were sufficient

wells to show the pumping hole-- Well 7R1, and there is also

another well immediately to the northeast, Well 7R2, which

both have turbine pumps on them and are used for irrigation.

There is a well and other wells in the vicinity of 18A1 that

are used for irrigation. I don't recall all the details of

who irrigated just how many acres, but that is an area of

irrigated land.

THE COURT: You are talking very fast and you probably

have the reporter very much distracted here. Slow down a

little bit.

MR. VEEDER: I tried and it didn't work, your Honor.

THE WITNESS: I get wound up. Pardon me.

BY MR. VEEDER:

Q Go ahead and show us the controls and differences

that you have between Exhibits 15 and 15A. Does the pumping

E

Z59

1    hole at 1050 appear on Exhibit 15?

2         A   In the vicinity of Sections 15, 16, 21 and 22,

3    Township 7 South, 3 West, the pumping hole shown on Exhibit

4    15A is not shown on Exhibit 15.  The contour interval used

5    on Exhibit 15 or indicated on 15 would not necessarily have

6    shown that pumping hole, if it existed in 1953.

7         THE COURT:  Which pumping hole are you looking at now?

8         THE WITNESS:  The pumping hole I am referring to is on

9    Exhibit 15A in Sections 15, 16, 21 and 22.

10         To determine for certain what the conditions were in

11   1953 at that particular point would require a further

12   analysis and comparison of 1953 water level measurements and

13   1958 water level measurements, which I have not made at the

14   moment.

15   BY MR. VEEDER:

16         Q  When you say "pumping hole," what is a simile.

17   Does it correspond to a depression in the water table?  Is

18   that what it is?

19         A  A pumping hole indicates-- a contour map is based

20   on non-pumping measurements, allowing a sufficient time for

21   recovery so that the water level measurement reflects the

22   static condition.  Following pumping the pumping hole

23   indicates an area from which or within which the water-bearing

24   deposits have been dewatered.  It represents a decrease in the

25   amount of ground water in storage.

E

Z60

1    THE COURT:  It is more permanent, then, than a cone

2  of depression around an operating pump?

3    THE WITNESS:  That is correct.  Now the cone of de-

4  pression creates the pumping hole, and if pumping were stopped

5  entirely and sufficient time were given for the effects of

6  recharge and discharge to get back in balance the system would

7  eventually recover, but it would take possibly a period of

8  years for that complete recovery to happen.  It may happen in

9  one season, depending on the hydraulics of the situation.

10    THE COURT:  If it is a cone of depression, it would

11  ordinarily be expected to recover fairly rapidly.  If it is

12  a pumping hole, it is going to take longer.  Is that your

13  point?

14    MR. VEEDER:  Don't ponder it too hard.

15    THE WITNESS:  In essence, you are correct, yes.

16    THE COURT:  Now don't give me a formula.  Just tell me

17  if that is substantially it.  In other words, we refer to these

18  cones of depression as something that is in existence while

19  the pump is operating.

20    THE WITNESS:  That is correct.

21    THE COURT:  These pumping holes are phenomena that you

22  find when no pumping is going on?

23    THE WITNESS:  That is right.  However, it does follow

24  that it is caused by pumping.

25    THE COURT:  But these pumping holes, given time, would

E

z61

1    again fill up with water?

2         THE WITNESS:  That is right, if there were no additional

3    pumpage.

4    BY MR. VEEDER:

5         Q  What effect does that have on surface runoff?

6         A  That is a question that just logically leads into

7    what would happen if there were surface runoff in Temecula

8    Creek, disregarding what would even happen for the moment in

9    regard to rainfall infiltration, et cetera.  Now, where a

10   large quantity of water discharged down Temecula Creek, there

11   has been approximately 60 feet of storage space made avail-

12   able in the younger alluvial deposits.  We know from examina-

13   tion that these deposits are very permeable on the surface.

14   The water would soak right in, causing the water levels to

15   rise in the wells in Pauba Valley very quickly.  The effect

16   would be then for the contours to move downstream, but the

17   effect in the older alluvium would not be as rapid and the

18   contour, take for example the 1050-foot contour, which is

19   coming from the northeast toward the Temecula Creek, if there

20   were a slug of water or a large quantity of water discharged

21   into the alluvium and the alluvium quickly became recharged

22   the 1050-foot contour would swing back downstream and yet it

23   would extend back and connect with the 1150--contour in the

24   older alluvium-- it has to do that.
     BY MR. VEEDER:

25        Q  What about the depression on the Murrieta area at

E

Z62

1    contour 1050, the pumping hole at contour 1050, would that same

2    phenomenon exist, and what would its effect be upon surface

3    runoff?

4        A  The same phenomenon wouldn't necessarily exist.

5        Q  What about surface runoff?

6        A  It would be decreased, particularly where it ran

7    over the areas where there was formerly rising water.

8        Q  Go ahead.

9        A  The point that I want to make is that the water level

10   contour in the Pauba Valley area, say, at 1050, for example,

11   and all of the contours for that matter would be moved down-

12   stream as an arcuate contour, actually facing upstream, and

13   ground water would bleed from the younger alluvial deposit

14   into the older continental deposit and recharge the older

15   continental deposits, and that increment of water would not

16   be found later on in the season as rising water in Pauba

17   Valley and that water would not go out Temecula Canyon in the

18   same manner that it would go out if the water levels had not

19   been pumped down.

20       Now, it is axiomatic that if the water can get out of

21   the deposit due to pumping, when you have recharge the water

22   would get back in.  In my opinion it is fundamental and the

23   evidence of the fact that water has gotten out is that there

24   has been a decline in the well, such as in the Schrode well,

25   and for that matter there has been a decline in the vicinity

1    of the Roripaugh well.  In my opinion, the Roripaugh well

2    draws 100% of its water from the older alluvial deposits.  The

3    younger alluvium in the vicinity of the Roripaugh well is

4    unsaturated and in my opinion it is unsaturated except for

5    just very brief periods following heavy runoff.

6         THE COURT:  Where is the Roripaugh well?

7         THE WITNESS:  The Roripaugh well is Well 26J1, Town-

8    ship 7 South, Range 3 West.  And likewise, the Pauba Well

9    for virtually its entire depth is in older alluvial deposits.

10   And in my opinion, the Querry well-- I don't have its location.

11        MR. LITTLEWORTH:  Then I object to the conclusion he

12   is about to draw, your Honor.

13        THE WITNESS: You can object, but the fact remains.

14        THE COURT:  Just a moment.

15        THE WITNESS:  I am sorry.  I mean no disrespect.

16        THE COURT:  The objection is overruled.  An expert

17   witness can draw conclusions.  He doesn't have to pin it to

18   a particular thing.  You may cross-examine when the time comes.

19        MR. VEEDER:  I think the objection is a little un-

20   becoming in view of the several weeks we have been waiting to

21   get the Querry log.

22        MR. LITTLEWORTH:  Let me state this for the record, and

23   Mr. Veeder knows this-- I told him already.  The Querry well

     was drilled before Mr. Querry came on the property.  I don't

     know who drilled it.  Mr. Veeder probably has more ways of

E

Z64

1   getting access to it than I do.

2        THE COURT:  Don't take these matters too seriously,

3   Mr. Littleworth.  You haven't been around here.

4        MR. STAHLMAN:  You don't know how well we are getting

5   along here.

6        THE COURT:  I know that you made an honest effort, and

7   if the well was drilled by a predecessor in interest to your

8   client the probability of your being able to obtain it is

9   very remote.

10        THE WITNESS:  I visited the Querry well and talked to

11   Mr. Querry, and I do not recall the exact depth he gave me--

12   I have it in my notes, I can check it.

13        MR. VEEDER:  Mr. Kunkel, I am asking you not to respond

14   until there is a question presented.

15        THE WITNESS:  I am sorry.

16        THE COURT:  Haven't we had enough identification of

17   this exhibit?

18        MR. VEEDER:  That was the next question I was going to

19   direct to your Honor.  I wanted to have the data that would

20   be requisite on direct examination, because I presume that I

21   will not have an opportunity for further direct examination

22   when we let Mr. Kunkel off the stand, and I have thought it

23   would be reasonable to interrogate-- not that I have very much--

24   in regard to the whole identification, and cross-examination

25   could take up at once when we got underway.

1          Q   What other data have you placed on this Identification

2     15-A, Mr. Kunkel, which does not appear on 15?

3          A   There is a small patch of basement complex shown

4     in the Southeast Quarter of Section 18, Township 8 South, Range

5     1 West, at the map scale 62,500.  It was so small it was left

6     off.  It appeared on my field sheets which have circulated

7     in the courtroom.  There is a slight change inthe extent of

8     the residuum in Section 25, Township 6 South, Range 3 West.

9     I am not certain exactly why it was not shown on Exhibit 15,

10    but the area is extremely small, and with regard to the over-

11    all ground water story it makes no difference.

12         Q   What changes, if any, have there been made in

13    connection with the Wildomar Fault or any other fault?

14         A   The Wildomar Fault has been extended for, oh, an

15    additional mile along the southeast.  The position on both

16    maps, as closely as I can determine, working on different

17    map scales, is the same.  I don't believe there is any differ-

18    ence.

19         The Elsinore Fault is somewhat different.  In Exhibit

20    15 it is shown as a concealed fault northeast of a patch of

21    older alluvium shown in Section 29, Township 8 South, Range

22    2 West, whereas it is shown south of that patch of older

23    alluvium on Exhibit 15A.  The fault is not extended for the

24    full length of Murrieta Valley on the southeast for the simple

25    reason that the larger map scale I did not feel I had sufficient

1    control to show it at the larger scale.  The fault exists--

2    there is no doubt in my mind that it is there, but when you

3    work on a larger scale you are narrowing your limits of

4    interpretation down to a smaller area, that I did not care

5    to show it on Exhibit 15 without further checking, whereas

6    on Exhibit 15A in the smaller scale its position is, in my

7    opinion, accurately shown.

8         Q  What does the map show as to differences, if any,

9    in regard to the points of rising water-- that is, on any

10   streams that you have there?

11        A  The points of rising water where shown are the

12   same, with the exception that I did not show--

13        Q  Are the same as what now?

14        A  Are the same as on Exhibit 15, except that I did

15   not show the extent or the distance to which the rising water

16   flowed in the stream channel.  It could very easily could be

17   done, but I just thought that I was beginning to put too many

18   things on one map.

19        Q  What are the other elements that appear on Exhibit

20   15-A, if any, that do not appear on Exhibit 15, or any variances

21   between the two?

22        A  As I testified earlier, they are virtually the same

23   map, but there are other differences.  They are ones of map

24   scale, or possibly-- I notice that there is a small patch of

25   older alluvium shown on Exhibit 15 that is not shown on 15-A.

1   At the moment I don't recall why that was left off, but it is

2   not critical with regard to ground water.   There may be other

3   minor things like that, but in general it is the same map.

4       MR. STAHLMAN:   Is this a new one?

5       MR. VEEDER:   No, this is part of the same investigation.

6       MR. SACHSE:   If you are going to end the other one, I

7   don't want to interrupt, but I have a couple of very simple

8   questions about the same sort of thing you are asking, Mr.

9   Veeder.   Shall I do it now?

10       MR. VEEDER:   I don't care.   However your Honor wants to

11   go ahead.

12       THE COURT:   If there are inquiries--

13       MR. SACHSE:   As to what is on the map.

14       THE COURT:   All right, proceed.

15

16               RECROSS-EXAMINATION

17   BY MR. SACHSE:

18       Q   Mr. Kunkel, it appears to me that Exhibit 15-A is

19   a photographic reproduction of the three United States Quads,

20   is it not, of the base map?

21       A   That is correct.

22       Q   So where I see "Gaging station," for instance, or

23   "Spring", and so on, that is the language of the quad sheet,

24   not yours?

25       A   That is correct.   That is photographically

e2

Z68 1    reproduced from the quadrangle.

2        Q  And Mr. Veeder asked you if the points of rising

3    water were the same.  Are all the points of rising water that

4    are on Exhibit 15 in that area reflected on Exhibit 15-A?

5        A  No, I have not shown the points of rising water

6    along the spring line south of Santa Gertrudis Creek.  They

7    are indicated by the reservoirs, et cetera, on the topographic

8    maps which are in evidence, and again I was getting to the

9    point that you get so many things on the map--

10        MR. VEEDER:  You don't have to apologize.  Just explain.

11   BY MR. SACHSE:

12        Q  You haven't indicated all of them, then?

13        A  No.

14        MR. SACHSE:  That is all I have.

15        THE COURT:  Any other inquiry?

16        MR. MOSKOVITZ:  I have an inquiry, your Honor.

17        THE COURT: Go ahead.

18        MR. MOSKOVITZ:  I think this Exhibit 15-A is very

19   interesting.  However, I don't feel that it complies with the

20   request that was made, and that was to have the location of the

21   wells, the water levels inthem, and the depths of the wells

22   which were used in drawing the contours on Exhibit 15.  We

23   have a new set of contours, and I think it is tough on the

24   case but he has not done what we have been waiting for.

25        THE COURT:  I think he probably has done a better job

E2

Z69

1    than I asked for.  He has taken a larger map and put in a

2    lot of detail.  If that is an objection, it is overruled.

3    The scale is much broader.  If he tried to work it out on a

4    smaller scale--

5           MR. MOSKOVITZ:  I am not sure that your Honor under-

6    stands my point.  The contours on Exhibit 15-A are for 1958,

7    the new set of contours.

8           THE COURT:  Yes.

9           MR. MOSKOVITZ:  They are fine.  I imagine they are

10   relevant to the case as much as those of 1953.  But we have

11   no way of testing the contours of 1953.  If Mr. Veeder were with-

12   drawing Exhibit 15 and supplanting it with 15-A--

13          THE COURT:  I haven't heard him say so.

14          MR. MOSKOVITZ:  I haven't either.  Then where is the

15   foundational material for Exhibit 15?

16          THE WITNESS:  May I answer?

17          MR. VEEDER:  We have another map here and we have a

18   great deal of data.

19          THE WITNESS:  Mr. Moskovitz--

20          MR. VEEDER:  Go ahead.

21          THE WITNESS:  If you will check, I have entered some

22   sheets-- I forget the numbers, 16A, or something to that

23   effect-- where the 1953 measurements that I copied from the

24   files of the Department of Water Resources are tabulated.

25   Those numbers are the same numbers for the wells shown onhere.

E2

Z70

1  If I remember correctly, the Court's instructions were not to

2  plot all of the wells that I used, but to plot a sufficient

3  number that the control would be adequate.'

4       MR. LITTLEWORTH:  I would like to join, your Honor,

5  in the request for the specific wells on which the 1953

6  contour lines were based, because I think now they are be-

7  ginning to draw some conclusions between the contour lines

8  on 1953 and 1958 and concluding that perhaps pumping has

9  affected them, et cetera, and I think we need to know on what

10  basis those 1953 contours were drawn.

11       THE COURT:  I think they are all in evidence here.

12       MR. VEEDER:  16-C, your Honor.  There are more than 400

13  wells entered here.

14       That was the source of data, is that not correct?

15       THE WITNESS:  That is correct.  Those wells which are

16  already in evidence in Exhibit 116-C, plotted on 15-A, will

17  give you the control that I used.

18       MR. LITTLEWORTH:  I understood they were to be plotted.

19  Maybe I misunderstood the Court's instructions.  This is a new

20  plot of present-day contours.  I understood the same thing

21  was to be done for 1953.

22       THE WITNESS:  My instructions were, if I understand

23  correctly, to locate the wells on a map that I used in

24  construction of Exhibit 15.  The wells are located on the map.

25       THE COURT:  He has not only done that, but he has gone

E2

Z71

1    out and checked water levels in the last month and given us a

2    complete check on that, which goes far beyond what would have

3    been obtained by merely taking only the older measurements.

4         MR. LITTLEWORTH:  I have no objection to Exhibit 15-A.

5    I think that is extremely helpful.

6         THE COURT:  There is nothing particularly inconsistent

7    between the two maps.  The contours may be moved somewhat

8    because of the date but the contours run in the same general

9    direction.

10        MR. LITTLEWORTH:  In some places, your Honor, they run

11   100% in opposite directions, and I think it is of some import-

12   ance to understand the basis of this 1953 line.

13        MR. VEEDER:  I understand that there is going to be

14   full and complete cross-examination.

15        THE COURT:  Yes, you are going to have an opportunity

16   to cross-examine.

17        MR. LITTLEWORTH:  Maybe I misunderstood the early

18   consensus, but I thought that when Exhibit 15 was put in with

19   the contour lines on it we asked Mr. Kunkel what wells he used,

20   and he didn't know at the time, and that was to come in and to

21   be shown on some kind of map.

22        MR. VEEDER:  That he didn't know?

23        MR. LITTLEWORTH:  Well, he didn't know at the time on

24   cross-examination which wells were used, and they were to

25   be produced and we were to find out how he drew the 1953

E2

Z72

1    contour lines.

2         THE WITNESS:  May I answer that?  Referring to Exhibit

3    15, I couldn't point to the positions of the wells, but I

4    knew where they were.  There is no doubt about that.

5         MR.LITTLEWORTH:  You might, but I don't know.  That is

6    what I am trying to find out.

7         THE WITNESS:  They are shown on Exhibit 15A.

8         MR. LITTLEWORTH:  Exhibit 15A, I understand, are the

9    wells which you have used to plot the 1958 contours.  Are they

10   the same ones you used to plot the 1953?

11        THE WITNESS:  Many of them are.  I have a few additional

12   wells.  Some of the wells in 1953 that were used are now

13   destroyed, and so indicated.

14        MR. LITTLEWORTH:  I think it is important to know what

15   was used in 1953, your Honor.  Maybe they are the same ones

16   used in 1958, and maybe not.

17        THE WITNESS:  They are in the record.

18        MR. LITTLEWORTH: Where are they?  There is a list of

19   them, but I have no idea where they are.

20        THE WITNESS:  They are on Exhibit 15.

21        MR. VEEDER:  There is the exhibit.

22        MR. LITTLEWORTH:  Were all the wells that are shown

23   on Exhibit 15-A used in the plotting of Exhibit 15 and no more?

24        THE WITNESS:  I am not sure I follow your question.

25   And secondly--

E2

Z73

1    MR. VEEDER:  If you don't follow his question, say so.

2    MR. LITTLEWORTH:  Were there any wells used in plotting

3    Exhibit 15 that are not plotted on Exhibit 15-A?

4    THE WITNESS:  There may be, but it was not my instruc-

5    tion to plot all of the wells.

6    MR. LITTLEWORTH:  This is what I am getting at, your

7    Honor.  I think we are entitled to have a list of the wells

8    and have them plotted on a map to show how he drew his 1953

9    contours and to compare those against the 1958.

10   THE COURT:  Now, I understand that on Exhibit 15-A you

11   have some additional wells that you have relied on that you

12   didn't rely on in your contours on Exhibit 15.

13   THE WITNESS:  I do not know that answer one way or the

14   other.

15   THE COURT:  Maybe?

16   THE WITNESS:  Possibly.

17   THE COURT:  And it may also be that some of the wells

18   you relied on for Exhibit 15 for your contours have been

19   destroyed and are not available for present check with the 1958

20   contours?

21   THE WITNESS:  That is correct, plus I have a few

22   additional wells which were not available to me for 1953.  I

23   don't recall the exact spot in the record, but it was pointed

24   out that there were more than 400 wells in that list, and the

25   Court's instructions were to show a reasonable number of them

E2

Z74

1   so that the control that I used could be checked.

2          THE COURT:  I don't find any criticism of what you have

3   done, Mr. Kunkel.  But Mr. Littleworth's and Mr. Moskovitz's

4   request is this-- and I will decide later about it-- they want

5   to know what wells you used as control wells or key wells or

6   wells that you considered in drawing your 1953 contours.  They

7   probably think that the contours in 1953 are in some way

8   different than the contours in 1958, and so they want to

9   cross-examine and they want to see what they can find out about

10   your 1953 contours.  Now, of course, your '53 contours didn't

11   go as far as your 1958 contours did.

12          THE WITNESS:  That is correct.

13          THE COURT:  When drawing your contours for 1953,

14   although you may have known about and had available the data

15   on 400 wells, you didn't use 400 wells in drawing the limited

16   contours you drew in 1953?

17          THE WITNESS:  That is correct.

18          THE COURT:  Do you have a list of the particular wells

19   that you relied upon in drawing your contours in 1953?

20          THE WITNESS:  That is a difficult question, when you

21   ask what wells I relied on.  I say with all due respect, but

22   I have almost fallen into this trap of "relied upon" before.

23   The word apparently must mean something different to me than

24   it means to other people.

25          THE COURT: By "relied upon", that you took into

E2

Z75

1    consideration, that you examined data from, that you used

2    as some sort of basis for your contours in 1953; no particular

3    significance placed on the words "relied upon", other than it

4    was some data that you considered. You either took a check

5    or you drew an inference, or you reasoned that if a well was

6    so much in 1927, in view of the changes that had taken place,

7    it would be so much in 1953-- in other words, there were

8    certain wells as starting points, or maybe, more accurately,

9    actual water levels at certain times that you used. That is

10   what I mean. Do you have a list of what those wells were?

11            THE WITNESS: That is a list in Exhibit 16-C.

12            THE COURT: 16-C? How many wells are there?

13            THE WITNESS: There are more than 400.

14            THE COURT: Well, did you take all 400 into account in

15   putting your contours in Exhibit 15?

16            THE WITNESS: Yes, but when you ask me which ones I

17   didn't consider and which ones I did, it was a process of

18   plotting the data, looking at it and saying, "Here is a

19   measurement that doesn't seem right", and I checked my data

20   and maybe that was a pumping measurement or a shallow well

21   or one reason or another.

22            THE COURT: Actually, you did consider, in one way

23   or another, all the 400 wells?

24            THE WITNESS: In one way or another I looked at the

25   data, I evaluated it, I thought about it; but whether I used

E2

Z76

1   or threw it out, I have no way of knowing, without going

2   through the process again. You could ask me the same ques-

3   tions on this map.

4           THE COURT: Let me ask you this. You said on Exhibit

5   15-A you had certain wells that you considered control wells,

6   that you used as a control for fixing a certain line; do you

7   remember that?

8           THE WITNESS: Yes. For example--

9           THE COURT: Well, don't give me an example. I refresh

10  your recollection on that point. Now, would those also be

11  wells that would control on your contours on Exhibit 15 for

12  1953?

13          THE WITNESS: Yes, and in my opinion the wells that

14  are shown on Exhibit 15-A are sufficient control, by plotting

15  '53 data on that map, to determine whether this is completely

16  off base or whether it is right. It doesn't mean that every

17  well is on there, but -- I see your problem.

18          MR. STAHLMAN: Yours, too.

19          MR. VEEDER: I was going to say it is mine.

20          MR. STAHLMAN: May we have a recess here?

21          THE COURT: All right.

22          (Recess.)

23

24

25

4683

F-1 ML j

1    MR. LITTLEWORTH:  Your Honor, concluding what we were

2    discussing, I wonder if it would be possible for Mr. Kunkel

3    to take 16-C, which is, apparently, the list of 400 wells,

4    and just by checkmark indicate the ones he discarded?

5    Apparently, some, he concludes, are not representative for

6    one reason or another and shouldn't be or, at least were

7    not the basis for his contour lines.

8    MR. VEEDER:  We will undertake that, your Honor.

9    MR. LITTLEWORTH:  What we would really like to know

10   is what wells he has used and which ones he has discarded,

11   so we can see what you can conclude from it.  Maybe nothing.

12   I don't know.  But this is important testimony to us, and

13   we want to know the basis of his conclusions.

14   THE COURT:  Of course, you have got more than that in

15   15-A.

16   MR. LITTLEWORTH:  That raises one other question.  He

17   says that there are wells which he has discarded on 15-A.

18   I wonder if we can also have a list of the wells which he

19   has examined but again on 15-A has discarded for one reason

20   or another.

21   MR. VEEDER:  We will undertake, your Honor, to do

22   all that we can in regard to that.  We have explained in

23   the original direct examination the source of the data.  We

24   repeated it again in cross-examination.  However, I will ask

25   him to go through and, to the best of his recollection, using

1  his notes, to obtain the data that is desired by these

2  gentlemen.

3       MR. LITTLEWORTH:  All I want to know are the wells

4  he believes in and the wells he doesn't believe in.

5       THE COURT:  Of course, Mr. Veeder has offered to do

6  what he can to help you.  You have got all the information

7  available through cross-examination.  You find a well that

8  you think is significant, and it is listed on 15-A.  Maybe

9  you have got something; maybe you haven't.

10       MR. LITTLEWORTH:  I understand that -- maybe I am

11  in error here -- that Mr. Kunkel has used the 200-odd wells

12  that are listed on 15-B --   Is it?  -- the list.

13       MR. VEEDER:  Yes.

14       MR. LITTLEWORTH:  Are there additional wells which

15  he has examined and has discarded?

16       THE WITNESS:  No, you have every well that I have

17  used.  The ones I have used completely to ones that maybe

18  I have evaluated.

19       MR.LITTLEWORTH:  These are all the wells you have

20  examined, and some of them you have relied upon and some you

21  have discarded.

22       THE WITNESS:  And to a matter of degree, again.  It

23  is not black and white.

24       MR. LITTLEWORTH:  I think that clarifies it.

25       THE COURT:  I understand there are two lists here.

1    There is one list of 400 wells and one list of 200.  Is that

2    it?

3         THE WITNESS:  That is correct.

4         THE COURT:  The list of 200 wells is what, Exhibit

5    16?

6         THE WITNESS:  15-B.  It is about 217 wells or some-

7    thing of that nature.

8         THE COURT:  Which is used in connection with 15-A?

9         THE WITNESS:  Used in connection with 15-A.

10        THE COURT:  Then, the other list is 16 --

11        MR. VEEDER:  C.

12        MR. LITTLEWORTH:  C.

13        THE COURT:  -- C, which was 400 wells and the work

14   sheets on that.

15             Now, as I understand that, on 15-B the 217 wells,

16   to some extent all of those wells, have been considered in

17   15-A?

18        THE WITNESS:  To some extent, yes.

19        THE COURT:  And then, actually, what you want is

20   which, wells in 16-C?

21        MR. VEEDER:  C.

22        THE COURT:  C.  He did not take into account or

23   reject it from his consideration?

24        MR. LITTLEWORTH:  That is right.  I am satisfied with

25   15-A and -B.

1    THE COURT:  That is what Mr. Veeder will get for you.

2    MR. LITTLEWORTH:  Yes, all right.

3    MR. VEEDER:  Your Honor, we had an incompete exhibit

4    in 16-C, 16-1, if you will recall.  The question arose in

5    regard to the diagram that is set forth in the upper center

6    of that exhibit.  Now, based upon the investigations Mr.

7    Kunkel undertook in connection with 15-A, he is now ready

8    to complete that drawing.  Objection was made, if you will

9    recall, in regard to the Roripaugh well and in regard to the

10   logs --

11   THE COURT:  I don't remember.  You will have to

12   refresh my recollection about 16-1.

13   MR. LITTLEWORTH:  I don't recall that this was in-

14   complete.  And I don't know what he is about to put

15   on it.  But I would make this objection which I think goes

16   beyond either of those two things, your Honor:  I think it

17   is improper and a case where precise measurements are im-

18   portant.  To have the witness on an exhibit approximate

19   things and draw diagrammatic schemes and illustrations and

20   the like which he may qualify by his oral testimony -- but

21   his oral testimony is going to be long separated from this

22   case.  Somebody looks at one of these exhibits and it will

23   look on the face of it as though it were an accurate draw-

24   ing.  And I think that if they have a scale, an accurate

25   thing which is relevant, that is one matter.  But you have

1  to have the witness go to the board and start drawing

2  diagrams and the like, I think is incompetent evidence.

3  THE COURT:  I don't agree with you, Mr. Littleworth.

4  Obviously, this is a schematic drawing.  No one could even

5  contend there was anything in the sense of accurate measure-

6  ments in the diagrams that have been put on.  They are

7  base sketches, 16-1.  As I recall, that was used merely to

8  support his contentions that, in his opinion, water worked

9  down through the older alluvial and back up the younger

10 alluvial.  And he certainly didn't contend that nobody

11 could think that the water followed the precise lines of

12 those arrows.

13 MR. LITTLEWORTH:  Well, I think then we need to have

14 a specific question from Mr. Veeder so I know what Mr. Kunkel

15 is about to draw.  I don't know what he is about to draw

16 when he says, "Go to the board and complete your drawing."

17 THE COURT:  What is your point?  Something, you say,

18 was incomplete?

19 MR. VEEDER:  Yes, your Honor.  That was the cir-

20 cumstance.  If you recall, objection was made in general to

21 the series investigations which Mr. Kunkel had made.  We

22 had made a field trip.  We came back after investigating

23 the Roripaugh well, after testing the well, very cursorily,

24 and then, on the interrogation I asked him to place on

25 16-1, which is a geological section along the Santa

Margarita River, and to show the younger alluvium and the older alluvium as they are related to the location of the Roripaugh well. Now, he has made his investigations. He has checked out the data. I believe he has now the information upon which the objection was predicated, namely, there was some question in regard to location of the well in regard to the log of the well. Now, we have that data supplied by my friend here, Mr. Littleworth. And just for the well not only. I think it is important that he completes this sketch that he has started. There was no objection to it at that time other than the basic data which you had not at that time supplied us.

MR. LITTLEWORTH: There was a problem then that we did not know that the well which Mr. Veeder came out and tested that Monday corresponded with the well log which I had given to him. And since we have been away I have checked that out, and those two documents do correspond, the two that, I think, were put in evidence.

THE COURT: We will mark those documents -- What would they be, 16?

MR. LITTLEWORTH: They are already in evidence, I believe, your Honor, both of them.

THE COURT: Are they in evidence?

MR. VEEDER: I am not sure the field notes are in evidence. I don't think they are, as a matter of fact.

THE COURT:  What is the other document?

MR. VEEDER:  16-A-72.  I would like to offer this 16-A-72-A the field notes.  Then, they correspond.

THE COURT:  Well, 16 --   What is it, again?

MR. VEEDER:  16-A-72.

THE COURT:  16-A was a series of data on wells?

MR. VEEDER:  Well logs, yes, your Honor.  And this was one of them.

A question was raised as to whether this was the right well or not.  Mr. Littleworth now says it is, and I think that it should be --

THE COURT:  Then, we will call this additional sheet --   All right, call it 16-A-72-A.

MR. VEEDER:  Yes.

THE COURT:  The additional data on the Roripaugh well. Any objection to it.  Be received in evidence.

Q  BY MR. VEEDER:  Now, would you proceed on Plaintiff's Exhibit 16-1 to finish the drawing which is immediately to the right of the legend on that illustration?

A   I am referring to Plaintiff's Exhibit 16-1, a pencilled drawing in the center part of the exhibit at the top on the right of the word "Legend."  I am testifying from my field notes made October 13, 1958, at the well site, which time I also examined the channel of Santa Gertrudus Creek.

THE COURT: Those notes are 16-A-72-A?

MR. VEEDER: That is right.

THE WITNESS: Correct.

The Roripaugh well, I first will draw a generalized cross section across Santa Gertrudus Creek from northwest to southeast. The qtoal can be observed northeast of the well.

Q BY MR. VEEDER: You are pointing to 15-A?

A As indicated on Exhibit 15-A, northeast of the Roripaugh well, which is Well 28-J-1. The younger alluvial plain, as mapped qyal, is a relatively flat surface at and into the younger alluvial plain. The Santa Gertrudus creek is incised a matter of, oh, ten feet below projected surface of the plain. The alluvial plain -- Let's see, the creek is also possibly, oh, 75 to 100 feet across from, back to back, and then the surface rises and flat alluvial plain extends to the southwest across the alluvial plain where it again is in contact with the older continental deposits.

The Roripaugh well is about 100 feet from the edge of the channel of Santa Gertrudus Creek. I have indicated an horizontal arrow with a hundred feet above and two vertical lines which is the Roripaugh well. The water level in the Roripaugh well was 39.32 feet below the top of the casing; and the top of the casing or the access pipe was about one foot above land surface; which means the depth to water is

1    to give the reference to it.

2          A    Well 7 South, 3 West, 26-J-1.  The alluvium at

3    that point, in my opinion, is on the order of six feet

4    thick.  It might be ten; it might be a little less.  But it

5    is considerably thinner than the depth to water, which is

6    38 feet.  According to the well log, the depth of the well

7    is -- T.D., total depth -- 508 feet.  It is perforated from

8    94 -- 508 feet.  According to Mr. Roripaugh, this well,

9    which yields 1350 gallons a minute at a drawdown of 17 1/2

10   feet, in my opinion draws 100 per cent of its water from

11   the intervals that it is perforated, 94 to 508 feet, which

12   is entirely of older alluvium, even though the well as shown

13   on Plaintiff's Exhibit 15-B is shown to start in the younger

14   alluvium.  In my opinion, that is not an unusual circumstance.

15         MR. VEEDER:  I would like to have marked for identifi-

16   cation Plaintiff's Exhibit 15-B, which is a map of the

17   well locations.

18         THE COURT:  We have a 15-B.

19         MR. VEEDER:  I beg your pardon.  It would be 15-C.

20         THE COURT:  These are well locations for what?  For

21   water levels?

22         MR. VEEDER:  That is correct.

23         THE WITNESS :  No, for wells.

24         MR. VEEDER:  For the well logs.  I beg your pardon.

25         THE WITNESS:  The well logs.

MR. VEEDER:  I have given one to the Court already.

THE COURT:  It will be marked 13-C.  15-C.

MR. VEEDER:  15-C.

THE COURT:  15-C.  Pardon me.

Q  BY MR. VEEDER:  Mr. Kunkel, would you state into the record the description of the exhibit marked for identification 15-C and state whether you made that map yourself or it was made under your direction?

A  Exhibit 15-C was prepared by me or under my direction.  It is the same base map as Exhibit 15-A.

THE COURT:  Just a minute.  Off the record.

(Discussion off the record.)

THE WITNESS:  On 15-C I have shown by solid circles the wells for which drillers' logs are available.  And they are the logs which I used in my analysis and computations to estimate the ground water storage capacity of the ground water units 1, 2, 3 and 4, in Exhibit 18.  There are one or two wells shown for which there are logs that I did not use in that analysis.  It could very easily be done by comparing my analysis against the exhibit.  It will be discovered there are, I believe it is one or two, that were very deep oil wells that, in my opinion, I didn't think the log was reliable enough to use for the estimate of storage capacity.  But it was of use for determining the total thickness of the unconsolidated deposits.  Therefore, I have

also shown that log or logs; I forget the exact number.

MR. VEEDER:  Your Honor, I assume that this will be the same circumstance as -- and we are certainly pleased to proceed that way of 15-A, and cross-examination will be subsequent to the time that they have had the opportunity to fully review the exhibit.  I would like to have marked for identification 15-D, which is: "Calculations of specific yield, Murrieta Valley."

THE COURT:  15-D marked for identification.

Q  BY MR. VEEDER:  Now, would you proceed to state --

MR. SACHSE:  What exhibit was that, Mr. Veeder?

MR. VEEDER:  15-D.

THE WITNESS:  On Exhibit 15-D I have listed the seven pages -- the title of the exhibit is:  "Calculations of specific yield."  Page 1 is Murrieta.  Pages 1 and 2 is Murrieta Valley.  Page 3 is Wolf Valley.  Page 4 is Pauba Valley.  Page 5 is the weathered older alluvium, Pauba Valley area.  That is page, yes, Page 5.  Page 6 is Lancaster-Nigger-Radec-and Aguanga Valleys.  Page 7 is Oak Grove Valley.  For each of the ground water storage units I have listed the well numbers.  The five classes to which the materials in the drillers' logs were assigned.  On Page 2, for the first area, the Murrieta area, the total footage has been totalled up for each of the five units.  It has been reduced to a percentage.  Figures of the total for each of

1    the five units have been converted to a per cent of total.

2    An arbitrary specific yield value is assigned to each per

3    cent and calculated on the last line to determine the

4    specific yield of the ground water storage unit.

5         THE COURT:  You told us before what these five

6    classifications were.  Do you want to tell us again in the

7    record right here?

8         THE WITNESS:  Yes, sir.  The five classifications

9    are:  First classification is predominantly sand or gravel.

10   And the emphasis is on the drillers' term where he implied

11   a fair or a good degree of sorting.  The second term was

12   sand and gravel, where the driller, by his terms, had implied

13   a mixture indicating a lower specific yield.  The third term

14   was, in my terminology, largely a sand, a sandy silt or

15   a sandy material that was a fair yield.  Again, "fair," is

16   not used at the moment with a quantative value.  That is

17   added later.  The fourth category is where there is cemented

18   material, cemented gravel, cemented sands, hard materials

19   that were of comparably lower specific yield.  And the fifth

20   category includes the drillers' term, "clay," to which I

21   have testified previously.  The clays of the drillers and

22   the clay of the geologists are two different things.  When

23   a driller logs "clay," he is generally talking about a sandy

24   silt or occasionally even a very coarse sand with some clay

25   in it.  But the fifth category includes the term "clay" in

1     the drillers' logs.   The five terms that I have just

2     testified to are totalled up, converted to percentage,

3     arbitrary specific yield value is assigned to each of the

4     five classes, and the total specific yield is calculated

5     on the last line of each unit.   In essence, this is a

6     tabulation that is comparable to Exhibit 41 by Mr. Worts

7     for a --

8            Q   BY MR. VEEDER:   Enter into the record what

9     designation is of 41.

10           A   Exhibit 41 is a bar graph showing specific yields

11    of materials in wells Upper, Chappo, and Ysidora Basins.   A

12    very similar graph could be made from this tabulation.   This

13    graph, I mean this Exhibit 15-D instead does not include

14    the materials below 100 feet, because they were not con-

15    sidered in analysis.   It includes merely materials between

16    the 1953 water table and 100 feet below that.

17           THE COURT:   Now, you say this has to do with how you

18    computed the storage capacities in the subbasins shown in

19    Exhibit 18?

20           THE WITNESS:   That is correct.

21           THE COURT:   Exhibit 18?

22           THE WITNESS:   That is the calculations of specific

23    yields which were used in the calculations.

24           THE COURT:   Was Exhibit a map or a computation?

25           THE WITNESS:   Exhibit 18 is a tabulation that relates

1    back to Exhibit 17, which is a map.

2        Q  BY MR. VEEDER:  Have you got 17-A?

3        A    17-A at one time was marked for identification.

4    I don't know if it has been entered in evidence or not, but

5    it is the same base map as 17.

6        Q    Here is 17.

7        A    17-A shows the location of formational logs, and

8    17-A and 15-D correspond for the area of where the two maps

9    overlap.  17-A also shows the locations of logs in other

10   valleys outside of ground water storage units 1, 2, 3 and 4.

11   On the basis of specific yield calculations in 15-D, times

12   the thickness of the top 100 feet of saturated materials,

13   times the areal extent of the unit as shown, equals the

14   ground water in storage in 1953 for that particular unit.

15   And that is tabulated on Exhibit 18.

16        Does the Court wish to refer to 18?

17        (To Clerk)  I guess the Court wants to see it.

18        I didn't hear what you said.

19   MR. MOSKOVITZ:  May I ask the Clerk whether 17-A is

20   in evidence?

21        THE CLERK:  No.

22        THE COURT:  17-A is not.

23   MR. VEEDER:  17-A has not been offered.  I am going

24   to offer it based on the wells that are locted there.  And

25   also I desire now to offer additional well logs that have

1   been added to -- I think the exhibit is 37. Wait a minute.

2   16-A. They should be, these new well logs which have been

3   obtained by Mr. Kunkel in preparation of this additional data

4   which we are offering in evidence now.

5           THE WITNESS: With regard to the logs that you have

6   just offered, it is all ready in the record, but I would like

7   to restate it: These logs have been copied from photographic

8   copies of State logs that are in my files. The State has

9   the original. I have the photographic copies. These are

10  typewritten copies of my photographic copies.

11          MR. VEEDER: And those would simply be added to --

12          THE CLERK: You want each one of these in evidence,

13  Mr. Veeder?

14          MR. VEEDER: Let's see. We numbered each one before?

15          THE CLERK: Yes.

16          MR. VEEDER: That went in. And I think that in due

17  time, Mr. Luddy, you can just probably proceed on through in

18  consecutive order.

19          THE COURT: These are being added to --

20          THE CLERK: 16.

21          MR. VEEDER: 16.

22          THE COURT: 16? Or 16-A?

23          THE CLERK: Or 16-A. I am sorry.

24          MR. VEEDER: 16-A. It will be 16-A- --?

25          THE CLERK: 73.

F-4

1      MR. VEEDER:  -- 73, and on through.

2      THE COURT:  You do it at your leisure.

3         16-A-73 on to the end.

4      MR. DENNIS:  I have a question, your Honor, I would

5   like to ask the witness at this time.  I think it might save

6   time later on.

7      THE COURT:  What is that?

8      MR. DENNIS:  Mr. Kunkel, if there are any discrepancies

9   between the logs of the wells which you have just introduced

10  and the logs which are in the State files, would you say

11  that the ones in the State files would be correct and these

12  could be corrected so that they would correspond with the

13  State logs?

14     THE WITNESS:  That is correct.  Because I used

15  photographic copies of these State logs.

16     MR. MOSKOVITZ:  I understand that 17-A has been

17  offered, also.  I would like to ask some questions.

18     MR. VEEDER:  Go ahead.

19

20            VOIR DIRE EXAMINATION

21  BY MR. MOSKOVITZ:-

22     Q   I see you have wells located on 17-A, and the

23  legend is:  "Formational log has been submitted in evidence."

24  Now, are these wells located on 17-A the wells that you used

25  in computing storage capacity or specific yield?

1    A    They are the wells that I used in computing

2  specific yield with what are two possible exceptions of oil

3  wells that I threw out, which I also used, though, for

4  estimating my thickness of the deposits.

5    THE COURT:  I thought you used the wells on 15-C to

6  estimate.

7    MR. MOSKOVITZ:  That was my next question.

8    Q    What is the relationship between the two?

9    A    They are the same wells, except on 15-C they are

10  more accurately located.  At first the Court asked me to

11  present a location map correct within 40 acres.  There is

12  a slight discrepancy in the projected section net between

13  17-A and 15-A, because 15-A is at a larger scale and the

14  survey control was better.  Where there is any discrepancy

15  15-A is more accurately located than 17.

16    THE COURT:  Don't you have more wells shown in 15-C,

17  15-C, the wells used to compute storage capacity, than you

18  have within the basin shown on 17-A?

19    THE WITNESS:  15-C is all of the wells.  17-1 or 17-A

20  shows the locations of only the logs that had been submitted

21  in evidence up until Mr. Veeder just entered more.

22    THE COURT:  All right.  But which did you use now,

23  all the wells to compute specific capacity?  Or did you only

24  use those you have spotted on 17-A?

25    THE WITNESS:  I used the logs that are shown on 15-D.

1    THE COURT:  15-D, then, must be the wells shown on
2  15-C?

3    THE WITNESS:  For the area covered.  But 17-A is a
4  larger area.  It includes Oak Grove Valley, which has some
5  wells in it which is not shown.

6    THE COURT:  Let me make myself clear.  Let us take the
7  big basin over Murrieta and Pauba Valley.  Just leave the
8  map up as you have got it.  15-A.  Pardon me.  17-A; your
9  big map.  The basin there, Murrieta Valley, Pauba Valley, and
10  the area on either side, one big area shown there.  You have
11  so many wells spotted in there.

12    THE WITNESS:  That is correct.

13    THE COURT:  Now, if that same basin were traced off
14  on 15-C, would more wells be shown than are shown there on
15  17-A?

16    THE WITNESS:  Yes, there would be more.  There are
17  more wells shown on 15-A than there are on 17-A.

18    THE COURT:  That is not 15-A.  That is 15-C we are
19  talking about.

20    THE WITNESS:  I have lost my numbers.  That is 15-C,
21  is correct.  15-C has more wells on it for the Pauba Valley
22  area than any other.

23    THE COURT:  All right.  Did you compute your specific
24  yield, then, on all the wells that you have shown within the
25  basin area on 15-C or did you compute it on the basis of only

1  the wells spotted in the basin on 17-A?

2  THE WITNESS: Oh, no, I used the wells that are shown

3  on 15-C, which are also the wells that are given in 15-D.

4  MR. STAHLMAN: What is the purpose of this?

5  MR. SACHSE: What is the materiality of this?

6  MR. VEEDER: 17-A? Is that the question?

7  MR. SACHSE: Yes.

8  MR. VEEDER: One, we were directed to do it. Secondly,

9  it is reflective of the storage unit basins on 17-A, and we

10  think it is reflective and demonstrative of certain important

11  factors in the over-all question of the ground water storage

12  unit.

13  MR. MOSKOVITZ: Your Honor, in other words, as I

14  understand it, there are some additional storage units

15  depicted on 17-A that don't appear on 15-C, is that correct?

16  THE WITNESS: Yes. Yes.

17  THE COURT: That is true, and 15-C is on a bigger

18  scale and shows in more detail.

19  MR. VEEDER: If you want to compare it, why, there

20  it is.

21  THE COURT: More than that, we have had some testimony

22  on 17-A, and for whatever value that testimony went in,

23  17-A should probably be in the record.

24  THE WITNESS: That was prepared under the Court's

25  direction by me several weeks ago in answer to a specific

1   request, byt I don't know whom, that the wells for which logs

2   were used be shown.  And this was a preliminary preparation,

3   and the instructions were to plot more wells and do it more

4   accurately, which I did on 15-C, which is at a larger scale.

5   On 15-C I have shown all of the wells.

6       MR. MOSKOVITZ:  May I ask another question, your

7   Honor.

8           Now, there are some basins shown of ground water

9   storage units, shown on 17-A, which do not appear on 15-C;

10  that is correct, isn't it?

11      A   There are no ground water basins shown on 15-C.

12  17 is the exhibit that outlines the ground water.

G

Z77

1    A  There are no ground water basins shown on Exhibit

2    15C.  Exhibit 17 is the exhibit that outlines the gound water.

3        THE COURT:  Yes, but what counsel means-- he didn't say

4    it accurately-- the area in Exhibit 15C is not extensive

5    enough to cover the areas shown, by some of the smaller ground

6    water basins on 17A.

7        THE WITNESS:  That is correct.

8    BY MR. MOSKOVITZ:

9        Q  Now, are the wells which you have located on 17A on

10   the areas which do not show on 15C, are those wells the ones

11   that you used in computing your ground water storage capacity

12   for those areas outside the scope of 15C?

13       A  Yes, yes.  Now I don't recall exactly.  Now here,

14   for example, at the due western part of the map there is a

15   well indicated on 17A, which is Well P2-- it is the westernmost

16   well.  I am not certain without checking against Exhibit 15D

17   whether that was the only well in that area that was available

18   or not.  It is relatively immaterial.

19       Q  Well, let's take your Ground Water Storage Unit No.

20   5, shown on 17A.  Now that area does not appear on 15C, does

21   it?

22       A  No, that does not appear on 15C at all.

23       THE COURT:  But the wells are in 15D?

24       THE WITNESS:  The wells which I used in calculating

25   specific yield are shown in 15D.  That is the Area 5 on Exhibit

G

Z78

1    18, which is called the Lancaster-Nigger-Radec-Aguanga Valleys.

2    In that area there are one, two, three, four, five, six logged

3    wells shown.  Actually on Page 15 of Exhibit 15D I used one,

4    two, three, four, five, six, seven, eight, nine, ten, eleven,

5    twelve, thirteen, fourteen, fifteen, sixteen, about twenty

6    wells.  They are not all of them shown.

7         MR. STAHLMAN:  I am a question.  I am getting more

8    confused.  May I ask a question?

9         THE COURT:  Yes.

10        MR. STAHLMAN:  When you calculated the storage capacity,

11   as you testified heretofore on your previous examination--

12        THE WITNESS:  Yes.

13        MR. STAHLMAN:  Did you use all of the wells which you

14   are now showing on Exhibit 15D?

15        THE WITNESS:  Exhibit 15-D is a complete list of the

16   wells that I used and is a complete list of the wells to which

17   I had reference when I testified earlier.  It is a complete

18   list of the wells that I used in the preparation of Exhibit 18.

19   BY MR. MOSKOVITZ:

20        Q  But only some of those are shown on Exhibit 17A?

21        A  But only some of the wells in Exhibit 15D are shown

22   on Exhibit 17A.

23        MR. STAHLMAN:  Why didn't you show them all?

24        THE WITNESS:  Because I was not instructed by the Court,

25   plus the fact that the map scale was so small that to show

G

Z79

1    them would have--

2         MR. STAHLMAN:  You made no further recalculation by

3    taking additional wells which you testified before were all

4    of the wells as shown on Exhibit 15D and your results as to

5    whether the capacities were the same?

6         THE WITNESS:  There has been no change in my estimate

7    of the storage capacity or specific yield.

8         THE COURT:  I think what happened, if you check the

9    record, was that Exhibit 17 was a map of the subbasins, and

10   that during some of the direct examination or cross-examination

11   we had the witness put in some wells, and I think he put in

12   wells that we were talking about, wells that particularly

13   appeared on some other map, and I remember telling him if he

14   could spot them within a 40 not to be too concerned about it--

15   it was a very rough proposition, I didn't think we went all

16   the way on it-- and subsequently we requested him to give us

17   a map showing all the wells that he used in his calculation

18   of capacity, and he has now submitted that in Exhibit 15C.

19        MR. MOSKOVITZ:  That is not all of them, your Honor.

20        THE COURT:  Exhibit 15C is a list of all the wells that

21   he used in computing specific yield.

22        MR. VEEDER:   That is Exhibit 15D, is it not, your

23   Honor?

24        THE COURT:  That is 15D.  And Exhibit 15C, to the extent

25   that the map covers the area, is all of the wells that he used.

1      MR. VEEDER:  If your Honor desires it, we will under-

2  take that.

3      THE COURT:  Let us have this understanding.  With the

4  understanding, first of all, that there may be a difference

5  between his smaller scale basins on Exhibit 17A and the basin

6  shown on the larger scale map 15C, and without holding you

7  to the gnat's eye in putting it in, you might well take a red

8  pencil and show us the boundaries of those basins to the extent

9  that they could be shown on 15C.  It wouldn't take too long,

10  would it?

11      THE WITNESS:  If I redo that, I will have to reanalyze

12  it to do it.  Do I have the privilege of planimetering it

13  and giving a revised figure for the area?  You are asking me

14  to work on a different base.

15      MR. VEEDER:  It would change Exhibit 18, that's for

16  sure.  Of course, we figure there is about a million acre

17  feet of storage water in that older alluvium, and it is im-

18  portant.

19      THE WITNESS:  When a man works on a small scale map, he

20  cannot do the precise work that he can on a large scale map.

21      MR. VEEDER:  All we want are the facts.

22      MR. STAHLMAN:  Is that million acres a fact, too?

23      THE WITNESS:  I was making a comparison in the recent

24  Exhibit 15A showing the water contours.  It might well lead

25  to the enlarging of these basins.  But why complicate it

G

Z82

1    further?  If there are basins there, as you contend they are,

2    Mr. Veeder, they are of substantial size.

3         MR. VEEDER:  That was the point when I made the offer on

4    Exhibit 17A, your Honor.

5         THE COURT:  If you are content to rely on Exhibit 17A--

6         MR. VEEDER:  Well, I would just as soon have him--

7         THE COURT:  --I think no one else would make an objec-

8    tion.

9         MR. STAHLMAN:  Why is this this one necessary for at

10   all, then?

11        MR. VEEDER:  17A?

12        MR. STAHLMAN:  Yes.

13        MR. VEEDER:  If we are going to abandon the storage

14   units on 17A, I certainly petition your Honor to let me--

15        THE COURT:  You have an exhibit in 17 that shows your

16   storage units.

17        MR. VEEDER:  That is right.

18        THE COURT:  17A was pulled out as a duplication of 17.

19   Exhibit 17 is in evidence.  Exhibit 17A was pulled out as a

20   blanket copy of Exhibit 17 when we got to having the witness

21   spot some of the wells on it.

22        MR. VEEDER:  That is right.

23        THE COURT:  That is how Exhibit 17A got into existence,

24   and since we have had testimony on it I think we had just

25   better leave 17A in.

4710

G

Z83

1    MR. VEEDER:  Yes, and there is a great deal on it.

2    THE COURT:  Do you offer Exhibit 17A?

3    MR. VEEDER:  Yes, sir, I have already, your Honor.

4    THE COURT:  Exhibit 17A is received in evidence.

5    MR. MOSKOVITZ:  Your Honor, this raises a question

6    that I would like to get into about contours.

7    MR. VEEDER:  It is quitting time, your Honor.

8    MR. STAHLMAN:  Let's do it tomorrow.

9    THE COURT:  Let's hear the question.

10    MR. MOSKOVITZ:  On Exhibit 17 the contours are spotted

11    on areas which are not shown on Exhibit 15A.  There are

12    contours shown for ground water storage unit 5 and for ground

13    water storage unit No. 12.  I don't think there has been any

14    foundational material brought in today on water well levels

15    supporting those contours.

16    THE COURT:  There was additional material put into

17    Exhibit 16A-73 on.  There were a number of well logs, were

18    there not?

19    MR. MOSKOVITZ:  Logs.  Are they water well levels?

20    THE WITNESS:  I have water well level measurements that

21    I made myself.  I was not instructed to do it for area 5.

22    THE COURT:  What did you put into Exhibit 16A?  Addi-

23    tional water levels or additional well logs?

24    MR. VEEDER:  Logs.

25    THE COURT:  Well logs.  Do they in certain instances

G

Z85

1   it appears in Exhibit 17.

2           Is that correct, Mr. Kunkel?

3       THE WITNESS:  That is correct, yes.

4       MR. MOSKOVITZ:  Is there any map in evidence on which

5   those are spotted?

6       THE WITNESS:  Yes.  Wells are shown on 17A.  That was

7   one of the reasons for 17A.  All of the wells are shown for

8   Units 5, 6, 7-- some of the wells are shown.

9       THE COURT:  For your information, my notes show that

10  on 15B, which is in for identification, there was a list of 146

11  wells, and certain ones were checked and the ones that were

12  checked were the ones that were put on 17A.

13      THE WITNESS:  That is correct.

14      MR. VEEDER:  When would they like to cross-examine?

15  That would be important to us.

16      MR. MOSKOVITZ:  I think next week.

17      MR. LITTLEWORTH:  Tuesday?

18      THE COURT:  Do you want to agree, so that Mr. Littleworth

19  can plan-- next Tuesday, next Wednesday?

20      MR. SACHSE:  It is all right with me.  Mr. Veeder's

21  idea, I suppose, would be then that we would drop whatever

22  else we were in.

23      THE COURT:  Are you satisfied with next Tuesday?

24      MR. SACHSE:  Yes, your Honor.

25      MR. MOSKOVITZ:  Yes.

G

Z86

1          THE COURT:  Will you be here?

2          MR. LITTLEWORTH:  Yes, your Honor.

3          THE COURT:  All right, be here Tuesday.  Mr. Kunkel

4   will be back Tuesday.  He will also be back tomorrow to finish

5   up anything further.

6          MR. VEEDER:  Yes.

7          THE COURT: Adjourn until 10 o'clock tomorrow morning.

8          THE CLERK:  Your Honor, I have completed numbering the

9   well logs.  It takes from 16A1 to 159.

10         (Adjournment until Friday, November 14, 1958, at 10

11  A. M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25