VOLUME NO. 44

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                  Plaintiff,

vs.

                                   No.   1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                  Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:     Friday, November 14, 1958

          Pages:  4714 to   4870

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
                        DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
                                )
        -vs-                    )        No. 1247-SD-C
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                Defendants.     )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Friday, November 14, 1958

APPEARANCES:

      For the Plaintiff:      WILLIAM H. VEEDER, ESQ.,
                                  Special Assistant to the
                                  Attorney-General,
                                  Department of Justice,
                                  Washington, D.C.

4715

APPEARANCES (Continued)

| | |
|---|---|
| For Defendant Vail<br>Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State<br>of California | EDMUND G. BROWN, ESQ.,<br>Attorney-General, by<br>ADOLPHUS MOSKOVITZ, ESQ.,<br>Deputy Attorney-General. |
| For Defendant Santa<br>Margarita Mutual Water<br>Company | W. B. DENNIS, ESQ. |
| For Defendants Fallbrook<br>Public Utility District,<br>et al. | F. R. SACHSE, ESQ. |

I N D E X

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Fred Kunkel | | | | 4718 |
| | | | 4719 | |
| Robert C. Fox | 4720 | 4862 | | |

4717

SAN DIEGO, CALIFORNIA, FRIDAY, NOVEMBER 14, 1958, 10:00 A.M.

---o---

THE CLERK:  Number three:  1247-SD-C, United States vs. Fallbrook for further court trial.

THE COURT:  Proceed.

MR. VEEDER:  Well, sir, I have completed my phase with Mr. Kunkel, and I assume that there must be some cross-examination.

MR. STAHLMAN:  It is next Tuesday, wasn't it?  We agreed on next Tuesday.

MR. VEEDER:  If there are any questions anyone wants to ask now, why --

MR. STAHLMAN:  We don't have Mr. "Worthlittle" here.

THE COURT:  The only inquiries that would be made would be further inquiries in the way of explaining what he did in preparing these exhibits.  If there are no further questions, we will go on to something else and we will postpone the cross.

MR. DENNIS:  I have just one question in that respect then.


FRED KUNKEL,

recalled as a witness on behalf of the plaintiff, having been previously sworn, testified further as follows:-

RECROSS-EXAMINATION

BY MR. DENNIS:-

    Q   Mr. Kunkel, at the time you measured the wells in October of this year, did you measure the depths to the wells at the same time that you measured the depths to water?

    A   Where possible, the well depths were measured.

    Q   And you have those records with you as to the depths of the wells?

    A   They are available.

    Q   They are available?

    A   Yes, sir.

    Q   And you will have them available Tuesday?

THE COURT:  Those measurements are shown on one of the exhibits offered here yesterday.

MR. DENNIS:  I think there will be some wells they do not have logs on, your Honor.

THE COURT:  You are talking about 15-B.  It shows the distance to water.

MR. DENNIS:  But not the depth of the well.

THE COURT:  Oh, depth to well.

MR. DENNIS:  Depth of the well.

THE COURT:  Oh, pardon me.  All right.

REDIRECT EXAMINATION

BY MR. VEEDER:-

    Q   You did measure the depth to the well?

    A   Where possible.

    Q   Where possible.

    THE COURT:  I want to ask a question.  On 15-B you have the symbol "A."  It says:  "Tape smears."  What does that mean?

    A   Well, measurements customarily are made to feet tenths and hundredths of feet.  Where a tape smears for various reasons:  the casing is wet on a side, or there is falling water and it is not possible to measure right down to a hundredth.  So we report the measurement to the nearest tenths or the nearest foot or the nearest increment that, in our opinion, represents the water level.  So when a water level appears without tenths or hundredths, the question immediately arises:  Is that a reported level by a person or is there a smeared measurement?  Now, the fact that it is a smeared measurement implies that the measurement is not accurate right down to -- I forget what the measurement was -- I think we had one of them there for 77 feet.  Well, it could be argued that could be 76 1/2 feet or it could be 77 1/2 feet.  I wouldn't stand behind that measurement down to a hundredth of a foot.  I will stand behind it to the nearest foot.

THE COURT:  These measurements are made by tape, but tape is smeared so you can't get the nicety of measurement, is that it?

THE WITNESS:  That is correct.

THE COURT:  All right.

MR. VEEDER:  Was that all, then?

THE COURT:  That is all.

MR. VEEDER:  You are through, Mr. Kunkel, for the moment.

Call Mr. Robert C. Fox.


ROBERT C. FOX,

called as a witness on behalf of the Plaintiff, having been first duly sworn, was examined and testified as follows:-

THE CLERK:  Would you state your name, please.

THE WITNESS:  Robert C. Fox.


DIRECT EXAMINATION

BY MR. VEEDER:-

Q   How old are you, Mr. Fox?

A   31.

Q   And where do you reside?

A   La Habra, California.

Q   And where is that?  It is close to what?

A   Orange County, eastern Los Angeles.

1       THE COURT:  You are calling this man as your own

2  witness?

3       MR. VEEDER:  Well, yes.  I am not calling him as an

4  adverse witness.

5       THE COURT:  All right.

6       MR. VEEDER:  It may be that I will change as we go

7  along, your Honor, but -- he may become adverse as the

8  matter progresses, and I will inform your Honor.  But I

9  think he is an honest young man.

10       Q   And what is your education, Mr. Fox?

11       A   College education?

12       Q   You must have gone through elementary school?

13       A   I went to elementary school in San Anselmo,

14  California, and high school in Mill Valley, graduating from

15  Tamalpais Union High School in 1944, or '43, I believe.

16  And I went into the service.  When I was discharged from the

17  Navy, I went to College of Marin, in Kentfield,

18  California for one year where I majored in physics.  I then

19  went to the University of California in Berkeley, still

20  majoring in physics, for another year, and transferred to

21  geology, from which I received my Bachelor's Degree in 1951.

22       Q   In 1951.

23       Now, did you make any investigations in the Santa

24  Margarita River Valley in regard to the geology of that area?

25       A   Yes, sir, I did.

1    Q   Referring to Plaintiff's Exhibit marked 15-A for

2   identification, are you familiar generally with the area

3   depicted on that exhibit?

4        A   Yes, sir, I am.

5        Q   And when did you first become acquainted with

6   that area?

7        A   We started the investigation in 1952.

8        Q   When you say "we," whom do you mean by that?

9        A   The Division of Water Resources.

10       Q   And with whom were you working in the field in

11   that connection?

12       A   My supervisor, Mr. Lawrence James; a geologist

13   by the name of Donald Fawcett, who is no longer with the

14   Division; another geologist by the name of Keith Jones, who

15   is no longer with the State; and a third geologist by the

16   name of John Roth, who is no longer with the State.

17       Q   And you started in your investigation in 1952,

18   you state.

19           What areas did you personally investigate?

20       A   More emphasis was placed on the area above

21   Temecula Gorge, as far as my work was concerned; although I

22   did have a general idea of the lower part of the watershed.

23       Q   In other words, you did go into the areas concern-

24   ing which Mr. Worts testified, isn't that right?

25       A   That is right.

1    Q    You have been in the courtroom virtually every
2 day, have you not?

3    A    Yes, sir.

4    Q    And you have heard all of the testimony of the
5 witnesses of the United States of America, particularly in
6 regard to geology, isn't that right?

7    A    I have.   Right.

8    Q    But primarily, you state you have investigated
9 the areas above Temecula Gorge, is that right?

10   A    That is right.

11   Q    And Temecula Gorge is the area where Temecula
12 Creek and Murrieta Creek have their confluence and there
13 commences the Santa Margarita River, is that right?

14   A    That is right.

15   Q    How long did you conduct this investigation,
16 Mr. Fox?

17   A    I didn't conduct it, Mr. Veeder.

18   Q    I mean, how long --   I know your boss is here.
19 So you made extensive investigations, is that right?

20   A    That is right, sir.

21   MR. MOSKOVITZ:  Ah --

22   MR. VEEDER:  Ah what?

23   MR. STAHLMAN:  Just plain "Ah."

24   MR. VEEDER:  I move to strike the "Ah."

25   Q    Now, did you investigate the Pauba Valley?

Fox - Direct

1    A   Yes, sir.

2    Q   And how long were you in that area making your

3  investigation?

4    A   It is hard for me to remember the exact number

5  of days I was in the field.  I probably wasn't in the field

6  more than two days total.  Although I did do the office work

7  in Los Angeles concerning Pauba Valley and other areas on

8  Exhibit 15-A.

9    Q   In other words, you say you spent approximately

10  two days in the whole area, is that right?

11    A   No, sir; just the Pauba Valley area.

12    Q   Oh, two days in the Pauba Valley area?

13    A   We had a resident geologist, Mr. Roth, living in

14  Murrieta for approximately two years.  I was his immediate

15  supervisor, and I was also under the supervision of Mr.

16  James.

17    Q   Did you at that time investigate the areas which

18  would constitute the irrigated lands in the Pauba Valley?

19  Did you really go in and search those things out?

20    A   We investigated the entire area.

21    Q   And what else did you do?  What did you do in

22  your investigation?

23    MR. MOSKOVITZ:  I object to that question.  I think it

24  is a little ambiguous.  When you say "you," do you mean him

25  personally or people who worked under his direction?

MR. VEEDER:  I mean him personally.

THE COURT:  All right.

THE WITNESS:  We mapped the geology on aerial photographs.  We went out into the field to check the results of our geologic interpretations to see that they were accurate.  We also --

Q  BY MR. VEEDER:  You made your interpretations from the aerial photographs?

A  In conjunction with field work.

Q  And you took the aerials into the field, then?

A  That is right, sir.

Q  And what did you place on those aerial photographs?

A  The contacts of the formations that we have designated in our bulletin.

Q  And when you say "contacts," what do you mean by "contacts"?

A  The lines that differentiate the various, different geologic units.  The boundaries.

Q  Would you produce for us those aerial photographs for us for examination?

A  I believe we have them here.  They are not in the courtroom, but in our office.  We have access to them.

Q  And you will make those available to me, is that right?

MR. MOSKOVITZ:  I object to that, your Honor.  These

1    are materials which were gathered by the State.  They are

2    available and will be available on the presentation of the

3    State's case.  I object to having the State's case being

4    put in by Mr. Veeder --

5          MR. VEEDER:  All we are searching for are the facts,

6    your Honor.

7          MR. MOSKOVITZ:  -- in this order.

8          THE COURT:  I am not to decide the order of the trial.

9    But there was evidence available.  And whether or not the

10   State intends to offer it, it would be entirely proper for

11   another party to make reference to it.

12          Have these photographs been lodged yet?

13          MR. MOSKOVITZ:  No, they have not, your Honor.  They

14   are not going to be lodged as exhibits.  They will be

15   available when the State's case is put in, at the time that

16   the background material is in.

17          THE COURT:  You propose to use them later as exhibits?

18          MR. MOSKOVITZ:  No.  No, we do not.  We have the

19   Bulletin.

20          THE COURT:  That is the more reason why they should

21   be made available, if they bear a relation to the case.

22          THE WITNESS:  I would like to clarify one thing --

23          MR. VEEDER:  Just a moment.  I have asked for the

24   production --

25          THE COURT:  Objection is overruled.  They are not

1   here today.

2        MR. VEEDER:  He says they are next door.

3        Q    Is that not right?

4        A    They are in our office.  But I would like to

5   explain that these are just aerial photographs.  We made

6   overlays, transparent overlays, upon which the geology has

7   been placed.

8        Q    Yes.  Now, would you produce those, too?

9        A    Those are in Los Angeles.

10       Q    You will have those for us?

11       A    I shall.

12       Q    Yes, thank you.

13            When do you suppose we can get those?

14       A    I will bring them Tuesday.

15       MR. STAHLMAN:  I don't understand.  The aerial

16  photographs are here and the overlays are in Los Angeles, or

17  are they all in Los Angeles?

18       MR. VEEDER:  No, the aerial photographs are here.

19       THE WITNESS:  That is right.

20       Q  BY MR. VEEDER:  And they are right in the room

21  next door?

22       A    No, they are in our office.

23       Q    And where is your office?

24       A    It is in San Diego, in town.

25       Q    Okay.  And we can have those at lunch, is that

Fox - Direct

1   right?  Did you say yes?

2       A    Yes, sir, I will get them for you.

3       Q    Thank you.

4       MR. MOSKOVITZ:  Let me make sure I know what you want

5   brought.  You want the aerial photographs that are here.  And

6   what else from the L. A. office?

7       MR. VEEDER:  As I understand, there are overlays

8   available, too.

9       MR. MOSKOVITZ:  And you have requested those, also?

10      MR. VEEDER:  Oh, yes.

11      Q    Now, when was the flight made from which those

12  aerials were prepared?

13      A    I don't remember, Mr. Veeder.

14      Q    You don't know, but you would say the flight was

15  probably in 1951?

16      MR. MOSKOVITZ:  I object to the leading nature of

17  some of these questions, your Honor.  This is direct examina-

18  tion.

19      THE COURT:  Sustained.

20      Q  BY MR. VEEDER:  When did you go into the field

21  with the aerial photographs for the purpose of checking out

22  the contacts?

23      A    Commencing sometime in 1952, to the best of my

24  recollection.

25      Q    What additional data did you obtain in your

A-3

1  personal investigation?  What other matter did you find
2  yourself?

3       A    We collected all the geologic data pertaining to
4  the watershed and outside of the watershed.

5       Q    Just list those elements that you had before you
6  when you made this investigation.

7       A    Published and unpublished geologic maps, cross-
8  sections, and literature.

9       Q    Could you name any of those documents?  For
10  example, U.S.G.S. material?

11       A    We did use some Water Supply papers.  We used
12  unpublished Ph. D. theses.

13       Q    What are Ph. D. theses?

14       A    A doctor's thesis.

15       Q    By whom?

16       A    This one was by John Mann of the University of
17  Southern California.

18       Q    What else did you personally do in this investiga-
19  tion?

20       A    As far as collecting the data or doing the work?

21       Q    No, in collecting the data?

22       A    We visited all the universities in the area, all
23  the libraries, to determine what people were working in the
24  area, if there were any students doing Master's or Ph. D.
25  theses.

1    Q    And you reviewed this Ph. D. thesis.

2         Were there any other theses that you relied upon?

3    A    I don't believe so.

4    Q    You don't think so.

5         Now, in making your study of the Pauba Valley

6    what data did you study in determining the kinds and types

7    of geological structure which comprised that valley?

8    A    We made a field survey, mapping the geology.

9    We also used logs of water wells and oil wells.

10   Q    And oil wells.

11        Where is Mr. Roth, do you know?

12   A    Yes, sir, I do.

13   Q    Is he close by, available?

14   A    I don't know if he is available.  He is working

15   for the Atomic International Subsidiary of North American

16   Aviation.

17   Q    In San Diego?

18   A    No, sir, in Santa Suzanna area.

19   Q    Would you state whether or not it was Mr. Roth

20   who did most of the work in making the investigation of the

21   Pauba Valley?

22   A    No.

23        MR. MOSKOVITZ:  I object to that question.  I think

24   that is ambiguous and indefinite.

25        THE COURT:  He answered it already.

1    THE WITNESS:  I answered it.

2    THE COURT:  What did you say?

3    A   He didn't do most of the work.

4    Q   BY MR. VEEDER:  Who did most of the work?

5    A   There were three of us that did all the work in

6    the area -- Mr. James, Mr. Roth, and myself.

7    Q   How long did you say Mr. Roth was in the area?

8    A   He was resident geologist for two years.

9    Q   And how long did you actually work in the remainder

10   of the valley?

11   MR. SACHSE:  Which valley?

12   Q   BY MR. VEEDER:  Now, I am speaking of the area

13   north of Pauba.

14   A   This is just field work you are referring to?

15   Q   Yes.

16   A   I would say close to forty days in the field

17   during the two years.

18   Q   And what did you do during that period?

19   A   I went out with Mr. Roth into areas where there

20   were some problems to try to resolve them.

21   Q   For an example, what kind and type of problem?

22   A   The major problem, we felt, in the area was the

23   delineation of the recent alluvium from the older alluvium.

24   Q   And what investigations did you make to determine

25   the older alluvium and the younger alluvium?

4732

A    Detail field investigations.

Q    And what would you state to be a detailed field investigation?

A    A complete inspection of the area by automobile, by walking, study of the aerial photographs, study of the available well logs.

Q    Based upon that investigation would you state your opinion as to the acceptability, in general, from the standpoint of an expert geologist, from the areas delineated on Plaintiff's Exhibit 15-A, being younger alluvium?

A    There are no major discrepancies between the work on Exhibit 15-A and the work we did.

Q    How about 15?

A    That would be the same answer.

Q    And when you say "younger alluvium," what does that mean to you?

A    The area where there is active deposition or there has been active deposition in what geologists refer to as recent time.

Q    And what is recent time to you?

A    Approximately the last twenty, thirty thousand years.

Q    What would be the source of this younger alluvium which you see in the Pauba Valley, based upon your investigation?

Fox - Direct                                                          4733

1       A   The source would be the high land areas to the
2   northeast.

3       Q   To the northeast.

4       A   And probably to the north, also.

5       Q   And how would it be deposited where it is, in
6   your view?   I am speaking now of the Pauba Valley.

7       A   As the streams discharge and lose their force or
8   carrying capacity, they deposit their load, which would be
9   the reason for deposition in Pauba Valley.

10       Q   Which stream in particular would you say laid in
11   the area of Temecula -- in Pauba Valley?

12       A   The Temecula River.

13       Q   And what investigation did you make as to the
14   depth of the Pauba Valley, the younger alluvium?

15       A   We tried to find some contacts between the
16   recent and older alluvium from the driller's logs, and we
17   found that it was not practical to rely on them solely.
18   It is geologic knowledge that the major depths of recent
19   alluvium in any area is usually not more than 100 feet.

20       Q   What did you accept as the depth of the younger
21   alluvium?

22       A   Roughly 100 feet.

23       Q   What investigation did you make to find whether
24   there was a differentiation between the younger alluvium
25   and the older alluvium?

1      MR. SACHSE:  In the Pauba Valley, Mr. Veeder?

2      MR. VEEDER:  Yes.  Yes, the Pauba Valley.  By all

3  means.  We will have the Pauba Valley until we change.

4      THE COURT:  Reframe your question.

5      MR. VEEDER:  In the Pauba Valley.

6      THE COURT:  You say, "If there was a differentiation

7  between."  Do you mean the material was different?  What do

8  you mean, "different"?

9      MR. VEEDER:  If it could be distinguished.  I will

10  rephrase the question.

11      Q   What investigation did you make to determine the

12  means pursuant to which you would distinguish between the

13  older and the younger alluvium?

14      A   From inspection of the well logs you could

15  differentiate an area of tighter material underlying an area

16  of looser or coarser material.

17      Q   Would you answer my question.

18      MR. MOSKOVITZ:  The question has been answered.

19      Q   BY MR. VEEDER:  I asked what investigation did

20  you make?  Was that the extent of your investigation?

21      A   Inspection of the drillers' logs.

22      Q   To determine?

23      A   That is right, sir.

24      Q   And to ascertain the distinguishing elements

25  between the younger and older alluvium, is that right?

1    A    Plus geologic knowledge of the depth of the

2    alluvium.

3    Q    You have stated that, in your opinion, the

4    younger alluvium is simply erosion from the basement complex

5    which has been transported in recent times.  Would you

6    state what, in your opinion, is the source of the older

7    alluvium which appears on Plaintiff's Exhibit 15?

8    A    That would also be the high land areas surround-

9    ing the area of older alluvium.

10    Q    How, then, would you distinguish between the

11    older and the younger alluvium from the standpoint of their

12    respective genesis?

13    A    The first areas for both are the same.  You

14    couldn't determine if there were any different source areas

15    just by inspection of the material on the surface.

16    Q    How would you compare them from the standpoint

17    of being identical except from the standpoint of the period

18    in which they were deposited?

19    A    Identical as to source area?

20    Q    Identical also as to type.

21    A    No.

22    MR. MOSKOVITZ:  I object to the form of this question.

23    This is getting into leading questions here.

24    THE COURT:  Overruled.

25    THE WITNESS:  They are not the same as to type.

4736

Q   BY MR. VEEDER:  In what respects are they
different?

A   In color, in permeability, and in depth of
weathering -- as we say, injuration; breakdown of the material.
We felt the older alluvium had been subject to the forces
of nature for a much longer period of time than the recent
alluvium.  And, therefore, they break down by depomposition
and disintegration.

Q   When you view the older and the younger alluvium
in the Pauba Valley on the surface, that is, what are the
distinguishing elements?

A   It is hard for me to recall exactly in that
particular area.  I could only answer it generally.

Q   Don't.  You cannot answer that question?

A   No, sir.

Q   Would you state generally whether the areas
depicted as younger alluvium in the Pechanga or Wolf Valley,
would you state whether you agree with the delineation which
is set forth there?

A   Essentially, I do.

MR. DENNIS:  15-A, Mr. Veeder, you are referring to?

THE COURT:  15-A.

MR. VEEDER:  15 or 15-A; both of them, in fact.  Until
I notify you to the contrary, it will be 15, 15-A.

Q   You have general acceptance of that?

A    Yes, sir.

THE COURT:  What about the areas of the older alluvial shown on 15 and 15-A?  Just the areas being marked in orange?

THE WITNESS:  I agree with it essentially.

THE COURT:  Generally?

THE WITNESS:  Yes, sir.

THE COURT:  With minor matters --

THE WITNESS:  That is right.

THE COURT:  -- where judgment would cause some little variation?  But no essential disagreement?

THE WITNESS:  No, sir, there are no essential differences.

Q  BY MR. VEEDER:  How, in your opinion, was the younger alluvium deposited in its present location in the Pauba Valley?  How did that occur, in your opinion?

MR. SACHSE:  It has been asked and answered, if the Court please.

MR. VEEDER:  No, this hasn't been answered.

MR. SACHSE:  The younger alluvium in the Pauba Valley? It certainly has.

THE WITNESS:  I believe I did, Mr. Veeder.  I said as streams lost carrying capacity they deposited their loads.

Q  BY MR. VEEDER:  How would it be, though, that a phenomenon like this would exist?

Fox - Direct

1      THE COURT:  What do you mean by "this"?

2      MR. VEEDER:  The Pauba Valley coming down as it

3   does.

4      Q   Was the younger alluvium debouched out over the

5   older alluvium?

6      MR. MOSKOVITZ:  I object to the form of the question.

7      THE COURT:  Overruled.

8      THE WITNESS:  Yes, sir.

9      Q   BY MR. VEEDER:  So where, then, are the lines of

10  demarcation, if you recall, between the younger and the older

11  alluvium?

12     MR. MOSKOVITZ:  Do you mean laterally or vertically?

13     Q   BY MR. VEEDER:  Laterally.

14     A   Where are the lines of demarcation?

15     Q   Yes.

16     Q   They are what we would refer to as the geologic

17  contacts.  What separates laterally the older and the younger

18  alluvium?

19     A   I don't exactly understand your question, Mr.

20  Veeder.

21     Q   What kind and type of gradation is there between

22  the two?  Have you observed?

23     A   There is a pretty good line of demarcation in

24  most of these stream valleys.

25     Q   What about the Pauba Valley?

1    A    In Pauba Valley, too.

2    Q    When you say "line of demarcation," what do you

3  mean?

4    A    There is a difference between the material

5  referred to as recent alluvium and material referred to as

6  older alluvium.

7    Q    What kind of confinement is there?  Now, I am

8  pointing to the north boundary of the younger alluvium as

9  in the Pauba Valley.  What kind and type of confinement did

10  you discern there, if any?

11    MR. MOSKOVITZ:  I object to that question.  It is not

12  clear what you mean by "confinement."

13    THE WITNESS:  I was just --

14    Q  BY MR. VEEDER:  What does "confinement" mean to

15  you as a geologist?

16    A    I can't answer that question.

17    THE COURT:  Get back a little further, Mr. Veeder.

18  Stand away from the witness.  I don't think he is frightened

19  of you.

20    MR. VEEDER:  Well, he and I are friends.

21    THE COURT:  But don't crowd up on him.

22    Q  BY MR. VEEDER:  Would you define "confinement"

23  for us into the record, then, please?

24    A    From a geological --

25    Q    From the geological standpoint.  I am not talking

1    about prison.

2            A    There is no definition of confinement from the

3    geological standpoint.

4            Q    What would be a confining bed from the standpoint

5    of the geologist?

6            A    The standpoint of hydrology?

7            Q    No.   No, from the standpoint of a geologist.

8            A    Geologists don't talk about confining beds.

9            Q    They don't?

10           A    In the strict sense.

11           Q    Have you ever used the term "confining"?

12           A    Yes, sir, I have.

13           Q    What did it mean when you used it, the term

14   "confinement" or "confining bed"?   "Confining bed"?

15           A    "Confining bed" is a bed of material of lesser

16   permeability.

17           Q    From what?

18           A    Which overlies the stratum of greater permeability.

19           THE COURT:   When you use this term, you use it, then,

20   not as a geologist but as a hydrologist?

21           THE WITNESS:   Engineering geologist, it is referred

22   to in our department.

23           Q    BY MR. VEEDER:   You have never used that term

24   yourself?

25           A    Yes.   I did say I have used that term.

1  Q  From the standpoint of the separation, you said

2  it is quite marked.  What is the line of demarcation that

3  you observed between the older and the younger alluvium?

4      MR. SACHSE:  Where?

5      MR. VEEDER:  I am still in Pauba Valley, in the

6  north side of Pauba Valley.

7      MR. SACHSE:  Vertically or laterally?

8      MR. VEEDER:  Laterally.

9      THE WITNESS:  Generally, a difference in color of the

10  material, in the appearance of the material on the surface,

11  whether it was flat or rolling; what I thought would be the

12  relative permeability.

13  Q  BY MR. VEEDER:  And what samples did you take

14  when you came to that line of demarcation to determine the

15  relative permeability of the two?

16      MR. MOSKOVITZ:  I object to that.  I think that is a

17  little indefinite; what samples did you take.

18  Q  BY MR. VEEDER:  What would that mean to you as a

19  geologist when one says "sample"?

20  A  Well, geologists are always picking up rocks,

21  Mr. Veeder, to look at.

22  Q  That is fine.  What kind of rocks did you pick up

23  in making the distinguishing elements between the younger

24  and the older alluvium?

25  A  We made a physical inspection of the material

1   using the equipment the geologist generally carries.

2        Q    What kind of rocks did you pick up?

3        A    We inspected the older alluvium and the recent

4   alluvium.

5        THE COURT:  When you use the word "rocks," you are

6   using it in a very broad sense?

7        THE WITNESS:  That is right; from the geologic sense,

8   your Honor.

9        THE COURT:  It may be very hard or it may be very

10  soft?

11       THE WITNESS:  That is right.

12       THE COURT:  All right.

13       Q    BY MR. VEEDER:  What borings did you make to

14  distinguish between the older and the younger alluvium on

15  the north side of Pauba Valley?

16       A    I made no borings.

17       THE COURT:  Now, Mr. Veeder, I don't know where you

18  are going, but the witness has admitted that your maps are,

19  in general, okay and satisfactory and show no major dis-

20  crepancies in demarking older and younger alluvial.  Now,

21  you, having got that admission, do you want to break him

22  down?  He, apparently, is content with these lines of demarca-

23  tion that your geologist selected and --

24       MR. VEEDER:  What I am interested in is, frankly, this:

25  If there is any --   I will ask him a leading question.

1      Q   Did you find any impervious strata laterally

2   which would separate the younger alluvium from the older

3   alluvium?

4              You want to make an objection?

5      A   I would like to have that question repeated, if

6   I may.

7          THE COURT:  Read it.

8          (The reporter read back the question.)

9          THE WITNESS:  The physical inspection of the older

10  alluvium led me to believe that it was less permeable than

11  the recent alluvium.

12         MR.VEEDER:  That is not answering the question.

13         THE COURT:  Specifically, you found no material other

14  or different from the older alluvium than the younger

15  alluvium that lay as a strata between the two laterally?

16         THE WITNESS:  We didn't have enough evidence to do

17  anything in the older alluvium.

18         THE COURT:  I mean, where you saw the line of demarca-

19  tion between the younger and the older alluvial along that

20  line of demarcation laterally, you didn't find any other

21  third type of material?

22         THE WITNESS:  No, sir.

23         THE COURT:  You found the younger up against the

24  older?

25         THE WITNESS:  That is right.

Fox - Direct                                            4744

```
 1          THE COURT:  And, in your opinion, the older was
 2   less permeable?
 3          THE WITNESS:  Yes, your Honor.
 4          THE COURT:  Now, there is no dispute about that.  The
 5   Government concedes the older is less permeable.
 6          MR. VEEDER:  Well, there is only one thing, your
 7   Honor -- and as Mr. Dennis can do so well -- I will argue
 8   a little bit on this.  The thing we are trying to show,
 9   your Honor, is that there is no confining -- these younger
10   fellows, I know.  I will stay away from the young -- there
11   is nothing that separates.  There is no impervious core,
12   in other words, which would separate the younger alluvium
13   from the older alluvium.
14          Q   Isn't that right?
15          MR. MOSKOVITZ:  Your Honor, there is no --
16          THE COURT:  He has already answered the question
17   asked him.  The younger is against the older, and there is
18   no other third kind of material in between the two.
19          MR. VEEDER:  Nothing separates them.
20          THE WITNESS:  Your Honor, I am only talking about
21   laterally.
22          THE COURT:  Yes, I understand.
23          MR. VEEDER:  Oh, yes.  Yes, we are going underground
24   in a little while.
25          THE COURT:  Let's go ahead and not waste time.  It
```

has been established.

MR. VEEDER:  Now, may I have 16, please.

1          Q  When you said "we" didn't have enough information to

2     make any determinations in regard to the older alluvium, you

3     said we collectively-- you, Mr. James, Mr. Roth; is that right?

4          MR. MOSKOVITZ:  I object to the form of that question,

5     your Honor.

6          THE COURT:  Sustained.

7     BY MR. VEEDER:

8          Q  Now, would you come down here, Mr. Fox.

9          THE COURT:  I don't think I have a copy of Exhibit 16.

10         MR. VEEDER:  Your Honor, I will get you one.  I thought

11    we had provided your Honor with a colored copy of that.

12         MR. STAHLMAN:  Yes, there was a colored one that your

13    Honor had.

14         THE COURT:  Well, I don't find it now.

15    BY MR. VEEDER:

16         Q  What investigation did you personally make in regard

17    to Dodge Valley?

18         A  I made a geologic inspection of the area with the

19    other geologists working on the report.

20         Q  Would you call it a windshield reconnaissance?  Did

21    you get out and look at the land itself?  Did you walk the

22    land?

23         MR. MOSKOVITZ:  I object to that question as being

24    leading and as being indefinite and ambiguous, your Honor.

25

B

ZL

1  BY MR. VEEDER:

2       Q  What kind of investigation did you make of Dodge

3  Valley?

4       A  I will refer just to Dodge Valley.  We made the same

5  type of investigation in Dodge Valley as we did all the area

6  above Temecula Gorge.

7       Q  How much time did you actually spend in Dodge Valley,

8  if you can recall?

9       MR. MOSKOVITZ:  By you do you mean Mr. Fox personally?

10      MR. VEEDER:  Yes.  I will call Mr. James.

11      THE WITNESS:  I can't recall the time I spent in there,

12  Mr. Veeder.

13  BY MR. VEEDER:

14      Q  How much investigation did you make in the Oak Grove

15  Valley?

16      THE COURT:  Let's save some time.  You have looked at

17  Exhibit 16 that the Government now has on the chart.  Do you

18  find yourself in major disagreement with any part of 16?

19      THE WITNESS:  No, your Honor, I don't.

20      THE COURT:  Well, then, let's stop right there.

21      MR. VEEDER:  But, your Honor, I mean--  All right.

22      Q  You are in complete accord with what is depicted on

23  Plaintiff's Exhibit 16, are you?

24      A  Not in complete accord.  There are a few discrepancies.

25      Q  Where are the variations to which you make reference?

B

Z23

1      A   Just the boundaries, the contacts between--

2      Q   We are looking at 16.

3      A   Without referring to the geologic section that I

4   made, I couldn't say, but in general they are essentially the

5   same.

6          MR. MOSKOVITZ:  I believe the witness can refer to his

7   own material if he wants to.

8          THE COURT:  Yes, but if he says that in general they

9   are essentially the same, why waste time.  We all know that

10   these matters are matters of judgment, and one man might vary

11   a little bit here and a little bit there.  But if essentially

12   he is in agreement with 16, why waste time on it?

13         MR. VEEDER:  I don't think I am wasting time, your

14   Honor.

15         THE COURT:  Don't worry about the little discrepancies.

16   We have enough major problems.

17         THE WITNESS:  Is this Pauba Valley?

18         MR. VEEDER:  Yes, that is Pauba Valley.

19         THE WITNESS:  There are some differences in Pauba Valley

20   the way we have delineated them on our geologic section.

21   BY MR. VEEDER:

22         Q   What are your views as to the differences, then, in

23   the geologic section of Pauba Valley as depicted on 16?

24         A   The major difference is that we considered Pauba

25   Valley was underlain by an upper more permeable Recent alluvial

B

Z4

1   member separated by interfingering lenses and stringers of less

2   permeable materials which was part of the older alluvium, and

3   then underlain in turn by the older alluvium to a depth ex-

4   ceeding 2,000 feet.

5   BY MR. VEEDER:

6        Q   Where, in your opinion, does that differentiation

7   take place, then, between the younger and the older alluvium?

8        MR. SACHSE:   Your Honor, may I inquire as to which

9   witness of his own witnesses is Mr. Veeder impeaching now?   It

10   is just a piece of information that I would like to have.

11        MR. VEEDER:   This is not impeachment.   I didn't call him

12   as an adverse witness.

13        THE COURT:   Let us go ahead.   Your objection is over-

14   ruled.

15        THE WITNESS:   May I have the question, please?

16        THE COURT:   Read it.

17        (The reporter read the pending question.)

18        MR. MOSKOVITZ:   By "where" you mean at what depth

19   vertically?

20        MR. VEEDER:   Yes, vertically.   We are looking at 16.   We

21   are in a hurry.

22        THE WITNESS:   The differentiation between the younger and

23   the older alluvium is essentially the same.   I am referring to

24   the line of demarcation or contact between the recent and the

25   older alluvium.   We stated that the recent alluvium was underlain

B

Z5

1    by interfingering lenses and stringers of less permeable

2    material which is part of the older alluvium.  It would be the

3    uppermost portion of the older alluvium.

4           Q  How would you know when you pass from the younger

5    alluvium into the older alluvium when you, for example, dig a

6    well in that area?

7           A  You can't tell from the material which comes up as

8    drill cuttings.

9           Q  Well, then, how would one arrive at the conclusion

10   you just expressed?

11          A  From observation of all the drillers' logs in the

12   area, it can be shown that there are lenses and stringers of

13   less permeable material than the material above it.

14          Q  Would you state whether or not the areas which are

15   shown on Plaintiff's Exhibit 16 are lenticular in character;

16   is that correct?

17          A  Yes, sir; lenticular or interfingering is synonymous.

18          THE COURT:  This is the same testimony that your experts

19   gave.

20          MR. VEEDER:  Yes, I am going to ask the punch question.

21          Q  Would you state whether or not there is a confining

22   bed separating the younger from the older alluvium?

23          A  As I recall, on our geologic section we called it a

24   confining bed or a confining zone.

25          Q  What is your opinion as to whether there is or is

B

Z6

Fox        Direct        4751

1    not a confining bed separating the younger from the older

2    alluvium?

3         A   From the differences in the water quality in the

4    upper zone of Recent alluvium and the water produced from the

5    material in the lower zone and the fact that there are

6    artesian wells, I would say that there is a zone of less

7    permeable material separating the Recent alluvium from the

8    older alluvium, and I had called it a confining zone.

9         Q   Would you state whether or not it is a continuous

10   confining bed?

11        A   No, it is not continuous.  It extends over most

12   of Pauba Valley, but it is /a clay cap, so to speak.
                               not

13        Q   Would you state whether or not the younger alluvium

14   and the older alluvium are in hydrologic connection in Pauba

15   Valley?

16        MR. MOSKOVITZ:  I think we ought to have a definition

17   of "hydrologic connection".

18   BY MR. VEEDER:

19        Q   Would you give a definition of hydrologic inter-

20   connection?

21        A   That is a difficult answer to give, Mr. Veeder.

22        Q   Well, you are a young man and strong.  Go ahead and

23   try it.

24        MR. MOSKOVITZ:  If you can.

25

B

Z7

BY MR. VEEDER:

Q   As Mr. Moskovitz says, if you can.

A   When two beds are in hydraulic or hydrologic continuity, there is an interchange of water or any other material deposited on the surface of one so that it will go into the underlying material, in simple terms.

Q   What, in your opinion, would cause the difference in water quality in the Pauba Valley between the waters taken from the upper strata of younger alluvium as you have defined it and the quality of water from the older deposits?

A   We have water quality experts in our department that do that type of work.   I can give a general answer to that.

Q   That is what I want.   What would cause it?

A   I feel that the difference in water quality in the Recent alluvium from the older alluvium is the fact that the surface waters are more nearly like the Recent alluvium, whereas the material in the older alluvium has probably there in storage for a longer period of time and is coming possibly from the older alluvium on either side of Pauba Valley.

Q   Lateral movement in from the--

A   Slow lateral movement, possibly.   We have no data to substantiate or to refute that idea, however.

Q   What is your opinion as to that phenomenon that you have just described, the lateral movement at low depth of water from the older alluvium into the Pauba Valley?

B

Z8

1    A   As I recall, in our geologic appendix--

2    Q   Would you state your own opinion, please?

3    A   That would be my opinion.

4    Q   All right, would you state it?

5    A   That there would be some continuity between the

6 older alluvium underlying Pauba Valley and the older alluvium

7 on either side.

8    Q   What would cause you to believe that there might be

9 a break between the older alluvium surrounding the Pauba

10 Valley and the older alluvium underlying the Pauba Valley?

11   A   There is nothing.

12   Q   There is nothing what?

13   A   I don't believe that there is a break in the older

14 alluvium underlying Pauba Valley from the older alluvium on

15 either side.

16   Q   Would you state whether or not the older alluvium

17 underlying the Pauba Valley is in hydrologic continuity with

18 the older alluvium both north and south of the Pauba Valley?

19   A   They are in hydrologic or hydraulic continuity, as

20 far as I can tell.

21   Q   What other sources are there, in your opinion, of

22 water entering the older alluvium in the Pauba Valley?

23   MR. MOSKOVITZ:   I object to that.   The question implies

24 that there has been some testimony as to sources of water.

25 There has been no testimony about sources of water in the

B

Z9

1    older alluvium.

2         MR. VEEDER:  I thought that he said that there was.  I

3    thought he said there was water moving in from the older

4    alluvium north and south into the older alluvium.

5         THE COURT:  That is what he said, but he didn't use the

6    word "source."  Just reframe the question and avoid the objec-

7    tion.

8    BY MR. VEEDER:

9         Q  What other waters, if any, in your opinion, move into

10   the older alluvium underlying Pauba Valley other than the

11   waters moving in laterally?

12        A  Percolation of precipitation above the area that we

13   have delineated in our section as a confining section in Pauba

14   Valley-- in other words, precipitation and percolation falling

15   in the Recent alluvium in the northeastern portion of Pauba

16   Valley would get below the confining zone in that area and

17   recharge the older alluvium.

18        Q  Would you state whether or not, in your opinion,

19   water from the Temecula Creek enters the lower, the older

20   alluvium in the Pauba Valley?

21        MR. MOSKOVITZ:  From what point in Pauba Valley?

22        THE WITNESS:  I just testified that in the area  above

23   where we have delineated our confining zone there would be

24   movement down to the older alluvium.  I can't recall offhand

25   just how far northeast we drew this confining zone.

B

Z10

1    THE COURT:  Well, then, there was a question asked

2    that was rephrased.  The question was whether the older and

3    the younger alluvium were in hydraulic continuity in the Pauba

4    Valley, and I take it that your answer would be that in the

5    upper part of the valley they were?

6    THE WITNESS:  That is right.

7    THE COURT:  In the lower part of the valley, to a lesser

8    extent?

9    THE WITNESS:  That is exactly right, your Honor.

10    THE COURT:  Some continuity, but lesser.

11    THE WITNESS:  Yes.

12    THE COURT:  All right.

13    BY MR. VEEDER:

14    Q  Now, I am placing on the easel a blank form of

15    Plaintiff's Exhibit 16.

16    THE COURT:  Now, if you are going to ask the witness

17    to put in this confining zone, he should have a chance to

18    consult any notes or maps that he has and not be required to

19    do it off the cuff, unless he wants to do it that way.  Is

20    that about what you are about to do?

21    MR. VEEDER:  Your Honor is anticipating.

22    MR. SACHSE:  We are all anticipating.  We are just

23    waiting.

24    MR. MOSKOVITZ:  This is a great big open secret.

25    MR. STAHLMAN:  You are not going underground again?

B

Z11

1   MR. MOSKOVITZ:  You can refer to any of the notes or
2   bulletins that you wish.
3   MR. VEEDER:  With the compliments of the National
4   Government, young man, and whatever notes you have.
5   THE WITNESS:  I would like to refer to my notes.
6   THE COURT:  All right, we will take a recess.
7   (Recess.)
8   MR. VEEDER:  Will you take the stand for just a moment,
9   Mr. Fox.
10   Q  You stated that you desired to refer to notes, Mr.
11   Fox.  Where are those notes?
12   A  The notes from which our geology appendix--
13   Q  I am speaking of you now.  Where are your personal
14   notes?
15   A  My personal notes are in Los Angeles.
16   THE COURT:  Just a minute.  You say he said he wanted
17   to refer to notes.  I don't know that he said anything of the
18   kind.  I said that he might refer to charts, material, notes.
19   MR. VEEDER:  That he had made.
20   THE COURT:  That he had made or that were the result
21   of other notes he had made.  I said he could refer to anything
22   he wanted to before he testified.  Now, I don't recall whether
23   he said he wanted to refer to his personal notes.
24   MR. VEEDER:  I am asking him for his personal field
25   notes.  I am making a call on him for them now.

4757

B

Z12

1    THE WITNESS:  I don't think I need my personal field

2    notes to do that, your Honor.  The results of the investi-

3    gation I made are depicted on our Bulletin No. 57.

4        MR. VEEDER:  What I would like is to have him produce

5    in the courtroom the notes upon which he relied, and I am

6    asking that he do so, your Honor.

7        THE COURT:  What help would that be?

8        MR. VEEDER:  Because, your Honor, I think this, I truly

9    believe that by and large that was written without very many

10   notes at all, and I think it is important.

11       THE COURT:  Well, has it been established that this

12   man wrote this yet, whatever you are talking about as "this"--

13   Bulletin 57?  He may have worked on it.  Did he write it?

14       MR. VEEDER:  I don't think he did, your Honor.

15   Q  Did you write Bulletin 57?

16   A  I was one of the authors of Bulletin 57.  I wrote

17   the geology appendix to that bulletin.

18       THE COURT:  The part that concerns the situation of

19   lenses and confining beds, et cetera, in the Lower Pauba

20   Valley-- did you write that part?

21       THE WITNESS:  That was the responsibility of the geolo-

22   gist assigned to that investigation.

23       THE COURT:  And you wrote that part.

24   BY MR. VEEDER:

25       Q Did you make all the interpretations of the geology?

B

Z13

1          A  Not by myself.

2          Q  Who made them?

3          A  We collaborated, Mr. Roth and myself, under the

4    supervision of Mr. James.

5          Q  Did Mr. Illingworth make any determinations?

6          MR. MOSKOVITZ:  Your Honor, I am going to object.  This

7    is taking on a flavor of cross-examination.  If Mr. Veeder

8    wants to find out how this bulletin was prepared, who worked

9    on it, whose conclusions are contained in it, he can introduce

10   the bulletin himself and then wait until cross-examination

11   of those people.

12         THE COURT:  I think so.

13         MR. VEEDER:  So do I.

14         THE COURT:  I think so.

15         MR. VEEDER:  Yes.  I will proceed.

16         Q  Now, I gave you a red pencil.  Would you step to

17   what I will now mark as Plaintiff's Exhibit No. 16.

18         THE COURT:  We have a 16 already.

19         MR. VEEDER:  16E for Identification.

20         THE COURT:  Is that the right number, Mr. Clerk?

21         THE CLERK:  Yes, your Honor.

22   BY MR. VEEDER:

23         Q  And on that exhibit indicate where, in your opinion,

24   surface water enters the older alluvium in the Pauba Valley?

25         A  I would so that, Mr. Veeder, but again coming to a

B

Z14

1    conclusion like that and illustrating it on a diagram takes

2    a lot of inspection, a lot of forethought before that can be

3    done.  Now I believe that these graphic representations of

4    the well logs are correct, but I wouldn't want to just take

5    this exhibit as it is and say that this is an exact representa-

6    tion of the drillers' logs in the area.  I therefore would like

7    to refer to the results of my notes which are depicted on one

8    of the plates in Bulletin 57, and from that I will be able

9    to put on this Exhibit 16--

10          MR. STAHLMAN:  May I ask a question on voir dire?

11          MR. VEEDER:  Yes, by all means.

12          THE WITNESS:  Plate 16.

13          MR. STAHLMAN:  Would your memory be refreshed by

14   referring to any material so that you could do that?

15          THE WITNESS:  It certainly would, Mr. Stahlman.

16          MR. STAHLMAN:  There is the foundation.

17   BY MR. VEEDER:

18          Q  Now, what investigations did you personally make

19   in regard to surface water entering the older alluvium in the

20   Pauba Valley?

21          A  I don't recall that I made any inspection of

22   surface water entering the older alluvium in Pauba Valley.

23          Q  Would you state then whether or not, based upon

24   your personal investigations, you could depict on Plaintiff's

25   Exhibit 16E the surface water entering the older alluvium in

B.

Z15

the Pauba Valley?

MR. MOSKOVITZ:  May I have the question again, please?

THE COURT:  Read it.

(The reporter read the pending question.)

THE WITNESS:  I could do that if I had the data from which I first drew my conclusion.

BY MR. VEEDER:

Q   Where is that data?

A   That data again is depicated in Bulletin 57.

Q   But where is the data that you used?

A   Probably in Los Angeles.  I couldn't swear that I know it is there.

Q   Would you produce it?

THE COURT:  Let him finish his statement.  That data depicted on Plate 16?

THE WITNESS:  Yes, your Honor.  It is the final draft of the work we did in the office, and whether we still have that available I can't say.

MR. MOSKOVITZ:  By "that"--

THE WITNESS:  All the geologic sections that we did draw for the Bulletin-- that is basic data, and sometimes it is in a safe place, but at other times we just don't have access to it any longer.

BY MR. VEEDER:

Q   How many days of investigation do you recall that

B

Z16

1    you made in that regard?

2              MR. MOSKOVITZ:  In what regard is that, Mr. Veeder?

3              MR. VEEDER:  In regard to the surface flow of the

4    Temecula which supplies the older alluvium in the Pauba

5    Valley.

6              MR. SACHSE:  The witness testified that he didn't make

7    any investigation of surface flow.

8    BY MR. VEEDER:

9         Q  You didn't make any investigation of surface flow at

10   all?

11        A  When we did our geologic mappings, there are prob-

12   ably times we would note the surface flow, but I don't recall

13   anything.

14        Q  Would you state whether or not, based upon your

15   personal investigation, you would be able to express a con-

16   clusion as to surface water entering?

17        A  No, I wouldn't be able to at this time.

18        Q  All right.  Now, who else worked on the surface

19   flow as a source of water for recharging the older alluvium

20   in the Pauba Valley?

21        A  There were several engineers who authored the in-

22   vestigation which has been printed as Bulletin 57.

23        Q  So would you state whether, from personal knowledge,

24   you would be able to draw anything about surface recharge for

25   the Pauba Valley?

4762

B

Z17

1          A   I would like to have that question again, please.

2     I didn't quite understand it.

3               THE COURT:  Read it.

4               (The reporter read the pending question.)

5               MR. MOSKOVITZ:  I object to that question.

6               MR. VEEDER:  I will rephrase the question.

7               Q. Would you state whether or not, based upon any

8     personal investigation, you could depict on Plaintiff's

9     Exhibit marked 16E for Identification the source of surface

10    water for the recharge of the older alluvium in the Pauba

11    Valley?

12              MR. MOSKOVITZ:  I object to that question until the

13    term "personal investigation" is further defined.  Do you mean

14    by that whether solely from having been on the field and looked

15    he could tell, or from his evaluation of material and data

16    available to him?

17              MR. VEEDER:  From his personal investigation.

18              THE COURT:  Wait a minute.  You haven't answered the

19    question.  Mr. Moskovitz's inquiry is a good one.  By

20    "personal investigation" do you mean looking with his eyes and

21    watching?

22              MR. VEEDER:  That is what I mean, your Honor.

23              THE COURT: Or do you mean a study that he made?

24              MR. VEEDER:  Precisely.

25              THE COURT:  Which?

1      MR. VEEDER:  By looking, by his personal eyeball.

2      MR. MOSKOVITZ:  You mean by watching the water go down?

3      MR. VEEDER:  That is right.

4      MR. MOSKOVITZ:  Standing and watching the stream?

5      THE WITNESS:  I can answer that by saying no.

6      MR. VEEDER:  All right.

7      Q  Now, what investigation did you personally make in

8  regard to the existence of faults in the Pauba Valley?

9      MR. MOSKOVITZ:  Again I want to object, unless--

10      MR. VEEDER:  With his eyeballs.

11      THE WITNESS:  From a geologic inspection of the area,

12  it was fairly evident that faults did exist in the area of

13  Pauba Valley by offsets in the stream channels, by alignment

14  of springs, by alignment of saddles, by growths of vegetation

15  and other forms of evidence that a geologist uses to delimit

16  faults.

17  BY MR. VEEDER:

18      Q  During that two-day period of investigation you

19  determined that?

20      A  I didn't say that I spent two days out there.

21      Q  I am speaking now of the Pauba Valley faults.

22      MR. MOSKOVITZ:  I object to that question that is

23  pending as being leading, your Honor.

24      THE COURT:  Overruled.

25

BY MR. VEEDER:

1

Q  How many days did you undertake your personal in-

3  vestigation of faults in the Pauba Valley?

4  A  Well, when you investigate a fault you just don't

5  look into the mouth of a valley to determine.  You investigate

6  the whole area.

7  Q  Well, how many days did you undertake the investiga-

8  tion of faults in this area?

9  A  I probably spent several days looking at faults in the

10  area and probably a great deal more time was spent studying

11  the aerial photographs, besides studying the water level

12  contours drawn by the engineers, which would show it following

13  the offset of any of the aquifers in the area.

14  Q  When you were investigating the area, what wells--

15  I am now speaking of the whole area on 15A-- what wells did

16  you go to, personally, to investigate?  Do you recall?

17  A  No, I don't.

18  Q  How many, do you recall, that you investigated?

19  A  I don't exactly understand what you mean by

20  "investigate."

21  Q  Measurements-- how many did you measure?

22  A  I didn't measure any wells, personally.

23  Q  Who did that?

24  A  The engineers assigned to the investigation and Mr.

25  Roth.  I know that he did study the wells, made measurements,

B

Z20

1    collected well logs, et cetera.

2         Q   Where are Mr. Roth's notes, do you know?

3         A   They are organized in the appendix, or either in

4    Volume I or the appendix of the Bulletin, the results of

5    his work.  They are also depicted on geologic sections.

6         Q   Where are the field sheets that he used?  Do you

7    know?

8         A   They are probably in our office in the files.

9         Q   Would you produce those?

10        A   I can get them.

11        Q   When will you get those?

12        A   I will try and get them Monday when I am in Los

13   Angeles.

14        THE COURT:  Now, stop right now.  If you want to look

15   at these notes to find out whether or not the witness is going

16   to be called by the State, an inspection of these notes and

17   all would be a matter of cross-examination and not direct

18   examination.  If he is not going to be called, that is another

19   thing.

20        MR. VEEDER:  May I inquire of the State of California

21   if Mr. Roth is going to--

22        MR. MOSKOVITZ:  Mr. Roth is not going to be called.

23        MR. VEEDER:  Mr. Sachse told you that you wouldn't call

24   Mr. Roth?

25        MR. MOSKOVITZ:  Mr. Veeder, the State's case is being

B

Z21

1    presented by me and by no one else, and I resent that insinua-

2    tion.

3         Mr. Roth is not going to be called.  He no longer works

4    for the State.  He was not in charge of the investigation.  He

5    did parts of it.  Mr. James is going to be called to testify

6    to the geology, because he was in charge of the geologic

7    investigation.

8    BY MR. VEEDER:

9         Q  Are the Roth notes going to be produced?

10        MR. MOSKOVITZ:  Your Honor--

11        THE WITNESS:  They are not the Roth notes, your Honor.

12   He was one of the engineers working on the investigation.  All

13   the engineers collaborated in collecting the data.

14        MR. MOSKOVITZ: Just a moment.  Your Honor, if Mr.

15   Veeder is going to ask that we produce all the field notes on

16   which Bulletin 57 was based, we will have them here at the

17   time the bulletin is offered by the State, so that the back-

18   ground can be looked into by Mr. Veeder on cross-examination,

19   if he wishes.  Before then he can completely--

20        THE COURT: I agree that they don't have to be brought

21   in before that time.  They should be brought in and made

22   available at that time for the purpose of cross-examination.

23        MR. VEEDER:  Thank you, your Honor.

24        Q  What investigations did you personally make as a

25   geologist in regard to ground water contours in the area of the

1    Santa Margarita Valley above Temecula Gorge?

2         A   The geologists collaborated with the engineers in

3    coming to the conclusions which are depicted in Bulletin 57

4    as plates.

5         Q   You haven't answered the question.  What did you do

6    personally from the standpoint of investigating ground water

7    in the area above the Temecula Gorge?

8         A   I thought you asked about ground water contours, Mr.

9    Veeder.

10        Q   That is what I mean, ground water contours.

11        A   In areas where the engineers had trouble arriving

12   at a certain conclusion, they would ask the geologists if there

13   was any physical features which would cause such a problem.

14        Q   When you were making your investigation--

15   THE COURT:  Let me interrupt.  You say this was put on

16   a plate in Bulletin 57?

17   THE WITNESS:  Yes, your Honor.

18   THE COURT:  Would it be the so-called "lines of equal

19   elevation of ground waters"?

20   THE WITNESS:  That is probably it.

21   MR. MOSKOVITZ:  Do you want to check the Bulletin to

22   make sure?  Refer to the plate number for the record.

23   THE COURT:  Here (handing document to the witness).

24   THE WITNESS:  10B, as I recall, this is the one I was

25   talking about.

Fox          Direct                                                  4768

B

Z23

1        MR. MOSKOVITZ:  What is the number?

2        THE WITNESS:  It is Plate 10B.

3  BY MR. VEEDER:

4        Q   Who made 10B?

5        THE COURT:  11B also?

6        THE WITNESS:  The engineers under the direction of

7  Illingworth.

8        MR. MOSKOVITZ:  There was a question from the Court

9  that I don't believe you answered.

10        THE COURT:  Also 11B?

11        THE WITNESS:  Yes, sir.  There may be some more.  I

12  don't recall offhand how many plates of water table contours

13  are in the report.

14  BY MR. VEEDER:

15        Q   Would you state then whether you, yourself, made any

16  determinations in regard to the availability of ground water

17  in the area in the older alluvium north of Pauba Valley?

18        MR. MOSKOVITZ:  I object to that question as being

19  ambiguous and vague as to the availability of ground water.

20  I think Mr. Veeder can make that more specific.

21        THE COURT:  Overruled.

22        THE WITNESS:  I knew by talking with the engineers and

23  working along with them who were doing this report that there

24  were wells in the older alluvium.  They did make some measure-

25  ments, I am sure-- I don't recall offhand, and I know that

Fox   Direct   4769

B

Z24

1    some wells do produce water from the older alluvium.

2    BY MR. VEEDER:

3         Q  Would you state whether or not there was ever an

4    estimation made by the State of California as to the quantity

5    of ground water in storage in the older alluvium?

6         A  We certainly considered it.  It is water-bearing

7    material.

8         Q  When you refer to a water-bearing material, what do

9    you mean by that, Mr. Fox?

10        A  It is material which is capable of storing water,

11   but not necessarily releasing it through wells.

12        Q  Did the State of California ever make an estimation

13   as to the quantity of water in the older alluvium which was

14   in storage?

15        A  At one time I seem to recall that we did consider

16   it.

17        Q  How much water did they estimate was in storage in

18   the older alluvium?

19        A  I can't recall the exact figure.

20        Q  Would you give us an approximation of what they

21   calculated to be in storage?

22        A  I can say that--

23   MR. MOSKOVITZ:  You may refer to your notes, if you

24   like.

25   THE WITNESS:  Well, I can remember offhand that we

B

Z25

1    considered the specific yield value of roughly 10$\frac{1}{2}$% in the

2    older alluvium, and multiplying that by the areal extent--

3    I think it was 28,000 acres, if I remember correctly; this

4    is rough-- and I don't recall what depth value we did use as

5    the saturated thickness of the older alluvium, but it was

6    considerable.

7        Q  Suppose you used a thousand feet.  Would that be a

8    reasonable depth?

9        A  Well, we have no evidence to say that it is reason-

10   able or isn't reasonable.

11       Q  What would be your estimate as an expert as to the

12   depth of the water-bearing material in the older alluvium?

13       A  The depth?

14       Q  Of the water-bearing material in the older alluvium?

15       A  In the area that we know about, I would say it is

16   in excess of 2,000 feet.  But I couldn't swear for the

17   remainder of the area on Exhibit 15A.  We just don't have any

18   data.  It may be 20 or 30 feet thick, with bedrock underlying

19   it at shallow depth.

20       Q  Where would you say the area would be approximately

21   2000 feet based on your investigation?

22       A  In the area of the Pauba Well.

23       Q  In the area of the Pauba Well, and you would say

24   that it is 2,000 feet deep there?

25       A  Yes, I would.

Fox        Direct                                    4771

B

Z26

1      Q   What areas north of the Pauba Well did you investi-

2   gate from the standpoint of the depth of the alluvium?

3      MR. MOSKOVITZ:  When you say "you," is this he, person-

4   ally, again, or the State?

5      MR. VEEDER:  It will always be he, Mr. Moskovitz.

6      THE WITNESS:  I seem to recall that there were some

7   logs of water wells that showed material which was unconsoli-

8   dated at a depth in excess of 500 feet, but I don't remember

9   exactly where that was.

10  BY MR. VEEDER:

11     Q   Throughout the whole length of the valley, then,

12  would you state whether you, as a geologist, investigated the

13  depth of the older alluvium?

14     MR. MOSKOVITZ:  What valley is this, Mr. Veeder?  You

15  didn't specify the valley.

16     MR. VEEDER:  North of the Pauba Valley.

17     MR. MOSKOVITZ:  How far up?

18     MR. VEEDER:  The whole way.

19     THE WITNESS:  All the way up?

20     THE COURT:  Be more specific, Mr. Veeder.

21     MR. VEEDER:  All right.

22     Q   In the area on Plaintiff's Exhibit marked 15A, which

23  is in orange, north of the Pauba Valley?

24     THE COURT:  Indicating the older alluvium.

25     MR. VEEDER:  The older alluvium.

Fox    Direct

4772

B

Z27

1      THE WITNESS:  Do you want what I consider would be the

2  thickness of that material?

3  BY MR. VEEDER:

4      Q  Yes.

5      A  I can't do it.  It is impossible.

6      Q  How many wells did you investigate in that connection

7  to make your determination of the depth?

8      A  We studied all the well logs that were available at

9  that time in the older alluvial area.

10      Q  Which areas, if any, did you find where the wells

11  encountered the basement complex?

12      A  I can't remember that offhand.

13      THE COURT:  Let me interrupt.  In the Government's

14  figures on their basin, what depth did you take in the older

15  alluvium?

16      MR. STAHLMAN:  A hundred feet.

17      THE COURT:  A hundred feet?

18      MR. VEEDER:  Yes.

19      THE WITNESS:  It could just as well have been 1,000

20  feet, your Honor.

21      THE COURT:  Well, was a hundred feet an unreasonable

22  estimate, from what investigation you made of the valley and

23  what you learned from your fellow workers?

24      THE WITNESS:  In the area where we have the data, your

25  Honor, I would say a hundred feet is not unreasonable; but as

B

Z28

4773

1    I pointed out before, bedrock could underlie this older

2    alluvium at very shallow depths in the area where this basement

3    complex is next to the surface.

4    BY MR. VEEDER:

5        Q   What area?

6        A   In this area.

7        Q   Would you call out the section, township and range?

8        A   In Townships 6 and 7 South, Range 3 and 4 West,

9    Sections 36, 31, 1, 6, 4, 5, 9--

10       THE COURT:  Well, now, just a minute.  That of course

11   is outside the area shown in Government's Exhibit 17 as

12   the basins estimated by the Government.  Let us find out if we

13   have any big disagreement here.  Here is Exhibit 17, and the

14   area you have described lay outside the--

15       THE WITNESS:  In this area here, your Honor, in the

16   northeastern part of what is referred to as Storage Unit No.

17   4 on this Exhibit 17.

18       MR. VEEDER:  Would you put that up on the easel and I

19   can follow along.

20       I will put the Exhibit 17 up on the easel, your Honor.

21

22

23

24

25

C-1 ML j

1    THE COURT:  Here is Exhibit 17 and the area --

2    MR. VEEDER:  This is 17-A, which is satisfactory.

3    THE COURT:  All right.  Let me be the lawyer here.

4    MR. VEEDER:  I always thought your Honor was a lawyer.

5    THE COURT:  You are familiar with Exhibit 17 and

6    17-A, both made on the same base map?

7    THE WITNESS:  Yes, your Honor.

8    THE COURT:  17-A, the only difference being spotting

9    some wells.  Are you familiar with the basins the Government

10   has laid out on the map?

11   THE WITNESS:  That is right, your Honor, I am.

12   THE COURT:  Well, now, first take the smaller ones,

13   11 and 12, up at the top in Diamond Valley.  Is there any

14   substantial disagreement with that?

15   THE WITNESS:  Not substantial disagreement.

16   THE COURT:  All right.  9 in Coahuila Valley?

17   MR. VEEDER:  Your Honor means as to the area?

18   THE COURT:  Yes, as to the areal extent.

19   THE WITNESS:  Well, I would like to refer to our,

20   what we did in our bulletin to see if there is any -- I can't

21   just --

22   THE COURT:  You can't do it offhand, then?

23   THE WITNESS:  No.  I would rather look, if I were

24   permitted.

25   THE COURT:  You could do it over the noon hour?  You

1    could look at it over the noon hour?

2         THE WITNESS:  I could say right now there is no

3    substantial disagreement in most of these areas.

4         THE COURT:  In the smaller areas.

5         MR. VEEDER:  In most of the smaller areas.

6         THE WITNESS:  Smaller areas, other than we considered

7    several areas which are not shown on Exhibit 17-A.

8         THE COURT:  Yes.  What about Basin 5 shown on 17-A?

9         MR. VEEDER:  That is the Lancaster-Aguanga.

10        THE WITNESS:  I don't recall.  There seems to be

11   some difference of opinion in there, your Honor.

12        MR. MOSKOVITZ:  With all due respect, I think we

13   probably should have some definition as to what he is

14   agreeing or disagreeing with.

15        THE COURT:  The aerial extent.  Surface area.

16        MR. MOSKOVITZ:  Of a ground water basin?

17        THE COURT:  That is right.  That is all we are

18   talking about now.

19        THE WITNESS:  There is no essential difference.

20        THE COURT:  Now, on the other basins -- let's take

21   three, the Pauba Basin, which is sort of a subbasin in there.

22        THE WITNESS:  Well, as I can remember, without

23   referring to our plate, there is no essential disagreement.

24        THE COURT:  And one and two, Murrieta and Wolf?

25        THE WITNESS:  There is no essential difference in

1    Units 1 or 2.

2         THE COURT:  Then, the difference, if any, exists in

3    connection with 4, the one that lays on either side of the

4    Pauba Valley?

5         THE WITNESS:  And the difference doesn't lie in the

6    fact that there is anything physically different about it

7    as shown on the maps.  It lies in the fact that we just

8    didn't consider it.  We felt we had insufficient data with

9    which to draw conclusions as to the storage capacity.  There

10   weren't enough wells, I thought, to come up with a conclusion

11   as to a valid storage capacity in that area.  And that is

12   the only difference in almost all the work pertaining to

13   geology, as far as I can recall, this end of the testimony

14   here.

15        MR. VEEDER:  A fine and honest boy.

16        MR. STAHLMAN:  Did you expect him to be otherwise,

17   Mr. Veeder?

18        MR. VEEDER:  I have had some dealings with the State.

19        THE COURT:  Let's eliminate the personal comments,

20   good or bad.

21        THE WITNESS:  I would like to clarify one thing.

22   When I said "no essential difference," in the geology as

23   depicted on the geologic plates but not from the interpreta-

24   tive data, such as the geologic sections, of course.

25        Q  BY MR. VEEDER:  What investigations did you make

Fox - Direct

1  in regard to the phenomenon of rising water at the toe of

2  the older alluvium on the east side of Murrieta Valley?

3      MR. DENNIS:  What do you mean by "toe"?   I wonder

4  if you could show us on the map.

5      MR. VEEDER:  At the contact between the older alluvium

6  and the younger alluvium.

7      MR. MOSKOVITZ:  Could I have the question read again?

8  I didn't catch the first part of it.

9      (The reporter read back the question.)

10     MR. VEEDER:  Now, I change that to the contacts

11 between the older alluvium and the younger alluvium.

12     MR. DENNIS:  At any particular location?

13     MR. VEEDER:  Yes, on the east side of Murrieta

14 Valley.

15     MR. DENNIS:  I mean, the entire length of the east

16 side or just --

17     MR. VEEDER:  Yes.

18     THE WITNESS:  In answer to that question, I would say

19 that the alignment of the springs in that area led us to

20 believe as to the existence of a structural feature in that

21 area.

22     Q  BY MR. VEEDER:  What did you actually observe,

23 though, from the standpoint of --

24     A   Areas of rising water.

25     Q   You did.  Would you state whether or not you are

1   in general agreement with the plaintiff's Exhibit 16?

2          A   Again, without being able to refer --

3          THE COURT:  15.

4   MR. VEEDER:  15; I beg your pardon.

5          THE WITNESS:  -- our geology map --

6          MR. MOSKOVITZ:  He is able to refer to it, your

7   Honor, isn't he?  He says, "without being able to."

8          THE WITNESS:  I would prefer to refer to our geology

9   plates in Bulletin 57.

10         MR. MOSKOVITZ:  You go right ahead and refer to it.

11         Q   BY MR. VEEDER:  Did you make your personal investi-

12  gations?

13         A   Yes, Mr. Veeder.

14         Q   And --

15         THE COURT:  Let him refer to it.  Let's not hurry

16  him.

17         MR. VEEDER:  I am in no hurry.  I think they will be

18  shown to be the same.

19         THE WITNESS:  I am looking at plate 13-B in Bulletin

20  57 of Fallbrook's AA.

21         Q   BY MR. VEEDER:  Did you make that phase of the

22  plate to which you are looking?

23         A   I worked on the preparation of the geology plate.

24         Q   What did you find in regard to the rising water

25  at the contact between the older and younger alluvium in

the area in question?

A   I don't exactly understand what you mean by "What did I find?"  There is rising water there and the areas of rising water were aligned; and, therefore, we concluded that there was a structural feature, a fault, in that area.

Q   What would you say would be the sources of that rising water, Mr. Fox?

A   The source would be water in the older alluvium, probably.  The reason that it did rise there was the barrier effect, I felt, of the Wildomar Fault.

Q   From the standpoint of your investigations, then, would you state whether you are in general agreement with the testimony of Mr. Kunkel in regard to the availability of ground water in the older alluvium?

MR. MOSKOVITZ:  I object to that question as being too vague and general.  The testimony of Mr. Kunkel -- he testified for a long, long, long time.  Let's be specific about this.

MR. VEEDER:  In regard to the availability of ground water in the older alluvium?

THE COURT:  The witness can limit his answer.

THE WITNESS:  I could answer that, your Honor, in saying that I believe there is ground water in storage in this area, but whether you can get it --

4780

Q   BY MR. VEEDER:  Would you --

A   Whether it is available to wells or not --

MR. MOSKOVITZ:  Let him finish his answer.

THE WITNESS:  I can't say, simply because there is
an insufficient number of wells tapping the older alluvium
as the source of supply.

Q   BY MR. VEEDER:  From the standpoint of your in-
vestigation, did you go to the Roripaugh well concerning
which testimony has been elicited?

A   Personally?  No.

Q   You did not.

MR. STAHLMAN:  Pardon me just a minute.  The Roripaugh
well, one of those wasn't even there.

MR. SACHSE:  Wasn't even drilled.

MR. STAHLMAN:  The one we are talking about wasn't
there at the time he stated he made his first investigation.

MR. VEEDER:  Thank you, George, because we are going
to see how --

THE COURT:  All right.  Just do your thanking outside
of court.

Q   BY MR. VEEDER:  Now, I am referring to the well
which is situated in Section 26, Township 7 -- I can't locate
it on this map -- Section 26, Township 7 South, Range 1 West.

MR. MOSKOVITZ:  You mean 3 West, don't you, Mr.
Veeder?

C-2

Fox - Direct

1    MR. VEEDER:  Yes, 3 West.  3.

2    MR. SACHSE:  Which well?  What number, please?

3    MR. VEEDER:  I don't have the number.

4    THE COURT:  Is this the well that was talked about

5    yesterday when the diagram was drawn?

6    MR. VEEDER:  That is correct.  It has "Roripaugh"

7    written right on it; in the southeast quarter.

8    THE COURT:  Just a minute.  It is described in 15-B.

9    I have it right before me.

10   MR. VEEDER:  It is 16-A-72.

11   THE COURT:  Just a minute.  The description is

12   7-S, 3-W, 26-J-1.  It is in Section 26, 7-S, 3-W.

13   Q   BY MR. VEEDER:  Did you investigate that?

14   A   No, sir, I didn't.

15   Q   Why didn't you?

16   MR. MOSKOVITZ:  I object to that question as being

17   a question on cross-examination, leading and --

18   MR. VEEDER:  All right, I will withdraw it.

19   MR. SACHSE:  Is he impeaching one of his own witnesses?

20   Q   BY MR. VEEDER:  When did you conclude your in-

21   vestigations in the Santa Margarita River Valley above

22   Temecula Gorge?  When did you conclude your work?

23   A   When the report was written.

24   Q   When was that?

25   A   I believe it was May or June of 1954.  I think

Fox - Direct

1    that was the publication date.  I can't remember exactly.

2         Q    What further investigations have been made, to

3    your knowledge, in that area by the State?

4         A    I think that is part of the area where the State

5    makes a regular well canvass.  I am not sure, however.  We

6    always have minor investigations in these areas.  Whether

7    they were included in the Santa Margarita River drainage

8    area, I can't say.

9         Q    What about your own personal work, however?

10        A    I never went back into the area except to drive

11   through it.

12        Q    What investigations did you personally make in

13   regard to the availability of ground water in the younger

14   alluvium in the Murrieta Valley, depicted in yellow on

15   Plaintiff's Exhibit marked 15-A for identification?

16        A    I am sort of mixed up on that question.  I would

17   like it clarified.  What did I do personally in there to tell

18   whether water was available or not?

19        Q    Yes.

20        A    I collaborated with the engineers and other

21   people working on this investigation at all times before I

22   drew any conclusions as to the availability or non-availability

23   of water in any of the upper parts of the watershed.

24        Q    What data did you utilize in that investigation?

25        A    We had results of pumping and drawdown in the wells.

1      Q   How did you obtain that data?

2      A   I didn't personally obtain it.  It was obtained

3 by the engineers working on the investigation.

4      Q   Mr. Roth was an engineer?

5      A   No, sir, he was a geologist.  But he was the

6 resident geologist on the investigation.

7      Q   What other data did you investigate in regard

8 to the availability of ground water in the Murrieta Valley,

9 personally?

10      A   I don't think we needed any other data except

11 to know there was lots of well logs in the area that we

12 collected.  They made water level measurements.  The con-

13 tours of water levels were drawn.  To me that indicated that

14 water was available.

15      Q   What data did you obtain for the purpose of

16 arriving at the contacts between the older and the younger

17 alluvium in the Murrieta Valley?

18      MR. MOSKOVITZ:  Is that lateral or vertical, Mr.

19 Veeder?

20      MR. VEEDER:  Lateral.

21      THE WITNESS:  Personal physical inspection in the

22 area.

23      Q  BY MR. VEEDER:  What aerials did you use?

24      A   The aerial photographs that cover the area to a

25 certain degree, but for the delineating the contacts between

1    older and recent alluvium the aerial photographs aren't too

2    necessary.

3        Q    You are going to produce those aerials, are you?

4        A    I havebeen instructed to do so.

5        Q    Yes.  I mean, it is a whole area you are going to

6    produce the aerials on?

7        A    I think the aerial coverage is for the entire

8    area.  I am not sure.

9        Q    From the standpoint of the determination of the

10   depth of the Murrieta Valley water-bearing strata, what data

11   did you use?

12       A    The logs of water wells.

13       Q    What test wells, if any, were drilled, do you

14   recall?

15       MR. MOSKOVITZ:  By whom?

16       MR. VEEDER:  By the State.

17       THE WITNESS:  The State didn't drill any test holes.

18       THE COURT:  Now, this is a good place to stop.  I

19   want to ask a question.

20       MR. VEEDER:  What?

21       THE COURT:  This is a good place to stop the examina-

22   tion.  I want to ask a question.

23       MR. VEEDER:  Oh, go ahead.

24       THE COURT:  Be seated, Mr. Fox.

25           I am looking at plate 16 in Bulletin 57, areas

1  indicated in the Pauba Valley, the witness mentioned here-

2  tofore as a confining bed.  He has further testified it is

3  not a clay cap.  He has further testified that although

4  there is fairly good hydrologic continuity at the upper part

5  of the valley, although there is some at the bottom part,

6  that is not as good.  My question is:  What difference does

7  it make in this lawsuit?  What difference does it make

8  whether or not there is a confining, a semi-confining bed

9  that is not a clay cap, I understand?  What difference does

10  it make in this lawsuit if the upper part of the valley has

11  good permeability so that water can get down into it? What

12  difference does it make?  Please tell me.

13      MR. VEEDER:  From the standpoint of availability of

14  the water to United States of America, to begin with.  It

15  is our view that this whole area in the Pauba Valley is a

16  single unit not separated at all as between the upper and the

17  lower sources of water.

18      THE COURT:  What difference does it make?  Supposing

19  there is what he calls a confining bed, but which is not

20  absolutely confining?  It is an area, as I would conclude

21  from his testimony, of less permeability, interlacing lenses

22  of clay material, the clay and silt, but not a cap, and some

23  hydrologic contacts but not as good as at the east end of

24  the valley.  What difference does it make in this case

24  whether it is one way or it is all one basin?

25

MR. VEEDER: The facility with which water will reach us, your Honor. What happens to the water that goes in here? Does it go out laterally? What occurs? What will occur if the Roripaugh well and ten other wells like it are constructed?

THE COURT: Well, then, I don't follow you. Some-body else want to offer? Does it make a difference, Mr. Moskovitz?

MR. MOSKOVITZ: Your Honor, one of the big issues that has developed on this upper watershed is what would the effect be on the flow of the Temecula Creek from the drilling of wells and extraction of water in the older alluvium north and south of Pauba Basin?

THE COURT: I am not talking now about -- well, yes, I am talking now about the basin referred to as the Pauba Valley Basin. No. 3, I think it is.

MR. MOSKOVITZ: Yes, your Honor, I am coming to that.

The thesis has been advanced that the pumping of water from the older deposits north and south will dewater those deposits to an extent that large amounts of water would be drawn to the dewatered areas from the Pauba Valley and, therefore, the creek will dry up and there will be no surface flow. Now, in order for that to happen, there must be ready recharge of those areas north and south which, by hypothesis, will be pumped in the future. Now, whether

1  there is ready recharge or not depends upon the permeability

2  of the materials both underlying the recent alluvium in

3  Pauba Basin and on both sides.

4           Now, as far as the State is concerned, the

5  permeability of the materials, from what they have been able

6  to gather underneath the recent alluvium in Pauba Valley,

7  is not very good.  And there is various evidences of that

8  fact which we will bring out in our direct case, case in

9  chief.  Further, as far as both sides are concerned, when

10  you get into the older materials --

11           THE COURT:  Why don't you limit yourself to what I

12  asked you.  Now, I want to ask that question, too.

13           MR. MOSKOVITZ:  I am sorry.

14           THE COURT:  I would like to have you answer the first

15  question.  Let's take the Pauba Valley and the two situations

16  -- the kind of a thing which he calls a confining bed and

17  which isn't absolutely confining, in the lower western part

18  of the valley, but not in the eastern part.  The permeability,

19  I take it, is much better.  What differences does it make

20  whether that is there or not there?

21           MR. MOSKOVITZ:  Your Honor, I don't know that the

22  witness has testified as to what the nature of the permeability

23  is at the upper end as precisely as you have indicated.

24           THE COURT:  He said there was hydrologic continuity

25  and that we could distinguish between the eastern part of the

Fox - Direct

1  Pauba Valley, as contrasted with some of the more western
2  parts.

3      MR. MOSKOVITZ:  The question, your Honor, is, how
4  much of a surface flow of the Temecula Creek will seep down
5  into the older materials underneath.  That is the issue.
6  And as I understand our expert's views, the amount would not
7  be great because of the relative impermeability of the
8  materials through which that surface stream would have to go
9  to get into the older materials, in either event.

10     THE COURT:  Do you have any idea in an area below
11 the so-called confining bed that there could be an area
12 there that was not full of water?  Do you have any idea that
13 there could be such pumping in this lower part under the
14 so-called confining bed that there would be an area in there
15 that was not full of water and that -- sort of a vacuum, as
16 it were, in the water bearing material?

17     MR. VEEDER:  It would not affect the surface flow.
18     MR. MOSKOVITZ:  You are talking about some future
19 condition that would result from pumping later on; is that
20 what you mean, your Honor?

21     THE COURT:  What it resulted from.

22     MR. VEEDER:  It would not affect the surface flow.
23     MR. MOSKOVITZ:  What I am saying is at present that
24 area has water to the extent there are pressure character-
25 istics.

C-4

1    But if in the future there was a vacuum created,

2  the question as to how much water would get down is not

3  clear.  And our information indicates that the water would

4  not readily go down.

5    THE COURT:  This you have to prove to me.

6    MR. MOSKOVITZ:  Yes, that is what we expect to do.

7    THE COURT:  You have to prove to me.

8    MR. VEEDER:  That is why I have the boy on the stand.

9    THE COURT:  I don't think this confining bed makes

10  a lot of difference.  If there was a clay cap or something --

11  I would have to think that out -- but even assuming that

12  there is less permeability, the further down in the basin

13  you go between the upper and the older alluvial because of

14  these lenses, and so forth, and assuming there is more

15  permeability up at the other end, when the water is taken

16  out of that lower area, it is going to come back into it

17  from the sides and from the top.

18    MR. VEEDER:  From the surface.

19    THE COURT:  From the younger alluvial above, from

20  the older alluvial on the sides.  I don't know how quickly

21  it is going to come back, but it is going to come back.

22  You are not going to have a void down there where you

23  pumped the water out of an area down below the so-called

24  confining bed, and you have a nice blank space in there with

25  no water in it.

1      MR. MOSKOVITZ:  Your Honor, you don't know how fast

2  it will come back, and how much will come back, and how much

3  of that will affect the surface flow.  I think that is very

4  important.

5      THE COURT:  You have got your work cut out for you on

6  that.

7          Now, the next point I want to ask about is this:

8  There is this dispute as to whether there is a basin that

9  extends up into the older alluvial.  Now, that makes a

10  difference, it is true, as to overlying owners, overlying

11  owners who lie over a basin with water in continuity with

12  a stream, I take it, have rights than owners who don't.

13  But in view of the testimony that there is water in that

14  area, whether there is a basin or not, in view of the

15  testimony of the wells, in view of the testimony of this

16  witness that this is water-bearing material -- this witness

17  says that the main problem they had was insufficient data

18  to estimate the storage of it as a basin.  The same problem,

19  apparently, the Government had on some of the smaller basins

20  which they made no estimates of, claiming there was in

21  sufficient data.

22          Now, what differences does this have on the case,

23  with the possible exception of the rights of the overlying

24  owners?

25      MR. MOSKOVITZ:  I think that is a point, your Honor,

Fox - Direct                                                    4791

1    as to whether --

2         MR. SACHSE:  The question of the overlying owners,

3    it has a very, very great effect.

4         THE COURT:  I will concede that.  But as to any other

5    part of the case, does it make any difference?

6         MR. MOSKOVITZ:  No, your Honor.  The question is

7    this:  To what extent do the rights of those overlying this

8    area of older material north and south of Pauba Valley, to

9    what extent do their rights have to be co-related at this

10   time?  Do the rights of those who claim rights in the stream

11   -- that is the question, your Honor.

12        THE COURT:  I concede that is significant, but the

13   question of whether there is a basin up there that is so big

14   or bigger or smaller, I don't see has, outside of this point

15   we concede exists, I don't see it has too much to do with

16   the case.

17        MR. VEEDER:  May I make an observation there?

18        THE COURT:  Yes.

19        MR. VEEDER:  Our view is this, and the witness has

20   so testified:  There is hydrological continuity between,

21   well, through the entire area and that there is water moving

22   laterally inward into the Pauba Valley, for example.  I was

23   going to inquire as to whether his views are the same in these

24   other areas.  Therefore, it is our belief, and I think why

25   this is extremely important to us, is that as long as there

C-5

is hydrologic continuity, pumping of the Roripaugh's, pumping of Querry, pumping in areas up here where we have this pump hole or pump depression, is extremely important to us because it could reduce the surface flow, and our life's blood, our values, is entirely dependent, in our view, upon the continued availability of water to us from the Pauba Valley and from the Murrieta Valley.

THE COURT: I will wager that you could take your engineers, the State and the Federal Government, and put them together in a room and throw the lawyers out --

MR. STAHLMAN: It is a good idea.

THE COURT: -- they wouldn't be confused with what they are doing, and they could come up with a formula that would be acceptable to all of us.

MR. MOSKOVITZ: It is a good idea.

THE COURT: On the present problem we are considering.

MR. VEEDER: If there is agreement on this hydrologic continuity, I don't see how there could be very much disagreement on the other.

THE COURT: It is all a matter of degree. This witness -- now, I am assuming a lot of things that other witnesses might not -- he concedes that this older alluvial is permeable. He says it is less permeable. Your witnesses say the same thing.

MR. VEEDER: That is right.

THE COURT:  Mr. Sachse, if the older alluvial is permeable to a greater or less degree, then it is just only a question of time.  In other words, if there was an excessive pumping in the Murrieta and the Pauba Valley, and there was a high degree of permeability from the orange-colored material, the water would come out of there in a hurry.  If, on the other hand, there was a low degree of permeability, it would come out much slower.  But all you have to do is take an element of time into consideration.  You get the same effect, or vice versa.  If there is a highdegree of pumping in the orange area --

MR. SACHSE:  Your Honor --

MR. VEEDER:  I would like to have his Honor finish.

MR. SACHSE:  Your Honor just made a misstatement, and I noticed it.

THE COURT:  What is wrong?

MR. SACHSE:  If it is very impermeable, this material is very tight, that you can get water out of it and you put a well down in it, you will create a cone of depression, and you will, for all practical purposes, dry up that well. You will dry it up.

THE COURT:  You will never get water into it again?

MR. SACHSE:  Oh, no, it will come back in, very, very, very, very slowly.  The result is that you can't, if it is very, very impermeable, if it is really tight material, you

Box - Direct

1    THE COURT:  There is no doubt there are wells in

2   that area.  If it is permeable, then it is a matter of degree.

3   And I will wager you could put the engineers together, if

4   you could keep the lawyers away from them, and say, "Now,

5   look, tell us what, in your opinion, is the picture here?"

6   And they could get together.  Now, if you lawyers keep

7   pushing them about little technicalities here and technicalities

8   there, you might get some divergence.  I have seen this

9   happen.. I have seen this happen.

10      MR. MOSKOVITZ:  I would be willing to try, your

11  Honor.

12      MR. SACHSE:  I would certainly be willing to try.

13       The only --

14      THE COURT:  I don't think there is too much of a

15  dispute on some of these things.

16      MR. SACHSE:  I think the only real problem is in the

17  older alluvium, the concerns of the overlying landowners

18  which, in turn, relates directly to what Mr. Veeder said.

19  And Mr. Veeder's theory is correct now, both his engineering

20  and his legal theories.  There are two sides to it.  Then,

21  assuming a shortage in the river, assuming an ultimate

22  shortage for the United States, or any other riparian, there

23  would have to be regulation of every single well and every

24  single diversion anywhere in the orange.  Now, that is the

25  physical problem that confronts us.

1   can't overload it.  All you can do is dry up this area

2   right around it.  If you abuse your well you will find --

3   this should be Littleworth talking.  He has a client.

4       MR. VEEDER:  It should be.

5       MR. SACHSE:  You will find people up there with a

6   hundred acres that can't irrigate 15 from their well.  And

7   I don't think they hurt the stream.  I believe if they abuse

8   their well and pump too hard, they mine the water that in

9   their own limited little area of this slowly percolating

10  material, then, having done that, they are stuck.  They sit

11  and wait.

12      THE COURT:  That may be true.  If you concede the

13  water would come back in and fill up that cone of depression,

14  by the same token, if the cone of depression didn't exist,

15  the water could go somewhere else.

16      MR. SACHSE:  Correct.  But I believe that water is

17  not a part of the stream.  Then, we get to the legal question.

18  That is the legal aspect of the physical question I spoke of;

19  that that is the kind of water I think no court can undertake

20  to regulate when it attempts to regulate a stream.

21      MR. MOSKOVITZ:  Your Honor, if I may, let's draw an

22  analogy between this area, and see if there is an analogy,

23  between this area and the area in Fallbrook, around Fallbrook,

24  where testimony has been entered in the master's hearing

25  that although water can be extracted from this residuum,

C-5

1    the extraction of that water will have little or no effect

2    on the stream.

3           MR. SACHSE:  Negligible.

4           MR. MOSKOVITZ:  Because the materials are so tight

5    they will not draw enough water from the stream to affect

6    in any material way the surface flow of the stream.  And

7    that is the same issue here.

8           MR. VEEDER:  Oh, no.

9           THE COURT:  You have got a different situation.

10          MR. VEEDER:  He doesn't understand this at all.

11          THE COURT:  You have got a residuum instead of an

12    alluvial.  It is conceded this orange area is an alluvial.

13          MR. VEEDER:  This gray material, your Honor.

14          MR. MOSKOVITZ:  That doesn't say how fast water will

15    drain through it, your Honor.

16          MR. VEEDER:  The gray material, your Honor, is the

17    decomposed granite which hasn't come down.  It is the source

18    of alluvium, but the whole area about which we are speaking,

19    about which the litigation turns, is the alluvial areas,

20    your Honor, as you just stated.

21          MR. SACHSE:  This would be a tremendous thing in

22    another way if we could again wash out a little of this.

23    Mr. Veeder just referred to the gray area.  I think all our

24    time could be saved.  I know my files I got down here could

25    be reduced tremendously if we could get together and say,

1   "Let's at least wipe out the blue, let's wipe out the gray,"

2   and know exactly what we are fighting about.

3        THE COURT:  The State has a basin up in that gray

4   area.

5        MR. STAHLMAN:  The important thing, that Mr. Sachse

6   so fervently interrupted your Honor, from our experience in

7   Vail, and we will adduce testimony, Mr. Sachse is completely

8   wrong and your Honor is right.

9        MR. VEEDER:  I wish that your Honor had finished the

10  statement which Mr. Sachse so rudely interrupted.

11       MR. SACHSE:  Thank you, Mr. Veeder.  I apologize to

12  your Honor.

13       MR. MOSKOVITZ:  Your Honor, I would ask -- I know this

14  is going to be so.  But we do have witnesses who will give

15  the State's position.  And, believe me, that is the position

16  they have told me; not the position I have told them on this

17  problem.  They will come in in December.

18       MR. VEEDER:  I feel relieved to hear that.

19       MR. STAHLMAN:  That points up something else to me.

20  We are doing a lot of wood sawing and wood chopping out on

21  the Vail ranch here.  And I dislike very much in this type

22  of lawsuit to have these conflicts that come as a result of

23  somebody's personal position in the case.  Vail's position

24  has been, as I indicated the other day, we have supplied the

25  State with the information, supplied the Federal Government

1   with whatever information they wanted; and we would like to

2   know what the facts are here; if it is important as to

3   whether or not there is that quantity of water here that the

4   Government says in in storage and that is those areas.

5   Now, if the State, the important thing that this witness has

6   brought out to this point, in my opinion, is that the State

7   has made some studies.   But they didn't have sufficient

8   information but they did come up with a figure; that they

9   thought in that area there are about 28,000 acre-feet in

10  storage.

11          MR. SACHSE:  No, Mr. Stahlman.

12          THE COURT:  He said 28,000 acres.

13          MR. VEEDER:  Of land dividing water.

14          THE COURT:  That was of land extent.

15          MR. STAHLMAN:  Pardon me.  I am wrong on that point,

16  then.  It would be important if they had any information as

17  to what the storage is or any data that may have a reflection

18  upon it; because I think that is an important feature in

19  this case.

20          THE WITNESS:  Your Honor --

21          THE COURT: Yes?

22          THE WITNESS:  I would like to interject a thought in

23  here; that in an analogous situation of an area that contains

24  water is the porosity that Mr. Kunkel referred to of clay

25  and silt, which is terrifically high, but also which has a

C-6

very, very low specific yield.

Now, this area depicted in orange on the exhibit may very well contain two or three million acre-feet of storage. But that isn't to say that wells drilled into that material would be able to get that water out.

THE COURT:  Did you see the experiment that was conducted with this piece of red, older alluvium?

THE WITNESS:  Your Honor, I made experiments on abutments of damsites in solid rock, dumping a piece of it into water, and in a matter of a short period of time it completely fell apart. I don't think that is conclusive evidence. A laboratory analysis is the scientific way of determining whether material is highly permeable or impermeable.

THE COURT:  Does either the State or Fallbrook have evidence to rebut the fact that was offered here yesterday that the Roripaugh well pumps out of the older alluvial and apparently some thirteen, nineteen hundred gallons a minute comes out of it?

THE WITNESS:  Your Honor, I have some thoughts on that, too, that would be concerning --

MR. SACHSE:  Fallbrook has no evidence, your Honor.

MR. VEEDER:  Your Honor, I would like to interrogate this young man.

THE COURT:  He said he had some thoughts on it.

1          THE WITNESS:  Most of those wells drilled in the

2    older alluvium are perforated in a deeper zone.  Now, it is

3    very possible, and it is apparent by looking at the surface,

4    that that older alluvium, from a physical inspection, looks

5    relatively impermeable or tighter than the recent alluvium

6    on the surface.  Now, we don't know, but that impermeable

7    material, due to injuration weathering, the processes of

8    disintegration and decomposition, may so break that older

9    alluvium down that water going over the surface of it may

10   not go down deep, although wells do obtain water at a hundred

11   or two or three hundred feet.  Now, I think the Roripaugh

12   well was perforated 92 to four or five hundred feet, but that

13   didn't tell what the first hundred feet was like.

14          THE COURT:  I know, but where is that water coming

15   from?

16          THE WITNESS:  It comes from the older alluvium.

17          THE COURT:  It is not coming up from the center of

18   the earth?

19          THE WITNESS:  It may be just in storage.  They  may

20   be mining water out of that.

21          THE COURT:  If it got in there one time, it could

22   get in again, couldn't it?

23          THE WITNESS:  It got in over a matter of maybe a

24   million or two million years by precipitation on the surface

25   and possibly by subsurface movement from the high land areas

1    or through the underlying cracks and fissures in the crystalline

2    rock.  We just don't know.  That is why we did not want to

3    come out and say that that area of older alluvium is a ground

4    water basin.  A ground water basin is one in which you can

5    pump economic quantities of water.  And I have listened to

6    all the data that has been presented, and I wouldn't change

7    my mind at this time to say that that is a ground water

8    basin.  There has been no more data presented to me in court

9    than we had available at the time we made our investigation.

10        THE COURT:  Well, the Court, of course, I don't think

11   will be called upon to say whether it is a basin.  The Court

12   will be called upon to say whether there is water in the

13   older alluvial that is in continuity with water in the streams.

14   In other words, is there water, particle by particle, from

15   that older alluvium down into the stream so that there can

16   be a movement of water from the older alluvial into the

17   younger in the stream?

18        THE WITNESS:  Your Honor, I think that on our direct

19   testimony that we will be able to show that there just as

20   well could be very, very little water moving down as well

21   as moving; and I wouldn't conclude at this time from my

22   testimony that there is a direct hydrolic continuity through-

23   out the whole orange area.  There are a lot of aspects that

24   haven't been brought out.

25        THE COURT:  What about rising water on the east side

of Murrieta?  Doesn't that illustrate that water is moving through the older alluvium?

THE WITNESS:  The quantity of water coming up along the fault zone through the springs is very small.  In an area of 28,000 acres you would expect, if there was a good hydrolic continuity, that there would be vastly more water coming up along the springs.

MR. VEEDER:  This boy is fighting for his job, your Honor.

THE WITNESS:  No, I am just fighting for the facts, Mr. Veeder.

THE COURT:  Mr. Veeder, let's not indulge in those statements.

Take a recess until 2:00 o'clock.

(Whereupon a recess was had until 2:00 o'clock p.m. of the same day.)

D

Z29

SAN DIEGO, CALIFORNIA, FRIDAY, NOVEMBER 14, 1958.  2:00 P.M.

MR. MOSKOVITZ:  Your Honor, we brought in the aerial photographs that Mr. Veeder referred to.  These are photographs on which others on the staff made notes while they were using them.  They are no different from the aerial photographs which I understand the United States has.  We have another set of them that are unmarked, and if you desire to have them in the court we would like to substitute those.  But these we would like to keep in our own files.  We will bring them in when our own case is put in.

MR. VEEDER:  I would like to see the notes.

MR. MOSKOVITZ:  You will have an opportunity to see them at the time of cross-examination of our own witnesses.

THE COURT:  I think it is proper.  This witness is called as your witness.  I don't know what you are going to get from aerial photographs other than what the Government has.  The physical characteristics of this area haven't changed by any major shake-ups.

Which ones do you have, the marked ones here now?

MR. MOSKOVITZ:  Yes, these are the marked ones, your Honor.

THE COURT:  Postpone any inspection of the notes until the cross-examination of your witnesses.

MR. MOSKOVITZ:  And we can return these to our own

D

Z30

1    office, or do you want them kept here?

2         THE COURT:  You may return those.  Do you have the un-

3    marked ones here?

4         MR. MOSKOVITZ:  No, we don't have the unmarked ones

5    here.

6         MR. VEEDER:  I was going to ask this young man how he

7    arrived at some of his conclusions from the aerials, your

8    Honor.

9         THE COURT: There is no conflict on what is shown by

10   air.  Aren't you satisfied with what you have?  He has agreed

11   that the maps showing the contact between the older and the

12   younger alluvium are substantially correct.  What else could

13   you get from an aerial?

14        MR. VEEDER:  Well, your Honor, sometimes we find out

15   quite a bit from just examining a witness.

16        MR. SACHSE:  You are not cross-examining the witness.

17        THE COURT:  You are not cross-examining.  If you want

18   to fish, you do that when the time comes.

19        MR. VEEDER:  I don't have to have leading questions to

20   fish, your Honor.  And let's face it, I didn't call him because

21   I thought I was going to get anything willingly.

22        THE COURT:  Well, I can control the order of the trial,

23   and I will direct that any inquiry as to the matter of notes

24   be postponed until the time of the Government's geology.

25        MR. VEEDER:  May the record note an objection, please.

D

Z31

1          THE COURT:  You don't need it, but you may note two of

2    them, to be sure you have one.

3          MR. VEEDER:  We will have one underscored.

4          THE COURT:  Underscored.

5          MR. VEEDER:  Thank you, sir.

6          MR. MOSKOVITZ:  Your Honor, may I have permission to

7    withdraw Exhibits 16D and 16C for reproduction this after-

8    noon.

9          THE COURT:  Yes.

10          I think this matter of asking these engineers to sit

11    down together is not an idle act.  And we are going to meet

12    again on Tuesday.  We will not meet on Monday.  I will fix

13    Monday as the time for them to get together.  I don't know

14    what they can come up with.  But there are certain issues that

15    confront the Court on findings of fact, and to the extent that

16    there is any agreement between them we are going to save a

17    lot of time.  Let's explore it.

18          There is no doubt, from what has transpired here today,

19    but that they could submit a joint memorandum to the effect

20    that the areas of older and younger alluvium on Exhibits 15 and

21    15A are, with minor qualifications, substantially correct;

22    that the areas of the basement complex are substantially

23    correct; that as to the areal dimensions of some of the

24    smaller basins they are in accord.

25          Now, the next issue that the Court would have to make

D

Z32

1  some findings on is whether or not the water in the older

2  alluvium or part of the older alluvium as shown by the orange

3  on Exhibit 15 and Exhibit 15A is vagrant, percolating water,

4  or whether it is in hydrologic continuity with water in the

5  Murrieta and the Temecula.  And I am not so sure but that they

6  can come up with an answer on that.  It is not a matter

7  whether it is a basin or not.  It is not a matter whether this

8  is vagrant, percolating water or whether it is water in con-

9  tinuity with the stream.  As near as I can understand the law,

10  that is the dividing line.  It is not a question whether it

11  is a basin.  If the water is in hydraulic continuity with the

12  stream, the underlying owner, I would think, has the same right

13  as an owner overlying the basin.  So whether you call it a

14  basin or not is not determinative of the issue.

15       And the very fact that the witness stated that at one

16  time they had contemplated, or checked out or started to check

17  out, the possibility of figuring a basin and then abandoned

18  it because of insufficient data, which is a credit to a man

19  of scientific mind that he is not going to draw a conclusion

20  if he doesn't have sufficient data-- the very fact that they

21  considered that, to my mind, indicates that they felt there

22  was water there in some continuity with the stream.  Now that

23  is a matter of degree.  There is no dispute between you that

24  the older alluvium is less permeable than the younger alluvium,

25  and you could have a situation where the permeability or lack

D

Z33

1   of permeability was such that you could maybe say it was

2   vagrant, percolating water.  But I am not so sure that these

3   experts for the State are going to be able to say that this is

4   vagrant, percolating water, at least in the part of the older

5   alluvium nearest to the Murrieta and Temecula Valleys.  When

6   you get up closer to the basement complex, it is again a

7   matter of degree.

8          Then there is another issue they can talk about, and

9   that is the matter of salt water intrusion.  I have the intima-

10   tion-- I don't know whether that is accepted or not-- I got

11   the intimation that the State may contend thatthis contamina-

12   tion of water results from the type of material that might

13   underlie some of it.  But if there is a concession that there

14   is salt water intrusion, let's get that out of the case.

15          And then of course you have the problem, well, what

16   has caused it?  Well, the Government's own testimony has shown

17   that at least one of the factors was over-pumping the Ysidora

18   Basin, and that one way to stem the inflow is less pumping

19   in the Ysidora Basin.  It is fairly obvious that the other

20   factor-- and to what extent it enters into it is hard to say,

21   but the other factor is, how much water comes into the basin.

22   And of course even if you conceded that the two factors,

23   pumping and the inflow into the basin, were the controling

24   factors, that is not determinative eventually of what the

25   correlative rights are.  So it seems to me that the Ysidora

D

Z34

1    Basin, the areal extent of the basin and the three subbasins,

2    is a matter on which there may not be much dispute.

3         MR. MOSKOVITZ:  That is correct, your Honor.

4         THE COURT:  Another one is the matter of the waters in

5    other parts of the downstream part of the watershed, and I am

6    particularly referring now on Fallbrook Creek because more

7    defendants live there-- there are more people there.  And there

8    doesn't seem to be much dispute from the evidence that there

9    are no alluvial planes in there and that this residuum is not

10   the equivalent of even the older alluvium.  Again, it may be

11   a matter of degree.  But that the amount of water-bearing

12   capacity in the residuum is far lower than that of even the

13   older alluvium and is to such a low degree that any water in

14   there could be called regular percolating water, and if the

15   experts say, "Yes, we all agree that that is true," there

16   again we have a major thing out of this case.

17        I am trying to think now of these matters of conflict

18   that have come along.  This witness has testified that there

19   is-- I will not say an interchange; I don't believe he said

20   that yet-- but that water from the older alluvium nearby the

21   Temecula younger alluvium will work its way into that younger

22   alluvium.  And again I don't think there is much dispute about

23   that.  And again it may be a matter of degree.

24        What other issue, as it were, has come to the fore in

25   this part of the case so far?

4809

D

Z35

1    MR. VEEDER:  I think there will be more if we go ahead

2    with this witness this afternoon, your Honor, right along the

3    line you are speaking of.

4        THE COURT:  Well, now, unless somebody now has some-

5    thing that changes my mind-- I will give you a chance to be

6    heard on the request that these men get together and sit down

7    and talk this over.

8        MR. DENNIS:  I would like to make a few observations,

9    your Honor.  I agree with you perfectly that the extent of

10   the older or younger alluvium is not too material because

11   there is not too much difference.

12       I am in complete agreement with Mr. Stahlman that as

13   far as my clients are concerned we want to get at the facts

14   in this case even more than Mr. Stahlman's clients do, because

15   if we were going to spend millions of dollars in the construc-

16   tion of a dam we want to have the most intelligent guess that

17   we can get as to what the water is and what chance we have of

18   getting any substantial amount of water.

19       But I do think that when it comes to drawing a judgment

20   your Honor is going to have to make other findings, and one

21   of those findings is going to be what water is not in hydraulic

22   continuity with the stream, but what underground water or

23   surface water is actually a part of the stream flow, because

24   only those people whose lands are traversed or abut upon the

25   stream, whether it is an underground stream or a surface stream,

4810

D

Z36

1   are going to have riparian rights.

2          And Mr. Veeder for the Government has made the conten-

3   tions that we are in a watershed which has a deficiency and

4   so there are going to have to be findings, if his position is

5   correct, relative to the correlative rights of the various

6   parties.  It is going to be incumbent upon your Honor, I

7   believe, to find that either the water in the younger alluvium

8   is part of the underground flow of the Santa Margarita River--

9   in other words, that the extractions of water from the younger

10  alluvium is the same thing as making direct diversions from

11  the surface stream itself, or you are going to have to find

12  that it is not.  And if you extend this theory of hydraulic

13  continuity as meaning that the water which is in hydraulic

14  continuity is part of the flow of the stream, then are you or

15  are you not going to have to say that those people whose lands

16  overlie this particular source of underground water have

17  riparian rights in determining how you are going to divide

18  up the water, are the Vails, for instance, going to be able

19  to take all the water out of the river and take the water

20  from the younger alluvium by extractions from the underground

21  basins to the extent of making the people in the orange area,

22  the upper alluvium, cut down on the amount of water which they

23  have?  Those are all questions that are going to have to be

24  answered, I believe, before the trial is over, and especially

25  when Mr. Veeder's clients come into the picture, and I think

1    that any information that we can obtain relative to the manner

2    in which the water moves through this area, either at the rate

3    of flow or how much it influences the river so that it will

4    aid the Court in determining what waters are part of the

5    stream flow and what waters are not part of the stream flow.

6         THE COURT:  Well, all you have said makes sense.  I

7    don't expect, even if these experts meet and come up with a

8    few agreements, that it would solve all our problems by any

9    means.  But to the extent thatsome problem is solved, we can

10   spend a lot less time talking about it.  We know that there

11   is no substantial agreement.  We know that there are going

12   to be differences in judgment on the part of expert witnesses.

13   But as this witness has fairly said, he has no real conflict

14   with the areas of older and younger alluvium laid out.  Now,

15   we could have spent hours here finding out whether or not the

16   older alluvium might move over a little bit here or a little

17   bit shorter there.  There might be instances where that might

18   become material, depending on the ownership, et cetera.  But

19   by and large that may cut down the case eventually.

20        MR. DENNIS:  I don't believe I made myself clear, your

21   Honor.  What I wantedto convey is, as far as which area is

22   younger alluvium and which is older alluvium, as far as I am

23   concerned, and I think probably as far as the other defendants

24   are concerned and the plaintiff, it is immaterial as to whether

25   you move it over a quarter of a mile or a half mile either way.

D

Z38

1        THE COURT:  I understand.  I only took that as an

2    example.

3        Mr. Moskovitz.

4        MR. MOSKOVITZ:  Your Honor, do you have in mind which

5    people you are requesting to meet?  Mr. Worts, Mr. Kunkel, Mr.

6    Fox, Mr. Illingworth, Mr. James-- are these the people you

7    have in mind?

8        MR. VEEDER:  Mr. Worts will not be available on Monday,

9    your Honor.  I know that.

10        THE COURT:  Why not?

11        MR. VEEDER:  He is on the job up there, your Honor.

12        THE COURT:  Well, this is his job as much as that is,

13    is it not?

14        MR. VEEDER:  Well, I released him.  As I say, he has

15    moved down to a new position.  I am not dragging my feet,

16    your Honor.  I will try to get hold of him.

17        But I feel this way, your Honor, about this proposal.

18    That all my joking about Bulletin No. 57 had very strong

19    basis for it, namely, that I believe that that bulletin

20    has to be defended at all costs, and I believe it is gravely

21    in error in several places.

22        Now, if the idea would be for the State engineers to

23    sit down, for example, with Col. Robertson, who is the real

24    man in charge from the client's side of the fence, and wanted

25    to go through page by page and say where we agree or where

4813

D

Z39

1  we disagree, I would be inclined to recommend that they re-

2  frain from such meeting because of the political implications

3  to which we would be subjected.

4       I can't object to whatever your Honor directs, but I

5  truly believe that there can be no agreement where the State

6  has come forth with a bulletin that so seriously and gravely

7  prejudices the United States.  So when we know that we are

8  going into a conference-- and I hope your Honor doesn't become

9  angry with me on this point-- when we go into a conference

10  under those circumstances, I am not sure what would be forth-

11  coming.

12       I feel this way, that we made a lot of miles this

13  morning with this young man.  I think that he showed truthfully

14  that we have no real differences geologically speaking.  I

15  don't believe that there are any differences hydrologically

16  speaking.

17       But if your Honor will bear with me for just a moment,

18  Mr. Holsinger's entire conclusion in regard to the Fallbrook

19  permit was predicated upon this bulletin, under amazing

20  circumstances.

21       But in any event, I believe that if Col. Robertson

22  were to sit down with the State of California, we would be

23  subjected to the possibility of agreement in regard to the

24  decisions of April 10th which came down from the State Water

25  Rights Board, and one of the principal bases upon which that

1  decision, if we may call it that, turns is that there be no

2  further development in the upper area.

3       THE COURT:  What do you mean, that there be no further

4  development?

5       MR. VEEDER:  By and large that the gist of the bulletin

6  and of the decision that, for practical purposes, the upper

7  area of the Santa Margarita River has reached full development.

8  That is why I have fought so strenuously.

9       THE COURT:  Well, that is a conclusion.  We don't have

10  to get that far along.  I am not asking-- if there is that

11  conclusion in the bulletin, I am not asking any conference on

12  conclusions.  I am asking a conference on some of the geology

13  and hydrology to the extent we have gone along in this case.

14  That is all I am asking.  I might be in disagreement with some

15  of the conclusions.  Having lived in this country as long as

16  I have, if somebody told me that there was now an end to the

17  development of even the high desert areas around here, I would

18  laugh at them, because I have seen what has happened in this

19  State and I think I can foresee what will happen.  But those

20  are ultimate conclusions.

21       I am talking now solely about largely the issues I have

22  demarked that involve the geology and hydrology in this area

23  as far as we have gone.  I am not asking that they sit down

24  with the bulletin and say whether this line is correct or in-

25  correct.  In fact, I think the further they stayed away from

1    the bulletin or prepared material by either side the better

2    off they would be.  See if they could come up with some state-

3    ment of general agreement on some of the issues in this area.

4    To the extent that they do, that helps us all.  Some other

5    defendant might decide to call an expert who would disagree

6    with both groups of them.  But that is rather remote.

7            MR.DENNIS:  Your Honor, by my silence I don't want it

8    to be thought that I agree with Mr. Veeder's conclusions that

9    Mr. Holsinger's decision was based on or followed the

10   recommendations in Bulletin 57, because it did not.

11           MR. VEEDER:  Well, your Honor--

12           THE COURT:  Nobody seems very enthusiastic about this

13   but me.

14           MR. VEEDER:  We appreciate your enthusiasm, your Honor.

15   But had I been forewarned of this proposal, I would have put

16   on my belt again, because I have never met with the Californians

17   yet where I came out whole, and I wouldn't want any of those

18   on whom I rely so heavily to suffer as I have.  It has broken

19   my spirit, by and large.  But in any event, I don't truly

20   believe that there would be anything good come out of it,

21   unless an exchange of insults might be worth something.

22           MR. SACHSE:  The only insults I have heard have been

23   between the lawyers, not the engineers.

24           THE COURT:  I have a hunch that these engineers have

25   their own view about you lawyers.  Engineers are used to

D

Z42

1    working with facts and drawing inferences.   Maybe they don't

2    like the way you lawyers draw inferences.

3        You inquired who I think should be present, and if I

4    read between the lines I guessed you are therefore inquiring

5    whether Col. Robertson should be present.

6        MR. SACHSE:   I was thinking about Col. Robertson, Mr.

7    Hall-- I know that Mr. Littleworth has an engineer who has

8    not appeared in court, but he is an expert whom Mr. Littleworth

9    and Mr. Krieger have been consulting.   Actually, I wanted to

10   get some direction from your Honor.   I had no particular list

11   in mind.

12       THE COURT:   Well, Mr. Littleworth is not here today.

13       MR. MOSKOVITZ:   All this is material to him, of course.

14       MR. STAHLMAN:   There might be others who might resent

15   this.   I don't know.

16       THE COURT:   Well, we will postpone any meeting on

17   Monday.   We will think about it maybe for the future.   I am

18   doing it largely because of the fact that Mr. Littleworth is

19   not present.

20       All right, proceed.

21

22

23

24

25

4817

D

Z43

1           ROBERT C. FOX,

2   recalled as a witness in behalf of the plaintiff, having been

3   previously sworn, testified further as follows:

4

5           DIRECT EXAMINATION (Resumed)

6   BY MR. VEEDER:

7       Q  Mr. Fox, in your investigation of the geology of the

8   lower Murrieta Valley, what were your findings in regard to

9   the closeness to the surface of the basement complex-- how

10  deep, in other words, is the alluvium near the confluence of

11  the Temecula and Murrieta on the basis of your investigation?

12      A  I would like to be able to refer to one of the plates,

13  Mr. Veeder.

14      Q  You can't remember?

15      A  Not offhand.  I would rather not guess.

16      THE COURT:  You may refer to the plate.

17      MR. STAHLMAN:  Give us the number you are referring

18  to.

19      MR. VEEDER:  And it was Mr. Moskovitz who told you

20  always to insist that you be permitted to refer to Bulletin

21  57?

22      MR. MOSKOVITZ:  Just a moment, I--

23      THE WITNESS:  I just can't recall offhand.  I would

24  rather be scientific about it and look instead of guessing.

25      MR. VEEDER:  Mr. Moskovitz told me that he did.  Mr.

D

Z44

1  Moskovitz came to me and said, "Mr. Veeder, I have told this

2  young man always to refer to Bulletin 57 at every opportunity."

3       MR. MOSKOVITZ:  This is not correct, your Honor.  That

4  is not what I told him.  I said I advised Mr. Fox to refer to

5  plates if he felt it was necessary to do so.

6       THE COURT:  Well, whether he did or not, I see nothing

7  wrong with it.  Go ahead.

8       MR. VEEDER:  Well, he is such a fine young man, your

9  Honor, to be corrupted that way.

10      THE WITNESS:  I am looking at Plate 16 in Bulletin 57.

11  That is the closest geologic section that we have to the area

12  that Mr. Veeder inquired about, and this is on the order of

13  about two miles.

14      THE COURT:  Plate 16?  That isn't of the Murrieta

15  Valley.

16      THE WITNESS:  It goes across Murrieta Valley.  I

17  believe it is Section JJ, as shown on Plate 13B, your Honor.

18  That is the closest section I have.  This is the area you

19  inquired about-- Wolf Valley, Mr. Veeder?

20      MR. VEEDER:  Oh, no, no.

21      THE COURT:  The lower Murrieta he is talking about.

22      MR. VEEDER:  The Murrieta, young man-- here-- it is the

23  stream that runs this way down 15A.

24      THE WITNESS:  The only section we have in that area

25  goes up Santa Gertrudis Valley.

4819

D

Z45

1          THE COURT:  And crosses the Murrieta?

2          THE WITNESS:  And crosses Murrieta Creek about two

3    miles northwest of Temecula.

4          THE COURT:  That is shown on Plate 16?

5          THE WITNESS:  That is right, your Honor.

6    BY MR. VEEDER:

7          Q  Would you state whether you have or have not any

8    information in regard to the depth of alluvium over the base-

9    ment complex at or near the point of confluence between the

10   Murrieta and Temecula Creeks?

11         A  We no doubt have some logs of wells in that area

12   on which we based our depth of the alluvium.  I don't have it

13   at my fingertips.

14         Q  Now, then, assuming that the basement complex

15   actually protrudes through the alluvium a distance perhaps

16   of threequarters of a mile down to the confluence with the

17   Temecula, what would that indicate to you as a geologist?

18         MR. MOSKOVITZ:  May I have the question read, please?

19         (The reporter read the pending question.)

20         THE COURT:  I don't know what you mean.

21         THE WITNESS:  I don't either.

22         MR. SACHSE:  I don't understand the question.

23         THE COURT:  Unless you mean that in the younger alluvium--

24   are you talking about the younger or the older?

25         MR. VEEDER:  Oh, yes, the younger alluvium produces

D

Z46

1    right through it.

2         THE COURT:  That there are outcroppings of the basement

3    complex in the younger alluvium?

4         MR. VEEDER:  In the younger alluvium in the bed of the

5    Murrieta Creek.

6         Q  What would that indicate to you?

7         A  I don't see that it is shown on Exhibit 15A.

8         Q  I asked you a question.

9         A  It would indicate to me that the alluvium is

10   relatively shallow.

11        Q  And what would it indicate to you from the stand-

12   point of the water which comes down in the younger alluvium?

13   Would it be forced to the surface at that point?

14        MR. MOSKOVITZ:  I object to the leading form of the

15   question, your Honor.

16        THE COURT:  Overruled.

17        THE WITNESS:  From a geological viewpoint, I would say

18   that it would force water to the surface if bedrock was in this

19   situation at shallow depth.

20   BY MR. VEEDER:

21        Q  Have you any knowledge as to the depth of the

22   alluvium immediately upstream from the area which I described,

23   say three-quarters of a mile of basement complex in the bed

24   of the stream?

25        A  I no doubt have some data from well logs.

Fox    Direct                                                    4821

D

Z47

1       Q  And how deep do you think the alluvium is?

2       A  Offhand I would say it is probably not thicker than

3  a hundred feet, like it is in the rest of the basin.

4       Q  You would think it would be around a hundred feet?

5       A  The alluvium?  Yes, sir, I would.

6       MR. MOSKOVITZ:  May I inquire.  Is this recent or

7  older alluvium?

8       MR. VEEDER:  I said the younger alluvium.

9       Q  In other words, you would say that the basement

10  complex to which we have made reference at the lower end

11  of the Murrieta Valley would constitute a barrier and force the

12  water this way?

13       MR. MOSKOVITZ:  I object to the form of the question,

14  your Honor.  It is a leading question.  Mr. Veeder is attempt-

15  ing to cross-examine this witness, and this is not proper on

16  direct examination.

17       THE COURT:  All right, Mr. Veeder.

18       MR. VEEDER:  I will rephrase it, your Honor.

19       Q  From the standpoint of your investigations in the

20  Murrieta Valley, what did you find from the standpoint of the

21  impervious, or the permeability, rather, of the older alluvium

22  underlying the younger alluvium?

23       MR. MOSKOVITZ:  At what point?

24       MR. VEEDER: Well, we will put the point here, we see

25  rising water, on Exhibit 15A marked for Identification.  It

D

Z48

1 would be in Section 35, Township 7 South, Range 3 West.

2          Do you want the question read?

3          THE WITNESS:  I would like to have it read.

4          (The reporter read the pending question, as follows:

5 "Q  From the standpoint of your investigations in the Murrieta

6 Valley, what did you find from the standpoint of the impervious,

7 or the permeability, rather, of the older alluvium underlying

8 the younger alluvium?")

9          THE WITNESS:  I don't recall that we made any tests in

10 that area to determine whether it was relatively impermeable

11 or permeable.  We considered storage capacity in the Recent

12 alluvium.

13 BY MR. VEEDER:

14          Q  What did you do about the older alluvium from the

15 standpoint of storage capacity?

16          A  We didn't compute storage capacity in the older

17 alluvium.

18          Q  What is your opinion as to the source of the water

19 which is pumped in the Murrieta Valley from wells which extend

20 below the younger alluvium?

21          MR. MOSKOVITZ:  Will you be specific as to what wells

22 you have in mind, Mr. Veeder?  Identify the wells.

23          MR. VEEDER:  See this point of rising water.

24          THE COURT:  What section?

25          MR. VEEDER:  That will be Section 35-7-3.

1822

1          THE WITNESS:   I never considered it in any detail other

2     than that the older alluvium does have water in it and that it

3     could be recharged possibly from the older alluvium on either

4     side or movement of water downstream in Murrieta Valley from

5     the northeast.

6     BY MR. VEEDER:

7          Q  What is your opinion as to whether or not the younger

8     alluvium recharges the older alluvium which underlies the

9     younger alluvium in the Murrieta Valley?

10         A  I think it is possible that the water in the Recent

11    alluvium does move downward into the older alluvium.

12         Q  What is your opinion as to whether or not the water

13    which you state is in the older alluvium moves into the younger

14    alluvium?

15         A  Moves upward?

16         Q  Yes.

17    MR. MOSKOVITZ:   Again, at what point, Mr. Veeder?

18    MR. VEEDER: Well, let's go back here to Section 35-7-3.

19         THE WITNESS:   I never considered that it moved up or

20    down.   It is one zone of saturation and the difference is that

21    the older alluvium is less permeable.   I don't recall any

22    barriers in there between the Recent and the older alluvium.

23    BY MR. VEEDER:

24         Q  Now, referring to the Roripaugh well which we

25    identified this morning and which is located in the Southeast

D

Z50

1    Quarter of 26-7-3 --

2         THE COURT:  J1.

3  BY MR. VEEDER:

4         Q  J1.  Would you state whether you believe that water

5  in the younger alluvium in Santa Gertrudis Creek contributes

6  to the water pumped from the Roripaugh well?

7         A  The water in Santa Gertrudis Creek stored in the

8  Recent alluvium?  I couldn't say.

9         Q  You don't know?

10        A  No, sir, I don't.

11        Q  Now, what would be your opinion as to the effect

12  upon the surface flow of the Santa Gertrudis Creek if the

13  Roripaugh well created, as shown on 15A, a pumping depression

14  right in the bed of the younger alluvium?

15        A  Would you repeat that, please.  I didn't quite hear

16  it all.

17        (The reporter read the pending question.)

18        MR. MOSKOVITZ:  I object, your Honor.  I think there

19  may be a misuse of terms.  Does Exhibit 15A show a pumping

20  depression?

21  BY MR. VEEDER:

22        Q  What does this indicate to you, Mr. Fox, where you

23  see these--

24        A  If there were a pumping depression there, water in

25  Santa Gertrudis Creek would fill up the void in the Recent

D

Z51

1  alluvium and probably very slowly, I imagine, go into the older

2  alluvium.  But again it is a matter of degree.

3      Q  But it would go in?

4      A  I believe it would in time, yes.

5      Q  And what would be the result then of the contribution

6  from Santa Gertrudis Creek to Murrieta Creek from the stand-

7  point of surface flow?

8      A  That would depend again, Mr. Veeder, on how the

9  water came down.

10      Q  Well, assuming your response as you have stated it

11  that the surface water of the Santa Gertrudis Creek would

12  recharge the younger alluvium, what would that do to the

13  surface flow of the Santa Gertrudis Creek?

14      A  To a degree it would be diminished.

15      Q  And what would be the effect then upon the surface

16  flow of Murrieta, to which the Santa Gertrudis is affluent?

17      A  Again, to that same degree it would be diminished,

18  and so on down Murrieta Creek.

19      Q  Speaking generally, then, what in your opinion would

20  be the effect of any of these wells tapping the older alluvium

21  upon the surface flow of the Santa Gertrudis Creek if they

22  created a cone of depression in the older alluvium?

23      MR. DENNIS:  When you say "any of these wells," which

24  ones did you refer to?

25      MR. VEEDER:  I am speaking of the full length of

D

Z52

1   Murrieta Creek.

2        MR. DENNIS:  Any well within the younger alluvium?

3        MR. VEEDER:  No, I said in the older alluvium.

4        MR. DENNIS:  In the older alluvium?

5        MR. MOSKOVITZ:  And that is in the area marked in orange

6   on Exhibit 15-A, any well anywhere in there?  Let me get your

7   question.

8        MR. VEEDER:  No, I said--

9        THE COURT:  Here is a well clear off in Section 36,

10   Township 6 South almost off the corner of the page.

11        MR. VEEDER:  All right, I will rephrase my question,

12   your Honor.

13        Q  Limiting yourself entirely to the area marked in

14   yellow as the Murrieta younger alluvium, what would be the

15   effect of pumping from those wells which are situated in that

16   area from the older alluvium?

17        A  If they tapped both the Recent and older alluvium

18   and dewater a section of the Recent alluvium, the water would

19   probably very definitely fill up the Recent alluvium.  How

20   much of that water would percolate on down from stream flow

21   into the older alluvium I can't say.  A degree would.

22        Q  Would?

23        A  It would.  Part of it would, depending on the way

24   the stream flowed again.

25        Q  Would you explain how it could be that the older

Fox  Direct

D

Z53

158

1  alluvium out of which the water was pumped would not be re-

2  charged, if that is your opinion?

3  A  How do I explain that it wouldn't be recharged?

4  Q  Would not be.

5  A  I think it would.

6  MR. MOSKOVITZ:  I object to the question, your Honor.

7  THE COURT:  I don't understand it.

8  MR. VEEDER:  I will start again.

9  THE WITNESS:  I thought I did.  Perhaps I didn't.

10  MR. VEEDER:  I will rephrase it.  I am far more inter-

11  ested in his Honor understanding it than you.

12  MR. SACHSE:  Mr. Veeder doesn't care whether our

13  witness knows what he is talking about.

14  MR. VEEDER:  I found that, by and large, the State

15  doesn't know what they are talking about anyway.

16  Q  Assuming that the deep water wells in the older

17  alluvium are pumped and create a cone of depression, and there

18  is no perforation whatever in the younger alluvium, in you

19  opinion would that cone of depression be recharged or would

20  not be recharged?

21  MR. MOSKOVITZ:  Where is this well you are talking about?

22  MR. VEEDER:  I will point to-- well, any number of the

23  wells that penetrate the older alluvium any place in the

24  Murrieta Valley which is shown in yellow.

25  MR. DENNIS:  And which are not perforated in the younger

D

Z54

1  alluvium?

2       MR. VEEDER:  That is right.

3       MR. DENNIS:  What wells do you have in mind?

4       MR. VEEDER:  Well, we will take the Roripaugh well.

5  That is a good one to start.

6       MR. MOSKOVITZ:  That is not in the Murrieta Valley.

7       MR. VEEDER:  Well, Santa Gertrudis.  I am not going to

8  argue about it.

9       THE WITNESS: Depending upon the transmissibility of that

10  older alluvium, it would eventually in time, given enough

11  time-- I can't state how much-- it would fill up.  That is the

12  natural way for things to go on.

13       Q  Transmissibility.  Would you state for the record

14  what you mean by "transmissibility"?

15       A  It is the sum of the vertical permeabilities or the

16  rate of flow of water in gallons per day considered in the

17  one-foot-wide section of the aquifer extending the whole height

18  of the aquifer.

19       Q  Referring to Exhibit 16-A-72A, would you look at that--

20  this is the report on the Roripaugh well-- and tell me how

21  far down that well is perforated as shown on that exhibit?

22       A  I would like you to point it out to me, Mr. Veeder.

23  I will not have to waste the time to look through all the

24  notes.

25       MR. DENNIS:  Mr. Veeder, is this a copy of the original

D

Z55

1  well log, or is this notes which were made by some member of

2  the U.S.G.S. at the time they made physical inspection this year?

3      MR. VEEDER:  This is the report made by Mr. Roripaugh

4  himself.

5      MR. DENNIS:  Did he actually write this?

6      MR. VEEDER:  He gave it to Mr. Kunkel.

7      MR. MOSKOVITZ:  You ought to have the log of the well.

8      MR. DENNIS:  Yes, you ought to have the log.

9      MR. VEEDER:  I suggest that you get it.  It is here.

10      THE WITNESS:  It doesn't say on here where the perfora-

11  tions are under this.

12      MR. SACHSE:  I didn't get the witness's answer.   What

13  was the answer?

14      THE WITNESS:  I said I couldn't find the perforations

15  on that.

16  BY MR. VEEDER:

17      Q  Would you find where they are perforated?

18      MR. SACHSE:  Now what is he looking at, please, Mr.

19  Veeder?

20      MR. VEEDER:  16A-72.

21      THE WITNESS:  It says it is perforated from 94 feet

22  to 508 feet.

23  BY MR. VEEDER:

24      Q  And assuming that that has been rated, pump tested

25  at 1300 gallons per minute, how would you evaluate that well

Fox   Direct                                          4830

D

z56

1    from the standpoint of a good or a bad producer?

2         MR. MOSKOVITZ:   I object to that question.   The rating

3    is incomplete; it is production without any indication as to

4    the drawdown.

5         THE WITNESS:   I was just going to ask that same ques-

6    tion.

7    BY MR. VEEDER:

8         Q   Assuming a drawndown of 17½ feet.

9         A   And what was the capacity?

10        Q   1300 gallons per minute.

11        A   That is a good well.

12        Q   What, then, is the controling factor, in your

13   opinion, in regard to getting water from the older alluvium--

14   the permeability of the area of the older alluvium or the

15   transmissibility of it?

16        MR. MOSKOVITZ:   I object to the form of the question

17   as being leading as on cross-examination.

18        MR. VEEDER:   I don't believe that is leading.

19        THE COURT:   Overruled.

20        MR. VEEDER:   Read the question, please.

21        (The reporter read the pending question.)

22        THE WITNESS:   In considering how a well performs there

23   are other factors than permeability or transmissibility.

24   BY MR. VEEDER:

25        Q   What would those factors be?

1          A   The kind and size of pump, the diameter of the well,

2     the depth of the well, where it was perforated, if it was

3     perforated in a water-bearing interval, the diameter of the

4     particles in which the well casing was perforated-- the

5     physical aspects of the well, in other words.

6          Q   Now, would you answer the question?  I asked you

7     for your opinion as to which factor was the controling and

8     important one, whether it is transmissibility or permeability.

9          A   Transmissibility is the important factor.

10         Q   Assuming that the well situated within a quarter

11    of a mile of the Roripaugh well was almost immediately

12    responsive to the pumping of the Roripaugh well, that is,

13    there was immediate drawdown--

14         MR. SACHSE:  Will you identify which one of those

15    you mean, Mr. Veeder?  There are several in this area.

16         MR. VEEDER:  I am just giving the man an assumption.  He

17    doesn't know these things himself.

18         MR. SACHSE:  You have reference, then, to no particular

19    well in that quarter-mile radius?  You said the well within

20    a quarter-mile radius.

21         MR. VEEDER:  I said a well.  I will change it to a

22    well.

23         Q   Assuming there is a well within a quarter-mile

24    radius which is immediately responsive to pumping in the

25    Roripaugh well, of what is that reflective to you, from the

D

58

1    standpoint of the permeability of the older alluvium?

2         MR. MOSKOVITZ:  I object to that question.  I think it

3    is too indefinite.  What do you mean by "immediately respons-

4    ive"?

5         MR. SACHSE:  I have another objection, your Honor.

6    This is direct examination and it is assuming facts not in

7    evidence.  This isn't cross-examination.  He has no right to

8    pose this type of hypothetical question to his own witness.

9         THE COURT:  You mean that you can't ask an expert

10   called as your own witness to assume certain facts?

11        MR. VEEDER:  On direct examination?

12        THE COURT:  The objection is overruled.

13

14

15

16

17

18

19

20

21

22

23

24

25

E-1 ML j

1    MR. MOSKOVITZ:  Is my objection overruled, sir?

2    THE COURT:  Yes.

3    THE WITNESS:  May I have the question again, please?

4    THE COURT:  Read it.

5    (The reporter read back the record.)

6    THE WITNESS:  I don't have enough data about this

7    hypothetical well which is a quarter of a mile away from the

8    Roripaugh well.

9    THE COURT:  The question didn't indicate whether it

10   was in the older or the younger alluvium.

11   THE WITNESS:  That is right; or where it was

12   perforated.

13   Q  BY MR. VEEDER:  I am stating that it is perforated

14   in the older alluvium, the one which is responsive to the

15   Roripaugh well.

16   A    In immediate response?

17   Q    Yes.

18   A    I would say that there is good hydrolic continuity

19   between the two wells in that particular area.

20   Q    Of what is that reflective from the standpoint of

21   permeability, in your opinion, of the sources of water for

22   those two wells?

23   A    I wouldn't make any conclusions on the permeability.

24   I would say the sediments were transmissible, the older

25   alluvium.

1    Q   Were transmissible.   Now, based upon your

2  investigations along the Wildomar Fault, what effect would

3  pumping have, of the kind and character to which I have made

4  reference in the Roripaugh well, upon the waters reaching

5  the mainstem of Murrieta creek?

6    MR. MOSKOVITZ:  I object to that question.  It is

7  indefinite in that it does not indicate for what length of

8  time the pumping would go on.

9    Q  BY MR. VEEDER:  Assuming that it went on for the

10  full irrigation season in 1956?

11    MR. MOSKOVITZ:  How long is that?

12    MR. VEEDER:  From April 1 until November 1st.

13    MR. MOSKOVITZ:  And it is still indefinite.  Do you

14  mean a continuous pumping at its particular rate 24 hours a

15  day?

16    MR. VEEDER:  Oh, yes.

17    MR. MOSKOVITZ:  During that period?

18    MR. VEEDER:  1300 gallons a minute for that full

19  period.

20    THE WITNESS:  I think the flow of those springs or

21  rising water is so small that I don't think it could be

22  measured to come up with any conclusion, Mr. Veeder.

23    Q  BY MR. VEEDER:  What springs do you have in mind?

24  What springs?

25    A   The rising water along the Wildomar Fault.  I

1    don't think you can tell if it was diminished by pumping or

2    whether it was diminished by natural consumptive use or less

3    rainfall.

4         Q   What, in your opinion, is the effect of the

5    Wildomar Fault upon the recharge into the younger alluvium

6    in Murrieta Creek?  Do you think it constitutes a barrier

7    or not?

8         A   In the younger alluvium?

9         Q   Yes.

10        A   No, I don't.

11        Q   You don't what?

12        A   I don't believe there is a barrier effect in the

13   younger alluvium due to the fault.

14        Q   Then, what do you think causes the rising water

15   at the toe of the older alluvium, if it is not a barrier

16   effect upon the water passing down to the Murrieta Valley?

17        MR. MOSKOVITZ:  Your Honor, I object to that question.

18   I think it misstates what the witness has previously said.

19   And I again want to interject this is in the nature of

20   cross-examination, not direct examination.

21        MR. VEEDER:  I will change the question, your Honor.

22        Q   What, in your opinion, causes the water to rise

23   at the toe of the older alluvium where it is in contact with

24   the younger alluvium in the Murrieta Valley in, well, Section

25   35 and 27 in 7, 3?

Fox - Direct

4836

A    In the older alluvium?  I thought the previous question referred to the younger alluvium.  The older alluvium, there is a barrier effect in the fault.

Q    Where is the fault so far as the older alluvium is situated?

A    Well, the delineation of the fault on a map doesn't necessarily say where the fault is.  We have no idea as to the dip of the fault.  That is just a picture of where we think the fault is.  However, if the fault sloped in one or another direction -- this is a fault line depicted on there.  It isn't the actual location of the dislocation.

Q    Where do you observe the water rising?

A    It would be upstream from the fault.

Q    In what kind and type of alluvium does the water rise in at that point?

A    I don't recall offhand whether it was recent or older, and I can't tell from that map.

MR. MOSKOVITZ:  Exhibit 15-A is what you are referring to?

THE WITNESS:  Exhibit 15-A.

Q  BY MR. VEEDER:  Step to 15-A and locate the Wildomar Fault, would you please?

A    As depicted on Exhibit 15-A it is probably these dotted lines that are indicated.

Q    Let's be sure.

1    A    I would like to look at my map instead of using

2  15-A.

3         MR. MOSKOVITZ:  Go right ahead.  Use your map.

4         MR. VEEDER:  Just a moment.

5    Q    Did you --

6         THE COURT:  Let him look at the map.  He asked to

7  look at the map, Mr. Veeder.

8         THE WITNESS:  On  plate 13-B of Bulletin 57 I have

9  the fault drawn quite close to the area of older alluvium, --

10        Q  BY MR. VEEDER:  Now, when you say --

11        A    -- closer than it is indicated --

12        MR. MOSKOVITZ:  Let the witness finish his answer.

13        THE WITNESS:  -- on Exhibit 15-A.  So the water --

14        Q  BY MR. VEEDER:  Where is the line as you have it

15  drawn?  Is it in or is it out of the upper alluvium where

16  you have it drawn?

17        A    In part it is shown going through the recent

18  alluvium and in part it is on the boundary between recent

19  and older alluvium, and in part it dissects the older

20  alluvial deposits.

21        Q    How did you arrive at that line?

22        A    From field observations and study of the photo-

23  graphs, I imagine.  I can't recall just what we did use.

24  And I can't recall if I myself put that line on the map.

25        Q    What investigation did you make as to the location

1    of the Wildomar Fault?

2         MR. MOSKOVITZ:  This is his personal observation?

3         MR. SACHSE:  I object.  That has been asked and

4    answered, your Honor, about three times.

5         THE COURT:  Sustained.

6         Q  BY MR. VEEDER:  What did you observe in the area

7    to which I have made reference as to the length of the area

8    of rising water along this dotted line on the east side of

9    the younger alluvium in the Murrieta Valley?

10        MR. MOSKOVITZ:  As depicted on Exhibit 15-A?

11        Q  BY MR. VEEDER:  As depicted on 15-A?

12        A  Your question refers to the length?

13        Q  Yes.  How many miles did you observe rising

14   water coming out of the older alluvium?

15        A  I can't say.  I don't recall how many miles it was.

16        Q  Would you estimate it as one mile or two miles?

17        MR. MOSKOVITZ:  I object again to the leading nature

18   of this examination.  Again, I think it is cross-examination.

19   And how long are we going to permit this to go on?

20        MR. VEEDER:  I think he is making a demand on your

21   Honor, if I may so observe.

22        MR. MOSKOVITZ:  I have an objection.

23        THE COURT:  Technically you would call it a leading

24   question:  Was it a mile or two miles?  And he suggests an

25   answer.  But that is not particularly disturbing to me.

1   This isn't what you would call cross-examination.  Overruled.

2          THE WITNESS:  I imagine there is a plate in our

3   bulletin that shows the area of rising water, if I could

4   refer to that plate.

5          THE COURT:  You may.

6          THE WITNESS:  Although I didn't do it.

7          Q  BY MR. VEEDER:  Well, you didn't do it yourself?

8          A   I didn't make the plate myself.  I could tell you,

9   Mr. Veeder.

10         MR. MOSKOVITZ:  I think he can refer to it.  It will

11  refresh his recollection of what he knows about the area,

12  your Honor.

13         THE COURT:  He may.

14         MR. VEEDER:  Your Honor, the only point that I make

15  is a man can't refresh his memory from something he didn't

16  do himself.

17         THE COURT:  Who said he can't?

18         THE WITNESS: You asked me how long an area it was --

19         MR. MOSKOVITZ:  Just a moment.  Let the --

20         THE COURT:  Wait a minute.

21         THE WITNESS:  -- and I said I can't answer.

22         MR. VEEDER:  But you see, your Honor, this man didn't

23  do the work.

24         THE COURT:  Your broad statement is incorrect.  Go

25  ahead.  Look at the plate.

1    THE WITNESS:  I would like to talk to Mr. Illingworth,

2  if I may, your Honor, to speed things up.

3    THE COURT:  You may.

4       It is time for recess.  We are going to adjourn

5  at 4:00.

6    MR. VEEDER:  Are we going to adjourn at 4:00?

7    THE COURT:  We agreed with Mr. Moskovitz on Fridays

8  to let him get home to his family.  He has a plane that

9  goes out.  How much longer will you be, Mr. Veeder?

10    MR. VEEDER:  With this?  Well, I have just got

11  nicely started, your Honor.

12    MR. SACHSE:  We will be back.

13    MR. MOSKOVITZ:  We can have Mr. Fox here again next

14  week.

15    THE COURT:  Let's see if we can shorten it up, Mr.

16  Veeder.

17       Take a short recess.

18    (Recess.)

19    MR. VEEDER:  Could we have the last question?

20    THE WITNESS:  I remember; the length of the area of

21  rising water.  I looked at the --

22    MR. VEEDER:  I am going to object to this, your

23  Honor.

24    THE COURT:  Mr. Reporter -- it will only take a

25  minute --  let us have the last question.

1      (The reporter read back the following question:

2           "Would you estimate it as one mile or two miles?")

3      MR. VEEDER:  And he said he didn't know the answer;

4  and that is good enough for me.

5      THE COURT:  Reframe the question.  Give us something

6  to start with.

7      Q  BY MR. VEEDER:  Have you personal knowledge as

8  to the distance the length of the area of rising water along

9  the eastern edge of the younger alluvium lies east of the

10  Wildomar Fault?

11      A   I can't recall those details.

12      Q   In regard to the areas above the Vail Dam on

13  Temecula Creek what investigation did you make from the

14  standpoint of geology?

15      MR. SACHSE:  It has been asked and answered, and I

16  object to it.

17      MR. VEEDER:  No, I haven't asked this.

18      MR. SACHSE:  He testified he spent 40 days in the

19  whole area.

20      THE COURT:  Overruled.

21      Q  BY MR. VEEDER:  What investigations did you make?

22      A   Similar investigation to that whole area above

23  the Temecula Gorge.  I don't recall if it was in that exact

24  area, but I know I covered the entire watershed at one time

25  or another.

Q    What did you observe in regard to rising water
in the Lancaster and Temecula Valleys when you made your
investigation?

A    I can't recall any of the details about the
areas of rising water.  I just don't remember.

Q    What did you observe from the standpoint of the
areas of younger alluvium immediately above the location of
the Vail Dam?  Were they sizeable?  Were they small?  What
were they?

A    The areas of recent alluvium?

Q    Yes.

A    They are depicted on our map.

Q    And how does that compare, in your opinion, with
the areas shown on the map 15?

MR. MOSKOVITZ:  Compare in what way?

Q  BY MR. VEEDER:  Areal extent.

A    If I could refer to some data, my map, then I
could tell.

MR. MOSKOVITZ:  You go right ahead.

THE COURT:  Refer to your map.

MR. MOSKOVITZ:  Identify what you are referring to.

THE WITNESS:  I am looking at plate 13-D of Bulletin
57.  Again, what area was that, Mr. Veeder?

Q  BY MR. VEEDER:  The area immediately above Vail
Dam, from the standpoint of the size of the younger alluvium

4843

1   as there depicted?

2        A   From just a glance it looks essentially the same

3   in the area that I am looking at immediately adjacent up-

4   stream to Vail Dam.   I can't say exactly unless I know what

5   the area is by planimeter and then weigh it against what I

6   have in my own --

7        THE COURT:   Mr. Veeder, are you laying a foundation

8   for Bulletin 57?

9        MR. VEEDER:   No.   No.

10       THE COURT:   Is that what you are doing?

11       MR. VEEDER:   No.

12       THE COURT:   All right.   Just inquiring.   Go ahead.

13       MR. VEEDER:   I certainly desire, your Honor, to --

14   believe me, when I say that --

15       THE COURT:   Just go ahead.

16       MR. VEEDER:   -- this witness has been coached very

17   hard by his lawyer; because he told the truth very nicely

18   this morning before --

19       THE COURT:   Just go ahead and ask your next question.

20       Q   BY MR. VEEDER:   What, in your opinion, would be the

21   effect of pumping from the younger alluvial in the area

22   immediately above Vail Dam?   Have you any opinion?

23       A   The effect to what?

24       Q   Upon the surface runoff of the Temecula Creek?

25       MR. MOSKOVITZ:   I object to that question as too

1    indefinite.

2        THE COURT:  Sustained.

3        Q  BY MR. VEEDER:  Come here.  Based upon your

4    investigation of the area marked as Nigger Valley, have you

5    an opinion as to what the effect of pumping would have upon

6    the surface runoff of the stream?

7        MR. MOSKOVITZ:  I object to that question as being

8    too indefinite.

9        THE COURT:  Sustained.

10        MR. VEEDER:  I will make an offer of proof.

11        THE COURT:  You may, but the uncertainty is you say

12    "pumping" -- when?  How much?  All sorts of things.

13        MR. VEEDER:  All right, your Honor.  I will do that.

14    I will do that.

15        Q  Assuming that there was a well of the capacity

16    of the Roripaugh well, 1300 gallons a minute, was dug in the

17    alluvium of Nigger Valley and was pumped --

18        THE COURT:  Where in the Nigger Valley?

19        Q  BY MR. VEEDER:  -- in the area marked between the

20    D and the L on Exhibit 15 --

21        THE COURT:  Section 14?

22        MR. VEEDER:  I don't have it on here, your Honor.

23        Q  -- what would be the effect of such pumping --

24        MR. DENNIS:  Is that the younger alluvium or the

25    older alluvium, Mr. Veeder?

MR. VEEDER:  Both younger and older.

Q  -- upon the surface flow of Temecula Creek?

MR. MOSKOVITZ:  I object to that question.  It doesn't say over what period of time.  It doesn't say how deep the well is.

MR. VEEDER:  I said 1300 gallons a minute.  We will put it on for the irrigation season.

MR. MOSKOVITZ:  What is the irrigation season?

MR. VEEDER:  In that area, Mr. Moskovitz, it is probably from, oh, April to the middle of October.

MR. SACHSE:  I would like to inquire, your Honor:  Is this --

THE COURT:  What is it going to prove?

MR. SACHSE:  Yes.

THE COURT:  Isn't it obvious if you pump water out of the younger and older alluvial, and you included younger in the question, that it is going to have some effect, nobody can say exactly what, on the water that would run in that creek?  Isn't it obvious?

MR. VEEDER:  Yes; and as long as that is agreed.

Q  Now, what, in your opinion, would be the effect of further development in the use of pumps in the Oak Grove Valley -- I don't like you to be looking at Moskovitz -- what would be the effect of pumping in the older and younger alluvium during the irrigation season -- which would

1  be, in Oak Grove Valley, probably from the first of April

2  to the end of September -- upon the rising water in that

3  area?

4      MR. MOSKOVITZ:  I object.  That is too indefinite.

5  There is no quantity of pumping included in that question.

6      Q  BY MR. VEEDER:  1300 gallons a minute, then.  What

7  would the effect be up there?

8      MR. SACHSE:  YourHonor, I have another objection.  I

9  pressed this earlier and your Honor overruled me.  It seems

10 to me that this is improper hypothetical questions to his

11 own witness.  Unless Mr. Veeder states that he intends to

12 produce evidence to show that these conditions exist.

13     MR. VEEDER:  I will produce evidence.

14     MR. SACHSE:  He is just shooting holes, shooting the

15 shotgun in the air and hoping he gets a duck.  That is

16 entirely improper.  You can't ask your own witness a

17 hypothetical question.  But then, you put in some evidence

18 to substantiate the assumptions you have given him.  And I

19 am very curious if he thinks he is going to prove there is

20 a 1300-gallon a minute well in Nigger Valley, because there

21 is no such beast.

22     THE COURT:  Your objection is overruled on the grounds

23 you state.  On the other hand, I am not getting anything

24 out of this, and I am going to stop this line of inquiry.

25 It is obvious in the smaller basins upstream, if you have

Wouldn't it be conceded generally that to the extent that development occurred in the Temecula Valley up above the Vail Dam, which development consisted of additional pumpage in the various basins and stream beds, to that extent there would be, without knowing exact relationship, would be some relative effect downstream?

MR. MOSKOVITZ:  Depending upon the kind of material the degree of variation --

THE COURT:  There are other factors depending, of course:  How much pumping, and how extensive the development was, how the water was used, and whether it was poured right back in on an alluvial bed, or whether it was put up  on some older alluvial; all that sort of thing.  But isn't it axiomatic that a further extensive development upstream on the Temecula, either branch of it, or upstream on the Murrieta would have an effect eventually downstream?  Does that require any proof?

MR. MOSKOVITZ:  As a general statement, this is probably true.  The degree, I think it depends on where your --

THE COURT:  Certainly.  It doesn't mean much unless we know the degree of that development.  But that is all you are asking?

MR. VEEDER:  By and large, yes, your Honor.

THE COURT:  Well then, let's get on with the case.

(Next follows 4848-A)

extensive pumping, you are going to have some effects.  And
that is all you are getting at.  The witness isn't prepared
to give you a definite figure.  So why waste time on it?

MR. VEEDER:  Well, as long as it is understood.  And,
apparently the State is willing to agree that pumping in
any of these areas and any development in these areas will
reduce the surface flow in Temecula Creek and Murrieta
Creek, Pechanga Creek; then I will have no further questions
of this kind and variety to present this young man.

THE COURT:  I don't think the State is going to
accept that broad a statement, because you have tied them
all together.  And pumping in the Trewilliger Valley wouldn't
affect the Murrieta.  You had them all tied in together.

MR. MOSKOVITZ:  I suggest --

THE COURT:  But --

MR. VEEDER:  I wish your Honor would -- now, this
is the second time your Honor is about to say something --

THE COURT:  Just a minute.  Just a minute.  Go ahead,
Mr. Moskovitz.

MR. MOSKOVITZ:  I suggest to Mr. Veeder if he really
wants the answer to what the State feels about these things,
wait until our case in chief is put in and then cross-examine
the witnesses then put on the stand.

THE COURT:  Let's see if we can't terminate this.
We are wasting time.

1          MR. VEEDER:  In other words, it is pretty well
2    recognized by everyone?
3          THE COURT:  Of course, if somebody puts a windmill
4    up on one of those streams, it would be de minimis.
5          MR. VEEDER:  It wouldn't make any difference by and
6    large, your Honor, and I am perfectly willing to proceed
7    on to another phase with this witness in a moment.  Our great
8          (Next follows 4849)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  concern is that this valley is far from reaching the point

2  of full development and far from reaching the point of

3  maximum demand upon each and every tributary above Temecula

4  Gorge.  That is our point.  We say that this development

5  here is really just beginning.  And that we are confronted

6  with a most serious problem with an explosion of population,

7  people moving in, increasing the demands throughout here.

8  And I thought we would have the good offices of the State to

9  help us prove that there will be, and is now, and will be

10  an ever-increasing demand upon the surface water of the

11  Temecula.

12      THE COURT:  Does anyone want to contest that?

13      MR. SACHSE:  Your Honor, I want to make a remark on

14  it.  I think we are constantly, due to Mr. Veeder's clever

15  handling of these things, getting sidetracked from what the

16  issues are that we have agreed here.  The rights of the United

17  States are not going to remain static as this upper Valley

18  develops.  The rights of the United States are co-relative.

19  If there is any one word that we have used again, again and

20  again, it is that they are co-relative.  Now, if we are trying

21  to ascertain the rights of the United States, we are theoretically

22  trying to ascertain what they are now; and to say that what

23  happens 20 years from now affects the rights of the United

24  States today is absolutely immaterial.  It is absolutely

25  incorrect legally in accordance with your Honor's own pre-trial

1 opinion.  Now, we can recognize this fact that you have

2 pointed out:  that it is very likely that any development

3 has an effect on a stream.  Surely.  It does.  But it doesn't

4 have any effect on the rights -- has an effect on a

5 quantative amount, but it doesn't have any effect on the

6 rights of the United States.  Their rights are going to be

7 to share whatever there is, much or little.

8      MR. VEEDER:  May I respond just for a moment to that?

9      THE COURT:  Mr. Moskovitz?

10      MR. MOSKOVITZ:  I think there is an issue, your

11 Honor, as to how much water is capable of being developed,

12 whether we have the facts on which we can predicate that

13 large quantities of water can be extracted.  This I think

14 there is an issue about, and this, of course, relates to the

15 materiality that we now can predict of the effects of

16 development in the future.

17      THE COURT:  I am going to cut all that short.  I am

18 going to take judicial notice of what I know of Southern

19 California; that Southern California will continue to

20 develop; and we haven't seen the end of it.  And any decree

21 I make is a decree which has to be left open for future

22 changes that may occur.

23      MR. MOSKOVITZ:  With that we agree 100 per cent.

24      THE COURT:  Let's go on.  Doesn't that solve your

25 problem?

1    MR. VEEDER:  That is a problem, your Honor.

2    THE COURT:  Well, nobody argues about that.

3    MR. VEEDER:  Oh, but the State does.

4    THE COURT:  No.  No.

5    MR. MOSKOVITZ:  The State does not.

6    THE COURT:  No.  No.  And I am not going to go into

7    it at this time to prophesy what that development is going

8    to be.

9    MR. MOSKOVITZ:  That is the State's position.  We

10   cannot prophesy now.

11   THE COURT:  I am going to leave the decree open,

12   because this country is not static.

13        Does that satisfy you?

14   MR. VEEDER:  Yes.

15   MR. DENNIS:  Your Honor, I have oneoother factor

16   that I think your Honor should take into consideration.

17   MR. STAHLMAN:  A little louder, Bill.

18   MR. DENNIS: I say, one other factor that should be

19   taken into consideration with the development of these basins,

20   and that is, and I think we will all concede, that during the

21   dry summer months the pumping within the basin will have an

22   effect and maybe a large effect on the stream flow during

23   those summer months.  However, the effect on these large

24   flash-flood flows which you have during periods of high

25   precipitation immediately thereafter, the effect of that

     pumping may be negligible; and I just wanted to call your

1     Honor's attention that that is one of the issues that

2 probably will be explored later on in the case.

3     MR. STAHLMAN:  I don't know what you said.

4     THE COURT:  They are going to call him Whispering

5 Dennis for a nickname here.  I heard you, but fellow counsel

6 didn't.  Read it from the transcript.

7     MR. VEEDER:  I will have to read the transcript.  I

8 didn't hear him.

9     MR. STAHLMAN:  I will read it when it comes out.

10 Mr. Dennis, he talks soft every now and then.

11     THE COURT:  All right.  Can we go on to something

12 else now?

13     MR. VEEDER:  Yes.  Yes.

14     Q  Now, from the standpoint of the development of

15 water in the older alluvium, did you run any tests as to

16 permeability?

17     A  I recall --

18     MR. MOSKOVITZ:  These are tests in the older alluvium?

19     MR. VEEDER:  Yes.

20     THE WITNESS:  We ran, I think, one or two pump tests,

21 and I can't recall if it was in the area of older alluvium

22 or recent alluvium.

23     Q  BY MR. VEEDER:  You stated that the specific

24 yield, as you determine it to be, was ten and a half; is

25 that not correct?

L-1

1      A  Or rough approximation was ten and a half per cent.

2      Q  What was the basis upon which you arrived at that

3  conclusion?

4      A  We just pulled it out of a hat.  We didn't feel

5  we had enough data to come up with anything better.

6      Q  Now, having pulled the ten and a half out of your

7  hat --

8      MR. STAHLMAN:  That is a good-sized hat.

9      Q  BY MR. VEEDER:  Having pulled the ten and a half

10  out of your hat, assuming that there was a thousand feet of

11  depth in the older alluvium in the area marked 4 on Plaintiff's

12  Exhibit -- (to clerk)  May I have 18, please?

13      THE COURT:  Let me interrupt you.  Rephrase your

14  question after I get through.

15      You notice in the government's 15-D where they assigned

16  yield values, they used a figure of 10% for sandy silt and

17  a 20% for a sand or gravel.  And then below the sandy silt

18  they use a 5% for cemented or hard material and a 3% for clay.

19  May I ask:  Do you say that those -- well, also the other

20  values:  25% for --

21      MR. VEEDER:  Which is that exhibit, your Honor?  I

22  beg your pardon.

23      THE COURT:  Exhibit 15-D.  -- for sand or gravel that

24  was fairly well sorted, and 20%, as I said, was for sand or

25  gravel.  Do you think those were fair estimates?

1    THE WITNESS:  Fair estimates?  Yes, your Honor, I do.

2    THE COURT:  Now, you say you pulled ten and a half out

3  of a hat.  You don't mean that literally?

4    THE WITNESS:  No, sir, I don't.

5    THE COURT:  You would say it was a rather calculated

6  guess or estimate?

7    THE WITNESS:  Your Honor, the area was so big that,

8  assuming you had a specific yield value of ten in this area,

9  as shown on Exhibit 15 --

10    MR. MOSKOVITZ:  By "this area" what do you mean?

11    THE WITNESS:  In the older alluvium, say, closer to

12  Murriet a  Valley.  You can't necessarily conclude that the

13  specific yield in an area six or seven miles away is also 10%.

14  So to go through the calculations of the few wells that were

15  here, derive at any figure other than 10%, which the Department

16  of Water Resources have used in other areas, it wouldn't give

17  you any better results.

18    THE COURT:  Well, I have the impression that you took a

19  rather generous figure on that basis.

20    THE WITNESS:  We looked at the logs and felt that 10%

21  was not excessive.  We never included this in our calculations

22  as shown in our Bulletin, because we figured it meant nothing.

23    THE COURT:  In other words, 10% would mean a fair

24  amount of permeability?

25    THE WITNESS:  Well, it would.  10% for an interval of

one hundred feet or 5% for an interval of two hundred feet,

you come up with the same value of storage capacity.  I could

have used 1% and used a thousand foot, and I probably would

have come up with something.  And I couldn't say that my value

of 10% is any further off than the value of 20% or even 5%.

We just didn't feel that we had sufficient data to come up

with any reasonable figure of storage capacity.

Q  BY MR. VEEDER:  Now, what in your opinion then, on

the basis of specific yield of 10 and a half, what would be

your opinion as to the probability of finding other wells,

such as the Roripaugh well?

MR. MOSKOVITZ:  I object to that question, your Honor.

There are many other factors you have to take into account

other than merely the specific yields in response as to

whether you would have wells of good producing character.

It is not the same thing.

THE COURT:  Sustained.

Q  BY MR. VEEDER:  Based upon your investigation and

upon the fact that you found a specific yield of 10 and a half,

what is your opinion as to the probabilities of further

development in the area immediately north of the P auba Valley?

MR. MOSKOVITZ:  I object to that question on the same

grounds:  completely indefinite.  It is the same question

rephrased.  Probability of development.  There are all kinds

of factors influencing it.

1    THE COURT:  Sustained.

2    Q  BY MR. VEEDER:  From the standpoint of the specific

3    yield of 10 and a half in this area where the Roripaugh well

4    was situated, have you an opinion as to whether a similar well

5    within the general vicinity would produce a like quantity of

6    water?

7    MR. MOSKOVITZ:  I object to that --

8    MR. VEEDER:  I said, "Have you an opinion?"

9    MR. MOSKOVITZ:  I object to that, because there are

10   other factors which we would have to take into account before

11   he could answer that question.

12   THE COURT:  He said in the immediate vicinity.

13   MR. VEEDER:  I asked him for his opinion.  He can say

14   he doesn't know.

15   THE COURT:  Overruled.

16   THE WITNESS:  The specific yield of a material is no

17   indication that it will produce good quantities of water to a

18   well.

19   Q  BY MR. VEEDER:  What are the factors that would be

20   taken into consideration?

21   A  Primarily the transmissibility, the size of the well,

22   the depth of the well, whether it was gravel packed or not.

23   Q  Assuming that you put down in this area here, in

24   the area Section 30, 7, 3, would you state whether in your

25   opinion -- or do you have an opinion whether you would be able

1    to obtain water in substantial quantities?

2            MR. MOSKOVITZ:  I object to that question.

3            MR. VEEDER:  I am asking him if he had an opinion.

4            MR. MOSKOVITZ:  The section covers a fairly good-sized

5    area.  You will note it includes recent alluvium on the

6    surface and older deposits --

7            THE COURT:  Where is the section?

8            MR. MOSKOVITZ:  Section 30, your Honor.

9            MR. VEEDER:  I simply asked him if he had an opinion,

10   your Honor.

11           THE COURT:  Overruled.

12           THE WITNESS:  I have no opinion.

13           Q  BY MR. VEEDER:  Have you an opinion anywhere in this

14   whole area as to the probability of future development of

15   water upon your investigation?

16           MR. MOSKOVITZ:  I object to that, your Honor.  The

17   probability of future development is not dependent solely on

18   geological matters of which this --

19           MR. VEEDER:  I am asking him if he has an opinion.

20           MR. MOSKOVITZ:  I don't think you can ask him for that

21   opinion.  He is not an expert on the possibility of economic

22   development in the future.

23           MR. SACHSE:  There have been no qualifications laid

24   qualifying this witness to testify to economic development.

25           THE COURT:  If this is testimony tending to show

1    future development, the objection is sustained.

2           MR. VEEDER:  No, it is strictly geology.

3           THE COURT:  If it is testimony attempting to show that

4    other wells like the Roripaugh well could be developed to show

5    that there are large amounts of water available in the older

6    alluvial, the objection is sustained also in that this

7    witness has not shown that he has made any investigations to

8    determine if those kinds of wells couldbe secured.  And you

9    are wasting time.  If you let me answer the question, he

10   would probably say he didn't know.

11          Q  BY MR. VEEDER:  Now, on the basis of your investiga-

12   tion as a geologist what is your opinion of the effect of the

13   narrowing down of the younger alluvium in Section 20, Township

14   7, Range 3?  You observe this area now?

15          A  I see where you are indicating.

16          MR. MOSKOVITZ:  I object to that question.  The effect

17   on what?

18          MR. VEEDER:  The effect on the surface flow of Murrieta

19   Creek.

20          MR. MOSKOVITZ:  A quantitative amount of water?

21          MR. VEEDER:  I am just asking if it would have any

22   effect on the surface flow of Murrieta Creek.

23          MR. MOSKOVITZ:  I think his question is too indefinite.

24          THE COURT:  Objection overruled.

25          THE WITNESS:  I have no opinion as far as the geology

map Exhibit 15-A goes.  I don't know whether that is the same way I depicted it on my geology map or --

Q  BY MR. VEEDER:  Have you made any investigations in that area?

A  We have investigated that area.

Q  Yourself personally?

A  I don't recall whether it was that particular area. I know I lived in Murrieta for days at a time.  I must have seen that, but I can't recall anything by looking at this map, this Exhibit 15-A.  If I can refer to my plate.  I am looking at Plate 13-E.

MR. MOSKOVITZ:  Just a moment.  May I have the pending question.

THE WITNESS:  It is similar.  The geology is almost identical.

THE COURT:  All right.  To save some time --

Q  BY MR. VEEDER:  Have you an opinion?

A  I have no opinion.

MR. VEEDER:  I have no further questions.

THE COURT:  Let me ask a question I have been curious about.  Maybe this witness can give me some help.  Take material like the older alluvial lying north of Pauba Valley. And you have said that water could move laterally out of that into the Pauba Valley if the Pauba Valley was extensively

Fox - Direct

1  pumped.   Now, let's assume a situation where for a number of
2  years Pauba Valley was not too extensively pumped -- let's
3  take a supposition case -- in the older material lying next
4  to the younger alluvial, no drain was put upon it.   And then
5  the Pauba Valley was pumped down.   There is a flow of water
6  from the older into the younger alluvial.

F

Z59

Fox   Direct

1   As time goes on, does this situation continue?  As time went

2   on, does that bring about a situation where small passageways

3   are formed in the ground and through which water passes more

4   readily, so that if this had gone on for two years it would

5   be an easier way to drain that out and if it went on for ten

6   years there would be more drainage on the area?  I mean, does

7   the movement of water in that manner open up little channels

8   and passageways underneath the ground which facilitate the

9   easier movement of water?

10   THE WITNESS:  There is a natural gravel packing, water

11   well drillers and hydrologists call it, in the immediate

12   vicinity of the perforations of a pumping well.  How far out

13   this natural gravel packing extends I don't know.  But when

14   wells are developed they pump them excessively for periods

15   of 24 to 48 hours to bring all the fine material out of the

16   material immediately adjacent to the perforations, and that

17   fine material is replaced by larger size pebbles and so forth.

18   But if it extends out any measure of degree, I just don't know.

19   I don't think anybody does.

20   But in answer to your question, I don't think that

21   water flowing through material would create any natural

22   channels in these fine-grained materials.

23   BY MR. VEEDER:

24   Q   Would you state what gravel packing means to you?

25   A   This is natural gravel packing I am referring to;

F

Z60

1    not artificial packing of a well.

2         THE COURT:  You mean gravel packing would constitute

3    putting gravel around a pipe--

4         THE WITNESS:  That is artificial gravel packing.

5         THE COURT:  And natural gravel packing would occur

6    when the finer materials would wash out of the material immed-

7    iately around the well?

8         THE WITNESS:  Yes-- in order to insure that you don't

9    ruin the pump.

10        THE COURT:  You have answered my question, because

11   having dug a well or two I have seen this phenomenon happen

12   in a well.  You would see the finer material drain out and

13   you would see your flow begin to increase.  That is what

14   prompted my question whether or not, assuming that in a state

15   of nature there had not been any large movement of water out

16   of the older alluvium into the younger, and then the younger

17   areas were heavily pumped so that there was more of a bleeding

18   from the older alluvium, whether that would accentuate and

19   make easier the bleeding as time went on?  You have no opinion?

20        THE WITNESS:  I don't think it would happen that way,

21   your Honor.

22        THE COURT:  All right.  Mr. Moskovitz.

23        BY MR. MOSKOVITZ:

24        Q  Mr. Fox, were you in the courtroom when Mr. Hofmann

25   testified for the Government?

F

Z61

1      A  No, I wasn't.

2      Q  You were just here when the geology witnesses for

3  the Government testified?

4      A  Mostly, yes.

5      MR. VEEDER:  You are cutting my witness to pieces with

6  that kind of questions.

7  BY MR MOSKOVITZ:

8      Q  On Exhibit 15 and Exhibit 15A, as you read and under-

9  stand the materials which are defined as older continental

10  deposits, Qtoal, what kind of deposits do they include-- only

11  alluvial deposits?

12      A  On our plate we have included terraces and older

13  alluvium.

14      Q  By "your plate" you refer to--

15      A  The plate in Bulletin 57, Plate 13B.

16      Q  And what is the difference between the two, between

17  older alluvium and terrace deposits?

18      A  Terrace deposits are mostly physiographic features

19  that we have included in our older alluvium unit.

20      Q  You have mentioned the term "engineering geologist".

21  What does that mean?

22      A  In the Department of Water Resources we don't have

23  ground water geologists.  We have engineering geologists, who

24  are not only responsible for ground water investigations

25  but investigations for dam sites, foundations for dams,

F

Z62

1    pumping houses, power plants, and work on canals and conduits.

2        Q  Are you an engineering geologist?

3        A  I am.

4        Q  Now, you testified to hydraulic continuity existing

5    between the Recent alluvium and entering Pauba Valley and the

6    older continental deposits on either side of Pauba Valley.

7    When you say that those areas are in hydraulic continuity,

8    does that imply any particular rate of flow of water between

9    them?

10       A  No.

11       Q  The rate may be very slow?

12       A  It could be.

13       Q  Now, knowing that specific yield was 10% in particular

14   material, would that tell you anything about the permeability

15   of that material?

16       A  No, I don't think it would.

17       Q  In your opinion, is there any direct relationship

18   between specific yield and permeability?

19       A  No.

20       Q  Now what is the relationship between transmissibility

21   and permeability?

22       A  Transmissibility is the sum of the permeabilities

23   in a vertical direction -- the sum of the vertical permeabili-

24   ties.  Permeability is just a measurement of a square foot of

25   the aquifer, whereas transmissibility refers to the whole

F

Z63

1     aquifer as a unit.

2              THE COURT:  But transmissibility could apply to a

3     lateral movement as well as an up and down movement?

4              THE WITNESS:  It does to lateral movement.

5              THE COURT:  Both the lateral as well as the vertical?

6              THE WITNESS:  There is vertical transmissibility, but

7     we never calculated it here.

8     BY MR. MOSKOVITZ:

9              Q  The term "permeability" can be applied to both

10    lateral and vertical movement, can it not?

11             A  That is correct.

12             MR. MOSKOVITZ:  Your Honor, a number of plates have

13    been referred to in Bulletin 57 by this witness on direct

14    examination, and I think those plates should be in evidence

15    at this time so that they can be readily referred to in reading

16    the evidence.  I offer those in evidence.

17             THE COURT:  They are marked for identification because

18    the bulletin has been marked for identification and the plates

19    were all part of the bulletin.

20             MR. MOSKOVITZ:  Yes, your Honor.

21             MR. VEEDER:  I don't want anything offered on cross-

22    examination, is all, your Honor.

23             MR. SACHSE:  Is that a rule of law?

24             MR. VEEDER:  Yes, they can't be admitted on cross-

25    examination.

F

Z65

1    he said he took out of his hat, was 10½.

2         MR. VEEDER:  I think that is interesting, your Honor,

3    particularly when they say there is going to be no more de-

4    velopment in California up there.

5         THE COURT:  Let's quit worrying about future development

6    in California.  We Californians will take care of that, Mr.

7    Veeder.

8         MR. VEEDER:  I am trying to help you, your Honor.

9         THE COURT:  Any further cross-examination, Mr. Moskovitz?

10        MR. MOSKOVITZ:  I have no further questions.

11        THE COURT:  Does somebody have five minutes of questions

12   here they can take care of?  Mr. Dennis, you are a good man

13   for short questions.  Mr. Sachse?

14        MR. SACHSE:  No, your Honor.

15        THE COURT:  Mr. Stahlman?

16        MR. STAHLMAN:  I can take up the five minutes, your

17   Honor.

18

19                      CROSS-EXAMINATION

20   BY MR. STAHLMAN:

21        Q  Mr. Fox, in the studies which were made, in which

22   you participated, were they the studies under the legislative

23   act by which the study of the Santa Margarita River system was

24   to be studied?

25        A  I believe that is correct, Mr. Stahlman.

F

Z66

1    Q   Are you familiar with another study that was made

2    by your Department in relation to the Oviatt case?

3    A   No, I am not familiar with that.

4    Q   You didn't work on that, then?

5    A   No.

6    Q   You didn't know there had been such?

7    A   I have heard the name mentioned around the court-

8    room.

9    Q   I see.  But do you know whether or not that study

10   was going on at the time that this particular study in which

11   you participated was going on, or was it prior thereto?

12   A   I can't recall, honestly.

13   Q   You don't know?  In other words, was there any inter-

14   lacing, to your knowledge, or duplication of those two studies

15   which we have mentioned?

16   A   Unless I am mixing this Temecula Creek reference with

17   the Oviatt case.

18   MR. VEEDER:  That is it; Barbee vs. Oviatt.

19   MR. STAHLMAN:  Barbee vs. Oviatt, yes.

20   THE WITNESS: Was that that Temecula --

21   MR. STAHLMAN:  That is the case I have reference to,

22   Barbee vs. Oviatt.

23   Q   Did you work on that case?

24   A   No, I didn't work on it.

25   Q   Was that performed as a separate function and study,

158

1    if you know?

2         A  I don't know.

3         Q  You don't know?  Are you familiar with a bulletin

4    that was issued as a result of the study made on the Barbee

5    vs. Oviatt case?

6         A  I am still not clear on this, Mr. Stahlman.  I hate

7    to put in some testimony that --

8         MR. MOSKOVITZ:  If you don't know, just say you don't

9    know.

10        THE WITNESS:  I know of this Temecula Creek reference,

11   but I don't know these other names you have just referred to.

12   BY MR. STAHLMAN:

13        Q  Let me put it to you this way:  When you work on a

14   case such as this case here and you are assigned, are you

15   assigned to a particular investigation, or do you just make

16   an investigation by orders of your department and then someone

17   else puts it into bulletin form?  In other words, do you know

18   which particular investigation you are working on when you are

19   assigned to it?

20        A  I knew we were working on the Santa Margarita River

21   watershed, and what happened to the report or bulletin when

22   it was finished I had no idea.

23        Q  In other words, as to whether or not the work which

24   you did and the report which you made and the analysis and

25   conclusions which you made reached Bulletin 57 or reached the

F
Z68

Fox        Cross

1  bulletin of Barbee vs. Oviatt, you are not familiar with that?

2        A  No, I am not at all.

3        MR. STAHLMAN:  I think that is all at this time.

4        MR. VEEDER:  I will have only a couple of days of

5  redirect, your Honor.

6        THE COURT:  No, seriously now, what witness do you

7  expect to call on Tuesday morning?

8        MR. VEEDER:  Mr. Frank Cannon.

9        MR. MOSKOVITZ:  What about Mr. Kunkel's cross-examina-

10  tion?

11        THE COURT:  Mr. Kunkel will be available Tuesday morning

12  for cross-examination.

13        This is the first time you have appeared as an expert

14  witness, Mr. Fox?

15        THE WITNESS:  Yes, it is, your Honor, and I hope it is

16  my last.

17        THE COURT:  You were not advised beforehand that you

18  would be called today either?

19        THE WITNESS:  I sure wasn't.

20        THE COURT:  You did very well.

21        We will adjourn until Tuesday morning.

22        (Adjournment until Tuesday, November 18, 1958, at 10

23  A.M.)

24

25