# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                                        Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                                        Defendants.

No.   1247-SD-C

---

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:        Tuesday, November 18, 1958

Pages:   4871 to 5030

*FILED*

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
                        DEPUTY

MALCOLM LOVE
and
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

Z1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,        )
                                 )
                Plaintiff,       )
                                 )
        vs.                      )        No.1247-SD-C.
                                 )
FALLBROOK PUBLIC UTILITY         )
DISTRICT, et al.,                )
                                 )
                Defendants.      )


REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, Nobember 18, 1958

APPEARANCES:

        For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                   WILLIAM E. BURBY, ESQ.,
                                   Special Assistants to the
                                   Attorney-General,
                                   Department of Justice,
                                   Washington, C.D.

APPEARANCES (Continued)

| | |
|---|---|
| For Defendant Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State of California | EDMUND G. BROWN, ESQ., Attorney-General, by ADOLPHUS MOSKOVITZ, ESQ., Deputy Attorney General. |
| For Defendant Santa Margarita Mutual Water Company | W. B. DENNIS, ESQ. |
| For Defendants Fall-brook Public Utility District, et al. | F. R. SACHSE, ESQ. |
| For Defendants Hartman, Lewis, Wilks and Bayle, and Oviatt | BEST, BEST & KRIEGER, by ARTHUR L. LITTLEWORTH, ESQ. |

- - -
-
-

Z3

1    SAN DIEGO, CALIFORNIA, TUESDAY, NOVEMBER 18, 1958.   10 A. M.

2

3         (Another matter.)

4         THE CLERK:  2-1247-SD-C, United States vs. Fallbrook

5    Public Utility, et al.

6         Further court trial.

7         MR. STAHLMAN:  Your Honor, before cross-examination

8    starts, I would like to report to the Court that I was

9    approached by one of the directors of Rainbow Municipal Water

10   District, who are a defendant in the case-- and some of the

11   issues might affect the Vail interests, the matter relative

12   to condemnation, et cetera-- and this director informed me

13   that the board had unanimously at their last meeting, I think

14   it was over the weekend on Saturday, voted to discontinue any

15   interest in the Santa Margarita River at all, to discontinue

16   the services of Mr. Dennis, and inasmuch as these issues rela-

17   tive to the condemnation and relative to other matters affect

18   Rainbow, I think we can eliminate some of the issues, if that

19   is the situation.

20        THE COURT:  Mr. Dennis has kept me advised from time

21   to time of the situation.

22        Is there any objection, Mr. Dennis, to advising or

23   stating on the record--

24        MR. DENNIS:  No, your Honor.

25        THE COURT:  --advising me this morning of the action

4873

## I N D E X

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Robert C. Fox (Recalled) | | | | |
| (By Mr. Littleworth) | | 4880 | | |
| | | | 4897 | |
| | | | | |
| Fred Kunkel (Recalled) | | | | |
| (By Mr. Sachse) | | 4900 | | |
| (By Mr. Littleworth) | | 4928 | | |
| (By Mr. Sachse) | | 4965 | | |
| (By Mr. Moskovitz) | | 4979 | | |

EXHIBITS:

| PLAINTIFF'S EXHIBITS: | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 15-A | | 4884 |
| 15-B | | 4884 |
| 15-C | | 4884 |
| 15-D | | 4884 |

MORNING RECESS - 4914
NOON RECESS   - 4949
AFTERNOON RECESS-4990

A

Z4

1   that Rainbow has taken, which means that Mr. Dennis will not

2   be with us as far as Rainbow is concerned.  And the Santa

3   Margarita Mutual Water District has not yet acted, but he

4   anticipates probably the same action when they meet.  He will

5   not know, however, until they hold their meeting.

6        MR. STAHLMAN:  I assume that that will follow.

7        MR. DENNIS:  If it will make Mr. Stahlman any happier,

8   yesterday morning at a meeting of the Board of Directors of

9   Rainbow, they instructed me to file a disclaimer in this

10  action on behalf of Rainbow, to dismiss the two petitions for

11  writs of mandate, one in Riverside County and one in San

12  Diego County, and to cause a dismissal to be filed in the

13  condemnation suit which is pending against the Vails in

14  Riverside County.

15       However, the Santa Margarita Mutual Water Company has

16  not yet had a board meeting, and probably will not have one

17  until sometime this week, and while I anticipate that they

18  will more or less follow the action of the Rainbow board, I

19  am not in a position to say that they will.

20       THE COURT: Mr. Littleworth, you were present, as I

21  recall, when there was testimony about the Roripaugh well and

22  how it pumped out of the older alluvium.

23       MR. LITTLEWORTH:  Yes; that was Mr. Kunkel's testimony

24  on Thursday.

25       THE COURT:  You were not here on Friday?

A

Z5

1    MR. LITTLEWORTH:  No.  I am a little disturbed about

2  that.  I had thought we were not being concerned, our area,

3  until Tuesday again.

4    THE COURT:  Have you read the transcript?

5    MR. LITTLEWORTH:  I have read the transcript, however,

6  your Honor.  Mr. Moskovitz was kind enough to order one for me

7  and have it sent out.  I read it yesterday.  So there are some

8  questions I want to ask.

9    I would like to do one other thing first, if I may,

10  your Honor.  In Friday's transcript there was a good deal of

11  discussion concerning the statements of the various parties.

12  I would like to just very briefly set forth the position of

13  our people.  I think it may help in showing the Court where I

14  am going in some of the cross-examination of Mr. Fox and Mr.

15  Kunkel.

16    THE COURT:  Tell me, first, where your people are, so

17  that I can keep this in mind.

18    MR. LITTLEWORTH:  We have people scattered throughout

19  the upper watershed, but I think we are primarily interested,

20  in this phase of the case, in those in the Murrieta area, some

21  of which are in Basin 1, some of which overlap into Basins 1

22  and 4, and some of which are in Basin 4 alone and some of

23  which are outside storage unit 4 altogether and are up in the

24  blue or in the gray.

25    It seems to me that the first issue that the Court is

A

Z6

1    faced with at this time is to determine actually what is

2    properly part of the stream.

3         This was filed as a river suit, and the statement of

4    the issues sets forth that one of the issues to be determined

5    is what ground water will be determined to be part of the river

6    system.

7         The older cases set forth pretty rigid requirements.

8    The ground water, in order to be considered as part of the

9    stream, had to be in a confined channel with known and defined

10   banks; the direction of the flow had to be the same as the

11   flow of the stream itself; there had to be a physical connec-

12   tion; and I think under those older tests there is not much

13   doubt but that all the water in Storage Unit 4 would not be

14   considered part of the stream.

15        There are, however, more recent cases, and I think

16   probably the Supreme Court case of San Bernardino vs. River-

17   side is the last clear expression on the subject, where the

18   courts have said that there may be some ground water which

19   sufficiently supports the flow of a stream that it will be

20   considered like stream flow, and if you take out this ground

21   water and cause a material effect upon the stream flow, the

22   surface flow, that ground water will be considered as part of

23   the stream flow.

24        Now, it seems to me that the test which was considered

25   in Friday's discussion is perhaps not correct.   There was a

4878

A

Z7

1    good deal of discussion about hydraulic continuity and whether

2    that is the sole test as to whether certain ground water

3    pumpers are going to be properly in this suit or whether in

4    fact their pumping is not the kind of pumping which the Court

5    will control in a river adjudication.

6         In that connection, what the Government has done, it

7    seems to me, is to approach this from a geologic basis, saying

8    as a geological fact that if you take water anywhere out of the

9    watershed to some degree you affect runoff; maybe over a

10   thousand years, maybe it is in infinitesimal amount, but

11   nevertheless there is this theoretical effect.

12        It seems to me that the legal test cuts across this

13   geologic factor and says, "Well, that may be true as a matter

14   of geology, but at some point this effect is not sufficient on

15   the runoff that we will consider these persons to be part of

16   the taking water from the river."  To that extent I think that

17   the question of degree, which was somewhat passed over and

18   minimized, becomes quite important.  As a matter of fact,

19   degree almost is the most crucial point in this case, because

20   perhaps Mr. Kunkel is right that as geologic phenomena and

21   given a thousand years time if you take a teaspoonful of water

22   out of the upper area some place it does have some infinitesimal

23   effect.

24        But we are concerned, and we have to be concerned, with

25   more practical results and whether the effect is material, it

1   seems to me; and if there is no material effect of pumping,

2   then I think, under the San Bernardino vs. Riverside rule,

3   that the ground water extractions then should not be consider-

4   ed as extractions from the river system.

5       THE COURT:  It is true, we didn't enlarge upon this.

6   Of course, you need have no concern about the situation, if

7   the facts show that if you take a teaspoon of water out which

8   in a thousand years might affect the stream.  The matter of

9   degree is definitely involved.  It would have to affect, I

10  think, if we can define it, to some material extent the

11  stream.  We were making no final decision.  We were just

12  finding out what the parties were contending for.

13      MR. LITTLEWORTH:  Our position is that, in the first

14  place, there is not nearly as much water up in that older

15  alluvium area as the Government storage chart, Exhibit 18,

16  indicating something like 288,000 acre feet of water stored

17  there would lead one to believe, and on cross-examination of

18  Mr. Kunkel I intend to ask him some questions which I think

19  will bear on that subject.

20      As far as the Roripaugh well is concerned, I think the

21  Roripaugh well is quite an exception and delivers far more

22  water than any other well in that whole area.

23      We are concerned with another point, and that is the

24  fact that there has been no effect on runoff from the pumping

25  which to date has taken place.  I think that goes to the

4880

A

Z9

1    question really whether the Government states a cause of

2    action and a case or controversy against these people in this

3    area.  If there has been no effect on the runoff, then the

4    Government has not been hurt by these people.  Maybe it has

5    been hurt by nature in not giving sufficient amount of recharge

6    and runoff, maybe it has been hurt by Vail who has been

7    impounding water and pumping large amounts, maybe it has been

8    hurt by other people; but I don't think it has been hurt by

9    our people.

10          Those are the things that we want to try to prove.

11          THE COURT:  Thank you for your statement, Mr. Little-

12   worth.

13          MR. VEEDER:  My silence doesn't mean that I have any

14   degree of agreement with it.

15

16                    ROBERT C. FOX,

17   recalled as a witness in behalf of the plaintiff, having been

18   previously sworn, testified further as follows:

19

20                  CROSS-EXAMINATION

21   BY MR. LITTLEWORTH:

22          Q  Mr. Fox, I wonder if you would glance at Exhibit 60,

23   pages 3 and 4, as they are clipped together, which are a

24   tabulation of the runoff of Murrieta Creek.

25          MR. VEEDER:  I object to this, your Honor.  It goes

1   beyond the scope of the direct examination.  We asked not one

2   thing of this witness in regard to surface runoff and there

3   is no basis whatever.

4          THE COURT:  This is a preliminary question, Mr. Veeder.

5   The objection is overruled.  See where we go.

6   BY MR. LITTLEWORTH:

7          Q  Would you glance over the runoff on the summer months?

8          THE COURT:  At what gaging station?

9          MR. LITTLEWORTH:  At Murrieta, your Honor.  This is

10   the flow of the Murrieta Creek, your Honor, and it is found

11   on the third page-- they are clipped together.

12          THE COURT:  Summer months of what year?

13          MR. LITTLEWORTH:  All of the summer months from 1931 on.

14          MR. VEEDER:  Before proceeding, your Honor, I had said

15   there was no redirect examination based upon the status of

16   the record when Mr. Fox left the stand.  I reserve the right,

17   of course, to redirect in the light of Mr. Littleworth's

18   questions, if I may, sir.

19   BY MR. LITTLEWORTH:

20          Q  Have you examined that, Mr. Fox?

21          A  I have, Mr. Littleworth.

22          Q  Would you say that the summer runoff of Murrieta

23   Creek has been fairly constant since 1931?

24          MR. VEEDER:  I object.

25          MR. STAHLMAN:  I object to it as not the best evidence.

A

Z11

1      MR. VEEDER:  I object on the grounds that it goes

2   beyond the direct examination.  It goes beyond the scope of

3   this witness's qualifications.  He is not qualified as a

4   hydrologist.  It did not go into the direct at all.

5      MR. LITTLEWORTH:  Mr. Veeder asked a good many ques-

6   tions, your Honor, about the effect of pumping on runoff, and

7   that is exactly the subject I want to get into.  But you have

8   to have some preliminary questions and draw some conclusions

9   about runoff if you are going to testify to an effect, as Mr.

10   Veeder asked.

11      THE COURT:  The objection is overruled.

12      THE WITNESS:  It looks rather constant, Mr. Littleworth.

13   BY MR. LITTLEWORTH:

14      Q  Comparing the summer runoff with the total discharge

15   of the creek, would you say that probably more than 90% of

16   the runoff of Murrieta Creek has occurred from the winter

17   storms?

18      MR. VEEDER:  Your Honor, I desire to have a continuing

19   objection to this whole cross-examination, both as to the

20   qualification of the witness and on the grounds that it goes

21   beyond the scope of the direct examination.

22      MR. STAHLMAN:  Your Honor, I would like to object on the

23   ground that there was no proper foundation.  It is not the

24   best evidence.  It is the witness's conclusion.

25      THE COURT:  These are preliminary questions.  The exhibit

1   itself is in evidence and the witness's characterization of

2   "constant" and "major part", et cetera, doesn't add very much,

3   but they are preliminary questions to whatever Mr. Littleworth

4   is getting at.

5          Secondly, you have the unusual situation of Mr. Veeder

6   calling Mr. Fox, qualifying him as an expert, and --

7          MR. VEEDER:  As a geologist, your Honor.

8          THE COURT:  --as a geologist, and scatter shotting the

9   field with a series of questions on all sorts of matters.

10          Finally, of course, Mr. Littleworth, who represents

11   some major interests in this area, was not even present.  I

12   certainly am going to give Mr. Littleworth a little latitude.

13   How far we are going to go we will find out.

14          The objection is overruled-- both objections.

15   BY MR. LITTLEWORTH:

16          Q  Would you answer the question?

17          A  It appeared that the greatest portion of the runoff

18   occurred during the winter months.

19          MR. VEEDER:  I am sorry about this, your Honor, but I

20   hadn't expected this course.

21          I observe that 15A, 15B, 15C and 15D had not been

22   offered at the conclusion of Mr. Kunkel's evidence.  If they

23   are going to examine on or offer those exhibits, I desire now

24   to offer them so that they will be in the record.

25          THE COURT:  Which ones are these that you offer?

A

Z13

1        MR. VEEDER:  15A, B, C, and D, and there will be others

2    as we progress, but those are the ones I think should be before

3    the Court now, if this witness is going to testify.

4        THE COURT:  All right, Exhibit 15A is received in

5    evidence, 15B received in evidence, 15C received in evidence,

6    and 15D received in evidence.

7        (Plaintiff's Exhibits 15A, 15B, 15C, and 15D for

8    Identification were received in evidence as Plaintiff's

9    Exhibits 15A, 15B, 15C and 15D.)

10   BY MR. LITTLEWORTH:

11       Q  Do you recall, Mr. Fox, that the Government Exhibit

12   17 shows storage unit No. 4 divided into an upper and a lower

13   section?  I don't know where it is now.

14       MR. VEEDER:  Here is 17A, counsel.  It is the same deal.

15       THE WITNESS:  That is right.

16   BY MR.LITTLEWORTH:

17       Q  Would you say that the pumping in the upper portion

18   of Storage Unit 1, as shown on 17A, since 1931, has affected the

19   runoff of Murrieta Creek at the gorge?

20       MR. VEEDER:  I am going to object, your Honor, on the

21   grounds that there is no proper foundation.  There is nothing

22   whatever to show that this witness has the slightest under-

23   standing or concept of what transpired that far back.

24       THE COURT:  I don't recall, Mr. Littleworth, that there

25   was direct evidence elicited from Mr. Fox on that subject

1  matter.

2      MR. LITTLEWORTH:  There was, your Honor.

3      THE COURT:  Where?

4      MR. LITTLEWORTH:  There were many questions asked about

5  the pumping of specific wells on runoff, and I am simply ask-

6  ing a more general question to try to take in the pumping of

7  the whole area.

8      THE COURT:  What wells was he questioned about?

9      MR. LITTLEWORTH:  One of the wells he was questioned

10  about was the Roripaugh well, and there were some other wells,

11  as I recall, in the general area.  I want to know what would

12  be the effect of pumping certain wells in specific areas

13  closeby upon runoff.

14      MR. VEEDER:  Your Honor, we were careful in regard to

15  the Roripaugh well, and then, as I recall, we pulled our

16  interrogation around to wells that were in the younger

17  alluvium.  That is quite one thing.  You take an overall

18  general inquiry, you could throw this thing wide open.  It

19  might be all right on direct examination, if he wants to ask

20  a witness that.

21      THE COURT:  Read the question.

22      (The reporter read the pending question.)

23      THE COURT:  Overruled.

24      THE WITNESS:  It is almost impossible to answer the

25  question.  Under natural conditions there has been precipitation

A

Z15

1    and runoff, and I made no measurements myself to show that

2    pumping has or has not affected the stream flow.

3         THE COURT:  You can't say.

4         MR. LITTLEWORTH:  All right.

5         Q  Now, Mr. Fox, you testified to the Wildomar Fault,

6    and I believe you said that in your opinion there was water

7    which passed over the fault in the Murrieta area; is that

8    correct?

9         MR. VEEDER:  May I inquire, your Honor.

10        You are at the Wildomar Fault now?

11        MR. LITTLEWORTH:  Yes.

12        Q  Is that correct?

13        A  I believe I did say that, yes.

14        Q  And that water passes through the younger alluvium,

15   in your opinion?

16        A  It goes through the younger alluvium.

17        Q  Now, do you believe that water passes through the

18   fault rather than over the top of it?

19        A  I wouldn't say that it passes through rather than

20   over.  There is a component movement that goes through the

21   fault, though.

22        Q  There is some water which passes through the fault?

23        A  I have made no calculations, but I imagine that there

24   is.  It is not a perfectly impermeable barrier.

25        MR. VEEDER:  I move to strike the answer on the grounds

A
Z16

1    that he says "I imagine", your Honor.

2            THE COURT:  Is your answer the same as if we strike

3    the word "imagine"?  Is this your opinion?

4            THE WITNESS:  Yes, sir, that is my opinion.

5            THE COURT:  All right.  Overruled.

6    BY MR. LITTLEWORTH:

7            Q  Can you characterize, Mr. Fox, how much water passes

8    through the fault itself as opposed to going over the top of

9    it?

10           A  No, I am unable to do that.

11           Q  And can you say that it would be small rather than

12   large?

13           MR. VEEDER:  Again I object.  That is far too big.

14           MR. LITTLEWORTH:  This is cross-examination, your

15   Honor.

16           MR. VEEDER:  The witness has shown absolutely no

17   knowledge, and there is nothing in the record upon which he

18   could predicate a conclusion.

19           MR. LITTLEWORTH:  Your Honor, Mr. Veeder asked these

20   same specific questions.  He asked him about the fault, he

21   asked him about how much of a restricted barrier there is, and

22   I am simply trying to get this witness to give his best

23   opinion as to the real effect.

24           THE COURT:  Your questions were very similar, Mr. Veeder.

25   Secondly, if I recall rightly, it was the Government's position

A

Z17

1      that the fault was not an impermeable barrier.

2           MR. VEEDER:  Right.

3           THE COURT:  Then why the protest?  You are not changing

4      your position, are you?

5           MR. VEEDER:  As far as I am concerned, the water just

6      moves right on through.  I will let him answer.  I don't care.

7           THE COURT:  Overruled.

8           THE WITNESS:  I would like to have the question again,

9      please.

10          THE COURT:  Read it.

11          (The reporter read the pending question as follows:

12     "Q  Can you characterize, Mr. Fox, how much water passes

13     through the fault itself as opposed to going over the top of

14     it?  A  No, I am unable to do that.   Q  And can you say

15     that it would be small rather than large?")

16          THE COURT:  That is really the same question.

17          MR. LITTLEWORTH:  I am trying to see whether he can

18     make any generalizations, your Honor.

19          THE COURT:  All right.

20          THE WITNESS:  I have made no calculations of how much

21     water does get over the fault or through the fault.  I believe

22     I testified that the rising water shows some indication of the

23     amount of water passing from the older alluvium into Murrieta

24     Valley, and in terms of large or small I can't say.

25

A

Z18

BY MR. LITTLEWORTH:

Q  Mr. Fox, the Government has indicated Unit No. 4 on 17 as a storage unit.  Would you consider that that is a basin?

A  No, I wouldn't.

Q  Now, in your examination and study of the area-- and I am speaking now of Storage Unit 4-- you examined a number of well logs and I think you said made some pumping tests; is that correct?

A  I didn't perform any pumping tests, but I did examine the well logs that were available.

Q  Do you believe that the State examined as much data on that area as the Government did in making its studies?

MR. VEEDER:  Don't answer.  I object to it.  How in the world could this man calculate how many hours, days, or weeks the State did or didn't spend, or the United States?

MR. LITTLEWORTH:  That isn't the question I asked.  I asked as much data was taken into consideration.

MR. VEEDER:  How could he know, your Honor?  How could anyone know how much data was taken into consideration?

MR. LITTLEWORTH:  Mr. Kunkel--

THE COURT:  Sustained.

BY MR. LITTLEWORTH:

Q  Did the State and yourself conclude that there was enough data in the older alluvium area storage unit 4 to determine how much water might be there?

A

Z19

1      MR. VEEDER:  I object to that.  I don't think this
2  witness can testify to the opinion of the State.

3      THE COURT:  The objection is sustained as to the form
4  of the question.  He has given his opinion.
5  BY MR. LITTLEWORTH:

6      Q  I will ask the same question with respect to your
7  own opinion, Mr. Fox.

8      A  I have testified that in my opinion there was
9  insufficient data to come up with any conclusions about the
10 storage capacity of the older alluvium.

11     Q  Do you believe that there is sufficient data in
12 the 15 series of exhibits put in by the Government to draw
13 accurate contour lines in Storage Unit 4?

14     MR. VEEDER:  I object to that question, your Honor:
15 First, it is a question to be resolved by the Court; secondly,
16 I object to the kind and type of question that is being
17 asked as to whether this man thinks that the data upon which
18 Mr. Kunkel relied is adequate.  I think it is wholly improper.

19     MR. LITTLEWORTH:  Mr. Veeder asked almost identically
20 the same kind of questions, asking the witness whether he
21 agreed with certain exhibits of the Government, and one he did
22 not ask him about was the contour line.  That is the purport
23 of that question.

24     MR. VEEDER:  There is no foundation for this question.
25 That is an additional aspect of my objection, your Honor.

Fox    Cross    4545    4891

A

Z20

1      THE COURT:  We can save some time, Mr. Veeder, if you

2   let some of these questions.  The foundation can be readily

3   laid.

4      Mr. Fox, did you inspect the chart that Mr. Kunkel

5   prepared with the contour lines?

6      THE WITNESS:  I have.

7      MR. VEEDER:  Are you referring to 15A, your Honor?

8      THE COURT:  Is that 15A?

9      MR. VEEDER:  Yes, your Honor.

10      THE COURT:  And did you look over the supporting data

11   that was submitted?

12      THE WITNESS:  I have.

13      THE COURT:  Now, do you have an opinion as to whether

14   or not contour lines can be drawn on that area?

15      THE WITNESS:  In the same vein that I answered the

16   question about computing the storage capacity, I myself didn't

17   prepare contour maps through the older alluvial area because

18   I don't feel there was sufficient data for me to prepare a

19   map.

20   BY MR. LITTLEWORTH:

21      Q  Mr. Fox, if water is pumped in Storage Unit 4, does

22   it automatically follow that the runoff of Murrieta Creek is

23   reduced?

24      MR. VEEDER:  I object to that question.  It is far too

25   vague.

Fox        Cross                                        4892

A

ZZ721

THE COURT:  Sustained. It is too broad.  The area is large.

MR. VEEDER:  Separate, too.

MR. LITTLEWORTH:  All right.

Q  Mr. Fox, if water is pumped from the older alluvium in the upper part of Storage Unit 4, does it follow that the runoff of Murrieta Creek is necessarily reduced?

MR. VEEDER:  I object.  It is still too vague-- far too vague.  There is no foundation for it.

THE COURT:  Overruled.  We are skipping the question whether he has an opinion and then what is his opinion, and shortening it up.

MR. VEEDER:  I would like to have the question read again before he answers it.

(The reporter read the pending question.)

MR. VEEDER:  I think we are being imposed upon by counsel's questions.  I desire your Honor to observe this. Here is pumping unit No. 4.

THE COURT:  It is on both sides.

MR. VEEDER:  Yes, that is correct; it is on both sides.

MR. LITTLEWORTH:  The question went to the upper part.

MR. VEEDER:  Well, when you say the "upper part," what do you mean?

MR. LITTLEWORTH:  You have a division.

MR. VEEDER:  Oh, you are limiting it now to the whole

A

Z22

1   area north of the Pauba?

2        MR. LITTLEWORTH:  In Storage Unit 4.

3        THE COURT:  I will sustain the objection on that ground.

4   It is too broad.  By the upper part, I was thinking you meant

5   up in the neck area this way.  So it is too broad.  I was

6   thinking of one thing and you were thinking of another.

7        Ask the witness each time if he has an opinion.  Maybe

8   he doesn't, and that solves that.

9   BY MR. LITTLEWORTH:

10        Q  Mr. Fox, what about the question, then, referring

11   simply to the area in orange in Sections, let us say, Sections

12   21, 22, 23 and the area north of those sections, Township 7

13   South, 3 West?

14        THE COURT:  21, 22, 23, and by the area north you mean

15   Sections 16, 15, 14?

16        MR. LITTLEWORTH:  Yes; 9, 8, 5, 6 and on up.

17        THE COURT:  Do you have an opinion as to what?

18        MR. LITTLEWORTH:  As to whether pumping in that area

19   would automatically decrease the amount of runoff in Murrieta

20   Creek.

21        MR. VEEDER:  I object on the ground that I don't know

22   what automatically means.

23        THE COURT:  Overruled.

24        Do you have an opinion?

25        THE WITNESS:  Your Honor, I can't have an opinion on

1    that.  I have no idea how much water is being pumped or pre-

2    cipitation, et cetera.

3    BY MR. LITTLEWORTH:

4         Q  Mr. Fox, does any more water from natural runoff get

5    into the ground if the Roripaugh 16J1 well stands at elevation

6    1030 than if it stands at, say, 1040 or 1050?

7         MR. VEEDER:  I object; there is no foundation whatever

8    for this-- none at all.

9         MR. LITTLEWORTH:  This question was also asked.  He

10   asked about the recharge of the Santa Gertrudis area.

11        THE COURT:  I am familiar with that.  Mr. Veeder in-

12   quired about the pumping cone around the Roripaugh well and

13   what would happen to runoff in it.  Now the witness was, in

14   your opinion, qualified to answer those questions.  It ill

15   behooves you to object now on cross-examination.

16        MR. VEEDER:  But this 1030, 1040 and 1045-- that is

17   what I am jobjecting to.  I have no objection to this witness

18   telling the truth.  But I think this 1030 and 1040 goes into

19   fantasia, your Honor.

20        MR. LITTLEWORTH:  Those are the precise elevations on

21   the map, your Honor, and all I am trying to find out--

22        THE COURT:  Maybe the witness knows what they mean,

23   maybe not.  They don't mean anything to me right now.

24        THE WITNESS:  I don't think anydifferences could be

25   found if the water table fluctuated just 10 or 15 feet.

A

Z24

Fox    Cross                                                      4895

BY MR. LITTLEWORTH:

Q  In other words, the same amount of recharge in the Santa Gertrudis area will occur whether the well levels stand as this map indicates at 1030 or whether they stand 10 or 20 feet lower?

MR. VEEDER:  I am going to object unless he specifies whether younger or older alluvium in the question.

MR. LITTLEWORTH:  This is tied right to Mr. Veeder's own map.

THE COURT:  Overruled.

THE WITNESS:  I am still a little vague on that question, Mr. Littleworth.  I previously answered that I didn't think it could be found by stream gaging; if the lowering of the water level of 10 or 20 feet would have any effect on the flow in the creek.  But whether there is any difference in the amount that would get downstream if you lowered it 10 or 20 feet, probably some would go in, but I don't know how much.

MR. VEEDER:  Some would go in where?

THE WITNESS: It would go into the alluvium.

BY MR. LITTLEWORTH:

Q  My point is does more go in simply because the ground water level is lower?

A  I am not in a position to answer that. I don't think any calculation has been made.  There is no foundation to say that one way or the other.

1          THE COURT:  What do you mean by "go in"?  Go into the

2     alluvium, or go into the Murrieta River?

3          MR. LITTLEWORTH:  I mean go into the ground.

4          Q  In other words, does more water percolate into the

5     ground simply because the ground water level is lower?  Can

6     you answer that question in a general manner?

7          A  No, I can't answer that.  If it was a hundred feet

8     lower, I imagine more would go into the ground than if it were

9     just 20 feet lower.  But what portion of the runoff would go

10    in, I don't know.

11         Q  Why would more water go into the ground if your

12    ground water levels are a hundred feet rather than, say, 20

13    feet?

14         A  There is more room for it to go in.

15         Q  Well, so long as there is enough room to take all

16    of the natural runoff, then does the level of the underground

17    water table make any difference as to the amount of water

18    which is going to percolate into the underground?

19         MR. VEEDER:  I am going to object to this matter of

20    room and all these things; they are so vague that I don't think

21    anyone knows.

22         THE COURT:  Overruled.

23         THE WITNESS:  May I have the question repeated, please?

24         (The reporter read the pending question.)

25         THE WITNESS:  I think the elevation of the water table

A

Z26

1    does have some effect on determining how much will get into

2    the ground.

3    BY MR. LITTLEWORTH:

4        Q  And this again, then, is a matter of degree?

5        A  That is exactly right.

6        MR. LITTLEWORTH:  I have no other questions, your Honor.

7        THE COURT:  Any other questions of Mr. Fox?

8        MR. VEEDER:  I have a few, your Honor.

9

10                         REDIRECT EXAMINATION

11   BY MR. VEEDER:

12       Q  When you investigated the pumping in the Pauba

13   Valley, what consideration, if any, did you give to the reduc-

14   tion in the surface flow of the Temecula Creek by reason of

15   that pumping?

16       MR. SACHSE:  That is objected to as being beyond the

17   scope of the cross-examination.  This is not proper redirect

18   examination, your Honor.

19       THE COURT:  This was not opened up on cross-examination.

20   Is this something that you forgot to inquire into?

21       MR. VEEDER:  No, your Honor, but I think we are perfectly

22   right in asking, did he know what occurred in Temecula Valley?

23   Wouldn't the same phenomena prevail in the Murrieta Valley?

24       THE COURT:  He hasn't testified to very much, Mr. Veeder.

25       MR. VEEDER:  I'll say he hasn't.

A
Z27

1      THE COURT:  Well, the objection is sustained.

2      MR. VEEDER:  I will make an offer of proof.  I would

3  prove by this witness--

4      THE COURT:  As redirect now?

5      MR. VEEDER:  Yes.

6      THE COURT:  That it goes into a subject matter opened

7  up by his testimony on cross-examination?

8      MR. VEEDER:  Yes, your Honor.

9      I make an offer of proof that this witness would have

10 testified that to his personal knowledge the pumping in the

11 Temecula Basin would have, in fact does, reduce the surface

12 flow.

13     THE COURT:  The surface flow in what?

14     MR. VEEDER:  Of the Temecula Creek.  That the same

15 phenomenon prevails in Murrieta Creek, and that pumping in the

16 Murrieta Creek younger alluvium would have identically the

17 same effect upon the surface flow of that stream.

18     I have no further questions.

19     MR. SACHSE:  I will continue to press the objection,

20 your Honor.

21     THE COURT:  The objection is sustained to the offer

22 of proof.  It doesn't have any bearing, as I see it, on what

23 he testified to on cross-examination.  And secondly, there

24 is no argument, there is no dispute, that pumping in either

25 one of those basins, in the younger alluvium in the basin, is

1  going to have effect on the surface flow.  There is no dispute

2  there.  That is not an issue.

3      Does anybody think it is?

4      MR. VEEDER:  I know that Mr. Sachse representing the

5  State of California is going to advance that--

6      MR. SACHSE:  Mr. Veeder, let the record show that I do

7  not represent the State of California.

8      THE COURT:  Let's wait until they do, Mr. Veeder.

9      MR. VEEDER:  All right.

10     THE COURT:  Any other questions from Mr. Fox?

11     Thank you, Mr. Fox.  You may step down.

12     Are you recalling Mr. Kunkel now?

13     MR. VEEDER:  I am not calling Mr. Kunkel.  He is up

14  for cross-examination, your Honor.

15     THE COURT:  Come forward, Mr. Kunkel.

16     MR. SACHSE:  I would like to cross-examine Mr. Kunkel,

17  your Honor.

18     MR. LITTLEWORTH:  I have some questions also.

19

20          FRED KUNKEL,

21  heretofore called and sworn as a witness in behalf of the

22  plaintiff, recalled, testified further as follows:

23

24

25

A

Z29

CROSS-EXAMINATION

BY MR. SACHSE:

    Q  Mr. Kunkel, first a few general questions about the relationship between 15A and 15.  I realize that 15A is on a larger scale and is more detailed and, as I understand, data from the Geologic Survey maps that does not appear on 15. But can you tell me whether there are any changes in your general geologic conclusions between the two maps?

B-1 ML j

1  Is there any place where you found different material on

2  your second, more detailed, study than you did on your first?

3      A   I have previously testified this isn't, as far

4  as the geology is concerned, a second and more detailed

5  study; it is the same study on a larger scale.

6      THE COURT:  He has testified that he has shown on

7  15-A --

8      MR. SACHSE:  In greater detail.

9      THE COURT:  A series of small outcroppings of base-

10  ment complex which were too small to show in 15.

11      THE WITNESS:  Likewise, Mr. Sachse, I have indicated

12  that at the point of rising water in Murrieta Valley in the

13  northwest quarters --

14      MR. VEEDER:  You are pointing to Temecula.

15      THE WITNESS:  Of 15 --

16      THE COURT:  Wait a minute.  Back up.  That is

17  Temecula Valley.

18      MR. SACHSE:  Pauba Basin.

19      THE WITNESS:  The Temecula.

20      THE COURT:  Pauba Valley.

21      THE WITNESS:  Pauba Valley is on the topographic map.

22  I am using the Geological Survey.

23      MR. VEEDER:  You said, "Murrieta."

24      THE COURT:  You said, "Murrieta."

25      THE WITNESS:  Oh, I am sorry.  In Temecula, along the

1    Temecula River.  In the northwest quarter of Section 14,

2    Township 8 South, Range 2 West, I have shown a very small

3    hash of older continental deposits that are not shown on

4    Exhibit 15.  I testified that on Exhibit 15 that the scale

5    of the map, that small patch, could not be shown.  That

6    small patch of older continental deposits is shown on my

7    field mapping which circulated in court early in October,

8    and that particular outcrop I consider to be very significant.

9    It, in my opinion, is personally conclusive evidence that

10   part, if not the major part, of the stream flow in Temecula,

11   along the Temecula River, is rising or derived from the

12   older continental deposits.

13        THE COURT:  Which section was that you are referring

14   to?

15        THE WITNESS:  Northwest quarter, Section 14.

16        Q  BY MR. SACHSE:  Now, you have shown also, while

17   you are there on 15, you indicated by a red line below

18   points of rising water and the approximate extent of

19   surface flow which you did not indicate on 15-A?

20        A    That is correct.

21        Q    Did you attempt to determine the extent of

22   surface flow when you prepared 15-A?

23        A    Yes.  I testified that I have revisited those

24   points, re-examined the stream channels in the areas in-

25   dicated, and the flow is the same.  I believe that is in

1    the record.

2        Q    They are substantially the same now at those

3    points of rising water as it was in October of 1957?

4        A    That is correct.

5        Q    Referring, in general, to the older continental

6    deposits on 15-A, which would be within your storage unit

7    4, the northerly portion of it.  You follow me?  That is

8    the area northwest of Pauba Valley and northeast of Murrieta

9    Valley.  You would agree, would you not, that those older

10   continental deposits contain a wide variety of rock in the

11   geological sense of the word?

12       A    As I have testified, they are made up of

13   lenticular deposits of clay, silt, sand, gravel, all mixtures,

14   proportions.

15       Q    And would you agree that that same area includes

16   materials with a very wide range of permeability?

17       A    A qualified yes.

18       Q    Would you agree that it includes material with

19   a wide range of transmissibility?

20       A    Inasmuch as the transmissibility is the sum of

21   the permeabilities for a saturated thickness of aquifer, if

22   there were considerable differences in thickness at any one

23   particular point for that particular strip, there would be

24   differences in transmissibility.

25       Q    The answer is yes, then?

1    A    Again, a qualified yes.

2    THE COURT:  Wouldn't these answers be just as

3  applicable to the younger alluvial as the clay?

4    THE WITNESS:  Absolutely, your Honor.

5    THE COURT:  Isn't there clay, gravel, sand, as shown

6  by the evidence so far in the record as adduced by the

7  testimony of Mr. Fox?

8    MR. SACHSE:  I am going to ask your indulgence for

9  a minute.  I am getting to it right now.

10    THE COURT:  All right.  Pardon me.  I don't want to

11  get ahead of you.

12    Q   BY MR. SACHSE:  On Exhibit 18 you assigned an

13  average specific yield to Area 4 of 11 per cent, I believe.

14  I hope I am right.  Correct me if I am wrong.

15    A    Correct.

16    THE COURT:  Subbasin 4, is it?

17    MR. SACHSE:  Yes.

18    THE COURT:  Is it called "Area 4" on that exhibit?

19    MR. SACHSE:  Yes, your Honor.

20    Q    Now, being an average, I assume that reflects

21  specific yields higher than 11 per cent and also specific

22  yields lower than 11 per cent, does it not?

23    A    Yes.  As indicated in the Exhibit 15-D, I

24  believe the number is.

25    MR. LITTLEWORTH:  D.

B-2

THE WITNESS:  15-D, showing the calculations of specific yield, it is obvious in the assignment of my specific yield values I used the values 25, 20, 15, 10, and 3, I believe.

Q  BY MR. SACHSE:  Still, with particular reference to the northerly portion of storage unit 4, what is the highest specific yield you assigned to any part of the qtoal in that area?

A   In the classification of drillers' terms, the highest specific yield that I assigned for one particular zone, as described in the log, was 25 per cent.

Q   In the qtoal?

A   That is correct.

Q   And the lowest, then, would be three per cent?

A   The lowest that I assigned was three, yes, sir.

Q   Can you tell us, in any general way, whether there are any particular areas of storage unit 4 where the lowest specific yield predominated surface area of 4?

MR. VEEDER:  I want to hear that again.

MR. SACHSE:  I will rephrase it.

MR. VEEDER:  Surface area?

Q  BY MR. SACHSE:  I am referring now to the surface area of hydrologic unit 4.

THE COURT:  You mean point out by surface area where --

Q  BY MR. SACHSE:  Can you point out anywhere on the

1    surface area of 4 any area where the materials of the

2    lowest specific yield predominated?

3         A    No.  And considering the nature of the deposits

4    I don't expect an area where there is going to be a great

5    preponderance or difference.

6         Q    There are, then, I presume, no surface physio-

7    graphic features that you can look at that will enable you

8    to say that a certain area has a higher specific yield or

9    a lower specific yield?

10        A    In general, that is correct within the limitations

11   of the geologic -- I shouldn't say within the limitations;

12   with the aid of the geologic map.  From the mapping that

13   has been done, it is perfectly obvious that the surface

14   areas I have previously testified, the q -- or the older

15   continental deposits north of the Pauba Valley where they

16   grade into the residuum is a very gradational thing.  And

17   on the surface they look identical, but on the basis of the --

18   on the surface where one crosses the contact they look

19   identical, but on the basis of geology we know there is a

20   difference.  Now, in that sense, you can tell by looking at

21   the deposits.

22        Q    I am still speaking of the qtoal strictly.

23        A    All right.  Within that area there is no --

24        Q    Now, you stated a moment ago that the subsurface

25   formations were lenticular.  Then, you would expect in that

1  area to find some areas where a well would be a very good

2  producer and other areas very well might be a poor producer,

3  or would you not?

4      MR. VEEDER:  You know you continue to speak about the

5  unit No. 4.

6      MR. SACHSE:  Northern portion of unit 4, that is all.

7      THE WITNESS:  Where there is a thick section of

8  deposits.  By "thick section" I mean something in excess of

9  500 to 1000 or more feet.  It would be very unlikely that a

10  properly drilled, properly developed, deep rotary gravel-

11  packed well would not produce water in usable quantities.

12      Q  BY MR. SACHSE:  You haven't answered my question,

13  Mr. Kunkel.  Perhaps I will try to rephrase it.  Since the

14  subsurface materials in unit 4 are lenticular in character,

15  would you not expect that in some areas where the lenses,

16  where there was a concentration of lenses of poor trans-

17  missibility, you might find a poor well, whereas in another

18  area where there was a concentration of lenses of high

19  transmissibility you might find a much better well?  That is

20  my question.  Would you not expect that?

21      THE COURT:  I think he--

22      THE WITNESS:  Would you care to put some limits in

23  terms of yields in gallons per minute that you are talking

24  about or some thickness --

25      MR. VEEDER:  I didn't hear your Honor's observation in

B-3

1    that regard.

2           THE COURT:  I think he answered the question.  As I

3    understood it, he said assuming a depth of the older alluvial

4    of 500 to 1000 feet.  He would expect -- he only put it in

5    terms of the well -- he would expect to find the average

6    situation.

7           MR. SACHSE:  Your Honor, that wasn't his answer.  He

8    said he would expect to find a well that could be used.

9    Now, he didn't say whether it would be used -- whether it

10   was a good well or poor well.

11          THE COURT:  In the sense he talked about a well, that

12   doesn't answer your question, but --

13          Q   BY MR. SACHSE:  Let's be very specific.  Would

14   you expect that a well of identical depth, identical gravel

15   packing, identical size, identical pump capacity to the

16   Roripaugh J-1 well, a well drilled anywhere in unit 4, would

17   be just as good a producer as the Roripaugh well?  Anywhere.

18          A   No, not anywhere.

19          Q   Then, there are areas where you would not an-

20   ticipate such good water production, are there?

21          A   I am sorry.  When I said, "not anywhere," I was

22   thinking that similar deposits were thin.  You said a well

23   of similar depth.

24          Q   I said a well of similar depth, yes.

25          A   I wish to correct that.  A well of similar depth,

1    similar in all respects to the Roripaugh well, including a

2    similar thickness of saturated section, same diameter, deep

3    rotary gravel pack, I would expect it to yield, in some

4    cases somewhat more, in some cases somewhat less.  But I

5    would not expect the well that would not -- let's put it

6    this way:  I would be extremely surprised if you could drill

7    a well, properly drilled well, in the older continental

8    deposits similar to the Roripaugh well and not get in excess

9    of several hundred gallons per minute.

10        Q    Now, then, Mr. Kunkel, you are saying, are you,

11   that you think if we have similar depth of older continental

12   deposits that everywhere the lenses are going to be the

13   same?  You will find the same lenticular structure that you

14   find in the Roripaugh well as any other well drilled to the

15   same depth?  No difference in the lenses?

16        MR. VEEDER:  The witness didn't say that.

17        MR. SACHSE:  I am asking him if that is what he

18   means.

19        Q    Is that what you mean?

20        A    Statistically it is going to average out; statis-

21   tically it does average out; statistically it averages out

22   throughout California.

23        MR. SACHSE:  I didn't ask you that.

24        Your Honor, would you instruct the witness to

25   answer the question.  I didn't ask him for an average.  I

asked him if he expected that every well drilled anywhere

to the same depth as the Roripaugh well would be as good

a producer as the Roripaugh well, not if the average would

be as good producers.  But would every one?

MR. STAHLMAN:  You mean in 4?

MR. SACHSE:  In 4, still.

That was my question.

Q   Now, please answer the question, Mr. Kunkel.

A   All right.  We are bringing in the human factor

of drillers, and there is a tremendous difference in drillers.

A properly -- and I emphasize the word "properly" -- large

diameter --

Q   All right.  I give you the same driller.  Give

you the same driller.  Would you expect every well to be as

good a producer as the Roripaugh well?  Same driller; same

depth; same pipe; same perforation; same pump; same gravel

pack; same everything.

MR. LITTLEWORTH:  The driller is Mr. Van Winkle, if

that makes any difference.

Q   BY MR. SACHSE:  Would you expect every well to be

the same?

A   I wouldn't expect every well to be identical.

Of course not.

MR. SACHSE:  It would make it so much easier if you

would just answer it.

1    THE COURT:  Let me ask you this:  Although you say
2 you would not expect them to be identical, you have also
3 said you would expect wells of equal depth and equal per-
4 foration in the older alluvial to be, although maybe not
5 identical, to be almost as good producing a well as the
6 Roripaugh well; as I understood you to say?

7    MR. SACHSE:  I don't think that was what he said, but
8 I am glad your Honor asked him.

9    MR. VEEDER:  That is what he said.

10    THE COURT:  I understood him to say that.  What did
11 you say?

12    THE WITNESS:  I would have to check the record and
13 see what I said; but, if I remember correctly, I said I
14 would expect a well to produce in excess of several hundred
15 gallons per minute, which, in my opinion, is a --

16    THE COURT:  This is preliminary.  I want to ask you
17 this question:  You will note the Roripaugh well starts out
18 in the younger alluvial and enters the older alluvial and is
19 perforated in the older alluvial.  You recall that?

20    THE WITNESS:  That is correct.

21    THE COURT:  There are other parts of this area where,
22 if a well was put down, you would be in the older alluvial
23 entirely and you would have no overlying burden of younger
24 alluvial above the older alluvial.  In the Roripaugh well.
25 Also, you have a well in the Santa Gertrudus Valley, which

1  is a watershed, surface water has come down, feeds that

2  younger alluvial, and that younger alluvial lies on top of

3  the older alluvial; and I take it it is your opinion that

4  there is a transmissibility of water or permeability

5  between the younger and the older alluvial?

6      THE WITNESS:  That is correct.

7      THE COURT:  Wouldn't the probabilities be, there-

8  fore, that you would be liable to get a better well where

9  one was located in an area where there was younger alluvial

10  lying over the older alluvial than if you had a well that

11  went down entirely through to qtoal without this bed of

12  younger alluvial to help replenish the older alluvial below?

13      THE WITNESS:  No, sir.  That is not necessarily so.

14  In my opinion, a well drilled on the older continental

15  deposits not going through any younger alluvium whatsoever,

16  for a similar saturated section, will give yields that are --

17      THE COURT:  Such well, then, is dependent entirely

18  upon water moving through the older alluvial between the

19  wells?

20      THE WITNESS:  That is correct.

21      THE COURT:  Now, isn't, in the case of the Roripaugh

22  well, isn't there a factor in addition, namely, not only

23  water moving through the older alluvial but water in the

24  younger alluvial on top of the older, feeding the older

25  alluvial?

Kunkel - Cross

1   THE WITNESS:  With regard to the Roripaugh well,

2  that has absolutely no relationship to the yield of that

3  well.  As I indicated in redirect, on Exhibit 16-1, where I

4  drew a cross-section, the younger alluvium is totally un-

5  saturated.  There is no water whatsoever in the younger

6  alluvium, in my opinion.  And, for all practical purposes,

7  the younger alluvium might as well not be there.  That well

8  would yield the same quantity of water.

9   THE COURT:  It is unsaturated and no water in it as

10  of the time late in the fall.  But wouldn't there be water

11  in that younger alluvial in the winter months?  Time when

12  floods were coming down, water coming down the Santa

13  Gertrudus?

14   THE WITNESS:  During winter months, during periods

15  of actual stream flow, there would be some water in the

16  channel deposits.  I am not certain if there would be water

17  beneath the alluvial plain.

18   THE COURT:  But you wouldn't consider that would be

19  an appreciable factor in feeding water into the older

20  alluvial?

21   THE WITNESS:  That would be a factor in feeding water

22  into the older alluvium, but would not be a factor on the

23  production of the Roripaugh well, the rate at which that

24  well could be pumped.

25   THE COURT:  All right.

1          MR. LITTLEWORTH:  Is this an appropriate time, your

2     Honor, to take our morning recess?

3          THE COURT:  Yes.  All right.

4          (Recess.)

1          Q   Mr. Kunkel, the depth of the older alluvium is not

2    uniform throughout the orange area in Unit 4?

3          A   No.

4          Q   Let us start, then, with Sections 20 and 21, Town-

5    ship 7 South, Range 2 West.  How deep is the older alluvium

6    up there?

7          MR. VEEDER:  May I have the description?

8          MR. SACHSE:  Sections 20 and 21, Township 7 South,

9    Range 2 West, at the very top of Storage Unit 4.

10         THE WITNESS:  May I refer to the well logs, please.

11         MR. SACHSE:  Yes.

12         THE WITNESS:  What is the description?

13         MR. SACHSE:  Sections 20 and 21, 7 South, 2 West.

14         There is at least one well on 21 on the edge of the

15    older alluvium.

16         THE WITNESS:  May I refresh my memory?

17         MR. SACHSE:  Go ahead-- any notes you have.

18         THE WITNESS:  Were you referring to a particular part

19    of Section 21?

20         MR. SACHSE:  If you have to break down your answer,

21    please do.  I was just asking about the section.

22         THE WITNESS:  Well, in my opinion, the thickness of the

23    alluvium in parts of the section would be, oh, as much as 200

24    feet or more in places.

25

1C

Z31

1    BY MR. SACHSE:

2         Q  Would that be the maximum, in your opinion?

3         A  I don't know what the maximum thickness is.

4         Q  In other words, taking, then, that single section,

5    you would not assume that in Section 21, Township 7 South,

6    Range 2 West you could get a producing well such as the

7    Roripaugh well?

8         A  In that particular section, I do not know.

9         Q  You don't know?

10        A  In that particular--

11        Q  Do you have an opinion as a geologist as to whether

12   you could get as good a producer as the Roripaugh well?

13        A  We are talking about 1300-plus gallons per minute.

14        Q  That is right.

15        A  In that particular section I don't know if we could

16   get 1300-plus gallons per minute.

17        Q  Do you have an opinion as to whether or not you could

18   get 1300--  just your opinion?

19        MR. VEEDER:  All you have to do is to answer yes or no.

20        THE WITNESS:  In my opinion, it is not necessarily an

21   impossibility.

22   BY MR. SACHSE:

23        Q  Do you think you could get it, or do you think you

24   could not get it?

25        MR. VEEDER:  He has answered the question.

Kunkel    Cross                                    4917

C

Z32

1          MR. SACHSE:  He said that it is not an impossibility.

2  I asked him if, in his opinion, a well as good as the Roripaugh

3  well could or could not be produced.  He can say that he has

4  no opinion or he can give an opinion.

5          THE COURT:  He has given you an opinion.

6          Can you be more specific than that, Mr. Kunkel?

7          You can't get the witness to say what you want him to

8  say, not even an expert.

9  BY MR. SACHSE:

10         Q  On the depth of the alluvium, then, would I be

11  generally correct in saying that the alluvium, the older

12  alluvium would be generally shallower at the upper end of the

13  deposit where it nears its contact with the weather basin

14  would be generally shallower than it would at the lower end

15  of the deposit where it makes contact with the younger alluvium?

16         A  In general, that is a correct statement.

17         Q  I have a question here that is utterly unrelated.

18  You have "Dry or destroyed well" symbol, an open circle with a

19  line through it, for Exhibit 15.  What is the distinction

20  between when you say "dry" or "destroyed"?

21         A  A dry well may be open to 20, 30, 50 or 100 feet

22  and there may be no water in the well.  That would be a dry

23  hole.  A destroyed well would be one that would be plugged

24  to the surface, or the casing pulled.

25         Q  You just know from the records that a well was there

C

Z33

1   once?

2       A  At one time there was a well.

3       Q  Is there any indication in your notes or anywhere as

4   to dry holes as distinct from a dry well?  In other words, a

5   hole that was drilled and produced no water?

6       A  A dry hole as produced by a driller and as they

7   appear on well logs include a multitude of sins.  If the

8   driller drilled beneath the water table he did not have a dry

9   hole.  For the purpose that the well was drilled, for various

10  reasons, the well may not have produced sufficient water and

11  the driller just wrote it off as a dry hole.

12      Q  You mean it is impossible to drill a hole that has

13  no water in it?

14      A  No, I say if you drill a hole beneath the water

15  table it has water in it.

16      Q  When he says "dry hole" he simply means that that is

17  not enough for the purpose for which he drilled it?

18      A  In many cases, that is what a--

19      MR. VEEDER:  I object to the question:  What did he

20  mean when he wrote down that it was a dry hole?  How would he

21  know?  There are a thousand well drillers.

22      THE COURT:  Sustained.

23  BY MR. SACHSE:

24      Q  Do you have a pocket scale with you, Mr. Kunkel?

25      A  Yes, sir.

Kunkel   Cross

C

z34

1    Q  I wish you would scale the northwesterly limit,

2    northwesterly end of the 980 contour that appears immediately

3    above the junction of Temecula and Murrieta Creeks.  You see

4    the one to which I refer?  The semi-circular contour.

5    A  On which one?

6    Q  On Exhibit 15A.

7    A  Yes.

8    Q  The distance of the contour at that point from the

9    junction of the two streams.  Excuse me, you are doing the

10   wrong one.  The upper, the northerly end.  I want you to

11   measure this distance first.

12   A  There is a distance from the northerly end to the

13   junction of the Murrieta and Temecula Creeks of approximately

14   3,000 feet.

15   Q  Will you do the same thing on Exhibit 15, please--

16   scale the same contour.

17   A  It is approximately 3400 feet on Exhibit 15.

18   Q  In other words, at the point where your 980 contour

19   intersects Murrieta Creek on 15A, the water table data,

20   according to 15A, is higher than the water table was in 1953;

21   is that right?

22   A  No, because you are comparing maps of different

23   scale and they cannot be directly compared for all points.

24   When you are changing map scale and measuring a distance of

25   about 400 feet in 3,000.  Considering the change in map scales,

C

Z35

1    I would say that that conclusion is not warranted.  You may be

2    correct.  I don't know.

3        Q   Taking only the facts that appear on these two

4    exhibits, it would appear, comparing 15 to 15A, that the water

5    table is closer to the surface at the point I indicated in

6    1958 than it was in 1953, would it not, from the water level

7    contours?

8        A   Not to me, it wouldn't.

9        Q   In other words, you don't trust the water level

10   contours?

11       A   I trust the water level contours.  There is a differ-

12   ence in map scale, a difference in projection.

13       Q   Now, I will direct your attention to the 1150 con-

14   tour as it passes through the easterly end of Pauba Valley in

15   the vicinity of The Windmill Well.  Do you recall to which I

16   am referring?

17       A   Yes.

18       Q   And I direct your attention then to this same 1150

19   contour on the smaller scale map of 15.  Now, there has been--

20   if you will scale it I am sure you will agree with me-- there

21   has been a very marked regression of that contour, it has

22   moved a long distance upstream between 1953 and 1958; is that

23   correct?

24       A   That is correct.

25       Q   Almost a mile upstream?

Kunkel - Cross 4921

A   Approximately a mile.  I didn't scale it, but I will take your word for it.

Q   Looking at the section, it is approximately a mile.

A   Yes.

Q   Will you scale the next contour, the 1200 contour, scaling from section lines, and tell me how that contour compares with what it was in 1953?

THE COURT:  The 1100 contour?

MR. SACHSE:  The 1150 has gone far upstream.  I am now asking him to measure the 1200 and see how it compares with 1953 immediately upstream from the same windmill well.

THE WITNESS:  On Exhibit 15A as compared with 15, the 1200-foot contour is approximately 3,000-- it is about a thousand feet farther upstream.  I say about a thousand.

BY MR. SACHSE:

Q   In other words, the two contours have not retrogressed upstream at an equal rate?

MR. VEEDER:  Don't answer the question until we get the word "retrogressed".

MR. SACHSE:  Retrograded, retreated.  Do you know what I mean, or shall I rephrase it, counsel?

MR. VEEDER:  I would like to have it rephrased, your Honor.

BY MR. SACHSE:

Q   In other words, the 1150 contour, which you testified

Kunkel   Cross                                    4922

1   a moment ago has moved almost a mile upstream, the 1200-foot

2   has moved only about a thousand feet upstream; is that right?

3        A   Approximately.

4        Q   How do you account for that phenomenon, that one

5   of them moves so much greater distance than the other in the

6   space of five years?

7        A   There has been a greater degree of pumping in the

8   vicinity of the windmill well and below it than there has

9   above the windmill well, which, in my opinion, would cause

10  a greater decline in the vicinity of the pumping.

11       Q   You don't think that that variation in decline is

12  in any way related to the materials through which the ground

13  water must move below the surface?

14       A   It definitely could be, in part, and I wish to point

15  out that I have used a different symbolism in indicating my

16  1200-foot contour and 1150-foot contour.

17       Q   One of them is interpolated and the other one is

18  positive?

19       A   One is positive and in part interpolated, and the

20  1200 is inferred.

21       Q   I would like you to scale, if you will, please,

22  another contour for me, comparing the two maps.  Take the

23  1050 contour at the point where it intersects Long Canyon in

24  Section 6, Township 8 South, Range 2 West, scale that contour

25  as it appears in 1958, and then do the same contour as it

4923

C

238

1    appeared in 1953.

2          THE COURT:   What section?

3          MR. SACHSE:   Section 6, Township 8 South, Range 2 West

4    at the point where the contour intersects Long Canyon.

5          THE WITNESS:   The 1050 contour at the intersection of

6    Long Canyon on both 15 and 15A are approximately the same

7    point as I have indicated in 1953 and 1958.

8    BY MR. SACHSE:

9          Q   That would indicate no substantial change in water

10   level between the two years, would it not?

11         A   At that particular point, that is correct.

12         Q   Now, rather than continuing this and taking a great

13   deal of the Court's time, having to do these one at at time,

14   if you want, take a piece of paper and note down some of them.

15   I am going to ask you to check some of these, scaling one

16   against the other, and come back and tell us what you find

17   this afternoon.

18         A   Do you want to give me a list?

19         MR. VEEDER:   Your Honor, I have never heard of such a

20   process.

21         MR. SACHSE:   All right, I will go ahead and take his

22   time and yours and have him scale each one, Mr. Veeder.

23         THE COURT:   What do you mean, I have never heard of

24   such a process?

25         MR. VEEDER:   I don't want the witness to anticipate the

4924

C

Z39

1  kind and type of question that Mr. Sachse is going to ask

2  this witness. Nor do I want to take his time. He is a very

3  valuable man to us.

4      THE COURT: Mr. Sachse has merely said that rather than

5  now have him do the scaling in court he will give him the

6  various contours in which he is interested and the locations

7  of them and let the witness make the calculations and come

8  back and give us the answers, to save us some time.

9      MR. SACHSE: To save us some time. That's all I am

10  asking.

11      THE COURT: Do you have a written list of them?

12      MR. SACHSE: No, I haven't. I have done this rough

13  calculating myself and they are marked on the map. I can tell

14  him which ones.

15      THE COURT: All right, tell him.

16      MR. SACHSE: I would like you to scale and to make the

17  same comparison, Mr. Kunkel, between the 1953 and the 1958

18  contours-- do you follow me?

19      THE WITNESS: Yes.

20      MR. SACHSE: The contours going up Wolf Valley, 1025,

21  1100, 1150 and 1200. I suggest that you will find no change.

22      MR. VEEDER: I would just as soon have the counsel quit

23  testifying.

24      THE COURT: Go ahead, Mr. Sachse.

25      THE WITNESS: Pardon me, Mr. Sachse.

C

Z40

1          THE WITNESS:  Pardon me, Mr. Sachse.

2          MR. SACHSE: Wolf Valley, 1025-- I am reading from 15A--

3     1025, 1100, 1150 and 1200.

4          Then proceeding up Murrieta Valley, the 980 you have

5     already scaled; the 1000 and the 1025 up Murrieta Valley.

6          Then in the area between Long Canyon and Pauba Valley--

7     do I make myself clear-- the older alluvium lying between

8     Long Canyon and Pauba Valley, the 1050, 1100 and 1150.

9          THE COURT:  Do you want him to take about the center

10    there?

11         MR. SACHSE:  Yes, in each case, just right about the

12    center of the area.

13         And tell us, if you will, when you have completed

14    that, whether you find any substantial change between the 1953

15    water level contours as drawn by you and the 1958 water level

16    contours as drawn by you.  Do you understand what my request

17    is?

18         THE WITNESS:  I understand.

19    BY MR. SACHSE:

20         Q  Now, you answered an earlier question of mine this

21    morning relative to the surface flow below points of rising

22    water, saying that you found no substantial change between

      last flow and this flow; is that correct?  Would you conclude

      from that--

           THE COURT:  You are speaking of rising water north and

Kunkel - Cross    4926

C

z41

1    east of Murrieta Valley?

2        MR. SACHSE: And in Murrieta Valley, yes, your Honor.

3    There is one point indicated in Murrieta Valley.

4        Q  Would you conclude from that point that whatever

5    pumping has taken place since October, 1957, has had no

6    appreciable effect on the rising water?

7        MR. VEEDER:  I want to hear the question.

8        (The reporter read the pending question.)

9        MR. VEEDER:  The answer is included in the fact that

10    1957 and 1958 have been an unusual runoff year.

11        MR. SACHSE:  He can explain his answer.  Are you object-

12    ing to the question?

13        MR. VEEDER:  I think you should include the fact that

14    we had a very heavy runoff.

15        MR. SACHSE:  Let me phrase my question.  You may ask

16    for the explanation.

17        Q  Would you so conclude, Mr. Kunkel?

18        A  Would I so conclude what?

19        Q  I will restate it.  That the pumping in the area

20    upstream, up contour I should say, from these points of rising

21    water since October, 1957, has had no appreciable effect on

22    the rising water?

23        A  No, I wouldn't necessarily conclude that, because

24    there are numerous other factors involved other than just

25    pumping.

C

Z42

1        Q Which other factors?

2        A  Well, the amount of precipitation during the year

3    preceding the measurements in 1957.

4        Q  As Mr. Veeder just suggested?

5        A  As Mr. Veeder just suggested.  It is a very true

6    fact.

7        Q  Do you recall-- I can't resist-- do you recall a

8    lengthy colloquy with his Honor and with, I believe, Mr.

9    Krieger during your original examination where you were asked

10   if inflow had anything to do with the regimen and you used the

11   bucket example and you used sixteen different examples in

12   insisting that the recharge had nothing whatsoever to do with

13   it?

14       MR. VEEDER:  Don't answer the question.

15       MR. SACHSE:  Do you recall?

16       MR. VEEDER:  It is beyond the scope of the direct.

17       MR. SACHSE:  It is impeachment.

18       THE COURT:  Overruled.

19   BY MR. SACHSE:

20       Q  Do you recall that?

21       A  If we will check the record--

22       Q  Do you recall?

23       THE COURT:  The answer is yes or no.

24       THE WITNESS:  Yes, I recall it.

25       MR. SACHSE:  That is all I want to know.

Kunkel - Cross    4928

THE WITNESS:  May I add something, your Honor?

THE COURT:  Yes.

THE WITNESS:  I think the record will show that Mr. Krieger and I were, I believe, talking about different things. I didn't understand his question at the time.  If I remember the record correctly--

MR. SACHSE:  I have no further questions.

MR. LITTLEWORTH:  I have some questions, then, your Honor.

THE COURT:  Mr. Littleworth.


CROSS-EXAMINATION

MR. LITTLEWORTH:  See if we can talk about the same thing, Mr. Kunkel.

I will put this up for my own use.

THE COURT:  What Exhibit is that?

MR. LITTLEWORTH:  It is my version of 15A.  I have just plotted some of my people's property on it.

MR. VEEDER:  Is it going to be offered?

MR. LITTLEWORTH:  No, I don't think so.  I don't think we will need to do that, unless you want my handiwork.

MR. VEEDER:  I don't, and I would object to it.

THE COURT:  It is a copy of 15A that you delivered to him.

MR. VEEDER:  Hacked up, your Honor.

Kunkel - Cross

C

Z44

THE COURT:  If we get into the hacking up, it may wind up in evidence.  If not, it is a copy that you delivered to him.

MR.SACHSE:  Excuse me, your Honor.  I neglected to ask Mr. Kunkel, and to make it clear to your Honor, that I would expect to ask him after the recess after he has made these calculations.

THE COURT:  I understand, you are going to ask him about the calculations.

BY MR. LITTLEWORTH:

Q  Do you know of any well drilled into the older alluvium in basin 4 which produced, say, an inch of water-- and I am speaking now of being drilled solely into the older alluvium?

A  Without checking the well log data, et cetera, at the moment I have to answer I do not recall.

Q  Will you check that also during the noon hour?  Will you check whether you find any well drilled directly and solely into the older alluvium which produces 50 inches of water?

A  Wells in excess of 90 inches and 50 inches?  I assume you are using 9 gallons per minute per inch?

Q  Yes.  And you may as well check 25 inches as well.

A  All right.  You say drilled solely in the older alluvium?

C

Z45

1      Q   Yes, not going through an overlay of younger

2  alluvium.

3      A   That is a different question.

4      Q   My question is this:  I don't want you to consider

5  any well which starts in younger alluvium and pierces into

6  the older alluvium.  I want you to consider only wells which

7  are drilled solely and exclusively in the older alluvium.

8      A   Are you possibly suggesting, by any stretch of the

9  imagination, that the Pauba well draws its water from the

10  younger alluvium?

11      Q   Suggesting that maybe some of its recharge may come

12  from there.

13      THE COURT:  Well, whether you agree or not, you check

14  what he asks you to.

15      THE WITNESS:  All right.

16      THE COURT:  Whether you find any wells that produce --

17  what is it, a hundred gallons a minute?

18      MR. LITTLEWORTH:  Right on down, 150 and 25.

19      THE WITNESS:  I will do it.

20  BY MR. LITTLEWORTH:

21      Q   Are you familiar with the property of Mr. Charles E.

22  Yoder?

23      A   Not by name.  If you will point it out, please.

24      THE COURT:  You are going to wind up with your exhibit

25  going into evidence.  But that is no great harm.  We can get

c

z46

1    you another copy.

2           MR. LITTLEWORTH:  I am not so proud of this, your Honor.

3           Q  I want you to assume, then, Mr. Kunkel, that Mr.

4    Yoder's property lies in Sections 9, 15 and 16, 7 South, 3

5    West.

6           A  9, 15 and 16?

7           Q  Yes, lies in that area.

8           A  I see.

9           Q  I want you to assume that he has about 397 acres.  I

10   want you further to assume that he has three wells, one which

11   is a dug well, to a depth of 46 to 50 feet, one a 14-inch case

12   well to a depth of 168 feet, and one a 6-inch cased well to

13   a depth of 210 feet, all lying within your storage unit 4.

14   And I further want you to assume--

15          A  Pardon me.  Are those wells by chance shown on

16   Exhibit 15?

17          Q  Yes.

18          A  Could you give me the numbers of those wells?

19          THE COURT:  M1?

20          MR. LITTLEWORTH:  No, it is the next Yoder's well that

21   is shown.

22          THE COURT:  Is M1 one of the wells?

23          MR. LITTLEWORTH:  I don't believe it is.

24          THE COURT:  It is in the diagram you have made.

25          MR. LITTLEWORTH:  Yes.  At least, I am not sure.  On

C

Z47

1   some of the others I know the wells which correspond to my

2   notes.  I am not sure of that one.

3        Q  I want you to assume that each of those wells

4   produces less than an inch of water.  If those facts are true,

5   Mr. Kunkel, does that change your opinion about the avail-

6   ability of water in the older alluvium?

7        MR. VEEDER:  I interpose an objection that there is

8   absolutely no evidence in the record upon which the hypotheses

9   can be based.

10       MR. LITTLEWORTH:  There is.  There will be precise

11  evidence to the facts I have given.  But I don't think that

12  is necessarily required anyhow.

13       THE COURT:  Overruled, Mr. Veeder.

14       THE WITNESS:  6-inch well cased at 210 feet, 14-inch

15  well cased to 168 feet, dug well 46 to 50 feet deep.  Is it a

16  14-inch well rotary gravel packed?

17  BY MR. LITTLEWORTH:

18       Q  I don't know.

19       THE COURT:  Where are they perforated?

20       MR. LITTLEWORTH:  I don't know that.

21       THE WITNESS:  What are the water levels in them?

22       MR. LITTLEWORTH:  In the dug well it is 31 feet to

23  water, in the 14-inch case well it is 35 feet to water, in

24  the 6-inch cased well it is 98 feet to water.  But the pro-

25  duction of each one is less than an inch.

c

z48

1          MR. VEEDER:  What about the pumps, your Honor?  I object

2     that there is no proper hypothesis.  It is short on many

3     aspects.

4          THE COURT:  It is certainly short on where they are

5     perforated.  It is certainly short on what kind of pump you

6     have on them.

7          MR. LITTLEWORTH:  I think, your Honor, that we can

8     assume that a farmer in this area is going to get as much

9     water as he can, that the difference between valuable land and

10    land which is relatively invaluable is water in this country,

11    and for Mr. Veeder and Mr. Kunkel to assume that a person is

12    not going to draw as much water out of these wells as he can

13    and he is going to dry farm rather than to irrigate, I think,

14    is a completely unrealistic assumption.

15         THE COURT:  Well, we still, to have a witness intelli-

16    gently answer your question, have to know what kind of pump

17    you have on these, you have to know where your perforations

18    were.

19         THE WITNESS:  When were they drilled?  The perforations

20    in the well?  Was Mr. Yoder there when they were drilled?

21         MR. LITTLEWORTH:  I think those things are not--

22         THE COURT:  I don't go that far.  But I think we can

23    postpone this question and answer until you get some further

24    data, particularly on perforatinns.

25         MR. LITTLEWORTH:  Is that the only other thing your

C

Z49

1  Honor feels we need?

2       MR. VEEDER:  Pump and motor, how is it run?  When was

3  the well last cleaned out?

4       MR. LITTLEWORTH:  It is obvious that if a man only has

5  a flow of an inch that there isn't water there.

6       MR. VEEDER:  You mean if it is a flowing well?

7       MR. LITTLEWORTH:  No, that you can only pump an inch

8  out of it.

9       THE COURT:  Well, this question is, for how long a time?

10 Here you have a 14-inch casing 168 feet deep and 31 feet to

11 water.  You can certainly pump more than an inch of water out

12 of there for some limited period of time.

13      MR. LITTLEWORTH:  Surely, but--

14      THE COURT:  But what the drawdown would be and all

15 those things is another question.

16      MR. LITTLEWORTH:  You take all these windmills up in

17 here, you can put a pump on them and for a short period of

18 time you can get a little more water out, but you pump your

19 well dry.  It isn't productive.  So far as the farmer is

20 concerned, the farmer has to count on what is a sustained flow.

21 And Mr. Yoder has 398 acres of dry farming only.  He hasn't

22 enough water to irrigate one acre of crop land.

23      THE WITNESS:  Shall I reply?

24      MR. VEEDER:  No.

25      THE COURT:  Well, your question, in fairness to the

C

Z50

1    witness, I think should give him some further information.

2    This 168-foot well with the 14-inch casing, do you know

3    whether or not there is a well log on that or when it was dug?

4         MR. LITTLEWORTH:  I don't just offhand.  I can go back

5    through my files and I might be able to find that out.

6         THE COURT:  Your question is-- Give us your hypothesis

7    again.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D-1 ML j

1      Q   BY MR. LITTLEWORTH:   Assuming that they exist in

2  the dimensions and capacities that I have just stated,

3  assuming that the only consistent flow which can be obtained

4  from these wells is less than an inch per well, I ask you

5  if that makes any difference, in your opinion, as to the

6  availability of water in this older alluvium area?

7          MR. VEEDER:   I want to interpose an objection.

8          THE COURT:   And your assumption of one inch of water,

9  that is the most you can get by continuous pumping without

10 drying up the water in the well?

11         MR. LITTLEWORTH:   That is correct, your Honor.

12         MR. SACHSE:   Nine gallons a minute, you mean?

13         MR. VEEDER:   From all the wells?

14         MR. LITTLEWORTH:   Yes.

15         MR. VEEDER:   From each well?

16         THE COURT:   Each well.

17         MR. LITTLEWORTH:   Each well will produce approximately

18 the same.

19         MR. VEEDER:   I have to object to that, your Honor.

20 The matter of the well log, where the perforations are, a

21 thousand other things.

22         THE COURT:   Let's save some time.   Let's assume also

23 they are perforated at various intervals to the bottoms of

24 the wells.

25         MR. LITTLEWORTH:   All right.

4937

1        THE COURT:  Objection is overruled.  Answer the
2  question.

3        THE WITNESS:  No, for the simple reason the man
4  hasn't tested the aquifer.  He doesn't --   In all due
5  respect to the gentleman -- he doesn't know what he has got
6  under his property.  He has got three wells that produce
7  nine gallons a minute.

8        MR. LITTLEWORTH:  All right.

9        Q   That doesn't change your testimony at all?

10       A   Absolutely not.

11       Q   Now, what I want you to assume --   Let me ask
12  you first:  Do you know the property of M. J. Yoder?

13       A   I am acquainted with it.  Well, you have "Yoder"
14  written here.  Yes, I am acquainted with the area.

15       Q   I want you to assume that he owns land in Sections
16  14, 15, and 10, Section 7 South, 3 West, and that he has
17  two wells and they would be 15-Q2 and 15-Q3 located within
18  your storage unit 4, and that those wells will produce only
19  sufficient water, without drying up the wells, to irrigate
20  15 acres of alfalfa out of the total property owned of some
21  1700 acres.

22       THE COURT:  Well, that doesn't tell me anything.
23  15 acres of alfalfa.  Do you know what they produce in
24  gallons per minute or inches?  One might irrigate his alfalfa
25  well and another man might irrigate it a different way.  One

1    might sprinkle it; one might flood it.  Do you know the --

2         Q  BY MR. LITTLEWORTH:  Assuming the water duty of

3    five acre-feet per year, then, Mr. Kunkel, and assuming the

4    usual irrigating season which is prevalent in the area?

5         MR. VEEDER:  I have to object again, your Honor.  I

6    hate to do it.

7         THE COURT:  You want me to understand this?

8         MR. LITTLEWORTH:  Yes, your Honor.

9         THE COURT:  Can you tell me how many gallons a minute

10   they produce or how many inches or something?

11        MR. LITTLEWORTH:  I don't have the calculations,

12   except that that was the total amount of water that the --

13   the total amount of water they were able to get would

14   support only 15 acres of alfalfa.  The rest of it is dry

15   farm lands.

16        MR. VEEDER:  How many cuttings are there?  How many

17   tons to the acre?

18        THE COURT:  How deep are the wells?

19        MR. LITTLEWORTH:  One of them, Q2, is 318 feet; Q3 is

20   1120 feet.  It is an abandoned oil well and produces how

21   water.  It produces sulfur water at 338 degrees Fahrenheit.

22        MR. VEEDER:  This is part of your assumption?

23        MR. LITTLEWORTH:  Yes.

24        THE COURT:  Does he use this sulfur water to irrigate?

25        MR. LITTLEWORTH:  He has to mix it.  The soil Conservation

1  people have shown him now to mix it with the water of this

2  other well.  By mixing both of them he is able to irrigate

3  15 acres of alfalfa.

4      MR. VEEDER:  I renew my objection.  There is certainly

5  no basis upon which this witness could answer that hypothesis.

6  Totally lacking the data that is required.

7      THE COURT:  Will you be able to make any calculations,

8  Mr. Kunkel, as to this water duty of --   What was it?

9      MR. LITTLEWORTH:  Five acre-feet.

10     THE COURT:  -- five acre-feet for the growing season

11  of alfalfa?   Do you have sufficient data to make a cal-

12  culation, what these wells are producing?

13     THE WITNESS:  I know about the wells.  I can answer

14  your question without knowing --

15     THE COURT:  All right.  What --

16     THE WITNESS:  The well 15 --   Let's see, you have

17  got two wells there:  Q2 and Q3.  Q2 is a shallow well.  I

18  don't recall its depth.  However, Q-3 was drilled to a

19  depth of 1120 feet and, as you say, it is a flowing hot

20  water well at the present time.  The well --

21     THE COURT:  Flowing without pumping?

22     THE WITNESS:  I am sorry; it was flowing when drilled

23  as a hot water well.  I would have to check the record.  We

24  have a water level measurement on it in Exhibit 15-B-73-20 --

25  Q2 and Q3 on Exhibit --   May I have the --

MR. LITTLEWORTH:  Q3 is the deep well.

THE WITNESS:  The deep well --

THE COURT:  What is that township and range?

THE WITNESS:  7 South, 3 West.

THE COURT:  It is on page 2.

MR. LITTLEWORTH:  Exhibit 15.

THE COURT:  It is on page 2.

THE WITNESS:  Q3 is the deep well.  That well was reportedly flowing, according to Exhibit 16-A, 17.  It is the log of the well.  The well was being pumped on the 28th of October when visited by the Geological Survey, and the water stood, while pumping, at 166 feet.

THE COURT:  166?

THE WITNESS:  I mean at 66 feet.  The well 15-Q-2, a short distance to the north, stood at 126 feet.

Q  BY MR. LITTLEWORTH:  When water was flowing?

A   When water was flowing, that is correct.  However, the critical thing in my regard, as far as I am concerned, is that well 15-Q-3 was drilled as an oil well, not as a water well.  And when a well is drilled as an oil well, a driller takes none of the precautions to drill in a manner that will yield him the greatest amount of water.  He is drilling after oil.  Unless he gets a showing of oil, the drilling practices are not in the least conducive to producing a satisfactory water well.

1    Q    Even though hot sulfur water is produced out of

2 that well, you think that properly drilled it would have

3 produced the same kind of well that Mr. Roripaugh has in

4 16-J-1?

5    A    No.  I do not have all the data with regard to

6 that well; just as to where the hot sulfur water comes from.

7 But if the well were drilled to exactly the same depth and

8 perforated in all the water-bearing zones without regard to

9 the quality, it is very likely that the hot sulfur water

10 that is now coming from the well would again come from the

11 well; but it might be blended with fresher and better

12 quality of water up above.  I don't have any idea what the

13 perforated interval for this is.  All of the water, as far

14 as I know, might be coming from the deep aquifer.  Do you

15 have any data as to where the well is perforated and --

16    Q    No.  All right, Mr. Kunkel, I want you to assume

17 that Mr. Roripaugh --

18    MR. VEEDER:  I didn't hear counsel's answer to the

19 witness' question.

20    MR. LITTLEWORTH:  I don't think he has the right to

21 ask counsel questions, but my answer is no.

22    THE WITNESS:  I don't have any record on perforations.

23    Q  BY MR. LITTLEWORTH:  I want you to assume Mr.

24 Roripaugh owns a piece of land which is not contiguous to the

25 land around well 16-J-1 and that this land is located in

1    Sections 24 and 25, 7 South, 3 West, and that in the 1920's

2    they tried to get water there and drilled a hole 157 feet

3    deep and hit bedrock.  At another well --

4              A    Give me the location.

5         MR. VEEDER:  Just a moment.  I want to know what --

6         Q   BY MR. LITTLEWORTH:  Both adjacent to Nicholas

7    Road.  And a second attempt to reach water in that area

8    resulted in a hole being drilled 160 feet deep.  And when

9    tested neither of these holes, neither of these wells would

10   yield ten inches of water.  And water today stands at

11   46 1/2 feet and 157-foot deep, one, and 44 feet to water

12   in the other one.

13        THE COURT:  They have numbers?

14        MR. LITTLEWORTH:  These don't have numbers.  They are

15   considered as dry holes by the farmers in that area, your

16   Honor.  They have been abandoned because they didn't produce

17   paying quantities.

18        Q    Assuming neither of those would produce ten

19   inches of water, does that change your opinion about the

20   amount of water in storage unit 4 and its availability?

21        MR. VEEDER:  I want my continuing objection to the

22   hypothesis in that it is not sufficient to impeach the

23   witness.

24        MR. LITTLEWORTH:  These are all the facts.  We have all

25   the facts that occurred.  They tried to drill for water and

1    didn't find it in a productive quantity.

2        THE COURT:  How big were the casings in the wells?

3        MR. LITTLEWORTH:  I don't think they were ever fixed,

4    your Honor.

5        THE COURT:  How big were the holes?

6        MR. LITTLEWORTH:  I don't know that.

7        MR. VEEDER:  How big were the pumps?

8        MR. LITTLEWORTH:  The pumps were never installed

9    because --

10       MR. VEEDER:  They have to test it.  What kind of test

11   do you have to pump?  What kind of pump?

12       MR. LITTLEWORTH:  Maybe I can find out.

13       Q    Assuming both of them were 16-inch holes, Mr.

14   Kunkel; one was cased partially, the other was not.

15       MR. VEEDER:  What about the pump when you ran the

16   test?  What was the size of the pump?

17       MR. LITTLEWORTH:  Is that an objection?

18       MR. VEEDER:  Yes, I am objecting to the hypothesis.

19       THE COURT:  Overruled.  Overruled.

20           Tell me again:  What the water level standing in

21   those wells are, now?

22       MR. LITTLEWORTH:  46 1/2 feet to water in the one,

23   which is 157-foot deep and 44 feet to water in the one which

24   is 161-foot deep.

25       Q    I also tell you that bedrock was hit, the bottom

1    of both of those holes.  I want you to assume that.

2        A    Do I have a right to ask counsel a question or

3    don't I?

4        THE COURT:  Answer the question.

5        THE WITNESS:  I mean, how far into bedrock was the

6    drilling continued?  I mean, did the driller go down and hit

7    bedrock?

8        Q  BY MR. LITTLEWORTH:  Assume that he hit bedrock

9    and discontinued?

10       A    On the basis of the geology, unless I had some

11   evidence he continued for a depth into bedrock, I would

12   strongly suspect, and this has happened many, many times,

13   the driller hits either a large boulder he couldn't get

14   through and goes back --    What years were those wells

15   drilled?  1927?

16       MR. VEEDER:  1920.

17       THE WITNESS:  In the '20's.  It was probably done by

18   a cable tooling method; he might have hit a large boulder,

19   not been able to get through and called it bedrock.  I don't

20   know.

21       Q  BY MR. LITTLEWORTH:  My question was whether --

22   this is assuming a state of facts that influences your

23   opinion about the availability of water in that area.

24       A    The depth to bedrock would be critical, although

25   I would put a big question mark --

D-2

1    THE COURT:  Let's assume that bedrock is where the
2    hypothetical question says it is.  What would be your view?

3    THE WITNESS:  If there were bedrock at the point, I
4    would doubt that you could get a very large producing well
5    at that point.

6    Q  BY MR. LITTLEWORTH:  Do you know how close to the
7    surface bedrock lies in any of the areas in storage unit 4
8    where wells have been drilled solely into the older alluvium?

9    A    What do you mean now by "bedrock"?  Basement
10   complex?

11   Q    Yes.

12   A    According to 15, the log of well 15-Q-3, which is
13   Exhibit 16-A-17, the well is 1120 feet deep, the bottom of
14   what is said to be hard sandstone, which is not necessarily
15   basement complex.  I have a list, if I may refer to it.  It
16   refers to wells 16-A-13.

17   MR. SACHSE:  All these are the same township and range?
18   THE WITNESS:  I will give you the township and ranges
19   as I refer to them.

20   Well 16-A-13, well 7-3-6K1.

21   THE COURT:  In what range and township?

22   THE WITNESS:  7 South, 3 West, 6K1.

23   THE COURT:  You said 16.

24   THE WITNESS:  I am sorry.  7 South, 3 West, 6K1.

25   THE COURT:  All right.

1  THE WITNESS:  Well is reported to a depth of 1355

2  feet.  Bottom is shale and hardrock.  That does not appear

3  to be basement complex.  There are shale and boulders to a

4  depth of 1331 feet.  We have referred to Well 16-A-17, which

5  is 73, 15-Q-3, which is 1120 feet deep.  Well 16-A-22,

6  Exhibit 16-A-22, Well 7 South, 3 West, 21-H-1, it is shown

7  on Exhibit 15 as an oil well, 15-A as an oil well, in the

8  Northeast Quarter of Section 21.  That well is drilled to

9  3106 feet and bottoms in soft, gray shale.

10  THE COURT:  21 --   What was the letter on it?

11  THE WITNESS:  21-H-1.  It is not shown by a number

12  on Exhibit 15, but in 15-A, but on 15-A in the northeast

13  quarter there is a symbol called "Oil Well," a tiny circle

14  with the word "Oil Well" written above it.  That is the

15  position of the log for Well 7-3-21-H-1.

16  THE COURT:  Tell us about the well.

17  THE WITNESS:  That well was drilled to a depth of

18  3106 feet and bottomed in soft, gray shale.

19  Q  BY MR. LITTLEWORTH:  Do you know much water it

20  produces?

21  A  Again, it was drilled as an oil well.  I would

22  expect it --

23  Q  It was abandoned as a water well?

24  A  It was never drilled as a water well.

25  Q  Does anyone use it as a water well now?

Kunkel - Cross

1  A   No, it has been destroyed.  I would expect it to

2  be.  An oil well just doesn't make a good water well.  But

3  the driller does mention water in his log down to a depth

4  of 1133 feet.  He refers to shale, soft and caving to a

5  depth of 1972 feet.  He refers to sandy blue shale to a

6  depth of 2000 feet.

7  Q   Isn't there a difference, Mr. Kunkel, in simply

8  hitting water and hitting it in quantities which will be

9  sufficient to use for irrigation?

10  A   You want me to finish the last question?  I have

11  a list of logs all of which have comparable depths if --

12  Q   Answer my question now I have just posed to you.

13  MR. VEEDER:  I object to this.  He asked the witness

14  a question about --

15  THE COURT:  How many more wells do you have?

16  THE WITNESS:  Six more, and some of them were drilled

17  as water wells and produced large quantities of water.

18  THE COURT:  Which are they?

19  MR. LITTLEWORTH:  We had better take them.  If he has

20  any that produce large quantities, I want to know about them.

21  MR. VEEDER:  All we want are the facts.

22  THE COURT:  These are in 7 South, 3 West?

23  THE WITNESS:  I would have to check my notations to

24  see where they are.  Well 8 South, 2 West --  8 South, 3

25  West, 1Pl.

1        THE COURT:  About where is that?

2        MR. VEEDER:  Would you locate that?

3        THE WITNESS:  I am sorry.  1P2, 8 South, 3 West.

4  1P2, at the mouth of the Long Canyon.

5        Q  BY MR. LITTLEWORTH:  That is not drilled into

6  younger alluvium, is it?

7        A    The well starts on the younger alluvial plain,

8  where the younger alluvium is extremely thin.  The well is

9  822 feet deep.  By no stretch of the imagination can the

10  well draw the bulk of its water from the younger alluvium.

11        Q    I think my question was confined to wells that

12  were drilled wholly into the older alluvium.

13        THE COURT:  Where is that well perforated, D-2, you

14  know?

15        THE WITNESS:  The length of the perforations is given

16  but not the exact position.  I do not know.  It is on the

17  Vail Ranch.

18        Q  BY MR. LITTLEWORTH:  Do you know what it produces,

19  Mr. Kunkel?

20        A    No, I don't know the production.  But I have

21  observed the well and it was putting out a large quantity;

22  hundreds of gallons per minute.

23        Q    But that is a well like the Roripaugh well,

24  drilled into a creek bed, isn't it?

25        A    Certainly.  I mean, that has nothing to do with

D-3

the production of water.

Q In your opinion?

A In my opinion.

Q I think there might be some other people who will disagree.

MR. VEEDER: I move to strike counsel's statement as arguing with the witness.

MR. LITTLEWORTH: It may go out.

THE WITNESS: What about the Pauba well? Are you implying that -- Pardon me. I am sorry. I apologize. I don't mean to argue.

THE COURT: Do you have any other wells, now, that were dug entirely in older alluvium?

THE WITNESS: Without checking the record I do not know. And in answer to your question: I do not recall wells, large producing wells, in the older alluvial area. Drilled entirely in the older alluvial area. You are making a big point out of the fact the well starts in the younger alluvium, which, in most cases is true; but it has nothing to do with the production of the well. It is drilled there, because that is where the water levels are shallowest. It is where you go for your water first.

MR. LITTLEWORTH: Am I to continue, your Honor?

THE COURT: We will adjourn until 2:00 o'clock.

(Whereupon, at 12:05 p.m. a recess was had until 2:00 p.m. of the same day.)

E

Z51

1    SAN DIEGO, CALIFORNIA, TUESDAY, NOVEMBER 18, 1958.  2:00 P.M.

2

3         THE COURT:  Proceed.

4

5                   FRED KUNKEL,

6    recalled as a witness in behalf of the plaintiff, having been

7    previously sworn, testified further as follows:

8

9                   CROSS-EXAMINATION

10   BY MR. LITTLEWORTH:

11        Q  During the noon hour, Mr. Kunkel, did you find any

12   wells drilled exclusively into the older alluvium in storage

13   unit 4 which produces as much as 25 inches?

14        A  Yes, I did.

15        Q  Which one?

16        A  The Schrode well, Well 7 South, 2 West, 7A1.

17        Q  That is a Vail well?

18        A  That is a Vail well.

19        Q  Do you know how much it produces?

20        THE COURT:  What section is that in now?

21        THE WITNESS:  7 South, 2 West, 7A1.

22   BY MR. LITTLEWORTH:

23        Q  Do you know how much it produces?

24        A  That well was test pumped in 1928 at 360 gallons

25   per minute.

E

Z52

1        Q  It has a windmill on it now, doesn't it?

2        A  It has a windmill on it now.

3        Q  Do you know how much it is producing now?

4        A  No, I haven't measured it.  I presume it is less

5   than that.

6        THE COURT:  It is not listed on Exhibit 15B?

7        THE WITNESS:  No.  Wait a minute.

8        MR. VEEDER:  It is located on 15A, however.

9        THE COURT:  Yes.

10  BY MR. LITTLEWORTH:

11       Q  Did you get that information from Mr. Hall?

12       A  Yes, I did; I got that from the records and files of

13  the Vail Company.

14       THE COURT:  When was it test pumped, did you say?

15       THE WITNESS:  In 1928, at 360 gallons per minute.

16  Now I would like to indicate that this well had not been fully

17  developed, and also, even though the well was drilled to a

18  depth of 604 feet, the casing had buckled at 377 feet.

19  BY MR. LITTLEWORTH:

20       Q  This is again information given you by Mr. Hall?

21       A  It is copied from the records in the Vail Company,

22  which are in the custody of Mr. Hall.

23       Q  Have you found any other well which produces as

24  much as 25 inches?

25       A  You are limiting yourself, or limiting me to wells

E

Z53

Kunkel   Cross   4952

1    that are drilled starting on the older alluvium, rather than

2    starting-- No, I haven't found any records to indicate

3    greater production.

4         Q  I want to ask you about one more piece of property

5    down here.  I want you to assume that Albert Ceas owns approx-

6    imagely 1450 acres and that he has Well No. 24A1 in Section

7    24, 7 South, 3 West.

8         A  How many acres?

9         Q  This well, according to your map, appears to be

10   sunk in the younger alluvium.  Assume that this well was

11   drilled in 1943, has a 12-inch casing perforated from 30 feet

12   for the rest of its depth, was drilled to 165 feet, and hit

13   bedrock at 165 feet.  It is equipped with a 10-horsepower

14   pump and produces 25 inches of water, which have been used to

15   irrigate 15 acres of alfalfa and permanent pasture.  Assuming

16   those facts to be true, I ask you whether that affects your

17   opinion as previously stated on the quantity of water available

18   inside Storage Unit No. 4?

19        A  May I check the well logs?  Well 7--

20        Q  24A1.

21        A  We looked for that.

22        Q  When I asked you earlier.

23        A  I couldn't find a record on that.

24           You say it encountered bedrock at what depth?

25        Q  165 feet.

E

Z54

1      THE COURT:  115B, on page 3.

2      THE WITNESS:  No.

3      MR. VEEDER:  Have you found the well?

4      THE WITNESS:  Yes, I have checked the well.  When

5  measured on the 29th of October, 1958, by myself or under my

6  direction, that particular well was measured under my direc-

7  tion, it was approximately 59 feet to water.  You stated the

8  well was 160-some feet deep?

9  BY MR. LITTLEWORTH:

10     Q   165 feet to bedrock.

11     A   There is 100 feet of saturated section in this area,

12  which places it reasonably within the area for which I

13  calculated the ground water in storage.  The production was

14  25 inches, you say.  For the saturated section and what you

15  have given me, that appears reasonable.  I see no reason to

16  change my conclusion.

17  BY MR. LITTLEWORTH:

18     Q   That doesn't affect your testimony that you gave

19  earlier about being able to drill a well like the Roripaugh

20  well in any part of the orange area and get the same results?

21     A   Would you read the record back to me where I said

22  that?

23     MR. VEEDER:  I object to that.  This was not the

24  question that was put to this witness.  Are you referring to

25  the question of Mr. Sachse?

Kunkel Cross 4954

E

Z55

1    MR. LITTLEWORTH: Yes.

2    MR. VEEDER: That was not the question.

3    THE COURT: How was it put?

4    MR. LITTLEWORTH: That was basically the question.

5    MR. VEEDER: The question was the same depth.

6    MR. LITTLEWORTH: I said like the Roripaugh well.

7    MR. VEEDER: There couldn't possibly be the same depth.

8    This is 165 feet.

9    MR. LITTLEWORTH: It only got stopped by bedrock. But

10   there is no reason, I suppose, why theoretically you can't go

11   into bedrock.

12   MR. VEEDER: How can he comply with the request under

13   the circumstances?

14   MR. LITTLEWORTH: That is precisely the point. You

15   can't, Mr. Veeder.

16   THE COURT: I will sustain the objection.

17   How big a casing was that, Mr. Littleworth?

18   MR. LITTLEWORTH: 12 inches.

19   Q  Incidentally, I calculated the elevation as you

20   measured it just recently in that well at 1047, and you show

21   the 1050 contour line lying southerly and below it. Is that

22   a mistake?

23   A  No, that is not a mistake. It is one of the cases

24   where judgment was used, and if you will notice it is an

25   interpolated line. The measurement that was given to me or

E

Z56

1   that I used, I had some reason to suspect that it didn't

2   represent the true conditions at that point, and as drawn I

3   believe it is so indicated.

4       Q  Would you look at, I believe it is, 15B, which has

5   your elevations on it, and refer to Well 35P1, which is found

6   in 7 South, 3 West?

7       A  That is indicated as the Gonzales well.  I am

8   acquainted with the well you are referring to.

9       Q  That is a well located just below the Roripaugh 16J1

10  well in the Santa Gertrudis Valley, is it not?

11      MR. VEEDER:  What was the number of that, please, your

12  last number?

13      MR. SACHSE:  P1.

14      MR. HALL:  35.

15      THE WITNESS:  It is about a mile and .35 southwest of

16  the Roripaugh well on the other side of the Windomar Fault.

17      THE COURT:  It is actually in the Murrieta Valley.

18      MR. LITTLEWORTH:  Yes, your Honor.

19      Q  Now, a comparison of the measurements between 1927

20  and October, 1958, shows that the water level therehas risen

21  about 4 feet, has it not?

22      A  May I check my notes, please.

23      Q  Yes.

24      A  May I see 15A.

25      THE COURT:  What page is 13B on?  I found it-- page 4.

E

Z57

1          THE WITNESS:  Yes, the measurement in the Gonzales well

2     is about 4 feet higher than it was in 1927.

3     BY MR. LITTLEWORTH:

4          Q  Would you now look at Well 35F1 in the same section,

5     7 South, 3 West, which is also located in the Santa Gertrudis

6     Valley, is it not?

7          A  That is correct.

8          Q  Don't your records show that the comparative measure-

9     ments between 1927 and 1958, that that well has held just firm--

10    There has been no lowering of the water table?

11         A  That is correct.  The measurements were within one

12    one-hundredth of a foot of each other for two days.

13         Q  Now, I notice that your contours differed quite

14    sharply around the Roripaugh well 16J1 from your 1953 map in

15    15, I believe it was, and 15A.

16         A  Pardon me.  I just noticed something here in regard

17    to the Gonzales well.  While the well is 4 feet higher now

18    than it was in 1927, the Gonzales well did flow when it was

19    first drilled.  It is now 12 feet to water.

20         Q  But it is still higher than it was in 1927?

21         A  Yes, but 12 feet lower than when it was drilled,

22    more than 12 feet.

23         Q  Now, referring to your contour lines around the

24    Roripaugh well 16J1, there is a difference between those

25    contours on 15A and 15; is that correct?

E

Z58

1  A That is correct.

2  Q What is the reason, Mr. Kunkel?

3  A To answer that question I would require a further

4 analysis and comparison of the 1953 and the 1958 measurements

5 by me at this time, which I have not done at the moment.  On

6 the basis of the data as presented in 15A, the pumping hole

7 as shown, in my opinion, is accurately depicted.  15 does not

8 show a pumping hole at that particular point, and right off I

9 do not recall the number of the measurements I had.  May I

10 check the well log of the Roripaugh well?  I believe it has

11 been drilled since 1953.  I may be incorrect.

12  Q 16J1 was drilled in 1956.

13  A Then that would indicate that I at least didn't have

14 a water level measurement at that point, and I do not recall

15 immediately what the water level measurements were in Well

16 25E1.  On the basis of the data available for both years, I

17 drew the contours as I saw them.

18  Q Do you think that condition existed in 1953?

19  A In my opinion, if a pumping hole existed now, which

20 it may well have because there were other wells in the area,

21 in my opinion it was probably deeper in 1958 than it was in

22 1953.  I am not stating that as an absolute fact until I would

23 check the data more carefully.

24  Q If you knew that substantially the same amount of

25 water had been taken from the Well 25E1, which is also Mr.

1    Roripaugh's well, since 1927, would that affect your con-

2    clusions?

3         MR. VEEDER:  I object to that as absolutely no evi-

4    dence in the record to support that hypothesis, and I see no

5    basis upon which counsel could substantiate what he has just

6    said by any kind of proof.

7         THE COURT:  Read the question.

8         (The reporter read the pending question.)

9         MR. VEEDER:  There are too many ifs and ands in that

10   hypothesis, your Honor.

11        THE COURT:  Overruled.

12        THE WITNESS:  In analyzing the data, I would certainly

13   give it consideration.  Without knowing all the other factors

14   or considering them at the moment, I don't know how it would

15   affect my conclusion or to what degree.  I certainly would

16   take it into consideration.

17   BY MR. LITTLEWORTH:

18        Q  Isn't it true, Mr. Kunkel, that if you have a real

19   pumping hole where one well is sucking water out from the

20   surrounding area, that that tends to even out in a relatively

21   short period of time?

22        THE COURT:  What do you mean by "even out"?

23        MR. LITTLEWORTH:  The contours are going to level out.

24        MR. VEEDER:  What do you mean by that?

25        MR. LITTLEWORTH:  Do you understand?

E

Z60

1      THE WITNESS:  Not exactly.  I don't quite understand

2  what you are driving at.

3      THE COURT:  You mean if you have a cone of depression,

4  a pumping hole which occurs while pumping is going on, and

5  then you stop the pumping, that the water will start to run

6  into the pumping hole and the contour lines that might be

7  drawn showing the pumping hole will tend to even out, as you

8  said, as the water fills into the pumping hole; is that what

9  you mean?

10     MR. LITTLEWORTH:  Yes, your Honor.  Specifically, in

11  this case I gathered from Mr. Kunkel's direct examination that

12  he tried to infer that this 1956 well had been taking a lot

13  of additional water out of the area and it caused this great

14  depression.  As a matter of fact, substantially the same amount

15  of water had come out of this 25E1 well and 26J1 was simply a

16  substitute and it has been substantially the same condition

17  since 1927.

18     MR. VEEDER:  I move to strike counsel's comments.  There

19  is absolutely no basis for his statement.

20     THE COURT:  These are just his contentions.  The record

21  will show they are not evidence.  I have to instruct the jury

22  that statements of counsel are not evidence, but I don't have

23  to instruct myself.  I know that what counsel says is not

24  evidence.  I am just understanding his position.

25     I have trouble, though, following you.  If E1 was pumped

E

Z61

1   and then subsequently pumping ceased in it and Jl was pumped,

2   couldn't you have a pumping hole as the accumulated result

3   of the pumping of both wells?

4        MR. LITTLEWORTH:  It just seems to me, your Honor, that

5   over a long period of years since 1927 you wouldn't have a

6   deep hole, that if you were consistently taking the same amount

7   of water out your contours would gradually level out to very

8   gradual slopes, and he has this sharp depression shown.

9        THE WITNESS:  What has been the pumping regime of other

10  wells in the area is a question that I would have to know.

11  And in the last analysis, it would depend on the water level

12  data.

13       MR. LITTLEWORTH:  All right, let us go on to one more

14  subject.

15       MR. STAHLMAN:  In as much as there has been a great deal

16  of reference to that map, shouldn't it be marked for the record

17  so that we know what we are talking about?

18       MR. LITTLEWORTH:  I think all of the data, your Honor,

19  has been put into the record from it.

20       THE COURT:  He has identified the various properties

21  as at least being within certain sections or some general

22  reference to where they are.  I don't like to take away his

23  map that he is using in his work.

24  BY MR. LITTLEWORTH:

25       Q  Mr. Kunkel, the importance of your calculations on

E

Z62

1    specific yield are that they are one step to calculating the

2    amount of water in storage; is that correct?

3         A   That is correct.

4         Q   And do I understand you that in every one of these

5    basins you took a number of wells, assigned a specific yield,

6    depending on the type of material, and averaged out the specific

7    yield for each well?

8         A   That is correct.

9         Q   And then you averaged the prospective results for

10   an average specific yield for the area; is that correct?

11        A   The end result is, yes-- I didn't do it exactly in

12   that order, but the principle is correct.

13        Q   It is important, then, that you get a fair sampling

14   of the wells and that they are typical of the area in order to

15   have accurate conclusions; isn't that correct?

16        A   The more wells one has statistically the better

17   chance you have of having a reliable answer, yes.

18        Q   They must also be typical of the area you are deal-

19   ing with?

20        A   Yes, they should be typical.

21        Q   Now, referring to your Exhibit 15C--

22        MR. VEEDER:   It is buried under there, if it would

23   help you, counsel.

24        MR. LITTLEWORTH:   If I may, I would like to refer to

25   this a moment.   It is the same one.   It is the copy that you

Kunkel  Cross                    4962

E

Z63

1   gave me.

2          I put a red circle around each of the wells.

3          THE COURT:  If you are going to refer to ones you put a

4   red circle around, you will have to use this exhibit in evi-

5   dence.

6          MR. LITTLEWORTH:  I don't mind losing this, your Honor.

7   That's all right.

8          MR. VEEDER:  I am not sure that--

9          MR. LITTLEWORTH:  Maybe I can finish my question and we

10  will see whether it is important to have this or not.  The

11  circles were for my benefit to begin with.

12         Q  I put a red circle around each of the wells which

13  you listed on 15D, which were within your storage unit No. 4.

14  I wonder if you can examine my map and see if the wells that I

15  have circled are correct, that they are all located in storage

16  unit 4?

17         A  I wouldn't say that they are all located in Storage

18  unit 4. They were the wells that were used for estimating the

19  storage capacity.

20         MR. VEEDER:  The question was whether they are in Unit

21  4.

22         THE WITNESS:  Not all of them are in Unit 4.

23  BY MR. LITTLEWORTH:

24         Q  Are these the wells which you used in calculating

25  the storage for Unit No. 4?

E

Z64

1          A   The wells that are listed on 15D, if you have

2     plotted the same ones, they are the ones.

3          Q   I have simply circled them, and I have counted the

4     wells which you used and I find that there are 26 wells, and

5     of that 26, 15 lie squarely in a stream bed in the younger

6     alluvium and 6 lie immediately adjacent to the younger

7     alluvium, and only one of them lies in the older alluvium

8     solely; is that correct?

9          A   I haven't checked them out in that regard, but it

10    may very well be true.

11         Q   As a matter of fact, the only well which I found

12    which was solely in the older alluvium, with the exception

13    of the two wells which are marked "Destroyed", was the Schrode

14    well; does that sound right?

15         A   It may be correct.  I haven't checked to see whether

16    it is correct or not.

17         Q   And I find in the area north and east of the Schrode

18    well about 15 sections of land and only one well which is

19    not destroyed in that area, and that is located squarely in

20    the creek bed of Long Canyon.  Is that the only well you used

21    to calculate 15 square miles of specific yield?

22         MR. VEEDER:  15 square miles of specific yield?

23         MR. LITTLEWORTH:  Calculate the territory involved

24    there, the specific yield in 15 square miles of territory.

25         THE WITNESS:  As is perfectly obvious from Exhibit 15D,

E

Z65

1    the number of wells that are listed -- I do not recall their

2    exact number-- were averaged and that value was applied to

3    the entire unit.

4    BY MR. LITTLEWORTH:

5         Q  Which bears out your theory that it makes no differ-

6    ence whether a well is sunk into younger alluvium and then

7    goes on into the older alluvium or whether it is put into the

8    older alluvium directly?

9         A  Well, as I have previously testified, by and large

10   the younger alluvium in the areas so depicted are not satur-

11   ated.  I calculated the storage capacity for the area that

12   was saturated and-- That is what I did.

13        MR. LITTLEWORTH:  I have no other questions, then.

14

15

16

17

18

19

20

21

22

23

24

25

F-1 ML j

1    MR. LITTLEWORTH:  I have no other questions, then.

2         I don't think this is necessary, your Honor.

3    THE COURT:  I don't think so.

4    MR. LITTLEWORTH:  Do you want it left up, Mr. Veeder?

     MR. VEEDER:  No.  No.

5    THE COURT:  Maybe someone else has some questions.

6

7    MR. SACHSE:  I don't want to interrupt if somebody

8  else has some questions.  If Mr. Kunkel has material, I

9  would like to wind up my cross-examination.  It wouldn't be

10  very long, your Honor, unless somebody else wants to go

11  ahead.

12         THE COURT:  Proceed.

13

14                    CROSS EXAMINATION

15  BY MR. SACHSE:-

16    Q    I asked you this morning, Mr. Kunkel, to check

17  15-A against 15; that is, to check the ground water contours

18  and to determine whether or not any substantial change had

19  taken place in certain areas.  Have you done that?

20    A    Yes, I did, I --

21    Q    Now, let's take them one at a time, please.  I

22  asked you first, I believe, to check the ground water

23  contours in Wolf Valley.  Starting with the 1000, 1025,

24  1100, 1150, 1200.

25         THE COURT:  Change between '53 and '58?

1          MR. SACHSE:  Yes, your Honor.

2          Q    Do you find any substantial change in those

3     contours between '53, between the way you drew them in '53,

4     and the way you drew them in '58?

5          A    For the contours that you asked me to check, I

6     have found no substantial change.

7          Q    Confining ourselves to Wolf Valley for a moment,

8     that would imply, would it not, that the water table in

9     Wolf Valley is about the same in 1958 aa it was in 1953?

10         A    About the same, yes, sir.

11         Q    And that whatever pumping has taken place in or

12    adjacent to Wolf Valley has had no effect on ground water

13    in Wolf Valley?

14         A    No, that doesn't follow at all.

15         Q    Ground water is the same, isn't it?  You just

16    answered me that it was.

17         A    I said, "about."  On the basis of the contour

18    interval that has been used, the number of wells.  If we

19    had enough wells and we had enough measurements, we drew our

20    contours down to one-foot increments, there is a change.

21         Q    Did you make the same calculation as I requested

22    for the 1000, 1025 and 1050 contours in Murrieta Valley?

23         A    For the contours that you have mentioned.

24         Q    No significant change?

25         A    No significant change.

1      Q    And would that answer apply also to the 1050

2    and 1100 contours between Long Canyon and Pauba Valley in

3    the older alluvium?  No significant change?

4      A    In general, no significant change.

5      Q    I have observed, comparing '53 contours as shown

6    on 15 in Pauba Valley, and the '58 contours for the same

7    area, that in 1953 they appear almost equally spaced and

8    would indicate a rather even ground water break; is that

9    correct?

10     A    That is correct.

11     Q    And then, looking at Exhibit 16 where you actually

12   depicted the ground water gradient, that would also appear

13   to gibe with the '53 ground water contours?

14     A    In general, that is correct.

15     Q    An even hydrolic gradient?

16     A    Fairly much so, yes.

17     Q    However, I observe that the hydrolic gradient

18   is no longer even but that it rises much more sharply

19   between the 1150 and the 1200 contours; and if you would

20   transpose it to 16, you would have to show a rather sharp

21   break in the angle of the gradient, would you not?

22     A    In general, there is a flatter gradient in 19 --

23   as indicated on Exhibit 15-A, between the 1100 and the 1150

24   contour than there was in 1953 as indicated and a gradient

25   between the 1150 and 1200 would be steeper, yes.

Q   Mr. Kunkel, just as a matter of information to me, don't hydrolic gradients tend, assuming like transmissibility of material, don't hydrolic gradients tend to follow an even slope rather than to go off in steps like that?

A   Now, if I were to draw the gradient out, I wouldn't have drawn it as you have drawn it.  It would be a smoother gradient.

Q   So how do you account, then, for the sudden change --   I won't say sudden -- for the change between '53 and '58 from an even hydrolic gradient running from east and west to the present one which is not even?

MR. VEEDER:   In what area, now?

MR. SACHSE:   Pauba Valley; the same one that is depicted on 16 and that we just discussed.

THE WITNESS:   It could be attributed to conservatism. I have indicated that the 1200 contour interval for virtually a number of miles, six, seven or eight miles, is inferred. I have used the shortest dashes.  If one would want to argue that the contour should go farther back, I wouldn't argue violently.  All it would mean would be that there had been more water withdrawn from storage than I originally indicated.

Q   BY MR. SACHSE:  With particular reference to this matter of inferring contours, I am going to ask you to assume that I have depicted here three wells, and we will say they are three miles apart, each one of them; and that they have

identical water tables when measured.  It would be perfectly

logical and possible to draw water contours like that

through them, would it not, ground water contours?

A   One would have to know some of the details on the

geology.  Under certain circumstances --

Q   In the older alluvium?  We will assume they are

all in the orange material you have here, material indicated

orange.  That would be a logical contour, possible contour,

would it not?

A   It would be a possibility, yes.

Q   This would be a possible contour, also, would

it not?

A   Yes.

MR. VEEDER:  Now, just a moment.

THE WITNESS:  I am sorry.

Q   BY MR. SACHSE:  Would it not?

MR. VEEDER:  It is not in the record.  There is

nothing in the record.  He says this could be a possible

contour.

MR. SACHSE:  Thank you, Mr. Veeder.  That is a good

criticism.  I could change the contour.

THE COURT:  Counsel first drew a straight line through

the three wells on the blackboard in a row.  And then he

drew a curved line dropping down from the first well up

through the middle one up above the level and then down to

the third row.

MR. SACHSE:   Thank you, your Honor.   That was a good criticism.

Q   That is a possible contour, also, is it not?

A   Yes.

Q   Now, I am going to reverse the process, and I am going to go above the first well, down through the middle well, and from below up to the third well.   That is a possible contour on the same state of facts, is it not?   Is it not?

A   Humm.

MR. VEEDER:   I hope the record reports that, whatever it was.

THE WITNESS:   It is a possibility.   I mean I --

Q   BY MR. SACHSE:   And, in fact, --

A   But I am not saying I would draw it.   I am not saying I would draw it that way.   I mean if --

MR. VEEDER:   Do you intend to introduce evidence to support that, counsel?

MR. SACHSE:   Mr. Veeder, I am asking only to assume these things; that the wells are equally distant apart; that they are all in the orange qtoal, as delineated on 15-A; and that they have identical water table.

THE WITNESS:   You are not putting it in the framework of the surrounding geology.   You are not telling me where it is.   You are just taking three wells out in the --

Q  BY MR. SACHSE:  I will ask you to assume that those three wells lie in the area between, lie along the 1150 foot contour, as you have delineated it on 15-A where it passes from the younger alluvium of Pauba Valley and next intersects the younger alluvium of Santa Gertrudus Creek. Have I made myself clear?  Three wells through --

A   Where are the three wells?  Will you point them out to me, please?

Q   Any three wells two miles apart along that line, each two miles apart?

A   Well, the circumstance you are pointing to isn't the circumstance that you have described.

Q   I don't follow the answer.

THE COURT:  He means there aren't three wells of that character along that 1150 line, is what he means.

Q  BY MR. SACHSE:  What I am trying to say is if you can locate any such three wells.

Let me ask you, then:  How did you decide whether your line is going to be a straight line through them or whether it is going to represent the first curve I drew, which passes below the first two and above the other two, or the third curve I drew?  How do you decide that as a geologist?

A   The map, Exhibit 15-A, before the contours were drawn on it, was plotted up showing the wells.  At each well

Kunkel – Cross                                      4972

in, say, in a red pencil I have shown the altitude of water surface for 1958.  For other wells where I didn't have any 1958 water level measurement I say the wells that are shown destroyed in Sections 6, 2 and 3, in Township 8 South, north of Pauba Valley, were 1927 measurements there.  I filled those in with a blue pencil, and I put a blue notation of the altitude of the water surface.  For other wells where I wanted some basis of comparison I may have shown a 1953 measurement in black.  On other wells, as indicated, as, for example, the Windmill Well, I showed the measurement for '53, 1927, 1958.  I did that for the whole area.  And I stopped and looked at it, and I thought.  And on the basis of the known facts and principles of geology and ground water hydrology, I drew in the water level contours, in my opinion, and based on the data as shown where those contours had to fall.  And by the types of symbolism I attempted to show the degree of certainty with which the contour was placed.

Q   You testified, at your very earliest description of ground water contours a week or two ago, that the movement of ground water was always a direct right-angle to the contour?

A   Yes, that is correct.

Q   So, the change, a slight change in the curve, the arc between two reference points on a contour might make a very substantial difference as to direction of ground water

1    flow, might it not?

2         A    A change in the position of the contour would

3    make a difference in ground water flow; but, when you have

4    a series of water level measurements spotted around, and we

5    know the water moves from high head to low head -- it isn't

6    moving in any other direction -- the degree of change isn't

7    going to be great, and if someone wanted to come up here

8    and quibble or honestly disagree with me, I don't really

9    care which.  We might say maybe the contour ought to be here

10   or there or elsewhere.  But when you are all done, the water

11   is going to be moving from the high land areas through the

12   older alluvial deposits.  Part of it --

13        Q    You are now pointing to 15-A?

14        A    I am pointing to 15-A.  Part of it will go

15   through the barriers, some of it may leak over the top.  It

16   is going to go into Murrieta Valley, discharge southeast out

17   of Murrieta Valley and ultimately it is going to go out of

18   Temecula Canyon.  Minor changes due to an honest disagreement

19   between a couple of hydrologists isn't going to change that

20   picture.

21        Q    Then, I think I have just about one or two more

22   questions.  And to make this question clear I am going to

23   draw a very schematic diagram of the Pauba Valley.  This is

24   supposed to be Pauba Valley.  This is qtoal on the one side

25   to the north.  This is qtoal to the south.  The water flow is

1    in this direction.  This, we will assume, is your 1050

2    contour.  Now, you heard Mr. Hall's testimony, did you not,

3    in which Mr. Hall stated that the releases of water from

4    the Vail Dam showed up in well level measurements downstream

5    sometimes very quickly, depending on distance, and sometimes

6    two weeks later or so?

7         MR. VEEDER:  Counsel, isn't your contour line just

8    backward?

9         MR. SACHSE:  I beg your pardon.  My contour is

10   curved the wrong way.  You are right, Mr. Veeder.  Let's do

11   it accurately.

12        MR. VEEDER:  All we want are the facts.

13        MR. SACHSE:  This way.

14        Q    Now, I am going to ask you to assume that enough

15   water has been released from the Vail Dam to push this

16   contour downstream a certain distance half a mile.  Are you

17   following me?

18        A    I am with you.

19        Q    What happens to the junction between the contour

20   line here at the point of contact between the older and

21   younger alluvium and the contour line in the older alluvium?

22   Does that move simultaneously with the contour in the

23   younger alluvium?

24        A    May I correct your drawing?

25        Q    Yes, go ahead.

1      MR. VEEDER:  No.

2      MR. SACHSE:  I want to find out.

3      MR. VEEDER:  Go ahead.

4      MR. SACHSE:  Yes, go ahead.

5      THE WITNESS:  Assuming that there has been a slug of

6   water released down Pauba Valley, disregarding the pre-

7   cipitation on both sides, make it from Vail Dam or any place

8   you want, I don't particularly care, you raise the water

9   levels.

10     Q   In Pauba Valley?

11     A   In Pauba Valley.  The immediate effect is not

12  that the contour is going to move down-gradient as you have

13  shown it, but it will move down-gradient.  And I will make

14  an X instead of a dash, so there won't be any confusion in

15  the symbols.  The immediate effect would be a movement in

16  that direction.  Ground water would bleed out of the younger

17  alluvial deposits and recharge the older alluvial deposits,

18  and the ultimate effect would be that this contour would

19  ultimately move down.  And assuming under conditions of

20  stability after the water had released and things are

21  stabilized, a position somewhat farther downstream and ultimately

22  would assume the arc position down-gradient.  But the

23  immediate effect would be the water would bleed into the

24  older alluvial deposits from the younger alluvial deposits.

25     Q   That is the exact correction I want to get at.

1  You used the phrase "immediate effect." Now, Mr. Hall

2  testified that the effect in the wells downstream in Pauba

3  Valley was very prompt in some cases, as much as a matter of

4  hours, as they got more remote a matter of a couple of weeks.

5  Now, what do you mean when you say that the immediate effect

6  would be to bleed out into the older alluvium? Timewise?

7       A   As soon as the head was established with a

8  hydrolic gradient toward the older alluvial deposits, which,

9  if the testimony of Mr. Hall was correct, which I have every

10 reason to believe that it is, as soon as that occurred, and

11 would occur rather quickly, the younger alluvial deposits

12 would immediately start bleeding into the older alluvial

13 deposits. And after the stream flow ceased, the younger

14 alluvial deposits would have considerable time to achieve

15 the position of stability.

16      Q   Now, if you will look --

17      MR. VEEDER: Just a moment. He has been drawing here

18 for some time. Where are the older alluvial deposits to

19 which you have been pointing your arrows?

20      MR. SACHSE: Qtoal. Qtoal. They are written on the

21 diagram. I think Mr. Kunkel understands.

22      MR. VEEDER: That is laterally into the qtoal?

23      THE WITNESS: I am talking about a lateral direction,

24 depending how deeply your deposits have been dewatered.

25 Pictures could be drawn for loss in a vertical direction.

Q  BY MR. SACHSE:  Now, with that in mind I want to direct your attention specifically now to the 1100-foot contour as it is shown on 15-A crossing Pauba Valley.  And you have drawn that as a -- you call it what?  It is exact --

A  Exact solid contour.

Q  Solid contours.  It is not a guess.  Now, that has very little curve in it.  A right-angle direction from the lines in the older continental deposits do not bleed into Pauba Valley, do they?

A  That is correct, as of 1958, --

Q  As of now?

A  -- and shows that is the way it is drawn.

Q  They would not be bleeding into Pauba Valley as of October, 1958?

A  But this point the basin is full.

Q  Suppose this contour line has moved downstream, as you have just discussed here on the blackboard, 1100-foot contour?  What would it do to a large discharge from Vail Dam?  What would it do to the contour in the older deposits on either side?

A  We would have a pretty hard time moving that contour down-gradient.  I believe that contour crosses at the, that water level contour crosses at approximately the 1100-foot land surface contour.  It does.  That is the reason the contours at that position -- that is the reason it is

drawn as a solid line.  You want a lake down there or --

Q   Am I to understand this should be a point of rising water?

A   It is a point.  Here is your point of rising water, and there is water in the stream all the way down these contours crossing at the corresponding land surface contours.

Q   In other words, from the point of rising water in Section 14, Township 8 South, Range 2 West, shown on Exhibit 15-A, you considered the Pauba Valley as of October of this year full all the way, the basin?

G

Z66

1          A  You are talking about Pauba Valley and Pauba Basin.

2  Will you define the limits--

3          Q  The basin.

4          A  I haven't defined basin yet, so--

5          MR. VEEDER:  There is nothing to show that that is a

6  basin.

7          MR. SACHSE:  The storage unit you have delineated as

8  Pauba Valley.

9          THE WITNESS:  Below the point of rising water, within

10  the area colored yellow, in general that is correct, the

11  basin--

12  BY MR. SACHSE:

13          Q  It is full.

14          A  Not the basin.

15          Q  The storage unit.

16          A  The storage unit is full.

17          MR. SACHSE:  I have no further questions.

18          MR. VEEDER:  Is that all?

19          MR. MOSKOVITZ:  No, I have some questions.

20

21                        CROSS-EXAMINATION

22  BY MR. MOSKOVITZ:

23          Q  Mr. Kunkel, what were the depths of the wells which

24  you used to draw the water level contours on Exhibit 15 in the

25  places where those contours passed through the Pauba Valley?

G

Z67

1      A  They were varying depths.  I had to use judgment
2  as to what I selected.  They ranged in depth from a couple of
3  hundred to four or five hundred feet.  Without checking my
4  notes and going into each specific well, I don't recall the
5  exact details.  As I pointed out, I plotted up the data,
6  considered it all within the hydrologic framework and drew
7  the contours in as they are.

8      Q  In specific answer to my question, would you say
9  they range in depth from 100 to 400 feet in Pauba Valley?

10      A  I believe I said a couple of hundred to 400.  I
11  didn't specifically bracket an exact distance.  I would have
12  to check my notes to be certain.

13      Q  Could you do so quickly now so we can get the range
14  of depths of wells that you actually used?

15      A  I don't know how quickly I could do it.  Well, you
16  have my 15B.  I would have to check those against the logs and
17  other data available and I would have to reanalyze what I did
18  and think about it again and explain it to you.  It is not a
19  simple, quick process.

20      MR. MOSKOVITZ:  Your Honor, last week when we were
21  discussing whether there should be spotted on Exhibit 15 the
22  wells that were used for those contours, the conclusion was
23  that we should attempt to spot them ourselves, and we had some
24  difficulty.  This is why I am asking the questions of the
25  witness.  Perhaps he can do so at the recess and tell us which

G

Z68

1    ones they were.

2            THE COURT:  What is the exhibit number for the list of

3    wells that you used to spot the contours?

4            THE WITNESS:  Well, if I may testify from my notes--

5    I would very much like to have them back-- I could put this on

6    Exhibit 15, I suppose, if I were so directed.  But this is

7    my work map upon which I might say I did my thinking.

8            THE COURT:  Do we have the exhibit number, my inquiry

9    is, that shows the list of wells that you used in connection

10   with water contours?

11           THE WITNESS:  15B.

12           MR. MOSKOVITZ:  15B relates to 15A, does it not?

13           THE WITNESS:  I am sorry.  Were you referring to--

14           MR. MOSKOVITZ:  17.

15           THE WITNESS:  You mean 15?

16           MR. MOSKOVITZ:  Pardon me, 15.

17           THE WITNESS:  I do not have an exhibit immediately

18   available for 15 as I have for 15A.  I would take a little time

19   to reorganize my notes so I could make a satisfactory presenta-

20   tion.  I do have the data.  I have gone through the identical

21   process that I used for 15A.

22           THE COURT:  What are you interested in, the data that

23   he used to put the contours on Exhibit 15?

24           MR. MOSKOVITZ:  Yes, your Honor.

25           THE COURT:  To contrast them on 15A?

G

Z69

1       MR. MOSKOVITZ:  Yes.

2       THE COURT:  Well, I think it is a waste of time.  You

3  have a small scale map.  You now have a map that is much

4  bigger in scale.  You have the data that he used in Exhibit 15B

5  to do it.  Do you still want to know the wells that he used

6  when he made the original map 15?

7       MR. MOSKOVITZ:  Your Honor, if no inferences or con-

8  clusions are going to be drawn from changes that are apparent

9  from 15 and 15A, then there is no problem.

10      THE COURT:  What changes do you think are apparent

11 between the two of them?

12      MR. MOSKOVITZ:  Well, your Honor, some of the contours

13 have moved, some have not.  I think there is some question as

14 to why some moved and some didn't.  Some of the contours have

15 been extended, for example, southeast of Pauba Valley there are

16 contours drawn in on 15B which do not appear on 15.  Some

17 inferences can be drawn as to the effect of pumping, activities

18 of man, and as long as they can be drawn I think we should be

19 able to compare the well levels that were used for each of

20 the two maps.

21      THE COURT:  What is it you want specifically?

22      MR. MOSKOVITZ:  What I specifically hoped for was to

23 have for Exhibit 15 the equivalent well locations as appear

24 on 15B, so that fairly readily we could match up the levels

25 with the contours.  Frankly, we have had trouble matching them

G

Z70

1    up.  On 15A we can do so without much trouble.  You can look

2    on the map and you can see the wells and then you can look

3    on 15B and see the levels.  But for 15 it is very difficult

4    to do that.

5        THE COURT:  Well, Mr. Kunkel, on 15B you list six pages

6    of wells which were used to make the contours on 15A.

7    Approximately how many wells did you use in making your

8    original partial contours on 15?

9        THE WITNESS:  I don't recall.  It is approximately the

10   same number.  It might be slightly more.  I evaluated the

11   results slightly different inasmuch as I was working with the

12   data that I copied from the files of the Department of Water

13   Resources, so I extended my interpretations as far as I might.

14   I had a series of my own measurements.  There were additional

15   wells drilled since 1953 also, and I secured water level

16   measurements in additional wells that the Department of Water

17   Resources hadn't secured water level measurements in.  So I

18   had some basis for extending my contours where I did-- I

19   wouldn't say some-- I had a basis for extending my contours where

20   I did.

21       MR. MOSKOVITZ:  Maybe I can get the information by asking

22   him what additional wells he had to make the changes that he

23   had.  I will try to approach it that way.

24       Q  Mr. Kunkel, what additional levels did you have in

25   the area southeast of Pauba Valley between the time you drew

Kunkel    Cross    4545    4984

G

Z871

1    Exhibit and 15A?

2        A  I had Well 26K1, which, as far as I know, was not

3    measured by the Department of Water Resources in 1953.  I

4    had some measurements, I believe, in Well 35C1, 8 South, 2

5    West, where, which were at some variance with the records

6    in the files of the Department of Water Resources.  The

7    measurements that I took were in an open casing, whereas in-

8    spection of the data by the Department indicated there was a

9    pump in the well and for one reason or another the measurement

10   was suspect.  I wouldn't say it was wrong, but there was

11   considerable difference and I very carefully checked my

12   measurement out.

13       So I had additional control in that area.  I don't

14   recall just which measurements the Department of Water

15   Resources, how many measurements they had in the area south-

16   east of Pauba Valley.  I also know-- I have seen the log and

17   the data-- that Vail has drilled a well, I believe, approx-

18   imately in the South Half of Section 13, 8 South, 2 West.

19   Without having the exact location of that well, the data does

20   support the existence of the 1200-foot contour.  As I have

21   emphasized, it is an inferred line.

22   BY MR. MOSKOVITZ:

23       Q  You didn't have that well spotted on Exhibit 15A?

24       A  No, it was not spotted, but it is something that I

25   knew, that I considered. You have to realy on all of your knowledge

1   and all of your judgement.  You just can't say, "Here are a

2   series of water level contours," and contour them or not

3   contour them, without relying on everything that you know.

4        Q  Then what you are saying is that you did have

5   additional data in 1958?

6        A  Yes.

7        Q  And that you did not have available for your 1953

8   contours?

9        A  That is correct.

10        Q  And since you had more data you felt that you could

11   draw more contours or extend them further than you could in

12   your earlier map?

13        A  In general, that is correct.

14        THE COURT:  Would you say that your 15A was a more

15   accurate set of contour lines than 15?

16        THE WITNESS:  Well, the very fact that it is on a larger

17   map scale would have some bearing on that.  In that regard, yes.

18        THE COURT:  And it is also based on more data than

19   your map 15?

20        THE WITNESS:  Where the contours are shown, I believe

21   they are, on 15, I believe they are accurate.  I did not ex-

22   tend them and cross the areas where I had a degree of un-

23   certainty when I constructed Exhibit 15.  As I earlier testified,

24   the 1100-foot contour just doesn't go up into the Long Canyon

25   area northeast of Pauba Valley and stop.  That contour does

1  continue on.  On the basis of the data that I had in 1958, I

2  was able to locate the position of that contour, I feel, with

3  a reasonable degree of certainty, as indicated by the type

4  of symbolism used.

5  Q  Now, on Exhibit 15 the contours you show going from

6  southeast of Pauba Valley through Pauba Valley and to the

7  northwest of Pauba Valley are dotted, are they not?

8  A  On 15?

9  Q  Yes.

10  A  They are dashed.  I had two types of contours on 15,

11  rather than three.

12  Q  You had the solid and--

13  A  Solid and dashed.

14  Q  The dotted one means that the positions were approx-

15  imate and could vary to some degree?

16  A  Again, to some degree; not to the point where you

17  would have the water flowing in another direction.

18  Q  When you drew Exhibit 15 and put the water level

19  contours on, did you have levels of wells up in the northeastern

20  portion of your ground water unit 4, such as those you have

21  spotted on Exhibit 15A?

22  MR. VEEDER:  I think that should be identified by

23  section.

24  MR. MOSKOVITZ:  Did I say northeast?  The northwest

25  portion.

G
Z74

1    Q  Do you know what I am talking about, without identi-

2   fying the sections?

3    A  The northwestern part, do you mean the part north-

4   east of Murrieta, approximately Section 9, 7 South, 3 West?

5    Q  Yes, in that neighborhood and northwesterly of

6   there.

7    A  If I remember correctly, I had water level measure-

8   ments in that area.  I would have to check Exhibit 16-- some

9   letter-- I don't recall the letter-- to see.

10   Q  And did you have fewer then than you had when you

11  drew 15A?

12   A  In that particular area I am not certain.  First,

13  I am not certain just where you are referring to.  I don't

14  know the answer to your question.

15   Q  To be certain about the area, in the area, do you

16  see the-- If you drew a straight line between the town of

17  Murrieta and Temecula Hot Springs, the area northwesterly of

18  that line.  I am talking about that area.  Did you have more

19  wells for 15A than you had for 15?

20   A  In that particular area I don't recall.  What it

21  amounts to is a comparison between 15B and Exhibit 16-B or C

22  that lists the lists that were used for 1953, and I didn't

23  make the comparison.  I didn't think it was particularly

24  significant.

25   Q  But apparently in drawing your 1953 contours you

1   did not have sufficient data to extend your contours up in that

2   area I just described?

3        A  It is not exactly what I said.  I said I am willing

4   to place more faith on measurements made under my direction

5   where I have checked out the water levels.  I know the men.

6   I can ask them what happened.  If there is something peculiar

7   about this measurement, why is it peculiar?  Or I was there

8   myself.  I have some basis-- I shouldn't say some-- I have a

9   better basis for evaluation of the data than I do if I take

10  someone else's data.  I don't know what problems-- a water

11  level measurement, for one reason or another, doesn't seem

12  right.  The man that made it isn't available for me to ask

13  him, "Why isn't this measurement right?  What was the condition

14  at the well?  Was the well pumping?  Did it have a big pump

15  on it?  Did your tape smear?"  This, that, or the other.  There

16  are many reasons.  So it is not a simple matter of just how

17  much data is available.  It is how to evaluate it and how to

18  consider it and what faith you put in it.

19       Q  I take it, then, you had more faith in the data which

20  related to wells immediately southeast and in Pauba Valley and

21  immediately northwest of Pauba Valley than you had in the data

22  which was available to you further northwesterly?

23       MR. VEEDER:  I am going to ask that they identify it,

24  and specify points of time and everything.

25       THE COURT:  Well, he finally said 1953.

G

Z76

1          MR. MOSKOVITZ:  1953.

2          Q  I am trying to find out, Mr. Kunkel, why the contour

3   lines in 1953 ended where they did.  Was it because of lack

4   of data that you later secured?

5          MR. VEEDER:  There are two questions.  Which?

6          THE COURT:  Well, he has withdrawn the first one.

7          MR. MOSKOVITZ:  I will withdraw the first one.

8          THE COURT:  He has a question pending.  Why did the

9   contour lines end where they did as of 1953 on Exhibit 15?

10   Was it because of lack of data?

11          THE WITNESS:  In one sense, that is correct.

12   BY MR. MOSKOVITZ:

13          Q  Is there any other sense that it is not correct?

14          A  Yes.  When I am using someone else's data I tend to

15   be more suspect than when I use my own data, and the person

16   who collected the data in 1953 I think had sufficient data

17   to do what I did in 1958.  If he didn't do it, that is neither

18   to his credit or discredit.  That is his business.

19          MR. VEEDER:  Your Honor, I fell off the sled.

20          THE COURT:  Mr. Veeder said he fell off the sled.  I

21   did, too.  What do you mean by the person who collected this

22   data in 1953 didn't do it, that was his business?  Did someone

23   else collect the data as of 1953?

24          THE WITNESS:  The data that I used was the original

25   records in the files of the Department of Water Resources.

G

Z77

1          THE COURT:  You mean if they didn't want to take the

2     responsibility of trying to draw contour lines with what they

3     had, that is none of your business?

4          THE WITNESS:  That is virtually correct.  I am not

5     challlenging what they did or didn't do.

6          THE COURT:  Well, they may have felt the same as you

7     do, that the data was a little skimpy.  It may have been

8     suspect in some way.

9          THE WITNESS:  I don't know what they think of their

10    own data.

11         THE COURT:  The question isn't much of a question.

12         MR. MOSKOVITZ:  Shall we have a recess now, your

13    Honor?

14         THE COURT:  Do you want one now?

15         MR. MOSKOVITZ:  Yes.

16         THE COURT:  Take a short recess.

17         (Recess.)

18    BY MR. MOSKOVITZ:

19         Q  Mr. Kunkel, were all the water level readings

20    appearing on Exhibit 15B, which were taken in October of this

21    year, made by you or under your direction?

22         A  With the exception of the water level measurement

23    in the windmill well, which was made by Mr. Green, on the two

24    days that I visited the well the well was leaking water and

25    I was unable to get as reliable a measurement as I considered

G2

Z78

Kunkel - Cross

1    Mr. Green's to be, which was taken when the well was pumping.

2         THE COURT:  Who is Mr. Green?

3         THE WITNESS:  Mr. Green is an employee of the Navy and

4    Vail Company who measures water levels regularly in Pauba

5    Valley or in the Santa Margarita River watershed.

6    BY MR. MOSKOVITZ:

7         Q   That is the windmill well that is up at the easterly

8    end of Pauba Valley?

9         A   Yes.

10        Q   Now, let me call your attention to Well 7 South,

11   3 West, Section 23K1.  This is located between Santa Gertrudis

12   Creek and Murrieta Hot Springs.

13        A   7 South, 3 West, Well number, please?

14        Q   23K1.

15        A   Yes, sir.  That well--

16        Q   I just want to ask you some questions on it now that

17   you have it located and noted on Exhibit 15B.

18        A   Yes.

19        Q   What was the level of the water from sea level in

20   that well when it was measured?

21        MR. VEEDER:  At what time?

22        MR. MOSKOVITZ:  By his people in October of this year.

23        THE COURT:  The chart shows 92.93.

24        MR. MOSKOVITZ:  That is distance to water.  I mean the

25   distance above sea level, so that we can correlate the two

G2

Z79

1 wells.

2  Q I have a figure, and you may want to check it; I

3 have 1018.1 feet.

4  A 1018 is what I have.

5  Q Now, I note that immediately to the north of that

6 well you have a 1050-foot contour on Exhibit 15A; isn't that

7 correct?

8  A That is correct.

9  Q And the contour to the south of that well is the

10 1040-foot contour; is that not correct?

11  A That is correct.

12  Q Do those two contours and the arrows which are drawn

13 through them showing the flow from north to south underground,

14 are those consistent with the level of that Well 23K1?

15  A Well 23K1 happens to be one of the wells, and it is

16 one of the very few wells, that I did not use, because I did

17 not believe the water level measurement was truly depicted of

18 the conditions at that point.

19  Q Did you have reason to believe that the measurement

20 reported to you was inaccurate?

21  A Not necessarily.  It might have been.  I did not have

22 an opportunity to go back and actually check that particular

23 measurement.  The man who measured it said, in his opinion, it

24 was as good a measurement as he could get and he thought it

25 was accurate.

4993

G2

Z80

1    However, there are several possibilties.  One, that is

2  a windmill well.  I am not familiar with its exact details of

3  construction.  It could have been pumped rather recently and

4  because of poor construction of the well, for one reason or

5  another, the level could have been pulled away down and had

6  not recovered sufficiently to reflect the true conditions.  It

7  could have been an inaccurate measurement.

8    In my opinion, that situation just can't exist where

9  the true water level plane at the present time is down at that

10  level.

11    Q  Why couldn't there have been a pumping hole there

12  just as you depicted in the vicinity of the Roripaugh well

13  southerly from there?

14    A  Because the Roripaugh well is a large producing well.

15  The well has been measured before.  We have had an opportunity

16  to check the water level measurements out.  Well, I just know

17  that the measurements in that area are accurate on the basis

18  of my experience.  I happen to know that on Well 23K1 the

19  State of California did not report a measurement for it.  They

20  either couldn't get into the well-- It is a well that is

21  difficult to measure.

22    Q  Now, let me call your attention to Well 7 South,

23  3 West, 25M1.  That is immediately to the east of the Roripaugh

24  well in the next section about a third of a mile west.

25    A  Yes, I am looking at it.

Kunkel - Cross

4994

G2

Z81

1    Q   The level that I have for that well in 1958 was

2  1048 feet. Would that be correct?

3    A   That is correct.

4    Q   Let me call your attention to Well 7 South, 2 West,

5  30D1. That is about three-quarters of a mile northeast of

6  the well I just called your attention to. It looks as though

7  it is right on the section line.

8    THE COURT: 1043? 58-foot water level?

9    MR. MOSKOVITZ: I figured 1053, your Honor.

10   MR. LITTLEWORTH: That is what I figure.

11   THE COURT: Now what are you taking, the 49 500, the

12  1953 level or the 1958 level?

13   MR. MOSKOVITZ: The 1958 level.

14   THE COURT: 5642 from 1110? Oh, pardon me. 1053. All

15  right.

16  BY MR. MOSKOVITZ:

17   Q   Mr. Kunkel, the level in that well in 1958 when it

18  was measured by you people was 1053.6, approximately?

19   A   Approximately. My notes say 1052, which is the

20  altitude that I used.

21   Q   Now, having the levels of the two wells that I just

22  mentioned, 25M1 in 7 South, 3 West, and 30D1 in 7 South, 2

23  West, would you say that your 1050 contour is accurately

24  located?

25   A   You are referring to 25M1?

Kunkel   Cross                                                                4995

G2

Z982

1    Q  Yes, and 30D1.

2    A  And 30D1.  In my opinion, it is accurately located.

3    Q  Isn't it closer to 30D1?

4    A  Well, as I pointed out before, if another qualified

5    hydrologist were to take the same data, there would be minor

6    differences.  He might draw it differently. But the direction

7    of ground water movement and points of discharge would be

8    virtually the same.

9    Q  Could you explain why that 1050-foot contour should

10   not be closer to Well 25M1?

11   MR. VEEDER:  I object to this.  This is repetitious,

12   your Honor.  The witness explained.

13   THE COURT:  Overruled.

14   THE WITNESS:  I also used control on Wells 24A1, which

15   is to the north, Well 25R1 to the south, and you certainly

16   aren't going to bring a contour up from the south to the east

17   of Well 25R1 and throw a peculiar hook in it, without some

18   justification or reason.

19   BY MR. MOSKOVITZ:

20   Q  Wouldn't the levels be sufficient justification or

21   reason -- the levels of the water in the wells?

22   A  When you draw a water level contour map you just don't

23   take data and mechanically add it up.  You look at it and you

24   think.  And on the basis of my thinking and reasoning and what

25   I know of hydrology, I placed the water level contour where, in

G

Z83

1    my opinion, it is reasonable.

2         Q  In other words, these contours may or may not be

3    consistent with the water level measurements you received;

4    as long as they were consistent with the thought you had of

5    what the hydrology was?

6         A  They are consistent with the water level measurements.

7         Q  Let me call your attention to Well 24A1, which you

8    just mentioned as being one of those which control the drawing

9    of the 1050 contour.  What was the level of the water in that

10   well when it was measured?

11        A 1047.  According to your definition, it should be to

12   the right.  Drill a well a little deeper there and you will

13   get a 1050.  Drill it a little deeper and you will get a 1055.

14   As previously testified by myself and Mr. Worts, you just

15   don't take data and mechanically plot it up.  You have to use

16   your judgment and intelligence and draw water level contours,

17   pick the conditions within the framework of a reasonable

18   hydrologic picture.

19        THE COURT:  Was that a shallow well?

20        THE WITNESS:  I would have to check the data to be

21   certain.

22        MR. LITTLEWORTH:  The Ceas well was 165 feet to bedrock.

23        THE COURT:  Specifically, what was your reason for

24   running the contour line to the west of it rather than to the

25   east of it?

G

Z84

1    THE WITNESS:  In my opinion, it doesn't seem reasonable

2    that a water level contour would go up and hook that way.

3    Now what could be done-- it is entirely possible; I don't

4    recall if there is a pump on that well or not-- but if a well

5    has been pumped there may be a small pumping hole around it.

6    I am not saying-- what I am trying to depict is the overall

7    water table on the water body within the older continental

8    and younger alluvial deposits to show the source the direction

9    and movement of ground water.

10    THE COURT:  All you could do is use your best judgment?

11    THE WITNESS:  You have to use your best judgment.

12    THE COURT:  Another engineer might have run that line

13    through Al or might have run it east of 24A1?

14    THE WITNESS:  That is correct.  And the ultimate or the

15    final picture would not be appreciably different.

16  BY MR. MOSKOVITZ:

17    Q Now, what you are saying, then, is that these water

18    level contours that you have been referring to could be

19    altered in location and be consistent with the data which you

20    used in drawing them?

21    A  To a degree.  I mean, to a certain point I would be-

22    gin to object with another qualified hydrologist that maybe

23    he was going a little bit too far one way or the other.

24    Q  And if he drew this 1050-foot contour so it was

25    closer to Well 25M1, that is, moved it westerly at that point,

G

Z85

1   and then if he continued drawing it so that it was easterly

2   of Well 24A1, you would think that that was consistent with the

3   data on which it was based?

4       A   I would have to see how the rest of the map worked

5   out.  I mean--

6       Q   But as I take it, your objective was to show the

7   general picture of the movement of water generally from the

8   higher area to the northeast down toward the southwest?

9       A   With due regard to the water level measurements in

10  Wells.  As I have previously stated on several occasions in

11  the record, all measurements were not used without some

12  consideration.  The type of measurement that you have pointed

13  up is the exception rather than the rule.

14      Q   In considering whether the 1050-foot contour should

15  be easterly of Well 24A1 or should be westerly as you actually

16  drew it, did you consider that there would be a problem by

17  having that 1050-foot contour very close in distance to the

18  1150-foot contour if you did have it swing to the east of

19  Well 24A1?

20      A   That would be a consideration, and I think it is

21  adequately demonstrated on the symbolism used on the 1050-foot

22  contour.  Coming up from the south it is a long dash, for a

23  portion there it is a rather extensive long dash, and then I

24  drop into my short system of dashes, in saying that it is an

25  inferred contour derived by reasoning or implication to a

1   conclusion of fact from premises.

2       Q   Specifically, I want to know whether the fact that

3   those two contours, 1050 and 1100 feet, would be close to-

4   gether was a factor which caused you to move the contour to the

5   west of Well 24A1?

6       A   In general I would say that that would be a factor.

7       Q   Generally speaking, is there something inconsistent

8   in having contours close together in one area and then immed-

9   iately adjacent having them far apart from one another--

10  contours of the same interval?

11      A   It would depend on the geology of the area.

12      THE COURT:   Does the fault line that cuts across there

13  from Murrieta Hot Springs to the east have any effect upon your

14  decision?

15      THE WITNESS:   Yes, it would have some effect.  With all

16  due regard to Mr. Littleworth's client, I strongly suspect the

17  occurrence of bedrock in Well A1.  It very well may be there.

18  I certainly wouldn't say it is not.  But I do suspect that it

19  isn't at that depth.

20      THE COURT:   Because of the fault line there?

21      THE WITNESS:   Because of the fault line there.  I do

22  not recall the depth at which wells have been drilled in

23  Murrieta Hot Springs.  But I don't recall that they encountered

24  bedrock.  They may have.  I don't remember.  But we do have

25  rising water at Murrieta Hot Springs, indicating that ground

G

Z87

1  water stands at 1100 feet there.  In general, water level

2  contours do not move in a direction and make a right-angle

3  turn or so.  I mean those things were all taken into consider-

4  ation.  But for the purposes of discussion, I will go along

5  with you and say, "O.K., put it on the other side.  What is it

6  going to do to your overall story on source and movement of

7  ground water?  It is still the same picture.

8  BY MR. MOSKOVITZ:

9      Q  In other words, the contours can be shifted around

10  considerably, but the overall story that you are attempting

11  to tell would not be changed?

12      A  The contours cannot be shifted around considerably.

13  You are picking one contour.

14      Q  Would you not be able to tell the story about the

15  general movement of ground water from the northeast to the

16  southwest by having arrows genenerally showing direction of

17  flow without ground water contours?

18

19

20

21

22

23

24

25

H-1 ML j

1    MR. VEEDER:  I object to this, your Honor.  The

2  witness has drawn a particular kind and type of illustration

3  here.  He might draw it by putting commas coming around.  I

4  object to the question.  I think it is irrelevant and

5  immaterial and has nothing whatever to do with this phase

6  of the litigation.

7    THE COURT:  Overruled.  The question you had better

8  ask:  Would it be sound and proper in your field of engineer-

9  ing to use arrows to show the movement of the ground water

10  without contours?

11    THE WITNESS:  It isn't customarily done that way.

12  However, if you chose to do it that way, there would be

13  nothing incorrect on it.

14    THE COURT:  Now, Mr. Sachse is looking at a map where

15  you apparently did it that way with arrows.

16    THE WITNESS:  That is correct.

17    MR. VEEDER:  I don't know what we are trying to prove.

18  He can use any kind of picture he wants, can't he?

19    THE WITNESS:  I am not drawing the same kind of con-

20  clusions from the valley where I used the arrows that I am

21  from the valleys where I used the contours.

22    Q  BY MR. MOSKOVITZ:  Let me ask this question:  What

23  is the purpose of drawing ground water contours?  What are

24  the purposes?

25    A   Oh, I stated several times into the record the

1   exhibits that I have prepared are to show the source,

2   occurrence and movement of ground water.   Contours assist

3   in that.

4       THE COURT:   What are you trying to prove, Mr.

5   Moskovitz?   You have got me entirely at sea.   I don't even

6   kno wwhat you are trying to prove.   I realize that different

7   men who take the same data might run a contour line a little

8   differently.   I can see where you might or might not hook

9   this contour line up around 24-A-1.   You would take into

10   account the fault.   You would take into account the fact that

11   this well -- which is, apparently, Mr. Creas's well, I

12   think, isn't it?

13       MR. LITTLEWORTH:   Creas.

14       THE COURT:   Creas' well may be a well that is pumped

15   day after day.   The day they took the water measurements

16   may have been one hour after he pumped.   It may have been

17   six hours after he pumped.   So you draw a line somewhere.

18   No witness is going to come in here and tell you to the

19   fraction of an inch on this diagram that he has got this

20   contour right.   If he told me that, I wouldn't believe him.

21   But he has made an estimate.   Now, you put a man on here,

22   and I will wager he will tell you the same thing:   That you

23   take these water levels and you draw a contour.   And it

24   might be a half an inch one way or the other on this map,

25   but approximately is a water level contour.   What are you

1    trying to prove?

2           MR. MOSKOVITZ:  Your Honor, I think our people will

3    say they didn't have enough well level data in this area of

4    older continental deposits to draw meaningful water level

5    contours; that you can generally see that there is a --

6           THE COURT:  Maybe they didn't over-all.  But here,

7    just what we have been talking about:  here is 25-M-1 where

8    the distance of ground water above sea level at 1048.  Here

9    is D-1, 30, 30-K-1, water 1053 feet above sea level.  Here

10   is 25-R-1, 1046 feet above sea level.  Here is 24-A-1,

11   1047 feet above sea level.  Now, that just is not happenstance.

12   Within really two sections, because one of the wells is

13   right on a line.  Within two sections here is water standing

14   in the ground in all instances within a range of ten feet.

15   Now, it would seem to me that you could draw a ground water

16   contour in there.  Maybe you can't somewhere else.  Maybe

17   you have to do a little bit of estimating when you hook the

18   1050 around to the west.

19           Take into account other controls.  Mention has

20   been made of water level at Murrieta.  And there are other

21   wells in here.  But wouldn't four wells within those two

22   sections allow you to draw an inference?

23          MR. MOSKOVITZ:  Your Honor, here is a point:  Having

24   four wells --

25          THE COURT:  Because I could pretty well draw that

inference, maybe.  If I am wrong, somebody has got the burden of proving to me that there isn't some relationship between the water levels in those four wells scattered as they are in various parts of those sections.  Those wells are, most of them, almost a mile apart.

MR. MOSKOVITZ:  There certainly is some relationship, your Honor.

THE COURT:  And they don't vary more than ten feet.

MR. MOSKOVITZ:  But with just these four wells you see it is possible to have your contours going in different directions at certain points, because, obviously, if you follow the levels the lines Mr. Kunkel had, follow them alone, would be different than they are here.

THE COURT:  Oh, I have pencilled in my map another contour line that might be as acceptable.  What difference does it make?

MR. MOSKOVITZ:  And that area, your Honor, has quite a greater concentration of wells, far greater than you have elsewhere in the older alluvial area where Mr. Kunkel has drawn contours with very little data.  And the question is: Are they any good as water level contours when they could be shifted so much and still be consistent with the water level data?  Why have them?  That is the question.

MR. LITTLEWORTH:  May I say one thing in answer to your question as to what difference it makes?  As a matter

1   of law, one of the tests as to whether ground water is

2   going to be declared to be part of the stream system is

3   whether it flows in any consistent direction or whether the

4   ground water goes off in many directions.  And it is Mr.

5   Kunkel's testimony that your ground water flows at right-

6   angles to the contour.   He now has the water going generally

7   in a direction towards the fault line.  But if you hook that

8   one 1050 contour line around the way it has just been

9   suggested, the water levels --

10          THE COURT:  24-A-1?

11          MR. LITTLEWORTH:  Yes.  And then hook it closer over

12   to the M-1 well, you completely shift the flow of water by

13   almost 90 degrees.  You shoot the water in that area not

14   toward the Wildomar Fault, but you put it up in a northwesterly

15   direction.

16          THE COURT:  I don't follow you.  Between the 25-M-1

17   and 30-D-1 the distance of less than a mile, you have a

18   variation of five feet.  Now, if you split that and ignore

19   everything else and said mathematically you were running

20   contour line in there to split that difference, in pencil

21   I have a contour line which starts down in the -- no name on

22   it -- but runs up in Section 25 just about between the "Q"

23   and the "T," and then in pencil it hooks up to the right of

24   24-A-1.  Well, what difference have you done?  If there is

25   another water contour line to the west of that at a lower

1    level, then, obviously, your movement of water is going to

2    be in that direction.   It is not going to move to the east,

3    if you have got a contour line to the east of that, of

4    1050 at 1100, and you can establish a line or part of a line

5    in there.   Then, your water, obviously, is not going to move

6    from west to east.   It is going to move from east to west.

7    It is going to move down-gradient.   What I am saying is:

8    There must be some relationship between four wells in those

9    two sections.   And I am not particularly concerned, and I

10   don't see how you are, whether the contour line hooks

11   through the qt in the symbol qtoal in Section 25 and then up

12   to the right of A-1, or whether it cuts, as Mr. Kunkel has

13   put it in there.   What difference does it make?   If there is

14   a water contour in there.

15        MR. LITTLEWORTH:   Well, I think the precise location

16   of the water contour is important.   Now, maybe we don't know

17   what it is.   And if he doesn't know what it is, that is one

18   piece of evidence we ought to have.   But if you put a line

19   here and you say this is my best judgment as to where it is,

20   it is a matter of some importance because of what Mr. Kunkel

21   concludes from it, namely, that the water flows at 90 degrees

22   to it.   If you hav e water flowing in many different

23   directions -- sometimes flowing northeasterly, sometimes

24   southeasterly, sometimes southwesterly -- that is all evidence

25   which tends to indicate that this is vagrant percolating

ground water.  If it flows in one consistent direction, that

is evidence which tends to indicate that it may support the

stream.

THE COURT:  Are you going to offer any proof that

the ground water flows from a westerly direction to an

easterly direction in qtoal?

MR. LITTLEWORTH:  In some areas the 15-A shows that.

In this Roripaugh pumping hole which he talks about he has

got areas where you --

THE COURT:  These are not pumping holes.  You show --

MR. LITTLEWORTH:  You have another area farther up

the way where it flows in a different direction where he has

got some circles in there.  And what I think we have to

find out is whether these are really accurate or whether

they are not.

MR. VEEDER:  Your Honor, why don't they call

somebody and put him on the stand?  That is the point.

They have been cross-examining.

THE COURT:  They will have their turn.

MR. VEEDER:  I am waiting.  I am waiting.

MR. LITTLEWORTH:  That is why I think they are

important, anyway, to determine the accuracy; because if you

can't determine the flow of ground water, that is one thing.

If you can determine it, then, I think it has got to be

accurate.

1    THE COURT:  Let me ask you a question.  You can

2  answer it now or not.  You can answer me later or not.  Do

3  you think there is any relationship between these four wells

4  I have been talking about?  They all have about the same

5  water level above sea level.  Or do you think that is just

6  coincidence?

7    MR. LITTLEWORTH:  I think obviously the levels of

8  the water are close in there, but I don't think that there is

9  enough data from here alone to show which way it is flowing.

10   THE COURT:  All right.  What about you on that same

11  point?  Do you think there is any significance in those four

12  wells with water levels above sea level ranging from 1046

13  feet to 1053 feet?  24-A-1, 25-M-1, 25-R-1, 30-D-1?

14   MR. MOSKOVITZ:  I think I had better consult with my

15  experts here before I give an answer to that.

16   (Discussion off the record.)

17   MR. MOSKOVITZ:  The objective of the cross-examination

18  is to show that ground water contours based upon the number

19  of well levels that Mr. Kunkel had throughout this whole area

20  are approximations of a very rough character.  That is the

21  point.

22   THE COURT:  You go ahead.  In some areas you don't

23  have much of a job convincing me.  In this particular area

24  I think you probably have got a burden if these figures are

25  correct.

1          MR. MOSKOVITZ:  As far as these areas are concerned,

2     your Honor, and using the data which he had, different

3     results can be secured just as we pointed out.  You can have

4     the contour running in a different direction in a small area.

5     Now, if no conclusions are going to be drawn as to the

6     relationship between two wells in a certain area based

7     upon these contours, then there is no problem.  But if these

8     are designed to show the direction of flow in a particular

9     small area, then the cross-examination.  I think it is shown

10    the direction of flow might be different in that small area

11    because --

12         THE COURT:  Oh, yes, but are you going to take the

13    burden of proving to me that a water flows generally in this

14    older alluvial from the west towards the east?

15         MR. MOSKOVITZ:  No.

16         THE COURT:  Or from the southwest towards the north-

17    east?

18         MR. MOSKOVITZ:  No.  What we are attempting to show

19    is that these ground water contours have enough area of

20    doubt in them throughout the whole portion of ground water

21    basin form in which they are drawn that they don't prove

22    very much about direction of flow, except in a general way.

23    And that to have them here is misleading in that you get

24    the idea that there is something very certain about them.

25    You draw your area of ground water movement at right-angles

1   to the contour and you have something.  And the question is:

2   Do you really have something?

3       Q   For example, let me ask Mr. Kunkel this question:

4   Mr. Kunkel, looking at the contours you have southeasterly

5   of Pauba Valley, 1100, 1150 and 1200, just northeast of

6   Wolf Valley -- they are very close together there at that

7   point -- and comparing the distance between the contours

8   there with the distance between 1100 contour and the 1150

9   contour just northerly of Pauba Valley and in Pauba Valley,

10  if there are not some inconsistency in the differences

11  between those distances?

12      A   I am sorry.  I don't follow you.  I don't --

13      Q   Just locate the 1100-foot contour running north-

14  westerly from Pauba Valley through Pauba Valley.

15      A   1100?

16      Q   1100-foot line.

17      A   Yes, sir.

18      Q   And then, locate the 1150-foot contour which is

19  to the east at that point and then swings as it goes through

20  Pauba Valley and runs in a southwesterly direction.  Did

21  you find that?

22      A   Yes.

23      Q   And then the 1200-foot contour?

24      A   Yes.

25      Q   Is there not something inconsistent in the very

small distance between those contours just northeasterly of
Wolf Valley and the great distance between the contours,
particularly 1100 and 1150, in the area just northwesterly
of Pauba Valley?

A    The basis of the available data, the knowledge
of ground water hydrology, my knowledge of the geology, are
not inconsistent.  They are what the data show.

Q    But you threw out some data before when we were
talking about the 1018-foot level of Well 23-K-1.  You said
that was just not a reliable piece of data.  Why don't you
throw out data down here?

MR. VEEDER:  Your Honor, this is just an argument
between counsel.  There is no question.  I move to strike it.

THE COURT:  Overruled.

THE COURT:  Because, in my opinion, the data --

MR. VEEDER:  Wait a minute.  There is no question
before you.

THE WITNESS:  I am sorry.

THE COURT:  There is what?

MR. VEEDER:  There is no question.

THE COURT:  He asked him why he threw out certain
data.

MR. VEEDER:  He said, "You threw it out."  He didn't
say "Why?"

MR. MOSKOVITZ:  I am asking why.

1    MR. VEEDER:  He puts in a "Why" now.

2    THE COURT:  I thought he put in a "Why."

3    MR. VEEDER:  He has got a hook on it now.

4    THE WITNESS:  In my opinion, the data as I use it

5    and evaluate it southwest of Pauba Valley is valid.

6    Q  BY MR. MOSKOVITZ:  Now, could you tell us on what

7    basis you decided that the 1219, well, the levels you had

8    for the wells which control your drawing of the 1000, 1100,

9    1150 and 1200 contours just northeasterly of Wolf Valley,

10   on what basis do you decide that that data should be used

11   whereas the data for Well 23-K-1 should not be used?  With-

12   out generalization, could you specify as to why one was good

13   and one wasn't?

14   A  There is no doubt in my mind that the geology,

15   the hydrology, and the data are all consistent one with the

16   other.  I don't see a problem.

17   Q  What are the possible explanations for the ground

18   water contours just northeasterly of Wolf Valley, 1100,

19   1150, and 1200, being so close together as compared with the

20   distance between the 1100 and 1150-foot contour in Pauba

21   Valley and northwesterly of Pauba Valley?

22   MR. VEEDER:  Did you get the question?

23   THE WITNESS:  I get the question.

24   MR. VEEDER:  Well, answer it.

25   THE WITNESS:  Number one, I wish to point out that the

1   contours are dash, my less degree of certainty.  Based on

2   the water levels in Well 26-K-1, 8 South, 2 West, knowledge

3   of the source, movement and occurrence of ground water in the

4   1150 contour and the 1200 contour of necessity must exist

5   in that area.  Now, apparently you are --   I don't know

6   what you are trying to show and not show.  I have shown on

7   the basis of the contours where I think the contours exist.

8   I mean, on the basis of the data where I think the contours

9   exist.

10       Q   BY MR. MOSKOVITZ:  I don't think you answered the

11   question, Mr. Kunkel.  I will ask it again.  What would be

12   the explanation for the counters being so close together

13   there?

14       A   Now, just where are you referring to?

15       Q   At the point where the contours --

16   THE COURT:  He means through the northwest corner of

17   Section 27 and the northeast corner of Section 28 and the

18   south half of Section 22, all in Township 8 South, Range 2

19   West.

20       THE WITNESS:  Well, in that particular spot there may

21   be an area of lower transmissibility.

22       Q   BY MR. MOSKOVITZ:  So that when counters are close

23   together, one explanation is that the materials are of low

24   transmissibility?

25       A   That is in some cases the explanation.

Q    What are other possible explanations?

A    The effects of pumping would create a temporary effect, to a greater or lesser degree.

Q    Where would this pumping be?

A    Talking generalities.

Q    Would you relate it to this particular area?

A    I haven't offered any reason why I think those contours are tied together.  I am saying on the basis of the data, that is the way they are.  You can draw your own --
Pardon me.

THE COURT:  He has asked what would be the reason why contour lines could be close together.  And you have given one reason:  there is a possibility of an area of lower transmissibility.  You have given as another reason: generally pumping that might create a situation.  However, there is no particular pumping in this area you have been talking about that would particularly affect that, is it?

THE WITNESS:  No, there isn't any pumping in that particular area.

Q    BY MR. MOSKOVITZ:  Are there any other possibilities?

A    Yes, there are other possibilities.  It is conceivable, and, again, we are getting down to specific cases: The water levels, say, in well E-1 -- well, as drawn that is a valid conclusion.  I will just let it go at that.

Q    And you would also stand behind the locations of

1    the 1150 -- the 1100, 1150, and 1200, and 1300, and the

2    1400-foot contours in the stretch northwesterly of Pauba

3    Valley where you have a large gap between the eleven and the

4    eleven hundred fifty-foot contours and much smaller gaps as

5    you go up?

6        A   On the basis of the data that I have observed

7    and the studies I have made, I am willing to stand behind these

8    contours on 15-A as they are shown.

9        Q   Do you have any explanation for the large gap

10    that exists between the 1100 and the 1150-foot contour in

11    this stretch northwesterly of Pauba Valley?

12        A   Yes.  I believe I testified earlier the effect

13    is due to pumping in Pauba Valley.

14        Q   Pumping in what areas or from what wells in

15    Pauba Valley?

16        A   I would have to check my record. I am not certain

17    at the moment.  I haven't made a study with regard to the

18    amount of pumpage in Pauba Valley.  I know there has been

19    pumpage.  I know they have pumping wells, and I know they

20    irrigate land.

21        Q   Has there been a change in the pattern of pumping

22    since 1953?

23        A   I haven't investigated that.  Be a difference in

24    water levels.

25        Q   Let me call your attention to Wells 7 South, 3 West,

1    15-Q-2 and 15-Q-3.   These are located just westerly of

2    Temecula Hot Springs.

3        A    I am acquainted with the wells.

4        Q    I beg your pardon?

5        A    I am acquainted with the wells.

6        Q    You are acquainted with the wells.   Now, as I

7    computed the levels 15-Q-2 had a level of 1043.3 feet.

8        THE COURT:   Q-2?

9        MR. MOSKOVITZ:   Q-2, yes.

10       THE COURT:   How much was it?

11       MR. MOSKOVITZ:   1043.3.

12       Q    And 15-Q-3 had a level of 1083 feet, approximately.

13   Would that be correct?

14       A    That is correct.

15       Q    Your notes on Exhibit 15-B indicate that Well

16   Q-3 was being pumped when measured, is that correct?

17       A    Yes, I remember.   I don't have any --   Yes, here

18   are my notes.   But I do remember that is correct.

19       Q    And Well 15-Q-2 was not being pumped, but you

20   indicate pumping nearby, which I assume was the pumping of

21   Q-3?

22       A    That is correct.

23       Q    Now, do you have any explanation for the fact

24   that the well being pumped had a higher level than the well

25   not being pumped?

A   Yes.  The well being pumped is, according to the well log 16-A-17 for Well 7 South, 3 West, 15-Q-3, drilled to a depth of 1120 feet.  I would expect -- I don't recall right off what the depth of Q-3 is, but if I remember correctly, it is shallower.  I would expect Well Q-3 to have a higher head than Well Q-2.

Q   And which well did you use in locating your 1050-foot, 1100 feet contours?

A   I obviously used an average between the two.

MR. VEEDER:  I think that ought to answer the question.

THE WITNESS:  I used, in general, an average between the two.  If you will notice, the area in that vicinity, the contours are shown with short dashes.

Q   BY MR. MOSKOVITZ:  Now, you mean that they were inferred?

A   Yes.

1      MR. VEEDER:  Is there a question pending?  Or is this

2  just the silence of--

3      MR. MOSKOVITZ:  The silence of thought.  Looking over

4  my notes.

5      Q  Did you pay any attention-- notice the uses to

6  which the wells located in the older continental deposits

7  on 15A are put?

8      MR. VEEDER:  I object on the ground that it is beyond

9  the scope of the direct examination.

10     THE COURT:  Read it.

11     (The reporter read the pending question.)

12     MR. VEEDER:  I don't know what it means.

13     THE COURT:  Overruled.

14     If you know.  Did you make that type of investigation,

15  or were you just measuring well levels?

16     THE WITNESS:  I didn't make that type of investigation,

17  but the study is more than just measuring water levels.

18     THE COURT:  Let me ask a question.  Now we are looking

19  at Sections 15 and 16 in 7 South, 3 West, and below that are

20  Sections 21 and 22.  What was your reason for running your

21  1050 contour line in an east-west direction across Sections

22  23, 22, and over into 21, where it reached the fault line,

23  and swinging the other 1050 contour line that runs through

24  16 and 15, starting with the west side of 16, running easterly

25  across 16 through the southwest corner of 15 and then cutting

I

Z89

1  back through the northwest corner of 22 and the north half of

2  21 to the fault line again-- what was your reason for running

3  it that way instead of running your 1050 contour line across ,

4  we will say, from the northwest corner of Section 23 to the

5  southwest corner of Section 15?

6      THE WITNESS:  You mean join the two 1050's?

7      THE COURT:  Yes, and eliminate that swing back.  Do

8  you have a reason for that?  Do you see what I mean?

9      THE WITNESS:  I see what you mean.

10      THE COURT:  In other words, your contour line possibly,

11  just from the looks of it, might have started at the northwest

12  corner of 23, cut across the northeast corner of 22 and into

13  the southwest corner of 16.

14      THE WITNESS:  Well, to do that you would have had to

15  disregard the water level of 1084 feet above land surface,

16  which is a pumping measurement, as Mr. Moskovitz brought out,

17  in Well 15Q3.

18      THE COURT:  I thought you told me you took the average

19  of those two, which would give you about 1060.  If you took

20  the average of them, that would place that well just about

21  right.

22      THE WITNESS:  You would have to run your contour south

23  of that.

24      THE COURT:  Yes.

25      THE WITNESS:  And another problem that you would run

I

Z90

1   into, if you did that-- just assume maybe that you didn't

2   have those two, didn't know about those wells. It then could

3   be argued that those could be run across.  But when you do

4   that you then have 1050-foot contour running, as you have

5   described, and in Murrieta Valley you have a 1050-foot contour

6   at a lower altitude, which would mean that there is water

7   bleeding at the present time from Murrieta valley into and

8   recharging the older continental deposits.

9       THE COURT:  Actually, the areas of rising-- there are

10  no areas of rising water there, are there?

11      THE WITNESS:  No, there aren't.

12      If continued pumping would keep up in the area, in my

13  opinion that is a very likely probability.  In my opinion, that

14  has not occurred at the present time, as far as I can determine.

15      THE COURT: Well, then, answering my question, the

16  contour line of 1050 feet that you ran across Murrieta Valley

17  had a definite influence in the fixing of your contour line

18  of 1050 in the older alluvium?

19      THE WITNESS:  That is correct.  I considered it.  I

20  considered their relative positions.  I did that on Wolf

21  Valley and Murrieta Valley.  Also, I know that there is a

22  considerable quantity of pumping in the vicinity of Murrieta

23  and to the north.

24      Now, in regard to your question, did I make a detailed

25  study of that?  No, I didn't.  I didn't plot the acreage in

I

Z91

1   that.  But I have them in the area, I have observed the

2   pumps, I know that pumping has taken place.  I also considered

3   that in my analysis.

4   BY MR. MOSKOVITZ:

5       Q  Isn't it true, Mr. Kunkel, that if you had more data,

6   mor wells, more level measurements, that your contours would

7   be a lot more exact than they are now?

8       MR. VEEDER:  I renew my objection to this line of

9   testimony.

10      THE COURT:  Overruled.  But the answer is obvious.

11  Why waste time on it.

12      What is your answer?

13      THE WITNESS:  Yes.

14      THE COURT:  All right.

15  BY MR. MOSKOVITZ:

16      Q  And the fact is that most of your contours on

17  Exhibit 15A are either dashed with large dashes or dashed with

18  short dashes, showing that there is some uncertainty about the

19  location of those contour lines?

20      A  That appears to be true.

21      Q  And that because of the margin of uncertainty these

22  lines that are shown dashed or dotted could have fallen in a

23  number of other locations on either side of where they actually

24  exist on your 15A?

25      MR. VEEDER:  Which lines are you referring to?

I

Z92

MR. MOSKOVITZ:  All the lines that are dashed with large or small dashes.

THE COURT:  I suppose your question is broad enough to include anything from the width of a pencil on up.  You say could have fallen on either side.

MR. MOSKOVITZ:  Yes.

MR. VEEDER:  Are we just killing the clock, your Honor? That is what it sounds like to me.

THE COURT:  It does to me.  It has been nice to have you here, Mr. Moskovitz.  I can't say that you have been any particular help to me.  I got more out of a question or two that I asked than I did out of your cross-examination.

What about the question?  Can you answer it?

THE WITNESS:  The degree of change, on the basis of the data and the geology and hydrology, with due regard to geologic and hydrologic principles, the changes would be very slight.  I have gone through this experience many times.  I have never seen a contour map prepared where it is not subject to some review and discussion.

THE COURT:  This is your best judgment; is that right?

THE WITNESS: And the best judgment of a group.  People will closely concur to that.  I am not going to quibble with you over the exact position of a particular contour, if you want to do it.  But by and large you are not going to come up with anything vastly different.  Neither is another hydrologist.

I

Z93

1   MR. MOSKOVITZ:  I have no more cross-examination.

2   THE COURT:  Any other questions now?

3   MR. STAHLMAN:  Is Mr. Dennis going to examine?

4   MR. DENNIS:  I have no questions.

6                    CROSS-EXAMINATION

7   BY MR. STAHLMAN:

8       Q  Mr. Kunkel, first let me ask you about this Roripaugh

9   well.  Is that in the stream bed at that point?

10      A It is not in the stream bed.  It is on the alluvial

11  plane about a hundred feet northeast of the stream bed.

12      Q  Is it incised through there, or is the contour of

13  the older alluvium as it joins the alluvium on a plane?

14      A  The contact between the younger alluvial plane and

15  the older continental deposits is abrupt.  The character of

16  the land changes decidedly.

17      Q  Now, assuming that a well were drilled in the

18  position that I have indicated, which is about a half inch to

19  the northwest of the Roripaugh well, as shown on the map,

20  which would bring it into the older alluvium there--

21      THE COURT:  This is on Exhibit 15A.

22      MR. STAHLMAN:  On Exhibit 15A.

23      Q Would in your opinion, that well have been as product-

24  ive, drilled under all the circumstances as a well identical

25  to the well drilled, be as productive as the well where it is

I

Z94

1    at this time?  Do you have an opinion on that?

2        A  Yes, I do.

3        Q  What is that opinion?

4        A  The well would be directly comparable in yield to

5    the Roripaugh well.  The depth of water would be greater

6    because you have gone up higher on the slope.  That is the

7    only difference you have.

8        Q  Now then, you do know, of course, that the older

9    alluvium is to a depth of 500 feet or more at the Roripaugh

10   well; is that correct?

11       A  At least that.

12       Q  Do you have any opinion as to the gradation between

13   the depth of the older alluvium to where it joins the weathered

14   material to the north?

15       A  The gradation in thickness?

16       Q  Yes, of the older alluvium?

17       A  No, I don't have exact figures.  I know there has

18   been a displacement south of there in hot springs along the

19   fault.  In any one point I would not be able to tell you the

20   exact thickness of it.

21       Q  Would you have an opinion as to whether or not a

22   well of equal kind and character drilled in any portion of

23   the older alluvium in the Basin No. 4, as to the probability

24   of it being equal in productivity to the Roripaugh well?

25       A  The probability would be very good.

I

Z95

1     Q  In other words, you have an opinion that a well

2 drilled any place in the alluvium where the depth of the older

3 alluvium is of equal depth of 500 feet or more, that the

4 probability of that well being an equivalent producer?

5     MR. VEEDER:  I object unless there is more added to that

6 hypothesis.  In other words, are the perforations the same?

7     MR. STAHLMAN:  I said a well identical to the well.

8     THE COURT:  Overruled.

9     THE WITNESS:  In general, that is correct.  A well

10 drilled through a sufficient thickness of saturated materials

11 and properly developed, all the best practices of drilling

12 used, should get yields comparable.  Now by comparable I mean

13 some will be less, some will be more.  But--

14 BY MR. STAHLMAN:

15     Q  A good well?

16     A  It would be a good well.

17     Q  Now, there is a well in Section 6, Township 7 South,

18 3 West, K-1.  Are you familiar with that well?

19     A  I know of the location, yes.

20     Q  What kind of well is that?

21     A  I would have to check my notes carefully.  That

22 well is 1300 feet deep.

23     Q  How deep?

24     A  1300 feet deep.

25     Q  Is that an oil well?

I

Z96

A   No, it was not.  It was drilled in 1953.  I do not have the details on production.  It is reportedly a 12-inch well.  The details in testing are not available to me.  I do not recall right off how that well was--

Q   In addition to that well, do you know of any other wells that were drilled in the older alluvium to greather depth than 500 feet?

A   Oh, yes, there are numerous wells drilled into the older alluvial deposit.

Q   Eliminating the Pauba Well and those we have already fully discussed, which other wells are there?

A   Well, there is Well 1P2 in Township 7 South, 3 West.  It is 822 feet deep, and in my opinion it is drilled in the older alluvium for virtually its entire depth.  It starts in the younger alluvial plane, but the younger alluvial plain is very thin there.

THE COURT:  In what section is that?

THE WITNESS:  Section 1, Township 8 South, 3 West.  It is a short section-- about a half mile high.

There are also oil test wells drilled, as I have previously testified, in the Northeast Quarter of Section 21, that I would have to check against-- several thousand feet thick, and again I would have to refer to my notes for a list of them.

BY MR. STAHLMAN:

Q  I don't care for all of them.  But are there any
other wells in this vicinity up here that are to a depth
greater than the 1300-foot well?

A  I don't recall right off.  I would have to spend
some time.

Q  Do you have an explanation or opinion as to the--
Do you have an outcropping of basement complex here-- speaking
of 15A-- in Section 7?  And that is Township 7, Range 3, also.
Do you have an explanation as to the reason for the depth
being in excessof 1300 feet at that point?

A  Well, as previously testified, the patch of basement
complex in 7 South, 3 West, Section 7, is along the Wildomar
Fault zone.  It is bounded on both sides by faults, and it
is a slivered basement complex.  It is either raised up or
left suspended along the fault line, and there has undoubtedly
been down dropping of the block to the northeast.

Q  One other question in relation to the older
alluvium.  Is it your opinion that the depth to basement
complex in the older alluvium, starting from where the basement
complex meets the older alluvium, that that is a gradation
of depth to the older alluvium toward the direction of the
fault line?

A  I don't have sufficient data.  I do not know the
answer to that specific question.

I

Z98

1    Q  Do you have an opinion as to whether that takes

2    immediate depth at that point or whether it gradually--

3    A  I have an opinion.

4    Q  What is your best opinion on that?

5    A  It is my opinion that there is probably faulting along

6    the face.  As to the exact position of the faulting, I have

7    not been able to observe evidence.

8    THE COURT:  One question while we are on it.  In Section

9    7 South, 3 West, at the very end of that piece of basement

10   complex, there is a well shown there as Well 7H1 and 3.  How

11   deep does that well go?  There are three wells there, really.

12   THE WITNESS:  Yes, sir.  I have measured those wells

13   personally, your Honor.

14   THE COURT:  How deep are those wells?  The reason I

15   ask is that they are right at the contact line between the

16   basement complex and the older alluvium.

17   THE WITNESS:  The deepest one is 79 feet, one of them

18   is 40 feet, and the other of them is 42 feet.

19   THE COURT:  You don't know whether they hit the basement

20   complex?

21   THE WITNESS:  I have no logs on those wells.  I don't

22   know who drilled them.

23   THE COURT:  Shallow wells?

24   THE WITNESS:  Yes.

25   MR. VEEDER:  Your Honor, before we recess or adjourn

I

Z99

1    for the evening, I would like to offer in evidence Plaintiff's

2    Exhibits marked 16B, 16C and 16-1.

3         16B is a list of well logs used in calculation of

4    specific yield.

5         Exhibit 16C is a list of water level measurements in

6    1953, used in preparation of Plaintiff's Exhibit 15.

7         Plaintiff's Exhibit 16-1 is a cross-section with

8    additions by Mr. Kunkel.

9         THE COURT:  Exhibit 16-1 I show as being already in

10   evidence.  Do you, Mr. Clerk?

11        THE CLERK:  No, your Honor.

12        THE COURT:  Well, it will not hurt to put it in

13   evidence again.

14        All three are admitted in evidence.

15        (Plaintiff's Exhibits 16B, 16C and 16-1 marked for

16   identification were received in evidence as Plaintiff's

17   Exhibits 16B, 16C, and 16-1.)

18        MR. LITTLEWORTH:  Do you have copies of the lists?

19        MR. VEEDER:  What list?

20        MR. LITTLEWORTH:  That you have just put in--

21   16B, 16C, and 16-1.

22        THE COURT:  He means, do you have for him a copy of

23   the material you gave other counsel?

24        MR. VEEDER:  I think so.  We will get you some.

25        THE COURT:  Mr. Veeder will get them for you.

I

Z100

1        I have to interpret what you gentlemen men when you

2   talk among yourselves here.

3        MR. STAHLMAN:   Your Honor, I have about five or ten

4   minutes more, but I would like to adjourn, if we may.   We

5   have an election going on in Fallbrook and I want to get home

6   before it is over.

7        THE COURT:   Adjourn until 10 o'clock tomorrow morning.

8        (Adjournment until Wednesday, November 19, 1958, at

9   10 A.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25