# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**  San Diego, California

**Date:**  Wednesday, November 19, 1958

**Pages:** 5031 to 5177

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

MALCOLM E. LOVE
**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 46

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
        vs.                    )        No. 1247-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISDRICT, et al.,              )
                               )
              Defendants.      )


REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, November 19, 1958


APPEARANCES:

        For the Plaintiff            WILLIAM H. VEEDER, ESQ.,
                                     WILLIAM E. BURBY, ESQ.,
                                     Special Assistants to the
                                     Attorney General,
                                     Department of Justice,
                                     Washington, D. C.

Z

APPEARANCES (Continued):

| | |
|---|---|
| For Defendant Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State of California | EDMUND G. BROWN, ESQ., Attorney-General, by ADOLPHUS MOSKOVITZ, ESQ., Deputy Attorney General |
| For Defendants Fallbrook Public Utility District, et al. | F. R. SACHSE, ESQ. |

I N D E X

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Frank H. Cannon | 5077 | | | |
| Fred Kunkel (Resumed) | | 5057 | | |

| EXHIBITS: | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| Plaintiff's Exhibits | | |
| 101 | | 5091 |
| 98-1 — Map | 5124 | |
| 98, 98-A and 99 | | 5138 |
| 71 (Withdrawn) | | |
| 75-5 | | 5154 |
| 75-1, 74 | | 5160 |
| 100 | | 5161 |
| 102 | | 5161 |
| 103 to 117, incl. | | 5164 |

MORNING RECESS  —  5073
NOON RECESS    —  5095
AFTERNOON RECESS — 5165

1  SAN DIEGO, CALIFORNIA, WEDNESDAY, NOVEMBER 19, 1958, 10:00 A.M.

2  ---o---

4      THE CLERK:  Number one:  1247-SD-C, United States

5  vs. Fallbrook.

6      THE COURT:  What happened to our guests?

7      MR. SACHSE:  Mr. Haskins  suggested that he could

8  most conveniently with his time take them now, your Honor.

9      THE COURT:  Okay.

10      Mr. Clerk, here is an envelope.

11      MR. SACHSE:  I have introduced them through the

12  courtroom.

13      MR. VEEDER:  Your Honor, there is a problem that is

14  confronting us.  It concerns the United States very greatly.

15  We are getting ready to have filed exceptions to the find-

16  ings of fact and conclusions of law.

17      MR. STAHLMAN:  Will you talk a little louder, Bill,

18  please.

19      MR. VEEDER:  We have been requested to file objec-

20  tions to the findings of fact and conclusions of law as

21  proposed by the Special Master.  We believe that findings

22  at this time would be premature.  There are two primary

23  reasons for that.  The Vail estate has approximately 10,000

24  acres of riparian land on De Luz Creek concerning which no

25  evidence has been introduced.  The United States has large

1   tracts of land concerning which there has been no evidence,

2   on De Luz Creek.   The State of California is going to

3   introduce geology, evidence respecting geology, commencing

4   on December 2nd.   We believe that the question of ground

5   water and the availability of that ground water in De Luz

6   Basin watershed is extremely important in this litigation.

7   Now, I feel the same way about the ground water in the

8   Fallbrook Creek drainage.   It occurs to me, your Honor, that

9   we would all profit by withholding any further action in

10   regard to the final acts respecting the Master's findings.

11   Now, I don't believe it will hurt anyone.   In fact, I know

12   it will be very greatly to our benefit, because there is a

13   strong prospect, in my view, of having to petition for

14   reopening of the record in regard to both those areas.   With

15   that thought in mind I was wondering if your Honor would

16   give consideration to the possibility of entering an order

17   to the effect that there will be no master's findings

18   entered at this time.   I realize that notice has gone out on

19   them.   And the more I have gone into this matter, the more

20   thoroughly I have examined his findings and considered the

21   proposals that are made, in the light of the facts which we

22   now have before us, it would be prejudicial, in my view, to

23   the United States, and I believe to the individuals, from

24   the standpoint of the ultimate disposition of the issues

25   presented.

1          Now, I am asking for guidance in this regard.
2     I haven't filed any petition, any motion.  But it strikes
3     me that they are premature; that it would be impossible to
4     have a true reflection in any findings at this time in the
5     present status of the record.

6          MR. STAHLMAN:  Your Honor, as far as the Fallbrook
7     Creek is concerned, of course, we have no interest.  But as
8     far as the De Luz watershed is concerned, you may recall
9     that at the time the hearings were started, the Government
10    were about to enter and make surveys on the Vail property
11    in relation to the irrigable acreage and the water duties
12    of the lands in that area; and, by reason of the Master's
13    hearings, they took their crew off and put them on these
14    smaller properties in order to -- and it was decided at
15    that time, then, that the Vail Company would not introduce
16    evidence in relation to De Luz watershed.  And I think it
17    would be impossible for me to file objections until I know
18    what our situation is.  So I rather agree with Mr. Veeder
19    on De Luz watershed.

20         MR. SACHSE:  Well, your Honor, this is a complete
21    surprise to me.  It was my understanding that one of the
22    purposes in taking the De Luz watershed was to give us, as
23    it were, a dry run where findings could be drafted; we could
24    determine the adequacy of the findings as to scope where we
25    would be concerned, not only with their correctness but

5037

1   with how much good we were getting out of the Master's

2   hearings.

3         THE COURT:  Let me interrupt you a minute.  I want

4   to hear from you further.  As I see the mechanics of this

5   matter, it is as follows:  The Master-heard testimony from

6   certain of the landowners and heard testimony about part of

7   the watershed, and he proposed to make some findings as

8   far as we go.  Now, objection could be heard to those find-

9   ings, and the Master then rules on them, and he finds as

10  far as he can go.  You realize that the Vail property is in

11  this watershed.  The findings, then, come before the Court.

12  The Court then has to take and, as it were, piece together

13  what the Master has done with the testimony the Court takes.

14  And I see no difficulty in this problem except there is some

15  work.  In other words, the Master makes certain findings.

16  Let's assume for argument that some finding he made isn't

17  going to gibe with the finding that is going to be necessarily

18  made after we hear the Vail showing.  The Court certainly

19  has power then to modify the Master's finding to make the

20  finding fit in with the picture as it should be when the job

21  is completed.  And I have difficulty in following you.  I

22  looked these findings over, and it is difficult for me to

23  see where the findings that he proposes to make would pre-

24  judice anyone here, even if we took them as they are.  There

25  may be some loose ends.  Give me an example, Mr. Veeder, of

A-2

5038

1 what we would find as to the Vail properties would cause

2 any change to be made in his proposed findings.

3     MR. VEEDER:  Well, certainly, your Honor, in regard

4 to the Vail Company they are the largest single oowner in

5 the area, and they certainly are directly and immediately

6 in competition for the short supply of water with every

7 other claimant on the stream.  That is necessarily true.

8 And they have, I assume, the greatest single ownership in

9 the whole valley.

10     THE COURT:  All right.

11     MR. VEEDER:  The result being that when we sit down

12 and try to figure out who gets what under the findings, it

13 is absolutely impossible.  I can give you another example.

14     THE COURT:  Now, let's take this example.  All that

15 the Master has done is to find as to certain owners; they

16 were riparian.  As to certain other owners that they had on

17 their ground vagrant percolating water and they weren't part

18 of the stream.  Now, he hasn't attempted to say what the

19 correlative rights are.  He has merely found that certain

20 people were riparian to the stream.  Now, we come along and

21 we find that Vail has a major piece of property riparian to

22 the stream.  Vail's situation may be very similar to what

23 the Master has found as to the people downstream:  that the

24 land is riparian; that the only runoff is in -- taking an

25 example -- is in periods of flood time in the winter; and

1   although there is a riparian right, it is one that is hardly
2   susceptible to any particular use.  At any rate, the finding
3   that the land is riparian with the land below the stream
4   below the Vails.  Where is there any problem in fitting
5   together what the Master finds below the Vails and what the
6   Court finds as to the Vails?  And the Court ultimately has
7   to approve the Master's findings and has to fit those
8   findings into the part of the case we are trying here.

9        MR. VEEDER:  That is right.

10       THE COURT:  Where do you see any problem?

11       MR. VEEDER:  I see a tremendous problem from the
12  standpoint of taking each individual finding and attempting
13  to understand the effect that it is going to have upon the
14  relationship, for example, to the United States of America
15  with the Vail Company.  We are very, very concerned about
16  that.  We are interested in knowing the full impact of the
17  competitive claims on De Luz Creek.  And I have looked at
18  these findings, and I have participated to some degree in
19  the trial of the matter; and, frankly, I came away from the
20  trial or the Special Master's hearings with the feeling that
21  it wasn't possible to make a finding with sufficient substance
22  so that the United States could say, "Well, we accept or
23  we reject any particular finding."  I can give you another
24  example that concerns me.  I am very concerned about this
25  matter of ground water.  It may be -- and the fact is, I will

1  say this:  I have already asked that there be another

2  investigation in regard to geology in that whole area.  I

3  know the State is going to put in some more evidence.  I

4  think what we are looking to is this:  there is a petition

5  by the United States to reopen the hearing in regard to

6  some of these matters.  The Vail Company is the most pressing,

7  of course.  But I am not satisfied that it is to the best

8  interests of the United States to proceed at this time with

9  an argument in regard to the findings, because I think the

10  whole thing is premature.  We can go ahead and appeal to

11  your Honor to send back and start all over again.

12      THE COURT:  Well, now, you tell us very lightly the

13  whole series of considerations.  Let's take the matter of

14  ground water.

1         Let us take the matter of ground water and the pro-

2  posed findings of the Master that in certain of this ground

3  there is percolating, vagrant water and it is not part of the

4  stream.  I assume that the Government is not satisfied with

5  those findings.  The Government thinks that the water in some

6  of those parcels of ground is part of the stream.  Is that your

7  position?

8         MR. VEEDER:  That is right, we do.  And I will say

9  this, that the delineation and demarcation of some of those

10  areas concerns me very much.  I can see a protracted argument

11  before the Master on those very matters.  I have no desire to

12  engage in it, because ultimately I think we will be back right

13  to the point.  I know your Honor well enough to know this,

14  that he is not going to enter a final decree which is not

15  reflective of the ultimate facts.  And yet what will we do?

16  We will come back and try each one of these issues in regard

17  to ground water before your Honor, and I think that we could

18  avoid that very process,-- the protracted and costly aspects

19  of it, by simply saying, "Fine.  The Master's findings are

20  before us.  They will be held in abeyance until such time as

21  the Vail Company proves up its rights, until such time as the

22  State puts in its geology,until such time as the United States

23  may take further action in regard to these matters."

24         I can refer to the Garnsey property.  I have looked at

25  the data in regard to them and we have considered the findings

B

Z2

1   overall in regard to them.  We feel that there can be no

2   sharp delineation between the ground waters in the alluvium

3   and the ground waters in the residuum in that area.

4         THE COURT:  Your own testimony offered here on the lower

5   part of this watershed, unless you have some other proof, is

6   enough for findings right now that you haven't got any water

7   in some of that residuum that is a part of the stream.

8         MR. VEEDER:  In some of it that is true.

9         THE COURT:  You had a witness here who told about

10  drilling a well in the residuum and that they could hardly

11  get enough water to make a test.  Now, do you think I am

12  going to find that water in that residuum is part of the

13  stream?

14        MR. VEEDER:  I think that there is a prospect that in

15  regard some of the residuum you might change.

16        Now, I would be derelict if I didn't bring these matters

17  to your Honor's attention, because I feel a great responsi-

18  bility in these matters.

19        THE COURT: Let us not worry about your responsibility.

20        MR. VEEDER:  And in regard to the individual land

21  owners up there, that we can go ahead and make some further

22  investigations and do a better job in the long run than if we

23  have findings that we will have to undertake to upset before

24  your Honor, because I don't believe on the basis of the record

25  that there can be anything other than an approach by the

B

Z3

1   United States that these findings are premature.  And that is

2   my personal feeling in regard to them, and I feel that absent

3   some unexpected thing such as being called by the Almighty

4   that we will have to resist the entry of them.

5        THE COURT:  Let us go back to this residuum.  I take it

6   from what I have heard so far that the residuum as shown in

7   the lower part of this watershed is all of the same general

8   character as far as the geology of it is concerned.  It is a

9   type of rock that has weathered some-- it is more weathered

10  than the basement complex, but it is pretty much impermeable,

11  it has a high degree of impermeability.  You haven't wells in

12  all of it, but you put wells in some of it.  It would be

13  expecting a lot to find that you would discover in other areas

14  besides where you have the test wells that you had permeability

15  anywhere equaling even that in the older alluvium upstream.

16       MR. VEEDER:  May I make one inquiry-- and I am sorry to

17  interrupt you.  But to which witness are you making reference--

18  Mr. Worts?  That he didn't get enough water?

19       THE COURT:  Well, that is one witness.  He said he

20  didn't get enough water to take a test of it.

21       MR. VEEDER:  But, your Honor, that was not in the

22  residuum.  That was in the La Jolla formation, which is away

23  down here at the bottom.

24       THE COURT:  Didn't you have a test well in the residuum

25  also?

1      MR. VEEDER:  No, not of that character at all.  Lt.

2    Walker put in some test pipes, but there was no test wells

3    whatever in the residuum, your Honor.  That was Mr. Worts's

4    testimony that he went into the La Jolla formation and they

5    put in some tests on that.

6      THE COURT:  Do you expect to have any proof that there

7    is water in the residuum that is part of this stream?

8      MR. VEEDER:  I believe certainly that in the De Luz

9    Creek area the contacts are not so well defined between the

10   residuum and the Recent alluvial deposits that we can make a

11   sharp differentiation, as has been made sometimes in regard

12   to individual tracts.

13     THE COURT:  I am more concerned with one aspect of

14   this than I am with the other.  I have no reason to make haste

15   in a case that has to undergo a lot more work before we arrive

16   at a final decree, with this one exception:  That I am very

17   hopeful to get out of this case by interlocutory decree a

18   number of people, cut this case down to some sizeable pro-

19   portions where we can work on it.  I am hopeful to do that

20   both in the lower part of the basin and in the upper part of

21   the basin.  And I thought that by these Master's findings as

22   to certain people whose land I was prepared to find had only

23   vagrant percolating water, that we would be along that road

24   to taking those people out of the case under proper procedure,

25   taking out of the case the people who have accepted the

B

Z5

1    Government's proposal for half an acre, and get this case cut

2    down to the real issues in the case.

3         Now, your suggestion bothers me in that regard, in that

4    apparently you want to reopen this whole subject matter of the

5    pieces of property where the record now shows they have only

6    vagrant percolating waters.

7         MR. VEEDER:  I am as anxious as anyone to get anyone

8    out of the case who has no claim in the Santa Margarita River.

9    But I truly don't believe that there is anything gained by

10   what I believe to be premature action.

11        THE COURT:  What do you propose to do?  To show that

12   in certain of these instances where the Master has proposed a

13   finding that, A, B, or C has on its property only percolating

14   vagrant water, do you propose to show that there is water on

15   that property as part of the stream?

16        MR. VEEDER:  Frankly, I would like to take another

17   review of some of the geology in that area-- I will be candid

18   with you, and I also want to take another review in regard to

19   the whole aspect of the runoff. And this has come pretty

20   largely from going into these matters with Lt. Walker, who

21   was a witness here in regard to the De Luz Creek area.  The

22   more we went into it and the more data that has gone into

23   evidence, we are all learning as this thing goes on, at least

24   I certainly am, certain aspects hydrological and geological

25   that gave me some pause when I think about findings going in.

1  And it may be too many years being a bureaucrat, but whenever

2  I see a set of findings going in I know where the burden lies

3  if anybody is going to try to upset them.  I feel that once

4  the die is cast on a set of findings the possibility of chang-

5  ing them is extremely remote once they are entered.

6  THE COURT:  How much time do you want to consider what

7  the geology is?  You have been working on this case since

8  1950.  How much time do you want?  Another eight years on it?

9  MR. VEEDER:  Well, eight years or until the 13th of

10  January, 1959.  I would like to have that time.

11  THE COURT:  What is the position of the State of

12  California?  Have you looked over the Master's proposed find-

13  ings?

14  MR. MOSKOVITZ:  Your Honor, we have reviewed them.  We

15  haven't made a point-by-point comparison of the evidence for

16  the findings.  Generally speaking, we have taken no exception

17  to the findings as to the existence of vagrant, percolating

18  waters in various places, because there is evidence in the

19  record, we think, supporting the findings.

20  THE COURT:  Is the State going to contend that there

21  is any water that is part of the stream in the residuum in

22  the lower part of the Santa Margarita Basin or watershed?

23  MR. MOSKOVITZ:  No, your Honor, we have no present

24  intention of doing that.

25  MR. VEEDER:  Our position would be that by January 13th

B

Z7

1    we would have a chance to pull these things around.   That is

2    all.   I am asking for that much more time.   And if that in-

3    vestigation doesn't reveal some reasons for changing, why I

4    would simply-- .

5         THE COURT:   When is the Master's hearing now set to

6    hear these objections?

7         MR. VEEDER:   December 1st.

8         MR. SACHSE:   December 1st.

9         MR. VEEDER:   And then a hearing also for December 15th.

10        THE COURT:   What is scheduled on the 1st?

11        MR. VEEDER:   A hearing on the De Luz area.

12        THE COURT:   On the 15th is the same?

13        MR. VEEDER:   No; the Fallbrook area.

14        THE COURT:   The Fallbrook area.   Your same concern

15   involves the Fallbrook area also?

16        MR. VEEDER:   Yes, your Honor.   I would feel better--

17   the fact is I have talked to the U.S.G.S.   I have asked them

18   what they could do for us in regard to making one more run on

19   this matter of checking out some of these individual parcels,

20   checking out a little further the De Luz Creek area for us.

21   I realize that maybe I should be embarrassed in making this

22   request, although I am not-- I think it is a sound thing to

23   do, and by that time, by our review, I would simply advise your

24   Honor and the Master that we are willing to either accept in

25   general what he has profered or to show where we think some

B

Z8

1    additional evidence or some change might stem from it.

2         THE COURT:  Does this problem we are now discussing

3    concern you more than the problem of the Vail testimony as to

4    the upper part of the De Luz?

5         MR. VEEDER:  Well, the whole thing.  I can't separate

6    it.

7         THE COURT:  There is a separation in this respect.  We

8    are now talking about a part of the case which possibly could

9    be called before the master on certain of these parcels.

10        MR. VEEDER:  That is right.

11        THE COURT:  The other facet is where we have to have

12   the Vail testimony before the Master can make his findings

13   downstream as to certain parcels.  It seems to me there is a

14   big separation between the two problems.  One is a situation

15   where you are asking to review the geology and hydrology of an

16   area in which the Master has worked.  The other is a question

17   of fitting together the testimony on the Vail estate with the

18   testimony taken before the Master. They are two different

19   problems.

20        MR. VEEDER:  I really hadn't separated them.  But I

21   look at it this way, that we would be in a position to know

22   the whole geology of the whole valley better by the middle

23   of January, and from the standpoint of putting in the Vail

24   testimony-- I haven't spoken to Mr. Stahlman about it, I

25   don't know when he would plan to put that in-- but I do know

B

Z9

1    that we have 10,000 acres of land up there that could have

2    a very drastic effect upon any ground water, upon any surface

3    waters.  They are going to develop land up there-- there is

4    no question in my mind about it, and what that impact is

5    going to be I don't know.

6         THE COURT:  Unless they get a permit to build a dam or

7    to impound some of that water up there, it is pretty hard

8    for me to see where they will ever get much use of it.  It

9    will fall on the streams, and at the time that it is running

10   off it will be in the winter and down it will go, I suppose.

11   I haven't seen or heard yet, but I would guess the gradient is

12   pretty steep.  And off it goes.  Of course, I suppose that

13   there might someday be consideration to the erection of a dam

14   and saving some of this water and all that.  But how a

15   riparian owner can make use of a stream that runs only in the

16   winter is pretty hard for me to see.  At the very time the

17   stream is running he doesn't need the water in his ground.

18   By the time he needs the water in his ground there is no

19   water in the stream to use.

20        MR. VEEDER:  Your Honor, I think we are going to have

21   some pretty good evidence in regard to practices that are com-

22   ing into vogue and that are very important in this day and

23   age of the utilizing of water when it is available and putting

24   it on the land.

25        Now, they may disagree with me as a legal proposition,

B

Z10

1    but I think we should have an opportunity to put in evidence

2    which we think is highly important.

3         THE COURT:  You will have that opportunity.

4         Let me say this.  I am going to try honestly to de-

5    cide the factual issues in this case.  But if I get to a

6    place involving some parcel of ground where I have great

7    difficulty in making up my mind whether it is vagrant,

8    percolating water or whether it is water that is part of the

9    stream, one of these situations where I am just on the fence

10   and where a finding might be supported on either side and I

11   have difficulty making up my mind, I will tell you very

12   frankly what my finding is going to be-- that it is vagrant,

13   percolating water.

14        MR. VEEDER:  That would be to our advantage.

15        THE COURT:  I am going to take the attitude that where

16   I can't find reasonably that it is part of the stream, I am

17   going to give the benefit of the doubt to the land owner and

18   say, "You have the right with your neighbors to that water."

19   This isn't the real issues in the case.  These are fringe

20   problems.  The Government supply of water at Pendleton isn't

21   affected really one way or the other by this matter.  As a

22   matter of fact, I think the Government would be better advised

23   to get rid of all this fringe stuff at the earliest possible

24   date.

25        MR. VEEDER:  I agree.

B

Z11

1  THE COURT:  The Government has substantial rights.  You

2 can't have bought the Rancho Santa Margarita, an old Mexican

3 rancho, without having acquired substantial water rights.

4 But to harrass, which is what it amounts to, some small land

5 owners by quibbling around over whether there is a little bit

6 of water that might come down through the residuum and feed

7 the stream, that leaves me cold.

8  MR. VEEDER:  Your Honor, I don't believe we ever asked

9 anyone, but the fact remains that one of our principal witnesses

10 was interrogated at great length on all kinds and types of

11 subjects, and that has worried me a great deal, too.

12  THE COURT:  Who is that?

13  MR. VEEDER:  Col. Bowen.  And my own view is this, that

14 we are just as anxious as anyone not to harrass any small

15 user.

16  THE COURT:  Wasn't he the witness you called to talk

17 about water on the--

18  MR. VEEDER:  True, he talked about water.  But I don't

19 believe it was fair to Col. Bowen in many regards to have him

20 interrogated with the minutiae in regard to ground water that

21 he was.  Now I am defending him on this matter and I don't

22 say that he was wrong.  But I do think this, that the pre-

23 cedents that are going to come out of the findings on De Luz

24 Creek are going to be extremely important to us, and if

25 anything precipitated me in this matter it was yesterday's

B

Z12

1    hearing in which we were confronted with the argument of Mr.

2    Littleworth that there are areas up in there-- and I am

3    pointing to 15A in the areas east of the younger alluvium in

4    Murrieta-- we are concerned about the kind and type of

5    precedent that will come out of the Master's findings and

6    which I believe might well be applied to the circumstances

7    that prevail.  I realize that is not residuum.  I realize it

8    is older alluvium.  But the same argument could be advanced.

9         THE COURT:  Isn't there geologically a world of differ-

10   ence between residuum and alluvium?

11        MR. VEEDER:  Well, the difference being this, your

12   Honor, the availability and transmissibility of water.  I

13   don't care whether it is residuum or older alluvium.  If a

14   determination is made that the soil is so packed that it

15   doesn't readily yield water, your Honor might very well come

16   down and say-- and your Honor's statement as to what course

17   you are going to pursue from the standpoint of precedent is

18   important to me, because if your Honor should find, "Well,

19   substantially the same situation prevails in De Luz as

20   prevails here so far as the transmissibility and the permea-

21   bility of the land is concerned.  Therefore, I am throwing

22   it out"--

23        THE COURT:  You call it precedent.  How can you have

24   precedent where you have two different kinds of material?

25        MR. VEEDER:  I don't believe the kind and type of

1    material makes any difference.  It is the transmissibility

2    and the permeability that makes the difference.

3         THE COURT:  Well, I am implying that.  Transmissibility

4    and permeability vary with the type of material.

5         Mr. Sachse, did you have something to add?

6         MR. SACHSE:  Yes, your Honor.  This concerns me con-

7    siderably.

8         As far as the Vail Company goes, I don't think anyone

9    considers anything that was done at the Master's hearing

10   limits the Vails.  The Master's findings themselves expressly

11   recite that nothing is determined about Vail.  There is still

12   to be determined how many acres of irrigable land they have,

13   what the water duty is, et cetera, and all that, I presume,

14   will be done here.  And I agree with your Honor.  I see no

15   problem on that.

16        What Mr. Veeder is saying, I think, in plain and simple

17   language, is that he is unhappy with the findings; not that

18   any peculiar problem is presented, but that he is unhappy.

19        THE COURT:  Well, let us put it this way.  I think he

20   is--

21        MR. VEEDER:  Now I am being psychoanalyzed again.

22        THE COURT:  Yes, I am going to psychoanalyze you right

23   now.  I think you have said a lot of words to say that you

24   are unhappy, and you have said a lot of words to say, secondly,

25   that you have the responsibility as chief counsel in this

1    case for the Government and you want to be fairly sure that

2    you are going to sit still for some of these findings, that

3    factually they are right and you are not going to be criticized

4    afterwards.  I think you could have said it all in about two

5    sentences.

6         MR. VEEDER:  Yes.  Well, I don't agree in all of that.

7    I will say this, that there are things about those findings

8    concerning which I am not happy, and I think this, that it is

9    not-- I hope that your Honor doesn't get angry when I say that

10   the point I am trying to make is that I think we would do a

11   better job if we had a little more time, your Honor.

12        THE COURT:  Go ahead, Mr. Sachse.

13        MR. SACHSE:  Your Honor, the United States put its case

14   on.  We agreed, everybody got together on this Master.  The

15   Master was appointed.  The United States put on their case.

16   They put on their witness.  They picked him.  They picked Col.

17   Bowen.  I didn't.  Col. Bowen testified.  He was cross-examined

18   extensively.

19        To the best of my knowledge, 90%, if not more, of the

20   individual land owners in the De Luz Creek watershed were

21   content with the testimony of Col. Bowen.  The United States

22   rested its case.  The land owners rested their case.  The whole

23   thing has been submitted.  The Master asked us to submit

24   arguments as to what we thought he should find, to summarize

25   what we thought the evidence was.  We did it.  I don't know

B

Z15

1    whether the United States did.  I did for each one of my

2    clients.  Now we have a set of findings.

3          Now Mr. Veeder is saying, in substance, that the wit-

4    ness that he called he is unhappy with, the testimony of the

5    witness he is unhappy with, the findings he is unhappy with,

6    and he wants to open the whole case again.  I think it is

7    absolutely grossly improper, and furthermore I don't think

8    this is the place to do it.  We do have findings.  Those were

9    submitted.  The case was rested by the United States on De

10   Luz Creek, and the place to argue is before the Master on the

11   1st of December.  Then if he is unhappy with the Master's

12   rulings, he of course has all the privileges of the Federal

13   Rules to come in and appear before your Honor.

14         THE COURT:  Here is what I am thinking about.  I am

15   not going to make an order on it this morning.  I want to

16   talk to the Special Master about it.  Hearing is now set

17   for the 1st and the 15th of December?

18         MR. SACHSE:  The 1st only.  Excuse me, your Honor.  I

19   think Mr. Veeder stated a little bit wrong.  The hearing is

20   set for the 1st on the objections to the findings.  Then the

21   Master's next hearing, the 15th, which would tentatively be

22   on the area north of the Fallbrook Creek drainage.  However,

23   if objections to findings were still in the mill, presumably

24   we would still on the 15th be on objections.

25         THE COURT:  Well, what I was going to say is this.  If

B

Z16

1    Mr. Veeder wanted a month or five weeks finally to review this

2    matter, I wouldn't think ordinarily any great harm would be

3    done by some reasonable extension of that hearing, and I would

4    hope that after he had made this further check he would be

5    content that the record had been properly made and that the

6    matter could then proceed.  I am not going to pass on it now.

7    I have your ideas.

8         I am not too much concerned about the Vail property,

9    because the Master's findings have to be fitted in with my

10   findings, and if his findings can't be made to jibe then we

11   will have to modify them.

12        MR. STAHLMAN:  Your Honor's expression as to how you

13   intend to handle the matter has allayed some of my feelings

14   or fears in regard to the matter.

15        The only thing that concerns me now is that we don't

16   come into a situation where maybe we have one reflection of

17   one witness who has given his interpretation relative to the

18   geology or the productivity of the water-bearing material in

19   one area and then someone else who have made an investigation

20   for the Vail Company.  I think there should be a consistency

21   there.  That is the thing that concerns me now.

22        THE COURT:  Well, there is not much that we can do about

23   that now, Mr. Stahlman.  We have so much territory to cover

24   that it is entirely possible that you will have different

25   witnesses testifying to different areas.  And you have the

1    human equation you will have to work with.   However, it seems

2    to me that on cross-examination you would be able to bring

3    those things out.

4            MR. STAHLMAN:  I am not too greatly concerned.

5            THE COURT:  All right, let me think about it.  Today

6    is Wednesday.  By the end of the week I will let you know what

7    I decide to do.

8            Proceed.

9

10                            FRED KUNKEL,

11   recalled as a witness in behalf of the plaintiff, having been

12   previously sworn, testified further as follows:

13

14                    CROSS-EXAMINATION (Resumed)

15   BY MR. STAHLMAN:

16       Q   Mr. Kunkel, in the manner in which the younger

17   alluvium was laid down by nature in the Pauba Valley or in

18   general, is there any opinion that you have relative to whether

19   the depth of the younger alluvium would be greater at the

20   upper end or the lower end?

21       A   As previously testified, it is impossible from

22   drillers' logs alone to determine the thickness of the younger

23   alluvium, because the contact is just not that distinct.

24   However, on the basis of geologic principles the younger

25   alluvium is graded to the lip at Temecula Creek, the bedrock

B

Z18

1    lip. I don't have the exact borings on it, but the thickness

2    of the younger alluvium at the lip is very shallow, in my

3    opinion 20 or 30 feet or less. The land surface rises toward

4    the east. Therefore, a projection of a reasonable gradient

5    for the base of the younger alluvium would allow a greater

6    thickness of younger alluvium the further east one went, in

7    general--

8            THE COURT: Now, wait a minute. The further east one

9    went across the older alluvium?

10           THE WITNESS: No, the further east one went up Pauba

11   Valley would allow a greater thickness by a projection of the--

12   May I demonstrate on Exhibit 16.

13

14

15

16

17

18

19

20

21

22

23

24

25

Kimbel — Cross

C-1 ML j

1    THE WITNESS:  The base of the younger alluvium by

2    the nature of its very deposition cannot be below Temecula

3    Canyon, inasmuch as land surface rises.  The greatest

4    thickness for the younger alluvium in Pauba Valley can be

5    farther east than it could be at the fartherest west.  As

6    pointed out on the basis of drillers' logs along the --

7    Exact contact cannot be picked up, either.  It is, in essence,

8    a kind line.

9    Q  BY MR. STAHLMAN:  Now, according to that same

10   principle of geology, would it apply to the older alluvium

11   at the time it was laid down when the direction of the

12   river was reversed to what it is at the present time, speak-

13   ing now about Murrieta Creek?

14   A   If the circumstances of the outlet, whatever it

15   was, at the time the older alluvium    lied  down, if the

16   circumstances were similar, a similar principle would apply.

17   However, I do not know that those were the circumstances.

18   Q   You have no knowledge as a result of your investi-

19   gation of the basic geological principles as to whether that

20   condition did exist?

21   A   That is right.  And may I add something else,

22   Mr. Stahlman.

23   Q   Surely.

24   A   Now, this principle where it has been applied in

25   Pauba Valley indicates a maximum point where a maximum

Cannon — Direct
Kunkel — Cross

1   thickness could occur.   There are other things taken into

2   consideration.   One, the channel of the Temecula Creek is

3   not deeply incised, whereas, in places such as Santa

4   Gertrudus Creek, as pointed out in the vicinity of Section

5   26, it is actually possible to go into the channel of the

6   creek and see the outcrop of the older alluvium.   It does

7   not automatically follow that as one proceeds up any of the

8   tributary streams that the deposits thicken.   This point I

9   wish to make, that for Pauba Valley because of the gradation

10   here.   We know the deposits are thin at the mouth of the

11   canyon, the younger alluvial deposits are thin at the

12   mouth of the canyon.   We do not know the exact thickness

13   farther up.

14        Q    When you drew the outlines in relation to the

15   No. 4 basin, was that done in relation to the thickness of

16   the older alluvium?

17        A    The outlines of ground water storage unit No. 4,

18   I presume you are referring to?

19        Q    Yes.

20        A    Is done on the basis of the older alluvial

21   deposits.

22        Q    And the reason that you did not include the area

23   that included all of the older alluvium, was that by reason

24   of the fact that you felt the depth did not exist near where

25   it meets the basement complex?

Kimbel - Cros

A    In general, that is correct.  The thing that I attempted to do was to confine the extent of the ground water storage unit 3 and 4 to the area where I had data or evidence, geologic evidence, to indicate that there was a saturated thickness of older alluvium of at least 100 feet.

Q    In relation to your contours which you have presented on 15-A, where your water level contours are in approximate relationship to the land level contours, I can understand why your line would cross the basin as it does here -- referring to the contour level of 4-1040'.

MR. SACHSE:  In 1040 in Murrieta Valley or --

MR. STAHLMAN:  Well, 1040 as it crosses Pauba and goes up into the Murrieta.  It is one of the long --

Q    It is possible, is it not, to determine water contour levels merely for the area that is covered by the newer alluvium in the Pauba Basin?  You could make it a study and draw contour levels from merely the newer alluvium?

A    Yes, you could confine your contours to the younger alluvium.

Q    And when you drew your contours, you used wells that were in both new alluvium and in the older alluvium, didn't you?

A    That is correct.  They start on the younger alluvial plain, penetrate a thickness of younger alluvium, and go into the older alluvial deposits underlying the

younger alluvium.

Q    Would, in your opinion, if you had drawn contour levels merely for the newer alluvium in the upper end of the Pauba Basin where contours as shown here do not approximate the land levels, would these contours, in your opinion, follow the same contour line as it is shown on Exhibit 15-A or would they be removed farther upstream by reason of the activity of pumping in the upper end of the basin or in the basin?

MR. VEEDER:  Could I have that question, please.

(The reporter read back the question.)

Q    BY MR. STAHLMAN:  Can you answer that question?

A    It is rather awkwardly worded.  I think I have --

Q    We have a lot of questions that are awkwardly worded.

A    I believe I understand what you are --

Q    What do you think it is?  Maybe we agree on it. You might ask it better than I do.

A    You asked me where the contours approximate land surface.  I believe you are referring to the fact that where the 1100-foot water level, or say the 1100-foot water level contour and the 1100-foot land surface, land contour approximately intersect in the area below rising water.  You are speaking of the area --

Q    My question is this:  As you progress upstream to

Kimbel-Cross

1    where the contour lines, as you have drawn them -- take, for

2    instance, 1150 contour line as it draws into the Pauba Basin

3    -- would, in your opinion, if you had drawn water level

4    lines using only the wells in the Pauba Basin to determine

5    the contour of the basin, would that line be the same as the

6    line, the same contour as the 1150?

7        A    The 1150-foot contour would be in the same

8    position.

9        Q    It would be in the same position?

10       A    As the 1150, yes, sir.

11       Q    Then, you believe that your water contour lines

12   here show on the date as you made your study the water levels

13   in the basin as well as in the alluvium at that time?

14       A    That is correct.

15       Q    When you talked about the question of releasing

16   a slug of water down to the Nigger Canyon as it entered the

17   basin, you spoke about it would bleed out into the older

18   alluvium?

19       A    Yes.

20       Q    Correct?

21       A    Yes.

22       Q    And the reason it would bleed out there, what

23   would that be, the change in gradient between the newer

24   alluvium and the older alluvium?

25       A    Well, the water would come down Temecula Creek.

C-2

Gannon - Direct

Kunkel - Cross

1   The deposits are very absorbtive.  The water would, depend-
2   ing on the quantity that was released, all or a major part
3   or part of the water would go underground and recharge, go
4   underground and fill the void spaces in the younger alluvium.
5   This is getting into a complex problem.  Underground water,
6   as it is percolating downward, has no head but as soon as
7   that ground water entered the water body and a head was
8   reflected, the effect would be a movement of the ground
9   water contours down-gradient in the immediate vicinity where
10  the recharge took place.  If at that particular moment
11  water levels could be measured, there would be a change in
12  the position of the 1150-foot contour.

13      Q   I think maybe we can go on.  What I am speaking
14  about now is this bleeding process.  You talk about where
15  the water would bleed from the younger alluvium into the
16  older alluvium?

17      A   Yes, sir.

18      Q   That would be the cause of the change in gradient
19  created by the inflow of the water, is that correct?

20      A   Yes, that is correct.

21      Q   Now, this bleeding that you speak about, you
22  previously said it would be a matter of degree, I believe,
23  as to the transmissibility of the water from the younger to
24  the older alluvium; is that correct?

25      A   It would be a matter of degree.

1    Q    Do you have any opinion --

2    MR. VEEDER:   Just a moment.  I fell off the sled

3    back there again.  He said that "the inflow of water."  Now,

4    I didn't follow what was meant by the "inflow of the water."

5    MR. STAHLMAN:   Releasing the slug of water, using his

6    own expression.

7    MR. VEEDER:   It is not the inflow of the water from

8    the older alluvium into the younger alluvium?

9    MR. STAHLMAN:   No, I am speaking about this reverse

10   process.

11   MR. VEEDER:   Thank you.

12   Q    BY MR. STAHLMAN:   Well, let me ask you that

13   question again.   There are occasions when the water could be

14   transferred from the older to the newer alluvium, depending

15   upon the water gradient and the activities in the basin;

16   that is true, isn't it?

17   A    That is correct, depending on the pumping regimen.

18   Q    Would that be a bleeding process, also?

19   A    Yes, it would be.

20   Q    You refer to it as that.

21   By "bleeding," I presume you mean a slow seepage?

22   A    A percolation of ground water through the void

23   spaces from points of high head to low head.

24   Q    You have made some tests, or tests have been made

25   which you consider relative to the permeability of the older

Kimbel - Cross

1    alluvium, haven't you?

2        A    Observations and exhibits have been drawn, yes,

3    sir.

4        Q    Do you have an opinion as to hours, days, months

5    or years as to the length of time that it would take for the

6    water level to be established with a slug of water coming

7    down into the older alluvium?

8        MR. VEEDER:  I object, your Honor, on that ground:

9    it is far too conjective and too vague.

10       THE COURT:  Overruled.

11       MR. STAHLMAN:  I don't know.  Maybe it is.  It is up

12   to him to say, I think.

13       THE WITNESS:  I have made no precise quantitative

14   tests.  I can give it down to you in hours, days, or months.

15       Q  BY MR. STAHLMAN:  I just mean, is it going to take

16   a long time, or is it relatively short, in your opinion, if

17   you have an opinion?

18       A    Well, I have an opinion.  I would like to  phrase

19   it a little different as far as long time or short time.

20       Q    All right.

21       A    We know that within, that there is water moving

22   out of the older alluvial deposits.  It can be observed, and

23   we have observed declines of the water levels in the Shrode

24   well on the order of 25 feet from the time that the well was

25   drilled.  Now, whether we are talking about the bleeding

Kimbel - Cross

1    process or the recharging of the older alluvium from the

2    younger alluvium, the alluvium taking place in one pumping

3    season for a matter of months, I am not absolutely certain.

4    But it is within a reasonable time, as man calculates time,

5    that the recharge does take place into the younger -- into

6    the older alluvial deposits.  We are not talking about

7    hundreds or thousands of years; we are talking about a

8    season, one or two seasons or --

9         Q    That is what I want to get at.  You think in one

10   or two seasons it is your best judgment that the water level

11   would be re-established to the older alluvium?

12        A    If you don't pin me down to too precise a time.

13   We are talking about a time that is measured in a matter of

14   a few years rather than many, many years.

15        Q    You were asked the question yesterday in regard

16   to the close proximity of the water levels, the 1150 and

17   the 1200 level as shown on the Exhibit 15-A to the south of

18   Pauba Basin, contrasting that with the width of the level to

19   the north of the basin; and I believe you stated that that

20   may be by reason of the permeability, of the difference in

21   permeability of the materials; is that correct?

22        A    I believe the area that we refer to specifically

23   was in sections, northwest part of Section 27, Southeast of

24   21, a rather limited area, in Township 8 South, 2 West, in

25   regard to that particular reference.

Kinkel - Cross

Q   Do you have an opinion as to why the gradient is much better here in Sections 23, this one here, 22 and 27, as contrasted to, say, Sections 26 and 27 of Township 7, Range 2?

A   Again, without being too specific, I emphasize the fact that in the area southeast of Temecula -- southeast of Pauba Valley along the 1150 and 1200 contours, are drawn with the shortest dashes, indicating the least degree of control.  However, it may well be that the deposits in the area southeast of Pauba Valley may be less transmissible than the deposits northwest.

Q   You heard the testimony, I believe it was Mr. Hall who said that the -- maybe it was you -- that the area south absorbs water during rainfall at a very high rate. Do you concur with that?

MR. VEEDER:  Areas south of where, please?

Q   BY MR. STAHLMAN:  South of the Pauba Basin?

A   I have no personal observations to that effect. I have every, the greatest regard for Mr. Hall's observations.

Q   The ability to absorb water more readily to the south, would that indicate that there is less permeability to the soil, generally, in that area?

A   No, it would indicate that the soils were more permeable.

1    Q    I mean more permeable.

2    A    In general, that would be true, yes, sir.

3    Q    And if they were more permeable, wouldn't it be

4  logical to assume, then, that the gradient would be less to

5  the south if they are more permeable to the south than to

6  the north and the gradient would be to the north?

7    A    Would you read that question back?  You may have

8  interchanged your terms.  I am not certain.

9    (The reporter read back the question.)

10    MR. STAHLMAN:  That doesn't sound as I intended to

11  say it.

12    Q    The point I am making is that where the soils

13  are generally more permeable the gradient will level out

14  more readily, will it not?

15    A    In general, that is correct.

16    Q    Then, do you have any explanation, with that

17  thought in mind, in relation to the greater distance between

18  the gradients as shown to the north and to the south?

19    A    The whole problem goes back to the -- I am sorry;

20  I have to refer to an equation.  By our equation Q equals

21  TID or Q equals PIA where the quantity of water moving along

22  in a contour is the sum of the permeability -- the product,

23  I mean; not the sum but the product of the permeability, the

24  cross-sectional area and the hydrolic gradient, or it can

25  be expressed as the product of the transmissibility, the

Kinkel—Cross

1  hydrolic gradient, and the length along the water level

2  contour.  If you vary one factor, you have to consider the

3  effect of the others.

4      Q  Are you familiar with the factors as they relate

5  to the area south that enter into that equation?

6      A  I am.  I do not have data on the transmissibility.

7  It is quantitative data.

8      Q  Let's go on to another subject.

9      Directing your attention to Exhibit 16, and, in

10  particular, to the designation of the Vail spillway and the

11  area that indicates the reservoir storage area of the Vail

12  Lake.  Can you, from this map, tell me what the distance

13  would be --  First, I will ask you this question:

14      As you drew this map would the water level as

15  shown of the Vail Lake be the level in relation to the

16  altitude when the dam is full?

17      A  That is correct.

18      Q  Then, can you tell me what the distance would be

19  from the level of the lake when full to the basement complex

20  which you show descending to the east?

21      A  As shown on Exhibit 16, that distance would be

22  on the order of 8000 feet.

23      Q  It wouldn't be more than that.  Well, then, --

24      A  Along the line of section that is --

25      Q  It is at least that much.  And, of course, as the

Cameron - Direct

Kunkel - Cross

1  dam were not full, why, that distance changes considerably?

2      A   It would be greater.

3      Q   However, you have shown on Exhibit 16 this one

4  well, being 8/1-24Bl projected.  Do you know whose property

5  that well is on?

6      A   Pardon me.  May I refer to my notes?  That is on

7  the Sunnybrook Ranch, if I remember the name of the ranch

8  correctly.

9      Q   And what is the depth of that well?

10      A   It is scaled on the exhibit; it is approximately

11  175, 180 feet.

12      Q   And the pumping area of that well is below the

13  level of the water in the dam, is it not?

14      A   That is correct, when the dam is --   Well, yes.

15      Q   When there is any water in the dam?

16      A   Well, I am not certain just what the pumping

17  level is.  The bottom of the well is below the dam.

18      Q   And from your investigation were there other

19  wells in that area, just generally speaking?

20      A   Yes, sir, there are other wells in the area

21  above Vail Dam.

22      Q   Are there any other deep wells in that area?

23      A   Well, I observed one well being drilled to a

24  depth of 588 feet in the southwest quarter of Section 7,

25  Township 8 South, Range 1 East.

Kenkel - Cross

1      Q   Do you have an opinion as to what the effect

2  would be if pumping of large quantities of water out of a

3  series of wells to the east of the Vail reservoir on the

4  reservoir?

5      A   The effect of pumping in the wells, one would be

6  to intercept water that would normally move toward the Vail

7  reservoir.  There is rising water at the present time above

8  Vail reservoir which is a feed into the reservoir.  It would

9  intercept that water; and, if there were sufficient number

10 of wells, the water table were sufficiently depressed, the

11 hydrolic gradient could and would be reversed, and ground

12 water would move from Vail Dam toward the pumping wells.

13     MR. VEEDER:  When you say "dam," you mean "reservoir"?

14     THE WITNESS:  The Vail reservoir towards the pumping

15 wells.

16     Q  BY MR. STAHLMAN:  And if there were sufficient

17 pumping so as to deplete the water level to the point where

18 the gradient would be reversed, would it, in your opinion,

19 be possible in that manner to take water out of the Vail

20 reservoir?

21     A   In my opinion, that circumstance would prevail.

22     Q   Then, in relation to the character and type of

23 basement to the -- if I am using the term right -- of the

24 area upon which the Vail Reservoir is set, that is the older

25 alluvium; correct?

Cannon - Direct
Kimbel - Cross

A    The reservoir is on older alluvium.  The dam itself is on --

Q    You are familiar with the reservoir --

THE COURT:  He didn't finish.  The dam itself is on what?

THE WITNESS:  Is on basement.

MR. STAHLMAN:  Basement complex.

THE WITNESS:  The dam itself, right.

Q    BY MR. STAHLMAN:  You are familiar with other dams in this part of the country that the reservoir area is on, similar material?

A    Well, I have examined the reservoirs at Lake Hinshaw behind --

Q    That is on a porous material, is it not?

A    It is on a, the reservoir is over an alluvial deposit.

Q    In fact, the last few years due to the extraction of water from the reservoir and the low levels in the reservoirs the users, Vista, has pumped water out of the basin?  Are you familiar with that?

MR. SACHSE:  I object, if the Court pleases.  This is not within the scope of the direct examination.

MR. STAHLMAN:  It is probably not.

MR. SACHSE:  I think this is an entirely new matter.

THE COURT:  Sustained.  Let's take a short recess.

(Recess.)

D
Z19

1          THE COURT:  Proceed, Mr. Stahlman.

2          MR. STAHLMAN:  That is all I have, your Honor.

3          THE COURT:  Any further questions of Mr. Kunkel on

4     cross-examination?

5          MR. SACHSE:  I have no questions, your Honor.

6          I would like to remind the Court and Mr. Veeder again,

7     however, that we still have no answer or whether or not the class-

8     ified  report on the Pauba Well is going to be released,

9     and if it is released it is quite conceivable we might want

10    to ask Mr. Kunkel something about it.

11         THE COURT:  He will be available.  I am not excusing

12    any witness permanently.

13         What word have you had on the release of the classified

14    report on the Pauba well?

15         MR. VEEDER:  I believe that has been released, already,

16    your Honor.

17         THE COURT:  Well, let us not believe.

18         MR. VEEDER:  It has been released, in the record as I

19    recall, and I haven't had a chance to check it back, but I

20    think Col. Robertson said it was.

21         Isn't that correct?

22         THE COURT:  I don't think it is in the record yet.  Let

23    us know tomorrow.

24         MR. VEEDER:  Your remember, your Honor, there was a

25    three-way ricochet, so to speak, and you observed that Mr.

1    Kunkel looked at me and I looked at Col. Robertson.

2         THE COURT:  There was no conclusion.  Just some looking

3    went on.

4         MR. VEEDER:  There was an observation by your Honor.

5    Anyway, I will tell Mr. Sachse at noon, if that is all right.

6         THE COURT:  All right.

7         MR. VEEDER:  And then I will tell your Honor.

8         THE COURT:  Mr. Kunkel, I had a question I wanted to

9    ask.

10        In the east end of Pauba Valley where the windmill well

11   is located on 15A, you have put on the map some water levels

12   above sea level for 1927, 1953 and 1958, and for 1958 you

13   have 1152.

14        THE WITNESS:  That is correct.

15        THE COURT:  This windmill well is 12H1?

16        THE WITNESS:  That is correct.

17        THE COURT:  Now, according to Exhibit 15B-- this is a

18   very minor matter-- you show the elevation there to be 1216

19   feet and you show the depth to water on September 25th as

20   64.05.  Maybe I have answered my own question.  1152 would be

21   correct, isn't it?  My mathematics are in error.  I thought

22   it was 1162.

23        All right, Mr. Veeder.

24        MR. VEEDER:  I have no redirect, your Honor.

25        THE COURT:  All right, Mr. Kunkel, you will be excused,

D

Z21

1    with the understanding that you will be back if we need you

2    at sometime in the future for further examination.

3         THE WITNESS:  Thank you, your Honor.

4         THE COURT:  Call your next witness.

5         MR. VEEDER:  I will call Mr. Frank Cannon.

6

7              FRANK H. CANNON,

8    called as a witness in behalf of the plaintiff, being first

9    duly sworn, testified as follows:

10        MR. VEEDER:  I would like the record to show that Mr.

11   Cannon testified at the hearing before the Special Master,

12   that at that time his qualifications were gone into.  I don't

13   know what your Honor's desire would be in regard to further

14   review of his qualifications or whether it would be necessary.

15   We have some certain aspects in regard to salt intrusion that

16   might require additional qualification.  However, I would like

17   to proceed without going into that, if I may, and if objection

18   is made we can qualify him at that time.

19        MR. SACHSE:  We have no objection.  Fallbrook certainly

20   will stipulate to Mr. Cannon's qualifications.

21        I think it might be wise just to state that he is a

22   licensed civil engineer and what his position is, et cetera.

23        MR. VEEDER:  Thank you, Mr. Sachse.  I will do that.

24        THE COURT:  How do you spell your last name?

25        THE WITNESS:  C-a-n-n-o-n.

D

Z22

1        THE CLERK:  Your first name?

2        THE WITNESS:  Frank H.

3        THE COURT:  Proceed.

4        You are a licensed surveyor, are you?

5        THE WITNESS:  I am a licensed civil engineer and a

6    certified structural engineer in the State of California.

7        THE COURT:  And you have worked at this profession for

8    how long?

9        THE WITNESS:  I have been a licensed civil engineer

10   since 1932 and a structural engineer since 1933.

11       THE COURT:  All right.

12

13                    DIRECT EXAMINATION

14   BY MR. VEEDER:

15       Q  I hand you Plaintiff's Exhibit 101 marked for iden-

16   tification and ask you to state into the record what is

17   depicted by that illustration.

18       A  Exhibit 101 is a representation, both in plan and

19   profile, of the Santa Margarita River Valley from the sea to

20   the upper end of the Naval Reservation, including the Naval

21   Ammunition Depot and Camp Pendleton.

22       The plan indicates the locations of all the principal

23   water mains, reservoirs--

24       MR. VEEDER:  If I may, I will put this up on the easel.

25   I think it would be easier for Mr. Stahlman and the rest to see.

D

Z23

MR. STAHLMAN: May I ask, is that the same map that you used at Reche?

MR. VEEDER: This is the same schematic drawing that was used at Reche. I have some additional questions, however.

MR. STAHLMAN: What I meant is, do you have the exhibit number?

MR. VEEDER: I think the exhibit number on that was-- I would have to check that, Mr. Stahlman, as to what exhibit number was assigned to it at the Reche School. However, I think it was M-73.

Q  Would you proceed, Mr. Cannon, to refer to the principal areas to which this illustration pertains and to describe in some detail the location of those principal areas?

A  The upper portion of the exhibit indicates the ocean at the left, the reservation boundaries to the bottom of the map, the course of the Santa Margarita River running thus to the northeasterly portion of the Reservation, the Naval Ammunition Depot in this area which is the northeasterly area, the various portions of Camp Pendleton, what we call the division area.

Q  Where are you pointing there, from the standpoint of sections?

A  In the central portion of the planned section of the exhibit.

The Camp Del Mar or ocean area at the easterly edge,

D

Z24

1    the left-hand edge, and the agricultural areas of Stewart Mesa

2    and South Mesa at the westerly edge near the Pacific Ocean.

3         The profile portion--

4         THE COURT:  Where is the South Mesa?

5         THE WITNESS:  The South Mesa is generally adjacent to

6    the south boundary of the reservation.

7         THE COURT:  Is it just the 240 acres that is called

8    South Mesa?

9         THE WITNESS:  At the time this map was made the 240

10   acres was the portion leased to the State of California

11   Department of Agriculture for a seed potato program.

12        Understand, this map is not really up to date.  It

13   was made in 1950.  There were some revisions in 1951, also

14   certain revisions in 1958.  However, those revisions do not

15   bring it up to-- I wouldn't say that it is absolutely accur-

16   ate at the present time.

17        THE COURT:  What I am asking is, does the area you

18   speak of as South Mesa embrace more than the 240 acres?

19        THE WITNESS:  It does, your Honor.

20   BY MR. VEEDER:

21        Q  Would you refer to the other areas?

22        A  Other areas which have been in cultivation include

23   areas both to the northeast and to the southwest of the area

24   marked "240 acres" and surrounded by hatched lines.

25        Q  What about the areas generally north of the areas to

Cannon - Direct

5089

D

Z25

1 which you have last made reference from the standpoint of

2 irrigation?

3     A North and west of the 240-acre plot, you will note

4 another plot of 200 acres, which embraces presently a lemon

5 grove and certain row crop areas and a nursery.

6     THE COURT: Is that part of the South Mesa?

7     THE WITNESS: That is considered part of South Mesa.

8     THE COURT: South area?

9     THE WITNESS: Yes.

10     THE COURT: What do you call it-- South Mesa?

11     THE WITNESS: South Mesa is the common name. It

12 probably wouldn't all qualify as being mesa lands, but that

13 is what it is generally known as.

14 BY MR. VEEDER:

15     Q What are the other areas depicted north, then?

16     A The other area is Stewart Mesa north of the river.

17 That embraces approximately 1100 acres of land, which is

18 either now in cultivation or has recently been in cultivation.

19     Q Specifically, would you refer to where Camp Del Mar

20 is located?

21     A The Camp Del Mar area is the portion adjacent to the

22 ocean, generally extending approximately half a mile inland

23 from the sea.

24     Q Refer to the sections, too.

25     A The central feature is marked "Boat Basin" on this

D

Z26

1   map, and it includes portions of Sections 22, 14, 15, 16,

2   Township 11 South, Range 5 West.

3        Q   Then would you proceed up the river and point to

4   the other major areas which are disclosed on this diagram.

5        A   Proceeding up river from the Del Mar area, one first

6   encounters the Ysidora Pumping Basin, which is that portion,

7   in part, within Section 2, Township 11 South, 5 West, and

8   Section 35 in 10 South, 5 West.

9        Q   And from there would you indicate the other areas?

10       A   Advance upstream, the next principal area of use is

11   the Chappo Flats area.

12       Q   For what use is that made by the military camps?

13       A   The main industrial area of the Camp is situated

14   in Chappo Flats.  It is also the headquarters area, the

15   Ranch House, and troop housing area.  Adjacent to the industrial

16   area is housing.  Across the river to the north--

17       Q   In what section?

18       A   In Section 11, 10 South, 5 West, is Camp Margarita.

19   I had better include Section 14 as a portion of that also.

20   Section 14, 10 South, 5 West, embraces a portion of Camp

21   Margarita.

22       Q   What use is made of Camp Margarita?

23       A   That is a permanent troop housing area, all rein-

24   forced concrete buildings, permanent construction, and troops

25   are housed there for training activities in the neighboring

Cannon - Direct 5088

D

Z27

1   territory.

2       Q   Would you proceed further up the river?

3       A   Proceeding further on up the river, there is a

4   secondary industrial area located in the neighborhood of

5   Sections 7 and 8, 10 South, 5 West.

6       Q   And by secondary industrial area what do you mean?

7       A   We have large reclamation salvage areas there which

8   require quite a large area, the so-called heavy equipment

9   section where all heavy equipment and heavy engineering

10  equipment is centered-- located, and certain railroad

11  terminals for the unloading of heavy tanks, side tracks and

12  considerable warehousing.  It is a vestige of the original

13  construction contract, which had warehousing, and those are

14  not permanent buildings-- they are a residue of the con-

15  struction area.

16      Q   Would you refer to the other areas in that general

17  vicinity?

18      A   Beyond that is the Naval Hospital, which was built

19  concurrently with the Camp.

20          Over the hill, lying in part within the San Luis Rey

21  watershed and in part in the Santa Margarita River watershed,

22  is what is known as the Division Area.  That was the first

23  large troop housing area built on the camp, construction

24  starting in 1942.

25          THE COURT:  In what section is that Division Area?

D

Z28

THE WITNESS:  The Division Area comprises portions of Section 7, all this, in Township 10 South, 4 West, portions of Sections 8, 9, 17, 16, 19, 20 and 21.

BY MR. VEEDER:

Q  It is observed that there are other numbers on those in the areas there.  What is represented by those numbers?

A  This exhibit is primarily a water distribution map, and the other lines and numerals indicated thereon are main transmission water lines and their sizes; the 12-inch, 6-inch, 14-inch, for instance, are the sizes of the pipes involved in that water transmission complex.

Q  Would you proceed to refer to the other areas on the river?

A  Extending on up the river, the U. S. Naval Ammuntion Depot and its basic water distribution system, not up to date but as it was in 1950, is depicted largely in Sections 23 and 26, Township 9 South, 4 West.

Q  In the lower portion of the illustration there appear some diagrams.  Would you proceed to explain those, starting from the sea coast?

A  On the lower portion of the exhibit is represented a profile of the Santa Margarita River extended approximately to scale.  It is impossible to get a direct projection from the meandering of the river, but as near as possible it

D

Z29

1    represents a profile up the river. You will notice that it

2    extends for a somewhat greater distance because of the meander-

3    ing.

4        This indicates most of the pumping wells.

5        Q  Would you just indicate that?

6        A  The wells are indicated from the ground profile

7    extending down to scale into the pumped medium. There again

8    this map represented conditions as of 1950, to which has been

9    added certain newer wells. The number designation on those

10   wells is either the old Rancho Margarita designation or the

11   plant account number, the official Marine Corps number. The

12   designations are not the same as have been used heretofore

13   in the other exhibits by the U. S. Geological system of

14   section and by each forty. They can be converted, however.

15       Q  What are the wells which are shown further toward

16   the sea? There are a series of wells which you have marked

17   on there "Not pumped." What do you mean by that?

18       A  There is a group of four, which indicate four wells,

19   in the Ysidora Basin. Those wells are primarily wells which

20   either are being used or have been used for irrigation pumping

21   at Stewart, or for domestic use at Camp Del Mar near the sea.

22       Q  Would you proceed to explain the other phases of

23   the illustration?

24       A  The rest of the profile section, which is at the

25   lower edge of Exhibit 101, indicates in rough profile the

D

Z30

1  entire water system, that is, on the Santa Margarita River,

2  of Camp Pendleton and the Naval Ammuntion Depot.

3    Q  Starting from the ocean would you proceed inland,

4  referring to the various units and structures that are de-

5  picted on the identification?

6    A  It may be more reasonable or logical to start at the

7  upper end.

8    Q  Well, you're the doctor.  Go ahead.

9    A  Beginning at the upper end, you notice that the whole

10  series of wells in effect pump into a header or interconnect-

11  ing pipe of fairly large diameter.  They are all interconnected

12  at the low level.  From that level numerous lines extend up

13  to a higher elevation, actually an elevation of approximately

14  between 250 feet above sea level and 268 feet above sea level,

15  and at that elevation you will notice the hospital reservoir

16  of a million gallons, the booster--

17    Q  Whenyou say a million gallons, what do you mean by

18  that?

19    A  A million gallons storage capacity.

20    Q  Where is that located?

21    A  That is located in the neighborhood of the hospital

22  grounds, just to the north, in Section 32 of Township 9 South,

23  Range 4 West.  That series of water vessels are all at the

24  same level; that is, the hospital reservoir, four 75,000-

25  gallon redwood booster tanks, and the Camp Margarita Reservoir,

in effect giving a fixed static head from all that water storage. The purpose of that group of storage vessels is to either provide for adequate pressures for direct use at the hospital or at all the installations which lie along the Sant Margarita River to the lower end of Chappo, and in the case of the boosters it also says to provide for a flooded section for booster pumps which lift the water by automatic controls to a series of high reservoirs. The purpose of the high reservoirs--

Q  How are those high reservoirs constructed?

A  All those high reservoirs are underground reservoirs, covered underground reservoirs, constructed of pneumatic concrete or commonly known as gunnite. They are permanent reservoirs.

Q  Will you proceed and describe them and their utilization?

A  With the exception of one, which is noted as Reservoir 1, a 500,000-gallon reservoir-- that reservoir is located so that it can furnish the needed pressure for the lower regimental areas, commonly known as Area 12 and Area 14, which lie in the Santa Margarita.

Q  Would you refer to the section to which you are now pointing so that we will know where that water is used?

A  Partly in the San Luis Rey. Those two areas are situated in Sections 8, 9, 16 and 17, Township 10 South, Range

D
Z32

1    4 West.

2            The higher reservoirs which are at elevation 540 feet

3    above sea level at the overflow line are for the purpose of

4    furnishing adequate fire pressure and temporary storage for

5    the other regimental areas in the division group, situated

6    in Sections 16, 17, 20 and 21, Township 10 South, Range 4

7    West.  It is also necessary to reduce pressures for one lower

8    area which is located in Section 21, 10 South, 4 West, be-

9    cause it lies at lower elevation.

10           Q  Now what other structures are shown on this

11   illustration?

12           A  This map indicates a direct connection to a golf

13   course, which is labeled "Memorial Golf Course Area,"

14   situated in Sections 29, 30, 31 and 32, Township 10 South,

15   Range 4 West.  That was true at the time as indicated.  It

16   is true now only in that that same water provides domestic

17   water for a clubhouse.  The irrigation of that golf course

18   has been taken over by a sewage effluent line, which is

19   not indicated on this drawing, from the neighborhood in

20   Section 28, Township 10 South, Range 4 West, in the neighbor-

21   hood of the 17 Housing Area.  That is not depicted on this

22   map.  But the same laterals are used.  However, the water

23   pressures are derived from a pond produced by an earth-filled

24   dam on the top of a range of hills between the Area 17 and

25   the golf course.

E-1   ML j

1      Q   BY MR. VEEDER:  Now, what other structures are

2  shown on the illustration, Mr. Cannon?

3      A   It will be noted that from the Chappo area in the

4  plan above an 18-inch line is indicated interconnecting the

5  Chappo area and the Ysidora area.  That same line is indicated

6  on the profile just above the words "Riverbed," and that

7  18-inch line draws its pressures from the aggregate of

8  storage adjacent to the Chappo area as well as the direct

9  connection to several of the wells, deep wells, the deep

10  well pumps.  Presently you will note by the plan there are

11  two 10-inch and 16-inch lines emptying into that 18-inch

12  line, together also with 12-inch lines from nearby wells.

13  That furnishes a static head on the 18-inch lines effective

14  from approximately elevation 268 feet above sea level.  That,

15  in turn, provides water for a booster pump station, which is

16  noted in the neighborhood of the four wells; booster pump,

17  in turn, provides water for two permanent granitic reservoirs:

18  one at an elevation of 223 with a capacity of a million

19  gallons, noted reservoir No. 7; the other at elevation 309

20  above sea level with a capacity of 750,000 gallons, noted

21  as reservoir No. 5.  The purpose of these reservoirs is to

22  furnish water at an adequate pressure for the fairly large

23  Del Mar area with all its troop-housing facilities and

24  training facilities for amphibious warfare, tanks, and all

25  of that.  Also indicated, and this is one of the items which

1  was added in 1958, is an elevated steel tank with a capacity

2  of 250,000 gallons; and its high water surface elevation is

3  433.79.  The purpose of that is to provide water at adequate

4  pressure for fire protection and domestic use for the

5  officers' housing area in that immediate neighborhood which

6  lies on a hilltop.

7      Q   And when you say "that immediate neighborhood,"

8  what is the section, township and range?

9      A   That is indicated largely in Section 11, Town-

10  ship 11 South, Range 5 West.  Sections 11 and 14, actually.

11      Q   I observe on there you have "a million gallons

12  proposed."  What do you mean by that?

13      A   That reservoir is not in existence.  It is noted

14  as being proposed.  It is a proposed reservoir at the same

15  elevation as the main water storage adjacent to Chappo.

16  This one also is adjacent to Chappo, but it is a proposed

17  addition to the system to take care of a proposed new camp

18  which is to replace Camp Matthews in the neighborhood of

19  La Jolla.

20      THE COURT:  Replace what?

21      THE WITNESS:  Camp Matthews.

22      THE COURT:  Where is Camp Matthews?

23      THE WITNESS:  Camp Matthews is in the neighborhood

24  of La Jolla.

25      MR. SACHSE:  Your Honor, I move that the answer be

1    stricken.  It is irrelevant and immaterial.  This Court is

2    not going to base its adjudication on proposed camps.  Further-

3    more, there is no foundation, and I did not stipulate to the

4    qualifications of Mr. Cannon to tell what the proposed

5    expansions of the Marine Corps are going to be.

6         THE COURT:  Well, it is not going to decide any

7    issues of this case.  Overruled.

8              I am glad to know what is going to happen to

9    Camp Matthews.  They wake me up every morning with rifle

10   practice.

11        MR. VEEDER:  That is why we are doing it, your Honor.

12        MR. SACHSE:  I wouldn't doubt that.

13        THE COURT:  You mean because I live there?

14        MR. SACHSE:  He said it, your Honor.

15        THE COURT:  Well, actually, it doesn't bother me, but

16   it bothers some of the older people who live in that area.

17        Q  BY MR. VEEDER:  Now, Mr. Cannon, is that

18   illustration of 101 prepared to scale?

19        A    It is prepared to scale of one inch to three

20   thousand feet in plan and approximately one inch to eighty

21   feet in the vertical scale.

22        Q    Is it accurate, to your personal knowledge, Mr.

23   Cannon?

24        A    It is accurate to the best of my knowledge.

25        Q    And who prepared it?

1    A    It was  prepared under my direction, partly by

2    me in person.

3         MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

4    marked 101 for identification.

5         THE COURT:  Be received in evidence.

6              The well listed as "De Luz" with the figure

7    "102" under it is not hooked up with the water system.

8         THE WITNESS:  It is not indicated so on this map.

9    Actually, it is hooked up with the Naval Ammunition Depot

10   water system.  That could well be added to this map.  It

11   was just in as a temporary line, but it is operative.

12        MR. VEEDER:  We will have another witness and another

13   exhibit on that point, your Honor.

14        THE COURT:  All right.

15             Now, at the right-hand side of the map is shown

16   a deep well pump, the word "Gallery."  What is meant by

17   "Gallery"?

18        A    The indication noted "Gallery" is the principal

19   water supply for the U. S. Naval Ammunition Depot.  It is a

20   different type method of obtaining water.  It consists of a

21   large perforated concrete pipe placed in a trench excavated

22   out of the granite residuum which is only a little bit

23   porous at that place, back-filled with sand.  The surface

24   water of the river enters through the sand, gathers in the

25   gallery.  It is conducted from there to a pit in which a

1  deep well pump is located.  That water is pumped by means

2  of deep well pump to a desanding tank with considerable sand.

3  THE COURT:  That is enough.  What I am interested in

4  now is:  Is that water system that supplies the Naval

5  Ammunition Depot connected with the other system or is it

6  a separate system?

7  THE WITNESS:  The De Luz well, when it is pumped,

8  when it is necessary to pump it, merely lifts water up so

9  it goes in the gallery.  That is my understanding.  I didn't

10  see the actual operation.

11  THE COURT:  It is not connected with your system

12  downstream?  The De Luz well or the gallery is not connected

13  with your system downstream?

14  THE WITNESS:  It is not.  There is no interconnection

15  between the De Luz well and that group of wells downstream.

16  THE COURT:  All right.

17  MR. VEEDER:  I have made the offer, your Honor.  I

18  didn't hear what you said.

19  THE COURT:  Received in evidence.

20  MR. VEEDER:  You may take the witness stand.

21  Q  Now, Mr. Cannon, would you state when you first

22  came to Camp Pendleton?

23  A  The 21st of May, 1942, I believe is the date.

24  THE COURT:  You are a full time employee there at

25  Pendleton?

THE WITNESS:  I am, sir.

THE COURT:  Civilian employee?

THE WITNESS:  I am a civilian employee.  Civil Service.

Q  BY MR. VEEDER:  Would you briefly state what your responsibilities have been during that period?

I realize now in that regard that we are covering some of the material that was in the Special Master's hearing, but I find that it is almost impossible not to repeat some of it, your Honor.

THE COURT:  You make it very brief.

MR. VEEDER:  I will ask him to make it very brief.

THE WITNESS:  Since I have been at Camp Pendleton I have had the same job essentially, and that is as Chief Engineer of the Public Works Office.  On first coming there the job was known --

Q  BY MR. VEEDER:  What is the Public Works Office, to begin with?

A  The Public Works Office at a Naval establishment does planning for all organizations and for outside contract work, estimates on new construction, as determined by the command, camp command.

Q  What kind of construction do you have reference to?

A  I have reference to all manner of construction -- buildings, utilities, roads, and all Marine construction, all types of construction which you might encounter on a

Cannon – Direct

1   large camp like Camp Pendleton.

2   Q   Will you proceed to describe the further aspects

3   of your position?

4   A   The position has been intimately tied up with

5   all utilities from 1942.   And it was one of my responsibilities

6   to head up the design and construction and additions to the

7   water and sewer systems serving the camp.   In connection

8   with the water system, we found rather early that we had

9   problems; and those problems have become more profound every

10  year since.

11  Q   And what other work have you had to do in

12  connection with the operation of both the Camp Pendleton and

13  the Naval Hospital, if you have responsibilities in connec-

14  tion with that institution.

15  A   My responsibilities are primarily not with

16  operation.   The Public Works Office on the Naval installa-

17  tion does the planning and supervises construction of all

18  facilities under contract; administers contracts.   The actual

19  operation duties on a Marine base, which is somewhat

20  different from other Naval establishments, is turned over,

21  at the finish of construction, to the Base Maintenance Office.

22  That is primary.

23  Q   When you arrived at Camp Pendleton what was the

24  phase of your responsibilities that you undertook at the

25  outset of your arrival there?

Cannon - Direct

1          A    The first phase was planning only, administering

2    the architect-engineer contracts.  But within a month I

3    also had the construction, the entire construction contract

4    to administer.  So it was planning and construction.  The

5    Public Works Office, as such, was not formed for approximately

6    two years later, and then I took on additional duties as

7    Chief Engineer of the Public Works Office.

8          MR. VEEDER:  Your Honor, I observe that it is noon.

9    If we are at a point where --

10         THE COURT:  All right.  We will adjourn until 2:00

11   o'clock.

12         (Whereupon a recess was had at 12:00 o'clock noon

13   until 2:00 o'clock p.m. of the same day.)

14

15

16

17

18

19

20

21

22

23

24

25

F

Z33

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, NOVEMBER 19, 1958.  2 P. M.

2

3         MR. VEEDER:  Would you take the stand, Mr. Cannon.

4

5                   FRANK H. CANNON,

6    recalled as a witness in behalf of the plaintiff, having been

7    previously sworn, testified further as follows:

8         THE COURT:  May I inquire, Mr. Veeder.  I thought you

9    were going to finish your geology before the State of Cali-

10   fornia puts theirs on.  Why are we going into matters of pipe

11   lines and installations?

12        MR. VEEDER:  As far as we are concerned, your Honor,

13   the geology is completed.

14        THE COURT:  It is completed.  All right.

15        MR. VEEDER:  I would like, if agreeable to your Honor

16   and counsel, to substitute this copy of Exhibit 101 for the

17   copy that was originally offered this morning.  It is a more

18   clear reproduction.

19        THE COURT:  It may be substituted-- copy of Exhibit 101

20   in lieu of the exhibit received in evidence.

21

22                   DIRECT EXAMINATION (Resumed)

23   BY MR. VEEDER:

24        Q  Now, Mr. Cannon, what have been your responsibilities--

25   You may sit down.  What have been your responsibilities in

F

Z34

1    regard to the pumping from the basin underlying Camp Pendleton

2    during the years since you came to the Camp in 1942?

3        A   I have served in an advisory capacity to the Public

4    Works Officers who have been in that position since I have been

5    there, and being the continuing technical individual it has

6    been my job to bridge the gap from one regime to the other.

7        Q   From the standpoint of the matter of salt intrusion

8    into the subterranean basin, when did you first become

9    acquainted with that fact?

10       A   In the year 1947 it first became obvious that a

11   change was occurring in a well which had pumped twenty years

12   before that.

13       Q   What was the character of the change that took place,

14   Mr. Cannon?

15       A   The chlorides content increased materially above

16   that that it had habitually been, in one well in particular

17   at first, and later in other wells in the Ysidora Basin.

18       Q   What acts did you take in regard to the intrusion

19   of salt water into the basin?

20       A   At first we only had occasional chemical analyses

21   of the water, and on one of these occasional analyses it

22   was noted that the water from the well which we knew as 4C,

23   which was an old Ranch well which was there long before the

24   Marines took over, it was noted that that had increased to

25   about 243 parts per million from an average of about 176 parts

5098

F

Z35

in 1942.  So thereupon I caused a series of weekly observations to be made of the chlorides content of five wells, I believe, in the Ysidora Basin.

THE COURT:  What did it increase to?  From 146 to--

THE WITNESS:  From 176, your Honor, to 243.

BY MR. VEEDER:

Q  That was in 1947?

A  It was 1947 that the start of the serious increase in chlorides content was noted.

Q  What did you do when that situation became apparent to you to analyze the situation?

A  We started a program of submitting samples of water weekly in order to note definite changes in chlorides content, and we plotted those records, kept the records for a number years, and we are still keeping them.

Q  What did it reveal to you when you took this step of checking this salt?

A  It revealed to me at least that during the first five years of operation of Pendleton when we had good replenishment of the Lower Basin, apparently good replenishment, let us put it that way, that we were not bothered by any marked change in chlorides content of the water.  But in 1947 the runoff became practically nil past Ysidora Gage and apparently there was not enough replenishment to prevent a rather serious draw-down in the Ysidora Basin, which, in my opinion, caused the

Cannon   Direct

5099

F

Z36

1    change of gradient from the ground water table from the land

2    toward the sea to a condition from the sea toward the land,

3    which allowed the salt water intrusion to advance.

4         Q  What investigations did you undertake in connection

5    with that intrusion?

6         A  At the time I caused four observation wells to be

7    put in with station forces, rather shallow wells, from a

8    point, as I recall it, approximately 1500 feet above the

9    Ysidora Gage to a point-- the four wells were from 1500 to

10   2,000 feet apart, and the locations of those wells are located

11   on Exhibit 101, I believe.  I am not sure about that.  I would

12   have to check to make sure.  Yes, they are noted-- circles

13   with black dots within them, just labeled 1, 2, 3, 4, in the

14   neighborhood of the Ysidora Gage.

15        Q  And would you state in which section your number one

16   is located?

17        A  No. 1 is located in Section 10, 11 South, 5 West, --

18   number$_8$ 1, 2 and 3 are in that section.  No. 4 is in

19   Section 2, 11 South, 5 West.

20        Q  How long did you continue that type of investigation,

21   Mr. Cannon?

22        A  We continued that until the investigation was taken

23   over at the request of the Navy by the Ground Water Branch

24   of the U. S. Geological Survey.

25        Q  What type of progression of salt intrusion followed

F

Z37

1  from the period when you started in this investigation?

2      A  There was a gradual increase in the gradient from a

3  seaward gradient to the reverse, a landward gradient, from the

4  period February, 1948, to the fall of 1951.  I plotted the

5  results of the readings of these observation wells which were

6  in the river sands, which made that apparent to me.

7      THE COURT:  You say these were shallow wells?

8      THE WITNESS:  They were quite shallow wells, your

9  Honor.

10     THE COURT:  How deep?

11     THE WITNESS:  They were not deeper than 15 feet, sir.

12     THE COURT:  And you found increasing chloride content

13 in each of these four wells?

14     THE WITNESS:  The principal purpose of the wells, your

15 Honor, was to determine the gradient of the water table.

16     THE COURT:  I am not asking you the purpose.  Did you

17 find increasing chloride content from the waters of these four

18 shallow wells?

19     THE WITNESS:  I don't recall actual chemical analyses.

20     THE COURT:  Your analyses were being taken from the --

21     THE WITNESS:  From the regular wells.

22     THE COURT:  These were then largely for the purpose of

23 plotting the gradient?

24     THE WITNESS:  That is correct; yes, sir.

25

F

Z38

BY MR. VEEDER:

1

2     Q   From the standpoint of operations, what did you do

3  in connection with the wells that were utilized in the Ysidora

4  Basin subsequent to the intrusion of salt water?

5     A   The one well which I mentioned before, the 4C one--

6  I could put that in terms the Court is used to.

7     Q   Go ahead and mark it on Exhibit 101, if you would.

8     A   By reference to a key map.

9     Q   So that we will have that noted, use the key we have

10 used on the other exhibits.

11    A   The well that I know as 4C is described as 11-5-2K1.

12    Q   Would you mark that on Plaintiff's Exhibit 101?

13    A   Do you wish me to identify that well?

14    A   Yes, if you would, and mark it on the upper drawing

15 and then also mark it on the cross-section.

16    A   I have added a mark to Exhibit 101, Well 4C is also

17 labeled 11-5-2K1, and I have added the well--

18    THE COURT:  Is there some symbol on Exhibit 101 that

19 shows that?

20    THE WITNESS:  Yes, your Honor; 4C is right in the

21 immediate neighborhood of the booster tank.

22    THE COURT:  I see-- 4C.

23    THE WITNESS:  That is the well which has been previously

24 referred to as 11-5-2K1.

25    THE COURT:  All right.

F

Z39

1      THE WITNESS:  I have added the same one on the profile.

2   It was not on the profile as originally submitted.

3   BY MR. VEEDER:

4      Q  Now, what other wells did you observe during this

5   period from the standpoint of salt water intrusion?

6      A  The next well to show marked increase in chlorides

7   content is the well-- this is on Exhibit 101 as 5A2 on the

8   north side of the river in Section 2 - 11 - 5.

9      Q  Do you recall when that phenomenon was first observed?

10     A  I believe it was during the year 1948.  I could

11  refresh my memory from notes I have in my briefcase.  I have

12  the dates there.

13     Q  It was 1948 as your best recollection; is that right?

14     A  I have the records in my pocket as to the dates.

15     Q  Check on it, if you wkll, and state into the record.

16     THE COURT:  Which well are you talking about?

17     THE WITNESS 5A2, your Honor.  I believe that is 11 - 5 -

18  2F2.  From a copy of the records which I kept myself, to

19  answer the question, Well 5A2, which is 11/5-2E1, started out

20  in 1947 with a chlorides content of 168 parts per million.

21  In 1948 it got as high as 228.  In December, 1949, it was 240.

22  In the early part of 1949 the chlorites content dropped some-

23  what, presumably from the influx of fresh water.  The latter

24  part of 1949 the chlorides content increased from 228 the 3rd

25  of June to 234 the 24th of June, to 244 the 1st of July.  That

Cannon Direct

5103

F

Z40

1   carried on until the 18th of July, still 244, at which time

2   we stopped the pumping, and that well-- we stopped the pump-

3   ing approximately a year.

Carroll - Direct 5104

G-1 ML j

1    Q   BY MR. VEEDER:  Now, when you renewed pumping on

2    that well would you state what transpired?

3    A   When we finally renewed the pumping the chlorides

4    content had gone down considerably.

5    Q   What transpired when you --

6    A   And on pumping the chlorides content increased

7    at a greater rate than it did at first.  In other words, by

8    plotting the chlorides content against time, the line was

9    much steeper than it was when the chlorides increase was

10   first noted.

11   Q   What then did you do?

12   A   As a result of that, the, well, we ceased pumping

13   the well altogether and moved upstream.

14   MR. SACHSE:  May I again:  Which of the wells is

15   shown?  Which profile is that?

16   Q   BY MR. VEEDER:  Give the number and the cross

17   reference.

18   A   That well is 11-5-2F2.

19   MR. SACHSE:  And on the profile?

20   THE COURT:  On the profile it is 5-A-2.

21   MR. VEEDER:  That is right.

22   THE WITNESS:  On the profile it is 5-A-2, on the

23   north side of the river.

24   MR. SACHSE:  Thank you.

25   Q   BY MR. VEEDER:  Would you make reference to the

1 next well concerning which you observed the presence of

2 salt water intrusion and give the date, if you have present

3 recollection of it?

4      A   The domestic well known as 4-P-B, which,

5 apparently, in the U.S.G.S. method of identification would

6 be 11-5-2A1.

7      Q   And where is that located?

8      A   11-5-2A1 is in the central eastern portion of

9 Ysidora pumping basin in the northeasterly corner of Section

10 2, 11 South, 5 West. And it was noted that from 1947, the

11 chlorides content was 145 parts per million.

12      THE COURT: Now, where is 2A1 on your Exhibit 101?

13 You called it 4B4; did you call it?

14      THE WITNESS: 4BB, your Honor.

15      THE COURT: 4BB.

16      MR. VEEDER: Have you located it?

17      THE COURT: I see it. There is an arrow drawn to

18 it; is that it?

19      Q  BY MR. VEEDER: Would you step down and refer to

20 the section to the end that we can identify it?

21      THE COURT: It is a pipe line, I take it, drawn about

22 mid over to a profile?

23      THE WITNESS: 4BB, your Honor, is the circled triangle

24 in the northeasterly corner of Section 2.

25      THE COURT: All right.

Cannon - Direct

1          THE WITNESS:  Is it desired to identify that?

2          Q  BY MR. VEEDER:  Would you put the symbols -- use

3     the U.S.G.S. symbol on that.

4          A  I have noted 11-5-2A1 adjacent to the indication

5     in the well 4BB.

6          Q   It is on Exhibit 101?

7          A   Exhibit 101.

8          Q   What was the history of the chloride content on

9     that well, Mr. Cannon?

10         A   According to our records of samples of water in

11    1947, 12 November when we started, the chlorides content

12    was 145  parts per million.  In 16 December, 1948, it was

13    200 parts per million.  In December, 1949, it was 208 parts

14    per million.  December, 1950, it was 212 parts per million.

15    And in November, 1951, it was 232 parts per million.  That

16    well was taken out of pumping for domestic purposes, and

17    it is not now pumped, for it is now not used, pumped at all.

18    It was formerly used as a supply for the Boat Basin housing

19    area.

20         Q   What tests, if any, did you make in regard to

21    salt water intrusion from the standpoint of static water

22    level and also during the period when the pumps were running?

23    Did you make any observations in regard to intrusion?

24         A   We made numerous observations of that kind.  And

25    at the time I kept a chart which would indicate the profile

of the ground water from the sea to the pumping basin at

various uneven intervals during 1948, 1949, and 1950.

Q    What did that reveal from the standpoint of

drawdown in the Ysidora Basin?

A    Well, we were attempting to determine the profile

from sea to the Ysidora Basin.  And we kept records where

we would measure the drawdown cones of the group of wells,

and there was the indication of a very definite hollow,

depression, in the water table at that point.  And by means

of the observation well records for water levels we could

plot the profile of the water surface from the sea to the

basin.

Q    Would you step to Plaintiff's Exhibit 101 and

just roughly sketch on that exhibit the general lines of the

profile based upon those observations?

MR. SACHSE:  As of when?

MR. VEEDER:  As of the period 1948 through 1950.

Q    Is that when you made these?

A    You will note on the profile section of Exhibit

101 there is a dashed line which has a label:  "Static water

level as of September, 1951."  That is the only one plotted

on this particular exhibit.  I have a record which is the

only copy in existence of some other profiles at other times.

Q    You can take that record that you have and just

roughly sketch onto 101 this profile that you had developed.

Cannon - Direct                                                          5108

1    A    It is rather difficult to indicate the picture

2  because of the scales of two maps.

3    Q    But you can put it on just to show --

4    MR. SACHSE:  If your Honor please, I am going to

5  object.  If it is going to be roughly sketched and he isn't

6  sure he can do it right, I don't think it is going to be of

7  any help to us.

8    THE COURT:  Sustained.

9    Q  BY MR. VEEDER:  Do you think you can draw it on

10  there with any degree of scale, Mr. Cannon, based upon your

11  own personal observations?

12    THE COURT:  If he is going to draw it with any degree

13  of accuracy, let him do it at a recess or after court.  Go

14  on with some other line.

15    MR. VEEDER:  Will you permit him to do that, your

16  Honor?

17    THE COURT:  Yes; if he says he can do it with some

18  degree of accuracy and not just a guess.

19    Q  BY MR. VEEDER:  Now, Mr. Cannon, have you considered

20  any means of retarding the salt water intrusion condition

21  that you have described?

22    MR. SACHSE:  If the Court please, I am going to

23  object to that as assuming a fact that the witness hasn't

24  testified.  He has not testified to any present salt water

25  intrusion condition, and I don't know how you are going to

1    retard something that happened in 1952.  A foundation could

2    be laid, but it hasn't been laid yet.

3         MR. VEEDER:  I will re-ask the question.

4         Q   What knowledge have you, Mr. Cannon, as of the

5    present time as to the presence of salt water intrusion

6    into the Santa Margarita River Basin?

7         A   I have to believe the chemical analyses of the

8    waters.  And the wells I have described have gone beyond

9    the salt content, have exceeded the allowable concentrations

10   set forth by the United States Public Health Standards.

11        THE COURT:  That allowable amount is --

12        THE WITNESS:  250 parts per million.

13        THE COURT:  250 parts per million.  That is the

14   situation as of the present?  Or last July?

15        THE WITNESS:  Of certain wells, your Honor.

16        THE COURT:  Which wells?  You showed us three wells

17   here.

18        THE WITNESS:  That is true with the first two wells

19   I discussed.  The third well --

20        THE COURT:  2K1 and 2F2, both in 11-5?

21        THE WITNESS:  That is correct.

22        THE COURT:  All right.

23        THE WITNESS:  Well, 4BB or the 2A1 well, as I recall,

24   is approximately 243 parts per million.  Now, we are still

25   receiving biweekly reports on that, and it is not considered

1    good practice to continue pumping. We are not pumping the

2    well. But, however, even though we are not pumping the salt

3    content, chlorides content seems to be on the increase.

4         Q BY MR. VEEDER: Now, would you proceed to state,

5    in your opinion, as to the method which could be adopted to

6    prevent that salt water intrusion and to remedy the

7    circumstances which prevail?

8         A    I have read a great deal of literature on the

9    subject in the last 15 years. I have kept a dozier on it

10   with all the information I could gather. And I know that

11   underground barriers of one sort or another have been used

12   in other parts of the country with some degree of success.

13   I have visted and observed and reported on operations of

14   that kind in the line of my duty. And we have investigated,

15   and I have derived some formulas indicating the controlling

16   factors in salt water intrusion under conditions which we

17   believe exist there in the aquifer.

18        Q    What is your opini n as to the best way of

19   correcting that situation?

20        A    The best way, of course, would be a positive

21   physical barrier. But a positive physical barrier is very

22   difficult to achieve. I have been recommending an hydrolic

23   barrier.

24        Q    And how would an hydrolic barrier operate in that

25   area, Mr. Cannon?

1    A    It is my opinion that an hydrolic barrier

2    produced by maintaining a water surface in connection with

3    certain wells which exist in the area of the Ysidora gage,

4    probably with the addition, with adding additional wells

5    there, would build up the static pressure of the underlying

6    aquifer to the point where it would be impossible to get an

7    underground gradient from the sea to the pumping basin.

8    Maintain by static head alone.  The use of an hydrolic

9    barrier there, it seems to me, has certain advantages over

10   a physical barrier, insofar as it will seek out and penetrate

11   porous sections of the aquifer which may extend beyond the

12   present canyon walls.

13   Q    Have you given any thought as to the sources of

14   the waters that you would utilize for that purpose?

15   A    We have pointed toward the operation of such a

16   barrier from, oh, perhaps six or seven years back in

17   connection with our sewage disposal systems.

18   Q    And how would that be done?  How would the sewage

19   be utilized for that purpose?

20   A    The purified sewage effluent would be put to use

21   to provide that fresh water barrier.

22   Q    Where would that be deposited?

23   A    In the narrowest section of Ysidora Narrows where

24   it could be done with the greatest efficiency.

25   THE COURT:  Would it be deposited on the surface of

1    the alluvial or pumped underground?

2    THE WITNESS: By means of a temporary dam to maintain

3    a comparatively small lake in the riverbed in the narrows

4    where great quantities of water are not required, but to

5    maintain a static head perhaps ten feet, ten or fifteen

6    feet above the sea, to produce a positive static head in the

7    underground water. It does require a certain amount of head

8    of fresh water to even counter-balance the salt water for

9    conditions of equillibrium. And the amount of that or the

10   value of that gradient of fresh water from the sea inland

11   can be calculated. The idea would be to accede that under-

12   ground gradient inland by means of an artificial pond of

13   fresh water in that neighborhood.

14   Q   BY MR. VEEDER: In the operation of your sewage

15   disposal plant what would be the sources of sewage water

16   that would be available for that purpose?

17   A   We have a sewage disposal plant, quite a large

18   one -- it is not located on this map -- in Section 10, 11

19   South, 5 West.   You will note just near the indication there

20   of the section number there is a pond.  That is the old,

21   historic Twin Lakes, known as Twin Lakes.  We have a sewage

22   disposal plant adjacent to the railroad and adjacent to the

23   ocean side of that pond.  That sewage disposal plant now

24   receives sewage from the entire Wire Mountain housing, which

25   is located in Section 11, 11 South, 5 West; also Section 14,

11 South, 5 West; a large section of trailer housing which is also located in Section 15, 11 South, 5 West; and at the present time a rather large contract is being completed, will be in operation within a month or so, whereby all of the sewage from, all of the raw sewage from three very large plants in the Del Mar Camp, Del Mar area, will all be pumped inland to that same sewage disposal plant. And the purified effluent, the purified effluent from all those areas I described would be available with a lift of not more than 10, 15 feet.

MR. VEEDER: Is your Honor desirous of looking at some pictures of those areas?

THE COURT: No.

MR. VEEDER: There are some oblique shots that have been taken that are, I think, quite reflective of the areas. And they have just been lodged with the Court. So if you are desirous of those pictures, you can look at them. They are available, at least, to look at.

THE CLERK:  Mr. Veeder, do you have a copy of Exhibit 99 for the Court?

MR. VEEDER:  Yes.  (Handing document to the Clerk.)

Q  Mr. Cannon, would you step to Plaintiff's Exhibit marked 99 for Identification and read into the record the title block on that identification?

A  The title block on Exhibit No. 99 for Identification reads, "Eleventh Naval District, San Diego, California, Amphibious Training Base, Oceanside, California.  Grading Plan," dated 1944.

Q  What is meant by the "Grading Plan" that you have there?

MR. SACHSE:  If the Court please, I am probably premature, but probably we can save some time.  I am certainly going to object to the introduction in evidence on the grounds of immateriality and irrelevancy of any plan dated 1944.  It is absolutely irrelevant to anything happening 14 years later. I think a little more foundation ought to be laid.

THE COURT:  I will overrule your objection.  Let us see what the foundation is further.

BY MR. VEEDER:

Q  Describe, if you will, Mr. Cannon, the area depicted on Plaintiff's Exhibit marked for Identification 99 as it relates to the Santa Margarita River and also to the Pacific Ocean.

H

Z42

1    A   The area depicted on Exhibit 99 is indicated by the

2    shaded portion in the vicinity maps of the upper right-hand

3    corner.   It is that area adjacent to the south boundary of

4    Camp Pendleton between the Santa Fe Railroad and the beach.

5    It represents the original contours at a very fine scale.

6    Q   What is that scale?

7    A   The interval is one inch to a hundred feet hori-

8    zontally, and the contours are one-foot contours.

9    Q   And what was your responsibility in regard to the

10   construction of the Amphibious Training Base?

11   A   I had charge of the construction of that contract,

12   constructing the camp, and the grading of the streets, and the

13   building of the buildings and the utilities.

14   Q   What is the situation as it exists today down there

15   where that area is to which you have just testified?

16   A   The buildings have all been removed, the streets are

17   intact, the paving and the gutters and the drainage system

18   is as indicated by the design figures at the street inter-

19   sections, and the grading work.   But the buildings have all

20   been removed.

21   Q   Based upon your personal knowledge, Mr. Cannon,

22   will you state whether, in your opinion, those contour marks

23   disclosed on Plaintiff's Exhibit marked 99 for Identification

24   are correct?

25   MR. SACHSE:   Are correct as of when?

1    MR. VEEDER:  As of 1944.

2    MR. SACHSE:  I object, your Honor.  It is absolutely

3  immaterial whether they were correct as of 1944.

4    THE COURT:  Overruled.

5    Were they correct as of 1944?

6    THE WITNESS:  Those contours, to the best of my

7  knowledge, were correct.

8    THE COURT:  Has there been any change in the contour

9  level of this coast since that date, to your knowledge?

10    THE WITNESS:  Except that incurred by the grading

11  of the streets, the elevations of which are indicated on the

12  plan.  This is a plan for the grading of the streets.

13    THE COURT:  I don't see in your vicinity map above

14  exactly where this detailed drawing fits in.  The shaded area?

15    THE WITNESS:  The shaded area, your Honor, yes.  It

16  extends to the top, to the edge of the bluff on the seaward

17  side to the south boundary of the reservation and to the

18  Santa Fe Railroad right of way.

19    THE COURT:  From the bigger portion of the map, it

20  looks like you have shown the contours of the sea coast on

21  the left-hand side.

22    THE WITNESS:  No, your Honor.  Those are the contours

23  just at the top of the bluff.  The sea is out beyond that

24  area.

25    THE COURT:  I see.

H

Z44

1          MR. SACHSE:  Your Honor, before we proceed, may I be

2     heard very briefly on this objection.  I think we are getting

3     into something that should be argued.

4          THE COURT:  First, what is the purpose of putting this

5     in?

6          MR. VEEDER:  Your Honor, we are going to establish the

7     watershed line as of the time the United States of America

8     acquired the property.  It is very important from the point

9     of the lands which we consider to be riparian to the Santa

10    Margarita River.

11         THE COURT:  All right, Mr. Sachse.

12         MR. SACHSE:  Your Honor, Mr. Veeder has made my point.

13    In other words, I think there is some misunderstanding or some

14    error.  The question perhaps is not whether these lines reflect

15    the conditions that exist today, whether they are the same as

16    existed in 1944, but whether 1944 reflects a state of nature.

17    There was extremely extensive reconstruction work and the

18    United States has two exhibits lodged, 71 and 72, which show

19    very clearly that a large area of land has been taken out

20    of the watershed under present conditions which was in the

21    watershed under natural conditions, according to the United

22    States's contention.  Now, what 1944 has to do with natural

23    conditions or present conditions I fail to see, and I think

24    we are bringing a lot of material in here which may be ab-

25    solutely irrelevant.  And I think the first thing we should

Cannon          Direct

H
Z45

1    decide, your Honor,-- and perhaps it would only take a fairly

2    brief ruling-- is the question whether the rights of the

3    United States as a riparian will be determined upon the water-

4    shed as it presently exists or the watershed as it existed

5    in a state of nature at the time the United States acquired

6    the Camp.  I think Mr. Veeder will concede that it involves

7    rather substantial areas of land both to the south and to

8    the north.

9         THE COURT:  Will there be any dispute about that, Mr.

10   Veeder?

11        MR. VEEDER:  No, none.

12        THE COURT:  We are interested, then, in where the

13   watershed was in the state of nature.

14        MR. VEEDER:  That is what we are shooting for, your

15   Honor.  We believe that the criterion which should govern in

16   this instance is the watershed as it existed in the state of

17   nature at the time the United States of America bought this

18   property.  This land is down in an area where there has been

19   development-- we admit it.

20        THE COURT:  Let me ask, Mr. Sachse, is there some

21   dispute as to this particular area?  Is it your contention that

22   part of this was at one time outside the watershed?

23        MR. SACHSE:  Yes, your Honor.  And furthermore, it is

24   my contention that even if Mr. Veeder is right, if all of

25   the area as delineated on Exhibit 71 was in a state of nature

1 a part of the watershed, this map doesn't prove anything.

2 This map is after they made the change.

3   MR. VEEDER:  I think he is confused as to the exhibit.

4   You are not referring to the right exhibits, Mr. Sachse.

5   MR. SACHSE:  I am simply pointing out to his Honor

6 that Exhibit 99 shows an area which, under your own contention

7 as I understand it to be, was in a state of nature a part of

8 the watershed.

9   MR. VEEDER:  That is right.

10   MR. SACHSE:  All of it, you so state.

11   MR. VEEDER:  Yes.

12   MR. SACHSE:  I don't think you so state that all of it

13 was in a state of nature in the watershed, and I am referring

14 to two other exhibits which you have lodged but not yet intro-

15 duced which appeared to contradict it.

16   THE COURT:  Do they involve some other area or the same

17 area?

18   MR. SACHSE:  Exactly the same area, your Honor.

19   MR. VEEDER:  No, they are not exactly the same area.

20   THE COURT:  Mr. Cannon, on Exhibit 99 I notice contour

21 lines running east and west across.  Do those represent ele-

22 vations?

23   THE WITNESS:  Those represent elevations at one-foot

24 intervals.

25   THE COURT:  Above sea level?

1    THE WITNESS:  Above mean sea level.

2    THE COURT:  Did you have anything to do with putting

3 those in there?

4    THE WITNESS:  No, I did not make the map myself.  The

5 map was made under the direction of Myron Hunt & H. C.

6 Chambers, who had the architect-engineer contract to design

7 the grading and the buildings.

8    THE COURT:  You don't know, then, how the lines were

9 put in?

10    THE WITNESS:  I don't know the particular method used.

11 Of course, I know that in making a map of the very fine interval

12 of one-foot contour interval it is likely that those indi-

13 vidual contours were run out on the field.  That is about the

14 only way.

15    THE COURT:  You don't know whether those lines were made

16 in this area when it was in a state of nature or not?

17    THE WITNESS:  I was well acquainted with the land before

18 the contours were made, yes.  No grading had been done there,

19 to my knowledge.

20    THE COURT:  What did the land consist of?  Sand?  Grass?

21    THE WITNESS:  It was grass and weeds.  It hadn't been

22 cultivated, to my knowledge.

23    MR. VEEDER:  May I proceed, your Honor?

24    MR. SACHSE:  My point, your Honor, is simply that about

25 half the area shown on this map is, I contend-- and I think

5121

H

z48

1   I can show it on voir dire, if your Honor wants me to-- out-

2   side the watershed in a state of nature.

3        THE COURT:  Which half?

4        MR. SACHSE:  The left half, to state it frankly, going

5   down through-- if you follow the bulges seaward of the con-

6   tours, I contend that everything that lies left of that on

7   the United States's own exhibits will be outside the watershed

8   in a state of nature.

9        MR. VEEDER:  I think he is touching on cross-examination

10  perhaps, your Honor.  But from the standpoint of being able

11  to identify these areas, from the standpoint of the other ex-

12  hibits that I desire to offer in connection with this, I think

13  that we can demonstrate that these contour lines do indicate

14  the delineation of the watershed line as of the time that these

15  properties were acquired and as of the time when this work

16  was contracted for by Mr. Cannon, and that--

17       THE COURT:  I hope you are certain as to what you have

18  here and that we don't spend a week trying to find out whether

19  a few acres of ground drained one way or the other where a

20  couple of engineers could sit down and come to agreement and

21  tell us in a hurry.

22       MR. SACHSE:  Perhaps that is my real point, your Honor.

23  I think this map is absolutely immaterial.  I think it could

24  very readily be drawn on this map from its own contours.  I am

25  not going to quarrel with the contours.  But it could very

1    readily be drawn on this map by Mr. Cannon himself where the

2    watershed line is.  And it is not all within the watershed.

3        THE COURT:  You don't make any criticism of the contour

4    lines as drawn and as the witness has indicated they were

5    drawn from the land as in a state of nature?

6        MR. SACHSE:  No, I make no criticism of that.  I am

7    sure that the engineers did an honest and accurate job.  But

8    what I am saying is that he has a map here, a good third,

9    possibly a half of which is outside the watershed and no

10   delineation of the watershed line on it.

11       MR. VEEDER:  We can't put all the exhibits in at the

12   same time.  I will tell you what I will do.  I will put up

13   another identification on the easel that might help him.

14       THE COURT:  Well, you finished the identification of

15   this.  We know the purpose of it.

16       MR. VEEDER:  Yes.

17       THE COURT:  All right.

18       MR. VEEDER:  Now, I would like to proceed and identify

19   Plaintiff's Exhibit 98.

20       This is your copy of 98, your Honor.

21       Q  Now, would you step to Plaintiff's Exhibit marked

22   for Identification 98 and read into the record the title block

23   of that identification.

24       A  Exhibit 98 has the title "Eleventh Naval District,

25   San Diego, Camp Joseph H. Pendleton, Santa Margarita Marine

H

Z50

1   Corps Training Area Topographic Survey."   The sheet is iden-

2   tified as "Yards and Docks"--

3        Q   What does that mean, Yards and Docks?

4        A   Bureau of Yards and Docks in the Navy.   No. 213961.

5        Q   State how was that illustration prepared?

6        A   That illustration is a plane table survey of the

7   original ground before any work at all was made on there.

8        THE COURT:   Where does it start?   At the ocean and

9   proceed?

10        THE WITNESS:   Your Honor, the horizontal group of

11   lines represents the ocean front at the bottom of the map.

12   The map was made in June, 1942, and the purpose of it at the

13   time was to delineate the topography in the neighborhood of

14   the present Boat Basin.   It was made under my supervision.

15        THE COURT:   What is this addenda on the right-hand side

16   of it?

17        THE WITNESS:   The addenda on the right-hand side, your

18   Honor, is a mechanical reduction of the one-foot contours

19   depicted on Exhibit 99 mechanically changed to the scale of

20   Exhibit 98.

21   BY MR. VEEDER:

22        Q   Who made that?

23        A   I did.   It was made under my direction and checked

24   by me.

25        MR. SCAHSE:   When?

H

Z51

THE WITNESS: Approximately a month ago.

BY MR. VEEDER:

Q   Would you proceed and state first in regard to the areas which are delineated in the vicinity depicted on Exhibit 99, will you describe the kind and type of terrain there at the time that the plane table survey was run?

A   It will be noted that the contours, for the most part, stop roughly in a semicircular line at the edge of the caption "Salt Marsh." The Salt Marsh which formerly existed there was approximately the same elevation above sea level, you note by the spot elevations 2.9, 2.6, 2.7, 2.5, 2.4.   It was remarkably level and consisted of swamp grass, sedge and cut through with a series of salt water creeks--tidal sloughs.

H3

Q   From your own personal observation, what was the course of the flow of those salt water sloughs?

A   The only connection those salt water sloughs had to the north was with the mouth of the Santa Margarita River.

THE COURT:   Where is the river?

THE WITNESS:   Off to the left, your Honor, approximately half a mile.

MR. VEEDER:   I would like to have marked for iden-tification Plaintiff's Exhibit 98-1.

(Map marked Plaintiff's Exhibit No. 98-1 for Iden-tification.)

H3

Z52

1    THE COURT: Before we leave this, your reason for

2    putting in this insert on the right of the map was what?

3    THE WITNESS: The reason was that the original top-

4    ography on Exhibit 98 did not extend to the south boundary

5    of the reservation, and it was to serve as an authentic ex-

6    tension of the contours on this map, to get the hook-up as

7    nature gave it to us. It is the only contour map in existence,

8    to my knowledge, taken before any work whatever was done.

9    THE COURT: What does this railroad have to do with the

10   boundaryline? Is that any boundary line?

11   THE WITNESS: It was merely a cutoff. It will be

12   noted on Exhibit 99 that is the limit of the topography. The

13   same line is noted, A.T.& S.F. Railway, and that is as far

14   as the contours went, to the right of way line.

15   THE COURT: I notice a red pencil on this insert which

16   says "Original watershedline."

17   BY MR. VEEDER:

18       Q  Who placed that there, Mr. Cannon?

19       A  I put that on myself.

20       Q  What was the basis on which you placed the red line

21   at that point?

22       A  The basis of starting a watershed line, you have to

23   have a firm starting point. You can't look at a map and just

24   tell right off which way it goes, unless we have some point

25   to start from.

H3

Z53

1     Q  And at what point did you start in this?

2     A  I started from Exhibit 98-- if the flap is turned

3  down it will be noted that the 10-foot contour line is a closed

4  contour line.  It entirely surrounds the complete marshed area

5  as delineated at the bottom of the sheet or the westward

6  section by a contour line which is inside the barrier beach.

7  It will be noted that the barrier beach has higher elevations.

8  They start, for instance, at the southerly end 14.1, 13.0,

9  12.9, 11.9, 13.7, and it is labeled "Sand dunes."  All that

10  area is higher than the salt marsh, which averages approximately

11  two and three feet elevation.  Therefore, it becomes obvious

12  that all water escaping over the bluff at the southerly limit

13  of the closed 10-foot contour line of necessity has to escape

14  to the north into the tidal sloughs.

15  BY MR. VEEDER:

16     Q  What were your personal observations in that regard?

17     A  Well, I knew conditions to be that.  I was on the

18  ground at the time it was mapped, and the existence of those

19  closed contour lines was observed by me at the time.

20     Q  Have you attempted to correlate the contour lines

21  which appear on Plaintiff's Exhibit marked 99 for Identifica-

22  tion with the contour lines that emanate from the plane table

23  survey which is depicted on Plaintiff's Exhibit No. 98?

24     A  I have tried to.  They do not match up exactly,

25  and I don't think that the topography made by two different

cannon - direct                                    5127

1    people at different scales could be expected to match pre-

2    cisely.

3         Q  But based upon your observations, what is your

4    opinion as to the propriety of the correlation of the two?

5         A  In the main I believe that in the upper portion of

6    the flap you will note that the agreement is very good.  The

7    42-foot contour, for instance, hits into the corresponding one

8    on the flap, so does the 44, and the 46-- they are almost

9    exact.  We do not get as good a match on the 40-foot contour.

10   But there again we are talking about the extreme edge of a

11   survey and one of necessity more credence can be given to that

12   of larger scale, which is Exhibit 99, because they are one-

13   foot contours whereas the others are two-foot.

14        THE COURT:  Letus go back to where you talk about this

15   10-foot contour line.  Water falling from the bluff, that line

16   would run to the north into the slough, you said.  Now, that

17   bluff runs up 10 feet, 20 feet, 30 feet?

18        THE WITNESS:  Approximately 30 feet.  You will note

19   there are location points at the side, which happens to be

20   on the base line.

21        THE COURT:  Yes.

22        THE WITNESS:  That is a first order triangulation point

23   put there by the Coast Geodedic Survey.  It is a point on which

24   the accuracy of all maps in the neighborhood is based.

25        THE COURT:  Then from the top of this bluff, which is

H3

Z55

Cannon - Direct                                                            5128

1    about 32 feet high, is that right?

2        MR. SACHSE:  May I inquire, your Honor, which bluff

3    are you referring to?

4        THE COURT:  Underneath the flap.  We are looking under-

5    neath the flap.

6        MR. SACHSE:  I see.

7        THE COURT:  The water would flow out to the ocean and

8    not into the --

9        THE WITNESS:  From the point in the neighborhood of

10   side, it would flow north.  It would have to, because--

11       THE COURT:  Well, everything on the left-hand side of

12   side would flow north?

13       THE WITNESS:  That is correct, your Honor.

14       THE COURT:  But water falling on the other side, which

15   would now take into account your flap, I am trying to figure

16   out how you--

17       THE WITNESS:  It is my opinion that water there would

18   flow into the San Luis Rey River mouth.  But it is in close

19   proximity.

20       THE COURT:  Probably actually flow into the ocean.

21       THE WITNESS:  Well, I believe the natural barrier beach,

22   which always exists there, would probably prevent it from going

23   directly out.

24       THE COURT:  How did you pick out this watershed line?

25       THE WITNESS:  I started from the known point, your

H

Z56

1    Honor, where the presence of this closed 10-foot contour

2    guarantees that water has to go to the north.  I started

3    from that point of the bluff.  You will notice that the

4    contours on the flap are a little more complete than they are

5    on Exhibit 98.  In other words, they run around there.  It is

6    done with greater accuracy.  So I started from the point side,

7    which you will notice is nothing but a triangle on the Exhibit

8    99, but it is located there, a small triangle adjacent to a

9    feature labeled "Chlorine Building," but it gives a common

10   point on both maps as well as the Santa Fe Railway line which

11   is indicated on both maps for location purposes.

12        THE COURT:  How can you determine from looking at this

13   kind of map which way water is going to run?  You show an

14   original watershed line.  I don't understand that now.

15        THE WITNESS:  I determine it from Exhibit 98, your

16   Honor.  I know that water going directly off the bluff at the

17   side-- you notice, in fact, there is a label "Bluff" there,

18   and so forth-- any water going at that point has to cross the

19   10-foot contour and flow to the north, and I take that as

20   proof of the point.  It may have extended further south, but

21   I couldn't prove it by this map.

22        MR. SACHSE:  May I ask a question, your Honor.

23        When you say cross the 10-foot contour, Mr. Cannon,

24   are you referring to the 10-foot contour shown on land level

25   or the 10-foot contour as shown at the top of the dunes?

H

Z57

1          THE WITNESS:  I am talking about the watershed line on

2     the land.

3          THE COURT:  I follow you so far.  Now pick me up and

4     show me how you extend this red line on the flap.

5          THE WITNESS:  Your Honor, that gives me a starting

6     point for the watershed line, at least knowing that water to

7     the left of that point has to go to the Santa Margarita; so

8     that gives a starting point on the bluff, and by the precept

9     that a watershed line always has to cross the contours at right

10    angles and follow the ridges from ridge to ridge, through the

11    saddles, that enables one to draw an accurate contour line

12    using the one-foot contours and trace out where that contour

13    line should lie.

14    BY MR. VEEDER:

15         Q  What have been your observations, Mr. Cannon,

16    during the periods of precipitation in that area from the

17    standpoint of the course which water takes?

18         A  You will note on Exhibit 99 that the proposed

19    grades are noted at the street intersections, the paving all

20    through.  Those streets were put in precisely according to

21    this plan, and those are the grades that are existing to this

22    day.  The first winter after those streets were paved, which

23    was the winter of 1944, we had difficulties in one spot-- it

24    is noted as Sixth Street near the top of the map, in the

25    neighborhood of a structure labeled "ISMOFF," where there is

5131

H

Z58

1   an arrow placed right at the head of a small gulch-- a down

2   drain was constructed at that point, a down drain was made with

3   asphaltic concrete, which washed out the first winter, and it

4   produced a rather serious condition in that neighborhood,

5   and I stood there and watched the water run down it and the

6   water came all the way down to Avenue L.  The L is rather hard

7   to find.  It is right at the 40-foot contour.  From the

8   neighborhood of the Santa Fe Railway tracks, you will note

9   that the established grade is 47.9 down to First Street, it

10  is 46.16, to 42, to 39.09, to 36, at which point the water

11  has to run down to the north rather, which is to the right of

12  Exhibit 99, and this grading plan was followed because it

13  offered a chance to get well-graded streets with the least

14  possible excavation or movement of earth following the natural

15  contours of the ground as closely as possible with a minimum

16  of excavation.

17

18

19

20

21

22

23

24

25

IN-1 ML j

1  MR. VEEDER:  Your Honor, if I could put up one more

2 exhibit marked for identification I think it might help.

3 That will be 98-A which will be a continuation of this proof,

4 in our view, of the location of the watershed lines.

5  THE COURT:  All right.  We will take a recess and

6 let counsel look it over and see.  Maybe there is no

7 appreciable dispute.

8  MR. VEEDER:  No what?

9  THE COURT:  Maybe there is no appreciable dispute

10 about it.  I take it again on 98-A the red line shows the

11 watershed line according to the opinion of this witness?

12  MR. VEEDER:  Projected, yes, your Honor.

13  THE COURT:  Recess.

14 (Recess.)

15  MR. VEEDER:  Give me the last question, please.

16 (The reporter read back the record.)

17 Q  BY MR. VEEDER:  Would you step to 98-A, please,

18 and state and read into the record from the title block as

19 to what is depicted by that identification?

20 A Exhibit 98-A is a Fairchild aerial topographic

21 map as made from aerials.  It is made, shown March, 1953,

22 and it is to the scale of one inch to 400 feet with a

23 contour interval of five feet.  And on it a flap reduced to

the same scale as this map has been attached.

24

25 Q The same scale as which map, now?

1    A    The flap is the same scale as the map to which
2  it is attached.

3    Q    Yes.

4    A    And that flap was made by mechanical means with
5  a pantograph; the scale was reduced from one inch to 100
6  feet, from one inch to 400 feet.

7    Q    Do you personally know whether that is correct
8  or not?

9    A    I vouche that it is correct.  It was made under
10  my direct supervision and checked by me.

11    THE COURT:  The flap?

12    THE WITNESS:  The flap was, sir.

13    Q  BY MR. VEEDER:  What about the rest of the area
14  from the standpoint of the contours in the areas that are
15  depicted on the identification 98-A?

16    A    The flap was attached because it proved to me
17  where the watershed line emerged at a point near the Santa
18  Fe Railroad so as to be traced onto the main Exhibit 98-A.
19  In other words, it is necessary to know where to start as
20  determined by the best scale, largest scale available.  And
21  that gave a starting point for a continuation of the water-
22  shed line according to the contours available, best contours
23  available.

24    Q    Have you been on the land personally and observed
25  the terrain and checked it back against the 98-A?

1    A    I have.  I have checked the terrain.  I have

2    checked it stereoscopticlly with old aerial photographs.

3    THE COURT:  Let me ask you:  I notice here on 98-A

4    a line running diagonnally across the map.  It is the line

5    of the base?

6    THE WITNESS:  The line running from --

7    THE COURT:  Left to right.

8    THE WITNESS:  Running northeasterly --

9    THE COURT:  Yes.

10    THE WITNESS:  -- from left to right is the south

11    boundary of Camp Pendleton on the old Rancho Santa Margarita.

12    THE COURT:  What is this area shown outside of the

13    base?  Looks like a housing area, outside of the base, right

14    just east of 101?

15    THE WITNESS:  That is presently within the city limits

16    of the city of Oceanside.  The Government has no ownership

17    in that area.  It is sold off for private housing.

18    Q    BY MR. VEEDER:  What does the red line depict, Mr.

19    Cannon, extending --

20    A    I have placed that red line as indicating the

21    location of the original watershed as drawn from the best

22    information available.

23    THE COURT:  I am going to find out how far apart you

24    are on this matter before I spend a lot more time on it

25    here.

1    MR. SACHSE:  Your Honor, could I ask a couple of

2    voir dires?  I think I can clear it up.

3    MR. VEEDER:  I will make the offer now if he wants

4    to do it on voir dire.  I will make it an offer of 3 --

5    THE COURT:  I am not ruling on it yet.

6    MR. SACHSE:  The one I am interested in principally

7    is not this little corner that we looked at during the

8    recess.  What I am principally interested in is, if we will

9    look at Exhibit 98, Mr. Cannon.

10

11                   VOIR DIRE EXAMINATION

12   BY MR. SACHSE:-

13       Q   Now, you have not extended your watershed line

14   to the north, have you?

15       A   I have extended it to a point where it is obvious

16   that water falling to the north and west of that line winds

17   up in the Santa Margarita River.

18       THE COURT:  Your answer is that you have not extended

19   it to the north?

20       THE WITNESS:  I have not.

21       THE COURT:  All right.

22       Q  BY MR. SACHSE:  Now, if you were to extend it to

23   the north -- am I correctly tracing this, now?  I see a

24   rather heavy contour line with the letter "10" in it which

25   appears immediately in from the dunes adjacent to your insert.

1    You see the line to which I refer?

2           A    I see the line.

3           Q    Would that be the extension of your watershed?

4           A    That would not be the extension.

5           Q    Where would the extension go?

6           A    The extension would be at some point between

7    there.  It would be along the top of the dunes.  There is

8    a dotted line indicating "Top of dunes."  It is so labelled.

9    And you will note by the random elevations which are given

10   throughout there is a line of elevations there: 14.1, 13,

11   12.9, 11.9, 13.7, 11.7; all higher than these elevations

12   which are given in this slough which connects to the point

13   where the watershed line ends.

14           MR. SACHSE:  All right, now.  May I continue?

15           Q    In other words, the projection of the watershed

16   line as you have conceived it would throw everything inland

17   from the dunes within the watershed, is that correct?

18           A    That is correct.

19           Q    May I start at the extreme left -- I marked them

20   on my own copy so I will --

21           MR. VEEDER:  Now, isn't this going into cross-

22   examination?

23           MR. SACHSE:  No.

24           THE COURT:  No, let's just see a minute, Mr. Veeder.

25   I am not going to spend a lot of time here on --

1    Q  BY MR. SACHSE:  Now, at the extreme left on the

2   dunes, the first two dune measurements I see for lengths of

3   dunes are 9.2 and 9.5.  Does that not indicate that the dunes

4   are below this 10-foot contour at that point?

5    A   I don't know where the 10-foot contour "peters

6   out," where it stops.  I do know that all this area in here

7   where I have directed the, where the watershed line directs

8   the water to is all down at an elevation in the neighborhood

9   of 1.9; 1.9.

10   THE COURT:  Is there any dispute that these marsh

11  rivers shown in here run northerly up to the Santa Margarita

12  entrance, Mr. Sachse?

13   MR. SACHSE:  There certainly is, except as influenced

14  by the effect of ocean storms and the existence of the

15  barrier beach.  There is a tremendous, an area that you can

16  get in here of a couple of sections --

17   THE COURT:  Wait a minute.

18   MR. SACHSE:  -- where if the bar exists in one place,

19  it is riparian.  If it isn't, it isn't.

20   THE COURT:  Where does the water come in?  From the

21  Santa Margarita end?  How does the water come in --

22   MR. SACHSE:  The water spills into the ocean.

23   THE COURT:  How does the salt water get into these

24  salt marshes?

25   MR. SACHSE:  Through any break in the barrier.  And

1 if your Honor will observe over here to the right, the

2 barrier is very low; eight and a half; seven and a half.

3     THE COURT:  Doesn't the water also come, aside from

4 the sand dune barrier, doesn't the water come in from some

5 entranceway farther north?

6     MR. SACHSE:  If your Honor has ever observed the

7 conditions as they exist today and as they have existed

8 many, many times for years on end, particularly in the dry

9 season, there is no entrance to the ocean.  There is a sand

10 bar all the way across.  A winter flood will come and will

11 wash it out.  A storm will shift it to another location.

12 Now, there have been many, many times when there was no

13 place where you had to walk across wet ground.  You would

14 be on dry land.

15     THE COURT:  What watershed do you claim that marsh

16 is in?

17     MR. SACHSE:  It is not in the Santa Margarita.  It is

18 draining into the Pacific direct.  That is my contention,

19 and it should be deleted from the calculation in the Santa

20 Margarita River water.

21     MR. VEEDER:  I make my offer, your Honor.

22     MR. SACHSE:  Maybe the rest of it is cross-examination,

23 but I think your Honor has my point.

24     THE COURT:  I have your point.  I am not very much

25 impressed.  It will be received in evidence as Exhibits 98,

1    98-A and 99.

2              And I am going to direct that you sit down and

3    mark out for me what your areas of dispute are in this

4    matter, Mr. Sachse.  California engineers can sit down with

5    Mr. Cannon or anyone else and look these maps over and let's

6    see what your position is.  I think I have got your position

7    as to the salt marsh.  You claim that is not part of the

8    watershed of the Santa Margarita?

9         MR. SACHSE:  That is correct.

10        THE COURT:  Any other dispute in this line that is

11   drawn here, I want to know just how big a dispute it is.

12        MR. SACHSE:  The other one, I can probably state

13   briefly, as far as Fallbrook is concerned right now, is not

14   a dispute.  I am perfectly willing to accept the figures as

15   drawn by the United States.  But the United States has here

16   three different exhibits with, apparently, three different

17   places.  And all I would like to know is which one is right,

18   which one they stand on.  I will take any one of the three.

19        THE COURT:  Which are the ones that you are in dispute,

20   in your opinion?

21        MR. VEEDER:  Well, your Honor, we had these made to

22   offer, the ones upon which we are going to rely.  And in this

23   case, this is watershed line upon which the United States

24   will rely.

25        THE COURT:  Which line is he talking about?

Cannon - Direct

H-2

1    MR. SACHSE:  I am talking about the line that is

2    indicated "Santa Margarita River                watershed,

3    natural conditions."

4    THE COURT:  What is the exhibit number?

5    MR. SACHSE:  71, your Honor.

6    MR. VEEDER:  That was marked for identification.  We

7    are withdrawing that.

8    THE COURT:  All right.  You have an answer, Mr. Sachse.

9    MR. VEEDER:  We are certainly withdrawing it.  We

10   have checked this thing through.  We have the most accurate

11   data that we can obtain on the Exhibits 98, 98-A, and 99.

12   MR. SACHSE:  Now, may I ask if 71, which is a much

13   larger scale --

14   MR. VEEDER:  You can take that home with you.

15   THE COURT:  What is your question, Mr. Sachse?

16   MR. SACHSE:  It is a much larger scale and delineates

17   both north and south of the actual river.  So far we have

18   only detail exhibits to the south.  Is the United States

19   also now --and I am making this as an inquiry -- intending

20   to change the delineation that it has of the watershed line

21   to the north of the river?  The one on 71 to the north?

22   MR. VEEDER:  We are going to work up around and come

23   down.

24   MR. SACHSE:  And you are not prepared to tell us at

25   this time whether the United States contends that it owns or

1    that it has within the watershed a couple of sections on

2    Stewart Mesa or whether they are without the watershed?

3          MR. VEEDER:  Oh, on Stewart Mesa?

4          MR. SACHSE:  Yes.

5          MR. VEEDER:  We have a vast area up there that is

6    within the watershed.  We have got about fourteen, fifteen

7    hundred acres up there.

8          THE COURT:  Mr. Veeder, Mr. Sachse's inquiry is

9    whether the lines away from the ocean on 71 are going to

10   conform with this other series of maps or whether they are

11   going to depart.

12        MR. SACHSE:  Away from the ocean, your Honor.  Not only

13   away but from the point where they meet the ocean; the

14   north boundary of the watershed, in other words.

15        THE COURT:  He says they are going to depart from

16   north 71.

17        MR. VEEDER:  They are, and he can have those.

18        THE COURT:  Mr. Sachse, on 98-A the red line is

19   picked up at the area marked "Side," red line being the

20   watershed, according to the witness, and is carried off the

21   map.  Now, are you content with the line shown on 98-A with

22   the exception of this question about those dunes?

23        MR. SACHSE:  As it goes upland, you mean, your Honor?

24        THE COURT:  Yes.

25        MR. SACHSE:  Yes.  I am not going to quarrel with it

1  at all.

2      THE COURT:  Mr. Moskovitz?

3      MR. MOSKOVITZ:  No, we are not quarreling with it.

4      THE COURT:  So the real dispute, then, involves the

5  matter of this lagoon and where the line from, down near

6  the bluff, whether it cuts acrossto the ocean there or

7  whether it excludes the lagoon in which the Boat Basin was

8  built?  Is that the real issue, then?

9      MR. SACHSE:  That is the only issue at the moment.

10  But this is spelling out what to me is a pretty serious

11  matter.  In 1951, the United States claimed one watershed.

12  I am speaking now to the north.  And this to the north

13  happens to be very serious.  It isn't a question of a few

14  buildings.

15      THE COURT:  We haven't got there yet.

16      MR. SACHSE:  Mr. Veeder has just told us that the

17  exhibits he has lodged, the information he has given us --

18  presumably the same evidence that we introduced in the

19  Master's hearing -- he is now repudiating and he is going to

20  put in some new evidence.

21      MR. VEEDER:  That is right.

22      MR. SACHSE:  What I want to know is:  How long is it

23  going to take the United States, with all its engineers and

24  all its efforts, to make up their minds where the watershed

25  line on this thing is so the "poor suckers" who are trying

1   this case against them know what they are claiming?  That

2   is all I want to know.

3        THE COURT:  If we got an answer to that question, how

4   long would it take them to make up their minds, it wouldn't

5   take us very far along toward the conclusion of this case.

6   Mr. Veeder has demonstrated an ingenuity or a facility to

7   change positions occasionally, and you should have been

8   forewarned.

9        MR. SACHSE:  Your Honor, I recognize Mr. Veeder's

10  ingenuity and ability to jump from precipice to precipice;

11  but I don't think that engineers usually jump from precipice

12  to precipice.  When they take a transit out and survey a

13  line, I have confidence in the average expert.

14       THE COURT:  Is it your contention that at the first

15  trial the Government proved that this lagoon in which the

16  Boat Basin was built was not part of the watershed?

17       MR. SACHSE:  No, your Honor.  My contention is that

18  on the first trial they threw Stewart Mesa out, and apparently

19  now they are bringing it in.

20       THE COURT:  We haven't got there.  I don't know about

21  that.

22       MR. VEEDER:  I think he is suffering from some kind

23  of a persecution complex.

24       THE COURT:  You observed this lagoon area where the

25  Boat Basin is now built?  Did you observe it before the

1   construction went on?

2        THE WITNESS:  I did, your Honor.

3        MR. VEEDER:  I could ask him a couple of questions

4   along that.

5        THE COURT:  Do you mind if I ask him a couple of

6   questions?

7        MR. VEEDER:  Not at all, your Honor.  In fact, I

8   think it is a good idea.

9        THE COURT:  Did you observe what would happen at

10  high tide?

11       THE WITNESS:  At high tide the whole area would be

12  covered.

13       THE COURT:  With what?

14       THE WITNESS:  With salt water, from the sea.

15       THE COURT:  Where does salt water come from?

16       THE WITNESS:  It came in the mouth of the Santa

17  Margarita River.

18       THE COURT:  From the south down into the lagoon?

19       THE WITNESS:  From the north down into the --

20       THE COURT:  From the north to the south?

21       THE WITNESS:  That is correct.

22       THE COURT:  At low tide what would happen?

23       THE WITNESS:  At low tide the tidal streams would

24  practically run dry and all flow out to the sea.

25       THE COURT:  Where would it flow out to the sea?

Cannon — Direct

1          THE WITNESS:   Through the mouth of the Santa

2     Margarita River.

3          THE COURT:   Did you ever observe waves breaking over

4     the sand dunes along the Pacific Ocean bordering this

5     lagoon?

6          THE WITNESS:   I don't recall that I observed waves

7     breaking over that.   The barrier was quite high.   14 feet

8     plus.   And it takes a pretty good wave for breaking over

9     that much of a barrier.

10          THE COURT:   There are certain times of the year when

11     you have much higher tides than others.   You don't know what

12     happened at the times of the real high tides?

13          THE WITNESS:   The real high tides in that neighborhood

14     -- I know the tidal range.   In relation to mean sea level,

15     the extreme high tides are approximately plus-five feet,

16     and the extreme lows are probably, are approximately minus-five

17     to mean sea level.

18          THE COURT:   That is always by the condition of the

19     weather; you get a little storm and you get a high tide; then

20     you are going to get a lot of water?

21          THE WITNESS:   Those are the extreme tides insofar as

22     I know.   There is an extreme variation from extreme low to

23     extreme high.   They approximate very closely to ten feet, in

24     the neighborhood of the area of which we are speaking.   I

25     know of no -- I am acquainted with tide tables and --

1          THE COURT:  Well, then, it is your testimony that,

2     looking at Exhibit 98-A, that on the bluffs and mesas back

3     where the Boat Basin is now, upland from there, that the

4     water running off there would run into a state of nature,

5     into that salt lagoon down at the basin?

6          THE WITNESS:  That is correct.  And from thence to

7     the Santa Margarita River.

8          THE COURT:  Now, do you gentlemen want to -- well, in

9     view of Mr. Sachse's concession about the rest of the line

10    in toward the mountains on 98-A leaves us only the issue

11    of this lagoon.  So proceed, Mr. Veeder.

12         MR. VEEDER:  We would like to offer in evidence the

13    exhibit marked for identification Plaintiff's Exhibit No.

14    75, which is a series of aerials, May 11, 1938, with

15    particular reference to the aerial marked 75-5, which is

16    this lagoon area.

17

18

19

20

21

22

23

24

25

1          MR. SACHSE:  Are you offering the entire 75 series, or

2     just one?

3          MR. VEEDER:  I am offering the whole 75 series.

4          MR. SACHSE:  I object, your Honor, that anything else

5     on a 1935 flight is entirely irrelevant and immaterial in

6     this interior area, which includes a great deal more than

7     Camp Pendleton, areas outside of Camp Pendleton.  There is all

8     sorts of irrelevant stuff.  I don't think we ought to clutter

9     up the record with a thing of that character when there is

10     only one photograph that means anything.

11          MR. VEEDER:  Your Honor, it is rather hard to have

12     just an individual photograph when we are taking in a whole

13     watershed, and that is what we are starting now.

14          MR. SACHSE:  And if the offer is pressed for the whole

15     thing, I would like an opportunity to go through each of these,

16     to have objections to each one, to the areas that lie outside

17     the watershed and have no proper place in here, much material

18     that is absolutely irrelevant, such as the state of de-

19     velopment in 1935, what existed in 1935-- none of those things

20     is of any materiality in this case.

21          THE COURT:  What is the purpose of having the photo-

22     graphs in there outside the watershed?

23          MR. VEEDER:  Your Honor, the whole area is depicated

24     here showing the Ranch.  I don't believe that there is a

25     single photograph that doesn't have some bearing upon the

J

Z60

1   watershed line.  I am perfectly willing to have Mr. Sachse go

2   through and delineate, although I thought he should have long

3   ago because this has been lodged with the Court for two months

4   at least if I remember.  I don't believe that there is a single

5   part of this whole offer that doesn't bear directly upon the

6   lands which are involved in this litigation.

7        THE COURT:  Can't the objection as to changes that have

8   occurred since 1935 be obviated by the obvious knowledge of

9   the Court that this was an exhibit taken in 1935?

10        MR. SACHSE:  Your Honor, a more serious objection is that

11   what the condition of the Rancho Santa Margarita may have been

12   in 1935, with the possible exception of this sea coast where

13   we are in controversy, is completely irrelevant and immaterial

14   to this proceeding.  I don't care whether the whole thing was

15   cultivated or none was cultivated.  And that is the purpose

16   for which Mr. Veeder wants these things in.  Otherwise, they

17   are just window dressing.  They have no useful purpose at all.

18   What do we care what it looked like in 1935?  What concern is

19   it of the Court?

20        THE COURT:  Of course, it depends on the purpose of the

21   offer of the exhibit.  If Mr. Veeder is offering the exhibit

22   to show areas that were cultivated and buildings in existence

23   and that sort of thing, that is one problem.  If he is offering

24   it to show the terrain, the creeks, the gullys, the mountains

25   and the mesas, that is another thing.

J

Z61

1          MR. SACHSE:  He has another series lodged with the

2    Court-- I can't tell you the number, but it is already in

3    evidence before the Master, and all counsel were supplied with

4    copies in a smaller bound edition-- of a flight since the

5    United States acquired Camp Pendleton.  Now that one, I con-

6    cede, is admissible in evidence.  Parts of it may be subject

7    to motions to strike because they involve outside the water-

8    shed.  But the basic set was admissible.  There was no quarrel.

9    They are in evidence now.

10         I will concede that the ocean front here may be ad-

11   missible because of the controversy over the state of nature

12   watershed line. But the rest of it, your Honor, no.  We have

13   more recent, far better evidence as to conditions as they exist

14   today, and Mr. Veeder has it himself.  This is completely

15   irrelevant.

16         MR. VEEDER:  Your Honor, I have a witness here.  If

17   Mr. Sachse had been more active it would have been simpler.

18   It is a 1938 flight.  Mr. Cannon arrived on the scene in 1942.

19   He commenced construction and handled the construction of the

20   whole camp area.  It is extremely important to us to have a

21   showing as to the area that was developed, the reason why the

22   development went on outside the watershed very largely, and

23   these aerials certainly depict the conditions that existed at

24   that time.  Moreover, from the standpoint of agricultural

25   development this 1938 flight is of extreme importance to us.

J

Z62

1    It is extremely important in view of the watershed line that

2    has been depicted here.  It will be observed that the areas

3    which were in agriculture in 1938, which were being subjected

4    in Stewart and South Mesa, in our view, have a direct and

5    immediate bearing upon the quantity of water to which we

6    will be entitled and to which we succeeded from the Rancho

7    Santa Margarita.

8         THE COURT:  Well, if you carry some of those back and

9    have other proof--

10        MR. VEEDER:  We will.  But here is a witness who

11   arrived on the scene almost at identically the same time as

12   this area was flown, and I do think it is highly relevant, I

13   do think it is extremely important that this Court have before

14   it the condition of the area at the time the Government

15   acquired the land and undertook the development of this

16   military camp.

17        THE COURT:  You say this flight was in 1938?  Some

18   reference was made to 1935.

19        MR. VEEDER:  Well, that was Mr. Sachse's reference.

20        THE COURT:  This is '38?

21        MR. VEEDER:  This is 1938, very close to the time when

22   Mr. Cannon arrived on the scene and build this big camp.

23        THE COURT:  Mr. Moskovitz.

24        MR. MOSKOVITZ:  Your Honor, if the condition of de-

25   velopment at the time in 1938 when these photographs were

1    taken were going to be used together with other evidence to

2    prove rights, I think perhaps it would be helpful to the

3    counsel and the Court if Mr. Veeder would tell us whether he

4    plans to introduce other evidence which will substantiate the

5    acquisition of rights outside the watershed.  Otherwise, we are

6    wasting our time to receive this.

7        MR. VEEDER:  If Mr. Moskovitz is laboring under the

8    delusion that I don't intend to prove our case-- I won't be

9    unkind.

10       MR. MOSKOVITZ:  Let me be more specific, your Honor.  I

11   am talking about the claims of prescription and appropriation.

12   Now, unless Mr. Veeder is able to comply with the purport

13   of your pretrial opinion that prescriptive rights cannot be

14   acquired by use downstream from other land owners and that

15   appropriation requires a permit after 1914 or 1923 at the

16   latest, unless he can show something thereafter which complies

17   with California law or something before which complies with it,

18   these exhibits are not--

19       THE COURT:  That is what I meant, whether on the maps

20   that show what areas were cultivated, do you expect to carry

21   proof of that fact?

22       MR. VEEDER: Yes.

23       THE COURT:  Prior to 1914?

24       MR. VEEDER:  Yes, we are going to take it back just as

25   far as we can, your Honor.  We have a fellow who raised sugar

J

Z64

1    beets in 1910.  But he is not here.

2         THE COURT:  Let's see this photograph 75-- what is the

3    subnumber?

4              MR. VEEDER:  75-5.

5         MR. STAHLMAN:  It will take six pallbearers to bring

6    it up to you.

7         THE COURT:  Well, let me step down rather than bringing

8    it up here.

9         MR. VEEDER:  Here, your Honor, you see the development

10   of the agricultural areas.  Here is the one that has immediate

11   bearing upon this phase of the trial.

12        THE COURT:  He is talking about this salt marsh.

13        MR. SACHSE:  We will agree that the tidal cree, is the

14   same one that shows on the 98 series.

15   BY MR. VEEDER:

16        Q  May I ask, Mr. Cannon, what did you observe in

17   regard to the availability of fresh water in that area during

18   the period when you were making your investigation?

19        MR. SACHSE:  I object to that as being immaterial and

20   irrelevant-- fresh water.

21        THE WITNESS:  The question of availability of fresh

22   water?

23   BY MR. VEEDER:

24        Q  The presence of fresh water in that area.  Were there

25   any springs at the time you were there?

Cannon          Direct          5154

J

Z65

THE WITNESS:  There were springs.  There was a fresh water spring in the tidal stream at extreme low tide.  It was a phenomenon that I couldn't understand, which was approximately in this neighborhood.

THE COURT:  Indicating down in the marsh area about the center of the picture 75-5.

THE WITNESS:  On one of the tidal streams.

THE COURT:  Put in an X where you saw that.

(The witness marking the exhibit.)

THE COURT:  How do you know that it was fresh?

THE WITNESS:  You could drink it, sir.

THE COURT:  What is the specific objection to 75-5?

MR. VEEDER:  He said there wasn't any.

MR. SACHSE:  I said 75 was fine.  I have no objection.

THE COURT:  Exhibit 75-5 will be received in evidence. The Clerk will flag it with a tag on the end and I will look this over.

(People's Exhibit No. 75-5 for Identification was received in evidence as People's Exhibit No. 75-5.)

THE COURT:  My feeling in the matter, Mr. Sachse, is that the exhibits come in as of the period 1938, the date shown, with the understanding that what is shown specifically on there as irrigated area or improvements, et cetera, may or may not be controling, depending upon whether their evidence is introduced.  Apparently there was no map taken as of the

X75x
X75-5

J

Z66

1   exact date the Government acquired this property.

2        MR. VEEDER:  That was the circumstance.

3        THE COURT:  Therefore, you work backwards or forwards,

4   and a witness could come on and say, "Well, here is a map

5   taken in 1946 afterward," on such and such a plate, "it shows

6   here that back in 1942 this was the condition."  By the same

7   token, an aerial map made in 1938, the witness can say, "Well,

8   this was in 1938, but by 1942 the situation was so and so."

9   I don't see any particular problem on it.  And I certainly

10  think I could look at a map that is marked May 11, 1938, and

11  know that this is not a condition as it necessarily would

12  exist in 1942 when the Government acquired the Rancho.

13       MR. SACHSE:  I have no objection to the specific

14  photograph that has been introduced.  Mr. Veeder offered the

15  entire series, and that was my objection-- to the whole

16  series.  Here is the City of Oceanside.  What do we want with

17  that?

18       MR. VEEDER:  Well, you can ignore it when you come to

19  that.

20       THE COURT:  Well, what do you want with it?

21       MR. VEEDER:  Well, we will take it out, your Honor.

22       THE COURT:  What happened to 75-1, 2 and 3?  Have they

23  been taken out already?

24       MR. VEEDER:  Just to assist your Honor-- actually, I

25  don't see how an aerial can be viewed, but we have it in

J

Z62x67

1      consecutive order to make sense from the standpoing of the

2      continuity of the kind and type of pictures that we have,

3      the whole area as of 1938.  I think it will be helpful to

4      your Honor.  I know that it has been helpful to us in preparing

5      the case.

6              THE COURT:  Where is Stewart Mesa?

7              MR. VEEDER:  I would like to have Col. Bowen.  Is he

8      here?

J2     9              THE COURT:  Exhibit 75-9.

10             MR. SACHSE:  That we would specifically object to,

11     your Honor.

12             THE COURT:  On what ground?

13             MR. SACHSE:  On the grounds of irrelevancy and im-

14     materiality.  There is no showing in this record, or the

15     only showing so far is that a very large part of this is

16     outside the watershed.  If so, whether or not it was culti-

17     vated can have no conceivable bearing on this case.  Your

18     Honor has already ruled in a pretrial ruling that they can't

19     have a prescriptive right, and--

20             THE COURT:  Mr. Sachse, is part of it within the

21     watershed?

22             MR. VEEDER:  It certainly is, your Honor.

23             THE COURT:  Is that your concession-- part of it?

24             MR. SACHSE:  Frankly, I couldn't attempt to say where

25     the watershed line is.  Here is the river.  I presume that the

Cannon      Direct

J2

Z68

1    fringe of it is.

2         THE COURT:  If any of it is in the watershed, it has

3    riparian rights.

4         MR. SACHSE:  That portion.

5         THE COURT:  Do you expect the Government to offer a

6    map that is cutoff?

7         MR. SACHSE:  No, but when that is offered I would make

8    an objection for the record for the lack of materiality and

9    relevancy, and I would again recall to the Court's recollec-

10   tion the state of the pretrial orders in the case.  That's all.

11        MR. VEEDER:  I think his Honor can remember those.

12        THE COURT:  I have those in mind.  But somewhere on this

13   map will probably be the watershed line.  You may contend it

14   is here, the Government may contend it is over here.  That has

15   to do with one part of it.  The second problem is whether the

16   ground is subject to being irrigated, that part of it that

17   is riparian.  A picture showing that that part that was in the

18   watershed was being cultivated is pretty good proof that it was

19   tillable land, isn't it?  Now, as to whether water was used

20   on there, the map itself doesn't tell you whether there was

21   water used on there.  Nobody could look at this map and tell

22   you whether this was irrigated or dry farming.

23        MR. VEEDER:  We have people in the courtroom who are

24   going to testify on this.  If it could all go in at once I

25   would be for that, your Honor.

THE COURT: I am inclined to let it in with these

limitations that I have indicated that it is going to be

evidence of just what it purports to be of 1938.

MR. SACHSE: What is the materiality of putting the

town of Fallbrook in?

MR. VEEDER: I have often thought about that, but as a

matter of fact part of Fallbrook is within the watershed.

THE COURT: What harm does it do?

MR. SACHSE: I say, what is the materiality? And I

think that is a legitimate and proper question. If it has

no materiality, there is no reason to clutter up the file.

THE COURT: It is part of the watershed. You would

spend more time tearing this apart, pulling out some of these

sheets, than you would to let them all in.

MR. SACHSE: Your Honor, for the record I will state

that I have objections, and very strenuous objections, to

many of the photographs contained in the 75 series.

THE COURT: When do you want to make them tonight or

tomorrow morning?

MR. SACHSE: I would prefer that your Honor, for

simplicity in the proceedings, admit it subject to a motion

to strike at the time that these individual photographs may

be referred to by any witness. I think it will simplify the

proceedings a great deal.

THE COURT: I will be glad to do that.

J

Z70

1        MR. VEEDER:  Thank you, Mr. Sachse.

2        Is it in now, your Honor?  We offer it again.

3        THE COURT:  Any other objection to Exhibit 75?

4        Exhibit 75 and the various photographs are received in

5    evidence--

6        THE CLERK:  1 to 74, your Honor.

7        THE COURT:  --1 to 74 received in evidence, with a

8    right of Mr. Sachse to move to strike all or any particular

9    subdivision of the exhibit as we progress with the trial.

10        MR. MOSKOVITZ:  Your Honor, may I have that same

11    privilege?

12        THE COURT: Mr. Moskovitz may have the same privilege.

13        It being understood in receiving it in evidence that

14    it depicts a period as of 1938, and that we are particularly

15    interested in one aspect of the case in what the situation

16    was in 1942; that there may be matters that go backward from

17    1942 in which some of the photographs may have some evidentiary

18    value.  To the extent that they depart generally from

19    conditions in 1942, we will not be particularly interested in

20    it.

21        MR. STAHLMAN:  I might remain completely silent,

22    except that my client is here today.

23        THE COURT:  Well, suppose you make a real smart

24    objection.

25        MR. STAHLMAN:  I am not going to make any objection,

KJ

Z71

1    your Honor.  I am merely making an observation that I take it

2    that trying a case without a jury your Honor is going to take

3    such matters as may be material in the photographs, little or

4    much as it may be, and disregard the rest of it.

5         THE COURT:  That is a very lawyer-like statement.  The

6    Court has said that time and time again.  That the Court

7    trying a case without a jury can sift the wheat from the chaff.

8    I don't think I am going to be misled by this exhibit.  As we

9    refer to particular pages of it, questions may be asked on

10   direct examination and cross-examination and voir dire.

11        All right, let's go ahead.

12        (Plaintiff's Exhibits 75-1 to 74, inclusive, for

13   Identification were received in evidence as Plaintiff's

X75-1,74   14   Exhibits 75-1 to 74, inclusive.)

15   BY MR. VEEDER:

16        Q   I ask you to look at Plaintiff's Exhibit marked 100

17   for Identification and ask that you state into the record what

18   is depicted by that identification.

19        A   Plaintiff's Exhibit No. 100 is a key map of the

20   Master Shore Station Development Plan of Camp Pendleton.  The

21   key map indicates the rectangular areas which are shown in

22   larger scale on other maps.  This is for location purposes.

23   It locates the main inhabited areas of Camp Pendleton by means

24   of numbers within circles.  The solid-faced numerals in the

25   center of the rectangles refer to the individual sheets which

J

Z72

1    are blown up at larger scale.

2        MR. VEEDER:  Mr. Luddy, would you give to the Court

3    Plaintiff's Exhibit 102.

4        Q  Now, Mr. Cannon, I ask you to view Plaintiff's

5    Exhibit 102 marked for identification and state into the

6    record what is depicated by that illustration?

7            A Plaintiff's Exhibit 102 represents a drawing of

8    the rectangle numbered as No. 2 on Exhibit 100.  It was drawn

9    at the scale of one inch equals 100 feet and depicts the water

10   and sewer lines in that particular--

11       Q  In what area would that be, Mr. Cannon?

12       A That would be in the Camp Del Mar area.

13   THE COURT:  This is Exhibit 102 now?

14   MR. VEEDER:  Exhibit 102.

15   THE COURT:  You have no marks on these.  I see, in the

16   very corner of the map.

17       MR. VEEDER:  We offer Exhibits 100 and 102, your

18   Honor.

19       THE COURT:  Exhibits 100 and 102 received in evidence.

20       (Plaintiff's Exhibits 100 and 102 for Identification

21   were received in evidence as Plaintiff's Exhibits 100 and 102.)

X100

X102

22       MR. SACHSE:  For the record, I will object to Exhibit

23   102 on the grounds that the location and extent and size of the

24   sewer and water lines have no materiality in this proceeding.

25       THE COURT:  Overruled.

5162

Z73

BY MR. VEEDER:

Q I hand you Plaintiff's Exhibit marked 103 for Identification and ask you to state into the record the contents of the title block of that identification.

A Exhibit 103 represents Sheet No. 3 as located on Exhibit 100, key map 100. It indicates the culture, construction, buildings, water and sewer lines in that area immediately to the east of the area depicted on Exhibit 102.

THE COURT: You say water and sewer lines. How are they marked-- S for Sewer and W for Water?

THE WITNESS: Yes, your Honor, S for sewer and W for water.

MR. SACHSE: May I inquire, your Honor, what is the date of this?

THE WITNESS: This map is a current map. These maps are kept up to date at all times and it could have today's date on it and be perfectly--

MR. STAHLMAN: May I ask a question. How many of these maps are you going to put in, Mr. Veeder? Just the maps that you supplied us with at Reche School, the big roll of them?

MR. VEEDER: Yes.

MR. STAHLMAN: Couldn't they all be put in together to save a lot of time?

MR. VEEDER: I would like to have them identified and have them marked and offered in the order in which I am

J

Z74

1 presenting them, your Honor.  I don't care whether we do it

2 that way, or if it is agreeable, if counsel will cut across

3 corners, I am willing to go.

4     MR. STAHLMAN:  I have seen the maps.

5     THE COURT:  Why couldn't the series that are keyed

6 to Map 100 all go in evidence?

7     MR. VEEDER:  All right

8     MR. MOSKOVITZ:  I have no objection, your Honor.

9     THE COURT:  Subject to cross-examination.

10     MR. SACHSE:  I have no objection as to foundation.  I

11 would like a continuing objection to all of them as to

12 materiality, your Honor.

13     THE COURT:  Overruled.

14     MR. VEEDER:  Under those circumstances, we will offer

15 in evidence Exhibits marked 100--

16     THE COURT:  --these having all been lodged.

17             Exhibits 100, 101 and 102 are already in

18 evidence.

19     MR. VEEDER:  Yes.

20     We offer in evidence Exhibits 103, 104, 105, 106, 107,

21 108, 109, 110, 111, 112, 113, 114, 115, 116, 117.

22     THE COURT:  They are all received in evidence.  Counsel

23 to have a right to cross-examine or seek information about

24 them as they may desire on cross-examination, the exhibits,

25 together with 102 and 101-- they are all keyed into exhibit

J

Z75

1          100?

2                   THE WITNESS:  No, your Honor.  No. 101 is an odd one.

3                   MR. VEEDER:  No. 101 is the schematic drawing of the

4     system.

5                   THE COURT:  All right.  Then Exhibit 100 is the key

6     for 102 to 117, inclusive.

7                   MR. VEEDER:  That is correct, your Honor.

8                   THE COURT:  All right.

9                   MR. SACHSE:  Mr. Veeder, we have been moving very fast

10    and I have lost one of them.  Didn't you introduce No. 99?

11    Or has that gone in?

12                  THE COURT:  That was a topo map of the amphibious base.

13                  MR. SACHSE:  That has gone in?

14                  THE COURT:  Yes, that was the one that showed the

15    contours on the plan.

16                  MR. SACHSE:  I just didn't have a note whether it was

17    in or not.

18                  THE COURT:  Mr. Clerk, you can at your leisure get me a

19    copy of the rest of these exhibits.

20                  THE CLERK:  Yes, your Honor.

21                  MR. VEEDER:  I have them, at your leisure.

22                  (Plaintiff's Exhibits 103 to 117, inclusive for

23    Identification were received in evidence as Plaintiff's Exhibits

24    103 to 117, inclusive.)

25

X103-
117

J

Z76

Z77
Z79
Title
Pages

1    BY MR. VEEDER:

2        Q   Mr. Cannon, I offer you the map marked for iden-

3    tification Plaintiff's Exhibit 97  and I ask you to read

4    into the record the title block of that identification.

5        A   Exhibit 97 bears the title "Coast Lands, Rancho

6    Santa Margarita, San Diego County, California, Completed

7    January, 1940." It was made by McKissick and Bell, Civil

8    Engineers, of Vista, California, for Rancho Santa Margarita.

9    It depicts a strip of land along the Pacific Ocean from the

10   southern boundary of Rancho Santa Margarita to the northern

11   boundary and extending from approximately a half mile inland

12   to as much as two and a half miles inland, with a contour

13   interval of five feet, and that was drawn to a scale of one

14   inch equals 1,000 feet.

15

16

17

18

19

20

21

22

23

24

25

K-1 ML j

Q   BY MR. VEEDER:  And in whose custody is this map?

A   The original of this map is in the custody of the Public Works Office at Camp Pendleton.

Q   And during your years of working as a Public Works officer have you had occasion to refer to this identification?

A   We have used the map frequently.  It has a use, because it is the, part of the time we had the Fairchild topography, it was the only detailed topography along the coast line.

Q   And what occasions have you had to check out its accuracy from the standpoint of locations, terrain, and similar physical phenomena depicted on that identification?

A   It is in general agreement with the later topography, which represents conditions as of 1953, as depicted on Exhibit 98-A, I believe, and its companion maps, which are at larger scale.

THE COURT:  The dotted line across the right-hand side of the map represents your opinion of the watershed line?

THE WITNESS:  In my opinion, it represents the watershed line, using contours indicated on this map.

Q BY MR. VEEDER:  And what has been your physical investigation of that area, Mr. Cannon, as to the correctness of where you have depicted the watershed line?

A   To the best of my knowledge, that is a true

Cannon - Direct                                                                5167

representation of the watershed line using these contours.

THE COURT:  What do you mean, "using these contours"?

THE WITNESS:  Any watershed line has to depend on the information at hand, and it can only be as accurate as the fineness of the contours that allow it.  There may have been small changes to that watershed line due to artificial ditches, drainage ditches.

Q  BY MR. VEEDER:  And what other changes might have occurred, to your personal knowledge, Mr. Cannon?

A  Levelling.  Portions of this map were made before the levelling process preparatory to irrigation.  That would make small differences.  Land levelling, artificial ditching, drainage.

Q  Have you an opinion as to the accuracy of that watershed line as depicted on Plaintiff's Exhibit marked 97 for identification?

A  I believe the watershed line is reasonably accurate, using the contours from which it was drawn.

MR. VEEDER:  We offer in evidence Plaintiff's Exhibit marked 97 for identification.

THE COURT:  Received in evidence.

MR. SACHSE:  Can we point out, your Honor --  I don't see any sense in cutting it -- point out that the left-hand six feet of the exhibit are completely immaterial.

MR. VEEDER:  If it makes him any happier, he can take

1   a scissors and cut it out himself.

2          THE COURT:  Will you point out on the map what the

3   area is referred to as Stewart Mesa?

4          THE WITNESS:  The area referred to as Stewart Mesa

5   is included on the right-hand two feet of the map, and it

6   is indicated in Sections 4, 5, 8, 9, and 33.

7          THE COURT:  How far does the Stewart Mesa go over

8   into 33?

9          THE WITNESS:  Stewart Mesa lands extend to the creek

10  labelled "Cockelbur Canyon," just to the bank of the stream.

11         MR. VEEDER:  May I ask your Honor to view this

12  Exhibit 75 in connection with 97.

13         THE COURT:  Let me -- I will.

14         MR. VEEDER:  Excuse me.

15         THE COURT:  Just, in other words, roughly speaking

16  you put in a light-red mark.

17         THE WITNESS:  Yes.

18         THE COURT:  Continue it on.

19         THE WITNESS:  (Marking.)

20         THE COURT:  All right.  The witness has put in light-

21  red pencil mark the area that he speaks of as Stewart Mesa.

22         You want me to look at a picture?

23         MR. VEEDER:  I would like to have you look at 75,

24  your Honor, in view of the comment by counsel in regard to

25  that aerial and as to the watershed line upon it.  Exhibit

1    75-9.

2              And would you bring 97 with you, Mr. Cannon?

3    Would you join us here, please, and bring 97 with you.

4              THE COURT:  I can see already the area shown on 97

5    as photographed on 75-9.  The area that the witness marked

6    out in red pencil, there is a line simply in that fashion?

7              THE WITNESS:  That is correct, your Honor.

8              MR. VEEDER:  I would like to have him do the same on

9    that.  Would you also take your red pencil and delineate

10   the area of Stewart Mesa on Plaintiff's Exhibit marked 75-9.

11             MR. MOSKOVITZ:  Can you come over to this side, Mr.

12   Cannon?

13             THE WITNESS:  (Marking.)

14             THE COURT:  Now, can you, from Exhibit 97, put in

15   a watershed line in there?

16             THE WITNESS:  I cannot do it with any great degree of

17   accuracy freehand.  The transfer could only be approximate,

18   your Honor.  I could put it on approximately.

19             THE COURT:  Would you like to do it after court?

20   Take a different colored pencil and just write on it,

21   "Approximate watershed line."  You can do that after court.

22             Q  BY MR. VEEDER:  Mr. Cannon, what were your

23   responsibilities in connection with the location of the

24   buildings which comprise Camp Pendleton?

25             A   I had charge of the design during the original

1   construction of Camp Pendleton, and I had a great deal to

2   do with the location of the individual buildings, their

3   grouping and arrangement.

4       Q   What was the basis upon which you located the

5   buildings comprised in the camp?

6       MR. MOSKOVITZ:   I object, your Honor.   I don't think

7   this is material.

8       THE COURT:   What difference does it make?

9       MR. VEEDER:   A great deal of the camp was built out-

10  side of the watershed, your Honor.

11      THE COURT:   So what?

12      MR. VEEDER:   And it was a matter of discussion.   And

13  when it was undertaken on that basis, and it was determined

14  that that was the course to pursue, I realize that we get

15  into what your Honor has termed the metaphysical approach

16  to the "incorporeal airidedimus."   But if I can't have it

17  admitted, I shall certainly make an offer of proof.

18      THE COURT:   Does it add to your rights?

19      MR. VEEDER:   Yes, sir.

20      THE COURT:   Where you put the buildings?

21      MR. VEEDER:   In my view it does.

22      THE COURT:   How?

23      MR. VEEDER:   Because it demonstrates those in charge,

24  both in the executive branch and in the Congress, were fully

25  aware that the United States of America was proceeding to

utilize the waters of the Santa Margarita River outside of
the watershed and that a duly authorized officer of the
United States of America proceeded with that kind and type
of construction.

THE COURT:  You are not going to prove by this witness
that the Congress of the United States was aware of what was
going on, are you?

MR. VEEDER:  I think that we will start with him,
your Honor.  And I certainly think this is highly relevant;
that the man who was in charge  proceeded as he did with a
full knowledge, full understanding, of the location of those
buildings; and that by reason of the wartime peril they were
so located.  And, as I say --

THE COURT:  It is not material, but you are going to
be entitled to make a record, either by offer of proof or
by summary evidence in short form.  I indicated heretofore,
and I indicate now that it is not material.  But I want you
to be able to make a record.  But I want you to do it as
rapidly as you can.

MR. VEEDER:  I would just as soon make an offer of
proof, your Honor.  I am a great one for an offer of proof,
your Honor.

THE COURT:  In other words, you offer to prove some-
times more than you can prove by the witness.  Let's see how
it works out.  I will sustain the objection.  What is your

1    offer of proof by this witness?

2    MR. VEEDER:  We would prove, your Honor, by this

3    witness that, due to the wartime peril it was essential and

4    absolutely necessary that the buildings be placed as they

5    have been within Camp Pendleton, and many of them outside

6    of the watershed of the Santa Margarita River; that there

7    was an immediate threat at that time of danger of destruction

8    of the camp by presence of enemy warcraft off the shore in

9    the form of submarines; and that there was a real danger.

10   Now, your Honor, I want the record to show --

11   THE COURT:  Are you going to prove that by this

12   witness?

13   (Laughter.)

14   MR. VEEDER:  I want the record to show that his Honor

15   was having quite some hilarity about it.

16   THE COURT:  I have in mind that you have on the

17   witness stand the man who is in charge of the operation of

18   the water system at Camp Pendleton.  I am not deprecating

19   his ability.  He probably has a good job.  But I am serious

20   now.  And he has also testified he had something to do with

21   building the buildings.

22   MR. VEEDER:  He was in charge of it.

23   THE COURT:  But I have serious doubt he is qualified

24   to testify to problems of military necessity or particular

25   danger or why a building was located to be out of the range

1    of submarine shots, or whatever you have in mind.  I think

2    you had better hurry through with question and answer.  Ask

3    a few questions.

4         MR. VEEDER:  Now, where are we?  I was fired up for

5    a fine offer of proof.

6         THE COURT:  I am going to let you ask a few questions.

7         MR. VEEDER:  All right.  Chances are that would have

8    been a good offer of proof.

9         (Laughter.)

10        MR. SACHSE:  Now, you can't prove it.

11        MR. VEEDER:  Oh, yes, we can prove it.  Mr. Cannon

12   can orate better than I.

13        Q    Mr. Cannon, what were the guides which dictated

14   the placement of the buildings on Camp Pendleton when you

15   undertook the plan, design and location of them?

16        MR. SACHSE:  I will object.  Hearsay, your Honor.

17        THE COURT:  Overruled.  We will consider it material.

18        MR. VEEDER:  Hearsay?  The man did it.

19        MR. SACHSE:  Guides that they told him to locate?

20        MR. VEEDER:  No, he did it himself.  Go ahead.

21        MR. SACHSE:  All right.

22        THE WITNESS:  In my work guiding the architect-engineer

23   group at Camp Pendleton, great discretion was given in the

24   siting of the buildings and the areas.  There was some rules

25   laid down which did not originate at Pendleton.  One of them

1    was that the whole division area, which at that time would

2    house about 20,000 people, was to be laid out, if possible,

3    by dispersing the buildings so that they would be not closer

4    than 300 feet.

5         Q  BY MR. VEEDER:  Closer than 300 feet to what?

6         A   From each other.  And if possible, not more than,

7    not three in a line in close proximity.  We found that we

8    could not provide an area, a usable area, either side of

9    the river, that would allow us to do that.  So we had to

10   settle at a distance of 270 feet between buildings.  We were

11   able to do that by going to the area known as the Division

12   Area, and which is depicted on sheets 17 and 24, referring

13   to the key map.  There was a time when it was talked of

14   putting two divisions, housing two divisions on Camp

15   Pendleton.  We tried very hard to locate one of those

16   divisions northerly of Santa Margarita River within the

17   watershed, in the area now known as Camp Margarita.  But

18   the terrain would not allow it.

19        Q   Why was it, if you know, that the buildings had

20   to be located 300 feet apart and no three buildings in a row?

21        A   Well, we were in danger at the time, and there

22   was danger --

23        MR. SACHSE:  Is this the witness' own knowledge or

24   is this hearsay, your Honor?

25        THE WITNESS:  This is from my own knowledge.  The

1    Jap subs had been bombarding the Coast in the neighborhood

2    of Goleta, to my own knowledge.

3           MR. SACHSE:  You read it in the paper, didn't you,

4    Mr. Cannon?

5           THE WITNESS:  I didn't get the question.

6           MR. SACHSE:  You read it in the paper?

7           MR. VEEDER:  I object to the heckling of these --

8           THE COURT:  Let's save some time.  The 300 feet apart

9    and not in a line was so that an enemy bomber wouldn't rip

10   out three buildings in a row dropping a stream of bombs;

11   is that it?

12          MR. VEEDER:  I would like to have the witness testify

13   on that.

14          Q    What was the answer, Mr. Cannon?

15          A    Well, one of the answers was that at that time

16   we got a ruling from the Bureau of Yards and Docks that

17   all of these buildings had to be covered with a bombproof

18   material, so as a result of that, a material --

19          Q    Bombproof?

20          A    Well, something that would detonate a two-pound

21   incendiary bomb.  Those were the conditions laid down.  And

22   the answer to that was that we would use a material called

23   Vanikulite, which is a lightweight concrete with the thickness

24   of three inches.  That was applied to the buildings.  That

25   was indicative of the thinking at the time that we were, in

1  imminent danger of being bombed, possibly from Jap submarines,

2  aircraft based on submarines.

3      MR. VEEDER:  Your Honor, I observe that it is quitting

4  time.

5      MR. SACHSE:  I don't want to quit without a motion

6  to strike every word of it, your Honor, for immateriality.

7      THE COURT:  It is immaterial, but I am letting it in

8  for the purpose of the record rather than an offer of proof.

9      MR. VEEDER:  I think he came --   Excuse me.

10      THE COURT:  Adjourn until 10:00 o'clock tomorrow

11  morning.

12      (Whereupon an adjournment was had at 4:30 o'clock

13  p.m., until Thursday, November 20, 1958, at 10:00 o'clock

14  a.m.)

15

16

17

18

19

20

21

22

23

24

25